## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br>SEARS HOLDINGS CORPORATION, et al.[1]<br>Debtor. | Chapter 11<br><br>Case No. 18-23538 (RDD) |

### OBJECTION OF STANLEY BLACK & DECKER TO DEBTORS' POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES NOTICE OF CURE COSTS AND IN CONNECTION WITH GLOBAL SALE TRANSACTION

Stanley Black & Decker, Inc. ("SBD" or the "Licensor"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction [Docket No. 1731] (the "Assumption Notice"). In support of this Objection, SBD respectfully represents as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## INTRODUCTION

1.    In January 2017, SBD purchased the Craftsman® brand from Sears Holdings Corporation ("SHC", "Sears" or the "Licensee").  In connection with the purchase of the Craftsman brand, SBD and Sears entered into the Acquired IP License Agreement ("License Agreement" or the "Agreement"),[2] which granted Sears a non-exclusive license to use the Craftsman mark.  Sears was authorized to use the mark only in specified "Channels of Retail Trade", generally limited to "big-box" format stores operated under a "Sears or "Kmart" brand and related specified e-commerce channels.

2.    On January 18, 2019, Sears (and with each of the above-captioned debtor affiliates, together, the "Debtors") announced its intention to assume and assign the License Agreement to ESL Investments, Inc. ("ESL") as part of a purported "going concern" sale of Sears.  As set forth below, that assignment is improper.

3.    Federal trademark law, and the plain terms of the License Agreement itself, prohibit assignment of the Craftsman trademark except under certain specific and limited circumstances.  The proposed "sale" of Sears to ESL is not within the limited circumstances set forth in the License Agreement, and federal trademark law precludes the assignment of a registered mark such as the Craftsman brand without the consent of the owner of the mark.  Neither Sears nor ESL has sought or obtained SBD's consent to the purported assignment of the License Agreement.

4.    *First*, under Section § 365(c)(1)(A) of chapter 11 of the United States Code (the "Bankruptcy Code"), a debtor may not assign an executory contract if that assignment is prohibited by applicable non-bankruptcy law.  Here, the applicable non-bankruptcy law—federal trademark

---

[2] Terms used herein and otherwise not defined shall have the meaning set forth in the Acquired IP License Agreement, attached hereto and incorporated herein as Exhibit 1.

[[3888436]]

law—precludes the unauthorized assignment of a registered mark in order to protect the value of the trademark to its owner.  Thus, trademark licenses are not assignable unless there is a clause expressly authorizing assignment.  As discussed below, the provisions at issue here expressly prohibit assignment.  Nor is there any applicable bankruptcy law that permits an assignment here.

5.      *Second*, the License Agreement prohibits assignment under these circumstances. The License Agreement permits a future assignment of SBD's trademark only in the case of a sale by Sears of all or substantially all its assets, and only where the purchaser will operate Sears in the same manner (i.e. as a big-box store) and with a similar scale.  But that is not the sale Sears now contemplates.  As other parties, including the Committee of Unsecured Creditors (the "UCC"), have observed, Sears is *not* selling all or substantially all of its assets to ESL.  Rather, for many months now, ESL has gradually stripped Sears of its assets, leaving behind a very different entity to be sold at auction.  Sears's attempt to characterize the chapter 11 sale of its remaining stores as a sale of "substantially all" of its assets ignores this piecemeal erosion.  Indeed, the "Sears" that ESL now proposes to buy bears little resemblance to the entity to which SBD granted a license two years ago.  Allowing Sears to assign this important license without SBD's consent in this circumstance is contrary to the spirit and the letter of the License Agreement.

6.      If Sears were permitted to assume and assign the License Agreement to ESL, SBD will suffer irreparable harm.  As courts have recognized, the identity of a trademark licensee is "crucially important" to the licensor because the owner of a trademark has a duty to protect the use, integrity and status of the mark.  *See In re Trump Entm't Resorts, Inc.*, 526 B.R. 116, 124 (Bankr. D. Del. 2015).  SBD anticipates that the Craftsman mark would suffer both brand degradation and value diminution if it were assigned to ESL.  A trademark owner suffers irreparable harm when "unwarranted interference [on its mark] by others" results in an intrusion

[[3888436]]

on its valuable property rights. *Stork Rest. v. Sahati*, 166 F.2d 348, 354 (9th Cir. 1948). Moreover, any use of the mark resulting in an erosion of good will, quality or value necessarily violates the trademark owner's interest in the mark. *See In re N.C.P. Mktg. Grp., Inc.*, 337 B.R. 230, 236 (D. Nev. 2005), *aff'd*, 279 F. App'x 561 (9th Cir. 2008).

7.      For the reasons set forth below, SBD objects to the proposed assumption and assignment of the License Agreement.[3]

8.      SBD also objects to Sears's proposed cure cost in connection with the Purchase and Sale Agreement (as defined below) by which SBD purchased the Craftsman brand. Sears's proposed cure cost of $0 fails account for deficiencies in Quarterly Warranty True Up payments as well as payments owing from Sears to SBD but unpaid due to the automatic stay.

## BACKGROUND

**A.      SBD and Sears Enter Into the License Agreement, Restricting Transfer or Assignment to Parties that Acquire "All or Substantially All of the Assets" of Sears**

9.      On January 5, 2017, Sears and SBD entered into a Purchase and Sale Agreement (the "PSA") by which SBD purchased the Craftsman brand from Sears (together with the License Agreement, the "Craftsman Transactions").

10.     As contemplated by the PSA, in early March 2017, SBD and Sears executed the License Agreement. The License Agreement granted Sears certain rights to continue using the Craftsman trademark and sell Craftsman branded products in limited Retail Channels of Trade.

11.     The License Agreement generally prohibits assignment: Article 18 expressly states that "[n]either Party shall be entitled to assign or otherwise transfer this Agreement without the

---

[3] If the proposed sale to ESL is not approved by the Court, SBD reserves all right to move for relief from the automatic stay or otherwise to terminate the license in connection with a liquidation of Sears.

[[3888436]]

prior written consent of the other Party except as provided in this Article 18.  Any assignment or

transfer in violation of this Article 18 shall be null and void."  However, Article 18 also carves out

limited circumstances under which Sears may exercise its right to assign or transfer the Agreement.

Article 18 provides, in relevant part:

> SEARS or a permitted transferee under this Section 18(c) may
> assign or transfer this Agreement to (a) any third party that
> acquires all or substantially all of the assets of SEARS . . .
> provided, in each case, that (x) such assignee agrees in writing to
> undertake the obligations of SEARS under this Agreement
> (including meeting the Brand Guidelines and Quality Standards,
> and being subject to the requirement for Retail Sales to be
> conducted through the Channels of Retail Trade), and (y) the
> transferred license grant does not extend to the past, present or
> future business, products or services of any party who acquires all
> or part of the business of SEARS, but only extends to the
> transferred business.

12.     Accordingly, under Article 18, Sears may assign the License Agreement only if,

*inter alia*, (a) the third party meets certain quality standards; (b) the third party limits its use of the

assigned IP to the approved Retail Channels of Trade and (c) the third party acquires "all or

substantially all of the assets of SEARS".[4]

**B.      Over the Course of 22 Months, Sears Gradually Winds Down and Sheds Its
Assets**

13.     Over the course of the 22 months—following the Craftsman Transaction and before

the filing of these chapter 11 cases—Sears disposed of the majority of its retail stores.

14.     At the time of the Craftsman Transactions in January 2017, the Debtors operated a

portfolio of 1,430 stores.[5]   Between January and March, Sears had closed 150 stores and

---

[4] As defined in the License Agreement, SEARS refers to Sears Holdings Corporation.

[5] Sears Holdings Corp., Annual Report (Form 10-K), at 63 (Mar. 21, 2017).

announced a $1 billion restructuring.[6]  The company's Form 2017 10-K cast into doubt the company's ability to continue as a going concern.[7]

15.    Sears continued to unwind its business through the summer and fall of 2017.  On June 23 and July 7, 2017, Sears announced the closure of a combined 63 stores.[8]  On July 20, 2017, Sears announced its plans to distribute Kenmore branded appliances outside of Sears' branded stores.[9]  On October 24, 2017, Sears announced that Whirlpool would no longer supply the company.[10]

16.    The erosion of Sears's business accelerated in 2018.  On January 4, 2018, Sears announced the closure of 103 stores.[11]  On April 23, 2018, Edward S. Lampert, Chairman and CEO of Sears, announced his offer to buy Kenmore, all of Sears's remaining real estate portfolio and the home service and parts business.[12]  On May 30 and July 2, 2018, Sears announced the closure of 63 and 78 stores, respectively.[13]  On August 14, 2018, Lampert and ESL Investments,

---

[6] *Is Your Local Sears or Kmart Among 150 Stores To Be Axed? See the List, USA Today (Jan. 5, 2017), https://www.usatoday.com/story/money/2017/01/05/sears-kmart-stores-closing/96195504/*; Sears Holdings Corp., Annual Report (Form 10-K), at 9 (Mar. 21, 2017).

[7] Sears Holdings Corp., Annual Report (Form 10-K), at 48 (Mar. 21, 2017).

[8] Sharyn Flanagan & Diana Kruzman, *20 More Sears Stores Closing: See the List*, USA Today (June 23, 2017), https://www.usatoday.com/story/money/2017/06/23/sears-holdings-store-closure-lista/424590001/; Richa Naidu, *Sears to Close 43 More Stores to Cut Costs*, Reuters (July 7, 2017), https://in.reuters.com/article/sears-restructuring-idINL1N1JY1QZ; Eddie Lampert, *Transformation Update*, SHC Speaks (July 7, 2017), https://blog.searsholdings.com/eddie-lampert/transformation-update/.

[9] Eddie Lampert, *Kenmore Products Now Available on Amazon.com*, SHC Speaks (July 20, 2017), https://blog.searsholdings.com/eddie-lampert/kenmore-products-now-available-on-amazon-com/.

[10] Suzanne Kapner & Andrew Tanger, *Sears Stops Selling Whirlpool Appliances*, Wall St. J. (Oct. 24, 2017), https://www.wsj.com/articles/sears-stops-selling-whirlpool-appliances-1508816783.

[11] Lauren Thomas, *Sears Is Closing over 100 More Stores*, CNBC (Jan. 4, 2018), https://www.cnbc.com/2018/01/04/sears-is-closing-more-than-100-more-stores.html.

[12] Chris Isidore, *Sears CEO Offers to Buy Kenmore Brand*, CNN (Apr. 23, 2018), https://money.cnn.com/2018/04/23/news/companies/sears-ceo-offers-buy-kenmore/index.html?iid=EL.

[13] Chris Isidore, *Sears Is Closing 63 More Stores*, CNN (May 31, 2018), https://money.cnn.com/2018/05/31/news/companies/sears-store-closings-sales-losses/index.html; Kelly Tyko, *Sears Adds More Stores to Closings List; 78 Set to Close in September*, USA Today (July 2, 2018),

[[3888436]]

Inc., Lampert's eponymous investment firm and the Debtors' controlling shareholder, submitted a bid proposal to acquire Kenmore and the Sears Home Improvement business ("SHIP").[14]  On August 23, 2018, Sears announced the closure of an additional 46 stores.[15]

17.    At the time the Debtors filed their joint petitions in these chapter 11 cases, the Debtors operated only 687 stores—down from 1,430 stores at the time of the Craftsman Transactions.[16]

C.    **Sears Files for Bankruptcy and Continues the Piecemeal Disposal of Its Assets**

18.    On October 15, 2018, Sears and each of the above-captioned debtor affiliates filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

19.    Sears's piecemeal disposal of assets continued postpetition.  Shortly after filing, the Debtors liquidated an additional 142 stores.[17]  In November, the Debtors announced the closure of 40 stores,[18] and, in late December, the Debtors announced the liquidation of an additional 80

---

https://www.usatoday.com/story/money/nation-now/2018/07/02/sears-closings-78-kmart-and-sears-closing-september/750127002/.

[14] Sears Holdings Corp., Schedule 13D, at 15-16 (Aug. 14, 2018).

[15] Lauren Thomas, *Sears is Closing 46 More Stores – Here's Where They Are*, CNBC (Aug. 23, 2018), https://www.cnbc.com/2018/08/23/sears-is-closing-46-more-stores-heres-where-they-are.html.

[16] Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York at 14, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2018), ECF No. 3.

[17] Mot. of Debtors for Approval of (I) Procedures for Store Closing Sales and (II) Assumption of Liquidation Consulting Agreement at 3, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2018), ECF No. 23.

[18] Notice of Intent to Conduct Store Closing Sales at Exhibit A, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 8, 2018), ECF No. 576.

7

locations,[19] reducing the company's store portfolio to 425 (which the Debtors refer to as the "Go

Forward Retail Footprint" or the "Go Forward Stores").[20]  Additionally, on November 3, 2017,

the Debtors announced a proposed sale of Sears Home Improvement.[21]

> **D.**     **Sears Proposes to Sell Its Remaining Assets in a Purported Sale of**
> **"Substantially All" Assets.**

20.     On November 1, 2018, the Debtors filed the Debtors' Motion for Approval of

Global Bidding Procedures [Docket No. 429] setting forth the process for the sale of certain assets

of the Debtors, including the Go Forward Stores.

21.     On November 19, 2018, the Bankruptcy Court entered an Order Approving Global

Bidding Procedures and Granting Related Relief [Docket No. 816], which included the

Assumption and Assignment Procedures for the Debtors' proposed assumption and assignment of

Contracts and Leases.

22.     On November 21, 2018, the Debtors filed the Notice of Filing of Global Bidding

Procedures Process Letter [Docket No. 862], which included as Schedule 1 the list of Go Forward

Stores comprising what the Debtors described as the go-forward retail footprint of Sears as a going

concern.

23.     At the January 8, 2019 Sears Global Asset Sale Status Conference, the Debtors

announced that although the Debtors had rejected ESL's initial offer, refusing to designate it as a

---

[19] Notice of Intent to Conduct Store Closing Sales at Exhibit A, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Dec. 28, 2018), ECF No. 1444.

[20] Sears Holdings Corp., Schedule 13D, at 2 (Dec. 28, 2018); Notice of Filing of Global Bidding Procedures Process Letter at Schedule 1, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 21, 2018), ECF No. 862.

[21] Much like the proposed "Global Asset" sale to ESL, which is facing numerous—seemingly significant—objections from the UCC and the PBGC, the SHIP sale is also now in jeopardy, though Service.com has filed an objection to the Debtors' purported termination of the sale.  Limited Objection of Service.com to Global Asset Sale Transaction and Statement of Continued Interest in Purchase of Sears Home Improvement Business, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Jan. 26, 2019), ECF No. 2029.

[[3888436]]

qualified bid, following many days of negotiation, the Debtors would permit ESL to re-submit its bid.  The Debtors also clarified that the Debtors would compare ESL's going concern bid against timely-submitted and qualified liquidation bids, suggesting ESL submitted the only bid for "Sears" as a going concern.[22]

24.    On January 17, 2019, and after extending the length of the auction, the Debtors announced ESL's selection as the winning bidder for the company's Go Forward Store portfolio and other assets, describing the sale as consisting of "substantially all of the Company's assets" and as a "going concern."[23]  Shortly thereafter, the UCC filed a motion to commence proceedings on behalf of the Debtors' estate related to Sears's and ESL's "serial asset stripping" of the company.[24]

25.    On January 18, 2019, the Debtors filed the Assumption Notice identifying those executory contracts the Debtors seek to assume pursuant to the proposed asset sale.  Pursuant to the Assumption Notice, the Debtors now purport to assume and assign the License Agreement.

26.    The proposed Go Forward Store portfolio includes 425 stores,[25] or less than one third of the 1,430 stores operated by the Debtors at the time of the Craftsman Transactions.

---

[22] Reorg Research, Inc., *Sears to Consider To-Be-Revised ESL Going-Concern Bid and Liquidation Alternatives at Jan. 14 Auction; Debtors Waive Requirement for Prior Court Approval of ESL Credit Bid Right* (Jan. 8, 2019).

[23] Press Release, Sears Holdings Corporation, Sears Holdings Announces ESL Investments as Winning Bidder in Bankruptcy Court-Supervised Auction (Jan. 17, 2019), *available at* https://www.prnewswire.com/news-releases/sears-holdings-announces-esl-investments-as-winning-bidder-in-bankruptcy-court-supervised-auction-300780050.html.

[24] Motion of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al., for Leave to File Under Seal Portion of the Committee's Motion for Entry of an Order (I) Granting Leave, Standing, And Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estate and (II) Non-Exclusive Settlement Authority in Respect of Such Claims at 4, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Jan. 17, 2019), ECF No. 1598.

[25] Sears Holdings Corp., Schedule 13D, at 2 (Dec. 28, 2018).

[[3888436]]

### E.   Sears Sets the Proposed Cure Amount for the PSA at Zero

27.   In addition to the License Agreement, the Debtors also propose to assume and assign the PSA, by which SBD acquired the Craftsman brand.  The Debtors' Assumption Notice states the proposed cure amount for the PSA is $0 (the "Proposed Cure Amount").  This amount, however, is wrong; the correct amount is $516,784.54.  SBD's calculations of the amount currently outstanding under the PSA is attached hereto and incorporated herein as Exhibit 2.

28.   On December 19, 2018, SBD sent the Debtors a Warranty Payment Objection Notice (the "Warranty Payment Notice") pursuant to Section 5.13(c) of the PSA, attached hereto and incorporated herein as Exhibit 3, objecting to certain determinations in the referenced Calculating Party Quarterly Warranty Statements.

29.   Pursuant to the Warranty Payment Notice, and inclusive of payments subject to the automatic stay, the correct cure amount is $516,784.54 (the "Correct Cure Amount").

## ARGUMENT

### A.   Trademark Licenses Are Not Assignable Absent Express Authorization by the Licensor.

30.   Section 365(c)(1) of the Bankruptcy Code states that "The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if —

(1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment.

In other words, "a debtor may not assume or assign an executory contract if assignment is prohibited by applicable non-bankruptcy law." *Trump Entm't Resorts* at 122; *see also In re Rupari Holding Corp.*, 573 B.R. 111, 117 (Bankr. D. Del. 2017); *In re Footstar, Inc.*, 323 B.R. 566, 576

(Bankr. S.D.N.Y. 2005).  The phrase "'applicable non-bankruptcy law" means "any law applicable to a contract, other than bankruptcy law".  *In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011). The License Agreement is a trademark license agreement and, accordingly, the "applicable non-bankruptcy law" at issue is federal trademark law.

31.     Under a well-developed body of federal trademark law, "the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment". *XMH Corp.*, 647 F.3d at 695; *see also Rupari*, 573 B.R. at 117; *Trump Entm't. Resorts*, 526 B.R. at 123 ("under federal trademark law, trademark licenses are not assignable in the absence of some express authorization from the licensor, such as a clause in the license agreement itself"); *see also* 4 McCarthy on Trademarks and Unfair Competition (5th ed.) § 25:33.  As the Bankruptcy Court held in *Trump Entertainment*, "the Court must understand *why* the applicable non-bankruptcy law bans assignment".  526 B.R. at 123.  As Judge Posner explained in *XMH Corp.*, the reason a trademark owner often requires consent for assignment is to ensure that the trademark's value is preserved:

> Often the owner of a trademark will find that the most efficient way to exploit it is to license the production of the trademarked good to another company, which may have lower costs of production or other advantages over the trademark's owner. Normally the owner who does this will not want the licensee to be allowed to assign the license . . . without the owner's consent, because while the owner will have picked his licensee because of confidence that he will not degrade the quality of the trademarked product he can have no similar assurance with respect to some unknown future [assignee].

*XMH Corp.*, 647 F.3d at 696; *see also Trump Entm't Resorts* 526 B.R. at 123-24.  A trademark "identif[ies] a good or service to the consumer, and identity implies consistency and a correlative duty to make sure that the good or service really is of consistent quality."  *XMH Corp.*, 647 F.3d at 695.  The trademark owner's ongoing duty to control the quality of goods sold under the

11

trademark requires that the owner have the right to control who may use the mark. *See* 4 McCarthy § 18:43; *see also United States v. Hon*, 904 F.2d 803, 806 (2d Cir. 1990) (identifying "the important purpose underlying the trademark laws of protecting the trademark owner's investment in the quality of the mark and his product's reputation"); *In re Wellington Vision, Inc.*, 364 B.R. 129, 134 (S.D. Fla. 2007) ("a licensor who grants a non-exclusive license for the use of its trademark is entitled to certain protections, including restrictions on assignment"). "In other words, federal trademark law generally bans assignment of trademark licenses absent the licensor's consent because, in order to ensure that all products bearing its trademark are of uniform quality, the identity of the licensee is crucially important to the licensor." *Trump Entm't Resorts*, 526 B.R. at 124. Because of its concerns about these very issues, SBD does not consent to the proposed assignment of the License Agreement.

### B. The License Agreement Does Not Authorize Sears to Assign the License As Part of a Serial Breaking-Up of its Business.

32.     As courts have recognized, "'parties to a license agreement are free to contract around' the default rule that bars assignment". *Rupari*, 573 B.R. at 118 (quoting *Trump Entm't Resorts*, 526 B.R. at 124). Here, the parties negotiated for Article 18 of the License Agreement (the "Limited Assignment Provision"), which permits Sears to assign the License Agreement only in certain, limited circumstances expressly set forth in the contract. Specifically, Sears is permitted to assign the License Agreement to a third party purchaser who (i) acquires all or substantially all assets of Sears; (ii) agrees to abide by the Quality Standards and Brand Guidelines and (iii) limits its use of the assigned IP to the approved Retail Channels of Trade. The License Agreement, in Article 2, provides that it is otherwise is non-transferable and non-assignable. *See* Article 2. Provisions such as the Limited Assignment Provision are often used in trademark licenses to limit

[[3888436]]

assignment to a party that acquires "all or substantially all assets" of the licensee.  *See, e.g.*, *Rupari*,

573 B.R. at 118.

33.    These provisions are consistent with the underlying purpose of trademark law's

default rule against assignment—*i.e.*, "protecting the trademark owner's investment in the quality

of the mark and his product's reputation", *Hon*, 904 F. 2d at 806, by limiting use of the mark only

to the licensor's chosen party.  *See Trump Entm't Resorts*, 526 B.R. at 124 ("the identity of the

licensee is crucially important to the licensor").  Moreover, these provisions reflect the parties'

intent:  that a successor to Sears could use the mark, but only if that successor bought all of Sears

and continued to operate the Sears business as the parties understood it at the time of contract.[26]

34.    The License Agreement refers to the Sears business in its definition of the Channels

of Retail Trade.  This provision limits where Sears may sell Craftsman products to its big-box

format stores and limited other channels.  However, by the Debtors' own admission, the big-box

store format has questionable continued viability in the current retail landscape.[27]

35.    Although the Debtors have characterized the proposed sale to ESL as a sale of

"substantially all assets" of Sears, as other parties have pointed out, that is not an accurate

description of Sears's proposed last-ditch effort to avoid a liquidation by "selling" itself to its

current owner.  *See* Motion of the Official Committee of Unsecured Creditors of Sears Holdings

Corporation, et al. for Leave to File Under Seal Portion of the Committee's Motion for Entry of

an Order (I) Granting Leave, Standing, And Authority to Commence and Prosecute Certain Claims

---

[26] *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 963 N.Y.S.2d 613, 986 N.E.2d 430, 436 (2013) (Courts interpret agreements "in accordance with the parties' intent", which is best evidenced by their written contract). When interpreting a contract, courts "must consider the contract as a whole" and "give significance to each term". *T.G.I. Friday's Inc. v. Nat'l Rests. Mgmt., Inc.*, 59 F.3d 368, 373 (2d Cir. 1995).

[27] Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York at 5, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2018), ECF No. 3.

13

on Behalf of the Debtors' Estate and (II) Non-Exclusive Settlement Authority in Respect of Such

Claims at 4, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Jan. 17,

2019), ECF No. 1598.  Rather, this supposed "going concern sale" is merely the proposed last

step[28] in a gradual disposal of Sears's assets, beginning prepetition and continuing during the

pendency of these chapter 11 cases.  In agreeing that Sears could assign the license in a sale of

"substantially all assets of SEARS", SBD did not agree to have its license assigned in the course

of a wind down and effective dissolution of the company just because a sale of remaining assets is

the last step in that process.

36.    The numbers alone show that the Sears of January 2017 is not the Sears that will

emerge from an approved sale.  At the time of the Craftsman Transactions in January 2017, the

Debtors operated 1,430 stores.  ESL's winning bid contemplates the purchase of only 425 stores—

less than 30% of the business that existed at the time the Craftsman Transaction took place.  This

proposed transaction is not a sale of January 2017 Sears.  It is not even a sale of October 2018

Sears.  Any attempts by the Debtors to characterize the proposed sale to ESL as a sale of

"substantially all assets" fundamentally ignores the overall course of Sears' disposal of assets.

37.    SBD purchased the Craftsman brand at significant cost and protecting this long-

term, strategic investment is of the utmost importance.  Although SBD consented to Sears's

ongoing sale of Craftsman products as part of the Craftsman Transactions, SBD did not bargain

for the continued use of the valuable Craftsman mark by a shell of the former Sears with highly

questionable future viability as a stand-alone entity.  A non-consensual assignment of the License

---

[28] The last step involving ESL, at least.  The UCC and other creditors seem to be of the view that the better last step from the perspective of Sears' creditors would be liquidation. *See* Motion of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al. for Leave to File Under Seal Portion of the Committee's Motion for Entry of an Order (I) Granting Leave, Standing, And Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estate and (II) Non-Exclusive Settlement Authority in Respect of Such Claims at 6, In re Sears Holdings Corporation, et al., No. 18-23538 (RDD) (Bankr. SDNY), ECF No. 1598.

[[3888436]]

Agreement presents a serious risk to SBD of the mark's use in new store formats and brand settings without SBD's approval, threatening SBD's control over the Craftsman brand and its federally protected interest in preserving the brand's quality.

38.    The Debtors themselves have raised serious concerns about the viability of Sears as a going-concern.[29]  SBD should not be compelled to assume the risk of the Debtors' Hail Mary sale through the forced acceptance of a non-consensual, compulsory licensing of SBD's vital trademark rights, contrary to both federal trademark law and bankruptcy law.

39.    It is unlikely that ESL will be able to satisfy the requirements of the license, including the Brand Guidelines and Quality Standard, even if the Court were to permit the assignment.  Indeed, during the course of these chapter 11 proceedings, Sears's independent Craftsman suppliers have sought payment for administrative expenses from the Debtors', citing an ongoing failure to pay for delivered goods and failure to respond to repeated requests for payment. *See generally* Motion of Milton Manufacturing, LLC to Allow and Compel Payment of Administrative Expense Claim Under 11 U.S.C. § 503(b) for *Craftsman* Branded Goods Delivered to the Debtor Postpetition [Docket No. 1477].  The Court should not impose further harm on SBD by forcing SBD to litigate these issues at a later date.  Instead, the Could should prohibit assignment now, in accordance with federal trademark law and the terms of the License Agreement.

---

[29] Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York at 10, In re Sears Holdings Corp., et al., No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2018), ECF No. 3.

[[3888436]]

## II.    THE DEBTORS' PROPOSED CURE COST OF ZERO WITH RESPECT TO THE PSA IS WRONG

40.    The Debtors may assume an executory contract on which they have defaulted only if, at the time of assumption, they satisfy certain statutory requirements to make the non-debtor party whole.  To do so, the Debtors must (i) cure, or provide adequate assurance that the Debtors will promptly cure, such default; (ii) compensate, or provide adequate assurance that the Debtors will promptly compensate, a non-debtor contractual party for any actual pecuniary loss to such party resulting from the default and (iii) provide adequate assurance of future performance under such contract or lease.  11 U.S.C. § 365(b)(1)(A)-(C).  This means the Debtors must pay the Correct Cure Amount in order to assume the PSA.

41.    The resolution of these claims restores the "debtor-creditor relationship . . . to pre-default conditions", *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982), and "[brings] the contract back into compliance with its terms".  *In re Wireless Data, Inc.*, 547 F.3d 484, 489 (2d Cir. 2008).  Any default under the contact must be cured in accordance with contract's terms.  As such, the terms of the contract dictate the appropriate cure amount.

42.    The Proposed Cure Amount is incorrect because, pursuant to the Warranty Payment Notice, the Debtors failed to accurately calculate the Quarterly Lookback Sales Amount in the Calculating Party Quarterly Warranty Statements for four consecutive quarters.  As a result, payments received for Q4 2017, Q1 2018 and Q2 2018 Warranty True-Up Payments were artificially low and additional payment is necessary to comply with the terms of the PSA.  The Debtors' calculation of Q3 2018 similarly miscalculates the Quarterly Lookback Sales Amount.

43.    Furthermore, SBD has not received the Q3 2018 Quarterly Warranty Payment, in any amount, due to the automatic stay. The full amount of this payment remains due and owing by the Debtors and is a necessary component of the Debtors' cure cost to assume and assign the PSA.

[[3888436]]

44.     As shown in Exhibit 3 hereto, the cure cost the Debtors must pay to assume and assign the PSA is $516,784.54.

## **CONCLUSION**

45.     For the reasons stated above, the Court should (a) find the License Agreement is not assignable in connection with the proposed asset sale to ESL and (b) hold that the PSA may not be assumed and assigned without the Debtors agreeing to pay the Correct Cure Amount of $516,784.54.

Dated: January 28, 2019

CRAVATH, SWAINE & MOORE LLP,

by
_/s/ Paul H. Zumbro_
Paul H. Zumbro
Karin A. DeMasi
David J. Kappos
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
pzumbro@cravath.com
kdemasi@cravath.com
dkappos@cravath.com

*Attorneys for Stanley Black & Decker, Inc.*

[[3888436]]

**<u>Exhibit 1</u>**
**Acquired IP License Agreement**

[[3888436]]

EXECUTION COPY

## ACQUIRED IP LICENSE AGREEMENT

THIS ACQUIRED IP LICENSE AGREEMENT (this "Agreement") is entered into and is made effective as of March 8, 2017 (the "Effective Date") by and between **Stanley Black & Decker, Inc.**, a corporation organized under the laws of the State of Connecticut having a place of business at 1000 Stanley Drive, New Britain, CT 06053, United States ("STANLEY"); and **Sears Holdings Corporation,** a Delaware corporation  ("SEARS") (each a "Party" or collectively, "Parties", as the case may be).

WHEREAS, STANLEY and SEARS have entered into that certain Purchase and Sale Agreement dated as of January 5, 2017 (the "Purchase and Sale Agreement"), whereby STANLEY agreed to acquire certain assets from SEARS, as set forth in the Purchase and Sale Agreement, including the "Craftsman" brand;

WHEREAS, STANLEY desires to allow SEARS to continue to sell "Craftsman" branded products through certain channels;

WHEREAS, the Parties desire to enter into this Agreement under which STANLEY has agreed to license to SEARS the Licensed IP, subject to the terms and conditions of this Agreement;

WHEREAS, STANLEY owns the rights in and to the Licensed IP;

WHEREAS, SEARS desires to obtain from STANLEY the right to use the Licensed IP, subject to the terms and conditions of this Agreement; and

WHEREAS, pursuant to the Purchase and Sale Agreement, the Parties have agreed to enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, agree as follows:

## 1.      CERTAIN DEFINED TERMS

Any capitalized term used in this Agreement but not otherwise defined herein shall have the meaning ascribed thereto in the Purchase and Sale Agreement. As used in this Agreement, the following terms shall have the following meanings:

"Advertising Materials" means print, television, radio, electronic (including internet), social media and any other advertising and promotional materials for one or more of the Craftsman branded Licensed Products.

"Agreement" has the meaning given in the Recitals.

"Brand Guidelines" means SEARS' trademark use and branding guidelines for Craftsman branded products as they exist as of immediately prior to the Effective Date, including as set forth in Schedule B (as may be amended from time to time pursuant to Article 5).

"Channels of Retail Trade" means solely the following: (i) within the Retail Territory (A) standalone retail stores having a combined average store size of five thousand (5,000) square feet or higher and operated under a "Sears" or "Kmart" brand, or a derivative thereof, (B) SHO Entity standalone retail stores or (C) the SHS Channel; and/or (ii) any Ecommerce Channel. Excluded Retail Channels shall be excluded from the Channels of Retail Trade.

"Contract Year" means (a) if the Closing occurs on or prior to June 30, 2017, the period from the Effective Date until December 31, 2017 and each calendar year thereafter; and (b) if the Closing occurs after June 30, 2017, the period from the Effective Date until December 31, 2018 and each calendar year thereafter.

"Control" has the meaning given to "control" in the definition of "Affiliates" in the Purchase and Sale Agreement.

"Ecommerce Channel" means any ecommerce website, mobile app or any other online retail channel, including any new or successor to ecommerce technology, in each case wholly owned and operated from time to time by SEARS or its Affiliates (including sears.com, shopyourway.com, partsdirect.com, kmart.com and searshomeservices.com), or by a SHO Entity (including searshometown.com and searsoutlet.com); provided, that: (i) the branding of any such channel (including its domain name and including any successor to domain names serving a similar purpose) may not have "Craftsman" in its name; (ii) following a Specified Change of Control of the Person owning and operating such channel, such channel shall only be branded with names (and derivatives thereof) used by such channel prior the transaction or series of related transactions resulting in the Specified Change of Control unless STANLEY otherwise consents in writing; (iii) such channel shall not have been established and shall not be operated exclusively or primarily for the purposes of selling tools (for which purposes "primarily" shall mean that a majority of products sold through such channel are tools), (iv) such channel shall not contain hyperlinks (or any successor technology serving a similar purpose) to a channel of a Party other than SEARS (and its Affiliates) or a SHO Entity (provided that any technology not widely adopted as of the date of the Purchase and Sale Agreement (1) pursuant to which a user specifically directs a change in site, and (2) does not suggest to the user to change to a specific site, shall not be deemed a hyperlink); and (v) unless STANLEY otherwise consents in writing, such channel shall not be owned and operated by an Excluded Entity; and, provided, further, that in the event (and with immediate effect from the date) of a Specified Change of Control of SEARS or SHO, no further such channels may be established by the Specified Acquirer or its Affiliates. For avoidance of doubt, the only parties who are entitled to exercise rights under this Agreement (as distinct from any license granted to a Former SEARS Entity pursuant to Section 2(l)) are SEARS, SHO Entities, their Affiliates (but only so long as they remain an Affiliate) and sublicensees.

"Effective Date" has the meaning given in the Recitals.

"Excepted Excluded Entity" means an Affiliate of either SEARS or Sears Hometown and Outlet Stores, Inc. that is publicly traded; provided, that no Specified Acquirer (x) owns more than 15% of the voting stock thereof, (y) has a representative on the board of directors or similar governing body or management of such Affiliate or (z) otherwise Controls such Affiliate.

"Excluded Entity" means an Affiliate or other joint venture of either SEARS or Sears Hometown and Outlets Stores, Inc. in which a Specified Acquirer owns any equity ownership interest or exercises or shares, or has the right to exercise or share, any operational control of an Ecommerce Channel, other than an Excepted Excluded Entity.

"Excluded Retail Channels" means any channels not listed in Channels of Retail Trade, including channels that are not owned or operated by SEARS or its Affiliates, or by a SHO Entity, and including any of the following (other than in the case of clause (a)) not owned or operated by SEARS or its Affiliates or by a SHO Entity: (a) stores within stores other than SEARS or SEARS Affiliate or SHO stores within SEARS or SEARS Affiliate or SHO stores (such that a Sears Homecenter within an Ace Hardware store will be an Excluded Retail Channel, but a "Sears Hardware" store within a SEARS store will not be an Excluded Retail Channel); (b) home improvement centers (such as Home Depot and Lowes), mass merchants (such as Walmart and Target); (c) shoppers clubs (such as Costco, Sam's, BJ's); (d) retailers (such as Ace Hardware and Orchard Supply Hardware); (e) industrial channels (such as Grainger); (f) 2-step channels (such as True Value, Do It Best); (g) discount channels (such as Dollar General, Big Lots, Steinmart), (h) online merchants (such as Amazon.com, Jet.com or eBay) and (i) any other resellers.

"Former SEARS Entity" means (i) any former Affiliate of SEARS, or (ii) any corporation, limited liability company or other legal Person (organized in the United States) which operates a material business formerly owned and operated by SEARS, in each case which, prior to ceasing to be an Affiliate of SEARS, was engaged in a line of business which involved the use of the Craftsman branded Licensed IP pursuant to this Agreement.

"Hand Tools" means tool sets, mechanics and auto tools, wrenches, ratchets and sockets, screwdrivers, pliers, specialty tools, nut drivers and hex keys, cutting and finishing tools, hammers and striking tools, marking and measuring tools, vises, clamps and stands, tool carriers and holders, open stock hand tools, and any items similarly situated to the foregoing, and any derivatives, combinations or extensions of the foregoing.

"Lawn and Garden Equipment" means lawn mowers and tractors, yard power equipment, lawn and garden care equipment, snow equipment, grills and outdoor living equipment, outdoor living equipment, and any items similarly situated to the foregoing, and any derivatives, combinations or extensions of the foregoing.

"Licensed IP" means all and any Acquired Business Intellectual Property.

"Licensed Marks" means the names, symbols, logos, slogans, trademarks and design elements identified in Schedule A.

"Licensed Products" means all and any Hand Tools, Power Tools, Lawn and Garden Equipment, Storage and Garage Products and Other Products, in each case manufactured or sold using (in whole or in part) the Licensed IP, and any New Products. For avoidance of doubt, every product set forth in Attachment J (Warranty Products:  Lifetime and Legacy Lifetime) to the Seller Disclosure Letter shall be a Licensed Product.

"Losses" means claims, demands, suits, actions, judgments, judicial orders, obligations, damages, assessments, penalties, liabilities, expenses, losses and costs (including reasonable attorneys' fees) of any kind or nature.

"Net Sales" means net sales, as calculated in accordance with GAAP, composed of gross sales less sales returns and allowances and is net of sales taxes.

"New Product" has the meaning given in Section 2(j).

"Objection Notice" has the meaning given in Section 10(b).

"Other Licensed IP" means any of the Licensed IP other than the Licensed Marks.

"Other Products" means clothing, boots, flashlights, work stool, wrench thermometer, pint glasses, coasters and bottle openers and any items similarly situated to the foregoing.

"Packaging Materials" means cartons, labels, hangtags, packaging inserts, containers, packing and wrapping materials for one or more Craftsman branded Licensed Products.

"Permitted Sublicensees" means (a) any supplier (solely for the purpose of manufacturing Licensed Products for sale by Sears and its Affiliates or STANLEY, an "OEM Permitted Sublicensee") or distributor (acting as such) of the Retained Business from time to time, (b) SHO Entities, (c) Sears Canada Inc. and its Affiliates and (d) Sears, Roebuck de Mexico, S.A. DE C.V. and its Affiliates.

"Power Tools" means corded and cordless handheld power tools, bench power tools, saw blades, batteries and chargers, power tool accessories, air tools and compressors, wet dry vacs, miter saws, riveters, rivets, and any items similarly situated to the foregoing, and any derivatives, combinations or extensions of the foregoing.

"Purchase and Sale Agreement" has the meaning given in the Recitals.

"Quality Standards" means quality standards and product requirements equivalent to those applicable to products manufactured by the Business immediately prior to the Effective Date, including as set forth in the applicable portions of the Sears Holdings Global Sourcing Ltd. Quality Assurance Manuals entitled  "Hardlines Quality Assurance Manual for Direct Import Vendors", "Hardlines Quality Assurance Manual for Domestic Import and Domestic Vendors", and the Sears Holdings Global Sourcing "Test Protocol for Gasoline-Engine-Powered Snow Throwers" (as may be amended from time to time pursuant to Article 6).

"Retail Sales" means the retail distribution or sale of Licensed Products to consumers other than through Ecommerce Channels.

"Retail Territory" means the United States, its possessions and territories, including Puerto Rico, Canada, Mexico and, solely in the case of SHO, Bermuda.

"Retained Business" means the business of SEARS and its Affiliates of selling products and services excluding the Acquired Business.

"Royalty Payment" has the meaning given in Section 4(a).

"Royalty Statement" has the meaning given in Section 4(c).

"Royalty Statement Review Period" has the meaning given in Section 10(a).

"SEARS Indemnified Parties" has the meaning given in Section 14(b).

"Selling Formats" means solely Retail Sales, Ecommerce Channels and the SHS Channel.  All other selling methods including kiosks outside of stand alone stores, mobile sales (i.e., sales from trucks) other than through the SHS Channel, and redirects (as customarily understood as of the date of the Purchase and Sale Agreement and any successor technology serving a similar purpose) from websites that are not Ecommerce Channels are excluded from Selling Formats.

"SHO" means Sears Hometown and Outlet Stores, Inc., its Affiliates.

"SHO Entity" means SHO and SHO's licensees and franchisees, in each case operating under a "Sears Hometown," "Sears Outlet," "Sears Appliance & Hardware," "Sears Authorized Hometown," or "Sears Hardware" brand or a derivative thereof.

"SHS Channel" means the "Sears Home Services" channel, including mobile sales (i.e., sales from trucks) and distribution formats operated under the "Sears", "Home Services," "Parts Direct" or "A&E" brands, or a derivative thereof, in each case solely as part of a business substantially all of which is comprised of a service (including the sale of extended warranties) or repair business that does not sell any Licensed Products other than parts that are for service or repair.

"Specified Acquirer" means any one of STANLEY's top five competitors or top five customers, as reasonably determined by STANLEY and notified to SEARS on or prior to November 1 in each Contract Year in accordance with Section 2(i).

"Specified Change of Control" means, with respect to a Person,, a change of Control of such Person in circumstances where the person obtaining Control thereof is a Specified Acquirer.

"STANLEY Indemnified Parties" has the meaning given in Section 14(a).

"STANLEY Products" has the meaning given in Section 14(b)(iii).

"Storage and Garage Products" means tool storage, garage and work area, garage organization and shelving, sheds, outdoor storage products, and any items similarly situated to the foregoing, and any derivatives, combinations or extensions of the foregoing.

"Territory" means, with respect to Retail Sales, the Retail Territory, and with respect to Ecommerce Channels, the entire world.

"USBC" has the meaning given in Section 2(f).

## 2.    GRANT OF LICENSE

(a) Subject to the terms and conditions set forth in this Agreement, STANLEY hereby grants, and shall cause each Purchaser Designee to grant, to SEARS and each of its Affiliates, a worldwide (except with respect to Retail Sales as provided in this Section 2(a)), royalty-free (until the sixteenth (16th) Contract Year as provided in Article 4), non-transferable and non-assignable (except as provided in Article 18), non-sublicenseable (except as provided in Section 2(d)), non-exclusive (except as provided in Section 2(h)), perpetual (except as provided in Article 15) and irrevocable (except as provided in Article 15) license of the Licensed IP, to make, have made, use, market, sell, offer to sell, import, export, distribute and otherwise dispose of Licensed Products, in each case solely for the purpose of enabling (i) SEARS and its Affiliates to carry on the Retained Business and (ii) SHO Entities to carry on their businesses; provided, however, that, such license, with respect to sales, shall be limited to sales conducted solely through any of the Channels of Retail Trade and solely via Selling Formats; provided, further, that, with the prior written consent of STANLEY, the license may be extended to specified Retail Sales channels beyond the Channels of Retail Trade and/or additional Selling Formats.  Subject to the foregoing, such license includes the ability, solely within the applicable Territory, to:  (x) use and display the Licensed Marks in connection with the Retained Business, for the purpose of and in connection with the advertising, marketing, promotion, distribution and sale of the Licensed Products; (y) copy, use, distribute, perform and display the Advertising Materials and Packaging Materials in connection with the Retained Business, in each case for the purpose of and in connection with the advertising, marketing, promotion, distribution and sale of the Licensed Products; and (z) sell, market, promote, distribute and advertise the Licensed Products.  For the avoidance of doubt, SEARS shall have no right or license to sell Licensed Products to Excluded Retail Channels.

(b) Subject to Section 2(h), nothing in this Agreement shall in any way limit or restrict STANLEY's right, either itself or through third-parties, to use, advertise, promote, license, or otherwise exploit the Licensed IP in any manner whatsoever.

(c) All rights, licenses, immunities and privileges not expressly granted to SEARS and its Affiliates by STANLEY hereunder shall remain solely and exclusively with STANLEY.  Nothing in this Agreement shall be deemed in any way to constitute an assignment by STANLEY to SEARS of any of the Licensed IP.  Notwithstanding the foregoing, any improvements, derivations or modifications of any of the Other Licensed IP developed by or on behalf of SEARS after the Effective Date shall be solely and exclusively the property of SEARS.

- 6 -

(d) <u>Right to Sublicense</u>.

i.      SEARS and its Affiliates shall be permitted to grant sublicenses of the rights granted to it in Section 2(a) to any Permitted Sublicensee, but only if and to the extent necessary to enable (A) SEARS and its Affiliates to carry on the Retained Business or (B) SHO to carry on its business pursuant to an agreement contemplated by Section 5.18 of the Purchase and Sale Agreement.  From and after the time that SHO enters into such agreement, except as provided in Section 15(c), SEARS shall have no obligation to STANLEY with respect to non-performance by SHO Entities under or pursuant to this Agreement.

ii.      In any sublicense under Section 2(d)i(A) SEARS shall be responsible to STANLEY for its sublicensees' compliance with all applicable terms of this Agreement.

iii.      In the event that STANLEY terminates a sublicense to SHO pursuant to the agreement contemplated by Section 2(d)i(B), SEARS shall have no right to grant any further sublicenses to SHO.

(e) <u>License Runs With Title</u>.  All licenses and other rights contained herein shall burden and run with title to the Licensed IP and shall be binding on any successors-in-interest or permitted assigns thereof or any other Person that obtains any interest in any of the Licensed IP.  STANLEY shall not assign, sell or otherwise transfer or grant any ownership right under any of the Licensed IP to any other Person unless such assignee or transferee first agrees in writing to observe all rights, licenses and other obligations of STANLEY in this Agreement, and to be bound by all of the applicable terms and conditions of this Agreement.

(f) <u>Licenses of Intellectual Property</u>.  The Parties acknowledge and agree that if a case under the US Bankruptcy Code ("<u>USBC</u>") is filed by or against STANLEY or its Affiliates, then SEARS may exercise all rights hereunder, including any rights beyond those provided by Section 365(n) of the USBC with respect to this Agreement, including the right to retain each and every right to use the Licensed Marks, which may not be included within the statutory definition of "intellectual property," under the licenses granted herein.  The rights and licenses granted to SEARS and its Affiliates pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the USBC, 11 U.S.C. Section 101 *et seq.*, licenses of rights to "intellectual property" as defined under Section 101(35A) of the USBC.

(g) <u>STANLEY's Rights</u>.  All rights, licenses, immunities and privileges with respect to the Licensed IP not expressly granted to SEARS by STANLEY hereunder shall remain solely and exclusively with STANLEY.  Upon a termination of this Agreement, all rights conveyed by STANLEY to SEARS with respect to the use of the Licensed Marks shall cease, and all such rights shall revert to STANLEY, in accordance with this Agreement.  Except as otherwise set forth herein, upon termination of this Agreement, SEARS shall immediately discontinue all use of the Licensed Marks.

(h) <u>SHO Exclusivity</u>.

i.      Subject to this Section 2(h), and notwithstanding the termination by STANLEY of any sublicense contemplated by Section 2(d)i(B) in any circumstance in which

- 7 -

such sublicense may be terminated, the license granted by STANLEY to SEARS pursuant to this Agreement shall be exclusive with respect to any sales, licensing or distribution of Craftsman branded Licensed Products to SHO in the Channels of Retail Trade. STANLEY hereby agrees that it (and its successors and assigns) shall not grant to any other Person, and shall ensure that no other Person obtains, any title, license, interest or other right in or to any Licensed IP for the purpose (in whole or in part) of selling, licensing or distributing Craftsman branded Licensed Products to SHO in the Channels of Retail Trade.

ii.    The rights of exclusivity with respect to SHO granted by STANLEY to SEARS under Section 2(h)i shall not apply to the Excluded Retail Channels or selling formats that are not Selling Formats.

(i)    Specified Acquirer.  On or prior to November 1 in any Contract Year, STANLEY shall provide SEARS with a list of its top five customers and top five competitors (based on such criteria as STANLEY shall determine, acting reasonably), which Persons shall compose the Specified Acquirers for the following Contract Year.  If STANLEY fails to deliver such list by such date, then:  (i) if no list has been provided previously, there shall be no Specified Acquirers and (ii) if a list was provided for the (or a) prior Contract Year, that list shall be deemed to apply by reference to the following Contract Year also.

(j)    New Product Categories.  If STANLEY markets, sells, distributes, licenses or otherwise commercializes any product branded or otherwise using a Licensed Mark but which does not fall within any of the Hand Tools, Power Tools, Lawn and Garden Equipment, Storage and Garage Products or Other Products categories (such product a "New Product"), STANLEY shall give SEARS three (3) months' written notice prior to sale of such New Product (or granting any other Person a right to sell such New Product), including example artwork, brand guidelines and quality standards of the New Product.  From and after such notice, such New Product shall be a "Licensed Product" for all purposes hereunder. The utilization by SEARS of any New Product shall be subject to the terms of this Agreement, including the Quality Standards.

(k)    SEARS' Rights.  STANLEY acknowledges that SEARS and its Affiliates have the right to innovate, design, market, sell, distribute, license or otherwise commercialize Licensed Products, including Licensed Products that do not exist as of the Effective Date (in each case in accordance with this Agreement); provided that such rights with respect to the Licensed Marks shall not survive the termination or expiration of this Agreement.

(l)    Former SEARS Entities.  SEARS may require STANLEY, on thirty (30) days' prior written notice, to grant a license with respect to Licensed IP to any Former SEARS Entity.  Such license shall grant rights to such Former SEARS Entity on substantially the same terms as those granted to SEARS as set forth in this Agreement; provided, that (i) the number of such Former SEARS Entities to which SEARS may require STANLEY to grant such licenses are assigned shall be no more than ten (10); (ii) STANLEY shall not be required to grant any such license to a Former SEARS Entity that is a Specified Acquirer or an Affiliate of a Specified Acquirer; (iii) any license so granted shall be deemed automatically to terminate on a Specified Change of Control of the relevant Former SEARS Entity; and (iv) any license so granted to a Former SEARS Entity shall not be assignable by

- 8 -

such Former SEARS Entity; provided, however, that SEARS may require STANLEY to grant a license with respect to Licensed IP to a Former SEARS Entity which operates the SHS Channel without the restrictions in the foregoing clauses (ii) or (iii) applying with respect to such license, so long as such license is restricted to the SHS Channel and Ecommerce Channels solely in support of the business of the SHS Channel.  The Parties agree to enter into such Contracts and take such further actions as may reasonably be required in order to give effect to this Section 2(l).

**3.       CUSTOMER SUPPORT**

SEARS shall maintain, at its own expense, customer support facilities (including a toll-free customer support number) with respect to the Retained Business (including in connection with retail sales of Licensed Products to consumers) on substantially the same basis as the customer support facilities of other business operations of SEARS and its Affiliates.

**4.       ROYALTIES**

(a) Rate.  Prior to the end of the fifteenth (15th) Contract Year (ending on December 31, 2031), the license granted under this Agreement shall be royalty-free.  For each Contract Year following the end of the 15th Contract Year, SEARS shall pay STANLEY a Three Per Cent (3.0%) royalty on all Net Sales of Licensed Products using the Licensed Marks (such payments, "Royalty Payments"), which shall be calculated in accordance with this Article 4.

(b) Calculation.  Royalty Payments shall be calculated on a quarterly basis.

(c) Payment.  From and after the end of the 15th Contract Year, not later than thirty (30) days following the end of the preceding full calendar quarter, i.e., Royalty Payments are due on the 30th of January, April, July and October, SEARS shall pay to STANLEY, by wire transfer of immediately available funds to the Purchaser Account (or such other account as STANLEY may designate, in writing, prior to the end of the Contract Year to which the payment relates), an aggregate amount equal to the Royalty Payment for each such quarter and, without regard to whether any Royalty Payment is payable, deliver to STANLEY a written statement setting forth in reasonable detail (such that STANLEY is able to verify the underlying data, including all components of the relevant calculations as set forth in this Agreement) its calculation of the amount of the relevant Royalty Payment for the relevant quarter (a "Royalty Statement").

(d) All Royalty Payments made under Article 4 shall be made in U.S. Dollars. Any Royalty Payment that remains unpaid thirty (30) days after the due date shall bear interest from the due date until received by STANLEY at the rate of LIBOR plus five percent(5.0%) per year.

(e) SEARS' obligations for all payments due from SEARS hereunder, if and to the extent such obligations remain outstanding at the time of termination of this Agreement, shall survive such termination.

5.    **BRAND GUIDELINES**

(a) All Licensed Products using the Licensed Marks must accord with the Brand Guidelines (unless otherwise agreed to in writing by STANLEY), including with respect to the inclusion of trademark legends, where applicable; provided, that Licensed Products which accord with either (i) the equivalent standards and guidelines used by SEARS in connection with the operation of the Business immediately prior to the Effective Date; or (ii) the brand guidelines used by STANLEY to sell similar products at the applicable time of sale, shall (in each case) be deemed to comply with this provision.

(b) STANLEY and SEARS may agree, in writing, to amend the Brand Guidelines from time to time. Each Party shall act reasonably with respect to, and shall discuss in good faith, any amendments to the Brand Guidelines proposed by the other Party. Either Party may, on ninety (90) days' written notice to the other Party, amend the Brand Guidelines from time to time without the other Party's prior agreement, if such amendment is reasonably required in order to comply with any changes in applicable federal, state and local laws (including if required to protect the interests of STANLEY in the Licensed Marks); provided, however, SEARS shall not be required in any case to implement such revisions with respect to any Licensed Products already in production or any Licensed Products subject to a pre-existing Contract for production.

(c) STANLEY may amend the brand guidelines in place from time to time for use with its own products or services at any time and for any reason without notifying SEARS in advance; provided, however, that STANLEY shall provide a copy of such amended brand guidelines to SEARS within thirty (30) days after their adoption.

6.    **QUALITY STANDARDS**

(a) SEARS represents and warrants that the Licensed Products at all times shall be sold, distributed and promoted in accordance with the Quality Standards. STANLEY and SEARS may agree, in writing, to implement changes to the Quality Standards (for purposes of this Agreement) from time to time. Each Party shall act reasonably with respect to, and shall discuss in good faith, any amendments to the Quality Standards proposed by the other Party. Either Party may, on sixty (60) days' written notice to the other Party, amend the Quality Standards from time to time without the other Party's prior agreement, if such amendment is reasonably required in order to comply with any changes in applicable federal, state and local laws. SEARS may amend the Quality Standards from time to time on sixty (60) days' written notice to STANLEY if, in its reasonable discretion based on a good faith determination, the amended standards will improve the competitiveness of the applicable products (including where such amendment is to comply with equivalent standards implemented by STANLEY for like products), provided such amended standards are at least as high as the Quality Standards as of the Effective Date or any lesser standards in effect at STANLEY with respect to a similar product manufactured or sold by STANLEY under a Licensed Mark.

(b) SEARS further represents and warrants that the quality of the Licensed Products shall be equivalent (or better) than the corresponding quality requirements for the relevant

Licensed Product set forth in the Quality Standards.  SEARS understands and agrees that STANLEY shall have no responsibility for SEARS' compliance with quality standards and all applicable laws, regulations and industry standards with respect to the Licensed Products.

(c) SEARS shall at all times use its commercially reasonable efforts to cause the Licensed Products and Packaging Materials used in connection with the Retained Business to be developed, produced and marketed in a manner which conforms with the Quality Standards.  SEARS acknowledges and is familiar with the high standards, quality, style and image of the Licensed Marks.

(d) During any Contract Year, STANLEY may request three (3) free samples of any Craftsman branded Licensed Product (with Packaging Material) taken at random from production runs.  If STANLEY requests any additional samples of such Craftsman branded Licensed Product during any Contract Year, STANLEY shall pay SEARS for those additional samples at manufacturer's lowest price offered to SEARS.

(e) No irregulars, seconds or other Licensed Products or Packaging Materials that do not conform in all material respects to the Brand Guidelines and the Quality Standards may be distributed or sold.

(f) For all sales of Legacy Lifetime Warranty Products, SEARS must offer customers a warranty which is consistent with the warranty terms offered by STANLEY for the same (or equivalent) products.

7.    **OWNERSHIP**

(a) SEARS hereby recognizes and acknowledges (i) STANLEY's ownership rights in the Licensed IP; (ii) the great value of the publicity and goodwill associated with the Licensed IP are valuable assets belonging to STANLEY; (iii) that all rights in and to the Licensed IP are and shall remain the sole property of STANLEY; and (iv) that SEARS' right to use the Licensed IP shall be governed exclusively by this Agreement and applicable law. Nothing in this Agreement shall confer any right of ownership in the Licensed IP in SEARS. SEARS acknowledges, and shall not at any time contest, oppose or challenge, STANLEY's ownership of, or the validity of, the Licensed IP.  SEARS agrees that all goodwill resulting from any use of the Licensed Marks by SEARS shall inure to the benefit of STANLEY. SEARS shall not use (other than as specified in this Agreement), register or attempt to register the Licensed Marks or any similar or derivative mark in any jurisdiction.  SEARS shall not seek to register any domain name including any of the Licensed Marks or similar names, alone or with other elements, without STANLEY's prior written approval, which shall be granted at STANLEY's sole discretion.   Notwithstanding the foregoing, it is understood that, for the one year period following the Effective Date, or an earlier date if agreed between the Parties, SEARS shall operate CraftsmanClub.com on the basis set forth in the Purchase and Sale Agreement and in a manner consistent with its existing quality practices with regard to the Licensed Marks.

(b) SEARS shall display (i) the following legend on Packaging Materials in print legible format; "Used under license"  and/or (ii) such other marks and legends on Packaging

Materials as are required by the Brand Guidelines (as amended from time to time under this Agreement); provided, however, that SEARS shall only be required to comply with the foregoing provisions of this Section 7(b) with respect to Licensed Products for which a production, manufacturing or other Contract is not already in existence prior to the Effective Date (provided that SEARS shall use reasonable efforts to amend such Contract to permit compliance with this Section 7(b) as soon as reasonably practicable), and SEARS shall not be required to re-label Packaging Materials for any existing inventory.

(c) SEARS agrees not to use any trademark or service mark other than the Licensed Marks or any subbrands in connection with the Licensed Products or in combination with the Licensed Marks, without prior written approval of STANLEY, and SEARS agrees not to use or create composite marks using the Licensed Marks without prior written approval of STANLEY.

(d) Ownership of all right, title and interest in any artwork, including without limitation, logo designs, supplied by STANLEY to SEARS, and in all trademarks and indicia of origin pertaining to the Licensed Marks (other than manufacturer and/or distributor legal notifications) shall be and remain the sole and exclusive property of STANLEY.

(e) SEARS will not (a) modify the Licensed Marks in any form or manner unless approved in advance in writing in each instance by STANLEY; or (b) combine the Licensed Marks with any other trademark, brand, logo, or source identifier. Neither STANLEY nor SEARS will directly or indirectly make any statement or do any act that disparages, degrades, misuses, tarnishes, dilutes or adversely affects, or creates any negative inference as to the reputation, prestige, value, image, or impression of the Licensed Marks. Notwithstanding the foregoing, SEARS may engage in comparative advertising with any STANLEY CRAFTSMAN product so long as such advertising is accurate and may include any accurate source information on any Licensed Product or any Packaging Materials or other advertising materials.

## 8.    PROTECTION OF LICENSED IP

(a) If SEARS becomes aware of any infringement or threatened infringement of the Licensed IP, or any improper disclosure of confidential components of the Licensed IP, or any violation or threatened violation relating to the Licensed IP of any common, civil or statutory law, of any application by any third party to register any rights in Intellectual Property in the United States which is the same as or confusingly similar to any part of the Licensed IP, or any apparent unauthorized use of the Licensed IP, then SEARS shall promptly notify STANLEY, in writing, giving the particulars thereof. However, subject to Section 8(b), on no account shall SEARS institute any suit or take any action to combat any of the foregoing, without the prior consent, in writing, of STANLEY.

(b) Except as provided herein, (i) STANLEY shall have the sole right and discretion to determine whether or not to institute any proceedings or actions against third parties relating to the Licensed IP, (ii) the cost of such proceedings or actions shall be at the expense of and under the exclusive control of STANLEY, and (iii) STANLEY shall be entitled to receive and retain all amounts awarded, if any, as damages, profits, settlement amounts or

otherwise in connection with such proceedings or actions.  SEARS shall, upon STANLEY's request, join in an action and otherwise provide STANLEY with such assistance and information as STANLEY may reasonably request in connection with taking such action; provided, that STANLEY shall reimburse SEARS for its reasonable costs and expenses in connection with such assistance.  If STANLEY fails to take such action within thirty (30) days after a relevant notification by SEARS, SEARS shall have the right to take such action. If SEARS elects to take such action, it shall notify STANLEY of its intent to do so and STANLEY shall have up to thirty (30) days thereafter to notify SEARS that it intends to join in such action; and in such event, both Parties shall share equally the expense and any recovery and mutually agree on the action strategy and any settlement.  If STANLEY chooses not to join SEARS in such action, SEARS shall have the right to proceed with such action or proceeding, and any such action or proceeding shall be at the expense of and under the exclusive control of SEARS, and all recovery shall be SEARS' at its expense and for its benefit, and STANLEY shall, at SEARS' request, provide such assistance and information as SEARS may reasonably request in connection with taking such action; provided, that SEARS shall reimburse STANLEY for its reasonable costs and expenses in connection with such assistance.  During any such litigation: (A) SEARS shall act in good faith to preserve and enhance STANLEY's rights in the Licensed IP and shall keep STANLEY advised as to the status of the litigation; and (B) STANLEY shall not enter into any settlement in derogation of SEARS' rights.

## 9.    BOOKS AND RECORDS

(a) Beginning in the first month of Contract Year 16, SEARS shall, and shall cause its Affiliates to, provide STANLEY and its officers, directors, Affiliates, employees and representatives, upon reasonable notice, reasonable access during normal business hours to the books and records of SEARS and its Affiliates, and to the officers, directors, employees and representatives of SEARS and its Affiliates, including SEARS' auditors and their work papers, in each case for purposes of confirming SEARS' compliance with its obligations relating to the Royalty Payments under this Agreement.

(b) With effect from the first month of Contract Year 16, upon STANLEY's reasonable request, SEARS shall make available to STANLEY's and its (and its Affiliates') employees, agents, advisors, accountants or other representatives, upon reasonable notice, reasonable access during normal business hours to such information as may reasonably be requested by such Persons for the purposes of verifying the information (including SEARS' calculations) set forth in any Royalty Statement.

## 10.    ROYALTY STATEMENTS REVIEW

(a) STANLEY shall have 45 calendar days after receipt of any Royalty Statement (the "Royalty Statement Review Period") to review it.  During the Royalty Statement Review Period, SEARS agrees that STANLEY and its Affiliates' employees, agents, advisors, accountants or other representatives, shall be provided promptly, upon reasonable notice, reasonable access during normal business hours to the accountants, representatives, information and records of SEARS and its respective Affiliates (including the right to take

copies thereof) as may be requested by STANLEY for purposes of the verification any amounts or calculations set forth in any Royalty Statement.

(b) Prior to the expiration of the Royalty Statement Review Period, STANLEY may object to SEARS' determination(s) or calculations set forth in the applicable Royalty Statement, including, in each case, any component thereof, or any other calculation or determination or amount of detail provided therein, by delivering (in each case) a written notice of objection to SEARS (each such notice, an "Objection Notice"). Any Objection Notice shall state, in reasonable detail, the basis for such objection, the Royalty Statement to which the Objection Notice relates, as well as the amount(s) and calculation(s) in dispute.

(c) If STANLEY fails to deliver an Objection Notice to SEARS prior to the expiration of the applicable Royalty Statement Review Period, then the calculations set forth in the relevant Royalty Statement shall be final and binding on the Parties. In the case of the determination of the amount of the Royalty Payment for any applicable period, if STANLEY fails to deliver an Objection Notice in respect of such period as aforesaid, the Royalty Amount in respect of such period shall be deemed to be the amount set forth in the applicable Royalty Statement for all purposes under this Agreement.

(d) If STANLEY timely delivers an Objection Notice in respect of one or more Royalty Statements, STANLEY and SEARS shall negotiate in good faith to resolve the relevant disputed items.

(e) If STANLEY and SEARS are unable to reach agreement within 30 days after the date of delivery of an Objection Notice (or any longer period that may be agreed between them to continue such discussions), all unresolved disputed items related to that Objection Notice shall be promptly submitted for resolution to the Accountant.

(f) The Accountant shall act as an arbitrator to determine, based solely on information provided to it by STANLEY or SEARS, and not by independent review, and without shifting the burden of proof to either STANLEY or SEARS, only those unresolved items that are specified in the Objection Notice and shall be limited to those adjustments, if any, required to be made to the relevant Royalty Statement to comply with the provisions of this Agreement. The Accountant shall, within 60 days after submission to it of the dispute, determine and report to SEARS and STANLEY upon such remaining disputed items or calculations, and such report shall be final and binding on the Parties.

(g) The final determination of the Accountant shall fall within the range of values assigned to such items in dispute between the Parties. SEARS and STANLEY shall make reasonably available to the Accountant all relevant books, records and other supporting information required to determine the amount of the Royalty Payment (and any element of the calculation thereof), and any other items reasonably requested by the Accountant. The fees and disbursements of the Accountant shall be borne equally by STANLEY and SEARS.

(h) If the amount of a Royalty Payment payable under this Agreement, as finally determined in accordance with this Article 10 (whether by agreement between the Parties or by determination of the Accountant), is greater than the applicable Royalty Payment amount

originally determined by SEARS, SEARS shall pay to STANLEY an amount (in cash) equal to the applicable Royalty Payment as determined by the Accountant (or, if payment of SEARS' determination of the applicable Royalty Payment has already been made, the excess of such amount over the Royalty Payment amount), as soon as reasonably practicable and in any event within ten (10) days of the final determination of the amount of the applicable Royalty Payment by the Accountant in accordance with this Article 10.

## 11.    ADDITIONAL UNDERTAKINGS OF SEARS

(a) SEARS hereby covenants that SEARS and its Affiliates will comply with all laws, regulations and industry standards applicable to the packaging, marketing and distribution of the Licensed Products, and will have and maintain in place throughout the term of this Agreement policies and procedures to ensure compliance with its obligations set forth above, in each case consistent with any such existing policies and procedures of SEARS.  SEARS further agrees to use reasonable efforts to include, in any Contract entered into after the Effective Date relating to the manufacture of Licensed Products between SEARS (or its Affiliates) and a third party manufacturer or supplier, a provision stating that such manufacturer or supplier shall comply with all laws, regulations and industry standards applicable to the manufacturing of the Licensed Products, or a substantially equivalent provision.

(b) SEARS shall be responsible for the development, manufacture, production, marketing, sale, and distribution of the Licensed Products in connection with the Retained Business and will bear all related costs associated therewith.

## 12.    WARRANTIES AND OBLIGATIONS

(a) <u>STANLEY</u>.  STANLEY hereby represents, warrants and agrees that:  (i) there are no other agreements, and STANLEY will enter into no other agreements with any other party in conflict with the rights granted to SEARS and its Affiliates in this Agreement; (ii) it will comply with all provisions of this Agreement; and (iii) when executed and delivered, this Agreement will constitute the legal, valid and binding obligation of STANLEY, enforceable against STANLEY in accordance with its terms. Notwithstanding the provisions of this Section 12(a), STANLEY does not represent or warrant that it owns trademark registrations for the Licensed Marks that include the Licensed Products within the scope of the identification of goods of such registrations.

(b) <u>SEARS</u>.  SEARS hereby represents, warrants and agrees that:  (i) it will comply with all provisions of this Agreement; and (ii) when executed and delivered, this Agreement will constitute the legal, valid and binding obligation of SEARS, enforceable against SEARS in accordance with its terms.

## 13.    LIMITATION ON LIABILITY

(a) Except as set forth in Section 13(b), STANLEY shall have no liability to SEARS or any other firm, corporation, or any organization, or person for, or on account of any injury, loss, or damage of any kind, or nature sustained by, or any damages assessed, or asserted against, or any other liability, costs, or expenses whatsoever incurred by, or imposed upon,

SEARS or any entity, or other organization or person arising out of, or in connection with, or resulting from (i) the production, use, sale, or other disposition of any Licensed Product or (ii) any labeling, packaging, advertising, or promotional activities with respect to any of the foregoing.

(b) NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER PARTY IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY AND OTHERWISE, FOR ANY LOST PROFITS OR SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, NOR SHALL ANY OF THE TERMS OF THIS AGREEMENT BENEFIT OR CREATE ANY RIGHT OR CAUSE OF ACTION IN OR ON BEHALF OF ANY PERSON OR ENTITY OTHER THAN THE PARTIES HERETO REGARDLESS OF THE FORM OF THE ACTION, DAMAGE, CLAIM, LIABILITY, COST, EXPENSE, OR LOSS, WHETHER IN CONTRACT, STATUTE, TORT (INCLUDING WITHOUT LIMITATION, NEGLIGENCE), OR OTHERWISE, PROVIDED THAT THIS LIMITATION SHALL NOT APPLY TO ANY AMOUNTS PAYABLE TO THIRD PARTIES UNDER THE INDEMNIFICATION PROVISIONS OF THIS AGREEMENT OR TO BREACH BY A PARTY OF THE CONFIDENTIALITY OBLIGATIONS APPLICABLE HEREUNDER.

## 14.    INDEMNIFICATION

(a)  By SEARS.  SEARS hereby agrees to indemnify and hold harmless STANLEY and its officers, directors, employees, successors and assigns ("STANLEY Indemnified Parties") from and against any and all Losses to the extent arising out of or resulting from:

(i)        any actual or alleged breach or violation by SEARS of any warranty, representation, covenant, obligation, agreement, undertaking or term of condition contained in this Agreement or any Schedule hereof;

(ii)       any act or omission of SEARS constituting willful misconduct or fraud (including any personal or bodily injury (including death) to any person or damage to or impairment of any property or property rights resulting, or allegedly resulting, in whole or in part, from or caused by any negligent or grossly negligent act or omission or willful misconduct of SEARS, its agents or employees, or any third-party acting on its behalf or under its control);

(iii)      the capability, adequacy, performance, quality, design, manufacture, marketing, sale or distribution of the Licensed Products, including, without limitation, any action founded, in whole or in part, on negligence, contract, warranty, product liability, strict liability or any alleged defect or deficiency in the Licensed Products (in each case, other than any Licensed Product that may at any time be purchased from STANLEY);

(iv)     any actual or alleged violation, infringement, unauthorised use or misappropriation of any intellectual property of any third parties (including, without limitation, any trademark, service mark, copyright, patent, trade secret, process, method or device) by SEARS or any third party acting on its behalf (other than STANLEY), arising under or in connection with the design, manufacture, distribution, sale and/or use of any Licensed Product, Packaging Material or Advertising Material, other than, after the expiration of three (3) years from the Effective Date, claims that the approved use permitted by this Agreement of the Licensed Marks infringes the trademark rights of such a third party;

(v)     any actual or alleged false advertising, fraud, misrepresentation or other claims related to the Licensed Products, Packaging Materials or Advertising Materials not based on claims of a right to the Licensed Marks as licensed under this Agreement; and/or

(vi)     any actual or alleged unauthorized use of the Licensed Marks or Licensed Products by SEARS or any third-party acting on its behalf (other than STANLEY) and any claim by a SEARS third-party manufacturer arising out of its agreement with SEARS.

(b) <u>By STANLEY</u>.   STANLEY hereby agrees to indemnify and hold harmless SEARS and its officers, directors, employees, successors and assigns ("<u>SEARS Indemnified Parties</u>") from and against any and all Losses to the extent arising out of or resulting from:

(i)     any actual or alleged breach or violation by STANLEY of any warranty, representation, covenant, obligation, agreement, undertaking or term or condition contained in this Agreement or any Schedule hereof;

(ii)     any act or omission of STANLEY constituting willful misconduct or fraud (including any personal or bodily injury (including death) to any person or damage to or impairment of any property or property rights resulting, or allegedly resulting, in whole or in part, from or caused by any negligent or grossly negligent act or omission or willful misconduct of STANLEY, its agents or employees, or any third-party acting on its behalf or under its control);

(iii)     the capability, adequacy, performance, quality, design, manufacture, marketing, sale or distribution of any products manufactured by STANLEY carrying any CRAFTSMAN mark ("<u>STANLEY Products</u>"), including without limitation, any action founded, in whole or in part, on negligence, contract, warranty, product liability, strict liability or any alleged defect or deficiency in the STANLEY Products, <u>provided</u>, <u>however</u> that this Section 14(b)(iii) shall not apply to STANLEY Products acquired as Inventory under the Purchase and Sale Agreement or acquired under the Transition Services Agreement;

(iv)     any actual or alleged violation, infringement, unauthorized use or misappropriation of any intellectual property of any third parties (including, without limitation, any trademark, service mark, copyright, patent, trade secret, process, method or device) by STANLEY or any third party (other than SEARS) acting on its behalf, arising under or in connection with the design, manufacture, distribution, sale and/or use of any STANLEY Product or related packaging material or advertising material, other than, prior to three (3) years from the Effective Date, claims that any STANLEY Product infringes the trademark rights of such a third party;

(v)      after the expiration of three (3) years from the Effective Date, any actual or alleged false advertising, fraud, misrepresentation or other claims related to STANLEY Products or related packaging material or advertising material; and/or

(vi)     after the expiration of three (3) years from the Effective Date, any challenge to the validity of the Licensed Marks or to the licensing of the Licensed Marks to SEARS under this Agreement and/or any alleged trademark infringement arising out of the approved use of the Licensed Marks as authorized in this Agreement (but not any modifications or changes made to the Licensed Marks by SEARS or any third-party).

(c) Indemnification Procedures.   Indemnification under this Article 14 shall be subject to the following procedures.

(i)      Notice.   The Party seeking indemnification (the "Indemnified Party") shall promptly give the Party obligated by this Agreement to provide indemnity (the "Indemnifying Party") written notice that it wishes to seek indemnification under this Agreement. Such notice shall provide a detailed description of the facts and circumstances giving rise to such claim. The failure of the Indemnified Party to give prompt notice shall not relieve the Indemnifying Party of any liability it may have to the Indemnified Party hereunder or otherwise, except to the extent that any delay or failure results in actual prejudice to the rights of the Indemnifying Party, and provided further that the Indemnifying Party shall have no obligation to indemnify the Indemnified Party for the costs of any defense, including attorney's fees, incurred by the Indemnified Party prior to the Indemnifying Party's receipt of such notice. If the claim relates to the commencement of any suit or proceeding by a third party, any such notice shall be accompanied by a copy of any papers served on or delivered to the Indemnified Party in connection with the third party claim.

(ii)     Defense of Claims.   If any claim is brought against the Indemnified Party in respect of which the Indemnified Party has notified the Indemnifying Party that it intends to seek indemnification from the Indemnifying Party for Losses covered by this Agreement and if the Indemnifying Party acknowledges and accepts responsibility without reservation to indemnify the Indemnified Party hereunder, then the Indemnifying

Party shall assume sole control over the defense and settlement of such claim; provided, however, that:

    (A)    the Indemnified Party shall be entitled to participate in, but not control, the defense of such claim and to employ counsel at its own expense to participate in the defense of such claim, and the Indemnifying Party shall have no further liability to the Indemnified Party for any legal fees or expenses incurred in connection with the claim;

    (B)    the Indemnifying Party shall obtain the prior written approval of the Indemnified Party before (x) entering into any settlement of such claim that would require the Indemnified Party to take any action other than the payment of money, or (y) ceasing to defend against such claim, which approvals shall not be unreasonably withheld or delayed;

    (C)    the Indemnifying Party shall notify the Indemnified Party of its election to assume control of the defense of any such claim within thirty (30) days after receipt of written notice of the action from the Indemnified Party; and

    (D)    the Indemnified Party shall cooperate in the defense of any claim for which indemnification is sought.

In the event the Indemnifying Party does not accept responsibility without reservation to indemnify the Indemnified Party hereunder, then the Indemnified Party shall retain sole control over the defense and settlement of such claim, and the Indemnifying Party shall remain obligated to indemnify the Indemnified Party for all Losses, including without limitation the costs of any defense, including attorney's fees, incurred by the Indemnified Party.

    (iii)    If the Indemnifying Party makes any payment on a claim for which indemnification is sought, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claim or benefits of the Indemnified Party with respect to such claim, and the Indemnified Party shall cooperate with the Indemnifying Party in the assessment, assertion, negotiation, prosecution, and settlement of such rights of subrogation.

    (d) Warranty Arrangement Under Purchase and Sale Agreement.  Notwithstanding the foregoing, this Article 14 shall not apply to any liability arising under any product warranty claim.  Section 5.13 of the Purchase and Sale Agreement shall govern all product warranty claims.

## 15.    TERM OF LICENSE; TERMINATION

    (a) Term.  This Agreement shall be effective as of the Effective Date and shall remain in effect unless terminated for material breach in accordance with the provisions of this Article 15.

(b) <u>Termination by STANLEY</u>.

i.      STANLEY shall have the right to terminate this Agreement (including all sublicenses granted by SEARS pursuant to Section 2(d)) in accordance with this Section 15(b) where any one or more of the following events (herein called "<u>Material Defaults</u>") has occurred and continues un-remedied for ninety (90) days (or such longer as set forth herein) from the date on which SEARS receives written notice of such Material Default from STANLEY:

  a.      If SEARS (or, subject to this Section 15(b), its Permitted Sublicensees, other than SHO) shall materially breach (and fail to cure, as aforesaid) any of the material terms of this Agreement; or

  b.      If SEARS ceases to sell or sublicense Licensed Products, such that no such License Products are sold for any consecutive six (6) month period.

ii.      If STANLEY reasonably believes that a Material Default has occurred (and has not been cured), it may provide written notice to SEARS specifying, in reasonable detail, the nature of such alleged Material Default (a "<u>Default Notice</u>").

iii.      Subject to Section 15(b)iv and Section 15(b)xi, if an alleged Material Default cannot be cured within ninety (90) days after the date of the Default Notice, but SEARS has commenced and is continuing to make commercially reasonable efforts to cure such Material Default within such ninety (90) day period, then the cure period shall be extended until SEARS has stopped making commercially reasonable efforts to cure such Material Default, such extension not to exceed a further forty-five (45) days (such total period (the "<u>Default Cure Period</u>") being one hundred thirty-five (135) days from the date of the Default Notice).

iv.      Subject to Section 15(b)xi, if an alleged Material Default involves a purported material breach by an OEM Permitted Sublicensee, then, (A) in addition to the Default Cure Period SEARS shall have a further seventy-five (75) day period within which to make commercially reasonably efforts to cure the breach of such Permitted Sublicensee, and (B) notwithstanding anything to the contrary in this Agreement, if prior to the end of such further seventy-five (75) day period, SEARS provides written notice to such Permitted Sublicensee terminating the relevant sublicense, no Material Default shall be deemed to have occurred for any purpose under this Agreement (and, accordingly, STANLEY may not exercise its termination right under Section 15(b)i in such circumstances).

v.      SEARS shall have thirty (30) calendar days after receipt of any Default Notice (the "<u>Initial Investigation Period</u>") within which to investigate the alleged Material Default and take such steps as it may deem appropriate, including making efforts to cure such Material Default.

vi.      Notwithstanding anything to the contrary in this Agreement (and without prejudice to its right to seek to cure any alleged Material Default), SEARS may, within the Initial Investigation Period, in its sole discretion, refer the issue of whether or not the matter or matters specified in a Default Notice constitutes a Material Default to final and binding arbitration under the Delaware Rapid Arbitration Act (the "<u>DRAA</u>," 10 Del. C. § 5801 *et seq.*) and the Delaware

Rapid Arbitration Rules promulgated thereunder by the Supreme Court of the State of Delaware ("Rules") in effect at the time of the date of delivery of the notice of arbitration as provided below, except as modified herein in accordance with the DRAA.  The arbitration shall be commenced by a written notice of arbitration sent by SEARS to STANLEY.  The arbitral panel shall consist of, and the arbitration shall be conducted by, three arbitrators (the "Tribunal"), who, pursuant to DRAA § 5801(3)(b), are and shall be authorized to exercise any power of a sole arbitrator by a majority vote.  The members of the Tribunal shall be appointed by the Delaware Court of Chancery in accordance with DRAA § 5805 and Delaware Court of Chancery Rule 96. The Delaware Court of Chancery shall appoint one of the three arbitrators as the chair of the Tribunal. In the event that such an arbitration is commenced, no Material Default will be deemed to have occurred unless and until the Tribunal shall have determined that a Material Default shall have occurred.

vii.    The legal seat of the arbitration shall be the State of Delaware, but the evidentiary and other hearings shall be conducted in location(s) determined by the chair of the Tribunal.  The Tribunal shall hold, as promptly as practicable, telephonically or in person, a preliminary hearing with the parties and/or their counsel to establish a schedule for the proceedings of the Tribunal.  The arbitration hearing shall be conducted as promptly as practicable, taking into account the nature of the claims and any facts and circumstances the Tribunal deems relevant and may, in the discretion of the Tribunal, be conducted over the course of one or more days.  The Tribunal shall set a schedule that will permit the Tribunal to issue a decision no later than 60 calendar days following the selection of the Tribunal.

viii.    In connection with any arbitration proceeding hereunder, the Tribunal shall allow reasonable requests for the production of documents relevant to the dispute and for the taking of depositions.

ix.    The parties shall bear their own costs incurred in connection with the arbitration and share equally the fees and expenses of the Tribunal and the costs of administration.

x.    It is understood and agreed that a decision by SEARS not to refer any question to arbitration shall not prejudice any of its rights or remedies.

xi.    In the event that SEARS elects to arbitrate pursuant to the foregoing provisions, the Default Cure Period referred to in this Section 15(b) shall end on the later of (x) the 135th day, or the 210th day in the case of an OEM Permitted Sublicensee, as applicable, after the date of the Default Notice and (y) the 30th day following delivery by the Tribunal of its decision.

xii.    This Section 15(b) shall be subject to the laws of the State of Delaware.

(c)  SHO.  Any breach or alleged breach by SHO of the SHO Agreement or of any sublicense granted under this Agreement shall be subject to the terms of Section 5.18 of the Purchase and Sale Agreement.  Subject to the foregoing, SEARS shall use its reasonable best efforts to cause each SHO Entity to comply with the provisions hereof; provided, however, that if, notwithstanding such efforts, any SHO Entity breaches any term of this Agreement,

such breach shall not constitute a Material Default by SEARS but can constitute a Material Default by such SHO Entity that shall entitle STANLEY to terminate the sublicense to such SHO Entity.    A material breach of this Agreement by SHO shall entitle STANLEY to terminate the sublicense to SHO, subject to the applicable Default Cure Period set forth above (but without any arbitration rights).

(d) Termination by SEARS.    SEARS shall have the right to terminate this Agreement on written notice to STANLEY.

(e) Post-Termination License to Other Licensed IP.    STANLEY hereby grants to SEARS and its Affiliates, effective immediately prior to termination of this Agreement by either Party (and surviving any such termination), a fully-paid, worldwide, royalty-free, sublicenseable, perpetual and irrevocable license, in connection with the Retained Business, to use any and all Other Licensed IP.    This Section 15(e) shall survive termination of this Agreement.

## 16.    FINAL STATEMENT UPON TERMINATION OR EXPIRATION

SEARS shall deliver, as soon as practicable, to STANLEY, following expiration or termination of this Agreement, a statement indicating the number and description of the Licensed Products on hand.    Except as indicated below, following a termination of this Agreement in accordance with Article 15, SEARS and its Affiliates may each continue to distribute and sell their remaining Licensed Products in inventory or on order for a period ("Sell-Off Period") not to exceed three hundred and sixty-five (365) days subject to payment of any outstanding royalties Royalty Payments in relation to such Licensed Products.    During such period, SEARS and its Affiliates may continue to use the rights granted hereby, subject to compliance with all terms hereof.    Immediately upon expiration of the Sell-Off Period, SEARS shall furnish STANLEY a detailed statement certified by an officer of SEARS showing the number and description of the Licensed Products on hand in its inventory and shall dispose of such inventory at STANLEY's direction.

## 17.    CONFIDENTIALITY

Each Party shall keep in confidence and shall not disclose to any third-party, or use other than in performance of this Agreement, any Confidential and Proprietary Information (defined below) received from the other Party in connection with the performance of this Agreement. For purposes of this Agreement, the term "Confidential and Proprietary Information" shall mean (i) any and all confidential and proprietary information which is disclosed to or acquired by a Party in connection with its performance of this Agreement or obtained by a Party in the course of disclosures and discussions with the other Party, provided such information is treated as confidential and proprietary by such owning Party, and (ii) the terms of this Agreement.    Neither Party shall acquire any right or interest in the Confidential and Proprietary Information of the other.    Upon termination of this Agreement, except as otherwise required herein, all Confidential and Proprietary Information of a Party in the possession of the other Party shall be returned to its owner, or at the owner's option, expense, and specific direction, be destroyed (per owner's request) with such destruction evidenced by sworn affidavit of the destroying Party. These obligations of confidentiality and non-use shall survive for a period of three (3) years following

- 22 -

any termination of this Agreement.  The restrictions in this Section shall not apply to any information which: (i) is at the time of disclosure available to the general public or at a later date becomes public domain information or available through no violation of this Agreement; (ii) as shown by written records, was specifically known to, or in possession of, the receiving Party at the time of its disclosure by the owning Party or its agent(s); (iii) as shown by written records, is hereafter acquired by the non-owning Party through a third-party which is not thereby breaching any obligation of confidence and has a bona fide right to disclose such information; (iv) is required to be disclosed pursuant to a judicial order or otherwise by law; or (v) is independently developed by the non-owning Party without reference to any of the owning Party's Confidential Information. Neither Party's Affiliates and representatives shall be considered third parties for purposes of the obligations of confidentiality under this Article 17.  It is understood and agreed that any information that may identify, or is otherwise related to, any Person that is a member of the "Craftsman Club" prior to the Effective Date is Confidential and Proprietary Information of SEARS.

## 18.    ASSIGNMENT

(a) Neither Party shall be entitled to assign or otherwise transfer this Agreement without the prior written consent of the other Party except as provided in this Article 18. Any assignment or transfer in violation of this Article 18 shall be null and void.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

(b) STANLEY or a permitted transferee under this Section 18(b) may assign or transfer this Agreement (as a whole, or separately with respect to the sale or transfer of portions of the Acquired Business) to (i) any third party that acquires all or substantially all of the assets of STANLEY, (ii) a surviving party in connection with a merger, or (iii) an Affiliate of STANLEY; provided, in each case, that such party agrees in writing to undertake the obligations of STANLEY under this Agreement.

(c) SEARS or a permitted transferee under this Section 18(c) may assign or transfer this Agreement to (a) any third party that acquires all or substantially all of the assets of SEARS, (b) a surviving party in connection with a merger, (c) an Affiliate of SEARS; provided, in each case, that (x) such assignee agrees in writing to undertake the obligations of SEARS under this Agreement (including meeting the Brand Guidelines and Quality Standards, and being subject to the requirement for Retail Sales to be conducted through the Channels of Retail Trade), and (y) the transferred license grant does not extend to the past, present or future business, products or services of any party who acquires all or part of the business of SEARS, but only extends to the transferred business.  In addition to the foregoing, SEARS and its Affiliates (but not a permitted transferee thereof) may grant limited sublicenses of the rights granted to it hereunder to its secured lenders and their agents to the extent reasonably necessary to permit such lenders and their agents to enforce customary rights and remedies of secured parties with respect to branded inventory.

19.    **MISCELLANEOUS**

(a) <u>Entire Agreement</u>. This Agreement and the Purchase and Sale Agreement (including all Schedules hereto) constitute the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede any prior discussion, correspondence, negotiation, proposed term sheet, agreement, understanding or arrangement and there are no agreements, understandings, representations or warranties among the Parties other than those set forth or referred to in this Agreement.

(b) <u>Amendments and Waivers</u>. This Agreement may not be modified or amended except by an instrument or instruments in writing signed by each of the Parties. Each Party may, only by an instrument in writing, waive compliance by the other Party with any term or provision of this Agreement on the part of such other Party to be performed or complied with.  The waiver by a Party of a breach of any term or provision of this Agreement by the other Party shall not be construed as a waiver of any subsequent breach.

(c) <u>Notices</u>.  All notices, requests, demands, waivers and other communications to be given to any Party hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service or three days after being mailed by certified or registered mail, return receipt requested, with appropriate postage prepaid, or when received in the form of a facsimile transmission (subject to confirmation of receipt) and shall be directed to the address or facsimile number set forth below (or at such other address or facsimile number as such Party shall designate by like notice):

<u>If to STANLEY</u>:

Stanley Black & Decker, Inc.
701 East Joppa Road, TW199
Towson, MD  21286
Attention:  Vice President – GT&S Licensing
Fax No.:  (410) 716-2610

<u>With a copy (which shall not constitute notice) to</u>:

Stanley Black & Decker, Inc.
Patent and Trademark Department
701 East Joppa Road, TW199
Towson, MD  21286
Attention:  General Patent Counsel
Fax No.:  (410) 716-2610

If to SEARS:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL  60179
Attention:  General Counsel
Fax No.:  (847) 286-2741

(d)  Relationship Between the Parties.  Neither Party shall represent itself as the agent or legal representative of the other Party for any purpose whatsoever, and neither Party shall have any right to create or assume any obligation of any kind, express or implied, for or on behalf of the other Party in any way whatsoever. This Agreement shall not create or be deemed to create any agency, partnership or joint venture between the Parties.

(e) Specific Performance. The Parties hereby acknowledge and agree that monetary damages, even if available, would not be an adequate remedy in the event of any actual or threatened material default in, or material breach of, any of the terms, conditions and provisions of this Agreement.  The non-breaching Party shall have the right to specific performance and injunctive or other equitable relief of its rights under this Agreement, in addition to any and all other rights and remedies at Law or in equity, and all such rights and remedies shall be cumulative.

(f)  Governing Law; Jurisdiction and Forum; Waiver of Jury Trial.

(i)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed and to be performed wholly within such State and without reference to the choice-of-law principles that would result in the application of the laws of a different jurisdiction.

(ii)    Each Party irrevocably submits to the jurisdiction of any New York state or federal court in any Action arising out of or relating to this Agreement, and hereby irrevocably agrees that all claims in respect of such Action may be heard and determined in such New York state or federal court. Each Party hereby irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Action. The Parties further agree, to the extent permitted by Law, that final and unappealable judgment against any of them in any Action contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which shall be conclusive evidence of the fact and amount of such judgment.

(iii)    EACH PARTY TO THIS AGREEMENT WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THEM AGAINST THE OTHER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR THE ADMINISTRATION THEREOF OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. NO PARTY TO THIS AGREEMENT SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE BASED UPON, OR ARISING OUT OF, THIS AGREEMENT OR ANY RELATED INSTRUMENTS OR THE

RELATIONSHIP BETWEEN THE PARTIES. NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EACH PARTY TO THIS AGREEMENT CERTIFIES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT OR INSTRUMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS SET FORTH ABOVE IN THIS SECTION 19(f). NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO THE OTHER PARTY THAT THE PROVISIONS OF THIS 19(f) WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

(g) <u>Force Majeure</u>.  There shall be no liability on either Party on account of any loss, damage, or delay occasioned or caused by strikes, riots, fires, insurrections or the elements, embargoes, failure of carriers, acts of God or of the public enemy, terrorism, cyber terrorism or breach of security, communications, transportation, or power interruptions or outages, compliance with any law, regulation or other governmental order, or any other causes beyond the reasonable control of either Party, whether or not similar to the foregoing.

(h) <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(i) <u>Construction</u>.  The Parties hereto acknowledge and agree that (a) each Party reviewed and negotiated the terms and provisions of this Agreement; and (b) the terms and provisions of this Agreement shall be construed fairly in accordance with their plain meaning, regardless of which Party was generally responsible for the preparation of this Agreement.

(j) <u>Interpretation</u>. The provisions of Sections 1.3 through 1.5 (inclusive) of the Purchase and Sale Agreement are incorporated into this Agreement as though set out in full herein, *mutatis mutandis*, with references to "Seller" being interpreted as references to SEARS and references to "Purchaser" being interpreted as references to STANLEY.

(k) <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by telecopy, electronic delivery or otherwise) to the other Party. Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a

document, will have the same effect as physical delivery of the paper document bearing the original signature.

(l)   <u>Survival</u>.  Each provision of this Agreement, that establishes with respect to any Party or beneficiary a right and/or obligation which expressly or by implication is to be in effect after the termination or expiration of this Agreement, shall be binding for such period of time as may reasonably be required in order to give full effect to the intended application of such provision. Such surviving provisions shall include, without limitation, (i) Articles 1, 14, 15, 16, 17, and 19, (ii) to the extent stated in Sections 2(k) and 15(e) and Article 18, and (iii) Sections 2(c), 2(f), 4(a) and 4(e).

<p align="center">[<i>Remainder of page left intentionally blank</i>]</p>

FINAL FORM

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed in duplicate originals as of the date first written above.

**STANLEY BLACK & DECKER, INC.**          **SEARS HOLDINGS CORPORATION**

By: _____          By: _____
   Name: _Corbin Walburger_                   Name:_____
   Title: _V.P. Business Development_         Title:_____
   Date:_____                         Date:_____

*[Signature Page to Acquired IP License Agreement]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed in duplicate originals as of the date first written above.

**STANLEY BLACK & DECKER, INC.**      **SEARS HOLDINGS CORPORATION**

By: _____      By: _____
     Name:                             Name:  Robert A. Riecker
     Title:                              Title:   Controller and Head of
     Date:                                             Capital Market Activities
                                          Date:

## SCHEDULE A

### Marks

1.  CRAFTSMAN®

2.  The CRAFTSMAN logo

3.  Each of the names, symbols, logos, slogans, trademarks and design elements set forth in Attachment G (Craftsman Trademarks) to the Seller Disclosure Letter is incorporated herein by reference.

4.  Those certain other trademarks, names, titles, logos and symbols relating to the CRAFTSMAN brand that STANLEY may from time to time authorize SEARS to use pursuant to this Agreement.

5.  Common law rights in any of the foregoing.

**SCHEDULE B**

**Brand Guidelines**



# BRAND STANDARDS

.......................................................

©2016 Sears Brands, LLC

**CONFIDENTIAL**
SEPT. 2016



## WELCOME TO THE CRAFTSMAN® BRAND

This is the most trusted tool brand in America, and since 1927, we've been a vital part of the country's ever-changing landscape. Craftsman brand's unwavering dedication to quality, value and durability has made it iconic, creating products that have inspired builders, DIYers, weekend warriors and more for generations.

The following guidelines provide general reference, direction and guidance for all involved in the brand's execution and development.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

# BRAND STANDARDS OVERVIEW

**BRAND
IDENTITY**

Look in any toolbox, garage or on any workbench across America and chances are you'll find Craftsman® products. And for good reason – the Craftsman name and logo are synonymous with trust and innovation. Protecting the iconic brand is key to all we do. In this section, you'll learn about the legacy of the brand and its personality. You'll also learn who the Craftsman customer is and how to use the brand trademark when speaking to them.

IN THIS SECTION:

▶ **P. 11  Brand Voice**          ▶ **P. 20  The Consumer**
▶ **P. 16  The Legacy of Craftsman**   ▶ **P. 21  Trademark Usage**

**MARKETING
EXECUTION**

These guidelines provide Craftsman agency and agency partners reference for everything from logo and type to campaign initiatives and online guidelines that are easy to access and update. Marketing guidelines aid in preserving a consistent brand image across all touch-points.

IN THIS SECTION:

▶ **P. 23  Introduction**         ▶ **P. 38  Photography**
▶ **P. 24  Marketing Logos**      ▶ **P. 42  When It Matters**
▶ **P. 32  The Shield**           ▶ **P. 52  Emblems & Credentials**
▶ **P. 33  Tool Platform Logos**
▶ **P. 34  Colors and Type**

**IN-STORE
GUIDELINES**

These guidelines provide a consistent look and feel for the consumer who is shopping for Craftsman products in store. The brand standard should be reinforced at department-wide, category, and on-product levels.

IN THIS SECTION:

▶ **P. 59  Introduction**              ▶ **P. 65  Endcaps**
▶ **P. 60  Tier 1: Brand Signage**     ▶ **P. 66  Displays &**
▶ **P. 61  Tier 2: Way-Finding &**        **Supplemental Signage**
   **Educational Signage**             ▶ **P. 67  Lawn & Garden**
▶ **P. 63  Tier 3: Product Signage**      **Product Signage**
                                       ▶ **P. 68  Vertical Store**
                                          **Display**



**BRAND STANDARDS**                                                        OVERVIEW    4

## BRAND STANDARDS OVERVIEW

ONLINE
GUIDELINES

The look and feel of the digital guidelines is meant to strengthen the connection between brand and consumer by increasing brand awareness and top-of-mind purchase consideration. These guidelines make it easier for consumers to shop the Craftsman brand by providing a consistent look across various channels and creating long-term competitive advantage by positively influencing consumer choice.

IN THIS SECTION:
- **P. 70  Introduction**          ▶ **P. 74  DEEP Pages**
- **P. 71  Homepage**              ▶ **P. 76  Mobile Guidelines**

CRAFTSMAN CLUB
GUIDELINES

Craftsman Club is the Craftsman brand's maker community. It's an online hub where people can gather to get everything they need to further their DIY interests – the inspiration, conversation, deals and more to nail the next project. The Club has elements of many top social communities, all spun together with a DIY focus including Facebook, blogs, message boards, Pinterest, LinkedIn and beyond.

IN THIS SECTION:
- **P. 81  Introduction**          ▶ **P. 84  Club.Craftsman.com**
- **P. 82  Marketing Logo**        ▶ **P. 92  Club Voice and Tone**
- **P. 83  Colors and Type**       ▶ **P. 93  Blog Voice and Tone**

**CRAFTSMAN®**

## BRAND STANDARDS OVERVIEW

**CRAFTSMAN PRO SERIES MARKETING GUIDELINES**

Craftsman® Pro Series is a premium product platform within the Craftsman brand structure. Backed by the trusted performance and strength that all Craftsman products deliver, Craftsman Pro Series products offer an enhanced level of performance and durability to handle the toughest tasks.

IN THIS SECTION:

▶ **P. 95  Introduction**
▶ **P. 96  Packaging Logo**
▶ **P. 99  Incorrect Logo Usage**
▶ **P. 100 Color Palette**

**PRODUCT GUIDELINES**

America's trust in the Craftsman brand begins with our products. Everything carrying the brand name is built to the highest standards of quality, durability and innovation. This section outlines the performance specifications and design philosophy that drives the creation and manufacturing of Craftsman products, as well as precise guidelines for applying the iconic Craftsman logo and labeling to these products.

IN THIS SECTION:

▶ **P. 102  Introduction**
▶ **P. 103  Performance Specs & Compliance**
▶ **P. 104  Design Philosophy**
▶ **P. 109  Product Logo Usage**
▶ **P. 114  Embossed Logo**
▶ **P. 115  Stamped Logo**
▶ **P. 116  Text Logo**
▶ **P. 117  Incorrect Usage**
▶ **P. 118  Shield Guidelines**
▶ **P. 124  Product Application**
▶ **P. 125  Shield Integrity**
▶ **P. 126  Product Label Design**
▶ **P. 130  Typography**
▶ **P. 133  Lithium Ion Battery Graphic**
▶ **P. 134  Color and Usage**

**CRAFTSMAN®**

# BRAND STANDARDS OVERVIEW

**PRO SERIES
PRODUCT GUIDELINES**

Craftsman® Pro Series is a premium product platform within the Craftsman brand structure. Backed by the trusted performance and strength that all Craftsman products deliver, Craftsman Pro Series products offer an enhanced level of performance and durability to handle the toughest tasks.

IN THIS SECTION:

▶ **P. 136  Design Philosophy**        ▶ **P. 140  Pro Series Shield**
▶ **P. 137  Pro Series Product Logos**  ▶ **P. 141  Logo Map Example (Tractor)**
▶ **P. 138  Logo Variations**          ▶ **P. 142  Logo Map Example (Blower)**

**BRAND
PACKAGING
GUIDELINES**

For most consumers, packaging is the public face of the Craftsman brand. From color to logo placement, use of typography and even the red brushed metal background, packaging communicates brand image. These packaging guidelines should be reviewed before delving into specific guidelines for Tools and Lawn & Garden packaging.

IN THIS SECTION:

▶ **P. 144  Logo Lockup**             ▶ **P. 147  Type Treatment**
▶ **P. 146  Color Palette**           ▶ **P. 148  Red Brushed Metal Background**

**TOOLS
PACKAGING
GUIDELINES**

From the carefully crafted photography style to the benefit-driven tone of the copy, Craftsman® Tools Packaging must communicate the brand's quality and durability. It must also impart product information in a concise, well-organized way to guide consumers at point of sale, often without sales assistance. These guidelines help create packaging that reflects the confidence the Craftsman brand inspires.

IN THIS SECTION:

▶ **P. 150  Photography**            ▶ **P. 160  Icons**
▶ **P. 153  Product Info Tab**       ▶ **P. 162  Copywriting**
▶ **P. 155  Product Number Lockup**  ▶ **P. 163  Bilingual Packaging**
▶ **P. 156  UPC Lockup**             ▶ **P. 164  Legal Statements**
▶ **P. 157  Panels**                 ▶ **P. 166  PDQ Trays**
                                     ▶ **P. 167  Kraft Carton Packaging**

**CRAFTSMAN®**

## BRAND STANDARDS OVERVIEW (CONT.)

**LAWN & GARDEN PACKAGING GUIDELINES**

Craftsman Lawn & Garden Packaging has its own distinct style, with key differences from Tools Packaging. It utilizes a more concise Product Tab, containing only the Craftsman logo and product name, for instance. Color coding may be used to communicate a step up in value or performance among products.

IN THIS SECTION:

▶ **P. 170  Overview**                  ▶ **P. 174  Feature Tab**
▶ **P. 171  Photography**               ▶ **P. 175  Dual Display Facings**
▶ **P. 172  Product Tab**               ▶ **P. 176  Panels**
▶ **P. 173  Color Coding**              ▶ **P. 178  Icons & Callouts**

**PRO SERIES PACKAGING GUIDELINES**

Craftsman® Pro Series is a premium product platform within the overall Craftsman brand structure that offers an enhanced level of performance and durability to handle tough tasks. Backed by the trusted performance and strength all Craftsman products deliver, Craftsman Pro Series features a unique packaging design and logo, conveying premium to all consumers.

IN THIS SECTION:

▶ **P. 181  Introduction**              ▶ **P. 191  Gradient Background**
▶ **P. 182  Logos**                     ▶ **P. 192  Shield Icon**
▶ **P. 186  Color Palette**             ▶ **P. 193  Panels**
▶ **P. 187  Photography**

**CRAFTSMAN®**

## BRAND STANDARDS OVERVIEW (CONT.)

**RETAILER CO-BRANDING**

The following guidelines provide reference, direction, and standards for how to treat the Ace/Craftsman logo lockup across all retail branding channels.

IN THIS SECTION:

▶ P. 201  Overview          ▶ P. 214  In-Store
▶ P. 202  Brand Spaces      ▶ P. 217  Advertising
▶ P. 206  The Partnership Mark   ▶ P. 222  Promotional
▶ P. 211  Social Media

**"SMART" PRODUCT GUIDELINES**

SMART is the term the Craftsman brand will use to easily identify products that are smart device enabled. These products either have wireless connectivity or are Bluetooth enabled.

IN THIS SECTION:

▶ P. 225  Overview          ▶ P. 232  Carton Front Panel
▶ P. 227  The SMART Tab     ▶ P. 233  SMART Story
▶ P. 228  Color Usage       ▶ P. 235  SMART Key Features
▶ P. 229  Font Usage        ▶ P. 239  On-Product Identification
▶ P. 230  Key Elements      ▶ P. 241  Merchandising
▶ P. 231  Feature Bump-Out  ▶ P. 242  App Icons & Icons

**CLASS ONE PRODUCT GUIDELINES**

Craftsman® items that include a free or bonus product are classified as Class One products. Class One items are only available for a limited time on shelf as a special promotion.

IN THIS SECTION:

▶ P. 245  Overview          ▶ P. 250  Tab Alternates
▶ P. 246  Legal Requirements  ▶ P. 251  Examples
▶ P. 247  Color Usage       ▶ P. 255  Class One Smart Products
▶ P. 248  Font Usage        ▶ P. 256  Hang Card Minimal Example
▶ P. 249  Primary Tab

**CRAFTSMAN®**

## BRAND STANDARDS OVERVIEW (CONT.)

**OWNERS' MANUAL AND WARRANTY**

Part of the unmatched trust in the Craftsman brand comes from the confidence inspired by our helpful product manuals and warranties backing each product. Use these guidelines for information on product manuals and approved warranty statements.

IN THIS SECTION:
▶ **P. 257 Owner's Manual Guidelines**    ▶ **P. 258 Warranties**

**BRAND MANAGEMENT PROCESS**

Whether you're launching a new marketing initiative or creating a licensed product, there are specific brand management processes in place to ensure the integrity of the Craftsman brand. The following flowcharts offer a step-by-step snapshot of those processes.

IN THIS SECTION:
▶ **P. 261 Marketing Approval Process**    ▶ **P. 263 Key Contact**
▶ **P. 262 Licensed Products Approval Process**



# BRAND IDENTITY

**IN THIS SECTION:**

- ► BRAND VOICE
- ► THE LEGACY OF CRAFTSMAN
- ► THE CONSUMER
- ► TRADEMARK USAGE

©2016 Sears Brands, LLC



## BRAND PURPOSE

Craftsman® tools are the catalyst of pride, which manifests itself in that feeling you get after you not only get the job done, but get it done right.

## BRAND DIFFERENTIATOR

Quality, Dependability, Trust – the Craftsman Legacy.

## BRAND TONE

Motivating, smart, insightful, plain-spoken. Craftsman does not mince words; we mean what we say and we say what we mean. Like a wise mentor, we've been trusted for generations without talking down to others.

## BRAND PERSONALITY

The Craftsman brand is driven by a pioneering spirit and an unrivaled commitment to quality. Standing for ingenuity, strength and superior performance, the Craftsman brand is also characterized by its:

Durability

Trustworthiness

Iconic Status

Innovation

**CRAFTSMAN®**



**CRAFTSMAN® IS ENDURING.**
OUR PRODUCTS ARE BUILT TO WITHSTAND YEARS OF WEAR & TEAR.

**CRAFTSMAN IS NOT TEMPORARY.**
OUR TOOLS AREN'T A MAKESHIFT SOLUTION AND DON'T HIDE THE CRACKS.
THEY FIX THEM.

©2016 Sears Brands, LLC



**CRAFTSMAN® IS TRUSTED.**

GENERATIONS OF BUILDERS HAVE USED CRAFTSMAN WITHOUT FAIL.
OUR PRODUCTS OUTPERFORM, AND OUTLAST, THE COMPETITION.

**CRAFTSMAN IS NOT MEDIOCRE.**

CRAFTSMAN PRODUCTS ARE NEVER "AVERAGE," "GOOD ENOUGH"
OR FOUND IN THE BARGAIN BIN.

BRAND STANDARDS                                                                          BRAND IDENTITY    14



CRAFTSMAN® IS AUTHENTIC.
OUR BRAND HAS A BLUE-COLLAR SPIRIT AND A PENCHANT
FOR GETTING THE JOB DONE.

CRAFTSMAN IS NOT PRETENTIOUS.
WE'RE NEVER ARROGANT, EGOTISTICAL OR JUDGMENTAL.



CRAFTSMAN® IS **INNOVATIVE.**

WE'RE CONSTANTLY REINVENTING OUR PRODUCTS, ADAPTING
TO THE CHANGING NEEDS OF TODAY'S CRAFTSMEN.

CRAFTSMAN **IS NOT** OBSOLETE.

ALTHOUGH WE'VE BEEN THE TOOL BRAND OF CHOICE FOR GENERATIONS,
WE CONTINUE TO PROGRESS, REFUSING TO REST ON OUR LAURELS.

**CRAFTSMAN®**

## THE LEGACY OF CRAFTSMAN®

The Craftsman brand was born in 1927, when Sears hired Arthur Barrows to lead its hardware department. Barrows, a seasoned hardware professional with his own innovative ideas, decided to create a brand name specifically for Sears that would distinguish it from other manufacturers. Having a particular fondness for the name Craftsman, which was already in use by the Marion-Craftsman Tool Company, Barrows allegedly offered Marion-Craftsman $500 for the rights to acquire and use the Craftsman name on Sears products.

Decades later, the brand is an American icon. In over 80 categories of products and with more than 6,000 SKUs, Craftsman is the best-selling tool brand in the United States. Since its inception, the brand's purpose remains unchanged as the standard bearer of quality with the highest expectations.

The Craftsman timeline is a journey of innovation, breakthroughs and industry firsts in both product development and marketing. Here's how we got to where we are today:

## 1920's - 30's

**Sears decides to create a superior brand of tools**



1927:  The Craftsman brand name is born

1929: Introduces its first power tools

1932: First to create fully-polished wrenches to work on cars
         without damaging engine parts

1934: Introduces its first lawnmowers

## 1940's

**Quick growth to dominate the market**



1940: Power tool sales increase 1,550% since their introduction

1941:  Craftsman hand tools become preferred hand tools for building
         U.S. warplanes

1948: Introduces new rotary-powered mower

**CRAFTSMAN®**

## THE LEGACY OF CRAFTSMAN® (CONT.)

### 1950's

**Expands portfolio through innovation**



1953: Introduces a self-propelled snow thrower and first riding mower

1955: The 500,000th Craftsman rotary lawnmower is sold

### 1960's

**Creates one of the most popular wrenches in the industry**



1960: The "Mister Craftsman" cordless, portable electric razor allows men to shave "on the beach, in the backyard, on the golf course, and even on the way to work"

1965: Wally Parks, founder of the National Hot Rod Association (NHRA), presents the Craftsman Championship Dragster Kit – a 120-piece, specially outfitted Craftsman Tool Kit.

1966: Sears debuts a quick-release ratchet wrench that quickly becomes one of the most popular wrenches in the hand tool industry.

### 1970's

**Leverages key sponsorships**



1973: Signs Bobby Allison, an 11-time NASCAR stock car champion, as spokesman

1976: Sells its 100 millionth screwdriver

1979: The first Sears/Craftsman National Pit Crew Championship is won by Richard Petty

**CRAFTSMAN**

## THE LEGACY OF CRAFTSMAN® (CONT.)

### 1980's

**Revolutionizes power tools**



1984: Introduces the first electronic portable and bench power tools

1986: Completely redesign modular power tools using consumer feedback

1989: 400 million screwdrivers, 44 million pairs of pliers, 23 million
adjustable wrenches sold between 1965 and 1989

### 1990's

**Craftsman unveils new logo**



1991:  Introduces Craftsman Club, saving members more than
$250,000 in first 4 months

1991:  The very first Craftsman Club calendar is introduced

1992:  Introduces "RoboGrip" pliers

1994: More than 1 million lawnmowers are sold in a single season,
an industry first

1995: 1 billion hand tools, 29 million adjustable wrenches, 60 million pairs
of pliers, 500 million screwdrivers sold between 1927 and 1995

1997:  First Craftsman tools offered on the internet

1997:  Iconic rectangular Craftsman logo debuts

### 2000's

**#1 brand in America for
overall quality**



2002: Ranked by men as the #1 brand in America for overall quality

2006: Craftsman products are offered through Kmart

**CRAFTSMAN**

BRAND STANDARDS                                    CRAFTSMAN LEGACY    19

## THE LEGACY OF CRAFTSMAN® (CONT.)

### 2010's

**After 85 years, Craftsman is ranked the most trusted and respected brand in the U.S.**



**Craftsman launches upscale Pro-Series line**



2010:  The Craftsman Experience is launched

2010:  Craftsman products are available through Ace Hardware®

2011:  Scores industry firsts with NEXTEC QuickBoost™ Charger and AssureLink™ Garage Door Opener; introduces Turn Tight™ Tractor, with best turning radius in the industry

2011:  Craftsman products are available through Costco®

2012:  Craftsman celebrates its 85th anniversary

2012:  Craftsman, in conjunction with DC Entertainment, releases the first-ever, limited-edition superhero/DIY crossover titled, "Craftsman Bolt-On System Saves the Justice League"

2013: The Craftsman "Make a Difference" Tour visits more than 20 locations nationwide, renovating homes of U.S. veterans helping communities in need

2014: Craftsman Pro-Series Riding Mower and Chain Saws debut

**CRAFTSMAN**®

## THE CONSUMER

He's someone we all know.

He is a person who needs to get things done right. His toolbox is stocked, but he's always looking for new, innovative ways to help him work smarter. From the beginner who is not afraid to tackle a new task on his own, to the expert who is always there to help out a neighbor in need. The value of a hard days work is never lost on him and he instills those values in everyone around him from friends to family to community.

His knowledge of Craftsman tools and ability to use them was passed down from the generation before him and it's important to him to pass that legacy down to his kids. He takes pride in every aspect of his home, from his lawn, to his garage to everything in between.







**CRAFTSMAN®**

## TRADEMARK USAGE

**GUIDELINES FOR ANY MEDIA:**

1. Always refer to the overall brand in these ways:

   **Correct**: "The Craftsman® brand" and "The Craftsman® Tools"

   **Incorrect**: "The Craftsman® Brand" and "The Craftsman® tools"

2. A trademark is always a proper adjective that describes a specific person, place or thing. Use a Craftsman® trademark as a proper adjective (not a noun or verb) every time it is used in text:

   **Correct**: Craftsman® power tools help DIYers accomplish any task.

   **Incorrect**: Craftsman® accomplishes any task.

3. When used in copy, the Craftsman mark should be set apart from the rest of the text by being placed in all capital letters or in bold.

4. When used in copy, the first and most prominent use of the Craftsman mark on each page must be accompanied by the proper trademark notification (® or TM), which must appear after the adjective (trademark), before the noun it modifies:

   **Correct**: Craftsman® drills

   **Incorrect**: Craftsman drills®

5. Always use the Craftsman logos exactly as provided, including the ® notification.

6. Never use trademarks in a possessive or plural form:

   **Correct**: Craftsman® saws power through the toughest materials.

   **Incorrect**: Craftsman's saws power through the toughest materials.

   **Correct**: Craftsman® hand tools are built to last a lifetime.

   **Incorrect**: Craftsmans are built to last a lifetime.

7. Never alter a trademark:

   **Correct**: Use Craftsman® tool storage to organize your garage.

   **Incorrect**: Craftsmanize® your garage.

8. Do not combine your marks or third-party marks with any Craftsman trademarks.

9. You may not use any Craftsman trademark as part of your company name, product name or service name.

10. You may not use any Craftsman trademark as part of an advertising slogan, promotion, tagline, event communication or similar phrase without express written consent. Use of the trademark in any communication that would imply sole proprietary ownership of the mark is not permitted.

©2016 Sears Brands, LLC



## MARKETING EXECUTION

**IN THIS SECTION:**

- ► INTRODUCTION
- ► MARKETING LOGOS
- ► SHIELD
- ► TOOL PLATFORM LOGOS
- ► COLORS AND TYPE
- ► PHOTOGRAPHY
- ► WHEN IT MATTERS
- ► IN-STORE POINT OF SALE SIGNAGE EXECUTION
- ► EMBLEMS AND CREDENTIALS



## INTRODUCTION

The marketing guidelines are a comprehensive resource for marketing agencies and agency partners. Additional information can be referenced within the packaging and product chapters, but this section provides a holistic view of the brand.

The marketing guidelines provide a frame of reference for everything from logo and type usage, to campaign initiatives and online guidelines. Please promote and encourage the use of this section to help maintain a consistent brand identity across all touch-points.

**CRAFTSMAN®**

## MARKETING LOGOS

This section provides an overview of Craftsman® marketing logos, outlining the appropriate use and application for each. A more detailed set of guidelines for product logos can be found in the related sections of these guidelines.

This section also includes preferred logo usage, colors, configurations and fonts for brand packaging and communications.

### ADHERENCE

These guidelines help ensure a consistent customer experience. Adherence to these guidelines is mandatory, and failure to comply may result in forfeiting usage of Craftsman trademarks. Please note that the logos featured in this section are for marketing purposes only, and differ greatly from those featured on product.



# MARKETING LOGOS (CONT.)

**PRIMARY LOGO:**
USE THIS LOGO ON A BLACK OR DARK GRAY BACKGROUND
WHENEVER POSSIBLE

CRAFTSMAN®

**WHEN PRINTING OPTIONS ARE LIMITED:**

ONLY FOR USE IN LOWER PRODUCTION INSTANCES
WHEN GRADIENTS CANNOT BE REPRODUCED

CRAFTSMAN®

*This is the Craftsman® brand logo. Please note that there is a different logo for Craftsman products, with their own guidelines. There are various logo marks and badges for different scenarios, but this identity remains consistent for brand usage.*

*See pages 148-149 for guidelines specific to packaging logo use.*

 ©2016 Sears Brands, LLC

# MARKETING LOGOS (CONT.)

## BACKGROUND COLOR OPTIONS - GRADIENT LOGOS

CRAFTSMAN®

BACKGROUND COLOR OPTIONS:

PROCESS BLACK
C:0 M:0 Y:0 K:100

90% BLACK
C:0 M:0 Y:0 K:90

CRAFTSMAN GRAY PMS 425C
C:0 M:0 Y:0 K:81

CRAFTSMAN®

BACKGROUND COLOR OPTIONS:

PROCESS WHITE
C:0 M:0 Y:0 K:0

SILVER 877C
C:0 M:0 Y:0 K:54

BGD RED 1807C
C:0 M:100 Y:96 K:28

## BACKGROUND COLOR OPTIONS - 2-COLOR LOGOS

CRAFTSMAN®

BACKGROUND COLOR OPTIONS:

PROCESS BLACK
C:0 M:0 Y:0 K:100

90% BLACK
C:0 M:0 Y:0 K:90

CRAFTSMAN GRAY PMS 425C
C:0 M:0 Y:0 K:81

CRAFTSMAN®

BACKGROUND COLOR OPTIONS:

PROCESS WHITE
C:0 M:0 Y:0 K:0

SILVER 877C
C:0 M:0 Y:0 K:54

BGD RED 1807C
C:0 M:100 Y:96 K:28

 ©2016 Sears Brands, LLC









# MARKETING LOGOS (CONT.)

The integrity of the Craftsman® brand identity is diminished when the logo is used incorrectly. In some instances where space is very limited, such as on product or online, the shield may be used. See pages 120-127 for guidelines on shield usage. The minimum size requirements for the Craftsman® brand have been established to ensure that legibility is maintained (see below).

## LOGO SIZING:

MINIMUM SIZE FOR PRINT: 2 IN. WIDE



MINIMUM SIZE FOR DIGITAL: 72px WIDE (@72 dpi)



*Craftsman logo must be scaled proportionately and cannot be stretched or altered in any way.*



**BRAND STANDARDS**                                          **MARKETING EXECUTION**    28

## MARKETING LOGOS (CONT.)

### ONE-COLOR LOGOS

The preferred versions of the brand logo shown on the previous pages should be used whenever possible, but in certain instances like these one-color versions seen below, may be used.

Brand approval to use the alternate one-color logos is required.

     

### CLEAR SPACE

Whenever practical, the Craftsman® logo should be surrounded by clear space. The clear space area should be free of elements.

The dimension of the minimum clear space area on all sides of the logo is equal to the cap height of the "C" in the Craftsman logotype.





# MARKETING LOGOS (CONT.)

**LIMITED-USE ALT. LOGO:**
**ONLY** USE THIS LOGO WHEN BLACK OR DARK GRAY CANNOT BE USED AS THE BACKGROUND COLOR

CRAFTSMAN®

**WHEN PRINTING OPTIONS ARE LIMITED:**
ONLY FOR USE IN LOWER PRODUCTION INSTANCES WHEN GRADIENTS CANNOT BE REPRODUCED

CRAFTSMAN®

*The CRAFTSMAN® lettering must be centered within logo's frame borders. Logo ALWAYS appears on a single-field color background. It should not bridge between two materials, colors or backgrounds.*

*See pages 148-149 for guidelines specific to packaging logo use.*

©2016 Sears Brands, LLC

**CRAFTSMAN**®

BRAND STANDARDS                                    MARKETING EXECUTION    30

## INCORRECT LOGO USAGE

Below are examples of how the CRAFTSMAN® logo/brandmark should not be used.



No bridging of multicolored backgrounds. Logo must appear on single-color, material, texture only.



Logo colors may not be interchanged.



Logo should never be removed from surrounding frame.



Logo must always have its border.



Logo colors may not be interchanged. Logo must be on solid background.



Logo must always have its border.



No black logo (lettering) with a red field or background color.



No black text with white outline.

**CRAFTSMAN** Brand Standards                                    ©2016 Sears Brands, LLC



BRAND STANDARDS                                    MARKETING EXECUTION      31

## RELATIONSHIP TO THIRD-PARTY LOGOS

When showing the Craftsman® logo with other third-party logos, retain a clear space of 1.5x (x = height).



**EXAMPLE OF SPONSORED PLACEMENTS**

This is an example of a third-party site using the Craftsman logo along with other partner logos. Fit logo to be proportionate to other logos, and keep the clear space rule.





BRAND STANDARDS                                    MARKETING EXECUTION    32

# THE SHIELD

**AN EXTENSION OF THE CRAFTSMAN® LEGACY**

The Craftsman Shield is based on a specific, carefully developed visual solution. The Shield offers a heroic alternative to the Craftsman wordmark in small spaces where the wordmark cannot fit.

The Shield is not a replacement for the Craftsman wordmark. Instead it is an option that should only be used in select circumstances that don't allow the wordmark to be used – such as online icons or apps. Never recreate the shield and only use the artwork provided.

**TRADEMARK**

The trademark symbol (™) is used with the Craftsman Shield to show that it is an intentional brand trademark and helps protect the Craftsman Shield and Craftsman brand in the marketplace. It should only be used without the trademark symbol on product application.



**REGISTRATION**

The registration symbol (®) is used on categories of tool chests, tool storage cases, lawn tractors, hex tools (bits, keys, sockets) and ratchet wrench.



## TOOL PLATFORM LOGOS

**NOTABLE INNOVATION**
Below are some examples of logos for tool platforms, created to support the brand's innovative and durable reputation. As new technologies and product lines are introduced, new logos may be created on a very limited basis. Marketing logos are often used online and in-store to highlight product features and aid in product/brand recognition.

MARKETING LOGOS: ISOLATED                    MARKETING LOGOS IN USE: ONLINE AND IN-STORE





**BRAND STANDARDS**                                            **MARKETING EXECUTION**   34

## COLORS AND TYPE

**CRAFTSMAN MARKETING COLOR PALETTE**
The primary Craftsman® colors are Craftsman gray and black.

The secondary palette adds depth, and offers a solid base to ground typography and balances strong photography. Craftsman logo red may be used as an accent color in typography or graphics, but should not be used as a background color.

Additional color usage guidelines for brand and product applications can be found on pages 133, 137, and 150.

**PRIMARY PALETTE**



PROCESS BLACK          C: 0   M: 100   Y: 100   K: 0          PMS 425 C          C: 0   M: 0   Y: 0   K: 81

**SECONDARY PALETTE**



CRAFTSMAN BACKGROUND RED          90% BLACK
PMS 1807 C                        C: 0   M: 0   Y: 0   K:90
C: 0   M: 100   Y: 96   K: 28

**ACCENT OPTIONS**



CRAFTSMAN LOGO RED - (Not to be          CRAFTSMAN SILVER - LIMITED USE
used as a background color)              PMS 877 C
PMS 185 C                                C: 0   M: 0   Y: 0   K: 54
C: 0   M: 100   Y: 100   K:0



BRAND STANDARDS                                        MARKETING EXECUTION    35

## COLORS AND TYPE [CONT.]

**CRAFTSMAN® BRAND FONT**

The United Sans typeface family provides a consistent look to the
Craftsman brand identity. Please note that Craftsman packaging
has its own set of font usage guidelines. Found on pages 149.



**HEADLINES**

Headlines should be typeset in United Sans Black and uppercase.



**SUBHEADLINES**

Subheadlines should be typeset in United Sans Medium and uppercase.

*Licensing Agreements for the United Sans Font
library can be purchased from House Industries.*

http://www.houseind.com/



## COLORS AND TYPE [CONT.]

**CRAFTSMAN® BRAND FONT**
When using the Craftsman brand font, there is no such thing as "typical" default for character kerning, leading or bullets.

**KERNING**
All characters must be optically adjusted, especially at large point sizes (i.e., headlines).



**LEADING**
Ensure that type doesn't overlap or touch. Two points leading from the font size.

# INNOVATION
# AND KNOW-HOW

# INNOVATION
# AND KNOW-HOW



BRAND STANDARDS                                      MARKETING EXECUTION    37

## COLORS AND TYPE [CONT.]

**CRAFTSMAN® BRAND FONT**

For instances that require longer copy or pages of information, use Arial Regular
to improve legibility. Leading should be two points higher than the actual point
size of the font. Ideal Kerning is set at point 0 with flexibility to extend 20 points
up or down.

ARIAL REGULAR

GREATER TORQUE WITH EVERY TURN

Greater torque with every turn

Craftsman® products must be produced in facilities that are reputable
and whose business and labor practices conform to the local law and
the Craftsman Global Compliance Program. The Program Requirements
set expectations related to child labor, wages/benefits, working
hours, harassment/discrimination, health and safety, factory security,
environmental compliance, freedom of association, and forced labor/
human trafficking. All manufacturers and licensees must be approved
as part of the Craftsman brand approval process. Compliance with
the program subjects manufacturers and licensees to periodic factory
audits to verify ongoing compliance, and to identify areas that warrant
corrective action. For more information about the Global Compliance
program, please contact the Craftsman brand approval team.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

# PHOTOGRAPHY

**LIFESTYLE/SET PHOTOGRAPHY - TOOLS**

Lifestyle photography highlights the brand spirit and personality, celebrating the day to day tasks that the Craftsman® consumer takes on proudly. Choose photography that reflects this pride and determination as well as captures moments of every day life.

The feel of the photography should be familiar and real, not overly stylized or glossy. Choose a setting that would be relatable to the consumer and tells the story in an interesting way of the task being handled based on the category you are shooting. Use authentic props. Models should appear natural and focused on their tool or the task at hand, never looking directly at the camera. Lighting should feel natural to the surroundings; never overly dark or lit like a stage.







**CRAFTSMAN**

BRAND STANDARDS                                    MARKETING EXECUTION    **39**

## PHOTOGRAPHY (CONT.)

**LIFESTYLE/SET PHOTOGRAPHY - LAWN & GARDEN**

Lifestyle photography for Lawn and Garden benefits greatly from the contextual nature of the environment. Therefore, it's vital to approach photoshoots with a clear vision about highlighting the full range of product features within that environment. Consider how props, if any, will be employed and where photos will be used – whether they'll be online-specific or otherwise. Also, depending on product(s), what angle(s) is best – wide angle shot/extreme close-up/both.

Since the majority of Lawn & Garden shoots are staged outdoors, natural lighting becomes key to the photography as well as telling an authentic story. Lawn & Garden photography has a more natural and slightly brighter look than that of Craftsman Tools, but should still feel unified with rich colors, strong contrasts and dynamic camera angles.











**CRAFTSMAN**®

BRAND STANDARDS · · · · · · · · · · · · · · · · · · · · · · MARKETING EXECUTION    40



## PHOTOGRAPHY (CONT.)

**ACTION/GLAMOUR**

Action/glamour shots give context to the products through environment and action. They are more dynamic than standard because of lighting, camera angle and the power of tool (include grass/sparks flying where appropriate). Craftsman® product must be central to shot and should be shown being used heroically in real-world situations. Craftsman logo must be visible whenever possible. Workers employing product are always secondary.

"Action" or "glamour" product shots differ from standard product shots, which are primarily used for packaging. For direction on product photography please refer to pages 152–154 and 174.









**CRAFTSMAN®**

BRAND STANDARDS                                                    MARKETING EXECUTION    41

## PHOTOGRAPHY (CONT.)

**MODEL CASTING**

Casting should reflect the fact that Craftsman® can be found in just about every home in America. Models should appear familiar and confident with the tools, but also not look like professionals. To avoid cliché, our Craftsman is the guy next door. It's not central casting, it's authentic.













**CRAFTSMAN®**

BRAND STANDARDS                                                                                      MARKETING EXECUTION    42

## WHEN IT MATTERS

There's a brief pause after you finish a tough job, when you take a step back and admire your work. That moment itself is fleeting, but the feeling that accompanies it is enduring; it's pride, and it's as enduring as the brand you trust—Craftsman®.

That internal confidence you gain after finishing a tough job on your own is just as important as the external gratification you get when your children see you grab your Craftsman toolbox and lend a hand to friends or neighbors.

Even the name Craftsman evokes pride through its legacy; forging hand tools that last a lifetime and making lawn and garden equipment that can be found in just about every backyard and home in America. From their commitment to innovation, to fueling the DIY spirit in all of us, it's no wonder Craftsman are the tools you choose to take you from just doing the job, to doing the job right.



BRAND STANDARDS                                    MARKETING EXECUTION    43

## WHEN IT MATTERS [CONT.]



### PREFERRED LOGO LOCK-UP
The logo is for use over all dark backgrounds.



### REVERSED BLACK LOGO LOCK-UP
The logo is for use over all light backgrounds.





### 3 DIMENSIONAL LOGO LOCK-UP
Use 3-D logo in TV spots and other
high production level executions.



### ONE-COLOR LOGO LOCK-UP
Only use this version of the logo when the
full color version is not an option.

**CRAFTSMAN®**

BRAND STANDARDS                                                    MARKETING EXECUTION    44

## WHEN IT MATTERS [CONT.]

**LOGO CLEAR SPACE**

The space marked X is the minimum space that must be maintained around the "When It Matters" logo lockup in all cases.



**SIZING**

The full logo lockup may not appear smaller than .75" wide to ensure legibility of the "When It Matters" wordmark.



Should not be used.

**CRAFTSMAN®**

BRAND STANDARDS                                    MARKETING EXECUTION    45

## WHEN IT MATTERS [CONT.]

**CAMPAIGN FONT**

The Franklin Gothic & Liberator typefaces are reserved for brand initiatives leveraging the When It Matters campaign. It does not replace the existing Craftsman® brand fonts.

PRIMARY FONT:

**ITC FRANKLIN GOTHIC DEMI CONDENSED**

# HEADLINE FONT

**ITC FRANKLIN GOTHIC DEMI & BOOK CONDENSED ITALIC**

## WHEN IT MATTERS ITALIC FONT
## *WHEN IT MATTERS ITALIC FONT*

ITC FRANKLIN GOTHIC BOOK CONDENSED

## WHEN IT MATTERS SUBHEADLINE FONT

**ITC FRANKLIN GOTHIC BOOK CONDENSED - BODY COPY**

Lorem ipsum dolor sit amet, mea error deserunt te, id duo idque denique scribentur. Et vim utroque incorrupte, pro an menandri tractatos, vel et essent inermis. Mea ex esse ubique minimum, inani dicit discere ius et.

**LIBORATOR FONT**

The Liberator typeface is the font used in "When It Matters." It is also to be used when creating a new lock-up for a special promotion.

SECONDARY FONT:

**LIBERATOR**

## MEDIUM WHEN IT MATTERS LOGO FONT
## HEAVY WHEN IT MATTERS LOGO FONT



"Father's Day" uses the Liberator font in this lock-up.

**CRAFTSMAN®**

# WHEN IT MATTERS [CONT.]

### COMMUNICATION GUIDELINES

When it Matters is about taking pride in all you do, for yourself, your home and for others. This initiative is about encouraging people to pick up a tool and tackle the job ahead with confidence and puts a spotlight on the feeling you get after a job well done.

### TONE OF VOICE

Motivating, emotional, insightful, plain-spoken. Craftsman® does not mince words; we mean what we say and we say what we mean. Like a wise mentor, we've been trusted for generations and back it up with our voice without talking down to others.  Examples:

"The beer you drink after you mow your lawn, tastes better than the beer you drink after someone else mows your lawn."

"The to-do list isn't a burden, it's a privilege."

### LOOK/FEEL

The campaign should feel familiar, like a slice of life. The people should feel real and performances should always be authentic.

### MUST-HAVES FOR WHEN IT MATTERS MESSAGING

1. Always ensure main message ladders up to the Craftsman
   brand pillars – pride, innovation, trust and value.

2. Use CRAFTSMAN®/"When It Matters" logo lockups.

©2016 Sears Brands, LLC



# WHEN IT MATTERS [CONT.]

**USAGE AND INTEGRATION - IN-STORE**
In-Store messaging for the When It Matters Campaign should reflect the same style and usage guidelines as the photography, highlighting real people in situation.

IN-STORE - PERIMETER/BACKWALL





# WHEN IT MATTERS [CONT.]

**USAGE AND INTEGRATION - PRINT**

This medium is vital for communicating the When It Matters campaign to our consumers. Key principles must be followed when creating print ads:

▶ **HEADLINES** should be insightful and emotional with an emphasis on pride.

▶ **PHOTOGRAPHY** should show humanity when possible. Should feel real and not overly stylized.







**BRAND STANDARDS**                                    **MARKETING EXECUTION**   **49**

# WHEN IT MATTERS [CONT.]

**USAGE AND INTEGRATION - INSTAGRAM**

Instagram content should feature a combination of product shots, where the product is isolated and shown on its own and some that are used in situation. User generated/curated content should feel authentic as well, and not staged. All messaging should ladder up to pride platform.



**USAGE AND INTEGRATION - FACEBOOK**

The use of Facebook in the Craftsman® brand strategy is to increase brand awareness and engagement, brand loyalty, member acquisition and ultimately, conversion. Facebook messaging should always ladder up to pride platform.







**BRAND STANDARDS**　　　　　　　　　　　　　　　　　　　　　**MARKETING EXECUTION**　**50**

# WHEN IT MATTERS [CONT.]

## USAGE AND INTEGRATION - TWITTER

The use of Twitter in the Craftsman® brand strategy is to increase brand awareness and engagement, brand loyalty, member acquisition and ultimately, conversion. Twitter messaging should always ladder up to pride platform.





## USAGE AND INTEGRATION - PINTEREST

Craftsman on Pinterest should be interesting and engaging, but more project focused. DIY projects from Craftsman Club as well as curated content should be featured here. Messaging should always ladder up to pride.







**BRAND STANDARDS**                                                    **MARKETING EXECUTION    51**

# WHEN IT MATTERS [CONT.]

### USAGE AND INTEGRATION - YOUTUBE

YouTube content is featured on Craftsman.com, in Craftsman Club (projects) – both of which are promoted on the Craftsman homepage – as well as throughout the main site. YouTube content is also featured on PDPs and vertical pages. Consumers viewing the content on the homepage and Club will then be enticed to submit their own content to the YouTube channel. The Craftsman YouTube page should feature the most current Community Pride initiative.





BRAND STANDARDS                                                 MARKETING EXECUTION    52

# EMBLEMS AND CREDENTIALS

Many times, a promotional, limited edition or key product feature will
need to be called out on product packaging. Please follow the appropriate
packaging guidelines for each.

## LIFETIME AND LIMITED WARRANTIES
Please note the different graphic treatments for Tools and Lawn & Garden.
See examples below.

**TOOLS MARKETING WARRANTY ICONS**



**LAWN & GARDEN MARKETING ICONS**





## SECONDARY BADGES/LOGOS
Sparingly use feature callouts and icons, as these should not inhibit product
photography. See examples below.







BRAND STANDARDS                                    MARKETING EXECUTION    53

# EMBLEMS AND CREDENTIALS [CONT.]

**CLAIMS**

Claims can be a compelling add to promo graphics and can be useful when size is limited – such as with circulars or banner ads. Include any essential disclaimers and never adjust/change claim language.

Contact Craftsman Brand Manager for a current list of approved claims and their appropriate usage.

---

**CONSUMERS DIGEST SEAL AND RIBBON**
Contact Craftsman Brand Manager for usage guidelines.



NOTE: Consumers Digest must review every piece of creative where their seal or published copy is being used, prior to creative being published, launched or released. Once Consumers Digest receives creative materials, they require a 24-hour window to review.












# EMBLEMS AND CREDENTIALS CONT.

### PREPRINT APPLICATION - CRAFTSMAN® CIRCULAR

The Consumers Digest logo should be leveraged due to its validity. The award logo may overlap the product slightly, but never cover it.



Recommendation for how to integrate Consumers Digest into preprint.



BRAND STANDARDS

MARKETING EXECUTION    55

# EMBLEMS AND CREDENTIALS [CONT.]

**PRODUCT LEVEL APPLICATION - IN-STORE**

Consider using product signs to showcase emblems and credentials. Utilize the lower right corner of the "key features" portion of the template when space allows. Key features should be prioritized over emblems and credentials, and no more than two per sign.





**PRODUCT LEVEL APPLICATION - ONLINE PRODUCT VIDEO**



©2016 Sears Brands, LLC



BRAND STANDARDS                                   MARKETING EXECUTION    56

# EMBLEMS AND CREDENTIALS [CONT.]

**PRODUCT LEVEL APPLICATION - ONLINE PRODUCT DETAILS PAGE**
Positions three and four in the product image carousel should be used to spotlight credentials.





BRAND STANDARDS                                    MARKETING EXECUTION    57

# EMBLEMS AND CREDENTIALS [CONT.]

**OPPORTUNITY - DRTV**
Direct Response Television focuses heavily on product promotion, while YouTube features a more versatile range of content and a larger potential audience.

Leveraging lifetime warranty





# IN-STORE GUIDELINES

**IN THIS SECTION:**

- ► INTRODUCTION
- ► TIER 1: BRAND SIGNAGE
- ► TIER 2: WAY-FINDING OR EDUCATIONAL SIGNAGE
- ► TIER 3: PRODUCT SIGNAGE
- ► ENDCAPS
- ► DISPLAYS & SUPPLEMENTAL SIGNAGE
- ► LAWN & GARDEN PRODUCT SIGNAGE
- ► VERTICAL STORE DISPLAY

**CRAFTSMAN®**

## INTRODUCTION

There are many categories and sub-categories that fall within the Craftsman® footprint, so it's crucial that a consistent brand presence is maintained across the sales floor. The in-store landscape should feel organized and intuitive. By utilizing the templatized family of signage, we maintain a tiered information structure that inform the consumers without overwhelming them. Other in-store opportunities to consider are endcaps and displays.

There are three tiers of signage across the Tools and Lawn & Garden in-store footprint:

- ▶ **TIER ONE:** large-format, department-wide brand signage (back walls, perimeter signs, column graphics, etc.)

- ▶ **TIER TWO:** mid-level category signage and way-finding (headers, educational signs, buy-guides, info charts, etc.)

- ▶ **TIER THREE:** product-level signage (product signs, hangtags, on-product signing or badging)

 



**BRAND STANDARDS**                                                **MARKETING EXECUTION**    60

## TIER ONE: BRAND SIGNAGE

Tier one signage is an opportunity to reinforce the brand personality and provide a
foundation of signage that speaks to the Craftsman® brand's leadership across categories.

**TIER ONE: PERIMETER/BACK WALL**





BRAND STANDARDS                                          MARKETING EXECUTION    61

# TIER TWO: WAY-FINDING OR EDUCATIONAL SIGNAGE

Tier two signage includes a wide range of product signage, with equally varied amounts of messaging. From header cards to detailed charts, there are a variety of educational signage templates that have been created to ensure consistency in graphic elements as well as content organization and quantity.

Select the appropriate, approved template to convey the necessary product information.

**TIER TWO: HEADER CARD / EDUCATIONAL SIGNAGE SYSTEM**



**CRAFTSMAN®**

BRAND STANDARDS                                        MARKETING EXECUTION   **62**

## TIER TWO: WAY-FINDING OR EDUCATIONAL SIGNAGE (CONT.)



**EDUCATIONAL SIGN WITH EXISTING HEADER CARD**

Always follow photography styling guidelines when incorporating product photography.

Complete font and image usage guidelines for product signage can be found in the Tools Templates Style Guide*.



**EDUCATIONAL SIGN WITH TABLE**

Care has been taken to eliminate repetitive information across various pieces of signage. Utilize the areas within each template as they have been specified to avoid redundancies.



**11" X 14" TECHNICAL VIOLATOR**

Although styles and layouts may vary by product, charts and graphs should follow the same general template:

▶ Black background

   Header copy: Helvetica Neue 75 Bold

▶ Info boxes are white with PMS 186 headers for Craftsman® or black for other brands

▶ White text on black and red; black text on white

*\*Please contact Jeff Klimek at Craftsman for more details.*



## TIER THREE: PRODUCT SIGNAGE

Tier three signage includes templated product signs and tags.

**TIER THREE: PRODUCT SIGNAGE**



**TIER THREE - ON-PRODUCT POP**

When designing POP for the Craftsman brand, each category and product requires a custom approach. While the design elements and placements may vary, key brand principles and strategy remain. On-product POP should be a consistent reflection of the Craftsman brand.



BRAND STANDARDS                                          MARKETING EXECUTION    64

## TIER THREE: PRODUCT SIGNAGE (CONT.)

Product signs are structured to facilitate varying amounts of information. The placement of the logo, header, and info boxes remains consistent – the template should never be altered.

Product image should be uncropped, full-color with specified outer glow.





A maximum of three bullets is acceptable under Key Features and Tool Compatibility.

NOTE: Copy should not be repeated if it is on the RES sign. Please refer to the complete Tools Template Guidelines for additional information.

**CRAFTSMAN®**

BRAND STANDARDS · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · MARKETING EXECUTION   65

# ENDCAPS

Endcaps present a unique opportunity to spotlight product in an attractive, impactful way. While there's more design flexibility, these key design considerations should be observed:

▶ The Craftsman® brand logo should be featured prominently in the header and be the leading brand presence.

▶ Photography and messaging should follow established styling and tonality established in the marketing guidelines.

▶ Fonts should adhere to marketing guidelines. Exceptions may apply.

▶ Be selective when designing the 30" features and benefits area – less is more. Consider the information that will be visible on the product(s) featured to avoid redundancies.



can expand max. 4" over top

14" header

30" features & benefits area

optional endcap blades (max.2)



**DO**
*prominently feature the Craftsman brand logo.*

**DO**
*create visual hierarchy, and a clear message.*



**DON'T**
*give product logos more importance than the brand logo, or violate the brand logo's clear space to create a lock-up with a product logo.*

**DON'T**
*overwhelm with repetitive visuals and too much copy.*

**CRAFTSMAN®**



## DISPLAYS & SUPPLEMENTAL SIGNAGE

The seasonality of Lawn & Garden results in a large number of displays and signage that are often in flux, making it especially important to maintain graphical consistency. It's likely that the piece you're creating will be situated near another display, sign or piece of POP, so carefully adhere to brand guidelines and utilize templates when available to ensure visual unity between the various pieces.

### IN-STORE SIGNAGE

Signage featuring the Craftsman logo must be compliant with requirements below:

▸ Preferred 2-Color Versions – The PMS 185 red field containing the Craftsman logotype is overprinted with a 25% - 0% black gradation. The Craftsman logotype is reversed out to white with a 65% black drop shadow. The frame surrounding the logo prints either black or white depending on background color.

▸ The Craftsman brand logo cannot be altered and should not overlap or touch other brand logos.

▸ Whenever practical, the Craftsman logo should be surrounded by an area of clear, open space. There is a minimum clear space area which no other elements should intrude.





**CRAFTSMAN®**

BRAND STANDARDS                                         MARKETING EXECUTION    67

## LAWN & GARDEN PRODUCT SIGNAGE

Varying in size and placement on the sales floor, Lawn & Garden product signs have been created to account for these deviations. Design these signs with a dual purpose in mind, as they must effectively sell the product as well as communicate its benefits. To communicate everything Lawn & Garden product signs should feature – pricing and warranty information, product specifications, features and accessories – utilize the protocol below.

**1. HEADER: LOGO/ PRODUCT NAME**
*Lead with Craftsman® logo in upper left corner whenever possible. Follow with product name, observing logo clearspace. Use approved background colors only, utilizing color-coding where applicable.*

**2. KEY FEATURES**
*Highlight key features in individual areas. No more than 3 bullets should be used in each. When they apply and when space allows, include secondary logos here.*

**2B. FEATURE IMAGE/DETAIL**
*Group feature images in close proximity to feature messaging, but do not overlap or layer images.*

**3. PRICING**
*Pricing area should be placed on the left side of the card whenever possible. DO NOT repeat copy that appears on the pricing card.*

**4. PARTS & ACCESSORIES/ WARRANTY**
*This should always occupy the bottom portion of the template. Prioritize parts and accessories over warranties when space is limited.*

**5. ADDITIONAL INCENTIVES**
*When space allows, include concise call-outs — compelling product benefits that are relatable to the consumer.*





BRAND STANDARDS                                    MARKETING EXECUTION      68

# VERTICAL STORE DISPLAY

The Craftsman logo was created to be used or positioned horizontally.  In limited situations, and with the approval from the Craftsman brand team, it may be positioned vertically. In those situations, place the letter "C" in Craftsman at the base so the brand name is always reading upward.





## ONLINE GUIDELINES

The Craftsman® brand is an American icon with thousands of products that have represented the very best in tools for decades. Despite the entry of many competitors into the tool market, the Craftsman brand has a strong emotional connection with its customers. Leveraging this relationship, the Craftsman brand has the opportunity to assert its unique and differentiated offering. The new look and feel detailed in these guidelines both elevates and maintains the Craftsman brand in order to:

► Deepen the emotional connection with the consumer
  by creating top-of-mind purchase consideration

► Make it easier for consumers to shop the Craftsman brand

► Enable repeat purchase consideration

► Provide a consistent look to the Craftsman packaging across categories

The end result is a packaging system that creates long-term competitive advantage by positively influencing consumer choice.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

## INTRODUCTION

The iconic Craftsman® brand is synonymous with trust and innovation, driven by a pioneering spirit and a commitment to unparalleled quality. Craftsman stands for ingenuity, strength and robust performance. And like baseball and apple pie, Craftsman is tied to the American experience, having engineered a host of iconic products that inspire confidence and deliver the ultimate in performance.

Characteristics that epitomize the Craftsman brand include:

Durable. Built to last a lifetime. And then some.

Trusted. Relied upon for generations to deliver innovative products that outperform and outlast the competition.

Reliable. Craftsman performs when and where you need it. Worth Paying For. Backed by a solid warranty, the Craftsman brand delivers products unparalleled in performance and quality.

Iconic. A celebrated history has cemented Craftsman as an American legend.

Innovative. On the pulse of change with bold, smart features.

                                    ©2016 Sears Brands, LLC

**CRAFTSMAN®**

BRAND STANDARDS                                                    ONLINE GUIDELINES    71



## HOMEPAGE

The homepage is, unequivocally, the most important component of the Craftsman® digital experience. It is the landing spot for anyone searching for Craftsman online, and must represent our brand – and more specifically – what we offer (promotions), clearly. The homepage is comprised of the various areas:

1. HERO

2. FEATURED PRODUCTS AND DEALS

3. MECHANIC AND WOODWORKER SPOTLIGHT

4. TOP TRENDING CRAFTSMAN TOOLS

5. SHOWCASE MODULE

6. INNOVATIONS SHOWCASE

7. BANNER ADS (INTERSPERSED)

These modules/drop zones are listed in order of business priority, i.e., which deals and tools we're currently trying the hardest to promote. On the homepage, we provide a look into the various sections/areas of Craftsman digital as a whole, from the Deals Page, Craftsman Club and of course, brand efforts. These sections allow users to navigate and delve into other parts of the site, while allowing Craftsman to promote multiple initiatives simultaneously.



**CRAFTSMAN**®

BRAND STANDARDS                    ONLINE GUIDELINES    72



## HOMEPAGE (CONT.)

### 1. HERO

The Hero module is always found at the top of the Craftsman® homepage. It is the first section visitors see when visiting the site, and as such, holds top billing in terms of the content it features. These deals/initiatives are of the utmost priority, and represent the most important deal we're trying to push or call attention to the brand effort we're promoting.

### 2. FEATURED PRODUCTS AND DEALS

Just below the hero, this section pulls in the user with particularly interesting/timely/popular products Craftsman is choosing to feature. It also hits the user fast with special deals such as free shipping or discounts available with a minimum purchase.

### 3. MECHANIC AND WOODWORKER SPOTLIGHT

This section features two modules that change out periodically. The strategy here is to speak directly to  particular trades/interests with a product beauty shot of relevant tools/and or products.

### 4. TOP TRENDING CRAFTSMAN TOOLS

The trending row has room has room for approximately seven products, with basic info including price and rating w/ images on white. It features tools and other products currently trending based on makers' interests and sales.





## HOMEPAGE (CONT.)

### 5. SHOWCASE MODULE

This module has multiple slides and is used to highlight various new products and product lines. It allows us to display to viewers how functional – and beautiful – these products can be. Video can also be embedded into this module

### 6. INNOVATIONS SHOWCASE

This module is dedicated to users being able to learn about, and choose a specific power platform for their tools. Between NEXTEC, BOLT-ON or C3, users can learn more about each line and make an educated decision on which one is best for them. Details:

2-4 tabs; option to link to DEEP page experience

2 rows of 4 products; link to view all

### 7. BANNER ADS (INTERSPERSED)

Featured throughout the site, these banner ads are particularly prominent at various points on the home page. Spotlighting various promotions and products, they're kept very simple and to the point, as to give the user all the necessary information to redeem the deal. There are currently three types of banners:



**CRAFTSMAN**®

BRAND STANDARDS                                          ONLINE GUIDELINES    74



# DEEP PAGES

Deep pages effectively serve as summary page for particular Craftsman® lines or product categories (e.g. ExtremeGrip™, Mach Series™ or Tillers, Garage Door Openers). This is the online answer to what a an associate might tell a shopper in the store—so we spell out all the product benefits and feature stories to get the job done right here.

This supports the "ladder up" concept, in that someone shopping for a particular product has the potential to come here and be attracted to features of high-end models. Starting with a hero banner, they showcase a variety of rich content that can include video, Featured products, Top Sellers and more.

Hero Banner with name of product and subline

Example of product video

Intro and positioning copy block w/ headline

Product features w/ image, description/benefits copy, learn more link

Product cards w/ basic details, linking to product purchase page

Top-Selling Tools row



## MOBILE GUIDELINES

**IN THIS SECTION:**

► HOMEPAGE
► SECONDARY PAGE
► SAVER DAYS
► RIGHT RAIL MENU



BRAND STANDARDS                                    MARKETING EXECUTION    76

## MOBILE GUIDELINES

Launched in 2014, the Craftsman mobile site was designed for full touch screen devices, focused primarily on iPhone and Android. The structure of the site represents the best of the full Craftsman.com desktop experience, with the current weekly promotion at the top of the page, and quick access to the most popular product lists. The look and feel is similar to Craftsman.com; assets for the desktop site are scaled down and reused for the mobile experience. The color scheme focuses on a dominant black background, with whites, grays and touches of Red (PMS 1807).
Font type to use is Quantico, supported with Arial.





BRAND STANDARDS                                    MARKETING EXECUTION    77

## MOBILE GUIDELINES





## MOBILE GUIDELINES





## MOBILE GUIDELINES





## CRAFTSMAN CLUB GUIDELINES

**IN THIS SECTION:**

- ► INTRODUCTION
- ► MARKETING LOGO
- ► THE SHIELD
- ► COLORS AND TYPE
- ► CLUB.CRAFTSMAN.COM
- ► VOICE AND TONE
- ► BLOG VOICE AND TONE



BRAND STANDARDS                                    MARKETING EXECUTION    81

# INTRODUCTION

Craftsman Club® is the Craftsman brand's maker community. It's an online hub where people can gather to get everything they need to further their DIY interests – the inspiration, conversation, deals and more to nail the next project. It's not important if you're a suburban dad working on a weekend fix-it project or a gearhead building a car from scratch. There's something for you here. The Club has elements of many top social communities, all spun together with a DIY focus including Facebook, blogs, message boards, Pinterest, LinkedIn and beyond.

MARKETING LOGOS

## PRIMARY LOGO



Use the white rule around the logo when used on black or dark backgrounds.

**CRAFTSMAN**®

BRAND STANDARDS                                              MARKETING EXECUTION    82

## MARKETING LOGO

**CLEAR SPACE**

The space marked "x" is defined as the space between the "Craftsman Club®" wordmark.
"x" must be maintained around the logo lock up in all cases.

"Supported by Shop Your Way Rewards℠" is part of the logo, and should not be removed or modified.

The only exception to this rule is some online circumstances, when the size of the logo is limited (see below for examples).



**SIZING**

The full logo lock up may not appear smaller than 1.25" wide to ensure legibility of the wordmark and tagline.









In select situations where the logo is smaller than 1.25" wide, the tagline should be removed. The logo should NEVER appear smaller than .75" wide.





BRAND STANDARDS                                                    MARKETING EXECUTION    83

## COLORS AND TYPE

**CRAFTSMAN® CLUB WEBSITE MARKETING COLOR PALETTE**
The primary Craftsman Club colors are Craftsman gray and black.

The secondary palette adds depth, and offers a solid base to ground typography and balances strong photography. Craftsman logo red may be used as an accent color in typography or graphics, but should not be used as a background color.

Additional color usage guidelines for brand and product applications can be found on pages 125-126, 137 and 150.

**PRIMARY PALETTE**



PROCESS BLACK          C: 0   M: 100   Y: 100   K: 0        PMS 425 C          C: 0   M: 0   Y: 0   K: 81

**SECONDARY PALETTE**



CRAFTSMAN BACKGROUND RED          90% BLACK
PMS 1807 C                        C: 0  M: 0  Y: 0  K:90
C: 0  M: 100  Y: 96  K: 28

**ACCENT OPTIONS**



CRAFTSMAN LOGO RED - (Not to be      CRAFTSMAN SILVER - LIMITED USE
used as a background color)          PMS 877 C
PMS 185 C                            C: 0  M: 0  Y: 0  K: 54
C: 0  M: 100  Y: 100  K:0

©2016 Sears Brands, LLC



**BRAND STANDARDS**                                      **MARKETING EXECUTION**    84

## CLUB.CRAFTSMAN.COM

### COMMUNITY OF MAKERS

The Craftsman Club® is an online hub allowing enthusiasts to learn more about the Craftsman brand experience versus just product.

Within the Club, members can display/find projects, start/join discussions, get product information and deals. There's also the "Monkeywrench" section, which features many of the brand's ongoing initiatives with fun, shareable content.

### LANDING PAGE





**BRAND STANDARDS**                                          **MARKETING EXECUTION**    **85**

# CLUB.CRAFTSMAN.COM [CONT.]

**ACTIVITY PAGE**
This is where you've been in Craftsman Club® and where you should go next. Get content curated around your own personal interests and see what's new. You can check back regularly to see a constantly updating feed of posts based on people and interests you follow.





BRAND STANDARDS                                          MARKETING EXECUTION    86

## CLUB.CRAFTSMAN.COM [CONT.]

**DEALS PAGE**

Exclusive deals for members only... Not everyone gets them. Not everyone deserves them. But as a member and a maker, you get exclusive pricing, including the monthly Saver Days – plus curated offers guys in sweater vests will never see.





BRAND STANDARDS                                          MARKETING EXECUTION    **87**

## CLUB.CRAFTSMAN.COM [CONT.]

### DISCUSSIONS PAGE

Get a hand. Lend a hand. Whether it's pre-project planning or a mid-project challenge, whether you're a novice or an expert – the Club's Discussion forum is the destination to seek and share DIY advice with your maker community.





**BRAND STANDARDS**                                  **MARKETING EXECUTION**    **88**

# CLUB.CRAFTSMAN.COM [CONT.]

**INSPIRATION PAGE**

A wall of inspiration to feed your primal urge. Dig into a curated feed of thousands of projects from around the web. See how other makers are dominating them. Find your next challenge and nod quietly in approval. You'll make it. You know you'll crush it. Because you can.





**BRAND STANDARDS**                                    **MARKETING EXECUTION**    **89**

# CLUB.CRAFTSMAN.COM [CONT.]

**PROJECTS PAGE**

You took on a project. You OWNED it. And the world should know. Share and discuss your conquests on the Club Projects Wall plus your individual profile – and let legions of fellow makers know how awesome you are.





**BRAND STANDARDS**                                                      **MARKETING EXECUTION**    **90**

## CLUB.CRAFTSMAN.COM [CONT.]

### EVENTS PAGE

The events page is where club members go to stay in the loop – learning about the latest Craftsman events and other exciting news for makers. Note: the events page consists of both physical, timely events like Makecation and Restoration Rollout, plus virtual, longer-term "events" such as sales and programs.





BRAND STANDARDS                                         MARKETING EXECUTION    **91**

## CLUB.CRAFTSMAN.COM [CONT.]

BLOG PAGE

This is the best from across the makerverse. Here, members can find out what's hot in the Craftsman Club® plus read stories DIY guys just dig. Topics range from tips and how-tos to inspiration and interest pieces.

The Craftsman blog should be a little more straightforward. While the Club is all about bravado and speaking to the rugged pro, the blog should be more welcoming to novices and pros alike.





**BRAND STANDARDS**

**MARKETING EXECUTION**    92

## CRAFTSMAN CLUB® VOICE AND TONE

Masculine, anthemic, confident and motivating with celebratory swagger. Craftsman Club should feel like one, big fist-bump to like-minded makers who rally around the world's finest tools. It embraces the hands-on grit and grime of the making process – by people who aren't afraid to get dirty.

The Club evokes the sense of an exclusive brotherhood, made up of a capable subset who can do things the rest can't, and know something others don't. There's a flavor of appreciation for restoring, fixing, creation and substance in a materialistic, superficial, throw-away world. And it's all built on the legacy and tradition of a tool brand almost a century old – that has helped build everything we know, plus everything to come.

Finally, while the tone has a masculine feel, we try to avoid specific "manly" or male gender references because the brand should be approachable and inclusive for female makers too.

**Tone examples:**

"Rub some sawdust on your hands and get ready."

"You'll make it. You know you'll crush it. Because you can."

"Wicked tools are our gear. Cuts and burns our badges of honor."

"Get curated offers guys in sweater vests will never see."

And don't be afraid to try swearing a little with hell and damn:

"Get your brag on with other guys who know what the hell they're talking about."

©2016 Sears Brands, LLC

**CRAFTSMAN**

## CRAFTSMAN® BLOG VOICE AND TONE

**Dos and Don'ts:**

**Do:** Look for more hardcore ways to say everyday things eg. "Celebrate our love of making" > "Embrace our primal drive to make."

**Do:** Use "the Craftsman brand" as a general rule instead of just "Craftsman." There have been some exceptions to this (such as headlines) where it interferes with tone and quality.

**Do:** Capitalize Club as a proper name.

**Do:** Always include "for a chance" ...to win...whenever writing for contests

**Don't:** Specifically reference Craftsman as being an "American" brand.

**Don't:** Use Craftsman as a noun. It's always Craftsman Tools, Craftsman brand, etc.

The important thing is to have some guts, speaking in a way that would simultaneously be respected by the gruff, blue collar guy at the end of the bar, the well-to-do businessman with a DIY spirit, and even the millennial who might need tools to last a lifetime. Generally, write on the aggressive side knowing it's engaging and memorable for the Craftsman brand – because it's always easier to pull back.



## CRAFTSMAN® PRO SERIES MARKETING GUIDELINES

**IN THIS SECTION:**

► INTRODUCTION

► PACKAGING LOGOS

► INCORRECT LOGO USAGE

► COLOR PALETTE

©2016 Sears Brands, LLC



# INTRODUCTION

## BUILT TOUGH. BUILT TO PERFORM.

**Craftsman® Pro Series is a premium product platform within the Craftsman brand structure.** Backed by the trusted performance and strength that all Craftsman products deliver, Craftsman Pro Series products offer an enhanced level of performance and durability to handle the toughest tasks.

A unique packaging design and logo set Craftsman Pro Series products apart from core Craftsman offerings. A black and gold color palette and chrome Craftsman logo establish a sleek, premium appearance, and minimal copy on packaging primary display panels allows the product photography and product name to be the hero.

Please adhere to the standards and guidelines on the following pages for Craftsman Pro Series products. For all other products, please refer to the previously outlined brand guidelines.

©2016 Sears Brands, LLC





**BRAND STANDARDS**                                                                        **LOGOS   96**

## CRAFTSMAN® PRO SERIES PACKAGING LOGOS

**PRIMARY LOGO – CMYK:**
BLACK , DARK GRAY OR GRADIENT BACKGROUND



**SECONDARY LOGOS – PMS 130:**
BLACK , DARK GRAY OR GRADIENT BACKGROUND

STACKED CENTERED:                    INLINE HORIZONTAL:                    STACKED & LEFT-JUSTIFIED:

**PRO SERIES**                    **PRO SERIES**                    **PRO SERIES**



**BRAND STANDARDS**                                                                    LOGOS    **97**

## CRAFTSMAN® PRO SERIES PACKAGING LOGOS (CONT.)

### ALTERNATE 1-COLOR PRIMARY LOGOS

The preferred versions of the primary logo shown on the previous page should be used whenever possible, but in certain instances – like those seen below – one-color versions may be used.

Brand approval to use the alternate one-color logos are required.

1-COLOR GRAYSCALE LOGO
Use for print applications where 4-color is unavailable

1-COLOR FLEXO LOGO
Use for flexo print applications



### CRAFTSMAN PRO SERIES PRIMARY AND SECONDARY LOGO RELATIONSHIP

When Craftsman Pro Series primary and secondary logos are coupled, the primary logo is intended to be dominant and should always appear before the secondary logo within a visual space.

Additionally, the inline horizontal secondary logo (seen below) is preferred but is not a lockup. There are many different "exceptions" that need to be met to accommodate different products. Select the appropriate secondary logo version based on available application space.

The secondary logo must be smaller than the primary logo. The secondary logo height is equal to 64% cap height of the "C" in the Craftsman logotype.

To assure readability refer to the clear space and sizing section on the following page.





**BRAND STANDARDS**                                                                    **LOGOS    98**

## CRAFTSMAN® PRO SERIES PACKAGING LOGOS (CONT.)

### CLEAR SPACE

Whenever practical, the Craftsman Pro Series primary and secondary logos should be surrounded by clear space and free of elements.

### PRIMARY LOGO

The dimension of the minimum clear space area on all sides of the primary logo is equal to the cap height of the "C" in the Craftsman logotype.

### SECONDARY LOGOS

The dimension of the minimum clear space area on all sides of the secondary logo is equal to the stem width of the "P" in the Pro Series logotype.

NOTE: Reserve clear space for all versions of the Pro Series secondary logo.



### MINIMUM SIZE

The primary logo has a minimum width of 2 inches. Secondary logo has a minimum width of 1 inch. To assure readability, the registered trademark should never be scaled down below 1/32 inch.

below 1/32 inch high.



**BRAND STANDARDS**

LOGOS    99

## INCORRECT LOGO USAGE

Below are examples of how the Craftsman® Pro Series logo should not be used.



DON'T PLACE LOGO ON A GOLD BACKGROUND



DON'T PLACE LOGO ON A RED BACKGROUND



DON'T CHANGE OUTER FRAME COLOR



DON'T CHANGE LOGOTYPE COLOR



DON'T REMOVE LOGO FRAME



DON'T SKEW OR DISTORT



DON'T CHANGE OPACITY



DON'T REMOVE LOGO FROM SURROUNDING FRAME

©2016 Sears Brands, LLC



BRAND STANDARDS                                                    COLOR PALETTE  100

# COLOR PALETTE

The Craftsman® Pro Series colors are black, gray and gold.

COLOR USAGE

The use of color should be consistent with the packaging architecture on the following pages for Craftsman Pro Series products. Black and gray are used for backgrounds. Gold is used less frequently, particularly for the Pro Series logo, in headlines of legal copy and within line/box strokes. Gold is intended to highlight focal product features or touchpoints, and is not intended for use as a background color.



100% PROCESS BLACK          C:0  M:0  Y:0  K:100          R:38  G:36  B:36          HEX#262424

PMS 425 C                   C:0  M:0  Y:0  K:81           R:88  G:91  B:93          HEX#585b5d

PMS 130 C                   C:0  M:30  Y:100  K:0         R:225  G:168  B:0         HEX#e1a800

**CRAFTSMAN**

# PRODUCT GUIDELINES

**IN THIS SECTION:**

- ► INTRODUCTION
- ► PERFORMANCE SPECIFICATIONS AND COMPLIANCE
- ► DESIGN PHILOSOPHY
- ► PRODUCT LOGO USAGE
- ► SHIELD GUIDELINES
- ► PRODUCT APPLICATION
- ► SHIELD INTEGRITY
- ► PRODUCT LABEL DESIGN
- ► TYPOGRAPHY
- ► LITHIUM ION BATTERY GRAPHIC
- ► COLOR AND USAGE

©2016 Sears Brands, LLC

**CRAFTSMAN**

## INTRODUCTION

This section provides a brief overview of the Craftsman® product & quality standards and a detailed guideline outlining the proper placement of the Craftsman logo and shield on product application. This section also includes preferred logo usage, colors, configurations and fonts for product labeling.

### ADHERENCE

These guidelines are essential to ensure a consistent brand identity and customer experience for the Craftsman brand. Adherence to this guideline is mandatory, and failure to comply may result in the loss of the right to use the Craftsman trademarks. The information contained in this document applies to two and three dimensional logos that appear on product only. Use only supplied master logo artwork from Craftsman Industrial Design to develop logos used on products. Master artwork may only be scaled proportionately. Please be aware that the logos used on products differ from those used in marketing, packaging, POP, advertising, etc.



**CRAFTSMAN**

## PERFORMANCE SPECIFICATIONS

Consumers of Craftsman® products expect a high level of quality and durability. Manufacturers and licensees responsible for the expansion of the Craftsman brand are expected to adhere to the high expectations of consumers by working closely with the Craftsman brand approval team to ensure new and expanded categories of products maintain the high quality that consumers expect from the Craftsman brand.

At a minimum, all Craftsman products must meet or exceed all industry and government standards established with respect to the products and must be fit for the use expected of such products.

Additional performance specifications may be identified during the approval process for products in existing categories and for new and expanded products.

## COMPLIANCE REQUIREMENTS

Craftsman products must be produced in facilities that are reputable and whose business and labor practices conform to the local law and the Craftsman Global Compliance Program. The Program Requirements set expectations related to child labor, wages/benefits, working hours, harassment/discrimination, health and safety, factory security, environmental compliance, freedom of association, and forced labor/human trafficking. All manufacturers and licensees must be approved as part of the Craftsman brand approval process. Compliance with the program subjects manufacturers and licensees to periodic factory audits to verify ongoing compliance, and to identify areas that warrant corrective action. For more information about the Global Compliance program, please contact the Craftsman brand approval team.

©2016 Sears Brands, LLC

**CRAFTSMAN**



## DESIGN PHILOSOPHY

Craftsman® products are tough, smart and built to last. Rugged durability combined with innovative features help deliver on all performance touchpoints. Products are generally Craftsman Red, Black or Metallic Gray, conveying a consistent design style and premium quality. Careful consideration is taken in the design of each Craftsman product for an experience that goes beyond functionality.













©2016 Sears Brands, LLC

**CRAFTSMAN**

BRAND STANDARDS



## DESIGN PHILOSOPHY (CONT.)

### HAND TOOLS

The high quality and attention to detail in manufacturing and design make Craftsman® hand tools highly desired by consumers everywhere. These tools come equipped with a lifetime guarantee that provides a high level of trust, reliability and satisfaction.











©2016 Sears Brands, LLC





## DESIGN PHILOSOPHY (CONT.)

### CRAFTSMAN® NEXTEC™ 12-VOLT LITHIUM-ION CORDLESS SYSTEM

NEXTEC products has been ergonomically designed and engineered to meet the high demands of the next generation of Do-It-Yourselfers. This product series design places an emphasis on compact and lightweight. With the most advanced features, portability and power built into every quality NEXTEC product, you can accomplish even the most challenging projects with confidence.











©2016 Sears Brands, LLC

**CRAFTSMAN**



## DESIGN PHILOSOPHY (CONT.)

### C3™ 19.2-VOLT CORDLESS SYSTEM

More power, life and choices. That's what the Craftsman® C3™ Cordless System delivers, with an interchangeable 19.2-Volt Lithium-Ion or Ni-Cd battery and more than 25 tools. The Craftsman C3 Cordless System offers endless versatility with industry-leading performance and innovation.















# DESIGN PHILOSOPHY (CONT.)

## LAWN & GARDEN SPEC POWER

Simple elegant shapes and reveals complement product feature attributes. Products are dominated by use of the Craftsman® Red to raise brand awareness. Overall styling of components attempt to convey a purposeful, strong and functional design language. Use of gloss surfaces help enhance cleanability and appearance.

©2016 Sears Brands, LLC



**CRAFTSMAN**

## PRODUCT LOGO APPLICATION: FULL COLOR



**FIRST PREFERENCE PRODUCT LOGO APPLICATION: FULL COLOR**

This is the preferred product logo to be used for the Craftsman® brand.
The logo should never be re-drawn, re-spaced or altered in any way, to insure
consistency across all products.

**CAN ONLY BE USED ON THESE PROPRIETARY PRODUCT BACKGROUND COLORS:**





**CRAFTSMAN Red**          **CRAFTSMAN
                          Silver or Metal**

**FULL COLOR PRODUCT LOGO SPECIFICATIONS:**

▸ Use the Craftsman Red proprietary color when possible, but PMS 1807 is required
  for print applications.

▸ The border around the logo is 100% black.

▸ There are no drop shadows on any of the text lettering.

▸ There are no gradients in the background.

▸ **No registration mark, circle "R", is required on the product logo. The CRAFTSMAN
  lettering must always be centered within the logo's black frame borders.**

▸ The logo will ALWAYS appear on a single field color background. It should not bridge
  between two materials, colors or backgrounds.

**CRAFTSMAN**

BRAND STANDARDS

PRODUCT GUIDELINES    110

## ALTERNATE PRODUCT LOGO APPLICATION OPTIONS

2ND PREFERENCE - TWO-COLOR LOGO



CAN ONLY BE USED
ON THESE COLORS:

  

CRAFTSMAN    CRAFTSMAN    CRAFTSMAN
Gray         Black        Red

3RD PREFERENCE - ONE-COLOR, BLACK LOGO



CAN ONLY BE USED
ON THIS COLOR:



CRAFTSMAN
Silver or Metal

4TH PREFERENCE - ONE-COLOR, WHITE LOGO



CAN ONLY BE USED
ON THESE COLORS:

  

CRAFTSMAN    CRAFTSMAN    CRAFTSMAN
Gray         Black        Red

©2016 Sears Brands, LLC

## ISOLATION ZONE

### CLEAR SPACE REQUIRED AROUND LOGO

Clear space is defined as the area around the logo, which is kept free from any
2D graphics or 3D design elements, including material breaks and parting lines.

### DETERMINING CLEAR SPACE

Calculate the "X" dimension. "X" = The distance between the inside edge of the outer
frame of the CRAFTSMAN® logo, to the left edge of the letter "C" in the CRAFTSMAN
logotype (as indicated by the blue square).

The "X" dimension applied to all four corners defines the clear space area. This is the
minimum clearance around the brandmark. Whenever possible, allow more space so
the logo has the prominence it deserves.

### THE MINIMUM CLEARANCE AROUND THE OUTSIDE OF THE CRAFTSMAN LOGO

X = THE DISTANCE BETWEEN THE INSIDE EDGE OF THE OUTER FRAME OF THE
CRAFTSMAN LOGO TO THE LEFT EDGE OF THE LETTER "C" IN THE CRAFTSMAN
LOGOTYTPE (AS INDICATED BY THE BLUE SQUARE BELOW).



**Clear space around the logo.**

## PERFECTLY CENTERED LOGO

### BACKGROUND SPACE AROUND CRAFTSMAN LETTERING

The CRAFTSMAN® name in the logo is perfectly centered within it's borders.
This is shown below.



The red squares are placed to show the equal-distant spaces on all sides
of the CRAFTSMAN lettering.

**CRAFTSMAN**

BRAND STANDARDS                                                         PRODUCT GUIDELINES    112

# INCORRECT LOGO USAGES - ON PRODUCT

Below are examples of how the CRAFTSMAN® logo or brandmark should not be used.



No gradient field in background.
No drop shadows on the lettering.

No ® on product logo.



No bridging of multiple colored backgrounds. Logo must appear on single color, material, texture only.

No ® on product logo.



Logo must always have border.



Logo must always have border.



No black logo (lettering) with a red field or background color.



No black text with white outline.

No ® on product logo.

©2016 Sears Brands, LLC

**CRAFTSMAN**

## PRESENTATION, PLACEMENT & SIZE

### PRESENTATION

The purpose of placing the brand logo on product is not only for identification but also for brand visibility. The first "read" of a Craftsman® product should be the apparent logo. Prominence is more important than actual scale. Therefore, the designer must use good judgement to size the logo properly. Final say will be controlled by the Craftsman Industrial Design Team.




### PLACEMENT

The brand logo should be placed centrally, in a prominent manner on each product. The Craftsman logo should never appear over top of vents or details in the form, or drastic form changes in either material or shape. Adequate space around the logo in a single material must be maintained.




### SIZE

The logo should never be smaller than 8 points in size (referring to type). Exceptions may be allowed in certain circumstances. Refer questions to the Craftsman Industrial Design Team.

©2016 Sears Brands, LLC

**CRAFTSMAN**

## EMBOSSED LOGO

While a full-color logo may be appropriate for printed or silk-screened application, other reproduction methods do not offer color.

When the CRAFTSMAN® letters are embossed, all parts of the logo should be embossed together at the same height level.



                                ©2016 Sears Brands, LLC

**CRAFTSMAN**

## STAMPED LOGO - ON PRODUCT

### STAMPED LOGO
When stamping the logo onto metal, the thickness of the font in the logo changes to optimize readability and longevity on both the tool and in the tooling used for the stamping process.



CRAFTSMAN® logo to be used when stamped on product (see example below).



### DETERMINING CLEAR SPACE
Calculate the X dimension. X = The distance between the inside edge of the outer frame of the CRAFTSMAN logo, to the left edge of the letter "C" in the CRAFTSMAN logotype (as indicated by the red square). The X dimension applied to all four corners defines the clear space.

**CRAFTSMAN**

## TEXT LOGO - ON PRODUCT

### TEXT LOGO: SPECIAL INSTANCES - LIMITED SPACE OR RAISED PANEL

When space on a tool becomes an issue, a CRAFTSMAN® logo without the border is available. Use is subject to approval by Craftsman Industrial Design Team. When the product space is too small or does not have an opportunity for an actual label, a simple text logo may be used. This is most evident in the classic Craftsman screwdrivers and wrenches. This can also be found on small items such as hex wrenches or files.

This logo is best used on metal products that do not lend themselves to printing or labeling. It is expected that the logo will still follow the lettering style of the CRAFTSMAN logo as best as the process will allow.

**CRAFTSMAN**

### DETERMINING CLEAR SPACE

The X dimension applied to all four corners defines the clear space area.





**CRAFTSMAN**

BRAND STANDARDS                                    PRODUCT GUIDELINES    117

## INCORRECT LOGO EXAMPLES



Do not bridge multiple colored backgrounds. Logo must appear on a single color.



The logo should not have the ®.
Logo should not be printed in red.



Do not use the gradient background logo. Logo should not have a drop shadow on the lettering. Logo does not have proper isolation zone or clear space from edge of label. This example also shows a logo with a thicker border, which is an incorrect use of the brandmark.



Inconsistent border width on left side. No ® required, Item # too prominent.



**BRAND STANDARDS**                                    **PRODUCT GUIDELINES**   118

## SHIELD GUIDELINES

### AN EXTENSION OF THE CRAFTSMAN LEGACY

A growing need to represent the Craftsman® brand in new and challenging situations created an opportunity to extend the brand presence. The new Craftsman Shield offers a heroic presence when featured on product and can be used in small spaces where the Craftsman wordmark cannot fit.
It is not a replacement for the existing Craftsman wordmark, but rather a complementary symbol to make branding more functional.



![CRAFTSMAN]

## USE WITH THE CRAFTSMAN WORDMARK

### CRAFTSMAN SHIELD & WORDMARK

The Craftsman® Wordmark is the primary mark, while the Craftsman Shield is a support element. The Craftsman Shield is special and heroic, and should be used in such a way that each application supports those ideals. When using these marks together, the use of location, placement and size should create a balanced relationship. There should be enough distance between the marks so that each mark achieves its own "personal space." The marks should never be close enough to each other to be mistaken as one unit. The placement of the shield on all products will be at the sole discretion of the Craftsman Industrial Design Team.



**CRAFTSMAN**

## CLEAR SPACE/MINIMUM SIZE

### CLEAR SPACE

The Craftsman® Shield should not be crowded or overwhelmed by other elements. No graphic element or text of any kind should be placed within its clear space. The recommended clear space is equal to the height of the letter "C" (X = height of "C" within shield).

### MINIMUM SIZE

For the 3D-rendered shield, the minimum size is 10mm for the height of the shield. For the 2-color shield, the minimum size is 5mm. For use in die-stamping on a tool, the minimum size is 3mm. Any exceptions must be approved by the Craftsman Industrial Design Team.




10mm


5mm


3mm



**BRAND STANDARDS**                    **PRODUCT GUIDELINES**   121

## COLOR AND USAGE

**CRAFTSMAN LOGOS COLOR PALETTE**

The CRAFTSMAN® logo colors are CRAFTSMAN Logo Red and CRAFTSMAN Black. These colors are a distinctive and powerful part of the CRAFTSMAN brand identity.

The CRAFTSMAN background colors act as a base for the CRAFTSMAN Wordmark and Shield. These colors are CRAFTSMAN Background Red, CRAFTSMAN Gray and CRAFTSMAN Silver.

CRAFTSMAN Red          CRAFTSMAN Black





CRAFTSMAN Red          CRAFTSMAN Black

**CRAFTSMAN LOGO COLORS**



PMS 1807 C



PROCESS BLACK

**CRAFTSMAN BACKGROUND COLORS**



CRAFTSMAN
PROPRIETARY RED
(PMS 1807 C)



CRAFTSMAN GRAY
(PMS 425 C)



CRAFTSMAN SILVER
(PMS 877 C)

©2016 Sears Brands, LLC

**CRAFTSMAN**

BRAND STANDARDS

PRODUCT GUIDELINES   122

## SHIELD VERSIONS

**SHIELD VERSIONS**

It is recommended that the 3D version of the Craftsman®
Shield be used whenever possible. In cases where the
shield cannot be used, acceptable alternatives have been
provided.

**EMBOSSED EXAMPLE**



**ETCHING EXAMPLE**





**MOLDED EXAMPLE**



**3D SHIELD**



**CAN ONLY BE USED ON THESE COLORS:**






CRAFTSMAN Black    CRAFTSMAN
Silver    CRAFTSMAN
Background Red    CRAFTSMAN Gray

**2-COLOR SHIELD**



**CAN ONLY BE USED ON THESE
COLORS:**




CRAFTSMAN
Background Red    CRAFTSMAN
Silver

**REVERSE BORDER**



**CAN ONLY BE USED ON THESE
COLORS:**





CRAFTSMAN Gray    CRAFTSMAN Black

**BLACK**



**CAN ONLY BE USED ON THESE
COLORS:**




CRAFTSMAN
Background Red    CRAFTSMAN
Silver

**REVERSE**



**CAN ONLY BE USED ON THESE
COLORS:**




CRAFTSMAN Gray    CRAFTSMAN Black

©2016 Sears Brands, LLC

**CRAFTSMAN**

BRAND STANDARDS                                    PRODUCT GUIDELINES  123

## SHIELD VERSIONS

**HANDLE TEXTURE**

The shield can also be used with design purpose. It can be used to create visual interest or break up large areas of flat space on a handle for example.

The Craftsman® Shield shape is an excellent tactile gripping texture that would improve a user's grip while providing a repeatable, unique design detail.



**CRAFTSMAN**

## PRODUCT APPLICATION

The Craftsman® Shield is meant to be a 3D object. It is best represented in this form and all attempts should be taken to produce it as such. When it cannot be produced as a 3D object, other techniques for making it part of the product should be used (etching, stamping, etc.). If none of these options are appropriate, simulating 3D by printing the 3D version of the logo would be acceptable. After all other options have been explored, printing 2-color or 1-color versions of the mark would be the final and least desirable option.





BRAND STANDARDS

PRODUCT GUIDELINES   125

# SHIELD INTEGRITY / CORRECT USAGE

### SHIELD INTEGRITY

The integrity of the Craftsman® brand identity is diminished when the Craftsman Shield is incorrectly applied. Unauthorized versions and unacceptable usage of the shield place its legal protection at risk. Any variation or alteration of the shield, however small, is unacceptable.



DO NOT add a border.



DO NOT use the 2-Color shield on black backgrounds.



DO NOT add a border.



DO NOT use the Reverse Border shield on white backgrounds.



DO NOT change the color.



DO NOT change the color.



DO NOT use the "C" alone.



DO NOT replace the "C" with any other element.



DO NOT use the shield with any part of the CRAFTSMAN wordmark.



DO NOT distort the mark.



DO NOT rotate the mark.



A paragraph of text should not come this close to the CRAFTSMAN Shield. A paragraph of text should not come this close to the CRAFTSMAN Shield. A paragraph of text should not come this close to the CRAFTSMAN Shield. A paragraph of text should not come this close to the

DO NOT violate the clear space.

©2016 Sears Brands, LLC

**CRAFTSMAN**

## PRODUCT LABEL DESIGN

### CRAFTSMAN PRODUCT LABEL DESIGN

The strength and character of the Craftsman® brand starts with its wordmark and shield. It is further enhanced by consistent use of the brand typefaces and typographic style. This typographic style is meant to extend the Craftsman brand across all elements of the product, and help consumers navigate product features with ease and confidence. Careful thought should be given to each product when choosing key features to highlight, the appearance of the product, and the size and placement of other supporting elements. There is an overall balance of information that should be achieved to aid the decision process and build the Craftsman brand.





**BRAND STANDARDS**                                        **PRODUCT GUIDELINES**  127

## PRODUCT LABEL EXAMPLE

United Sans Extended Bold                          United Sans Condensed Bold



United Sans Extended Heavy        Trade Gothic Medium        Trade Gothic Bold Condensed No. 20



United Sans Semi-Extended Heavy        Trade Gothic Bold Condensed No. 20        Trade Gothic Extended

**CRAFTSMAN** Brand Standards                                        ©2016 Sears Brands, LLC



## PRODUCT LABEL EXAMPLE



United Sans Extended Heavy

Trade Gothic Extended

United Sans Semi-Extended Heavy

United Sans Semi-Condensed Medium

Trade Gothic Bold Condensed No. 20

United Sans Semi-Extended Heavy

Trade Gothic Bold Condensed No. 20

Trade Gothic Extended



Trade Gothic Bold Condensed No. 20

United Sans Extended Heavy

United Sans Semi-Extended Heavy

United Sans Extended Heavy

©2016 Sears Brands, LLC

# CRAFTSMAN

## PRODUCT LABEL

Proper alignment & graphic detail of the elements within our product labels is imperative to insure Craftsman brand is consistently portrayed in the marketplace.



keep same equal space as in tab from right edge of tab to where text starts outside

equal clear space required on top, bottom and right sides in a tab from left side

Ø 1.970"
50.04 mm

top of text aligns to the bottom edge of slant

baseline of text aligns to baseline tab

all labels should be supplied to Craftsman Product Development ID with size measurement callouts

2.288"
58.11 mm

1.243"
31.58 mm



* PANTONE COLOR REFERENCES ARE PROVIDED AS A GUIDE, HOWEVER PRODUCT / LABEL COLOR ACCURACY IS DETERMINED VIA COLOR MATCH TO CRAFTSMAN COLOR SAMPLES.



# TYPOGRAPHY



KEY SPEC / SUPPORTING SPECS

UNITED SANS SEMI-EXTENDED
HEAVY

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

UNITED SANS EXTENDED
HEAVY

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

MODEL NAME / NUMBER

UNITED SANS CONDENSED BOLD

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

UNITED SANS EXTENDED
BOLD

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()



BRAND STANDARDS                                    PRODUCT GUIDELINES    131

# TYPOGRAPHY (CONT.)



**PRODUCT DESCRIPTOR / FEATURES**

TRADE GOTHIC CONDENSED BOLD NO. 20
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

TRADE GOTHIC EXTENDED
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

TRADE GOTHIC REGULAR
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

**PRODUCT NUMBER**

UNITED SANS SEMI-CONDENSED MEDIUM
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*[]

**CRAFTSMAN**

BRAND STANDARDS                                                    PRODUCT GUIDELINES   132

## TYPEFACES

**UNITED SANS SEMI-EXTENDED HEAVY**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**1234567890!@#$%^&*()**

**UNITED SANS EXTENDED HEAVY**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**1234567890!@#$%^&*()**

UNITED SANS CONDENSED BOLD
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

**UNITED SANS EXTENDED BOLD**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**1234567890!@#$%^&*()**

UNITED SANS SEMI-CONDENSED MEDIUM
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

TRADE GOTHIC CONDENSED BOLD NO. 20
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

*TRADE GOTHIC EXTENDED*
*ABCDEFGHIJKLMNOPQRSTUVWXYZ*
*abcdefghijklmnopqrstuvwxyz*
*1234567890!@#$%^&*()*

**TRADE GOTHIC REGULAR**
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890!@#$%^&*()

**PRIMARY: UNITED SANS FAMILY**

The United Sans family of typefaces provides a distinctive and consistent character to the Craftsman® brand identity.

► Use United Sans Semi-Extended and Extended Heavy to call out on product key specifications and supporting specifications.

► Use United Sans Condensed and Extended Bold to call out on product model names and numbers.

► Use United Sans Semi-Condensed Medium to call out product numbers on each model.

**SECONDARY: TRADE GOTHIC FAMILY**

The Trade Gothic family of typefaces extends the primary typefaces and provides enhanced function and character to the Craftsman brand. They should be used to complement and add depth to the primary typefaces in all applications.

Use the Trade Gothic family of typefaces to call out product descriptions and features on product.

**FONT PURCHASES**

The United Sans family of typefaces can be ordered from House Industries via www.houseind.com or 1-800-888-4390. The Trade Gothic family of typefaces can be ordered from FontShop via www.fontshop.com or 1-888-333-6687. Be sure to specify either Macintosh® or Windows® operating system.



# LITHIUM ION BATTERY GRAPHIC

* PANTONE COLOR REFERENCES ARE PROVIDED AS A GUIDE, HOWEVER PRODUCT / LABEL COLOR ACCURACY IS DETERMINED VIA COLOR MATCH TO CRAFTSMAN COLOR SAMPLES.

Some of the required text must be manually italicized. In order to match the angle of the DieHard logo the shear tool must be used to create a 7.9 degree angle.

 ©2016 Sears Brands, LLC

**CRAFTSMAN**

BRAND STANDARDS                                                    PRODUCT GUIDELINES    134



**CRAFTSMAN RED**

match to PANTONE® 1807 C*
SPOT COLOR
C:24   M:91   Y:79   K:16
R:166   G:52   B:55



**CRAFTSMAN BLACK**

SPOT COLOR
C:0   M:0   Y:0   K:100
R:0   G:0   B:0



**CRAFTSMAN RED**

match to PANTONE® 1807 C*
SPOT COLOR
C:24   M:91   Y:79   K:16
R:166   G:52   B:55



**CRAFTSMAN GRAY**

match to PANTONE® 425 C*
SPOT COLOR
C:64   M:57   Y:54   K:31
R:85   G:84   B:85



**CRAFTSMAN SILVER**

SPOT COLOR
Metallic silver in some decals is
represented by the gradient
above. Use Pantone 877 C ink.

## COLOR AND USAGE

### CRAFTSMAN LABEL COLOR PALETTE

The Craftsman® logo colors are a distinctive and powerful part
of the Craftsman brand identity. The color palette consists of:

▶ **PMS 1807 C**
▶ **Process Black**

The Craftsman background colors act as a base for the
Craftsman Wordmark and Shield. The color palette consists of:

▶ **Pantone 1807 C**
▶ **Pantone 425 C**
▶ **Pantone 877 C**

### PRINTING SUGGESTIONS

Please refer to the color palette section on page 34
for printing recommendations.

**\*NOTE:** Craftsman brand pre-approval to use a 4-color process
version of PMS 1807 C is required.

**NOTE:** If printer capabilities do not meet brand standards,
please contact the Craftsman team for possible printing and/or
layout options. Brand approval is required to move forward.



## PRO SERIES PRODUCT GUIDELINES

**IN THIS SECTION:**

- ► DESIGN PHILOSOPHY
- ► PRO SERIES PRODUCT LOGOS
- ► PRO SERIES SHIELD
- ► LOGO VARIATIONS
- ► LABEL MAP



## DESIGN PHILOSOPHY

Craftsman® Pro Series is a step up and differentiation from Craftsman core brand offerings. The Pro Series product and packaging features a different color offering. The red is replaced with black, yellow and metal to establish a premium identifiable look within the Craftsman family. This shift in color better communicates the step-up offering PRO SERIES brings to the Craftsman lineup while keeping with the customer's expectation with the brand. This color palette along with the robust and hard angles, create a product design with powerful aesthetics and a presence that conveys heavy-duty performance.









BRAND STANDARDS · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · LOGOS   137

# PRO SERIES PRODUCT LOGOS

Craftsman® Pro Series has a unique and distinguishable design, color palette and logo separate from core brand offerings. The product line features a black and gold color palette with a chrome logo for a sleek, premium appearance.

Craftsman Pro Series Product never should contain the Craftsman logo with the red background. The logos will always have a black background and be be positioned on a black background.

OPTION 1 - SOLID (BLACK) BRUSHED ALUMINUM



OPTION 2



OPTION 3



There are product logo badge options that have the background knocked out so when placed on the product surface it occupies the Craftsman Pro Series

Craftsman On Product Application logos should not contain the trademark registration. This is a different logo than the approved Craftsman logo used in marketing applications.

Craftsman Industrial Design Team must review and approve all branding on product applications.



BRAND STANDARDS                                    PRODUCT GUIDELINES   138

## LOGO VARIATIONS

**STACKED & CENTERED**



**INLINE HORIZONTAL**



**STACKED & LEFT JUSTIFIED**





Italicized version for LH applications



Italicized version for RH applications



CRAFTSMAN PRO YELLOW
match to PANTONE® 130 C*
C:2    M:38    Y:100    K:0
R:247   G:167   B:0

**Select appropriate logo version based on available application space.**

**The Pro Series logo should never be locked-up with the Craftsman logo.**

**Make sure that an appropriate amount of space separates them.**

**CLEAR SPACE AROUND LOGO**
**X is determined by a square lying within the P vertical stroke**



## LOGO VARIATIONS

The Craftsman® Pro Series Product label needs to adhere to the same standards as Craftsman in terms of alignments. The only change is that the red tab is changed to Craftsman Pro Yellow.

**NOTE:**

All product labels must be submitted to Craftsman Product Development team for review and approvals.



**CRAFTSMAN**

BRAND STANDARDS                                                    PRODUCT GUIDELINES   140



## PRO SERIES SHIELD

The Craftsman® Pro Series Shield needs to follow all of the guidelines specified earlier from Craftsman brand. However, the Pro Series Shield will be chrome & black, which differs from the standard color treatment of the red Craftsman rectangular primary logo.

CAN ONLY BE USED ON THESE COLORS:



CRAFTSMAN Black

EMBOSSED EXAMPLE







## LABEL MAP EXAMPLE (TRACTOR)





## LABEL MAP EXAMPLE (SNOW BLOWER)





## PACKAGING GUIDELINES

**IN THIS SECTION:**

► LOGO LOCKUP
► COLOR PALETTE
► TYPE TREATMENT
► BACKGROUND

©2016 Sears Brands, LLC

**CRAFTSMAN**

## LOGO LOCKUP

**NOTE:** Brand approval to use the alternate 2-color logo and the 1-color logo options specified on this page is required.

This is the Craftsman® brand logo. To ensure consistency across all brand packaging and communications, the logo should never be re-drawn, re-spaced or altered in any way. The Craftsman logotype should never be removed from its surrounding frame and used on its own.

### CORRECT USES

**NOTE:** The alternate 2-color logo has no gradient or drop shadows and is used primarily for Flexo printed packaging.

**PREFERRED 2-COLOR LOGO**



ON WHITE BACKGROUND



ON BLACK BACKGROUND

**ALTERNATE 2-COLOR LOGO**



ON WHITE BACKGROUND



ON BLACK BACKGROUND

**1-COLOR LOGO**



ON WHITE BACKGROUND



ON BLACK BACKGROUND

### INCORRECT USES





## LOGO LOCKUP (CONT.)

### SIZING

Whenever practical, the Craftsman® logo should be surrounded by an area of clear, open space. There is a minimum clear space area into which no other elements should intrude. The dimension of this minimum clear space area on all sides of the logo is equal to twice the width of the stroke of the surrounding frame (as indicated by the light blue boxes in the diagram below).



The logo will appear in many sizes. To ensure that it looks right every time, there are four versions – each for a specific size range. The official reproduction art provided with these guidelines includes each version.

On all Craftsman logos the only point of differentiation, from one size range to the next, is the relative size and position of the ®. While print capabilities vary from one printer to the next, it is important to note that these logos have been sized to accommodate minimum print tolerances of most common print processes.

**LOGO SIZED AT 6 IN. OR LARGER**



**LOGO SIZED BETWEEN 4 IN. - 6 IN.**

**LOGO SIZED BETWEEN 2 IN. - 4 IN.**

**NOTE**: The Craftsman logo should never be reproduced at a size less than 1 inch in width.

**LOGO SIZED BETWEEN 1 IN. - 2 IN.**



# COLOR PALETTE

**PMS 185 C**
4-color process*:
c: 0
m: 100
y: 100
k: 0

PMS 185 C

**PROCESS BLACK**
4-color process:
c: 0
m: 0
y: 0
k: 100

PROCESS BLACK

**\*NOTE:** Brand pre-approval to use a 4-color process version of PMS 185 C is required.

**NOTE:** If printer capabilities do not meet brand standards, please contact the Craftsman team for possible printing and/or layout options. Brand approval is required to move forward.

**NOTE:** Please see the Approvals section on pages 160-161 of these guidelines for further information on obtaining the necessary approvals.

## PRIMARY BRAND COLORS
The color palette consists of:

▸ **Pantone 185 C**
▸ **Process Black**

## PRINTING SUGGESTIONS
To ensure color consistency PMS 185 C should always be printed as a spot color. A 4-color process version of the PMS 185 C WILL NOT be consistent with the spot color.

In some cases there is no choice but to print 4-color process*. It is highly recommended to get proofs of the artwork for Brand approval. As a starting point, use the following 4-color process breakdown of PMS 185 C:

**c:0, m:100, y:100, k:0**

Depending on the technical capabilities of the printer, a rich process black can be used as the background color on both the left and right side panels. A minimum line screen of 150 LPI is required to print this rich process black background to avoid possible registration issues. Use the following 4-color process breakdown for the rich process black:

**c:40, m:40, y:0, k:100**

Otherwise, the background color of these side panels should print 100% process black with copy reversing out to white. See pages 124-125 for left and right side panel layout specifications.

## LITHO PRINTING PREFERENCE
A minimum of 6 colors is required to print all Craftsman® packaging:

▸ **4-color process (CMYK) for product images and PMS 130 C match**
▸ **Pantone 185 C for Brand red**
▸ **Line black for printing background blacks and gradient**

## FLEXO PRINTING
A minimum of 6 colors and a minimum line screen of 85 LPI is required to print all Craftsman packaging:

▸ **4-color process (CMYK) for product images and PMS 130 C match**
▸ **Pantone 185 C for Brand red**
▸ **Line black for printing background blacks and gradient**

**CRAFTSMAN®**

## TYPE TREATMENT

**PRIMARY AND SECONDARY FONT USAGE**

Consistent use of a specific typeface can have a strong unifying effect on visual communications. United Sans is used exclusively for the Craftsman® branding system. All copy on packaging is set in various weights of United Sans, in a combination of all-caps and upper and lower case. Only the Roman version of the United Sans Semi Condensed font family should be used (no italic).

License Agreements for the United Sans Font Library can be purchased from House Industries. **http://www.houseind.com/**

**FONTS**

UNITED SANS SEMI CONDENSED MEDIUM
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

**UNITED SANS SEMI CONDENSED BOLD**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

**UNITED SANS SEMI CONDENSED HEAVY**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

**UNITED SANS SEMI CONDENSED BLACK**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

UNITED SANS REGULAR MEDIUM
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

**UNITED SANS SEMI EXTENDED BLACK**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

**CRAFTSMAN**®

BRAND STANDARDS                                        PACKAGING GUIDELINES   148

## RED BRUSHED METAL BACKGROUND

The brushed metal background is available in several different sizes to accommodate a variety of package configurations. This background forms the foundation upon which all other elements are constructed. The distinctive red background creates strong brand blocking in the retail environment and is mandatory for all principal display panels.

This .psd background is constructed from Pantone 185 red base with an overprinting gradient of black combined with a brushed metallic texture, adding depth and visual interest. The base artwork for the front, back, top and bottom of the carton consists of this vignetted red texture.



### SIZING AND PLACEMENT

Place the appropriately sized Craftsman red background into the production file based on the width of the front panel of the die template. The Craftsman red brushed metal background should be placed starting in the lower right-hand corner of the front panel of the die so that the direction of the highlight moves from lower right to upper left for both the front and back panels. Scale the appropriate size background to fit the width of the front panel. All three highlight stripes should appear on the panel where the background is being used. For 6-sided cartons, follow the same guidelines as previously stated, but start in the lower right-hand corner of the bottom panel.

Do not alter the background by rotating or distorting it in any way. The background may be scaled in equal horizontal and vertical proportions. Each background may be enlarged a maximum of 150% to fit the package. It is NOT recommended to use a background that has to be reduced in size to fit the package, as it will result in a loss of detail in the brushed metallic texture.

**NOTE:** If the width of the front panel is less than 3 inches, do NOT use the brushed metal background. Use a solid PMS 185 for the background.



**CRAFTSMAN** Brand Standards                                        ©2016 Sears Brands, LLC



# TOOLS PACKAGING GUIDELINES

**IN THIS SECTION:**

- ► PHOTOGRAPHY
- ► PRODUCT INFORMATION TAB
- ► PRODUCT NUMBER LOCKUP
- ► UPC LOCKUP
- ► PANELS
- ► ICONS
- ► COPYWRITING - TONE AND STYLE
- ► BILINGUAL PACKAGING
- ► LEGALLY REQUIRED STATEMENTS
- ► PDQ TRAYS
- ► KRAFT CARTON PACKAGING

©2016 Sears Brands, LLC



**BRAND STANDARDS**                                    **TOOLS PACKAGING GUIDELINES**  150

## PHOTOGRAPHY

**NOTE:** The photographic style for Lawn & Garden products is slightly different. Please see page 174 for details.

### PHOTOGRAPHIC STYLE

Photography is the most dominant visual aspect of Craftsman® packaging, as it showcases our innovative products. The use of product photography must remain consistent and appropriate in terms of overall style; e.g., lighting, camera angle and product placement as described in this section. Products are photographed from three approved angles: straight profile, straight slightly angled and top angled. Choose the angle based on the size, shape, color, etc., that showcases the individual product and any of its key features best.

### THE "HERO" SHOT

The "Product as Hero" photography on the front of all cartons allows the consumer to see the quality and detail that goes into each Craftsman product. It is a heroic shot complemented with the high-contrast lighting photographic style. The consumer now views the product as premium or upscale.

The "Hero" Shot on the principal display (front) panel always uses a three-quarter reference photograph of the actual product. This offers the consumer a 3D look and assists in quick identification and shopability.







**CRAFTSMAN®**

BRAND STANDARDS                                    TOOLS PACKAGING GUIDELINES    151

## PHOTOGRAPHY (CONT.)

**THE "HERO" SHOT - PLACEMENT**

When applied to a 6-sided carton, the "hero" photography overlaps the Craftsman® Red background on the package front panel. It is imperative to show most, if not all, of the product. This will showcase all features of the product, giving the consumer a great idea of what they're getting.

Care must be taken not to create distracting shapes or tangents at the intersection of design elements or carton panels. This image should be clipped out with no background and incorporate a soft-edged drop shadow that angles down and to the right, set to multiply with a 75% opacity. As with the drop shadow, the main light for these images should fall from the top left to the bottom right (see right).



**THE "HERO" SHOT - AS A SET**

When using an image of a tool set, make sure it's shot in the case whenever possible. This keeps the product together and clutter-free.

For instances that require a tool set to be shot out of, or without a case, arrange tools in an organized manner. Uniformly arrange items, creating a visually appealing shape.*





**CRAFTSMAN**®

## PHOTOGRAPHY (CONT.)

### THE INFORMATION TAB SHOT

The Information Tab Shot is a straight profile view with the lighting being consistent with the overall photographic style look and feel.

The Information Tab Shot on the principal display panel always uses a profile reference photograph of the actual product. This image should be clipped out with no background and incorporate a soft-edged drop shadow that angles down and to the right, set to multiply with a 50% opacity. As with the drop shadow, the main light for these images should fall from the top left to the bottom right. Since this image appears on a white background, care should be taken to ensure the outer edges of the product are well defined using fill and detail lighting as necessary.



### THE PRODUCT WALKAROUND SHOT

The Product Walkaround Shot appears on the back panel and contains the same photographic style as described for the Information Tab Shot. This shot should offer the opportunity for walkarounds/callouts for features and benefits. This offers insights to the consumer in regards to the product.

The Product Walkaround Shot reference photography should overlap the Craftsman red background on the package back panel. This image should be clipped out with no background and incorporate a soft-edged drop shadow that angles down and to the right, set to multiply with a 75% opacity. As with the drop shadow, the main light for these images should fall from the top left to the bottom right.



                                    ©2016 Sears Brands, LLC

**CRAFTSMAN®**

BRAND STANDARDS                                    TOOLS PACKAGING GUIDELINES   153

**NOTE**: The product tab for Lawn & Garden products does not utilize all of this information. See page 175 for details.

# PRODUCT INFORMATION TAB

The drop-down information panel houses all the information a consumer will need in a "Tab" system in order to ease shopability. This "Tab" system contains the updated Craftsman® logo, size and product name, amplitude (where available), a three-quarter view reference shot of the product and bulleted feature callouts that indicate unique product innovation.

The Product Information Tab is located in the upper left corner of the principal display panel (front panel) on top of the "Hero" photography. This tab wraps over the top of the carton and down the top right side of the back panel. The Craftsman logo, primary product description and any sub-branded logos are repeated on the top of the box and on the back panel. If the product is sub-branded, the top panel is used to describe the unique overarching features and benefits associated with that sub-brand.

The Craftsman packaging system also enables a main feature / benefit box tab. This design detail enables those main features / benefits to stand out visually to the consumer. They should not contain more than three segments or call outs. This design detail can be positioned underneath the product information tab or possibly to the right depending on the product and packaging orientation.

The specifications detailed on the following pages are intended to serve as a basic guideline for the Product Information Tab. There is a template of the Product Information Tab available in the artwork assets that will be provided. Typically, the size of the tab should be approximately 40% the overall width of the principal display panel.



**CRAFTSMAN** Brand Standards                                    ©2016 Sears Brands, LLC

**CRAFTSMAN®**

BRAND STANDARDS                    TOOLS PACKAGING GUIDELINES    154

# PRODUCT INFORMATION TAB (CONT.)

These are the basic art elements that appear in the Craftsman® Product Information Tab.

### 1. LOGO
Located prominently at the top of the tab. See page 147 for minimum clearance specifications.

### 2. PRODUCT NAME
75% height of "CRAFTSMAN" in the logo, United Sans Semi-Condensed Bold in all-caps. If product name runs on two or more lines, set leading at 85% of type size. Translation is 55% of that, United Sans Semi-Condensed Bold in all-caps, 75% black.

### 3. BULLETED RULE
Stroke weight is 6% point size of the product name. Dashes are set same as stroke weight and gaps are 150% of that. Rules are set with a black butt cap.

### 4. PRODUCT SPECIFICATION CALLOUT
Some products throughout a category will have different size/amplitude specifications. These get called out directly under the product name, separated by a bulleted rule. Equal to size of product name and all units of measurement/amplitude are 50% of that, United Sans Semi-Condensed Bold in all-caps, PMS 185 C.

### 5. INFORMATION TAB SHOT
Set within the product specification area. The image can overlap the bulleted rules. See page 119 for detailed specifications.

### 6. FEATURE CALLOUTS
45% of Product Name, but should not drop below 8 points. United Sans Semi-Condensed Medium in title case, black. Leading is 93% of type size and space before paragraph is set to 40% of type size. Triangle bullets are 66.7% height of feature callouts and align with the left edge of the logo.

**NOTE:** Product name, bulleted rule and feature callouts left-align with the center of the space between the "C" and the black frame of the logo. (See example to the right)

**NOTE:** The tab is placed 10% of the width of the tab away from the left edge of the panel.



**CRAFTSMAN**

**BRAND STANDARDS**                                    **TOOLS PACKAGING GUIDELINES**   155

## PRODUCT NUMBER LOCKUP









On 6-sided cartons, the Product Number appears on four panels: front, top, left and right side.

Sizing for the product number lockup is based on the size of the five main digits. On the front and top panels, they are set 90%-100% of the product name. On the left and right side panels, they are 60%-80% of what they are on the front and top panels, depending on the width of those panels. The digits are set in United Sans Semi-Condensed Medium. The lockups are aligned with the top of the Craftsman® logo.

When the Product Number Lockup is on the red or white brushed metal background, the product number is reversed out in a black box (see examples 1 and 2). When the Product Number Lockup is on a black background, the product number is reversed out and in a stroked box in PMS 185 (example 3). When the Product Number Lockup lies on top of a product image, the product number is reversed out in a black box with a white stroke (example 4).

On clamshell cards and sleeves, the Product Number Lockup will appear on the front and back panels with the same treatment. If the panel is very narrow, the Product Number Lockup is placed within the product information tab above the logo and right-justified with it.

In some cases, cards or labels are mass-printed for an entire category, and specific product information, such as product number and UPC, is thermal or laser overprinted after as needed. Leave white space above the Craftsman logo in the product information tab. This space should be 75% the height of the Craftsman logo (example 5).





**CRAFTSMAN**

BRAND STANDARDS                    TOOLS PACKAGING GUIDELINES   156

## UPC LOCKUP

These are the basic art elements that appear in the Craftsman® UPC Lockup.

**1. UPC**
Placed in a bounding box with a black keyline. Stroke weight:

**80% UPC = 1 pt. stroke**
**100% UPC = 1.25 pt. stroke**
**200% UPC = 2.5 pt. stroke**

**2. DISTRIBUTION COPY**
Placed to the right and bottom-aligned or above and left-aligned with the UPC bounding box. Set in United Sans Semi-Condensed Medium.

Type sizes are as follows:

**80% UPC = 6-8 pt. type**
**100% UPC = 8-10 pt. type**
**200% UPC = 12-16 pt. type**

Set in black on a white background and reversed out on red and black backgrounds. See pages 166-167 for details on legally required statements.

**NOTE:**
The placement of the UPC Lockup will depend on the space available after all package elements have been applied to the artwork. On 6-sided cartons, the UPC Lockup NEVER appears on the front or left side panel.

If the UPC Lockup appears on the bottom panel, it is recommended to place it within a white box along with any other specific vendor information (see example to the right).

It is acceptable for the UPC Lockup to appear on multiple panels, especially on larger cartons.

HORIZONTAL:



**Made in Country of Origin**
Product distributed by
Lorem Ipsum
Lorem Ipsum 00000

VERTICAL:

**Made in Country of Origin**
Product distributed by
Lorem Ipsum
Lorem Ipsum 00000





CRAFTSMAN Brand Standards                    ©2016 Sears Brands, LLC

# LEFT SIDE PANEL

These are the basic art elements that appear on the Craftsman® left side panel.

### 1. LOGO

Located prominently at the top, roughly 67% of the width of the panel. See page 147 for minimum clearance specifications.

### 2. PRODUCT NUMBER LOCKUP

Located in the upper right-hand corner and top-aligned with front panel logo. See page 157 for detailed specifications.

### 3. PRODUCT NAME

Reversed out with the product specification callout directly underneath.

### 4. IN-USE LOCKUP

Feature headlines are in United Sans Semi-Condensed Bold, Title Case, with a PMS 185 triangle bullet. Feature copy is underneath and tabbed, 85% of feature headline in United Sans Semi-Condensed Medium. In-use photography is placed to the right of the copy, top-aligned with the feature headline and masked with a notched corner tab box set with a gray stroke (68% black), typically 1-3 points.

### 5. WARNING TAB

Located at the bottom of the panel. Warning/Caution/Safety statements in United Sans Semi-Condensed Medium typically between 7-10 points, Black. The tagline "See the full line of Craftsman® products at craftsman.com. Click on the Craftsman® Club link, and join today!" always appears in the red bottom bar of the warning tab in United Sans Semi-Condensed Bold, reversed out.

2 00000
1 CRAFTSMAN®
3 PRODUCT NAME
PRODUCT NAME TRANSLATION
00.0 VOLT
Feature Headline 1
Feature/benefit in-use copy
4
FEATURE/BENEFIT/
IN-USE PHOTO
Feature Headline 2
Feature/benefit in-use copy
FEATURE/BENEFIT/
IN-USE PHOTO
Important Note: Be sure to read, understand and follow all warnings, safety rules and instructions in the operator's manual before using this product. Failure to do so can result in serious personal injury. Always wear safety glasses, eye shields or full shield, hearing protection and dust mask when operating power tools.
5
See the full line of Craftsman® products at craftsman.com
Click on the Craftsman® Club link, and join today!

**NOTE:**
If there is not a left side panel, all information moves to the back panel.

### INSET STROKE

The inset image has a gray (75% black) stroke around it.

### BLACK AND WHITE PHOTOGRAPHY

Side panel in-use photography will print 1 color (black).

Side panel outlined photography will have a gray background of 30%-40% black behind it. The background black value will be determined by the outlined images. There should be good contrast between the image and background. The value of black should be consistent on all panels of the package.

### WHITE BACKGROUND

The warning background is white.

### RED BACKGROUND

The tagline background is solid PMS 185 C with a 0 to 22% black radial gradient overprinting.

CRAFTSMAN
PRODUCT NAME
CRAFTSMAN
PRODUCT NAME
00.0
CRAFTSMAN
PRODUCT NAME
00.0

 ©2016 Sears Brands, LLC



**CRAFTSMAN**®

BRAND STANDARDS                                         PACKAGING GUIDELINES   158

## RIGHT SIDE PANEL

These are the basic art elements that appear on the Craftsman® right side panel.

**1. LOGO**
Located prominently at the top with reversed-out border, roughly 67% of the width of the panel and left-aligned with warranty copy. See page 147 for minimum clearance specifications.

**2. PRODUCT NUMBER LOCKUP**
Located in the upper right-hand corner and top-aligned with front panel logo. See page 157 for detailed specifications.

**3. WARRANTY HEADLINE**
United Sans Semi-Condensed Bold, centered, all-caps, reversed out. The headline is 110% the size of the warranty copy.

**4. WARRANTY COPY**
United Sans Semi-Condensed Medium, left justified, reversed out. Each Warranty copy block must end with an ownership line(s). See pages 166-167 for details on legally required statements.

**NOTE:**
If there is not a right side panel, all information moves to the back panel.

**NOTE:**
See warranty guide to confirm correct warranty copy, or contact the Craftsman Packaging Director for more information.





**CRAFTSMAN**®

BRAND STANDARDS                                                    PACKAGING GUIDELINES   **159**

## BACK PANEL

These are the basic art elements that appear on the Craftsman® back panel.

**1. PRODUCT INFORMATION TAB**
Located in the upper right-hand corner. See pages 155-156 for detailed specifications.

**2. PRODUCT WALKAROUND SHOT**
See page 154 for detailed specifications.

**3. WALKAROUND COPY**
Feature callout is United Sans Semi-Condensed Bold. Feature callout description is United Sans Semi-Condensed Medium. Bulleted rules are used to highlight product features. All walkaround copy and rules are reversed out.

**4. UPC LOCKUP**
Located at the bottom right-hand corner. See page 158 for detailed specifications.





**CRAFTSMAN**®

BRAND STANDARDS                                             PACKAGING GUIDELINES   160

## ICONS

**NOTES:**
Any legal, regulatory, country of origin, warranty, certification, copyright, contact information, icons and additional information should be incorporated into the package as appropriate.

Individual manufacturers should take responsibility for the legal use and placement of icons relating to energy usage, sustainability, recyclability, safety and/or physical material compliance. These items and others may be legally restricted by governmental and/or non-governmental agencies.

Use of these icons must be approved for each package by the Craftsman brand team, legal department and individual product manufacturers.

In an effort to more clearly communicate specific product attributes and qualifications, benefit icons are used as graphic devices. These icons vary in usage, as some must adhere to strict legal guidelines. The product sub-brand icons (shown below) all further emphasize the Craftsman® brand's legacy of quality, knowledge and innovation.

**SPECIAL FEATURE ICONS**
Special feature icons appear within the product information tab along with any product specification callouts, separated from the product name and feature callouts by bulleted rules. It is sized appropriately and should not compete with the Craftsman logo.

Packaging for Craftsman Lawn & Garden products utilize different icons. See page 181 for details.



**V4 Logo used with all V4 products**



**C3 Logo used with all C3 products**



**Nextec Logo used with all products using the Nextec battery**



**Bolt On logo used with all Bolt On products**

                                             ©2016 Sears Brands, LLC

# ICONS (CONT.)

**NOTES:**
Any legal, regulatory, country of origin, warranty, certification, copyright, contact information, icons and additional information should be incorporated into the package as appropriate.

Individual manufacturers should take responsibility for the legal use and placement of icons relating to energy usage, sustainability, recyclability, safety and/or physical material compliance. These items and others may be legally restricted by governmental and/or non-governmental agencies.

Use of these icons must be approved for each package by the Craftsman brand team, legal department and individual product manufacturers.

## WARRANTY ICONS

The warranty icon only appears on the principal display panel in the lower right-hand corner, reversed-out over the red brushed metal background and incorporates a soft-edged drop shadow that angles down and to the right (see example A). The icon is 120% the width of the product number lockup and right-justified with it. The warranty icon should NOT appear over any of the product hero shot. If this is unavoidable, create a second version of the warranty icon with a 100% black stroke that is at least 1/32 of an inch and eliminate the drop shadow on the original (example B).

See page 181 for additional detail on Craftsman® Lawn & Garden product warranties.

1 | YEAR WARRANTY

2 | YEAR WARRANTY

3 | YEAR WARRANTY

4 | YEAR WARRANTY

5 | YEAR WARRANTY

7 | YEAR WARRANTY

10 | YEAR WARRANTY

example A

example B

LIFETIME WARRANTY

©2016 Sears Brands, LLC











**CRAFTSMAN**®

BRAND STANDARDS                                    PACKAGING GUIDELINES   162

## COPYWRITING - TONE AND STYLE

Craftsman® tools are serious and capable tools that inspire confidence. Hence, effective copy must communicate features and benefits both clearly and quickly. Consumers must be able to grasp this information at point of sale often without sales assistance. Here are key style and copy guidelines that will help you provide quality messaging for Craftsman packaging copy:

▸ Copy statements should be brief and informative on front panel/card.

▸ Features must come with consumer benefits.

▸ All features/benefits require prioritization. Place the most important, fundamental elements on front panel with supporting and more detailed copy moved to the side or back panel. Not everything will fit on the front panel, nor should it.

▸ Benefit copy should be carefully considered from the consumer's viewpoint. It should be straightforward, clear, and not technical copy or jargon.

▸ Avoid industry terms that require lengthy explanations. The consumer will always think: "Don't tell me what it is, tell me what it does for me."

▸ All claims and performance statements must be cleared with the Craftsman team well in advance. Preferably this should be done at the same time as actual product verification.

©2016 Sears Brands, LLC

**CRAFTSMAN**®

BRAND STANDARDS                                                    PACKAGING GUIDELINES    163

## BILINGUAL PACKAGING

**NOTE:**
The actual type size
and weight of these
statements may vary
depending on print
process and minimum print
capability standards.

To address the needs of a rapidly growing market segment, the Craftsman®
packaging will now be translated into Spanish. The packaging makes every effort
to balance the simple aesthetic that enabled shopability as per consumer research
with providing important product information to our Hispanic consumers.

Copy translations are limited to a handful of areas in order to provide either adequate
product identification or necessary safety information at the point of sale. Also
included are a number of optional areas for translation dependent on the amount of
labeling space and agreed upon by the Craftsman Packaging Services Team.

The following copy content requires Spanish translations on all products:

1. Product Name (55% of English, same font and in all caps)

2. Content Statement (55%-85% of English, initial caps)

3. Caution and Warning Statements (same size as English)

Optional copy content for which Spanish translations are permitted include:

4. Features or Bullet Points on the Drop-Down Tab (select process, in title case)

5. Warranty and Guarantee Statements

6. Distribution and Country of Origin Statements

7. Use of Icons and color-coding is also permitted (if industry-standard)

In many cases there is adequate space to include some of the optional Spanish
content as outlined above. The amount of packaging real estate and the number of
features that are highlighted on the package will be the determining factor when it
comes to deciding how much of the optional copy content gets translated.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

BRAND STANDARDS
PACKAGING GUIDELINES    164

## LEGALLY REQUIRED STATEMENTS

**Made in USA**
The product is entirely made in the United States. All parts, components and units and all assembling, processing and finishing that go into the product is of United States origin. That is, the product contains no foreign content or processing. The icon below should be placed near or within the UPC lockup. If the MADE IN USA icon is on a black or dark background, use the reversed-out version on the right (see below).

    

    

    

**Made in USA of US and global components**
The product's final assembly, processing and finishing takes place in the United States, and the product is last substantially transformed in the United States. In addition, the product has a significant amount of United States content. The United States content (parts, components or units) in relation to the product's total manufacturing cost is more than 51%.

**Made in USA of global components**
The product's final assembly, processing and finishing takes place in the United States, and the product is last substantially transformed in the United States.

**Assembled in USA of US and global components**
The product's principal assembly takes place in the United States; that assembly is substantial; and the product is last substantially transformed in the United States. In addition, the product has a significant amount of United States content. The United States content (parts, components or units) in relation to the product's total manufacturing cost is more than 51%.

**Assembled in USA**
The product's principal assembly takes place in the United States; that assembly is substantial; and the product is last substantially transformed in the United States.

CRAFTSMAN Brand Standards
©2016 Sears Brands, LLC

**CRAFTSMAN®**

BRAND STANDARDS                                                    PACKAGING GUIDELINES   165

## LEGALLY REQUIRED STATEMENTS (CONT.)

### NET CONTENTS STATEMENT

If there is more than one item in a package, there must be a contents statement telling the customer only what is in the package. There should be no descriptive or "sell" copy in the contents statement or list:

**CONTENTS: Drill, Battery, Case, Operator's Manual, Screwdriver Bit**

Do NOT list contents as follows:

**CONTENTS: Cordless Drill, Lithium Battery, Pleather Case, 56-pg Owner's Manual, Chrome Molybdenum, hand-forged screwdriver bit.**

The Net Contents Statement is set in United Sans Semi-Condensed Bold. The glow around the Net Contents Statement is achieved by creating a second version of the Net Contents Statement with a 100% black stroke that is 12.5% the size of the contents statement and a 100% black blur that is 1% the size of the black stroke, set to multiply directly beneath the reversed-out white version of the Net Contents type. This will alleviate any potential registration issues with reversing the Net Contents Statement out of multiple colors.

**CONTENTS: Drill, Battery, Case, Operator's Manual, Screwdriver Bit**

Federal Regulations dictate the location and type size of the Net Contents Statement. The location must be in the lower 30% of the principal display panel or bottom panel and with the appropriate size:

| Size of Panel Area | Minimum Type Height |
|---|---|
| 5 sq. inches and under | 1/16 inch |
| Over 5 sq. inches to 25 sq. inches | 1/8 inch |
| 25 sq. inches to 100 sq. inches | 3/16 inch |
| 100 sq. inches to 400 sq. inches | 1/4 inch |
| Over 400 sq. inches | 1/2 inch |

### MEASUREMENTS

Do not ever use tick marks (") or (') to signify inches or feet as there are no metric equivalents. Always spell out "inches" and "feet" or abbreviate appropriately, e.g, "1/2 in." or "6-1/2 ft." when room does not allow for spelling the measurement out. Hyphens should be used to join together the whole numerical value and the fractional unit of measurement, e.g, "6-1/2 ft." All upper-case letters are used primarily in the product information tab when describing measurement, e.g, "1/2 IN." or "6-1/2 FT." Lowercase should be used in all other instances.

### CHARACTERS

Exclamation points (!) and bomb-bursts are not appropriate in any copy or graphic device. These elements are inconsistent with the tone of the Craftsman® brand: a serious and capable tool that builds confidence. Registered (®) and Copyright (©) symbols should never be set in United Sans Semi-Condensed. Use Helvetica Regular or Medium.

**CRAFTSMAN**

BRAND STANDARDS                                         PACKAGING GUIDELINES   166

## PDQ TRAYS

**NOTE:** In order to maintain consistency in PDQ widths and front lip heights, please check with the Craftsman buyer or product manager for sizing requirements.

PDQ trays should be 1-color direct print Flexo flooded with PMS 1807 C and have rolled-over edges.

### FRONT LIP LABEL

The front lip label for the PDQ tray is printed 1-color (PMS 1807 C) and should be offset .25" on all sides from the dimensions of the front lip. In most cases, the Craftsman® logo is the only element on the PDQ front lip label. It should be roughly 65% the height of the label, centered and reversed-out of the PMS 1807 C with no gradients or drop shadows (see example below).



**LABEL**



Red is PMS 1807.

**FLAT PDQ TRAY**



**ASSEMBLED PDQ TRAY**

**CRAFTSMAN**

## CRAFTSMAN KRAFT CARTON PACKAGING GUIDELINE

### 1. LOGO

Located prominently within each package side. The CRAFTSMAN logo must always be the same size on all panels, with the same baseline and centered within each panel. The size of the logo will be dictated by the smallest panel. In the example below it was the Back / Front panel. The CRAFTSMAN logo always must maintain the proper isolation zone or free space. See page 28 of the CRAFTSMAN BRAND STANDARDS.

### 2. PRODUCT NAME

75% height of "CRAFTSMAN" in the logo. United Sans Semi Extended Heavy, Case Sensitive. 100% black. Center vertically under the Craftsman logo. Distance from bottom edge of outer edge of CRAFTSMAN rectangle logo should be 1-1/2 times the distance of "X". "X" is the distance from the inside left edge of the CRAFTSMAN rectangle logo to the left edge of the letter "C" in CRAFTSMAN.

### 3. HANDLING GRAPHICS

Only use the approved CRAFTSMAN handling graphic icons which are appropriate for the product / package.

### 4. PANEL IDENTIFICATION

Each panel needs to be specified. United Sans Semi Condensed Bold, all caps  100% black. Left justified under the CRAFTSMAN handling graphic icons. Can be the same height as the handling graphics. Distance or space from Handling Graphics should be approx 1/3 the height of the handling graphic.

### 5. ITEM NUMBER

Product number appears on 4-panels: front, top, left side, right side.  Size of item number should be same on all 4-panels. United Sans Semi Condensed Medium, 100% black, 90% of product name.

### 6. DISTRIBUTION COPY

Placed on left side of the two largest package panels (most likely front and back) and left justified with the CRAFTSMAN handling graphic icons and panel identification. Set in United Sans Semi Condensed Medium, 100% black.

# CRAFTSMAN KRAFT CARTON PACKAGING GUIDELINE

Numbered directions in diagram above correspond to the numbered instructions on previous page.

 ©2016 Sears Brands, LLC



## LAWN & GARDEN PACKAGING GUIDELINES

**IN THIS SECTION:**

- ► OVERVIEW
- ► PHOTOGRAPHY
- ► PRODUCT TAB
- ► COLOR CODING
- ► FEATURE TAB
- ► DUAL DISPLAY FACINGS
- ► PANELS
- ► ICONS AND CALLOUTS

**CRAFTSMAN**

## OVERVIEW

For Lawn & Garden products, a separate structure of color coding and feature callouts can be utilized. This structure was designed to ease shopability among product lines that require clear communication in "step-up" ("good," "better" and "best") and/or product differentiation. Color coding helps reinforce this communication.

A feature tab has been developed to communicate product features and benefits. Within this structure, features can be prioritized in size and placement for easy-to-follow messaging that may be supported by icons to indicate unique product innovation. Product features and the information tab shot are not featured within the iconic product tab, which houses the Craftsman logo and product name only. The whole product is shown, so the customer knows exactly what they are purchasing.

Use these devices when differentiation is needed. For all other products in the line please refer to the Craftsman® Standards previously outlined.



**CRAFTSMAN**®

BRAND STANDARDS                                          LAWN & GARDEN PACKAGING GUIDELINES    171



# PHOTOGRAPHY

### PHOTOGRAPHIC STYLE

Photography is the most dominant visual aspect of Craftsman® packaging, as it showcases our innovative products. The use of product photography must remain consistent and appropriate in terms of overall style; e.g. lighting, camera angle and product placement as described in this section. Products are photographed slightly angled from either the left or right side. Choose the angle based on the size, shape, color, etc., that showcases the individual product and any of its key features best.

### THE "HERO" SHOT

The "Product as Hero" photography on the front of all cartons allows the consumer to see all the "Quality and Detail" that goes into the Craftsman product. It is a heroic shot complemented with the high-contrast lighting photographic style. The consumer now views the tool as a premium or upscale product.

### THE "HERO" SHOT - PLACEMENT

For Lawn & Garden products make sure to show as much of the product as possible. It is acceptable for the product to violate the tab. This image should be clipped out with no background and incorporate a soft-edged drop shadow that angles down and to the right, set to multiply with a 75% opacity. As with the drop shadow, the main light for these images should fall from the top left to the bottom right. Also, it is preferred to overlap the product tab in order to show the whole product.





BRAND STANDARDS                          LAWN & GARDEN PACKAGING GUIDELINES    172

## PRODUCT TAB

The product tab is located in the upper left corner of the principal display panels, behind the "Hero" photography. Due to the wide range of package sizes and proportions there are exceptions to the placement of the product tab. See pages 155-156 for more information.

### 1. LOGO
Located prominently at the top of the tab. See page 141 for minimum clearance specifications.

### 2. PRODUCT NAME
100% height of "CRAFTSMAN" in the logo, United Sans Semi-Condensed Bold in all caps. If product name runs on two or more lines, set leading at 85% of type size.

### 3. PRODUCT DIFFERENTIATOR
Some products throughout a category will have a product pre- or post-descriptor above or below the name, 50% the size of product name, United Sans Semi-Condensed Bold in Title Case, black.

### 4. SPANISH TRANSLATION
The Spanish translation is placed directly under the product name, 35% the size of product name, United Sans Semi-Condensed Bold in all-caps, black.

**NOTE:** Unlike the Product Tab in other categories, the Lawn & Garden Product Tab does not include a Product Photo or Feature Callouts.

**NOTE:** Left-align the Product Name with the center of the space between the "C" and the black frame of the logo.

**NOTE:** The tab is placed 10% of the width of the tab away from the left edge of the panel.



## COLOR CODING

Within certain Lawn & Garden product categories there is the use of color coding to indicate a step-up in value or performance. This is the step-up color-coding palette:

- **PANTONE COOL GRAY 6 C (GOOD)**
- **PMS 185 C (BETTER)**
- **PANTONE COOL GRAY 11 C (BEST)**

### PLACEMENT

It is located as a bar on the right side of the principal display panel. If a second principal display panel with a horizontal orientation is required, the bar should run across the top. See page 140 for more details.

### TYPE

50% height of the color bar, United Sans Semi-Condensed Black in all-caps.

COOL GRAY 6 C

**PANTONE COOL GRAY 6 C**
4-color process:
c: 0
m: 0
y: 0
k: 30

PMS 185 C

**PMS 185 C**
4-color process:
c: 0
m: 100
y: 100
k: 0

COOL GRAY 11 C

**PANTONE COOL GRAY 11 C**
4-color process:
c: 0
m: 0
y: 0
k: 70

 ©2016 Sears Brands, LLC

**CRAFTSMAN**

## FEATURE TAB



A feature tab provides a vehicle to prioritize and communicate product features to ease shopability. These are the basic art elements that appear on the feature tab of the Craftsman® Lawn & Garden product packaging artwork.

### 1. FEATURE AREA
A feature tab has been developed to hold product callouts. Within this structure, product features can be prioritized in order of importance and size. When numbers can be used, scale them up to provide a quicker read.

### 2. COLOR
The color inside the feature tab should be the color of the step-up color coding.

### 3. BORDER
The line weight and notches should reflect the pull-down tab. The divider lines within feature categories have a width of 2 pts.

### 4. TYPE
Feature headlines and large numbers are white and in United Sans Semi-Extended Bold, all-caps. The copy directly underneath is white and in United Sans Regular.

### 5. LOGOS AND ICONS
In some cases, logos and icons can be used instead of headlines. Size them in relation to the headlines of the other features.

## DUAL DISPLAY FACINGS



In cases where the product can be displayed horizontally or vertically, two front panels need to be created. These are the basic art elements that appear on the front-facing panels of the Craftsman® Lawn & Garden product packaging artwork.

### 1. PRODUCT INFORMATION TAB
Located at the top and centered on the front and back panel. For a horizontal panel, the product tab is located in the upper left-hand corner.

### 2. PRODUCT NUMBER LOCKUP
Located at the top right corner of the product tabs.

### 3. DUTY CALLOUT
Located in a color bar on the right-hand side or top of the front panel.

### 4. FEATURE TAB
Located over the color bar on the right-hand side or top of the front panel.

### 5. HERO PHOTOGRAPHY
Located on the front panel.

### 6. WARRANTY ICONS
Located at the bottom right-hand corner of the front panel.



**CRAFTSMAN®**



## LEFT SIDE PANEL

These are the basic art elements that appear on the left side panel of Craftsman® Lawn & Garden product packaging artwork.

### 1. LOGO
Located prominently at the top with reversed-out border, roughly 85% of the width of the panel. See page 115 for minimum clearance specifications.

### 2. PRODUCT NAME
If space permits, use the product name from the front panel reversed out, without the pull-down tab.

### 3. BULLETED RULE
Stroke weight is 6% point size of the product name. Dashes are set same as stroke weight and gaps are 150% of that. Rules are set with a butt cap.

### 4. WALKAROUND
Feature headlines are in United Sans Semi-Condensed Bold, Title Case, with a PMS 185 triangle bullet. Feature copy is underneath, 85% of feature headline in United Sans Semi-Condensed Medium. In cases where the carton is Flexo printed make sure to include a minimum of 10 pt. white rule around the product.

### 5. INSET FEATURES
Feature headlines are in United Sans Semi-Condensed Bold, Title Case, with a PMS 185 triangle bullet. Feature copy is underneath and tabbed, 85% of feature headline in United Sans Semi-Condensed Medium. Left-align photography with the feature headline and mask with a notched corner.

### 6. WARRANTY
United Sans Semi-Condensed Medium, left justified, reversed out. Each Warranty copy block must end with an ownership line(s). See pages 166-167 for details on legally required statements.

# RIGHT SIDE PANEL

These are the basic art elements that appear on the right side panel of Craftsman® Lawn & Garden product packaging artwork.

## 1. LOGO

Located prominently at the top with reversed-out border, roughly 85% of the width of the panel. See page 115 for minimum clearance specifications.

## 2. PRODUCT NAME

If space permits, use the product name from the front panel reversed out, without the pull-down tab.

## 3. BULLETED RULE

Stroke weight is 6% point size of the product name. Dashes are set same as stroke weight and gaps are 150% of that. Rules are set with a butt cap.

## 4. PRODUCT FEATURES

Feature headlines are in United Sans Semi-Condensed Bold, Title Case, with a PMS 185 triangle bullet. Feature copy is underneath and is 85% of feature headline in United Sans Semi-Condensed Medium. Left-align photography with the feature headline and mask with a notched corner.

## 5. PRODUCT WARNINGS

United Sans Semi-Condensed Medium, left justified, reversed out.
Each Warranty copy block must end with an ownership line(s).
See pages 166-167 for details on legally required statements.

 ©2016 Sears Brands, LLC

**CRAFTSMAN®**

**BRAND STANDARDS**                          **LAWN & GARDEN PACKAGING GUIDELINES**    178

## ICONS AND CALLOUTS

**NOTES:**

Any legal, regulatory, country of origin, warranty, certification, copyright, contact information, icons and additional information should be incorporated into the package as appropriate.

Individual manufacturers should take responsibility for the legal use and placement of icons relating to energy usage, sustainability, recyclability, safety and/or physical material compliance. These items and others may be legally restricted by governmental and/or non-governmental agencies.

Use of these icons must be approved for each package by the Craftsman brand team, legal department and individual product manufacturers.

### WARRANTY ICONS

The warranty icon only appears on the principal display panel in the lower right-hand corner and reversed-out over the red brushed metal background and incorporates a soft-edged drop shadow that angles down and to the right. The warranty icon should NOT appear over any of the product hero shot. The part warranty icon should be the same width as the product warranty icon and placed directly under it.

  

### FEATURE CALLOUTS AND ICONS

In many instances, a promotional Limited Edition or key product feature may be important to call out on the package graphically. Some examples are shown below.

 

   



BRAND STANDARDS

For detailed packaging artwork instruction manuals,
please contact the Craftsman® Packaging Director.



©2016 Sears Brands, LLC



# PRO SERIES PACKAGING

**IN THIS SECTION:**

- ► OVERVIEW
- ► LOGOS
- ► COLOR PALETTE
- ► PHOTOGRAPHY
- ► PDQ TRAYS
- ► GRADIENT BACKGROUND
- ► SHIELD ICON
- ► PANELS

**CRAFTSMAN**

BRAND STANDARDS                                                                          INTRODUCTION    181

## BUILT TOUGH. BUILT TO PERFORM.

**Craftsman® Pro Series is a premium product platform within the Craftsman brand structure.** Backed by the trusted performance and strength that all Craftsman products deliver, Craftsman Pro Series products offer an enhanced level of performance and durability to handle the toughest tasks.

A unique packaging design and logo set Craftsman Pro Series products apart from core Craftsman offerings. A black and gold color palette and chrome Craftsman logo establish a sleek, premium appearance, and minimal copy on packaging primary display panels allows the product photography and product name to be the hero.

Please adhere to the standards and guidelines on the following pages for Craftsman Pro Series products. For all other products, please refer to the previously outlined brand guidelines.





## CRAFTSMAN® PRO SERIES PACKAGING LOGOS

**PRIMARY LOGO – CMYK:**
BLACK , DARK GRAY OR GRADIENT BACKGROUND



**SECONDARY LOGOS – PMS 130:**
BLACK , DARK GRAY OR GRADIENT BACKGROUND

STACKED CENTERED:

**PRO SERIES**

INLINE HORIZONTAL:

**PRO SERIES**

STACKED & LEFT-JUSTIFIED:

**PRO SERIES**



**BRAND STANDARDS**                                                                 LOGOS  **183**

## CRAFTSMAN® PRO SERIES PACKAGING LOGOS (CONT.)

**ALTERNATE 1-COLOR PRIMARY LOGOS**

The preferred versions of the primary logo shown on the previous page should be used whenever possible, but in certain instances – like those seen below – one-color versions may be used.

Brand approval to use the alternate one-color logos are required.

1-COLOR GRAYSCALE LOGO
Use for print applications where 4-color is unavailable

1-COLOR FLEXO LOGO
Use for flexo print applications



**CRAFTSMAN PRO SERIES PRIMARY AND SECONDARY LOGO RELATIONSHIP**

When Craftsman Pro Series primary and secondary logos are coupled, the primary logo is intended to be dominant and should always appear before the secondary logo within a visual space.

Additionally, the inline horizontal secondary logo (seen below) is preferred but is not a lockup. There are many different "exceptions" that need to be met to accommodate different products. Select the appropriate secondary logo version based on available application space.

The secondary logo must be smaller than the primary logo. The secondary logo height is equal to 64% cap height of the "C" in the Craftsman logotype.

To assure readability refer to the clear space and sizing section on the following page.





## CRAFTSMAN® PRO SERIES PACKAGING LOGOS (CONT.)

### CLEAR SPACE

Whenever practical, the Craftsman Pro Series primary and secondary logos should be surrounded by clear space and free of elements.

### PRIMARY LOGO

The dimension of the minimum clear space area on all sides of the primary logo is equal to the cap height of the "C" in the Craftsman logotype.

### SECONDARY LOGOS

The dimension of the minimum clear space area on all sides of the secondary logo is equal to the stem width of the "P" in the Pro Series logotype.

NOTE: Reserve clear space for all versions of the Pro Series secondary logo.



### MINIMUM SIZE

The primary logo has a minimum width of 2 inches. Secondary logo has a minimum width of 1 inch. To assure readability, the registered trademark should never be scaled down below 1/32 inch.

below 1/32 inch high.





**BRAND STANDARDS**                                                                LOGOS   **185**

## INCORRECT LOGO USAGE

Below are examples of how the Craftsman® Pro Series logo should not be used.



DON'T PLACE LOGO ON A GOLD BACKGROUND



DON'T PLACE LOGO ON A RED BACKGROUND



DON'T CHANGE OUTER FRAME COLOR



DON'T CHANGE LOGOTYPE COLOR



DON'T REMOVE LOGO FRAME



DON'T SKEW OR DISTORT



DON'T CHANGE OPACITY



DON'T REMOVE LOGO FROM SURROUNDING FRAME



## COLOR PALETTE

The Craftsman® Pro Series colors are black, gray and gold.

COLOR USAGE

The use of color should be consistent with the packaging architecture on the following pages for Craftsman Pro Series products. Black and gray are used for backgrounds. Gold is used less frequently, particularly for the Pro Series logo, in headlines of legal copy and within line/box strokes. Gold is intended to highlight focal product features or touchpoints, and is not intended for use as a background color.



| 100% PROCESS BLACK | C:0  M:0  Y:0  K:100 | R:38  G:36  B:36 | HEX#262424 |

| PMS 425 C | C:0  M:0  Y:0  K:81 | R:88  G:91  B:93 | HEX#585b5d |

| PMS 130 C | C:0  M:30  Y:100  K:0 | R:225  G:168  B:0 | HEX#e1a800 |



## PHOTOGRAPHY STYLE

Photography is the most dominant visual aspect of the Craftsman® Pro Series packaging, as it showcases our innovative product offering. The use of product photography must remain consistent and appropriate in terms of overall style described in this section (e.g. lighting, camera angle and product placement). Products are photographed from one approved view – 3/4 angled profile view. Choose view based on size, shape, color, etc., that showcases the individual product and its key features best.

### THE "HERO" SHOT

The "Product as Hero" photography on packaging allows the consumer to see all the "Quality and Detail" that goes into the Craftsman Pro Series product. It is a heroic 3/4 view complemented with high-contrast photographic lighting style. The upscale nature of this product photography will lead the consumer to view the product as premium.

The product should be photographed against a black background, to ensure richer, more realistic colors and highlights on reflective surfaces. The main light for these images should fall from the top right to the bottom left. The "Hero" photography should be clipped out with no background and incorporate a soft-edged grounding shadow. Shadows are made up of 2 soft-edged shapes. The primary (base) shadow is filled with black and set to multiply at 80% opacity. The secondary shadow is filled with black and set to multiply at 50% opacity. Shadow opacities can be adjusted depending on how dark the background color is.



**CRAFTSMAN**

BRAND STANDARDS                                                    PHOTOGRAPHY  188

# PHOTOGRAPHY STYLE (CONT.)

**IMPORTANT!** PHOTO COMPOSITION

The product should be shot as a silhouette on a black background to ensure richer, more realistic colors and highlights on reflective surfaces. Within shot, products should be 100% centered.

LIGHTING

Use natural lighting to show the product. The main light should be positioned top down with it slightly behind the product to create a shallow grounding shadow. Use lights left and right for filling light and back lighting to create highlights to separate product from background.

SCENE STYLING & PROPPING

No scene styling.
Product should be shot as a silhouette only.

Propping should be used on rare occasions when composition calls for it.

FORMAT

Photography should be shot digitally at 300 ppi. High resolution CMYK TIFF files are recommended.

CAMERA POINT OF VIEW

The product should be photographed from an angle between 10°-45°. This angle will be determined by the package orientation. Choose angle based on the size, shape, color, etc., that showcases the individual product and any of its key features best.

The product is photographed at a distance determined by the product size, fill frame with product and shadow.

The product should be photographed from a height of 12-18 inches, determined by the actual height of the product. Choose the view based on the size, shape, color, etc., that showcases the individual product and any of its key features best.





10°-45°

TBD
PER PRODUCT

12-18 inches

**BRAND STANDARDS**                                                                 **PHOTOGRAPHY**  189

## PHOTOGRAPHY STYLE (CONT.)

### "HERO" SHOT PLACEMENT

When applied to a 6-sided package, the "Hero" photography overlaps the Craftsman® Pro Series gradient background on the package front and back panels. It is imperative to show all of the product. This will showcase all features of the product, giving the consumer a great idea of what they're getting.

The "Hero" shot should dominate the panel covering 90% of the panel width. Care must be taken to show the "Hero" shot as dynamic and impactful and not violate any elements on the panel, allowing clear space to further communicate premium quality.





### PRODUCT WALKAROUND SHOTS

This shot (or shots) appear on the side panel and contain the same photographic style as the "Hero" shots. It should offer the opportunity for walkarounds/callouts for features and benefits. This offers insights to the consumer in regards to the product Quality, Knowledge and Innovation.



©2016 Sears Brands, LLC

**CRAFTSMAN**

BRAND STANDARDS                                                                 PDQ TRAYS  190

## PDQ TRAYS

**NOTE:** In order to maintain consistency in PDQ widths and front lip heights, please check with the Craftsman buyer or product manager for sizing requirements.

PDQ trays should be 1-color direct print Flexo flooded with black and have rolled-over edges.

### FRONT LIP LABEL

The front lip label for the PDQ tray has a 4-color printed label applied to a 1-color (Process Black) direct print flexo tray/carton. The Pro Series Chrome logo should be offset .25" on all sides from the dimensions of the front lip. In most cases, the Craftsman® Pro Series primary and secondary logos are the only elements on the PDQ front lip label. The ProSeries logo should be 67% the width of the Craftsman logo, flush-right (see example below).



**LABEL**



**FLAT PDQ TRAY**



**ASSEMBLED PDQ TRAY**

### VARIATIONS

In instances where print production is limited, the 1 color white reverse Craftsman™ logo may be used instead of 4-color process chrome logo, however, the secondary logo must appear in PMS 130 yellow as defined previously in this section.



BRAND STANDARDS                                                        GRAPHIC ELEMENTS   191

# GRADIENT BACKGROUND

This background forms the foundation upon which all other elements are constructed. The distinctive black background creates strong brand blocking in the retail environment and is mandatory for all principal display panels.

This vector art background is constructed from a Pantone 425 gray base with an overprinting gradient of black adding depth and visual interest.

### SIZING AND PLACEMENT

The Craftsman® black gradient overprint should be placed starting solid black at the top of the front panel of the die so that the direction of the overprint fades towards the bottom for both the front and back panels. Adjust gradient to best showcase the "Hero" shot.



Base color = 100% Pantone 425



Gradient overlay = 100% Black, location 10% ➔ 10% Black, location 100%; Gradient slider 70%; Set to multiply



Gradient background comp



# SHIELD ICON

The shield icon represents the shape of the Craftsman® Shield Logo. It is based on a specific, carefully developed visual solution. It should not be re-created. Use only the artwork provided.

## ICON USE

This icon is the approved visual used to call out key features on Craftsman® Pro Series products.

## ICON COLOR

Inside stroke = 100% PMS 130
Outside stroke = 100% PMS 425
Fill = 45% white
Glow = 88% White

Example: 16-inch Gas Chain Saw

Example: Heavy Duty Drill/Driver Kit

©2016 Sears Brands, LLC

**CRAFTSMAN**

BRAND STANDARDS                                    PACKAGING ARCHITECTURE   193

# FRONT PANEL

These are the basic art elements that appear
on the front panel of the Craftsman® Pro Series
6-sided package.

1. CRAFTSMAN LOGO (PRIMARY)
Located prominently at the upper left-hand corner,
roughly 45% of the width of the panel. See page 147
for minimum clearance specifications. Position of
the primary logo will determine the overall carton
margins.

2. PRO SERIES LOGO (SECONDARY)
Located directly below the Craftsman logo.
Color is 100% Pantone 130.

3. PRODUCT NAME
Located directly below the Pro Series logo, reversed
out with the product specification callout directly
above and Spanish translation directly below.

　3-A. PRODUCT SPECIFICATION
　Size is equal to 50% of "C" height in Craftsman
　logotype. The text is set in United Sans Semi-
　Extended Black in all caps.
　3-B. ENGLISH PRODUCT NAME
　Size is equal to 100% of the product
　specification. The text is reversed out and set
　in United Sans Semi-Condensed Medium, all caps.
　3-C. SPANISH PRODUCT NAME
　Size is equal to 60% of the English product name.
　The text is reversed out and set in United Sans
　Semi-Condensed Medium, all caps.

4. PRODUCT NUMBER LOCKUP
Located in the upper right-hand corner and top-
aligned with the Craftsman logo. Point size is equal
to 75% of the product name. Width is determined
by the size of the main five digits. The digits are
reversed out set in United Sans Semi-Condensed
Medium.

5. GRADIENT BACKGROUND
Constructed from a Pantone 425 gray base with an
overprinting gradient of black. Adjust gradient to
best showcase the "Hero" shot.





©2016 Sears Brands, LLC

**CRAFTSMAN**

BRAND STANDARDS                                    PACKAGING ARCHITECTURE    194

# LEFT SIDE PANEL

These are the basic art elements that appear on the left side panel of the Craftsman® Pro Series 6-sided package.

## 1. CRAFTSMAN LOGO (PRIMARY)

Located prominently at the upper left-hand corner, size and margins are equal to the front panel Craftsman logo.

## 2. PRO SERIES LOGO (SECONDARY)

Located directly below the Craftsman logo. Color is 100% Pantone 130. See page 97-99 for detailed specifications.

## 3. PRODUCT NAME

Located directly below the Pro Series logo. See point 3 on the previous page for detailed text specifications.

## 4. PRODUCT NUMBER LOCKUP

Located in the upper right-hand corner and top-aligned with the Craftsman logo. Size is determined by the front panel.

## 5. PRODUCT WALKAROUND LOCKUP

Reversed out with a gold line directly below leading the consumer to the product feature.

### 5-A. WALKAROUND COPY FEATURE

Point size is equal to 65% of product name point size. The text is set in United Sans Semi-Condensed Heavy, title case.

### 5-B. WALKAROUND COPY FEATURE BENEFIT

Point size is equal to 65% of product name point size. The text is set in United Sans Semi-Condensed Medium, sentence case.

## 5-C. WALKAROUND GOLD LINE

Stroke weight is equal to 20% of the product feature point size. Inside stroke color is 100% Pantone 130, outside stroke is 100% Pantone 425.

## 5-C. WALKAROUND SHIELD

Size is equal to the "C" height in the Craftsman logo. Inside stroke color is 100% Pantone 130, outside stroke is 100% Pantone 425, glow is 88% white. Shield color fill is 45% white.

## 6. PRODUCT WALKAROUND PHOTO

See page 190-192 for walkaround shot style and placement specifications.

## 7. BACKGROUND COLOR

100% flood of Pantone 425 gray.





# RIGHT SIDE PANEL

These are the basic art elements that appear on the right side panel of the Craftsman® Pro Series 6-sided package.

1. CRAFTSMAN LOGO (PRIMARY)

Located prominently at the upper left-hand corner, size and margins are equal to the front panel Craftsman logo.

2. PRO SERIES LOGO (SECONDARY)

Located directly below the Craftsman logo.
Color is 100% Pantone 130. See page 97-99 for detailed specifications.

3. PRODUCT INSET LOCKUP

Located directly below the product name, no more then six feature insets should be included.

3-A. INSET PHOTOGRAPHY

Size is equal to roughly 175% height, 65% width of Craftsman logo. Inset photography should showcase the individual product key features.

3-B. INSET COPY

Point size is equal to 50% of product name point size. The headline text is set in United Sans Semi-Condensed Heavy in title case. Supporting copy is set in United Sans Semi-Condensed Medium, sentence case.

3-C. INSET GOLD LINE

Stroke weight is equal to 15% of the inset copy point size. Color is 100% Pantone 130.

4. WARRANTY

Aligned with the Craftsman logo above, reversed out with the supporting message callout directly below the headline. Headline font size is equal to 50% of "C" height in the Craftsman logotype, United Sans Semi-Condensed, all caps. Supporting copy point size is 87.5% of the headline point size set in United Sans Semi-Condensed Medium, sentence case. Each Warranty copy block must end with an ownership line(s). See primary Craftsman Brand Standards for details on legally required statements.

5. CRAFTSMAN CLUB LOCKUP

Located at the bottom of the panel, centered with clear space equal to the carton margins.

6. AIR INDEX CHART

Located to the right of the Craftsman warranty.

7. BACKGROUND COLOR

100% flood of Pantone 425 gray.

1
CRAFTSMAN
00000
2
PRO SERIES
16-INCH
GAS CHAIN SAW
MOTOSIERRA DE GAS
3
SIM-PUL TECHNOLOGY
For smooth, easy starting. Reduces effort needed to start.
Reduced Vibration System
For increased operator comfort
Visible Fuel Level Window
Helps keep track of remaining runtime
Front Screw Tensioning System
For easy chain tensioning
CRAFTSMAN LIMITED WARRANTY
4
6
The Air Index of this engine is 3
Most Clean
Least Clean
Note: The lower the air index, the less pollution.
TO JOIN
CRAFTSMAN CLUB
5
Text CRAFTSMAN to 73277
www.craftsman.com/signup
7





**CRAFTSMAN**

BRAND STANDARDS                                      PACKAGING ARCHITECTURE   196

# BACK PANEL

On large cartons, the back panel is a secondary display panel. Select appropriate orientation (horizontal or vertical) based on product needs.

These are the basic art elements that appear on the back panel of the Craftsman® Pro Series 6-sided package.

**1. CRAFTSMAN LOGO (PRIMARY)**
Located prominently at the upper left-hand corner, size and margins are equal to the front panel Craftsman logo.

**2. PRO SERIES LOGO (SECONDARY)**
Located directly below the Craftsman logo. Color is 100% Pantone 130. See page 97-99 for detailed specifications.

**3. PRODUCT NAME**
Located directly below the Pro Series logo.

**4. PRODUCT NUMBER LOCKUP**
Located in the upper right-hand corner and top-aligned with the Craftsman logo. Size is determined by the front panel.

**5. THE "HERO" SHOT**
See page 190 – 192 for "Hero" shot style and placement specifications.

**6. GRADIENT BACKGROUND**
Constructed from a Pantone 425 gray base with an overprinting gradient of black. Adjust gradient to best showcase the "Hero" shot.







BRAND STANDARDS                                    PACKAGING EXAMPLE  197

## SMALL CARTON

On small cartons where space is limited, the product walkaround information is on the back panel.

These are the basic art elements that appear on the Craftsman® Pro Series small 6-sided package.

1. FRONT PANEL
Primary display panel. See page 195 for detailed panel elements and specifications.

2. LEFT SIDE PANEL
Contains product features. See page 196 for detailed panel elements and specifications.

3. RIGHT SIDE PANEL
Contains product warranty and Craftsman Club lockup. See page 197 for detailed specifications.

4. BACK PANEL
Contains the product walkaround lockup. See page 198 for detailed panel elements and specifications.

5. TOP PANEL
See page 201 for detailed panel elements and specifications.

6. BOTTOM PANEL
See page 200 for detailed panel elements and specifications.









# BOTTOM PANEL

These are the basic art elements that appear on the bottom panel of the Craftsman® Pro Series 6-sided package.

1
CRAFTSMAN
5
00000
2
PRO SERIES
16-INCH
3
GAS CHAIN SAW
MOTOSIERRA DE GAS
6
CONTENTS: Chain Saw, 2.6 oz. Oil, Operator's Manual
WARNING: Alternative fuels [not gasoline] such as E-15 (15% alcohol), E-20 (20% alcohol), E-85 (85% alcohol) are NOT classified as gasoline and are NOT approved for use in 2-stroke gasoline engines.
IMPORTANT: BE SURE to read, understand and follow all warnings, safety rules, instructions and labels in the Operator's Manual and on the product itself before using the product. Failure to do so can result in serious personal injury.
4
ALWAYS WEAR PROPER safety goggles, glasses with side shields, a full-face shield when needed, proper respiratory protection and hearing protection when operating power tools.
CONTENIDO: Motosierra, 2.6 oz de Aceite, Manual del Operador
ADVERTENCIA: Los combustibles alternativos [que no son gasolina], tales como E-15 (15% de alcohol), E-20 (20% de alcohol), E-85 (85% de alcohol) NO se clasifican como gasolina y NO están aprobados para usarse en motores de gasolina de dos tiempos.
IMPORTANTE: ASEGÚRESE DE LEER, entender y seguir todas las advertencias, reglas de seguridad, instrucciones y las etiquetas en el manual del operador y el producto mismo antes de usar el producto. El no hacerlo puede resultar en lesiones graves.
USE SIEMPRE GAFAS de seguridad adecuadas, gafas con protectores laterales, un escudo de cara completa cuando sea necesario, y protección adecuada para la respiración y para los oídos cuando opere herramientas eléctricas.
Made in China.
Product distributed in the United States by
Sears Brands Management Corporation,
Hoffman Estates, IL 60179
7
0 00000 00100 7

1. CRAFTSMAN LOGO (PRIMARY)

Located prominently at the upper left-hand corner, size and margins are equal to the front panel Craftsman logo.

2. PRO SERIES LOGO (SECONDARY)

Located directly below the Craftsman logo. Color is 100% Pantone 130. See pages 97-99 for detailed specifications.

3. PRODUCT NAME

Located directly below the Pro Series logo.

4. CONTENTS & WARNING COPY

Located directly below the product name, on the same baseline as the UPC code.

4-A. COPY HEADLINE

Point size is equal to 45% of product name point size. The text is 100% Pantone 130 and set in United Sans Semi-Condensed Heavy, all caps.

4-B. SUPPORTING COPY

Point size is equal to 45% of product name point size. The text is reversed out and set in United Sans Semi-Condensed Medium, sentence case.

4-C. DIVIDER LINE

Stroke weight is equal to 20% of the contents and Warning copy point size.

5. PRODUCT NUMBER LOCKUP

Located in the upper right-hand corner and top-aligned with the Craftsman logo. Size is determined by the front panel.

6. UPC CODE & ADDRESS LOCKUP

See primary Craftsman Brand Standards for detailed specifications.

7. BACKGROUND COLOR

100% flood of black.

 ©2016 Sears Brands, LLC





**BRAND STANDARDS**                                    **PACKAGING ARCHITECTURE**  199

# TOP PANEL

These are the basic art elements that appear on the top panel of the Craftsman® Pro Series 6-sided package.

### 1. CRAFTSMAN LOGO (PRIMARY)

Located prominently at the upper left-hand corner, roughly 75% of the width of the front panel Craftsman logo. Clear space is equal to the carton margins determined by the front panel logo.

### 2. PRO SERIES LOGO (SECONDARY)

Located directly below the Craftsman logo. Color is 100% Pantone 130. Size is equal to 95% width of the Craftsman logotype. See page 147 for detailed clear space specifications.

### 3. PRO SERIES STORY

This copy is intended to describe the premium product features that create a step-up from core Craftsman products. It's written in paragraph form, but should include a maximum of four concise sentences that describe the features in an engaging, confident tone. Located directly below the Pro Series logo.

Reversed out with point size equal to 65% of the product name point size. The text is set in United Sans Semi-Extended Bold, sentence case.

### 4. PRODUCT NAME

Located directly below the Pro Series logo.

### 5. THE "HERO" SHOT

Located in the bottom, left-hand corner of the panel directly below the product name. See page 190 – 192 for "Hero" shot style specifications.

### 6. PRODUCT NUMBER LOCKUP

Located in the upper right-hand corner and top-aligned with the Craftsman logo. Size is determined by the front panel.

### 6. GRADIENT BACKGROUND

Constructed from a Pantone 425 gray base with an overprinting gradient of black. Adjust gradient to best showcase the "Hero" shot.







 **RETAILER CO-BRANDING**

IN THIS SECTION

► OVERVIEW

► BRAND SPACES

► THE PARTNERSHIP MARK

► SOCIAL MEDIA

► IN-STORE

► ADVERTISING

► PROMOTIONAL

©2016 Sears Brands, LLC



Since 1924, Ace has been your local hardware store and part of your community with over 4,700 locations across the globe. Ace's Helpful Hardware Folks provide reliable service, advice, and products to help customers get projects done right.

Enter Craftsman®, the toughest and most trusted tool brand in America. Since 1927, Craftsman products have been forged by an unwaivering dedication to quality and durability, and have inspired users for generations. These two iconic brands now together make Ace your neighborhood place for Craftsman.

The following guidelines provide reference, direction, and standards for how to treat the Ace/Craftsman logo lockup across all retail branding channels.





BRAND STANDARDS                                                    BRAND SPACES    202

Both Craftsman and Ace represent two separate and distinct parts in a business relationship. The retail store Ace Hardware is a **Destination** in the context of the Ace/Craftsman relationship. Craftsman is a **Product Brand**, available at the destination.

The websites of Craftsman and Ace Hardware for example, are brand-specific locations that inherit the design attributes of the respective brand.  That said, each brand will live 'under the hood' of the other, for each brand's specific communication needs.

Ace website



This is the Ace brand website, therefore Ace brand format is appropriate. Craftsman is a **'product'** at Ace the **'destination';** where Ace branding will always consistently appear on the pages.

All imagery should reflect Craftsman style when representing the Craftsman brand.

©2016 Sears Brands, LLC



**BRAND STANDARDS**

**BRAND SPACES**  203

This is an example of how duplication of a brand logo is not suitable within its own branded environment.

A co-branded logo used in this dedicated brand environment would compete with the Ace brand website pages.

Ace website





**BRAND STANDARDS**                                                    **BRAND SPACES**   204

This is an example of how duplication of a brand logo is not suitable within its own branded environment.

A co-branded logo used in this dedicated brand environment would compete with the Craftsman brand website pages.

Craftsman website



BRAND STANDARDS                                          BRAND SPACES   **205**

Here is an example of how the Destination brand is positioned within the Product Brand environment.

Positioning ACE as a **Retail Partner Destination** with Ace brand look & feel visuals within the Craftsman brand environment.

The essence of the Ace brand with singular, clear messaging will allow each brand its focus, and reduce brand conflicts.

Craftsman website





When co-branded communications are required, a special Ace/Craftsman **Partnership Mark** has been created for use.

Each application of this mark will be approved by the Craftsman brand Team and Ace brand Team before being released. Recommendations for proper application of the Partnership Mark are detailed on the following pages.

The Ace logo should always appear above or to left of the Craftsman logo when used as partnership mark.




Primary Ace/Craftsman Partnership Mark



Secondary Ace/Craftsman Partnership Mark

CRAFTSMAN Brand Standards                                         ©2016 Sears Brands, LLC



When used in proximity as a lockup within Ace marketing communications materials, the Partnership Mark must be used as shown here, using supplied artwork.







If background color or print execution dictates need for a white Ace logo, then Craftsman logo should also be white



**BRAND STANDARDS**                                                                    **PARTNERSHIP STORY**   208

When brands are to be treated together as part of a dedicated and exclusive partnership communication or promotion, the lockup should be used in conjunction with a positioning statement or Relationship Story. The Relationship Story can be used as the supplied tagline, or as part of a larger story, however, no additional brand logo should be used.



EXAMPLE:
IN STORE SIGNAGE OR DIGITAL MEDIA

Presentation where the focus is only on Craftsman products. The Ace/Craftsman lockup maybe used here, within the brand-driven look & feel of Craftsman. Look and feel with diamond plate background for mechanic's tools category only.

Collateral will be Craftsman brand look & feel, but can be customized with retailer logo as secondary emphasis

 ©2016 Sears Brands, LLC





**CRAFTSMAN®**

BRAND STANDARDS                                              PARTNERSHIP SUPPORT    210

The partnership mark should not be placed onto Craftsman® brand collateral.

The retailer logo is a secondary communication.

Consistent placement, size and treatment of retailer logo should be maintained, as shown on the following page.







**CRAFTSMAN®**

BRAND STANDARDS                                           SOCIAL MEDIA   211



In social media channels, it is important to follow a few general guidelines:

•  Speak to PRIDE whenever possible

•  Use #WhenItMatters on Instagram & Twitter.
   Avoid hashtags on Facebook.

•  Always tag the partner brand when applicable

•  Use logos with a white outline on dark backgrounds,
   black outline on light backgrounds

•  "Craftsman" must not be used as a proper noun, instead it
   should always be used as an adjective like "Craftsman Tools."

•  All independent retailer social posts, images and copy,
   promoting Ace need to be reviewed and approved by Ace's
   Digital Marketing Specialist and/or Creative Advertising &
   Public Relations Manager to ensure messaging connects well
   with the Ace brand. (for the giveaway posts, we will not need to
   review your posts since you will be sharing the posts we created)

•  Posts must tag @AceHardware

•  Use #TheHelpfulPlace when applicable on Instagram,
   Facebook and Twitter

•  When including the Ace, The Helpful Place logo, please refer
   to the Ace Brand Style Guide

Use the appropriate brand type styles and colors, and consider
the examples indicated on the following pages.

©2016 Sears Brands, LLC



**BRAND STANDARDS**                                          **SOCIAL MEDIA**   212

**Craftsman® Social Media Color & Font Use**

Social media sites use their own styles. Within the scope of creative presentations that are published for Craftsman and Ace Brands, the styles used are appropriate to the brand.  Reference each brand guideline as needed.

### Primary Font
## ITC FRANKLIN GOTHIC STD
BOOK, **MEDIUM, DEMI, DEMI COMPRESSED**

**CAMPAIGN FONT**

The Liberator typeface is reserved for brand initiatives leveraging the #When It Matters campaign. It does not replace the existing Craftsman® brand fonts.

### Secondary Font
# LIBERATOR
**MEDIUM, HEAVY**



**CRAFTSMAN RED 185**
C:90  M:95  Y:81  K:1



**WHITE**
C:0  M:0  Y:0  K:0

**Ace® Social Media Color Use**

Ace The Helpful Place logo should appear in Ace Red (186) and black. When used on a black background, the tagline words 'The' and 'Place' will be reversed out in white.  On other dark backgrounds that are not black, the tagline should be entirely white.









**ACE RED 186**
M:100  Y:81  K:4
R: 94.9%  G: 0.2%  B: 13.7%



**BLACK**
C:0  M:0  Y:0  K:100



**BRAND STANDARDS**                                                     **SOCIAL MEDIA**   213

Ace/Craftsman® Social Media Examples

Below or general references of acceptable social media promotion
with marketing graphics from each brand.  Work with your Ace and
Craftsman Marketing Teams to establish parameters for your project.



For in-store signing promotional applications, the Partnership Mark should be used when product and price is exclusive to Craftsman product.





Example:
Ace in-store promotional poster



BRAND STANDARDS                                                                          IN-STORE    215

For in-store merchandising and signing applications, each brand will have its own identity and visual space.

For instance, the Craftsman display will conform to Craftsman graphic standards, and will 'take-over' the look and feel of the endcap display with a few exceptions:

'Moment of Help' endcap creative will not communicate price or product, and therefore does not use the Partnership Mark.

Wayfaring Signing: Remains in Ace (retailer) brand format.

In-store Services Communications:
Such as warranty, services, in-store on-demand pricing and Ace Rewards promotional signing will remain in Ace branding format.

Additional Examples of in-store merchandising available from your marketing team leader



Store format.
Retailer look and feel

Craftsman brand format look and feel

Collateral –
Craftsman brand look and feel, maybe customized with retailer logo as secondary emphasis



BRAND STANDARDS                                                              IN-STORE    216

For special, EXCLUSIVE in-store merchandising and signing applications, the Partnership Mark maybe applied in the same visual space.

For instance, the Craftsman display will conform to Craftsman graphic standards, however, an exclusive offer, product or service that is offered by Craftsman ONLY AVAILABLE at Ace will justify the use of the Partnership Mark.

In-store services communications such as warranty, services, in-store on-demand pricing and Ace Rewards promotional signing will remain in Ace branding format.



Co-brand format.
CRAFTSMAN look and feel

Craftsman brand format look and feel

Additional Examples of in-store merchandising available from your marketing team leader

Collateral –
Craftsman brand look and feel, maybe customized with retailer logo as secondary emphasis

                                    ©2016 Sears Brands, LLC

**CRAFTSMAN**®

BRAND STANDARDS                                                    ADVERTISING   **217**

On dedicated circulars in retailer format, exceptions may be allowed to present co-branded communication without the use of the Parnership mark.



**Relationship Story.** In this example, an exclusive Craftsman Product page is branded only with the Relationship Mark and Story. This Ad would appear on a circular with NO OTHER additional Craftsman OR Ace logos.

## EXAMPLE: DEDICATED CIRCULAR COVER

The Ace format Circular is designed in a format that requires the Ace brand mark to remain consistent. In this case the proportions of the Partnership mark maybe adjusted to accomodate. Contact your Ace or Craftsman Marketing Team leader for details.

# CRAFTSMAN®

BRAND STANDARDS                                                    ADVERTISING    218

When brands are to be treated together as part of a
co-branded communication or promotion, the
Partnership Mark should always be used as supplied.



EXAMPLE: INTERIOR CIRCULAR PAGE

Focus only on Craftsman products. The Ace/Craftsman lockup maybe used here,
within the look & feel of Ace brand circular.

**CRAFTSMAN®**

When brands are to be treated together as part of a
co-branded communication or promotion, the
Partnership Mark should always be used as supplied.



## EXAMPLE: EMAIL

Focus only on Craftsman products. The Ace/Craftsman lockup maybe used here,
with the look & feel of Craftsman within the Ace brand email format.

**CRAFTSMAN®**

BRAND STANDARDS                                                    ADVERTISING   220

Any communications that are **_shared_** space with other brands
WILL NOT use the Partnership Mark.



Example:
Circular Ad with multiple branded products, including
Craftsman products. The Ace/Craftsman Partnership Mark
may NOT be used here.



BRAND STANDARDS                                                   CLEAR SPACE    221

The Partnership Mark has been crafted for visual balance to best portray each brand in a respectful light, and must be used as supplied. Clear zones are detailed below.

▮ Minimum Clear Space



Primary Ace/Craftsman Partnership Mark



Secondary Ace/Craftsman Partnership Mark

**CRAFTSMAN®**

BRAND STANDARDS                                                 PROMOTIONAL   222

In Addition, a Partnership Seal has been created for flexibility in specific need-based applications.  Here are a few examples of store associate promotional materials.

Any and all promotional applications must be approved by Craftsman and Ace brand Teams.



Branded, Stand-Alone Applications



Branded, 'On-Craftsman' Applications



BRAND STANDARDS                                    PROMOTIONAL    223

Below are a few examples of promotional ad headline messaging with acceptable language.







©2016 Sears Brands, LLC

**CRAFTSMAN**

# "SMART" PRODUCT GUIDELINES

## IN THIS SECTION

► OVERVIEW

► STYLE

► TAB

► COLOR USAGE

► FONT USAGE

► ELEMENTS

► KEY ELEMENTS

► FEATURE BUMP-OUT

► ARCHITECTURE

► ON-PRODUCT IDENTIFICATION

► MERCHANDISING

► SUPPORT ELEMENTS



**BRAND STANDARDS**                                   **SMART PRODUCT OVERVIEW**   225

## WHAT ARE "SMART" PRODUCTS?

SMART is the term the Craftsman brand will use
to easily identify those products that are smart
device enabled. These products either have wireless
connectivity or are Bluetooth enabled.

The following chapter will detail how to differentiate
and treat connected products from non-connected
products. The objective is to make it easy for the
customer to easily identify SMART products and
understand the benefits on how they can help
improve or simplify their lives.



©2016 Sears Brands, LLC

**CRAFTSMAN®**

In an effort to maintain a family look and feel among all Craftsman® SMART products, the following guidelines have been developed for a highly visible graphic lockup and treatment for SMART communications.

Elements and examples on the following pages are designed to provide clear identification of SMART features and functionality within the Craftsman brand.



©2016 Sears Brands, LLC

**CRAFTSMAN**

## THE SMART TAB

The SMART Tab is used as the primary identification element on Craftsman® brand SMART capable products. The tab is used at the right edge of the front panel and visually connects the user to an informational side panel dedicated to SMART features.

The SMART Tab should appear on the front, and wrap to the right side panel of cartons. Select appropriate vertical position based on available application space.

      

Primary application

      

Secondary applications            Variation: When tab extends to side or back packaging panel, this simplified tab can be used in conjunction with SMART supporting copy.

## USAGE

Positioned at the right edge of Craftsman brand packaging design architecture to visually draw the user to the right side panel SMART Control Story.  For designs with limited horizontal space, use the vertical orientation.



## COLOR USAGE

SMART as a technology brand feature requires the use of color that is easily identified within the Craftsman® brand color pallete as uniquely different. The SMART blue must be used with reservation, and only as defined in the pages that follow.

The blue is used for the SMART Tab, icons, text and headlines to communicate meaningful points of interaction. Blue should be used to draw attention to emphasized text. Craftsman Gray 11 is used for the complement background color of the bump-out tabs.



**SMART BLUE**

**PMS 306 C**

C:75   M:00   Y:07   K:00

R:092   G:186   B:226

HEX#5cbae1



**COMPLEMENT COLOR #1**

**PMS COOL GRAY 11**

C:00   M:02   Y:00   K:68

R:113   G:113   B:115

HEX#666366

**CRAFTSMAN®**

BRAND STANDARDS                                    SMART PRODUCT STYLE    229

## FONT USAGE

SMART as an ingredient utilizes the fonts of the Craftsman®
brand with the addition of a few font weights in the United
Sans family. The SMART dedicated panel and any SMART
message should include the Craftsman brand fonts.

New font weights for SMART products:

**UNITED SANS REGULAR HEAVY**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

UNITED SANS CONDENSED MEDIUM
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

Craftsman brand fonts:

UNITED SANS REGULAR MEDIUM
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

UNITED SANS SEMI CONDENSED MEDIUM
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

**UNITED SANS SEMI CONDENSED BOLD**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

**UNITED SANS SEMI CONDENSED HEAVY**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

**UNITED SANS CONDENSED BLACK**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

**UNITED SANS SEMI EXTENDED BLACK**
**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

**CRAFTSMAN®**

## SMART PACKAGING – KEY ELEMENTS

The key elements for Craftsman® brand packaging with SMART features are illustrated here using the Craftsman SMART Garage Door Opener. Select use of blue is placed throughout the design and is intended to instantly draw the eye to the SMART benefit story.

### CARTON FRONT PANEL

"SMART" pre-describer in product name

SMART Tab (with text)

SMART bump-out with connectivity story, smartphone illustration and mobile app icon

### NOTE:

The red packaging background is the core Craftsman packing design background. For Garage Door Opener Products, the background color is also used as a point of product differentiation. On this design, the gray background color used is to identify belt drive garage door openers.

### SMART TAB

Used as supplied, wraps from front to right side panel story featuring SMART Control Connectivity overview (as space allows)

### CARTON TOP PANEL (NOT SHOWN)

"SMART" pre-describer in product name

SMART Feature bump-out with connectivity story

Smartphone illustration, mobile app icon

Apple App Store & Google Play icons



### CARTON BACK PANEL (NOT SHOWN)

"SMART" pre-describer in product name

SMART Tab (icon only)

SMART Connectivity Headline

SMART Key Features

SMART Step-by-Step Setup Story

SMART Device Compatibility Information

### SMART DEDICATED RIGHT SIDE PANEL

SMART Connectivity Story

NOTE: Tool Packaging graphic elements specified to be on the right panel will now be combined with left panel contents

©2016 Sears Brands, LLC

**CRAFTSMAN®**

## SMART FEATURE BUMP-OUT

The Feature Tab is approved for use on several categories of Craftsman® products. For priority impact on the SMART feature message, a SMART bump-out is used to quickly communicate the product's primary benefits of SMART connectivity.

The SMART bump-out with connectivity feature App Icon and smartphone imagery should appear on carton front and top panels. Select appropriate horizontal size based on available application space.



Quickly explains benefits of SMART functions to the customer.

The supporting message should be called out concisely, clearly and main benefit-driven.

The image of a smartphone linked to the Craftsman App Icon and SMART message visually reinforces the idea of "control from anywhere" using the mobile app.



**CRAFTSMAN®**

BRAND STANDARDS                                    SMART PRODUCT PACKAGING ARCHITECTURE    232

## CARTON FRONT PANEL

Front panel design carries the Craftsman® brand look, information hierarchy, brand style and structure per the Craftsman brand guidelines. SMART appears on the front panel as the primary product feature represented by the "SMART" pre-describer, SMART tab element and features tab bump-out.

The SMART tab is always on the right edge, visually drawing the consumer to the SMART dedicated panel.



**X** = height of the interior red bounding box of the Craftsman logo

### MEASUREMENTS

"X" = Height of the interior red box of the Craftsman logo establishes the root measurement for the package.

### 1. "SMART" PRE-DESCRIBER

The "SMART" pre-describer has the same font and proportion characteristics in relation to the product name as a pre-describer on a standard Craftsman package.

### 2. SMART TAB ZONE

SMART tab height is equal to 80% of "X". The tab is only used at the right edge of the front panel to visually draw the user to the side panel. The space below the tab is determined by the Craftsman packaging margins.

The SMART tab wraps around the right side panel to the SMART Control Connectivity Story.

The tab element includes shadow effects to create implied dimension from the background, use as supplied.

### 3. SMART BUMP-OUT

The SMART bump-out should appear in the lower left-hand corner. Select appropriate horizontal size based on available application space.

**The general principles of how SMART is applied to Craftsman brand Packaging design format is illustrated here using the Craftsman SMART Garage Door Opener and should be used as a general guide for adapting the architecture to different Craftsman brand design formats.**

**CRAFTSMAN®**

## SMART STORY – DEDICATED RIGHT PANEL

The SMART story panel is designed to provide an overview of wireless or Bluetooth connectivity as it relates to the product's functionality. The SMART story panel should always be the right side panel, as illustrated here. On small cartons where space is limited, the SMART story can be included in the product feature walkaround on the back panel. Select the appropriate panel based on available space.

### 1. PRODUCT PHOTOGRAPHY

The product photography should appear near the top of the panel. Product should be marked with the SMART Control icon.

### 2. SMART TAB WRAP

Tab wraps in alignment with the front panel tab with shadow effect at intersection with light gray box.

### 3. CONNECTIVITY STORY

The connectivity story should appear below the product photo. Fonts used are that of the Craftsman brand.

Fonts: United Sans Regular Heavy
Fonts: United Sans Regular Medium
All caps/sentence case; centered

### 4. CONNECTIVITY ILLUSTRATIONS AND/OR KEY FEATURES LIST

The connectivity illustrations should appear below the connectivity headline. Fonts used are those of the Craftsman brand.

NOTE:
See packaging examples section for additional execution references.



**CRAFTSMAN®**

BRAND STANDARDS                    SMART PRODUCT PACKAGING ARCHITECTURE    234

## SMART STORY PANEL – ALTERNATE

This is a flexible zone that can accommodate additional useful product information depending on the marketing needs of the specific product. In this example, the SMART Key Features are presented without the use of the connectivity illlustrations.



**CRAFTSMAN** Brand Standards                                                    ©2016 Sears Brands, LLC

**CRAFTSMAN®**

**BRAND STANDARDS**                    **SMART PRODUCT PACKAGING ARCHITECTURE**    235

## SMART KEY FEATURES

Key features appear on the SMART dedicated side panel, on the back
of designs that do not allow for a side panel, or as support for a larger
back panel SMART story if required. Select appropriate panel based on
available application space.



### 1. KEY FEATURES LIST

Quickly explains benefits in concise,
clear and benefit-driven copy.

SMART supporting icons should be used
for key features.

### 2. APP ICON AND PHONE IMAGE

The image of an iPhone® with a
representative image of the App
functionality is linked to key features
and icons visually to reinforce the idea
of "control from anywhere" using the
SMART app.



**CRAFTSMAN®**

## TOP PANEL FEATURE BUMP-OUT

Top panel design carries the Craftsman® brand look, information hierarchy, brand style and structure per the Craftsman brand guidelines. SMART appears on the top panel as the product feature represented by the "SMART" pre-describer and SMART bump-out.





### 1. "SMART" PRE-DESCRIBER

The "SMART" pre-describer has the same font and proportion characteristics in relation to the product name as a pre-describer on a standard Craftsman package.

### 2. BUMP-OUT

The SMART bump-out should appear right of the Craftsman information tab. Select appropriate horizontal size based on available application space.

Bump-out should have a border with drop shadow to create separation and depth.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

# SMART CARTON BACK PANEL

Back panel design carries the Craftsman® brand look, information hierarchy, brand style and structure per the Craftsman brand guidelines. SMART appears on the back panel as the connectivity story.



## 1. SMART TAB

SMART Tab height is equal to 80% of "X".

The tab is only used at the left edge of the front panel to visually draw the user to the compatibility story. The tab contains the WiFi icon only, as this tab is continued from the front to the side and terminates on the back panel, and is visually aligned with the Control Headline.

## 2. CONTROL HEADLINE

The headline should appear right of the SMART Control tab. Font used is that of the Craftsman brand.

## 3. COMPATIBILITY HEADLINE WITH MOBILE APP ICON

The headline and icon should appear below the SMART tab and control headline. Font used is that of the Craftsman brand.

## 4. "SMART" PRE-DESCRIBER

Same as front panel.

## 5. SMART KEY FEATURES WITH SMARTPHONE IMAGE

Each feature should appear within an individual 100% Black box. Fonts used are those of the Craftsman brand. Smartphone image should depict the mobile app in use.

## 6. STEP-BY-STEP SETUP STORY

Brief instructional copy should connect to the overall SMART Story, including instructions on retrieving the App on mobile devices via language provided by Apple and Google, respectively.

## 7. DEVICE REQUIREMENTS

Clear communication regarding system components and network requirements for fully functioning connectivity to be summarized and presented near the complete SMART Story.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

## SMART PACKAGING ALTERNATE EXAMPLES

Below is an example of packaging design for an accessory that allows a Garage Door Opener to be converted for SMART technology. Note restrictive panel sizes call for a concise and clear connectivity story and a simplified top panel.





![CRAFTSMAN]

## SMART ON-PRODUCT IDENTIFICATION

Products with SMART connectivity should be easily identified by featuring the Craftsman brand's smart wireless symbol and accompanying word "SMART" lockup as shown. The position and relationship of the lockup in relation to other mandated on-product branding elements may change based on individual product layout and characteristics. A Craftsman Product Development Industrial Design Manager must approve all on-product identification.





**CRAFTSMAN®**

BRAND STANDARDS                                    SMART ON-PRODUCT IDENTIFICATION    240

## SMART ON-PRODUCT IDENTIFICATION

Products with SMART connectivity should be easily identified by featuring the Craftsman brand's smart wireless symbol and accompanying word "SMART" lockup as shown. When designed into the on-product graphics of Craftsman products, the mark is integrated into the electronic user interface of the product.



**Horizontal**



**Vertical**

## USAGE

The Craftsman brand's smart wireless symbol must be used as supplied. Craftsman Product Development is allowed flexibility in the font face of United Sans Font Family to integrate into the product design graphic style for said product line.  However, application of the combined element must be consistent among all products within a product category.



## SMART IN CRAFTSMAN®
## BRANDED MERCHANDISING

When a grouping of products that all feature SMART connectivity are supported by in-store merchandising, Craftsman® branding takes center stage while the SMART tab clearly identifies the feature benefit. The SMART tab should appear on the right edge of signage, and additional supporting elements such as channel strips can be included.



**SMART TAB AND CONNECTIVITY STORY**

Top line messaging supporting SMART product feature and benefit as it relates to mechandised offering.

**SMART TAB ON PACKAGE**

Strive for uniform placement that aligns across packaging. For product mixes that include non-smart products, SMART control is given prime space and emphasis.

**SHELF STRIP PROMOTIONAL SUPPORT**

Shelf merchandising, tray packs, displays...any single product facing with SMART product can include the use of SMART blue as a device to differentiate or add support for SMART product on-shelf directly adjacent to SMART product packaging.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

BRAND STANDARDS SMART PRODUCT SUPPORT ELEMENTS 242

## APP ICONS

Beyond the mobile website experience, technology has been reaching into Craftsman® product lines with functionality that improves life through connectivity with devices.

The Craftsman SMART App and several product-specific Craftsman branded mobile applications have been developed for iOS and Android devices. The icons for these applications are shown here.


SMART


Garage Door


Tool Storage


Riding Mower


Android


iOS

©2016 Sears Brands, LLC



## FEATURE ICONS

Symbols are powerful communication devices when used purposefully. Icons may be used to visually support the SMART Story, and when used in direct relation to the SMART Story and graphic treatments, SMART blue is the recommended color. For in-app use, and alternative uses that are not directly tied into SMART product visual identification, icons should be used within the Craftsman brand color scheme utilized.

These Craftsman icons are styled to be simple, intuitive and angular in form and are reflective of the Craftsman brand look & feel.

       

OIL          BATTERY          BLADE          CHAT          USER          CALENDAR          POWER          UNLOCK          LOCK

     

FENCE PRESSURE          WRENCH          SETTINGS          DRILL          NOTES          MEGAPHONE          CONVENIENCE

        

MAP          CART          TOOLS          LIGHT          ADD          CHECK          RIDING MOWER          GARAGE          TOOLBOX



**EXAMPLE: ICONS APPLIED IN SMART STORY CONTEXT**

Used here in a SMART product key features list, the icons have been placed into a blue graphic that connects to the adjacent SMART Product story.

                                    ©2016 Sears Brands, LLC



## CLASS ONE PRODUCT GUIDELINES

**IN THIS SECTION**

► OVERVIEW

► LEGAL REQUIREMENTS

► COLOR USAGE

► FONT USAGE

► PRIMARY TAB

► TAB ALTERNATES

► EXAMPLES

► CLASS ONE SMART PRODUCTS

► HANG CARD MINIMAL EXAMPLE

**CRAFTSMAN®**

BRAND STANDARDS                                            CLASS ONE PACKAGING    245

## CLASS ONE PACKAGING GUIDELINES

Certain Craftsman® items that include a free or bonus product are classified as Class One products. Class One items are only available for a limited time on shelf as a special promotion. Therefore, packaging for Class One items has a different design execution than standard Craftsman packaging to stand out on shelf and be quickly identifiable.

Please follow the following guidelines for development of Class One packaging. This packaging execution requires approval from Craftsman Product Management. It is reserved for Class One items only, not for everyday use.



**CRAFTSMAN®**

## CLASS ONE LEGAL REQUIREMENTS

To include the term "Free" on packaging for Class One items, all terms and conditions must be set forth, clearly and conspicuously at the outset of the offer. These terms and conditions must appear in close proximity to the Free offer (no footnotes).

"Free" must be based upon a regular price sold in the market (e.g. the lowest price at which any substantial sales were made during a reasonably substantial period of time (30 days). The exact same product must be sold at a price in order to establish a true dollar value.

FTC regulations prohibit continuously offering a free item. You cannot offer a free item in a trade area for more than 6 months in a 12-month period; further "Free" offer sales should not exceed 50% of the total volume of the sales of the product. Thirty (30) days should pass before you offer another free product in the same trade area. No more than 3 of these offers should be made in the same area in any 12-month period.

**NOTE:** The Federal Trade Commission does not recognize a difference between "Free" and "Bonus," or "gift" or "given without charge."



## COLOR USAGE

Class One packaging requires the use of an additional color that further differentiates it within the Craftsman® brand. Class One yellow is used for the background of the tab to call attention to meaningful points of interaction.



**CLASS ONE YELLOW**

**PMS Yellow C**

C:03   M:08   Y:100   K:00

R:255   G:222   B:000

HEX#ffde00



BRAND STANDARDS                                              CLASS ONE PACKAGING    248

## FONT USAGE

Class One products utilize the fonts of the Craftsman® brand
with an additional font weight from the United Sans family.

New font weight for Class One products:

**UNITED SANS SEMI CONDENSED BLACK
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789**

Craftsman brand fonts:

UNITED SANS SEMI CONDENSED MEDIUM
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

UNITED SANS SEMI CONDENSED BOLD
ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

# CRAFTSMAN®

BRAND STANDARDS                                      CLASS ONE PACKAGING    249

## THE CLASS ONE PRIMARY TAB

The Class One Tab is used as the primary identification element on Craftsman® brand Class One products. The information contained in the tab is specific to each package's special offer.

The Class One Tab is placed on the right edge of the front, right, top and back panels. Select appropriate vertical position based on available application space.



Primary application

**1. OFFER**

Font: United Sans Semi-Condensed Black
All caps; left-justified
Fill: PMS 185c (100%)
Stroke: White (weight equals 13.5%
of the type size)
Black Drop Shadow

**2. VALUE**

Font: United Sans Semi-Condensed Black
All caps; left-justified
Fill: Black (100%)

**3. DISCLAIMER**

Font: United Sans Semi-Condensed Medium
All caps; left-justified
Fill: Black (100%)

**4. OFFER PHOTOGRAPHY**

Black Drop Shadow

**5. OFFER NAME**

Font: United Sans Semi-Condensed Black
All caps; left-justified
Fill: Black (100%)

**6. OFFER DESCRIPTION**

Font: United Sans Semi-Condensed Bold
All caps; left-justified
Fill: Black (100%)

**7. TAB**

Black Inner Glow

NOTE:
See packaging examples section for additional execution references.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

## TAB – ALTERNATES

The Class One Tab shown on the previous page is designed to work on most packaging configurations. The Class One Tabs shown below will work for the most common exceptions: packaging featuring a bump-out tab and hang cards. The Class One Tab is still placed on the right edge of the appropriate panels and the vertical position is still based on available application space.



Alternate application – bump-out tab
**Note:** The Inner Glow does not appear along the top edge on this execution.



Reserved for space-constrictive formats – under-tab extension
**Note:** The tab does not have an Inner Glow on this execution.

                                ©2016 Sears Brands, LLC

## EXAMPLE – STANDARD

Craftsman® brand Class One packaging features a few characteristics that differentiate it from standard Craftsman® brand packaging. In addition to the Class One Tab, Craftsman® brand Class One packaging also features a white background. Other more subtle differences are listed below.



Front panel



Right panel

**Note:** All type located in the background area should be filled with 100% black.

Any logo or lock-up (like the Craftsman Club® lock-up) should be designed to use on a white background.

The drop shadow normally used with the Craftman® tab and/or any other tab or inset is eliminated.

Drop shadows used to enhance the product photography is set to a lighter opacity.



©2016 Sears Brands, LLC

**CRAFTSMAN®**

BRAND STANDARDS                                    CLASS ONE PACKAGING   **252**

## EXAMPLE – STANDARD

Craftsman® brand Class One packaging features a few characteristics that differentiate it from standard Craftsman® brand packaging. In addition to the Class One Tab, Craftsman® brand Class One packaging also features a white background. Other more subtle differences are listed below.



Top panel

**Note:** All type located in the background area should be filled with 100% black.

Any logo or lock-up (like the Craftsman Club® lock-up) should be designed to use on a white background.

The drop shadow normally used with the Craftman® tab and/or any other tab or inset is eliminated.

Drop shadows used to enhance the product photography is set to a lighter opacity.



Back panel

**CRAFTSMAN®**

## EXAMPLE – BUMP-OUT TAB

On Craftsman® brand packaging using a bump-out tab to list product features, the Class One Tab is integrated into the larger tab structure on the front and top panels. Other considerations are noted below.



Front panel



Right panel

**Note:** When used as part of the bump-out tab, the Class One Tab has an outer stroke equal in size and color to the rest of the larger tab. When used on its own, the outer stroke is eliminated.

On all panels, the Class One Tab is placed in the upper right corner, surrounding the part number. The part number should have enough clear space around it to make it visible and legible.



**CRAFTSMAN®**

**BRAND STANDARDS**                                    **CLASS ONE PACKAGING**    254

## EXAMPLE – BUMP-OUT TAB

On Craftsman® brand packaging using a bump-out tab to list product features, the Class One Tab is integrated into the larger tab structure on the front and top panels. Other considerations are noted below.



Top panel



Left panel

**Note:** When used as part of the bump-out tab, the Class One Tab has an outer stroke equal in size and color to the rest of the larger tab. When used on its own, the outer stroke is eliminated.

On all panels, the Class One Tab is placed in the upper right corner, surrounding the part number. The part number should have enough clear space around it to make it visible and legible.



Back panel

©2016 Sears Brands, LLC

**CRAFTSMAN®**

**BRAND STANDARDS**                                                                 **CLASS ONE PACKAGING**    **255**

# EXAMPLE – SMART PRODUCTS

Craftsman® brand Class One packaging that includes the Smart feature differs from standard Class One packaging in that the right panel is dedicated to the Smart technology story and does not include the Class One tab. The Class One tab appears on the front, back and top panels as normal. Smart feature components and guidelines can be found in the Smart Product Addendum.



Top panel





Front panel                                                    Back panel

**Note:** Drop shadows used to enhance the product photography is eliminated on this specific carton to suggest that the product is off the ground.



**CRAFTSMAN®**

## EXAMPLE – HANG CARD

This Craftsman® brand Class One package is executed in a space-constrictive format using the under-tab extension.



Front panel



Back panel



For the most recent edition of Owner's Manual Guidelines applicable to Craftsman products, visit the following web site and click on the Franchise Brands Owner's Manual Guidelines link under the For Hardlines category header:

http://supplychain.intra.sears.com/guides/index.htm

©2016 Sears Brands, LLC

**CRAFTSMAN**®

BRAND STANDARDS                                          WARRANTY GUIDELINES   258

## WARRANTIES

For products shipped with an Operator's Manual, the Craftsman warranty statement differs between the packaging and the manual. Packaging contains an abbreviated statement that references the manual for complete warranty details. Example below: Circular Saw

**CRAFTSMAN LIMITED WARRANTY**

**FOR ONE YEAR** from the date of sale this product is warranted against defects in material or workmanship.

**WITH PROOF OF SALE** a defective product will be replaced free of charge.

See the product Operator's Manual for complete warranty details.

Sears Brands Management Corporation, Hoffman Estates, IL 60179

The complete warranty statement in the operator's manual for the example above would read as follows:

**CRAFTSMAN LIMITED WARRANTY**

**FOR ONE YEAR** from the date of sale this product is warranted against defects in material or workmanship.

**WITH PROOF OF SALE** a defective product will be replaced free of charge.

For warranty coverage details to obtain free replacement, visit the web page: www.craftsman.com/warranty

This warranty does not cover the blade, which is an expendable part that can wear out from normal use within the warranty period.

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

Sears Brands Management Corporation, Hoffman Estates, IL 60179

For products such as hand tools, the complete warranty statement is usually printed on the packaging. Example below: Mechanic's Tool Set

**CRAFTSMAN HAND TOOL FULL WARRANTY**

If any Craftsman hand tool ever fails to provide complete satisfaction, it will be repaired or replaced free of charge.

For warranty coverage details to obtain free repair or replacement, visit the web page: www.craftsman.com/warranty

This warranty does not cover bits, which are expendable parts that can wear out from normal use within the warranty period.]

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

Sears Brands Management Corporation, Hoffman Estates, IL 60179

**CRAFTSMAN®**

## WARRANTIES (CONT.)

In cases where space on the packaging is extremely limited, an abbreviated statement may be used. Example below: Individual socket

**CRAFTSMAN HAND TOOL FULL WARRANTY**

If this Craftsman® hand tool ever fails to provide complete satisfaction, it will be replaced free of charge.

For details to obtain free replacement, visit the web page: www.craftsman.com/warranty

Sears Brands Management Corporation, Hoffman Estates, IL 60179

NOTE: In the course of development of a product for Craftsman marketing, the vendor will receive precise instructions as to the exact warranty statements for packaging and operator's manuals. In addition, the documents listed below provide detailed guidance for drafting appropriate warranty statements.

For the most recent edition of Craftsman warranty statements, visit the following web site and click on either the Craftsman Operator's Manual Warranty Statements or Craftsman Packaging Warranty Statements link under the For Hardlines category header:

http://supplychain.intra.sears.com/guides/index.htm



## BRAND MANAGEMENT PROCESS

**IN THIS SECTION:**

► MARKETING APPROVAL PROCESS

► LICENSED PRODUCTS APPROVAL PROCESS

► CONTACT

©2016 Sears Brands, LLC

**CRAFTSMAN®**

BRAND STANDARDS                                    BRAND MANAGEMENT PROCESS   261

## MARKETING APPROVAL PROCESS



# LICENSED PRODUCTS APPROVAL PROCESS

*Please contact the Craftsman brand team to obtain the Approval Process Submission Form.

©2016 Sears Brands, LLC



# CONTACTS

**Director of Craftsman Marketing**

Sears Holdings
3333 Beverly Rd.
Hoffman Estates, IL 60179

(847) 286-2400

©2016 Sears Brands, LLC

**CRAFTSMAN®**

## IN THIS SECTION:

- ► THE 90TH ANNIVERSARY LOGO
- ► LOGO APPLICATIONS
- ► LOGO CLEAR SPACE
- ► EXCEPTIONS & SPECIAL APPLICATIONS
- ► INTERNATIONAL APPLICATIONS



**CRAFTSMAN®**

BRAND STANDARDS                                                                    SECTION    A-2

### 90TH ANNIVERSARY LOGO

In 2017, the Craftsman® brand is celebrating it's 90 Year Anniversary. To commemorate this event, a 90th Anniversary Logo has been developed for use across multiple mediums. The bold and powerful essence of this mark reflects the heritage, quality and performance of Craftsman in celebration of this milestone. This mark will only will be used in applications approved and guided by the Craftsman Brand Team.



## LOGO APPLICATIONS

Primarily, the Craftsman® 90th Anniversary Logo will be used in full color for web, media and print applications. Additionally, the mark may be used on-product to signify and designate products that are specially designed to commemorate the 90th Anniversary of the Craftsman® brand, or support promotions and marketing efforts geared to create hype and interest around the 90th Anniversary Celebration.





**WEB & PRINT**

The use of the full color logo is required. Formats that may be used over light or dark backgrounds will be supplied on approved applications.



**SIMPLIFIED PROCESSES**

The use of the 1- or 2- color logo may be used to accomodate simple production processes and on-product applications.

©2016 Sears Brands, LLC

**CRAFTSMAN®**

## LOGO CLEAR SPACE

When using any version of the Anniversary Logo, a clear space equal to the height of the "C" in Craftsman on all sides is required.

Use the logo as supplied, without skewing or distorting it. Use the mark over backgrounds that are not visually distracting. Leave ample clear space from discernible features of photographic backgrounds.



**CRAFTSMAN®**

BRAND STANDARDS                                        90TH ANNIVERSARY LOGO   A-5

## EXCEPTIONS & SPECIAL APPLICATIONS

Several variations of the 90th Anniversary Logo have been developed
for use across a wide range of materials and applications.  For
production processes and on-tool applications using substrates
and materials that are process-specific, simplified 1- and 2-color
logo variations are available. These simplified versions should only
be used under 3" height on processes that cannot support the full
color logo. The Craftsman Product Development Team will guide you
through proper application for your project.

COLOR
The color(s) used for logos
under 3" tall are as follows:

1-color
100% Black

2-color
100% Black
100% PMS 185






**CRAFTSMAN®**

## INTERNATIONAL APPLICATIONS

The 90th Anniversary Logo has been adapted to provide clarity when used on international marketing or communications materials which requires the use of the Place of Origin when presented in these markets.

### ORIGIN

For International Applications, the bottom portion of the logo must include the place of origin.









# CRAFTSMAN KRAFT CARTON PACKAGING GUIDELINE

1. **LOGO**
   Located prominently within each package side.  The CRAFTSMAN logo must always be the same size on all panels, with the same baseline and centered within each panel.
   The size of the logo will be dictated by the smallest panel .  In the example below it was the Back / Front panel.  The CRAFTSMAN logo always must maintain the proper isolation zone or free space.
   See page 48 of the CRAFTSMAN BRAND STANDARDS.

2. **PRODUCT NAME**
   75% height of "CRAFTSMAN" in the logo.  United Sans Semi Extended Heavy, Case Sensitive.  100% black.  Center vertically under the Craftsman logo.
   Distance from bottom edge of outer edge of CRAFTSMAN rectangle logo should be 1-1/2 times the distance of "X".  "X" is the distance from the inside left edge of the CRAFTSMAN
   rectangle  logo to the left edge of the letter "C" in CRAFTSMAN.

2a The product name should always appear in spanish on a carton's two largest panels only.   In the example below, it is shown on the side panels but for another carton it may
    appear on front and back instead.  United Sans Semi Extended Heavy, Case Sensitive.  100% black.  Size 50% of the english product name font size.  Center vertically under the Craftsman logo.

3. **HANDLING GRAPHICS**
   Only use the approved CRAFTSMAN handling graphic icons which are appropriate for the product / package.

4. **PANEL IDENTIFICATION**
   Each panel needs to be specified.  United Sans Semi Condensed Bold, all caps  100% black. Left justified under the CRAFTSMAN handling graphic icons.
   Can be the same height as the handling graphics.  Distance or space from Handling Graphics should be approx 1/3 the height of the handling graphic

5. **ITEM NUMBER**
   Product number appears on 4-panels: front, top, left side, right side.  Size of item number should be same on all 4-panels.   United Sans Semi Condensed Medium,  100% black, 90% of product name.

6. **DISTRIBUTION COPY**
   Placed on left side of the two largest package panels (most likley front and back )and left justified with the CRAFTSMAN handling graphic icons and panel identification.
   Set in  United Sans Semi Condensed Medium,  100% black.



CRAFTSMAN EVOLV "REVERSED" LOGO
SINGLE COLOR LOGO ART





**PMS 425C GRAY**

LOGO PLACED ON GREEN PORTION OF PRODUCT





**WHITE**

LOGO PLACED ON GREY PORTION OF PRODUCT



CRAFTSMAN EVOLV LOGO (SINGLE COLOR LOGO )





THIS DOCUMENT AND IT'S CONTENTS (TO INCLUDE ATTACHMENTS) ARE THE PROPERTY OF SEARS HOLDINGS, SEARS ROEBUCK AND CO., K MART HOLDINGS, AND/OR THEIR AFFILIATES AND CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION.
YOU ARE HEARBY NOTIFIED THAT ANY DISCLOSURE, COPYING, OR DISTRIBUTION OF THIS MESSAGE, OR THE TAKING OF ANY ACTION BASED ON THE INFORMATION CONTAINED HEREIN IS STRICTLY PROHIBITED.
UNAUTHORIZED USE OF INFORMATION CONTAINED HEREIN MAY SUBJECT YOU TO CIVIL AND CRIMINAL PROSECUTION AND PENALTIES. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU SHOULD DESTROY THIS DOCUMENT IMMEDIATELY.

TS 05.27.10
817-5084 v3



# BRAND STANDARDS

**For Vendors, Designers and Printers**

©2009 Sears Holdings Corporation

XX.XX.09

CRAFTSMAN
evolv

## contents

### introduction

brand identity ........................................ 3

### packaging elements

logo lockup ........................................4-5

color palette ........................................ 6

type treatment ......................................7

layout..................................................8-9

packaging materials and philosophy...........10

photography..........................................11

### packaging examples

case label..............................................12

corrugate label ......................................13

direct print carton with label ....................14

die-cut wrap ..........................................15

### appendix

contact information ............................................16

**CRAFTSMAN**

# evolv

introduction 3

## brand identity

**who we are...**

If you swing it, turn it, push it or pull it, then Evolv's got it.
Whether it's a bookshelf that needs putting together,
or adding that dimmer switch in the dining room,
Evolv™ hand tools love to help out around the house.

our goal is to keep it simple and get the job done,
which is how we've designed our packaging.

Do you want to spend all day unwrapping a tool,
or are you ready to get to work?

Evolv™ doesn't make expensive tools — just practical ones.
Tools that are simple and comfortable.

**Tools that simply get the job done.**



NEED UPDATED
PRODUCT GROUP SHOT

**CRAFTSMAN**
**evolv**

## logo lockup

This is the logo of the Evolv™ brand.
To ensure consistency across all brand packaging and communications,
the logo should never be re-drawn, re-spaced or altered in any way.
The logo is to be only used in black or reversed out.

### correct uses





### incorrect uses

  

## logo lockup (cont.)

### sizing

Size relationships within this packaging system are based on the unit X.
The value of X can easily be determined by measuring the length of the
line underscoring the "e" in the logo. The live area around the logo should
be half the length of "X". All graphics, copy and edges should be kept this
distance from the logo. The logo should never be placed over copy,
photography or any other graphic element.



The minimum size for the Evolv™ logo with tagline is illustrated below:



*If the logo size drops below this minimum, the tagline is dropped

**CRAFTSMAN**

# evolv

## color palette

**PMS 390 C**

4-color process:
c: 22
m: 0
y: 100
k: 8

PMS 390 C

**PMS 425 C**

4-color process:
c: 0
m: 0
y: 0
k: 77

PMS 425 C

**WHITE**

4-color process:
c: 0
m: 0
y: 0
k: 0

WHITE



**PMS 466 U**

4-color process:
c: 12
m: 22
y: 43
k: 0

PMS 466 U

### primary brand colors

The color palette consists of:
Pantone 390 C
Pantone 425 C
opaque white

### paper stock recommendations

Production color specifications paper stock 85-92%
brightness substrate minimum, matte finish.

### printing suggestions

**Label:**
The label should be printed using spot inks
(Pantone 390 and Pantone 433 U), NOT 4-color process.

**Corrugate:**
All corrugate bases should be uniform in regard to color
of front and back as well as the size of the corrugate.
The color of the corrugate should match approximately Pantone 466 U.

**CRAFTSMAN**
**evolv**

## type treatment

### primary and secondary font usage

The bold and machine-like choice of typefaces is essential to the look and feel of the Evolv™ brand. Gotham Bold is used for all main descriptor copy while Gotham book provides a cleaner presentation for subtext. Helvetica Neue Regular is used for legal information.

### fonts

**Gotham Bold**

**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**0123456789**

Gotham Book

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

Helvetica Neue Regular

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

packaging elements 8

## layout

These are the basic art elements that appear on Evolv™ packaging.

### 1. logo lockup
Typically 40% of width of panel.

### 2. product name
x-height = height of underscore. Translation is 50% of that, Gotham Bold in lowercase.

### 3. bulleted rule
1/2 height of underscore in logo. Space between bullets = 3x the width of one bullet. The rule should run the length of the longer element: logo or product name. Space between the separating bullet line/logo/product name = 2x the height of the underscore.

### 4. product number
Typically set at 10 pt. If the Product Name drops below 12 pt., then set to 7 pt. If the Product Name is above 26 pt., set to 12 pt.

### 5. feature callouts
90% of translation of Product Name. Translation of callouts set at same size. Gotham Bold in lowercase.

### 6. warranty callout
Set at same size as product number, Gotham Bold in all-caps.

### 7. ergo grip bug
150% size of "O" in logo, but do not scale below 1-in. diameter. Align with left edge of the "e" in the logo except in the centered layout.

### 8. contents
If there is more than one item in a package, there must be a contents statement telling only what it is in the package. There should be no descriptive or "sell" copy in the contents list. Translation of contents set at same size. Gotham Bold in Title Case.

**left-aligned vertical**



**center-aligned vertical**



**NOTES:**

Bulleted rule, Product Name and feature callouts all align with the left edge of the underscore in the logo, NOT the Craftsman logo.

Ergo Grip bug aligns with the left edge of the "e" in the logo, NOT the underscore.

Federal Regulations dictate the location and type size of the net contents statement. The location must be in the lower 30% of the principal display panel and with the appropriate size:

**Panel Area | Minimum Type Height**

5 sq. in. and under = 1/16 in.
Over 5 sq. in.-25 sq. in. = 1/8 in.
25 sq. in.-100 sq. in. = 3/16 in.
100 sq. in.-400 sq. in. = 1/4 in.
Over 400 sq. in. = 1/2 in.

# layout (cont.)

**1. logo lockup**

Typically 40% of width of panel.

**2. product name**

**This is the only element that differs from the vertical layout.**
x-height = 125% height of underscore. Translation is 50% of that, Gotham Bold in lowercase.

**Note:** In instances when the width of the logo is less than 1/3 the width of the panel, the x-height of the product name = 185% height of underscore.

**3. bulleted rule**

1/2 height of underscore in logo. Space between bullets = 3x the width of one bullet. The rule should run the height of the logo. Space between the separating bullet line/logo/product name = 2x the height of the underscore.

**4. product number**

See page 8.

**5. feature callouts**

See page 8.

**6. ergo grip bug**

See page 8.

**7. contents**

See page 8.

**8. warranty**

warranty heading set at a comfortable size within the panel, Gotham Bold in all-caps. Warranty copy is set in Gotham Book same size as callout with leading 133% of type size.

**9. UPC/legal**

UPC is framed in a white box, not truncated (unless necessary). Legal copy is 6 pt. with 7 pt. leading. Recycled logo is 1/2 height of UPC.

## left-aligned horizontal



## warranty/copy



**NOTES:**

Bulleted rule, Product Name and feature callouts all align with the left edge of the underscore in the logo, NOT the Craftsman logo.

Ergo Grip bug aligns with the left edge of the "e" in the logo, NOT the underscore.

Warranty copy and any other body copy (warnings, legal, etc.) align with the left edge of the underscore in the logo, NOT the Craftsman logo.

Below is a link to the Evolv™ Hand Tool Warranty: **http://warranty.intra.sears.com/ new/609hardware/craftsman_ evolv_hand_tool_may_2009.htm**

## UPC/legal lockup (stacked on left, horizontal on right)





packaging elements 10

# packaging materials and philosophy

## materials

Packaging forms consist of a multi-layered corrugate base with a die-cut cavity for the tool (or portion of the tool) and an adhesive label. Some packages will consist of a label applied directly to the product  (no corrugate).



Side view of multi-layered corrugate package base.

## ergonomic package forms

Rounded corners should be used on both the corners of the corrugate base and the adhesive label. Larger packages such as tool sets should have a handle when possible (see wrench). Tool cavity should conform to the contours of the tool and create a very snug fit. Grips of tools (one in a set) should be accessible. The tools should be nested 75-80% into the corrugate. Products should align at top of multiple tool sets. See illustration below.





cross section of screwdriver packaging—handles align at top of packaging

## simple presentation of information

**Label:** The label should contain the following information: Evolv logo, product name (all lower case) in English, followed by the Spanish translation in smaller type below (all lower case), and the product number. See example for specifications.

**Corrugate base:** One feature/benefit specific to the tool should be called out on the corrugate base. It should be listed near the feature referenced. Also printed on each package should be the Ergo Grip circle art.





# photography

## photographic style

4-color process, with shot looking down upon the product with no perspective. The approach should be straightforward and simple. Individual elements should be laid out in a logical and visually organized rectilinear configuration. Product should be lit from above and to the left (see sample). The photo should have good contrast and dark edges so that products stand out on the package. Products will be outlined and superimposed on the solid color of the label. No shadows should be preserved, created or shown.



Direction of light source.

**CRAFTSMAN®**
**evolv**

## case label

These are the basic art elements that appear on the Evolv™ case labels.

### 1. logo lockup
Placed prominently in the upper left-hand corner with 1/2 the width of the underscore in the Evolv™ logo as the distance from the edges of the panel.

### 2. product name
Placed under the dotted rule separating from logo. Product Name is in all lowercase and aligned with left edge of underscore. Translation is directly below set 50% of English.

### 3. product number
Placed in the upper right-hand corner with 1/2 the width of the underscore in the Evolv™ logo as the distance from the edges of the panel and set at 10 pt.

### 4. feature callout
Placed under the product photography and reversed out. Set at 90% of Product Name translation and all lowercase.

### 5. ergo grip bug
Placed in the lower left-hand corner aligned left with the "e" in the Evolv™ logo.

### 6. photography
Located to the right of the logo.

### 7. warranty
Located under the feature callouts.

### 8. UPC/legal
Located on the lower right-hand corner of the panel.





# CRAFTSMAN
# evolv

## corrugate label

These are the basic art elements that appear on the Evolv™ corrugate labels.

### 1. logo lockup
Placed prominently on the left with 1/2 the width of the underscore in the Evolv™ logo as the distance from the left edge of the panel.

### 2. product name
Placed right of the dotted rule separating from logo. Product Name is in all lowercase and aligned with left edge of underscore. Translation is directly below set 50% of English.

### 3. product number
Placed in the upper right-hand corner on front and back panels with 1/2 the width of the underscore in the Evolv™ logo as the distance from the edges of the panel and set at 10 pt.

### 4. feature callout
Placed under logo, aligned with left edge of underscore and directly printed to corrugate in white. Set at 90% of Product Name translation and all lowercase.

### 5. ergo grip bug
Placed in the lower left-hand corner aligned left with the "e" in the Evolv™ logo and directly printed to corrugate in white.

### 6. warranty
Located on back panel under the logo aligned with left edge of underscore.

### 7. UPC/legal
Located on the lower right-hand corner of the back panel.



**NEED UPDATED PRODUCT SHOT OF 8" LINESMAN PLIERS**





**CRAFTSMAN**
**evolv**

## direct print carton with label

These are the basic art elements that appear on the Evolv™ cartons with labels.

### 1. logo lockup
Placed prominently in the upper left-hand corner with 1/2 the width of the underscore in the Evolv™ logo as the distance from the edges of the panel.

### 2. product name
Placed under the dotted rule separating from logo. Product Name is in all lowercase and aligned with left edge of under-score. Translation is directly below set 50% of English.

### 3. product number
Placed in the upper right-hand corner on all panels with 1/2 the width of the underscore in the Evolv™ logo as the distance from the edges of the panel and set at 10 pt.

### 4. feature callout
Placed under the product photography and reversed out. Set at 90% of Product Name translation and all lowercase.

### 5. photography
Located in the center of the front panel. For single product hero shots, an Outer Glow effect is applied: white, set to screen at 75% opacity with a .03"-.06" blur, then duplicated once. Illustrative representations should be used for other panels of direct print cartons (walkaround shots, etc.).

### 6. warranty
Located on the right side panel.

### 7. warning
Located on the left side panel.

### 8. UPC/legal
UPC located on the lower right-hand corner of the panel, and the legal copy is placed in the lower left-hand corner of the right side panel.



NEED UPDATED PRODUCT SHOT OR 3D RENDERING OF CIRCULAR SAW CARTON



NEED UPDATED PRODUCTION FILE WITH SUSTAINABLE ICON

**CRAFTSMAN**
**evolv**

packaging examples 15

## die-cut wrap

These are the basic art elements that appear on the Evolv™ die-cut wraps.

### 1. logo lockup
Placed prominently on the front and centered.

### 2. product name
Placed below the dotted rule separating from logo. Product Name is in all lowercase and centered. Translation is directly below set 50% of English.

### 3. product number
Placed in the upper right-hand corner on front and back panels with 1/2 the width of the underscore in the Evolv™ logo as the distance from the edges of the panel and set at 10 pt.

### 4. feature callout
Placed under logo, centered and reversed out. Set at 90% of Product Name translation and all lowercase.

### 5. ergo grip bug
Placed at the bottom and centered.

### 6. warranty
Located on back panel under the logo and center-justified.

### 7. UPC/legal
Located at the bottom of the back panel.





## contact information

**submit all packaging proofs to:**

**Ed Smith**
Sears Packaging Department
3333 Beverly Road, DC-266A
Hoffman Estates, IL 60179
tel: (847) 286-7567

esmi160@searshc.com

**Jim Recore**
Sears Holdings Corporation

jrecore@searshc.com

**Barry Lyon**
Director of Marketing
Danaher Tool Group
14600 York Road, Suite A
Sparks, MD 21152
tel: (410) 773-7907
cell: (206) 940-3638
fax: (410) 472-2051

barry.lyon@danahertool.com

# Craftsman® Evolv™ Package Design Guidelines
# Example: 18V Cordless Combo Kit 30857

Please consult with Packaging Services at Sears prior to creating any artwork to obtain specific design instructions for each package. Please contact:
**Edward.R.Smith@searshc.com**
**Jennifer.Blum@searshc.com**

## Color Usage
This label prints in CMYK 4-color process, plus two spot colors (PMS 185 and PMS 430). No additional colors should be used.

## Brand Logo
The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. It is typically 30-40% the width of the panel. The logo should between 50-80% on other panels depending on space available. The clearance space around the logo is 1.5 x the width of the underscore in the logo, as shown below in magenta. When the logo is scaled down to a point where the tagline copy (durable, affordable, everyday tools) is less than 8 points, it should be deleted.

## Product Name
The product name should follow the bilingual language rules, which is 45-55% The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out.

## Product Features/Benefits
Copy statements should be brief and informative on front panel/card and must come with consumer benefits. All features/benefits require prioritization. Place the most important, fundamental elements on front panel with supporting and more detailed copy moved to the side or back panels. Not everything will fit on the front panel, nor should it.

## Product Photography
The full product image should appear on the front panel with a grounding shadow. It should not be obstructed by any art. Please refer to the Craftsman Brand Standards for specifications on nero photography. Please consult with the packaging team to obtain photo art direction for each item, before proceeding with photography. Each shot will be different based on the nature of the item.

## Dotted Rule Guidelines
### Horizontal Lockup (A, B, C)
Based on the proportions, if the Product Name and its translation both run on 2 lines, it will be equal to the height of the logo lockup. This will also be the height of the dotted rule (see example A).
If the logo lockup is taller than the product name, the dotted rule will equal the height of the logo lockup and be horizontally centered with the product name (see example B).
If the product name is taller than the logo lockup, the dotted rule will equal the height of the product name and be horizontally centered with the logo lockup (see example C).

A  Product Name
Product name translation

B  Product Name
Product name translation

C  Longer Product Name
Longer product name translation

## Clearance Space Key:

━━━ = 1.5 x width of logo underscore

**C** = the "C" in the Craftsman logo

- - - - - = alignment

### Vertical Lockup (D)
The dotted rule should always equal the width of the logo lockup and be vertically centered with the product name (see example D).

D  Product Name
Product name translation

**Front,Back & Top Panel Background: PMS 430 C**

**Side Panel In-Use Image**
Set in a white ruled bounding box with .125" corner radius
Image should be scaled to the width of the logo/dotted rule/product name lockup

**Product Name Horizontal Lockup**
Gotham Bold, Title Case, white
Size: 85% height of "e" in logo
Leading: 103.5% of type size
Translation: 45-55% of English, Initial cap

**Product Number**
Gotham Bold, white
Size: Typically set at 10 pt. If the Product Name drops below 12 pt., then set to 7 pt. If the Product Name is above 26 pt., set to 14 pt. Same size on all panels

**Side Panels Background: 35% K overprinting PMS 430 C**



## Product Specifications
Headline: Gotham Bold, white and rules of specification box set to 80% K
**Copy:**
Headline: Gotham Bold, white
Size: 8 pt.
Copy: Gotham Book, black
Size: 6 pt.
Leading: 9.25 pt.
Translation: Same as English

## Product Walkarounds
Split panel in half.
Images: 75% of front panel heroes
**Walkaround copy:**
Feature: Gotham Bold, reversed out
Size: 20-30% of product name
Benefit: Gotham Book, reversed out
Size: same as feature
Translation: same as English

## Warranty Copy
Headline: Gotham Bold, white
Size: 12.5 pt.
Copy: Gotham Book, white
Size: 10 pt.
Leading: 133% of type size
Paragraph Space: 62.5% of type size

## Warnings/Legal
Headline: Gotham Book, white
Size: 7 pt. (minimum)
Leading: 8 pt.
Translation: same as English

## Contents
Headline: Gotham Bold, 80% K
Copy: Gotham Book, 80% K
Size: 30-35% of Product Name
Leading: 110% of type size
Paragraph Space: 55% of type size
Translation: 80% of English

## Warranty Icon
Provided in assets
Same width as insets (Roughly 50-60% width of logo)
Bounding box of icon is 35% K set to overprint

## Product Features/ Insets
Image: set in a white ruled bounding box with .125" corner radius
**Copy:**
Feature: Gotham Bold, right-justified, white
Size: 10 pt.
Translation: Gotham Bold, right-justified, white
Size: 80% of English

**NOTE: No more than 5 Features/ Insets should be used.**

**PLEASE NOTE: This file is for a general reference only. This is NOT a print-ready file.**

# Craftsman® Evolv™ Package Design Guidelines
# Example: 18V Cordless Drill/Driver 30856

Please consult with Packaging Services at Sears prior to creating any artwork to obtain specific design instructions for each package. Please contact:
Edward.R.Smith@searshc.com
Jennifer.Blum@searshc.com

## Color Usage
This label prints in CMYK 4-color process, plus two spot colors (PMS 185 and PMS 430). No additional colors should be used.

## Brand Logo
The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. It is typically 30-40% the width of the panel. The logo should between 50-80% on other panels depending on space available. The clearance space around the logo is 1.5 x the width of the underscore in the logo, as shown below in magenta. When the logo is scaled down to a point where the tagline copy (durable, affordable, everyday tools) is less than 8 points, it should be deleted.

## Product Name
The product name should follow the bilingual language rules, which is 45-55% The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out.

## Product Features/Benefits
Copy statements should be brief and informative on front panel/card and must come with consumer benefits. All features/benefits require prioritization. Place the most important, fundamental elements on front panel with supporting and more detailed copy moved to the side or back panels. Not everything will fit on the front panel, nor should it.

## Product Photography
The full product image should appear on the front panel with a grounding shadow. It should not be obstructed by any art. Please refer to the Craftsman Brand Standards for specifications on hero photography. Please consult with the packaging team to obtain photo art direction for each item, before proceeding with photography. Each shot will be different based on the nature of the item.

## Dotted Rule Guidelines
### Horizontal Lockup (A, B, C)
Based on the proportions, if the Product Name and its translation both run on 2 lines, it will be equal to the height of the logo lockup. This will also be the height of the dotted rule (see example A).
If the logo lockup is taller than the product name, the dotted rule will equal the height of the logo lockup and be horizontally centered with the product name (see example B).
If the product name is taller than the logo lockup, the dotted rule will equal the height of the product name and be horizontally centered with the logo lockup (see example C).


**A**


**B**


**C**

### Vertical Lockup (D)
The dotted rule should always equal the width of the logo lockup and be vertically centered with the product name (see example D).


**D**

**Front,Back & Top Panel Background: PMS 430 C**

**Side Panels Background: 35% K overprinting PMS 430 C**

## Clearance Space Key:
= 1.5 x width of logo underscore

= the "C" in the Craftsman logo

- - - - - = alignment

## Product Walkaround
Image: 85% of front panel hero
Walkaround copy:
Feature: Gotham Bold, reversed out
Size: 20-30% of product name
Benefit: Gotham Book, reversed out
Size: same as feature
Translation: same as English

## Product Number
Gotham Bold, white
Size: Typically set at 10 pt. If the Product Name drops below 12 pt., then set to 7 pt. If the Product Name is above 26 pt., set to 14 pt. Same size on all panels

## Product Name
### Horizontal Lockup
Gotham Bold, Title Case, white
Size: 85% height of "e" in logo
Leading: 103.5% of type size
Translation: 45-55% of English, Initial cap

## Warranty Copy
Headline: Gotham Bold, white
Size: 10 pt.
Copy: Gotham Book, white
Size: 8 pt.
Leading: 133% of type size
Paragraph Space: 62.5% of type size

## Contents
Headline: Gotham Bold, 80% K
Copy: Gotham Book, 80% K
Size: 30-35% of Product Name
Leading: 110% of type size
Paragraph Space: 55% of type size
Translation: 80% of English

## Warranty Icon
Provided in assets
Same width as insets
(Roughly 50-60% width of logo)
Bounding box of icon is 35% K set to overprint

## Warnings/Legal
Gotham Book, white
Size: 7 pt. (minimum)
Leading: 8 pt.
Translation: same as English

## Product Specifications
Headline bar and rules of specification box set to 80% K
Copy:
Headline: Gotham Bold, white
Size: 8 pt.
Copy: Gotham Book, black
Size: 6 pt.
Leading: 9.25 pt.
Translation: Same as English

## Top Panel In-Use Image
Set in a white ruled bounding box with .125" corner radius
Image should be scaled to the height of the logo/dotted rule/product name lockup

## Product Name
### Vertical Lockup
Gotham Bold, Title Case, white
Size: 55% height of "e" in logo
Leading: 103.5% of type size
Translation: 45-55% of English, Initial cap

## Product Features/ Insets
Image: set in a white ruled bounding box with .125" corner radius
Copy:
Feature: Gotham Bold, right-justified, white
Size: 10 pt.
Translation: Gotham Bold, right-justified, white
Size: 80% of English
NOTE: No more than 5 Features/Insets should be used.



**PLEASE NOTE: This file is for a general reference only. This is NOT a print-ready file.**

2015

# CRAFTSMAN

## INDUSTRIAL®

# BRAND STANDARDS

©2015 SEARS BRANDS, LLC
CONFIDENTIAL

JULY 2015

## WELCOME TO THE CRAFTSMAN INDUSTRIAL® BRAND

As an American icon, the Craftsman brand has showcased thousands of products that have represented the very best in the marketplace since 1927.

Craftsman Industrial® products carry on this legacy of quality and trusted performance and take it to an even higher standard. Built for the toughest jobs and engineered for the professional user, Craftsman Industrial delivers innovative, durable products that stand up to the rigorous demands of a jobsite. Craftsman Industrial carries a large variety of tools Made in the USA to maintain the Craftsman tradition of quality. Our quality standards, breadth of line, workmanship and brand reputation build a story that is compelling to millions of industrial tool users across the United States.

The following guidelines provide general reference, direction and guidance for all involved in the brand's execution and development.

## CONTENTS

### INTRODUCTION

Overview.................................................................2

### BRAND IDENTITY

Brand Positioning ...............................................4
Is and Is Not's .....................................................6
Brand Domain.................................................. 11
Trademark Usage .............................................12

### MARKETING EXECUTION

Marketing Logo.................................................13
Copywriting.......................................................18
Photography .....................................................19

### BRAND PACKAGING GUIDELINES

Overview........................................................... 20
Type Treatment.................................................21
Product Information Tab...................................22
Principal Display Panel.................................... 24
Other Packaging Elements ............................25
Photography .................................................... 26
UPC Lockup.......................................................27
Warranty........................................................... 28
Copywriting - Tone and Style......................... 30
Bilingual Packaging..........................................31
Legally Required Statements ........................ 32
Package Design Guidelines  ......................... 34

### PRODUCT GUIDELINES

Overview........................................................... 45
Logo on Product .............................................. 46
Product Examples.............................................51

### APPENDIX

Approval Process .............................................52
Contact Information......................................... 55

**CRAFTSMAN**

**INDUSTRIAL**®

BRAND STANDARDS



## BRAND POSITIONING

Craftsman Industrial is a sub-brand of Craftsman®, fiercely committed to continuing a legacy of engineering superior products and making them even tougher for professional use. Built for heavy-duty jobs, Craftsman Industrial stands for strength, rugged aesthetic and professional-grade performance.

## BRAND ESSENCE

Focused on the professional user and built upon a legacy of trusted performance, Craftsman Industrial delivers durable, ergonomic solutions to enhance productivity and ease of use.

## BRAND PURPOSE

Made to work, Craftsman Industrial® products deliver:

▶ **Productivity.** Best in class performance to get a job done faster

▶ **Durability.** Tools that withstand the rigorous demands of the professional jobsite

▶ **Ease of Use.** Products that are ergonomic to use and make the job easier

## BRAND PERSONALITY

A fierce commitment to continuing a proud legacy of innovation and engineering superior products drives the Craftsman Industrial brand forward. Hardworking,  proud and versatile, the Craftsman Industrial brand is also:

▶ **Heavy-Duty.** Engineered to meet industrial-grade needs

▶ **Tough.** Synonymous with rugged strength and ultimate dependability

▶ **Trusted.** Backed by the Craftsman brand name, relied upon for generations to deliver innovative products that outperform and outlast the competitors

▶ **Reliable.** Craftsman Industrial performs when and where you need it

▶ **Worth Paying For.** Backed by a lifetime warranty, the Craftsman Industrial brand delivers products unparalleled in performance and quality

▶ **Iconic.** Backed by the Craftsman brand name, an American legacy

▶ **Innovative.** On the pulse of change with bold, smart features

▶ **Made in America.** Every ratchet, wrench, socket and mechanics tool accessory that is stamped Craftsman Industrial is "Made in the USA"

18-23538-shl    Doc 2072    Filed 01/28/19    Entered 01/28/19 15:04:47    Main Document
Pg 343 of 492

**CRAFTSMAN**

**INDUSTRIAL**®

BRAND STANDARDS

**BRAND PACKAGING GUIDELINES**    5

# BRAND POSITIONING (CONT.)



**TRUSTED PERFORMANCE**

**BRAND ESSENCE**

CORE CHARACTERISTICS OF BRAND

**WE ARE MADE TO WORK**

MADE TO WORK STANDS FOR
**Productivity.** Best in class performance to do your job faster
**Durability.** tools that withstand the rigorous of the pro job site
**Ease of use.** Products that are ergonomic to use & make the job easier to do

**BRAND CAMPAIGN**

HOW WE MARKET THAT ESSENCE

**EXCEED PROFESSIONAL EXPECTATIONS FOR PRODUCTIVITY, DURABILITY AND EASE OF USE**

**BRAND DOMAINS**

HOW BRAND DELIVERS ON THOSE CORE CHARACTERISTICS

©2015 Sears Brands, LLC    07.2015

**CRAFTSMAN**

**INDUSTRIAL®**    BRAND STANDARDS

BRAND IDENTITY    6



**CRAFTSMAN INDUSTRIAL IS TOUGH.**
OUR PRODUCTS ARE ENGINEERED FOR HEAVY-DUTY, PROFESSIONAL USE.
WE'RE THE STRONGER, MEANER, BIGGER ONE IN THE CRAFTSMAN® FAMILY.

**CRAFTSMAN INDUSTRIAL IS NOT FLIMSY.**
OUR TOOLS HELP USERS TACKLE JOBSITE DEMANDS WITH CONFIDENCE AND EASE.

**CRAFTSMAN**

**INDUSTRIAL**®

BRAND STANDARDS



**CRAFTSMAN INDUSTRIAL IS TRUSTED.**
BACKED BY THE CRAFTSMAN® BRAND NAME, AN AMERICAN LEGACY,
AND FIERCELY COMMITTED TO THE SAME SUPERIOR PRODUCT QUALITY.

**CRAFTSMAN INDUSTRIAL IS NOT UNRELIABLE.**
RIGOROUSLY TESTED. CRAFTSMAN INDUSTRIAL TOOLS
ARE BUILT TO OUTPERFORM AND OUTLAST THE COMPETITION.



**CRAFTSMAN INDUSTRIAL IS INNOVATIVE.**
WE'RE CONSTANTLY ADDING SMART, UNIQUE FEATURES TO OUR PRODUCTS,
TO ADAPT TO THE NEEDS OF OUR USERS.

**CRAFTSMAN INDUSTRIAL IS NOT ORDINARY.**
NEVER BLAND, CRAFTSMAN INDUSTRIAL TOOLS STAY AHEAD OF EXPECTATIONS.



CRAFTSMAN INDUSTRIAL IS CONFIDENT.
OUR PRODUCTS ARE QUIETLY HEROIC; THEY MOTIVATE AND INSPIRE
USERS TO GET THE JOB DONE RIGHT.

CRAFTSMAN INDUSTRIAL IS NOT ARROGANT.
NEVER EGOTISTICAL, NEVER SARCASTIC.

©2015 Sears Brands, LLC    07.2015



**CRAFTSMAN INDUSTRIAL IS DURABLE.**
TOOLS THAT WITHSTAND THE RIGOROUS DEMANDS OF THE PROFESSIONAL JOB SITE.

**CRAFTSMAN INDUSTRIAL IS NOT LOW QUALITY.**

18-23538-shl    Doc 2072    Filed 01/28/19    Entered 01/28/19 15:04:47    Main Document
Pg 349 of 492

## BRAND DOMAIN

Craftsman Industrial® products are engineered for industry and rigorously tested, to exceed the expectations of:

▸ Maintenance, Repair & Operation Professionals

▸ Facility Engineers

▸ Energy & Petro Chemical Professionals

▸ Fleet Maintenance Mechanics

▸ Government & Municipality Professionals

▸ Military Installations

## TRADEMARK USAGE

### GUIDELINES FOR ANY MEDIA:

1. A trademark is always a proper adjective that describes a specific person, place or thing. Use the Craftsman Industrial® trademark as a proper adjective (not a noun or verb) every time it is used in text:

   **Correct:** Craftsman Industrial® wrenches help Facility Managers accomplish any task.
   **Incorrect:** Craftsman Industrial® accomplishes any task.

2. When used in copy, the Craftsman Industrial mark must always be set apart from the rest of the text by being placed in all capital letters or in bold.

3. When used in copy, the first and most prominent use of the Craftsman Industrial mark on each page must be accompanied by the proper trademark notification (®), which must appear after the adjective (trademark), before the noun it modifies:

   **Correct:** Craftsman Industrial® ratchets
   **Incorrect:** Craftsman Industrial ratchets®

4. Always use the Craftsman Industrial logos exactly as provided, including the ® notification.

5. Never use trademarks in a possessive or plural form:

   **Correct:** Craftsman Industrial® wrenches break loose the toughest fasteners.
   **Incorrect:** Craftsman Industrial's wrenches break loose the toughest fasteners.

   **Correct:** Craftsman Industrial® mechanics tools are built to last a lifetime.
   **Incorrect:** Craftsman Industrials are built to last a lifetime.

6. Never alter a trademark:

   **Correct:** Use Craftsman Industrial® tool storage to organize your garage.
   **Incorrect:** Craftsman Industrialize® your garage.

7. Do not combine your marks or third-party marks with any Craftsman Industrial trademarks.

8. You may not use any Craftsman Industrial trademark as part of your company name, product name or service name.

9. You may not use any Craftsman Industrial trademark as part of an advertising slogan, promotion, tagline, event communication or similar phrase without express written consent. Use of the trademark in any communication that would simply sole proprietary ownership of the mark is not permitted.



BRAND STANDARDS

## MARKETING LOGO

This is the logo of the Craftsman Industrial® brand. To ensure consistency across all brand packaging and marketing communications, the logo should never be re-drawn, re-spaced or altered in any way. The Craftsman logotype should never be removed from its surrounding frame and used on its own.

**PRIMARY LOGO:**
USE THIS LOGO ON A BLACK BACKGROUND WHENEVER POSSIBLE





**WHEN PRINTING OPTIONS ARE LIMITED:**
ONLY FOR USE IN LOWER PRODUCTION 1-COLOR INSTANCES



**NOTE:** Brand approval to use the 1-color logo option specified on this page is required.
Please see the Approval Process on page 53 of these guidelines for further information on obtaining the necessary approvals.

18-23538-shl    Doc 2072    Filed 01/28/19    Entered 01/28/19 15:04:47    Main Document
Pg 352 of 492

**CRAFTSMAN**
**INDUSTRIAL**®
BRAND STANDARDS

MARKETING EXECUTION    14

## MARKETING LOGO (CONT.)

### PRIMARY ALT. LOGO:
USE THIS LOGO WHEN BLACK IS NOT USED AS THE BACKGROUND COLOR



### WHEN PRINTING OPTIONS ARE LIMITED:
ONLY FOR USE IN LOWER PRODUCTION 1-COLOR INSTANCES



**NOTE:** Brand approval to use the 1-color logo option specified on this page is required.
Please see the Approval Process on page 53 of these guidelines for further information on obtaining the necessary approvals.



**CRAFTSMAN**

**INDUSTRIAL**®

**BRAND STANDARDS**

MARKETING EXECUTION    15

# MARKETING LOGO COLOR PALETTE

**PMS 1807 C**

4-color process:*
c: 0
m: 100
y: 96
k: 28
*see approval note

PMS 1807 C

**PROCESS BLACK**

4-color process:
c: 0
m: 0
y: 0
k: 100

PROCESS
BLACK

## PRIMARY BRAND COLORS

The color palette consists of:
Pantone 1807 C
Process Black

## PRINTING SUGGESTIONS

To ensure color consistency PMS 1807 C should always be printed as a spot color.
A 4-color process version of the PMS 1807 C **WILL NOT** be consistent with the spot color.

In some cases there is no choice but to print 4-color process.* It is highly recommended to get proofs of the artwork for Brand approval. As a starting point, use the following 4-color process breakdown of PMS 1807 C:

c: 0
m: 100
y: 96
k: 28

**\*NOTE: Brand pre-approval to use a 4-color process version of the PMS 1807 C is required.**

Depending on the technical capabilities of the printer, a rich process black can be used as the background color on both the left and right side panels. A minimum line screen of 150 LPI is required to print this rich process black background to avoid possible registration issues. Use the following 4-color process breakdown for the rich process black:

c: 40
m: 40
y: 0
k: 100

Otherwise, the background color of these side panels should print 100% process black with copy reversing out to white.

## LITHO PRINTING PREFERENCE

A minimum of 6 colors is required to print all Craftsman Industrial® packaging:

4-Color process (CMYK) for product images
Pantone 1807 C for Brand red
Line Black for printing background blacks and gradient

## FLEXO PRINTING

A minimum of 6 colors and a minimum line screen of 85 LPI is required to print all Craftsman Industrial packaging:

4-Color process (CMYK) for product images
Pantone 1807 C for Brand red
Line Black for printing background blacks and gradient

Please refer to the Craftsman Packaging Standards for info on Flexo printed packaging.

**NOTE: If printer capabilities do not meet brand standards, please contact Sears for possible printing and/or layout options.  Brand approval is required to move forward.**

**Please see the Approval Process on page 52 of these guidelines for further information on obtaining the necessary approvals.**

## MARKETING LOGO ISOLATION ZONE

Whenever practical, the Craftsman Industrial® logo should be surrounded by an area of clear, open space. There is a minimum clear space area into which no other elements should intrude. The dimension of this minimum clear space area on all sides of the logo is equal to the width of the "C" in the Craftsman logotype (as indicated by the magenta Cs in the diagram below).



### SIZING

The logo will appear in many sizes. To ensure that it looks right every time, there are four versions – each for a specific size range.

On all Craftsman logos the only point of differentiation, from one size range to the next, is the relative size and position of the ®. While print capabilities vary from one printer to the next, it is important to note that these logos have been sized to accommodate minimum print tolerances of most common print processes.

The official reproduction art assets provided with these guidelines include these versions:

▶ **logo to be sized at 6 in. or larger**
▶ **logo to be sized between 4 in. - 6 in.**
▶ **logo to be sized between 2 in. - 4 in.**
▶ **logo to be sized between 1 in. - 2 in.**



**NOTE:** The Craftsman Industrial logo should never be reproduced at a size less than 1 inch in width.
The Craftsman Industrial logo must be scaled proportionally and cannot be altered or manipulated in any way.



BRAND STANDARDS

## MARKETING LOGO INCORRECT LOGO USAGE

Below are examples of how the Craftsman Industrial® brand logo should **NOT** be used.



No bridging of multicolored backgrounds. Logo must appear on single-color, material texture only.



Logo colors may not be interchanged



Spacing between "Craftsman" and "Industrial®" should never be closed up



"Industrial®" should never be positioned above "Craftsman"



Logo should never be removed from surrounding frames



Logo should always have its border

## COPYWRITING

### TONE & STYLE

Craftsman Industrial® tools are heavy-duty and built upon a legacy of trusted performance. Copy statements should convey confidence, and should be straightforward yet approachable in tone.

**Here are a few key style and copy guidelines that will help you provide quality messaging for Craftsman Industrial copy:**

- ► Copy statements should be brief and informative
- ► Copy must communicate features and benefits both clearly and quickly
- ► Benefit copy should be carefully considered from the consumer's viewpoint. The copy should be clear, concise, and easy to comprehend.
- ► Avoid industry terms that require lengthy explanations.

All claims and performance statements must be cleared with Sears Brands, LLC well in advance. Preferably this should be done at the same time as actual product verification.

## PHOTOGRAPHY

### LIFESTYLE PHOTOGRAPHY

Lifestyle photography highlights the brand spirit and personality, celebrating challenges that the Craftsman Industrial® consumer takes on proudly. Choose photography that reflects this pride and determination. The feel of Craftsman Industrial photography is bold and rich, but with a bit of grit — there is a good deal of contrast and detail, but photos should not appear too "slick," glossy or overly photoshopped.

When shooting products in an environment, choose a setting that tells a category-specific story about the "worker" and is relatable to the consumer. Use natural lighting when possible and choose authentic props. Do not create an overly stylized environment. Models should always be in profile, focused on their tool and the task at hand, never looking directly at camera.

### ACTION/GLAMOUR PRODUCT PHOTOGRAPHY

Action/glamour shots give context to the products through environment and action. They are more dynamic than standard product shots because of the camera angle and lighting. Craftsman Industrial product must be central to shot and should be shown being used heroically in real-world situations. Craftsman Industrial logo must be visible whenever possible.

"Action" or "glamour" product shots differ from standard product shots, which are primarily used for packaging. For direction on product photography please refer to page 25.



**CRAFTSMAN**

**INDUSTRIAL®**

## BRAND STANDARDS

## BRAND PACKAGING OVERVIEW

To properly execute the new Craftsman Industrial® packaging design you must familiarize yourself with the design standards enclosed plus the Craftsman design standards and execute them with attention to detail in order to assure that visual and branding consistency across our products is maintained to the utmost.

**THIS PACKAGING DESIGN HAS BEEN DEVELOPED TO...**

▶ Make shopping easier for the consumer

▶ Elevate the overall look and feel while maintaining a strong brand presence

▶ Convey the Quality of the Craftsman Industrial® tool through innovative and unique product photography which makes each important detail visible

▶ Highlight the Knowledge and Innovation of each item, as well as the trusted Craftsman warranty through the use of a "Tab Menu" on the front panel of each package

▶ Build the Brand equity and Product story in a consistent manner





## TYPE TREATMENT

### PRIMARY AND SECONDARY FONT USAGE

Consistent use of a specific typeface can have a strong unifying effect on visual communications. United Sans is used exclusively for the Craftsman Industrial® branding system. All copy on packaging is set in various weights of United Sans, in a combination of all-caps and upper and lower case. Only the roman version of the United Sans Semi Condensed font family should be used (no italic).

Licence Agreements for the United Sans Font Library can be purchased online from House Industries.

http://www.houseind.com/

### FONTS

UNITED SANS SEMI CONDENSED MEDIUM

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

UNITED SANS SEMI CONDENSED BOLD

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

UNITED SANS SEMI CONDENSED HEAVY

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

UNITED SANS SEMI CONDENSED BLACK

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
0123456789

©2015 Sears Brands, LLC    07.2015

## PRODUCT INFORMATION TAB

The drop-down information panel houses all the information a consumer will need in a "Tab" system in order to ease shopability. This "Tab" system contains the Craftsman Industrial® logo, the size and name of the product, amplitude (where available) and bulleted feature callouts that indicate unique product innovation.

The product information tab is located in the upper left corner of the principal display panel (front panel) on top of the "Hero" photography. The Craftsman Industrial logo, primary product description and any sub-branding logos are repeated on the back panel within a simplified version of the product information tab.

Due to the wide range of package sizes and proportions, there are exceptions to the placement of the information tab. Designers should be aware of space and always have a balance. As an example, extremely tall, narrow packages (like string trimmers) make it necessary to center the information tab at the top of the carton, to preserve the overall balance of the principal display panel. Likewise, extremely small packages (like rechargeable batteries) also necessitate a centered location of the information tab at a size approaching the entire width of the package. This allows sufficient space for the information the consumer will need to make an informed purchase decision.

The specifications detailed on the following pages are intended to serve as a basic guideline for the development of the product information tab. Typically, the size of the tab should be approximately 30-40% the overall width of the principal display panel.



## PRODUCT INFORMATION TAB (CONT.)

These are the basic art elements that appear in the Craftsman Industrial® product information tab.

### 1. LOGO
Located prominently at the top of the tab. See page 16 for minimum clearance specifications.

### 2. PRODUCT NAME
75% height of "CRAFTSMAN" in the logo, United Sans Semi-Condensed Bold in all-caps. If product name runs on two or more lines, set leading at 85% of type size. Translation is 55% of that, United Sans Semi-Condensed Bold in title case.

### 3. DIVIDING BEVELS
Top of product name area, double bevel= 40% height of white bevel above logo and 60% Black. Bevel edges are at a 45° angle. Bottom of double bevel reflected and in 100% Black.

### 4. FEATURE CALLOUTS
45-55% of Product Name, but should not drop below 7 points. United Sans Semi-Condensed Medium in title case, Black. Leading is 93% of type size and space before paragraph is set to 40% of type size.



### CLEARANCE SPACE KEY

= the "I" in the Craftsman Industrial® logotype

= the "C" in the Craftsman Industrial® logotype

=75% X-height of Product Name

= 100% X-height of Product Name translation

= alignment

### COLOR KEY

A. Top bevel of logo area = white

B. Logo area = 20% Black

C. Product name/feature callout area = 85% Black

©2015 Sears Brands, LLC    07.2015

# CRAFTSMAN
## INDUSTRIAL®

## BRAND STANDARDS

## PRINCIPAL DISPLAY PANEL (FRONT)

These are the basic art elements that appear in the Craftsman Industrial® principal display panel.

### 1. PRODUCT INFORMATION TAB
See pages 22- 23 for detailed specifications.

### 2. PRODUCT "HERO" PHOTOGRAPHY
See page 26 for specifications on product photography.

### 3. PRODUCT NUMBER LOCKUP
Located in the upper right-hand corner of the panel bounded in a white stroked box with the stroke weight being 6% of the main code size. United Sans Semi-Condensed Bold, 90-100% of Product Name.

### 4. SIZE CALLOUT/ICON
Located in the upper right-hand corner of the panel near the product number lockup, space providing. Provided in the art assets.

### 5. WARRANTY ICON
See page 29 for detailed specifications.

### 6. CONTENTS
United Sans Semi-Condensed Bold. Translation is 55-75% of that. See page 31 for bilingual specifications.



### CLEARANCE SPACE KEY

= the "I" in the Craftsman Industrial® logotype

= the "C" in the Craftsman Industrial® logotype

= alignment

### COLOR KEY

A. Panel border = 92% Black

B. Bevel = 75% Black

C. Main background = 100% Black

**CRAFTSMAN**

**INDUSTRIAL®**

BRAND STANDARDS

## OTHER PACKAGING ELEMENTS

These are the basic art elements that appear on the Craftsman Industrial® packaging.

### 1. LOGOS

Located on the back panel within the product information tab, same size as on front, and on the left side panel, centered, 75% of the front. Besides the front panel, all other logos should be the 1-color version, reversed-out in the case of the carton below. On card backs, the 1-color version in Black is used (see example). See page 16 for minimum clearance specifications.

### 2. PRODUCT NUMBER LOCKUPS

Located in the upper right-hand corner of back and side panels, 80% of the front.

### 3. PRODUCT NAME

Located on the back and left side panels.

### 4. WARRANTY COPY

Located on the right side panel. See page 28 for detailed specifications.

### 5. UPC LOCKUP

Located on the back panel. See page 27 for detailed specifications.

### CLEARANCE SPACE KEY

**I** = the "I" in the Craftsman Industrial® logotype

**C** = the "C" in the Craftsman Industrial® logotype

**X** = 75% X-height of Product Name

**X** = 100% X-height of Product Name translation

**¦** = alignment

### COLOR KEY

A. Side panels = 100% Black

B. Back panel = 92% Black

C. Back panel product information tab = 85% Black

D. Top and bottom panels = 92% Black

**NOTE:**
On insert cards, all information moves to the back panel (logos, lockups, warranty) and is all set in 100% Black with the back of the card being white.



**CRAFTSMAN**

**INDUSTRIAL®**

**BRAND STANDARDS**

## PHOTOGRAPHY

### PHOTOGRAPHIC STYLE

Photography is the most dominant visual aspect of Craftsman Industrial® packaging, as it showcases our innovative products. The use of product photography must remain consistent and appropriate in terms of overall style; e.g. lighting, camera angle and product placement as described in this section. Products are photographed from three approved angles: straight profile, straight slightly angled and top angled view. Choose the angle based on the size, shape, color, etc., that showcases the individual product and any of its key features best.

### THE "HERO" SHOT

The "Product as Hero" photography on the front of all cartons allows the consumer to see all the "Quality and Detail" that goes into the Craftsman Industrial product. It is a heroic shot complemented with the high-contrast lighting photographic style. The consumer now views the product as a premium or upscale item.

The "Hero" Shot on the principal display (front) panel always uses a three-quarter reference photograph of the actual product. This offers the consumer a 3-dimensional look and assists in quick identification and shopability.




**CRAFTSMAN**

**INDUSTRIAL®**

## BRAND STANDARDS

## UPC LOCKUP

These are the basic art elements that appear in the Craftsman Industrial® UPC Lockup.

### 1. UPC

Placed in a white bounding box when on black. See example B.

### 2. DISTRIBUTION COPY

Placed to the right and bottom-aligned or above and left-aligned with the UPC bars. Set in United Sans Semi-Condensed Medium.
Type sizes are as follows:
80% UPC = 6-8 pt. type
100% UPC = 8-10 pt. type
200% UPC = 12-16 pt. type
Set in black on a white background and reversed-out on red and black backgrounds. See page 31 for details on legally required statements.

**NOTE:**
The placement of the UPC lockup will depend on the space available after all package elements have been  applied to the artwork. On 6-sided cartons, the UPC lockup NEVER appears on the front or left side panel.

It is acceptable for the UPC lockup to appear on multiple panels, especially on larger cartons.



Made in Country of Origin
Product distributed in the United States by
Sears Brands Management Corporation
Hoffman Estates, IL 60179

**example A**



**example B**

**CRAFTSMAN**

**INDUSTRIAL®**

BRAND STANDARDS

# WARRANTY

In an effort to more clearly communicate specific product attributes and qualifications, benefit icons are used as graphic devices. These icons vary in usage, as some must adhere to strict legal guidelines. The lifetime and length of warranty icons and product sub-brand icons (shown below) all further emphasize the Craftsman Industrial® brand's legacy of quality, knowledge and innovation.

## CRAFTSMAN INDUSTRIAL HAND TOOL FULL WARRANTY

If this Craftsman Industrial hand tool ever fails to provide complete satisfaction, it will be repaired or replaced free of charge.

For warranty coverage details to obtain repair or replacement, visit the web page:
http://www.craftsman.com/warranty

[This warranty does not cover the _____(s), which (is an) (are) expendable part(s) that can wear out from normal use within the warranty period.]

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

**Sears Brands Management Corporation, Hoffman Estates, IL 60179**

## Tool Storage Warranty (example)

## CRAFTSMAN INDUSTRIAL LIMITED WARRANTY

FOR SIX YEARS from the date of sale, this product is warranted against defects in material or workmanship.

WITH PROOF OF SALE, a defective part will be replaced free of charge. If a replacement part is unavailable, the product will be replaced with one of equal value.

For warranty coverage details to obtain free replacement, visit the web page: www.craftsman.com/warranty

This warranty does not apply to a product that is damaged or altered through transportation, misuse, abuse, corrosion, accident, neglect modification or mishandling, nor does coverage apply if the product is ever attached to a moving vehicle.

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

**Sears Brands Management Corporation, Hoffman Estates, IL 60179**

## NOTE TO THE ABOVE:

The brackets [ ] around the "expendable parts" paragraph indicate that the paragraph is only to appear if applicable. That is, if the product does have an expendable part or parts, then fill in the blank with what it is or they are, and include the statement in the warranty.

## EXAMPLES:

This warranty does not cover the blade, which is an expendable part that can wear out from normal use within the warranty period.

This warranty does not cover the bits, which are expendable parts that can wear out from normal use within the warranty period.

This warranty does not cover the batteries or bulb, which are expendable parts that can wear out from normal use within the warranty period.

**CRAFTSMAN**

**INDUSTRIAL®**

**BRAND STANDARDS**

## WARRANTY (CONT.)

### WARRANTY ICONS

The warranty icon only appears on the principal display panel in the lower right-hand corner and reversed-out over the black background (see example A below). The icon is 120% the width of the product number lockup and right-justified with it. The warranty icon should NOT appear over any of the product hero shots. If this is unavoidable, create a second version of the warranty icon with a 100% black stroke that is at least 1/32 of an inch (see example B below).



example A



example B

**Length of Warranty Icon**

**1 | YEAR**
**WARRANTY**

**2 | YEAR**
**WARRANTY**

**3 | YEAR**
**WARRANTY**

**4 | YEAR**
**WARRANTY**

**5 | YEAR**
**WARRANTY**

**7 | YEAR**
**WARRANTY**

**10 | YEAR**
**WARRANTY**

**Lifetime Warranty Icon**



©2015 Sears Brands, LLC    07.2015

## COPYWRITING - TONE AND STYLE

Industrial products are sold primarily online or through a catalog. Currently, they're not sold at the retail level. Because Craftsman Industrial tools are designed specifically for manufacturing, trade and industry purposes, copy should speak directly to the professionals who purchase and use them. Here are a few key style and copy guidelines that will help you provide quality messaging for Craftsman packaging copy:

▸ Copy statements should be brief and informative on front panel/card.

▸ Features must be linked to corresponding benefits.

▸ All features/benefits require prioritization. Place the most important, fundamental elements on front panel with supporting and more detailed copy moved to the side or back panels. Not everything will fit on the front panel, nor should it.

▸ Benefit copy should be straightforward and clear.

▸ All claims and performance statements must be cleared with Sears well in advance. Preferably this should be done at the same time as actual product verification.

BRAND STANDARDS

## BILINGUAL PACKAGING

To address the needs of a rapidly growing market segment, the Craftsman Industrial® packaging will now be translated into Spanish. The packaging makes every effort to balance the simple aesthetic that enabled shopability as per consumer research with providing important product information to our Hispanic consumers.

Copy translations are limited to a handful of areas in order to provide either adequate product identification or necessary safety information at the point of sale. Also included are a number of optional areas for translation dependent on the amount of labeling space and agreed upon by the Craftsman Packaging Services Team.

**NOTE:** The actual type size and weight of these statements may vary depending on print process and minimum print capability standards.

The following copy content requires Spanish translations on all products:

1. Product Name (55% of English, same font and in title case)
2. Content Statement (55-85% of English)
3. Caution and Warning Statements (same size as English)

Optional copy content for which Spanish translations are permitted include:

4. Features or Bullet Points on the Drop-Down Tab (select process)
5. Warranty and Guarantee Statements
6. Distribution and Country of Origin Statements
7. Use of Icons and Color-Coding is also permitted (if Industry Standards)

You will notice on the product example pages that follow that in many cases there has been adequate space to include some of the optional Spanish content as outlined above. The amount of packaging real estate and the number of features that are highlighted on the package will be the determining factor when it comes to deciding how much of the optional copy content gets translated.

**CRAFTSMAN**

**INDUSTRIAL®**

BRAND STANDARDS

## LEGALLY REQUIRED STATEMENTS

### COUNTRY OF ORIGIN STATEMENT

A Country of Origin Statement is required by law to be located in close proximity to any US signature address. Always set the country of origin FIRST, just above the Sears signature line:

**Made in China
Product distributed in the United States by
Sears Brands Management Corporation
Hoffman Estates, IL 60179**

▶ The street address is not used

▶ The "Distributed by" statement is always "Sears Brands Management Corporation" never "Sears Holdings"

This is the abbreviated line that is allowed on packaging with restricted space:

**Product dist. in U.S. by
Sears Brands Mgt. Corp.,
Hoffman Estates, IL 60179**

Please use the appropriate statement for goods and their country of origin. Note also that if anything in the package, or a part of an item in the package, is imported, this fact must be addressed in the statement above the Sears Signature Line:

**Made in USA**
The product is entirely made in the United States. All parts, components and units and all assembling, processing and finishing that go into the product are of United States origin. That is, the product contains no foreign content or processing. The icon below should be placed near or within the UPC lockup. If the Made In USA icon is on a black or dark background, use the reversed-out version on the right (see below).

 

**Made in USA of US and global components**
The product's final assembly, processing and finishing takes place in the United States, and the product is last substantially transformed in the United States. In addition, the product has a significant amount of United States content. The United States content (parts, components or units) in relation to the product's total manufacturing cost is more than 51%.

**Made in USA of global components**
The product's final assembly, processing and finishing takes place in the United States, and the product is last substantially transformed in the United States.

**Assembled in USA of US and global components**
The product's principal assembly takes place in the United States; that assembly is substantial; and the product is last substantially transformed in the United States. In addition, the product has a significant amount of United States content. The United States content (parts, components or units) in relation to the product's total manufacturing cost is more than 51%.

**Assembled in USA**
The product's principal assembly takes place in the United States; that assembly is substantial; and the product is last substantially transformed in the United States.

**NOTES:**

Any legal, regulatory, country of origin, warranty, certification, copyright, contact information, icons and additional information should be incorporated into the package as appropriate.

Individual manufacturers should take responsibility for the legal use and placement of icons relating to energy usage, sustainability, recyclability, safety and/or physical material compliance. These items and others may be legally restricted by governmental and/or non-governmental agencies. Use of these icons must be approved for each package by the Craftsman brand team, legal department and individual product manufacturers.

## LEGALLY REQUIRED STATEMENTS (CONT.)

### NET CONTENTS STATEMENT

If there is more than one item in a package, there must be a contents statement telling the customer only what is in the package. There should be no descriptive or "sell" copy in the contents statement or list:

**CONTENTS: Drill, Battery, Case, Operator's Manual, Screwdriver Bit**

Do NOT list contents as follows:

**CONTENTS: Cordless Drill, Lithium Battery, Pleather Case, 56-pg Owner's Manual, Chrome Molybdenum, hand-forged screwdriver bit.**

The Net Contents Statement is set in United Sans Semi-Condensed Bold. The glow around the Net Contents Statement is achieved by creating a second version of the Net Contents Statement with a 100% black stroke that is 12.5% the size of the contents statement directly beneath the reversed-out white version of the Net Contents type. This will alleviate any potential registration issues with reversing the Net Contents Statement out of multiple colors.

Federal Regulations dictate the location and type size of the Net Contents Statement. The location must be in the lower 30% of the principal display panel and with the appropriate size:

| Size of Panel Area | Minimum Type Height |
|---|---|
| 5 sq. inches and under | 1/16 inch |
| Over 5 sq. inches to 25 sq. inches | 1/8 inch |
| 25 sq. inches to 100 sq. inches | 3/16 inch |
| 100 sq. inches to 400 sq. inches | 1/4 inch |
| Over 400 sq. inches | 1/2 inch |

### MEASUREMENTS

Do not ever use tic marks (") or (') to signify inches or feet as there are no metric equivalents. Always spell out "inches" and "feet" or abbreviate appropriately, e.g, "1/2 in." or "6-1/2 ft." when room does not allow for spelling the measurement out. Hyphens should be used to join together the whole numerical value and the fractional unit of measurement. All upper-case letters are used primarily in the Product Information Tab when describing measurement. Lower case should be used in all other instances.

### CHARACTERS

Exclamation points (!) and bomb-bursts are not appropriate in any copy or graphic device. These elements are inconsistent with the tone of the Craftsman® brand: a serious and capable tool that builds confidence.

Registered (®) and Copyright (©) symbols should never be set in United Sans Semi-Condensed. Use Helvetica Regular or Medium.

**CRAFTSMAN**
**INDUSTRIAL®**

## BRAND STANDARDS

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – BOX LABEL

**Example:** 283-Piece Mechanics Tool Set Box Label

**Color Usage:** This label prints in CMYK 4-Color process, plus one spot color (PMS 1807). No additional colors should be used.

**Product Information Tab:** This area houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons. It is typically 30-40% the width of the front panel.

**Brand Logo:** The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. The logo should be between 50-80% on other panels depending on space available. On the front panel, the logo is set in a 20% Black bounding box. The clearance space around the logo is the width of the "C" in the logo, as shown to the right in Magenta.

**Product Name:** The product name should follow the bilingual language rules. The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out.

**Product Features/Benefits:** Copy statements should be brief and informative on front panel/card and must come with consumer benefits. All features/benefits require prioritization. Place the most important, fundamental elements on front panel with supporting and more detailed copy moved to the side or back panels. Not everything will fit on the front panel, nor should it.

**Product Photography:** Please refer to the Craftsman Brand Standards for specifications on hero photography.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

**X** = 75% X-height of Product Name

**X** = 100% X-height of Product Name translation

**– –** = alignment



**CRAFTSMAN**
**INDUSTRIAL®**

BRAND STANDARDS

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – CASE LABEL

**Example:** 200-Piece Mechanics Tool Set Case Front Label

**Color Usage:** This front label prints in CMYK 4-Color process, plus one spot color (PMS 1807). The back label prints in CMYK 4-Color process. No additional colors should be used.

**Product Information Tab:** This area houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons. It is typically 30-40% the width of the front panel.

**Brand Logo:** The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. The logo should be between 50-80% on other panels depending on space available. On the front panel, the logo is set in a 20% Black bounding box. The clearance space around the logo is the width of the "C" in the logo, as shown to the right in Magenta. If no other panels that the logo appears on are being used as a secondary principal display panel, it is preferred that the knocked-out version of the logo be used.

**Product Name:** The product name should follow the bilingual language rules. The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out.

**Product Features/Benefits:** Copy statements should be brief and informative on front panel/card and must come with consumer benefits. All features/benefits require prioritization. Place the most important, fundamental elements on front panel with supporting and more detailed copy moved to the side or back panels. Not everything will fit on the front panel, nor should it.

**Product Photography:** Please refer to the Craftsman Brand Standards for specifications on hero photography.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

**X** = 75% X-height of Product Name

**X** = 100% X-height of Product Name translation

--- = alignment



Front Label Dieline 14.75" x 8.125"
0.56" corner radius

**CRAFTSMAN**

**INDUSTRIAL®**

**BRAND STANDARDS**

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – CASE LABEL (CONT.)

**Example:** 200-Piece Mechanics Tool Set Case Back Label

**Color Usage:** This front label prints in CMYK 4-Color process, plus one spot color (PMS 1807). The back label prints in CMYK 4-Color process.
No additional colors should be used.

**Product Information Tab:** This area houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons.
It is typically 30-40% the width of the front panel.

**Brand Logo:** The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. The logo should be between 50-80% on other panels depending on space available. On the front panel, the logo is set in a 20% Black bounding box. The clearance space around the logo is the width of the "C" in the logo, as shown to the right in Magenta. If no other panels that the logo appears on are being used as a secondary principal display panel, it is preferred that the knocked-out version of the logo be used.

**Product Name:** The product name should follow the bilingual language rules. The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out.

**Product Features/Benefits:** Copy statements should be brief and informative on front panel/card and must come with consumer benefits. All features/benefits require prioritization. Place the most important, fundamental elements on front panel with supporting and more detailed copy moved to the side or back panels. Not everything will fit on the front panel, nor should it.

**Product Photography:** Please refer to the Craftsman Brand Standards for specifications on hero photography.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

**X** = 75% X-height of Product Name

**X** = 100% X-height of Product Name translation

– – = alignment



**BACK**

**Product Number**
United Sans
Semi-Condensed Bold
Knocked Out
90-100% of Product Name

**Product Name**
United Sans
Semi-Condensed Bold
Knocked Out
60% height of "CRAFTSMAN"
Leading=85% of type size

**Product Name Translation**
United Sans
Semi-Condensed Bold
Knocked Out
55% of Product Name
Leading=85% of type size

**Contents List**
United Sans
Semi-Condensed Heavy
Knocked Out (It is recommended to use a bolder font when knocked out and printing Flexo.)

**Warranty**
COPY: United Sans
Semi-Condensed Bold
Knocked Out

HEADLINE: United Sans
Semi-Condensed Heavy
Knocked Out
110% size warranty copy

**UPC**
100% (typical for direct print flexo)
100% Black

**Address/Legal**
United Sans
Semi-Condensed Medium

**CRAFTSMAN INDUSTRIAL**

**INDUSTRIAL®**

**BRAND STANDARDS**

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – DIRECT PRINT

**Example:** 283-Piece Mechanics Tool Set Direct Print Carton

**Carton Material:** This carton has been set up for printing on **white corrugate**.

**Color Usage:** This direct print carton prints in 1-Color: Black. No additional colors should be used.

**Product Information Tab:** This area houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons. It is typically 30-40% the width of the front panel.

**Brand Logo:** The brand logo should never be altered or translated in any way. On side panels, the logo is typically 80% of the size it is on the front panel, in this case the label. It is the same size on the back panel. On a direct print carton, it is recommended to use the 1-Color version of the logo, in this case knocked out.

**Product Name:** The product name should follow the bilingual language rules. The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out.

**Address/Legal Copy:** Address and legal copy should print no smaller than 6pt and knocked out. Do not change lockup of address/legal copy.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

**X** = 75% X-height of Product Name

**X** = 100% X-height of Product Name translation

**– –** = alignment



**CRAFTSMAN**

**INDUSTRIAL®**

BRAND STANDARDS

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – CARD

**Example:** 13-pc. Ball End Hex Key Set Card

**Color Usage:** This card prints in CMYK 4-Color process, plus one spot color (PMS 1807) on the front and 1-Color (Black) on the back.
No additional colors should be used.

**Product Information Tab:** This area houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons.
It is typically 30-40% the width of the front panel.

**Brand Logo:** The brand logo should never be altered or translated in any way. It is the same size and in the same position on the back panel.
On a card back, it is recommended to use the 1-Color version of the logo, in this case 100% Black.

**Product Name:** The product name should follow the bilingual language rules. The translation should be placed directly underneath the primary product name
descriptor. Product name copy should always be reversed out on the front panel.

**Address/Legal Copy:** Address and legal copy should print no smaller than 6pt and knocked out. Do not change lockup of address/legal copy.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

**X** = 75% X-height of Product Name

**X** = 100% X-height of Product Name translation

– – = alignment



**FRONT**

**BACK**

White  20% Black  85% Black  100% Black  92% Black

**Product Number**
United Sans
Semi-Condensed Bold
Knocked Out
90-100% of Product Name

**Product Name**
United Sans
Semi-Condensed Bold
Knocked Out
75% height of "CRAFTSMAN"
Leading=85% of type size

**Product Name Translation**
United Sans
Semi-Condensed Bold
Knocked Out
55% of Product Name
Leading=85% of type size

**Contents**
Please Reference
Craftman Brand Standards

**Warranty Icon**
Provided in assets
125% width
of Product Number

**Product Number**
United Sans
Semi-Condensed Bold
100% Black
Same size as front

**Product Name**
United Sans
Semi-Condensed Bold
100% Black
80% of front

**Product Name Translation**
United Sans
Semi-Condensed Bold
100% Black
80% of front

**Warranty**
COPY: United Sans
Semi-Condensed Medium
100% Black
HEADLINE: United Sans
Semi-Condensed Bold
100% Black
110% size warranty copy

**Contents**
Please Reference
Craftman Brand Standards

**UPC**
100% size
100% Black

**Address/Legal**
United Sans
Semi-Condensed Medium
100% Black

Top of product name area double bevel =
40% height of white bevel above logo
and 60% Black. Bottom of double bevel
reflected and in 100% Black.

**CRAFTSMAN**

**INDUSTRIAL®**

BRAND STANDARDS

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – SLEEVE

**Example:** 10-in. Flex T-Handle Sleeve

**Color Usage:** This sleeve prints in 1-Color process (Black), plus one spot color (PMS 1807) on the front and 1-Color (Black) on the back. No additional colors should be used.

**Product Information Tab:** This area houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons. It is typically 30-40% the width of the front panel.

**Brand Logo:** The brand logo should never be altered or translated in any way. It is the same size and in the same position on the back panel. On a card back, it is recommended to use the 1-Color version of the logo, in this case 100% Black.

**Product Name:** The product name should follow the bilingual language rules. The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out on the front panel.

**Feature Callout/Icon:** When the size of a panel permits, it is ideal to include any feature icons within the Product Information Tab between the Product Name and any Product Features/Benefits. Throughout a category, such as sockets, different colors are used to differentiate size/speed, etc. These secondary spot colors are PMS 108, PMS 285 and PMS 334.

**Address/Legal Copy:** Address and legal copy should print no smaller than 6pt and knocked out. Do not change lockup of address/legal copy.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial

**C** = the "C" in the Craftsman Industrial

**X** = 75% X-height of Product Name

**X** = 100% X-height of Product Name translation

**––** = alignment



**CRAFTSMAN**

**INDUSTRIAL®**

**BRAND STANDARDS**

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – SMALL LABEL

**Example:** This label prints in CMYK 4-Color process, plus one spot color (PMS 1807). No additional colors should be used.

**Color Usage:** This label prints in CMYK 4-Color process, plus one spot color (PMS 1807). No additional colors should be used.

**Product Information Tab:** This area houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons. It is typically 30-40% the width of the front panel.

**Brand Logo:** The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. The logo should be between 50-80% on other panels depending on space available. On the front panel, the logo is set in a 20% Black bounding box. The clearance space around the logo is the width of the "C" in the logo, as shown to the right in Magenta.

**Product Name:** The product name should follow the bilingual language rules. The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out.

**Product Features/Benefits:** Copy statements should be brief and informative on front panel/card and must come with consumer benefits. All features/benefits require prioritization. Place the most important, fundamental elements on front panel with supporting and more detailed copy moved to the side or back panels. Not everything will fit on the front panel, nor should it.

**Product Photography:** Please refer to the Craftsman Brand Standards for specifications on hero photography.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

**X** = 75% X-height of Product Name

—— = alignment



White    20% Black    65% Black    Top of product name area double bevel= 40% height of white bevel above logo and 60% Black. Bottom of double bevel reflected and in 100% Black.    92% Black    75% Black    100% Black

**Product Number**
United Sans
Semi-Condensed Bold
Knocked Out
90-100% of Product Name

**Product Name**
United Sans
Semi-Condensed Bold
Knocked Out
75% height of "CRAFTSMAN"
Leading=85% of type size

**Product Name Translation**
United Sans
Semi-Condensed Bold
Knocked Out
55% of Product Name
Leading=85% of type size

**Product Features/ Benefits**
United Sans
Semi-Condensed Medium
Knocked Out
45-55% of Product Name
Leading=93% of type size
Paragraph Space=40%
of type size

**UPC**
80% (truncated up to 3/8 in.)
100% Black

**Address/Legal**
United Sans
Semi-Condensed Medium

934860

SECURITY DEVICE ENCLOSED

7  14994 34660  3

**CRAFTSMAN**

**INDUSTRIAL®**

**11-PC.**
**1/4-IN. DRIVE INCH SET**
Conjunto De La Pulgada Del Mecanismo
Impulsor De 1/4 Pulgada De 11 Piezas

**Includes:** 3/16, 7/32, 1/4, 9/32, 5/16, 11/32, 3/8, 7/16, 1/2-in. 6-pt. Inch Sockets, 1-1/2-in. Extension Bar and 1/4-in. Drive Quick Release Ratchet

All 1/4-in. Drive Inch

**Tools Made in U.S.A.**
**Tool Case Made in China**
Product distributed in the United States by
Sears Brands Management Corporation
Hoffman Estates, IL 60179

**CRAFTSMAN**

**INDUSTRIAL®**

**BRAND STANDARDS**

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – LABEL

**Example:** 9-pc. Deep Socket Set Label

**Color Usage:** This card prints in 1-Color process (Black), plus 2 spot colors (PMS 1807 and PMS 108). No additional colors should be used.

**Product Information Tab:** This area houses the Brand Logo, Product Name, Product Features and any size/speed/special Feature Callouts/Icons. It is typically 30-40% the width of the front panel.

**Brand Logo:** The brand logo should never be altered or translated in any way. It is the same size and in the same position on the back panel. On a card back, it is recommended to use the 1-Color version of the logo, in this case 100% Black.

**Product Name:** The product name should follow the bilingual language rules. The translation should be placed directly underneath the primary product name descriptor. Product name copy should always be reversed out on the front panel.

**Feature Callout/Icon:** When the size of a panel permits, it is ideal to include any feature icons within the Product Information Tab between the Product Name and any Product Features/Benefits. Throughout a category, such as sockets, different colors are used to differentiate size/speed, etc. These secondary spot colors are PMS 108, PMS 285 and PMS 334.

**Address/Legal Copy:** Address and legal copy should print no smaller than 6pt and knocked out. Do not change lockup of address/legal copy.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

X = 75% X-height of Product Name

X = 100% X-height of Product Name translation

–– = alignment



**Product Name**
United Sans
Semi-Condensed Bold
Knocked Out
75% height of "CRAFTSMAN"
Leading=85% of type size

**Product Name Translation**
United Sans
Semi-Condensed Bold
Knocked Out
55% of Product Name
Leading=85% of type size

**Feature Callout/Icon**
Provided in assets

White    20% Black    85% Black    100% Black    92% Black

**Product Number**
United Sans
Semi-Condensed Bold
Knocked Out
90-100% of Product Name

**Contents**
Please Reference
Craftman Brand Standards

**Warranty Icon**
Provided in assets
125% width
of Product Number

**UPC**
80% size
100% Black

**Address/Legal**
United Sans
Semi-Condensed Medium
Knocked out

**Top of product name area double bevel= 40% height of white bevel above logo and 60% Black. Bottom of double bevel reflected and in 100% Black.**

CRAFTSMAN

INDUSTRIAL®

BRAND STANDARDS

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – LABEL (CONT.)

**Example:** Overprinted Open Stock Socket Labels

**Color Usage:** This label prints in 3-Color: Black, plus two spot colors (PMS 1807 and a category spot color). No additional colors should be used.

**Product Information Tab:** This area typically houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons. Due to space confinements, the label is split into a logo area (see specifications for logo clearance space below) and a product information area, which is White.

**Brand Logo:** The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. The logo should be between 50-80% on other panels depending on space available. On the front panel, the logo is set in a 20% Black bounding box. The clearance space around the logo is the width of the "C" in the logo, as shown to the right in Magenta. The absolute minimum size of the logo is 1 inch in width.

**Product Name:** Due to space confinements, the product name cannot follow the bilingual language rules. Product name copy should always be reversed out.

**Clearance Space Key:**

**C** = the "C" in the Craftsman Industrial®

**– –** = alignment



**CRAFTSMAN**
**INDUSTRIAL®**

**BRAND STANDARDS**

# CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – LABEL (CONT.)

**Example:** Single and Set Socket Labels

**Color Usage:** This label prints in 3-Color: Black, plus two spot colors (PMS 1807 and a category spot color). No additional colors should be used.

**Product Information Tab:** This area typically houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons. Due to space confinements, the label is split into a logo area (see specifications for logo clearance space below) and a product information area, which is 92% Black.

**Brand Logo:** The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. The logo should be between 50-80% on other panels depending on space available. On the front panel, the logo is set in a 20% Black bounding box. The clearance space around the logo is the width of the "C" in the logo, as shown to the right in Magenta. The absolute minimum size of the logo is 1 inch in width.

**Product Name:** Due to space confinements, the product name cannot follow the bilingual language rules. Product name copy should always be reversed out.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

**X** = 75% X-height of Product Name

**X** = 100% X-height of Product Name translation

**— —** = alignment



**Single Socket Labels**
One for Each Drive Size



**Socket Set Labels**

**Torx Bit Socket Labels**

## CRAFTSMAN INDUSTRIAL® PACKAGE DESIGN GUIDELINES – LABEL (CONT.)

**Example:** Dual Ratcheting Wrench Labels

**Color Usage:** This label prints in 2-Color: Black, plus one spot color (PMS 1807). No additional colors should be used.

**Product Information Tab:** This area typically houses the Brand Logo, Product Name, Product Features and any size/speed/special feature callouts/icons. Due to space confinements, the label is split into a logo area (see specifications for logo clearance space below) and a product information area, which is 92% Black.

**Brand Logo:** The brand logo should never be altered or translated in any way. When logo is on more than one panel the largest logo should be placed on the front panel. The logo should be between 50-80% on other panels depending on space available. On the front panel, the logo is set in a 20% Black bounding box. The clearance space around the logo is the width of the "C" in the logo, as shown to the right in Magenta.

**Product Name:** Due to space confinements, the product name cannot follow the bilingual language rules. Product name copy should always be reversed out.

**Clearance Space Key:**

**I** = the "I" in the Craftsman Industrial®

**C** = the "C" in the Craftsman Industrial®

**X** = 75% X-height of Product Name

**– –** = alignment



## LOGO ON PRODUCT OVERVIEW

**PURPOSE:**

To document the preferred logo to be used on Craftsman Industrial® products. This guideline document also defines logo colors on product, logo configurations and their preferred usage.

**SCOPE:**

The information contained in this document applies to 2D and 3D logos that appear on product. Use supplied master logo artwork from Craftsman Industrial Design to develop logos used on products. Master artwork may only be scaled proportionately.



## LOGO ON PRODUCT

The "stacked" full-color logo below is the preferred logo for use on Craftsman Industrial® products.

**PRIMARY LOGO:**
USE THIS LOGO ON A BLACK BACKGROUND WHENEVER POSSIBLE



**PRIMARY ALT. LOGO:**
USE THIS LOGO WHEN BLACK IS NOT USED AS THE BACKGROUND COLOR



**NOTE:** On product logo application DOES NOT contain the ® after Craftsman Industrial which is the difference from the marketing and on product logo.



BRAND STANDARDS

## LOGO ON PRODUCT (CONT.)

The Craftsman Industrial® logo on product may be reproduced with a 1-color process that permanently marks the product.

### WHITE LOGO:
USE THIS LOGO ON A BLACK BACKGROUND

**CRAFTSMAN**

**INDUSTRIAL**

### BLACK LOGO:
USE THIS LOGO ON A RED BACKGROUND

**CRAFTSMAN**

**INDUSTRIAL**

**NOTE:** On product logo application DOES NOT contain the ® after Craftsman Industrial which is the difference from the marketing and on product logo.

**INDUSTRIAL®**

**BRAND STANDARDS**

## LOGO ON PRODUCT (CONT.)

When stamping the logo onto metal, the thickness of the font in the logo changes to optimize readability and longevity on both the tool and in the tooling used for the stamping process.

---

**PRIMARY STAMPED LOGO:**
USE THIS LOGO WHEN STAMPING THE LOGO ONTO METAL WHENEVER POSSIBLE



---

**ALT. STAMPED LOGO:**
REDUCED SIZED VERTICALLY STACKED LOGO FOR SPECIAL APPLICATIONS.
USE IS SUBJECT TO APPROVAL BY CRAFTSMAN INDUSTRIAL DESIGN

**CRAFTSMAN INDUSTRIAL**

---

**HORIZONTAL STAMPED LOGO:**
THE LOGO MAY ALSO BE STAMPED IN A HORIZONTAL LAYOUT WHEN SPACE ON THE TOOL BECOMES AN ISSUE

**CRAFTSMAN INDUSTRIAL**

---

**HORIZONTAL ALT. STAMPED LOGO:**
INTENDED FOR LIMITED SPACE (REMOVED RECTANGLE). PREFERRED VERSION FOR RAISED PANEL TOOLS



---

**NOTE:** On product logo application DOES NOT contain the ® after Craftsman Industrial
which is the difference from the marketing and on product logo.



BRAND STANDARDS

## LOGO ON PRODUCT COLOR PALETTE



**PMS 1807 C**
4-color process:*
c: 0
m: 100
y: 96
k: 28
*see approval note



**PROCESS BLACK**
4-color process:
c: 0
m: 0
y: 0
k: 100

### PRIMARY BRAND COLORS
The color palette consists of:
Pantone 1807 C
Process Black

### PRINTING SUGGESTIONS
To ensure color consistency PMS 1807 C should always be printed as a spot color.  A 4-color process version of the PMS 1807 C **WILL NOT** be consistent with the spot color.

In some cases there is no choice but to print 4-color process.* It is highly recommended to get proofs of the artwork for Brand approval. As a starting point, use the following 4-color process breakdown of PMS 1807 C:

c: 0
m: 100
y: 96
k: 28

**\*NOTE: Brand pre-approval to use a 4-color process version of the PMS 1807 C is required.**

Depending on the technical capabilities of the printer, a rich process black can be used. A minimum line screen of 150 LPI is required to print this rich process black background to avoid possible registration issues. Use the following 4-color process breakdown for the rich process black:

c: 40
m: 40
y: 0
k: 100

Otherwise, the background color should print 100% process black with copy reversing out to white.

**NOTE: If printer capabilities do not meet brand standards, please contact Sears for possible printing and/or layout options.  Brand approval is required to move forward.**

**Please see the Approval Process on page 52 of these guidelines for further information on obtaining the necessary approvals.**

**BRAND STANDARDS**

# LOGO ON PRODUCT ISOLATION ZONE

**CLEAR SPACE AROUND LOGO**

Clear space is defined as the area around the logo that is kept free from any 2D graphics or 3D design elements including material breaks and parting lines.

**DETERMINING CLEAR SPACE:**

Calculate the X dimension. X= The distance between the inside edge of the outer frame of the Craftsman logo, to the left edge of the letter "C" in the Craftsman logotype (as indicated by the blue squares). The X dimension applied to all four corners defines the clear space.



**DETERMINING CLEAR SPACE FOR STAMPED LOGO:**

Calculate the X dimension. X= The distance between the inside edge of the outer frame of the Craftsman logo, to the left edge of the letter "C" in the Craftsman logo type (as indicated by the red squares).



**CRAFTSMAN**

**INDUSTRIAL®**

BRAND STANDARDS

## EXAMPLES OF LOGO ON PRODUCT

HORIZONTAL STAMPED LOGO



VERTICAL STACKED LIMITED SPACE LOGO



**CRAFTSMAN**
**INDUSTRIAL®**

BRAND STANDARDS

## APPROVAL PROCESS

### PACKAGING DEVELOPMENT PROCESS (PDP)

The Craftsman Industrial® brand will align with the Packaging Development Process
that is used for other Sears Brands, LLC.

Kenmore

Kenmore Elite

DieHard

### BENEFITS OF THE NEW PROCESS:

**Consistent, impactful and differentiated packaging across all categories/products**
The process will increase the power and visibility of the brand by aligning all categories
positioning of the brand. We will be able to improve brand perception and product positioning.

We can insure that we clearly explain to customers the product features and benefits.

### OUTLINE OF PROCESS:

The preferred Craftsman Approved Packaging Design Agencies will work directly with our
vendors to develop packaging files for the Craftsman brand.

All packaging jobs will be initiated when vendor completes and submits a Packaging
Development Process (PDP) form to the agency. The form identifies all necessary information
to create packaging: item name, specs, photography, features and benefits, COO, who the
vendor will use for printing, the deadline for receipt of packaging files, etc.

**The agencies will be responsible for artwork/layout, photography, copy, etc., on:**
Packaging for all new product

Rolling existing product into new packaging design (as appropriate)

Maintaining a library of all packaging, copy and photography (SHC will own)

Vendors will be responsible for managing their packaging projects through direct engagement
with the packaging agency

Sears and vendors will review/approve first and final packaging design submissions

Corrections are electronically sent to packaging suppliers who will make changes as
necessary while maintaining brand design integrity

The Packaging Agencies will submit final revised files for final approval and release files to
vendor's print suppliers for production

**See PDP flow chart and PDP form example on the following pages.**

## APPROVAL PROCESS (CONT.)

### PACKAGING DEVELOPMENT PROCESS (PDP)



| | |
|---|---|
| **CRAFTSMAN VENDOR** | Provides ALL required input on PDP form (package copy, printer specifications, dieline, existing photography and artwork, product samples, etc.). |
| **PACKAGING AGENCY** | Completes first round of packaging artwork. Files are sent electronically for review; first to the vendor for initial feedback, then to Sears after initial feedback from vendor is addressed. **10 BUSINESS DAYS** |
| **KCD / VENDOR** | **FIRST ROUND REVIEW** Files are routed and reviewed by brand team, buyer, PS and vendor. **2 BUSINESS DAYS** |
| **PACKAGING AGENCY** | Agency makes changes once all comments are received. Completed files are sent to Sears and vendor for final approval. **2 BUSINESS DAYS*** |
| **KCD / VENDOR** | **SECOND ROUND REVIEW** Files are routed and reviewed by brand team, buyer, PS and vendor. **2 BUSINESS DAYS** |
| **PACKAGING AGENCY** | Agency makes final changes once all comments are received. **2 BUSINESS DAYS*** |
| **KCD / VENDOR** | **FINAL REVIEW** Confirms that packaging is final and ready for release. **1 BUSINESS DAY** |

*Dependent upon depth of changes

| | |
|---|---|
| **PACKAGING AGENCY** | Agency to prepare and pre-flight artwork for vendor printer. **2 BUSINESS DAYS** |
| **VENDOR** | Sends to printer. Printer sends Sears pre-press proof for review. **2 BUSINESS DAYS** |
| | ▶ **APPROVED** Proceed to next steps. ▶ **REJECTED** Agency or printer makes changes once all comments are received. Packaging artwork goes back through final review process. |
| **VENDOR** | To start mass printing after approval from Sears and ship out. |
| **VENDOR / PRINTER** | To send 2 printed samples (without product) to Sears for review promptly after mass printing is completed. |
| **KCD** | **FINAL APPROVAL** To review and issue QA report and return 1 signed sample. **2-4 BUSINESS DAYS** |
| | ▶ **PASSED** ▶ **CONDITIONALLY PASSED** **Minor Change:** No need to resubmit revised press proof before next shipment. **Major Change:** Re-print if time allows. Any new print run requires a press proof to be resubmitted to Sears for approval before next shipment. ▶ **REJECTED** Must take immediate corrective action before the shipment. |
| **TOTAL** | **50 DAYS** (Minimum Timeline) |

18-23538-shl Doc 2072 Filed 01/28/19 Entered 01/28/19 15:04:47 Main Document
Pg 392 of 492

# APPROVAL PROCESS (CONT.)

## PACKAGING DEVELOPMENT PROCESS (PDP) FORM

CRAFTSMAN Packaging Development Protocol (PDP)

CONTACT INFORMATION

Project Requested by: ______ Date: ______
Product Manager: ______ Phone: ______
Brand Manager: ______ Phone: ______
Product Develop. Engineering Manager: ______ Phone: ______
Manufacturing Vendor: ______ Phone: ______

PROJECT OVERVIEW

Project Name: ______
Please Select One: New Product ☐ Running Change: ☐
**Artwork Due Date:** ______ **Planned 1st Ship Date:** ______
**Planned Print Date:** ______ **Planned In-Store Date:** ______

REQUIRED MATERIALS

Completed and SIGNED PDP
Completed package requirements
Completed printer input form
Complete product specifications
Dieline (.ai, .eps, .dxf, .dwg) at 100% with complete dimensions
2 existing product samples (1 must be in current packaging)
Photography/Illustrations: NA ☐ Provided ☐ Agency to provide ☐
UPC/EAN: NA ☐ Provided ☐ Agency to provide ☐
Usage Icons: NA ☐ Provided ☐ Agency to provide ☐

PACKAGE REQUIREMENTS

**FRONT PANEL (Principle Display Panel)**

Brand: Craftsman ☐ Craftsman Pro ☐
Product Name: ______ Suggested Retail: ______
Department #: ______ Item #/SKU: ______ UPC: ______

Key Features Bullet Copy (List in order of importance, 5 features with correlating benefits):
1 Feature: ______ Benefit: ______
2 Feature: ______ Benefit: ______
3 Feature: ______ Benefit: ______
4 Feature: ______ Benefit: ______
5 Feature: ______ Benefit: ______

Special callout required? ______

Photography: Please provide a detailed description if hero photography is not provided (please include any featured components and accessories):

List package contents:

**LEFT SIDE PANEL (In-Use / Feature Close-up Panel)**

In-Use/Feature Close-Up Photography (List in order of importance, 3-5 key features with correlating benefits.
Please provide a detailed description if in-use photography is not provided):
1 Feature: ______ Description: ______
2 Feature: ______ Description: ______
3 Feature: ______ Description: ______
4 Feature: ______ Description: ______
5 Feature: ______ Description: ______

Product Distribution Statement: ☐ Distributed by Sears Brands Management Corp., Hoffman Estates, IL 60179
Country of Origin: ______
Certifications:
UL ☐ ETL ☐ Others ☐ ______
Legal Mandatories and/or Disclaimer copy: ______

Warning/Caution Statements: ______

**RIGHT SIDE PANEL (Warranty Panel)**

Warranty:
______ YEAR WARRANTY ☐ LIFETIME WARRANTY ☐
Warranty copy: ______

**BACK PANEL (Product Reference Panel)**

Include feature/benefit copy for product walkaround or additional components included in the contents such as battery, charger, carrying case, etc.
(Identify if additional components need to be photographed. Please provide a detailed description if photography is not provided):
1 Feature: ______ Description: ______
2 Feature: ______ Description: ______
3 Feature: ______ Description: ______
4 Feature: ______ Description: ______
5 Feature: ______ Description: ______

**ADDITIONAL COMMENTS/CONCERNS**

PRINTER INFORMATION

Company Name: ______
Contact Name: ______
Address: ______
Phone Number: ______
Cell Phone Number: ______
Fax Number: ______
Email Address: ______
Component: ______
Die: Chop cut ☐ Diecut ☐
**Printing Capabilities:**
Process ☐ Spot ☐ # Colors: ___
**Type Press:** ______
**Print Process:**
Offset ☐ Direct ☐ Flexo: ☐ Other: ______
**Other Print Considerations:**
Line Screen: ______ Minimum Point Size: ______ Minimum Keyline Size: ______
Gradient/ Tint Max./ Min. Dot Range: ______ Trap/ Stay-Away Tolerance: ______
Dot Gain: ______ Dot Loss: ______
**File Formats (Acceptable by Printer):**
Quark: ☐ InDesign: ☐ Photoshop: ☐ Illustrator: Version ______ Other: ______
**Printer FTP Instructions:**

**Proof Types (Acceptable by Agency):**
For Content and Layout Only (not color): HP ☐ PDF ☐
For Color Approval: Digital Waterproof ☐ Ink Drawdowns on Actual Substrate ☐
Color Contract Proof (i.e. Kodak, Fuji) ☐

VENDOR RESPONSIBILITIES (signature required)

Vendor: sign PDP and return the following pages along with required materials no later than 5 days from date of request. If product samples are not available at time of request, PDP forms and dieline must be returned within the 7 days to avoid delays. Please contact Ed Smith to inform him of the delay. Package Design and Production will NOT begin until the signed PDP, along with required materials, have been received. Questions: contact Ed Smith 847-286-7567, (esmi160@searshc.com) DC-267A, 3333 Beverly Road, Hoffman Estates, IL 60179

On behalf of ______ (vendor), I agree to the terms of **Sears Holdings Management Corporation or its affiliates (collectively, "SHMC")** Product Development as outlined in **the brand identity guidelines** and attest to the accuracy of the information provided. I understand that any delays in product development or shipping resulting from late, inaccurate/incomplete materials, or failure to comply with PDP instructions will result in penalties reflecting **SHMC's** additional costs and/or lost sales in addition to set financial penalties (available upon request). These terms apply whether or not item development is initiated by Sears Holdings Global Sourcing or Buyer. Vendor is responsible for all packaging/design development and QA evaluation costs. All required information and samples are being submitted with my signature below. These terms are in addition to the standard **SHMC** purchase agreement terms. Please do not change or edit released, final files in any way, without notifying and receiving an approval from Ed Smith, Sears Packaging Manager. Files that are altered without notification are subject to a $10,000 fine.

**NOTES:**

For a Microsoft Excel version of the PDP form, please contact your packaging agency or go to the link below to download.

http:/xxxxxxxxxxxx.xxx

 ©2015 Sears Brands, LLC

## CONTACT INFORMATION

Direct all inquiries to:

Director of Craftsman Marketing
3333 Beverly Road,
Hoffman Estates, IL 60179
tel: (847) 286-2400



# CRAFTSMAN® PRO SERIES MARKETING

## IN THIS SECTION:

► INTRODUCTION

► PACKAGING LOGOS

► INCORRECT LOGO USAGE

► COLOR PALETTE



# INTRODUCTION

## BUILT TOUGH. BUILT TO PERFORM.

**Craftsman® Pro Series is a premium product platform within the Craftsman brand structure.** Backed by the trusted performance and strength that all Craftsman products deliver, Craftsman Pro Series products offer an enhanced level of performance and durability to handle the toughest tasks.

A unique packaging design and logo set Craftsman Pro Series products apart from core Craftsman offerings. A black and gold color palette and chrome Craftsman logo establish a sleek, premium appearance, and minimal copy on packaging primary display panels allows the product photography and product name to be the hero.

Please adhere to the standards and guidelines on the following pages for Craftsman Pro Series products. For all other products, please refer to the previously outlined brand guidelines.

 ©2015 Sears Brands, LLC



**CRAFTSMAN®**

## CRAFTSMAN® PRO SERIES PACKAGING LOGOS

**PRIMARY LOGO – CMYK:**
BLACK , DARK GRAY OR GRADIENT BACKGROUND



**SECONDARY LOGOS – PMS 130:**
BLACK , DARK GRAY OR GRADIENT BACKGROUND

STACKED CENTERED:

**PRO SERIES**

INLINE HORIZONTAL:

**PRO SERIES**

STACKED & LEFT-JUSTIFIED:

**PRO SERIES**

**CRAFTSMAN**

# CRAFTSMAN® PRO SERIES PACKAGING LOGOS (CONT.)

## ALTERNATE 1-COLOR PRIMARY LOGOS

The preferred versions of the primary logo shown on the previous page should be used whenever possible, but in certain instances – like those seen below – one-color versions may be used.

Brand approval to use the alternate one-color logos are required.

1-COLOR GRAYSCALE LOGO
Use for print applications where 4-color is unavailable

1-COLOR FLEXO LOGO
Use for flexo print applications



## CRAFTSMAN PRO SERIES PRIMARY AND SECONDARY LOGO RELATIONSHIP

When Craftsman Pro Series primary and secondary logos are coupled, the primary logo is intended to be dominant and should always appear before the secondary logo within a visual space.

Additionally, the inline horizontal secondary logo (seen below) is preferred but is not a lockup. There are many different "exceptions" that need to be met to accommodate different products. Select the appropriate secondary logo version based on available application space.

The secondary logo must be smaller than the primary logo. The secondary logo height is equal to 64% cap height of the "C" in the Craftsman logotype.

To assure readability refer to the clear space and sizing section on the following page.



©2015 Sears Brands, LLC



BRAND STANDARDS                                                                    LOGOS  100

## CRAFTSMAN® PRO SERIES PACKAGING LOGOS (CONT.)

### CLEAR SPACE

Whenever practical, the Craftsman Pro Series primary and secondary logos should
be surrounded by clear space and free of elements.

### PRIMARY LOGO

The dimension of the
minimum clear space
area on all sides of
the primary logo is
equal to the cap
height of the "C" in the
Craftsman logotype.

### SECONDARY LOGOS

The dimension of the
minimum clear space
area on all sides of
the secondary logo is
equal to the stem width
of the "P" in the Pro
Series logotype.

NOTE: Reserve clear
space for all versions
of the Pro Series
secondary logo.



### MINIMUM SIZE

The primary logo has a minimum width of 2 inches. Secondary logo has a minimum width of 1 inch.
To assure readability, the registered trademark should never be scaled down below 1/32 inch.

below 1/32 inch high.



**BRAND STANDARDS**                                                    LOGOS   101

## INCORRECT LOGO USAGE

Below are examples of how the Craftsman® Pro Series logo should not be used.



DON'T PLACE LOGO ON A GOLD BACKGROUND



DON'T PLACE LOGO ON A RED BACKGROUND



DON'T CHANGE OUTER FRAME COLOR



DON'T CHANGE LOGOTYPE COLOR



DON'T REMOVE LOGO FRAME



DON'T SKEW OR DISTORT



DON'T CHANGE OPACITY



DON'T REMOVE LOGO FROM SURROUNDING FRAME

©2015 Sears Brands, LLC



# COLOR PALETTE

The Craftsman® Pro Series colors are black, gray and gold.

COLOR USAGE

The use of color should be consistent with the packaging architecture on the following pages for Craftsman Pro Series products. Black and gray are used for backgrounds. Gold is used less frequently, particularly for the Pro Series logo, in headlines of legal copy and within line/box strokes. Gold is intended to highlight focal product features or touchpoints, and is not intended for use as a background color.



100% PROCESS BLACK          C:0  M:0  Y:0  K:100          R:38  G:36  B:36          HEX#262424

PMS 425 C          C:0  M:0  Y:0  K:81          R:88  G:91  B:93          HEX#585b5d

PMS 130 C          C:0  M:30  Y:100  K:0          R:225  G:168  B:0          HEX#e1a800



# PRO SERIES PRODUCT GUIDELINES

**IN THIS SECTION:**

► PRO SERIES PRODUCT LOGOS

► DESIGN PHILOSOPHY

► PRO SERIES SHIELD

► LOGO VARIATIONS

► LABEL MAP



## DESIGN PHILOSOPHY

Craftsman® Pro Series is a step up and differentiation from Craftsman core brand offerings. The Pro Series product and packaging features a different color offering. The red is replaced with black, yellow and metal to establish a premium identifiable look within the Craftsman family. This shift in color better communicates the step-up offering PRO SERIES brings to the Craftsman lineup while keeping with the customer's expectation with the brand. This color palette along with the robust and hard angles, create a product design with powerful aesthetics and a presence that conveys heavy-duty performance.








**BRAND STANDARDS**                                                                                    **LOGOS**   139

# PRO SERIES PRODUCT LOGOS

Craftsman® Pro Series has a unique and distinguishable design, color palette and logo separate f
rom core brand offerings. The product line features a black and gold color palette with a chrome logo
for a sleek, premium appearance.

Craftsman Pro Series Product never should contain the Craftsman logo with the red background.
The logos will always have a black background and be be positioned on a black background.

OPTION 1 - SOLID (BLACK) BRUSHED ALUMINUM



OPTION 2



OPTION 3



There are product logo badge options that have the background knocked out so when placed
on the product surface it occupies the Craftsman Pro Series

Craftsman On Product Application logos should not contain the trademark registration.
This is a different logo than the approved Craftsman logo used in marketing applications.

Craftsman Industrial Design Team must review and approve all branding on product applications.



BRAND STANDARDS                                                    PRODUCT GUIDELINES   140

# LOGO VARIATIONS

**STACKED & CENTERED**



**INLINE HORIZONTAL**



**STACKED & LEFT JUSTIFIED**





Italicized version for LH applications



Italicized version for RH applications



CRAFTSMAN PRO YELLOW

match to PANTONE® 130 C°
C:2   M:38   Y:100   K:0
R:247   G:167   B:0

**Select appropriate logo version
based on available application space.**

**The Pro Series logo should never be
locked-up with the Craftsman logo.**

**Make sure that an appropriate
amount of space separates them.**

**CLEAR SPACE AROUND LOGO
X is determined by a square lying
within the P vertical stroke**



CRAFTSMAN Brand Standards                                          ©2015 Sears Brands, LLC



BRAND STANDARDS                                                                    PRODUCT GUIDELINES    141

## LOGO VARIATIONS

The Craftsman® Pro Series Product label needs to adhere to the same standards as Craftsman in terms of alignments.
The only change is that the red tab is changed to Craftsman Pro Yellow.

**NOTE:**

All product labels must be submitted to Craftsman Product Development team for review and approvals.



**CRAFTSMAN**



## PRO SERIES SHIELD

The Craftsman® Pro Series Shield needs to follow all of the guidelines specified earlier from Craftsman brand. However, the Pro Series Shield will be chrome & black, which differs from the standard color treatment of the red Craftsman rectangular primary logo.

CAN ONLY BE USED ON THESE COLORS:



CRAFTSMAN Black

EMBOSSED EXAMPLE






**BRAND STANDARDS**                                        **PRODUCT GUIDELINES** 143

## LABEL MAP EXAMPLE (TRACTOR)





## LABEL MAP EXAMPLE (SNOW BLOWER)





# CRAFTSMAN® PRO SERIES PACKAGING

## IN THIS SECTION:

▶ OVERVIEW

▶ LOGOS

▶ COLOR PALETTE

▶ PHOTOGRAPHY

▶ GRADIENT BACKGROUND

▶ SHIELD ICON

▶ PANELS

©2015 Sears Brands, LLC

**CRAFTSMAN**

# BUILT TOUGH. BUILT TO PERFORM.

**Craftsman® Pro Series is a premium product platform within the Craftsman brand structure.** Backed by the trusted performance and strength that all Craftsman products deliver, Craftsman Pro Series products offer an enhanced level of performance and durability to handle the toughest tasks.

A unique packaging design and logo set Craftsman Pro Series products apart from core Craftsman offerings. A black and gold color palette and chrome Craftsman logo establish a sleek, premium appearance, and minimal copy on packaging primary display panels allows the product photography and product name to be the hero.

Please adhere to the standards and guidelines on the following pages for Craftsman Pro Series products. For all other products, please refer to the previously outlined brand guidelines.





## CRAFTSMAN® PRO SERIES PACKAGING LOGOS

**PRIMARY LOGO – CMYK:**
BLACK , DARK GRAY OR GRADIENT BACKGROUND



**SECONDARY LOGOS – PMS 130:**
BLACK , DARK GRAY OR GRADIENT BACKGROUND

STACKED CENTERED:

**PRO SERIES**

INLINE HORIZONTAL:

**PRO SERIES**

STACKED & LEFT-JUSTIFIED:

**PRO SERIES**



**BRAND STANDARDS**                                                                            LOGOS    186

## CRAFTSMAN® PRO SERIES PACKAGING LOGOS (CONT.)

### ALTERNATE 1-COLOR PRIMARY LOGOS

The preferred versions of the primary logo shown on the previous page should be used whenever possible, but in certain instances – like those seen below – one-color versions may be used.

Brand approval to use the alternate one-color logos are required.

1-COLOR GRAYSCALE LOGO
Use for print applications where 4-color is unavailable

1-COLOR FLEXO LOGO
Use for flexo print applications



### CRAFTSMAN PRO SERIES PRIMARY AND SECONDARY LOGO RELATIONSHIP

When Craftsman Pro Series primary and secondary logos are coupled, the primary logo is intended to be dominant and should always appear before the secondary logo within a visual space.

Additionally, the inline horizontal secondary logo (seen below) is preferred but is not a lockup. There are many different "exceptions" that need to be met to accommodate different products. Select the appropriate secondary logo version based on available application space.

The secondary logo must be smaller than the primary logo. The secondary logo height is equal to 64% cap height of the "C" in the Craftsman logotype.

To assure readability refer to the clear space and sizing section on the following page.



**BRAND STANDARDS**

## CRAFTSMAN® PRO SERIES PACKAGING LOGOS (CONT.)

### CLEAR SPACE

Whenever practical, the Craftsman Pro Series primary and secondary logos should be surrounded by clear space and free of elements.

### PRIMARY LOGO

The dimension of the minimum clear space area on all sides of the primary logo is equal to the cap height of the "C" in the Craftsman logotype.

### SECONDARY LOGOS

The dimension of the minimum clear space area on all sides of the secondary logo is equal to the stem width of the "P" in the Pro Series logotype.

NOTE: Reserve clear space for all versions of the Pro Series secondary logo.



### MINIMUM SIZE

The primary logo has a minimum width of 2 inches. Secondary logo has a minimum width of 1 inch. To assure readability, the registered trademark should never be scaled down below 1/32 inch.

below 1/32 inch high.



©2015 Sears Brands, LLC



**BRAND STANDARDS**                                                                LOGOS  188

## INCORRECT LOGO USAGE

Below are examples of how the Craftsman® Pro Series logo should not be used.



DON'T PLACE LOGO ON A GOLD BACKGROUND



DON'T PLACE LOGO ON A RED BACKGROUND



DON'T CHANGE OUTER FRAME COLOR



DON'T CHANGE LOGOTYPE COLOR



DON'T REMOVE LOGO FRAME



DON'T SKEW OR DISTORT



DON'T CHANGE OPACITY



DON'T REMOVE LOGO FROM SURROUNDING FRAME

©2015 Sears Brands, LLC



## COLOR PALETTE

The Craftsman® Pro Series colors are black, gray and gold.

COLOR USAGE

The use of color should be consistent with the packaging architecture on the following pages for Craftsman Pro Series products. Black and gray are used for backgrounds. Gold is used less frequently, particularly for the Pro Series logo, in headlines of legal copy and within line/box strokes. Gold is intended to highlight focal product features or touchpoints, and is not intended for use as a background color.



| 100% PROCESS BLACK | C:0  M:0  Y:0  K:100 | R:38  G:36  B:36 | HEX#262424 |

| PMS 425 C | C:0  M:0  Y:0  K:81 | R:88  G:91  B:93 | HEX#585b5d |

| PMS 130 C | C:0  M:30  Y:100  K:0 | R:225  G:168  B:0 | HEX#e1a800 |



BRAND STANDARDS

PHOTOGRAPHY   190

## PHOTOGRAPHY STYLE

Photography is the most dominant visual aspect of the Craftsman® Pro Series packaging, as it showcases our innovative product offering. The use of product photography must remain consistent and appropriate in terms of overall style described in this section (e.g. lighting, camera angle and product placement). Products are photographed from one approved view – 3/4 angled profile view. Choose view based on size, shape, color, etc., that showcases the individual product and its key features best.

THE "HERO" SHOT

The "Product as Hero" photography on packaging allows the consumer to see all the "Quality and Detail" that goes into the Craftsman Pro Series product. It is a heroic 3/4 view complemented with high-contrast photographic lighting style. The upscale nature of this product photography will lead the consumer to view the product as premium.

The product should be photographed against a black background, to ensure richer, more realistic colors and highlights on reflective surfaces. The main light for these images should fall from the top right to the bottom left. The "Hero" photography should be clipped out with no background and incorporate a soft-edged grounding shadow. Shadows are made up of 2 soft-edged shapes. The primary (base) shadow is filled with black and set to multiply at 80% opacity. The secondary shadow is filled with black and set to multiply at 50% opacity. Shadow opacities can be adjusted depending on how dark the background color is.



©2015 Sears Brands, LLC

**CRAFTSMAN**

## PHOTOGRAPHY STYLE (CONT.)

**IMPORTANT!** PHOTO COMPOSITION

The product should be shot as a silhouette on a black background to ensure richer, more realistic colors and highlights on reflective surfaces. Within shot, products should be 100% centered.

### LIGHTING

Use natural lighting to show the product. The main light should be positioned top down with it slightly behind the product to create a shallow grounding shadow. Use lights left and right for filling light and back lighting to create highlights to separate product from background.

### SCENE STYLING & PROPPING

No scene styling.
Product should be shot as a silhouette only.

Propping should be used on rare occasions when composition calls for it.

### FORMAT

Photography should be shot digitally at 300 ppi. High resolution CMYK TIFF files are recommended.

### CAMERA POINT OF VIEW

The product should be photographed from an angle between 10°-45°. This angle will be determined by the package orientation. Choose angle based on the size, shape, color, etc., that showcases the individual product and any of its key features best.

The product is photographed at a distance determined by the product size, fill frame with product and shadow.

The product should be photographed from a height of 12-18 inches, determined by the actual height of the product. Choose the view based on the size, shape, color, etc., that showcases the individual product and any of its key features best.



10°-45°

TBD
PER PRODUCT



12-18 inches

©2015 Sears Brands, LLC

## PHOTOGRAPHY STYLE (CONT.)

### "HERO" SHOT PLACEMENT

When applied to a 6-sided package, the "Hero" photography overlaps the Craftsman® Pro Series gradient background on the package front and back panels. It is imperative to show all of the product. This will showcase all features of the product, giving the consumer a great idea of what they're getting.

The "Hero" shot should dominate the panel covering 90% of the panel width. Care must be taken to show the "Hero" shot as dynamic and impactful and not violate any elements on the panel, allowing clear space to further communicate premium quality.





### PRODUCT WALKAROUND SHOTS

This shot (or shots) appear on the side panel and contain the same photographic style as the "Hero" shots. It should offer the opportunity for walkarounds/callouts for features and benefits. This offers insights to the consumer in regards to the product Quality, Knowledge and Innovation.



©2015 Sears Brands, LLC



BRAND STANDARDS                                                                    GRAPHIC ELEMENTS   193

# GRADIENT BACKGROUND

This background forms the foundation upon which all other elements are constructed.
The distinctive black background creates strong brand blocking in the retail environment
and is mandatory for all principal display panels.

This vector art background is constructed from a Pantone 425 gray base with an
overprinting gradient of black adding depth and visual interest.

### SIZING AND PLACEMENT

The Craftsman® black gradient overprint should be placed starting solid black at the top of
the front panel of the die so that the direction of the overprint fades towards the bottom
for both the front and back panels. Adjust gradient to best showcase the "Hero" shot.



Base color = 100% Pantone 425



Gradient overlay = 100% Black, location 10% ➔ 10% Black, location 100%; Gradient slider 70%; Set to multiply



Gradient background comp



BRAND STANDARDS                                                      GRAPHIC ELEMENTS  194

# SHIELD ICON

The shield icon represents the
shape of the Craftsman® Shield Logo.
It is based on a specific, carefully
developed visual solution. It should
not be re-created. Use only the
artwork provided.

## ICON USE

This icon is the approved visual
used to call out key features on
Craftsman® Pro Series products.

## ICON COLOR

Inside stroke = 100% PMS 130
Outside stroke = 100% PMS 425
Fill = 45% white
Glow = 88% White





Example: 16-inch Gas Chain Saw



Example: Heavy Duty Drill/Driver Kit

**CRAFTSMAN**

BRAND STANDARDS              PACKAGING ARCHITECTURE   195

# FRONT PANEL

These are the basic art elements that appear on the front panel of the Craftsman® Pro Series 6-sided package.

**1. CRAFTSMAN LOGO (PRIMARY)**

Located prominently at the upper left-hand corner, roughly 45% of the width of the panel. See page 147 for minimum clearance specifications. Position of the primary logo will determine the overall carton margins.

**2. PRO SERIES LOGO (SECONDARY)**

Located directly below the Craftsman logo. Color is 100% Pantone 130.

**3. PRODUCT NAME**

Located directly below the Pro Series logo, reversed out with the product specification callout directly above and Spanish translation directly below.

   **3-A. PRODUCT SPECIFICATION**

   Size is equal to 50% of "C" height in Craftsman logotype. The text is set in United Sans Semi-Extended Black in all caps.

   **3-B. ENGLISH PRODUCT NAME**

   Size is equal to 100% of the product specification. The text is reversed out and set in United Sans Semi-Condensed Medium, all caps.

   **3-C. SPANISH PRODUCT NAME**

   Size is equal to 60% of the English product name. The text is reversed out and set in United Sans Semi-Condensed Medium, all caps.

**4. PRODUCT NUMBER LOCKUP**

Located in the upper right-hand corner and top-aligned with the Craftsman logo. Point size is equal to 75% of the product name. Width is determined by the size of the main five digits. The digits are reversed out set in United Sans Semi-Condensed Medium.

**5. GRADIENT BACKGROUND**

Constructed from a Pantone 425 gray base with an overprinting gradient of black. Adjust gradient to best showcase the "Hero" shot.





**BRAND STANDARDS**                                    **PACKAGING ARCHITECTURE**  196

## LEFT SIDE PANEL

These are the basic art elements that appear on the left side panel of the Craftsman® Pro Series 6-sided package.

### 1. CRAFTSMAN LOGO (PRIMARY)

Located prominently at the upper left-hand corner, size and margins are equal to the front panel Craftsman logo.

### 2. PRO SERIES LOGO (SECONDARY)

Located directly below the Craftsman logo. Color is 100% Pantone 130. See page 97-99 for detailed specifications.

### 3. PRODUCT NAME

Located directly below the Pro Series logo. See point 3 on the previous page for detailed text specifications.

### 4. PRODUCT NUMBER LOCKUP

Located in the upper right-hand corner and top-aligned with the Craftsman logo. Size is determined by the front panel.

### 5. PRODUCT WALKAROUND LOCKUP

Reversed out with a gold line directly below leading the consumer to the product feature.

#### 5-A. WALKAROUND COPY FEATURE

Point size is equal to 65% of product name point size. The text is set in United Sans Semi-Condensed Heavy, title case.

#### 5-B. WALKAROUND COPY FEATURE BENEFIT

Point size is equal to 65% of product name point size. The text is set in United Sans Semi-Condensed Medium, sentence case.

### 5-C. WALKAROUND GOLD LINE

Stroke weight is equal to 20% of the product feature point size. Inside stroke color is 100% Pantone 130, outside stroke is 100% Pantone 425.

### 5-C. WALKAROUND SHIELD

Size is equal to the "C" height in the Craftsman logo. Inside stroke color is 100% Pantone 130, outside stroke is 100% Pantone 425, glow is 88% white. Shield color fill is 45% white.

### 6. PRODUCT WALKAROUND PHOTO

See page 190-192 for walkaround shot style and placement specifications.

### 7. BACKGROUND COLOR

100% flood of Pantone 425 gray.





# RIGHT SIDE PANEL

These are the basic art elements that appear on the right side panel of the Craftsman® Pro Series 6-sided package.

1. CRAFTSMAN LOGO (PRIMARY)

Located prominently at the upper left-hand corner, size and margins are equal to the front panel Craftsman logo.

2. PRO SERIES LOGO (SECONDARY)

Located directly below the Craftsman logo. Color is 100% Pantone 130. See page 97-99 for detailed specifications.

3. PRODUCT INSET LOCKUP

Located directly below the product name, no more then six feature insets should be included.

3-A. INSET PHOTOGRAPHY

Size is equal to roughly 175% height, 65% width of Craftsman logo. Inset photography should showcase the individual product key features.

3-B. INSET COPY

Point size is equal to 50% of product name point size. The headline text is set in United Sans Semi-Condensed Heavy in title case. Supporting copy is set in United Sans Semi-Condensed Medium, sentence case.

3-C. INSET GOLD LINE

Stroke weight is equal to 15% of the inset copy point size. Color is 100% Pantone 130.

4. WARRANTY

Aligned with the Craftsman logo above, reversed out with the supporting message callout directly below the headline. Headline font size is equal to 50% of "C" height in the Craftsman logotype, United Sans Semi-Condensed, all caps. Supporting copy point size is 87.5% of the headline point size set in United Sans Semi-Condensed Medium, sentence case. Each Warranty copy block must end with an ownership line(s). See primary Craftsman Brand Standards for details on legally required statements.

5. CRAFTSMAN CLUB LOCKUP

Located at the bottom of the panel, centered with clear space equal to the carton margins.

6. AIR INDEX CHART

Located to the right of the Craftsman warranty.

7. BACKGROUND COLOR

100% flood of Pantone 425 gray.

1
CRAFTSMAN
2
PRO SERIES
16-INCH
GAS CHAIN SAW
MOTOSIERRA DE GAS
3
SIM-PUL
TECHNOLOGY
For smooth, easy starting. Reduces effort needed to start.
Reduced Vibration System
For increased operator comfort
Visible Fuel Level Window
Helps keep track of remaining runtime
Front Screw Tensioning System
For easy chain tensioning
4
CRAFTSMAN LIMITED WARRANTY
6
The Air Index of this engine is 3
Most Clean
Least Clean
Note: The lower the air index, the less pollution.
This engine is certified to be emissions compliant for the following use: Moderate 50 hours
TO JOIN
CRAFTSMAN CLUB
5
Text CRAFTSMAN to 73277
7
www.craftsman.com/signup

 ©2015 Sears Brands, LLC





**CRAFTSMAN**

BRAND STANDARDS                                    PACKAGING ARCHITECTURE   198

# BACK PANEL

On large cartons, the back panel is
a secondary display panel. Select
appropriate orientation (horizontal
or vertical) based on product needs.

These are the basic art elements
that appear on the back panel of the
Craftsman® Pro Series 6-sided package.

1. CRAFTSMAN LOGO (PRIMARY)
Located prominently at the upper left-hand
corner, size and margins are equal to the
front panel Craftsman logo.

2. PRO SERIES LOGO (SECONDARY)
Located directly below the Craftsman logo.
Color is 100% Pantone 130. See page 97-99
for detailed specifications.

3. PRODUCT NAME
Located directly below the Pro Series logo.

4. PRODUCT NUMBER LOCKUP
Located in the upper right-hand corner and
top-aligned with the Craftsman logo. Size is
determined by the front panel.

5. THE "HERO" SHOT
See page 190 – 192 for "Hero" shot style
and placement specifications.

6. GRADIENT BACKGROUND
Constructed from a Pantone 425 gray base
with an overprinting gradient of black.
Adjust gradient to best showcase the
"Hero" shot.







# SMALL CARTON

On small cartons where space is limited, the product walkaround information is on the back panel.

These are the basic art elements that appear on the Craftsman® Pro Series small 6-sided package.

1. FRONT PANEL
Primary display panel. See page 195 for detailed panel elements and specifications.

2. LEFT SIDE PANEL
Contains product features. See page 196 for detailed panel elements and specifications.

3. RIGHT SIDE PANEL
Contains product warranty and Craftsman Club lockup. See page 197 for detailed specifications.

4. BACK PANEL
Contains the product walkaround lockup. See page 198 for detailed panel elements and specifications.

5. TOP PANEL
See page 201 for detailed panel elements and specifications.

6. BOTTOM PANEL
See page 200 for detailed panel elements and specifications.

 ©2015 Sears Brands, LLC













# BOTTOM PANEL

1
2
PRO SERIES
16-INCH
3
GAS CHAIN SAW
MOTOSIERRA DE GAS
4
5
6
7

These are the basic art elements that appear on the bottom panel of the Craftsman® Pro Series 6-sided package.

1. CRAFTSMAN LOGO (PRIMARY)

Located prominently at the upper left-hand corner, size and margins are equal to the front panel Craftsman logo.

2. PRO SERIES LOGO (SECONDARY)

Located directly below the Craftsman logo. Color is 100% Pantone 130. See pages 97-99 for detailed specifications.

3. PRODUCT NAME

Located directly below the Pro Series logo.

4. CONTENTS & WARNING COPY

Located directly below the product name, on the same baseline as the UPC code.

4-A. COPY HEADLINE

Point size is equal to 45% of product name point size. The text is 100% Pantone 130 and set in United Sans Semi-Condensed Heavy, all caps.

4-B. SUPPORTING COPY

Point size is equal to 45% of product name point size. The text is reversed out and set in United Sans Semi-Condensed Medium, sentence case.

4-C. DIVIDER LINE

Stroke weight is equal to 20% of the contents and Warning copy point size.

5. PRODUCT NUMBER LOCKUP

Located in the upper right-hand corner and top-aligned with the Craftsman logo. Size is determined by the front panel.

6. UPC CODE & ADDRESS LOCKUP

See primary Craftsman Brand Standards for detailed specifications.

7. BACKGROUND COLOR

100% flood of black.

 ©2015 Sears Brands, LLC

**BRAND STANDARDS**                                              **PACKAGING ARCHITECTURE**  201

# TOP PANEL

These are the basic art elements that appear on the top panel of the Craftsman® Pro Series 6-sided package.

## 1. CRAFTSMAN LOGO (PRIMARY)

Located prominently at the upper left-hand corner, roughly 75% of the width of the front panel Craftsman logo. Clear space is equal to the carton margins determined by the front panel logo.

## 2. PRO SERIES LOGO (SECONDARY)

Located directly below the Craftsman logo. Color is 100% Pantone 130. Size is equal to 95% width of the Craftsman logotype. See page 147 for detailed clear space specifications.

## 3. PRO SERIES STORY

This copy is intended to describe the premium product features that create a step-up from core Craftsman products. It's written in paragraph form, but should include a maximum of four concise sentences that describe the features in an engaging, confident tone. Located directly below the Pro Series logo.

Reversed out with point size equal to 65% of the product name point size. The text is set in United Sans Semi-Extended Bold, sentence case.

## 4. PRODUCT NAME

Located directly below the Pro Series logo.

## 5. THE "HERO" SHOT

Located in the bottom, left-hand corner of the panel directly below the product name. See page 190 – 192 for "Hero" shot style specifications.

## 6. PRODUCT NUMBER LOCKUP

Located in the upper right-hand corner and top-aligned with the Craftsman logo. Size is determined by the front panel.

## 6. GRADIENT BACKGROUND

Constructed from a Pantone 425 gray base with an overprinting gradient of black. Adjust gradient to best showcase the "Hero" shot.





# CRAFTSMAN PRO SERIES KRAFT CARTON PACKAGING GUIDELINE

1. CRAFTSMAN LOGO
   Located prominently within each package side.  The CRAFTSMAN logo must always be the same size on all panels, with the same baseline on each panel.
   The size of the logo will be dictated by the smallest panel .  In the example below it was the Back / Front panel.  The CRAFTSMAN logo always must maintain the proper isolation zone or free space.
   See page 48 of the CRAFTSMAN BRAND STANDARDS.

1a  PRO SERIES LOGO
   Located directly below the CRAFTSMAN logo.  Height of PRO SERIES logo is equal to 64% cap height for the C in the CRAFTSMAN logotype.
   Distance from bottom edge of outer edge of CRAFTSMAN rectangle logo should be equal to the C in the CRAFTSMAN logotype. The PRO SERIES logo must always be the same size on all panels, with the same baseline and centered within each panel.

2. PRODUCT NAME
   100% height of PRO SERIES logo.  United Sans Semi Extended Heavy, ALL CAPS.  100% black.  Center vertically under the Craftsman Pro Series logo.
   Distance from bottom edge of PRO SERIES logo should be 1-1/2 times the distance of "X".  "X" is the distance from the inside left edge of the CRAFTSMAN
   rectangle  logo to the left edge of the letter "C" in CRAFTSMAN.

2a The product name should always appear in spanish on a carton's two largest panels only.   In the example below, it is shown on the side panels but for another carton it may
    appear on front and back instead.  United Sans Semi Condensed Medium, Case Sensitive.  100% black.  Size 60% of the english product name font size.  Center vertically under the Craftsman Pro Series logo.

3. HANDLING GRAPHICS
   Only use the approved CRAFTSMAN handling graphic icons which are appropriate for the product / package.

4. PANEL IDENTIFICATION
   Each panel needs to be specified.  United Sans Semi Condensed Bold, all caps  100% black. Left justified under the CRAFTSMAN handling graphic icons.
   Can be the same height as the handling graphics.  Distance or space from Handling Graphics should be approx 1/3 the height of the handling graphic

5. ITEM NUMBER
   Product number appears on 4-panels: front, top, left side, right side.  Size of item number should be same on all 4-panels.  United Sans Semi Condensed Bold, 100% black, 90% of product name.

6. DISTRIBUTION COPY
   Placed on left side of the two largest package panels (most likley front and back )and left justified with the CRAFTSMAN handling graphic icons and panel identification.
   Set in  United Sans Semi Condensed Medium, 100% black.

7. ALLIGNMENT
   Dashed lines show what needs to be grouped as a unit in order to center the logos and copy to the width of the panel.
   **Note;** the size of the logos and copy is determined by the smallest panel but not the copy placement as it varies depending on the lenght of product title.







# Packaging Style Guide

05/03



## TABLE OF CONTENTS

LOGO USAGE ................................................................................. Page 01

COLOR USAGE ............................................................................... Page 02

FONT USAGE ................................................................................. Page 03

OPEN PACKAGE FRONT ..................................................................... Page 04

OPEN PACKAGE SIDES ...................................................................... Page 05

OPEN PACKAGE BACK ....................................................................... Page 06

CLOSED PACKAGE FRONT .................................................................. Page 07

CLOSED PACKAGE SIDES ................................................................... Page 08

CLOSED PACKAGE BACK .................................................................... Page 09

BONUS AREA ................................................................................. Page 10

PRODUCT NAME ............................................................................. Page 11

ICONS ........................................................................................ Page 12

PHOTO USAGE ............................................................................... Page 13

PEGBOARD BACKGROUND ................................................................. Page 14

ADDITIONAL PACKAGE EXAMPLE ......................................................... Page 15

FILM & PRINTING REQUIREMENTS ....................................................... Page 18

LABELING REQUIREMENTS ................................................................ Page 19

APPENDIX
Artwork on Disk and Format ............................................................... Page 20





## LOGO USAGE

### MY FIRST CRAFTSMAN MARK

MY FIRST CRAFTSMAN™ is a line of toys offered exclusively through K•B Toys and Sears stores.

©2003 Sears, Roebuck and Co. Craftsman™ and My First Craftsman™ trademarks are owned by Sears, Roebuck and Co.

### MARK COLOR USAGE ON SOLID COLOR

The My First Craftsman mark is a 3D Adobe Photoshop EPS file with a drop shadow behind the "My First" type.





01

**COLOR USAGE**



### BRAND COLOR USAGE

The three colors used in the My First Craftsman logo are
PMS 485*, PMS Yellow* and Black*.

• The "My First" type and the product name are filled
  with PMS Yellow.

• The Craftsman logo is filled with a PMS 485 CV box, an outer
  black frame and reversed type.

  *PMS colors can be converted to their CMYK process color
  equivalents when necessary*

### MARK COLOR USAGE ON SOLID COLOR

The My First Craftsman mark is a 3D Adobe Photoshop EPS file
with a drop shadow behind the "My First" type.


Pantone
Yellow CV


Pantone
485 CV


Black





**FONT USAGE**



The main type font for the product descriptor is Helvetica Black Oblique.

# *ABCDEFGHIJKLMNOPQRSTUVWXYZ*
# *abcdefghijklmnopqrstuvwxyz*
# *1234567890*

For Example:   *Power Tool Master Set, Be a Real Carpenter!*

The support font for My First Craftsman is ITC Franklin Gothic Demi.

**ABCDEFGHIJKLMNOPQRSTUVWXYZ**
**abcdefghijklmnopqrstuvwxyz**
**1234567890**

For Example:   **Realistic Motorized Power Drill**

The tertiary packaging support font family for My First Craftsman is Helvetica.

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz
1234567890

For specific usage examples, please refer to the package panel walkarounds on the proceeding pages.





**OPEN PACKAGE FRONT PANEL**

**POWER TOOL MASTER SET PACKAGE**

Front of Package

**Product Name**
located at:
.405" from right edge of logo mark
.5" from top edge

**Leave Area Open
for Price Sticker**

**Logo Mark**
located at:
.566" from left edge
.149" from top edge

**Die-Cut Window**

**Pegboard**
See page 14
for details

**Background**
color:
PMS 485 CV

**Try Me Violator**
4/C Photoshop file
See page 12
for details

**Callout**
font:
Franklin
Gothic Demi
24pt/29pt
PMS 485 CV
Black Drop Shadow

**Callout**
font:
Franklin Gothic Demi
24pt/29pt
PMS 485 CV
Black Drop Shadow



**Legal Area**
For ASTM F963-96a
or CFR 16 safety labeling
required to be on the
principal display panel

**Age Designation**
font:
Franklin Gothic Demi
24.6pt/29.6pt
Reversed
Age subject to BVCPS Age Grading Determinations

*Scale artwork and fonts proportionately for SKU specific box.
**Window die should be adjusted to specific product but should maintain the look presented here.



**OPEN PACKAGE SIDE PANELS**



**POWER TOOL MASTER SET PACKAGE**

**Background**
color:
    PMS 485 CV

**In-Use Photography**
See page 13
for details

**Top and Sides of Package**



**Logo Mark**
located at:
.661" from left edge
.216" from top edge

**Product Name**

3.483"

15.374"

Ages 0+

**Age Designation**
font:
    Franklin Gothic Demi
    24.6pt/29.6pt
    Reversed
    Age subject to BVCPS Age
Grading Determinations

**Bottom of Package**

**Product Name**



**Logo Mark**
located at:
.661" from left edge
.216" from top edge

#83500

3.483"

15.374"

Ages 0+

**UPC**
box size:
    1.333"w x 1.355"h
    .22" from top edge
    .40" from right edge

**Model Number**
fonts:
    Franklin Gothic Book
    18pt/21.5pt
    Reversed

**In-Use Photography**
See page 13
for details

**Background**
color:
    PMS 485 CV

**Age Designation**
font:
    Franklin Gothic Demi
    24.6pt/29.6pt
    Reversed
    Age subject to BVCPS Age
Grading Determinations

*Scale artwork and fonts proportionately for SKU specific box.



**OPEN PACKAGE BACK PANEL**

**POWER TOOL MASTER SET PACKAGE**

Back of Package

**Product Name**
located at:
.405" from right edge of logo mark
.5" from top edge

**Background**
color:
PMS 485 CV

**Logo Mark**
located at:
.566" from left edge
.149" from top edge

**Pegboard Photo**
See page 14 for details

**Callouts**
font:
Franklin
Gothic Demi
24pt/29pt
PMS 485 CV
Black Drop Shadow

**Includes**
font:
Helvetica Neue
Black Italic
17.5pt/19.4pt
PMS 485 CV
Black Drop Shadow

Bullet font:
Helvetica Neue
Black Italic
13.3pt/17pt
PMS 485 CV
Black Drop Shadow

**Callout**
font:
Franklin
Gothic Demi
24pt/29pt
PMS 485 CV
Black Drop Shadow

**In-Use Photography**
See page 13 for details



**Manufacturer Info**
font:
Franklin Gothic
Demi All Caps
10.5pt/12.5pt
Reversed

**Country of Origin**
font:
Franklin Gothic
Demi All Caps
10.5pt/12.5pt
Reversed

**Copyright Info**
font:
Franklin Gothic Book
10.5pt/12.5pt
Reversed

**Age Designation**
font:
Franklin Gothic Demi
24.6pt/29.6pt
Reversed
Age subject to BVCPS Age
Grading Determinations

*Scale artwork and fonts proportionately for SKU specific box.



**CLOSED PACKAGE FRONT PANEL**



**TAKE ALONG TOOL KIT PACKAGE**

**Product Name**
located at:
  .405" from right edge of logo mark
  .5" from top edge

**Front of Package**



**Logo Mark**
located at:
  .566" from left edge
  .149" from top edge

**Leave Area Open for Price Sticker**

**Piece Icon**
4/C Photoshop file
2.7" diameter
See page 12
for details

**In-Use Photography**
See page 13
for details

**Yellow Frame**
6pt stroke
11.68" x 7.6"

**Background Color**
PMS 485 CV

11.375"

15.386"

**Legal Area**
For ASTM F963-96a
or CFR 16 safety labeling
required to be on the
principal display panel

**Age Designation**
fonts:
  Franklin Gothic Demi
  24.6pt/29.6pt
  Reversed
Age subject to BVCPS Age
Grading Determinations

*Scale artwork and fonts proportionately for SKU specific box.



**CLOSED PACKAGE SIDE PANELS**



**TAKE ALONG TOOL KIT PACKAGE**

**Top and Sides of Package**

**Background**
color:
    PMS 485 CV

**In-Use Photography**
See page 13
for details

**Piece Icon**
4/C Photoshop file
2.7" diameter
See page12
for details

**Logo Mark**
located at:
    .337" from left edge
    .149" from top edge

**Product Name**

**Age designation**
fonts:
    Franklin Gothic Demi
    24.6pt/29.6pt
    Reversed
Age subject to BVCPS Age
Grading Determinations

**Bottom of Package**

**Product Name**

**Logo Mark**
located at:
    .337" from left edge
    .149" from top edge



**UPC**
box size:
    1.333"w x 1.355"h
    .22" from top edge
    .40" from right edge

**Model Number**
fonts:
    Franklin Gothic Book
    18pt/21.5pt
    Reversed

**Background**
color:
    PMS 485 CV

**In-Use Photography**
See page 13
for details

**Age Designation**
fonts:
    Franklin Gothic Demi
    24.6pt/29.6pt
    Reversed
Age subject to BVCPS Age
Grading Determinations

*Scale artwork and fonts proportionately for SKU specific box.



08

**CLOSED PACKAGE BACK PANEL**



**TAKE ALONG TOOL KIT PACKAGE**

**Product Name**
located at:
.405" from right edge of logo mark
.5" from top edge

**Background**
color:
PMS 485 CV

**Back of Package**

**Logo Mark**
located at:
.566" from left edge
.149" from top edge



**Piece Icon**
See page 12
for details

11.375"

**4/C Walkaround Photograph**
See page 13
for details

**Included**
font:
Helvetica Neue
Black Italic
17.5pt/19.4pt
PMS 485 CV
Black Drop Shadow

Bullet font:
Helvetica Neue
Black Italic
13.3pt/17pt
PMS 485 CV
Black Drop Shadow

**Callout**
font:
Franklin
Gothic Demi
24pt/29pt
PMS 485 CV
Black Drop Shadow

15.386"

**Manufacturer Info**
font:
Franklin Gothic
Demi All-Caps
7.7pt/9.2pt
Reversed

**Country of Origin**
font:
Franklin Gothic
Demi All-Caps
7.7pt/9.2pt
Reversed

**Copyright Info**
font:
Franklin Gothic Book
7.7pt/9.2pt
Reversed

**Age Designation**
fonts:
Franklin Gothic Demi
24.6pt/29.6pt
Reversed
Age subject to BVCPS Age Grading Determinations

*Scale artwork and fonts proportionately for SKU specific box.



09

**BONUS AREA**



The Bonus Area is used to highlight a special feature or added value of a given product. This Bonus Area should be placed on the front panel 4.375" from the left edge and 1.5" from the bottom edge.

It can also be repeated on back panel if there is space and should be placed 4.4" from the top edge and 0.4" from the left edge.

**Bonus Type**
font:
  Helvetica
  Black Oblique
  72.7pt
  Process Yellow
  Bevel & Emboss

**Copy**
font:
  Helvetica
  Black Oblique
  28.3pt
  Reversed
  Drop Shadow

**Black Background**

**Glow**

**Photo**
See page 13
for details





*Scale artwork and fonts proportionately for SKU specific box.



**PRODUCT NAME**



**PRODUCT NAMES**

**Copy**
font:
　Helvetica Neue
　Black Italic
　54.3pt/18pt
　Process Yellow
　Drop Shadow
　Bevel and Emboss



**Copy**
font:
　Helvetica Neue
　Black Italic
　30.3pt/18pt
　Process Yellow
　Drop Shadow
　Bevel and Emboss

**Background**
color:
　PMS 485 CV




*Files are built to 150 dpi. Effects will need to double when built to 300 dpi.



11

**ICONS**



## ICONS

Special icons are used to call out "Try Me" items or to show "Piece Count" of product.



**Copy**
font:
   Franklin Gothic
   Demi
   17.3pt
   Process Yellow
   Drop Shadow
   Bevel and Emboss

**4/C Photoshop Layered File**

**Copy**
font:
   Franklin Gothic
   Demi
   35.3pt
   Process Yellow
   PMS 485 Drop Shadow
   Bevel and Emboss

**Copy**
font:
   Franklin Gothic
   Demi
   27pt
   Process Yellow
   Drop Shadow
   Bevel and Emboss



**Number Copy**
font:
   ITC Franklin Gothic
   Demi
   100pt
   PMS Yellow
   with 5pt black
   outline

**Copy**
font:
   ITC Franklin Gothic
   Demi
   36.5pt
   Black

**4/C Photoshop Layered File**

**Copy**
font:
   ITC Franklin Gothic
   Demi
   30pt
   PMS Yellow with
   5pt black outline

**Copy**
font:
   ITC Franklin Gothic
   Demi
   32.21pt
   Black



**PHOTO USAGE**



Photography will be used on all panels of
My First Craftsman tool products.

The photos will depict toy in use as well
as what is included in the package.



**IN-USE PHOTOGRAPHY
WITH FULL PRODUCT LINE**

• Unfinished wood tabletop
• Pegboard background



**IN-USE PHOTOGRAPHY**



**WALKAROUND PHOTOGRAPHY**

• Unfinished wood tabletop
• Pegboard background



**IN-USE PHOTOGRAPHY**



**PEGBOARD BACKGROUND**



### PEGBOARD BACKGROUND

Pegboard backgrounds will be used as stripped-in background or as the background in a photo.

Use unfinished light colored pegboard to match sample.



**SAMPLE**



**PACKAGING EXAMPLE**



**POWER TOOL MASTER SET**





**PACKAGING EXAMPLE**



**TAKE ALONG TOOL KIT**





**PACKAGING EXAMPLE**



**TAKE ALONG TOOL BENCH**





**FILM & PRINTING REQUIREMENTS**



### FILM PROCESS

Positive film
Emulsion down
Four-color process, 175 lpi
Li & Fung, Inc. must approve any substitutions in film specifications.

### COLOR PROOF SPECIFICATIONS

Li & Fung, Inc. to match provided proofs to insure color consistency.

### PRINTING AND FINISHING SPECIFICATIONS

Offset lithography, four-color process with Calender coating. Litho labels mounted to E flute corrugated board.

Li & Fung, Inc. and K•B Toys must approve any substitutions in print and finishing specifications.

### DENSITY

The following are acceptable density ranges for colors used on packaging. Ink swatches are provided and a spectrophotometer should be used to assure color is within the acceptable density range.
CMY: 125-130
Black: 175-190

### QUALITY CONTROL PROCESS

Samples should be pulled from the mass print run and die-cutting for quality control inspection at the rate of 1 every 100 sheets.

K•B Toys reserves the right to refuse products if they do not meet the above specifications.



## LABELING REQUIREMENTS



There are a variety of rules and regulations that set
forth requirements for product, packaging and warning
labels.  It is the sole and exclusive responsibility of the
manufacturer to ensure that the product, packaging
and warning labels comply with all federal, state and
local rules and regulations. Relevant rules and
regulations include, but are not limited to, the CPSC
or other agency regulations, Title 16 of the Code of
Federal Regulations, and the ASTM  F963-96a.



**APPENDIX**



**MY FIRST CRAFTSMAN PACKAGING STYLE GUIDE**

**STYLE GUIDE CD CONTENTS**
• Approved K•B Toys My First Craftsman Packaging Style Guide
  saved as PDF file
• Approved logos and fonts
• Photoshop PSD build files for feature icons and art elements
• K•B Toys approved timeline and process documents

**STYLE GUIDE CONTENTS**

**THREE DESIGN LEADER SKUS**
• "Power Tool Master Set"
• "Take-Along Tool Kit"
• "Take-Along Tool Bench"



**<u>Exhibit 2</u>**
**Cure Cost Calculation**

1

[[3888436]]

**Quarterly Lifetime Warranty Payment Calculation**
**Lifetime Warranty Expense and Lookback Sales**

($ 000's)

| | | | **Q2 & Mar 2017** | **Q3 2017** | **Q4 2017** | **Q1 2018** | **Q2 2018** | **Q3 2018** |
|---|---|---|---|---|---|---|---|---|
| Sears Lookback Net Sales | (1) | | 676,449 | 656,923.057990 | 642,466.888220 | 655,845.000000 | 639,537.952270 | 615,769.000000 |
| Sears Estm'd Lookback Wholesale Sales | | | 450,909 | 436,317.851289 | 430,167.191869 | 432,814.000000 | 422,145.978312 | 405,042.000000 |
| **Sears Quarterly Lifetime Warranty Expense** | | | **3,136** | **1,958.976740** | **1,893.402760** | **1,911.000000** | **1,737.616930** | **1,494.000000** |
| | | | | | | | | |
| SBD Lookback Net Sales | (1) | | 1,393 | 11,619.483227 | 18,720.933599 | 27,204.000000 | 34,503.744178 | 56,753.000000 |
| SBD Quarterly Lifetime Warranty Expense | | | 469 | 401.154150 | 470.924060 | 562.000000 | 567.336570 | 554.000000 |
| | | | | | | | | |
| Sears % | | | 1.00 | 0.982620 | 0.971686 | 0.960173 | 0.948811 | 0.915612 |
| SBD % | | | 0.00 | 0.017380 | 0.028314 | 0.039827 | 0.051189 | 0.084388 |
| | | | | | | | | |
| Sears Allocated Warranty | | | 3,598 | 2,319.111060 | 2,297.383050 | 2,374.507078 | 2,186.964470 | 1,875.172726 |
| SBD Allocated Warranty | | | 7 | 41.019830 | 66.943770 | 98.492922 | 117.989030 | 172.827274 |
| Total Warranty | | | 3,605 | 2,360.130890 | 2,364.326820 | 2,473.000000 | 2,304.953500 | 2,048.000000 |
| | | | | | | | | |
| Sears Warranty Expense Adj | | | 462 | 360.134320 | 403.980290 | 463.507078 | 449.347540 | 381.172726 |
| SBD Warranty Expense Adj | | | (462) | (360.134320) | (403.980290) | (463.507078) | (449.347540) | (381.172726) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SBD Warranty Expense Adj based on Wholesale Sales | | | (458) | (339.932414) | (372.319524) | (415.754653) | (393.148917) | (302.307920) |
| Cure Cost | | | (4) | (20.201906) | (31.660766) | (47.752425) | (56.198623) | (78.864806) |
| Add Q2 Adjustment | | | | | | | | (22.920000) |
| Cure Cost | | | | | | | | (325.227920) |
| | | | | | | | | |
| | | | | | | | | |
| **Total Cure Cost** | | | | | | | | **(516.78454)** |

(1) Lookback Sales include Craftsman Lifetime
   product sales for the prior 8 quarters.

**<u>Exhibit 3</u>**
**Warranty Payment Objection Notice**

[[3888436]]

# SEARS HOLDINGS

**Luke J. Valentino**
DVP, Deputy General Counsel and
Corporate Secretary

Sears Holdings Management Corporation
3333 Beverly Road B6-237B
Hoffman Estates, IL  60179
(847) 286-9551
Email: Luke.Valentino@searshc.com

December 27, 2018

VIA EMAIL
Stanley Black & Decker, Inc.
1000 Stanley Drive
New Britain, CT  06053

Re:    Warranty Statement Objection pursuant to Section 5.13 of the Purchase Agreement.

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement (the "Purchase Agreement"), dated as of January 5, 2017, by and between Sears Holdings Corporation ("Seller") and Stanley Black & Decker, Inc. ("Purchaser").  Capitalized terms used but not otherwise defined hereto shall have the meanings assigned to such terms in the Purchase Agreement.

Reference is further made to Purchaser's letter dated December 19, 2018 pursuant to which Purchaser objected to Seller's Calculating Party Quarterly Warranty Statements with respect to Purchaser's Q4 2017 and Q1-Q3 2018 fiscal quarters, a copy of which is attached hereto as Exhibit A ("Purchaser's Objection").

Pursuant to Section 5.13(c) of the Purchase Agreement, and as detailed in Seller's statements for the respective periods, Seller objects to Purchaser's Reporting Party Quarterly Warranty Statements for the Q4 2017 and Q1-Q3 2018 fiscal quarters and to the conclusions stated in Purchaser's Objection.

The purpose of the balance of sale calculation, relating to the sharing of the Lifetime Warranty Product expense, was to provide for a fair allocation of the expense between the parties based on their respective share of the covered products being sold in the marketplace.  Purchaser's failure to provide the actual retail sales of its products prevents such a fair allocation from being made.  Consequently, and as detailed in each of Seller's quarterly statements, Seller adjusted its sales to reflect the wholesale cost for the covered products so as to provide an "apples to apples" comparison against the information being reported by Purchaser.  Seller has been consistent in this practice throughout all reporting periods.   To the extent that Purchaser claims that the Purchase Agreement provides otherwise, Seller disagrees.

Seller is available to discuss this matter further at Purchaser's convenience.

Sincerely,

*Luke Valentino*

Luke J. Valentino

cc:    Cravath, Swaine & Moore LLP
       Worldwide Plaza
       825 Eighth Avenue
       New York, NY  10019

Attn:  Robert I. Townsend, III and Thomas E. Dunn
Email:  rtownsend@cravath.com and tdunn@cravath.com

Michael F. Vagnini (via email)
Theodore C. Morris (via email)
Scott K. Charles, Esq. (via email)
David M. Silk, Esq. (via email)

**StanleyBlack&Decker**

December 19, 2018

<u>VIA EMAIL</u>

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Attention:  General Counsel
Fax No.:     (847) 286-2741
E-mail:      general.counsel@searshc.com

Re:      <u>Warranty Payment Objection Notice</u>

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement, dated as of January 5, 2017
(as amended, modified or supplemented from time to time in accordance with its terms,
the "<u>Agreement</u>"), by and between Sears Holdings Corporation ("<u>Seller</u>") and Stanley Black &
Decker, Inc. ("<u>Purchaser</u>").  Capitalized terms used but not otherwise defined herein have the
meanings given to them in the Agreement.

Pursuant to Section 5.13(c)(i) of the Agreement, Purchaser hereby objects to certain
determinations of Seller set forth in Seller's (i) Calculating Party Quarterly Warranty Statement
with respect to Purchaser's fiscal quarter ended December 30, 2017 (such fiscal quarter, "<u>Q4
2017</u>", and such statement, the "<u>Q4 2017 Calculating Party Statement</u>"), a copy of which is
attached hereto as <u>Exhibit A</u>, (ii) Calculating Party Quarterly Warranty Statement with respect to
Purchaser's fiscal quarter ended March 31, 2018 (such fiscal quarter, "<u>Q1 2018</u>", and such
statement, the "<u>Q1 2018 Calculating Party Statement</u>"), a copy of which is attached hereto as
<u>Exhibit B</u>, (iii) Calculating Party Quarterly Warranty Statement with respect to Purchaser's fiscal
quarter ended June 30, 2018 (such fiscal quarter, "<u>Q2 2018</u>", and such statement, the "<u>Q2 2018
Calculating Party Statement</u>"), a copy of which is attached hereto as <u>Exhibit C,</u> and (iv)
Calculating Party Quarterly Warranty Statement with respect to Purchaser's fiscal quarter ended
September 29, 2018 (such fiscal quarter, "<u>Q3 2018</u>", and such statement, the "<u>Q3 2018
Calculating Party Statement</u>"), a copy of which is attached hereto as <u>Exhibit D</u>.  Each such
determination to which Purchaser objects is set forth below, together with the basis for
Purchaser's objection thereto.

<u>Q4 2017 Calculating Party Statement</u>

Purchaser objects to Seller's determination, as set forth in the Q4 2017 Calculating Party
Statement, that Seller's Quarterly Lookback Sales Amount for Q4 2017 is equal to
$430,167,000.  "Quarterly Lookback Sales Amount" is defined in the Agreement as follows:

for a specified fiscal quarter, an amount equal to the aggregate net sales by Purchaser or Seller and their respective Affiliates, as applicable, of Lifetime Warranty Products for the eight immediately preceding fiscal quarters, such amount to be determined in accordance with GAAP and Seller's or Purchaser's, as applicable, quarterly and annual financial statements.

As indicated in the Q4 2017 Calculating Party Statement, Seller determined its Quarterly Lookback Sales Amount for Q4 2017 on the basis of "estimated wholesale sales", rather than aggregate net sales as required by the definition of "Quarterly Lookback Sales Amount". Accordingly, Seller's determination of its Quarterly Lookback Sales Amount for Q4 2017 is inconsistent with the definition of "Quarterly Lookback Sales Amount".  Based on the information contained in the Q4 2017 Calculating Party Statement, Seller's Quarterly Lookback Sales Amount for Q4 2017 would be $642,467,000 if such amount were determined on the basis of aggregate net sales in accordance with the definition of "Quarterly Lookback Sales Amount".

Q1 2018 Calculating Party Statement

Purchaser objects to Seller's determination, as set forth in the Q1 2018 Calculating Party Statement, that Seller's Quarterly Lookback Sales Amount for Q1 2018 is equal to $432,814,000.  As indicated in the Q1 2018 Calculating Party Statement, Seller determined such Quarterly Lookback Sales Amount on the basis of "estimated wholesale sales", rather than aggregate net sales as required by the definition of "Quarterly Lookback Sales Amount". Accordingly, Seller's determination of its Quarterly Lookback Sales Amount for Q1 2018 is inconsistent with the definition of "Quarterly Lookback Sales Amount".  Based on the information contained in the Q1 2018 Calculating Party Statement, Seller's Quarterly Lookback Sales Amount for Q1 2018 would be $655,845,000 if such amount were determined on the basis of aggregate net sales in accordance with the definition of "Quarterly Lookback Sales Amount".

Q2 2018 Calculating Party Statement

Purchaser objects to Seller's determination, as set forth in the Q2 2018 Calculating Party Statement, that Seller's Quarterly Lookback Sales Amount for Q2 2018 is equal to $422,146,000.  As indicated in the Q2 2018 Calculating Party Statement, Seller determined such Quarterly Lookback Sales Amount on the basis of "estimated wholesale sales", rather than aggregate net sales as required by the definition of "Quarterly Lookback Sales Amount". Accordingly, Seller's determination of its Quarterly Lookback Sales Amount for Q2 2018 is inconsistent with the definition of "Quarterly Lookback Sales Amount".  Based on the information contained in the Q2 2018 Calculating Party Statement, Seller's Quarterly Lookback Sales Amount for Q2 2018 would be $639,538,000 if such amount were determined on the basis of aggregate net sales in accordance with the definition of "Quarterly Lookback Sales Amount".

Q3 2018 Calculating Party Statement

Purchaser objects to Seller's determination, as set forth in the Q3 2018 Calculating Party Statement, that Seller's Quarterly Lookback Sales Amount for Q3 2018 is equal to $405,042,000.  As indicated in the Q3 2018 Calculating Party Statement, Seller determined such Quarterly Lookback Sales Amount on the basis of "estimated wholesale sales", rather than

aggregate net sales as required by the definition of "Quarterly Lookback Sales Amount". Accordingly, Seller's determination of its Quarterly Lookback Sales Amount for Q3 2018 is inconsistent with the definition of "Quarterly Lookback Sales Amount". Based on the information contained in the Q3 2018 Calculating Party Statement, Seller's Quarterly Lookback Sales Amount for Q3 2018 would be $615,769,000 if such amount were determined on the basis of aggregate net sales in accordance with the definition of "Quarterly Lookback Sales Amount".

Purchaser acknowledges that Purchaser's claims under this Warranty Payment Objection Notice (the "Claims"), arose prior to October 15, 2018, the date of Seller's and certain of its affiliates' voluntary chapter 11 petitions under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York [Case No. 18-23538 (RDD) (the "Cases")], rendering the Claims a prepetition claim in the Cases. Purchaser does not intend to take any action to collect or enforce the Claims that would violate the automatic stay under section 362(a) of the Bankruptcy Code.

Please do not hesitate to contact Mike Vagnini directly at 410-716-7562 or Mike.Vagnini@sbdinc.com if you have any questions.

 about the attached.

Sincerely,

Michael F. Vagnini
GTS North America Controller

Copies to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attention: Scott K. Charles, Esq. and David M. Silk, Esq.
Fax No.:    (212) 403-2000
E-mail:    skcharles@wlrk.com
           dmsilk@wlrk.com

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Attention: Robert I. Townsend, III and Thomas E. Dunn
Fax No.:    (212) 474-3700
E-mail:    rtownsend@cravath.com
           tdunn@cravath.com

EXHIBIT A

<u>Q4 2017 Calculating Party Statement</u>

(See attached.)

# SEARS HOLDINGS

**Luke J. Valentino**
Associate General Counsel and
Corporate Secretary

Sears Holdings Management Corporation
3333 Beverly Road B6-237B
Hoffman Estates, IL  60179
(847) 286-9551
Email: Luke.Valentino@searshc.com

February 23, 2018

Stanley Black & Decker, Inc.
1000 Stanley Drive
New Britain, CT  06053

Attn:   Bruce Beatt, General Counsel and Secretary

Re:   Calculating Party Quarterly Warranty Statement pursuant to Section 5.13 of the
Purchase Agreement

Dear Mr. Beatt:

Reference is made to the Purchase and Sale Agreement (the "Purchase Agreement"), dated as
of January 5, 2017, by and between Sears Holdings Corporation ("Seller") and Stanley Black
& Decker, Inc. ("Purchaser").  Capitalized terms used but not otherwise defined hereto shall
have the meanings assigned to such terms in the Purchase Agreement.

Pursuant to Section 5.13 of the Purchase Agreement, Seller hereby delivers to Purchaser the
Calculating Party Quarterly Warranty Statement set forth as Exhibit A hereto.  As set forth
on the Calculating Party Quarterly Warranty Statement, the Quarterly Warranty True-Up
Payment due from Seller to Purchaser is $372,319.52.

*[Signature page follows]*

Very truly yours,

SEARS HOLDINGS CORPORATION

By: _____
     Name:  Luke J. Valentino
     Title:   Associate General Counsel
            and Corporate Secretary

cc:    Wachtell, Lipton, Rosen & Katz
      51 West 52nd Street
      New York, NY 10019
      Attn: Scott K. Charles and David M. Silk

      Cravath, Swaine & Moore LLP
      Worldwide Plaza
      825 Eighth Avenue
      New York, NY 10019
      Attn: Robert I. Townsend, III and Thomas E. Dunn

**Exhibit A**

See attached.

**Lifetime Warranty True-up Calculation**
**$ Thousands**

| $ Thousands | Sears | SHO | SHC |
|---|---|---|---|
| Sales | $548,299 | $94,168 | $642,467 |
| SM | $216,553 | $33,987 | $250,539 |
| COGS | $331,746 | $60,181 | $391,927 |
| CMDs | $11,794 | $702 | $12,497 |
| COGS less CMDs | $319,952 | $59,479 | $379,431 |
| Est. Wholesale Value | $362,735 | $67,432 | $430,167 |

| Lifetime Warranty True Up - $ Thousands | SHC** | SBD | Total Market |
|---|---|---|---|
| Sales | $430,167 | $18,721 | $448,888 |
| BOS % | 96% | 4% | 100% |
| CLW - Actuals (Act) | $1,893 | $471 | $2,364 |
| % Total | 80% | 20% | 100% |
| CLW - Calculation | $2,266 | $99 | $2,364 |
| True-up  - SHC Receives/ (SHC Owes) | ($372.32) | $372.32 | $0 |

*All time frames are tied to SBD's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)*
**SHC Sales is the estimated wholesale sales using the 13% markup on COGs.*
*** Sales time frame is from Oct 4 2015 thru Sep 30th 2017. Warranty expense timeframe is from Oct 1st 2017 through Decemeber 30 2017*

**Notes**
1) In order to have a meaningful BOS calculation KCD has used retail sales and converted to a wholesale value.  The COGs less Clearance Markdowns was marked up by 13% which is historical external CM wholesale GM %

SHC Sales Schedule
$ Thousands

| | 2015 | 2016 | | | | 2017 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **SHC (Sears & SHO) - $ Thousands** | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q4'15 - Q3'17 |
| Sales | $75,052 | $68,398 | $66,785 | $58,040 | $207,513 | $63,739 | $53,400 | $49,539 | $88,540 | $642,467 |
| SM | $25,214 | $27,961 | $27,176 | $22,753 | $77,529 | $26,892 | $23,069 | $19,946 | $37,054 | $250,539 |
| COGS | $49,839 | $40,437 | $39,609 | $35,287 | $129,984 | $36,848 | $30,331 | $29,593 | $51,486 | $391,927 |
| CMDs | $1,015 | $2,705 | $1,307 | $1,113 | $3,651 | $1,482 | $801 | $421 | $298 | $12,497 |
| COGS less CMDs | $48,824 | $37,732 | $38,302 | $34,173 | $126,333 | $35,366 | $29,530 | $29,172 | $51,188 | $379,431 |
| Est. Wholesale Value** | $55,352 | $42,777 | $43,423 | $38,743 | $143,225 | $40,095 | $33,478 | $33,073 | $58,033 | $430,167 |
| | | | | | | | | | | |
| **Sears - $ Thousands** | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q4'15 - Q3'17 |
| Sales | $63,580 | $57,657 | $56,834 | $49,292 | $176,868 | $55,257 | $45,874 | $42,938 | $76,857 | $548,299 |
| SM | $21,379 | $24,062 | $23,369 | $19,498 | $66,846 | $23,779 | $20,173 | $17,448 | $32,339 | $216,553 |
| COGS | $42,201 | $33,595 | $33,465 | $29,793 | $110,022 | $31,478 | $25,701 | $25,491 | $44,518 | $331,746 |
| CMDs | $888 | $2,612 | $1,233 | $1,016 | $3,605 | $1,278 | $721 | $442 | $280 | $11,794 |
| COGS less CMDs | $41,314 | $30,983 | $32,233 | $28,777 | $106,417 | $30,199 | $24,980 | $25,049 | $44,238 | $319,952 |
| Est. Wholesale Value** | $46,838 | $35,126 | $36,543 | $32,625 | $120,647 | $34,238 | $28,321 | $28,398 | $50,154 | $362,735 |
| | | | | | | | | | | |
| **SHO - $ Thousands** | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q4'15 - Q3'17 |
| Sales | $11,473 | $10,741 | $9,951 | $8,748 | $30,645 | $8,483 | $7,526 | $6,601 | $11,683 | $94,168 |
| SM | $3,835 | $3,899 | $3,808 | $3,254 | $10,683 | $3,113 | $2,896 | $2,498 | $4,715 | $33,987 |
| COGS | $7,638 | $6,842 | $6,144 | $5,494 | $19,962 | $5,370 | $4,630 | $4,103 | $6,968 | $60,181 |
| CMDs | $128 | $99 | $74 | $97 | $46 | $203 | $81 | ($20) | $18 | $702 |
| COGS less CMDs | $7,510 | $6,749 | $6,069 | $5,396 | $19,915 | $5,167 | $4,549 | $4,123 | $6,950 | $59,479 |
| Est. Wholesale Value** | $8,514 | $7,651 | $6,881 | $6,118 | $22,579 | $5,858 | $5,158 | $4,674 | $7,879 | $67,432 |

*All time frames are tied to SBD's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)
**SHC Sales is the estimated wholesale sales using the 13% markup on COGS

**SHC/SHO Warranty Expense**
**$ Ones**

|  | Include |
|---|---|
| SHC/SHO  - Month | CLW_NET_CST_DOLLARS |
| Sears | $1,508,847 |
| Oct | $462,744 |
| Nov | $487,504 |
| Dec | $558,599 |
| SHO | $384,556 |
| Oct | $120,266 |
| Nov | $118,131 |
| Dec | $146,159 |
| Grand Total | $1,893,403 |

**Reporting Party Quarterly Warranty Statement**
**Fiscal Quarter of Stanley Black & Decker, Inc. ended December 30, 2017 (Q4 2017)**

**Quarterly Lifetime Warranty Expense of Reporting Party**
For Q4 2017

| Period | | Warranty Expense[1] |
|---|---|---|
| October | $ | 141,343.81 |
| November | $ | 173,949.10 |
| December | $ | 155,631.15 |
| Quarterly Lifetime Warranty Expense | $ | 470,924.06 |

**Quarterly Lookback Sales Amount of Reporting Party**
For Q4 2017

| Fiscal Quarter | | Net Sales[2] |
|---|---|---|
| Q4 2015 | $ | - |
| Q1 2016 | $ | - |
| Q2 2016 | $ | - |
| Q3 2016 | $ | - |
| Q4 2016 | $ | - |
| Q1 2017 | $ | 1,392,852.54 |
| Q2 2017 | $ | 10,226,630.68 |
| Q3 2017 | $ | 7,101,450.37 |
| Quarterly Lookback Sales Amount | $ | 18,720,933.60 |

Notes

Capitalized terms used but not defined herein have the meanings given to them in the Purchase and Sale Agreement, dated as of January 5, 2017 (as amended), by and between Sears Holdings Corporation and Stanley Black & Decker, Inc. ("SBD"). Amounts shown have been determined in accordance with GAAP and SBD's quarterly and annual financial statements. Refer to Annexes A through D for additional detail supporting the calculation of the Reporting Party's Quarterly Lifetime Warranty Expense and Quarterly Lookback Sales Amount for Q4 2017.

(1) Refers to the aggregate expense incurred by SBD and its Affiliates in respect of the repair or replacement of Lifetime Warranty Products (other than any recall thereof).

(2) Refers to the aggregate net sales by SBD and its Affiliates of Lifetime Warranty Products.

EXHIBIT B

Q1 2018 Calculating Party Statement

(See attached.)

# SEARS HOLDINGS

**Luke J. Valentino**
Divisional Vice President,
Deputy General Counsel and Corporate Secretary

Sears Holdings Management Corporation
3333 Beverly Road B6-237B
Hoffman Estates, IL  60179
(847) 286-9551
Email: Luke.Valentino@searshc.com

May 29, 2018

Stanley Black & Decker, Inc.
1000 Stanley Drive
New Britain, CT  06053

Attn:  Bruce Beatt, General Counsel and Secretary

Re:  Calculating Party Quarterly Warranty Statement pursuant to Section 5.13 of the
    Purchase Agreement

Dear Mr. Beatt:

Reference is made to the Purchase and Sale Agreement (the "Purchase Agreement"), dated as
of January 5, 2017, by and between Sears Holdings Corporation ("Seller") and Stanley Black
& Decker, Inc. ("Purchaser").  Capitalized terms used but not otherwise defined hereto shall
have the meanings assigned to such terms in the Purchase Agreement.

Pursuant to Section 5.13 of the Purchase Agreement, Seller hereby delivers to Purchaser the
Calculating Party Quarterly Warranty Statement set forth as Exhibit A hereto.  As set forth
on the Calculating Party Quarterly Warranty Statement, the Quarterly Warranty True-Up
Payment due from Seller to Purchaser is $416,200.67.

*[Signature page follows]*

Very truly yours,

SEARS HOLDINGS CORPORATION


By: _Luke Valentino_____

     Name:  Luke J. Valentino
     Title:    Divisional Vice President,
              Deputy General Counsel
              and Corporate Secretary




cc:     Wachtell, Lipton, Rosen & Katz
        51 West 52nd Street
        New York, NY  10019
        Attn:  Scott K. Charles and David M. Silk

        Cravath, Swaine & Moore LLP
        Worldwide Plaza
        825 Eighth Avenue
        New York, NY  10019
        Attn:  Robert I. Townsend, III and Thomas E. Dunn

## Exhibit A

See attached.

**Lifetime Warranty True-up Calculation**
**$ Thousands**

| $ Thousands | Sears | SHO | SHC |
|---|---|---|---|
| Sales | $561,475 | $94,370 | $655,845 |
| SM | $227,439 | $34,861 | $262,300 |
| COGS | $334,037 | $59,509 | $393,545 |
| CMDs | $11,187 | $592 | $11,780 |
| COGS less CMDs | $322,850 | $58,916 | $381,766 |
| Est. Wholesale Value | $366,020 | $66,794 | $432,814 |

| Lifetime Warranty True Up - $ Thousands | SHC*** | SBD | Total Market |
|---|---|---|---|
| Sales | $432,814 | $27,204 | $460,018 |
| BOS % | 94% | 6% | 100% |
| CLW - Actuals (Act) | $1,911 | $562 | $2,473 |
| % Total | 77% | 23% | 100% |
| CLW - Calculation | $2,327 | $146 | $2,473 |
| True-up - SHC Receives/ (SHC Owes) | ($416.20) | $416.20 | $0 |

*All time frames are tied to SBD's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)

**SHC Sales is the estimated wholesale sales using the 13% markup on COGs.

*** Sales time frame is from Jan 3rd 2016 thru Dec 30th 2017. Warranty expense timeframe is from December 31st 2017 through April 7th 2018

**Notes**

1) In order to have a meaningful BOS calculation KCD has used retail sales and converted to a wholesale value. The COGs less Clearance Markdowns was marked up by 13% which is historical external CM wholesale GM %

**SHC Sales Schedule**
**$ Thousands**

| SHC (Sears & SHO) - $ Thousands | 2015 | | | 2016 | | | | 2017 | | | | Q1'16 - Q4'17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | |
| Sales | $72,903 | $63,974 | $75,038 | $68,380 | $66,773 | $58,034 | $207,477 | $63,724 | $53,389 | $49,532 | $88,536 | $655,845 |
| SM | $28,436 | $25,816 | $25,204 | $27,950 | $27,168 | $22,746 | $77,504 | $26,880 | $23,061 | $19,940 | $37,052 | $262,300 |
| COGS | $44,467 | $38,158 | $49,834 | $40,430 | $39,605 | $35,288 | $129,973 | $36,844 | $30,328 | $29,592 | $51,485 | $393,545 |
| CMDs | $2,076 | $3,569 | $1,015 | $2,705 | $1,307 | $1,113 | $3,651 | $1,482 | $801 | $422 | $298 | $11,780 |
| COGS less CMDs | $42,390 | $34,589 | $48,818 | $37,725 | $38,298 | $34,175 | $126,322 | $35,362 | $29,527 | $29,170 | $51,187 | $381,766 |
| Est. Wholesale Value** | $48,059 | $39,214 | $55,346 | $42,769 | $43,419 | $38,744 | $143,213 | $40,091 | $33,475 | $33,070 | $58,031 | $432,814 |

| Sears - $ Thousands | 2015 | | | 2016 | | | | 2017 | | | | Q1'16 - Q4'17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | |
| Sales | $60,427 | $53,345 | $63,567 | $57,640 | $56,823 | $49,287 | $176,834 | $55,242 | $45,864 | $42,932 | $76,854 | $561,475 |
| SM | $24,013 | $21,805 | $21,370 | $24,051 | $23,361 | $19,492 | $66,822 | $23,768 | $20,165 | $17,443 | $32,337 | $227,439 |
| COGS | $36,413 | $31,540 | $42,196 | $33,589 | $33,462 | $29,795 | $110,012 | $31,474 | $25,698 | $25,489 | $44,517 | $334,037 |
| CMDs | $1,895 | $3,424 | $888 | $2,612 | $1,233 | $1,016 | $3,605 | $1,278 | $721 | $442 | $280 | $11,187 |
| COGS less CMDs | $34,519 | $28,116 | $41,309 | $30,977 | $32,229 | $28,779 | $106,407 | $30,196 | $24,978 | $25,047 | $44,237 | $322,850 |
| Est. Wholesale Value** | $39,134 | $31,875 | $46,832 | $35,119 | $36,539 | $32,627 | $120,636 | $34,233 | $28,318 | $28,396 | $50,152 | $366,020 |

| SHO - $ Thousands | 2015 | | | 2016 | | | | 2017 | | | | Q1'16 - Q4'17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | |
| Sales | $12,476 | $10,628 | $11,471 | $10,740 | $9,950 | $8,747 | $30,643 | $8,482 | $7,526 | $6,600 | $11,682 | $94,370 |
| SM | $4,423 | $4,010 | $3,834 | $3,899 | $3,807 | $3,253 | $10,682 | $3,112 | $2,896 | $2,498 | $4,714 | $34,861 |
| COGS | $8,053 | $6,618 | $7,638 | $6,841 | $6,143 | $5,493 | $19,961 | $5,370 | $4,630 | $4,102 | $6,968 | $59,509 |
| CMDs | $182 | $145 | $128 | $93 | $74 | $97 | $46 | $203 | $81 | (520) | $18 | $592 |
| COGS less CMDs | $7,872 | $6,473 | $7,510 | $6,748 | $6,069 | $5,396 | $19,915 | $5,166 | $4,549 | $4,123 | $6,950 | $58,916 |
| Est. Wholesale Value** | $8,924 | $7,339 | $8,514 | $7,651 | $6,880 | $6,118 | $22,578 | $5,857 | $5,157 | $4,674 | $7,879 | $66,794 |

*All time frames are tied to SBD's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)*
**SHC Sales is the estimated wholesale sales using the 13% markup on COGs

**SHC/SHO Warranty Expense**
**$ Ones**
**Time Frame: 3/9/2017-7/1/2017 (wk 22)**

DIV_NO (All)
SBL_NO (All)
Warranty Calculation Identifier   Include

| SHC/SHO - Month | CLW_NET_CST_DOLLARS |
| --- | --- |
| Sears | $1,501,539 |
| Mar | $571,395 |
| Feb | $414,613 |
| Jan | $515,531 |
| SHO | $409,277 |
| Mar | $156,077 |
| Feb | $117,520 |
| Jan | $135,681 |
| Grand Total | $1,910,816 |

**Reporting Party Quarterly Warranty Statement**
**First Quarterly Measurement Period - Fiscal Quarter of Stanley Black & Decker, Inc. ended March 31, 2018 (Q1 2018)**
All amounts shown are in U.S. dollars (actual)

**Quarterly Lifetime Warranty Expense of Reporting Party**
For Q1 2018

| Period | Warranty Expense[1] |
|---|---|
| January | $ 214,959.46 |
| February | $ 174,366.18 |
| March | $ 173,135.54 |
| Quarterly Lifetime Warranty Expense | $ 562,461.18 |

**Quarterly Lookback Sales Amount of Reporting Party**
For Q1 2018

| Fiscal Quarter | Net Sales[2] |
|---|---|
| Q1 2016 | $ - |
| Q2 2016 | $ - |
| Q3 2016 | $ - |
| Q4 2016 | $ - |
| Q1 2017 | $ 1,392,852.54 |
| Q2 2017 | $ 10,226,630.68 |
| Q3 2017 | $ 7,101,450.37 |
| Q4 2017 | $ 8,482,836.99 |
| Quarterly Lookback Sales Amount | $ 27,203,770.59 |

Notes

Capitalized terms used but not defined herein have the meanings given to them in the Purchase and Sale Agreement, dated as of January 5, 2017 (as amended), by and between Sears Holdings Corporation and Stanley Black & Decker, Inc. ("SBD"). Amounts shown have been determined in accordance with GAAP and SBD's quarterly and annual financial statements. Refer to Annexes A through D for additional detail supporting the calculation of the Reporting Party's Quarterly Lifetime Warranty Expense and Quarterly Lookback Sales Amount for Q1 2018.

(1) Refers to the aggregate expense incurred by SBD and its Affiliates in respect of the repair or replacement of Lifetime Warranty Products (other than any recall thereof).

(2) Refers to the aggregate net sales under GAAP as reported by SBD and its Affiliates of Lifetime Warranty Products.

EXHIBIT C

<u>Q2 2018 Reporting Party Statement</u>

(See attached.)

# SEARS HOLDINGS

**Luke J. Valentino**
DVP, Deputy General Counsel and
Corporate Secretary

Sears Holdings Management Corporation
3333 Beverly Road B6-237B
Hoffman Estates, IL  60179
(847) 286-9551
Email: Luke.Valentino@searshc.com

August 30, 2018

Stanley Black & Decker, Inc.
1000 Stanley Drive
New Britain, CT  06053

Re:    Calculating Party Quarterly Warranty Statement pursuant to Section 5.13 of the
       Purchase Agreement

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement (the "Purchase Agreement"), dated as
of January 5, 2017, by and between Sears Holdings Corporation ("Seller") and Stanley Black
& Decker, Inc. ("Purchaser").  Capitalized terms used but not otherwise defined hereto shall
have the meanings assigned to such terms in the Purchase Agreement.

Pursuant to Section 5.13 of the Purchase Agreement, Seller hereby delivers to Purchaser the
Calculating Party Quarterly Warranty Statement set forth as Exhibit A hereto.  As set forth
on the Calculating Party Quarterly Warranty Statement, the Quarterly Warranty True-Up
Payment due from Seller to Purchaser is $393,178.

*[Signature page follows]*

Very truly yours,

SEARS HOLDINGS CORPORATION


By: _Luke Valentino_____

     Name:  Luke J. Valentino
     Title:   DVP, Deputy General Counsel
            and Corporate Secretary


cc:    Wachtell, Lipton, Rosen & Katz
       51 West 52nd Street
       New York, NY  10019
       Attn:  Scott K. Charles and David M. Silk

       Cravath, Swaine & Moore LLP
       Worldwide Plaza
       825 Eighth Avenue
       New York, NY  10019
       Attn:  Robert I. Townsend, III and Thomas E. Dunn

**Exhibit A**

See attached.

**Lifetime Warranty True-up Calculation**
**$ Thousands**

| $ Thousands | Sears | SHO | SHC |
|---|---|---|---|
| Sales | $549,630 | $89,908 | $639,538 |
| SM | $224,195 | $33,672 | $257,866 |
| COGS | $325,435 | $56,236 | $381,671 |
| CMDs | $8,806 | $510 | $9,316 |
| COGS less CMDs | $316,629 | $55,727 | $372,356 |
| Est. Wholesale Value | $358,968 | $63,178 | $422,146 |

| Lifetime Warranty True Up - $ Thousands | SHC** | SBD | Total Market |
|---|---|---|---|
| Sales | $422,146 | $34,504 | $456,650 |
| BOS % | 92% | 8% | 100% |
| CLW - Actuals (Act) | $1,738 | $567 | $2,305 |
| % Total | 75% | 25% | 100% |
| CLW - Calculation | $2,131 | $174 | $2,305 |
| True-up  - SHC Receives/ (SHC Owes) | ($393.18) | $393.18 | $0 |

*All time frames are tied to SBD's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)*
**SHC Sales is the estimated wholesale sales using the 13% markup on COGs.*
***** Sales time frame is from Apr 3rd 2016 thru Apr 7th 2018. Warranty expense timeframe isfrom April 8th 2018 through July 7th 2018*

**Notes**
   1) In order to have a meaningful BOS calculation KCD has used retail sales and converted to a wholesale value.  The COGs less Clearance Markdowns was marked up by 13% which is historical external CM wholesale GM %

SHC Sales Schedule
$ Thousands

| SHC (Sears & SHO) - $ Thousands | 2015 | | | 2016 | | | | 2017 | | | | 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 | Q2'16 - Q1'18 |
| Sales | $72,903 | $63,974 | $75,038 | $68,380 | $66,773 | $58,034 | $207,477 | $63,724 | $53,389 | $49,532 | $88,536 | $52,073 | $639,538 |
| SM | $28,436 | $25,816 | $25,204 | $27,950 | $27,168 | $22,746 | $77,504 | $26,880 | $23,061 | $19,940 | $37,052 | $23,517 | $257,866 |
| COGS | $44,467 | $38,158 | $49,834 | $40,430 | $39,605 | $35,288 | $129,973 | $36,844 | $30,328 | $29,592 | $51,485 | $28,557 | $381,671 |
| CMDs | $2,076 | $3,569 | $1,015 | $2,705 | $1,307 | $1,112 | $3,651 | $1,482 | $801 | $422 | $298 | $242 | $9,316 |
| COGS less CMDs | $42,390 | $34,589 | $48,818 | $37,725 | $38,298 | $34,176 | $126,322 | $35,362 | $29,527 | $29,170 | $51,187 | $28,314 | $372,356 |
| Est. Wholesale Value** | $48,059 | $39,214 | $55,346 | $42,770 | $43,419 | $38,745 | $143,213 | $40,091 | $33,475 | $33,070 | $58,031 | $32,100 | $422,146 |
| | | | | -4.0% | -2.0% | -1.9% | -1.8% | -2.3% | -1.5% | -0.9% | -0.3% | -0.5% | |

| Sears - $ Thousands | 2015 | | | 2016 | | | | 2017 | | | | 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 | Q2'16 - Q1'18 |
| Sales | $60,427 | $53,345 | $63,567 | $57,640 | $56,823 | $49,287 | $176,834 | $55,242 | $45,864 | $42,932 | $76,854 | $45,795 | $549,630 |
| SM | $24,013 | $21,805 | $21,370 | $24,051 | $23,361 | $19,492 | $66,822 | $23,768 | $20,165 | $17,443 | $32,337 | $20,807 | $224,195 |
| COGS | $36,413 | $31,540 | $42,196 | $33,589 | $33,462 | $29,795 | $110,012 | $31,474 | $25,698 | $25,489 | $44,517 | $24,988 | $325,435 |
| CMDs | $1,895 | $3,424 | $888 | $2,612 | $1,233 | $1,015 | $3,605 | $1,278 | $721 | $442 | $280 | $232 | $8,806 |
| COGS less CMDs | $34,519 | $28,116 | $41,309 | $30,977 | $32,229 | $28,779 | $106,407 | $30,196 | $24,978 | $25,047 | $44,237 | $24,756 | $316,629 |
| Est. Wholesale Value** | $39,134 | $31,875 | $46,832 | $35,119 | $36,539 | $32,628 | $120,636 | $34,233 | $28,318 | $28,396 | $50,152 | $28,066 | $358,968 |
| | | | | -4.5% | -2.2% | -2.1% | -2.0% | -2.3% | -1.6% | -1.0% | -0.4% | -0.5% | |

| SHO - $ Thousands | 2015 | | | 2016 | | | | 2017 | | | | 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 | Q2'16 - Q1'18 |
| Sales | $12,476 | $10,628 | $11,471 | $10,740 | $9,950 | $8,747 | $30,643 | $8,482 | $7,526 | $6,600 | $11,682 | $6,279 | $89,908 |
| SM | $4,423 | $4,010 | $3,834 | $3,899 | $3,807 | $3,253 | $10,682 | $3,112 | $2,896 | $2,498 | $4,714 | $2,710 | $33,672 |
| COGS | $8,053 | $6,618 | $7,638 | $6,841 | $6,143 | $5,493 | $19,961 | $5,370 | $4,630 | $4,102 | $6,968 | $3,569 | $56,236 |
| CMDs | $182 | $145 | $128 | $93 | $74 | $97 | $46 | $203 | $81 | $(20) | $18 | $10 | $510 |
| COGS less CMDs | $7,872 | $6,473 | $7,510 | $6,748 | $6,069 | $5,396 | $19,915 | $5,166 | $4,549 | $4,123 | $6,950 | $3,559 | $55,727 |
| Est. Wholesale Value** | $8,924 | $7,339 | $8,514 | $7,651 | $6,880 | $6,118 | $22,578 | $5,857 | $5,157 | $4,674 | $7,879 | $4,035 | $63,178 |

*All time frames are tied to SBD's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)
**SHC Sales is the estimated wholesale sales using the 13% markup on COGs

**SHC/SHO Warranty Expense**
**$ Ones**
**Time Frame: 3/9/2017-7/1/2017 (wk 22)**

| DIV_NO | (All) |
|---|---|
| SBL_NO | (All) |
| Warranty Calculation Identifier | Include |

| SHC/SHO  - Month | CLW_NET_CST_DOLLARS |
|---|---|
| Sears | $1,386,222 |
| Apr | $476,373 |
| May | $419,656 |
| Jun | $490,193 |
| SHO | $351,395 |
| Apr | $120,435 |
| May | $107,118 |
| Jun | $123,842 |
| Grand Total | $1,737,617 |

## Reporting Party Quarterly Warranty Statement

**Second Quarterly Measurement Period - Fiscal Quarter of Stanley Black & Decker, Inc. ended June 30, 2018 (Q2 2018)**

All amounts shown are in U.S. dollars (actual)

**Quarterly Lifetime Warranty Expense of Reporting Party**

For Q2 2018

| Period | Warranty Expense[1] |
|---|---|
| April | $ 187,690.68 |
| May | $ 200,832.14 |
| June | $ 178,813.75 |
| Quarterly Lifetime Warranty Expense | $ 567,336.57 |

**Quarterly Lookback Sales Amount of Reporting Party**

For Q2 2018

| Fiscal Quarter | Net Sales[2] |
|---|---|
| Q2 2016 | $ - |
| Q3 2016 | $ - |
| Q4 2016 | $ - |
| Q1 2017 | $ 1,392,852.54 |
| Q2 2017 | $ 10,226,630.68 |
| Q3 2017 | $ 7,101,450.37 |
| Q4 2017 | $ 8,482,836.99 |
| Q1 2018 | $ 7,299,973.59 |
| Quarterly Lookback Sales Amount | $ 34,503,744.18 |

Notes

Capitalized terms used but not defined herein have the meanings given to them in the Purchase and Sale Agreement, dated as of January 5, 2017 (as amended), by and between Sears Holdings Corporation and Stanley Black & Decker, Inc. ("SBD"). Amounts shown have been determined in accordance with GAAP and SBD's quarterly and annual financial statements. Refer to Annexes A through C for additional detail supporting the calculation of the Reporting Party's Quarterly Lifetime Warranty Expense and Quarterly Lookback Sales Amount for Q2 2018.

(1) Refers to the aggregate expense incurred by SBD and its Affiliates in respect of the repair or replacement of Lifetime Warranty Products (other than any recall thereof).

(2) Refers to the aggregate net sales under GAAP as reported by SBD and its Affiliates of Lifetime Warranty Products.

EXHIBIT D

Q3 2018 Reporting Party Statement

(See attached.)

# SEARS HOLDINGS

**Luke J. Valentino**
DVP, Deputy General Counsel and
Corporate Secretary

Sears Holdings Management Corporation
3333 Beverly Road B6-237B
Hoffman Estates, IL  60179
(847) 286-9551
Email: Luke.Valentino@searshc.com

November 28, 2018

Stanley Black & Decker, Inc.
1000 Stanley Drive
New Britain, CT  06053

Re:    Calculating Party Quarterly Warranty Statement pursuant to Section 5.13 of the
       Purchase Agreement

Ladies and Gentlemen:

Reference is made to the Purchase and Sale Agreement (the "Purchase Agreement"), dated as
of January 5, 2017, by and between Sears Holdings Corporation ("Seller") and Stanley Black
& Decker, Inc. ("Purchaser").  Capitalized terms used but not otherwise defined hereto shall
have the meanings assigned to such terms in the Purchase Agreement.

Pursuant to Section 5.13 of the Purchase Agreement, Seller hereby delivers to Purchaser the
Calculating Party Quarterly Warranty Statement set forth as Exhibit A hereto.  As set forth
on the Calculating Party Quarterly Warranty Statement, the Quarterly Warranty True-Up
Payment due from Seller to Purchaser is $325,510.

As you are aware, on October 15, 2018 (the "**Commencement Date**"), Seller and certain of
its affiliates (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11
of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States
Bankruptcy Court for the Southern District of New York, which cases are jointly
administered under Case No. 18-23538 (RDD).

The Quarterly Warranty True-Up Payment referenced herein was incurred and arose as a
result of sales that occurred prior to the Commencement Date.

At this time, the Debtors are not permitted under the Bankruptcy Code to pay or make
distributions to creditors on account of claims that arose prior to the Commencement Date,
and Purchaser is prohibited from taking any act to collect or enforce its prepetition claim by

the automatic stay extant pursuant to section 362(a) of the Bankruptcy Code.  11 U.S.C. § 362.

Should you have any questions regarding this matter, please do not hesitate to contact me. The Debtors reserve all rights and defenses in connection with this matter.

Very truly yours,

SEARS HOLDINGS CORPORATION

By:  _Luke Valentino_____

     Name:  Luke J. Valentino
     Title:  DVP, Deputy General Counsel
          and Corporate Secretary

cc:    Wachtell, Lipton, Rosen & Katz
      51 West 52nd Street
      New York, NY  10019
      Attn:  Scott K. Charles and David M. Silk

      Cravath, Swaine & Moore LLP
      Worldwide Plaza
      825 Eighth Avenue
      New York, NY  10019
      Attn:  Robert I. Townsend, III and Thomas E. Dunn

**Exhibit A**

See attached.

Lifetime Warranty True-up Calculation
$ Thousands

| $ Thousands | Sears | SHO | SHC |
|---|---|---|---|
| Sales | $529,205 | $86,564 | $615,769 |
| SM | $217,695 | $32,631 | $250,326 |
| COGS | $311,510 | $53,933 | $365,443 |
| CMDs | $7,725 | $448 | $8,174 |
| COGS less CMDs | $303,785 | $53,485 | $357,269 |
| Est. Wholesale Value | $344,406 | $60,636 | $405,042 |

| Lifetime Warranty True Up - $ Thousands | SHC** | SBD | Total Market |
|---|---|---|---|
| Sales | $405,042 | $56,753 | $461,795 |
| BOS % | 88% | 12% | 100% |
| CLW - Actuals (Act) | $1,494 | $554 | $2,048 |
| % Total | 73% | 27% | 100% |
| CLW - Calculation | $1,796 | $252 | $2,048 |
| Q3 - True-up - SHC Receives/ (SHC Owes) | ($302.58) | $302.58 | $0 |
| Prior Quarter Payment True-up | ($23) | $23 | $0 |
| Q3 - True-up - SHC Receives/ (SHC Owes) | ($325.51) | $325.51 | $0 |

*All time frames are tied to SBD's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)

**SHC Sales is the estimated wholesale sales using the 13% markup on COGs.

*** Sales time frame is from July 3rd 2016 thru June 7th 2018. Warranty expense timeframe is from July 8th through Oct 6th 2018

Notes

1) In order to have a meaningful BOS calculation KCD has used retail sales and converted to a wholesale value.  The COGs less Clearance Markdowns was
marked up by 13% which is historical external CM wholesale GM %

($325,506.01)

**Lifetime Warranty True-up Calculation**
**$ Thousands**

Recirculation after an updated submission received from SBD

| $ Thousands | Sears | SHO | SHC |
|---|---|---|---|
| Sales | $549,630 | $89,908 | $639,538 |
| SM | $224,195 | $33,672 | $257,866 |
| COGS | $325,435 | $56,236 | $381,671 |
| CMDs | $8,806 | $510 | $9,316 |
| COGS less CMDs | $316,629 | $55,727 | $372,356 |
| Est. Wholesale Value | $358,968 | $63,178 | $422,146 |

Lifetime Warranty True Up - $ Thousands

| | SHC** | SBD | Total Market |
|---|---|---|---|
| Sales | $422,146 | $34,504 | $456,650 |
| BOS % | 92% | 8% | 100% |
| CLW - Actuals (Act) | $1,738 | $592 | $2,330 |
| % Total | 75% | 25% | 100% |
| CLW - Calculation | $2,154 | $176 | $2,330 |
| True-up - SHC Receives/ (SHC Owes) | ($416.10) | $416.10 | $0 |

*All time frames are tied to SBD's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)

**SHC Sales is the estimated wholesale sales using the 13% markup on COGs.

*** Sales time frame is from Apr 3rd 2016 thru Apr 7th 2018. Warranty expense timeframe isfrom April 8th 2018 through July 7th 2018

**Notes**

1) In order to have a meaningful BOS calculation KCD has used retail sales and converted to a wholesale value.  The COGS less Clearance Markdowns was marked up by 13% which is historical external CM wholesale GM %

**Oriingal Submission**
**$ Thousands**

| | Sears | SHO | SHC |
|---|---|---|---|
| Sales | $549,630 | $89,908 | $639,538 |
| SM | $224,195 | $33,672 | $257,866 |
| COGS | $325,435 | $56,236 | $381,671 |
| CMDs | $8,806 | $510 | $9,316 |
| COGS less CMDs | $316,629 | $55,727 | $372,356 |
| Est. Wholesale Value | $358,968 | $63,178 | $422,146 |

Lifetime Warranty True Up - $ Thousands

| | SHC** | SBD | Total Market |
|---|---|---|---|
| Sales | $422,146 | $34,504 | $456,650 |
| BOS % | 92% | 8% | 100% |
| CLW - Actuals (Act) | $1,738 | $567 | $2,305 |
| % Total | 75% | 25% | 100% |
| CLW - Calculation | $2,131 | $174 | $2,305 |
| True-up - SHC Receives/ (SHC Owes) | ($393.18) | $393.18 | $0 |
| Q3 Adjustment | ($22.92) | $22.92 | $0 |

SHC Sales Schedule
$ Thousands

**SHC (Sears & SHO) - $ Thousands**

| | 2015 | | | 2016 | | | | 2017 | | | | 2018 | | | | Q2'16 - Q1'18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 | Q2'18 | Q3'18 | Q4'18 | |
| Sales | $72,903 | $63,974 | $75,038 | $68,380 | $66,773 | $58,034 | $207,477 | $63,724 | $53,389 | $49,532 | $88,536 | $52,073 | $43,004 | $41,449 | $0 | $615,769 |
| SM | $28,436 | $35,816 | $25,204 | $27,950 | $27,168 | $22,746 | $77,504 | $26,880 | $23,061 | $19,940 | $37,052 | $23,517 | $19,628 | $18,801 | $0 | $250,326 |
| COGS | $44,467 | $38,158 | $49,834 | $40,430 | $39,605 | $35,288 | $129,973 | $36,844 | $30,328 | $29,592 | $51,485 | $28,557 | $23,377 | $22,648 | $0 | $365,443 |
| CMDs | $2,076 | $3,559 | $1,015 | $2,705 | $1,307 | $1,112 | $3,651 | $1,481 | $801 | $422 | $298 | $242 | $165 | $315 | $0 | $8,174 |
| COGS less CMDs | $42,390 | $34,589 | $48,818 | $37,725 | $38,298 | $34,176 | $126,322 | $35,362 | $29,527 | $29,170 | $51,187 | $28,314 | $23,212 | $22,334 | $0 | $357,269 |
| Est. Wholesale Value** | $48,659 | $39,214 | $55,346 | $42,770 | $43,419 | $38,745 | $143,213 | $40,091 | $33,475 | $33,070 | $58,031 | $32,100 | $26,316 | $25,520 | $0 | $405,042 |
| | | | | -4.0% | -2.0% | -1.9% | -1.8% | -2.3% | -1.5% | -0.9% | -0.3% | -0.5% | -0.4% | | | |

**Sears - $ Thousands**

| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 | Q2'18 | Q3'18 | Q4'18 | Q2'16 - Q1'18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | $60,427 | $53,345 | $63,567 | $57,640 | $56,823 | $49,287 | $176,834 | $55,242 | $45,864 | $42,932 | $76,854 | $45,795 | $36,398 | $36,485 | $0 | $529,205 |
| SM | $24,013 | $21,805 | $21,370 | $24,051 | $23,361 | $19,492 | $66,822 | $23,268 | $20,165 | $17,443 | $32,337 | $20,807 | $16,861 | $16,743 | $0 | $217,695 |
| COGS | $36,413 | $31,540 | $42,196 | $33,589 | $33,462 | $29,795 | $110,012 | $31,474 | $25,698 | $25,489 | $44,517 | $24,988 | $19,537 | $19,742 | $0 | $311,510 |
| CMDs | $1,895 | $3,424 | $888 | $2,612 | $1,233 | $1,015 | $3,605 | $1,278 | $721 | $442 | $280 | $232 | $152 | $161 | $0 | $7,725 |
| COGS less CMDs | $34,519 | $28,116 | $41,309 | $30,977 | $32,229 | $28,779 | $106,407 | $30,196 | $24,978 | $25,047 | $44,237 | $24,756 | $19,385 | $19,581 | $0 | $303,785 |
| Est. Wholesale Value** | $39,134 | $31,875 | $46,832 | $35,119 | $36,539 | $32,628 | $120,636 | $34,233 | $28,318 | $28,396 | $50,152 | $28,066 | $21,977 | $22,199 | $0 | $344,406 |
| | | | | -4.5% | -2.2% | -2.1% | -2.0% | -2.3% | -1.6% | -1.0% | -0.4% | -0.5% | -0.4% | | | |

**SHO - $ Thousands**

| | Q2'15 | Q3'15 | Q4'15 | Q1'16 | Q2'16 | Q3'16 | Q4'16 | Q1'17 | Q2'17 | Q3'17 | Q4'17 | Q1'18 | Q2'18 | Q3'18 | Q4'18 | Q2'16 - Q1'18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | $12,476 | $10,628 | $11,471 | $10,740 | $9,950 | $8,747 | $30,643 | $8,482 | $7,526 | $6,600 | $11,682 | $6,279 | $6,606 | $4,964 | $0 | $85,564 |
| SM | $4,423 | $4,010 | $3,834 | $3,899 | $3,807 | $3,253 | $10,682 | $3,112 | $2,896 | $2,498 | $4,714 | $2,710 | $2,766 | $2,058 | $0 | $32,631 |
| COGS | $8,053 | $6,618 | $7,638 | $6,841 | $6,143 | $5,493 | $19,961 | $5,370 | $4,630 | $4,102 | $6,968 | $3,569 | $3,840 | $2,906 | $0 | $53,933 |
| CMDs | $182 | $145 | $128 | $93 | $74 | $97 | $46 | $203 | $81 | $(30) | $18 | $10 | $13 | $153 | $0 | $448 |
| COGS less CMDs | $7,872 | $6,473 | $7,510 | $6,748 | $6,069 | $5,396 | $19,915 | $5,167 | $4,549 | $4,123 | $6,950 | $3,559 | $3,827 | $2,753 | $0 | $53,485 |
| Est. Wholesale Value** | $8,924 | $7,339 | $8,514 | $7,651 | $6,880 | $6,118 | $22,578 | $5,858 | $6,157 | $4,674 | $7,879 | $4,035 | $4,339 | $3,121 | $0 | $60,636 |

*All time frames are tied to SRO's fiscal calendar. Q1 (Jan, Feb, Mar), Q2 (Apr, May, Jun), Q3 (Jul, Aug, Sep), Q4 (Oct, Nov, Dec)
**SHC Sales is the estimated wholesale sales using the 13% markup on COGs

**SHC/SHO Warranty Expense**
**$ Ones**
**Time Frame: 3/9/2017-7/1/2017 (wk 22)**

| DIV_NO | (All) |
|---|---|
| SBL_NO | (All) |
| Warranty Calculation Identifier | Include |

| SHC/SHO - Month | CLW_NET_CST_DOLLARS |
|---|---|
| Sears | $1,194,767 |
| Jul | $362,937 |
| Aug | $375,054 |
| Sep | $456,776 |
| SHO | $299,142 |
| Jul | $91,424 |
| Aug | $93,322 |
| Sep | $114,396 |
| Grand Total | $1,493,908 |

# Reporting Party Quarterly Warranty Statement

**Third Quarterly Measurement Period - Fiscal Quarter of Stanley Black & Decker, Inc. ended September 29, 2018 (Q3 2018)**

All amounts shown are in U.S. dollars (actual)

## Quarterly Lifetime Warranty Expense of Reporting Party

For Q3 2018

| Period | Warranty Expense[1] |
|---|---|
| July | $ 164,999.19 |
| August | $ 209,724.96 |
| September | $ 179,576.05 |
| Quarterly Lifetime Warranty Expense | $ 554,300.20 |

## Quarterly Lookback Sales Amount of Reporting Party

For Q3 2018

| Fiscal Quarter | Net Sales[2] |
|---|---|
| Q3 2016 | $ - |
| Q4 2016 | $ - |
| Q1 2017 | $ 1,392,852.54 |
| Q2 2017 | $ 10,226,630.68 |
| Q3 2017 | $ 7,101,450.37 |
| Q4 2017 | $ 8,482,836.99 |
| Q1 2018 | $ 7,299,973.59 |
| Q2 2018 | $ 22,248,793.35 |
| Quarterly Lookback Sales Amount | $ 56,752,537.52 |

## Notes

Capitalized terms used but not defined herein have the meanings given to them in the Purchase and Sale Agreement, dated as of January 5, 2017 (as amended), by and between Sears Holdings Corporation and Stanley Black & Decker, Inc. ("SBD"). Amounts shown have been determined in accordance with GAAP and SBD's quarterly and annual financial statements. Refer to Annexes A through C for additional detail supporting the calculation of the Reporting Party's Quarterly Lifetime Warranty Expense and Quarterly Lookback Sales Amount for Q3 2018.

(1) Refers to the aggregate expense incurred by SBD and its Affiliates in respect of the repair or replacement of Lifetime Warranty Products (other than any recall thereof).

(2) Refers to the aggregate net sales under GAAP as reported by SBD and its Affiliates of Lifetime Warranty Products.