# **EXHIBIT A**

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number: 28913ST

Page 1

## MASTER ORDERING AGREEMENT

This Master Ordering Agreement ("***Agreement***") is made as of January 31, 2014 ("***Effective Date***"), between the ServiceNow entity set forth below ("***ServiceNow***") and the Customer, on behalf of itself and for the benefit of its Affiliates, set forth below.

| | |
|---|---|
| Customer Name: | Sears Holdings Management Corporation |
| Address: | 3333 Beverly Road |
| | Hoffman Estates, IL 60179 |

This Agreement contains the terms and conditions for Customer's purchase and use of ServiceNow's products and services.

Only entities directly or indirectly controlled by Sears Holdings Corporation shall be deemed Affiliates of Customer for purposes of this Agreement.

This Agreement includes the following terms and conditions, which are incorporated by this reference, all of which are attached to this Agreement.

1)   ServiceNow General Terms and Conditions
2)   ServiceNow Professional Services Guide
3)   ServiceNow Product Guide
4)   Information Security Requirements (Exhibit A)

This Agreement, together with the referenced or attached documents and Order Form(s), is the entire agreement of the parties regarding the subject matter of this Agreement, and supersedes all prior or contemporaneous oral or written agreements, representations and negotiations.

THE PARTIES EACH ACTING UNDER DUE AND PROPER AUTHORITY EXECUTE THIS AGREEMENT AS OF THE EFFECTIVE DATE.

| **Customer: Sears Holdings Management Corporation** | **ServiceNow entity: ServiceNow, Inc.** |
|---|---|
| By: *David Schauble* (DocuSigned) | By: *Michael P. Scarpelli* (DocuSigned) |
| Name: David Schauble | Name: Michael P. Scarpelli |
| Title: VP I&TG Technologies | Title: Chief Financial Officer |
| Date: 2/3/2014 | Date: 1/29/2014 |



Matt Daly
ServiceNow
Digitally signed by Matt Daly
ServiceNow
DN: cn=Matt Daly ServiceNow, o=ServiceNow, ou=Legal, email=matt.daly@servicenow.com, c=US
Date: 2014.01.28 15:36:16 -08'00'

**servicenow**
MASTER ORDERING AGREEMENT

Contract Number: __28913ST__

Page 2

## GENERAL TERMS AND CONDITIONS

**1.    PRODUCT AND SERVICES**

Subject to this Agreement, ServiceNow will make available the purchased ServiceNow subscription product ("**Product**") and professional services ("**Services**"). Customer's purchases are not contingent on the delivery of any future functionality or features regardless of any verbal or written communication about ServiceNow's product plans.

**2.    ORDERING TERMS**

2.1.    ORDER FORM. Each Order Form is an ordering document signed by the parties which may contain: the subscription fee; the number and type of permitted users, servers and other use requirements; the period of authorized use ("**Subscription Term**"); the description of Services which may incorporate one or more statements of work (**"SOWs"**) for Services; and other ordering terms (**"Order Form"**).

2.2.    PAYMENT. Customer shall pay fees and other amounts as stated on the Order Form. Orders are final when placed and non-cancellable and non-refundable. Customer will make payment on ServiceNow's properly submitted invoices 60 days after receipt of invoice.  Customer is not required to pay any disputed charge until after the resolution of the dispute.  All fees and expenses are payable in U.S. Dollars.  ServiceNow agrees to establish, implement and maintain "Electronic Funds Transfer" (EFT), or ePayables (credit card settlement), in accordance with Customer's reasonable policies and requirements as communicated to ServiceNow, as the only means to receive payments from Customer during the term of this Agreement provided, however, the foregoing shall not relieve Customer of its obligation to pay fees due under this Agreement. ServiceNow may suspend use of the Product after giving 14-business days' notice for undisputed amounts more than 30-days past due.

2.3.    TAXES. All payments required by this Agreement are exclusive of federal, state, local and foreign taxes, duties, tariffs, levies and similar assessments. Customer agrees to bear and be responsible for the payment of all taxes, duties, tariffs, levies, fees and charges of any kind, including sales, use, excise or value added taxes, and all other similar charges (collectively, "**Taxes**") which are imposed on transactions under this Agreement by or under the authority of any government body, excluding Taxes based upon ServiceNow's net income. Customer shall make all payments required without deduction of any Taxes, except as required by law, in which case the amount payable shall be increased as necessary so that after making any required deductions and withholdings, ServiceNow receives and retains (free from any liability for payment of Taxes) an amount equal to the amount it would have received had no such deductions or withholdings been made. If Customer is a tax-exempt entity or claims exemption from any Taxes under this Agreement, Customer shall provide a certificate of exemption upon execution of this Agreement and, after receipt of valid evidence of exemption, ServiceNow shall not charge Customer any Taxes from which it is exempt.

**3.    TERM AND TERMINATION**

3.1.    TERM AND TERMINATION. This Agreement commences on the Effective Date and continues until terminated. Each Party may terminate: (i) this Agreement upon thirty (30) days' prior written notice to the other party, if at the time such notice is served there are no Order Forms in effect; (ii) this Agreement in its entirety or with respect to any individual Product or Service for material breach without liability with 30-days prior written notice to the other Party, if the complaining party informs the other party of the nature of the breach in its notice to terminate and the breach remains uncured for that 30-day period; or (iii) this Agreement if the other party becomes the subject of a petition in bankruptcy or any proceeding related to its insolvency, receivership, liquidation that is not dismissed within 60-days of its commencement or an assignment for the benefit of creditors.

3.2    EFFECT OF TERMINATION.  Upon any termination of this Agreement: (i) Customer will cease using the Product; (ii) Customer shall pay any unpaid Product subscription fees under all Order Forms covering the Subscription Term prior to the effective date of termination; (iii) for cause by Customer, ServiceNow shall refund to Customer any prepaid Product subscription fees covering the remainder of the Subscription Term under all Order Forms after the effective date of termination; (iv) for cause by ServiceNow, Customer shall pay any unpaid Product subscription fees covering the remainder of the Subscription Term under all Order Forms after the effective date of termination; and (v) Sections 3, 5, 6.2, 6.3, 7, and 8 of this Agreement shall survive .

3.3    INDEPENDENT ORDERS. The expiration or termination of this Agreement with respect to any individual Product or Service for whatever reason does not terminate this Agreement in its entirety nor terminate the parties' duties and obligations with respect to other Products and Services.  A breach of this Agreement with respect to any particular Product or Service does not, by itself, constitute a breach of the entire Agreement or of the breaching party's obligations with respect to other Products or Services.

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number: __28913ST__

Page 3

**3.4** **TRANSITION RIGHTS.** Upon expiration or termination of this Agreement or an Order Form by either party for any reason, ServiceNow will provide Customer, or Customer's designated Users, as the case may be, all reasonable transition Services ("Transition Services") requested by Customer, for up to 12 months after such termination (the "Transition Period"), relating to the transition from the Product to another system or provider, including continued access to the Product subject to the terms of this Agreement. Such services may include month to month extensions of existing SOWs. For Services which Customer was receiving from ServiceNow prior to such expiration/termination, the fees applicable to such Transition Service will be the rates which Customer was paying prior to such expiration/termination. For all other Transition Services, ServiceNow will not charge Customer fees in excess of the ServiceNow's then standard rates. Any Transition Services fees will be agreed to by both Parties prior to the commencement of any work and an Order Form will be executed documenting the agreed to services.

**4.    WARRANTIES**

The warranties for Product and Services are set forth in the applicable product or service guide incorporated into this Agreement. EXCEPT FOR THE WARRANTIES STATED IN THIS AGREEMENT, SERVICENOW MAKES NO REPRESENTATION, EXPRESS, STATUTORY OR IMPLIED, AS TO THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, AVAILABILITY OR ACCURACY OF THE PRODUCT OR ANY RELATED PRODUCT OR SERVICE. WITHOUT LIMITING THE FOREGOING, SERVICENOW MAKES NO WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

**5.    CONFIDENTIALITY AND NON-USE**

**5.1.** __CONFIDENTIAL INFORMATION__. Confidential information means all information disclosed by a party ("***Disclosing Party***") to the other party ("***Receiving Party***"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of the disclosure: including, without limitation, each party's respective business plans and processes; financial and employee data; proprietary technology and product information and designs; the Product; data submitted by Customer to the Product (***"Customer Data"***); and the terms of the Agreement. Without limitation, ServiceNow's prices and discounts are its Confidential Information. Without limitation, Customer Data is Customer's Confidential Information. Confidential Information excludes information that: (i) is or becomes generally known to the public; (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation to the Disclosing Party; (iii) is received from a third party without breach of any obligation to the Disclosing Party; (iv) was independently developed by the Receiving Party; or (v) is Product usage metrics in an aggregate form and not attributable to the Disclosing Party. Customer agrees that ServiceNow may use its name in promotional materials and discussions regarding ServiceNow's customer accounts, where ServiceNow will work with Customer for Customer's review and approval prior to publishing promotional materials.

**5.2.** __PROTECTION__. The Receiving Party shall (i) not disclose and use the same degree of care to protect the Disclosing Party's Confidential Information against unauthorized disclosure that it uses to protect its own Confidential Information (but in no event less than reasonable care); and (ii) not use Confidential Information except to the extent necessary under this Agreement. To the extent necessary under this Agreement, each party may disclose the Confidential Information of the other party to employees or subcontractors who are bound by written obligations of confidentiality and non-disclosure at least as protective as those set forth herein. In the event of a court order or government regulation compelling disclosure of any Confidential Information, the Receiving Party shall provide the Disclosing Party with prompt written notice thereof, and shall reasonably cooperate with the other party to seek confidential or other protective treatment. Each party's obligations set forth in this Section 5 shall remain in effect after termination of the Agreement for 3 years. Each party will promptly return to the other party all Confidential Information of the other party in its possession or control upon request from the Disclosing Party.

**6.    INDEMNIFICATION**

**6.1.** __CLAIMS__. ServiceNow shall: (i) defend Customer, its officers, directors and employees against any third party suit, claim, action or demand (***"Claim"***) (a) alleging that the Product as used in accordance with this Agreement infringes any valid and issued patent, copyright, or trademark of a third party, or (b) resulting from the negligence or intentional misconduct of ServiceNow, any subcontractor of ServiceNow, or any of their respective personnel or agents that result in bodily injury (including death), or damage or loss to tangible personal or real property; and (ii) pay any court-ordered award of damages or settlement amount, and reasonable attorney fees, arising from such Claim. If any portion of the Product becomes the subject of an infringement Claim, ServiceNow may: (a) obtain permission for Customer's continued use of the Product; (b) replace or modify the Product to avoid infringement, such update or replacement having substantially similar capabilities; or, if the foregoing (a) and (b) are not available on commercially reasonable terms, (c) terminate Customer's use of the affected Product upon 30-days' written notice

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number: 28913ST

Page 4

and refund the pro rata portion of prepaid Product subscription fees covering the remainder of the Subscription Term after the date of termination. The term *"Product"* includes Software and Documentation as defined in the **Product Guide**.

6.2.    LIMITATIONS.  Notwithstanding the above, ServiceNow shall have no liability for any Claim to the extent arising from: (i) any use of the Product which exceeds the scope of the subscription granted to Customer or due to the content of Customer Data; (ii) use of the Product by Customer not in compliance with laws; (iii) use of the Product after ServiceNow notifies Customer to discontinue use; or (iv) modifications to the Product or use of the Product in combination with any software, application or service made or provided other than by ServiceNow, unless such combination was reasonably anticipated by the parties.

6.3.    CUSTOMER OBLIGATION.  Customer shall: (i) defend ServiceNow, its officers, directors and employees against any third party Claim alleging that the Customer Data infringes any valid and issued patent, copyright, or trademark of a third party; and (ii) pay any court-ordered award of damages or settlement amount, and reasonable attorney fees, arising from such Claim.

6.4.    PROCESS.  The foregoing indemnity obligations are conditioned on the indemnified party notifying the indemnifying party promptly in writing of any actual or threatened Claim, the indemnified party giving the indemnifying party sole control of the defense thereof and any related settlement negotiations, and the indemnified party cooperating and, at the indemnifying party's request and expense, assisting in such defense. SECTION 6 STATES THE EACH PARTY'S ENTIRE LIABILITY AND THE OTHER PARTY'S EXCLUSIVE REMEDY FOR THIRD PARTY INFRINGEMENT CLAIMS AND ACTIONS.

7.    **LIMITATIONS OF LIABILITY**

7.1.    CUSTOMER RESULTS. Customer assumes sole responsibility for results obtained from use of the Product or Services.

7.2.    EXCLUSIONS. TO THE EXTENT PERMITTED BY LAW, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO EACH OTHER OR ANYONE FOR LOST PROFITS (WHETHER DIRECT OR INDIRECT) OR REVENUE OR LOSS OF USE OR DATA, COSTS OF COVER, OR FOR INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, OR INDIRECT DAMAGES OF ANY TYPE OR KIND HOWEVER CAUSED, WHETHER BY BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, OR ANY OTHER LEGAL CAUSE OF ACTION AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

7.3.    LIMITATIONS ON DIRECT DAMAGES. THE MAXIMUM LIABILITY OF EITHER PARTY WHATSOEVER ARISING OUT OF OR IN CONNECTION WITH THE AGREEMENT WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED ON BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, TORT, OR OTHERWISE, SHALL IN NO CASE EXCEED THE AGGREGATE OF TWO TIMES (2X) 12 MONTHS IN FEES RECEIVED BY SERVICENOW AND/OR DUE FROM CUSTOMER IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM. THE EXISTENCE OF MULTIPLE CLAIMS SHALL NOT ENLARGE THIS AGGREGATE MAXIMUM LIABILITY.

7.4.    EXCEPTIONS. THE EXCLUSIONS AND LIMITATIONS OF LIABILITY SET FORTH IN SECTIONS 7.2 (EXCLUSIONS) AND 7.3 (LIMITATIONS ON DIRECT DAMAGES) SHALL NOT APPLY TO EACH PARTY'S INDEMNITY OBLIGATIONS SET FORTH IN SECTION 6 (INDEMNIFICATION) OF THIS AGREEMENT, DEATH OR BODILY INJURY CAUSED BY EITHER PARTY, FRAUD, A PARTY'S INFRINGEMENT OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, CUSTOMER'S PAYMENT OBLIGATIONS HEREUNDER, OR BREACHES BY A PARTY OF ITS CONFIDENTIALITY OBLIGATIONS AS SET FORTH IN SECTION 5 (CONFIDENTIALITY AND NON-USE) OF THIS AGREEMENT ; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE AGGREGATE MAXIMUM LIABILITY OF A PARTY FOR ANY AND ALL CLAIMS ARISING FROM A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 5 (CONFIDENTIALITY AND NON-USE) SHALL BE LIMITED TO ONE MILLION DOLLARS ($1,000,000.00). THE EXISTENCE OF MULTIPLE CLAIMS SHALL NOT ENLARGE THIS AGGREGATE MAXIMUM LIABILITY.

7.5.    ENCRYPTION. NOTHING HEREIN SHALL WAIVE OR OTHERWISE DIMINISH CUSTOMER'S OBLIGATION IN SECTION 1.3 (CUSTOMER SAFEGUARDS) OF THE PRODUCT GUIDE TO USE THE PRODUCT'S COLUMN LEVEL ENCRYPTION FEATURE TO ENCRYPT CUSTOMER DATA CONSISTING OF PERSONALLY IDENTIFIABLE INFORMATION, SUCH AS SOCIAL SECURITY NUMBERS, CREDIT CARD AND

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number: **28913ST**

Page 5

ACCOUNT INFORMATION, AND HEALTH INFORMATION. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, SERVICENOW SHALL HAVE NO LIABILITY TO THE EXTENT THAT DAMAGES ARE CAUSED BY CUSTOMER'S FAILURE TO USE THE COLUMN LEVEL ENCRYPTION FEATURE OR SIMILAR ADDITIONAL OR SUCCESSOR ENCRYPTION FEATURES MADE AVAILABLE IN THE PRODUCT, AND SERVICENOW SHALL HAVE NO LIABILITY TO THE EXTENT THAT DAMAGES WOULD HAVE BEEN MITIGATED BY CUSTOMER'S USE OF SUCH ENCRYPTION MEASURES.

**8. GENERAL PROVISIONS**

8.1. <u>ASSIGNMENT</u>. Neither party may assign its rights or obligations, whether by operation of law or otherwise, without the prior written consent of the other party, not to be unreasonably withheld. Notwithstanding the foregoing, either party, in connection with a merger, reorganization, or sale of all or substantially all of the assets or equity of such party, may assign this Agreement in its entirety to such party's successor without the other party's consent. This Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns.

8.2. <u>GOVERNING LAW</u>. This Agreement shall be governed by New York, without regard to the Uniform Computer Information Transactions Act ("***Applicable Law***"). Choice of law rules and the United Nations Convention on Contracts for the International Sale of Goods will not apply. The parties agree, with respect to any litigation arising directly or indirectly out of, or that in any way relates to, this agreement, the business relationship or any other transaction, matter, or issue between the parties, to commence it exclusively in the United States District Court located in New York, NY, and the parties by this Agreement consent to the jurisdiction of these courts.

8.3. <u>NOTICE</u>. Except as otherwise provided herein, all notices shall be in writing and deemed given upon: (i) personal delivery, (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested), or (iii) the first business day after sending by confirmed email; provided that e-mail shall not be sufficient for notices of termination or a Claim. Notices shall be sent to the Parties listed below:

If to the Customer: If to Company: Sears Holdings Management Corporation, 3333 Beverly Road, Mail Station: B6-210B, Hoffman Estates, Illinois 60179, Attn.: CIO

with a copy to: Sears Holdings Management Corporation, 3333 Beverly Road, Mail Station: B6-210B, Hoffman Estates, Illinois 60179, Attn.: General Counsel.

If to ServiceNow: Legal Counsel, 4810 Eastgate Mall, San Diego, CA 92121, with copy for all notices to: legalnotices@servicenow.com.

8.4. <u>RELATIONSHIP OF THE PARTIES</u>. The parties are independent contractors. Nothing in this Agreement shall be construed to create a partnership, joint venture or agency relationship. Neither party shall have any right or authority to assume or create any obligation of any kind expressed or implied in the name of or on behalf of the other Party.

8.5. <u>EXPORT COMPLIANCE</u>. Each party shall comply with United States and foreign export control laws and regulations. Neither party shall distribute or supply or allow access to the Product to any person or entity if there is reason to believe that such person or entity intends to export or re-export or otherwise use the Product in violation of applicable export control laws and regulations.

8.6. <u>FORCE MAJEURE</u>. No party shall be liable or responsible to the other party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (except for any obligations to make payments to the other party hereunder), when and to the extent such failure or delay is caused by or results from acts beyond the affected party's reasonable control. The party suffering a Force Majeure Event shall use diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized.

8.7. <u>ENTIRE AGREEMENT</u>. This Agreement, together with the referenced and/or attached documents and Order Form(s), is the entire agreement of the parties regarding the subject matter of this Agreement, and supersedes all prior or contemporaneous oral or written agreements, representations and negotiations. For any conflict between this Agreement and any referenced and/or attached documents or Order Form(s), this Agreement shall govern unless such referenced and/or attached document, SOW, or Order Form is signed by both parties and expresses an intent to override the terms of the Agreement. Any purchase order submitted by Customer is for Customer's internal purposes and its terms and conditions are superseded and replaced by this Agreement, and the purchase order terms and conditions have no force or effect. Any modification must be in writing and signed by authorized representatives of

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number: 28913ST

Page 6

the parties. A waiver of any right is only effective if it is in writing and only to the party addressed and for the circumstances given. If any provision is determined by a court or arbitrator in accordance with Section 8.2 to be illegal or unenforceable, its invalidity shall not affect the other provisions that can be given effect without the invalid provision. If any provision does not comply with any law, ordinance or regulation, to the extent possible it shall be interpreted to comply with such law, ordinance or regulation, or, if not possible, struck and the Agreement construed in accordance with the remaining provisions of the Agreement.

8.8     Security Policies. With respect to Customer Data, ServiceNow will comply with the information security requirements contained in Customer's Security Requirements document, attached hereto as Exhibit A.

8.9     Publicity. ServiceNow will not reveal the existence of this Agreement or disclose that Customer is client of ServiceNow's in any advertising, promotional activities, sales presentations or publicity releases without the Customer's prior written consent

8.10    Electronic Communications.

8.10.1   If required by Customer, in order to more effectively communicate electronically with one another and automate various operations between Customer and ServiceNow, the parties shall utilize Customer's third party e-commerce service provider, currently Ariba Supplier Network, or as otherwise identified by Customer to ServiceNow from time to time ("E-Commerce Provider"). This will allow the parties to transmit to one another various documents and communications, including but not limited to, purchase orders, work orders, change requests, advance ship notices, delivery schedules and receipt confirmations, requests for proposals, invoices, acknowledgements, catalogs, catalog punch-outs, portal usage, fees, discount rates, acceptances of discounts, reports provided by ServiceNow to Customer, product literature and information, parts lists, notices as required or allowed hereunder, clarifications and confirmations ("E-Documents"). ServiceNow will utilize such E-Commerce Provider, provided that (except for invoices submitted by ServiceNow) any communication or transaction between Customer and ServiceNow under this Agreement may also be handled through standard means of communication (written communication in accordance with section 8.3 above).

8.10.2   Customer and ServiceNow shall be individually responsible for purchasing or acquiring their own license to install and/or use any software application, and their own agreement for a host site, any support services agreement, any equipment, maintenance service agreement or any other process or service that may be necessary to access and utilize the E-Commerce Provider's electronic communications portal, record retention system and any other modules or ancillary applications (the "E-Network"). Neither Party shall not be responsible for the other Party's failure to pay fees due to the E-Commerce Provider or the other Party's failure to adhere to the E-Commerce Providers terms of use of the E-Network. Each Party shall be responsible to adhere to the terms and conditions of its agreements with the E-Commerce Provider. In the event that ServiceNow fails to maintain a relationship or breaches or defaults on its agreements with the E-Commerce Provider, ServiceNow will use all reasonable efforts to work with Customer to find a mutually acceptable alternative for the submission of ServiceNow invoices.

8.10.3   Customer and ServiceNow shall each be solely responsible for its purchase price or licensing fees, transaction fees, renewal fees, etc. assessed to it by the E-Commerce Provider, and a Party shall not pass along any such fees to the other Party. Each Party shall also be responsible for the training of its employees or agents in utilizing the E-Network and for their proper use of the E-Network and any associated user IDs and passwords. Each Party shall maintain current email addresses and other contact information in the E-Network so to maintain the timely and efficient routing of all E-Documents with the other Party.

8.10.4   The transmission of E-Documents via the E-Network shall have the same validity and enforceability as if they were delivered as signed, written paper documents or communications. If Customer submits its purchase orders or work orders to ServiceNow via the E-Network then ServiceNow shall submit its invoices under those purchase orders or work orders to Customer via the E-Network. If ServiceNow fails to do so, then Customer may give ServiceNow notice with a thirty (30) day period to cure if Customer deems ServiceNow's invoices submitted by ServiceNow outside the E-Network to be unacceptable. The party submitting its E-Document via the E-Network is responsible to confirm the transmission of the E-Document and its availability on the E-Network to the other party, and to resubmit its E-Document in the event of any transmission or submission error, due to whatever cause. Neither party shall use the failure, crash or temporary unavailability of the E-Network as a basis or excuse for any breach it commits under this Agreement.

8.11    Vendor Code of Conduct. The ServiceNow Code of Conduct ("Code of Conduct") is hereby incorporated into the Agreement by reference which may be amended from time to time. ServiceNow agrees to adhere to Code of Conduct.

8.12    Required Insurance.   ServiceNow will, at its own expense, obtain and maintain the following insurance:

    8.12.1    Commercial General Liability, with coverage including, but not limited to, premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of at least $3,000,000 per occurrence for bodily injury and property damage combined.  Customer shall be named as an additional insured, with the standard "separation of Insureds" provision or an endorsement for cross-liability coverage.  The policy shall be endorsed with forms CG 20 10 07 04 and CG 20 37 07 04 or their equivalent, to state that coverage is primary, and non-contributory with other available coverage.  Except where prohibited by law, the insurance carrier shall waive all rights of subrogation that the insurer may have against Customer.  ServiceNow warrants that its subcontractors will maintain Commercial General Liability insurance, provided that ServiceNow shall remain responsible for any failure of its subcontractors to maintain such insurance.  ServiceNow further warrants that, if a subcontractor does not maintain Commercial General Liability insurance, ServiceNow's Commercial General Liability insurance shall insure the subcontractor.  Limits of liability requirements may be satisfied by a combination of Commercial General Liability and Umbrella Excess Liability policies.

    8.12.2    If any persons are employed or uninsured independent contractors are hired by ServiceNow at any time during the term of this Agreement, Workers' Compensation insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by ServiceNow, for all states in which ServiceNow will perform services for Customer, and Employer's Liability insurance with limits of liability of at least $100,000 per accident or disease and $500,000 aggregate by disease. Except where prohibited by law, the insurance carrier shall waive all rights of subrogation that the insurer may have against Customer. ServiceNow warrants that its subcontractors will maintain Workers' Compensation and Employer's Liability insurance, provided that, ServiceNow shall remain responsible for any failure of its subcontractors to maintain such insurance.  ServiceNow further warrants that, if a subcontractor does not maintain Workers' Compensation insurance, ServiceNow's Workers' Compensation insurance shall insure the subcontractor.  ServiceNow may self-insure Workers' Compensation only in states where the governing state bureau has issued to ServiceNow a qualified self-insurance license for Workers' Compensation.

    8.12.3    Automobile Liability insurance for non-owned and hired vehicles, with limits of at least $1,000,000 per occurrence for bodily injury and property damage combined.  If no vehicles are owned or leased, the Commercial General Liability insurance shall be extended to provide insurance for non-owned and hired automobiles in lieu of separate Automobile Liability insurance. Limits of liability requirements may be satisfied by a combination of Automobile Liability and Umbrella Excess Liability policies.

    8.12.4    Professional Liability or Errors & Omissions Insurance with limits of not less than $3,000,000 per claim and annual aggregate, covering all acts, errors, omissions, negligence, infringement of intellectual property (except patent and trade secret) and network risks (including coverage for unauthorized access, failure of security, breach of privacy perils, as well at notification costs and regulatory defense) in the performance of services for Customer or on behalf of Customer hereunder. The policy shall contain an affirmative coverage grant for contingent bodily injury and property damage emanating from the failure of the technology services or an error or omission in the content/information provided. Such insurance shall be maintained in force at all times during the term of the agreement and for a period of 3 years thereafter for services completed during the term of the agreement.

    8.12.5    Policies.   Insurance shall be purchased from companies having a rating of A-VII or better in the current Best's Insurance Reports published by A.M. Best Company or the reasonable equivalent by another reputable rating agency.  Insurance policies shall not be cancelled or materially changed without at least 30 days prior written notice by ServiceNow to Customer.  Evidence of insurance shall be submitted in advance of or concurrent with the execution of this Agreement, on each insurance policy renewal thereafter.

    8.12.6    Coverage.   If ServiceNow does not provide Customer with such evidence of insurance or such policies do not afford adequate protection for Customer, Customer will so advise ServiceNow, but Customer failure to do so is not a waiver of these insurance requirements.  If ServiceNow does not furnish evidence of the coverages specified herein, Company shall have the right, in its sole discretion, to (a) withhold payments from the Contractor until evidence of adequate coverage is provided, or (b) immediately terminate this Agreement.

Failure to obtain and maintain required insurance or failure by Customer to notify ServiceNow shall not relieve ServiceNow of any obligation contained in this Agreement.   Additionally, any approval by Customer of any of ServiceNow's insurance policies shall not relieve ServiceNow of any obligation contained in this Agreement, including liability for claims in excess of described limits.

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number:    28913ST

Page 8

## PROFESSIONAL SERVICES GUIDE

**1.    PROFESSIONAL SERVICES**

1.1.    <u>STATEMENTS OF WORK</u>. ServiceNow will perform Services specified in statements of work (**"SOW"**) entered into between the parties from time to time and which are incorporated into and made a part of the Agreement. If no SOW is written for Services, then unless otherwise provided on the Order Form: (i) the Services shall be time and materials at ServiceNow's standard rates; and (ii) ServiceNow's reasonable, actual travel and incidental expenses in performing the Services shall be reimbursed by Customer. ServiceNow may delegate its performance of Services to a third party, and ServiceNow shall remain responsible for any such subcontractor's performance.

1.2.    <u>DELIVERABLES</u>. **"Deliverable"** means any deliverable specified in the SOW that is created for Customer in the performance of the Services. As between the parties, ServiceNow assigns to Customer all rights, title and interest, in and to the Deliverables; provided, however, that such assignment does not include any ServiceNow Core Technology. Customer will not receive any rights for any Deliverables for which it has not paid in full. **"ServiceNow Core Technology"** means (a) ServiceNow technology, methodologies and intellectual property (including, without limitation, product(s), software tools, hardware designs, algorithms, templates, software (in source and object forms), architecture, class libraries, objects and documentation (both printed and electronic)) existing at the Effective Date or otherwise arising outside of work under the SOW, (b) any derivatives, improvements, enhancements or extensions of the foregoing conceived, reduced to practice, or developed during the term or in performance of the SOW, and (c) any intellectual property anywhere in the world relating to any of the foregoing. To the extent (if at all) any ServiceNow Core Technology is incorporated into the Deliverables, ServiceNow grants to Customer a non-exclusive, royalty-free, worldwide license to use the ServiceNow Core Technology solely in order to use the Deliverables as contemplated under the Agreement during the Subscription Term. Nothing will be deemed to restrict or limit ServiceNow's right to perform similar services for any other party or to assign any employees or subcontractors to perform similar services for any other party.

1.3.    <u>SERVICES WARRANTY</u>. ServiceNow represents and warrants that the Services will be performed in a professional and workmanlike manner in accordance with accepted industry standards and practices. The Services will comply with all material requirements set forth in the applicable Order Form and SOW, if any. If ServiceNow fails to comply with the foregoing warranty, ServiceNow shall use commercially reasonable efforts to re-perform the Services in full conformance with the warranty requirements set forth in this Section, and if ServiceNow is unable to do so then Customer may terminate the Services and receive a refund of any prepaid amounts for unperformed Services. THIS SECTION REPRESENTS SERVICENOW'S SOLE OBLIGATION AND CUSTOMER'S SOLE REMEDY WITH RESPECT TO THE WARRANTY SET FORTH IN THIS AGREEMENT. EXCEPT FOR THE FOREGOING EXPRESS LIMITED WARRANTY, THE SERVICES ARE PROVIDED AS-IS, WITH NO OTHER WARRANTY WHATSOEVER, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

1.4.    <u>TERM AND TERMINATION</u>.  The non-breaching party may terminate the applicable SOW by giving the breaching party thirty (30) days written notice of such breach, unless the breach is cured within the notice period. Any such termination may be limited to one or more SOWs (and, if the termination is for a party's breach with respect to a specific SOW, it must be so limited to the applicable SOW), in which case, the consequences of termination will be limited to the subject matter of that SOW. Furthermore, a breach of the obligations for Services shall not, by itself, constitute a material breach of the Agreement entitling either party to terminate the Agreement.

1.5.    <u>PRECEDENCE</u>. To the extent any terms and conditions contained in an SOW conflict with any terms and conditions of this Agreement, the terms and conditions of this Agreement shall control unless the SOW expresses an intent to control with respect to the Services provided under such SOW.

**servicenow**

Contract Number:   28913ST

MASTER ORDERING AGREEMENT

Page 9

# PRODUCT GUIDE

**1.    AUTHORIZED USE**

1.1.    USERS. Customer authorizes *"Users"* to access the Product, each with a unique username and password that may not be shared or transferred, and designates to some a named level of access or functionality defined by Customer (a *"Role"*). Users with a Role are *"Process Users"*. A Role is not required for Users to: (i) create a task; (ii) check on the status of a task the User created; (iii) shop a service catalog; or (iv) view knowledge articles, reports and other general published information. Customer shall limit its use of the Product to the use restriction type(s) as set forth on the Order Form. The ServiceNow Service Automation Platform Supplement on www.servicenow.com/schedules.do is hereby incorporated by reference and applies to Customer's use of the ServiceNow Platform (defined below).  Users and Process Users may include the Personnel of any the following entities  (a) Customer, (b) Customer's Affiliates, (c) each subsidiary and each business that is divested by Customer or its Affiliates but only for a period of five years following the divestiture, (d) each individual and each entity that (i) is licensed to do business using the Customer's or its Affiliates' name (e.g., Sears Hometown Stores and Customer franchisees), or (ii) does business with one of Customer's or its Affiliates' retail businesses (e.g., licensed businesses).  Personnel means  employees, partners, agents, advisers, independent contractors, subcontractors and outsourcers of Customer or its Affiliates; provided that the Personnel of  ServiceNow will not be deemed to be Personnel of Customer.

1.2.    SERVERS. Customer shall limit the number of Discovery Servers and RBA Servers managed through *ServiceNow Discovery* and *Runbook Automation* to the number ordered. A **"Discovery Server"** is a non-virtual machine configured as a server. An **"RBA Server"** is a physical or virtual machine configured as a server upon which a task is performed as a step in a process or procedure automated by *Runbook Automation*.

1.3.    CUSTOMER SAFEGUARDS. Customer shall be responsible for: (i) protecting User names and passwords and preventing and notifying ServiceNow of unauthorized use; (ii) using the column level encryption features of the Product to protect personally identifiable information, such as social security numbers, credit card and account information, and health information (iii) all Customer Data; and (iv) using the Product lawfully, in compliance with the Agreement. If Customer exceeds its permitted use of the Product, it will regain compliance within 30-days by: (i) disabling un-permitted use; (ii) purchasing additional Product subscriptions; or (iii) taking other steps reasonably requested by ServiceNow. ServiceNow may review Customer's use of the Product, and Customer shall provide other reasonable assistance, to verify Customer's compliance with the Agreement.

1.4.    SERVICENOW SERVICE AUTOMATION PLATFORM. Customer's order for ServiceNow Enterprise, or for individual ServiceNow Enterprise applications ("**ServiceNow Applications**"), is for use of the specified ServiceNow Applications designated on the Order Form or attachment thereto, and does not include Custom Applications except for the limited use of the ServiceNow Service Automation Platform as may be specified in ServiceNow Enterprise. "**Custom Application**" is an application created on the ServiceNow Service Automation Platform ("**ServiceNow Platform**") to address a business process or workflow outside the scope of the ServiceNow Applications. A customization or an extension of the ServiceNow Platform in support of the delivery of the ServiceNow Applications— such as definitions of roles, assets, locations, integrations, user interface policies, client scripts, and business rules that are necessary to implement a ServiceNow Application-defined process—does not constitute a Custom Application and is a use of the ServiceNow Platform that is included within Customer's authorized use of the ServiceNow Applications at no additional fee.

**2.    SUPPORT GUIDE**

2.1.    SUPPORT. During the Subscription Term, ServiceNow shall use reasonable efforts to resolve Defects in the Product (*"Support"*) for no additional charge for production instances of the current release of the Product and the two prior releases (*"Supported Versions"*) except for problems known to be resolved by upgrading. Support does not include: implementation services; configuration services; integration services; custom software development; support for Customer or third-party developed applications; support for Customer or third-party modifications to the Product; support for Custom Applications; training or "how-to"; assistance with administrative functions or other professional services; corrections of immaterial Defects or corrections that will degrade the Product. Prior to submission of any Support request, Customer is encouraged to consult the official Product specifications at https://wiki.service-now.com/ or any successor site (*"Documentation"*) to determine if the support issue has been addressed.

2.2.    REQUESTS. Customer may request Support for a problem causing the Product to not conform to the Documentation (*"Defect"*) at the online portal https://hi.service-now.com/ or any successor site. Customer assigns a priority level, and ServiceNow will respond to the Support request in the time frames below.

DocuSign Envelope ID: C263A30C-27CC-4146-AF54-48356AAFB12A
18-23538-shl    Doc 2090-1    Filed 01/28/19    Entered 01/28/19 16:01:57    Exhibit A
Pg 11 of 17

servicenow™
MASTER ORDERING AGREEMENT

Contract Number: 28913ST

Page 10

|  | Production Instance Response Time | Non-Production Instance Response Time |
|---|---|---|
| Availability Defect | P1<br>30 minutes per 24 x 7 x 365 | P2<br>2 hours per 24 x 7 x 365 |
| Critical Defect | P2<br>2 hours per 24 x 7 x 365 | P3<br>12 hours per 24 x 5, excluding holidays |
| Non-Critical Defect | P3<br>12 hours per 24 x 5, excluding holidays | P4<br>24 hours per 24x5, excluding holidays |
| Other | P4<br>N/A | P4<br>N/A |

The priority level will be assigned by these guidelines: **"P1"** is a production instance of the Product not Available; **"P2"** is a non-production instance not Available or a Defect in a critical function of a production instance; **"P3"** is a production instance Defect that is not a P1 or P2 request or a Defect in a critical function of a non-production instance; and **"P4"** is a Defect that is not a P1, P2 or P3 request.

2.3.    PLANNED DOWNTIME. ServiceNow may perform maintenance during which the Product will be unavailable for up to 2-hours per month (**"Planned Downtime"**). Whenever possible, ServiceNow will give at least 5-days' notice of Planned Downtime by email to Customer's email accounts registered in the support portal, and it will be scheduled as much as practical for Customer's non-core business hours. ServiceNow may not be able to accommodate requests to delay or reschedule Planned Downtime.

2.4.    UPGRADES. **"Upgrades"** are modifications to the Product for repairs or enhancements and are provided to Customer at no additional fee during the Subscription Term. ServiceNow determines how and when to develop and release any Upgrade. ServiceNow has the discretion to provide new functionality as an Upgrade or as different software or service for a separate fee.

2.5.    AVAILABILITY SERVICE LEVEL. If the production instances of the Product are not Available 99.8% of the time in a calendar month, and Customer is running on a Supported Version, Customer's sole remedy is to request either a service credit or an extension of the Subscription Term, in each case equal to the dollar value (at Customer's subscription rate) of the number of minutes the Product was not Available in excess of the foregoing percentage. Customer must request all service credits or extensions in writing to ServiceNow within 30 days of the end of such month, identifying the Support requests relating to the unavailability. The credit may be applied against the next Product invoice. The total amount of service credits or extensions for any month may not exceed the subscription fee for the affected Product for the month, and has no cash value. **"Available"** means that the Product can be accessed by Customer via a secure password protected site(s) hosted by ServiceNow on the world wide web except for: (i) Planned Downtime; and (ii) downtime caused by circumstances beyond ServiceNow's control, including without limitation, Customer modifications, Custom Applications, events of Force Majeure, general Internet outages, failure of Customer's infrastructure or connectivity, computer and telecommunications failures and delays not within ServiceNow's control, and network intrusions or denial-of-service attacks, provided ServiceNow has implemented commercially reasonable measures to mitigate or prevent such an attack or intrusion.

2.6.    CONFORMANCE WARRANTY. The Product will materially conform to the Documentation. ServiceNow's obligation for this warranty shall be to use reasonable efforts to modify the Product so that it conforms with the Documentation. For a persistent unresolved material breach of Customer's production instance(s), Customer may request that ServiceNow develop a remedial plan including timetable (**"Recovery Plan"**). Should ServiceNow fail to implement the agreed Recovery Plan, Customer shall have the right to terminate the Order From with respect to the affected Product, and receive a pro-rata refund of the prepaid Product subscription fees covering the reminder of the Subscription Term after the date of termination. Customer shall have submitted a request for technical support to make a warranty claim. This warranty set forth in this Agreement shall be Customer's sole remedy for any failure of the Product to conform to the Documentation.

2.7.    DISCLAIMER OF WARRANTIES. EXCEPT FOR THE WARRANTIES STATED IN THIS AGREMENT, SERVICENOW MAKES NO REPRESENTATION, EXPRESS, STATUTORY OR IMPLIED, AS TO THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, AVAILABILITY, PERFORMANCE OR ACCURACY OF THE PRODUCT OR ANY RELATED PRODUCT OR SERVICE. WITHOUT LIMITING THE FOREGOING, SERVICENOW MAKES NO WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number:  28913ST

Page 11

2.8.  <u>SOFTWARE</u>. ServiceNow may provide software products (***"Software"***) for use in connection with the Product.  Any Software is licensed and not sold, and ServiceNow grants Customer a limited, personal, non-sublicensable, non-transferable, non-exclusive license to use the Software only for Customer's internal use with the Product during the Subscription Term and only in accordance with the Documentation.

2.9.  <u>OWNERSHIP; GRANT OF RIGHTS</u>. As between ServiceNow and Customer, all rights, title, and interest in and to all intellectual property rights in the Product, Documentation and Software are owned exclusively by ServiceNow. Except as provided in this Agreement, ServiceNow does not grant Customer any rights, express or implied, or ownership in the Product, Documentation, Software or any intellectual property rights. ServiceNow shall have a royalty-free, worldwide, non-exclusive, transferable, sub-licensable, irrevocable, perpetual right to use or incorporate into the Product, Documentation, Software and Services any suggestions, enhancements, recommendations or other feedback provided by Customer and its users relating to the Product, Documentation, Software or Services.

2.10.  <u>RESTRICTIONS</u>. Customer shall not (or permit others to): (i) license, sub-license, sell, re-sell, rent, lease, transfer, distribute, or time share the Product, Documentation or Software or make it available in the manner of a service bureau; (ii) create derivative works based on the Product, Documentation or Software; (iii) disassemble, reverse engineer or decompile the Product or Software; (iv) access the Product, Documentation or Software in order to build a competing product or service; (v) use or send viruses or other harmful computer code; (vi) interfere with the integrity of the Product or its data; or (vii) use or distribute material protected by copyright or other intellectual property right (including the right of publicity and/or privacy) without first obtaining the permission of the owner.

2.11.  <u>CUSTOMER DATA</u>. Following the end of the Subscription Term, Customer shall have 45-days to request a copy of its data submitted by users to the Product (***"Customer Data"***) and, if requested, ServiceNow shall use commercially reasonable efforts to provide a copy of that data within 7 days in a mutually agreed upon, commercially standard format at no cost to Customer unless it is determined that the data output is not routine in which case the parties shall mutually agree on an SOW for Services. After such 45-day period, ServiceNow shall have no obligation to maintain or provide any Customer Data and shall thereafter, unless legally prohibited, retain the right to delete all Customer Data in its systems or otherwise in its possession or under its control.

2.12.  <u>FEDERAL GOVERNMENT.</u>  All ServiceNow software is commercial computer software and all services are commercial items.  "Commercial computer software" has the meaning set forth in Federal Acquisition Regulation ("FAR") 2.101 for civilian agency purchases and the Department of Defense ("DOD") FAR Supplement ("DFARS") 252.227-7014(a)(1) for defense agency purchases.  If the software is licensed or the services are acquired by or on behalf of a civilian agency, ServiceNow provides the commercial computer software and/or commercial computer software documentation and other technical data subject to the terms of this commercial Master Ordering Agreement as required in FAR 12.212 (Computer Software) and FAR 12.211 (Technical Data) and their successors.  If the software is licensed or the services are acquired by or on behalf of any agency within the DOD, ServiceNow provides the commercial computer software and/or commercial computer software documentation and other technical data subject to the terms of this commercial Master Ordering Agreement as specified in DFARS 227.7202-3 and its successors.  Only if this is a DOD prime contract, the Government acquires additional rights in technical data as set forth in DFARS 252.227-7015.  This U.S. Government Rights clause is in lieu of, and supersedes, any other FAR, DFARS, or other clause or provision that addresses Government rights in computer software or technical data.

2.13.  <u>ENGLISH</u>. All Support will be provided in the English language unless agreed otherwise. The parties confirm that they have requested that the Master Ordering Agreement and all related documents be drafted in English at the express wishes of the parties.

18-23538-shl    Doc 2090-1    Filed 01/28/19    Entered 01/28/19 16:01:57    Exhibit A
Pg 13 of 17

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number:   28913ST

Page 12

# Exhibit A

## Information Security Requirements

This Exhibit is made as of the Effective Date and pertains to and is made a part of the Master Ordering Agreement between ServiceNow and Customer, Contract Number 28913ST (the "Agreement"). At a minimum and as specified herein, ServiceNow ("ServiceNow" or "Vendor") shall provide the following security for all data and communication systems in support of the Agreement (this "Exhibit"). As used in this Exhibit, "SHMC" shall mean Customer.  All undefined capitalized terms herein shall have the meanings ascribed to such terms as set forth in the Agreement.

Vendor's security efforts will include, without limitation:

Logical Access Controls: Vendor agrees to employ effective logical  access control measures over all systems used to create, transmit, or process Customer Data ("SHMC Confidential Information"), including but not limited to:

- User authentication must use unique identifiers ("User ID's") consistent with individual accountability; shared User ID's do not provide the level of accountability required by SHMC;

- A complex password policy, including the prohibition of clear-text credentials must be enforced;

- User access rights/privileges to information resources containing SHMC Confidential Information must be granted on a need-to-know basis consistent with role-based authorization.

- User access to SHMC Confidential Information must be removed upon user separation or role transfer eliminating valid business need for continued access.

- Default passwords and security parameters must be changed in third-party products/applications used to support SHMC Confidential Information.

- Two-factor authentication such as token devices, smart cards, biometrics, or public keys shall be used to secure all remote administrative access to the data centers used to store SHMC Confidential Information.

Network Security Architecture: Vendor agrees to employ effective network security control measures over all systems used to create, transmit, or process SHMC Confidential Information including but not limited to:

- Firewalls shall be operational at all times and shall be installed at the network perimeter between Vendor's internal (private) and public (Internet) networks.

- Properly configured and monitored IDS (Intrusion Detection Systems) must be used on Vendor's network.

- Databases must be logically or physically separated from the web server, and the database may not reside on the same host as the web server, where applicable.

- The database and other information systems used for the purposes of processing SHMC Confidential Information must have only those services/processes and ports enabled to perform routine business. All other services/processes on the host must be disabled.

- All information systems, repositories, etc. used for SHMC by Vendor, or its business partners, must be physically located in a controlled data center environment used for the purpose of protecting information systems.

- Secure channels (e.g., SSL, SFTP, SSH, IPSEC, etc.) will either be utilized by ServiceNow as part of its provision of the Product or made available to SHMC to configure and implement.

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number:  28913ST

Page 13

Physical Access Controls: Vendor agrees to maintain servers, databases, and other hardware and/or software components that store information related to SHMC's business activities in an access controlled and consistently monitored Data Center secured by appropriate alarm systems, which will not be commingled with another unrelated party's hardware, software or information.

Risk Assessment: At no additional cost, Vendor agrees to provide responses to a risk assessment questionnaire (if provided by SHMC), but no more than once annually except in the event of a data breach involving SHMC Confidential Information, and participate in application scans in accordance with the process set forth below.

•   Vendor agrees to perform regular security vulnerability assessments and shall provide SHMC with results of a current security assessment by an accredited third-party (e.g., penetration test results of internet-facing devices, SAS 70-Type II reports, ISO 27001 certification, etc.) as well as action plans describing how Vendor will address all identified security vulnerabilities affecting systems used to store, process or otherwise access SHMC Confidential Information.

•   SHMC may request to perform, at its own expense, an application penetration test of the Product, which shall be no more than once per year except in the event of a data breach involving SHMC Confidential Information.  SHMC must notify Vendor in advance of any tests by submitting a request using Vendor's online support portal and completing a penetration testing agreement with Vendor.  Vendor and SHMC will agree upon a mutually acceptable time for the test, which shall typically be within thirty (30) days of such request.  The test is to be of reasonable duration, conducted during reasonable times and shall not unreasonably interfere with Vendor's day-to-day operations.

Security Policy:  Vendor agrees to maintain and enforce security policies consistent with industry standard practices, and all applicable regulatory and legal security and privacy requirements, including but not limited to Massachusetts 201 CMR 17.00 et. seq. "Standards for the Protection of Personal Information of Residents of the Commonwealth".  Upon request, Vendor shall provide copy of current security policy and standards.

Protection of SHMC Confidential Information:  In addition to what may be described in the Agreement to which this Exhibit is attached, Vendor agrees to protect SHMC Confidential Information as it would its own.  For purposes of clarity, SHMC Confidential Information may include, but is not limited to, the following:

- Credit Card numbers
- Credit Card Validation Codes
- Personal Identification (PIN) numbers
- Loyalty Card Numbers with or without any associated PIN or Access Code
- Checking Account number (alone or in combination with checking account routing information)
- Bank Account number (alone or in combination with routing information)
- Driver's License Number or State-issued Identification Card Number
- Customer or Employee Names, in whole or in part
- Customer or Employee Postal Address
- Customer or Employee email address
- Date of Birth
- Social Security Numbers
- Health Insurance Card or Policy Identification Number
- Medical or Health Information

Sears MOA - FINAL(v.16clean 1-28-2014)_Final

**servicenow**

MASTER ORDERING AGREEMENT

Contract Number: 28913ST

Page 14

- Personal Telephone Number (when used with a customer/employee name or address)

Additionally, Vendor agrees to adhere to the following controls surrounding the use and protection of SHMC Confidential Information:

- Vendor shall provide column level encryption functionality to enable SHMC to encrypt SHMC Confidential Information with 256-bit encryption.

- Clear text (ftp, telnet, etc.) protocols may not be used to access or transfer SHMC Confidential information. SHMC Confidential Information must be encrypted when transmitted on wireless networks or across public networks. Vendor shall not store SHMC Confidential Information on portable media, which by way of example shall include USB Sticks, Portable hard drives, Laptops, and DVD/CDs.

- SHMC Confidential Information may not be copied, sold or used for solicitation purposes by the Vendor or its business partners. SHMC Confidential Information may only be used in conjunction with and within the scope of the Agreement to which this Exhibit is attached.

- SHMC Confidential Information (data) must be segregated (physically and/or logically if in a database or virtual (VM) environment) from other Vendor customers. If data is not physically segregated from other customers, systems, or applications unrelated to SHMC, vendor must provide appropriate data security controls over data at rest, including access controls and encryption.

- Vendor must disclose where SHMC data will be stored and processed. Storage and Processing of SHMC Confidential Information shall take place within the United States.

- Ensure secure processes and procedures (e.g., degaussing, anti-static bags, etc.) for handling or removal of physical media or equipment that may contain SHMC Confidential Information.

System Monitoring: Vendor agrees to regularly audit and monitor information systems processing SHMC's business activities to ensure the protection of SHMC's information. Monitoring includes, but is not limited to, potential breaches or hacking activity and access to devices. Vendor must have defined processes for security alerting, escalation and remediation that are consistent with the Services procured pursuant to the Agreement. Vendor must ensure that event logs with SHMC data are not provided to other subscribers. Vendor shall not use virtual machines.

Vulnerability Management Controls: Vendor agrees to employ effective vulnerability management control measures over all of its systems used to create, transmit, or process SHMC Confidential Information, including; but, not limited to:

- Third-party vulnerability scans or audits of any external-facing (public) infrastructure devices.

- Annual third-party assessment of applications or processes supporting SHMC Confidential Information.

- Deploy and maintain currency of up-to-date commercially available anti-virus, anti-spam, anti-malware software on all information system components including personal computers, laptops, and interconnecting networks, where applicable, used for the purpose of managing SHMC Confidential Information. Additionally, provide for regular scanning for viral infections and update virus signature files frequently.

- Maintain a standard patch management process and practice designed to ensure the protection of any devices used to access, process or store SHMC Confidential Information. Vendor agrees to provide SHMC with their patch management policies and procedures upon request.

- Regularly auditing and monitoring to ensure the protection of the devices used to access, process, or store SHMC Confidential Information.

- Any security breach that involves SHMC Confidential Information must be reported to SHMC in accordance with the Notice provision of the Agreement without unreasonable delay. Vendor shall immediately perform a root cause analysis as well as provide detailed information about measures taken by the Vendor to prevent future breaches. All efforts to rectify or resolve the situation must include subsequent and regular notification for the

DocuSign Envelope ID: C263A20C-27CC-4146-AF54-48356AAFB12A
18-23538-shl    Doc 2090-1    Filed 01/28/19    Entered 01/28/19 16:01:57    Exhibit A
Pg 16 of 17

![servicenow logo]
MASTER ORDERING AGREEMENT

Contract Number:  28913ST

Page 15

reported incident.

•    Within 24 hours of suspected fraudulent or malicious activity occurring on the Vendor site, Vendor will notify the SHMC by phone to inform the SHMC team about the activity.  Any request by the SHMC team for such information will be provided to SHC within two hours.

•    Vendor agrees to use all reasonable efforts to provide full cooperation with SHMC and in the event of a data breach involving SHMC Confidential Information including, but not limited to:  server log information showing network and application traffic, provided that, such logs may be redacted as necessary to protect the confidentiality of ServiceNow's sensitive, confidential and / or proprietary information.

•    SHMC must be immediately notified of any known attacks occurring against Vendor systems used to store or process SHMC Confidential Information.  Vulnerabilities discovered by the SHMC's or Vendor's Security Scanning tools must be promptly addressed, and ServiceNow shall use all commercially reasonable efforts to promptly make any necessary changes to secure the Product..

Data Recovery and Availability.   Vendor must provide detailed disaster recovery and business continuity plans that support the pre-defined recovery time objective (RTO) of two (2) hours / recovery point objective (RPO) of one (1) hour.

•    Vendor must utilize industry standard practices for data, services, and communications recoverability. Data and applications must be replicated across multiple independent sites and alternate communication channels must be available.

•    Vendor is expected to validate and verify their existing capabilities through realistic scenario testing.  Vendor must agree to participate in periodic recovery testing with SHMC. Proof of successful testing of the Vendor plan must be provided to SHMC upon request.

•    Vendor must provide company name, address, and contact information on all third-party relationships as well as services provided by each wherever those services create, transmit or process SHMC Confidential Information.

Data Destruction. Vendor shall ensure that residual magnetic, optical, or electrical representation of SHMC Confidential Information that has been deleted may not be retrieved or reconstructed when storage media is transferred, become obsolete or is no longer usable or required by SHMC.

•    Vendor data retention and destruction must align with SHMC requirements and policies as well as comply with applicable laws or regulations.

•    SHMC information stored on vendor media (e.g., hard drive) must be rendered unreadable or unattainable using the NIST Guidelines for Media Sanitization (Special Pub 800-88), prior to the media being recycled, disposed of, or moved off-site.

Application Vendor.  Vendor agrees to adhere to the following controls surrounding application development for applications developed and hosted off-site as well as off-site application development for on-site deployment:

1.    Vendor must provide supporting documentation that commonly accepted web application security guidelines and frameworks are used for developing Internet-facing applications (e.g. Open Web Application Security Project [OWASP], SANS).

2.    Vendor must provide a data flow diagram that includes the entry points (the main pages and the i-framed pages as may be applicable), a description of the data flowing from each node in the system (e.g., username, password, address, captcha, etc.), a listing of all attributes stored, processed, or transmitted, and how the data is securely stored. The diagram must also demonstrate all security controls in place. Provided, that the foregoing is applicable to Vendor's out of box functionality and SHMC will be responsible for diagramming its own data flow.

3.    Vendor must demonstrate how Internet-facing applications are tested for security vulnerabilities and remediated prior to the source code being promoted to production.

4.    If Vendor has performed prior security testing, the results of such test(s) must be made available to



| | Contract Number: __28913ST__ |
|---|---|
| MASTER ORDERING AGREEMENT | Page 16 |

SHMC for evaluation prior to launch else allow penetration testing and/or application source code review to be performed by SHMC, when requested in accordance with this Exhibit.

5.     Vendor must provide supporting documentation describing how fraud is detected and prevented when requested by SHMC.