**EXHIBIT "A"**

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

## MASTER PRINT AGREEMENT

This Agreement ("Agreement") is effective as of August 1, 2013 ("Effective Time") by and between Sears Holdings Publishing Company, LLC, an Illinois corporation having an office at 3333 Beverly Road, Hoffman Estates, IL 60179 on behalf of itself and for the benefit of its Affiliates ("Customer") and The Core Organization ("Supplier"), a Illinois corporation having an office at 321 W Lake St, Suite F Elmhurst, IL 60126. For purposes of this Agreement "**Affiliate(s)**" means any individual, entity (e.g., corporation, L.L.C., etc.) that, at the applicable time, directly or indirectly controls, is controlled with or by or is under common control with, a party.

## RECITALS

The parties are entering into this Agreement for the production of Customer's printed materials by Supplier. This Agreement supersedes and replaces any and all previous agreements between the parties. The parties mutually agree as follows:

### 1. GENERAL TERMS

Supplier agrees to sell to Customer and Customer agrees to purchase the plate making, ink, printing, binding, distribution and loading required by Customer for the production of Customer's printed materials as the parties may agree from time to time ("Services") in statements of work in the form attached as Exhibit A or other form acceptable to Customer (the "SOW") on a nonexclusive basis, pursuant to the terms and conditions of this Agreement. All SOWs are incorporated by this reference into this Agreement.

### 2. TERM

The term of this Agreement will commence on the date first above written and expire on July 31, 2016 (the "Term"). The Term will continue to apply after the expiration date, but only to the extent necessary to cover the completion of any SOW accepted before the expiration date.

### 3. PRICES

3.1.    Pricing and product specifications for the Services are set forth in the SOW(s). All additional charges need to be approved by Customer prior to billing.

3.2.    Pricing for the Services provided pursuant to this Agreement will be made in accordance with the quotation and bidding policies and procedures of Customer. Specific pricing for each item of each SOW will be made in accordance with Supplier's bid response or written price quotation. All bid responses or written price quotations will be deemed incorporated into all SOWs.

### 4. INVOICING, PAYMENT AND REMITTANCE

Supplier will invoice Customer, in accordance with Customer's standard invoicing instructions as specified in each SOW, upon shipment to Customer. Customer

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

will initiate payment on Supplier's properly submitted invoices 60 days after receipt of invoice. Customer has no obligation to pay any fees or expenses invoiced more than six (6) months after those fees or expenses have accrued. Customer is not required to pay any disputed charge until after the resolution of that dispute. All fees and expenses are payable in U.S. Dollars. Supplier agrees to establish, implement and maintain Electronic Funds Transfer ("EFT"), or ePayables (credit card settlement), in accordance with Customer's policies and requirements as communicated to Supplier, as the only means to receive payments from Customer during the term of this agreement.

## 5.  **PRELIMINARY OPERATIONS**

5.1    For each page, Customer will furnish to Supplier a complete digital file and will use reasonable efforts to comply with Supplier's specifications. Customer will provide file codes that identify each folio.

5.2    Along with the digital file, Customer will supply a hard copy proof as a verification of file contents as well as an authorized color proof (final form) of sufficient quality to serve as press guidance, each such proof will be created by Customer from the supplied digital files. No editing of images will be performed by Supplier.

5.3    If Customer does not supply proofs, Supplier assumes no accountability for any missing or incomplete data, but will generate proofs from Customer's files to serve as Okays for Supplier's pressroom. If Supplier is unable to output Customer's files due to incorrect format, damaged disk or other reason solely attributable to Customer's files, Customer will resubmit the files.

## 6.  **OWNERSHIP OF PRODUCTION ITEMS.**

Copy, electronic data files, and any film furnished by Customer will be used solely for Customer's work and will remain Customer's property. Film, electronic data files, prints, and reproduction mediums made by Supplier will be used solely for Customer's work but will remain Supplier's property.

## 7.  **CUSTOMER FURNISHED PAPER**

7.1    If Customer furnishes paper it will: (i) be in the weights, kinds and sizes set forth in this Agreement; or (ii) as the parties otherwise mutually agree upon in accordance with a mutually agreeable delivery schedule. Notwithstanding anything to the contrary in this Agreement, Customer's delivery of the paper will be in sufficient time to meet the event schedule. Supplier will be responsible for providing accurate paper requirements for each job. All paper furnished by Customer will be of good quality and will conform to a standard of mechanical quality suitable for efficient performance of the work for which it is intended. There will be no additional charge for unloading and handling that paper.

7.2    Paper received by Supplier in damaged condition, visible or concealed, will be rejected in part or in total at Supplier's discretion, and Customer will be promptly notified of that rejection. At no additional charge to Customer, Supplier will notify the applicable carrier and submit the necessary report of damage. Supplier will also send a

copy of the report of damage to Customer. Supplier will then send the report of damage, a copy of the manifest, a copy of the bill of lading, a copy of the carrier's exception report, and pictures of the damaged paper, if available, to the applicable mill, paper merchant or broker. It will be the responsibility of the mill, merchant or broker to prosecute the claim. Paper not conforming to specifications as set forth above will be classified as defective paper. Supplier will immediately notify both the affected mill and Customer of the presence of defective paper. Disposition of such damaged or defective paper will be made at the earliest practicable time. Should Supplier be instructed to scrap the damaged or defective paper, Supplier will do so and issue appropriate credit to Customer of salvage value.

## 8.  CUSTOMER FURNISHED PAPER ACCOUNTING

8.1     Supplier will make an accounting of all paper furnished by Customer under this Agreement within 48 hours of the completion of each event. Such accounting will show the paper received, paper consumed and paper requirements based on agreed allowances (specified in separate pricing documents), as adjusted for light and/or heavy paper and damaged (claimed or concealed) or other defective paper.

8.2     The financial reconciliation for overconsumption and underconsumption of paper will be as specified in the applicable SOW. Any damaged or other unusable paper will remain the property of Customer. All manufacturing waste or other waste will become Supplier's property. Any paper not used by the Supplier in the production of the work will remain the property of Customer.

## 9.  STORAGE

9.1     Supplier will store final reproduction medium (film or electronic data file) made by Supplier and used in the production of Customer's work for a period of thirty (30) days after last use, after which film will be destroyed and data files erased unless otherwise agreed to.

9.2     All furnished material, other than paper stock, will be stored without charge for a period of thirty (30) days after last use but in no event will such free storage be for longer than sixty (60) days after receipt of such materials by supplier and at Customer's instruction will be disposed of without charge to Customer or returned immediately after completion of production of the event for which such material was used. at Customer's expense. Customer will pay Supplier's prevailing rate for any additional storage.

9.3     Supplier will provide storage space without additional charge for blank paper stock delivered by Customer for the work under this Agreement as specified in each applicable SOW.

9.4     Unless otherwise specified, the prices within a SOW under this Agreement contain no storage of furnished inserts, work in process or finished goods beyond the event schedule span. If Customer delays completion of the work or postpones delivery of finished goods thirty (30) beyond the date specified in the event schedule, storage will be charged at the prevailing rates for each month up to twelve months the finished goods,

work in process or furnished materials remain in Supplier's possession. If, following the second month of storage Supplier receives no direction from Customer as to the disposition of the stored items, such items will be destroyed. The foregoing notwithstanding, Supplier must provide to Customer written notice of its intent to destroy the material thirty (30) days prior to disposal.

## 10. MATERIALS AND PURCHASED SERVICES

Unless otherwise provided, Supplier will supply the materials (ink, binding materials, etc.) or purchased services specified herein or their equivalents. The parties agree that should Supplier be unable to obtain such materials or services or their equivalents in necessary quantities, the parties will select mutually agreeable substitute materials or services.

## 11. FREIGHT CHARGES; MODE OF TRANSPORT

11.1    Unless specified otherwise by Customer, all freight routings and billing procedures will be made in accordance with the current Customer shipping instructions.

11.2    If Supplier is unable to deliver any portion of the Services on the date and in the amount specified in the SOW(s), and if it is determined that such inability is the fault of Supplier, Supplier will bear all freight charges in excess of normal freight charges, that may be incurred in the delivery of such remaining portion of the applicable Services.

## 12. TITLE AND RISK OF LOSS

Title to all Services and risk of loss will pass to Customer upon delivery of the Services by Supplier to Customer's carrier, excluding, however, such instances where Supplier ships the Services via Supplier's own vehicle, in which case title to the Services and risk of loss will pass to Customer upon properly receipted delivery.

## 13. PACKAGING AND LABELING

All Services shipped to Customer's facilities will be packaged in such a manner as to preclude all reasonably anticipated in-transit damage. Supplier acknowledges that Customer has issued instructions regarding proper labeling of shipments and Supplier further agrees to comply with such instructions. Supplier will pack the final product on non-returnable skids for delivery, f.o.b. Supplier's plant of manufacture.

## 14. MAILED PRODUCTS

Supplier will ensure that all Supplier products produced for mailing through or with the United States Postal Service (the "USPS") will comply with and be in conformity with all USPS rules and regulations, including without limitation, the USPS Direct Mail Manual, so as to ensure that Customer will receive the appropriate and intended discounted postage rates. In the event that Supplier determines that any Customer supplied designs or materials may not be in conformity with the above, Supplier will promptly provide Customer written notification of the nonconformity.

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

### 15. TIME OF THE ESSENCE

Supplier acknowledges that the Services herein sold are vital to a timely and proper coordination of Customer's business activities and that any failure by Supplier to produce or ship the Services on a timely basis will cause serious problems and additional expense to Customer. Accordingly, the time periods specified in all SOW(s) will be of the essence.

### 16. CHANGES.

Customer may at any time issue written changes ("Change Orders"), which specify additions, deletions, or changes to the SOW. With respect to additional quantities of any item required, Customer may issue Change Orders, and Supplier agrees to produce such additional Services at prices agreed upon at the time of the addition. With respect to all changes, Supplier will be deemed to have accepted Customer's proposed changes without additional cost and without extension of Supplier's time for performance unless Supplier, within ten (10) business days following receipt of Customer's Change Order, notifies Customer in writing of the change in cost and time for performance.

### 17. FORCE MAJEURE.

Either party will be excused for any failure or delay in performance hereunder arising from acts of God, acts of the public enemy, acts of a sovereign nation or any state or political subdivision of any department or regulatory agency or entity created thereby, acts of any person engaged in subversive activity or sabotage, terrorism, fires, floods, explosions or other catastrophes, epidemics or quarantine restrictions, third party strikes, third party slowdowns, third party lockouts or third party labor stoppage or freight embargoes ("force majeure"), provided that the party so unable to perform will give prompt notice. Customer will accept and pay for all copies that have been printed for it before notice of force majeure. Where despite force majeure limited production by Supplier is possible, Supplier will apportion its materials and resources to produce for Customer that quantity of Services ordered by Customer which bears the same relationship to Supplier's total scheduled production. During the continuance of force majeure, upon Customer notifying Supplier in writing, Customer may purchase or commit itself to purchase from sources other than Supplier that quantity of Services ordered but not yet manufactured by Supplier as of the date Customer so notifies Supplier, in which event the total quantity of Services which Customer may be committed to purchase under this Agreement will be reduced by the amount of purchases from other sources. Where Customer is unable to accept delivery as a result of force majeure, Supplier will reschedule shipment.

### 18. CUSTOMER'S RIGHT TO REJECT.

Without prejudice to Customer's additional remedies arising by operation of law or as elsewhere provided in this Agreement, Customer may reject or revoke any prior acceptance of any delivery of Services which are deemed by Customer to be nonconforming to Supplier's representations and warranties set forth herein. Customer will advise Supplier of any such nonconforming Services and Supplier will be afforded

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

the opportunity to correct any such nonconforming condition; provided, however, that Supplier will promptly remedy any such breach. If Supplier fails to correct the nonconforming condition on a timely basis, Customer may correct the nonconforming Services and Supplier will bear all costs for same.

## 19. REPRESENTATIONS AND WARRANTIES.

19.1     Supplier represents and warrants to Customer that it will perform the Services in accordance with the specifications and production schedule and that each item supplied pursuant to this Agreement will (a) meet the specifications contained in the applicable SOW, (b) meet generally accepted quality standards of the commercial printing industry, and (c) nothing in the manufacturing process will infringe or encroach upon any third party's personal, contractual or proprietary rights, including, without limitation, patents, trademarks, trade names, copyrights, rights of privacy, rights of publicity or trade secrets. If Supplier arranges to have the Services produced in whole or in part by a third party, Supplier will do so pursuant Section 37. Supplier's representations and warranties contained in this Agreement will survive the delivery of the items sold hereunder to Customer. If the work is defective or delayed due to Supplier's fault (except for negligence), Supplier will not be liable for special or consequential damages, including, but not limited to, lost profits or business; provided, however, Supplier will be liable to Customer for all Customer's direct out-of-pocket expenses incurred in securing substitute printing and paper in order to correct Supplier's fault if Supplier has failed to correct such fault after being given a reasonable opportunity by Customer to correct such fault.

19.2     In furnishing the Supplier matter to reproduce or to have incorporated in the completed product, Customer represents and warrants that none of such matter infringes any copyright (either furnished to the Supplier by Customer or as altered by the Supplier at Customer's direction), is libelous, or otherwise violates the rights of or will cause damage or injury to other persons.

## 20. APPLICABLE LAW.

THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW THEREOF. THE PARTIES HEREBY SUBMIT TO EXCLUSIVE JURISDICTION AND VENUE IN THE UNITED STATES DISTRICT COURT IN CHICAGO, ILLINOIS, OR THE ILLINOIS COURTS OF COOK COUNTY, ILLINOIS.

## 21. INDEMNIFICATION.

21.1     Each party will indemnify and hold harmless the other party, its subsidiaries and affiliate companies, their respective directors, officers, employees, and agents (individually and collectively referred to as an "Indemnified Party"), from and against any and all claims, actions, proceedings, losses, profits, judgments, penalties, fines, damages, costs, and expenses, including, but not limited, to reasonable counsel fees, disbursements, court costs, and costs of settlement (individually and collectively referred to as a "Claim"), which will arise out of or result from (i) any breach of this

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

Agreement, (ii) negligence in performing the Services or (iii) breach of any representation or warranty of such party pursuant to this Agreement.

21.2    Customer will indemnify and hold Supplier harmless from and against any and all Claims for libel, copyright infringement, plagiarism, unauthorized additions, omissions, or modifications, and any other claims that any rights have been infringed by the content of the Services; provided that such Claims are based upon matters which were contained in the copy furnished to Supplier by Customer and are not based on any unauthorized deletions, modifications or additions to such copy by Supplier. Supplier similarly will indemnify and hold Customer harmless from and against any and all Claims for libel, copyright infringement, plagiarism, unauthorized additions, omissions, or modifications and any other Claims that any rights have been infringed by the content of the Services; which arise because of the failure of Supplier or any of its employees to accurately reproduce the copy, artwork or illustrations furnished by Customer.

21.3    If any Claim is brought against an Indemnified Party, the party against whom such Claim is brought, on behalf of itself or on behalf of its Indemnified Party, will promptly notify the other party and at the Indemnified Party's option, the other party will resist and defend such Claim by reputable counsel retained at the other party's expense and will obtain the Indemnified Party's prior approval of any counsel employed to defend such Claim, which approval will not be unreasonably withheld. If the Indemnified Party does not approve counsel to be employed by the other party, the Indemnified Party will have the right to retain its own counsel, and the expense of such counsel will be paid by the other party. The Indemnified Party will have the right to participate fully in all proceedings, including, without limitation, settlement discussions, and the Indemnified Party will be provided copies of notices, orders, and all other papers; the Indemnified Party will be given prior notice by the other party of all meetings, hearings, and other discussions involving such Claim. The other party will consult with and keep the Indemnified Party fully advised of the progress of any such Claim, will make no admissions or otherwise act in a manner which might be prejudicial to the Indemnified Party's rights in connection with any such Claim, and will have no right to settle or discuss settlement of any such Claim, without the prior written approval of the Indemnified Party. The Indemnified Party may undertake its own respective defense, without affecting in any manner its rights to indemnity under this Agreement; provided, however, that the Indemnified Party agrees to cooperate with the indemnifying party in the defense of such Claim and agree not to make admissions or otherwise act in a manner prejudicial to the indemnifying party.

## 22. INSURANCE

Supplier will, at its own expense, obtain and maintain the following insurance:

**Commercial General Liability**, with coverage including, but not limited to, premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of at least $5,000,000 per occurrence for bodily injury and property damage combined and $5,000,000 in the aggregate. SHPC will be named as an additional insured, with the standard "separation of Insured's provision or an endorsement for cross-liability coverage. The policy will be endorsed to state that coverage is primary, and non-contributory with other available coverage. Limits of

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

liability requirements may be satisfied by a combination of Commercial General Liability and Umbrella Excess Liability policies.

**Workers' Compensation** insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Supplier, for all states in which the Supplier will perform services for SHPC, and Employer's Liability insurance with limits of liability of at least $100,000 per accident or disease and $500,000 aggregate by disease. Supplier warrants that its subcontractors will maintain Workers' Compensation and Employer's Liability insurance, and Supplier will indemnify SHPC for any loss, cost, liability, expense and/or damage suffered by SHPC as a result of failure of its subcontractors to maintain such insurance. Supplier may self-insure Workers' Compensation only in states where the governing state bureau has issued to the Supplier a qualified self-insurance license for Workers' Compensation.

**Property Coverage** , "All Risk" Property Insurance upon all buildings, building improvements, furniture, fixtures and merchandise on the premises, including those perils generally covered on a "Causes of Loss - Special Form," including fire, extended coverage, windstorm, vandalism, malicious mischief, sprinkler leakage, water damage, accidental collapse, flood, and earthquake, in an amount equal to at least 90% of the full replacement cost.

**Printers Professional Liability** insurance covering injury or damage arising out of the rendering of or failure to render professional services, with limits of at least $3,000,000 per Claim

Insurance will be purchased from companies having a rating of A- VII or better in the current *Best's Insurance Reports* published by A.M. Best Company. Insurance policies will not be cancelled or materially changed without at least thirty (30) days prior written notice to Customer. Evidence of insurance will be submitted in advance of or concurrent with the execution of this Agreement, on each insurance policy renewal thereafter, and annually for two (2) years after this Agreement ends.

## 23. <u>TERMINATION.</u>

23.1    Convenience.  Customer has the right to terminate this Agreement or any Statement of Work, in whole or in part, without cause or penalty by providing 30 days written notice to Supplier.  Termination of this Agreement for convenience will result in the immediate termination for convenience of all SOW's.

23.2    Default.  If Supplier is in default of any of its material obligations pursuant to this Agreement, and that default by Supplier remains un-remedied for 30 calendar days after receipt of notice by Customer of that default, Customer may immediately terminate this Agreement. Upon termination of this Agreement for whatever cause, Supplier will render to Customer invoices regarding all unpaid sums for any of the Services performed or in process as of the date of termination.

23.3    Bankruptcy.  Customer may terminate this Agreement immediately upon written notice of Supplier making an assignment for the benefit of creditors, files a voluntary petition for bankruptcy or reorganization, is adjudicated bankrupt or insolvent or applies for or consents to the appointment of a receiver for it or its property.

23.4    **Transition Upon Termination**.

(a)    Supplier acknowledges the longstanding relationship of the parties, the economic value of this Agreement over its term, the scope and breadth of Services provided hereunder, and the complexity of implementing a large scale transition by Customer to a replacement Supplier for Services upon termination of this Agreement.  Furthermore Supplier recognizes that Customer's orderly conduct of ongoing operations depends on timely invoice payment and other functions covered by this Agreement.  In the event of termination of this Agreement for any reason, whether by Customer or by Supplier, or upon expiration of its term, Supplier shall cooperate with, and use its best commercial efforts to effect a smooth transition to, any replacement Supplier chosen by Customer so as to prevent interruption to Customer's operations. Supplier's obligations to provide such transition assistance shall include, but not be limited to, coordinating of invoice payment and information transfer to a new provider.  It is understood and agreed to by the parties that Supplier shall bear all costs related to the final information transfer in connection with any termination of this Agreement, and that Supplier will not charge Customer any additional fees for such.

(b)    **Transition**.  During the Term of this Agreement or any SOW and upon expiration or termination of this Agreement or any SOW by either party for any reason, Supplier will provide Customer, or its designated Personnel, as the case may be, all reasonable transition Services ("**Transition Services**") requested by Customer, for up to twelve (12) months after such termination (the "**Transition Period**"), relating to the transition from the Services to another system or provider, including all other Services necessary for an orderly conversion of the Services.  Such services may include month to month extensions of existing SOWs.  For Services which Customer was receiving from Supplier prior to such expiration/termination, the fees applicable to such Transition Service will be the rates which Customer was paying prior to such expiration/termination.  For all other Transition Services, Supplier will not charge Customer fees in excess of the Supplier's then standard rates (taking into account the average discount Supplier provides to its similarly sized customers).  Customer's payment of any such Transition Services fees will not be a waiver of Customer's right to claim such amount as damages, in the event Supplier has breached this Agreement or the applicable SOW.  Notwithstanding anything to the contrary in this Agreement, termination of this Agreement will not terminate any licenses granted under this Agreement until expiration of the Transition Period.

## 24. **CANCELLATION**.

Customer may, at its sole discretion and at no cost to Customer, cancel any specific SOW(s) provided, however, such SOW(s) are canceled prior to the completion date or the date on which the Services become proprietary to and identified with

Customer.  In the event a SOW is so cancelled by Customer (except pursuant to the provisions of the Termination Section), the rights or obligations of the parties which have accrued hereunder or under any individual SOW issued hereunder will not be affected by such cancellation.

### 25. SEVERABILITY AND VALIDITY.

The various provisions of this Agreement are severable and any determination of invalidity or unenforceability of any one provision hereof will have no bearing on the continuing force and effect of the remaining valid provisions hereof.

### 26. OFFSETS.

Customer may at any time offset against amounts payable to Supplier hereunder any present indebtedness of Supplier to Customer arising from this Agreement or any other contract or event.  Customer will advise Supplier in writing of the offset and will specify in reasonable detail the reason(s) for such offset.

### 27. ASSIGNMENT.

This Agreement will not be assigned by either party without the prior written consent of the other.

### 28. RIGHT TO AUDIT.

Supplier agrees to maintain accurate and complete business records, books, and account information relating to the Services purchased by Customer under this Agreement, including records relating to shipping, billing and payments, and to retain the same for a period of at least two (2) years from the date of the last invoice for such Services.  All such records, books and information, and any inventory supplied exclusively for Customer may be audited or inspected by Customer representative(s) upon reasonable notice at all reasonable times.  Customer may use audit software to access any such information maintained by Supplier in electronic form.  Notwithstanding the foregoing, Customer will not be allowed to review Supplier's profit information relating to Supplier's provision of the Services pursuant to this Agreement or information pertaining to other customers of Supplier.  In the event that an audit of Supplier's records indicates that Supplier has overcharged SHPC, SHPC will furnish the audit report to Supplier together with any supporting materials not in Supplier's custody or control. If Supplier agrees with the findings of the audit (such agreement not to be unreasonably withheld), it will immediately refund such overcharge (the "Overcharge") to SHPC.  If the Overcharge is greater than two percent (2%) of the total charges to SHPC during the period under review, then SHPC's external audit expenses related to identifying such Overcharge will be reimbursed to SHPC by Supplier.

### 29. SUBSIDIARY AND AFFILIATE AVAILABILITY.

Supplier and Customer agree that for the term of this Agreement any subsidiary and/or affiliate company of Customer will have the right to purchase Services from Supplier under the terms and conditions contained herein and at prices no less favorable

than those set forth in active SOW(s). For purposes of this Agreement "**Affiliate(s)**" means any individual, entity (e.g., corporation, L.L.C., etc.) that, at the applicable time, directly or indirectly controls, is controlled with or by or is under common control with, a party.

## 30. REPORTS.

Supplier agrees to submit to Customer when, as and if necessary, any reports deemed by Customer to be necessary to the proper administration of this Agreement; such reports to be submitted on forms supplied by Customer or in a format stipulated or approved by Customer.

## 31. CONFIDENTIALITY AND PROPRIETARY INFORMATION.

31.1    Supplier will not, without Customer's permission, in any manner advertise or publish the fact that the Supplier has contracted to furnish to Customer the Services. This Agreement is confidential and, except to the extent required by performance hereof, or as required by law, Supplier will not disclose to any third party the details hereof. In connection with their respective performance hereunder, either party may be furnished with or otherwise learn of information concerning the other that is non-public, confidential or proprietary in nature All such information will be treated in a confidential manner; neither party, its employees or its agents will, without the other's prior written consent or as required by law, disclose or allow access to any third party to such confidential information or make use of it except for purposes hereof. This obligation will not apply to information which (1) was known to the other before the disclosure hereunder; (2) is acquired from a third party who is not in default of any obligation to protect from disclosure such information; (3) becomes available to the public generally; or (4) appears in a printed publication not in violation of this Agreement.

31.2    All proprietary information and property (including, without limitation, all films, disks, transparencies, mechanicals, negatives, plates or other property and all other electronic media) furnished to Supplier by Customer, or other property specifically paid for by Customer, will be Customer's property and will be used only in meeting Customer's requirements. Supplier will be liable for all loss or damage to, or destruction of, such proprietary information or property.

## 32. CORRELATION AND INTENT OF DOCUMENTS.

In the event of conflict or inconsistency in Customer's specifications and drawings or color laser printouts, Supplier will promptly submit the matter to Customer for determination; such notification by Supplier being a condition precedent to any claim by Supplier for reimbursement for costs incurred by Supplier in the production of Services deemed by Customer to be nonconforming to Customer's material and design specifications or Supplier's warranties set forth in the Agreement.

33. **Codes of Vendor Conduct**. Supplier agrees to comply with the Sears Holdings Corporation *Code of Vendor Conduct* (revised June 29, 2010), attached hereto as Exhibit B ("Code of Conduct") which may be updated from time to time and can be                    found                    at

http://www.searsholdings.com/govern/SHCCodeofVendorConduct.pdf.    As
referenced in the Code of Conduct, the Sears Holdings Corporation *Code of
Conduct* is set forth at www.searsholdings.com/govern/code.htm, the Sears
Holdings Corporation *Vendor Allowance Policy* is set forth at
www.searsholdings.com/govern/shcvendorallowance.doc, and the Sears Holdings
Corporation *Global Compliance Program for Merchandise Vendors* is set forth at
www.searsholdings.com/govern/compliance.htm.

34. **Divestitures.**    Customer may require, from time to time, that Supplier treat any
business that has been or is hereafter divested by Customer (or one of its Affiliates), as
an Affiliate of Customer for five years after its divestiture.

35. **CAPTIONS.**

Captions given to various paragraphs herein are for convenience only and are not
intended to modify or affect the meaning of any of the substantive provisions.

36. **RELATIONSHIP OF THE PARTIES.**

Nothing contained in this Agreement is intended, nor will it be so construed to
constitute the parties as employer-employee, partners, joint ventures or as principal and
agent.

37. **Subcontractors.**    Only with the prior approval of Customer, Supplier may
contract with or use Subcontractors to perform some of the Services to be managed
by Supplier hereunder ("Subcontractors"). Supplier shall be responsible for the
acts and omissions of each of its Subcontractors. For purposes of determining
liability hereunder, any time "Supplier" is used in this Agreement it shall be
deemed to include all Subcontractors or other persons and entities performing any
part of the Services under this Agreement with or on behalf of Supplier, including
suppliers and agents. Supplier's entering into any subcontract shall not relieve,
release or affect in any manner any of Supplier's duties, liabilities or obligations
hereunder, and Supplier shall be and remain liable hereunder to the same extent as
if Supplier had performed the Services. Customer reserves the right to require
Supplier to immediately remove any personnel objectionable to Customer.

(a)    Customer retains the sole right to reject any Subcontractor
furnished, and in such event, Supplier shall provide alternative Subcontractors for
Customer's consideration, until approved by Customer. There shall be no
additional costs incurred by Customer as a result of usage of Subcontractors by
Supplier. Supplier shall be solely responsible for payments due to the
Subcontractors it uses, and when requested by Customer. Customer shall have the
right to require further assurances, including a set-off, in the event that allegations
are made that Supplier has failed to pay its Subcontractors, and such failure may
be considered a substantial breach of the Agreement.

(b)    In the event this Agreement is terminated for any reason, there
shall be no limitations, restrictions, or conditions on the rights of Customer to
hire, or cause to be hired by any third party, any Subcontractor, or its employees.

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

(c)    In the event that Customer approves the use of Subcontractors for any Services hereunder, Supplier will enter into written agreements ("**Agreements**") with any Subcontractors, subject to Customer's approval, in its own name, as an independent Supplier and not as agent for Customer.

(i)    All such Agreements must be subject to termination by Supplier without cause or penalty, upon notice to the Subcontractor.

(ii)    All such Agreements must require the Subcontractor to comply with all security and safety rules implemented by Customer.

(iii)    All such Agreements will provide insurance coverage as set forth in Section 22 of this Agreement and shall require the Subcontractor's insurance carriers for each coverage to waive all rights of subrogation which the insurer may have against the Supplier or the Customer or against the Indemnified Parties.

(iv)    All such Agreements will provide for indemnification and defense obligations from the Subcontractor to Supplier. Supplier will defend and indemnify the Indemnified Parties for the acts of the Subcontractors under Section 21.

(v)    All such Agreements will require Subcontractors to be trained and certified and to comply with industry best practices with respect to the Services and in accordance with the Agreement and supporting exhibits.

(vi) Supplier shall be responsible for tracking and ensuring that each Subcontractor has required insurance coverages as set forth in Section 22. Upon request by Customer, Supplier shall provide Customer with certificates of insurance evidencing the insurance coverage required hereunder, and at the request of the Customer, certified copies of such policies of portions thereof.

(d)    Nothing in the Agreement minimum requirements set forth above shall limit Supplier's liability to Customer under this Agreement for the actions of the Subcontractors, or their agents and employees, under this Agreement, including but not limited to the defense and indemnification provisions of Section 21 of this Agreement. In the event that a claim arises that involves Subcontractor's acts or omissions, Supplier shall be responsible for such actions under this Agreement and Supplier shall accept Customer' tender of defense and request for indemnification from Customer, notwithstanding any rights that Supplier may have against the Subcontractor under the terms of the Agreements.

38. **NOTICES.**

All notices and other communications under this Agreement will be in writing and

will be delivered personally, sent by facsimile or email transmission or sent by certified, registered or express mail, postage prepaid.  Any such notice or other communications will be deemed given:  (a) confirmation of receipt by the person to whom addressed, if presented personally or by facsimile or email transmission and (b) five (5) business days following deposit in the United States mail, if sent by certified, registered or express mail, postage prepaid, in each case to the following address:

| | |
|---|---|
| If to Customer: | Sears Holdings Publishing Company<br>Attention: VP of Procurement<br>3333 Beverly Road<br>Hoffman Estates, Illinois  60179<br>Facsimile No. (847) 286-8488 |
| With a copy to: | Sears Holdings Management Corporation<br>Attention: General Counsel<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Facsimile No. (847) 286-0266 |
| If to Supplier: | The Core Organization<br>Attn: Stephan Lumley<br>321 W Lake St, Suite F<br>Elmhurst, IL 60126<br>Facsimile No. (630)782-9710 |
| With a copy to: | The Core Organization<br>Attn: Betty McCormick<br>321 W Lake St, Suite F<br>Elmhurst, IL 60126<br>Facsimile No. (630)782-9710 |

Notice of any change in any such address will also be given in the manner set forth above.  Whenever the giving of notice is required, the giving of such notice may be waived by the party entitled to receive such notice.

## 39. Electronic Communications.

(i) If required by Customer, in order to more effectively communicate electronically with one another and automate various operations between Customer and Supplier, the parties shall utilize Customer's third party e-commerce service provider, currently Ariba Supplier Network, or as otherwise identified by Customer to Supplier from time to time ("E-Commerce Provider").  This will allow the parties to transmit to one another various documents and communications, including but not limited to, purchase orders, work orders, change requests, advance ship notices, delivery schedules & receipt confirmations, requests for proposals, invoices, acknowledgements, catalogs, catalog punch-outs, portal usage, fees, discount rates, acceptances of discounts, reports provided by Supplier to Customer, product literature and information, parts lists, notices as required or allowed hereunder, clarifications, and confirmations (E-Documents").

(ii) Customer and Supplier shall be individually responsible for purchasing or acquiring a license to install and/or use any software application, host site, support services agreement, equipment, maintenance service agreement or any other process or service deemed necessary by Customer, and any renewals thereof, in order to access and utilize the E-Commerce Provider's electronic communications portal, record retention system and any other modules or accessory applications deemed necessary by Customer (the "**E-Network**"). Customer shall not be responsible for Supplier's failure to pay fees due to the E-Commerce Provider or Supplier's failure to adhere to the terms of use of the E-Network. Supplier shall adhere to the terms and conditions of its agreements with the E-Commerce Provider. In the event that Supplier fails to maintain a relationship or breaches or defaults on its agreements with the E-Commerce Provider, such failure may result in a cross-default of this Agreement, and the cancellation by Customer of purchase orders or work orders placed with Supplier with no liability to Customer for any such cancellation.

(iii) Supplier shall be solely responsible for the purchase price or licensing fees, transaction fees, renewal fees, etc. assessed by the E-Commerce Provider, and Supplier shall not pass along any such fees to Customer. Supplier shall also be responsible for the training of its employees or agents in utilizing the E-Network and for their proper use of the E-Network and any associated user IDs and passwords. Supplier shall maintain current email addresses and other contact information in the E-Network so to maintain the timely and efficient routing of all E-Documents with Customer.

(iv) The transmission of E-Documents via the E-Network shall have the same validity and enforceability as if they were delivered as signed, written paper documents or communications. If Customer submits its purchase orders or work orders to Supplier via the E-Network then Supplier shall submit its invoices under those purchase orders or work orders to Customer via the E-Network. If Supplier fails to do so, then Customer may give Supplier notice with a thirty (30) day period to cure if Customer deems Supplier's invoices submitted by Supplier outside the E-Network to be unacceptable. The party submitting its E-Document via the E-Network is responsible to confirm the transmission of the E-Document and its availability on the E-Network to the other party, and to resubmit its E-Document in the event of any transmission or submission error, due to whatever cause. Neither party shall use the failure, crash or temporary unavailability of the E-Network as a basis or excuse for any breach it commits under this Agreement.

### 40.  **AMENDMENTS AND WAIVERS.**

Except as specifically provided, this Agreement may be amended, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder will operate as a waiver, nor will any waiver on the part of any party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

## 41. <u>SUPPLANTING PRINTED PORTIONS OF STANDARD FORMS</u>.

During the term of this Agreement, all documents between the parties executed subsequent to the date of this Agreement (including SOW(s)) for the purchase and sale of Services will be deemed to include and will be governed by the terms and conditions of this Agreement except as the parties may otherwise agree in a duly executed writing.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this Agreement as of the date first above written.

By: The Core Organziation

Printed Name: Stephan Lumley

Title: President/CEO

By:   SEARS HOLDINGS PUBLISHING COMPANY, LLC.

Printed Name: John Baetz

Title: President

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

## EXHIBIT A

# [program name]
# Statement of Work
# [program description]

Home Services Print Program Statement of Work (this "**SOW**") is effective as of August 1, 2013, (the "**SOW Date**") between Sears Holdings Publishing Company, LLC ("**Company**") and The Core Organization, ("**Supplier**"). This SOW is incorporated as part of, and is governed by the terms and conditions of, that certain Master Print Agreement dated August 1, 2013 between Supplier and Company (the "**Agreement**"). Except as modified by this SOW, all terms and conditions of the Agreement remain in full force and effect. Capitalized terms not otherwise defined in this SOW have the meaning set forth in the Agreement.

**I. Statement of Work Application Overview:**

**II.    Frequency/Timing:** Based on schedules provided by the Company from time to time. Due to changing business conditions, the number and frequency of events is subject to change in Company's sole discretion.

**III.    Specifications:**

**IV.    Terms and Conditions specific to this Statement of Work:**

Supplier shall sell and Customer agrees to purchase the Services set forth in this SOW on a non-exclusive basis.

**Pricing**:

**Customer Furnished Paper Accounting**:

If paper consumption for an Event exceeds the tonnage allowances set forth Schedule A, Company shall, in its sole discretion, determine the source of the additional paper necessary to complete production of an Event. If such overconsumption results from Company's action or inaction and Company purchases the additional paper from Supplier, Company shall pay Supplier a mutually agreed upon amount in accordance with the payments terms set forth in this SOW. If such over consumption results from Supplier's action or inaction, Supplier shall reimburse Company for the amount of additional paper required to complete production of the Event at a value calculated as the latest month's RISI index value. If the paper grade or basis weight is not published in the RISI index, a mutually agreed upon formula will be applied to arrive at an equivalent RISI value. Supplier shall account for paper consumption on an Event by Event basis and shall provide Company with monthly paper consumption reports. Supplier shall provide Company with an annual paper consumption reports, such reports shall include all information reasonably requested by Company. Supplier shall pay to Company the net amount, if any, owed to Company for over consumption at the end of the last Event of Company's fiscal year shall be paid no later than January 31st of 2014 for fiscal 2013, January 31st of 2015 for fiscal 2014 and September 31st of 2015 for work completed through August 2015.

**Indemnification:**
The parties will indemnify and hold harmless the other party, pursuant to Section 21 of the Agreement.

**Termination:**    Termination of this SOW shall not automatically result in termination of the Agreement or any other Statement of Work. Company may terminate this SOW upon thirty (30) days written notice to Supplier.

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

**V.    Invoicing:**

All invoices are sent via email as attachment to:

Sears Holdings Publishing Company, LLC
Attn: Kim Newman Kimberly.newman@searshomepro.com
1024 Florida Central Parkway
Longwood, FL 32750

Email copy to: Dave Rogers at droge32@searshc.com.

**VI.    Payment Terms:** Company shall pay Supplier pursuant to Section 4 of the Agreement.

The Core Organization LLC

By _Stephen Lumley_
___8041029DF2F4432...___

Name: Stephan Lumley

Title: President/CEO

SEARS HOLDINGS PUBLISHING COMPANY,

By _John Baetz_
___B601EDCF856F4F7...___

Name: John Baetz

Title: President

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

**Exhibit B**

**Sears Holdings Corporation**
**Code of Vendor Conduct**
*Revised June 29, 2010*

## I. *Introduction*

Sears Holdings Corporation and its subsidiaries, including Sears Holdings Management Corporation, Sears, Roebuck and Co., and Kmart Corporation (together "**Sears Holdings**"), are committed to conducting business in accordance with the highest ethical standards and in compliance with all applicable laws. Sears Holdings expects the same commitments from each of its vendors.

Sears Holdings conducts business worldwide with vendors in many countries with different legal, ethical, and cultural systems and beliefs. This Code describes the minimum standards of conduct that Sears Holdings insists that its vendors, regardless of their country of domicile or origin, comply with scrupulously and without exception as a condition to doing business with Sears Holdings. This Code is mandatory, and if a vendor does not comply with it Sears Holdings may terminate immediately its business relationship with the vendor and take any other action Sears Holdings may deem appropriate under the circumstances. If this Code establishes a standard of legal or business-ethics conduct that is higher than local legal or business-ethics requirements, this Code will always apply to vendors that desire to do business with Sears Holdings. Each Vendor shall provide training about this Code to all of its employees who will conduct business with Sears Holdings.

When we refer to "vendors" in this Code we mean each business enterprise, regardless of its form (such as a corporation or company, partnership, or sole proprietorship) that engages or participates, directly or indirectly, in the sale, consignment, or other provision of goods or services to Sears Holdings. "Vendors" includes agents, subcontractors, and other third parties, and vendors cannot avoid the responsibilities and obligations imposed by this Code by using, or associating with, agents, subcontractors, or other third parties. When we refer to "applicable" law in this Code we mean the law, including regulations, judicial decrees, and other governmental actions that have the force of law, in effect at each location where a vendor conducts operations with respect to, or that affect, the vendor's business with Sears.

## II. *Vendor Requirements*

**A. No Improper Influence**. Vendors shall not attempt to influence a Sears Holdings' associate, agent, or representative (each a "**Sears Representative**") with respect to any business arrangement through bribery, kickbacks, favors, gifts, sporting or entertainment events, offers of future employment, or similar conduct. This prohibition means that vendors shall not engage in an action if it is intended to improperly influence, or could create the appearance of improperly influencing, a Sears Representative. This prohibition extends to the relatives of a Sears Representative and to each other person with whom a Sears Representative has a significant personal relationship. A vendor's cash payment, or the vendor's giving of a non-cash item with a value of $50 or more, to a Sears Representative for personal use will violate this prohibition.

**B. No Conflicts of Interest**. Vendors shall not enter into any relationship with a Sears Representative that creates, or reasonably could be expected to create, an actual or a potential conflict of interest for the Sears Representative. For purposes of this Code a conflict of interest arises, or reasonably could be expected to arise, when a material personal interest of the Sears Representative is inconsistent with, or adverse to, the Sears Representative's responsibilities to Sears Holdings. Vendors shall not assign its employee, agent, or representative to conduct business with a Sears Representative if the assigned employee, agent, or representative was employed by Sears Holdings within the preceding twelve months.

DocuSign Envelope ID: E09E0D23-BE98-439E-90B8-D886F9DA069F

**C. No Unfair Business Practices**. Vendors shall not engage in bid collusion or customer or market allocation with other Sears Holdings' vendors. Vendors shall comply with all applicable antitrust, trade-regulation, and competition laws.

**D. No Unauthorized Activities**. Vendors shall not engage in any activity on behalf of Sears Holdings, including without limitation projects, transactions, political contributions, charitable donations, lobbying, and appearances before government entities, officials, and representatives.

**E. Confidentiality**. Vendors may have access to Sears Holdings' confidential (non-public) information, such as historical sales results, sales projections, customer information, and agreed pricing for merchandise or services offered or sold to Sears Holdings. Vendors shall hold this confidential information in the strictest confidence and shall not (except as required by law) disclose it to anyone without Sears Holdings' approval and then only on a need-to-know basis. Sears Holdings retains exclusive ownership of its confidential information. Vendors shall not buy or sell Sears Holdings' equity or debt securities based on, or otherwise take advantage of, material, non-public information relating to Sears Holdings or its businesses.

**F. Sears Holdings Code of Conduct and Vendor Allowances Policy**. Vendors shall familiarize themselves with, and support, the Sears Holdings Code of Conduct and the Vendor Allowances Policy and the obligations and responsibilities of Sears Holdings' associates under the Code of Conduct and the Vendor Allowances Policy. Vendors shall not take any action, or refrain from taking any action, that the vendor reasonably could expect would result in, or would facilitate or assist the commission of, a violation by a Sears Holdings associate of the Code of Conduct or the Vendor Allowances Policy.

**G. Other Compliance**. Vendors shall comply with all other Sears Holdings' policies, processes, and procedures applicable to vendors, including without limitation Sears Holdings' Global Compliance Program for Merchandise Vendors and Factories (which applies only to merchandise vendors) and travel, communication, and bidding policies, processes, and procedures. Vendors shall not attempt to subvert Sears Holdings' procurement policies, processes, or procedures including without limitation by making unauthorized contact with Sears Representatives. Vendors shall comply with all other laws applicable to its business with Sears Holdings including without limitation the U.S. Foreign Corrupt Practices Act.

**III. *Reporting of Violations***
It is Sears Holdings' clear expectation that all vendors promptly will report suspected violations of this Code, the Sears Holdings Code of Conduct, and the Sears Holdings Vendor Allowances Policy. Vendors may do so anonymously by contacting Sears Holdings' Office of Ethics and Compliance at 1-(800) 827-7478 or via email at compliance@searshc.com.