# EXHIBIT A

**Parties**        THIS LEASE made and entered into as of this    7th    day of September        , 19 72
between   JACK A. SNEEDEN CORPORATION

a   North Carolina        corporation having its principal office at P. O. Box 92,
Suite 402, Wachovia Bank Bldg., Wilmington, North Carolina 28401
(herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having
its principal office at 2727 Second Avenue, Detroit, Michigan 48232 (herein referred to as "Tenant"),
3100 W. Big Beaver Rd., Troy, Michigan 48084
WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth,
Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**        1. Landlord does demise unto Tenant and Tenant does take from Landlord for the term here-
inafter provided, and any extension thereof, the following property: Tenant's completed building
or buildings (designated K mart and Food Market), together with site improvements to be con-
structed, as hereinafter specified, by Landlord at its expense on the land comprising not less than
twelve and 7/10ths  ( 12.7 ) acres described in Exhibit "A", attached hereto and made a part
hereof, situated in the City    of    Wilmington      , County of New Hanover     , State
of North Carolina , said building or buildings to be in the locations depicted on Exhibit "B",
attached hereto and made a part hereof, and of the following dimensions:

K mart store:  450' x 210'  =  94,500 sq. ft.

Food market:  137' x 160'  =  21,920 sq. ft.

TOTAL   = 116,420 sq. ft.

In addition, Landlord shall provide a garden shop measuring
55' x 93' 7".

Said completed buildings and site improvements, together with the licenses, rights, privileges and
easements set forth in Article 9 hereof, shall be hereinafter collectively referred to as the "demised
premises".

**Term**        2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that
term is defined in Article 10 hereof, and shall terminate upon such date as shall be   twenty-five
( 25 ) years from the last day of the month in which said date of occupancy by Tenant shall occur;
provided, however, the term of this lease may be extended as provided in Article 12 hereof. The phrase
"lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant
to said Article 12.

**Annual Minimum Rental**        3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall desig-
nate in writing from time to time, an annual minimum rental of    TWO HUNDRED FORTY THOUSAND
- - - - - - - - - - - - - - - - - - - - - - - - - DOLLARS ($240,000.00 - -),
unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of
each month, in advance, commencing upon the first day of the lease term; provided, however, in the
event the first day of the lease term shall not be the first day of a calendar month, then the rental for
such month shall be prorated upon a daily basis.

1                                    3/13/67

**Additional Rental**

4.   In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of NINE MILLION TWO HUNDRED FIFTY THOUSAND - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -DOLLARS ($ 9,250,000.00   ), Tenant shall pay to Landlord as additional rental an amount equal to one percent (1%) of gross sales exceeding   NINE MILLION TWO HUNDRED FIFTY THOUSAND - - - - - - - - - - - - - - - - - - - - - - - DOLLARS ($ 9,250,000.00 - ) up to but not in excess of   EIGHTEEN MILLION FIVE HUNDRED THOUSAND - - - - - - - - - - - - - - - - - - - - - - - - - -DOLLARS ($ 18,500,000.00   ); and Tenant shall pay to Landlord as additional rental an amount equal to five-tenths of one percent (.5%) of gross sales for such lease year exceeding   EIGHTEEN MILLION FIVE HUNDRED THOUSAND - - - - - - - - - - - - - - - - - - - - - - DOLLARS ($ 18,500,000.00   ) up to but not in excess of   TWENTY-THREE MILLION - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -DOLLARS ($ 23,000,000.00 ).

Said additional rental shall be paid on or before the twenty-first (21st) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall, on or before the twenty-first (21st) day following the end of each lease year or "lesser period", deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 11 shall have been fulfilled, or an opening for business under Article 10 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a)   Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b)   Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise tax, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided, further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

2

4/19/72

**Additional Rental (cont'd)**

    (c)  Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

    (d)  Service and interest charges for time payment accounts and charge accounts;

    (e)  All sales of merchandise or services made by any supermarket grocery store, which shall occupy any portion or portions of demised premises, provided that the aggregate area of said portion or portions shall not exceed twenty-one thousand nine hundred twen ( 21,920 ) square feet of floor area; and

    (f)  All sales of automotive gasoline or diesel fuel.

**New Building by Landlord**

    5.  Tenant's said buildings and site improvements shall be completed and delivered to Tenant promptly and with due diligence, giving consideration to scarcity of materials, strikes, lockouts, fire or other casualty, governmental restrictions and regulations, and construction delays; and Landlord warrants that a general contract for construction of said buildings and improvements referred to in Article 11 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than    March 1, 1973    . If for any reason whatever Landlord shall fail to comply fully with this warranty, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with Tenant's typical plans and specifications and possession thereof tendered to Tenant prior to    April 1, 1974    , then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

**Plans and Specifications**

    6.  Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with working plans and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store plans and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No.  2069 containing such additional changes and modifications as are more particularly set forth in that certain letter dated July 7, 1972 written by James A. Kilgore, A.I.A., Manager, Design Division of Tenant's Construction Department to Mr. Jack A. Sneeden, P. O. Box 92, Wilmington, North Carolina 28401, copy of which is attached hereto and marked Exhibit "C".

Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

    (a)  Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on a store layout drawing which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

    (b)  Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

7/22/71

**Plans and
Specifi-
cations
(cont'd)**

Said working plans and specifications shall be submitted to Tenant for approval prior to com-
mencement of construction and such approval shall not be unreasonably withheld. Within sixty (60)
days after receipt of such working plans and specifications Tenant shall, in writing, inform Landlord
of required revisions or corrections thereto, and Landlord shall make such revisions or corrections and
resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such
desired revisions or corrections within said sixty (60) days, said working plans and specifications shall
be deemed approved and accepted for the purposes hereof.

Said typical plans and specifications, store layout drawing and working plans and specifications,
as approved by Tenant, shall constitute a part of this lease.

**Guarantee
of
Materials**

7.  Landlord shall unconditionally guarantee all work performed by Landlord, or at its expense,
in the construction of Tenant's buildings and site improvements against defective workmanship and
materials either for the period of one (1) year from the date of completion thereof or for the period of
any guarantee therefor given Landlord, whichever period shall be the longer.

**Advance
Possession
for
Fixturing**

8.  For a period of four (4) weeks prior to completion of Tenant's buildings by Landlord, Tenant
shall have the privilege, rent free, of entering said buildings for installing storage bins, storing
merchandise, and other purposes not creating unreasonable interference with the work of Landlord.
Such entry shall not be construed as an acceptance thereof by Tenant under the provisions of this
lease, or as a waiver of any of the provisions hereof.

**Parking
and
Other
Common
Areas**

9.  Prior to the date of commencement of the lease term, Landlord shall construct (as hereinafter
provided) the sidewalks, service drives, parking aisles, driveways, streets and parking areas (all of
which shall be hereinafter sometimes referred to as the "common facilities") substantially as shown
on Exhibit "B". The aggregate area provided for the parking of automobiles shall, during the lease
term, be ~~either in the ratio of~~ ( ) ~~square feet of parking area for each
square foot of gross floor area contained in buildings at any time located on site depicted on Exhibit
"B"~~ or sufficient to accommodate not less than eight hundred sixty -- ( 860 ) automobiles
on basis of arrangement depicted on Tenant's typical plans, ~~whichever shall be the greater~~. All sidewalks
shall be of concrete construction, and all service drives, parking aisles, driveways, streets and parking
areas shall be graded, levelled and paved with concrete or asphalt, and properly marked with painted
lines to be repainted annually, for the orderly distribution of automobiles. Landlord covenants,
represents and warrants that, during the lease term, there shall be adequate sidewalks, driveways and
roadways for automotive and pedestrian ingress and egress to and from Tenant's buildings and adjacent
public streets and highways. Landlord shall make no charge of any kind or nature for the use of said
common facilities or any additions thereto. All of said common facilities, including any signs owned by
Landlord, shall be constructed in a workmanlike manner and shall, during the lease term, be maintained
by Landlord, at its sole cost and expense, in good order and repair and in an adequate, sightly and
serviceable condition. Said maintenance shall include, without limitation, keeping the same reasonably
free and clear of foreign objects, papers, debris, obstructions, standing water, snow and ice, and supplying
illumination during Tenant's business hours, and a reasonable period prior and subsequent thereto, to a
minimum of one and one-half (1½) foot candles measured at ground level, for each square foot of
common facilities. To assure the foregoing the Landlord shall cause the common facilities to be thoroughly
cleaned not less than once weekly, and more often if necessary, and snow to be promptly removed on
every occasion where it impedes the use of said facilities.

During the lease term, Landlord shall maintain paved driveways at the rear of Tenant's buildings
in order to provide convenient ingress and egress from the delivery or service entrances to adjacent
public streets and highways for the purpose of receiving and delivering merchandise and otherwise
servicing said buildings. Said driveways shall be of sufficient width so as to permit the passage, un-
loading and, if necessary, the turning around of trailer trucks and other commercial vehicles.

The term "common areas", as used in this lease, shall include the following: (a) said common
facilities indicated on Exhibit "B" and those which shall at any time and from time to be contained
within the site depicted on Exhibit "B" or any future enlargement thereof, (b) areas within the said
site which shall be open to the public generally, such as rest rooms and other facilities, if any, and
(c) all other areas (except those areas which shall be occupied from time to time by building structures)
included within the confines of the land described in Exhibit "A" or any enlargement of said site.
Landlord will maintain said "common areas" and the property, if any, between the demised premises
and any street or roadway serving demised premises in a reasonably clean and sightly condition and
will mow and weed not less than once weekly when necessary.

During the lease term, Landlord shall keep Tenant insured against all statutory and common law
liabilities for damages on account of injuries to property or person, including death, sustained by any
person or persons while within said common areas, in a policy or policies in the amount of Two Hundred
Fifty Thousand Dollars ($250,000) with respect to injury to any one person and in the amount of
One Million Dollars ($1,000,000) with respect to any one accident or disaster, and in the amount of One
Hundred Thousand Dollars ($100,000) with respect to damage to property; and Landlord shall also
indemnify and save Tenant harmless against any such liability. Any such policies shall bear endorse-

9/12/89

**Parking and Other Common Areas (cont'd)**

ments to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

Landlord hereby gives and grants unto Tenant, including Tenant's agents, employees, customers, licensees and invitees the full licenses, rights, privileges and easements to use said common areas, in common with Landlord and other tenants, if any, of the land described in said Exhibit "A", and their respective agents, employees, customers, licensees and invitees. No persons other than those described in the preceding sentence of this paragraph shall be permitted to park upon or exercise any other rights over any of the parking areas of said site. In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now, or at any future time located beyond the limits of the land described in Exhibit "A", utilize said parking areas for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Tenant may, at its election, from time to time, utilize portions of the common areas for carnival or circus type shows and entertainment, outdoor shows, home shows, automobile shows or such other uses which in Tenant's judgment tend to attract the public. Tenant shall give Landlord notification of such intended use a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against injuries to property or person, including death, sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

**Store Opening**

10.  The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working plans and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 11 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 10, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working plans and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct or remedy in all or part, any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Representations and Warranties**

11.  Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common facilities in accordance with the provisions of Article 9 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B".

9/1/71

**Landlord's Representations and Warranties (cont'd)**

Notwithstanding the provisions of Article 10 or any other provision of this lease, the lease term shall not commence and said annual minimum rental, and other charges payable under this lease, shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided further, in lieu thereof, Tenant shall pay monthly in arrears one per cent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental as set forth in Articles 3 and 4 hereof.

In the event Landlord's said representations and warranties shall not be fulfilled within twelve (12) months after such date as Tenant shall open for business, Tenant may notify Landlord in writing thereof and Landlord shall have ninety (90) days within which to fulfill said representations and warranties. If said representations and warranties shall not have been fulfilled within said ninety (90) day period, Tenant thereafter shall have the option of terminating this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Option to Extend Lease**

12.  (a)  Tenant shall have the option to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to expiration of the term hereof.

(b)  If Tenant shall have exercised the foregoing option, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such extended term.

(c)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(d)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(e)  If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of such further extended term.

(f)  Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease, or any extension thereof.    SEE RIDER, Page 1.

**First Refusal to Purchase Option**

13.  Anything in this lease contained to the contrary notwithstanding, and without in any manner affecting or limiting any of the rights, privileges, options or estates granted to Tenant under this lease, it is agreed that if the Landlord, at any time during the term of this lease or any extension thereof, receives one or more bona fide offers from third parties to purchase the demised premises, or property of which the demised premises are a part, and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration and on the terms and conditions contained in the bona fide offer. If Tenant does not elect to purchase said property and Landlord sells the property, the purchaser shall take the property, subject to and burdened with all the terms, provisions and conditions of this lease, including this Article 13, and the rights of the Tenant under this lease as against the new owner shall not be lessened or diminished by reason of the change of ownership. Tenant's failure at any time to exercise its option under this Article 13 shall not affect this lease or the continuance of Tenant's rights and options under this Article 13 or any other article.

4/2/70

**Repairs**

14. Tenant shall make and pay for all replacement of plate glass and all nonstructural repairs and replacements to the interior of Tenant's buildings which it deems necessary to keep the premises in a good state of repair, but in no event shall Tenant be obligated to make repairs and replacements which Landlord shall be required to make under any provision of this lease or which shall be necessitated by Landlord's negligence, default or failure to repair. Landlord shall make and pay for all repairs and replacements (except those which Tenant shall be specifically obligated to make under the provisions of this Article and those due to Tenant's negligence) to said buildings which shall be necessary to maintain the same in a safe, dry and tenantable condition, and in good order and repair. Notwithstanding anything to the contrary herein contained, Tenant shall not be required to make any repairs or replacements (or be liable for the cost thereof) which shall be necessitated by any damage or destruction with respect to which Landlord shall be insured or against which Landlord shall be required by the terms of this lease to insure, but Landlord shall make all such repairs or replacements.

In the event buildings or improvements constituting demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed One Thousand Dollars ($1000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations and Additional Construction**

15. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to plans and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural strength of the building will not be impaired by such work. The term, "structural changes", as used herein, shall not include moving of stud partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

Tenant may, at its own expense, at any time erect or construct additional buildings or structures on any portion of the "common facilities" areas as defined in Article 9 and depicted on Exhibit "B"; provided, however, gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, Tenant shall reimburse Landlord for any real estate taxes imposed on said additions or new construction, which taxes are solely attributable thereto, and Tenant shall reimburse Landlord for any increase in insurance premiums attributable thereto. Tenant shall also be solely responsible for exterior and interior repairs thereto, except those necessitated by fire or casualty for which Landlord is obligated to insure. In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, nor shall the floor area thereof be utilized in any computation with respect to required ratio of building area to parking area under said Article 9, and the number of parking spaces required thereunder shall be reduced by the number of spaces covered by such additional buildings or structures.

**Utilities**

16. Tenant shall promptly pay for all public utilities rendered or furnished to Tenant's buildings during the lease term, including water, gas and electricity, provided separate meters shall be installed for Tenant. Landlord covenants, represents and warrants that, during the lease term, said buildings shall at all times be connected to electric, water and gas lines of an adequate source of supply, and to storm and sanitary sewer systems of adequate capacity.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition during the full term of this lease or any extension and at its sole expense. Sewer charges or sewer taxes, regardless of the manner billed or assessed, shall be paid by Landlord.

**Governmental Regulations**

17. Tenant shall observe and comply with all rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said buildings, including the making of nonstructural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes including, but not limited to the erection of a fire escape or exit, installation of a sprinkler system or other fire preventive device of a structural nature, or (b) require nonstructural changes which would have been required irrespective of the nature of the tenancy, then, in either such event, the same shall be complied with by Landlord at its sole expense.

9/10/70

**Landlord's Covenant**

~~18. Landlord covenants, represents and warrants that, within the confines of the land de~~scribed in Exhibit "A" now or in the future owned or controlled, directly or indirectly, by Landlord, Landlord's principal owners, stockholders, directors or officers, or their assignees or vendees, no premises (other than Tenant's buildings) shall be leased, rented, used or occupied for any purposes whatsoever without Tenant's prior written consent, which may be withheld or granted at Tenant's sole discretion and further, that in addition no premises so owned or controlled outside the confines of said area but within a four (4) mile radius thereof, shall be leased, rented, used or occupied for the operation of a variety store, department store, junior department store, cut-rate store, discount store, a store selling tires, batteries and auto accessories, a restaurant, drive-in restaurant, supermarket or a drug store. This covenant shall run with the land commencing with the date of execution of this lease and shall continue until such date as shall be the last day of the lease term or extension or renewal thereof; provided, however, this covenant shall cease and determine and be of no further force or effect in the event that either (a) subsequent to the commencement of the lease term, Tenant's buildings shall cease to be used for the operation of any store managed by Tenant for a period of six (6) consecutive months, excluding temporary interruptions of said operation because of causes beyond Tenant's control, or (b) said date of occupancy described in Article 10 hereof shall not occur prior to such date as shall be ~~seven (7) years from the date of this lease.~~

**Fire**

19. From and after the date on which Tenant shall be privileged to enter upon demised premises for the purposes specified in Article 8 hereof, Landlord shall insure the buildings depicted on Exhibit "B", including Tenant's buildings, against damage or destruction by fire and other casualties insured under a standard extended coverage endorsement. Said insurance shall be in an amount equal to not less than eighty per cent (80%) of the insurable value of the permanent improvements thereof. All such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof, so endorsed, shall be promptly delivered to Tenant upon written request therefor. Irrespective of the cause thereof, Tenant shall not be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Twenty-five Thousand Dollars ($25,000.00), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 12 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and, upon the exercise of any such option (other than the option set forth in subparagraph (f) of Article 12) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the said permanent improvements as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that that part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's building rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

~~In the event that, at any time during the lease term, except the last two (2) years thereof, any~~ building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, during such period of time (including the last two (2) years of the lease term) that either ~~(a) sixty per cent (20%) or more of the gross rentable floor area of said buildings shall be rendered~~

8

2/1/71

**Fire (cont'd)**

~~untenantable, or (b) any of the stores of tenants specifically required to be open for business prior to~~ Tenant's opening for business (by terms of Article 11) shall not be ~~open for business~~ because of such damage or destruction, then the annual minimum rental for such period of time shall be abated, whether or not Tenant's buildings shall be damaged or destroyed and during such period Tenant shall ~~pay monthly in arrears one per cent (1%) of its gross sales.~~

**Eminent Domain**

20. In the event all of Tenant's buildings shall be expropriated by public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived of the physical possession thereof.

In the event that less than the whole, but more than ten per cent (10%) of Tenant's buildings shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and minimum basis of sales shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that more than ten per cent (10%) of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date possession of the land shall be taken by such authority, by giving notice to Landlord of such election within ninety (90) days thereafter; provided, however, said termination by Tenant shall be null and void if, within ninety (90) days following the date possession of said land shall be so taken, Landlord shall substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". Notwithstanding any other provision of this lease, in the event that more than ten per cent (10%) of the aggregate number of square feet of ground floor area in the buildings located on said site shall be expropriated by public or quasi-public authority, Tenant may terminate this lease at any time following notice of such expropriation. Any such termination shall be effective as of the date of notice to Landlord. Landlord shall immediately notify Tenant of any notice of any such proposed expropriation.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant so much of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

**Assignment and Subletting**

21. The premises hereby demised shall not be used for any unlawful purpose. Tenant may assign this lease or sublet the whole or any part of said demised premises, but if it does so without Landlord's consent, it shall remain liable and responsible under this lease.

**Signs**

22. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing, directly or indirectly,

**Signs (cont'd)**

contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the premises described in Exhibit "A", one or two pylon-type signs. Any such sign shall be of such height and other dimensions as Tenant shall determine and shall bear such legend or inscription advertising Tenant's store as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

Landlord shall not permit any other advertising signs, billboards or posters to be displayed on any portion of the premises described in Exhibit "A" hereof, excepting flat wall signs which may be placed on stores, if any, now depicted on Exhibit "B" or in the future erected on "future building areas" as depicted thereon, providing such signs shall be utilized solely for the purpose of advertising the names of the respective tenants thereof.

Landlord shall not, without Tenant's written consent, at any time utilize the exterior of Tenant's buildings, or the space above, for sign display purposes.

**Ingress and Egress**

23. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain for the period of this lease and any extension thereof, ingress and egress facilities to public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

24. If the rent reserved in this lease, or any part thereof, shall remain unpaid for a period of thirty (30) days or if Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of said nonpayment or other default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

25. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

26. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

12/31/69

**Covenant of Title (cont'd.)**

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple in the land described in Exhibit "A" free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof) with exceptions as follows:

None

Landlord shall, without expense to Tenant, and within thirty (30) days after written request by Tenant, furnish (a) a certification by an attorney acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Sub-ordination**

27.  Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

28.  During the lease term, Tenant and its assignees and sublessees shall indemnify and save Landlord harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of its buildings, except those which shall result, in whole or in part, and directly or indirectly, from the default or negligence of Landlord.

**Tenant's Right to Cure Landlord's Defaults**

29.  In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, (two (2) days with respect to defaults under Article 9 hereof) pay said taxes, assessments, principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of six per cent (6%) per annum, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall, (with respect to taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate) in the event it shall notify Landlord to correct any default, give a similar notice to such holder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

30.  At the expiration or earlier termination of the lease term, Tenant shall surrender demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty or occurrence excepted. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time

5/24/65

Condition of Premises at Termination (cont'd.)

to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.

Holding Over

31. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of demised premises after the expiration of the lease term, it shall so remain as a tenant from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

Notices

32. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in ~~Detroit~~, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be date on which such notice is deposited in a post office of the United States Post Office Department.

Captions and Definitions

33. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions thereof. The necessary grammatical changes which shall be required to make the provisions of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

Successors and Assigns

34. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

Memorandum of Lease

35. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

For Article 36 see Rider, Pages 1, 2 and 3.

IN WITNESS WHEREOF, the parties hereto have executed these presents in ~~duplicate~~ triplicate and affixed their seals hereto as of the day and year first above written.

WITNESSES:

JACK A. SNEEDEN CORPORATION

_Helen L. Ferrell_

By: _J. A. Sneeden_
President

_Helen L. Ferrell_

Attest: _Elizabeth M. Leahy_
Secretary

S. S. KRESGE COMPANY

_J. M. Schmidt_

By: _____
Vice President

_Vivian S. Germain_

Attest: _A. B. Caudell_
Assistant Secretary

APPROVED

12

6/24/63

## ACKNOWLEDGMENTS

STATE OF *North Carolina* }
COUNTY OF *New Hanover* } ss:

I do hereby certify that on this *18th* day of *September* , 19 *72*, before me, *Reid B. Kirkham* , a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared *J.A. Snieder* and *Elizabeth M. Fischer* , known to me to be the President and Secretary of *Jack A. Snieder Corporation*

who, being by me duly sworn, did depose and say that they reside in *Wilmington, N.C.* ,

respectively; that they are the President and Secretary respectively of *Jack A. Snieder Corporation* the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: *Aug. 8, 1975*    *Reid B. Kirkham*
                                                            Notary Public

STATE OF MICHIGAN }
COUNTY OF WAYNE } ss:

I do hereby certify that on this *2nd* day of *October* , 19 *72*, before me, *Axcelia A. Nims* , a Notary Public in and for the County and State aforesaid, residing therein and duly commissioned, personally appeared *John C. Cook* and *W.B. Canfield* , known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by me duly sworn, did depose and say that they reside in *Grosse Pointe Park, Mich,* *and Grosse Pointe Farms, Mich,* respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge Company, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: ~~Notary Public, Wayne County, Mich.~~    *Axcelia A. Nims*
AXCELIA A. NIMS                                                          Notary Public
My Commission Expires Mar. 24, 1974
Acting In Oakland County

18

THIS RIDER CONSISTING OF THREE PAGES IS
ATTACHED TO AND FORMS A PART OF THE LEASE
ENTERED INTO SEPTEMBER 7, 1972 BETWEEN
JACK A. SNEEDEN CORPORATION, LANDLORD,
AND S. S. KRESGE COMPANY, TENANT.

ptions to
xtend Lease
ubstitution for
rticle 12,
age 6 of
rinted lease)

12.    (a) Tenant shall have ten successive options to extend the term of
this lease for an additional period of five (5) years on each such option, such
extended term to begin respectively upon the expiration of the term of this
lease or of this lease as extended and the same terms and conditions as herein
set forth shall apply to each such extended term.  If Tenant shall elect to
exercise the aforesaid options, it shall do so by giving notice to Landlord not
less than six (6) months prior to the expiration of the term of this lease or
of this lease as extended.

(b) Regardless of the exercise or nonexercise by Tenant of any or
all of the foregoing options, Tenant shall have, unless the last day of the
lease term shall be January 31 of any year, the option to extend (or further
extend, as the case may be) the term of this lease for such period of time as
shall cause the last day of the term of this lease to be the January 31 next
succeeding the date upon which the term of this lease would expire but for the
exercise of this option.  This option shall be exercised by notice to Landlord
not less than six (6) months prior to the expiration of the term of this lease
or any extension thereof.  Tenant's rental during this option period shall be
the same rental payable under the terms of this lease at the time Tenant notifies
Landlord of its intention to exercise this option.

al Estate
xes

36.    Tenant shall pay and discharge all ad valorem real estate taxes and
assessments which shall be levied against the taxable premises during the lease
term, excluding therefrom payment of assessments which are incurred or levied as
a result of Landlord's activity in developing the demised premises for Tenant's
occupancy.

To the extent permitted by law, Tenant may pay any such assessments
in annual installments.  In the event any such assessment shall be payable in a
lump sum or on an installment basis, Tenant shall have the sole right to elect
the basis of payment.  If Tenant shall elect to pay such assessment on the
installment basis, then Tenant shall pay only those installments which shall
become due and payable during the lease term.  Any such installments due and
payable in the years in which this lease commences and terminates shall be
prorated proportionately.

1.

al Estate
xes (cont'd)

Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the demised premises except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 36.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed TWENTY-EIGHT THOUSAND DOLLARS ($28,000.00) during any lease year, shall be hereinafter referred to as an "excess tax payment" All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year.  In the event the excess tax payment for any lease year exceeds said additional rental due and payable during the same lease year, the amount by which said excess tax payment exceeds said additional rental shall be carried forward and be deductible from additional rentals due and payable for succeeding lease years on a cumulative basis.

The taxable premises, as defined below, shall be separately assessed from any contiguous lands and from any additional lands and improvements incorporated into the demised premises in the future.

In the event Tenant constructs, as provided in Article 15 hereof, additional buildings or structures on any portion of the land described in Exhibit "A", said additional buildings or structures shall be excluded from the taxable premises.  Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments.  Tenant shall have the right to contest the validity of the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises.  Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

2.

Should the Landlord institute proceedings to contest the validity of the amount of any tax or assessment levied against the taxable premises, the Tenant will cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 36 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authority. After payment of all of Landlord's and Tenant's expenses incurred in any such proceedings in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

The term "taxable premises", as used in this lease, shall be that certain land described in Exhibit "A", Parcel "A", together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

3.

EXHIBIT "A" ATTACHED HERETO AND MADE A PART OF
THE LEASE ENTERED INTO SEPTEMBER 7, 1972 BETWEEN
JACK A. SNEEDEN CORPORATION, LANDLORD, AND
S. S. KRESGE COMPANY, TENANT

### PARCEL "A"

BEGINNING at a concrete monument in the eastern line of South College Road (N. C. Highway No. 132, 200 foot right-of-way), the northernmost corner of the tract conveyed to MacMillan Buick Company by Deed recorded in Book 847 at Page 646 of the New Hanover County Registry, said monument being N. 24° 10' E. a chord distance of 380.2 feet from an iron pipe at the intersection of said line of said road with the northeastern line of Old Meares Road (30 foot right-of-way), said tract and said intersection being shown on the map of the Mrs. Mary S. Beasley property recorded in Map Book 10 at Page 29 of said registry; running thence from said Beginning point northwardly along the eastern line of South College Road as it curves to the east to a concrete monument that is N. 29° 25' E. 600.58 feet from the preceding point; thence S. 58° 4' E. 150.45 feet to a concrete monument; thence N. 31° 56' E. 150 feet to a concrete monument; thence S. 58° 4' E. 625.95 feet to a concrete monument; thence S. 31° 56' W. 750 feet to a concrete monument that is S. 58° 4' E. 150 feet from a concrete monument at the easternmost corner of said MacMillan Buick Company tract; thence N. 58° 4' W. along the northeastern line of said MacMillan Buick Company tract 600 feet to the point of Beginning; the same containing 12.70 acres, and being a portion of the Mrs. Mary S. Beasley property as shown on the aforementioned map recorded in Map Book 10, Page 29 of the New Hanover County Registry.

### PARCEL "B"

BEGINNING at a concrete monument in the eastern line of South College Road (N. C. Highway No. 132, 200 foot right-of-way) that is N. 29° 25' E. a chord distance of 600.58 feet from a concrete monument in said line of said road, the northernmost corner of the tract conveyed to MacMillan Buick Company by Deed recorded in Book 847 at Page 646 of the New Hanover County Registry, the last-mentioned monument being N. 24° 10' E. a chord distance of 380.2 feet from an iron pipe at the intersection of said line of said road with the northeastern line of Old Meares Road (30 foot right-of-way), said tract and said intersection being shown on the map of the Mrs. Mary S. Beasley property recorded in Map Book 10 at Page 29 of said registry; running thence from said Beginning point

Exhibit "A", Page 1

northwardly along the eastern line of South College Road as it curves to the

East to a point in the center of the eastern edge of a right-of-way monument at

the northern end of said curve that is N. 31° 59½' E. 122.35 feet from the

beginning point; thence N. 32° 37' E. along said line of said road 27.65 feet to

a concrete monument; thence S. 58° 4' E. 150 feet to a concrete monument; thence

S. 31° 56' W. 150 feet to a concrete monument; thence N. 58° 4' W. 150.45 feet

to the point of Beginning; the same containing .517 acre, and being a portion of

the Mrs. Mary S. Beasley property as shown on the aforementioned map recorded in

Map Book 10, Page 29 of the New Hanover County Registry.



EXHIBIT "C" ATTACHED HERETO AND MADE A PART OF
THE LEASE ENTERED INTO SEPTEMBER 7, 1972 BETWEEN
JACK A. SNEEDEN CORPORATION, LANDLORD, AND
S.S. KRESGE COMPANY, TENANT

 **S. S. KRESGE COMPANY**
GENERAL OFFICES
2727 SECOND AVENUE
DETROIT, MICHIGAN 48232
AREA CODE 313 PHONE 985-7300

July 7, 1972

Mr. Jack A. Sneeden
P. O. Box 92
Wilmington, North Carolina  28401

Reference:  K mart #     – Wilmington, North Carolina
            E/S. College Drive North of Oleander Drive

Dear Mr. Sneeden:

At the request of Mr. J. G. Schmidt of our Real Estate Department, we are
forwarding to you two (2) sets of Typical Plans and Outline Specifications
identified with the set number 2069, covering our minimum requirements for
the construction of a K mart and Food Market.

The Typical K mart Store plans and specifications consist of the following:
450' x 210' K mart plans all dated June 1, 1971

| | | | |
|---|---|---|---|
| A1a | A10a | 4E1a | 4M1a |
| 4A2a | A11a | 4E2a | M2b |
| 4A3a | A12b | 4E3a | M3b |
| 4A4 | A13a | E4c | M4b |
| 4A5a | A14a | E5c | M5a |
| A6c | A15a | E6a | M6b |
| A7a | A16b | E7a | M7a |
| A8a | A17a | | M8a |
| A9b | A18a | | |

K mart Pylon Sign drawing NS-18 dated January 16, 1970.

Outline Specifications dated through June 1, 1971 including a
Modified Roofing Specification, pages 1 and 2, dated thru April 5, 1972
and a Gross Lease Appendix dated March 1, 1972.

These plans and specifications describe a 450' wide x 210' deep K mart,
containing 94,500 square feet, with an attached Food Market to the left.
We are including a Preliminary layout 2069, dated 6-27-72, for this size
store.  This drawing also indicates any required modifications to the Typicals
for this specific location.

Exhibit "C", Page 1

Kresge    •    Jupiter    •    K mart    •    Holly, Inc.    •    K mart Enterprises, Inc.

Mr. Jack A. Sneeden              - 2 -         July 7, 1972
Re: #  - Wilmington, North Carolina

The Food Market operator contemplated for this location is Colonial Stores, Inc. We are, therefore, enclosing two (2) sets of Colonial Stores, Inc. typical criteria documents for a 137'-0" x 160'-0" left hand Food Market. These typical Food Market plans and specifications consist of the following:

137'-0" x 160'-0" LH Food Market plans all dated January 13, 1972

| | | | |
|---|---|---|---|
| A-3 | A-7 | M-1 | E-1 |
| A-4 | A-8 | M-2 | E-2 |
| A-5 | A-9 | M-3 | E-3 |
| A-6 | T-1 | M-3A | |

General Construction Specifications stamped as received by the S. S. Kresge Company June 5, 1972.

The above listed drawings and specifications have been modified, as marked in red, to comply with S. S. Kresge Company criteria requirements.

For your information, we have also included a list entitled Division of Responsibility for Food Market, dated February 11, 1972.

The Landlord shall advise his consulting mechanical and electrical engineers of the following:

Secondary electric service at 277/480 volt - 4 wire - 3 phase is acceptable. No power factor correction is required. Service shall be sized for an all electric store. Utility transformer shall be located where shown on layout.

Electric for space heating (resistance type) with demand control equipment or devices as required to limit demand during heating season will be required for the K mart and the Food Market. Demand control to be as follows:

Include in control circuit to last half of stages for main electric duct heater, normally closed relays, arrange relays to be energized or open when salesroom lights are turned on or when the time clock is in the night position. Provide in circuit a manual over-ride switch to by-pass the relays, if required.

Domestic hot water heaters and cooking equipment shall be electric.

No gas to be used at this location.

Provide one (1) meter for each utility to the K mart. Subfeed Food Market from K mart with record meters in their lines (record meters shall be located in K mart proper).

The parking lot lighting, sidewalk (under canopy) lighting and service drive lighting shall be on Landlord's separate meter and separate electric service.

Mr. Jack A. Sneeden          - 3 -          July 7, 1972
Re: #     - Wilmington, North Carolina

Air conditioning for the main system shall require the use of three (3) open
compressors and the required remote air cooled condensers to limit maximum
condensing temperature to 120 degrees F.  All systems shall be of equal
capacity.

Solid wall separates K mart proper and Food Market, therefore, provide two
(2) separate sprinkler services using only one (1) non-coded supervisory
panel located in K mart proper.  Water flow indicator in Food Market shall
sound horn in both Food Market and K mart proper.

Landlord's engineer shall consult the telephone company relative to proper
facilities, including conduit, to handle the telephone installation.

These sets of Typical plans and specifications are to be used only as a
guide for the preparation of complete working drawings and specifications.
If, at the time this project is formalized, modifications which affect elec-
trical or plumbing underfloor locations have occured additional information
covering such modifications will then be furnished.

                              Very truly yours,

                              James A. Kilgore, A.I.A.
                              Manager, Design Division
                              Construction Department

JAK:jer
cc:  Mr. W. J. Mottershaw
     Mr. A. D. Kerkau
     Mr. J. G. Schmidt
     Public Utilities