# EXHIBIT C

# HOUSEKEEPING SERVICES
## MASTER SERVICE AGREEMENT
*(for retail store facilities)*

This Housekeeping Services Agreement (the "**Agreement**"), is made as of this 9th day of May 2014, but effective June 1, 2014 (the "**Effective Date**"), by and between Sears, Roebuck and Co., a New York corporation ("**Sears**"), Kmart Corporation, a Michigan corporation ("**Kmart**") (Kmart together with Sears, sometimes referred to herein as the "**Company**"), and **Kellermeyer Bergensons Services, LLC**, a Delaware limited liability company ("**Contractor**") which is the surviving entity of the merger of **Kellermeyer Building Services, LLC** and **Bergensons Property Services, Inc.**

## W I T N E S S E T H:

**WHEREAS**, the Company desires to retain Contractor to furnish housekeeping services in connection with the Sears and Kmart facilities listed in **Exhibit B** (the "**Premises**" or "**Facility**" or "**Facilities**"); and

**WHEREAS**, this Agreement replaces and supersedes the following Housekeeping Services Master Service Agreements as between Company and:

- **Kellermeyer Building Services, LLC**, dated June 5, 2011 as amended
- **Kellermeyer Building Services, LLC**, dated October 1, 2008 as amended
- **Bergensons Property Services, Inc.**, dated September 11, 2011 as amended
- **Bergensons Property Services, Inc.**, dated October 1, 2007 as amended

in their entirety, *provided that* any claims arising or related to Services rendered or payments due thereunder are not waived nor released.

**WHEREAS**, Contractor represents that it has the expertise and experience to perform such services and work and desires to undertake and perform such services and work for the Company in accordance with the requirements of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby confirmed and acknowledged, the parties do hereby agree as follows:

## 1.   SCOPE OF SERVICES

**1.1   Scope of Services.** Contractor, in accordance with the terms and conditions of this Agreement, shall perform the Daily Cleaning Services, Porter Services, Additional Optional Services and Project Services, and other related activities in connection with the Facilities, as more specifically described herein and in the "Scope of Services" attached hereto and made part hereof as **Exhibit A** (collectively, the "**Services**"). **Exhibit A** also includes requirements to establish certain minimum quality standards pertaining to the Services.  The term "**Services**" means the work and services required by this Agreement and includes all labor, materials, equipment and other activities provided or to be provided by Contractor to fulfill the Contractor's obligations or which are reasonably inferable as necessary to produce the results

intended by this Agreement. The terms "**Full Service**" and "**Reduced Service**" for purposes of this Agreement are defined in **Exhibit A**. It is understood and agreed to by the parties that Contractor shall provide Full Service at each Facility every day of each week unless Company notifies Contractor pursuant to Section 2.2 of this Agreement of Company's intention to change the scope of Services at a Facility on particular days from Full Service to Limited Service or unless Company and Contractor otherwise agree in writing to such a change. Whenever Company and Contractor mutually agree to have Contractor perform the Services at certain Facilities of Company, the parties shall execute a written amendment to this Agreement which shall add and incorporate an **Exhibit B** to this Agreement that will identify such Facilities and the fees payable to Contractor for its Services at such Facilities. Each such amendment which adds an **Exhibit B** to this Agreement shall indicate the applicable term (i.e. period of time) during which Services will be performed at the Facilities identified in that **Exhibit B** in accordance with this Agreement.

    **1.2**    **Qualified Workers, Drug Testing and Background Checks.** Contractor shall perform all work in a good, professional and workmanlike manner. Contractor represents and warrants that the Services shall be performed by only qualified, trained, careful and efficient employees or Subcontractors, to the extent Subcontractors are approved herein, in strict conformance with the highest industry practices and standards, and such additional requirements as set forth herein and as may be imposed by the Company from time to time. The requirements of this Section 1.2 shall also apply to Subcontractors, if any.

        **(a)**    **Supervision and Account Manager.** Contractor shall be responsible for the direct supervision of its employees and Subcontractors and shall assign such responsibilities to its designated Account Manager, whom shall be available at all times to report to, and confer with, the Company's representatives with respect to the Services. The Account Manager shall be identified to Company in advance, and shall be subject to Company's prior approval. The Account Manager shall be an employee of Contractor with overall responsibility for ensuring that Contractor's duties are carried out at a national level, and will serve as Company's executive level contact for all material business matters surrounding the Agreement and its performance. The Account Manager shall not be changed without the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed. Contractor acknowledges and agrees that the designation and dedication of the Account Manager and their availability to perform the Services is a material inducement to the Company entering into this Agreement. The Company and Contractor shall agree on mutually acceptable substitute personnel, if any. This Account Manager's attendance at the quarterly Home Office meetings is a requirement of this Agreement.

        **(b)**    **Crew Leaders.** Contractor shall provide Company with a list of key members of Contractor's staff with responsibility for the Services and contact information, including crew leaders. A Crew Leader is that member of Contractor's work force designated by Contractor as the senior Contractor representative at the Facility for each shift. Such list may be changed from time to time by Contractor, by providing written notice to Company.

        **(c)**    **Right to Work.** Without limiting the generality of the foregoing, Contractor expressly assures Company that all individuals used to perform work under this Agreement have presented sufficient documentation to establish identity and

GLO-L-000274-17    08/17/2018 3:11:14 PM  Pg 4 of 34 Trans ID: LCV20181434894
DocuSign Envelope ID: 46A4D46F-6595-4048-B2EA-E6E8C8CAD26C

employment eligibility.  Contractor represents and warrants:  (i) that it has complied with the requirements of the Immigration Reform and Control Act and all related authority, including, but not limited to, required Form I-9 completion, re-verification and retention, (ii) that all personnel rendering the Services are authorized to work in the United States, and (iii) that all personnel performing the Services have cleared background checks as set forth herein.  At Company's request, Contractor shall submit signed, sworn certifications to Company concerning the lawful immigration and background check clearance status of all personnel rendering the Services.

    **(d)**    **Drug Testing.**  With respect to personnel supplied by Contractor to render the Services, Contractor shall be responsible for completing random and periodic drug testing.

    **(e)**    **Background Checks.**  (i)  Contractor shall conduct and obtain, at its expense, a criminal background check report, and obtain any other job-relevant consumer report, on personnel who will be assigned to render the Services to Company.  Said reports must be based on a minimum of seven (7) years residential history, unless otherwise restricted by law; however, the time span of the information obtained must extend to that which is reasonably available from court records or any other applicable source, even if in excess of seven (7) years, except as otherwise restricted by law.

GLO-L-000274-17   08/17/2018 3:11:14 PM Pg 5 of 34 Trans ID: LCV20181434894
DocuSign Envelope ID: 46A4D46F-6595-4D48-B2EA-E8E8C8CAD26C

(ii)  Contractor must use the services of a background investigation service provider to conduct the criminal background checks and to obtain any other job-relevant consumer report.  Criminal background checks must be based on information obtained by the provider for seven (7) years of residential history from every county court associated with the personnel's residences during such seven year period.  A statewide database search is not considered to be an acceptable alternative to searching in individual county court clerk's offices for records.  Also, Contractor must use a consumer-reporting agency that conducts searches (typically via pass-through of credit bureau data) to obtain aliases and other addresses found that are then used for additional criminal background checks and must conduct retail theft background checks when offered as an option by the consumer reporting agency.  Company reserves the right to reject any background investigation service provider being utilized by Contractor.

(iii)  In addition to the county search described herein, Contractor must require the background investigation service provider to include a database search of criminal history records to determine whether any records not discovered in the county search may exist.  Such database should contain no less than 150 million history records that the provider had obtained from various law enforcement agencies.

(iv)  The background check must be completed and the results must be satisfactory before Contractor's personnel report for their first day of providing Services for Company's location, unless otherwise specifically agreed to by Company.  In any such case, Contractor must promptly notify Company of any adverse results on any of Contractor's personnel obtained after such personnel has begun work for Company and remove such personnel from the assignment.

(v)  If a satisfactory criminal background check and review of other job-relevant consumer reports, where applicable, has been completed on any of Contractor's personnel specifically for an assignment to Company within thirty (30) days prior to a subsequent assignment to Company in accordance with these requirements, an additional check is not required due to a break in service, as long as the personnel's primary residence has not changed.  Contractor may not assign personnel with job-relevant adverse information or information that indicates an unreasonable risk to property, safety or the welfare of individuals or the public to perform Services for Company.  At a minimum, adverse information must be evaluated by Contractor in accordance with all applicable laws.  Company reserves the right to approve and modify the criteria Contractor utilizes.

(vi)  At Company's request, Contractor shall submit reliable evidence of Contractor's compliance with these background check requirements.  If any of Contractor's personnel assigned to Company is found to have a criminal background that would have precluded assignment to Company, then Contractor will immediately remove the personnel from assignment to Company.

**1.3   Subcontractors.** For purposes of this Agreement, the term "**Subcontractors**" shall mean subcontractors, franchisees, suppliers, independent contractors, agents and any and all entities or non-employee persons, including but not limited to employees or agents of any of the foregoing, used to perform any portion of the Services hereunder, with or on behalf of Contractor. Contractor is not permitted to use Subcontractors to provide Services under this Agreement without the prior written consent of Company, which consent Company may withhold or provide in its sole discretion. In the event that Company gives its prior written consent, then Contractor is permitted to use Subcontractors provided that it complies with the provisions of this Agreement, including, but not limited to the following provisions:

(a)   **Compliance With Terms.** Contractor shall ensure that each of its Subcontractors complies with the Company's requirements and the terms and conditions of the Services as set forth herein and in the exhibits. In addition to the insurance coverage to be maintained by Contractor in this Agreement, Contractor will require each Subcontractor performing the Services hereunder to obtain insurance coverage in the same form and amounts as detailed in Sections 5.1 and 5.2 below. The Subcontractor insurance shall name Sears Holdings Management Corporation and its subsidiaries and affiliates and all other Indemnified Parties as additional insureds, and shall stipulate that such insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Sears Holdings Management Corporation or its subsidiaries and affiliates or the other additional insured. It is the responsibility of Contractor to obtain and maintain a certificate of insurance from each Subcontractor and make the certificate available to Company upon request. If a Subcontractor does not maintain Workers' Compensation insurance, Contractor's workers' compensation insurance shall insure such Subcontractor

(b)   **No Additional Costs.** There shall be no additional costs incurred by Company as a result of usage of Subcontractors by Contractor. Contractor shall be solely responsible for payments due to the Subcontractors it uses. Company shall have the right to require further assurances, including a set-off, in the event that allegations are made that Contractor has failed to pay its Subcontractors or that its Subcontractors have failed to pay their personnel, and such failure may be considered a substantial breach of the Agreement. No set-off will be taken under this provision, unless Contractor has been given written notice and a three (3) business day opportunity to cure, and no such cure has been made during the three (3) day period.

(c)   **Expiration Date.** Under no circumstances shall Contractor enter into any subcontract agreement related to Services to be provided to Company whose expiration date is past the term of this Agreement.

(d)   **Notice and Approval by Company.** Prior to the commencement of Services hereunder and at any time requested by Company, Contractor shall furnish to Company, in writing, a list of all Subcontractors Contractor intends to use at each Facility, along with their address, primary contact person, and area of responsibility. In addition, any time Contractor wants to change or add Subcontractors at a Facility, Contractor shall provide Company with thirty days prior written notice and Company shall have the right to reject such proposal. Company retains the sole right to reject any Subcontractor furnished, and in such event, Contractor shall provide alternative Subcontractors for Company's consideration, until approved by Company. Under no

circumstances shall Contractor use a cleaning crew whose past service was rated as "Poor" by Kmart or Sears, nor will it use any cleaning crews whose past performance was rated as "Fair" by Kmart or Sears without Company's prior written consent.

(e)    **No Hiring Restrictions.**  In the event this Agreement is terminated for any reason, there shall be no limitations, restrictions, or conditions on the rights of Company to hire, or cause to be hired by any third party, any Subcontractor. Any attempt to restrict Company's or any Subcontractor's rights in this regard shall be null and void.

(f)    **Responsibility for Subcontractors.**  Contractor shall be responsible for the acts and omissions of each of its Subcontractors.   Notwithstanding any other provision of this Agreement, and for purposes of determining liability and responsibility hereunder, any time "**Contractor**" is used in this Agreement it shall be deemed to include all Subcontractors or employees. Contractor's entering into any agreement with any Subcontractor under this Agreement shall not relieve, release or affect in any manner any of Contractor's duties, liabilities or obligations hereunder, and Contractor shall be and remain liable hereunder to the same extent as if Contractor had performed the Services.

1.4    **Local Rules.**  Contractor shall cause its employees and Subcontractors to observe the working rules, building rules and regulations, security regulations and holiday schedule of Sears or Kmart, as the case may be, while working on the Premises and to perform their respective duties in a manner which does not unreasonably interfere with business and operations at the Premises of Sears or Kmart, as the case may be.  Contractor shall be responsible to the Company for acts, errors and omissions of Contractor's employees and Subcontractors. Sears or Kmart may require Contractor's employees and Subcontractors to exhibit identification credentials at all times while at the Premises, which credentials must be returned to Sears or Kmart, as the case may be, promptly when such personnel are no longer performing any Services.

1.5    **Licenses, Permits and Compliance with Laws.**  Prior to the commencement of the Services on the Premises, Contractor shall procure all licenses, permits and approvals required by federal, state or local authorities in connection with the performance of the Services. Contractor shall keep all such licenses, permits and approvals in full force and effect during performance of the Services and pay all fees therefor and furnish copies to Company upon request.  Contractor shall comply with (and give all notices required by) all laws, ordinances, rules, regulations, lawful orders and other requirements of public authorities bearing on performance of the Services, including but not limited to, applicable federal and state OSHA laws, regulations and guidelines, and applicable regulations governing the use, clean up and disposal of materials used in providing the Services (including requirements relating to the provision of material safety data sheets).  If an allegation is made that Contractor failed to comply with any law, regulation or requirement, or failed to obtain any required permit or license, Contractor shall pay any fines or penalties imposed upon Company as a result and Contractor shall reimburse Company for any expenses, including, but not limited to, reasonable attorney's fees, incurred by Company in responding to such allegation.

1.6    **Changes in Scope of Service and Schedule.**  Subject to the provisions of Section 2.2 hereof, Company may order changes or alterations in the Services that are within the general scope of this Agreement without invalidating this Agreement.  No changes or alterations to

Services shall be valid unless in writing and signed by an authorized representative of the Company. Both parties must agree in writing on changes or alterations in the Services that are not within the general scope of this Agreement. Contractor shall perform its work in accordance with the dates and timeline (hereinafter referred to as "Schedule") set forth in the exhibits and their attachments. No change shall be made to the Schedule without the express written consent of Company in each instance.

**1.7    Safety and Security.** Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs for its employees and Subcontractors (if any) in connection with the performance of this Agreement , including the supply and use of all required personal protective equipment (PPE), including but not limited to safety gloves, clothing, headgear, safety glasses or other accessory. in connection with the performance of this Agreement.   Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (i) all persons performing any portion of the Services and other persons who may be affected thereby; (ii) the Premises, and materials and equipment to be used, whether in storage on or off the site, under the care, custody or control of Contractor or Contractor's Subcontractors; and (iii) other property at the Premises.  Contractor shall erect and maintain, as required by existing conditions and performance of the Services, safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.   Contractor shall ensure compliance with all safety laws, regulations, rules, and ordinances in the performance of Services under this Agreement.

**1.8    Chemicals and Supplies.** Unless otherwise agreed to by Company, Contractor shall use only the approved chemicals and supplies listed on **Attachment A.3**. In the event Contractor or its Subcontractors desires to use products not provided for on **Attachment A.3**, then such persons or entities shall be required to receive written approval from the Company prior to such use.  Company is permitted to change **Attachment A.3** upon notice to Contractor. Contractor will submit orders for chemicals through a designated Company representative, at Company's expense. Non-chemical cleaning supplies, including, but not limited to buckets, mops, pads, and spray bottles are shown as specifications. Contractor will be responsible for ordering non-chemical cleaning supplies and paying for non-chemical cleaning supplies at its sole cost. Company may change the procedures for ordering non-chemical cleaning supplies upon notice to Contractor.

**1.9    Theft and Damages.** Contractor will be responsible to Company for all losses incurred by Company as a result of damage to Company property caused by Contractor's employees or Subcontractors, including but not limited to fixtures. In addition, Contractor shall be responsible for the theft of Company property by the Contractor's employees or Subcontractors that are at Company's Facilities performing any part of the Services. Theft loss includes, but is not limited to, the theft of cash, merchandise, equipment and any personal property belonging to Company's employees. Contractor is obligated to reimburse Company for all such theft and damage losses and Company's extra investigative costs and expenses incurred outside the normal scope of expected loss prevention functions. In the event that it is determined by Company that Contractor's employees or Subcontractors are involved in any theft related activity, Company shall notify Contractor and, upon Contractor's request, send Contractor written investigative findings generated in connection therewith.  Contractor shall reimburse such losses within ten (10) days after Contractor is presented with evidence of the loss or

damage. Losses of equipment, supplies and/or merchandise shall be calculated on the basis of the retail value of such equipment, supplies and/or merchandise as of the date of the loss. A signed statement from an employee or Subcontractor of Contractor admitting to the theft or loss shall be conclusive evidence of the loss. If Contractor fails to reimburse Company within ten (10) days of such request, Company may withhold the amount of such losses from any payments owed by Company to Contractor. Company will provide reasonable assistance to aid Contractor in filing theft and loss claims with Contractor's bonding company or insurance carrier, but Contractor shall reimburse Company for the loss regardless of whether Contractor is able to recover from its bonding company or insurance carrier.

**1.10   Check-In at Facilities.** Upon entering each Facility to perform the Services, all of Contractor's employees and Subcontractors, must sign in and out at a predetermined location. The personal property of such personnel, including lunch pails, knapsacks, outwear, etc. will be stored at the predetermined location and will be subject to inspection by Company at any time.

**1.11   Equipment and Tools.** All of Contractor's equipment, tools and supplies used in rendering the Services shall be provided and maintained in a clean, safe, and fully operable condition by Contractor at its sole cost and expense. Further, Contractor shall, at its sole cost and expense, promptly repair or replace such tools and equipment and replenish consumable supplies, including, but not limited to, dust mops and propane (as fuel for Contractor's equipment) as required to fully comply with this Agreement. Contractor shall be provided with reasonably adequate and secure areas at each of Company's Facilities for Contractor to keep its equipment, tools and supplies when not in use. Contractor shall give each Facility Manager or his or her designee the proper key to access these areas at all times, and Company's management personnel shall safeguard the key to prevent unauthorized access.

**1.12   Use of Equipment and Tools By Company.** Contractor agrees that its equipment, tools and supplies (excepting heavy equipment such as buffers and scrubbers) may be used by Company's personnel at no extra cost or expense to clean and maintain store areas during the hours when Contractor's personnel are not rendering services. Contractor shall still be responsible for necessary repair, replacement, maintenance, and replenishment of all such equipment, tools and supplies used by Company's personnel at Contractor's sole cost and expense, provided that Company shall be responsible for any damage to Contractor's equipment or tools caused by Company employees during such cleaning. Company may, in its sole discretion, decide to provide Contractor with equipment, tools and/or supplies for use in Contractor's performance of the Services at one or more of Company's Facilities. All such equipment shall remain the property of Company and Company shall maintain and repair such equipment. If this Agreement is terminated for any reason, all of Company's equipment shall be immediately surrendered to Company in the same condition in which it was provided to Contractor, reasonable wear and tear excepted.

**1.13   Key Supplier Performance Program and Information on Costs.** Contractor agrees to participate in the Company Key Supplier Performance Program in accordance with the terms and conditions set forth in **Exhibit C** attached hereto and incorporated herein by this reference. In addition, Contractor specifically agrees that it will make available to Company details regarding the Services provided to Company, including but not limited to costs (direct and indirect); profit margins, effective practices and methodologies, manpower planning, work scheduling, project management, floor care, equipment and chemicals and supplies, all with the explicit purpose of achieving cost effective Services for Company. Contractor hereby waives

and releases any claims that such information is proprietary or confidential and will provide such information to Company. In no event will Contractor be required to provide Company with any information relating to other customers of Contractor.

**1.14   Code of Conduct.** Contractor agrees to comply with the Sears Holdings Corporation Code of Vendor Conduct set forth at http://www.searsholdings.com/govern/SHCCodeofVendorConduct.pdf. Furthermore, Contractor acknowledges that it is aware of the Sears Holdings Code of Conduct set forth at http://www.searsholdings.com/govern/code.htm and that Company's employees are required to follow the Sears Holdings Code of Conduct. Contractor shall support the Sears Holdings Code of Conduct and shall not take any action that may cause an employee to violate the Sears Holdings Code of Conduct. Contractor shall report any violations of or attempt to violate the Code of Conduct to the Ethics Hotline or Chief Ethics and Compliance Officer as described in the Code of Conduct. Further, the parties acknowledge that items outlined in any Code of Conduct which reflect requirements that are relevant only to retail items for resale by Company do not apply to this Agreement.

**1.15   Electronic Communications.**

(a) If required by Company, in order to more effectively communicate electronically with one another and automate various operations between Company and Contractor, the parties shall utilize Company's third party e-commerce service provider, currently Ariba Supplier Network, and/or any other third party e-commerce service provider ("E-Commerce Provider"). This will allow the parties to transmit to one another various documents and communications, including but not limited to, purchase orders, work orders, change requests, advance ship notices, delivery schedules & receipt confirmations, requests for proposals, invoices, acknowledgements, catalogs, catalog punch-outs, portal usage, fees, discount rates, acceptances of discounts, reports provided by Contractor to Company, product literature and information, parts lists, notices as required or allowed hereunder, clarifications and confirmations ("E-Documents").

(b) Company and Contractor shall be individually responsible for purchasing or acquiring a license to install and/or use any software application, host site, support services agreement, equipment, maintenance service agreement or any other process or service deemed necessary by Company, and any renewals thereof, in order to access and utilize the E-Commerce Provider's electronic communications portal, record retention system and any other modules or accessory applications deemed necessary by Company (the "E-Network"). Company shall not be responsible for Contractor's failure to pay fees due to the E-Commerce Provider or Contractor's failure to adhere to the terms of use of the E-Network. Contractor shall adhere to the terms and conditions of its agreements with the E-Commerce Provider. In the event that Contractor fails to maintain a relationship or breaches or defaults on its agreements with the E-Commerce Provider, such failure may result in a cross-default of this Agreement, and the cancellation by Company of purchase orders or work orders placed with Contractor with no liability to Company for any such cancellation.

(c) Contractor shall be solely responsible for the purchase price or licensing fees, transaction fees, renewal fees, etc. assessed by the E-Commerce Provider, and Contractor shall not pass along any such fees to Company. Contractor shall also be

responsible for the training of its employees or agents in utilizing the E-Network and for their proper use of the E-Network and any associated user IDs and passwords. Contractor shall maintain current email addresses and other contact information in the E-Network so to maintain the timely and efficient routing of all E-Documents with Company

(d)     The transmission of E-Documents via the E-Network shall have the same validity and enforceability as if they were delivered as signed, written paper documents or communications.   If Company submits its purchase orders or work orders to Contractor via the E-Network then Contractor shall submit its invoices under those purchase orders or work orders to Company via the E-Network. If Contractor fails to do so, then Company may give Contractor notice with a thirty (30) day period to cure if Company deems Contractor's invoices submitted by Contractor outside the E-Network to be unacceptable. The party submitting its E-Document via the E-Network is responsible to confirm the transmission of the E-Document and its availability on the E-Network to the other party, and to resubmit its E-Document in the event of any transmission or submission error, due to whatever cause.  Neither party shall use the failure, crash or temporary unavailability of the E-Network as a basis or excuse for any breach it commits under this Agreement.

## 2.     **PAYMENT**

**2.1     Fees and Full Consideration.**   The Company agrees to pay Contractor, and Contractor agrees to accept from the Company the fees set forth in **Exhibit B** for Services provided in accordance with the terms of this Agreement **("Schedule of Compensation")** as full consideration for Services rendered.  **All fees on Exhibit B are inclusive of any and all taxes and shall be payable as follows:**

(a)     **Daily Service Annual Cleaning Cost, Including Taxes.**  The "**Daily Service Annual Cleaning Cost**" set forth in **Exhibit B** for a Facility is calculated by adding together the following: (i) the "**Full Daily Service Rate**" set forth in **Exhibit B** times the number of days within a 12 month period that Contractor is required to provide Full Service; and (ii) the "**Reduced Daily Service Rate**" set forth in **Exhibit B** times the number of days within a 12 month period that Contractor is required to provide Reduced Service. The Daily Service Annual Cleaning Cost shall be paid to Contractor as follows: (i) for each month in which Full Service is provided at a Facility every day of the month, Company shall pay Contractor 1/12 of the Daily Service Annual Cleaning Cost (the "**Full Service Monthly Rate**") for such Facility; and (ii) for each month in which Reduced Service is provided at a Facility on any number of days during the month, Company shall pay Contractor an amount equal to the Full Service Monthly Rate, reduced by an amount equal to the Full Daily Service Rate times the number of Reduced Service days in the month, and increased by an amount equal to the Reduced Daily Service Rate times the number of Reduced Service days in the month (the resulting figure being the "**Reduced Service Monthly Rate**"). For any partial month, Company shall pay Contractor a pro rata portion of the Full Service Monthly Rate or the Reduced Service Monthly Rate (depending on whether the partial month is Full Service or Reduced Service) based on the total number of days Contractor provided Services in that month.

(b)     **Project Services, Including Taxes.**  In addition, provided that Contractor completes the following additional Project Services in accordance with this Agreement,

Contractor shall be paid for the following additional Services as set forth in **Exhibit B**. **Exhibit B** specifies the number of times the Project Services are to be performed and the fees applicable to each additional Project Service:

      (i)    **Annual Strip and Wax, Including Taxes.** This cost will vary depending upon the number of coats of floor wax required by Company for the particular Facility. The number of coats required will be decided by Company at its sole discretion and the parties will confirm in writing to the number of coats in advance of the Annual Strip and Wax Service. Fees for four and eight coats of wax are set forth on **Exhibit B**. Contractor will be paid depending upon the amount of annual strip and wax work completed and the number of coats of wax as determined by Company.

      (ii)    **Double Scrub and Recoat, Including Taxes.** The number of times this Service is to be performed at each Facility is specified in **Exhibit B**.

      (iii)    **Carpet Extractions on Vestibules and Walk-off Matting, Including Taxes.** The number of times this Service is to be performed at each Facility is specified in **Exhibit B** and the fees include extractions at all entrances. For Facilities designated as "**Snow Belt**" Facilities in **Exhibit B**, Contractor will invoice for this Service the month after the Service is performed. "**Snow Belt**" vestibule and walk-off matting extractions will be scheduled and completed in the following months: December, January, February, March, and April. For Facilities not designated as "**Snow Belt**" Facilities in **Exhibit B**, Contractor will invoice for this Service in January, April, July, and October.

      (iv)    For Sears Facilities only, **Full Store Carpet Extraction, Including Taxes**. The number of times this Service is to be performed at each Facility is specified in **Exhibit B**.

Facilities designated as "**Southern**" Facilities in **Exhibit B** will invoice Annual Strip and Wax in April and for the Double Scrub and Recoats in July, October and January. Facilities designated as "**Northern**" Facilities in **Exhibit B** will invoice Annual Strip and Wax in July and for the Double Scrub and Recoats in October, January and April. Annual Carpet Extractions will be performed between February 1 and October 31, but Contractor will invoice for Annual Carpet Extractions along with the regular monthly invoice submitted by Contractor for its Daily Cleaning Services performed in April. Contractor is not entitled to compensation if Services were not actually performed. In the event that Contractor was paid for any Project Services in advance of the actual completion date, and the work is not completed to Company's satisfaction, Company shall be entitled to deduct the amounts paid to Contractor for such work on a later invoice, in addition to any other remedies at law or under this Agreement.

      **(c)**    **Porter Service, Including Taxes.** In the event that Contractor is retained to perform Porter Services, Contractor will be paid the hourly fee set forth in **Exhibit B**, not to exceed the maximum authorized number of hours set forth in **Exhibit B**. The maximum number of Porter Hours on **Exhibit B** is the maximum per "**Contract Year**" (October through September). Facilities currently approved for Porter Services are

specified in **Exhibit B**. Charges for Porter Services will also be clearly broken out on the invoices per Facility, including hours worked and billing rate per hour per porter. It is understood that Porter Hours may be reduced or eliminated completely by Company at its sole discretion and Company shall notify Contractor accordingly. Individual Facilities may not increase the maximum number of Porter Hours without the prior written consent of the Company District Facilities Manager. Contractor will only be paid for the Porter Hours actually worked. Porter Services will be invoiced based on the actual number of hours worked per week per Company Facility (subject to the maximum hours set forth in **Exhibit B**). In no event will the amount billed for Porter Hours per Contract Year exceed the Maximum Annual Porter Cost set forth on **Exhibit B**. Unless approved in writing by the District Facilities Manager, Porter Hours cannot be billed or worked until at least 3 hours after the Facility has opened.

(d)     **Additional Optional Services, Including Taxes.**     Contractor has provided pricing in **Exhibit B** for Additional Optional Services for floor tape removal/reapplication and labor for moving/replacing racks in connection with the Annual Strip and Wax. In the event that Company, in its sole discretion, decides to use Contractor for such Additional Optional Services, Contractor shall be paid the fees set forth in **Exhibit B**. The applicable District Facility Manager will notify Contractor in writing of its intent to have Contractor perform the Additional Optional Services in advance of the Annual Strip and Wax.

(e)     **Miscellaneous Services, Including Taxes.** In the event that Contractor is retained by Company to perform any Miscellaneous Services (defined herein as any services that are above and beyond the scope of Daily Cleaning Services or Porter Services but that are not Project Services or Additional Optional Services, examples of which would include but not be limited to isolated strip and wax floor repairs, VCT floor tile repairs, non-routine spill clean-ups, and any other such like miscellaneous services), Contractor will be paid a fee based on the hourly rate set forth in **Exhibit B** for such Miscellaneous Services. Any such Miscellaneous Services shall be performed by Contractor's employees. Charges for Miscellaneous Services will be clearly broken out on Contractor's invoices per Facility per week, including hours worked and hourly billing rate per Contractor employee. Individual Facilities may not retain Contractor to perform Miscellaneous Services without the prior written consent of the Company District Facilities Manager. Contractor will only be paid for the Miscellaneous Service hours actually worked.

Notwithstanding the foregoing, in no event will the payment to Contractor for any Contract Year exceed the **Total Annual Cleaning, Project and Porter Cost** set forth in **Exhibit B**, plus the fees associated with Additional Optional Services performed, if any. Contractor agrees that the fees, amounts and rates charged for Services and any other work provided hereunder shall not be greater than those paid by Contractor's other customers for like services or work. Contractor further agrees that if during the term of this Agreement, Contractor reduces the fees, amounts or rates charged to its other customers, the prices charged to the Company for similar services or work shall be reduced in direct proportion to Contractor's price reduction to other customers.

2.2     **Reductions or Increases in Frequency of Services or Elimination of Services, including Project Services.** Company has the right to reduce or increase the frequency of, or

eliminate, any or all Services and/or Project Services as shown on **Exhibit A** or its attachments, including but not limited to **Attachments A.1** or **A.2**, by providing Contractor with fifteen (15) days prior written notice. If Company elects to reduce or increase any task or project, or frequency or scope of any task or project, Contractor's charges to Company shall be adjusted effective as of the effective date of Company's written notice to Contractor. To the extent unit pricing in the form of cost per square foot, cost per occurrence or other discrete pricing methodology for the subject task or project has been provided by Contractor in **Exhibit B**, Contractor will reduce relevant charges in direct proportion using said pricing. To the extent unit pricing is not provided for the subject task or project in **Exhibit B**, Contractor and Company will arrive at a mutually agreed adjustment in pricing based on generally accepted housekeeping industry practices for activity based costing.

    **2.3    Supporting Documentation.** Invoices for payments shall include all supporting documentation requested by Company to verify and evaluate an invoice, and, if requested by Company, a lien waiver from Contractor and its Subcontractors. Contractor's invoices shall specify whether the Facility is Sears or Kmart and the Facility number to which the Services relate. Each invoice will clearly list and describe which periodic work was performed in the previous month. In no event shall Contractor deliver invoices or will Company be obligated to pay invoices for Services not actually provided prior to the payment date.

    **2.4    Invoices.** Contractor understands and agrees that Kmart and Sears may have different billing requirements and that these billing procedures may be changed from time to time upon notice to Contractor. Contractor agrees to comply with the invoicing procedures provided by each company.

    **(a)    Sears Facilities.** Invoices for Sears Facilities will be submitted no later than the fifteenth (15th) day of each month (to allow Contractor to capture accurate actual information and not to use estimates) and each invoice shall cover all Services performed by Contractor for all Sears Facilities during the prior calendar month. Invoices will be sent by email to the email address specified by Sears.

    **(b)    Kmart Facilities.** Invoices for Kmart Facilities will be submitted no later than the fifteenth (15th) day of each month (to allow Contractor to capture accurate actual information and not to use estimates) and each invoice shall cover all Services performed by Contractor for all Kmart Facilities during the prior calendar month. Invoices will be sent by email to the email address specified by Kmart.

    **2.5    Deductions from Invoices.** In addition to any other rights set forth herein or available to Company at law, the following shall be deducted from payments made to Contractor:

    **(a)    Failure to Report for Shift.** For purposes of this Section 2.5(a), a "**Shift**" shall be defined as the period of time during which Contractor is required to clean the Facilities each day as provided for in Section 6.0, Scheduling, of **Exhibit A** hereto; and the term Contractor's "**Work Force**" as used herein shall mean the number of janitors or other individual personnel typically provided by Contractor to provide the Daily Cleaning Services hereunder at an individual Facility. In the event that Contractor's Work Force fails, in whole or in part, to report for their Shift ("**No-Shows**"), Company shall be entitled to a deduction from Contractor's next billing ("**No-Show Deduction**") calculated

as follows: **one times the Daily Rate**. The "**Daily Rate**" is calculated by dividing the Daily Service Annual Cleaning Cost, including taxes, set forth in **Exhibit B** by 365. Any applicable deduction pursuant to this Section 2.5(a) shall be reflected as a credit on the next monthly escalation report (in the form of **Attachment A.7**) and the next monthly invoice provided by Contractor to Company.

To the extent the Contractor provides a replacement Work Force which works the missed hours on the same day (in the case of morning cleaning) or the next calendar day (in the case of evening cleaning), the amount due to Company for No-Shows will be reduced by the number of man hours worked by the replacement Work Force at those times ("**Contractor Make Up Hours**"), provided any Contractor Make Up Hours must be completed no later than three hours after the Facility opens to the public. Contractor must make up the entire hours that were not worked. The actual hours not worked will be determined based upon the customary number of staff used for Daily Cleaning at the Facility and the set shift hours. To the extent Contractor makes up the missed hours in compliance with the provisions of this Section, the No-Show Deduction will be reduced to an amount derived by multiplying the penalty by a ratio whose numerator is the number of Contractor Make Up Hours, and whose denominator is the number of hours in the Shift.

Facilities with night cleaners must notify Contractor via the designated email address to be provided by Company of any No-Shows on the evening that the crew fails to arrive for work. Facilities with morning cleaners must notify Contractor via the designated email address of any No-Shows during the morning of the day that the crew fails to arrive. Contractor will be responsible for tracking all credits for No-Shows and any such credits will be set forth separately in the monthly invoice. Contractor will summarize all such credits for No-Shows in writing to the Sears Facilities email provided by Company on a monthly basis. Each email will, among other things, list the Facility and the hours and date the credit is based upon.

    **(b)   Service Deficiencies.**   Company, at its sole discretion, may notify Contractor that Services were improperly performed. Contractor shall promptly and diligently undertake to correct such deficiency within 24 hours after such notice. If the deficiency is not curable within 24 hours, then Contractor shall, within 36 hours of the original notice by Company, provide Company with a proposed plan for remediation, remediation plan or if Contractor fails to cure within the agreed upon remediation period, then Company may retain another company to provide such Services, and Contractor shall be responsible for the cost of such replacement Services. In such case, Company shall subtract the cost of the replacement Services from the monthly payment to Contractor.

    **(c)   Equipment Failure.**   In the event that Contractor's equipment, such as scrubber, burnisher, vacuum, and supporting materials such as propane and pads is not operable or for any other reason Contractor is not able to operate its equipment in order to complete the Services required in this Agreement, and the Facility Manager notified Contractor via the designated Contractor 800- number, and Contractor fails to repair or replace the equipment or otherwise correct the reason that the equipment is not being used within 48 hours (or 72 hours in the case of any Facility located in a "rural" area as hereinafter defined) after the aforementioned phone notification, then Company shall be

entitled to deduct $100 per day per Facility for each day that the equipment is not used
properly to complete Services under this Agreement (up to a maximum deduction of
$300 per occurrence for each piece of malfunctioning equipment). This deduction shall
commence on the first full day after the 48 hours notice (or 72 hours for rural Facilities).
Any applicable deduction pursuant to this Section 2.5(c) shall be reflected as a credit on
the next monthly escalation report (in the form of **Attachment A.7**) and the next monthly
invoice provided by Contractor to Company. For purposes of this subsection, the term
"rural" is defined as those locations where, due to geographical distance from major
metropolitan areas, Contractor is unable to obtain equipment repair service within 48
hours. The parties agree that the locations more particularly identified in **Exhibit E**,
which is attached hereto and incorporated herein by reference, are the locations which
shall be considered "rural" for purposes of this Agreement. In the event that additional
Facilities are added to the scope of this Agreement, Contractor reserves the right to
update **Exhibit E** to add additional "rural" locations if applicable.

    **(d)**    **Failure to Complete Strip and Wax.**  Upon completion of the Annual
Strip and Wax by Contractor's Work Force at a Facility, Contractor's Area Manager shall
inspect the work. Contractor shall promptly and 1.) affirmatively notify (by e-mail) the
District Facilities Manager ("**DFM**") and Company that the work is substantially
complete and ready for Punch-List inspection, and 2.) schedule and conduct a walk-
through of the Facility with the DFM. The DFM must complete the walk through within
ten (10) days of notification by Contractor that the work is completed and ready for
inspection. The DFM will identify and indicate areas needing remedial actions, and
Contractor shall compile a written list of such areas ("Punch List") to be corrected. DFM
and Contractor will agree on a date by which all items on the Punch List are to be
completed and schedule a re-inspection on a mutually agreed date ("Re-Inspection
Date"). The DFM and Contractor will conduct a second walk-through on the Re-
inspection Date. If in Company's sole discretion, the Punch List is not complete,
Company may elect to impose a penalty of $500, which amount shall be deducted from
Contractor's invoice. If the Punch List is still not complete upon a third inspection, then
Company may resort to self-help as set forth in Section 2.5(b) above. Upon completion
of all Punch List items to the satisfaction of the DFM and written sign-off (in the form of
**Attachment A.6**) of the DFM the Annual Strip and Wax will be considered complete. In
no case shall completion of the Annual Strip and Wax to the satisfaction of the DFM
exceed thirty (30) days. Any applicable penalty pursuant to this Section 2.5(d) shall be
reflected as a credit on the next monthly escalation report (in the form of **Attachment
A.7**) and the next monthly invoice provided by Contractor to Company.

    **(e)**    **Unsatisfactory Services.**  Notwithstanding any term to the contrary
herein, Company hereby reserves the right to set-off and/or withhold payment of invoiced
amounts to the extent Contractor has not performed the Services to the full satisfaction of
the Company. Such payment shall be made only when the requirements are satisfactorily
completed. Any payment so withheld or set-off will not accrue interest. It is understood
that any instances of substandard work will be reported to and discussed with Contractor.

    **(f)**    **Failure to Complete Monthly Restroom Detailing.**  In connection with
the Monthly Restroom Detailing as set forth in **Attachment A.1**, if Contractor fails to
receive Facility manager sign-off (in the form of **Attachment A.6**), Company shall be

entitled to deduct $100 per restroom per Facility per month. Any applicable deduction pursuant to this Section 2.5(f) shall be reflected as a credit on the next monthly escalation report (in the form of **Attachment A.7**) and the next monthly invoice provided by Contractor to Company.

**2.6    Technological and Operational Improvements: Gain Sharing**  Contractor will constantly seek ways and means to increase the efficiency and lower the cost of delivery of the Services to Company, including but not limited to continuous process improvements, equipment upgrades, and improvements in floor stripping, scrubbing, burnishing supplies and chemicals. To the extent Contractor can demonstrate to Company, in Company's sole opinion that any such improvements result in an ongoing cost reduction to Company, Company and Contractor will discuss mechanisms to incent Contractor for finding and implementing such improvements. Company reserves the right at its sole election to approve or reject any such proposals from Contractor without cost or penalty to Company of any kind.

**2.7    Payment.**  Company shall initiate payment within 30 days from the date which all requested supporting documentation, including, without limitation, invoice(s), is received by Company. Each invoice shall cover all Services performed during the prior calendar month. Company has no obligation to pay any fees or expenses invoiced more than six months after they accrue, i.e. in the month in which the Services were rendered. Contractor shall promptly comply with Company requests to provide an aging report with each periodic invoice, and/or to provide by January 15 a final invoice for all Services rendered through the calendar year. Company is not required to pay any disputed charge until after the resolution of the dispute. All fees and expenses are payable in U.S. Dollars. Contractor agrees to establish, implement and maintain "Electronic Funds Transfer" (EFT), or ePayables (credit card settlement), in accordance with Company's policies and requirements as communicated to Contractor, as the only means to receive payments from Company during the term of this Agreement.

**2.8    Books and Records, Audit Rights.**  Contractor shall keep and maintain complete and accurate books and records regarding the services provided hereunder at its principal place of business for a period of three (3)  years, or such longer period as may be required by law, following the completion of all Services.   During this Agreement and for three years after expiration of the Term or termination, Contractor shall permit Company and its representatives to visit its facilities upon two business days' notice, during normal business hours, to audit Contractor's records and systems and interview Contractor's employees and independent contractors regarding Contractor's performance of and charges for the Services, Contractor's practices, policies, and procedures relating to processing and security of Company information. Each party will bear its own costs in connection with the audit, including costs of the time spent by each party's representatives in performing and cooperating with the audit. Contractor will bear all on-site photocopy costs. Notwithstanding the foregoing, in the event any such audit reveals deficiencies in Contractor's record-keeping or accounting resulting in overcharges to Company of more than one half of one percent (.005) of the annualized fees for the Services, Contractor shall reimburse Company the reasonable cost of the audit as well as such overcharges. In the event that Company chooses to perform an off-site audit and requests audit documents from Contractor, Contractor agrees to provide such documents within 10 business days. In no event will Contractor be required to provide Company with any information relating to other customers of Contractor.

**2.9    Disputed Invoices.**  No interest shall accrue on the disputed portion of any

invoice, and Company shall not be required to pay any such disputed charge until after the resolution of the dispute. In the event of any Contractor failure of performance, or partial failure of performance occurring during any invoice period, Company may deduct a pro rata amount of such invoice to reflect such failure of performance.

**2.10    Additional Work Not Approved.**  Company shall not be responsible for the payment for additional work performed by Contractor or its Subcontractors, if any, that an authorized representative of Company did not approve in writing in advance.

**2.11    Contractor to Bear All Costs.**  Contractor shall be responsible for and shall bear the cost of all aspects of administering, operating and performing the Services and complying with the terms of this Agreement, unless otherwise expressly provided for herein. Contractor's sole compensation for the performance of the Services shall be the fees detailed in this Agreement. Contractor shall purchase in its own name all non-chemical supplies, services and equipment necessary for Contractor's performance of the Services.

**2.12    Changes in Total Cleanable Square Footage.**  Subject to the provisions permitting adjustments to the **Total Cleanable Square Footage** within ninety (90) days of execution of this Agreement or within sixty (60) days of completion of remodeling, as set forth in Section 11.0 C of **Exhibit A**, Contractor has reviewed the **Total Cleanable Square Footage** and other specifications as set forth in **Exhibit B** and agrees that such information is accurate, and hereby waives any claims to the contrary. Contractor understands and agrees that Company may reduce or increase the **Total Cleanable Square Footage** for a particular Facility. In such case, Company will notify Contractor in writing of the adjustment and the effective date of such adjustment, and the **Total Cost – Daily Clean, Project and Porter** for the Facility as indicated in **Exhibit B** will be increased (in the case of a square footage increase) or decreased (in the case of a square footage decrease) by the **"Total Cost Differential Amount"** calculated as follows:

> **Total Cost per Cleanable Square Foot** for the Facility equals the **Total Cost – Daily Clean, Project and Porter** for the Facility divided by the **Total Cleanable Square Footage** for the Facility (prior to the increase or decrease in square footage).

> **Total Cost Differential Amount** for the Facility equals the amount of the increase or decrease in the **Total Cleanable Square Footage** for the Facility multiplied by the **Total Cost per Cleanable Square Foot** for the Facility.

**2.13    Taxes.**  It is agreed and understood that the fees set forth in **Exhibit B** are inclusive of all federal, state, or local sales, use, transportation-related or other taxes of any kind or nature. Contractor's invoices to Company for the Services shall list the sales and use taxes included in the fees in connection with Contractor's provision of the Services to Company. The fees set forth in **Exhibit B** already include all taxes due and payable or to become due and payable in connection with the Services. Contractor shall be solely responsible for the remittance of all such sales and use taxes, if any, to the proper taxing authorities. Furthermore, Contractor shall indemnify, defend and hold Kmart, Sears and the Indemnified Parties harmless from any and all liabilities and obligations including, without limitation, attorney's and accountant's fees and expenses, arising out of or resulting from Contractor's failure to collect or pay any sales or use taxes related to the Services.   Contractor shall submit evidence as required by Company that all taxes have been paid.   Contractor shall be responsible for any increases in taxes during the term of the Agreement.

**2.14    Favorable Pricing.** If Contractor provides services comparable to the Services to one or more customers other than Company at prices lower than the price charged to Company for the Services, Contractor shall reduce the price for the Services to Company to the lower price. If Contractor fails to make such price reduction to Company at the time such lower price takes effect with its other customers, and such price differential is only later discovered by Company or Contractor, then Contractor's price to Company shall be reduced immediately by Contractor to the lower price, and made retroactive to the date such lower price was first charged to its other customers, and Company will be entitled to a credit for the appropriate differential amount for the period of time during which the lower price should have applied.

**2.15    Minimum Wage and Health Care Benefit Cost Increases**

(a)    **Minimum Wage Increases.** If there is an increase in the federal or state minimum wage requirements ("**Wage Change**") enacted at any time from June 1, 2014 through March 31, 2018, and if Contractor provides written notice of such Wage Change to Company within thirty (30) days of the enactment date of the change (the "**Enactment Date**"), then the fees payable to Contractor as set forth in **Exhibit B** for the Facilities in jurisdictions affected by the Wage Change shall be increased, retroactive to the Enactment Date, in accordance with the following calculation:

1.    For each Kmart Facility in the affected jurisdiction(s), Contractor will receive an additional annualized fee amount equal to: the sum of one hundred percent (100%) of the federal or state minimum wage increase (i.e. the increase from the then current minimum wage amount to the new minimum wage amount) and the increase in affected Payroll Taxes (which are Social Security taxes, Medicare taxes, and the net amount of FUTA (Federal Unemployment Tax Act) and SUTA (State Unemployment Tax Authority) taxes inclusive of all Federal and State rebates and credits), multiplied by a figure of 6.4 (which is 80% of the average daily labor hours of a Kmart Facility (8 hours)), excluding Porter Hours, multiplied by a figure of 364 (which is the number of days within Company's fiscal year that Kmart Facilities are open, as Kmart stores are closed on Christmas). Porter Hours also will be subject to this calculation.

Below is an example of how this calculation would be made for a Kmart Facility (*using hypothetical minimum wage and payroll tax figures*):

a.    If the federal minimum wage was to rise from $6.55 to $6.65, then:

i.    100% of the federal or state increase in minimum wage:         $6.65 - $6.55 = $.10

ii.   100% of increase in affected Payroll Taxes:         $.01 (hypothetical)

iii.  Average daily labor hours of a Kmart Facility:         8 hours

| | | |
|---|---|---|
| iv. | 80% of the average daily labors hours of a Kmart Facility: | 8 hrs * 80% = 6.4 hours |
| v. | Days in Company fiscal year that Kmart Facilities are open: | 364 |
| vi. | Total annualized fee increase per affected Kmart Facility (excluding Porter Hours): | ($.10 + $.01) * 6.4 hrs * 364 days = $256.26 |
| vii. | Total Porter Hours in a year of a Kmart Facility: | 2,000 (hypothetical) |
| viii. | 80% of total Porter Hours in a year of a Kmart Facility: | 2,000 * 80% = 1,600 hrs |
| ix. | Total annualized fee increase per affected Kmart Facility (for Porter Hours): | ($.10 + $.01) * 1,600 hrs = $176.00 |
| x. | Total annualized fee increase per affected Kmart Facility: | $256.26 + $176.00 = $432.26 Plus sales tax if applicable |

2. For each Sears Facility in the affected jurisdiction(s), Contractor will receive an additional annualized fee amount equal to: the sum of one hundred percent (100%) of the federal or state minimum wage increase (i.e. the increase from the then current minimum wage amount to the new minimum wage amount) and the increase in affected Payroll Taxes (which are Social Security taxes, Medicare taxes, and the net amount of FUTA (Federal Unemployment Tax Act) and SUTA (State Unemployment Tax Authority) taxes inclusive of all Federal and State rebates and credits), multiplied by a figure of 9.6 (which is 80% of the average daily labor hours of a Sears Facility (12 hours)), excluding Porter Hours, multiplied by a figure of 364 (which is the number of days within Company's fiscal year that Sears Facilities are open, as Sears Facilities are closed on Christmas). Porter Hours also will be subject to this calculation.

Below is an example of how this calculation would be made for a Sears Facility (*using hypothetical minimum wage and payroll tax figures*):

| | | |
|---|---|---|
| a. | If the federal minimum wage was to rise from $6.55 to $6.65, then: | |
| i. | 100% of the federal or state increase in minimum wage: | $6.65 - $6.55 = $.10 |
| ii. | 100% of increase in affected Payroll Taxes: | $.01 (hypothetical) |
| iii. | Average daily labor hours of a Sears Facility: | 12 hours |

| | | |
|---|---|---|
| iv. | 80% of the average daily labors hours of a Sears Facility: | 12 hrs * 80% = 9.6 hours |
| v. | Days in Company fiscal year that Sears Facilities are open: | 364 |
| vi. | Total annualized fee increase per affected Sears Facility (excluding porter hours): | ($.10 + $.01) * 9.6 hrs * 364 days = $384.38 |
| vii. | Total Porter Hours in a year of a Sears Facility: | 2,000 (hypothetical) |
| viii. | 80% of total Porter Hours in a year of a Sears Facility: | 2,000 * 80% = 1,600 hrs |
| ix. | Total annualized fee increase per affected Sears Facility (for Porter Hours): | ($.10 + $.01) * 1,600 hrs = $176.00 |
| x. | Total annualized fee increase per affected Sears Facility: | $384.38 + $176.00 = $560.38 Plus sales tax if applicable |

3.    The average daily labor hours are uniform for each respective format (Kmart and Sears) and will not be changed on an individual Facility level.

4.    The above calculations are reflective of an annualized fee increase in that they are based on the number of days that Kmart or Sears Facilities (as the case may be) are open during a Company fiscal year. If the Wage Change is enacted during such fiscal year, the annualized fee increase shall become effective as of the Enactment Date, and the increased fee amount shall remain in effect unless otherwise adjusted pursuant to this Section 2.14 or any other applicable terms of this Agreement.

**(b)    Health Care Benefit Cost Increases.** If any federal or state legislation related to an increase in employee health care benefits ("**Health Care Legislation**") is enacted at any time from June 1, 2014 through March 31, 2018, and if such Health Care Legislation results in a material impact on the Contractor's profit and loss statement and Contractor can establish such impact with documents, including payroll records, and if Contractor provides written notice of such Health Care Legislation to Company within thirty (30) days of the date on which such Health Care Legislation results or will result in a material impact on Contractor's profit and loss statement (the "**Adjustment Date**"), then Company shall consider in good faith an equitable increase in fees payable to Contractor for the Facilities in jurisdictions affected by the Health Care Legislation. If the parties cannot agree on an increase in fees related to any Health Care Legislation, then Contractor shall have the right to terminate this Agreement pursuant to Section 6.2. Any fee increase agreed to by the parties pursuant to this paragraph shall be retroactive to the Adjustment Date.

## 3.   INDEPENDENT CONTRACTOR AND PERSONNEL

**3.1   Independent Contractor.**  It is clearly understood and agreed, and it is the exclusive intention of the parties that Contractor's status shall be that of an independent contractor and not that of a partner, joint venture, servant, agent or employee of the Company. Contractor shall not hold itself out as, nor claim to be acting as, a partner, joint venture, employee, agent or servant of the Company. Contractor is not authorized to, and shall not, make or undertake any agreement, understanding, waiver or representation on behalf of the Company. Nothing contained herein shall be construed to create the relationship of partner, joint venture, principal and agent, or employer and employee between Contractor and the Company.

**3.2   Employees of Contractor.**  Neither Contractor nor any of Contractor's employees or Subcontractors shall be construed to be an employee of the Company in performing services under this Agreement for any purpose whatsoever including, but not limited to, the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, income tax withholding (federal, state and local) and any and all state and local tax laws.  Contractor agrees to timely file any necessary federal income tax returns, whether quarterly, annual or otherwise.  Notwithstanding the foregoing sentence, if a court or any agency of either the federal or state government determines that any workers engaged by Contractor, in the performance of the services under this Agreement, are employees of the Company for any purposes whatsoever including, but not limited to, liability for withholding taxes, social security, unemployment compensation, and all similar taxes, workers' compensation coverage or liability, or any other state or federal law applicable to employment, Contractor agrees to defend, indemnify, and hold Sears, Kmart and the other Indemnified Parties harmless from any and all liability, obligation or expense incurred by the Indemnified Parties, including, but not limited to, the amount of any assessment, award, judgment or other cost, which may be entered against the Company on account of such determination, as well as any other expense incurred by the Company in connection with such matter, including attorneys' fees.  The Company shall have the right to reduce any payments due to Contractor by amounts due to the Company by Contractor pursuant to this Section 3.2.

**3.3   Removal of Employees or Subcontractors from Facilities.**  Subject to Section 1.3 above, Contractor shall have the right to select and determine the persons who shall render the Services on the Premises, provided that the Company reserves the right, which may be exercised in its sole discretion, to immediately remove, or to require Contractor to immediately remove, from the Premises any employees or Subcontractors of Contractor who, in the Company's sole discretion, are unqualified, have engaged in improper conduct, or otherwise pose a hazard or threat to any persons or property on the Premises; provided, however, that such right of the Company shall not give rise to a duty on the part of the Company to exercise this right for the benefit of Contractor or any other person or entity. Contractor shall promptly comply with Company's directive in this regard and obtain the appropriate replacement personnel to render the Services at the store at no additional cost or obligation to Company. Contractor shall furnish the Company with a list of all personnel at the Premises and update such list as necessary to keep all information current.

**3.4   Supervision.**  Contractor shall be solely responsible for issuing instructions to its employees and Subcontractors as to the Services.  The Company shall have no right to supervise the employees and Subcontractors, if any, of Contractor or to control the method or means by

which they perform the duties assigned to them by Contractor. Contractor shall take all necessary precautions to assure the safety of its employees and Subcontractors, and of all equipment and supplies used in connection therewith.

**3.5     Payroll Taxes.** Contractor assumes full responsibility for all contributions, deductions, taxes and assessments on all payrolls or otherwise under all applicable federal, state and local laws (including withholding from wages of its employees where required). Contractor shall at its own expense comply with all applicable workers' compensation, unemployment insurance, employer's liability, minimum wage and other federal, state, county and municipal laws, ordinances, rules, regulations and orders, including, without limitation, the Federal Civil Rights Acts, Fair Labor Standards Act, Americans With Disabilities Act, Occupational Safety and Health Act, and the Labor Management Relations Act.

**3.6     Equal Employment Opportunity.** Contractor shall not discriminate against any employee or applicant for employment because of age, race, color, religion, sex, national origin, handicap or status as a disabled or Vietnam-era veteran. Contractor shall comply with all federal, state and local requirements regarding equal employment opportunity and affirmative action and shall use good faith efforts to utilize minority and women-owned business enterprises as Subcontractors and suppliers in the performance of this Agreement. Where applicable, the EEO clauses required under Executive Order 11246, and the implementing regulations of the Department of Labor as well as related executive orders, the Rehabilitation Readjustment Assistance Act of 1973, the Americans with Disabilities Act of 1990, and the Vietnam Era Veterans Readjustment Assistance Act of 1974 are incorporated by reference.

**3.7     Harmonious Labor Relations.** Contractor shall maintain harmony and avoid any and all disputes with labor unions in which the Contractor, Subcontractors, or any employees may become involved. Contractor shall be responsible to Company for any delay, disruption, obstruction or hindrance in the Services, and damages and extra costs resulting from such disputes.

**4.     INDEMNIFICATION AND DEFENSE OF CLAIMS**

**4.1     Indemnification.** To the fullest extent permitted by law, Contractor shall protect, indemnify and hold harmless Kmart, Sears, their parent corporation and Affiliates and Divested Businesses, and the landlords of the Facilities (if any) and the officers, directors, shareholders, distributors, agents, employees, successors and assigns of each of the foregoing (collectively, the "**Indemnified Parties**"), from and against any and all claims, demands, actions, causes of action, liabilities, damages, losses, fines, penalties and expenses, including, without limitation, reasonable attorneys' fees and expenses, resulting from or arising out of any injury to or death of any person, damage to any property, or other loss, cost or damage or expense arising out of or related to the following: (i) the Services or any acts, errors or omissions of Contractor, its employees or Subcontractors, whether or not lawful or within the scope of their employment; (ii) the failure of Contractor, its employees or Subcontractors to comply with any law, statute, ordinance, code, rule, regulation or requirement of a public authority; (iii) an inquiry, investigation, or charges of any public authority relating to the Services; (iv) any actual or alleged infringement of any patent, copyright, trade secret or other proprietary right of any third party relating to the Services performed under this Agreement; (v) claims by Contractor's employees or Subcontractors, relating to the Services, including without limitation, claims for wrongful discharge; (vi) assertions under workers' compensation or similar employee benefit

acts by Contractor or its employees or Subcontractors; (vii) the failure by Contractor or its Subcontractors to pay any employment wages or benefits and taxes required of it of any nature whatsoever; or (viii) any breach by Contractor of any obligation of Contractor under this Agreement (items (i)-(viii) are collectively the "**Claims**"). The obligations of Contractor under this Article 4 shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 4.1.

**4.2   Work-related Injuries.** The foregoing provisions shall apply irrespective of whether Claims are asserted by a party, its employees, Subcontractors, or by unrelated third parties. In claims against any person or entity indemnified under this Article 4 by an employee of Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under this Article 4 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

**4.3   Attorneys Fees.** The indemnity obligations of Contractor under this Article 4 also include, without limitation, all costs, expenses and reasonable attorneys' fees incurred by the Company to enforce the obligations of Contractor under this Article 4.

**4.4   Defense Obligations.** Contractor shall, at its own cost and expense, defend the Indemnified Parties from and against all allegations (even though such allegations may be false, fraudulent or groundless) asserted in any and all Claims, whether actual or alleged and whether or not Contractor's indemnity obligations under this Article 4 shall apply. Contractor shall use counsel reasonably satisfactory to the Company in the defense of the Claims. Contractor shall advise Company of the current status of any action, claim, demand, or suit being defended by Contractor in accordance herewith. Upon written notice to Contractor and in the event that Contractor fails to adequately defend Claims, Company may, at its election, take control of the defense and investigation of the Claims, and may employ and engage attorneys of its own choice to manage and defend such Claims, at Contractor's cost, risk and expense, provided that the Company and its counsel shall proceed with diligence and good faith with respect thereto.

**4.5   Company Negligence or Willful Misconduct.** Contractor will not be relieved of the foregoing indemnity and related obligations by allegations or claims that Company was negligent or that an injury or loss occurred as a result of the concurrent negligence of Company, Contractor and or a Subcontractor. Notwithstanding the foregoing, Contractor shall not be liable for indemnification to the extent any injury, damage or loss is finally judicially determined by a court of competent jurisdiction to have been caused by the negligence or willful misconduct of Company or its employees.

**4.6   Construction.** It is understood and agreed that the parties intend this defense and indemnification provision to be construed broadly in favor of Company, so as to provide the fullest defense and indemnity protection permitted by law. If this indemnity provision is construed by a court of competent jurisdiction to require indemnification over and above that permitted by applicable law or public policy, the parties intend that the Agreement be judicially modified to afford Company the maximum indemnification protection allowed by law.

**4.7   Limitation of Liability.** The work to be performed under this Agreement by Contractor shall be performed at Contractor's risk. Company shall not be liable for any loss,

18-23538-shl    Doc 2188-5    Filed 01/30/19    Entered 01/30/19 15:02:35    Exhibit C to Bartolomeo Cert    Pg 25 of 34

GLO-L-000274-17    08/17/2018 3:11:14 PM  Pg 25 of 34  Trans ID: LCV20181434894
DocuSign Envelope ID: 48A4D4BF-6595-4046-B2EA-E6E8C6CAD26C

theft or damage of or to any vehicles, equipment, supplies or other property of Contractor or its employees, or Subcontractors, or in the possession or custody of Contractor or its employees or Subcontractors, nor shall Company be liable for any damage to Contractor's business or other consequences arising out of loss, theft or damage (except as provided in Section 1.12). Furthermore, in no event shall Company be liable to Contractor or its employees or Subcontractors for any lost or prospective profits, or any other special, punitive, exemplary, consequential, incidental, or indirect loss or damage  (whether in tort, contract or otherwise) relating to or arising from this Agreement.

5.    **INSURANCE**

    **5.1    Insurance Amounts.** Contractor shall procure and maintain, at its own expense, during the term of this Agreement, the following policies of insurance:

        **(a)    Workers' Compensation Insurance** providing statutory benefits and limits of liability complying with all applicable statutory requirements in the state(s) in which Contractor will be providing the Services, with a waiver of subrogation in favor of all Indemnified Parties, and Employer's Liability Insurance with limits of not less than $100,000 per accident or disease and $500,000 aggregate by disease.

        **(b)    Motor Vehicle Liability Insurance** with coverage for all owned, non-owned and hired vehicles including the loading or unloading thereof with combined single limits of not less than Two Million Dollars ($2,000,000) per occurrence for bodily injury and property damage. If no vehicles are owned or leased, the Commercial General Liability Insurance shall be extended to provide insurance for non-owned and hired automobiles, naming Sears Holdings Management Corporation and its subsidiaries and affiliates and all other Indemnified Parties as additional insureds, and shall stipulate that such insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Sears Holdings Management Corporation and its subsidiaries and affiliates or the other additional insured.

        **(c)    Commercial General Liability Insurance** providing coverage for premises/ operations, contractual, products/completed operations and personal/advertising injury liabilities with combined single limits of not less than Five Million Dollars ($5,000,000) per occurrence for bodily injury and property damage, naming Sears Holdings Management Corporation and its subsidiaries and affiliates and all other Indemnified Parties as additional insureds, and shall stipulate that such insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Sears Holdings Management Corporation or its subsidiaries and affiliates or the other additional insured.  Completed operations coverage shall continue to be maintained for at least two (2) years following the completion of the Services, naming Sears Holdings Management Corporation and its subsidiaries and affiliates and the Indemnified Parties as additional insureds, during such period of continuation.

        **(d)    Fidelity Insurance** covering employee dishonesty in an amount not less than One Hundred Thousand Dollars ($100,000) for each loss.

    **5.2    Insurance Requirements.** All policies shall be issued by companies qualified to do business in the state where the services are to be provided, and shall be rated A-/VII or better

in the most current edition of Best's Insurance Reports. Prior to execution of this Agreement, Contractor shall provide the Company with certificates of insurance evidencing the insurance coverage required hereunder, and at the request of the Company, certified copies of such policies of portions thereof. All such insurance policies shall provide that they may not be materially changed, non-renewed or canceled without at least thirty (30) days' prior written notice to the Company.

**5.3   Failure to Maintain Insurance.** Any approval by the Company of any insurance policies shall not relieve Contractor of any responsibility hereunder, including, without limitation, claims in excess of the limits and coverage described above. Receipt and review by the Company of any copies of insurance policies or insurance certificates, or failure to request such evidence of insurance, shall not relieve Contractor of its obligation to comply with the insurance provisions of this Agreement. Any failure of Contractor to procure and properly maintain the required insurance coverage shall give the Company the right to immediately cancel this Agreement, effective upon written notice to Contractor.

**5.4   Waiver of Subrogation.** Except where prohibited by law, the insurance carriers for each coverage set forth in above shall waive all rights of subrogation that the insurer may have against the Company and the Indemnified Parties.

## 6.   TERM

**6.1   Term.** The term of this Agreement shall commence on the Effective Date and shall continue until March 31, 2018, unless terminated sooner hereunder (the "**Term**").

**6.2   Without Cause Termination.** Company shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days' prior written notice to Contractor. Contractor shall have the right to terminate this Agreement, without cause, upon not less than one hundred fifty (150) days' prior written notice to Company.

**6.3   Removal of Facilities.** Company shall also have the right to terminate Services, without cause, upon not less than fifteen (15) days' prior written notice to any Facilities covered under this Agreement. Upon the effective date of any such removal of any Facilities, Contractor shall have no obligation to provide Services to such Facilities, and Company shall have no obligation to pay for any of Contractor's Services to such Facilities beyond any fees due under this Agreement arising out of service performed for such Facilities through the effective date of such removal. In the event of removal of Facilities under this Agreement, there shall be no increase in fees at the remaining Facilities.

**6.4   Out of the Ordinary Closures.** Contractor understands that from time to time, Company Facilities may be temporarily or permanently and partially or entirely closed as a result of natural disasters, remodeling, actions of landlords or governmental entities, or other such causes. In such case, the Company will have the right to terminate Services to the individual Facility without providing fifteen (15) days prior written notice. Company will notify Contractor of the closure as soon as practicable and whether the Services are to be suspended or modified. Fees will be eliminated or reduced accordingly and immediately without any increase in fees at the other Facilities.

GLO-L-000274-17   08/17/2018 3:11:14 PM   Pg 27 of 34   Trans ID: LCV20181434894
DocuSign Envelope ID: 48A4D4BF-6595-4045-B2EA-E8E8C8CAD2BC

**6.5   Termination for Cause by Company.**  In addition, the Company may terminate this Agreement or any Facility covered under this Agreement upon any substantial breach by Contractor, as determined in the judgment of the Company, which termination shall be effective immediately upon Contractor's receipt of written notice from the Company or such other date as specified in by Company in the notice. Such substantial breach includes, but is not limited to, any failure on the part of Contractor, its employees or Subcontractors, if any:  (i) to provide the Services in accordance with this Agreement; (ii) to provide a sufficient number of adequately trained personnel to perform the Services when scheduled; (iii) to observe any and all applicable regulations of Company, including, but not limited to, all security regulations; (iv) to ensure that Services are performed by employees or Subcontractors with a legal right to work and acceptable background clearances; or (v) to pay Subcontractors or employees.

**6.6   Termination for Cause by Contractor.**  Contractor may terminate this Agreement upon any substantial breach by Company.  In the case of such termination, Contractor shall provide Company with written notice of the breach and an opportunity to cure. In the event that the breach is not cured within twenty (20) days of receipt of the cure notice, Contractor shall provide Company with written notice of termination, which termination shall be effective no earlier than twenty (20) days after Company's receipt of the termination notice.

**6.7   Additional Termination Rights.**  Company and Contractor shall also both have the right to cancel or terminate immediately the Agreement or any part of their obligations under this Agreement if:

    **(a)**   The other party becomes the subject of a case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of the other party Contractor commences an action to enforce or foreclose upon a lien or security interest in property of the other party ; or any property of the other party passes into the hands of a creditor , receiver, or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment, or otherwise is attached for the benefit of a creditor of the other party (excluding the consensual granting of a lien or security interest to secure a debt);

    **(b)**   A change of Control occurs with respect to the other party , as defined in Section 8.7.

**6.8   No Business Guarantee.**  Contractor understands and agrees that there is no guarantee as to the number of Facilities or volume of business to be provided by Company hereunder or otherwise.  Company does not make any guarantee or assurance that this Agreement will not be terminated early or that Services will not be modified under the Agreement and fees adjusted accordingly.   Contractor recognizes that its investment in equipment, materials, personnel and facilities utilized to render the Services may not be fully realized upon the termination of this Agreement.  Contractor assumes this business risk and releases and discharges Kmart, Sears and the Indemnified Parties from any and all claims in law or equity for expenses or damages incurred during the term of this Agreement or after its termination arising out of Contractor's investment in such equipment, materials, personnel and facilities.

**6.9   Transition Assistance Upon Termination.** Contractor acknowledges the relationship of the parties, the economic value of this Agreement over its term, the scope and

breadth of Services provided hereunder, and the complexity of implementing a large scale transition by Company to a replacement contractor for Services upon termination of this Agreement. In the event of termination of this Agreement for any reason, whether by Company or by Contractor, or upon expiration of its term, Contractor shall cooperate with, and use its best commercial efforts to effect a smooth transition to, any replacement contractor chosen by Company so as to prevent interruption to Company's operations. Contractor will provide Company all reasonable transition Services ("Transition Services") requested by Company, for up to 12 months after such termination (the "Transition Period"), relating to the transition from the Services to another contractor, including all other Services necessary for an orderly conversion of the Services. Transition Services may include month to month extensions of the monitoring, maintenance, and installation of certain Locations and removal or modification of equipment. For Services which Company was receiving from Contractor prior to such expiration/termination, the fees applicable to such Transition Service will be the rates which Company was paying prior to such expiration/termination. For all other Transition Services, Contractor will not charge Company fees in excess of the Contractor's then standard rates (taking into account the average discount Contractor provides to its similarly sized customers).

## 7.   CONFIDENTIALITY

**7.1   Confidential Business Information.**   The term "Confidential Business Information" means any information, whether disclosed in oral, written, visual, electronic or other form, which Company discloses, Contractor observes, or Contractor generates in connection with the Services. Confidential Business Information includes, but is not limited to, reports and other documents generated by Contractor, work product, Company's business plans, strategies, forecasts and analyses, financial information, information about real estate owned or leased by Company or which Company is contemplating leasing or purchasing, employee and vendor information, Company software (including all documentation and code), hardware and system designs, architectures and protocols, Company product and service specifications, purchasing, logistics, sales, marketing and other business processes; and the terms and existence of this Agreement.

**(a)   Use of Confidential Information.**   Contractor shall use Confidential Business Information only as necessary to perform the Services and its other obligations under this Agreement.  Contractor shall restrict disclosure of Confidential Business Information to its personnel who have a need to know such information to perform the Services and who have first agreed to be bound by the terms of this Article 7.  Contractor shall require its employees and Subcontractors who are exposed to Confidential Business Information to execute a document stating such agreement.  Contractor is liable for any unauthorized disclosure or use of Confidential Business Information by its employees or Subcontractors. Within ten days after receiving Company's written request, Contractor shall destroy, in such a manner that it cannot be retrieved, or return (as instructed by Company) any materials containing Confidential Business Information; provided, however, that Contractor will not be required to destroy any Confidential Business Information that Contractor is required by law, statute or regulation to maintain. Contractor shall certify to Company that it has satisfied its obligations under this Article 7.

**(b)   Provisions Not Applicable.**   The obligations under this Article 7 do not apply to any Confidential Business Information that Contractor can demonstrate: (a) is or

becomes publicly available without breach of this Agreement by Contractor; (b) is independently developed by Contractor without use of any Confidential Business Information; or (c) is received by Contractor from a third party that does not have an confidentiality obligation to Company. Contractor may disclose Confidential Business Information to the extent that, in the reasonable opinion of Contractor's legal counsel, it is legally required to be disclosed. Contractor shall notify Company within a reasonable time prior to disclosure and allow Company a reasonable opportunity to seek appropriate protective measures. Any such disclosure shall be limited in scope, nature and degree to that deemed necessary by counsel.

**7.2 Trademarks and Advertising.** Contractor agrees that it will not use Sears', Kmart's, any Affiliate's or any Divested Business' name nor reveal the existence of this Agreement in any advertising, promotional activities, or publicity releases without the Company's prior written consent and that it will direct its employees and agents to refrain from making any reference to this Agreement or to Sears, Kmart, any Affiliate or Divested Business in the solicitation of business. Contractor shall not post any advertising in the Facilities without the prior written approval of Company. Notwithstanding the foregoing, Contractor may make any disclosure required by Securities and Exchange Commission laws, rules or regulations, any other government law or regulation, or the rules of any securities exchange on which any of Contractor's securities are listed; provided that any such disclosure shall be limited in scope, nature and degree to that deemed necessary by competent counsel, and the Company shall have the right to review and approve such release in advance.

**7.3 Customer Information.** Contractor agrees that all information about Company's or its Affiliates' or any Divested Business' individual customers, including, but not limited to, names, addresses, telephone numbers, account numbers, customer lists, and demographic, financial and transaction information will be deemed confidential. This Section 7.3 does not apply to information independently developed by Contractor, without the use of Confidential Information, provided that Contractor is not using such information on Company's or its Affiliates' or any Divested Business' behalf. Contractor will not duplicate or incorporate the customer information into its own records or databases. Contractor will restrict disclosure of customer information to its employees who have a need to know such information to perform the Services and who have first agreed to be bound by the terms of confidentiality. Contractor is liable for any unauthorized disclosure or use of customer information by any of its employees or Subcontractors. Contractor will not disclose such customer information to third parties and will notify Company immediately upon the discovery of the loss, unauthorized disclosure or unauthorized use of the customer information, and will defend, indemnify and hold harmless Company and the Indemnified Parties for such loss, and unauthorized disclosure or use, including attorneys' fees.

## 8. **GENERAL PROVISIONS**

### 8.1 Notices.

Any notice, request, demand, instruction or other document to be given or served hereunder or under any document or instrument executed pursuant hereto shall be in writing and shall be (i) delivered personally with a receipt requested therefor, or (ii) sent by a nationally recognized overnight courier service using one day delivery, or (iii) sent by United States

registered or certified mail, return receipt requested, postage prepaid and addressed to the parties at their respective addresses set forth below, and the same shall be effective (a) upon receipt or refusal if delivered personally, (b) one (1) business day after depositing with an overnight courier service, or (c) three (3) business days after deposit in the mails, first class mail, postage prepaid, if mailed. A party may change its address for receipt of notices by service of a notice of such change in accordance herewith.

    (a)    If to Contractor:

        Kellermeyer Bergensons Services, LLC
        1575 Henthorne Dr.
        Maumee, OH 43537United States
        Attn: Gregory A. Williams, General Counsel

    (b)    If to Company:

        Sears Holdings Management Corporation
        3333 Beverly Road
        Hoffman Estates, Illinois 60179
        Attn:  Division Vice President, Procurement

With a copy to:

        General Counsel
        Sears Holdings Management Corporation
        3333 Beverly Road
        Hoffman Estates, Illinois 60179

**8.2  Assignment.** Subject to Section 1.3 above, Contractor shall not assign all or any part of its rights or obligations hereunder, without the prior written consent of Company, and any attempt to do so shall be null and void and of no force or effect whatsoever. The Company may assign or transfer its interest in this Agreement without the consent of Contractor or other limitation. The Company shall have no further duties or obligations under this Agreement upon its assignment of all of its rights. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

**8.3    Waiver.** No delay or omission on the part of any party hereto in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement.

**8.4    Headings.** The Article and Section headings used herein are for reference only and shall not limit or control any term or provision of this Agreement or the interpretation or construction thereof.

**8.5    Applicable Law and Venue.** This Agreement shall be deemed to be entered into and shall be interpreted and construed in accordance with the laws of the State of Illinois without reference to rules governing choice of law. Contractor and its Subcontractors and employees, hereby agree that any legal action or proceeding involving this Agreement shall be brought in the

courts of the State of Illinois or in the United States District Court for the Northern District of Illinois, Eastern Division, and by execution and delivery of this Agreement, Contractor, its Subcontractors and employees, hereby agree to and submit themselves to the jurisdiction of the above-referenced courts.

**8.6    Entire Agreement.** This Agreement, together with the schedules, attachments and Exhibits referred to herein, constitute the entire agreement between the parties hereto with respect to the subject matter hereof and this Agreement supersedes all prior proposals, agreements, memorandum, understanding, negotiations and discussions, whether written or oral, of the parties in connection with the subject matter hereof, and in addition supersedes and replaces the agreements referenced in the recitals to this Agreement and all other prior agreements that existed as between Company and the entities that merged to form Contractor, *provided that* any claims arising or related to Services rendered or payments due thereunder are not waived nor released. No change, amendment or modification of this Agreement shall be binding unless in writing and executed by the party to be bound thereby. The recitals to this Agreement are true and correct, and hereby made part of this Agreement as if repeated in this Section 8.6.

**8.7    Company Affiliates.** If requested by Company in writing, Contractor will make the Service available under these terms and conditions to any entity that is, at the time it requests Services, a subsidiary or affiliate of Sears or Kmart. Company Affiliates who are provided Services under this Section of the Agreement will remain solely and independently responsible for payment to Contractor for any and all Services provided to them. Contractor will, if requested, provide separate billing and record keeping for Services provided to Sears' or Kmart's subsidiaries, affiliates, or departments.

For this purpose, **"Affiliate"** means:

(i)    any person, corporation, partnership, limited liability company, joint venture, business trust, association or other entity that controls, is controlled with or by or is under common control with Kmart or Sears, or

(ii)    any entity that is managed, operated or directed by Sears or Kmart, is licensed to do business using the Sears or Kmart name, or does business within a Sears or Kmart store, or

For this purpose, **"Control"** means, for a corporation, directly or indirectly holding 50% or more of the voting power to elect directors or, for foreign corporations, if less than 50%, the amount allowed by applicable law; and for any other entity, power to direct the management of the entity

**8.8    Survival.** Upon termination of this Agreement, and without limitation, the obligations set forth in Articles and Sections 2.5, 4, 5.1(c), 7, and 8 hereof shall survive.

**8.9    Ownership of Documents.** All originals, duplicates and negatives of all plans, drawings, reports, photographs, charts, programs, models, specimens, specifications, and other documents and materials which may be furnished to Contractor hereunder, including drafts and reproduction copies thereof, shall be and remain the exclusive property of the Company. Upon

the termination of this Agreement, or upon request of the Company, during any stage of the Services, Contractor shall promptly deliver all such materials to the Company.

**8.10   Rights and Remedies.** Duties and obligations imposed by this Agreement and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**8.11   Interpretation.** This Agreement has been negotiated and entered into by each party with the independent advice of counsel and shall not be construed against one party or the other based on which party drafted any portion of the Agreement.

**8.12   Severability.** If any provision of this Agreement is deemed invalid, illegal, or unenforceable in any jurisdiction, (i) such provision will be deemed amended to conform to applicable laws of such jurisdiction so as to be valid and enforceable, or if it cannot be so amended without materially altering the intention of the parties, it will be stricken, and (ii) the remainder of this Agreement will remain in full force and effect.

**8.13   Further Assurances and Cooperation.** Each party hereto agrees to execute or cause the execution of such further instruments and documents as may be reasonably necessary or proper in order to complete the transactions and implement the agreements of the parties contemplated by this Agreement, including but not limited to the attached Exhibits hereto. Contractor agrees to use best efforts to (i) cooperate with the Company and any persons and entities designated by the Company, and (ii) make documents, materials and information available to the Company, respond promptly to all requests and inquiries of the Company and keep the Company informed of any performance of the Services.

**8.14   No Third Party Beneficiaries.** Other than Company's Affiliates, this Agreement shall not be deemed to confer any rights to any other party as a third party beneficiary or otherwise.

**8.15   Youth Employment.** Contractor further agrees and warrants that, as to minor employees (under the age of 18), all Federal and State Child Labor Laws, including, but not limited to, wages, hours, work authorizations and hazardous occupations, are complied with, that Contractor has a program to train and audit for compliance, that Contractor will immediately notify Sears of any violation, and Contractor will allow Sears reasonable access to Contractor business records to audit and determine compliance. Contractor agrees that failure to adhere to or comply with child labor laws would constitute a breach of this Agreement.

**8.16   Vendor Compliance Manual and Material Safety Data Sheets.** The attached Compliance Manual for Vendors is hereby incorporated into the Agreement as **Exhibit D**. By signing below, Contractor certifies that it has read and will comply with the Vendor Compliance Manual. Contractor agrees to comply with any other safety requirements provided by Company and will provide all appropriate safety training to its employees and Subcontractors, including but not limited to, training on Company's Vendor Compliance Manual. In addition, Contractor agrees to provide Material Safety Data Sheets for the chemicals and supplies used by its employees and Subcontractors when working in the Facilities.

**8.18    Exhibits and Attachments.**    Attached hereto are **Exhibits A, including A.1-A.10, B, C, and D** all of which are requirements under the Agreement. The terms and conditions of these exhibits are hereby incorporated by reference herein.   In the event of a conflict between this Agreement and the exhibits, the terms and conditions of this Agreement shall prevail.  In the event of a conflict between **Exhibit A** and any other Exhibit or Attachment, the terms and conditions of **Exhibit A** shall prevail.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first written above.

**SEARS, ROEBUCK AND CO. AND KMART CORPORATION**
By their agent **Sears Holdings Management Corporation**

By _Hemant Porwal_ _____

Name: Hemant Porwal

Title: Vice President

Contractor:
**KELLERMEYER BERGENSONS SERVICES, LLC**

By: _Brett S. Himes_ _____

Name: Brett S. Himes

Title: CFO

Exhibits:    **A.       Scope of Work/Specifications dated May 1, 2012**

   **A.1 Ongoing Cleaning Tasks/Frequency Matrix dated November 23, 2011**
   **A.2 Sears Holdings General Schedule (Project Services) dated October 26, 2009**
   **A.3 List of Company Approved Chemicals and Supplies dated May 2, 2012**
   **A.4 Porter Services Requirements by Facility as of October 26, 2009**
   **A.5 Strip/Wax Format March 1, 2010**
   **A.6 Project Services Sign-off Form dated March 1, 2010**
   **A.7 Monthly Escalation Report dated November 1, 2010**
   **A.8 Carpet Spot Removal Process dated December 29, 2009**
   **A.9 Carpet Cleaning Extraction Process dated December 29, 2009**
   **A.10 VCT Floor Tile Bleaching Procedure dated December 29, 2009**

DocuSign Envelope ID: 4B4ADBF-6595-4048-B2EA-E8E8C8CAD2BC

B.    Daily Cleaning Services, Porter Services, Additional Optional
      Services and Project Services Schedule of Compensation,
      Porter Hours and Facilities (Template)

C.    Key Supplier Performance Program

D.    Compliance Manual for Vendors

E.    KBS Rural Locations

**Exhibit A – Scope of Work/Specifications dated May 1, 2012**