**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SEARS HOLDINGS CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-23538 (RDD)<br>(Jointly Administered)<br><br>**Re: Docket No. 1730, 2069 and 2093** |

## DECLARATION OF LEE BRODY SUPPORTING SUPPLEMENTAL OBJECTION OF WEINGARTEN REALTY INVESTORS TO GLOBAL ASSET SALE TRANSACTION, PROPOSED SALE ORDER, AND ASSET PURCHASE AGREEMENT

I, LEE BRODY, declare:

1.     I am a Senior Vice President and Director of the Mid-Atlantic Region for

Weingarten Realty Investors ("Weingarten Realty"), which is affiliated with, and has been retained

by, WRI/Raleigh, L.P. ("Landlord"), the landlord of debtor Kmart Corporation ("Tenant") with

respect to retail premises located in the Six Forks Station shopping center in Raleigh, North

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); SHC Licensed Business LLC (3718); and SHC Promotions LLC (9626). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Carolina, designated by Tenant as Kmart Store No. 3667. Based at Weingarten Realty's Atlanta, Georgia, regional office, I am responsible for a portfolio of shopping centers located in Weingarten Realty's Mid-Atlantic Region, the states of Georgia, Kentucky, Tennessee, North Carolina, Virginia and Maryland, including Six Forks Station, and am personally involved in asset management, anchor tenant leasing, acquisitions, dispositions, redevelopment and new development activities within this area. I am directly involved in all prospective leases with "big box" retailers in Weingarten Realty's Mid-Atlantic Region.

2.      I have over 28 years of experience in the real estate industry. I joined Weingarten Realty in February 2006 as an Associate Director of Leasing in Atlanta, was promoted to Vice President in 2010, Director Mid-Atlantic Region in May, 2013 and Senior Vice President in 2016. Prior to joining Weingarten Realty, I was employed by Ramco Gershenson, Inc. (now RPT Realty), in Farmington Hills, Michigan in various roles including Director of Mid Box Leasing and Redevelopment. I am a member of the International Council of Shopping Center (ICSC) and, since 1998, have held the ICSC designation of CLS (Certified Leasing Specialist).

3.      This declaration is submitted in support of the *Supplemental Objection of Weingarten Realty Investors to Global Asset Sale Transaction, Sale Order, and Asset Purchase Agreement* [Docket No. 2093] in these Chapter 11 cases with respect to the proposed "Global Asset Sale Transaction" between Sears Holdings Corporation and affiliates and Transform Holdco LLC ("Buyer"), an affiliate of ESL Investments, Inc.

4.      As a consequence of my position, I am one of the custodians of records of Landlord as those books, records, and files relate to the use and occupancy of retail premises at Six Forks Station. I am personally familiar with the Six Forks Station shopping center and Tenant's Premises. Weingarten Realty maintains a regional leasing and property management office at Six Forks

Station and, as part of my duties, I regularly visit the shopping center approximately eight times a year, most recently in December 2018. If called upon to testify in this proceeding, as to the matters set forth in this declaration, I could and would competently testify thereto, since the facts set forth herein are personally known to me to be true.

5.    Six Forks Station is an open-air regional shopping center, consisting of approximately 468,414 rentable square feet, located at Six Forks Road and Strickland Road in Raleigh, North Carolina. Anchored by Kmart and The Home Depot, Six Forks Station has spaces for over 35 retail stores, restaurants and services, including well-known tenants such as Bed Bath & Beyond, Chick-Fil-A, Food Lion, Hardee's, Papa John's, PetSmart, PNC Bank, Rite Aid, Starbucks, and Taco Bell. The shopping center has shared parking areas with approximately 1928 parking spaces. A copy of the marketing package for Six Forks Station prepared by Weingarten Realty, containing a site plan, tenant list and other information regarding Six Forks Station, is attached hereto as Exhibit "1" and incorporated herein by this reference.

6.    On or about July 31, 1987, Leadmine Associates I, Ltd., Landlord's predecessor-in-interest, as landlord, and Debtor, as tenant, entered into a written Lease (the "Lease") for retail premises consisting of approximately 113,849 square feet commonly known as 8711-102 Six Forks Road, Raleigh, North Carolina (the "Premises"), located in the Six Forks Station, as more particularly described in the Lease. A true and correct copy of the Lease is attached hereto as Exhibit "2" and incorporated herein by this reference. The Lease was amended by that certain First Amendment To Lease, dated April 23, 1999, a true and correct copy of which is attached hereto as Exhibit "3" and incorporated herein by this reference.

7.    On September 20, 2017, Debtor exercised its option to extend the term of the Lease for an additional five years and the term of the Lease, as amended, is currently scheduled to expire

3

on March 31, 2023. A true and correct copy of Tenant's September 20, 2017 correspondence is attached hereto as Exhibit "4" and incorporated herein by this reference.

8.      Current monthly rent and charges under the Lease are the sum of $37,271.67, payable together certain expenses and adjustments billed on an annual basis, including common area operating expenses ("CAM").

9.      In the ordinary course of its business, the Weingarten Realty and its affiliates, including Landlord, require credit enhancements, in the form of security deposits, letters of credit and third party guaranties when leasing (or assessing a proposed assignment of a lease) to certain companies based on their financial information and history. In the case of a new company, particularly a recently-capitalized "newco" created for the purpose of acquiring distressed assets, Weingarten Realty would ordinarily seek security in the form of cash deposits or letters of credit covering monetary obligations under assigned leases for at least one month's rent and charges, potentially increasing (up to six months') depending on the financial information provided by the proposed tenant/assignee. Alternatively, or in combination with such deposits, when a parent holding company forms a new entity without an operating history that seeks an initial lease from a Weingarten Realty-affiliated landlord, the landlord would typically seek a continuing guaranty of lease obligations from a parent company or another entity with sufficient assets to meet those underlying lease obligations.

10.     I have received and reviewed a 4-page letter from Buyer, with attachment, dated January 24, 2019, purporting to provide, on a "confidential and proprietary" basis, evidence of adequate assurance of future performance required by the Bankruptcy Code in connection with Buyer's proposed acquisition of substantially all of Debtors' assets and the prospective assignment of leases, including Tenant's Lease for the Premises. Based on my experience and the limited

4

information provided to date, Buyer's short narrative and limited projections do not evidence a viable business plan for its planned "go forward" store footprint that would reverse Debtors' recent inability to achieve increased sales and profitability.  Buyer has not provided any information comparing its projected financial condition to that of Tenant at any time period.  At the time the Lease was entered into in 1987, Kmart was the second-largest retailer in the United States.

11.    Unlike the initial leasing to prospective tenants for similar premises, Buyer is not proposing to invest significant sums in the Premises through remodeling, restoration and other capital improvements that would demonstrate a long-term commitment to the Premises and potentially ameliorate credit risk.  Buyer does not appear to make any such commitment to the Premises here and, indeed, appears to lack the liquidity to do so.  The physical appearance of Tenant's store at the Premises has effectively remained the same for over a decade and the Premises are in need of substantial improvements.

12.    Based on the foregoing, if Landlord was presented with an initial proposal by an entity similar to Buyer to lease the Premises, Landlord would require a credit enhancement consisting of some combination of a security deposit (in the form of cash or letter of credit) of at least three months' rent and charges and a guaranty of lease obligations by a parent entity or other third party.  There would be a substantial question as to whether we would even do such a deal at all.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Atlanta, Georgia
         January 30, 2019

_____
LEE BRODY

5

# EXHIBIT 1

**WEINGARTEN REALTY**
Real Estate for Everyday Retail

18-23538-shl    Doc 2218    Filed 01/31/19    Entered 01/31/19 10:55:43    Main Document
Six Forks Station Shopping Center
Raleigh, NC
Pg 7 of 49





## Center Highlights

**View the Drone Property Tour here.**
Along the robust Six Forks Rd corridor, Six Forks Station is a regional retail destination for North Raleigh. It includes major national retailers like Bed Bath & Beyond, The Home Depot and PetSmart. Six Forks Station is one of North Raleigh's largest open air shopping centers, and is well-suited to serve its highly educated, affluent community.

360° views of Six Forks Station and surrounding area: Main Intersection, Strickland Rd, Six Forks Rd, and Forum Rd.

**Center Address:** Six Forks Rd at Strickland Rd

**City/State:** Raleigh, NC

**Property Size:** 468,414 sq. ft.

**Latitude/Longitude:** 35.90017 N, -78.65452 W

## Demographics



**Population:**
3-mile radius

**62,201**



**Traffic Counts:**
Six Forks Rd & Strickland Rd

**49,950**



**Average Household Income:**

**$104,312**

## Contact Us

**Jimmy Conder**
Leasing Agent
Phone: 919.845.3944
Email: jconder@weingarten.com

**Gene Douglas**
Property Manager, Short-Term Leasing
Phone: 919.845.3942
Email: gdouglas@weingarten.com

**Weingarten Realty Investors**
2600 Citadel Plaza Drive, Ste.125 • Houston, TX 77008 • 1.800.688.8865

**WEINGARTEN REALTY**
Real Estate for Everyday Retail

18-23538-shl    Doc 2218    Filed 01/31/19    Entered 01/31/19 10:55:43    Main Document
Pg 8 of 49

Six Forks Station Shopping Center
Raleigh, NC



## TENANT LIST

| | | |
|---|---|---|
| A0A | Six Forks Cleaners | 1,875 SF |
| A0B | Ni Asian Kitchen | 1,875 SF |
| A0C | Audibel Hearing Aid Center | 762 SF |
| A0D | Professional Opticians | 1,500 SF |
| A0E | Zest Cafe & Home Art | 4,500 SF |
| A0F | Supercuts | 1,500 SF |
| A0G | GNC | 1,428 SF |
| A0H | Rite Aid Pharmacy | 8,640 SF |
| A0I | School of Dance Instructions | 7,300 SF |
| A0J | School of Dance Instructions | 4,574 SF |
| A0K | Bellagio Nail Spa | 2,000 SF |
| A0L | Lloyd and Lady | 2,929 SF |
| A0M | Milton's Pizza | 7,052 SF |
| B0A | PetSmart | 14,375 SF |
| B0F | Aqua Tots Swim School | 7,100 SF |
| C0A | The Home Depot | 117,424 SF |
| C0B | Kaplan Catering Group | 12,889 SF |
| C0D | The Musicians Learning Center | 2,840 SF |
| C0E | Weingarten Realty | 3,696 SF |
| D0A | Bed Bath & Beyond | 55,688 SF |
| E0A | Food Lion Grocer | 44,213 SF |
| G0A | Kmart | 113,849 SF |
| G0B | Subway | 1,420 SF |
| G0C | Krishna Jewelers | 990 SF |
| G0D | Shish Kabob Mediterranean Grill | 912 SF |
| G0Z | Quick Pak Storage | 360 SF |
| R01 | Meineke Muffler and Car Care | 2,816 SF |
| R02 | Chick-Fil-A | 4,764 SF |
| R03 | Taco Bell | 2,600 SF |
| R04 | Hardee's | 3,400 SF |
| R05 | PNC Bank | 2,600 SF |
| R06 | Starbucks | 2,715 SF |
| R07 | EXXON MOBIL | 5,000 SF |
| R08 | Chargrill | 2,400 SF |
| R09 | Papa John's | 1,500 SF |
| R10 | Raleigh Oak Charter School | 18,870 SF |

This site plan is presented solely for the purpose of identifying the approximate location and size of the building, and intended for use as a reference only.

Jimmy Conder    jconder@weingarten.com
weingarten.com    Phone: 919.845.3944

**WEINGARTEN REALTY**
Real Estate for Everyday Retail

**Six Forks Station Shopping Center**
Raleigh, NC



## Demographics



**Population:**

1-Mile **8,388**

3-Mile **62,201**

5-Mile **168,203**



**Number of Households:**

1-Mile **3,768**

3-Mile **27,228**

5-Mile **73,041**



**Average Household Income:**

1-Mile **119,542**

3-Mile **104,312**

5-Mile **104,415**



**Total Number of Employees:**

1-Mile **9,138**

3-Mile **31,087**

5-Mile **99,793**

**Jimmy Conder**   jconder@weingarten.com
weingarten.com   Phone: 919.845.3944

# EXHIBIT 2

Parties

THIS LEASE made and entered into as of this 31st day of July, 1987, between LEADMINE ASSOCIATES I, LTD., a North Carolina limited partnership having its principal office at Bob Hughes Associates, 8865 Six Forks Road, Raleigh, North Carolina 27615 (herein referred to as "Landlord"), and K MART CORPORATION, a Michigan corporation having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant do hereby covenant, promise and agree as follows:

Demised
Premises

1.    Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term the following property: Tenant's completed building or buildings (designated K mart), together with site improvements to be constructed as hereinafter specified by Landlord at its expense together with land comprising not less than 7.1296 acres described in Exhibit "A-1", attached hereto and made a part hereof, and situated in the City of Raleigh, County of Wake, State of North Carolina; said building or buildings to be in the locations depicted on Exhibit "B" attached hereto and made a part hereof, and of the following dimensions: K mart store unit, 361'-4" X 239'-4", 86,479 sq. ft., and Garden Shop, 50' X 184'.

Said land, completed buildings and site improvements, together with all licenses, rights, privileges and easements, appurtenant thereto shall be herein collectively referred to as the "demised premises".

Term

2.    The term of this lease shall commence upon the "date of occupancy by Tenant", as that term is defined in Article 11 hereof, and shall terminate upon such date as shall be Twenty-Five (25) years from the last day of the month in which said date of occupancy by Tenant shall occur; provided, however, the term of this lease may be extended as provided in Article 13 hereof. The phrase "lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant to said Article 13.

Annual
Minimum
Rental

3.    Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall designate in writing from time to time, an annual minimum rental of FOUR HUNDRED TEN THOUSAND SEVEN HUNDRED SEVENTY-FIVE DOLLARS ($410,775.00), unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of each month, in advance, commencing upon the first day of the lease term; provided, however, in the event the first day of the lease term shall not be the first day of a calendar month, then the rental for such month shall be prorated upon a daily basis.

Additional
Rental

4.    In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of SIXTEEN MILLION SIX HUNDRED THOUSAND DOLLARS ($16,600,000.00), Tenant shall pay to Landlord as additional rental an amount equal to one per cent (1%) of gross sales exceeding SIXTEEN MILLION SIX HUNDRED THOUSAND DOLLARS ($16,600,000.00).

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser

-1-

period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any negotiations for bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on the demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A-1", except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

-2-

(d) Service and interest charges for time payment accounts and charge accounts;

(e) All sales of merchandise or services made by any food market which shall occupy any portion or portions of the demised premises;

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within ninety (90) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said ninety (90) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect.

Real
Estate
Taxes

5.    Tenant shall pay and discharge all ad valorem real estate taxes and assessments which shall be levied against the taxable premises during the lease term, excluding therefrom payment of assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the demised premises except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 5.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed THIRTY THOUSAND DOLLARS ($30,000.00) during any lease year, shall be hereinafter referred to as an "excess tax payment". All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year.

The taxable premises, as defined below, shall be separately assessed if practicable from any contiguous lands and from any additional lands and improvements incorporated into the demised premises in the future.

In the event Tenant constructs, as provided in Article 16 hereof, additional buildings or structures on any portion of the land described in Exhibit "A-1", said additional buildings or structures shall be excluded from the taxable premises. Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall be paid and discharged by Tenant and shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises, the Tenant will cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

The term "taxable premises", as used in this lease, shall be that certain land described in Exhibit "A-1" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

New Building by Landlord

6.    Tenant's said buildings and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Landlord warrants that a general contract for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than November 1, 1987. If for any reason whatever Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to June 1, 1988, then Tenant shall, at any time thereafter, have the further option of

-4-

terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be two (2) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

Drawings
and
Specifi-
cations

7.    Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. B-1896, containing such additions, changes and modifications as are more particularly set forth in that certain letter dated March 20, 1986 written by Paul H. Goldsmith, R.A., Manager, Design Division, Construction Department, K mart Corporation, to Bob Hughes Associates, 8865 Six Forks Road, Raleigh, North Carolina 27609, Attention: Mr. Robert V. Hughes, copy of which is attached hereto and marked Exhibit "C".

Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a)    Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on store layout drawings which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b)    Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Said working drawings and specifications shall be submitted to Tenant in time to permit a review and approval by Tenant prior to commencement of construction. Such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

Subsequent to approval of the typical drawings and specifications, in the event that criteria changes to the lease shall be requested by Tenant, which result in a savings to the Landlord in construction costs, then, Landlord shall pay Tenant an amount equal to the savings.

Guarantee
of
Materials

8.    Landlord shall unconditionally guarantee all work performed by or for the Landlord in the construction of Tenant's buildings and site improvements against defective workmanship and materials for a period of one (1) year from commencement of lease term or date of final acceptance by Tenant, whichever is later, unless a different period of time is expressly

-5-

stated under section of the criteria documents and/or job specifications.
Landlord shall assign to Tenant any and all guarantees of workmanship and
materials which it may receive.

**Advance**
**Possession**
**for**
**Fixturing**
**and**
**Merchan-**
**dising**

9.    For a period of sixty seven (67) days after completion of Tenant's
building by Landlord, as set forth in Article 11 (b), Tenant shall have the
privilege, rent free of entering said buildings for the purposes of installing
stockroom equipment and salesfloor trade fixtures, storing merchandise,
training personnel and other pre-opening activities.  The Landlord's completion
of the building shall be construed to mean the building is substantially
complete except connections to tenants equipment, i.e. permanently enclosed,
completely decorated inside and out, floor covering installed, electrical
system complete, mechanical systems functioning on controls, toilet facilities
complete for both sexes, fire protection system including alarms complete.

Landlord shall advise Tenant's Regional Construction Manager in writing
ninety (90) days prior to his projected completion date to allow tenant to
place orders for fixtures, arrange for personnel and order merchandise.

**Parking**
**and Other**
**Common**
**Areas**

10.    Prior to commencement of the lease term, Landlord shall construct, in
accordance with said working drawings and specifications approved by Tenant,
on the premises described in Exhibit "A-1", all of the sidewalks, service
drives, parking areas, driveways, streets, curbs, directional signs and
related improvements, substantially as shown on said working drawings and
specifications (all of which improvements shall hereinafter, along with the
land thereon constructed, be referred to as the "common areas").

Landlord shall also construct or cause to be constructed upon certain
property or rights-of-way in and contiguous to the premises described in
Exhibits "A-1" and "A-2", all sidewalks, driveways, streets, curbs,
acceleration, deceleration and stacking lanes, traffic controls, and signals,
directional signs and related improvements in accordance with said working
drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease
term, there shall be adequate sidewalks, driveways, roadways and entrances for
automotive and pedestrian ingress and egress to and from the demised premises
and adjacent public streets and highways, as shown on said working drawings
and specifications.

Landlord further covenants that the aggregate area provided for the
parking of automobiles shall during the lease term be sufficient to
accommodate not less than four hundred twenty (420) automobiles on basis of
arrangement depicted on Tenant's working drawings and specifications.

At least sixty-seven (67) days prior to the commencement of the lease
term, Landlord shall provide in accordance with said working drawings and
specifications as approved by Tenant and as shown on Exhibit B all of the
sidewalks, service drives, parking areas and entrances, from adjoining public
streets to permit receiving and delivering of fixtures, merchandise and other
property and to permit parking for persons involved in the pre-opening
activities of the Tenant

Liability Insurance.  During the lease term, Landlord at its sole expense
shall keep Tenant insured against all statutory and common law liabilities for
damage to property or injuries, including loss of life, sustained by any
person or persons within or arising out of said common areas, whether caused
by Tenant's negligence or otherwise, in a policy or policies with minimum
coverage of Five Hundred Thousand Dollars ($500,000) with respect to injury to
any one person and One Million Dollars ($1,000,000) with respect to any one
accident or disaster, and One Hundred Thousand Dollars ($100,000) with respect
to damage to property.  All such policies shall bear endorsements to the

effect that Tenant is named an additional insured and that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

Indemnification. Landlord further agrees at its sole expense to defend, indemnify and hold Tenant (and all of its officers, agents and employees) harmless against any and all liabilities for damages for claims arising out of said common areas or Tenant's use thereof, by reason of any act, action, neglect or omission on the part of Landlord and/or Tenant.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be reasonably requested to prevent said unauthorized utilization.

Store Opening

11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates:  (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty-seven (67) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date.  Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct, or remedy in all or part any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

Landlord's Represent- ations and Warranties

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements, including Tenant's demised premises as Phase II, substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord represents, warrants and covenants that there currently is, and will be at time Tenant's lease begins, an existing Phase I portion of the shopping center consisting of approximately 70,000 sq. ft. containing 25,000 sq. ft. Food Lion Market, 9,000 sq. ft. Eckerd drug store, and 36,000 sq. ft. of retail shops; plus a 20,000 sq. ft. 6-Plex theatre.  Further, Landlord is to use its best efforts and will aggressively pursue Phase III development of 160,000 square feet of additional retail shops and services, including one additional anchor fashion store of approximately 60,000 sq. ft., all to the end that these additional spaces will be complete within approximately one year from Tenant's store opening. When the shopping center is fully developed it will contain Phase IV of 113,000 sq. ft. of additional retail space, including a third anchor, for a total of 450,000 sq. ft. in the center.  Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A-1" except as shown on said Exhibit "B".

-7-

Landlord further represents, warrants and covenants that the land described in Exhibits "A-1" and "A-2" will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use, and that all necessary governmental consents, permits and approvals for such use shall have been obtained. Further, Landlord shall deliver to Tenant a Certificate of Occupancy prior to commencement of the lease term.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event Landlord's representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant thereafter shall have the option of either completing said representations and warranties at Landlord's cost and expense, or, alternatively, Tenant shall have an option to terminate this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Options to Extend Lease**    13. (a) Tenant shall have ten (10) successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or of this lease as extended.

(b) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof. Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

**First Refusal to Purchase Option**    14. Intentionally deleted.

**Repairs and Maintenance**    15. Tenant shall make and pay for all maintenance, replacement and repair necessary to keep the demised premises in a good state of repair and tenantable condition, except for the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility:

(a) all maintenance, replacement and repair to the roof, outer walls and structural portion of the buildings which shall be necessary to

-8-

maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and

(b) all repairs, maintenance or replacement of or to the utility services to the building and any underground storm sewers, sanitary sewers, water lines or electrical lines under the parking areas, service drives, streets, sidewalks, driveways, entrances; and

(c) all repairs and replacement (exclusive of sweeping, striping and snow and ice removal) necessary to maintain all driveways, sidewalks, street and parking areas free of all settling, clear of standing water, and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks.

Notwithstanding the foregoing provisions of Article 15 herein set forth, Landlord shall contract for sweeping, striping and snow removal for the parking areas, driveways, sidewalks and streets of the premises and maintain same in a clean, safe, sightly and serviceable condition. The Landlord shall further maintain all landscaped areas.

Tenant shall pay the Landlord its pro-rata share of the costs. Tenant's said share shall be based upon the ratio that the ground floor area of Tenant's building, exclusive of outside Garden Shop, bears to the total gross ground floor area contained in all buildings actually erected on any portion of the land described in Exhibit "A-2", exclusive of separately developed outlots.

For purposes of this Article, the costs of maintaining the common areas and common facilities shall mean the following: All amounts paid for (1) cleaning, and restriping the parking areas, sidewalks and driveways; (2) maintenance, repair and replacement of planted or landscaped areas; (3) lighting of parking lot (unless K mart premises are separately metered) including repair and replacements; and (4) wage and salaries of persons directly and actually performing services described herein. The cost of maintaining the common areas and common facilities shall not include real estate taxes, captital expenses, office overhead, permit fees, or rubbish removal for other tenants.

Tenant shall pay to Landlord on account of the aforesaid costs, an amount equal to one-twelfth (1/12) of Tenant's pro rata share of the estimated annual costs of such work performed by Landlord on the first day of each month in advance along with the monthly installment of minimum rental. Said amount shall be adjusted and revised by Landlord as of the end of the initial Lease year and each subsequent Lease year during the term hereon on the basis of the actual maintenance costs incurred during ti.· immediately preceding Lease year plus reasonably anticipated increases in such costs. Upon Landlord's furnishing to Tenant a written statement setting forth such revised estimate of maintenance costs to be incurred by Landlord pursuant to Article 15, Tenant shall pay to Landlord such revised estimated share in monthly installments, in advance, on the first day of each month in each Lease year upon the next succeeding provision of such estimate. Landlord agrees to provide the Tenant within sixty (60) days after the end of each Lease year a written statement signed by Landlord setting for the the cost of reimbursable items incurred by the Landlord pursuant to this Article and the calculations for determining the pro rata share of Tenant then due. If Tenant's pro rata share of the maintenance costs incurred exceed Tenant's payment in that Lease year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of the statement. In the event of a dispute between Landlord and Tenant concerning the dollar amount or method of allocation contained in the statement of Landlord, initially, Tenant shall be responsible only for that portion of the billing not in dispute. Upon request, Landlord must provide copies of all paid receipts which form the basis for the statement. If

-9-

Tenant's payment exceeds Tenant's pro rata share of the costs incurred, Tenant shall be entitled to a credit for such excess against estimated payments next thereafter due to Landlord on account of Tenant's pro rata share of the costs incurred by Landlord pursuant to this Article.

Tenant may, upon thirty (30) days notice, have Landlord's records of common area expenditures for the previous calendar year audited by Tenant's accountant; should such audit disclose any overpayment by Tenant, Landlord shall remit said overpayment upon demand.

Further, notwithstanding anything contained herein to the contrary, Tenant reserves the right, for any reason whatsoever, at any time upon thirty (30) days prior written notice to Landlord to assume the duties to maintain Tenant's demised premises. In such event, Tenant shall perform any and all maintenance work on Tenant's demised premises and Landlord shall have no current responsibility therefor, until and unless Tenant again requests, upon thirty days written notice, that Landlord assume the responsibility of maintaining Tenant's demised premises as well as the remainder of the shopping center.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Two Thousand Dollars ($2,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

Alterations and Additional Construction
16. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the buildings will not be impaired by such work. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

Utilities
17. Landlord covenants and agrees that the demised premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility raw materials (gas, water, sewage, telephone, electricity, etc.) furnished to the demised premises during the lease term.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

Governmental Regulations
18. Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and

-10-

regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

**Exculpation**    19.    Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

**Damage to**    20.    From and after the date on which Tenant shall be privileged to enter
**Demised**    upon the demised premises for the purposes specified in Article 9 hereof, Ten-
**Premises**    ant shall insure its buildings depicted on Exhibit "B" against damage or destruction by fire and other casualties insurable under a standard extended coverage endorsement. Said insurance shall be in an amount equal to not less than eighty per cent (80%) of the insurable value of the permanent improvements thereof. All such policies shall bear endorsements to the effect that Landlord shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Landlord. Copies of such insurance policies or certificates evidencing the existence thereof so endorsed, shall be promptly delivered to Landlord upon written request therefore. Irrespective of the cause thereof, Landlord shall not at any time be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty. At any time while Tenant's net worth shall exceed ONE HUNDRED MILLION DOLLARS ($100,000,000.00), the Tenant may elect to self-insure its obligation to restore.

Policies of insurance procured pursuant to this Article shall assure and be payable to Landlord, Tenant and mortgagee and shall provide for release of insurance proceeds to Tenant for restoration of loss.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement Tenant shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Twenty-five Thousand Dollars ($25,000.00), Tenant may terminate this lease as of the date of such damage or destruction by giving written notice to the Landlord within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises.

During any period commencing upon the date of any such damage or destruction by fire, the elements or any other casualty whatsoever, and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's buildings rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

-11-

In the event that, at any time during the lease term except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or Landlord may, at its option, elect to raze any buildings so damaged or destroyed and pave the area formerly occupied by said buildings so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required in Articles 10 and 15 hereof for other parking areas in the demised premises.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

**Eminent Domain**  21.  In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Exhibit "A-1" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the land described in Exhibit "A-1", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to

-12-

Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

**Use, Assign-ment and Subletting**    22. The premises hereby demised may be used for any lawful purpose, except as hereinafter limited. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease. Notwithstanding, Tenant may not assign or sublet the whole or any part of the demised premises without Landlord's approval, which approval will not be unreasonably withheld. The following uses shall be prohibited during the entrie Term of the Lease: Bingo parlor, Bowling alley, Movie theatre, Disco, Bar/Lounge, Auto sales or service, Flea market, Manufacturing facility, Skating rink, Residential use(s), Truck terminal, Lodging facility, Hospital, Nursing home, Distribution center or Warehouse (except that any stock area or the storage of goods intended to be sold at any retail establishment or business on the demised premises shall not be deemed a warehouse). Tenant may not operate a supermarket in the demised premises as long as the present food tenant continues to operate a supermarket in its premises.

**Signs**    23. The demised premises shall be referred to by only such designation as Tenant may indica.;. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of its signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine.

-13-

Tenant's pylon sign is not allowed by city regulations; only shopping center identification pylon signs are allowed, without any tenant identification.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

**Ingress and Egress**

24.    Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

25.    If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**

26.    If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**

27.    Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Exhibit "A-1", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a) Public utility easements not impairing Tenant's use of the demised premises.

(b) Mortgage lien on the demised premises.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) a certification by an attorney acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A-1", (b) an as-built survey by a licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Subordination**
28. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises or mortgage (or deed of trust) necessary for the interim construction or permanent financing of the shopping center improvements, but only as to such mortgage that directly affects the Tenant's demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**
29. During the lease term Tenant shall indemnify and save Landlord and Landlord's ground lessor, if any, harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any.

**Tenant's Right to Cure Landlord's Defaults**
30. In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said principal,

-15-

interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of seven percent (7%) per annum or the then current prime rate, whichever is the higher, and Tenant may to the extent 'necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

Condition of Premises at Termination    31. At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire if covered by insurance. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

Holding Over    32. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

Investment Tax Credit    33. Landlord hereby agrees to elect under the applicable provisions of the Internal Revenue Code of 1954, as amended, (hereinafter referred to as the "Code"), or any subsequent tax code, to pass through to the Tenant all investment tax credit which may be available from time to time in respect of the demised premises under Section 38 of said Code to the extent such investment tax credit is not usable under said Code by the Landlord, its successors and assigns. Landlord agrees to timely execute all documents required by said Code, and regulations issued thereunder, to enable Tenant to obtain such investment tax credit.

Landlord further agrees to maintain adequate records so that the qualifying property can be identified and the cost thereof can be determined and to provide such records to the Tenant upon written request and otherwise to cooperate with Tenant in said matter. Landlord agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Tenant.

Notices    34. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid, to Landlord's mortgagee, or to Tenant at its principal office in Troy, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

Captions and Definitions    35. Marginal captions of this lease are solely for convenience of refer-ence and shall not in any way limit or amplify the terms and provision

thereof. The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**
36. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum of Lease**
37. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

**Use of Common Areas, Right of Ingress and Egress**
38. Tenant, its agents, customers, invitees, employees, and assigns shall have a non-exclusive easement for access over, across and upon the streets, service drives, walkways and parking areas in the shopping center described in Exhibit "A-2". Landlord, its tenants, agents, customers, invitees,employees and assigns shall have a non-exclusive easemnt of access over, across and upon the streets, service drives, walkways and parking areas upon the demised premises of tenant described in Exhibit "A-1".

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:

LEADMINE ASSOCIATES I, LTD.

By: _____ (Seal)
    H. Arthur Sandman, General Partner

By: _____ (Seal)
    Robert V. Hughes, General Partner

K MART CORPORATION

By: _____
    M. L. Skiles, Vice President

Attest: _____
    C. E. Lotzar, Jr., Assistant Secretary

7603N

-17-

ACKNOWLEDGMENTS

STATE OF NORTH CAROLINA)
COUNTY OF WAKE          )ss:

     I do hereby certify that on this   31st     day of July, 1987, before
me,  Sheila Burnette Braddy                      , a Notary Public in and for the
Edgecombe County and State aforesaid, and duly commissioned, personally appeared H.
Arthur Sandman and Robert V. Hughes, known to me to be the General Partners of
Leadmine Associates I, LTD., who, being by me duly sworn, did depose and say
that they reside in   Wake County, NC

                                                                   ,
respectively; that they are the General Partners of  Leadmine Associates I, Ltd.,
the ʤʤʤʤʤʤʤʤʤ limited partnership described in and which executed the foregoing
instrument; that they know the seal of said partnership; that the seal affixed
to said instrument is the seal of said partnership; that, on behalf of said
partnership and by order of its general partners, they signed, sealed and
delivered said instrument for the uses and purposes therein set forth, as its
and their free and voluntary act; and that they signed their names thereto by
like order.

     In Witness Whereof, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

My commission expires:   11/2/88          _Sheila Burnette Braddy_
                                                 Notary Public


STATE OF MICHIGAN)
COUNTY OF OAKLAND)ss:

     I do hereby certify that on this /3th day of August, 1987, before
me,  (Patricia A. Hewelt)                 , a Notary Public
in and for the County and State aforesaid, and duly commissioned, personally
appeared M. L. Skiles and C. E. Lotzar, Jr., known to me to be the Vice
President and Assistant Secretary of K mart Corporation, who, being by me duly
sworn, did depose and say that they reside in Oakland County; that they are
the Vice President and Assistant Secretary respectively of K mart Corporation,
the corporation described in and which executed the foregoing instrument; that
they know the seal of said corporation; that the seal affixed to said
instrument is the corporate seal of said corporation; that, on behalf of said
corporation and by order of its board of directors, they signed, sealed and
delivered said instrument for the uses and purposes therein set forth, as its
and their free and voluntary act; and that they signed their names thereto by
like order.

     In Witness Whereof, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

My commission expires:_____     _Patricia A. Hewelt_
                                                 Notary Public

                    PATRICIA A. HEWELT
                    Notary Public, Macomb County, Mich.
                    My Commission Expires Aug. 17, 1988

                        Acting In Oakland County.

EXHIBIT A-1

BEGINNING AT A NEW IRON PIPE ON THE WESTERN RIGHT-OF-WAY OF SIX FORKS
ROAD, SAID IRON PIPE BEING THE SOUTHEAST PROPERTY CORNER OF PARCEL 1 AS
DENOTED ON A MAP PREPARED BY BASS, NIXON & KENNEDY, INC., DATED JUNE 2,
1987.   THENCE IN A SOUTHERLY DIRECTION ALONG THE WESTERN RIGHT-OF-WAY
OF SIX FORKS ROAD SOUTH 22-24-24 EAST A DISTANCE OF 380.05 FEET TO A
NEW IRON PIPE MARKING THE NORTHEAST CORNER OF FUDDRUCKERS LEASE PARCEL;
THENCE ALONG THE NORTHERN LEASE LINE OF SAID, FUDDRUCKERS, SOUTH
56-36-54 WEST A DISTANCE OF 290.00 FEET TO A NEW IRON PIPE MARKING THE
NORTHWEST CORNER OF FUDDRUCKERS LEASE PARCEL; THENCE ALONG THE WESTERN
LEASE LINE OF FUDDRUCKERS SOUTH 33-23-06 EAST A DISTANCE OF 198.89 FEET
TO A NEW IRON PIPE ON THE NORTHERN RIGHT-OF-WAY OF FORUM DRIVE AND
BEING THE SOUTHWEST CORNER OF FUDDRUCKERS LEASE PARCEL; THENCE
FOLLOWING THE NORTHERN RIGHT-OF-WAY OF FORUM DRIVE ALONG A CURVE TO THE
LEFT HAVING A RADIUS OF 985.00 FEET AND AN ARC LENGTH OF 231.45 FEET,
SUBTENDED BY A CHORD BEARING OF SOUTH 72-11-27 WEST AND A DISTANCE OF
230.91 TO A NEW IRON PIPE; THENCE CONTINUING ALONG THE NORTHERN
RIGHT-OF-WAY OF FORUM DRIVE SOUTH 65-27-34 WEST A DISTANCE OF 17.00
FEET TO A NEW IRON PIPE; THENCE LEAVING THE RIGHT-OF-WAY OF FORUM DRIVE
AND RUNNING NORTH 33-23-06 WEST A DISTANCE OF 102.00 FEET TO A NEW IRON
PIPE; THENCE SOUTH 65-40-49 WEST A DISTANCE OF 60.75 FEET TO A NEW IRON
PIPE; THENCE NORTH 33-25-00 WEST A DISTANCE OF 232.00 FEET TO A NEW
IRON PIPE; THENCE NORTH 78-25-00 WEST A DISTANCE OF 156.57 FEET TO A
NEW IRON PIPE; THENCE NORTH 11-35-00 EAST A DISTANCE OF 100.00 FEET TO
AN NEW IRON PIPE; THENCE NORTH 56-35-00 EAST A DISTANCE OF 315.33 FEET
TO A NEW IRON PIPE; THENCE NORTH 14-48-40 WEST A DISTANCE OF 92.59 FEET
TO A NEW IRON PIPE IN THE SOUTHERN PROPERTY LINE OF PARCEL I AS SHOWN
ON THE BASS, NIXON & KENNEDY, INC., MAP REFERRED TO ABOVE; THENCE ALONG
THE SOUTHERN PROPERTY LINE OF PARCEL I, NORTH 71-51-45 EAST A DISTANCE
OF 203.77 FEET TO A NEW IRON PIPE; THENCE NORTH 82-31-30 EAST A
DISTANCE OF 71.93 FEET TO A NEW IRON PIPE; THENCE NORTH 68-43-09 EAST A
DISTANCE OF 97.89 FEET TO A NEW IRON ON THE WESTERN RIGHT-OF-WAY OF SIX
FORKS ROAD AND BEING THE POINT AND PLACE OF BEGINNING AND SAID TRACT
CONTAINING 7.1296 ACRES.

BSCOTT.LTR

EXHIBIT A-2

BEGINNING at a point in the southern right of way line of Strickland Road
said point being located where NC Grid Coordinate X=2,101,817.719
intersects Y=783,135.252; thence from said beginning point South 13-30-24
West 105.00 feet to a point; thence South 01-09-28 East 135.00 feet to a
point; thence South 18-26-56 West 159.19 feet to a point; thence South
39-23-20 West 230.00 feet to a point; thence South 13-56-30 West 320.04
feet to a point; thence South 06-32-30 East 280.00 feet to a point; thence
South 16-02-19 West 200.10 feet to a point; thence South 18-32-17 West
168.78 feet to a point in the northern right of way line of Forum Drive;
thence with the northern right of way of Forum Drive South 87-31-44 East
1068.67 feet to a point; thence with the arc of a curve to the left having
a radius of 491.00 feet an arc distance of 231.48 feet to a point; thence
North 65-27-34 East 150.00 feet to a point; thence with the arc of a curve
to the right having a radius of 985.00 feet an arc distance of 247.37 feet;
thence North 79-50-54 East 134.00 feet to a point; thence with a curve to
the left having a radius of 543.00 feet an arc distance of 74.20 feet to a
point; thence with a curve to the left having a radius of 25.00 feet an arc
distance of 41.20 feet to a point in the western right of way line of Six
Forks Road; thence with the western right of way line of Six Forks Road
North 22-24-24 West 648.05 feet to a point; thence North 22-40-36 West
217.03 feet to a point; thence North 22-39-56 West 245.62 feet to a point;
thence North 53-30-27 West 78.57 feet to a point in the southern right of
way of line of Strickland Road; thence with the southern right of way line
of Strickland Road North 83-30-31 West 128.23 feet to a point; thence North
77-36-42 West 203.29 feet to a point; thence North 76-29-36 West 717.02 to
the point and place of beginning and being all of Parcels 1, 2, 3 and 4 as
shown on map prepared by Bass, Nixon & Kennedy, Inc., dated June 2, 1987,
entitled "Property of Leadmine Land Co."

K MART CORPORATION

INTERNATIONAL HEADQUARTERS
3100 WEST BIG BEAVER RD.
TROY, MICHIGAN 48084

March 20, 1986

EXHIBIT "C"

Bob Hughes Associates
8865 Six Forks Road
Raleigh, North Carolina  27609

Attention:  Mr. Robert V. Hughes

Re:  K mart #       - Raleigh, NC
SWC Strickland Road & Six Forks Rd.

Dear Mr. Hughes:

At the request of Mr. W. R. Kendell of our Real Estate Department, we are
forwarding to you two (2) sets of Typical Criteria Drawings and Outline
Specifications identified with the set number B-1869, covering our minimum
requirements for the construction of a K mart.

The Typical K mart Criteria drawings and specifications consist of the
following:

86,479 sq. ft. K mart dated February 17, 1986

    SD-1                            M-1 thru M-6
    A-1 thru A-11                   E-1 thru E-11

Outline Specifications dated February 17, 1986

(Outdoor Garden Shop:  Trellis, lighting and overhead irrigation spray system
are required.)

PLEASE NOTE:
1.  The enclosed Criteria Drawings are reduced (not to any scale) from the
    original drawings and thus they should not be scaled for any purpose.

2.  The Contract Documents to be prepared by your Architects/Engineers shall
    be drawn on 30"x42" sheets and shall be to scales as indicated on the
    Criteria Drawings.

SITE DEVELOPMENT

The K mart Corporation shall be party to the initial site development
decisions.  To enable the K mart Corporation to properly evaluate the site
conditions and have a meaningful input in these major decisions, the
Developer shall submit to the K mart Corporation, in written and drawing
form, a description of his proposed preliminary site development design.

Bob Hughes Associates                    - 2 -              March 20, 1986
Mr. Robert V. Hughes
Re:  K mart #          - Raleigh, NC

SITE DEVELOPMENT  (Continued)

The site development design shall encompass all aspects of the proposed
K mart operation i.e. access, site drainage and the relationship of the
K mart floor elevation to adjacent grades, roads and buildings.  Land
balance shall be given consideration but shall not be the overriding
factor in the ultimate site design.

Preparation of final engineering drawings or commitments affecting site
improvements and development shall not be made by the Developer until
approval has been granted by the K mart Corporation.

The design package shall indicate the proposed building location, floor
elevation, site drainage pattern and utilities.  The design package shall
also include a topographical survey of the entire site including an area
extending approximately 150' onto all adjacent properties and to the
centerline of all boundary roads, or as may be required to determine any
adjacent terrain conditions which might influence the site development
design.  The survey shall also include the site description, measurements
and all existing utilities.  Preliminary test boring reports indicating
the sub-surface soil conditions shall also be submitted.

The K mart Corporation will review all submitted data and if necessary,
visit the site.  If in the judgement of the K mart Corporation the
proposed site development design would be detrimental to the K mart
operation, the design will be returned to the Developer for re-study.
Upon approval of the Site Development Design by the K mart Corporation,
the Developer may proceed with final engineering drawing.

The Typical K mart store plans and specifications described above are to be
modified as indicated in the criteria revisions outlined in the following
paragraphs.

1.  Garden Shop Trellis consisting of drawings TD-250 and TD-250 M/E, dated
    February 26, 1986.

These drawings and specifications describe a 86,479 square foot K mart with
the Garden Shop to the right.  At this location however, the K mart is
opposite hand.  We are including a Preliminary Layout B-1869, dated March 13,
1986, for this size and hand store.  This drawing also indicates any required
modifications to the Typicals for this specific location.

It is contemplated that this K mart store be part of an enclosed mall.  If the
K mart entrance, storefront and canopy are required to be modified to
integrate them with the enclosed mall, these modifications to the Typical
Criteria, must be reviewed and approved by the K mart Corporation.

Please advise your consultants regarding the following utilities and services
for the above mentioned location.

Secondary electric service from Carolina Power and Light is acceptable.  Power
factor correction is not required unless energy conservation codes in effect
require improvement.  Utility transformer shall be located where shown on
layout.

Bob Hughes Associates                    - 3 -              March 20, 1986
Mr. Robert V. Hughes
Re:  K mart #        - Raleigh, NC

Firm gas shall be utilized for space heating and domestic hot water heater
#1.  Water heater #2 serving the Delicatessen area shall be electric as
indicated on the drawings.  Landlord's consulting engineer shall verify
availability of firm natural gas and obtain a commitment from Public Service
Company of North Carolina before proceeding with design drawings.  When no
firm commitment is obtainable, Landlord shall advise K mart Corporation,
Energy Systems immediately.

Provide one (1) meter for each utility to the K mart.

All public utilities (including the sprinkler system) for other co-tenant
facilities, shall be separate and completely independent from the K mart and
shall be provided by the Landlord.

The parking lot lighting and service drive lighting shall be on Landlord's
separate meter and separate electric service.  Landlord shall re-bill
appropriate charges for the K mart area to K mart Corporation.

Landlord's Engineer shall consult the telephone company relative to proper
facilities, including conduit, to handle the telephone installation.

Supplemental information, which modifies or clarifies the enclosed drawings
and/or specifications, is as follows:

All stock rooms, both upper and lower levels, shall be air conditioned.  See
drawings M-2 and M-3 which show independent air conditioning units for
checking and receiving, main stock area and mezzanine stock areas (A.C. units
#15, #16 & #17).  When stock rooms are air conditioned, power exhausters #4,
#5 & #6 and unit heaters designated for "main stock" shall be eliminated.

Due to the climatic conditions prevailing at this location, nite set-back of
heating controls in Sales Area Roof Top Units shall be required.

Please advise your Architect and Consulting Engineers that our insurance
underwriter is Protection Mutual Insurance Company, 17330 Preston Road, Suite
200C, L. B. 436 & 442, Dallas, Texas 75252, phone:  (214) 931-7650.

Direct any inquiries to Mr. W. D. Patterson at the above address.

In addition to gas piping shown on drawing M-2, provide two inch (2") gas
lines connected to heating units at AC #6 and AC #9.

These sets of typical plans and specifications are to be used only as a guide
for the preparation of complete working drawings and specifications and as
such are not intended, nor will their use be permitted, for construction
purposes.  If, at the time this project is formalized, modifications which
affect electrical or plumbing underfloor locations have occured additional
information covering such modifications will then be furnished.

Bob Hughes Associates                    - 4 -              March 20, 1986
Mr. Robert V. Hughes
Re:  K mart #          - Raleigh, NC


After final approval of Contract Documents, one complete set of <u>drawings only</u>
must be submitted to the Tax Department, K mart International Headquarters,
Troy, Michigan.  Drawings to include architectural, structural, site,
mechanical and electrical.  Specifications <u>not</u> required.

Very truly yours,

Paul H. Goldsmith, R. A.
Manager, Design Division
Construction Department

PHG:klg
cc: Mr. J. A. Kilgore
    Mr. J. M. Vachon
    Mr. J. E. Dinkins
    Mr. A. J. Collins
    Mr. D. F. Slater
    Mr. W. R. Kendell
    Energy Systems
    Real Estate, K. I. H.

# EXHIBIT 3

**STATE OF NORTH CAROLINA**

**COUNTY OF WAKE**

**FIRST AMENDMENT TO LEASE**

THIS FIRST AMENDMENT TO LEASE (the "Amendment") is made and entered into this the **23ᴿᴰ** day of **APRIL**_____, 1999 (the "Effective Date") by and between LEADMINE ASSOCIATES I LIMITED PARTNERSHIP, a North Carolina limited partnership ("Landlord"), and K MART CORPORATION, a Michigan corporation ("Tenant"). These parties shall hereinafter sometimes be referred to collectively as the "Parties", and individually as a "Party".

WITNESSETH:

WHEREAS, Landlord and Tenant entered into a Lease dated July 31, 1987 (the "Lease"), for certain premises located in the Six Forks Station Shopping Center (the "Shopping Center"), Raleigh, North Carolina, containing approximately 7.134 acres, and as more particularly described in the Lease (the "Premises"); and

WHEREAS, Tenant wishes to expand the Premises and the improvements situated thereon; and

WHEREAS, the Shopping Center will be improved and expanded (the "Shopping Center Improvements") to accommodate new tenants, including, without limitation, Home Depot U.S.A., Inc. ("Home Depot"); and

WHEREAS, the Parties have agreed to amend and modify the terms of the Lease based on the foregoing and as set forth hereinbelow.

NOW THEREFORE, in consideration of the Premises, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      RECITALS. The foregoing recitals shall constitute an integral part of this Amendment, and this Amendment shall be construed in light thereof.

2.      EXPANSION OF PREMISES. Section 1 of the Lease is hereby amended to reflect that, as of the Effective Date, the Premises shall be increased by approximately 13,926 square feet, as described on Exhibit "A-3" attached hereto and incorporated herein by this reference (legal description of the expanded Premises), which exhibit shall replace Exhibit "A-1" to the Lease. Further, Tenant shall, at is sole cost and expense, construct on the Premises, in substantially the same location shown on Exhibit "B-2" attached hereto and incorporated herein by this reference (the "Premises Site Plan"), additional leasehold improvements (the "Tenant

1

Improvements") in accordance with all applicable laws, and plans and specifications approved by Landlord (which approval shall not be unreasonably withheld) (the "Improvement Plans"). The Improvement Plans shall be attached hereto as Exhibit "C-1" within ninety (90) days after the Effective Date. The Improvement Plans shall include a designation for a merchandise trailer area on the Premises, which area shall be operated and maintained by Tenant in a manner consistent with first class shopping center practices.

3.    RENT. Notwithstanding the foregoing, the annual minimum rent set forth in Section 3 of the Lease and the additional rent set forth in Section 4 of the Lease shall not be increased hereby.

4.    COMMON AREA MAINTENANCE COSTS. Section 15 of the Lease is hereby amended to reflect that, as of the Effective Date, Tenant's prorata share of common area maintenance costs shall be based on a fraction, the numerator of which shall be the gross leasable area (the "GLA") of the expanded Premises, and the denominator of which shall be the GLA of the Shopping Center. The Shopping Center is more particularly described on Exhibit "A-4" attached hereto and incorporated herein by this reference, which exhibit shall replace Exhibit "A-2" to the Lease (legal description of the Shopping Center); and the Shopping Center will be substantially as shown on Exhibit "B-1" attached hereto and incorporated herein by this reference (the "Shopping Center Site Plan"), which exhibit shall replace Exhibit "B" to the Lease. The Premises Site Plan and the Shopping Center Site Plan shall hereinafter sometimes be referred to collectively as the "Site Plans". It is understood and agreed that the GLA of the expanded Premises shall be approximately 109,304 square feet, and the GLA of the Shopping Center shall be approximately 464,931 square feet. Promptly following completion of the Tenant Improvements and the Shopping Center Improvements, the Parties shall execute a mutually acceptable document setting forth the GLA of the expanded Premises and the GLA of the Shopping Center.

5.    SIGNS. The second paragraph of Section 23 of the Lease is hereby deleted in its entirety and replaced with the following:

"Tenant shall, at its sole cost and expense, install its standard signage, excluding any pylon signs, on the Premises, in a location(s) approved by Landlord (which approval shall not be unreasonably withheld), and in accordance with all applicable laws. Tenant shall be responsible for maintaining such signage in good condition and repair throughout the term of the Lease.

Landlord shall, at its sole cost and expense, obtain all necessary approvals and permits for, and construct within one (1) calendar year from the date hereof, a Shopping Center pylon sign substantially similar to the sign shown on Exhibit "D" attached hereto and incorporated herein by this reference ("Pylon 1"). Pylon 1 shall be located in substantially the same location cross-hatched on the Site Plans, and shall contain a panel identifying the Shopping Center. Tenant shall be entitled to have an identification panel posted on Pylon 1 in substantially the same location and as otherwise shown on Exhibit "D" (the "Panel"). The Panel shall be no smaller than the panel of any other Shopping Center tenant; and the Panel shall be posted on the

2

Pylon in a position based on the GLA of the Premises (e.g., Tenant is currently the second largest tenant in the Shopping Center; therefore, the Panel would be posted in at least the second position on Pylon 1 reserved for tenants of the Shopping Center). Landlord shall also use its best commercially reasonable efforts to obtain all necessary approvals and permits for, and construct within one (1) calendar year from the date hereof, an additional pylon sign in substantially the same location shown on the Site Plans ("Pylon 2"). If Landlord is able to construct Pylon 2 in accordance with the provisions hereof, Tenant shall be entitled to have a Panel posted on Pylon 2 in substantially the same location and as otherwise shown on Exhibit "D"."

6.    SHOPPING CENTER IMPROVEMENTS. In connection with the above-referenced expansion of the Shopping Center, Home Depot plans to construct improvements in the Shopping Center, including, without limitation, a parking lot adjacent to the Premises, which improvements shall be substantially similar in manner and location, as shown on the Shopping Center Site Plan (the "Home Depot Improvements"). Landlord represents that Home Depot has agreed to have an individual on the Home Depot construction site who will be available to address questions and concerns of other Shopping Center tenants pending completion of the Home Depot Improvements.

7.    PARTIES' ACKNOWLEDGMENT.

A.    Tenant Acknowledgment. Tenant hereby acknowledges that the Home Depot Improvements may temporarily (a) encroach on the Premises, and (b) disrupt traffic flow between the Premises and the remainder of the Shopping Center; but reasonable, good faith efforts shall be made to minimize any such encroachment and disruption. Tenant hereby further acknowledges that, as of the date of this Amendment, Landlord has materially complied with all of its obligations under the Lease.

B.    Landlord Acknowledgment. Landlord hereby acknowledges to Tenant that, as of the date of this Amendment, Tenant has materially complied with all of its obligations under the Lease.

8.    MISCELLANEOUS.

A.    Interpretation of Lease. In the event of any conflict between the terms of this Amendment and the terms of the Lease, the terms of this Amendment shall govern. Except as expressly modified hereby, all other terms, conditions, provisions, rights and obligations of the Lease shall continue in full force and effect and are hereby ratified and confirmed.

B.    Successors and Assigns. This Amendment shall bind and inure to the benefit of and may be enforced by the parties hereto and their respective heirs, legal representatives, successors and assigns.

C.    Governing Law. This Amendment shall be construed under and in accordance with the laws of the State of North Carolina.

INITIALS

3

concerning exterior merchandise sales and signs on the premises which reules and regulations shall be approved by Tenant within sixty (60) days after the date hereof (such approval not to be unreasonably withheld).

In WITHNESS WHEREOF and intending to be legally bound hereby, the Parties have caused this First Amendment to Lease to be executed as of the day and year first above written.

LANDLORD:

LEADMINE ASSOCIATES I LIMITED
PARTNERSHIP

By: _____ (SEAL)
Robert V. Hughes, General Partner

By: _____ (SEAL)
H. Arthur Sandman, General Partner

TENANT:

K MART CORPORATION

ATTEST:

_____
Anne Hancock, Assistant Secretary
(CORPORATE SEAL)

ANNE HANCOCK
REAL ESTATE LEGAL COUNSEL
ASSISTANT SECRETARY

By: _____
Lorrence Kellar, Vice President of Real
Estate



| Book of Maps _____ | Vol ____ | Page ____ | Deed Book _____ | Pg ____ | County of _____ WAKE |
| LOT ____ | SIX FORKS STATION S/C SUBDIVISION | | | | |

I HEREBY CERTIFY THAT THIS MAP IS CORRECT AND THAT THE BUILDING FOUNDATION LIES WHOLLY ON THE LOT AND THAT THERE ARE NO ENCROACHMENTS ON SAID LOT EXCEPT AS NOTED.

| Surv'd. | Drawn GPM | Chk'd. GSW | FIELD BOOK | Date 02-16-99 | Scale 1" - 100' |

**BNK BASS, NIXON & KENNEDY, INC.**
CONSULTING ENGINEERS
7416 CHAPEL HILL ROAD
RALEIGH, NORTH CAROLINA  27607
919-851-4422      FAX• 851-8968

SURVEY FOR

LEADMINE LAND CO.

RALEIGH            NORTH CAROLINA

**EXHIBIT "A-3"**

PAGE 1

 **BASS, NIXON & KENNEDY, INC., CONSULTING ENGINEERS**
7416 CHAPEL HILL ROAD, RALEIGH, NC 27607
919/851-4422 ▪ FAX 919/851-8968

LEGAL DESCRIPTION
K-MART LEASE PARCEL

Commencing at an N.C. grid monument "Stricksix" located in the northwest corner of the intersection of Strickland Road and Six Forks Road and having N.C. grid NAD'27 coordinates of N=783097.799 and E=2102803.109; thence S 22°52'45" E 718.26 feet to the Point and Place of BEGINNING, said point being in the western right-of-way of Six Fork Road, S.R. 1005; thence continuing along said right-of-way S 22°24'24" E 380.05 feet to a point; thence leaving said right-of-way S 56°36'54" W 290.00 feet to a point; thence S 33°23'06" E 198.89 feet to a point on a curve in the northern right-of-way of Forum Drive, said curve having a radius of 985.00 feet; thence along said curve as it turns to the left an arc distance of 231.45 feet and said curve having a chord bearing of S 72°11'27" W and a chord distance 230.91 feet to a point of tangency; thence S 65°27'34" W 17.00 feet to a point; thence leaving said right-of-way N 33°23'06" W 102.00 feet to an existing iron pipe; thence S 65°40'49" W 97.09 feet to a point; thence N 49°54'51" W 58.76 feet to a point; thence N 33°25'00" W 162.25 feet to a point; thence N 42°47'04" W 21.42 feet to a point; thence N 57°17' 47" W 23.76 feet to a point; thence N 68°42'46" W 18.94 feet to a point; thence N 77°34'48" W 20.74 feet to a point; thence N 33°25'00" W 68.71 feet to a point; thence N 11°35'00" E 67.45 feet to a point; thence N 56°32'56" E 318.94 feet to a point; thence N 14°48'40" W 91.84 feet to a point;  thence N 71°51' 45" E 203.77 feet to a point; thence thence N 82°31' 30" E 71.93 feet to a point; thence N 68°43'09" E 97.89 feet to the Point and Place of BEGINNING and containing 7.4537 acres.

EXHIBIT "A-3"
PAGE 2

BEING a certain parcel of land located in Wake County, North
Carolina more particularly described as follows: beginning at a
point in the western right of way of Six Forks Road, said point
being located southeasterly 1086.50' from the southwest corner of
the intersection of Strickland Road and Six Forks Road, then
leaving Six Forks Road southwesterly along a curve to the right
40.48', said curve having a radius of 25.00' to a point in the
northern right of way of Forum Drive; then with the northern line
of Forum Drive westerly along a curve to the right 90.09', said
curve having a radius of 543.00'; then S79-50-56W, 134.00'; then
southwesterly along a curve to the left 247.37', said curve
having a radius of 985.00'; then S-65-27-34W, 150.00'; then
westerly along a curve to the right 231.48', said curve having a
radius of 491.00'; then N87-31-44W, 1068.67'; then leaving the
right of way of Forum Drive N18-32-17E 168.78'; then N16-02-19E,
200.10'; then N6-32-30W, 280.00'; then N13-56-30E, 320.04'; then
N39-23-20E, 230.00'; then N18-26-59E, 159.19'; then N01-09-28W,
135.00"; then N13-30-24E, 120.00' to a point in the southern
right of way of Strickland Road; then with the right of way of
Strickland Road S76-29-36E, 717.02'; then S77-36-42E, 202.37';
then S83-30-31E, 101.48'; then S53-30-27E, 137.83' to a point in
the western right of way of Six Forks Road; then with the right
of way of Six Forks Road S22-39-56E, 220.50'; then S22-40-36E,
217.06."; then S22-24-24E, 648.94' to the point of beginning and
containing 48.5275 acres, as shown on boundary plat for Six Forks
Station prepared by Bass, Nixon & Kennedy, Inc., EXCEPT AND
EXCLUDING 13.09 acres as shown on map recorded in Book of Maps
1982, Page 404, Wake County Registry, the metes and bounds
description of which is incorporated herein by reference.

EXHIBIT "A-4"



**EXHIBIT "B-2"**
**PREMISES SITE PLAN**

## EXHIBIT "C-1"

## PLANS AND SPECIFICATIONS

{TO BE ATTACHED}

f:\cindy\realest\leases\amend.709

9



# EXHIBIT 4

10/25/2017    00248379

*Batch 2465, pg 1*

*OCT 23 2017*

*legal received, 9/21/17*

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

September 20, 2017

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0646 3066**

WRI/Raleigh, L.P.
c/o Weingarten Realty Investors
2600 Citadel Plaza Drive, Suite 125
Houston, TX  77008
Attn:  General Counsel

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0646 3073**

WRI/Raleigh, L.P
c/o Weingarten Realty Management Co.
9420 Forum Drive, Suite 101
Raleigh, NC  27615
Attn: Gene Douglas, Property Manager

Re:    Lease dated July 31, 1987, as amended,
       for the premises located at 8701 Six Forks Rd.,
       Raleigh, NC, and known as Kmart Unit # 3667

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing April 1, 2018, to and including March 31, 2023, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION,
a Michigan corporation

By: _JoAnn Catanese_____
JoAnn Catanese
Divisional Vice President, Real Estate

JC/cm

cc:    S. Jeffrey Stollenwerck
       Lease File

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7014 2120 0001 5427 0280**

WRI/Raleigh, L.P.
Tenant No. 122672/Company No. 29935
P.O. Box 301074
Dallas, TX  75303-1074

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certified that a true and correct copy of the foregoing instrument has been served via electronic mail and/or first class mail, postage pre-paid on this 31st day of January, 2019 upon the parties listed below and electronically via ECF notification upon all parties requesting service via ECF notification:

Sears Holdings Management Corporation
Attn: Rob Riecker (rob.riechker@searshc.com)
Attn: Luke Valentino (luke.valentino@searshc.com)
Attn: Mohsin Meghji (mmeghji@miiipartners.com)
Attn: General Counsel (counsel@searshc.com)
3333 Beverly Road
Hoffman Estates, IL 60179

Weil, Gotshal & Manges LLP
Attn: Ray C. Schrock (ray.schrock@weil.com)
Attn: Jacqueline Marcus (jacqueline.marcus@weil.com)
Attn: Garret A. Fail (garrett.fail@weil.com)
Attn: Sunny Singh (sunny.singh@weil.com)
767 Fifth Avenue
New York, NY 10153

Lazard Fréres & Co., LLC
Attn: Brandon Aebersold and Levi Quaintance (project.blue.rx@lazard.com)
30 Rockefeller Plaza
New York, NY 10112

Bank of America, N.A.
c/o Skadden, Arps, Slate, Meagher & Flom LLP
Attn: Paul D. Leake (Paul.Leake@skadden.com)
Attn: Shana A. Elberg (Shana.Elberg@skadden.com)
Attn: George R. Howard (George.Howard@skadden.com)
4 Times Square
New York, NY 10036

Bank of America, N.A.
c/o Berkeley Research Group, LLC
2200 Powell Street, Suite 1200
Emeryville, CA 94608

Wells Fargo Bank, National Association
c/o Choate, Hall & Stewart LLP
Attn: Kevin J. Simard (ksimard@choate.com)
Attn: Jonathan D. Marshall (jmarshall@choate.com)
Two International Place
Boston, MA 02110

Akin Gump Strauss Hauer & Feld LLP
Attn: Philip C. Dublin (pdublin@akingump.com)
Attn: Ira S. Dizengoff (idizengoff@akingump.com)
Attn: Abid Qureshi (aqureshi@akingump.com)
Attn: Sara L. Brauner (sbrauner@akingump.com)
One Bryant Park
New York, NY 10036

Transform Holdco LLC
c/o ESL Partners, Inc.
Attn: Kunal S. Kamlani (kunal@eslinvest.com)
Attn: Harold Talisman (harold@eslinvest.com)
1170 Kane Concourse, Suite 200
Bay Harbor Islands, FL 33154

Cleary Gottlieb Steen & Hamilton LLP
Attn: Christopher E. Austin (caustin@cgsh.com)
Attn: Benet J. O'Reilly (boreilly@cgsh.com)
Attn: Sean A. O'Neal (soneal@cgsh.com)
One Liberty Plaza
New York, NY 10006

Office of the United States Trustee
Attn: Paul Schwartzberg
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014

*/s/ Maeghan J. McLoughlin*
Maeghan J. McLoughlin