# EXHIBIT A

K mart #3808 – Statesville, NC

**Parties**

      THIS LEASE made and entered into as of this *5th* day of *april /*   ,
1989, between COLLETT, BRANSTROM AND ASSOCIATES, a North Carolina general
partnership, having its principal office at 320 S. Tryon Street, Suite 202,
Charlotte, NC 28209 (herein referred to as "Landlord"), and K MART
CORPORATION, a Michigan corporation having its principal office at 3100 West
Big Beaver Road, Troy, Michigan 48084 (herein referred to as "Tenant"),

      WITNESSEIH: That in consideration of the rents, covenants and conditions
herein set forth, Landlord and Tenant do hereby covenant, promise and agree as
follows:

**Demised Premises**

      1.   Landlord does demise unto Tenant and Tenant does take from Landlord
for the lease term the following property:  Tenant's completed building
(designated K mart), together with site improvements to be constructed as
hereinafter specified by Landlord at its expense together with land comprising
Eight and 42/100 (8.4234) acres more or less as described in Exhibit "A-1",
attached hereto and made a part hereof, and situated in the City of
Statesville, County of Iredell, State of North Carolina; said building to be
in the locations depicted on Exhibit "B" attached hereto and made a part
hereof, and of the following dimensions:

      K mart Building: 361'-4" in width by 239'-4" in depth
      Total Size: 86,479 sq. ft.

      In addition, Landlord shall provide a fenced garden shop area having
dimensions of 50' in width by 100' in depth, as indicated on Exhibit "B",
attached hereto.

      Said land, completed building and site improvements, together with all
licenses, rights, privileges and easements, appurtenant thereto shall be
herein collectively referred to as the "demised premises".

      Landlord hereby gives and grants unto Tenant, in common with others
entitled thereto, including Tenant's agents, employees, customers, licensees
and invitees the following licenses, rights, privileges and easements:  the
use of parking areas, common areas (including rest rooms and other facilities,
if any), roadways, sidewalks and accessways to public streets and highways
indicated on said Exhibit "B", together with the use of any delivery or
servicing areas adjoining Tenant's said buildings or designated as such on
Exhibit "B", which areas shall be adequate for the passage  unloading and, if
necessary, turning around of trailer trucks and other commercial vehicles.

**Term**

      2.   The term of this lease shall commence upon the "date of occupancy by
Tenant", as that term is defined in Article 11 hereof, and shall terminate
upon such date as shall be twenty five (25) years from the last day of the
month in which said date of occupancy by Tenant shall occur; provided,
however, the term of this lease may be extended as provided in Article 13
hereof.  The phrase "lease term", as used in this lease, shall be the term of
this lease and any extension thereof pursuant to said Article 13.

**Annual Minimum Rental**

      3.   Tenant shall, during the lease term, pay to Landlord, at such place
as Landlord shall designate in writing from time to time, an annual minimum
rental of FOUR HUNDRED TWO THOUSAND ONE HUNDRED TWENTY-SEVEN DOLLARS
($402,127.00), unless abated or diminished as hereinafter provided, in equal
monthly installments on the first day of each month, in advance, commencing
upon the first day of the lease term; provided, however, in the event the
first day of the lease term shall not be the first day of a calendar month,
then the rental for such month shall be prorated upon a daily basis.

-1-

**Additional**
**Rental**

4.    In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of SIXTEEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($16,500,000.00), Tenant shall pay to Landlord as additional rental an amount equal to one per cent (1%) of gross sales exceeding SIXTEEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($16,500,000.00).

Said additional rental shall be paid on or before the thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the thirtieth (30th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail (including merchandise ordered on the demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the demised premises, except that the following shall be excluded:

(a)  Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b)  Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such

occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d) Service and interest charges for time payment accounts and charge accounts;

(e) All sales of merchandise or services made by any food market which shall occupy any portion or portions of the demised premises; and

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within ninety (90) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said ninety (90) day period and the Tenant shall be released from any further liability under this lease.

Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect.

Notwithstanding the provisions of the two preceding paragraphs, Tenant shall be entitled, at any time prior to the discontinuance of the operation of its store and the delivery of the notice to Landlord of its election to discontinue its operation (as hereinabove provided) to assign this lease or sublet the whole or any part of the demised premises pursuant to Article 22 hereof; subject, however, to the terms and conditions of this lease including the provisions of Article 4 hereof. Any such assignment or subletting shall not be construed to be a discontinuance of Tenant's operation of its store.

In the event Landlord shall fail to exercise its option to cancel and terminate this lease after receiving notice from Tenant of its intention to discontinue the operation of its store (as hereinabove provided) and Tenant thereafter assigns this lease or sublets the whole or any part of the demised premises pursuant to Article 22, the rent which Tenant or Tenant's assignee shall be obligated to pay to Landlord during the remainder of this Lease shall be the rent more particularly set forth in Article 3 and the word "minimum" in said Article 3 shall be deemed deleted and all the provisions contained in the preceding paragraphs of this Article 4 shall be of no further force and effect.

Real
Estate
Taxes

      5.   Tenant shall pay and discharge all ad valorem real estate taxes and all assessments, general or specific, levied against the taxable premises during the term of the Lease, excluding therefrom payment of general or special assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

The term "taxable premises", as used in this lease, shall be that certain land described in Exhibit "A-1" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

Landlord and Tenant shall use their reasonable efforts to obtain a separate tax assessment with respect to the taxable premises. In the event that a separate tax assessment with respect to the taxable premises cannot be obtained, then for purposes of this lease, the parties shall refer to the office records of the assessing authority including but not limited to worksheets and field reports, in order to obtain the relevant land and building valuations required to calculate Tenant's separate liability for the real estate taxes hereunder.

In the event that neither a separate tax assessment for the taxable premises can be obtained nor an accurate tax liability established from the assessing office records can be determined, then the Tenant's Portion of Real Estate Taxes shall mean the following: (1) Tenant's pro rata share of taxes attributable to the Tenant's Building shall be the fraction, the numerator of which shall be the number of square feet of ground floor area of the Tenant's Building at the end of such real estate fiscal tax year (excluding the garden shop) and the denominator of which shall be the total number of square feet of ground floor area of all of the buildings located on the property depicted on Exhibit "A-2" (including the Tenant's Building) at the end of such real estate fiscal tax year, plus (2) tenant's pro rata share of the taxes assessed against the total land described in Exhibit "A-2". Tenant's pro rata share of the taxes assessed against the total land described in Exhibit "A-2" shall be computed by multiplying the total tax liability against the land described in Exhibit "A-2" by a fraction, the numerator of which shall be the number of square feet of land within the demised premises and the denominator of which shall be the number of square feet of land within the land described in Exhibit "A-2". In no event shall tenant be responsible for the payment of taxes and assessments incurred or levied on other buildings existing on the land other than the taxable premises.

The date of levy of all ad valorem real estate taxes shall be deemed to be the date specified by each applicable taxing jurisdiction for which such taxes become a lien on the taxable premises. The Tenant's liability and obligation hereunder to pay such ad valorem real estate taxes shall be fully accrued, fixed and final on the date of levy thereof.

To the extent permitted by law, Tenant may pay any such assessment in annual installments. In the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately.

Tenant shall not be chargeable with, nor be obligated to pay any income, profit, inheritance, estate, succession, gift, franchise, or transfer taxes which are or may be imposed upon Landlord, its successors or assigns, by whatsoever authority imposed or howsoever designated.

Written evidence of the payment of taxes and assessments hereunder shall be furnished by Tenant to Landlord upon Landlord's written request therefor.

The amount, if any, by which the ad valorem real estate taxes and assessments payable hereunder exceed TWENTY-NINE THOUSAND DOLLARS ($29,000.00) during any lease year, shall be hereinafter referred to as an "excess tax payment". All excess tax payments shall be deductible by Tenant from additional rentals, as defined in Article 4, due and payable for such lease year.

In the event Tenant constructs, as provided in Article 16 hereof, additional buildings or structures on any portion of the land described in Exhibit "A-1", said additional buildings or structures shall be excluded from the taxable premises. Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall be paid and discharged by Tenant and shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises or the Shopping Center by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall, at Tenant's expense, cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the Shopping Center, the Tenant will cooperate in such proceedings; provided, however, that Landlord shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises which might result in the termination of this Lease.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refund paid by the taxing authorities. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost.

**New Building by Landlord**   6.   Tenant's said building and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay. Landlord warrants that a general contract

for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than September 1, 1989. If for any reason whatever Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to January 15, 1990, then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

Drawings
and
Specifi-
cations

7.    Tenant's said building and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. K-0351 containing such additions, changes, and modifications as are more particularly set forth in that certain letter dated December 7, 1988, written by S. K. Li, Manager, Design Division, Construction Department to Collett and Associates, 320 S. Tryon Street, Suite 202, Charlotte, NC  28202, a copy of which letter is attached hereto and marked Exhibit "C".

Said typical plans and specifications are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department:

(a)    Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on store layout drawings which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b)    Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Said working drawings and specifications shall be submitted to Tenant in time to permit a review and approval by Tenant prior to commencement of construction. Such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

-6-

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

Subsequent to approval of the typical drawings and specifications, in the event that criteria changes to the lease shall be requested by Tenant, which result in a savings to the Landlord in construction costs, then, Landlord shall pay Tenant an amount equal to the savings. In the event such criteria changes result in extra construction costs to the Landlord, then Tenant shall pay Landlord the extra construction costs resulting from such changes.

**Guarantee of Materials**

8.    Landlord shall unconditionally guarantee all work performed by or for the Landlord in the construction of Tenant's building and site improvements against defective workmanship and materials for a period of one (1) year from commencement of lease term or date of final acceptance by Tenant, whichever is later, unless a different period of time is expressly stated under section of the criteria documents and/or job specifications. Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive.

**Advance Possession for Fixturing and Merchandising**

9.    For a period of sixty seven (67) days after completion of Tenant's building by Landlord, as set forth in Article II (b), Tenant shall have the privilege, rent free of entering said buildings for the purposes of installing stockroom equipment and salesfloor trade fixtures, storing merchandise, training personnel and other pre-opening activities. The Landlord's completion of the building shall be construed to mean the building is substantially complete except connections to tenants equipment, i.e. permanently enclosed, completely decorated inside and out. floor covering installed, electrical system complete, mechanical systems functioning on controls, toilet facilities complete for both sexes, fire protection system including alarms complete.

Landlord shall advise Tenant's Regional Construction Manager in writing ninety (90) days prior to his projected completion date to allow tenant to place orders for fixtures, arrange for personnel and order merchandise.

**Parking and Other Common Areas**

10.    Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises described in Exhibits "A-1" and "A-2", all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications (all of which improvements shall hereinafter, along with the land thereon constructed, be referred to as the "common areas").

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibits "A-1" and "A-2", all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements in accordance with said working drawings and specifications and the requirements of any governmental bodies.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.

Landlord also covenants that the area within the demised premises provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than four hundred thirty-two (432) automobiles on basis of arrangement depicted on Tenant's working drawings and specifications.

Landlord further covenants that the aggregate area depicted on Exhibit "B" provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than seven hundred twelve (712) automobiles on basis of arrangement depicted on Tenant's working drawings and specifications.

At least sixty-seven (67) days prior to the commencement of the lease term, Landlord shall provide in accordance with said working drawings and specifications as approved by Tenant and as shown on Exhibit B all of the sidewalks, service drives, parking areas and entrances, from adjoining public streets to permit receiving and delivering of fixtures, merchandise and other property and to permit parking for persons involved in the pre-opening activities of the Tenant.

Liability Insurance. During the lease term, Landlord at its sole expense shall keep Tenant insured against all statutory and common law liabilities for damage to property or injuries, including loss of life, sustained by any person or persons within or arising out of said common areas, whether caused by Tenant's negligence or otherwise, in a policy or policies with minimum coverage of One Million and No/100 Dollars ($1,000,000) with respect to injury to any one person and Two Million and No/100 Dollars ($2,000,000) with respect to any one accident or disaster, and Five Hundred Thousand and No/100 Dollars ($500,000) with respect to damage to property. All such policies shall bear endorsements to the effect that Tenant is named an additional insured and that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

Indemnification. Landlord further agrees at its sole expense to defend, indemnify and hold Tenant (and all of its officers, agents and employees) harmless against any and all liabilities for damages for claims arising out of said common areas or Tenant's use thereof, by reason of any act, action, neglect or omission on the part of Landlord and/or Tenant.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever reasonable action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Should Tenant, at any time, utilize portions of the common areas for outdoor shows, entertainment or such other uses which in Tenant's judgment tend to attract the public, Tenant shall give Landlord notification of such intended use, a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against damage to property, injuries to persons and loss of life sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

Store
Opening
    11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty-seven (67) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's building and site improvements shall be completed in accordance with said working drawings and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall

be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct, or remedy in all or part any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

**Landlord's Represent- ations and Warranties**

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B".

Landlord also represents, warrants, and covenants that a major retail tenant of at least 30,000 square feet shall be located within the shopping center premises as depicted on Exhibit B and shall open for business prior to or contemporaneously with Tenant K mart.

Landlord further represents, warrants and covenants that the land described in Exhibits "A-1" and "A-2" will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use, and that all necessary governmental consents, permits and approvals for such use shall have been obtained. Further, Landlord shall deliver to Tenant a Certificate of Occupancy prior to commencement of the lease term.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof.

In the event Landlord's representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant thereafter shall have the option of (i) completing said representations and warranties at Landlord's cost and expense including, without limitation, overhead plus interest at the lower rate of eighteen percent (18%) per annum or the highest rate not prohibited by law, (ii) continue to pay monthly in arrears one percent (1%) of said gross sales until Landlord's said representations and warranties shall be fulfilled or (iii) terminating the Lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Options
to Extend
Lease**

13. (a) Tenant shall have ten (10) successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or of this lease as extended.

(b) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof. Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

**First
Refusal to
Purchase
Option**

14. Intentionally Deleted.

**Repairs and
Maintenance**

15. Tenant shall make and pay for all maintenance, replacement and repair necessary to keep the demised premises in a good state of repair and tenantable condition, except for the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility:

(a) all maintenance, replacement and repair to the roof, outer walls and structural portion of the buildings which shall be necessary to maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and

(b) all repairs, maintenance or replacement of or to the utility services to the building and any underground storm sewers, sanitary sewers, water lines or electrical lines under the parking areas, service drives, streets, sidewalks, driveways, entrances; and

(c) all repairs and replacement including resurfacing (exclusive of sweeping, striping and snow and ice removal) necessary to maintain all driveways, sidewalks, street and parking areas free of all settling, clear of standing water, and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks.

(d) All maintenance, replacement and repair necessary to keep the buildings, exclusive of Tenant's building, as may be erected in those areas depicted on Exhibit "B", in a good state of repair.

Notwithstanding the foregoing provisions of Article 15 herein set forth, Landlord shall contract for sweeping, striping and snow removal for the parking areas, driveways, sidewalks and streets of the premises and maintain same in a clean, safe, sightly and serviceable condition. The Landlord shall further maintain all landscaped areas.

Tenant shall pay the Landlord its pro-rata share of said costs. Tenant's said share shall be based upon the ratio that the ground floor area of Tenant's building bears to the total gross ground floor area contained in all buildings actually erected on any portion of the land described in Exhibits "A-1" and "A-2", and depicted on Exhibit "B".

For purposes of this Article, the costs of maintaining the common areas and common facilities shall mean the following: (1) all amounts paid for cleaning and sweeping (which shall be performed as often as necessary but not less than once weekly) and restriping (which shall be done not less than once every two years) of the parking areas, sidewalks and driveways, including snow and ice removal, which shall be performed as often as necessary; (2) maintenance and repair of planted or landscaped areas; (3) maintenance, repair and replacement of bulbs and light standards with respect to the parking lot lighting; (4) and wages and salaries of persons directly and actually performing services described herein. The cost of maintaining the common areas and common facilities shall not include real estate taxes, capital expenses, depreciation, permit fees, rubbish removal for other tenants, or other administrative expenses, including overhead.

Landlord shall maintain accurate records with respect to the aforesaid costs and shall submit to Tenant a bill not more often than every 30 days during the term of the lease for the amount required to be paid by Tenant hereunder. Such bill will set forth the items and amounts charged to Tenant in reasonable detail and will reflect the calculations of Tenant's obligation. With such bill, Landlord shall also submit to Tenant copies of paid receipts to support each said item and amount. Tenant shall pay such amounts within thirty (30) days after receipt of Landlord's billing therefor.

Tenant may, upon seven (7) days notice, have Landlord's records of common area expenditures for the previous twelve (12) month period audited by Tenant's accountant; should such audit disclose any overpayment by Tenant, Landlord shall remit said overpayment upon demand.

Notwithstanding anything contained herein to the contrary, Tenant reserves the right, for any reason whatsoever, at any time upon thirty (30) days prior written notice to Landlord to assume the duties of Landlord to maintain the common areas located within Exhibit "A-1". If Tenant shall elect to maintain the common areas located within Exhibit "A-1", then, and in such event, Tenant shall not during such period be required to make any contributions to the common area costs as hereinabove defined, however, Landlord shall maintain the remaining portions of the common area described in Exhibit "A-2". If the Tenant elects to maintain its demised premises then Tenant shall perform such in a manner equal to other first class shopping centers. Notwithstanding, Landlord's responsibilities as set forth in subparagraphs (a), (b), (c) and (d) above shall not be diminished.

With respect to parking lot illumination, Landlord shall, at Landlord's sole cost and expense, have that portion of the common facilities lighting standards located within the land described in Exhibit "A-1" metered directly into Tenant's meter and Tenant shall be responsible for the cost of supplying electricity thereto. The balance of the common facilities lighting standards shall be metered into the meters of Landlord's other tenants as depicted on Exhibit "B" or into Landlord's own meter and Landlord's other tenants or Landlord shall be responsible for the cost of supplying electricity thereto.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Five Thousand Dollars ($5,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

Alterations
and
Additional
Construction

16. Tenant may, at its own expense, from time to time expand its building or make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the buildings will not be impaired by such work. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

Tenant may, at its own expense, at any time, erect or construct additional buildings or structures on any portion of the demised premises. In such event gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, said additional building or structure shall be excluded from the taxable premises and all ad valorem taxes and assessments levied thereon shall not be deductible from additional rents payable under the terms of Article 4 hereof. Tenant shall reimburse Landlord for any increase in insurance premiums attributable solely thereto. Tenant shall also be solely responsible for exterior and interior repairs thereto, except those necessitated by fire, the elements or other casualty. In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, and the number of parking spaces required under Article 10 shall be reduced by the number of spaces covered by such additional buildings or structures.

Utilities

17. Landlord covenants and agrees that the demised premises shall be serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility raw materials (gas, water, sewage, te'ephone, electricity, etc.) furnished to the demised premises during the lease term.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

Governmental
Regulations

18. Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

Exculpation

19. Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

**Damage to**
**Demised**
**Premises**

20.  From and after the "date of occupancy by Tenant," as that term is defined in Article 11 hereof, should Tenant's net worth at any time be less One Hundred Million Dollars ($100,000,000.00), upon written request of the Landlord or mortgagee, Tenant shall procure fire insurance with extended coverage endorsement upon the building erected by Landlord pursuant to Article 6 hereof in an amount equal to eighty per cent (80%) of the replacement value of the building above the foundation walls.  At any time while Tenant's net worth shall exceed One Hundred Million Dollars ($100,000,000.00), the Tenant may elect to self-insure its obligation to restore.

Policies of fire insurance procured pursuant to this Article shall assure and be payable to Landlord, Tenant and mortgagee and shall provide for release of insurance proceeds to Tenant for restoration of loss.

Landlord and mortgagee, if any, shall be furnished certificates from the insuring company showing the existence of such insurance.  In case of loss, Tenant is hereby authorized to adjust the loss and execute proof thereof in the name of all parties in interest.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's building and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement Tenant shall, at its expense, promptly and with due diligence either (1) repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction or (2) repair, rebuild and restore the same for the same use and purposes but in accordance with such plans and specifications as are then generally in use by Tenant for the construction of K marts and related structures, provided, however, the repaired, rebuilt or replaced building will have a value not less than its value just prior to said loss.  Anything herein to the contrary notwithstanding, it is understood and agreed that if (1) as a result of any such damage or destruction during the last two years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding One Hundred Thousand Dollars ($100,000.00), or (2) if such damage or destruction shall have taken place within five years of the then scheduled expiration date of the current term of the lease and if the extent of such damage or destruction is such that the cost of restoration would exceed fifty per cent (50%) of the amount it would have cost to replace the Tenant's building on the demised land in its entirety at the time such damage or destruction took place, then Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice to the Landlord within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises.  If Tenant is carrying fire insurance to eighty per cent (80%) of the replacement value, all the insurance proceeds shall belong to Landlord and/or Landlord's mortgagee as their interest may appear; in the event the property is self-insured at the time of the loss Tenant shall reimburse Landlord and/or the mortgagee for an amount equivalent to the insurance proceeds that would have been paid had insurance been in force, but not to exceed eighty per cent (80%) of replacement value of the building. In the event that this Lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

In the event that, at any time during the lease term, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or alternatively Landlord shall be required to clear, clean and raze the fire damaged buildings.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

**Eminent Domain**

21.  In the event all of Tenant's buildings constructed by Landlord shall be expropriated or the points of ingress and egress to the public roadways substantially as depicted on Exhibit "B" be materially impaired by a public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation.  The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Exhibit "A-1" shall be expropriated by public or quasi-public authority, Landlord shall make every reasonable effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B".  If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the land described in Exhibit "A-1", then, in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises.  In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures.  Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

-14-

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

Use, Assign-    22.  The premises hereby demised may be used for any lawful purpose.
ment and    Tenant may assign this lease or sublet the whole or any part of the demised
Subletting    premises but if it does so, it shall remain liable and responsible under this
lease.

Signs    23.  The demised premises shall be referred to by only such designation as Tenant may indicate.  Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant.  Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the demised premises signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine.  Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises.

Landlord shall install a 25 foot to 35 foot (variance to ordinance permitting) shopping center pylon on East Broad Street and upon which Tenant shall have the right to install a sign in the prime position after a small, upper portion of the sign which shall set forth "Broad Street Station".  Tenant to share in cost of sign construction and maintenance.

Ingress and    24.  Landlord warrants as a consideration for Tenant entering into this
Egress    lease it will provide and will maintain, for the period of this lease and any extension thereof, ingress and egress facilities to the adjoining public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

Landlord's
Remedies

25. If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises, including attorney fees, and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

Bankruptcy

26. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

Covenant
of Title

27. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Exhibit "A-1", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a) Public utility easements not impairing Tenant's use of the demised premises.

(b) Deed restriction made by Landlord's predecessor in title dated October 14, 1981 and recorded in Book 669, page 197, in the Register's Office of the County of Iredell, North Carolina, restricting the storage or sale of gasoline, diesel or other motor fuels, and provision of maintenance or lubrication services normally provided by a motor car service station.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) an ALTA leasehold policy of Title Insurance in form acceptable to Tenant in an amount not less than One Million Dollars ($1,000,000.00) showing that Landlord's title is as herein represented, (b) an as-built survey by a licensed surveyor of the land described in Exhibit "A-1", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Mortgage Subordination**

28.  Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

29.  During the lease term Tenant shall indemnify and save Landlord and Landlord's ground lessor, if any, harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any.

**Tenant's Right to Cure Landlord's Defaults**

30.  In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the lower rate of eighteen percent (18%) per annum or the highest rate not prohibited by law, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

31.  At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except fo the following:  ordinary wear and tear, repairs required to be made by Landlord,

and loss or damage by fire, the elements and other casualty. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

Holding Over        32. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

Investment          33. Landlord hereby agrees to elect under the applicable provisions of
Tax Credit      the Internal Revenue Code, as amended, (hereinafter referred to as the "Code") to pass through to the Tenant all investment tax credit which may be available from time to time in respect of the demised premises under said Code. Landlord agrees to timely execute all documents required by said Code, and regulations issued thereunder, to enable Tenant to obtain such investment tax credit.

Landlord further agrees to maintain adequate records to enable Tenant to obtain such tax credit and to provide such records to the Tenant upon written request and otherwise to cooperate with Tenant in said matter. Landlord agrees not to destroy or otherwise dispose of such records until written consent to such destruction or disposal has been obtained from Tenant.

Notices         34. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Troy, Michigan, Attention: Vice President Corporate Facilities or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

Captions and        35. Marginal captions of this lease are solely for convenience of refer-
Definitions     ence and shall not in any way limit or amplify the terms and provision thereof. The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

Successors          36. The conditions, covenants and agreements contained in this lease
and Assigns     shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

Severability        37. If any one or more of the provisions contained herein shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, unenforceability shall not affect any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

Choice
of Law

38.   This Lease shall be construed and enforced in accordance with the laws of the State of North Carolina.  The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either Landlord or Tenant.

Waiver and
Modifi-
cations

39.   The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the agreements, terms, covenants, conditions or obligations of this lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or obligations of this lease or of the right to exercise such right, remedy or election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.  This lease may be changed or amended only by a writing signed by the party against whom enforcement thereof is sought.

Memorandum
of Lease

40.   The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:

COLLETT, BRANSTROM AND ASSOCIATES
General Partnership

By: _____
      John Collett, Managing General Partner


K MART CORPORATION

By: _____
      M. L. Skiles, Vice President

Attest: _____
      Assistant Secretary

APPROVED

8924q

-20-

## ACKNOWLEDGMENTS

STATE OF NORTH CAROLINA)
COUNTY OF MECKLENBURG )ss:

    I do hereby certify that on this 1st day of APRIL , 1989 , before me, THERESA G. CAMPBELL , a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared ~~and~~ JOHN COLLETT , known to me to be the ~~President and Secretary of~~ GENERAL PARTNER , who, being by me duly sworn, did depose and say that they reside in NORTH CAROLINA , respectively; that they are the GENERAL PARTNER ~~President and Secretary~~ respectively of COLLETT, BRANSTROM AND ASSOCIATES , the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

    In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: 9/11/93      Theresa G. Campbell
                                         Notary Public


STATE OF MICHIGAN)
COUNTY OF OAKLAND)ss:

    I do hereby certify that on this 5th day of april , 1989 , before me, , a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared M. L. Skiles and D. H. Burdick, II , known to me to be the Vice President and Assistant Secretary of K mart Corporation, who, being by me duly sworn, did depose and say that they reside in Rochester, MI and Birmingham, MI respectively; that they are the Vice President and Assistant Secretary respectively of K mart Corporation, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

    In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: PATRICIA A. HEWELT     Patricia A. Hewelt
                      Notary Public, Macomb County, Mich.
                      My Commission Expires July, 26 1992                 Notary Public
                      Acting in Oakland County

EXHIBIT A-1

PROPERTY DESCRIPTION OF K MART PREMISES

Situated in the City of Statesville, Inside Township, Iredell County, North Carolina and being more particularly described as follows:

BEGINNING at an iron rod, said iron rod being the southeasterly corner of the Red Roof Inn's Incorporated Property as recorded in Deed Book 696, Page 941 in the Register's Office for Iredell County, North Carolina on the northeasterly side of Marlou Street (North Carolina State Road 2332, 40 foot right of way); thence with the said Red Roof Inn's Incorporated three courses: (1) North 16 degrees 30 minutes 00 seconds East - 150.00 feet to a point; (2) South 74 degrees 30 minutes 00 seconds East - 155.26 feet to an iron rod; (3) North 13 degrees 12 minutes 38 seconds East - 437.94 feet to a point, corner to the termination point of a proposed right of way easement on Red Roof Inn's Incorporated Line; thence with said proposed right of way easement four new courses: (1) South 76 degrees 47 minutes 22 seconds East - 33.00 feet to a point; (2) Around a curve to the Right (Chord North 36 degrees 38 minutes 34 seconds East - 127.52 feet, Radius 163.34 feet, Delta Angle 46 degrees 51 minutes 51 seconds Right, Arc Length 131.00 feet) to a point; (3) Around a curve to the Right (Chord North 79 degrees 08 minutes 58 seconds East - 141.05 feet, Radius 215.81 feet, Delta Angle 38 degrees 08 minutes 58 seconds Right, Arc Length 143.69 feet) to a point; (4) South 81 degrees 46 minutes 33 seconds East - 154.98 feet to the termination point of the southwesterly side of Carolina Street (40 foot right of way); thence with the southwesterly side of Carolina Street South 81 degrees 51 minutes 30 seconds East - 20.00 feet to a point, a new corner to Collett, Branstrom, and Associates on the southwesterly side of Carolina Street; thence with said



THOMPSON, HUMPHREY & PARTNERS, INC.
ENGINEERS • SURVEYORS • PLANNERS
COMMERCE PARK 3300 BRISTOL'S MILL ROAD
P.O. BOX 562
JOHNSON CITY, TN 37601
(615) 282-2687 • 72...

RECEIVED
MAR 3 1 1999
REAL ESTATE DEPT.

PROPERTY DESCRIPTION OF K MART PREMISES

Situated in the City of Statesville, Inside Township, Iredell County, North Carolina and being more particularly described as follows:

(CONTINUED)

Collett, Branstrom and Associates eight new courses:  (1) South 38 degrees 09 minutes 37 seconds East - 133.44 feet to a point; (2) South 18 degrees 29 minutes 31 seconds West - 534.60 feet to a point; (3) South 71 degrees 30 minutes 29 seconds East - 12.00 feet to a point; (4) South 18 degrees 29 minutes 31 seconds West - 45.00 feet to a point; (5) South 71 degrees 30 minutes 29 seconds East - 33.00 feet to a point (6) South 18 degrees 29 minutes 31 seconds West - 25.00 feet to a point; (7) North 71 degrees 30 minutes 29 seconds West 45.00 feet to a point; (8) South 18 degrees 29 minutes 31 seconds West - 110.08 feet to a point, a new corner to Collett, Branstrom and Associates on the northeasterly side of Marlou Street; thence with the northeasterly side of Marlou Street North 74 degrees 29 minutes 07 seconds West - 589.50 feet to the point of BEGINNING. Containing 366,925 square feet or 8.4234 acres more or less.



F. _____ B_____ & P_____, INC.
_____ • _____ • _____
(O_____ PARK 3200 B_____'S MILL ROAD
P.O. BOX 982
JOHNSON CITY, TN 37601
(615) 232-2582 • 74...

There is reserved a 33 foot wide access and utility easement along the northwesterly side of the above described parcel and being more particularly described as follows:

To find the point of BEGINNING, commence at an iron rod, said iron rod being the southeasterly corner of Red Roof Inn's Property on the northeasterly side of Marlou Street; thence with said Red Roof Inn's Property three courses: (1) North 16 degrees 30 minutes 00 seconds East - 150.00 feet to a point; (2) South 74 degrees 30 minutes 00 seconds East - 155.26 feet to a point; (3) North 13 degrees 12 minutes 38 seconds East - 273.60 feet to the point of BEGINNING; thence with Red Roof Inn's Incorporated continue North 13 degrees 12 minutes 38 seconds East - 164.34 feet to a point, corner to proposed right of way to be conveyed to the City of Statesville, North Carolina; thence with said proposed right of way South 76 degrees 47 minutes 22 seconds East - 33.00 feet to a point, corner to Collett, Branstrom and Associates at the termination of the easterly side of said proposed right of way to be conveyed to the City of Statesville, North Carolina; thence across the property of Collett, Branstrom and Associates two courses: (1) South 13 degrees 12 minutes 38 seconds West - 164.34 feet to a point; (2) North 76 degrees 44 minutes 22 seconds West - 33.00 feet to the point of BEGINNING. Containing 5,423 Square Feet or .125 acres more or less.



THOMAS, HAMPTON & PARTNERS, INC.
ENGINEERS • SURVEYORS • PLANNERS
COMMERCE PARK 3100 BRISTOL HILL ROAD
P.O. BOX 922
JOHNSON CITY, TN 37601
(615) 282-2687 • 74-4x

EXHIBIT A-2

PROPERTY DESCRIPTION OF BROAD STREET STATION SHOPPING CENTER

Situated in the City of Statesville, Inside Township Iredell County, North Carolina and being more particularly described as follows:

BEGINNING at an iron rod, said iron rod being the northeasterly corner of Interstate Development Company's Property as recorded in Deed Book 610, Page 868 on the southwesterly side of East Broad Street (80 foot right of way); thence with the southwesterly side of East Broad Street two courses: (1) South 80 degrees 02 minutes 53 seconds East - 44.42 feet to a highway right of way monument; (2) South 84 degrees 21 minutes 19 seconds East - 4.93 feet to an iron rod, corner to Burger King Property on the southwesterly side of East Broad Street; thence with said Burger King Property three courses: (1) South 07 degrees 40 minutes 34 seconds West - 280.03 feet to an iron rod; (2) South 81 degrees 46 minutes 33 seconds East - 142.07 feet to an iron pipe; (3) North 06 degrees 23 minutes 51 seconds East - 279.72 feet to an iron pipe, corner to Burger King Company on the southwesterly side of East Broad Street; thence with East Broad Street South 81 degrees 33 minutes 37 seconds East - 49.06 feet to a concrete right of way monument, corner to S.J. Holland, Jr. Property on the southwesterly side of East Broad Street; thence with Holland South 07 degrees 49 minutes 23 seconds West - 279.31 feet to a concrete right of way monument, corner to the termination of the northwesterly side of Carolina Street (40 foot right of way) and S.J. Holland, Jr.; thence with the termination line of Carolina Street South 08 degrees 08 minutes 30 seconds West - 40.00 feet to a point, corner to the termination point of the southwesterly side of Carolina Street; thence with the southwesterly side of Carolina Street South 81 degrees 51 minutes





PROPERTY DESCRIPTION OF BROAD STREET STATION SHOPPING CENTER

Situated in the City of Statesville, Inside Township Iredell County, North
Carolina and being more particularly described as follows:

(CONTINUED)

30 seconds East - 20.00 feet to a point, a new corner to Collett, Branstrom and

Associates on the southwesterly side of Carolina Street; thence with said

Collett, Branstrom and Associates two new courses:    (1) South 38 degrees 09

minutes 37 seconds East - 180.00 feet to a point; (2) South 69 degrees 55 minutes

05 seconds East - 225.00 feet to an iron pipe, corner to Collett, Branstrom and

Associates, Douglas A. Haneline, and Jeffery L. Rumple; thence with Rumple two

courses:    (1) South 18 degrees 14 minutes 36 seconds West - 54.51 feet to a

point; (2) South 81 degrees 44 minutes 44 seconds East - 149.64 feet to a point,

corner to Jeffery L. Rumple on the northwesterly side of East Side Drive (40 foot

right of way); thence with said East Side Drive South 18 degrees 29 minutes 31

seconds West - 621.52 feet to a point, said point being at the intersection of

the northwesterly side of East Side Drive and the northeasterly side of Marlou

Street (a 40 foot right of way); thence with the northeasterly side of Marlou

Street three courses: (1) North 81 degrees 47 minutes 05 seconds West - 150.36

feet to a point; (2) North 72 degrees 54 minutes 54 seconds West - 258.64 feet

to an iron pipe; (3) North 74 degrees 29 minutes 07 seconds West - 594.00 feet

to an iron rod, corner to Red Roof Inn Property on the northeasterly side of

Marlou Street; thence with said Red Roof Inn Properties four courses:    (1) North

16 degrees 30 minutes 00 seconds East - 150.00 feet to a point; (2) South 74

degrees 30 minutes 00 seconds East - 155.26 feet to an iron rod; (3) North 13

TYSINGER, HAMPTON & PARTNERS, INC.
ENGINEERS • SURVEYORS • PLANNERS
COMMERCE PARK 3300 BROWN'S MILL ROAD
P.O. BOX 982
JOHNSON CITY, TN 37601
(615) 282-2687 • 74-4h.

PROPERTY DESCRIPTION OF BROAD STREET SHOPPING CENTER

Situated in the City of Statesville, Inside Township Iredell County, North Carolina and being more particularly described as follows:

(CONTINUED)

degrees 12 minutes 38 seconds East - 437.94 feet to a point; (4) Around a curve

to the Right, (Chord North 36 degrees 38 minutes 34 seconds East - 153.77 feet,

Radius 193.34 feet, Delta Angle 46 degrees 51 minutes 51 seconds Right, Arc

Length 158.14 feet) to a point, corner to Red Roof Inn's Incorporated and the

Interstate Development Company Property leased to Shoneys; thence with said

leased to Shoney's Property three courses: (1) North 60 degrees 04 minutes 29

seconds East - 96.90 feet to a point; (2) North 08 degrees 30 minutes 07 seconds

East - 149.88 feet to a point; (3) North 81 degrees 36 minutes 39 seconds West -

12.47 feet to a point, corner to Interstate Development Company Property leased

to Shoneys and Interstate Development Company Property; thence with Interstate

Development Company Property two courses: (1) North 18 degrees 57 minutes 16

seconds East - 32.94 feet to a point; (2) North 09 degrees 05 minutes 25 seconds

East - 98.96 feet to the point of BEGINNING.

Containing 681,355 square feet or 15.6418 acres more or less.



TYSINGER, HAMPTON & PARTNERS, INC.
ENGINEERS • SURVEYORS • PLANNERS
COMMERCE PARK 3300 BROWN'S MILL ROAD
P.O. BOX 982
JOHNSON CITY, TN 37601
(615) 282-2687 • 74....



K MART CORPORATION

INTERNATIONAL HEADQUARTERS
3100 WEST BIG BEAVER RD.
TROY, MICHIGAN 48084

December 7, 1988

Collett and Associates
320 S. Tryon Street
Suite 202
Charlotte, North Carolina  28202

**EXHIBIT C**

Attention:  Mr. John Collett

                              Re:  K mart #      - Statesville, NC
                                   SEC Broad Street and I-77

Dear Mr. Collett:

At the request of Mr. W. R. Kendell of our Real Estate Department, we are
forwarding to you two (2) sets of Typical Criteria Drawings and Outline
Specifications identified with the set number #K-0351, covering our minimum
requirements for the construction of a K mart.

The Typical K mart Criteria Drawings and Specifications consist of the
following:

86,479 sq. ft. K mart dated May 1, 1987

       SD-1              M-1G thru M-5G
       A-1 thru A-11     E-1 thru E-11

Outline Specifications dated May 1, 1987, including specification revision
sheets SPR-87 dated June 2, 1987, SPR-88 dated June 3, 1987, SPR-89 dated
August 27, 1987, SPR-90 dated August 28, 1987, SPR-91 dated August 31, 1987,
SPR-93 dated November 11, 1987, SPR-94 dated February 24, 1988, SPR-95 thru
SPR-95g dated March 7, 1988, SPR-98 dated March 24, 1988, SPR-99 dated June 8,
1988, SPR-100 dated July 25, 1988, SPR-101 dated August 5, 1988 and SPR-102
dated August 12, 1988.

(Outdoor Garden Shop:  Trellis, lighting and overhead irrigation spray systems
are required.)

        SITE DEVELOPMENT

        The K mart Corporation shall be party to the initial site development
        decisions.  To enable the K mart Corporation to properly evaluate the
        site conditions and have a meaningful input in these major decisions, the
        Developer shall submit to the K mart Corporation, in written and drawing
        form, a description of his proposed preliminary site development design.

Collett and Associates                    - 2 -                    December 7, 1988
Attention:  Mr. John Collett
Re:  K mart #      - Statesville, NC

The site development design shall encompass all aspects of the proposed
K mart operation i.e. access, site drainage and the relationship of the
K mart floor elevation to adjacent grades, roads and buildings.  Land
balance shall be given consideration but shall not be the overriding
factor in the ultimate site design.

Preparation of final engineering drawings or commitments affecting site
improvements and development shall not be made by the Developer until
approval has been granted by the K mart Corporation.

The design package shall indicate the proposed building location, floor
elevation, site drainage pattern and utilities.  The design package shall
also include a topographical survey of the entire site including an area
extending approximately 150' onto all adjacent properties and to the
centerline of all boundary roads, or as may be required to determine any
adjacent terrain conditions which might influence the site development
design.  The survey shall also include the site description, measurements
and all existing utilities.  Preliminary test boring reports indicating
the sub-surface soil conditions shall also be submitted.

The K mart Corporation will review all submitted data and if necessary,
visit the site.  If in the judgement of the K mart Corporation the
proposed site development design would be detrimental to the K mart
operation, the design will be returned to the Developer for re-study.
Upon approval of the Site Development Design by the K mart Corporation,
the Developer may proceed with final engineering drawing.

BUILDING DESIGN DEVELOPMENT

The K mart Corporation shall be party to the initial design phase of the
K mart building exterior in order to ensure its compatability with the
entire development.  The K mart exterior can be modified to achieve this
requirement.  However, the economy of the design concept should be
preserved.

The Developer shall submit to the Tenant's Design Division two (2) sets
of preliminary design presentation drawings depicting the total project.
The drawings shall include elevations, sections, dimensions and indicate
proposed materials.  A sample board of the proposed materials shall be
submitted.

The submittal shall be made and Tenant's approval shall be obtained prior
to the start of Construction Documents.

The checking and approval of the Contract Documents will not be processed
without the compliance of the above.

The Typical K mart store plans and specifications described above are to be
modified as indicated in the criteria revisions outlined in the following
paragraphs.

Collett and Associates          - 3 -          December 7, 1988
Attention:  Mr. John Collett
Re:  K mart #      - Statesville, NC


1. **Rear Stockroom Observation Towers** consisting of drawing TD-291 dated
   revised June 24, 1988.

2. **Processing Table - Electrical** consisting of drawing TD-288 dated revised
   through September 8, 1987.

3. **Power Poles - Electrical** consisting of drawing TD-295 dated revised
   October 30, 1987.

4. **Garden Shop Sign** consisting of drawing TD-296 dated revised October 28,
   1987.

5. **Revised Dressing Room Area** consisting of drawing TD-298 dated revised
   November 2, 1988.

6. **Revised Checking and Receiving Room Door** consisting of drawing TD-302
   dated December 30, 1987.

7. **Overhead Door Addition** consisting of drawing TD-304 dated revised October
   20, 1988.

8. **New Office Area** consisting of drawings TD-306A-1 dated revised July 13,
   1988 and TD-306M-1, TD-306E-1 and TD-306E-2 dated February 26, 1988.

9. **Column Extension for Dish Antenna Support** consisting of drawing TD-307
   dated revised August 22, 1988.

10. **Security Window in Manager's Office** consisting of drawing TD-311 dated
    April 22, 1988.

11. **Garden Shop Power Plan** consisting of drawing TD-312 dated August 9, 1988.

12. **Horizontal Aluminum Mullion Addition** consisting of drawing TD-313 dated
    September 2, 1988.

13. **New Delicatessen for TP-288** consisting of drawings TD-310A dated May 25,
    1988, TD-310M dated revised October 25, 1988 and TD-310E dated revised
    October 13, 1988.

These drawings and specifications describe a 86,479 square foot K mart with
the Garden Shop to the right. We are including a Preliminary Layout #K-0351,
dated November 11, 1988, for this size and hand store. This drawing also
indicates any required modifications to the Typicals for this specific
location.

Please be advised that the ceiling in the Sales Area will be raised from
twelve feet (12'-0") to fourteen feet (14'-0"). A space of eight inches (8")
above ceiling must be maintained clear of obstructions. Raising the roof
structure will not be necessary.

Please advise your consultants regarding the following utilities and services
for the above mentioned location.

Collett and Associates          - 4 -                    December 7, 1988
Attention:  Mr. John Collett
Re:  K mart #      - Statesville, NC

Secondary electric service from City of Statesville is acceptable.  Power
factor correction is not required unless energy conservation codes in effect
require improvement.

Firm gas shall be utilized for space heating.  Landlord's consulting engineer
shall verify availability of firm natural gas and obtain a commitment from
Public Service Company of North Carolina as soon as possible.  When no firm
commitment is obtainable, Landlord shall advise K mart Corporation, Energy
Systems immediately.

Domestic water heaters shall be electric.

Provide one (1) meter for each utility to the K mart.

The K mart parking lot lighting and service drive lighting shall be connected
directly to K mart switchboard through K mart meter.  Where the site includes
one or more co-tenants the parking lot lighting in front and on the Garden
Shop side shall be fed through the K mart meter and the remaining portion on
the Landlord or other meters.

Landlord's Engineer shall consult the telephone company relative to proper
facilities, including conduit, to handle the telephone installation.

Supplemental information, which modifies or clarifies the enclosed drawings
and/or specifications, is as follows:

Please be advised that the fluorescent lamps used in the Sales Room shall be
F96T12/SP35WM 60 watt units not standard 75 watt.

All stock rooms, both upper and lower levels, shall be air conditioned.  See
drawings M-2 and M-3 which show independent air conditioning units for
checking and receiving, main stock area and mezzanine stock areas (A.C. units
#15, #16 & #17).  When stock rooms are air conditioned, power exhausters #5,
#6 & #7 and unit heaters designated for "main stock" shall be eliminated.

When any alternates are accepted, as described in, but not limited to Division
15 - Substitutions, the Developer shall advise K mart Corporation of such
deviations from the specifications to allow smooth review(s) of the associated
shop drawings and/or Letter(s) of Intent during the submittal period.

Please advise your Architect and Consulting Engineers that our insurance
underwriter is Protection Mutual Insurance Company, 17330 Preston Road, Suite
200C, L. B. 436 & 442, Dallas, Texas 75252, phone:  (214) 931-7650.

Direct any inquiries to Mr. K. R. McCrary at the above address.

These sets of typical plans and specifications are to be used only as a guide
for the preparation of complete working drawings and specifications and as
such are not intended, nor will their use be permitted, for construction
purposes.  If, at the time this project is formalized, modifications which
affect electrical or plumbing underfloor locations have occured additional
information covering such modifications will then be furnished.

Collett and Associates             - 5 -             December 7, 1988
Attention:  Mr. John Collett
Re:  K mart #      - Statesville, NC

Please Note:  K mart Corporation requires that the Developer's Architects
submit the contract drawings and specifications at least sixty (60) days
before the start of construction.

Very truly yours,

Stephen K. Li, A.I.A.
Manager, Design Division
Construction Department

SKL:rn
cc:  Mr. J. M. Vachon
     Mr. C. E. Strom
     Mr. J. E. Dinkins
     Mr. W. R. Kendell
     Energy Systems

15........-?

PREPARED BY:
.........., Counsel
......, U.S.A.
(.... of Exxon Corporation)
: 2557
....., Texas    77001

BOOK 689 PAGE 197

RECEIVED
APR ....
....REAL ESTATE DEPT.

DEED

STATE OF NORTH CAROLINA    }
COUNTY OF IREDELL          }    KNOW ALL MEN BY THESE PRESENTS;    THAT

EXXON CORPORATION, a New Jersey corporation (successor by
merger to Humble Oil & Refining Company), having an office at
800 Bell Avenue, Houston, Texas 77002, hereinafter called "Grantor",
for and in consideration of the sum of Twenty Thousand and No/100
Dollars ($20,000.00) cash to it in hand paid by INTERSTATE DEVELOP-
MENT COMPANY, a North Carolina corporation, P. O. Box 1001, States-
ville, North Carolina 28677, hereinafter called "Grantee", the
receipt of which is hereby acknowledged, does hereby GRANT, BARGAIN,
SELL and CONVEY unto the said Grantee, subject to the further
provisions of this Deed, all that certain tract or parcel of land
lying and being in the County of Iredell, State of North Carolina,
being more particularly described in Exhibit "A", attached hereto
and incorporated herein for all purposes.

This conveyance is made by Grantor and accepted by Grantee
subject to all valid and subsisting encumbrances, conditions,
covenants, restrictions, reservations, exceptions, rights of way
and easements of record and all laws, regulations and restrictions,
including building and zoning ordinances, of municipal or other
governmental authorities applicable to and enforceable against
the above described premises.

Grantor reserves unto itself and its successors and assigns the
right of ingress, egress and regress across the property being

motor vehicle service station is operated on property adjoining and to the west of the above described land but in no event for a period of more than fifteen (15) years from the effective date hereof which shall constitute a covenant running with the land for the benefit of Grantor, its successors and assigns, and is binding upon Grantee, Grantee's successors and assigns during the term thereof. Provided further, however, that the aforesaid restriction shall not preclude the sale by Grantee and its successors and assigns on the above described land of automobile supplies including motor oils as incidental to the operation of a supermarket nor the operation thereon of an automobile accessory store as long as the same do not store and sell gasoline, diesel or other motor fuels and do not provide maintenance or lubrication services normally provided by service stations.

Ad valorem taxes and special assessments, if any, against the property herein conveyed for the current year shall be prorated between Grantor and Grantee as of the effective date hereof, and Grantee hereby assumes and agrees to pay same.

TO HAVE AND TO HOLD the above described land, together with the appurtenances, estate, title and interest thereto, unto the said Grantee, Grantee's successors and assigns, forever, subject to the provisions hereof, and in lieu of all other warranties, express or implied, Grantor does hereby bind itself, its successors and assigns, to warrant and forever defend the title to said premises unto the said Grantee, Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under Grantor, but not otherwise.

IN WITNESS WHEREOF, Grantor has signed and sealed this deed this 14th day of October, 19 81, but EFFECTIVE as of the _____ day of _____, 19___.

ATTEST:                          EXXON CORPORATION

_____          By _____
Assistant Secretary                 Edgar A. Robinson
                                     Vice President

-2-

BOOK 669 PAGE 199

STATE OF TEXAS    I

COUNTY OF HARRIS    I

This __14th__ day of __October_____, 1981, personally came before me, __Natalie S. Reynolds__, a notary public in and for the State of Texas, __Robert A. Blome__, Assistant Secretary of EXXON CORPORATION, who, being by me duly sworn, says that he knows the common seal of said corporation, and is acquainted with __Edgar A. Robinson__ _____, who is the Vice President of said corporation, and that he, the said __Robert A. Blome__, is the Assistant Secretary of the said corporation, and saw the said Vice President sign the foregoing instrument, and that he, said __Robert A. Blome__, Assistant Secretary as aforesaid, affixed said seal to said instrument, and that he, the said __Robert A. Blome__, signed his name in attestation of the execution of said instrument in the presence of said Vice President of said corporation.

Witness my hand and official seal this the __14th__ day of __October__, 1981.

Natalie S. Reynolds
Notary Public
State of Texas

My commission expires: __4-27-85__



BOOK 669 PAGE 200

EXHIBIT "A" TO DEED FROM EXXON CORPORATION, A NEW JERSEY CORPORATION, TO INTER-
STATE DEVELOPMENT COMPANY, A NORTH CAROLINA CORPORATION, P. O. BOX 1001, STATES-
VILLE, NORTH CAROLINA 28677

All that certain tract or parcel of land lying and being in Statesville
Outside Township, Iredell County, North Carolina, and being more particularly
described as follows:

Beginning at a three-inch iron filled with con-
crete, the Northeast corner of lot No. 52 in
Block B of the East side park subdivision,
Section I, as the same is platted, planned
and recorded in Plat Book 3 at page 137,
Iredell County Registry, and running with the
rear property lines of lots No. 43 and No. 52,
inclusive, in Block B of said subdivision,
run North 81° 32' West 27.32' to a point;
thence North 18° 52' East 32.86' to a point
at the Southeastern corner of an existing
8" block wall; thence North 8° 58' 30" East
99.10' along the East side of said 8" concrete
block wall to a point on the new Southern R/W
line of East Broad Street; thence South 80°
22' East 44.47' along the Southern R/W line
of East Broad Street to a point; thence South
18° 52' West 132.69' to the Point of Beginning.

Being a portion of the same land as described in that certain Warranty Deed
dated June 28, 1965, from W. Y. Davis and wife, Idelle M. Davis, Grantors,
to Humble Oil & Refining Company, Grantee, recorded in Book 413, page 101,
of the Deed Records of Iredell County, North Carolina.

Humble Oil & Refining Company, a Delaware corporation, merged into Exxon
Corporation, a New Jersey corporation, on January 1, 1973.

STATE OF NORTH CAROLINA -- Iredell County
The foregoing certificate (s) of _Natalie S. Reynolds, a Notary
Public of State of Texas_

is (are) certified to be correct. This instrument was presented for registration this day and hour and duly recor
office of the Register of Deeds of Iredell County, North Carolina in Book _669_, Page _197_.
This _12_ day of _November_, A.D., 19_81_ at _4:30_ o'clock _P_ .M.

_P. L. Nesbit_
REGISTER OF DEEDS

By: _Brenda K. Dowdle_
Deputy Register of Deeds