**BLANK ROME LLP**
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5001
Ira L. Herman

*Attorneys for Berkeley Mall, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------ x | | |
| **In re:** | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |
| ------------------------------------------------------------ x | | |

<u>**LIMITED OBJECTION AND RESERVATION OF RIGHTS OF BERKELEY MALL, LLC WITH RESPECT TO PROPOSED GLOBAL ASSET SALE TRANSACTION AND NOTICE OF CURE AMOUNTS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**</u>

Berkeley Mall, LLC ("<u>Berkeley</u>"), in response to (i) the Global Asset Sale Transaction as described in the Debtors' *Notice of Successful Bidder and Sale Hearing* [Docket No. 1730] (the "<u>Sale Transaction Notice</u>") and (ii) the *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

*Global Sale Transactions* [Docket No. 1774] (the "Supplemental Notice"), by and through its undersigned counsel, hereby joins and adopts (the "Joinder") the objections and reservations of rights set forth in the *Objection and Reservation of Rights of the Kin Landlords with Respect to Proposed Global Asset Sale Transaction and Notice of Cure Amounts and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 1930] (the "Objection"), as if the same were set forth fully herein.[2]

Additionally, Berkeley makes the further objections set forth below:[3]

## BACKGROUND

1.      Berkeley is a party to an unexpired lease of nonresidential real property with Sears, Roebuck and Co. located at 703 Berkeley Boulevard, Goldsboro, NC, identified as Store No. 2225 (the "Berkeley Lease").[4]

2.      The Berkeley Lease is an unexpired lease "of real property in a shopping center" for purposes of 11 U.S.C. § 365(b)(3).

3.      Pursuant to the Supplemental Notice, the Berkeley Lease is among the unexpired leases that the Debtors potentially seek to assume and assign to the Buyer pursuant to the Global Bidding Procedures.

## ADDITIONAL OBJECTIONS TO PROPOSED CURE AMOUNTS

4.      The "Proposed Cure Amount" with respect to the Berkeley Lease in the Supplemental Notice includes only the Debtors' base rent obligations that will be due on February 1, 2019 and not the full amount of the rent obligation due at that time.  Berkeley, therefore, objects

---

[2] Berkeley's Joinder applies regardless of whether the Objection is settled, withdrawn, or otherwise resolved. Although the Objection was made on behalf of parties whose unexpired leases were listed in the Initial Notice, the arguments set forth therein apply with equal force to the potential assumption and assignment of unexpired leases listed in the Supplemental Notice, such as the Berkeley Lease.

[3] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Supplemental Notice or Sale Transaction Notice and exhibits thereto, as applicable.

[4] Capitol Funds, Inc., the counterparty listed in the Supplemental Notice, is Berkeley's parent corporation and predecessor under the lease as the successor-in-interest to D.W. Royster and David W. Royster, Jr.

to the Proposed Cure Amount because it does not include additional rent under the Berkeley Lease including $850.47 for 2017 property taxes and the Debtors' proportionate share of 2019 property taxes, prorated to the date of any assumption and assignment of the Berkeley Lease.

5.      Such liquidated cure amounts, however, do not include any cure amounts that may become due and owing after the date hereof and prior to the time that the Berkeley Lease is actually assumed and assigned, or any amounts that are currently unknown or undetermined by Berkeley. Berkeley accordingly reserves the right to amend or supplement any statement of cure amount as necessary or appropriate under the circumstances, including without limitation to account for year-end adjustments which have not yet been billed or have not yet become due under the terms of the Berkeley Lease, amounts that become due and owing after the date hereof and prior to the time the Berkeley Lease is actually assumed and assigned, or amounts that Berkeley becomes aware of after the date hereof.

6.      Berkeley further objects to the extent the Proposed Cure Amount fails to include monetary and non-monetary defaults under the Berkeley Lease existing as of the date the Berkeley Lease is assumed by the Debtors, including, without limitation, any and all defaults with respect to insurance requirements under the Berkeley Lease, real estate taxes and other charges (accrued or otherwise), obligations with respect to reciprocal easements, utilities (including, without limitation, electricity, gas, oil, water, telephone, sanitary sewer services and all other and utilities), attorneys' fees and costs, repair, maintenance,[5] and replacement obligations, and environmental cleanup obligations, hazardous materials restrictions, the satisfaction of liens, compliance with laws, indemnification obligations, or similar charges owing under the Berkeley Lease that remain undetermined as of the date hereof (the "<u>Unliquidated Obligations</u>").

---

[5] Berkeley and its property manager have not yet been granted a "walk-through" of the property to determine if the Debtors have met their maintenance obligations. Berkeley intends to inspect the property. Such inspection may reveal additional cure amounts.

Additionally, the Debtors must cure, or provide adequate assurance of prompt cure of all liquidated amounts and of Unliquidated Obligations under the Berkeley Lease, including, without limitation, their current and future obligations to maintain the property and make repairs and replacements, as a condition to the assumption and assignment of the Berkeley Lease. *See* 11 U.S.C. § 365(b)(1).

7.    Thus, any order approving assumption and assignment should (a) require all liquidated cure amounts to be paid at or prior to assumption, (b) provide that all Unliquidated Obligations shall survive the assumption and any potential assignment, and that any assignee shall take the Berkeley Lease subject to all of its respective terms and undertake to satisfy all monetary and all non-monetary obligations under the Berkeley Lease, regardless of whether such Unliquidated Obligations could be argued to have existed, occurred, or accrued prior to the assumption and assignment of the Berkeley Lease.

### ADDITIONAL OBJECTIONS REGARDING
### ADEQUATE ASSURANCE OF FUTURE PERFORMANCE

8.    Berkeley has not yet received adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code, regarding any potential assumption and assignment of the Berkeley Lease.

9.    Before assuming and assigning a lease of a shopping center that is in default, a debtor must also, *inter alia*, provide adequate assurance of future performance by the potential assignee to the landlord.[6] Bankruptcy Code section 365(b)(3) states:

---

[6] 11 U.S.C. § 365(b)(1), (3), (f)(2)(B); *see also E. Air Lines, Inc. v. Ins. Co. of the State of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999 (2d Cir. 1996) (section 365(b) is designed to ensure that parties receive the benefit bargained for if a lease or contact is assumed); *c.f., In re Embers 86th Street, Inc.*, 184 B.R. 892, 900–01 (Bankr. S.D.N.Y. 1995) (adequate assurance of payment of cure did not exist where plan was to "meet its projections by reducing its staff (and thereby affording its customers fewer services) while simultaneously offering smaller food portions at increased prices"); *Enfield Tr. Assocs., Inc. v. World Skating Ctr., Inc. (In re World Skating Ctr., Inc.)*, 100 B.R. 147, 148–49 (Bankr. D. Conn. 1989) ("[a]dequate assurance requires a foundation that is nonspeculative and sufficiently substantive so as to assure the landlord that it will receive the amount of the default"); *In re Future Growth Enters., Inc.*, 61 B.R. 469 (Bankr. E.D. Pa. 1986) (lease could not be assumed where operating profit was too narrow to provide adequate assurance that arrearages could be cured).

(3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance--

>(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

>(B) that any percentage rent due under such lease will not decline substantially;

>(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

>(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

10.     "The Bankruptcy Code imposes heightened restrictions on the assumption and assignment of leases for shopping centers." *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1086 (3d Cir. 1990). "Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping center lease to an outside party can have a significant detrimental impact on others, in particular, the center's other tenants." *Id.* "Where the leased premises are in a shopping center, the assignee must meet the heightened definition of adequate assurance of future performance in section 365(b)(3) to ensure that [t]he essential terms of a debtor's lease in a shopping center [are] not . . . changed in order to facilitate assignment." *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.),* 209 F.3d 291, 299 (3rd Cir. 2000), cert. denied, 531 U.S. 873 (2000) (internal citation omitted).

11.     Because Berkeley has received no information concerning the actual intended use by the Buyer or any other proposed assignee to satisfy the above requirements, and has yet to

receive sufficient adequate assurance information regarding the Buyer or any other proposed assignee, Berkeley objects to the proposed assumption and assignment of the Berkeley Lease for lack of adequate assurance of future performance of the terms of the Berkeley Lease, including, without limitation:

a. The Debtors' continuing maintenance obligations pursuant to Section 7(b) of that certain Second Amendment to Lease and Operating Agreement dated as of April 22, 2008 (the "Second Amendment"), a true and correct copy of which is attached hereto as Exhibit A; and

b. The Debtors' continuing obligations to maintain insurance policies pursuant to Section 13 of the Second Amendment.

12. It is not only Berkeley that is dissatisfied with the Buyer's disclosures. The Official Committee of Unsecured Creditors has criticized the Buyer's purported evidence of adequate assurance of future performance as being woefully insufficient and premised upon an unrealistic and unreasonable business plan. *Objection of the Official Committee of Unsecured Creditors to Sale of Substantially all of the Debtors' Assets to ESL Investments, Inc.*, at 48–77 [Docket No. 2042].

13. Berkeley further objects to any attempts by the Debtors, Buyer or any potential assignee to modify the Berkeley Lease or any of Berkeley's rights thereunder. The Berkeley Lease must be assumed and assigned without modification, with all of its benefits and burdens, as expressly provided in 11 U.S.C. §365(b)(3)(C). *See Thompson v. Texas Mexican Ry. Co*., 328 U.S. 134 (1946); *In re Jamesway Corp*., 201 B.R.73, 76 (Bankr. S.D.N.Y. 1996); *Rockland Ctr. Assocs. v. TSW Stores of Nanuet, Inc.* (*In re TSW Stores of Nanuet, Inc*.), 34 B.R. 299, 304 (Bankr. S.D.N.Y. 1983).

14. Since 11 U.S.C. § 365(b)(3) requires that the Berkeley Lease be assumed without modification, Berkeley objects to any attempt by the Debtors to assume and assign the Berkeley Lease free and clear of the Debtors' indemnity obligations (including, without limitation, the

Debtors' environmental covenants pursuant to Section 14 of the Second Amendment) under the Berkeley Lease. 11 U.S.C. §365(b)(3)(C).  Berkeley's claims under the Berkeley Lease should therefore be preserved and survive any order authorizing assumption of the Berkeley Lease.

15.    Accordingly, any requests by the Debtors to modify clauses in the Berkeley Lease must be denied, since compelled modification of the Berkeley Lease would be inconsistent with the protections afforded to lessors. 11 U.S.C. § 365(b)(3).  To the extent this Court authorizes assumption and assignment of the Berkeley Lease, the Buyer and/or any potential assignee should be required to take the Berkeley Lease as is.

## RESERVATAION OF RIGHTS

16.    Berkeley expressly reserves all of its rights under the Berkeley Lease with respect to any and all obligations of the Debtors and/or any proposed assignee as tenant, including, without limitation, Berkeley's rights to claim any amounts of rent, charges to compensate for monetary defaults, such as accrued real estate taxes, utility charges that have been assessed against the leased property, unsatisfied liens on the leased property created by the Debtors and/or the proposed assignee and/or insurance premiums, and charges to compensate for non-monetary defaults, including without limitation all maintenance, indemnification and environmental obligations of the Debtors and/or any proposed assignee.

17.    Additionally, Berkeley expressly reserves all rights to raise further objections, as necessary or appropriate under the circumstances, relating to the Global Asset Sale Transaction, and any proposed assumption and assignment of the Berkeley Lease, including without limitation any objections relating to the obligations of the Debtors and/or any proposed assignee to cure any defaults under the Berkeley Lease, and the ability of any proposed assignee to provide adequate assurance of future performance.

WHEREFORE, for the reasons set forth in the Objection and above, Berkeley hereby requests that any order approving the Global Asset Sale Transaction and assumption and assignment of the Berkeley Lease incorporate the objections and other relief requested therein and herein, and that it be granted such other or further relief as is just and appropriate under the circumstances.

Dated: New York, New York
      January 31, 2019        By:      */s/* Ira L. Herman
                                      Ira. L Herman
                                      **BLANK ROME LLP**
                                      The Chrysler Building
                                      405 Lexington Avenue
                                      New York, New York 10174
                                      Telephone:  (212) 885-5000
                                      Facsimile:   (212) 885-5001
                                      Email:        IHerman@BlankRome.com

                                      and

                                      Jeffrey L. Helms
                                      **CAUDLE & SPEARS, P.A.**
                                      121 West Trade Street
                                      Suite 2600
                                      Charlotte, North Carolina 28202
                                      Telephone:  (704) 377-1200
                                      Facsimile:   (704) 338-5858
                                      Email:        JHelms@CaudleSpears.com

                                    *Attorneys for Berkeley Mall, LLC*

## **<u>EXHIBIT A</u>**

**Second Amendment**

## SECOND AMENDMENT TO LEASE AND OPERATING AGREEMENT

**THIS SECOND AMENDMENT TO LEASE AND OPERATING AGREEMENT** (hereinafter the **"Second Amendment"**) is made and entered into this 22ⁿᵈ day of April, 2008, (**"Effective Date"**) by and between **SEARS, ROEBUCK AND CO.**, a New York corporation (hereinafter **"Tenant"**)**,** and **BERKELEY MALL, LLC**, a North Carolina limited liability company (hereinafter **"Landlord"**, as successor-in-interest to D.W. Royster and David W. Royster, Jr.), (collectively the **"Parties"**).

### RECITALS

A.      Landlord's predecessor and Tenant entered into that certain Lease and Operating Agreement dated April 4, 1968, supplemented by that certain letter agreement dated October 17, 1968, amended by that certain letter agreement dated September 27, 1974 and that certain First Amendment dated February 28, 1997 (the "First Amendment"), and extended by those certain Notices of Extension of Lease dated March 18, 1987, May 28, 1992, September 17, 1997, and August 19, 2002 (collectively, the **"Lease"**), for the lease by Tenant of certain property commonly known as 703 Berkeley Boulevard, Goldsboro, North Carolina, (the **"Demised Premises"**), located in the Berkeley Mall Shopping Center (which Shopping Center property is more particularly described in the First Amendment and referred to therein and herein as the **"Center"** or the **"Shopping Center"**).

B.      The current Term of the Lease expires on October 15, 2008.

C.      Landlord and Tenant wish to amend the Lease as provided herein.

### AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby confirmed and acknowledged, the Parties do hereby agree as follows:

1.      **Recitals and Defined Terms**.  The foregoing Recitals are incorporated into this Second Amendment as though fully rewritten herein at length. Unless otherwise defined herein, all capitalized terms used herein shall have the same meaning given to them in the Lease.

2.    **Demised Premises**.  From and after the Effective Date:

(a) Paragraph 2 of Part I of the Lease is deleted and replaced with the following:

2.  Landlord leases to Tenant and Tenant takes from Landlord the following premises (referred to herein as the "premises", or "demised premises" or "the Demised Premises"):  (i) Tenant's existing store building containing approximately seventy-four thousand one hundred twenty-six (74,126) square feet (the **"Main Premises"**) and (ii) Tenant's existing auto center building containing approximately seven thousand seven hundred (7,700) square feet together with surrounding parking area (**"TBA"**).  The Main Premises and TBA are shown on the site plan attached hereto as **Exhibit A**.

(b) Exhibit A to the Lease and Exhibit A-1 to the First Amendment are deleted and replaced with the site plan attached to this Second Amendment as **Exhibit A**.

(c) Exhibit B to the Lease (being one and the same as Exhibit B-1 to the First Amendment) is deleted and replaced with the site plan attached to this Second Amendment as **Exhibit A**.

(d) Exhibit D to the First Amendment is deleted.

3.    **Initial Term**.  Upon expiration of the current option period scheduled to expire on October 15, 2008, the Lease shall be extended for an initial term of ten (10) years and (2) two weeks commencing on October 16, 2008 (**"Extension Commencement Date"**) and expiring at 11:59:59 p.m. on October 31, 2018 (**"Term"**).  The first lease year of the Term shall run from the Extension Commencement Date through and including October 31, 2009, with all Rent due for such first lease year (to the extent same is stated in the Lease or herein as an annual or monthly figure) being adjusted accordingly to take into account the actual length of such first lease year.  All subsequent lease years of the Term shall begin on November 1 and end on October 31 of the following year.

4.    **Extension Options**.  Paragraph 18 of Part I of the Lease is hereby deleted and replaced with the following:

Provided that Tenant is not then in default beyond the expiration of any applicable notice and cure period, Tenant may extend the Term of this Lease on the same terms and conditions contained in the Lease, except as hereinafter provided, for four (4) additional periods of five (5) years each, by giving Landlord written notice, not less than twelve (12) months prior

to the end of the Term (or the end of the period of the most recent previously exercised renewal option, as the case may be); provided, however, that if Tenant shall fail to give such written notice on or before twelve (12) months prior to the expiration of the Term (or the then current renewal period, as the case may be), Tenant's right to exercise its option shall nevertheless continue until fifteen (15) days after Landlord shall have given Tenant written notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said fifteen (15) day period provided that Tenant is not then in default beyond the expiration of any applicable notice and cure period. Notwithstanding the above, if Tenant is in default beyond the expiration of any otherwise applicable notice and cure period when the option period would otherwise commence, such exercise of such option shall be voidable by Landlord, at its option, upon written notice given to Tenant at any time prior to Tenant's substantial completion of the cure of such default. During any extension period, all provisions of the Lease shall be effective, and references to Term will incorporate the extensions.

5.    **Rent.**  As of the Extension Commencement Date, Paragraphs 7 (except subparagraph (f) thereof), 27 and 28 of Part I of the Lease are hereby deleted in their entirety.  Tenant agrees to pay **"Base Rent"** under the following schedule as of the Extension Commencement Date:

| PERIOD | RENT/MO. | RENT/YR. | RENT/S.F. |
|---|---|---|---|
| 10/16/2008 to 10/31/2008 (payable with rent due on 10/1/2008) | $14,077.59 (prorated) | - | $4.00 |
| 11/1/2008 to 10/31/2013 | $27,275.34 | $327,304.08 | $4.00 |
| 11/01/2013 to 10/31/2018 | $30,002.87 | $360,034.44 | $4.40 |
| 11/01/2018 to 10/31/2023 | $33,003.16 | $396,037.92 | $4.84 |
| 11/01/2023 to 10/31/2028 | $36,276.20 | $435,314.40 | $5.32 |
| 11/01/2028 to 10/31/2033 | $39,890.18 | $478,682.16 | $5.85 |
| 11/01/2033 to 10/31/2038 | $43,913.29 | $526,959.48 | $6.44 |

or a proportionate sum during partial months, in advance, on the first day of each month.  The rent shall be made payable to Landlord and mailed to Landlord as follows:

BERKELEY MALL, LLC
c/o Faison & Associates, LLC
121 West Trade Street, Suite 2550
Charlotte, North Carolina  28202

until the payee or address is changed by written notice from Landlord. Within thirty (30) days of the Effective Date, Landlord shall provide Tenant with a copy of a completed IRS Form W-9. Base Rent and additional rent hereunder are herein collectively referred to as **"Rent"**.

6.   **Additional Rent**. In addition to the Base Rent provided for in this Second Amendment, Tenant agrees, from and after the Extension Commencement Date and during the remainder of the Term, to pay to Landlord, as additional rent, the following amounts:

(a)   a fixed amount of fifty-five cents ($0.55) per square foot of the Demised Premises per year, to be paid on a monthly basis, in advance, in the amount of $3,750.36 per month, as Tenant's contribution towards Landlord's cost of maintaining commercial general liability, fire and extended coverage insurance and Landlord's common area maintenance costs; and

(b)   Tenant's proportionate share of *ad valorem* real estate taxes and assessments levied on the Shopping Center by any governmental authority having jurisdiction, but no other taxes or assessments. The reimbursement shall be payable to Landlord after Tenant's receipt of copies of the applicable tax bill, and no later than the later of (i) fifteen (15) days before such tax bill is due, or (ii) thirty (30) days after Tenant's receipt of such tax bill.   Tenant's proportionate share for purposes of this subsection shall be defined as the sum due for the Shopping Center multiplied by a fraction, the numerator of which shall be the number of gross leasable square feet in the Demised Premises, and the denominator of which shall be the gross leasable area of the Shopping Center. The gross leasable area of the Shopping Center as of the date hereof is 446,848 square feet.

Landlord may, at its option and at its sole cost and expense, take any and all steps necessary to have the Demised Premises separately assessed for ad valorem real estate taxes and assessments. In such event, Tenant will thereafter pay the actual ad valorem real estate taxes and assessments assessed on the Demised Premises during the Lease Term. At no cost to Tenant, Tenant will reasonably cooperate with any such action by Landlord to have the Demised Premises separately assessed.

7.   **Repairs and Maintenance.**   As of the Extension Commencement Date, Paragraphs 8(d), 9 and 10 of Part I and Paragraph 5 of Part II of the Lease are deleted in their entirety and replaced with the following:

(a)   Tenant acknowledges and represents to Landlord that, as of the Effective Date, to the actual knowledge of Tenant, without independent

investigation or due inquiry, there are no unperformed repairs outstanding which are the responsibility of the Landlord under the Lease. From and after the Extension Commencement Date, Landlord shall, at its cost, during the Term:

(i)     Maintain, repair and/or replace when necessary all structural members, structural supporting walls and columns, floor slab, trusses, structural supporting beams, exterior walls and exterior painting, foundations and roofs of the Demised Premises; except for such repairs or replacements that are caused by, necessary due to, or arise out of, the willful acts or negligence of Tenant, or its agents, invitees, employees or contractors; and

(ii)    Maintain, repair and/or replace when necessary (A) all storm, sewage, drainage systems, electrical wiring, plumbing lines and other utility facilities, that do not exclusively serve the Demised Premises, up to the point of their connection with such facilities as do exclusively serve the Demised Premises (except for such repairs or replacements that are caused by, necessary due to, or arise out of, the willful acts or negligence of Tenant or its agents, invitees, employees or contractors, and such maintenance that is expressly identified as Tenant's obligation under subsection b(iv) below), and (B) all parking lot areas, landscaping, parking lot and common area lighting whether or not any of these areas or items are located on Tenant's Demised Premises (but excluding any maintenance that is expressly identified as Tenant's obligation under subsection b below, including but not limited to clause (v) thereof), and interior and exterior common areas on the Shopping Center; except in each case for such repairs or replacements that are caused by, necessary due to, or arise out of, the willful acts or negligence of Tenant, or its agents, invitees, employees or contractors; and

(iii)   Make all repairs or replacements to the Demised Premises necessary due to or arising out of the negligence of Landlord, its agents, employees, or by reason of the breach of this Lease by Landlord; and

(iv)    Perform all required maintenance and repairs outside the Demised Premises not expressly identified as Tenant's obligation under subsection (b), below; and

(v)     Use reasonable efforts to enforce all warranties and guarantees to which it is entitled related to the Demised Premises; and

(vi)    Keep the Shopping Center and (except for compliance for which Tenant is responsible as provided in subsection b(ix) below) the Demised Premises in compliance with all applicable state, federal and municipal laws and regulations; and

(vii)   Indemnify, protect, defend and hold Tenant harmless from all losses, damages, liabilities, costs and expenses (including attorneys' fees and court costs) which may occur, result from or arise out of Landlord's failure to perform its repair and maintenance obligations under this Lease.

(b)     Landlord acknowledges and represents to Tenant that, as of the Effective Date, to the actual knowledge of Landlord, without independent investigation or due inquiry, there are no unperformed repairs outstanding which are the responsibility of Tenant under the Lease. From and after the Extension Commencement Date, Tenant shall, except as provided in subsection (a), above, and at Tenant's cost, during the Term:

(i)     Make repairs and/or replacements (except such repairs or replacements that are Landlord's responsibility, or become necessary as a result of the negligence of Landlord or its agents, contractors or employees) to or within the Demised Premises which become necessary during Tenant's occupancy of the Demised Premises, including, but not limited to, repair maintenance and/or replacement of plate glass, doors, door frames, non-structural walls, entrances to the buildings that comprise or are within the Demised Premises (including customer entrances, loading entrances, emergency exits or service entrances), canopies over entrances and windows of the Demised Premises, and the heating, ventilating and air conditioning (**"H.V.A.C."**) equipment serving the Demised Premises; and

(ii)    Paint the interior walls of the Demised Premises, as deemed necessary by Tenant, and perform interior decorating; and

(iii)   Keep the Demised Premises in a clean condition, meeting applicable city ordinances; and

(iv)    Maintain all utilities exclusively serving the Demised Premises, up to the point of their connection with such facilities as do not exclusively serve the Demised Premises (except for such repairs or replacements that are caused by, necessary due to, or arise out of, the willful acts or negligence of Landlord or its agents, employees or contractors); provided that Landlord will cooperate fully with Tenant in the event Tenant must access areas outside of Tenant's Demised Premises to perform such maintenance and repairs of utilities, including, but not limited to, holding Tenant harmless from claims from other tenants or their licensees or invitees as a result of Tenant accessing and/or temporarily altering the common areas during such repairs and maintenance of utilities (excluding any claim for damages resulting from the negligence or gross negligence of Tenant or its employees, agents or contractors); and

(v)    Make repairs and/or replacements to Tenant's loading docks which exclusively serve the Demised Premises (including the canopies covering same), provided Landlord shall not be relieved of its responsibility to maintain the common areas, including, but not limited to parking areas or service drives whether or not located on Tenant's Demised Premises; and

(vi)    Make all repairs or replacements to the Shopping Center and/or Demised Premises necessary due to or arising out of the negligence of Tenant, its agents, employees or contractors, or by reason of the breach of this Lease by Tenant; and

(vii)    Perform all required maintenance and repairs to the Demised Premises not expressly identified as Landlord's obligation under subsection (a), above; and

(viii)    Use reasonable efforts to enforce all warranties and guarantees to which it is entitled related to the Demised Premises; and

(ix)    Keep the portions of the Demised Premises which Tenant is responsible to maintain as provided above, in compliance with all applicable state, federal and municipal laws and regulations provided such compliance is required solely by reason of Tenant's particular use of

the Demised Premises and/or the manner in which Tenant operates its business in the Demised Premises; and

(x)     Indemnify, protect, defend and hold Landlord harmless from all losses, damages, liabilities, costs and expenses (including attorneys' fees and court costs) which may occur, result from or arise out of Tenant's failure to perform its repair and maintenance obligations under this Lease.

(c)     In the event Tenant replaces all or any major component of the H.V.A.C. system or any other structural component of the buildings comprising the Demised Premises within the last three (3) years of the Term (including any renewal term that has been or is thereafter exercised by Tenant) (collectively, a **"Capital Replacement"**), and the Lease terminates by lapse of time or for any reason other than Tenant's default and Tenant vacates the Demised Premises in accordance with the terms of the Lease, then Landlord shall pay to Tenant the unamortized cost for such Capital Replacement based upon a five (5) year amortization period. Such payment shall be made to Tenant within thirty (30) days after the later of (i) Landlord's receipt of invoices or other documentation evidencing Tenant's cost of such Capital Replacement, or (ii) the date of expiration of Tenant's right to exercise any then remaining options provided for herein to extend the Term.

(d)     Tenant shall have the right at all times, at its sole option, without prior notice to Landlord, to make emergency repairs or replacements to the Demised Premises as Tenant in good faith deems necessary; provided that, in the case of a repair or replacement that is Landlord's responsibility, Tenant shall notify the on-site mall manager (or equivalent) of such action as soon as possible. In the event that Tenant so performs an emergency repair or replacement to the Demised Premises which is the responsibility of Landlord under Subsection 7(a) above, then upon written demand by Tenant, Landlord shall pay Tenant an amount equal to the cost of the repair or replacement. If Landlord fails to pay to Tenant such repair cost within thirty (30) days of Tenant's written request therefor, then Tenant may recover the cost thereof from Landlord in the manner provided in Paragraph 11 of Part I of the Lease.

8.     **Landlord's Right to Recapture Existing TBA Premises**.

(a)     Landlord shall have the right at any time after the Effective Date, upon written notice to Tenant (a **"Recapture Notice"),** to recapture the TBA premises and remove same from the Demised

Premises in accordance with this Section 8. In the event Landlord gives Tenant a Recapture Notice, Tenant shall have thirty (30) days thereafter within which to elect, by giving written notice to Landlord, either (i) to construct a new Sears auto center within the **"Rear Expansion Area"** adjacent to the Main Premises building (as shown on **Exhibit A** attached hereto); or (ii) to cease operating an auto center at the Shopping Center.

(b)     In the event Tenant gives such notice that it elects to construct a new Sears auto center, then (i) within thirty (30) days of receipt of notice of Tenant's election, Landlord shall pay to Tenant, an initial advance of Five Hundred Thousand and 00/100 Dollars ($500,000.00) towards Tenant's construction of the new Sears auto center; (ii) at the completion of the construction of the new Sears auto center, Landlord shall pay to Tenant the amount in excess of $500,000.00 by which the actual cost of the construction of the new Sears auto center (including costs incurred in relocating equipment from the existing TBA) exceeds the initial advance provided above, provided that such additional payment by Landlord shall not exceed $462,500.00 (such that the maximum total payment by Landlord under clauses (i) and (ii) of this subsection shall be $962,500.00), and (iii) subject to Paragraph 1 of Part III of the Lease and any delays caused solely by Landlord or its agents, employees or contractors, Tenant shall have nine (9) months from the date of its notice of election to Landlord to substantially complete the construction of the new Sears auto center and fully vacate the TBA premises. **"Substantial completion"** for purposes of this Second Amendment shall mean (i) construction of the new Sears auto center in accordance with Tenant's plans and specifications approved by Landlord in advance (such approval not to be unreasonably withheld); (ii) issuance of a temporary certificate of occupancy (or the local equivalent) from the proper authority, allowing Tenant to commence its receiving of merchandise and its fixturing of the new auto center; (iii) issuance of a certificate of substantial completion by Tenant's architect; and (iv) all utilities are available and operating in the new auto center. Landlord shall cooperate with Tenant, at Tenant's cost (subject to the reimbursement provisions above), in securing any permits, consents or approvals required for any aspect of Tenant's construction of the new Sears auto center.

(c)     In the event Tenant gives such notice that it elects to construct a new Sears auto center, then Tenant shall have the right to continue to operate in the existing TBA until the earlier of (i) such time as the construction of the new auto center has been substantially completed or (ii) the end of the nine (9) month period set forth in Subsection 8(a) above. Upon Tenant's occupancy of, and as of the date Tenant is open for business in, the new auto center, but in no

{W0238732-1 }

9

event later than the end of the nine (9) month period set forth in Subsection 8(b) above, the existing TBA shall be removed from the Demised Premises and its square footage of 7,700 shall be removed from the computation of Rent and the new Sears auto center shall become part of the Demised Premises and its square footage included in the computation of Rent. If Tenant fails to vacate the TBA within the time period permitted herein, Tenant shall not be considered to have a month-to-month or other tenancy in the TBA and may be summarily evicted therefrom, and in the event Tenant has not vacated the TBA within thirty (30) days after the expiration of the nine (9) month period provided for herein, Tenant shall indemnify Landlord for actual damages and costs incurred by Landlord as a result of such failure (including but not limited to (i) reasonable attorneys' fees, and (ii) any rentals that would have been payable by a third party under any lease of the TBA or any portion thereof entered into by Landlord prior to the date Tenant is otherwise required to vacate the TBA as provided above, which rentals are lost as a result of Tenant's failure to vacate the TBA within the time period permitted herein). In the event Tenant remains in possession of the TBA after the expiration of the nine month period, Rent payable for the period which Tenant remains in possession of the TBA shall be increased to 200% of the Rent payable during the month immediately preceding the expiration of the nine month period. In no event shall Tenant be liable to Landlord for consequential or punitive damages under this paragraph.

(d)     In the event Tenant gives notice to Landlord under subsection (a) of this Section above that Tenant elects not to construct a new Sears auto center, then (i) within thirty (30) days of receipt of such notice of Tenant's election, Landlord shall pay to Tenant a fee of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (**"Release Fee"**); (ii) Tenant will have sixty (60) days from the receipt of the Release Fee to vacate the existing TBA; and (iii) the existing TBA shall be removed from the Demised Premises and its square footage of 7,700 shall be removed from the computation of Rent on the later of (A) the date Tenant vacates the TBA, or (B) the end of the sixty (60) day period referenced in clause (ii) of this subsection. If Tenant fails to vacate the TBA within the time period permitted herein, Tenant shall not be considered to have a month-to-month or other tenancy in the TBA and may be summarily evicted therefrom, and Tenant shall indemnify Landlord for actual damages and costs incurred by Landlord as a result of such failure (including but not limited to (i) reasonable attorneys' fees, and (ii) any rentals that would have been payable by a third party under any lease of the TBA or any portion thereof entered into by Landlord prior to the date Tenant is otherwise required to

vacate the TBA as provided above, which rentals are lost as a result of Tenant's failure to vacate the TBA within the time period permitted herein). In no event shall Tenant be liable to Landlord for consequential or punitive damages under this paragraph.

(e)  In the event Landlord elects to recapture the existing TBA in accordance with this Section 8, Tenant shall deliver possession of the existing TBA premises to Landlord in "broom-clean" condition, subject to all provisions in the Lease, including Section 14 of this Second Amendment. Within ten (10) days following Tenant's vacation of the TBA premises, Landlord shall order a Phase I environmental assessment to be performed on the TBA premises which shall be commenced no later than thirty (30) days from Tenant's vacation. Landlord and Tenant shall share equally in the cost of obtaining the Phase I report. If the Phase I discloses any known environmental contamination caused by Tenant which, in the reasonable determination of Landlord and Tenant, requires a Phase II environmental assessment to be completed, Tenant shall be responsible for the cost of obtaining the Phase II. If the parties cannot reach a mutually agreeable determination on the necessity of a Phase II, the parties shall submit the matter to a mutually chosen independent third party environmental consultant for determination. If Landlord does not cause a Phase I to be commenced within said thirty (30) day period, Landlord shall have been deemed to have accepted the TBA premises in its "AS IS", "WHERE IS" condition, with all faults, including any environmental matters affecting the TBA premises. Notwithstanding the foregoing, in the event that a potential third party tenant of the TBA premises (or a portion thereof) performs a Phase I environmental assessment on the TBA premises prior to the date of Tenant's vacation thereof (subject to the immediately following paragraph (f)), upon provision of a copy thereof to Tenant within ten (10) days of the completion of the Phase I such Phase I shall at Landlord's election satisfy the Landlord's obligation to cause a Phase I to be commenced within the aforementioned thirty (30) day period; and the cost of such Phase I to be shared by Landlord and Tenant shall be such portion of the cost thereof (if any) as is required to be paid by Landlord as between Landlord and the third party performing such Phase I.

(f)  Provided Landlord and the prospective future tenant of the TBA premises have executed an Access Agreement in the form attached hereto as **Exhibit C**(with such revisions thereto as the Licensee thereunder may reasonably request and which are approved by Tenant and by Landlord, such approval not to be unreasonably withheld), Tenant hereby grants to Landlord and any such prospective future tenant, and their respective duly authorized

agents and contractors, the right to enter upon the TBA premises to conduct certain on-site investigations and tests, including without limitation sign tests, soil tests, Phase I and/or Phase II environmental assessments, and to obtain a survey of the TBA premises; provided that (i) such inspections, tests, assessments and survey will be conducted in such a manner as not to unreasonably disturb Tenant's conduct of business in the TBA, (ii) Landlord will immediately repair any damage to the TBA created by such inspections, tests, assessments and survey and will return the TBA to the condition it was in prior to conducting such activities, and (iii) Landlord will indemnify Tenant from and against any and all actual costs, expenses (including reasonable attorney's fees and costs), claims, damages or liabilities incurred by Tenant arising out of or in any way connected with or incident to such inspections, tests, assessments and survey. In no event shall Landlord be liable to Tenant for consequential or punitive damages under this paragraph.

(g)    Landlord's right to recapture is limited solely to Tenant's existing TBA. In the event Tenant elects to construct a new Sears auto center pursuant to this Second Amendment or at some later date in accordance with Tenant's right to expand within the Rear Expansion Area, any new Sears auto center not located on the existing TBA premises shall not be subject to recapture by Landlord.

9.    **Shopping Center Building Areas**. Tenant agrees to the construction of additional buildings or other structures within, and only within, the areas labeled as "future expansion", "outparcel" and/or "future outparcel" on **Exhibit A** attached hereto, provided such building or other structure:

(a)    does not reduce available parking for the Shopping Center below the greater of that permitted by local law or that required under the Lease; and

(b)    is not to be used as an auto service center or tire and battery facility as long as Tenant continues to operate its TBA or elects to construct a new Sears auto center as provided in this Second Amendment.

In addition, with respect to the construction of buildings or other structures on the future outparcel currently known as the Wachovia parcel (and identified as such on Exhibit A), or on the TBA premises in the event Landlord recaptures the TBA premises in accordance with Section 8 of

this Second Amendment, Tenant approves the construction of additional buildings or other structures thereon, provided that:

(i)    such construction shall be subject to the provisions of paragraphs (a) and (b) of this Section, and

(ii)    no building or other structure to be built thereon shall exceed twenty-five feet in height, be more than two (2) stories, or exceed 12,000 square feet of gross leasable area without Tenant's prior written consent, and

(iii)    no building or other structure built thereon is used for the sale, servicing and/or storing of appliances or electronics, including, but not limited to washers, dryers, refrigerators, ranges, water heaters, televisions and other major appliance items or services or major electronic items or services normally sold (A) in a Sears or Kmart full line or specialty store, or (B) in any other retail business format used or implemented by Tenant from time to time on a national basis; provided that if Tenant ceases to sell appliances described in this subparagraph at the Demised Premises for a period of ninety (90) consecutive days, then the restrictions in this subparagraph shall cease thereafter to apply as to appliances; and provided that if Tenant ceases to sell electronics described in this subparagraph at the Demised Premises for a period of ninety (90) consecutive days, then the restrictions in this subparagraph shall cease thereafter to apply as to electronics.

Except as provided in this Section above, Landlord agrees to not construct or permit to be constructed any buildings or other improvements on the Shopping Center property except as shown on Exhibit A, or such other common area improvements which do not materially adversely affect visibility of Tenant's signage and entrances to the Main Premises, do not materially adversely affect access, ingress or egress to the Demised Premises, and do not reduce available parking for the Shopping Center below the greater of the amount required by applicable local law or the amount required under the Lease.

Nothing herein shall be construed so as to obligate Landlord to construct or develop any of the "future expansion", "outparcel" and/or "future outparcel" areas depicted on **Exhibit A** attached hereto, or on the TBA in the event of its recapture by Landlord as provided in Section 8 above; and Landlord may construct any smaller expansions provided they are within the aforesaid areas and otherwise comply with the applicable provisions of this Section 9.

In addition to Tenant's right to construct a new TBA premises pursuant to Section 8(b) of this Second Amendment, Tenant may, at any time during the Term or any extension thereof, expand its Demised Premises within the Rear Expansion Area and/or Possible Future Expansion area identified on Exhibit A. Such expansion by Tenant shall be in accordance with plans and specifications approved by Landlord in advance (such approval not to be unreasonably withheld) and shall be subject to Tenant and Landlord reaching agreement on the amount of rent to be paid for the additional square footage.   Landlord shall neither construct nor cause to be constructed any structures within Tenant's expansion areas without Tenant's prior written approval, which approval may be withheld or granted in Tenant's sole discretion.  In the event Tenant elects to relocate its TBA premises pursuant to this Second Amendment, Rent for such new TBA shall be computed as provided for in Section 8(c).

10.   **Sale of Outparcels and Recaptured TBA Premises**.  Landlord shall be permitted to sell all or any part of those areas labeled as "outparcel" or "future outparcel" on **Exhibit A** attached hereto, and/or all or any part of the TBA premises should Landlord recapture same as provided in Section 8 above, to a third party, provided Landlord causes the buyer to be bound by the restrictions applicable to the property in question as set forth in Section 9 above.

Nothing herein shall be construed so as to obligate Landlord to sell any of the "outparcel" or "future outparcel" areas depicted on **Exhibit A** attached hereto, or the TBA in the event of its recapture by Landlord as provided in Section 8 above.

11.   **Landlord's Adjoining Property**.  Subparagraph 2(b)(vii) of Part II of the Lease and Sections 9 and 10 of the First Amendment are hereby deleted in their entirety.   Tenant shall not have approval rights over the right of Landlord, or its parent corporation, Capitol Funds, Inc., to develop Tract 2 or Tract 3B as defined in the First Amendment.

12.   **Notices**.  Paragraph 21 of Part I of the Lease is deleted in its entirety and replaced with the following:

21.   Notices shall be in writing and shall be deemed properly served (A) three (3) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (B) the next business day after being deposited with a reputable overnight express earlier (e.g., Federal Express, Airborne, Express Mail) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing

delivery, or (C) upon receipt if personally delivered. Notices shall be addressed as follows:

Tenant-                    **Sears, Roebuck and Co.**
                           3333 Beverly Road
                           Department 824RE
                           Hoffman Estates, Illinois 60179
                           Attn:   Vice President
                                   Real Estate

Copy to:                   **Sears, Roebuck and Co.**
                           3333 Beverly Road
                           Department 824RE
                           Hoffman Estates, Illinois 60179
                           Attn:   Associate General Counsel
                                   Real Estate

Landlord-                  **Berkeley Mall, LLC**
                           c/o Faison & Associates
                           121 W. Trade Street, 27th Floor
                           Charlotte, NC 28202-5399
                           Attn:   Kenneth D. McCoy

Copy to:                   **Caudle & Spears, P.A.**
                           121 West Trade Street, Suite 2600
                           Charlotte, North Carolina 28202
                           Attn: Jeffrey L. Helms

13.   **Insurance**.   The second sentence of Paragraph 6(c) of Part I, all of Paragraph 8(f) of Part I, and all of Paragraph 24 of Part I of the Lease are hereby deleted in their entirety. Paragraph 9 of Part II of the Lease is hereby deleted in its entirety and replaced with the following:

9A. Subject to Subsection 6(a) of the Second Amendment to this Lease, Landlord shall pay for and maintain through the end of the Term the following policies of insurance covering the Shopping Center, which insurance shall be obtained from companies currently rated "A-/VII" or better as defined in the then-current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published):

(a)   Workers' Compensation:

    1)   Workers' Compensation insurance with statutory limits covering all costs, benefits and liabilities under State Workers' Compensation and similar laws for the employees of Landlord in the state where the Shopping Center is located, with waiver of subrogation in favor of Tenant; and

Employers Liability Insurance with limits of not less than $100,000 per accident or disease and $500,000 aggregate per occurrence.

2)   Landlord warrants that its contractors performing work at the Shopping Center shall maintain Workers' Compensation and Employers Liability Insurance for the contractor's employees and Landlord further shall indemnify Tenant for any loss, cost, liability, expense and damage suffered by Tenant as a result of Landlord's breach of this warranty.

(b)   Commercial General Liability Insurance covering Landlord's operations on the Shopping Center with coverage for premises/operations, products/completed operations, contractual, and personal/advertising injury liabilities with combined single limits of not less than $5,000,000.00 per occurrence for bodily injury and property damage, including Tenant named as a named additional insured (as defined in ISO Form CG 20 26 11 85, or its equivalent).

(c)   All Risk Property Insurance upon all buildings, building improvements and supplies on the Shopping Center premises, including, but not limited to, Fire and Extended Coverage (providing coverage against loss or damage by flood, earthquake, fire, windstorm, hail, explosion, damage from aircraft, vehicles and smoke damage) and Vandalism and Malicious Mischief in the amount of ninety percent (90%) of the full replacement cost with an Increased Cost of Construction Endorsement, including Tenant as a named insured.

(d)   If Landlord maintains any vehicles on the Shopping Center premises, Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with a combined single limit of not less than $3,000,000.00 per occurrence for bodily injury and property damage.   If no vehicles are owned or leased, the Commercial General Liability insurance shall be extended to provide insurance for non-owned and hired vehicles.

(e)   The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies.  Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Tenant, and that the coverage provided by such insurance policy shall be deemed primary insurance and that any insurance provided by or on behalf

of Tenant shall be in excess of any insurance provided by such policy. Landlord shall furnish Tenant, or cause to be furnished to Tenant, concurrently with the execution of this Second Amendment, and prior to the inception of each successive policy period, insurance certificates, and upon request by Tenant, copies of such policies required to be maintained hereunder. All policies required to be provided by Landlord hereunder shall include an endorsement to show that such insurance carrier acknowledges a waiver of subrogation in favor of Tenant.

9B. (a) Tenant shall pay for and maintain through the end of the Term the following policies of insurance, which insurance shall be obtained from companies currently rated "A-/VII" or better as defined in the then-current edition of Bests Insurance Reports (or the equivalent thereof if Bests Insurance Reports is no longer published):

(i)   Comprehensive general   liability insurance covering the Demised Premises in the amount of at least $1,000,000 for any occurrence resulting in bodily and personal injury to or the death of one person and in the amount of at least $1,000,000 for any such occurrence for more than one person; and

(ii) Comprehensive property damage insurance covering liability for damage to all property on the Demised Premises in the amount of at least $1,000,000 for each occurrence either without the policy containing the "care, custody and control" exclusion or, in the alternative, providing fire and extended coverage legal liability insurance.

(iii) Property insurance covering Tenant's trade fixtures, furniture, furnishings, equipment, betterments and improvements and other installations of Tenant, providing protection to the extent of not less than eighty percent (80%) of the insurable value of the same against all casualties included under standard insurance industry practices within the classification "Fire and Extended Coverage, Vandalism and Malicious Mischief" and covering sprinkler leakage;

(iv) plate glass insurance covering the plate glass in the Demised Premises;

(v)   insurance covering all partially completed construction performed by or for Tenant against all casualties included under standard insurance industry practices within the classification "Fire and Extended Coverage," and "Builders Risk Coverage," which insurance shall be maintained until at least thirty (30) days after

Tenant has completed such construction.  In no event shall Tenant cancel the insurance provided for in this subparagraph until notice has been given to Landlord and Landlord has included such completed construction under Landlord's insurance as provided for in Section 9A above; and

(vi)  workers' compensation insurance in limits and form necessary to comply with the laws of North Carolina.

(b)     Tenant shall cause all contractors performing work for Tenant to furnish Tenant (to be then furnished to Landlord) with certificates showing evidence of comprehensive general liability insurance in the same amounts as set out in subparagraph (a) of this Paragraph 9B, such insurance to include "completed operations coverage," and worker's compensation insurance at legal limits. Further, if any work involving excavation or underground operations should be required, the related exclusions must be omitted.

(c)     Such insurance and certificates shall name Landlord, its property manager (if any), agents and any mortgagee, as an additional insured for the full amount of the insurance herein required.  The specified limits of insurance may be satisfied by any combination of primary or excess/umbrella liability insurance policies.  Each policy shall expressly provide that it shall not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Landlord.  Tenant shall furnish Landlord, or cause to be furnished to Landlord, concurrently with the execution of this Second Amendment, and prior to the inception of each successive policy period, insurance certificates, and upon request by Landlord, copies of such policies required to be maintained hereunder.   All policies required to be provided by Tenant hereunder shall include an endorsement to show that such insurance carrier acknowledges a waiver of subrogation in favor of Landlord.

(d)     Nothing in this Lease shall prevent the taking out of policies of blanket insurance by Tenant or any Successor, which may cover real and/or personal property and improvements in locations other than the Demised Premises, and/or provide liability coverage for locations in addition to the Demised Premises; provided, however, that in all other respects each such policy shall comply with the other applicable provisions of this Lease.

(e)     Sears, Roebuck and Co. may, at its election, self-insure its insurance obligations under this Lease.   In the event Sears,

Roebuck and Co. assigns this Lease or sublets the Demised Premises to any affiliate or subsidiary of Sears, Roebuck and Co., then (i) that affiliate or subsidiary may, at its election, self-insure its insurance obligations under this Lease if it is permitted to do so under paragraph (f) immediately following, or (ii) Sears, Roebuck and Co. may, at its election, privately insure the insurance obligations of such affiliate or subsidiary under this Lease.

(f)     Except as provided in subsection (e) above, any subtenant, assignee or successor of Tenant's interest (or any part thereof) under this Lease (hereinafter Tenant's "Successor") may, at its election (subject to the following limitations), self-insure its liability risks otherwise required to be insured under subparagraph (a) above; provided that the following conditions are met:

(i)     At all times during which such Successor does so self-insure, such Successor must have a net worth of no less than $10 million;

(ii)     The Successor shall notify Landlord in writing prior to converting to self-insurance from the third-party insurance otherwise required under subparagraph (a) above, such notice to contain certification by an officer of the Successor that Successor meets the foregoing minimum net worth requirement; and

(iii)     Thereafter Successor provides annually a written re-certification by an officer of Successor that Successor continues to meet the foregoing minimum net worth requirement.

If while so self-insuring, Successor's net worth falls below such minimum requirement, then within fifteen (15) days thereafter Successor shall notify Landlord in writing and shall obtain the insurance coverages required under subparagraph (a) above.

14.     **Environmental Covenants.**  The following provisions are hereby added to the Lease as of the Effective Date:

(a)     The term "Hazardous Substances" as used herein shall mean pollutants, contaminants, toxic or hazardous wastes, or any other substances, the removal of which is required or the use or storage of which is restricted, prohibited, regulated or penalized by any "Environmental Law," which term shall mean any federal, state or local law or rules, regulations or orders relating to pollution or protection of the environment, including the Comprehensive

Environmental Response, Compensation and Liability Act (CERCLA).

(b)    Except for those materials typically used and those activities typically conducted in Tenant's ordinary course of business, including the operation of the TBA premises, Tenant hereby agrees that (1) no activity will be conducted on the Demised Premises that will produce any Hazardous Substance; (2) the Demised Premises will not be used in any manner for the storage of any Hazardous Substance; and (3) Tenant will not permit any Hazardous Substance to be brought into the Premises. Tenant hereby further agrees that (i) Tenant will not install any underground tanks or storage containers of any type on or under the Demised Premises; (ii) Tenant will not allow any surface or subsurface conditions to exist or come into existence on or under the Demised Premises that constitute, or with the passage of time may constitute, a public or private nuisance; (iii) as to those materials typically used and those activities typically conducted in Tenant's ordinary course of business, including the operation of the TBA premises, Tenant shall comply with all Environmental Laws applicable to the use and disposal thereof; and (iv) Tenant shall maintain all records required by law.

(c)    If any such Hazardous Substance is so brought in or on, or found located in or on, the Demised Premises or any part thereof and the same resulted in whole or in part from any act or omission (whether before or after the Extension Commencement Date) of Tenant or its agents, employees, licensees or contractors, or any other person holding or occupying the same or any part thereof under or by right of Tenant, then the same shall be immediately removed by Tenant, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws, by Tenant, at Tenant's sole expense. If, at any time during or after the Term the Demised Premises (or any part thereof) are found to be so contaminated or subject to said conditions caused or permitted by Tenant or its agents, employees, licensees or contractors, or any other person holding or occupying the same or any part thereof under or by right of Tenant, or if Tenant shall, by any act or omission, breach any of its obligations under this subsection or the preceding subsection (b), then Tenant shall and does hereby indemnify and hold harmless Landlord from any and all claims, demands, actions, liabilities, causes, damages, losses and obligations of any nature (including but not limited to attorney's fees and litigation costs) arising from or as a result thereof. Provided that, in the case of any contamination of the TBA premises, if Landlord recaptures same as provided in Section 8 above, then Tenant's

responsibility under this paragraph shall be limited to such environmental conditions as are reflected in the Phase I and/or Phase II environmental assessment reports described in Section 8(e) above (subject to the sixth sentence of Section 8(e) above if applicable).

(d)     Landlord hereby agrees that (1) no activity will be conducted by Landlord or any party under Landlord's direction or control on the Shopping Center property that will produce any Hazardous Substance that will adversely affect the Demised Premises or Tenant's use or occupancy thereof; (2) the Shopping Center Premises will not be used in any manner for the storage of any Hazardous Substance in violation of any Environmental Law; and (3) Landlord shall maintain all records required by law.

(e)     If any such Hazardous Substance is so brought in or on, or found located in or on, the Demised Premises or any part thereof and the same resulted in whole or in part from any act or omission (whether before or after the Extension Commencement Date) of Landlord or its agents, employees or contractors, then the same shall be immediately removed by Landlord, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws, by Landlord, at Landlord's sole expense. If, at any time during or after the Term, the Demised Premises (or any part thereof) are found to be so contaminated or subject to said conditions caused by Landlord or its agents, employees, licensees or contractors, or if Landlord shall, by any act or omission, breach any of its obligations under this subsection or the preceding subsection (d), then Landlord shall and does hereby indemnify and hold harmless Tenant from any and all claims, demands, actions, liabilities, causes, damages, losses and obligations of any nature (including but not limited to attorney's fees and litigation costs) arising from or as a result thereof.

15.     **Default by Tenant**. As of the Effective Date, Paragraph 16 of Part I of the Lease is deleted in its entirety and replaced with the following:

16.     If Tenant fails: 1) to make within fifteen (15) days of receipt of written notice any monetary payment past due hereunder; or 2) to commence to cure any non-monetary covenant or agreement to be performed by Tenant under this Lease within thirty (30) days of receipt of written notice, and to cure same within said thirty (30) day period (or within such additional time as is reasonably necessary if such cure cannot reasonably be completed within said thirty (30) day period), then in either such event Landlord shall be entitled to declare the Lease term ended; re-enter the Demised Premises, or any part thereof, with or without legal

process; remove Tenant or any other occupants, using such force as may be necessary; and fully repossess said Demised Premises. Landlord shall also have the right to distrain for any rent due and unpaid after said fifteen (15) day period; and the further right, at any time, to collect and receive all or any portion of any rent due without thereby waiving or affecting the service of notice, the commencement of suit, or any final judgment for possession of the Demised Premises.

16.   **Miscellaneous.**

(a)   **Utilities.**   Tenant will pay for all gas, water and electric current used by Tenant upon the Demised Premises.

(b)   **Assignment**.   Paragraph 14(c) of Part I of the Lease is amended by deleting all references therein to Paragraph 27 and replacing them with "Section 5 of the Second Amendment to this Lease".

(c)   **Other Amendments to Existing Lease**.

Paragraph 29 of Part I, and Paragraph 1 of Part II of the Lease are hereby deleted in their entirety.

The phrase "the selling of gasoline from pumps served by tanks having a capacity of 5000 gallons or greater," contained in Paragraph 23 of Part I of the Lease is hereby deleted.

Subparagraph 8(b) of Part II of the Lease is hereby deleted in its entirety.

(d)   **Ratification and Conflict**.   Except as amended herein, the Lease shall remain in full force and effect. If any conflict exists between the terms and provisions of the Lease and the terms and provisions of this Second Amendment, the terms and provisions of this Second Amendment shall govern and control.

(e)   **Successors and Assigns**.   This Second Amendment shall bind and inure to the benefit of the Parties hereof and to their respective successors and assigns.

(f)   **Counterparts.**   This Second Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

(g)   **Authority.**   Landlord represents and warrants that Landlord holds fee title to the Demised Premises and the Center and has the full

power and authority to amend the Lease and enter into this Second Amendment.

(h) **Estoppel.** Tenant acknowledges and represents to Landlord that, as of the Effective Date, to the actual knowledge of Tenant, without independent investigation or inquiry, there are no defaults or other breaches of the Lease by Landlord outstanding; and that to the actual knowledge of Tenant there is currently no condition or circumstance which would, with the giving of notice and passage of time, would become a default or other breach of the Lease by Landlord. Landlord acknowledges and represents to Tenant that, as of the Effective Date, to the actual knowledge of Landlord, without independent investigation or inquiry, there are no defaults or other breaches of the Lease by Tenant outstanding; and that to the actual knowledge of Landlord there is currently no condition or circumstance which would, with the giving of notice and passage of time, would become a default or other breach of the Lease by Tenant.

(i) **Subordination, Non-Disturbance and Attornment.** Landlord's current mortgagee shall execute a Subordination, Non-Disturbance and Attornment Agreement in the form attached hereto as **Exhibit B**, and Landlord shall deliver such executed agreement to Tenant within ten (10) days of execution of this Second Amendment. With respect to a mortgage entered into after the execution of this Second Amendment, Landlord shall use commercially reasonable efforts to obtain such Subordination, Non-Disturbance and Attornment Agreement on the form attached hereto as **Exhibit B**.

**IN WITNESS WHEREOF**, the parties have executed this Second Amendment to Lease as of the day and year first above written.

**LANDLORD:**                          **TENANT:**

**BERKELEY MALL, LLC,** a North          **SEARS, ROEBUCK AND CO.,**
Carolina limited liability company       a New York corporation

By _David W. Royster, III_              By _[signature]_
Name: _David W. Royster, III_           Name: _James B. Terrell_
Title: _Manager_                        Title: _Vice President_

REAL ESTATE
LEGAL
BMS



= Leased Premises

Outer boundary of Shopping Center

Outer Boundary of Shopping Center

EXHIBIT A

TBA Tract

Future Expansion

PROPOSED FUTURE EXPANSION

BERKELEY MALL
GOLDSBORO, NC

Outer Boundary of Shopping Center

Outer Boundary of Shopping Center

BERKELEY MALL
GOLDSBORO, NC

CAPITOL
FUNDS,
INC.

SHEET TITLE
SITE PLAN
DATE  11/8/95
SCALE
SHEET

1

24

**EXHIBIT B**

| | |
|---|---|
| Prepared by and after recording | ) |
| return to: | ) |
| Margitta Breeding BC-106A | ) |
| Sears Holdings Corporation | ) |
| 3333 Beverly Road | ) |
| Hoffman Estates, IL 60179 | )      [This space reserved for recording purposes] |

---

*SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT*

**THIS SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT** (this "**Agreement**") is made and entered into as of the ___ of _____, 2008, by and between _____ ("**Lender**"), and _____ corporation ("**Tenant**").

*RECITALS*

_____ ("**Landlord**") is the owner of certain real property, legally described on Exhibit "B-1", attached hereto and made a part hereof (the "**Landlord Parcel**"), which is located in the city of _____, County of _____, and State of _____ and commonly known as _____#____.

By the Lease dated ____, between Landlord and Tenant, as_____(collectively the "**Lease**"), the Tenant has leased from Landlord a portion of the Landlord Parcel and the improvements thereon (the "**Premises**"), containing approximately _____ square feet, together with various easements and rights over the Landlord Parcel and the Shopping Center.

Lender is the holder of a mortgage or beneficiary under a deed of trust on the Landlord Parcel, given to the Lender by Landlord dated as of _____ 200___, recorded on _____, ____, in the Office of the Recorder of Deeds [Registrar of Titles] of _____ County, _____, in Book _____ at Page _____, as Document No. _____ (collectively referred to herein with any other documents securing the debt secured by the mortgage as the "**Mortgage**").

The loan terms require Tenant to subordinate the Lease and its interest in the Premises to the lien of the Mortgage and that Tenant attorn to Lender.

Tenant desires recognition of and consent to the Lease terms by Lender and to be assured of continued occupancy of the Premises under the terms of the Lease in the event Lender succeeds to the rights of Landlord under the Lease pursuant to the terms of the Mortgage.

**NOW, THEREFORE**, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Lender hereby consents to the Lease.

2.      The Lease is and shall be subject and subordinate to the lien of the Mortgage and to all renewals, replacements and extensions of the Mortgage to the full extent of the principal sum secured thereby and interest thereon.

3.      In the event that Lender shall commence an action to foreclose the Mortgage or to obtain a receiver of the Premises, or shall foreclose the Mortgage by advertisement, entry and sale according to any procedure available under the laws of the state where the Landlord Parcel is located, Tenant shall not be joined as a party defendant in any such action or proceeding and Tenant shall not be disturbed in its possession of the Premises, provided Tenant is not in default under the Lease past any applicable cure period.

4.      In the event that Lender shall acquire the Premises upon foreclosure, or by deed in lieu of foreclosure, or by any other means:

   A.      Tenant shall be deemed to have made a full and complete attornment to Lender as the landlord under the Lease so as to establish direct privity between the Lender and Tenant; and

   B.      All rights and obligations of Tenant under the Lease shall continue in full force and effect and be enforceable by and against Tenant respectively with the same force and effect as if the Lease had originally been made and entered into directly by and between Lender as the landlord thereunder, and Tenant; and

   C.      Lender shall recognize and accept the rights of Tenant and shall thereafter assume the obligations of Landlord under the Lease.

5.      Nothing herein contained shall impose any obligations upon Lender to perform any of the obligations of Landlord under the Lease, unless and until Lender shall become owner or mortgagee in possession of the Premises.

6.      Any notice required or desired to be given under this Agreement shall be in writing and (a) personally delivered, or (b) given by certified or registered mail, return receipt requested, postage prepaid, or (c) sent by reputable overnight air courier service (i.e., Federal Express, Airborne, etc.) with guaranteed overnight delivery; in each instance addressed to the party as provided below. Notices shall be deemed given when actually received by the recipient, receipt thereof is refused by the recipient, or the impossibility of delivery due to the failure to provide a new address as required herein. All notices hereunder shall be addressed as follows:

   If to Lender:            _____
                           _____
                           _____

   If to Tenant:           Sears, Roebuck and Co.
                           3333 Beverly Road
                           Hoffman Estates, Illinois  60179
                           Attn:   Vice President, Real Estate
                           Department 824RE

   With a copy to:         Sears, Roebuck and Co.
                           3333 Beverly Road
                           Hoffman Estates, Illinois  60179
                           Attn:  Divisional  Vice  President  and  Associate
                           General Counsel, Real Estate
                           Department 824RE

Either party, at any time and from time to time (by providing notice to the other party in the manner set forth above), may designate a different address or person, or both, to whom such notice may be sent.

7.      This Agreement shall be binding upon and inure to the benefit of any person or entity acquiring rights to the Premises by virtue of the Mortgage, and the successors, administrators and assigns of the parties hereto.

8.      No personalty, real property, or fixtures of the Tenant are subject to the lien of the Mortgage.

{W0238732-1 }                              26

9.  Landlord or Lender shall give written notice to Tenant of the reconveyance or other release of the Mortgage within thirty (30) days of the date the reconveyance or other release is recorded.

10.  This Agreement shall not apply to any equipment owned or leased by Tenant which is now or hereafter placed on or installed in the Premises, and Tenant shall have the full right to remove said equipment at the expiration of the Lease term.

**IN WITNESS WHEREOF**, this Subordination, Attornment and Non-Disturbance Agreement has been signed and sealed on the day and year first above set forth.

Attest:                                 **Lender:**

_____         By: _____
                                        Name: _____
                                        Title: _____


STATE OF _____        )
                                ) SS:
COUNTY OF _____         )

**THE** undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____ and _____ personally known to me to be the _____ and _____ of _____, a _____, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that in such capacities they signed and delivered the said instrument pursuant to authority duly given to them by said _____.

**GIVEN** under my hand and seal this _____ day of _____, 200___.

                          _____
                          Notary Public

My Commission Expires:

_____

Attest:                                    **Landlord:**


_____            By: _____
                                   Name: _____
                                   Title _____


STATE OF _____     )
                             ) SS:
COUNTY OF _____      )


    **THE** undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____ and _____ personally known to me to be the _____ and _____ of _____, a _____, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that in such capacities they signed and delivered the said instrument pursuant to authority duly given to them by said _____.

    **GIVEN** under my hand and seal this _____ day of _____, 200___.


                                   _____
                                   Notary Public

My Commission Expires:


_____

Attest:                                                    **Tenant:**

_____          By: _____
                                                          Name: _____
                                                          Its: _____

STATE OF ILLINOIS          )
                                          ) SS:
COUNTY OF COOK          )

**THE** undersigned, a Notary Public in and for the County and State aforesaid, does hereby certify that _____ and _____ personally known to me to be the _____ and _____, of Sears, Roebuck and Co., a New York corporation, appeared before me this day in person and acknowledged under oath that in such capacity he signed and delivered the said instrument pursuant to authority duly given to him by said corporation.

**GIVEN** under my hand and seal this _____ day of _____, 200___.

                                                    _____
                                                    Notary Public

My Commission Expires:

_____

*EXHIBIT "B-1"*

## LEGAL DESCRIPTION- LANDLORD PARCEL

### *Berkeley Mall, LLC - Berkeley Mall Shopping Center*
Goldsboro, North Carolina
Per Alonzo E. Little Survey Dated May 13, 1996

PROPERTY DESCRIPTION: ALL THAT TRACT OF LAND CONTAINING 47.15 ACRES MORE OR LESS.  BEING PART OF THE PROPERTY RECORDED IN DEED BOOK 844, PAGE 453, AND PART OF DEED BOOK 810, PAGE 507, BEING LOCATED IN GOLDSBORO TOWNSHIP, WAYNE COUNTY, N.C. AND DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT AN IRON STAKE, POINT "A", ON THE WESTERN RIGHT OF WAY OF THE SERVICE ROAD FOR U.S. HIGHWAY 70, THE SOUTHEASTERN MOST CORNER OF THE CAROLINA-DIXIE GRAIN COMPANY PROPERTY AS DESCRIBED IN DEED BOOK 1154, PAGE 647 AND HAVING N.C. GRID COORDINATES OF Y=595,169.79875 AND X=2,316,232.41508 AND BEING LOCATED S 57-00-40 W 175.69 FEET FROM N.C.G.S. MONUMENT "OVERTON"; THENCE FROM SAID IRON STAKE, POINT "A", S 21-46-02 E 108.08 FEET TO A CONCRETE MONUMENT; THENCE CONTINUED WITH SAID RIGHT OF WAY AS IT CURVES, HAVING A RADIUS OF 1400.80 FEET, A CHORD OF S 13-52-32 E 384.66 FEET TO A CONCRETE MONUMENT; THENCE CONTINUED WITH SAID RIGHT OF WAY S 05-59-02 E 361.28 FEET TO A CONCRETE MONUMENT; THENCE CONTINUED WITH SAID RIGHT OF WAY S 84-00-58 W 10.00 FEET TO A CONCRETE MONUMENT; THENCE CONTINUED WITH SAID RIGHT OF WAY S 06-38-38 W 107.36 FEET TO A POINT; THENCE CONTINUED WITH SAID RIGHT OF WAY S 35-38-32 W 64.74 FEET TO A POINT AT THE INTERSECTION OF SAID RIGHT OF WAY AND RICHLAND CREEK; THENCE CONTINUED WITH SAID RIGHT OF WAY S 35-38-32 W 13.47 FEET TO A POINT; THENCE CONTINUED WITH SAID RIGHT OF WAY S 48-36-48 W 90.03 FEET TO A POINT; THENCE CONTINUED WITH SAID RIGHT OF WAY S 62-52-30 W 97.04 FEET TO A POINT; THENCE CONTINUED WITH SAID RIGHT OF WAY S 48-08-48 W 11.80 FEET TO A POINT, THE POINT OF BEGINNING; AND RUNS THENCE FROM SAID BEGINNING AND CONTINUED WITH SAID RIGHT OF WAY, S 48-08-48 W 48.48 FEET TO A CONCRETE MONUMENT FOUND; THENCE CONTINUED WITH SAID RIGHT OF WAY, WITH A CURVE, HAVING A RADIUS OF 424.90 FEET, AND A CHORD BEARING AND DISTANCE OF S 33-16-24 E 126.61 FEET TO A CONCRETE MONUMENT FOUND; THENCE S 18-24-00 W 26.07 FEET TO A CONCRETE MONUMENT FOUND ON THE NORTHERN RIGHT OF WAY OF BERKELEY AVENUE; THENCE WITH SAID ROAD RIGHT OF WAY S 65-17-00 W 1855.57 FEET TO AN IRON STAKE ON SAID ROAD RIGHT OF WAY, THE SOUTHEASTERN CORNER OF THOMAS M. EISNER, DEED BOOK 1114, PAGE 776; THENCE LEAVING THE NORTHERN RIGHT OF WAY OF BERKELEY AVENUE AND WITH SAID EISNER'S LINE ALONG THE WESTERN EDGE OF PERIMETER ROAD, N 24-43-00 W 154.63 FEET TO AN IRON STAKE, THE NORTHEASTERN CORNER OF EISNER; THENCE LEAVING SAID EISNER'S LINE AND ALONG THE WESTERN EDGE OF SAID ROAD, N 24-43-00 W 215.01 FEET TO AN IRON STAKE FOUND ON THE SOUTHERN RIGHT OF WAY OF EASTGATE DRIVE, THENCE CONTINUED ALONG THE WESTERN EDGE OF PERIMETER ROAD N 24-43-00 W 60.00 FEET TO A CONCRETE MONUMENT FOUND ON THE NORTHERN RIGHT OF WAY OF EASTGATE DRIVE; THENCE LEAVING THE NORTHERN RIGHT OF WAY OF EASTGATE DRIVE AND ALONG THE WESTERN EDGE OF PERIMETER ROAD AND WITH THE LINE OF CAPITOL FUNDS, INC.. SECTION ONE, PLAT CABINET "I", SLIDE 73, N 24-43-00 W 465.71 FEET TO AN IRON STAKE; THENCE WITH A CURVE, HAVING A RADIUS OF 132.10 FEET, AND A CHORD BEARING AND DISTANCE OF N 04-05-20 E 127.30 FEET TO A POINT; THENCE ALONG THE NORTHERN EDGE OF PERIMETER ROAD THE FOLLOWING COURSES AND DISTANCES, N 32-53-36 E 88.25 FEET TO A POINT, N 32-53-36 E 448.13 FEET TO A POINT; THENCE WITH A CURVE, HAVING A RADIUS OF 129.50 FEET AND A CHORD BEARING AND DISTANCE, N 47-52-02 E 66.92 FEET TO A POINT, N 62-50-27 E 375.14 FEET TO A POINT; THENCE WITH A CURVE, HAVING A RADIUS OF 133.70 FEET, A CHORD BEARING AND DISTANCE, S 87-17-53 E 133.14 FEET TO A POINT, S 57-26-13 E 172.26 FEET TO A POINT; THENCE WITH A CURVE, HAVING A RADIUS OF 196.30 FEET, A CHORD BEARING AND DISTANCE, S 84-51-38 E 180.82 FEET TO A POINT, N 67-42-58 E 185.64 FEET TO A POINT; THENCE WITH A CURVE, HAVING A RADIUS OF 150.20 FEET, A CHORD BEARING AND DISTANCE, S 77-49-37 E 169.96 FEET TO A POINT, AND S 43-22-12 E 808.01 FEET OF THE BEGINNING, CONTAINING 47.15 ACRES MORE OR LESS.

## EXHIBIT C

## ACCESS AND ENVIRONMENTAL INDEMNITY AGREEMENT

THIS ACCESS AND ENVIRONMENTAL INDEMNITY AGREEMENT (the "Agreement") is entered into as of the _____ day of _____, 20__, by and between SEARS, ROEBUCK AND CO., a New York corporation ("Sears" or "Company") and BERKELEY MALL, LLC, a North Carolina limited liability company ("Landlord") and _____, a _____ _____ ("Licensee").

### RECITALS

1.      Company, as lessee of the certain real property located at 703 Berkeley Boulevard, Goldsboro, North Carolina, commonly known as Sears Store #2225 ("the Property"), has the authority to grant access to the Property described herein.

2.      Licensee has requested access to the auto center building (containing approximately seven thousand seven hundred (7,700) square feet) and the surrounding parking areas (the "TBA Premises"), which is a portion of the Property leased by Company from Landlord, to perform a Phase I and/or Phase II Environmental Assessment and other physical inspections and testing in and about the TBA Premises (as hereinafter detailed); and Company has agreed to permit Licensee and/or Licensee's agents a revocable license to conduct the requested activity at the TBA Premises for the purposes set forth herein.

NOW THEREFORE, in consideration of their mutual covenants and other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

### AGREEMENT

1.      Incorporation of Recitals.   The foregoing recitals are true and correct and are incorporated herein by reference.

2.      Access.   Landlord and Company have agreed to permit Licensee to carry out certain investigations and inspections on the TBA Premises in accordance with the terms and conditions of this Agreement, as described on Exhibit "C-1" attached hereto (collectively, the "Investigations").   Such Investigations will be performed in accordance with the work plan attached hereto as Exhibit "C-2" ("Work Plan").

At reasonable times and upon reasonable prior notice to Company, Landlord and Company hereby grant Licensee reasonable access to the TBA Premises for the sole

purpose of conducting the Investigations in the manner described in the Work Plan. Any additions to the existing activities to be included in the Investigations and any changes to the existing Work Plan shall be submitted to Company in writing for Company's prior approval, which approval shall not be unreasonably withheld. If Company approves such proposal for additional or amended Investigations on the TBA Premises, such additional Investigations or amendments to the Work Plan shall be deemed to be a part of the Investigations and Work Plan as defined herein, and Licensee's implementation of such additional Investigations and plan will be subject to the terms and conditions of this Agreement.

3.    Conduct of Investigations. Licensee, its employees, agents and subcontractors (collectively with Licensee, the "Licensee Entities") will not conduct any work or engage in any activities on the TBA Premises other than those set forth in the Work Plan. In the event that the Licensee Entities engage in activity materially outside of or materially beyond the scope of the Work Plan ("unauthorized activity"), the Parties agree that it would be difficult to ascertain the extent of damages caused to Company, and accordingly the Parties agree Company shall be entitled to a one-time liquidated damages payment of $5,000.00 from Licensee for any such unauthorized activity. The Parties agree that this liquidated damages payment for unauthorized activity is in addition to, and does not limit in any manner whatsoever, any other damages, remedy or relief that otherwise might be available to the Parties herein. All costs associated with the activities conducted by Licensee Entities on the TBA Premises shall be borne by Licensee. The Work Plan shall be conducted in any event in a manner and at times that will not unreasonably interfere with Company's use of the TBA Premises or Property and which comply with the terms and conditions of this Agreement. Company reserves all rights or claims which they may have at law or in equity against Licensee or other Licensee Entities related to or arising from Investigations of the TBA Premises.

4.    Data and Reports. Licensee shall give reasonable advance notice to Company of any sampling, testing, drilling, or other on-site activities under the Work Plan, so as to allow a representative of the Company to observe such activity. Company shall have the right to obtain split samples or conduct contemporaneous sampling when any sampling is conducted by any Licensee Entity on the TBA Premises. Licensee shall transmit to Company in writing copies of quality-assured results of samples taken pursuant to the Work Plan as soon as they are made available to Licensee. A copy of any correspondence, data, report, test or other communication with any agency relating to the environmental condition of the TBA Premises or the presence of any petroleum or other hazardous substances therein or thereon shall be simultaneously sent to Company. As used in this Agreement, the term "Hazardous Substances" shall mean any hazardous substance as defined in federal and state or local laws, regulations or ordinances.

5.    Repair. If any portion of the TBA Premises, including any improvements and/or personal property of Company, suffers damage by reason of the entry of Licensee Entities on the TBA Premises, including but not limited to damage arising from the Investigations or any other tests, investigations and/or monitoring conducted upon the TBA Premises by Licensee Entities, Licensee shall, at its own cost and expense, repair

such damage and restore the TBA Premises to as good a condition as before such damage occurred. Repair of damage includes, without limitation, regrading and resurfacing any holes, ditches, or other indentations caused by any Licensee Entities, as well as any mounds or other inclines caused by any Licensee Entities. If the location of the equipment installed pursuant to the approved Work Plan shall in the future interfere or conflict with Company's use of the TBA Premises, Licensee shall upon receipt of a request from Company to do so, close, remove and/or relocate said equipment, including any monitoring wells set forth in the Work Plan, within a reasonable time after receipt by Licensee of such governmental approvals as may be required to close, remove or relocate said equipment or well or wells. Licensee shall use its best efforts to obtain all such required governmental approvals.

6.    Safety.    Licensee shall be responsible for ensuring that the Licensee Entities comply with good safety and security practices in performing the Work Plan. If monitoring wells are permitted in the Work Plan, Licensee shall install a locked cap on such wells, ensure that said caps are secure, and take all reasonable steps necessary to prohibit access to the recovery wells by parties not authorized to do so by Licensee Entities.    As between Licensee and Company, Licensee is responsible for any contamination or damage caused by the authorized or unauthorized access to the recovery wells. Licensee agrees to ensure that the Licensee Entities also close any recovery wells and perform the Work Plan in accordance with federal, state and local laws, regulations and ordinances and prudent engineering principles upon the completion of the Investigations or the termination of this Access and Environmental Indemnity Agreement, whichever is sooner.

7.    Indemnification.    Licensee shall indemnify, protect, defend and hold harmless Company and its parent corporation and affiliates, and Landlord and its parent corporation and affiliates, and each of their respective officers, employees, agents, shareholders, directors, members, managers, attorneys, licensees, contractors and subcontractors (collectively "the Indemnified Parties") against any and all costs (including license fees and reasonable attorney's fees), liabilities, claims, damages, losses, penalties, or suits resulting from (1) any release of Hazardous Substances on, in, under, or about the TBA Premises caused by the Licensee Entities during their entry on or use of the TBA Premises, (2) Licensee's failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (3) the acts, omissions and/or willful misconduct of Licensee Entities during their entry upon and use of the TBA Premises or in performing the Work Plan under this Agreement, and/or (4) a breach of the terms and conditions of this Agreement by Licensee. Notwithstanding this indemnity, (i) Company expressly reserve all rights it may have under the law to prosecute any claims or demand against either Licensee or Landlord arising out of or related to the environmental condition of the TBA Premises or responsibility for such environmental condition under the law or under the Lease or otherwise; and (ii) Landlord expressly reserve all rights it may have under the law to prosecute any claims or demand against either Licensee or Company arising out of

or related to the environmental condition of the TBA Premises or responsibility for such environmental condition under the law or under the Lease or otherwise..

8.    Compliance with Law/Permits. Licensee shall cause all Licensee Entities to comply with all applicable federal, state, and local laws and regulations in the performance of the Investigations of the TBA Premises. Licensee shall obtain, at its own expense, and prior to any access to the TBA Premises by Licensee Entities under this Agreement, all permits and authorizations of whatever nature from any and all governmental agencies necessary for conducting the Investigations pursuant to this Agreement. Licensee shall ensure that Licensee Entities properly handle, sort, and dispose of at its own expense all Hazardous Substances on, in, under, or about the TBA Premises generated by Licensee Entities in the course of conducting the Investigations under this Agreement. Licensee agrees that it shall be the licensee and/or generator of any and all Hazardous Substances generated in the course of conducting the Investigations authorized herein, and shall identify itself as the Licensee and/or generator of such Hazardous Substances on any and all documentation, including without limitation all hazardous waste manifests, associated with the handling, storage, treatment, disposal or transportation of any and all Hazardous Substances generated in the course of the Investigations.

9.    Term. The term of this Agreement shall be _____ from the date of execution of the Agreement by both parties. If Licensee breaches any term of this Agreement, then Company may give Licensee written notice thereof. If Licensee fails to remedy such breach within five (5) days after its receipt of such notice (or in the case of a breach which cannot reasonably be cured within five days, if Licensee fails to commence to remedy such breach within such five (5) days and to diligently prosecute such remedy to completion thereafter), then Company may terminate this Agreement at any time before such breach is cured by giving written notice of immediate termination to Licensee and Landlord.

10.    Upon Termination. Upon termination of this Agreement, Licensee shall ensure that Licensee (1) immediately removes any of the equipment, fixtures, improvements and other property located on any portion of the TBA Premises which was installed during the term of the Agreement, (2) closes all work performed by Licensee Entities including all wells, in compliance with applicable federal, state, and local laws, rules and regulations and/or to industry standards, and (3) restores the TBA Premises to its condition existing immediately prior to Licensee Entities' entry thereon.

11.    Liens. Licensee shall discharge at once or bond or otherwise secure all liens and attachments which are filed in connection with Licensee's implementation of the Work Plan and shall indemnify and hold harmless the Indemnified Parties from and against any and all loss, damage, injury, liability, and claims thereof resulting directly or indirectly from such liens and attachments.

12.    Insurance. Licensee shall ensure that the Licensee Entities shall maintain, at their sole cost and expense, the following policies of insurance:    (a) Workers

Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the TBA Premises is located with a waiver of subrogation in favor of the Company and Landlord, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease; (b) Motor Vehicle Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage; (c) Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage; and (d) Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate. Any contractor hired by any Licensee Entity to perform environmental tests at the TBA Premises shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

All policies shall be issued by insurance companies qualified to do business in the state where the TBA Premises is located, and rated "A-/VII" or better in the most current edition of Best's Insurance Reports published by the A.M. Best Company. Prior to commencement of any part of the Investigations, Licensee shall provide the Company and Landlord with certificates of insurance evidencing the insurance coverage required hereunder, and at the request of the Company or Landlord, certified copies of such policies or portions thereof. All such insurance policies shall provide that they may not be materially changed, non-renewed or canceled without at least thirty (30) days' prior written notice to the Company and Landlord. All such insurance policies, except worker's compensation and Motor Vehicle Insurance shall name the Company, Landlord, and their respective affiliates as additional insureds, and shall stipulate that Licensee's insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, the Company or Landlord or their respective affiliates. Completed operations coverage shall continue to be maintained for at least one (1) year following the completion of the Investigations and Work Plan, naming the Company, Landlord, and their respective affiliates as additional insureds during such period of continuation.

13.    Binding Effect. This instrument shall bind and inure to the benefit of the respective heirs, executors, administrators, other personal and legal representatives, grantees, successors and assigns of the parties hereto.

14    Entire Agreement: Modification. This Agreement between Licensee, Company and Landlord contains the entire understanding and agreement among the parties and supersedes all prior understandings and agreements between the parties with respect to the subject matter hereof, whether oral or written. This instrument may be modified only by a writing signed by all parties hereto.

15.    Governing Law. This instrument shall be governed by and shall be construed in accordance with the laws of the State of North Carolina.

16.    Notice. Any and all notices or other communication required or permitted by this Agreement, or by law, to be delivered to, served on, or given to either party to this Agreement shall be in writing, and shall be deemed properly delivered, given or served when personally delivered to such party, when electronically delivered with receipt acknowledged, or when mailed by United States mail, express, certified or registered with the return receipt signed, postage paid (or other overnight delivery service, charges prepaid), addressed as follows:

If to Licensee:          _____
                         _____
                         _____

with a copy to:          _____
                         _____
                         _____
                         _____

If to Landlord:          Berkeley Mall, LLC
                         c/o Faison & Associates
                         121 W. Trade Street, 27th Floor
                         Charlotte, NC  28202-5399
                         Attn:  Kenneth D. McCoy

With a copy to:          Caudle & Spears, P.A.
                         121 West Trade Street, Suite 2600
                         Charlotte, North Carolina  28202
                         Attn:  Jeffrey L. Helms

If to Company:           Bruce Kaye, Manager Environmental Services
                         Sears Holdings Management Corporation
                         3333 Beverly Road, A2-236A-A
                         Hoffman Estates, IL 60179

With a copy to:          Counsel, Environmental
                         Sears Holdings Management Corporation
                         3333 Beverly Road
                         Hoffman Estates, Illinois  60179

Any party may change its address by giving ten (10) day advance written notice of such change to the other party in the manner provided in this Paragraph.

17.    Representation. Licensee represents and warrants that it does not need the consent of any other party to enter into this Agreement.

18.    <u>Severability</u>. If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, unless such ruling shall materially alter the economic effect of this Agreement.

19.    <u>Survivability</u>. All obligations and commitments by Licensee specified in this Agreement (including, without limitation, the provisions of Paragraphs 3 through 8 and 10 through 15), shall survive the expiration or termination of this Agreement.

20.    <u>Assignment</u>. Licensee may not assign, delegate or subcontract (by contract, operation of law or otherwise) its rights or obligations under the Agreement, except with Company's prior written consent, and the failure of Licensee to obtain Company's prior written consent shall render any such attempt to assign, delegate, subcontract of no force and effect.

21.    <u>No Waiver; Cumulative Remedies</u>. The failure of either party to insist, in any one or more instances, or the delay in insisting, upon the performance of any provision of this Agreement or to exercise any right hereunder, does not constitute an election of remedies or waiver, and the obligations of the parties with respect to such future performance will continue in full force and effect. Except as otherwise provided herein, the remedies in this Agreement are cumulative with and not in lieu of other remedies available to a party at law or in equity.

22.    <u>No Third Party Beneficiaries</u>. Other than Company's affiliates, this Agreement shall not be deemed to confer any rights to any other party as a third party beneficiary or otherwise.

23.    <u>Exhibits</u>. Attached hereto are <u>Exhibit C-1</u> and <u>Exhibit C-2</u>, the terms and conditions of which are hereby incorporated by reference herein. In the event of a conflict between this Agreement and the exhibits, the terms and conditions of this Agreement shall prevail. Any provisions of Licensee's proposals, contracts, invoices, billing statements, acknowledgement forms or any other document which are inconsistent with the provisions of this Agreement shall be of no force or effect.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

LICENSEE:

[_____]

Dated: _____, 2007          By: _____

                                    Its: _____

                                    SEARS, ROEBUCK AND CO.,
                                    by its agent SEARS HOLDINGS
                                    MANAGEMENT CORPORATION

Dated: _____, 2007          By: _____

                                    Its: _____

                                    LANDLORD:

                                    BERKELEY MALL, LLC

Dated: _____, 2007          By: _____
                                        David W. Royster, III, Manager

## EXHIBIT C-1

### INVESTIGATIONS

[Generally list the inspections and investigations to be performed.]

EXHIBIT C-2

Work Plan