# **EXHIBIT A**

WATERTOWN, NEW YORK

LANDLORD:  PYRAMID COMPANY OF WATERTOWN
TENANT: SEARS, ROEBUCK AND CO.

TABLE OF CONTENTS

LEASE

SECTION

1.  Demised Premises

2.  Use

3.  Term and Extensions of the Lease

4.  Construction of Demised Premises and Other Improvements

5.  Landlord's Warranties

6.  Rent

7.  Transfer Taxes and Recording Taxes

8.  Repairs

9.  Tenant's Right to Repair

10. Landlord's Access

11. Assignment or Subletting

12. Right to Alter or Improve

13. Damage or Destruction to the Demised Premises

14. Damage or Destruction to the Shopping Center

15. Exclusives

16. Evidence of Title

17. Insurance for the Entire Tract

19. Waiver of Subrogation

19. Indemnity

20. Landlord's Insurance

ingress and egress, machinery, equipment, fixtures and
appurtenances now or hereafter belonging or granted or
reserved to Tenant, and

TOGETHER WITH all rights, servitudes, charges, encumbrances,
restrictions and privileges of Landlord on, over, in, running
with and binding all of the land on the Entire Tract and the
buildings and other improvements existent or hereafter erected
thereon.

2.    Use

     (a)   Subject to the provisions of Tenant's Operating
Covenant contained in Section 30 of this Lease, the Demised
Premises shall be used by Tenant only as follows, and for no
other purpose:

     (i)     The Retail Store Building and the Service and
Turnaround Area shall be used for the operation
of a single retail department store including
the sale, storage and servicing of retail
merchandise and for any other business purpose
as found in a majority of other Sears retail
stores in the Northeastern United States region,
provided, however, that in no event shall Tenant
use or occupy more than twenty percent (20%) of
the sales area of the Retail Store Building for
the sale or delivery to the public of those
items referred to in subsections (d)(9), (18)
and (21) of Section 6 of this Lease;

     (ii)    The TBA Building shall be used for an automobile
service center, including the sale, storage and
servicing of automobile tires, batteries and
accessories and for other automotive repairs as
found in a majority of other Sears TBA facili-
ties in the Northeastern United States region,
provided, however, that in no event shall Tenant
use the TBA building or any part thereof for the
sale or storage of gasoline, kerosene, diesel
fuel or other automotive fuels.

     (b)   However, following the period of Tenant's
Operating Covenant as set forth in Section 30 of this Lease,
if Tenant sublets the Demised Premises or assigns this Lease,
pursuant to the terms of Section 11 of this Lease, then the
Demised Premises shall be used for the operation of a single
retail department store compatible with the operation of a
first class regional shopping center, and for no other pur-
pose.

department store building for SCOA Industries, Inc. ("Hills")
at the approximate locations designated on Exhibit B, each
containing not less than 50,000 square feet of Gross Leasable
Area.   Landlord covenants that it will enter into a binding
agreement with Penney by June 1, 1986, for the construction
and operation of a retail store of the approximate dimensions
and at the location indicated on Exhibit B.   Landlord further
covenants that it will use its best efforts to enter into a
binding agreement with Hills by June 1, 1986, for the con-
struction and operation of a retail store of the approximate
dimensions and at the location indicated on Exhibit B.   Such
lease agreements will require (subject to Landlord's per-
formance of obligations of Landlord under the leases) Penney
to use its best efforts to open for business by February 1,
1987, and Hills to use its best efforts to open for business
by September 1, 1986.   Landlord either has entered into or
will enter into bona fide leases, noncancellable by tenants
except for default, condemnation, noncompliance with construc-
tion provisions or provisions for restoration in case of sub-
stantial damage by fire or other casualty, or like matters,
with tenants, for the occupancy of not less than 120,000
square feet of Gross Leasable Area (excluding Department
Stores), plus Landlord will use its best efforts to enter into
a lease with C.E. Chappell & Sons, Inc. ("Chappell") which
lease will start not later than October 15, 1988, and which
lease shall expire no sooner than the expiration of Tenant's
Operating Covenant.

(b)   If, following Tenant's request therefor,
Landlord fails to furnish Tenant by August 15, 1986, proof
reasonably satisfactory to Tenant that the aforesaid leases
and operating agreements (except the Chappell lease) have been
made, Tenant will not be obligated to open until the
requirement is met.

30. Tenant's Operating Covenant

(a)   Sears, Roebuck and Co. ("Sears"), as Tenant,
covenents and agrees that from and after the opening for
business of the Retail Store Building and for the period of
the first ten (10) Lease Years of the Term, Tenant shall
continuously operate or cause to be operated in the Demised
Premises, a retail Department Store containing approximately
85,456 square feet of Gross Leasable Area, under the name of
Sears or other name as Sears will be operating in the majority
of its like retail department stores in the Northeastern
United States region.

(b)   Any provision to the contrary notwithstanding,
Tenant may cease its operations in the Demised Premises upon
thirty (30) days written notice to Landlord in the case of
(i), or (ii) as hereinafter set forth during such time that

-34-

the circumstances therein set forth shall not have been
remedied:

   (i)   if at any time after the first anniversary
         of the date when Tenant shall have opened
         the Retail Store Building to the public for
         business, less than sixty (60%) percent of
         the Gross Leasable Area in the Mall Store
         Buildings are open or ready to be open for
         business and such condition shall have con-
         tinued for a period of twelve (12) consecu-
         tive months; or

   (ii)  if at any time after the date when Tenant
         shall have opened the Retail Store Building
         to the public for business there is less
         than one other Department Store operating
         in the Shopping Center and such condition
         shall have continued for a period of twelve
         (12) consecutive months.

   (c)   A temporary cessation of business by Tenant or
any Department Store or by any tenant or occupant of the
Shopping Center shall not be deemed a cessation of business
for the purposes of this Section 30 if such cessation:

   (i)   is occasioned by the making of repairs,
         alterations, or renovations due to damage
         or destruction of the premises where such
         cessation of business occurs; or

   (ii)  is occasioned by an eminent domain taking;
         or

   (iii) is caused by "Unavoidable Delay"; or

   (iv)  is not longer than two (2) months in
         duration.

   (d)   Tenant's Operating Covenant as set forth in this
Section 30, will be personal to Landlord and not assignable
except to (i) a successor Landlord who acquires Landlord's
interest in the Lease, or the Demised Premises, or (ii) a
mortgagee in possession.  Landlord shall not enter into any
agreement pursuant to which any other tenant of a portion of
the Entire Tract will be entitled to enforce this provision.
Tenant's covenant to operate is conditioned upon Landlord not
entering into an agreement with a third party (other than a
mortgagee of the Entire Tract, or portion thereof) where the
third party has the right to sue Tenant to enforce the
operating covenant.

-35-

(e)   Tenant will set its own hours of operations pro-
vided such hours are consistent with the hours of operation
for a majority of its like retail department stores in the
Northeastern United States Region.

## 31. Landlord's Operating Covenant

Landlord shall for the first ten (10) Lease Years,
and for so long thereafter as Tenant is operating, con-
tinuously operate the Shopping Center, under the name "Salmon
Run Mall", or other name as may be approved by Landlord and
Tenant in writing in a first class manner consistent with
other regional shopping centers.  Landlord shall use all
reasonable efforts to keep all of the mall store space in the
Shopping Center leased for uses not inconsistent with the
operation of a first-class regional shopping center.

## 32. Tenant's Mall Maintenance Contribution

(a)   As Tenant's Exterior Mall Maintenance
Contribution, Tenant will pay to Landlord an annual sum equal
to $.20 per square foot of Gross Leasable Area of the Demised
Premises, as additional rent, in equal monthly installments,
on the first day of each month during each of the first five
(5) Lease Years.  Tenant's obligation to pay the Exterior Mall
Maintenance Contribution shall continue only if (i) the
Shopping Center is being heated and cooled as the season may
require as specified in Section 41(a)(3), and (ii) all or
substantially all outside entrances to the Shopping Center are
open during the hours the Retail Store Building is open for
business and for one-half hour thereafter, and customers and
patrons of both the Shopping Center and Retail Store Building
are allowed free access to the Shopping Center.  The condi-
tions of (i) and (ii) herein will not apply before 9:00 a.m.
or after 10:30 p.m., or during periods when necessary main-
tenance or repairs to the Shopping Center or to the equipment
are being performed.  In the event the temperature must be
lowered or raised in order to comply with governmental
requirements, this will not be a default, and Tenant will
continue to pay its contribution.  Tenant shall increase its
contribution, if due, every five (5) Lease Years during the
Term, including Extension Terms, if any (commencing with the
sixth (6th) Lease Year) by an amount equal to an additional
$.10 per square foot of Gross Leasable Area of Demised
Premises per year.  At no time, however, shall Tenant con-
tribute more than a sum equal to $1.00 per square foot of
Gross Leasable Area of the Demised Premises in any one Lease
Year toward exterior common maintenance costs.  Upon comple-
tion of construction, the square footage of Tenant's Demised
Premises shall be determined and the exact sums in this
Section shall be specified by Supplemental Agreement.

-36-

(qq)  "Untenantable" shall mean the extent to which Tenant is actually unable to use any or all of the Demised Premises in the normal course of its business.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease, the corporate parties by their duly authorized representative.

WITNESS:

By: _____

By: _____


ATTEST:

By: _____
     Assistant Secretary


LANDLORD:

PYRAMID COMPANY OF WATERTOWN

By: _____

By: _____


TENANT:

SEARS, ROEBUCK AND CO.

By: _____
     National Manager Real Estate
     Planning Group

R.E. DIRECTOR
LEGAL

-55-

# <u>EXHIBIT B</u>

LEASE

BY AND BETWEEN

S&R COMPANY OF WEST SENECA

AS LANDLORD

AND

KMART CORPORATION

AS TENANT

requirements of any federal, state or municipal government, or of any governmental or public or quasi-public authority, now existing or hereafter created, having jurisdiction over the Demised Premises.

Tenant shall be entitled, without Landlord's consent, to assign this Lease or sublet the Demised Premises to: (i) any company affiliated with Tenant; or (ii) any successor company or entity that acquires all or substantially all of Tenant's assets or into which Tenant is merged.  Tenant shall be entitled, with Landlord's consent, to assign this Lease or sublet the Demised Premises into not more than three (3) spaces of not less than 20,000 square feet each to unrelated third parties.  The consent by Landlord to any such transfer, assignment, subletting, license or concession agreement, change or ownership or hypothecation shall not be unreasonably withheld, conditioned or delayed; provided, however, if Landlord fails to respond to any request by Tenant for Landlord's consent or approval within thirty (30) days of such request, the consent or approval of Landlord shall be deemed given.  If Landlord refuses to consent to such assignment, this Lease shall be terminated as of the date of such refusal and Landlord and Tenant shall each be released from all obligations under this Lease accruing from and after the date of such refusal.  Tenant shall not assign this Lease or sublease the Demised Premises (or any portion thereof) to any proposed assignee or subtenant whose intended use of the Demised Premises would be in violation of an exclusive use restriction in the Shopping Center, would be illegal or immoral, or would be for those uses prohibited by Article 14(c) of this Lease.

In the event Tenant wishes to sublet the whole or any portion of the Demised Premises, and Landlord's consent is required, Tenant shall first offer the same to Landlord and Landlord may within thirty (30) days elect to terminate this Lease provided, however, that should Landlord exercise such termination right after an assignment or sublet has occurred, any existing tenant of a portion of the Demised Premises shall, upon termination of this Lease, become a direct tenant of Landlord and such tenant shall attorn to Landlord.  In the event Landlord fails to terminate this Lease within the aforesaid time frame, such sublet or assignment shall be deemed approved.

Notwithstanding any assignment of this Lease or subletting of the Demised Premises, the Tenant shall, at all times, remain responsible for the payment of Rent and the performance of all other terms, covenants, and conditions of this Lease and may be joined in any suit to enforce this Lease, unless expressly released by the Landlord.

14.    **Exclusives.**

(a)    Landlord and Tenant represent, warrant and covenant that during the Lease Term no part of the Shopping Center shall be used for:  (i) a bookstore or other establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials; (ii) a so-called "head shop"; (iii) an off-track betting parlor; (iv) a pawn shop; (v) a recycling facility or stockyard; (vi) an automobile body or fender shop; (vii) a motor vehicle or boat storage facility; or (viii) a training or educational facility.

In addition, Tenant shall not use the Demised Premises and Landlord shall not permit the Shopping Center to be used for any of the following:  (i) any noise, liter, odor or other activity which may constitute a public or private nuisance or fire hazard; (ii) any unusual firing, explosive or other damaging or dangerous hazards; (iii) any warehouse operation (except if incidental and directly related to a tenant's on-site retail activities) or any assembling, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation; (iv) any dumping, disposal, incineration or reduction of garbage or refuse other than handling or reducing such waste as is produced on the premises from authorized uses and if handled in a reasonably clean and sanitary manner; (v) any commercial laundry or dry cleaning plant, laundromat, veterinary hospital, car washing establishment, bowling alley, mortuary or similar establishment; (vi) any so-called "flea market"; (vii) any so-called "fire", "bankruptcy", "auction" or similar sale, except pursuant to court order (other than auctions conducted in the ordinary course of business of quality works of art, fine jewelry, or antique furniture), or any spurious "going out of business" sale; (viii) any manufacture, use or

November _____, 1998
Kmart Store #7173

storage of any "Hazardous Materials" (other than storage or use of immaterial amounts of Hazardous Materials), if used in connection with the operation of other permitted uses in accordance with applicable law; (ix) any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness except for normal noise incident to the operation of a retail regional shopping center; (x) any obnoxious odor; or (xi) any dust, dirt or fly ash in excessive quantities.

If any tenant, owner or occupant of any portion of the Shopping Center violates the foregoing restriction in any material respect, Landlord, after notice from Tenant, shall promptly and as expeditiously as possible at its sole cost and expense take any and all steps necessary to prevent or correct such violation. Further, in all events of a violation of the foregoing restriction, Tenant shall also be entitled to injunctive relief and any other appropriate remedy available at law or in equity or otherwise as Tenant may elect. Without limiting the generality of the foregoing, Tenant shall be entitled to collect from Landlord an amount equal to the damages incurred by Tenant as a direct result of a violation of the foregoing restriction during any period from the date of any such violation until the same shall be cured. Such damages for violation shall include, without limitation, reasonable attorneys' fees, court costs and interest on any amounts advanced by Tenant to cure such violation, such interest to be calculated at the "prime rate", as defined in The Wall Street Journal, or similar publication, plus four percent (4%). Any remedies conferred upon Tenant shall not be exclusive of any other remedy, and each and every remedy shall be cumulative except Tenant may not terminate this Lease.

(b)    As a material inducement to Landlord's entering into this Lease, notwithstanding anything contained in the Lease, the Demised Premises shall not be used for:  (i) a full-line food supermarket; or (ii) a cinema or movie theater or similar entertainment use.

### 15.    Repairs.

From and after the Date of Tenant Occupancy, Tenant shall, at its sole cost and expense, carry out such repairs and maintenance, including roof, structure or otherwise, as it deems reasonably necessary to keep Tenant's Building and the Site Improvements located on the Land in good order and repair consistent with the quality of the Shopping Center, but in no event shall Tenant be required to make any repairs or replacements (or be liable for the cost thereof) which shall be the obligations of Landlord under Articles 5 and 7, or for any Hazardous Materials on the Demised Premises as of the Date of Tenant Occupancy or coming onto the Common Areas of the Land during the Lease Term. During the Lease Term, Tenant shall comply with all present and future laws, acts, rules, requirements, orders, directions, ordinances and/or regulations, ordinary or extraordinary, foreseen or unforeseen, concerning the Demised Premises or any part thereof, applicable to Landlord, Tenant or any assignee or subtenant, or of any federal, state, municipal or other public department, bureau, office or authority having jurisdiction over the Demised Premises; provided, however, Tenant may, in good faith and at Tenant's expense, upon prior written notice to Landlord (and where ever necessary, in the name of, but without expense to, Landlord) contest the validity of any such law, act, rule, requirement, order, direction, ordinance and/or regulation and, pending the determination of such contest, may postpone compliance therewith, provided that such contest is conducted with due diligence, except that Tenant shall not so postpone compliance therewith so as to subject Landlord to any fine or penalty or to the prosecution for a fine or to cause the Demised Premises or any part thereof to be condemned or vacated.

Notwithstanding the foregoing provisions of Article 15, Landlord shall clean and sweep the Common Areas (which shall be performed as often as reasonably necessary), restripe the parking areas, sidewalks and driveways (as reasonably necessary) and remove snow and ice from the parking areas, sidewalks and driveways (which shall be performed as often as is necessary), maintain landscaped areas and replace the plantings therein and maintain and replace light bulbs and light standards with respect to the parking lot. From and after the Date of Tenant Occupancy, Tenant shall pay to the Landlord Tenant's Share of the costs of repairs and maintaining the

November _____, 1998
Kmart Store #7173

Tenant's accountant; should such audit disclose any overpayment by Tenant, Landlord shall remit said overpayment upon demand and, if such overpayment shall exceed 3% of the amount paid by Tenant for any twelve (12) month period, Landlord shall pay to Tenant the reasonable costs of such audit, not to exceed One Thousand Five Hundred Dollars ($1,500.00).

Notwithstanding anything contained herein to the contrary, Tenant reserves the right, for any reason whatsoever, at any time upon thirty (30) days prior notice to Landlord to assume the duties of Landlord to maintain the Common Areas within the area shown as "Tenant's Protected Area" on <u>Exhibit "B"</u>.  If Tenant shall elect to maintain the Common Areas located within the Demised Premises, then, and in such event, Tenant shall not during such period be required to make any contributions to the costs of maintaining the Common Areas as hereinabove defined, except for Tenant's proportionate share of the costs of maintaining, illuminating and repairing the common ring road and access roads depicted on <u>Exhibit "B"</u>, however, Landlord shall maintain or cause to be maintained the remaining portions of the Common Areas on the Land.  If Tenant shall elect to maintain the Common Areas on the Land, Tenant shall maintain such Common Areas in accordance with the standards required of Landlord for maintain of the Common Areas pursuant to this Lease.  In addition, Tenant shall indemnify, defend and hold Landlord harmless for any claims, demands, liabilities and causes of action arising out of Tenant's negligent act or omission in maintaining such Common Areas.

Unless otherwise specified in Tenant's Typical Drawings and Specifications, Landlord, shall, at Landlord's sole cost and expense, have that portion of the common facilities lighting standards located within Tenant's Protected Area metered directly into Tenant's meter and Tenant shall be responsible for the cost of supplying electricity thereto.  The balance of the common facilities lighting standards shall be metered into the meters of Landlord's other tenants as depicted on <u>Exhibit "B"</u> or into Landlord's own meter, and Landlord's other tenants or Landlord shall be responsible for the cost of supplying electricity thereto.

Notwithstanding anything contained herein to the contrary, Tenant shall have no responsibility to remediate or pay for the remediation of Hazardous Materials (as defined in Article 28 below) not discharged or disposed of by Tenant, its subtenants, agents, contractors, employees or concessionaires.

16.    **Alterations and Additional Construction.**

Subject to compliance with applicable law and obtaining necessary Governmental approvals, Tenant may, at its sole cost and expense and at any time, make such non-structural alterations, additions or changes, in and to Tenant's Building, as it may deem necessary or suitable (including, without limitation, satellite dishes and cellular towers).  Tenant may, subject to governmental approvals and the consent of any lender having a loan secured by the Demised Premises and Landlord's consent which shall not be unreasonably delayed, conditioned or withheld, make structural changes and may at any time raze the whole or any part of Tenant's Building at any time standing upon the Demised Premises, provided that, if it does so raze Tenant's Building, it will, without unnecessary delay, replace that which is demolished with a structure of equal size and equal or greater value than the razed Tenant's Building.  Any change to Tenant's Building shall be performed in a good and workmanlike manner, using new materials, and shall be constructed in a lien-free manner.  No such change shall increase the Floor Area of Tenant's Building.  Landlord shall cooperate with Tenant in securing building, sign and other permits or authorizations required by appropriate authorities for any work permitted hereunder by Tenant and relocating easements, and any out-of-pocket costs of Landlord and costs connected with filing applications for such permits shall be borne by Tenant.  In the event of any changes to or alterations to Tenant's Building, Tenant shall furnish Landlord with a copy, for information only (except where Landlord's consent is required) of any and all plans and specifications relating to such alteration.  In addition, such changes or alterations shall be undertaken with reasonable diligence and Tenant shall use reasonable efforts to provide for orderly

DET_C:\183900 5

circulation of traffic and minimize any interference with the use, occupancy and operation of the Shopping Center during the prosecution of such work.

Tenant shall submit to Landlord for execution any and all applications for permits or other authorizations, easement releases and grants, and other documents incidental thereto, together with all supporting documentation reasonably necessary for Landlord to review the same.  If Landlord shall not execute same within twenty (20) days after delivery of such complete documentation or Landlord's request for additional information or modification, then Tenant shall have the right to execute said application, releases or grants, or other documents on Landlord's behalf.  In the event Landlord does not approve or reject Tenant's request to alter Tenant's Building within sixty (60) days after delivery of such notice, such request will be deemed approved.

### 17.    Utilities.

Landlord shall construct in accordance with Section 9 of this Lease, and cause to be maintained in accordance with Section 15 of this Lease, for the benefit of the Demised Premises gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the Lease Term; provided, however, Tenant shall be responsible for maintaining all such facilities located within five (5') feet Tenant's Building and above or below Tenant's Building.  In addition, Tenant shall be responsible for all repairs and maintenance of any specialty fixtures or devices outside Tenant's Building, or below the concrete slab, loading areas, garden center, including, but not limited to, grease traps or grease and oil separators, hydraulic lifts, storage tanks or other device or installation specific to Tenant's use of the Demised Premises.  Tenant shall pay all charges for utility raw materials (gas, water, sewage, telephone, electricity, etc.) furnished to Tenant's Building from and after the Date of Tenant Occupancy and for utility meter installation.

If public sanitary sewer is not available, Landlord may provide a disposal or septic tank system in lieu thereof, subject to tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole cost and expense.

### 18.    Governmental Regulations.

Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting the Demised Premises including the making of all alterations, additions or improvements.

### 19.    Liability Insurance; Indemnification.

During the Lease Term, Landlord at its sole cost and expense shall keep Tenant insured against all statutory and common law liabilities for damage to property or injuries, including loss of life, sustained by any person or persons within or arising out of the Common Areas, whether caused by Tenant's negligence or otherwise, in a policy or policies with minimum coverage of a combined single limit of Five Million and 00/100 Dollars ($5,000,000.00), with a deductible not to exceed $10,000.00. Such minimum amount shall be increased by Landlord no more frequently than annually upon receipt of written notice from Tenant specifying such increased minimum, such notice to be binding on Landlord if the increase approximately reflects decreases in the value of the U.S. Dollar since the date hereof.  Such insurance shall be carried on commercial general liability coverage form (or then current equivalent form) with a financially responsible insurance company or companies maintaining a Best's Rating or equivalent of at least A-IX.  All such policies shall bear endorsements naming Tenant as an additional insured and providing that Tenant shall be notified not less than thirty (30) days in advance of any modification or cancellation thereof.  Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

November _____, 1998
Kmart Store #7173

WITNESSES:

Printed Name:  Adam S. Bersin

Printed Name:  Carmen D. Spinoso

Printed Name:  John D Gaber

Printed Name:  Christine Roman

LANDLORD:

S&R COMPANY OF WEST SENECA,
a New York general partnership

By:
Printed Name:  Scott R. Congel
Its:            General Partner

TENANT:

KMART CORPORATION,
a Michigan corporation

By:
Printed Name: LORRENCE T. KELLAR
Its:  V. P. REAL ESTATE

Attest: Anne Hancock
Printed Name:
Its:

32