## Exhibit B

Diaz Declaration

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| **SEARS HOLDINGS CORPORATION, *et al*.,** | : | Case No. 18-23538 (RDD) |
|  | : |  |
| **Debtors.[1]** | : | (Jointly Administered) |
|  | : |  |

------------------------------------------------------------

## DECLARATION OF MATTHEW DIAZ IN SUPPORT OF THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO ESL INVESTMENTS, INC.

January 26, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).   The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1.      I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading, NYSE-listed international financial advisory firm. I have been providing financial advisory services to companies and creditor groups undergoing in-court and out-of-court restructurings in a variety of industries for over 15 years. In the course of my professional experience, I have had the occasion to review and assess many business plans, wind down plans, claims analyses, asset purchase agreements, and related sales documents. I have also advised trusts formed pursuant to Chapter 11 plans whereby I reviewed administrative and priority claims.

2.      FTI was retained as the financial advisor to the Unsecured Creditors' Committee (the "Committee") of Sears Holdings Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors") effective October 25, 2018.

3.      Among the services being provided by FTI to the Committee are the following: (i) assist in the review of the Debtors' claims reconciliation and estimation process, including assessment of priority level; (ii) conduct due diligence regarding, and provide advice with respect to, the Debtors' projected cash flow, liquidity and operating results; (iii) review and evaluate the Debtors' business plan and go-forward business strategies; and (iv) assist in the review and/or preparation of information and analysis necessary for the confirmation of a plan and related disclosure statement in these chapter 11 cases.

4.      As a part of FTI's engagement, I have overseen various workstreams during the Debtors' bankruptcy process, including, but not limited to, assessing the impact of the Debtors' proposed sale to ESL Investments ("ESL") and the resulting wind down of the Debtors' estates.

## I.  The ESL Sale Will Render the Debtors' Estates Administratively Insolvent

5.      The Debtors have consistently and repeatedly stated the importance of keeping their estates administratively solvent, given the Debtors' precarious financial position.

2

Nevertheless, the Debtors agreed to accept an ESL bid, which by their own calculations, renders the Debtors' estates administratively insolvent.

### a.    The Debtors established a Wind-Down Reserve account to satisfy administrative claims

6.    On October 15, 2018, concurrent with the bankruptcy petition, the Debtors filed a motion for post-petition Debtor-In-Possession ("DIP") financing. Pursuant to this motion, the Debtors were required to set up a reserve account funded by the first $200 million of proceeds from the sale of unencumbered assets. This reserve account was to be used to fund wind-down costs (the "Wind-Down Reserve"). During the first day motion hearings, the Debtors' legal counsel made the following statement to the Court:

> [A] very important and, frankly, hard-fought negotiated point is that the first $200 million of proceeds that come from unencumbered asset sales are going to be put in a winddown reserve account. That winddown reserve account is there for the estate that if they sell their assets, if they have an estate that needs to be administered, they're really there to make sure that the company has sufficient funds to always wind down the estate and importantly pay severance, pay other administrative claims of the company.[2]

7.    On November 27, 2018, at the DIP hearing, and in connection with the Committee's objections, the Wind-Down Reserve balance requirement was increased to $240 million (from $200 million) and subsequently entered into the final DIP order.[3]

---

[2] ECF No. 136, *Tr. regarding Hearing Held on Oct. 15, 2018 at 2:13 PM regarding Notice of Hearing/ Notice of Commencement of Chapter 11 Cases and Agenda for First Day Hearing; Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases filed by Ray C Schrock on behalf of Sears Holdings Corporation; Debtors Motion for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Schedule Second Interim Hearing and Final Hearing.*

[3] ECF No. 952, *Final order (i) authorizing the debtors to (a) obtain post-petition financing, (b) grant senior secured priming liens and superpriority administrative expense claims, and (c) utilize cash collateral; (ii) granting adequate protection to the prepetition secured parties; (iii) modifying the automatic stay; and (iv) granting related relief*, ¶23 (Nov. 30, 2018).

b.     *Ensuring administrative solvency was a key point of negotiation between the Debtors and ESL*

8.     On December 28, 2018, the Debtors received a bid from ESL for a going concern sale of substantially all of their assets that would have rendered the Debtors substantially administratively insolvent.[4] Since then, the Debtors have engaged in numerous discussions and negotiations with ESL concerning a shortfall of required administrative claims.

9.     On January 6, 2019, in a presentation prepared by the Debtors' advisors, Lazard and M-III Partners, the Debtors summarized the administrative and priority claims that will need to be satisfied in the event of a going concern sale, and identified a total gross administrative claims shortfall of $680 million. After taking into account the assets not subject to the sale, the net administrative claims shortfall was $335 million. The Debtors requested that ESL back-stop this net shortfall.[5]

10.     On January 7, 2019, ESL updated its terms to assume $257 million of liabilities not included in its original bid that would essentially reduce the administrative claims shortfall from $335 million to $78 million.[6]

11.     Between January 7, 2019, and the start of the Section 363 "auction" on January 14, 2019, the Debtors continued to refine their numbers and determined that the administrative claims shortfall had grown from $78 million to $206 million, or to $318 million if one were to include $112 million of accrued post-petition royalties ("IP Royalty Payments") related to intellectual property licensing fees owed to KCD IP LLC ("KCD"), a non-debtor entity.[7,8]

---

[4] Letter from Transform Holdco LLC c/o ESL Investments, Inc. to Lazard Frères & Co. LLC dated December 28, 2018, regarding definitive bid to acquire substantially all assets of the Debtors.

[5] "Discussion Materials – Project Blue," prepared by Lazard and M-III Partners, on behalf of the Debtors, dated January 6, 2019.

[6] "Project Transform – ESL Bid Proposal," prepared by ESL Investments, dated January 7, 2019.

[7] *Id.*

*c.    During the auction process the Debtors' counsel repeatedly asserted that the ESL bid was deficient and left the estate administratively insolvent*

12.    On January 14 and 15, 2019, during the sale proceedings, counsel for both the Debtors and the Restructuring Subcommittee reiterated that the ESL bid did not cover the administrative claims shortfall and would render the estate administratively insolvent.

13.    On January 15, 2019, counsel for ESL stated "Over the past few weeks, the Debtors have been singularly focused on one thing, which is requiring ESL to guarantee that the debtors will not become administratively insolvent."[9]

14.    Later, counsel for the Debtors stated in regard to the status of the ESL bid that "At this time, unfortunately, after consulting with the consultation parties, the restructuring committee has determined that the ESL bid is not executable and is not otherwise higher or better when compared to the company's alternatives."[10]

15.    Counsel for the Debtors continued, highlighting one of the many shortfalls of ESL's bid that would lead to administrative insolvency:

> When we looked at the consideration that was being provided for unencumbered assets . . . most of those assets were being purchased by ESL for relatively little consideration . . . But when you couple that with having a party that's buying basically all of the assets and we are left in [an] administratively insolvent position, *we believe that there was insufficient consideration for the unencumbered assets*.[11]

16.    Counsel for the Restructuring Subcommittee also highlighted the deficiencies in ESL's bid:

> The subcommittee proposed that ESL could credit bid, receive a release of equitable subordination and recharacterization claims if it proposed a better

---

[8] "Discussion Materials – Project Blue," prepared by Lazard and M-III Partners, on behalf of the Debtors, dated January 14, 2019.

[9] Auction Proceedings transcript dated January 15, 2019, received from the United States Bankruptcy Court Southern District of New York, reported by Mary F. Bowman, (Job No. 154062).

[10] *Id.*

[11] *Id* (emphasis added).

transaction. And a better transaction is a transaction that can close, that would not leave the company administratively insolvent, that would provide a better recovery for creditors other than ESL, and that has provided some direct consideration for the opportunity to credit bid and release the equitable subordination and recharacterization claims . . . *Unfortunately, the proposed ESL transaction meets none of the legal requirements and primarily benefits ESL.*[12]

17.     Counsel for the Restructuring Subcommittee concluded that "Administrative solvency is a commitment by the company to pay back those parties that provide goods and services to the estate post-petition, so it can conduct a reorganization and get to the other side. ESL's bid leaves the company admittedly administratively insolvent."[13]

18.     Despite this, at 2:20 in the morning, on January 16, 2019, the Debtors and the Restructuring Subcommittee accepted ESL's bid, even though their own calculations showed it would leave the Debtors administratively insolvent, as discussed below.

## II.  The Debtors' Estimate of Administrative Claims Shortfall is Understated

19.     As set forth in the table below, at the time of the auction, the Debtors estimated that there would be an administrative claims shortfall of $62 million, and the Committee estimated that there could be an administrative claims shortfall of as much as $226 million,[14] as a result of accepting the ESL bid.

---

[12] *Id* (emphasis added).

[13] Auction Proceedings transcript dated January 15, 2019, received from the United States Bankruptcy Court Southern District of New York, reported by Mary F. Bowman, (Job No. 154062).

[14] I understand that the indenture trustee for the KCD Notes has asserted that royalty payments obligations are due and owing.  While the Committee continues to evaluate the propriety of such assertion, the Debtors chose to ignore the assertion of such payment obligations.

| $ in millions | Debtors' Estimate | Committee's Estimate |
|---|---|---|
| **Administrative Obligations Not Assumed by ESL** | | |
| 503(b)(9) | $34 | $34 |
| Accounts Payable | 30 | 30 |
| Taxes and Other | 4 | 4 |
| RemainCo Winddown Costs | 80 | 80 |
| ABL DIP | 100 | 142 |
| **Total Administrative Claims** | **$248** | **$290** |
| | | |
| **Sources of Value Left Behind by the Debtors' Estate** | | |
| Less: MTN Sale Proceeds | (81) | (81) |
| Less: Cash at Banks | (54) | (54) |
| Less: Store Cash | (15) | (15) |
| Less: Other Cash - Utility Deposit | (10) | - |
| Less: Insurance Proceeds | (13) | (13) |
| Less: SHIP Sale Deposit | (6) | (6) |
| Less: UHAUL Unencumbered Proceeds | (7) | (7) |
| | | |
| **Potential Additional Post-Petition Obligations** | | |
| Add: KCD Royalties | - | 112 |
| | | |
| **Total Potential Administrative Claims Shortfall As Of the Time of the Auction** | **$62** | **$226** |

20.    The table above identifies three differences between the Debtors' and the Committee's estimates of the claims shortfall as of the time of the auction.

21.    First, the Debtors understood that there would be a shortfall because the proposed Asset Purchase Agreement ("APA") limited the amount of the ABL DIP outstanding at close to $850 million.[15,16]    Rather than include the amount actually expected to be outstanding at close on the ABL DIP based on then-current projected cash flows, the Debtors estimated that $950 million would be outstanding on the ABL DIP—a $100 million shortfall.  In fact,  the Debtors' cash flow budget at the time of the auction, which contained *actual* cash flow results through

---

[15] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[16] "Transform Transaction – Weekly Tracking" dated January 23, 2019, prepared by the Debtors.

January 5, 2019 ("Debtors' Auction Cash Flow Budget"), projected the ABL DIP balance to be $992 million as of the anticipated sale closing date of February 9, 2019.[17] Thus, the actual amount of the projected shortfall was $142 million, not $100 million, meaning there was an unaccounted for $42 million delta in the Debtors' shortfall estimate. Accordingly, the Committee used the $992 ABL DIP balance to calculate its estimate, consistent with the Debtors' cash flow projections.

22.     Second, at the time of the auction, the Debtors assumed that they would retain $10 million of proceeds from utility deposits. However, section 2.1(o) of the ESL APA concerning the acquired assets states that ESL, not the Debtors, would retain any such security deposits.[18,19] Therefore, the Committee has excluded the utility deposit from its estimate of administrative claims shortfall.

23.     Third, the Debtors may owe $112 million of IP Royalty Payments to KCD at closing.[20] These royalties are associated with the Debtors' sale of products with intellectual property owned by KCD. The Debtors have not paid these royalties since the petition date. For illustrative purposes, the Committee has included this amount in its estimate.

---

[17] "Project Blue Revised Cash Flow Budget – Going Concern" dated January 11, 2019 prepared by the Debtors.

[18] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[19] SEARS-UCC00282037; "Discussion Materials – Project Blue," prepared by Lazard and M-III Partners, dated January 16, 2019.

[20] "Discussion Materials – Project Blue", prepared by Lazard and M-III Partners, on behalf of the Debtors, dated January 14, 2019.

>    a.    *At the time of the auction, the Debtors' advisors tried to justify their decision to accept the ESL bid by citing certain potential "upsides" that could cover the administrative claims shortfall*

24.    Based on my discussions with the Debtors' advisors at the auction, I understood that there were certain sources of value they hoped would mitigate the projected administrative claims shortfall. Since that time, Debtors have attempted to quantify the potential upsides, as discussed below.[21]

25.    <u>Inventory Not Being Sold to ESL</u>: In early January, the Debtors initiated going out of business sales at eighty of its stores (the "<u>Wave 3 GOB Sales</u>"). The inventory associated with the Wave 3 GOB Sales is considered an excluded asset under section 2.2(d) of the ESL APA.[22] The Debtors estimate and include $43 million of proceeds associated with the Wave 3 GOB Sales after the proposed closing of the sale to ESL.

26.    <u>Value from Credit Bid Release Consideration Reserve</u>: The ESL purchase price will include a $35 million cash reserve for release and discharge of certain claims.[23]

27.    <u>Value of Excess Inventory and Receivables</u>: Pursuant to section 10.9 of the APA, if the aggregate amount of the inventory, credit card receivables and pharmacy receivables (together, the "<u>New ABL Collateral</u>") acquired by ESL as of the closing date exceeds $1.657 billion, the Debtors, at their own expense, can have the aggregate amount in excess of the $1.657 billion transferred, primarily in the form of inventory, to the GOB stores and retain the proceeds.[24] The Debtors' estimate of New ABL Collateral as of January 23, 2019 indicates a

---

[21] "Transform Transaction – Weekly Tracking" dated January 23, 2019, prepared by the Debtors.

[22] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[23] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[24] *Id.*

projected shortfall of $8 million.[25] The $1.657 billion of required New ABL Collateral is a condition precedent to close. It is unclear what will happen if the New ABL Collateral is insufficient at closing. Separately, the Debtors have identified $30 million of excess inventory that is presumably not New ABL Collateral that could be a source of value to reduce the administrative shortfall. It is not clear if the Debtors will be able to liquidate this excess inventory, and even if liquidation is possible, the price obtainable for the inventory remains uncertain.[26]

28.    <u>Reduced Accounts Payable</u>: The Debtors estimate that there may be opportunities to reduce up to $30 million of projected accounts payables as a result of managing disputed payables, reducing non-essential spend, and potentially recovering prepetition cash deposits.[27,28] The actual amount and likelihood of these mitigating factors is subject to significant uncertainty.

29.    <u>Historical Favorable Budget to Actual Variance</u>: The Debtors hope that their cash flow budget is conservative and cite past favorability to their budgets as a potential additional source of cash.  As of the week ending January 19, 2019, the Debtors' rolling four-week net cash flow was $36 million favorable to budget.[29] The Debtors hope that these trends continue and recently lowered their projected February 9, 2019 DIP ABL balance from $992 million to $954 million in the Debtors' most recent cash flow budget, which shows actual results through January 19, 2019 ("<u>Debtors' Cash Flow Budget</u>").[30,31] Additionally, the Debtors have identified up to $102 million of additional opportunities to reduce its ABL DIP balance from various

---

[25] "Transform Transaction – Weekly Tracking" dated January 23, 2019, prepared by the Debtors.

[26] *Id.*

[27] *Id.*

[28]  SEARS-UCC00282037; "Discussion Materials – Project Blue," prepared by Lazard and M-III Partners, dated January 16, 2019.

[29] "Project Blue Weekly Flash Report (DIP Budget Week 14)" dated January 23, 2019 prepared by the Debtors.

[30] "Project Blue Revised Cash Flow Budget – Going Concern" dated January 11, 2019 prepared by the Debtors.

[31] "Project Blue Rolling Cash Flow Budget (Week 14)" dated January 23, 2019 prepared by the Debtors.

receipts and operational proceeds.[32] The actual amount and the likelihood of receiving these additional funds is subject to significant uncertainty.

> **b.    *The Debtors' assessment, however, was one-sided and considered potential "upsides" and essentially ignores the numerous "downsides" to the Debtors' liquidity picture that would increase the Debtors' estimated administrative claims shortfall***

30.    The Debtors' advisors failed to adequately assess the risk that numerous potential downsides would materialize and would increase the degree to which they will be administratively insolvent.

31.    <u>Accrued Payroll Due at Closing</u>: ESL will assume the liability of payroll obligations of the employees beginning on the anticipated sale closing date of February 9, 2019 per sections 2.4(f) and 9.7(b) of the APA.[33] The Debtors will be liable to pay all accrued but unpaid payroll obligations until the sale closing date. Most of the Debtors' employees are paid in alternating staggered biweekly cycles every other Friday. Approximately 12% of the Debtors' employees are paid on a semi-monthly basis: on the 15th and the last day of each month.[34]  The Debtors have not included accrued payroll in their administrative claims estimates. Based on the Debtors' Cash Flow Budget, approximately $44 million in payroll, taxes and benefits are estimated to be paid out during the week of February 16, 2019, which is a conservative indication of the amount of payroll obligations that would have been accrued as of the previous week (the week ending February 9).[35]

---

[32] "Transform Transaction – Weekly Tracking" dated January 23, 2019, prepared by the Debtors.

[33] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[34] ECF No. 31, *Motion of the Debtors for entry of order (i) authorizing the Debtors to(a) pay certain prepetition wages and reimbursable employee expenses, (b) pay and honor employee medical and other benefits, and (c) continue employee benefits programs, and (ii) granting related relief* (Oct. 15, 2018).

[35] "Project Blue Rolling Cash Flow Budget (Week 14)" dated January 23, 2019 prepared by the Debtors.

32.    <u>Warranties and Protection Agreements Liabilities</u>: Pursuant to section 2.3(e) and section 2.8(e) of the APA, ESL will not assume the warranty and protection agreement liabilities from the Debtors until the KCD Notes—which are debt obligations between KCD and Sears Reinsurance Company Ltd. ("<u>Sears Re</u>")—are transferred to ESL. The transfer of the KCD Notes require consent from the applicable Bermuda regulatory authority.[36] The timing of this transfer is uncertain. Until the KCD Notes get transferred, ESL will service the warranty claims and protection agreements, and the Debtors will reimburse ESL for the associated costs.[37] The Debtors' cost of servicing under the warranties and protection agreements is approximately $30 million a month, an amount Sears Re was supposed to reimburse. Since the petition date, Sears Re has stopped reimbursing the Debtors. It is uncertain how the Debtors will reimburse ESL for the warranty and protection agreement liabilities without reimbursement from Sears Re. These claims have not been considered in the Debtors' estimate of administrative liabilities and will increase the administrative claims shortfall by an estimated $30 million per month. For illustrative purposes, it is assumed that the Debtors will incur costs of at least $30 million, or one month.

33.    <u>Loss of Cash at Banks</u>: The Debtors estimate that $54 million of cash at banks will remain in their estates. The Debtors' most recent administrative claims analysis acknowledges the risk of recovering all of this cash and assigns a 50% risk weighting on the proceeds."[38] If the cash is not collected, the Debtors' administrative claims shortfall would increase by roughly $27 million.

---

[36] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[37] *Id.*

[38] SEARS-UCC00282037; "Discussion Materials – Project Blue," prepared by Lazard and M-III Partners, dated January 16, 2019

34.    <u>Loss of the SHIP Deposit</u>: The Debtors currently assume that they will retain the $6 million deposit received from Service.com in connection with the SHIP purchase agreement. However, section 2.1(z) and section 2.2(p) of the ESL APA concerning the acquired assets and excluded assets, respectively, state that the Debtors will retain this deposit only if the SHIP purchase agreement terminates prior to ESL closing. If the SHIP purchase agreement terminates after the closing, then the SHIP assets will be included in the ESL sale, and all proceeds including the deposit from the SHIP sale will be retained by ESL. The Creditors' Committee understands, however, that Service.com may contest the Debtors' termination of the SHIP Purchase Agreement, and the Debtors' entitlement to retain the $6 million deposit. If the Debtors are not permitted to retain the $6 million deposit, there would be a dollar of dollar increase in the Debtors' administrative insolvency.

35.    <u>Mechanic's Lien Obligations</u>: There are approximately $4 million of mechanic's liens that have been alleged or asserted against the Debtors' estates. During the auction proceedings, ESL's counsel stated that "NewCo [was] to assume 4 million dollars in mechanic's liens."[39] However, in the executed APA, ESL has not agreed to assume these mechanic's liens and considers them as excluded assets under section 2.4(r).[40] If not resolved, these liens will further increase the administrative claims of the Debtors.[41]

36.    <u>Cost of Closing Delays</u>: A delay in closing the sale to ESL from February 9, 2019, will cause the Debtors to incur substantial costs. First, there is significant uncertainty to ESL's ability to timely close the transaction, including ESL's ability to demonstrate adequate assurance to counterparties associated with assumed leases and contracts. Second, the Debtors'

---

[39] Auction Proceedings transcript dated January 15, 2019, received from the United Stated Bankruptcy Court Southern District of New York, reported by Mary F. Bowman, (Job No. 154062).

[40] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[41] *Id.*

Cash Flow Budget shows the DIP ABL balance growing from $954 million to $991 million due to a one-week delay, and exceeds $1.1 billion with further delays.[42] Third, if the ESL sale does not close by February 9, 2019, the additional cash burn impacting the Debtors' estates is estimated to be $6.6 million per day based on the Debtors' own estimates, which were stated during the sale hearing on January 8, 2019.

37.   _Unfavorable Budget to Actual Variances_: The Debtors' Auction Cash Flow Budget projects the ABL DIP balance to be $992 million as of the anticipated closing date of February 9, 2019.[43] If there are any unfavorable variances to this budget, it would reduce projected liquidity.

38.   _Unfavorable 503(b)(9) Claims_: The Debtors' actual 503(b)(9) costs could be larger than the $173 million identified by the Debtors' administrative claims schedule, of which ESL is assuming only up to $139 million.[44] The claims bar date has not been set and there is risk that the Debtors' estimate of 503(b)(9) claims is not sufficient. Pursuant to the Debtors' recently filed Statements of Assets and Liabilities, the inventory purchased during the 20 days before the petition date amounts to approximately $370 million.[45] While this amount does not entirely consist of 503(b)(9) claims and may not include inventory received by the Debtors from third parties during the 20-day period prior to filing, without additional information it is reasonable to infer that the Debtors' 503(b)(9) claims could potentially be materially larger than the identified $173 million.

39.   _Working Capital Adjustments_: Under Sections 2.3(k)(vii)-(ix) of the APA, if the value of certain current assets (specified receivables, warranty receivable and prepaid inventory)

---

[42] "Project Blue Rolling Cash Flow Budget (Week 14)" dated January 23, 2019 prepared by the Debtors.

[43] "Project Blue Revised Cash Flow Budget – Going Concern" dated January 11, 2019 prepared by the Debtors.

[44] "Admin Claims Schedules" dated January 13, 2019, prepared by the Debtors.

[45] Dockets, 1609-1713, Schedules of Assets and Labilities filed for the Debtor entities dated January 18, 2019.

is lower than the dollar value that ESL set forth in the ESL APA, thus resulting in a working capital "shortfall", the amount of liabilities ESL has agreed to assume related to severance, 503(b)(9) claims, and accounts payables will be reduced dollar-for-dollar by the shortfall amount.[46] In such an event, the administrative claims shortfall would increase. In fact, as of January 23, 2019, the Debtors' estimates for warranty receivables and prepaid inventory are barely in excess of the targets set forth in the ESL APA.[47] Additionally, per section 2.3(k)(vi) of the ESL APA, if the aggregate balance of the outstanding ABL DIP and Junior DIP loans is lower than the estimated $1.2 billion (i.e. $850 million for the ABL DIP and $350 million for the Junior DIP), then ESL's obligation to assume certain administrative liabilities will be reduced on a dollar-for-dollar basis.[48]

40.    Liabilities Remaining with the Debtors: ESL is agreeing to pay for certain liabilities including severance obligations of $43 million, 503(b)(9) claims of $139 million, accounts payable of $166 million, and property taxes of $135 million.[49] However, payments on certain of these claims are not due until and up to 120 days following the closing date or plan confirmation date. If ESL breaches its obligations to pay these assumed liabilities under section 2.3(k)(x) of the ESL APA, the Debtors' recourse is limited to a general unsecured contractual obligation from ESL, yet the Debtors remain responsible for these administrative obligations.

41.    Liabilities regarding Employee Benefits: Pursuant to section 9.7(j) of the ESL APA, the Debtors are responsible for the medical, dental, and health claims of eligible

---

[46] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[47] "Transform Transaction – weekly Tracking" dated January 23, 2019, prepared by the Debtors.

[48] Asset Purchase Agreement by and among Transform HoldCo LLC, Sears Holdings Corporation and its subsidiaries dated as of January 17, 2019.

[49] Id.

employees for services rendered prior to the sale closing date.[50] The majority of the Debtors' medical plans are self-insured, and it is not unusual for such benefit related claims to lag due to timing and processing delays. As a proxy to estimate this liability as of the closing date, I have reviewed the Debtors' first day wage motion, which shows that as of the petition date, the Debtors had approximately $19.1 million of these types of obligations.[51]

42.    The chart below summarizes my analysis of the Debtors' estimated administrative insolvency and shows that the significant risk that, even after considering all the potential "upsides" and the "downsides," the Debtors will be woefully administratively insolvent following the ESL sale.

---

[50] *Id.*

[51] ECF No. 31, *Motion of the Debtors for entry of order (i) authorizing the Debtors to(a) pay certain prepetition wages and reimbursable employee expenses, (b) pay and honor employee medical and other benefits, and (c) continue employee benefits programs, and (ii) granting related relief* (Oct. 15, 2018) (stating that as of the petition date, the Debtors has obligations of $17.2 million related to the Debtors' Employee Benefit Programs, $0.4 million of administration cost related to the Employee Benefit Programs and $1.5 million related to the Debtors' Former Employee Benefit Programs).

| $ in millions | Committee's Estimate |
|---|---|
| **Total Potentail Administrative Claims Shortfall As Of the Time of the Auction** | **$226** |
| | |
| **Potential Upsides** | |
| 1. Inventory Not Being Sold to ESL | (43) |
| 2. Value from Credit Bid Release Consideration Reserve | (35) |
| 3. Value from Excess Inventory and Receivables | tbd |
| 4. Reduced Accounts Payable | tbd |
| 5. Historical Favorable Budget to Actual Variance | tbd |
| **Total Potential Administrative Claims Shortfall Considering Only Potential Upsides** | **$148 - tbd** |
| | |
| **Potential Downsides** | |
| 6. Accrued Payroll Due at Closing | $44 +/- tbd |
| 7. Warranties and Protection Agreements Liabilities | 30 +/- tbd |
| 8. Loss of Cash at Banks | 27 +/- tbd |
| 9. Loss of the SHIP Deposit | 6 |
| 10. Mechanics' Lien Obligations | 4 |
| 11. Cost of Closing Delays | tbd |
| 12. Unfavorable Budget to Actual Variances | tbd |
| 13. Unfavorable 503(b)(9) Claims | tbd |
| 14. Working Capital Adjustments | tbd |
| 15. Liabilities Remaining With the Debtors | tbd |
| 16. Liabilities regarding Employee Benefits | tbd |
| **Total Potential Administrative Claims Shortfall Considering Both Potential Upsides and Downsides** | **$259 +/- tbd** |

### III. NewCo is at Risk of Breaching its Debt Covenants by as Early as October 2019

43.     I reviewed ESL's projected liquidity analysis for the Debtors' going concern business. Based on adjustments to that analysis to account for errors, and the assumptions deemed reasonable contained in Mr. Jan Kniffen's expert report, I determined that NewCo is at risk of breaching its debt covenants by as early as October 2019. My calculations and the adjustments are contained in the attached presentation ("Exhibit A" hereto).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge. I reserve the right to amend and modify this declaration if new information is presented to me.

New York, New York
January 26, 2019                                    By:

 

Matthew Diaz
Senior Managing Director
FTI Consulting, Inc.

18



# Exhibit A - Assessment of NewCo's Liquidity Analysis

*January 26, 2019*

# Summary Conclusion

**ESL Investments, Inc. ("ESL") provided a projected liquidity analysis ("ESL Liquidity Analysis") for the Debtors' going concern business ("NewCo")[1]. This analysis sets forth projections for the monthly periods from the presumed sale on February 9, 2019 ("Closing") to January 2020 ("FY 2019"), as well as for the fiscal years from 2020 to 2023.**

- Upon review of these documents, and as discussed further herein, I determined that these analyses needed to be revised to incorporate certain adjustments relating to the following categories ("Adjusted Liquidity Analysis"):
  - Category I: Correcting for calculation errors.
  - Category II: Revising for more reasonable operating assumptions, per the expert report of Jan Kniffen ("Kniffen Expert Report")[2].

**As a result of these adjustments, NewCo is projected to breach the Minimum Excess Availability Covenant starting in October 2019[3].**

*($ in Millions)*

| | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ESL Liquidity Analysis: Projected Liquidity[4] | $ 486 | $ 559 | $ 485 | $ 470 | $ 627 | $ 645 | $ 582 | $ 549 | $ 406 | $ 434 | $ 715 | $ 714 |
| Liquidity Req. for Min. Excess Avail. Covenant[5] | 97 | 90 | 101 | 101 | 82 | 75 | 83 | 96 | 90 | 105 | 92 | 25 |
| **Excess Liquidity** | $ 389 | $ 469 | $ 384 | $ 369 | $ 545 | $ 570 | $ 499 | $ 453 | $ 316 | $ 329 | $ 624 | $ 689 |
| **Category I: Correcting for Calculation Errors** | | | | | | | | | | | | |
| (1) Incorrectly Calculated the Source of Cash from Accounts Payable | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) |
| **Cumulative Liquidity Impact** | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) |
| **Category II: Revising for More Reasonable Operating Assumptions** | | | | | | | | | | | | |
| (2) Same Store Sales Adjustment | (5) | (11) | (17) | (24) | (32) | (37) | (43) | (49) | (54) | (61) | (72) | (83) |
| (3) Gross Margin Adjustment | (5) | (10) | (15) | (21) | (27) | (32) | (37) | (43) | (48) | (54) | (63) | (72) |
| (4) Days Payable Outstanding Adjustment | - | - | - | - | - | (113) | (126) | (145) | (102) | (151) | (201) | (469) |
| **Cumulative Liquidity Impact** | (9) | (22) | (32) | (45) | (59) | (183) | (206) | (237) | (204) | (266) | (336) | (624) |
| (5) Cumulative Difference in ABL Interest due to change in Cash Flows | (1) | (2) | (3) | (4) | (5) | (7) | (9) | (11) | (13) | (15) | (17) | (19) |
| **Adjusted Excess Liquidity** | $ 213 | $ 280 | $ 183 | $ 155 | $ 316 | $ 215 | $ 119 | $ 40 | $ (66) | $ (118) | $ 105 | $ (120) |

1. ESL-UCC-00005178 - ESL-UCC-00005186
2. Expert Report of Jan R. Kniffen, dated January 26, 2019. The Kniffen Expert Report provides what he opines are three more reasonable assumptions for the FY 2019 liquidity forecast: (1) a decline of 5.5 percent in same store sales, (2) no improvement in gross margins, and (3) an increase to no more than 22 DPO. There are other aspects of ESL's business plan that Mr. Kniffen opines are unrealistic or overly optimistic but does not offer an alternative, empirical assumption that can be incorporated into the Adjusted Liquidity Analysis
3. As defined in the ABL Commitment Letter Dated January 9, 2019, among and between Transform Holdco LLC and certain banks, pages B20 and B21, ¶I(e) ("Minimum Excess Availability Covenant")
4. Shown as "Ending ABL Availability" in the ESL Liquidity Analysis, except for May 2019 which includes $33m of cash as shown on page 8 of the ESL Liquidity Analysis
5. Shown as the "FCCR Reserve" in the ESL Liquidity Analysis

F T I™ CONSULTING

# Category I: Correcting for Calculation Errors

**The ESL Liquidity Analysis contains an error that I have corrected in the Adjusted Liquidity Analysis.**

1. **Incorrectly Calculated the Source of Cash from Accounts Payable**

   - <u>Overview</u>: The ESL Liquidity Analysis shows an accounts payable balance of $166m at Closing and $148m at the end of February. When accounts payable increases, this is a source of cash as the business has deferred paying its bills. When accounts payable decreases, this is a use of cash as the business has paid outstanding bills.

   - <u>ESL Liquidity Analysis</u>: This analysis assumes a $148m source of cash for February, $32m for March, ($23m) for April, $61m for May, etc.

   - <u>Adjusted Liquidity Analysis</u>: In calculating the $148m source of cash in February, the ESL Liquidity Analysis does not seem to take the $166m accounts payable balance at Closing into account. A $148m source of cash implies that the accounts payable balance increases by $148m in February. In fact, the accounts payable balance decreased by $18m.

     – Therefore, the cash flow for February in the ESL Liquidity Analysis is overstated by $166m.

   - <u>Impact</u>: This $166m error is a permanent difference and causes liquidity to be reduced by $166m in every month.

($ in Millions)

| ESL Liquidity Analysis | Closing | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total A/P Balance [1] | $166 | $148 | $181 | $158 | $219 | $318 | $362 | $402 | $463 | $328 | $484 | $642 | $... |
| **A** Difference in A/P Balance between Monthly Periods | | (18) | 32 | (23) | 61 | 99 | 44 | 40 | 61 | (136) | 156 | 158 | (232) |
| **B** Source/((Use)) of Cash from Change in A/P Balance Shown in the ESL Liquidity Analysis [2] | | 148 | 32 | (23) | 61 | 99 | 44 | 40 | 61 | (136) | 156 | 158 | (232) |
| *Variance (A – B)* | | *(166)* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* |
| *Cumulative Liquidity Impact* | | *$(166)* | *$(166)* | *$(166)* | *$(166)* | *$(166)* | *$(166)* | *$(166)* | *$(166)* | *$(166)* | *$(166)* | *$(166)* | *$(166)* |

> **The ESL Liquidity Analysis incorrectly assumes that there is a $148m source of liquidity from accounts payable instead of a $18m use of liquidity, for a difference of $166m.**

1. As shown on page 8 of the ESL Liquidity Analysis
2. As shown on page 7 of the ESL Liquidity Analysis


FTI CONSULTING

# Category II: Revising for More Reasonable Operating Assumptions

**Based on the Kniffen Expert Report, certain operating assumptions included in the ESL Liquidity Analysis are aggressive, and I changed them in the Adjusted Liquidity Analysis to be more reasonable.**

2. **Same Store Sales ("SSS") Adjustment**

- Overview: The same store sales metric measures the amount of sales generated compared to the year prior for the same set of stores. In the ESL Liquidity Analysis, ESL uses various SSS assumptions to estimate go-forward revenue for its brick and mortar stores.

- ESL Liquidity Analysis: Page 2 of the ESL Liquidity Analysis indicates negative 1% in SSS for FY 2019 for the brick and mortar business segment.

- Adjusted Liquidity Analysis: Based on the Kniffen Expert Report, the SSS decline of negative 5.5% is a more reasonable assumption for retail stores in FY 2019[1]

- Impact: By adjusting the SSS assumption to negative 5.5%, retail sales are reduced to $5.5b by FY 2019. At an ESL assumed gross margin of 29.4%, the projected impact on liquidity is negative $77m, as shown in the table below.

  – Of note, every incremental 1% change to the SSS assumption equates to a $17m cumulative impact on liquidity for FY 2019. For example, if SSS were negative 4.5% the cumulative liquidity impact for FY 2019 would be negative $60m, or $17m less than the chart shown below. Similarly, if SSS were negative 6.5%, the cumulative liquidity impact would be negative $94m, or $17m more than the chart shown below.

*($ in Millions)*

| | Closing | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | FY2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail Revenue (assuming (5.5%) Same Store Sales)[2] | | $ 365 | $ 469 | $ 372 | $ 444 | $ 547 | $ 387 | $ 410 | $ 473 | $ 346 | $ 534 | $ 730 | $ 431 | $ 5,506 |
| Retail Revenue (assuming (1%) Same Store Sales)[3] | | 382 | 491 | 390 | 465 | 573 | 405 | 429 | 495 | 362 | 559 | 765 | 452 | 5,768 |
| Variance | | (17) | (22) | (18) | (21) | (26) | (18) | (20) | (23) | (16) | (25) | (35) | (21) | (262) |
| Gross Margin (%)[4] | | 28.3% | 29.3% | 33.1% | 31.6% | 29.5% | 31.4% | 26.6% | 26.7% | 29.6% | 29.2% | 30.7% | 26.8% | 29.4% |
| **EBITDA Impact of SSS Adjustment** | | $ (5) | $ (7) | $ (6) | $ (7) | $ (8) | $ (6) | $ (5) | $ (6) | $ (5) | $ (7) | $ (11) | $ (6) | $ (77) |
| **Cumulative Liquidity Impact** | | $ (5) | $ (11) | $ (17) | $ (24) | $ (32) | $ (37) | $ (43) | $ (49) | $ (54) | $ (61) | $ (72) | $ (77) | |

1. Kniffen Expert Report, Para. 86
2. Based on the retail revenue numbers shown on page 6 of the ESL Liquidity Analysis, adjusted for the negative 5.5% SSS assumption
3. As shown on page 6 of the ESL Liquidity Analysis
4. Based on the retail gross margin dollars divided by the retail revenue amounts as shown on page 6 of the ESL Liquidity Analysis

FTI™ CONSULTING

# Category II: Revising for More Reasonable Operating Assumptions (cont.)

3. **Gross Margin Adjustment**

- Overview: Gross margin reflects the percentage of gross profit to revenue.
- ESL Liquidity Analysis: Page 2 of the ESL Liquidity Analysis indicates that retail stores are assumed to have a gross margin improvement of 1.25% in FY 2019, compared to FY 2018.
- Adjusted Liquidity Analysis: Based on the Kniffen Expert Report, keeping FY 2019 gross margin for retail stores constant with FY 2018 is a more reasonable assumption[1].
- Impact: With retail sales of $5.5b (using the negative 5.5% SSS assumption), a 1.25% reduction in gross margin has a negative $69m cumulative liquidity impact for FY 2019 as shown in the table below.
  – Of note, every incremental 25 bps change in the gross margin adjustment equates to a $14m impact on liquidity. For example, if the gross margin adjustment were negative 1% the cumulative liquidity impact for FY 2019 would be negative $55m, or $14m less than the chart shown below. Similarly, if the gross margin adjustment were negative 1.5%, the cumulative liquidity impact for FY 2019 would be negative $83m, or $14m more than the chart shown below.

($ in Millions)

| | Closing | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | FY19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail Revenue (assuming (5.5%) Same Store Sales)[2] | | $ 365 | $ 469 | $ 372 | $ 444 | $ 547 | $ 387 | $ 410 | $ 473 | $ 346 | $ 534 | $ 730 | $ 431 | $ 5,506 |
| Reduction in Gross Margin | | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) | (1.25%) |
| *EBITDA Impact of Gross Margin Adjustment* | | (5) | (6) | (5) | (6) | (7) | (5) | (5) | (6) | (4) | (7) | (9) | (5) | $ (69) |
| *Cumulative Liquidity Impact* | | $ (5) | $ (10) | $ (15) | $ (21) | $ (27) | $ (32) | $ (37) | $ (43) | $ (48) | $ (54) | $ (63) | $ (69) | $ (69) |

1. Kniffen Expert Report, Para. 91
2. Based on the retail revenue numbers shown on page 6 of the ESL Liquidity Analysis, adjusted for the negative 5.5% SSS assumption

FTI CONSULTING

5

# Category II: Revising for More Reasonable Operating Assumptions (cont.)

**4.  Days Payable Outstanding ("DPO") Adjustment**

- **Overview:** Days Payable Outstanding is an efficiency ratio that measures the average number of days it takes for a company to pay its suppliers. If a company can extend its DPO, that can be a source of cash as payments are extended to later dates. This source of cash can be used for other activities, such as the paydown of debt.

- **ESL Liquidity Analysis:** Page 3 of the ESL Liquidity Analysis assumes NewCo's DPO starts at 10 days in February, with gradual increases between March and June, before reaching 32 days in July, where it will remain constant for the remainder of FY 2019. This means that as the year progresses, NewCo has more time to pay its suppliers, and thus can borrow less money from its debt facilities.

- **Adjusted Liquidity Analysis:** Based on the Kniffen Expert Report, capping DPO at 22 days for the remainder of FY 2019[1], which is consistent with the Debtors' prepetition accounts payable terms as listed on page 3 of the ESL Liquidity Analysis, is a more reasonable assumption.

- **Impact:** Capping the DPO terms to 22 days from up to 32 days means that for the months of July 2019 – January 2020, NewCo will have less credit from its vendors. The monthly impact to liquidity ranges from negative $102m to negative $201m as shown in the table below.

($ in Millions)

| | Closing | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ESL Liquidity Analysis: Projected DPO[2] | | 10 | 13 | 15 | 18 | 20 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| Adjusted Liquidity Analysis DPO (Capped at 22 days) | | 10 | 13 | 15 | 18 | 20 | 22 | 22 | 22 | 22 | 22 | 22 | 22 |
| **A**  Difference in DPO | | - | - | - | - | - | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| **B**  ESL Liquidity Analysis: Implied Payables Per Day[3] | $ | 15 | $ 14 | $ 11 | $ 12 | $ 16 | $ 11 | $ 13 | $ 14 | $ 10 | $ 15 | $ 20 | $ |
| **Liquidity Impact (A*B)** | $  - | $  - | $  - | $  - | $  - | $  - | $ (113) | $ (126) | $ (145) | $ (102) | $ (151) | $ (201) | $ (12 |

1.  Kniffen Expert Report, Para. 111
2.  As shown on page 8 of the ESL Liquidation Analysis
3.  Implied payables per day is calculated as the monthly A/P balance divided by the DPO. For example, the $15m of implied payables per day for February represents the A/P balance of $148m divided by the DPO of 10 days

F T I™
CONSULTING

# Difference in ABL Interest Due to Change in Cash Flows

**5.   Cumulative Difference in ABL Interest Due to Change in Cash Flows**

- <u>Overview</u>: NewCo's ABL facility is a revolving line of credit that can be drawn when cash is needed (subject to a borrowing base) and paid back when there is excess cash. The annual interest rate on NewCo's ABL Facility is L + 375, or 6.05%[1].

- <u>ESL Liquidity Analysis</u>: N/A

- <u>Adjusted Liquidity Analysis</u>: The Category I and Category II adjustments will cause NewCo to borrow more money under its ABL facility, which will cause additional interest expense than what was forecasted in the ESL Liquidity Analysis.

- <u>Impact</u>: As a result of incurring additional interest associated with the Category I and Category II adjustments, the cumulative effect on liquidity is projected to be negative $19m as shown in the table below.

($ in Millions)

| | Closing | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow Impact of Adjustments** | | | | | | | | | | | | |
| Category I Changes | | $ (166) | $ (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) | (166) |
| Category II Changes | | (9) | (22) | (32) | (45) | (59) | (183) | (206) | (237) | (204) | (266) | (336) |
| Total Cash Flow Impact | | (175) | (187) | (198) | (210) | (225) | (348) | (371) | (402) | (369) | (432) | (501) |
| | | | | | | | | | | | | |
| Monthly Interest on ABL Debt Facility (based on annual rate of L+375) | | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| Additional Interest Payments due to Higher ABL Balance | | (1) | (1) | (1) | (1) | (1) | (2) | (2) | (2) | (2) | (2) | (3) |
| ***Cumulative Liquidity Impact*** | $ (1) | $ (2) | $ (3) | $ (4) | $ (5) | $ (7) | $ (9) | $ (11) | $ (13) | $ (15) | $ (17) | $ (19) |

1.   The LIBOR rate is assumed to be 2.3%, per ESL-UCC-00004499, per tab "Projections BS and CF" cell D5

FTI CONSULTING