WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                            :
**In re**                                    :        **Chapter 11**
                                            :
**SEARS HOLDINGS CORPORATION**, *et al.*,    :        **Case No. 18-23538 (RDD)**
                                            :
               **Debtors.**[1]              :        **(Jointly Administered)**
                                            :
---------------------------------------------------------------x

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## MOTION OF DEBTORS PURSUANT TO SECTION 1121(d)
## OF THE BANKRUPTCY CODE TO EXTEND EXCLUSIVE PERIODS

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-debtor affiliates, "**Sears**" or the "**Company**"), file this motion (the "**Motion**") for entry of an order extending the periods during which the Debtors have the exclusive right to file a chapter 11 plan (the "**Exclusive Filing Period**") and to solicit acceptances thereof (the "**Exclusive Solicitation Period**," and together with the Exclusive Filing Period, the "**Exclusive Periods**") by four (4) months through and including June 12, 2019 and August 13, 2019, respectively.  In support of the Motion, the Debtors respectfully represent as follows:

### Preliminary Statement

1.      These are some of the largest and most complex retail chapter 11 cases in history.  Sears is an American icon with billions of dollars in debt, and, as of the Commencement Date, had approximately 68,000 employees, more than 10,000 vendors, and 687 retail stores in forty-nine (49) states, Guam, Puerto Rico and the U.S. Virgin Islands.  The Debtors and their advisors have worked tirelessly during the initial stages of these chapter 11 cases to fulfill their fiduciary obligations and reorganize the Company, consistent with purposes underlying the Bankruptcy Code.  As recently announced, the Debtors have supervised a successful sale process that culminated the execution of a going concern bid with ESL Investments, Inc. (together with its principals and affiliates, "**ESL**"), that they hope will maximize value, minimize claims, and save tens of thousands of jobs.  The Debtors are confident that by any measure they have earned their extension of exclusivity as they embark on the next crucial stage of these cases, plan negotiations.

2

2.     The Debtors have maintained complete independence throughout these chapter 11 cases.  Prior to the Commencement Date, the Company's Board of Directors (the "**Board**") formed a special committee (the "**Restructuring Committee**") composed solely of independent directors to oversee the Company's restructuring.  The Board delegated authority to the Restructuring Committee to (i) recommend that the Company enter into transactions not involving ESL, including with respect to a potential restructuring of indebtedness and/or a sale, transfer or other disposition of certain assets and (ii) authorize and approve a transaction involving ESL, or where ESL has a conflict of interest by virtue of its security interest in an asset or otherwise.  The Board also established a subcommittee of the Restructuring Committee (the "**Subcommittee**"), specifically authorized to, among other things, investigate potential claims of the Debtors against ESL.  In all dealings with ESL, the Debtors have acted independently and through the Restructuring Committee or Subcommittee, as applicable.  Further, the Restructuring Committee and Subcommittee will maintain sole control and authority through the chapter 11 plan process as ESL maintains large claims against the Debtors.  In addition, the Debtors have been totally transparent and worked cooperatively with their creditors and constituencies to minimize disputes whenever possible.  In particular, the Debtors were in nearly constant contact with the Official Committee of Unsecured Creditors' (the "**Creditors' Committee**"), the Debtors' junior and senior DIP lenders, the office of the United States Trustee, vendors and individual creditors throughout the administration of the chapter 11 cases and leading into and through the auction.[2]

---

[2] As the Debtors approached the sale hearing, they have modified their communications as they move through discovery for the sale hearing.  They fully expect to maintain regular and frequent dialogue with the Creditors' Committee and other stakeholders following the sale hearing.

3.      As summarized below, the Debtors have made enormous progress in these chapter 11 cases.  In less than four months since the Commencement Date (defined below), the Debtors have made significant progress toward stabilizing their businesses, maximizing value for creditors and successfully executing a sale process that culminated in the execution of a going concern bid to save the Company and almost 45,000 jobs for employees.  The Debtors and their advisors have been focused on many tasks to get to this point, including, among others: (i) securing "first day" relief to enable them to continue their operations in the ordinary course; (ii) securing approval of approximately $2.2 billion in the aggregate of senior and junior debtor in possession financing to provide the Debtors with sufficient working capital to fund their operations through these cases, with the benefit of up to a $240 million segregated winddown reserve (the "**Winddown Reserve**") (a first of its kind) designated for the payment of winddown costs; (iii) obtaining approval of and executing global auction and sale procedures for the sale of substantially all of the Debtors' assets; (iv) preserving the Debtors' supply chain by implementing a Court-approved critical vendor program; (v) retaining key employees to administer the chapter 11 cases; (vi) obtaining court approval for various procedures to streamline these chapter 11 cases; and (vii) administering "going out of business" ("**GOB**") sales at 262 retail stores after determining that the cost of operating such stores exceeded the benefits.  These accomplishments alone warrant the requested four-month extensions of the Exclusive Periods.  Indeed, given all that the Debtors have established, it is hard to believe that the Debtors have only been in chapter 11 for less than four months.

4.      The Debtors are at a critical juncture in these cases.  Specifically, the Debtors are in the midst of securing Court approval of a going concern sale of the Company.  If the Exclusive Periods are not extended and control of the administration of the Debtors' estates

WEIL:\96841205\11\73217.0004

is improperly wrested away now, it could ruin the Debtors' prospects of confirming a chapter 11 plan. Such an outcome is contrary to the fundamental objectives of chapter 11 and should not be permitted. Even if the going concern sale is not achieved, the Debtors simply have had insufficient time to negotiate a chapter 11 plan with their constituents. To say that the workload has been enormous is truly an understatement. As the professional fee statements attest, these efforts have been all-consuming. Termination of the Exclusive Periods at this critical juncture in these chapter 11 cases would defeat the very purpose of section 1121 of the Bankruptcy Code— to afford the debtor a meaningful opportunity to propose a confirmable chapter 11 plan based on adequate information that maximizes value and that is fair and equitable to all of the Debtors' economic stakeholders.[3] Accordingly, for the reasons set forth herein, the Debtors' request for an extension of the Exclusive Periods should be granted.

**Background**

5.        Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.        On October 24, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "**Creditors' Committee**"). No trustee or examiner has been appointed in these chapter 11 cases.

---

[3] To the extent the Court requires evidence in support of the Debtors' request, the Debtors intend to present declarations or offers of proof at or before the hearing on the Motion and will make any witnesses available for cross examination.

WEIL:\96841205\11\73217.0004

7.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

8.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (the "**Riecker Declaration**") (ECF No. 3).[4]

### Jurisdiction

9.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

10.    By this motion, the Debtors request, pursuant to section 1121(d) of the Bankruptcy Code, a four-month extension of (a) the Exclusive Filing Period through and including June 12, 2019, and (b) the Exclusive Solicitation Period through and including August 13, 2019, in each case, without prejudice to the Debtors' right to seek additional extensions of such periods.[5] A proposed form of order granting the relief requested in the Motion is attached hereto as **Exhibit A** (the "**Proposed Order**").[6]

---

[4] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

[5] The Exclusive Filing Period is set to expire on February 12, 2019, but Local Rule 9006-2 of the Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") provides that if a motion to extend time to take an action is filed prior to the expiration of such period, with a return date that is no later than fourteen days after the date of the filing of the motion or, "if the Court is unable to schedule a return date within such period, as soon thereafter as

## The Relief Requested Should Be Granted

11.     Pursuant to section 1121(d) of the Bankruptcy Code, the Court may extend the Exclusive Periods for cause.  *See* 11 U.S.C. § 1121(d) ("[O]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.").  However, the 120-day period "may not be extended beyond a date that is 18 months after the [petition] date" and the 180-day period "may not be extended beyond a date that is 20 months after the [petition] date." *Id*. §§ 1121(d)(2)(A), (B).

12.     The Exclusive Periods established by Congress were incorporated in the Bankruptcy Code to afford a debtor a full and fair opportunity to propose a chapter 11 plan and enable solicitation of acceptances of the plan without the deterioration and disruption of a debtor's business that might be caused by the filing of multiple competing plans.  Indeed, the primary objective of a chapter 11 case is the formulation, confirmation, and consummation of a consensual chapter 11 plan.  To terminate the Exclusive Periods in these chapter 11 cases when meaningful and substantive plan negotiations realistically only could have begun and are in their initial stages, would be to defeat the very purpose of section 1121 of the Bankruptcy Code, *i.e.*, affording a debtor the full and fair opportunity to formulate and prosecute its proposed chapter 11 plan.  Although the Debtors have achieved a great deal in the first four (4) months of

---

the return date may be scheduled by the Court," the applicable deadline shall automatically be extended "until the Court resolves the motion to extend the time."  In addition, the Amended Case Management Order (defined herein) provides that "if a motion to extend the time to take any action is filed . . . before the expiration of the period prescribed by the Bankruptcy Code, . . . the time shall automatically be extended until the Court acts on the motion, without the necessity . . . of a bridge order."  (Amended Case Management Order, ¶ 25).  By filing this Motion prior to the expiration of the Exclusive Filing Period, Local Rule 9006-2 and the Amended Case Management Order automatically extend the Exclusive Filing Period until the Court resolves the Motion.

[6] The Debtors intend to engage in discussions with the Creditors' Committee following the filing of this Motion and hope to obtain their support for the relief requested herein.

these cases, the initial 120- and 180-day Exclusive Periods provided under the Bankruptcy Code simply are unrealistic for chapter 11 cases of this size and complexity.

13.     As stated, section 1121(d) of the Bankruptcy Code empowers a Bankruptcy Court to extend the Exclusive Periods "for cause."  The Bankruptcy Code neither defines the term "cause" for purposes of section 1121(d) nor establishes formal criteria for an extension.  The legislative history of section 1121 indicates that "cause" is intended to be a flexible standard to balance the competing interests of a debtor and its creditors.  *See* H.R. Rep. No. 95-595, at 231–32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963 (noting that Congress intended to give Bankruptcy Courts great flexibility to protect a debtor's interests by allowing a debtor unimpeded opportunity to negotiate settlement of debts without interference from other parties in interest).

14.     In exercising its broad discretion to determine whether "cause" exists, the Bankruptcy Court should be guided by a variety of factors.  *See In re Borders Grp., Inc.*, 460 B.R. 818, 821−22 (Bankr. S.D.N.Y. 2011) ("The determination of cause under section 1121(d) is a fact-specific inquiry and the court has broad discretion in extending or terminating exclusivity."); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (identifying objective factors courts historically have considered in determining whether cause exists to extend or terminate exclusivity); *see also In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (identifying factors used by courts to determine whether cause exists to extend exclusivity).  Those factors include, without limitation:

  i.   the size and complexity of the debtor's case;

  ii.  the necessity for sufficient time to permit the debtor to negotiate a chapter 11 plan and prepare adequate information;

  iii. the existence of good faith progress towards reorganization;

8

     iv.   the fact that the debtor is paying its bills as they become due;

     v.   whether the debtor has demonstrated reasonable prospects for filing a viable plan;

     vi.   whether the debtor has made progress in negotiations with its creditors;

     vii.   the amount of time which has elapsed in the case;

     viii.   whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

     ix.   whether an unresolved contingency exists.

*Adelphia Commc'ns*, 352 B.R. at 587 (noting that the nine factors listed above are "objective factors which courts historically have considered in making determinations of this character"); *see also Borders*, 460 B.R. at 822 (evaluating the nine factors set forth in *Adelphia* to hold that debtor established cause to extend exclusivity); *McLean Indus.*, 87 B.R. at 834; *accord In re Express One*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (identifying all of the nine factors as relevant in determining whether cause exists to extend exclusivity); *In re United Press Int'l, Inc.*, 60 B.R. 265, 269 (Bankr. D.D.C. 1986) (holding that the debtor showed cause to extend exclusive period based upon certain of the nine factors).  The above factors are not the exclusive bases for the exercise of the Court's discretion to extend the Exclusive Periods.  *See Adelphia Commc'ns*, 352 B.R. at 586-87.

       15.    Application of the identified standards to the facts of these chapter 11 cases demonstrates that ample cause exists to grant the Debtors' requested extensions of the Exclusive Periods.  The extensions are necessary and appropriate for the Debtors to have the opportunity contemplated by the Bankruptcy Code to propose a chapter 11 plan and solicit acceptances of such plan.

WEIL:\96841205\11\73217.0004

## A. **These Chapter 11 Cases Are Large and Complex.**

16.     It is well-established that the size and complexity of a debtor's case alone may constitute cause to extend the Exclusive Periods.  *See In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("The large size of the debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.") (citing *Gaines v. Perkins* (*In re Perkins*), 71 B.R. 294, 298 (W.D. Tenn. 1987); *In re Pine Run Trust*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986); *In re United Press International, Inc.*, 60 B.R. 265, 270 (Bankr. D.C. 1986); *In re American Federation of Television and Radio Artists*, 30 B.R. 772, 774 (Bankr. S.D.N.Y. 1983)).

17.     The legislative history provides that "if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement."  H.R. Rep. No. 95-595, at 232 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963.  Similarly, this Court has stated: "The large size of a debtor and the consequent difficulty in formulating a plan . . . for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods." *Texaco*, 76 B.R. at 326.

18.     The size and complexity of, and the legal issues involved in, these chapter 11 cases alone warrant the requested extension of the Exclusive Periods.  The Debtors operate a massively complex and interconnected enterprise.  As of the Commencement Date, the Debtors operated 687 stores across the country and maintained a labor force of approximately 68,000 employees.  The Debtors' stores are supplied by thousands of vendors and the Debtors are party to thousands of real property leases and executory contracts, including supply agreements and

equipment leases. As described in detail in the Riecker Declaration, the Debtors have more than $11 billion of total prepetition liabilities and have an immensely complex capital structure. The Debtors are indebted under eleven (11) separate facilities with seven (7) different agents or trustees, certain intercompany notes, and certain other loans, which, adding to the complexity, are secured by siloed collateral, with certain facilities secured by real estate assets and others secured by other assets, such as accounts receivable and inventory.

19.    The scope of the Debtors' operations necessitated procurement of approximately $2.2 billion in the aggregate of senior and junior debtor in possession postpetition financing (the "**DIP Financing**") to continue the Debtors' operations during the chapter 11 process. Securing the full amount of the DIP Financing was a lengthy and complicated process. The Debtors first solicited and obtained approval of the approximately $1.8 billion senior DIP Financing, which was essential to allowing the Debtors the ability to (i) operate in chapter 11, (ii) avoid irreparable harm to the Debtors' estates, and (iii) provide the Debtors with the possibility to be sold as a going concern or reorganize around a reduced footprint of stores. The Debtors ran a separate postpetition marketing and solicitation process for junior DIP Financing (reaching out to approximately 90 parties), which was obtained and approved in the amount of approximately $350 million. The junior DIP Financing was essential to allowing the Debtors to operate a larger number of stores while running the auction and sale process and evaluate their "bubble" stores. The overlapping processes to obtain the DIP Financings were extensive and resulted in a multi-party discussions in advance of the hearing for final relief on the senior DIP Financing and interim relief for the junior DIP Financing. Ultimately, a global settlement was reached, with respect to both facilities with various objecting parties, including the Creditors' Committee.

20.     As a measure of the time devoted to the DIP financing and the complexities associated therewith, the Debtors received 31 objections to the senior DIP Financing, resolved all but two of them prior to the hearing (and reserving rights with respect to several others), and ultimately obtained approval of such financing in the face of the remaining objections.  The Debtors also drafted and filed an extensive reply brief and two (2) declarations in support of approval of the senior DIP Financing.  Tellingly, the Debtors only received four (4) objections with respect to the junior DIP Financing on a final basis, one of which was withdrawn, and the remainder ultimately overruled.  Relatedly, the Debtors negotiated and ultimately agreed to a cash management protocol to allay certain concerns of the Creditors' Committee, wherein intercompany cash transfers between Debtors would be made on a secured basis, and also established a protocol with the Creditors' Committee and DIP lenders concerning intercompany loans to both foreign and domestic non-debtor affiliates.

21.     The Debtors' sale strategy has likewise been complex, as the Debtors have sought to sell substantially all of their assets via an open, transparent process.  Obtaining approval of the Debtors' global bidding and sale procedures (the "**Global Bidding Procedures**") was hard-fought.  The Debtors received seventeen (17) formal objections to the motion and numerous other informal responses to approve the Global Bidding Procedures (the "**Global Bidding Procedures Motion**"), worked with the majority of the objecting parties to resolve their issues prior to the hearing, and obtained approval of the Global Bidding Procedures over the remaining objections, including from the Creditors' Committee.  Pursuant to the sale process in the Global Bidding Procedures, the Debtors solicited interest from hundreds potential bidders on various assets of the company, including the Company as a going concern and on a liquidation basis, individual target businesses within the Company, and the Company's real estate assets.  As

WEIL:\96841205\11\73217.0004

discussed in further detail below, the Debtors are currently seeking approval of a going concern sale that will save tens of thousands of jobs. The stakes and importance of the Debtors' exclusivity could not be higher.

22.     In addition, prior to and continuing after the Commencement Date, the Subcommittee and its advisors have conducted extensive diligence and discovery in furtherance of the Subcommittee's investigation into prepetition related party transactions and have served broad document requests on the Debtors, ESL, and certain of their former counsel and advisors (including Centerview Partners, Cushman & Wakefield, Fairholme Capital Management, Seritage Growth Properties, Deloitte & Touche, Duff & Phelps, and Wachtell Lipton Rosen & Katz). The Subcommittee has received and reviewed millions of pages of discovery and have conducted eleven (11) on-the-record interviews of key witnesses, including Edward Lampert, other senior Sears personnel, and representatives of certain of the aforementioned counsel and advisors. Based on its findings, the Subcommittee negotiated the limited release embodied in the sale the Debtors are currently seeking approval of. The investigation into potential claims and causes of action relating to prepetition related party transactions is ongoing, and the Subcommittee continues to pursue all remaining claims.

23.     In cases of the size and complexity of the Debtors, 120 days to formulate, achieve consensus on, and prosecute a chapter 11 plan simply is inadequate. Thus, as in other large and complex reorganization cases, the initial Exclusive Periods do not provide remotely sufficient time to pursue the objectives of chapter 11. The instant chapter 11 cases are indisputably of the size and complexity that Congress and courts have recognized warrant extensions of the Exclusive Periods as requested.

**B. (i) There Has Not Been Sufficient Time to Permit the Debtors to Initiate and Resolve Major Issues Critical to the Chapter 11 Process or to Negotiate and Prosecute a Chapter 11 Plan, and (ii) Substantial Good Faith Progress Has Been Made to Achieve the Objectives of Chapter 11.**

24.     This is the Debtors' first motion for extension of the Exclusive Periods. The Debtors are not even four months into these chapter 11 cases, which is not enough time to formulate and prosecute a chapter 11 plan in most chapter 11 cases, and definitely not enough time here considering the immense size and complexity of these cases as described above.

25.     Notwithstanding the short duration of these cases, as noted above, the Debtors have made substantial progress to date. During the first few months of these chapter 11 cases, the Debtors' primary focus has been twofold: (i) stabilizing their business and (ii) pursuing a sale strategy to determine if the Debtors' can sell their business as a going-concern and preserve jobs or should pivot to an orderly winddown of the Debtors' estates. To stabilize their business, among other things, the Debtors secured approximately $2.2 billion of postpetition financing and obtained, and effectively implemented, certain relief with respect to their cash management system, employee compensation and benefit programs, insurance programs, utility providers, taxes, and critical vendors, among others. All of these efforts have enabled the Debtors to substantially maintain business as usual and minimize the disruption often attendant to the commencement of chapter 11 cases of this magnitude.

26.     The Debtors also separately filed motions and obtained approval of sales of certain discrete subsets of assets, including the sale of certain of the Debtors' medium-term intercompany notes (the "**MTNs**") for approximately $82.5 million (ECF Nos. 826, 1481) and the sale of thirteen (13) parcels of non-residential real property and related assignment of six (6) unexpired leases for the aggregate purchase price of approximately $62 million (ECF No. 1393). Each transaction involved extensive, arm's length negotiations with numerous parties in interest

WEIL:\96841205\11\73217.0004

including the applicable buyer of each set of assets, certain objecting parties, the DIP lenders, and the Creditors' Committee.    There are many constituencies in these cases, with diverse interests, and the Debtors have been working to coordinate efforts with all parties to achieve as much consensus as possible.

27.    The Debtors obtained approval of the Global Bidding Procedures on November 19, 2018 (ECF No. 816) (the "**Bidding Procedures Order**") and on November 21, 2018, filed a process letter identifying the assets available for sale in connection with the global sale process (ECF No. 862) (the "**Global Sale Process Letter**").    Pursuant to the Global Bidding Procedures, the Debtors solicited going-concern and liquidation bids for a sale of the go-forward retail stores (the "**Retail Stores**"), including partial bids for divisions of the Debtors' business, in an effort to maximize value for creditors.    The Debtors' financial advisor Lazard Frères & Co. sent the Global Sale Process Letter to over 70 potential bidders and sent an additional addendum to the process letter to well known liquidators.    In addition, the Debtors' real estate advisor Jones Lang LaSalle Americas, Inc. sent a separate process letter and related documents soliciting bids on the Debtors' various real estate assets to over 800 potential bidders.    The deadline to submit binding bids for the Retail Stores and for indications of interest for retail assets was December 28, 2018.    The Debtors have been engaged in good-faith arm's length negotiation with various bidders since entry of the Bidding Procedures Order and are seeking approval of the bid submitted by ESL, the only bid for the company on a going-concern basis.

28.    In addition to the foregoing, during the first four (4) months of these chapter 11 cases, the Debtors have:

- Implemented their critical vendor protocol as approved by the Court (ECF No. 793) and negotiated and executed vendor agreements with 25 critical vendors;

15

- Closed and commenced liquidation sales of 268 stores, which generally had negative EBITDA, negative leasehold value, and/or no indications of interest with respect to a proposed sale;

- Rejected 266 retail and non-retail leases at locations that provided no leasehold value;

- Facilitated the flow of information and diligence materials to the Subcommittee and the Creditors' Committee and coordinated with such parties on numerous issues in these chapter 11 cases, including producing over 6.2 million pages in response to discovery requests in connection with the dual investigations into certain of the Debtors' prepetition transactions, and, separately, hundreds of thousands of documents to Creditors' Committee in connection with diligence related to the DIP Financing and the Global Bidding Procedures Motion;

- Worked with the office of the U.S. Trustee to comply with U.S. Trustee's operating guidelines and to provide information to the U.S. Trustee's office;

- Filed approximately 23,000 pages of Schedules; and

- Responded to countless inquiries related to the status of these cases, specific contract counterparty demands, and other matters related to ongoing operations and the administration of these cases.

29.     Notwithstanding the significant progress that has been made to date, the administration of these chapter 11 cases and the negotiation, formulation, filing, and prosecution of a chapter 11 plan necessarily will require additional time and effort.    Under these circumstances, the requested extensions of the Exclusive Periods are necessary and appropriate to afford the Debtors the opportunity to achieve the objectives of chapter 11 as contemplated by section 1121 of the Bankruptcy Code.

## C.  **The Debtors have Demonstrated Reasonable Prospects for Filing a Viable Plan.**

30.     The first phase of these chapter 11 cases have centered on stabilizing the Debtors' businesses and pursuing the sale process.  The Debtors have commenced formulation of a chapter 11 plan and are evaluating the contours of a potential plan including the Debtors' significant tax attributes.    The Debtors are currently highly focused on the sale process,

16

following which the Debtors will engage in discussions with their stakeholders on the terms of a chapter 11 plan. The Debtors are prepared to quickly proceed with the plan negotiation, solicitation and confirmation process. Given the Debtors' track record to date in these cases and the achievements summarized above, the Debtors have demonstrated reasonable prospects for filing a viable chapter 11 plan.

**D. The Debtors Are Not Seeking to Use Exclusivity to Pressure Creditors to Submit to the Debtors' Demands.**

31.    This is the Debtors' first request for extensions of the Exclusive Periods. The Debtors' conduct in these chapter 11 cases, in particular, the limited number of contested issues that have required judicial intervention, as well as the consultation with their key stakeholders virtually every step of the way, demonstrates that Debtors are acting in a prudent and transparent manner and are not seeking these extensions to artificially delay the administration of these chapter 11 cases or to hold creditors hostage to an unsatisfactory plan proposal. Simply put, there has not been a real opportunity for the Debtors to propose and file a plan during the short period of time since the Commencement Date. The size and complexities of these chapter 11 cases are patent and, together with what has transpired to date, establish more than adequate cause for the requested extensions.

32.    The Debtors' relationship with their key economic stakeholders, including the DIP lenders and the Creditors' Committee and both groups' professionals, is transparent, cooperative, and constructive. The Debtors have been responsive to the Creditors' Committee's document requests, producing more than 250,000 pages in response to almost 40 document requests. The Debtors have held numerous meetings and negotiation sessions with these creditor constituencies to discuss virtually every issue in these cases, including the sale process, the GOB process, the DIP Financing, and the sales of discrete assets. Although the parties may not always

agree, the Debtors have tried their best to be open and keep parties informed.  The request for extending the Exclusive Periods is not a negotiation tactic, but rather reflects that these cases are not yet sufficiently mature for the formulation, filing, and prosecution of a feasible and, hopefully, consensual chapter 11 plan.

33.    Finally, this Motion is without prejudice to any party seeking to shorten the Exclusive Periods pursuant to section 1121(d) of the Bankruptcy Code.  *See* 11 U.S.C. § 1121(d).  As such, no party in interest will be prejudiced if the requested extensions are approved.

**E.  Important Contingencies Must be Resolved by the Debtors.**

34.    Courts have recognized the need to resolve important contingencies as justification for extending the Exclusive Periods.  *See, e.g.*, *Borders*, 460 B.R. at 826; *Adelphia Commc'n*s, 352 B.R. at 587.  Notwithstanding the significant progress that has been made by the Debtors to date, in particular on the global sale process, open issues still remain.  The Debtors are currently in the process of seeking approval of a going concern sale of the Company.  The Debtors also need additional time to address other key issues, including, among others: (i) negotiations with key economic stakeholders with respect to the terms of a plan of reorganization followed by the preparation of a chapter 11 plan and disclosure statement; (ii) resolution of the matters being investigated by the Restructuring Subcommittee; (iii) if the Company is not sold as a going concern, the Debtors will have to parse through significant intercompany issues and conduct a substantive consolidation analysis and execute a strategy to sell the thousands of assets, including real estate properties, in an organized winddown; and (iv) the setting of the bar date in these cases so that the universe of claims asserted against the Debtors' estates can be fixed and evaluated.

35.    In addition, reconciling and resolving the hundreds of claims that have been, and will be, filed against the Debtors' estates will be a complicated, time-consuming process. The Debtors recently filed their respective schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules**"), comprising approximately 23,000 pages. To date, over 7,500 proofs of claim are already on file. The size and complexity of the Debtors' claims reconciliation process mirrors the size and complexity of similarly situated chapter 11 cases, and warrants a further extension of the Exclusive Periods.

36.    The extension of the Exclusive Periods as requested will not prejudice any party in interest, but rather will afford the Debtors a realistic opportunity to propose a feasible and consensual chapter 11 plan. Failure to extend the Exclusive Periods as requested herein would defeat the very purpose of section 1121 of the Bankruptcy Code, *i.e.*, to provide the Debtors with a meaningful and reasonable opportunity to propose a confirmable chapter 11 plan. The termination of Exclusive Periods would lead to unnecessary adversarial situations and the litigation costs attendant therewith to the detriment of all parties in interest.

**F. The Debtors Are Making Required Postpetition Administrative Expense.**

37.    Courts considering an extension of exclusivity also may assess a debtor's liquidity and ability to pay costs and expenses of administration. *Adelphia Commc'ns*, 352 B.R. at 587; *Texaco*, 76 B.R. at 322. Here, the Debtors have the liquidity, are paying their administrative expenses as they come due, and will continue to do so.

**G. Relatively Little Time Has Elapsed Since These Chapter 11 Cases Were Commenced.**

38.    Less than four (4) months have passed since the Commencement Date. This is the Debtors' first request for an extension of the Exclusive Periods. This Court has

WEIL:\96841205\11\73217.0004

routinely granted initial requests by debtors to extend their exclusive period to file and solicit a chapter 11 plan. *See In re Breitburn Energy Partners LP, et al.*, No. 16-11390 (Bankr. S.D.N.Y. Dec. 14, 2016) (ECF No. 844) (extending the exclusivity periods by 120-days); *In re The Great Atlantic & Pacific Tea Company, Inc., et al.*, No. 15-23007 (Bankr. S.D.N.Y. Nov. 13, 2015) (ECF No. 1838) (same). For all of the reasons set forth above, the facts and circumstances of this case demonstrate that sufficient cause exists to grant the requested relief at this time.

## Conclusion

39.    For the reasons stated herein, this first requested extension of the Exclusive Periods is warranted and necessary to afford the Debtors a meaningful opportunity to pursue the chapter 11 reorganization process and build a consensus among their economic stakeholders, all as contemplated by section 1121 of the Bankruptcy Code. Accordingly, the Debtors should be afforded a full, fair, and reasonable opportunity to propose, file, and solicit acceptances of a chapter 11 plan, and the Exclusive Periods should be extended as requested.

## Notice

40.    Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) (the "**Amended Case Management Order**"). The Debtors respectfully submit that no further notice is required.

41.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WEIL:\96841205\11\73217.0004

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: January 31, 2019
      New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\96841205\11\73217.0004

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | **Case No. 18-23538 (RDD)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |
|  | : |  |

----------------------------------------------------------------x

## ORDER PURSUANT TO SECTION 1121(d)
## OF THE BANKRUPTCY CODE EXTENDING THE ECLUSIVIVE PERIODS

Upon the motion, dated January 31, 2019 (ECF No. [\_\_]) (the "**Motion**")[2] of

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to section 1121(d) of

title 11 of the United States Code (the "**Bankruptcy Code**"), for an order (i) extending the

Debtors' exclusive periods in which to file a chapter 11 plan (the "**Exclusive Filing Period**")

and solicit acceptances thereof (the "**Exclusive Solicitation Period**," and together with the

Exclusive Filing Period, the "**Exclusive Periods**"), and (ii) granting related relief, all as more

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

fully set forth in the Motion; and the Court having jurisdiction to decide the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Motion having been provided in accordance with the Amended Case Management Order; such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on February 14, 2019 (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT

1.    The Motion is granted to the extent set forth herein.

2.    Pursuant to section 1121(d) of the Bankruptcy Code, the Debtors' Exclusive Filing Period in which to file a chapter 11 plan is extended through and including June 12, 2019.

3.    Pursuant to section 1121(d) of the Bankruptcy Code, the Debtors' Exclusive Solicitation Period in which to solicit acceptances of their chapter 11 plan is extended through and including August 13, 2019.

2

4.      The extensions of the Exclusive Periods granted herein are without prejudice to such further requests that may be made pursuant to section 1121(d) of the Bankruptcy Code by the Debtors or any party in interest.

5.      Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

6.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

7.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
         White Plains, New York

                                        _____
                                        THE HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

WEIL:\96841205\11\73217.0004