PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Kelley A. Cornish
Lewis R. Clayton

*Counsel to the Debtors Acting at the Direction*
*of the Restructuring Subcommittee of the Board of Directors*
*of Sears Holdings Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.** [1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------x

**RESTRUCTURING SUBCOMMITTEE'S RESPONSE TO THE OBJECTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO ESL INVESTMENTS, INC.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## Table of Contents

**Page**

Preliminary Statement ................................................................................................................ 1

Background ........................................................................................................................... 4

    A.    The Subcommittee Is Independent of ESL. ....................................................... 4

    B.    The Subcommittee Extensively Investigated Claims Against ESL. ...................... 5

    C.    The Subcommittee Negotiated with ESL at Arm's Length,
          Demonstrated Its Willingness to Repeatedly Reject an ESL
          Transaction, and Forced ESL to Meaningfully Improve Its Bid. .......................... 7

    D.    The Asset Purchase Agreement Provides Adequate
          Consideration for the Limited Release of ESL. ..................................................... 9

    E.    The UCC's Consistent Demand to Liquidate the
          Debtors Is Not in the Best Interests of the Estates. .............................................. 10

Argument ........................................................................................................................... 10

I.     The Limited Release Should Be Approved under Bankruptcy Code Section 363. .......... 10

    A.    There Are Good Business Reasons for the Limited Release. ............................... 11

    B.    Although the Entire Fairness Standard Does Not
          Apply, the Limited Release Is Entirely Fair. ....................................................... 11

II.    The Limited Release Should Be Approved under Bankruptcy Rule 9019. ..................... 12

    A.    A Settlement Within the Range of Reasonableness Should Be Approved. ........... 12

    B.    The Proposed Settlement Falls Well Within the Range of Reasonableness. ........ 14

III.   The Good Faith Purchaser Protections of Section 363(m)
     of the Bankruptcy Code Should Apply to ESL. ............................................................... 17

Conclusion ......................................................................................................................... 19

**Table of Authorities**

**Page(s)**

**Cases**

*Allstate Ins. Co.* v. *Hughes*,
174 B.R. 884 (S.D.N.Y. 1994)............................................................................17

*In re Ambac Fin. Grp., Inc.*,
457 B.R. 299 (Bankr. S.D.N.Y. 2011),
*aff'd*, 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011),
*aff'd*, 487 F. App'x 663 (2d Cir. 2012)...............................................................16

*In re Ashford Hotels, Ltd.*,
226 B.R. 797 (Bankr. S.D.N.Y. 1998)..................................................................14

*Reloeb Co.* v. *LTV Corp (In re Chateaugay Corp.)*,
No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130
(S.D.N.Y. May 10, 1993).....................................................................................17

*In re Commercial Loan Corp.*,
316 B.R. 690 (Bankr. N.D. Ill. 2004) ..................................................................15

*In re Cooper*,
592 B.R. 469 (S.D.N.Y. 2018), *appeal filed*, No. 18-3212 (2d Cir. 2018)..............11

*Cosoff* v. *Rodman (In re W.T. Grant Co.)*,
699 F.2d 599 (2d Cir. 1983).................................................................................13

*In re Dreier LLP*,
453 B.R. 499 (Bankr. S.D.N.Y. 2011)............................................................14, 15

*In re Enron Corp.*,
2005 WL 3832053 (Bankr. S.D.N.Y. Nov. 28, 2005) ...........................................14

*Fairchild Dornier GmbH* v. *Official Comm. of Unsecured Creditors
(In re Dornier Aviation (N. Am.), Inc.)*,
453 F.3d 225 (4th Cir. 2006) ...............................................................................15

*In re Found. for New Era Philanthropy*,
1996 Bankr. LEXIS 1892 (Bankr. E.D. Pa. Aug. 21, 1996)..................................16

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007)..................................................................................11

*In re Motors Liquidation Co.*,
555 B.R. 355 (Bankr. S.D.N.Y. 2016) ..................................................................12

*Nuevo Pueblo, LLC* v. *Napolitano (In re Nuevo Pueblo, LLC),*
 608 F. App'x 40 (2d Cir. 2015) ......................................................................13

*Protective Comm. for Independent S'holders*
 *of TMT Trailer Ferry, Inc.* v. *Anderson,*
 390 U.S. 414 (1968) ............................................................................12, 13

*In re Remsen Partners, Ltd.,*
 294 B.R. 557 (Bankr. S.D.N.Y. 2003) ...........................................................13, 16

*Sabatini Frozen Foods, LLC* v. *Jones,*
 No. 11-CV-1294 (SLT), 2013 WL 1345104 (E.D.N.Y. Mar. 29, 2013) ................................18

*In re Sabine Oil & Gas Corp.,*
 547 B.R. 503 (Bankr. S.D.N.Y. 2016) .................................................................14

*In re Sabine Oil & Gas Corp.,*
 555 B.R. 180 (Bankr. S.D.N.Y. 2016) .................................................................13

*In re Stein & Day, Inc.,*
 113 B.R. 157 (Bankr. S.D.N.Y. 1990) .............................................................17, 18

*Vaughn* v. *Drexel Burnham Lambert Grp., Inc.*
 *(In re Drexel Burnham Lambert Grp., Inc.),*
 134 B.R. 499 (Bankr. S.D.N.Y. 1991) .......................................................12, 13, 14

*In re Vivaro Corp.,*
 541 B.R. 144 (Bankr. S.D.N.Y. 2015) .............................................................15, 16

*Weisfelner* v. *Blavatnik (In re Lyondell Chem. Co.),*
 544 B.R. 75 (Bankr. S.D.N.Y. 2016) .................................................................15

## Statutes

11 U.S.C. § 363 ............................................................................. *passim*

11 U.S.C. § 507 .................................................................................3, 8, 9

## Other Authorities

Fed. R. Bankr. P. 2004 ...........................................................................6

Fed. R. Bankr. P. 9019 ........................................................................3, 12

The Restructuring Sub-Committee (the "Subcommittee") of the Restructuring

Committee (the "Restructuring Committee") of the Board of Directors ("Board") of Sears

Holdings Corporation ("Sears," and together with its debtor affiliates, as debtors and debtors in

possession, the "Debtors") hereby submits this response in opposition to the *Objection of the*

*Official Committee of Unsecured Creditors to the Sale of Substantially All of the Debtors' Assets*

*to ESL Investments, Inc.* [Dkt. No. 2042] (the "UCC Objection") and reply in further support of

the Debtors' *Notice of Successful Bidder and Sale Hearing* [Dkt. No. 1730] (the "Sale Motion").

## Preliminary Statement

1.      In less than four months since the petition date, the Debtors have negotiated a

transaction that will maximize the value of their estates for the benefit of *all* creditors.  The asset

sale embodied in the proposed Asset Purchase Agreement [Dkt. No. 1730 at 15–260] ("APA")

with Transform Holdco, LLC ( "NewCo") is the result of several months of hard-fought, arm's

length, and often contentious negotiations among the Debtors (acting through their independent

Restructuring Committee and Subcommittee) and ESL Investments, Inc. ("ESL").  Among other

benefits to the Debtors and their estates, as compared to a liquidation, the ESL bid provides:

a.      approximately $152 million of value to the Debtors' non-insider secured lenders
($113 million to Cyrus, and $39 million to other third party lenders);

b.      approximately $534 million of value to the Debtors' prepetition unsecured
creditors (excluding cure payments), including approximately $453 million on
account of assumed protection agreement liabilities, $13 million on account of
assumed gift card liabilities, and $68 million on account of assumed Shop Your
Way liabilities;

c.      approximately $621 million in reduced administrative liabilities of the Debtors'
estates (through (i) the assumption of junior debtor in possession financing
claims, 503(b)(9) claims, and other administrative claims, and (ii) the reduction in
future administrative liabilities that would be incurred to fund a liquidation of the
Debtors' assets);

d.      a $35 million cash payment to the Debtors; and

    e.        an opportunity for continued employment for tens of thousands of the Debtors' employees, as well as a go-forward business partner to many of the Debtors' vendors and other stakeholders.

    2.        All of this consideration was taken into account by the Subcommittee when it considered whether to approve ESL's ability to credit bid and the limited release of claims necessary to allow that bid.  Without that limited release—which is narrowly tailored to preserve extremely valuable estate claims—the significant benefits of the asset sale cannot be achieved.

    3.        During months of negotiation, the Subcommittee firmly rejected *multiple* ESL proposals, each of which demanded a full Debtor release of ESL and Lampert in exchange for $35 million.  Among others, the limited release ("Limited Release") preserves:

    a.        all claims for actual and constructive fraudulent conveyance;

    b.        all claims for breach of fiduciary duty;

    c.        all claims for illegal dividends;

    d.        all claims arising from the Lands' End Inc. ("Lands' End") and Seritage Growth Properties Inc. ("Seritage") transactions; and

    e.        certain claims that have been alleged in the CCAA proceedings of Sears Canada.

    4.        Based on the significant work performed by the Subcommittee and its advisors to date, as described in detail in the Declaration of Alan Carr, the Subcommittee has determined that these preserved claims are colorable and material, and will provide a significant benefit to the Debtors and their estates.  The Debtors will be able to pursue these claims regardless of how the Court rules on the Sale Motion, and the Subcommittee intends to exercise its power to do so.

    5.        The Subcommittee was not satisfied, however, with the mere preservation of these valuable estate claims.  Instead, as provided in the APA, the Subcommittee negotiated with ESL to ensure that (i) it could not receive the proceeds of any claims involving Lands' End, Seritage, or any form of willful misconduct by ESL or Lampert, and (ii) if ESL is granted an

2

allowed 507(b) claim, its priority recoveries from the proceeds of preserved claims (other than claims related to Lands' End, Seritage, or ESL's willful misconduct) will be capped at $50 million (with any excess 507(b) claim being treated as an unsecured prepetition claim against the Debtors' estates). These critical provisions of the APA provide a path to administrative solvency and recovery for the Debtors' non-insider creditors. Finally, the Subcommittee insisted, and ESL ultimately agreed, that the non-payment of any allowed ESL 507(b) claim will not prevent confirmation of any chapter 11 plan that may be proposed by the Debtors.

6.      Having negotiated and won these critical concessions from ESL, and in light of the significant value provided to the Debtors and their estates by ESL's going-concern bid, the Subcommittee approved the Limited Release and ESL's ability to credit bid in the early morning hours of January 16.

7.      The UCC Objection misrepresents the robust and fair process leading to approval of the Limited Release, overstates the value of the limited claims being released, and misstates the legal standard governing the approval of the Sale Motion (including the Limited Release). Indeed, the UCC's argument concerning the value of the released claims relies largely on ESL's conduct in connection with the Lands' End and Seritage transactions—but the UCC ignores the fact that all of the estates' claims arising from those transactions are expressly preserved by the Limited Release. We submit that the Limited Release easily meets the applicable standards for approval under both section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and that the Sale Motion should be granted.

**Background**

A.    **The Subcommittee Is Independent of ESL.**

8.    The Subcommittee consists of two highly qualified independent directors, Alan

Carr and Bill Transier, both appointed to the Board and the Subcommittee in October 2018.  Carr

¶¶ 6–7.[2]  Carr joined the Board on October 3, and Transier on October 11.  *Id.*

9.    Carr is the co-founder, CEO, and managing member of Drivetrain LLC, a firm

focused on leading complex restructurings and litigations.  *Id.* ¶ 3.  Carr has 20 years of

experience investing in or advising financially distressed companies, including both in- and out-

of-court restructurings.  *Id.*  He was formerly a managing director at Strategic Value Partners

LLC and, before that, corporate restructuring attorney at Skadden, Arps, Slate, Meagher & Flom

LLP.  *Id.*

10.    Transier is the founder and CEO of Transier Advisors LLC, an independent

financial restructuring and advisory firm.  Transier ¶ 3.  Transier has 25 years of experience

serving as a corporate executive and on boards of directors, including on special committees of

independent directors.  *Id.* ¶¶ 3–4 & Ex. A.  Before starting Transier Advisors, he was the co-

founder, chairman, and CEO of Endeavor, an international upstream energy company and the

CFO of Ocean Energy, Inc., a NYSE-listed oil and gas company.  *Id.* Ex. A.  Before that, he was

a partner at KPMG LLC, an international auditing and consulting firm.  *Id.*

11.    Prior to joining the Board, neither Carr nor Transier had a business or personal

relationship with ESL, Lampert, Kunal Kamlani, or Sears.  Carr ¶ 5; Transier ¶ 7.

---

[2]    Citations to "Carr" and "Transier" are to the declarations of Alan Carr and Bill Transier, the members of the
Subcommittee.  Citations to "APA" are to the proposed Asset Purchase Agreement [Dkt. No. 1730 at 15–260].
Citations to "UCC Compl." are to the UCC's proposed adversary proceeding complaint [Dkt. No. 1765-2].

12.      As set forth in more detail in the *Debtors' Omnibus Reply in Support of the Going Concern Sale Transaction* ("Debtors' Reply"), which is being filed today, the Restructuring Committee was authorized to consider and negotiate any restructuring transaction on behalf of the Debtors, whether with ESL or another party.  The Restructuring Committee consists of Carr and Transier, as well as two other independent directors of Sears: Paul G. DePodesta and Ann N. Reese.  Like Carr and Transier, DePodesta and Reese have no business relationship (other than their service on the Board) with Lampert, Kamlani, or ESL.

13.      Unlike Carr and Transier, DePodesta and Reese were involved in approving certain prepetition related-party transactions with ESL.  The Subcommittee—which consists *solely* of Carr and Transier—was therefore created.

14.      The Subcommittee was given the "purpose of investigating any cause of action that the Corporation may have with respect to any transactions involving affiliates prior to the date of the Subcommittee's formation (the 'Prior Transactions'), and taking, or causing to be done, any related actions that the Subcommittee considers necessary or desirable to carry out its mandate."  Carr App'x 3 at 3.  By Board resolution, the Subcommittee is authorized to "[p]rosecute, waive, release, settle, negotiate and bind the Corporation with respect to any claims or causes of action of the Corporation that arise out of or relate to Prior Transactions that are the subject of the Subcommittee's investigation (the 'Specified Matters')."  *Id.*  The Subcommittee is further authorized to "[d]etermine, act on behalf of and bind the Corporation with respect to the right of and/or extent to which a party that is the subject of the Subcommittee's investigation may . . . credit bid pursuant to 11 U.S.C. 363(k) . . . ."  *Id.*

**B.      The Subcommittee Extensively Investigated Claims Against ESL.**

15.      The Subcommittee focused its investigation on a series of spinoffs, rights offerings, and sales that transferred value to Sears' shareholders—including the transactions

5

related to Orchard Supply Hardware, LLC (2011), Sears Hometown & Outlet Stores (2012),
Sears Canada Inc. (2012 and 2014), Lands' End (2014), and Seritage (2015)—as well as Sears'
more recent related-party financing transactions with ESL and others.

16.    With this Court's approval, the Subcommittee retained Paul, Weiss, Rifkind,
Wharton & Garrison LLP and Young Conaway Stargatt & Taylor, LLP as its legal counsel,
Alvarez & Marsal North America, LLC as its financial advisor, Evercore Group LLC as its
investment banker, and Stout Risius Ross, LLC as its real estate consultant and advisor.
*See* Dkt. Nos. 417, 419, 423–424, 692–694, 1073, 1089, 1420.  The Court further authorized the
Subcommittee to conduct discovery from third parties pursuant to Bankruptcy Rule 2004.
*See* Dkt. Nos. 609, 803.

17.    The Subcommittee and its advisors have received approximately 1,117,582
documents (9,479,181 pages), reviewed approx. 400,000 documents (more than 6 million pages),
and conducted eleven on-the-record interviews of key individuals.  Carr ¶¶ 13–15.  In addition to
the Debtors' documents, the Subcommittee and its advisors have reviewed documents from the
Debtors' outside counsel, investment banker, auditor, controlling shareholders, related-party
lenders, financial advisor to the special related-party transaction committee, real estate appraisal
firm, and Seritage.  *Id.* ¶ 12.  The interviewees include Lampert, Sears' current and prior CFOs,
two other Sears directors, other high-level Sears executives, and the team leaders of Sears'
outside counsel, investment banker, financial advisor, and real estate appraisal firm.  *Id.* ¶ 15.

18.    The Subcommittee has coordinated its investigation with the UCC and its
advisors, which have—except to the extent required to maintain the Debtors' attorney-client
privilege—received the same documents and participated in the same interviews.  *Id.* ¶ 19;
*see* UCC Objection ¶¶ 22–23.

6

19.    The Subcommittee has concluded that claims related to the Lands' End and Seritage transactions, which involved transfers of nearly $4 billion in value, are strong, and could produce significant recoveries for the Debtors' estates.  Carr ¶ 21; *see* UCC Objection ¶¶ 37, 41–44.  The Subcommittee continues to investigate these and other claims against the Debtors' insiders.

20.    The Subcommittee has also considered potential claims related to the ESL loan transactions, such as equitable subordination, recharacterization, and other claims affecting ESL's ability to credit bid.  In light of the evidence gathered in its investigation and the applicable legal standards, the Subcommittee determined that the benefit to the Debtors' estates of the sale transaction fairly compensates the Debtors for the Limited Release.  Carr ¶¶ 31–33.

21.    The UCC's assertion that "the Debtors have decided not to pursue any of the very valuable claims" against Lampert and ESL (UCC Objection ¶ 50) is incorrect.  The Subcommittee intends vigorously to pursue the material claims not released in the APA and it is the appropriate party to do so on behalf of the Estate.

C.    **The Subcommittee Negotiated with ESL at Arm's Length, Demonstrated Its Willingness to Repeatedly Reject an ESL Transaction, and Forced ESL to Meaningfully Improve Its Bid.**

22.    The Limited Release, like the other terms of the APA, is the result of extensive, difficult, arm's-length negotiations during which the Restructuring Committee and Subcommittee repeatedly rejected ESL's bids.  Prior to accepting ESL's offer on January 16, 2019, the Restructuring Committee and Subcommittee repeatedly turned down prior offers from ESL.  *See* UCC Objection ¶¶ 61–63, 66, 68 (acknowledging rejection of ESL's initial bids).  As Mr. Transier testified at his deposition, "either informally or formally, we rejected their bid multiple times with the concept that we would pivot to liquidation."  Transier Dep. 107:5–8.  The

7

details of those negotiations are discussed in the Debtors' Reply and in the declaration of Bill Transier.

23.    In the final ESL bid accepted by the Restructuring Committee and Subcommittee in early morning hours of January 16, ESL agreed to: (i) ensure a full refinancing of the $350 million junior DIP loan; (ii) remove $23 million in purchase price adjustments (including transfer taxes and mechanic's liens); (iii) provide for certain valuable assets—valued in the aggregate at $26 million—to remain with the Debtors' estates, including insurance proceeds, the Sears Home Improvement ("SHIP") sale deposit, and the U-Haul sale proceeds; (iv) remove significant qualifications on the assumption protection agreement liabilities, which are estimated at $465 million; (v) provide for a limited release (discussed below) rather than a general release; (vi) limit ESL's right to receive proceeds of litigation recoveries on its 507(b) and deficiency claims; and (vii) remove significant conditions to close.  Carr ¶ 24.[3]  These changes meaningfully reduced the administrative claims against the estates.

24.    At the Subcommittee's insistence, ESL dropped the request for a full release that had appeared in each of its previous proposals.  Instead, it agreed to the strictly limited release demanded by the Subcommittee, the terms of which are described below.

25.    The UCC Objection misquotes statements made by counsel for the Subcommittee at the January 15 auction as if they were criticisms of the final deal.  *See* UCC Objection ¶¶ 69, 184, 220, 236.  To the contrary, they were criticisms of a *rejected* bid.  Far from calling the Subcommittee's decisions into question, these quotes highlight that the Subcommittee carefully considered the issues now raised by the UCC, rejected ESL's bids when they were not in the best interests of the Debtors' estates, and negotiated material improvements to the deal.

---

[3]    The January 16 bid also added SHIP to the list of transferred assets.

### D.   The Asset Purchase Agreement Provides Adequate Consideration for the Limited Release of ESL.

26.     The Restructuring Committee and Subcommittee reasonably determined in the exercise of their business judgment that it was in the best interests of the Debtors' estates to accept ESL's bid.  As set forth in more detail in the Debtors' Reply, the APA provides for the sale of substantially all of the Debtors' assets to NewCo and provides for the Limited Release of ESL in exchange for substantial consideration from ESL.

27.     As noted above, the Limited Release expressly *excludes*—and permits the Debtors to continue to pursue—all other claims, prevents ESL from receiving the proceeds of any litigation recovery related to the Lands' End or Seritage transaction or any other claims involving intentional misconduct and caps ESL's distributions on any claims arising under section 507(b) of the Bankruptcy Code at $50 million, with any further 507(b) claims being treated as a general unsecured deficiency claim.  APA § 9.13(c).  In exchange, as discussed above, the transaction provided for in the APA gives the Debtors hundreds of millions of dollars of benefits as compared to a liquidation, and makes possible an opportunity for continued employment for tens of thousands of the Debtors' employees, and establishes a go-forward business partner to many of the Debtors' vendors and other stakeholders.

28.     With a going concern transaction, the Debtors will also incur approximately $621 million less in liquidation-related administrative expenses.  Carr ¶ 31.

29.     As a result of the substantial consideration provided by ESL and the additional administrative expense savings, the Subcommittee and its advisors believe that the proposed sale is likely to provide value of *$720 million more* to non-ESL creditors ($607 million excluding Cyrus), as compared to a liquidation.  *Id.*  Non-ESL third party secured creditors will receive an additional $152 million: $113 million to Cyrus and $39 million to other third party creditors.  *Id.*

And prepetition unsecured creditors will receive an additional $569 million: $453 million for

protection agreements, $13 million for gift cards, $68 million for Shop Your Way, and the $35

million in cash.  *Id.*  These amounts exclude recoveries on account of cure claims.

       **E.**       **The UCC's Consistent Demand to Liquidate the
Debtors Is Not in the Best Interests of the Estates.**

      30.      The UCC—consistent with its longstanding position in favor of a liquidation of

the Debtors—objects to the Sale Motion.  It contends that: (i) NewCo will not be a viable

business, and thus will not be able to pay the liabilities of the Debtors that it is assuming or

continue to employ tens of thousands of people, UCC Objection ¶¶ 95–116; (ii) the sale will

leave the estates administratively insolvent, *id.* ¶¶ 117–34; (iii) insufficient consideration has

been given for the Limited Release and the right to credit bid, *id.* ¶¶ 135–93; and (iv) a

liquidation would provide more value to the Debtors' estates than the proposed sale, *id.* ¶¶ 194–

248.  In the alternative, the UCC argues that the sale order should be stayed—even though that

will cost the Debtors approximately $6 million per day and give ESL the right to terminate the

APA—in order to permit the UCC to appeal.  *Id.* ¶¶ 249–56.

**Argument**

    **I.**    <u>**The Limited Release Should Be Approved under Bankruptcy Code Section 363**</u>.

      31.      The Limited Release should be approved as part of the sale under section 363 of

the Bankruptcy Code.  The sale maximizes, in the view of the Debtors' fiduciaries and advisors,

the value of the estates.  This opportunity will depreciate or disappear if not approved promptly.

No standard more searching than business judgment should be applied to the approval of the

APA, including the Limited Release, because the APA and Limited Release were approved by

unconflicted fiduciaries.  In any event, the Limited Release is also entirely fair.

### A.     There Are Good Business Reasons for the Limited Release.

32.     As set forth in more detail in the Debtors' Reply, a sale of property of the estate should be approved under section 363 of the Bankruptcy Code if there is a "good business reason."  *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (internal quotation marks omitted).  A litigation claim, just like any other property of the estate, can be sold under section 363.  *See, e.g.*, *In re Cooper*, 592 B.R. 469, 478–80 (S.D.N.Y. 2018), *appeal filed*, No. 18-3212 (2d Cir. 2018).  There are good business reasons for the Limited Release.

33.     *First,* the Limited Release is an integral component of the APA, which, as the Debtors' Reply explains, is the value-maximizing option for the estates, as compared to a liquidation.  The Debtors must give the Limited Release in order to gain the benefits of the APA, described above.  The Limited Release expressly preserves extremely valuable Estate claims, and the APA limits ESL's ability to receive the proceeds of those claims.

34.     *Second*, timing considerations favor a sale under section 363.  If a sale is not closed quickly, the value of the Debtors' business likely will decline and the opportunity for a going concern sale likely will disappear entirely.  As the UCC acknowledges, the Debtors are burning cash at a rate of $6 million per day.  *See* UCC Objection ¶ 68.

### B.     Although the Entire Fairness Standard Does Not Apply, the Limited Release Is Entirely Fair.

35.     Given the obvious business justifications for the sale, the UCC is forced to argue that the relief requested in the Sale Motion is not governed by the business judgment rule, but rather by the "entire fairness" standard.  UCC Objection ¶¶ 81–84.  The UCC asserts that this higher standard applies because ESL is an "insider" (UCC Objection ¶ 81) and because the transaction was supposedly approved "by Board members who were handpicked by and beholden to Lampert and ESL" (UCC Objection ¶ 137).  As the cases cited in the Debtors' Reply

make clear, the decisions of the independent Restructuring Committee and Subcommittee are properly judged under the business judgment rule, not the entire fairness standard. The UCC offers no evidence that the Restructuring Committee members were "handpicked by" or are "beholden to" (*id.*) Lampert and ESL, and the negotiation history demonstrates the opposite.

36.     In any event, the inapplicable entire fairness standard would be satisfied here. The Limited Release was negotiated at arm's length, by the unconflicted Subcommittee, assisted by its own counsel and advisors, and the Committee repeatedly refused ESL's offers until acceptable terms were achieved. That is a fair process. The APA also represents the best option available to the Debtors and fairly compensates the Debtors for the released claims.

## II. The Limited Release Should Be Approved under Bankruptcy Rule 9019.

37.     In the alternative, the Limited Release should be approved under Bankruptcy Rule 9019. Under that rule, a settlement should be approved if it is in the best interests of the Debtors' estates and falls within the range of reasonableness. That is the case here.

### A.     A Settlement Within the Range of Reasonableness Should Be Approved.

38.     "Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re Motors Liquidation Co.*, 555 B.R. 355, 364–65 (Bankr. S.D.N.Y. 2016). "In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." *Protective Comm. for Independent S'holders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 424 (1968) (citation and internal quotation marks omitted).

39.     Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). A settlement should be approved if it is in "the best interests of the estate." *Vaughn* v.

*Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 134 B.R. 499,

505 (Bankr. S.D.N.Y. 1991).  A settlement need not result in the best possible outcome for the

estate, but must not "'fall[ ] below the lowest point in the range of reasonableness.'"  *Cosoff* v.

*Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 613 (2d Cir. 1983) (quoting *Newman* v. *Stein*, 464

F.2d 689, 693 (2d Cir. 1972)).

      40.     The factors typically considered by courts include:

        i.     "the probability of success in the litigation";

       ii.     "the difficulties, if any, to be encountered in the matter of collection";

     iii.     "the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it";

     iv.     "the paramount interest of creditors and a proper deference to their reasonable views";

      v.     "the competency and experience of the trustee [here, the debtor in possession] and [its] counsel";

     vi.     "the nature and breadth of releases to be issued as a result of the settlement"; and

    vii.     "the extent to which the settlement is not the product of fraud or collusion."

*In re Remsen Partners, Ltd.*, 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003) (Drain, J.); *see also*

*TMT Trailer Ferry*, 390 U.S. at 424–41 (discussing factors); *Nuevo Pueblo, LLC* v. *Napolitano*

*(In re Nuevo Pueblo, LLC)*, 608 F. App'x 40, 41–42 (2d Cir. 2015) (listing factors similarly).

      41.     While a bankruptcy court should consider all "factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *TMT Trailer Ferry*, 390 U.S. at 424, it

should not conduct a "mini-trial" into the merits of the dispute being settled, *In re Sabine Oil &*

*Gas Corp.*, 555 B.R. 180, 257 (Bankr. S.D.N.Y. 2016), or "decide the numerous questions of law

and fact" underlying the settled claims, *W.T. Grant,* 699 F.2d at 608.  The court should give

weight to the "informed judgments of the . . . debtor-in-possession and their counsel," *Drexel*

*Burnham Lambert,* 134 B.R. at 505, and "test [their] choice for reasonableness" without "substitut[ing] [its] judgement," *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998). "If the [debtor] chooses one of two reasonable choices, [the court] must approve that choice, even if, all things being equal, [it] would have selected the other." *Id.*

> **B.** **The Proposed Settlement Falls Well Within the Range of Reasonableness.**

42.      The *TMT Trailer Ferry* factors support the conclusion that this settlement falls well within the range of reasonableness.

43.      ***Probability of success in litigation***.  After consideration of the factual record and after consultation with its counsel and other advisors, as discussed above, the Subcommittee concluded that the equitable subordination, recharacterization, and other claims affecting ESL's ability to credit bid involve significant litigation risk.  Carr Decl. ¶ 32.

44.      *Equitable subordination.*  As the UCC admits (UCC Objection ¶ 158), "[e]quitable subordination is an extraordinary remedy that is to be used sparingly."  *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 564 (Bankr. S.D.N.Y. 2016) (internal quotation marks omitted). Equitable subordination is "remedial" rather than "punitive."  *In re Enron Corp.*, 2005 WL 3832053 at *8 (Bankr. S.D.N.Y. Nov. 28, 2005).  As the UCC itself alleges, ESL's secured loans to the Debtors during 2016–2018 were generally new money loans that made more than $2 billion available to the Debtors for general corporate purposes.  *See* UCC Compl. ¶¶ 135–36. The UCC also alleges that, at the time, the Debtors "were unable to obtain financing in any meaningful amount from sources other than ESL."  *Id.* ¶ 164.  While the UCC cites the doctrine that equitable subordination may provide a remedy for "unrelated" misconduct (UCC Objection ¶¶ 115, 155), the law is also clear that equitable subordination cannot provide a duplicative remedy for a wrong with another remedy, such as a fraudulent transfer claim.  *See, e.g.*, *In re Dreier LLP*, 453 B.R. 499, 517 (Bankr. S.D.N.Y. 2011) (dismissing equitable subordination

14

claim because fraudulent transfer claim was available for the "same wrong"). Thus, it does not follow that success on, for example, the Lands' End or Seritage claims, would also have resulted in the equitable subordination of the ESL loans. And, as noted above, the Debtors' estates will retain the right to pursue the Lands' End and Seritage claims.

45.    *Recharacterization.* In order to recharacterize ESL's debt as equity, the Debtors would have been required to satisfy an 11-factor balancing test. "The purpose of the 11 point analysis . . . is . . . to discern the intent of the parties." *Weisfelner* v. *Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 101 (Bankr. S.D.N.Y. 2016).[4] The fact that these loans were documented as debt, as the UCC admits (UCC Objection ¶ 46; UCC Compl. ¶ 135), cuts against this claim. The UCC's argument for recharacterization also relies heavily on ESL's insider status and the Debtors' undercapitalization (*see* UCC Objection ¶¶ 143–54), but the case law makes clear that these two factors alone are insufficient to recharacterize debt as equity. *See, e.g.*, *Fairchild Dornier GmbH* v. *Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006). Litigating this claim would require the Debtors "to sail into legal waters not so much uncharted as charted differently by everyone who has had the misfortune to venture into them." *In re Commercial Loan Corp.*, 316 B.R. 690, 703 (Bankr. N.D. Ill. 2004).

46.    *Disallowance.* Even once it is determined that ESL received fraudulent transfers, ESL's claims would not be disallowed if ESL were to repay those transfers. *See, e.g.*, *In re*

---

[4]    The factors are: "(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments." *Weisfelner*, 544 B.R. at 93–94.

*Vivaro Corp.*, 541 B.R. 144, 147–48 (Bankr. S.D.N.Y. 2015).  Thus, a disallowance claim would

not necessarily result in additional relief.  A debtor can, of course, settle a disallowance claim,

just like any other claim.  *See, e.g.*, *In re Found. for New Era Philanthropy*, 1996 Bankr. LEXIS

1892, at *72–73 (Bankr. E.D. Pa. Aug. 21, 1996).

47.    ***Complexity, expense, and delay of litigation***.  The litigation of equitable

subordination or recharacterization claims would have been complex, expensive, and slow.

These costs would be borne by the Debtors' estates, and meanwhile the opportunity for a sale of

a portion of the business as a going concern would disappear.  *See supra* ¶ 34.

48.    ***Interests of creditors***.  The settlement confers substantial benefits on creditors, as

compared to a liquidation, by bringing substantial consideration into the estates, avoiding the

increased administrative expenses of a liquidation, and limiting ESL's right to receive proceeds

of litigation recoveries.  While unsecured creditors may prefer litigation, the Debtors are not

obliged "to gamble with the senior creditors' recovery in the unreasonable hope of hitting a

litigation jackpot." *Remsen Partners*, 294 B.R. at 567; *see also In re Ambac Fin. Grp., Inc.*, 457

B.R. 299, 305 (Bankr. S.D.N.Y. 2011) ("Nothing in [the] applicable case law requires a debtor to

gamble with the estate's interest at the behest of an out-of-the-money party who has nothing to

lose by a roll of the litigation dice."), *aff'd*, 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), *aff'd*,

487 F. App'x 663 (2d Cir. 2012).

49.    ***Competency of Debtors and their counsel***.  The Subcommittee and its legal

counsel and advisors are all highly competent and well-informed of the relevant facts.  *See supra*

¶¶ 8–10, 15–20.  The Court should defer to the business judgment of these fiduciaries.

50.    ***The narrow tailoring of the Limited Release***.  Unlike the general release ESL

initially demanded, the Limited Release applies only to equitable subordination,

recharacterization, and other claims affecting ESL's ability to credit bid, while preserving all other claims, including the valuable claims related to the Lands' End and Seritage transactions. The Subcommittee is continuing to pursue those claims.

51.     While the UCC suggests that the Limited Release should be even further narrowed (UCC Objection ¶¶ 178–80), insisting upon such a modification would result in the loss of this deal, the only going concern deal available, with disastrous results.

52.     *Lack of collusion*.  The UCC has offered no evidence of collusion, and the details of the difficult negotiations leading to the APA refute any such suggestion.

### III.    The Good Faith Purchaser Protections of Section 363(m) of the Bankruptcy Code Should Apply to ESL.

53.     Section 363(m) of the Bankruptcy Code provides, in relevant part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code protects a purchaser of assets sold pursuant to section 363(b) from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  *See Allstate Ins. Co.* v. *Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *Reloeb Co.* v. *LTV Corp (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993) (noting that section 363(m) fosters the policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to

17

11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

54.     "It is important to note . . . that '[t]he good faith inquiry is limited to the purchaser's conduct during the course of the sale proceedings.'" *Sabatini Frozen Foods, LLC* v. *Jones*, No. 11-CV-1294 (SLT), 2013 WL 1345104, at *4 (E.D.N.Y. Mar. 29, 2013) (quoting *Bace* v. *Babitt*, No. 07 CIV. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008)).  A court may consider the insider status of a potential purchaser as part of its good faith analysis, but "[i]t is not 'per se bad faith' for an insider to purchase assets of a debtor, and 'a sale to him without more would not suffice to show a lack of good faith.'"  *Id.* at *4.

55.     The terms of the APA are the product of extensive, difficult, arm's length negotiations between the Restructuring Committee and Subcommittee, on the one hand, and ESL, on the other hand.  Throughout such negotiations, each party was advised by competent legal counsel and advisors.  The Sale Motion is made in good faith, and the consideration to be received by the Debtors is fair and reasonable.  Accordingly, NewCo and ESL are entitled to the protections of section 363(m) of the Bankruptcy Code as good faith purchasers.

**Conclusion**

The Sale Motion should be granted.

Dated: February 1, 2019
New York, New York

 /s/ Paul M. Basta

PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Paul M. Basta
Kelley A. Cornish
Lewis R. Clayton

*Counsel to the Debtors Acting at the Direction*
*of the Restructuring Subcommittee of the Board of Directors*
*of Sears Holdings Corporation*