**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors. [1] | : | **(Jointly Administered)** |
| | : | |

-----------------------------------------------------------------x

**DECLARATION OF ALAN J. CARR**
**IN SUPPORT OF RESTRUCTURING SUBCOMMITTEE'S RESPONSE TO THE**
**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO**
**THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO ESL**
**INVESTMENTS, INC.**

I, Alan J. Carr, make this declaration under 28 U.S.C. § 1746:

1. I am a disinterested director of Sears Holdings Corporation ("Sears").[2] In

that capacity, I serve on the Restructuring Committee and the Restructuring Subcommittee of

the board of directors (the "Board") of Sears.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); SHC Licensed Business LLC (3718); SHC Promotions LLC (9626); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used herein, but not otherwise defined, have the meaning ascribed to them in the accompanying motion.

2.   I submit this declaration ("Declaration") on behalf of the Restructuring Subcommittee in response to the objection of the Official Committee of Unsecured Creditors (the "UCC") to the sale of substantially all of the Debtors' assets to Transform Holdco LLC ("NewCo"), a newly formed entity controlled by ESL Investments, Inc. ("ESL").  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) information provided to me by the Debtors' employees or advisors; (iii) information provided to me by William Transier, another disinterested director of the Debtors; (iv) my knowledge and experience as a disinterested director of the Debtors; and (v) my experience as a current and former member of the boards of directors of other distressed companies that have been involved in the restructuring process.  If I were called to testify as a witness in this matter, I would testify to the facts set forth herein.

**Background**

3.   I am the co-founder, CEO, and Managing Member of Drivetrain LLC, a firm focused on leading complex restructurings and litigations.  Prior to forming Drivetrain, I served as a Managing Director at Strategic Value Partners LLC from 2003 to 2013, where I led financial restructurings for companies in North America and Europe, and as a corporate restructuring attorney at Skadden, Arps, Slate, Meagher & Flom LLP from 1997 to 2003.  I have a B.A. from Brandeis University and a J.D. from Tulane University School of Law.

4.   I have held management and leadership roles at many distressed companies. These roles include serving as an independent director or manager of: (i) Toys R US DE, Inc. from September 2017 to January 2019; (ii) ExGen Texas Power, LLC from April 2017 to April 2018; (iii) UCI Holdings Limited from February 2016 to December 2016; (iv) NewPage

2

Corporation from December 2015 to July 2016; (v) LightSquared Inc. from September 2013 to December 2015; (vi) Statewide Mobility Partners LLC from August 2014 to May 2015; and (vii) Nautilus Holdings, Inc. from June 2014 to February 2015. I also served as the Chief Restructuring Officer for Seacastle Ship Holdings from April 2015 to March 2016. I currently serve as the Chairman of the Board of Directors of Kaupthing ehf, a former Icelandic bank.[3]

5. In late September 2018, I was contacted by Ray Schrock of Weil, Gotshal & Manges LLP, counsel to the Debtors ("Debtors' Counsel"), about possibly joining the Sears Board as an independent director. Before joining the Sears Board, I had no prior business or personal relationship with Eddie Lampert, Kunal Kamlani, or any other ESL or Sears management or leadership personnel.

6. On October 3, 2018, I was appointed to the Sears Board as a disinterested director, and on October 10, 2018 I was appointed to serve on the newly constituted Restructuring Committee (the "Committee"), alongside Paul DePodesta and Ann Reese. The Restructuring Committee was authorized to, among other things: (i) consider, evaluate and, if it deemed it to be in the best interests of Sears, recommend to the Board that Sears enter into a transaction not involving ESL, or authorizing and approving a transaction involving ESL; (ii) oversee the provision of confidential information by or on behalf of Sears and its subsidiaries to third parties under cover of an appropriate confidentiality arrangement; (iii) oversee discussions and negotiations with Sears' stakeholders as part of a restructuring transaction; (iv) supervise the implementation and execution of any restructuring transaction; and (v) monitor

---

[3] Additional information regarding my background and qualifications can be found in my resume and deal sheet, attached to this Declaration as **Appendix 1**.

the work of the Debtors' Chief Restructuring Officer.  A full and complete copy of the Restructuring Committee Resolutions is attached hereto as **Appendix 2**.

7.    In addition, a Restructuring Subcommittee (the "Subcommittee") was created to investigate any potential causes of action with respect to any of the Debtors' related-party transactions.  I was appointed to the Subcommittee as its sole member at that time. Shortly thereafter, on October 11, 2018, William Transier was selected as a disinterested director of Sears, and he was appointed to serve on the Restructuring Committee and Subcommittee.  Before  Mr. Transier's appointment I had no prior business relationship with him.

8.    On November 2, 2018, the Sears Board adopted a resolution setting forth the authority and responsibilities of the Subcommittee.  Specifically, the Subcommittee was delegated full authority to, among other things: (i)  conduct an investigation on behalf of the Debtors into potential claims and causes of action arising out of the myriad of prepetition related-party transactions, and to prosecute, settle, or release any such claims; (ii)  approve or disapprove potential post-petition transactions that would affect claims arising from the related-party transactions, including proposed credit bids by ESL or its affiliates and releases of prepetition claims; and (iii)  assert or waive the Debtors' attorney-client privilege with respect to the foregoing.  A full and complete copy of the Subcommittee Resolution is attached hereto as **Appendix 3**.

### The Investigation and Analysis of Potential Claims

9.    The Subcommittee, with the assistance of its legal and financial advisors, has been conducting an in-depth investigation of material prepetition related-party

4

transactions.  To date, the Subcommittee and its advisors have collected and reviewed millions

of pages of documents, conducted eleven on-the-record interviews of past and present senior

executives and Board members (including Mr. Lampert) and the Debtors' financial advisors,

lawyers, and appraisers, and performed detailed analyses of potential causes of action.  This

investigation is continuing.

10. The Subcommittee has engaged experienced legal and financial advisors to

assist in its investigation.  Paul, Weiss, Rifkind, Wharton & Garrison LLP and conflicts counsel

Young Conaway Stargatt & Taylor, LLP (together, "Counsel") were retained to oversee the

investigation and provide legal advice to the Subcommittee.    Evercore Group LLC

("Evercore"), Alvarez & Marsal North America LLC ("A&M"), and Stout Risius Ross, LLC

("Stout") (together, the "Financial Advisors") were retained as financial advisors.  Evercore

has provided, and continues to provide, valuation and financial-market advice.  A&M has

conducted analyses of the Debtors' prepetition financial condition and projections, and

analyzed relevant industry and economic conditions.  Finally, Stout has evaluated the real

estate that Sears transferred in the Seritage transaction (discussed below).

11. The Subcommittee's investigation has focused on the following prepetition

related-party transactions:

    (a)    The Lands' End Transaction: in 2014, Sears spun off its 100%
           ownership interest in Lands' End, a successful lifestyle clothing and
           home items brand, the equity of which was valued
           contemporaneously by the Debtors' advisors at approximately $1.1
           billion (net of a $500 million pre-spinoff dividend to Sears).  The
           equity in the newly independent Lands' End was provided to Sears
           shareholders, the largest of which were Mr. Lampert and ESL, for
           no consideration;

5

(b) <u>The Seritage Transaction</u>: in 2015, Sears engaged in a rights offering and sale and lease back transaction involving some of its most valuable properties. Sears sold 266 stores that it owned, or had an interest in, to a newly formed real estate investment trust, Seritage, for $2.7 billion. Since its formation, ESL has held the largest economic interest in Seritage, and Mr. Lampert has served as the Chairman of its Board. The master lease included numerous terms that benefited Seritage at the expense of Sears, including Seritage's ability to recapture some or all of the Sears stores and re-lease them to competitors. In addition, Sears conducted a rights offering where Seritage equity was offered to all Sears shareholders, the largest of which were ESL and Mr. Lampert. The value of that rights offering was at least $400 million;

(c) <u>Loans from ESL to the Debtors</u>: between 2016 and 2018 ESL extended over $2 billion in loans to Sears that were secured by the Debtors' property (the "<u>ESL Loans</u>");

(d) <u>The Rights Offering of Sears Hometown and Outlet Stores</u>: On October 11, 2012 Sears conducted a rights offering of Sears Hometown and Outlet stores valued at that time between $425 and $515 million; and

(e) <u>The Partial Spin-Off and Rights Offering of Sears Canada</u>: On November 13, 2012 Sears spun off Sears Canada, valued by the Debtors at $500 million, and on November 10, 2014 completed a $380 million rights offering to existing shareholders to reduce its Sears Canada stake to approximately 12% (collectively the "<u>Related-Party Transactions</u>").

12. The Subcommittee began its investigation as soon as it was formed. On October 12, 2018, it served preliminary document requests on the Debtors and ESL, seeking multiple categories of core documents associated with the Related-Party Transactions and other relevant materials (such as Board minutes and business plans) from January 2012 until the Petition Date. Between October 26 and October 28, 2018, the Subcommittee served wide-ranging supplemental document requests on the Debtors, ESL, Seritage and Fairholme (the second-largest investor in Sears), as well as the Debtors' counsel (Wachtell, Lipton, Rosen, &

Katz, LLP), valuation advisor (Duff & Phelps), auditor (Deloitte), financial advisor (Centerview Partners LLC), and real estate appraisal firm (Cushman & Wakefield) (collectively the "Producing Parties").  On November 16, 2018, the Court entered an order authorizing the Subcommittee to obtain documents and conduct interviews pursuant to Bankruptcy Rule 2004. (Dkt. No. 803).

13. Between October 17 and December 18, 2018, the Subcommittee received over 9 million pages of documents from the Producing Parties, as follows:

| Party | Number of Documents | Number of Pages |
|---|---|---|
| Centerview | 14,866 | 155,629 |
| Cushman & Wakefield | 4,439 | 140,772 |
| Deloitte | 4,764 | 135,308 |
| Duff & Phelps | 32,230 | 2,066,786 |
| ESL | 11,121 | 130,413 |
| Fairholme | 4,127 | 16,473 |
| Sears | 981,085 | 6,230,017 |
| Seritage | 4,881 | 49,030 |
| Wachtell | 60,069 | 554,753 |
| **Total** | **1,117,582** | **9,479,181** |

14. In an effort to make our investigation as efficient as possible, the Subcommittee used technology assisted review ("TAR") to prioritize which documents to review.  To date, the Subcommittee has reviewed over 400,000 documents, consisting of over 6 million pages.

15. The Subcommittee has also conducted detailed on-the-record interviews of eleven individuals who held key positions in Sears or its advisors.  Those individuals are:

| Date of Interview | Witness | Role at Sears | Topics |
|---|---|---|---|
| Dec. 4, 2018 | Sinha, Naren | Senior VP, Finance, Sears | Sears' Business Strategy and Financial Projections; Seritage; Lands' End |
| Dec. 5, 2018 | Riecker, Robert | CFO, Sears | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Valuation; Solvency |
| Dec. 6, 2018 | Kamlani, Kunal | Director, SHC and President ESL | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Real Estate Appraisals; Valuation; Solvency |
| Dec. 10, 2018 | Charles, Scott | Restructuring Partner at Wachtell | Sears' Financial Projections; Related-Party Loans; Seritage; Lands' End; Real Estate Appraisals; Valuation; Solvency |
| Dec. 10, 2018 | Reese, Ann | Director, SHC and RPT Committee member | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Valuation; Solvency |
| Dec. 11, 2018 | Puntus, Mark | Co-head of the Debt Advisory and Restructuring Group of Centerview Partners | Sears' Financial Projections; Related-Party Loans; Solvency |
| Dec. 11, 2018 | Schiedemeyer, Jeffrey | Managing Director, Duff & Phelps | Sears' Projections; Lands' End; Seritage; Sears Canada; Fairness Opinion; Solvency |
| Dec. 12, 2018 | Lampert, Edward | Sears Chairman and Former CEO, and principal of ESL | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Valuation; Solvency |
| Dec. 13, 2018 | Latella, Richard | Executive managing Director of Cushman & Wakefield | Real Estate Appraisals; Seritage |
| Dec. 19, 2018 | Schriescheim, Robert | Former CFO, Sears | Sears' Business Strategy and Financial Projections; Related-Party Loans; Seritage; Lands' End; Solvency |
| Jan. 16, 2019 | Stollenwerk, Jeffrey | President of Real Estate, Sears | Related-Party Loans; Seritage; Real Estate Appraisals |

16. Our Financial Advisors have conducted a variety of analyses in connection with the investigation. Specifically, Evercore analyzed: (i) the third party marketing process for transferred assets and debt; (ii) the value of any transferred assets; and (iii) the terms of related-party financing transactions. A&M focused its analysis on: (i) the Debtors' prepetition financial condition and projections; (ii) contemporaneous solvency analyses; (iii) the financial performance of transferred assets; and (iv) the value of a going-concern bid. Stout analyzed real estate appraisals for the real properties that Sears transferred to Seritage. The Financial Advisors' work is being conducted at the direction of the Subcommittee's Counsel and is ongoing.

8

17. The Subcommittee receives frequent updates from both the Financial Advisors and Counsel, including regularly scheduled status calls two to three times a week and frequent communications scheduled on an ad hoc basis.  These status updates include detailed discussions about the status of the investigation, the analyses being conducted by Counsel and the Financial Advisors, the strategy of the investigation, and issues related to ESL's going-concern bid.  In addition, Counsel and the Financial Advisors made formal presentations to the Subcommittee on November 10, 2018, November 11, 2018, November 20, 2018, December 5, 2018, December 7, 2018, December 16, 2018, and December 26, 2018.

18. The Subcommittee also has met regularly with the Board, the full Restructuring Committee, the Debtors' Chief Restructuring Officer, and the Debtors' restructuring advisors to discuss the restructuring and issues related to the Related-Party Transactions.

19. At all points during the investigation, the Subcommittee has coordinated with the UCC.  To date, the Subcommittee has produced more than two million pages of responsive, non-privileged documents to the UCC that it received from the Producing Parties, identified using the TAR process, and the Subcommittee continues to provide the UCC with documents following privilege review.  The UCC's counsel has participated fully in each of the Subcommittee's on-the-record interviews (with the exception of a portion of the interview of Scott Charles, counsel for the Debtors, that involved discussion of privileged matters).  At each interview, the UCC's counsel was accompanied by its own experts and conducted its own examination.  Counsel for the Subcommittee has been in regular contact with the UCC's

counsel to discuss potential claims and theories of liability, including the Subcommittee's view

of the strengths and weaknesses of potential claims.

20. Counsel for the Subcommittee also has discussed potential claims with

ESL's counsel and has provided ESL's counsel opportunities to present ESL's views regarding

potential claims.

21. Based on the work performed so far by Counsel and the Financial Advisors,

the Subcommittee has identified valuable claims arising from the Related-Party Transactions,

including claims against Mr. Lampert, ESL, and others, including claims for actual and

constructive fraudulent transfer and illegal dividend payments arising from the Lands' End and

Seritage transactions.  As noted, the Seritage and Lands' End claims together involve transfers

in excess of $3.7 billion.

22. The Subcommittee and its advisors also have considered potential claims

for equitable subordination, recharacterization and disallowance of ESL's Loans to the

Debtors.  These claims are discussed below.

### Negotiations with ESL

23. The UCC's objection alleges that the outcome of the negotiation process

was preordained in ESL's favor and that the Committee and Subcommittee were led by

directors "handpicked by and beholden to Lampert and ESL."  These allegations are belied by

the record.  The Committee formally voted to reject separate bids by ESL on January 9, 2019

and January 15, 2019.[4]   In addition, the Subcommittee repeatedly made clear that ESL's

---

[4]  Additional information on the sale and negotiation process can be found in the Declaration of William Transier,
filed with the Bankruptcy Court on February 1, 2019.

demand for a global release that would fully exculpate Mr. Lampert and ESL from claims arising out of the Related-Party Transactions in return for $35 million was unacceptable.

24. In the final agreement, memorialized by the Asset Purchase Agreement ("APA") [Dkt. No. 1730 at 15–260], ESL agreed to: (i) a full refinancing of the $350 million junior DIP loan; (ii) remove $23 million in purchase price adjustments (including transfer taxes and mechanic's liens); (iii) provide for certain valuable assets—valued in the aggregate at $26 million—including insurance proceeds, the $6 million Sears Home Improvement sale deposit, and the U-Haul sale proceeds to remain with the Debtors' estates; and (iv) fully assume protection agreement liabilities estimated at $465 million.  As a result, the administrative solvency gap narrowed significantly and certain prepetition claims against the Debtors will be transferred to NewCo.

25. The final agreement also maintained concessions Mr. Lampert had made in earlier bids, such as agreeing to provide employment offers, and severance protection, to over 45,000 Sears employees.

26. The APA does *not* include a global release for claims arising from the Related-Party Transactions as ESL had previously required.  Instead, ESL agreed to the Subcommittee's demand that the release discharge *only* the equitable subordination, recharacterization, and other claims against ESL associated with its ability to credit bid (the "Limited Release").  The Limited Release expressly excludes all other claims and causes of action including:

      (a)     claims for actual or constructive fraudulent transfer;

      (b)     claims for illegal dividend;

      (c)     claims for breach of fiduciary duty;

(d)    all claims related to the Lands' End or Seritage transactions; and

(e)    certain claims that have been alleged in the CCAA proceedings of Sears Canada.

27. Further, under the parties' agreement and as documented in the APA, Mr. Lampert and ESL *cannot* benefit from prospective litigation involving Seritage or Lands' End, including claims asserted by third parties or any other claims involving willful misconduct by ESL or Mr. Lampert.  Specifically,

(a)    Mr. Lampert and ESL *cannot* assert 507(b) claims or deficiency claims on proceeds of litigation involving Seritage, Lands' End, or any willful misconduct by ESL; and

(b)    Any 507(b) recoveries by ESL from the proceeds of any other litigation are limited to $50 million, with the remainder of any such 507(b) claims to be treated as unsecured prepetition deficiency claims.

28. Finally, ESL's 507(b) claims, if any, cannot be used to block confirmation of a plan.

**Approval of Limited Release and Sale**

29. The approval of the Limited Release would allow Sears to continue as a going-concern.

30. Based upon the analyses of the Subcommittee's advisors, the Subcommittee has concluded that the sale of Sears as a going-concern, which includes providing ESL with the Limited Release, offers a greater financial benefit to the Debtors than a wind-down of the Debtors' business

31. Specifically, as compared to a liquidation, the ESL going-concern bid provides the following benefits to the Debtors' estates and creditors:

(a)    Non-ESL third party secured creditors will receive an additional $152 million, as illustrated by the recoveries of Cyrus ($113 million) and other third party creditors ($39 million) in the chart below.

*($ in millions)*

| Creditors | ESLBid | | | Wind Down | | | Value Delta | Adjustment[5] | ProForm | Value Accrues to | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gross Claim | Total Recovery | Recovery | Gross Claim | Total Recovery | Recovery | | | | ESL | Cyrus | 3rd Party | Total |
| Senior DIP ABL | $850 | $850 | 100% | $894 | $894 | 100% | (44) | 44 | - | - | - | - | - |
| Junior DIP | 350 | 350 | 100% | 175 | 175 | 100% | 175 | (175) | - | - | - | - | - |
| FILO (1.5) | 125 | 125 | 100% | 125 | 125 | 100% | - | - | - | - | - | - | - |
| Citi LC Facility (1.75) | 271 | 271 | 100% | 271 | 247 | 91% | 24 | - | 24 | 9 | 15 | - | 24 |
| 2nd Lien Line of Credit Loans | 570 | 232 | 41% | 570 | - | 0% | 232 | - | 232 | 205 | - | 26 | 232 |
| ESL 2nd Lien Term Loan (PIK) | 320 | 130 | 41% | 320 | - | 0% | 130 | - | 130 | 130 | - | - | 130 |
| 2nd Lien Notes (PIK) | 175 | 71 | 41% | 175 | - | 0% | 71 | - | 71 | 8 | 61 | 2 | 71 |
| 2nd Lien Notes (2.5; Cash) | 89 | - | 0% | 89 | - | 0% | - | - | - | - | - | - | - |
| Dove Loans | 831 | 544 | 65% | 831 | 429 | 52% | 115 | - | 115 | 92 | 23 | - | 115 |
| Sparrow Loans | - | - | 0% | - | - | 0% | - | - | - | - | - | - | - |
| GL / IP Loan | 231 | 231 | 100% | 231 | 159 | 69% | 72 | - | 72 | 47 | 14 | 11 | 72 |
| **Total Secured** | **3,812** | **2,804** | **74%** | **3,681** | **2,029** | **55%** | **775** | **(131)** | **644** | **493** | **113** | **39** | **644** |

---

[5] Adjustment to reflect difference in claim balance in wind-down versus ESL bid.

    (b)      Prepetition unsecured creditors will receive an additional $534 million ($453 million for protection agreement liability, $13 million for gift card liability, and $68 million for Shop Your Way liability). This excludes additional recoveries on account of cure claims;

| ESLBid | | | | Wind Down | | | Value Adjustment | ProForma | Value Accrues to | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Creditors | Gross Claim | Total Recovery | Recovery | Gross Claim | Total Recovery | Recovery | | | ESL | Cyrus | 3rd Party | Total |
| NPV Protection Agreement (PA) Liability[6] | 465 | 465 | 100% | 465 | 12 | 3% | 453 | 453 | - | - | 453 | 453 |
| Gift Card Liability | 13 | 13 | 100% | 13 | - | 0% | 13 | 13 | - | - | 13 | 13 |
| SYW Points Liability | 68 | 68 | 100% | 68 | - | 0% | 68 | 68 | - | - | 68 | 68 |
| **Total Unsecured** | **546** | **546** | **--** | **546** | **12** | **0%** | **534** | **534** | **-** | **-** | **534** | **534** |

    (c)      ESL will pay for material administrative claims of the Debtors' estates, and the Debtors will incur materially less administrative claims under the ESL sale versus a liquidation (an aggregate $621 million benefit to the Debtors' estates) as illustrated in the chart below;

| Administrative Claims | | | | | |
|---|---|---|---|---|---|
| | Going Concern | | | Winddown | Difference |
| | ESL | Estate | Total | Estate | |
| 503(b)(9) | $ 139 | $ 34 | $ 173 | $ 192 | $ 19 |
| AP[7] | 166 | 30 | 196 | 140 | (56) |
| Severance & WARN | 28 | - | 28 | 68 | 40 |
| Taxes | 134 | 4 | 138 | 210 | 72 |
| Home Office Payroll Claims | - | - | - | 246 | 246 |
| RemainCo Winddown Costs | - | 80 | 80 | 140 | 60 |
| Professional Fees | - | 102 | 102 | 72 | (30) |
| Cure Costs | 200 | - | 200 | - | (200) |
| Logistics and SG&A | - | - | - | 325 | 325 |
| Gift Card Redemptions | - | - | - | 10 | 10 |
| KEIP/KERP | - | - | - | 19 | 19 |
| PTO | - | - | - | 8 | 8 |
| Post-Petition TSA/CSA | - | - | - | 40 | 40 |
| Cash Interest and Financing Fees | - | - | - | 68 | 68 |
| Post-Petition Warranties | 27 | - | 27 | 27 | 0 |
| **Total** | **694** | **250** | **944** | **1,565** | **621** |
| **Total less Post-Petition Protection Agreement Liability** | **$ 667** | **$ 250** | **$ 917** | **$ 1,538** | **$ 621** |

---

[6]  Protection agreement liability of $465 million reflects the net present value of expected redemptions, inclusive of $27 million in administrative claims due to post-petition liability incurred prior to the Assurant transaction. Liability notional amount of $1,009 million represents a $544 million increase relative to net present value.

[7]  Assumes ESL is taking $166 million of liabilities at close.

(d)     As a result of the terms of the Limited Release, nearly all proceeds of the Debtors' preserved litigation claims will inure to the benefit of non-insider creditors;

(e)     Debtors will receive an additional $35 million in exchange for the Limited Release; and

(f)     NewCo will extend offers of employment to at least 45,000 of the Debtors' employees.

32. Based upon its work to date, and after consultation with the Financial Advisors and Counsel, the Subcommittee has considered the following facts in agreeing to the Limited Release:

(a)     ESL's Loans to the Debtors during 2016, 2017, and 2018 were generally new money loans that provided $2.6 billion to the Debtors;

(b)     The terms of the ESL Loans do not appear to be less favorable to the Debtors than the terms that could have been obtained from a third party;

(c)     The ESL Loans were documented in customary written agreements, prepared by outside counsel; and

(d)     The security interests appear to have been properly perfected.

33. Based on these facts, and after receiving advice from Counsel and analyses from the Financial Advisors, the Subcommittee determined that there is substantial litigation risk associated with the equitable subordination and recharacterization claims.

34. The Subcommittee determined that the value of the Debtors' estates will be maximized through a going concern transaction and the accompanying Limited Release.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this February 1, 2019

/s/ Alan J. Carr
Alan J. Carr
Disinterested Director
Sears Holdings Corporation