Hearing Date and Time: February 4, 2019 at 10:00 a.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.0
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION, *et al.*,** | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

------------------------------------------------------------ x

## DEBTORS' OMNIBUS REPLY
## IN SUPPORT OF THE GOING CONCERN SALE TRANSACTION

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page**

**Preliminary Statement**

**Background**

I.     General Background .................................................................................................11

    A.     History of the Global Sale Process .................................................................11

    B.     The Evolution of the December 28 ESL Bid and Sale Transaction .....................19

    B.     ESL's Successful Bid Is Superior To a Controlled Winddown ...........................27

    C.     The Debtors Consulted Extensively With the Consultation Parties,
           Including the Creditors' Committee ..................................................................28

**Response**

I.     The Asset Purchase Agreement and the Transactions Thereunder Should be
      Approved.................................................................................................................31

    A.     The Sale Hearing Is a Summary Proceeding ........................................................31

    B.     The Sale Transaction Is Subject to the Business Judgement Standard, Is a
           Valid Exercise of the Debtors' Business Judgment, and Is Warranted
           Under the Circumstances ...................................................................................33

    C.     Transform Can Demonstrate Adequate Assurance of Future Performance
           and the Assumption and Assignment of the Executory Contracts and
           Unexpired Leases Should be Approved...............................................................42

    D.     The Sale Transaction Is Superior to the Winddown Alternative ..........................47

**Response to Objections**

I.     Creditors' Committee Objection...............................................................................62

    A.     The Sale Transaction Does Not Guarantee Administrative Insolvency ...............62

    B.     The Execution Risk Related to the Sale Transaction is Manageable....................64

II.    PBGC Objection .....................................................................................................68

    A.     The Debtors Do Not Intend to Seek Bankruptcy Code Protection for the
           Sale of Non-Debtor Assets.................................................................................68

    B.     The Exclusive License Is Permitted.....................................................................69

    C.     The Allocation of Consideration Is a Confirmation Issue ...................................72

III.   Service.com Objection..............................................................................................72

IV.    The Sale Order Should Be Effective Immediately Upon Entry.......................................73

**Conclusion**

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbotts Dairies of Pa., Inc.*,
  788 F.2d 143 (3d Cir. 1986)................................................................41

*Aceto Corp. v. TherapeuticsMD, Inc.*,
  953 F. Supp. 2d 1269 (S.D. Fla. 2013) ........................................69, 70

*Banayan v. Wolf (In re YBA Nineteen, LLC)*,
  No. 15CV1742-WQH-RBB, 2016 WL 541347 (S.D. Cal. Feb. 11, 2016) ............59

*In re Beker Indus. Corp.*,
  58 B.R. 725 (Bankr. S.D.N.Y. 1986)................................................44

*In re Bidermann Indus. U.S.A., Inc.*,
  203 B.R. 547 (Bankr. S.D.N.Y. 1997)..........................................34, 36

*In re Bygaph, Inc.*,
  56 B.R. 596 (Bankr. S.D.N.Y. 1986)..........................................43, 45

*C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*,
  92 B.R. 87 (Bankr. S.D.N.Y. 1988)................................................36

*Camco Int'l Inc. v. Perry R. Bass, Inc.*,
  926 S.W.2d 632 (Tex. App.—Fort Worth 1996)................................70

*Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*,
  103 B.R. 524 (Bankr. D.N.J. 1988)................................................43

*In re Chelsea Therapeutics Int'l Ltd. Stockholders Litig.*,
  No. 9640-VCG, 2016 WL 3044721 (Del. Ch. May 20, 2016)................38

*In re Chrysler LLC*,
  405 B.R. 84 (Bankr. S.D.N.Y. 2009)..........................................41, 59

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
  722 F.2d 1063 (2d Cir. 1983)..........................................33, 41, 53, 54

*In re Countrywide Corp. S'holders Litig.*,
  No. 3464–VCN, 2009 WL 846019 (Del. Ch. Mar. 31, 2009)................34

*In re DDJ, Inc.*,
  No. 05-10001-A-7, 2011 WL 10638435 (Bankr. E.D. Cal. June 8, 2011)............60

*In re Delphi Corp.*,
    No. 05-44481(RDD), 2009 WL 637315 (Bankr. S.D.N.Y. Mar. 10, 2009),
    *reh'g denied and opinion modified*, No. 05-44481(RDD), 2009 WL 637259
    (Bankr. S.D.N.Y. Mar. 11, 2009).............................................................................................31

*Delphi Corp. v. Appaloosa Mgmt. LP (In re Delphi Corp.)*,
    No. 05-44481(RDD), 2008 WL 3486615 (Bankr. S.D.N.Y. Aug. 11, 2008),
    *modified*, 2008 WL 5155561 (Bankr. S.D.N.Y. Nov. 7, 2008).............................................32

*In re Evelyn Byrnes, Inc.*,
    32 B.R. 825 (Bankr. S.D.N.Y. 1983)..............................................................................44, 45

*In re Family Christian, LLC*,
    533 B.R. 600 (Bankr. W.D. Mich. 2015)...............................................................................60

*In re Fin. News Network, Inc.*,
    126 B.R. 152 (S.D.N.Y. 1991).................................................................................................53

*In re Genco Shipping & Trading Limited*,
    509 B.R. 455 (Bankr. S.D.N.Y. 2014).....................................................................................34

*In re Global Crossing Ltd.*,
    295 B.R. 726 (Bankr. S.D.N.Y. 2003).....................................................................................33

*In re Great Atl. & Pac. Tea Co.*,
    472 B.R. 666 (S.D.N.Y. 2012).................................................................................................43

*In re The Great Atl. & Pac. Tea Co.*,
    544 B.R. 43 (Bankr. S.D.N.Y. 2016).......................................................................................32

*In re Grubb & Ellis Co.*,
    No. 12-10685 MG, 2012 WL 1036071 (Bankr. S.D.N.Y. Mar. 27, 2012),
    *aff'd*, 523 B.R. 423 (S.D.N.Y. 2014)................................................................................31, 41

*In re GSC, Inc.*,
    453 B.R. 132 (Bankr. S.D.N.Y. 2011).................................................................................53, 54

*In re Gulph Woods Corp.*,
    No. 87-03093S, 1988 WL 134688 (Bankr. E.D. Pa. Dec. 13, 1988)................................59, 60

*In re HHH Choices Health Plan, LLC*,
    554 B.R. 697 (Bankr. S.D.N.Y. 2016).....................................................................................58

*In re Innkeepers USA Tr.*,
    442 B.R. 227 (Bankr. S.D.N.Y. 2010).................................................................................34, 36

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,
    248 F.3d 1333 (Fed. Cir. 2001)..............................................................................................70

*Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*,
   No. 9714–VCG, 2015 WL 2270673 (Del. Ch. May 8, 2015), *aff'd,* 132 A.3d
   748 (Del. 2016) (unpublished table decision)......................................................38

*In re Jennifer Convertibles, Inc.*,
   447 B.R. 713 (Bankr. S.D.N.Y. 2011)..................................................................43

*Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*,
   264 F. Supp. 3d 1294 (M.D. Fla. 2017)...............................................................70

*In re Lafayette Radio Elecs. Corp.*,
   9 B.R. 993 (Bankr. E.D.N.Y. 1981).....................................................................44

*In re M. Fine Lumber Co.*,
   383 B.R. 565 (Bankr. E.D.N.Y. 2008).................................................................44

*In re Natco Indus., Inc.*,
   54 B.R. 436 (Bankr. S.D.N.Y. 1985)...................................................................44

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re
   Integrated Res., Inc.)*,
   147 B.R. 650 (S.D.N.Y. 1992).............................................................................33

*Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV
   Corp. (In re Chateaugay Corp).*,
   973 F.2d 141 (2d Cir. 1992)................................................................................33

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S
   & B Holdings LLC)*,
   420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd as modified sub nom. Geltzer v.
   Bay Harbour Mgmt LC (In re BH S & B Holdings LLC)*, 807 F. Supp. 2d 199
   (S.D.N.Y. 2011) ...........................................................................................34, 38

*Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential
   Capital, LLC)*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013).................................................................49

*In re Orion Pictures*,
   4 F.3d 1095 (2d Cir. 1993).........................................................................8, 31, 32

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
   430 B.R. 65 (S.D.N.Y. 2010)..........................................................................53, 54

*Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Schools, Inc.)*,
   No. 96 Civ. 3576 (PKL), 1997 WL 188127 (S.D.N.Y. Apr. 17, 1997)...................41

*In re Residential Capital*,
   No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) .................34, 35, 39, 40

iv

*In re Residential Capital, LLC*,
  No. 12-12020 (MG), 2012 WL 12906668 (Bankr. S.D.N.Y. Nov. 21, 2012).......................54

*Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*,
  272 B.R. 74 (Bankr. S.D.N.Y. 2002) .......................................................................36

*In re Rock 49th Rest. Corp.*,
  No. 09-14557(ALG), 2010 WL 1418863 (Bankr. S.D.N.Y. Apr. 7, 2010)...........................43

*In re Sabine Oil & Gas Corp.*,
  547 B.R. 66 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017),
  *aff'd*, 734 F. App'x 64 (2d Cir. 2018).....................................................................32

*In re Sapolin Paints, Inc.*,
  5 B.R. 412 (Bankr. E.D.N.Y. 1980)...................................................................44, 45

*In re Tempnology, LLC*,
  542 B.R. 50 (Bankr. D.N.H. 2015), *aff'd sub nom. Mission Prod. Holdings,
  Inc. v. Old Cold, LLC (In re Old Cold, LLC)*, 558 B.R. 500 (B.A.P. 1st Cir.
  2016), *aff'd*, 879 F.3d 376 (1st Cir. 2018).........................................................59, 60

*In re Trans World Airlines, Inc.*,
  No. 01-00056(PJW), 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001)..............................54

*In re U. L. Radio Corp.*,
  19 B.R. 537 (Bankr. S.D.N.Y. 1982) .......................................................................44

*Waterman v. Mackenzie*,
  138 U.S. 252 (1891)............................................................................................69

*In re Westview 74th St. Drug Corp.*,
  59 B.R. 747 (Bankr. S.D.N.Y. 1986) .......................................................................43

## Statutes & Rules

11 U.S.C. § 363.............................................................................................*passim*

11 U.S.C. § 363(b) ......................................................................................31, 32, 33, 58

11 U.S.C. § 363(b)(1) .........................................................................................33

11 U.S.C. § 363(k) ............................................................................................26

11 U.S.C. § 365(b)(1) .........................................................................................42

11 U.S.C. § 365(b)(3) .....................................................................................43, 46

11 U.S.C. § 365(f)........................................................................................47, 74

11 U.S.C. § 365(f)(2) ..........................................................................................................43

11 U.S.C. § 365(f)(2)(B) .....................................................................................................43

11 U.S.C. § 503(b)(9) ...............................................................................................4, 27, 56

11 U.S.C. § 506(c) ...................................................................................................48, 50, 51

11 U.S.C. § 507(b) ........................................................................................................*passim*

11 U.S.C. § 1129(a)(9)(A) ..................................................................................................58

FED. R. BANKR. P. 6004(h) ..........................................................................................73, 74

FED. R. BANKR. P. 6006(d) .................................................................................................74

**Treatises**

3 Collier on Bankruptcy ¶ 363.02 (16th ed.) .....................................................................55

1 McCarthy on Trademarks and Unfair Competition § 2:15 (5th ed.) ...............................71

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and together with their non-debtor affiliates, the "**Company**"), respectfully submit this response (this "**Response**") to the objections filed (collectively, the "**Objections**")[2] to the *Notice of Successful Bidder and Sale Hearing* (ECF No. 1730) (the "**Notice of Successful Bidder**"), and in support of entry of the *Revised Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith and (IV) Granting Related Relief* (the "**Revised Proposed Sale Order**"), filed contemporaneously herewith:

## PRELIMINARY STATEMENT[3]

1.      Sears is an American retail icon with a long and lauded history.  As a precursor to popular nationwide retailers such as Walmart, Target, and Amazon, Sears began with a successful mail-order catalog and eventually helped establish what we know today as the "one stop shopping" experience.  Like many modern retailers, Sears sustained substantial operating losses while working to turn around and keep its sizeable workforce employed.  When

---

[2]    Objections to the Sale Transaction and the assumption and assignment of the Initial Assigned Agreements that are not addressed in the body of this Response are summarized in the chart attached hereto as **Exhibit A**.

The Debtors do not intend to proceed with any: (1) Cure Cost Objections or (2) Objections relating to Additional Contracts or Designatable Leases at the February 4, 2019 hearing.  Accordingly, such Objections are not addressed in **Exhibit A** and are preserved for a subsequent hearing, to the extent necessary.

[3]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Global Bidding Procedures Order (as defined herein), Revised Proposed Sale Order, or Asset Purchase Agreements as applicable.

filing for chapter 11 soon became a reality, the Debtors prepared for a smooth transition into chapter 11 and to seek out the best possible path forward.

2.      The Debtors began these chapter 11 cases during the "retail apocalypse" and from the outset, the Debtors fought negative market perception and a constant barrage of media predictions of an inevitable liquidation spurred on by the Creditors' Committee's unfortunate statements from the very moment the landlord-dominated Creditors' Committee was formed. In the wake of the failures of other large retail bankruptcies, the Debtors were acutely aware that liquidation was a real possibility. In consequence, the Debtors negotiated with their DIP and secured lenders for a reserve of $240 million—a first of its kind—dedicated for the payment of estate winddown costs and the Debtors began their contingency planning.

3.      As demonstrated by the record in these cases, the Debtors, led by Lazard Frères & Co. ("**Lazard**")—the Debtors' investment banker, also engaged in a public, transparent, and thorough sale process over a span of multiple months. Numerous indications of interest—for the businesses as a going-concern, parts or divisions of the businesses, real-estate, and liquidator bids—were all progressed simultaneously. ESL Investments, Inc. (together with its principals and affiliates, "**ESL**") provided the only going-concern bid for the enterprise in any form. The CRO and other members of the Debtors' management were active participants in the process, essential to the diligence and negotiations. But the ultimate decision making authority for any proposed transaction was delegated to the Debtors' independent and disinterested Restructuring Committee and to the Subcommittee for any issues respecting ESL's ability to credit bid. The Restructuring Committee and Subcommittee kept abreast of the issues and held calls, on average, three times per week. The Restructuring Committee and Subcommittee are

both advised by highly competent and experienced legal and financial advisors, with the Subcommittee retaining separate professionals.

4.      The Debtors compared ESL's bid for substantially all of the assets of the Debtors with a winddown or liquidation scenario—which incorporated and took into consideration the liquidation values of merchandise inventory, remaining services and other stand-alone businesses and real estate. The Debtors and their advisors worked diligently to increase the value reflected in the ESL bid to a level that would qualify as "highest or best"— higher or better than the modeled recoveries in a total winddown scenario. And, as further detailed below, throughout the sale process, the Restructuring Committee voted three times to reject ESL's bid. The first refusal was on December 28, 2018, the second refusal was in advance of the January 8, 2019 status conference, and the third refusal was during the three-day, public auction (the "**Auction**"). Each time the Debtors rejected ESL's bid—at the direction of the Restructuring Committee—the Debtors clearly messaged to ESL that its offer was deficient and the Debtors could not move forward with the deal as offered. At the two rejections in advance of January 8, 2019 and during the Auction, the Restructuring Committee was prepared to pivot to an orderly liquidation. Despite any rhetoric to the contrary, in no way was this a Restructuring Committee "hand-picked" by ESL nor was the Restructuring Committee pandering to ESL. This was a difficult process, guided by independent and disinterested board members. The Debtors are confident that the evidence will demonstrate this. If there was any concern that the Debtors and the independent Restructuring Committee are acting solely for the benefit of ESL, the three rejections easily rebut such unfounded allegations. In fact, by rejecting ESL's bids at three different points, the Debtors were able to increase the value ESL offered and tailor the structure of the transaction such that the Debtors could reasonably ensure administrative solvency.

5.       Ultimately, the Debtors were successful and executed an Asset Purchase Agreement[4] with Transform within only three months.  This was no easy feat.  The Sale Transaction provides the businesses, the employees, and all creditors, with a better future and greater recoveries.  The Debtors executed the Asset Purchase Agreement with these objectives in mind and on the basis that the Debtors reasonably concluded that Transform could provide adequate assurance of future performance.  The evidence will support the Debtors' judgment.

6.       Specifically, the Asset Purchase Agreement will, among other things:

- Preserve tens of thousands of jobs and avoid a costly and risky liquidation of the Debtors' enterprise;

- Keep Sears and Kmart stores open across the United States and internationally;

- Preserve the integrity of the Debtors' various business lines, including: Innovel, Sears Home Services, Monark, and Sears Auto Centers;

- Provide for the assumption of approximately $1,100 million of secured debt and administrative liabilities (including up to $139 million in 503(b)(9) claims);

- Provide superior recoveries to creditors;

- Provide for the assumption of contracts and a corresponding cure of all prepetition claims associated therewith;

- Provide for the assumption of liabilities for home warranties and protection agreements sold to about 6.5 million households across the United States;

- Rollover or refinance approximately $1.3 billion of the Debtors' secured debt obligations with the support of those lenders;

- Satisfy approximately $3 billion of secured claims; and

---

[4]     *See* Asset Purchase Agreement, dated as of January 17, 2019, between the Debtors and certain other Sellers party thereto and Transform Holdco LLC ("**Transform**"), as established by ESL (the "**Asset Purchase Agreement**," and the transactions contemplated and to be effected thereby, the "**Sale Transaction**"), filed as <u>Exhibit B</u> to the Notice of Successful Bidder.  The Debtors will file the *Amendment No. 1 to the Asset Purchase Agreement* in advance of the February 4, 2019 hearing.

Pg 12 of 112

▪   Preserve litigation claims (other than with respect to the Credit Bid Release) against insiders for the benefit of creditors, to be dealt with in the Debtors' chapter 11 plan process.

7.      To be clear: there are no alternative offers for a going concern sale.  The only alternative to the current Sale Transaction is a mass liquidation, with: increased administrative claims; increased unsecured claims; increased pain for all parties in interest; potentially protracted litigation; uncertain prospects for recoveries; and no guarantee of administrative solvency.   Exercising their sound business judgment, the Restructuring Committee decided that the going-concern sale to Transform is the "higher or better" alternative to a mass liquidation.

8.      Unfortunately, at every stage, the Debtors have been met with unsupported allegations and opposition to any going-concern sale by the Creditors' Committee.  Almost immediately after its formation, the Creditors' Committee made its intentions crystal clear[5]—the Creditors' Committee and its advisors rallied for the immediate liquidation of the Debtors without due consideration of any alternatives.   In fact, within hours of hiring advisors, the Debtors' professionals met with the newly hired Creditors' Committee advisors and this intention was made clear.  Remarkably, the Creditors' Committee insisted blindly on a complete liquidation of the Debtors' businesses in just two weeks.   Creditors' Committee's Bidding Procedures Supp. Obj. ¶ 1.

9.      The Creditors' Committee approached these chapter 11 cases with a truly single-minded focus, to the benefit of certain of their members, such as its landlord members, but to the detriment of others—such as customers, vendors, and employees[6] that will benefit from a

---

[5]   *See Preliminary Objection of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al., to Debtors' Motion for Approval of Global Bidding Procedures* (ECF No. 640) (the "**Creditors' Committee's Objection the Global Bidding Procedures**").

[6]   The Committee has kept up the drum beat of liquidation, even suggesting in a letter that the Company commence a full-chain liquidation and distribute WARN Act notices to employees one week before Christmas.

going-concern sale rather than a liquidation.    Just ten days after the commencement of these cases, during the 2018 third quarter earning's call of Simon Property Group Incorporated ("**Simon**")—a clearly dominant member of the Creditors' Committee—David Simon, the Chairman and CEO of Simon, made his views clear: "Sears will no longer exist in 2019.  They will either be torn down, redeveloped, re-leased, but they'll be in our rearview mirror. . . . and, regarding Sears' bankruptcy . . . I think we'll make this – it'll be an opportunity for us . . ." (Simon Property Group's Chairman and CEO David E. Simon on Q3 2018 Results - Earnings Call Transcript (October 25, 2018)).

10.     Nevertheless, the Debtors have consulted with the Creditors' Committee, through its advisors, in a constant stream of open communication and transparency:  there were meetings and calls multiple times each week and, in certain periods, multiple times a day.  The Debtors shared their analyses regarding bids as well as an orderly winddown.  Unfortunately, the sharing of information has been largely one way.  Indeed, the Creditors' Committee did not share its winddown analysis until days before the Auction, which unfortunately, upon information and belief, was not completed until shortly before it was shared with the Debtors.  It was the only insight ever shared with the Debtors, and was underwhelming to say the least; largely in support for much of the Debtors' own analysis with a minor critique.

11.     Rhetoric and baseless allegations aside, the Creditors' Committee raises four main objections to the Sale Transaction:

- ▪ <u>First</u>, the Debtors' sale process—conducted in compliance with and pursuant to the Court-approved Global Asset Sale Procedures—was inadequate.

- ▪ <u>Second</u>, the Debtors failed to exercise their judgment in a manner to warrant Court approval under "entire fairness" standard.

6

- ▪ <u>Third</u>, the Sale Transaction provides inadequate consideration for the unencumbered assets and the Credit Bid Release and will guarantee that the Debtors will be administratively insolvent.

- ▪ <u>Fourth</u>, the Buyer has not provided adequate assurance of future performance.

12.    None of the Creditors' Committee's arguments are supported by the underlying facts in these chapter 11 cases or the law, and the Court should overrule all such objections:

- ▪ <u>First</u>, as detailed in section I.A. and I.B. herein and in the Aebersold Declaration, the Debtors ran a thorough, competitive, and highly public process under the framework of the Court-approved Global Bidding Procedures, with the advice and assistance of competent and highly qualified advisors. Specifically, the process was led by Lazard, a highly respected and reputable investment bank, that regularly undertakes large sales processes in complex, chapter 11 cases. Hundreds of parties were contacted and given opportunities to participate; the sale process gave equal opportunity and notice to all parties in interest and was not biased towards any particular bidder.

- ▪ <u>Second</u>, the appropriate standard of review is business judgment. The Debtors formed the independent Restructuring Committee and delegated complete authority to the Restructuring Committee to approve or reject any bid or proposal received and to negotiate terms on behalf of the Debtors. The directors on the Restructuring Committee do not have any connection to—let alone any conflict with—ESL. The Restructuring Committee has exercised proper business judgment in deciding to pursue the Sale Transaction. Nonetheless, the Sale Transaction also satisfies the entire fairness standard.

- ▪ <u>Third</u>, the Sale Transaction is an integrated transaction that provides sufficient and fair consideration for all Acquired Assets and the Credit Bid Release—as negotiated and determined by the Debtors' independent Subcommittee. Contrary to the Creditors' Committee's statements, the Sale Transaction does not guarantee administrative insolvency. But, critically, there is no legal requirement to prove administrative solvency as a precondition to a sale under section 363 of the Bankruptcy Code, although administrative solvency very much remains the Debtors' goal as they have stated from the outset of these cases. To be clear, the Debtors believe there is a reasonable probability that the Debtors will remain administratively solvent following the Sale Transaction. Among other things, the Creditors' Committee ignores that the current administrative solvency analysis does not include any recoveries on account of preserved

7

litigation, which the Creditors' Committee estimates to be worth hundreds of millions of dollars. Creditors' Committee's Obj. ¶ 136. Further, the Creditors' Committee ignores the risks surrounding an orderly winddown; the fact that an orderly winddown does not guarantee administrative solvency and the fact that the Sale Transaction does not guarantee administrative insolvency.

▪ <u>Fourth</u>, the Creditors' Committee confuses the standard for adequate assurance. Transform's business plan provides adequate assurance of future performance, as is required. Adequate assurance does <u>not</u> mean absolute assurance or guaranteed performance. While the Creditors' Committee can challenge certain assumptions in Transform's business plan (which is not surprising, as any assumption in any business plan can be challenged), it cannot be ignored that sophisticated third party financial institutions have committed more than a billion dollars in support of Transform. Such decisions are not made lightly.[7]

13.     Parties in interest have also filed objections ("**Cure Cost Objections**) to the cure amounts as set forth in the assumption and assignment notices.[8] The Debtors do not intend to proceed with any Cure Cost Objections at the February 4, 2019 hearing. In advance of the February 4, 2019 hearing, the Debtors and Transform will file a list of Initial Assigned Agreements as an exhibit to the Revised Proposed Sale Order. ESL will reserve the disputed cure amounts relating to unresolved Cure Cost Objections pertaining to the Initial Assigned Agreements. As set forth in section 2.3 of the Asset Purchase Agreement, all Cure Costs will be borne by the Buyer. Thus, the Cure Cost Objections are not a barrier to approval of the Sale Transaction.

14.     The Debtors are also not proceeding with any Objections to assumption and assignment as to contracts or leases that have not yet been designated for assumption and

---

[7]  It must also be noted that the Creditors' Committee has detracted focus from the issues at hand and filed three separate and substantial objections (almost 600 pages in the aggregate) ahead of a summary proceeding—all of which has burdened these chapter 11 cases unnecessarily. *See In re Orion Pictures*, 4 F.3d 1095, 1099 (2d Cir. 1993). The Creditors' Committee also sought nine depositions from the Debtors and two additional depositions from the Subcommittee and three depositions from ESL in opposition to the Sale Transaction, ultimately agreeing to take a total of ten depositions.

[8]  *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* at 8-342 (ECF No. 1731).

assignment, including Cure Cost Objections (the "**Adjourned Assumption and Assignment Objections**").  As provided in the Revised Proposed Sale Order, all parties' rights asserted in filed Adjourned Assumption and Assignment Objections are preserved.  *See* Revised Proposed Sale Order ¶¶ 3, 31, 36. The Revised Proposed Sale:

- The Debtors will provide notice of any proposed assumption and assignment of any Additional Contracts or Designatable Lease as and when such contracts or leases are designated by the Buyer in accordance with the Asset Purchase Agreement and an opportunity to be heard.  All applicable Adjourned Assumption and Assignment Objectives will automatically be carried to such future certain dates and all parties' rights shall be preserved.

- If the Adjourned Assumption and Assignment Objection cannot be resolved by the parties, the Debtors may: (a) assume the Contract or Lease prior to the resolution of Adjourned Assumption and Assignment Objection, provided that the Buyer shall (i) pay to the applicable counterparty the undisputed portion of the Cure Cost within five (5) business days after the entry of the Revised Proposed Sale Order, and (ii) reserve cash in an amount sufficient to pay the disputed portion of the Cure Cost asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty, the Buyer, and the Debtors); or (ii) adjourn the request to assume the Contract or Lease pending resolution of the Adjourned Assumption and Assignment Objection.

- Parties may also raise adequate assurance issues and any other issues and relevant objections to assumption and assignment that have been reserved at such time.

- To the extent a Contract or Lease is assigned to a third party, the applicable Counterparty will receive appropriate notice and a new opportunity to object to the assumption and assignment (but not cure) at that time.

*See* Revised Proposed Sale Order ¶¶ 3, 31, 36.

15.    In support of their request for approval of the Sale Transaction, the Debtors will rely on the following declarations, each dated and filed contemporaneously herewith:

- The Declaration of Brandon Aebersold, Managing Director at Lazard Frères & Co. LLC, the Debtors' investment banker (the "**Aebersold Declaration**");

- The Declaration of Mohsin Meghji, Debtors' Chief Restructuring Officer and Managing Partner at M-III Partners, LP, ("**M-III**"), the Debtors' financial advisor (the "**Meghji Declaration**");

- The Declaration of William Transier, director on the Debtors' Restructuring Committee and Subcommittee (the "**Transier Declaration**");

- The Declaration of Alan Carr, director on the Debtors' Restructuring Committee and Subcommittee (the "**Carr Declaration**");

- The Declaration of Robert A. Riecker, Chief Financial Officer and member of the Office of the Chief Executive's Office (the "**Riecker Sale Declaration**");

- The Declaration of Michael Welch, Head of Valuation and Advisory Services at Jones Lang LaSalle Americas, Inc. and JLL Valuation & Advisors Services, LLC, the Debtors real estate advisor (the "**Welch Declaration**");

- The Declaration of Kunal S. Kamlani, President at ESL Investments, Inc. (the "**Kamlani Declaration**"); and

- The Declaration of Sunny Singh, Partner at Weil, Gotshal, Manges LLP, the Debtors' restructuring counsel (the "**Singh Declaration**").

16.     For these reasons, as more fully set forth herein, the Sale Transaction is in the best interest of the Debtors and their stakeholders and constitutes an exercise of sound business judgment.  Upon the consummation of the Sale Transaction, the Debtors will have accomplished a reorganization of the Debtors' businesses, satisfied many of the claims against the Debtors, and will be ready to embark on plan negotiations—the next crucial stage of these cases.  The Debtors are eager to move forward with this next phase and fulfill the very purpose of a chapter 11 case: proposing a confirmable chapter 11 plan based on adequate information that maximizes value and that is fair and equitable to all of the Debtors' economic stakeholders.

# BACKGROUND

I.    **General Background**

A.    **History of the Global Sale Process**

17.    Prior to the Commencement Date, acutely aware that maintaining complete independence from insiders and affiliates would be essential to conducting a successful restructuring, the  board of directors (the "**Board**") formed a special committee (the "**Restructuring Committee**") composed solely of independent directors—Alan Carr, Paul DePodesta, Ann Reese, and William Transier—to oversee the Debtors' restructuring.  Two of the members of the Restructuring Committee, Ann Reese and Paul DePodesta, were longstanding independent members of the Sears Board and provided the Restructuring Committee with the benefit of their knowledge about the Debtors' businesses.   And throughout these chapter 11 cases, the Restructuring Committee and its advisors explored a broad array of strategic alternatives and options, including a possible sale, recapitalization, reorganization, or orderly winddown of all or substantially all of the Debtors' businesses (the "**Sale Process**" or "**Process**").  To effectuate the Sale Process, the Debtors obtained approval of global bidding and sale procedures (the "**Global Bidding Procedures**") for the efficient marketing, auction and sale of substantially all of their assets (collectively, the "**Assets**").

i.    **Role of the Restructuring Committee and Subcommittee**

18.    The independent roles of the Restructuring Committee and Subcommittee cannot be overstated.  The Debtors intentionally delegated complete and absolute authority to the Restructuring Committee to, among other things, consider and evaluate various strategic alternatives available to the Debtors that may involve an affiliated party.  And given that ESL, as the Debtors' largest creditor and shareholder, made its intention known to bid on the Debtors' assets, the Restructuring Committee was tasked with, and mandated to, supervise the Debtors'

chapter 11 cases on behalf of these estates. In particular, the Restructuring Committee was empowered to approve or reject any bid or proposal received and to negotiate terms on behalf of the Debtors. *See* Exhibit B-1. As the evidence will demonstrate, the Restructuring Committee has fulfilled its fiduciary duties in these cases. The Restructuring Committee has been incredibly involved in the Sale Process, meeting together with the Debtors' advisors over 50 times to discuss and deliberate at each and every step of the Process, including multiple in-person meetings and has met multiple times per day on several occasions. Transier Dec. ¶ 10.

19. The Board also established a subcommittee of the Restructuring Committee (the "**Subcommittee**"), comprised of Alan Carr and William Transier, specifically authorized to, among other things, investigate potential claims of the Debtors against ESL, and, with respect to a restructuring transaction, determine any insider's ability to credit bid and the Debtors' ability to provide releases in any such transaction. *See* Exhibit B-2. In particular, Alan Carr and William Transier, members of both the Restructuring Committee and Subcommittee, were present in-person for the five days of negotiations leading up to and through the Auction. *See* Transier Dec. ¶ 26. The Subcommittee retained separate advisors to investigate potential claims of the Debtors against ESL: Paul, Weiss, Rifkind, Wharton & Garrison LLP, Young Conaway Stargatt & Taylor, LLP, Alvarez & Marsal North America, LLC, and Evercore Group LLC.

20. Filed contemporaneously herewith is the *Restructuring Subcommittee's Response to the Objection of the Official Committee of Unsecured Creditors to the Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc.* (the "**Subcommittee Response**") the Subcommittee's reply brief in support of the Sale Transaction, responding to

among other things, the Creditors' Committee's allegations that the Credit Bid Release (as defined in the Revised Proposed Sale Order) was granted for inadequate consideration.

### ii.    The Global Bidding Procedures

21.    As of the Commencement Date, approximately 400 of the Debtors' stores were four-wall EBITDA positive, and the Debtors understood that a successful sale of these viable stores as a going concern could save the Sears and Kmart businesses and the jobs of tens of thousands of employees that depend on the continued operation of the Debtors' stores. However, the Debtors determined early on that: (i) the Debtors must continue to explore all available alternatives to seek the most value maximizing option; and (ii) to help finance the chapter 11 cases, maximize value, and, importantly, fund their hard-fought winddown reserve, the Debtors would need to market and sell certain of their non-core and unencumbered assets, such as the specialty businesses.  Importantly, at all times, the Debtors were aware that time was of the essence and they communicated that to all concerned, including communicating an aggressive timeline to conduct the sale process.  The chapter 11 cases had to progress with all deliberate speed to minimize the substantial operating losses that continued to decrease the value of the Debtors' estates.

22.    To explore value maximizing alternatives, the Debtors and the Restructuring Committee, led by Lazard, and other restructuring professionals including the Debtors' CRO and financial advisors, M-III, pursued a broad array of strategic alternatives and options within the framework of the Global Bidding Procedures, consistent with their objectives as communicated to the Court and parties early on in these cases.  The Restructuring Committee and its advisors assessed and discussed potential transactions, including sale transactions whereby all or substantially all of the Debtors' assets would be sold to an investor or buyer who would continue to operate the Debtors' businesses as a going concern, and alternatives whereby

individual businesses would be sold separately to multiple purchasers. Transier Dec. ¶ 16. The Restructuring Committee also assessed and discussed an analysis of a Debtor-run winddown of these chapter 11 estates.

23.    The Global Bidding Procedures were designed to provide the Debtors with flexibility to solicit proposals, negotiate transactions, hold auctions and consummate transactions for the highest or best value, all while protecting the due process rights of all interested parties and ensuring that there was a full and fair opportunity to review and consider proposed transactions carried out with the advice of the Debtors' advisors and in consultation with the DIP ABL Administrative Agent and Co-Collateral Agents (the "**DIP ABL Agents**") and the Creditors' Committee (together with the DIP ABL Agents, the "**Consultation Parties**"). After the entry of the Global Bidding Procedures Order[9], the Debtors, with the assistance of its advisors, commenced the Sale Process.

### iii.    The Sale Process

24.    On November 21, 2018, the Debtors filed a process letter identifying the Assets available for sale in connection with the global sale process (ECF No. 862) (the "**Global Sale Process Letter**"). Pursuant to the Global Bidding Procedures, the Debtors solicited going-concern and liquidation bids for a sale of the Debtors, including a list of 505 "go-forward" stores; that the Debtors, in consultation with the Restructuring Committee, had decided to market that would comprise the primary real-estate assets of the business that was being offered for sale (the "**Go-Forward Stores**") and bids for divisions of the Debtors' business (the "**Global Assets**"). The Sale Process, led by Lazard, was extensive, involving solicitations of interest from a diverse set of potential strategic and financial parties. Throughout these chapter 11 cases,

---

[9]    *See* Order Approving Global Bidding Procedures and Granting Related Relief ¶¶ 28-42, ECF No. 816 (the "**Global Bidding Procedures Order**").

Lazard contacted over 250 potential third party investors, approximately 128 of which executed non-disclosure agreements allowing them to receive confidential information about the Debtors' assets.  Aebsersold Dec. ¶ 15.  In addition, the Debtors' real estate advisor Jones Lang LaSalle Americas, Inc. ("**JLL**") contacted 842 prospective bidders for both core and non-core properties. In connection with this effort, JLL distributed a master list of the properties being offered for sale to these 842 prospective bidders, of which, 495 executed NDAs.  JLL undertook a number of significant outreach measures to solicit interest in the Debtors' real estate assets that were successful and resulted in signing of NDAs and submission of indications of interest for certain real estate assets.  *See* Meghji Dec. ¶ 27.

25.    Diligence for the Global Assets was extensive and thorough and included, among other efforts, (i) compiling in electronic data rooms over 17,000 documents concerning retail operations and associated assets, the Sears Home Services business—including the repair and warranty business, the Sears Home Improvements Products ("**SHIP**") business and the Parts Direct Business, Monark, Sears Auto Centers, the Kenmore® and DieHard® brands, taxes, labor, employment, real estate, and the Debtors' tort claims against certain credit card processors (the "**Credit Card Tort Claims**"); (ii) facilitating iterative discussions with the Debtors' management; (iii) responding to ongoing inquiries; (iv) hosting multiple site visits; and (v) coordinating extensive legal due diligence.

26.    Lazard provided potential purchasers with access to the extensive virtual data rooms, as well as confidential information memoranda ("**CIMs**"), which contained certain non-public information concerning certain of the Debtors' businesses.  Although the Debtors did not formally establish a bid deadline for the real estate assets, JLL distributed a separate process letter soliciting bids on the Debtors' various real estate assets to potential bidders (the "**Real**

**Estate Process Letter**"). Meghji Dec. ¶ 24. Both the Global Sale Process Letter and the Real Estate Process Letter were posted on Prime Clerk's website and publicly available. JLL included an expanded list of the real-estate assets being offered—all of the Debtors' real estate rather than just the Go-Forward Stores—in a separate filing at Prime Clerk. The Debtors and their advisors, including JLL, had decided to expand the list of real-estate assets originally offered by the Debtors in the Global Sale Process Letter in order to make the Sale Process for the real-estate assets more complete. The deadline to submit indications of interest for the Global Assets was December 5, 2018. The deadline to submit binding bids for the Global Assets and for indications of interest for real estate assets was December 28, 2018 (the "**Bid Deadline**").

27.     The Debtors received only one indication of interest for substantially all of the Global Assets from ESL on December 5, 2018. Eighteen other indications of interest were received for certain Assets, including advisory and agency proposals from liquidators and bids for the Credit Card Tort Claims. Aebersold Dec. ¶ 17.

28.     JLL and the Company utilized Intralinks as its virtual data-room site for the Real-Estate Sales Process. The Debtors and their advisors, including JLL, populated the Intralinks site with relevant information on the properties being offered, and the site was then made available to interested parties on or about December 7, 2018. Information uploaded to Intralinks included leases, title documentation where available, site plans where available, and property tax and common-area maintenance ("**CAM**") data. Parties who requested data room access were required to execute an NDA and provide a list of individuals seeking access. JLL and M-III administered the Intralinks data room and provided access to interested parties once approved. Meghji Dec. ¶ 26. Important to note, leases, by their nature, are not as liquid as fee-owned real estate. The existence of a large number of lease contracts would have limited the

16

number and the types of potential buyers and goes some way to explain why there may not have
been as many IOIs for the Company's real-estate assets as one might see under typical
circumstances. Meghji Dec. ¶ 35.

29.    On December 20, 2018, the Debtors and their advisors emailed a form
purchase agreement to prospective bidders for the Global Assets, which included form agency
agreements with potential liquidators. Around the same time, the Debtors shared form agency
agreements with potential liquidators and a form asset purchase agreement for the Credit Card
Tort Claims with bidders interested in that transaction.  Throughout the Process, Lazard, Weil,
M-III, and the Debtors' management worked closely to coordinate diligence so that Prospective
Bidders could receive adequate information to formulate their bids.  The Debtors and their
advisors responded to several hundred diligence inquires and held over 40 diligence calls and
meetings with Prospective Bidders and their advisors (approximately half of which included
relevant members of the Debtors' management), and held management presentations (that were
preceded by numerous preparatory sessions and in-person rehearsals).  Aebsersold Dec. ¶ 18.
All the while, the Debtors and their advisors continued to work to determine the most effective
plan for maximizing the Debtors' assets and reducing creditors' exposure, including by
developing analyses that compared ESL's proposal to a potential winddown of the business.

30.    Throughout this period, the advisors for the Debtors and Restructuring
Committee regularly consulted with key constituencies, including advisors to the Consultation
Parties.  Transier Dec. ¶ 18.  In multiple formal meetings and numerous other informal
discussions with Creditors' Committee representatives, the Debtors outlined their marketing
strategy, shared indications of interest and binding bids, facilitated in-person meetings with
management, and gave the Consultation Parties the opportunity to review and comment on

proposed purchase agreements of Prospective Bidders. In particular, professionals for the Creditors' Committee were provided with access to the data rooms, multiple excel sheets tracking parties interest in the real estate assets, performed extensive due diligence, and reviewed and provided comments on sale documents. Specifically, the financial advisor to the Creditors' Committee made a number of suggestions and input regarding timing and tactics with respect to potential bidders of the Other Assets. Aebersold Dec. ¶ 42.

31.    As the Creditors' Committee's acknowledges, the Other Assets, components of which are unencumbered, are not simple to market. Creditors Committee's Obj. section IV.A. A key reason is because, for the most part they are not fully-functioning stand-alone businesses, but rather all depend in part on the Sears retail platform for revenue (including because, for example, they do not have stand-alone financials or supply agreements, rely on platform-wide intellectual property, or in some cases, are physically connected to Sears retail stores). Accordingly, significant time and resources were dedicated to market those assets. Aebersold Dec. ¶¶ 42-49.

32.    Further, to state the obvious, the Sale Process was public and court-supervised. All parties in interest following these chapter 11 cases were acutely aware of the process and, at minimum, sophisticated parties would know to contact the Debtors or their advisors for any necessary clarity. The Debtors were clear that the process would be expedited in light of the administrative cost, and parties in interest could not wait for the ESL bids to "play out" before sending in their best and final offers. As the evidence will demonstrate, the Sale Process was appropriately thorough and efficient under the realities and circumstances of these cases.

#### iv.    Bids Received by the December 28th Bid Deadline

33.    The only bid received by the Bid Deadline for substantially all of the Debtors' assets as a going concern was from ESL, which was a binding bid for a go-forward retail footprint of 425 stores and other assets and component businesses of the Debtors (including Sears Auto Centers, Shop Your Way, Monark, Innovel, Sears Home Services), material related contracts, and certain other assets (the "**December 28 ESL Bid**").    ESL also submitted an "alternative" bid for Innovel, Sears Home Services, Shop Your Way, certain IP, and certain real estate assets, which was to be considered by the Debtors against other "parts" bids if the Debtors did not deem the going concern ESL bid as a Qualified Bid.

34.    In total, the Debtors received seven (7) bids that the Debtors believed were potentially executable and informed by substantial purchaser due diligence Of those bids, five (5) proposed to purchase a going-concern business line or lines (the "**Other Assets**"), and two proposed to serve as liquidation agent (i.e., an equity bid) to the Debtors.    Separately, the Debtors' received four proposals to serve as advisors to liquidate the Debtors' retail stores.    In addition, the Debtors received approximately 440 non-binding indications of interest for various real estate assets, including for unencumbered leased and ground leased properties, unencumbered owned properties, and encumbered properties.    Meghji Dec. ¶ 33; *see also* Welch Dec. ¶¶ 26, 30 (describing limitations on marketability of real estate properties by a distressed seller).    Ultimately, in consultation with the Consultation Parties, the Debtors determined that none of the bids for discrete "parts" of the business or assets, even in the aggregate, came close to the value provided by ESL's going concern bid for the Company.

### B.    The Evolution of the December 28 ESL Bid and Sale Transaction

35.    The Debtors were acutely aware that the December 28 ESL Bid contained deficiencies including that the bid provided insufficient consideration to allow the Debtors to

maintain administrative solvency post-closing, provided minimal consideration for unencumbered assets, the financing supporting the bid was not fully committed, the bid provided for up to $30 million in expense reimbursement payable to ESL and the bid was conditional on, among other things: (i) confirmation of ESL's right to credit bid the secured debt in an amount described by ESL as $1.3 billion, (ii) a release of ESL and certain ESL-related parties from a broad range of claims including those arising out of transactions with the Debtors and other sellers under the Asset Purchase Agreement or the service of such ESL-related parties as officers or directors of the Debtors or the other sellers under the Asset Purchase Agreement or any of their affiliates, (iii) documented financing with Cyrus as a lender, and (iv) the consummation of ESL's debt financing and the receipt of the proceeds therefrom. The Restructuring Committee—after receiving advice from Weil, Lazard, M-III, and the Debtors' other advisors, who had engaged in extensive negotiations with ESL and its advisors to improve the December 28 ESL Bid—determined that the December 28 ESL Bid was <u>not</u> actionable, and declined to declare the bid as a "Qualified Bid" on the January 4 deadline for such announcement. Transier Dec. ¶ 22. An ESL-centered transaction was never a "sure thing."

36.     Over the course of the following weeks leading up the Auction, and including the three days of the Auction itself, the Debtors and ESL, with input from the Restructuring Committee, and in consultation with the Consultation Parties, engaged in many rounds of hard-fought, arm's length negotiations and made significant improvements to ESL's bid. *See* Aebersold Dec. ¶¶ 25-33.

        **i.      The January 9 ESL Bid**

37.     Following discussions with ESL and the Consultation Parties at the Bankruptcy Court on January 8, 2019, and subsequent consultation with members of the Restructuring Committee, the Debtors agreed that <u>if</u> ESL submitted a revised written bid

consistent with oral conversations with the Debtors and if ESL increased its deposit to $120 million within a day (of which $17.9 million was to be non-refundable if ESL was not determined to be the successful bidder at the Auction), the revised written bid would be permitted to proceed to the Auction with the understanding that ESL would need to improve the December 29 ESL Bid to be successful.

38.    On January 9, 2019, ESL funded the deposit by 4:00 pm (prevailing Eastern Time) and submitted a revised formal offer in a complete form by midnight that same day (the "**January 9 ESL Bid**").  As a result, ESL was permitted to participate in the Auction.

**ii.    The January 14 ESL Bid**

39.    In the days leading up to the Auction, the Debtors and their advisors engaged in continued discussions with advisors to ESL, including during in-person meetings at Weil's New York office on January 11, 2019 and January 13, 2019.

40.    As set forth in the Auction transcript, which is attached as Exhibit E to the Singh Declaration, the Auction began at Weil's New York offices on the morning of January 14, 2019 at 10:37 a.m. with ESL reading its bid into the record following preliminary statements from the Debtors.  In this bid, ESL made certain revisions to the January 9 ESL Bid, including, among other things, removing ESL's debt financing condition, agreeing to the forfeiture of the $120 million deposit amount for ESL's failure to obtain debt financing, and the assumption of certain liabilities as consideration for ESL's release in connection with the credit bid, the assumption of environmental liabilities and certain other changes to the draft asset purchase agreement (as so revised, the "**January 14 ESL Bid**").  *See* Transcript of January 14 Auction at 20:19-22:11.

41.    The Debtors also entered into the Auction record a summary of the Debtors' Winddown Recovery Analysis (as defined below) that provided expected recoveries for creditors during a twelve-month orderly liquidation commencing on January 14, 2019.[10]

42.    Throughout the first day of the Auction, the Debtors, the Restructuring Committee, and their advisors reviewed the outstanding, material obstacles preventing their acceptance of the January 14 ESL Bid in consultation with the Consultation Parties. The Debtors and the Restructuring Committee also evaluated the January 14 ESL Bid against the Debtors' Winddown Recovery Analysis and continued discussions with ESL and the Consultation Parties. In the evening on January 14, after presenting the necessary updates to the Creditors' Committee, the Debtors provided ESL with their "final ask," designed to address the Debtors' key concerns with the January 14 ESL Bid, which included (but were not limited to):  whether certain proposed conditions to closing the transaction could be met, whether the Debtors would be administratively solvent following the transaction.  Transier Dec. ¶ 28.

### iii.    The January 15 ESL Bid

43.    After receiving the Debtors' "final ask," ESL further revised its bid on the Auction record on the morning of January 15, 2019 (as so revised, the "**January 15 ESL Bid**"). The January 15 ESL Bid included a number of revisions, including, among other things: allowing the estates to have the benefit of any inventory and receivables in excess of the amounts required to be delivered at closing; accelerating the timing of payment of certain assumed obligations; removing the requirement that holders of protection agreements reaffirm their agreements; and eliminating a $30 million in expense reimbursement payable to ESL requirement.[11]

---

[10]    *Id.* at 22:19-27:5.

[11]    *See* Transcript of January 15 Auction at 45:5-47:13.

44.    After careful consideration, the Restructuring Committee unanimously agreed that the January 15 ESL Bid was still not a higher or otherwise better alternative to a winddown due to, among other things, risks that the ensuing transaction would not be executable and that the Debtors' estates could face administrative insolvency.  Transier Dec. ¶ 30.  This decision was the product of extensive discussions and analysis and not a decision easily made. At approximately 1:12 p.m. (prevailing Eastern Time) on the afternoon of January 15, 2019, the Debtors announced on the record of the Auction that the January 15 ESL Bid was not a successful bid, for the second time determining that the bid was not higher or better than the alternative.[12]  The Debtors stated onto the Auction record the various elements that remained open and deficient.

### iv.    The Revised January 15 ESL Bid

45.    Immediately following its announcement, the Debtors held a confidential chambers conference to update the Bankruptcy Court on the status of the Auction at approximately 2:00 p.m. (prevailing Eastern Time).  Following that chambers conference, the Debtors and ESL agreed to continue negotiations for the remainder of the day.  The Debtors, the Consultation Parties, and ESL were each aware of the costs associated with a lengthy auction. After many additional hours of negotiations with the Debtors and their advisors, shortly after midnight on January 16, 2019, ESL submitted another revised bid on the record of the Auction (the "**January 16 ESL Bid**").  The January 16 ESL Bid included substantial improvements, most notably providing that Transform would assume the entirety of the $350 million Junior DIP Facility, which represented a $120 million increase in "cash equivalent" consideration.  The January 16 ESL Bid also provided that Transform would assume an additional $23 million of liabilities and allowed the Debtors to keep approximately $19 million of sale and insurance

---

[12]    *Id.* at 50:23-51:5.

proceeds, which was partially offset by ESL's acquisition of the SHIP assets and assumption of the SHIP liabilities as detailed in the SHIP Asset Purchase Agreement (as defined below) (or the proceeds of such transaction in the event that it was not consummated) and ESL's acquisition of the Credit Card Tort Claims, among other things.  Additionally, as described in detail in the Subcommittee Response, ESL made significant changes to the release provisions included in the bid.

46.    After several further hours of consideration among the Restructuring Committee, Subcommittee, and the Debtors' advisors stretching into the early hours of January 16, the Debtors, in consultation with their advisors, and consistent with the Global Bidding Procedures, determined that the good-faith bid of ESL to purchase substantially all of the Debtors' assets, including certain of the Go-Forward Stores and other Assets and component businesses as a going concern, constituted the highest or otherwise best at the Auction (the "**Successful Bid**") and announced the same on the Auction record at approximately 3:05 am (prevailing Eastern Time).[13]  Transier Dec. ¶ 38.  The Debtors communicated the terms of the Successful Bid to the Consultation Parties and the advisors to the Creditors' Committee made clear their view was that the bid was not superior to the Debtors' professionals.

47.    In making this decision, the Debtors determined, in their business judgment, that the Successful Bid maximized value, minimized claims, preserved thousands of jobs, and adequately minimized the risk of administrative insolvency.  In determining that the Successful Bid provided a net benefit to the estates, the Debtors found that the bid: (i) provided reasonable and valuable consideration (including protection against potential tax exposures) in exchange for the assets being purchased; (ii)  had a high enough likelihood of being able to close on the proposed transaction and the timing of the same, to warrant the risks involved;

---

[13]    *See* Transcript of January 15 Auction at 76:20-77:5.

(iii) provided a greater recovery to creditors other than ESL than would a winddown of the Company;[14] (iv) provided sufficient liquidity for the new Sears post-acquisition; and, notably, (v) saved tens of thousands of jobs.  Transier Dec. ¶ 36-37.

>        v.        **Summary of the Successful Bid**

48.        To preserve their ability to quickly pivot to a non-ESL alternative option or to execute on an ESL-transaction as quickly as possible, the Debtors' advisors worked diligently to move both processes forward.  Reaping the rewards of such continued effort, the Debtors were able to quickly enter into the Asset Purchase Agreement with Transform, memorializing the terms of the Successful Bid on January 17, 2019, hours after the final decision was made by the Debtors' Restructuring Committee.

49.        At a high level, the Successful Bid involves the purchase of substantially all of the Assets of the Debtors and other Sellers party to the Asset Purchase Agreement, including, without limitation:[15]

- A go-forward retail footprint of approximately 425 Go-Forward Stores and certain other owned and leased real estate interests;

- Certain individual business lines, including, among others, businesses conducted at the retail stores detailed in the Asset Purchase Agreement, the "Sears Auto Centers" brand, the "PartsDirect" brand, the "ServiceLive" brand, the "Sears Home Services" brand, the "Wally" brand, the "Kenmore" and "Diehard" businesses, the "Monark Premium Appliance Co." brand, a home delivery and retail installation business, various websites, the "Shop Your Way" membership program, and the

---

[14]    A reorganization around a smaller business division of the Debtors was considered but the potential value attributable to an effort to preserve and utilize net operating losses or other tax attributes was recognized as speculative and significantly discounted when compared with the actual value presented by the Sale Transaction.

[15]    The summary of certain material terms of the Asset Purchase Agreement set forth herein does not contain all of the terms of the Asset Purchase Agreement and should not be used or relied upon as a substitute for the full terms and conditions set forth in the Asset Purchase Agreement.  The summary of the Asset Purchase Agreement contained herein is qualified in its entirety by the actual terms and conditions thereof.  To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

"Sears Home Improvement" brand (in certain circumstances only), and certain contracts and agreements related thereto;

▪ Certain inventory, receivables, equipment, and improvements;

▪ Subject to compliance with the Asset Purchase Agreement including obtaining the required Bermuda Monetary Authority approval, certain notes issued by KCD IP, LLC;

▪ All equity interests of SRC O.P. LLC owned by SRC Sparrow 2 LLC as Seller (subject to certain conditions);

▪ The Credit Card Tort Claims;

▪ Certain assets as described in the SHIP APA (in certain circumstances only); and

▪ Various other assets including, but not limited to, certain intellectual property, data, certain claims and causes of action, prepaid taxes and refunds, rights to books and records, plans, licenses and permits, certain prepaid expenses and other prepaid items, security deposits, insurance proceeds, actions and other rights, and any proceeds from the sale or other disposition of the collateral pledged to secure the applicable debt obligations with respect to certain credit bids.

50.    Pursuant to the Asset Purchase Agreement, ESL has agreed to commit approximately $5.2 billion in the form of cash and non-cash consideration, including without limitation the following:

▪ A cash payment of approximately $885 million;

▪ A credit bid pursuant to section 363(k) of the Bankruptcy Code of secured debt facilities totaling up to approximately $1.3 billion;

▪ The assumption of $621 million of senior indebtedness (including $350 million of the amounts owed under the Junior DIP Facility and up to $271 million of the Stand-Alone L/C Facility) into exit facilities, which is equivalent to cash; and

▪ The assumption of certain other of the Debtors' liabilities in the total amount of approximately $1.3 billion, including, among others:

▪ (i) certain liabilities for warranties and protection agreements or other services contracts (other than warranties relating to certain intellectual property) for the goods and services of Sellers sold or performed prior to

the closing, including any liabilities owed by Sears Re to any Seller in respect of reinsurance of such warranties and protection agreements;

▪ (ii) certain customer credits that relate to existing customer loyalty programs, including, Shop Your Way, and any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs issued by, on behalf of or in relation to Sellers since January 1, 2018;

▪ (iii) all cure costs solely with respect to the agreements that ESL is assuming pursuant to the Asset Purchase Agreement;

▪ (iv) up to $43 million of certain severance reimbursement obligations (which may be reduced in certain circumstances);

▪ (v) up to $139 million of liabilities under section 503(b)(9) of the Bankruptcy Code (which may be reduced in certain circumstances);

▪ (vi) up to $166 million in certain accounts payable (which may be reduced in certain circumstances);

▪ (vii) payables for ordered merchandise not yet received by the Debtors;

▪ (viii) certain property taxes;

▪ (ix) certain environmental liabilities, among other potential claims; and

▪ (x) certain mechanic's liens totaling approximately $3.75 million.

*See generally* Aebersold Dec. ¶ 37; *see also* Asset Purchase Agreement.

51. The Asset Purchase Agreement represents an integrated transaction that, in the Debtors' business judgment, after good faith negotiations, in the aggregate will maximize the value of the Debtors' estates and minimize claims.

**B.    ESL's Successful Bid Is Superior To a Controlled Winddown**

52. As further detailed in section II.D. herein, the Restructuring Committee ultimately determined, in its business judgment, that the terms of the Asset Purchase Agreement were the higher or otherwise better than a winddown of the Debtors' businesses for several reasons, including, among other things, the following:

- The Asset Purchase Agreement will provide greater recoveries for the Debtors' estates and creditors than would be provided by any other practically available alternative, including, specifically, a liquidation (because, inter alia, the claims pool would be significantly higher in a winddown scenario and the recoveries in that scenario were uncertain);

- The winddown scenario does not guarantee administrative solvency;

- The terms of the Asset Purchase Agreement including the consideration for the Debtors' Assets, constitute the best terms presently available for the Debtors Assets;

- Potentially viable litigation claims against ESL were preserved; and

- A winddown or liquidation would have resulted in the loss of tens of thousands of jobs.

**C.    The Debtors Consulted Extensively With the Consultation Parties, Including the Creditors' Committee**

53.    The Creditors' Committee's Objection[16] alleges that throughout the Sale Process, the Creditors' Committee was insufficiently consulted.  Nothing could be further from the truth.  The Global Bidding Procedures provide that the Consultation Parties shall have "consultation rights" throughout the auction and sale process, including with respect to, among other things, extending the Bid Deadline and determining if a bidder is a "Qualified Bidder." The procedures also permit the Consultation Parties to attend auctions and require that all bids submitted to the Debtors be shared with the Consultation Parties.  Even though the Creditors' Committee made it unambiguous that its preference was a pivot to an orderly winddown on multiple occasions, the Debtors still made certain that throughout this Sale Process the Consultation Parties remained informed and consulted, as required by the Global Bidding Procedures Order.  The Debtors consulted extensively, but, consultation rights are <u>not</u> consent rights.  Indeed, at the hearing on November 15, 2018 for approval of the Global Bidding Procedures, despite the Committee's broad request for consent rights with respect to extension of

---

[16]    *See Obj. of the Official Committee of Unsecured Creditors to Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc.* (ECF No. 2042) (the "**Committee's Objection**").

the bid deadline and for inclusion of additional assets at the auction, the Bankruptcy Court denied consent rights and instead merely modified the Committee's consultation rights with respect to the Debtors' ability to change the Bid Deadline.    Hr'g Tr. 53:4-7, 61:7-13 (Nov. 15, 2018).

54.    The Sale Process was conducted pursuant to a Court approved process which bears on many facets of the Committee's objections.    In accordance with the Global Bidding Procedures, the Debtors conducted the Sale Process with the utmost transparency and consulted extensively with the Consultation Parties, and in particular with the Creditors' Committee.    The Debtors shared every bid received with the Consultation Parties and kept parties apprised of material updates, and expended considerable effort and focus to regularly update the Creditors' Committee advisors regarding the development of the Debtors' tax profile and the consequential implications as to potential emergence transactions during regular, bi-weekly phone calls (which at times increased to daily phone calls) with the Creditors' Committee advisors over the past several weeks, and regular calls with the DIP ABL Agents.    The Debtors also met with the Creditors' Committee advisors at not less than four (4) in-person meetings between December 11, 2018 and January 13, 2019 and many more informal meetings.    Two of these meetings, on January 8, 2019 and January 11, 2019, occurred immediately prior to the Auction and involved in-depth evaluations of ESL's bid and comparison to a winddown scenario.    Meghji Dec. ¶ 51.    The Debtors and their advisors shared the Winddown Recovery Analysis with the Creditors' Committee on December 3, 2018, and continually shared updated versions of the analysis all the way up to and throughout the Auction.    In addition, M-III had multiple "advisor to advisor" conversations (in addition to frequent calls on an ad hoc basis), including multiple in-person meetings, with the Committees' financial advisors, walking them

29

through the Debtors' Winddown Recovery Analysis step by step.  *Id*.  Further, the Creditors' Committee's advisors met directly with ESL's financial advisors to walk through ESL's analysis of the transaction.  The Committee's advisors were also present in-person for all three days of the Auction, and were present at every chambers conference and public status conference.  As set forth in the Carr Declaration, the Subcommittee and its counsel coordinated closely with the Creditors' Committee in conducting its investigation and the Subcommittee's counsel discussed in detail with the Creditors' Committees' counsel its view about potential estate claims, including claims being released under the proposed transaction.  Carr Dec. ¶ 19.  Throughout the Auction and Sale Process generally, the Debtors kept the Consultation Parties apprised of the key negotiations and any changes in the terms of the ESL bids and the Debtors' professionals were available to discuss specific changes where necessary.

55.    The Debtors continually provided the Creditors' Committee with various analyses used to evaluate their options, including the Winddown Recovery Analysis, described above, and also analyses of a potential going-concern path, possible creditor recovery scenarios, and winddown budgets.  Conversely, although the Debtors repeatedly requested that the Creditors' Committee provide the Debtors with any analysis that disagreed with the Debtors' conclusions to pursue a going concern path, the very first time such an analysis was shared with the Debtors was on January 11, 2019, more than two months after the Committee accused the Debtors of not having done such an important analysis and only three days prior to the commencement of the Auction.  Clearly, the Creditors' Committee maintained a liquidation prejudice without giving thoughtful analysis and consideration to a going-concern sale of the Debtors, but importantly, they did not appear to have a completed winddown analysis, or at least, it was not shared with the Debtors until just a few days before the Auction. Meghji Dec. ¶ 51.

Of course, the Debtors were not required to adopt the Creditors' Committee's views to have sufficiently consulted with the Creditors' Committee.  If the Debtors ever made a decision without formally presenting it to the Creditors' Committee first, they were acutely aware of the Creditors' Committee's views on the subject due to their extensive consultation with the Committee in general, and through the numerous letters the Committee sent to the Debtors regarding the ESL bids.

## RESPONSE

**I.      The Asset Purchase Agreement and the Transactions Thereunder Should be Approved**

       **A.      The Sale Hearing Is a Summary Proceeding**

       56.      A motion to sell a debtor's assets pursuant to section 363(b) of the Bankruptcy Code is, "at its core, a summary proceeding." *In re Grubb & Ellis Co.*, No. 12-10685 MG, 2012 WL 1036071, at *4 n.4 (Bankr. S.D.N.Y. Mar. 27, 2012), (internal quotation marks omitted) *aff'd*, 523 B.R. 423 (S.D.N.Y. 2014).  Summary proceedings are "limited" in nature, and cannot be substituted for lengthy evidentiary trials.  *See In re Delphi Corp.*, No. 05-44481(RDD), 2009 WL 637315, at *7 (Bankr. S.D.N.Y. Mar. 10, 2009), *reh'g denied and opinion modified*, No. 05-44481(RDD), 2009 WL 637259 (Bankr. S.D.N.Y. Mar. 11, 2009).  In *Orion Pictures*, the Second Circuit noted that a summary proceeding is "intended to efficiently review the trustee's or debtor's decision . . . in the course of the swift administration of the bankruptcy estate," where a bankruptcy court "sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession," and not as the "arbiter of disputes between creditors and the estate." 4 F.3d at 1098-99.  Put simply, a summary proceeding is "not the time or place for prolonged discovery or a lengthy trial with disputed issues." *Id.*

57.     Courts in this Circuit, including this Court,[17] have similarly held that bankruptcy courts cannot make any final determination as to substantive rights in a summary proceeding, even though bifurcating the summary proceedings and further proceedings to finally resolve the underlying disputed issues is an "inefficient use of judicial and private resources" and "it would have been far preferable for the Court to hear the two together."  *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 73, 79-80 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 F. App'x 64 (2d Cir. 2018); *see also In re The Great Atl. & Pac. Tea Co.*, 544 B.R. 43, 45, 50 (Bankr. S.D.N.Y. 2016) (holding that *Orion Pictures* precluded the court from deciding in a summary proceeding the application of New York's voluntary surrender doctrine to the continued possession issue); *Delphi Corp. v. Appaloosa Mgmt. LP (In re Delphi Corp.)*, No. 05-44481(RDD), 2008 WL 3486615, at *14 (Bankr. S.D.N.Y. Aug. 11, 2008) (holding that a summary proceeding decided the debtor's exercise of its business judgment, as opposed to whether the debtor "actually had the right to hold the Investors to the earlier form of the EPCA and what [the debtor's] rights would be in connection therewith"), *modified*, 2008 WL 5155561 (Bankr. S.D.N.Y. Nov. 7, 2008), *and on reargument*, 2008 WL 5146952 (Bankr. S.D.N.Y. Nov. 19, 2008).

58.     Summary proceedings are designed to permit the efficient review of, among other things, a debtor's decision to sell a debtor's assets pursuant to section 363(b), as part of the "swift" administration of the debtor's estate—the exact circumstances in which we find ourselves now.  Time is of the <u>essence</u> as the Debtors work diligently toward an anticipated

---

[17]    This Court has also followed the *In re Orion Pictures* holding in other contexts in the chapter 11 cases, including a motion for relief from the automatic stay.  *See* Hr'g Tr. at 48, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. 2019), ECF No. 1727 ("So, look, this is a summary proceeding. I'm not prepared or authorized to determine, in that context, whether this is -- this arrangement, which may include the party's course of dealing with each other too, which I have no evidence on, is one that creates and maintains a trust, or not. And that's something that needs to be decided in a proper procedural context.  That's what the Second Circuit said in *Orion Pictures* and I said in *A&P* and Judge Chapman said in *Sabine*.").

Closing Date of February 8, 2019.  And the Debtors, for their part, as further detailed herein, believe the Sale Transaction is the best path forward for these chapter 11 cases and to the ultimate benefit of all creditors.

**B.     The Sale Transaction Is Subject to the Business Judgement Standard, Is a Valid Exercise of the Debtors' Business Judgment, and Is Warranted Under the Circumstances**

59.     Section 363 provides, in relevant part "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ."  11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor.  *See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp).*, 973 F.2d 141, 143, 145 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (emphasizing the business judgment standard).  Although the determination of what constitutes a sufficient business reason depends on the facts and circumstances of each case, a debtor often satisfies the business judgment standard if "the directors of [the] corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).  Courts should not generally interfere with business decisions "absent a showing of bad faith, self-interest, or gross negligence." *Id*.

60.     To enjoy the business judgment rule's protection from judicial second-guessing, the debtor needs to show the following elements are present in a sale: (i) a business

decision; (ii) disinterestedness; (iii) due care; (iv) good faith; and (v) no abuse of discretion or waste of corporate assets. *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010). Moreover, rebutting the business judgment is a difficult burden by the challenging party, as the burden to rebut the business judgment is by a preponderance of evidence. *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC),* 420 B.R. 112, 146-47 (Bankr. S.D.N.Y. 2009), *aff'd as modified sub nom. Geltzer v. Bay Harbour Mgmt LC (In re BH S & B Holdings LLC)*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *see In re Countrywide Corp. S'holders Litig.*, No. 3464–VCN, 2009 WL 846019, at *9 (Del. Ch. Mar. 31, 2009) (referring to the business judgment rule as an "almost impenetrable barrier").  Further bankruptcy courts have applied the business judgment standard to transactions involving insiders, including in *In re Residential Capital, LLC*, described below.  In applying the business judgment standard, courts have pointed to the presence of an independent advisor approving the transaction. *See, e.g. In re Genco Shipping & Trading Limited*, 509 B.R. 455, 466 (Bankr. S.D.N.Y. 2014) (finding that the debtors were "clearly making their own decisions through an independent board of directors," distinguishing *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997)*,* which involved "obvious instances of self-dealing," and approving a termination fee under section 363 of the Bankruptcy Code as a reasonable exercise of the debtors' business judgment).

61.    Contrary to the Creditors' Committee's assertion, the entire fairness standard does not apply simply because an insider is involved in the transaction.  Where the transaction is negotiated or supervised by an independent fiduciary, such as the Restructuring Committee, the business judgement standard continues to apply.  For example, *In re Residential Capital, LLC*, the Bankruptcy Court for the Southern District of New York applied the business judgment standard to approve the debtors' motion to enter into a plan support agreement (the

"**PSA**") with an insider which was the indirect parent of the debtors. No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013).  There, the Court overruled an objection that the entire fairness doctrine should be invoked because the insider sat on "both sides of the transaction, as a creditor and the major beneficiary of the PSA [where the PSA sought to release the insider from its own liability]." *Id*. at *14.  Specifically, the court found that the debtors did not violate their duty, since the debtors were represented by a chief restructuring officer, who was an "unconflicted fiduciary . . . not beholden to [the insider]," the PSA resulted from a "months-long, Court-supervised mediation involving [the active participation of] numerous parties," and it contained "numerous proposed compromises and settlements of billions of dollars of claims" as well as a $2.1 billion contribution from the insider to the estates.  *Id*. at *19.  Accordingly, the court concluded that the negotiations were conducted in good faith, and the business judgment standard was "appropriately applied." *Id*.

62.    Here, similar to *Res Cap*, the Debtors conducted a Sale Process pursuant to the Court approved Global Bidding Procedures.  The Debtors solicited bids, provided diligence, and ultimately ran an Auction, all in accordance of the rules as set forth therein.  Per the Global Bidding Procedures, the Auction was set to determine a "Successful Bid" and in order to do so, per the Auction Procedures, the Debtors were to "determine, consistent with these Global Bidding Procedures, which Qualified Bids constitute the highest or best Qualified Bids." Global Bidding Procedures Order VIII.C.I.  Also, per the Auction Rules, as provided to each Auction attendee, the Auction would continue "until such time as the highest or otherwise best bid or alternative is determined in the business judgment of the Debtors."  Singh Dec. Ex. A ¶ 8(f).  Needless to say, the process, the Debtors' operating standard, and the rules of the road were clear, public, and Court-approved.  Also paralleling *Res Cap*, the Debtors appointed an

independent Chief Restructuring Officer, an independent Restructuring Committee, and an independent Subcommittee, all active participants in the Sale Process.  It follows that the Debtors similarly should be found to have conducted in good faith and the business judgment is appropriately applied.

63.     Even if the heightened scrutiny standard is applicable, "sales to fiduciaries in chapter 11 cases are not per se prohibited," *Bidermann*, 203 B.R. at 551 (emphasis omitted). In applying heightened scrutiny, courts are "concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. at 231.  Importantly, "[t]he integrity of the sale is the issue to be addressed—not any general past conduct of a bidder in relation to other matters." *C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.)*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (emphasis omitted); *see also Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, 272 B.R. 74, 100–01 (Bankr. S.D.N.Y. 2002) (noting that creditors' committee membership did not automatically preclude participation in auction as insider and that to "insure the integrity of the sale and [demonstrate] that the [c]ommittee member [had] not breached his fiduciary duty," it must be shown that the member did "not use his position to advance his personal interest at the expense of the creditor class").

ii.     **The Restructuring Committee and the Subcommittee are Both Independent**

64.     As stated above, in October 2018, the independent Restructuring Committee was formed and constituted with four undeniably independent directors: Ms. Ann Reese, a historically independent director of Sears Holdings Corp., Mr. Paul DePodesta, another historically independent director of Sears Holdings Corp., Mr. William

Transier, a new independent director, and Mr. Alan Carr, also a new independent director with substantial restructuring experience. None of the members of the Subcommittee had any ties or other preexisting relationships with Edward S. Lampert or ESL. Transier Dec. ¶ 7; Carr Dec. ¶ 5. The Restructuring Committee was specifically mandated to oversee the Debtors' restructuring process and delegated the full decision-making authority with respect to transactions involving ESL. Transier Dec. ¶ 8. Further, in early October 2018, the Subcommittee was formed. Transier Dec. ¶ 9. The Subcommittee was tasked with a more targeted mandate—to specifically review affiliate transactions that were consummated prior to the Commencement Date and to evaluate whether there were any viable causes of action with respect to such transactions. Carr Dec. ¶¶ 7-8.

65.     Pursuant to their respective corporate mandates, the independent Restructuring Committee, upon the advice of the Debtors' professionals, made the decision to pursue the Sale Transaction, and the Subcommittee negotiated the Credit Bid Release as set forth in section 9.13 of the Asset Purchase Agreement. Carr Dec. ¶ 23. The Restructuring Committee's decision was a result of independent review of the Sale Transaction and a comparison against all other available alternatives. Similarly, the Subcommittee not only conducted its own independent review of the Credit Bid Release component of the Sale Transaction, but also relied on its independent set of advisors—which allowed for discussions one-step further removed from the Sears Holdings Corp.'s board of directors. Carr Dec. ¶¶ 9-17.

66.     To show a lack of good faith by directors for purposes of rebutting the business judgment presumption, the challenging party must show that the directors acted with a motive to harm, or with indifference to harm, *i.e.*, that "disinterested directors were intentionally disregarding their duties, or that the decision . . . is so far beyond the bounds of reasonable

judgment that it seems essentially inexplicable on any ground other than bad faith." *In re Chelsea Therapeutics Int'l Ltd. Stockholders Litig.*, No. 9640-VCG, 2016 WL 3044721, at *7 (Del. Ch. May 20, 2016) (internal quotation marks omitted); *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti,* No. 9714–VCG, 2015 WL 2270673, at *27 (Del. Ch. May 8, 2015), *aff'd,* 132 A.3d 748 (Del. 2016) (unpublished table decision); *In re BH S & B Holdings LLC*, 420 B.R. at 147 ("[I]n order for the court to apply an entire fairness standard of review, the plaintiff must show that a majority of the directors were either self-interested or dominated by an interested party, or the only explanation for their conduct is bad faith.") (internal quotation marks omitted).  In fact, a showing of "bad faith" requires more than a showing of "a questionable or debatable decision." *Ironworkers*, 2015 WL 2270673, at *27; *see also BH S & B Holdings LLC*, 420 B.R. at 147 ("Bad faith . . . is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.") (internal quotation marks omitted).  This is a heavy burden that has obviously not been met here.

67.    Despite the foregoing, the Creditors' Committee attempts to shift its burden by arguing that the law is "well-settled" that an insider transaction cannot be approved unless it is found to be "inherent[ly] [fair]" to interested parties.  Creditors' Committee's Obj. ¶ 82.  Yet none of the cases that the Creditors' Committee cites for its proposition involves a court disapproving a transaction where the debtors had an independent committee overseeing the transaction.

68.    For the avoidance of doubt, the Restructuring Committee regularly participated on calls upwards of three times a week with management and advisors regarding the

chapter 11 cases. And beginning in late December, the Restructuring Committee intensified their meeting schedule and met numerous times either in-person or telephonically, many times through the weekend. Transier Dec. ¶ 10. During the Auction and as negotiations with ESL escalated regarding the Sale Transaction, the Restructuring Committee convened meetings multiple times a day, while maintaining a constant discussion with their advisors. The record will show that throughout the Sale Process, the Restructuring Committee remained informed, maintained regular discourse with management and the Debtors' advisors, and analyzed all available options. Moreover, throughout these chapter 11 cases, the Restructuring Committee has remained wholly independent, as clearly demonstrated by its decision to reject ESL's bid twice during the Sale Process. Transier Dec. ¶¶ 21-31. The Subcommittee, also with regularity, convened Subcommittee-only meetings with their independent set of advisors, analyzed the circumstances at hand, and ultimately negotiated the Credit Bid Release. Carr Dec. ¶ 17.

> ### iii.    Even if the Entire Fairness Standard Applies, the Sale Transaction, When Compared to a Winddown, Satisfies the Standard

69.    The record will reflect that the Restructuring Committee members' decisions satisfy the entire fairness standard. Under the entire fairness doctrine, "courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Residential Capital*, 2013 WL 3286198, at *19. Here, just as in *In re Residential Capital*, the Sale Transaction follows months of arm's length negotiations, reflects a public and transparent process, and represents a package of compromises and settlements. As stated above, the Debtors ran a fair and extensive process, beginning with the Global Bidding Procedures Order, and continued with multiple, simultaneous work streams. As the Debtors solicited interest for everything from

39

liquidation bids, to bids for parts of the Debtors' businesses, real estate bids, and going-concern bids, the Restructuring Committee continued to remain abreast of updates across all fronts, continually analyzing which avenue would provide the best or highest bid available to the Debtors.    The process culminated in the Auction, whereby the Restructuring Committee compared the orderly winddown scenario to ESL's going-concern bid—as all other bids, even when combined, did not offer value akin to ESL's bid (inclusive of the credit bid element). Transier Dec. ¶ 33-36.   Utilizing the competitive tension provided by the Auction, the Debtors were able to negotiate a more favorable Asset Purchase Agreement, and the Debtors believe the Purchase Price is fair and maximizes the value of the estates for the benefit of all stakeholders. The Sale Transaction also provides for a limited Credit Bid Release and preserves litigation claims against insiders for the benefit of the estates.   Therefore, undoubtedly, the Restructuring Committee's decision to enter into the Sale Transaction, even judged under the more stringent entire fairness standard, is entirely fair because it resulted from a fair process and resulted in a fair price.

> **iv.**     **The Sale Transaction Is In the Best Interests of the Debtors' Estates and Reflects a Sound Exercise of the Debtors' Business Judgment**

70.     Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Schools, Inc.),* No. 96 Civ. 3576 (PKL), 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997).   In the context of auctions, "the trustee or DIP is entitled to great judicial deference in deciding which bid to accept as the best and highest bid on the sale of the Debtor's assets; and although the trustee's or DIP's discretion is not without limit, the Court should not step in and assume a

role and responsibility properly placed by the Code in another's hands." *In re Grubb & Ellis Co.*,
2012 WL 1036071, at *4.

71.     A sound business purpose for the sale of the debtor's assets outside the
ordinary course of business exists where such sale is necessary to preserve the value of the estate
for the benefit of creditors and interest holders. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788
F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063.   Here, the Debtors have
demonstrated a sound business justification for the Sale Transaction.   The single-sale transaction
proposed by ESL for all or substantially all of the Debtors' businesses both maximizes value for
the Debtors and presents the best opportunity to preserve up to tens of thousands of jobs vital to
the communities in which those employees reside.   Like here, in *In re Chrysler LLC*, the debtors
sought approval of a sale of substantially all of the assets of the company when the "only other
alternative" was the "immediate liquidation of the company" which would "result in closing of
plants and layoffs, impacting suppliers, dealers, workers and retirees. . ." 405 B.R. 84, 96-97
(Bankr. S.D.N.Y. 2009).   The circumstances surrounding this sale are not in dispute.   The
Debtors cannot continue operating absent the Sale Transaction.   In approving the sale in
*Chrysler*, the court noted that the debtors maintained the integrity of the business a going
concern and "exercised their fiduciary duty by electing the only option available other than
piecemeal liquidation." *Id* at 97.   And this decision, this transaction, must be viewed without a
bias view on the ultimate buyer.   Certain parties in interest who object to the Sale Transaction,
unfairly taint the Sale Transaction without appropriately acknowledging that the Sale
Transaction is best for the estates now and in the future.   To reiterate, as of the date of this
response, the Debtors believe that the Sale Transaction will be successful and the Debtors will be
administratively solvent at closing.   Meghji Dec. ¶ 55.

72.    Other alternatives, including liquidation, would leave thousands of employees unemployed, thousands of customers without recourse for warranties or protection agreements or returns, countless construction projects interrupted, and would provide no additional benefit for creditors or these estates.  In the Creditors' Committee's Objection, the Creditors' Committee's objection to ESL's proofs of claim,[18] and the Creditors' Committee's standing papers,[19] the Creditors' Committee has reiterated the same message multiple times over: that the Credit Bid Release was not granted for adequate consideration and should not otherwise be allowed.  The Sale Transaction is a package deal and cannot be achieved without components as to which the Creditors' Committee does not agree.

### C.    Transform Can Demonstrate Adequate Assurance of Future Performance and the Assumption and Assignment of the Executory Contracts and Unexpired Leases Should be Approved

73.    Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under an executory contracts or unexpired leases of nonresidential real property that will be assumed must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors' proposed treatment of objections to their proposed cure amounts is described in paragraphs 13 – 14 herein.  Further, pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B).  Section 365(b)(3) of the Bankruptcy Code "imposes heightened restrictions on the assumption and assignment of

---

[18]    Prelim. Omnibus Obj. of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al., to the ESL Proofs of Claim ¶ 3, ECF No. 2025.

[19]    Mot. Of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al., for Entry of an Order Granting (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and (ii) Non-Exclusive Settlement Authority in Respect of Such Claims Ex. C, at 6, ECF No. 1765.

leases for shopping centers . . . to protect the rights of the lessors and the center's other tenants by requiring the DIP to provide additional adequate assurance," *In re Great Atl. & Pac. Tea Co.*, 472 B.R. 666, 676–77 (S.D.N.Y. 2012) (internal quotation marks and citations omitted).

74.    The meaning of adequate assurance of future performance depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).   Adequate protection "does not mean absolute insurance that the debtor will thrive and make a profit," and the "test is not one of guaranty but simply whether it ***appears*** that [underlying obligations] will be paid . . . ." *In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986) (emphasis added); *see also In re Great Atl. & Pac. Tea Co.*, 472 B.R. at 674–75 ("A debtor need not provide 'an absolute guarantee of performance'; rather, it must simply appear that the rent will be paid and other lease obligations met . . . .  The emphasis is on protection."); *In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 719 (Bankr. S.D.N.Y. 2011) ("A debtor need not prove that it 'will thrive and make a profit' but only that it appears that it will meet its obligations."); *In re Rock 49th Rest. Corp.*, No. 09-14557(ALG), 2010 WL 1418863, at *10 (Bankr. S.D.N.Y. Apr. 7, 2010) ("A debtor in possession need not prove that it will 'thrive or make a profit,' or provide 'an absolute guarantee of performance') (citations omitted); *In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986) ("No guarantee is required but the lessor must be given adequate assurance of future performance . . ."); *In re Beker Indus. Corp.*, 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) ("Adequate protection, not absolute protection, is the statutory standard."); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (holding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).   Assurance of future performance "is to be 'defined by commercial rather

than legal standards . . . .' [and the landlord] must exercise good faith and observe commercial standards . . ." *In re Sapolin Paints, Inc.*, 5 B.R. 412, 421 (Bankr. E.D.N.Y. 1980) (citation omitted).  There is also a strong Congressional policy "favoring assumption and assignment as a means of continuing performance and realizing value and thereby assisting the debtor in its rehabilitation or liquidation." *In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 829 (Bankr. S.D.N.Y. 1983).

75.     Demands for adequate assurance cannot be unreasonable and confer more than what the leases originally provide. *See In re M. Fine Lumber Co.*, 383 B.R. 565, 572–73 (Bankr. E.D.N.Y. 2008) ("Section 365 gives no indication that a landlord . . . is to improve its position upon the bankruptcy of a tenant."); *In re U. L. Radio Corp.*, 19 B.R. 537, 543 (Bankr. S.D.N.Y. 1982) ("Congress indicates that adequate assurance will give the landlord [only] the full benefit of his bargain."); *In re Lafayette Radio Elecs. Corp.*, 9 B.R. 993, 998 (Bankr. E.D.N.Y. 1981) ("The Bankruptcy Code requires only that the lessor be given the performance for which he has contracted . . . [and] cannot be granted any greater rights than what the lease provides.").  In making a determination on adequate assurance, courts are entrusted by Congress to "[take] into account whether the landlord's opposition to the assignment is based upon ***reason and . . . is not . . . arbitrary or capricious***." *Evelyn Byrnes, Inc.*, 32 B.R. at 829 (internal quotation marks omitted) (emphasis added).  For example, in *In re Sapolin Paints, Inc.*, where a landlord objected to a proposed assignment on the basis that the debtor and the assignee were unable to to satisfy an occupancy lease condition notwithstanding contrary market evidence, the court concluded that the "fear [was] not realistic" and the objection was an attempt by the landlord to "use the legislative concern that landlords be fully protected to bring about precisely the kind of windfall that the statute was intended to prevent." 5 B.R. at 421.

44

76.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See *In re Bygaph, Inc.*, 56 B.R. at 605-06 (holding that adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is whether rent will be paid).  For shopping centers, adequate assurance must also "be provided upon assumption of [the] lease that [the] lease's location, use, or exclusivity provisions, *inter alia*, will not be breached 'substantially' nor will any tenant mix or balance be disrupted 'substantially.'"  *In re Evelyn Byrnes, Inc.*, 32 B.R. at 830.

77.     In the Sale Transaction, the proposed assignee will be purchasing the Debtors' businesses, including shopping centers, as a going-concern.[20]  No tenant mix will be disrupted, the operating performance of the assignee shall be similar to the operating performance of the Debtors, and any percentage of rent due under the lease will not decline substantially.  In the event that the shopping center lease is assigned to a third party, the counterparty will be provided with sufficient notice and an opportunity to object.  Further, it is well known that ESL has extensive experience with the Debtors' businesses and is well versed in the Debtors' domestic and global operations.  For these reasons, the Debtors believe that the Buyer is ready, willing, and able to comply with the heightened requirements established by section 365(b)(3) of the Bankruptcy Code with respect to the assumption and assignment of the Debtors' shopping centers, to the extent applicable.

---

[20] The Debtors do not concede that any particular lease is for real property in a "shopping center," as such term is used in the Bankruptcy Code.

78.    As described herein, a non-exhaustive list of factors that substantiate the

Buyer's ability to provide sufficient assurance includes:

- The Company should emerge as a leaner, more profitable enterprise: the Transform business plan provides for a go-forward retail footprint of approximately 425 retail stores—approximately 400 of which are four-wall positive since 2013 and Transform expects them to continue on a positive trajectory thereafter;

- The Sale Transaction will simplify the Company's capital structure and reduce their debt load upon consummation: compared to the $11 billion of total prepetition liabilities and an immensely complex capital structure under eleven (11) separate facilities with seven (7) different agents or trustees, Transform will operate with a much simpler structure—a $850 million asset-based loan, $350 million Cyrus loan and a real estate loan, which will enable the management to focus on only one thing: returning the business to sustainable profitability;

- Indeed, the Buyer has put together a business plan which, among other things, has projected significant cost-savings initiatives across the Company, projecting a reduction in SG&A expenses to $656 million in 2019. And the Debtors are on the right track: by end of January 2019, a significantly reduced SG&A cost of $284 million in annualized savings—more than one-third of the goal—has already been achieved;

- The Buyer plans to continue to streamline the Company's operations through assortment optimization and improved inventory management, including better use of distribution center storage and favorable vender costs, which will generate additional liquidity for the Company;

- Sophisticated parties, including Bank of America and Cyrus vetted the Transform business plan before they agreed to roll over the DIP ABL Facility and a portion of the Junior DIP Facility, respectively, which evidences their favorable view of Transform's viability;

- The Debtors have consistently outperformed the DIP Budget, and the DIP balance is expected to be $850 million upon consummation of the Sale Transaction;

- The Transform business plan is substantively more conservative than the prepetition plans adopted by the Debtors that projected a rapid and dramatic turnaround; and

- Importantly, the Buyer—Transform—is established by ESL, a large, well-capitalized asset manager with substantial financial resources.

*See generally* Kamlani Dec.

46

79.     For the reasons set forth above, contract counterparties have received "adequate assurance of future performance" within the meaning of section 365(f) of the Bankruptcy Code.

**D.     The Sale Transaction Is Superior to the Winddown Alternative**

**i.     The Debtors' Winddown Analysis**

80.     To properly weigh the benefits and risks of the Sale Transaction, a high-level overview of the winddown the Debtors used in comparison, is provided in this section. To begin, the Debtors believe that in an orderly winddown scenario, these chapter 11 estates remain administratively solvent. The orderly winddown would be funded from: (1) the gross proceeds from GOB sales of merchandise inventory; (2) proceeds from the sale of previously unencumbered assets, applied in the following order: (a) $240 million to fund the wind-down reserve, (b) repayment of the Junior DIP in full, and (c) to pay remaining claims in the order of their priority; (3) the imposition of a 4% charge on encumbered assets sold throughout the case for illustrative purposes, with the exception of the first lien and prepetition ABL collateral and Junior DIP collateral due to Section 506(c) waivers granted to these lenders in their capacity as DIP lenders; and (4) any proceeds above lien value realized from sales of encumbered collateral. Meghji Dec. ¶ 16.  And as the analysis—submitted into the record at the Auction (the "**Winddown Recovery Analysis**")—shows, assuming a twelve-month orderly liquidation commencing on January 14, 2019, all administrative and other priority claims are projected to be paid in full.  Singh Dec. Ex. 2 to Ex. C. The forecasted bucket of administrative claims includes, among other things, the payment of store operating expenses, severance and/or WARN Act payments, merchandise accounts payable, and SG&A associated with an orderly winddown. Applying a waterfall, the Winddown Recovery Analysis also projects the payment in full of: the

DIP ABL Facility, the Junior DIP Facility, the FILO Term Loan Facility, and the Stand-Alone L/C Facility, with an aggregate of over $3 billion of recovery.[21]  And although not paid in full, the IP/Ground Lease Term Loan and the Prepetition Consolidated Loan recover approximately 69% and 52% of their respective claims.   Further, the section 507(b) claims, granted to Prepetition Second Lien Credit Parties for any Second Lien Diminution in Value (which would be litigated) are projected to recover approximately 41%.

ii.      **An Orderly Winddown Does Not Guarantee Administrative Solvency**

81.     The Winddown Recovery Analysis was created by the Debtors in conjunction with their experienced advisors, underwent multiple rounds of revisions, and continued to be refined.  As such, the Debtors feel confident in the reflected projections and the attendant demonstration of administrative solvency.  However, administrative solvency is not guaranteed.   The Winddown Recovery Analysis was built on a set of assumptions, and depending on the ultimate outcome of each assumption, the Debtors in a winddown scenario may or may not be administrative solvent.  Meghji Dec. ¶¶ 19-20.  For example, among other things:

- The Winddown Recovery Analysis assumes that administrative and other priority claims will be paid in the ordinary course during an orderly winddown;

- The values attributed to unencumbered assets, in particular real estate may vary;

- The assumed claim amounts are subject to material change and dispute, including a yet-to-be-set claims bar date; and

- The Winddown Recovery Analysis assumes a section 507(b) claim amount of approximately $331 million.  Applying a "middle of the road" approach in light of case law (including *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013)) the Debtors attributed a value that falls in the range between what ESL attributes (at a high end) and the value attributed to the section 507(b) claim by the Creditors' Committee (at the low end).

---

[21]    The Winddown Recovery Analysis assumes an outstanding Junior DIP Facility balance of $175 million.

82.    To expand on one of the above assumptions—the Debtors assume approximately $331 million of section 507(b) claims on behalf of Second Lien Diminution in Value.  The Debtors further assume that, as a practical matter, although claims arising under section 507(b) are entitled to superpriority administrative expense treatment, budgeted expenses and claims that enjoy the benefit of the Carve-Out would be paid ahead in time of the section 507(b) claims.  Although the Debtors believe this is a reasonable and defensible position, ESL and other second lien creditors have already voiced their opposition to these assumptions and have indicated that this issue would be heavily litigated in a winddown.  Should the section 507(b) claims be litigated, the Debtors would be at risk of not only a costly and protracted litigation, but also a materially increased section 507(b) claim.  Further, ESL and other second lien creditors would litigate the method and timing of payment of administrative and other priority claims "ahead" of the section 507(b) claims.  And although the Debtors' professionals harbor substantial doubt on the ability of ESL to successfully prosecute such section 507(b) claims in a winddown, if ESL were to prevail on these issues, the Debtors could quickly be faced with administrative insolvency.  This particular issue would be just one of several substantial risks associated with the winddown.

83.    Moreover, liquidations, generally, have additional attendant risks.  No matter how diligently an orderly winddown is planned, liquidations are inherently risky.  Negative media coverage can increase the cost of administering the liquidation and the Debtors may suffer from the consequence of fire sales.  Among other things, the flooding of the market with hundreds of real estate opportunities may drive down price, further reducing the estates' recoveries.  There are immeasurable risks that cannot perfectly be accounted for.  No certain result or administrative solvency can be guaranteed in a winddown.

84.    In section IV.B.3. of the Creditors' Committee's Objection, the Creditors' Committee states that the Debtors "failed to surcharge collateral." Creditors' Committee's Obj. ¶ 240. This is false. As the Creditors' Committee well knows of, the Court approved section 506(c) waivers to certain prepetition secured credit parties in their capacities as DIP Lenders. But to be clear, in the Windown Recovery Analysis, the Debtors clearly state "[t]he imposition of a 4% charge on encumbered assets sold throughout the case pursuant to 506(c) of the Bankruptcy code, with the exception of the first lien and prepetition ABL collateral (including non-insider portions of the FILO and Citi L/C), and Junior DIP collateral, due to the 506(c) waivers granted to these lenders solely in their capacity as DIP lenders." Singh Dec. Ex. 2 to Ex. C. p. 2. And pursuant to the Final DIP ABL Order, ESL was not afforded 506(c) waivers and the surcharge was appropriately applied in the analysis. The orderly winddown of the estates is not being carried on the shoulders of general unsecured creditors.

### iii.    The Debtors Appropriately Estimated Unencumbered Asset Recoveries in the Winddown Recovery Analysis

85.    The Debtors' reasonable estimate of the cash proceeds the Debtors could expect to recover from unencumbered real estate in the Winddown Recovery Analysis is appropriate and, indeed, more accurate and thorough than the analysis undertaken in the *Expert Report of Ronald F. Greenspan* (the "**Greenspan Report**") filed in support of the Creditors' Committee's Objection. M-III did not purport to provide the Restructuring Committee with a valuation of those unencumbered real-estate assets; rather, it provided what it believed was a reasonable amount of liquidation proceeds—specifically, $561 million, net of transaction costs— that the Debtors' estates could expect to recover from the sale of the Debtors' unencumbered real-estate assets of which a material portion (approximately 64%) would be recovered from the sale or assignment of the Debtor's lease portfolio by May 13, 2019 (the "**Outside Lease**

**Rejection Date**"). Meghji Dec. ¶ 48. The balance would be from the sale of fee-owned real estate over the course of 2019. In arriving at that amount, M-III considered: (1) buyer indications of interest ("**IOIs**") received in the course of the Debtors' real-estate marketing and sales process (the "**Real-Estate Sales Process**"), undertaken in connection with and parallel to the Sales Process; (2) twenty-four property appraisals performed by JLL in November 2018; (3) twenty-five broker opinions of value performed by A&G Realty Partners, LLC ("**A&G**") in October 2018; (4) 400 restricted form appraisals performed by JLL in December 2018 and January 2019; and (5) the results of the recent lease auction and sale in the Toys R Us wind-down and liquidation. Meghji Dec. ¶ 22.

86.    All as more fully set forth in the Meghji declaration, the JLL 2018 Appraisals and A&G BOVs—which, evaluated what each property might be worth were it to be sold as a standalone property outside the context of a wind-down or liquidation or what each lease would be worth if subleased at market rental rates—were not accurate assessments of the potential proceeds that could be obtained in a wind-down and liquidation scenario for the Company's real-estate assets. Accordingly, M-III applied a discounting methodology that it concluded was reasonable based upon its (a) knowledge; (b) experience; (c) review and analysis of the data available to it, including but not limited to the IOIs received in connection with the Real-Estate Sales Process; and (d) the results of the recent auctions and sales of leases in the Toys R Us bankruptcy, in which only 35% of the company's leases sold and the recovery rate on those leases was 44%. Meghji Dec. ¶ 46, 49; *see also* Welch Dec. ¶¶ 30-31.

87.    The Creditors' Committee argues that because the Debtors' included prospective bidders' indications of interest in real estate assets as one of the datapoints in providing a reasonable estimate of the cash proceeds the Debtors could expect to recover in the

Winddown Recovery Analysis, the analysis is fundamentally flawed. However, the Court expressly stated that utilizing indications of interest, in particular from landlords who submitted such interest by the Bid Deadline, would likely be used by the Debtors in evaluating their alternatives to the ESL bid. At the status conference on January 8, 2019, the Court stated that in the Debtors' evaluation of the proposal from ESL against their alternatives, those alternatives were "somewhat open ended" and included "not only bids that have been made so far [by landlords]," liquidation firms, and also the Debtors' assessment of the value of assets that were not included in any bids made by that point, including potential liquidation claims. The Court noted that the Debtors likely had "information already from the bids that have been submitted" and directed potential bidders to "submit additional or improved bids," if they wanted the Debtors to consider them. Hr'g Tr. 16: 12-24 (Bankr. S.D. N. Y. Jan 8, 2019). Further, for the various reasons set forth in the Welch Declaration, the valuations for the leasehold estates that the JLL team applied accepted appraisal methodologies and standards throughout the process and the appropriate and necessary discount was applied to account for the distressed nature of the sale. Welch Dec. ¶¶ 23-24, 30-31.[22]

### iv.    The Sale Transaction Maximizes the Value of the Debtors' Estates When Compared to a Winddown Scenario

88.    When faced with competing restructuring alternatives, the "[t]rustee's decision of what is best for the estate should be undertaken with the goal of maximizing the

---

[22] Indeed, Mr. Greenspan himself testified that his opinion was predicated on an assumption that the Debtors would market their real estate assets over a 20-22 month period, and that if all the Debtors' real estate assets had to be sold in a four-month period (i.e., by the Outside Lease Rejection Date), it would likely result in less value than he had opined. *See* Greenspan Dep. Tr. at [76:19-77:5]. Mr. Greenspan also testified that his report did not make an assumption with respect to the debt associated with the majority of the encumbered real estate assets when calculating the value of those assets, even though the nominal debt on those assets exceeded his high end valuation of them, further improperly inflating his calculations. *Id.* at [103:23-104:21]. Correcting for these and other deficiencies in the Greenspan Report, as set forth in further detail in the Welch Dec. ¶¶29-35, would result in liquidation values at or near the Debtors' estimates of cash proceeds the Debtors reasonably could expect to recover from unencumbered real estate.

value of the estate." *In re GSC, Inc.*, 453 B.R. 132, 169–70 (Bankr. S.D.N.Y. 2011). And a trustee maximizes value for creditors by selecting the highest or best bid, and thereby "further[ing] the interests of creditors, equity holders, and the debtor [alike]." *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) (citing *In re Lionel Corp.*, 722 F.2d at 1071). Importantly, public interest is an important factor in evaluating a section 363 sale. *See Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 84 (S.D.N.Y. 2010) ("[I]n connection with Section 363 sales, courts also consider the broader public interest, a critical factor here, given GM's position in the U.S. automotive industry and the national economy."). And courts have concluded that public interest considerations, such as the adverse impact on employment, economy, and communities, "lie[] at the core of chapter 11." *Id.* (quoting *In re Trans World Airlines, Inc.*, No. 01-00056(PJW), 2001 WL 1820326, at *14 (Bankr. D. Del. Apr. 2, 2001) (quotation marks omitted) ("[T]here is a substantial public interest in preserving the value of TWA as a going concern and facilitating a smooth sale of substantially all of TWA's assets to American. This includes the preservation of jobs for TWA's 20,000 employees, the economic benefits the continued presence of a major air carrier brings to the St. Louis region, and preserving consumer confidence in purchased TWA tickets American will assume under the sale . . . . I conclude that the alternative to the Sale Order in this case is a free-fall chapter 11 leading to a liquidation with the subsequent substantial disruption of diverse economic relationships and likelihood of material adverse harm to a very broad spectrum of creditor constituencies."). Accordingly, the duty of the trustee in a 363 sale is an "obligation to the estate as a whole, not to individual creditors," *In re GSC, Inc.*, 453 B.R. at 169–70, and a "bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups" *In re Lionel*, 722 F.2d at 1071.

89.    In determining whether the Sale Transaction was the "highest or best offer," in light of all other alternatives, the Debtors took into consideration a multitude of factors. *See In re Residential Capital, LLC*, No. 12-12020 (MG), 2012 WL 12906668, at *3 (Bankr. S.D.N.Y. Nov. 21, 2012) ("[T]he Debtors' determination that the Ocwen APA constitutes the highest **or** best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.") (emphasis added).[23]  This includes whether the Sale Transaction would provide greater value to the estate regardless of the "dollar amount," including noneconomic factors such as the preservation of jobs and preservation of the business as a going concern.  Additional factors provided by the Global Bidding Procedures and considered are:

- Whether creditors would recover more in the Sale Transaction compared to a liquidation;

- Impact on employees and employee claims;

- Administrative solvency;

- Assets to be acquired and left-behind;

- Benefit from the assumption or waiver of liabilities;

- Execution risk;

- Impact of trade creditors and landlords; and

- Other relevant factors consistent with the Restructuring Committee's fiduciary duties.

Global Bidding Procedures Order at 17; Transier Dec. ¶¶ 36-37.

90.    The Restructuring Committee weighed the Sale Transaction against the orderly liquidation and determined in its business judgment that the benefits of a Sale Transaction outweighed the benefits of an orderly winddown.  Transier Dec. ¶ 36-37.  The

---

[23]    3 Collier on Bankruptcy ¶ 363.02 (16th ed.) ("[T]he trustee usually intends to use the prospective buyer's bid as an inducement to solicit higher or better bids or as a floor price at the auction.") (emphasis added).

following chart demonstrates some of the significant benefits of the Sale Transaction over a winddown scenario.  Meghji Dec. ¶¶ 50-51.

| | Winddown | Sale Transaction |
|---|---|---|
| **Treatment** | | |
| Debtors' Enterprise | <ul><li>GOB remaining stores</li><li>Certain businesses or divisions sold in parts</li><li>Orderly liquidation of remaining assets</li></ul> | <ul><li>Sold as a going-concern</li></ul> |
| Employees | <ul><li>A majority, if not all, employees will be terminated</li><li>Winddown estate will face significant employee claims</li></ul> | <ul><li>Tens of thousands of employees offered continued employment</li><li>Employee claims (e.g. severance) will be minimized</li></ul> |
| Protection Agreement Liabilities | <ul><li>Protection Agreements will be rejected</li><li>Winddown estate will face claims arising from the Protection Agreements</li></ul> | <ul><li>Assumption of the Protection Agreements</li><li>Protection Agreement claims eliminated</li></ul> |
| Avoidance Actions and Litigation Claims | <ul><li>No claims against ESL are released</li></ul> | <ul><li>Only recharacterization, equitable subordination, and other claims affecting ESL's ability to credit bid are being released</li><li>All other claims remain with the Debtors' estates</li></ul> |
| Second Lien 507(b) Claims | <ul><li>Debtors' estimate up to approximately $331 million in section 507(b) claims</li><li>Significant litigation in connection with such claims is expected</li></ul> | <ul><li>Capped at $50 million from proceeds of claims or causes of action with distributions in excess of $50 million treated as an unsecured claim</li></ul> |
| Vendors | <ul><li>No ongoing business relationship</li><li>Significant unsecured claims arising from contract rejection, including 503(b)(9)</li></ul> | <ul><li>Ongoing business relationship</li><li>Cure costs paid by the Buyer</li></ul> |
| General Claims Pool | <ul><li>Substantial</li></ul> | <ul><li>Mitigated by ongoing operations and the assumption of cure costs, 503(b)(9) claims, and Protection Agreements</li></ul> |
| **Assumed Creditor Recoveries[24]** | | |
| Administrative and Other Priority Claims | 100% | 100%[25] |
| DIP ABL | 100% | 100% |

---

[24] The assumed creditor recoveries reflect the numbers presented in the Winddown Recovery Analysis.

[25] The Sale Transaction at its baseline provides for 96% recovery on account of administrative claims. But, the Debtors reasonably believe that under a Sale Transaction all administrative claims will be paid in full and the remaining 4% (or approximately $62 million) gap can be bridged with mitigating items such as outperformance

| | Winddown | Sale Transaction |
|---|---|---|
| Facility | | |
| Junior DIP Facility | 100% | 100% |
| FILO Term Loan Facility | 100% | 100% |
| Stand-Alone L/C Facility | 100% | 100% |
| Second Lien 507(b) Claims | 41% | N/A |
| Second Lien PIK Term Loan | 0% | 41% |
| Second Lien L/C Loans | 0% | 41% |
| Second Lien PIK Notes | 0% | 41% |
| Second Lien Notes | 0% | 0% |
| Consolidated Loans (Note A) | 100% | 100% |
| Consolidated Loans (Note B) | 44% | 60% |
| IP/Ground Lease Term Loan | 69% | 100% |
| General Unsecured Claims[26] | 0% | 1% |

91.    The benefits of the Sale Transaction outweigh its risks (which are manageable) and an orderly liquidation.  If the Sale Transaction is consummated, over tens of thousands of employees will continue to have jobs, vendors will continue to have a sizeable counterparty, and the landlords will continue to have tenants.  In turn, reducing claims against the Debtors' estates arising from employee severance, or contract or lease rejection.  Unlike in a winddown, the Sale Transaction can take advantage of maintaining the enterprises' synergies as

---

of the DIP Budget, maintained inventory levels, etc., as more fully set forth in section III.B herein. Assuming such measures can bridge the gap, the Debtors believe the $35 million received as consideration for the Credit Bid Release will flow to general unsecured creditors.  If the gap remains unfilled, the Debtors will utilize the $35 million to fill that gap rather than flowing through the waterfall to general unsecured creditors.

[26]    The recovery to general unsecured claims does not take into account any recoveries on account of avoidance actions or proceeds of litigation asserted against ESL and any affiliates.

the businesses continue largely undisrupted.  Importantly, the Sale Transaction also contemplates an assumption of liabilities, including most notably the liabilities in respect of reinsurance of warranties and protection agreements (which in the aggregate is approximately $1 billion).  All of these actions combined results in a smaller claims pool; without a doubt, the claims pool in an orderly winddown will be substantially higher than in a sale transaction, yet the recovery from selling the business in parts in an orderly liquidation will likely be substantially lower than in a Sale Transaction—reducing the recoveries available for all creditors.  To support this assertion with numbers, the above chart clearly shows that secured lenders recover significantly more in the Sale Transaction—with secured lenders receiving at minimum $600 million more in a Sale Transaction.

92.    Additionally, the Sale Transaction does not seek to release any claims, other than those relating to the Credit Bid, against ESL.  The Creditors' Committee argues that the estates' claims against ESL and related parties are significant.  Creditors' Committee's Obj. III.  As detailed in the Subcommittee Response, the Credit Bid Release is limited. Combined with the assumption of liabilities, adequate assurance of an ongoing business, and the continued employment of a sizeable workforce, the Debtors believe the Sale Transaction is for the benefit of all creditors.

### v.    Administrative Solvency Is Not a Precondition to the Sale Transaction

93.    Approval of the Sale Transaction is not contingent on the Debtors' administrative solvency, which is a requirement for plan confirmation under section 1129(a)(9)(A) of the Bankruptcy Code, but not for approval of a section 363 sale. *See* 11 U.S.C. § 363(b); 11 U.S.C. § 1129(a)(9)(A); *In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 704–05 (Bankr. S.D.N.Y. 2016) ("It is true that a plan cannot be confirmed without paying administrative claims and without paying secured and priority creditors, but we

do not necessarily have to confirm a plan of reorganization here. If a sale did not generate

enough assets, the Debtor could have converted its case to chapter 7 and liquidated there.").

Courts have approved the sale of substantially all of a debtor's assets pursuant to section 363

even when the debtor's estate is administratively insolvent. *See, e.g.*, *Banayan v. Wolf (In re YBA*

*Nineteen, LLC)*, No. 15CV1742-WQH-RBB, 2016 WL 541347, at \*3 (S.D. Cal. Feb. 11, 2016)

(affirming bankruptcy court's order approving sale of assets of an estate that "[was] already

administratively insolvent"); *In re Tempnology, LLC*, 542 B.R. 50, 66–67 (Bankr. D.N.H. 2015),

*aff'd sub nom. Mission Prod. Holdings, Inc. v. Old Cold, LLC (In re Old Cold, LLC)*, 558 B.R.

500 (B.A.P. 1st Cir. 2016), *aff'd*, 879 F.3d 376 (1st Cir. 2018) (holding that a 363 sale was a

"logical vehicle to attempt to maximize the [d]ebtor's value as a going concern" when "[b]y all

accounts[] the [d]ebtor is administratively insolvent"); *see, e.g., In re Chrysler LLC*, 405 B.R.

at 97 (approving sale of substantially all debtors' assets where only first-lien lenders would

receive recovery from proceeds of sale).

94.    The Creditors' Committee, in its objection, cites to a Pennsylvania case

for the proposition that there must be a showing of good faith and feasibility for the approval of a

363 sale. *See* Creditors' Committee's Obj. ¶ 92; *In re Gulph Woods Corp.*, No. 87-03093S, 1988

WL 134688, at \*4 (Bankr. E.D. Pa. Dec. 13, 1988). *Gulph Woods* is non-binding and

distinguishable. There, the court tied together the analysis of good faith and feasibility in

reaching the conclusion that the sale could not be approved. Unlike here, the *Gulph Woods* court

determined that there were many aspects of the sale there that "fail[ed] to inspire confidence:"

among other things, a purchase agreement "bristle[ed] with undisclosed insider dealing," a

failure to "obtain[] requisite financing . . . [for the balance of the sale-price]," and the sponsor's

express unwillingness to tie up his assets for this transaction. *Id.* at \*3, \*4. None of the

"combination of factors [that rendered] the proposed sale [infeasible and] totally unacceptable" existing in *Gulph Woods* is present here. *Id.* at *4. As described, the involvement of the Restructuring Committee and Subcommittee has ensured that the Sale Transaction is fair, sufficient financing has been committed for the closing of the Sale Transaction, and, the Buyer, based on its projections, was also optimistic that the reorganized Debtors can be revived. The Sale Transaction satisfies both the good faith and feasibility analysis under the *Gulph Woods* court.

95.     Courts have upheld the sale of a debtor's assets over a competing alternative when the sale provides greater value to the estates, regardless of whether the debtor is or will be in the zone of administrative insolvency.[27] *See, e.g.*, *In re Tempnology, LLC*, 542 B.R. at 66–67 (approving sale of assets of an administratively insolvent debtor when the value of the estates would "continue to decline . . . unless the sale [was] consummated quickly" and there "would be no funds available for distribution in a Chapter 7 liquidation" without a sale); *In re Family Christian, LLC*, 533 B.R. 600, 624 (Bankr. W.D. Mich. 2015) (indicating preference for a bid that would have a higher likelihood of satisfying administrative expenses over an alternative bid); *In re DDJ, Inc.*, No. 05-10001-A-7, 2011 WL 10638435, at *7, *8 (Bankr. E.D. Cal. June 8, 2011) (approving asset sale that would generate instant cash when the alternative scenario might risk "litigation in perpetuity and futility" that would "render these estates administratively insolvent").

---

[27] Other courts have also issued similar rulings. For example, in *In re Real Mex Rests. Inc.*, the Bankruptcy Court for the District of Delaware approved a sale of the assets of the administratively insolvent debtors, even though "with approval of this sale, there [was] still a measure of an administrative insolvency." Sale Hr'g Tr., No. 11-13122 (BLS) (Bankr. D. Del. Feb. 10, 2012), (ECF No. 903) at 186. The Delaware court approved the sale not only because it would "preserve[] over 10,000 jobs," but also "denial of the sale[] would yield only a more substantial administrative insolvency" – "circumstances for all creditors [that] would be much worse . . . ." *Id.* at 190-92.

96.    The Debtors are reasonably confident that, based on the projections prepared by their advisors and the continuous diligence applied to steering their business in the right direction, there is a high likelihood that the Debtors will be able to bring the Sale Transaction to a timely close and provide sufficient liquidity for the reorganized Company going forward.  Meghji Dec. ¶ 55. However, due to the complex nature of the chapter 11 cases, administrative solvency following the Transaction is not guaranteed; although, it remains the Debtors' goal.  An orderly winddown is not a risk-free exercise, either: the risk of a protracted, expensive litigation on ESL's 507(b) claim remains, the Debtors' assets will likely be sold at prices lower than their inherent values when all of the Debtors' assets flood into the market at the same time and, as described, administrative costs may become larger than expected due to the multifaceted nature of the Debtors' business operations.  Put differently, an orderly winddown does not guarantee that the Debtors will be more administratively solvent than in a Sale Transaction and does not guarantee to provide a greater recovery to the creditors, as a winddown will result in billions of dollars more in claims.

97.    Ultimately, in a situation in which none of the available alternatives can guarantee administratively solvency, the Debtors compared both alternatives and based on their projections, determined that the Sale Transaction will likely produce a greater economic outcome than an orderly winddown.  An orderly winddown will certainly result in the immediate termination of tens of thousands of jobs and considerable disruptions to the Debtors' stakeholders, including vendors and landlords alike, while providing little additional benefit for the Debtors' creditors or their estates.  The closing down of an American retail icon, the rippling effect through the communities where the Debtors currently operate, and the human cost it would extract cannot and should not be accounted for by dollar sign alone.  Accordingly, the Debtors,

in their business judgment, determined that the Sale Transaction is on balance in the best interest of their estates, creditors and other stakeholders, and should be approved.

## RESPONSE TO OBJECTIONS[28]

I.    **Creditors' Committee Objection**

A.    **The Sale Transaction Does Not Guarantee Administrative Insolvency**

98.    In sections II.A.2. and II.B.3 of their objection, the Creditors' Committee not only alleges that the Sale Transaction guarantees administrative insolvency, it also lists several factors that the Creditors' Committee believes are significant potential downsides to the Sale Transaction.  First and foremost, as stated above in section II.C.v, the Debtors need not prove administrative solvency as a predicate to a 363 sale.  But, the Debtors believe they will remain administratively solvent as a result of Sale Transaction and, more immediately important, meet the various closing conditions to the Asset Purchase Agreement.    Furthermore, the Debtors respond to the following points:

> ▪ **The Debtors Have the Ability to Pay Administrative Expenses at Closing.**  The Creditors' Committee argues that the Debtors are contractually obligated to incur additional administrative expenses (including payroll obligations), which they have no ability to pay.  To be clear, pursuant to section 5.1(b) of the Asset Purchase Agreement, the Buyer shall pay or reimburse the Sellers for all Expenses associated with the Designatable Leases (as defined in the Asset Purchase Agreement). The Buyer is also responsible for certain expenses related to any Additional Contracts.    Further, pursuant to section 2.9 of the Asset Purchase Agreement, the Buyer shall pay all Expenses accrued post-Closing and all Cure Costs associated with Additional Contracts.   The liability is not being shifted, rather it is a timing issue.  With regard to the payment of accrued payroll obligations, as is common in asset purchase agreements, the Debtors are liable for payroll, taxes, and benefits through the Closing Date and the Buyers shall be responsible from and after the Closing Date.  Although the amounts will be paid during the week of February 16, 2019, the Debtors have appropriately accounted for the

---

[28]    The Objections are summarized on the chart attached hereto as **Exhibit A**. The Debtors do not intend to proceed with any: (1) Cure Cost Objections or (2) Objections relating to Additional Contracts or Designatable Leases at the February 4, 2019 hearing.

payment of payroll obligations through the Closing Date of February 8, 2019. Similarly, the Debtors have sufficiently forecasted employee benefit claims (e.g. medical, dental and health) to account for the delays in processing.

- **The Debtors Shall Seek Consent of the Bermuda Monetary Authority (the "BMA").** The Debtors remain obligated on warranty and protection agreement liabilities unless and until the KCD Notes are transferred, which requires the consent of the BMA. The Debtors are in the process of preparing their application to the BMA has already begun and the Debtors, upon the advice of local counsel, believe it will take several weeks (rather than an indeterminately open time period) to obtain the approval.

- **The Buyers Are Assuming Mechanics' Lien Obligations.** The Creditors' Committee argues that the Debtors remain liable for mechanics' lien obligations. As stated at the Auction on January 16, 2019, ESL would be assuming the obligations and it was an inadvertent mistake that the Asset Purchase Agreement does not explicitly state such assumption and is being corrected. Singh Dec. Ex. E.

- **The Debtors Believe the Closing Will Occur On February 8.** The Creditors' Committee argues that any delay in closing the Sale Transaction will cause the Debtors to incur substantial costs. The Debtors are unaware of any significant obstacles to a timely closing, and ESL's marketing period has already begun and continues to run. Moreover, the Debtors believe that the ESL business plan has sufficiently demonstrated adequate assurance of future performance with regard to contract and lease counterparties. Finally, the Asset Purchase Agreement provides that should each of the closing conditions be satisfied but the Buyer fails to close the Sale Transaction, the Debtors, following notice to the Buyer as set forth in the Asset Purchase Agreement, are entitled to retain the $120 million deposit.

- **The Debtors Have Outperformed the DIP Budget.** The Creditors' Committee warns of unfavorable budget to actual variances, but the Debtors continue to outperform their DIP Budget and could also experience additional favorable budget to actual variances.

- **The Cure Costs Will Be Timely Paid.** The Creditors' Committee argues that the payments of cure costs are delayed. The Buyer is obligated to pay cure costs in line with when any Designatable Leases or Additional Contracts are assumed. There is no requirement that all be paid as of the Closing Date, especially when not all contracts and leases will be assumed at that juncture.

- **Transition Services are Critical to the Debtors.** The Creditors' Committee argues that the Debtors may be required to pay for transition

services, including professional fees. The transition services agreement will be a two-way agreement that provides for services both from the Debtors to the Seller and vice versa. The costs accrued therein should be at minimum, neutral, as ESL will be paying (at cost) for the services provided to ESL.

**B.    The Execution Risk Related to the Sale Transaction is Manageable**

**i.    The Debtors Believe the Closing Conditions Can Be Satisfied**

99.    As with all sale transactions, the Sale Transaction is not immune from execution risk. Although the Creditors' Committee may contend that the execution risks in the Sale Transaction are above and beyond any ordinary sale transaction, it behooves all parties to take note of the rare quality of the transaction at hand. As the Creditors' Committee has noted, the Sale Transaction—as with all asset sales—encompasses execution risk in the form of closing conditions and termination events (the "Closing Conditions"). The Closing Conditions highlighted by the Creditors' Committee as the most "dire" include:

- one of the IP Alternatives (as defined below) must be satisfied;

- the requirement that an aggregate amount of (i) Inventory Value of the Acquired Inventory (excluding any Pending Inventory), (ii) the amounts due to Seller with respect to (A) the Credit Card Accounts Receivable, and (iii) the Pharmacy Receivables shall be at least $1,657 million (together the "Inventory and AP Condition") as of the Closing Date; and

- satisfaction of certain financial conditions, including the aggregate amount required under the (i) DIP ABL Facility shall be no greater than $850 million and (ii) the Junior DIP Facility shall be no greater than $350 million (together, the "DIP Financing Condition"). The Debtors do not deny that these are in fact risks, but the Debtors with the guidance of their advisors and the Restructuring Committee analyzed these risks and concluded that they are reasonably achievable.

*See generally* Creditors' Committee's Obj. ¶ 131.

**a)    The IP Alternatives Have Been Satisfied**

100.    Section 9.14 of the Asset Purchase Agreement sets out certain alternatives (the "**IP Alternatives**") concerning Intellectual Property owned by KCD IP, LLC ("**KCD**")

(defined under the Asset Purchase Agreement as "**KCD IP**").    One of the available IP Alternatives is outlined in section 9.14(b), which requires the reasonable best efforts of the Debtors to cause KCD to grant, effective as of the Closing an Exclusive License to Buyer to the KCD IP (the "**Exclusive License**").    To be clear, only one of the IP Alternatives must be satisfied for the corresponding closing condition to be satisfied.    This condition to closing was satisfied on January 30, 2019, when the Board of Managers of KCD approved the Exclusive License set out in section 9.14(b) of the Asset Purchase Agreement.    Riecker Dec. ¶ 32.

### b)    The Inventory and AP Condition Can Be Satisfied

101.    With regard to the Inventory and AP Condition, the Debtors through extensive and iterative negotiations, was able to successfully negotiate the "netting" of the Acquired Inventory, Credit Card Accounts Receivable, and Pharmacy Receivables to an aggregate amount of $1,657 million.    In the beginning stages of negotiations, the Sale Transaction contemplated an itemized amount for each of the Acquired Inventory, Credit Card Accounts Receivable, and Pharmacy Receivables, which would have increased execution risk exponentially, as for example, a surplus in both Acquired Inventory and Credit Card Receivables would not "make up" for the deficit in Pharmacy Receivables.    Now, with the ability to "net" amounts across all three categories, the Debtors have greater flexibility in achieving the $1,657 million aggregate number, and has less risk of foot-faulting on one of the three factors. Further, the Debtors believe they will be able to successfully manage the Acquired Inventory, Credit Card Accounts Receivable, and Pharmacy Receivables balances to meet the closing condition as the Debtors maintain the ability to control inventory and receivables.    Under the Asset Purchase Agreement, to the extent the Debtors exceed $1,657 million in the aggregate for these categories, the Debtors have negotiated for limited rights to reduce such excess amounts. Specifically, at the Debtors' expense and in consultation with the Buyer, Inventory that would

otherwise be Acquired Inventory could be transferred to a GOB store or a different location, until the Inventory Value is equal to $1,553 million—another effective way to managing the Inventory and AP Condition.

### c)    The DIP Financing Condition Can Be Satisfied

102.    The DIP Financing Condition should be analyzed in tandem with Inventory and AP Condition, because to satisfy both conditions, the Debtors must maintain a delicate balance (particularly with regard to the DIP ABL Facility as one consequence of maintaining a lower DIP ABL Facility balance is a reduced spend on Inventory).  Put simply, the Debtors must maintain a balance of $850 million of the DIP ABL Facility as of the Closing Date. As of January 31, 2018, the Debtors' DIP ABL Facility balance was approximately $873 million. Fortunately, such pressures are in part relieved by the Debtors' continued outperformance of their DIP Budget (as defined in the Final DIP Order).  Since the commencement of these cases, the Debtors have outperformed the DIP Budget on an operating basis by approximately $59 million per week.

103.    In addition to the outperformance of the DIP Budget, the Debtors are cautiously optimistic regarding their ability to meet the DIP Financing Condition, as the Debtors are pursuing multiple avenues to increase cash flow.  In fact, the Debtors have put into place mechanics to reduce the balance outstanding under the DIP ABL Facility below the required threshold in time for the Closing Date.  For example, the Debtors are reengaging vendors with increased fervor to gain favorable trade terms and reducing associated spend.  Similarly, the Debtors are also reviewing amounts earmarked for critical vendors under the corresponding first day order to ensure those amounts are being efficiently used.  And servicers are continually being pressed to return any unused holdback amounts—again in an effort to reduce amounts outstanding under the DIP ABL Facility.  The Debtors also continue to sweep excess cash from

the regional banks and stores—of course, leaving the amounts necessary for store operation. Meghji Dec. ¶ 54-55.

104.    And as of January 18, 2019, the Debtors had fully drawn the Junior DIP Facility—drawing the remaining $175 million, which was used for general corporate purposes and to reduce the DIP ABL Facility balance.  Importantly, going forward, the Debtors' spending will be reduced to only essential payments.   Needless to say, the Debtors are focused on expenditures spend and increasing receivables to meet the DIP Financing Condition.

105.    The second half of the DIP Financing Condition, which provides that the Junior DIP Facility shall be no greater than $350 million as of the Closing Date, poses no risk to the estates.  The Junior DIP Facility is a multi-draw term loan facility with the maximum aggregate amount of $350 million and as of January 18, 2019, the Junior DIP Facility was fully drawn and no additional amounts can or will be drawn.  And the Sale Transaction contemplates a roll-over of the entire outstanding $350 million.

### d)    Other Closing Conditions Can Be Satisfied

106.    The Creditors' Committee also argues that there is execution risk associated with the Buyer's termination rights, relating to the entry of the Approval Order by February 8, 2019 (subject to Court availability) and an Outside Date of February 19, 2019. Other termination rights apply if the bankruptcy case is dismissed or converted to a case under chapter 7, there is a material breach of a representation or covenant, and such breach is uncured after the notice and cure period.  However, these types of termination rights are typical of sale transactions in the chapter 11 context and do not significantly unduly jeopardize the Debtors' ability to close the Sale Transaction.  The Debtors analyzed the risk associated with the Closing Conditions, weighed it against alternative options, and approved the Sale Transaction (inclusive of the associated risks) in light of all the possible benefits to be realized.

107.    To be clear, the Debtors rigorously negotiated the Closing Conditions as well as other closing conditions to the fullest extent possible and what remains is the byproduct of extensive negotiations.   Throughout the negotiations, the Debtors were able to successfully negotiate away other bespoke conditions relating to the Sparrow entities and the Seritage Master Lease.   Another risk that could have been borne by the Debtors.   Finally, and critically, the Debtors negotiated that if the Sale Transaction is terminated due to the Buyer's breach or failure to close the Transaction, the Debtors would be entitled to retain the $120 million deposit amount.

## II.    PBGC Objection

108.    The PBGC Objection[29] to the Sale Transaction is premised on the following: (i) the Bankruptcy Court cannot approve a "free and clear" sale of any non-debtor assets (including the KCD Notes or the KCD IP), (ii) the Exclusive License is not permitted and (iii) the Buyer must allocate the consideration associated with each Acquired Asset.  The Debtors take each argument in turn.

### A.    The Debtors Do Not Intend to Seek Bankruptcy Code Protection for the Sale of Non-Debtor Assets

109.    First and simply, the Debtors do not intend to seek section 363 protections for the sale of non-Debtor assets.   The Asset Purchase Agreement's definition of "Acquired Asset" includes non-Debtor assets, but as the Revised Proposed Sale Order reflects, each reference the sale of the Acquired Assets "free and clear" has been appropriately limited to the "Acquired Assets of Debtors," as intended.   And to be absolutely clear, the Debtors have added language to the Revised Proposed Sale Order that states "Notwithstanding anything to the contrary herein or in the Asset Purchase Agreement, nothing in this Sale Order shall approve the

---

[29]    *Objection and Reservation of Rights of Pension Benefit Guaranty Corporation to Debtors' Sale Motion* (ECF No. 2002) (the "**PBGC Objection**").

sale or transfer of any Acquired Assets of non-Debtors free and clear of all Claims pursuant to section 363(f)." Revised Proposed Sale Order ¶ 19.

B.    **The Exclusive License Is Permitted**

110.    The PBGC Objection states that the terms of the Asset Purchase Agreement violate the PBGC bargained-for terms of the Pension Plan Protection and Forbearance Agreement, dated as of March 18, 2016 (the "**PPPFA**"), among the Debtors, KCD and Pension Benefit Guaranty Corporation (the "**PBGC**"). PBGC Obj. II. Notwithstanding that the ability of PBGC to bind the Debtors to the terms of the prepetition PPPFA is questionable, the Exclusive License to be granted to the Buyer under section 9.14 of the Asset Purchase Agreement does not violate the PPPFA.

111.    Section 9.14(b) of the Asset Purchase Agreement plainly requires the Sellers to "use reasonable best efforts to cause KCD IP, LLC to grant, effective as of the Closing, a perpetual, irrevocable [(subject to suspension of the license for material breach)] . . . worldwide, sublicensable [solely with the consent to KCD except in specific circumstances] . . . *exclusive license*." (emphasis added). The Asset Purchase Agreement is explicit that no sale is contemplated. PBGC alleges that the Exclusive License, even if not an explicit sale, amounts to a sale—but the language of the Asset Purchase Agreement and the Exclusive License itself clearly demonstrate that this allegation is meritless.

112.    KCD retains numerous rights and responsibilities under the Exclusive License that make it fall far short of the level of a sale or a transfer of "all substantial rights." Courts construing the distinction between a sale and an exclusive license have emphasized that "[w]hether a transfer is an assignment or a license does not depend upon the name by which it calls itself but upon the legal effect of its provisions." *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1279 (S.D. Fla. 2013) (citing *Waterman v. Mackenzie*, 138 U.S. 252, 256

(1891)).  Where a licensor has retained the right and/or responsibility to police the licensed trademark(s), courts find that such licenses are not grants of "all substantial rights" such as would be required for the transfer to qualify as an assignment or sale.  *See id.*; *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 264 F. Supp. 3d 1294, 1300 n.3 (M.D. Fla. 2017); *accord Camco Int'l Inc. v. Perry R. Bass, Inc.*, 926 S.W.2d 632, 636 (Tex. App.—Fort Worth 1996).  Additional considerations include the licensee's right to sublicense, the licensor's ability to supervise licensee's activities, the obligation of the licensor to continue paying maintenance fees, the nature of limits on the licensee's right to assign the intellectual property, and the nature and scope of any right to sue retained by the licensor.  *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001).

113.    The Exclusive License does not confer on the Buyer standing to bring an action with regard to the KCD IP—KCD retains that right pursuant to 9.14(b) of the Asset Purchase Agreement and section 6 of the Exclusive License.  In addition to retaining the primary right to enforce and defend the KCD IP, KCD will also maintain: (i) the right to convert to a non-exclusive license if Buyer is in material breach of its obligations under the Exclusive License and fails to cure such breach in a timely manner; (ii) the right to suspend Buyer's use of the KCD IP if Buyer fails to cure such breach within a longer allotted timeframe; and (iii) certain controls over Buyer's use of the KCD IP, including through significant quality control provisions.  KCD will continue to be the registered owner of the KCD IP and will be responsible for related maintenance fees.  The Buyer's ability to sublicense its rights under the Exclusive License, as well as to transfer the Exclusive License, is limited, with certain sublicense rights and almost all transfer rights requiring KCD's prior consent.  And KCD will collect royalties from Buyer in connection with net sales of any license products using the KCD IP.  Additionally, as noted

above, the exclusivity of the license is subject to pre-existing licenses to the KCD IP in effect as of the Closing Date.    In fact, the Exclusive License includes the Buyer's explicit acknowledgment that KCD is the sole and exclusive owner of the KCD IP.

114.    Furthermore, section 4(e) Exclusive License provides that any and all goodwill arising from Buyer's use of the trademarks included within the scope of the KCD IP "will inure solely to the benefit of [KCD]."  It is widely acknowledged that a key characteristic of trademark ownership is that the goodwill inures to the benefit of a trademark's owner. *See* 1 McCarthy on Trademarks and Unfair Competition § 2:15 (5th ed.) ("A trademark has no existence separate from the good will of the product or service it symbolizes. Good will and its tangible symbol, a trademark, are inseparable. Therefore, a trademark cannot be sold or assigned to another unless the associated goodwill is also sold."  KCD's retention of such goodwill under the Exclusive License further makes clear that there is no sale here of the KCD IP.  In sum, KCD retains substantive rights under the Exclusive License and, under applicable law, the Debtors are confident that the Exclusive License is not a sale or transfer.

115.    The Board of Managers of KCD (the "**KCD Board**") in providing its consent to the Exclusive License, complied with both the KCD Operating Agreement[30] and the PPPFA.  The approval of the Exclusive License does not constitute a "Material Action" as defined in KCD Operating Agreement and, therefore, does not require the affirmative vote of the Independent Manager pursuant to the PPPFA.[31]

---

[30]    "**KCD Operating Agreement**" means the *Limited Liability Company Operating Agreement of KCD IP, LLC*, dated May 18, 2006

[31]    Consistent with the foregoing, the Independent Manager of KCD, advised by independent counsel, abstained from the vote regarding approval of the Exclusive License at the January 30, 2019 meeting of the KCD Board of Managers.

C.    **The Allocation of Consideration Is a Confirmation Issue**

116.    The Creditors' Committee and the PBGC also argue that ESL and the Debtors must allocate the purchase price in the Successful Bid to the unencumbered assets pursuant to the requirements in the Global Bidding Procedures.  Creditors' Committee's Obj. ¶ 14; PBGC Obj. B.  Importantly, the Debtors have the ability to waive the terms and conditions with respect to all Prospective Bidders, including the requirement that the purchaser allocate its purchase price among the assets being purchased.  Global Bidding Procedures Order ¶¶ 19, 47. It is also premature to provide for the allocation of value on an obligor-by-obligor basis.  This is a summary proceeding and neither the Creditors' Committee nor PBGC will be prejudiced by the Sale Transaction.  The value allocations will be done in time for the Debtors plan confirmation, if appropriate, and the allegation of *de facto* substantive consolidation can be fully addressed at that juncture.

III.    **Service.com Objection**

117.    Service.com filed its objection[32] without raising any legitimate issues regarding the propriety of the Sale Transaction or the benefits thereof to the estates.  In response to the objection, the Debtors will set the record straight and let the facts speak for themselves.

118.    Service.com has violated section 2.07(a) of the Asset Purchase Agreement, dated as of November 2, 2018, between the Debtors and Service.com (as amended on November 13, 2018, the "**SHIP APA**"), approved by this Court, for the Debtors' Sears Home Improvement business (the "**SHIP Business**") by failing to consummate the purchase of the SHIP Business, even though the Debtors had granted Service.com an extension for closing and all of the conditions required for the Debtors to sell the SHIP Business, as set forth in

---

[32]    *Limited Objection of Service.com to Global Asset Sale Transaction and Statement of Continued Interest in Purchase of Sears Home Improvement Business* (ECF No. 2037) (the "**Service.com Objection**").

section 7.02 of the SHIP APA (other than those conditions that by their terms require the delivery of a document or taking of any other action at the closing but subject to the satisfaction of such conditions), had been satisfied or had otherwise been waived.  Before the Debtors terminated the SHIP APA pursuant to sections 10.01(d) and 10.09 on January 18, 2019, Service.com approached the Debtors acknowledging insufficient financing for closing and proposing various "workarounds," ranging from a request for a purchase price reduction to an additional deposit to be held in escrow.  None of the proposed "workarounds" provided the Debtors within any certainty that Servic.com would ever be able to consummate the SHIP transaction. [33]

119.    The Service.com Objection does not include any cognizable objections to the Sale Transaction, other than the statement that "Service.com is the better buyer than Holdco because it is a bona fide arm's length purchaser."  Service.com Obj. ¶ 24.  Surely, the Court should not entertain such an unfounded and vacuous objection, particularly when its being asserted by Service.com whose conduct is in violation of the Court-approved SHIP APA.  Accordingly, since Service.com has not raised an issue relevant to the Sale Transaction and has not provided a factual basis with regard to any of its other allegations, the Court should overrule the Service.com Objection.

## IV.    The Sale Order Should Be Effective Immediately Upon Entry

120.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or

---

[33]    In the interests of full disclosure, the Debtors intend to file a motion to compel Service.com to comply with its obligations under the SHIP APA to turn over the $6 million deposit posted in connection with the SHIP APA as soon as possible.

unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d).

121.    In light of the current circumstances and financial condition of the Debtors, the Debtors believe that to maximize value and preserve jobs, the Sale Transaction should be consummated as soon as practicable.    Accordingly, the Debtors request that the Revised Proposed Sale Order be effective immediately upon entry of such order and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## CONCLUSION

122.    Inasmuch as each of the Objections has been resolved or adjourned, or should be overruled, the Debtors respectfully request that the Court enter the Revised Proposed Sale Order approving the Sale Transaction.

Dated: February 1, 2019
        New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors and Debtors in Possession*

## __Exhibit A__

**Objection Chart**

**EXHIBIT A**

**OBJECTION RESPONSES**

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| 1. | Icon DE Holdings LLC, et al. <br><br> (ECF No. 2000) | A. **Cure Objection:** asserts that the following amounts are due under three license agreements: <br><br> (1) Joe Boxer License Agreement: $662,313 pre-petition and $7,109,679 post-petition; the amount proposed by the Debtors is $0. <br><br> (2) Bongo License: $16,776 pre-petition and $233,244 Ppst-petition; the amount proposed by the Debtors is $0. <br><br> (3) Cannon License: $205,849 pre-petition and $3,926,001 post-petition; the amount proposed by the Debtors is $0. <br><br> B. **Clarification Request:** requests that the Debtors confirm that assumption and assignment of the three licenses includes all amendments and modifications thereto. | A. The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing. To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date. The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29 <br><br> B. The Debtors will work with the Objecting Party toward the proper and complete identification and description of the applicable contracts and to determine whether each of the agreements is intended to be assumed and assigned. If the Parties are unable to consensually resolve the issue, the Parties shall seek a determination by the Court. | A. Adjourned <br><br><br><br><br><br><br><br><br><br><br><br> B. Pending |
| 2. | Sears Hometown and Outlet Stores <br><br> (ECF No. 1835) | A. **Cure Objection:** asserts Cure Costs are $1,144,154; the amount proposed by the Debtors is $0. | A. The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing. To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date. The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29. | A. Adjourned |

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| | | | | |
| 3. | Everlast World's Boxing Headquarters Corp.<br><br>(ECF No. 1980) | A. **Cure Objection:** asserts Cure Costs are $592,183.39 plus, if assumption and assignment occur on March 4th, $2,158,856.55, or if after March 4th, $2,751,039.94; the amount proposed by the Debtors is $683,206. | A. The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Order, ¶ 29.  To the extent there are any postpetition amounts due and owing under the license agreement that arose prior to the Closing Date, such amounts shall be paid by the Debtors in the ordinary course. | A. Adjourned |
| | | B. Objector reserves the right under section 365(d)(2) of the Bankruptcy Code to seek to compel assumption or rejection of the agreement. | B. If the Sale Transaction is not approved, the rights of the Debtors are also reserved. | B. Resolved |
| 4. | Adam Levine Productions, Inc.<br><br>(ECF No. 2009) | A. **Cure Objection:** asserts that Cure Costs are $ 390,891.09 plus any post-petition quarterly payments due through Closing; the amount proposed by the Debtors is $180,854. | A. The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; | A. Adjourned |

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  |  | Proposed Revised Sale Order, ¶ 29.  To the extent there are any postpetition amounts due and owing under the license agreement that arose prior to the Closing Date, such amounts shall be paid by the Debtors in the ordinary course. |  |
|  |  | B.  **Adequate Assurance Objection**: asserts that Adequate Assurance Information was not provided and requests that such adequate assurance information be provided. | B.  The Debtors provided adequate assurance information and instructions for obtaining adequate assurance information on Exhibit C to each served Cure Notice.  The Buyer provided its adequate assurance information directly to this party.  For the reasons stated in the Reply and supporting declarations, the Debtors have provided adequate assurance of future performance in accordance with the Bankruptcy Code. *See* Response, ¶¶ 73-76. | B.  Pending |
| 5. | Bonnier Corporation (ECF No. 2005) | A.  **Cure Objection:** asserts that Cure Costs are $ 288,250.89 plus any post-petition royalty payments; the amount proposed by the Debtors is $0. | A.  The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29.  To the extent there are any postpetition amounts due and owing under the agreement that arose prior to the Closing Date, such amounts shall be paid by the Debtors in the ordinary course. | A.  Adjourned |
|  |  | B.  **Assumption and Assignment Objection**: argues that the agreement will terminate by its terms on February 2, 2019. | B.  The Debtors are reviewing the agreement's term.  If the Debtors confirm that the agreement terminates on February 2, 2019, and that it can no longer be extended, the Debtors will stipulate to its removal from the lists of Potential Transferred Agreements | B.  Pending |

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  |  | and Initial Assumed Agreements, unless another arrangement has been reached between the Buyer and the agreement counterparty. |  |
|  |  | C. **Adequate Assurance Objection**: requests adequate assurance information. | C. The Debtors provided adequate assurance information and instructions for obtaining additional adequate assurance information on <u>Exhibit C</u> to each served Cure Notice. The Buyer provided its adequate assurance information directly to this party. For the reasons stated in the Reply and supporting declarations, the Debtors have provided adequate assurance of future performance in accordance with the Bankruptcy Code. *See* Response, ¶¶ 73-76. | C. Resolved |
| 6. | Stanley Black & Decker Inc.<br><br>(ECF No. 2072) | A. **Assumption and Assignment Objection**: SBD argues that the license agreement with the Debtors cannot be assigned without SBD's consent. SBD relies on a provision of the license agreement which permits a future assignment of SBD's trademark without consent only in the case of a sale by Sears of all or substantially all its assets, and only where the purchaser will operate Sears in the same manner (i.e. as a big-box store) and with a similar scale. In support of its argument that the license agreement cannot be assumed and assigned without consent, SBD argues that the Sale Transaction does not constitute "all or substantially all of the assets of SEARS," because the assets being transferred to Transform are not all of the same assets that Sears owned on January 5, 2017, the date the license agreement was executed. | A. Nothing in the license agreement suggests that Sears's assignment rights under the license agreement are conditioned on Sears keeping their store portfolio and assets at January of 2017 levels. The license agreement also does not define "all or substantially all of the assets of SEARS" to mean the assets that Sears owned in January 2017, as opposed to at the time of the Sale Transaction – a more natural and logical reading of the agreement.<br><br>Generally, "[i]n determining whether a company has sold "substantially all" of its assets, New York courts. . . look to both qualitative and quantitative factors. The qualitative analysis may focus on factors such as the overall effect of the transaction on the company, whereas the quantitative analysis may focus on the economic value and number of assets to be transferred in comparison to the assets retained." *Roseton OL, LLC v. Dynegy Holdings Inc., No. CIV.A. 6689-VCP*, 2011 WL 3275965, at *13 (Del. Ch. July 29, 2011) (applying New York law). The Debtors are clearly transferring all or substantially all of the assets of the Company pursuant to the Sale Transaction on both a qualitative and quantitative analysis. Acquired Assets have the effect of transferring the entire business to | A. Pending |

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| | | | the Buyer, while only certain non-core assets will remain with the estate. The Acquired Assets are numerous, and include a retail footprint of approximately 425 retail stores under the "Sears" and "Kmart" brands and certain other owned and leased real estate interests and individual target businesses, including, among others, the business conducted at the retail stores, the "PartsDirect" brand, the "ServiceLive" brand, the "Sears Home Services" brand, the "Wally" brand, the "Kenmore" and "Diehard" businesses, the "Monark Premium Appliance Co." brand, a home delivery and retail installation business, various websites, the "Shop Your Way" membership program, Innovel, and the "Sears Home Improvement" brand, among the Debtors' other assets which are described more fully in the Asset Purchase Agreement. | |
| 7. | Little Caesar Enterprises, Inc.  (ECF No. 1865) | A. **Cure Objection:** asserts Cure Costs of $ 71,761.30 for the pre-petition period and $196,279.22 for the post-petition period under the franchise agreement, plus any other post-petition amounts that become due through Closing; the amount proposed by the Debtors is $112,207. | A. Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29. | A. Adjourned |
| | | B. **Assumption and Assignment Objection**: asserts that the franchise agreement cannot be assumed and assigned without its consent. | B. The Buyer and the Debtors intend to work with the party, and hope to resolve the objection.  The Proposed Revised Sale Order includes bracketed which is still under review and, if agreed, would provide that consent to assign an agreement will be obtained, if and to the extent that such consent is determined to be required under the applicable | B. Pending |

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  |  | agreement and such provision is determined to be enforceable under applicable law. *See* Revised Proposed Sale Order, ¶ 68. If it cannot be resolved, the parties will seek determination by the Court as to whether consent to assuming this agreement is enforceable. |  |
|  |  | C. **Adequate Assurance Objection**: The Objecting Party requests adequate assurance information. | C. The Debtors provided adequate assurance information and instructions for obtaining additional adequate assurance information on Exhibit C to each served Cure Notice. The Buyer provided its adequate assurance information directly to this party. For the reasons stated in the Reply and supporting declarations, the Debtors have provided adequate assurance of future performance in accordance with the Bankruptcy Code. *See* Response, ¶¶ 73-76. | C. Pending |
| 8. | SAP Industries, Inc., SAP America, Inc. and Concur Technology, Inc.<br><br>(ECF No. 1886) | A. **Assumption and Assignment Objection:** asserts that the SAP contracts cannot be assumed and assigned without SAP's consent. | A. The Buyer and the Debtors intend to work with the party, and hope to resolve the objection. The Proposed Revised Sale Order includes bracketed which is still under review and, if agreed, would provide that consent to assign an agreement will be obtained, if and to the extent that such consent is determined to be required under the applicable agreement and such provision is determined to be enforceable under applicable law. *See* Revised Proposed Sale Order, ¶68. | A. Pending |
|  |  | B. **TSA Objection:** objects to the extent that any transition services agreement shall allow shared use of intellectual property between the Buyer and the Debtors. | B. The Buyer and the Debtors intend to work with the party, and hope to resolve the objection. The Proposed Revised Sale Order includes bracketed which is still under review and, if agreed, would not authorize the use of SAP's software or other intellectual property for the benefit of any non-Debtor party under any Transition Services Agreement to the extent prohibited by the agreement governing the same. *See* Revised Proposed Sale Order, ¶ 67. | B. Resolved |

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| 9. | Salesforce. Com, Inc.<br><br>(ECF No. 1981)<br><br>Supplemental Objection<br><br>(ECF No. 2252) | A. **Cure Objections:** asserts Cure Costs of $580,351.27, including $109,525.95 pre-petition, $370,647.26 post-petition, and $100,178.06 that will come due on February 8, 2019; the amount proposed by the Debtors is $460,880. | A.  The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29. | A.   Adjourned |
| | | B. **Assumption and Assignment Objection**: asserts that the agreements listed by the Debtors are part of an integrated agreement with agreements that were not listed by the Debtors, and that all agreements must be assumed and assigned in their entirety. | B.  The Debtors will work with the Objecting Party toward proper and complete identification and description of the applicable executory contracts and unexpired leases, pending resolution by the parties or the Court.  To the extent that it is determined that such contracts cannot be assumed without assumption of a related contract or lease, and to the extent such provisions are found to be enforceable under applicable law, the Debtors and the Buyer will work to resolve such objection with the Objecting Party. | B.   Pending |
| | | C. **Adequate Assurance Request**: states that it will not object to assumption and assignment if the Court finds that adequate assurance has been provided and requests adequate assurance of future performance. | C.  For the reasons stated in the Reply and supporting declarations, the Debtors have provided adequate assurance of future performance in accordance with the Bankruptcy Code. *See* Response, ¶¶ 73-76. | C.   Pending |
| 10. | Cisco Systems, Inc.<br><br>(ECF No. 1988) | A. **Cure Objection:** asserts Cure Costs of $519,160.56, plus any amounts that accrue prior to the effective date of assumption and assignment, including $94,703.02 on 2/1/2019, $76,627.36 on 2/6/2019, and any additional amount that may accrue; the amount proposed by the Debtors is $424,905. | A.  The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the | A.   Adjourned |

7

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  |  | Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29.  To the extent there are any postpetition amounts due and owing under the applicable agreements that arose prior to the Closing Date, such amounts shall be paid by the Debtors in the ordinary course. |  |
|  |  | B.  **Assumption and Assignment Objection:** argues that the Cisco contracts, including those not listed by the Debtors on any assumption and assignment notice, constitute one integrated agreement that constitute one executory contract and must be assumed and assigned together. | B.  The Debtors will work with the Objecting Party toward proper and complete identification and description of the applicable executory contracts and unexpired leases, pending resolution by the parties or the Court.  To the extent that it is determined that such contracts cannot be assumed without assumption of a related contract or lease, and to the extent such provisions are found to be enforceable under applicable law, the Debtors and the Buyer will work to resolve such objection with the Objecting Party. | B.  Pending |
|  |  | C.  **Adequate Assurance Objection:** asserts that it will not object to assumption and assignment if the Court finds that adequate assurance has been provided and requests adequate assurance of future performance. | C.  For the reasons stated in the Response, the Debtors have provided adequate assurance of future performance in accordance with the Bankruptcy Code. *See* Response, ¶¶ 73-76. | C.  Pending |
| 11. | Oracle<br><br>(ECF No. 1992) | A.  **Assumption and Assignment Objection:** asserts that the Oracle agreements cannot be assumed and assigned without its consent. | A.  The Buyer and the Debtors intend to work with the party, and hope to resolve the objection.  The Proposed Revised Sale Order includes bracketed which is still under review and, if agreed, would provide that would provide that consent to assign an agreement will be obtained, if and to the extent that such consent is determined to be required under the applicable agreement and such provision is determined to be enforceable under applicable law. *See* Revised Proposed Sale Order, ¶68.  If it cannot be resolved, the parties will seek determination by the Court as to whether consent to assuming this agreement is enforceable. | A.  Pending |

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| | | B. **Assumption and Assignment Objection:** assert that the listed contract(s) are not identifiable, are misrepresented, or should be listed with related contracts, which are not currently listed by the Debtors. | B. The Debtors and Buyer will work with the Objecting Party toward proper and complete identification and description of the applicable executory contracts and unexpired leases. If the parties are unable to resolve the issue, they will seek judicial determination in Bankruptcy Court. | B. Pending |
| | | C. **Adequate Assurance Objection**: requests adequate assurance information. | C. The Debtors provided adequate assurance information and instructions for obtaining adequate assurance information on Exhibit C to each served Cure Notice.  The Buyer provided its adequate assurance information directly to this party.  For the reasons stated in the Reply and supporting declarations, the Debtors have provided adequate assurance of future performance in accordance with the Bankruptcy Code. *See* Response, ¶¶ 73-76. | C. Pending |
| 12. | Google LLC  (ECF No. 1995) | A. **Cure Objection:** asserts Cure Costs of $1,115,563.36 plus all amount unpaid and due after January 24, 2019 through the date of assumption; the amount proposed by the Debtors is $0. | A. Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29. | A. Pending |
| | | B. **Assumption and Assignment Objection:** assert that certain of the listed contracts are not identifiable as listed. | B. The Debtors will work with the Objecting Party toward proper and complete identification and description of the applicable executory contracts and unexpired leases. If the parties are unable to resolve the issue, they will seek judicial determination in Bankruptcy Court. | B. Pending |

|    | Objecting Party | Objection Summary | Response | Status |
|----|-----------------|-------------------|----------|--------|
|    |                 |                   |          |        |
| 13. | Google LLC<br><br>(ECF No. 2153) | A.  **Cure Objection:** asserts Cure Costs of $128,820.00 plus all amount unpaid and due after January 24, 2019 through the date of assumption; the amount proposed by the Debtors is $0. | A.  The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29. | A.  Adjourned |
| 14. | Microsoft Corporation and affiliates<br><br>(ECF No. 1842) | A.  **Cure Objections:** asserts Cure Costs of $35,116.92 is due under the licenses and $1,562,932.49 is due for certain ads; the amount proposed by the Debtors is $0 in each case. | A.  The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29. | A.  Pending |
|    |                 | B.  **Assumption and Assignment Objection**: assert that the Licenses Agreements cannot be assumed and assigned without their consent. | B.  The Buyer and the Debtors intend to work with the party, and hope to resolve the objection.  The Proposed Revised Sale Order includes bracketed language includes bracketed which is still under review and, if agreed, would provide that provide that consent to assign an agreement will be obtained, if and to the extent that such consent is determined to be required under the applicable agreement and such provision is determined to be enforceable under | B.  Pending |

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  |  | applicable law. *See* Revised Proposed Sale Order, ¶ 68.  If it cannot be resolved, the parties will seek determination by the Court as to whether consent to assuming this agreement is enforceable. |  |
| 15. | LinkedIn Corporation<br><br>(ECF No. 1852) | A. **Cure Objections:** asserts Cure Costs of $278,099.17; the amount proposed by the Debtors is $124,466.<br><br><br><br><br><br><br><br><br><br>B. **Assumption and Assignment Objection**: assert that the Licenses cannot be assumed and assigned without its consent. | A. The Asset Purchase Agreement permits Buyer to modify the list of Initial Assigned Agreements until two Business Days prior to Closing.  To the extent that the applicable agreements are ultimately assumed and assigned, the Buyer will pay the undisputed portion of the Cure Cost on the Assumption Effective Date.  The Buyer will reserve the disputed portion of the Cure Cost asserted by the Objecting Party, pending consensual resolution by the Debtors, the Buyer, and the Objecting Party or determination by the Court, in accordance with the procedures in the Proposed Revised Sale Order. *See* Response, ¶ 13; Proposed Revised Sale Order, ¶ 29.<br><br>B. The Buyer and the Debtors intend to work with the party, and hope to resolve the objection.  The Proposed Revised Sale Order includes bracketed which is still under review and, if agreed, would provide that provide that consent to assign an agreement will be obtained, if and to the extent that such consent is determined to be required under the applicable agreement and such provision is determined to be enforceable under applicable law. *See* Revised Proposed Sale Order, ¶68.  If it cannot be resolved, the parties will seek determination by the Court as to whether consent to assuming this agreement is enforceable. | A.  Adjourned<br><br><br><br><br><br><br><br><br><br>B.  Resolved |
| 16. | DFS Services LLC<br><br>(ECF No. 2024) | A. **Assumption and Assignment Objection**:  asserts that the listed contract(s) are not identifiable, are misrepresented, or should be listed with related contracts, which are currently not listed by the Debtors. | A. The Debtors and Buyer will work with the Objecting Party toward proper and complete identification and description of the applicable executory contracts and unexpired leases. If the parties are unable to resolve the issue, they will seek judicial determination in Bankruptcy Court. | A.  Resolved |

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  | B. **Assumption and Assignment Objection**: Discover contracts, including those not listed by the Debtors on any assumption and assignment notice, constitutes one integrated agreement that constitute one executory contract and must be assumed and assigned together. | B. The Debtors will work with the Objecting Party toward proper and complete identification and description of the applicable executory contracts and unexpired leases, pending resolution by the parties or the Court.  To the extent such contracts cannot be assumed without assumption of a related contract or lease, and to the extent such provisions are enforceable, the Debtors and the Buyer will work to resolve such objection with the Objecting Party. | B.   Resolved |
|  |  | C. **Assumption and Assignment Objection**:  argues Buyer must assume all liabilities arising under the assumption and assignment of the Discover contracts, including returns and chargebacks relating to purchases and sales made prior to the date of assignment. | C. The Buyer is working with the Objecting Party to determine the enforceability of all such liabilities.  To the extent such contracts cannot be assumed without assumption of such liabilities, the Debtors and the Buyer will work to resolve such objection with the Objecting Party. | C.   Pending |
| 17. | Waste Management National Services, Inc.<br><br>(ECF No. 1783) | A.   Objects to the extent that any transition services arrangement allows the Buyer to utilize services or equipment after the closing of the Sale Transaction without effecting an assignment of the master service agreement to the Buyer. | A.   All parties' rights are reserved.  To the extent services or equipment are required under the Transition Services Agreement, parties will work to resolve the issue. If the parties are unable to resolve the issue, they will seek judicial determination in the Bankruptcy Court on an expedited basis. *See* Revised Proposed Sale Order, ¶ 26. | A. Pending |
| 18. | Ramco Jackson Crossing SPE, LLC<br><br>(ECF No. 1859) | A.   Real estate rights or assets should not be sold free and clear of easements, reciprocal easement agreements, and other similar interests that are not executory or that run with the land. | A.   Paragraph 59 of the Proposed Sale Order provides that no sale of any real estate rights or assets shall be free and clear of any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits that are not executory or that run with the land. | A. Resolved |
| 19. | National Distribution Centers, LLC | A.   Objects to the extent that a parking lot is transferred to Buyer without honoring objector's right of first | A.   The lessee does not have a right of first refusal in this context under the terms of the Parking Lot Lease. | A. Pending |

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| | (ECF No. 1864) | refusal in purchasing the property, which objector currently leases. | The Parking Lot Lease provides that:<br><br>"[n]otwithstanding anything to the contrary contained herein, . . . Tenant [Objector] shall have no right to acquire Landlord's [seller's] interest in the Premises [Parking Lot Parcel] if . . . [seller] sells or transfers [seller's] interest in the [Parking Lot Parcel] to any affiliate of the [seller], provided, however, that this right of first offer shall continue to be in effect during the Term of this Lease . . . ." (Parking Lot Lease, ¶ 39.)  In the apparent absence of a definition of "affiliate" within the lease, the Bankruptcy Code is instructive.  Under the Bankruptcy Code, Buyer would qualify as an "affiliate" of Debtor/Seller Kmart Corporation, the Landlord under the Parking Lot Lease.  *See* 11 U.S.C. § 101(2)(B) ("The term 'affiliate' means—(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote . . . by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ."). Thus, to the extent that Buyer is purchasing the Parking Lot Parcel, it would be a sale or transfer of the Landlord seller's interest in the Parking Lot Parcel to a Landlord seller's affiliate, that does not trigger a right of first refusal under the terms of the Parking Lot Lease.<br><br>Moreover, courts have held that right of first refusal is unenforceable when the lease in question is assumed and assigned pursuant to section 365 of the Bankruptcy Code. *See, e.g., In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 89 (Bankr. S.D.N.Y. 2007) ("[R]ights of first refusal constitute forbidden restraints upon assignment, . . . which . . . are subject to invalidation under section 365(f)."). | |

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| 20. | Cross Country Home Services, Inc.<br><br>(ECF No. 1893) | A.  Asserts that the setoff and recoupment rights under relevant contracts with the Debtors should not be sold free and clear as a result of the Sale Transaction. | A.  The Buyer and the Debtors intend to work with the party, and hope to resolve the objection.  The Proposed Revised Sale Order includes bracketed which is still under review and, if agreed, would provide that nothing in the Revised Proposed Sale Order shall modify, impair, limit, or otherwise interfere with the rights of recoupment and setoff of objector under the relevant agreements.  *See* Revised Proposed Sale Order, ¶ 64. | A. Resolved |
| 21. | Chubb Companies<br><br>(ECF No. 1990) | A.  Objects on the following bases: (i) it cannot determine how the Debtors propose to treat the insurance policies in connection with the Sale Transaction; (ii) to the extent that the insurance policies are assumed and assigned, they must be assumed and assigned as a whole; (iii) the insurance policies cannot be assigned without the consent of the objector.  Further, the objector seeks clarification that the objector are not responsible for determining which entity, as between the Debtors and the Buyer, is entitled to coverage under the insurance policies. | A.  The Buyer and the Debtors intend to work with the party, and hope to resolve the objection.  No insurance policies issued by objector or any rights, benefits, claims, rights to payments and/or recoveries arising thereunder are being sold, assigned or otherwise transferred to the Buyer.  Further, the terms or conditions of the insurance contracts shall not be modified.  Debtors may pursue claims in accordance with the terms of the insurance policies and turn over to the Buyer any proceeds in respect of such claims in accordance with section 2.1(q) of the Asset Purchase Agreement.  Objector does not have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover.  *See* Revised Proposed Sale Order, ¶ 65. | A. Resolved |
| 22. | Carl Ireland, Administrator of the Estate of James Garbe<br><br>(ECF No. 1931) | A.  Objects that certain property on which objector possess a first-priority, perfected mortgage lien was listed in the Asset Purchase Agreement to be transferred free and clear of any liens and encumbrances.  Objector seeks to set aside sale proceeds for any such transfer for payment of mortgage, or alternatively have a lien attached to the proceeds of the collateral.  Objector further requests an opportunity to participate in the property valuation process. | A.  Although the property is being sold free and clear pursuant to section 363(f) of the Bankruptcy Code, any liens shall attach to applicable proceeds in the same order of priority of the Sale Transaction.  Objector's right to object to the allocation of proceeds is preserved. | A. Pending |

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| 23. | Luxottica Retail North America Inc.<br><br>(ECF No. 2011) | A. Objects to the extent that the Sale Order seeks to amend, release, waive, or otherwise affect its rights under any contract and/or Junior DIP Order prior to the assumption of the contracts.<br><br>B. To the extent that one or more of its contracts are not assumed, the Objector objects to the Sale Order to the extent that it seeks to amend, release, waive, or otherwise affect any of its right to set off, recoupment, or any other lease rights that may exist in law or equity. | A. The Revised Proposed Sale Order does not seek to abridge, amend, or otherwise affect the Objector's rights under the Junior DIP Order.<br><br>B. Nothing in the Sale Order affects Luxottica or the Debtors' rights if Luxottica's contract is not assumed. | A. Resolved<br><br><br><br><br>B. Resolved |
| 24. | Royal Consumer Products, LLC<br><br>(ECF No. 2014) | A. RCP is a consignment vendor that supplies paper products to the Debtors. RCP objects to the transaction to the extent the Debtors purport to transfer any inventory or sale proceeds attached thereto in violation of objector's perfected security interest. If Debtors do not assume and assign the agreement, RCP demands that Debtors return all inventory in good condition and remit share of the proceeds from sales of inventory as provided for in the consignment agreement.<br><br>B. Objector reserves its rights under the consignment agreement and associated UCC financing statements. | A. Objector's rights in any trust funds or consignment arrangements are preserved.<br><br><br><br><br><br><br><br><br>B. The Sale Transaction only transfers property of the Debtors. The Debtors likewise reserve their rights under applicable law and contract. | A. Pending<br><br><br><br><br><br><br><br><br><br>B. Pending |
| 25. | Wilmington Trust, N.A<br><br>(ECF No. 2089) | A. Requests modifications to the Sale Order to account for the interests of Non-ESL Second Lien Creditors as part of ESL's credit bidding. | A. This objection has been consensually resolved. *See* Revised Proposed Sale Order, ¶ k, 7(c). | A. Pending |
| 26. | Santa Rosa Mall, LLC<br><br>(ECF No. 2013) | A. Objects to the Sale Transaction to the extent the Asset Purchase Agreement unilaterally caps to $13 million the coverage limit of an insurance policy under which objector is the loss payee on this policy. | A. The Asset Purchase Agreement does not cap the insurance coverage requirements under any lease. The provision cited by objector is unrelated to insurance coverage under a lease agreement. Section § 2.1(q) of the APA addresses the payment of certain insurance proceeds that will be paid to the Debtors | A. Pending |

15

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  |  | and not sold to Buyer, which are capped at $13 million. . |  |
| 27. | Blue Cross and Blue Shield of Illinois (ECF No. 1876) | A.  Asserts that the Asset Purchase Agreement fails to take into consideration employees who are not Transferred Employees and who incurred medical claims pre-closing, which claims may not be submitted to objector until post-closing, where the Asset Purchase Agreement provides that such claims shall be the Debtors' responsibility and may therefore not be satisfied in full. | A.  Administrative solvency is not a precondition to a 363 sale, but, the Debtors believe they will remain administratively solvent as a result of Sale Transaction to pay employees who are not Transferred Employees. *See* Response ¶¶ 93-97. | A. Resolved |
|  |  | B.  Asserts that the Asset Purchase Agreement fails to determine a procedure for any run off payments at time of assignment. | B.  Pursuant to paragraphs 37 and 38 of the Revised Proposed Sale Order, counterparties whose contracts or leases are designated for assumption and assignment pursuant to an asset purchase agreement shall be provided sufficient notice and opportunity to object to assumption and assignment (including with regard to any run off payments). | B. Resolved |
| 28. | Acadia Realty Limited (ECF No. 2153) | A.  Objects to any waiver of Federal Rule of Bankruptcy Procedure 6004(h) and 6006(d). | A.  The Revised Proposed Sale should be effective immediately upon entry to maximize value and preserve jobs. *See* Response ¶¶ 119-120. | A. Pending |
|  |  | B.  Objects to the Sale Order on the basis that it seeks to render provisions of leases unenforceable in connection with any future assignments to a non-debtor third party. | B.  This issue is adjourned. Pursuant to ¶ 36 of the Revised Proposed Sale Order, all Contract Lease Counterparties' rights under section 365 with respect to the assumption and assignment of the Designatable Leases and Additional Contracts pursuant to the Bankruptcy Code (including, without limitation, as to the provision of adequate assurance of future performance) are reserved for those who have filed a timely objection pending delivery of a Buyer Assumption Notice or a notice pursuant to Section 2.9 of the Asset Purchase Agreement and the procedures set forth in the Revised Proposed Sale Order. Sufficient notice and opportunity to object will be | B. Resolved |

16

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| | | | provided to such Contract Lease Counterparty subject to assumption and assignment. | |
| | | C.  Asserts that any order approving the assumption and assignment of the leases must provide that the assumption and assignment is pursuant to the terms of the leases.  In the alternative, Objector asserts the Debtors must provide (by insurance or otherwise) that it can satisfy the indemnification obligations under the leases for any such claims that relate to the period prior to any assumption and assignment of the leases. | C.  This issue is adjourned. | C. Resolved |
| | | D.  Objects to any sale free and clear of encumbrances as it is defined broadly in the asset purchase agreement, such as rights of first refusal, first negotiation or first offer, among others. | D.  This issue is adjourned.  Pursuant to paragraphs 37 and 38 of the Revised Proposed Sale Order, counterparties whose contracts or leases are designated for assumption and assignment pursuant to an asset purchase agreement shall be provided sufficient notice and opportunity to object to assumption and assignment. | D. Resolved |
| | | E.  Objects to designation rights procedures to the extent that it restricts the landlords ability to object to the assumption and assignment of the leases. | E.  The Sale Order does not restrict landlords' ability to object if their leases are designated for assumption and assignment. | E. Resolved |
| | | F.  Objects that the asset purchase agreement and Sale Order should not modify agreements such as master leases, or provide for a sale free and clear of restrictive covenants. | F.  The *Revised Proposed Sale Order* provides that any assets will not be sold free and clear of Restrictive Covenants that are not executory and that run with the land.  If any party seek to assume and assign any real estate leases free and clear of any Restrictive Covenant, parties will have an opportunity to object in accordance with the procedures in the Revised Proposed Sale Order.  *See* Revised Proposed Sale Order, ¶59. | F. Resolved |
| | | G.  Requests that sufficient funds remain with the Debtors to cover lease obligations (both monetary and non-monetary) during any such designation | G.  The Buyer is covering costs during the Designation Rights Period. | G. Pending. |

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  | period in the event that a licensee fails to perform under the Lease. |  |  |
| 29. | Simon Property Group, L.P  (ECF No. 2082)  Supplemental Objection  (ECF No. 2214) | A. Landlords object to any sale free and clear of the obligations to satisfy unbilled taxes, reconciliations, percentage rent, or other year-end adjustments or unbilled charges that may have accrued under the Leases prior to the assignment of the Leases, but which have not yet been billed. | A. This issue is adjourned.  The objection is fully preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order.  Sufficient notice and opportunity to have this objection heard will be provided if the agreement is designated by the Buyer for assumption and assignment.  *See* Revised Proposed Sale Order, ¶¶ 3, 36. | A. Adjourned |
|  |  | B. Real estate rights or assets should not be sold free and clear of easements, reciprocal easement agreements, and other similar interests that are not executory or that run with the land. | B. The *Revised Proposed Sale Order* provides that any assets will not be sold free and clear of Restrictive Covenants that are not executory and that run with the land.  If any party seek to assume and assign any real estate leases free and clear of any Restrictive Covenant, parties will have an opportunity to object in accordance with the procedures in the Revised Proposed Sale Order.  *See* Revised Proposed Sale Order, ¶59. | B. Resolved |
|  |  | C. All leases that are subject to a master lease must be assumed and assigned in entirety. | C. This issue is adjourned.  The objection is fully preserved pursuant to the Revised Proposed Sale Order.  Further, such parties' rights are fulling preserved pursuant to the Global Bidding Procedures Order.  Sufficient notice and opportunity to have this objection heard will be provided if the agreement is designated by the Buyer for assumption and assignment.  *See* Revised Proposed Sale Order, ¶¶ 3, 36; Global Bidding Procedures Order, ¶ 50. | C. Adjourned |
|  |  | D. **Adequate Assurance Objection**: Landlords preserve rights for additional adequate assurance information with respect to assumption and assignment of leases related to the shopping provisions of the Bankruptcy Code. | D. This issue is adjourned.  For the reasons stated in the Response, the Debtors have provided adequate assurance of future performance in accordance with the Bankruptcy Code. *See* Response, ¶¶ 73-76. | D. Pending |

18

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| 30. | Benderson Development Company LLC and affiliates<br><br>(ECF No. 2069)<br><br>Supplement Objection<br><br>(ECF No. 2093) | A. Landlords object to any sale free and clear of the obligations to satisfy unbilled taxes, reconciliations, percentage rent, or other year-end adjustments or unbilled charges that may have accrued under the Leases prior to the assignment of the Leases, but which have not yet been billed. | A. This issue is adjourned. The objection is fully preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order. Sufficient notice and opportunity to have this objection heard will be provided if the agreement is designated by the Buyer for assumption and assignment. *See* Revised Proposed Sale Order, ¶¶ 3, 36. | A. Adjourned |
| | | B. The transfer of the Leases to the Buyer is not free and clear of assumed liabilities and the Buyer must comply with all indemnification provisions of the Leases with respect to any claims that may arise post-assignment against the Landlord, regardless of whether such indemnification claims relate to the period prior to the assignment. | B. This issue is adjourned. The objection is fully preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order. Sufficient notice and opportunity to have this objection heard will be provided if the agreement is designated by the Buyer for assumption and assignment. *See* Revised Proposed Sale Order, ¶¶ 3, 36. | B. Adjourned |
| | | C. Debtors must cure non-monetary defaults. | C. This issue is adjourned. The objection is fully preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order. Sufficient notice and opportunity to have this objection heard will be provided if the agreement is designated by the Buyer for assumption and assignment. *See* Revised Proposed Sale Order, ¶¶ 3, 36. | C. Adjourned |
| | | D. Designation procedures should be appropriate and should, among other things, (i) adequately preserve the rights of landlords, including with respect to any proposed assumption and assignment, the ability to assert revised cure cost amounts, adequate assurance information of any third party assignees, and (ii) provide for Court resolution of any disputes that arise. | D. The designation procedures provided in paragraphs 33 to 44 of the Sale Order are reasonable and appropriate. Landlords' rights to object are adequately preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order. Sufficient notice and opportunity to have objections heard will be provided if the agreement is designated by the Buyer for assumption and assignment. *See* Revised Proposed Sale Order, ¶¶ 3, 36. | D. Pending |
| | | E. The sale order should not invalidate lease provisions, extend go-dark periods, or sever master leases. | E. This issue is adjourned. The objection is fully preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order. Sufficient notice and opportunity to have this objection heard will be provided if the agreement is designated by the Buyer | E. Adjourned |

19

|  | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
|  |  |  | for assumption and assignment. *See* Revised Proposed Sale Order, ¶¶ 3, 36. |  |
|  |  | F.   Real estate rights or assets should not be sold free and clear of easements, reciprocal easement agreements, and other similar interests that are not executory or that run with the land. | F.   This issue is adjourned.  The *Revised Proposed Sale Order* provides that any assets will not be sold free and clear of Restrictive Covenants that are not executory and that run with the land.  If any party seek to assume and assign any real estate leases free and clear of any Restrictive Covenant, parties will have an opportunity to object in accordance with the procedures in the Revised Proposed Sale Order.  *See* Revised Proposed Sale Order, ¶59. | F.   Adjourned |
|  |  | G.   Landlords are entitled to additional security for the performance of the Debtors' obligations under the leases under section 365(*l*) of the Bankruptcy Code. | G.   This issue is adjourned.  The objection is fully preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order.  Sufficient notice and opportunity to have this objection heard will be provided if the agreement is designated by the Buyer for assumption and assignment. *See* Revised Proposed Sale Order, ¶¶ 3, 36. | G.   Adjourned |
|  |  | H.   **Adequate Assurance Objection**: Buyer must provide evidence of adequate assurance to ensure that it can perform under the Leases. | H.   This issue is adjourned.  For the reasons stated in the Reply and supporting declarations, the Debtors have provided adequate assurance of future performance in accordance with the Bankruptcy Code. *See* Response, ¶¶ 73-76. | H.   Adjourned |
|  |  | I.   Rule 6004(h) and 6006(d) waivers should be revised to become inapplicable to assignments of Designatable Leases. | I.   The Debtors believe that in order to maximize value for the Debtors' estates, Rule 6004(h) and 6006(d) waivers should be granted.  *See* Response, ¶¶120-121. | I.   Pending |
| 31. | Westfield LLC  (ECF No. 1991) | A.   Leases must be assumed *cum onere*, with all their benefits and burdens. | A.   This issue is adjourned.  The objection is fully preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order.  Sufficient notice and opportunity to have this objection heard will be provided if the agreement is designated by the Buyer for assumption and assignment. *See* Revised Proposed Sale Order, ¶¶ 3, 36. | A.   Adjourned |

| | Objecting Party | Objection Summary | Response | Status |
|---|---|---|---|---|
| | | B.  Designation procedures should be appropriate and should, among other things, (i) adequately preserve the rights of landlords, including with respect to any proposed assumption and assignment, the ability to assert revised cure cost amounts, adequate assurance information of any third party assignees, and (ii) provide for Court resolution of any disputes that arise. | B.  The designation procedures provided in paragraphs 33 to 44 of the Sale Order are reasonable and appropriate.  Landlords' rights to object are adequately preserved pursuant to paragraphs 3 and 36 of the Revised Proposed Sale Order.  Sufficient notice and opportunity to have objections heard will be provided if the agreement is designated by the Buyer for assumption and assignment.  *See* Revised Proposed Sale Order, ¶¶ 3, 36. | B.  Pending |
| | | C.  Debtors should remain liable for all obligations under the leases pursuant to § 365(d)(3) and there should be a clear mechanism and ability to fund the payment of rent during any "designation rights" period. | C.  This Debtors are not being discharged of any obligations during the designation period.  They have simply agreed with the Buyer to be responsible to pay or reimburse certain costs during the Designation Rights Period as provided in the Asset Purchase Agreement. | C.  Adjourned |
| | | D.  Real estate rights or assets should not be sold free and clear of easements, reciprocal easement agreements, and other similar interests that are not executory or that run with the land. | D.  The *Revised Proposed Sale Order* provides that any assets will not be sold free and clear of Restrictive Covenants that are not executory and that run with the land.  If any party seek to assume and assign any real estate leases free and clear of any Restrictive Covenant, parties will have an opportunity to object in accordance with the procedures in the Revised Proposed Sale Order.  *See* Revised Proposed Sale Order, ¶59. | D.  Resolved |

**<u>Exhibit B - 1</u>**

Board Resolutions Appointing the Restructuring Committee

**PROPOSED RESOLUTIONS**
**THE BOARD OF DIRECTORS OF**
**SEARS HOLDINGS CORPORATION**

**October 10, 2018**

Formation of Restructuring Committee; Appointment of Members

WHEREAS, pursuant to Article 4, Section 1 of the Amended and Restated By-Laws ("By-Laws") of Sears Holdings Corporation (the "Corporation") By-laws and Section 141(c) of the General Corporation Law of the State of Delaware (the "DGCL"), the board of directors of the Corporation (the "Board") may by resolution designate one or more committees of the Board to consist of one or more of the directors of the Corporation, with responsibilities and duties of which may be prescribed by the Board, subject to such limitations as provided by law;

WHEREAS, the Board deems it advisable and in the best interests of the Corporation to establish a restructuring committee of the Board, which shall consist solely of one or more independent members of the Board (the "Restructuring Committee"), to, among other things, consider and evaluate various strategic alternatives that may be available to the Corporation and its subsidiaries (each such strategic alternative, a "Transaction") and, if the Restructuring Committee deems it to be in the best interests of the Corporation: (a) recommend to the Board that the Corporation enter into a Transaction, including with respect to a potential (i) restructuring of the indebtedness of the Corporation and its subsidiaries and/or (ii) sale, transfer, or other disposition of certain assets in connection therewith, in each case, not involving ESL Investments, Inc. or its affiliates (excluding the Corporation) ("ESL") (each such potential transaction, a "Non-ESL Transaction"), and (b) authorize and approve a Transaction where ESL has indicated an interest in participating in such Transaction, including by placing a bid, or where ESL has a conflict of interest by virtue of its security interest in an asset or otherwise (each such potential Transaction, an "ESL Transaction" and together with a Non-ESL Transaction, a "Restructuring Transaction);

WHEREAS, the Board deems it advisable and in the best interests of the Corporation to establish a subcommittee of the Restructuring Committee, consisting of one or more members of the Restructuring Committee recommended by the Nominating and Corporate Governance Committee (the "NCG Committee") of the Board (the "Subcommittee"), with the purpose of investigating any cause of action that the Corporation may have with respect to any transactions involving affiliates prior to the date hereof (the "Prior Transactions"), and taking, or causing to be done, any related actions that the Subcommittee considers necessary or desirable to carry out its mandate;

WHEREAS, the NCG Committee is responsible for recommending to the Board director nominees for each committee and for reviewing and making recommendations to the Board with respect to compensation and benefits of directors;

WHEREAS, the NCG Committee has recommended that each of Alan J. Carr, Paul G. DePodesta and Ann N. Reese, each of whom has been determined to be an independent director in accordance with applicable securities laws and NASDAQ rules, be appointed as members of

1

the Restructuring Committee, and that Alan J. Carr be appointed as a member of the Subcommittee;

WHEREAS, the Committee has further recommended that each of the members of the Restructuring Committee receive a fee of $25,000 per month during their service on the Restructuring Committee; and

WHEREAS, upon the recommendation of the NCG Committee, the Board deems it advisable and in the best interests of the Corporation to appoint each of Messrs. Carr and DePodesta and Ms. Reese as a member of the Restructuring Committee.

NOW, THEREFORE, BE IT RESOLVED, the Board hereby establishes a Restructuring Committee, to consist solely of independent members of the Board, which shall be authorized and empowered to take the following actions:

a.      Consider, evaluate and, if the Restructuring Committee deems it to be in the best interests of the Corporation, (a) recommend to the Board that the Corporation enter into a Non-ESL Transaction, or (b) authorize and approve an ESL Transaction;

c.      Oversee the provision of confidential information by or on behalf of the Corporation and its subsidiaries to third parties under cover of an appropriate confidentiality arrangement;

c.      Oversee discussions and negotiations with the Corporation's stakeholders in respect of a Restructuring Transaction;

d.      Oversee the implementation and execution of a Restructuring Transaction;

e.      Oversee the work of the Chief Restructuring Officer, who shall report to the Restructuring Committee; and

f.      Take such other actions as the Restructuring Committee considers necessary or desirable in order to carry out its mandate, subject, as appropriate, to the approval of the Board;

RESOLVED FURTHER, that the Board hereby establishes the Subcommittee to investigate any cause of action that the Corporation may have with respect to any Prior Transactions, and taking, or cause to be done, any related actions that the Subcommittee considers necessary or desirable to carry out its mandate;

RESOLVED FURTHER, that, in carrying out its responsibilities, each of the Restructuring Committee and the Subcommittee is empowered and authorized to coordinate and consult with management, and professional advisors of and to the Corporation, as appropriate, regarding matters within the authority and mandate of the Restructuring Committee and the Subcommittee, as applicable;

RESOLVED FURTHER, that, after consultation with the Board, the Restructuring Committee is authorized to retain professionals for advice or assistance, as it deems necessary and proper, to carry out its responsibilities;

2

RESOLVED FURTHER, that, following consultation with the Restructuring Committee, the Subcommittee is authorized to retain professionals for advice or assistance, as it deems necessary and proper, to carry out its responsibilities;

RESOLVED FURTHER, that the members of the Board, officers, employees, attorneys, auditors, agents and advisors of the Corporation are directed to cooperate fully with the each of the Restructuring Committee and the Subcommittee in the exercise of its duties;

REVOLVED FURTHER, that each of the members of the Restructuring Committee shall receive a fee of $25,000 per month during their service on such committee;

RESOLVED, FURTHER, that, upon the recommendation of the NCG Committee, each of Alan J. Carr, Paul G. DePodesta and Ann N. Reese, each of whom has been found to be an independent director in accordance with applicable securities laws and NASDAQ rules, be, and each hereby is, appointed as a member of the Restructuring Committee and that Alan J. Carr is a member of the Subcommittee; and

<u>Retention of M-III Advisory Partners, LP; Appointment of Mohsin Y. Meghji as Chief Restructuring Officer</u>

WHEREAS, the Board believes that it is advisable and in the best interests of the Corporation to appoint Mohsin Y. Meghji, Managing Partner of M-III Partners, LP, as the Chief Restructuring Officer of the Corporation with the role, responsibilities and compensation as recommended by the Compensation Committee of the Board (the "Compensation Committee"), in each case, as described in the M-III engagement letter in substantially the form attached hereto as <u>Exhibit A</u> (the "M-III Engagement Letter"); and

WHEREAS, the Board believes that it is advisable and in the best interests of the Corporation to retain M-III Advisory Partners, LP ("M-III") to provide services and to be compensated, as recommended by the Compensation Committee, as described in the M-III Engagement Letter.

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby appoints Mr. Meghji as Chief Restructuring Officer of the Corporation, effective as of the date of the execution of the Engagement Letter, with the role, responsibilities and compensation, and retains M-III to provide services and be compensated, in each case, as described in the M-III Engagement Letter;

RESOLVED, FURTHER, that, it is contemplated that Mr. Meghji, as Chief Restructuring Officer, shall report to the Restructuring Committee.

<u>General Authorization</u>

RESOLVED, FURTHER, that the executive officers of the Corporation (each a "Proper Officer"), each of whom may act without the joinder of any of the others, be, and each of them individually hereby is, authorized and directed, in the name and on behalf of the Corporation, to take or cause to be taken all such further actions, including without limitation, negotiating, signing, executing, acknowledging, certifying, attesting, delivering, accepting, recording and filing (with such changes as such Proper Officer shall approve, the execution and delivery

3

thereof or the taking of such other action to be conclusive evidence of such approval) the M-III Engagement Letter and all such further documents, agreements, certificates and instruments and paying all fees, taxes and other expenses or payments, in each case as such Proper Officer, in such Proper Officer's sole discretion, may determine to be necessary, appropriate or desirable in order to fulfill the intent and accomplish the purposes of the foregoing resolution, such determination to be conclusively evidenced by the taking of any such further action; and

RESOLVED, FURTHER, that any actions taken by any Proper Officer, for or on behalf of the Corporation, prior to the date hereof that would have been authorized by these resolutions but for the fact that such actions were taken prior to the date hereof be, and they hereby are, authorized, adopted, approved, confirmed and ratified in all respects as the actions and deeds of the Corporation.

4

## **Exhibit B-2**

Board Resolutions Appointing the Subcommittee

**PROPOSED RESOLUTIONS OF**
**THE SUBCOMMITTEE OF THE**
**RESTRUCTURING COMMITTEE OF**
**THE BOARD OF DIRECTORS OF**
**SEARS HOLDINGS CORPORATION**

WHEREAS, the Subcommittee (the "Subcommittee") of the Restructuring Committee (the "Restructuring Committee") of the board of directors (the "Board") of Sears Holdings Corporation (the "Company"), following consultation with the Restructuring Committee, is authorized to retain professionals for advice or assistance, as it deems necessary and proper, to carry out its responsibilities; and

WHEREAS, the Subcommittee has consulted with the Restructuring Committee regarding the retention of Paul, Weiss, Rifkind, Wharton & Garrison LLP by the Subcommittee.

NOW, THEREFORE, BE IT RESOLVED, that the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, located at 1285 Avenue of the Americas, New York, NY 10019, is hereby retained as counsel to the Subcommittee, subject to approval of the United States Bankruptcy Court for the Southern District of New York.

<u>**Ratification**</u>

RESOLVED, that any and all past actions heretofore taken by any officer of the Company (each an "Authorized Person"), any director, or any member of the Company in the name and on behalf of the Company in furtherance of any or all of the preceding resolutions be, and the same hereby are, ratified, confirmed, and approved in all respects;

<u>**General Authorization**</u>

RESOLVED, FURTHER, any Authorized Person, each of whom may act without the joinder of any of the others, be, and each of them individually hereby is, authorized and directed, in the name and on behalf of the Corporation, to take or cause to be taken all such further actions, including without limitation, negotiating, signing, executing, acknowledging, certifying, attesting, delivering, accepting, recording and filing (with such changes as such Authorized Person shall approve, the execution and delivery thereof or the taking of such other action to be conclusive evidence of such approval) and all such further documents, agreements, certificates and instruments and paying all fees, taxes and other expenses or payments, in each case as such Authorized Person, in such Authorized Person's sole discretion, may determine to be necessary, appropriate or desirable in order to fulfill the intent and accomplish the purposes of the foregoing resolution, such determination to be conclusively evidenced by the taking of any such further action; and

RESOLVED, FURTHER, that any actions taken by any Authorized Person, for or on behalf of the Corporation, prior to the date hereof that would have been authorized by these resolutions but for the fact that such actions were taken prior to the date hereof be, and they hereby are, authorized, adopted, approved, confirmed and ratified in all respects as the actions and deeds of the Corporation.

## **Exhibit B-3**

Board Resolutions Regarding the Authority of the Subcommittee

<u>PROPOSED RESOLUTIONS OF THE</u>
**BOARD OF DIRECTORS OF
SEARS HOLDINGS CORPORATION**

**November 2, 2018**

<u>Authority of the Subcommittee of the Restructuring Committee</u>

WHEREAS, pursuant to Article 4, Section 1 of the Amended and Restated By-Laws of Sears Holdings Corporation (the "Corporation") and Section 141(c) of the General Corporation Law of the State of Delaware, the Board of Directors of the Corporation (the "Board") by resolution duly established a Subcommittee (the "Subcommittee") of the Restructuring Committee of the Board (the "Restructuring Committee") consisting of one or more members of the Restructuring Committee, which consists solely of one or more independent members of the Board, with the purpose of investigating any cause of action that the Corporation may have with respect to any transactions involving affiliates prior to the date of the Subcommittee's formation (the "Prior Transactions"), and taking, or causing to be done, any related actions that the Subcommittee considers necessary or desirable to carry out its mandate;

WHEREAS, Alan J. Carr and William L. Transier were duly appointed by the Board, at the recommendation of the Nominating and Corporate Governance Committee of the Board, as members of the Subcommittee; and

WHEREAS, the Board deems it advisable and in the best interests of the Corporation to clarify the role and responsibilities of the Subcommittee.

NOW, THEREFORE, BE IT RESOLVED that the Board hereby authorizes and empowers the Subcommittee to take the following actions:

1. Prosecute, waive, release, settle, negotiate and bind the Corporation with respect to any claims or causes of action of the Corporation that arise out of or relate to Prior Transactions that are the subject of the Subcommittee's investigation (the "Specified Matters");

2. Control the Corporation's attorney-client and attorney work product privilege for any information disclosed to or developed by the Subcommittee or its advisors during the course of the Subcommittee's investigation;

3. Determine, act on behalf of and bind the Corporation with respect to the right of and/or extent to which a party that is the subject of the Subcommittee's investigation may (i) credit bid pursuant to 11 U.S.C. 363(k) or (ii) take similar actions during the course of the Corporation's chapter 11 cases (the "Chapter 11 Cases") including any credit bid or similar action pursuant to a chapter 11 plan;

4. Determine, act on behalf of and bind the Corporation with respect to any proposed releases, exculpations or indemnifications by the Corporation of its current or former directors, officers or affiliates, in each case, solely with respect to the Specified Matters;

5. Determine whether a bid from or a chapter 11 plan proposed by an affiliate or equity holder of the Corporation that is the subject of the Subcommittee's investigation is higher and/or better than any other alternative, limited to the appropriateness of releases, exculpations or indemnifications by the Corporation of its current or former directors, officers or affiliates contained therein, in each case, solely with respect to to the Specified Matters;

6. Determine, act on behalf of and bind the Corporation with respect to any other matter that is within the scope of the mandate of the Restructuring Committee which the Restructuring Committee may decide to delegate to the Subcommittee without any further action of the Board, including matters that the Restructuring Committee determines pose or may pose a conflict for it to act upon. To the extent the Restructuring Committee does delegate additional matters to the Subcommittee, it shall promptly advise the Board of the same;

7. In carrying out its responsibilities, coordinate and consult with management, and professional advisors of and to the Corporation, as appropriate, regarding matters within the authority and mandate of the Subcommittee; and

8. Retain professionals for advice or assistance, as it deems necessary and proper, to carry out the responsibilities of the Subcommittee; and be it

General Authorization

RESOLVED, FURTHER, that the executive officers of the Corporation (each a "Proper Officer"), each of whom may act without the joinder of any of the others, be, and each of them individually hereby is, authorized and directed, in the name and on behalf of the Corporation, to take or cause to be taken all such further actions, including without limitation, negotiating, signing, executing, acknowledging, certifying, attesting, delivering, accepting, recording and filing (with such changes as such Proper Officer shall approve, the execution and delivery thereof or the taking of such other action to be conclusive evidence of such approval) all such documents, agreements, certificates and instruments and paying all fees, taxes and other expenses or payments, in each case as such Proper Officer, in such Proper Officer's sole discretion, may determine to be necessary, appropriate or desirable in order to fulfill the intent and accomplish the purposes of the foregoing resolution, such determination to be conclusively evidenced by the taking of any such further action; and be it

RESOLVED, FURTHER, that any actions taken by any Proper Officer, for or on behalf of the Corporation, prior to the date hereof that would have been authorized by these resolutions but for the fact that such actions were taken prior to the date hereof be, and they hereby are, authorized, adopted, approved, confirmed and ratified in all respects as the actions and deeds of the Corporation.