ELISE S. FREJKA, CIPP/US
Frejka PLLC
420 Lexington Avenue – Suite 310
New York, New York 10170
Telephone: (212) 641-0800
Facsimile: (212) 641-0820

*Consumer Privacy Ombudsman*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                    :

In re:                                 :         Chapter 11
                                    :

SEARS HOLDINGS CORPORATION, *et al.*,[1]    :         Case No.: 18-23538 (RDD)
                                    :

         Debtors.                      :         (Jointly Administered)
                                    :

-------------------------------------------------------------------- X

## REPORT OF THE CONSUMER PRIVACY OMBUDSMAN
### (*GLOBAL ASSET SALE TRANSACTION*)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Debtors also include SHC Licensed Business LLC (3718), filed as Case No. 18-23616 and SHC Promotions LLC (9626), filed as Case No. 18-23630 (the "Additional Debtors"). The Additional Debtors each filed a motion in their respective chapter 11 cases requesting joint administration with the Debtors for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.

## TABLE OF CONTENTS

Preliminary Statement..................................................................................................... 1

Background ....................................................................................................................... 2

Review of the Debtors' Privacy Policies and Practices .................................................. 4

Consumer Information Collected and the Debtors' Privacy Policy................................. 5

Analysis............................................................................................................................ 7

    Shop Your Way........................................................................................................... 8

    Sears Automotive....................................................................................................... 10

    Sears Home Services.................................................................................................. 11

    Innovel ....................................................................................................................... 12

    Wally.......................................................................................................................... 12

    Videos/Video Games/DVDs (Applicable to all Customer Records)......................... 14

    Other Sources and Uses of Personally Identifiable Information ............................... 15

    SHIP........................................................................................................................... 16

PCI DSS Compliant Vault ............................................................................................. 16

Pharmacy Records ......................................................................................................... 17

Implementation .............................................................................................................. 20

Conclusion ..................................................................................................................... 21

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Elise S. Frejka, the consumer privacy ombudsman[1] (the "Ombudsman"), files this report

(the "Report")[2] in the above-captioned cases to assist the Bankruptcy Court in its consideration

of the facts, circumstances, and conditions of the proposed sale (the "Global Asset Sale") of

substantially all of the assets of Sears Holdings Corporation and its debtor affiliates (collectively,

the "Debtors"), including personally identifiable information ("Personally Identifiable

Information")[3] and Protected Health Information (defined below) (collectively, "Customer

Data"), to Transform Holdco, LLC (the "Proposed Buyer") pursuant to the Asset Purchase

Agreement dated as of January 17, 2019, as may be amended or supplemented, (the "Asset

Purchase Agreement").

## PRELIMINARY STATEMENT

The Ombudsman is pleased to acknowledge the extraordinary cooperation and assistance

she received from the Debtors in ascertaining the sources, uses and safeguards for the Debtors'

---

[1]  See Stipulation and Agreed Order with Respect to Appointment of Consumer Privacy [Dkt. No. 999]; Notice of Appointment of Consumer Privacy Ombudsman [Dkt. No. 1009].

[2]  The Ombudsman provided earlier drafts of this Report to counsel for the Debtors and counsel for the Proposed Buyer. The Proposed Buyer has agreed to implement the recommendations contained in this Report.

[3]  Pursuant to 11 U.S.C. § 101(41A), [t]he term "PII" means—

   (A)  if provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes—

      (i)   the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;

      (ii)  the geographical address or a physical place of residence of such individual;

      (iii) an electronic address (including an e-mail address) of such individual;

      (iv)  a telephone number dedicated to contacting such individual at such physical place of residence;

      (v)   a social security account number issued to such individual; or

      (vi)  the account number of a credit card issued to such individual[.]

11 U.S.C. § 101(41A)

customer data and associated Personally Identifiable Information.  The Debtors' commitment to

protecting customer information and Personally Identifiable Information is evidenced by the

rigorous policies implemented and the diligence exercised by the Debtors in carrying out these

policies.  The Ombudsman wishes to strongly commend the relevant and knowledgeable

personnel and counsel who made themselves readily available to answer the Ombudsman's

extensive information requests and who provided thought provoking and legitimate business

reasons for the majority of the Debtors' data retention practices.  It is because of the dedication

and involvement of these professionals in gathering, applying, and protecting Customer Data and

the use of an affirmative "opt-in" process that the Ombudsman can recommend that the Court

approve a broad sale of Personally Identifiable Information.

The recommendations contained herein regarding the transfer of Customer Data are

specific to a going concern sale and would likely change if the Global Asset Sale is not approved

and business segments are sold separately.

**BACKGROUND**

1.      Beginning on October 15, 2018 (the "Commencement Date") and continuing

thereafter, each of the Debtors commenced with this Bankruptcy Court a voluntary case under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are

authorized to continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 24, 2018, the United States Trustee for Region 2 appointed an official

committee of unsecured creditors.  No trustee or examiner has been appointed in these chapter 11

cases.

3.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.      On November 1, 2018, the Debtors filed their Motion for Approval of Global Bidding Procedures (the "Global Sale Motion") [Dkt. No. 429].

5.      On November 19, 2018, the Bankruptcy Court entered that certain Order Approving Bidding Procedures and Granting Related Relief (the "Global Bidding Procedures Order") in connection with the Global Asset Sale [Dkt. No. 816].

6.      On November 21, 2018, the Debtors filed the Notice of Filing of Global Bidding Procedures Process Letter soliciting bids for the Global Assets, on a going concern or liquidation basis and individual target businesses, including Sears Home Services and the business units PartsDirect, Sears Auto Centers, Innovel and Wally Home [Dkt. No. 862].

7.      On January 14, 2019, the Debtors commenced an auction for the sale of the Global Assets.  The bid submitted by the Proposed Buyer was selected by the Debtors, as directed by the Debtors' Restructuring Committee, as the highest or best offer for the Global Assets.

8.      On January 17, 2019, the Debtors and the Proposed Buyer entered into the Asset Purchase Agreement pursuant to which the Proposed Buyer will acquire all or substantially all of the Global Assets [Dkt. No. 1730].

9.      Among the assets to be sold to the Proposed Buyer pursuant to the Asset Purchase Agreement is Customer Data.  Customer Data is defined in the Asset Purchase Agreement as meaning:

> all data (including personal data and personally identifiable
> information) owned or controlled (meaning any data [the Debtors]
> have the ability to transfer in compliance with applicable Law) by or

on behalf of [the Debtors] related to [the Debtors'] customers,
consumers or end users, including (i) customer, consumer and end user
files and lists and contact information, (ii) purchasing, transaction and
installation histories (namely, the product purchased, date of purchase,
location of purchase, date of installation and whether a warranty was
purchased), (iii) customer, consumer and end-user complaints and
returns, (iv) customer, consumer or end user opt-outs, unsubscribe or
opt-ins requests in relation to the use or processing of their
information, (v) all analytics relating to any of the foregoing and other
customer-based analyses or reports and, (vi) all loyalty program data
and participation information (including all information and data with
respect to Shop Your Way).

Asset Purchase Agreement at Section 1.1.

10.    A hearing to consider the Global Asset Sale is scheduled before the Bankruptcy

Court on February 4, 2019.

### REVIEW OF THE DEBTORS' PRIVACY POLICIES AND PRACTICES

11.    In performing her duties, the Ombudsman has relied upon and reviewed, among

other things, the following:

a.    The Debtors' privacy policies in effect on the Commencement Date and
all prior privacy policies;

b.    Telephone interviews, discussions, and emails with (1) counsel to the
Debtors, Weil Gotshal & Manges LLP (Randi Singer, Lauren Springer and
Meggin Bednarczyk); (2) internal representatives of the Debtors including
Jeremy Holbrook (Deputy General Counsel), Gregory Russell (Chief
Information Officer), Justin Kurt (Divisional Vice President – Mobile
Marketing and Targeted Interactions), Michelle Johnson (Senior Director
– I&TG, Financial Services and Point of Sale), Carol Ricchio (Vice
President – Retail Solutions), Eui Chung (Vice President – Social
Commerce), Vatsala Dubey (Director – Information Security and
Compliance), Espen Zachrisen (Vice President – Online and Telluride),
Ajay Sharma (Senior Director, Technology – Home Services), Ramesh
Nallabelli (Senior Director, Technology – Home Services), and Jonathan
Ramesbottom (Senior Manager, I&TG); (3) special health law counsel to
the Debtors, Quarles & Brady LLP (Edward D. Rickert); and (4) counsel
to the Proposed Buyers, Cleary Gottlieb Steen & Hamilton LLP (Daniel
Ilan, Michelle Elsner and Jane Rosen);

c.    The Global Sale Motion, the Global Bidding Procedures Order, and the
Global Bidding Procedures Process Letter;

    d.        The Debtors' privacy practices and collection procedures concerning Personally Identifiable Information, including the Debtors' database maintenance procedures for Personally Identifiable Information, and their procedures for the sharing and use of such information;

    e.        Research and review of case law, commentaries, and court orders from bankruptcy cases involving the sale of Personally Identifiable Information and Protected Health Information;

    f.        Public filings by the Debtors;

    g.        Applicable United States federal and state privacy laws, regulations, enforcement actions, guidance and industry best practices; and

    h.        The Asset Purchase Agreement.

### CONSUMER INFORMATION COLLECTED AND THE DEBTORS' PRIVACY POLICY

12.    The facts in this Report are based solely upon the Ombudsman's information and belief, based upon her discussions with representatives of the Debtors, information provided by the Debtors, and historical information provided by the Debtors in public filings with the SEC and elsewhere.

13.    The Debtors operate multiple business segments where Personally Identifiable Information is collected including, brick and mortar stores under the Sears and Kmart banners, websites under the sears.com, kmart.com, shopyourway.com and mypartsdirect.com domains, automotive repair and maintenance at Sears Auto Centers ("Sears Auto"), appliance and home service solutions through Sears Home Services ("Sears Home Services"), cutting edge sensor technology offered by Wally Labs LLC ("Wally"), warehousing, transportation, installation, and home delivery services by Innovel Solutions Inc. ("Innovel"), and full-service pharmacies operated under the Kmart banner.

14.    The centerpiece of the Debtors' consumer data collection is the Shop Your Way loyalty program ("Shop Your Way") which was created in November 2009.  The Shop Your Way program provides a free, comprehensive, membership-based program that allows

consumers to shop, compare, purchase items, and earn rewards points that can be used towards future purchases at the Debtors or other participating vendors. Purchases at all of the Debtors' brands feed into the Shop Your Way program but participation in the program is voluntary. In addition, members of the loyalty program enjoy the benefit of aggregating their purchasing history in one place with in-store and on-line transactions stored within a consumer's profile for access through either the Shop Your Way app or at shopyourway.com. Similarly, consumers can manage their email and marketing preferences from within the Shop Your Way platform.

15.    The Shop Your Way program has grown and evolved over the years with advances in technology. When the program first began, customers signed up in store at the point of sale and were identified by a loyalty card with a bar code. Now, there are multiple entrance points to the program and a member need never set foot in a store and a cell phone number replaces the bar code. Throughout the evaluation of the loyalty program one thing has remained constant: members have always been required to affirmatively acknowledge and accept the Privacy Policy and terms of use through a pin pad acknowledgment at the cash register, by accepting text messaging charges and text marketing on a cellphone, or through an email confirmation process. This two-step process of enrollment ensures that all Shop Your Way members with active profiles, i.e., those that took the required second affirmative step after obtaining a loyalty number, consented, or opted-in, to the Shop Your Way privacy policy. Since the inception of the loyalty program, over 145 million loyalty numbers have been assigned to customers but only 86 million loyalty profiles contain Personally Identifiable Information because of this extra level of protection instituted by the Debtors.[4]

---

[4] Consumers can also create accounts at sears.com and kmart.com. These accounts are subject to the Privacy Policy.

16.    The Debtors have instituted a consistent privacy policy (the "Privacy Policy")

applicable across all business lines.  Since September 8, 2008, each iteration of the privacy

policy has contained a nearly identical statement that:

> Sears Holdings may sell, transfer and/or share PII with
> third parties in connection with a merger, reorganization,
> joint venture, assignment, spin-off, transfer or sale or
> disposition of all or any portion of our business, and in the
> event of a store closing or bankruptcy.

See Privacy Policy attached hereto as Exhibit A.  The Debtors' predecessor privacy policy,

effective October 26, 2011 through July 5, 2015, permitted the transfer or sale of Personally

Identifiable Information but contained a requirement that the Debtors notify consumers of any

such transaction, but this requirement was not carried forward to the current Privacy Policy that

was adopted on July 6, 2015.  The pre-2008 privacy policy did not contain this explicit language.

However, as discussed more specifically with respect to Personally Identifiable Information that

is relevant to different business lines, there is a legitimate business need, adequately articulated

by the Debtors, for certain Personally Identifiable Information associated with specific segments

of the Debtors' business to be transferred to the Proposed Purchaser even though it was collected

pursuant to one of the earlier privacy policies.

## ANALYSIS

17.    Section 363(b)(1) of the Bankruptcy Code governs a debtor's ability to "use, sell,

or lease" Personally Identifiable Information.  Generally, a debtor may not sell or lease Personally

Identifiable Information if, at the time of the commencement of a bankruptcy case, the debtor's

privacy policy prohibits the transfer of Personally Identifiable Information to unaffiliated

entities.[5]  Notwithstanding this general prohibition, a sale is permitted, pursuant to section

363(b)(1)(B) of the Bankruptcy Code, if:

> after the appointment of a consumer privacy ombudsman,
> the court approves the sale (i) giving consideration to the
> facts, circumstances, and conditions of the sale and (ii)
> finding that no showing was made that the sale would
> violate applicable nonbankruptcy law.[6]

18.    Here, the Privacy Policy does not contain a restriction on the Debtors' ability to

sell or transfer Personally Identifiable Information to a third party with respect to Personally

Identifiable Information collected on or after September 8, 2008.  However, the Ombudsman

recommends, and the Debtors and the Proposed Purchaser have agreed to limit or expand, as

discussed herein, the transfer of Personally Identifiable Information.

19.    The Ombudsman's recommendations are based upon discussions with the

Debtors' personnel at the business unit level about the sources and uses of information, what

information is necessary to continue to seamlessly service consumers and meet expectations, and

how limiting the scope of Personally Identifiable Information to the Proposed Buyer would

impact operations post-closing.  Certain of the Debtors' business units provide specialty goods

and services to consumers and the Personally Identifiable Information that is required to

appropriately operate is specific to that business.  Except where otherwise indicated, the

recommendations that follow are organized by business unit and apply only to that business unit:

### ***Shop Your Way***

20.    The Shop Your Way loyalty program is the primary focus of the Debtors' targeted

marketing campaigns because these consumers represent the Debtors' most loyal customers.  All

---

[5]  See 11 U.S.C. § 363(b)(1).

[6]  See 11 U.S.C. § 363(b)(1)(B).

loyalty program members enrolled in Shop Your Way when the Privacy Policy was in effect

therefore affirmatively consented to the transfer of Personally Identifiable Information in the

event of a business transaction.

21.    After discussions with the Debtors, the Ombudsman recommends that all Shop

Your Way accounts be transferred to the Proposed Buyer provided that (a)(i) all incomplete[7]

Shop Your Way accounts be purged to the extent the consumer does not complete his/her profile

within one (1) year from the date of closing of the Global Asset Sale; (ii) all foreign addresses[8]

associated with a Shop Your Way account where the address is located within the European

Union be anonymized; (iii) all foreign addresses that are not associated with a Shop Your Way

account be purged; (iv) all consumers who previously requested that their accounts be de-

activated be purged; and (v) all video, video game and DVD titles (discussed below) be de-

identified, and (b) consumers receive notification, either via email or through the Shop Your

Way app or desktop site that (i) the Global Asset Sale occurred; (ii) Personally Identifiable

Information has been transferred to the Proposed Buyer as part of the Global Asset Sale; and (iii)

the Proposed Buyer will adhere to the Privacy Policy or a privacy policy that is at least as

protective of consumer privacy.[9]

---

[7]  The Ombudsman intends incomplete Shop Your Way accounts to mean accounts that have a loyalty number assigned but the consumer did not complete the registration process by affirmatively verifying their membership account.

[8]  Shop Your Way members resident in Mexico and Canada will, on occasion, shop in the United States and these consumers have agreed to the Debtors' Privacy Policy.  Non-US online shoppers have their orders fulfilled by a third-party and Personally Identifiable Information is not retained by the Debtors unless these consumers are members of the Shop Your Way program.  Finally, the Debtors are compliant with the General Data Protection Regulation (EU) 2016/679 and do not have any transactional data for EU residents.  However, to the extent these EU consumers are also members of the Shop Your Way program, the Debtors do have Personally Identifiable Information and this information will be anonymized.

[9]  These same recommendations apply to consumers with kmart.com and sears.com accounts.

### *Sears Automotive*

22.    Sears Automotive, a business segment of the Debtors, offers complete automotive services including tires, batteries, diagnostic and engine services, brakes, and more to both Shop Your Way members and guests.  Personally Identifiable Information is collected and maintained by Sears Automotive in a separate database in order to record historical repairs and parts.  The Personally Identifiable Information collected by Sears Automotive is governed by the Privacy Policy.  Sears Automotive engages in targeted marketing campaigns to its customers with the customer's affirmative opt-in consent with such consent from non-Shop Your Way members[10] being revisited during each visit to an auto center.

23.    Sears Automotive has articulated to the Ombudsman a strong basis establishing its legitimate business need for Personally Identifiable Information that may have been collected under the Debtors' predecessor privacy policies related to delivering effective service, maintenance, and repair work to its customers.  These reasons include the ability to service parts installed by Sears Automotive that have a warranty, the increasing average lifespan of automobiles, and recall and regulatory issues.

24.    After discussions with the Debtors, the Ombudsman recommends that all Sears Automotive customer records be transferred to the Proposed Buyer provided that (a) all consumer records related to the period prior to January 1, 2004 be purged; and (b) consumers receive notification, via email, to the extent email addresses are available, that (i) the Global Asset Sale occurred; (ii) Personally Identifiable Information has been transferred to the Proposed

---

[10] Shop Your Way members are not queried each visit as they are able to control their marketing preferences from within the Shop Your Way platform.

Buyer as part of the Global Asset Sale; and (iii) the Proposed Buyer will adhere to the Privacy

Policy or a privacy policy that is at least as protective of consumer privacy.

### ***Sears Home Services***

25.     Sears Home Services, a division of the Debtors, provides consumers with on

demand appliance repair and appliance and home warranties.  Like Sears Automotive, Sears

Home Services maintains its own database to track warranties, warranty renewals, repairs,

service contracts, and service orders and Sears Home Services has legacy records dating back

decades.

26.     Sears Home Services has articulated to the Ombudsman strong business needs for

Personally Identifiable Information that may have been collected under the Debtors' predecessor

privacy policies related to delivering effective service, maintenance, and repair work to its

customers.  These reasons include the ability to service appliances purchased from the Debtors,

the general lifespan of appliances, and recall and regulatory issues.

27.     After discussions with the Debtors, the Ombudsman recommends that all Sears

Home Services customer records be transferred to the Proposed Buyer except for consumer

records related to products purchased on or before January 1, 2006 provided; however, that the

Debtors may transfer to the Proposed Buyer Personally Identifiable Information and related

customer files for products purchased earlier than December 31, 2006 if such product is (i)

currently under warranty or a service contract; (ii) eligible to renew a service contract; (iii)

subject to a lifetime warranty; or (iv) the consumer has an active subscription for parts.  In

addition, the Ombudsman recommends that consumers receive notification, via email, to the

extent email addresses are available, that (i) the Global Asset Sale occurred; (ii) Personally

Identifiable Information has been transferred to the Proposed Buyer as part of the Global Asset

Sale; and (iii) the Proposed Buyer will adhere to the Privacy Policy or a privacy policy that is at least as protective of consumer privacy.

### *Innovel*

28.     Innovel was launched by the Debtors in 2016 to provide warehousing and final-mile delivery to third parties as well as customers of the Debtors.

29.     The Debtors maintain a separate database containing delivery information that includes a customer's name and associated contact information to facilitate a delivery.  The Ombudsman has been advised that Innovel intends to maintain this information for a maximum of seven (7) years for historical purposes in the event of litigation relating to the delivery.  In addition, only customer information obtained by Innovel from the Debtors' customers is Personally Identifiable Information; delivery information related to products purchased from third parties but delivered by Innovel is subject to an agreement between the Debtors and that third-party and is excluded from the definition of Personally Identifiable Information contained in section 101(41A) (Personally Identifiable Information is information provided by an individual to the debtor in connection with obtaining a product or service from the debtor).

30.     The Ombudsman recognizes that there are legitimate reasons to retain the limited Personally Identifiable Information associated with the Innovel business and recommends that the Debtors be permitted to transfer all customer records without limitation.  The Ombudsman does not believe that notice to consumers is necessary as the business transaction between Innovel and the consumer is complete, and the retention of records is for a limited purpose.

### *Wally*

31.     As part of the Global Asset Sale, the Proposed Buyer will acquire the assets of Wally, a debtor subsidiary since 2015.  Wally is a sensor and service platform company operating under the brand Wally that uses wireless technology to gauge moisture and

12

temperature in homes and businesses.  Owners are alerted to leaks and other potentially hazardous conditions through either the Wally app or the wallyhome.com website.  Other smart home products, such as the Amazon Alexa, can be connected to Wally to enhance a consumer's digital experience.

32.    The collection of Personally Identifiable Information from Wally consumers is governed by a separate privacy policy (the "Wally Privacy Policy").  For purposes of this Report and the recommendations contained herein, the Wally Privacy Policy, last updated on August 28, 2017, permits the sale, transfer and/or sharing of Personally Identifiable Information with third parties in connection with a merger, reorganization, joint venture, assignment, spin-off, transfer or sale or disposition of all or any portion of the business, and in the event of a store closing or bankruptcy.  See Wally Privacy Policy annexed hereto as Exhibit B.

33.    Accordingly, the proposed sale of the Personally Identifiable Information collected by Wally is consistent with the Wally Privacy Policy.  The Ombudsman does not believe that there should be any limitation on the scope of the Personally Identifiable Information collected by Wally given that consumers affirmatively consented to the Wally Privacy Policy when accessing the Wally app or creating an account at wallyhome.com.  However, based upon her review of the relevant facts and circumstances, the Ombudsman recommends that Wally consumers receive notification, either via email or through the Wally app or desktop site that (a) the Global Asset Sale occurred; (b) Personally Identifiable Information has been transferred to the Proposed Buyer as part of the Global Asset Sale; and (c) the Proposed Buyer will adhere to the Wally Privacy Policy or a privacy policy that is at least as protective of consumer privacy.

### Videos/Video Games/DVDs (Applicable to all Customer Records)

34.     The Video Privacy Protection Act of 1988 (the "VPPA") restricts the disclosure of consumer's "personally identifiable information"[11] by a company "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."[12]   Under both the Kmart and Sears banners, the Debtors sold video games, CDs, and DVDs (collectively, "Videos Titles")and the plain language of the statute covers the sale of media such as DVDs, which are "similar audio visual materials."[13]   The Customer Database contains records of the titles and other details about specific "video" purchases by consumers. This information is "personally identifiable information" within the meaning of the VPPA.  The legislative history of the VPPA clarifies that a business "that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products."[14] [15]  Courts have limited the scope of the VPPA's restriction to the disclosure of records showing that an individual requested or obtained specific video materials.[16]

---

[11] 18 U.S.C. § 2710; see also In re Hulu Privacy Litigation, No. 11-cv-03764-LV (N.D. Cal. Mar. 31, 2015) (Three key elements that must be met to constitute "personally identifiable information" under the VIPPA: (i) the identity of the individual; (ii) the identity of the video material; and (iii) a connection between the individual and the video material).

[12] 18 U.S.C. § 2710(b)(1).

[13] 18 U.S.C. § 2710(a)(4); see also S. Rep. No. 100-599, at 12 (1988), reprinted in 1988 U.S.C.C.A.N. 4342-1, 4342-10 ("similar audio visual materials" include "laser disks, open reel movies, [and] CDI technology").

[14] S. Rep. No. 100-599, at 12 (1988), reprinted in 1988 U.S.C.C.A.N. 4342-1, 4342-10 (the definition of personally identifiable information "includes the term 'video' to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill").

[15] While there is consensus that the VPPA applies to video game titles, no cases have, as of the date of this Report, been asked to decide this issue.  See Electronic Privacy Information Center, https://epic.org/privacy/vppa/

[16] See, e.g., Costanzo v. City of Omaha, No. 8:04 CV 99, 2004 WL 2359722, at *2 (D. Neb. Oct. 19, 2004) (VPPA "protects people from having records of videotape rentals and purchases disclosed").

35.    A covered entity may not disclose "personally identifiable information" unless one of the VPPA's exceptions permits such disclosure.[17]  Under the VPPA disclosure is permitted "if the disclosure is incident to the ordinary course of business".[18]  "Ordinary course of business" is defined to mean, among other things, the "transfer of ownership".[19]  There is limited case law interpreting this exception where the personally identifiable information related to video materials is obtained incidental to the primary business of the provider such as the Debtors.[20]

36.    The Debtors have identified certain fields in their database that would identify titles of Videos that were purchased by consumers.  To comply strictly with the VPPA and without any temporal limitation, the Debtors, with the consent of the Proposed Purchaser, have begun the process of de-identifying Video titles from a consumer's transaction history and loyalty program prior to transmittal to the Proposed Buyer and replace specific titles and item numbers with a generic reference to "DVD purchase" or something similar.

### *Other Sources and Uses of Personally Identifiable Information*

37.    The Ombudsman has undertaken an extensive factual investigation of the many ways that the Debtors collect and use Personally Identifiable Information.  To the extent a specific business segment is not mentioned in this Report it is because the use of Personally Identifiable Information was contemplated by the Privacy Policy, governed by a contractual agreement with a third-party, or otherwise not at issue.

---

[17] 18 U.S.C. § 2710(b)(2).

[18] Id. § 2710(b)(2)(E).

[19] Id. § 2710(a)(2).

[20] See Rodriguez v. Sony Computer Entertainment America LLC, No. C 11-4084 PJH (N.D. Cal. Sept. 25, 2012) (civil litigant does not have a cause of action under the VPPA for retention of PII and disclosures made as a result of the transfer of ownership do not violate the provisions of the Act).

### *SHIP*

38.     To the extent the Sears Home Improvement Business ("SHIP") is included among the assets subject to the Global Asset Sale, the Ombudsman adopts in full her report dated December 17, 2018 [Dkt. No. 1273].

### PCI DSS COMPLIANT VAULT

39.     The Debtors process credit and debit card payments for their customers in compliance with the Payment Card Industry Data Security Standard ("PCI DSS") a worldwide information security standard defined by the Payment Card Industry Security Standards Council. This standard applies to all organizations that hold, process, or exchange cardholder information from any card branded with the logo of one of the card brands which include American Express, Discover Financial Services, JCB International, MasterCard, and Visa Inc.

40.     Rather than storing customer payment details locally at the point of sale, which is a violation of the PCI DSS, the Debtors utilize a PCI DSS compliant vault (the "PCI Vault") which converts sensitive payment information to a token[21].  Payments are processed through encrypted payment gateway channels without exposing actual account details that could potentially be compromised in a security breach.  Each time a consumer makes a purchase with a new debit or credit card, this payment method is added to PCI Vault.  Similarly, any customer return is processed using the corresponding token that was issued to make the purchase.  Shop Your Way members and other online customers with user profiles, to facilitate their seamless and secure digital payment experience, have the option of saving preferred payment methods to their accounts.  For all of these reasons, there is adequate support for recommending that some portion of the PCI Vault be transferred to the Proposed Buyer.

---

[21] Tokenization is the process of replacing sensitive data with surrogate values.  For example, a consumer's 16-digit account number is replaced by unique digital identifier called a "token".

41.    The Ombudsman, the Debtors and the Proposed Buyer, however, are cognizant of the data security risks associated with providing too many specifics about the PCI Vault and the volume of credit card records stored.  Accordingly, the Ombudsman, the Debtors and the Proposed Buyer are in discussions regarding the appropriate scope of credit card records that should be transferred to the Proposed Buyer that meets consumer expectations and allows the Proposed Buyer to operate without any business interruption.  The specific details regarding the PCI Vault will be shared with the Bankruptcy Court, *in camera*, to the extent the Court has any questions, comments or concerns.  Because the collection and retention of credit card information in a safe and secure manner is part of the Debtors' ordinary course of business and is handled on the back end, the Ombudsman does not recommend that any notice be given to consumers that this transfer has, or will, occur.

### PHARMACY RECORDS

42.    Under the Kmart banner, the Debtors currently operate 90 licensed in-store pharmacies offering full-service pharmacy services such as pharmacy counseling, immunizations, and medicines for pets.  Mobile pharmacy services are also available to permit customers to refill their prescriptions through on-line portals, including a smart phone mobile app, for in-store pickup or home delivery.

43.    The Ombudsman understands that as part of the Sale, the Debtors intend to transfer to the Proposed Buyer the Debtors' hard copy and electronic prescription files and records, pharmacy customer lists and patient profiles (the "Pharmacy Records").  These Pharmacy Records are deemed protected health information ("Protected Health Information"), a subset of individually identifiable health information, each as defined under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (Pub. L. 104-191) and are entitled to heightened privacy protections.

44.     The privacy of a consumer's individually identifiable health information is regulated by HIPAA, the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), 45 C.F.R. § 164.504, and various regulations promulgated under those laws, including the Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules under the Health Information Technology for Economic and Clinical Health Act and the Genetic Information Nondiscrimination Act; Other Modifications to the HIPAA Rules (the "Omnibus Rule"), 78 Fed. Reg. 5566 (Jan. 25, 2013).  The term Protected Health Information is defined in the Privacy Rule issued under HIPAA to mean any health information that identifies, or reasonably could be used to identify, an individual, and that relates to physical or mental health or condition of the individual, the provision of health care to the individual, or the payment for the provision of health care to the individual, in each case if maintained or transmitted by a healthcare provider or other "Covered Entity," other than certain limited exceptions.  45 C.F.R. § 160.103.

45.     Pharmacies are considered Covered Entities and are required to comply with HIPAA regarding the acceptable uses and disclosures of Protected Health Information and the secure storage and transmission of Protected Health Information.  All Protected Health Information maintained by the Debtors is subject to the applicable privacy policy of the Debtors under which it was collected and HIPAA.

46.     The Debtors have advised the Ombudsman that all Protected Health Information is stored in a HIPAA-compliant separate database and the Debtors have systems in place to prevent inadvertent disclosure or access by unauthorized employees.  For example, pharmacy customers often participate in the Shop Your Way loyalty program and earn points for pharmacy purchases, but all prescription information is de-identified on cash register receipts with a generic reference to "prescription" and purchasing history is added to an individual's Shop Your

Way account in the same manner.  These protections are designed to appropriately protect Protected Health Information while allowing a consumer to have a complete, multi-purpose shopping experience.

47.    Under § 164.508 of the Privacy Rule of HIPAA, a "Covered Entity" may not use or disclose Protected Health Information for purposes not otherwise permitted under that rule, unless the "Covered Entity" has obtained a valid authorization from the subject of the Protected Health Information.  Similarly, under § 13405(d)(1) of the HITECH Act, a "Covered Entity" may not receive direct or indirect remuneration in exchange for the disclosure of Protected Health Information unless the "Covered Entity" has obtained a valid authorization consistent with § 164.508.  The Omnibus Rule added § 164.502(a)(5)(ii) to the Privacy Rule, which permits the disclosure of Protected Health Information without obtaining authorization from the subject of the Protected Health Information in certain limited circumstances, including when a "Covered Entity" seeks to transfer Protected Health Information pursuant to a sale, transfer, merger or consolidation of all or part of such "Covered Entity" with another "Covered Entity" or an entity that following such activity will become a "Covered Entity".  See 45 C.F.R. § 164.502(a)(5)(ii).

48.    Once[22] the Proposed Buyer is authorized under state pharmacy law to engage in the practice of pharmacy and thereby becomes a "Covered Entity,"[23] the proposed sale of the Pharmacy Records to such "Covered Entity" is permitted by law and consistent with the Debtors' privacy practices and should be approved without limitation.  The Ombudsman does not believe that any notice to consumers about the proposed sale is necessary since the Proposed Buyer

---

[22] The Ombudsman understands that this process is underway.

[23] Due to state and federal licensing requirements, the Debtors and the Proposed Buyer will enter into a transition services agreement/management agreement to, among other things, maintain compliance with HIPAA pending satisfaction of all licensing requirements.

intends to operate the pharmacies under the same banner and at the same location such that the transition, from a consumer's perspective, should be seamless.

## IMPLEMENTATION

49.    The implementation of the recommendations contained in this Report will not be complete as of the date of the closing of the Global Asset Sale due to the volume of Personally Identifiable Information implicated and the multiple databases impacted.  The Ombudsman proposes, and the Proposed Buyer has agreed, to work with the Ombudsman to implement these procedures over the next six (6) months, subject to extension, and file a certificate of completion with the Bankruptcy Court.

50.    The Ombudsman anticipates that during the implementation process the Proposed Buyer will identify other areas where there is a legitimate business need to transfer previously excluded Personally Identifiable Information.  The Ombudsman expects that the scope will be narrow and that the failure to explicitly include a particular category of information was inadvertent given the magnitude of customer data that has been collected, the need to coordinate among many business lines in a short period of time, and other operational realities.  However, the Ombudsman respectfully requests that the Bankruptcy Court afford the parties an opportunity to address these issues in a consensual basis as they arise without the need for a further order of the court.

—————————————————

<u>**CONCLUSION**</u>

In summary, the Ombudsman believes that the recommendations in this Report strike an

appropriate balance between the privacy rights of consumers after taking into consideration the

Debtors' privacy policies in effect on the Commencement Date and practical considerations

associated with the Global Asset Sale.

Dated: New York, New York
      February 1, 2019

                RESPECTFULLY SUBMITTED,

                ELISE S. FREJKA, CIPP/US
                Frejka PLLC
                420 Lexington Avenue – Suite 310
                New York, New York 10170
                Telephone:  (212) 641-0800
                Facsimile:  (212) 641-0820

                *Consumer Privacy Ombudsman*