**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :    **Chapter 11** |
| **SEARS HOLDINGS CORPORATION** *et al.,* | : |
| | :    **Case No. 18-23538 (RDD)** |
| | : |
|      Debtors. | :    **(Jointly Administered)** |

-----------------------------------------------------------------x

## <u>DECLARATION OF MICHAEL WELCH</u>

I, Michael Welch, make this declaration under 28 U.S.C. § 1746 (the "**Declaration**"):

    1.    I am the Head of Valuation and Advisory Services for Jones Lang LaSalle

Incorporated ("**JLL**"), a professional services and management company specializing in real

estate.  JLL was retained by Sears Holdings Corporation (with its affiliated debtors and debtors

in possession in the above-styled case, the "**Debtors**" and together with their non-debtor

affiliates, the "**Company**") to appraise a combination of fee and leasehold interests to assist the

Debtors in determining the value of their assets for bankruptcy proceedings.

    2.    I submit this Declaration in response to the *Expert Report of Ronald F. Greenspan,*

(the "**Greenspan Report**") filed with the Bankruptcy Court on January 26, 2019 in support of the

*Objection of the Official Committee of Unsecured Creditors to Sale of Substantially All of the*

*Debtors' Assets to ESL Investments, Inc.*  I also submit this Declaration in support of the *Revised*

*Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer (II) Authorizing the*

*Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and*

*Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection therewith and (IV) Granting Relied Relief* (the "**Revised Proposed Sale Order**").[1]  More specifically, I have prepared this Declaration in order to summarize the opinions and conclusions I would offer, if called to testify in support of the Revised Proposed Sale Order, regarding the (a) process JLL used to conduct a valuation of the Debtors' real estate interests, and (b) deficiencies in the Greenspan Report.

3.       Except as otherwise indicated in this Declaration, the facts set forth herein are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Company or the Company's advisors, or my opinion, which itself would be based upon my experience, knowledge, and information concerning the Company.  I reserve the right to update and supplement this Declaration as additional information and materials are provided or otherwise made available to me.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

## I.    EXPERIENCE & QUALIFICATIONS

4.       I have over 30 years of experience in the valuation of real property, including commercial, retail, office, multi-family, industrial, residential and special-purpose properties. Throughout my career, I have conducted thousands of real estate valuations, and have been involved in appraisal matters and project management in more than 25 states.  I am currently licensed as a Certified General Real Estate Appraiser in Arkansas, Arizona, California, Louisiana, Oklahoma, Michigan, New York, Pennsylvania, Texas, and Washington D.C.

---

[1] Capitalized terms used in this Declaration but not otherwise defined have the meanings given to them in the Revised Proposed Sale Order, including the attached Asset Purchase Agreement.

5.      Since October 2016, I have served as the Head of JLL's Valuation and Advisory Services, in which I focus on the formation, implementation, oversight, and expansion of JLL's national valuation and advisory services strategy.  I also serve on JLL's Global Valuation Board, overseeing international portfolio work and shaping the vision for global valuations.  JLL is an internationally recognized real estate professional services and management company that possesses a wealth of experience in providing real estate services in complex restructurings and reorganizations.

6.      Prior to joining JLL, I worked for Integra Realty Resources ("**Integra**"), America's largest independent valuation firm, which provides world-class, comprehensive commercial real estate market research, valuation, and advisory services.  Integra is a multi-faceted valuation and consulting firm with experience in properties including office buildings, single-family and multi-family residential, single and multi-tenant retail centers, industrial facilities, subdivisions, billboard valuation, convenience stores/service stations, and mini-warehouse facilities.  I first joined one of Integra's founding offices, Dominy, Ford & McPherson, Inc., as a Senior Analyst in 1990.  In 1997, I developed and headed Integra's litigation department, which assisted clients, including financial institutions, insurance companies, law firms, governmental entities, oil companies, developers, and private property owners in matters including general commercial litigation, property partitioning, estate tax matters, environmental contamination, and eminent domain cases.  In 2011, I was elected to Integra's Board of Directors.  In 2013, I was elected Vice Chairman of the Board and in 2015, I was elected Chairman of the Board and Chief Executive Officer.

7.      I am a Member of, and hold professional designations from, among other professional organizations, the International Right of Way Association, the Appraisal Institute,

and the Royal Institute of Chartered Surveyors.  Additionally, I am a member of the Appraisal

Foundation Industry Advisory Council ("**Council**"), which is the entity that helps determine the

governing and licensing standards for appraisers within the United States.  As a Member of the

Council, I am required to disclose that my opinion contained in this Declaration is not rendered

as a member of any board, council, committee, subcommittee, or task force of the Council, nor

do I possess a special interpretive ability by virtue of my affiliation with the Council.

8.      I have a Bachelor's Degree from the University of Houston.

9.      I have testified as an expert at trial or by deposition in federal and state courts

throughout the United States during the previous 4 years, a listing of which is attached as

Appendix 1.  I have authored one publication in the last 10 years, a copy of which is attached as

Appendix 2.

10.     My education, professional experience, and qualifications are set forth in my

curriculum vitae, a copy of which is attached as Appendix 3.

11.     Working under my direction, several professionals from JLL contributed to the

analysis and conclusions presented herein.

12.     The information that I relied upon or otherwise considered in forming the

opinions set forth in this Declaration is listed in Appendix 4.  The opinions presented in this

Declaration are the result of the information available to me as of the date of this analysis.

## II.    <u>SUMMARY OF OPINIONS</u>

13.     After reviewing the Greenspan Report and its supporting material, as well as

reviewing the work my team and I conducted on behalf of the Debtors, I have formed the opinion

that the Debtors applied a fair and reasonable methodology to determine the liquidation value of

their real estate assets.  I have also formed the opinion that the deficiencies the Greenspan Report

finds in the Debtors' methodology are not credible.

III.    **METHODOLOGY AND BASIS OF VALUATION OPINIONS**

A.    **Selection of Phase 1 Properties**

14.    In November 2018, the Debtors engaged JLL to appraise 24 of the Debtors'

higher-valued fee and leasehold interests to assist the Debtors in determining the market value of

their assets for bankruptcy proceedings (the "**Phase 1 Properties**").  Of the 24 Phase 1

Properties, 18 were leasehold interests, and 6 were fee simple interests.

15.    M-III Advisory Partners, L.P. ("**M-III**"), court-authorized restructuring advisors

to the Debtors, selected the Phase 1 Properties based upon the properties' high values.  However,

no one from M-III nor the Company, ever stated, directly or indirectly, at any stage in the

valuation process, that a certain valuation number was sought.  Instead, my team and I conducted

our analyses in accordance with the Uniform Standards of Professional Appraisal Practice

("**USPAP**"), and with complete impartiality.  We did not look at, review, or rely upon any

analyses conducted by any third parties, including Cushman & Wakefield or A&G Realty

Partners.

B.    **Scope of Phase 1: Market Value v. Liquidation Value**

16.    JLL was not asked to conduct liquidation analyses on the Phase 1 Properties.

Instead, it was my understanding that when JLL was engaged to conduct appraisals on the Phase

1 Properties, the Debtors were unsure how the bankruptcy would unfold—i.e., if the Debtors'

properties would be sold as a going concern or liquidated.  It was my understanding that, if the

Debtors were to pivot to a wind-down, JLL would be asked to later conduct liquidation analyses

on the Phase 1 Properties.  Accordingly, it is my opinion that the Debtors did not, as Mr.

Greenspan stated, erroneously "disregard . . . the valuation opinions of their own real estate

experts." (Greenspan Report, p. 8).  Instead, when the Debtors sought to conduct a liquidation

analysis, they *should* have made significant downward adjustments to the JLL appraisals from

the Phase 1 Properties because they were not liquidation values and market value appraisals differ from a liquidation value analysis.

17.     A widely accepted definition of market value is the "most probable price that the specified property interest should sell in a competitive market after a reasonable exposure time, as of a specified date, in cash, or in terms equivalent to cash, under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, for self-interest, and assuming that neither is under duress."[2]  It is my understanding that the Debtors, under duress, must assume or reject leases by May 13, 2019 (although Mr. Greenspan erroneously assumes an 18-month sale process, (Greenspan Report, at p. 20)).  Therefore, a market value analysis, without significant discounts reflecting this reality, would be inappropriate.

18.     In contrast to market value, a liquidation value is the "most probable price that a specified interest in real property should bring under the following conditions:  (1) Consummation of a sale within a short time period.  (2) The property is subjected to market conditions prevailing as of the date of valuation.  (3) Both the buyer and seller are acting prudently and knowledgeably.  (4) The seller is under extreme compulsion to sell.  (5) The buyer is typically motivated.  (6) Both parties are acting in what they consider to be their best interests.  (7) A normal marketing effort is not possible due to the brief exposure time.  (8) Payment will be made in cash or U.S. dollars in or in terms of financial arrangements comparable thereto.  (9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sale concessions granted by anyone associated with the sale."[3]

_____

[2] Appraisal Institute, The Dictionary of Real Estate Appraisal, Fifth Edition at p. 122.

[3] Appraisal Institute, The Dictionary of Real Estate Appraisal, Fifth Edition at p. 115-16.  As to the fifth factor—the motivation of the buyer—a mall owner attempting to maintain control over an asset in its master development would

### C.    Phase 1 Methodology

19.    To estimate the market value of each fee simple estate, my team and I considered the Sales Comparison Approach.  A Sales Comparison Approach is inappropriate for a leasehold estate because the Debtors do not have the ability to sell the leasehold asset, they only have the right to sublease it.  The Sales Comparison Approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership.  It is based on the principles of supply and demand, balance, substitution and externalities.  A Sales Comparison Approach is most applicable when sufficient data on recent market transactions is available and there is an active market for the property type.

20.    To estimate the market value of each leasehold estate of the Phase 1 Properties, my team and I applied a discounted cash flow ("**DCF**") analysis.  A DCF analysis is a valuation method used to estimate the present value of expected cash flows using a discount rate.  The discount rate essentially reflects the required rate of return on investment based on the risk level inherent in realizing the annual cash flows and the estimated reversion, if applicable.  Leasehold assets, due to relative lack of marketability as compared to owned real estate assets, including the lack of reversionary value, typically require a premium return to entice an investor.

### D.    Phase 2 Methodology

21.    In December 2018, it was my understanding that the Debtors were engaging in a sale process and needed to know the value of their real estate portfolio in a liquidation scenario on an asset by asset basis.  The Debtors hired JLL to conduct a summary valuation on approximately

---

be expected to pay a premium to avoid having outside influence in its development.  Offers from these entities would not meet the standard of market value due to the atypical motivation.

400 properties on an individual asset basis, comprised of 298 leasehold interests and 103 fee

simple interests.

22.     Due to the expedited nature of a valuation of approximately 400 properties, my

team and I developed a strategy and model to report credible results on a significant number of

assets.  Each property was individually valued based upon assumptions and criteria outlined by

accredited professionals, and subjected to intensive internal scrutiny and review.  To do so, a team

of approximately 30 analysts canvassed each market for sale/lease comparables; researched

markets for available listings to determine the upper bounds of market value rates for each listing;

and located or confirmed several hundred sales transactions and approximately 3,000 retail lease

comparables.  As needed, local brokers were consulted for area expertise.  Once this information

was obtained, a panel of eight (8) senior JLL appraisers drafted valuation assumptions and

specific criteria for the model.  JLL also engaged a third-party vendor to create a valuation

template based upon JLL's specific criteria and the necessary outputs.  As an additional method

of quality assurance and control, I, along with three others, performed a secondary check on each

asset on an individual basis.  After confirming the appropriate outputs, the indications of value

were provided to M-III.

23.     In conducting the valuations for the leasehold estates, my team and I applied

accepted appraisal methodologies and standards throughout the process.  My team and I first

determined market rent by analyzing approximately 3,000 retail leases, applying two (2) sets of

comparables per subject (one set to consider the subject in its entirety and another set of

comparables to determine if the asset generated more value being subdivided).  Each property's

four (4) to six (6) closest or most relevant comparables were entered into a JLL proprietary

valuation grid, with adjustments made based upon an appraiser's evaluation of a combination of

median household income (to reflect buying power), population density, retail surplus, retail

vacancy, under construction inventory and other relevant characteristics such as size, age and

condition.  After careful consideration of the dissimilar characteristics, we determined a potential

market rent for the asset, if available to be subleased.  We were provided with the current

contract rent for the asset and set about to measure the cash flow that could be realized on the

delta between existing contract rent and projected market rent.  Deductions were made for

vacancy and collection loss and operating expenses (during vacancy).  Consideration was also

given for tenant improvements and leasing commissions.  The resulting proceeds by year were

then discounted to a present value to derive an undiscounted opinion of value for the subject

property.  When appropriate, deductions for demising the space were accounted for and a

liquidation but not a bulk sale discount was applied (low (25%), medium (50%), or high (75%)).

24.    The discount is appropriate and necessary to account for the distressed nature of

the sale, as well as a lack of purchasers for hundreds of big-box stores flooding the market at one

time.  Accordingly, my team and I applied a 25% discount to leases in highly desirable areas or

superior locations, including those within "Class A" or quality malls, redevelopment

opportunities, or other favorable conditions as evaluated by the appraiser.  "Class A" locations

generally gross the most profitable returns (sales per square foot) of the three classes of malls,

and have the greatest likelihood of being re-leased or having recapture rights exercised.  For the

remaining stores, my team and I applied a discount between 50%-75%.  A 50% discount was

applied to leases in an area of average desirability with some potential marketability, whereas a

75% discount was reserved for assets located in less desirable and tertiary areas exhibiting any

combination of the following:  low population density, an exceptionally high retail surplus, high

retail vacancy or under construction inventory, or other unfavorable location characteristics as determined by the appraiser.

25.    In conducting valuations of the Phase 2 fee simple estates, my team and I applied the Sales Comparison Approach, utilizing the quality assurance / quality control measures described above.  As discussed above, the Sales Comparison Approach is not appropriate for leaseholds.

26.    My team and I determined the market value (fee simple or leasehold, as appropriate) of the Phase 2 Properties and applied a discount to account for a quick sale.  These appraisals did not, however, consider a bulk sale of all of the Debtors' properties.  This is a critical distinction between market value of a single asset, liquidation value of a single asset, or the liquidation or bulk sale of multiple properties in a compressed time period.  If all, or a substantial portion, of the Debtors' properties were simultaneously liquidated, a higher discount would need to be applied to account for the lower sales price that would result if the market was flooded with hundreds of assets that cannot be quickly absorbed, as only a finite amount of purchasers even have uses for such spaces.  The likelihood of a significant number of transactions is further complicated because many of these stores are 75,000 square feet or larger.  Demand for big-box retail has been significantly reduced over the last decade with the rise in prominence of digital retail and e-commerce, as evidenced by firms such as Amazon, Walmart, and Costco, who now deliver from large distribution centers, lessening the need for large brick and mortar retail locations.  And even if some of the properties were absorbed, they would be sold for a lower price than if they were individually released to the market because buyers are unwilling to pay premium prices when they know that the seller is in a distressed or precarious financial position.

### E.    Phase 2 Methodology Was Properly Applied

27.    I disagree with Mr. Greenspan's incorrect premise that "JLL's cash flow analyses also erroneously deducted operating expenses from triple-net market rents without showing offsetting reimbursement revenue applicable to triple-net leases." (Greenspan Report, at fn. 7). It is true that in a triple-net lease scenario, the majority of operating expenses are paid by the tenant passing through the landlord, relieving the landlord of those obligations.  In a pre-bankruptcy setting, the Debtor, as a tenant, is responsible for paying triple-net expenses to the landlord as Mr. Greenspan indicates.  However, in a post-bankruptcy setting, or in a Go Dark scenario, triple-net charges are still due to the landlord, even though the space may not be occupied by a Sears/Kmart entity.  During the estimated holding period, those rental obligations still fall to Sears/Kmart, and therefore, must be recognized as a deduction in the cash flow analysis. As there is no sublease tenant making payments to the Debtor during the marketing period, there is no reimbursement from a third party.  Mr. Greenspan's criticism fails to recognize that expenses must be paid on vacant space by the existing lessee until a sublease tenant occupies the space.

28.    Mr. Greenspan stated, "JLL's cash flow model had an input error that incorrectly modeled Tenant Improvements in the Market Rent column in all but seven of the 297 appraisals that had a higher than $0 value conclusion.  This resulted in valuation conclusions which were off by over 30%." (Greenspan Report, at fn. 7).  It is understandable that Mr. Greenspan believed that we "modeled tenant improvement in the market rent column" based upon his uninformed understanding of the modeling process.  I assume that Mr. Greenspan believed this was an error because the first year rent matched the tenant improvements.  Those numbers are identical as it is our intent to show tenant improvements equating to one year's rent over the initial term of the lease.  In all of those instances noted by Mr. Greenspan, the tenant improvement figure exactly matches year one rent.  This was intentional, by design, and

appropriate.  With that understanding, I am confident that Mr. Greenspan would withdraw his

objection and, as a result, remove his 30% increase to the JLL market values.  Mr. Greenspan's

failure to rectify what he erroneously called a mistake results in FTI values that are 30%

overstated for this reason alone.  Mr. Greenspan's mistake results in a $152 million difference in

value.  Other than the two items clarified above, Mr. Greenspan provides no criticism or critique

of the JLL appraisals, including our methodologies, formulas, capitalization rates, discounted

cash flow rates, or discounts.

## IV.    DEFICIENCES IN GREENSPAN REPORT

### A.    Mr. Greenspan Applies the Same Reasonable Discounting Method For Which He Criticizes the Debtors

29.    Despite Mr. Greenspan's criticism, it appears that he applies the *same*

methodology that he critiques the Debtors for using—Mr. Greenspan uses JLL's undiscounted

values and then applies discount ranges of 15% to 35%.  (Greenspan Report, p. 17, Ex. C).

Although Mr. Greenspan is not an accredited appraiser qualified to perform market value

appraisals, it appears that, as a practical matter, Mr. Greenspan *agrees* that discounting should be

applied, he just disagrees with the percentage discount applied by the Debtors.

30.    Mr. Greenspan appears to overlook the short timeframe for the sale of the

Debtors' properties.  It is my understanding that the Debtors must assume or reject leases by

May 13, 2019; yet Mr. Greenspan assumes an 18-month marketing plan (an increase in

marketing time of over 350%).  In my opinion and based on my experience, an expedited forced

sale period typically results in depressed prices, which the Debtors attempted to accurately

capture through discounting, supported by multiple data points.  Mr. Greenspan also appears to

omit from his Report any credible absorption analysis explaining how hundreds of properties

could be sold in 18 months.  For example, it is my understanding that in the Toys "R" Us

liquidation, only approximately 35% of the leases sold, and only for approximately 44% of their appraised dark value. Accordingly, it is my opinion that the discount applied to liquidating Company stores is appropriate because the Toys "R" Us stores were more desirable and easier to sell or lease given their smaller size than the Debtors' stores. In my experience, coupled with my understanding of the current retail environment, there is no purchaser(s) that could absorb hundreds of big-box stores in a few months. If a bulk sale of these properties were to occur, the sales prices for such properties would be significantly depressed. In my opinion, Mr. Greenspan's discounts are consistent with the liquidation of a small portfolio, rather than one as large as the Debtors'.

31.    I believe that the discounts applied by the Debtors were reasonable because the Debtors' analysis was intended to derive an estimation of cash proceeds during a liquidation, not of value possibly recognized in a one-off asset transaction. As explained above, in my opinion, the discounts the Debtors applied were fair and reasonable in light of (1) the financial condition of the Debtors, (2) the expedited sale process, (3) the inability of the market to absorb the properties in bulk, and (4) the antiquated physical characteristics of the assets in light of current retail demands.

**B.    Mr. Greenspan's Characterization of the Valuation of the Unencumbered Leases is Misleading**

32.    It is my opinion that Mr. Greenspan's characterization of the Debtors' valuation of the unencumbered properties is misleading. It is my understanding that of the 957 unencumbered properties, Mr. Greenspan alleges that the Debtors attributed no value to 555 properties. Mr. Greenspan states, "the Debtors' analysis only included 46% of the Debtors' real estate portfolio (484 out of 1,054 properties); on that basis alone, it should be rejected." (Greenspan Report, at p. 20). But it appears that Mr. Greenspan *also attributed no value* to 440

of these 555 properties.  Although the Greenspan Report categorizes the Debtors as "assigning zero value" to certain properties, it fails to acknowledge that it was not that the Debtors disregarded certain properties; instead, the Debtors chose, due to the nature of the leases, not to ascribe value to those leases.  The Debtors reasonably did not ascribe any value to leases with terms of less than 10 years because it is unlikely that a new tenant would incur the attendant over-head and start-up costs for a short-duration lease.  In addition, it appears that the Debtors attributed a zero value to leaseholds in which the current rent did not materially differ from market-rate rent.  Mr. Greenspan and FTI appear to agree with this approach, as it is the same approach taken in Appendix C to the Greenspan Report.

33.    It also appears that Mr. Greenspan further *did not* value 39 unencumbered properties that the Debtors *did* value, resulting in a delta of around $41 million.

34.    It is my understanding that the Debtors did not value the remaining 117 unencumbered properties because they did not believe that the deltas in the contract rent and market rent would result in meaningful value.  Further, of these 117 properties, 51 are Sears and Kmart facilities that do not have any encumbrances.  Of these 51 properties, Mr. Greenspan appeared to value the market rent for 49 of the assets at $4.00 - $6.50 per square foot (rent), without any apparent analysis or consideration of the specific property, its geographic location, local market influences, etc.  It is inconceivable that 49 facilities of different age, size, and location could fall into such a narrow band of rental rates.

### C.    Mr. Greenspan Ignores the Debt on the Encumbered Assets

35.    It is my understanding that M-III believes that the debt on the encumbered assets exceeds their market values.  It is improbable that anyone would purchase an asset where the debt on such asset exceeds the market value.  However, if one of these encumbered assets were to transact, the sale proceeds would inure to the benefit of the lender and not to the Debtors.

Accordingly, in my opinion, the Debtors appropriately applied a zero value to such properties. Yet it appears that Mr. Greenspan completely ignores the debt on the encumbered assets, even though the debt on the encumbered assets appears to exceed even FTI's high values for such properties.

### D.   The Debtors' Marketing and Sale Process Appears Reasonable

36.     JLL's valuation group conducted its valuations of the Debtors' properties in an independent manner to maintain impartiality, and I was not involved in the Debtors' marketing and sale process.[4]  I became generally aware of the Debtors' marketing and sale process in connection with responding to the Greenspan Report.  Based upon such knowledge, I disagree with Mr. Greenspan's statement that the Debtors' marketing process was "truncated and deficient."  (Greenspan Report, at p. 11).  Instead, it is my opinion that the Debtors' marketing and sale process was consistent with normal business practices for the time requirements allotted. In fact, it is my opinion that the sales team was extremely motivated to run an active process in order to obtain sales commissions on transactions, especially because the sales team would not receive a commission if the properties were sold to ESL.

## V.   COMPENSATION

37.     The fee paid to JLL in connection with this Declaration was $3,000 per property analyzed.  Regarding testimony or other legal proceedings related to this Declaration, JLL will be compensated at a rate of $750 per hour for trial and deposition preparation, court time, travel, time and testimony or other consultation, as well as reimbursement for all reasonable travel-related costs and time in addition to all trial preparation, testimony, or other consultation fees. No portion of the compensation or reimbursement paid or payable to JLL is dependent upon the

---

[4] The marketing and sales process was independently conducted by JLL's retail disposition team.

opinions offered in this Declaration or the outcome of any litigation relating to value of the

Debtors' property interests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and after reasonable inquiry.

Dated:  January 31, 2019
New York, New York

_____
Michael Welch

# APPENDIX 1

**APPENDIX 1**

| Year | Styled: | Admin Hrg. | Deposition | Trial |
|------|---------|:----------:|:----------:|:-----:|
| 2018 | *Magellan v.Martin & Magellan v. Trimble* | X | | |
| 2018 | *Magellan v. M.E. Florence Investment Company, Ltd., et al.* | X | | |
| 2018 | *Magellan v. Sir Carrington Place* | X | | |
| 2018 | *Magellan v. Jaquelin Guzman* | X | | |
| 2018 | *Magellan v. Guzman* | X | | |
| 2018 | *Magellan v. Gaston* | X | | |
| 2018 | *Magellan v. Wooten* | X | | |
| 2018 | *Magellan v. Larry Joseph Busa, et al.* | X | | |
| 2018 | *Magellan v. SNS Investments, LLC* | X | | |
| 2018 | *Magellan v. Dincans* | X | | |
| 2018 | *Magellan v. Imhoff Family Partnership, L.P.* | X | | |
| 2018 | *Magellan v. Omaha Ranch* | X | | |
| 2018 | *Magellan v. F&D* | X | | |
| 2018 | *CCID v Union Pacific* | X | | |
| 2018 | *Magellan v. Johnson* | X | | |
| 2018 | *Magellan v. Texas Specialty Homes* | X | | |
| 2018 | *City of Pearland v. Alexander* | X | | |
| 2018 | *Brazos Electric v. Tarsan* | X | | |
| 2018 | *Brazos Electric v. Swisher Partners* | X | X | |
| 2018 | *State of Texas v. Gay Buick* | | X | |
| 2018 | *State of Texas v. Kerr* | | X | |
| 2018 | *State of Texas v. Fairfield Baptist Church* | | X | X |
| 2018 | *State of Texas v. DH 2004* | | | X |
| 2017 | *SJRA v. Imperial Oaks* | X | X | X |
| 2017 | *City of Sugar Land v. Genesis Caltex, LLC* | X | | |
| 2017 | *State of Texas v. Sue Harral* | X | | |
| 2017 | *State of Texas v. Stone Land Seabrook* | X | | |
| 2017 | *State of Texas v. Jason Morman* | X | | |
| 2017 | *State of Texas v. John M. Burkland, et ux., et al.* | X | | |
| 2017 | *State of Texas v. Onion Group LLC* | X | | |
| 2017 | *State of Texas v. Ko-Chien Shih, et ux., et al.* | X | | |
| 2017 | *Fort Bend County v. Earl Newsome, et al.* | X | | |
| 2017 | *Harris County MUD No. 489 v. The Gillson Longenbaugh Foundation, et al.* | X | | |
| 2017 | *City of Sugar Land v. Denly Sugar Land, Ltd., et al.* | X | | |
| 2017 | *Harris County MUD No. 53 v Allstate BK Real Estate Holdings, Ltd., et al.* | X | | |
| 2017 | *City of Sugar Land v. JP Morgan Chase Bank, et al.* | X | | |
| 2017 | *City of Sugar Land v. AEI Accredited Investor Fund 2002 LP, et al.* | X | | |
| 2017 | *City of Pearland v. James Anthony and/or Unknown Heirs, et al.* | X | | |
| 2017 | *City of Pearland v. Jerome G. Kemick, et al.* | X | | |
| 2017 | *City of Pearland v. The Unknown Stockholders of N.D.C., Inc.* | X | | |
| 2017 | *The State of Texas v. American International Texas Properties, Inc., a Nevada corporation, et al.* | X | | |

| Year | Styled: | Admin Hrg. | Deposition | Trial |
|------|---------|:----------:|:----------:|:-----:|
| 2017 | *City of Sugar Land v. Lilly Dry Cleaning, et al.* | X | | |
| 2017 | *City of Pearland v. Rebecca R. Ross, et al.* | X | | |
| 2017 | *City of Pearland v. Philip A. Ross, et al.* | X | | |
| 2017 | *City of Pearland v. Cube HHF* | X | | |
| 2017 | *State of Texas v. Five Star Austin Group* | | X | |
| 2017 | *State of Texas v. Holverson* | | X | |
| 2017 | *State of Texas v. CC Telge Rd.* | | X | |
| 2017 | *Katy Washington v. Ng* | | X | X |
| 2017 | *State of Texas v. A-S Northwest Crossing Acquisition LLC, et al.* | | X | X |
| 2016 | *Harris County MUD 53 vs Fronterra Energy* | X | | |
| 2016 | *Montgomery County, Texas vs. BNS Rayford Partners, LP* | X | | |
| 2016 | *City of Pearland v. Jui-Lien Chou and Ming Tao-Ho* | X | | |
| 2016 | *City of Pearland v. Lorene C. Gonzales. Et al.* | X | | |
| 2016 | *City of Pearland v. Manju K. Mani, et al.* | X | | |
| 2016 | *Fort Bend v.Westheimer Holdings, LLC* | X | | |
| 2016 | *City of Pearland v. Sterling McQueen* | X | | |
| 2016 | *City of Sugar Land v. Southwest Medical Village* | X | | |
| 2016 | *Bridgestone MUD v. Inthapanya* | X | | |
| 2016 | *Fort Bend v. Amegy Bank* | X | | |
| 2016 | *State of Texas v. East Montgomery County Improvement District* | X | X | X |
| 2016 | *State of Texas v. Northwest Airport Management* | | X | |
| 2016 | *State of Texas v. James Clarence Loge* | | X | X |
| 2015 | *State of Texas v. Liberty Bankers Life Insurance Company* | X | | |
| 2015 | *Fort Bend v. Debra Ann Dalio Stephens, et al.* | X | | |
| 2015 | *Fort Bend v. Harwood Trust* | X | | |
| 2015 | *Harris County MUD 167 v. Wong* | X | | |
| 2015 | *State of Texas v. Eastfield Realty, Inc.* | X | | |
| 2015 | *Harris County MUD 200 v. Badat* | X | | |
| 2015 | *City of Pearland v.Valle* | X | | |
| 2015 | *Harris County MUD 276 v Intown Suites* | X | | |
| 2015 | *Harris County MUD 276 v P2H2 Investments* | X | | |
| 2015 | *City of Pearland v. Abdullatif* | X | | |
| 2015 | *State of Texas v. Gill* | X | | |
| 2015 | *Harris County MUD 276 v Denshor* | X | | |
| 2015 | *WHCRWA v. Tarah, Inc.* | X | | |
| 2015 | *Harris County MUD 276 v Pharmacon* | X | | |
| 2015 | *State of Texas v.Outfront Media* | | X | |
| 2015 | *City of Sugar Land v. Vu* | X | X | |
| 2015 | *State of Texas v. Luby's Fuddruckers Restaurants, LLC* | | X | X |
| 2015 | *Fort Bend v. Kilburn* | | X | X |
| 2014 | *WHCRWA v. Greenhouse Property Investments, LLC* | X | | |
| 2014 | *WHCRWA v. Westfield HOA* | X | | |
| 2014 | *Brazos Electric v. Adams* | X | | |

**APPENDIX 1**

| Year | Styled: | Admin Hrg. | Deposition | Trial |
|------|---------|------------|------------|-------|
| 2014 | *State of Texas v. Best Properties* | X | | |
| 2014 | *SJRA v. Garth Wallisville, Ltd.* | X | | |
| 2014 | *State of Texas v. Crystal Spring Water Company* | X | | |
| 2014 | *State of Texas v. 22730 Gosling, Ltd.* | X | | |
| 2014 | *State of Texas v. Chesapeake* | X | | |
| 2014 | *State of Texas v. Johnson* | X | | |
| 2014 | *WHCRWA v Cook* | X | | |
| 2014 | *City of Pearland v. Oakbrook Estates* | X | | |
| 2014 | *State of Texas v. Molina* | X | | |
| 2014 | *State of Texas v. Kuehn* | X | | |
| 2014 | *State of Texas v. Moore* | X | | |
| 2014 | *State of Texas v. Rathwell* | X | | |
| 2014 | *WHCRWA v. RCR Group* | X | | |
| 2014 | *State of Texas v. Theiss Properties* | X | | |
| 2014 | *State of Texas v. Howden* | X | | |
| 2014 | *State of Texas v. Baker* | X | | |
| 2014 | *Williams v. Garcia* | X | | |
| 2014 | *State of Texas v. Raza* | X | | |
| 2014 | *Williams v. Huerta* | X | | |
| 2014 | *State of Texas v. Harris County* | X | | |
| 2014 | *State of Texas v. Salazar* | X | | |
| 2014 | *State of Texas v. Nemesio* | X | | |
| 2014 | *State of Texas v. Valley Ranch Town Center Ltd.* | X | | |
| 2014 | *State of Texas v. Perry* | X | | |
| 2014 | *State of Texas v. Krinitskaia* | X | | |
| 2014 | *State of Texas v. Vincent* | X | | |
| 2014 | *SJRA v. 1488-2978 SC, LP* | X | | |

# APPENDIX 2

# intelligence

News / Reviews / Opinions / Reactions



DIFFERENCE OF OPINION

## Does the Trump administration spell good or bad news for the US construction sector? Discuss.



**MICHAEL WELCH MRICS** HEAD OF VALUATION & ADVISORY SERVICES, JLL, HOUSTON, TEXAS

IN WHAT WILL BE REMEMBERED AS ONE OF THE MOST CONTENTIOUS ELECTIONS in US history, Donald Trump, a real-estate mogul and political neophyte prevailed over Hillary Clinton, a career public servant. But despite a notoriously negative campaign on both sides, the president-elect has proposed several notable policies.

As part of his pledge to "Make America Great Again", Trump's most significant vow was to spend $1tn upgrading the US's ageing infrastructure. Trump asserts maintenance and repairs to US roadways, bridges and airports will jump-start the economy, create countless jobs and stimulate growth.

His plan is certainly not new. The US has a history of using large-scale infrastructure expenditure as a means for economic growth. Programmes instituted in the early 1930s are credited with launching the country from the Great Depression and into a period of sustained growth.

Infrastructure spending, coupled with job growth creation, appears to be a simple means of stimulating the economy. However, all major public projects come with a cost. To fund $1tn of infrastructure expenditures, some form of tax must be levied on the citizens of the country.

This is the big quandary at the heart of the plan, especially as the Republican-controlled Congress is expected to remain tax averse, and Trump has vowed to cut taxes. But if the president-elect can successfully source adequate funding without increasing the tax burden, the $1tn infrastructure pledge will be a campaign promise fulfilled and would mark the beginning of a boom for infrastructure-related industries.



**CHRIS GUTHKELCH FRICS**, PROJECT DIRECTOR, SKANSKA INFRASTRUCTURE DEVELOPMENT, WASHINGTON DC

WE STILL HAVEN'T SEEN MUCH DETAIL REGARDING THE TRUMP administration's $1tn infrastructure package, but the election promises were certainly encouraging for the industry. For example, the mention of cutting corporate tax rates, increasing public-private partnerships (PPP), and the use of other funding mechanisms, such as the repatriation of overseas profits back into the federal system to possibly fund a federal "infrastructure bank".

It is an imperative to get projects started, so I expect us to be hearing far more detail in the first 100 days. More PPP projects would be welcome. A scheme such as the Elizabeth River tunnels in Virginia — in which Skanska has been involved — is a good advert for PPP as it was completed six months ahead of schedule. Getting more social infrastructure is also critical — schools, higher education, civic centres, courthouses to list just a few. The Performance-based Building Coalition is also pushing for tax-exempt private activity bonds for social infrastructure — if this can go through in the near future, it would help kick-start an enormous amount of work.

And it's not just at state level that projects are happening. PPP is also gaining much more interest from cities and other localities. Sales tax increases are encouraging, too. "Measure M" in Los Angeles is helping to raise $120bn in revenue over the next 40 years to fund infrastructure. But no matter what the new administration does, some of the biggest ongoing challenges will still be around competition for industry talent, and an ageing construction workforce as the baby-boomer generation retires.

US infrastructure spending: top Trump or hot air? Join the debate at *linkedin*, or tweet using *#RI...*

INTERVIEW BRENDON HOOPER ILLUSTRATION ANDREA MANZATI

# **APPENDIX 3**

# Michael W. Welch, SR/WA, R/W-AC, MRICS

### Head of Valuation and Advisory Services

**Current Responsibilities**
Michael Welch serves as the Head of JLL's Valuation and Advisory Services (VAS) in the United States. In this role, he is focused on the formation, implementation, oversight and expansion of JLL's national VAS strategy. Mr. Welch, who has been involved in the appraisal and consulting field since 1988, is known nationally for his expertise involving large-scale infrastructure projects. He has conducted initial route studies, cost analysis, impact studies and valuations for more than 2,500 miles of linear projects including pipelines, electrical transmission lines, rail corridors, drainage facilities and major transportation roadways. Additionally, Mr. Welch has been involved in appraisal matters and project management in more than 25 states and in more than 100 Texas counties and has completed litigation services and provided expert witness testimony for properties involved in various county courts of law and state and federal district courts.

**Experience**
Prior to joining JLL in late 2016, Mr. Welch was with Integra Realty Resources, where he most recently served as the Chairman of the Board and CEO. Mr. Welch joined one of Integra Realty Resources' founding offices, Dominy, Ford & McPherson, Inc., as a Senior Analyst in 1990. During his tenure with the firm, he developed appraisal and consulting expertise involving a wide range of property types including commercial, office, multifamily, industrial, residential and special-purpose properties. In 1997, Mr. Welch was tapped to develop and head the firm's litigation division. In 2011, Mr. Welch was elected to Integra's Board of Directors and then Vice Chairman of the Board in 2013. In 2015, he was elected Chairman of the Board and Chief Executive Officer.

**Education and Affiliations**
- International Right of Way Association (IRWA), Member–SR/WA, R/W-AC
- Appraisal Institute, Associate Member
- Royal Institute of Chartered Surveyors, Member (MRICS)
- Integra Realty Resources Former Chairman of the Board and CEO
- Integra Realty Resources Associates Council
- IRWA Young Leadership Council, Former Chairman
- The Appraisal Foundation Industry Advisory Council, Member
- Qualified before numerous courts and administrative bodies

**Contact**
T: +1-713-243-3344
E: michael.welch@am.jll.com



*Certified General Real Estate Appraiser:*
- *Arkansas*
- *Arizona*
- *Louisiana*
- *Oklahoma*
- *New York*
- *Pennsylvania*
- *Texas*
- *Washington DC*

# APPENDIX 4

# <u>APPENDIX 4</u>

Materials Relied Upon:

- Appraisal Institute, The Dictionary of Real Estate Appraisal, Fifth Edition.

- The Expert Report of Ronald F. Greenspan (the "Greenspan Report"), filed with the Bankruptcy Court on January 26, 2019 in support of Objection of the Official Committee of Unsecured Creditors to Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc.

- The documents listed on Appendix D to the Greenspan Report.