# Exhibit 1

The New York Times

**ECONOMY**

# Retail Sales Are Weakest in 35 Years

By STEPHANIE ROSENBLOOM    DEC. 4, 2008

The nation's retailers turned in the worst sales figures in at least a generation on Thursday, starting the holiday shopping season with double-digit declines across a broad spectrum of stores.

For many chains, the precipitous sales drops that took hold in September and October got worse, not better, in November, despite relatively strong sales in the few days after Thanksgiving.

The International Council of Shopping Centers, an industry group, described November's figures as the weakest in more than 35 years. Declines were recorded in every retail segment the group tracks, with the biggest coming from department stores, with sales down 13.3 percent compared with November a year ago, and specialty apparel retailers, down 10.4 percent.

Some retailers, though, have begun to figure out how to manage in the bleak environment, selling huge amounts of merchandise at steep discounts to generate cash. That will erode profits, of course. Department store profits will most likely plummet 20 to 60 percent in the final three months of the year, said Bill Dreher, senior retailing analyst with Deutsche Bank Securities. But retailers who are unloading merchandise early in the season are at least demonstrating an ability to take control.

"Even if they're giving away the product, it reduces inventory levels and keeps the problem from continuing," Mr. Dreher said. "It shows retailers are being disciplined."

Retail stocks rallied Thursday as investors interpreted the sales report as showing that, with sufficient discounts, goods can be sold in volume despite the poor economy. The Standard & Poor's retail index rose 1.5 percent.

The discounts being dangled by stores are the biggest retailing analysts have ever seen. "When did you ever see, on Dec. 1, 70 percent off apparel on the high end?" said Claire Gruppo, managing director of Gruppo, Levey & Company, a New York investment bank. "You just don't."

Any retailer that refused to trot out jaw-dropping bargains in November paid the price.

For example, Abercrombie & Fitch, the chain that uses sexy bodies in seductive poses to sell clothes to teenagers and young adults, has refused to get on the discount bandwagon. In November, sales at stores open at least a year, an important measure of retail health, fell a whopping 28 percent for the company, in contrast to a 2 percent increase for the period a year ago.

That is a far worse decline than previous months: Sales at Abercrombie & Fitch stores open at least a year were down 14 percent in September and 20 percent in October.

Saks, on the other hand, has driven consumers into shopping frenzies with eye-popping deals on luxury names like the Armani Collezioni and Zac Posen. The tactic worked: In November, Saks had only a 5.2 percent decline in sales at stores open at least a year, clawing its way up from months of double-digit declines.

Other stores that improved their lot in November took a page from the same playbook. Neiman Marcus, for example, has also been selling luxury goods at startling discounts. Sales at Neiman Marcus stores open at least a year fell 11.8 percent in November — better than the 15.8 percent drop in September and the 27.6 percent dive in October.

"If you don't understand the consumer and his mood right now and you're doing things as usual," said Walter Loeb, president of Loeb Associates, a consultant firm, "you're not going to get any business."

Stunning declines have become the norm in retailing since sales first plunged in September amid the financial crisis. The November figures indicate the downturn is migrating to some discount and warehouse stores, some of which even had sales growth in October.

Ken Perkins, president of Retail Metrics, a research firm, said either Wal-Mart Stores was stealing market share from its bargain competitors or the whole sector was softening.

At Target, sales at stores open at least a year tumbled 10.4 percent, in contrast to a 10.8 percent increase a year ago. Sales at Target were down 3 percent in September and 4.8 percent in October.

Sales at Kohl's stores open at least a year sank 17.5 percent, in contrast to a 10.2 percent increase last year. Sales at Kohl's stores dropped 5.5 percent in September and 9 percent in October. Sales at Costco were down 5 percent in November after a 7 percent increase in September and a 1 percent dip in October.

Even some stores with October sales increases lost their edge in November. Children's Place, which had a 4 percent sales increase in October, sank 7 percent in November. Aéropostale, which was up 1 percent in October, was down 5 percent in November.

Of all the major retailers, only Wal-Mart and BJ's Wholesale Club, two of the country's best-known discount chains, thrived, in part because of robust grocery sales. Wal-Mart, in fact, enjoyed the biggest grocery sales spike in its history.

With new lines of brand-name merchandise from makers like Sony and Samsung, and with rock-bottom prices and an ability to move high volumes of merchandise, Wal-Mart seems to have cornered the market on Christmas this year.

The company began the critical holiday season by exceeding expectations. Sales at stores open at least a year increased 3.4 percent in November, not including fuel,

compared with a 1.5 percent increase a year ago.

(The company made a point of being subdued in its sales announcement, noting its sadness that a worker, Jdimytai Damour, had been trampled to death at a Wal-Mart in Valley Stream, N.Y., when rowdy shoppers burst through the doors on Black Friday.)

Sales at BJ's Wholesale Club stores were up 4.1 percent in November, not including fuel, compared with a 7.7 percent increase a year ago.

Many retailers were buoyed by sales over Black Friday weekend, which increased about 0.9 percent, compared with a 6.5 percent increase last year, according to ShopperTrak, a research firm. Yet the weekend after Thanksgiving did not account for the majority of retailers' November sales. Results for the month were weakened, many people in retailing said, by the calendar — a later Thanksgiving this year meant fewer post-Thanksgiving shopping days in November.

"The Thanksgiving weekend improvement was not enough to significantly alter the month's outcome," Linda M. Farthing, president and chief executive of Stein Mart, said in a statement on Thursday. "We expect to continue aggressive promotional activity through the remainder of the year."

It was a plan echoed on Thursday by other retailers, like American Eagle Outfitters and Kohl's.

John D. Morris, an analyst with Wachovia whose Holiday Sale Rack Index tracks promotions at specialty mall retailers, said discounts were up 12 percent compared with last year. That may not sound like much, but it is the biggest jump in the decade-long history of the index. Usually, a big promotional period sends the index up 5 percent.

"It's a terrible story for retailers and their margins," said Michael Unger, a principal with Archstone Consulting. "But if you're a consumer looking for a good deal, you will find it."

A version of this article appears in print on , on Page B1 of the New York edition with the headline: Retail Sales Are Weakest In 35 Years.

© 2019 The New York Times Company

▶

# Exhibit 2

# The worst is yet to come for retail stocks, says former department store executive Jan Kniffen

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

distilnfo.com/retail/2017/07/06/worst-yet-come-retail-stocks-says-former-department-store-executive-jan-kniffen/

July 6, 2017

Tweet
Share
+1
Share

Retail consultant Jan Kniffen expects many stores will post ugly traffic and sales comparisons this year.



He also expects many more bankruptcies, including Sears as early as next month.

Retail stocks are only going to get uglier, former department store executive Jan Kniffen said Monday.

"I said last year the fourth quarter is going to be the toughest quarter for retailing," the CEO of consulting firm J. Rogers Kniffen Worldwide Enterprises told CNBC. "It's not better this year."

The S&P consumer discretionary sector has fallen about 2.6 percent from one month ago versus the S&P 500's loss of less than half a percent.

Kniffen said on "Squawk on The Street" that many stores will post bad traffic and same-store sales comparisons this year. Even Black Friday won't be enough to save many struggling companies, he said.

All of this is being driven by "things going online," Kniffen added.

Kniffen said he expects many more bankruptcies, including Sears as early as next month, and said more strategic mergers are likely.

In response, Sears said in a statement: "We remain committed to and have taken steps to reduce costs and continue to execute against our transformation." The statement also said the company is making progress to improve operational performance and to enhance liquidity and financial flexibility.

With the Amazon-Whole Foods deal in the works, retailers are preparing for a "huge battle," Kniffen said. "We're going to see online and brick and mortar merge into one big entity."

"It's not like Whole Foods was a great business, and yet it still got bought by Amazon," he added.

The next big disruption in retail may be pharmaceuticals, he said.

Just last week, Walgreens announced plans to buy more than 2,000 Rite Aid locations. It remains to be seen how Amazon might respond, if at all, he said.

"Wouldn't you go to Amazon to let them full your drugs?" Kniffen asked. "[There's] no reason that can't be done online."

Amazon did not immediately respond to CNBC's requests for comment.

Date:July 03, 2017

Source:Cnbc

# Exhibit 3

**News**Room

10/25/18 FD (Fair Disclosure) Wire 11:30:00

FD (Fair Disclosure) Wire
Copyright (c) 2018 Thomson Financial and ASC LLC

October 25, 2018

Q3 2018 Simon Property Group Inc Earnings Call - Final

Presentation

OPERATOR: Good day, ladies and gentlemen and welcome to the Third Quarter 2018 Simon Property Group, Inc. Earnings Conference Call. (Operator Instructions) As a reminder, this conference call is being recorded.

I would now like to turn the call over to Mr. Tom Ward, Senior Vice President of Investor Relations. Sir, you may begin.

THOMAS WARD, SVP OF IR, SIMON PROPERTY GROUP, INC.: Thank you, Joel. Good morning, everyone and thank you for joining us today. Presenting on today's call is David Simon, Chairman and Chief Executive Officer. Also on the call are: Rick Sokolov, President and Chief Operating Officer; Brian McDade, Chief Financial Officer; and Adam Reuille, Chief Accounting Officer.

Before we begin, a quick reminder that statements made during this call may be deemed forward-looking statements within the meaning of the safe harbor of the Private Securities Litigation Reform Act of 1995, and actual results may differ materially due to a variety of risks, uncertainties and other factors. We refer you to today's press release and our SEC filings for a detailed discussion of the risk factors relating to those forward-looking statements.

Please note that this call includes information that may be accurate only as of today's date. Reconciliations of non-GAAP financial measures to the most directly comparable GAAP measures are included within the press release and the supplemental information in today's Form 8-K filing. Both the press release and the supplemental information are available on our IR website at investors.simon.com.

For our prepared remarks, I'm pleased to introduce David Simon.

DAVID E. SIMON, CHAIRMAN & CEO, SIMON PROPERTY GROUP, INC.: Good morning. We're pleased to report another record quarter with continued strong operating and financial results. Our investment in our product remains unabated with a long-term view of creating compelling, integrated environments with critical mass that serve as the hub of retail dining, entertainment and socializing within their communities. We completed several significant new developments and redevelopments in the quarter, are under construction on others and announced more transformational mixed-use activity that will further enhance the value of our real estate and grow our cash flow.

Turning to the results. Highlighted FFO by $1.090 billion or $3.05 per share, an increase of 5.5% per share compared to the prior year. We continue to grow our cash flow and report solid key operating metrics. Total portfolio of NOI increased 4.1% or approximately $188 million to date. Comp NOI increased 2.3% for the year-to-date period. Leasing activity remains solid. Average base rent was $53.88, up 2.8% compared to last year.

The Mall and Premium Outlet recorded leasing spreads of $7.59 per square foot, an increase of 13.9%. We're pleased that retailer sales momentum continued. In the third quarter, our Mall and Premium Outlets was $650 compared to $622 in the prior year period per foot, an increase of 4.5%. And sales were strong across the portfolio in the third quarter.

Retail sales productivity has increased each month over the last 12 consecutive months. Occupancy at the end of the quarter was 95.5% -- I'm sorry, 95.5%, an increase of 80 basis points for the second quarter and an increase of 20 basis points compared to prior years. On an NOI weighted basis, our operating metrics were as follows: retail sales would be $817 per foot compared to $650, occupancy would be 96.3% compared to 95.5% and average base minimum rent would be $71.21 compared to $53.88.

At the end of September, we opened Denver Premium Outlet centers, fully leased, it's off to a great start. Center is another terrific asset within a great portfolio in a great location in a strong and growing market. Construction continues on 2 international outlets expected to open in 2019 Queretaro, Mexico and Malaga, Spain. And we announced a 50-50 joint venture with Macerich to create Los Angeles Premium Outlets. This will be an exciting project on fantastic real estate and obviously, one of the country's most attractive markets.

Now at the end of the third quarter, redevelopment and expansion projects were ongoing across all of our platforms in the U.S. internationally. And internationally, we started construction on significant expansions of Paju Premium Outlets in Seoul and Tosu Premium Outlets in Japan.

Last week, we held the groundbreaking of our landmark mixed-use transformation at Phipps Plaza that will include Atlanta's first Nobu Hotel and Restaurant, a Class A office building, a life time athletic resort, food hall and outdoor community gathering space, all in the area of one department store that we reclaim. We also announced our transformational vision for Northgate in Seattle. We're thrilled to collaborate with NHL Seattle, make their training center and corporate headquarters an integral element of the reimagined Northgate community. This project is a prime example of our unique ability to repurpose our well-located real estate to create compelling ways for consumers to live, work, play, stay, shop and now skate at our destination.

Now Sears. Over the last several years, as you know, including what we just recently did at Phipps, we have reclaimed a number of our unproductive stores in our -- department stores in our portfolio. The reclamation of unproductive space, specifically some department stores, is an unprecedented opportunity for us to dramatically enhance the productivity of the space, our centers overall, and we will continue to proactively recapture additional stores to further enhance our centers.

The SPG portfolio currently has 33 Sears stores that Sears has closed or announced they will be closed. Of those 33 stores, we have, through proactive action, control 22 of those 33, 5 of which are in our joint venture with Seritage. Of those 17 that we control, Sears will no longer exist in 2019. They will be demolished, replaced and redeveloped.

Now turning back to the 33, Sears owns and controls 5 that will be closing and Seritage controls 6 for the total of 33, not including the ones in our joint venture, and they are -- Seritage is in the process of redeveloping those and are in construction -- under construction with 6 of those former Sears stores. The remaining, we have 29 that are currently operating, 8 are owned by us and leased to Sears, 4 are owned by Seritage and leased to Sears and 17 are owned by Sears.

Turning to capital markets. During the first 9 months, we closed on 13 mortgages, totaling approximately $3 billion, of which our share is approximately $1.3 billion with a weighted average interest rate of 3.83%, term of 8.4. We have the highest-investment grade credit rating in the industry. Our net-to-EBITDA was 5.4x. Our interest coverage is 5, which is well in excess of our peers, well in excess on both fronts. Our current liquidity is $7 billion. We continue to have excess cash flow, which we can reinvest in our businesses.

Today, we announced our dividend of $2 per share for the fourth quarter, a year-over-year increase of 8.1%, and we're approaching the $100 per share dividend since we've been public, which we will celebrate in December. So $100 have been paid to the shareholders roughly in dividends through our public company existence. Our total dividend payment will be $7.90 in 2018, which is an increase of 10.5% compared to last year.

Now turning to guidance. We once again raised our full year guidance to $12.09 to $12.13. Just to keep in mind, this is an updated range compared to our -- updated range includes -- compared to our original guidance of $11.90 to $12.02. And this range -- this new range is a growth of approximately 7.9% to 8.2% compared to our reported FFO of last year.

So we're ready for questions but before I turn that over, we had a very strong quarter, and we continue to grow our cash flow.

Questions and Answers

OPERATOR: (Operator Instructions) Our first question comes from Steve Sakwa with Evercore ISI.

STEPHEN THOMAS SAKWA, SENIOR MD & SENIOR EQUITY RESEARCH ANALYST, EVERCORE ISI INSTITUTIONAL EQUITIES, RESEARCH DIVISION: I just wondered, if you or Rick could just talk maybe a little bit about the leasing environment. And as you sit here today, looking forward, maybe just reflect on the last year and how you felt maybe a year ago and just sort of give us a flavor for the leasing environment?

DAVID E. SIMON: Well, we tend to take a longer-term view. So we can talk about quarter-to-quarter or even year-to-year. But as you know, we take a longer-term view. And I would say, certainly our long-term view has not changed. The activity has increased from '17 to '18. I think there is clearly -- for the retailers that are investing in their product, there is increased sales, as you know. We showed you that. And I'd say, it's certainly generally better than last year. But again, you got to take a longer-term view. We have more activity going on. There is more new concepts on the restaurant, entertainment, overall retail. You got the folks that start out on the Internet that want to own physical stores. So I'd say, generally the environment is better. But as you know, we never really were overly concerned about maybe a less robust leasing environment in '17 because we tend to take longer-term views of this. Happy for Rick to add anything he would like to this.

RICHARD S. SOKOLOV, PRESIDENT, COO & DIRECTOR, SIMON PROPERTY GROUP, INC.: The only thing that I would add is that, there is, I sense, an acceleration. Last year at this time, I think people were talking but there was less aggressive approach to opening new stores. I think, as David said, the people that are well positioned are now more encouraged to open stores. Obviously, sales are better. The profitability is better, and we are very well positioned. We don't talk about it a lot but every day, every one of our properties is getting better because of the capital we're spending.

STEPHEN THOMAS SAKWA: Okay. David, secondly, I just noticed on the leasing spreads information you provided on Page 22 of the supplemental. There was a pretty big jump in the square footage of openings and a pretty sharp decline in the average rent per foot. I realize these are trailing 12-month figures but it almost appears like maybe a different set of assets is being compared now. Do you have any comments on that?

DAVID E. SIMON: Sure. We're -- again, I -- what's the most important thing that I focus on, just so we're clear.

STEPHEN THOMAS SAKWA: [Got it there].

DAVID E. SIMON: You got it. So -- and the operating metrics, it's funny, right? Just to take a step back. So when sales were -- it's always like, okay, what's the operating metrics du jour, okay. And the reality is, our business is changing,

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

in that we're going to be recapturing these boxes that pay very low rent, and we're carving them up. And we're now showing to you that, love metrics, okay, the importance of the embedded growth in our business by recapturing these leases that pay very low rent. So we'll put all of our openings and all of our closings in that number, so that you can see the embedded market rent growth that we have in our business.

STEPHEN THOMAS SAKWA: Okay. And then lastly, just in the Other Income, I know there were different components. And last year, you had some securities gains and this year you didn't. But is there any -- there was a big jump in the Other Income, and I just know there's a lot of different things that run through that but are there any comments and things you can give?

DAVID E. SIMON: Yes. So last year, as you know, we sold the Seritage stock at 48, 49, which I think, if I look today, it was a pretty good trade to sell it at that rate. In other income, we did get our business interruption, not all of it but some of it from Puerto Rico and that's what's in Other Income. It doesn't flow through the operating numbers. That was -- we always had planned to get that. It's always been in our numbers but you can't book that until you actually get the cash from that, according to GAAP. And then, we got some of that BI in the third quarter.

STEPHEN THOMAS SAKWA: Okay. Is there a number you could share with us that's kind of embedded in that Other Income or...

DAVID E. SIMON: Well, it's the big jump in that, the vast majority of it, yes.

STEPHEN THOMAS SAKWA: It's vast majority, the $20 million [increase]? Okay.

DAVID E. SIMON: That's correct. And it really is -- now so you know, we always planned on getting the BI, you just can't show it in your normal minimum rent or CAM recoveries or any of that information. It's got to be in Other Income.

OPERATOR: Our next question comes from Christy McElroy with Citi.

MICHAEL BILERMAN, MD AND HEAD OF THE US REAL ESTATE AND LODGING RESEARCH, CITIGROUP INC, RESEARCH DIVISION: It's Michael Bilerman here with Christy. David, can you just elaborate a little bit on Sears. You were named to the creditors' committee yesterday, so maybe talk a little bit about the role that you plan to play there. And you went through a lot of different numbers in terms of the Sears boxes. If you just look sequentially, you went from 59, effectively down to 46, which includes the 17 which are closing. So there's 13 stores during the quarter that fell out. I wasn't sure whether those were recaptured during the quarter and form part of some redevelopment plan but just looking sequentially [sub-to-sub] 59 to 46, inclusive of the 17 that are closing, just try to get some color there?

DAVID E. SIMON: Yes. Look, I think the thing to focus on, we're putting Sears in our rearview mirror, okay? So what we're trying to explain and there are a lot of moving boxes, and obviously, the whole situation is a tragic -- frankly, put aside how it affects us, we think this is a unique opportunity. We're going to redevelop this. We're going to generate positive momentum with the properties due to this. We're going to reinvest in the communities. We're going to be able to drive traffic now from this box. Put all of that aside, we're going to be able to make money on this. Put that all aside, if I may, and just it's a tragic set of events that a company that's been around for so long is in this state of affairs. So that to us is -- that's what I think about. It wasn't that long ago, 10, 12 years ago that 300,000 people worked at Sears, okay? So I mean, I think, we should put that in perspective but let's focus on what we -- the task at hand. And what I'm trying to do and there are a lot of moving parts. But basically and what I explained, I'm sure I garbled some because I have a hard time spitting out words. But the reality is we have 33 stores that have -- are closed or in the process of closed at the end of this year. We control 22 of those. And 5 of those are in our joint venture with Seritage. Of the 17 that we have unmitigated control, Sears will no longer exist in '19. They will either be torn down, redeveloped, re-leased but they

will be in our rearview mirror. So we are effectively down to 29 operating stores. We own 8, Seritage owns 4 and then the 17 are owned by Sears. And we'll have to wait and see what happens on the -- in terms of whether they'll continue to operate those or not. Obviously, we're planning for the ultimate unfortunate demise of Sears, and we're ready for it. And we have the balance sheet and the capital, intellectual and human resources to deal with this -- these set of events. So that's what I would focus on. The other thing to keep in mind is that, there's also Seritage that owns some in that, and they've done a reasonable job of re-leasing some of their space. So those are the numbers that I would focus on. And it's still moving around because they -- some are closed, some aren't, but that -- those are the numbers. At the end of the day, next year, we'll report 29 Sears stores, that's it.

MICHAEL BILERMAN: Right. It sounds like there were at least 11 that are controlled by others, other than you and Seritage that closed during the quarter. It's going from that 33 to 22, right?

DAVID E. SIMON: That's correct. Sears owns the balance of those. That's correct, that's correct.

MICHAEL BILERMAN: And then -- but the creditors' committee and sort of your role there, and it's worth a mention not a big competitor...

DAVID E. SIMON: There is no comment that I can have on that where we -- for better or worse, we tend to be on creditors' communities with large, unfortunate bankruptcies of retailers. So we have a certain expertise in that. We'll see how it all plays out but beyond that I can't -- I really can't comment.

MICHAEL BILERMAN: Can you talk a little bit about international in terms of what's happening there. Obviously, Kl[#]©pierre, its shares are -- have come down meaningfully alongside a lot of other real estate stocks in Europe. There's obviously been consolidation activity going on there in part. Kl[#]©pierre tried to make the bid for Hammerson, when Hammerson went after Intu. And now Intu has its own consortia bid from their main shareholder alongside capital sources. How are you thinking about Europe overall, both of your investment in Kl[#]©pierre? But then, also, consolidation opportunities in that region, whether that would be Simon-led or Kl[#]©pierre-led?

DAVID E. SIMON: Well, that was -- that -- I would classify that as an add-on sentence but let's put that aside. I'm very comfortable with our investment in Kl[#]©pierre. They have -- I mean, I have to look at the long-term prospects of that company, measured against kind of the short-term volatility. And from a long-term perspective, I don't really see any real change. There is very little new development. They have a lot of redevelopment activity. They're good operators, getting better. So our investment is solid, and stocks go up, stocks go down. We take a long-term view. I -- we have exposure in Europe, not only through Kl[#]©pierre but obviously, through McArthurGlen and through our interest in value retail. I would tell you that the market generally ignores and underestimates the value that we have outside of the U.S., whether that's Mexico, Europe, Asia, there is no appreciation of the value that we've created in that. That's fine. We continue to do what we do. I don't really -- we -- I think, we mentioned briefly, what Kl[#]©pierre did on Hammerson. That's in the -- that's in their rearview mirror. I think that's better coming from them. I think the CEO has made that clear to investors. Not much I can add to that. And there's nothing I can add to what's going on with Intu. I mean, we don't -- as they say, we don't have a dog in that hunt, so here in Indiana that is. But -- so I continue to think Europe is fine. It's certainly -- they -- the better -- I think the trends there are similar to ours, and that the better assets will get better and the ones that are smaller, unless they're uniquely positioned, will be put under pressure. But even the better ones will grow, will offset whatever diminution might have happened on the little ones. So I generally feel pretty good. I mean, there are parts in Europe that you might want to avoid, i.e. Turkey and other places like that, given the currency and the lira and what happens on that front. But generally, I think it's okay. Look, we -- I'm sure the Kl[#]©pierre team has a focus on Italy, what's going on there. You have Brexit. So you could certainly take a contrarian view at the right time. We did that in 2012, when we invested in Kl[#]©pierre. Could we be coming into another contrarian point of view? Perhaps, but we're really not overly active other than making sure our investments grow in value.

OPERATOR: Our next question comes from Jeremy Metz with BMO Capital Markets.

ROBERT JEREMY METZ, DIRECTOR & ANALYST, BMO CAPITAL MARKETS EQUITY RESEARCH: Just going back to the Sears boxes in terms of the 17 that you are expected to close by year-end, the 22, including the Seritage JV. I know it's a little early here still. But can you sort of frame it out from a timing and capital allocation perspective in terms of how much of this you really think will fall into redevelopment, potentially kick off some larger redevelopments? And what sort of rough capital investment this could possibly represent?

DAVID E. SIMON: Well, it -- remember, part of -- the vast majority of the 17 of the 22, we actually transacted to get back. When was that?

UNIDENTIFIED COMPANY REPRESENTATIVE: November.

DAVID E. SIMON: November, okay. So remember that, just to put that in perspective. So those plans are already moving. I mean, not to -- just to name a few, Northshore, Cape Cod, Brea, Stoneridge, Broadway, Midland, just to name a few. So all of those are coming online, and that's why I made the comment that the 17 that we control, Sears is going to be gone. There won't be -- you won't -- there will not be a Sears, it will be either gone under construction or we'll take the box and there will be a new retailer, hopefully open by then but obviously, it does take time. So the 22 of the 33 are basically all under redevelopment. The capital of that is over $1 billion, that's always been in our plan. And there is no surprise there. And so that's -- that we are moving at a high level to redevelop those boxes as quickly and as smartly as we can. Then there is 11 that Sears and Seritage own that we're not involved in. I think Seritage, of those 6 -- and again, there's a lot of numbers here, that's why I'm repeating myself, and I appreciate the question. Of those 6, Seritage has already redeveloped over half of those. So those are moving. They're doing those independently in conjunction with us but independently and that's fine. And then there is 5 that Sears owns, and then we'll see what happens with that real estate. And I think it's a blanket statement that we would love to own at the right price any of the real estate that we don't control. And so we -- patience, seeing how this plays out is important. So I hope that answers it but it will be well over $1 billion. You'll start to see in the 8-K, the stuff as we approve it. I don't know. I'm asking Tom. I don't know. We just approved Cape Cod, Northshore...

THOMAS WARD: There are some in there.

DAVID E. SIMON: There are some in there. So you're going to see it. We have a busy capital appropriations committee. We approved 3 or 4 Monday, you'll see those in the fourth quarter numbers. So it's all moving quickly. We're -- and I would tell you generally other than, obviously, to see a retailer like Sears end up where it is, I mean, this will be fine for us. We'll add value to the real estate. We wish it would have been done in a different manner but we have to confront what we have to confront, and I think we'll make this -- it will be an opportunity for us just like everything else we've dealt with over the last 25 years as a public company.

ROBERT JEREMY METZ: No, I appreciate that color. And as we see that start to come onto the development pipeline, I mean, is it fair to assume the same kind of yields you've been achieving that 7% to 8% on redevelopments or would it be higher here?

DAVID E. SIMON: Yes. No, look, every -- as you know, every deal is different but that's -- that would be our goal for sure.

ROBERT JEREMY METZ: Great. And second one from me, just going back to the leasing commentary about the environment being a little better here today. Are you starting to see this translate into your leases as well in terms of timing to get deals done, terms, leasing, capital? Or is it more just on the activity front at this point? And then, in terms of rents. We've talked about this before but you're not necessarily getting the benefit of sales in an area move online but

you do feel the return to the store level. So to that end, are you starting to push occupancy costs to account for that leakage? You're looking at other metrics to understand tenant profitability and therefore what a tenant can pay and are tenants accepting that this old model maybe needs to change? Or is just more of an educational process on both sides still at this point?

RICHARD S. SOKOLOV: This is Rick. Obviously, you covered a lot of ground. Let me take it apart. One, our terms, our TA are certainly within the norms that we've established over the years. Our tempo of leasing is accelerating in that. We now have more tenants coming in saying, "All right. Let me look at 5, 10, 15 openings for '19." That is an acceleration from what we had this time last year. That's encouraging. Our occupancy costs today are the lowest they have been in the last 2.5 years, so that's encouraging and that's taking into account the fact that there is an understatement of sales productivity. All of our leasing agents are totally aware of not that potential but that fact. And as we are pricing our real estate, we are prosecuting that to the extent we can to drive rents. And you've seen our average base rent go up, so -- and our spreads are going up.

DAVID E. SIMON: I would just add though. I mean, it is -- retailers are smart and savvy. They are doing what they need to do on the -- on their cost structure and -- so it's not easy. But like I said, we have a unique position in this industry. We have really quality properties, a lot of scale. We have the ability to think. We have the ability to be patient. We have the ability to say, no. We take gambles. We win. We lose. We draw. So we do okay but it continues to be -- it's not -- it's still -- there is still very thoughtful negotiations. There -- everybody is focused on increasing their profitability. They're no different with us. And we just -- we try as hard as we can to create a decent win-win scenario. And then when we do that, the math spits out. And -- but it's better than it was last year. The long run, we have no worries about where we're going to be. And I think as we continue to redevelop, we're going to make these properties fantastic. But in the meantime, we're going to be in this spot where it's going to be a thoughtful, diligent but appropriately focused negotiation between us and our best clients.

OPERATOR: Our next question comes from Craig Schmidt with Bank of America.

CRAIG RICHARD SCHMIDT, DIRECTOR, BOFA MERRILL LYNCH, RESEARCH DIVISION: I noticed on your redevelopment activity, the yields for the Premium Outlet redevs went from 10 to 11 and the mills went from 11 to 13. I just wondered what was pushing those returns? And is it, perhaps, that the leasing is going better at these redevelopment efforts?

DAVID E. SIMON: That I wouldn't -- those are hard to like extrapolate trends. I think it's just a function of mix, nothing that really jumps out. But I'm sure, we'll look at it, and Tom could answer. But I just think it's probably just mix at the top of my head, nothing major. No change. We do have the ability, I think, to continue that value through our redevelopment, new development efforts. And it goes up and it will go down but it will -- that gives you the directional idea of kind of where things are.

CRAIG RICHARD SCHMIDT: Okay. So -- and I mean, it's clear that although the construction costs are going up, that it really isn't impacting your returns on these?

DAVID E. SIMON: Well, that's a good question, and let me just say this. Everything -- we are -- it's a good point, and let me address this, this way. I mean, we are -- we have no risk at this point but things always change. But at this point, we have absolutely no risk in what we're building today. You always have contingency in there but nothing what I would say beyond our contingency. And obviously, our contingencies in our 8-K. We are seeing a general increase in construction costs. It's really a market-by-market scenario. But the rise -- potential rise of those costs are not in any way at the point where we're saying, we can't make the numbers work. I don't anticipate that happening but obviously, we're paying attention to it.

CRAIG RICHARD SCHMIDT: Okay. And then, we keep hearing about new technology in both retail and just the retail center. I wonder if there is anything new that might surprise consumers this holiday season, whether it's unmanned checkouts or mobile apps making things more personalized or virtual or augmented reality?

DAVID E. SIMON: Well, I think we and all sorts of retailers and technology companies are focused on a couple of things: payment, obviously; driving traffic, which could be through a lot of individual, personalized promotion; the checkout process, and improving that is really important; and then the ease of parking as well. So lots of experiments, lots of things happening by us and others, by retailers and by technology companies. And I think there is clearly a bounce-back on the physical world compared to the pure online -- Internet, just because I do think payment and ease and convenience can be enhanced by technology in the store environment. So we're looking forward to those introductions into the physical world. That will -- I think that will make physical shopping a lot more easier and convenient. And then, obviously, there's so much benefits to physical shopping compared to looking on your phone and trying to buy stuff. So -- and what's fascinating to us, fascinating -- and we see it because remember, we have [our rights], so we can see the high level of returns that we see from online sales to the physical stores is never talked about, okay? But if you wanted to go, write a research report, Craig, that would be the big focus because everybody wants to say, here is the gross Internet sale but they don't want to tell you the net, they want to hit the physical world. But the returns are staggering, okay, especially in the product that I'm discussing but no one wants to talk about that.

CRAIG RICHARD SCHMIDT: So I can -- I understand your frustration but thank you for your answers.

DAVID E. SIMON: Sure. Well, I'm not frustrated by the way. Just so it's clear, I'm not -- I'm just saying it's very interesting that no one talks about it. It's just a fact.

OPERATOR: Our next question comes from Alexander Goldfarb with Sandler O'Neill.

ALEXANDER DAVID GOLDFARB, MD OF EQUITY RESEARCH & SENIOR REIT ANALYST, SANDLER O'NEILL + PARTNERS, L.P., RESEARCH DIVISION: So 2 questions from us. First, you mentioned the international, and you think that is underappreciated. But just curious, I mean, obviously, in the U.S., you guys have a very efficient platform but globally, you're definitely spread out. So just sort of curious, how you would compare your overseas platforms' efficiency to the U.S.? And then, as you expand into like Thailand or the Middle East, are those -- how those markets are initially versus once you get a concentration of assets? Do you really see a material improvement in operations or the Premium Outlets are -- work very well as a standalone or in clusters?

DAVID E. SIMON: Well, I'd say both. I mean, the reality is our joint ventures with the Premium Outlet business is -- has its own group of personnel. So they can add -- as they add product to their platform, I mean, they get scale. It's safe to say, no one -- none of our investments overseas has anywhere near the scale and the overhead metrics that we have. I mean, our overhead metrics are underappreciated. I mean, Tom can give you the numbers but many of our peers are at 10% of NOI and we're at 3. Well, give me the numbers.

UNIDENTIFIED COMPANY REPRESENTATIVE: We're at 3.

DAVID E. SIMON: We're 3, and they're 8, 9, 10. So all of our places don't have quite that scale. I could certainly -- if I wanted to or could, I could certainly probably find a way to scale but they're doing fine. And so it is what it is. So they all benefit from adding good product to their platforms. I would say, none of them have the scale that we do, and we don't impose our scale to them at all. And I don't think that we will but you can't rule it out. And if we did, I'm sure, we could do it. We could have better results. But at the moment, everything is good. So we let it go.

ALEXANDER DAVID GOLDFARB: Okay. And then the second question is, you guys -- on the last call, you talked about converting retail to other uses, and obviously, you had to deal out in Northgate, where it looks to be sort of cutting

the mall in half. As you guys increasingly go through, is there like basically a -- not exact percentage but a view of how much existing retail you could do without to replace with things like apartments or hotels or office versus how much you would increase the overall square footage of your properties to add incremental uses? So trying to get a sense of how much of your existing retail would you scale back to increase uses versus how much of the new mixed uses would be incremental to the existing retail that's already there?

DAVID E. SIMON: Well, it's hard to give you a number but let me look at it this way, okay? So I think the greatest opportunity that we have -- I think, we're in good shape with small shop. There's always going to be a mall here or there that has too much small shops. But I think, we're in decent shape there. And so what we have the opportunity to do and we are doing is, we probably -- the mall of the future doesn't need 5, 6, 3. It depends on the mall but it doesn't need the department stores. And then, the ability to reclaim that allows us to densify the properties. And I think we have that opportunity in a rather large scale. So again, this is where we suffer maybe from the scope of what we do and all the activity that we have. But take Phipps as an example. So this is -- was that put in the 8-K or not?

THOMAS WARD: Yes.

DAVID E. SIMON: So it's in the 8-K now, all right. So take Phipps, we had 1 department store built that was 140,000?

RICHARD S. SOKOLOV: 160,000.

DAVID E. SIMON: 160,000. Thank you, Rick. We are adding essentially 300 -- wow, we have -- the office is 324, right? And the hotel is -- how big is that? Whatever. Okay. So let's say, we're adding 500,000 square feet in something that was doing 160,000 -- that was taking up 160,000 square feet. And I encourage you to look at the renderings, do we have the renderings on our website?

RICHARD S. SOKOLOV: We can get them out.

DAVID E. SIMON: Okay. We should, let's get them. Do we have the video of me and Mr. De Niro and Chef Nobu on our website? And Rick?

RICHARD S. SOKOLOV: That's right.

DAVID E. SIMON: [Is it out there]? Okay. So we won't but we'll do that. And Northgate, you say the mall cut in half. I got to tell you Northgate is so much bigger than that. And again, we're -- we have up to 800-plus apartments.

RICHARD S. SOKOLOV: 1,200 apartments. Frankly, we're going to have 1,200 apartments, 600,000 feet of retail. We're going to have probably 600,000 feet of office and the NHL Seattle training facility.

DAVID E. SIMON: So, I mean, the scope of some of these things are really large. But if you're looking for it, here is the number, I can't give it to you other than with these -- we do feel like there is a lot of fun stuff to do. It's aggravating in the sense that it's -- you have to herd all of the cats, in terms of accomplishment. But once we built something, I mean, like once we -- Phipps will be open, hopefully in, and I'm pushing for 2 years but maybe 2.5 years, I think, we're going to be really proud of that and our shareholders will be happy, and Rick and I will have great sushi. So what else could you want?

OPERATOR: Our next question comes from Caitlin Burrows with Goldman Sachs.

CAITLIN BURROWS, RESEARCH ANALYST, GOLDMAN SACHS GROUP INC., RESEARCH DIVISION: So your dividend is going to be up 10.5% this year, which is great. I guess, I was just wondering considering you're growing

Q3 2018 Simon Property Group Inc Earnings Call, Final

cash flow, how are you thinking about prioritizing on development and redevelopment where you're obviously very active versus increasing the dividend and potential acquisition opportunities right now?

DAVID E. SIMON: Well, I'd say to you that I would expect obviously board decision, blah, blah, blah. But we would expect to continue to increase our dividend next year. Clearly, we will be -- our redevelopment is really active and that could be increased, and again, the reality is, Caitlin, that it takes time. So take Brea, which we control that Sears store. It's going to be unbelievable but we have another 6 months of permitting. So we're able to -- I would love to like just step it all into the box and do it all at once but the reality is we can't because we have external constraints. I wouldn't say necessarily capital constraints at all but -- and I'm -- so I'm looking at Brian, he is saying, we don't have any. But a little -- maybe I tend to be a little conservative on that front but anyway, we just have constraints on doing the redevelopment only because we've got the permitting and so on and so forth. So that continues to be a big priority. Obviously, new development is not in the U.S., is not wildly active, though I will tell you that the deal with Macerich, I think is going to be a really good project but that's a 3-year project essentially, okay? So that takes time, and that we are really -- we think that's going to be really a good deal. We've got another one in the works in another area of the country and probably 2 more outlets that we're going to build. But again, those are over -- one could be a little bit quicker but 2 years or so. So that continues to be a focus.

Internationally, it's basically, we take our cash flow there and reinvest it. So it's not what I'd call Simon capital. We're actually not [writing] -- yes, we may not get repatriation back to us but we're basically doing what many thoughtful companies do, is they take profits and they reinvest it and have more profits and keep doing it until they can't do it anymore. So we don't see that. And so that -- so then the next thing is, look, we're going to -- we still have, if the market doesn't like our business or doesn't like what we're doing, we still have a focus on buying stock back, and then we're not all that active in the acquisition area. We could do a deal here or there. We certainly are interested in reclaiming at the right price certain department stores, and that's kind of how we're thinking about the world right now. I hope that's helpful.

CAITLIN BURROWS: It is. And just in terms of that time it takes, is there any -- I think there is some concern out there with the amount of department store reclaims that you have and everyone else does, that finding those

new uses is taking longer. Is that part of it? Or is it not?

DAVID E. SIMON: Not with us. No, no, no, no, sir, no way. That's not our issue. Our issue is execution, permitting, it has nothing to do with demand -- supply and demand, and has nothing to do with capital. That's not us, sorry.

CAITLIN BURROWS: Great to hear. And then maybe just last quickly. It looks like you guys have $600 million of 2.2% debt maturing in early '19. So just wondering the plans to address that, and if it were a 10-year unsecured deal, what you think the rate could be?

DAVID E. SIMON: Well, we'll either use our cash or certainly our -- we have $7 billion available. So that's just basically standard operating procedure, no big deal there. We could go to the unsecured market. Obviously, there is a lot of rate volatility today. We wouldn't probably do it today but we'll have to wait and see kind of where the world shakes out. Brian, I don't know if you want to add anything?

BRIAN J. MCDADE, EXECUTIVE VP & CFO, SIMON PROPERTY GROUP, INC.: Yes. Look, I think our cost of money today on a 10-year basis would be about 4 1/8. So we have as, David said, we've got over $7 billion of liquidity. So we have plenty of options to address the upcoming maturity. It is our only maturity we have in 2019.

DAVID E. SIMON: Yes. And I would say to you what's fascinating, we have very, very little debt coming due in '19 or '20, both on the unsecured and secured basis. So we're in a very good spot to do that. And I would also, again, it's

overlooked but if you look at our peers, internationally, north of the border, domestic, Far East, nobody has our balance sheet, nobody is 5x debt-to-EBITDA, nobody. People are 2x of us. Not 7 but 10-plus. Please appreciate that.

CAITLIN BURROWS: (technical difficulty) commentary?

DAVID E. SIMON: Okay. So you broke up there but anyway. So we're in good shape there, and we'll see what happens on that front.

OPERATOR: Our next question comes from Jeff Donnelly with Wells Fargo.

JEFFREY JOHN DONNELLY, SENIOR ANALYST, WELLS FARGO SECURITIES, LLC, RESEARCH DIVISION: I guess, a question for both of you, Rick and David. I'm just curious in situations where you guys have redeveloped anchor boxes, do you have any statistics you can share on the change in foot traffic sales or asking rents of the property since the new anchor opened?

DAVID E. SIMON: I'm sure we could put something together. Here is what's interesting that we're seeing, again, I wouldn't like -- this is anecdotal. So don't like go -- and I don't know if this means anything and so it's too early. But we've had department store closings in the portfolio. It's -- there is no hiding that, right? And we have seen, and again, nothing drives our business. This does not drive our business one way or another because the size of the portfolio. But what we've seen, which is actually encouraging is that the in-line sales are actually getting the benefit of the department store closures. And we're also seeing some of the other department stores pick that business up. So at the end of the day, like I said, maybe our industry got just too carried away with having all these big department store boxes. It -- as we transition to the smaller more appropriately sized group, and there will be centers that lose in that and we may have 1 or 2 that we're nervous about.

The reality is, the rest of that center and we will get a better and bigger benefit, I think we'll get healthier. And we're starting to see that. But again, I'd say that's anecdotal and nothing to quantify. But we are seeing that in some of these cases, which I think is encouraging, and that's what we want. We don't need all of those. We don't really get much of an economic benefit from those boxes. We've taken over driving the traffic to the center from those boxes that would have been the historical reason to have them. So this could be healthy other than Rick and I pull our hair out, we want every box leased, we want everything redeveloped, we -- the team's moving really hard, and everybody is like, we're playing very hard here to make this stuff happen quick. I mean, that's the downside, is that, we ain't -- not that we ever have but we are not coasting, okay? We're not coasting. So not that you should feel sorry for us but I'm not asking you to. But that's the reality. We're humping and pumping. And I think this will be -- I really think other than, yes, there will be a couple of losses on the scoreboard for us but at the end of the day, this will be a good thing for us and likely our entire industry.

RICHARD S. SOKOLOV: The one unambiguous result of replacing these anchors is there is no doubt that our total sales and total footfall at our properties is increasing. Just think about David's example at Phipps. When we're done, we're probably going to have triple the retail sales plus have all the hotel traffic plus the office traffic. So in every instance, what we're adding is going to be more productive and more dynamic than what we're replacing.

JEFFREY JOHN DONNELLY: Thanks. And I guess on Sears, I'm curious, were they current on their rent before they filed because typically retailers build up a pre-petition receivable before they file. But it's sounding like some of the landlords that they were largely current, which frankly makes it seem like the bankruptcy started out as a bluff that they got called out on?

DAVID E. SIMON: Yes. We don't -- we're not going to have a bad debt reserve. I think, that's correct.

JEFFREY JOHN DONNELLY: Just one last one on Sears. You mentioned about $1 billion of investment for the 22 boxes you're redeveloping. Should people think of that as like a rule of thumb is $40 million to $50 million a box, or does that include investment beyond the Sears? I think people are looking for a number there. And I'm curious how your return on investment you see on that $1 billion compares to what it's been on prior anchor developments?

DAVID E. SIMON: I think what I would -- the best way to do this is really say to you, Jeff, that we're going to have $1 billion-plus spend. We've been at this -- Tom, $1 billion for how many years? 6, okay. 6 years, a $1 billion spend, a lot of - so I think, Jeff, if you look at what we've been doing, we've been spending $1 billion. And if you look at '15, '16, some of that may have been tilted toward new development more than redevelopment. It's now going to tilt more toward redevelopment but -- and it -- I think it will go up. But that $1 billion of spend is not just those 22 boxes. That's a lot of stuff in there, okay? So like Phipps is a $350-million-plus spend, it will be over 2 years -- 2.5 probably but 2 years, and that's not Sears, that was an old Belk store.

Northgate, I mean, the Northgate numbers could be much bigger than that but again, that will be over 3 years and again, that's not a Sears box. So when I say that $1 billion-plus spend, it's like -- it's what we -- it's the vision of what we see on redeveloping our business, and it will tilt more toward that. On the other hand, when you add Carsons with Macerich and you add a couple more, I think our spend on average is averaged about $1 billion. It could go up as we add these things. It's not going to go to $2 billion a year but it could go to $1.3 billion, $1.4 billion. We're doing our plan for '19. Tom told me not to invite anybody to our planning process, correct?

THOMAS WARD: Correct.

DAVID E. SIMON: So I'm officially not inviting anybody. But right now, we're looking at a little over a $1 billion, $1.3 billion. So it's -- I think, it's just more than just Sears, okay.

OPERATOR: Our next question comes from Michael Mueller with JPMorgan.

MICHAEL WILLIAM MUELLER, SENIOR ANALYST, JP MORGAN CHASE & CO, RESEARCH DIVISION: It looks like sales growth at the Mills has been similar to the rest of the portfolio. So I'm curious what's enabling you to drive the spreads that are significantly higher there?

RICHARD S. SOKOLOV: The Mills is, they're very well-positioned in virtually every market where they operate, they're a unique mix of full price, value, outlet, entertainment, food, they're all 1.5 million to 2 million square feet and they just are able to attract a very broad segment of shoppers, and they're performing well. There is no real magic, which -- but we have a very broad use of potential users there, and we've been able to keep those things very well leased, and they're very productive.

MICHAEL WILLIAM MUELLER: Is the occupancy cost notably different than the other part of the portfolio?

RICHARD S. SOKOLOV: No.

OPERATOR: Our next question comes from Rich Hill with Morgan Stanley.

RICHARD HILL, HEAD OF U.S. REIT EQUITY AND COMMERCIAL REAL ESTATE DEBT RESEARCH AND HEAD OF U.S. CMBS, MORGAN STANLEY, RESEARCH DIVISION: I want to go back to a comment you made, I think at the outset talking about how maybe your international portfolio has been, I'm going to put words into your mouth, undervalued or underappreciated. When I look at your development pipeline, it looks like there is a tremendous amount of focus on international. So how are you thinking about that? I think it's just a little bit above 10%

right now as a percentage of NOI. Do you -- as you think forward over the next 5 years, do you have a bright-line test as to where you want to get it? Or is it just, you're going to do good deals when you can find them?

DAVID E. SIMON: I think, Rich, it's -- we don't have an, oh boy, we're -- we need to be a 12%, 13%, 14%, 15%, 20%, that's not how we look at it. So the reality is -- and most of that, as you know, is through development that we've made some strategic investments, i.e. Kl[#]©pierre and McArthurGlen that come to mind. And I would -- and remember, we own a decent chunk of value retail. We don't really book any of their earnings, and we've had this discussion, we only book when we get cash, which is cash distributions, which is basically cost accounting for those of you who remember cost accounting, which I do. But long story short, we don't really have -- we don't have -- I don't have any desire to do more. I don't have any desire to do less. I only have desire to make money. So we do think we add value. We do think maybe some of our international partners don't think so but I think we do. So I think it's more deal-driven but it's an important part of our business, and we will continue to invest in our platforms, whether it's Japan, Korea. We announced a development in Thailand, which I think will be fantastic. That opens up that whole country, the tourism there is remarkable. I just happen to do a retail tour in Europe, and the interest in that is the Far East -- our Premium Outlet businesses in the Far East is very -- it has a high level of interest from our retailers. So I just think it's going to be, how do we continue to drive and make money from our investments there. No desire one way or another.

RICHARD HILL: Got it. So just one quick follow-up question then. Maybe this is just in light of some global consolidation that we're seeing. Do you think landlords have to have global footprints to make money?

DAVID E. SIMON: I think it can help but I don't think it's the -- I -- and I have evolved on this. I don't think you need it. I think it can help. I wouldn't do a deal because that was a really important component of that transaction, i.e. exporting retailers from one level to another. However, it's not inconsequential. So take an example, we -- I met, and I won't name a name but I was just in Spain with a large retailer, and the fact that we have a terrific relationship with them in the U.S. and Kl[#]©pierre has a terrific relationship in Europe, doesn't hurt. But it would -- if I had overpaid for the Kl[#]©pierre stake, that relationship wouldn't make it up, okay? So but -- I think it is helpful but it's not a reason to do a deal.

OPERATOR: Our next question comes from Tayo Okusanya with Jefferies.

OMOTAYO TEJAMUDE OKUSANYA, MD AND SENIOR EQUITY RESEARCH ANALYST, JEFFERIES LLC, RESEARCH DIVISION: So my question is more numbers-focused. I'm just trying to understand the nature of the guidance change. And then just kind of given the $0.05 [deed] in 3Q, how come the low end of guidance that was raised rather than the high end as well?

DAVID E. SIMON: Well, look, I don't know. There is lots of numbers. We're a big company, one deal, one event is not going to change this, that and the other. But obviously, the currency in Europe is a little softer than it was. We tend to be conservative. There is nothing really, to really study or read into that, just a number, okay?

OMOTAYO TEJAMUDE OKUSANYA: Okay. Fair enough, David. All right. And then...

DAVID E. SIMON: I mean, right? As I said -- just a number, okay.

OMOTAYO TEJAMUDE OKUSANYA: All right. Fair enough. And then any update in regards to those lease accounting charges we should be expecting for 2019? I know earlier in the year you've kind of given us some -- something....

DAVID E. SIMON: That's the same general number, no change in that. We're not going to -- we'll make that clear when we give our guidance in February. We'll absolutely make it clear. The number that we told the market more or less is the same number. There is not going to be much change there. And we'll debate whether we should -- we might go a

year just saying, here is what it would have been before and after just so people do it but we might not but you'll see the number, and it's not -- and that's really the only thing that's going to -- with these other new pronouncements, that's the only thing that's really going to be different. And again, it's not a huge number. Yes, it's basically 1% . So -- and it's over -- it's pretty much over the -- it's 25 basis points per quarter, and you can do the math to get to the number.

OMOTAYO TEJAMUDE OKUSANYA: Great. And then last one for me. Although, it's a couple of years out, any other information you can just share about the JV with Macerich?

DAVID E. SIMON: No. It's a development JV. I think a lot of people from discussions with Macerich are probably familiar with the site, and we take the site over in about a year and then we build. So it's -- we're happy to be part of it, and we think it will be a very good L.A. Premium Outlet center. So it -- we don't get the site back until Carsons does what they need to do, and the timing on that is roughly a year from now.

OPERATOR: Our next question comes from Haendel St. Juste with Mizuho.

HAENDEL EMMANUEL ST. JUSTE, MD OF AMERICAS RESEARCH & SENIOR EQUITY RESEARCH ANALYST, MIZUHO SECURITIES USA LLC, RESEARCH DIVISION: Dave, I guess, a question for you on the lease termination environment. Are you guys still -- are you receiving early termination buyout offers from retailers? And what's your appetite or sentiment regarding these early buyout offers?

DAVID E. SIMON: We had some, it was lower this quarter -- much lower this quarter than a year-ago quarter, right? It's in our -- actually you can see it in our 8-K, I don't remember the number off the top of like...

THOMAS WARD: It's [$9.8 million] for the quarter.

RICHARD S. SOKOLOV: Versus [$13.2 million].

DAVID E. SIMON: So it's down. I'm not a big fan of them, frankly. But I would say, we'll do them occasionally. Certainly, as you know, it's not in our comp NOI because we -- there is a lot of volatility associated with it. I would say, generally, the buyout requests are down pretty reasonably. Rick, do you agree?

RICHARD S. SOKOLOV: I agree. There has been less activity this period than we had last year.

DAVID E. SIMON: Yes. So it's down. Occasionally, we get it. I'm not a big fan of it but look, we'll do it for -- we'll do it for strategic reasons. One is, maybe we're helping the retailer. Two is, we want the space back. But it's not what we -- I would prefer not to like do a lot of it, and -- but we will do it strategically, and it's basically a function of whether the offer is fair and whether it helps the retailer and whether our prospects for renewing the space quickly. So all that goes into the blender, and then we make a decision one way or another. But we don't run around trying to look for it. It basically comes to us.

HAENDEL EMMANUEL ST. JUSTE: Got it. Got it. All right. That's helpful, thanks. I missed it earlier, I think you mentioned that you did receive business interruption income in the third quarter, and you put it in the Other Income. But I didn't catch a figure. Did you provide one?

DAVID E. SIMON: No, we didn't. But it's the vast majority of the Other Income number.

HAENDEL EMMANUEL ST. JUSTE: Got it. Okay. And capital allocation, I guess, a follow-up to an earlier question. You guys did not buy back any stock after being active, it looks like second quarter stock is pretty much at the same level.

Anything precluding you there from buying back stock? Or just maybe storing up dry powder for incremental redev? Just curious on your thoughts on capital allocation regarding stock buybacks.

DAVID E. SIMON: Yes, I just think we're conservative. I would tell you that I want to hug Brian and Andy every day, maybe I should get a little credit too. I just love our balance sheet where it is. I just love it, love it, love it. I just think it's so cool to have a balance sheet like that. So we're going to be really conservative, thoughtful and then as you mentioned, I mean, obviously, we've got a very active redevelopment pipeline. But I just love, love, love our balance sheet, and I just think that's something that -- it's got to be unique, it's got to be unique set of circumstances to really do anything material to it.

HAENDEL EMMANUEL ST. JUSTE: Okay. Last one, I guess same-store expense growth in the third quarter. Can you provide what that was?

DAVID E. SIMON: I don't know. I mean, I've no idea, but Tom will -- we don't really do that. It's just, our NOI, our comp NOI, we kind of -- it is what it is.

OPERATOR: Our next question comes from Ki Bin Kim with SunTrust.

KI BIN KIM, MD, SUNTRUST ROBINSON HUMPHREY, INC., RESEARCH DIVISION: Just to clarify something you guys mentioned earlier. The definition for leasing spreads and the volume, I think the pool changed and now you're including anchor boxes. If that's correct, do you have any of those stats under the previous language available, just for the sake of comparability?

DAVID E. SIMON: Well, it's not just anchor, it's everything. It's whatever boxes come in and [come out], whatever theaters we renew, whatever amendments we take. And we just, we sat back and said, look, this is our business and it's important to focus on that because I think the market wants to know, great you're getting these boxes back but is there value in that real estate? Why are you paying for it if there is not value on the re-leasing of that? And that's what we are trying to express. So we had -- I will say this, if you look at the earlier definition, we had positive spreads that we think the market would be fine with. But I think, the more important thing is to focus on what the future of our opportunity set is, and that's what we're trying to do.

KI BIN KIM: All right. And if I think about Simon and the size and the scale you guys have, up well above your peers. It's still interesting that on simon.com you can't buy anything. Have you guys thought about that or are there any initiatives underway? I can imagine having something like that could probably help a lot of your data collection initiatives?

DAVID E. SIMON: Have you been studying what we're up to? A very good question and an appropriate question and the best answer, I have a really thoughtful answer and that is to stay tuned.

OPERATOR: Our next question comes from Derek Johnston with Deutsche Bank.

DEREK CHARLES JOHNSTON, RESEARCH ANALYST, DEUTSCHE BANK AG, RESEARCH DIVISION: How is the mixed-use redevelopment at Phipps Plaza reshaping your vision of the portfolio's potentiality? And in your thinking, how many additional large-scale repositionings exist within the mall's portfolio? And what's your appetite for accelerating these investments?

RICHARD S. SOKOLOV: It's interesting. We've been active now for over an hour and the words KOP and King of Prussia haven't come up yet. Just our portfolio has a number of those activities. We emphasized before, when we get back one of these department store boxes, it's more than just 150,000 to 200,000 feet, it's anywhere from 10 to 18 acres adjacent to some of the best real estate in the United States. We are very focused on what we can do with those 18 acres.

And you are going to see an accelerating amount of activity in a number of our properties where we have back 22 boxes, David said, we'd like to get back others, we've taken back Penney's, we've taken back Belk, we've taken -- so you're going to keep seeing that. We have the capital, we have the expertise, we have the opportunity, and it's going to be accelerating throughout the portfolio. Frankly, we've been doing this for a decade. The difference is, we now have access to these 10 to 18 acres adjacent to our properties that can accelerate all of these activities and they are more top-of-mind for the investment community. So it's a great opportunity. We're well positioned to doing it, and it is in fact happening as we sit here talking to you.

DEREK CHARLES JOHNSTON: Excellent. And just a last one. If you could share any updates on digitally native or e-tailer initiatives? I know have some experience there now and you've been doing it for a while. Any early customer or maybe brand retailer feedback that you think is worth sharing?

DAVID E. SIMON: I would simply say that the store experience, the best way I can and be -- we warble on a little bit, so let me be really concise. The best way I can say that is, the store experience and the store requirement is back. And that is -- it shouldn't be underappreciated. They all want stores. Period, end of story.

RICHARD S. SOKOLOV: And they are opening stores. We have a very active program right now where we've got probably 25 retailers that started on the Internet that have opened stores with us and are opening more because as David said, they work and they make money.

OPERATOR: Our next question comes from Linda Tsai with Barclays.

LINDA TSAI, VP & RESEARCH ANALYST OF RETAIL REITS, BARCLAYS BANK PLC, RESEARCH DIVISION: In terms of the business interruption, insurance from and other income from Puerto Rico this quarter, do you expect anything material in 4Q as well?

DAVID E. SIMON: Yes. We expect to have some more because it comes in over a period of time. But again, all of that was planned in our guidance at the beginning of the year. Remember, we had -- we had Puerto Rico down, so we've been reporting our numbers with basically on average around $35 million of EBITDA, adios, okay? So -- between those 2 assets. So now we're starting to play catch-up and it happened a year ago. So that's been out of our numbers, fourth quarter of last year, all the way up now, and we're starting to come back a little bit as we get to -- as we collect the cash.

LINDA TSAI: Would that continue into '19 as well?

DAVID E. SIMON: Well, at that point the property will be back online, so then we'll have -- then we'll report it, just our normal NOI that we would get from that property.

LINDA TSAI: And then I understand that Sears' going away is a long-term positive for you and the rest of the industry. As this is playing out though, short-term medium-term, do you see store closures or liquidation sales as having a dampening effect on retailers for the holiday season? And then to the extent that the liquidations continue post-holiday?

DAVID E. SIMON: Well, look, let me restate what I've said about Sears. I am disappointed. We didn't want Sears to basically file Chapter 11 or go out of business but given that it's -- at least the Chapter 11 process is happening and given the fact that they -- that we could buy some of the real estate back, we're going to make the best of it. So -- and at the end of the day, that could be a positive for us. And in terms of diversifying the mix of our properties and so on and all the stuff that we already talked about. There is always a little bit of disruption when you have liquidation. Just so you know, when you liquidate a store, you got to follow a lot of rules. We will certainly enforce our legal rights there, and hopefully it will not be disruptive to the other patrons of our shopping environments and/or have any impact on our retailers but there is a process there that they've got to run by, and we intend to make sure they operate accordingly.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

LINDA TSAI: Thanks. And then finally, you said you just completed a tour of Europe, and I'm sure you visit regularly. But are there any novel retail models or concepts you felt inspired by or see making it for the U.S.?

DAVID E. SIMON: Well, listen, a lot of the -- there are a lot of great retailers in Europe; Spain, obviously Sweden, Italy, France. So I think what you don't see a lot of is kind of the Internet folks. I mean, we're seeing most of that here. But beyond that in terms of Internet entertainment, restaurants and obviously, fashion and apparel, they're fantastic, and they are very good people. And we do a lot of good stuff with them throughout the world, Asia and Europe and the U.S. so it's important for us. And I think one of the benefits we've gotten over the years is that we're now -- they recognize who we are and what we do, which may not have been the case a decade ago.

OPERATOR: Thank you. I'm not showing any further questions.

DAVID E. SIMON: Go ahead, ma'am.

OPERATOR: I'm not showing any further questions at this time. I would now like to turn the call back over to David Simon for any further remarks.

DAVID E. SIMON: All right. Thank you. We appreciate your questions and we'll talk to you soon.

OPERATOR: Ladies and gentlemen, thank you for participating in today's conference. This does conclude today's program, and you may all disconnect. Everyone have a great day.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2018 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2018 ASC LLC (www.ascllc.net) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or ASC's copyright or other proprietary rights or interests

in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and ASC so long as they provide conspicuous attribution to Thomson Financial and ASC as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]

---- **Index References** ----

Company: BARCLAYS PLC; BANK OF AMERICA CORP; CITIGROUP INC; DEUTSCHEN BANK AG; GOLDMAN SACHS GROUP INC (THE); HAMMERSON PLC; INTU PROPERTIES PLC; JPMORGAN CHASE AND CO; JV GLOBAL LTD; JEFFERIES LLC; MACERICH CO (THE); MIZUHO SECURITIES USA LLC; MORGAN STANLEY; SANDLER ONEILL AND PARTNERS LP; SERITAGE GROWTH PROPERTIES; SIMON PROPERTY GROUP INC; STONERIDGE INC; SUNTRUST ROBINSON HUMPHREY INC; THOMSON REUTERS CORP; BMO CAPITAL MARKETS CORP; BMO CAPITAL MARKETS LTD; WELLS FARGO SECURITIES LLC; WELLS FARGO SECURITIES LLC; WELLS FARGO SECURITIES LLC

News Subject: (Business Management (1BU42); Corporate Events (1CR05); Earnings Calls (1EA37); Emerging Market Countries (1EM65); Meeting Announcements (1ME17))

Industry: (Commercial Real Estate (1CO51); Department Stores (1DE95); General Merchandise Stores (1GE70); Press Releases (1PR19); Real Estate (1RE57); Retail (1RE82); Retailers (1RE64))

Region: (Americas (1AM92); Asia (1AS61); Caribbean (1CA06); Central Europe (1CE50); Eastern Asia (1EA61); Europe (1EU83); Eurozone Countries (1EU86); Far East (1FA27); Germany (1GE16); Iberia (11B61); Indo China (1IN61); Latin America (1LA15); Massachusetts (1MA15); Mediterranean (1ME20); Mexico (1ME48); North America (1NO39); Puerto Rico (1PU56); South Korea (1SO65); Southeast Asia (1SO64); Southern Europe (1SO59); Spain (1SP23); Thailand (1TH74); U.S. New England Region (1NE37); U.S. West Region (1WE46); USA (1US73); Washington (1WA44); Western Europe (1WE41))

Language: EN

Other Indexing: (ASC LLC; BMO Capital Markets; EVERCORE ISI INSTITUTIONAL EQUITIES; VP & RESEARCH; WELLS FARGO SECURITIES LLC) (OMOTAYO TEJAMUDE OKUSANYA; Alexander Goldfarb; Richard James Hill; Richard Hill; Michael Mueller; Michael Mueller; Charles H. Johnston; Charles Johnston; De Niro; Jeff Donnelly; Caitlin Burrows; Steve Sakwa; Richard S. Sokolov; Richard Sokolov; Craig Schmidt; Linda Tsai; Thomas G. Ward; Thomas Ward; KI BIN KIM; JEFFREY JOHN DONNELLY; Tom Ward; Jeremy Metz; STEPHEN THOMAS SAKWA; CRAIG RICHARD SCHMIDT; Irwin David Simon; Irwin Simon; Michael Mueller; Michael Mueller; ALEXANDER DAVID GOLDFARB; Adam J. Reuille; Adam Reuille; Brian J. McDade; Brian McDade; Richard S. Sokolov; Richard Sokolov; BRIAN MCDADE; David E. Simon; David Simon; MICHAEL BILERMAN; ROBERT JEREMY METZ; Derek Johnston; Christy McElroy; Richard James Hill; Richard Hill)

Word Count: 11851

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.



# Exhibit 4

**News**Room

10/30/18 FD (Fair Disclosure) Wire 14:00:00

FD (Fair Disclosure) Wire
Copyright (c) 2018 Thomson Financial and ASC LLC

October 30, 2018

Q3 2018 Brixmor Property Group Inc Earnings Call - Final

Presentation

OPERATOR: Greetings, and welcome to Brixmor Property Group Third Quarter 2018 Earnings Conference Call. (Operator Instructions) As a reminder, this conference is being recorded.

It is now my pleasure to turn the conference over to your host for today's call, Stacy Slater. Thank you. You may begin.

STACY SLATER, SVP OF IR, BRIXMOR PROPERTY GROUP INC.: Thank you, Rob, and thank you all for joining Brixmor's third quarter conference call. With me on the call today are Jim Taylor, Chief Executive Officer and President; and Angela Aman, Executive Vice President and Chief Financial Officer; as well as Mark Horgan, Executive Vice President and Chief Investment Officer; and Brian Finnegan, Executive Vice President Leasing, who will be available for Q&A.

Before we begin, let me remind everyone that some of our comments today may contain forward-looking statements that are based on certain assumptions and are subject to inherent risks and uncertainties as described in our SEC filings, and actual future results may differ materially. We assume no obligation to update any forward-looking statements.

Also, we will refer today to certain non-GAAP financial measures. Further information regarding our use of these measures and reconciliations of these measures to our GAAP results are available in the earnings release and supplemental disclosure on the Investor Relations portion of our website. (Operator Instructions)

At this time, it's my pleasure to introduce Jim Taylor.

JAMES M. TAYLOR, CEO, PRESIDENT & DIRECTOR, BRIXMOR PROPERTY GROUP INC.: Thank you, Stacy, and thank you all for joining our third quarter call. I'm very pleased to report that our team is well ahead of the 2018 plan to deliver value now that we outlined at our Investor Day last December. But importantly, we've not only accelerated the delivery of that value through capital recycling, leasing, reinvestment and balance sheet management, we've also substantially increased the intrinsic value of what we own. Said another way, our progress continues to reduce the appropriate cap rate for Brixmor, while it also sets us up for consistent sustainable growth in 2019 and beyond. Allow me to explain.

Let's start with our investment team where year-to-date, we've closed on $780 million of dispositions, well beyond our original goal. With that progress, we now expect to close nearly $1 billion of dispositions this year at a weighted average cap rate just below 8%. This is an outstanding achievement in several respects. First, we realized these cap rates for assets that have averaged in the bottom quartile of what we own as it relates to 3- and 5-mile population density,

average household incomes and most importantly, anchor productivity. Through systematically pruning the bottom of our portfolio and exiting 39 noncore markets, we have significantly improved both the growth prospects and cap rate of our remaining portfolio.

Secondly, we transacted on an asset by asset basis, which we believe drove pricing 5% to 10% higher than what would have been achieved in larger portfolio trades. That effort, which has involved over 50 discrete transactions, captured an additional $50 million to $75 million of value over what might have resulted in portfolio trades. And even more significantly, the nearly $1 billion we expect to close has raised liquidity at NAV or equity valuations at least 40% higher than our average stock price over the past year.

This accelerated disposition activity has enabled us to shift to more of a balanced capital recycling stance for 2019 and beyond. I'm encouraged by identified opportunities for us to cluster further in those retail nodes where we have a dominant presence. Of course, we will also have the ability to acquire more shares under our repurchase program should that prove more advantageous.

Speaking of capital allocation. During the quarter, we repaid over $500 million of secured debt, greatly enhancing our flexibility to accelerate our reinvestment program. Our overall debt plus preferred to EBITDA now stands at 6.5x, which is lower than where half of our shopping center peers stood at the end of 2Q. And importantly, we expect to end this year with no debt maturing until 2021 and more than adequate capital flexibility to fund several years of our value-added plan.

On the reinvestment front, we delivered 8 projects this quarter for a total investment of $54 million at an incremental return of 9%. These projects delivered included the opening of The Shops at Riverhead, one of our first HomeSense locations and Hunter's Creek in Orlando where we opened a new Lucky's Market, transforming a tired under-invested center into the center of its community with a best-in-class specialty grocer.

Allow me to pause on just this quarter's reinvestment progress. Not only did we generate $5 million of incremental income with the delivery of these projects, we've created over $25 million of incremental value before considering any compression in cap rate on the balance of the in-place NOI that naturally occurs when you improve a center.

In the case of Hunter's Creek, we believe our investment drove over 200 basis points of overall cap rate compression. I believe that our opportunity to leverage that kind of value impact of reinvestment truly stands apart within the shopping center sector given our older, well-located portfolio.

This quarter, we added 9 additional projects to our active pipeline comprising $55 million of investment at an incremental return of 10%, bringing our total pipeline underway to over $340 million. Importantly, these new projects impact centers with over $100 million of in-place NOI, so we have tremendous embedded upside from cap rate compression on the centers impacted that goes far beyond our incremental investment.

The projects underway now include our redevelopment of Newtown Shopping Center, which some of you saw in a recent property tour where we are adding great tenants like Harvest, Steak Bar and Turning Point to a center anchored by a very strong regional grocer doing over $900 a foot. From a timing perspective, we've accelerated past our original reinvestment goal set forth at Investor Day as we now expect to deliver over $220 million of accretive reinvestment through the end of next year.

What I think is important to note here is that we are creating tremendous value now in our core business of retail while mitigating leasing and duration risks that occur with ground-up projects or the development of other asset classes. And again, we get additional benefit from the balance of the centers impacted, which, including our shadow pipeline, will be in excess of 35% of our portfolio as they benefit from small shop increases and cap rate compression. Simply put, we're improving the quality of what we own and making money doing so with very modest risk.

Speaking of value creation, let's look at leasing where we signed a sector-leading 2.2 million square feet of new and renewal leases, at cash-on-cash spreads of 13.4%, which included spreads of 39.7% for new deals. For the first 9 months of 2018, we've signed a record 68 new anchor deals. This leasing continues to drive our value-added reinvestments. And as we deliver these new anchor tenants, we're seeing the follow-on growth in our small shop leased occupancy, which grew 110 basis points year-over-year to 85.5%, a record for this company since its IPO in 2013. Please note that our leasing has also driven an overall growth in portfolio average ABR of 8% in the last 2 years as we re-leased space to better tenants at better rents.

Speaking of anchors, subsequent to quarter end on October 14, Sears Holdings filed for Chapter 11 bankruptcy protection. As you will recall, we have been working diligently since joining Brixmor to reduce our Sears exposure by over half through both dispositions and proactively recapturing and re-leasing these spaces. This team has significant experience in re-merchandising and redeveloping former Kmart Sears boxes and since IPO has completed or is finishing over $100 million of such projects, at incremental returns above 9%. Where we haven't seen opportunities for value creation, we've already sold, positioning us to drive very attractive returns on the balance. We've also worked with Sears Kmart on shortening terms and eliminating options on several of our remaining locations so importantly, we can control our fate.

With the filing, we now expect to recapture 9 of our 11 remaining locations. We have leases and/or active LOIs for each of these 9 locations, which are some of the very best of our former Sears Kmart boxes, including Miami Gardens, Naples, Metro Philly and Cincinnati. Our weighted average in-place rent is $5.11 for these boxes, and we expect to achieve new rents that are a multiple of that on the backfill tenants.

As we've said many times before, rent basis truly matters in whether you can make money through disruption. While the timing of the Sears Kmart unwind came a few quarters earlier than we had anticipated, the preemptive hard work of our team has put us in a position to capitalize quickly on this opportunity to meaningfully upgrade our centers. I look forward to reporting to you on the remainder of the Kmart repositions over the coming quarters.

Looking forward, our leasing pipeline continues to be very robust, with over 450 deals representing over $51 million of ABR. And deals executed to date now represent over $44 million of ABR signed but not yet commenced. These executed deals, again, are what drive the 2019 same-store growth expectations that we set forth at our Investor Day. While the earlier-than-anticipated timing of the Sears unwind as well as the projected timing of rent commencements will likely drive us closer to 3% than 4%, I couldn't be more pleased with how these executed deals provide for visible, robust growth through this disruption.

When I joined Brixmor a little over 2 years ago, I introduced myself to the team by sharing a list of my core beliefs, cultural tenets, if you will, that have guided me throughout my career. The first and primary tenet is that great real estate matters but great people matter even more. Over the last 2 years, a unique opportunity to create value at Brixmor has allowed us to assemble one of the best teams in the open-air business.

And this third quarter of 2018 is the quarter where across all facets of our business, the quality of this team has clearly emerged with record-setting leasing, accelerating reinvestment, exceptional capital recycling and prudent balance sheet management. Across the board, what we've achieved not only sets us up for sustainable growth in 2019 and beyond. Each element of our execution has increased the intrinsic value of the well-located assets we own, moving us towards our vision of being the center of the communities we serve. Angela?

ANGELA M. AMAN, EXECUTIVE VP, CFO & TREASURER, BRIXMOR PROPERTY GROUP INC.: Thanks, Jim, and good morning. FFO was $0.42 per share in the third quarter and included a $0.07 loss on debt extinguishment as we've repaid over $500 million of longer-dated high-cost secured debt, significantly increasing our unencumbered asset

base and enhancing our financial and operational flexibility as we continue to execute on the business plan laid out at our Investor Day last December.

Same-property NOI growth during the third quarter was 1.2%, driven by a 270 basis point contribution from base rent, which represents a significant acceleration from the 150 basis point contribution in the first half of 2018 despite a year-over-year decline in billed occupancy. At Investor Day, we underscored our expectation that redevelopment would become a positive contributor to same-property growth beginning in the second half of this year, and the acceleration we saw in top line performance during the third quarter speaks to that underlying trend.

Provision for doubtful accounts and net recoveries were both headwinds to same-property NOI growth in the third quarter, consistent with the expectation communicated on last quarter's call. Provision for doubtful accounts was impacted by unusually low bad debt expense in the prior period and unfavorable bankruptcy reserves in the current period, while net recoveries were impacted primarily by favorable real estate tax refund activity in the prior period.

On a year-to-date basis, same-property NOI growth was 1.3%, just above the midpoint of our full year guidance range of 1% to 1.5%, and we have affirmed this range despite the impact of the Sears Kmart and Mattress Firm bankruptcies that were announced in October and could have as much as a 40 basis point impact on annualized base rent in the fourth quarter. As Jim highlighted in his remarks, we have proactively addressed our Sears Kmart exposure over the last 2 years, successfully repositioning or disposing of 11 of the 22 locations that were in the portfolio when we joined.

At the time of the bankruptcy filing, we had 11 locations remaining, representing approximately 60 basis points of annualized base rent. We have already taken back 6 of the 11 locations, representing 80 basis points of GLA and expect that we will take back another 3, representing 40 basis points of GLA by the end of January.

As a result, we currently expect Sears Kmart to detract approximately 40 basis points of same-property base rent growth or 50 basis points of same-property NOI growth during 2019. In addition, we also expect a detraction of up to 20 basis points of base rent growth or 30 basis points of NOI growth related to Mattress Firm, which includes our current expectations for both lease rejections and selected short-term rent concessions. While it is expected that Mattress Firm will pay rejection damages potentially totaling 1 year of rent, these amounts, if received, would most likely be treated as lease termination income and excluded from same-property NOI.

As Jim indicated earlier, despite these significant headwinds from unusually late in the year bankruptcy activity, we remain confident in our ability to achieve 3% same-property NOI growth in 2019. While the Sears Kmart bankruptcy filing will certainly result in more downtime in 2019 than we had originally anticipated, our forward planning and execution has put us in a position to minimize the potential impact from these closures with rent commencements on backfill tenants expected to begin as early as the fourth quarter of 2019. In fact, Greeneville Commons, the first of these 11 locations to be successfully addressed, was added to the active anchor repositioning pipeline this quarter as leases have already been executed with Marshalls, Five Below and Hobby Lobby.

This further demonstrates the effective and efficient manner with which our leasing teams have approached bankruptcy-impacted space over the last 2 years, consistently setting the pace for the industry as it relates to bringing rent back online following retailer disruption as many of you have noted.

We have tightened our 2018 FFO guidance range to reflect our elevated disposition expectation, and we have further adjusted guidance to reflect the $0.07 loss on debt extinguishment recognized during the third quarter. Please note that the revised guidance does not assume additional loss on debt extinguishment in the fourth quarter, although as Jim mentioned earlier, we are currently evaluating the repayment of additional secured debt before year-end.

Last night, we also announced a 1.8% per share dividend increase, demonstrating both our commitment to providing growing income to shareholders and our commitment to prudently funding our growing value accretive reinvestment pipeline. As a result of share repurchase activity in 2018, we expect that total growth distributions in 2019 will be flat to slightly down despite an attractive per share increase to investors, and we will continue to demonstrate one of the lowest FFO payout ratios in the open-air sector.

The rate of change at Brixmor since May of 2016 has been extraordinary. We have sold over 15% of the portfolio we inherited, and we have or will soon have value accretive reinvestment activities underway at 35% of the remaining portfolio. These value accretive investments are not only enhancing the company's short-term and long-term growth rates, but they are fundamentally improving the underlying quality and residual value of the company's unlevered cash flow stream.

At the same time, we have also substantially improved the company's balance sheet by significantly extending duration, expanding our unencumbered asset base and lowering leverage, which currently sits at 6.5x, all while maintaining over $1 billion of available liquidity. As a result, we are well positioned to capitalize on this current period of disruption as we execute on our balanced and self-funded business plan to continue to create meaningful value for shareholders.

And with that, I will turn the call over to the operator for Q&A.

Questions and Answers

OPERATOR: (Operator Instructions) Our first question comes from Todd Thomas with KeyBanc Capital Markets.

TODD MICHAEL THOMAS, MD AND SENIOR EQUITY RESEARCH ANALYST, KEYBANC CAPITAL MARKETS INC., RESEARCH DIVISION: Just, first question. In terms of the disposition activity and the much higher pace than expected in 2018, can you just provide some guideposts around what you might be thinking for 2019? And some additional insights around your comments that 2019 would be relatively more balanced from an investment standpoint?

JAMES M. TAYLOR: Yes, thanks, Todd. I appreciate the question. As Angela alluded to, we've now sold over 15% of the portfolio, which has enabled us to get after some of the noncore markets and some of the more troubled assets that didn't fit with our strategy going forward. Because we were able to exceed, significantly, the expected volume for 2018, it sets us up in 2019 for much lower level of overall transaction activity, one; and two, to be much more balanced. By that, I mean, what we're selling, we're reinvesting either in additional acquisitions or as I alluded to, share repurchases. And of course, we continue to find great redevelopment opportunities at high single-digit and low double-digit incremental returns, which we think not only create incremental value but as we've said multiple times, significantly improves the intrinsic value of the centers that are impacted. And it's particularly exciting this quarter to see that all coming together. Whether it's in the volume of leasing that we've done, the amount of redevelopment that we're actually delivering now, we're not asking you to wait. In fact, if you look at the total volume that we expect to deliver over the next 5 quarters of $220 million, it's roughly 2/3 of what we have underway. And again, every quarter, you'll see more projects moved from the shadow pipeline into the active. So it's kind of a great position to be in, to have that be self-funded and to take this disruption that's occurring, whether it's Kmart or Mattress Firm or others, and we do expect others to similarly struggle over the coming year or so. It puts us in a great position to make our assets better.

So long-winded answer, I apologize, but I want you to understand how we think about the capital allocation. And importantly, the significant amount of work that Mark and team got done this year in over 50 separate deals, a lot of hard work well ahead of where we expected to be and valuation is much better.

TODD MICHAEL THOMAS: Okay. And just the second question just on the Kmart and Sears opportunity. Can you sort of size up what that opportunity looks like? You mentioned that the 9 that you're going to recapture, the in-place

rents are $5 or so. Can you just talk about that potential mark-to-market? Maybe how much capital investment it might require to re-tenant those spaces and what you're seeing there?

JAMES M. TAYLOR: Yes, I mean, it sets up additional accretive reinvestment. And importantly, we've sold the locations. If you remember several quarters ago, Todd, I said of the 21 or 22 locations that we had, there were some where we didn't see an opportunity to make money. And as I alluded to in our remarks, we've already sold those boxes. So what remains are some of the very best locations that we have, Miami Gardens, Naples, Cincinnati, et cetera. And we're excited about the plans to backfill those. We've got active leases or LOIs on all 9 and I'll let Brian provide some more color.

BRIAN T. FINNEGAN, EVP OF LEASING, BRIXMOR PROPERTY GROUP INC.: Yes, thanks, Jim. And Todd, what we've done to date has really set us up for the opportunity, as Jim mentioned. And just to dig in a little further in terms of what we have on these boxes, we've got 85% of the GLA for our remaining boxes either leased, at lease or LOI. That's to grocers, value apparel retailers, best-in-class fitness operators. And some of the retailers that have been thriving in this space and have -- still have large open to buys. As Jim mentioned in his remarks, our team has gotten very good at demising these boxes and being able to deliver them quickly and execute on these plans. So from a CapEx perspective, we've been delivering a lot of these boxes over the last few years in terms of these redemises. So we don't expect a material uptick in TIs. We expect the TI piece of this to be in the $30 a square foot range. Obviously, there's some landlord work associated with that in terms of demising the boxes. But in terms of our ability to create value, you look at where these remaining boxes are, Metro Philadelphia, Miami, Cincinnati, central Jersey and the demand that we have already. We feel as though we're in a pretty good position. And the last thing I'd say is of the 6 boxes that we're getting back, we expected to get all them back within the last 12 months. So all this does is really accelerate our plans.

OPERATOR: Our next question is from Christy McElroy with Citigroup.

KATHLEEN MCCONNELL, RESEARCH ANALYST, CITIGROUP INC, RESEARCH DIVISION: This is Katy McConnell on for Christy. So just heading into 2019, Sears aside, can you talk about how you're feeling about the level of tenant fallout risk, given other box tenants out there that either have potential for bankruptcy or where the businesses are continuing to suffer or they may be overstored?

JAMES M. TAYLOR: Thanks, Katy. I think as I've said several times over the last few quarters, as we look forward into '19, we do expect that disruption or that activity to revert to more normal levels. I think what we've seen prior to the Sears and Mattress Firm activity this year has been remarkably low. But that doesn't mean that we're not going to continue, as part of this business, to see that type of disruption. So as we look into '19, we do so with an expectation that there will be additional disruption beyond just Sears and Mattress Firm.

But again, it's really an opportunity for us to get our centers better, take these tenants who aren't doing well where we have good, low in-place rents and put in better tenants. And it really, I think, is something unique as an opportunity for us as a company because as we put the capital into these older centers, we're transforming them. And we're creating value even in the space that we're not touching, which is a great opportunity for us to move to that vision of being the center of the community we serve.

So when you're talking about a tenant who's not doing growth on sales, not really driving traffic to the center, you've got to ask yourself, "Do you really want that in your center?" And if you expect that tenant to fail, what's then your plan to replace it with a use that's more relevant and more vibrant? And as I've been saying for the last couple of years and as we've been demonstrating every quarter in terms of the volume of leasing that we're doing, there's no shortage of tenant demand for our centers. And we demonstrate that every quarter with leasing volumes that stand at the top of our peer group.

So we welcome the additional disruption. We think given all the leasing that we've done, we're set up to outperform through that disruption but also importantly, make what we own better.

OPERATOR: Our next question comes from the line of Derek Johnston with Deutsche Bank.

DEREK CHARLES JOHNSTON, RESEARCH ANALYST, DEUTSCHE BANK AG, RESEARCH DIVISION: It looks like you have about $40 million of ABR that's signed but not yet commenced. Over what period should we expect to see this come online? And when I look in terms of the small shop component of that, is the majority coming in centers that are being redeveloped? Or was it just underutilized or vacant space in existing centers?

ANGELA M. AMAN: Yes, thanks, Derek. About $30 million of the $44 million should be online by really June 30 of next year with the remainder coming in, in the second half of 2019. Across the board, I would say it's a mix obviously between normal course leasing activity and redevelopment activity. As the amount we have invested in the value-enhancing redevelopment pipeline continues to grow, we would expect that number on a forward-look basis to continue to increase based on a higher contribution going forward from redevelopment.

JAMES M. TAYLOR: Yes. And importantly, Derek, that -- and I really appreciate the question because when you dig into what we have in our reinvestment pipeline, the small shop occupancy there intentionally lags our portfolio average because as we deliver that new anchor, we're holding some of that space back to lease off the strength of the new anchor. And in fact, once that new anchor is put in, we're seeing increases in those centers of 700 to 900 basis points in small shop occupancy, and importantly, not only occupancy but better tenants, higher-quality tenants as we transform those centers. And that's beginning to be seen in that small shop lease performance that you're seeing, which is up 110 basis points year-over-year. We'll face a little bit of a headwind next quarter as we get some of those Mattress Firm boxes back. But I can guarantee you, we will backfill them very quickly.

DEREK CHARLES JOHNSTON: Great. And just switching gears, any notable trends now that more grocers are expanding delivery and curbside pickup options, given that you have a lot of heavily grocery-anchored centers? Can you just comment on traction you might be seeing with omnichannel efforts with any of your retailers?

JAMES M. TAYLOR: Absolutely. We've been partnering with Kroger and Publix and many of other large grocery tenants as they roll out plans to better serve the customer through multiple channels, which include curbside pickup with very little investment on our part in terms of restriping, resigning the parking lot, providing additional lighting, et cetera, investing capital alongside them in their stores for additional rent. There are many ways that we're capitalizing on this. But importantly, these great well-run grocers are finding ways to continue to evolve and adapt, including better use of technology, which is something that I think you'll see more of over the coming couple of years where not only will customers be able to pick up and order online but apps and other things will allow the experience in the store to be much more efficient.

So I think it's -- the physical store is an incredible competitive advantage in this low-margin business. And I think the well-run grocers are figuring out how to capitalize on some of these changes to better serve their customers.

BRIAN T. FINNEGAN: And I would just add -- close to half our Kroger stores now have ClickList. And for us, it's creating additional trips. As Jim mentioned, it's another way to connect with the consumer and it's very little investment. So we have been working with all of our major grocers in this initiatives -- within these initiatives that they have.

OPERATOR: Our next question is from Karin Ford with MUFG Securities.

KARIN ANN FORD, SENIOR REAL ESTATE ANALYST, MUFG SECURITIES AMERICAS INC., RESEARCH DIVISION: I think Jim, you said in your opening remarks that dispositions this year are going to be $1

billion and an 8% cap rate. That 8% number seemed a little higher than what we had talked about on previous calls. Just wanted to get your thoughts on whether cap rates have moved? Was it just a different mix that you sold and why that number was a little higher?

JAMES M. TAYLOR: Yes, we're still a little under 8% but as we moved into the balance of the pipeline this year, we're selling some of the tougher assets. It's really a mix issue. We've been pleased that cap rates have held in pretty well, and in fact, a lot of it's being driven by the availability of debt financing where we've seen spreads compressed. So with that, it was really part of what informed our decision, Karin, to accelerate what we were going to get done this year. We saw liquidity there, we saw a strong financing market. If there was one thing I worried about going into 2018, it was whether that liquidity would be there. But in addition to good and attractive debt financing, we're seeing a lot of capital being raised for investments in these community-anchored centers. So we haven't seen a diminution in cap rates. For us, as we've moved into the balance of our execution this year, it's really been more mix.

KARIN ANN FORD: Great. My second question is just on the next step in the debt pay-down plan. You mentioned you might repay some more secured debt here before the end of the year. Can you talk about what rate the next tranche is at? And would you also plan to continue to pay down on the term loan side alongside of it like you did this quarter?

ANGELA M. AMAN: Thanks, Karin. We do lay out sort of tranche by tranche what the debt looks like in the supplemental. You'll see that for really all the remaining secured debt it's at a rate at or just a little bit above 6% in terms of the stated interest rate. The GAAP interest rate, I would note, is a little bit below that, probably 5 3/4% or so, but it's pretty consistent across tranches. The extent of how much debt we end up paying off -- how much of the secured debt we end up paying off in the fourth quarter will depend a lot on sort of the disposition time -- disposition magnitude as well as the timing of disposition activity in the fourth quarter, which is why we haven't sort of embedded that necessarily into the guidance range but certainly continuing to evaluate it. On the term loan, I would expect at this point that the term loan likely gets refinanced in the term loan market.

OPERATOR: Our next question is from Wes Golladay with RBC Capital Markets.

WESLEY KEITH GOLLADAY, ASSOCIATE, RBC CAPITAL MARKETS, LLC, RESEARCH DIVISION: Going back to dispositions, you mentioned selling some of the tougher assets towards the end of the year. How many, I guess, noncore assets as a percentage of NOI remained in the portfolio?

JAMES M. TAYLOR: It's pretty low. I can't give you an exact percentage, but we got rid of a lot of the ones that we saw limited growth prospects for that were too far in terms of our other assets, where frankly, as we looked at anchor productivity, had productivity that we thought signaled flat to declining ABR. We still and always will have assets over the coming years that we look at that hold IRR and say, "That's below our cost of capital." And we'll have the flexibility on a more balanced basis, given all the work that we've done this year, to sell those assets at the right point in time.

There are some assets that we'll continue to lease and then sell. We're seeing good leasing momentum. And I think that's an important thing to note that when you see the improvement in our statistics as it relates to occupancy, et cetera, that's not being driven by our disposition activity. In fact, what we've disposed of is slightly more occupied year-to-date. And that's quite intentional because we are in an environment where you're not getting value for vacant space. So as stewards of our investors' capital, we're very focused on that. But as a percentage of our overall NOI, it's pretty modest now having sold about 15% of the portfolio.

WESLEY KEITH GOLLADAY: Okay. Now looking at the Sears bankruptcy, I know a lot of landlords have prepared for it. How has the mind-set of the retailers changed? Is this something they've been waiting for? Do you get the sense they may accelerate their open -- store opening plans?

BRIAN T. FINNEGAN: I don't think it necessarily changes from a retailer mind-set. Look, the retailers that are thriving in this market and we continue to do a lot of business with, whether those are specialty grocers, whether those are operators like Marshalls and Ross who we've signed leases with this quarter, 3 Five Belows that we did this quarter, those retailers continue to have strong open to buys. And if anything, the fact that landlords like us, and we've done a great job of it, have been able to execute on demising these boxes: working with specific prototypes; working with frontage, and all the things it takes to demise a box up for 3 retailers; and have been doing it consistently and delivering to these retailers over the past few years, I think, gives us a leg up in terms of our ability to retrofit them and bring them back online with better operators.

So I don't necessarily think it changes their plans from an opening perspective, but they now see in terms of their ability to execute and operate out of these spaces. So I think it's additional opportunity there.

OPERATOR: Our next question is from Jeff Donnelly with Wells Fargo.

JEFFREY JOHN DONNELLY, SENIOR ANALYST, WELLS FARGO SECURITIES, LLC, RESEARCH DIVISION: Jim, I guess, based on Angela's comments, it sounds like the bankruptcies you guys discussed are taking about 80 basis points off your 2019 NOI growth potential and pushing you towards the lower end of that to 3% to 4% NOI growth plan. I guess, the first question is, do you believe NOI for next year could ultimately come in at something in the mid- to high 2% range? Or are you still confident you're kind of within that original range?

And maybe as a follow-up, all else equal, do you think the re-leasing of the anchor spots in '19, combined with the redevelopment seeds you've been planting, position the company for NOI growth in 2020 that could theoretically actually top the 3% to 4% range you're anticipating because of the easy comp you're going to have in '19?

JAMES M. TAYLOR: I do think it positions us for more robust growth in 2020, Jeff. And as it relates to the range, we obviously were conservative as we were setting up '19. That 80 basis points of impact really does move us to the low end of the range, but we still feel confident that we'll achieve that really based in part, as I mentioned in my remarks, on all of the signed but not yet commenced leases that we have. What will be a critical factor next year, Jeff, to that point is the timing of rent commencements. So every day that we beat another timing of rent commencements next year, is worth about $180,000. So it kind of gives you a sense of how much is coming on board as well as, to the latter part of your question, how it sets us up for 2020.

And again, we're also seeing and I'm very grateful that we're seeing good small shop follow-on growth where we're impacting these anchors. And that continues with much better tenants, better credit, better rent, local anchors, things that really drive traffic to the center and make it more relevant to the community it serves. So long-winded answer, I apologize, but we still feel confident in the low end of the range and do believe that it sets us up for better growth in '20.

JEFFREY JOHN DONNELLY: And just maybe a follow-up is, there's certainly a lot of dynamics out there that are pushing construction costs, both labor as well as the materials themselves. But rent growth, when you think about asking rents in markets, I think the view and correct me if I'm wrong, is that maybe the asking rent growth has been maybe a little more tepid in the last 12 to 24 months. I'm just curious if you feel like that's maybe setting you up to rethink or change the scope of some of the bigger redevelopment projects you guys have been contemplating, like, in a mall at 163rd or some of these other projects that are hanging out there just because maybe they won't pencil quite the same as you might have hoped?

JAMES M. TAYLOR: It's a great question. Interestingly, Jeff, in our assets in particular, we have huge embedded upside opportunity in rents. Almost regardless of what happens to the ABR trend in a particular market, including North Dade in Miami, including Western Hills outside of Cincinnati, it gives us a real opportunity because basis matters to outperform as we put capital to work.

Construction costs have had an impact but that impact has typically been less than 75 basis points on what the expected returns for the projects are. So maybe instead of doing a 10.5%, we're doing a 9.75% type return and we've been seeing some of that. But again, it's really the rent that's driving the equation. The other interesting thing, Jeff, is that in a lot of our markets, we did not see the rental rate inflation that you saw in some of the top 5 markets. And that rental rate inflation significantly outpaced underlying tenant productivity, which I think is putting a lot of pressure on folks who have invested recently at high ABRs in those markets. We're in those markets, too. We have one of the largest portfolios in the Northeast. We have one of the largest portfolios in California. But we have low rents. And those low rents give us a lot of flexibility here to create value, both incrementally, Jeff, but I think the other point that I just hope I'm getting across here is: that when you replace an old Kmart with a Sprouts and a Marshalls and a TJ, et cetera, you're improving the cap rate not just on the box but you're improving the cap rate on the total center. And that's what's exciting about this period of time for us is that even with rising construction costs and flat to even in some markets, negative ABR, we can create value. And I see that opportunity ahead. It's in our shadow pipeline. We talk about our shadow pipeline, but the one thing you got to know, Jeff, is we're running really hard on getting those leases signed, getting the construction costs out so that we can move that into active. And in fact, we're out-achieving our goals in terms of that rate. So I like how we're positioned. I like how we're positioned on a relative basis. And again, part of it starts with where we started and that fundamental truth that rent basis matters in this business if you're going to make money.

OPERATOR: Our next question comes from Haendel St. Juste with Mizuho.

HAENDEL EMMANUEL ST. JUSTE, MD OF AMERICAS RESEARCH & SENIOR EQUITY RESEARCH ANALYST, MIZUHO SECURITIES USA LLC, RESEARCH DIVISION: So Jim, just curious, I guess, how you're thinking about the portfolio's long-term prospects from here from a same-store NOI and earnings growth basis after selling close to $1 billion of assets since your Investor Day last December. I understand that 2019 is a bit of a transition year on an earnings basis, given the volume of dispositions this year and redev still ramping and that the same-store pool still has various puts and takes. So I guess, I'm curious what you think the portfolio can generate on a same-store NOI and FFO growth basis on a more steady state basis once all this -- all the noise settles down.

JAMES M. TAYLOR: I think we're right in line with what we laid out at the Investor Day. And as we go into next year, the ability to deliver that 3% same-store growth is really being driven by all the things that we've been doing, as you kind of alluded to, whether it's the portfolio recycling, putting our capital into work in the reinvestment pipeline. But also Haendel, importantly, all the balance sheet work we've done, which gives us additional flexibility going forward to self-fund that reinvestment and take that, what should be on a run-rate basis, 3% to 4% unlevered growth and deliver FFO growth of 5% or better.

And so what's been great about this quarter is I think if you dig into any element of what we've laid out, you'll -- you can see how they're all pointing us forward towards achieving that goal, and in some instances, bettering that goal. We didn't expect Sears Kmart to happen when it did but we certainly expected it to happen. And we expect other disruption to occur. And again, I think we're really in a good position, given our low rent basis and track record with these key tenants, to outperform as we go forward. You just -- you made me think of one other thing, and that is that what's interesting is we all tend to focus on the shopping center REIT sector and what one REIT is doing versus the other REIT. One of the things you got to appreciate is that we actually don't really compete with each other on the ground much. We own probably 10% to 12% of the open-air shopping centers. And through this period of disruption, the fact that you have a national platform, the fact that you have proven relationships with these tenants, the fact that you can deliver boxes on time and to prototype and to budget really matters as these retailers continue to evaluate new store opening plans. And so platforms such as ours, such as the team that has come together here, I think are positioned to really outperform within the industry as it relates to a business that is going through a lot of disruption.

HAENDEL EMMANUEL ST. JUSTE: Appreciate your thoughts there. A follow-up on capital allocation. Looked like you guys haven't been active here for a couple of quarters on the stock buyback front. Just curious where that stands today in your minds with you having opted to buy back some debt and even raising the dividend?

JAMES M. TAYLOR: Well, we bought back about $50 million this quarter, which I think program to-date is about $90 million of total repurchases, leaving us a little over $300 million to repurchase under the program. It levels today. It looks a lot more attractive than it did last quarter in the $17 range. And so we certainly will look to that. The ability to earn that type of equity yield on buying back our stock is quite attractive to us. Importantly, we've built the flexibility to do that while also bringing down our debt-to-EBITDA, and importantly, funding -- prefunding that redev pipeline.

OPERATOR: Our next question comes from the line of Scott Frost with State Street Global Advisors.

SCOTT FROST, RESEARCH ANALYST OF FIXED INCOME AND VP, STATE STREET GLOBAL ADVISORS, INC.: Thank you for talking about the debt maturities. Just where do you expect your revolver balance is to be at year-end just for modeling purposes?

ANGELA M. AMAN: Yes, it's a good question, and it will depend in part on disposition proceeds and as I mentioned earlier, the amount of debt we end up -- the amount of secured debt we end up paying down. Consistently, we have managed with either no -- nothing drawn on the revolver or very little drawn on the revolver. So I would certainly expect that it's in line with where it was at the end of the third quarter, just over $100 million or below that level at year-end.

SCOTT FROST: And you said you're going to refi the term loan in the term loan market. I cuff that at that about $350 million or so remaining based on your previous comments. Is that right? And is there a reason -- why not come to debt capital markets and issue a senior unsecured?

ANGELA M. AMAN: Yes, you're right. There's $350 million left on the term loan. What I would say as it relates to the term loan market relative to the unsecured bond market is that for us, it's really not an either/or decision. We're likely to be active in both markets over the next 6 to 12 months.

SCOTT FROST: So we should expect to see some senior unsecured issuance in debt capital markets in 2019?

ANGELA M. AMAN: Yes.

SCOTT FROST: Can you give us a range?

JAMES M. TAYLOR: Well, I think what's important is that we will approach the market when it appears conducive for us to do so. But importantly, we don't have to. And I think as we manage our capital going forward, that's really the most important guiding principle, that we never put ourselves in the position to have to issue at a particular point in time. With that said, I would expect us to issue in an index-eligible range at some point in 2019.

OPERATOR: Our next question comes from the line of Linda Tsai with Barclays.

LINDA TSAI, VP & RESEARCH ANALYST OF RETAIL REITS, BARCLAYS BANK PLC, RESEARCH DIVISION: Over the last 2 quarters, there's been a 300-basis-point spread between leased and billed. For 2019, will the spread increase because of the Sears and Mattress Firm closures? If not and it narrows, how much of the gains can offset dilution from dispositions and refinancing costs from an FFO perspective?

BRIAN T. FINNEGAN: Linda, this is Brian. Just from a lease versus billed standpoint, I think what it indicates first is that we have got a lot of space back but we also have been able to lease it up very quickly. So typically at this time

of year, that does tighten a bit. With getting the boxes back here in October from Kmart, it will be a little bit wider and expect that to be wider at the beginning of next year. And typically, that tends to tighten in the third and fourth quarter.

JAMES M. TAYLOR: Yes, one point to highlight just from a big picture standpoint, I'll let Angela weigh in, about $44 million of rent signed but not commenced, as Angela mentioned, about $30 million of that will commence by the end of the second quarter next year. So that will be reducing that spread. Hopefully, Brian and team continue to be the most productive team in the business and we're leasing additional space, which takes that leased occupancy higher. We certainly expect that to happen. And then as you mentioned, the take is whatever billed vacancy we get back as a result of Sears Kmart, which Angela, on an occupancy standpoint, is pretty meaningful.

ANGELA M. AMAN: Right. 120 basis points by the end of the first quarter. And as I think about trajectory as it relates to same-property NOI and obviously, the associated FFO impact in 2019, you should expect to see it back-end weighted, again, based on the timing of Sears Kmart and Mattress Firm. I think we talked about situations such as these. We're certainly embedded in that 3% to 4% range we communicated at Investor Day last year. The timing with which those are happening during the year has a more significant impact on 2019 than we might have originally expected. So you should expect to see it back-end weighted, but again, feel confident in that 3% range for next year.

LINDA TSAI: And then Mark, you made some comments earlier about how the team's gotten good at demising the boxes and delivering them sooner. Can you just talk a little bit more about what's driving that process?

BRIAN T. FINNEGAN: This is Brian. I think it's back to our experience with these, and really highlighting what Jim mentioned. We have a national platform and we've been able to deliver to prototype. And as our team on the operations side has been developing relationships with the retailers operation teams, we've gotten very good at delivering flexible formats, right? Understanding that they can live within a certain type of frontage, working with loading docks, sometimes on a box like this, you have one loading dock and you got to split those up for a few different tenants. And so as we've done a number of these over the years, like Ann Arbor, Michigan where we put 2 TJX concepts in with Sierra Trading Post and HomeGoods and added an Ulta, we've been able to work with those retailers to deliver to as close to prototype, while working in what is an irregular box. And we think that experience going forward will allow us to deliver -- to bring these boxes online a lot faster.

OPERATOR: There are no further questions. At this time, I'd like to turn the call back to Stacy Slater for closing comments.

STACY SLATER: Thanks, everyone, for joining us today. We look forward to seeing many of you next week at NAREIT.

JAMES M. TAYLOR: Thank you.

OPERATOR: This will conclude today's conference. You may disconnect your lines at this time, and we thank you for your participation.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-

looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2018 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2018 ASC LLC (www.ascllc.net) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or ASC's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and ASC so long as they provide conspicuous attribution to Thomson Financial and ASC as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]

---- Index References ----

Company: BARCLAYS PLC; BRIXMOR PROPERTY GROUP INC; CITIGROUP INC; DEUTSCHEN BANK AG; HOBBY LOBBY STORES INC; KEYBANC CAPITAL MARKETS INC; MUFG SECURITIES AMERICAS INC; MUFG SECURITIES EMEA PLC; MARSHALLS PLC; MATTRESS FIRM INC; MIZUHO SECURITIES USA LLC; RBC CAPITAL MARKETS LLC; SEARS HOLDINGS CORP; TJX COMPANIES INC (THE); THOMSON REUTERS CORP; HOMEGOODS INC; SIERRA TRADING; SIERRA TRADING CO; STATE STREET GLOBAL ADVISORS INC; TJX COMPANIES INC (THE); WELLS FARGO SECURITIES LLC; WELLS FARGO SECURITIES LLC; WELLS FARGO SECURITIES LLC

News Subject: (Business Management (1BU42); Corporate Events (1CR05); Earnings Calls (1EA37); Funding Instruments (1FU41); Meeting Announcements (1ME17); Real Estate Investment Trusts (REITs) (1RE39); Real Estate Investments (1RE04))

Industry: (Discount Stores (1DI04); Financial Services (1FI37); General Merchandise Stores (1GE70); Housing (1HO38); Real Estate (1RE57); Rental Real Estate (1RE07); Retail (1RE82))

Region: (Americas (1AM92); Central Europe (1CE50); Europe (1EU83); Eurozone Countries (1EU86); Florida (1FL79); Germany (1GE16); Michigan (1MI45); North America (1NO39); Ohio (1OH35); U.S. Midwest Region (1MI19); U.S. Southeast Region (1SO88); USA (1US73); Western Europe (1WE41))

Language: EN

Other Indexing: (ASC LLC; Investor Day; STATE STREET GLOBAL ADVISORS INC.; VP & RESEARCH; WELLS FARGO SECURITIES LLC; homegoods; sierra trading) (Todd Thomas; Katy McConnell; Brian T. Finnegan; Brian Finnegan; KATHLEEN MCCONNELL; Michael William Thomas; Michael Thomas; BRIAN FINNEGAN; James M. Taylor; Jim Taylor; DEREK CHARLES JOHNSTON; Jeff Donnelly; Stacy Slater; Mark Horgan; Mark Horgan;

LINDA TSAI; ANGELA AMAN; WESLEY KEITH GOLLADAY; James M. Taylor; Jim Taylor; JEFFREY JOHN DONNELLY; KARIN ANN FORD; Karin Ford; SCOTT FROST; Angela M. Aman; Angela Aman; Christy McElroy)

Word Count: 8654

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 5



Home > Media > Press Releases

# Sears Holdings Announces Appointment Of New Independent Director

Oct 9, 2018

HOFFMAN ESTATES, Ill., Oct. 9, 2018 /PRNewswire/ -- Sears Holdings Corporation ("Holdings," "we," "us," "our," or the "Company") (NASDAQ: SHLD) today announced that Alan J. Carr, Managing Member and CEO of Drivetrain, LLC, has joined the Board of Directors (the "Board").

Carr has significant experience as a principal, investor and advisor leading complex financial restructurings, as well as serving as a director of reorganized businesses in the U.S. and Europe. Carr was previously an attorney at Skadden, Arps, Slate, Meagher & Flom LLP and Ravin, Sarasohn, Baumgarten, Fisch & Rosen.

Edward S. Lampert, Chairman and Chief Executive Officer of Sears Holdings, said: "Alan brings deep experience as a director for companies that went through complex organizational change. We are pleased to welcome him to the Board and look forward to the benefit of his expertise as we work to maximize value for the Company and its stakeholders."

**About Sears Holdings Corporation**

Sears Holdings Corporation (NASDAQ: SHLD) is a leading integrated retailer focused on seamlessly connecting the digital and physical shopping experiences to serve our members - wherever, whenever and however they want to shop. Sears Holdings is home to Shop Your Way®, a social shopping platform offering members rewards for shopping at Sears and Kmart as well as with other retail partners across categories important to them. The Company operates through its subsidiaries, including Sears, Roebuck and Co. and Kmart Corporation, with full-line and specialty retail stores across the United States. For more information, visit www.searsholdings.com.

**Forward-Looking Statements**

This press release contains forward-looking statements intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. Whenever used, words such as "will," "expect," and other terms of similar meaning are intended to identify such forward-looking statements. Forward-looking statements, including these, are based on the current beliefs and expectations of our management and are subject to significant risks, assumptions and uncertainties, many of which are beyond the Company's control, that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Detailed descriptions of risks, uncertainties and factors relating to Sears Holdings are discussed in our most recent Annual Report on Form 10-K and other filings with the Securities and Exchange Commission. While we believe that our forecasts and assumptions are reasonable, we caution

that actual results may differ materially. We intend the forward-looking statements to speak only as of the time made and do not undertake to update or revise them as more information becomes available, except as required by law.

**NEWS MEDIA CONTACT:**
Sears Holdings Public Relations
(847) 286-8371

SOURCE Sears Holdings Corporation

Press Releases

    Sears Holdings

    Sears, Roebuck and Co.

    Kmart

    Subscribe

    RSS Feed

    Search

SHC Speaks

Media Inquiries

Company Statements

Press Kits

    Sears

    Kmart

Media Gallery

    Images

    Lookbooks

    Videos

QUICK LINKS

Contact Us

Terms of Service

Privacy Policy

California Privacy Rights

California Transparency Act

*Security Incident Update*

## CORPORATE SITES

SHC Speaks

Sears Holdings Alumni

Sears Archives

## SHOP

ShopYourWay.com

Sears.com

Kmart.com

mygofer.com

## SOCIAL MEDIA

©2019 Sears Brands, LLC

# Exhibit 6

2/1/2019    Sears Holdings Initiates Processes To Accelerate Strategic Transformation And Facilitate Financial Restructuring | Sears Holdings Corpor…

18-23538-shl    Doc 2355-1    Filed 02/01/19    Entered 02/01/19 15:39:40    Exhibits 1-14    Pg 49 of 762



Home > Media > Press Releases

# Sears Holdings Initiates Processes To Accelerate Strategic Transformation And Facilitate Financial Restructuring

Receives Commitments for $300 million Debtor-in-Possession Financing; Negotiating $300 million Junior Debtor-in-Possession Financing; Commences Voluntary Chapter 11 Proceedings

Sears and Kmart Stores, Online and Mobile Platforms Remain Open for Business; Operations Continue in Normal Course

Announces Intent to Reorganize Around Smaller Store Platform of EBITDA-Positive Stores, Evaluation of Potential Sale of Stores, and Additional Store Closures

Implements Leadership and Board Changes in Support of Restructuring Process; Transitions CEO Responsibilities from Edward S. Lampert to Office of the CEO; Appoints Mohsin Y. Meghji as Chief Restructuring Officer and William L. Transier as New Independent Director; Forms Independent Restructuring Committee

Oct 15, 2018

HOFFMAN ESTATES, Ill., Oct. 15, 2018 /PRNewswire/ -- Sears Holdings Corporation ("Holdings," "we," "our," or the "Company") (NASDAQ: SHLD) today announced a series of actions to position the Company to establish a sustainable capital structure, continue streamlining its operating model and grow profitably for the long term. To facilitate these actions, the Company and certain of its subsidiaries have filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York (the "Court").

The Company expects to move through the restructuring process as expeditiously as possible and is committed to pursuing a plan of reorganization in the very near term as it continues negotiations with major stakeholders started prior to today's announcement.

Holdings has received commitments for $300 million in senior priming debtor-in-possession ("DIP") financing from its senior secured asset-based revolving lenders and is negotiating a $300 million subordinated DIP financing with ESL Investments, Inc. ("ESL"). ESL is the Company's largest stockholder

and creditor, and Edward S. Lampert is ESL's Chairman and Chief Executive Officer. Subject to Court approval, the DIP financing is expected to improve the Company's financial position immediately and support its operations during the financial restructuring process.

Holdings has filed a number of customary motions with the Court seeking authorization to support its operations during the restructuring process and ensure a smooth transition into Chapter 11. The Company intends to continue payment of employee wages and benefits, honor member programs, and pay vendors and suppliers in the ordinary course for all goods and services provided on or after the filing date.

The Company's Sears and Kmart stores, and its online and mobile platforms, are open and continue to offer a full range of products and services to members and customers. Holdings' services and brand businesses will also continue to operate as usual. Customers should expect Holdings' loyalty programs, including the Shop Your Way membership program, and the Sears and private label credit card rewards programs, to continue as normal. The Company is committed to working with its vendors and other partners to help maintain inventory levels and ensure timely product delivery.

"Over the last several years, we have worked hard to transform our business and unlock the value of our assets," said Edward S. Lampert, Chairman of Sears Holdings. "While we have made progress, the plan has yet to deliver the results we have desired, and addressing the Company's immediate liquidity needs has impacted our efforts to become a profitable and more competitive retailer. The Chapter 11 process will give Holdings the flexibility to strengthen its balance sheet, enabling the Company to accelerate its strategic transformation, continue right sizing its operating model, and return to profitability. Our goal is to achieve a comprehensive restructuring as efficiently as possible, working closely with our creditors and other debtholders, and be better positioned to execute on our strategy and key priorities."

Lampert continued, "As we look toward the holiday season, Sears and Kmart stores remain open for business and our dedicated associates look forward to serving our members and customers. We thank our vendors for their continuing support through the upcoming season and beyond. We also thank our associates for their hard work and commitment to providing millions of Americans with value and convenience."

**Strategic Actions**

Holdings intends to reorganize around a smaller store platform of EBITDA-positive stores. The Company believes that a successful reorganization will save the Company and the jobs of tens of thousands of store associates. Holdings is currently in discussions with ESL regarding a stalking-horse bid for the purchase of a large portion of the Company's store base. There can be no assurance that any transaction will be consummated or on what terms any transaction may occur. Additionally, Holdings expects to market and sell certain of the Company's assets over the coming months.

Holdings will also close 142 unprofitable stores near the end of the year. Liquidation sales at these stores are expected to begin shortly. This is in addition to the previously announced closure of 46 unprofitable stores that is expected to be completed by November 2018.

**Leadership and Board Changes**

Holdings has enacted a series of leadership and Board changes in support of the continued transformation and restructuring process:

- **CEO Transition**: Edward S. Lampert has stepped down from his role as Chief Executive Officer of the Company, effective immediately. He will remain Chairman of the Board. The Company's Board has created an Office of the CEO, which will be responsible for managing the Company's day-to-day operations during this process. The Office of the CEO will be composed of Robert A. Riecker, Chief Financial Officer; Leena Munjal, Chief Digital Officer, Customer Experience and Integrated Retail; and Gregory Ladley, President of Apparel and Footwear.
- **Formation of Restructuring Committee**: The Board has formed a special committee (the "Restructuring Committee") that will oversee the restructuring process and have decision making

authority with respect to transactions involving affiliated parties. The Restructuring Committee consists solely of independent directors and includes Alan J. Carr, Paul G. DePodesta, Ann N. Reese and William L. Transier.

- **Appointment of Chief Restructuring Officer**: Mohsin Y. Meghji, Managing Partner of M-III Partners, has been appointed Chief Restructuring Officer. Meghji is a nationally recognized U.S. turnaround professional with a track record of revitalizing companies experiencing financial, operational or strategic transitions to maximize value for stakeholders. He has joined the Company's senior management team and will help lead the Company's restructuring efforts, reporting to the Restructuring Committee.
- **Addition of New Independent Director:** William L. Transier, Chief Executive Officer of Transier Advisors LLC, has joined Holdings' Board as an independent director. In addition to his leadership roles at public companies, Transier has extensive restructuring experience involving companies with complex capital structures and has served on special committees of independent directors responsible for overseeing restructuring processes. This appointment follows the recent addition of Alan J. Carr to the Board.

### Additional Information about the Restructuring Process

Additional information is available on the Company's restructuring website at restructuring.searsholdings.com. For Court filings and other documents related to the court-supervised process, please visit http://restructuring.primeclerk.com/sears, call (844) 384-4460 (for toll-free domestic calls) and +1 (929) 955-2419 (for tolled international calls), or email searsinfo@primeclerk.com.

### Advisors

Weil, Gotshal & Manges LLP is serving as legal counsel, M-III Partners is serving as restructuring advisor and Lazard Frères & Co. LLC is serving as investment banker to Holdings.

### About Sears Holdings Corporation

Sears Holdings Corporation (NASDAQ: SHLD) is a leading integrated retailer focused on seamlessly connecting the digital and physical shopping experiences to serve our members - wherever, whenever and however they want to shop. Sears Holdings is home to Shop Your Way®, a social shopping platform offering members rewards for shopping at Sears and Kmart as well as with other retail partners across categories important to them. The Company operates through its subsidiaries, including Sears, Roebuck and Co. and Kmart Corporation, with full-line and specialty retail stores across the United States. For more information, visit www.searsholdings.com.

### Forward-Looking Statements

This press release includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, included in this filing that address activities, events or developments that the Company expects, believes, targets or anticipates will or may occur in the future are forward-looking statements. The Company's actual results may differ materially from those anticipated in these forward-looking statements as a result of certain risks and other factors, which could include the following: risks and uncertainties relating to the Company's chapter 11 cases (the "Chapter 11 Case"), including but not limited to, the Company's ability to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Case, the effects of the Chapter 11 Case on the Company and on the interests of various constituents, Bankruptcy Court rulings in the Chapter 11 Case and the outcome of the Chapter 11 Case in general, the length of time the Company will operate under the Chapter 11 Case, risks associated with third-party motions in the Chapter 11 Case, the potential adverse effects of the Chapter 11 Case on the Company's liquidity or results of operations and increased legal and other professional costs necessary to execute the Company's reorganization; the conditions to which the Company's senior debtor-in-possession financing is subject and the risk that these conditions may not be satisfied for various reasons, including for reasons outside of the Company's control; the Company's ability to obtain junior debtor-in-possession financing and the amount, terms and conditions of any such

financing; the impact of and ability to successfully implement store closures and to right-size the Company's operating model; the Company's ability to consummate sales of its store base and other assets and the terms and conditions of any such sales; the Company's ability to implement operational improvement efficiencies; uncertainty associated with evaluating and completing any strategic or financial alternative as well as the Company's ability to implement and realize any anticipated benefits associated with any alternative that may be pursued; the consequences of the acceleration of our debt obligations; trading price and volatility of the Company's common stock and the ability of the Company to remain listed on Nasdaq as well as other risk factors set forth in the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission. The Company therefore cautions readers against relying on these forward-looking statements. All forward-looking statements attributable to the Company or persons acting on the Company's behalf are expressly qualified in their entirety by the foregoing cautionary statements. All such statements speak only as of the date made, and, except as required by law, the Company undertakes no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**NEWS MEDIA CONTACT:**
Sears Holdings Public Relations
(847) 286-8371

SOURCE Sears Holdings Corporation

Press Releases

    Sears Holdings
    Sears, Roebuck and Co.
    Kmart
    Subscribe
    RSS Feed
    Search

SHC Speaks

Media Inquiries

Company Statements

Press Kits

    Sears
    Kmart

Media Gallery

    Images
    Lookbooks

2/1/2019    Sears Holdings Initiates Process to Accelerate its Transformation | Full Website | Sears Holdings Corpo...

18-23538-shl    Doc 2355-1    Filed 02/01/19    Entered 02/01/19 15:39:40    Exhibits
1-14    Pg 53 of 762

Videos

## QUICK LINKS

Contact Us

Terms of Service

Privacy Policy

California Privacy Rights

California Transparency Act

*Security Incident Update*

## CORPORATE SITES

SHC Speaks

Sears Holdings Alumni

Sears Archives

## SHOP

ShopYourWay.com

Sears.com

Kmart.com

mygofer.com

## SOCIAL MEDIA

©2019 Sears Brands, LLC

# Exhibit 7

*EXECUTION VERSION*

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JANUARY 17, 2019**

**BY AND AMONG**

**TRANSFORM HOLDCO LLC,**

**SEARS HOLDINGS CORPORATION and**

**ITS SUBSIDIARIES PARTY HERETO**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...........................................................................................2
    Section 1.1        Definitions ....................................................................2
    Section 1.2        Other Definitions and Interpretive Matters.........................34

ARTICLE II PURCHASE AND SALE ........................................................................35
    Section 2.1        Purchase and Sale of the Acquired Assets..........................35
    Section 2.2        Excluded Assets.............................................................39
    Section 2.3        Assumption of Liabilities ................................................40
    Section 2.4        Excluded Liabilities .......................................................43
    Section 2.5        Year-End Adjustments.....................................................45
    Section 2.6        Purchase and Sale of Designation Rights ...........................45
    Section 2.7        Assignments..................................................................46
    Section 2.8        Further Assurances .........................................................48
    Section 2.9        Additional Contracts ......................................................49
    Section 2.10      Withholding ..................................................................50
    Section 2.11      Rejection of Outbound IP Licenses ...................................50
    Section 2.12      Tax Reorganization.........................................................50
    Section 2.13      Foreign Assets. ..............................................................51
    Section 2.14      Bulk Transfer Law .........................................................52

ARTICLE III PURCHASE PRICE ............................................................................52
    Section 3.1        Purchase Price................................................................52
    Section 3.2        Cash Deposit..................................................................53
    Section 3.3        Closing Payment ............................................................54
    Section 3.4        Reserved ......................................................................54
    Section 3.5        Discharge of Assumed Liabilities After Closing...............54

ARTICLE IV CLOSING ............................................................................................54
    Section 4.1        Closing Date ..................................................................54
    Section 4.2        Buyer's Deliveries .........................................................54
    Section 4.3        Sellers' Deliveries..........................................................55
    Section 4.4        Local Sale Agreements ...................................................56

ARTICLE V DESIGNATION RIGHTS PERIOD........................................................56
    Section 5.1        Parties' Respective Obligations Before and During Designation
                       Rights Period .................................................................56
    Section 5.2        Assumption ...................................................................60
    Section 5.3        Election Not to Assume and Assign a Designatable Lease ...............61

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF SELLERS ...........62

i

# TABLE OF CONTENTS
(continued)

**Page**

Section 6.1          Organization and Good Standing..........................................................62
Section 6.2          Authority; Validity; Consents..............................................................62
Section 6.3          No Conflict ..........................................................................................63
Section 6.4          Environmental Matters ........................................................................63
Section 6.5          Title to Acquired Assets ......................................................................63
Section 6.6          Real Property .......................................................................................64
Section 6.7          Taxes....................................................................................................65
Section 6.8          Brokers or Finders ...............................................................................65
Section 6.9          Employee and Employee Plan Matters................................................65
Section 6.10         Intellectual Property ............................................................................67
Section 6.11         Material Contracts ...............................................................................69
Section 6.12         Seller SEC Reports ..............................................................................70
Section 6.13         Financial Statements ...........................................................................70
Section 6.14         Litigation..............................................................................................70
Section 6.15         No Other Representations or Warranties; No Survival ......................70

ARTICLE VII REPRESENTATIONS AND WARRANTIES OF BUYER ..............................71

Section 7.1          Organization and Good Standing; Organizational Documents;
                     Ownership.............................................................................................71
Section 7.2          Authority; Validity; Consents..............................................................71
Section 7.3          No Conflict ..........................................................................................72
Section 7.4          Financing; Availability of Funds .........................................................72
Section 7.5          Litigation..............................................................................................73
Section 7.6          Brokers or Finders ...............................................................................73
Section 7.7          Condition of Acquired Assets; Representations ..................................74
Section 7.8          No Survival ..........................................................................................74

ARTICLE VIII ACTION PRIOR TO THE CLOSING DATE....................................................74

Section 8.1          Operations............................................................................................74
Section 8.2          Bankruptcy Court Matters ...................................................................78
Section 8.3          Registrations, Filings and Consents....................................................79
Section 8.4          Financing Assistance; Additional Information ...................................81
Section 8.5          Financing ..............................................................................................83
Section 8.6          Trade Payables.....................................................................................84
Section 8.7          SHIP Purchase Agreement ..................................................................85
Section 8.8          Transition Services Agreement; Management Services
                     Agreement.............................................................................................85
Section 8.9          Sparrow Rent .......................................................................................86

ARTICLE IX ADDITIONAL AGREEMENTS ..........................................................................86

Section 9.1          Access to Information...........................................................................86

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 9.2 | Tax-Related Undertakings and Characterization of the Transaction. | 86 |
| Section 9.3 | Miscellaneous Tax Matters. | 88 |
| Section 9.4 | Payments Received | 90 |
| Section 9.5 | Post-Closing Books and Records and Personnel | 90 |
| Section 9.6 | Confidentiality | 91 |
| Section 9.7 | Employment Offers. | 92 |
| Section 9.8 | Owned Real Property | 95 |
| Section 9.9 | Title Matters. | 96 |
| Section 9.10 | Use of Name | 97 |
| Section 9.11 | Apportionments | 97 |
| Section 9.12 | Intercompany IP Agreement; Sublicenses | 97 |
| Section 9.13 | Settlement and Release | 97 |
| Section 9.14 | KCD IP Covenants. | 99 |
| Section 9.15 | Seritage Master Lease | 102 |

ARTICLE X CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE ... 102

| | | |
|---|---|---|
| Section 10.1 | Accuracy of Representations | 102 |
| Section 10.2 | Sellers' Performance | 102 |
| Section 10.3 | No Material Adverse Effect | 103 |
| Section 10.4 | No Order | 103 |
| Section 10.5 | Governmental Authorizations | 103 |
| Section 10.6 | Sellers' Deliveries | 103 |
| Section 10.7 | Approval Order | 103 |
| Section 10.8 | KCD IP | 103 |
| Section 10.9 | Inventory and Receivables | 103 |
| Section 10.10 | Outstanding DIP Indebtedness | 104 |

ARTICLE XI CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE ... 104

| | | |
|---|---|---|
| Section 11.1 | Accuracy of Representations | 104 |
| Section 11.2 | Buyer's Performance | 104 |
| Section 11.3 | No Order | 104 |
| Section 11.4 | Governmental Authorizations | 104 |
| Section 11.5 | Buyer's Deliveries | 104 |
| Section 11.6 | Bidding Procedures Order | 104 |
| Section 11.7 | Approval Order in Effect | 104 |
| Section 11.8 | Pay-Down of Real Estate 2020 Loan | 105 |

ARTICLE XII TERMINATION ... 105

| | | |
|---|---|---|
| Section 12.1 | Termination Events | 105 |

# TABLE OF CONTENTS
(continued)

**Page**

Section 12.2        Effect of Termination ....................................................................107
Section 12.3        Termination and Adjustment Rights of Buyer as to Properties and Related Acquired Assets ...........................................................107

ARTICLE XIII GENERAL PROVISIONS .........................................................................109

Section 13.1        Public Announcements .................................................................109
Section 13.2        Notices .........................................................................................109
Section 13.3        Amendment; Waiver ....................................................................110
Section 13.4        Entire Agreement.........................................................................110
Section 13.5        No Presumption as to Drafting ....................................................111
Section 13.6        Assignment ..................................................................................111
Section 13.7        Severability ..................................................................................111
Section 13.8        Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver...........................................................................................111
Section 13.9        Counterparts.................................................................................113
Section 13.10       Parties in Interest; No Third Party Beneficiaries ..........................113
Section 13.11       Fees and Expenses .......................................................................113
Section 13.12       Non-Recourse ..............................................................................113
Section 13.13       Schedules; Materiality .................................................................114
Section 13.14       Specific Performance ...................................................................114

## EXHIBITS

Exhibit A:          Approval Order
Exhibit B:          IP Assignment Agreement
Exhibit C:          IP Power of Attorney
Exhibit D:          Occupancy Agreement
Exhibit E:          Assignment and Assumption of Lease
Exhibit F:          Seller Retained Occupancy Agreement
Exhibit G:          Credit Bid Release Exhibit

## SCHEDULES

Schedule 1.1(a):    [*Reserved*]
Schedule 1.1(b):    [*Reserved*]
Schedule 1.1(c):    Excluded IT
Schedule 1.1(d):    IP/Ground Lease Property
Schedule 1.1(e):    Seller Knowledge Parties
Schedule 1.1(f):    Ordered Inventory

## TABLE OF CONTENTS
(continued)

**Page**

Schedule 1.1(g):        Other Payables

Schedule 1.1(h):        [*Reserved*]

Schedule 1.1(i):        Permitted Post- Closing Encumbrances

Schedule 1.1(j):        Permitted Pre-Closing Encumbrances

Schedule 1.1(k):        Specified Receivables

Schedule 1.1(l):        Warranty Receivables

Schedule 1.1(m):        GOB Leases

Schedule 1.1(n):        GOB Owned Stores

Schedule 1.1(o):        Operating Leases

Schedule 1.1(p):        Operating Owned Properties

Schedule 1.1(q):        Sparrow Properties

Schedule 2.1(a):        Intellectual Property

Schedule 2.1(q):        Proceeds Properties

Schedule 2.7(a):        Potential Transferred Agreements

Schedule 7.1:        Buyer Equity

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of January 17, 2019 (the "Effective Date"), by and between Transform Holdco LLC, a Delaware Limited Liability Company (together with any applicable Affiliated Designee (as defined below), "Buyer"), and Sears Holdings Corporation, a Delaware corporation ("SHC" or the "Seller" and together with each of its Subsidiaries party hereto, the "Sellers").

## RECITALS

WHEREAS, among other things, Sellers own and operate, through direct and indirect Subsidiaries:

(a)     a national network of retail stores and pharmacies under the "Sears" and "Kmart" brands as conducted at the Operating Owned Properties and the Operating Leased Properties (as defined below) and the supporting general and administrative functions related to such retail stores;

(b)     a national network of specialty stores, including under the "Sears Auto Centers" brand;

(c)     a business that provides various home services solutions, including product repair, repair parts and accessories under the "PartsDirect" brand, home improvement project services, franchise services in the residential home service sector, repair services under the "ServiceLive" brand or the "Sears Home Services" brand and home solution technology under the "Wally" brand;

(d)     the KCD Notes (as defined below) and the business of designing, researching, developing, testing, having made, procuring the manufacture of, packaging, selling, marketing and distributing products and services under the Kenmore Marks and the DieHard Marks and licensing the Kenmore Marks and the DieHard Marks to third parties (the "Kenmore/DieHard Business");

(e)     a business that distributes and sells appliances under the "Monark Premium Appliance Co." brand;

(f)     a business that provides home delivery and retail installation services, including for third party customers, freight management, truck-load solutions, warehousing and final-mile delivery services;

(g)     various websites under the sears.com and kmart.com banners;

(h)     a membership program for Sellers' members, including that offered under the "Shop Your Way" brand; and

(i)     the "Business" as defined in the SHIP Purchase Agreement  (as defined below),

(collectively, each of (a) through (h) above, (but, in the event that the SHIP Closing (as defined below) shall have occurred prior to the Closing Date, excluding the "Business" as defined in the SHIP Purchase Agreement), the "Business");

WHEREAS, on October 15, 2018, (the "<u>Petition Date</u>") (or, with respect to certain Sellers as applicable, following the Petition Date), Sellers filed voluntary petitions for relief (the "<u>Filing</u>") commencing cases under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Cases</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, Sellers desire to sell to Buyer (or, in accordance with the terms set forth herein, an applicable Assignee (as defined below)) the Designation Rights (as defined below) and Acquired Assets (as defined below) and to transfer to Buyer the Assumed Liabilities (as defined below) and Buyer desires to purchase from Sellers the Designation Rights and Acquired Assets and to assume from Seller the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Parties (as defined below) desire to consummate the proposed transactions as promptly as practicable after the Bankruptcy Court enters the Approval Order (as defined below), subject to the terms of this Agreement; and

WHEREAS, the Parties desire and intend that the transactions set forth in this Agreement, together with the Bankruptcy Plan (as defined below), will, unless Buyer elects otherwise pursuant to this Agreement, (i) constitute one or more plans of reorganization under section 368(a) of the Code (as defined below) and as qualifying as one or more reorganizations thereunder and (ii) satisfy the ownership requirements set forth in section 382(l)(5)(A)(ii) of the Code.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I

### DEFINITIONS

Section 1.1    <u>Definitions</u>.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"<u>401(k) Plan</u>" shall have the meaning set forth in <u>Section 9.7(b)</u>.

"<u>ABL Commitment Letter</u>" shall mean the commitment letter (including all annexes, exhibits, schedules and other attachments thereto) among Buyer, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets, Inc. and Royal Bank of Canada, dated as of the date hereof, as amended, supplemented or replaced in compliance with the terms hereof and thereof.

"<u>ABL Financing</u>" shall mean the financing incurred or intended to be incurred pursuant to the ABL Commitment Letter, including the borrowing of loans contemplated by the ABL Commitment Letter.

"ABL Financing Sources" shall mean the Financing Sources specified in clause (z) of the definition of "Financing Sources".

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Acquired Data" shall have the meaning set forth in Section 2.1(g).

"Acquired Equipment" shall mean, with respect to any Acquired Property, all Equipment to the extent located at or on the applicable Acquired Lease Premises or Owned Real Property.

"Acquired Foreign Assets" shall have the meaning set forth in Section 2.13(a).

"Acquired Improvements" shall mean, with respect to any Acquired Property, all Improvements located on or comprising the applicable Acquired Lease Premises or Owned Real Property.

"Acquired Intellectual Property" shall have the meaning set forth in Section 2.1(e).

"Acquired Inventory" shall mean (i) with respect to any Operating Leased Property, all Inventory which is located at or on the applicable Operating Lease Property as of the Closing Date, (ii) with respect to any Operating Owned Property, all Inventory which is located at or on the Operating Owned Property as of the Closing Date, (iii) with respect to any IP/Ground Lease Property, all Inventory which is located at or on the IP/Ground Lease Property as of the Closing Date and (iv) all other Inventory Related to the Business other than Inventory included in clause (ii) of the definition of Excluded Inventory.

"Acquired Lease" shall mean each Lease that is assumed by any Seller and assigned to Buyer pursuant to the terms of this Agreement.

"Acquired Lease Premises" shall mean the Lease Premises which is the subject of an Acquired Lease.

"Acquired Lease Rights" shall mean, with respect to an Acquired Lease, all real property rights and all other rights and interests of the tenant thereunder, including all options to renew, purchase, expand or lease (including rights of first refusal, first negotiation and first offer), and all credit for the prepaid rent associated therewith and all Security Deposits made in respect of such and any Improvements thereon.

"Acquired Property" shall mean (i) each Lease Premises which is subject to an Acquired Lease and (ii) each Owned Real Property.

"Acquired Receivables" shall mean (i) all Credit Card Accounts Receivable, (ii) all Pharmacy Receivables, (iii) the Specified Receivables and (iv) the Warranty Receivables.

"Action" shall mean any Claim, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Order, decree, legal proceeding, investigation or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority.

3

"ADA" shall have the meaning set forth in the definition of Law.

"Additional Contract" shall have the meaning set forth in Section 2.9.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.  For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.  Notwithstanding the foregoing, (i) each Seller and its respective Subsidiaries, on the one hand, shall not, for the purposes of this Agreement, be deemed to be an "Affiliate" of ESL or Buyer or any of their respective Affiliates (excluding each Seller and its respective Subsidiaries), on the other hand, and (ii) Buyer, ESL and their Affiliates (excluding each Seller and its respective Subsidiaries), on the one hand, shall not, for the purposes of this Agreement, be deemed to be an "Affiliate" of Sellers or any of their respective Subsidiaries, on the other hand; and Buyer and ESL shall be deemed to be Affiliates of each other.

"Affiliated Designee" shall have the meaning set forth in Section 13.6.

"Aggregate DIP Shortfall Amount" shall mean, as of the Closing Date, an amount equal to $1,200,000,000 *less* the aggregate amounts required to be paid (net of any available cash) to fully satisfy the existing indebtedness of Sellers under both (i) the DIP Credit Agreement and (ii) the Junior DIP Term Loan Agreement.

"Agreement" shall have the meaning set forth in the Preamble.

"Agreement Assignment Notice" shall have the meaning set forth in Section 2.7(a)(ii).

"Allocation Schedule" shall have the meaning set forth in Section 9.3(d).

"Alternative Financing" shall have the meaning set forth in Section 8.5.

"Antitrust Actions" shall have the meaning set forth in Section 8.3(d).

"Antitrust Division" shall mean the Antitrust Division of the United States Department of Justice.

"Antitrust Laws" shall mean the Sherman Antitrust Act, the Clayton Antitrust Act of 1914, the HSR Act and all other federal, state and foreign statutes, rules, regulations, orders, decrees and other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or competition.

"Approval Order" shall mean an Order approving the Transactions entered by the Bankruptcy Court in the Bankruptcy Cases substantially in the form of Exhibit A attached hereto or in a form reasonably agreed by Buyer and Sellers prior to the Closing.

"Arbitrator" shall have the meaning set forth in the definition of Law.

4

"Assigned Agreements" shall mean (i) the Citi Card Agreement, (ii) the Initial Assigned Agreements, (iii) the Designatable Leases, solely to the extent designated for assumption by the Sellers and assignment to Buyer by written notice from Buyer to Sellers delivered prior to the end of the Designation Rights Period, and (iv) such other Additional Contracts as Buyer elects to have assigned or assumed and assigned to Buyer in accordance with this Agreement.

"Assigned Plans and Permits" shall mean, with respect to any Acquired Assets, all Plans and Permits, if any, that are assignable pursuant to the applicable issuing Governmental Authority and are Related to such Acquired Asset.

"Assignee" shall mean, as to any Acquired Lease, Buyer or any other Person designated by Buyer in the applicable Buyer Assumption Notice.

"Assignment Actions" shall have the meaning set forth in Section 5.2(c).

"Assignment and Assumption of Lease" shall have the meaning set forth in Section 5.2(b).

"Assignment Instruments" shall have the meaning set forth in Section 5.2(c).

"Assumed 503(b)(9) Claims" shall mean all Liabilities against any of the Debtors arising under section 503(b)(9) of the Bankruptcy Code.

"Assumed Customer Credits" shall mean all Liabilities arising under, or relating to, (i) any existing customer loyalty program (*e.g.*, points, rewards, discounts, etc.) of any of Sellers or community marketing undertaken by any of Sellers, including Shop Your Way, and (ii) any Liability in respect of any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs issued by, on behalf of or in relation to Sellers since January 1, 2018.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Assumed Property Tax Liabilities" shall mean all Liabilities for Property Taxes payable with respect to any Acquired Property for Pre-Assignment Tax Periods, not to exceed $135,000,000.

"Assumption Effective Date" shall mean, (i) with respect to the Initial Assigned Agreements, the Closing Date, (ii) with respect to the Designatable Leases, following the delivery of the applicable Buyer Assumption Notice, the earliest of (A) the deadline for objecting to assumption and assignment of such Lease, if no such objection is submitted and (B) the fifth (5th) Business Day following the date of resolution of any objection to assumption and assignment of such Lease, if any such objection is timely submitted and (iii) with respect to the Additional Contracts, the earliest of (A) the deadline for objecting to assumption and assignment of such Additional Contract, if no such objection is submitted and (B) the fifth (5th) Business Day following the date of resolution of any objection to assumption and assignment of such Additional Contract or to proposed Cure Costs, if any such objection is timely submitted.

"Auction" shall mean the auction undertaken pursuant to the Bidding Procedures Order.

5

"Avoidance Actions" shall mean any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or other similar state laws.

"Bankruptcy Cases" shall have the meaning set forth in the Recitals.

"Bankruptcy Code" shall mean Title 11 of the United States Code, sections 101 et seq.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bankruptcy Plan" shall mean the joint chapter 11 plan for the Sellers in the Bankruptcy Cases.

"Bidding Procedures Order" shall mean the Order approving the global bidding procedures entered by the Bankruptcy Court in the Bankruptcy Cases on November 19, 2018 (Docket No. 816).

"BMA Consent" shall have the meaning set forth in Section 2.8(e).

"Books and Records" shall mean, with respect to Sellers, all documents, instruments, records and other written or electronic materials in whatever form or media (including all hard and electronic copies, CAD files and all discs, tapes and other media-storage data and materials containing such information, and including originals, if available) in the possession or control of Sellers in connection with, or relating to any Acquired Assets, any related Assumed Liabilities, or the operations of Sellers at any Acquired Property, or the operations of the shopping center in which such Acquired Property is located, including to the extent in Sellers' possession or control, all files, data, reports, surveys (ALTA and topographical), soil reports, title reports and title insurance policies (including copies of all underlying exception documents), physical inspection, engineering and asbestos reports, environmental tests, inspections and reports, insurance reports, schematic plans, site plans and drawings, mailing lists, supplier lists, customer lists, price lists, financial projections, marketing information and procedures, copies of Tax Returns to the extent related to the Acquired Assets, advertising and promotional materials, equipment records, warranty information, architects and engineers agreements, architectural and engineering plans and specifications, construction contracts, drawings, plans and specifications, records of operations, manuals of operations or business procedures and other similar procedures, including all policies and procedures for the protection of individual and consumer privacy (including all CAD files and all discs, tapes and other media-storage data containing such information). Without limiting the foregoing, with respect to any Acquired Property, the term "Books and Records" shall include, to the extent in the possession or control of a Seller, (a) the original file for the applicable Acquired Property, including the applicable Acquired Lease and any other related Assigned Agreements, which includes originals of the following: the fully executed Acquired Lease and any other related Assigned Agreements, together with all Exhibits, Schedules and Addenda thereto, and all amendments, modifications and supplements thereto; letter agreements; correspondence; renewal notices; estoppel certificates issued by any Seller or the landlord under any applicable Acquired Lease; estoppel certificates issued by any party under any applicable easement, operation and easement agreement, reciprocal easement agreement, declaration of covenants, conditions and restrictions or similar documents with respect to an Acquired Property (each, an "OEA");

6

accounting records; gross sales records to the extent reporting of gross sales is required pursuant to each such Acquired Lease; audit files (whether generated internally or by a third party); surveys of the Acquired Lease Premises or the common areas of the shopping center in which such Acquired Property is located with respect to compliance with Law; any OEA and all amendments, modifications and supplements thereto; the applicable Sellers' title insurance policy, together with legible copies of all exception documents; any agreements confirming the commencement date or other relevant dates in the Acquired Lease; recorded copies of any memorandum of lease; and lease abstracts, and (b) keys to such Acquired Property, security codes for such Acquired Property or any of such Acquired Property's building systems, any keys or security codes for parking and other common areas of any shopping centers in which such Acquired Property is located and any other document or information in the possession or control of any Seller useful or necessary to operate a retail store from the Acquired Lease Premises.  Notwithstanding the foregoing, the term "Books and Records" shall not include (i) personnel files with respect to any Seller employees who are not Transferred Employees, (ii) any information as to Seller employees that is prohibited by Law from being delivered by Sellers to Buyer (including (1) employee medical information protected by the Health Insurance Portability and Accountability Act of 1996, as amended, the ADA, the Family and Medical Leave Act of 1993, as amended, or the Genetic Information Nondiscrimination Act of 2008, as amended, (2) any Employment Eligibility Verification on Form I-9 and (3) any employee background reports), provided that Sellers shall inform Buyer of the general nature of the materials being withheld and, upon Buyer's request and at Buyer's sole cost and expense, reasonably cooperate with Buyer to provide such materials, in whole or in part, in a manner that would not result in the outcome described in this clause (ii), including by reasonably cooperating with Buyer to enter into additional agreements to the extent required to render the access to any personally identifiable information permissible under any applicable Law or contractual obligation, (iii) any non-disclosure or confidentiality, non-compete or non-solicitation agreements other than contemplated by Section 2.1(k) and (iv) the Retained Books and Records.

"Business" shall have the meaning set forth in the Recitals.

"Business Day" shall mean any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to remain closed.

"Business Employees" shall mean each employee who, as of the Closing Date, is primarily engaged in providing services in connection with, or in support of, the Business, including in any commercial or corporate function (excluding employees employed in the GOB Leased Stores, the GOB Owned Stores or at any distribution center which is announced for closing prior to the Closing Date and any employees who have been provided notice of termination by Sellers prior to the Closing Date).  The number of Business Employees is expected to total approximately 45,000 employees.

"Business Names" shall have the meaning set forth in the definition of Intellectual Property.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Assumption Notice" shall have the meaning set forth in Section 5.2(a).

7

"Buyer Occupancy Costs" shall mean (i) with respect to any GOB Leased Stores, all Occupancy Expenses that are incurred, accrued or apportioned solely for the period commencing on the first calendar day following the GOB Period for such GOB Store and ending at the expiration of the Designation Rights Period for such GOB Store and (ii) with respect to any Operating Leased Property, all Occupancy Expenses that are incurred, accrued or apportioned solely for the period commencing on the Closing Date and ending at the expiration of the Designation Rights Period for such Operating Leased Property.

"Buyer Party Release" shall have the meaning set forth in Section 9.13.

"Buyer Rejection Notice" shall have the meaning set forth in Section 5.3(a).

"Buyer Related Party" shall mean (i) Buyer, (ii) ESL, (iii) the Cyrus Related Parties and (iv) any Person who is currently or formerly was a director, officer, employee, stockholder, member, limited partner, general partner, controlling person, manager, representative, attorney, agent or successors of Buyer, ESL or any of the Cyrus Related Parties.

"Buyer's Savings Plan" has the meaning given in Section 9.7(k)(i).

"Casualty / Condemnation Event" shall have the meaning set forth in Section 12.3(a).

"Challenge" shall have the meaning set forth in the definition of Final Order.

"Citi Card Agreement" shall mean the Second Amended and Restated Program Agreement, dated as of October 3, 2018, by and among Sears, Roebuck and Co., Sears Brands Business Unit Corporation, the Other Sears Parties, and Citibank, N.A., as may be amended from time to time.

"Citi L/C Facility" shall mean that certain letters of credit facility granted pursuant to that certain Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as at any time amended, restated, amended and restated, supplemented or otherwise modified), by and among Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, SHC, Citibank N.A. as administrative agent, and the financial institutions party thereto from time to time.

"Claims" shall mean all rights to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or rights to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, in each case, of whatever kind or description against any Person.

"Closing" shall have the meaning set forth in Section 4.1.

"Closing Date" shall have the meaning set forth in Section 4.1.

"Closing Legal Impediment" shall have the meaning set forth in Section 10.4.

"Closing Payment Amount" shall have the meaning set forth in Section 3.1(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Commitment Letters" shall mean, collectively, the Cyrus Commitment Letter, the Debt Commitment Letter, the Real Estate Financing Commitment Letter and the Equity Commitment Letter.

"Competing Transaction" shall mean any direct or indirect financing, refinancing, acquisition, sale, divestiture (including by merger, acquisition or other business combination), public offering, recapitalization, business combination or reorganization, whether in one transaction or a series of related transactions, of or involving or implicating all or any material part of the Designation Rights, the Properties, the Leases, the Acquired Assets, the Assumed Liabilities or any Business (other than any such transaction or series of related transactions with Buyer or any Affiliate thereof) or any standalone plan of reorganization or liquidation for any Seller that does not contemplate the consummation of the Transactions.

"Compliant" shall mean, with respect to the written Required Information that has been or will be made available to Buyer by the Sellers or any of their respective representatives on their behalf in connection with the Transactions, that the Sellers' auditors have not withdrawn any audit opinion with respect to any financial statements contained in the Required Information for which they have provided an opinion (unless a new audit opinion is issued with respect to the financial statements for the applicable periods by such auditors or any other independent public accounting firm of national standing or otherwise reasonably acceptable to Buyer).

"Confidential Information" shall mean, with respect to any Person, all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, which relates to such Person or their respective business relations and its respective business activities. Confidential Information includes, but is not limited to, the following: (i) internal business information (including historical and projected financial information and budgets and information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures and accounting and business methods); (ii) identities and individual requirements of, and specific contractual arrangements with, such Person's customers, clients, distributors, vendors, service providers, independent contractors, joint venture partners and other business relations and their confidential information; (iii) trade secrets; and (iv) other non-public Intellectual Property.

"Confidentiality Agreement" shall mean the Confidentiality Agreement, dated as of May 15, 2018, by and between ESL Investments, Inc. and SHC.

"Consent" shall mean any consent, approval, concession, grant, waiver, exemption, license, entitlement, suitability determination, franchise, development right, certificate, variance, registration, permit, Order or other authorization of or notice of any Person.

"Contract" shall mean any contract, agreement, undertaking, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment, whether written or oral (including commitments to enter into any of such) that purports to be binding on any Person or any part of its property (or subjects any such assets or property to an Encumbrance).

"Controlling Person" shall mean ESL Investments, Inc., its Affiliates and their respective directors and officers.

"Copyrights" shall have the meaning set forth in the definition of Intellectual Property.

"CPA Firm" shall mean a national firm of independent public accountants as to which the Parties mutually agree.  In the event the Parties do not mutually agree in a timely manner, the Bankruptcy Court shall determine the CPA Firm.

"Credit Bid Release Consideration" shall mean an amount of cash equal to Thirty-Five Million Dollars ($35,000,000).

"Credit Card Accounts Receivable" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to a Seller resulting from charges by a customer of a Seller on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Seller or services performed by a Seller, in each case in the ordinary course of its business.

"Credit Card Claims" means all claims arising from Seller's involvement as a class plaintiff in the class actions consolidated in the multi-district litigation In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, No. 1:05-MD-01720 (E.D.N.Y.) against Visa Inc., Mastercard Inc., JPMorgan Chase & Co, Citigroup N.A., Bank of America N.A., and other defendants, alleging antitrust violations in relation to certain practices with respect to merchant processing fees and merchant processing agreements attributable to merchants that accepted Visa Inc. or Mastercard Inc. credit or debit cards beginning on January 1, 2004, and any proceeds thereof, including proceeds arising from any settlement with respect to the foregoing.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of the Assigned Agreements, whether as determined by the Bankruptcy Court or agreed to by the Buyer and the non-debtor counterparty to the applicable Assigned Agreement.

"Current Fiscal Year" shall mean, in relation to the Seller, the Seller's current fiscal beginning February 4, 2018.

"Customer Data" shall mean all data (including personal data and personally identifiable information) owned or controlled (meaning any data Sellers have the ability to transfer in compliance with applicable Law) by or on behalf of Sellers related to Sellers' customers, consumers or end users, including (i) customer, consumer and end user files and lists and contact information, (ii) purchasing, transaction and installation histories (namely, the product purchased, date of purchase, location of purchase, date of installation and whether a warranty was purchased), (iii) customer, consumer and end-user complaints and returns, (iv) customer, consumer or end user opt-outs, unsubscribe or opt-ins requests in relation to the use or processing of their information, (v) all analytics relating to any of the foregoing and other customer-based analyses or reports and

(vi) all loyalty program data and participation information (including all information and data with respect to Shop Your Way).

"Cyrus Commitment Letter" shall mean the commitment letter (including all annexes, exhibits, schedules and other attachments thereto) among Buyer, the Cyrus Lender, the Sponsor and Citibank, N.A., dated as of the date hereof, as amended, supplemented or replaced in compliance with the terms hereof and thereof.

"Cyrus Financing" shall mean the debt financing incurred or intended to be incurred pursuant to the Cyrus Commitment Letter, including the borrowing of loans contemplated by the Cyrus Commitment Letter.

"Cyrus Lender" shall mean Cyrus Capital Partners, L.P.

"Cyrus Related Parties" shall mean the Cyrus Lender, its Affiliates and any of their respective directors, officers, or employees, in such capacities and in their individual capacities.

"Debt Commitment Letters" shall mean, collectively, the ABL Commitment Letter, the Cyrus Commitment Letter and the Real Estate Financing Commitment Letter.

"Debt Financing" shall mean, collectively, the ABL Financing, the Cyrus Financing and the Real Estate Financing.

"Debt Financing Documents" means the agreements, documents and certificates contemplated by the Debt Financing, including (a) all credit agreements, loan documents, debentures, notes, pledge and security documents, guarantees, mortgages, intercreditor agreements and other related documents pursuant to which the Debt Financing will be governed or contemplated by the Debt Commitment Letters and (b) officer, secretary, solvency, closing and perfection certificates, legal opinions, corporate organizational documents, good standing certificates, Lien searches, and resolutions contemplated by the Debt Commitment Letters or requested by the Financing Sources.

"Deposit Amount" shall have the meaning set forth in Section 3.2.

"Designatable Lease" shall mean each of (i) the GOB Leases and the Operating Leases and (ii) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any of the Leases (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders.

"Designated Sale Transaction" shall have the meaning set forth in Section 2.12(b).

"Designated Tax Advisor" shall mean Weil, Gotshal & Manges LLP, or Deloitte Tax LLP, as decided in the Sellers' discretion, or if neither of the foregoing is able to deliver a Tax Opinion, Cleary Gottlieb Steen & Hamilton LLP.

"Designation Assignment Date" shall have the meaning set forth in Section 5.2(d).

11

"<u>Designation Deadline</u>" shall have the meaning set forth in <u>Section 2.9</u>.

"<u>Designation Rights</u>" shall mean the exclusive right to irrevocably select, identify and designate each Designatable Lease in respect of which Assignee will acquire all of Sellers' right, title and interest in and to the applicable Designatable Lease, together with all of Sellers' right, title and interest in and to certain assets related to such Designatable Lease, to the extent, but only to the extent, set forth in <u>Article II</u>, all in accordance with the terms and conditions of this Agreement.

"<u>Designation Rights Period</u>" shall mean, with respect to each Designatable Lease, the period commencing on the Closing Date and ending on the earliest of (i) five (5) Business Days after delivery of the applicable Buyer Rejection Notice, (ii) the date on which an applicable agreement is assumed and assigned to an Assignee, (iii) the date which is sixty (60) days after the Closing Date and (iv) May 3, 2019.

"<u>DieHard Marks</u>" shall mean the name "DIEHARD" and any name consisting of, containing or incorporating "DIEHARD", and all designs and logos associated therewith in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

"<u>DIP Credit Agreement</u>" means that certain Superpriority Senior Secured Debtor-in-Possession Asset Based Credit Agreement, dated as of November 29, 2018, among SHC, as holdings, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, Bank of America, N.A., in its capacity as administrative agent and co-collateral agent, Wells Fargo Bank, National Association, in its capacity as co-collateral agent, and the lenders named therein, as in effect on the date hereof [Docket No. 955-1].

"<u>Distribution Requirement</u>" shall mean the requirement that each Seller (except if and to the extent (x) Buyer elects, in accordance with this Agreement, that the transactions set forth in this Agreement with respect to such Seller shall not be treated as a Tax Reorganization, or (y) if requested by such Seller, Designated Tax Advisor is unable to deliver a Tax Opinion that the transactions set forth in this Agreement with respect to such Seller may be treated as a Tax Reorganization) (i) shall distribute the Securities Consideration received by it to Persons qualifying as holders of "securities" of such Seller for purposes of section 354 of the Code, (ii) shall distribute all of the cash received pursuant to <u>Section 3.1(a)</u>, as well as all of its other property pursuant to the Bankruptcy Plan, (iii) shall dissolve no later than the end of the third taxable year ending after the Closing Date, and (iv) during the period between the Closing Date and its dissolution, shall limit its activities to those which are merely for the purpose of liquidating its assets (which may include maintaining a going operation for the preservation of value, pending distribution or sale), winding up its affairs, resolving and paying its debts, and distributing any remaining assets (which may include a distribution to a non-corporate liquidating vehicle).

"<u>Domain Names</u>" shall have the meaning set forth in the definition of Intellectual Property.

"<u>Effect</u>" shall have the meaning set forth in the definition of "<u>Material Adverse Effect</u>."

"<u>Effective Date</u>" shall have the meaning set forth in the Preamble.

12

"Employee Plan" shall mean each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), whether or not subject to ERISA, and each other employee benefit plan, program, policy, or arrangement (including each stock purchase, stock option, restricted stock or other equity-based, severance, retention, change-of-control, bonus, deferred compensation, fringe benefit and other similar benefit plan, program, policy, or arrangement), in each case, that provides any kind of compensation or benefits to Business Employees or former employees of the Business or their dependents or beneficiaries or with respect to which Seller would reasonably be expected to have any Liability in respect of the Business Employees.

"Employment Laws" shall mean all Laws (including the WARN Act), now or at the applicable time in effect and regulating, respecting, concerning or relating directly or indirectly to employees, independent contractors, labor relations, workers' compensation, unemployment compensation, foreign workers employed in the United States, wages and hours, safety, compensation, worker classification or other workplace or employment standards or practices.

"Encumbrance" shall mean all mortgages, pledges, hypothecations, charges, liens, interests, debentures, trust deeds, claims and encumbrances of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, and whether imposed by agreement, understanding, Law, equity, or otherwise), including Claims, assignments by way of security or otherwise, security agreements and interests, conditional sales contracts or other title retention agreements, rights of first refusal, first negotiation or first offer, options to purchase or similar restrictions or obligations, instruments creating a security interest in the Acquired Assets or any part thereof or interest therein, and any agreements, leases, subleases, licenses, occupancy agreements, options, easements, rights of way, covenants, conditions, restrictions, declarations, defects in title, encroachments, exceptions or other encumbrances adversely affecting title to the Acquired Assets or any part thereof or interest therein.

"Environmental Laws" shall mean all applicable Laws relating to pollution or protection of human health or safety (to the extent related to exposure to Hazardous Substances) or the environment (including ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources, including applicable Laws relating to the generation, storage, transfer, transportation, investigation, cleanup, treatment, remediation, or use of, or release or threatened release into the environment of, any Hazardous Substances.

"Environmental Permits" shall mean all licenses, permits, variances, consents or certificates issued pursuant to Environmental Laws.

"Equipment" shall mean all machinery, equipment, appliances, supplies, furniture, fixtures, janitorial and cleaning equipment, partitions, desks, chairs, tables, telephone lines, cubicles, point-of-sale systems, graphics, branding, signs and signage (including any signs and signage on any buildings, pylons or monuments and any directional or other ground or off-premises signs and signage).  For the avoidance of doubt, Improvements do not constitute Equipment.

13

"Equity Commitment Letter" shall have the meaning set forth in Section 7.4(a).

"Equity Financing" shall have the meaning set forth in Section 7.4(a).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"ERISA Affiliate" shall mean, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"ESL" shall mean ESL Investments, Inc., JPP, LLC, JPP II, LLC, Eddie S. Lampert and any of their respective directors, officers, or employees, in such capacities and in their individual capacities.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Asset-Reorganization Taxes" shall mean any and all (i) Taxes imposed on or with respect to the Excluded Assets or the Excluded Liabilities for any taxable period, other than any Tax to the extent such Tax would have been reduced or eliminated had the Sellers' Tax attributes not transferred to Buyer (taking into account Tax attributes Sellers would have had if all transactions described in Article II were Designated Sale Transactions and respected as such by the Internal Revenue Service), (ii) Taxes imposed on or with respect to the Acquired Assets, the Acquired Properties, the Business or the Assumed Liabilities for any Pre-Assignment Tax Period (for the avoidance of doubt, other than amounts payable by Buyer under Section 5.1(b)), other than any Tax to the extent such Tax would have been reduced or eliminated had the Sellers' Tax attributes not transferred to Buyer (taking into account Tax attributes Sellers would have had if all transactions described in Article II were Designated Sale Transactions and respected as such by the Internal Revenue Service), (iii) Liabilities of Buyer or any of its Affiliates for Taxes described in clause (i) or (ii) hereof of any Sellers or their Affiliates as a transferee or successor, by contract, operation of law or otherwise, other than as part of any agreement entered into in the Ordinary Course of Business the primary purpose of which is not related to Tax and (iv) Taxes imposed on any earnings on the investment of the cash received pursuant to Section 3.1(a) pending its distribution pursuant to the Bankruptcy Plan.

"Excluded Asset-Sale Taxes" shall mean any and all (i) Taxes imposed on or payable by any Sellers or their Affiliates for any taxable period (whether starting or ending before or after the Closing Date) or with respect to any of the Acquired Assets, the Acquired Properties the Business or the Assumed Liabilities, other than amounts payable by Buyer under Section 5.1(b), and (ii) Liabilities of Buyer or any of its Affiliates for Taxes of any Sellers or their Affiliates as a transferee or successor, by contract, operation of law or otherwise, other than as part of any agreement entered into in the Ordinary Course of Business the primary purpose of which is not related to Tax. Notwithstanding anything to the contrary herein, "Excluded Asset-Sale Taxes" shall not include any Excluded Asset-Reorganization Taxes.

"Excluded Equipment" shall mean all Equipment other than the Acquired Equipment.

"Excluded Improvements" shall mean all Improvements other than the Acquired Improvements.

"Excluded Inventory" shall mean (i) all Inventory other than the Acquired Inventory, (ii) all Inventory held by Sellers which is located at any site which is not a Property and (iii) for the avoidance of doubt, all Inventory located at any GOB Store.

"Excluded IT" shall mean the Equipment and other assets set forth on Schedule 1.1(c).

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Exclusive License" shall mean the license agreement by and between KCD IP, LLC and Buyer as described in Section 9.14(b).

"Existing Financing Arrangements" shall mean the Citi L/C Facility, the DIP Credit Agreement, the FILO Facility, the IP/Ground Lease Term Loan Facility, the Junior DIP Term Loan Agreement, the Real Estate Loan 2020, the Second Lien Line of Credit Facility, the Second Lien Term Loan, the Second Lien PIK Notes and the Third Amended and Restated Credit Agreement.

"Expenses" shall mean (i) the Buyer Occupancy Costs, if applicable, and (ii) the reasonable and documented out-of-pocket fees, costs and expenses or other disbursements borne by any Seller or its Affiliates incurred or accruing (a) during the Designation Rights Period, to the extent Related to the Operating Leases or Operating Leased Stores, (b) to the extent Related to the GOB Leases or GOB Leased Stores incurred or accruing following the GOB Period for each such GOB Lease or GOB Leased Store, (c) after the Closing, to the extent related to an Additional Contract or any Operating Lease or Operating Leased Store or (d) as a result of Sellers being the tenant under the Designatable Lease or Additional Contract during, with respect to the GOB Leased Stores, the period commencing after the GOB Period for each such GOB Leased Store and ending at the expiration of the Designation Rights Period, and with respect to any Operating Leased Property, during the Designation Rights Period, and any reasonable and documented fees, costs and expenses incurred by any Seller or its Affiliates in connection with any transfer of a Designatable Lease to Purchaser following the Designation Rights Period, but in each case shall not, for the avoidance of doubt, include rejection damages or Cure Costs.

"Filing" shall have the meaning set forth in the Recitals.

"FILO Facility" shall mean the first-in, last-out tranche of debt under the Third Amended and Restated Credit Agreement (as amended by (i) that certain Fifth Amendment to Third Amended and Restated Credit Agreement, dated as of March 21, 2018, by and between, inter alios, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, SHC, Bank of America, N.A., as administrative agent, co-collateral agent and lender, Wells Fargo Bank, National Association, as co-collateral agent and lender, and PNC Bank, National Association, Citibank N.A., Citizen Business Capital, and Regions Bank,  as revolving lenders and (ii) that certain Sixth Amendment to Third Amended and Restated Credit Agreement, dated as of March 21, 2018, by and between, inter alios, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers,

SHC, Bank of America, N.A., as administrative agent and co-collateral agent, Wells Fargo Bank, National Association, as co-collateral agent,  and Benefit Street 2018 LLC, JPP LLC and JPP II LLC as lenders).

"FILO Facility Buyout Amount" shall have the meaning set forth in Section 3.1(c).

"Final Order" shall mean an action taken or order issued by the applicable Governmental Authority (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial, request for stay, motion or petition for reconsideration, application or request for review, or other similar motion, application, notice or request (collectively, a "Challenge") has been timely filed, or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further Challenge thereon and (ii) as to which the time for instituting or filing a Challenge shall have expired.

"Financing" shall mean, collectively, the Debt Financing and the Equity Financing.

"Financing Sources" shall mean, with respect to (x) the Real Estate Financing, the Cyrus Lender and the Sponsor, (y) the Cyrus Financing, the Cyrus Lender, the Sponsor and Citibank, N.A.  and (z) the ABL Financing, the Persons that have directly or indirectly committed to provide or otherwise entered into agreements in connection with the ABL Financing in connection with the transactions contemplated hereby pursuant to the ABL Commitment Letter, including the agents, arrangers and lenders party to the ABL Commitment Letter and/or the Debt Financing Documents relating to the ABL Financing, together with any of their respective Affiliates and their respective Affiliates' former, current or future officers, directors, employees, agents and representatives, direct or indirect shareholders or equity holders, managers, members and their respective successors and assigns, in each case in their capacities as such.

"Foreign Subsidiary" shall mean any Subsidiary of any Seller incorporated under any jurisdiction other than the United States of America and its territories, other than Sears RE.

"FTC" shall mean the Federal Trade Commission.

"GAAP" shall mean U.S. generally accepted accounting principles in effect from time to time.

"GOB Leases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the real properties identified on Schedule 1.1(m) (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders.

"GOB Leased Store" shall mean the real property demised pursuant to a GOB Lease.

"GOB Owned Stores" shall mean the real property described in Schedule 1.1(n), including, in each case, all of the right, title and interest of Seller and its Subsidiaries to all Improvements located thereon and all easements and other rights and interests appurtenant thereto and any associated rights to parking.

"GOB Period" shall mean with respect to each GOB Leased Store, the period commencing on the Closing Date and ending on the date that Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such GOB Leased Store has been completed and all inventory of Sellers has been removed from such GOB Leased Store. For the avoidance of doubt, Sellers may deliver any such notice on or prior to the Closing Date.

"GOB Stores" shall mean, individually or collectively as the context may require, the GOB Leased Stores and the GOB Owned Stores.

"Governmental Authority" shall mean any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"Hazardous Substances" shall mean any material, substance or waste (solid, liquid, gaseous or combination thereof) defined, characterized or regulated as "hazardous," "toxic," "explosive," a "pollutant" or a "contaminant" under Environmental Laws, including asbestos or any substance containing asbestos, formaldehyde, polychlorinated biphenyls, lead paint and petroleum or petroleum products (including crude oil and any fraction thereof), and by-products of any or all of the foregoing.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the relevant rules and regulations thereunder.

"HSR Filing" shall have the meaning set forth in Section 8.3(b).

"Improvements" shall mean all building systems (including HVAC, electrical, plumbing, mechanical, vertical transportation and other similar systems), leasehold alterations, improvements, structures, buildings, fixtures and equipment which are affixed to and constitute a part of any applicable real property. For the avoidance of doubt, Inventory are not Improvements.

"Inbound IP License" shall mean any Contract pursuant to which any Seller is granted any license, covenant not to sue or other rights to use any (i) Intellectual Property or (ii) data (including personal data and personally identifiable information); provided, however, that the term "Inbound IP License" shall not include any Outbound IP License.

"Initial Assigned Agreements" shall have the meaning set forth in Section 2.7(b).

"Initial Assigned Contract" shall have the meaning set forth in Section 2.7(b).

"Initial Assigned Lease" shall have the meaning set forth in Section 2.7(b).

17

"Intellectual Property" shall mean all intellectual property and other similar proprietary rights, anywhere in the world, whether registered or unregistered, including all rights in and to (i) all trademarks, service marks, logos, trade dress and other source identifiers and commercial indicia of origin, and all registrations and applications therefor, in each case together with the goodwill of the businesses in which the foregoing are used and all goodwill connected with the use of and symbolized by the foregoing (collectively the "Trademarks"), (ii) all trade names, fictitious business names, corporate names and d/b/a names, together with the goodwill of the businesses in which the foregoing are used and all goodwill connected with the use of and symbolized by the foregoing (collectively the "Business Names"), (iii) all domain names, URLs and IP addresses (collectively, such domain names and websites, the "Domain Names"), (iv) any social media accounts, identifiers and handles (collectively the "Media Accounts"), (v) trade secrets, know-how and confidential information, including proprietary rights in and to processes, methods, formulae, marketing and technical information, blueprints, quality assurance and control procedures, design tools and simulation capabilities (collectively, the "Know-How"), (vi) all patents and patent applications (including provisionals, continuations, divisionals, continuations-in-part, renewals, reissues, re-examinations, substitutions and extensions thereof), inventions and inventions disclosures (whether or not patentable)(collectively the "Patents"), (vii) all copyrights and registrations and applications therefor and works of authorship, moral rights, designs and mask work rights (collectively the "Copyrights"), (viii) all database rights and (ix) computer programs and applications and any other software (regardless of the stage of development or completion), including libraries, subroutines, protocols, toolsets, compilers, schematics, plugins, APIs and other components thereof, whether in source code, object code or other form, computerized databases and other computerized compilations and collections of data or information, user interfaces, command structures, report formats, templates, menus, buttons and icons, in each case, relating to computer programs or other software, and descriptions, flow charts, architectures, development tools and other materials used to design, plan, organize and develop any of the foregoing; and all related specifications and documentation (collectively, the "Software").

"Intellectual Property Related Documentation" shall mean each of the following to the extent existing as of the Closing Date and in Sellers' possession or control as of the Closing Date: (i) all correct and complete physical and electronic copies of all prosecution files and dockets, registration certificates, litigation files and related opinions of counsel and correspondence relating thereto for all issued, registered and applied-for items of Acquired Intellectual Property, (ii) all litigation files to the extent relating to Actions brought for the infringement, dilution, misappropriation or other violation of the Acquired Intellectual Property, (iii) all books, records, files, ledgers or similar documentation in Sellers' possession used to track, organize or maintain any of the Acquired Intellectual Property, (iv) a list of outstanding maintenance, renewal and prosecution deadlines with respect to the applied-for, registered or issued Acquired Intellectual Property that fall within ninety (90) days following the Closing Date and (v) copies of acquisitions agreements relating to acquisitions of the Acquired Intellectual Property.

"Intellectual Property Security Agreement" shall mean that certain Intellectual Property Security Agreement, dated January 4, 2018 (at any time amended, restated, amended and restated, supplemented or otherwise modified), by and among SHC, Sears Roebuck Acceptance Corp. and Kmart Corporation, as Borrowers, and the other guarantors party thereto, and the lenders named therein, in favor of JPP, LLC, as Agent.

"Intercompany IP Agreements" shall mean any Contract under which a Seller or an Affiliate of a Seller licenses or grants any license, covenant not to sue or other rights under any of the Acquired Intellectual Property to any other Seller(s) or Affiliate(s) of any Seller.

"Inventory" shall mean goods, other than farm products, reflected in the stock ledger of the Sellers as of any date of the determination thereof, which (A) are leased by a person as lessor, (B) are held by a person for sale or lease or to be furnished under a contract of service, (C) are furnished by a person under a contract of service or (D) consist of raw materials, work in process, or materials used or consumed in a business.

"Inventory Value" shall mean, with respect to any Inventory of the Sellers, the value of such Inventory valued at the lower of cost or market value on a basis consistent with the Sellers' current and historical accounting practice in effect on the date hereof, per the stock ledger (without giving effect to LIFO reserves and general ledger reserves for discontinued inventory, markdowns, intercompany profit, rebates and discounts, any cut off adjustments, revaluation adjustments, purchase price adjustments or adjustments with respect to the capitalization of buying, occupancy, distribution and other overhead costs reflected on the balance sheet of the Sellers in respect of Inventory).

"IP/Ground Lease Buyout Amount" shall have the meaning set forth in Section 3.1(c).

"IP/Ground Lease Property" shall mean the properties that are collateral under the IP/Ground Lease Term Loan Facility, as set forth on Schedule 1.1(d).

"IP/Ground Lease Term Loan Facility" shall mean the loan facility granted pursuant to that certain Term Loan Credit Agreement, dated as of January 4, 2018 (at any time amended, restated, amended and restated, supplemented or otherwise modified), by and between SHC, as holdings, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the guarantors party thereto from time to time, JPP LLC as agent, and JPP LLC, JPP II LLC, Cyrus Opportunities Master Fund II, Ltd., CRS Master Fund, L.P., Crescent 1, L.P., Canary SC Master Fund, L.P., Cyrus Select Opportunities Master Fund, Ltd., Cyrus Special Strategies Master Fund, LP, and Cyrus 1740 Master Funds, LP, as lenders.

"IP Assignment Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit B, to be entered into by and between Sellers, on the one hand, and Buyer or its applicable Affiliates, on the other hand.

"IP License" shall mean each Inbound IP License and each Outbound IP License, and any agreement that constitutes an "IP License" as defined in the Intellectual Property Security Agreement, in each case, for the avoidance of doubt, including the KCD Agreements.

"IP Powers of Attorney" shall mean documents appointing attorneys for Buyer or Buyer's designees with full power to execute documents and take all other steps solely in connection with (i) effectuating and implementing the assignment of the Acquired Intellectual Property, (ii) perfecting Buyer's right, title and interest in, to and under the Acquired Intellectual Property pursuant to such assignment and (iii) as otherwise necessary for related bona fide purposes, in each of cases (i) through (iii) in the intellectual property offices of various jurisdictions around the

19

world, at or after the Closing, including, (A) with respect to the applied-for, issued or registered United States Intellectual Property, the power of attorney substantially as set forth in the form at Exhibit C and (B) with respect to any Intellectual Property included in the Acquired Intellectual Property that is issued, filed or registered in a jurisdiction outside of the United States, powers of attorney suitable for recording in each such jurisdiction with terms and conditions substantially similar to those set forth in Exhibit C, except for any different terms and conditions that would be necessary in a recordable power of attorney for the respective local jurisdiction.

"IT Systems" shall have the meaning set forth in Section 6.10(e).

"Junior DIP Consideration" shall mean evidence reasonably satisfactory to the Sellers that all obligations (including any accrued and unpaid interest) of the Sellers with respect to $350,000,000 aggregate principal amount outstanding under the Junior DIP Term Loan Agreement (or such lesser aggregate principal amount outstanding  thereunder to the extent that the junior DIP facility under the Junior DIP Credit Agreement is not fully drawn as of the Closing Date) have been satisfied and released.

"Junior DIP Term Loan Agreement" shall mean that certain Superpriority Junior Lien Secured Debtor-in-Possession Credit Agreement dated as of November 29, 2018 by and among SHC, as holdings, Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, the several banks, financial institutions or other entities from time to time party thereto as Term Lenders thereunder and Cantor Fitzgerald Securities as administrative agent and collateral agent as filed with the Bankruptcy Court [Docket No. 951-2].

"KCD Agreements" shall mean all IP Licenses under which KCD IP, LLC or a Seller grants any license, sublicense, covenant not to sue or other rights under any KCD IP to any Seller prior to the Closing.

"KCD IP" shall mean any Intellectual Property owned by KCD IP, LLC as of the date hereof or as of the Closing.

"KCD Notes" shall mean the 6.90% KCD IP, LLC Asset-Backed Notes issued pursuant to the Indenture dated as of May 18, 2006, by KCD IP, LLC as Issuer and U.S. Bank National Association, as Trustee.

"Kenmore Marks" shall mean the name "KENMORE" and any name consisting of, containing or incorporating "KENMORE", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

"Kenmore/DieHard Business" shall have the meaning set forth in the Recitals.

"Kmart Marks" shall mean the name "KMART" and any name consisting of, containing or incorporating "KMART", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

20

"Knowledge" shall mean, with respect to any matter in question, in the case of Sellers, the knowledge after reasonable inquiry of the individuals set forth on Schedule 1.1(e) with respect to such matter.

"Know-How" shall have the definition set forth in the definition of Intellectual Property.

"L/C Facility Consideration" shall mean evidence reasonably satisfactory to the Sellers that all obligations of Sellers with respect to amounts outstanding or commitments under the Citi L/C Facility (but in no event with respect to a principal amount of greater than $271 million) have been satisfied and released, including as contemplated by the Cyrus Financing.

"Labeling and Marketing Materials" shall mean all product labeling, product advertising, marketing and promotional materials, training materials and other similar materials, in each case created or developed by or on behalf of a Seller.

"Law" shall mean any foreign or domestic law, statute, code, ordinance, rule, regulation, order, decision, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority, including all Environmental Laws and the Americans with Disabilities Act, as amended ("ADA"), together with all final and unappealable awards or decisions by an arbitrator or arbitration panel ("Arbitrator") by which Sellers or any of the Properties, Leases or Acquired Assets is bound.

"Leases" shall mean collectively (i) the Initial Assigned Leases, and (ii) the Designatable Leases.

"Lease Premises" shall mean each of the Sellers' or its Subsidiaries' leased real properties that is an Initial Assigned Lease or a Designatable Lease.

"Liability" shall mean any liability, indebtedness, debt, guaranty, claim, demand, loss, damage, deficiency, assessment, responsibility, Claim, Action, proceeding or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured) and including all costs, fees and expenses relating thereto.

"Lien" means any claim, mortgage, option, pledge, lien, encumbrance, title defect, preemptive right, restriction on transfer or other restriction of any kind (other than restrictions on transfer created under applicable securities laws, charge or other security interest).

"Managed Properties" shall have the meaning set forth in Section 8.8(b).

"Management Services" shall have the meaning set forth in Section 8.8(b).

"Management Services Period" shall mean the period commencing immediately following the Closing and (i) for each Acquired Property at which Management Services are being provided, upon (a) the earliest to occur of (1) the date that the applicable Seller receives written notice of termination from Buyer, (2) the six (6) month anniversary of the Closing Date or (3) such later

21

date as may be agreed by the Parties, and (ii) for each Occupancy Leased Premise, five (5) Business Days following the delivery by Buyer of a Buyer Rejection Notice with respect to such Occupancy Leased Premise.

"Management Services Reimbursements" shall have the meaning set forth in Section 8.8(b).

"Marketing Period" means the first period of fourteen (14) consecutive Business Days after the date of this Agreement and throughout each day of which Buyer shall have all of the Required Information and such Required Information is Compliant; provided that January 21, 2019 shall not be considered a Business Day for the purposes of calculating such fourteen (14) Business Day period.  Notwithstanding the foregoing, the Marketing Period shall not commence and shall be deemed not to have commenced if, on or prior to the completion of such fourteen (14) consecutive Business Day period, (i) Sellers (or any Affiliate thereof) have determined that a restatement of any financial information included in the Required Information is necessary or that such restatement is under consideration, in which case the Marketing Period shall be deemed not to commence unless and until any such restatement has been completed and the applicable Required Information has been amended or Sellers (or any Affiliate thereof) have determined that no restatement shall be required, or (ii) any Required Information would not be Compliant during such fourteen (14) Business Day period. Notwithstanding the provisions of this paragraph, the Marketing Period shall end on any earlier date on which the Debt Financing is consummated; provided, that if Sellers in good faith reasonably believe that they have delivered the Required Information that is Compliant to Buyer, they may deliver to Buyer a written notice to that effect (stating when they believe they completed such delivery), in which case such Required Information shall be deemed to have been delivered on the date specified in that notice, unless Buyer in good faith reasonably believes that Sellers have not completed delivery of the Required Information or that the Required Information is not Compliant and, within two (2) Business Days after receipt of such notice from Sellers, Buyer delivers a written notice to Sellers to that effect and stating with specificity which Required Information Sellers have not delivered or the reason for which the Required Information is not Compliant, in which case, the Marketing Period shall commence upon delivery to Buyer of such specified information or when such information is Compliant.

"Material Adverse Effect" shall mean any effect, change, condition, circumstance, development or event (any of the foregoing, an "Effect") that, individually or in the aggregate with all other Effects has had, or would reasonably be expected to have, a material adverse effect on (A) the assets, liabilities, properties, business or condition (financial or otherwise) of the Designation Rights, Acquired Assets and Assumed Liabilities taken as a whole, or (B) Sellers' ability to consummate the Transactions pursuant to the terms hereof, in each case excluding any Effect that results from or arises out of: (i) the execution and delivery of this Agreement or the announcement thereof or the pendency or consummation of the Transactions; (ii)  any change in the United States or foreign economies or securities or financial markets generally; (iii) any change arising in connection with natural disasters, earthquakes, fire, flood, hurricane, tornado or other weather event, geopolitical conditions or any outbreak or escalation of hostilities or acts of terrorism or war, military actions or any escalation or material worsening of any such hostilities or acts of terrorism or war, military actions existing or underway as of the date hereof; (iv) any

22

effect, change or event that is otherwise generally applicable to the industries and markets in which Sellers operate; (v) changes in (or proposals to change) Laws or accounting regulations or principles; (vi) any action expressly contemplated by this Agreement; (vii) compliance with the terms of this Agreement; or (viii) the Bankruptcy Cases and reasonably anticipated Effects thereof on the Business, the Acquired Assets or the Designation Rights; provided, however, that in the case of the foregoing clauses (ii), (iii), (iv) or (v), any such Effect shall not be deemed to be excluded solely to the extent it has a materially disproportionate adverse effect on the assets, liabilities, properties, business or condition of the Sellers, taken as a whole, compared to other Persons similarly situated in the same industry.

"Material Contracts" shall have the meaning set forth in Section 6.11(a).

"Media Accounts" shall have the meaning set forth in the definition of Intellectual Property.

"Multiemployer Plan" shall mean a "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA.

"Non-Recourse Parties" shall have the meaning set forth in Section 13.12.

"Non-Represented Employees" shall have the meaning set forth in Section 9.7(a).

"Occupancy Agreement" shall mean that certain Occupancy Agreement substantially in the form attached hereto as Exhibit D.

"Occupancy Expenses" shall mean, with respect to any Lease Premises, all liquidated costs, expenses, obligations and liabilities under or in connection with the applicable Lease payable or paid by any Seller, including any and all mortgage payments, base rent, percentage rent, additional rent, CAM, utilities, Property Taxes and assessments, costs of continuing the level of maintenance and security required by this Agreement, a pro rata portion of insurance (including public liability and casualty insurance) attributable to such Lease or Lease Premises and all other categories of expenses, obligations and liabilities arising or accruing under or in connection with such Lease (whether or not billed by the applicable counterparty to such Lease). For the avoidance of doubt, Occupancy Expenses shall not include any Seller's costs and expenses of (a) any professionals retained in connection with the Bankruptcy Cases or (b) counsel of any kind except to the extent counsel is retained with respect to a Lease or Owned Real Property and not Sellers' other operations.

"Occupancy Leased Premise" has the meaning assigned thereto in the Occupancy Agreement.

"OEA" shall have the meaning set forth in the definition of Books and Records.

"Operating Leases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the real properties identified on Schedule 1.1(o) (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior

landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders.

"Operating Leased Property" shall mean the real property demised pursuant to an Operating Lease.

"Operating Owned Property" shall mean the real property described in Schedule 1.1(p), including, in each case, all of the right, title and interest of Seller and its Subsidiaries to all Improvements located thereon and all easements and other rights and interests appurtenant thereto and any associated rights to parking.

"Order" shall mean any award, writ, injunction, judgment, order, decree, attachment, stay, stipulation, certification, determination, decision, verdict, ruling, subpoena, or award issued or entered by or with any Governmental Authority or Arbitrator (whether temporary, preliminary or permanent).

"Ordered Inventory" shall mean Inventory (other than Prepaid Inventory) of the type set forth on Schedule 1.1(f) that has been ordered by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery prior to the Closing Date.

"Ordinary Course of Business" shall mean the operation of the Business in the ordinary and usual course consistent with past practice as well as (and subject to) the Filing and all Orders entered in connection therewith.

"Other Payables" shall mean the accounts payable set forth on Schedule 1.1(g).

"Outbound IP License" shall mean any Contract pursuant to which any Seller has granted any license, covenant not to use or other rights under any (i) Acquired Intellectual Property or (ii) Acquired Data, in each case, whether or not, pursuant to such Contract, any Seller was granted any license, covenant not to sue or other rights to use any (A) Intellectual Property or (B) data (including personal data and personally identifiable information).

"Outside Date" shall have the meaning set forth in Section 12.1(a)(ii).

"Owned Real Property" shall mean (i) the GOB Owned Stores and (ii) the Operating Owned Properties.

"PA Liabilities" shall have the meaning set forth in Section 2.3(e).

"PA Liabilities Services Agreement" shall have the meaning set forth in Section 2.8(e).

"PartsDirect Marks" shall mean the name "PARTSDIRECT" and any name consisting of, containing or incorporating "PARTSDIRECT", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

24

"Party" or "Parties" shall mean, individually or collectively, Buyer and Sellers.

"Patents" shall have the meaning set forth in the definition of Intellectual Property.

"Payoff Letters" shall mean, with respect to the Third Amended and Restated Credit Facility, the FILO Facility, the DIP Credit Agreement and the Junior DIP Term Loan, payoff letters in form and substance reasonably satisfactory to Buyer (subject only to delivery of funds, as arranged by Buyer, the credit bids pursuant to Section 363(k) of the Bankruptcy Code described in Section 3.1(b)(ii) or other satisfaction), that provide for the full and unconditional release of any and all Liens and other security interests on the Acquired Assets (subject, in each case, only to delivery of funds as arranged by Buyer). To the extent required to effect the release in the previous sentence, such Payoff Letter shall include UCC-3 termination statements and fully executed short-form termination and release agreements with respect to any and all security interests in intellectual property that, when filed or recorded, as the case may be, will be sufficient to release any and all such security interests in intellectual property, and the authorization for the Sellers to file or record such documents (unless already filed concurrently with delivery of such Payoff Letter).

"Pending Inventory" shall mean the Ordered Inventory and the Prepaid Inventory.

"Permits" shall mean, with respect to any Lease Premises or Owned Real Property, all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates (including all certificates of occupancy), building permits, fire, health and safety permits, site plan approvals and all other planning approvals, zoning variances, conditional or special use permits (including for firearms or other special occupancies or uses), general assembly or general use permits or other similar documentation, and all Environmental Permits, approvals, clearances and Orders of a Governmental Authority.

"Permitted Encumbrances" shall mean Permitted Post-Closing Encumbrances and Permitted Pre-Closing Encumbrances.

"Permitted Post-Closing Encumbrances" shall mean (i) with respect to real property leased or owned by Sellers, zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property, (ii) non-monetary encumbrances to the extent that the Approval Order does not in fact release any such Encumbrance upon Closing, (iii) any encumbrances on the interest of any landlord or sublandlord or underlying fee interest of any Acquired Lease and (iv) as otherwise set forth on Schedule 1.1(i).

"Permitted Pre-Closing Encumbrances" shall mean (i) with respect to real property leased or owned by Sellers, zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property and defects of title, easements, rights of way, covenants and restrictions, and any other encumbrance, in each case, that do not, individually or in the aggregate, materially affect the value and do not materially interfere with the use and operation of the assets to which they relate, (ii) other non-monetary Encumbrances that do not, individually or in the aggregate, materially interfere with the use or market value of the assets to which they relate or which will be cleared by the Bankruptcy Court, (iii) any encumbrances on the interest of any landlord or sublandlord or underlying fee interest of any Acquired Lease, (iv) non-exclusive licenses to Intellectual Property granted to customers, suppliers and other service providers of

25

Sellers to the extent necessary for their respective use of the products and services of the Business or for the provision of services to Sellers and its Subsidiaries in connection therewith and entered into in the Ordinary Course of Business, (v) liens for Taxes that are not delinquent or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained to the extent required in accordance with GAAP, (vi) mechanics', carriers', workmen's, repairmen's or other similar liens arising or incurred in the Ordinary Course of Business for amounts which are (x) not due and payable and (y) not, individually or in the aggregate, material to the Business or the Acquired Assets, (vii) such other imperfections in title, charges, easements, restrictions and encumbrances which do not secure an obligation to pay money or materially interfere with the use or market value of the assets to which they relate and (viii) as otherwise set forth on Schedule 1.1(j).

"Person" shall mean any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Petition Date" shall have the meaning set forth in the Recitals.

"Pharmacy Receivables" means Accounts (as defined under the UCC) arising from the sale of prescription drugs or other Inventory which can be dispensed only through an order of a licensed professional (including, for the avoidance of doubt, for pharmacy scripts).

"Plans and Permits" shall mean, with respect to any Lease Premises or Owned Real Property, all related reports (including engineering and environmental), surveys (boundary and topographical), plans, blueprints and other schematics, franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates (including all certificates of occupancy), building permits, fire, health and safety permits, site plan approvals and all other planning approvals, zoning variances, conditional or special use permits (including for firearms or other special occupancies or uses), general assembly or general use permits or other similar documentation, and all Environmental Permits, approvals, clearances and Orders of a Governmental Authority, together with all architect, engineer, contractor, vendor and supplier warranties and guarantees with respect to any of the foregoing and/or the related Improvements.

"Potential Acquired Assets" shall mean all assets of Seller of any kind that either (i) constitute an Acquired Asset (other than Leases or Contracts) or (ii) constitute Potential Transferred Agreements.

"Potential Transferred Agreement" shall mean (i) all Leases and (ii) all other Contracts Related to the Business to which a Seller is a party and all IP Licenses, excluding, in each case, this Agreement, the Approval Order, the Existing Financing Arrangements and any other Transaction Documents, and any engagement letters or agreements between any Seller and any estate professionals retained by such Seller. For the avoidance of doubt, the foregoing Leases and Contracts are required to be listed on the list provided by the Seller to Buyer within five (5) Business Days following the date hereof in accordance with Section 2.7.

"Pre-Assignment Tax Period" shall mean, with respect to any Acquired Asset, Acquired Property or Assumed Liability, any taxable period (or portion thereof) ending on or before the date

26

on which (i) the sale, transfer, assignment, conveyance or delivery of, or relating to, such Acquired Asset or Acquired Property to Buyer (or an applicable Assignee) or (ii) the assumption of such Assumed Liability by Buyer (or an applicable Assignee), in each case, is consummated, which date shall be the Closing Date or the applicable Designation Assignment Date pursuant to the terms of this Agreement.

"<u>Prepaid Inventory</u>" shall mean all Inventory that has been paid for by Sellers prior to the Closing Date but as to which Sellers have not taken title or delivery as of the Closing Date.

"<u>Prepaid Inventory Shortfall Amount</u>" shall mean an amount equal to $147,000,000 less the amount of the Prepaid Inventory as of the Closing Date; <u>provided</u>, that if the Warranty Receivables Shortfall Amount is a negative number, the Prepaid Inventory Shortfall Amount shall be reduced by the absolute value of the Warranty Receivables Shortfall Amount.

"<u>Proceeding</u>" shall mean any claim, as defined in the Bankruptcy Code, action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"<u>Product Catalogs and Manuals</u>" shall mean all product catalogs, manuals and user guides, in each case created or developed by or on behalf of any Seller.

"<u>Property</u>" shall mean any (i) each Lease Premises and (ii) each Owned Real Property.

"<u>Property Taxes</u>" shall have the meaning set forth in <u>Section 2.1(i)</u>.

"<u>Purchase Price</u>" shall have the meaning set forth in <u>Section 3.1</u>.

"<u>Real Estate Financing</u>" shall have the meaning set forth in <u>Section 7.4(a)</u>.

"<u>Real Estate Financing Commitment Letter</u>" shall have the meaning set forth in <u>Section 7.4(a)</u>.

"<u>Real Estate Loan 2020</u>" shall mean the loan extended pursuant to that certain Third Amended and Restated Loan Agreement, dated June 4, 2018 (as at any time amended, restated, amended and restated, supplemented or otherwise modified), among Sears, Roebuck and Co,, Kmart Stores of Illinois LLC, Kmart of Washington LLC, Kmart Corporation, SHC Desert Springs, LLC, Innovel Solutions, Inc., Sears Holdings Management Corporation, MaxServ, Inc., Troy Coolidge No 13, LLC, Sears Development Co. and Big Beaver of Florida Development, LLC, collectively as borrowers, SHC, as guarantor, JPP, LLC as agent, and JPP, LLC, JPP II LLC and Cascade Investment, L.L.C., as lenders.

"<u>Real Estate Loan 2020 Buyout Amount</u>" shall have the meaning set forth in <u>Section 3.1(c)</u>.

"<u>Related</u>" to any business, asset or Liability, shall mean owned or held primarily by, required primarily for, or used, intended for use, leased or licensed, primarily in connection with,

or (in the case of Liabilities) to the extent accrued, reserved or incurred in connection with, such business, asset or Liability.

"Representative" shall mean, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Represented Employees" shall have the meaning set forth in Section 9.7.

"Required Information" means (x) the financial information regarding the Sellers necessary and requested in writing from the Sellers prior to the date hereof for Buyer to prepare the pro forma financial statements referenced in paragraph 5(i) of Exhibit C of the ABL Commitment Letter and (y) the financial statements regarding the Sellers referenced in paragraph 5(ii) of Exhibit C of the ABL Commitment Letter; (*provided*, that Buyer acknowledges that as of the date of this Agreement Buyer has received the financial information and financial statements referred to in clauses (x) and (y) of this definition).

"Retained Books and Records" shall mean (i) any documents that Sellers are required by applicable Law to retain, provided that a copy of such Books and Records that is also related to the Business, the Acquired Assets or the Assumed Liabilities shall be included in Books and Records, and Sellers shall redact from any copies included in the Retained Books and Records any information to the extent related to the Business, the Acquired Assets or the Assumed Liabilities to the extent permitted by applicable Law, (ii) corporate seals, minute books, charter documents, corporate stock record books, original Tax Returns and such other books and records, in each case, as pertaining to the organization, or share capitalization of any of Sellers, (iii) any documents, instruments, records and other written or electronic material in whatever form or media exclusively related to any of the Excluded Assets or Excluded Liabilities, (iv) copies of any Books and Records or information Related to any Excluded Assets or Excluded Liabilities, provided that a copy of such Books and Records that is also related to the Business, the Acquired Assets or the Assumed Liabilities shall be included in Books and Records, (v) confidential personnel and medical records pertaining to current and former directors, officers, employees, consultants and independent contractors of the Sellers solely to the extent that a transfer of such information would be in violation of applicable Laws and provided that Sellers shall reasonably cooperate with Buyer to enter into any Contracts that Buyer may reasonably request in order to render the provision of such information compliant with all applicable Laws, (vi) documents relating to proposals to acquire the Business or the Acquired Assets or any part thereof by any Person other than Buyer, (vii) all documents prepared in connection with this Agreement or the Transactions and (viii) all documents primarily relating to the Bankruptcy Case and copies of all documents relating to the Bankruptcy Case.

"Sears Marks" shall mean the name "SEARS" and any name consisting of, containing or incorporating "SEARS", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

"Sears Re" shall mean Sears Reinsurance Company Ltd., a Bermuda Class 3 insurer.

28

"Second Lien Credit Agreement" shall mean that certain Second Lien Credit Agreement, dated as of September 1, 2016 by and among Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, SHC, JPP LLC, as administrative agent and collateral administrator, JPP LLC and JPP II LLC, as lenders, and the guarantors party thereto from time to time.

"Second Lien Line of Credit Facility" shall mean the line of credit facility granted pursuant to an amendment to the Second Lien Credit Agreement.

"Second Lien Term Loan" shall mean the term loan granted pursuant to the Second Lien Credit Agreement.

"Second Lien PIK Notes" shall mean those certain 6 5/8% secured convertible notes due October 2019, issued by SHC pursuant to that certain Indenture, dated March 20, 2018 (as at any time amended, restated, amended and restated or otherwise modified) by and among SHC, as issuer, Computershare Trust Company, N.A., as trustee, and California Builder Appliances, Inc., Florida Builder Appliances, Inc., Kmart Corporation, Kmart Holding Corporation, Kmart Operations LLC, Sears Operations LLC, Sears, Roebuck and Co., Sears Holdings Management Corporation, Sears Home Improvement Products, Inc., Sears Roebuck Acceptance Corp., A&E Factory Service, LLC, A&E Home Delivery, LLC, A&E Lawn & Garden, LLC, A&E Signature Service, LLC, KLC, Inc., Kmart of Michigan, Inc., Private Brands, Ltd., Sears Brands Management Corporation, Sears Protection Company, Sears Protection Company (Florida) L.L.C., Sears Roebuck de Puerto Rico, Inc., SOE, Inc., Starwest, LLC, Kmart.com LLC, Kmart of Washington LLC, Kmart Stores of Illinois LLC, Kmart Stores of Texas LLC, and Mygofer LLC, as guarantors.

"Securities Consideration" means debt or equity securities in Buyer, in an amount and form to be determined by Buyer in an amount and form reasonably acceptable to Buyer, including as to subordination.

"Security Deposit Documents" shall have the meaning set forth in Section 2.1(o).

"Security Deposits" shall have the meaning set forth in Section 2.1(o).

"Seller" and "Sellers" shall have the meanings set forth in the Preamble.

"Seller Instructions" shall have the meaning set forth in Section 2.8(c).

"Seller Retained Occupancy Agreement" shall mean that certain Seller Retained Occupancy Agreement in the form attached hereto as Exhibit F.

"Seller SEC Reports" shall have the meaning set forth in Section 6.12.

"Seller Products" shall mean any product manufactured, sold, offered for sale or otherwise distributed by a Seller within the scope of the Business.

"Seller Releasing Party" shall have the meaning set forth in Section 9.13.

29

"Seller Services" shall mean any service of the type provided by a Seller within the scope of the Business.

"Seritage Master Lease" shall mean the Master Lease by and among Seritage SRC Finance LLC, Seritage KMT Finance LLC, Kmart Operations, LLC, and Sears Operations, LLC, dated as of July 7, 2015, as modified by the Side Letter to Master Lease, by and among Seritage SRC Finance LLC, Seritage KMT Finance LLC, Kmart Operations, LLC, and Sears Operations, LLC, dated as of July 7, 2015.

"Service Providers" shall mean the current and former directors, officers, employees, consultants and independent contractors of Sellers and their Affiliates.

"ServiceLive Marks" shall mean the name "SERVICELIVE" and any name consisting of, containing or incorporating "SERVICELIVE", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

"Severance Reimbursement Obligations" shall have the meaning set forth in Section 9.7(i).

"SHC" shall have the meaning set forth in the Preamble.

"SHIP Closing" shall mean the Closing (as defined in the SHIP Purchase Agreement).

"SHIP Purchase Agreement" means that certain SHIP Asset Purchase Agreement entered into as of November 2, 2018 by and between SHC, a Delaware corporation, and Service.com, Inc., a Delaware corporation (as may be amended from time to time).

"SHIP Purchase Agreement Assets"  means the Transferred Assets (as defined in the SHIP Purchase Agreement).

"SHIP Purchase Agreement Liabilities" means the Assumed Liabilities (as defined in the SHIP Purchase Agreement).

"Shop Your Way Marks" shall mean the name "SHOP YOUR WAY" and any name consisting of, containing or incorporating "SHOP YOUR WAY", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

"Short Form Assignments" shall mean (i) with respect to any Trademarks, Patents or Copyrights issued, filed or registered in the United States and included in the Acquired Intellectual Property, agreements substantially in the form of Schedule 1, Schedule 2 or Schedule 3 of the IP Assignment Agreement, (ii) with respect to any Domain Names included in the Acquired Intellectual Property, an agreement substantially in the form of Schedule 4 of the IP Assignment Agreement and (iii) with respect to any Intellectual Property included in the Acquired Intellectual Property that is issued, filed or registered in a jurisdiction outside of the United States, an assignment agreement suitable for recording in the relevant jurisdictions with terms and conditions substantially similar to those set forth in Schedule 1, Schedule 2 or Schedule 3 of IP Assignment

Agreement, except for any different terms and conditions that would be necessary in a recordable assignment agreement for the respective local jurisdiction, in each case of clauses (i) thorough (iii) to be entered into by and between a Seller, on the one hand, and Buyer or its applicable Affiliates, on the other hand (clauses (i) through (iii) shall include each of the issued, registered or applied-for items of Intellectual Property included in the Acquired Intellectual Property).

"Smart Sense Marks" shall mean the name "SMART SENSE" and any name consisting of, containing or incorporating "SMART SENSE", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

"Software" shall have the meaning set forth in the definition of Intellectual Property.

"Sparrow Properties" shall mean the real properties set forth on Schedule 1.1(q).

"Specified Receivables" shall mean the accounts receivable set forth on Schedule 1.1(k).

"Specified Receivables Shortfall Amount" shall mean an amount equal to $255,200,000 less the amount of the Specified Receivables delivered to Buyer at Closing.

"Sponsor" shall have the meaning set forth in Section 7.4(a).

"Straddle Period" shall have the meaning set forth in Section 9.2(d).

"Store Cash" shall mean any cash of the Sellers in the registers or otherwise held at any Operating Lease Property or any Operating Owned Property, in an amount not to exceed $17,000,000.

"Subsidiary" shall mean, with respect to any Person, any other Person where a majority of its outstanding voting or equity interests are held, directly, or indirectly through one or more intermediaries, by such Person.

"Tax" or "Taxes" shall mean any federal, state, provincial, local, municipal, foreign or other taxes, duties, levies, governmental charges or assessments or deficiencies thereof, including all income, alternative, minimum, franchise, capital stock, net worth, capital gains, profits, intangibles, gross receipts, value added, sales, use, goods and services, excise, customs, transfer, recording, occupancy, employment, unemployment, social security, payroll, withholding, estimated or other taxes, duties, levies or other governmental charges or assessments or deficiencies thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Tax Opinion" shall mean an opinion at a "more likely than not" or higher standard as to the tax consequences of any of the transactions described in Article II.

"Tax Proceeding" shall mean any audit, examination, investigation or other administrative or judicial proceeding with or against any Governmental Authority or otherwise with respect to Taxes.

31

"Tax Reorganization" shall have the meaning set forth in Section 2.12.

"Tax Result" shall mean (i) the minimization of the net amount of Taxes imposed on, and (ii) the maximization of the aggregate amount of the Tax attributes described in section 108(b)(2) of the Code available for utilization by, in each case, (x) Buyer or the group of affiliated corporations (within the meaning of section 1504(a) of the Code) of which Buyer is the parent (or a member) or (y) Buyer or any combined group of which it is a member for state Tax purposes.

"Tax Return" shall mean any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"Third Amended and Restated Credit Agreement" shall mean that certain Third Amended and Restated Credit Agreement dated as of July 21, 2015 (as at any time amended, restated, amended and restated, supplemented or otherwise modified), by and among Sears Roebuck Acceptance Corp. and Kmart Corporation, as borrowers, SHC, Bank of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Bank, National Association as co-collateral agent, Wells Fargo Bank, National Association as syndication agent, PNC Bank, National Association, Siemens Financial Services, Inc., Ally Bank and Citigroup Global Markets Inc. as co-documentation agents, Merrill Lynch Pierce, Fenner & Smith Incorporated, Wells Fargo Bank, National Association, as joint lead arrangers, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Wells Fargo Bank, National Association, PNC Bank, National Association and Citigroup Global Markets Inc. as joint bookrunners pursuant to which Third Amended and Restated Credit Agreement Sears Roebuck Acceptance Corp. and Kmart Corporation entered into two senior secured term loan facilities as well as a $1.5 billion asset-based revolving credit facility with a syndicate of lenders.

"Title Company" shall have the meaning set forth in Section 9.9.

"Titled Property" shall have the meaning set forth in Section 9.9.

"Trademarks" shall have the meaning set forth in the definition of Intellectual Property.

"Transaction Documents" shall mean this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transactions" shall mean the transactions contemplated to be consummated by this Agreement and the Transaction Documents, including the purchase and sale of the Designation Rights and the Acquired Assets and the assumption of the Assumed Liabilities provided for in this Agreement.

"Transfer Taxes" shall have the meaning set forth in Section 9.3(a).

"Transferred Employees" shall have the meaning set forth in Section 9.7(a).

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in the State of Delaware.

"Wally Marks" shall mean the name "WALLY" and any name consisting of, containing or incorporating "WALLY", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar Law (including any similar local, state or non-U.S. notice requirement relating to the termination of employees), and the rules and regulations thereunder.

"Warranty Receivables" shall mean those certain accounts receivable set forth on Schedule 1.1(l).

"Warranty Receivables Shortfall Amount" shall mean an amount equal to $53,600,000 less the amount of the Warranty Receivables delivered to Buyer at Closing; provided, that if the Prepaid Inventory Shortfall Amount is a negative number, the Warranty Receivables Shortfall Amount shall be reduced by the absolute value of the Prepaid Inventory Shortfall Amount.

"Weatherbeater Marks" shall mean the name "WEATHERBEATER" and any name consisting of, containing or incorporating "WEATHERBEATER", and all designs and logos associated therewith, in each case, together with all variations thereof; and all Trademarks, Business Names, Domain Names and Media Accounts consisting of, containing or incorporating any of the foregoing.

Section 1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Any reference in this Agreement to "dollars" or "$" means U.S. dollars.

(iii)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules.  No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  Solely to the extent any Schedule

33

is related to any representation or warranty contained in this Agreement, any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules relating to representations or warranties contained in this Agreement if the relevance of such disclosure to such other Schedule is reasonably apparent on the face of such disclosure.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(vi)    Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if."

(viii)    The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)    References to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or."

(b)    No Strict Construction.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of the Acquired Assets</u>.  Upon the terms and subject to the conditions of this Agreement, and subject to <u>Section 2.6</u> and <u>Article V</u> with respect to the Designation Rights and Designatable Leases, and <u>Section 2.7(d)</u>, <u>Section 2.9</u> and <u>Article V</u> with respect to Additional Contracts, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall purchase, all right, title and interest of Sellers, in, to or under all assets, properties and rights Related to the Business other than the Excluded Assets, and the following assets, properties and rights (collectively, the "<u>Acquired Assets</u>") free and clear of any and all Encumbrances of any kind, nature or description and any Claims, in each case other than Permitted Post-Closing Encumbrances and those rights subject to Section 365(n) of the Bankruptcy Code to the extent applicable:

(a)    the Assigned Agreements and the Designation Rights;

(b)    all Acquired Lease Rights;

(c)    all Owned Real Property;

(d)    all Acquired Inventory, all Acquired Receivables, all Acquired Equipment and all Acquired Improvements;

(e)    all Intellectual Property owned (whether solely or jointly with others) by Sellers, including (i) the Sears Marks, the Kmart Marks, the Shop Your Way Marks, the ServiceLive Marks, the PartsDirect Marks, the Wally Marks, the Smart Sense Marks, the Weatherbeater Marks, the Kenmore Marks registered or applied for outside of the United States and the DieHard Marks registered or applied for outside of the United States, (ii) the Trademarks, listed on <u>Schedule 2.1(a)(i)</u> attached hereto, (iii) the Business Names listed on <u>Schedule 2.1(a)(ii)</u> attached hereto, (iv) the Patents listed on <u>Schedule 2.1(a)(iii)</u> attached hereto, (v) the Copyrights listed on <u>Schedule 2.1(a)(iv)</u> attached hereto, (vi) the Domain Names listed on <u>Schedule 2.1(a)(v)</u> attached hereto, (vii) the Media Accounts listed on <u>Schedule 2.1(a)(vi)</u> attached hereto and (viii) all Intellectual Property that constitutes "Collateral" as defined in the Intellectual Property Security Agreement (collectively, the "<u>Acquired Intellectual Property</u>"), in each case of the foregoing together with the rights (A) to sue and recover damages and obtain equitable relief for past, present and future infringement, misappropriation, dilution or other violation thereof, (B) to collect past and future royalties and other payments thereunder, (C) to claim priority thereon under any Law, (D) to prosecute, register, maintain and defend such Intellectual Property before any public or private agency, office or registrar and (E) to fully and entirely stand in the place of Sellers, as applicable, in all matters related thereto; for the avoidance of doubt, Buyer and Sellers hereby acknowledge and agree that as of the Closing Date, Buyer shall be the successor in interest to each of the businesses of Sellers to which the Trademarks included in the Acquired Intellectual Property pertain, and such businesses shall be ongoing and existing;

(f)    all goodwill and other intangible assets associated with or connected to the Business or symbolized by any of the Acquired Intellectual Property and all goodwill of the businesses in which the Trademarks and Business Names included in the Acquired Intellectual Property are used and all goodwill connected with the use of and symbolized by the foregoing;

(g)    (i) all data owned or controlled (meaning any data Sellers have the ability to transfer in compliance with applicable Law) by any of the Sellers and contained in Sellers' IT Systems, data centers or databases stored by third parties on behalf of Sellers or otherwise collected, accessed, acquired, stored, protected, used, re-used or otherwise processed by or on behalf of a Seller to the extent the sale or transfer of such data is not in contravention with applicable Law or any of any Seller's applicable privacy policies or contractual restrictions, (ii) Customer Data to the extent the sale or transfer of such Customer Data is not in contravention with applicable Law or any of any Seller's applicable privacy policies or contractual restrictions and (iii) all other data that constitutes "Collateral" as defined in the Intellectual Property Security Agreement, to the extent the sale or transfer of such data is not in contravention with applicable Law or any of any Seller's applicable privacy policies or contractual restrictions (the data described in this clause (iii), together with the data described in clauses (i) and (ii), the "Acquired Data");

(h)    any Claims, causes of action, claims, rights of recovery or rights of set-off arising under any IP Licenses included in the Assigned Agreements on or after the Closing Date, and the right to collect past and future royalties and other payments, as well as prepaid expenses of Sellers thereunder;

(i)    any and all real (including real estate taxes, assessments and related governmental impositions both general and special imposed under the laws of any one or more jurisdictions in which the applicable Lease Premises is located against the land, buildings and other improvements), personal and intangible property Taxes ("Property Taxes") that are prepaid with respect to such Acquired Lease or any other related Acquired Assets; provided, that such Property Taxes are Assumed Liabilities or Liabilities for which Buyer is otherwise responsible hereunder;

(j)    any interest in or right to any refund, rebate or credit of Taxes that are Assumed Liabilities or for which Buyer is otherwise responsible hereunder including (for the avoidance of doubt) any such refund, rebate or credit of a Tax that becomes payable or available to Sellers in the future in respect of a Tax previously paid or otherwise incurred by Buyer pursuant to Section 3.5;

(k)    all rights (but not obligations) of Sellers under any non-disclosure or confidentiality, non-compete or non-solicitation agreements, to the extent any such agreement relates to the Business or any Acquired Asset;

(l)    all assignable Assigned Plans and Permits that are Related to the Business;

(m)    any and all Books and Records (which, with respect to any electronic forms thereof, may be copies) and any and all Intellectual Property Related Documentation;

(n)    all Labeling and Marketing Materials and Product Catalogs and Manuals owned by Sellers;

36

(o)     any and all rights of Sellers in and to any restricted cash, security deposits, letters of credit, escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit, utility deposits, performance, payment or surety bonds, credits, allowance, prepaid rent or other assets, charges, setoffs, prepaid expenses, other prepaid items and other security (collectively, "Security Deposits"), together with all contracts, agreements or documents evidencing or related to the same (collectively, "Security Deposit Documents"), in each case to the extent related to any Acquired Asset;

(p)     any and all Claims (other than returns of merchandise for warranty claims (except, for the avoidance of doubt, to the extent comprising Assumed Liabilities) and excluding any Claims Related to an Excluded Asset or Excluded Liability) of Sellers as of the Closing to the extent related to the Business or any Acquired Asset;

(q)     subject to Section 5.1(a)(v), Section 5.1(a)(vi) and Section 9.8(c), any and all insurance proceeds, warranty proceeds, condemnation awards or other compensation in respect of loss or damage to the Business or any Acquired Asset (and any right or claim of Sellers to any such proceeds, awards or other compensation), in each case, to the extent relating to a casualty occurring prior to, on or after the date hereof, and whether received prior to, on or after Closing Date, but less any proceeds in respect of the Acquired Assets set forth on Schedule 2.1(q) in an aggregate amount not to exceed $13,000,000.

(r)     subject to Section 2.8(e), the KCD Notes from Sears Re as Seller;

(s)     all equity interests of SRC O.P. LLC owned by SRC Sparrow 2 LLC as Seller; provided, that if either (i) SRC Sparrow 2 LLC has filed a petition for relief commencing a case under chapter 11 of the Bankruptcy Code for the purpose of selling such equity interests in SRC O.P. LLC, and Buyer or its Affiliate has purchased such equity interests pursuant to a chapter 11 plan of reorganization or a sale of assets pursuant to section 363(m) of the Bankruptcy Code or (ii) Buyer shall have acquired the Sparrow Properties pursuant to foreclosure, then Buyer shall be deemed to have purchased the equity interests in SRC O.P. LLC described in this subsection (s);

(t)     all Actions and other rights, rebates, refunds, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise), in each case to the extent related to the Business or any Acquired Asset (excluding for the avoidance of doubt, any Claims arising under any Transaction Document), including, subject to the terms and conditions of the SHIP Purchase Agreement and applicable Law, if the SHIP Closing shall have occurred prior to the Closing Date, the indemnities set forth in Section 6.08(b) and Section 6.08(e) of the SHIP Purchase Agreement;

(u)     all Contracts Related to the Business (i) that include a manufacturer's warranty relating to Seller Products or Seller Services and (ii) relating to repair services provided by the Business in relation to Seller Products or Seller Services;

(v)     the Buyer Party Release;

37

(w)     all assets, properties and rights that constitute "Collateral" as defined in the Intellectual Property Security Agreement, other than data which is the subject of Section 2.1(g); and Intellectual Property which is the subject of Section 2.1(e);

(x)     the right to receive the Pending Inventory;

(y)     the Credit Card Claims;

(z)     either (i) the SHIP Purchase Agreement Assets, if the SHIP Closing shall not have occurred prior to the Closing Date (in which circumstance, for the avoidance of doubt, any Owned Real Property (as defined in the SHIP Purchase Agreement) shall be deemed Operating Owned Property, and all Leased Real Property (as defined in the SHIP Purchase Agreement) shall be deemed Operating Leased Property), or (ii) any and all proceeds received by Sellers pursuant to the SHIP Purchase Agreement, if the SHIP Closing shall have occurred prior to the Closing Date;

(aa)    the Store Cash;

(bb)    to the extent permitted by Law, all licenses or permits granted by any Governmental Authority held by Sellers that are necessary for the provision or assumption of the PA Liabilities; and

(cc)    any proceeds from the sale or other disposition of the collateral pledged to secure the applicable debt obligations with respect to the credit bids set forth in Section 3.1(b) to which the holders of Claims secured by such collateral has attached.

Section 2.2    Excluded Assets.   Nothing contained herein shall be deemed to sell, transfer, assign, convey or deliver, or cause to be sold, transferred, assigned, conveyed or delivered, any right, title or interest of Sellers in, to or under the Excluded Assets.  "Excluded Assets" shall mean:

(a)     any Contract that is not an Assigned Agreement;

(b)     any lease, sublease or similar agreement that is not a Lease and any Designatable Lease that is not designated for assumption by the Seller and assignment to Buyer pursuant to the terms of this Agreement;

(c)     any real property interest of any kind or nature that is not Related to Owned Real Property or the Assigned Leases;

(d)     all Excluded Inventory, all Excluded Equipment and all Excluded Improvements;

(e)     this Agreement and the other Transaction Documents;

(f)     except as otherwise expressly included as Acquired Assets, all cash and cash equivalents (including any cash of the Sellers in the registers or otherwise held at any Operating Lease Property or any Operating Owned Property in excess of Store Cash), including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits;

38

(g)    the Retained Books and Records;

(h)    any interest in or right to any refund, rebate or credit of Excluded Asset-Reorganization Taxes (including, for the avoidance of doubt, with respect to any Taxes for which Sellers remain liable); provided, however, that if Buyer makes the election under Section 2.12(b) to treat all the transactions described in this Article II as Designated Sale Transactions (resulting in no transfer of Sellers' Tax attributes to Buyer), then this Section 2.2(h) shall also include any interest in or right to any refund, rebate or credit of Excluded Asset-Sale Taxes;

(i)    all Claims and Proceedings of Sellers (other than Claims described in Section 2.1(p));

(j)    all Avoidance Actions;

(k)    the Excluded IT;

(l)    except as otherwise expressly included as Acquired Assets, all shares of capital stock or other equity interests of any Seller or Subsidiary of the Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller, Subsidiary of the Seller or any other Person;

(m)    all Employee Plans, including any assets, trust agreements or other funding Contracts related thereto;

(n)    all bank accounts;

(o)    any accounts receivable other than the Acquired Receivables;

(p)    if the SHIP Purchase Agreement shall have terminated prior to the Closing Date, all rights of any Seller to (i) the Deposit Escrow Amount (as defined in the SHIP Purchase Agreement) or (ii) any other claims against Buyer (as defined in the SHIP Purchase Agreement); and

(q)    the SHIP Asset Purchase Agreement Assets (if the SHIP Closing shall have occurred prior to the Closing Date).

Section 2.3    Assumption of Liabilities.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date Buyer, or the applicable Assignee, shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities (collectively, the "Assumed Liabilities"):

(a)    all Liabilities of the Seller or any of its Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets on or after the Closing Date that are Related to any Acquired Asset;

(b)    all Liabilities arising on or after the Closing Date or Designation Assignment Date, as applicable, relating to the payment or performance of obligations with respect to the Assigned Agreements;

(c)      all Liabilities arising on or after the Closing Date from or related to any Claim, Action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) arising out of the Assumed Liabilities, the Acquired Assets or the operation of the Business on or after the Closing Date (but not prior to the Closing Date) or relating to facts, actions, omissions, circumstances or conditions existing, occurring or accruing on or after the Closing Date (but not prior to the Closing Date) that are Related to the Acquired Assets or the Assumed Liabilities;

(d)      Buyer's obligation to pay the Buyer Occupancy Costs;

(e)      subject to Section 2.8(e), all Liabilities for warranties and protection agreements or other services contracts (other than warranties relating to Intellectual Property) for the goods and services of Sellers sold or performed prior to the Closing, including any Liabilities owed by Sears Re to any Seller in respect of reinsurance of such warranties and protection agreements (the "PA Liabilities");

(f)      all Assumed Customer Credits;

(g)      all Cure Costs solely with respect to the Assigned Agreements;

(h)      all Excluded Asset-Sale Taxes (except if otherwise provided in Section 2.4(i));

(i)      all Liabilities resulting from actions or inactions taken by the Sellers or any Affiliate of Sellers in compliance with Section 9.2;

(j)      all Liabilities with respect to the Transferred Employees (i) to the extent arising as a result of an event, action or omission that occurs on or following the Closing or (ii) expressly assumed by Buyer and its Subsidiaries  pursuant to Section 9.7;

(k)      the Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities, Other Payables and all payment obligations with respect to the Ordered Inventory; provided, that:

(i)      Buyer shall not be required to make any payments with respect to the Other Payables until the later of (1) the Closing Date and (2) the date that the applicable obligation thereunder becomes due in the Ordinary Course of Business;

(ii)      Buyer shall not be required to make any payments with respect to Assumed 503(b)(9) Liabilities until the earlier of (1) the date that is 120 days following the Closing Date and (2) the date on which a chapter 11 plan of reorganization is confirmed by the Bankruptcy Court with respect to the Debtors;

(iii)      Buyer's obligations with respect to the Severance Reimbursement Obligations shall not exceed $43,000,000 in the aggregate, and notwithstanding Section 2.3(k)(i), the timing of such reimbursement shall be made in accordance with Section 9.7(i);

(iv)     Buyer's obligations with respect to the Assumed 503(b)(9) Claims shall not exceed $139,000,000 in the aggregate;

(v)     Buyer's obligations with respect to the Other Payables shall not exceed $166,000,000 in the aggregate;

(vi)     In the event that the Aggregate DIP Shortfall Amount is a positive number, Buyer's obligations to assume the Liabilities described in this clause (k) shall be reduced dollar for dollar by the Aggregate DIP Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Aggregate DIP Shortfall Amount: *first*, the Severance Reimbursement Obligations, *second*, the Other Payables and *third*, the Assumed 503(b)(9) Claims.  The allocation of any reduction determined in accordance with the previous sentence of (A) the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims and (B) the amount of the Other Payables among any specific Other Payables shall be determined by Buyer in its sole discretion;

(vii)     In the event that the Specified Receivables Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Specified Receivables Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Specified Receivables Shortfall Amount: *first*, the Severance Reimbursement Obligations and *second*, the Assumed 503(b)(9) Claims.  The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion;

(viii)     In the event that the Warranty Receivables Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Warranty Receivables Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Warranty Receivables Shortfall Amount: *first*, the Severance Reimbursement Obligations and *second*, the Assumed 503(b)(9) Claims.  The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion;

(ix)     In the event that the Prepaid Inventory Shortfall Amount is a positive number, Buyer's obligations to assume the Severance Reimbursement Obligations and the Assumed 503(b)(9) Claims shall be reduced dollar for dollar by the Prepaid Inventory Shortfall Amount in the following order, until the aggregate amount of all such reductions is equal to the Prepaid Inventory Shortfall Amount: *first*, the Severance Reimbursement Obligations and *second*, the Assumed 503(b)(9) Claims.  The allocation of any reduction determined in accordance with the previous sentence of the amount of the Assumed 503(b)(9) Claims among any specific Assumed 503(b)(9) Claims shall be determined by Buyer in its sole discretion; and

41

(x)      Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Specified Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers.

(l)      the Assumed Property Tax Liabilities;

(m)      the SHIP Purchase Agreement Liabilities (if the SHIP Closing shall not have occurred prior to the Closing Date);

(n)      all Liabilities relating to amounts required to be paid by Buyer under the Transaction Documents; and

(o)      all Liabilities arising prior to, at or after the Closing Date under or pursuant to any Environmental Law relating to the presence of Hazardous Substances at, on, in, under or migrating to or from any Acquired Asset.

Section 2.4      Excluded Liabilities.   None of Buyer, any Affiliate of Buyer or any Assignee shall assume, be deemed to assume or become obligated hereunder in any way to pay or perform (whether as a successor to any Seller or otherwise) any Liabilities of any Sellers or any of their respective Affiliates of any kind or nature, known, unknown, contingent or otherwise, whether direct or indirect, matured or unmatured, other than the Assumed Liabilities, (the foregoing including the following, the "Excluded Liabilities") which shall include the following Liabilities:

(a)      all Liabilities of the Seller or any of its Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets prior to the Closing Date other than Cure Costs, Other Payables, the Assumed 503(b)(9) Claims, Severance Reimbursement Obligations, and Ordered Inventory;

(b)      all Liabilities relating to the payment or performance of obligations arising solely out of facts or circumstances in existence prior to the Closing Date or Designation Assignment Date, as applicable, with respect to the Assigned Agreements;

(c)      all Liabilities arising from or related to any claim, Action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) arising out of the Assumed Liabilities, the Acquired Assets or the operation of the Business prior to the Closing Date or relating to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date against any Seller or its Affiliates;

(d)      all Liabilities to the extent arising prior to the Closing Date or arising from or related to the operation of a Seller's business or any of Sellers' products or services, including any Liability relating to (i) design or manufacturing defects (whenever discovered) and (ii) warranties, product liability, safety or other Liability, in the cases of clauses (i) and (ii), relating to any product sold or manufactured by any Seller or any of its Affiliates;

42

(e)      all Liabilities in respect of any indebtedness of any Seller or guaranty obligations relating to any such Indebtedness of any Seller;

(f)      all Liabilities (i) under the Employee Plans, including all Liabilities in respect of (A) any compensation earned by any Business Employee or otherwise accrued or payable to or with respect to any Business Employee prior to the Closing, unless expressly assumed by Buyer pursuant to Section 9.7, and (B) any Taxes related thereto, (ii) relating to (A) all current and former employees of Seller and Service Providers and its Subsidiaries (including the Business Employees) to the extent arising as a result of an event, action or omission that occurs prior to the Closing and (B) all current and former employees of Seller and Service Providers and its Subsidiaries who do not become Transferred Employees (except to the extent subject to the Severance Reimbursement Obligations) and (iii) those Liabilities relating to the Transferred Employees expressly retained by Seller pursuant to Section 9.7;

(g)      except as otherwise provided for in Section 2.3(o), all Liabilities of the Seller or any of its Subsidiaries relating to (i) fines or penalties arising from noncompliance with Environmental Laws occurring prior to the Closing Date, including (ii) Claims for personal injury or property damage related to exposure occurring prior to the Closing Date to Hazardous Substances present at, on, in, under or migrating to or from any Acquired Asset or (iii) the offsite disposal of Hazardous Substances occurring prior to the Closing Date;

(h)      any Excluded Asset-Reorganization Taxes;

(i)      if (A) Buyer makes the election under Section 2.12(b) to treat all the transactions described in this Article II as Designated Sale Transactions (resulting in no transfer of Sellers' Tax attributes to Buyer), (B) such transactions do not result in a transfer of substantially all of Sellers' Tax attributes to Buyer solely as a result of Sellers' failure to make good faith efforts to comply with Section 9.2(a), or (C) the Internal Revenue Service successfully asserts (for which assertion there is a final determination), that none of Sellers' Tax attributes transferred to Buyer, Excluded Asset-Sale Taxes (but in the case of clause (C) in respect of a Tax arising in any period prior to any such final determination, only to the extent Sellers actually obtain a refund or other current economic Tax reduction in respect of the applicable Taxes); provided, however, that if Buyer makes the election under Section 2.12(b) to treat all the transactions described in this Article II as Designated Sale Transactions and the Internal Revenue Service successfully asserts that a transfer of any such Tax attributes to Buyer shall have occurred notwithstanding such Buyer election, then Excluded Asset-Sale Taxes shall not be an Excluded Liability to the extent any such tax would have been reduced or eliminated had the Sellers' Tax attributes not transferred to Buyer (taking into account Tax attributes Sellers would have had if all transactions described in Article II were Designated Sale Transactions and respected as such by the Internal Revenue Service);

(j)      all Liabilities with respect to any brokerage or finders' fees or agents' commissions or other similar payment in connection with the Transactions incurred by any Seller;

(k)      all Liabilities under this Agreement or any documents or instruments executed and delivered by Seller and its Affiliates pursuant to this Agreement;

43

(l)    all Liabilities relating to or arising, whether before, on or after the Closing Date or, subject to Article V, any applicable Designation Assignment Date, out of, or in connection with, the Excluded Assets;

(m)    all Liabilities in respect of any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs issued by, on behalf of or in relation to Sellers other than the Assumed Customer Credits;

(n)    all Liabilities related to or arising from, whether before, on or after the Closing Date, use by Sellers of any of the Trademarks or Business Names included in the Acquired Intellectual Property pursuant to Section 9.10;

(o)    except as otherwise provided in this Agreement, all Liabilities for the rejection of any Contract to which a Seller is a party;

(p)    the SHIP Purchase Agreement Liabilities (if the SHIP Closing shall have occurred prior to the Closing Date);

(q)    other than the liabilities assumed in accordance with Section 2.3(g) (Cure Costs) and 2.3(k) (Severance Reimbursement Obligations, Assumed 503(b)(9) Liabilities and Other Payables and the payment obligations with respect to the Ordered Inventory), accounts payable incurred in the Ordinary Course of Business existing on the Closing Date (including (i) invoiced amounts payable and (ii) accrued but uninvoiced accounts payable); and

(r)    the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5.

For the avoidance of doubt, all Taxes of any Seller shall be Assumed Liabilities, regardless of the time and circumstances giving rise to any such Taxes, except for any Tax expressly excluded under Section 2.2(h) or Section 2.4(i).

Section 2.5    Year-End Adjustments.    For the avoidance of doubt, notwithstanding anything to the contrary set forth in this Agreement, neither Buyer nor any Assignee shall have any obligations in respect of any portion of any year-end (or other) adjustment (including for royalties, rents, utilities, Taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under any of the Acquired Leases or any other Assigned Agreements for the calendar year in which the applicable Lease Assignment occurs that is attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y) any previous calendar year, and Sellers shall fully indemnify and hold harmless Buyer and the applicable Assignee with respect thereto. Buyer shall be solely responsible for any of the matters described in the preceding sentence for the portion of the calendar year in which the Closing Date occurs following each applicable Lease Assignment and all subsequent calendar years, and Buyer shall fully indemnify and hold Sellers harmless with respect thereto. Following the applicable Lease Assignment Date, except as expressly set forth in this Agreement or the Approval Order, Sellers shall have no further liabilities or obligations with respect to each of the Acquired Leases and the other Assigned Agreements (including obligations related to royalties rents, utilities, Taxes, insurance and common area maintenance, regardless of when due and payable), and Sellers

shall be released from all such obligations and Buyer shall indemnify and hold harmless Sellers with respect thereto.

Section 2.6    Purchase and Sale of Designation Rights.  Upon the terms and subject to the conditions of this Agreement and the Approval Order, on the Closing Date, Sellers shall sell, transfer, assign and convey, or cause to be sold, transferred, assigned and conveyed, to Buyer, and Buyer shall purchase from Sellers, the Designation Rights.  For the avoidance of doubt, the sale, transfer, assignment and conveyance of the Designation Rights provided for herein on the Closing Date shall not effectuate a sale, transfer, assignment or conveyance of any Designatable Lease to Buyer or any other Assignee, which shall only be effectuated on a Designation Assignment Date; provided, that, notwithstanding the foregoing, Buyer shall be responsible for all Expenses arising under or related to any Designatable Lease from and after the Closing Date until, if applicable, the rejection of such Designatable Lease in accordance with this Agreement.  Subject to the terms and conditions of this Agreement, the Approval Order and the requirements of section 365(b) of the Bankruptcy Code, Buyer shall have the right to designate itself or, with the consent of Seller, any other Person as the Assignee to which a Designatable Lease is to be assumed and assigned.  The Designation Rights shall terminate upon the expiration of the Designation Rights Period.

Section 2.7    Assignments.

(a)    Potential Transferred Agreements.

(i)    Schedule 2.7(a) contains a list of all Potential Transferred Agreements (including, to the extent in the possession or control of any Seller, the underlying agreements).  Subject to section 365 of the Bankruptcy Code, Buyer may elect to have the Potential Transferred Agreements assigned to Buyer or assumed by Seller and assigned to Buyer on the applicable Assumption Effective Date (which shall be deemed to be "Assigned Agreements" in accordance with the definition thereof). At Buyer's reasonable request, Seller shall make reasonably available to Buyer the appropriate employees of Seller necessary to discuss the Potential Transferred Agreements.

(ii)    To the extent a Potential Transferred Agreement is an executory contract or lease, as soon as practicable after the date hereof, Seller shall file a notice of assignment and assumption (an "Agreement Assignment Notice") with the Bankruptcy Court and serve such notice via electronic or first class mail on each counterparty to a Potential Transferred Agreement that is an executory contract or lease, consistent with the terms of the Bidding Procedures Order.   The Agreement Assignment Notice shall identify all Potential Transferred Agreements that are executory contracts or leases and related to the Acquired Assets that Sellers believe may be assigned or assumed and assigned in connection with the sale of the Acquired Assets and set forth a good faith estimate of the amount of the Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00").

(b)    Initial Assigned Agreements.

(i)     As soon as practicable after delivery of the list of Potential Transferred Agreements by the Seller but no later than five (5) Business Days following such delivery, Buyer shall deliver to the Seller a list of those Potential Transferred Agreements proposed to be assigned to Buyer or assumed by Seller and assigned to Buyer on the Closing Date (the Contracts on such list, the "Initial Assigned Contracts", the Leases on such list (including, to the extent applicable to such Leases, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders) the "Initial Assigned Leases", and together the "Initial Assigned Agreements").

(ii)     Following delivery of the list of Initial Assigned Agreements and to the extent consistent with the Bidding Procedures Order, at any time prior to the second (2nd) Business Day prior to the Closing Date, Buyer will be entitled, after consultation with the Sellers, to add (x) any Initial Assigned Agreement  to the list of Excluded Assets by providing written notice thereof to Sellers, and any Initial Assigned Agreement so added will cease to be an Initial Assigned Agreement and will be deemed to be an Excluded Asset (and all Liabilities thereunder Excluded Liabilities) for all purposes hereunder or (y) any Potential Transferred Agreement to the list of Initial Assigned Agreements so long as (1) it is not a Contract to be assumed or available to be assumed pursuant to any other sale previously approved by the Bankruptcy Court in connection with the Bankruptcy Cases; and (2) it is prior to the entry of a Final Order of the Bankruptcy Court approving the rejection of such Contract, in each case subject to the non-Debtor party to such Contract receiving information evidencing Buyer's adequate assurance of future performance and having an opportunity to object consistent with the Bidding Procedures Order and the Approval Order.  No change referred to in this Section 2.7(b)(i) shall reduce or increase the amount of the Purchase Price, except to the extent of any increase or decrease in the assumption of the Assumed Liabilities, including Cure Costs, as a result of the Potential Transferred Agreements being added to or removed from the list of Acquired Leases or Assigned Agreements by Buyer.

(iii)     On the Closing Date, pursuant to section 365 of the Bankruptcy Code and the Approval Order, and subject to consent if applicable Law requires it, Sellers shall assume and assign to Buyer the Initial Assigned Agreements and Buyer shall pay all Cure Costs with respect to such Initial Assigned Agreements to the appropriate counterparty or establish a reserve for disputed cure amounts in accordance with the Bidding Procedures Order and Approval Order.

(c)     Designatable Leases.  On each Assumption Effective Date, pursuant to section 365 of the Bankruptcy Code and the Approval Order, Sellers shall assume and assign to the applicable Assignee any Designatable Lease so designated by Buyer for assumption and assignment in accordance with the terms of this Agreement, and Buyer shall pay all or be responsible for Cure Costs with respect to such Designatable Leases.

(d)     Additional Contracts.  On each applicable Assumption Effective Date, and in no event later than the date that is five (5) Business Days following the Designation Deadline,

46

pursuant to section 365 of the Bankruptcy Code, the Approval Order, and any other applicable Order, Sellers shall assume and assign to the applicable Assignee any Additional Contract that Buyer designates for assumption and assignment in accordance with <u>Section 2.9</u>, and Buyer shall pay all Cure Costs with respect to such Additional Contract and all Expenses related to or arising under such Additional Contract after the Closing Date.

(e)     <u>Adequate Assurance and Consents</u>.     Notwithstanding anything to the contrary herein, Sellers shall not be obligated to assume and assign any Lease or Contract pursuant to this <u>Section 2.7</u> with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance or for which Consent is required to assume and assign such Lease or Contract and such Consent has not been obtained; <u>provided</u>, <u>however</u>, that the Parties shall use their commercially reasonable best efforts to obtain all such Consents.

Section 2.8     <u>Further Assurances</u>.

(a)     On and after the Closing Date, each of the Sellers and Buyer shall use its commercially reasonable efforts  to further give full effect to, evidence and record the assignments, waivers, ratifications, consents and agreements granted herein, and, Sellers shall, upon Buyer's request, assist Buyer in a commercially reasonable way to obtain, maintain, enforce and defend any rights specified to be owned by or assigned to a Seller, including by testifying in any legal Proceedings, executing all lawful papers and making all rightful oaths required or necessary to aid Buyer or its successors or assigns in obtaining and enforcing its right, title and interest in, to and under the Acquired Assets, including in connection with the IP Assignment Agreement and the Short Form Assignments and in complying with all requirements of the applicable social media sites and Domain Name registrars.

(b)     On each Designation Assignment Date, Seller shall, upon the request of Buyer or the applicable Assignee, execute and deliver to such Assignee such instruments of transfer as shall be reasonably necessary or desirable to vest in such Assignee title to the applicable Designatable Leases and related Acquired Lease Rights, Acquired Improvements and all other related Acquired Assets required hereunder to be transferred on such Designation Assignment Date (and evidence the assumption by Seller, and the assignment by Seller to the applicable Assignee, of such Designatable Leases), and Seller, on the one hand, and such Assignee, on the other hand, shall (and Buyer shall use commercially reasonable efforts to cause each Assignee to) take (or cause to be taken) all appropriate action, do (or cause to be done) all things necessary under applicable Law, and execute and deliver such instruments and documents, in each case as may be reasonably requested and reasonably necessary or desirable to consummate the Transactions at or after the Designation Assignment Date. In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing or on the applicable Designation Assignment Date, as applicable, Seller shall convey such Acquired Assets to Buyer or such Assignee, as applicable, as promptly as practicable after the Closing or on the applicable Designation Assignment Date, as applicable.  As promptly as practicable following the date on which Buyer is permitted to receive Customer Data constituting "personally identifiable information" (as defined in the Bankruptcy Code) that was not transferred on the Closing Date, Seller shall deliver to Buyer a copy of the Customer Data constituting Acquired Data to an extent and in a format mutually agreeable to Seller and Buyer that is readable, useable, indexed and

searchable and, if any portion of such Customer Data is encrypted, the necessary decryption tools and keys to read such materials contemporaneously.

(c)    Not later than ten (10) days prior to  the Closing Date, Sellers shall instruct all of Sellers' outside counsel responsible for maintaining, prosecuting or renewing any of the Acquired Intellectual Property (i) that the ownership of the Acquired Intellectual Property will be assigned to Buyer as of the Closing Date, (ii) to keep all Acquired Intellectual Property (as relevant to such counsel) in full force and effect, including by filing and documentation and paying any fees required therefor, (iii) to release to Buyer or counsel designated by Buyer at locations to be designated by Buyer copies of all the tangible embodiments of the Intellectual Property Related Documentation existing as of the Closing Date and in such counsel's possession, and (iv) that Buyer or counsel designated by Buyer may contact such Sellers' counsel for coordination relative to further prosecution of the Acquired Intellectual Property at Buyer's expense (such correspondence, "Seller Instructions").  Sellers shall also include in the Seller Instructions any other information that Buyer reasonably instructs Sellers to include that is communicated to Sellers prior to the Closing Date.

(d)    If after the Closing (i) Buyer or any of its Affiliates holds or is otherwise liable for any Excluded Assets or Excluded Liabilities or (ii) any Seller or any of their respective Affiliates holds any Acquired Assets or Assumed Liabilities, Buyer or the applicable Seller will, and will cause their respective controlled Affiliates to, and will use commercially reasonable efforts to cause their other Affiliates to, (including through the execution and delivery of all appropriate transfer documents) promptly transfer (or cause to be transferred) such Assets or assume, pay or reimburse (or cause to be assumed, paid or reimbursed) such Liabilities to or from (as the case may be) the other party for no additional consideration.  Prior to any such transfer, the party receiving or possessing any such asset will hold it in trust for such other party.

(e)    Notwithstanding anything to the contrary contained in this Agreement, Seller shall not transfer the KCD Notes to Buyer, and Buyer shall not assume the PA Liabilities from Seller, unless and until Seller has received the requisite consent of the Bermuda Monetary Authority or any other applicable Bermuda regulatory authority to the transfer of the KCD Notes (the "BMA Consent").  Immediately following receipt of the BMA Consent, the transfer of the KCD Notes and the assumption of the PA Liabilities shall take place simultaneously.  From the Closing Date until such time as the transfer of the KCD Notes and the assumption of the PA Liabilities occurs, pursuant to a services agreement to be in a form reasonably agreed to by Sellers and Buyer (the "PA Liabilities Services Agreement"), (i) Buyer shall provide services to the applicable Sellers sufficient to enable Sellers to perform the PA Liabilities and (ii) in consideration for such services, Sellers shall pay to Buyer an amount equal to the aggregate of all amounts paid by Buyer to Sellers with respect to any licenses under which Buyer licenses the KCD IP.

Section 2.9    Additional Contracts.  If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019 (the "Designation Deadline"), Buyer so determines as to any Contract that is Related to the Acquired Assets or is an IP License, in each case but is not an Initial Assigned Contract (other than (i) any lease of non-residential real property and (ii) any Excluded Asset set forth in Section 2.2) (each, an "Additional Contract"), Buyer may elect, after consultation with the Sellers, by written notice delivered to Sellers, to designate for assignment or assumption and assignment any Additional Contract for no additional consideration.

Upon the designation of any such Additional Contract as an Assigned Agreement pursuant to this Section 2.9, Sellers will use their reasonable best efforts to assume and assign to the applicable Assignee such Additional Contract so long as the Buyer pays all Expenses accrued post-Closing and all Cure Costs associated with such Additional Contract; provided, however, that nothing herein shall be deemed or construed to obligate Sellers to retain, or refrain from rejecting or terminating any Lease or Contract after the Designation Deadline that does not constitute an Assigned Agreement.  Notwithstanding anything to the contrary herein, Sellers shall not be obligated to assume and assign any Contract pursuant to this Section 2.9 with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance or for which Consent is required to assume and assign such Additional Contract and such Consent has not been obtained, provide that the Parties shall use their reasonable best efforts to obtain all such Consents.

Section 2.10    Withholding.  Notwithstanding anything in this Agreement to the contrary, Buyer shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement but only to the extent of such amounts as may be required to be deducted and withheld by Buyer with respect to the making of such payments under applicable U.S. federal, state or local or foreign laws, and any such withheld amount shall be properly paid by Buyer to the appropriate Governmental Authority. To the extent that amounts are so deducted and withheld and properly paid to the appropriate Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to Sellers or any other Person in respect of which such deduction and withholding was made.

Section 2.11    Rejection of Outbound IP Licenses.  Prior to the Closing Date, subject to section 365(n) of the Bankruptcy Code, Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject any Outbound IP Licenses included in the Potential Transferred Agreements that (i) are executory Contracts and (ii) are not designated by Buyer for assignment or assumption and assignment as an Assigned Agreement in accordance with the terms of this Agreement or for solely assumption pursuant to Section 9.14(d). Without limiting the foregoing, promptly following the Designation Deadline, Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject, any Outbound IP Licenses that (x) are not included in the Potential Transferred Agreements, (y) are executory Contracts and (z) are not designated by Buyer for assignment or assumption and assignment as an Assigned Agreement in accordance with the terms of this Agreement or for solely assumption pursuant to Section 9.14(d).

Section 2.12    Tax Reorganization.

(a)    The Parties intend that the transactions set forth in this Agreement, as structured and implemented as described in Section 9.2(a), together with the Bankruptcy Plan (as defined below), will, unless and except to the extent that Buyer elects otherwise with respect to a particular Seller or Sellers pursuant to Section 2.12(b), (i) constitute one or more plans of reorganization under section 368(a) of the Code (as defined below) and (ii) as qualifying as one or more reorganizations thereunder (a "Tax Reorganization").

49

(b)      Buyer may, at any time on or before the earlier of (i) 15 days prior to the effective date of the Bankruptcy Plan and (ii) December 1, 2019, elect, by providing to Sellers written notice of its election, to treat one or more of the transactions (each, a "Designated Sale Transaction") set forth in this Agreement as not qualifying as a Tax Reorganization, which election shall be effective unless Designated Tax Advisor cannot provide a Tax Opinion that such Designated Sale Transaction can be completed in a manner that would not be treated as a "reorganization" within the meaning of section 368 of the Code; provided, however, that in connection with any such Buyer election to treat all the transactions described in this Article II as Designated Sale Transactions (resulting in no transfer of Sellers' Tax attributes to Buyer), the Parties shall, if requested by Sellers in writing, identify a business of the Sellers that would become part of the Excluded Assets and consider in good faith any other changes to the structure of the transaction that are reasonable and necessary as a commercial, bankruptcy law and other legal matter to achieve that result. If Buyer does not elect pursuant to this Section 2.12(b) to treat all the transactions described in this Article II as Designated Sale Transactions (resulting in no transfer of Sellers' Tax attributes to Buyer), or any such election is not effective, then Buyer and Sellers shall continue to comply with Section 9.2(a).

(c)      Each Tax Opinion shall be based on representations reasonably requested by Designated Tax Advisor to be provided by each of Buyer and Sellers in the form of a representation letter, and each such representation must continue to be true and accurate in all material respects as of immediately before such Tax Opinion is issued. To the extent requested by Designated Tax Advisor, each of Sellers and Buyer shall confirm to Designated Tax Advisor the accuracy and completeness, as of immediately before such Tax Opinion is issued, of the applicable representation letter. For the avoidance of doubt, and notwithstanding anything to the contrary set forth in this Agreement, (i) reliance by Sellers on any Tax Opinion requested or otherwise required pursuant to this Agreement shall not affect Buyer's liability for Taxes that are Assumed Liabilities and (ii) the inability or failure to deliver or receive any Tax Opinion requested or otherwise required pursuant to this Agreement shall not delay or in any way interfere with the consummation and closing of the Transactions. Notwithstanding anything to the contrary set forth in this Agreement, any transaction or transactions (including any transaction described in clause (B) of Section 9.2(a)) in respect of which any Tax Opinion is not or cannot be delivered as otherwise required under this Agreement (other than a Tax Opinion described in Section 2.12(b)) shall be deemed to be a Designated Sale Transaction.

Section 2.13    Foreign Assets.

(a)      On the Closing Date, Sellers shall use reasonable best efforts to cause each of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall use reasonable best efforts to purchase, all right, title and interest of each of the Foreign Subsidiaries, in, to or under all assets, properties and rights Related to the Business other than the Excluded Assets and any other assets of the type that would have been Acquired Assets had they been owned by Sellers as of the Closing Date or any minority equity interests held by the Foreign Subsidiaries (collectively, the "Acquired Foreign Assets"), in each case free and clear of any and all Encumbrances of any kind, nature or description and any Claims, other than Permitted Post-Closing Encumbrances.  If the transfer of any Acquired Foreign Assets does

50

not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable following the Closing Date and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated.

(b)    If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019, Buyer determines (in its sole discretion) that it is necessary or desirable to acquire other minority equity interests in non-U.S. Persons held by Subsidiaries of Seller (other than any Subsidiary who is a Seller) so as to ensure that Buyer or the applicable Assignee shall be able to secure the benefit of the applicable Acquired Foreign Assets, Buyer may elect, by written notice delivered to Sellers, to acquire such equity interests directly from Seller. Following any such election, Buyer and Seller shall promptly execute all documentation required to effectuate the purchase and sale of such equity interests under applicable Law.

(c)    No purchase of Acquired Foreign Assets or equity interests pursuant to this <u>Section 2.13</u> shall require the delivery of any additional consideration by Buyer; <u>provided</u>, that to the extent required by applicable Law (including, for the avoidance of doubt, Tax Law), Buyer and Seller shall in accordance with <u>Section 9.3(d)</u> either (i) allocate a portion of the Purchase Price to the purchase of such equity interests or (ii) provide for nominal consideration to be paid by Buyer to Sellers in an amount no greater than the minimum amount required by applicable Law.

Section 2.14    <u>Bulk Transfer Law</u>.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer Laws.  In furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted by applicable Law, compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws in all applicable jurisdictions in respect of the Transactions (including under any applicable Tax Laws).

# ARTICLE III

# PURCHASE PRICE

Section 3.1    <u>Purchase Price</u>.  The aggregate purchase price for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of the following (collectively, the "<u>Purchase Price</u>"):

(a)    cash in an amount (the "<u>Closing Payment Amount</u>") equal to:

(i)    $1,408,450,000; *plus*

(ii)    an amount in cash equal to the Store Cash as of 12:00 a.m. New York City time on the Closing Date; *plus*

(iii)    the Credit Bid Release Consideration; *less*

(iv)    the aggregate amount of (A) the credit bid set forth in <u>Section 3.1(b)(ii)</u> *plus* (B) the credit bid set forth in <u>Section 3.1(b)(iv)</u>, *plus* (C) the FILO Facility Buyout Amount (if any);

(b)    subject to Bankruptcy Court approval, a credit bid pursuant to Section 363(k) of the Bankruptcy Code of:

(i)    all outstanding obligations held by Buyer and its Affiliates as of the Closing Date under the IP/Ground Lease Term Loan Facility, *plus*

(ii)    all outstanding obligations held by Buyer and its Affiliates as of the Closing Date under the FILO Facility, *plus*

(iii)    obligations held by Buyer and its Affiliates as of the Closing Date under the Real Estate Loan 2020 in an amount equal to $544,000,000, *plus*

(iv)    obligations held by Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes,

in the case of each of (i), (ii), (iii) and (iv) in exchange for the collateral pledged to secure the applicable debt obligations, including any proceeds from the sale or other disposition of such collateral prior to the Closing Date to which the Liens securing such debt obligations are attached, in the same order of priority and with the same validity, force and effect as the original Liens; *plus*

(c)    cash in the amount of the outstanding obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date under (i) the IP/Ground Lease Term Loan Facility (the "<u>IP/Ground Lease Buyout Amount</u>"), (ii) the FILO Facility (the "<u>FILO Facility Buyout Amount</u>"), and (iii) the Real Estate Loan 2020 (the "<u>Real Estate Loan 2020 Buyout Amount</u>"), unless such lender(s) provide written confirmation to the Sellers that such cash payment and the obligations owed to lenders by the Seller under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, are permanently waived and discharged against the Sellers; *plus*

(d)    the Securities Consideration;

(e)    the Junior DIP Consideration;

(f)    the L/C Facility Consideration; and

(g)    the assumption by Buyer of the Assumed Liabilities in accordance with <u>Section 3.5</u>.

To the extent payable, the IP/Ground Lease Buyout Amount, the FILO Facility Buyout Amount and the Real Estate Loan 2020 Buyout Amount shall each be deposited and held in separate segregated accounts of the Debtors and the Liens of the lenders other than Buyer or its Affiliates under IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, shall attach to the cash proceeds held in the applicable designated segregated account

52

in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two business days following the Closing Date and shall not otherwise be used by the Debtors without further order of the Bankruptcy Court.

Section 3.2    <u>Cash Deposit</u>.  On or prior to January 9, 2019, Buyer paid an aggregate amount in cash equal to $120,000,000 (the "<u>Deposit Amount</u>") by wire transfer of immediately available funds into an escrow account maintained by Citibank, N.A. as Escrow Agent.  Buyer's and Sellers' right to retain the Deposit Amount in the event of a termination of this Agreement shall be governed by <u>Section 12.2</u>.

Section 3.3    <u>Closing Payment</u>.

(a)    At the Closing, Buyer shall:

(i)    pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Closing Payment Amount *less* the Deposit Amount *plus* any amounts payable pursuant to Section 3.1(c); and

(ii)    deliver the Securities Consideration to the Sellers.

Section 3.4    <u>Reserved</u>.

Section 3.5    <u>Discharge of Assumed Liabilities After Closing</u>.  From and after the later of the Closing or the applicable Assumption Effective Date, Buyer shall pay, perform, discharge and satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed, discharged or satisfied, in each case in accordance with their respective terms.

**ARTICLE IV**

**CLOSING**

Section 4.1    <u>Closing Date</u>.  The closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights and Sellers' right, title and interest in, to and under the Acquired Assets by Sellers to Buyer contemplated hereby (the "<u>Closing</u>") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or at such other place or time as Buyer and Sellers may mutually agree, on the third (3rd) Business Day following satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing).    Notwithstanding the immediately preceding sentence, if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), then the Closing shall occur instead on the date that is the earlier to occur of (x) any Business Day as may be specified by Buyer on no less than two (2) Business

Days' prior written notice to Sellers and (y) two (2) Business Days following the final day of the Marketing Period.  The date and time at which the Closing actually occurs is referred to as the "Closing Date."

Section 4.2    Buyer's Deliveries.  At the Closing, Buyer shall deliver to Sellers:

(a)    the Closing Payment Amount *less* the Deposit Amount in accordance with Section 3.3;

(b)    the Securities Consideration;

(c)    the certificates of Buyer to be received by Sellers pursuant to Sections 11.1 and 11.2;

(d)    the Occupancy Agreement, duly executed by Buyer;

(e)    the PA Liabilities Services Agreement, duly executed by Buyer; and

(f)    such assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers and Buyer, which are reasonably requested by Seller to (i) transfer to Buyer all the right, title and interest of Sellers in, to or under the Acquired Assets to be acquired on the Closing Date in accordance with this Agreement and (ii) properly give effect to Buyer's assumption of all of the Assumed Liabilities in accordance with this Agreement.

Section 4.3    Sellers' Deliveries.  At the Closing, Sellers shall deliver to Buyer:

(a)    a copy of the Approval Order entered by the Bankruptcy Court;

(b)    the certificates of Sellers to be received by Buyer pursuant to Sections 10.1 and 10.2;

(c)    a certificate of non-foreign status executed by each Seller (or, if a Seller is a disregarded entity for U.S. federal income Tax purposes, by the Person treated as the owner of such Seller for U.S. federal income Tax purposes) that is a "United States person" within the meaning of Section 7701(a)(30) of the Code, substantially in the form of the sample certification in Treasury Regulations Section 1.1445-2(b)(2)(iv)(B);

(d)    all items required to be delivered pursuant to Section 9.9;

(e)    a quit-claim deed to be recorded with respect to the Owned Real Property;

(f)    such assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers and Buyer, which are reasonably requested by Buyer to (i) transfer to Buyer all the right, title and interest of Sellers in, to or under the Acquired Assets to be acquired on the Closing Date in accordance with this Agreement and (ii) properly give effect to Buyer's assumption of all of the Assumed Liabilities in accordance with this Agreement;

54

(g)    all Intellectual Property Related Documentation;

(h)    all tangible embodiments of the Acquired Intellectual Property, including all (i) Software object code and source code related thereto, (ii) all materials and documentation (in electronic and editable form, to the extent existing in such form) necessary for the use, modification, manufacture, sale and other exploitation of the Acquired Intellectual Property, to the extent not included in Intellectual Property Related Documentation, (iii) all content made available on or through any websites and webpages accessed through any Domain Names or Medical Accounts included in the Acquired Intellectual Property and all other audio-visual or written materials (including such archival materials) produced by or on behalf of Sellers, (iv) all Labeling and Marketing Materials and (v) all Product Catalogs and Manuals;

(i)    to the extent the sale and transfer of such data is not in contravention with applicable Law, all Acquired Data in the format in which it exists and, if any portion of such Acquired Data is encrypted, the necessary decryption tools and keys to read such materials contemporaneously;

(j)    a counterpart of the IP Assignment Agreement, duly executed by each applicable Seller;

(k)    unless otherwise agreed in writing by the Parties between signing and Closing, a counterpart of each Short Form Assignment, duly executed by each applicable Seller;

(l)    a counterpart of each IP Power of Attorney, duly executed by each applicable Seller;

(m)    the Occupancy Agreement, duly executed by the applicable Sellers;

(n)    the PA Liabilities Services Agreement, duly executed by the applicable Sellers;

(o)    the Payoff Letters (including UCC terminations or authorization to file UCC terminations and other filings); and

(p)    subject to Section 2.8(e), certificates representing the KCD Notes in proper form for transfer, free and clear of all Liens.

Section 4.4    Local Sale Agreements.  Subject to the terms and conditions hereof, to the extent necessary or desirable to effect the Closing on the terms hereof, Buyer or applicable Assignee and relevant Sellers shall, enter into such agreements or instruments, including a sale agreement and quit-claim deed for the Owned Real Property and bills of sale and/or assignment and assumption agreements, providing for the sale, transfer, assignment or other conveyance to Buyer or applicable Assignee, in accordance with the requirements of applicable local Law.

## ARTICLE V

## DESIGNATION RIGHTS PERIOD

Section 5.1    Parties' Respective Obligations Before and During Designation Rights Period.

(a)    <u>Sellers' Obligations</u>.

(i)    Sellers shall pay when due any and all Occupancy Expenses with respect to each Lease Premises and the related Lease solely to the extent arising during the period commencing on the Petition Date through, in the case of any Operating Leased Property, the Closing Date, and in the case of any GOB Leased Store, the end of the GOB Period for such GOB Leased Store, at such times and in such amounts as are required under the terms of the applicable Lease and any other applicable agreement pertaining to such Property. Sellers shall not pay any amount due from Sellers pursuant to any provision of this Agreement using any security deposit associated with any Lease Premises, Lease or other Lease Premises-related agreement or, to the extent so paid prior to Closing, Buyer, as Buyer's sole remedy, will be entitled to a credit against the Purchase Price for any amounts so applied (except that Buyer shall be entitled to invoke other remedies if such credit is not duly applied at Closing).

(ii)    From the date hereof through (A) the Closing Date with respect to each Operating Leased Property and (B) the end of the applicable GOB Period with respect to each GOB Leased Store, Sellers shall use commercially reasonable efforts to maintain and preserve each Lease Premises, each Lease and all related Potential Acquired Assets in a condition substantially similar to their condition as of October 15, 2018, other than reasonable wear and tear, casualty and condemnation (which shall be governed by <u>Section 12.3</u>). During the Designation Rights Period, Sellers shall not without Buyer's consent, and shall not solicit any other Person to, (A) sell, transfer, assign, convey, lease, license, mortgage, pledge or otherwise encumber any Lease Premises, related Lease or related Potential Acquired Asset (other than sales of Inventory by Buyer in accordance with <u>Section 5.1(c)</u>, Permitted Encumbrances and any applicable statutory liens (solely to the extent that such Lease or related Potential Acquired Asset will be transferred free and clear of such statutory liens pursuant to the Approval Order)), (B) amend, supplement or modify in any fashion (or terminate or enter into) any Designatable Lease (provided that Sellers shall use reasonable best efforts to comply with instructions from Buyer as to the renewal (or lack of renewal) of each Lease that comes up for renewal), (C) grant or terminate any other interests in any Lease Premises, related Lease or related Potential Acquired Asset (other than sales of Inventory located at such Lease Premises in the Ordinary Course of Business), (D) cancel or compromise any claim or waive or release any right, in each case that is related to any Lease Premises or any related Potential Acquired Assets (for the avoidance of doubt, other than any Excluded Assets), (E) except following receipt of a Buyer Rejection Notice in accordance with <u>Section 5.3</u>, seek or obtain an order approving rejection of a Designatable Lease (which, shall in no way affect Sellers' rights to seek or obtain an order approving rejection in connection with any of Sellers' assets other than the Lease Premises), (F) take any action with respect to Taxes or Tax matters that is not in the Ordinary Course of Business that could reasonably be expected to result in (I) an Encumbrance on any Lease Premises or related Potential Acquired Assets (unless such Lease or related Potential Acquired Asset will be transferred free and clear of such Encumbrances pursuant to the applicable Lease Assignment Order) or (II) an increase in the Tax Liability of Buyer or any of its Affiliates, or (G) enter into any agreement or commitment to take any action prohibited by this <u>Section 5.1(a)(ii)</u>.

(iii)    From the date hereof through the end of the Designation Rights Period, Sellers shall continue to make available to Buyer the data room made available to Buyer prior to the date hereof, and Sellers shall use commercially reasonable efforts to post to such data room copies of all material notices received by Sellers with respect to any Designatable Leases during the Designation Rights Period.  From the date hereof through the end of the Designation Rights Period, subject to the terms of the Occupancy Agreement, Sellers shall make available to Buyer reasonable access to the Lease Premises for the Designatable Leases at such times as Buyer or its agents may reasonably request, provided that prior to the Closing Date there is no unreasonable interference with Sellers' use and occupancy.

(iv)    From the date hereof through the (A) Closing with respect to the Initial Assigned Leases and (B) the end of the Designation Rights Period with respect to the Designatable Leases, Sellers shall reasonably cooperate with Buyer at no cost, expense or Liability to Sellers with regard to all negotiations between Buyer and the landlords under the applicable Leases, but Sellers will not be required to enter into any agreements with such landlords or expend any costs in connection with such negotiations  (other than any costs that Buyer has agreed in writing to reimburse Seller).

(v)    With respect to the Lease Premises which Leases are Designatable Leases, Sellers shall continue all existing insurance policies with respect to such Lease Premises or policies providing similar coverage to the extent available at commercially reasonable rates during the Designation Rights Period and in all instances shall maintain all insurance required to be maintained under any Lease, and shall use commercially reasonable efforts to cause Buyer to be named as a loss payee or additional insured, as applicable, with respect to all such policies, which premiums and other amounts due to such insurance companies to maintain such insurance policies during the Designation Rights Period shall be Occupancy Expenses.  Sellers shall (i) hold in escrow all insurance recoveries and all warranty and condemnation proceeds received or receivable after the date hereof with respect to such Lease Premises or such related Leases for events occurring during the Designation Rights Period, and (ii) following the Designation Rights Period shall pay any such recoveries or proceeds to Buyer to the extent relating to any Acquired Lease.  In connection with any payment of recoveries or proceeds under this Section 5.1(a)(v), (i) such payment of recoveries or proceeds shall not include any recoveries or proceeds to the extent attributable to lost rents or similar costs applicable to any period prior to the Closing or paid in connection with repair, restoration or replacement during such period, and (ii) to the extent that Buyer has received written notice thereof in reasonable detail not less than fifteen (15) days prior to the end of the Designation Rights Period, such payment of recoveries or proceeds shall be reduced by the amount of (x) all actual and documented, reasonable out of pocket repair costs incurred by Sellers in connection with the repair or restoration of such damage or destruction, (y) all actual and documented, reasonable out of pocket collection costs of Sellers respecting any awards or other proceeds, and (z) any amounts required to be paid (and solely to the extent actually paid) by Sellers or the insurance company to the applicable landlord under the Lease, if applicable, or to such landlord's lender as required pursuant to any of such lender's financing, as applicable.  For the avoidance of doubt, the costs of such policies allocable to, in the case of the GOB

57

Leased Stores for the period following the end of the GOB Period for each such GOB Leased Store and in the case of the Owned Leased Stores following the Closing Date, shall be borne by Buyer and shall otherwise be borne by Sellers. During the Designation Rights Period, Sellers shall use commercially reasonable efforts to provide Buyer with notice of any Casualty / Condemnation Event within three (3) Business Days of the occurrence of such Casualty / Condemnation Event.

(vi)    From the date hereof through the end of the Designation Rights Period, at Buyer's specific written request, and at no cost, expense or Liability to Sellers, Sellers will take such actions as Buyer may reasonably request to cause each landlord under the Designatable Leases to perform such party's covenants, agreements and obligations (including repair and maintenance obligations and obligations to maintain insurance with respect to such Lease Premises and any shopping center or mall in which any such Lease Premises is located) under the respective Designatable Leases.

(vii)    From the date hereof through the Closing Date, Sellers shall perform repairs and maintenance and provide security services at the Properties in substantially the same manner and to the same extent in place as of the date hereof (for the avoidance of doubt, the costs of providing such repairs, maintenance and security services prior to the Closing Date shall be borne by Sellers.

(viii)    From the date hereof through the end of the Designation Rights Period, Sellers shall maintain, as an Occupancy Expense, the effectiveness of and, to the extent expiring, renew, all Plans and Permits with regard to the Properties.

(b)    Buyer's Obligations.

(i)    Buyer shall pay (or reimburse Sellers) (subject to the restrictions set forth herein) all Expenses with respect to the Designatable Leases.

(ii)    Buyer will, as soon as reasonably practicable, but in no event later than the Designation Deadline, identify to Seller any Designatable Leases that Buyer has determined will not be designated for assumption and assignment pursuant to the Designation Rights and Seller shall be free to dispose of such Designatable Leases in its sole discretion.

(c)    Operation of Lease Premises.

(i)    The operation of the Lease Premises related to the (A) Operating Leased Property during the Designation Rights Period and (b) with respect to each GOB Leased Store following the end of the applicable GOB Period for each such GOB Leased Store and ending at the end of the Designation Rights Period,  shall in each case be governed by an Occupancy Agreement in the form attached hereto as Exhibit D, and Buyer shall conduct such operation pursuant to such Occupancy Agreement, including the sale of the Acquired Inventory at such Lease Premises related to the Designatable Leases, as Buyer determines in its sole discretion, including by (A) conducting liquidation sales at any or all of such

58

Lease Premises related to the Designatable Leases or (B) operating the Lease Premises pursuant to the Occupancy Agreement.

(ii)    The operation of the GOB Owned Stores during the GOB Period shall be governed by the Seller Retained Occupancy Agreement and Seller shall conduct such operation pursuant to such Seller Retained Occupancy Agreement as Seller determines in its sole discretion.

Section 5.2    Assumption.

(a)    Following Closing, at any time on or prior to the Designation Deadline, Buyer shall have the right, which right may be exercised at any time and from time to time, in consultation with the Sellers, to designate such Designatable Lease for assumption and assignment and shall provide notice to Sellers executed by Buyer and the Assignee (a "Buyer Assumption Notice") of Buyer's election to require Sellers to assume such Designatable Leases and assign the same to the Assignee identified in such Buyer Assumption Notice; provided that Buyer shall pay all Cure Costs associated with any assumption and assignment of any such Designatable Leases in accordance with the terms of Section 2.7; provided further, that the Assignee shall agree, pursuant to the Buyer Assumption Notice, to assume Buyer's obligations under this Agreement in relation to the relevant Designatable Lease.  The Buyer Assumption Notice shall provide the following information: (1) the Designatable Leases being assumed and assigned and (2) the identity of the applicable Assignee(s).

(b)    Within five (5) Business Days following the date upon which Buyer delivers a Buyer Assumption Notice to Sellers with respect to any Designatable Lease, together with a related assignment agreement substantially in the form attached hereto as Exhibit E (the "Assignment and Assumption of Lease") executed by the applicable Assignee, Sellers shall (1) deliver to Buyer and such Assignee a fully executed Assignment and Assumption of Lease and (2) file with the Bankruptcy Court and serve on the applicable lessor(s) and other appropriate notice parties (as applicable) a notice, and shall seek entry by the Bankruptcy Court of the Approval Order in respect of the Designatable Leases subject to such Buyer Assumption Notice; provided, that, in no event shall any Designation Assignment Date be prior to the Inventory Date.  As of the applicable Designation Assignment Date, except for such obligations and liabilities with respect to such Designatable Leases and the related Lease Premises arising during the Designation Rights Period and except for Buyer's obligations specifically set forth in this Agreement, as between Buyer and the Assignee, Buyer shall have no further obligation or Liability with respect to such Designatable Lease or the related Lease Premises (including any obligation to continue to pay Expenses with respect thereto) and Assignee shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Designatable Lease or the related Lease Premises; provided, however, that nothing in this sentence shall affect Sellers' rights against Buyer with respect to such Designatable Lease or the Lease Premises as set forth in this Agreement.

(c)    Upon Buyer's request prior to the last day of the Designation Rights Period (provided that the Assignee shall have notified Sellers as to the particular Assignment Instruments and Assignment Actions to be delivered and taken at least two (2) Business Days prior thereto), Sellers shall deliver to the applicable Assignee  instruments reasonably necessary or desirable (as

59

reasonably agreed between Sellers and Assignee) providing for the assignment, conveyance and delivery to such Assignee of the applicable Designatable Lease, together with the related Acquired Assets, in each case free and clear of all Encumbrances of any and every kind, nature and description, other than Permitted Encumbrances (the "Assignment Instruments") and shall otherwise take such actions as are reasonably necessary or desirable (as reasonably agreed by Seller and such Assignee) in order to cause such sale, transfer, assignment, conveyance and delivery to become effective (collectively, the "Assignment Actions"); provided, however, that Buyer shall be solely responsible for all Cure Costs in accordance with the terms of this Agreement.

(d)    The effective date of the sale, transfer, assignment, conveyance and delivery by Sellers to such Assignee of a Designatable Lease and related assets pursuant to this Agreement and the applicable Assignment and Assumption of Lease shall be the "Designation Assignment Date" with respect to such Lease and related assets.

(e)    With respect to any Designatable Lease designated in a Buyer Assumption Notice:

(i)    Sellers, at no cost, expense or Liability to Sellers, and Buyer shall each use (and Buyer shall use commercially reasonable efforts to cause Assignee to use) commercially reasonable efforts to accomplish, and shall fully cooperate with each other in, the resolution of any objections to the proposed assumption and assignment of such Designatable Lease and related assets;

(ii)    Buyer shall cause Assignee to provide evidence (A) of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code, (B) that Assignee is a good faith purchaser for purposes of section 363(m) of the Bankruptcy Code, including, in both cases, through the provision of such financial information and/or the filing of such affidavits or declarations with the Bankruptcy Court as may reasonably be requested by Sellers, or (C) any other information as may be required by the Bidding Procedures Order; and

(iii)    Buyer shall pay or be responsible for all Cure Costs and Expenses and pay and perform the other obligations of Buyer set forth in this Agreement.

(f)    Except as otherwise set forth in this Article V, each Person shall bear their own costs and expenses in respect of obtaining entry of the Approval Order and otherwise implementing the sale, transfer, assignment, conveyance and delivery of the applicable Lease and related assets to the applicable Assignee, including the filing and prosecution of any motions or other papers with respect to the same.

Section 5.3    Election Not to Assume and Assign a Designatable Lease.

(a)    At any time before the date that is five (5) Business Days on or before the Designation Deadline, Buyer shall in accordance with the terms of this Agreement provide notice to Sellers (each such notice, a "Buyer Rejection Notice") of Buyer's election not to have such Designatable Lease assumed and assigned.

(b)      Within five (5) Business Days following the date upon which Buyer delivers a Buyer Rejection Notice to Sellers with respect to the applicable Lease, Buyer shall vacate the applicable Property and deliver to Sellers the keys to such Property, if in the possession of Buyer. As of the date that is the later of (i) the date Buyer vacates the applicable Property and delivers to Sellers the keys to such Property, if in the possession of Buyer and (ii) five (5) Business Days after the date of the Buyer Rejection Notice, Buyer shall have no further obligation or liability with respect to the applicable Lease, Contract or Lease Premises, except with respect to obligations and liabilities with respect to such Lease, Contract, or Lease Premises arising during the Designation Rights Period, and Sellers shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Lease, Contract or Lease Premises.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered as of the date hereof by Sellers to Buyer and except as relates to a matter involving a Buyer Related Party (as to which no representation or warranty is being made), Sellers hereby, jointly and severally, represent and warrant to Buyer that the statements contained in this <u>Article VI</u> are true and correct as of the date hereof:

Section 6.1      <u>Organization and Good Standing</u>.  Each Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Subject to the limitations imposed on such Seller as a result of the Filing, each Seller has the requisite corporate, partnership or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Each Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where a Property is located where the character of its business or the nature of its properties requires such qualification or licensing, except where the failure to be so qualified or licensed or to be in good standing would not reasonably be expected to have a Material Adverse Effect.

Section 6.2      <u>Authority; Validity; Consents</u>.      Each Seller has, subject to requisite Bankruptcy Court approval, as applicable, the requisite corporate, partnership or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is, or will become, a party and to consummate the Transactions.  This Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by Sellers at any time will be duly and validly executed and delivered by each Seller.  Subject to requisite Bankruptcy Court approval, as applicable, this Agreement and (when duly executed by Sellers) the other Transaction Documents constitute, with respect to each Seller, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Subject to, and after giving effect to, requisite Bankruptcy Court approval (including the Approval Order) no Seller is required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other

Transaction Documents or the consummation or performance of any of the Transactions, except for (i) expiration or termination of any applicable waiting periods under the HSR Act and (ii) such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.3   No Conflict.  When the Approval Order and the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Transactions will not result in the material breach of any of the terms and provisions of, or constitute a default under, or conflict with, or require consent or the giving of a notice under, or cause any acceleration of any obligation of Sellers under (a) any Order, (b) any Law or (c) the organizational documents of any Seller except, with respect to (a) or (b), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.4   Environmental Matters.   Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, to Sellers' Knowledge, (i) none of the Acquired Properties has been used by any Person as a landfill or storage, treatment, or disposal site for any type of Hazardous Substance or non-hazardous solid wastes as defined under the Resource Conservation and Recovery Act of 1976, as amended, in a manner which would reasonably be expected to result in any Seller incurring liabilities under Environmental Laws; (ii) the use by each Seller of the Acquired Properties is, and since the beginning of the Current Fiscal Year has been, in compliance with all Environmental Laws and Environmental Permits, except for such non-compliance that has not been, and would reasonably be expected to result in any Seller incurring liabilities under Environmental Laws; and (iii) none of the Acquired Assets is subject to any pending Action alleging that any Acquired Assets or Seller, with respect to the Acquired Assets,  is in violation of any Environmental Law or Environmental Permit that would reasonably be expected to result in any Seller incurring liabilities under Environmental Laws.  Since the beginning of the Current Fiscal Year, the Sellers have not received any written notice threatening any Action alleging that any Seller is in violation of any Environmental Law or Environmental Permit in respect of any Acquired Property that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

Section 6.5   Title to Acquired Assets.

(a)   Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers (directly or indirectly) have good  title to, or, in the case of Potential Acquired Assets that are leased by Sellers, a valid leasehold interest in, all of the Potential Acquired Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.

(b)   Sellers shall (i) with respect to the Owned Real Property, the Business and the Acquired Assets, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3 and (ii) with respect to any Potential Acquired Assets related to any Acquired Lease Premises, upon delivery to the applicable Assignee of the instruments of transfer contemplated by an applicable Assignment and Assumption of Lease, and in each case subject to the terms of the Approval Order, thereby transfer to Buyer or the applicable Assignee, as applicable, good (and, in the case of owned real property, marketable fee simple) title to, or, in the

62

case of Potential Acquired Assets that are leased by Sellers, a valid leasehold interest in, all of the Potential Acquired Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.

Section 6.6   Real Property.

(a)      Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers have good and marketable fee title to the Owned Real Property, free and clear of all liens (except for Permitted Encumbrances).  None of the Owned Real Property is subject to any leases or tenancies or other rights of occupancy.

(b)      Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) there is no pending condemnation proceeding, administrative action or judicial proceeding of any type relating to the Owned Real Property or other matters affecting adversely the current use, occupancy or value of the Owned Real Property and (ii) neither the current use of the Owned Real Property nor the operations of Sellers violates any applicable legal requirements.

(c)      The Initial Assigned Leases and the Designatable Leases constitute all leases and material Security Deposit Documents with respect to any real property for the Lease Premises.  On or before the date hereof, Sellers have delivered or made available to Buyer true and complete copies of all Leases and Security Deposit Documents for the Lease Premises (it being agreed that, while Sellers shall use reasonable best efforts to deliver or make available to Buyer all such documents, Sellers shall not be deemed to have breached this representation if, in the case of Security Deposit Documents, lease amendments, non-disturbance agreements, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller and estoppel certificates from landlords, Sellers shall have only delivered or made available to Buyer true and complete copies of only those of the same which are material). There are no material agreements, understandings or undertakings pertaining to the Leases, the Security Deposits, the Security Deposit Documents, the Sellers' leasehold interest in the Properties, the Lease Premises or Sellers' use or occupation of the Lease Premises or any portion thereof which are in Sellers' possession which have not been disclosed to Buyer or made available in the data room made available to Buyer prior to the date hereof.  To Sellers' Knowledge, no Person that is not a Seller has any right to possess, use or occupy the Lease Premises.

(d)      Each of the Leases is legal, valid, binding and enforceable against Sellers party thereto and, to Sellers' Knowledge, against each other party thereto, in accordance with its terms (except for any direct or indirect restriction, limitation or condition on Sellers' assignment of the Leases to Buyer which shall not be of any force or effect pursuant to the Approval Order), and, subject to the entry of the Approval Order and payment of the Cure Costs and other than solely as a result of the filing of the Bankruptcy Cases or the financial condition of Holdings or its Subsidiaries, to Sellers' Knowledge, no event of default currently exists thereunder by any counterparty thereto, and no event has occurred thereunder that after the giving of notice or passage of any applicable cure period or both would constitute an event of default of Sellers or, to Sellers' Knowledge, any other party thereto, and no Seller has delivered or received any written notice from the other party to any such Lease of the termination or surrender thereof, and the Leases have not been amended, modified or supplemented, except to the extent, in each case as

63

described in this Section 6.6(d), that the failure of the same to be true would not in the aggregate reasonably be expected to have a Material Adverse Effect.

(e)    There are no pending condemnation or eminent domain proceedings or any proceedings in lieu thereof against any of the Lease Premises, Owned Real Property or any part thereof, except to the extent that the failure of the same to be true would not in the aggregate have a Material Adverse Effect.

Section 6.7    Taxes.    There are no Encumbrances for Taxes on any of the Potential Acquired Assets other than statutory liens for current Taxes not yet delinquent or Taxes being contested in good faith.  Each Seller has timely filed or caused to be timely filed with the appropriate Governmental Authority all material Tax Returns required to be filed by or on behalf of such seller with respect to or in connection with the Acquired Assets, the Properties, Business and the Assumed Liabilities.  Such Tax Returns are true, complete and accurate in all material respects.  Other than any Taxes the timely payment of which is precluded by the Bankruptcy Case, each Seller has paid and discharged in full all material amount of Taxes payable by or on behalf of such Seller.  None of the Acquired Assets include or consist of an interest in any partnership, corporation or other regarded entity for U.S. federal, state or local income tax purposes.  No Tax Proceeding is pending or has been threatened in writing against or with respect to any Seller in connection with the Potential Acquired Assets, the Properties, the Seller's business or the Assumed Liabilities.  Each Seller has complied in all material respects with all applicable Laws (including information reporting requirements) relating to the collection, withholding and remittance of Taxes with respect to or in connection with the Acquired Assets, the Properties, the Seller's business and the Assumed Liabilities.

Section 6.8    Brokers or Finders.    Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the Transactions for which Buyer is or will become liable.

Section 6.9    Employee and Employee Plan Matters.

(a)    No Seller is party to any collective bargaining, works council or similar Contract with any labor organization, union or association.  No labor organization or group of employees of Sellers has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed, with the National Labor Relations Board or any other labor relations tribunal or authority.  There is no pending labor dispute, strike, controversy, slowdown, work stoppage or lockout pending or, to the Knowledge of Sellers, threatened, against the Business or any Seller in connection with the Business, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  There are no pending labor union grievances or unfair labor practices against any Seller, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Sellers are in compliance in all material respects with all Employment Laws.  There are no pending employment-related lawsuits or administrative actions alleging violations of

64

Employment Laws against any Seller in state or federal court or pending with any Government Authority (including the U.S. Equal Employment Opportunity Commission, the U.S. Department of Labor or any equivalent state or local agencies charged with investigating or adjudicating employee claims concerning alleged violations of Employment Laws), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)        Each Employee Plan that is intended to be a qualified under Section 401(a) of the Code has either received a favorable determination letter from the Internal Revenue Service or may rely on a favorable opinion letter issued by the Internal Revenue Service and, to the Knowledge of Sellers, nothing has occurred since the date of such determination or opinion letter that would reasonably be expected to adversely affect such qualification. Each Employee Plan has been established, operated and administered in compliance with its terms and applicable Laws (including ERISA and the Code), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. All contributions or other amounts payable by Sellers with respect to each Employee Plan in respect of current or prior plan years have been timely paid or accrued in accordance with applicable accounting standards.

(d)        There are no actions, suits, audits or investigations by any Governmental Authority, termination proceedings or other claims (except routine claims for benefits payable under the Employee Plans) pending or, to the Knowledge of Sellers,  threatened, other than any such investigations, proceedings or claims that would not individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)        No Employee Plan is subject to Section 302 or Title IV of ERISA or Section 412, 430, or 4971 of the Code.  During the immediately preceding six (6) years, no Liability under Section 302 or Title IV of ERISA has been incurred by Sellers or their respective ERISA Affiliates or their respective predecessors that has not been satisfied in full, and no condition exists that presents a risk to Sellers or any such ERISA Affiliates of incurring any such Liability.

(f)        Neither Sellers nor any of their respective ERISA Affiliates has, at any time during the preceding six (6) years, contributed to, been obligated to contribute to or had any Liability (including any contingent Liability) with respect to any Multiemployer Plan or a plan that has two or more contributing sponsors, at least two of whom are not under common control, within the meaning of Section 4063 of ERISA, and no condition exists that presents a risk to Sellers or any such ERISA Affiliates of incurring any such Liability.

(g)        Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (either alone or in conjunction with any other event): (i) entitle any current or former employee, officer, director or independent contractor of any Seller to any payment or benefit (or result in the funding of any such payment or benefit) under any Employee Plan; (ii) increase the amount of any compensation, equity award or other benefits otherwise payable by any Seller under any Employee Plan; (iii) result in the acceleration of the time of payment, funding or vesting of any compensation, equity award or other benefits under any Employee Plan; or (iv) result in any "excess parachute payment" (within the meaning of Section 280G of the Code) becoming due to any current or former employee, officer, director or independent contractor of any Seller.

Section 6.10    Intellectual Property.

(a)    Set forth in Schedule 6.10(a) is a correct and complete list of all issued Patents, registered Trademarks, registered Copyrights, Domain Names and Media Accounts, and as applicable, all applications for each of the foregoing, which are owned by a Seller as of the date hereof or as of the Closing Date, including for each registered, issued or applied-for item: (i) the registered owner (and, if different, the legal owner) of the item, (ii) the jurisdiction in which the item is issued or registered or which any application for issuance or registration has been filed, (iii) the respective issuance, registration or application number of such item, (iv) the date of application and issuance or registration of the item, as applicable, and (v) with respect to Domain Names, the relevant domain name registrar and paid-until date.

(b)    With respect to each item of Acquired Intellectual Property, including each item identified in Schedule 6.10(a):

(i)    Sellers exclusively own all right, title and interest in and to each such Acquired Intellectual Property free and clear of any Encumbrance and from any Contract that restricts Sellers' right to use the Acquired Intellectual Property, in each case, except Permitted Pre-Closing Encumbrances; for the avoidance of doubt, Schedule 6.10(b)(i) shall identify the co-owner(s) of each item of Acquired Intellectual Property and the agreements under which any Seller and the co-owner(s) share ownership of such Intellectual Property;

(ii)    the item is not subject to any outstanding material Order, not including any outstanding objection, rejection or refusal issued by the United States Patent and Trademark Office or the foreign equivalent thereof in connection with the prosecution or examination of a patent or trademark application; and

(iii)    to Sellers' Knowledge, each issued Patent and registered Trademark (excluding those registered Trademarks that are currently in the grace period) is valid, subsisting and enforceable and duly registered or issued, as applicable, in the name of a Seller.

(c)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business or the ownership or operation of the Acquired Assets, to Sellers' Knowledge: (i) neither the operation of the Business nor the Acquired Assets (other than the Acquired Inventory) is infringing, misappropriating, diluting or violating or have, since the beginning of the Current Fiscal Year, infringed upon, misappropriated, diluted or otherwise violated, any Intellectual Property of any other Person, (ii) since the beginning of the Current Fiscal Year, no Seller has received any written charge, complaint, claim, demand, or notice (including in the form of "cease and desist" letters, indemnification claims or "invitation to license" offers) alleging any such infringement, misappropriation, dilution or violation, nor is there any Action pending or threatened relating to the same, and (iii) since the beginning of the Current Fiscal Year, no Person has initiated or threatened any Action challenging the validity, enforceability or ownership of any Acquired Intellectual Property.  To the Knowledge of Sellers, no Person has infringed upon, misappropriated, diluted or otherwise violated any of the Acquired Intellectual Property in any material respect.

66

(d)     To the extent any current or former officers, directors, employees, contractors and consultants of Sellers have made contributions for or on behalf of Sellers to the creation or development of any Intellectual Property that is material to the operations of Sellers, Sellers own the entire right, title and interest in such contributions.

(e)     Since the beginning of the Current Fiscal Year, there has been no material failure or other material substandard performance of any servers, computer hardware, networks, Software, databases, telecommunications systems, interfaces or related systems (collectively, "IT Systems") of Sellers, which has caused any material disruption to the operation of any of Sellers' businesses. Sellers have taken commercially reasonable (i) steps to provide for the backup and recovery of data and commercially reasonable disaster recovery plans, procedures and facilities of IT Systems included in the Potential Acquired Assets and, as applicable, have taken commercially reasonable steps to implement such plans and procedures and (ii) actions to protect the integrity and security of IT Systems included in the Potential Acquired Assets, the information stored thereon and Acquired Data from unauthorized use or access by third parties and from viruses and contaminants. Since the beginning of the Current Fiscal Year, and to the Knowledge of Sellers, since January 1, 2017, there have been no material unauthorized intrusions or breaches of the security of the IT Systems (including any ransomware attack), nor any material loss or breach of, or unauthorized access to, any data, in each case with respect to IT Systems or data that relate to the Potential Acquired Assets.

(f)     Sellers have taken commercially reasonable steps to protect and preserve the secrecy and confidentiality of all information and materials that derive independent economic value from not being generally known to the public and all Know-How of third parties which was provided to a Seller under confidentiality obligations. Sellers have not (A) deposited or agreed to deposit any source code of Software the rights to which are included in the Potential Acquired Assets into a source code escrow or (B) disclosed or agreed to disclose or delivered or agreed to deliver such source code to any Person, other than disclosures made pursuant to clause (B) to Persons who are subject to confidentiality obligations which restrict their use and disclosure of such source code to other Persons not bound by confidentiality restrictions, and no Person has any contractual right to receive such source code.

(g)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business or the ownership or operation of the Acquired Assets, since the beginning of the Current Fiscal Year, and to the Knowledge of Sellers, since January 1, 2017, (i) Sellers have complied with all applicable Laws and contractual obligations relating to the collection, transfer, storage, disposal, use, processing and disclosure of the Customer Data included in the Acquired Data, and (ii) to the Knowledge of Sellers, there have been no losses or thefts of Customer Data or any other data held by or on behalf of Sellers, and in each case, included in the Acquired Data. Since January 1, 2016, Sellers have not received any unresolved written notice, request or written claim from any Person, including any Governmental Authority, concerning the material violation of any applicable Laws relating to the collection, transfer, storage, disposal, use, processing or disclosure of personally identifiable information, and, to the Knowledge of Sellers, no investigation by any Governmental Authority regarding a violation of such Laws is pending or threatened, in each case, solely as related to the Potential Acquired Assets.

67

Section 6.11    Material Contracts.

(a)    Schedule 6.11 sets forth all of the following Orders or Contracts to which any Seller is a party or by which it is bound and that are currently in effect (or by which the Potential Acquired Assets may be bound or affected) other than the Leases (collectively, whether or not disclosed on Schedule 6.11, the "Material Contracts"):

(i)    with any labor union or association representing any Employees of any Seller;

(ii)    for the sale after the date hereof of any Potential Acquired Asset owned or used by Sellers for consideration in excess of $15,000,000;

(iii)    relating to the pending acquisition by any Seller of any operating business or the capital stock of any other Person;

(iv)    which is an IP License with respect to which annual payments or consideration furnished by or to Sellers pursuant to such IP License with respect to the Business is in excess of fifteen million dollars ($15,000,000) in the Current Fiscal Year (other than, (A) in the case of Inbound IP Licenses, (x) off-the-shelf, non-customized computer programs, and (y) non-exclusive licenses granted by suppliers and other service providers of Sellers, in each case, to the extent necessary to use, sell and offer to sell the products and services of such suppliers or service providers, as applicable, and entered into in the Ordinary Course of Business; and (B) in the case of Outbound IP Licenses, non-exclusive licenses to customers, suppliers, vendors and other service providers of Sellers, in each case to the extent necessary for their respective use of the products and services of the Business or for the manufacture of products on behalf of Sellers or provision of services to Sellers in connection therewith and entered into in the Ordinary Course of Business);

(v)    which involve any Potential Transferred Agreement (other than purchase orders entered into in the Ordinary Course of Business) the performance of which involves payment by or to any of Sellers of consideration in excess of $15,000,000 over the Current Fiscal Year and which cannot be canceled by notice of ninety (90) days or fewer without penalty or payment; and

(vi)    which regard the employment, services, consulting, termination or severance from employment relating to or for the material benefit of any director, officer, employee, independent contractor or consultant of any Seller and require annual payments by any Seller in excess of $400,000.

(b)    Sellers have delivered to Buyer true and complete copies of such Material Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement; provided, however, that Sellers shall not be required to deliver any Material Contract or amendment, modification, supplement, exhibit or restatement thereto that cannot be located notwithstanding the reasonable efforts of Sellers to locate such document if and only if such Material Contract is not an Assigned Agreement.

68

(c)    Each Material Contract is in full force and effect, has not been amended, modified or supplemented and is the valid and binding obligation of the Seller party thereto, and to the Knowledge of Sellers, each other party thereto, in each case except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditor's rights generally or general principles of equity.

(d)    If any Material Contract were to be designated by Buyer for assignment as an Assigned Agreement, upon entry of the Approval Order and payment of the Cure Costs, no Seller is in breach or in default under any Material Contract.

Section 6.12    <u>Seller SEC Reports</u>.    Since the beginning of the Current Fiscal Year, SHC has filed or furnished (as applicable) all forms, reports, schedules, statements and other documents with the SEC that have been required to be filed or furnished (as applicable) by it under applicable Laws prior to the date hereof (all such forms, reports, schedules, statements and other documents, as amended and supplemented, and together with all exhibits and schedules thereto, the "<u>Seller SEC Reports</u>"). As of its filing date (or, if amended or superseded by a filing prior to the date of this Agreement, on the date of such amended or superseded filing), (a) each Seller SEC Report complied as to form in all material respects with the applicable requirements of the Securities Act, the Exchange Act or the Sarbanes-Oxley Act, as the case may be (including, in each case, the rules and regulations promulgated thereunder), each as in effect on the date such Seller SEC Report was filed, and (b) each Seller SEC Report did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

Section 6.13    <u>Financial Statements</u>.    The consolidated financial statements of SHC and its Subsidiaries included or incorporated by reference into the Seller SEC Reports have been prepared in accordance with GAAP consistently applied during the periods and at the dates involved (except as may be indicated in the notes thereto or, with respect to any unaudited interim financial statements, the absence of footnote disclosures and other presentation items and normal year-end audit adjustments or as permitted by the SEC's rules and forms), comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto and fairly present in all material respects the consolidated financial position of SHC and its Subsidiaries as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended.

Section 6.14    <u>Litigation.</u>    Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, there are no Actions pending or, to the knowledge of Sellers, threatened before, or by any Governmental Authority against any Seller with respect to the Business.

Section 6.15    <u>No Other Representations or Warranties; No Survival</u>.    Except for the representations and warranties contained in this <u>Article VI</u> (subject to the disclosures set forth on the Schedules) and in the other Transactions Documents, as applicable, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers, its Subsidiaries, the Business, the Acquired Assets, the Assumed Liabilities, the Transactions or with respect to any information provided by or on behalf of Sellers to Buyer and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of

Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in this <u>Article VI</u> and in the other Transactions Documents, as applicable, the Sellers (a) expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or their respective representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Seller or any of its Affiliates). It is expressly acknowledged and agreed that Sellers make no representations or warranties to Buyer regarding the success or profitability of the Business or with respect to the assets, liabilities or business of the Business (as defined in the SHIP Purchase Agreement). The representations and warranties of Sellers will expire upon the Closing Date.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that the statements contained in this <u>Article VII</u> are true and correct as of the date hereof:

Section 7.1    <u>Organization and Good Standing; Organizational Documents; Ownership</u>. Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and the Acquired Assets and to carry on its business as now conducted and the Business. Buyer has delivered to Seller true and correct copies of the organizational documents of Buyer in effect as of the date hereof. All of the equity interests in Buyer as of the date hereof are owned of record and beneficially as set forth on <u>Schedule 7.1</u>.

Section 7.2    <u>Authority; Validity; Consents</u>. Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the Transactions. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the Transactions have been duly and validly authorized by all requisite corporate, partnership or limited liability company actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document required to be executed and delivered by Buyer at any time will be duly and validly executed and delivered by Buyer. This Agreement and (when duly executed by Buyer) the other Transaction Documents constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to requisite Bankruptcy Court approval, as applicable, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the Transactions, except for (a) expiration or termination of any applicable waiting periods under the HSR Act and

(b) such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a material adverse effect on Buyer's right or ability to consummate the Transactions.  There are no consents of any Buyer Related Party required for the execution, delivery and performance of the Transaction Documents and the consummation of the Transactions, including for the satisfaction of any condition set forth in <u>Article X</u> or <u>Article XI</u>.

Section 7.3    <u>No Conflict</u>.  When the consents and other actions described in <u>Section 7.2</u> have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Transactions will not result in the breach of any of the terms and provisions of, or constitute a default under, or materially conflict with, or require consent or the giving of a notice under, or cause any acceleration of any material obligation of Buyer under (a) any organizational documents of Buyer, (b) any Order or (c) any Law, except to the extent any such default, conflict or consent would not affect in any material respect Buyer's ability to consummate the Transactions.

Section 7.4    <u>Financing; Availability of Funds</u>.

(a)    Buyer shall deliver to Sellers concurrently herewith or prior to the execution of this Agreement a true, correct and complete copies of:

(i)    an executed equity commitment letter (the "<u>Equity Commitment Letter</u>") to Buyer from ESL Investments, Inc. (the "<u>Sponsor</u>"), including all annexes, exhibits, schedules and other attachments thereto, dated as of the date hereof, pursuant to which the Sponsor has committed to provide Buyer with equity financing in the amount set forth therein (the "<u>Equity Financing</u>") for the purpose of funding the Transactions;

(ii)    an executed mortgage loan commitment letter (the "<u>Real Estate Financing Commitment Letter</u>") to Buyer from the Cyrus Lender and the Sponsor, including all annexes, exhibits, schedules and other attachments thereto, dated as of the date hereof, pursuant to which Cyrus and the Sponsor have committed to provide Buyer with real estate mortgage financing in the amount set forth therein (the "<u>Real Estate Financing</u>") for the purpose of funding the Transactions;

(iii)    the executed Cyrus Commitment Letter; and

(iv)    the executed ABL Commitment Letter and the related fee letter (provided that fees, economics and other provisions which are customarily redacted in connection with acquisitions of this type may be redacted in a customary manner (to the extent any such provisions would not adversely affect the conditionality, enforceability, or availability of the amount of the Debt Financing necessary to consummate the Transactions)).

(b)    As of the date hereof, the Commitment Letters are in full force and effect and have not been withdrawn or terminated or otherwise amended or modified in any respect. As of the date hereof, the Commitment Letters are a legal, valid and binding obligation of Buyer and, to the knowledge of Buyer, the other parties thereto (subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and to general principles of equity). As of the date hereof, (x) there are no side letters or

other agreements, contracts or arrangements to which Buyer or any of its Affiliates is a party relating to the Financing that could affect the availability of the amount of the Financing funded on the Closing Date necessary to consummate the Transactions and (y) there are no conditions precedent or other contingencies related to the funding the Financing that could adversely affect the availability of the Financing or the timing of the Closing, other than as expressly set forth in the Commitment Letters. Buyer has fully paid any and all commitment fees or other fees required by the Commitment Letters to be paid by it on or prior to the date of this Agreement. Assuming the satisfaction of the conditions set forth in Article X, as of the date hereof, Buyer has no reason to believe that any of the conditions to the Financing in the Commitment Letters will not be satisfied. As of the date hereof, Buyer is not aware of any fact or occurrence that, with or without notice, lapse of time or both, would reasonably be expected to result in the Financing not being available on a timely basis in order to consummate the Transactions.

(c)     Assuming (i) the accuracy of the representations and warranties set forth in Article VI of this Agreement and (ii) the performance by Sellers of their respective obligations hereunder in a manner sufficient to satisfy the condition specified in Section 10.2, the net proceeds from the Financing will be sufficient to consummate the Transactions, including the payment by Buyer of all obligations pursuant to this Agreement and any fees and expenses payable by Buyer on the Closing Date (including in respect of the Debt Financing).

(d)     The obligations of Buyer under this Agreement are not contingent on the availability of the Debt Financing.

(e)     Buyer owns of record and beneficially obligations in the amount it is credit bidding under Section 3.1(b) and a sufficient amount of the aggregate obligations outstanding under the Second Lien Term Loan, Second Lien Line of Credit Facility and the Second Lien PIK Notes to direct the Second Lien Trustee to credit bid 100% of such amount as provided in Section 3.1(b)(iv).

Section 7.5     Litigation.   There are no Proceedings pending or, to the knowledge of Buyer, threatened, or to which Buyer is otherwise a party before any Governmental Authority, that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the Transactions.

Section 7.6     Brokers or Finders.   Except for any brokers utilized by Buyer in the normal course of business (which brokers shall be compensated, if at all, by Buyer), neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the Transactions for which Sellers are or will become liable, and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

Section 7.7     Condition of Acquired Assets; Representations.

(a)     Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article VI (subject to the disclosures set forth on the Schedules), and Buyer acknowledges and agrees that the Acquired Assets are being transferred on an "as is", "where is" basis.  Buyer acknowledges and accepts the

disclaimers made by Sellers in <u>Section 6.16</u>.  Buyer acknowledges that it has conducted to its satisfaction its own independent investigation of the Business, the Acquired Assets and Assumed Liabilities and, in making the determination to proceed with the Transactions, Buyer has relied solely on the results of its own independent investigation.    In connection with Buyer's investigation, Buyer has received or may receive from Sellers certain projections, forward-looking statements and other forecasts and certain business plan information.  Buyer acknowledges that Sellers make no representation or warranty with respect to forward-looking estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).  Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer shall have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges that Sellers make no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans) or the success or profitability of the Business.

Section 7.8    <u>No Survival</u>.  The representations and warranties of Buyer will expire upon the Closing Date.

## ARTICLE VIII

## ACTION PRIOR TO THE CLOSING DATE

Section 8.1    <u>Operations</u>.

(a)    From the date hereof and prior to the Closing, except (i) as required by applicable Law, (ii) as expressly contemplated by this Agreement or (iii) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, delayed or conditioned), Sellers covenant and agree to comply with applicable Law in all material respects and to use commercially reasonable efforts to conduct their business in the Ordinary Course of Business (taking into account Sellers' status as debtors-in-possession), including (A) to maintain and preserve the Potential Acquired Assets in their condition as of October 15, 2018 (including by using commercially reasonable efforts to comply with instructions from Buyer as to the renewal (or lack of renewal) of each Lease and other Potential Transferred Agreement that comes up for renewal), other than reasonable wear and tear, casualty and condemnation (which shall be governed by <u>Section 12.3</u>), and sales of Inventory in the Ordinary Course of Business, (B) by using commercially reasonable efforts to cause the landlord under the respective Leases and any applicable counterparty under the Outbound IP Licenses and any other Potential Transferred Agreements to perform such parties' covenants, agreements and obligations under the respective Leases, Outbound IP Licenses and other Potential Transferred Agreements and (C) managing Inventory in the Ordinary Course of Business, including with regard to Inventory in transit and Inventory located in distribution centers (and for the avoidance of doubt, Sellers shall not delay taking delivery of Inventory that would be Acquired Inventory on the Closing Date if delivery of such Inventory were managed in the Ordinary Course of Business prior to the Closing Date;

provided, that Sellers shall be permitted to reasonably manage the amount of Inventory in consultation with Buyer in order to satisfy the condition set forth in Section 10.9 and Section 10.10 as of the Closing).    Sellers shall promptly notify Buyer of (x) any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions; and (y) the commencement of any material Proceedings related to the business conducted by Sellers, the Designations Rights or the Potential Acquired Assets; provided, however, that the delivery of any notice pursuant to this Section 8.1(a) will not (A) limit or otherwise affect any remedies available to Buyer or Sellers, or (B) be deemed to amend or supplement any Schedule or prevent or cure any misrepresentations or breach of representation or warranty.

(b)    Without limiting the generality of the foregoing, from the date hereof and prior to the Closing, Sellers covenant and agree:

(i)    not to sell, lease (as lessor), license (as licensor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than Permitted Pre-Closing Encumbrances) on, any Potential Acquired Assets (excluding the Acquired Intellectual Property and Acquired Data, which are addressed below), other than sales of Inventory in the Ordinary Course of Business;

(ii)    not to assign, transfer, otherwise dispose of or convey any Patent, Trademark, registered or applied-for Copyright or Domain Name included in the Acquired Intellectual Property, or any other material Acquired Intellectual Property or any Acquired Data, except, with respect to the purging of any Acquired Data, as required by the consumer privacy ombudsman or the Bankruptcy Court; provided Sellers provide Buyer written notice describing the steps that Sellers plan to take in order to accomplish such requirement, at least five (5) Business Days prior to any response that would violate this covenant absent such requirement;

(iii)    not to allow to lapse, abandon, cancel, fail to renew or fail to continue to prosecute, protect or defend any (A) Patent, Trademark, registered or applied-for Copyright or Domain Name included in the Acquired Intellectual Property, or any other material Acquired Intellectual Property, in each case, other than registered Trademarks (x) that Sellers have ceased to use and intend not to resume use of and (y) that have entered the grace period for renewal, or (B) Acquired Data, except, with respect to the purging of any Acquired Data, as required by the consumer privacy ombudsman or the Bankruptcy Court; provided Sellers provide Buyer written notice describing the steps that Sellers plan to take in order to accomplish such requirement, at least five (5) Business Days prior to any response that would violate this covenant absent such requirement;

(iv)    not to license or grant any Person any rights to any Acquired Intellectual Property or any Acquired Data (other than, in each case, non-exclusive licenses granted to customers, vendors, suppliers and other service providers of Sellers to the extent necessary for their respective use of the products and services of Sellers or for the provision of services to Sellers in connection therewith and entered into in the Ordinary Course of Business);

74

(v)      not to modify any privacy policies, notices or statements in a manner that (A) limits the ability or right of a Seller to sell and transfer the Acquired Data to Buyer, or (B) limits the use of the Acquired Data by Buyer after the Closing;

(vi)      not to settle, pay, discharge or satisfy any material Action that, in each case, would constitute a Potential Acquired Asset (for the avoidance of doubt, other than any Excluded Assets) or Assumed Liability where such settlement, payment, discharge or satisfaction would impose any restrictions or limitations upon the operation of Sellers' business or any Acquired Assets, whether before or after the Closing Date;

(vii)      not to cancel or compromise any claim or waive or release any right related to any Potential Acquired Asset (for the avoidance of doubt, other than any Excluded Assets);

(viii)      except as required by Section 8.1(a) or permitted under Section 8.1(b)(iv) with respect to Outbound IP Licenses, not to amend, supplement, modify, terminate or enter into any Leases, Outbound IP Licenses (under which a Seller is a licensor) or other Potential Transferred Agreements;

(ix)      unless required by Law, not to take any action, without the consent of Buyer (which may not be unreasonably delayed, conditioned or denied), with respect to Taxes or Tax matters that is not in the Ordinary Course Of Business and that (A) would materially adversely affect the Potential Acquired Assets, the Properties, Business and the Assumed Liabilities or (B) otherwise could reasonably be expected to increase the Tax Liability of Buyer or any of its Affiliates;

(x)      to use commercially reasonable efforts to cause any applicable counterparty under the IP Licenses included in the Assigned Agreements to perform such party's covenants, agreements and obligations under such IP Licenses, including with respect to quality control;

(xi)      not to grant or terminate any other interests in any Potential Acquired Asset (other than sales of Inventory in the Ordinary Course of Business);

(xii)      not to seek or obtain an order approving rejection of a Lease or other Potential Transferred Agreement;

(xiii)      not to issue any gift cards, gift certificates, merchandise credits, return credits, customer membership or customer loyalty discount programs, coupons, groupons or other similar credits or programs at a discount or pursuant to any promotion that would result in any Seller receiving less than face value in such issuance;

(xiv)      not to (A) increase the annual level of compensation payable or to become payable by any Seller to any director or officer of any Seller, except in the Ordinary Course of Business, (B) increase the annual level of compensation payable or to become payable by any Seller to any other employee of any Seller, except in the Ordinary Course of Business, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect

75

compensation to any director, officer or employee except as authorized by the Bankruptcy Court, (D) increase the coverage or benefits available under any (or create any new) Employee Plan (E) take any action (other than a termination of employment in accordance with clause (xiv) of this Section 8.1(b)), whether in writing or otherwise, that has or could reasonably be expected to have the effect of increasing in any manner the liability of the Buyer or any Seller for any severance or other post-termination payments or benefits otherwise payable or due to any individual or group of individuals, or otherwise enhancing, or accelerating the timing of, such payment or benefit or accelerating the funding thereof, or (F) enter into any employment, deferred compensation, severance, consulting, noncompetition or similar agreement to which any Seller is a party or involving a director, officer or employee of any Seller, except, in each case, as required by applicable Law from time to time in effect or by any of the Employee Plans as in effect on the date hereof;

(xv)    not to terminate the employment of any director, officer or employee of any Seller other than in the Ordinary Course of Business;

(xvi)    not to enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization with respect to any Potential Acquired Asset;

(xvii)    not to permit Sears Re to (A) pay any dividend or distribution, (B) issue any debt or equity securities or (C) take any of the actions described in this Section 8.1(b) with respect to its assets or Contracts; and

(xviii)    not to enter into any agreement or commitment to take any action prohibited by this Section 8.1(b).

(c)    Without in any way limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that (i) nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers, Sellers' business or the Properties prior to the applicable Closing Date and (ii) prior to the Closing Date, Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the operations of Sellers, the Business and the Properties to the extent permitted by Law, including taking into account Sellers' status as debtors-in-possession in the Bankruptcy Case.  Notwithstanding anything herein to the contrary, Sellers shall be permitted to take all actions that are necessary or desirable to comply with the WARN Act, including providing any notices required under the WARN Act, and no such actions shall constitute a violation of this Section 8.1.

Section 8.2    Bankruptcy Court Matters.

(a)    Reserved.

(b)    Bankruptcy Court Filings and Approvals.

(i)    Buyer agrees that it will promptly furnish such affidavits or other documents or information for filing with the Bankruptcy Court as are reasonably requested by Sellers

to assist Sellers in obtaining entry of the Approval Order, including a finding of adequate assurance of future performance by Buyer. Sellers shall provide Buyer with advance drafts of any motions, pleadings or Bankruptcy Court filings relating to the sale of the Acquired Assets or the Approval Order no later than two (2) Business Days prior to the date Sellers intend to file such motion, pleading or Bankruptcy Court filing to the extent practicable (or, to the extent not practicable, as soon as reasonably practicable prior to the filing of such pleading). Buyer may file or join in any motion, pleading or Bankruptcy Court filing in support or seeking approval of, and reply to any response or objection to, the sale of the Acquired Assets hereunder, and the Approval Order.

(ii)     Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Agreements and to determine the amount of the Cure Costs; provided, that subject to Section 2.7, Section 2.9 and Section 5.2, nothing herein shall preclude Sellers from filing such motions, including from and after the Petition Date, to reject any Contracts that are not Assigned Agreements.

(iii)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better Competing Transactions.

(iv)     Sellers and Buyer acknowledge that Buyer (or any applicable Assignee) must provide adequate assurance of future performance under the Assigned Agreements to be assigned by Sellers, and Buyer hereby agrees to provide such adequate assurance to the extent required under the Bankruptcy Code and the Bidding Procedures Order, including by demonstrating financial wherewithal to pay Cure Costs.

(v)     Buyer and Sellers shall reasonably cooperate as requested by the consumer privacy ombudsman appointed in these Bankruptcy Cases and shall use commercially reasonable efforts to take actions recommended by such ombudsman pursuant to 11 U.S.C. § 332 in any report authored by such ombudsman and approved or adopted by the Bankruptcy Court in the Approval Order.

(vi)     After entry of the Approval Order, Sellers shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Approval Order.

(vii)     If applicable, Sellers shall cause any plan of reorganization or liquidation approved in the Bankruptcy Cases to permit assumption of Sellers' executory contracts and unexpired leases of real property through the end of the Designation Rights Period.

(c)     Back-Up Bidder. Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction, if (i) Buyer submits the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid, and (ii) Sellers give written notice to Buyer on or before the tenth (10th) Business Day prior to the Outside Date, stating that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer shall promptly consummate the Transactions upon the terms and conditions as set forth herein, including the Purchase Price.

(d)    Bankruptcy Milestones. The Parties will use reasonable best efforts to comply with the following milestones:

(i)    to obtain entry of the Approval Order by the Bankruptcy Court on or before February 8, 2019 (subject to Bankruptcy Court availability).

(ii)    to close the Transactions on or before February 19, 2019.

Section 8.3    Registrations, Filings and Consents.

(a)    Subject to the Parties' additional obligations under this Section 8.3, each Party shall use its respective reasonable best efforts and, as applicable, cooperate with the other Parties, to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things reasonably necessary, proper or advisable under Laws to consummate and make effective the Transactions, including using its respective reasonable best efforts (i) to fulfill all conditions to the other Party's obligation to effect the Closing in Article X, (ii) to execute, acknowledge and deliver in proper form any further documents, certificates, agreements and other writings, and take such other action as such other Party may reasonably require, in order to effectively carry out the intent of the Transaction Documents, (iii) to make or cause to be made all registrations, filings, notifications, submissions and applications with, to give all notices to and to obtain any consents, governmental transfers, approvals, orders, qualifications and waivers from any Governmental Authority necessary for the consummation of the Transactions and (iv) not take any action that could reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any such consents, approvals or waivers.

(b)    The Parties shall duly file with the FTC and the Antitrust Division the notification and report forms (each an "HSR Filing"), that may be required under the HSR Act necessary to consummate the Transactions, as promptly as possible and in no event later than January 18, 2019, including with respect to Buyer causing to be filed by its Affiliates and interest holders any HSR Filings necessary to consummate the Transactions. If an HSR Filing is required, each Party shall cooperate with the other Party to the extent necessary to assist the other Party in the preparation of its HSR Filing, to request early termination of the waiting period required by the HSR Act with respect to the HSR Filing and, if requested, to promptly amend or furnish additional information under its HSR Filing. Each Party shall as promptly as practicable comply with any Laws that are applicable to any of the Transactions and pursuant to which any consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority is necessary. Subject to applicable Laws and the preservation of any applicable attorney-client privilege, the Parties shall promptly furnish to each other all such information as is necessary to prepare any such registration, declaration or filing. The Parties shall have joint decision-making authority with respect to the strategy for obtaining any necessary consents, approvals, orders or authorizations from any Governmental Authority, including under any Antitrust Laws. Neither Buyer nor Sellers, nor their respective counsel, shall independently participate in any substantive call or meeting with any Governmental Authority regarding the Transactions without giving the other Party or its counsel prior notice of such call or meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate. In furtherance of the foregoing and to the extent permitted by applicable Law: (i) each Party shall notify the other, as far in advance as practicable, of any material or substantive communication or inquiry it or any of

78

its Affiliates or Subsidiaries intends to make with any Governmental Authority relating to the matters that are the subject of this Section 8.3; (ii) prior to submitting or making any such communication or inquiry, such Party shall provide the other Party and its counsel a reasonable opportunity to review, and shall consider in good faith the comments of the other Party in connection with, any such communication or inquiry; (iii) promptly following the submission or making such communication or inquiry, provide the other Party with a copy of any such communication or inquiry, if in written form; and (iv) consult with the other Party in connection with any inquiry, hearing, investigation or litigation by, or negotiations with, any Governmental Authority relating to the Transactions, including the scheduling of, and strategic planning for, any meetings with any Governmental Authority relating thereto. In exercising the foregoing cooperation rights, Buyer and Sellers each shall act reasonably and as promptly as reasonably practicable. Notwithstanding the foregoing, materials provided pursuant to this Section 8.3 may be reasonably redacted (A) to remove references concerning the valuation of the Transactions, (B) as necessary to comply with contractual arrangements, (C) as necessary to address reasonable privilege concerns or (D) as otherwise required by Law. The Parties shall bear their own costs and expenses incurred with respect to the preparation of their respective filings contemplated in this Section 8.3(b), provided, however, that Buyer shall pay the filing fees, if any, in connection therewith.

(c)    Each of Seller and Buyer agrees that it will (and will cause its Affiliates to), if necessary to enable the Parties to consummate the Transactions, use reasonable best efforts to defend against any Actions that would prevent, delay or challenge the Transaction Documents or the consummation of the Transactions, including by seeking to vacate or reverse any temporary restraining order, preliminary injunction or other legal restraint or prohibition entered or imposed (or which becomes reasonably foreseeable to be entered or imposed) by any court or other Governmental Authority that is not yet final and nonappealable, in order that the Transactions shall occur as promptly as reasonably practicable and in any event no later than the Outside Date.

(d)    Buyer shall, at Buyer's sole cost, take, or cause to be taken, any and all actions and do, or cause to be done, any and all things necessary, proper or advisable to avoid, eliminate and resolve each and every impediment and obtain all Consents required to permit the satisfaction of the conditions in Section 10.4, Section 10.5, Section 11.3, and Section 11.4, as promptly as reasonably practicable and in any event no later than the Outside Date, including by offering and causing its Affiliates to offer to: (i) sell or otherwise dispose of, or hold separate and agree to sell or otherwise dispose of specific assets or categories of assets or businesses constituting the Business or any of the Acquired Assets or any other assets or businesses owned by Buyer or its Affiliates; (ii) terminate any existing relationships and contractual rights and obligations of Buyer or its Affiliates including, after the Closing, the Business or any of the Acquired Assets; (iii) amend or terminate such existing licenses or other intellectual property agreements and to enter into such new licenses or other intellectual property agreements; (iv) take any and all actions and make any and all behavioral commitments, whether or not they limit or modify Buyer's or its Affiliates' rights of ownership in, or ability to conduct the business of, one or more of its or their operations, divisions, businesses, product lines, customers or assets, including, after the Closing, the Business or any of the Acquired Assets; and (v) enter into agreements, including with the relevant Governmental Authority, giving effect to the foregoing clauses (i) through (iv) (such actions in clauses (i) through (v), "Antitrust Actions"); provided, that such Antitrust Actions are conditioned

79

upon and become effective only from and after the Closing. In furtherance of the foregoing, prior to the Closing, Buyer shall keep Sellers reasonably informed of all matters, discussions and activities relating to any of the matters described in or contemplated by clauses (i) through (v) of this Section 8.3(d).

(e)    Notwithstanding anything herein to the contrary, neither Buyer nor Seller, without the other Party's prior written consent, shall (i) enter into any timing, settlement or similar agreement, or otherwise agree or commit to any arrangement that would have the effect of extending, suspending, lengthening or otherwise tolling the expiration or termination of the waiting period applicable to the Transactions under the HSR Act or any Antitrust Laws, or (ii) enter into any timing or similar agreement, or otherwise agree or commit to any arrangement, that would bind or commit the Parties not to complete the Transactions (or that would otherwise prevent or prohibit the Parties from completing the Transactions).

Section 8.4    Financing Assistance; Additional Information.

(a)    From the date hereof to earlier of (x) the date this Agreement is terminated in accordance with its terms and (y) the Closing Date, Sellers shall provide to Buyer and shall use reasonable best efforts to cause its officers, employees and advisors to provide to Buyer, such cooperation as is customary for financings of the type contemplated by the Debt Commitment Letters and as is reasonably requested by Buyer in connection with arranging and obtaining the Debt Financing, which cooperation includes using reasonable best efforts to (i) cause the participation by one or more representatives of senior management in a reasonable number of meetings, due diligence sessions and presentations upon reasonable prior notice and in reasonably convenient locations, (ii) reasonably assist Buyer and the ABL Financing Sources with the preparation of (A) one or more customary bank information memoranda (and, to the extent necessary, additional information memoranda that do not include material non-public information), (B) customary materials for rating agency presentations, (C) syndication materials, (D) lender presentations and (E) other customary marketing and similar documents, each in connection with the syndication and marketing of the ABL Financing (including customary authorization and representation letters), (iii) furnish to Buyer and the ABL Financing Sources, on a timely basis, the Required Information and such other customary financial and other pertinent information regarding Sellers (including information regarding the business, operations and financial projections thereof) as may be reasonably requested by Buyer to assist in the preparation of a customary confidential information memorandum or other customary information documents used in financings of the type contemplated by the ABL Commitment Letter, (iv) cooperate with the Buyer's and the ABL Financing Sources' reasonable evaluation of the applicable Sellers for the purpose of establishing collateral arrangements (including conducting, at the Buyer's sole cost and expense, appraisals and field audits contemplated by the ABL Commitment Letter and providing information reasonably requested with respect to inventory, receivables, cash management and accounting systems, deposit accounts and related assets and procedures), in each case, to the extent customary in asset-based revolving credit facilities (including by providing Buyer and the Financing Sources with reasonable and customary access to the books and records, properties and applicable representatives of Sellers), (v) (A) reasonably cooperate with the marketing efforts of Buyer and the Financing Sources for any portion of the Debt Financing and (B) ensure that the syndication efforts for the ABL Financing benefit materially from the existing

banking relationships of the Sellers, (vi) permit the use by Buyer and its Affiliates of the Sellers' logos and/or Trademarks included in the Acquired Assets in connection with the syndication of the Debt Financing, provided that such logos and/or marks are used in a manner that is not intended, or reasonably likely, to harm or disparage Sellers, (vii) cause the taking of corporate actions by the Sellers that are necessary to permit the consummation of the Financing on the Closing Date as are reasonably requested by Buyer, (viii) facilitate the release and termination, effective upon the Closing, of liens and security interests, including obtaining customary release letters (including delivery of draft Payoff Letters at least three (3) Business Days prior to the anticipated Closing Date), lien terminations and releases and other similar documents as may reasonably be requested by Buyer and (ix) execute and deliver any documents as reasonably requested by Buyer as are customary in financings of such type and as are accurate, and otherwise facilitate the pledging of and granting, recording and perfection of security interests in share certificates, securities and other collateral (including releasing any Liens on the Acquired Assets in connection with any existing indebtedness of Sellers) and the obtaining of appraisals, surveys and title insurance as reasonably requested by Buyer; it being understood and agreed that (A) no such corporate action will take effect prior to the Closing and (B) any such corporate action will only be required of the directors, members, partners, managers or officers of the Sellers who retain their respective positions as of the Closing; provided that no obligation of Sellers shall be effective until the Closing Date; provided, however, that nothing herein shall require Sellers to (A) waive or amend any terms of this Agreement or cause any condition to Closing set forth in Article X to not be satisfied or otherwise cause any breach of this Agreement, (B) authorize, execute, and/or deliver any certificate, document or instrument pursuant to the Debt Financing that will be effective prior to the Closing Date, (C) take any action that would conflict with any applicable Law, the organizational documents of Sellers or result in the contravention of, or would reasonably be expected to result in the violation or breach of, or default under, any Material Contract to which any of Sellers is a party or (D) prepare, assist in the preparation of, or otherwise provide any information that is not in the possession or control of Sellers or any other information to the extent such disclosure (x) may result in a waiver of attorney-client privilege, work product doctrine or similar privilege, provided that Sellers shall use reasonable best efforts to provide such information in a form or manner that would not waive such legal privilege (including by redacting or otherwise not disclosing any portion thereof the disclosure of which would jeopardize such privilege) or (y) would violate any confidentiality obligation of Sellers.

(b)    Sellers shall not be required to pay any commitment fees or other fees or make any other payment (other than reasonable out-of-pocket costs) or incur any other liability or provide or agree to provide any indemnity in connection with the Debt Financing or any of the foregoing that would be effective prior to the Closing. Buyer shall promptly reimburse Sellers for all out-of-pocket costs and expenses (including attorneys' fees) incurred by Sellers or any of their Affiliates in connection with the cooperation of the Sellers contemplated by this Section 8.4 and shall indemnify and hold harmless Sellers, their Affiliates and their respective representatives from and against any and all losses suffered or incurred by any of them of any type in connection with the arrangement of any Financing and any information used in connection therewith, except in the event such loss or damage arises out of or results from the gross negligence, willful misconduct or bad faith by Sellers or their Affiliates or, in each case, their respective representatives.

Section 8.5    Financing.

(a)     Buyer shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, as promptly as possible, all things necessary, advisable or desirable to (i) satisfy on a timely basis all terms, conditions, representations and warranties applicable to Buyer set forth in the Commitment Letters (including any flex provisions) (or, if deemed advisable by Buyer, seek a waiver of conditions applicable to Buyer contained in the Commitment Letters) (and, for the avoidance of doubt, this clause (i) shall have no effect where the failure to satisfy such terms, conditions, representations and warranties results directly from the Sellers' failure to furnish the Required Information or breach of their obligations hereunder in a manner that would cause the condition in Section 10.2 not to be satisfied), (ii) maintain in effect the Commitment Letters through the Closing Date (as such may be amended, supplemented, modified and replaced in accordance with the terms hereof), (iii) negotiate and enter into Debt Financing Documents and enforce its rights under the Debt Commitment Letters (other than pursuant to any Action taken prior to the satisfaction or waiver of the conditions set forth in Article X and Article XI hereunder) and (iv) upon satisfaction of the conditions set forth in the Commitment Letters, consummate the Financing at the Closing; provided, however, that, if all or any portion of funds in the amounts and on the terms set forth in the Debt Commitment Letters become, or would be reasonably expected to become, unavailable to Buyer on the terms and conditions set forth therein (including any "flex" provisions related thereto) and such portion is reasonably required to fund the transactions contemplated by this Agreement and all fees, expenses and other amounts contemplated to be paid (or caused to be paid) by Buyer pursuant to this Agreement, in each case other than as a result of a breach by Sellers of any representation, warranty or covenant contained in this agreement in a manner that would cause the conditions in Section 10.1 or Section 10.2 not to be satisfied, Buyer shall use its reasonable best efforts to obtain substitute alternative financing (the "Alternative Financing") for all or such portion of such funds to the extent so unavailable, (i) in amounts and otherwise on terms and conditions no less favorable to Buyer than as set forth in the applicable Debt Commitment Letter and (ii) that does not expand upon the conditions precedent or contingencies to funding the Financing on the Closing Date as set forth in the applicable Debt Commitment Letter or Debt Financing Documents with respect to the Alternative Financing; provided, further, that, if Buyer proceeds with Alternative Financing, it shall be subject to the same obligations with respect to such Alternative Financing as set forth in this Section 8.5 as with respect to the Debt Financing. For the avoidance of doubt, references to the "Debt Commitment Letter" shall include such document as permitted or required by this Section 8.5 for such Alternative Financing from the time of such substitution.

(b)     Buyer shall provide prompt written notice of (i) any material breach or default (or any event or circumstance that, with or without notice, lapse of time or both, would reasonably be expected to give rise to any material breach or default) by Buyer under the Commitment Letters, or to the knowledge of Buyer, any other party to the Commitment Letters or definitive agreement related thereto and (ii) receipt by Buyer of any written notice or other written communication from any party to the Commitment Letters with respect to any actual or threatened material breach, default, termination or repudiation by any party to the Commitment Letters or any definitive agreement related thereto or any provision of the Financing or any definitive agreement related thereto (including any proposal by any Financing Source to withdraw, terminate, reduce the amount of financing necessary to consummate the transactions contemplated hereby or materially delay the timing of the financing contemplated by Commitment Letters). Buyer shall not consent to (i) any replacement, amendment or waiver of any provision or remedy under any Commitment

Letter (including, for the avoidance of doubt, any provision of any fee letter or engagement letter related thereto) without Sellers' prior written consent if such replacement, amendment or waiver (A) reduces the aggregate amount of the Financing (including by changing the amount of fees to be paid or original issue discount thereof, unless, in the case of the Debt Commitment Letters, any such change is matched from Alternative Financing to the extent required or permitted pursuant to <u>Section 8.5(a)</u>), unless such portion is not reasonably required to fund the transactions contemplated by this Agreement or (B) imposes new or additional conditions precedent or changes the conditions precedent to the Financing or otherwise changes the terms of the Financing, in each case, in a manner that would reasonably be expected to delay in any material respect or prevent the Closing or make the funding of the Financing materially less likely to occur or adversely impact in any material respect Buyer's ability to enforce its rights under any such Commitment Letter or to consummate the transactions contemplated hereby (for the avoidance of doubt, it is understood that, subject to the limitations set forth in this <u>Section 8.5</u>, Buyer may amend the Debt Commitment Letters to add lenders, lead arrangers, bookrunners, syndication agents or similar entities, but if and only if the addition of such additional parties, individually or in the aggregate, and together with any amendments or modifications to such Debt Commitment Letter in connection therewith, would not result in the occurrence of a modification to such Commitment Letter prohibited by this clause (i)) and (ii) termination of such Commitment Letter prior to the Closing Date (unless, in the case of the Debt Commitment Letter, Buyer has arranged for Alternative Financing to the extent permitted or required by <u>Section 8.5(a)</u>). Buyer shall provide to Sellers copies of any commitment letter associated with a replacement Financing or Alternative Financing as well as any amendment or waiver of any Commitment Letter. For the avoidance of doubt, references to "Commitment Letter" shall include as such Commitment Letter is modified in accordance with this <u>Section 8.5(b)</u> from the time of such modification.

Section 8.6    <u>Trade Payables</u>.  The Sellers shall make all payments in respect of payables of the Business (including rent payments and sales taxes) arising from the date of this Agreement until the Closing Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in accordance with the Sellers' cash management policies and practices (as in effect prior to the Petition Date) in the Ordinary Course of Business; provided that Seller's obligations pursuant to this <u>Section 8.6</u> with respect to taxes are limited to taxes that are not Assumed Liabilities. Within fourteen (14) days following the date hereof, the Sellers shall deliver to Buyer an initial report containing an aging report for all payables of the Business allocated by vendor. For the period following the date of this Agreement until the Closing Date, Sellers shall make their employees and advisors (including the Chief Restructuring Officer) reasonably available (during business hours) upon reasonable advance notice from Buyer to answer any questions Buyer may have, and provide such additional information Buyer may reasonably request, with respect to any accrued payables of the Business.

Section 8.7    <u>SHIP Purchase Agreement</u>.  From the date hereof until the earlier of (a) the SHIP Closing or (b) any Termination (as defined in the SHIP Purchase Agreement), Sellers shall not amend or modify the SHIP Purchase Agreement or waive any rights under the SHIP Purchase Agreement without the prior written consent of Buyer.

Section 8.8    <u>Transition Services Agreement; Management Services Agreement</u>.

83

(a)    The Parties shall work together in good faith and use their respective reasonable best efforts to agree as to the terms of, and execute, a transition services agreement pursuant to which Sellers shall provide Buyer and Buyer shall provide Sellers, as applicable, with certain services for a transitional period following the Closing Date.

(b)    To the extent permitted by applicable Law, during the Management Services Period, the applicable Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective  (the "Management Services").  Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, each of the Sellers hereby appoints Buyer and its Affiliated Designees as agent of such Seller to manage, control and operate each of (i) the Acquired Properties, (ii) Occupancy Leased Premises and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties").  Pursuant to their appointment as Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion and collect and retain all revenues generated by each Managed Property.  In furtherance thereof, the Parties acknowledge and agree that Sellers shall have no economic interest in the Managed Properties other than the right to receive the Management Services Reimbursements.  As consideration for the provision of the Management Services, Buyer shall reimburse Sellers, or cause Sellers to be reimbursed, for any reasonable and documented out-of-pocket costs, fees and expenses incurred at any time in providing the Management Services, including any income and other taxes incurred by Seller and its Subsidiaries in respect of the payment and receipt of such reimbursement (the "Management Services Reimbursements") and indemnify the Sellers from any Liability arising from the provision of the Management Services, except for any such Liability arising from gross negligence or willful misconduct of the Sellers.  For the avoidance of doubt, all employees of the Managed Properties shall be employed by Buyer or its Affiliated Designee and no Seller shall have any authority to take action as an employer with respect to any such employee or to enter into any Contract on behalf of Buyer or any Affiliated Designee.

Section 8.9    Sparrow Rent.  Sellers shall pay on the Closing Date all accrued and unpaid rent to each of SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC that are not "dark" stores.  All parties' rights with respect to rent at the "dark" stores shall be reserved.

## ARTICLE IX

## ADDITIONAL AGREEMENTS

Section 9.1    Access to Information.  Sellers agree that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees and representatives (including legal advisors, Financing Sources, consultants, appraisers and accountants), to make such investigation of the properties (including non-invasive environmental site assessments), businesses and operations of Sellers' businesses (including any of the Properties) and such examination of the Books and Records of Sellers' businesses, the Acquired Assets and the Assumed Liabilities as is reasonable

(and reasonably requested) and to make extracts and copies of such Books and Records.  Any such investigation and examination shall be conducted in a reasonable manner (and shall not unreasonably interfere with the operations of Sellers), during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to any applicable restrictions under applicable Law. Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Sellers to reasonably cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and Buyer's representatives shall reasonably cooperate with Sellers and Sellers' representatives and Buyer and Buyer's representatives shall, at all times and at the discretion of Sellers, take all reasonable measures to minimize any disruption to Sellers' business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would (x) require any Seller to disclose information subject to attorney-client privilege, <u>provided</u> that Sellers shall use reasonable best efforts to provide information in response to such an investigation or examination in a form or manner that would not waive such attorney-client privilege (including by redacting or otherwise not disclosing any portion thereof the disclosure of which would jeopardize such privilege) or (y) conflict with any confidentiality obligations to which the Sellers or any of their Subsidiaries are bound.

Section 9.2    <u>Tax-Related Undertakings and Characterization of the Transaction</u>.

(a)    Unless Buyer makes the election under <u>Section 2.12(b)</u> to treat all the transactions described in <u>Article II</u> as Designated Sale Transactions (resulting in no transfer of Sellers' Tax attributes to Buyer): (1) Buyer shall provide to Sellers detailed instructions as to steps to take (or not take) in order to secure and preserve the qualification of any of the transactions set forth in this Agreement as a Tax Reorganization (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller) and to achieve the Tax Result, including, without limitation, with respect to (i) repayment, cancellation or settlement of, or other actions with respect to, intercompany accounts after the approval of the Bankruptcy Plan and on or before the Closing Date, (ii) the merger of any of Sellers' Subsidiaries with another Sellers' Subsidiaries after the approval of the Bankruptcy Plan and on or before the Closing Date or conversion of any of Sellers' Subsidiaries into limited liability companies with effect after the approval of the Bankruptcy Plan and on or before the Closing Date, (iii) the filing of any Tax elections to treat any such Subsidiaries as disregarded entities for U.S. federal income tax purposes with effect after the approval of the Bankruptcy Plan and on or before the Closing Date or otherwise taking such action to establish that such Subsidiaries have liquidated for tax purposes after the approval of the Bankruptcy Plan and on or before the Closing Date, (iv) implementation of the Distribution Requirement in a manner that is consistent with section 507 of the Bankruptcy Code, (v) satisfaction of the ownership requirements set forth in section 382(l)(5)(A)(ii) of the Code, and (vi) any other instructions that in the reasonable opinion of tax counsel for Buyer are necessary or desirable to ensure the qualification of the Tax Reorganization and the achievement of the Tax Result, and Sellers shall follow such instructions; <u>provided</u> that (A) such instructions shall not limit Sellers' discretion or actions in respect of (x) operating the Business and its other Assets in the Ordinary Course of Business and in compliance with the other provisions of this Agreement for all periods through the Closing Date, (y) disposing of any of its Assets if and to the extent permitted under the other provisions of this Agreement (z) taking or refraining from taking any action required by this Agreement or under the law, including if such

85

actions would be inconsistent with its obligations under the Bankruptcy Code, (B) if requested by Sellers, Buyer's tax counsel shall deliver to Sellers a Tax Opinion that each and any such transaction (other than any Designated Sale Transactions) qualifies as a Tax Reorganization, and (C) nothing herein shall affect Buyer's liability for Taxes that are Assumed Liabilities; (2) subject to the preceding clause (1), Sellers agree to cooperate with Buyer in order that, for federal income Tax purposes, the transactions effected pursuant to this Agreement, together with the distributions made by, and liquidation of, Sellers pursuant to the Bankruptcy Plan, are treated as one or more plans of reorganization under section 368 of the Code and as qualifying as one or more reorganizations under section 368(a)(1)(G) of the Code (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller); and (3) any Tax Return in respect of a Tax imposed on any Seller for which Buyer is liable hereunder shall be prepared by Buyer, a copy of such Tax Return shall be provided to SHC at least thirty (30) days prior to the due date thereof, Buyer shall consider in good faith any reasonable comments provided by Sellers, Sellers shall, if necessary for filing, properly execute any such Tax Return, and Buyer shall timely and properly file any such Tax Return and pay the amount of any Taxes shown due on any such Tax Return.

(b)    Sellers agree that (i) Buyer will suffer irreparable damage and harm in the event that any Seller does not comply with Section 9.2(a) or any instructions properly given by Buyer thereunder and that, although monetary damages may be available for such a breach, monetary damages would be an inadequate remedy therefor and (ii) Buyer shall be entitled to an injunction or injunctions against any non-compliance with, and to seek specific performance of, the agreements and covenants set forth in Section 9.2(a) and any instructions properly given by Buyer thereunder.

(c)    Buyer (or its regarded owner for U.S. federal income Tax purposes, if applicable) shall make (if not previously made) a valid election, effective on or prior to the Closing Date, to be classified as an association taxable as a corporation for U.S. federal income Tax purposes (unless one or more Affiliated Designees shall acquire all of the Acquired Assets and assume all of the Assumed Liabilities).  Buyer shall cause any Affiliated Designee (or its regarded owner for U.S. federal income Tax purposes, if applicable) to be classified as a corporation or an association taxable as a corporation for U.S. federal income Tax purposes at all times during the period beginning on the Closing Date and ending on the effective date of the Bankruptcy Plan.

(d)    For purposes of this Agreement, (x) Taxes (other than Property Taxes) imposed on or with respect to any the Acquired Assets, the Acquired Properties, the Business or the Assumed Liabilities with respect to a taxable period that commences on or prior to and ends after the Closing Date or the applicable Designation Assignment Date, as applicable (a "Straddle Period"), shall be allocated to the Pre-Assignment Tax Period based on a "closing of the books" method as of the end of the Closing Date or the applicable Designation Assignment Date, as applicable, and (y) Property Taxes for a Straddle Period shall be allocated to the Pre-Assignment Tax Period by multiplying the amount of such Property Taxes for the entire Straddle Period by a fraction, the numerator of which is the number of days during the Straddle Period that are in the Pre-Assignment Tax Period and the denominator of which is the number of days in the entire Straddle Period.

(e)    Notwithstanding anything to the contrary contained herein, from and after the Closing the Buyer will indemnify and hold each Seller (and its Affiliates) harmless from and

against, and pay to such Seller (without duplication) the amount of any Taxes that are Assumed Liabilities.

Section 9.3    Miscellaneous Tax Matters.

(a)    Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) imposed on or payable in connection with the sale, transfer, assignment, conveyance or delivery of the Designation Rights, the Acquired Assets or the Assumed Liabilities (or any Excluded Asset pursuant to Section 2.8(d)) ("Transfer Taxes") shall be borne solely by Buyer.  Sellers and Buyer shall use reasonable efforts and cooperate in good faith in all matters relating to such Transfer Taxes (including with respect to the application of any exemption therefrom or reduction thereof). Buyer shall prepare and, except to the extent required by applicable Law to be filed by Sellers, Buyer shall file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by the other Party, the preparing Party shall prepare and deliver to the other Party a copy of such Tax Return at least three (3) Business Days before the due date thereof, and such other Party shall promptly execute such Tax Return and return it for filing. If Seller is required to file any such Tax Return, no later than three (3) Business Days before the due date of such Tax Return Buyer shall pay to Sellers the amount of Transfer Taxes shown on such Tax Return. Subject to the other provisions of this Agreement, the Parties shall reasonably cooperate with each other in any reasonable and lawful arrangement designed to minimize any applicable Transfer Taxes.

(b)    Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets, the Properties, the Business or the Assumed Liabilities as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, and the preparation, prosecution or defense of or for any Tax Proceeding. Unless Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of Sellers Tax attributes to Buyer), to the extent not addressed by the foregoing, Buyer and Sellers shall also furnish or cause to be furnished to each other all documentation and information of Sellers' or any of their Affiliates as reasonably requested in connection with (i) the treatment of the Transactions as one or more reorganizations under section 368 of the Code and/or in connection with qualifying for the application of section 382(l)(5) of the Code and (ii) the Tax basis, losses and credits (including carryovers), income, gains, deductions and other attributes or Tax items of Buyer or an Assignee that are dependent in whole or in part by the treatment of any such Tax item in any Pre-Assignment Tax Period.  Any out-of-pocket expenses incurred in furnishing such information or assistance pursuant to this Section 9.3(b) shall be borne by the Party requesting it. Furthermore, except for any refund, asset or amount described in Section 2.2(h), Sellers shall pay (or cause to be paid) to Buyer any Tax refund  actually received by Sellers or any Affiliate of Sellers  that is an Acquired Asset, and any such refunds credited against future Taxes of the Sellers or their Subsidiaries (including any interest paid thereon and net of any reasonable out-of-pocket costs and any Taxes incurred in respect of the receipt thereof). Upon Buyer's reasonable request and at Buyer's sole cost and expense, Sellers shall (A) file (or cause to be filed) all Tax Returns (including amended Tax Returns) or other documents required to obtain such refunds and (B) take any such other action as may be reasonable and practicable to

preserve Sellers' ability to file a refund claim for any Tax year. Any payments required to be made under this Section 9.3(b) shall be made in immediately available funds, to an account or accounts as directed by Buyer, within ten (10) days after the actual receipt of the refund or the application of any such refunds as a credit against a future tax of Sellers or any Affiliate of Sellers.

(c)     Buyer shall pay (or cause to be paid) to Sellers any Tax refund, asset or amount described in Section 2.2(h) that is actually received by any Subsidiary of any Seller that is an Acquired Asset, Buyer or any Affiliate of Buyer, and any such refunds or amount credited against future Taxes to which any Subsidiary of any Seller that is an Acquired Asset, Buyer or any Affiliate of Buyer become entitled (including any interest paid thereon and net of any reasonable out-of-pocket costs and any Taxes incurred in respect of the receipt thereof).  Upon Sellers' reasonable request and at Sellers' sole cost and expense, Buyer shall (A) file (or cause to be filed) all Tax Returns (including amended Tax Returns) or other documents required to obtain such refunds and (B) take any such other action as may be reasonable and practicable to preserve Buyer's ability to file a refund claim for any Tax year.  Any payments required to be made under this Section 9.3(c) shall be made in immediately available funds, to an account or accounts as directed by Sellers, within ten (10) days after the actual receipt of the refund or the application of any such refunds as a credit against a future tax of any Subsidiary of any Seller that is an Acquired Asset, Buyer or any Affiliate of Buyer.

(d)     As soon as practicable (and in any event within ninety (90) days) after the Closing Date, Buyer shall deliver to Sellers a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Acquired Assets for Tax purposes) (the "Allocation Schedule"). The Allocation Schedule shall allocate the Purchase Price among the Sellers and among the Acquired Assets acquired from each Seller, and shall be prepared in accordance with Section 1060 of the Code if Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of Sellers' Tax attributes to Buyer), and in any case shall be prepared in accordance with applicable law to the extent necessary to comply with reporting in respect of applicable Transfer Taxes. The Allocation Schedule shall be deemed final unless Sellers notify Buyer in writing that Sellers object to one or more items reflected in the Allocation Schedule within forty-five (45) days after delivery of the Allocation Schedule.  In the event of any such objection, Buyer and Sellers shall negotiate in good faith to resolve such dispute; provided, however, that if Buyer and Sellers are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days after the delivery of the Allocation Schedule, such dispute shall be resolved by the CPA Firm.  The fees and expenses of the CPA Firm in connection therewith shall be borne equally by Buyer and Sellers.  Each of Buyer and Sellers agrees to file its respective federal, state and local Tax returns in accordance with the Allocation Schedule, and any adjustments to the Purchase Price pursuant to this Section 9.3 shall be allocated in a manner consistent with the Allocation Schedule. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the parties do not agree with respect to such determination, such matter shall be resolved in accordance with the determination of the CPA Firm; provided further, that such Tax Return will be adjusted, as applicable, consistent with the procedures described above, to reflect any adjustments to the allocated Purchase Price.

Section 9.4    <u>Payments Received</u>.  Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other in accordance with the terms of this Agreement and will account to the other for all such receipts.

Section 9.5    <u>Post-Closing Books and Records and Personnel</u>.  For twelve (12) months after the end of the Designation Rights Period, (a) neither Buyer nor any Seller shall dispose of or destroy any of the business records and files of the Properties or relating to any Acquired Assets and (b) Buyer and Sellers (including, for clarity, any trust established under a chapter 11 plan of Sellers or any other successors of Sellers) shall allow each other, any applicable Assignee and the Representatives of any of the foregoing reasonable access during normal business hours, and upon reasonable advance notice and to the extent permitted by applicable Law, to all employees, files, the Books and Records and other materials included in the Potential Acquired Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the functions of any such trusts or successors, or other reasonable business purposes, including Tax matters, litigation, or potential litigation, each as it relates to the Potential Acquired Assets or the Assumed Liabilities, and Buyer and Sellers (including any such trust or successors) and such Representatives shall have the right to make copies of any such files, books, records and other materials.  In addition, from and after the Closing Date or the applicable Designation Assignment Date for a period of sixty (60) days, Sellers will permit Buyer, any applicable Assignee and their respective Representatives access to such personnel of Sellers during normal business hours as Buyer or any applicable Assignee may reasonably request to assist with the transfer of the applicable Acquired Assets (including any related Assigned Plans and Permits), provided that nothing in this <u>Section 9.5</u> shall prohibit Sellers from ceasing operations or winding up their affairs following the end of the Designation Rights Period.  Following the end of the Designation Rights Period, nothing in the foregoing shall be construed to prevent Sellers from winding down their operations and dissolving their business entities as is determined by Sellers (in their sole discretion) to be in their best interests.

Section 9.6    <u>Confidentiality</u>.

(a)    The terms of the Confidentiality Agreement shall continue in full force and effect until the Closing, at which time Buyer's and Seller's obligations under the Confidentiality Agreement shall terminate.

(b)    The Parties shall (i) treat and hold as confidential all Confidential Information of the other Parties and their Affiliates (which, as such term is used in this <u>Section 9.6(b)</u> shall mean the information provided to the receiving Party by or on behalf of a disclosing Party in connection with this Agreement and the other Transaction Documents and the Transactions) and (ii) not disclose any such Confidential Information a disclosing Party to any other Person without the prior written consent of such disclosing Party, in each case for so long as such information remains Confidential Information.  In the event any receiving Party is requested or required (by oral or written request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand or similar process or by applicable Law) to disclose any Confidential Information of a disclosing Party provided in accordance with this <u>Section 9.6(b)</u>, then such

89

receiving Party shall, to the extent legally permitted, notify the disclosing Party promptly of the request or requirement so the disclosing Party, at its expense, may seek an appropriate protective Order or waive compliance with this <u>Section 9.6(b)</u>. If, in the absence of a protective Order or receipt of a waiver hereunder, the receiving Party is, on the advice of counsel, compelled to disclose such Confidential Information, the applicable receiving Party may so disclose such Confidential Information; provided that the applicable receiving Party shall use commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded to such Confidential Information. Notwithstanding the foregoing, the provisions of this <u>Section 9.6(b)</u> shall not prohibit the disclosure of Confidential Information by the receiving Party to the extent reasonably required (i) to comply with applicable Law or any regulatory authority or self-regulatory organization having jurisdiction or of which a Party is a member, (ii) in connection with asserting any rights or remedies or performing any obligations under this Agreement or any of the Transaction Documents or (iii) to such Party's Affiliates and Representatives. Notwithstanding the foregoing, the provisions of this <u>Section 9.6(b)</u> shall not apply to information that (A) is or becomes publicly available other than as a result of a disclosure by any receiving Party in violation of this Agreement, (B) is or becomes available to a receiving Party on a non-confidential basis from a source that, to the receiving Party's knowledge, is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation, or (C) is or has been independently developed by a receiving Party. For the avoidance of doubt, following the Closing, all Confidential Information relating to the Business, the Acquired Assets or the Assumed Liabilities shall be deemed to be Confidential Information of Buyer.

Section 9.7    <u>Employment Offers</u>.

(a)    Buyer shall make an offer of employment to any Business Employee represented by a labor union and whose terms and conditions of employment are covered by a collective bargaining agreement ("<u>Represented Employees</u>") using reasonable best efforts to comply with the requirements of any such collective bargaining agreement. For any Business Employee not represented by a labor union ("<u>Non-Represented Employees</u>"), Buyer shall, or shall cause any of its Subsidiaries to, (i) no later than five (5) days prior to the Closing Date, use reasonable best efforts to provide a written offer of employment in a comparable position to, effective as of 11:59 p.m., local time, on the Closing Date each of such Business Employees, or (ii) to the extent required by and in accordance with applicable Law, enter into employment agreements with each of such Business Employees. Those Business Employees, including both Represented Employees and Non-Represented Employees, who accept such offer of employment on or before the Closing Date in accordance with the provisions of such offer and continue employment with Buyer or any of its Subsidiaries, shall be referred to as "<u>Transferred Employees</u>."

(b)    Subject to the last sentence of this <u>Section 9.7(b)</u> and except as otherwise expressly provided in this <u>Section 9.7(b)</u>, with respect to each Transferred Employee who remains employed by Buyer or any of its Subsidiaries, Buyer shall, or shall cause any of its Subsidiaries to, provide for the period commencing on the Closing Date and ending on the last day of the Sellers' fiscal year ending in 2020, subject to such Transferred Employee's continued employment with Buyer or any of its Subsidiaries (as applicable) (i) (A) base salary or hourly wage rate and (B) a target short-term cash incentive opportunity, in each of (A) and (B), that is at least equal to the base salary or wages and target short-term cash incentive opportunity, respectively, provided to such

Transferred Employee immediately prior to the Closing Date and (ii) a group health and welfare plan and, subject to and in accordance with Section 9.7(k), a 401(k) plan, qualified under Sections 401(a) and 401(k) of the Code ("401(k) Plan"), that are substantially comparable in the aggregate to the group health and welfare plan and 401(k) Plan under which such Transferred Employee participates as of the date hereof.  For the avoidance of doubt, (x) the terms of this Section 9.7(b) shall apply notwithstanding anything to the contrary in any non-solicitation or similar agreement currently entered into by Buyer or any of its Affiliates and Sellers and (y) from and after the date hereof, no such non-solicitation or similar agreement by Buyer and any Seller or any affiliate thereof entered into prior to the date hereof shall prevent Buyer from hiring (or seeking to hire) any employee of Sellers.  The Parties agree to cooperate in good faith to coordinate the establishment of benefit plans and arrangements so as to satisfy the obligations set forth in this Section 9.7(b)(ii).

(c)     Except as otherwise provided under the terms of the applicable Employee Plan, each Transferred Employee shall be given credit for all service with Sellers under all employee benefit plans, programs and policies and fringe benefits of the Business or Buyer or any of its Subsidiaries in which they become participants (i) for purposes of eligibility, participation, and vesting (but not benefit accruals), and (ii) with respect to any vacation and severance plans, programs or arrangements of Buyer or its Subsidiaries, for purposes of determining the level of benefits except to the extent such crediting would result in duplication of benefits with respect to the same period of service.

(d)     If a Transferred Employee becomes eligible to participate in a medical, dental or health plan of Buyer (or its Subsidiaries), Buyer shall, or shall cause its Subsidiaries to, to the extent permitted by (x) applicable Law and (y) the terms of the applicable medical, dental or health plan of Buyer or any of its Subsidiaries in which the Transferred Employee participates following the Closing, cause the plan provider of such plan to (i) waive any preexisting condition limitations to the extent such pre-existing condition limitations would not have been applicable under the applicable medical, dental or health plans of Sellers as of immediately prior to the Closing Date and (ii) credit any complete or partial satisfaction of any deductible and out-of-pocket expenses incurred by the Transferred Employee and his or her dependents under the applicable Seller's or its Subsidiaries' medical, dental or health plans during the portion of the calendar year in which the Closing Date occurs.  Buyer agrees to use commercially reasonable efforts to cause a medical, dental and health plan provider to provide such waivers and credits contemplated by the first (1st) sentence of this Section 9.7(d).  If a Transferred Employee becomes eligible to participate in a group term life insurance plan maintained by Buyer or its Subsidiaries, Buyer shall use commercially reasonable efforts to cause such plan to waive any medical certification for such Transferred Employee up to the amount of coverage the Transferred Employee had under the life insurance plan of Sellers (but subject to any limits on the maximum amount of coverage under Buyer's life insurance plan).

(e)     Except as required by Law or an applicable bargaining agreement or as otherwise agreed in writing by the Parties, Buyer or any of its Subsidiaries shall provide severance and other separation benefits to each Transferred Employee terminated by Buyer or any of its Subsidiaries within the period commencing on the Closing Date and ending on the last day of the Sellers' fiscal year ending in 2020 that are at least equal to the severance and other separation benefits provided

by Seller and its Subsidiaries to such Transferred Employee as in effect immediately prior to the Petition Date, it being understood that such severance and other separation benefits do not include any long-term incentive, equity incentive, defined benefit pension or retiree welfare or life insurance benefits.

(f)     Except as prohibited by applicable Law, each offer letter shall provide that by accepting employment with Buyer the Business Employee is acknowledging that Buyer is assuming, and Buyer shall assume all vacation days and other paid time off accrued but not yet taken by each Transferred Employee through the Closing Date, in accordance with their terms as of the date hereof.  To the extent that applicable Law prohibits a Transferred Employee's vacation from being assumed by Buyer and requires that a Transferred Employee to be paid for any vacation days and other paid time off accrued but not yet taken by such Transferred Employee as of the Closing Date without regard to any acknowledgement by such Transferred Employee to the contrary, Sellers shall pay each Transferred Employee for such vacation days.

(g)     Sellers agree to pay to the Transferred Employees any bonus (including any related payroll Taxes) that such Transferred Employees would have been paid had they remained employees of Sellers through the date the bonus in respect of the fiscal year ending February 2, 2019.

(h)     Buyer and Seller agree to cooperate in good faith to ensure that Transferred Employees do not experience a break in health coverage from and after the Closing Date. Buyer shall take commercially reasonable efforts to provide or make available the health coverage required by Section 4980B of the Code available with respect to any individual who is an "M&A Qualified Beneficiary" (as defined in Treasury Regulation Section 54.49806-9 (Q&A 4) of the Code) as the result of the consummation of the Transactions.

(i)     From and after the Closing Date, subject in all respects to the limitations set forth in Section 2.3(k), Buyer shall, within thirty (30) days following written demand by the Seller, with such supporting documentation as the Buyer shall reasonably request, reimburse the Sellers for the payment of any cash severance or other cash separation pay, and Seller's portion of any related employment and payroll Taxes, made by any Seller to any employee of any Seller whose employment with any of the Sellers terminated following the Petition Date or terminates on, or following the Closing Date (it being understood that this does not include any Transferred Employees who shall have become the employees of Buyer and its Subsidiaries and shall be covered by Buyer's obligations as set forth in Section 9.7(b)), to the extent of the cash severance or other cash separation pay that has been paid on or following the Petition Date and prior to the Closing Date or would have been due and payable had such employee's employment been terminated by any of the Sellers immediately prior to the date hereof (the reimbursement Liabilities of Buyer set forth in this Section 9.7(i), including with respect to any related employment and payroll Taxes, the "Severance Reimbursement Obligations").

(j)     Sellers shall retain liability for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Sellers prior to the Closing.  Buyer shall be liable for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Buyer or any of its Subsidiaries on or after the Closing.  For purposes of this Section 9.7(j), a claim shall

be deemed to have been incurred on the date on which the medical or other treatment or service was rendered and not the date of the inception of the related illness or injury or the date of submission of a claim related thereto; provided, that claims relating to a hospital confinement that begins on or before the Closing but continues thereafter shall be treated as incurred before the Closing. Notwithstanding anything herein to the contrary, with respect to any Business Employee who becomes a Transferred Employee following the Closing, any reference in this Section 9.7(j) to the Closing will be deemed to be references to the date such Business Employee becomes a Transferred Employee.

(k)    U.S. Savings Plan.

(i)    As soon as practicable following the Closing Date, Buyer shall, or shall cause its Subsidiaries to, establish a new savings plan or designate an existing savings plan qualified under Section 401(a) of the Code and including a cash or deferred feature under Section 401(k) of the Code and a related trust thereunder which shall be exempt under Section 501(a) of the Code ("Buyer's Savings Plan") that will permit participation by all Transferred Employees who are participating in Seller's or its Subsidiaries' 401(k) Plan ("Seller's Savings Plan") as of the Closing Date.

(ii)    No assets or liabilities of Seller's Savings Plan shall be transferred to Buyer's Savings Plan, other than in connection with a rollover of a Transferred Employee's account balance under Seller's Savings Plan.  Except as could reasonably be expected to cause the Buyer's Savings Plan to cease to qualify under Section 401(a) and 401(k) of the Code or cause the trust to cease to be qualified under Section 501(a) of the code or otherwise result in the Buyer or its Affiliates incurring any penalties thereunder, Buyer shall permit the Transferred Employees to roll over into Buyer's Savings Plan any rollover distribution (in cash or loan notes of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code)).  Effective as of the Closing, Seller shall and shall cause it Subsidiaries to take any action necessary to ensure that the accounts of each Transferred Employee in Seller's Savings Plan shall be fully vested and nonforfeitable.

(l)    The Parties acknowledge and agree that all provisions contained in this Section 9.7 are included for the sole benefit of the respective Parties and shall not create any right (i) in any other person, including any Business Employees, Transferred Employees, current or former employees of Seller, any participant in any Employee Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries or any beneficiary thereof or (ii) in any other person, to continued employment with Buyer or its Subsidiaries or particular compensation or benefits coverage in any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries.  The provisions of this Section 9.7 shall not constitute an amendment to any Employee Plan or any plan, program, agreement or arrangement maintained by Buyer or any of its Subsidiaries.

(m)    Sellers and Buyer hereby agree to follow the "alternate procedure" for employment tax reporting as provided in Section 5 of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 for each Transferred Employee and to cooperate with each other in furtherance thereof. Provided that Sellers provide Buyer with all necessary payroll records for the calendar year which includes the date on which the Transferred Employee commences employment with Buyer, Buyer, and not

Sellers, shall furnish a Form W-2 to each Transferred Employee, disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom.

Section 9.8    Owned Real Property.

(a)     Seller shall pay when due any and all Occupancy Expenses with respect to each Owned Real Property solely to the extent arising during the period commencing on the Petition Date through the Closing Date.

(b)     From the date hereof through the Closing Date, Seller shall use commercially reasonable efforts to maintain and preserve each Owned Real Property and all related Acquired Assets in a condition substantially similar to the their present condition. Prior to Closing, Seller shall not without Buyer's consent, and shall not solicit any other Person to, (A) sell, transfer, assign, convey, lease, license, mortgage, pledge or otherwise encumber any Owned Real Property or related Acquired Asset (other than sales of Inventory in accordance with the terms of this Agreement, Permitted Encumbrances and any applicable statutory liens (solely to the extent that such Owned Real Property or related Acquired Asset will be transferred free and clear of such statutory liens pursuant to the applicable transfer document)), (B) grant or terminate any other interests in any Owned Real Property or related Acquired Asset, (C) cancel or compromise any claim or waive or release any right, in each case that is related to any Owned Real Property or any related Acquired Assets (for the avoidance of doubt, other than any Excluded Assets), (D) take any action with respect to Taxes or Tax matters that could reasonably be expected to result in an Encumbrance on any Owned Real Property or related Acquired Assets (other than Permitted Encumbrances) or (E) enter into any agreement or commitment to take any action prohibited by this Section 9.8(b).

(c)     From and after the date hereof through Closing, Sellers shall bear the risk of loss or damage to the Owned Real Property and Seller shall continue all insurance policies with respect to the Owned Real Property or policies providing substantially similar coverages to the extent available at commercially reasonable rates (and in all instances without any reductions in the amounts of available coverage), including comprehensive public liability, casualty and umbrella liability insurance, and shall cause Buyer to be named as a loss payee or additional insured, as applicable, with respect to all such policies.  Seller shall pay to Buyer on the Closing Date all insurance recoveries and all warranty and condemnation proceeds received or receivable after the date hereof with respect to the Owned Real Property.  In connection with any payment of recoveries or proceeds under this Section 9.8(c), (i) such payment of recoveries or proceeds shall not include any recoveries or proceeds to the extent attributable to lost rents or similar costs applicable to any period prior to the Closing or paid in connection with repair, restoration or replacement during such period, and (ii) to the extent that Buyer has received written notice thereof in reasonable detail not less than fifteen (15) days prior to the Closing, such payment of recoveries or proceeds shall be reduced by the amount of (x) all actual and documented, reasonable out of pocket repair costs incurred by Sellers in connection with the repair or restoration of such damage or destruction, (y) all actual and documented, reasonable out of pocket collection costs of Sellers respecting any awards or other proceeds, and (z) any amounts required to be paid (and solely to the extent actually paid) by Sellers or the insurance company to the applicable landlord under the Lease, if applicable, or to such landlord's lender as required pursuant to any of such lender's financing, as applicable.

94

Section 9.9    Title Matters.  Buyer, at its own discretion and sole expense, may order preliminary title reports from a nationally recognized title company (the "Title Company") with respect to any of the Leased Premises or Owned Real Property (the property covered by such reports being referred to herein as the "Titled Property").  Seller shall at no cost, expense or Liability to Seller, cooperate in good faith with Buyer and the Title Company in connection with the compilation of title to the Titled Property and in connection with any efforts by Buyer to obtain title insurance policies pursuant thereto on behalf of itself and/or its lender, including, in the case of any efforts by Buyer to obtain lender's title insurance policies on behalf of its lender, by providing reasonable affidavits and other similar instruments as are reasonably required by the Title Company for the deletion of any standard or printed exceptions in such lender's title insurance policies that are customarily deleted by virtue of a seller delivering such instruments in commercial real estate transactions in the state or province in which the Titled Property which is the subject of such lender's title insurance policy is located. Subject to the foregoing proviso, such cooperation by Seller and its Subsidiaries shall include providing Buyer and the Title Company copies of, with respect to Titled Property, reasonably requested existing surveys, maps, existing title reports and title insurance policies and true and complete copies of the encumbrance documents identified therein, to the extent the same are in the possession of Seller or its Subsidiaries and are not publicly available.

Section 9.10    Use of Name.  Sellers agree that they shall (i) as soon as practicable after the Closing Date and in any event within six (6) months following the Closing Date, cease to make use of the Trademarks included in the Acquired Intellectual Property and change the Business Names of all of their applicable Affiliates to a Business Name that does not consist of, contain or incorporate any Trademarks included in the Acquired Intellectual Property, provided that as soon as practicable after the Closing Date and in any event within thirty (30) days following the Closing Date, Sellers shall cease to make use of the Trademarks included in the Acquired Intellectual Property in connection with the Business and (ii) as promptly as practicable after the Closing Date, file a motion with the Bankruptcy Court to amend the caption of the Bankruptcy Cases to reflect a change in the name of the Sellers in accordance with the foregoing clause (i) and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Acquired Assets.  Sellers shall promptly deliver to Buyer any relevant documentation evidencing such name change, including any name change amendment and name change notice filed with or submitted to any Governmental Authority in each jurisdiction in which such Seller or Affiliates of Seller is qualified to do business.  Nothing in this Section 9.10 shall prohibit Sellers' use of such Trademarks to the extent that such use (a) is required by Law to wind down Sellers' estate or (b) constitutes nominative or descriptive fair use under United States Laws, which refers to Sellers and would not cause confusion as to the origin of a good or service, including in accurately stating the historical relationship between Sellers and Buyer for information purposes (and in a non-Trademark manner) in historical, tax and similar records.

Section 9.11    Apportionments.  All charges and fees payable for telephone services, water, sewer rents heat, steam, electric power, gas and other utilities, at the price charged by the suppliers, including any taxes thereon and based upon applicable meter readings, where available, made on or immediately prior to or immediately after the Closing Date (and credits therefor to the extent paid prior to the Closing Date) that relate to Owned Real Property shall be apportioned

between Sellers, on the one hand, and Buyer, on the other hand, as of midnight on the Closing Date for the period that begins prior to the Closing Date and ends after the Closing Date.

Section 9.12   Intercompany IP Agreement; Sublicenses.   As of the Closing Date, all Intercompany IP Agreements and all sublicenses to any Person thereunder, in each case that are not assigned to Buyer or assumed and assigned in accordance with this Agreement, shall be, and are hereby, automatically terminated.   Sellers shall take all necessary actions to cause such licenses, grants or sublicenses that are not terminated by virtue of the foregoing sentence to be terminated at the Closing Date.   The foregoing provision shall not affect any sublicenses under which neither any Seller nor any Affiliate of any Seller is the sublicensee, unless such sublicense is terminable without cause by a Seller pursuant to its terms.

Section 9.13   Settlement and Release.

(a)   Effective upon the Closing, in exchange for the payment by Buyer of the Credit Bid Release Consideration and other good and valuable consideration provided to the Debtors and their estates by ESL in connection with the Transactions, each Debtor, for itself and its estate, and on behalf of each of its Subsidiaries and controlled Affiliates (each of the foregoing, a "Seller Releasing Party"), hereby absolutely, unconditionally and irrevocably (i) releases and forever discharges ESL from any and all Released Estate Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have, and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge, dispute or collaterally attack the ESL Claims, provided however that the assertion of any Claim other than a Released Estate Claim shall not be deemed to violate this Section 9.13(a)(ii).

(b)   Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (c)(i)-(vi), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit bid set forth in Section 3.1(b).

(c)   After giving effect to the credit bid set forth in Section 3.1(b), ESL shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and their estates in the Chapter 11 Cases, provided that (i) no Claims or causes of action of ESL shall have recourse to, or any other right of recovery from, any Claims or causes of action of the Debtors or their estates related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or cause of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing, (ii) any ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the Claims and causes of action described

in the preceding clause (c)(i); provided that, in the event that, in the absence of this clause (c)(ii), any such proceeds to the Debtors or their estates would have resulted in distributions in respect of such ESL Claims in excess of $50 million, the right to receive such distributions in excess of $50 million shall be treated as an unsecured claim and receive pro rata recoveries with general unsecured claims other than the Claims and causes of action described in the preceding clause (c)(i), and (iii) notwithstanding any order of the Bankruptcy Court to the contrary or section 1129 of the Bankruptcy Code, it shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part.

(d)    This Section 9.13, and all statements or negotiations relating hereto, shall be governed by Federal Rule of Evidence 408 and any corresponding state rules of evidence. Without limiting the foregoing, neither this Section 9.13 nor any statements or negotiations relating hereto shall be offered or received in evidence in any proceeding for any purpose other than to enforce the terms of this Section 9.13.

(e)    For the purposes of this Section 9.13, the terms set out below shall be defined as follows:

(i)    "Debtors" means each of the debtors and debtors in possession in the Bankruptcy Cases, including the Sellers.

(ii)    "Released Estate Claims" means any and all Claims and causes of action of the Debtors and their estates against ESL arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) equitable principles of subordination or recharacterization, or (iii) any other applicable Law that could be asserted to challenge the allowance of the ESL Claims pursuant to section 9.13(c). For the avoidance of doubt the Released Estate Claims do not include any other Claims or causes of action of the Debtors or their estates against ESL or any other Person, including but not limited to any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b) or 550(a) or any applicable state or federal law, for breach of fiduciary duty (including any Claims for breach of fiduciary duty in connection with the incurrence of any debt described on Exhibit G), or for illegal dividend under 8 Del. C. 170-174 or any other state law; (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.:. CV-17-11846-00CL.

97

Section 9.14    KCD IP Covenants.

(a)    Commencing as of the date hereof (and, for the avoidance of doubt, continuing after the Closing Date), Sellers shall not, and shall cause all of their Affiliates (including KCD IP, LLC) not to, (i) sell, transfer, assign, encumber, allow to lapse, abandon, cancel, fail to renew, fail to continue to prosecute, protect or defend, or otherwise dispose of or convey, any KCD IP, (ii) license, sublicense or grant any Person (other than Buyer and its Affiliates) any rights to, as applicable, any KCD IP or (iii) amend, renew or terminate (or fail to exercise termination rights or option rights with respect to) any Contract pursuant to which any Seller or any of its Affiliates has granted, prior to the date hereof, any license, sublicense, covenant not to sue or other rights under any KCD IP, in each case of the foregoing without the prior written consent of Buyer in its sole discretion.  Sellers shall not, and shall cause all of their Affiliates not to, sell, assign, or in any way transfer any equity interests in KCD IP, LLC without requiring as a condition of such sale, assignment or transfer that the purchaser of such equity interests agree to the limitations set forth in this Section 9.14, and any sale, assignment or transfer in violation of this Section 9.14 shall be null and void *ab initio*.

(b)    As soon as reasonably practicable after the date hereof and in any event prior to the Closing Date, Sellers shall use reasonable best efforts to cause KCD IP, LLC to grant, effective as of the Closing, a perpetual, irrevocable (provided that, if Buyer commits a material breach of its obligations under the Exclusive License and KCD IP, LLC gives notice to Buyer specifying the basis for termination and Buyer fails to cure, resolve or remediate the basis for the breach within ninety (90) days after such notice is provided, KCD IP, LLC may convert the exclusive license granted under the Exclusive License to a non-exclusive license; and provided, further, that if Buyer fails to cure, resolve or remediate the basis for such material breach within one hundred twenty (120) days after such notice is provided, KCD IP, LLC may, upon notice to Buyer, suspend the license with respect to the uses that cause the material breach until such cure, resolution or remediation has been effected), worldwide, sublicensable (in connection with uses and sublicensees of the same type and scope as those for which sublicenses were granted by Sellers under the KCD IP prior to the date hereof and, subject to the consent of KCD IP, LLC, such consent not to be unreasonably withheld, conditioned or delayed, in connection with other uses and sublicensees), transferable  (A) in whole to an Affiliate of Buyer or (B) in connection with a sale of assets, properties, rights or businesses associated with the Kenmore Marks included in the KCD IP or with the DieHard Marks included in the KCD IP, provided that all of the rights and obligations under the applicable license grant are assigned, and provided further that such third party assumes in writing all of the applicable rights and responsibilities of Buyer under the Exclusive License) exclusive license (but subject to (i) any licenses under the KCD IP in effect as of the Closing Date and (ii) if the SHIP Closing shall have occurred prior to the Closing Date, the license to Service.com in the form of Exhibit E of the SHIP Purchase Agreement contemplated to be entered into in connection with the SHIP Purchase Agreement) to Buyer under all of the KCD IP used or held for use by Sellers as of the date hereof (including, for the avoidance of doubt, the Kenmore Marks and the DieHard Marks, in each case owned by KCD IP, LLC) for all purposes in connection with the Buyer's businesses (including the Business) and the natural evolutions thereof. The Exclusive License shall include the same quality control provisions as set forth in the Kenmore License Agreement, dated as of March 18, 2006, by and between KCD IP, LLC and KMART Corporation, as amended by that certain First Amendment to Kenmore License

Agreement dated as of November 29, 2009 and that certain Second Amendment to Kenmore License Agreement dated as of March 7, 2012 and shall provide that KCD IP, LLC, as licensor, will continue to maintain its rights to enforce, maintain and defend the Intellectual Property licensed under the Exclusive License in the first instance; provided that Buyer shall have the right to independently enforce, maintain and defend the applicable KCD IP if the business or businesses of Buyer of its Affiliates would otherwise be materially adversely affected. The Exclusive License shall otherwise be in the form proposed by Buyer and any additional terms (other than the terms set forth  above) must be reasonably acceptable to Sellers (Sellers' review and approval not to be unreasonably withheld, delayed or conditioned, provided that it shall not be unreasonable for Sellers to not accept any such additional terms that they reasonably consider render the license a sale, transfer or other disposition of all or substantially all of the assets of KCD IP, LLC). The Exclusive License shall be subject to royalties equal to those in effect as of the date hereof under (x) with respect to the Kenmore Marks, the Kenmore License Agreement, dated as of March 18, 2006, by and between KCD IP, LLC and KMART Corporation, as amended by that certain First Amendment to Kenmore License Agreement dated as of November 29, 2009 and that certain Second Amendment to Kenmore License Agreement dated as of March 7, 2012 and (y) with respect to the DieHard Marks, the DieHard License Agreement, dated as of March 18, 2006, by and between KCD IP, LLC and KMART Corporation, as amended by that certain First Amendment to DieHard License Agreement dated as of November 29, 2009 and that certain Second Amendment to DieHard License Agreement dated as of March 7, 2012, provided that the terms of the Exclusive License taken collectively shall not constitute a sale, transfer or other disposition of all or substantially all of the assets of KCD IP, LLC.

(c)      In the event that, despite Sellers' reasonable best efforts, KCD IP, LLC has not agreed to grant Buyer the Exclusive License effective as of the Closing Date by the date that is ten (10) days prior to the Closing, and provided that any such delay is not due to Buyer's acts or omissions, then at Buyer's election, Sellers shall, prior to the Closing, use reasonable best efforts to obtain any Consent from KCD IP, LLC necessary to assign to Buyer those KCD Agreements that are designated for assignment and assumption by written notice of Buyer pursuant to this Agreement, and assume and assign such KCD Agreements in accordance with this Agreement (such that such KCD Agreements are Assigned Agreements as contemplated herein).

(d)      In the event that, despite Sellers' reasonable best efforts, KCD IP, LLC's Consent described in the above clause (c) is not obtained by the date that is five (5) days prior to the Closing, and provided that any such delay is not due to Buyer's acts or omissions, then (i) Sellers shall, prior to the Closing, assume all KCD Agreements that provide Sellers with the right to sublicense KCD IP to Buyer that are designated only for assumption by written notice of Buyer and (ii) effective as of the Closing Date, Sellers hereby grant to Buyer, a perpetual, irrevocable, worldwide, royalty-bearing (as described in Section 9.14(b)), further sublicensable, transferable, non-exclusive sublicense under all of the KCD IP used or held for use by Sellers as of the date hereof (including, for the avoidance of doubt, the Kenmore Marks and the DieHard Marks, in each case owned by KCD IP, LLC) for all purposes in connection with the businesses of Buyer (including the Business) and the natural evolutions thereof, provided that to the extent Sellers cannot grant the foregoing, Sellers hereby grant to Buyer a non-exclusive sublicense of the broadest scope that Sellers can grant under all the KCD Agreements assumed by Sellers pursuant to this clause (d). For the purpose of this Section 9.14(d)(ii), any such sublicense granted to Buyer is subject to (x)

99

any licenses under the KCD IP in effect as of the Closing Date and (y) if the SHIP Closing shall have occurred prior to the Closing, the license to Service.com in the form of Exhibit E of the SHIP Purchase Agreement contemplated to be entered into in connection with the SHIP Purchase Agreement), and shall be of the broadest scope that Sellers can grant under, and subject to the terms of the relevant KCD Agreement.  Buyer shall ensure that its use of the KCD IP, as provided in this Section 9.14(d), shall only be with respect to goods and services of a substantially similar level of quality to the goods and services with respect to which Sellers used the KCD IP prior to the Closing.  For the avoidance of doubt, (i) Sellers shall not reject, seek to terminate or agree to terminate the KCD Agreements assumed pursuant to this Section 9.14(d) or amend or agree to amend such Contracts in any manner that narrows any of the licenses thereunder and (ii) to the extent that Sellers cease to exist or the KCD Agreements assumed pursuant to this Section 9.14(d) expire or terminate, the sublicense granted herein shall survive.

(e)       Solely with respect to the Exclusive License or any sublicense granted pursuant to Section 9.14(d)(ii), Buyer agrees that (A) Sellers and their Affiliates (including KCD IP, LLC) shall have no responsibility for claims by third parties arising out of, or relating to, Buyer's use of the KCD IP in any manner and (B) in addition to any and all remedies, from and after the Closing, Buyer shall indemnify, defend and hold harmless Sellers and their Affiliates (including KCD IP, LLC), for so long as any Seller or Affiliate of Seller is in existence, from and against any and all third party claims that may arise out of use of such KCD IP by or on behalf of Buyer or any of its Affiliates or assignees, in each case other than claims that the KCD IP infringes or otherwise violates the Intellectual Property of any third party.  Except as provided in the foregoing sentence, all Intellectual Property licensed under Section 9.14(b) or Section 9.14(d)(ii) is licensed "as-is" with all faults, without warranty of any kind (whether express, implied, statutory or otherwise), and Seller does not make, and Buyer hereby specifically disclaims, any representations or warranties (whether express or implied, statutory or otherwise).  For the avoidance of doubt, with respect to Section 9.14(c), the allocation of the foregoing shall be determined by the applicable KCD Agreements that are designated for assignment and assumption by written notice of Buyer pursuant to this Agreement.

(f)       For clarity, and not in limitation of the foregoing, Buyer (or its applicable designee) may grant a security interest in any or all of its rights and benefits under Section 9.14(b), Section 9.14(c) or Section 9.14(d) for collateral purposes to the Financing Sources in connection with the Debt Financing.

Section 9.15    Seritage Master Lease.  Any assignment and assumption of Seritage Master Lease shall be an assignment and assumption of such Seritage Master Lease in its entirety, except as otherwise agreed by the landlord under the Seritage Master Lease.

## ARTICLE X

## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the Transactions is subject to the satisfaction or waiver, as of the Closing, of each of the following conditions; provided, however, that Buyer may not rely on the failure of any condition set forth in this Article X if such failure was caused by Buyer's

failure to comply with any provision of this Agreement or if such failure was caused by any action or failure to act by Seller at the direction of any Buyer Related Party:

Section 10.1    Accuracy of Representations.  The representations and warranties of Sellers contained in Article VI shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date); provided, however, that the condition in this Section 10.1 shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.  Buyer shall have received a certificate of Sellers, signed by a duly authorized officer of Sellers, to that effect.

Section 10.2    Sellers' Performance.  Sellers shall have performed and complied with in all material respects the covenants and agreements that Sellers are required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

Section 10.3    No Material Adverse Effect.  Since the date of this Agreement, there shall not have been any Effect that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

Section 10.4    No Order.  No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the Transactions (a "Closing Legal Impediment").

Section 10.5    Governmental Authorizations.  Any applicable waiting period required by the HSR Act and any extensions thereof, or any timing agreements, understandings or commitments obtained by request or other action of the FTC and/or the Antitrust Division, as applicable, shall have expired or been terminated.

Section 10.6    Sellers' Deliveries.  Without limiting Section 10.2, each of the deliveries required to be made to Buyer pursuant to Section 4.3 have been so delivered, except for such deliveries which, by their nature, cannot be made on or prior to the Closing.

Section 10.7    Approval Order.  The Bankruptcy Court shall have entered the Approval Order, and the Approval Order shall be in full force and effect and shall not have been stayed, vacated or modified.

Section 10.8    KCD IP.

(a)    Sellers shall have (i) caused KCD IP, LLC to grant the Exclusive License in accordance with Section 9.14(b), (ii) obtained any Consent of KCD IP, LLC required under Section 9.14(c) and assigned to Buyer as of the Closing Date all KCD Agreements referenced therein or (iii) assumed all KCD Agreements effective as of the Closing Date that provide Sellers with the right to sublicense KCD IP to Buyer that are designated only for assumption by written notice of Buyer in accordance with Section 9.14(d).

101

(b)      KCD IP, LLC shall not have voluntarily filed for bankruptcy under the Bankruptcy Code.

Section 10.9   Inventory and Receivables.  The aggregate amount of (i) the Inventory Value of the Acquired Inventory (excluding any Pending Inventory), (ii) the amounts due to Seller with respect to (A) the Credit Card Accounts Receivable and (iii) the Pharmacy Receivables shall be at least $1,657,000,000.  To the extent that the aggregate amount of items (i) through (iii) in the foregoing sentence exceeds $1,657,000,000 on the Closing Date, Sellers may reduce such amount to be equal to $1,657,000,000 by *first*, transferring (at Sellers' expense and in consultation with Buyer) Inventory that would otherwise be Acquired Inventory to a GOB Leased Store or a GOB Owned Store or any other location designated by Sellers that is not a Property, until the Inventory Value of the Acquired Inventory is equal to $1,553,000,000 and *second*, retaining as an Excluded Asset the oldest of any Credit Card Accounts Receivable or Pharmacy Receivables.

Section 10.10  Outstanding DIP Indebtedness.  The aggregate amount required to be paid to fully satisfy the existing indebtedness of Sellers under (a) the DIP Credit Agreement shall be no greater than $850,000,000 and (b) the Junior DIP Term Loan shall be no greater than $350,000,000 (exclusive of any accrued and unpaid interest thereon).

## ARTICLE XI

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

Sellers' obligation to consummate the Transactions is subject to the satisfaction or waiver, as of the Closing, of each of the following conditions; provided, however, that Seller may not rely on the failure of any condition set forth in this Article XI if such failure was caused by Seller's failure to comply with any provision of this Agreement:

Section 11.1   Accuracy of Representations.  The representations and warranties of Buyer contained in Article VII shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date); provided, however, that the condition in this Section 11.1 shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to prevent or materially impair the ability of Buyer to perform, or to consummate the Transactions.  Sellers shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 11.2   Buyer's Performance.  Buyer shall have performed and complied with in all material respects the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 11.3   No Order.  No Closing Legal Impediment shall be in effect.

Section 11.4    <u>Governmental Authorizations</u>.  Any applicable waiting period required by the HSR Act and any extensions thereof, or any timing agreements, understandings or commitments obtained by request or other action of the FTC and/or the Antitrust Division, as applicable, shall have expired or been terminated.

Section 11.5    <u>Buyer's Deliveries</u>.  Each of the deliveries required to be made to Sellers pursuant to <u>Section 4.2</u> shall have been so delivered, except for such deliveries which, by their nature, cannot be made on or prior to the Closing.

Section 11.6    <u>Bidding Procedures Order</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order, and such Order shall not have been stayed, vacated or modified.

Section 11.7    <u>Approval Order in Effect</u>.  The Bankruptcy Court shall have entered the Approval Order and the Approval Order shall be in full force and effect and shall not have been stayed, vacated or modified.

Section 11.8    <u>Pay-Down of Real Estate 2020 Loan</u>.  To the extent not previously provided, at least two (2) Business Days prior to the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including, without limitation the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* [Docket No. 1393].

## ARTICLE XII

## TERMINATION

Section 12.1    <u>Termination Events</u>.  Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)    by either Sellers or Buyer:

(i)    if the Bankruptcy Court shall have determined that it will not enter the Approval Order or if a Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any final and non-appealable applicable Law (including any Order) which is in effect and has the effect of making the Transactions illegal or otherwise restraining or prohibiting consummation of the Transactions and which is not satisfied, resolved or preempted by the Approval Order; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 12.1(a)(i)</u> shall not be available to any Party whose material breach of any of its representations, warranties, covenants or agreements contained herein results in or causes such event;

(ii)    if the Closing shall not have occurred by 11:59 p.m. New York City time on February 19, 2019 (the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 12.1(a)(ii)</u> shall not be available to any Party whose

material breach of any of its representations, warranties, covenants or agreements contained herein results in the failure of the Closing to be consummated by such time;

(iii)     if Sellers accept or agree to any Competing Transaction or upon approval by the Bankruptcy Court of, or the filing by or on behalf of any Seller of a motion or other request to approve, a Competing Transaction; provided, however, that if Seller, pursuant to Section 8.2(c) and the Bidding Procedures Order, has designated Buyer as a "Back-Up Bidder," then Buyer shall not be permitted to terminate this Agreement prior to the Outside Date except as consistent with the terms of Section 8.2(c) and the Bidding Procedures Order; or

(iv)     by mutual written consent of Sellers and Buyer.

(b)     by Buyer:

(i)     in the event of any breach by any Seller of any of its agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Section 10.1 or Section 10.2 to be satisfied, and the failure of Sellers to cure such breach by the earlier of (A) the Outside Date and (B) the date that is fifteen (15) days after receipt of a notice in writing from Buyer of their intention to exercise their rights under this Section 12.1(b)(i) as a result of such breach; provided, however, that that the right to terminate this Agreement pursuant to this Section 12.1(b)(i) shall not be available to Buyer if Buyer is in breach of any of its representations, warranties, covenants or agreements contained herein in a manner that would result in the failure of a condition set forth in Article XI to be satisfied;

(ii)     if any of the Bankruptcy Cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(iii)     if the Bankruptcy Court has not approved the consummation of the Transactions on or before February 8, 2019, or if the Approval Order has not been entered on or before February 8, 2019 subject to Bankruptcy Court availability (or is vacated or stayed as of such date); or

(iv)     if Sears Re shall not have agreed to be bound by all of the terms of this Agreement as a Seller hereunder by delivering a signature page in the form attached hereto by 11:59 p.m. New York City time on January 22, 2019. For the avoidance of doubt, it is the intent of the Parties that this Agreement shall be binding on each of the Parties (other than Sears Re) notwithstanding that Sears Re has not yet delivered its signature page hereto.

(c)     by Sellers:

(i)     in the event of any breach by Buyer of any of its agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Section 11.1 or Section 11.2 to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is fifteen (15) days after receipt of a notice in writing from Sellers of their intention to exercise their rights

under this Section 12.1(c)(i) as a result of such breach; provided, however, that that the right to terminate this Agreement pursuant to this Section 12.1(c)(i) shall not be available to Seller if Sellers are themselves in breach of any of their representations, warranties, covenants or agreements contained herein, in each case in a manner that results in the failure of a condition set forth in Article X to be satisfied;

(ii)    if the Bankruptcy Court has not approved the consummation of the Transactions on or before February 8, 2019, or if the Approval Order has not been entered on or before February 8, 2019 subject to Bankruptcy Court availability (or is vacated or stayed as of such date); or

(iii)    if (A) all of the conditions set forth in Article X have been satisfied (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but which would be satisfied if the Closing Date were the date of such termination, or would have been satisfied, assuming the Closing had in fact occurred), (B) Buyer failed to consummate the transactions contemplated by this Agreement by the time set forth in Section 4.1, (C) Sellers have irrevocably confirmed to Buyer in writing that all the conditions in Article XI have been satisfied (or that it is willing to waive any unsatisfied conditions set forth in Article XI) and that Sellers have indicated to Buyer in writing that Sellers are ready, willing and able to consummate the transactions contemplated by this Agreement, (D) Sellers have given Buyer written notice at least two (2) Business Days prior to such termination stating Sellers' intention to terminate this Agreement pursuant to this Section 12.1(c)(iii), and (E) Buyer fails to consummate the transactions contemplated by this Agreement within such two (2) Business Day period.

Section 12.2    Effect of Termination.

(a)    Subject to the first sentence of Section 12.2(b), in the event of any termination of this Agreement pursuant to Section 12.1, this Agreement (other than the provisions set forth in this Section 12.2, Section 12.3 and Article XIII) shall forthwith become null and void and be deemed of no further force and effect.  Subject to Section 12.2(b) and the provisions set forth in the immediately preceding sentence, there shall be no liability or obligation thereafter on the part of any Party.  Notwithstanding the foregoing, subject to the second sentence of Section 12.2(b), any such termination shall not limit any Party's liability for any willful and material breach prior to the time of such termination.  For purposes of this Agreement, "willful and material breach" means a material inaccuracy or breach of any material representation, warranty or covenant or other agreement set forth in this Agreement that is a consequence of an act or failure to act by or on behalf of the breaching Party with knowledge that the taking of such act or failure to take such act would, or would reasonably be expected to, result in a breach of this Agreement.  In the event of any valid termination of this Agreement pursuant to Section 12.1 (other than a termination by Sellers pursuant to Section 12.1(c)(i) or Section 12.1(c)(iii)), Sellers shall promptly (and in no event later than two (2) Business Days following such termination) return to Buyer the Deposit Amount and any other deposit delivered by Buyer to Sellers pursuant to the Bidding Procedures Order.  Notwithstanding anything to the contrary in this Agreement, the maximum liability of the Seller and its Subsidiaries under this Agreement shall not exceed $30,000,000 (except in the case of a willful and material breach, in which event such maximum liability shall not exceed $120,000,000).

(b)    In the event of any valid termination of this Agreement by Sellers pursuant to Section 12.1(c)(i) or Section 12.1(c)(iii), then Sellers, as Sellers' sole and exclusive remedy as a result of such termination, shall have the right to retain the Deposit Amount, if any. Notwithstanding anything to the contrary in this Agreement, the maximum liability of Buyer under this Agreement shall not exceed the Deposit Amount.

Section 12.3    Termination and Adjustment Rights of Buyer as to Properties and Related Acquired Assets.

(a)    If a material portion of any Lease Premises, a material portion of any Owned Real Property, or a material portion of the Potential Acquired Assets related to the Lease Premises is materially damaged or destroyed, or the physical condition thereof is materially and adversely changed (including as a result of failure of proper repair or maintenance or environmental contamination that occurs from and after the date hereof), or any Lease Premises or Owned Real Property is subject to a condemnation or other governmental taking of a material portion thereof or any shopping center in which a Lease Premises is located is damaged, destroyed or condemned such that the operations of such Lease Premises are materially and adversely affected at any time from the date of this Agreement up to and including the Closing (each of the foregoing, a "Casualty / Condemnation Event"), Sellers shall provide prompt written notice of such Casualty / Condemnation Event to Buyer.  Buyer shall elect within ten (10) days after notice of such Casualty / Condemnation Event from Sellers, together with Sellers' best estimate of the net amount of insurance proceeds and/or condemnation award available to Buyer pursuant to Section 12.3(b) (including any deductions pursuant to Section 12.3(b)), to either (A) in the case of a Lease Premises, acquire Designation Rights with respect to such Lease Premises at the Closing or, in the case of Owned Real Property, acquire such Owned Real Property at the Closing and, in either case, Sellers shall assign to Buyer any right Sellers have to any insurance proceeds or condemnation award or proceeds relating to such Casualty/Condemnation Event at the Closing (including any insurance proceeds actually received by Sellers with respect to such Casualty/Condemnation Event, but less, as provided in Section 5.1(a)(v), (x) any amounts used by any Seller for restoration, repair or replacement and (y) any recoveries or proceeds to the extent attributable to lost rents or similar costs applicable to any period prior to the Closing) or (B) in the case of a Lease Premises, decline to acquire Designation Rights with respect to such Lease Premises or, in the case of Owned Real Property, decline to acquire such Owned Real Property, in which case the Purchase Price shall not be reduced (but, in the case of Owned Real Property, Seller shall assign to Buyer any right Sellers have to any insurance proceeds or condemnation award relating to any such Casualty/Condemnation Event at Closing). For the avoidance of doubt, Casualty / Condemnation Events that are subject to this  Section 12.3(a) are only those occurring during the period from the date of this Agreement up to and including the Closing.  Additionally, in the case of any Owned Real Property or Leased Real Property with respect to which a claim for damages to buildings or fixtures is pending as of the date of this Agreement, Sellers shall assign to Buyer any right Sellers have to any insurance proceeds relating to such claim and any amounts actually received in respect of such claim, other than any insurance proceeds in respect of the Acquired Assets set forth on Schedule 2.1(q) in an aggregate amount not to exceed $13,000,000, and the Purchase Price shall not be reduced.

106

(b)     In connection with any assignment of awards, proceeds or insurance under this Section 12.3, (i) such assignment of proceeds or awards shall not include any awards, proceeds or insurance to the extent attributable to lost rents or similar costs applicable to any period prior to the applicable Closing or paid in connection with repair, restoration or replacement during such period, and (ii) to the extent that Buyer has received written notice thereof in reasonable detail not less than fifteen (15) days prior to the Closing, such assignment of proceeds or awards shall be reduced by the amount of (x) all actual and documented, reasonable out-of-pocket repair costs incurred by Sellers in connection with the repair or restoration of such damage or destruction, (y) all actual and documented, reasonable out-of-pocket collection costs of Sellers respecting any awards or other proceeds, and (z) any amounts required to be paid (and solely to the extent actually paid) by Sellers or the insurance company to the applicable landlord under the Lease, if applicable, or to such landlord's lender as required pursuant to any of such lender's financing, as applicable.

(c)     Buyer shall have the right, prior to Closing, to decline to acquire (i) Designation Rights with respect to any Lease and related Potential Acquired Assets or (ii) any Acquired Assets, in each case if and only if any Consent from any Person (other than a Governmental Authority) has not been obtained from such Person or has not otherwise been provided for pursuant to the Approval Order, the absence of which prevents the acquisition or exercise of the Designation Rights with respect to such Lease and related Potential Acquired Assets or the acquisition of such Acquired Assets; provided, that if the failure to obtain such Consent is curable, Sellers shall have until the earlier of (i) the Closing Date or (ii) ten (10) days after receipt of Buyer's notice of intent to terminate to obtain such Consent; and provided, (c) further that, for the avoidance of doubt, the provisions of this Section 12.3(d) shall not apply with respect to any license (incoming or outgoing) of any Intellectual Property.

## ARTICLE XIII

## GENERAL PROVISIONS

Section 13.1   Public Announcements.  Except as required by applicable Law (including any Order by the Bankruptcy Court) or pursuant to filings by Sellers with, or in any proceeding before, the Bankruptcy Court, neither Sellers nor Buyer shall issue any press release, or make any public announcement concerning this Agreement or the Transactions, without first consulting the other Party or Parties.

Section 13.2   Notices.  Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) via e-mail or (c) by a nationally recognized courier for overnight delivery service.  A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if via e-mail, on the date of successful transmission and (iii) if by nationally recognized courier, one Business Day after delivery to such courier.  Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt.  Any such notice, election, demand, request or response shall be addressed as follows:

If to Sellers, then to:
Sears Holdings Corporation

3333 Beverly Road
Hoffman Estates, IL 60179
Attention: General Counsel
E-mail: counsel@searshc.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C., Ellen J. Odoner, Gavin Westerman and Sunny
Singh
E-mail:  Ray.Schrock@weil.com; Ellen.Odoner@weil.com;
Gavin.Westerman@weil.com; Sunny.Singh@weil.com

If to Buyer, then to:
Transform Holdco LLC
c/o ESL Partners, Inc..
1170 Kane Concourse, Suite 200
Bay Harbor Islands, FL 33154
Attention:  Kunal S. Kamlani and Harold Talisman
Facsimile:  (305) 864-1370
E-mail: kunal@eslinvest.com; harold@eslinvest.com

with a copy (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attention:  Christopher E. Austin, Benet J. O'Reilly and Sean A. O'Neal
E-mail: caustin@cgsh.com; boreilly@cgsh.com; soneal@cgsh.com

Section 13.3    Amendment; Waiver.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party; provided that this Section 13.3, Section 13.6, Section 13.8, Section 13.10 or Section 13.12, in each case as such Sections relate to the Financing Sources, may not be amended in a manner adverse to the Financing Sources without the prior written consent of the applicable Financing Source under the applicable Debt Commitment Letter.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.  Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.  No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

108

Section 13.4    <u>Entire Agreement</u>.    This Agreement (including the Schedules and the Exhibits), the Confidentiality Agreement and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter.    The representations, warranties, covenants and agreements contained in this Agreement (including the Schedules and the Exhibits) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the Transactions, including risks associated with matters as to which the party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules.    Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 13.5    <u>No Presumption as to Drafting</u>.    Each of the Parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the Transactions.    Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 13.6    <u>Assignment</u>.    Subject to Buyer's express rights of assignment with respect to any Assignee, this Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of Law or otherwise without the express written consent of the other Parties (which consent maybe granted or withheld in the sole discretion of such other Party); <u>provided</u>, <u>however</u>, that Buyer shall be permitted, upon prior notice to Sellers but without consent of Sellers, to assign all or any part of its rights or obligations hereunder to an Affiliate (an "<u>Affiliated Designee</u>"); <u>provided</u> that such assignment would not reasonably be expected to prevent or materially impair or delay the consummation of the Transactions or otherwise be materially adverse to Sellers; <u>provided</u> <u>further</u> Buyer shall be permitted to, at or after the Closing, collaterally assign its rights under this Agreement for purposes of creating a security interest or otherwise assigning collateral to the Financing Sources in connection with the Debt Financing; <u>provided</u> <u>further</u> that that no such assignment shall relieve Buyer of any of its obligations under this Agreement.

Section 13.7    <u>Severability</u>.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.    If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 13.8    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>.

109

(a)        Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the procedural and substantive laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.   Notwithstanding anything herein to the contrary, all claims or causes of action (whether in contract or tort) brought against the Financing Sources that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement), including any dispute arising out of or relating in any way to the Financing or the performance thereof or the transactions contemplated thereby, shall be governed by the Laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

(b)        Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may be based upon, arise out of or relate to this Agreement, any breach or default hereunder, or the Transactions and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings based upon, arising out of or relating to this Agreement shall be heard and determined in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of Delaware and any federal appellate court therefrom, and the Parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of Delaware and any federal appellate court therefrom) with respect to all Proceedings based upon, arising out of or relating to this Agreement and the Transactions (whether in contract or in tort, in law or in equity or granted by statute); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Agreement or the Transactions (whether in contract or in tort, in law or in equity or granted by statute) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding based upon, arising out of or relating to this Agreement or the Transactions and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  The Parties

110

agree that any violation of this Section 13.8(b) shall constitute a material breach of this Agreement and shall constitute irreparable harm. The parties hereto agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by applicable Law. Notwithstanding anything to the contrary contained in this Agreement, each of the Parties agrees that it will not bring or support any person in any Proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any of the Financing Sources in any way relating to this Agreement or any of the transaction contemplated by this Agreement, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, in any forum other than the federal and New York state courts located in the Borough of Manhattan within the City of New York and any appellate courts therefrom.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER IN CONTRACT OR IN TORT, IN LAW OR IN EQUITY OR GRANTED BY STATUTE). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 13.8.

Section 13.9  Counterparts.  This Agreement may be executed in any number of counterparts (including via electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party. Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 13.10  Parties in Interest; No Third Party Beneficiaries.  Except as set forth in Section 13.12, nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party; provided that the Financing Sources are intended third party beneficiaries of this Section 13.10, Section 13.6, Section 13.8 and Section 13.12.

Section 13.11  Fees and Expenses.  The Parties agree that, except as otherwise expressly provided in this Agreement, each Party shall bear and pay all costs, fees and expenses that it incurs, or which may be incurred on its behalf, in connection with this Agreement and the Transactions. The pre-Closing costs of any privacy ombudsman shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand, to the extent such costs are incurred in relation to the Transactions.

Section 13.12 <u>Non-Recourse</u>.  All Claims and Liabilities that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the Transactions may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement.  No other Person, including any Buyer Related Party (other than Buyer) or any of the Parties' Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to (including the Financing Sources in their capacities as such), any of the foregoing (together, the "<u>Non-Recourse Parties</u>") shall have any liabilities for any Claims or Liabilities arising under, out of, in connection with, or related in any manner to, this Agreement, the Transactions or the Debt Financing or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach, whether at law, in equity, in contract, in tort or otherwise.

Section 13.13 <u>Schedules; Materiality</u>.  The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that the relevance of such disclosure to any Section is readily apparent from the text of such disclosure, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 13.14 <u>Specific Performance</u>.    The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement by the breaching Party or Parties.  If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at Law.

[Signature pages follow]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**TRANSFORM HOLDCO LLC**

By: _____

Name:        Edward S. Lampert

Title:        Chief Executive Officer

*[Signature Page to Asset Purchase Agreement]*

**Sears Holdings Corporation**

By:

Name:          Robert A. Riecker

Title:          Chief Financial Officer

[Signature Page to Asset Purchase Agreement]

**Kmart Holding Corporation**

By:

Name:         Robert A. Riecker

Title:         Chief Financial Officer & Director

[Signature Page to Asset Purchase Agreement]

**Kmart Operations LLC**

By:

Name:      Robert A. Riecker

Title:       Chief Financial Officer & Director

[Signature Page to Asset Purchase Agreement]

**Sears Operations LLC**

By:

Name:      Robert A. Riecker

Title:      Chief Financial Officer & Director

**Sears, Roebuck and Co.**

By:

Name:      Robert A. Riecker

Title:       Chief Financial Officer,
President & Director

[Signature Page to Asset Purchase Agreement]

**ServiceLive, Inc.**

By:

Name:          Robert A. Riecker

Title:          Chief Financial Officer & Director

[Signature Page to Asset Purchase Agreement]

**SHC Licensed Business LLC**

By: _____

Name:          Robert A. Riecker

Title:          **Chief Financial Officer of Kmart Corporation, its Member**

**A&E Factory Service, LLC**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

**A&E Home Delivery, LLC**

By:

Name:    Robert A. Riecker

Title:    Vice President & Director

[Signature Page to Asset Purchase Agreement]

**A&E Lawn & Garden, LLC**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Asset Purchase Agreement]

**A&E Signature Service, LLC**

By: _____

Name:         Robert A. Riecker

Title:          Vice President & Director

[Signature Page to Asset Purchase Agreement]

**FBA Holdings Inc.**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Officer &
             Director

[Signature Page to Asset Purchase Agreement]

**Innovel Solutions, Inc.**

By:

Name:    Robert A. Riecker

Title:    Chief Financial Officer & Director

[Signature Page to Asset Purchase Agreement]

**Kmart Corporation**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Officer & Director

[Signature Page to Asset Purchase Agreement]

**MaxServ, Inc.**

By:

Name:       Robert A. Riecker

Title:       Vice President & Director

[Signature Page to Asset Purchase Agreement]

**Private Brands, Ltd.**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Asset Purchase Agreement]

**Sears Development Co.**

By:

Name:        Robert A. Riecker

Title:        President & Director

[Signature Page to Asset Purchase Agreement]

**Sears Holdings Management Corporation**

By:

Name:          Robert A. Riecker

Title:          President & Director

[Signature Page to Asset Purchase Agreement]

**Sears Home & Business Franchises, Inc.**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Asset Purchase Agreement]

**Sears Home Improvement Products, Inc.**

By:

Name:        Robert A. Riecker

Title:          President & Director

[Signature Page to Asset Purchase Agreement]

**Sears Insurance Services, L.L.C.**

By: _____

Name:        Robert A. Riecker

Title:        Chief Financial Officer

[Signature Page to Asset Purchase Agreement]

**Sears Procurement Services, Inc.**

By:

Name:      Robert A. Riecker

Title:       Vice President

[Signature Page to Asset Purchase Agreement]

**Sears Protection Company**

By:

Name:          Robert A. Riecker

Title:          Vice President

**Sears Protection Company (PR), Inc.**

By:

Name:       Robert A. Riecker

Title:        Vice President

[Signature Page to Asset Purchase Agreement]

**Sears Roebuck Acceptance Corp.**

By:

Name:       Robert A. Riecker

Title:       Chief Financial Officer & Director

[Signature Page to Asset Purchase Agreement]

**Sears, Roebuck de Puerto Rico, Inc.**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Asset Purchase Agreement]

**SYW Relay LLC**

By:

Name:        Robert A. Riecker

Title:        **Chief Financial Officer of Sears, Roebuck and Co., its Member**

[Signature Page to Asset Purchase Agreement]

**Wally Labs LLC**

By:

Name:        Robert A. Riecker

Title:        Vice President

[Signature Page to Asset Purchase Agreement]

**SHC Promotions LLC**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Officer

[Signature Page to Asset Purchase Agreement]

**Big Beaver of Florida Development, LLC**

By:

Name:        Robert A. Riecker

Title:        President

[Signature Page to Asset Purchase Agreement]

**California Builder Appliances, Inc.**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Officer & Director

[Signature Page to Asset Purchase Agreement]

**Florida Builder Appliances, Inc.**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Officer & Director

**KBL Holding Inc.**

By:

Name:        Robert A. Riecker

Title:       Vice President & Director

[Signature Page to Asset Purchase Agreement]

**Kmart of Michigan, Inc.**

By: _____

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Asset Purchase Agreement]

**Kmart of Washington LLC**

By:

Name:     Robert A. Riecker

Title:     **Chief Financial Officer of Kmart Corporation, its Member**

[Signature Page to Asset Purchase Agreement]

**Kmart of Illinois LLC**

By: _____

Name:         Robert A. Riecker

Title:         **Chief Financial Officer of Kmart Corporation, its Member**

[Signature Page to Asset Purchase Agreement]

**Kmart Stores of Texas LLC**

By:

Name:       Robert A. Riecker

Title:        **Chief Financial Officer of Kmart Corporation, its Member**

[Signature Page to Asset Purchase Agreement]

**MyGofer LLC**

By:

Name:        Robert A. Riecker

Title:        **Chief Financial Officer of Kmart Corporation, its Member**

**Sears Brands Business Unit Corporation**

By: _____

Name:        Robert A. Riecker

Title:        Vice President & Director

**Sears Holdings Publishing Company, LLC**

By:

Name:        Robert A. Riecker

Title:        Vice President

[Signature Page to Asset Purchase Agreement]

**Sears Protection Company (Florida), L.L.C.**


By:

Name:        Robert A. Riecker

Title:        Vice President

**SHC Desert Springs, LLC**

By: _____

Name:    Robert A. Riecker

Title:    **Chief Financial Officer of Kmart Corporation, its Member**

[Signature Page to Asset Purchase Agreement]

**SOE, Inc.**

By: _____

Name:        Robert A. Riecker

Title:        President & Director

[Signature Page to Asset Purchase Agreement]

**StarWest, LLC**

By: _____

Name:        Robert A. Riecker

Title:        President & Director

[Signature Page to Asset Purchase Agreement]

**STI Merchandising, Inc.**

By:

Name:          Robert A. Riecker

Title:           President & Director

[Signature Page to Asset Purchase Agreement]

**Troy Coolidge No. 13, LLC**

By:

Name:     Robert A. Riecker

Title:     **Chief Financial Officer of Kmart Corporation,
its Member**

[Signature Page to Asset Purchase Agreement]

**BlueLight.com, Inc. .**

By: _____

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Asset Purchase Agreement]

**Sears Brands, L.L.C.**

By:

Name:       Robert A. Riecker

Title:       Vice President & Manager

**Sears Buying Services, Inc.**

By:

Name:    Robert A. Riecker

Title:    President & Director

[Signature Page to Asset Purchase Agreement]

**Kmart.com LLC**

By: _____

Name:  Robert A. Riecker

Title:  **Vice President of BlueLight.com, Inc., its Member**

[Signature Page to Asset Purchase Agreement]

**Sears Brands Management Corporation**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

**KLC, Inc.**

By:

Name:      Robert A. Riecker

Title:       Vice President & Director

[Signature Page to Asset Purchase Agreement]

**SRe Holding Corporation**

By:

Name:    Robert A. Riecker

Title:    Vice President & Director

[Signature Page to Asset Purchase Agreement]

**SRC Sparrow 2 LLC**

By:

Name:        Robert A. Riecker

Title:        President & Director

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, Sears Reinsurance Company Ltd., a Bermuda Class 3 insurer, has caused this Agreement to be executed and delivered by its duly authorized representatives, and hereby agrees to be bound by all of the terms of this Agreement as a Seller hereunder.

**Sears Reinsurance Company Ltd.**

By:

Name:    ROBERT J. PHELAN

Title:    PRESIDENT

Its duly authorized officer

*Highly Confidential*
*CGSH Draft of January 16, 2019*
*Subject to Ongoing Review and Update*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

-------------------------------------------------------------x

## ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS AND BUYER (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated November 1, 2018 (Docket No. 429) (the "Sale Motion"),[2] filed by the

above-captioned debtors and debtors in possession (the "Debtors") seeking, among other things,

the entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United

States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Motion.

6006, 9007, 9008, and 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 6004-1, 6005-1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), authorizing and approving the sale of the Acquired Assets and the assumption and assignment of certain executory contracts and unexpired leases of the Debtors in connection therewith; and the Court having entered this Court's prior order, dated November 19, 2018 (Docket No. 816) including the schedule as revised by the global bidding procedures process letter filed with the Bankruptcy Court on November 21, 2018 (Docket No. 862) (the "Bidding Procedures Order"), approving competitive bidding procedures for the Acquired Assets (the "Bidding Procedures") and granting certain related relief; and Transform Holdco LLC (the "Buyer") having submitted the highest and best bid for the Acquired Assets, as reflected in the Asset Purchase Agreement (as defined below); and the Court having conducted a hearing on the Sale Motion (the "Sale Hearing") on February 1, 2019, at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of [●] (as may be amended, restated, amended and restated from time to time, the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit A, by and between Sellers and the Buyer, whereby the Sellers have agreed, among other things, to sell the Acquired Assets to the Buyer, including, without limitation, (x) the Assigned Agreements that will be assumed and assigned to Buyer or designated, as applicable, each on the terms and conditions set forth in the Asset Purchase Agreement and (y) designation rights ("Designation Rights") for certain Designatable Leases and Additional Contracts (the sale of such Acquired Assets, collectively, the "Sale Transaction"), (iii) the Bidding Procedures Order and the record of the hearing before the Court on November

2

15, 2018 at which the Bidding Procedures Order was approved, (iv) the ability of the Buyer to submit its Credit Bid, and the record of the hearing before the court on [February 1, 2019], at which the Court authorized the Buyer's Credit Bid (as approved pursuant to this Sale Order), [(v) the Declaration of [●] in Support of the Sale Motion (Docket No. [●])], and (vi) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale Motion, the Asset Purchase Agreement, the Bidding Procedures Order, and the form of this order (the "Sale Order") having been provided in accordance with the Bidding Procedures Order and the Amended Order Implementing Certain Notice and Case Management Procedures, entered on November 1, 2018 (Docket No. 405) (the "Amended Case Management Order"); and all objections to the Sale Motion having been withdrawn, resolved or overruled as provided in this Sale Order; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors and all parties in interest in these chapter 11 cases; and upon the record of the Sale Hearing and these chapter 11 cases; and after due deliberation thereon; and good cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing.  This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

3

B.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Sale Motion, the

Sale Transaction and the property of the Debtors' estates, including the Acquired Assets,

pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431,

dated January 31, 2012 (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. §

157.  Venue of these chapter 11 cases and the Sale Motion in this district is proper under 28

U.S.C. §§ 1408 and 1409.

C.      **Statutory and Rule Predicates**.  The statutory and other legal predicates for the

relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code,

Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Local Rules 6004-1, 6005-1 and

6006-1, and the Amended Guidelines for the Conduct of Asset Sales, Approved by

Administrative Order Number 383 in the United States Bankruptcy Court for the Southern

District of New York.

D.      **Final Order**.  This Sale Order constitutes a final order within the meaning of 28

U.S.C. § 158(a).  In the absence of a stay pending appeal, Buyer, being a good faith purchaser

under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset

Purchase Agreement at any time after entry of this Sale Order and shall not be subject to the stay

provided by Bankruptcy Rules 6004(h) and 6006(d).

E.      **Notice and Opportunity to Object**.  Actual written notice of, and a fair and

reasonable opportunity to object to and to be heard with respect to the Sale Motion, the Sale

Transaction, the sale of the Acquired Assets free and clear of any Claims (as defined below), the

assumption and assignment of the Assigned Agreements, the Auction, the Bidding Procedures

and the relief requested in the Sale Motion has been given, as required by the Bankruptcy Code

4

and the Bankruptcy Rules, the Local Rules, the Amended Case Management Order and the
Bidding Procedures Order.

      F.      **Title to the Acquired Assets**.  The Acquired Assets owned by the Debtors
constitute property of the Debtors' estates and good title is vested in the Debtors' estates within
the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful
owners of such Acquired Assets with all right, title and interest to transfer and convey the
Acquired Assets to the Buyer, and no other person has any ownership right, title, or interests
therein.

      G.      **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and
sound business purposes and justifications for approval of and entry into the Sale Motion, the
Sale Transaction, the Asset Purchase Agreement, and all related agreements (the "Related
Agreements").  The Debtors' entry into and performance under the Asset Purchase Agreement
and Related Agreements (i) is a result of due deliberation by the Debtors and constitute a sound
and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties,
(ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the
Debtors and their estates, creditors and other parties in interest, and (iii) are reasonable and
appropriate under the circumstances.  The Debtors have demonstrated compelling circumstances
for the Sale Transaction outside: (i) the ordinary course of business pursuant to section 363(b) of
the Bankruptcy Code and (ii) a plan of reorganization, in that, among other things, the immediate
consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the
value of the Debtors' estates.  Business justifications for the Sale Transaction include, but are not
limited to, the following: (i) the Purchase Price set forth in the Asset Purchase Agreement
constitutes the highest or otherwise best offer received for the Acquired Assets; (ii) the Asset

Purchase Agreement and the transactions contemplated thereby present the best opportunity to maximize the value of the Acquired Assets, whether on a going concern basis or otherwise, and avoid decline and devaluation of the Acquired Assets that would occur in an immediate liquidation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase Agreement, recoveries to creditors will be diminished; and (iv) the value of the Debtors' estates will be maximized through the sale of the Acquired Assets pursuant to the Asset Purchase Agreement.

H.    **Compliance with Bidding Procedures**.  The Bidding Procedures were substantively and procedurally fair to all parties and were the result of arms'-length negotiations. The Debtors, ESL, the Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects.  The Buyer subjected its bid to the competitive Bidding Procedures approved by this Court and the Buyer was designated a Qualified Bidder eligible to participate in the Auction and the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance with the Bidding Procedures Order and Bidding Procedures.  The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Acquired Assets.

I.    **Sale Process**.  (i) The Debtors and their advisors, including Lazard Frères & Co. LLC, engaged in a robust and extensive marketing and sale process through the postpetition sale process pursuant to the Bidding Procedures Order and the Bidding Procedures, (ii) the Debtors and their advisors conducted a fair and open sale process, (iii) the sale process, the Bidding

6

Procedures and the Auction were non-collusive, duly noticed and provided a full, fair and

reasonable opportunity for any entity to make an offer to purchase the Acquired Assets, and

(iv) the process conducted by the Debtors pursuant to the Bidding Procedures obtained the

highest or otherwise best value for the Acquired Assets for the Debtors and their estates, and any

other transaction would not have yielded as favorable an economic result.

J.    **Fair Consideration; Highest or Best Value**.  The consideration to be paid by the

Buyer under the Asset Purchase Agreement, including, without limitation, the Credit Bid

Amount and the Credit Bid Release Consideration (i) constitutes fair and reasonable

consideration for the Acquired Assets, (ii) is the highest or best offer for the Acquired Assets,

(iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided

by any other practically available alternative, (iv) constitutes fair value, fair, full and adequate

consideration, reasonably equivalent value and reasonable market value under the Bankruptcy

Code and the Uniform Fraudulent Transfer Act, (v) constitutes fair consideration under the

Uniform Fraudulent Conveyance Act, and (vi) constitutes reasonably equivalent value, fair

consideration and fair value under any other applicable laws of the United States, any state,

territory or possession or the District of Columbia or any other applicable jurisdiction with laws

substantially similar to the foregoing.  Pursuant to Section 3.1(c) of the Asset Purchase

Agreement, the Purchase Price may include cash in the amount of the outstanding obligations

owed to lenders other than Buyer or its Affiliates as of the Closing Date under (A) the IP/Ground

Lease Term Loan Facility (the "IP/Ground Lease Buyout Amount"), (B) the FILO Facility (the

"FILO Facility Buyout Amount"), and (C) the Real Estate Loan 2020 (the "Real Estate Loan

2020 Buyout Amount", together with the IP/Ground Lease Buyout Amount and the FILO

Facility Buyout Amount, the "Buyout Amounts") unless such lender(s) provide written

7

confirmation to the Sellers that such cash payment and the obligations owed to lenders by the Sellers under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, are permanently waived and discharged against the Sellers.  Pursuant to Section 3.1 of the Asset Purchase Agreement, to the extent payable, each Buyout Amount, if applicable, shall be deposited and held in separate segregated accounts of the Debtors and the Liens of the lenders other than Buyer or its affiliates under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, shall attach to the cash proceeds held in the applicable designated segregated account in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two business days following the Closing Date and shall not otherwise be used by the Debtors without further order of the Bankruptcy Court (the mechanic referred to in this sentence and the preceding sentence shall be referred to herein as the "Buyout Option").  Such consideration, including the Credit Bid Amount, the Credit Bid Release Consideration and the Buyout Option constitutes the highest or best bid for the Acquired Assets. Under the facts and circumstances of these chapter 11 cases, the purchase price for the Acquired Assets is fair and reasonable.

K.      **Secured Claims**.  ESL holds valid, allowed secured claims against certain of the Debtors, their estates and the property of their estates pursuant to the obligations owed to ESL under the IP/Ground Lease Term Loan Facility, the FILO Facility, the Real Estate Loan 2020, the Second Lien Term Loan, the Second Lien Line of Credit Facility and the Second Lien PIK Notes (together, the "Credit Bid Claims").  The assignment of the claims of ESL to Newco (as defined below) will take place on the Closing Date.  Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, ESL is hereby authorized to credit bid the Credit Bid

8

Claims and to use such Credit Bid Claims as a portion of the Purchase Price as set forth in the Asset Purchase Agreement (the "Credit Bid").  At the Auction, pursuant to the Asset Purchase Agreement, the Buyer agreed to pay the Purchase Price, which includes the Credit Bid Amount that will be transferred to the Buyer at the Closing Date.

L.    **No Successor or Other Derivative Liability**.  The sale and transfer of the Acquired Assets to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of the Assigned Agreements, will not subject the Buyer or ESL to any liability (including any successor liability) under any laws, including any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories, with respect to the operation of the Debtors' business prior to the Closing, and for each Assigned Agreement, the applicable Assumption Effective Date, except that, upon the Closing, the Buyer shall become liable for the applicable Assumed Liabilities.  The Buyer (i) is not, and shall not be considered a mere continuation of, or successor to, the Debtors in any respect; (ii) has not, *de facto* or otherwise, merged with or into the Debtors; and (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors and there is no continuity of enterprise between the Debtors and the Buyer.  Accordingly, the Buyer is not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement, and except with respect to any Assumed Liabilities and exceptions, Buyer's acquisition of the Acquired Assets shall be free and clear of any "successor liability" claims of any nature whatsoever.  Buyer would not purchase the

9

Acquired Assets but for the protections against any claims based upon "successor liability"
theories.

M.    **Good Faith; No Collusion**.  The Asset Purchase Agreement and each of the
transactions contemplated therein were negotiated, proposed, and entered into by the Debtors,
their management and their boards of directors or equivalent governing bodies and the Buyer and
its management, board of directors or equivalent governing body, officers, directors, employees,
agents, members, managers and representatives, including ESL, in good faith, without collusion
or fraud, and from arms'-length bargaining positions.  The Buyer is a "good faith purchaser" and
the Buyer and ESL are acting in good faith within the meaning of section 363(m) of the
Bankruptcy Code and, as such, are entitled to all the protections afforded thereby.  Effective
upon the Closing, it shall be judicially determined that neither the Debtors, ESL nor the Buyer
have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be
avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  The
Buyer and ESL have proceeded in good faith in all respects in that, among other things, (i) the
Buyer and ESL have recognized that the Debtors were free to deal with any other party interests
in acquiring the Acquired Assets, (ii) the Buyer and ESL have complied with the provisions of
the Bidding Procedures Order, (iii) the Buyer's bid was subjected to competitive Bidding
Procedures as set forth in the Bidding Procedures Order, and (iv) all payments to be made by the
Buyer and all other material agreements or arrangements entered into by the Buyer and the
Debtors in connection with the Sale Transaction have been disclosed and are appropriate. The
sale price in respect of the Acquired Assets was not controlled by any agreement among
potential bidders and neither the Debtors nor the Buyer have engaged in collusion or fraud or any
conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and

10

damages to be imposed under section 363(n) of the Bankruptcy Code or that would prevent the application of section 363(m) of the Bankruptcy Code.  Accordingly, neither the Asset Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code.  Specifically, neither ESL nor the Buyer has acted in a collusive manner with any person or entity.

N.     **Notice**.  As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate and sufficient notice of the Sale Motion, the Bidding Procedures (including the bidding process and the deadline for submitting bids and the Auction), the Sale Hearing, the Sale Transaction, the proposed Sale Order attached to the Asset Purchase Agreement and the other relief requested in the Sale Motion was provided by the Debtors; (ii) such notice was good, sufficient and appropriate under the particular circumstances and complied with the Bidding Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, the Proposed Sale Order or any of the relief requested in the Sale Motion is required.  With respect to persons whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice in *[NEWSPAPER]*, national edition on [DATE] was sufficient and reasonably calculated under the circumstances to reach such persons.

O.     **Cure Notice**.  As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served prior to the Sale Hearing the Assumption and Assignment Notice (as defined in the Bidding Procedures Order) on each counterparty to a Potential Transferred Agreement, dated [●], which provided notice of the related proposed Cure Costs upon each non-debtor counterparty to the Potential Transferred Agreements.  The service of the Assumption and Assignment Notice was

11

timely, good, sufficient and appropriate under the circumstances and no further notice need be

given with respect to the Cure Costs for the assumption and assignment of the Assigned

Agreements, including without limitation the Designatable Leases and any Additional Contracts

that were listed as Potential Transferred Agreements.  All non-debtor parties to the Potential

Transferred Agreements have had a reasonable opportunity to object both to the Cure Costs

listed on the applicable Assumption and Assignment Notice and, for Assigned Agreements other

than Designatable Leases and Additional Contracts, to the assumption and assignment of the

Assigned Agreements to the Buyer.  No defaults exist in the Debtors' performance under the

Assigned Agreements as of the date of this Sale Order other than the failure to pay the Cure

Costs, as may be required, or such defaults that are not required to be cured.

      P.      **Satisfaction of Section 363(f) Standards**.  The Debtors may sell the Acquired

Assets free and clear of all liens, claims (including those that constitute a "claim" as defined in

section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges,

charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or

recoupment, royalties, conditional sales or title retention agreements, hypothecations,

preferences, debts, easements, suits, licenses, options, rights-of-recovery, judgments, orders and

decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and

local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets,

recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration,

encumbrances and other interests of any kind or nature whatsoever against any of the Debtors or

the Acquired Assets, including, without limitation, any debts arising under or out of, in

connection with, or in any way relating to, any acts or omissions, obligations, demands,

guaranties, rights, contractual commitments, restrictions, product liability claims, environmental

<div align="center">12</div>

liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors, any claims under, or trusts or liens created by, PACA,[3] and any derivative, vicarious, transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material stator non-statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses before the effective time of the Closing and for each Assigned Agreement, the applicable Assumption Effective Date, pursuant to the Asset Purchase Agreement, or the transfer of any of the Debtors' interests in the Acquired Assets to the Buyer, and all Excluded Liabilities (collectively, excluding any Assumed Liabilities, the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied; provided, however, that, nothing herein shall be deemed, or construed as, a ruling or determination by this Court that the Assumed Liabilities encumber the Acquired Assets.  Without limiting the generality of the foregoing, "Claims" shall include

---

[3] "PACA" means The Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§499a, et seq.) or the Packers and Stockyards Act (7 U.S.C. §§181 et seq.) or any similar state laws.

[AM_ACTIVE 400950087_43]

any and all liabilities or obligations whatsoever arising under or out of, in connection with, or in any way relating to: (1) any of the employee benefit plans, including any Claims related to unpaid contributions or current or potential withdrawal or termination liability; (2) any of the Debtors' collective bargaining agreements; (3) the Worker Adjustment and Retraining Notification Act of 1988; and (4) any of the Debtors' current and former employees. Those holders of Claims who did not timely object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors. All persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering or asserting such Claims against the Buyer or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.

Q.      The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Acquired Assets was not free and clear of all Claims, if the Buyer would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities related to the Business that will not be

14

assumed by the Buyer, as described in the Asset Purchase Agreement, or if the Credit Bid Release or the Credit Bid were not components of the Sale Transaction.  A sale of the Acquired Assets other than one free and clear of all Claims would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

R.    The total consideration to be provided under the Asset Purchase Agreement reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Acquired Assets free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

S.    As of the Closing, the transfer of the Acquired Assets of the Debtors to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Buyer with all rights, title and interest of the Debtors in, and to, the Acquired Assets, free and clear of all Claims.

T.    **Assumption and Assignment of Assigned Agreements**.  The assumption and assignment of the Assigned Agreements are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Assigned Agreements (i) is necessary to sell the Acquired Assets to the Buyer, (ii) allows the Debtors to sell their business to the Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assigned Agreements, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Agreements.

15

U. With respect to each of the Assigned Agreements, the Debtors have met all applicable requirements of section 365(b) of the Bankruptcy Code in their entirety.  Further, the Buyer and/or the Debtors, in accordance with the provisions of the Asset Purchase Agreement, have cured or will cure on or before the Closing, or have provided or will provide adequate assurance of the prompt cure after the Closing (which adequate assurance may include an agreement by and between the Buyer and the counterparty to the applicable Assigned Agreement to enter into a new agreement, provided that any such agreement shall provide for the Buyer's payment of applicable Cure Costs in an amount agreed to by the Buyer and the counterparty, and provided further, that any such agreement shall require the counterparty's waiver of any and all prepetition claims against the Debtors based on the Assigned Agreement, and any damage claims arising out of the rejection of any such Assigned Agreement) of, any monetary default required to be cured with respect to the Assigned Agreements under section 365(b)(1) of the Bankruptcy Code, and the Buyer has provided adequate assurance of future performance under the Assigned Agreements in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the non-debtor counterparties to such Assigned Agreements.  Accordingly, the Assigned Agreements may be assumed by the Debtors and assigned to the Buyer as provided for in the Asset Purchase Agreement and herein.  The assumption and assignment of each Assigned Agreement is approved notwithstanding any provision in such Assigned Agreement or other restrictions prohibiting its assignment or transfer.

V. **Validity of the Transfer**.  As of the Closing, the transfer of the Acquired Assets to the Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title and interest of the Sellers in and to the Acquired Assets, free and clear of all Claims.  The consummation of the Sale Transaction is legal, valid and properly authorized

16

under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

W.      **Corporate Power and Authority.**  The Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) upon entry of this Sale Order, other than any consents identified in the Asset Purchase Agreement (including with respect to antitrust matters), need no consent or approval from any other person to consummate the Sale Transaction.

X.      **Valid and Binding Contract.**  The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia.  None of the Debtors nor the Buyer is or will be entering into the Asset Purchase Agreement and transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially

17

similar to the foregoing) or for an otherwise improper purpose.  The Asset Purchase Agreement and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

Y.      The Sale Transaction does not constitute a de facto plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors, (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities. Entry into the Asset Purchase Agreement and the Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictate the terms of a chapter 11 plan for the Debtors.  Entry into the Asset Purchase Agreement does not constitute a sub rosa chapter 11 plan.

Z.      **Valid and Binding Release**.  The proposed compromise and resolution embodied in the Credit Bid Release (as defined below and as reflected in Section 9.13 of the Asset Purchase Agreement) is reasonable and appropriate and a valid exercise of the Debtors' business judgment and the consideration provided for in the Asset Purchase Agreement, including the Credit Bid Release Consideration constitutes fair and appropriate consideration for the Credit Bid Release.  The Credit Bid Release is required by the Buyer in order to enter into and perform in accordance with the Sale Transaction and providing such release is in the best interests of the Debtors, their estates, creditors and other parties in interest.  The Claims and actions released

18

through the Credit Bid Release are complex and in the absence of the release would involve extended and expensive litigation, the outcome of which would be uncertain.

      AA.    **Debtor Authorization of Non-Debtor Subsidiary Action or Inaction**. The proposed Sale Transaction requires certain of the Debtors to take certain actions with respect to Sears Re, KCD IP, LLC and the other Foreign Subsidiaries. As further described in the Asset Purchase Agreement, the Sale Transaction contemplates the purchase of the KCD Notes, and accordingly, requires Debtor authorization of Sears Re's sale of the KCD Notes to Buyer (the "KCD Notes Purchase"). The Buyer has the right to terminate the Asset Purchase Agreement if Sears Re has not agreed to be bound by the terms of the Asset Purchase Agreement as a Seller by 11:59 p.m. New York City time on January 22, 2019. Additionally, as further described in Section 9.14 of the Asset Purchase Agreement, and each to the extent provided for in and in accordance with the Asset Purchase Agreement, the Sale Transaction contemplates (i) certain restrictions upon Sellers' and their Affiliates' (including KCD IP, LLC's) ability to sell, transfer, assign, encumber, license, sublicense or otherwise grant certain rights or take or fail to take certain actions related to the KCD IP or to amend, terminate, renew or fail to take certain actions with respect to, certain Contracts related to the KCD IP (the "KCD IP Restrictions"), (ii) Sellers' use of reasonable best efforts to (a) cause KCD IP, LLC to grant, effective as of the Closing, the Exclusive License (the "KCD Exclusive License Right"), or (b) if KCD IP, LLC has not agreed to grant the Buyer the Exclusive License in accordance with the Asset Purchase Agreement, at the Buyer's election, obtain any Consent from KCD IP, LLC necessary to assign to the Buyer those KCD Agreements that are designated for assignment and assumption by written notice of the Buyer and assume and assign to Buyer such KCD Agreements to the Buyer (the "KCD Consent Right"), (iii) if the KCD Consent Right is not obtained in accordance with the Asset

[AM_ACTIVE 400950087_43]

Purchase Agreement despite Sellers' reasonable best efforts, Sellers' assumption of all KCD

Agreements that provide Sellers with the right to sublicense KCD IP to the Buyer that are

designated only for assumption by written notice of the Buyer, and Sellers' granting of a

sublicense under the KCD IP to the Buyer in accordance with the Asset Purchase Agreement (the

"KCD Sublicense Right"), (iv) prior to such time that the BMA Consent is obtained, the Buyer

shall provide services to the Sellers sufficient to perform the PA Liability in exchange for which

the Sellers shall pay certain consideration to the Buyer (the "KCD Servicing Right") (v)

restrictions on Sellers' and their Affiliates' ability to sell, assign or transfer in any way any

equity interests in KCD IP, LLC without requiring a condition that the purchaser in such sale,

assignment or transfer agrees to the limitations set forth in Section 9.14 of the Asset Purchase

Agreement (the "KCD Equity Transfer Restriction Right" and together with the KCD Sublicense

Right, KCD IP Restrictions, the KCD Exclusive License Right and the KCD Consent Right, the

"KCD IP Related Rights") and (vi) the Sellers' obligation to transfer the KCD Notes and the

Buyer's obligation to assume the PA liabilities is dependent upon obtaining the BMA Consent.

Furthermore, the Sellers have agreed to use reasonable best efforts to cause each of the Foreign

Subsidiaries to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold,

transferred, assigned, conveyed and delivered to the Buyer or the applicable Assignee, all right,

title and interest of each of the Foreign Subsidiaries in, to or under the Acquired Foreign Assets

(the "Foreign Assets Rights").  Each of the KCD Notes Purchase, the KCD IP Related Rights

and the Foreign Assets Rights are required by Buyer and are reasonable and appropriate

exercises of the Debtors' business judgment and the consideration provided by the Buyer

(including the assumption of the Assumed Liabilities) constitutes fair and appropriate

consideration to the Debtors and the appropriate non-debtor subsidiaries.

BB.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired

Assets must be approved and consummated promptly in order to preserve the value of the

Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and

the Debtors and the Buyer intend to close the Sale Transaction as soon as reasonably practicable.

The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound

business purpose and justification for the immediate approval and consummation of the Sale

Transaction as contemplated by the Asset Purchase Agreement.  Accordingly, there is cause to

lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the

transactions contemplated by this Sale Order.

CC.    **Personally Identifiable Information**.  As contemplated in the Bidding

Procedures Order, and subject to the terms of this Sale Order, the sale to the Buyer under the

Asset Purchase Agreement of any personally identifiable information (as such term is defined in

section 101(41A) of the Bankruptcy Code) and private health information about individuals is

either consistent with the privacy policy of the Debtors in effect on the date of commencement of

these chapter 11 cases or consistent with the recommendations of any consumer privacy

ombudsman appointed in these chapter 11 cases and satisfies the requirements of section

363(b)(1)(A).

DD.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and

at the Sale Hearing establish just cause for the relief granted herein.

EE.    **Necessity of Order.**  The Buyer would not consummate the transactions without

all of the relief provided for in this Sale Order.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT**:

[AM_ACTIVE 400950087_43]

1.      **Motion is Granted**.  The Sale Motion and the relief requested therein to the extent not previously granted by this Court pursuant to the Bidding Procedures Order is granted and approved as set forth herein.

2.      The Court's findings of fact and conclusions of law in the Bidding Procedures Order and the record of the hearing with respect to that order are incorporated herein by reference.

3.      **Objections Overruled**.  All objections (except for Cure Objections, if any, that have been adjourned solely to the extent such objections relate to any asserted cure obligations pursuant to section 365(b) of the Bankruptcy Code), if any, to the Sale Motion or the relief requested therein, and any joinders thereto, that have not been withdrawn with prejudice, waived, settled, or otherwise resolved as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.  All holders of Claims or other persons and entities that failed to timely object, or withdrew their objections to the Sale Motion or this Sale Order are deemed to consent to the relief granted herein for all purposes, including pursuant to section 363(f)(2) of the Bankruptcy Code.  Each holder of any Claim against the Debtors, their estates, or any of the Acquired Assets: (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction; (ii) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such Claim; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.

4.      **Notice**.  Notice of the Motion and the Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the

Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, and the Amended Case

Management Order.

5.      **Fair Purchase Price**.  The consideration provided by the Buyer under the Asset

Purchase Agreement, including the portion of the Purchase Price that is the Credit Bid Amount,

the Credit Bid Release Consideration and the Buyout Option is fair and reasonable and

constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform

Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act,

and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable

laws of the United States, any state, territory or possession or the District of Columbia.  The

Credit Bid constitutes a valid, duly authorized credit bid and is proper under the Bidding

Procedures Order, sections 363(b) and 363(k) of the Bankruptcy Code, the applicable Prepetition

Loan Documents (as defined in the Final DIP Order) and applicable law.  The consideration

given by the Buyer shall constitute valid and valuable consideration for the Credit Bid Release

and the releases of any potential claims of successor or transferee liability of the Buyer Related

Parties, which releases shall be deemed to have been given in favor of the Buyer Related Parties

by all holders of Claims.

6.      **Approval of the Asset Purchase Agreement**.  The Asset Purchase Agreement,

all ancillary documents filed therewith or described therein, the Credit Bid and all other

transactions contemplated therein (including, but not limited to, all ancillary agreements

contemplated thereby) and all of the terms and conditions thereof, including, without limitation,

the credit bid pursuant to section 363(k) of the Bankruptcy Code of the Credit Bid Amount as

described in the Asset Purchase Agreement, are hereby approved.  The failure specifically to

include any particular provision of the Asset Purchase Agreement in this Sale Order shall not

[AM_ACTIVE 400950087_43]

diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement (including, but not limited to, all ancillary agreements and Related Agreements contemplated thereby) be authorized and approved in its entirety.

7.      **Approval of the Release**.  As set forth in Section 9.13 of the Asset Purchase Agreement:

(a)      Effective upon the Closing, in consideration for the payment by Buyer of the Credit Bid Release Consideration, and other good and valuable consideration provided to the Debtors and their estates by ESL in connection with the Transactions, each Debtor, for itself and its estate, and on behalf of each of its Subsidiaries and controlled Affiliates (each of the foregoing, a "Seller Releasing Party"), hereby absolutely, unconditionally and irrevocably (i) releases and forever discharges ESL from any and all Released Estate Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have, and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge, dispute or collaterally attack the ESL Claims, provided however that the assertion of any Claim other than a Released Estate Claim shall not be deemed to violate Section 9.13(a)(ii) of the Asset Purchase Agreement.

(b)      Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (b)(i)-(vi), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy

24

Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G to the Asset

Purchase Agreement, as reduced by the credit bid set forth in Section 3.1(b) of the Asset

Purchase Agreement.

(c)    After giving effect to the credit bid set forth in Section 3.1(b) of

the Asset Purchase Agreement, ESL shall be entitled to assert any deficiency Claims, Claims

arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it

may have against the Debtors and their estates in the Chapter 11 Cases, provided that (i) no

Claims or causes of action of ESL shall have recourse to, or any other right of recovery from,

any Claims or causes of action of the Debtors or their estates related to Lands' End, Inc., the

"spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March

18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, the "Transaction"

(as that term is defined in the registration statement on Form S-11 filed by Seritage Growth

Properties, which registration statement became effective on June 9, 2015), any Claim or cause

of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing,

(ii) any ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to

distributions of not more than $50 million from the proceeds of any Claims or causes of action of

the Debtors or their estates other than the Claims and causes of action described in the preceding

clause (c)(i); provided that, in the event that, in the absence of this clause (c)(ii), any such

proceeds to the Debtors or their estates would have resulted in distributions in respect of such

ESL Claims in excess of $50 million, the right to receive such distributions in excess of $50

million shall be treated as an unsecured claim and receive pro rata recoveries with general

unsecured claims other than the Claims and causes of action described in the preceding clause

(c)(i), and (iii) notwithstanding any order of the Bankruptcy Court to the contrary or section 1129

25

of the Bankruptcy Code, it shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part.

(d)    Section 9.13 of the Asset Purchase Agreement, and all statements or negotiations relating hereto, shall be governed by Federal Rule of Evidence 408 and any corresponding state rules of evidence.  Without limiting the foregoing, neither Section 9.13 of the Asset Purchase Agreement nor any statements or negotiations relating hereto shall be offered or received in evidence in any proceeding for any purpose other than to enforce the terms of this Section 9.13.

(e)    The release set forth in Section 9.13 of the Asset Purchase Agreement and in paragraphs 7(a)-(d) hereof shall be referred to herein as the "Credit Bid Release".  The Credit Bid Release is hereby approved in its entirety and the Credit Bid Release Consideration and the other consideration provided by Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration for the Credit Bid Release.  The Seller Releasing Parties and the Buyer Related Parties are authorized and directed to perform under the Credit Bid Release pursuant to its terms and to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising under the Credit Bid Release.

8.    **Approval of Debtor Authorization of Non-Debtor Subsidiary Action or Inaction**.  The KCD Notes Purchase, the KCD IP Related Rights and the Foreign Assets Rights are hereby approved in their entirety and the consideration provided by the Buyer pursuant to the Asset Purchase Agreement is found to be fair and reasonable consideration for the KCD Notes Purchase, the KCD IP Related Rights and the Foreign Assets Rights.  The Sellers and the Buyer

26

are authorized and directed to perform in accordance with the Asset Purchase Agreement, their obligations with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets rights, including to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising with respect to the KCD Notes Purchase, the KCD IP Related Rights and the Foreign Assets Rights.  As and to the extent necessary, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign or only assume any or all of the KCD Agreements in accordance with Section 9.14(c) or Section 9.14(d) and to execute and deliver to the Buyer, or cause KCD IP, LLC to execute and deliver to Buyer, such documents or other instruments as may be necessary to license or sublicense the KCD IP to the Buyer as provided in the Asset Purchase Agreement.

9.      **Consummation of Sale Transaction**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the Asset Purchase Agreement and the Related Agreements and to close and consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, the Related Agreements and this Sale Order.

10.     The Debtors, their affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be necessary or desirable to implement the Asset Purchase Agreement and Related Agreements, including the transfer and

27

the assignment of all the Acquired Assets, and the assumption and assignment of all the Assigned Agreements, and to take all further actions as may be (i) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to the Buyer's possession, the Acquired Assets or (ii) necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement or to implement the Sale Transaction, including pursuant to this Sale Order, all without further order of the Court.

11.     All persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Buyer as of the Closing or at such time as the Buyer requests.  To the extent required by the Asset Purchase Agreement, the Debtors agree to exercise commercially reasonable efforts to assist the Buyer in assuring that all persons that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtors before the Closing Date or (ii) the Buyer on or after the Closing Date.

12.     All persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; provided that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

13.     Each Assignee has provided or will provide, as applicable, adequate assurance of future performance of and under the Designated Agreements, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

[AM_ACTIVE 400950087_43]

14.    **Direction to Creditors and Parties in Interest**.  On the Closing, each of the

Debtors' creditors and the holders of any Claims are authorized and directed to execute such

documents and take all other actions as may be necessary to terminate, discharge or release their

Claims in the Acquired Assets, if any, as such Claims may otherwise exist.

15.    **Direction to Government Agencies**.  Each and every filing agent, filing officer,

title agent, recording agency, governmental department, secretary of state, federal, state and local

official, and any other person and entity who may be required by operation of law, the duties of

its office or contract, to accept, file, register, or otherwise record or release any documents or

instruments or who may be required to report or insure any title in or to the Acquired Assets, is

hereby authorized and directed to accept any and all documents and instruments necessary and

appropriate to consummate the Sale Transaction contemplated by the Asset Purchase Agreement

and approved by this Sale Order.

16.    **Assumption of Protection Agreement Obligations**.  Pursuant to and in

accordance with Section 2.3(e) of the Asset Purchase Agreement, the Buyer has expressly

assumed Sellers' obligations (the "Assumed Protection Agreement Obligations") with respect to

warranties and protection agreements or other services contracts (other than warranties relating

to Intellectual Property) for the goods and services of Sellers sold or performed prior to the

Closing, including any obligations owed by Sears Re to any Seller in respect of reinsurance of

such warranties and protection agreements (collectively, the "Assumed Protection Agreements").

To the fullest extent permitted by applicable law, the Buyer is authorized to operate in place of

the Sellers with respect to the Assumed Protection Agreements and to take any actions

contemplated to be taken by the Sellers thereunder, including collecting any amounts payable by

any counterparty to any such Assumed Protection Agreement and performing the Assumed

29

Protection Agreement Obligations.  The court hereby orders that the Sellers and all other parties

in interest shall cooperate in respect of Buyer's operation in place of the Sellers under the

Assumed Protection Agreements, including, without limitation, by furnishing such documents or

records as are necessary to the Buyer to perform the Assumed Protection Agreement Obligations

without interruption.  Moreover, except for good cause based on violations of Law unrelated to

the assumption by the Buyer of the Assumed Protection Agreement Obligations occurring

pursuant to the Asset Purchase Agreement and this Sale Order, no regulatory agency (including,

without limitation, any state insurance regulator) shall interrupt Buyer's performance of the

Assumed Protection Agreement Obligations from and after the Closing Date without first

obtaining relief from this Court.  The Buyer may continue to perform the Assumed Protection

Agreement Obligations under any existing licenses or permits of the Sellers, with no interruption

of the right of the Buyer to so perform, until any required licenses and permits have been

transferred to the Buyer by Sellers, or new licenses and permits have been issued to the Buyer.

17.     **Transfer of the Acquired Assets Free and Clear**.  Pursuant to sections 105(a),

363(b), 363(f) and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the

Acquired Assets, including, without limitation, Designated Agreements (as defined below) in

accordance with the terms of the Asset Purchase Agreement.  The Acquired Assets shall be

transferred to the Buyer in accordance with the terms of the Asset Purchase Agreement, and

upon the Closing, such transfer shall: (i) be valid, legal, binding and effective; (ii) vest the Buyer

with all right, title and interest of the Debtors in the Acquired Assets; and (iii) be free and clear

of all Claims (including Claims of any Governmental Authority) in accordance with section

363(f) of the Bankruptcy Code, with the net proceeds of the Sale Transaction from the Acquired

Assets upon which the DIP ABL Lenders (as defined in the Final DIP Order) have a first lien

[AM_ACTIVE 400950087_43]

being used to repay in full in cash all DIP ABL Secured Obligations (as defined in the Final DIP Order) on the Closing and all other Claims that represent interests in property shall attach to the net proceeds of the Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing.  The cash portion of the Purchase Price, to the extent payable, that is paid in connection with a Buyout Option shall be deposited and held in segregated accounts in accordance with Section 3.1 of the Asset Purchase Agreement with the Liens of any lenders other than Buyer or Affiliates attaching to the cash proceeds held in the applicable designated segregated account in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two business days following the Closing Date and shall not otherwise be used by the Debtors without further order of the Bankruptcy Court.

18.    This Sale Order (i) shall be effective as a determination that, as of the Closing, all Claims have been unconditionally released, discharged and terminated as to the Buyer Related Parties and the Acquired Assets, and that the conveyances and transfers described herein have been effected, and (ii) is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee and owner of the Acquired Assets free and clear of all Claims, or who may be required to report or insure any

[AM_ACTIVE 400950087_43]

title or state of title in or to any lease (all such entities being referred to as "Recording Officers").

All Recording Officers are authorized and specifically directed to strike recorded Claims against

the Acquired Assets recorded prior to the date of this Sale Order.  A certified copy of this Sale

Order may be filed with the appropriate Recording Officers to evidence cancellation of any

recorded Claims against the Acquired Assets recorded prior to the date of this Sale Order.  All

Recording Officers are hereby directed to accept for filing any and all of the documents and

instruments necessary and appropriate to consummate the transactions contemplated by the Asset

Purchase Agreement.

19.    Following the Closing, no holder of any Claim shall interfere with the Buyer's

title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or

based on any actions the Debtors may take in these chapter 11 cases.

20.    Except as expressly set forth in the Asset Purchase Agreement, the Buyer Related

Parties and their successors and assigns shall have no liability for any Claim or Excluded

Liabilities, whether known or unknown as the Closing Date, now existing or hereafter arising,

whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter

ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or

equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any

employment or labor agreements or the termination thereof relating to the Debtors; (ii) any

pension, welfare, compensation or other employee benefit plans, agreements, practices and

programs, including, without limitation, any pension plan of or related to any of the Debtors or

any Debtor's affiliates or predecessors or any current or former employees of any of the

foregoing, including, without limitation, the Employee Plans and any participation or other

agreements related to the Employee Plans, or the termination of any of the foregoing; (iii) the

[AM_ACTIVE 400950087_43]

Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (A) the Employee Retirement Income Security Act of 1974, as amended, (B) the Fair Labor Standards Act, (C) Title VII of the Civil Rights Act of 1964, (D) the Federal Rehabilitation Act of 1973, (E) the National Labor Relations Act, (F) the Worker Adjustment and Retraining Notification Act of 1988, (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (H) the Americans with Disabilities Act of 1990, (I) the Consolidated Omnibus Budget Reconciliation Act of 1985, (J) the Multiemployer Pension Plan Amendments Act of 1980, (K) state and local discrimination laws, (L) state and local unemployment compensation laws or any other similar state and local laws, (M) state workers' compensation laws or (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (U) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

33

21.     If any person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Claims (collectively, the "Release Documents") the person has with respect to the Debtors or the Acquired Assets or otherwise, then with regard to the Acquired Assets that are purchased by the Buyer pursuant to the Asset Purchase Agreement and this Sale Order (i) the Debtors are hereby authorized and directed to, and the Buyer is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the Acquired Assets, (ii) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets and (iii) the Buyer may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Acquired Assets other than liabilities expressly assumed under the Asset Purchase Agreement; provided that, notwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Sellers nor Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

34

22.     On the Closing Date, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Acquired Assets acquired under the Asset Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Acquired Assets to the Buyer.

23.     To the maximum extent available under applicable law and to the extent provided for under the Asset Purchase Agreement, the Buyer and its Affiliated Designees shall be authorized, as of the applicable Assumption Effective Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Properties, the other Acquired Assets, the Occupancy Leased Premises (as defined in the Occupancy Agreement) and the Sparrow Properties and, to the maximum extent available under applicable law and to the extent provided for under the Asset Purchase Agreement, all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been transferred to the Buyer or its Applicable Designee as of the applicable Assumption Effective Date.  All existing licenses or permits applicable to the business shall remain in place for the Buyer's and its Affiliated Designees' benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures and, in furtherance thereof, the Management Services to be provided to the Buyer and its Affiliated Designees pursuant to Section 8.8(b) of the Asset Purchase Agreement are hereby approved in their entirety.  Moreover, except for good cause based on violations of Law unrelated to the assumption by the Buyer and its Affiliated Designees of the existing licenses and permits applicable to the business occurring pursuant to the Asset Purchase Agreement and this Sale Order, no licensing or permitting authority or other regulatory agency

35

shall interrupt Buyer's or any Affiliated Designee's operation of the business, or refuse to renew any license, permit, or authorization to operate the Acquired Assets, from and after the Closing Date without first obtaining relief from this Court.

24.      **No Successor or Other Derivative Liability**.  By virtue of the Sale Transaction, the Buyer Related Parties and their affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors, (ii) have, *de facto* or otherwise, merged with or into any or all Debtors, (iii) be a consolidation with the Debtors or their estates or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Buyer Related Parties have not assumed nor are they in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Assumed Liabilities.  Except as expressly set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, de facto merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the

36

operation of the Acquired Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.

25.    **Assumption and Assignment of Assigned Agreements**.  Subject to and conditioned upon the occurrence of the Closing Date, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assigned Agreements to the Buyer free and clear of all Claims, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Agreements to the Buyer as provided in the Asset Purchase Agreement.  Upon the applicable Assumption Effective Date with respect to an Assigned Agreement, the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such Assigned Agreement and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to such Assigned Agreement.  Buyer acknowledges and agrees that from and after the applicable Assumption Effective Date with respect to an Assigned Agreement, subject to and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each of such Assigned Agreement in its entirety, including any indemnification obligations expressly contained in such Assigned Agreement that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order.  The assumption by the Debtors and assignment to the Buyer of any Assigned Agreement shall not be a default under such Assigned Agreement; provided that with respect to liabilities from any Assumed 503(b)(9) Claims, Buyer shall not be obligated to make any payments in respect of such liabilities until the earlier of (i) the date that is 120 days following the closing of the sale and (ii) the date on which a chapter 11 plan is confirmed by the Court with respect to the Debtors; provided further that with respect to

37

the liabilities from any Other Payables, Buyer shall not be obligated to make any payments in

respect of such liabilities until the later of (i) the date of the closing of the sale and (ii) the date

that the applicable obligation thereunder becomes due in the ordinary course of business;

provided further, and for the avoidance of doubt, the Buyer's agreement to pay Assumed

503(b)(9) Claims, Specified Payables, or any other administrative or priority claim of the Sellers

pursuant to the terms of the Asset Purchase Agreement is a general unsecured contractual

obligation of the Buyer owed solely to the Sellers.

26.    All Cure Costs that have not been waived by, or that have not been otherwise

addressed in an alternate arrangement with, any non-debtor party to an Assigned Agreement

shall be determined in accordance with the Bidding Procedures Order or other applicable order

of this Court, and, as required by the Asset Purchase Agreement, (i) paid in cash by the Buyers

and/or the Debtors, on or before the Closing, or (ii) adequate assurance of the payment in cash

promptly after the Closing has been provided (which adequate assurance may include an

agreement by and between the Buyer and the counterparty to the applicable Assigned Agreement

to enter into a new agreement, provided that any such agreement shall provide for the Buyer's

payment of applicable Cure Costs in an amount agreed to by the Buyer and the counterparty, and

provided further, that any such agreement shall require the counterparty's waiver of any and all

prepetition claims against the Debtors based on the Assigned Agreement, and any damage claims

arising out of the rejection of any such Assigned Agreement), and the Debtors shall have no

liability therefor in accordance with the terms of the Asset Purchase Agreement on the applicable

Assumption Effective Date.  Payment of the Cure Costs by the Debtors and the Buyers shall (i)

be in full satisfaction and cure of any and all defaults under the Assigned Agreements, whether

monetary or non-monetary and (ii) compensate the non-Debtor counterparty for any actual

[AM_ACTIVE 400950087_43]

pecuniary loss resulting from such defaults.  Each non-Debtor party to an Assigned Agreement is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.  Nothing in this Sale Order shall affect the rights of the Buyer, to add or remove any Potential Transferred Agreement to or from the list of Assigned Agreements set forth in the Asset Purchase Agreement in accordance with the terms thereof.  All of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, of each of the Assigned Agreements, other than the demonstration of adequate assurance of future performance with respect to the Designatable Leases and the Additional Contracts.

27.     To the extent a counterparty to an Assigned Agreement failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost at any time and any proof of claim filed or to be filed with respect to any prepetition default under an Assigned Agreement shall be deemed expunged with prejudice.

28.     An Adjourned Cure Objection (as such term is defined in the Bidding Procedures Order) may be resolved after the Closing; provided that the Debtors maintain the Reserve Amount (as such term is defined in the Bidding Procedures Order).  Upon resolution of such Adjourned Cure Objection and the payment of the applicable Cure Cost, if any, the applicable Assigned Agreement that was the subject of such Adjourned Cure Objection shall be deemed assumed and assigned to the Buyer as of the Assumption Effective Date without further order of

[AM_ACTIVE 400950087_43]

the Court, and Debtors' shall have no obligation to maintain the Cure Cost Reserve with respect

to such Assigned Agreement.

29.    **Designation Rights Procedures**.  The Debtors are authorized, at the direction of

the Buyer pursuant to the Asset Purchase Agreement, to seek to assume and to assign pursuant to

sections 363 and 365 of the Bankruptcy Code, the Designatable Leases and any Additional

Contracts that the Buyer designates for assumption and assignment in accordance with Section

2.9 of the Asset Purchase Agreement to a designated Assignee.  Each of the Designatable Leases

and Additional Contracts constitutes an unexpired lease or executory contract within the meaning

of section 365 of the Bankruptcy Code and, at the Buyer's election, will be deemed assumed and

assigned by the Debtors effective in accordance with the timing set forth in the Asset Purchase

Agreement and the procedures set forth in the Asset Purchase Agreement and herein.  The

assumption of any liabilities under a Designatable Lease or Additional Contract that is assumed

by an Assignee shall constitute a legal, valid and effective delegation of all liabilities thereunder

to the applicable Assignee and, following payment of any Cure Costs related thereto and except

as expressly set forth in the Asset Purchase Agreement or this Sale Order, shall divest the

Debtors of all liability with respect to such Designatable Lease or Additional Contract for any

breach of such Designatable Lease occurring after the applicable Designation Assignment Date

or any breach of such Additional Contract after the applicable date on which such Additional

Contract is assigned to the applicable Assignee in accordance with Section 2.9 of the Asset

Purchase Agreement (the "Additional Contract Assignment Date").

30.    The Debtors served all counterparties to the Designatable Leases and Additional

Contracts listed as Potential Transferred Agreements ("Designatable Contract Counterparties")

with an Assumption and Assignment Notice and the deadline to object to the Cure Costs has

40

passed. Accordingly, unless an objection to the proposed Cure Costs was filed and served before

the Cure Objection deadline, the applicable Designatable Contract Counterparty is forever barred

from objecting to the Cure Costs and from asserting any additional cure or other amounts with

respect to the applicable Designatable Lease or Additional Contract in the event it is assumed

and/or assigned by an Assignee; provided, however, that in the event that an Additional Contract

was not listed as a Potential Transferred Agreement, and accordingly, no Assumption and

Assignment notice was served upon the applicable Designatable Contract Counterparty, such

Designatable Contract Counterparty shall have eight (8) days following after the date on the

applicable supplemental Assumption and Assignment Notice is filed with the Court and served

on the applicable Designatable Contract Counterparty (the "Supplemental Additional Contract

Cure Objection Deadline"), to (a) object to the applicable proposed Cure Costs for such

Additional Contract (the "Supplemental Additional Contract Cure Cost Objection") and to (b)

serve the Supplemental Additional Contract Cure Cost Objection (by email, facsimile or hand

delivery) so that it is actually received by counsel for the Debtors and the Buyer on or before the

Supplemental Additional Contract Cure Objection Deadline.

31.    If any objection to the proposed Cure Costs was filed and served before the Cure

Objection deadline, the Debtors, the Buyer and the applicable Designatable Contract

Counterparty shall have authority to compromise, settle or otherwise resolve any objections to

proposed Cure Costs without further order of the Court. If the Debtors, the Buyer and the

applicable Designatable Contract Counterparty determine that the objection cannot be resolved

without judicial intervention, then the determination of the proposed Cure Costs with respect to

such Designatable Lease or Additional Contract will be determined by the Court. Other than

with respect to objections to the proposed Cure Costs as set forth in Paragraph 30 above and the

limitations set forth in Paragraphs 35 and 36 below, all Contract Lease Counterparties' rights under section 365 with respect to the assumption and assignment of the Designatable Leases and Additional Contracts pursuant to the Bankruptcy Code (including, without limitation, as to the provision of adequate assurance of future performance) are reserved pending delivery of a Buyer Assumption Notice or a notice pursuant to Section 2.9 of the Asset Purchase Agreement (a "Section 2.9 Assumption Notice") and the procedures set forth in Paragraphs 35 and 36 below.

32.    During the Designation Rights Period, the Buyer may designate any Designatable Lease or Additional Contract for assumption and assignment in accordance with the terms of the Asset Purchase Agreement.  In such event, the Debtors shall file with the Court and serve on the applicable Designatable Contract Counterparty a Buyer Assumption Notice or Section 2.9 Assumption Notice, together with any applicable Designation Assignment Agreement or other applicable assignment agreement with respect to an Additional Contract.  If the proposed Assignee is not either the Buyer or an affiliate of the Buyer, the Debtors shall also deliver to the applicable Designatable Contract Counterparty (and deliver by email or facsimile to counsel for the applicable Designatable Contract Counterparty, if such counsel has filed a notice of appearance in the Bankruptcy Cases) evidence of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code with respect to the applicable Designatable Lease or Additional Contract that is proposed to be assumed and assigned to such Assignee.  Any party seeking to object to the assumption and assignment of any Designatable Lease or Additional Contract on any basis other than the Cure Costs (including, but not limited to, objections to adequate assurance of future performance), must (a) file a written objection in compliance with the Bankruptcy Rules and the Local Rules (a "Designatable Contract Assumption and Assignment Objection") with the Court, so that such objection is filed no later

42

than eight (8) days after the date on which (i) the applicable Buyer Assumption Notice or Section 2.9 Assumption Notice is filed with the Court and (ii) evidence of adequate assurance of future performance required pursuant to the preceding sentence is served on the applicable Designatable Contract Counterparty (the "Designatable Contract Assumption and Assignment Objection Deadline"), and (b) serve the Designatable Contract Assumption and Assignment Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Buyer on or before the Designatable Contract Assumption and Assignment Objection Deadline.

33.    If no Designatable Contract Assumption and Assignment Objection is filed by the Designatable Contract Assumption and Assignment Objection Deadline, this Sale Order shall serve as approval of the assumption and assignment of the applicable Designatable Contract or Additional Contract.  If a Designatable Contract Assumption and Assignment Objection is timely filed and not withdrawn or resolved, the Debtors, the Buyer and the objecting Designatable Contract Counterparty shall have authority to compromise, settle or otherwise resolve any objections without further order of the Court.  If the Debtors, the Buyer and the objecting Designatable Contract Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Designatable Lease or Additional Contract will be determined by the Court on a date to be scheduled (which hearing date shall be no sooner than ten (10) business days following the date of filing of the Buyer Assumption Notice or Section 2.9 Assumption Notice), unless the Debtors, the Buyer and the applicable Designatable Contract Counterparty agree otherwise.

34.    Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, (a) the Buyer shall, on the Designation Assignment Date or Additional Contract Assignment Date for a

43

Designatable Lease or Additional Contract, pay to the applicable Designatable Contract Counterparty all undisputed Cure Costs with respect to such Designatable Lease or Additional Contract, solely to the extent designated for assumption by the Sellers and assignment to Buyer by written notice from Buyer to Sellers delivered prior to the end of the Designation Rights Period (the "Designated Agreements").  The applicable Assignee shall assume the obligations of the Debtors under each such Designated Agreement and arising from and after the applicable Designation Assignment Date or Additional Contract Assignment Date.  Upon assumption and assignment of any Designated Agreement, the Debtors and the estates shall be relieved of any liability for breach of such Designated Agreement occurring after the applicable Designation Assignment Date or Additional Contract Assignment Date pursuant to section 365(k) of the Bankruptcy Code; provided that, except as expressly provided in the Asset Purchase Agreement or Related Agreements, neither the Buyer (except to the extent such obligations constitute Cure Costs) nor the applicable Assignee shall have any obligations under any Designated Agreement that is an Acquired Lease or related Assigned Agreement in respect of any portion of any year-end (or other) adjustment (including, without limitation, for royalties, rents, utilities, taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under any of the Acquired Leases or any other Assigned Agreements for the calendar year in which the applicable Lease Assignment occurs attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y)for any previous calendar year, and the Sellers shall fully indemnify and hold harmless the Buyer and the applicable Assignee with respect thereto; provided, however, that, with respect to each Designated Agreement that is an Acquired Lease or related Assigned Agreement, commencing on the applicable Designation Assignment Date until the final reconciliation of all such adjustments

44

with respect the calendar year in which the applicable Designation Assignment Date occurs, the Debtors shall hold (in a segregated account held by a third-party financial institution, which account shall be free and clear of all claims against the Debtors other than the applicable Landlord's claim with respect to such year-end reconciliations) cash in an amount equal to the Debtors' expected obligations in respect of such year-end adjustments (as mutually agreed by the Debtors and the applicable Landlord or, if the Debtors and the applicable Landlord cannot reach a mutual agreement, as determined by the Court), which cash, prior to such final reconciliation, may be used solely to fund such obligations and, following such final reconciliation, will be allocated between the Debtors and the applicable Landlord in accordance with such final reconciliation.

35.     Any provision in any Designated Agreement that purports to declare a breach or default as a result of a change or transfer of control or any interest in respect of the Debtors is unenforceable and all Designated Agreements shall remain in full force and effect notwithstanding assignment thereof.  No sections or provisions of any Designated Agreements, that in any way purport to (i) prohibit, restrict, or condition the Debtors' assignment of such Designated Agreement (including, but not limited to, the conditioning of such assignment on the consent of any non-debtor party to such Designated Agreement);; (ii) provide for the cancellation, or modification of the terms of the Designated Agreement based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such Designated Agreement upon assignment thereof; or (iv) provide for any rights of first refusal on a Designatable Contract Counterparty's part, or any recapture or termination rights in favor of a Designatable Contract

45

Counterparty, or any right of a Landlord to take an assignment or sublease from a tenant, shall have any force or effect with respect to the grant and honoring of the Designation Rights or the rights under Section 2.9 of the Asset Purchase Agreement in accordance with this Sale Order and the Asset Purchase Agreement and assignments of Designated Agreements by the Debtors in accordance therewith, because they constitute unenforceable antiassignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code. Upon assumption and assignment of any Designatable Lease or Additional Contract pursuant to the procedures set forth herein and in the Asset Purchase Agreement, the applicable Assignee shall enjoy all of the rights and benefits under each such Designated Agreement as of the applicable Designation Assignment Date or Additional Contract Assignment Date.

36.    Except as otherwise expressly agreed by the Buyer and the applicable Designatable Contract Counterparty, notwithstanding any provision in any Designatable Lease that purports to prohibit, restrict or condition such action, upon the assumption and assignment of such Designatable Lease to an Assignee in accordance with the terms of the Asset Purchase Agreement, (x) the applicable Assignee shall be authorized to (i) use the applicable Lease Premises (as defined in the Asset Purchase Agreement), subject to section 365(b)(3) of the Bankruptcy Code, as a retail store (and related goods and services) upon consummation of the assumption and assignment of such Designatable Lease to such Assignee in accordance with the terms of the Asset Purchase Agreement, (ii) operate such Lease Premises under the Buyer's trade name or any other trade name which the Buyer owns or is authorized to use (including any of the Debtors' trade names), (iii) make such alterations and modifications to the applicable Lease Premises (including signage, together with appropriate changes to existing tenant signage in the

46

respective shopping center or mall, including panels on all pylons, monuments, directional and

other ground and off-premises signs where Sellers are presently represented) deemed necessary

by such Assignee (subject to applicable municipal codes) as are necessary or desirable for such

Assignee to conform such Lease Premises to the prototypical retail store (or such Assignee's

typical retail store), (iv) remain "dark" with respect to such Lease Premises after such

assumption and assignment until the date that is necessary to permit such Assignee to remodel,

restock, re-fixture, change signage and/or until completion of the work described in clause (iii)

above (so long as such date is not more than one hundred fifty (150) days after the applicable

Designation Assignment Date) or such later date as may be reasonably required for the

restoration of the such Lease Premises following any applicable Casualty / Condemnation Event,

and (v) exercise, utilize or take advantage of any renewal options and any other current or future

rights, benefits, privileges, and options granted or provided to the Debtors under such Designated

Agreement (including all of the same which may be described or designated as, or purport to be,

"personal" to the Debtors or to a named entity in such Designated Agreement or to be

exercisable only by the Debtors or by a named entity or an entity operating under a specific trade

name)  and (y) neither the Buyer nor the applicable Assignee shall have any responsibility or

liability for any Excluded Asset-Sale Taxes and Excluded Asset-Reorganization Taxes.

37.    ***Ipso Facto* Clauses Ineffective**.  Except as otherwise specifically provided for by

order of this Court, the Assigned Agreements shall be transferred to, and remain in full force and

effect for the benefit of, the Buyer or, for applicable Designated Agreements, the Assignee in

accordance with their respective terms, including all obligations of the Buyer or, for applicable

Designated Agreements, the Assignee as the assignee of the Assigned Agreements,

notwithstanding any provision in any such Assigned Agreements (including, without limitation,

47

those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no, and all non-Debtor parties to any Assigned Agreements are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer, any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assigned Agreements or the Closing.

38.    Except as otherwise specifically provided for by order of this Court, upon the Debtors' assignment of the Assigned Agreements to the Buyer under the provisions of this Sale Order, no default shall exist under any Assigned Agreements, and no counterparty to any Assigned Agreements shall be permitted to declare a default by any Debtor or the Buyer or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Agreement. Any provision in an Assigned Agreement that prohibits or conditions the assignment or sublease of such Assigned Agreement (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, refuse to renew, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Agreement shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Agreement.

39.    **Statutory Mootness**.  The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full

[AM_ACTIVE 400950087_43]

rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.  The Sale

Transaction contemplated by the Asset Purchase Agreement is undertaken by the Buyer and ESL

without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy

Code, and accordingly, the reversal or modification on appeal of the authorization provided

herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the

transfer of the Acquired Assets to the Buyer, free and clear of Claims, unless such authorization

is duly stayed before the Closing of the Sale Transaction pending such appeal.  The Debtors and

the Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any

time after entry of this Sale Order.

40.     **No Avoidance of Asset Purchase Agreement**.  Neither the Debtors nor the

Buyer Related Parties have engaged in any conduct that would cause or permit the Asset

Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of

the Bankruptcy Code.  Accordingly, the Asset Purchase Agreement and the Sale Transaction

shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party

shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy

Code in respect of the Asset Purchase Agreement or the Sale Transaction.

41.     **Waiver of Bankruptcy Rules 6004(h), 6006(d) and 7062**.  Notwithstanding the

provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the

Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and

enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy

Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Time is of the

essence in closing the Sale Transaction and the Debtors and the Buyer intend to close the Sale

Transaction as soon as practicable.  Any party objecting to this Sale Order must exercise due

diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal will be foreclosed as moot. This Sale Order constitutes a final order upon which the Debtors and the Buyer are entitled to rely.

42. **[Personally Identifiable Information**. After appointment of any consumer privacy ombudsman in these chapter 11 cases, in accordance with section 332 of the Bankruptcy Code, and after giving due consideration to the facts, circumstances and conditions of the Asset Purchase Agreement, as well as the report (as supplemented) of the consumer privacy ombudsman filed with the Court which Buyer agrees to comply with, no showing was made that the sale of personally identifiable information or private health information contemplated in the Asset Purchase Agreement, subject to the terms of this Sale Order, would violate applicable nonbankruptcy law.]⁴

43. **Distribution and Application of Sale Proceeds**. At the Closing, the Buyer shall pay to the Sellers (in accordance with the terms of the Asset Purchase Agreement), the balance of the purchase price remaining due and owing under the Asset Purchase Agreement. The proceeds of the Sale Transaction shall be applied as provided in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 955) ("Final DIP Order"), including to repay the DIP ABL Secured Obligations (as defined in the Final DIP Order) in full in cash from the sale of those Acquired Assets upon which the DIP ABL Lenders have a first lien on the Closing. The

---

⁴ **NTD**: Buyer understands that a draft of the consumer privacy ombudsman's report will be shared prior to its submission to the Bankruptcy Court.

50

methodology for allocation of proceeds shall be as set forth in the Asset Purchase Agreement.  If any order under section 1112 of the Bankruptcy Code is entered in the cases, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that this Sale Order, including the rights granted to Buyer hereunder, shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest.  This Sale Order shall not be modified by any chapter 11 plan confirmed in the cases or by any subsequent orders of the Court.

44.    **Binding Effect of Sale Order**.  The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates and their creditors, non-debtor affiliates, any affected third parties, all holders of equity interests in the Debtors, all holders of any claims, whether known or unknown, against the Debtors, any holders of Claims against or on all or any portion of the Acquired Assets, including, but not limited to all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the debtors' chapter 11 cases, and each of their respective affiliates, successors and assigns. The Asset Purchase Agreement and the Sale Order shall inure to the benefit of the Debtors, their estates and creditors, the Buyer and their respective successors and assigns.  The Asset Purchase Agreement, the Sale Transaction and this Sale Order shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

45.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order, the Asset Purchase Agreement

51

and any documents executed in connection therewith shall govern, in that order.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases, any order confirming such plan, or in any other order of any type or kind entered in these chapter 11 cases (including, without limitation, any order entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

46.     **Modification of Asset Purchase Agreement**.  The Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; <u>provided</u> that any such modification, amendment or supplement does not materially change the terms of the Asset Purchase Agreement or Related Agreements, documents or other instruments.

47.     **Bulk Sales; Taxes**.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply in any way to the transactions contemplated by the Asset Purchase Agreement, the Sale Motion or this Sale Order.  Except as otherwise expressly provided in the Asset Purchase Agreement, all obligations of the Debtors relating to taxes, whether arising under any law, by the Asset Purchase Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

48.     **Lease Deposits and Security**.  The Buyer shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Assigned Agreement to the extent not previously provided by the Debtors.

49.    **Automatic Stay**.  The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement, and Related Agreements, documents or other instruments.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

50.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Sale Order or the Asset Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

Dated:   [February] _____, 2019
            White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

[AM_ACTIVE 400950087_43]

## Exhibit B

## FORM OF

## IP ASSIGNMENT AGREEMENT

**THIS IP ASSIGNMENT AGREEMENT** ("Assignment"), effective as of [●] ("Effective Date")[1], is made and entered into by and among Sears Holdings Corporation, a corporation organized and existing under the laws of Delaware ("SHC") and each of its Subsidiaries party hereto[2] (all such Subsidiaries and together with SHC, "Assignors"), on the one hand, and [●][3], a [●] organized and existing under the laws of [●] ("Assignee"), on the other hand (each a "Party", and collectively, the "Parties").

**WHEREAS**, pursuant to that certain Asset Purchase Agreement, dated as of [●], by and among Assignors and [Assignee together with any applicable Affiliated Designees][4] (the "Purchase Agreement"), Sellers agreed to sell, transfer, assign, convey and deliver, and [Assignee together with any applicable Affiliated Designees][5] agreed to purchase, the Acquired Assets, including the Acquired Intellectual Property, in each case on the terms and subject to the conditions contained in the Purchase Agreement;

**WHEREAS,** Assignors are the owners of the Acquired Intellectual Property, including, without limitation, each of the Trademarks set forth on Exhibit A-1 hereto, each of the Business Names set forth on Exhibit A-2 hereto, each of the Patents set forth on Exhibit A-3 hereto, each of the Copyrights set forth on Exhibit A-4 hereto, each of the Domain Names set forth on Exhibit A-5 hereto and each of the Media Accounts set forth on Exhibit A-6 hereto (in each case, as applicable, together with all goodwill of the businesses in which the foregoing are used and all goodwill connected with the use of and symbolized by the foregoing);

**WHEREAS**, the Acquired Intellectual Property is included in the Acquired Assets;

**WHEREAS**, as required in the Purchase Agreement, Assignors hereby desire to sell, transfer, assign, convey and deliver to Assignee their entire worldwide right, title and interest

---

[1] **Note to Draft:** Effective Date of this Assignment will be the Closing Date.

[2] **Note to Draft**: Every Subsidiary that is party to the Purchase Agreement, should also be party to this Assignment, as this Assignment effectuates the transfer of all Acquired Intellectual Property (whether registered or unregistered).

[3] **Note to Draft**: Prior to the Closing, Transform Holdco LLC may designate (i) itself as Assignee, (ii) itself and an Affiliated Designee to each receive a portion of the Acquired Intellectual Property, in which case, a separate assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and such assignee, (iii) itself and more than one Affiliated Designee to each receive a portion of the Acquired Intellectual Property, in which case, a separate assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and each such assignee or (iv) more than one Affiliated Designee to each receive a portion of the Acquired Intellectual Property, in which case, a separate assignment agreement in the form hereof will be executed for each such Affiliate.

[4] **Note to Draft**: If Assignee is not Transform Holdco LLC, this bracketed language should be replaced with "Transform Holdco LLC together with any applicable Affiliate Designees, including Assignee".

[5] **Note to Draft**: If Assignee is not Transform Holdco LLC, this bracketed language should be replaced with "Transform Holdco LLC together with any applicable Affiliate Designees, including Assignee".

in, to and under the Acquired Intellectual Property; and

**WHEREAS**, Assignee desires to acquire the Acquired Intellectual Property from Assignors.

**NOW, THEREFORE**, in consideration of the premises and covenants hereinafter contained, in consideration of the representations, warranties and covenants contained in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties desire to enter into this Assignment on the terms set forth herein.

Intending to be legally bound, the Parties agree as follows:

1.      Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Purchase Agreement.

2.      As of the Effective Date, Assignors hereby irrevocably sell, convey, assign and transfer to Assignee, and its successors and assigns, their entire worldwide right, title and interest in, to and under the Acquired Intellectual Property free and clear of all Encumbrances (other than Permitted Encumbrances), the same to be held and enjoyed by Assignee for its own use and enjoyment and the use and enjoyment of its successors, assigns and other legal representatives as fully and entirely as the same would have been held and enjoyed by Assignors if this IP Assignment Agreement had not been made, together with (A) the rights to all causes of action (whether known or unknown or whether currently pending, filed or otherwise) and other enforcement rights under, or on account of, any of the Acquired Intellectual Property, including the right to sue and recover damages and obtain equitable relief for past, present and future infringement, misappropriation, dilution or other violation, (B) all rights to collect past and future income, royalties, damages and other payments now or hereafter due or payable under or on account of any of the Acquired Intellectual Property, (C) the right to prosecute, register, maintain and defend the Acquired Intellectual Property before any public or private agency, office or registrar, (D) the right, if any, to claim priority based on the filing dates of the Acquired Intellectual Property under any Law, including under the International Convention for the Protection of Industrial Property, the Patent Cooperation Treaty, the European Patent Convention, the Paris Convention and all other treaties of like purposes, (E) the right to fully and entirely stand in the place of Assignors in all matters related to the Acquired Intellectual Property, (F) all other rights corresponding to the Acquired Intellectual Property throughout the respective countries in which Assignors hold rights in the Acquired Intellectual Property and (G) all goodwill of the businesses in which the foregoing are used and all goodwill connected with the use of and symbolized by the foregoing.  This foregoing assignment is intended to be an absolute assignment and not by way of security.

3.      This Assignment is binding upon, and inures to the benefit of, the Parties and their respective legal representatives, successors and assigns.

4.      The respective rights of Assignor and Assignee with respect to the Acquired Intellectual Property sold, conveyed, transferred, assigned and delivered hereby to the

Assignee shall be governed exclusively by the Purchase Agreement, and nothing in this Assignment shall alter any Liability arising under the Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the sole and exclusive representations and warranties of the Parties with respect to such Acquired Intellectual Property. If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Assignment, the provisions of the Purchase Agreement shall govern. Notwithstanding anything to the contrary in this Assignment, nothing herein (other than <u>Section 6</u>, <u>Section 7</u> and <u>Section 8</u>) is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

5.    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Assignment or the negotiation, execution or performance of this Assignment (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Assignment or as an inducement to enter into this Assignment) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

6.    Upon reasonable request by Assignee, the applicable Assignors will timely execute and deliver any additional documents (including those referenced in <u>Section 7</u> below) and take such other actions as may be necessary or desirable to record or memorialize the assignments of the Acquired Intellectual Property set forth herein, or to vest or perfect in Assignee such right, title, and interest in, to and under the Acquired Intellectual Property.  If Assignee is unable for any reason to secure any Assignor's signature to any document it is entitled to hereunder (including those referenced in <u>Section 7</u> below), each Assignor hereby irrevocably designates and appoints Assignee, and Assignee's duly authorized officers, agents and representatives, as its agents and attorneys-in-fact with full power of substitution to act for and on the behalf and instead of such Assignor, to execute and file any such document or documents and to do all other lawfully permitted acts to further the purposes of this Assignment with the same legal force and effect as if executed by such Assignor.  Assignors shall not enter into any agreement in conflict with this Assignment.

7.    Each Assignor agrees that (i) with respect to any Trademarks, Patents or Copyrights issued, filed or registered in the United States and included in the Acquired Intellectual Property, at Closing, it will enter into an assignment agreement substantially in the form set forth in <u>Schedule 1</u>, <u>Schedule 2</u> or <u>Schedule 3</u>, as applicable, (ii) with respect to any Domain Names included in the Acquired Intellectual Property, at Closing, it will enter into an agreement substantially in the form of <u>Schedule 4</u> and (iii) with respect to any Intellectual Property included in the Acquired Intellectual Property that is issued, filed or registered in a jurisdiction outside of the United States, at Closing, it will enter into an assignment agreement suitable for recording in the relevant jurisdictions with terms and conditions substantially similar to those set forth in <u>Schedule 1</u>, <u>Schedule 2</u> or <u>Schedule 3</u>, as applicable, except for any different

3

terms and conditions that would be necessary in a recordable assignment agreement for the respective local jurisdiction.

8. Assignee shall be responsible for the preparation and filing of such additional documents that may be reasonably necessary to record or perfect Assignee's right, title and interest in, to and under the Acquired Intellectual Property (including with any applicable Governmental Authorities) and for any and all costs, expenses and fees associated with the recordation or perfection of the sale, conveyance, transfer and assignment to Assignee of the Acquired Intellectual Property at the United States Patent and Trademark Office, and each of the corresponding entities or agencies in any applicable foreign countries or multinational authorities. Assignors and Assignee shall each pay their own costs with respect to any notarization, legalization and other equivalent actions required on such Party's behalf for the execution and recordation of any document it is entitled to under Section 6 or Section 7 hereof.

9. No amendment, modification or discharge of this Assignment, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Assignment, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Assignment or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Assignment or any rights to payment of any Party under or by reason of this Assignment.

10. This Assignment may be executed and delivered in any number of counterparts (including by facsimile transmission or other means of electronic transmission, such as by electronic mail in "pdf" form) with the same effect as if the signatures to each counterpart were upon a single instrument, each of which when executed shall be deemed to be an original and all such counterparts together shall be deemed an original of this Assignment. Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

11. Section 13.4 (Entire Agreement), Section 13.7 (Severability), Section 13.8(c) (Waiver of Jury Trial) and Section 13.14 (Specific Performance) of the Purchase Agreement are incorporated herein by reference, *mutatis mutandis*. In this Assignment, (i) whenever the word "including" is used, it is deemed to be followed by the words "without limitation" and (ii) "or" is used in the inclusive sense of "and/or".

[Signature pages follow]

4

IN WITNESS WHEREOF, the Parties, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

ASSIGNOR[6]:

[●]

By: _____
Name:
Title:

---

[6] **<u>Note to Draft</u>**:  This signature block should be duplicated for each applicable Assignor (each Seller under the Purchase Agreement).

ASSIGNEE:

**[●]**

By: _____
Name:
Title:

# EXHIBIT A

## ACQUIRED IP

[Exhibit A to mirror the schedules of registered, issued and applied-for Trademarks, Patents, Copyrights, Domain Names, and Business Names and Media Accounts, in each case included on Schedule 2.1(a) of the Purchase Agreement, provided that Exhibit A shall also include any registered, issued or applied-for Trademarks, Patents, Copyrights, Domain Names, Business Names or Media Accounts included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(i)-(vi) of the Purchase Agreement.]

[Exhibit A to IP Assignment Agreement]

## SCHEDULE 1

## FORM OF

## TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT AGREEMENT, effective as of [●] ("**Effective Date**"), is between [●][7] ("**Assignor**") and [●][8] ("**Assignee**").

## W I T N E S S E T H :

WHEREAS, Sears Holdings Corporation, a corporation organized and existing under the laws of Delaware ("SHC", together with each of its Subsidiaries party thereto, the "**Sellers**") and [Assignee][9] have entered into that certain Asset Purchase Agreement, dated [●] (the "**Purchase Agreement**"), pursuant to which Sellers have agreed to sell, convey, transfer, assign and deliver to Assignee, and [Assignee together with any applicable Affiliated Designees][10] have agreed to purchase from Sellers, all of their respective right, title and interest in, to and under all Trademarks included in the Acquired Intellectual Property, including without limitation those trademark registrations and applications for registration listed in Exhibit A (such Trademarks, the "**Transferred Marks**"), and all goodwill of the businesses in which the foregoing are used and all goodwill connected with the use of and symbolized by the foregoing;

WHEREAS, Assignor is the owner of the Transferred Marks and all goodwill of the businesses in which the foregoing are used and all goodwill connected with the use of and symbolized by the foregoing;

WHEREAS, [Assignee][11] will be, as of the Effective Date, the successor in interest to the business of Assignor to which the Transferred Marks pertain, and such business is ongoing and existing; and

WHEREAS, pursuant to the Purchase Agreement, Assignor agrees to sell, convey, transfer, assign and deliver to Assignee, and Assignee wishes to acquire from Assignor, Assignor's entire

---

[7] **Note to Draft**: To duplicate the short-form and replace Assignor with each Assignor listed as a record owner of the Trademarks under Schedule 2.1(a)(i) to the Purchase Agreement (or the record owner of any other registered or applied-for Trademarks included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(i)).

[8] **Note to Draft**:  Prior to the Closing, Transform Holdco LLC may designate (i) itself as Assignee, (ii) itself and an Affiliated Designee to each receive a portion of the Transferred Marks, in which case, a separate short-form assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and such assignee, (iii) itself and more than one Affiliated Designee to each receive a portion of the Transferred Marks, in which case, a separate short-form assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and each such assignee or (iv) more than one Affiliated Designee to each receive a portion of the Transferred Marks, in which case, a separate short-form assignment agreement in the form hereof will be executed for each such Affiliate.

[9] **Note to Draft**:  To adjust the party if Assignee is not Transform Holdco LLC.

[10] **Note to Draft**:  If Assignee is not Transform Holdco LLC, this bracketed language should be replaced with "Transform Holdco LLC together with any applicable Affiliate Designees".

[11] **Note to Draft**:  To adjust the party if Assignee is not Transform Holdco LLC.

[Schedule 1 to IP Assignment Agreement]

right, title and interest in, to and under the Transferred Marks, and all goodwill of the businesses in which the foregoing are used and all goodwill connected with the use of and symbolized by the foregoing.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements contained in this Trademark Assignment Agreement, in the Purchase Agreement, in the IP Assignment Agreement and in the other Transaction Documents, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      <u>Assignment</u>.  Pursuant to and subject to the terms and conditions of the Purchase Agreement, Assignor, as of the Effective Date, hereby irrevocably sells, conveys, transfers and assigns to Assignee, and its successors and assigns, and Assignee hereby accepts, Assignor's entire right, title and interest in, to and under the Transferred Marks, and any renewals thereof, all registrations that have been or may be granted thereon, all applications for registrations thereof, all common law rights thereto and all goodwill of the businesses in which the foregoing are used and all goodwill connected with the use of and symbolized by the foregoing, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Trademark Assignment Agreement had not been made, together with (A) the rights to all causes of action (whether known or unknown or whether currently pending, filed or otherwise) and other enforcement rights under, or on account of, any of the Transferred Marks, including the right to sue and recover damages and obtain equitable relief for past, present and future infringement, misappropriation, dilution or other violation, (B) all rights to collect past and future income, royalties, damages and other payments now or hereafter due or payable under or on account of any of the Transferred Marks, (C) the right, if any, to claim priority based on the filing dates of the Transferred Marks under any Law, (D) the right to prosecute, register, maintain and defend the Transferred Marks before any public or private agency, office or registrar, (E) the right to fully and entirely stand in the place of Assignor in all matters related to the Transferred Marks and (F) all other rights corresponding to the Transferred Marks throughout the respective countries in which Assignor holds rights in the Transferred Marks.  This foregoing assignment is intended to be an absolute assignment and not by way of security.

2.      <u>Cooperation</u>.  (A) Assignor shall, at its expense, timely take all reasonable actions and execute and deliver all documents that Assignee may reasonably request to effect the terms of this Trademark Assignment Agreement and to perfect Assignee's title in, to and under the Transferred Marks.

(B) If Assignee is unable for any reason to secure Assignor's signature to any document it is entitled to under <u>Section 2(A)</u> hereof, Assignor hereby irrevocably designates and appoints Assignee, and Assignee's duly authorized officers, agents and representatives, as its agents and attorneys-in-fact with full power of substitution to act for and on the behalf and instead of Assignor, to execute and file any such document or documents and to do all other lawfully permitted acts to effect the terms of this Trademark Assignment Agreement with the same legal force and effect as if executed by Assignor.  Assignor shall not enter into any agreement in conflict with this Trademark Assignment Agreement.

2

3.    <u>Recordation</u>.  Assignee shall be responsible for the preparation and filing of such additional documents that may be reasonably necessary to record or perfect Assignee's right, title and interest in, to and under the Transferred Marks (including with any applicable Governmental Authorities) and for any and all costs, expenses and fees associated with the recordation or perfection of the sale, conveyance, transfer and assignment to Assignee of the Transferred Marks at the United States Patent and Trademark Office, and each of the corresponding entities or agencies in any applicable foreign countries or multinational authorities.  Assignor and Assignee shall each pay its own costs with respect to any notarization, legalization and other equivalent actions required on such party's behalf for the execution and recordation of this Trademark Assignment Agreement and any other document provided pursuant to <u>Section 2(A)</u> hereof.  Assignor hereby authorizes the Director of Patents and Trademarks in the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries or multinational authorities, to record Assignee as the assignee and owner of the Transferred Marks, and to deliver to Assignee and to Assignee's attorneys, agents, representatives, successors or assigns, all official documents and communications as may be warranted by this Trademark Assignment Agreement.

4.    <u>Governing Law; Venue; Jury Trial</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Assignment or the negotiation, execution or performance of this Assignment (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Assignment or as an inducement to enter into this Assignment) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.  The venue and waiver of jury trial provisions of <u>Section 13.8</u> of the Purchase Agreement are incorporated herein by reference, *mutatis mutandis*.

5.    <u>General Provisions</u>.  All capitalized terms used in this Trademark Assignment Agreement and not defined herein shall have the meanings set forth in the Purchase Agreement.  Whenever the word "including" is used in this Trademark Assignment Agreement, it shall be deemed to be followed by the words "without limitation" and whenever the word "or" is used in this Trademark Assignment Agreement, it is used in the inclusive sense of "and/or." This Trademark Assignment Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Trademark Assignment Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Trademark Assignment Agreement.  This Trademark Assignment Agreement, along with its Exhibit, the IP Assignment Agreement, the other Transaction Documents, the Purchase Agreement and the Schedules and Exhibits of the IP Assignment Agreement, the other Transaction Documents and the Purchase Agreement, constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between and among the parties with respect to the subject matter hereof.  This Trademark Assignment Agreement may not be

amended, modified, supplemented, changed or waived in any manner except by a writing signed by all parties hereto.  The failure of any party to enforce any terms or provisions of this Trademark Assignment Agreement shall not waive any of its rights under such terms or provisions.  Each of the parties shall be entitled to injunctive or other equitable relief to prevent or cure breaches of this Trademark Assignment Agreement and, in addition to any other remedy to which they are entitled at Law or in equity, to enforce specifically the terms and provisions hereof, such remedy being in addition to any other remedy to which any party may be entitled at Law or in equity.  This Trademark Assignment Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns.  In the event of any conflict between the Purchase Agreement and this Trademark Assignment Agreement, the provisions of the Purchase Agreement shall control.

**[Remainder of this page intentionally left blank]**

WHEREFORE, Assignor and Assignee have duly executed this Trademark Assignment Agreement on the date indicated below.

Date: _____ __, _____

<div align="right">

**ASSIGNOR**

By _____
    Name:
    Title:

</div>

State of _____         )
                     ss.:
County of _____         )

On the ___ day of _____ in the year _____ before me, the undersigned, a Notary Public in and for said State, personally appeared, _____personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is signed on the preceding instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which this individual acted, executed the instrument.

_____
Notary Public

My commission expires: _____

Dated: _____

<div align="center">

[Signature Page to Trademark Assignment Agreement]

</div>

Date: _____ \_\_, _____

**ASSIGNEE**

By _____
    Name:
    Title:

[Signature Page to Trademark Assignment Agreement]

## EXHIBIT A

## TRANSFERRED MARKS[12]

| Trademark | Owner | Application Number | Application Date | Registration Number | Registration Date |
|-----------|-------|--------------------|------------------|---------------------|-------------------|
|           |       |                    |                  |                     |                   |

---

[12] **Note to Draft**:  Exhibit A shall be populated with those Trademarks listed on Schedule 2.1(a)(i) to the Purchase Agreement, provided that Exhibit A shall also include any registered or applied-for Trademarks included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(i).

[Exhibit A to Trademark Assignment Agreement]

## SCHEDULE 2

## FORM OF

## PATENT ASSIGNMENT AGREEMENT

This PATENT ASSIGNMENT AGREEMENT, effective as of [●] ("**Effective Date**"), is between [●][13] ("**Assignor**") and [●][14] ("**Assignee**").

W I T N E S S E T H:

WHEREAS, Sears Holdings Corporation, a corporation organized and existing under the laws of Delaware ("SHC", together with each of its Subsidiaries party thereto, the "**Sellers**") and [Assignee][15] have entered into that certain Asset Purchase Agreement, dated [●] (the "**Purchase Agreement**"), pursuant to which Sellers have agreed to sell, convey, transfer, assign and deliver to Assignee, and [Assignee together with any applicable Affiliated Designees][16] have agreed to purchase from Sellers, all of their respective right, title and interest in, to and under all patents and patent applications included in the Acquired Intellectual Property, including without limitation those patent and patent applications listed in Exhibit A (such patents and patent applications, the "**Transferred Patents**");

WHEREAS, Assignor is the owner of the Transferred Patents; and

WHEREAS, pursuant to the Purchase Agreement, Assignor agrees to sell, convey, transfer, assign and deliver to Assignee, and Assignee wishes to acquire from Assignor, Assignor's entire right, title and interest in, to and under the Transferred Patents.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements contained in this Patent Assignment Agreement, in the Purchase Agreement, in the IP Assignment Agreement and in the other Transaction Documents, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

---

[13] **Note to Draft**: To duplicate the short-form and replace Assignor with each Assignor listed as a record owner of the Patents under Schedule 2.1(a)(iii) to the Purchase Agreement (or the record owner of any other registered or applied-for Patents included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(iii)).

[14] **Note to Draft**:  Prior to the Closing, Transform Holdco LLC may designate (i) itself as Assignee, (ii) itself and an Affiliated Designee to each receive a portion of the Transferred Patents, in which case, a separate short-form assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and such assignee, (iii) itself and more than one Affiliated Designee to each receive a portion of the Transferred Patents, in which case, a separate short-form assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and each such assignee or (iv) more than one Affiliated Designee to each receive a portion of the Transferred Patents, in which case, a separate short-form assignment agreement in the form hereof will be executed for each such Affiliate.

[15] **Note to Draft**:  To adjust the party if Assignee is not Transform Holdco LLC.

[16] **Note to Draft**:  If Assignee is not Transform Holdco LLC, this bracketed language should be replaced with "Transform Holdco LLC together with any applicable Affiliate Designees".

[Schedule 2 to IP Assignment Agreement]

1.      Assignment.  Pursuant to and subject to the terms and conditions of the Purchase Agreement, Assignor, as of the Effective Date, hereby irrevocably sells, conveys, transfers and assigns to Assignee, and its successors and assigns, and Assignee hereby accepts, Assignor's entire right, title and interest in, to and under the Transferred Patents, including the inventions claimed therein and any reissues, reexaminations, divisionals, continuations, continuations-in-part, extensions, provisionals, substitutions and counterparts of such Transferred Patents already granted and which may be granted therefrom, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Patent Assignment Agreement had not been made, together with (A) the rights to all causes of action (whether known or unknown or whether currently pending, filed or otherwise) and other enforcement rights under, or on account of, any of the Transferred Patents, including the right to sue and recover damages and obtain equitable relief for past, present and future infringement, misappropriation or other violation, (B) all rights to collect past and future income, royalties, damages and other payments now or hereafter due or payable under or on account of any of the Transferred Patents, (C) the right, if any, to claim priority based on the filing dates of the Transferred Patents under any Law, including under the International Convention for the Protection of Industrial Property, the Patent Cooperation Treaty, the European Patent Convention, the Paris Convention and all other treaties of like purposes, (D) the right to prosecute, register, maintain and defend the Transferred Patents before any public or private agency, office or registrar, (E) the right to fully and entirely stand in the place of Assignor in all matters related to the Transferred Patents and (F) all other rights corresponding to the Transferred Patents throughout the respective countries in which Assignor holds rights in the Transferred Patents.  This foregoing assignment is intended to be an absolute assignment and not by way of security.

2.      Cooperation.  (A) Assignor shall, at its expense, timely take all reasonable actions and execute and deliver all documents that Assignee may reasonably request to effect the terms of this Patent Assignment Agreement and to perfect Assignee's title in, to and under the Transferred Patents.

(B) If Assignee is unable for any reason to secure Assignor's signature to any document it is entitled to under Section 2(A) hereof, Assignor hereby irrevocably designates and appoints Assignee, and Assignee's duly authorized officers, agents and representatives, as its agents and attorneys-in-fact with full power of substitution to act for and on the behalf and instead of Assignor, to execute and file any such document or documents and to do all other lawfully permitted acts to effect the terms of this Patent Assignment Agreement with the same legal force and effect as if executed by Assignor.  Assignor shall not enter into any agreement in conflict with this Patent Assignment Agreement.

3.      Recordation.  Assignee shall be responsible for the preparation and filing of such additional documents that may be reasonably necessary to record or perfect Assignee's right, title and interest in, to and under the Transferred Patents (including with any applicable Governmental Authorities), and for any and all costs, expenses and fees associated with the recordation or perfection of the sale, conveyance, transfer and assignment to Assignee of the Transferred Patents at the United States Patent and Trademark Office, and each of the

corresponding entities or agencies in any applicable foreign countries or multinational authorities.  Assignor and Assignee shall each pay its own costs with respect to any notarization, legalization and other equivalent actions required on such party's behalf for the execution and recordation of this Patent Assignment Agreement and any other document it is entitled to under Section 2(A) hereof.  Assignor hereby authorizes the Director of Patents and Trademarks in the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries or multinational authorities, to record Assignee as the assignee and owner of the Transferred Patents, and to deliver to Assignee and to Assignee's attorneys, agents, representatives, successors or assigns, all official documents and communications as may be warranted by this Patent Assignment Agreement.

4.    _Governing Law; Venue; Jury Trial_.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Assignment or the negotiation, execution or performance of this Assignment (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Assignment or as an inducement to enter into this Assignment) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto..  The venue and waiver of jury trial provisions of Section 13.8 of the Purchase Agreement are incorporated herein by reference, *mutatis mutandis*.

5.    _General Provisions_.  All capitalized terms used in this Patent Assignment Agreement and not defined herein shall have the meanings set forth in the Purchase Agreement. Whenever the word "including" is used in this Patent Assignment Agreement, it shall be deemed to be followed by the words "without limitation" and whenever the word "or" is used in this Patent Assignment Agreement, it is used in the inclusive sense of "and/or."  This Patent Assignment Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Patent Assignment Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Patent Assignment Agreement.  This Patent Assignment Agreement, along with its Exhibit, the IP Assignment Agreement, the other Transaction Documents, the Purchase Agreement and the Schedules and Exhibits of the IP Assignment Agreement, the other Transaction Documents and the Purchase Agreement, constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between and among the parties with respect to the subject matter hereof. This Patent Assignment Agreement may not be amended, modified, supplemented, changed or waived in any manner except by a writing signed by all parties hereto.  The failure of any party to enforce any terms or provisions of this Patent Assignment Agreement shall not waive any of its rights under such terms or provisions.  Each of the parties shall be entitled to injunctive or other equitable relief to prevent or cure breaches of this Patent Assignment Agreement and, in addition to any other remedy to which they are entitled at Law or in equity, to enforce

3

specifically the terms and provisions hereof, such remedy being in addition to any other remedy to which any party may be entitled at Law or in equity.  This Patent Assignment Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns.  In the event of any conflict between the Purchase Agreement and this Patent Assignment Agreement, the provisions of the Purchase Agreement shall control.

**[Remainder of this page intentionally left blank]**

WHEREFORE, Assignor and Assignee have duly executed this Patent Assignment Agreement on the date indicated below.

Date: _____ __, _____

<p style="text-align:center">**ASSIGNOR**</p>

By _____

Name:

Title:

State of _____       )

                             ss.:

County of _____       )

On the ___ day of _____ in the year _____ before me, the undersigned, a Notary Public in and for said State, personally appeared, _____ personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is signed on the preceding instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which this individual acted, executed the instrument.

_____

Notary Public

My commission expires: _____

Dated: _____

<p style="text-align:center">[Signature Page to Patent Assignment Agreement]</p>

Date: _____ __, _____

**ASSIGNEE**

By _____

    Name:

    Title:

[Signature Page to Patent Assignment Agreement]

**EXHIBIT A**

**TRANSFERRED PATENTS**[17]

| Patent | Owner | Application Number | Application Date | Patent Number | Issue Date |
|--------|-------|--------------------|------------------|---------------|------------|
|        |       |                    |                  |               |            |

---

[17] **Note to Draft**: Exhibit A shall be populated with those Patents listed on Schedule 2.1(a)(iii) to the Purchase Agreement Disclosure Schedules, provided that Exhibit A shall also include any issued or applied-for patents included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.01(a).

[Exhibit A to Patent Assignment Agreement]

## SCHEDULE 3

## FORM OF

## COPYRIGHT ASSIGNMENT AGREEMENT

This COPYRIGHT ASSIGNMENT AGREEMENT, effective as of [●] ("**Effective Date**"), is between [●][18] ("**Assignor**") and [●] [19] ("**Assignee**").

W I T N E S S E T H:

WHEREAS, Sears Holdings Corporation, a corporation organized and existing under the laws of Delaware ("**SHC**", together with each of its Subsidiaries party thereto, the "**Sellers**") and [Assignee][20] have entered into that certain Kenmore Asset Purchase Agreement, dated [●] (the "**Purchase Agreement**"), pursuant to which Sellers have agreed to sell, convey, transfer, assign and deliver to Assignee, and [Assignee together with any applicable Affiliated Designees][21] have agreed to purchase from Sellers, all of their respective right, title and interest in, to and under all copyright registrations and applications for registration included in the Acquired Intellectual Property, including without limitation those copyright registrations and applications for registration listed in Exhibit A (such copyrights, the "**Transferred Copyrights**");

WHEREAS, Assignor is the owner of the Transferred Copyrights; and

WHEREAS, pursuant to the Purchase Agreement, Assignor agrees to sell, convey, transfer, assign and deliver to Assignee, and Assignee wishes to acquire from Assignor, Assignor's entire right, title and interest in, to and under the Transferred Copyrights.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements contained in this Copyright Assignment Agreement, in the Purchase Agreement, in the IP Assignment Agreement and in the other Transaction Documents, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    Assignment. Pursuant to and subject to the terms and conditions of the Purchase Agreement, Assignor, as of the Effective Date, hereby irrevocably sells, conveys,

---

[18] **Note to Draft**: To duplicate the short-form and replace Assignor with each Assignor listed as a record owner of the Copyrights under Schedule 2.1(a)(iv) to the Purchase Agreement (or the record owner of any other registered or applied-for Copyrights included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(iv)).

[19] **Note to Draft**: Prior to the Closing, Transform Holdco LLC may designate (i) itself as Assignee, (ii) itself and an Affiliated Designee to each receive a portion of the Transferred Copyrights, in which case, a separate short-form assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and such assignee, (iii) itself and more than one Affiliated Designee to each receive a portion of the Transferred Copyrights, in which case, a separate short-form assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and each such assignee or (iv) more than one Affiliated Designee to each receive a portion of the Transferred Copyrights, in which case, a separate short-form assignment agreement in the form hereof will be executed for each such Affiliate.

[20] **Note to Draft**: To adjust the party if Assignee is not Transform Holdco LLC.

[21] **Note to Draft**: If Assignee is not Transform Holdco LLC, this bracketed language should be replaced with "Transform Holdco LLC together with any applicable Affiliate Designees".

[Schedule 3 to IP Assignment Agreement]

transfers and assigns to Assignee, and its successors and assigns, and Assignee hereby accepts, Assignor's entire right, title and interest in, to and under the Transferred Copyrights, and any renewals or extensions thereof, all registrations that have been or may be granted thereon, all applications for registration, together with all rights derived therefrom, including all statutory and contractual rights and any moral rights that Assignor has the ability to assign, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Copyright Assignment Agreement had not been made, together with (A) the rights to all causes of action (whether known or unknown or whether currently pending, filed or otherwise) and other enforcement rights under, or on account of, any of the Transferred Copyrights, including the right to sue and recover damages and obtain equitable relief for past, present and future infringement, misappropriation or other violation, (B) all rights to collect past and future income, royalties, damages and other payments now or hereafter due or payable under or on account of any of the Transferred Copyrights, (C) the right to prosecute, register, maintain and defend the Transferred Copyrights before any public or private agency, office or registrar, (D) the right to fully and entirely stand in the place of Assignor in all matters related to the Transferred Copyrights and (E) all other rights corresponding to the Transferred Copyrights throughout the respective countries in which Assignor holds rights in the Transferred Copyrights. This foregoing assignment is intended to be an absolute assignment and not by way of security.

2.      Cooperation.  (A) Assignor shall, at its expense, timely take all reasonable actions and execute and deliver all documents that Assignee may reasonably request to effect the terms of this Copyright Assignment Agreement and to perfect Assignee's title in, to and under the Transferred Copyrights.

(B) If Assignee is unable for any reason to secure Assignor's signature to any document it is entitled to under Section 2(A) hereof, Assignor hereby irrevocably designates and appoints Assignee, and Assignee's duly authorized officers, agents and representatives, as its agents and attorneys-in-fact with full power of substitution to act for and on the behalf and instead of Assignor, to execute and file any such document or documents and to do all other lawfully permitted acts to effect the terms of this Copyright Assignment Agreement with the same legal force and effect as if executed by Assignor.  Assignor shall not enter into any agreement in conflict with this Copyright Assignment Agreement.

3.      Recordation.  Assignee shall be responsible for the preparation and filing of such additional documents that may be reasonably necessary to record or perfect Assignee's right, title and interest in, to and under the Transferred Copyrights (including with any applicable Governmental Authorities), and for any and all costs, expenses and fees associated with the recordation or perfection of the sale, conveyance, transfer and assignment to Assignee of the Transferred Copyrights at the U.S. Copyright Office, and each of the corresponding entities or agencies in any applicable foreign countries or multinational authorities. Assignor and Assignee shall each pay its own costs with respect to any notarization, legalization and other equivalent actions required on such party's behalf for the execution and recordation of this Copyright Assignment Agreement and any other document it is entitled to under Section 2(A) hereof. Assignor hereby authorizes the Register of Copyrights of the United States, and the corresponding entities or agencies in any applicable foreign countries or multinational authorities, to record Assignee as the assignee and owner of the Transferred Copyrights, and to

2

deliver to Assignee and to Assignee's attorneys, agents, representatives, successors or assigns, all official documents and communications as may be warranted by this Copyright Assignment Agreement, including Certificates of Copyright in the Transferred Copyrights.

4.    <u>Governing Law; Venue; Jury Trial</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Assignment or the negotiation, execution or performance of this Assignment (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Assignment or as an inducement to enter into this Assignment) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto..  The venue and waiver of jury trial provisions of Section 13.8 of the Purchase Agreement are incorporated herein by reference, *mutatis mutandis*.

5.    <u>General Provisions</u>.  All capitalized terms used in this Copyright Assignment Agreement and not defined herein shall have the meanings set forth in the Purchase Agreement.  Whenever the word "including" is used in this Copyright Assignment Agreement, it shall be deemed to be followed by the words "without limitation" and whenever the word "or" is used in this Copyright Assignment Agreement, it is used in the inclusive sense of "and/or."  This Copyright Assignment Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Copyright Assignment Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Copyright Assignment Agreement.  This Copyright Assignment Agreement, along with its Exhibit, the IP Assignment Agreement, the other Transaction Documents, the Purchase Agreement and the Schedules and Exhibits of the IP Assignment Agreement, the other Transaction Documents and the Purchase Agreement, constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between and among the parties with respect to the subject matter hereof.  This Copyright Assignment Agreement may not be amended, modified, supplemented, changed or waived in any manner except by a writing signed by all parties hereto.  The failure of any party to enforce any terms or provisions of this Copyright Assignment Agreement shall not waive any of its rights under such terms or provisions.  Each of the parties shall be entitled to injunctive or other equitable relief to prevent or cure breaches of this Copyright Assignment Agreement and, in addition to any other remedy to which they are entitled at Law or in equity, to enforce specifically the terms and provisions hereof, such remedy being in addition to any other remedy to which any party may be entitled at Law or in equity.  This Copyright Assignment Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns.  In the event of any conflict between the Purchase Agreement and this Copyright Assignment Agreement, the provisions of the Purchase Agreement shall control.

**[Remainder of this page intentionally left blank]**

3

WHEREFORE, Assignor and Assignee have duly executed this Copyright Assignment Agreement on the date indicated below.

Date: _____ __, _____

**ASSIGNOR**

By  _____
      Name:
      Title:

State of _____        )
                            ss.:
County of _____        )

On the ___ day of _____ in the year _____ before me, the undersigned, a Notary Public in and for said State, personally appeared, _____personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is signed on the preceding instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which this individual acted, executed the instrument.

_____
Notary Public

My commission expires: _____

Dated: _____

[Signature Page to Copyright Assignment Agreement]

Date: _____ __, _____

**ASSIGNEE**

By _____

Name:

Title:

[Signature Page to Copyright Assignment Agreement]

**EXHIBIT A**

**TRANSFERRED COPYRIGHTS**[22]

| Copyright | Owner | Application Number | Application Date | Registration Number | Registration Date |
|-----------|-------|--------------------|-----------------|---------------------|-------------------|
|           |       |                    |                 |                     |                   |

---

[22] **Note to Draft**:  Exhibit A shall be populated with those Copyrights listed on Schedule 2.1(a)(iv) to the Purchase Agreement, provided that Exhibit A shall also include any registered or applied-for Copyright included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(iv).

[Exhibit A to Copyright Assignment Agreement]

## SCHEDULE 4

## FORM OF

## DOMAIN NAME ASSIGNMENT AGREEMENT

This DOMAIN NAME ASSIGNMENT AGREEMENT, effective as of [●] ("**Effective Date**"), is between [●][23] ("**Assignor**") and [●][24] ("**Assignee**").

W I T N E S S E T H:

WHEREAS, Sears Holdings Corporation, a corporation organized and existing under the laws of Delaware ("SHC", together with each of its Subsidiaries party thereto, the "**Sellers**") and [Assignee][25] have entered into that certain Asset Purchase Agreement, dated [●] (the "**Purchase Agreement**"), pursuant to which Sellers have agreed to sell, convey, transfer, assign and deliver to Assignee, and [Assignee together with any applicable Affiliated Designees][26] have agreed to purchase from Sellers, all of their respective right, title and interest in, to and under all Internet domain names included in the Acquired Intellectual Property, including without limitation those Internet domain names listed in Exhibit A (such Domain Names, the "**Transferred Domain Names**");

WHEREAS, Assignor is the registered owner of the Transferred Domain Names; and

WHEREAS, pursuant to the Purchase Agreement, Assignor agrees to sell, convey, transfer, assign and deliver to Assignee, and Assignee wishes to acquire from Assignor, Assignor's entire right, title and interest in, to and under the Transferred Domain Names.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements contained in this Domain Names Assignment Agreement, in the Purchase Agreement, in the IP Assignment Agreement and in the other Transaction Documents, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Assignment.  Pursuant to and subject to the terms and conditions of the Purchase Agreement, Assignor, as of the Effective Date, hereby irrevocably sells, conveys, transfers and assigns to Assignee, and its successors and assigns, and Assignee hereby accepts,

---

[23] **Note to Draft**: To duplicate the short-form and replace Assignor with each Assignor listed as a record owner of the Domain Names under Schedule 2.1(a)(v) to the Purchase Agreement (or the record owner of any other Domain Names included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(v)).

[24] **Note to Draft**:  Prior to the Closing, Transform Holdco LLC may designate (i) itself as Assignee, (ii) itself and an Affiliated Designee to each receive a portion of the Transferred Domain Names, in which case, a separate short-form assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and such assignee, (iii) itself and more than one Affiliated Designee to each receive a portion of the Transferred Domain Names, in which case, a separate short-form assignment agreement in the form hereof will be executed for each of Transform Holdco LLC and each such assignee or (iv) more than one Affiliated Designee to each receive a portion of the Transferred Domain Names, in which case, a separate short-form assignment agreement in the form hereof will be executed for each such Affiliate.

[25] **Note to Draft**:  To adjust the party if Assignee is not Transform Holdco LLC.

[26] **Note to Draft**:  If Assignee is not Transform Holdco LLC, this bracketed language should be replaced with "Transform Holdco LLC together with any applicable Affiliate Designees".

Assignor's entire right, title and interest in, to and under the Transferred Domain Names, together with all rights derived therefrom, including statutory and contractual rights, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Domain Name Assignment Agreement had not been made, together with (A) the rights to all causes of action (whether known or unknown or whether currently pending, filed or otherwise) and other enforcement rights under, or on account of, any of the Transferred Domain Names (B) all rights to collect past and future income, royalties, damages and other payments nor or hereafter due or payable under or on account of any of the Transferred Domain Names, (C) the right to fully and entirely stand in the place of Assignor in all matters related to the Transferred Domain Names and (D) all other rights corresponding to the Transferred Domain Names.  This foregoing assignment is intended to be an absolute assignment and not by way of security.

2.      Cooperation.  (A) Assignor shall, at its expense, timely take all reasonable actions and execute and deliver all documents (including affidavits, testimonies, declarations, oaths, samples, exhibits and specimens) that Assignee may reasonably request to effect the terms of this Domain Name Assignment Agreement and to assist Assignee in changing the registrant, technical and administrative contact information for the Transferred Domain Names with the applicable domain name registrars to such information of Assignee's choice (including, without limitation, by delivering to Assignee any and all applicable user names and passwords for any accounts related to the Transferred Domain Names to enable Assignee to assume control of the Transferred Domain Names) and in obtaining, securing, maintaining and enforcing its rights in, to and under the Transferred Domain Names worldwide.

(B) If Assignee is unable for any reason to secure Assignor's signature to any document it is entitled to under Section 2(A) hereof, Assignor hereby irrevocably designates and appoints Assignee, and Assignee's duly authorized officers, agents and representatives, as its agents and attorneys-in-fact with full power of substitution to act for and on the behalf and instead of Assignor, to execute and file any such document or documents and to do all other lawfully permitted acts to effect the terms of this Domain Name Assignment Agreement with the same legal force and effect as if executed by Assignor.  Assignor shall not enter into any agreement in conflict with this Domain Name Assignment Agreement.

3.      Governing Law; Venue; Jury Trial.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Assignment or the negotiation, execution or performance of this Assignment (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Assignment or as an inducement to enter into this Assignment) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.  The venue and waiver of jury trial provisions of Section 13.8 of the Purchase Agreement are incorporated herein by reference, *mutatis mutandis*.

2

4.    <u>General Provisions</u>.  All capitalized terms used in this Domain Name Assignment Agreement and not defined herein shall have the meanings set forth in the Purchase Agreement.  Whenever the word "including" is used in this Domain Name Assignment Agreement, it shall be deemed to be followed by the words "without limitation" and whenever the word "or" is used in this Domain Name Assignment Agreement, it is used in the inclusive sense of "and/or."  This Domain Name Assignment Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Domain Name Assignment Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Domain Name Assignment Agreement.  This Domain Name Assignment Agreement, along with its Exhibit, the IP Assignment Agreement, the other Transaction Documents, the Purchase Agreement and the Schedules and Exhibits of the IP Assignment Agreement, the other Transaction Documents and the Purchase Agreement, constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between and among the parties with respect to the subject matter hereof.  This Domain Name Assignment Agreement may not be amended, modified, supplemented, changed or waived in any manner except by a writing signed by all parties hereto.  The failure of any party to enforce any terms or provisions of this Domain Name Assignment Agreement shall not waive any of its rights under such terms or provisions.  Each of the parties shall be entitled to injunctive or other equitable relief to prevent or cure breaches of this Domain Name Assignment Agreement and, in addition to any other remedy to which they are entitled at Law or in equity, to enforce specifically the terms and provisions hereof, such remedy being in addition to any other remedy to which any party may be entitled at Law or in equity.  This Domain Name Assignment Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns.  In the event of any conflict between the Purchase Agreement and this Domain Name Assignment Agreement, the provisions of the Purchase Agreement shall control.

**[Remainder of this page intentionally left blank]**

WHEREFORE, Assignor and Assignee have duly executed this Domain Name Assignment Agreement on the date indicated below.

Date: _____ __, _____

<div align="right">

**ASSIGNOR**

By  _____
            Name:
            Title:

</div>

State of _____        )
                             ss.:
County of _____        )

On the ___ day of _____ in the year _____ before me, the undersigned, a Notary Public in and for said State, personally appeared, _____personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is signed on the preceding instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which this individual acted, executed the instrument.

_____
Notary Public

My commission expires: _____

Dated: _____

<div align="center">

[Signature Page to Domain Name Assignment Agreement]

</div>

Date: _____ __, _____

**ASSIGNEE**

By _____
     Name:
     Title:

[Signature Page to Domain Name Assignment Agreement]

# EXHIBIT A

## TRANSFERRED DOMAIN NAMES[27]

| Domain Name |
| --- |
|  |

---

[27] **Note to Draft**: Exhibit A shall be populated with those Domain Names listed on Schedule 2.1(a)(v) to the Purchase Agreement, provided that Exhibit A shall also include any registered or applied-for Domain Names included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(v).

[Exhibit A to Domain Name Assignment Agreement]

## Exhibit C

## FORM OF

## POWER OF ATTORNEY

[●][1] ("Assignor") hereby appoints Transform Holdco LLC ("**Assignee**") and its successors, assigns and transferees (such appointment being coupled with an interest) as its true and lawful agent and attorney-in-fact, with the authority and the full power of substitution, in the name and stead of Assignor but on behalf and for the benefit of Assignee, to take and execute in the name of Assignor any and all actions and documents that may be deemed proper to effectuate, consummate, record, perfect or confirm the assignment, transfer, conveyance and delivery to Assignee of all intellectual property owned by Assignor, including the trademark registrations and applications set forth on Schedule A (the "**Listed Trademarks**"), the patents and patent applications set forth on Schedule B (the "**Listed Patents**"), the copyright registrations and applications set forth on Schedule C (the "**Listed Copyrights**"), the domain names set forth on Schedule D (the "**Listed Domain Names**"), the social media accounts, identifiers and handles set forth on Schedule E (the "**Listed Media Accounts**") and the trade names, fictitious business names, corporate names and d/b/a names set forth on Schedule F (the "**Listed Business Names**").  This Power of Attorney includes the authority to delegate, and to appoint attorneys and agents.

This document is effective as of [●][2].  This Power of Attorney does not prevent or restrict Assignor in any manner from acting on its own behalf with respect to taking and executing any and all actions and documents that may be deemed proper to effectuate, consummate, record, perfect or confirm the assignment, transfer, conveyance and delivery to Assignee of all such intellectual property.

Assignor hereby ratifies and confirms whatever Assignee does or purports to do in good faith in the exercise of any power conferred by this Power of Attorney.  Assignor declares that a person who deals with Assignee may accept a written statement signed by Assignee, its delegates,

---

[1] **Note to Draft**: To duplicate this Power of Attorney and replace Assignor with each Assignor listed as a record owner of the Trademarks, Patents, Copyrights, Domain Names and Media Accounts set forth Schedule 2.1(a) to the Purchase Agreement (or the record owner of any other registered , issued or applied-for Intellectual Property included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)).

[2] **Note to Draft**:  The effective date of this Power of Attorney shall be the Closing Date.

attorneys, or agents, to the effect that this Power of Attorney has not been revoked as conclusive evidence of that fact.

Assignee hereby agrees to indemnify, defend and hold harmless Assignor, for so long as Assignor is in existence, from and against any and all losses resulting from third party claims that arise out of Assignee's acts in the exercise of any power conferred solely by this Power of Attorney.

WHEREFORE, Assignor has duly executed this Power of Attorney on the date indicated below.

Date: _____ __, _____

**ASSIGNOR**

By  _____

Name:

Title:

State of _____        )

                                            ss.:

County of _____        )

On the ____ day of _____ in the year _____ before me, the undersigned, a Notary Public in and for said State, personally appeared, _____personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is signed on the preceding instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which this individual acted, executed the instrument.

_____

Notary Public

My commission expires: _____

Dated: _____

[Signature Page to Power of Attorney]

## Schedule A

## LISTED TRADEMARKS[3]

---

[3] **Note to Draft**:  Schedule A shall be populated with those Trademarks listed on Schedule 2.1(a)(i) to the Purchase Agreement, provided that Schedule A shall also include any registered or applied-for Trademark included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(i).

[Schedule A to Power of Attorney]

## Schedule B

## LISTED PATENTS[4]

---

[4] **Note to Draft**:  Schedule B shall be populated with those Patents listed on Schedule 2.1(a)(iii) to the Purchase Agreement, provided that Schedule B shall also include any issued or applied-for Patent included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(iii).

[Schedule B to Power of Attorney]

## Schedule C

## LISTED COPYRIGHTS[5]

---

[5] **Note to Draft**:  Schedule C shall be populated with those Copyrights listed on Schedule 2.01(a)(iv) to the Purchase Agreement, provided that Schedule C shall also include any registered or applied-for Copyright included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(iv).

[Schedule C to Power of Attorney]

## Schedule D

## LISTED DOMAIN NAMES[6]

---

[6] **Note to Draft**:  Schedule D shall be populated with those Domain Names listed on Schedule 2.1(a)(v) to the Purchase Agreement, provided that Schedule D shall also include any Domain Names included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(v).

[Schedule D to Power of Attorney]

## Schedule E

## LISTED MEDIA ACCOUNTS[7]

---

[7] **Note to Draft**:  Schedule E shall be populated with those Media Accounts listed on Schedule 2.1(a)(vi) to the Purchase Agreement, provided that Schedule E shall also include any Media Accounts included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(vi).

[Schedule E to Power of Attorney]

## Schedule F

### LISTED BUSINESS NAMES[8]

---

[8] **Note to Draft**:  Schedule F shall be populated with those Business Names listed on Schedule 2.1(a)(ii) to the Purchase Agreement, provided that Schedule F shall also include any Business Names included in the Acquired Intellectual Property identified after signing and not listed on Schedule 2.1(a)(ii).

[Schedule F to Power of Attorney]

## Exhibit D

## OCCUPANCY AGREEMENT

**THIS OCCUPANCY AGREEMENT** ("Occupancy Agreement") is effective as of the [●] day of [●], 2018, by and between Sears Holdings Corporation, a Delaware corporation ("Licensor") and [●] ("Licensee").

## RECITALS:

A.    Licensor and Licensee are parties to that certain Asset Purchase Agreement dated as of [●], 2018 (the "Purchase Agreement") pursuant to which the Licensor agreed to sell to the Licensee the Designation Rights and the Acquired Assets and to transfer to Licensee the Assumed Liabilities and the Licensee agreed to purchase from the Licensor the Designation Rights and the Acquired Assets and to assume from the Licensor the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement.

B.    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement.

C.    The transactions contemplated by the Purchase Agreement were consummated on the date hereof ("Closing Date");

D.    Prior to the Closing Date, the Business and one or more affiliates of Licensor occupied the Leased Properties related to the Designatable Leases.

E.    Pursuant to Section 5.1(c) of the Purchase Agreement, the operation of the Lease Premises for each of the Leased Properties associated with the (x) Operating Leased Stores during the Designation Rights Period and (y) GOB Leased Stores following the end of the applicable GOB Period for each such GOB Leased Stores until the end of the Designation Rights Period (collectively, the "Occupancy Leased Premises") will be governed by the terms of this Occupancy Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals, the mutual covenants and agreements set forth herein, Licensor and Licensee do hereby agree as follows:

1.    Grant of License.  Licensor hereby grants to Licensee an exclusive license to use and occupy the Occupancy Leased Premises during the Term (as defined below).  It is hereby specifically acknowledged and agreed to by both Licensor and Licensee that this

Occupancy Agreement is not intended to negate or supersede the terms of the Purchase Agreement nor are the terms of the Purchase Agreement intended to negate or supersede the terms of this Occupancy Agreement, and to the extent of any conflict, the terms of the Purchase Agreement shall govern and control.

2.     Use.

(a)     The Occupancy Leased Premises may be used by Licensee in a manner that is substantially similar to the manner in which the Occupancy Leased Premises were used for the operation of the Business immediately prior to the Closing Date; provided, that for the avoidance of doubt, Licensee shall not be required to conduct business in the GOB Leased Stores in any manner following the end of the GOB Period.  Subject to the terms of the Purchase Agreement, Licensee shall comply with all federal, state and local governmental laws, rules, regulations and ordinances applicable to Licensee's use and/or occupancy of the Occupancy Leased Premises during the Term (collectively, the "Applicable Laws") and with any leases or other agreements affecting Licensor's rights with respect to the Occupancy Leased Premises.  During the Designation Rights Period, Licensee will be permitted to operate the Occupancy Leased Premises pursuant to this Occupancy Agreement.

3.     Term.  The term of this Occupancy Agreement (the "Term") shall, with respect to each Operating Leased Store commence on the Closing Date and with respect to each GOB Leased Store commence on the day immediately following the end of the GOB Period, and shall, in each case case, expire with respect to each Occupancy Leased Premises upon the expiration of the Designation Rights Period as set forth in the Purchase Agreement.

4.     Consideration.  Licensee shall not have any obligation to pay any compensation to Licensor for the use and/or occupancy of the Occupancy Leased Premises during the Term other than that set forth in the Purchase Agreement.

5.     Expenses; Condition of Occupancy Leased Premises.  Licensee shall pay directly (or reimburse Licensor) for all Expenses incurred in connection with the Occupancy Leased Premises during the Term solely in accordance with Section 5.1(b) the Purchase Agreement. Licensee agrees, at its sole cost and expense, to (i) repair any damage to the Occupancy Leased Premises that arises as a result of a casualty event occurring during the Term and (ii) maintain the Occupancy Leased Premises during the Term in a condition substantially similar to that existing as of the Closing Date; provided, that for the avoidance of doubt, Licensee shall not be required to conduct business in the GOB Leased Stores in any manner following the end of the GOB Period.

6.     Alterations.  During the Term, Licensee shall not make any material alterations to or undertake any material construction at the Occupancy Leased Premises, including modifications to the exterior of the building and signage, without the prior written approval of Licensor, such approval not to be unreasonably withheld, delayed or conditioned.

2

7.    Liens.  During the Term, Licensee shall keep the Occupancy Leased Premises and appurtenant easements free from any liens (other than Permitted Post-Closing Encumbrances) for any labor or material furnished to Licensee in connection with any work performed at the Occupancy Leased Premises by Licensee or its contractors or agents during the Term, except that Licensee shall have the right to contest the validity or amount of any such lien provided that Licensee shall maintain adequate reserves with respect to the same contest, to the extent required in accordance with GAAP.

8.    Surrender.  If the Designatable Lease for any Occupancy Leased Premises does not become designated for assumption and assignment pursuant to a Buyer Assumption Notice on or before the end of the Designation Rights Period in accordance with [Section 5.2] of the Purchase Agreement, then upon expiration of the Term, Licensee shall remove all Acquired Inventory and other personal property from the Occupancy Leased Premises prior to expiration of the Term and shall deliver possession of the Occupancy Leased Premises to Licensor with all Inventory and other personal property removed and otherwise in substantially the same condition as existed on the Closing Date.  Any Licensee's property left on the Occupancy Leased Premises after expiration of the Term shall be deemed abandoned and Licensor shall have no Liability with respect thereto and Licensor may dispose of and/or demolish any such property without compensation to Licensee.

9.    As Is.   Subject to the terms of the Purchase Agreement, Licensee hereby acknowledges that Licensee accepts the Occupancy Leased Premises in "AS IS" condition without any representation or warranty of any kind.  Licensee has performed and is relying solely on its own investigation or independent inquires as to the condition of the Occupancy Leased Premises or Licensee has elected to waive any right to perform its own investigation or independent inquiries as to the condition of the Occupancy Leased Premises and agrees that, except as set forth in the Purchase Agreement, Licensee is not relying on any representation of Licensor regarding the physical condition of the Occupancy Leased Premises, any environmental matters affecting the Occupancy Leased Premises or regarding the suitability of the Occupancy Leased Premises for any particular purpose.  [Subject to the terms of the Purchase Agreement, ]Licensee agrees to accept the Property from Licensor in such condition.

10.    Risk of Loss.  Licensee shall bear the responsibility and Liability for any loss of or damage to any Inventory or any of Licensee's property located at, on or about the Occupancy Leased Premises during the Term.

11.    Insurance, Indemnity.

(a)    Licensor shall have the sole obligation to maintain insurance with respect to the Occupancy Leased Premises during the Term and during the Term Licensor shall maintain casualty, Liability and other insurance with respect to the Occupancy Leased Premises that is substantially similar to the insurance coverage maintained by Licensor with respect to the Occupancy Leased Premises prior to the date of the Purchase Agreement.

3

(b)    Licensee shall indemnify and hold Licensor and Licensor's parents, subsidiaries and affiliated companies and their respective officers, directors, shareholders, agents, employees, invitees, customers, guests, contractors or subcontractors (collectively, "Licensor Parties") harmless from and against all claims, actions, losses, damages, costs and expenses (including without limitation all reasonable attorney's fees and court costs), and Liabilities (except those caused by the willful misconduct or grossly negligent acts or omissions of Licensor after the Closing Date), arising out of Licensee's use and occupancy of the Occupancy Leased Premises, including without limitation, any of same arising out of actual or alleged injury to or death of any person or loss of or damage to property in or on the Occupancy Leased Premises, in each case solely during the Term.    The terms of this paragraph shall survive the termination of this Occupancy Agreement.

12.    Destruction (Fire or Other Cause) and Eminent Domain.  In the event of casualty or taking of all of any part of the Occupancy Leased Premises under the power of eminent domain, all insurance recoveries and all warranty and condemnation proceeds received or receivable during the Term with respect to such Occupancy Leased Premises shall be held in escrow with a depository institution selected by Licensor and Licensee solely in their reasonable discretion, and immediately following the Designation Rights Period, such depository institution shall either (i) pay any such recoveries or proceeds to Licensee to the extent relating to any Designatable Lease that is an Acquired Lease or (ii) pay any such recoveries or proceeds to Licensor to the extent relating to any Designatable Lease that is not an Acquired Lease.  During the Term, Licensee will use commercially reasonable efforts to provide Licensor with prompt notice of any Casualty/Condemnation Event.

13.    Assignment.  Except as otherwise provided in the Purchase Agreement, during the Term of this Occupancy Agreement, Licensee shall not assign this Occupancy Agreement or further license the use and/or occupancy of all or any part of the Occupancy Leased Premises.

14.    Notices.  Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) via e-mail or (c) by a nationally recognized courier for overnight delivery service.  A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if via e-mail, on the date of successful transmission and (iii) if by nationally recognized courier, one Business Day after delivery to such courier.  Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt.  Any such notice, election, demand, request or response shall be addressed as follows:

If to Licensee:          Sears Holdings Corporation
                         3333 Beverly Road, Dept. 824RE
                         Hoffman Estates, Illinois  60179
                         Attn: General Counsel; Senior Vice President
                         and President, Real Estate

4

|  | Email: counsel@searshc.com; [●] |
|---|---|
| Copy to (which shall not constitute notice): | Sears Holdings Corporation<br>3333 Beverly Road, Dept. 824RE<br>Hoffman Estates, Illinois  60179<br>Attn: Associate General Counsel, Real Estate<br>Email: [●]<br><br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention: Ray C. Schrock, P.C., Ellen J. Odoner, Gavin Westerman and Sunny Singh<br>E-mail:  Ray.Schrock@weil.com;<br>Ellen.Odoner@weil.com;<br>Gavin.Westerman@weil.com;<br>Sunny.Singh@weil.com |
| If to Licensor: | [●] |
| Copy to (which shall not constitute notice): | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Attention:  Christopher E. Austin, Benet J. O'Reilly, Sean A. O'Neal and Joseph Lanzkron<br>E-mail: caustin@cgsh.com;<br>boreilly@cgsh.com; soneal@cgsh.com,<br>jlanzkron@cgsh.com |

or to any other address furnished in writing by either party, provided that, any change of address furnished shall comply with the notice requirements of this Section 14.

      15.    Licensor Access.  During the Term of this Occupancy Agreement, Licensor shall only be permitted access to the Occupancy Leased Premises in the event of an emergency or as otherwise reasonably requested by Licensor by reasonable notice to Licensee, provided that there is no unreasonable interference with Licensee's use and occupancy of the Occupancy Leased Premises (taking into account the nature of the emergency).

      16.    Miscellaneous.

[AM_ACTIVE 401039999_2]

(c)     <u>Voluntary Agreement</u>.  The parties have read this Occupancy Agreement and the mutual releases contained in it, and on advice of counsel they have freely and voluntarily entered into this Occupancy Agreement.

(d)     <u>Governing Law.</u> This Occupancy Agreement shall be construed and enforceable in accordance with the laws indicated in Section 13.8(a) of the Purchase Agreement. Any lawsuit brought by Licensor or Licensee against the other must comply with the requirements of [Section 13.7] of the Purchase Agreement.

(e)     <u>Consent to Jurisdiction</u>.  Without limitation of any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Occupancy Agreement and to decide any claims or disputes which may be based upon, arise out of or relate to this Occupancy Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; <u>provided</u>, <u>however</u>, that, if the Bankruptcy Case is closed, all Proceedings based upon, arising out of or relating to this Occupancy Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of Delaware) with respect to all Proceedings based upon, arising out of or relating to this Occupancy Agreement and the transactions contemplated hereby (whether in contract or in tort, in law or in equity or granted by statute); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Occupancy Agreement or the transactions contemplated hereby (whether in contract or in tort, in law or in equity or granted by statute) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding based upon, arising out of or relating to this Occupancy Agreement or the transactions contemplated hereby and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. The Parties agree that any violation of this <u>Section 16(b)</u> shall constitute a material breach of this Occupancy Agreement and shall constitute irreparable harm.  Notwithstanding anything to the contrary contained in this Occupancy Agreement or in the Purchase Agreement, each of the Parties agrees that it will not bring or support any person in any Proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any of the Debt Financing Sources in any way relating to this Occupancy Agreement or the Purchase Agreement or any of the transactions contemplated by either, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, in any forum other than the federal and New York state courts located in the Borough of Manhattan within the City of New York and any appellate courts therefrom. The Debt Financing Sources are intended third party beneficiaries of this Section 16(b).

<div align="center">6</div>

(f)    <u>WAIVER OF TRIAL BY JURY; INJUNCTION</u>.  LICENSOR AND LICENSEE EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF OR RELATING TO THIS OCCUPANCY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER IN CONTRACT OR IN TORT, IN LAW OR IN EQUITY OR GRANTED BY STATUTE).  EACH OF LICENSOR AND LICENSEE (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER SUCH PARTY HAVE BEEN INDUCED TO ENTER INTO THIS OCCUPANCY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 16(c)</u>.  THE DEBT FINANCING SOURCES ARE INTENDED THIRD PARTY BENEFICIARIES OF THIS SECTION 16(c).

(g)    <u>Agreements</u>.  This Occupancy Agreement together with the Purchase Agreement and the other Transaction Documents constitutes the entire agreement between Licensee and Licensor with respect to the subject matter hereof, and there are no other covenants, agreements, promises, terms, provisions, conditions, undertakings, or understandings, either oral or written, between them concerning the Occupancy Leased Premises other than those herein and therein set forth.  Nothing in this Occupancy Agreement shall alter any Liability arising under the Purchase Agreement.  If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Occupancy Agreement, the provisions of the Purchase Agreement shall govern.

(h)    <u>Amendment; Waiver</u>.  No amendment, modification or discharge of this Occupancy Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by Licensee and Licensor.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time.  Neither the waiver by any of the Licensee or Licensor of a breach of or a default under any of the provisions of this Occupancy Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Occupancy Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.  No course of dealing between or among the parties shall be deemed effective to modify, amend or discharge any part of this Occupancy Agreement or any rights to payment of any party under or by reason of this Occupancy Agreement.

(i)    <u>Headings</u>.  The headings, captions, numbering system, etc., are inserted only as a matter of convenience and may under no circumstances be considered in interpreting the provisions of this Occupancy Agreement.

7

(j)    <u>Binding Effect</u>.  All of the provisions of this Occupancy Agreement are hereby made binding upon and shall inure to the benefit of the personal representatives, heirs, successors, and assigns of both parties hereto.

(k)    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts (including via electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Occupancy Agreement.  This Occupancy Agreement shall become effective when, and only when, each party shall have received a counterpart hereof signed by the other party.  Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

(l)    <u>Construction</u>.    This Occupancy Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that the Occupancy Agreement may have been prepared primarily by counsel for one of the parties, it being recognized that both Licensor and Licensee have contributed substantially and materially to the preparation to this Occupancy Agreement.

(m)    <u>Time is of the Essence</u>. Time is of the essence with respect to the timeliness of all obligations of Licensor and Licensee under this Occupancy Agreement.

(n)    <u>No Recording.</u>  Neither Licensor <u>nor</u> Licensee shall record this Occupancy Agreement.

(o)    <u>Exculpation</u>. Notwithstanding anything to the contrary contained herein, no officer, director, shareholder, employee, agent, manager, member or partner of Licensor or Licensee or any other Non-Recourse Party shall have any personal Liability with respect to any of the obligations contained herein.  The provisions of this <u>Section 16(n)</u> shall survive the expiration of the Designation Rights Period or any earlier termination of this Occupancy Agreement.

(p)    <u>Savings Clause</u>.  To the extent any agreement to which Licensor or its Subsidiaries is a party prohibits or limits the ability of Licensor to enter into this Occupancy Agreement or limits the rights which may be granted pursuant to this Occupancy Agreement, then the rights granted pursuant to this Occupancy Agreement will automatically and without further action be limited to the maximum rights that may be granted in compliance with such other agreement and Licensor and Licensee will cooperate in all reasonable respects in order to grant to Licensee the material benefits intended to be provided pursuant to this Occupancy Agreement and remain in compliance with such other agreement.

(q)    17.    <u>Severability</u>. The provisions of this Occupancy Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Occupancy Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry

8

out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Occupancy Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

*[Signatures Appear on Following Page.]*

[AM_ACTIVE 401039999_2]

**<u>LICENSEE</u>**:

[_____], a [_____]


By:_____

Name: _____

Title_____


[Signature Page to Occupancy Agreement]

[AM_ACTIVE 401039999_2]

WEIL:\96868117\7\73217.0004

**<u>LICENSOR</u>**:
[**SEARS HOLDINGS CORPORATION**, a Delaware corporation]


By:_____
Name: _____
Title_____

[Signature Page to Occupancy Agreement]

**Exhibit E**

**FORM ASSIGNMENT AND ASSUMPTION OF LEASE**

**Sears Store #[_____] – [City], [State]**

Between

[_____]

as Assignor

and

**Transform Holdco LLC**,

a Delaware Limited Liability Company

as Assignee

Dated: [_____ __, 2019]

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (the "Assignment") is made effective as of this ___ day of _____, 2019 ("Effective Date"), by and [_____, a _____] ("Assignor") and Transform Holdco LLC, a Delaware Limited Liability Company ("Assignee" and together with Assignor, individually a "Party" and collectively, the "Parties").

### RECITALS

WHEREAS, Assignor is a direct or indirect subsidiary of Sears Holdings Corporation, a Delaware corporation ("Sears");

WHEREAS, Sears and Assignee are parties to that certain Asset Purchase Agreement dated as of [_____ __], 2019 (the "Purchase Agreement") (capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement);

WHEREAS, Assignor, as tenant, is a party to that certain lease agreement described in **Exhibit A** attached hereto and incorporated herein by reference (the "Assumed Lease"); and

WHEREAS, pursuant to the Assumed Lease, Assignor leases space within certain premises (the "Demised Premises"), as more particularly described in the Assumed Lease; and

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed that Assignor or one or more of its subsidiaries shall sell, convey, transfer and assign certain assets and liabilities, including the Assumed Lease and, subject to the provisions of the Purchase Agreement, all liabilities arising thereunder, to the extent such liabilities arise or accrue on or after the date hereof (the "Assumed Lease Liabilities"), and Assignee has agreed that Assignee shall purchase the Assumed Lease and assume the Assumed Lease Liabilities.

WHEREAS, subject to the provisions of the Purchase Agreement, Assignor shall retain and remain responsible for all liabilities arising under the Assumed Lease, solely to the extent such liabilities arise or accrue prior to the date hereof (the "Excluded Lease Liabilities").

WHEREAS, pursuant to this Assignment, Assignee shall assume and become responsible for the Assumed Lease and the Assumed Lease Liabilities.

NOW, THEREFORE, in consideration of the Demised Premises and covenants hereinafter contained, in consideration of the representations, warranties and covenants contained in the Purchase Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereto desire to enter into this Assignment on the terms set forth herein.

Intending to be legally bound, the Parties hereto agree as follows:

1.    The recitals set forth above are accurate, represent the intent of the parties hereto and are incorporated herein by reference.

2.    Effective as of the date hereof, Assignor does hereby irrevocably grant, bargain, sell, assign, transfer and set over unto Assignee and Assignee hereby purchases, acquires, and accepts from Assignor, all of Assignor's right, title and interest in and to and its obligations under the Assumed Lease.  Effective as of the date hereof, Assignee hereby assumes and becomes responsible for all

of the Assumed Lease Liabilities, but not the Excluded Lease Liabilities, and does hereby assume and agree to perform all of the obligations of Landlord under the Assumed Lease.

3.    Assignor and the Assignee shall, and shall cause their respective affiliates to execute, acknowledge and deliver all further conveyances, notices, assumptions, releases, consents, assurances, powers of attorney and such other instruments, and shall take such further actions, as may reasonably be necessary or appropriate to assure fully to the Assignee and its respective successors or permitted assigns, all of the Assignor's rights, titles and interests in, to and under, the Assumed Lease, and to assure fully to Assignor and its affiliates and their respective successors and permitted assigns, the assumption of the Assumed Lease Liabilities and to otherwise make effective and carry out the purpose and intent of this Assignment.

4.    This Assignment shall be binding upon and inure to the benefit of the Assignee and Assignor and their respective successors and permitted assigns.

5.    Each party hereto represents and warrants that it has full authority to enter into and perform this Assignment without the consent or approval of any other person or entity and it has the full and complete authority to bind such party.

6.    This Assignment may be executed in counterparts, each of which shall be deemed to be an original and all of which, collectively, shall be deemed to constitute one and the same Assignment.  This Assignment may also be executed by.pdf file transmission via electronic mail, and .pdf file signatures shall have the same force and effect as originals, provided however, any party delivering a .pdf file signature will, upon request by the receiving party, deliver an original signature.

7.    No modification, waiver, amendment, discharge or change of this Assignment shall be valid unless the same is in writing and signed by the party against which enforcement of such modification, waiver, amendment, discharge or change is or may be sought.

8.    This Assignment is executed and delivered pursuant to the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

9.    This Assignment shall be governed by the Laws of the state in which the Demised Premises are located, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

*[The remainder of this page is intentionally left blank; Signature Page Follows]*

WEIL:\96869652\3\73217.0004

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date set forth above.

**ASSIGNOR:**

[_____]
a [_____]


By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date set forth above.


**ASSIGNEE:**

**Transform Holdco LLC**,
a Delaware Limited Liability Company


By: _____
Name:
Title:

## EXHIBIT A

## The Assumed Lease

Lease dated [_____] by and between [_____], as Landlord, and [_____], as Tenant, as the same may have been heretofore amended.

## Exhibit F

## SELLER RETAINED OCCUPANCY AGREEMENT

**THIS SELLER RETAINED OCCUPANCY AGREEMENT** ("Occupancy Agreement") is effective as of the [●] day of [●], 2019, by and between [●] ("Licensor") and [Sears Holdings Corporation, a Delaware corporation] ("Licensee").

## RECITALS:

A.     Licensor and Licensee are parties to that certain Asset Purchase Agreement dated as of [●], 2019 (the "Purchase Agreement") pursuant to which the Licensee agreed to sell to the Licensor (or an affiliate of Licensor) the Acquired Assets and to transfer to Licensor (or an affiliate of Licensor) the Assumed Liabilities and the Licensor (or an affiliate of Licensor) agreed to purchase from the Licensee the Acquired Assets and to assume from the Licensee the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement.

B.     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement.

C.     Prior to the Closing Date, the Business and one or more affiliates of Licensee occupied the Owned Real Property.

D.     The transactions contemplated by the Purchase Agreement were consummated on the date hereof ("Closing Date") and title to all of the Owned Real Property was conveyed on the Closing Date to Licensor or an affiliate of Licensor;

D.     Because employees and Inventory not being transferred to Licensor and its affiliates will remain located at those Stores included in the Owned Real Property which are identified on Schedule 1 attached hereto (the "GOB Owned Stores"), Licensor and Licensee desire to enter into this Occupancy Agreement in order to set forth the terms by which Licensee shall operate the GOB Owned Stores for a period commencing on the Closing Date and ending at the end of the GOB Period with respect to each GOB Owned Store.

**NOW THEREFORE**, in consideration of the foregoing recitals, the mutual covenants and agreements set forth herein, Licensor and Licensee do hereby agree as follows:

[AM_ACTIVE 401039999_2]

WEIL:\96873966\2\73217.0004

1.     Grant of License.  Licensor hereby grants to Licensee an exclusive license to use and occupy the GOB Owned Stores during the Term (as defined below).  It is hereby specifically acknowledged and agreed to by both Licensor and Licensee that this Occupancy Agreement is not intended to negate or supersede the terms of the Purchase Agreement nor are the terms of the Purchase Agreement intended to negate or supersede the terms of this Occupancy Agreement, and to the extent of any conflict, the terms of the Purchase Agreement shall govern and control.

2.     Use.

(a)     The GOB Owned Stores may be used by Licensee in a manner that is substantially similar to the manner in which the GOB Owned Stores were used for the operation of the Business immediately prior to the Closing Date and in addition Licensee may conduct "going out of business" sales at the GOB Owned Stores. Subject to the terms of the Purchase Agreement, Licensee shall comply with all federal, state and local governmental laws, rules, regulations and ordinances applicable to Licensee's use and/or occupancy of the GOB Owned Stores during the Term (collectively, the "Applicable Laws") and with any leases or other agreements in effect on the date hereof with respect to the GOB Owned Stores.  During the period commencing on the Closing Date and ending at the end of the GOB Period. Licensee shall be permitted to operate the GOB Owned Stores pursuant to this Occupancy Agreement.

3.     Term.  The term of this Occupancy Agreement (the "Term") shall commence on the Closing Date and shall expire with respect to each GOB Owned Store upon the expiration of the GOB Period for each such GOB Owned Store.

4.     Consideration.  Licensee shall not have any obligation to pay any compensation to Licensor for the use and/or occupancy of the GOB Owned Stores during the Term.

5.     Expenses; Condition of Occupancy Leased Premises.  Licensee shall pay directly (or reimburse Licensor) for all Expenses incurred in connection with the GOB Owned Stores in accordance with Section 5.1(a) of the Purchase Agreement during the Term with respect to each such GOB Owned Store.  Licensee agrees, at its sole cost and expense, to repair any damage to the Occupancy Leased Premises that arises as a result of a casualty event occurring during the Term applicable to each GOB Owned Store and to maintain the GOB Owned Stores during the Term in a condition substantially similar to that existing as of the Closing Date.  Licensor shall not be responsible for the cost of any Expenses incurred with respect to any GOB Owned Store during the Term applicable to each GOB Owned Store.

6.     Alterations.  During the Term of this Occupancy Agreement, Licensee shall not make any material alterations to or undertake any material construction at the GOB Owned Stores, including modifications to the exterior of the building and signage, without the prior written approval of Licensor, which such approval may be withheld or granted in Licensor's sole discretion.

2

[AM_ACTIVE 401039999_2]

7.    <u>Liens</u>.  During the Term, Licensee shall keep the GOB Owned Stores and appurtenant easements free from any liens (other than Permitted Encumbrances) for any labor or material furnished to Licensee in connection with any work performed at the GOB Owned Stores by Licensee or its contractors or agents during the Term, except that Licensee shall have the right to contest the validity or amount of any such lien provided that Licensee shall maintain adequate reserves with respect to the same contest, to the extent required in accordance with GAAP.

8.    <u>Surrender</u>.  Licensee shall remove all of its Inventory, other personal property and employees from each GOB Owned Store prior to expiration of the Term applicable to each GOB Owned Store and shall deliver possession of such GOB Owned Store to Licensor with all of Licensee's Inventory, other personal property and employees removed and otherwise in substantially the same condition as existed on the Closing Date.  Any Licensee's property left at any GOB Owned Store after expiration of the Term applicable to each GOB Owned Store shall be deemed abandoned and Licensor shall have no Liability with respect thereto and Licensor may dispose of and/or demolish any such property without compensation to Licensee.

9.    <u>As Is</u>.  Subject to the terms of the Purchase Agreement, Licensee hereby acknowledges that Licensee accepts the GOB Owned Stores in "<u>AS IS</u>" condition without any representation or warranty of any kind.  Licensee is relying solely on its own investigation or independent inquires, or its own history as the owner of the same properties, as to the condition of the GOB Owned Stores and Licensee agrees that Licensee is not relying on any representation of Licensor regarding the physical condition of the GOB Owned Stores, any environmental matters affecting the GOB Owned Stores or regarding the suitability of the GOB Owned Stores for any particular purpose.  Licensee agrees to accept the GOB Owned Stores from Licensor in such condition.

10.    <u>Risk of Loss</u>.  Licensee shall bear the responsibility and Liability for any loss of or damage to any of Licensee's Inventory or any of Licensee's property located at, on or about the GOB Owned Stores during the Term.

11.    <u>Insurance, Indemnity</u>.

(a)    Licensor shall have the sole obligation to maintain casualty insurance with respect to the GOB Owned Stores during the Term and during the Term Licensor shall maintain casualty, liability and other insurance with respect to the GOB Owned Stores.

(b)    Licensee shall indemnify and hold Licensor and Licensor's parents, subsidiaries and affiliated companies and their respective officers, directors, shareholders, agents, employees, invitees, customers, guests, contractors or subcontractors (collectively, "<u>Licensor Parties</u>") harmless from and against all claims, actions, losses, damages, costs and expenses (including without limitation all reasonable attorney's fees and court costs), and Liabilities (except those caused by the willful misconduct or grossly negligent acts or omissions of Licensor after the Closing Date), arising out of Licensee's use and occupancy of the GOB Owned Stores, including without limitation, any of same arising out of actual or alleged injury to or death of any person or loss of or damage to property in or on the GOB Owned Stores, in each case, solely during the Term

3

applicable to each GOB Owned Store.  The terms of this paragraph shall survive the termination of this Occupancy Agreement.

12.    Destruction (Fire or Other Cause) and Eminent Domain.  In the event of casualty or taking of all of any part of any GOB Owned Store under the power of eminent domain, all insurance recoveries and all warranty and condemnation proceeds received or receivable after the Closing Date with respect to such GOB Owned Store shall be paid to Licensor and used by Licensor as it determines in its sole discretion.  During the Terms of this Occupancy Agreement, Licensee shall use commercially reasonable efforts to provide Licensor with prompt notice of any Casualty/Condemnation Event.

13.    Assignment.  During the Term of this Occupancy Agreement, Licensee shall not assign this Occupancy Agreement or further license the use and/or occupancy of all or any part of the GOB Owned Stores.

14.    Notices.  Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) via e-mail or (c) by a nationally recognized courier for overnight delivery service.  A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if via e-mail, on the date of successful transmission and (iii) if by nationally recognized courier, one Business Day after delivery to such courier.  Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt.  Any such notice, election, demand, request or response shall be addressed as follows:

| | |
|---|---|
| If to Licensee: | Sears Holdings Corporation<br>3333 Beverly Road, Dept. 824RE<br>Hoffman Estates, Illinois  60179<br>Attn: General Counsel; Senior Vice President and President, Real Estate<br>Email: counsel@searshc.com; [●] |
| Copy to (which shall not constitute notice): | Sears Holdings Corporation<br>3333 Beverly Road, Dept. 824RE<br>Hoffman Estates, Illinois  60179<br>Attn: Associate General Counsel, Real Estate<br>Email: [●]<br><br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention: Ray C. Schrock, P.C., Ellen J. Odoner, Gavin Westerman and Sunny Singh<br>E-mail:  Ray.Schrock@weil.com; |

4

|  | Ellen.Odoner@weil.com;<br>Gavin.Westerman@weil.com;<br>Sunny.Singh@weil.com |
|---|---|
| If to Licensor: | [●] |
| Copy to (which shall not constitute notice): | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, NY 10006<br>Attention:  Christopher E. Austin, Benet J. O'Reilly, Sean A. O'Neal and Joseph Lanzkron<br>E-mail: caustin@cgsh.com; boreilly@cgsh.com; soneal@cgsh.com, jlanzkron@cgsh.com |

or to any other address furnished in writing by either party, provided that, any change of address furnished shall comply with the notice requirements of this Section 14.

15.    Licensor Access.  During the Term of this Occupancy Agreement, Licensor shall be permitted access to the GOB Owned Stores in the event of an emergency or as otherwise reasonably requested by Licensor by reasonable notice to Licensee, provided that there is no unreasonable interference with Licensee's use and occupancy of the GOB Owned Stores (taking into account the nature of the emergency).

16.    Miscellaneous.

(a)    Voluntary Agreement.  The parties have read this Occupancy Agreement and the mutual releases contained in it, and on advice of counsel they have freely and voluntarily entered into this Occupancy Agreement.

(b)    Governing Law. This Occupancy Agreement shall be construed and enforceable in accordance with the laws indicated in Section 13.8(a) of the Purchase Agreement. Any lawsuit brought by Licensor or Licensee against the other must comply with the requirements of Section 13.7 of the Purchase Agreement.

(c)    Consent to Jurisdiction.  Without limitation of any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Occupancy Agreement and to decide any claims or disputes which may be based upon, arise out of or relate to this Occupancy Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense

5

of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings based upon, arising out of or relating to this Occupancy Agreement shall be heard and determined in a Delaware state court or a federal court sitting in the State of Delaware, and the parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding in the United States District Court for the District of Delaware) with respect to all Proceedings based upon, arising out of or relating to this Occupancy Agreement and the transactions contemplated hereby (whether in contract or in tort, in law or in equity or granted by statute); (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Occupancy Agreement or the transactions contemplated hereby (whether in contract or in tort, in law or in equity or granted by statute) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding based upon, arising out of or relating to this Occupancy Agreement or the transactions contemplated hereby and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. The Parties agree that any violation of this Section 16(b) shall constitute a material breach of this Occupancy Agreement and shall constitute irreparable harm. Notwithstanding anything to the contrary contained in this Occupancy Agreement or in the Purchase Agreement, each of the Parties agrees that it will not bring or support any person in any Proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any of the Debt Financing Sources in any way relating to this Occupancy Agreement or the Purchase Agreement or any of the transactions contemplated by either, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, in any forum other than the federal and New York state courts located in the Borough of Manhattan within the City of New York and any appellate courts therefrom. The Debt Financing Sources are intended third party beneficiaries of this Section 16(b).

(d)

WAIVER OF TRIAL BY JURY; INJUNCTION. LICENSOR AND LICENSEE EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF OR RELATING TO THIS OCCUPANCY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER IN CONTRACT OR IN TORT, IN LAW OR IN EQUITY OR GRANTED BY STATUTE). EACH OF LICENSOR AND LICENSEE (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER SUCH PARTY HAVE BEEN INDUCED TO ENTER INTO THIS OCCUPANCY AGREEMENT BY, AMONG OTHER

6

THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 16(c)</u>. THE DEBT FINANCING SOURCES ARE INTENDED THIRD PARTY BENEFICIARIES OF THIS SECTION 16(c).

(e)    <u>Agreements</u>. This Occupancy Agreement together with the Purchase Agreement and the other Transaction Documents constitutes the entire agreement between Licensee and Licensor with respect to the subject matter hereof, and there are no other covenants, agreements, promises, terms, provisions, conditions, undertakings, or understandings, either oral or written, between them concerning the GOB Owned Stores other than those herein and therein set forth. Nothing in this Occupancy Agreement shall alter any Liability arising under the Purchase Agreement. If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Occupancy Agreement, the provisions of the Purchase Agreement shall govern.

(f)    <u>Amendment; Waiver</u>. No amendment, modification or discharge of this Occupancy Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by Licensee and Licensor. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Licensee or Licensor of a breach of or a default under any of the provisions of this Occupancy Agreement, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Occupancy Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the parties shall be deemed effective to modify, amend or discharge any part of this Occupancy Agreement or any rights to payment of any party under or by reason of this Occupancy Agreement.

(g)    <u>Headings</u>. The headings, captions, numbering system, etc., are inserted only as a matter of convenience and may under no circumstances be considered in interpreting the provisions of this Occupancy Agreement.

(h)    <u>Binding Effect</u>. All of the provisions of this Occupancy Agreement are hereby made binding upon and shall inure to the benefit of the personal representatives, heirs, successors, and assigns of both parties hereto.

(i)    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts (including via electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Occupancy Agreement. This Occupancy Agreement shall become effective when, and only when, each party shall have received a counterpart hereof signed by the other party. Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

[AM_ACTIVE 401039999_2]

(j)    <u>Construction</u>.    This Occupancy Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that the Occupancy Agreement may have been prepared primarily by counsel for one of the parties, it being recognized that both Licensor and Licensee have contributed substantially and materially to the preparation to this Occupancy Agreement.

(k)    <u>Time is of the Essence</u>. Time is of the essence with respect to the timeliness of all obligations of Licensor and Licensee under this Occupancy Agreement.

(l)    <u>No Recording.</u>  Neither Licensor <u>nor</u> Licensee shall record this Occupancy Agreement.

(m)    <u>Exculpation</u>. Notwithstanding anything to the contrary contained herein, no officer, director, shareholder, employee, agent, manager, member or partner of Licensor or Licensee or any other Non-Recourse Party shall have any personal Liability with respect to any of the obligations contained herein.  The provisions of this <u>Section 16(n)</u> shall survive the expiration of the Term or any earlier termination of this Occupancy Agreement.

(n)    <u>Savings Clause</u>.  To the extent any agreement to which Licensor or its Subsidiaries is a party prohibits or limits the ability of Licensor to enter into this Occupancy Agreement or limits the rights which may be granted pursuant to this Occupancy Agreement, then the rights granted pursuant to this Occupancy Agreement shall automatically and without further action be limited to the maximum rights that may be granted in compliance with such other agreement and Licensor and Licensee shall cooperate in all reasonable respects in order to grant to Licensee the material benefits intended to be provided pursuant to this Occupancy Agreement and remain in compliance with such other agreement.

(o)    17.    <u>Severability</u>. The provisions of this Occupancy Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Occupancy Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Occupancy Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

*[Signatures Appear on Following Page.]*

8

**LICENSEE**:

[**SEARS HOLDINGS CORPORATION**, a Delaware corporation]

By:_____

Name: _____

Title_____

[Signature Page to Occupancy Agreement]

**<u>LICENSOR</u>**:

[_____], a [_____]

By:_____

Name: _____

Title_____

[Signature Page to Occupancy Agreement]

## Schedule 1

[GOB Owned Stores]

[Signature Page to Occupancy Agreement]

**Exhibit G**
**ESL's Allowed Claims Against the Debtors**

| Loan Facility | Allowed Amount Owed to ESL (as Defined in the Asset Purchase Agreement) Amounts as of October 15, 2018[1] |
|---|---|
| IP/Ground Lease Term Loan Facility | $187,327,014[2] |
| FILO Facility | $70,560,076.93 |
| Real Estate Loan 2020 | $726,483,196.21 |
| Second Lien Term Loan | $318,610,234 |
| Second Lien Line of Credit Facility | $507,072,878.33 |
| Second Lien PIK Notes | $21,346,945 |
| Citi L/C Facility | $108,410,464.44 |

---

[1] Amounts owed to ESL as to each claim listed are not less than the amounts set forth herein and may include additional claims for post-petition interest and all reasonable out-of-pocket expenses, including legal fees incurred by ESL by reason of the enforcement and protection of its rights in accordance with the applicable loan terms, plus any contingent and/or unliquidated claims not presently ascertainable.  In the event that the Buyer or its affiliates purchase any additional obligations outstanding under any of the debt facilities listed in this Exhibit G prior to the Closing, the allowed amount in the right hand column shall be increased by the amount of the additional purchased debt obligations.

[2] On January 3, 2019, ESL purchased $31,887,343 of obligations outstanding under the IP/ Ground Lease Term Loan Facility, which amount is included in the total of amount of ESL's allowed claim on this Exhibit G

**SCHEDULES**

**TO**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JANUARY 17, 2019**

**BY AND AMONG**

**TRANSFORM HOLDCO LLC**

**AND**

**SEARS HOLDINGS CORPORATION**

# SCHEDULES

These schedules (the "Schedules") are being furnished by Sears Holdings Corporation ( "Seller") to Transform Holdco LLC ("Buyer"), in connection with the execution and delivery of that certain Asset Purchase Agreement dated as of January 17, 2019 by and between Seller and Buyer (the "Agreement"). All capitalized terms used in these Schedules without definition shall have the respective meanings assigned to them in the Agreement.

Any matter disclosed in any Schedule shall be deemed to have also been disclosed in each other Schedule to which the applicability of such disclosure is reasonably apparent on its face. The inclusion of any matter in any Schedule shall expressly not be deemed to constitute an admission by either Party or otherwise imply that any such matter is material, has a Material Adverse Effect or creates a measure for, or further defines the meaning of, materiality or Material Adverse Effect and their correlative terms for the purposes of the Agreement. The inclusion of any matter in any Schedule shall expressly not be deemed constitute an admission by either Party or otherwise imply that such matter will in fact exceed any applicable threshold limitation set forth in the Agreement and shall not be construed as an admission by the disclosing party of any non-compliance with, or violation of, any third party rights (including Intellectual Property rights) or any applicable law of any Governmental Authority.

These Schedules shall not be construed as, are not intended to constitute, and shall not be construed as constituting, representations or warranties of the Seller nor shall these Schedules be construed as expanding the scope of any of the representations or warranties of the Seller contained in the Agreement.

The headings herein are for reference purposes only and shall not in any way affect the meaning or interpretation of the Agreement.

Seller does not assume any responsibility to any person that is neither a Party nor a third party beneficiary of the Agreement for the accuracy of any information contained herein. The information contained in the Schedules was not prepared or disclosed with a view to its potential disclosure to any such person that is neither a Party nor a third party beneficiary of the Agreement. This information is disclosed in confidence for the purposes contemplated in the Agreement.

**<u>Schedule 1.1(a)</u>**

[Reserved]

**<u>Schedule 1.1(b)</u>**

[Reserved]

**<u>Schedule 1.1(c)</u>**

**Excluded IT**

1.  None.

**Schedule 1.1(d)**

**IP/Ground Lease Property**

|     | Store Number | Locations |
| --- | --- | --- |
| 1. | 1044 | Jersey City/Newport, NJ |
| 2. | 1924 | Valley Stream, NY |
| 3. | 1114 | Brooklyn, NY |
| 4. | 1094 | Hackensack, NJ |
| 5. | 1368 | Concord, CA |
| 6. | 1378 | Orange, CA |
| 7. | 1288 | Stockton, CA |
| 8. | 1304 | Silver Spring, MD |
| 9. | 1048 | Pasadena, CA |
| 10. | 1494 | Moorestown, NJ |
| 11. | 1758 | Escondido, CA |
| 12. | 1333 | Poughkeepsie, NY |
| 13. | 2148 | Kahului Maui, HI |
| 14. | 1765 | Palm Beach Gardens, FL |
| 15. | 1309 | Downey, CA |
| 16. | 30962 | Groveport, OH |

**<u>Schedule 1.1(e)</u>**

**Seller Knowledge Parties**

1.  Robert A. Riecker, Chief Financial Officer, Sears Holdings Corporation.

2.  Solely with respect to the representations and warranties contained in <u>Section 6.6</u> of the Agreement, Jane Borden, President, Real Estate, Sears Holdings Corporation.

3.  Solely with respect to the representations and warranties contained in <u>Section 6.10</u> of the Agreement, Peter Boutros, Chief Brand Officer, Sears Holdings Corporation and Greg Russell, CIO, President Member Technology, Sears Holdings Corporation.

## Schedule 1.1(f)

## Ordered Inventory

| Ordered Inventory as of January 7th, 2019 | | | | | | |
|---|---|---|---|---|---|---|
| | | Domestic | | Imports | | Total |
| Total on Order | $ | 120,193,318 | $ | 157,735,211 | $ | 277,928,529 |
| Less: Paid in Transit | | (50,000,000) | | - | | (50,000,000) |
| Less: On The Water | | - | | (61,370,908) | | (61,370,908) |
| Ordered Inventory | $ | 70,193,318 | $ | 96,364,303 | $ | 166,557,621 |

**Schedule 1.1(g)**

**Other Payables**

1.  See Annex 9, attached.

WEIL:\96826275\11\73217.0003

**Schedule 1.1(h)**

[Reserved]

<u>**Schedule 1.1(i)**</u>

**Permitted Post-Closing Encumbrances**

1. Liens with respect to consigned goods in Puerto Rico.

2. Certain Sellers are parties to consignment agreements with respect to which no UCC filings have been filed.

### Schedule 1.1(j)

### Permitted Pre-Closing Encumbrances

1.  Any liens in favor of Cantor Fitzgerald Securities, as collateral agent for the secured parties pursuant to that certain Superpriority Junior Lien Secured Debtor-in-Possession Credit Agreement, dated November 29, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders party thereto and Cantor Fitzgerald.

2.  Any liens in favor of Bank of America, N.A., as Control Co-Collateral Agent pursuant to that certain Superpriority Senior Secured Debtor-in-Possession Asset-Based Credit Agreement, dated November 29, 2018, among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the lenders party thereto, the issuing lenders party thereto, Bank of America, N.A., as administrative agent, co-collateral agent and swingline lender, Wells Fargo Bank, National Association, as co-collateral agent and syndication agent, Citigroup Global Markets Inc., as documentation agent, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Citibank, N.A., And Wells Fargo Bank, National Association, as joint lead arrangers and bookrunners.

3.  Any liens in favor of Pension Benefit Guaranty Corporation ("PBGC") resulting from the Pension Plan Protection and Forbearance Agreement, dated March 18, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified on or prior to the Effective Date), between, among others, Sears Holdings Corporation and PBGC.

4.  Any liens in favor of JPP, LLC, as collateral agent for the secured parties pursuant to that certain Term Loan Credit Agreement, dated as of January 4, 2018 (as amended, supplemented, or otherwise modified on or prior to the Effective Date), by and among, inter alios, Sears Holdings Corporation, as holdings, Sears, Roebuck and Co. and Kmart Corporation, as borrowers, the subsidiaries of Sears Holdings Corporation party thereto, the lenders party thereto from time to time, and JPP, LLC as administrative and collateral agent.

5.  Any liens in favor of JPP, LLC, as agent for the secured parties pursuant to that certain Third Amended and Restated Loan Agreement, dated as of June 4, 2018 (as amended, supplemented, or otherwise modified on or prior to the Effective Date), by and among, inter alios, Sears Holdings Corporation, as guarantor, its subsidiaries party thereto as borrowers, JPP, LLC, as agent, and the lenders party thereto.

6.  Any liens in favor of JPP, LLC, as administrative agent for the secured parties, as successor in interest to UBS AG, Stamford Branch, LLC, for the secured parties pursuant to that certain Credit Agreement, dated as of March 14, 2018 (as amended, supplemented, or otherwise modified on or prior to the Effective Date), by and among, inter alios, SRC O.P. LLC, SRC Facilities LLC and SR Real Estate (TX) LLC, as the borrowers, the lenders party thereto and UBS AG, Stamford Branch, LLC as administrative agent.

7.  Any liens in favor of JPP, LLC, as administrative agent for the secured parties pursuant to that certain Mezzanine Loan Agreement, dated as of March 14, 2018 (as amended, supplemented, or otherwise modified on or prior to the Effective Date), by and among SRC Sparrow 2 LLC, as borrower, JPP, LLC and JPP II, LLC as lenders, and JPP, LLC, as administrative agent.

8.  Any liens in favor of U.S. Bank National Association, as trustee for the secured parties pursuant to that certain Indenture, dated as of May 18, 2006 (as amended, supplemented, or otherwise modified on or prior to the Effective Date), by KCD IP, LLC as issuer and U.S. Bank National Association, as trustee with respect to 6.90% KCD IP, LLC Asset-Backed Notes.

9.  Any liens in favor of Wilmington Trust, National Association, as collateral agent for secured parties pursuant to (i) that certain Indenture, dated as of October 12, 2010 (as amended, supplemented, or otherwise modified on or prior to the Effective Date), among Sears Holdings Corporation, the

guarantors party thereto and Wilmington Trust, National Association (successor to Wells Fargo Bank, National Association) as trustee and collateral agent, governing the 6 5/8% Senior Secured Notes, (ii) that certain Indenture, dated as of March 20, 2018 (as amended, supplemented, or otherwise modified from time to time on or prior to the Effective Date), by and among Sears Holdings Corporation, the guarantors party thereto and Computershare Trust Company, N.A., as trustee, governing the 6 5/8% Senior Secured Convertible PIK Toggle Notes and (iii) that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented, or otherwise modified on or prior to the Effective Date), by and among, inter alios, Sears Holdings Corporation, as holdings, Sears, Roebuck and Co. and Kmart Corporation, as borrowers, the lenders party thereto, and JPP, LLC as administrative agent and collateral administrator.

10. Any liens in favor of Bank of America, N.A., as co-collateral agent for the secured parties pursuant to that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, supplemented or otherwise modified on or prior to the Effective Date), by and among, inter alios, Sears Holdings Corporation, as holdings, Sears, Roebuck and Co. and Kmart Corporation, as borrowers, the lenders party thereto, and Bank of America, N.A., as agent.

11. Liens with respect to consigned good in Puerto Rico.

12. Certain Loan Parties are parties to consignment agreement with respect to which no UCC filings have been filed.

13. Any liens in favor of the secured parties pursuant to that certain Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as amended, supplemented or otherwise modified on or prior to the Effective Date), by and among Sears Holdings Corporation, Sears, Roebuck and Co., Kmart Corporation, the financial institutions party thereto from time to time as L/C lenders, and Citibank N.A., as administrative agent and issuing bank.

14. Any encumbrances affecting the real properties that secure the IP/GL Loan as disclosed in the lenders' loan policies for title insurance issued by Chicago Title Insurance Company and/or its affiliates in connection with the making of the IP/GL Loan.

15. Any encumbrances affecting the real properties that secure that certain Third Amended and Restated Loan Agreement, dated as of June 4, 2018 (as amended, supplemented, or otherwise modified on or prior to the Effective Date), by and among, inter alios, Sears Holdings Corporation, as guarantor, its subsidiaries party thereto as borrowers, JPP, LLC, as agent, and the lenders party thereto (the loans made pursuant to such Credit Agreement, the "<u>Dove Loan</u>"). as disclosed in the lenders' loan policies for title insurance issued by Chicago Title Insurance Company and/or its affiliates in connection with the making of the Dove Loan.

16. Any encumbrances affecting the real properties that secure the Sparrow Mortgage Loan as disclosed in the lenders' loan policies for title insurance issued by Chicago Title Insurance Company and/or its affiliates in connection with the making of the Sparrow Mortgage Loan.

17. Any liens in favor of the secured parties pursuant to that certain Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as amended, supplemented or otherwise modified on or prior to the Effective Date), by and among Sears Holdings Corporation, Sears, Roebuck and Co., Kmart Corporation, the financial institutions party thereto from time to time as L/C lenders, and Citibank N.A., as administrative agent and issuing bank.

18. All encumbrances identified on the title policies, commitment and reports and surveys listed below:

*[Remainder of page intentionally left blank]*

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 108910 | AK | Anchorage(Sur) | Owned | P | Transamerica | 1/12/1970 | 69-10278-0 | Dickinson, Oswald & Associates | 10/13/1969 | N/A |
| 2. | 8106 | AL | Birmingham | Owned | P | Lawyers Title | 5/31/1977 | J21971 | - | - | - |
| 3. | 113600 | AL | Riverchase | Owned | C | CTIC | 3/30/2018 | 21800633 | CARR | 3/13/2018 | 18.0302 |
| 4. | 30957 | AR | Springdale | Owned | C | Chicago Title | 11/12/2018 | 21802099 | - | - | - |
| 5. | 68235 | AZ | Phoenix | Owned | C | Chicago Title | 11/9/2018 | 21802088 | - | - | - |
| 6. | 1588 | AZ | Phoenix-Metro Ctr | Owned | C | Chicago Title | 11/29/2018 | 21800634 | - | - | - |
| 7. | 228800 | CA | Antioch | Owned | C | CTIC | 3/23/2018 | 21800640 | Slooten | 3/9/2018 | 10685-02 |
| 8. | 1228 | CA | Arden | Owned | C | Chicago Title | 11/21/2018 | 21800639 | - | - | - |
| 9. | 126800 | CA | Buena Park | Owned/Lease* | P | FATIC | 10/5/2016 | 801871 | -- | -- | -- |
| 10. | 1598 | CA | City of Industry | Owned | P | Title Insurance and Trust Company | 12/22/1972 | 7139913 | - | - | - |
| 11. | 44900 | CA | DELANO | Owned | C | CTIC | 3/23/2018 | 21800635 | Slooten | 3/3/2016 | 10571-01 |
| 12. | 485700 | CA | Desert Hot Springs | Owned | C | CTIC | 3/23/2018 | 21800644 | ALS | 3/29/2018 | 117-18 |
| 13. | 8038 | CA | El Cajon | Owned | P | Security | 7/13/1970 | A-452987 | - | - | - |
| 14. | 120900 | CA | Long Beach | Owned | C | CTIC | 3/19/2018 | 21800638 | Bock/Clark | 11/23/2016 | 7201600160 |
| 15. | 106800 | CA | Palmdale | Owned | C | CTIC | 3/19/2018 | 21800637 | SiteTech | 3/15/2018 | N/A |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 16. | 336800 | CA | Redlands | Owned | C | CTIC | 3/23/2018 | 21800641 | ALS | 12/23/2016 | 160-16 |
| 17. | 178800 | CA | Richmond | Owned | C | FATIC | 4/24/2015 | 700526-62 | Bock/Clark | 5/26/2015 | 201403456-056 |
| 18. | 1788 | CA | Richmond | Owned | C | Lawyers Title | 9/2/1987 | 100717 | - | - | - |
| 19. | 8098 | CA | San Bernardino | Owned | C | Chicago Title | 11/14/2018 | 21701755 | - | - | - |
| 20. | 127800 | CA | Torrance | Owned/GL* | P | FATIC | 8/24/2010 | 347950 | -- | -- | -- |
| 21. | 3968 | CA | Wasco | Owned | P | First American | 7/20/1990 | KER-1071352 | Lars Andersen & Associates, Inc. | 32921 | 89-157 |
| 22. | 2451 | CO | Greely | Owned | P | First American | 11/2/2015 | 5011408-700526-66 | - | - | - |
| 23. | 127100 | CO | Littleton/Denver | Owned | C | CTIC | 4/2/2018 | 21800647 | Inter-Mountain | 4/2/2018 | 18-9004 |
| 24. | 128100 | CO | Pueblo | Owned | C | CTIC | 3/26/2018 | 21800648 | ESC | 3/9/2018 | 17036-S |
| 25. | 183100 | CO | Thornton | Owned | C | CTIC | 3/30/2018 | 21800649 | Inter-Mountain | 3/12/2018 | 17-9029 |
| 26. | 144300 | CT | Manchester | Owned | C | CTIC | 4/4/2018 | 21800652 | Flynn/CYR | 5/15/2017 | 4-39-190 |
| 27. | 1043 | CT | Meriden | Owned | C | Chicago Title | 11/30/2018 | 21800650 | - | - | - |
| 28. | 1263 | CT | Waterbury | Owned | C | Chicago Title | 11/29/2018 | 21800651 | - | - | - |
| 29. | 185300 | DE | Wilmington | Owned | C | CTIC | 4/4/2018 | 21800653 | Spartan | 5/11/2017 | N/A |
| 30. | 1255 | FL | Citrus Park | Owned | P | Lawyers Title | 7/27/1998 | 136-00-837327 | - | - | - |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 31. | 105500 | FL | Coral Springs | Owned | C | CTIC | 3/26/2018 | 21800656 | Altamax | 3/13/2018 | 902005 |
| 32. | 107500 | FL | Daytona Beach | Owned | C | Lawyers | 7/19/1974 | N434748 | -- | -- | -- |
| 33. | 1075 | FL | Daytona Beach | Owned | P | Lawyers Title | 7/19/1974 | N434748 | Phillips, Wine & Phillips, Inc. | Not legible | Not legible |
| 34. | 31930 / 4767 / 52518 | FL | Haileah | Owned | C | First American | 7/30/1998 | FA-C-1945 | Ludovici & Orange | 34641 | 9028K |
| 35. | 7435 / 7008 | FL | Hialeah | Owned | P | CTIC | 3/17/1995 | 10 5120 106 00000009 | Fortin, Leavy, Skiles, Inc. | 34736 | 950187 |
| 36. | 31930 | FL | Hialeah | Owned | C | Chicago Title | 11/2/2018 | 21802096 | - | - | - |
| 37. | 1635 | FL | Jacksonville | Owned | P | CTIC | 5/26/1981 | 10 044 01 00409 | - | - | - |
| 38. | 4019 | FL | Melbourne | Owned | C | Chicago Title | 11/29/2018 | 21802107 | - | - | - |
| 39. | 117500 | FL | Merritt Island | Owned | C | CTIC | 3/28/2018 | 21800657 | Altamax | 3/15/2016 | 902004 |
| 40. | 82920 0 | FL | Ocala | Owned | C | Chicago Title | 3/30/2018 | 21800668 | Altamax | 3/10/2018 | 902007 |
| 41. | 148500 | FL | Orange Pk | Owned | C | CTIC | 3/28/2018 | 21800661 | Bock/Clark | 3/27/2018 | 9201800100 |
| 42. | 128500 | FL | Orlando-South | Owned | C | CTIC | 3/28/2018 | 21800659 | Altamax | 3/25/2018 | 902015 |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 43. | 288500 | FL | Port Richey | Owned | C | CTIC | 3/19/2018 | 21800663 | Altamax | 3/10/2018 | 901999 |
| 44. | 1555 | FL | Sanford | Owned | P | CTIC | 8/24/1997 | FL 014 04 N 58986B | Professional Engineering Consultants, Inc. | 34312 | 50C-01-1.8 |
| 45. | 213500 | FL | Sebring | Owned | C | Ok | 6/12/2018 | 21801223 | -- | -- | -- |
| 46. | 8245 | FL | Seminole | Owned | C | First American | 11/27/2013 | 5011612-NCS-646445-CHI2 | - | - | - |
| 47. | 101500 | FL | Vero Beach | Owned | C | CTIC | 3/29/2018 | 21800655 | ASI | 3/30/2018 | N/A |
| 48. | 2815 | GA | Albany | Owned | P | Lawyers Title | 6/14/1974 | M425873 | - | - | - |
| 49. | 284500 | GA | Athens | Owned | C | CTIC | 3/21/2018 | 21800677 | Moreland | 12/22/2017 | 17386-90 |
| 50. | 103500 | GA | Augusta | Owned | C | CTIC | 3/20/2018 | 21800670 | Moreland | 11/17/2017 | 17349-002 |
| 51. | 2065 | GA | Brunswick | Owned | P | CTIC | 3/21/1985 | O194662 | - | - | - |
| 52. | 109500 | GA | Douglasville | Owned | C | CTIC | 3/20/2018 | 21800671 | Moreland | 11/15/2017 | 11245-01 |
| 53. | 115500 | GA | Kennesaw | Owned | C | CTIC | 3/20/2018 | 21800672 | Garmon | 12/22/2017 | 2017-36 |
| 54. | 1565 | GA | Morrow/Southlake | Owned | C | Chicago Title | 11/25/2018 | 21800673 | - | - | - |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55. | 875500 | GA | TUCKER | Owned | C | CTIC | 3/26/2018 | 21800678 | Moreland, Altobelli Assoc. | 3/12/2018 | 17349-04 |
| 56. | 770500 | GU | Tamuning | Owned | C | CTIC | 7/24/2018 | 21801466 | Pineda | 9/19/2018 | N/A |
| 57. | 7439 | IA | Council Bluff | Owned | P | Fidelity National Title | 4/10/1992 | O-103889 | - | - | - |
| 58. | 1012 and 8112 | IA | Des Moines, Iowa | Owned | C | Chicago Title | 11/30/2018 | 21800679 | - | - | - |
| 59. | 117200 | IL | Bloomingdale | Owned | C | CTIC | 4/10/2018 | 21800683 | JLH | 11/16/2017 | N/A |
| 60. | 61510 / 1510 | IL | Calumet City | Owned | P | CTIC | 8/3/1964 | 53-70-141 | - | - | - |
| 61. | 61030 / 1030 | IL | Chicago | Owned | P | CTIC | 12/21/1984 | 69-74-495 | - | - | - |
| 62. | 30920 / 4235 | IL | Chicago | Owned | P | Lawyers Title | 12/16/2003 | 03-10184 | - | - | - |
| 63. | 26987 / 9824 / 1987 | IL | Chicago | Owned | P | First American | 9/27/2001 | CC200257 | Landmark Engineering Corporation | 36762 | 00-08-041-R |
| 64. | 184000 | IL | Chicago Ridge | Owned | C | CTIC | 4/3/2018 | 21800688 | JLH | 12/22/2017 | N/A |
| 65. | 2632 | IL | Fairview Hts | Owned | C | Lawyers Title | 3/20/1998 | 173504-1 | Sherrill Associates | 36082 | 21459 |
| 66. | 49000 | IL | HOFFMAN EST | Owned | C | CTIC | 3/20/2018 | 18006243NC | Sarko | 4/2/2018 | 130975.18R00 |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 67. | 828900 | IL | Manteno | Owned | C | CTIC | 3/23/2018 | 21800693 | Sherrill Associates | 3/9/2018 | 18010101 |
| 68. | 132100 | IL | Peoria | Owned | C | CTIC | 4/6/2018 | 21800684 | Sarko | 3/9/2018 | N/A |
| 69. | 2121 | IL | Peru | Owned | C | Chicago Title | 11/27/2018 | 21800689 | - | - | - |
| 70. | 2360 | IL | Quincy | Owned | C | Chicago Title | 12/13/2018 | 21800690 | - | - | - |
| 71. | 31914 / 4938 | IL | Round Lake Beach | Owned | C | First American | 11/8/2004 | NCS-72282-CHI1 | Joseph A. Schudt & Associates | 35590 | 9220-233 |
| 72. | 157000 | IL | Schaumburg | Owned | C | CTIC | 3/20/2018 | 18006246NC | Geodetic | 12/15/2017 | N/A |
| 73. | 1780 | IL | Springfield, Illinois | Owned | C | Chicago Title | 11/30/2018 | 21800686 | - | - | - |
| 74. | 31900 / 3105 | IL | Sterling | Owned | P | First American | 1/7/2008 | NCS-322276-CHI1 | - | - | - |
| 75. | 182000 | IL | West Dundee | Owned | C | CTIC | 3/27/2018 | 18006248NC | JLH | 10/19/2017 | N/A |
| 76. | 1600 | IN | Castleton | Owned | C | Chicago Title | 11/26/2018 | 21800695 | - | - | - |
| 77. | 26185 / 9445 | IN | Clarksville | Owned | P | First American | 12/28/1999 | 5715753 | - | - | - |
| 78. | 165000 | IN | Merrillville | Owned | C | CTIC | 3/21/2018 | 21800696 | JAS | 12/19/2017 | N/A |
| 79. | 2290 | IN | Michigan City, Indiana | Owned | C | Chicago Title | 11/16/2018 | 21800699 | - | - | - |
| 80. | 180000 | IN | Mishawaka | Owned | C | CTIC | 3/23/2018 | 21800698 | LFA | 12/12/2017 | 133-85 |
| 81. | 26711 / 1680 | IN | Washington Sq | Owned | P | Lawyers Title | 12/21/1973 | 125730 | - | - | - |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 82. | 8171 | KS | Overland Park | Owned | C | Chicago Title | 11/19/2018 | 21802157 | - | - | - |
| 83. | 1642 | KS | Topeka | Owned | C | Chicago Title | 11/12/2018 | 21800700 | - | - | - |
| 84. | 1730 | KY | Florence | Owned | C | Chicago Title | 12/3/2018 | 21800701 | - | - | - |
| 85. | 2087 | LA | Alexandria, Louisiana | Owned | C | Chicago Title | 11/26/2018 | 21800707 | - | - | - |
| 86. | 114700 | LA | Baton Rouge | Owned | C | CTIC | 3/23/2018 | 21800705 | Dading/Marques | 4/13/2018 | N/A |
| 87. | 2677 | LA | Bossier City, Louisiana | Owned | C | Chicago Title | 11/26/2018 | 21800708 | - | - | - |
| 88. | 26736 or 1086 | LA | Cortana | Owned | C | Chicago Title | 12/5/2018 | 21800703 | - | - | - |
| 89. | 1116 | LA | Monroe, Louisiana | Owned | C | Chicago Title | 11/26/2018 | 21800704 | - | - | - |
| 90. | 1077 | LA | Shreveport | Owned | C | Chicago Title | 11/26/2018 | 21800702 | - | - | - |
| 91. | 343300 | MA | Holyoke | Owned | C | CTIC | 4/4/2018 | 21800714 | OSM | 1/4/2017 | 20160998 |
| 92. | 110400 | MA | Marlborough | Owned | C | CTIC | 4/4/2018 | 21800711 | Merrimack | 3/10/2018 | 11283AL03 |
| 93. | 103300 | MA | N Attleboro | Owned | C | CTIC | 4/2/2018 | 21800709 | OSM | 3/9/2018 | 20171044 |
| 94. | 925500 | MA | Palmer | Owned | P | Lawyers | 7/27/1980 | K 744046 | -- | -- | -- |
| 95. | 2934 | MA | Silver City Galleria, Massachusetts | Owned | C | Chicago Title | 12/26/2018 | 21800713 | - | - | - |
| 96. | 1093 | MA | Springfield | Owned | P | Hampden County | 11/2/1964 | F1380 | | | |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 97. | 163400 | MD | Baltimore-West | Owned | C | CTIC | 3/30/2018 | 21800716 | Precision | 12/21/2017 | N/A |
| 98. | 185400 | MD | Parkville | Owned | C | CTIC | 4/4/2018 | 21800718 | Precision | 12/21/2017 | N/A |
| 99. | 107400 | MD | Waldorf | Owned | C | CTIC | 3/28/2018 | 21800715 | Dewberry | 12/14/2017 | 50099780 |
| 100. | 6303 | ME | Bangor | Owned | C | Chicago Title | 11/21/2018 | 21802159 | - | - | - |
| 101. | 218300 | ME | So Portland | Owned | C | CTIC | 4/2/2018 | 21800314 | Owen Haskell | 3/26/2018 | 2016-098 |
| 102. | 2040 | MI | Battle Creek, Michigan | Owned | C | Chicago Title | 11/29/2018 | 21800730 | - | - | - |
| 103. | 938500 | MI | Clio | Owned | C | CTIC | 3/29/2018 | 21800734 | Geodetic | 3/12/2018 | N/A |
| 104. | 1700 | MI | Dearborn, Michigan | Owned | C | Chicago Title | 11/16/2018 | 21800727 | - | - | - |
| 105. | 1100 | MI | Flint | Owned | P | Lawyers Title | 1/22/1969 | F-40793 | - | - | - |
| 106. | 101100 | MI | Grandville | Owned | C | CTIC | 3/28/2018 | 21800720 | Michigan Surveying | 3/9/2018 | 17-167 |
| 107. | 30918 | MI | Jackson | Owned | C | Chicago Title | 11/20/2018 | 21802110 | - | - | - |
| 108. | 146000 | MI | Livonia | Owned | C | CTIC | 3/2/2018 | 21800725 | Michigan Surveying | 5/24/2014 | 16-188.017 |
| 109. | 119200 | MI | Muskegon | Owned | C | CTIC | 3/30/2018 | 21800724 | Williams &Works | 12/19/2017 | N/A |
| 110. | 176000 | MI | Novi | Owned | C | CTIC | 3/26/2018 | 21800729 | Geodetic | 12/15/2017 | N/A |
| 111. | 111000 | MI | Portage | Owned | C | CTIC | 5/7/2018 | 21800723 | Geodetic | 3/9/2018 | N/A |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 112. | 159000 | MI | Saginaw | Owned | C | CTIC | 4/2/2018 | 21800726 | Kem-Tec | 3/13/2018 | N/A |
| 113. | 1720 | MI | Sterling Heights | Owned | C | Chicago Title | 12/17/2018 | 21800728 | - | - | - |
| 114. | 2180 | MI | Traverse City, Michigan | Owned | C | Chicago Title | 12/28/2018 | 21800731 | - | - | - |
| 115. | 38480 | MI | Troy | Owned | C | Chicago Title | 12/17/2018 | 21800736 | - | - | - |
| 116. | 420600 | MI | Warren | Owned | C | CTIC | 3/21/2018 | 21800732 | Michigan Surveying | 3/29/2018 | 18-114.066 |
| 117. | 1032 | MN | Brooklyn Ctr | Owned | C | Chicago Title | 12/6/2018 | 21802229 | - | - | - |
| 118. | 870200 | MN | MINNEAPOLIS | Owned | C | CTIC | 3/20/2018 | 21800738 | Egan, Field & Nowak, Inc. | 12/21/2017 | 133.22 |
| 119. | 182200 | MO | Cape Girardeau | Owned | C | CTIC | 3/30/2018 | 21800745 | L.I. Smith | 3/12/2018 | 170392 |
| 120. | 112100 | MO | Independence | Owned | C | CTIC | 4/4/2018 | 21800740 | Kaw Valley | 3/26/2018 | B18S3480 |
| 121. | 117100 | MO | Springfield | Owned | C | CTIC | 3/27/2018 | 21800741 | J-Mark Surveying | 3/13/2018 | 17-545 |
| 122. | 118200 | MO | St Peters | Owned | C | CTIC | 3/30/2018 | 21800742 | Massmann | 3/12/2018 | 17055.00.001 |
| 123. | 1306 | MS | Hattiesburg, Mississippi | Owned | C | Chicago Title | 11/29/2018 | 21800747 | - | - | - |
| 124. | 61106 / 1106 | MS | Jackson | Owned | P | CTIC | 2/18/1977 | JO12962 | - | - | - |
| 125. | 1166 | MS | Meridian, Mississippi | Owned/GL | C | Chicago Title | 11/30/2018 | 21800746 | - | - | - |
| 126. | 30949 | MS | Natchez | Owned | C | Chicago Title | 11/26/2018 | 21802162 | - | - | - |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 127. | 3213 | MS | Southaven | Owned | C | Chicago Title | 11/21/2018 | 21802161 | - | - | - |
| 128. | 2242 | MT | Billings | Owned | C | CTIC | 3/17/1980 | Not specified | - | - | - |
| 129. | 116500 | NC | Concord | Owned | C | CTIC | 3/20/2018 | 21800750 | Donaldson /Garrett | 3/12/2018 | N/A |
| 130. | 147500 | NC | Durham | Owned | P | Ticor | 7/20/2001 | 990027712 | -- | -- | -- |
| 131. | 30961 | NC | Greensboro | Owned | C | Chicago Title | 11/19/2018 | 21802114 | - | - | - |
| 132. | 217500 | NC | Greenville | Owned | C | CTIC | 3/20/2018 | 21800755 | Jimmy F. Cain | 3/9/2018 | N/A |
| 133. | 251500 | NC | Hickory | Owned | C | CTIC | 3/19/2018 | 21800756 | David B. Jordan | 3/13/2018 | 43.22 |
| 134. | 160500 | NC | Raleigh | Owned | C | CTIC | 3/16/2018 | 21800752 | KCI | 3/9/2018 | N/A |
| 135. | 1712 | ND | Grand Forks, North Dakota | Owned | C | Chicago Title | 11/27/2018 | 21800758 | - | - | - |
| 136. | 219100 | NE | Lincoln | Owned | C | CTIC | 4/4/2018 | 21800760 | JEO | 3/9/2018 | R160856 |
| 137. | 1022 | NE | Omaha | Owned | C | Chicago Title | 12/6/2018 | 21800759 | - | - | - |
| 138. | 1554 | NJ | Hamilton Center, New Jersey (Mays Landing) | Owned/GL | C | Chicago Title | 11/19/2018 | 21800762 | - | - | - |
| 139. | 1734 | NJ | Lawrenceville | Owned | C | Chicago Title | 11/27/2018 | 21802163 | - | - | - |
| 140. | 161400 | NJ | Livingston | Owned | C | CTIC | 4/2/2018 | 21800763 | Crest | 3/9/2018 | N5623 |
| 141. | 131400 | NJ | New Brunswick | Owned | C | CTIC | 3/23/2018 | 21800761 | Landpoint | 3/9/2018 | 17-1454 |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 142. | 1744 | NJ | Ocean | Owned | P | CTIC | 11/7/1975 | 31-911-04-00266 | - | - | - |
| 143. | 176400 | NJ | Rockaway | Owned | C | CTIC | 4/8/2018 | 21800766 | Professional Surveying | 3/9/2018 | N/A |
| 144. | 2374 | NJ | Vineland | Owned | C | First American | 12/2/2003 | 03-37091-110 | - | - | - |
| 145. | 1717 | NM | Cottonwood, New Mexico | Owned | C | Chicago Title | 12/27/2018 | 21800769 | - | - | - |
| 146. | 6298 | NV | Sparks | Owned | C | Chicago Title | 11/27/2018 | 21802163 | - | - | - |
| 147. | 1353 | NY | De Witt/Syracuse | Owned | P | Monroe Title and Insurance Corporation | 11/13/1995 | 201-010785 | - | - | - |
| 148. | 47260 | NY | Jamestown | Owned | C | CTIC | 3/1/2018 | 21800773 | Lehr | 4/2/2018 | 18-C-44 |
| 149. | 136400 | NY | Lake Grove | Owned | C | CTIC | 3/30/2018 | 7404-000242 | Lehr | 3/31/2018 | 16-B-83 |
| 150. | 1514 | NY | Niagara Falls | **Owned** | C | Chicago Title | 11/12/2018 | 21802116 | - | - | - |
| 151. | 8254 | NY | Rochester | Owned | P | First American | 1/19/1996 | Y0036980 | MRB group | 35051 | 942-373-R2B |
| 152. | 1370 | OH | Eastland | Owned | P | Commonwealth | 9/9/1971 | N247959 | - | - | - |
| 153. | 2940 | OH | Franklin | Owned | P | CTIC | 11/12/1975 | 36 062 17 00015 | - | - | - |
| 154. | 201000 | OH | Mansfield | Owned | C | CTIC | 3/22/2018 | 21800780 | LMS | 3/9/2018 | B-170742 |
| 155. | 171000 | OH | No Olmsted | Owned | C | CTIC | 3/23/2018 | 21800778 | North Coast Geomatics | 3/9/2018 | NCG 1369 |
| 156. | 1610 | OH | Northgate | Owned | P | Lawyers Title | 3/17/1971 | T655887 | - | - | - |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 157. | 239000 | OH | Springfield | Owned | C | CTIC | 3/27/2018 | 21800781 | Judge Engineering | 10/23/2017 | 10061 |
| 158. | 1051 | OH | Strongsville/South Park, Ohio | Owned | C | Chicago Title | 11/22/2018 | 21800775 | - | - | - |
| 159. | 112000 | OH | Tuttle Crossing | Owned | C | CTIC | 4/6/2018 | 21800776 | IBI Group | 3/9/2018 | |
| 160. | 8305 | OH | Warren | Owned | P | First American | 10/10/2007 | NCS-249329-CHI1 | - | - | - |
| 161. | 1261 | OK | Midwest City | Owned | P | Lawyers Title | 8/1/1977 | K249446 | - | - | - |
| 162. | 122400 | PA | Harrisburg | Owned | C | CTIC | 3/19/2018 | 21800785 | SAS | 3/28/2018 | SRN 1606 |
| 163. | 1863 | PA | Johnstown | Owned | P | Commonwealth | 11/9/1992 | 101-675327 | - | - | - |
| 164. | 352900 | PA | Pittsburgh | Owned | C | CTIC | 3/12/2018 | 21800788 | MDM | 3/20/2018 | 7592 |
| 165. | 1293 | PA | Robinson Twp | Owned | P | First American | 11/3/2000 | 118598 | Not legible | 36749 | Not legible |
| 166. | 135400 | PA | Willow Grove | Owned | C | CTIC | 3/26/2018 | 21800787 | SAS | 3/26/2018 | SRN1501 |
| 167. | 939400 | PR | Fajardo | Owned | P | Am Land | 1/27/1999 | 53-0002-04-006203 | -- | -- | -- |
| 168. | 385300 | PR | Guayama | Owned | C | Hato Rey | 12/7/1992 | 13562 | -- | -- | -- |
| 169. | 2305 | SC | Anderson, South Carolina | Owned | C | Chicago Title | 4/5/2018 | 21800792 | - | - | - |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 170. | 159500 | SC | Greenville | Owned | C | CTIC | 3/16/2018 | 21800790 | Site Design, Inc. | 3/9/2018 | N/A |
| 171. | 179500 | SC | Myrtle Beach | Owned | C | CTIC | 3/31/2018 | 21800791 | Freeland-Clinkscales | 3/19/2018 | H38114 |
| 172. | 1545 | SC | Spartanburg, South Carolina | Owned | C | Chicago Title | 12/7/2018 | 21800789 | - | - | - |
| 173. | 30941 / 7306 | SD | Sioux Falls | Owned | P | First American | 7/16/2007 | CO 866158 | - | - | - |
| 174. | 1315 | TN | Chattanooga | Owned | C | Chicago Title | 12/5/2018 | 21800795 | - | - | - |
| 175. | 314700 | TN | Kingsport | Owned | C | CTIC | 3/30/2018 | 21800797 | Barrett Surveying | 3/23/2018 | N/A |
| 176. | 1675 | TN | Knoxville East Town | Owned | P | Title Insurance Company of Minnesota | 3/27/1986 | AZ-551986 | - | - | - |
| 177. | 446 | TN | Memphis | Owned | C | Chicago Title | 11/15/2018 | 21701113 | - | - | - |
| 178. | 26596 | TN | Memphis/Hickory | Owned | C | Chicago Title | 12/7/2018 | 21802129 | - | - | - |
| 179. | 1216 | TN | Memphis/Southland | Owned | P | Commercie Title Guaranty Company | 7/31/1964 | MS-121572 | - | - | - |
| 180. | 130700 | TX | Abilene | Owned | C | CTIC | 4/12/2018 | 21800807 | Landpoint | 3/9/2018 | 17-1455 |
| 181. | 143700 | TX | Arlington/Parks | Owned | C | CTIC | 3/26/2018 | 21800815 | Benchmark Group | 3/7/2017 | 1730003 |
| 182. | 1487 | TX | Austin, Texas | Owned | C | Chicago Title | 12/12/2018 | 21800819 | - | - | - |
| 183. | 140700 | TX | Beaumont | Owned | C | CTIC | 2/20/2018 | 21800814 | Thomas Land | 3/9/2018 | 16490 |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 184. | 249700 | TX | Brownsville | Owned | C | CTIC | 4/6/2018 | 21800822 | Guzman & Munoz | 3/12/2018 | N/A |
| 185. | 2547 | TX | College Station, Texas | Owned | C | Chicago Title | 11/18/2018 | 21800823 | - | - | - |
| 186. | 12170 | TX | Corpus Christi | Owned | C | CTIC | 2/23/2018 | 21501922 | SGC | 3/13/2018 | N/A |
| 187. | 2587 | TX | Denton, Texas | Owned | C | Chicago Title | 11/26/2018 | 21800825 | - | - | - |
| 188. | 8247 | TX | Dickinson | Owned | P | Lawyers Title Insurance Corporation | 1/21/1998 | 113-00-002984 | - | - | - |
| 189. | 1027 | TX | El Paso, Texas | Owned | C | Chicago Title | 11/29/2018 | 21800800 | - | - | - |
| 190. | 8217 | TX | Ft. Worth+J209 | Owned | C | Chicago Title | 11/27/2018 | 21800828 | - | - | - |
| 191. | 871700 | TX | HOUSTON | Owned | C | CTIC | 3/28/2018 | 21800829 | Thomas Land | 3/9/2018 | 16397 |
| 192. | 8137 | TX | Houston | Owned | C | Lawyers Title Insurance Corporation | 5/23/1983 | 4876-83 | - | - | - |
| 193. | 6874 | TX | Houston | Owned | P | Lawyers Title Insurance Corporation | 6/9/1998 | 90-00-494623 | - | - | - |
| 194. | 8167 | TX | Houston | Owned | P | Steward Title Guaranty Company | 11/4/1969 | 9240-J | - | - | - |
| 195. | 61237 | TX | Houston | Owned | C | Chicago Title | 11/15/2018 | 4715002318A | - | - | - |
| 196. | 144700 | TX | Hulen | Owned | C | CTIC | 3/26/2018 | 21800818 | Benchmark Group | 3/12/2018 | 1730041 |
| 197. | 141700 | TX | Humble | Owned | C | CTIC | 3/28/2018 | 21800815 | Thomas Land | 3/12/2018 | 16435 |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 198. | 129700 | TX | Hurst | Owned | C | CTIC | 3/26/2018 | 21800806 | Benchmark Group | 3/9/2018 | 1730040 |
| 199. | 224700 | TX | Laredo | Owned | C | CTIC | 3/26/2018 | 21800821 | SGC | 3/9/2018 | N/A |
| 200. | 118700 | TX | Mesquite-Town East | Owned | C | CTIC | 3/28/2018 | 21800803 | Benchmark Group | 3/9/2018 | 1730039 |
| 201. | 117600 | TX | Pasadena | Owned | C | CTIC | 3/28/2018 | 21800802 | Town and Country | 3/12/2018 | 17-1516 |
| 202. | 1267 | TX | Ridgmar-Fort Worth, Texas | Owned | C | Chicago Title | 11/27/2018 | 21800805 | - | - | - |
| 203. | 142700 | TX | Rolling Oaks | Owned | C | CTIC | 3/27/2018 | 21800816 | SGC | 3/9/2018 | N/A |
| 204. | 49027 | TX | Round Rock | Owned | C | First American | 5/22/2008 | 354541-CHI2 | Dupont | 35453 | A-609 |
| 205. | 2332 | TX | San Antonio | Owned | P | Mission Title | 10/13/2016 | 1603063-02 | ALTA/NSPS | 42599 | Not legible |
| 206. | 219700 | TX | Texas City | Owned | C | CTIC | 3/27/2018 | 21800820 | Rekha Engineering | 3/9/2018 | 1017-3917 |
| 207. | 137700 | TX | Willowbook | Owned | C | CTIC | 3/28/2018 | 21800812 | Town and Country | 3/13/2018 | 17-0235 |
| 208. | 102300 | VA | Loudoun/Dulles | Owned | C | CTIC | 4/4/2018 | 21800832 | Urban | 4/5/2016 | |
| 209. | 2671 / 7518 | VA | Newport News | Owned | P | Commonwealth | 11/29/1994 | 101792 | - | - | - |
| 210. | 197400 | VA | Roanoke | Owned | C | CTIC | 4/3/2018 | 21800833 | Berkley Howell | 12/27/2016 | 160111 |
| 211. | 3544 | VA | Salem | Owned | P | First American | 10/26/2007 | 308898-CHI2 | - | - | - |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 212. | 229900 | WA | Aberdeen | Owned | P | Pioneer | 12/23/1980 | Z177716 | -- | -- | -- |
| 213. | 372200 | WA | Burlington | Owned | C | CTIC | 3/30/2018 | 21800840 | Terramark | 12/2/2016 | 5188-20105 |
| 214. | 103800 | WA | E Valley | Owned | C | CTIC | 3/29/2018 | 21800835 | Duryea | 3/13/2018 | 17-2269 |
| 215. | 221900 | WA | Lacey/Olympia | Owned | C | CTIC | 3/30/2018 | 21800838 | Terramark | 3/9/2018 | N/A |
| 216. | 230900 | WA | Silverdale | Owned | C | CTIC | 3/30/2018 | 21800839 | All County Surveyors | 3/9/2018 | N/A |
| 217. | 102900 | WA | Spokane | Owned | C | CTIC | 3/29/2018 | 21800834 | Duryea | 3/9/2018 | 08-1375 2017 |
| 218. | 414700 | WA | Spokane | Owned | C | CTIC | 3/15/2018 | 21800841 | Terramark | 3/9/2018 | N/A |
| 219. | 6579 | WA | Spokane | Owned | C | Lawyers Title Insurance Corporation | 10/7/1992 | 92-0355 | - | - | - |
| 220. | 209200 | WI | Appleton | Owned | C | CTIC | 3/27/2018 | 21800842 | Lampert-Lee | 3/28/2018 | 18-37 |
| 221. | 4395 | WI | Cudahy | Owned | C | ALTA | 4/12/2004 (mark-up) | 1173527 | - | - | - |
| 222. | 308800 | WI | Kenosha | Owned | C | CTIC | 3/20/2018 | 21800845 | JLH | 3/27/2018 | 18-260-105 |
| 223. | 2432 | WI | La Crosse | Owned | C | Chicago Title | 12/3/2018 | 21800844 | - | - | - |
| 224. | 223200 | WI | Madison-East | Owned | C | CTIC | 4/2/2018 | 21800843 | Sarko | 3/29/2018 | 45.22 |

| | RE ID | ST | City | 10K Own/L/GL | Policy (P), Commitment (C), Other (R) | Title Company | Date | Policy or Commitment Number | Surveyor | Date of Survey | Survey No. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 225. | 180400 | WV | Barboursville | Owned | C | CTIC | 4/2/2018 | 21800847 | Eastham & Associates | 3/22/2018 | N/A |

19. Each of the Encumbrances listed below:

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 1. | California Builder Appliances, Inc. | CA Secretary of State | UCC-1 | Maytag Appliances Sales Company | PMSI inventory | 9/22/00 | 0027760879 | 6/10/02 7/08/02 7/6/05 5/18/10 3/27/15 | 02162C0017 02190C0069 05/70332234 10-72320757 15-74569635 |
| 2. | Florida Builder Appliances, Inc. | DE Secretary of State | UCC-1 | U.S. Bank Equipment Finance, a division of U.S. Bank National Association | Specific equipment | 7-16-18 | 20184851396 | 7-19-18 | 20184952046 |
| 3. | Innovel Solutions, Inc. | DE Secretary of State | UCC-1 | Captive Finance Solutions, LLC | Leased equipment | 12/24/14 | 20145241856 | N/A | N/A |
| 4. | Innovel Solutions, Inc. | DE Secretary of State | UCC-1 | LG Electronics U.S.A., Inc. | Inventory that the Debtor holds as bailee under agreement between | 1/13/17 | 20170301009 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | the Debtor and the secured party | | | | |
| 5. | Kmart Corporation | IL Secretary of State | UCC-1 | Abrim Enterprises, Inc. | Consigned inventory | 09/22/16 | 21733199 | N/A | N/A |
| 6. | Kmart Corporation | IL Secretary of State | UCC-1 | Joseph Enterprises Inc. | PMSI inventory | 9/27/17 | 22744488 | N/A | N/A |
| 7. | Kmart Corporation | IL Secretary of State | UCC-1 | Royal Consumer Products LLC | Poster board and foam board | 11/18/14 | 19811727 | N/A | N/A |
| 8. | Kmart Corporation | MI Department of State | UCC-1 | State Street Bank and Trust Company/U.S. Bank National Association | Precautionary filing; parties intended to be a true lease | 5-16-02 | D910941 | 1-22-07 1-31-07 1-18-12 1-26-17 | 2007012057-9 2007017707-3 2012009674-3 20170126000489-4 |
| 9. | Kmart Corporation | MI Department of State | UCC-1 | The Bank of New York, as Note Trustee | Precautionary filing; parties intended to be a true lease | 5-28-02 | D915512 | 2-12-07 3-19-07 1-18-12 5-27-12 2-3-17 | 2007024132-3 2007043214-0 2012009204-8 2012077131-5 20170203000169-1 |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 10. | Kmart Corporation | MI Department of State | UCC-1 | Horizon Group USA, Inc. | Consigned inventory | 4-13-09 | 2009054475-9 | 4-1-13 11-1-13 | 2013045352-7 2013157896-4 |
| 11. | Kmart Corporation | MI Department of State | UCC-1 | Clover Technologies Group, LLC | Consigned inventory | 7-11-12 | 2012099717-3 | 3-3-17 | 20170303000786 -1 |
| 12. | Kmart Corporation | MI Department of State | UCC-1 | Abrim Enterprises, Inc. | Consigned inventory | 9/22/16 | 201609220009 30-0 | N/A | N/A |
| 13. | Kmart Corporation | MI Department of State | UCC-1 | ACCO Brands USA LLC | Consigned inventory | 11/1/16 | 201611010007 96-0 | N/A | N/A |
| 14. | Kmart Corporation | MI Department of State | UCC-1 | ACCO Brands USA LLC | Consigned inventory | 11/2/16 | 201611020004 27-2 | N/A | N/A |
| 15. | Kmart Corporation | MI Department of State | UCC-1 | American Greetings Corporation | Consigned inventory | 5/6/03 | 2003087025-3 | 5/5/08 4/26/13 8/22/16 4/25/18 | 2008069511-2 2013059416-9 2016115608-1 20180425000414 -7 |
| 16. | Kmart Corporation | MI Department of State | UCC-1 | American Greetings Corporation | Consigned inventory | 5/7/03 | 2003087053-2 | 5/5/08 4/26/13 | 2008069512-4 2013059415-7 2016115609-3 |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 8/22/16 4/25/18 | 20180425000416-5 |
| 17. | Kmart Corporation | MI Department of State | UCC-1 | Aneri Jewels L.L.C. | Consigned inventory | 12/30/15 | 2015178917-9 | N/A | N/A |
| 18. | Kmart Corporation | MI Department of State | UCC-1 | Aneri Jewels, L.L.C. | Consigned inventory | 9/17/14 | 2014135693-0 | 12/11/15 | 2015171608-7 |
| 19. | Kmart Corporation | MI Department of State | UCC-1 | Beauty Gem, Inc. | Consigned inventory | 6/19/12 | 2012088753-6 | 10/04/16 1/31/17 | 20161004000429-9 20170131000492-0 |
| 20. | Kmart Corporation | MI Department of State | UCC-1 | Bio-Lab, Inc. | Consigned inventory | 1/23/07 | 2007012556-7 | 1/23/12 11/02/16 | 2012011696-3 20161102000409-6 |
| 21. | Kmart Corporation | MI Department of State | UCC-1 | Combine International, Inc. (d/b/a I.L. MFG Co., Shan Corporation and/or NSM Corp.) | Consigned inventory | 8/28/08 | 2008135282-6 | 6/26/13 4/10/18 | 2013093663-4 20180410000852-1 |
| 22. | Kmart Corporation | MI Department of State | UCC-1 | Early Morning LLC | Consigned inventory | 1/19/18 | 201801190007 28-9 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 23. | Kmart Corporation Sears, Roebuck and Co./Sears Holdings Management, Inc. | MI Department of State | UCC-1 | ET Enterprises Distributors, Inc. | Consigned apparel and visor merchandise. Total $54,846.00 | 7/29/16 | 2016105914-8 | N/A | N/A |
| 24. | Kmart Corporation | MI Department of State | UCC-1 | Hilco Wholesale Solutions, LLC | Consigned inventory | 3/18/16 | 2016037312-9 | N/A | N/A |
| 25. | Kmart Corporation | MI Department of State | UCC-1 | Homecare Labs, Inc. | Consigned inventory | 1/23/07 | 2007012558-1 | 1/23/12 11/02/16 | 2012011699-9 20161102000412-0 |
| 26. | Kmart Corporation | MI Department of State | UCC-1 | Kama-Schachter Jewelry, Inc. | Consigned inventory | 9/20/16 | 201609200009 78-2 | N/A | N/A |
| 27. | Kmart Corporation | MI Department of State | UCC-1 | LM Farms, LLC | Consigned inventory | 1/19/18 | 201801190007 26-1 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 28. | Kmart Corporation | MI Department of State | UCC-1 | Lucent Jewelers, Inc. N.D. Gems Inc. | Consigned inventory | 2/2/17 | 201702020010 80-3 | N/A | N/A |
| 29. | Kmart Corporation | MI Department of State | UCC-1 | Mantua Manufacturing Co. | Consigned inventory | 10/2/18 | 201810020011 08-6 | N/A | N/A |
| 30. | Kmart Corporation | MI Department of State | UCC-1 | Maxcolor LLC | Consigned inventory | 9/7/17 | 201709070003 78-6 | N/A | N/A |
| 31. | Kmart Corporation | MI Department of State | UCC-1 | Mill Creek Entertainment, LLC | Consigned inventory | 10/29/14 | 2014155704-9 | N/A | N/A |
| 32. | Kmart Corporation | MI Department of State | UCC-1 | MJ Holding Company, LLC | Consigned inventory | 12/01/09 | 2009169240-0 | 7/13/12 6/28/13 6/3/14 | 2012100886-4 2013095152-3 2014079863-2 |
| 33. | Kmart Corporation | MI Department of State | UCC-1 | NCR Corporation | PMSI inventory | 3/12/09 | 2009037776-6 | 2/28/14 | 2014029466-0 |
| 34. | Kmart Corporation | MI Department of State | UCC-1 | Plus Mark LLC | PMSI inventory | 10/4/16 | 201610120005 41-9 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 35. | Kmart Corporation | MI Department of State | UCC-1 | Richline Group, Inc. | Consigned inventory | 10/23/14 | 2014153071-4 | N/A | N/A |
| 36. | Kmart Corporation | MI Department of State | UCC-1 | Riverstone USA LLC | Consigned inventory | 10/31/16 | 201611140002 97-8 | N/A | N/A |
| 37. | Kmart Corporation | MI Department of State | UCC-1 | Rosy Blue, Inc. | Consigned inventory | 9/10/13 | 2013131226-5 | 3/14/18 | 20180314001201 -7 |
| 38. | Kmart Corporation | MI Department of State | UCC-1 | Royal Consumer Products LLC | Poster board and foam board | 12/16/14 | 2014178469-6 | N/A | N/A |
| 39. | Kmart Corporation | MI Department of State | UCC-1 | S&J Diamond Corp. Disons GEMS, Inc. | Consigned inventory | 8/05/15 | 2015111249-3 | N/A | N/A |
| 40. | Kmart Corporation | MI Department of State | UCC-1 | Sakar International, Inc. | Consigned inventory | 9/30/14 | 2014141770-2 | N/A | N/A |
| 41. | Kmart Corporation | MI Department of State | UCC-1 | Scents of Worth, Inc. | Consigned inventory | 12/20/13 | 2013179478-4 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 42. | Kmart Corporation | MI Department of State | UCC-1 | Shaghal Ltd. | Consigned inventory | 10/01/15 | 2015137503-3 | N/A | N/A |
| 43. | Kmart Corporation | MI Department of State | UCC-1 | Shanti Corporation D/B/A Vijay Gold Designs | Consigned inventory | 9/18/13 | 2013135456-6 | 8/07/18 | 20180807000509-4 |
| 44. | Kmart Corporation | MI Department of State | UCC-1 | The News Group, L.P. | PMSI inventory | 2/23/18 | 201802230005 73-3 | N/A | N/A |
| 45. | Kmart Corporation | MI Department of State | UCC-1 | Tiger Capital Group, LLC | Consigned inventory | 2/08/18 | 201802080005 47-9 | N/A | N/A |
| 46. | Kmart Corporation | MI Department of State | UCC-1 | Twentieth Century Fox Home Entertainment LLC | Consigned inventory | 4/27/17 | 201704270011 83-6 | N/A | N/A |
| 47. | Kmart Corporation | MI Department of State | UCC-1 | Verbatim Americas LLC | Consigned inventory | 5/13/14 | 2014068095-0 | N/A | N/A |
| 48. | Kmart Corporation | MI Department of State | UCC-1 | Vijaydimon (USA) Inc. | Consigned inventory | 9/13/13 | 2013133133-0 | 8/07/18 | 20180807000510-0 |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 49. | Kmart Corporation/Kmart of Michigan, Inc. | MI Department of State | UCC-1 | Jacmel Jewelry Inc. | Consigned inventory | 10/27/14 | 2014154479-9 | N/A | N/A |
| 50. | Kmart Corporation/Sears, Roebuck and Co.,/Sears Holdings Management Corporation./Sears Holdings Corporation | IL Secretary of State | UCC-1 | Chapal Zenray Inc. | Consigned inventory | 11/05/14 | 019779882 | N/A | N/A |
| 51. | Kmart Holding Corporation/ Sears Holdings Corporation | IL Secretary of State | UCC-1 | RGGD, Inc. D/B/A Crystal Art Gallery | Framed art and wall décor | 03/26/12 | 17136976 | 03/08/17 | 9467438 |
| 52. | Kmart of Michigan, Inc. | MI Department of State | UCC-1 | Bio-Lab, Inc. | Consigned inventory | 1/23/07 | 2007012557-9 | 1/23/12 11/02/16 | 2012011697-5 20161102000414 -8 |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 53. | Kmart of Michigan, Inc. | MI Department of State | UCC-1 | Homecare Labs, Inc. | Consigned inventory | 1/23/07 | 2007012559-3 | 1/23/12 11/02/16 | 2012011701-6 20161102000419-3 |
| 54. | Kmart of Washington LLC | WA Secretary of State | UCC-1 | Bio-Lab, Inc. | Consigned inventory | 1/23/07 | 2007-024-4055-9 | 1/23/12 11/02/16 | 2012-023-5218-2 2016-307-2158-1 |
| 55. | Kmart of Washington LLC | WA Secretary of State | UCC-1 | HomeCare Labs, Inc. | Consigned inventory | 1/23/07 | 2007-024-4054-2 | 1/23/12 11/02/16 | 2012-023-5219-9 2016-307-2157-4 |
| 56. | Kmart of Washington LLC | WA Secretary of State | UCC-1 | Jacmel Jewelry Inc. | Consigned inventory | 10/27/14 | 2014-300-2219-2 | N/A | N/A |
| 57. | Kmart Operations LLC | DE Secretary of State | UCC-1 | American Greetings Corporation | PMSI inventory | 7/1/15 | 2015 2834785 | 8/22/16 | 20165092646 |
| 58. | Kmart Operations LLC | DE Secretary of State | UCC-1 | RX Gear, LLC | Consigned inventory | 7/31/15 | 20153333670 | N/A | N/A |
| 59. | Kmart Operations LLC | DE Secretary of State | UCC-1 | Work 'N Gear, LLC | Consigned inventory | 07/31/15 | 20153333647 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 60. | Kmart Operations LLC/Sears Operation LLC/ Sears Holdings Corporation | DE Secretary of State | UCC-1 | Lucent Jewelers, Inc. N.D. Gems Inc. | Consigned inventory | 4/18/18 | 20182630396 | N/A | N/A |
| 61. | Kmart Operations LLC/Sears Operations LLC/Sears, Roebuck and Co. | IL Secretary of state | UCC-1 | D-Link Systems, Inc. | Consigned inventory | 10/16/14 | 19726150 | 6/26/15 | 09363045 |
| 62. | Kmart Stores of Illinois LLC | IL Secretary of State | UCC-1 | Bio-Lab, Inc. | Consigned inventory | 1/23/07 | 11741681 | 1/23/12 11/02/16 | 009157193 009444896 |
| 63. | Kmart Stores of Illinois LLC | IL Secretary of State | UCC-1 | HomeCare Labs, Inc. | Consigned inventory | 1/23/07 | 11741703 | 1/23/12 11/02/16 | 009157194 009444897 |
| 64. | Kmart Stores of Illinois LLC | IL Secretary of State | UCC-1 | Jacmel Jewelry Inc. | Consigned inventory | 10/27/14 | 19751392 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 65. | Kmart Stores of Texas LLC | TX Secretary of State | UCC-1 | Bio-Lab, Inc. | Consigned inventory | 1/29/07 | 07-0003108756 | 1/23/12 11/02/16 | 12-00023888 16-00358725 |
| 66. | Kmart Stores of Texas LLC | TX Secretary of State | UCC-1 | HomeCare Labs, Inc. | Consigned inventory | 1/23/07 | 07-0002446699 | 1/23/12 11/02/16 | 12-00023886 16-00358729 |
| 67. | Kmart Stores of Texas LLC | TX Secretary of State | UCC-1 | Jacmel Jewelry Inc. | Consigned inventory | 10/27/14 | 14-0034360314 | N/A | N/A |
| 68. | Sears Brand Management Corporation | DE Secretary of State | UCC-1 | Early Morning LLC | Consigned inventory | 1/18/18 | 20180425047 | N/A | N/A |
| 69. | Sears Brand Management Corporation | DE Secretary of State | UCC-1 | Hilco Wholesale Solutions, LLC | Consigned inventory | 3/18/16 | 20161652229 | N/A | N/A |
| 70. | Sears Brand Management Corporation | DE Secretary of State | UCC-1 | LM Farms, LLC | Consigned inventory | 1/18/18 | 20180424727 | N/A | N/A |
| 71. | Sears Brand Management Corporation | DE Secretary of State | UCC-1 | Riverstone USA LLC | Consigned inventory | 10/28/16 | 20166659104 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 72. | Sears Brand Management Corporation | DE Secretary of State | UCC-1 | Shaghal Ltd. | Consigned inventory | 10/1/15 | 20154442397 | N/A | N/A |
| 73. | Sears Brand Management Corporation/Sears Holdings Management Corporation/Sears Holdings Corporation | DE Secretary of State | UCC-1 | Tiger Capital Group, LLC | Consigned inventory | 2/8/18 | 20180915161 | N/A | N/A |
| 74. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Aneri Jewels, L.L.C | Consigned inventory | 12/29/15 | 20156311038 | N/A | N/A |
| 75. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Bracketron, Inc. | Consigned inventory | 3/22/16 | 20161715067 | N/A | N/A |
| 76. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Mantua Manufacturing Co. | Consigned inventory | 10/2/18 | 20186813873 | N/A | N/A |
| 77. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Riverstone USA LLC | Consigned inventory | 10/28/16 | 20166658916 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 78. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Rosy Blue, Inc. | Consigned inventory | 9/10/13 | 20133515278 | 3/13/18 | 20181727904 |
| 79. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Shaghal Ltd. | Consigned inventory | 10/1/15 | 20154442603 | N/A | N/A |
| 80. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Shanti Corporation D/B/A Vijay Gold Designs | Consigned inventory | 9/17/13 | 20133616209 | 8/6/18 | 20185411505 |
| 81. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Soft Air USA Inc. | Consigned inventory | 5/19/17 | 20173319099 | N/A | N/A |
| 82. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Suberi Brothers, LLC | Consigned inventory | 3/12/13 | 20130947524 | 3/12/18 | 20181692199 |
| 83. | Sears Holdings Corporation | DE Secretary of State | UCC-1 | Vijaydimon (USA) Inc. | Consigned inventory | 9/12/13 | 20133564060 | 8/6/18 | 20185411547 |
| 84. | Sears Holdings Corporation | IL Secretary of State | UCC-1 | MaxMark, Inc. | Consigned inventory | 3/03/17 | 022163000 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 85. | Sears Holdings Corporation/Kmart Holding Corporation | DE Secretary of State | UCC-1 | RGGD, Inc. d/b/a Crystal Art Gallery | Consigned inventory | 3/16/12 | 20121026733 | 3/06/17 | 20171481271 |
| 86. | Sears Holdings Corporation/Kmart Holding Corporation | IL Secretary of State | UCC-1 | RGGD, Inc., d/b/a Crystal Art Gallery | Consigned inventory | 3/26/14 | 01713697 | 3/8/17 | 009467438 |
| 87. | Sears Holdings Corporation/Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Aneri Jewels, L.L.C. | Consigned inventory | 9/17/14 | 20143714227 | 12/10/15 | 20155946255 |
| 88. | Sears Holdings Corporation/Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Combine International, Inc.(d/b/a I.L. MFG Co., Shan Corporation and/or NSM Corp.) | Consigned inventory | 8/28/08 | 20082932810 | 5/19/09 6/26/13 4/10/18 | 20091581823 20132463777 20182435051 |
| 89. | Sears Holdings Corporation/S | DE Secretary of State | UCC-1 | Sun Diamond, Inc. d/b/a Sun Source | Consigned inventory | 8/13/14 | 20143244829 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| | ears Holdings Management Corporation | | | | | | | | |
| 90. | Sears Holdings Corporation/Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Suberi Brothers, LLC | Consigned inventory | 3/12/18 | 20181687009 | N/A | N/A |
| 91. | Sears Holdings Corporation/Sears Holdings Management Corporation/Sears Holdings Inc. | DE Secretary of State | UCC-1 | The Luxe Group Inc. | Consigned inventory | 12/05/16 | 20167514852 | N/A | N/A |
| 92. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Abrim Enterprises, Inc. | Consigned inventory | 9/23/16 | 20165840119 | N/A | N/A |
| 93. | Sears Holdings | DE Secretary of State | UCC-1 | Aneri Jewels, L.L.C | Consigned inventory | 12/29/15 | 20156311178 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| | Management Corporation | | | | | | | | |
| 94. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Canon Financial Services, Inc. | Leased or financed equipment | 12/19/14 | 20145172150 | N/A | N/A |
| 95. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Canon Financial Services, Inc. | Leased or financed equipment | 12/29/15 | 20156308844 | N/A | N/A |
| 96. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Cross Country Home Services, Inc., on behalf of itself and as Agent | Receivables under THM program documents (with HomeSure vendors) | 11/1/17 | 20177234570 | N/A | N/A |
| 97. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Hewlett-Packard Financial Services Company | Leased or financed equipment | 8/4/14 | 20143096716 | N/A | N/A |
| 98. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Jacmel Jewelry Inc. | Consigned inventory | 10/27/14 | 20144299681 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 99. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Kama-Schachter Jewelry, Inc. | Consigned inventory | 9/19/16 | 20165726466 | N/A | N/A |
| 100. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Mantua Manufacturing Co. | Consigned inventory | 10/2/18 | 20186813626 | N/A | N/A |
| 101. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Plymouth Packaging, Inc. dba Box on Demand | Specific machinery | 10/13/16 | 20166295644 | N/A | N/A |
| 102. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Three Point Capital, LLC | Tax credit from State of IL | 10/5/16 | 20166110884 | N/A | N/A |
| 103. | Sears Holdings Management Corporation | DE Secretary of State | UCC-1 | Twentieth Century Fox Home Entertainment LLC | Consigned inventory | 4/27/17 | 20172761630 | N/A | N/A |
| 104. | Sears Holdings Management Corporation | IL Secretary of State | UCC-1 | Abrim Enterprises, Inc. | Consigned inventory | 9/22/16 | 21733121 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 105. | Sears Holdings Management Corporation | IL Secretary of State | UCC-1 | Allure Gems LLC | Consigned inventory | 10/21/16 | 21810061 | N/A | N/A |
| 106. | Sears Holdings Management Corporation | IL Secretary of State | UCC-1 | MaxMark Inc. | Consigned inventory | 10/17/13 | 18685485 | N/A | N/A |
| 107. | Sears Holdings Management Corporation/Sears Holdings Corporation | DE Secretary of State | UCC-1 | Suberi Brothers, LLC | Consigned inventory | 3/12/13 | 20130947813 | 3/12/185 3/13/18 | 2018 1692199 2018 1733290 |
| 108. | Sears Home & Business Franchises, Inc. | DE Secretary of State | UCC-1 | U.S. Bank Equipment Finance, a division of U.S. Bank National Association | Specific equipment | 12-8-15 | 20155868921 | N/A | N/A |
| 109. | Sears Home & Business Franchises, Inc. | DE Secretary of State | UCC-1 | VAR Resources, LLC | Specific equipment | 3-22-17 | 20171866307 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 110. | Sears Home Improvement Products, Inc. | PA Secretary of Commonwealth | UCC-1 | Toyota Industries Commercial Finance, Inc. | Specific machinery | 1/20/17 | 2017012000854 | N/A | N/A |
| 111. | Sears Operations LLC | DE Secretary of State | UCC-1 | American Greetings Corporation | PMSI inventory | 7/1/2015 | 20152834777 | 8/22/16 | 2016 5092653 |
| 112. | Sears Operations LLC | DE Secretary of State | UCC-1 | RX Gear, LLC | Consigned inventory | 7/31/15 | 20153333522 | N/A | N/A |
| 113. | Sears Operations LLC | DE Secretary of State | UCC-1 | Seiko Corporation of America | Consigned inventory | 8/26/15 | 20153752911 | N/A | N/A |
| 114. | Sears Operations LLC | DE Secretary of State | UCC-1 | Work 'N Gear, LLC | Consigned inventory | 7/31/15 | 20153333423 | N/A | N/A |
| 115. | Sears Roebuck and Co. | NY Department of State | UCC-1 | Seiko Corporation of America | Consigned inventory | 9-20-13 | 201309208382954 | 8-10-18 | 201809108411994 |
| 116. | Sears, Roebuck and Co. | IL Secretary of State | UCC-1 | Abrim Enterprises, Inc. | Consigned inventory | 9/22/16 | 021732508 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 117. | Sears, Roebuck and Co. | IL Secretary of State | UCC-1 | Crown Credit Company | Equipment | 10/6/14 | 019695123 | N/A | N/A |
| 118. | Sears, Roebuck and Co. | IL Secretary of State | UCC-1 | Dell Financial Services, L.P. | Computer equipment | 6/23/00 | 004231060 | 5/26/05 4/30/10 11/18/10 5/29/15 | 008764570 009042080 009078848 009359027 |
| 119. | Sears, Roebuck and Co. | IL Secretary of State | UCC-1 | Richline Group, Inc. | Consigned inventory | 10/23/14 | 019744515 | N/A | N/A |
| 120. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Abrim Enterprises, Inc. | Consigned inventory | 9/22/16 | 201609228377179 | N/A | N/A |
| 121. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | American Greetings Corporation | PMSI inventory | 7/1/15 | 201507015725202 | 8/22/16 | 201608226001740 |
| 122. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Aneri Jewels, Inc. | Consigned inventory | 12/29/15 | 201512296458142 | N/A | N/A |
| 123. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Lucent Jewelers, Inc. | Consigned inventory | 9/11/14 | 201409118353324 | 8/10/15 | 201508108306068 |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 124. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Beauty Gem, Inc. | Consigned inventory | 8/10/11 | 201108100433869 | 4/15/16 10/4/16 | 201604150176930 20161004047734 4 |
| 125. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Bio-Lab, Inc. | Consigned inventory | 1/23/07 | 200701230055253 | 1/23/12 12/2/16 | 201201235087232 20161202057156 0 |
| 126. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Combine International, Inc. (d/b/a I.L. Mft. Co., Shan Corporation and/or NSM Corp. | Consigned inventory | 8/28/08 | 200808280601486 | 6/27/13 4/10/18 | 201306270359563 20180410016628 6 |
| 127. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Cross Country Home Services, Inc., on behalf of itself and as agent | Receivables under THM program documents (with HomeSure vendors) | 11/1/17 | 201711010534407 | N/A | N/A |
| 128. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Early Morning LLC | Consigned inventory | 1/19/18 | 201801190029719 | N/A | N/A |
| 129. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Envisions LLC | Consigned inventory | 3/31/17 | 201703318132790 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 130. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | ET Enterprises Distributors, Inc. | Consigned apparel and visor merchandise, total $54,846.00 | 8/11/16 | 201608110386101 | N/A | N/A |
| 131. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Gold LLC | Consigned inventory | 6/20/13 | 201306205672669 | 5/11/18 | 201805115580409 |
| 132. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Hilco Wholesale Solutions, LLC | Consigned inventory | 3/18/16 | 201603188106670 | N/A | N/A |
| 133. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | HomeCare Labs, Inc. | Consigned inventory | 1/23/07 | 200701230055241 | 1/23/12 12/2/16 | 201201235087244 201612020571522 |
| 134. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Jacmel Jewelry Inc. | Consigned inventory | 10/27/14 | 201410270600834 | N/A | N/A |
| 135. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Kama-Schachter Jewelry, Inc. | Consigned inventory | 9/19/16 | 201609196110859 | N/A | N/A |
| 136. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Lands' End Inc. | Consigned inventory | 1/27/17 | 201701270037999 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 137. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | LM Farms, LLC | Consigned inventory | 1/19/18 | 201801190029721 | N/A | N/A |
| 138. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Mantua Manufacturing Co. | Consigned inventory | 10/2/18 | 201810028451499 | N/A | N/A |
| 139. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Maxcolor LLC | Consigned inventory | 9/6/17 | 201709068382318 | N/A | N/A |
| 140. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | NMHG Financial Services, Inc. | Leased equipment | 1/14/10 | 201001145039567 | 8/19/14 | 201408195885473 |
| 141. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | PAJ, Inc. | Consigned inventory | 10/23/13 | 201310238426034 | 5/20/14 7/28/14 9/25/14 12/12/14 1/20/15 2/11/15 2/25/15 4/1/15 5/26/15 | 201405208192056 201407288290826 201409258374391 201412128486689 201501208021186 201502118051411 20150225806729 |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 7 201504018114482 201505268197264 |
| 142. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Riverstone USA LLC | Consigned inventory | 11/10/16 | 201611100538286 | N/A | N/A |
| 144. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Rosy Blue, Inc. | Consigned inventory | 8/23/13 | 201308230481633 | 2/28/18 | 201802280096569 |
| 146. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | S&J Diamond Corp. Disons Gems, Inc. | Consigned inventory | 8/5/15 | 201508050398618 | N/A | N/A |
| 147. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Sakar International, Inc. | Consigned inventory | 9/30/14 | 201409308380725 | N/A | N/A |
| 148. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Shaghal Ltd. | Consigned inventory | 10/1/15 | 201510018378394 | N/A | N/A |
| 149. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Shanti Corporation d/b/a Vijay Gold Designs | Consigned inventory | 9/17/13 | 201309170529052 | 8/7/18 | 201808070371826 |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 150. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Suberi Brothers, LLC | Consigned inventory | 3/12/13 | 201303125262415 | 3/12/18 | 201803125295476 |
| 151. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Aneri Jewels, L.L.C. | Consigned inventory | 9/17/14 | 201409175988722 | 12/10/15 | 201512106388702 |
| 152. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Sun Diamond, Inc. | Consigned inventory | 10/08/09 | 200910085908309 | 8/13/14 | 201408135861344 |
| 153. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Thompson Tractor Co., Inc. | Caterpillar tractor | 3/5/15 | 201503058082566 | N/A | N/A |
| 154. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Tiger Capital Group, LLC | Consigned inventory | 2/8/18 | 201802080062302 | N/A | N/A |
| 155. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Twentieth Century Fox Home Entertainment LLC | Consigned inventory | 4/27/17 | 201704270202869 | N/A | N/A |
| 156. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Vijaydimon (USA) Inc. | Consigned inventory | 6/22/15 | 201506220309221 | N/A | N/A |

| | Debtor | Place of Filing | Type of filing found | Secured Party | Collateral | Original File Date | Original File Number | Amendment /Continuation File Date | Amendment/Continuation File Number |
|---|---|---|---|---|---|---|---|---|---|
| 157. | Sears, Roebuck and Co. | NY Department of State | UCC-1 | Vijaydimon (USA) Inc. | Consigned inventory | 9/13/13 | 201309130523646 | 8/7/18 | 201808070371814 |

**<u>Schedule 1.1(k)</u>**

**Specified Receivables**

1.  See Annex 11, attached.

## **Schedule 1.1(l)**

**Warranty Receivables**

1. See Annex 12, attached.

**Schedule 1.1(m)**

**GOB Leases**

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 9711 | Russellville | AR | Lease |
| 1169 | Chandler | AZ | Lease |
| 1078 | Mesa/East | AZ | Lease |
| 1768 | Paradise Vly | AZ | Lease |
| 1708 | Phoenix-Desert Sky | AZ | Lease |
| 2047 | Sierra Vista | AZ | Lease |
| 4996 | Tucson | AZ | GL |
| 4996 | Tucson | AZ | GL |
| 2078 | Yuma | AZ | Lease |
| 9608 | Auburn | CA | Lease |
| 1318 | Bakersfield | CA | Lease |
| 3834 | Burbank | CA | Lease |
| 3834 | Burbank | CA | Lease |
| 1518 | Cerritos | CA | Lease |
| 3945 | Delano | CA | Lease |
| 1988 | El Centro | CA | Lease |
| 1408 | Florin | CA | Lease |
| 2298 | Merced | CA | Lease |
| 1618 | Modesto | CA | Lease |
| 2138 | Santa Barbara | CA | Lease |
| 1658 | Santa Rosa | CA | Lease |
| 3174 | Stockton | CA | Lease |
| 3828 | Temecula | CA | GL |
| 1221 | Chapel Hills | CO | Lease |
| 1221 | Chapel Hills | CO | Lease |
| 1111 | Colorado Springs | CO | GL |
| 1111 | Colorado Springs | CO | GL |
| 1071 | Lakewood | CO | Lease |

| | | | |
|---|---|---|---|
| 3216 | Vernon | CT | Lease |
| 1193 | Waterford | CT | Lease |
| 1755 | Boynton Beach | FL | Lease |
| 2565 | Bradenton | FL | Lease |
| 4893 | Ellenton | FL | Lease |
| 4893 | Ellenton | FL | Lease |
| 2315 | Jensen Bch(Stuart) | FL | Lease |
| 1955 | Lakeland | FL | Lease |
| 2245 | Melbourne | FL | Lease |
| 1006 | Ocala | FL | Lease |
| 2145 | Port Charlotte | FL | Lease |
| 2145 | Port Charlotte | FL | Lease |
| 1585 | Tallahassee | FL | GL |
| 1745 | Tampa/Westshore | FL | Lease |
| 2505 | Covington | GA | Lease |
| 2505 | Covington | GA | Lease |
| 2422 | Sioux City | IA | Lease |
| 9309 | Webster City | IA | Lease |
| 1229 | Boise | ID | Lease |
| 2278 | Idaho Falls | ID | Lease |
| 3371 | Chicago | IL | Lease |
| 1640 | Elk Grove Vlg | IL | GL |
| 1640 | Elk Grove Vlg | IL | GL |
| 1740 | Joliet | IL | Lease |
| 4297 | Mokena | IL | Lease |
| 2990 | Rockford-Cherryvale | IL | Lease |
| 2990 | Rockford-Cherryvale | IL | Lease |
| 9030 | Peru | IN | Lease |
| 9030 | Peru | IN | Lease |
| 1161 | Wichita-Town East | KS | GL |
| 1226 | Metairie | LA | Lease |

| 1226 | Metairie | LA | Lease |
|------|----------|----|----|
| 4810 | Metairie | LA | Lease |
| 4810 | Metairie | LA | Lease |
| 1403 | Natick | MA | Lease |
| 3256 | Baltimore | MD | Lease |
| 1424 | Bethesda | MD | Lease |
| 2034 | Bowie | MD | Lease |
| 1844 | Columbia | MD | Lease |
| 1773 | Prince Frederick | MD | Lease |
| 1773 | Prince Frederick | MD | Lease |
| 9521 | Madawaska | ME | Lease |
| 3380 | Waterville | ME | Lease |
| 1390 | Ann Arbor | MI | Lease |
| 1250 | Lincoln Park | MI | Lease |
| 1722 | Bloomington | MN | GL |
| 1112 | Minnetonka | MN | Lease |
| 4351 | Rochester | MN | Lease |
| 4351 | Rochester | MN | Lease |
| 1052 | St Paul | MN | Lease |
| 9353 | Crystal City | MO | Lease |
| 9353 | Crystal City | MO | Lease |
| 4304 | Florissant | MO | Lease |
| 9520 | Gulfport | MS | Lease |
| 9520 | Gulfport | MS | Lease |
| 2106 | Tupelo | MS | Lease |
| 3886 | Asheville | NC | Lease |
| 3886 | Asheville | NC | Lease |
| 1045 | Durham-Northgate | NC | Lease |
| 9619 | Morehead City | NC | Lease |
| 9619 | Morehead City | NC | Lease |
| 9549 | Morganton | NC | Lease |

| 9549 | Morganton | NC | Lease |
|------|-----------|-----|-------|
| 1375 | Winston Salem | NC | Lease |
| 4022 | Grand Forks | ND | Lease |
| 4022 | Grand Forks | ND | Lease |
| 9319 | Alliance | NE | Lease |
| 9319 | Alliance | NE | Lease |
| 2421 | Grand Island | NE | Lease |
| 1041 | Omaha | NE | GL |
| 2663 | Portsmouth | NH | Lease |
| 1464 | Deptford | NJ | Lease |
| 1574 | Middletown | NJ | Lease |
| 3071 | Toms River | NJ | Lease |
| 3071 | Toms River | NJ | Lease |
| 1287 | Coronado | NM | Lease |
| 1828 | Las Vegas | NV | GL |
| 1328 | Las Vegas(Blvd) | NV | Lease |
| 1328 | Las Vegas(Blvd) | NV | Lease |
| 9274 | Greenwich | NY | Lease |
| 9274 | Greenwich | NY | Lease |
| 7065 | Horseheads | NY | Lease |
| 9381 | Huntington | NY | Lease |
| 1414 | Nanuet | NY | Lease |
| 1894 | Rochester | NY | GL |
| 2173 | Saratoga | NY | Lease |
| 2683 | Watertown | NY | Lease |
| 7677 | Wellsville | NY | Lease |
| 1944 | Yorktown Hts | NY | Lease |
| 3013 | Cleveland | OH | Lease |
| 3013 | Cleveland | OH | Lease |
| 9096 | Fostoria | OH | Lease |
| 9096 | Fostoria | OH | Lease |

| 2001 | Piqua | OH | GL |
| 1210 | Polaris | OH | Lease |
| 2311 | Norman | OK | Lease |
| 1151 | Tulsa Woodland Hls | OK | Lease |
| 3839 | Corvallis | OR | Lease |
| 3839 | Corvallis | OR | Lease |
| 2179 | Medford | OR | Lease |
| 1079 | Washington Sq | OR | Lease |
| 2494 | Altoona | PA | Lease |
| 2494 | Altoona | PA | Lease |
| 7746 | Carlisle | PA | Lease |
| 4113 | Erie | PA | Lease |
| 4113 | Erie | PA | Lease |
| 1714 | Greensburg | PA | GL |
| 1644 | Lancaster | PA | GL |
| 4064 | North Versailles | PA | Lease |
| 3527 | Philadelphia | PA | Lease |
| 1484 | Reading | PA | Lease |
| 2074 | Stroudsburg | PA | Lease |
| 4858 | Caguas | PR | Lease |
| 3896 | San German | PR | Lease |
| 4490 | San Juan | PR | Lease |
| 2807 | Rock Hill | SC | Lease |
| 7043 | Rock Hill | SC | Lease |
| 7062 | Sumter | SC | Lease |
| 7062 | Sumter | SC | Lease |
| 4170 | Rapid City | SD | Lease |
| 4170 | Rapid City | SD | Lease |
| 1146 | Cordova | TN | Lease |
| 1386 | Goodlettsville | TN | GL |
| 2036 | Jackson | TN | Lease |

| 2036 | Jackson | TN | Lease |
|------|---------|-----|-------|
| 2156 | Maryville | TN | Lease |
| 2226 | Murfreesboro | TN | Lease |
| 9735 | Sevierville | TN | Lease |
| 9735 | Sevierville | TN | Lease |
| 1387 | Amarillo | TX | Lease |
| 1387 | Amarillo | TX | Lease |
| 1357 | Austin/Barton Creek | TX | Lease |
| 1080 | Frisco | TX | Lease |
| 1277 | Ingram | TX | Lease |
| 2147 | Irving | TX | Lease |
| 2487 | Killeen | TX | Lease |
| 2487 | Killeen | TX | Lease |
| 2557 | Longview | TX | Lease |
| 1247 | Lubbock | TX | Lease |
| 2637 | Port Arthur | TX | Lease |
| 1207 | Richardson | TX | Lease |
| 1227 | Southwest Ctr | TX | Lease |
| 1367 | Waco | TX | Lease |
| 1367 | Waco | TX | Lease |
| 2435 | Charlottesville | VA | Lease |
| 2435 | Charlottesville | VA | Lease |
| 1575 | Hampton | VA | Lease |
| 2329 | Kennewick(Pasco) | WA | Lease |
| 2329 | Richland | WA | Lease |
| 1130 | Janesville | WI | GL |
| 3692 | Oconomowoc | WI | Lease |
| 3692 | Oconomowoc | WI | Lease |
| 4188 | Charleston | WV | Lease |
| 4736 | Casper | WY | Lease |

**<u>Schedule 1.1(n)</u>**

**GOB Owned Stores**

| <u>Store #</u> | <u>City</u> | <u>State</u> |
|---|---|---|
| 1075 | Daytona Beach | FL |
| 2885 | Port Richey | FL |
| 1475 | Durham | NC |
| 2191 | Lincoln | NE |
| 1216 | Memphis/Southland | TN |
| 2092 | Appleton | WI |
| 4395 | Cudahy | WI |

**Schedule 1.1(o)**

**Operating Leases**

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 2027 | Wasilla | AK | GL |
| 8706 | Birmingham | AL | Lease |
| 2306 | Gadsden | AL | Lease |
| 49003 | Mobile | AL | Lease |
| 2796 | Tuscaloosa | AL | GL |
| 2126 | Hot Springs | AR | Lease |
| 8941 | Little Rock | AR | Lease |
| 1206 | North Little Rock | AR | Lease |
| 1798 | Glendale | AZ | Lease |
| 30938 | Glendale | AZ | Lease |
| 3707 | Lake Havasu City | AZ | Lease |
| 7088 | Mesa | AZ | Lease |
| 8778 | Phoenix | AZ | Lease |
| 2218 | Prescott | AZ | Lease |
| 5865 | Scottsdale | AZ | Lease |
| 61901 | Scottsdale | AZ | GL |
| 49028 | Tempe | AZ | Lease |
| 5880 | Tempe | AZ | Lease |
| 1728 | Tucson | AZ | GL |
| 49011 | Tucson | AZ | Lease |
| 8937 | Tucson | AZ | Lease |
| 5866 | Tucson (Marana) | AZ | Lease |
| 4762 | Antioch | CA | Lease |
| 7619 | Atascadero | CA | Lease |
| 1018 | Baldwin Hills | CA | Lease |
| 8901 | Benicia | CA | Lease |
| 7653 | Big Bear Lake | CA | Lease |
| 7756 | Bishop | CA | Lease |

| 1008 | Boyle | CA | Lease |
|------|-------|----|----|
| 1638 | Brea | CA | Lease |
| 1268 | Buena Park | CA | Lease |
| 1838 | Burbank | CA | GL |
| 7165 | Camarillo | CA | Lease |
| 1678 | Carlsbad | CA | GL |
| 3086 | Chico | CA | Lease |
| 1358 | Chula Vista | CA | Lease |
| 1098 | Clovis | CA | Lease |
| 1368 | Concord | CA | GL |
| 7098 | Concord | CA | Lease |
| 5798 | Concord-Mcphails | CA | Lease |
| 1388 | Costa Mesa | CA | Lease |
| 4047 | Costa Mesa | CA | Lease |
| 5382 | Costa Mesa | CA | Lease |
| 1309 | Downey | CA | GL |
| 2728 | Downey | CA | GL |
| 1758 | Escondido | CA | GL |
| 2628 | Eureka | CA | Lease |
| 3725 | Freedom | CA | GL |
| 1208 | Fresno | CA | Lease |
| 8366 | Fresno | CA | Lease |
| 8913 | Fresno | CA | Lease |
| 1088 | Glendale | CA | GL |
| 9746 | Grass Valley | CA | Lease |
| 2656 | Hanford | CA | Lease |
| 1248 | Hayward | CA | Lease |
| 4457 | Hayward | CA | GL |
| 5689 | Hayward | CA | Lease |
| 2028 | Hemet | CA | GL |
| 3748 | Hollister | CA | GL |

| 4819 | Lakeport | CA | Lease |
| 8258 | Lakewood | CA | Lease |
| 3982 | Lemoore | CA | Lease |
| 9328 | Long Beach | CA | GL |
| 8253 | Mcclellan | CA | Lease |
| 7390 | Mckinleyville | CA | Lease |
| 8868 | Milpitas | CA | Lease |
| 8780 | Mira Loma | CA | Lease |
| 8928 | Mira Loma(Jurupa Vl) | CA | Lease |
| 3345 | Modesto | CA | Lease |
| 1748 | Montclair | CA | Lease |
| 1998 | Montebello | CA | Lease |
| 1868 | Moreno Vly | CA | Lease |
| 1168 | No Hollywood | CA | Lease |
| 4421 | North Hollywood | CA | Lease |
| 1508 | Northridge | CA | Lease |
| 3842 | Oakdale | CA | Lease |
| 3483 | Ontario | CA | Lease |
| 8287 | Ontario | CA | Lease |
| 8729 | Ontario | CA | Lease |
| 1378 | Orange | CA | GL |
| 1968 | Palm Desert | CA | Lease |
| 2798 | Palm Desert | CA | GL |
| 9551 | Paradise | CA | Lease |
| 1048 | Pasadena | CA | GL |
| 3501 | Petaluma | CA | Lease |
| 3531 | Pinole | CA | Lease |
| 7471 | Placerville | CA | Lease |
| 1019 | Pleasanton | CA | Lease |
| 3678 | Ramona | CA | Lease |
| 5668 | Rancho Cordova | CA | Lease |

| 1818 | Rancho Cucamonga | CA | GL |
|---|---|---|---|
| 4349 | Redwood City | CA | Lease |
| 1298 | Riverside | CA | Lease |
| 4706 | Riverside | CA | Lease |
| 7175 | Riverside | CA | Lease |
| 5784 | Rohnert Park | CA | Lease |
| 8768 | Sacramento | CA | Lease |
| 1688 | Salinas | CA | Lease |
| 3412 | Salinas | CA | Lease |
| 1398 | San Bernardino | CA | Lease |
| 1478 | San Bruno | CA | Lease |
| 62529 | San Diego | CA | Lease |
| 8748 | San Diego | CA | Lease |
| 31882 | San Diego | CA | Lease |
| 5000 | San Francisco | CA | Lease |
| 8398 | San Jose | CA | Lease |
| 1488 | San Jose-Eastridge | CA | Lease |
| 30969 | San Leandro | CA | Lease |
| 5787 | San Rafael - Mcphails | CA | Lease |
| 8369 | Santa Ana | CA | Lease |
| 8808 | Santa Ana | CA | Lease |
| 5764 | Santa Clara | CA | Lease |
| 2088 | Santa Maria | CA | Lease |
| 7639 | Santa Paula | CA | Lease |
| 9797 | Scotts Valley | CA | GL |
| 9153 | South Lake Tahoe | CA | Lease |
| 1288 | Stockton | CA | GL |
| 8708 | Stockton | CA | Lease |
| 8758 | Sylmar | CA | Lease |
| 4751 | Tehachapi | CA | Lease |
| 1108 | Temecula | CA | Lease |

| 3127 | Temple City | CA | Lease |
| 1278 | Torrance | CA | GL |
| 2059 | Tracy | CA | Lease |
| 62538 | Tustin | CA | Lease |
| 3018 | Valencia | CA | Lease |
| 1148 | Ventura | CA | Lease |
| 2829 | Victorville | CA | Lease |
| 2068 | Visalia | CA | Lease |
| 9761 | Visalia | CA | Lease |
| 1189 | West Covina | CA | Lease |
| 3235 | West Covina | CA | Lease |
| 9489 | West Hills | CA | Lease |
| 1149 | Whittier | CA | Lease |
| 2238 | Yuba City | CA | Lease |
| 1141 | Aurora | CO | Lease |
| 8290 | Brighton | CO | Lease |
| 1131 | Centennial | CO | Lease |
| 4224 | Denver | CO | Lease |
| 1467 | Ft Collins | CO | GL |
| 7329 | Loveland | CO | Lease |
| 4453 | Pueblo | CO | Lease |
| 1303 | Danbury | CT | Lease |
| 1014 | Enfield | CT | Lease |
| 1134 | Milford | CT | Lease |
| 3495 | Milford | CT | Lease |
| 7109 | Watertown | CT | Lease |
| 4807 | Bear | DE | Lease |
| 4456 | Bridgeville | DE | Lease |
| 2654 | Dover | DE | Lease |
| 7725 | Rehoboth Beach | DE | Lease |
| 3873 | Wilmington | DE | Lease |

| 3317 | Boca Raton | FL | Lease |
| 5958 | Bonita Springs Showroom | FL | Lease |
| 6820 | Boynton Beach | FL | GL |
| 7321 | Bradenton | FL | Lease |
| 1007 | Brandon | FL | Lease |
| 2485 | Brooksville | FL | GL |
| 1125 | Coral Gables | FL | Lease |
| 1715 | Doral(Miami) | FL | Lease |
| 7067 | Fort Myers | FL | Lease |
| 1195 | Ft Lauderdale | FL | GL |
| 1495 | Ft Myers | FL | Lease |
| 5863 | Ft Myers | FL | Lease |
| 8972 | Ft Myers | FL | Lease |
| 8990 | Ft Pierce | FL | Lease |
| 3424 | Gainesville | FL | Lease |
| 1345 | Hialeah/Westland | FL | Lease |
| 3818 | Hollywood | FL | Lease |
| 425 | Jacksonville | FL | Lease |
| 7979 | Jacksonville | FL | Lease |
| 9614 | Key Largo | FL | Lease |
| 2215 | Key West | FL | Lease |
| 4725 | Key West | FL | Lease |
| 49012 | Lake Mary | FL | Lease |
| 3269 | Lantana | FL | Lease |
| 2745 | Leesburg | FL | Lease |
| 9224 | Marathon | FL | Lease |
| 3074 | Miami | FL | Lease |
| 3793 | Miami | FL | Lease |
| 4728 | Miami | FL | Lease |
| 8065 | Miami | FL | Lease |
| 5991 | Miami - Showroom | FL | Lease |

| 1365 | Miami/Cutler Rdg | FL | Lease |
|---|---|---|---|
| 2056 | Mry Est/Ft Wltn Bch | FL | Lease |
| 2695 | Naples | FL | Lease |
| 5237 | Oakland Park | FL | Lease |
| 8864 | Ocala | FL | Lease |
| 1456 | Oviedo | FL | GL |
| 1765 | Palm Beach Gardens | FL | GL |
| 2805 | Panama City | FL | Lease |
| 1775 | Pembroke Pines | FL | Lease |
| 31918 | Pembroke Pines | FL | Lease |
| 8066 | Pensacola | FL | Lease |
| 8957 | Pensacola | FL | Lease |
| 1205 | Pompano Beach | FL | Lease |
| 5962 | Pompano Beach | FL | Lease |
| 5976 | Sarasota | FL | Lease |
| 4355 | St. Petersburg | FL | Lease |
| 8815 | Sunrise | FL | Lease |
| 8895 | Tampa | FL | Lease |
| 1066 | The Avenues | FL | Lease |
| 7294 | Vero Beach | FL | Lease |
| 5959 | West Palm Bch | FL | Lease |
| 5185 | Winter Park | FL | Lease |
| 8825 | Winter Park | FL | Lease |
| 1385 | Atlanta | GA | Lease |
| 3713 | Covington | GA | Lease |
| 3978 | Peachtree City | GA | Lease |
| 8872 | Pendergrass | GA | Lease |
| 1305 | Savannah | GA | Lease |
| 8902 | Savannah | GA | Lease |
| 1578 | Aiea Oahu-Pearl Rdg | HI | Lease |
| 8049 | Hilo | HI | GL |

| 2388 | Hilo(Sur) | HI | Lease |
|---|---|---|---|
| 1681 | Honolulu | HI | Lease |
| 8158 | Honolulu | HI | GL |
| 2148 | Kahului Maui(Sur) | HI | GL |
| 1738 | Kaneohe(Sur) | HI | GL |
| 8818 | Pearl City | HI | GL |
| 9220 | Algona | IA | Lease |
| 7767 | Charles City | IA | Lease |
| 9222 | Cherokee | IA | Lease |
| 3447 | Clive | IA | Lease |
| 3097 | Council Bluffs | IA | Lease |
| 45113 | Des Moines | IA | Lease |
| 8711 | Boise | ID | Lease |
| 7033 | Lewiston | ID | Lease |
| 7006 | Twin Falls | ID | Lease |
| 8844 | Bloomington | IL | Lease |
| 4381 | Bridgeview | IL | Lease |
| 2936 | Chicago | IL | GL |
| 4214 | Des Plaines | IL | Lease |
| 8555 | Elk Grove Village | IL | Lease |
| 8730 | Granite City | IL | Lease |
| 8720 | Melrose Park | IL | Lease |
| 1212 | N Riverside | IL | Lease |
| 8262 | Naperville | IL | Lease |
| 1290 | Niles | IL | Lease |
| 9348 | Norridge | IL | Lease |
| 1300 | Oakbrook | IL | Lease |
| 4433 | Quincy | IL | Lease |
| 8871 | Romeoville | IL | Lease |
| 8934 | Romeoville | IL | Lease |
| 7289 | Steger | IL | Lease |

| 30936 | Tinley Park | IL | GL |
|---|---|---|---|
| 8017 | Elwood | IN | Lease |
| 9124 | Elwood | IN | Lease |
| 8013 | Fort Wayne | IN | Lease |
| 1830 | Ft Wayne | IN | Lease |
| 1470 | Greenwood | IN | Lease |
| 9354 | Griffith | IN | Lease |
| 3251 | Indianapolis | IN | GL |
| 8750 | Indianapolis | IN | Lease |
| 3823 | Jasper | IN | Lease |
| 7243 | Kokomo | IN | Lease |
| 7246 | Richmond | IN | Lease |
| 8014 | South Bend | IN | Lease |
| 2600 | Terre Haute | IN | Lease |
| 7042 | Valparaiso | IN | GL |
| 9122 | Warsaw | IN | Lease |
| 4215 | Kansas City | KS | Lease |
| 8273 | Lawrence | KS | Lease |
| 8420 | Olathe | KS | Lease |
| 7169 | Salina | KS | Lease |
| 8081 | Wichita | KS | Lease |
| 2546 | Bowling Green | KY | Lease |
| 3029 | Erlanger | KY | Lease |
| 7229 | Grayson | KY | Lease |
| 24015 | Louisville | KY | Lease |
| 8920 | Louisville | KY | Lease |
| 1790 | Louisville-Okolona | KY | Lease |
| 3941 | Russell Springs | KY | Lease |
| 7255 | Somerset | KY | Lease |
| 8896 | Gonzales | LA | Lease |
| 8736 | Harahan | LA | Lease |

| | | | |
|---|---|---|---|
| 7223 | Metairie | LA | Lease |
| 7104 | Acton | MA | Lease |
| 1213 | Auburn | MA | Lease |
| 3288 | Billerica | MA | Lease |
| 1283 | Braintree | MA | GL |
| 4407 | Brockton | MA | Lease |
| 1223 | Brockton-Westgate | MA | GL |
| 4444 | Fitchburg | MA | Lease |
| 1243 | Hanover | MA | Lease |
| 2323 | Hyannis | MA | Lease |
| 3040 | Hyannis | MA | Lease |
| 1133 | Leominster | MA | Lease |
| 2373 | No Dartmouth | MA | Lease |
| 1053 | Saugus | MA | Lease |
| 3486 | Somerville | MA | Lease |
| 9692 | Webster | MA | Lease |
| 8851 | Westwood | MA | Lease |
| 1725 | Annapolis | MD | Lease |
| 2823 | Baltimore/E Pt | MD | Lease |
| 1374 | Bel Air | MD | GL |
| 8814 | Columbia | MD | Lease |
| 2774 | Cumberland | MD | Lease |
| 7713 | Edgewater | MD | Lease |
| 2664 | Frederick | MD | Lease |
| 3131 | Frederick | MD | Lease |
| 1754 | Gaithersburg | MD | Lease |
| 1013 | Glen Burnie | MD | GL |
| 3172 | Hagerstown | MD | Lease |
| 3798 | Hyattsville | MD | Lease |
| 3654 | Oxon Hill | MD | Lease |
| 3807 | Prince Frederick | MD | Lease |

| 1304 | Silver Spring | MD | GL |
| 4399 | Silver Spring | MD | Lease |
| 7673 | Stevensville | MD | Lease |
| 2963 | Westminster | MD | Lease |
| 3021 | Auburn | ME | Lease |
| 7133 | Augusta | ME | Lease |
| 2203 | Brunswick | ME | Lease |
| 3155 | Belleville | MI | Lease |
| 3820 | Charlevoix | MI | Lease |
| 9557 | Grayling | MI | Lease |
| 3819 | Hastings | MI | Lease |
| 2050 | Jackson | MI | Lease |
| 3308 | Lake Orion | MI | Lease |
| 1170 | Lansing | MI | Lease |
| 8830 | Livonia | MI | Lease |
| 9693 | Marine City | MI | Lease |
| 3841 | Marshall | MI | Lease |
| 7031 | Menominee | MI | GL |
| 7068 | Midland | MI | Lease |
| 9593 | Oscoda | MI | Lease |
| 6232 | Roseville | MI | Lease |
| 8982 | Saginaw | MI | Lease |
| 3379 | Waterford Twp. | MI | Lease |
| 8949 | Wayland | MI | Lease |
| 1092 | Westland | MI | GL |
| 8134 | Wyoming | MI | Lease |
| 8162 | Eden Prairie | MN | Lease |
| 9689 | International Falls | MN | Lease |
| 3405 | Minneapolis | MN | GL |
| 3059 | St. Paul | MN | Lease |
| 30956 | West St. Paul | MN | GL |

| 7021 | Cape Girardeau | MO | Lease |
| 7323 | Fenton | MO | Lease |
| 1042 | Joplin | MO | GL |
| 3239 | Kansas City | MO | GL |
| 7324 | O'Fallon | MO | Lease |
| 8701 | Riverside | MO | Lease |
| 62707 | Springfield | MO | GL |
| 4026 | St. Joseph | MO | Lease |
| 7719 | Columbus | MS | Lease |
| 88776 | Olive Branch | MS | Lease |
| 9808 | Hamilton | MT | Lease |
| 7030 | Kalispell | MT | Lease |
| 4112 | Asheville | NC | Lease |
| 2105 | Burlington | NC | Lease |
| 8319 | Charlotte | NC | Lease |
| 8822 | Charlotte | NC | Lease |
| 7208 | Clemmons | NC | Lease |
| 1405 | Fayetteville | NC | Lease |
| 2225 | Goldsboro | NC | Lease |
| 1335 | Greensboro | NC | GL |
| 8704 | Greensboro | NC | Lease |
| 2755 | Jacksonville | NC | Lease |
| 3744 | Kill Devil Hills | NC | GL |
| 1646 | Pineville | NC | Lease |
| 3667 | Raleigh | NC | Lease |
| 4450 | Raleigh | NC | Lease |
| 7385 | Raleigh | NC | Lease |
| 3808 | Statesville | NC | Lease |
| 7626 | Waynesville | NC | Lease |
| 3116 | Wilmington | NC | Lease |
| 4272 | Bismarck | ND | Lease |

| 4057 | Fargo | ND | Lease |
|---|---|---|---|
| 4353 | Minot | ND | Lease |
| 45114 | Omaha | NE | Lease |
| 2023 | Concord | NH | Lease |
| 3175 | Hooksett | NH | Lease |
| 8703 | Kingston | NH | Lease |
| 2443 | Manchester | NH | Lease |
| 1313 | Nashua | NH | Lease |
| 1003 | Salem | NH | Lease |
| 4448 | Salem | NH | Lease |
| 7048 | West Lebanon | NH | Lease |
| 3438 | Avenel | NJ | Lease |
| 7177 | Belleville | NJ | Lease |
| 1204 | Freehold | NJ | Lease |
| 3393 | Glassboro | NJ | Lease |
| 1094 | Hackensack | NJ | GL |
| 1044 | Jersey Cty/Newport | NJ | GL |
| 3499 | Kearny | NJ | Lease |
| 1494 | Moorestown | NJ | GL |
| 78714 | Secaucus | NJ | Lease |
| 9463 | Somers Point | NJ | GL |
| 8835 | Swedesboro | NJ | Lease |
| 4478 | Trenton | NJ | Lease |
| 7602 | Wall | NJ | Lease |
| 8380 | Wall Township | NJ | Lease |
| 1434 | Wayne | NJ | Lease |
| 3056 | Wayne | NJ | Lease |
| 4470 | West Long Branch | NJ | Lease |
| 9413 | West Orange | NJ | Lease |
| 3202 | Westwood | NJ | Lease |
| 1684 | Woodbridge | NJ | GL |

| | | | |
|---|---|---|---|
| 8905 | Albuquerque | NM | Lease |
| 2597 | Farmington | NM | Lease |
| 7035 | Farmington | NM | Lease |
| 7016 | Hobbs | NM | Lease |
| 2527 | Las Cruces | NM | Lease |
| 3301 | Santa Fe | NM | Lease |
| 1709 | Henderson | NV | GL |
| 2754 | Henderson | NV | GL |
| 3592 | Las Vegas | NV | Lease |
| 5864 | Las Vegas | NV | Lease |
| 8970 | Las Vegas | NV | Lease |
| 1668 | Las Vegas(Meadows) | NV | Lease |
| 5779 | Reno - Mcphails | NV | Lease |
| 26741 | Amherst | NY | GL |
| 4741 | Batavia | NY | Lease |
| 9589 | Bath | NY | Lease |
| 3862 | Bohemia | NY | GL |
| 9423 | Bridgehampton | NY | Lease |
| 7654 | Bronx | NY | GL |
| 9420 | Bronx | NY | Lease |
| 1114 | Brooklyn | NY | GL |
| 3415 | Buffalo | NY | Lease |
| 1984 | Buffalo/Hamburg | NY | Lease |
| 8854 | Cheektowaga | NY | Lease |
| 2626 | College Point | NY | GL |
| 4871 | Farmingville | NY | GL |
| 2744 | Horseheads/Elmira | NY | GL |
| 2584 | Lakewood | NY | Lease |
| 9415 | Mahopac | NY | Lease |
| 1404 | Massapequa | NY | GL |
| 2741 | Massapequa | NY | GL |

| 4034 | Mattydale | NY | Lease |
|---|---|---|---|
| 8959 | Menands | NY | Lease |
| 7749 | New York | NY | Lease |
| 7777 | New York | NY | Lease |
| 2593 | Newburgh | NY | Lease |
| 4123 | Niagara Falls | NY | Lease |
| 1333 | Poughkeepsie | NY | GL |
| 8102 | Rochester | NY | Lease |
| 3600 | Schenectady | NY | Lease |
| 7676 | Sidney | NY | Lease |
| 1624 | Staten Island | NY | Lease |
| 8753 | Syosset | NY | Lease |
| 1924 | Valley Stream | NY | GL |
| 1584 | Victor | NY | Lease |
| 9392 | West Seneca | NY | Lease |
| 1674 | White Plains | NY | Lease |
| 9416 | White Plains | NY | Lease |
| 1733 | Yonkers | NY | Lease |
| 9414 | Yorktown Heights | NY | Lease |
| 7383 | Barberton | OH | Lease |
| 3286 | Brunswick | OH | Lease |
| 1410 | Canton | OH | Lease |
| 1810 | Cincinnati-Eastgate | OH | Lease |
| 8790 | Cleveland | OH | Lease |
| 8712 | Columbus | OH | Lease |
| 8862 | Columbus | OH | Lease |
| 1560 | Dayton Mall | OH | Lease |
| 7209 | East Liverpool | OH | Lease |
| 7595 | Gahanna | OH | Lease |
| 7397 | Grove City | OH | Lease |
| 30962 | Groveport | OH | Lease |

| | | | |
|---|---|---|---|
| 7644 | Harrison | OH | Lease |
| 1081 | Heath | OH | GL |
| 7477 | Marietta | OH | Lease |
| 4257 | Middleburg Heights | OH | Lease |
| 8918 | Monroe | OH | Lease |
| 1564 | Niles | OH | Lease |
| 3243 | North Canton | OH | Lease |
| 3243 | North Canton | OH | Lease |
| 1280 | Springdale | OH | GL |
| 2104 | St Clairsville | OH | Lease |
| 3142 | Tallmadge | OH | Lease |
| 4782 | Clinton | OK | Lease |
| 8931 | Oklahoma City | OK | Lease |
| 4363 | Tulsa | OK | Lease |
| 4455 | Beaverton | OR | Lease |
| 8883 | Eugene | OR | Lease |
| 1119 | Happy Valley | OR | Lease |
| 8228 | Portland | OR | Lease |
| 8841 | Portland | OR | Lease |
| 2715 | Salem | OR | Lease |
| 2119 | Salem(Lancaster) | OR | Lease |
| 3888 | The Dalles | OR | Lease |
| 3361 | Allentown | PA | Lease |
| 8744 | Allentown | PA | Lease |
| 4150 | Altoona | PA | Lease |
| 8875 | Altoona | PA | Lease |
| 1454 | Bensalem/Crnwls Hts | PA | Lease |
| 9161 | Berwick | PA | Lease |
| 24411 | Bridgeville | PA | Lease |
| 1711 | Camp Hill | PA | Lease |
| 3225 | Chambersburg | PA | Lease |

| 8781 | Chambersburg | PA | Lease |
|------|--------------|----|----|
| 7293 | Clifton Heights | PA | Lease |
| 3911 | Columbia | PA | Lease |
| 3737 | Doylestown | PA | Lease |
| 2124 | Dubois | PA | Lease |
| 7192 | Easton | PA | Lease |
| 3266 | Edwardsville | PA | Lease |
| 3963 | Elizabethtown | PA | Lease |
| 9662 | Ephrata | PA | Lease |
| 1073 | Exton | PA | GL |
| 8873 | Gouldsboro | PA | Lease |
| 2244 | Hanover | PA | Lease |
| 3597 | Holmes | PA | Lease |
| 7470 | Hummelstown | PA | Lease |
| 1064 | Langhrn/Oxford Vly | PA | Lease |
| 7699 | Lebanon | PA | Lease |
| 7372 | Leechburg | PA | Lease |
| 3884 | Matamoras | PA | Lease |
| 1654 | Media | PA | GL |
| 433 | Middletown | PA | Lease |
| 8275 | Morrisville | PA | Lease |
| 7083 | New Castle | PA | Lease |
| 4054 | New Kensington | PA | Lease |
| 1834 | North Wales | PA | GL |
| 9409 | Phoenixville | PA | Lease |
| 4010 | Pittsburgh | PA | Lease |
| 8724 | Pittsburgh | PA | Lease |
| 9438 | Pleasant Hills | PA | Lease |
| 1034 | Ross Park | PA | Lease |
| 8976 | Royersford | PA | Lease |
| 3136 | Shillington | PA | Lease |

| 2605 | State College | PA | Lease |
|------|---------------|-----|-------|
| 8962 | Steelton | PA | Lease |
| 9539 | Thorndale | PA | Lease |
| 4713 | Towanda | PA | Lease |
| 3954 | Walnutport | PA | Lease |
| 2114 | Washington | PA | Lease |
| 7374 | West Chester | PA | Lease |
| 1154 | Whitehall | PA | Lease |
| 443 | Wilkes-Barre[1] | PA | Lease |
| 3268 | Wilkes-Barre | PA | Lease |
| 3390 | Williamsport | PA | Lease |
| 3810 | Willow Street | PA | Lease |
| 3949 | Wind Gap | PA | Lease |
| 4732 | Aguadilla | PR | Lease |
| 7566 | Arecibo | PR | Lease |
| 1915 | Bayamon | PR | GL |
| 7570 | Bayamon | PR | Lease |
| 7788 | Bayamon | PR | Lease |
| 1085 | Caguas | PR | Lease |
| 7419 | Caguas | PR | Lease |
| 1925 | Carolina | PR | Lease |
| 7665 | Carolina | PR | Lease |
| 7446 | Cayey | PR | Lease |
| 2085 | Fajardo | PR | Lease |
| 2675 | Guayama | PR | Lease |
| 7768 | Guaynabo | PR | Lease |
| 2355 | Hatillo(Arecibo) | PR | GL |
| 1905 | Hato Rey | PR | GL |
| 7783 | Hato Rey | PR | GL |
| 7842 | Hato Rey | PR | Lease |

---

[1] **Note to Draft**: This store will be a GOB store as of Closing.

WEIL:\96826275\11\73217.0003

| | | | |
|---|---|---|---|
| 3993 | Juana Diaz | PR | Lease |
| 1935 | Mayaguez | PR | GL |
| 1935 | Mayaguez | PR | Lease |
| 3882 | Mayaguez | PR | Lease |
| 2385 | Naranjito | PR | Lease |
| 1945 | Ponce | PR | Lease |
| 1945 | Ponce | PR | Lease |
| 7741 | Ponce | PR | Lease |
| 4844 | Rio Piedras | PR | Lease |
| 4494 | Trujillo Alto | PR | Lease |
| 7784 | Vega Alta | PR | Lease |
| 7752 | Yauco | PR | Lease |
| 4016 | Greenville | SC | Lease |
| 8846 | Greenville | SC | Lease |
| 8858 | Ladson | SC | Lease |
| 7616 | Lexington | SC | Lease |
| 7274 | Mauldin | SC | Lease |
| 4141 | West Columbia | SC | Lease |
| 7241 | Bartlett | TN | Lease |
| 1115 | Chattanooga | TN | Lease |
| 8037 | Chattanooga | TN | Lease |
| 2335 | Clarksville | TN | Lease |
| 2265 | Johnson City | TN | Lease |
| 7460 | Knoxville | TN | Lease |
| 8947 | Knoxville | TN | Lease |
| 9621 | Lebanon | TN | Lease |
| 8756 | Memphis | TN | Lease |
| 8206 | Nashville | TN | Lease |
| 1395 | West Town | TN | Lease |
| 1137 | Austin | TX | Lease |
| 1327 | Baytown | TX | Lease |

| | | | |
|---|---|---|---|
| 30954 | Brownsville | TX | Lease |
| 8870 | Dallas | TX | Lease |
| 1317 | El Paso | TX | Lease |
| 8021 | El Paso | TX | Lease |
| 8907 | Garland | TX | Lease |
| 8807 | Grapevine | TX | Lease |
| 2537 | Harlingen | TX | Lease |
| 4389 | Mcallen | TX | Lease |
| 7972 | Mcallen | TX | Lease |
| 1067 | Memorial | TX | Lease |
| 8922 | Pflugersville | TX | Lease |
| 1629 | Pharr | TX | Lease |
| 1097 | San Antonio | TX | Lease |
| 8747 | San Antonio | TX | Lease |
| 9507 | San Antonio | TX | Lease |
| 1127 | Shepherd | TX | Lease |
| 2077 | Tyler | TX | Lease |
| 2617 | Victoria | TX | Lease |
| 8948 | Salt Lake Cty | UT | Lease |
| 9794 | St. George | UT | Lease |
| 1888 | West Jordan | UT | Lease |
| 1284 | Alexandria | VA | Lease |
| 3471 | Chesapeake | VA | Lease |
| 8838 | Chesapeake | VA | Lease |
| 1274 | Chesterfield | VA | GL |
| 8823 | Dulles | VA | Lease |
| 1814 | Fairfax | VA | Lease |
| 1024 | Falls Church | VA | Lease |
| 2694 | Fredericksburg | VA | Lease |
| 2395 | Manassas | VA | GL |
| 8836 | Richmond | VA | Lease |

| | | | |
|---|---|---|---|
| 7415 | Springfield | VA | Lease |
| 3785 | Tabb | VA | Lease |
| 7717 | Waynesboro | VA | Lease |
| 7259 | Williamsburg | VA | Lease |
| 2784 | Winchester | VA | Lease |
| 7413 | Frederiksted | VI | Lease |
| 3972 | St. Croix | VI | Lease |
| 3829 | St. Thomas | VI | Lease |
| 7793 | St. Thomas | VI | Lease |
| 1463 | Burlington | VT | GL |
| 45061 | Colchester | VT | Lease |
| 3133 | Bellingham | WA | Lease |
| 2049 | Everett | WA | Lease |
| 8709 | Kent | WA | Lease |
| 8897 | Kent | WA | Lease |
| 2330 | Puyallup | WA | Lease |
| 36692 | Seattle | WA | Lease |
| 8004 | Spokane | WA | Lease |
| 9480 | Spokane | WA | Lease |
| 1139 | Tukwila | WA | GL |
| 2029 | Union Gap | WA | GL |
| 7034 | Walla Walla | WA | Lease |
| 8968 | Janesville | WI | Lease |
| 7648 | Mauston | WI | Lease |
| 8220 | New Berlin | WI | Lease |
| 3851 | Racine | WI | Lease |
| 7649 | Ripon | WI | Lease |
| 3750 | Waupaca | WI | Lease |
| 8782 | Waupaca | WI | Lease |
| 6375 | Bridgeport | WV | Lease |
| 4442 | Charleston | WV | Lease |

| 3484 | Elkview | WV | Lease |
|------|---------|----|----|
| 3724 | Scott Depot | WV | Lease |
| 2304 | Westover/Morgantown | WV | Lease |
| 2341 | Casper | WY | Lease |
| 7139 | Jackson | WY | Lease |

**Schedule 1.1(p)**

**Operating Owned Properties**

| Store# | City | State |
|--------|------|-------|
| 8722 | Anchorage(Sur) | AK |
| 8106 | Birmingham | AL |
| 1136 | Riverchase | AL |
| 30957 | Springdale | AR |
| 68235 | Phoenix | AZ |
| 1588 | Phoenix-Metro Ctr | AZ |
| 2288 | Antioch | CA |
| 1598 | City of Industry | CA |
| 449 | Delano | CA |
| 4857 | Desert Hot Springs | CA |
| 8038 | El Cajon | CA |
| 1209 | Long Beach | CA |
| 1068 | Palmdale | CA |
| 3368 | Redlands | CA |
| 1788 | Richmond | CA |
| 8098 | San Bernardino | CA |
| 3968 | Wasco | CA |
| 2451 | Greeley | CO |
| 1271 | Littleton/Denver | CO |
| 1443 | Manchester | CT |
| 1853 | Wilmington | DE |
| 1255 | Citrus Park | FL |
| 1055 | Coral Springs | FL |
| 31930 | Hialeah | FL |
| 7435 | Hialeah | FL |
| 1635 | Jacksonville | FL |
| 4019 | Melbourne | FL |
| 1175 | Merritt Island | FL |
| 8292 | Ocala | FL |

| | | |
|---|---|---|
| 1485 | Orange Pk | FL |
| 1285 | Orlando-South | FL |
| 1555 | Sanford | FL |
| 2135 | Sebring | FL |
| 8245 | Seminole | FL |
| 1015 | Vero Beach | FL |
| 2815 | Albany | GA |
| 2065 | Brunswick | GA |
| 8035 | College Park | GA |
| 3978 | Peachtree City | GA |
| 7705 | Tamuning | GU |
| 7439 | Council Bluff | IA |
| 61510 | Calumet City | IL |
| 26987 | Chicago | IL |
| 30920 | Chicago | IL |
| 61030 | Chicago | IL |
| 2632 | Fairview Hts | IL |
| 490 | Hoffman Est | IL |
| 30927 | Macomb | IL |
| 470 | Manteno | IL |
| 8289 | Manteno | IL |
| 30900 | New Lenox | IL |
| 31914 | Round Lake Beach | IL |
| 31900 | Sterling | IL |
| 26185 | Clarksville | IN |
| 61540 | Indianapolis | IN |
| 8171 | Overland Park | KS |
| 3433 | Holyoke | MA |
| 9255 | Palmer | MA |
| 1093 | Springfield | MA |
| 6303 | Bangor | ME |

| | | |
|---|---|---|
| 2183 | So Portland | ME |
| 9385 | Clio | MI |
| 1100 | Flint | MI |
| 30918 | Jackson | MI |
| 1460 | Livonia | MI |
| 1590 | Saginaw | MI |
| 38480 | Troy | MI |
| 4206 | Warren | MI |
| 1032 | Brooklyn Center | MN |
| 2500 | Duluth | MN |
| 1121 | Independence | MO |
| 61106 | Jackson | MS |
| 30949 | Natchez | MS |
| 3213 | Southaven | MS |
| 2242 | Billings | MT |
| 30961 | Greensboro | NC |
| 30961 | Greensboro | NC |
| 1744 | Ocean | NJ |
| 2374 | Vineland | NJ |
| 6298 | Sparks | NV |
| 1353 | De Witt/Syracuse | NY |
| 4726 | Jamestown | NY |
| 1364 | Lake Grove | NY |
| 1514 | Niagara Falls | NY |
| 8254 | Rochester | NY |
| 26731 | Dublin | OH |
| 1370 | Eastland | OH |
| 2940 | Franklin | OH |
| 1610 | Northgate | OH |
| 8305 | Warren | OH |
| 1261 | Midwest City | OK |

| | | |
|---|---|---|
| 1224 | Harrisburg | PA |
| 1863 | Johnstown | PA |
| 1293 | Robinson Twp | PA |
| 1354 | Willow Grove | PA |
| 9394 | Fajardo | PR |
| 3853 | Guayama | PR |
| 8935 | Rio Piedras | PR |
| 8975 | Rio Piedras | PR |
| 1795 | Myrtle Beach | SC |
| 30941 | Sioux Falls | SD |
| 1675 | Knoxville East Town | TN |
| 30934 | Memphis | TN |
| 26596 | Memphis/Hickory | TN |
| 1437 | Arlington/Parks | TX |
| 8247 | Dickinson | TX |
| 61237 | Houston | TX |
| 6874 | Houston | TX |
| 8137 | Houston | TX |
| 8167 | Houston | TX |
| 49027 | Round Rock | TX |
| 2332 | San Antonio | TX |
| 1023 | Loudoun/Dulles | VA |
| 26717 | Newport News | VA |
| 1974 | Roanoke | VA |
| 3544 | Salem | VA |
| 8345 | Virginia Beach | VA |
| 2299 | Aberdeen | WA |
| 3722 | Burlington | WA |
| 6579 | Spokane | WA |
| 3088 | Kenosha | WI |
| 2432 | La Crosse | WI |

| 2232 | Madison-East | WI |
|------|--------------|-----|
| 8725 | Vandenbroek | WI |
| 1804 | Barboursville | WV |

WEIL:\96826275\11\73217.0003

**Schedule 1.1(q)**

**Sparrow Properties**

| Store # | City | State |
|---------|------|-------|
| 1228 | Arden | CA |
| 1281 | Pueblo | CO |
| 1831 | Thornton | CO |
| 1043 | Meriden | CT |
| 1263 | Waterbury | CT |
| 2845 | Athens | GA |
| 1035 | Augusta | GA |
| 1095 | Douglasville | GA |
| 1155 | Kennesaw | GA |
| 1565 | Morrow(Southlake) | GA |
| 8755 | Tucker | GA |
| 2760 | Davenport | IA |
| 1012 | Des Moines | IA |
| 1172 | Bloomingdale | IL |
| 1840 | Chicago Ridge | IL |
| 1321 | Peoria | IL |
| 2121 | Peru | IL |
| 2360 | Quincy | IL |
| 1570 | Schaumburg | IL |
| 1780 | Springfield | IL |
| 1820 | West Dundee | IL |
| 1600 | Indianapolis | IN |
| 1680 | Indianapolis | IN |
| 1650 | Merrillville | IN |
| 2290 | Michigan City | IN |
| 1800 | Mishawaka | IN |
| 1642 | Topeka | KS |
| 1730 | Florence | KY |
| 2087 | Alexandria | LA |

| | | |
|---|---|---|
| 1086 | Baton Rouge | LA |
| 1147 | Baton Rouge | LA |
| 2677 | Bossier City | LA |
| 1116 | Monroe | LA |
| 1077 | Shreveport | LA |
| 1223 | Brockton-Westgate | MA |
| 1104 | Marlborough | MA |
| 1033 | N Attleboro | MA |
| 2934 | Taunton | MA |
| 1634 | Baltimore-West | MD |
| 1854 | Parkville | MD |
| 1074 | Waldorf | MD |
| 2040 | Battle Creek | MI |
| 1700 | Dearborn | MI |
| 1011 | Grandville | MI |
| 9693 | Marine City | MI |
| 1192 | Muskegon | MI |
| 1760 | Novi | MI |
| 1110 | Portage | MI |
| 1720 | Sterling Hts | MI |
| 2180 | Traverse City | MI |
| 1092 | Westland | MI |
| 8702 | Minneapolis | MN |
| 1822 | Cape Girardeau | MO |
| 1042 | Joplin | MO |
| 1171 | Springfield | MO |
| 1182 | St Peters | MO |
| 1222 | St. Louis | MO |
| 1306 | Hattiesburg | MS |
| 1166 | Meridian | MS |
| 1165 | Concord | NC |

| | | |
|---|---|---|
| 2175 | Greenville | NC |
| 2515 | Hickory | NC |
| 1605 | Raleigh | NC |
| 1712 | Grand Forks | ND |
| 1022 | Oakview | NE |
| 1734 | Lawrenceville | NJ |
| 1614 | Livingston | NJ |
| 1554 | Mays Landing | NJ |
| 1314 | New Brunswick | NJ |
| 1764 | Rockaway | NJ |
| 1717 | Albuquerque | NM |
| 2010 | Mansfield | OH |
| 1710 | No Olmsted | OH |
| 2390 | Springfield | OH |
| 1051 | Strongsville | OH |
| 1120 | Tuttle Crossing | OH |
| 2305 | Anderson | SC |
| 1595 | Greenville | SC |
| 1545 | Spartanburg | SC |
| 1315 | Chattanooga | TN |
| 1307 | Abilene | TX |
| 1487 | Austin | TX |
| 1407 | Beaumont | TX |
| 2497 | Brownsville | TX |
| 2547 | College Station | TX |
| 1217 | Corpus Christi | TX |
| 2587 | Denton | TX |
| 1027 | El Paso | TX |
| 1317 | El Paso | TX |
| 1267 | Fort Worth | TX |
| 8217 | Fort Worth | TX |

| 8717 | Houston | TX |
|------|---------|-----|
| 1447 | Hulen | TX |
| 1417 | Humble | TX |
| 1297 | Hurst | TX |
| 2247 | Laredo | TX |
| 1187 | Mesquite-Town East | TX |
| 1176 | Pasadena | TX |
| 1427 | Rolling Oaks | TX |
| 8147 | San Antonio | TX |
| 2197 | Texas City | TX |
| 1377 | Willowbook | TX |
| 1038 | E Valley | WA |
| 2219 | Lacey/Olympia | WA |
| 2309 | Silverdale | WA |
| 1029 | Spokane | WA |
| 1139 | Tukwila | WA |
| 2029 | Union Gap | WA |

## Schedule 2.1(a)

### Acquired Intellectual Property[2]

### Schedule 2.1(a)(i) - Trademarks

1.  See Annex 1, attached.

### Schedule 2.1(a)(ii) – Business Names

1.  See Annex 2, attached.

### Schedule 2.1(a)(iii) - Patents

1.  See Annex 3, attached.

### Schedule 2.1(a)(iv) - Copyrights

1.  See Annex 4, attached.

### Schedule 2.1(a)(v) – Domain Names

1.  See Annex 5, attached.

### Schedule 2.1(a)(vi) – Media Accounts

**Facebook**

https://www.facebook.com/sears
https://www.facebook.com/kmart
https://www.facebook.com/shopyourway/
https://www.facebook.com/searsauto/
https://www.facebook.com/SearsHomeServices
https://www.facebook.com/SearsPartsDirect
https://www.facebook.com/kenmore/
https://www.facebook.com/DieHard/

**Instagram**

https://www.instagram.com/kenmoreappliances/
https://www.instagram.com/sears/

---

[2] **Note to Draft**: Each of the items of Intellectual Property in *each of the tabs* of Annex 1, Annex 2, Annex 3, Annex 4 and Annex 5 shall be included in the Acquired Intellectual Property.

https://www.instagram.com/kmart/
https://www.instagram.com/shopyourway/
https://www.instagram.com/searsauto/
https://www.instagram.com/searsholdings/

**LinkedIn**

https://www.linkedin.com/company/sears-roebuck-and-co./
https://www.linkedin.com/company/kmart/
https://www.linkedin.com/company/shop-yourway/
https://www.linkedin.com/company/sears-auto-centers/
https://www.linkedin.com/company/sears-home-services/
https://www.linkedin.com/company/innovel-solutions/
https://www.linkedin.com/company/sears-holdings-corporation/

**Pinterest**

https://www.pinterest.com/Sears/
https://www.pinterest.com/Kmart/
https://www.pinterest.com/searshomeexpert/
https://www.pinterest.com/Kenmore/

**Twitter**

https://twitter.com/sears
https://twitter.com/kmart
https://twitter.com/ShopYourWay
https://twitter.com/SearsAuto
https://twitter.com/SearsHomeExpert
https://twitter.com/partsdirect
https://twitter.com/SearsHoldings
https://twitter.com/SearsOutlet
https://twitter.com/SearsCares
https://twitter.com/KmartCares
https://twitter.com/SearsDeals
https://twitter.com/KmartDeals
https://twitter.com/kenmore
https://twitter.com/DieHardBattery

**YouTube**

https://www.youtube.com/user/Sears
https://www.youtube.com/user/Kmart
https://www.youtube.com/user/shopyourway
https://www.youtube.com/user/SearsAuto

https://www.youtube.com/user/SearsHomeService
https://www.youtube.com/channel/UCyneGks78mAm0QCLMPTmAaA
https://www.youtube.com/user/SearsHoldingsVideo
https://www.youtube.com/user/Kenmore
https://www.youtube.com/user/diehard

All social media handles and other social media identifiers for the foregoing social media accounts (e.g., @Sears) are hereby incorporated.

**Schedule 2.1(q)**

**Proceeds Properties**

**INSURED:  Sears Holdings Corporation**
**POLICY TERM: 6/1/17 - 6/1/18**
**DOL: 9-20-2017**
**Loss:  Hurricane Maria, CAT 1745**
**VERICLAIM FILE NO.:**
**CHI17212330**

| Market | Claim Number | Market % |
|--------|--------------|----------|
| AWAC BDA | P003839/014-001 | 13.33% |
| AWAC BDA | P003839/014-001 | 5.00% |
| Swiss Re - Westport Ins | 20171206974 | 8.00% |
| HDI | 01-837-02583-17-4 | 2.50% |
| Aspen | PX1770028710 | 1.67% |
| Lex London | 8923459439US | 8.50% |
| Starr | STP8920 | 5.00% |
| Liberty | 991898300 | 4.00% |
| Zurich | 5630011962 | 10.00% |
| Tokio Marine | PR0000128103 | 4.00% |
| Chubb | KY17K22945X | 12.00% |
| Ironshore | PRP00066862 | 2.50% |
| Novae BDA | B10114017ADFRTAA | 3.00% |
| Ascot Syn 1414 (Lloyds) | PTNAM1701559 | 8.00% |
| MSP Syn 318 (Lloyds) | PTNAM1701562 | 7.50% |
| Markel Syn 3000 (Lloyds) | PTNAM1701122 | 3.00% |
| (Endurance Syn 5151  Lloyds) | 10130927 | 1.20% |
| Endurance | 10130927 | 0.80% |
| **Total** | | **100.00%** |

**<u>Schedule 2.7(a)</u>**

**Potential Transferred Agreements**

[To be provided by Sellers within 5 Business Days of signing.]

103

## Schedule 6.1

**Organization and Good Standing**

1. None.

WEIL:\96826275\11\73217.0003

## Schedule 6.2

### Authority; Validity; Consents

1. Approval of the Bermuda Monetary Authority is required for Sears Reinsurance Company, Ltd. to be able to provide its consent.

2. Sears Protection Company Florida may require approval from the Florida Insurance Company Agency.

3. Any approval required under or related to the transfer of the Acquired Foreign Assets or the equity in any Foreign Subsidiary.

4. Any approval required from any Governmental Authority under the following contracts:

    a. Ecom – Illinois Department of Commerce and Economic Opportunity – Edge Tax Credit Agreement, dated as of October 26, 2012, by and between Sears Holdings Management Corporation and Illinois Department of Commerce and Economic Opportunity.

    b. Sears Commercial – Michigan State University – 1855 Place-Sales Order, by and between Sears, Roebuck and Co. and Michigan State University.

    c. Sears Commercial – Michigan State University – B2 & C2 Contract Rider, by and between Sears, Roebuck and Co. and Michigan State University.

    d. Sears Commercial – Michigan State University – D1 & D2 Sales Order, by and between Sears, Roebuck and Co. and Michigan State University.

    e. Sears Commercial – Michigan State University – 1855 Place Phase II B1 & C1 – Sales Order, by and between Sears, Roebuck and Co. and Michigan State University.

    f. Sears Commercial – Michigan State University – A Bldg. – Sales Order, by and between Sears, Roebuck and Co. and Michigan State University.

    g. Request for Proposals, by and between Innovel Solutions, Inc. and Navy Exchange Service Command, as amended.

    h. Request for Proposals, by and between Sears Holdings Corporation and Navy Exchange Service Command, as amended.

    i. Request for Proposals, by and between Sears Holdings Management Corporation and Navy Exchange Service Command, as amended.

    j. Use and Dissemination Agreement, dated as of July 19, 2018, by and between Sears Holdings Management Corporation and New York State Division of Criminal Justice Services.

    k. Master Lease, by and between Sears Holdings Management Corporation and Ohio Teachers Retirement.

    l. Sales Order, by and between Sears, Roebuck and Co. and Portland Community Housing.

    m. Agreement, by and between Sears, Roebuck and Co. and State of Illinois, Department of Transportation.

    n. Offshore Department of Economic Development and Commerce Weatherization Assistance Program and Liheap Weatherization Assistance Program, by and between Sears, Roebuck de Puerto Rico and State Office of Energy Policy of Puerto Rico.

    o. Sales Order, by and between Sears, Roebuck and Co. and The University of Mexico.

WEIL:\96826275\11\73217.0003

p.  Services Agreement, dated as of August 8, 2020, by and between Sears Holdings Management Corporation and United States Postal Service.

q.  2016 Sears Naming Rights Agreement, by and between Sears, Roebuck and Co. and Village of Hoffman Estates.

r.  2016 Sears Naming Rights Agreement, dated as of April 27, 2016, by and between Sears, Roebuck and Co. and Village of Hoffman Estates.

s.  Renewal Application for Lottery Retailer's License, dated as of June 22, 2016, by and between Kmart Corporation and Arizona Lottery, as amended.

t.  Arkansas Scholarship Lottery Retailer Contract, dated as of February 8, 2016, by and between Kmart Corporation and Office of the Arkansas Lottery, as amended.

u.  Delaware State Lottery Retailer Agreement, dated as of October 1, 2010, by and between Kmart Corporation and Delaware State Lottery.

v.  Retailer Contract, dated as of March 21, 2016, by and between Kmart Corporation and Florida Lottery.

w.  Retailer Contract, dated as of December 28, 1994, by and between Kmart Corporation and Georgia Lottery Corporation.

x.  Idaho Lottery Retailer Contract, dated as of November 19, 2012, by and between Kmart Corporation and Idaho State Lottery.

y.  Retailer Agreement for the Sale of Lottery Products, dated as of September 30, 2013, by and between Kmart Corporation and State Lottery Commission of Indiana.

z.  Kansas Lottery – Retailer All Games Contract, dated as of September 10, 2013, by and between Kmart Corporation and Kansas Lottery, as amended.

aa.  Kentucky Lottery Retailer License Agreement, dated as of May 19, 2017, by and between Kmart Corporation and Kentucky Lottery Corporation.

bb.  Maine State Lottery Application to Sell Lottery Tickets, dated as of June 15, 2012, by and between Kmart Corporation and Maine State Lottery, as amended.

cc.  [Retailer Lottery License], dated as of June 12, 2017, by and between Kmart Corporation and State of Michigan – Bureau of State Lottery.

dd.  Minnesota State Lottery Retailer Contract for Chain Accounts, dated as of November 15, 2016, by and between Kmart Corporation and Minnesota State Lottery.

ee.  Missouri Lottery Contract Agreement, dated as of November 7, 2016, by and between Kmart Corporation and Missouri Lottery.

ff.  Master Corporate Conditions of Licensing, dated as of December 11, 2013, by and between Kmart Corporation and Montana Lottery.

gg.  New Mexico Lottery Retailer Contract, dated as of June 12, 2015, by and between Kmart Corporation and New Mexico Lottery Authority, as amended.

hh.  New York Lottery Retailer License Agreement, dated as of September 12, 2016, by and between Kmart Operations, LLC and New York State Division of the Lottery.

ii.  North Carolina Education Lottery Retailer Agreement, dated as of May 7, 2008, by and between Kmart Corporation and North Carolina Education Lottery, as amended.

106

jj. Retailer Contract, dated as of December 18, 2003, by and between Kmart Corporation and Tennessee Lottery Corporation.

kk. Virginia Lottery Retailer Contract, dated as of March 7, 2000, by and between Kmart Corporation and Lottery Commonwealth of Virginia – State Lottery Department.

ll. Lottery Retailer Contract Terms and Conditions – Renewal Application, dated as of December 27, 2016, by and between Kmart Corporation and Wisconsin Department of Revenue – Lottery Division.

mm. Nondisclosure Agreement, dated as of August 23, 2017, by and between Sears Holding Management Corporation and United States Postal Service, as amended.

nn. 2016 Sears Naming Rights Agreement, dated as of May 9, 2016, by and between Sears, Roebuck and Co. and Village of Hoffman Estates.

oo. Use & Dissemination Agreement, dated as of August 31, 2018, by and between NYS Division of Criminal Justice Services and Sears Holdings.

pp. Edge Tax Credit Agreement, dated as of October 26, 2012, by and between the State of Illinois, acting by and through its Department of Commerce and Economic Opportunity, and Sears Holdings Management Corporation.

5. Collective Bargaining Agreement between Sears, Roebuck and Co. Detroit, MI and Teamsters Local Union No. 243 (Livonia, MI) requires that prior to the conclusion of any sale, conveyance, assignment, or transfer of operations the Employer provide the Union sixty (60) days advance written notice.

6. Collective Bargaining Agree between Sears, Roebuck and Co. and Teamsters Local Union No. 243 (Detroit, MI) requires that prior to the conclusion of any sale, transaction, conveyance, assignment, or transfer of operations the Employer provide the Union thirty (30) days advance written notice.

7. Superpriority Junior Lien Secured Debtor-in-Possession Credit Agreement, dated November 29, 2018, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the several banks, financial institutions or entities from time to time party thereto as term lenders, and Cantor Fitzgerald Securities, as administrative agent.

8. Debtor-in-Possession Guarantee and Collateral Agreement, dated November 29, 2018, by and among Sears Holdings Corporation, Sears Roebuck and Co., Sears Roebuck Acceptance Corp., Kmart Holding Corporation, Kmart Corporation and Cantor Fitzgerald Securities, as collateral agent.

9. Superpriority Senior Secured Debtor-in-Possession Asset-Based Credit Agreement, dated November 29, 2018, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the banks, financial institutions and other institutional lenders party thereto as revolving lenders or term lenders, Bank of America, N.A., as administrative agent, Wells Fargo Bank, National Association, as co-collateral agent and syndication agent, Citigroup Global Markets Inc. as documentation agent, Merrill Lynch, Pierce, Fenner & Smith Incorporation, Citibank, N.A. and Wells Fargo Bank, National Association, as joint lead arrangers and bookrunners.

10. Debtor-in-Possession Guarantee and Collateral Agreement, dated November 29, 2018, by and among Sears Holdings Corporation, Sears Roebuck and Co., Sears Roebuck Acceptance Corp.,

Kmart Holding Corporation, Kmart Corporation, and Bank of America, N.A. and Wells Fargo Bank, National Association, as co-collateral agents.

11. Term Loan Credit Agreement, dated January 4, 2018, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, each of Sears Holdings Corporation's other direct or indirect  domestic subsidiaries that is or otherwise becomes party thereto, and JPP, LLC, as collateral agent.

12. Intellectual Property Security Agreement, dated January 4, 2018, by and between Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, and each of Sears Holdings Corporations other direct or indirect domestic subsidiaries that is or otherwise becomes party thereto, and JPP, LLC, as collateral agent.

13. Certain permits may require consent for transfer to the Buyer, including, but not limited to, liquor licenses, pharmacy licenses, business licenses, contractor licenses, food retail licenses and service contract registrations.

WEIL:\96826275\11\73217.0003

## Schedule 6.3

### No Conflict

**Schedule 6.3(c)**

1. Limited Liability Company Agreement of SHC Desert Springs LLC, dated as of February 29, 2008, by Kmart Corporation, as the Member, and Sears, Roebuck and Co., as a Springing Member.

2. Limited Liability Company Operating Agreement of KCD IP, LLC, dated as of May 18, 2006, by Sears Brands, LLC, as the Member.

3. Limited Liability Company Agreement of SRC Sparrow 1 LLC, dated as of March 14, 2018, by Sears, Roebuck and Co., as the Member.

4. Limited Liability Company Agreement of SRC Sparrow 2 LLC, dated as of March 14, 2018, by SRC Sparrow 1 LLC, as the Member, Jennifer A. Schwartz, as Springing Member 1, and Ricardo Beausoleil, as Springing Member 2.

5. Limited Liability Company Agreement of SRC O.P. LLC, dated as of March 14, 2018, by SRC Sparrow 2 LLC, as the Member, Jennifer A. Schwartz, as Springing Member 1, and Ricardo Beausoleil, as Springing Member 2.

6. Limited Liability Company Agreement of SRC Facilities LLC, dated as of March 14, 2018, by SRC O.P. LLC, as the Member, Jennifer A. Schwartz, as Springing Member 1, and Ricardo Beausoleil, as Springing Member 2.

7. Limited Liability Company Agreement of SRC Real Estate (TX), LLC, dated as of March 14, 2018, by SRC Facilities LLC, as the Member, Jennifer A. Schwartz, as Springing Member 1, and Ricardo Beausoleil, as Springing Member 2.

8. Any approval required under the organizational documents of any non-U.S. Seller.

9. Certain permits may require consent for transfer to the Buyer, including, but not limited to, liquor licenses, pharmacy licenses, business licenses, contractor licenses, food retail licenses and service contract registrations.

WEIL:\96826275\11\73217.0003

## Schedule 6.4

### Environmental Matters

1. On November 7, 2018, SRC Facilities received a notice of violation of hazardous waste storage and handling requirements from the County of Sacramento concerning the location at 1601 Arden Way, Sacramento, CA.

2. On November 1, 2018, Kmart Corporation received a notice of violation of flammable liquid storage requirements from the Western Lakes Fire District concerning the location at 1450 Summit Ave., Oconomowoc, WI.

3. On October 18, 2018, Innovel Solutions Inc. received a notice of violation related to late annual stormwater reporting from the Santa Ana Regional Water Quality Control Board concerning the location at 5691 E. Philadelphia St., Ontario, CA.

4. Seller or a subsidiary has reported releases at the following locations and currently is undertaking investigation, remediation or monitoring or is otherwise awaiting agency feedback on a submitted report:

| Unit | City | State | Unit Type | Project | Regulator |
|------|------|-------|-----------|---------|-----------|
| 6418 | Jacksonville | NC | Sears Roebuck and Co | Remedial action | NCDEQ |
| 1300 | Oakbrook | IL | Sears Operations LLC | Remedial action | IEPA |
| 1365 | Miami/Cutler Rdg | FL | Sears Operations LLC | Remedial action | DERM |
| 1045 | Durham-Northgate | NC | Sears Roebuck and Co | Remedial action | NCDEQ |
| 1053 | Saugus | MA | Sears Operations LLC | Remedial action | MADEP |
| 1345 | Hialeah/Westland | FL | Sears Operations LLC | Remedial action | FDEP |
| 1125 | Coral Gables | FL | Sears Roebuck and Co | Groundwater sampling - annual | DERM |
| 1248 | Hayward | CA | Sears Roebuck and Co | Groundwater sampling - annual | San Francisco Bay Regional Water Quality Control Board |

WEIL:\96826275\11\73217.0003

| 6636 | Key West | FL | Sears Roebuck and Co | Groundwater sampling - annual | FDEP |
|------|----------|----|----|----|----|
| 6218 | Aiea Oahu | HI | Sears Roebuck and Co | Hydraulic Lifts | Hawaii Department of Health |
| 1195 | Ft Lauderdale | FL | Sears Roebuck and Co | Used Oil | FDEP |
| 6854 | Hackensack | NJ | Sears Roebuck and Co | Heating Oil | NJDEP |
| 1570 | Schaumburg | IL | SRC Facilities LLC | Gasoline | IEPA |
| 8975 | Rio Piedras | PR | Sears Roebuck De Puerto Rico, Inc | Used Oil | Puerto Rico Environmental Quality Board |
| 475 | Jacksonville | FL | Innovel Solutions, Inc | Mixed | FDEP |
| 8137 | Houston | TX | Sears Roebuck and Co | Gasoline | TCEQ PST Division |
| 3127 | Temecula | CA | Kmart | Remedial action | |
| 425 | Jacksonville | FL | Sears Roebuck and Co | Gasoline | FDEP |
| 1205 | Pompano Beach | FL | Sears Roebuck and Co | Gasoline Hydraulic lifts | |
| 3380 | Waterville | ME | Kmart | Remedial action | |
| 1328 | Las Vegas | NV | Sears Roebuck and Co | Gasoline | |
| 2065 | Brunswick | GA | Sears Roebuck and Co | Remedial action | |
| 1100 | Flint | MI | Sears Roebuck and Co | Remedial action | |
| 1106 | Jackson | MI | Sears Roebuck and Co | Remedial action | |
| 2374 | Vineland | NJ | Sears Roebuck and Co | Gasoline | |
| 1610 | Northgate | OH | Sears Roebuck and Co | Gasoline | |
| 8137 | Houston | TX | Sears Roebuck and Co | Gasoline | |
| 1077 | Shreveport | LA | Sears Roebuck and Co | Gasoline | |
| 2040 | Battle Creek | MI | Sears Roebuck and Co | | |

111

## Schedule 6.5

### Title to Acquired Assets

1. Schedule 1.1(j) is incorporated herein by reference.

2. The following mechanic's liens have been alleged or asserted against the Potential Acquired Assets:

| RE ID | ST | Name | Address | Detail | Lien Claim Amt |
|-------|----|------|---------|--------|----------------|
| 108800 | CA | Glendale | 236 N Central Ave | Northstar Recovery Services, Lien | $130,158.00 |
| 384200 | CA | Oakdale | 175 Maag Avenue | Northstar Recovery Services, Lien | $7,802.56 |
| 110800 | CA | Temecula | 40710 Winchester Rd | ICE Builders, Lien | $130,158.00 |
| 472500 | FL | Key West | 2928 North Roosevelt Blvd | Simon Roofing & Sheet Metal Corp. lien | $26,558.15 |
| 130000 | IL | Oakbrook | 2 Oakbrook Ctr | NetRelevance Lien $228,939.15<br><br>Continental Electrical Construction Lien $55,547.00;<br><br>CRB Commercial Interiors, Inc. $115,934.25;<br><br>NIR Roof Care, Inc. Lien $29,210.00 | $429,630.40 |
| 305900 | MN | St. Paul | 245 E Maryland Ave | Northland Mechanical Contractors, Lien | $9,918.90 |
| 275500 | NC | Jacksonville | 344 Jacksonville Mall | Northstar Recovery Services, Lien | $29,682.98 |
| 143400 | NJ | Wayne | 50 Route 46 | Schindler Elevator Corp. Lien | $56,866.00 |
| 166800 | NV | Las Vegas (Meadows) | 4000 Meadow Ln | ICE Builders, Lien for $847,301.01; Gray ICE Builders, Lien for $7,098.88;<br>Construction Group International, Lien for $26,466.00; Holm Electric LV LLC, Lien for $76,217.45 | $957,083.34 |
| 399300 | PR | Juana Diaz | State Rd 149&State Rd 584 | Retail Contractors of Puerto Rico; Juana Diaz, PR - Hurricane repairs; letter ceasing work until we renegotiate terms. Letter sent by | 0 |

112

| RE ID | ST | Name | Address | Detail | Lien Claim Amt |
|-------|----|------|---------|--------|----------------|
|       |    |      |         | Michael Doron, PE - Dir. of Construction[3] |  |
| 157000 | IL | Schaumburg | 2  Woodfield Mall | Northstar Recovery Services, Lien | $34,493.96 |
| 472600 | NY | Jamestown | 975 Fairmount Ave | Guy Roofing Inc, Lien | $27,670.00 |
| 179500 | SC | Myrtle Beach | 1200 Coastal Grand Circle | Guy Roofing Inc, Lien | $25,440 |
| 224700 | TX | Laredo | 5300 San Dario Ave | The Brandt Companies, Lien | $10,738.50 |
| 45113 | IA | Des Moines | 1605 NE 58th Ave | Northstar Recovery Services, Lien | $52,458.71 |
| 1052 | MN | St. Paul |  | Northland Mechanical Contractor's Lien | $2,237.00 |
| 1112 | MN | Minnetonka |  | Northland Mechanical Contractor's Lien | $5,373.81 |
| 1137 | TX | Austin |  | Northstar Recovery Services | $10,616.98 |
| 1484 | PA | Reading |  | NetRelevance Mechanics Lien | $1,268.40 |
| 1668 | NV | Las Vegas (Meadows) |  | Ice Builder's Mechanic's Lien | $847,301.01 |
| 1668 | NV | Las Vegas (Meadows) |  | Grey Ice Builders | $7,098.88 |
| 1668 | NV | Las Vegas (Meadows) |  | Construction Grp Int'l | $26,466.00 |
| 1668 | NV | Las Vegas (Meadows) |  | Holm Electric LV LLC | $76,217.45 |

---

[3] Amount of claim not provided.

113

| RE ID | ST | Name | Address | Detail | Lien Claim Amt |
|-------|----|----|------|------|------|
| 1668 | NV | Las Vegas (Meadows) | | Ice Builders | $22,500.00 |
| 1944 | NY | Yorktown Hts | | NetRelevance Mechanics Lien | $97,640.51 |
| 1944 | NY | Yorktown Hts | | Healy Electric Contracting | $107,471.10 |
| 1944 | NY | Yorktown Hts | | Sun industrial Inc./Peter Gisondi & Co. Inc. | $44,073.93 |
| 2147 | TX | Irving | | Northstar Recovery Services Mechanics Lien | $15,307.69 |
| 2147 | TX | Irving | | The Brandt Companies, LLC | $11,899.00 |
| 2605 | PA | State College | | NetRelevance Mechanics Lien | $996.40 |
| 470 | IL | Manteno | | N.L.M.S., Inc. Mechanics Lien (Manteno Property A: #440 and #470) | $154,376.10 |
| 1032 | MN | Brooklyn Center | | Northland Mechanical Contractor's Lien | $5,372.81 |
| 1634 | FL | Jacksonville | | Northstar Recovery Services | $14,444.15 |
| 1634 | FL | Jacksonville | | Northstar Recovery Services | $52,658.79 |
| 2451 | CO | Greely | | Northstar Recovery Services | $90,409.99 |
| 2451 | CO | Greely | | Exteriors By Design Inc. | $244,475.65 |

WEIL:\96826275\11\73217.0003

**Schedule 6.6**

**Real Property**

**Schedule 6.6(a)**

1.  Schedule 6.5 is incorporated herein by reference.

2.  The following is a list of tenancies applicable to the Owned Real Property:

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 490 | Hoffman Estates | IL | Board of Trustees of Northern Illinois University (d/b/a Niu Parking) | N/A | 2016 | 6/30/2020 |
| 490 | Hoffman Estates | IL | Sprintcom Inc. (DBA "Sprint") | | 2000 | 11/7/2018* |
| 490 | Hoffman Estates | IL | Kum Cha Truscott (DBA "Evergreen Cleaners") | 626 | 2003 | 11/30/2018 * |
| 490 | Hoffman Estates | IL | Sears Auto Center (Atrium) | 656 | 2007 | MTM |
| 490 | Hoffman Estates | IL | Hairstylist Management Systems, Inc | 983 | 2009 | MTM |
| 490 | Hoffman Estates | IL | International Business Machines Corporation | 210 | 1999 | 12/31/2019 |
| 490 | Hoffman Estates | IL | Sedgwick Claims Management Services, Inc. | 23,350 | 2009 | 7/31/2021 |
| 490 | Hoffman Estates | IL | Hoffman Estates Latus, LLC (DBA "Sbarro") | 1,000 | 2011 | 11/30/2021 |
| 490 | Hoffman Estates | IL | Panda Express, Inc. | 1,000 | 2011 | 7/24/2021 |
| 490 | Hoffman Estates | IL | Sears Hometown & Outlet Stores, Inc. | 35,942 | 2012 | 10/31/2022 |
| 490 | Hoffman Estates | IL | The Salvation Army | | 2013 | 6/30/2099 |
| 490 | Hoffman Estates | IL | RH Tax and Financial Services d/b/a "Jackson Hewitt" | 366 | 2015 | 8/31/2020 |
| 490 | Hoffman Estates | IL | Sears Hometown & Outlet Stores, Inc. | 5,017 | 2016 | MTM |
| 490 | Hoffman Estates | IL | Squadhelp, Inc. (DBA "Leapmatrix Inc.") | 365 | 2016 | 12/31/2018 * |
| 490 | Hoffman Estates | IL | David L. Templer Insurance Agency, LLC | 462 | 2008 | 9/30/2020 |
| 490 | Hoffman Estates | IL | Bright Horizon's | 19,500 | 2017 | 8/31/2022 |

115

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 490 | Hoffman Estates | IL | Fifth Third Bank | | 2017 | 12/31/2020 |
| 490 | Hoffman Estates | IL | (DBA "ST Messaging Services (formerly Skytel)") | | | MTM |
| 490 | Hoffman Estates | IL | T-Mobile | N/A | 3/1/2016 | 1/31/2021 |
| 1011 | Grandville | MI | Lands' End, Inc. | 4,621 | 2014 | 1/31/2020 |
| 1023 | Dulles/ Loudoun County | VA | Lands' End, Inc. | 9,535 | 2014 | 1/31/2019 |
| 1029 | Spokane | WA | Price Spokane Limited Partnership | | 1999 | 9/26/2040 |
| 1029 | Spokane | WA | Lands' End, Inc. | 6,049 | 2014 | 1/31/2019 |
| 1033 | North Attleboro | MA | Lands' End, Inc. | 7,609 | 2014 | 1/31/2019 |
| 1068 | Palmdale | CA | Antelope Valley Mall Developers | 983,699 | 1989 | 12/31/2059 |
| 1068 | Palmdale | CA | Metro Floors Inc. | 18,000 | 1996 | 10/31/2022 |
| 1074 | Waldorf/St Charles | MD | Lands' End, Inc. | 8,771 | 2014 | 1/31/2020 |
| 1075 | Daytona Beach | FL | Volusia Mall LLC (Developer) | | 2001 | 12/31/2018 * |
| 1110 | Portage | MI | Lands' End, Inc. | 5,178 | 2014 | 1/31/2020 |
| 1120 | Columbus | OH | Lands' End, Inc. | 8,374 | 2014 | 1/31/2020 |
| 1136 | Hoover (Birmingham) | AL | Lands' End, Inc. | 4,215 | 2014 | 1/31/2020 |
| 1155 | Kennesaw | GA | Lands' End, Inc. | 8,086 | 2014 | 1/31/2019 |
| 1171 | Springfield | MO | Lands' End, Inc. | 4,748 | 2014 | 1/31/2020 |
| 1182 | St Peters | MO | Lands' End, Inc. | 8,004 | 2014 | 1/31/2019 |
| 1187 | Mesquite | TX | Boot Barn (FKA Sheplers, Inc.) | | 1981 | 7/31/2020 |
| 1192 | Muskegon | MI | Lands' End, Inc. | 4,261 | 2014 | 1/31/2020 |

116

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1224 | Harrisburg | PA | Penrac, LLC (DBA "Enterprise Rent-A-Car") | 29 Parking Spaces | 2007 | 4/30/2022 |
| 1224 | Harrisburg | PA | Rare Hospitality International, Inc. c/o Darden Restaurants Inc. (DBA "Longhorn Steakhouse") | 14,132 | 2012 | 4/30/2024 |
| 1224 | Harrisburg | PA | Lands' End, Inc. | 7,435 | 2014 | 1/31/2019 |
| 1268[4] | Buena Park | CA | Newkoa, LLC | 542 Parking Spaces | 1980 | 9/30/2049 |
| 1268 | Buena Park | CA | Newkoa, LLC | | 2013 | 9/30/2019 |
| 1271 | Littleton | CO | Lands' End, Inc. | 5,885 | 2014 | 1/31/2020 |
| 1278[5] | Torrance | CA | Fourth Searsvale Properties Inc | | 1979 | |
| 1278 | Torrance | CA | Del Amo Mills LP | 87,800 | 1980 | 6/30/2049 |
| 1278 | Torrance | CA | First States Investors Realty LLC | 35,000 | 1983 | 6/30/2019 |
| 1278 | Torrance | CA | Lands' End, Inc. | 7,489 | 2014 | 1/31/2020 |
| 1285 | Orlando-South | FL | Promenade II (DBA "Florida Mall Hotel") | | 2011 | 10/31/2022 |
| 1297 | Hurst | TX | Simon Property Group (Texas) LP | 1.788 acres | 1999 | 8/2/2038 |
| 1297 | Hurst | TX | Chesapeake Exploration LLC | 10.875 acres | 2011 | 5/10/2038 |
| 1314 | New Brunswick | NJ | OTB Acquisitions | 1.56 acres | 1996 | 2/28/2023 |
| 1314 | New Brunswick | NJ | HOP New Brunswick (DBA "Houlihan's") | | 2002 | 11/30/2023 |
| 1314 | New Brunswick | NJ | Lands' End, Inc. | 7,107 | 2014 | 1/31/2020 |
| 1314 | New Brunswick | NJ | Cellco Partnership (DBA "Verizon Wireless") | 13 | 2014 | 1/31/2020 |
| 1354 | Willow Grove | PA | Lands' End, Inc. | 8,635 | 2014 | 1/31/2019 |

[4] Owned/Lease
[5] Owned/Ground Lease

117

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1354 | Willow Grove | PA | Primark Us Corp. | 77,615 | 2014 | 10/30/2024 |
| 1364 | Lake Grove | NY | Lands' End, Inc. | 7,133 | 2014 | 1/31/2019 |
| 1407 | Beaumont | TX | Parkdale Mall | | | |
| 1443 | Manchester | CT | Lands' End, Inc. | 6,482 | 2014 | 1/31/2019 |
| 1447 | Hulen | TX | Xto Energy Inc | 14.11 acres | 2008 | 10/22/2050 |
| 1447 | Ft Worth | TX | Lands' End, Inc. | 4,387 | 2014 | 1/31/2019 |
| 1460 | Livonia | MI | Lands' End, Inc. | 5,116 | 2014 | 1/31/2020 |
| 1475 | Durham | NC | Lands' End, Inc. | 7,596 | 2014 | 1/31/2020 |
| 1570 | Schaumburg | IL | Namco entertainment Inc. (DBA "Level 257") | 41,960 | 2013 | 2/28/2025 |
| 1570 | Schaumburg | IL | Lands' End, Inc. | 6,552 | 2014 | 1/31/2020 |
| 1590 | Saginaw | MI | Central Florida Restaurants Inc | 86,876 | 2001 | 11/30/2021 |
| 1595 | Greenville | SC | Forever 21Retail, Inc. (Winter 2014) | 15,481 | 2012 | 8/31/2023 |
| 1595 | Greenville | SC | Lands' End, Inc. | 5,742 | 2014 | 1/31/2019 |
| 1605 | Raleigh | NC | Lands' End, Inc. | 7,204 | 2014 | 1/31/2019 |
| 1614 | Livingston | NJ | Lands' End, Inc. | 8,270 | 2014 | 1/31/2019 |
| 1634 | Baltimore | MD | Security Square Associates | | 1997 | 9/30/2022 |
| 1650 | Merrillville | IN | Gary Joint Venture | | 1987 | 9/17/2039 |
| 1710 | North Olmsted | OH | Steak and Ale of OH, Inc. | | | |
| 1710 | North Olmsted | OH | George Group-Great Northern Ltd (DBA "Harry Buffalo Restaurant & Lounge") | 6,342 | 2009 | 8/31/2019 |
| 1710 | North Olmsted | OH | Star-West Great Northern Mall LLC | | 2013 | 11/30/2023 |
| 1710 | North Olmsted | OH | Lands' End, Inc. | 8,789 | 2014 | 1/31/2020 |

118

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1760 | Novi | MI | Lands' End, Inc. | 8,769 | 2014 | 1/31/2019 |
| 1764 | Rockaway | NJ | Raymours Furniture Company, Inc | 38,678 | 2015 | 8/31/2026 |
| 1800 | Mishawaka | IN | Lands' End, Inc. | 5,927 | 2014 | 1/31/2020 |
| 1804 | Barboursville | WV | Lands' End, Inc. | 8,441 | 2014 | 1/31/2019 |
| 1853 | Wilmington | DE | Lands' End, Inc. | 8,415 | 2014 | 1/31/2019 |
| 1854 | Parkville | MD | Lands' End, Inc. | 7,928 | 2014 | 1/31/2020 |
| 1974 | Roanoke | VA | Cheddars Casual Café | 20,447 | 2010 | 10/31/2020 |
| 2092 | Appleton | WI | Lands' End, Inc. | 5,792 | 2014 | 1/31/2020 |
| 2183 | S Portland | ME | Maine Mall | | 1982 | |
| 2183 | S Portland | ME | OTB Acquisition LLC (DBA "On the Border #146") | 6,585 | 1999 | 11/30/2019 |
| 2183 | So Portland | ME | Lands' End, Inc. | 5,564 | 2014 | 1/31/2019 |
| 2191 | Lincoln | NE | Bair / Superior Pointe? | See docs | See docs | See docs |
| 2191 | Lincoln | NE | McDonald's Corporation | | 1981 | 8/4/2081 |
| 2191 | Lincoln | NE | A.T. Thomas Jewelers | 5,000 | 2005 | 6/30/2025 |
| 2191 | Lincoln | NE | GMRI, Inc. | 2.01 acres | 2012 | 10/31/2022 |
| 2309 | Silverdale | WA | Kitsap Mall, LLC | 1.75 acres | 1984 | 8/7/2024 |
| 2309 | Silverdale | WA | Lands' End, Inc. | 4,226 | 2014 | 1/31/2019 |
| 2497 | Brownsville | TX | CBL & Asssociates Management Inc | 119,790 | 2000 | |
| 3088 | Kenosha | WI | Albor Restaurant Group, LLC (DBA "Taco Bell") | 2,646 | 1994 | 4/30/2031 |
| 3088 | Kenosha | WI | Dollar Tree Stores, Inc #3811 | 10,520 | 2002 | 5/31/2018* |
| 3088 | Kenosha | WI | Limitless PCS, Inc. (DBA "Metro PCS") | 1,600 | 2015 | 3/3/2020 |
| 3433 | Holyoke | MA | D'Angelo's Restaurant | 1,800 | 1983 | 6/30/2024 |

119

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---------|------|----|--------------------------|---------------|-----------------------------|------------------------------|
| 3433 | Holyoke | MA | Taco Bell | 2,850 | 2010 | 11/30/2030 |
| 3433 | Holyoke | MA | Sears Outlet Stores, LLC | 18,012 | 2012 | 12/31/2018 * |
| 3699 | Apple Valley | CA | Blessing Nails | 800 | 1994 | 12/31/2021 |
| 3699 | Apple Valley | CA | Mina Patel d/b/a Smoke 4 Less | 800 | 2007 | 10/31/2021 |
| 3699 | Apple Valley | CA | Ye Old Tyme Barber Shoppe | 1,000 | 2006 | 9/30/2022 |
| 3722 | Burlington | WA | Payless Shoe Source, Inc. #653 | 3,600 | 1989 | 6/30/2020 |
| 3722 | Burlington | WA | Phan Thuy Anh & Nguyen Vu Tan (DBA "Hi-Tek") | 1,200 | 2008 | 6/30/2021 |
| 3722 | Burlington | WA | Rent-A-Center West, Inc. | 1,720 | 2011 | 3/31/2021 |
| 3722 | Burlington | WA | PACIFIC NW PROPERTIES I | 3,600 | 2016 | 1/31/2099 |
| 4857 | Desert Hot Springs | CA | Yucaipa Trading Co., Inc. (DBA "Rio Ranch Market") | 27,917 | 2017 | 1/31/2027 |
| 6298 | Sparks | NV | Sears Outlet Stores, LLC | 20,098 | 2012 | 12/31/2022 |
| 8702 | Minneapolis | MN | Rail Way Restoration Inc | 10,500 | 2003 | 8/31/2019 |
| 8702 | Minneapolis | MN | Oopegard Vending | 835 | 2007 | 4/30/2019 |
| 8702 | Minneapolis | MN | Sears Home Improvement Products, Inc. (Embedded) | 15,300 | | |
| 8717 | Houston | TX | Holliday Door & Gate, LLC | 12,000 | 2003 | 2/28/2019 |
| 8717 | Houston | TX | Sears Outlet Stores, LLC | 82,593 | 2012 | 12/31/2022 |
| 8755 | Tucker | GA | Sears Outlet Stores, LLC | 133,404 | 2012 | 12/31/2022 |
| 8975 | Rio Piedras | PR | Sears Outlet Stores, LLC | 36,472 | 2012 | 12/31/2022 |
| 9255 | Palmer | MA | Gil's Gym and Racquet Health Club LLC | 18,512 | 2006 | 11/30/2018 * |
| 9394 | Fajardo | PR | AutoZone Puerto Rico, Inc. | 10,530 | 2013 | 1/31/2024 |
| 1310 | Elyria | OH | Red Lobster | 59,300 | | 8/31/2027 |
| 1610 | Cincinnati Northgate | OH | Lands' End, Inc. | 5,933 | | 1/31/2019 |

WEIL:\96826275\11\73217.0003

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 3544 | Salem (Store Closing) | VA | West Main Hair Salon | 1,120 | | 1/31/2019 |
| 3544 | Salem (Store Closing) | VA | Sally Beauty Company, Inc. | 1,600 | | 11/30/2020 |
| 3544 | Salem (Store Closing) | VA | Ups Store | 1,600 | | 9/30/2018* |
| 3544 | Salem (Store Closing) | VA | Chick-Fil-A Inc | 33,799 | | 4/30/2022 |
| 4395 | Cudahy | WI | Sears Outlet Stores, LLC | 21,070 | | 12/31/2020 |
| 8245 | St. Petersburg | FL | Sears Outlet Stores, LLC | 58,617 | | 9/30/2022 |
| 8254 | Rochester | NY | Sears Home Improvement Products, Inc. (Embedded) | 500 | | |
| 8345 | Virginia Beach | VA | Sears Home Improvement Products, Inc. (Embedded) | 1,500 | | |
| 8935 | Rio Piedras | PR | Sears Home Improvement Products, Inc. (Embedded) | 4,813 | | |
| 26185 | Clarksville | IN | Peddlers Mall | 108,813 | | 12/31/2019 |
| 26731 | Dublin | OH | AT&T | 2,435 | | 3/31/2028 |
| 26731 | Dublin | OH | Sport Clips | 1,200 | | 4/30/2028 |
| 26731 | Dublin | OH | Starbucks | 2,050 | | 1/31/2029 |
| 26731 | Dublin | OH | Zoup! | 2,100 | | 12/31/2028 |
| 30934 | N Memphis | TN | First Tennessee Bank | 4,338 | | 1/31/2022 |
| 30961 | Grensboro | NC | National Distribution Centers, LLC | 1,546,815 | | 1/31/2022 |
| 61540 | Indianapolis | IN | Cinema Veterans LLC – Keep For Tax Tracking Purpose | 236,190 | | |
| 1012 | Des Moines | IA | ABBELL CREDIT CORPORATION | | | 11/5/28 |
| 1012 | Des Moines | IA | LAMAR COMPANY LLC | 300 | | 11/5/28 |
| 1077 | Shreveport | LA | Mall St Vincent LP | | | 12/31/24 |
| 1730 | Florence | KY | Lands' End, Inc. | 6,338 | | 1/31/19 |

121

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 2290 | Michigan City | IN | First Source Bank | 40,950 | | 12/31/22 |
| 2934 | Taunton | MA | Silver City Galleria | | | 10/31/55 |
| 8217 | Ft. Worth | TX | Sears Home Improvement Products, Inc. (Embedded) | 3,500 | | |

*Recently Expired

WEIL:\96826275\11\73217.0003

3.  The leases for the foregoing tenancies have been provided in the data rooms operated by the Company on the Intralinks platform.

4.  The following is a list of licenses applicable to the Owned Real Property or Lease Premises

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 1206 | North Little Rock | AR | Sears FLS | | Universal Vending, Avis/Budget Car Rental |
| 49028 | Tempe | AZ | Call Center | | Universal Vending |
| 49011 | Tucson | AZ | Call Center | | Universal Vending |
| 1768 | Paradise Vly | AZ | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending |
| 1798 | Glendale | AZ | Sears FLS | | Luxottica Optical, Picture People Portrait, Universal Vending |
| 2218 | Prescott | AZ | Sears FLS | | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 4996 | Tucson | AZ | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, Distributech |
| 8253 | McClellan | CA | RTG CTR | | Universal Vending |
| 8258 | Lakewood | CA | RSVC | | Universal Vending |
| 8369 | Santa Ana | CA | RSVC | | Universal Vending removed 1/31/18 |
| 3531 | Pinole | CA | Kmart | | Western Union, Cardtronics ATM, Lottery, Universal Vending, KeyMe, Dacra Glass |
| 7165 | Camarillo | CA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe |
| 3834 | Burbank | CA | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, KeyMe, Coinstar |
| 2138 | Santa Barbara | CA | Sears FLS | 1/20/2019 | Universal Vending |
| 31882 | San Diego | CA | Kmart | x/x/xx | Kmart 4290 closed |
| 1868 | Moreno Vly | CA | Sears FLS | | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 1968 | Palm Desert | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 1148 | Ventura | CA | Sears FLS | | Repair & Wear Watch Repair, Universal Vending |
| 1189 | West Covina | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 3501 | Paradise | CA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 3235 | West Covina | CA | Kmart | | Universal Money ATM, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|-------|------|-----------------|------------|------------|-------------------------------------|
| 4047 | Costa Mesa | CA | Kmart | | Western Union, Universal Money ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 9328 | Livermore | CA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 3828 | Temecula | CA | Kmart | 1/20/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 2728 | Downey | CA | Sears Auto Center | | Universal Vending |
| 2798 | Palm Desert | CA | Sears Auto Center | | Universal Vending |
| 3127 | Temecula | CA | Kmart | | Western Union, Universal Money ATM, Lottery, Universal Vending, NEN Amusement vending, KeyMe |
| 1221 | Chapel Hills | CO | Sears FLS | 3/24/2019 | Universal Vending, Avis/Budget Car Rental |
| 1111 | Colorado Springs | CO | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending, Keyless Key Shop |
| 7725 | Rehoboth Beach | DE | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Avis/Budget Car Rental |
| 425 | Jacksonville | FL | RRC | | Universal Vending |
| 2315 | Jensen Bch(Stuart) | FL | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending |
| 2145 | Port Charlotte | FL | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 1755 | Boynton Beach | FL | Sears FLS | 1/20/2019 | Luxottica Optical, Action Time Watch Repair, Universal Vending, Avis/Budget Car Rental, iCan Health Benefits |
| 4893 | Ellenton | FL | Kmart | 3/24/2019 | Western Union, Intelicom Wireless, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 7321 | Bradenton | FL | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 1495 | Ft Myers | FL | Sears FLS | | Luxottica Optical, Action Time Watch Repair, Universal Vending, Avis/Budget Car Rental |
| 6820 | Boynton Beach | FL | Sears Auto Center | | Universal Vending |
| 2505 | Covington | GA | Sears FLS | 3/24/2019 | Luxottica Optical |

124

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 8158 | Honolulu | HI | SVC CTRL | | Universal Vending |
| 2278 | Idaho Falls | ID | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending |
| 7289 | Steger | IL | Kmart | | Western Union, Universal Money ATM, Universal Vending, Dacra Glass |
| 3371 | Chicago | IL | Kmart | 1/20/2019 | Western Union, Universal Money ATM, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 2990 | Rockford-Cherryvale | IL | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 1640 | Elk Grove Vlg | IL | Sears FLS | 3/24/2019 | Universal Vending |
| 2936 | Chicago | IL | Sears Auto Center | | Universal Vending |
| 9030 | Peru | IN | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 1226 | Metairie | LA | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 4810 | Metairie | LA | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 3288 | Billerica | MA | Kmart | | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 1424 | Bethesda | MD | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending, Keyless Key Shop |
| 1754 | Gaithersburg | MD | Sears FLS | | Luxottica Optical, Jackson Hewitt Tax, Universal vending, Avis/Budget Car Rental |
| 3131 | Frederick | MD | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dcara Glass, Coinstar |
| 1773 | Prince Frederick | MD | Sears FLS | 3/24/2019 | Luxottica Optical, Picture People Portrait, Universal Vending |
| 3380 | Waterville | ME | Kmart | 1/20/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 6232 | Roseville | MI | Sears Auto Center | | Universal Vending |
| 4351 | Rochester | MN | Kmart | 3/24/2019 | Western Union, Universal Money ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 9353 | Crystal City | MO | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|-------|------|-----------------|------------|------------|-------------------------------------|
| | | | | | NEN Amusement Vending, Dacra Glass |
| 2106 | Tupelo | MS | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending |
| 9520 | Gulfport | MS | Kmart | 3/24/2019 | Western Union, Universal Vending |
| 9619 | Morehead City | NC | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 1375 | Winston Salem | NC | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 3886 | Asheville | NC | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 9549 | Morganton | NC | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 4022 | Grand Forks | ND | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 9319 | Alliance | NE | Kmart | 3/24/2019 | Western Union, Universal Vending, Coinstar |
| 2421 | Grand Island | NE | Sears FLS | 1/20/2019 | Universal Vending |
| 1313 | Nashua | NH | Sears FLS | | Picture People Portrait, Universal Vending |
| 3071 | Toms River | NJ | Kmart | 3/24/2019 | Universal Money ATM, Universal Vending, NEN Amusement Vending, Distributech, Coinstar |
| 2597 | Farmington | NM | Sears FLS | | Universal Vending |
| 1668 | Las Vegas(Meadows) | NV | Sears FLS | | Luxottica Optical, Picture People Portrait, Repair & Wear Watch Repair, Universal Vending |
| 1328 | Las Vegas(Blvd) | NV | Sears FLS | 3/24/2019 | Universal Vending |
| 1828 | Las Vegas | NV | Sears FLS | 1/20/2019 | Luxottica Optical, Ignazio Lanzafame Watch Repair, Universal Vending |
| 9274 | Greenwich | NY | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending |
| 2173 | Saratoga | NY | Sears FLS | 1/20/2019 | Universal Vending |
| 2683 | Watertown | NY | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending |
| 9381 | Huntington | NY | Kmart | 1/20/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech, Coinstar |
| 1624 | Sidney | NY | Sears FLS | | Universal Vending |
| 2626 | College Point | NY | Sears Auto Center | | Universal Vending |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 2741 | Massapequa | NY | Sears Auto Center | | Universal Vending |
| 3013 | Cleveland | OH | Kmart | 3/24/2019 | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass |
| 9096 | Fostoria | OH | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 3142 | Tallmadge | OH | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 1280 | Springdale | OH | Sears FLS | 8/5/2018 | Family Dental Care Associates is still temporarily operating in the closed FLS |
| 2001 | Piqua | OH | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending |
| 3243 | North Canton | OH | Kmart | | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass |
| 3839 | Corvallis | OR | Kmart | 3/24/2019 | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 2715 | Salem | OR | Sears Auto Center | | Universal Vending |
| 2074 | Stroudsburg | PA | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending |
| 2494 | Altoona | PA | Sears FLS | 3/24/2019 | Luxottica Optical, Beauty Express Hair Salon, Universal Vending |
| 1484 | Reading | PA | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending |
| 2605 | State College | PA | Sears Auto Center | | Universal Vending |
| 4113 | Erie | PA | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 3527 | Philadelphia | PA | Kmart | 1/20/2019 | Western Union, Universal Money ATM, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Distributech, Dacra Glass |
| 1154 | Whitehall | PA | Sears FLS | | Luxottica Optical, Beltone Hearing, Universal Vending |
| 3361 | Allentown | PA | Kmart | 1/31/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, N EN Amusement Vending, KeyMe, Coinstar |
| 4064 | North Versailles | PA | Kmart | 1/20/2019 | Western Union, Lottery, Universal Vending, NN Amusement Vending, KeyMe, Dacra Glass, Parking Lot (JDM Structures) |
| 7293 | Chambersburg | PA | Kmart | | Western Union, Lottery, Universal Vending, N |

127

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| | | | | | EN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 1834 | North Versailles | PA | Sears FLS | | Luxottica Optical, Universal Vending |
| 1935 | Mayaguez | PR | Sears FLS | | Mayaguez Optical, Hearing Aid Associates, S elect Salons Hair Salons, Universal Vending, T ravel Concepts, Avis/Budget Car Rental, Banco Popular ATM, Blanco Velez Men's Suits, Universal Sunglasses, Libreria Mundo Escovar Books |
| 3896 | San German | PR | Kmart | 1/20/2019 | Western Union, Banco Popular ATM, Universal vending, NEN Amusement Vending, Coinstar, MCS Advantage |
| 4490 | San Juan | PR | Kmart | 1/20/2019 | Western Union, Banco Popular ATM, Lottery, Universal Vending, NEN Amusement Vending, H&R Block Tax, Coinstar, Yogen Fruz, Mini Gold Watch Repair, MCS Advantage, MMM Holdings |
| 4858 | Caguas | PR | Kmart | 1/20/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, MMM Holdings |
| 3853 | Guayama | PR | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, H&R Block Tax, Parking Lot (Auto-Lux Mobile Car Wash), MCS Advantage, Triple-S Salud, MMM Holdings |
| 7062 | Sumter | SC | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 2807 | Rock Hill | SC | Sears FLS | 1/20/2019 | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 4170 | Rapid City | SD | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 2036 | Jackson | TN | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 9735 | Sevierville | TN | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending |
| 2226 | Murfreesboro | TN | Sears FLS | 1/20/2019 | Universal Vending |
| 2156 | Maryville | TN | Sears FLS | 1/20/2019 | Universal Vending |
| 9507 | San Antonio | TX | MSO | | Universal Vending |
| 2557 | Longview | TX | Sears FLS | 1/20/2019 | Universal Vending |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 1387 | Amarillo | TX | Sears FLS | 3/24/2019 | Universal Vending, Avis/Budget Car Rental |
| 1367 | Waco | TX | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 2487 | Killeen | TX | Sears FLS | 3/24/2019 | Universal Vending |
| 2435 | Charlottesville | VA | Sears FLS | 3/24/2019 | Universal Vending, Avis/Budget Car Rental |
| 3750 | Waupaca | WI | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 3692 | Oconomowoc | WI | Kmart | 3/24/2019 | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech |
| 6375 | Bridgeport | WV | Sears Auto Center | | Universal Vending |
| 1788 | Richmond | CA | Sears FLS | | Luxottica Optical, Jackson Hewitt Tax, Universal Vending |
| 1075 | Daytona Beach | FL | Sears FLS | 3/24/2019 | Luxottica Optical, Action Time Watch Repair, Universal Vending |
| 470 | Manteno | IL | CDFC | | Universal Vending |
| 2632 | Fairview Hts | IL | Sears Auto Center | 1/19/2018 | Universal Vending |
| 1475 | Durham | NC | Sears FLS | 3/24/2019 | Universal Vending |
| 1216 | Memphis/Southland | TN | Sears FLS | 1/20/2019 | Universal Vending, Avis/Budget Car Rental |
| 4395 | Cudahy | WI | Kmart | 1/20/2019 | Western Union, Cardtronics ATM, Lottery, Universal vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 8217 | Ft. Worth | TX | | | Universal Vending |
| 8147 | San Antonio | TX | | | Universal Vending |
| 100700 | Brandon | FL | Sears FLS | | Luxottica Optical, Action Time Watch Repair, Universal Vending, Avis/Budget Car Rental |
| 100800 | Boyle | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, H&R Block Tax, Universal Vending, Hugo Gonzalez Watch Repair |
| 101300 | Glen Burnie | MD | Sears FLS | | Luxottica Optical, Universal Vending |
| 101800 | Baldwin Hills | CA | Sears FLS | | Luxottica Optical, Universal Vending, KeyMe |
| 102400 | Falls Church | VA | Sears FLS | | Luxottica Optical, Universal Vending, KeyMe |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 104100 | Omaha | NE | Sears FLS | 3/24/2019 | Universal Vending |
| 104200 | Joplin | MO | Sears FLS | | Universal Vending |
| 104400 | Jersey City/Newport | NJ | Sears FLS | | Luxottica Optical, Jackson Hewitt Tax, Universal Vending, KeyMe |
| 104500 | Durham-Northgate | NC | Sears FLS | | Universal Vending |
| 104800 | Pasadena | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, Repair and Wear Watch Repair, Universal Vending |
| 105300 | Saugus | MA | Sears FLS | | Universal Vending, Avis/Budget Car Rental |
| 106600 | The Avenues | FL | Sears FLS | | Luxottica Optical, Nadar Zarou Watch Repair, Universal Vending |
| 107300 | Exton | PA | Sears FLS | | Universal Vending |
| 108100 | Heath | OH | Sears FLS | | Luxottica Optical, Universal Vending |
| 108500 | Caguas | PR | Sears FLS | | Hearing Associates Hearing Aids, Select Salons Hair Salon, Universal Vending, Travel Concepts, Banco Popular ATM, Universal Sunglasses, Liberia Mundo Escolar Books |
| 108800 | Glendale | CA | Sears FLS | | Luxottica Optical, Repair and Wear Watch Repair, Universal Vending |
| 109200 | Westland | MI | Sears FLS | | Luxottica Optical, Easy Method Driving School |
| 109400 | Hackensack | NJ | Sears FLS | | Universal Vending, Keyless Key Shop |
| 109700 | San Antonio | TX | Sears FLS | | Luxottica Optical, Universal Vending |
| 109800 | Clovis | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 110800 | Temecula | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 111100 | Colorado Springs | CO | Sears FLS | | Luxottica Optical, Universal Vending, Keyless Key Shop |
| 111400 | Brooklyn | NY | Sears FLS | | Luxottica Optical, Universal Vending, KeyMe (with Kmart in basement with Western Union, Lottery) |
| 112500 | Coral Gables | FL | Sears FLS | | Luxottica Optical, Action Time Watch Repair, Universal Vending, Avis/Budget Car Rental |
| 112700 | Shepherd | TX | Sears FLS | | Luxottica Optical, Universal Vending, Outside Key Shop |
| 113300 | Leominster | MA | Sears FLS | | Luxottica Optical, Universal Vending |
| 113900 | Tukwila | WA | Sears FLS | | Luxottica Optical, Universal Vending |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 114100 | Aurora | CO | Sears FLS | | Universal Vending |
| 114800 | Ventura | CA | Sears FLS | | Repair and Wear Watch Repair, Universal Vending |
| 114900 | Whittier | CA | Sears FLS | | Luxottica Optical, Beltone Hearing, Universal Vending, KeyMe |
| 115400 | Whitehall | PA | Sears FLS | | Luxottica Optical, Beltone Hearing, Universal Vending |
| 116100 | Wichita-Town East | KS | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending, Avis/Budget Car Rental, Safelite Auto Glass |
| 116800 | No Hollywood | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 117000 | Lansing | MI | Sears FLS | | Luxottica Optical, Jackson Hewitt Tax, Universal Vending, Keyless Key Shop |
| 118900 | West Covina | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 119500 | Ft Lauderdale | FL | Sears FLS | | Action Time Watch Repair, Universal Vending |
| 120400 | Freehold | NJ | Sears FLS | | Beltone Hearing, Universal Vending |
| 120600 | North Little Rock | AR | Sears FLS | | Universal Vending, Avis/Budget Car Rental |
| 120700 | Richardson | TX | Sears FLS | 3/24/2019 | Universal Vending, SSES Driving School |
| 120800 | Fresno | CA | Sears FLS | | Repair and Wear Watch Repair, Universal Vending |
| 121000 | Polaris | OH | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 121200 | N Riverside | IL | Sears FLS | | Luxottica Optical, Picture People Portrait, Universal Vending, KeyMe |
| 121300 | Auburn | MA | Sears FLS | | Luxottica Optical, Universal Vending |
| 122100 | Chapel Hills | CO | Sears FLS | 3/24/2019 | Universal Vending, Avis/Budget Car Rental |
| 122300 | Brockton-Westgate | MA | Sears FLS | | Universal Vending |
| 122600 | Metairie | LA | Sears FLS | 3/24/2019 | Luxottica Optical, Jackson Hewitt Tax, Universal Vending, Avis/Budget Car Rental |
| 124300 | Hanover | MA | Sears FLS | | Universal Vending |
| 124800 | Hayward | CA | Sears FLS | | Luxottica Optical, Ansari Mohsen Dental, Repair and Wear Watch Repair, Beauty Express Hair Salon, Universal Vending |
| 126800 | Buena Park | CA | Sears FLS | | Luxottica Optical, Repair and Wear Watch Repair, Universal Vending, KeyMe |
| 127400 | Chesterfield | VA | Sears FLS | | Universal Vending |

131

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 127800 | Torrance | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, Repair and Wear Watch Repair, Universal Vending, Avis/Budget Car Rental, KeyMe |
| 128300 | Braintree | MA | Sears FLS | | Luxottica Optical, Universal Vending |
| 128400 | Alexandria | VA | Sears FLS | | Universal vending, Avis/Budget Car Rental, KeyMe |
| 128800 | Stockton | CA | Sears FLS | | Luxottica Optical, Universal Vending, KeyMe |
| 129800 | Riverside | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 130000 | Oakbrook | IL | Sears FLS | | Repair and Wear Watch Repair, Universal Vending |
| 130300 | Danbury | CT | Sears FLS | | Luxottica Optical, Universal Vending |
| 130400 | Silver Spring | MD | Sears FLS | | Luxottica Optical, Picture People Portrait, Far East Watch Repair, Andy Melwani Formalwear, Avis/Budget Car Rental |
| 130900 | Downey | CA | Sears FLS | | Luxottica Optical, Avedis Ovayan Watch Repair, Universal Vending |
| 131300 | Nashua | NH | Sears FLS | | Picture People Portrait, Universal vending |
| 131700 | El Paso | TX | Sears FLS | | Luxottica Optical, Wilhemine Torres Watch Repair, Universal Vending, Distributech |
| 132800 | Las Vegas(Blvd) | NV | Sears FLS | 3/24/2019 | Universal Vending |
| 133300 | Poughkeepsie | NY | Sears FLS | | Luxottica Optical, Universal Vending |
| 133500 | Greensboro | NC | Sears FLS | | Universal Vending |
| 134500 | Hialeah/Westland | FL | Sears FLS | | Luxottica Optical, Jackson Hewitt Tax, Action Time Watch Repair, Universal Vending, Avis/Budget Car Rental |
| 135800 | Chula Vista | CA | Sears FLS | | Luxottica Optical, Repair and Wear Watch Repair, Beauty Express Hair Salon, Universal Vending |
| 136500 | Miami/Cutler Rdg | FL | Sears FLS | | Luxottica Optical, Action Time Watch Repair, Universal Vending, Avis/Budget Car Rental |
| 136700 | Waco | TX | Sears FLS | 3/24/2019 | Luxottica Optical, Universal vending |
| 136800 | Concord | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, Visant Jadia Watch Repair, Universal Vending, Avis/Budget Car Rental |
| 137400 | Bel Air | MD | Sears FLS | | Luxottica Optical, Universal Vending |
| 137800 | Orange | CA | Sears FLS | | Luxottica Optical, Universal Vending |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|-------|------|-----------------|------------|------------|-------------------------------------|
| 138600 | Goodlettsville | TN | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 138700 | Amarillo | TX | Sears FLS | 3/24/2019 | Universal Vending, Avis/Budget Car Rental |
| 139800 | San Bernardino | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 140400 | Massapequa | NY | Sears FLS | | Universal Vending |
| 141000 | Canton | OH | Sears FLS | | Luxottica Optical, HMS Salons, Universal Vending |
| 143400 | Wayne | NJ | Sears FLS | | Luxottica Optical, Beauty Express Hair Salon, Universal Vending, Avis/Budget Car Rental, Keyless Key Shop |
| 145600 | Oviedo | FL | Sears FLS | | Luxottica Optical, John Zarou Watch Repair, Universal Vending |
| 146300 | Burlington | VT | Sears FLS | | Universal Vending |
| 147800 | San Bruno | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, Eddy Lim Dental, Inna Maze Watch Repair, Universal Vending, Avis/Budget Car Rental, KeyMe |
| 148800 | San Jose-Eastridge | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, Roberto Paras Watch Repair, Universal Vending, Avis/Budget Car Rental, KeyMe |
| 149400 | Moorestown | NJ | Sears FLS | | Luxottica Optical, Beauty Express Hair Salon, Universal Vending |
| 149500 | Ft Myers | FL | Sears FLS | | Luxottica Optical, Action Time Watch Repair, Universal Vending, Avis/Budget Car Rental |
| 150800 | Northridge | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, Repair and Wear Watch Repair, Universal Vending |
| 157800 | Aiea Oahu-Pearl Rdg | HI | Sears FLS | | Luxottica Optical, Hilo Hearing Aids, Repair and Wear Watch Repair, Bon Jon Formalwear, Universal Vending, Zippy's Restaurant, Cardtronics ATM, Hawaii Pacific Credit Union, Cingula Wireless Cell Phone Tower |
| 158500 | Tallahassee | FL | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 162400 | Staten Island | NY | Sears FLS | | Universal Vending |
| 162900 | Pharr | TX | Sears Small Store | | Universal Vending |
| 164000 | Fairview Hts | IL | Sears FLS | 3/24/2019 | Universal Vending |
| 164400 | Lancaster | PA | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 165400 | Media | PA | Sears FLS | | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |

133

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 166800 | Las Vegas(Meadows) | NV | Sears FLS | | Luxottica Optical, Picture People Portrait, Repair and Wear Watch Repair, Universal Vending |
| 167400 | White Plains | NY | Sears FLS | | Beauty Express Hair Salon, Universal Vending, Nailport Nail Salon, KeyMe |
| 167800 | Carlsbad | CA | Sears FLS | | Luxottica Optical, Repair and Wear Watch Repair, Universal Vending |
| 168100 | Honolulu | HI | Sears Small Store | | Universal Vending |
| 168400 | Woodbridge | NJ | Sears FLS | | Luxottica Optical, Universal Vending |
| 168800 | Salinas | CA | Sears FLS | | Luxottica Optical, Far East Watch Repair, Universal Vending |
| 171100 | Camp Hill | PA | Sears Small Store | | Universal Vending |
| 171400 | Greensburg | PA | Sears FLS | 3/24/2019 | Luxottica Optical, Jackson Hewitt Tax, Beauty Express Hair Salon, Universal Vending, Lottery |
| 172200 | Bloomington | MN | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending, Coffee & Tea by Lee Restaurant |
| 172500 | Annapolis | MD | Sears FLS | | Luxottica Optical, Picture People Portrait, HMS Hair Salon, Universal Vending |
| 172800 | Tucson | AZ | Sears FLS | | Picture People Portrait, Jorge Valencia Watch Repair, Universal Vending |
| 173300 | Yonkers | NY | Sears FLS | | Luxottica Optical, Picture People Portrait, Jackson Hewitt Tax, Universal Vending, KeyMe |
| 173800 | Kaneohe(Sur) | HI | Sears FLS | | Luxottica Optical, Bon Jon Formalwear, Universal Vending, Cingula Wireless Cell Phone Tower |
| 174500 | Tampa/Westshore | FL | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 174800 | Montclair | CA | Sears FLS | | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 175400 | Gaithersburg | MD | Sears FLS | | Luxottica Optical, Jackson Hewitt Tax, Universal Vending, Avis/Budget Car Rental |
| 175800 | Escondido | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, Universal Vending |
| 176500 | Palm Beach Gardens | FL | Sears FLS | | Luxottica Optical, Karin Krause Watch Repair, Universal Vending, iCan Health Benefits |
| 177300 | Salisbury | MD | Sears FLS | 3/24/2019 | Luxottica Optical, Picture People Portrait, Universal Vending |
| 177500 | Pembroke Pines | FL | Sears FLS | | Luxottica Optical, Action Time Watch Repair, Universal Vending, Avis/Budget Car Rental |
| 179800 | Glendale | AZ | Sears FLS | | Luxottica Optical, Picture People Portrait, Universal Vending |
| 181000 | Cincinnati-Eastgate | OH | Sears FLS | | Luxottica Optical, Family Care Dental, Universal Vending |

134

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 181800 | Rancho Cucamonga | CA | Sears FLS | | Luxottica Optical, Picture People Portrait, Atanacio Enrices Watch Repair, Universal Vending |
| 183400 | North Wales | PA | Sears FLS | | Luxottica Optical, Universal Vending |
| 183800 | Burbank | CA | Sears FLS | | Luxottica Optical, Jackson Hewitt Tax, Universal Vending |
| 186800 | Moreno Vly | CA | Sears FLS | | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 189400 | Rochester | NY | Sears FLS | | Luxottica Optical, Avis/Budget Car Rental |
| 190500 | Hato Rey | PR | Sears FLS | | Mayaguez Optical, Hearing Associates Hearing Aids, Centro Tecnico Watch Repair, Universal Vending, Select Salons Hair Salon, Travel Concepts, Avis/Budget Car Rental, Deli Plus, Yogen Fruz, Direct Distribution, Academia des Artes Manales, Blanco Veles Suits, Mariangely Class-Arand Perez Gift Wrap, PR Teloco, Universal Sunglasses, Burger King |
| 191500 | Bayamon | PR | Sears FLS | | Mayaguez Optical, Hearing Associates Hearing Aids, Select Salons Hair Salon, Travel Concepts, BMJ Foods, Banco Popular ATM, Deli Plus, Yogen Fruz, Blanco Velez Suits, Universal Sunglasses |
| 192400 | Valley Stream | NY | Sears FLS | | Luxottica Optical, Universal Vending, KeyMe |
| 192500 | Carolina | PR | Sears FLS | | Hearing Associates Hearing Aids, Select Salons Hair Salon, Universal Vending, Travel Concepts, Banco Popular ATM, Yogen Fruz, Blanco Velez Suits, Rocketfix Mobile, Universal Sunglasses |
| 193500 | Mayaguez | PR | Sears FLS | | Mayaguez Optical, Hearing Associates Hearing Aids, Select Salons Hair Salon, Universal Vending, Travel Concepts, Avis/Budget Car Rental, Banco Popular ATM, Blanco Velez Suits, Universal Sunglasses |
| 194500 | Ponce | PR | Sears FLS | | Mayaguez Optical, Hearing Associates Hearing Aids, Select Salons Hair Salon, Universal Vending, Travel Concepts, Avis/Budget Car Rental, Yogen Fruz, Blanco Velez Suits., PR Telco, Rocketfix Mobile |
| 196800 | Palm Desert | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 198400 | Buffalo/Hamburg | NY | Sears FLS | | Luxottica Optical, Universal Vending |
| 202300 | Concord | NH | Sears FLS | | US Vision Optical, Universal Vending |
| 202700 | Wasilla | AK | Sears FLS | | Universal Vending |
| 202800 | Hemet | CA | Sears FLS | | Luxottica Optical, Universal Vending |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 202900 | Union Gap | WA | Sears FLS | | Universal Vending |
| 203600 | Jackson | TN | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 204900 | Everett | WA | Sears FLS | | Luxottica Optical, Universal Vending |
| 205900 | Tracy | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 206800 | Visalia | CA | Sears FLS | | Luxottica Optical, Universal Vending, Parking Lot - Famers Market - Angela Warkenton-Wakley |
| 208500 | Fajardo | PR | Sears FLS | | Mayaguez Optical, Universal Vending, Travel Concepts |
| 208800 | Santa Maria | CA | Sears FLS | | Universal Vending |
| 210400 | St Clairsville | OH | Sears FLS | | Luxottica Optical, Ohio Valley Family Dental, Universal Vending |
| 210500 | Burlington | NC | Sears FLS | | Universal Vending |
| 211400 | Washington | PA | Sears FLS | | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 214500 | Port Charlotte | FL | Sears FLS | 3/24/2019 | Luxottica Optical, Universal Vending |
| 214800 | Kahului Maui(Sur) | HI | Sears FLS | | Universal Vending |
| 217900 | Medford | OR | Sears FLS | 3/24/2019 | Universal Vending |
| 220300 | Brunswick | ME | Sears FLS | | US Vision, Universal Vending |
| 221500 | Key West | FL | Sears FLS | | Luxottica Optical, Mama's Rock and Sand Garden Center |
| 221800 | Prescott | AZ | Sears FLS | | Luxottica Optical, Universal Vending, Avis/Budget Car Rental |
| 223800 | Yuba City | CA | Sears FLS | | Luxottica Optical, Universal Vending |
| 226500 | Johnson City | TN | Sears FLS | | Universal Vending |
| 232900 | Kennewick(Pasco) | WA | Sears FLS | 3/24/2019 | Universal Vending, Avis/Budget Car Rental |
| 235500 | Hatillo(Arecibo) | PR | Sears FLS | | Hearing Associates Hearing Aids, Universal Vending, Travel Concepts, Banco Popular ATM, Blanco Velez Suits, Universal Sunglasses |
| 237300 | No Dartmouth | MA | Sears FLS | | Luxottica optical, Universal Vending |
| 238800 | Hilo(Sur) | HI | Sears FLS | | Universal Vending |
| 239500 | Manassas | VA | Sears FLS | | Picture People Portrait, Universal Vending, Avis/Budget Car Rental |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|-------|------|-----------------|-----------|-----------|-------------------------------------|
| 242200 | Sioux City | IA | Sears FLS | 3/24/2019 | Universal Vending |
| 243500 | Charlottesville | VA | Sears FLS | 3/24/2019 | Universal Vending, Avis/Budget Car Rental |
| 248500 | Brooksville | FL | Sears FLS | | Luxottica Optical, Heavenly Jewelry on Earth Watch Repair, Universal Vending |
| 248700 | Killeen | TX | Sears FLS | 3/24/2019 | Universal Vending |
| 249400 | Altoona | PA | Sears FLS | 3/24/2019 | Luxottica Optical, Beauty Express Hair Salon, Universal Vending |
| 250500 | Gainesville | GA | Sears FLS | 3/24/2019 | Luxottica Optical |
| 252700 | Las Cruces | NM | Sears FLS | | Universal Vending, Avis/Budget Car Rental |
| 259300 | Newburgh | NY | Sears FLS | | Universal Vending |
| 259700 | Farmington | NM | Sears FLS | | Universal Vending |
| 262800 | Eureka | CA | Sears FLS | | Universal Vending |
| 263700 | Port Arthur | TX | Sears FLS | 3/24/2019 | Universal Vending |
| 266400 | Frederick | MD | Sears FLS | | Luxottica Optical, Jackson Hewitt Tax, Universal Vending, Keyless Key Shop |
| 267500 | Guayama | PR | Sears FLS | | Universal Vending |
| 269400 | Fredericksburg | VA | Sears FLS | | Universal Vending |
| 274400 | Horseheads/Elmira | NY | Sears FLS | | Luxottica Optical, Universal Vending |
| 274500 | Leesburg | FL | Sears FLS | | Luxottica Optical, Action Time Watch Repair, Universal Vending |
| 275500 | Jacksonville | NC | Sears FLS | | Luxottica Optical, Universal Vending |
| 277400 | Cumberland | MD | Sears FLS | | Luxottica Optical |
| 278400 | Winchester | VA | Sears FLS | | Universal Vending |
| 282900 | Victorville | CA | Sears FLS | | Luxottica Optical, Doribel Pleitez Watch Repair, Universal Vending |
| 299000 | Rockford-Cherryvale | IL | Sears FLS | 3/24/2019 | Luxottica Optical, Avis/Budget Car Rental |
| 301300 | Cleveland | OH | Kmart | 3/24/2019 | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass |
| 302100 | Auburn | ME | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |

137

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|-------|------|-----------------|------------|------------|-------------------------------------|
| 302900 | Erlanger | KY | Kmart | | Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 304000 | Hyannis | MA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 305600 | Wayne | NJ | Kmart | | Western Union, ATM (Universal Money), Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 305900 | St. Paul | MN | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 307100 | Toms River | NJ | Kmart | 3/24/2019 | Universal Money ATM, Universal Vending, NEN Amusement Vending, Distributech, Coinstar |
| 307400 | Miami | FL | Kmart | | Western Union, Intelicome Wireless, Lottery, Universal Vending, NEN Amusement Vending |
| 308600 | Chico | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass |
| 312700 | Temple City | CA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, KeyMe |
| 313100 | Frederick | MD | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 313600 | Shillington | PA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 314200 | Tallmadge | OH | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 315500 | Belleville | MI | Kmart | | Western Union, ATM (Universal Money), NEN Amusement Vending, Dacra Glass, Distributech, Coinstar |
| 317200 | Hagerstown | MD | Kmart | | ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 317400 | Stockton | CA | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 317500 | Hooksett | NH | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 320200 | Westwood | NJ | Kmart | | Western Union, ATM (Universal Money), Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 321600 | Vernon | CT | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 322500 | Chambersburg | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech, Euro-Tech |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 323500 | West Covina | CA | Kmart | | ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 324300 | North Canton | OH | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass |
| 325600 | Baltimore | MD | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 326600 | Edwardsville | PA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 326800 | Wilkes-Barre | PA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 326900 | Lantana | FL | Kmart | | Western Union, Lottery, Universal Vending, Dacra Glass, Coinstar |
| 328600 | Brunswick | OH | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Euro-Tech |
| 328800 | Billerica | MA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 330100 | Santa Fe | NM | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Distributech |
| 331700 | Boca Raton | FL | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 337900 | Waterford Twp. | MI | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 339000 | Williamsport | PA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 340500 | Minneapolis | MN | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 341200 | Salinas | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe |
| 341500 | Buffalo | NY | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 343800 | Avenel | NJ | Kmart | | Western Union, ATM (Universal Money), Universal Vending, KeyMe, Distributech, Coinstar |
| 347100 | Chesapeake | VA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 348400 | Elkview | WV | Kmart | | Western Union, ATM (Cardtronics), Universal Vending |

139

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 348600 | Somerville | MA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 349900 | Kearny | NJ | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 350100 | Petaluma | CA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 359200 | Las Vegas | NV | Kmart | | Western Union, Nevada Gaming, ATM (Universal Money), Universal Vending, NEN Amusement Vending, KeyMe, Distributech |
| 359700 | Holmes | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 366700 | Raleigh | NC | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 367800 | Ramona | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |
| 369200 | Oconomowoc | WI | Kmart | 3/24/2019 | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech |
| 370700 | Lake Havasu City | AZ | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech, Coinstar |
| 372500 | Freedom | CA | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending, Coinstar |
| 373700 | Doylestown | PA | Kmart | | Western Union, ATM (Universal Money), Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 374400 | Kill Devil Hills | NC | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending |
| 374800 | Hollister | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, NEN Amusement Vending, KeyMe, Dacra Glass |
| 375000 | Waupaca | WI | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 378500 | Tabb | VA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech |
| 379800 | Hyattsville | MD | Kmart | | Western Union, ATM (Universal Money), Universal Vending, NEN Amusement Vending, KeyMe, Coinstar, Parking Lot (CW & Sons) |
| 381000 | Willow Street | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech, Euro-Tech |
| 381800 | Hollywood | FL | Kmart | | Western Union, Intelicom Wireless, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 381900 | Hastings | MI | Kmart | | Western Union, ATM (Cardtronics), NEN Amusement Vending, Dacra Glass |

140

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 382900 | St. Thomas | VI | Kmart | | Western Union, Lottery, Universal Vending |
| 383400 | Burbank | CA | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, KeyMe, Coinstar |
| 383900 | Corvallis | OR | Kmart | 3/24/2019 | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 384100 | Marshall | MI | Kmart | | Western Union, ATM (Cardtronics), Lottery, NEN Amusement Vending, Dacra Glass |
| 384200 | Oakdale | CA | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending |
| 385100 | Racine | WI | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech |
| 386200 | Bohemia | NY | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 387300 | Wilmington | DE | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 388200 | Mayaguez | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar, Yogen Fruz, Travel Concepts, MCS Advantage, Triple-S Salud |
| 388600 | Asheville | NC | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 388800 | The Dalles | OR | Kmart | | Western Union, ATM (Cardtronics, Universal Vending, NEN Amusement Vending |
| 391100 | Columbia | PA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 394900 | Wind Gap | PA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Euro-Tech |
| 395400 | Walnutport | PA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Euro-Tech, Coinstar |
| 396300 | Elizabethtown | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 397200 | St. Croix | VI | Kmart | | Western Union, Lottery, Universal Vending |
| 399300 | Juana Diaz | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, Triple-S Salud |
| 401600 | Greenville | SC | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending |
| 402200 | Grand Forks | ND | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Dacra Glass |

141

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 403400 | Mattydale | NY | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 404700 | Costa Mesa | CA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 405700 | Fargo | ND | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending, Dacra Glass |
| 411300 | Erie | PA | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 414100 | West Columbia | SC | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe |
| 417000 | Rapid City | SD | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 421400 | Des Plaines | IL | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 427200 | Bismarck | ND | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending, Parking Lot (Off The Hook Seafood) |
| 429700 | Moline | IL | Kmart | 1/6/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 434900 | Redwood City | CA | Kmart | | Western Union, Lottery, Universal Vending, KeyMe, Coinstar, Parking Lot (rePlanet) |
| 435100 | Rochester | MN | Kmart | 3/24/2019 | Western Union, Universal Money ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 435300 | Minot | ND | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending, Dacra Glass |
| 435500 | St. Petersburg | FL | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 438100 | Bridgeview | IL | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Coinstar |
| 438900 | McAllen | TX | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Distributech, Coinstar |
| 439900 | Silver Spring | MD | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 440700 | Brockton | MA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 442100 | North Hollywood | CA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, Coinstar, Parking Lot (Imperial Auto Body) |
| 444200 | Charleston | WV | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending, Dacra Glass |

142

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 444800 | Salem | NH | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Coinstar |
| 445300 | Pueblo | CO | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Parking Lot (Ramblin Express) |
| 445700 | Hayward | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 447000 | West Long Branch | NJ | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 447800 | Trenton | NJ | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Distributech, Coinstar |
| 449400 | Trujillo Alto | PR | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, Triple-S Salud |
| 471300 | Towanda | PA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 472500 | Key West | FL | Kmart | | Western Union, Intelicom Wireless, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 472800 | Miami | FL | Kmart | | Western Union, Intelicome Wireless, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar, Restaurant (El Paraiso De Los Jugos) |
| 473200 | Aguadilla | PR | Kmart | | Western Union, AMT (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, Triple-S Salud |
| 475100 | Tehachapi | CA | Kmart | | Western Union, ATM (Cardtronics). Lottery, Universal Vending, NEN Amusement Vending |
| 478200 | Clinton | OK | Kmart | | Western Union, ATM (Cardtronics), NEN Amusement Vending, Dacra Glass |
| 480700 | Bear | DE | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech, Coinstar |
| 481000 | Metairie | LA | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Coinstar |
| 481900 | Lakeport | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 484400 | Rio Piedras | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, Triple-S Salud |
| 487100 | Farmingville | NY | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar, Nightingale Medical |

143

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 499600 | Tucson | AZ | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, Distributech |
| 700600 | Twin Falls | ID | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 701600 | Hobbs | NM | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |
| 703000 | Kalispell | MT | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 703100 | Menominee | MI | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 703300 | Lewiston | ID | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 703400 | Walla Walla | WA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 703500 | Farmington | NM | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, |
| 704200 | Valparaiso | IN | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 704800 | West Lebanon | NH | Kmart | | Western Union, ATM (Cardtronics), NEN Amusement Vending |
| 706200 | Sumter | SC | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 706500 | Horseheads | NY | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 706800 | Midland | MI | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 708300 | New Castle | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 709800 | Concord | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Coinstar |
| 710400 | Acton | MA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 710900 | Watertown | CT | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |
| 713300 | Augusta | ME | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 713900 | Jackson | WY | Kmart | | ATM (Cardtronics), Universal Vending |
| 716500 | Camarillo | CA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe |
| 717500 | Riverside | CA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, Coinstar |

144

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 717700 | Belleville | NJ | Kmart | | Western Union, ATM (Universal Money), Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 719200 | Easton | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 720800 | Clemmons | NC | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 724300 | Kokomo | IN | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Euro-Tech |
| 724600 | Richmond | IN | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 725500 | Somerset | KY | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 729300 | Clifton Heights | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 729400 | Vero Beach | FL | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 732100 | Bradenton | FL | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 732900 | Loveland | CO | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 737200 | Leechburg | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 737400 | West Chester | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Distributech |
| 738300 | Barberton | OH | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 739000 | McKinleyville | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |
| 739700 | Grove City | OH | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Euro-Tech, Parking Lot (JDM Structures) |
| 741300 | Frederiksted | VI | Kmart | | Western Union, Lottery, Universal Vending |
| 741900 | Caguas | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 744600 | Cayey | PR | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, Triple-S Salud |
| 747700 | Marietta | OH | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 756600 | Arecibo | PR | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, Triple-S Salud |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|-------|------|-----------------|------------|------------|--------------------------------------|
| 757000 | Bayamon | PR | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Coinstar, Yogen Fruz, MCS Advantage, Triple-S Salud |
| 760200 | Wall | NJ | Kmart | | Western Union, ATM (Universal Money), Universal Vending, NEN Amusement Vending, KeyMe, Distributech, Coinstar |
| 761600 | Lexington | SC | Kmart | | Western Union, NEN Amusement Vending, KeyMe, Dacra Glass |
| 761900 | Atascadero | CA | Kmart | | Western Union, Lottery, Universal Money |
| 762600 | Waynesville | NC | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass |
| 763900 | Santa Paula | CA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 764400 | Harrison | OH | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 764800 | Mauston | WI | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 764900 | Ripon | WI | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacar Glass, Coinstar |
| 765300 | Big Bear Lake | CA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending |
| 765400 | Bronx | NY | Kmart | | ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass |
| 766500 | Carolina | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, Triple-S Salud |
| 767300 | Stevensville | MD | Kmart | | Western Union, ATM (Universal Money), NEN Amusement Vending, Dacra Glass, Coinstar |
| 767600 | Sidney | NY | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 767700 | Wellsville | NY | Kmart | 3/24/2019 | Western Union, Universal Money ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 769900 | Lebanon | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 771300 | Edgewater | MD | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 772500 | Rehoboth Beach | DE | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Avis/Budget Car Rental |
| 774100 | Ponce | PR | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Coinstar, Parking Lot (Auto-Lux Mobile Car Wash), MCS Advantage, Triple-S Salud |
| 774900 | New York | NY | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending |

WEIL:\96826275\11\73217.0003

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 775200 | Yauco | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar, Yogen Fruz, MCS Advantage, Triple-S Salud |
| 775600 | Bishop | CA | Kmart | | Western Union, ATM (Universal Money), Lottery, Coinstar |
| 776700 | Charles City | IA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |
| 776800 | Guaynabo | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar, MCS Advantage, Triple-S Salud |
| 777700 | New York | NY | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, KeyMe |
| 778300 | Hato Rey | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar, Travel Concepts, MCS Advantage, Triple-S Salud |
| 778400 | Vega Alta | PR | Kmart | | Western Union, ATM (Banco Popular), Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 778800 | Bayamon | PR | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Coinstar, Travel Concepts, MCS Advantage, Triple-S Salud |
| 779300 | St. Thomas | VI | Kmart | | Western Union, Lottery, Universal Vending |
| 803700 | Chattanooga | TN | Repair Center | | Universal Vending |
| 820600 | Nashville | TN | SVC District | | Universal Vending |
| 870900 | Kent | WA | DDC | | Universal Vending |
| 875300 | Syosset | NY | MDO | | Universal Vending |
| 877800 | Phoenix | AZ | DOS Inventory | | Universal Vending |
| 879000 | Cleveland | OH | MDO | | Universal Vending |
| 881500 | Sunrise | FL | MDO | | Universal Vending |
| 882300 | Dulles | VA | MDO | | Universal Vending |
| 882500 | Winter Park | FL | MDO | | Universal Vending |
| 887100 | Romeoville | IL | DDC | | Universal Vending |
| 887300 | Gouldsboro | PA | DDC | | Universal Vending |
| 889500 | Tampa | FL | MDO | | Universal Vending |
| 897000 | Las Vegas | NV | Mixload | | Universal Vending |
| 903000 | Peru | IN | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |

147

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 909600 | Fostoria | OH | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 912200 | Warsaw | IN | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 912400 | Elwood | IN | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, Euro-Tech |
| 915300 | South Lake Tahoe | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement, Distributech |
| 916100 | Berwick | PA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 922000 | Algona | IA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 922400 | Marathon | FL | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |
| 927400 | Greenwich | NY | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending |
| 931900 | Alliance | NE | Kmart | 3/24/2019 | Western Union, Universal vending, Coinstar |
| 932800 | Long Beach | CA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Coinstar |
| 935300 | Crystal City | MO | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 941300 | West Orange | NJ | Kmart | | Western Union, ATM (Universal Money), Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass, Distributech, Coinstar |
| 941400 | Yorktown Heights | NY | Kmart | | Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 941600 | White Plains | NY | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, KeyMe, Dacra Glass |
| 942000 | Bronx | NY | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, KeyMe |
| 942300 | Bridgehampton | NY | Kmart | | Lottery, Universal Vending, KeyMe |
| 946300 | Somers Point | NJ | Kmart | | Western Union, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 952000 | Gulfport | MS | Kmart | 3/24/2019 | Western Union, Universal Vending |
| 954900 | Morganton | NC | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 955100 | Paradise | CA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |
| 955700 | Grayling | MI | Kmart | | Western Union, ATM (Cardtronics), NEN Amusement Vending |
| 958900 | Bath | NY | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending |

148

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 959300 | Oscoda | MI | Kmart | | Western Union, ATM (Cardtronics), Universal Vending, NEN Amusement Vending |
| 960800 | Auburn | CA | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass |
| 961400 | Key Largo | FL | Kmart | | Western Union, Intelicom Wireless, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Coinstar |
| 961900 | Morehead City | NC | Kmart | 3/24/2019 | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 962100 | Lebanon | TN | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 966200 | Ephrata | PA | Kmart | | Western Union, ATM (Universal Money), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Distributech |
| 968900 | International Falls | MN | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 969200 | Webster | MA | Kmart | | Western Union, ATM (Cardtronics), Lottery, Universal Vending, NEN Amusement Vending, Dacra Glass, Coinstar |
| 969300 | Marine City | MI | Kmart | | Western Union, Universal Vending, NEN Amusement Vending |
| 973500 | Sevierville | TN | Kmart | 3/24/2019 | Western Union, Cardtronics ATM, Lottery, Universal Vending, NEN Amusement Vending |
| 974600 | Grass Valley | CA | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 979400 | St. George | UT | Kmart | | Western Union, Universal Vending, NEN Amusement |
| 979700 | Scotts Valley | CA | Kmart | | Western Union, Lottery, Universal Vending, KeyMe |
| 980800 | Hamilton | MT | Kmart | | Western Union, Lottery, Universal Vending, NEN Amusement Vending |
| 7871400 | Secaucus | NJ | MDO | | Universal Vending |
| 8877600 | Olive Branch | MS | DDC | | Universal Vending |

WEIL:\96826275\11\73217.0003

**Schedule 6.6(b)**

1.   The following condemnation matters are pending with respect to the Owned Real Property:

| RE ID | ST | Name | Address | Detail |
|---|---|---|---|---|
| 157000 | IL | Schaumburg | 2  Woodfield Mall | There is a threatened condemnation at Schaumburg IL S#1570.  Permanent ROW and TCE for road widening. |
| 117100 | MO | Springfield | 2825 S Glenstone Ave | Road widening – ROW and TCE. |
| 171000 | OH | No Olmsted | 5000 Great Northern Mall | City needs easement to complete traffic signal and pedestrian signal improvements. |
| 2374 | NJ | Vineland | 8 W. Landis Avenue | Sewer authority requested easement and deposited $6,808.02 with court for value of easement.  On 10/03/18, authority increased offer to $8K. |
| 9676 | OH | Streetsboro | 9059 State Route 14 | City threatening taking for highway improvement and offered $9,405 for value of taking.  Buyer has been informed of taking. |
| 116500 | NC | Concord | 1480 Concord Pkwy N | Sears not a named party to condemnation action as rights are with mall developer per Declaration.  Sears to determine if it wants to pursue an inverse condemnation action. |
| 1012 | IA | De Moines | | Taking of 1,848 square feet does not appear to affect or owned or leased parcels. |
| 2677 | LA | Bossier City | | Sewer right of way acquisition (condemnation). |
| 1077 | LA | Shreveport | | City needing permanent and temporary servitude re upgrading and replacement of sewer line.  City is under consent decree with federal government to complete the project. |
| 2374 | NJ | Vineland | | Potential condemnation by the local Landis Sewer Authority |

150

| RE ID | ST | Name | Address | Detail |
|-------|-----|------|---------|--------|
| 1012 | IA | | | Eminent domain action.  Sears receipted a notice of appraisement of damages and time for appeal. |

2.    The following litigation matters are pending or threatened with respect to the Owned Real Property:

| RE ID | STATE | CITY | ADDRESS | DESCRIPTION |
|-------|-------|------|---------|-------------|
| | CA | Arden | | [Potential] Claim by mall owner that attempts to sell violate his ROFR |
| 02374 | NJ | Viceland | | Sears, Roebuck and Co. v. (Commercial Development Company) |
| 09676 | OH | Streetsboro | | Sears, Roebuck and Co. v. City of Streetsboro |
| 44900 | CA | Delano | Delano Industrial Park | Kmart Corporation v. Marketing & Printing Solutions Inc. |
| 485700 | CA | Desert Hot Springs | 14011 Palm Drive | [Potential] |
| 184000 | IL | Chicago Ridge | 6501 95th St | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 157000 | IL | Schaumburg | 2  Woodfield Mall | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 182000 | IL | West Dundee | 5000 Spring Hill Mall | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 146000 | MI | Livonia | 29500 7 Mile Rd | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 176000 | MI | Novi | 27600 Novi Rd | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 116500 | NC | Concord | 1480 Concord Pkwy N | Department of Transportation v. Carolina Mall, LLC, et al. |
| 112000 | OH | Dublin | 5053 Tuttle Crossing Blvd | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 171000 | OH | North Olmsted | 5000 Great Northern Mall | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 1155 | GA | Kennesaw | 400 Ernest W Barrett Pkwy Nw | Claimant: Cathy Dunham |
| 3088 | WI | Kenosha | 4100 52Nd St | Claimant: Scott Carter |
| 1650 | IN | Merriville | 2300 Southlake Mall | Claimant: Rosemarie Ksiazek |

151

3.  The following listing is of pending property claims, for damages to buildings and FF&E, at the Owned Real Property:

| Unit | Address | Loss City | Loss State | Property Group | 10K Owned / L/GL | Date of Loss | Claim Property: Claim Property Number | Estimated Loss to Building and FF&E |
|---|---|---|---|---|---|---|---|---|
| 01027 | | El Paso | TX | | | 9/6/2018 | P180906510 6 | 600,000 |
| 01315 | | Chattanooga | TN | | | 12/28/2018 | P181228500 2 | 1,000 |
| 01224 | 4600 Jonestown Road | Harrisburg | PA | Open Store | Owned | 11/11/2018 | P181112506 90001 | 2,500 |
| 03853 | Puerto Rico Hwy 3 | Guayama | PR | Open Store | Owned | 9/21/2017 | P170922503 90001 | 5,493,436 |
| 02191 | 6400 O Street | Lincoln | NE | Open Store | Owned | 11/24/2018 | P181126500 90001 | 5,000 |
| 02191 | 6400 O Street | Lincoln | NE | Open Store | Owned | 11/21/2018 | P181126500 80001 | 1,000 |
| 02515 | 1940 U.S. Highway 70 SE | Hickory | NC | Open Store | Owned | 11/26/2018 | P181126503 50001 | 1,000 |
| 01590 | 4900 Fashion Square Mall | Saginaw | MI | Open Store | Owned | 11/14/2018 | P181114501 70001 | 500 |
| 04206 | 2000 Ten Mile Road | Warren | MI | Open Store | Owned | 9/20/2018 | P180920508 10001 | 500 |
| 03368 | 1625 West Redlands | Redlands | CA | Open Store | Owned | 11/7/2018 | P181108507 80001 | 0 |
| 45056 a/k/a 8975 | Road #176 KM 0.5 Cupey Bajo | Rio Piedras | PR | Non-Retail | Owned | 9/21/2017 | P170921508 80001 | 1,100,000 |
| 01314 | 51 U.S. Highway 1 | New Brunswick | NJ | Open Store | Owned | 9/9/2018 | P180909504 40001 | 1,000 |
| 45056 a/k/a 8975 | Road #176 KM 0.5 Cupey Bajo | Rio Piedras | PR | Non-Retail | Owned | 10/16/2017 | P171016511 40001 | 0 |
| 01377 | 7925 Fm 1960 Road West | Houston | TX | Open Store | Owned | 11/3/2018 | P181103501 60001 | 5,000 |
| 08292 | 655 West 52nd Avenue | Ocala | FL | Non-Retail | Owned | 9/12/2017 | P170915512 50001 | 120,000 |
| 01075 | 1700 West International Speedway Boulevard | Daytona Beach | FL | Open Store | Owned | 9/10/2017 | P171006509 40001 | 4,500 |
| 01217 | 1305 Airline Road | Corpus Christi | TX | Open Store | Owned | 10/19/2018 | P181019500 20001 | 25,000 |

152

| Unit | Address | Loss City | Loss State | Property Group | 10K Owned / L/GL | Date of Loss | Claim Property: Claim Property Number | Estimated Loss to Building and FF&E |
|------|---------|-----------|------------|----------------|------------------|--------------|--------------------------------------|-------------------------------------|
| 01027 | | El Paso | TX | | | 9/6/2018 | P1809065106 | 600,000 |
| 01315 | | Chattanooga | TN | | | 12/28/2018 | P1812285002 | 1,000 |
| 01364 | 4 Smith Haven Mall | Lake Grove | NY | Open Store | Owned | 7/16/2018 | P18071750770001 | |
| 01175 | 777 E. Merritt Island Causeway | Merritt Island | FL | Open Store | Owned | 9/12/2017 | P17091250280001 | 20,000 |

4.  The following are alleged unresolved code violations with respect to the Potential Acquired Assets:

| Unit | Address | City | State | Comment |
|------|---------|------|-------|---------|
| 1018 | 3755 Santa Rosalia Dr | Baldwin Hills | CA | Fire code issues related to Reg 4/Threatened default by LL |
| 1674 | 100 Main St | White Plains | NY | Notice of Violation/Escalator/Elevator not operable. |
| 3711 | 1550 S. Burlington Blvd | Burlington | WA | Numerous fire code violations |
| 49027 | | Round Rock | TX | Inspection deficiencies in Fire alarm; repairs currently scheduled. |
| 68235 | | Phoenix | AZ | Citation/City of Phoenix - Pending dismissal from AZ Court/no fines, violations have been cleared. |

5. The following issues affect the status of Owned Real Property

| Store | Unit # | City | State | Status |
|-------|--------|------|-------|--------|
| MDO | 8975 | Rio Piedras | PR | 2 year Co-Occupancy License Agreement being granted to Service.com upon SHIP APA Closing |

**Schedule 6.6(c)**

1.  Seller has made available leases and security deposit documents in Intralinks.

2.  The following is a list of tenancies applicable to the Lease Premises.

153

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1013 | Glen Burnie | MD | Lands' End, Inc. | 8,050 | 2014 | 1/31/2020 |
| 1024 | Falls Church | VA | Bill Page Imports, Inc. | 200 Parking Spaces | 2014 | 9/30/2020 |
| 1024 | Falls Church | VA | Lands' End, Inc. | 7,472 | 2014 | 1/31/2020 |
| 1044 | Jersey Cty/Newport | NJ | Lands' End, Inc. | 5,411 | 2014 | 1/31/2020 |
| 1048 | Pasadena | CA | FR Hastings Ranch, LLC | | 1984 | 4/29/2024 |
| 1048 | Pasadena | CA | HomeGoods, Inc. | 28,113 | 2012 | 4/29/2024 |
| 1048 | Pasadena | CA | Lands' End, Inc. | 7,168 | 2014 | 1/31/2020 |
| 1053 | Saugus | MA | Lands' End, Inc. | 5,565 | 2014 | 1/31/2020 |
| 1073 | Exton | PA | Lands' End, Inc. | 9,039 | 2014 | 10/5/2019 |
| 1088 | Glendale | CA | Star Parking Management, Inc. | | 2015 | 4/30/2021 |
| 1092 | Westland(Detroit) | MI | Auto Accessories USA | 15,324 | 2018 | 4/30/2022 |
| 1094 | Hackensack | NJ | ALDI Inc (Pennsylvania) | 55,718 | 2014 | 5/31/2032 |
| 1111 | Colorado Spgs | CO | Univest-Btc S&R LLC | | 2004 | 11/30/2025 |
| 1125 | Miami | FL | Goodwill Industries Of South Florida | 208 | 2014 | 2/28/2019 |
| 1133 | Leominster | MA | Lands' End, Inc. | 7,483 | 2014 | 1/31/2020 |
| 1139 | Tukwila | WA | Lands' End, Inc. | 7,216 | 2014 | 1/31/2020 |
| 1148 | Ventura | CA | Lands' End, Inc. | 6,691 | 2014 | 1/31/2020 |
| 1154 | Whitehall | PA | Lands' End, Inc. | 7,401 | 2014 | 1/31/2020 |
| 1170 | Lansing | MI | Lands' End, Inc. | 9,553 | 2014 | 11/30/2019 |
| 1195 | Ft Lauderdale | FL | Greenstar Corp | 26,000 | 1954 | 2/28/2026 |
| 1210 | Columbus/Polaris | OH | Lands' End, Inc. | 6,611 | 2014 | 1/31/2020 |
| 1213 | Auburn | MA | Lands' End, Inc. | 7,269 | 2014 | 1/31/2019 |

154

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1221 | Colorado Springs | CO | Lands' End, Inc. | 5,076 | 2014 | 1/31/2019 |
| 1243 | Hanover | MA | Lands' End, Inc. | 11,168 | 2014 | 1/31/2019 |
| 1248 | Hayward | CA | Wells Fargo Bank | 4,247 | 1975 | 10/1/2018 |
| 1248 | Hayward | CA | Sears Outlet Stores, LLC | 48,434 | 2012 | 1/31/2022 |
| 1268[6] | Buena Park | CA | Newkoa, LLC | 542 Parking Spaces | 1980 | 9/30/2049 |
| 1268 | Buena Park | CA | Newkoa, LLC | | 2013 | 9/30/2019 |
| 1274 | Richmond/Chesterfield | VA | Lands' End, Inc. | 7,551 | 2014 | 1/31/2020 |
| 1278[7] | Torrance | CA | Fourth Searsvale Properties Inc | | 1979 | |
| 1278 | Torrance | CA | Del Amo Mills LP | 87,800 | 1980 | 6/30/2049 |
| 1278 | Torrance | CA | First States Investors Realty LLC | 35,000 | 1983 | 6/30/2019 |
| 1278 | Torrance | CA | Lands' End, Inc. | 7,489 | 2014 | 1/31/2020 |
| 1283 | Braintree | MA | Lands' End, Inc. | 8,694 | 2014 | 1/31/2020 |
| 1283 | Braintree | MA | Primark Us Corp. | 70,816 | 2014 | 11/30/2024 |
| 1284 | Alexandria | VA | Lands' End, Inc. | 9,608 | 2014 | 1/31/2020 |
| 1288 | Stockton | CA | Weberstown Mall LLC | 3,480 | 1985 | 1/31/2023 |
| 1304 | Silver Spring | MD | Lands' End, Inc. | 4,973 | 2014 | 1/31/2019 |
| 1309 | Downey | CA | Macerich Stonewood LLC | | 2002 | 1/31/2051 |
| 1313 | Nashua | NH | Lands' End, Inc. | 7,573 | 2014 | 1/31/2019 |
| 1317 | El Paso | TX | Celina Development Company | 3,856 | 1981 | 6/30/2020 |
| 1333 | Poughkeepsie | NY | Lands' End, Inc. | 5,523 | 2014 | 1/31/2019 |

[6] Owned/Lease
[7] Owned/Ground Lease

WEIL:\96826275\11\73217.0003

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1335 | Greensboro | NC | Chick-Fil-A Inc | 54,450 | 2001 | 1/31/2023 |
| 1335 | Greensboro | NC | Whole Foods Market Inc. | 34,364 | 2010 | 1/31/2028 |
| 1335 | Greensboro | NC | Lands' End, Inc. | 5,856 | 2014 | 1/31/2020 |
| 1368 | Concord | CA | Thomas A Morabito Trustee & Francis J Morabito, Trustee of the Morabito Family Trust Dated 4-14-88 | 18,000 | 1985 | 10/30/2061 |
| 1368 | Concord | CA | Sun Valley Associates | | 2005 | 10/19/2026 |
| 1368 | Concord | CA | Lands' End, Inc. | 9,947 | 2014 | 1/31/2019 |
| 1374 | Bel Air | MD | Macy's, Inc. | 24,599 | 2003 | 9/30/2021 |
| 1374 | Bel Air | MD | Lands' End, Inc. | 6,517 | 2014 | 1/31/2020 |
| 1378 | Orange | CA | The Village at Orange, LLC | 28,600 | 1993 | 5/31/2024 |
| 1378 | Orange | CA | 24 Hour Fitness USA Inc. | 54,462 | 2011 | 2/29/2024 |
| 1378 | Orange | CA | Lutheran High School of Orange County | 100 Parking Spaces | 2012 | 6/30/2019 |
| 1404 | Massapequa | NY | Lands' End, Inc. | 6,997 | 2014 | 1/31/2020 |
| 1463 | Burlington | VT | Lands' End, Inc. | 7,315 | 2014 | 1/31/2020 |
| 1478 | San Bruno | CA | Lands' End, Inc. | 8,698 | 2014 | 1/31/2019 |
| 1494 | Moorestown | NJ | Lands' End, Inc. | 8,126 | 2014 | 1/31/2020 |
| 1644 | Lancaster | PA | Lands' End, Inc. | 8,635 | 2014 | 1/31/2020 |
| 1654 | Media | PA | Lands' End, Inc. | 8,919 | 2014 | 1/31/2020 |
| 1654 | Media | PA | Granite Run Buick GMC | | 2017 | 12/31/2018 |
| 1684 | Woodbridge | NJ | Cellco Partnership | 8,070 | 1987 | 7/31/2021 |
| 1722 | Bloomington | MN | Lands' End, Inc. | 8,564 | 2014 | 1/31/2020 |

156

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1725 | Annapolis | MD | Lands' End, Inc. | 8,588 | 2014 | 1/31/2019 |
| 1733 | Yonkers | NY | Lands' End, Inc. | 6,664 | 2014 | 1/31/2020 |
| 1754 | Gaithersburg | MD | Lands' End, Inc. | 8,839 | 2014 | 1/31/2020 |
| 1754 | Gaithersburg | MD | Sears Home Improvement Products, Inc. (Embedded) | 10,000 | | |
| 1810 | Cincinnati | OH | Lands' End, Inc. | 8,305 | 2014 | 1/31/2020 |
| 1834 | North Wales | PA | Lands' End, Inc. | 9,819 | 2014 | 1/31/2020 |
| 1984 | Buffalo/Hamburg | NY | Lands' End, Inc. | 8,118 | 2014 | 1/31/2019 |
| 2023 | Concord | NH | Lands' End, Inc. | 6,718 | 2014 | 1/31/2019 |
| 2027 | Wasilla | AK | Lands' End, Inc. | 7,063 | 2014 | 1/31/2019 |
| 2049 | Everett | WA | Brixton Everett, LLC | | 2008 | 12/31/2018 |
| 2049 | Everett | WA | Brixton Everett, LLC | | 2015 | 6/30/2019 |
| 2085 | Fajardo | PR | Sears, Roebuck de Puerto Rico, Inc. | 24,536 | 1986 | 9/30/2023 |
| 2373 | No Dartmouth | MA | Lands' End, Inc. | 4,076 | 2014 | 1/31/2019 |
| 2395 | Manassas | VA | Lands' End, Inc. | 7,407 | 2014 | 6/14/2019 |
| 2435 | Charlottesville | VA | Lands' End, Inc. | 6,125 | 2014 | 1/31/2020 |
| 2694 | Fredericksburg | VA | Lands' End, Inc. | 5,347 | 2014 | 1/31/2020 |
| 3029 | Erlanger | KY | Sinkula Investments, Ltd. | 3,500 | 1984 | 10/31/2022 |
| 3029 | Erlanger | KY | EDGEWOOD PLAZA HOLDINGS, LLC | | | 11/30/2022 |
| 3040 | Hyannis | MA | The Paper Store, LLC | | 2017 | 3/31/2023 |
| 3074 | Miami | FL | Split rent for AmFoods | | 0 | 6/30/2022 |
| 3074 | Miami | FL | AmFoods LLLC | 2,430 | 1987 | 6/30/2022 |
| 3127 | Temple City | CA | H. Demirjian, Inc. | 5,151 | 2014 | 11/30/2022 |

157

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 3136 | Shillington | PA | Amelia's LLC | | 2013 | 7/31/2019 |
| 3172 | Hagerstown | MD | Fazou's Restaurant | 3,246 | 2000 | 9/30/2019 |
| 3235 | West Covina | CA | Sears Outlet Stores, LLC | 17,310 | 2012 | 4/20/2022 |
| 3235 | West Covina | CA | Filza Khan | 3,400 | 2015 | 3/31/2022 |
| 3286 | Brunswick | OH | GREF II REIT,LLC | | 0 | 12/31/2019 |
| 3286 | Brunswick | OH | Jud's Best Discount Muffler & Brake, Inc. | 3,035 | 2010 | 3/30/2020 |
| 3379 | Waterford | MI | Lou Dallo | 3,701 | 2008 | 2/28/2021 |
| 3412 | Salinas | CA | Rexfor Title, Inc. | | 2013 | 1/31/2034 |
| 3471 | Chesapeake | VA | Sears Outlet Stores, LLC | 33,137 | 2012 | 10/31/2020 |
| 3499 | Kearny | NJ | Modell's NJ II., Inc. | | 2013 | 4/30/2021 |
| 3725 | Watsonville/Freedom | CA | Dora M. Espindola (DBA "Designing Cut") | 1,050 | 1994 | 6/30/2018 |
| 3725 | Watsonville/Freedom | CA | Advance America, Cash Advance Centers of California LLC | 1,400 | 1998 | 1/31/2021 |
| 3725 | Watsonville/Freedom | CA | Foodmaker, Inc. (DBA "Jack in the Box") | 2,800 | 1998 | 7/30/2019 |
| 3725 | Watsonville/Freedom | CA | Louis Hong D.D.S (DBA "Freedom Dental") | 1,750 | 2000 | 7/31/2020 |
| 3725 | Watsonville/Freedom | CA | Richard E. Turner and Joanne K. Turner (DBA "The 99 Cent Store") | 2,800 | 2007 | 10/31/2018 |
| 3725 | Watsonville/Freedom | CA | Tina Dang (DBA "D&L Nails") | 1,366 | 2007 | 1/31/2021 |
| 3725 | Watsonville/Freedom | CA | Hein Thuy le and Hoa Le (DBA "Whispering Pines Dry Cleaners") | 1,200 | 2014 | 2/28/2019 |
| 3725 | Watsonville/Freedom | CA | Split rent for The 99 Cent Store | | | 10/31/2018 |
| 3748 | Hollister | CA | Crystal TV, Inc. / Radio Shack Licensed Dealer | 2,300 | 2007 | 3/31/2020 |

158

WEIL:\96826275\11\73217.0003

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 3748 | Hollister | CA | VIP Wireless, Inc., MetroPCS Authorized Dealer | 2,800 | 2016 | 10/21/2020 |
| 3785 | Tabb | VA | Chick-Fil-A Inc. | 54,860 | 2000 | 3/31/2021 |
| 3785 | Tabb | VA | Kroger Limited Partnership I | 92,348 | 2014 | 9/30/2033 |
| 3785 | Tabb | VA | Kroger Limited Partnership I | 37,268 | 2014 | 9/30/2033 |
| 3785 | Tabb | VA | Restaurant Property Investors II LLC c/o Burger Busters Inc. (DBA "Taco Bell") | 38,768 | 2015 | 9/30/2033 |
| 4022 | Grand Forks | ND | Hometown Automotive Repair LLC | 4,620 | 2010 | 8/31/2019 |
| 4057 | Fargo | ND | NDM Restaurants (DBA "Burger King") | 5,000 | 1976 | 6/30/2018 |
| 4057 | Fargo | ND | Dakota Tire Service, Inc | 4,000 | 2004 | 3/31/2019 |
| 4113 | Erie | PA | Erie Physicians Network ~ UPMC, Inc | 7,760 | 2008 | 11/30/2020 |
| 4170 | Rapid City | SD | MTS Enterprises LLC (DBA "Tiretech") | 2,914 | 2010 | 2/28/2019 |
| 4214 | Des Plaines | IL | (DBA "Eddies Restaurant CO") | 3,205 | 1988 | 7/31/2022 |
| 4214 | Des Plaines | IL | The Twins Group, Inc. (DBA "Taco Bell") | | 1988 | 10/31/2018 |
| 4214 | Des Plaines | IL | (DBA "Quick Service Auto") | 4,192 | 2008 | 11/30/2022 |
| 4214 | Des Plaines | IL | Split rent w/ ML for Eddie's Restaurant Co.- Lasalle Bank Na Trust #54625 D | | | 7/31/2022 |
| 4272 | Bismarck | ND | McDonalds Corp. | 5,000 | 1984 | 8/20/2020 |
| 4272 | Bismarck | ND | Split rent for Mc Donald's | | | 10/31/2019 |
| 4351 | Rochester | MN | Salvation Army | 20,000 | 2004 | 11/30/2020 |
| 4381 | Bridgeview | IL | Sears Outlet Stores, LLC | 11,576 | 2012 | 1/31/2021 |

WEIL:\96826275\11\73217.0003

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 4389 | Mc Allen | TX | Big Lots Stores Inc #01544B | 22,755 | 2000 | 11/30/2019 |
| 4399 | Silver Springs | MD | DavCo Food, Inc. (DBA "Wendy's") | 2,453 | 1990 | 10/31/2018 |
| 4421 | North Hollywood | CA | Successor in interest to Pic N Save (DBA "Big Lots Stores Inc.") | 20,000 | 1970 | 3/31/2021 |
| 4421 | North Hollywood | CA | Paul Jardin of USA, Inc. (DBA "3 Day Suit Broker") | 11,000 | 1986 | 3/30/2021 |
| 4478 | Trenton/Hamilton | NJ | Brixmor Operating Partnership | | | 6/30/2020 |
| 4494 | Trujillo Alto | PR | RD Management Corporation | 4,100 | 1985 | 5/31/2024 |
| 7030 | Kalispell | MT | Burger King Corporation | 4,000 | 1999 | 5/5/2020 |
| 7030 | Kalispell | MT | Split Rent for Burger King Sublease | | 1999 | 5/5/2020 |
| 7030 | Kalispell | MT | Evergreen Chamber of Commerce | | 2013 | 7/31/2019 |
| 7033 | Lewiston | ID | Split rent for Wendy's outlot | | 0 | 2/28/2015 |
| 7033 | Lewiston | ID | Dale F. Nagy/Picadilly Investment Properties (DBA "Wendy's") | 3,000 | 1984 | 2/28/2015 |
| 7042 | Valparaiso | IN | BR Associates Inc (DBA "Long John Silver Seafood Shoppes") | 35,875 | 1977 | 12/31/2018 |
| 7783 | San Juan (Hato Rey) | PR | Marketing & Printing Solutions, Inc. | 695 | 2010 | 11/30/2018 |
| 8206 | Nashville | TN | Sears Outlet Stores, LLC | 70,227 | 2012 | 12/31/2022 |
| 8262 | Naperville | IL | Dart Warehouse Corporation | | 2011 | 12/31/2020 |
| 8273 | Lawrence | KS | (DBA "Berry Plastics Corporation") | 100 Parking Spaces | 2013 | 10/15/2018 |
| 8724 | Pittsburgh | PA | Sears Outlet Stores, LLC | 44,215 | 2012 | 12/31/2022 |
| 8744 | Allentown | PA | Fedex Ground Package System Inc | 50 Trailers | 2015 | 1/31/2019 |

WEIL:\96826275\11\73217.0003

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 8768 | Sacramento | CA | Sears Outlet Stores, LLC | 43,063 | 2012 | 12/31/2018 |
| 8818 | Pearl City | HI | Bethany Korean United Methodist Church | 9,096 | 2011 | 4/30/2021 |
| 8818 | Pearl City | HI | Sears Outlet Stores, LLC | 28,978 | 2012 | 12/31/2022 |
| 8937 | Tucson | AZ | Sims Recycling Solutions Inc. | 6,000 | 2012 | 12/31/2020 |
| 9413 | West Orange | NJ | Dollar Tree Stores, Inc. #3811 | 10,280 | 1981 | 1/31/2022 |
| 9413 | West Orange | NJ | Eyeglass Service Industries, Inc. | 800 | 1981 | 10/31/2014 |
| 9413 | West Orange | NJ | Staples, Inc. #0168 | 19,740 | 1988 | 2/28/2017 |
| 9420 | Bronx | NY | David's Check Cashing, Inc. | 722 | 2008 | 11/20/2018 |
| 9420 | Bronx | NY | G-Maxx Home of Bruckner, LLC | 5,138 | 2009 | 10/31/2014 |
| 9420 | Bronx | NY | Sears, Roebuck and Co. | 2,736 | 2018 | 11/30/2023 |
| 9420 | Bronx | NY | Burlington Coat Factory of California LLC | | 2018 | |
| 9423 | Bridgehampton | NY | Lands' End, Inc. | | 2014 | 1/31/2016 |
| 9693 | Marine City | MI | Frank Koehldorfer (DBA "Marine City Auto Care") | 3,216 | 2010 | 2/28/2019 |
| 1280 | Springdale | OH | Tri-County Mall LLC | 4,316 | | 7/31/2024 |
| 2138 | Santa Barbara | CA | Sprint PCS Assets, LLC | | | 6/30/2019 |
| 3018 | Valencia | CA | Magic Auto Center | 4,406 | | 3/30/2022 |
| 3018 | Valencia | CA | McDonalds Corp L/C 004-1368 | 5,000 | | 5/31/2022 |
| 3018 | Valencia | CA | Simply Discount Furniture | 79,699 | | 5/31/2022 |
| 3116 | Wilmington (Store Closing) | NC | Jack A. Sneeden Corporation | 5,604 | | 6/30/2023 |
| 3239 | Kansas City | MO | Zeller Auto Repair | 4,201 | | 8/31/2020 |
| 3239 | Kansas City | MO | Advance America | 1,480 | | 1/31/2020 |

WEIL:\96826275\11\73217.0003

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 3239 | Kansas City | MO | Barbers Plus | 1,600 | | 12/31/2018* |
| 3239 | Kansas City | MO | H & R Block | 2,400 | | 4/30/2019 |
| 3239 | Kansas City | MO | Big Bowl Pho | 2,400 | | 4/30/2022 |
| 3239 | Kansas City | MO | Papa John's | 2,000 | | 6/30/2021 |
| 3239 | Kansas City | MO | Tasty Thai | 2,000 | | 3/31/2020 |
| 3361 | Allentown | PA | Floreff LLC & Nathan & Alison LLC | | | 5/31/2023 |
| 3371 | Chicago | IL | AGC Addison Owner, LLC | | | 4/1/2019 |
| 3447 | Clive | IA | At Home Stores, LLC | 90,000 | | 1/31/2021 |
| 3483 | Ontario | CA | Wolf Family Series LP | 11,000 | | 5/31/2020 |
| 3793 | Miami | FL | Goodwill | 208 | | 9/30/2019 |
| 4064 | N Versailles | PA | Burger King Corporation | 2,750 | | 11/24/2020 |
| 4215 | Kansas City | KS | Xiao Jun Song and Liu Y Lin | 11,408 | | 1/31/2019 |
| 4433 | Quincy | IL | Gengenbacher Ice Shack | | | 10/31/2018* |
| 4450 | Raleigh | NC | Choice Auto Repair | 4,581 | | 9/30/2021 |
| 4450 | Raleigh | NC | Grand Slam USA | 20,000 | | 9/30/2021 |
| 4455 | Beaverton | OR | Glowing Greens, LLC | 20,000 | | 7/31/2018 |
| 4455 | Beaverton | OR | Beaverton Mart Company | | | 8/31/2022 |
| 4455 | Beaverton | OR | Carr Auto Group | | | 4/30/2019 |
| 7067 | Ft. Meyers | FL | Floor & Decor | 75,200 | | 8/31/2026 |
| 7259 | Williamsburg | VA | New Oriental Crafts, LLC | 3,200 | | 10/31/2019 |
| 7259 | Williamsburg | VA | H & R Block | 1,600 | | 4/30/2019 |
| 7259 | Williamsburg | VA | International Styles | 1,200 | | 9/30/2019 |

WEIL:\96826275\11\73217.0003

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---------|------|----|--------------------------|---------------|----------------------------|------------------------------|
| 7259 | Williamsburg | VA | New Oriental Crafts, LLC | 2,000 | | 10/31/2019 |
| 7259 | Williamsburg | VA | Tu Tienda and Gifts | 5,160 | | 8/30/2019 |
| 7259 | Williamsburg | VA | Williamsburg Peking Corp | 9,560 | | 9/30/2019 |
| 7274 | Mauldin | SC | Mauldin at Butler, LLC (Hughes Development) | | | 3/31/2019 |
| 7324 | O'Fallon | MO | At Home Stores, LLC | 87,314 | | 11/29/2020 |
| 8065 | Miami | FL | Miami Hotel Enterprise LLC | 50 Parking Spaces | | 11/14/2019 |
| 8065 | Miami | FL | Sears Home Improvement Products, Inc. (Embedded) | 1,000 | | |
| 8398 | San Jose | CA | Beacon Sales Acquisition, Inc. | 37,500 | | 10/31/2023 |
| 9348 | Norridge | IL | Darden/Longhorn Steakhouse | | | 3/31/2021 |
| 9354 | Griffin | IN | El Centro Mall, Ltd. | | | |
| 30936 | Tinley Park | IL | Bettenhausen Automotive | 250 Parking Spaces | | 8/6/2018* |
| 30936 | Tinley Park | IL | Ziegler Nissan of Orland Park | 250 Parking Spaces | | 3/20/2019 |
| 30938 | Glendale | AZ | Living Spaces | 126,164 | | 4/30/2024 |
| 30969 | San Leandro | CA | Living Spaces | 91,905 | | 11/30/2022 |
| 31882 | San Diego | CA | Lucky Star Seafood Restaurant | 11,000 | | 4/30/2019 |
| 31882 | San Diego | CA | Northgate Gonzalez Markets | 41,371 | | 7/31/2023 |
| 31882 | San Diego | CA | Burlington Coat Factory | 63,900 | | 2/28/2025 |
| 61901 | Scottsdale | AZ | Living Spaces Furniture, LLC | 133,120 | | 9/30/2024 |
| 62529 | San Diego | CA | Zion Market San Diego Inc. | 94,500 | | 12/31/2023 |
| 62707 | Springfield | MO | David's Bridal Inc | 12,370 | | 1/31/2019 |

2. The following is a list of security deposits applicable to the:

### A. *Owned Real Property*

| PS Unit# | Lease | City | State | Landlord/Tenant name | Paid (Received) Amount |
|---|---|---|---|---|---|
| **Sears** | | | | | |
| | | | | | |
| 3966 | 29976 | APPLE VALLEY | CA | VIRGINIA BARNICOAT AND DAVID B | (1,166.67) |
| 3966 | 33059 | APPLE VALLEY | CA | MINA PATEL DBA APPLE VALLEY SM | (1,806.00) |
| 3966 | 35548 | APPLE VALLEY | CA | DIEM HONG NGO | (340.00) |
| 3966 | 35548 | APPLE VALLEY | CA | DIEM HONG NGO | (525.85) |
| 01314 | 01314 01C | NEW BRUNSWICK | NJ | NEW BRUNSWICK RESTAURANT LLC | (21,666.66) |
| 01710 | 01710 01C | NORTH OLMSTED | OH | GEORGE GROUP - GREAT NORTHERN LTD, AN OHIO LTD | (22,183.98) |
| 02183 | 02183 01B | S PORTLAND | ME | OTB ACQUISITION LLC | (22,500.00) |
| 45115 | 08702 43A | MINNEAPOLIS | MN | BEAUPRE AERIAL EQUIPMENT | (3,333.00) |
| 45162 | 08717 48D | HOUSTON | TX | HOLLIDAY DOOR & GATE LLC | (3,500.00) |
| 26731 | 26731 08B | MANAKIN SABOT | VA | SAWYER BUSINESS GROUP INC | (3,585.00) |
| | | | | | |
| **Kmart** | | | | | |
| 3088 | 36116 | KENOSHA | WI | METRO PCS | (1,800.00) |
| 3722 | 35477 | BURLINGTON | WA | RENT-A-CENTER WEST, INC. | (3,734.13) |
| 3722 | 35457 | BURLINGTON | WA | HI-TEK NAILS | (4,234.00) |
| 9255 | 34822 | PALMER | MA | GIL'S GYM AND RACQUET HEALTH C | (14,997.75) |
| 26185 | 35269 | CLARKSVILLE | IN | PEDDLERS MALL, LLC | (19,000.00) |
| 3544 | 35422 | SALEM | VA | WEST MAIN HAIR SALON | (1,866.66) |
| 3544 | 34984 | SALEM | VA | NAIL TIPS | (1,251.00) |
| 3544 | 34988 | SALEM | VA | UPS STORE | (1,533.33) |
| 30934 | 35159 | MEMPHIS | TN | TENNESSEE CASH CONNECTION, LLC | (1,498.00) |

### B. *Leased Properties*

| PS Unit# | Lease | City | State | Landlord/Tenant name | Paid (Received) Amount |
|---|---|---|---|---|---|
| **Sears** | | | | | |
| | | | | | |

164

| 25016 | 25016 44D | COLUMBUS | OH | BROWNING POLARIS, LLC | 18,657.74 |
| 07595 | 07595 16A | GAHANNA | OH | MHI OHIO CC III LLC | 4,331.25 |
| 01678 | 01678 10A | CARLSBAD | CA | RPI CARLSBAD, L.P. | 75,000.00 |
| 45145 | 08901 48A | BENICIA | CA | ICON NEWCO POOL 1 SF NON-BUS PARKS | 57,912.24 |
| 45146 | 08868 48A | MILPITAS | CA | PSB N CA INDUSTRIAL PORTFOLIO LLC | 23,233.69 |
| 7979 | 07979 15B | JACKSONVILLE | FL | TOWN CENTER STORAGE | 37,200.00 |
| 45359 | 08004 48D | SPOKANE | WA | NEW AFC REALITY LLC | 12,467.00 |
| 45415 | 08709 73B | KENT | WA | CENTERPOINT PROPERTIES TRUST | 553,922.66 |
| 9507 | 09507 11B | SAN ANTONIO | TX | COPT SA TECHNOLOGY C | 56,669.92 |
| 08162 | 08162 15B | EDEN PRAIRIE | MN | EDEN PRAIRIE ASSOCIATES LLC | 6,560.25 |
| 01092 | 01092 05A | WAYNE | MI | AUTO ACCESSORIES USA INC | (14,600.00) |
| 45167 | 08818 48C | PEARL CITY | HI | BETHANY KOREAN UNITED METHODIST CHURCH | (22,740.00) |
| 8369 | 08369 15E | SANTA ANA | CA | ATLAS INTERNATIONAL INC | (22,650.00) |
| 8398 | 08398 15B | SAN JOSE | CA | ROOFING SUPPLY GROUP - BAY AREA LLC | (50,000.00) |
|  |  |  |  |  |  |
| **Kmart** |  |  |  |  |  |
| 3127 | 36019 | TEMPLE CITY | CA | CROWN CITY AUTOMOTIVE | (12,997.70) |
| 3235 | 36970 | WEST COVINA | CA | PURRFECT AUTO SERVICE | (10,999.00) |
| 3286 | 35669 | BRUNSWICK | OH | JUD'S BEST DISCOUNT MUFFLER & | (2,100.00) |
| 3379 | 35119 | WATERFORD | MI | M & L AUTO | (4,934.66) |
| 3725 | 29334 | FREEDOM | CA | RICHARD & JOANNE TURNER (99 CE | (6,160.00) |
| 3725 | 29336 | FREEDOM | CA | JOSE & DORA ESPINDOLA (DESIGN | (2,730.00) |
| 3725 | 29337 | FREEDOM | CA | LOUIS HONG D.D.S | (3,500.00) |
| 3725 | 29343 | FREEDOM | CA | ADVANCE AM CASH CENTERS | (1,540.00) |
| 3725 | 34757 | FREEDOM | CA | D&L NAILS | (4,917.60) |
| 3725 | 35894 | FREEDOM | CA | WHISPERING PINES DRY CLEANERS | (2,000.00) |
| 3748 | 29345 | HOLLISTER | CA | CRYSTAL TV, INC. | (2,875.00) |
| 3748 | 37149 | HOLLISTER | CA | VIP WIRELESS, INC. | (7,466.66) |
| 4022 | 35363 | GRAND FORKS | ND | HOMETOWN AUTOMOTIVE REPAIR LLC | (2,310.00) |
| 4057 | 33593 | FARGO | ND | DAKOTA TIRE SERVICE, INC | (4,400.00) |
| 4113 | 35763 | ERIE | PA | ERIE PHYSICIANS NETWORK-UPMC, | (8,907.50) |
| 4170 | 35306 | RAPID CITY | SD | TIRETECH | (1,214.17) |
| 4214 | 35045 | DES PLAINES | IL | QUICK SERVICE AUTO | (7,685.34) |
| 4351 | 34636 | ROCHESTER | MN | SALVATION ARMY | (5,000.00) |

165

| 9420 | 35597 | BRONX | NY | G-MAXX HOME OF BRUCKNER, LLC | (22,936.57) |
| 9420 | 27016 | BRONX | NY | DAVID'S CHECK CASHING, INC | (7,600.00) |
| 9693 | 35463 | MARINE CITY | MI | MARINE CITY AUTO CARE | (4,598.88) |
| 3018 | 35326 | VALENCIA | CA | MAGIC AUTO CENTER | (11,015.00) |
| 3127 | 36019 | TEMPLE CITY | CA | CROWN CITY AUTOMOTIVE | (12,997.70) |
| 3235 | 36970 | WEST COVINA | CA | PURRFECT AUTO SERVICE | (10,999.00) |
| 3239 | 35458 | KANSAS CITY | MO | KEN ZELLER/ZELLER AUTO REPAIR, | (6,301.50) |
| 3239 | 33598 | KANSAS CITY | MO | TASTY THAI | (1,666.67) |
| 3239 | 33602 | KANSAS CITY | MO | BARBERS PLUS | (700.00) |
| 3239 | 33603 | KANSAS CITY | MO | ADVANCE AMERICA CASH | (1,171.67) |
| 3239 | 35643 | KANSAS CITY | MO | RG THRIFT STORE LLC | (2,800.00) |
| 3239 | 35950 | KANSAS CITY | MO | M & D ENTERPRISES, INC. | (6,144.00) |
| 4022 | 35363 | GRAND FORKS | ND | HOMETOWN AUTOMOTIVE REPAIR LLC | (2,310.00) |
| 4113 | 35763 | ERIE | PA | ERIE PHYSICIANS NETWORK-UPMC, | (8,907.50) |
| 4170 | 35306 | RAPID CITY | SD | TIRETECH | (1,214.17) |
| 4215 | 27610 | KANSAS CITY | KS | XIAO JUN SONG AND LIU Y LIN | (5,000.00) |
| 4351 | 34636 | ROCHESTER | MN | SALVATION ARMY | (5,000.00) |
| 4450 | 35061 | RALEIGH | NC | CHOICE AUTO REPAIR | (6,489.72) |
| 4455 | 35839 | BEAVERTON | OR | GLOWING GREEN, LLC | (8,000.00) |
| 7259 | 29383 | WILLIAMSBURG | VA | WILLIAMSBURG PEKING CORP | (15,817.62) |
| 7259 | 34571 | WILLIAMSBURG | VA | KING'S CREEK PLANTATION LLC | (2,000.00) |
| 7259 | 35465 | WILLIAMSBURG | VA | NEW ORIENTAL CRAFTS, LLC | (2,500.00) |
| 7259 | 35722 | WILLIAMSBURG | VA | DPE INC, | (2,400.00) |

3. The Following issues affect the status of Lease Premises.

| Store | Unit # | City | State | Status |
|-------|--------|------|-------|--------|
| Kmart | 30938 | Glendale | AZ | Lease renewal sent extending term to 04/30/2024. |
| Sears | 1098 | Clovis | CA | A 60 day stay letter was sent and Seller exercised its 5 year renewal option |

166

| Store | Unit # | City | State | Status |
|-------|--------|------|-------|--------|
| Kmart | 7390 | McKinleyville | CA | At landlord, Seritage's, request, Seller, as tenant, has signed a bifurcated lease but Seller has not received countersignature by landlord (Seritage likely selling property). |
| Sears | 2829 | Victorville | CA | A 60 day stay letter was sent and Seller exercised its 5 year renewal option |
| Sears | 2068 | Visalia | CA | Lease amendment pending re setting of rent amounts for 3 year renewal option as lease provides for renewal rent to be set at FMV (current lease expires 05/31/19); At landlord, Seritage's, request, Seller, as tenant, has signed a bifurcated lease but Seller has not received countersignature by landlord (Seritage likely selling property). |
| Sears | 8065 | Miami | FL | 6 month Co-Occupancy License Agreement being granted to Service.com upon SHIP APA Closing |
| MDO | 8920 | Louisville | KY | Renewal was due by 10/30/18.  10/31/18 letter to landlord re BK and reservation of right to exercise renewal. LL sent notice dated 12/1/18 terminating tenant renewal |
| Sears | 1053 | Saugus | MA | Landlord has issued a notice of partial recapture. |
| Sears | 1754 | Gaithersburg | MD | 6 month Co-Occupancy License Agreement being granted to Service.com upon SHIP APA Closing |
| Kmart | 7035 | Farmington | NM | Seller and Seritage, landlord, have signed a bifurcated lease (Seritage likely selling property). |
| Kmart | 7016 | Hobbs | NM | Seller and Seritage, landlord, have signed a bifurcated lease (Seritage likely selling property); landlord has issued a notice of partial recapture. |
| Kmart | 4871 | Farmingville | NY | A 60 day stay letter was sent and Seller exercised its 5 year renewal option, however, LL is contesting the validity of the renewal notice. |

167

| Store | Unit # | City | State | Status |
|-------|--------|------|-------|--------|
|  | 5864 | Las Vegas | NV | Term of lease expired 08/31/18; lease provides that tenancy goes to month to month after term expires.  Negotiating new lease with Landlord. |
| Kmart | 3266 | Edwardsville | PA | A 60 day stay letter was sent and Seller exercised its 5 year renewal option |
| Kmart | 3268 | Wilkes Barre | PA | A 60 day stay letter was sent and Seller exercised its 5 year renewal option, however, LL is contesting the validity of the renewal notice |
| Sears | 2355 | Hatillo | PR | A 60 day stay letter was sent and Seller exercised its 5 year renewal option. |
| Sears | 1905 | San Juan | PR | 2 year Co-Occupancy License Agreement being granted to Service.com upon SHIP APA Closing |
| Sears | 1575 | Hampton | VA | At landlord, Seritage's, request, Seller, as tenant, has signed a bifurcated lease but Seller has not received countersignature by landlord (Seritage likely selling property). |

168

**Schedule 6.6(d)**

1.    The following lease defaults have been alleged against the Leased Properties and remain unresolved:

| RE ID | ST | Name | Address | Detail |
|-------|-----|------|---------|--------|
| 704200 | IN | Valparaiso | 2801 Calumet Ave | Default Notice – Alleged failure to pay ATM rent of $15, 638.71 and 2016 RE Taxes of $34,886.76, and 2017 taxes owed for $9,230.90 |
| 885100 | MA | Westwood | 349 University Ave | Default Notice – Alleged failure to pay rent |
| 980800 | MT | Hamilton | 1235 North First Street | Default Notice - October rent NSF and returned. |
| 720800 | NC | Clemmons | 2455 Lewisville-Clemmon | Deferred Maintenance Notice – alleged failure to maintain: parking lot, exterior walls, curbs, down spouts, bollards. |
| 487100 | NY | Farmingville | 2280 North Ocean Ave. | Default Notice – Alleged failure to properly maintain Premises and portions of the Common Area. Landlord is seeking an order by the BK Court declaring that the automatic stay is inapplicable to the lease in question based on an alleged default by Tenant and asserts that the lease expired by its terms on October 23, 2018. Landlord is arguing that because the lease terminated by its terms on October 23, 2018, the automatic stay does not apply to the lease in question and Landlord is seeking a declaration from the Court stating as such and that the lease is not property of the Debtors' estates. |
| 882300 | VA | Dulles | 45065 Old Ox Rd | Default Notice – Alleged failure to maintain building. |
| 883600 | VA | Richmond | 4100 Tomlyn St | Default Notice - Failure to pay CAM |
| 173800 | HI | Kaneohe(Sur) | 46-056 Kamehameha Hwy | Default Notice – Nonpayment of rent |
| 777700 | NY | New York | 770 Broadway | Rent Dispute |
| 932800 | CA | Long Beach | 2900 Bellflower Blvd | Possible lease default alleged; |
| 700600 | ID | Twin Falls | 2258 Addison Ave East | Landlord claims Tenant has breached lease by (i) building addition over property line and (ii) obligations related to installation and removal of underground storage |

169

| RE ID | ST | Name | Address | Detail |
|---|---|---|---|---|
| | | | | tanks. Landlord has filed motion in BK proceeding to compel the Debtors to reject the lease associated with this location or, in the alternative, establish a deadline by which the Debtors must assume and cure all defaults or reject the lease. |
| 2537 | TX | Harlington | | Rent dispute with Landlord re correct amount of rent that is owed, including utility charges |
| 30961 | NC | Greensboro | | Dispute regarding maintenance of roof |
| 3725 | CA | Freedom | 1702 Freedom Boulevard | Dispute regarding payment of additional rent and delivery of subtenant rent reports. |
| 3202 | NJ | Westwood | 700-732 Broadway | Alleged failure to pay additional rent for real-estate taxes in the amount of $119,799.29. |

2.    With respect to factual matters that could give rise to an event of default after the giving of notice and the passage of any applicable cure period, Item 16 of Schedule 6.5 is hereby incorporated by reference.

3.    The following listing is of pending property claims for damage to buildings and FF&E at the Lease Premises, which could give rise to an event of default after the giving of notice and the passage of time:

| Unit | Address | Loss City | Loss State | Property Group | 10K Owned / L/GL | Date of Loss | Claim Property: Claim Property Number | Estimated Loss to Building and FF&E |
|---|---|---|---|---|---|---|---|---|
| 03692 | | Oconomowoc | WI | | | 8/31/2018 | P1808315017 | 1,000 |
| 03750 | | Waupaca | WI | | | 9/20/2018 | P1809215022 | 1,000 |
| 01575 | | Newport News | VA | | | 10/12/2018 | P1810125008 | 3,000 |
| 01814 | | Fairfax | VA | | | 10/26/2018 | P181026578 | 0 |
| 02147 | | Irving | TX | | | 2/21/2018 | P1802215013 | 1,000,000 |
| 01247 | | Lubbock | TX | | | 5/30/2018 | P1806085128 | 1,276,710.45 |
| 03853 | | Guayama | PR | | | 9/21/2017 | P1709225039 | 5,493,436 |

WEIL:\96826275\11\73217.0003

| Unit | Address | Loss City | Loss State | Property Group | 10K Owned / L/GL | Date of Loss | Claim Property: Claim Property Number | Estimated Loss to Building and FF&E |
|------|---------|-----------|------------|----------------|------------------|--------------|----------------------------------------|-------------------------------------|
| 04490 | | Guaynabo | PR | | | 9/20/2017 | P1709215105 | 15,939 |
| 03896 | | San German | | | | 9/20/2017 | P1710115032 | 1,360,000.45 |
| 01935 | | Mayaguez | PR | | | 9/20/2017 | P1710025033 | 191,843.39 |
| 07293 | | Clifton Heights | PA | | | 12/13/2018 | P1812135064 | 10,000 |
| 01154 | | Whitehall | PA | | | 9/4/2018 | P1809055062 | 3,000 |
| 03527 | | Philadelphia | PA | | | 11/16/18 | P1811165001 | 2,500 |
| 02494 | | Altoona | PA | | | 1/5/2019 | P1901065007 | 0 |
| 03600 | | Schenectady | NY | | | 10/9/2018 | P1810115031 | 1,000 |
| 01668 | | Las Vegas | NV | | | 11/13/2018 | P1811135043 | 7,500 |
| 04112 | | Asheville | NC | | | 9/13/2018 | P1809135056 | 1,000 |
| 04450 | | Raleigh | NC | | | 12/10/2018 | P1812105001 | 0 |
| 08319 | | Charlotte | NC | | | 11/29/2018 | P1811295040 | 500 |
| 01403 | | Natick | MA | | | 12/19/2018 | P1812215036 | 0 |
| 03288 | | Billerica | MA | | | 1/6/2019 | P1901075009 | 0 |
| 04215 | | Kansas City | KS | | | 8/31/2018 | P1809055014 | 1,000 |
| 01740 | | Joliet | IL | | | 12/21/2018 | P1812215050 | 1,000 |
| 02805 | | Panama City | FL | | | 10/10/2018 | P1811095002 | 0 |
| 07321 | | Bradenton | FL | | | 9/12/2017 | P1709185056 | 10,000 |
| 04893 | | Ellenton | FL | | | 9/10/2017 | P1709115098 | 3,123.18 |
| 03424 | | Gainesville | FL | | | 12/7/2018 | P1812075016 | 500 |
| 01755 | | Boynton Beach | FL | | | 9/11/17 | P1709125057 | 17,263 |
| 03235 | | West Covina | CA | | | 12/7/18 | P1812075016 | 500 |

171

WEIL:\96826275\11\73217.0003

| Unit | Address | Loss City | Loss State | Property Group | 10K Owned / L/GL | Date of Loss | Claim Property: Claim Property Number | Estimated Loss to Building and FF&E |
|---|---|---|---|---|---|---|---|---|
| 01408 | | Sacramento | CA | | | 11/3/2018 | P1811035047 | 500 |
| 01618 | | Modesto | CA | | | 6/18/2018 | P1806195001 | 242,000 |
| 03483 | | Ontario | CAN | | | 10/22/2018 | P1810235033 | 1,000 |
| 03405 | 10 W. Lake Street | Minneapolis | MN | Open Store | GL | 9/29/2018 | P18100950350001 | 1,000 |
| 01085 | Intersection of State Roads Pr 1 & Pr 156 | Caguas | PR | Open Store | Lease | 9/6/2017 | P17090850990001 | 0 |
| 02675 | Road 3 KM.L34.7 | Guayama | PR | Open Store | Lease | 9/21/2017 | P17092250450001 | 1,566,308 |
| 07788 | Pr 167 & Las Cumbres | Bayamon | PR | Open Store | Lease | 9/20/2017 | P17092250650001 | 849,407 |
| 07419 | Rafael Cordero & Hwy 30 | Caguas | PR | Open Store | Lease | 9/20/2017 | P17092250620001 | 292,399 |
| 07570 | Plaza Rio Hondo & Comerio Ave | Bayamon | PR | Open Store | Lease | 9/21/2017 | P17092250510001 | 222,810 |
| 07741 | 2643 Ponce Bypass | Ponce | PR | Open Store | Lease | 9/20/2017 | P17092250640001 | 278,379 |
| 03829 | 26-A Tutu Park Mall | St Thomas | VI | Open Store | Lease | 9/6/2017 | P17092050090001 | 1 |
| 01024 | 6211 Leesburg Pike | Falls Church | VA | Open Store | Lease | 8/31/2018 | P18090150060001 | |
| 45091 a/k/a 8720 | 2065 George Street | Melrose | IL | Non-Retail | Lease | 11/3/2018 | P18110350310001 | 0 |
| 01668 | 4000 Meadow Lane | Las Vegas | NV | Open Store | Lease | 11/13/2018 | P18111350430001 | 7,500 |
| 04457 | 26231 Mission Blvd. | Hayward | CA | Open Store | GL | 12/1/2018 | P18120150500001 | 500 |
| 01274 | 11500 Midlothian Turnpike | Richmond | VA | Open Store | GL | 12/3/2018 | P18120450040001 | 500 |
| 04457 | 26231 Mission Blvd. | Hayward | CA | Open Store | GL | 9/20/2018 | P18092050920001 | 1,000 |
| 07566 | State Road 2 Km 80.2 | Arecibo | PR | Open Store | Lease | 10/7/2018 | P18100850050001 | 7,000 |
| 07639 | 895 Faukner Road | Santa Paula | CA | Open Store | Lease | 11/9/2018 | P18110950210001 | 500 |
| 02355 | 506 Calle Truncado | Hatillo | PR | Open Store | GL | 7/25/2018 | P18072551180001 | |

172

WEIL:\96826275\11\73217.0003

| Unit | Address | Loss City | Loss State | Property Group | 10K Owned / L/GL | Date of Loss | Claim Property: Claim Property Number | Estimated Loss to Building and FF&E |
|------|---------|-----------|------------|----------------|------------------|--------------|----------------------------------------|-------------------------------------|
| 01765 | 3101 PGA Blvd. | Palm Beach Gardens | FL | Open Store | GL | 10/1/2018 | P18100151320001 | 1,000 |
| 07570 | Plaza Rio Holdo & Comerio Ave. | Bayamon | PR | Open Store | Lease | 8/20/2018 | P18082050710001 | 200 |
| 09551 | 6600 Clark Road | Paradise | CA | Open Store | Lease | 11/8/2018 | P18110850480001 | 10,000 |
| 07413 | Remainder Matriculate #1 | St Croix | VI | Open Store | Lease | 11/11/2018 | P18111250390001 | 15,000 |
| 45168 a/k/a 8825 | 3825 Forsyth Road | Winter Park | FL | Non-Retail | Lease | 11/27/2018 | P18112850030001 | 5,000 |
| 04389 | 1801 South 10th Street | Mc Allen | TX | Open Store | Lease | 10/31/2018 | P18103150520001 | 500 |
| 01905 | Avenue F D Roosevelt | San Juan | PR | Open Store | GL | 9/20/2017 | P17092150980001 | 166,151 |
| 04732 | Road 2 Km 126.5 | Aquadilla | PR | Open Store | Lease | 9/20/2017 | P17101250240001 | 75,789 |
| 03842 | 175 Maag Avenue | Oakdale | CA | Open Store | Lease | 11/30/2018 | P18113050460001 | 1,000 |
| 45438 a/k/a 8870 | 1600 Roe Street | Dallas | TX | Non-Retail | Lease | 11/19/2018 | P18112150160001 | 0 |
| 01644 | 200 Park City Center | Lancaster | PA | Open Store | GL | 11/13/2018 | P18111350010001 | 150,000 |
| 01935 | 975 Hostos Avenue | Mayaguez | PR | Open Store | GL | 9/20/2017 | P17100250330001 | 191,843 |
| 03317 | 1401 West Palmetto Park Road | Boca Raton | FL | Open Store | Lease | 9/9/2017 | P17091150720001 | 2,000 |
| 04893 | 6126 Highway 301 | Ellentown | FL | Open Store | Lease | 9/10/2017 | P17091150980001 | 3,123 |
| 09614 | 101399 Overseas Highway | Key Largo | FL | Open Store | Lease | 9/12/2017 | P17091251450001 | 10,000 |
| 07665 | 65th Infantry Avenue | Carolina | PR | Open Store | Lease | 9/20/2017 | P17092151070001 | 1,203,431 |
| 07783 | Pr #22 & Pr #18 | San Juan | PR | Open Store | GL | 9/20/2017 | P17092151020001 | 1,003,158 |
| 07321 | 7321 Manatee Avenue West | Bradenton | FL | Open Store | Lease | 9/12/2017 | P17091850560001 | 10,000 |
| 02027 | 1000 S. Seward Meridian Road | Wasilla | AK | Open Store | GL | 11/30/2018 | P18113050430001 | 20,000 |

173

| Unit | Address | Loss City | Loss State | Property Group | 10K Owned / L/GL | Date of Loss | Claim Property: Claim Property Number | Estimated Loss to Building and FF&E |
|---|---|---|---|---|---|---|---|---|
| 07793 | 9000 Lockhart Gardens S/C; Suite 1 | St Thomas | VI | Open Store | Lease | 9/25/2017 | P17100350750001 | 0 |
| 03993 | State Road 1498 & State Road 584 | Juana Diaz | PR | Open Store | Lease | 9/20/2017 | P17100350650001 | 75,769 |
| 01274 | 11500 Midlothian Turnpike | Richmond | VA | Open Store | GL | 9/17/2018 | P18091850100001 | 2,500 |
| 03692 | 1450 Summit Avenue | Oconomowoc | WI | Open Store | Lease | 8/31/2018 | P18083150170001 | 1,000 |
| 07713 | 3207 Solomons Island Road | Edgewater | MD | Open Store | Lease | 11/22/2018 | P18112350570001 | 1,000 |
| 01085 | Intersection of State Rd Pr 1 & Pr 156 | Caguas | PR | Open Store | Lease | 9/21/2017 | P17092550040001 | 3,571,007 |
| 07566 | State Road 2 KM 80.2 | Arecibo | PR | Open Store | Lease | 10/4/2018 | P18100950600001 | 0 |
| 07566 | State Road 2 KM 80.2 | Arecibo | PR | Open Store | Lease | 10/6/2018 | P18100950620001 | 0 |
| 03750 | 830 West Fulton Street | Waupaca | WI | Open Store | Lease | 9/20/2018 | P18092150220001 | 1,000 |
| 07255 | 411 Russell Dyche Highway | Somerset | KY | Open Store | Lease | 11/29/2018 | P18120650070001 | |
| 02694 | 100 Spotsylvania Mall | Fredericksburg | VA | Open Store | Lease | 5/18/2018 | P18051950040001 | |
| 02694 | 100 Spotsylvania Mall | Fredericksburg | VA | Open Store | Lease | 4/26/2018 | P18042750210001 | |
| 03266 | U.S. Route 11 Mark Plaza | Kingston | PA | Open Store | Lease | 9/13/2018 | P18091350180001 | 9,000 |
| 03235 | 730 South Orange | West Covina | CA | Open Store | Lease | 12/7/2018 | P18120750150001 | 500 |
| 07749 | 250 West 34th Street | New York | NY | Open Store | Lease | 12/7/2018 | P18120750080001 | 1,000 |
| 03269 | 1201 South Dixie | Lantana | FL | Open Store | Lease | 9/13/2017 | P17091350410001 | 2,500 |
| 07566 | State Road 2 Km 80.2 | Arecibo | PR | Open Store | Lease | 9/21/2017 | P17092550220001 | 384,627 |
| 04844 | 9410 Avenue Los Romeros | Rio Piedras | PR | Open Store | Lease | 9/21/2017 | P17092550180001 | 313,403 |

174

| Unit | Address | Loss City | Loss State | Property Group | 10K Owned / L/GL | Date of Loss | Claim Property: Claim Property Number | Estimated Loss to Building and FF&E |
|---|---|---|---|---|---|---|---|---|
| 07793 | 9000 Lockhart Gardens S/C; Suite 1 | St Thomas | VI | Open Store | Lease | 10/22/2017 | P17102550240001 | 0 |
| 07793 | 9000 Lockhart Gardens S/C; Suite 1 | St Thomas | VI | Open Store | Lease | 9/21/2017 | P17092550220001 | 175,000 |
| 01154 | 1259 Whitehall Mall | Whitehall | PA | Open Store | Lease | 9/4/2018 | P18090550620001 | 3,000 |
| 01984 | South 3701 McKinley Parkway | Buffalo | NY | Open Store | Lease | 11/27/2018 | P18120150130001 | 32,412 |
| 01925 | Caroline S/C | Carolina | PR | Open Store | Lease | 9/6/2017 | P17090751060001 | 2,500 |
| 03829 | 26-A Tutu Park Mall | St Thomas | VI | Open Store | Lease | 9/21/2017 | P17092550120001 | 1 |
| 45577 a/k/a 7385 | 819 E. Six Forks Road | Raleigh | NC | Non-Retail | Lease | 1/11/2018 | P18011250460001 | 45,000 |
| 01654 | 1067 West Baltimore Pike | Media | PA | Open Store | GL | 8/28/2018 | P18082850460001 | 1,000 |
| 07793 | 9000 Lockhart Gardens S/C; Suite 1 | St Thomas | VI | Open Store | Lease | 9/6/2017 | P17090651250001 | 300,000 |
| 03829 | 26-A Tutu Park Mall | St Thomas | VI | Open Store | Lease | 9/6/2017 | P17090651220001 | 5,007,517 |
| 01365 | 20701 SW 112th Avenue | Miami | FL | Open Store | Lease | 9/10/2017 | P17091250480001 | 26,668 |
| 01345 | 1625 West 49th Street | Hialeah | FL | Open Store | Lease | 9/11/2017 | P17091250870001 | 545 |

175

**Schedule 6.6(e)**

1. Items 1 and 2 of Schedule 6.6(b) are incorporated herein by reference.

2. The following condemnation matters are pending with respect to the Leased Properties:

| RE ID | ST | Name | Address | Detail |
|-------|-----|------|---------|--------|
| 724600 | IN | Richmond | 3150 National Road West | Taking of less than ½ acre. |
| 340500 | MN | Minneapolis | 10 W Lake Street | Taking for easement for County Streetscaping project. Notice of Condemnation and Quick Taking filed 3/2017. |
| 774900 | NY | New York | 250 W. 34th St | Threatened condemnation by the Metropolitan Transit Authority |
| 1012 | IA | De Moines | | Taking of 1,848 square feet does not appear to affect or owned or leased parcels. |
| 2677 | LA | Bossier City | | Sewer right of way acquisition (condemnation). |
| 1077 | LA | Shreveport | | City needing permanent and temporary servitude re upgrading and replacement of sewer line. City is under consent decree with federal government to complete the project. |
| 2374 | NJ | Vineland | | Potential condemnation by the local Landis Sewer Authority |
| 1684 | NJ | Woodbridge | | Potential condemnation by State of New Jersey. State has offered $291. |

3. The following litigation matters are pending or threatened with respect to the Lease Premises:

| STORE NO. | STATE | CITY | ADDRESS | DESCRIPTION |
|-----------|-------|------|---------|-------------|

WEIL:\96826275\11\73217.0003

| 101800 | CA | Baldwin Hills | 3755 Santa Rosalia Dr | [Potential] |
|---|---|---|---|---|
| 100800 | CA | Boyle | 2650 E Olympic Blvd | [Potential] |
| 183800 | CA | Burbank | 111 E Magnolia Blvd | Cabrera, Gabriela v. Sears, Roebuck and Co. and Does 1-20 |
| 932800 | CA | Long Beach | 2900 Bellflower Blvd | [Potential] |
| 323500 | CA | West Covina | 730 South Orange | Cabrera, Gabriela v. Kmart Corporation and Does 1-20 |
| 176500 | FL | Palm Beach Gardens | 3101 PGA Blvd | Sears #1765 (Palm Beach Gardens, FL) v. Forbes.  Case dismissed without prejudice and may be re-filed. |
| 173800 | HI | Kaneohe(Sur) | 46-056 Kamehameha Hwy | [Potential] |
| 703300 | ID | Lewiston | 1815-21St St | The Joseph P. McCann and Frances E. McCann Family Trust of Lewiston Idaho 8351 v. Kmart Corporation |
| 700600 | ID | Twin Falls | 2258 Addison Ave East | Motion filed by landlord in bankruptcy court. |
| 130000 | IL | Oakbrook | 2 Oakbrook Ctr | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 109200 | MI | Westland | 35000 Warren Rd | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 340500 | MN | Minneapolis | 10 W Lake Street | Boitnott, Jerald v. K-Mart Corporation d/b/a K-Mart |
| 307100 | NJ | Toms River | 213 Highway 37 E | Raven Associates v. Sears Holdings, Kmart Corporation, et al.  Case No. C-126-15; Ocean County, Superior Court of New Jersey  [On Appeal] |
| 143400 | NJ | Wayne | 50 Route 46 | State of New Jersey, by the Commissioner of Transportation v. Willowbrook Mall, LLC; Sears, Roebuck and Co.; et al. |
| 386200 | NY | Bohemia | 5151 Sunrise Hwy | Sayville Menlo, LLC v. Sears Holdings Management Corporation |

177

| | | | | |
|---|---|---|---|---|
| 942000 | NY | Bronx | 1998 Bruckner Blvd | Kmart #9420 (Bruckner Plaza, Bronx, NY) v. Vornado Realty Trust |
| 942000 | NY | Bronx | 1998 Bruckner Blvd | Kmart Corporation #9420 v. Lens Lab Express, Inc. |
| 111400 | NY | Brooklyn | 2307 Beverley Rd | Flatbush Center Parking LLC v. Sears Holding Corp. (ARB) AAA Arbitration Case No. 02-18-0001-6118 |
| 487100 | NY | Farmingville | 2280 North Ocean Ave. | Motion has been filed in the bankruptcy case initially; may become a separate suit |
| 777700 | NY | New York | 770 Broadway | [Potential] |
| 941600 | NY | White Plains | 399 Tarrytown Rd | Cerbone of Naples Inc., et al v. Sears Holdings Management, et al. |
| 141000 | OH | Canton | 4100 Belden Village Mall | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 171400 | PA | Greensburg | 5256 Route 30 | Sears, Roebuck and Co. v. DentalCare Partners, Inc., et al. |
| 757000 | PR | Bayamon | Plaza Rio Hondo & Comerio Ave | Kmart Corporation v. Marketing & Printing Solutions Inc. |
| 778800 | PR | Bayamon | Pr 167 & Las Cumbres | Kmart Corporation v. Marketing & Printing Solutions Inc. |
| 778300 | PR | Hato Rey | Pr #22 & Pr #18 | Kmart Corporation v. Marketing & Printing Solutions Inc. |
| 348400 | WV | Elkview | I-79/Us 43 Crossings Mall | Kmart Corporation v. Tara Retail Group |
| 4706 | CA | Riverside | | Claimant: Christina Lagunas |
| 1357 | TX | Austin/Barton Creek | | Claimant: MaryLou Trigo |
| 2306 | AL | Gadsden | | Claimant: Karen Hogeland |
| 3793 | FL | Miami | | Claimant: Oneida Lazo |
| 4123 | NY | Niagara Falls | | Claimant: Nancy Burkhart |

178

| | | | | |
|---|---|---|---|---|
| 1464 | NJ | Deptford | | Claimant: Natalie Parker |
| 3424 | FL | Gainesville | | Claimant: Angela Powell |
| 1414 | NY | Nanuet | | Claimant: Patrizia Proscia |
| 1955 | FL | Lakeland | | Claimant: Mary Miller |
| 9348 | IL | Norridge | | Claimant: Miroslav Stevanovic |
| 2990 | IL | Rockford-Cherryvale | | Claimant: Leonor Jaimes |
| 4706 | CA | Riverside | | Claimant: Trinity Annan |
| 3818 | FL | Hollywod | 3800 Oakwood Blvd | Claimant: Julia Hernandez |
| 1758 | CA | Escondido | 210 E Via Rancho Pkwy | Claimant: Mary Senic |
| 7139 | WY | Jackson | 510 S Hwy 89 | Claimant: Martha McCravey |
| 3592 | NV | Las Vegas | 5051 E Bonanza Rd | Claimant: Felix Counterman |
| 1226 | LA | Metairie | 4400 Veterans Mem Blvd | Claimant: Rhonda Christopher |
| 4272 | ND | Bismarck | 2625 State St | Claimant: Frances Grueneich |
| 4272 | ND | Bismarck | 2625 State St | Claimant: Vivian Hilken |
| 3862 | NY | Bohemia | 5151 Sunrise Hwy | Claimant: Vivian Romanowski |
| 4421 | CA | North Hollywood | 13007 Sherman Way | Claimant: Karen Barrientos |
| 7192 | PA | Easton | 320 South 25Th Street | Claimant: Blanca Hernandez |
| 3873 | DE | Wilmington | 4700 Limestone Road | Claimant: Linda Cronk |
| 1300 | IL | Oakbrook | 2 Oakbrook Ctr | Claimant: Zayna Abdeldeen |
| 3954 | PA | Walnutport | 400 North Best Ave | Claimant: Rita Erschen |
| 8287 | CA | Ontario | 5600 East Airport Rd | Claimant: Inocencio Ibarra |
| 1733 | NY | Yonkers | Rte 87(Ny St)  & Cross Ct Pkwy | Claimant: Eunice Tuitt |
| 1212 | IL | N Riverside | 7503 W Cermak Rd | Claimant: Genoveva Diego |

WEIL:\96826275\11\73217.0003

| 3972 | VI | St. Croix | Sunny Isle S/C, Space #1 | Claimant: Joanna Samuel |
|---|---|---|---|---|
| 2219 | WA | Lacey/Olympia | 651 Sleater Kinney Rd Se 1300 | Claimant: Tabitha Priest |
| 7654 | NY | Bronx | 300 Baychester Avenue | Claimant: Abel Santiago |
| 2990 | IL | Rockford-Cherryvale | 7200 Harrison Ave | Claimant: Jaimes Leonor |
| 3818 | FL | Hollywood | 3800 Oakwood Blvd | Claimant: Heidie Mulato |
| 4389 | TX | Mcallen | 1801 South 10Th Street | Claimant: Olga Hernandez |
| 7413 | VI | Frederiksted | Remainder Matriculate #1 | Claimant: Aquita Williams |
| 3972 | VI | St. Croix | Sunny Isle S/C, Space #1 | Claimant: O'Rosia Figueroa |
| 3829 | VI | St. Thomas | 26 – A Tutu Park Mall | Claimant: Andlib Salem |
| 7616 | SC | Lexington | 748 W Main Street | Claimant: Michelle Peele |
| 1560 | OH | Dayton Mall | | (ADA) Access Center for Independent Living, et al. v. WP Glimcher Inc., et al. [Sears #1560] |
| 3235 | CA | West Covina | | (ADA) Cabrera, Gabriela v. Kmart Corporation and Does 1 - 20 |
| 4047 | CA | Costa Mesa | | (ADA) Von Trapp, Debra v. Kmart Store #4047 |
| 4490 | PR | San Juan | | Marketing & Printing Solutions v. Kmart Operations, LLC and Kmart Corporation |

4.   The following subrogation and/or indemnification claims have been alleged by Sellers against third parties with respect to damage to the:

   A.   *Owned Real Property*

180

WEIL:\96826275\11\73217.0003

| Debtor | Unit | Address | City | State | SCH Format | 10K Owned/L/GL | Defendant Name | Recover | Jurisdiction | Court Case Number |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 01720 |  | Sterling Heights | MI |  |  |  |  |  |  |
|  | 01012 |  | Des Moines | IA |  |  | North American Roofing |  | Iowa District Court for Polk County | LACL 140725 |
|  | 01171 | 2825 S. Glenstone Ave | Springfield | MO | Sears | Owned |  | Yes |  |  |
|  | 01364 | 4 Smith Haven Mall | Lake Grove | NY | Sears | Owned | Biscayne Roofing | Yes |  |  |
|  | 01217 | 1305 Airline Road | Corpus Christi | TX | Sears | Owned | Geico | Yes |  |  |
|  | 01074 | 11170 Mall Circle | Waldorf | MD | Sears | Owned | Integrated Service Mgt. (ISM) | Yes |  |  |
|  | S490 | 3333 Beverly Road | Hoffman Estates | IL | Office | Owned | Madhuri Matta/ Nationwide Ins. | Yes |  |  |
|  | 01217 | 1305 Airline Road | Corpus Christi | TX | Sears | Owned | Firetrol Ins. Carrier: US HDI Global | Yes |  |  |
|  | 01634 | 6901 Security Square Blvd. | Baltimore | MD | Sears | Owned |  | Yes |  |  |
|  | 01307 | 4310 Buffalo Gap Road | Abilene | TX | Sears | Owned |  | Yes |  |  |
|  | 01224 | 4600 Jonestown Road | Harrisburg | PA | Sears | Owned |  | Yes |  |  |

181

| Debtor | Unit | Address | City | State | SCH Format | 10K Owned/ L/GL | Defendant Name | Recover | Jurisdiction | Court Case Number |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 013 54 | 2500 W. Moreland Road | Willow Grove | PA | Sears | Owned |  | Yes |  |  |

### A. *Leased Properties:*

| Debtor | Unit | Address | City | State | SCH Format | 10K Owned/ L/GL | Defendant Name | Recover | Jurisdiction | Court Case Number |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 072 23 |  | Metairie | LA |  |  | Swift |  |  |  |
|  | 014 70 |  | Greenwood | IN |  |  | Kimco |  |  |  |
|  | 018 44 |  | Columbia | MD |  |  | RCC |  |  |  |
|  | 010 71 |  | Lakewood | CO |  |  | Central Mutual Insurance /Debra Molinaro |  |  |  |
|  | 026 17 |  | Victoria | TX |  |  |  |  |  |  |
|  | 021 73 |  | Saratoga | NY |  |  | Wilton Mall, LLC c/o The Macerich Company |  |  |  |
|  | 040 26 |  | St Joseph | MO |  |  | Mart Plaza, LLC |  |  |  |
|  | 010 17 |  | Lakewood | CO |  |  |  |  |  |  |
|  | 018 44 |  | Columbia | MD |  |  |  |  |  |  |
|  | 024 35 |  | Charlottesville | VA |  |  | Swift Transportation |  |  |  |
|  | 095 20 |  | Gulfport | MS |  |  |  |  |  |  |
|  | 013 88 |  | Costa Mesa | CA |  |  | S-Tract, LLC |  |  |  |
|  | 020 78 |  | Yuma | AZ |  |  | Allstate Insurance Company / Maria Urquijo |  |  |  |

182

| Debtor | Unit | Address | City | State | SCH Format | 10K Owned/L/GL | Defendant Name | Recover | Jurisdiction | Court Case Number |
|---|---|---|---|---|---|---|---|---|---|---|
| | 022 78 | | Idaho Falls | ID | | | USI | | | |
| | 032 35 | | West Covina | CA | | | | | | |
| | 019 68 | | Palm Desert | CA | | | Kellermeyer Bergensons Services, LLC. | | | |
| | 044 33 | | Quincy | IL | | | Twister Services | | | |
| | 016 18 | | Modesto | CA | | | | | | |
| | 011 37 | | Austin | TX | | | | | | |
| | 013 88 | | Costa Mesa | CA | | | | | | |
| | 012 47 | | LUBBOCK | TX | | | LUBBOCK | | | |
| | 019 35 | | MAYAGUEZ | PR | | | | | | |
| | 011 11 | | COLORADO SPRINGS | CO | | | Jeremy Coe, vehicle owner, Kaelin Coe, driver, Safeco Ins. Y8382197. | | | |
| | 041 70 | | Rapid City | IA | | | | | | |
| | 018 14 | | Fairfax | VA | | | Capital Demolition LLC | | | |
| | 094 15 | | Mahopac | NY | | | Heidenberg Properties | | | |
| Kmart Corporation | 040 26 | | ST JOSEPH | MO | | | Mart Plaza, LLC c/o GJ Realty | Yes | Circuit Court of Buchanan County | 18BU-CV04503 |

WEIL:\96826275\11\73217.0003

| Debtor | Unit | Address | City | State | SCH Format | 10K Owned/L/GL | Defendant Name | Recover | Jurisdiction | Court Case Number |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | , Missouri | |
| Innovel and Sears Roebuck and Company | 8872 | 580 Raco Parkway | Pendergrass | GA | Distrib. Center | Lease | Jackson County Water & Sewage Authority | Yes | Superior Court of Jackson County State of Georgia | 15CV0516 |
| Sears Roebuck & Co | 08830 | 12001 Sears Avenue | Livonia | MI | Logistics | Lease | Frigidaire | Yes | Circuit Court of Cook County Illinois | 2018-L-004825 in IL + 17-010869 in MI |
| Sears Roebuck & Co | 01925 | Carolina S/C | Carolina | PR | Sears | Lease | Atlas Roofing | Yes | US Dist Court for the Dist of Puerto Rico | 3:15-cv-01645 |
| Sears Roebuck & Co | 01915 | Avennida Aguas Buenas | Bayamon | PR | Sears | GL | Atlas Roofing | Yes | United States District Court for the District of Puerto Rico | 3:18-cv-01649 |
| Kmart Corp. | 03484 | I-79/US 43 | Elkview | WV | Kmart | Lease | Tara Retail Group | Yes | US Bankruptcy Court for the Northern District of WV | 1:17-bk-00057 |

184

| Debtor | Unit | Address | City | State | SCH Format | 10K Owned/ L/GL | Defendant Name | Recover | Jurisdiction | Court Case Number |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 01066 | 10302 Southside Blvd | Jacksonville | FL | Sears | Lease |  | Yes |  |  |
|  | 03972 | Sunny Isle S/C, Space #1 | St Croix | VI | Kmart | Lease | Sunny Isle Shopping Center, Inc. | Yes |  |  |
|  | 07192 | 320 South 25th Street | Easton | PA | Kmart | Lease |  | Yes |  |  |
|  | 03707 | 1870 McCulloch Blvd. | Lake Havasu City | AZ | Kmart | Lease | Mather Brothers Ice | Yes |  |  |
|  | 04494 | 200 Carr 181 | Trujillo Alto | PR | Kmart | Lease |  | Yes |  |  |
|  | 07139 | 510 S. Hwy 89 | Jackson | WY | Kmart | Lease |  | Yes |  |  |
|  | 09420 | 1998 Bruckner Blvd. | Bronx | NY | Kmart | Lease | Diversified | Yes |  |  |
|  | 04170 | 111 E. North Street | Rapid City | SD | Kmart | Lease |  | Yes |  |  |
|  | 01111 | 2050 Southgate Road | Colorado Springs | CO | Sears | GL | Jeremy Coe, vehicle owner, Kaelin Coe, driver, Safeco Ins. Y8382197. | Yes |  |  |
|  | 07006 | 2258 Addison Ave. East | Twin Falls | ID | Kmart | Lease | Minor, Dominic M. Farag. Janice Kroeger, Sr. | Yes |  |  |

185

| Debtor | Unit | Address | City | State | SCH Format | 10K Owned/ L/GL | Defendant Name | Recover | Jurisdiction | Court Case Number |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Deputy Prosecuting Atty, Twin Falls County, Idaho. | | | |
| | 01935 | 975 Hostos Ave | Mayaguez | PR | Sears | GL | | Yes | | |
| | 07192 | 320 South 25th Street | Easton | PA | Kmart | Lease | | Yes | | |
| | 01968 | 72-880 Highway 111 | Palm Desert | CA | Sears | Lease | Kellermeyer Bergensons Services, LLC. | Yes | | |
| | 01248 | 660 W. Winton Ave. | Hayward | CA | Sears | Lease | | Yes | | |
| | 03235 | 730 South Orange | West Covina | CA | Kmart | Lease | | Yes | | |
| Sears Roebuck & Co | 02694 | 100 Spotsylvania Mall | Fredericksburg | VA | Sears | Lease | Spotsylvania Mall Company c/o The Cafaro Company | Yes | Court of Common Pleas Trumball County, Ohio | 2018 cv 1614 |
| | 03972 | Sunny Isle S/C, Space #1 | St Croix | VI | Kmart | Lease | Sunny Isle Shopping Center, Inc. | Yes | | |
| | 09520 | 12057-A Hwy 49 | Gulfport | MS | Kmart | Lease | | Yes | | |

186

WEIL:\96826275\11\73217.0003

| Debtor | Unit | Address | City | State | SCH Format | 10K Owned/ L/GL | Defendant Name | Recover | Jurisdiction | Court Case Number |
|--------|------|---------|------|-------|-----------|-----------------|----------------|---------|-------------|-------------------|
|  | 02435 | 1531 Rio Road E. | Charlottesville | VA | Sears | Lease | Swift Transportation | Yes |  |  |
|  | 01674 | 100 Main Street | White Plains | NY | Sears | Lease | Manager Realty, LLC c/o Pacific Retail Capital Partners | Yes |  |  |
|  | 03873 | 4700 Limestone Road | Wilmington | DE | Kmart | Lease |  | Yes |  |  |
|  | 09224 | 5561 Overseas Highway | Marathon | FL | Kmart | Lease |  | Yes |  |  |
|  | 03592 | 5051 E. Bonanza Road | Las Vegas | NV | Kmart | Lease | Lange | Yes |  |  |
|  | 01008 | 2650 E. Olympic Blvd. | Los Angeles | CA | Sears | Lease |  | Yes |  |  |
|  | 01008 | 2650 E. Olympic Blvd. | Los Angeles | CA | Sears | Lease |  | Yes |  |  |
|  | 07653 | 42126 Big Bear Boulevard | Big Bear Lake | CA | Kmart | Lease | NorthStar Recovery Services Chubb | Yes |  |  |
|  | 01674 | 100 Main Street | White Plains | NY | Sears | Lease |  | Yes |  |  |
|  | 07383 | 241 Wooster Road North | Barberton | OH | Kmart | Lease | Danny Greenwade Ontario Bradley 3rd Defendant | Yes |  |  |

187

188

WEIL:\96826275\11\73217.0003

**Schedule 6.7**

**Taxes**

Sears Reinsurance Company, Ltd is a regarded entity for U.S. federal income tax purposes.
_____

**State Sales Tax Audits**

| Company Name | State | Audit Period | Status/Audit Issues / Proposed Assessment |
|---|---|---|---|
| A & E FACTORY SERVICES | CA | 01/12/2012-12/31/2014 | Field work beginning |
| A & E FACTORY SERVICES | PA | 1/01/2009 - 12/31/2012 | $2.6m proposed assessment; being appealed |
| A & E FACTORY SERVICES | SC | 1/12/2015-12/31/2018 | Awaiting contact from auditor |
| A & E FACTORY SERVICES | TN | 12/01/2008 - 1/31/2012 | Awaiting contact from auditor |
| A & E SIGNATURE SERVICES | CA | 01/01/12-12/31/14 | Field work beginning |
| KMART CORP | AR | 10/01/2013-09/30/2016 | Audit under way, no workpapers received |
| KMART CORP | FL | 05/01/2015-04/30/2018 | Fixed assets and expense reviewed with auditor proposing $60k liability.  Sales review has started. |
| KMART CORP | MI | TBD | Audit not yet started |
| KMART CORP | NJ | 01/01/14-12/31/17 | Fixed assets reviewed. |
| KMART CORP | PA | 1/1/15 - 8/1/18 | Audit under way, no workpapers received |
| KMART CORP | TX | 1/1/15-12/31/18 | Audit just starting |
| KMART OPERATIONS LLC | AR | 04/01/15-09/30/16 | Audit under way, no workpapers received |
| KMART OPERATIONS LLC | NV | 10/01/15-09/30/18 | Audit just starting |
| KMART OPERATIONS LLC | NY | 6/1/2015 - 11/30/2017 | Agreed/settled amount $363,381.96 |
| KMART STORES OF TEXAS | TX | 1/1/15-10/31/2018 | Audit just starting |
| SEARS ROEBUCK | AR | 10/01/2013-09/30/2016 | Audit under way, no workpapers received |
| SEARS ROEBUCK | AR | 10/01/2013-09/30/2016 | Audit under way, no workpapers received |
| SEARS ROEBUCK | CA | 01/01/2012 - present | Audit under way, no workpapers received: purchases & bad debt to be examined |

189

| SEARS ROEBUCK | CA | 10/01/07 - 12/31/11 | Audit is being protested on credit card bad debt, penalty & interest of $600k, share 50% of exposure with Citibank |
| SEARS ROEBUCK | CO City of Castle Rock | 10/1/15-9/30/18 | Audit under way, no workpapers received |
| SEARS ROEBUCK | CO City of Lakewood | 4/1/15-3/31/18 | Proposed assessment of $70,426 |
| SEARS ROEBUCK | CT | 1/1/16-12/31/18 | Audit under way, no workpapers received |
| SEARS ROEBUCK | IL | 01/01/2013-06/30/2015 | Received assessment for $923,769. Being protested. |
| SEARS ROEBUCK | IL | 01/01/2016-06/30/2018 | Audit just starting |
| SEARS ROEBUCK | KS | 8/1/2015-7/31/2018 | Audit in progress; no work papers yet |
| SEARS ROEBUCK | KS | 08/01/2015-07/31/2018 | Audit in progress; no work papers yet |
| SEARS ROEBUCK | KS | 08/01/2015-07/31/2018 | Audit in progress; no work papers yet |
| SEARS ROEBUCK | MA | 07-01-14 - 09-30-16 | $300K assessment |
| SEARS ROEBUCK | MN | 9/01/2011 - 12/31/2015 | Audit in progress; no work papers yet |
| SEARS ROEBUCK | NC | 3/1/2016-2/28/2019 | Audit just starting |
| SEARS ROEBUCK | NJ | 01/01/14-12/31/17 | Audit just starting. |
| SEARS ROEBUCK | NV | 10/01/15-09/30/18 | Audit just starting |
| SEARS ROEBUCK | NV | 10/01/15-09/30/18 | Audit just starting |
| SEARS ROEBUCK | TN | 01/01/2011-06/30/2016 | Audit under way, no workpapers received |
| SEARS ROEBUCK | TX | 11/01/07 - 9/30/11 | Audit assessment and offsetting refund claim on credit card bad debt issue is being investigated by the State, share 50% of exposure with Citibank. |
| SEARS ROEBUCK | TX | 10/01/11 - 12/31/15 | Audit assessment and offsetting refund claim on credit card bad debt issue is being investigated by the State, share 50% of exposure with Citibank. |
| SEARS HOLDINGS CORP | OH | 01/01/15 - 12/31/17 | Commercial activity tax (CAT) audit; information provided for examination, no work papers yet |
| SEARS LOGISTICS SERVICES (INNOVEL) | PA | 01/01/13-06/30/16 | Audit under way, no workpapers received. |

190

| | | | |
|---|---|---|---|
| SEARS LOGISTICS SERVICES (INNOVEL) | TX | 1/1/17-10/31/18 | Audit just starting |
| SEARS OPERATIONS LLC | AR | 04/01/15-09/30/16 | Audit under way, no workpapers received |
| SEARS OPERATIONS LLC | CO City of Lakewood | 7/1/15-3/31/18 | Assessment of $45,735 |
| SEARS OPERATIONS LLC | FL | 07/01/15-06/30/18 | Audit not started. |
| SEARS OPERATIONS LLC | MA | 3/1/15 to 5/31/18 | Audit just starting |
| SEARS OPERATIONS LLC | NV | 10/01/15-09/30/18 | Audit just starting |
| SEARS OPERATIONS LLC | TX | 5/1/15 to 9/30/18 | Audit just starting |
| SEARS OPERATIONS LLC | NY | 6/1/2015 - 11/30/2017 | Agreed/settled amount $256,866.73 |
| SEARS PROCUREMENT COMPANY | NJ | 07/01/13-06/30/17 | Proposed assessment of $50,000 |
| SEARS PROCUREMENT SERVICES | NV | 10/01/15-09/30/18 | Audit just starting |

191

**State Income Tax Audits**

| Company Name | State | Audit Period | Status |
|---|---|---|---|
| Sears Reinsurance Co | NJ | 2000-2017 | Nexus audit in process |
| Sears, Kmart etc. (NJ filers) | NJ | 2013-2016 | In-process |
| Sears Combined Group | NY | 2015-2016 | In-process |
| Sears Logistics Services (Innovel) | CO | 2014-2017 | In-process |
| Kmart Holdings & Subs | CO | 2014-2017 | In-process |
| Sears Kmart etc. (AL filers) | AL | 2016-2017 | In-process |
| Sears Kmart etc. (GA filers) | GA | 2014-2016 | In-process |

192

## Schedule 6.8[8]

**Brokers or Finders**

1. Engagement Letter by and between the Special Committee of the Board of Directors of Sears Holdings Corporation and Centerview Partners LLC, dated as of April 28, 2018 (as may be amended from time to time).
2. Letter Agreement by and between Lazard Freres & Co. LLC and Sears Holdings Corporation, dated as of October 11, 2018 (as may be amended from time to time).
3. Real Estate Services Agreement by and between A&G Realty Partners, LLC, dated November 6, 2018 (as may be amended from time to time).
4. Engagement Letter by and between JLL Valuation & Advisory Services, LLC and Sears Holdings Corporation dated November 28, 2018 (as may be amended from time to time).
5. Real Estate Advisory Services Agreement (December 2018 Sales Process for Real Estate) by and between Sears Holdings Corporation and Jones Lang LaSalle Americas, Inc. dated December 6, 2018 (as may be amended from time to time).
6. Real Estate Advisory Services Agreement by and between Sears Holdings Corporation and Jones Lang LaSalle Americas, Inc. dated December 6, 2018 (as may be amended from time to time).
7. Items 10-45 from Schedule 6.11(a)(2) are hereby incorporated by reference.

---

[8] **Note to Draft**: The agreements represent the current agreements for Seller to pay brokerage or finders' fees, as applicable. Buyer has not agreed to pay any amounts under these agreements.

193

## Schedule 6.9

### Employee and Employee Plan Matters

**Schedule 6.9(a)**

1. Sears, Roebuck & Co, Respondent and Local 881, United Food and Commercial Workers, Charging Party, Case No. 13-CA-191829.
2. Sears, Roebuck & Co, Respondent and Local 881, United Food and Commercial Workers, Charging Party, Case No. 13-CA-191829, NLRB (unfair labor practice charge pending appeals filed October and November 2018).
   Collective Bargaining Agreements
3. :

| Business Unit | Loan Party or other Subsidiary | Union | Contract Term |
|---|---|---|---|
| Supply Chain | Kmart Corporation – Logistics – RDC – Manteno, IL | IBT #705 | 2/5/18 - 1/31/21 |
| Supply Chain | Kmart Corporation – Logistics – RDC – Morrisville, PA | UAW #8275 | 9/11/16 - 3/8/20 |
| Supply Chain | Kmart Corporation – Logistics – RDC – Warren, OH | UAW #1112 | 9/2/15 - 9/8/18[9] |
| Home Services | Sears Roebuck – PRS – Detroit, MI | IBT #243 | 10/19/17 - 10/18/20 |
| Supply Chain | Sears Roebuck – MDO – Livonia, MI | IBT #243 | 10/26/17 - 10/26/20 |
| Auto | Sears Roebuck – Auto Center – Fairview Heights, IL | UFCW #881 | 3/25/18 - 3/27/21 |
| Retail | Sears Roebuck – Retail – Fairview Heights, IL | UFCW #881 | 3/25/18 - 3/27/21 |
| Home Services | Sears Roebuck – PRS – Akron, OH | IBT #348 | 5/19/18 - 5/18/21 |
| Home Services | Sears Roebuck – PRS – Cleveland, OH | UFCW #880 | 2/1/16 - 1/31/19 |
| Home Services | Sears Roebuck – PRS – Philadelphia, PA | IBT #107 | 7/15/11 - 7/14/15 |
| Supply Chain | Kmart Corporation – Logistics –- RSC – Chambersburg, PA | UNITE # 196 | 3/3/18 - 3/6/21 |
| Supply Chain | Kmart Corporation – Distribution Center – Mira Loma, CA | UNITE # 512 | 1/13/18 - 12/26/20 |
| Supply Chain | Sears Roebuck – MDO – Sacramento, CA | IBT #150 | 11/5/18 - 10/31/21 |
| Home Services | Sears Roebuck – PRS – St. Louis, MO | IBT #688 | 11/1/17 - 10/31/20 |
| Supply Chain | Sears Roebuck – DDC – Kent, WA | IBT # 174 | 11/1/16 - 10/31/19 |

---

[9] **Note to Draft**: Unit is operating under an Extension of the 2015-2018 contract; extended until 3/31/19. Unit announced for closing on 11/6. They anticipate operations will cease by mid-February. Bargaining of the effects of the closure are underway. Upon closure of unit, the contract will be void.

194

| Business Unit | Loan Party or other Subsidiary | Union | Contract Term |
|---|---|---|---|
| Supply Chain | Sears Roebuck – MDO – Kent, WA | IBT # 174 | 12/4/16 – 9/30/19 |
| Home Services | Sears Roebuck – PRS – Fairview Heights, IL | UFCW #881 | 3/25/18 - 3/27/21 |
| Home Services | Sears Roebuck – PRS – McMurray (Pittsburgh), PA | USW 5852-28 | 1/1/17 - 12/31/19 |
| Home Services | Sears Roebuck – PRS – Toledo, OH | IBEW #8 | 2/1/18 – 1/31/21 |

**Schedule 6.9(b)**

1. Afzal, Massoud et al. v. Sears, Roebuck and Co., et al., BC 631074, Los Angeles Superior Court (Aug. 23, 2016).

2. Doe, John, James and Jane v. Sears Holdings Corporation; Kmart Corporation; Rebecca Van Hattem and Does 1-25, inclusive, C18-01719, Superior Court Cal. (Aug. 28, 2018).

3. Kmart Corporation v. National Retirement Fund, 01-16-0003-2951, AAA Arbitration.

**Schedule 6.9(c)**

1. SHC confirms as stated below and described in our annual reports:

   - Pension Plans

     o On July 14, 2015, the Company received notice from the U.S. Department of Labor, Employee Benefits Administration, Chicago Regional Office ("EBSA-Chicago") that EBSA-Chicago opened an investigation to determine whether any violations of ERISA occurred with respect to the Legacy Plan covering the period from January 1, 2012 through the present. EBSA-Chicago has indicated that it will not assess penalties against the Company or the Legacy Plan, but has requested that the Company enhance its administrative process for contacting participants eligible to commence benefits and commencing their benefits accordingly.

**Schedule 6.9(d)**

1. Sears Holdings Pension Plan – Department of Labor audit regarding missing participants is outstanding – SHIP notified of audit on July 10, 2015.

2. Sears Holdings Savings Plan – IRS audit regarding missing participants is outstanding – SHIP notified of audit on February 1, 2016.

**Schedule 6.9(e)**

1. Sears Holdings Pension Plan 1

2. Sears Holdings Pension Plan 2

WEIL:\96826275\11\73217.0003

**Schedule 6.9(f)**

1. Liability to Multiemployer Plan: Kmart Corporation incurred withdrawal liability in connection with its 2015 withdrawal from the National Retirement Fund.

**Schedule 6.9(g)**

1. Participant Letter (bonus payment) – Key Employee Retention Plan

2. Participant Letter (bonus payment) – Sears Holding Corporation Key Employee Incentive Plan

3. Pursuant to an offer letter between Sears Holdings and Carrie Price, dated October 11, 2017, Ms. Price is entitled to certain severance pay and benefits if she is (i) involuntarily terminated in connection with the sale of the Home Services Business Unit ("HSBU"), and (ii) not offered comparable employment by the buyer of HSBU or the surviving entity of HSBU following such sale.

4. Pursuant to the Executive Agreement between J. Mitchell Bowling and Sears Holding Management Corporation, dated October 27, 2017, Mr. Bowling is entitled to certain severance benefits if he is (i) terminated without cause and in connection with the sale of HSBU, and (ii) not offered comparable employment by the buyer of HSBU or the surviving entity of HSBU following such sale.

WEIL:\96826275\11\73217.0003

## Schedule 6.10

### Intellectual Property

### Schedule 6.10(a)

### Issued or Applied-For Patents

Schedule 2.1(a)(iii) is hereby incorporated by reference.

### Registered or Applied-For Trademarks

Schedule 2.1(a)(i) is hereby incorporated by reference.

### Registered or Applied-For Copyrights

Schedule 2.1(a)(iv) is hereby incorporated by reference.

### Domain Names

Schedule 2.1(a)(v) is hereby incorporated by reference.

### Media Accounts

Schedule 2.1(a)(vi) is hereby incorporated by reference.

### Schedule 6.10(b)(i)

| Patent Application No. | Patent No. | Description |
|---|---|---|
| 09/636181 | 6523840 | No recorded assignment from Ohio Steel to Sears |
| 10/340024 | 6679506 | Same as previous case (continuation) |
| 12/011106 | | No recorded assignment from Delver Comm'n to SHC Israel |
| 13/004331 | | No recorded assignment from inventor Klondick; filed petition during prosecution to proceed without him.  The USPTO granted Sellers' petition and awarded the application Rule 1.47(a) status on May 23, 2011. |
| 13/283943 | 9225766 | No recorded assignment from inventor Lash; filed petition during prosecution to proceed without him. The USPTO granted Sellers' petition and awarded the application Rule 1.47(a) status on May 18, 2012. |
| 13/421423 | 9438678 | No recorded assignment from inventors Kozolowski and Monnie; filed petition during prosecution to proceed without them. The USPTO granted Sellers' petition and awarded the application Rule 1.47(a) status on February 13, 2013. |
| 13/421603 | 9129302 | No recorded assignment from inventor Lucas |
| 13/826128 | 9330413 | No recorded assignment from inventor Lyons |
| 13/910216 | | No recorded assignment from inventors |
| 13/926383 | | No recorded assignment from inventors |

WEIL:\96826275\11\73217.0003

| | | |
|---|---|---|
| 13/998540 | | No recorded assignment from inventor Lucas |
| 14/083815 | | No recorded assignment from inventor Tamir |
| 14/084903 | | No recorded assignment from inventor Tamir |
| 29/209636 | D509654 | No recorded assignment from Kmart of Michigan to Sears |
| 29/528304 | D767648 | No recorded assignment from inventors Ogg and Lee |
| 29/528339 | D773917 | No recorded assignment from inventors Green and Burgess |
| 29/554459 | D791180 | No recorded assignment from inventor Sun |
| 29/554463 | D801388 | No recorded assignment from inventor Sun |
| 29/554469 | D791181 | No recorded assignment from inventor Sun |
| 29/554470 | D791168 | No recorded assignment from inventor Sun |
| 29/554472 | D797117 | No recorded assignment from inventor Sun |
| 29/554475 | D793425 | No recorded assignment from inventor Sun |
| 29/554476 | D789946 | No recorded assignment from inventor Sun |
| 29/554479 | D793426 | No recorded assignment from inventor Sun |
| 29/554480 | D789947 | No recorded assignment from inventor Sun |
| 29/554481 | D791816 | No recorded assignment from inventor Sun |
| 29/554483 | D789984 | No recorded assignment from inventor Sun |
| 29/554484 | D773516 | No recorded assignment from inventor Sun |
| 29/554487 | D791817 | No recorded assignment from inventor Sun |
| 29/554489 | D791169 | No recorded assignment from inventor Sun |
| 29/554492 | D789948 | No recorded assignment from inventor Sun |
| 29/554493 | D789949 | No recorded assignment from inventor Sun |
| 29/554494 | D791170 | No recorded assignment from inventor Sun |
| 29/554496 | D792445 | No recorded assignment from inventor Sun |
| 29/554497 | D791818 | No recorded assignment from inventor Sun |
| 29/554499 | D793427 | No recorded assignment from inventor Sun |
| 29/554500 | D792446 | No recorded assignment from inventor Sun |
| 29/554501 | D790587 | No recorded assignment from inventor Sun |
| 29/554503 | D791171 | No recorded assignment from inventor Sun |
| 29/554843 | D795287 | No recorded assignment from inventor Sun |
| 29/571792 | D795312 | No recorded assignment from inventors Ogg and Lee |

Encumbrances

1. First Amended and Restated Sublicense Agreement, dated April 1, 2005, by and between Sears Intellectual Property Management Company and Sears, Roebuck and Co.

2. License and Intellectual Property Management Agreement, dated February 1, 2003, by and between Sears Brands, LLC and Sears Intellectual Property Management Company.

3. Trademark License Agreement, dated December 14, 2001, by and between Sears, Roebuck and Co., and A&E Factory Service, LLC.

4. Amended and Restated License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as successor in interest to the trademark rights of Kmart of Michigan, Inc., and Kmart Corporation.

5. Sublicense Agreement, dated February 9, 2010, by and between Sears Brands Business Unit Corporation and Kmart Corporation.

6. License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as a successor in interest to the trademark rights of Kmart of Michigan, Inc., and Kmart.com LLC.

WEIL:\96826275\11\73217.0003

7.  License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., and Kmart of Michigan, Inc.

8.  License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as successor in interest to the trademark rights of Kmart of Michigan, Inc. and Kmart of Washington LLC.

9.  License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as a successor in interest to the trademark rights of Kmart of Michigan, Inc., and Kmart Stores of Illinois LLC.

10. License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as a successor in interest to the trademark rights of Kmart of Michigan, Inc., and Kmart Stores of Texas LLC.

11. Sublicense Agreement, dated February 9, 2010, by and between Kmart Corporation and MyGofer LLC.

12. Sublicense Agreement, dated September 22, 2008, by and between Sears Brands Business Unit Corporation and Sears Brands Management Corporation as amended by First Amendment to Sublicense Agreement, dated November 24, 2008, and Second Amendment to Sublicense Agreement, dated April 30, 2012.

13. Sublicense Agreement, dated February 9, 2010, by and between Sears Brands Business Unit Corporation and Sears Holdings Management Corporation.

14. Sublicense Agreement, dated February 9, 2010, by and between Sears, Roebuck and Co. and Sears Home Improvement Products, Inc.

15. First Amended and Restated Sublicense Agreement, dated April 1, 2005, by and between Sears Brands Business Unit Corporation and Sears, Roebuck and Co. as amended by Amendment 1 to First Amended and Restated Sublicense Agreement, dated May 1, 2006, and Amendment 2 to First Amended and Restated Sublicense Agreement, dated January 1, 2008.

16. Corporate Name Agreement, dated April 21, 2010, by and between Sears, Roebuck and Co. and Sears, Roebuck de Puerto Rico, Inc.

17. Sublicense Agreement, dated April 21, 2010, by and between Sears, Roebuck and Co. and Sears, Roebuck de Puerto Rico, Inc.

18. Sublicense Agreement, dated November 20, 2007, by and between Sears Intellectual Property Management Corporation and ServiceLive, Inc.

19. Retail Store License Agreement, dated January 1, 2014, by and between Sears Brands Management Corporation and Homemart, S.A.

20. License Agreement, dated June 23, 2017, by and between Sears Brands Management Corporation and Cleva North America, Inc.

21. License Agreement, dated December 2017, by and between Sears Brands Management Corporation and Drinkpod LLC.

22. License Agreement, dated February 2, 2017, as amended May 30, 2017 and August 28, 2017, by and between Sears Brands Management Corporation and Permasteel, Inc.

23. License Agreement (DieHard Portable Power Products), dated January 10, 2014, by and between Sears Brands Management Corporation and Schumacher Electric Corporation, as amended by Amendment #1 to License Agreement for DieHard Portable Power Products, dated January 31, 2018, and Amendment #2 to License Agreement for DieHard Portable Power Products, dated October 25, 2018.

24. License Agreement, dated June 15, 2017, by and between Sears Brand Management Corporation and Dorcy International, Inc.

WEIL:\96826275\11\73217.0003

25. License Agreement, dated February 20, 2018, by and between Sears Brands Management Corporation and Andrew J. Consulting, Inc., as amended by Amendment #1 to License Agreement, dated April 4, 2018.

26. Brand Sales Agreement, dated November 23, 2005, by and between Sears, Roebuck and Co. and Orchard Supply Hardware LLC.

27. Amended and Restated Trademark License Agreement, dated April 17, 2002, by and among Sears, Roebuck and Co., Sears Brands Management Corporation, and Sears, Roebuck de Mexico, S.A. de C.V.; as amended by Amendment to Amended and Restated Trademark License Agreement, dated October 1, 2009, and Second Amendment to Amended and Restated Trademark License Agreement, dated January 1, 2010.

28. License Agreement, dated December 2016, as amended May 29, 2017, by and between Sears Holdings Management Corporation and Beijing Industrial Development Co., Ltd.

29. License Agreement, dated August 2, 2018, by and between Sears Brands Management Corporation and Gibson Overseas, Inc.

30. Label Trade Credit Program Agreement, dated April 20, 2011, by and between Sears Holdings Management Corporation and Bluetarp Financial, Inc.

31. Amended and Restated Merchandising Agreement, dated May 1, 2016, by and among, Roebuck and Co., Kmart Corporation, Sears Holdings Corporation, Sears Hometown Outlet Stores, Inc., Sears Authorized Hometown Stores, LLC and Sears Outlet Stores L.L.C., as amended by Amendment to Amended and Restated Merchandising Agreement, dated March 8, 2017, Amendment No. 2 to Amended and Restated Merchandising Agreement, dated July 10, 2017, and Amendment No. 3 to Amended and Restated Merchandising Agreement, dated December 15, 2017.

32. Trademark License Agreement, dated August 8, 2012, by and between Sears, Roebuck and Co. and Sears Hometown and Outlet Stores, Inc., as amended by Amendment No. 1 to Trademark License Agreement, dated October 11, 2012.

33. Amended and Restated Agreement, dated February 16, 2018, by and among Sears Holding Corporation, Sears, Roebuck and Co., Kmart Corporation, Sears Hometown and Outlet Stores, LLC, Sears Outlet Stores, L.L.C., Sears Home Appliance Showrooms, LLC, Bank of America, N.A., and Gordon Brothers Finance Company, as agent.

34. Store License Agreement, dated August 8, 2012, by and between Sears, Roebuck and Co. and Sears Authorized Hometown Stores, LLC, as amended by Amendment No. 1 to Store License Agreement, dated July 10, 2017.

35. Store License Agreement, dated August 8, 2012, by and between Sears Roebuck and Co. and Sears Home Appliance Showrooms, LLC.

36. Store License Agreement, dated August 8, 2012, by and between Sears Roebuck and Co. and Sears Outlet Stores, L.L.C., as amended by Amendment No. 1 to Store License Agreement (Outlet), dated October 6, 2013, and Amendment No. 2 to Store License Agreement (Outlet) dated May 1, 2016.

37. Retail Operations Agreement, dated April 4, 2014, by and between Sears, Roebuck and Co. and Lands' End, Inc., as amended by the Letter Agreement, dated July 23, 2018.

38. License and Services Agreement, dated October 28, 2016, by and between Afero, Inc. and Sears Brands Management Corporation.

WEIL:\96826275\11\73217.0003

39. Master License and Services Agreement, dated September 12, 2017, by and between Afero, Inc. and Sears Brands Management Corporation.

40. Superpriority Junior Lien Secured Debtor-in-Possession Credit Agreement, dated November 29, 2018, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the several banks, financial institutions or entities from time to time party thereto as term lenders, and Cantor Fitzgerald Securities, as administrative agent.

41. Debtor-in-Possession Guarantee and Collateral Agreement, dated November 29, 2018, by and among Sears Holdings Corporation, Sears Roebuck and Co., Sears Roebuck Acceptance Corp., Kmart Holding Corporation, Kmart Corporation and Cantor Fitzgerald Securities, as collateral agent.

42. Superpriority Senior Secured Debtor-in-Possession Asset-Based Credit Agreement, dated November 29, 2018, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, the banks, financial institutions and other institutional lenders party thereto as revolving lenders or term lenders, Bank of America, N.A., as administrative agent, Wells Fargo Bank, National Association, as co-collateral agent and syndication agent, Citigroup Global Markets Inc. as documentation agent, Merrill Lynch, Pierce, Fenner & Smith Incorporation, Citibank, N.A. and Wells Fargo Bank, National Association, as joint lead arrangers and bookrunners.

43. Debtor-in-Possession Guarantee and Collateral Agreement, dated November 29, 2018, by and among Sears Holdings Corporation, Sears Roebuck and Co., Sears Roebuck Acceptance Corp., Kmart Holding Corporation, Kmart Corporation, and Bank of America, N.A. and Wells Fargo Bank, National Association, as co-collateral agents.

44. Term Loan Credit Agreement, dated January 4, 2018, by and among Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, each of Sears Holdings Corporation's other direct or indirect  domestic subsidiaries that is or otherwise becomes party thereto, and JPP, LLC, as collateral agent.

45. Intellectual Property Security Agreement, dated January 4, 2018, by and between Sears Holdings Corporation, Sears Roebuck Acceptance Corp., Kmart Corporation, and each of Sears Holdings Corporations other direct or indirect domestic subsidiaries that is or otherwise becomes party thereto, and JPP, LLC, as collateral agent.

46. Exclusive Distributorship Agreement, dated August 31, 2017, by and between Sears Brands Management Corporation and Distribuidora y Comercializadora Master Brands SpA.

47. Distributorship Agreement, dated January 25, 2018, by and between Sears Brands Management Corporation and Globistic Company, Inc.

48. Distributorship Agreement, as amended February 7, 2018, by and between Sears Brands Management Corporation and ANSA McAL (US) Inc.

49. Distributorship Agreement, dated June 7, 2017, by and between Sears Brands Management Corporation and Algert Company.

50. Second Amended and Restated Program Agreement, dated October 3, 2018, by and among Sears, Roebuck and Co., Sears Brands Business Unit Corporation, Sears Brands,

51. Sellers' form of Sears Garage Door Services Franchise Agreement for the sale, installation and repair of garage doors and garage door openers (the "Garage Door Business") may restrict Sellers from operating, or granting to a licensee the right to operate, a Garage Door Business on a stand-alone basis (without any additional products included in such sale, installation or repair) within the applicable franchised territory under certain trademarks owned or licensed, and used,

WEIL:\96826275\11\73217.0003

promoted and licensed by Sears Home & Business Franchises, Inc. for the term of such agreement.

52. On July 26, 1995 the entity Plaza Lama recorded itself before the Central Bank of the Dominican Republic as the exclusive distributor for products sold under the trademarks Kenmore, and DieHard (the "Products") in the Dominican Republic based on a number of documents and invoices from Cargil International Corp., the authorized regional distributor at that time. The recordation expressly recognizes Plaza Lama as the "exclusive distributor" in the Dominican Republic. For a two (2) year period beginning on February 20, 2007, Plaza Lama distributed Products in the Dominican Republic, in the absence of any written distribution agreement, but in February of 2009, Sears informed Plaza Lama that it had assigned its sales and marketing of Products to the entity Ansa McAL. Plaza Lama stopped distributing Products and requested to purchase directly from Sears. In November of 2011, Plaza Lama contacted Ansa McAL and claimed exclusive distribution rights in the Dominican Republic under Local Law 173 and requested that Ansa McAL cease distribution of Products through other companies. The disagreement led Sears to file a lawsuit against Plaza Lama in a court of first instance (the "Court") in the Dominican Republic, and Plaza Lama counterclaimed. On September 20, 2017, the Court ruled that Plaza Lama held exclusive distribution rights to Products in the Dominican Republic. Sears is currently considering whether to appeal the Court's ruling.

**Schedule 6.10(c)**

(ii)    Alleged infringement of third-party IP

- C&D Letters:

| Sending Party | Date Received | Overview of Claim |
|---|---|---|
| Combe Inc. | 11/13/18 | Alleging that Kmart's feminine wash product, which states "ODOR BLOCK PROTECTION" on its label, infringes Combe's registered trademark ODOR BLOCK, used in connection with its Vagisil product |
| Emeline Tate-Robertson | 11/16/2018 | Alleging that certain bike helmets and bedding sold by Kmart infringe ETR's alleged copyright rights in her "jagged glass" artwork; no indication that the work is registered |
| Airstream, Inc. | 12/7/18 | Alleging that Sears's inflatable Christmas decoration of a trailer infringes Airstream's registered trademark AIRSTREAM and trade dress rights in the design of its trailers |

- Actions pending:

| Court | Docket Number | Description | Filed |
|---|---|---|---|
| U.S. District - Michigan Western | 1:14cv83 | Rohn et al. v. Viacom International, Inc. et al. | 01/23/2014 |
| U.S. District - Texas Eastern | 6:16cv33 | Tinnus Enterprises, LLC et al. v. Telebrands Corp. | 01/26/2016 |
| U.S. District - Texas Eastern | 6:16cv34 | Tinnus Enterprises, LLC v. Wal-Mart Stores, Inc. | 01/26/2016 |
| U.S. District - Oregon | 3:15cv171 | Trailers Intl, LLC et al. v. Mastercraft Tools Florida, Inc. et al. | 01/30/2015 |

WEIL:\96826275\11\73217.0003

| U.S. District - New York Southern | 1:14cv1254 | The Fashion Exchange LLC v. Hybrid Promotions, LLC et al. | 02/26/2014 |
| U.S. District - Florida Southern | 9:18cv80296 | Aspen Licensing International, Inc. v. Sears Holdings Management Corp. et al. | 03/08/2018 |
| U.S. District - Illinois Northern | 1:18cv1885 | Grecia v. Sears Holdings Corporation | 03/15/2018 |
| U.S. District - New Jersey | 3:13cv1944 | Richmond v. Ningbo Hangshun Electrical Co., Ltd. et al. | 03/27/2013 |
| U.S. District - Texas Eastern | 6:17cv199 | Tinnus Enterprises, LLC et al. v. Bed Bath & Beyond Inc., et al. | 04/03/2017 |
| U.S. District - California Central | 2:18cv3556 | Gold Value International Textile, Inc. v. Ax Paris USA, LLC et al. | 04/26/2018 |
| U.S. District - Minnesota | 0:09cv1091 | Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc., et al. | 05/11/2009 |
| U.S. District - New Mexico | 1:15cv406 | Shive v. Amazon.Com, Inc. et al. | 05/12/2015 |
| U.S. District - California Central | 2:17cv3665 | L.A. Gem and Jewelry Design, Inc. v. Sears Holdings Management Corporation et al. | 05/16/2017 |
| U.S. District - Texas Eastern | 2:18cv228 | Flectere LLC v. Sears Brands, L.L.C. | 05/24/2018 |
| U.S. District - Texas Eastern | 2:18cv275 | Unoweb Virtual, LLC v. Sears Holdings Corp. | 07/09/2018 |
| U.S. District - New York Southern | 1:18cv6281 | GCE International, Inc. v. Kmart Corporation | 07/11/2018 |
| U.S. District - New York Southern | 1:18cv6812 | Graham v. RWTW, LLC et al. | 07/30/2018 |
| U.S. District - California Central | 2:17cv6226 | Benavidez v. Kmart Corporation et al. | 08/23/2017 |
| U.S. District - New York Southern | 1:17cv7097 | Bulski v. Tanya Creations, LLC, et al. | 09/18/2017 |
| U.S. District - California Central | 2:17cv7151 | Deckers Outdoor Corporation v. Sears, Roebuck and Co., et al. | 09/27/2017 |
| U.S. District - California Central | 2:17cv7151 | Deckers Outdoor Corporation v. Sears, Roebuck and Co., et al. | 09/27/2017 |
| U.S. District - Texas Eastern | 6:18cv569 | Tinnus Enterprises, LLC et al. v. Sears Holding Corp. | 10/31/2018 |
| U.S. District - California Central | 2:17cv9046 | Universal Dyeing and Printing Inc. v. Walmart Inc., et al. | 12/15/2017 |
| U.S. District - New York Southern | 1:17cv9840 | Standard Fabrics International, Inc. v. Project 28 Clothing, LLC et al. | 12/15/2017 |

(iii)

Third Party Challenges to the Validity of Acquired Intellectual Property

| Country | Type of Proceeding | Other Party | Marks at Issue |
| --- | --- | --- | --- |
| Brazil | Third Party Opposing Sears Mark | Limpeza | SEARS (App. No. 910112100) in Class 11 |

203

| Brazil | Third Party Seeking to Cancel of Sears's Registration | Limpeza | SEARS (Reg. No. 811234940) in Class 35 |
|--------|--------|--------|--------|
| Brazil | Third Party Opposing Sears Mark | Limpeza | SEARS (App. No. 910112053) in Class 09 |
| Brazil | Third Party Opposing Sears Mark | Limpeza | SEARS (App. No. 910112169 in Class 21 |
| Brazil | Third Party Opposing Sears Mark | Limpeza | SEARS (App. No. 910112193) in Class 24 |
| Brazil | Third Party Opposing Sears Mark | Limpeza | SEARS (App. No. 910112231) in Class 25 |
| Brazil | Third Party Opposing Sears Mark | Limpeza | SEARS (App. No. 910207364) in Class 07 |
| Brazil | Third Party Opposing Sears Mark | Limpeza | SEARS (App. No. 910207372) in Class 28 |
| Brazil | Third Party Opposing Sears Mark | Limpeza | SEARS (App. No. 910207399) in Class 36 |

With respect to the last sentence of Section 6.10(c) only:

1. Rob Gerlach, Divisional VP – Loyalty Marketing for SHC, is serving in the Middle East on a nine-month military deployment.  In early October 2018, Mr. Gerlach e-mailed Eddie Lampert a video (https://www.youtube.com/watch?v=Md5BiPn0b-k) showing a retail store in Kuwait bearing the SEARS logo.  After some internal investigation, it was determined that the store belonged to Al Husawi Group, a former Sears distributor.  Sears forwarded the materials to its outside IP counsel, who contacted an IP firm in Kuwait to discuss potential next steps – including sending a cease and desist letter.  At this point, Sears has not contacted Al Husawi regarding this issue.

2. In connection with the Proceedings listed below, the applicable third parties have used and filed to register the following Marks at Issue:

| Country | Type of Proceeding | Other Party | Marks at Issue |
|---------|--------|--------|--------|
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909339708) in Class 35 |
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909498865) in Class 07 |
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909420670 ) in Class 09 |
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909420742) in Class 11 |
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909420777) in Class 21 |
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909420807) in Class 24 |
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909420815) in Class 25 |
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909498938) in Class 28 |
| Brazil | Opposition of Third-Party Mark | Limpeza | SEARS (App. No. 909499128) in Class 36 |

| India | Opposition of Third-Party Mark | K. ANAND t/as CEARS MARKETING | CEARS (App. No. 1421296) in Class 11 |
|---|---|---|---|
| India | Opposition of Third-Party Mark | Kmart Retail India Pvt. Ltd. | K KIDS MART and Design (App. No. 1641668) in Class 35 |
| India | Opposition of Third-Party Mark | K MART TOURS (P) LTD. | K MART TOURS (P) LTD. (App. No. 1865978) in Class 39 |
| India | Opposition of Third-Party Mark | Aggarwal Enterprises | K-Mark (App. No. 1166777) in Class 24 |
| India | Opposition of Third-Party Mark | Besta Cosmetics Ltd. | Kmart and Design (App. No. 1132511) in Class 5 |
| India | Opposition of Third-Party Mark | Sear Energy Pvt. Ltd. | SEAR ENERGY (App. No. 1584141) in Class 9 |
| India | Opposition of Third-Party Mark | Ashok K Chhabra d/b/a Sears Enterprises | SEARS (App. No. 2474429) in Class 35 |
| India | Opposition of Third-Party Mark | Sears Industries | SEARS (Appl. No. 2342129) in Class 21 |
| Peru | Cancellation of Third-Party Registration | Corporacion Electronica Internacional S.A.C. | SEARS (App. No. 713022-2017) in Class 11 |

**Schedule 6.10(e)**

1.  In mid-March 2018, [24]7.ai, a company that provides online support services to Sears and Kmart, notified Sears, as well as a number of other companies, that [24]7.ai had experienced a security incident in the fall of 2017. Sears believes this incident involved unauthorized access to less than 100,000 of Sears and Kmart customers' credit card information. After [24]7.ai informed Sears, Sears notified the credit card companies in order to prevent potential fraud, and launched an investigation with federal law enforcement authorities, Sears banking partners, and IT security firms.

    As a result of the investigation, Sears discovered that an unauthorized individual incorporated a malicious script into code used by [24]7.ai to provide services on Sears.com and Kmart.com, which collected the names, addresses, and payment card information of customers who placed or attempted to place orders on the Sears.com or Kmart.com websites between September 27, 2017 and October 12, 2017, and entered their payment card information manually on the checkout screen. Sears notified credit card companies in order to prevent potential fraud, and launched a further investigation with federal law enforcement authorities, Sears banking partners and IT security firms. Sears sent emails and letters to affected customers notifying them of the breach, and released a press release to notify any other customer who attempted to place this type of order but had their payment card declined that such customer could also potentially be affected by the incident. Such press release notified affected customers of their rights under certain state and federal privacy regulations. Sears provided information regarding the incident to the Attorney General, and there are no outstanding requests at this time. [24/7].ai has fully remediated the vulnerabilities that enabled the unauthorized access, and Sears's CIO, Greg Russell and a third party auditor inspected [24]/7.ai's systems and practices at [24]7.ai's facilities. In addition, Sears

205

obtained the PFI (Verizon) report and [24]7.ai's report from Crowdstrike, which also outlined all actions taken by [24]7.ai to remedy the situation.

2.  In February 2017, a third party gained access to a small number of employee enterprise ID accounts, through phishing attacks. The third party changed these employees' direct deposit account information.  The Company discovered the attempt, prevented any loss, and has fully remediated this particular situation including by requiring all employees to reset their enterprise passwords.

**Schedule 6.10(g)**

1.  In 2018, Sears Protection Company received a generic reminder email from New York Department of Financial Services that was sent to all Covered Entities who had not yet submitted a certificate of compliance pursuant to 23 NYCRR 500 (the New York Department of Financial Services Cybersecurity Regulation). Sellers have not yet submitted such certificate of compliance, and are currently working with outside counsel to review and modify (if necessary) the cybersecurity programs, policies and practices of Sears Protection Company to ensure that Sears Protection Company is fully in compliance with 23 NYCRR 500, and to submit the certificate of compliance with a view toward submitting such certificate prior to the Closing. Sears Protection Company has not received a claim from any third party, including from the New York Department of Financial Services, in connection with any aspect of its compliance with 23 NYCRR 500.

**Schedule 6.10(g)(ii)**

1.  Item 1 of Schedule 6.10(e) is incorporated herein by reference.

WEIL:\96826275\11\73217.0003

## Schedule 6.11

### Material Contracts

### Schedule 6.11(a)

<u>(i)</u>

1. The collective bargaining agreements set forth in <u>Schedule 6.9(a)</u> are hereby incorporated by reference.

<u>(ii)</u>

1. Real Estate Sale Contract, dated as of November 29, 2018, by and between Sears, Roebuck and Co. and Other Seller Parties Named Herein and Amerco Real Estate Company, as amended.

2. Real Estate Contract, dated as of May 4, 2018, by and between KMART Corporation ("<u>Seller</u>") and Amerco Real Estate Company ("<u>Purchaser</u>"), as amended by that certain Amendment to Real Estate Contract, dated as of December 14, 2018, by and between Seller and Purchaser.

3. Contract for Purchase and Sale of Property, dated as of June 4, 2018, by and between Sears, Roebuck and Co. ("<u>Seller</u>") and LGR Investments, Ltd. ("<u>Purchaser</u>"), as amended by that certain First Amendment to Contract for Purchase and Sale of Property, dated as of September 10, 2018, by and between Seller and LGR Investments, Ltd., as amended by that certain Second Amendment to Contract for Purchase and Sale of Property, dated as of November 30, 2018, by and between Seller and Purchaser.

4. Real Estate Sale Contract, dated as of September 27, 2018, by and between SRC Facilities LLC ("<u>Seller</u>") and Onward Investors Value Fund, L.P. ("<u>Purchaser</u>"), as amended by that certain Amendment to Real Estate Contract, dated as of October 29, 2018, by and between Seller and Purchaser, as amended by that certain Second Amendment to Real Estate Contract, dated as of November 2, 2018, by and between Seller and Purchaser, as amended by that certain Third Amendment to Real Estate Contract, dated as of November 9, 2018, by and between Seller and Purchaser, and as amended by that certain Fourth Amendment to Real Estate Contract dated as of November 26, 2018.

5. Real Estate Sale Contract, dated as of September 28, 2018, by and between KMART Corporation ("<u>Seller</u>") and New Generation Properties, LLC ("<u>Purchaser</u>"), as amended by that certain Amendment to Real Estate Contract, dated as of December 10, 2018, by and between Seller and Purchaser.

6. Real Estate Sale Contract, dated as of August 13, 2018, by and between Sears, Roebuck and Co. ("<u>Seller</u>") and Stonecrest Resorts, LLC, as predecessor in interest to Fitness Central SPE, LLC ("<u>Purchaser</u>"), as amended by that certain Amendment to Real Estate Contract, dated as of January 8, 2019, by and between Seller and Purchaser.

7. Real Estate Sale Contract, dated as of May 23, 2028, by and between KMART Corporation and Troy Coolidge No. 7, LLC, collectively, as seller and Rise Holdings, LLC, as purchaser.

8. Real Estate Sale Contract, dated as of July 25, 2018, by and between Troy Coolidge No. 10, LLC, KMART Corporation, and Sears, Roebuck and Co. (collectively, "<u>Seller</u>") and Industrial Commercial Properties LLC ("<u>Purchaser</u>"), as amended by that certain First Amendment to Real Estate Sale Contract, dated as of September 24, 2028, by and between Seller and Purchaser, as amended by that certain Second Amendment to Real Estate Contract, dated as of December 19, 2018, by and between Seller and Purchaser.

WEIL:\96826275\11\73217.0003

9.  Real Estate Sale Contract, dated as of December 27, 2018, by and between Sears, Roebuck and Co. and TQ Investments, LLC.

10. Exclusive Listing Agreement, dated as of December 13, 2018, by and between Sears Holding Corporation and Holliday GP Corp.

11. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and KPM Realty Advisors.

12. Exclusive Listing Agreement, dated as of December 12, 2018, by and between Sears Holding Corporation and Stokas Realty Advisors, LLC.

13. Exclusive Listing Agreement, dated as of December 13, 2018, by and between Sears Holding Corporation and Pinpoint Retail Company, LLC.

14. Exclusive Listing Agreement, dated as of December 12, 2018, by and between Sears Holding Corporation and JBRS Realty, LLC.

15. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and Hurd Real Estate Services, LLC and LANE4 Property Group, Inc.

16. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and LANE4 Property Group, Inc.

17. Exclusive Listing Agreement, dated as of December 2018, by and between Sears Holding Corporation and Colliers International, MN., LLC.

18. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and Investors Realty, Inc.

19. Exclusive Listing Agreement, dated as of December 2018, by and between Sears Holding Corporation and Morton G. Thalhimer, Inc.

20. Exclusive Listing Agreement, dated as of December 17, 2018, by and between Sears Holding Corporation and Venture Commercial Real Estate, LLC.

21. Exclusive Listing Agreement, dated as of December 12, 2018, by and between Sears Holding Corporation and R.I. Properties, Inc.

22. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and Legend Partners, LLP.

23. Exclusive Listing Agreement, dated as of December 12, 2018, by and between Sears Holding Corporation and SullivanHayes Companies, NE, LLC.

24. Exclusive Listing Agreement, dated as of January 4, 2019, by and between Sears Holding Corporation and Legend Partners II

25. Exclusive Listing Agreement, dated as of December 12, 2018, by and between Sears Holding Corporation and Wm, Bourdoures Co.

26. Exclusive Listing Agreement, dated as of December 12, 2018, by and between Sears Holding Corporation and Southplace Properties, Inc.

27. Exclusive Listing Agreement, dated as of December 28, 2018, by and between Sears Holding Corporation and Legend Partners, LLC.

28. Exclusive Listing Agreement, dated as of December 17, 2018, by and between Sears Holding Corporation and Jones Lang La Salle America, Inc.

WEIL:\96826275\11\73217.0003

29. Exclusive Listing Agreement, dated as of December 20, 2018, by and between Sears Holding Corporation and The Trilogy Group, LLC.

30. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and Metro Commercial Real Estate.

31. Exclusive Listing Agreement, dated as of December 19, 2018, by and between Sears Holding Corporation and Baker Storey McDonald Properties, Inc.

32. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and TRIO Commercial Property Group, LLC.

33. Exclusive Listing Agreement, dated as of December 2018, by and between Sears Holding Corporation and Metro Commercial Real Estate, Inc.

34. Exclusive Listing Agreement, dated as of December 2018, by and between Sears Holding Corporation and Metro Commercial Real Estate, Inc.

35. Exclusive Listing Agreement, dated as of December 12, 2018, by and between Sears Holding Corporation and Stokas Realty Advisors, LLC.

36. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and Howard Hanna WNY, Inc.

37. Exclusive Listing Agreement, dated as of December 12, 2018, by and between Sears Holding Corporation and The Chambers Group, LLC.

38. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and The Dartmouth Company.

39. Exclusive Listing Agreement, dated as of December 26, 2018, by and between Sears Holding Corporation and SRSA Commercial Real Estate, Inc.

40. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and Avision Young Florida, LLC.

41. Exclusive Listing Agreement, dated as of December 10, 2018, by and between Sears Holding Corporation and NMERA, Inc.

42. Exclusive Listing Agreement, dated as of December 14, 2018, by and between Sears Holding Corporation and Gehrki Commercial Real Estate.

43. Exclusive Listing Agreement, dated as of December 11, 2018, by and between Sears Holding Corporation and Edge Real Estate Group, LLC.

44. Exclusive Listing Agreement, dated as of December 28, 2018, by and between Sears Holding Corporation and Legend Partners, LLC

45. Exclusive Listing Agreement, dated as of December 2018, by and between Sears Holding Corporation and Jones Lang La Salle America, Inc.


**(iii)**

1. None.


**(iv)**

1. Kenmore License Agreement, dated May 18, 2006, by and between KCD IP, LLC and Sears, Roebuck and Co, as amended by First Amendment to Kenmore License Agreement, made effective as of November 29, 2009, Second Amendment to Kenmore License Agreement, dated March 7, 2012 and Third Amendment to Kenmore License Agreement, dated April 24, 2017.

2. Amended and Restated Merchandising Agreement, effective May 1, 2016, as amended March 8, 2017, July 10, 2017 and December 15, 2017, by and between Sears, Roebuck and Co., Kmart Corporation, and Sears Holdings Corporation, and Sears Hometown and Outlet Stores, Inc., Sears Authorized Hometown Stores, LLC, and Sears Outlet Stores, L.L.C.

3. The following Contracts, to the extent annual payments or consideration furnished by or to Sellers pursuant to such Contract is in excess of $15,000,000:

    a. First Amended and Restated Sublicense Agreement, dated April 1, 2005, by and between Sears Intellectual Property Management Company and Sears, Roebuck and Co.

    b. License and Intellectual Property Management Agreement, dated February 1, 2003, by and between Sears Brands, LLC and Sears Intellectual Property Management Company.

    c. Trademark License Agreement, dated December 14, 2001, by and between Sears, Roebuck and Co., and A&E Factory Service, LLC.

    d. Amended and Restated License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as successor in interest to the trademark rights of Kmart of Michigan, Inc., and Kmart Corporation.

    e. Sublicense Agreement, dated February 9, 2010, by and between Sears Brands Business Unit Corporation and Kmart Corporation.

    f. License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as a successor in interest to the trademark rights of Kmart of Michigan, Inc., and Kmart.com LLC.

    g. License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., and Kmart of Michigan, Inc.

    h. License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as successor in interest to the trademark rights of Kmart of Michigan, Inc. and Kmart of Washington LLC.

    i. License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as a successor in interest to the trademark rights of Kmart of Michigan, Inc., and Kmart Stores of Illinois LLC.

    j. License Agreement, dated January 29, 2007, by and between Sears Brands, L.L.C., as a successor in interest to the trademark rights of Kmart of Michigan, Inc., and Kmart Stores of Texas LLC.

    k. Sublicense Agreement, dated February 9, 2010, by and between Kmart Corporation and MyGofer LLC.

    l. Sublicense Agreement, dated September 22, 2008, by and between Sears Brands Business Unit Corporation and Sears Brands Management Corporation as amended by First Amendment to Sublicense Agreement, dated November 24, 2008, and Second Amendment to Sublicense Agreement, dated April 30, 2012.

    m. Sublicense Agreement, dated February 9, 2010, by and between Sears Brands Business Unit Corporation and Sears Holdings Management Corporation.

n. Sublicense Agreement, dated February 9, 2010, by and between Sears, Roebuck and Co. and Sears Home Improvement Products, Inc.

o. First Amended and Restated Sublicense Agreement, dated April 1, 2005, by and between Sears Brands Business Unit Corporation and Sears, Roebuck and Co. as amended by Amendment 1 to First Amended and Restated Sublicense Agreement, dated May 1, 2006, and Amendment 2 to First Amended and Restated Sublicense Agreement, dated January 1, 2008.

p. Corporate Name Agreement, dated April 21, 2010, by and between Sears, Roebuck and Co. and Sears, Roebuck de Puerto Rico, Inc.

q. Sublicense Agreement, dated April 21, 2010, by and between Sears, Roebuck and Co. and Sears, Roebuck de Puerto Rico, Inc.

r. Sublicense Agreement, dated November 20, 2007, by and between Sears Intellectual Property Management Corporation and ServiceLive, Inc.

**(v)**

1. Transportation Agreement dated as of July 25, 2013, as amended, by and between Sears Logistics Services, Inc. and Circle 8 Logistics, Inc.

2. Supply Agreement for Auto Repair Parts, dated as of October 1, 2011, by and between Sears, Roebuck and Co. and AutoZone Parts, Inc., AutoZone Operations, Inc., AutoZone Northeast, Inc., AutoZone West, Inc., AutoZone Stores, Inc., AutoZone Puerto Rico, Inc., AutoZone Texas, L.P., and AutoZone Mississippi, Inc.

3. Master Outsourced Services Agreement, dated as of January 5, 2012, as amended, by and between Sears Holdings Management Corporation and Tata America International Corporation.

4. Transportation Agreement, dated as of July 27, 2007, as amended, by and between Sears Logistics Services, Inc. and AFN, LLC.

5. Service Contract, dated as of May 1, 2018, by and between Innovel Solutions, Inc.; KMART Corporation; Sears, Roebuck and Co; Sears Roebuck de Puerto Rico, Inc; Sears Puerto Rico and Maersk Inc. As agent to A.P. Moller-Maersk A/S trading under the name of MAERSK LINE.

6. Transportation Agreement, dated January 26, 2017, Innovel Solutions, Inc. and Echo Global Logistics, Inc.

7. Transportation Agreement, dated as of April 1, 1998, as amended, by and between Sears Logistics Services, Inc. and Heartland Express Inc., of Iowa.

8. Transportation Agreement, dated as of April 1, 1998, as amended, by and between Sears Logistics Services, Inc. and Dart International.

9. Transportation Agreement, dated as of April 1, 1998, as amended, by and between Sears Logistics Services, Inc. and Hub Group Operations Management, a division of Hub Group Associates, Inc.

10. Transportation Agreement, dated as of February 27, 2018, as amended, by and between Innovel Solutions Inc., formerly known as Sears Logistics Services, Inc. and Swift Transportation Co. of Arizona, LLC.

11. Master Services Agreement, dated as of April 1, 2014, as amended, by and between Sears Holdings Management Corporation on behalf of itself and its Affiliates and iCrossing, Inc.

12. Transportation Agreement, dated as of July 12, 2005, as amended by and between Sears Logistics Services, Inc. and Intermodal Sales Corp.

WEIL:\96826275\11\73217.0003

13. Warehouse Operating Agreement, dated as of June 1, 2014, by and between Sears Logistics Services, Inc. and 3PD, Inc.

14. Home Delivery & Shuttle Carrier Agreement, dated as of April 20, 2014, by and between Sears Roebuck and Co. and 3PD, Inc.

15. Home Delivery & Shuttle Carrier Agreement, dated as of April 20, 2014, by and between Sears Logistics Services, Inc. and XPO Last Mile, Inc.

16. Home Delivery & Shuttle Carrier Agreement, dated as of February 8, 2015, as amended, by and between Innovel Solutions, Inc. and XPO Last Mile, Inc.

17. Warehouse Operating Agreement, dated as of August 3, 2014, by and between Sears Logistics Services, Inc. and XPO Last Mile, Inc.

18. Warehouse Operating Agreement, dated as of February 8, 2015, by and between Sears Logistics Services, Inc. and XPO Last Mile, Inc.

19. Home Delivery & Shuttle Carrier Agreement, dated as of February 15, 2015, as amended, by and between Sears Roebuck and Co. and XPO Last Mile, Inc.

20. Distribution and Supply Agreement, dated as of September 6, 2003, as amended, by and between KMART Corporation including its subsidiaries and affiliates and McLane Company, Inc.

21. Master Purchase Agreement, dated as of November 8, 2017, by and between Sears, Roebuck and Co. d/b/a Sears Commercial and Cardinal Group Construction LLC.

22. Service Agreement, dated as of October 1, 2012, as amended, by and between A&E Factory Service, LLC and General Electric Company.

23. Supply Agreement, dated as of November 1, 2010, as amended, by and between Sears, Roebuck and Co., Kmart Corporation and Sears Brands Management and Apex Tool Group, LLC, Lea Way Hand Tool Limited, and Danaher Tool Limited.

24. Master Consulting and Professional Services Agreement, dated as of February 1, 2011, by and between Sears Holdings Management Corporation and UPS Professional Services, Inc.

25. Master Outsourced Services Agreement, dated as of September 1, 2012, as amended, by and between Sears Holdings Management Corporation and Sitel Operating Corporation.

26. Master Outsourced Services Agreement, dated as of January 1, 2017, by and between Sears Holdings Management Corporation and Sitel Operating Corporation.

27. Advertising Agency Agreement, dated as of March 1, 2014, as amended, by and between Sears Holdings Management Corporation and Havas Worldwide Chicago, Inc.

28. A&R IBM Customer Agreement, dated as of September 28, 2012, by and between Sears Holdings Management Corporation and IBM.

29. Waste Hauling Master Services Agreement, dated as of January 20, 2015, by and between Sears, Roebuck and Co., Kmart Corporation, Sears Roebuck de Puerto Rico, Inc., Sears Logistics Services, Inc. Sears Home Improvement Products, Inc. and Sears Hometown and Outlet Stores, Inc. and Waste Management National Services, Inc., as amended.

30. Transportation Agreement, dated as of May 31, 2001, by and between Sears Logistics Services, Inc. and Knight Transportation, Inc., as amended.

31. Universal Terms and Conditions dated as of August 18, 2006 by and between Sears Holdings Management Corporation and Husqvarna Outdoor Products, Inc.

WEIL:\96826275\11\73217.0003

32. Universal Terms and Conditions dated as of December 6, 2004 by and between Sears, Roebuck and Co. and Hasbro, Inc.

33. Universal Terms and Conditions dated as of January 12, 2010 by and between Sears Holdings Management Corporation and Zhongshan Galanz Consumer Electric Appliances Co. Ltd.

34. Universal Terms and Conditions dated as of July 15, 2004 by and between Sears, Roebuck and Co. and Mattel Sales Corp.

35. Universal Terms and Conditions dated as of May 23, 2008 by and between Sears Holdings Management Corporation and Permasteel, Inc.

36. Universal Terms and Conditions dated as of August 4, 2001 by and between Sears holdings Management Corporation and Prudent International Ltd.

37. Universal Terms and Conditions dated as of December 7, 2004 by and between Sears, Roebuck and Co. and Hasbro, Inc.

38. Universal Terms and Conditions dated as of December 15, 2001 by and between Sears Holdings Management Corporation and Samsung Electronics America, Inc., as amended.

39. Universal Terms and Conditions dated as of October 1, 2007 by and between Sears Holdings Management Corporation and Samsung Electronics America, Inc.

40. Universal Terms and Conditions dated as of September 21, 2006 by and between Sears Holdings Management Corporation and Samsung Electronics Co., Ltd.

41. Universal Terms and Conditions dated as of September 28, 2007 by and among Sears, Roebuck and Co., Kmart Corporation, all other subsidiaries of Sears Holdings Corporation, and Samsung Electronics America, Inc., as amended.

42. Supply Agreement for Garage Door Operators and Accessories Dated as of January 1, 2010 by and among Kmart Corporation, Sears, Roebuck and Co., Sears Brands Management Corporation and The Chamberlain Group, Inc., as amended.

43. Vendor Agreement to Supply Fixtures dated as of July 29, 2013 by and between Sears, Roebuck and Co. and Samsung Electronics America, Inc.

44. Vendor Agreement to Supply Fixtures dated as of October 10, 2008 by and between Sears, Roebuck and Co. and Samsung Electronics America, Inc.

45. Vendor Agreement to Supply Fixtures dated as of February 26, 2010 by and among Kmart Corporation, Sears, Roebuck and Co., and Samsung Electronics America, Inc.

46. Vendor Agreement to Supply Fixtures dated as of January 20, 2008 by and among Kmart Corporation, Sears, Roebuck and Co., and Samsung Electronics America, Inc.

47. Vendor Agreement to Supply Fixtures dated as of September 1, 2009 by and among Kmart Corporation, Sears, Roebuck and Co., and Samsung Electronics America, Inc.

48. Vendor Agreement to Supply Fixtures dated as of August 16, 2011 by and among Kmart Corporation, Sears, Roebuck and Co., and Samsung Electronics America, Inc.

49. Product Evaluation Agreement dated as of May 10, 2013 by and between Sears Holdings Management Corporation and Samsung Electronics America, Inc.

50. Subsidy Agreement dated as of July 25, 2014 by and among Sears Roebuck and Co., Kmart Corporation, other subsidies of Sears Holdings Corporation, including Sears Brands Management Corporation, and One World Technologies, Inc.

WEIL:\96826275\11\73217.0003

51. Amended and Restated Merchandising Agreement, dated May 1, 2016, by and among, Roebuck and Co., Kmart Corporation, Sears Holdings Corporation, Sears Hometown Outlet Stores, Inc., Sears Authorized Hometown Stores, LLC and Sears Outlet Stores L.L.C., as amended by Amendment to Amended and Restated Merchandising Agreement, dated March 8, 2017, Amendment No. 2 to Amended and Restated Merchandising Agreement, dated July 10, 2017, and Amendment No. 3 to Amended and Restated Merchandising Agreement, dated December 15, 2017.

52. Master Services Agreement, dated as of November 24, 2015, by and between Innovel Solutions, Inc. and Costco Wholesale Corporation.

53. B2B Agreement, dated as of May 1, 2014, by and between Sears Holdings Management Corporation and American Home Shield.

**(vi)**

1. Narendra N. Sinha – Promotional Offer Letter and ESA dated as of April 2, 2012.

2. Narendra N. Sinha – Internal Action Letter dated as of November 16, 2018.

3. Stephen L. Sitley – Internal Action – Promotion – Executive Agreement, dated as of November 20, 2017.

4. Stephen L. Sitley – Internal Action Letter dated as of October 8, 2018.

5. Robert B. Walsh – Offer Letter and ESA dated as of March 25, 2015.

6. Robert A. Riecker – Amended ESA – AIP Guarantee and Position Change dated as of October 13, 2016.

7. Robert A. Riecker – Offer Letter and ESA dated as of September 28, 2011.

8. Gregory G. Ladley – Cover Letter and Executive Agreement dated as of October 5, 2017.

9. Leena Munjal – Offer Letter and ESA dated as of October 17, 2012.

10. Mitch Bowling – Offer Letter and Executive Agreement dated as of October 27, 2017.

11. Jane Borden – Executive Agreement dated as of May 31, 2018.

12. Peter Boutros – Offer Letter and ESA dated as of November 10, 2015.

13. Gregory J. Russell – Executive Agreement dated as of January 1, 2018.

14. Peter Y. Lai – Executive Agreement dated as of May 9, 2018.

15. Robert J. Naedele Jr. – Offer Letter and ESA dated as of January 19, 2017.

16. William Liannane – Offer Letter and ESA dated as of May 27, 2016.

17. Mark D. Johnson – Executive Agreement dated as of August 29, 2018.

18. Spencer Insolia – Executive Agreement dated as of August 30, 2018.

19. Robert Phelen – SHC Letter – LTIP – RS Award dated as of March 16, 2016.

20. Robert A. Riecker – Internal Action Letter dated as of November 16, 2018.

21. Robert A. Riecker – Internal Action Letter dated as of April 21, 2017.

22. Greg Ladley – Internal Action Letter dated as of November 20, 2018.

23. Leena Munjal – Internal Action Letter dated as of November 16, 2018.

WEIL:\96826275\11\73217.0003

24. Peter Boutros – Internal Action Letter – Promotion – Executive Agreement dated as of September 27, 2018.

25. Robert J. Phelan – Internal Action Letter dated as of November 16, 2018.

26. Rajat Prakash – Internal Action Letter – Promotion dated as of March 29, 2018.

27. Rajat Prakash – Key Employee Retention Plan Bonus dated as of January 8, 2019.

28. Jennifer White – Executive Agreement dated as of June 4, 2018.

29. Jennifer White – Key Employee Retention Plan Bonus dated as of January 8, 2019.

30. Katherine L. Green – Offer Letter and ESA dated as of July 8, 2016.

31. Katherine L. Green – Key Employee Retention Plan Bonus dated as of January 8, 2019.


### Schedule 6.11(c)

1. Blackhawk Network Inc. has shut off the Sellers' ability to activate gift cards post-bankruptcy under the Gift Card Marketing Services Agreement, dated as of February 10, 2003, by and between Blackhawk Network, Inc. and SHC Promotions, L.L.C., as amended. The Sellers have removed all gift cards from their sales floors.

2. Sellers have provided notice of termination of the Protection Agreement Benefit Administration services under the Master Outsourced Services Agreement, dated as of January 1, 2017, by and between Sears Holdings Management Corporation and Sitel Operating Corporation.


### Schedule 6.11(d)

1. Universal Terms and Conditions – Michelin, dated as of June 13, 2014, by and between Sears Holdings Management Corporation and Michelin North America, as amended.

2. Supply Agreement for Tool Storage and Accessories, dated as of August 1, 2012, by and between Sears Holdings Management Corporation and Waterloo Industries, Inc.

3. Master Outsourced Services Agreement, dated as of January 5, 2012, by and between Sears Holdings Management Corporation and Tata America International Corporation, as amended.

4. Master Services Agreement, dated as of April 1, 2014, by and between Sears Holdings Management Corporation on behalf of itself and its Affiliates and iCrossing, Inc., as amended.

5. Direct to Customer Terms and Conditions, dated as of March 1, 2013, by and between Sears Holdings Management Corporation and VF Jeanswear Limited Partnership, as amended.

6. Direct to Customer Terms and Conditions, dated as of April 18, 2013, by and between Sears Holdings Management Corporation (together with its Affiliates) and Hanesbrands, Inc.

7. Universal Terms and Conditions, dated as of May 4, 2007, by and between Kmart Corporation (together with its subsidiaries), Sears, Roebuck and Co. (together with its subsidiaries) and all other subsidiaries of Sears Holdings Management Corporation and Hanesbrands, Inc.

8. Project Services Agreement, dated as of February 15, 2011, by and between Sears Holdings Management Corporation and The Procter & Gamble Distributing LLC.

9. Universal Terms and Conditions – International, dated as of November 12, 2007, by and between Sears Holdings Management Corporation and Hangzhou GreatStar Industrial Co., Ltd.

WEIL:\96826275\11\73217.0003

10. Supply Agreement for Tool Storage and Accessories, dated as of August 1, 2012, by and between Sears Holdings Management Corporation and Waterloo Industries, Inc.

11. Master Services Agreement, dated as of April 1, 2014, by and between Sears Holdings Management Corporation on behalf of itself and its Affiliates and iCrossing, Inc., as amended.

12. Universal Terms and Conditions, dated as of September 3, 1996, by and between Sears Roebuck and Co. and Wolverine World Wide Inc.

13. Letter Agreement, dated as of September 28, 2005, by and between Sears Roebuck and Co. and Wolverine World Wide Inc.

14. Vendor Terms Exception Request, dated as of June 13, 2018, by and between Sears Roebuck and Co. and Wolverine World Wide Inc.

15. Amended and Restated Sears Holdings and IBM Customer Agreement, dated as of September 28, 2012, by and between Sears Holdings Management Corporation and International Business Machines Corporation.

16. Amended and Restated Master Agreement for Outsourcing and Transport Services, dated as of February 22, 2012, by and between Sears Holdings Management Corporation and AT&T Corp.

17. Amended and Restated Master Services Agreement, dated as of July 7, 2014, by and between Innovel Solutions, Inc. f/k/a Sears Logistics Services, Inc. and UPS Supply Chain Solutions, Inc., as amended.

18. Master Services Agreement, dated as of September 1, 2012, by and between Sears Holdings Management Corporation and Sitel Operating Corporation.

19. Universal Terms and Conditions, dated as of March 27, 1998, by and between Sears Holdings Management Corporation and Icon Health & Fitness Inc.

20. Diehard Supply, Sales Agent and Servicing Agreement for Batteries dated as of September 1, 2014 by and among Kmart Corporation, Sears, Roebuck and Co., Sears Brands Management Corporation and East Penn Manufacturing Co., as amended.

21. Alliance Agreement for Home Appliances dated as of May 19, 2008 by and among Kmart Corporation, Sears, Roebuck and Co., LG Electronics, Inc., and LG Electronics USA Inc., as amended.

22. Supply Agreement for Lawn Power Tools dated as of February 3, 2008 by and among Sears, Roebuck and Co., Kmart Corporation, Sears Canada Inc., Husqvarna Outdoor Products Inc., and Husqvarna Canada Corp., as amended.

23. Supply Agreement for Tractors and Mowers dated as of November 16, 2009 by and among Sears, Roebuck and Co., Kmart Corporation, Sears Brands Management Corporation, and Husqvarna Consumer Outdoor Products N.A., Inc., as amended.

24. Supply Agreement for Tractors, Mowers, and Tillers effective as of January 1, 2009 by and among Sears, Roebuck and Co., Kmart Corporation, Sears internationals Marketing Inc., and Husqvarna Consumer Outdoor Products N.A., Inc.

25. Strategic Sourcing Supply Agreement for Tractors and Mowers dated as of December 9, 2003 by and between Sears, Roebuck and Co. and Electrolux Home Products Inc.

26. Supply Agreement for Auto Tires dated as of May 1, 2016 by and between Sears, Roebuck and Co. and Hankook Tire America Corp., as amended.

27. Direct to Customer Terms and Conditions dated as of December 1, 2011 by and between Sears Holdings Management Corporation and Permasteel, Inc.

216

28. A&R Blackhawk Network Alliance Partners Agreement, dated as of February 1, 2013, by and between Blackhawk Network, Inc. and SHC Promotions, L.L.C., as amended.

29. Gift Card Marketing Services Agreement, dated as of February 10, 2003, by and between Blackhawk Network, Inc. and SHC Promotions, L.L.C., as amended.

30. Professional Seller Program, dated as of June 29, 2017, by and among Sears Protection Company, Amazon Services LLC, and Amazon Payments, Inc.

31. Vendor Terms and Conditions, dated as of May 25, 2017, by and between Amazon Fulfillment Services, Inc. and Sears Brands Management Corporation, as amended.

WEIL:\96826275\11\73217.0003

## Schedule 6.14

### Litigation

1. Nina Greene and Gerald Greene v. Sears Protection Company, Sears, Roebuck and Co., Sears Holdings Corporation, Case Number 1:15 cv 02546, US District Court for Northern District of Illinois Eastern Division, served March 26 2015.

2. Schedule 6.10(c)(ii) and Schedule 6.10(c)(iii) are incorporated herein by reference.

### Schedule 7.1

**Equity Interests in Buyer**

1. Transform Holdco LLC is a Delaware limited liability company
2. The sole owner of Transform Holdco LLC is ESL Investments, Inc., a Delaware Corporation
3. The sole owner of ESL Investments, Inc. is Edward S. Lampert

WEIL:\96826275\11\73217.0003

# Exhibit 8

8-K 1 d647911d8k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**October 10, 2018**
**Date of Report (Date of Earliest Event Reported)**

---

# SEARS HOLDINGS CORPORATION
**(Exact Name of Registrant as Specified in Its Charter)**

---

| Delaware | 000-51217, 001-36693 | 20-1920798 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**3333 Beverly Road**
**Hoffman Estates, Illinois 60179**
**(Address Of Principal Executive Offices, including Zip Code)**

**Registrant's Telephone Number, Including Area Code: (847) 286-2500**

**Not Applicable**
**(Former Name or Former Address, If Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

**Item 1.03 Bankruptcy or Receivership**

*Chapter 11 Filing*

On October 15, 2018 (the "Petition Date"), Sears Holdings Corporation (the "Company") and the subsidiaries of the Company listed in Exhibit 99.1 (collectively, the "Debtors") filed voluntary petitions (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. To ensure their ability to continue operating in the ordinary course of business, the Debtors have filed with the Bankruptcy Court motions seeking a variety of "first-day" relief (collectively, the "First Day Motions"), including authority to obtain debtor-in-possession financing, pay employee wages and benefits, honor member programs, and pay vendors and suppliers in the ordinary course for all goods and services provided after the Petition Date.

*Senior "Debtor-in-Possession" Financing*

Pursuant to a term sheet dated as of October 15, 2018 (the "DIP ABL Term Sheet"), by and among Sears Roebuck Acceptance Corp. ("SRAC") and Kmart Corporation ("Kmart"), as borrowers (SRAC and Kmart, together the "DIP ABL Borrowers"), the Company and the Debtors other than SRAC and Kmart, as guarantors (the "Guarantors"), the lenders party thereto from time to time, including each prepetition lender that chooses to roll up its prepetition extensions of credit (the "DIP ABL Lenders"), and Bank of America, N.A. ("BofA"), as administrative agent for the DIP ABL Lenders and BofA and Wells Fargo Bank, National Association ("Wells Fargo") as co-collateral agents, BofA, Wells Fargo and the DIP ABL Lenders have committed to provide a senior secured superpriority priming debtor-in-possession asset-based credit facility in an aggregate principal amount of approximately $1.830 billion (assuming 100% participation by prepetition lenders) (the "DIP ABL Facility"), representing an estimated increase to availability under the existing facility of $300 million, with up to $50 million of such DIP ABL Facility available for the issuance of standby letters of credit. The DIP ABL Facility is subject to the approval of the Bankruptcy Court. The proceeds of loans extended under the DIP ABL Facility will be used for purposes permitted by orders of the Bankruptcy Court, including (i) for working capital and other general corporate purposes of the DIP ABL Borrowers, (ii) to pay transaction costs, professional fees and other obligations and expenses incurred in connection with the DIP ABL Facility, the Chapter 11 Cases and the transactions contemplated thereunder, and (iii) to pay adequate protection expenses, if any, to the extent set forth in any order entered by the Bankruptcy Court.

The DIP ABL Facility will mature on the earliest of (i) the date that is 12 months after the Petition Date, (ii) 36 days after the Petition Date, if the final order with respect to the DIP ABL Facility has not been approved by the Bankruptcy Court, (iii) 43 days after the interim order with respect to the DIP ABL Facility has been entered by the Bankruptcy Court, if the final closing date of the DIP ABL Facility has not occurred, (iv) the substantial consummation of a Chapter 11 plan of reorganization of the Debtors (the "Plan"), (v) the consummation of a sale of all or substantially all of the prepetition ABL collateral and (vi) the date of termination of the DIP ABL Lenders' commitments and the acceleration of the outstanding loans, in each case, under the DIP ABL Facility. Subject to an intercreditor agreement and certain exceptions, the DIP ABL Facility will be secured by a senior perfected security interest in substantially all of the assets of the DIP ABL Borrowers and the Guarantors, including the prepetition ABL collateral and other previously unencumbered assets.

The Company will pursue a going-concern sale process for the remaining stores after the closures described in Item 2.05 below. The Debtors have set a deadline of December 15, 2018 to obtain and find acceptable a non-contingent and fully-financed stalking horse bid for the sale of these stores that is reasonably acceptable to the DIP ABL Lenders. If no such bid (or financing) is achieved by December 15, 2018, the DIP ABL Lenders may direct the loan parties to sell or liquidate these assets and other collateral in order to maximize value for the Debtors' estates.

**Item 2.03. Creation of a Direct Financial Obligation or Obligation under an Off Balance Sheet Arrangement of a Registrant.**

The information set forth in Item 1.03 of this Form 8-K regarding the DIP ABL Term Sheet is incorporated herein by reference.

**Item 2.04 Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement.**

The commencement of the Chapter 11 Cases constitutes an event of default that accelerated the obligations under the following debt instruments (the "Debt Instruments"):

- Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as amended, supplemented or otherwise modified from time to time), between the Company, SRAC, and Kmart, the lenders party thereto, and Bank of America, N.A., as agent, related to $1.656 billion outstanding aggregate principal amount of revolving and term loans and letters of credit;

- Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as amended, supplemented or otherwise modified from time to time), among the Company, SRAC, and Kmart, the financial institutions party thereto from time to time as L/C Lenders, and Citibank N.A., as Administrative Agent and Issuing Bank, related to $271.1 million outstanding aggregate principal amount of letters of credit;

- Second Lien Credit Agreement, dated as of September 1, 2016 (as amended, supplemented, or otherwise modified from time to time), between the Company, SRAC and Kmart, the lenders party thereto, and JPP, LLC as administrative agent and collateral administrator, related to $887.1 million outstanding aggregate principal amount of term loans, line of credit loans and alternative tranche line of credit loans;

- Credit Agreement, dated as of March 14, 2018 (as amended, supplemented, or otherwise modified from time to time), among SRC O.P. LLC, SRC Facilities LLC and SR Real Estate (TX) LLC, as the borrowers, the lenders party thereto, UBS AG, Stamford Branch, LLC as administrative agent, and UBS Securities LLC, as lead arranger and bookrunner, related to $111.0 million outstanding aggregate principal amount of term loans;

- Mezzanine Loan Agreement, dated as of March 14, 2018 (as amended, supplemented, or otherwise modified from time to time), among SRC Sparrow 2 LLC, as borrower, JPP, LLC and JPP II, LLC as lenders, and JPP, LLC, as administrative agent, related to $513.2 million outstanding aggregate principal amount of term loans;

- Indenture, dated as of October 12, 2010 (as amended, supplemented, or otherwise modified from time to time), among the Company, the guarantors party thereto and Wilmington Trust, National Association (successor to Wells Fargo Bank, National Association) as Trustee and Collateral Agent, governing the 6 5/8% Senior Secured Notes which mature on October 15, 2018, of which $89.0 million aggregate principal amount are outstanding;

- Indenture, dated as of March 20, 2018 (as amended, supplemented, or otherwise modified from time to time), by and among the Company, the guarantors party thereto and Computershare Trust Company, N.A., governing the 6 5/8% Senior Secured Convertible PIK Toggle Notes which mature on October 15, 2019, of which $175.4 million aggregate principal amount are outstanding;

- Indenture, dated as of November 21, 2014 (as amended, supplemented, or otherwise modified from time to time), by and between the Company and Computershare Trust Company, N.A., as Trustee, governing the 8% Senior Unsecured Notes which mature on December 15, 2019, of which $411.0 million aggregate principal amount are outstanding;

- Second Supplemental Indenture, dated as of March 20, 2018 (as amended, supplemented, or otherwise modified from time to time), by and between the Company and Computershare Trust Company, N.A., as Trustee, governing the 8% Senior Unsecured Notes Convertible PIK Notes which mature on December 15, 2019, of which $222.6 million aggregate principal amount are outstanding;

- Third Amended and Restated Loan Agreement, dated as of June 4, 2018 (as amended, supplemented, or otherwise modified from time to time), among the Company, as guarantor, the subsidiaries of the Company party thereto as borrowers, JPP, LLC, as Agent, and the lenders party thereto, related to $831.4 million outstanding aggregate principal amount of term loans;

- Term Loan Credit Agreement, dated as of January 4, 2018 (as amended, supplemented, or otherwise modified from time to time), among the Company, SRAC and Kmart, as borrowers, the subsidiaries of the Company party thereto, the lenders party thereto from time to time, and JPP, LLC as administrative and collateral agent, related to $231.2 million outstanding aggregate principal amount of term loans;

- Indenture, dated as of May 15, 1995 (as amended, supplemented, or otherwise modified from time to time), between SRAC and The Bank of New York Mellon Trust Company, N.A. (successor trustee to The Chase Manhattan Bank, N.A.), governing the 7.50% Notes due 2027 which mature on October 15, 2027, the 6.75% Notes due 2028, which mature on January 15, 2028, the 6.50% Notes due 2028, which mature on December 1, 2028, the 7.00% Notes due 2032, which mature on June 1, 2032, the 7.00% Notes due 2042, which mature on July 15, 2042, and the 7.40% Notes due 2043, which mature on February 1, 2043, of which $185.5 million aggregate principal amount are outstanding;

- Supplemental Indenture, dated as of March 20, 2018 (as amended, supplemented, or otherwise modified from time to time), among SRAC, Sears, Roebuck and Co., the guarantor parties thereto, and the Bank of New York Mellon Trust Company, N.A. (successor trustee to The Chase Manhattan Bank, N.A.), governing the 7.00% / 12.00% PIK-Toggle Notes due March 31, 2028, of which $107.9 million aggregate principal amount are outstanding; and

- Indenture, dated as of October 1, 2002 (as amended, supplemented, or otherwise modified from time to time), between SRAC and BNY Midwest Trust Company, governing various intercompany medium-term notes, with various rates of interest and maturities ranging from October 25, 2018 to March 12, 2024, of which $2.3 billion aggregate principal amount are outstanding.

Any efforts to enforce payment obligations under the Debt Instruments are automatically stayed as a result of the filing of the Chapter 11 Cases and the holders' rights of enforcement in respect of the Debt Instruments are subject to the applicable provisions of the Bankruptcy Code.

**Item 2.05. Costs Associated with Exit or Disposal Activities.**

The First Day Motions filed by the Debtors with the Bankruptcy Court include a motion to reject leases at approximately 220 locations, nearly all of which are "dark store" locations at which the Debtors have already ceased ongoing operations, and another motion to commence "going out of business sales" at 142 unprofitable stores that the Company expects to close near the end of the year. This is in addition to the previously-announced closure of 46 unprofitable stores that is expected to be completed by November 2018. Based upon their continuing review, the Debtors may file additional motions seeking relief from the Bankruptcy Court to reject other leases and contracts. The Company is not able to estimate at this time the amount, nature and timing of restructuring and impairment charges that will be incurred as a result of these actions.

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officer**

*Chief Executive Officer Transition*

On October 14, 2018, Mr. Lampert stepped down as Chief Executive Officer of the Company. He will continue to serve as Chairman of the Company's Board of Directors (the "Board"). To fulfill the responsibilities of the Chief Executive Officer, the Board has created an Office of the Chief Executive, which will be composed of the following officers of the Company: Robert A. Riecker, Chief Financial Officer, Leena Munjal, Chief Digital Officer, and Greg Ladley, President of Apparel and Footwear.

Mr. Riecker was appointed to his current position in April 2017, and had served as Controller and Head of Capital Markets Activities since October 2016. He joined the Company as Assistant Controller in October 2005 and served as Vice President and Assistant Controller from May 2007 to October 2011. From October 2011 until his election as Vice President, Controller and Chief Accounting Officer in January 2012, he served as the Company's Vice President, Internal Audit.

Ms. Munjal was appointed to her current position in January 2018. She previously served as Senior Vice President, Customer Experience and Integrated Retail, since October 2012. She was appointed as Divisional Vice President, Integrated Retail and Member Experience, in July 2011 and was promoted to Vice President in June 2012. From October 2009 to June 2011, she served as Divisional Vice President, and Chief of Staff, Office of the Chairman, and served as Chief of Staff, Office of the CEO, from November 2007 to November 2009. Ms. Munjal joined the Company as Director, Information Technology, in March 2003.

Mr. Ladley was appointed to his current position in February 2018. He previously served as President, Apparel since joining the Company in October 2017. Prior to joining the Company, Mr. Ladley served as Senior Vice President, Luxury Brands Global Strategy, at Ralph Lauren.

There is no arrangement or understanding pursuant to which any of the members of the Office of the Chief Executive was appointed to that position and none has any family relationships with any executive officer or director of the Company, or persons nominated or chosen by the Company to become directors or executive officers. Furthermore, the Company is not aware of any transaction requiring disclosure under Item 404(a) of Regulation S-K.

*Director Appointment*

On October 11, 2018, William L. Transier, Chief Executive Officer of Transier Advisors LLC, was elected to the Board. Mr. Transier will hold office until the 2019 annual meeting of stockholders of the Company, or until his successor is duly elected and qualified. The Board has determined that Mr. Transier meets the standards of independence under the Company's Corporate Governance Guidelines and the applicable NASDAQ listing rules. There is no arrangement or understanding between Mr. Transier and any other person pursuant to which he was selected as a director. Mr. Transier has been appointed as a member of the restructuring committee of the Board (the "Restructuring Committee") discussed below. As a non-employee director, Mr. Transier is entitled to receive compensation in the same manner as the Company's other non-employee directors and will also receive compensation for service on the Restructuring Committee. For a description of the Company's non-employee director compensation program, see "Compensation of Directors" in the Company's Proxy Statement for the 2018 Annual Meeting of Stockholders, filed with the Securities and Exchange Commission on March 29, 2018.

*Restructuring Committee*

The Board has formed a Restructuring Committee consisting solely of independent directors to, among other things, review and evaluate strategic alternatives available to the Company, including the restructuring of indebtedness and sale of assets. The Restructuring Committee has decision-making authority over transactions in which ESL or its affiliates (excluding the Company) has indicated an interest in participating or has a conflict of interest by virtue of its security interest in an asset or otherwise.

The members of the Restructuring Committee are Alan J. Carr, Paul G. DePodesta, Ann N. Reese, and William L. Transier. Each member of the Restructuring Committee will receive a fee of $25,000 per month for his or her service on the Restructuring Committee.

*Appointment of Chief Restructuring Officer*

On October 10, 2018, the Company appointed Mohsin Y. Meghji, Managing Partner of M-III Advisory Partners, LP ("M-III"), as Chief Restructuring Officer of the Company ("CRO"). Mr. Meghji has joined the Company's senior management team and will help lead the Company's restructuring efforts, reporting to the Restructuring Committee.

The services of Mr. Meghji and other M-III personnel are being provided pursuant to an engagement letter between the Company and M-III. Mr. Meghji will not receive any compensation directly from the Company. There is no other arrangement or understanding pursuant to which Mr. Meghji was appointed CRO of the Company. Mr. Meghji has no family relationships with any executive officers or directors of the Company, or persons nominated or chosen by the Company to become directors or executive officers. Furthermore, the Company is not aware of any transaction requiring disclosure under Item 404(a) of Regulation S-K.

**Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year**

On October 14, 2018, the Board approved and adopted amendments to the Company's Amended and Restated By-Laws to add after the words "In the absence or incapacity of the Chief Executive Officer, the Board of Directors shall determine which other officer shall perform the duties of that office" the following: "or establish an Office of the Chief Executive to perform such duties and designate the individuals who shall serve in such office from time to time."

**Item 7.01 Regulation FD Disclosure.**

The Company cautions that trading in the Company's securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks. Trading prices for the Company's securities may bear little or no relationship to the actual recovery, if any, by the holders of the Company's securities in the Chapter 11 Cases. The Company expects that its equity holders could experience a significant or complete loss on their investment, depending on the outcome of the Chapter 11 Cases.

Additional information is available on the Company's restructuring website at restructuring.searsholdings.com. For documents filed with the Bankruptcy Court and other documents related to the court-supervised process, please visit http://restructuring.primeclerk.com/sears, call (844) 384-4460 (for toll-free domestic calls) and +1 (929) 955-2419 (for tolled international calls), or email searsinfo@primeclerk.com.

A copy of the press release dated October 15, 2018 issued by the Company is attached hereto as Exhibit 99.2 and is incorporated herein by reference.

The information set forth in Item 7.01 of this Form 8-K is being furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of such section. The information in Item 7.01 of this Form 8-K shall not be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, regardless of any incorporation by reference language in any such filing.

<div align="center">

**Private Securities Litigation Reform Act of 1995 –**
**A Caution Concerning Forward-Looking Statements**

</div>

This Form 8-K includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, included in this filing that address activities, events or developments that the Company expects, believes, targets or anticipates will or may occur in the future are forward-looking statements. The Company's actual results may differ materially from those anticipated in these forward-looking statements as a result of certain risks and other factors, which could include the following: risks and uncertainties relating to the Chapter 11 Cases, including but not limited to, the Company's ability to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Cases, the effects of the Chapter 11 Cases on the Company and on the interests of various constituents, Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the Chapter 11 Cases in general, the length of time the Company will operate under the Chapter 11 Cases, risks associated with third-party motions in the Chapter 11 Cases, the potential adverse effects of the Chapter 11 Cases on the Company's liquidity or results of operations and increased legal and other professional costs necessary to execute the Company's reorganization; the conditions to which the Company's senior debtor-in-possession financing is subject and the risk that these conditions may not be satisfied for various reasons, including for reasons outside of the Company's control; the Company's

ability to obtain junior debtor-in-possession financing and the amount, terms and conditions of any such financing; the impact of and ability to successfully implement store closures and to right-size the Company's operating model; the Company's ability to consummate sales of its store base and other assets and the terms and conditions of any such sales; the Company's ability to implement operational improvement efficiencies; uncertainty associated with evaluating and completing any strategic or financial alternative as well as the Company's ability to implement and realize any anticipated benefits associated with any alternative that may be pursued; the consequences of the acceleration of our debt obligations; trading price and volatility of the Company's common stock and the ability of the Company to remain listed on Nasdaq as well as other risk factors set forth in the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission. The Company therefore cautions readers against relying on these forward-looking statements. All forward-looking statements attributable to the Company or persons acting on the Company's behalf are expressly qualified in their entirety by the foregoing cautionary statements. All such statements speak only as of the date made, and, except as required by law, the Company undertakes no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit No. | Exhibit |
| --- | --- |
| 99.1 | List of Subsidiaries that are Debtors |
| 99.2 | Press Release, dated October 15, 2018 |

**Exhibit Index**

| Exhibit No. | Exhibit |
|---|---|
| 99.1 | List of Subsidiaries that are Debtors |
| 99.2 | Press Release, dated October 15, 2018 |

### SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**SEARS HOLDINGS CORPORATION**

By:  /s/ Robert A. Riecker

    Robert A. Riecker
    Chief Financial Officer

Dated: October 15, 2018

# Exhibit 9

# United States
# Securities and Exchange Commission
### Washington, D.C. 20549

---

# FORM 10-K

---

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the Fiscal Year Ended February 3, 2018**

or

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Commission file number 000-51217, 001-36693**

# SEARS HOLDINGS CORPORATION

#### (Exact Name of Registrant as Specified in Its Charter)

---

| | |
|---|---|
| **Delaware** | **20-1920798** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |
| **3333 Beverly Road, Hoffman Estates, Illinois** | **60179** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's Telephone Number, Including Area Code: (847) 286-2500**

---

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, par value $0.01 per share | The NASDAQ Stock Market |
| Warrants to Purchase Common Stock | The NASDAQ Stock Market |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such response) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405) is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐    Accelerated filer ☒    Non-accelerated filer (Do not check if a smaller reporting company) ☐

Smaller reporting company ☐    Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

On March 16, 2018, the registrant had 107,957,410 shares of common stock outstanding. The aggregate market value (based on the closing price of the Registrant's common stock for stocks quoted on the NASDAQ Global Select Market) of shares of the Registrant's common stock owned by non-affiliates as of the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $200 million.

**Documents Incorporated By Reference**

Part III of this Form 10-K incorporates by reference certain information from the Registrant's definitive proxy statement relating to our Annual Meeting of Stockholders to be held on May 9, 2018 (the "2018 Proxy Statement"), which will be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this Form 10-K relates.

receivables of $293 million, partially offset by cash used for capital expenditures of $80 million. For 2016, net cash flows from investing activities primarily consisted of cash proceeds from the sale of properties and investments of $386 million, partially offset by cash used for capital expenditures of $142 million. For 2015, net cash flows from investing activities primarily consisted of cash proceeds from the sale of properties and investments of $2.7 billion, partially offset by cash used for capital expenditures of $211 million. Proceeds from the sales of properties and investments in 2015 included approximately $2.6 billion of net proceeds from the Seritage transaction.

We spent $80 million, $142 million and $211 million during 2017, 2016 and 2015, respectively, for capital expenditures. Capital expenditures during all three years primarily included investments in online and mobile shopping capabilities, enhancements to the Shop Your Way platform, information technology infrastructure and store maintenance.

We anticipate 2018 capital expenditure levels to be similar to 2017 levels. In the normal course of business, we consider opportunities to purchase leased operating properties, as well as offers to sell owned, or assign leased, operating and non-operating properties. These transactions may, individually or in the aggregate, result in material proceeds or outlays of cash and cause our capital expenditure levels to vary from period to period. In addition, we review leases that will expire in the short term in order to determine the appropriate action to take with respect to them.

## Financing Activities

During 2017, the Company used net cash flows in financing activities of $2 million, which consisted of debt repayments of $1.4 billion and the payment of debt issuance costs of $43 million, offset by proceeds from debt issuances of $1.0 billion, an increase in short-term borrowings of $271 million and $106 million of net cash proceeds received from sale-leaseback financing transactions.

During 2016, we generated net cash flows from financing activities of $1.2 billion, which consisted of proceeds from debt issuances of $2.0 billion and $71 million of net cash proceeds received from a sale-leaseback financing transaction for five Sears Full-line stores and two Sears Auto Centers that have continuing involvement, partially offset by a decrease in short-term borrowings of $797 million, debt repayments of $66 million and the payment of debt issuance costs of $51 million.

During 2015, the Company used net cash flows in financing activities of $364 million, which consisted of debt repayments of $1.4 billion, of which $927 million was the purchase of Senior Secured Notes pursuant to the tender offer and $400 million was the repayment of the secured short-term loan, the payment of debt issuance costs of $50 million related to the amendment and extension of our Domestic Credit Facility and fees related to the tender offer related to our Senior Secured Notes. These uses of cash were partially offset by an increase in short-term borrowings of $583 million and $508 million of net cash proceeds from sale-leaseback financing, which consisted of $426 million of proceeds from the JV transactions received during 2015 and $82 million of proceeds received in 2015 related to four joint venture properties that have continuing involvement.

During 2017, 2016 and 2015, we did not repurchase any of our common shares under our share repurchase program. The common share repurchase program was initially announced in 2005 and had a total authorization since inception of the program of $6.5 billion. At February 3, 2018, we had approximately $504 million of remaining authorization under the program. The common share repurchase program has no stated expiration date and share repurchases may be implemented using a variety of methods, which may include open market purchases, privately negotiated transactions, block trades, accelerated share repurchase transactions, the purchase of call options, the sale of put options or otherwise, or by any combination of such methods.

## Uses and Sources of Liquidity

Our primary need for liquidity is to fund working capital requirements of our businesses, capital expenditures and for general corporate purposes, including debt repayments and pension plan contributions. The Company has taken a number of actions to support its ongoing transformation efforts, while continuing to support its operations and meet its obligations in light of the incurred losses and negative cash flows experienced over the past several years. These actions included:

- The completion of various secured and unsecured financing transactions, the extension of the maturity of certain of our indebtedness, and the amendment to other terms of certain of our indebtedness to increase our overall financial flexibility, including:

   ◦ a $750 million Senior Secured Term Loan (the "2016 Term Loan") under its domestic credit facility maturing in July 2020;

   ◦ a $500 million real estate loan facility in April 2016 (the "2016 Secured Loan Facility"), initially maturing in July 2017, initially extended to January 2018, subsequently extended to April 2018, and then further extended to July 2018, subject to the payment of an extension fee;

   ◦ an additional $500 million real estate loan facility in January 2017 (the "2017 Secured Loan Facility"), maturing in July 2020;

   ◦ a Second Lien Credit Agreement in September 2016, pursuant to which the Company borrowed $300 million under a term loan (the "Second Lien Term Loan"), maturing in July 2020;

   ◦ an amendment in July 2017 to the Second Lien Credit Agreement to provide for the creation of a $500 million uncommitted second-lien line of credit loan facility under which the Company may borrow line of credit loans (the "Line of Credit Loans"), and a subsequent amendment to that facility to extend the maximum duration of the Line of Credit Loans from 180 days to 270 days and permit total borrowings of up to $600 million;

   ◦ a Letter of Credit and Reimbursement Agreement in December 2016, originally providing for up to a $500 million secured standby letter of credit facility (the "LC Facility") from certain affiliates of ESL Investments, Inc. ("ESL");

   ◦ a $200 million real estate loan facility (the "Incremental Loans") in October 2017, with the Incremental Loans maturing in April 2018, with the option to extend to July 2018, subject to the extension of the 2016 Secured Loan Facility;

   ◦ the extension of the maturity date of the initial $1.0 billion term loan (the "Term Loan") under our Amended Domestic Credit Agreement from June 2018 to January 2019 (with a right of the borrowers thereunder to further extend such maturity, subject to the satisfaction of certain conditions, to July 2019);

   ◦ amendments to our Amended Domestic Credit Agreement and certain other indebtedness which reduced the aggregate revolver commitments from $1.971 billion to $1.5 billion, but also implemented other modifications to covenants and reserves against the domestic credit facility borrowing base that improved net liquidity, and increased the maximum permissible short-term borrowings of the Company from $750 million to $1.25 billion;

   ◦ a Term Loan Credit Agreement in January 2018 providing for a secured term loan facility (the "Term Loan Facility"), secured by substantially all of the unencumbered intellectual property of the Company and its subsidiaries, other than intellectual property relating to the Kenmore and DieHard brands, as well as by certain real property interests, in each case subject to certain exclusions. An aggregate principal amount of $250 million was borrowed with the ability to borrow an additional $50 million against the same collateral;

   ◦ an amendment to the indenture governing our 6 5/8% Senior Secured Notes due 2018 to increase the maximum permissible borrowings secured by inventory to 75% of book value of such inventory from 65% and defer the collateral coverage test for purposes of the repurchase offer covenant in the indenture to restart it with the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018);

   ◦ an amendment to the March 2016 Pension Plan Protection and Forbearance Agreement (the "PPPFA") with the Pension Benefit Guaranty Corporation (the "PBGC") providing for the release of 138 of our properties from a ring-fence arrangement created under our five-year PPPFA in exchange for the payment of approximately $407 million into the Sears pension plans. This agreement provides the Company with financial flexibility through the ability to monetize properties, and, in addition, provides funding relief from contributions to the pension plans for the next two years; and

44

- ◦ various commercial paper issuances to meet short-term liquidity needs, with the maximum amount outstanding during fiscal 2017 of $160 million.

- Achievement of $1.25 billion in annualized cost savings in 2017 as part of the restructuring program announced earlier this year. Actions taken to realize the annualized cost savings have included simplification of the organizational structure of Holdings, streamlining of operations, reducing unprofitable categories and the closure of under-performing stores. In 2017, we closed approximately 435 stores, and an additional 103 stores previously announced for closure are expected to be closed by the end of the first quarter of 2018. As a result of these actions, the Company has begun to see improvement in the operations in fiscal 2017, as the restructuring program actions, including the closing of unprofitable stores, have begun to take effect.

- The sale of the Craftsman brand to Stanley Black & Decker for consideration consisting of cash payments and a royalty.

- Sales of properties and investments for proceeds of $1.1 billion and $386 million in 2017 and 2016, respectively.

On March 8, 2018, the Company secured an additional $100 million incremental real estate loan (the "Second Incremental Loan"), pursuant to an amendment to the Second Amended and Restated Loan Agreement, dated as of October 18, 2017, with JPP, LLC and JPP II, LLC, entities affiliated with ESL Investments, Inc. The Second Incremental Loan is secured by the same real estate properties as the 2017 Secured Loan Facility, and certain properties under the previous Incremental Loans outstanding, and matures in July 2020. The Company used the proceeds from the Incremental Loan for general corporate purposes.

In March 2018, the Company also closed on the $200 million Secured Loan and the $240 million Mezzanine Loan, both as defined in Note 3 of Notes to Consolidated Financial Statements, in connection with the release of 138 of our properties from the ring-fence arrangement with the PBGC as described above. The properties, which have an aggregate appraised value of nearly $980 million, serve as collateral for the Secured Loan, and the Mezzanine Loan is secured by pledge of the equity interests in the direct parent company of the entities that own such properties. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of our pension plans. The Mezzanine Loan Agreement, as defined in Note 3 of Notes to Consolidated Financial Statements, contains an uncommitted accordion feature pursuant to which we may incur additional loans of not more than $200 million in aggregate, subject to certain conditions, including that such additional loans not exceed an amount equal to the principal amount of the Secured Loan repaid. The Company expects to pay down the Secured Loan over the next three to six months using proceeds generated from the sale of the underlying properties.

In February 2018, the Company commenced private exchange offers for its outstanding 8% Senior Unsecured Notes Due 2019 and 6 5/8% Senior Secured Notes Due 2018 (the "Exchange Offers"), pursuant to which it offered to (1) issue in exchange for its outstanding 8% Senior Unsecured Notes Due 2019 (the "Old Senior Unsecured Notes") new 8% Senior Unsecured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option (the "New Senior Unsecured Notes"), and (2) issue in exchange for its outstanding 6 5/8% Senior Secured Notes Due 2018 (the "Old Senior Secured Notes") new 6 5/8% Senior Secured Notes Due 2019, of a like principal amount, convertible into common stock of the Company, with interest on such notes to be payable in kind at the Company's option (the "New Senior Secured Notes"). The Exchange Offers expired on March 15, 2018. Approximately $214 million aggregate principal amount of the Old Senior Unsecured Notes and approximately $170 million aggregate principal amount of the Old Senior Secured Notes were validly tendered, accepted and canceled in the Exchange Offers, and the Company issued a like principal amount of New Senior Unsecured Notes and New Senior Secured Notes. The New Senior Unsecured Notes and New Senior Secured Notes are optionally convertible by the holders thereof into shares of the Company's common stock at conversion prices of $8.33 and $5.00, respectively, per share of common stock, and are mandatorily convertible at the Company's option if the volume weighted average trading price of the common stock on the NASDAQ exceeds $10.00 for a prescribed period. In connection with the closing of the Exchange Offers, the Company also obtained the requisite consent of holders of Old Senior Secured Notes to adopt amendments to the indenture governing those notes to eliminate substantially all of the restrictive covenants and certain events of default in the indenture, and make the liens securing senior second lien obligations, including the new Senior

45

Secured Notes and the Second Lien Term Loan described below, effectively senior to the liens securing junior second lien obligations, including the Old Senior Secured Notes.

Also in connection with the closing of the Exchange Offers, the Company entered into an amendment to its Second Lien Credit Agreement. The amendment provides the Company with the option to pay interest on its outstanding $300 million principal amount Second Lien Term Loan in kind, and also provides that the Company's obligation under the Second Lien Term Loan is convertible into common stock of the Company, on the same conversion terms as the New Senior Secured Notes. Also in connection with the closing of the Exchange Offers, the Company's subsidiary, Sears Roebuck Acceptance Corp. ("SRAC"), consummated a private exchange with certain third parties of approximately $100 million in principal amount of senior unsecured notes issued by SRAC maturing between 2027 and 2043 and bearing interest at rates between 6.50% and 7.50% per annum, pursuant to which SRAC issued a like principal amount of new unsecured notes (the "SRAC Exchange Notes"). The SRAC Exchange Notes mature in March 2028 and bear interest at a rate of 7.0% per annum, and provide the Company with the option to pay such interest in kind at an interest rate of 12.0% per annum. The SRAC Exchange Notes are also guaranteed by the same subsidiaries of the Company that guarantee the New Senior Secured Notes.

On March 21, 2018, we obtained a $125 million FILO term loan (the "FILO Loan") from JPP, LLC and JPP II, LLC, entities affiliated with ESL, and Benefit Street 2018 LLC, an entity affiliated with Thomas J. Tisch, under our Amended Domestic Credit Agreement. The Company received approximately $122 million in net proceeds from the FILO Loan, which proceeds were using to reduce outstanding borrowings under our revolving credit facility. The FILO Loan has a maturity date of July 20, 2020, which is the same maturity date as the Company's revolving credit facility commitments, and does not amortize.

In addition to pursuing several transactions to adjust our capital structure in order to enhance our liquidity and financial position, the Company is also taking incremental actions to further streamline operations to drive profitability, including cost reductions of $200 million on an annualized basis in 2018 unrelated to store closures.

In addition to the actions taken above, the Company has other resources available to support its operations. Our domestic credit facility permits us up to $2.0 billion of second lien loan capacity (of which $1.1 billion was utilized at February 3, 2018) outside the credit agreement, all depending on the applicable and available borrowing base as defined in our applicable debt agreements, as well as our ability to secure commitments from lenders. We also have the ability to obtain longer-term secured financing maturing outside of the domestic credit facility maturity date which would not be subject to borrowing base limitations (see Note 3 of Notes to Consolidated Financial Statements). Other options available to us, which we will evaluate and execute as appropriate, include refinancing existing debt, borrowing against facilities in place with availability and additional real estate loans against unencumbered properties, which we have successfully executed in the past.

We also continue to explore ways to unlock value across a range of assets, including entering into or renegotiating commercial arrangements, and exploring ways to maximize the value of our Home Services, Innovel and Sears Auto Centers businesses, as well as our Kenmore and DieHard brands, through partnerships, sales or other means of externalization that could expand distribution of our brands and service offerings to realize significant growth. We expect to continue to right-size, redeploy and highlight the value of our assets, including monetizing our real estate portfolio and exploring potential asset sales, in our transition from an asset intensive, historically "store-only" based retailer to a more asset light, integrated membership-focused company.

We expect to continue to face a challenging competitive environment. While we continue to focus on our overall profitability, including managing expenses, we reported a loss in 2017, and were required to fund cash used in operating activities with cash from investing and financing activities. If we continue to experience operating losses, and we are not able to generate additional liquidity through the actions described below or through some combination of other actions, including real estate or other asset sales, while not expected, then our liquidity needs may exceed availability under our Amended Domestic Credit Agreement, our second lien line of credit loan facility and our other existing facilities, and we might need to secure additional sources of funds, which may or may not be available to us. A failure to secure such additional funds could cause us to be in default under the Amended Domestic Credit Agreement. Moreover, if the borrowing base (as calculated pursuant to our outstanding second lien debt) falls below the principal amount of such second lien debt plus the principal amount of any other indebtedness for borrowed money that is secured by liens on the collateral for such debt on the last day of any two consecutive quarters, it could trigger an obligation to repurchase our New Senior Secured Notes in an amount equal to such

46

deficiency. As of February 3, 2018, we are in a deferral period of the collateral coverage test and the calculation restarts in the second quarter of 2018 (such that no collateral coverage event can occur until the end of the third quarter of 2018). Additionally, a failure to generate additional liquidity could negatively impact our access to inventory or services that are important to the operation of our business.

We believe the following actions, some of which we expect, subject to our governance processes, to include related party participation and funding, are probable of occurring and will be sufficient to satisfy our liquidity needs for the next twelve months from the issuance of the financial statements:

- Sales of the properties securing the $200 million Secured Loan to fund the repayment of such Secured Loan;
- Additional borrowings under the Mezzanine Loan Agreement and the Term Loan Facility;
- Renegotiation of certain commercial arrangements;
- Monetization of the Kenmore brand;
- Extension of maturities beyond March 2019 of Line of Credit Loans under the Second Lien Credit Agreement, the 2016 Secured Loan Facility, the Incremental Secured Loan Facility and the LC Facility and the Term Loan under the Amended Domestic Credit Agreement;
- Additional borrowings secured by real estate assets or borrowings under the short-term basket; and
- Further restructurings to help manage expenses and improve profitability.

The PPPFA contains certain limitations on our ability to sell assets, which could impact our ability to complete asset sale transactions or our ability to use proceeds from those transactions to fund our operations. Therefore, the analysis of liquidity needs includes consideration of the applicable restrictions under the PPPFA. We expect that the actions outlined above will further enhance our liquidity and financial flexibility and we expect that these actions will be executed in alignment with the anticipated timing of our liquidity needs.

Our outstanding borrowings at February 3, 2018 and January 28, 2017 were as follows:

| millions | February 3, 2018 | | January 28, 2017 | |
|---|---|---|---|---|
| Short-term borrowings: | | | | |
| Unsecured commercial paper | $ | — | $ | — |
| Secured borrowings | | 271 | | — |
| Line of credit loans | | 500 | | — |
| Incremental loans | | 144 | | — |
| Long-term debt, including current portion: | | | | |
| Notes, term loan and debentures outstanding | | 3,145 | | 4,018 |
| Capitalized lease obligations | | 72 | | 145 |
| Total borrowings | $ | 4,132 | $ | 4,163 |

47

We fund our peak sales season working capital needs through our domestic revolving credit facility and commercial paper markets and secured short-term debt.

| millions | | 2017 | | 2016 |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Maximum daily amount outstanding during the period | $ | 799 | $ | 1,150 |
| Average amount outstanding during the period | | 374 | | 334 |
| Amount outstanding at period-end | | 271 | | — |
| Weighted average interest rate | | 6.2% | | 4.6% |
| | | | | |
| **Unsecured commercial paper:** | | | | |
| Maximum daily amount outstanding during the period | $ | 160 | $ | 250 |
| Average amount outstanding during the period | | 26 | | 106 |
| Amount outstanding at period-end | | — | | — |
| Weighted average interest rate | | 9.1% | | 7.9% |
| | | | | |
| **Line of credit loans:** | | | | |
| Maximum daily amount outstanding during the period | $ | 500 | $ | — |
| Average amount outstanding during the period | | 214 | | — |
| Amount outstanding at period-end | | 500 | | — |
| Weighted average interest rate | | 10.2% | | —% |

Information about our Domestic Credit Agreement, Letter of Credit Facility, Secured Loan and Mezzanine Loan, Term Loan Facility, 2017 Secured Loan Facility, 2016 Secured Loan Facility, Second Lien Credit Agreement, Old Senior Secured Notes and New Senior Secured Notes, Old Senior Unsecured Notes and New Senior Unsecured Notes, Unsecured Commercial Paper, Secured Short-Term Loan and Wholly-owned Insurance Subsidiary and Intercompany Securities is included in Note 3 of Notes to Consolidated Financial Statements.

*Domestic Pension Plans Funding*

Contributions to our pension plans remain a significant use of our cash on an annual basis. While the Company's pension plans are frozen, and thus associates do not currently earn pension benefits, the Company has a legacy pension obligation for past service performed by Kmart and Sears associates. During 2017, we contributed $295 million to our domestic pension plans, including amounts contributed from the escrow created pursuant to the PPPFA. We estimate that our minimum pension funding obligations will be approximately $280 million in 2018 (excluding the $20 million supplemental payment described below) and approximately $276 million in 2019. As previously noted, the Company agreed to grant the PBGC a lien on, and subsequently contribute to the Company's pension plans, the value of the $250 million cash payment payable to the Company on the third anniversary of the Craftsman closing (the "Craftsman Receivable"). During the 13 weeks ended July 29, 2017, we sold the Craftsman Receivable to a third-party purchaser, and deposited the proceeds into an escrow for the benefit of our pension plans. We subsequently contributed a portion of the proceeds received from the sale of the Craftsman Receivable to our pension plans, which contribution was credited against the Company's minimum pension funding obligations in 2017. Under our agreement with the PBGC, the remaining proceeds will also be contributed to our pension plans, and when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019.

The Company also agreed to grant a lien to the PBGC on the 15-year income stream relating to new Stanley Black & Decker sales of Craftsman products, and agreed to contribute the payments from Stanley Black & Decker under such income stream to the Company's pension plans, with such payments to be credited against the Company's minimum pension funding obligations starting no later than five years from the closing date. The Company also

48

agreed to grant the PBGC a lien on $100 million of real estate assets to secure the Company's minimum pension obligations through the end of 2019.

In November 2017, the Company announced an amendment to the PPPFA that allowed the Company to pursue the monetization of 138 of our properties that were subject to a ring-fence arrangement created under the PPPFA. In March 2018, the Company closed on the Secured Loan and the Mezzanine Loan, which transactions released the properties from the ring-fence arrangement. The Company contributed approximately $282 million of the proceeds of such loans to our pension plans, and deposited $125 million into an escrow for the benefit of our pension plans. Under our agreement with the PBGC, the escrowed amount will also be contributed to our pension plans and, when so contributed, will be fully credited against the Company's minimum pension funding obligations in 2018 and 2019 described above. Following such transactions, the Company has been relieved of contributions to our pension plans for approximately two years (other than the contributions from escrow described above and a $20 million supplemental payment due in the second quarter of 2018). The ultimate amount of pension contributions could be affected by factors such as changes in applicable laws, as well as financial market and investment performance and demographic changes.

# Exhibit 10

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Project Transform – Creditor Recovery Side by Side Analysis

ANY INFORMATION REGARDING VALUATION, FORECASTS, PROJECTIONS, RECOVERIES OR TREATMENT IN THIS PRESENTATION IS FOR ILLUSTRATIVE AND DISCUSSION PURPOSES ONLY, AND ASSUMES THAT ALL TRANSACTIONS CONTEMPLATED HEREIN ARE EXECUTED IN A TIMELY MANNER AND THAT NO TRANSACTION WILL BE EXECUTED UNLESS ALL TRANSACTIONS ARE EXECUTED AS CONTEMPLATED HEREIN.

**January 14, 2019**

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Disclaimer

This presentation has been prepared by ESL Investments ("ESL") based on confidential information provided by the Company and publicly available information. ESL and its representatives have not assumed any responsibility for independently verifying the information herein, ESL and its representatives make no representation or warranty as to the accuracy, completeness or reasonableness of the information herein and ESL and its representatives disclaim any liability with respect to the information herein. This presentation may include projections, forecasts or other forward-looking statements with respect to the Company and there can be no assurance as to ESL's or the Company's future performance. This presentation speaks only as of its date, and ESL and its representatives assume no obligation to update it or to advise any person that any of its conclusions has changed.

Sears has not approved or endorsed this document. Any action or response of Sears in connection with the items discussed in this presentation will require prior review and approval by Sears' Board, the Restructuring Sub-Committee, the Special Committee and/or the Related Party Committee. There can be no assurance that any action will be taken in response to ESL's proposals contained herein, and any action plan that is adopted could vary materially from the proposals described in this document.

This presentation is solely for informational purposes. This presentation is not intended to provide the basis for any decision on any transaction. The recipient should make its own independent business and legal decisions based on all other information, advice and the recipient's own judgment. **This presentation is not an offer to sell or a solicitation of an indication of interest to purchase any security, option, commodity, future, loan or currency. It is not a commitment to underwrite any security, to loan any funds or to make any investment.**

1

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Creditor Recovery Side by Side Analysis

**The ESL Going Concern bid offers the estate ~$5.1bn in value**

*$ millions*

| Creditors | Debtors - Liquidation | | Priority Based Distribution - Liquidation | | ESL - Going Concern |
|---|---|---|---|---|---|
| | $ Recovery | % Recovery | $ Recovery | % Recovery | Recovery |
| DIP ABL | $894 | 100% | $894 | 100% | 100% |
| Junior DIP | 175 | 100% | 175 | 100% | Roll-Over / Cash Paydown |
| FILO (1.5) | 125 | 100% | 125* | 100% | 100% |
| Citi LC Facility (1.75) | 271 | 100% | 271* | 100% | 100% |
| Adequate Protection - 507(b)[1] | 136 | 41% | 413* | 100% | Recovery from previously unencumbered assets not in bid |
| 2nd Lien Line of Credit Loans | - | 0% | 349* | 61% | Full Recovery / Debt Extinguished |
| ESL 2nd Lien Term Loan (PIK) | - | 0% | 196* | 61% | Full Recovery / Debt Extinguished |
| 2nd Lien Notes (PIK) | - | 0% | 107* | 61% | Full Recovery / Debt Extinguished |
| Dove Loans - Tranche A | 108 | 100% | 108* | 100% | Full Recovery / Debt Extinguished |
| Dove Loans - Tranche B | 321 | 44% | 322* | 44% | Full Recovery / Debt Extinguished |
| Sparrow Loans | NA | NA | NA | NA | NA |
| GL / IP Loan - Tranche A | 79 | 100% | 79* | 100% | Full Recovery / Debt Extinguished |
| GL / IP Loan - Tranche B | 80 | 53% | 80* | 53% | Full Recovery / Debt Extinguished |
| Admin and Other Priority Claims | 1,405 | 100% | 476 | 34% | NewCo to assume substantially all admin claims |
| **Total Distributed Value to Secured Creditors** | **$3,594** | | **$3,594** | | **$4,000** |
| **Assumption of PA Liability & Other Liabilities[2]** | **-** | | **-** | | **$1,100** |
| **Total Value To The Estate** | **$3,594** | | **$3,594** | | **$5,100** |

*Adhering to the priorities established by Bankruptcy code section 507(b) the estate has a ~$930mm administrative claim shortfall in a liquidation scenario, rendering the Debtors grossly administratively insolvent*

Note:   Estimates of proceeds based on Lazard Wind Down Recoveries Analysis 2019/01/12
1.   For the Priority Based Distribution, this number assumes collateral value ascribed in Debtors' liquidation analysis. **See Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief (Docket No. 955), paragraph 18; see also 11 U.S.C. § 507(b)** (emphasis added) ("If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section . . . then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection").
2.   Other Liabilities include certain Gift Card liabilities and Shop Your Way rewards points

HIGHLY CONFIDENTIAL                    ESL-UCC-00003958

HIGHLY CONFIDENTIAL NOT FOR DISTRIBUTION SUBJECT TO FRE 408

# Lien Priority Chart

| | Prepetition Second Lien ABL Collateral (e.g., inventory) | Prepetition First Lien Encumbered Collateral (i.e., Dove, IP/GL collateral) | Prepetition Unencumbered Collateral (e.g., leases and other assets that were not collateral before the Petition Date) (Excluding Specified Collateral) | Specified Collateral (i.e., NY store leases, Credit Card litigation) |
|---|---|---|---|---|
| 1 | Carve-Out | Carve-Out | Carve-Out | Carve-Out |
| 2 | Senior Permitted Liens (e.g., mechanics' liens) | All valid and perfected prepetition liens | Senior Permitted Liens | Senior Permitted Liens |
| 3 | DIP ABL Liens | DIP ABL Liens | DIP ABL Liens | DIP ABL Liens, pari passu with Junior DIP Liens |
| 4 | Prepetition ABL Facilities Adequate Protection Liens | Junior DIP Liens | Junior DIP Liens | Prepetition ABL Facilities Adequate Protection Liens |
| 5 | 2018 FILO Adequate Protection Liens | Prepetition ABL Facilities Adequate Protection Liens | Prepetition ABL Facilities Adequate Protection Liens | 2018 FILO Adequate Protection Liens |
| 6 | Prepetition LC Facility Adequate Protection Liens | 2018 FILO Adequate Protection Liens | 2018 FILO Adequate Protection Liens | Prepetition LC Facility Adequate Protection Liens |
| 7 | Prepetition ABL Liens | Prepetition LC Facility Adequate Protection Liens | Prepetition LC Facility Adequate Protection Liens | Postpetition Intercompany Liens |
| 8 | Postpetition Intercompany Liens | Postpetition Intercompany Liens | Postpetition Intercompany Liens | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) |
| 9 | Prepetition Second Lien Adequate Protection Liens | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | Prepetition Second Lien Adequate Protection Liens (only with respect to property of Prepetition Second Lien Loan Parties) | |
| 10 | Prepetition Second Lien Facilities Liens | | | |
| 11 | Junior DIP Liens | | | |

HIGHLY CONFIDENTIAL

ESL-UCC-00003959

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Superpriority/ Administrative Priority Claim Priority Chart

**Carve Out**

**1** ABL DIP Superpriority Claims / Junior DIP Superpriority Claims (against each of the DIP ABL Loan Parties)

**2** Prepetition ABL Superpriority Adequate Protection Claims (against each of the DIP ABL Loan Parties)

**3** Prepetition FILO Superpriority Adequate Protection Claims (against each of the DIP ABL Loan Parties)

**4** Prepetition LC Facility Superpriority Adequate Protection Claims (against each of the DIP ABL Loan Parties)

**5** Postpetition Intercompany Obligations (against the Postpetition Intercompany Borrower)

**6** Section 506(c) Surcharge Claims against Prepetition Second Lien Collateral (actual and necessary costs of preserving or disposing of Second Lien Collateral to the extent beneficial to secured party)

**7** Prepetition Second Lien Facilities Superpriority Adequate Protection Claims (against the Prepetition Second Lien Loan Parties)

**8** Non-Superpriority Administrative Claims against any Debtor (costs of the estate, professional fees, etc. that are not Section 506(c) Surcharge Claims)

HIGHLY CONFIDENTIAL

# Exhibit 11

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Project Transform – ESL Bid Presentation

ANY INFORMATION REGARDING VALUATION, FORECASTS, PROJECTIONS, RECOVERIES OR TREATMENT IN THIS PRESENTATION IS FOR ILLUSTRATIVE AND DISCUSSION PURPOSES ONLY, AND ASSUMES THAT ALL TRANSACTIONS CONTEMPLATED HEREIN ARE EXECUTED IN A TIMELY MANNER AND THAT NO TRANSACTION WILL BE EXECUTED UNLESS ALL TRANSACTIONS ARE EXECUTED AS CONTEMPLATED HEREIN.

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Disclaimer

This presentation has been prepared for ESL Investments ("ESL") based on confidential information provided by the Company and publicly available information. ESL and its representatives have not assumed any responsibility for independently verifying the information herein, ESL and its representatives make no representation or warranty as to the accuracy, completeness or reasonableness of the information herein and ESL and its representatives disclaim any liability with respect to the information herein. This presentation may include projections, forecasts or other forward-looking statements with respect to the Company and there can be no assurance as to ESL's or the Company's future performance. This presentation speaks only as of its date, and ESL and its representatives assume no obligation to update it or to advise any person that any of its conclusions has changed.

Sears has not approved or endorsed this document. Any action or response of Sears in connection with the items discussed in this presentation will require prior review and approval by Sears' Board, the Restructuring Sub-Committee, the Special Committee and/or the Related Party Committee. There can be no assurance that any action will be taken in response to ESL's proposals contained herein, and any action plan that is adopted could vary materially from the proposals described in this document.

This presentation is solely for informational purposes. This presentation is not intended to provide the basis for any decision on any transaction. The recipient should make its own independent business and legal decisions based on all other information, advice and the recipient's own judgment. **This presentation is not an offer to sell or a solicitation of an indication of interest to purchase any security, option, commodity, future, loan or currency. It is not a commitment to underwrite any security, to loan any funds or to make any investment.**

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# ESL Bid Summary

**ESL is pleased to offer its $4.4bn bid for NewCo as a going concern, which is composed of the following:**

— $1.2bn in cash ($900mm new ABL financing, ~$220mm of senior debt repayment[1] and $35mm of UCC settlement proceeds)

— $1.3bn credit bid of secured debt

— $501mm in roll-over debt ($230mm of Junior DIP and $271mm of Citi LC facility)

— $1.1bn of assumed liabilities

▪ The ESL offer is for the acquisition of:

— A 425 go-forward store footprint

  • Additionally includes Dove and Sparrow properties not included in the 425 footprint

— Sears Auto Centers

— Innovel & supply chain (DCs, MDOs, etc.)

— Sears Home Services

— Monark

— Shop Your Way

— KCD Notes (purchased in connection with the assumption of the SHS PA Liability)

— Additional previously unencumbered assets (e.g. real estate)

▪ Bid amount does not include transaction for Kenmore and Diehard, which is being separately negotiated

▪ ESL's bid incorporates the agreement in principle with Cyrus

---

1.    Not shown pro forma for potential pay down resulting from contemplated U-Haul transaction

[ 2 ]

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Transaction Overview – Sources & Uses[1]

**The contemplated transaction offers the estate ~$4.4bn in total value**

*($ in millions)*

| Sources | $ | % |
|---|---|---|
| Credit Bid - Dove | $436 | 9% |
| Dove - Cash to Buyout of Tranche A Holder[12] | 108 | 2% |
| Cash to Purchase Sparrow Equity | 0.005 | 0% |
| Assumption of Sparrow Debt | 592 | 13% |
| Citi L/C Facility | 271 | 6% |
| New ABL Facility and Term Loan[5] | 900 | 20% |
| Credit Bid of FILO - Inventory & Receivables[4] | 90 | 2% |
| FILO - Cash to Sears from Non-Credit Bid Part of FILO (Great American) | 35 | 1% |
| 2L Credit Bid ESL - Inventory & Receivables[2,3] | 351 | 8% |
| 2L Credit Bid Third Party - Inventory & Receivables[2,3] | 83 | 2% |
| Credit Bid - IP/GL | 152 | 3% |
| IP/GL - Cash to Buyout 3rd party holder(s) | 79 | 2% |
| New Real Estate Debt | 175 | 4% |
| Home Services PA Liability | 1,009 | 22% |
| Junior DIP Rollover - SHS & Other | 230 | 5% |
| 2018 Gift Card Vintage | 13 | 0% |
| SYW Point Liability | 68 | 1% |
| **Total Sources** | **$4,592** | **100%** |

| | |
|---|---|
| **Total Cash Potentially Needed to Buyout 3rd Party Debtholders** | **$222** |

| | |
|---|---|
| **Total Credit Bid[9]** | **$1,334** |

| | |
|---|---|
| **2L Deficiency Claim[10]** | **$637** |

| | |
|---|---|
| **Dove Deficiency Claim** | **$254** |

| Uses | $ | % |
|---|---|---|
| Purchase of Dove Real Estate | $544 | 12% |
| Cash to Purchase Sparrow Equity | 0.005 | 0% |
| Assumption of Sparrow Debt | 592 | 13% |
| New Citi LC Facility | 271 | 6% |
| Purchase of Inventory[6,7] | 1,320 | 29% |
| Purchase of Credit Card / Pharmacy Receivables[6,8] | 88 | 2% |
| Cash to Paydown Revolver | 175 | 4% |
| Transaction Fees | 50 | 1% |
| Home Services PA Liability | 1,009 | 22% |
| Purchase of IP/GL Collateral | 231 | 5% |
| Purchase of SHS & Other[11] | 230 | 5% |
| 2018 Gift Card Vintage | 13 | 0% |
| SYW Point Liability | 68 | 1% |
| **Total Uses** | **$4,592** | **100%** |

*Revised S&U as of 12/28/18 reflects a 425 store footprint (down from 505 on 12/05/18 and the sale of SHIP). The values herein reflect the interdependencies across these assets and are contingent on acquiring the enumerated assets collectively.*

1. Sources & Uses excludes the impact associated with any direct purchase of Kenmore & Diehard
2. Third party 2L holders to credit bid alongside ESL pursuant to 2L collateral agent direction
3. Total 2L debt of $1,160mm comprised of $847mm of ESL owned debt, $293mm of 3rd party debt and $20mm owned by Tommy Tisch. Approximately $89mm of 3rd party 2L debt (cash pay notes due 10/15/18) not part of credit bid because it is subordinated in waterfall and remaining $1,071mm of 2L debt is pro-rata shared between ESL/Tommy Tisch (81% or $351mm) and 3rd Party (19% or $83mm)
4. Assumes Tommy Tisch credit bids along with ESL
5. Used to pay down $850mm of 1L debt and $50mm transaction fees
6. Assumes pro rata ownership of inventory, accounts receivables and scripts in NewCo for 2L component of the credit bid
7. Assumes purchase of $1,553mm projected book value of inventory at close at 85 cents
8. Assumes purchase of $104mm projected book value of credit card and pharmacy receivables at close at 85 cents
9. Total credit bid amount includes cash used to buyout 3rd party debtholders
10. Assumes shared deficiency claim amongst 2L credit-bidders
11. Other includes certain Unencumbered RE, Innovel, SYW, Monark, SAC and Designation Rights (see Annex 3.05)
12. Does not account for potential paydown of Tranche A debt as a result of pending U-Haul transaction

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Transaction Mechanics

| | | Key Details |
|---|---|---|
| **ESL Credit-Bidding** | **Dove & Sparrow** | ▪ ESL owns all of the Sparrow first mortgage debt, as well as over 85% of Dove outstanding debt<br>— Dove collateral agent (Cascade) signed credit bid letter as part of ESL's 12/28/18 bid package<br>— ESL intends to purchase Cascade's Dove debt and credit bid the facility in exchange for the Dove RE assets, including $32mm of U-Haul proceeds held in segregated account<br>— ESL could either purchase the equity of Sparrow and foreclose on the Sparrow properties, or flip Sparrow into Chapter 11 and credit bid its debt for the Sparrow real estate |
| | **FILO** | ▪ Current holders include ESL, Tisch and Great American<br>▪ ESL intends to purchase the Great American owned FILO debt and credit bid the entire facility for inventory and receivables |
| | **IP/GL** | ▪ Current holders include ESL, Cyrus and Kawa<br>▪ ESL intends to purchase Cyrus and Kawa's positions and credit bid the facility in exchange for the non-KCD IP of Sears, as well as the 17 ground leases which secure the facility |
| | **2L** | ▪ ESL Currently owns $827mm of 2L debt and the remainder is held by other third parties<br>▪ ESL has directed the 2L collateral agent to credit bid in exchange for inventory and receivables<br>▪ 2L collateral agent signed credit bid letter as part of ESL's 12/28/18 bid package |
| **New Financing** | **New ABL Facility** | ▪ ESL obtained commitment for a $1.3bn committed ABL facility to fund purchase of key assets of NewCo<br>— Facility is being led by a syndicate of three large global banks (BAML, Citi and RBC) |
| | **Real Estate Financing** | ▪ ESL to raise up to $275mm of RE debt, secured by Dove & Sparrow real estate assets<br>— ESL has committed $87.5mm, and Cyrus will fund $87.5mm |
| | **Citi LC Facility** | ▪ ESL and Cyrus to roll-over $271mm LC facility onto the balance sheet of NewCo as a new LC facility |
| | **Junior DIP Roll-Over** | ▪ NewCo to assume up to $230mm of the Jr. Dip facility in exchange for the purchase of $230mm of value of previously unencumbered real estate assets |
| **Other** | **Releases** | ▪ ESL is currently in negotiations with the estate for the purchase of a release<br>— APA seeks to purchase release for $35mm in cash, plus rights to participate in $100mm NewCo rights offering |
| | **Kenmore & Diehard** | ▪ ESL is currently negotiating a transaction for Kenmore and Diehard with the PBGC, but can acquire Kenmore and Diehard through purchase of KCD notes |

[ 4 ]

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# ESL Bid Evolution

**ESL's bid has been revised to purchase a 425 go forward store footprint (down from 505) and no longer includes SHIP, Kenmore or Diehard, but does include the purchase of the KCD notes**

*($ in millions)*

| 13D Transaction Offer (12/5) | | |
|---|---|---|
| **Uses** | **$** | **%** |
| Purchase of Dove & Sparrow Real Estate | $965 | 21% |
| Purchase of IP/GL Collateral | 231 | 5% |
| Purchase of Inventory | 1,445 | 31% |
| Purchase of Credit Card / Pharmacy Receivables | 88 | 2% |
| New Citi LC Facility | 271 | 6% |
| Transaction Fees | 50 | 1% |
| Home Services PA Liability | 1,009 | 22% |
| Purchase of Previously Unencumbered Non-IP Assets | 500 | 11% |
| 2018 Gift Card Vintage | 13 | 0% |
| SYW Point Liability | 68 | 1% |
| **Total Purchase Price** | **$4,640** | **100%** |

| Updated ESL Offer | | |
|---|---|---|
| **Uses** | **$** | **%** |
| Purchase of Dove Real Estate | $544 | 12% |
| Cash to Purchase Sparrow Equity[1] | 0.005 | 0% |
| Assumption of Sparrow Debt | 592 | 13% |
| New Citi LC Facility | 271 | 6% |
| Purchase of Inventory | 1,320 | 30% |
| Purchase of Credit Card / Pharmacy Receivables | 88 | 2% |
| Transaction Fees | 50 | 1% |
| Home Services PA Liability | 1,009 | 23% |
| Purchase of IP/GL Collateral | 231 | 5% |
| Previously Unencumbered Assets (Jr. DIP Roll-Over)[2] | 230 | 5% |
| 2018 Gift Card Vintage | 13 | 0% |
| SYW Point Liability | 68 | 2% |
| **Total Purchase Price** | **$4,417** | **100%** |

| Original Bid Commentary |
|---|

- Assumed NewCo footprint of 505 go forward locations and associated inventory
- Assumed credit bid of Sparrow real estate portfolio
- Assumed purchase of SHIP, Kenmore and Diehard in the form of cash/stock/debt/waiver of AP liens

| Updated Bid Commentary |
|---|

- Assumes NewCo footprint of 425 go forward locations and associated inventory
- Assumes purchase of Sparrow equity and foreclosure on real estate assets
- Does not assume purchase of SHIP, Kenmore or Diehard
- Assumes roll-over of Junior DIP ($230mm) in exchange for $230mm of unencumbered assets

1. Excludes assumption of liability through purchase of Sparrow equity
2. Assumes total purchase of unencumbered assets and designation rights purchased through roll-over of Junior DIP of $230mm. Assets includes Unencumbered RE, Innovel, SYW, Monark, SAC and Designation Rights

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# Why ESL's Bid Should Be Accepted

**ESL's going concern bid provides the most value maximizing alternative for the Debtors and their constituents, as well as has an important social impact in the form of significant job preservation**

**1** Going concern business preserves tens of thousands of jobs and ensures the continuance of an iconic American brand

— Best result for vendors, suppliers, customers and other unsecured creditors who can continue relationship with Sears

**2** Bid includes ~$1.2bn of cash: (i) entry into $900mm of new ABL financing, (ii) repayment of ~$220mm[1] of senior debt, and (iii) payment of $35mm of UCC settlement proceeds

**3** Provides for payment of substantially all of Sears' senior debt (~$4.3bn) through repayment, credit-bidding, roll-overs and assumption of debt as part of the offer

**4** Significantly reduces threshold for unsecured creditor recovery (~$300mm+ reduction); additionally:

— NewCo to assume ~$1.1bn of unsecured claims

— NewCo to assume contracts and leases

— Opportunity for out of the money creditors to participate in NewCo through equity investment

**5** Maximizes value of the assets

A liquidation scenario will lead to a significant degradation of value, as demonstrated by recent retail bankruptcy auctions having proven unsuccessful (e.g., Toys R Us, Sports Authority and BonTon) and Sears' multiple prepetition analysis

---

1.    Does not account for planned use of segregated funds to Tranche A debt as a result of pending U-Haul transaction

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

**1** **Positive Social Impact**

- **Going Concern bid will save tens of thousands of American jobs**

  — Jobs saved provide good income to middle class American families

  — With the success of NewCo, thousands of additional jobs could be created

- Liquidation harms brand value while the Going Concern bid saves an iconic American brand

- Vendor community has strong interest in the survival of NewCo

  — Many landlords would prefer to see NewCo bid succeed and continue to receive rent payments as opposed to trying to recover in the GUC pool

  — Landlords rooting for liquidation should not drive process intended to maximize recovery for creditors

- NewCo's assumption of ~$80mm of customer rewards / gift cards sends strong message to customer community

- ESL is willing to assume some social costs (e.g., post closing severance)

- Liquidation results in administrative costs to implement a value minimizing transaction (e.g., severance, WARN Act, professional fees)

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

**②  Cash Consideration**

- **ESL's bid is composed of a significant cash infusion (total $1.2bn):**

- $900mm new ABL financing

  — Syndicated between 3 large global banks

- ~$220mm of senior debt paydown in form cash

  — Includes repayment of Cascade ($108mm Dove)[1], Great American ($35mm FILO) and Cyrus / Kawa ($79mm IP/GL)

- $35mm of UCC settlement proceeds (see pg. 12)

---

1.    Does not account for planned use of segregated funds to Tranche A debt as a result of pending U-Haul transaction

**HIGHLY CONFIDENTIAL NOT FOR DISTRIBUTION SUBJECT TO FRE 408**

## ③ ESL's Proposal Eliminates ~$4.3bn of Sears' Debt

### Reduction in Sears Indebtedness

*(in $ millions)*

| Debt | Current Amount | Adjustment | Pro Forma Amount |
|---|---|---|---|
| **Senior DIP Facility** | | | |
| Senior DIP Facility - New Money | $300.0 | ($300.0) | - |
| Incremental DIP Facility | 350.0 | (230.0) | 120.0 |
| **Total DIP Facility** | **$650.0** | **($530.0)** | **$120.0** |
| ABL Revolving Credit Facility | 318.0 | (318.0) | - |
| 1st Lien Term Loan B | 571.0 | (571.0) | - |
| 1st Lien L/C Facility | 121.0 | (121.0) | - |
| ABL Revolving Credit Facility - Roll-up | 1,010.0 | (1,010.0) | - |
| **Total DIP Facility (inc. Roll-up)** | **$1,660.0** | **($1,540.0)** | **$120.0** |
| **Senior Secured Debt Facility** | | | |
| Cascade Real Estate Loan (Note A) | $108.1 | ($108.1) | - |
| ESL Real Estate Loan (Note B) | 723.3 | (723.3) | - |
| First Mortgage | 624.2 | (624.2) | - |
| **Total Real Estate Debt** | **$1,455.6** | **($1,455.6)** | **-** |
| IP/GL Term Loan (PIK) | 231.0 | (231.0) | - |
| Capitalized Lease Obligations | 59.8 | (59.8) | - |
| Citi L/C Facility | 271.1 | (271.1) | - |
| FILO | 125.0 | (125.0) | - |
| **Total Other 1st Lien Debt** | **$686.9** | **($686.9)** | **-** |
| ESL 2nd Lien Loan (PIK) | 320.0 | (320.0) | - |
| 2nd Lien Notes (Cash) | 89.0 | (89.0) | - |
| 2nd Lien Notes (PIK) | 181.0 | (181.0) | - |
| 2nd Lien Line of Credit Loans | 570.0 | (570.0) | - |
| 2L Adequate Protection Liens | - | 591.4 | 591.4 |
| **Total 2nd Lien Debt** | **$1,160.0** | **($568.6)** | **$591.4** |
| **Total Secured Debt** | **$4,962.4** | **($4,251.1)** | **$711.4** |
| **Senior Unsecured Debt Facility** | | | |
| Senior Unsecured Notes (Cash) | 411.0 | - | 411.0 |
| Senior Unsecured Notes (PIK) | 222.6 | - | 222.6 |
| SRAC Notes (Cash) | 185.6 | - | 185.6 |
| SRAC Notes (PIK) | 101.9 | - | 101.9 |
| **Total Unsecured Debt** | **$921.0** | **-** | **$921.0** |
| **Total Secured & Unsecured Debt** | **$5,883.5** | **($4,251.1)** | **$1,632.4** |

Ⓐ Total DIP Facility (inc. Roll-up)
Ⓑ Total Real Estate Debt
Ⓒ Total Other 1st Lien Debt
Ⓓ 2L Adequate Protection Liens

### Key Commentary

Ⓐ Assumes entirety of Senior DIP facility roll-up is paid down with new ABL financing

Ⓑ Assumes ESL buys out Cascade and credit bids real estate debt for Dove & Sparrow assets

Ⓒ Assumes IP/GL, FILO or Citi L/C are rolled over or credit bid in order to acquire assets

Ⓓ Assumes minimum amount of 2L is credit bid to acquire inventory and receivables



| | $5,883.5 | ($4,251.1) | $1,632.4 |
|---|---|---|---|
| | Current Debt | De-Leveraging From Going Concern Bid | RemainCo Debt |

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# ③ How a Going Concern Maximizes Value by Claimant

| | Going Concern Bid | | Liquidation | |
|---|---|---|---|---|
| | **Value to Claimant** | **Recovery** | **Value to Claimant** | **Recovery** |
| **DIP ABL Facility** | ▪ Repaid in cash in full at transaction date | 100% | ▪ Paydown over time from the liquidation of inventory and additional ABL collateral (including restricted cash and receivables) | 100% |
| **Citi L/C Facility** | ▪ Facility to be rolled-over into NewCo | 100% | ▪ Paydown over time from the liquidation of inventory and additional ABL collateral (including restricted cash and receivables)<br>▪ Any residual claim to receive adequate protection lien | 100% |
| **FILO Facility** | ▪ Used to credit bid for inventory and other ABL collateral<br>▪ Third party (excluding Tisch) to be cashed out | 100% | ▪ Paydown over time from the liquidation of inventory and additional ABL collateral (including restricted cash and receivables)<br>▪ Any residual claim to receive adequate protection liens and claims | 100% |
| **IP/GL Facility** | ▪ Used to credit bid for collateral, including ground leases and non-KCD intellectual property<br>▪ Third parties (Cyrus, Kawa) to be cashed out | 100% | ▪ Liquidation would result in harm to value of collateral<br>▪ Paydown to result from the sale of ground leases and IP serving as collateral / potential credit bid for collateral<br>▪ Any residual claim to be treated as deficiency claim | Possibly Impaired |
| **Dove & Sparrow** | ▪ Dove debt used to credit bid for real estate collateral; Sparrow debt to be assumed<br>▪ Any residual claims to receive deficiency claim | Assets Acquired | ▪ Used to credit bid for real estate collateral<br>▪ Any residual claim to receive deficiency claim | Possibly Impaired |
| **2L Indebtedness** | ▪ Used to credit bid for inventory and other ABL collateral<br>▪ Residual claims to include adequate protection super priority liens and claims | Assets Acquired | ▪ Liquidation would result in harm to value of collateral<br>▪ Paydown to result from the liquidation of inventory and additional ABL collateral (including receivables)<br>▪ Any residual claim to receive adequate protection super priority liens and claims | Impaired |
| **Jr. DIP Facility** | ▪ $230mm of facility to be rolled-over into NewCo in exchange for ownership interests in NewCo<br>▪ Remainder of facility to receive sale proceeds or other cash payout from the residual assets of Debtor | Roll-over / Cash Paydown | ▪ Liquidation would result in harm to value of collateral<br>▪ Paydown to result from the sale of previously unencumbered assets<br>▪ Any residual claim to be treated as deficiency claim | Possibly Impaired |
| **Unsecured Claims** | ▪ TBD from ESL for settlement of any potential claims<br>▪ All other unsecured claims to receive any proceeds from the residual assets of Debtor and other litigation or settlements | Settlement and Recovery | ▪ Liquidation would result in significant reduction in value of assets<br>▪ PBGC claims dilute recovery<br>▪ All other unsecured claims to receive any remaining proceeds after adequate protection liens and claims are fully recovered | No Recovery |

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# 4 ESL Bid Eliminates Virtually All Claims Senior to Unsecured Creditors

## Unsecured Threshold Calculation

| Outstanding 1L Indebtedness on 2/1 | Going Concern | Liquidation |
|---|---|---|
| **Total 1L ABL Debt** | **$1,831.0** | **$1,831.0** |
| Less: Proceeds from GOB Sales | TBD | TBD |
| Less: Use of Restricted Cash | (100.0) | (100.0) |
| Plus: Operating Cash Burn | TBD | TBD |
| **1L ABL Debt on 2/1**[1] | **$850.0** | **$850.0** |
| **ABL Collateral At Close** | | |
| Inventory[1] | $1,553.0 | $1,553.0 |
| Credit Card / Pharmacy Receivables | 104.0 | 104.0 |
| A  **ABL Collateral on 2/1** | **$1,657.0** | **$1,657.0** |

| Illustrative 1L Paydown | Going Concern | Liquidation |
|---|---|---|
| Remaining ABL Collateral | $1,657.0 | $1,657.0 |
| @ Illustrative Purchase Price[2] | 1,408.5 | 1,367.1 |
| Less: 1L ABL Indebtedness | (850.0) | (1,246.0) |
| B  **Remaining ABL Collateral** | **$558.5** | **$121.1** |

| Pre-Petition Unencumbered Threshold | Going Concern | Liquidation |
|---|---|---|
| Wind Down Reserve | $240.0 | $240.0 |
| Less: MTN Issuance | (100.0) | (100.0) |
| Less: SHIP Proceeds | (55.0) | (55.0) |
| Less: Sale of Credit Card Litigation | (40.0) | (40.0) |
| C  Net Wind Down Reserve Funding Need | $45.0 | $45.0 |
| D  Plus: Jr. DIP | 120.0 | 100.0 |
| Total Pre-Adequate Protection Liens | $165.0 | $145.0 |
| E  Adequate Protection Liens and Claims - ESL[3] | $503.6 | $769.6 |
| Adequate Protection Liens and Claims - Others[3] | 87.8 | 134.2 |
| Total Post-Adequate Protection Liens, Pre Admin Claims | $756.4 | $1,048.8 |
| F  Plus: Admin Claims[4] | $430.0 | $430.0 |
| Less: Wind Down Reserve | (240.0) | (240.0) |
| Admin Claims Net of Wind Down | $190.0 | $190.0 |
| Plus: Intercompany Liens[4] | TBD | TBD |
| G  **Unsecured Value Threshold** | **$946.4** | **$1,238.8** |

1. Assumption per Company's daily cash forecast 12/21/2018
2. Assumes 85% purchase price in Going Concern scenario, while the liquidation scenario assumes 82.5% purchase price
3. Potential AP Liens and claims are calculated using 96% of the book value of petition date inventory to determine coverage; Assumes credit bid of 2L debt of ~$434mm leaving ~$591mm of AP liens and claims and additional deficiency claims
4. $430mm of administrative claims per conversation with the Debtor in a going concern scenario; further diligence required to determine administrative claims in a liquidation scenario (e.g., severance and other wind down costs) and analysis illustratively assumes $430mm

## Commentary

A  Assumed remaining ABL collateral from Company forecast, based off 425 store footprint at 2/1

B  Illustrative bid price of collateral net of 1L paydown

C  Wind-Down Reserve net of proceeds to be received from potential transactions

D  In Going Concern Scenario, NewCo assumes $230mm of the Jr. DIP facility outstanding leaving $120mm for paydown; in the Liquidation scenario, assumed balance of $100mm due to shorter case duration resulting in smaller cash need

E  Assumes, in Going Concern Scenario, 2L is credit bid to buy the remaining ABL collateral, leaving deficiency claims including substantial adequate protection super priority claim of ~$591mm; in Liquidation scenario, the adequate protection super priority claims is ~$312mm higher

F  Illustratively assumes $430mm of Admin Claims in both Going Concern and Liquidation scenarios

G  In the Liquidation scenario the unsecured value threshold is ~$300mm higher than in the Going Concern and the pool of unsecured claims is larger as a result of incremental deficiency claims from the Real Estate, 2L and IP/GL facilities

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

## ④ Settlement Overview

In connection with the transaction, ESL would purchase a release to provide value to the Estate. ESL has proposed the following offer to the Estate:

- $35 million cash; plus

- Opportunity to buy $100 million of equity in NewCo through a Rights Offering

  — Equity has no voting rights (assumption is that this is a separate class of equity)

  — Put Right: Higher of appraisal or NewCo value at close; not exercisable until the 3rd anniversary of the Closing

- In exchange, the Estate would waive all related claims against ESL and its related parties (not to include Seritage, Land's End or other third parties)

- In addition, in connection to the ESL offer for NewCo, an assumption ~$1.1bn of liabilities would substantially reduce the unsecured claim pool and provide an increased recovery for the GUCs

- ESL is willing to discuss other frameworks for purchase of release

**HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408**

# ⑤ Asset Value Maximization

- ESL believes that there is synergistic value which can only be achieved through the preservation of the Sears "ecosystem"

- Preserving the cohesion of Sears' essential business segments is a pre-requisite for maximizing value



*Appendix*

HIGHLY CONFIDENTIAL
NOT FOR DISTRIBUTION
SUBJECT TO FRE 408

# NewCo Pro Forma Capital Structure

*(in $ millions)*

| Debt | Amount |
|---|---:|
| **New ABL Facility** | |
| ABL Revolver Oustanding | $480 |
| ABL Term Loan | $250 |
| **Total ABL Factility** | **$730** |
| Citi L/C Facility | $271 |
| **Total Other 1st Lien Debt** | **$271** |
| **Senior Secured Debt Facility** | |
| Real Estate Debt | $175 |
| **Total Real Estate Debt** | **$175** |
| **Rollover Jr. DIP Facility** | |
| Jr. DIP Rollover | $230 |
| **Total DIP Facility** | **$230** |
| **Total Secured Debt** | **$1,406** |

# Exhibit 12



sears

kmart.

# Lender Presentation

January 24, 2019

# Cautionary Statement: Forward-Looking Info

Certain statements made in this presentation contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, Section 21E of the Securities Exchange Act of 1934, as amended, and the Private Securities Litigation Reform Act of 1995. Forward-looking statements include information concerning future financial performance and liquidity, business strategy, plans, goals and objectives. Statements preceded or followed by, or that otherwise include, the words "believes," "expects," "anticipates," "intends," "estimates," "plans," "forecast," "is likely to" and similar expressions or future or conditional verbs such as "will," "may" and "could" are generally forward-looking in nature and not historical facts. Such statements are based upon the current beliefs and expectations of the Company's management and are subject to significant risks and uncertainties, many of which are beyond the Company's control, which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The following factors, among others, could cause actual results to differ from those set forth in the forward-looking statements: our ability to achieve cost savings initiatives; vendors' lack of willingness to do business with us or to provide acceptable payment terms or otherwise restricting financing to purchase inventory or services; our ability to effectively compete in a highly competitive retail industry; our ability to offer merchandise and services that our members and customers want; our ability to successfully implement our integrated retail strategy to transform our business into a member-centric retailer; our ability to successfully manage our inventory levels; initiatives to improve our liquidity through inventory management and other actions; the effect of worldwide economic conditions, an economic downturn, a renewed decline in customers' spending patterns, inflation and changing prices of energy; our failure to execute effective advertising efforts; the negative impact as a result of the recapture rights included in the Master Leases in connection with the Seritage transaction and the JV transactions; disruptions to our computer systems which are used to implement our integrated retail strategy, process transactions, summarize results and otherwise manage our business; our ability to maintain the security of our members and customers, associate or company information; payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business operations; the impact of the seasonality of our business and customers spending patterns on the annual operating results; our dependence on sources outside the United States for significant amounts of our merchandise, which may be impacted by changes in U.S. and international trade regulations, including new or increased duties, tariffs, retaliatory tariffs, trade limitations and termination or renegotiation of the North American Free Trade Agreement; our reliance on third parties to provide us with services in connection with the administration of certain aspects of our business; impairment charges for goodwill and intangible assets or fixed-asset impairment for long-lived assets; our ability to attract, motivate and retain key executives and other associates; our ability to protect or preserve the image of our brands and our intellectual property rights; the effect of product safety concerns or claims concerning the services we offer; the outcome of future legal proceedings, changes in laws and government regulations, product liability, patent infringement and qui tam claims; our failure to comply with federal, state, local and international laws; consumer spending impacted by weather conditions and natural disasters; increases in employee wages and the cost of employee benefits; the ability to rightsize our operating model; our ability to consummate sales of our store base and other assets, including on the expected time-lines or the terms and conditions of any such sales; and our ability to implement operational improvement efficiencies.

2

# Today's Presenters

**Rob Riecker**
*Office of the CEO – Chief Financial Officer*

**Leena Munjal**
*Office of the CEO – Chief Digital Officer*

**Greg Ladley**
*Office of the CEO – President of Apparel and Footwear*

**Kunal Kamlani**
*President – ESL Investments, Inc.*



# Transaction Overview

# Transaction Summary

- On January 17, 2019, Sears Holdings Corporation announced that ESL Investments, Inc. was selected as the winning bidder in the Bankruptcy Court auction

- Subject to Bankruptcy Court approval, ESL will acquire substantially all of the Company's assets, including the "Go Forward Stores" on a going-concern basis ("New Sears") for approximately $5.2 billion
  - 425 stores (consists of 223 Sears and 202 Kmart banners)
  - Synergistic network and interdependent ecosystem of business segments to unlock value of the franchise, including Sears Auto Centers, Shop Your Way, Monark, Innovel, Sears Home Services (incl. PartsDirect) and the rights to the Kenmore and DieHard brands

- The debt financing supporting the acquisition will consist of the following:
  - $1,300 million ABL Credit Facility
    - Up to $1,050 million ABL Revolver ($360 million drawn at close)
      - ABL Revolver size reduced by any increase in FILO Term Loan size
    - Minimum $250 million FILO Term Loan
    - $400 million minimum Excess Availability at closing
  - $350 million rollover of the existing Junior Dip
  - $175 million Real Estate Debt

- The proposed transaction is expected to close in early February, subject to approval by the Bankruptcy Court and the satisfaction of customary closing conditions

# Sources & Uses and Pro Forma Capitalization

*($ in millions)*

| Sources | Amount |
|---|---|
| New ABL Revolver ($1,050)[1] | $360 |
| New ABL FILO Term Loan | 250 |
| ESL Real Estate Debt Bridge[3] | 175 |
| Citi L/C Facility | 271 |
| Rolled Junior DIP | 350 |
| New Equity / Credit Bid | 1,352 |
| Home Services PA/Gift Card/Points | 1,090 |
| AP Liability/Admin Exp/Assump. Sparrow Debt | 1,266 |
| **Total Sources** | **$5,114** |

| Uses | Amount |
|---|---|
| Purchase Consideration | $2,082 |
| Rolled Citi L/C Facility | 271 |
| Rolled Junior DIP | 350 |
| Rolled Home Services PA/Gift Card/Points | 1,090 |
| AP Liability/Admin Exp/Assump. Sparrow Debt | 1,266 |
| Transaction Fees & OID | 55 |
| **Total Uses** | **$5,114** |

*($ in millions)*

| Pro Forma Capitalization | Maturity | Pricing | Amount At Closing |
|---|---|---|---|
| Cash and Cash Equivalents | | | $– |
| ABL Revolver ($1,050)[1] | 5 years[2] | L + 375-400 bps | 360 |
| ABL FILO Term Loan | 5 years[2] | TBD | 250 |
| ESL Real Estate Debt Bridge[3] | 3 years | L + 850 bps | 175 |
| Rolled Junior DIP | 5 years | L + 1,300 bps[4] | 350 |
| **Total Funded Debt** | | | **$1,135** |
| Citi L/C Facility | -- | L + 1,100 bps | 271 |
| **Total Obligations** | | | **$1,406** |

(1) *Excludes $118 million of letters of credit.*
(2) *Includes a springing maturity of 90 days prior to the maturity of the ESL Real Estate Debt Bridge.*
(3) *Located at a non-guarantor, special purpose entity.*
(4) *Represents PIK interest rate.*

6

# Summary of Terms for ABL Credit Facilities

| | |
|---|---|
| **Borrowers:** | Each domestic subsidiary of New Sears which owns any ABL Priority Collateral |
| **Guarantors:** | All existing and future direct and indirect material domestic subsidiaries of New Sears, subject to certain exceptions |
| **Security:** | A perfected first priority lien on substantially all working capital assets and pharmacy scripts ("ABL Priority Collateral"); second lien on substantially all other assets excluding owned or ground leased real property |
| **Facilities:** | $1,300MM<br> ▪ ABL Revolver: Maximum of $1,050MM (reduced dollar for dollar for any increase in FILO Term Loan)<br> ▪ ABL FILO Term Loan: Minimum of $250MM |
| **LC Sublimit:** | $250MM in Year 1 (allowing new LCs above current amounts under Revolver), thereafter $400MM and allow Citi L/C facility movement subject to PF Excess Availability ≥ the greater of (i) 25% of the Line Cap and (ii) $250MM |
| **Swingline Sublimit:** | $100MM |
| **Maturity:** | 5 Years (springing maturity to 90 days inside maturity of the Real Estate debt facility and any other debt maturities > $50MM) |

**Borrowing Base:**

Equal to the sum of:
a) 90% of eligible credit card receivables;
b) 85% of eligible pharmacy receivables;
c) 85% of the NOLV of eligible pharmacy scripts (at 30% of the borrowing base);
d) 90% of the appraised NOLV of eligible inventory;
e) 90% of the appraised NOLV of eligible in-transit inventory;
f) Less Reserves

**Pricing:**

▪ ABL Revolver: Based on an availability-based grid outlined below:

| Excess Availability | LIBOR Margin & Letter of Credit Fees | Base Rate Margin |
|---|---|---|
| ≥ 50% of Revolving Commitments | 3.75% | 2.75% |
| < 50% of Revolving Commitments | 4.00% | 3.00% |

▪ ABL FILO Term Loan: TBD

| | |
|---|---|
| **Undrawn Fee:** | ABL Revolver: 50 bps |
| **LIBOR Floor:** | 0.00% |
| **Amortization:** | None |
| **Line Cap:** | Lesser of (a) the sum of (i) aggregate Revolver commitments and (ii) the FILO Term Loan amount outstanding and (b) the borrowing base |
| **Revolver Line Cap:** | Lesser of the aggregate Revolver commitments and the borrowing base |
| **Excess Availability:** | Line Cap, minus Revolver borrowings, minus letters of credit minus the FILO Term Loan amount outstanding |
| **Cash Dominion:** | Springing when Excess Availability is < the greater of (i) 12.5% of the Line Cap and (ii) $125MM for 3 business days during any 30 day period |
| **Borrowing Base Reporting:** | Monthly, springing to weekly when Excess Availability < the greater of (i) 15% of the Line Cap and (ii) $150MM for 3 business days during any 30 day period |
| **Exams & Appraisals:** | 2x per annum in Year 1, thereafter 1x per annum, springing to 2x when Excess Availability < greater of (i) 25% of Line Cap and (ii) $250MM |
| **Financial Covenant:** | Year 1: Minimum Excess Availability equal to the greater of (i) 10% of the Revolver Line Cap and (ii) $75MM<br>Thereafter: Springing 1.00x FCCR when Excess Availability < the greater of (i) 10% of the Revolver Line Cap and (ii) $75MM |
| **Optional Prepayments:** | ▪ ABL Revolver: Prepayable anytime at par         ▪ ABL FILO Term Loan: 102 / 101 hard call |
| **Mandatory Prepayments:** | Usual and customary for facilities of this type |
| **Negative Covenants:** | Usual and customary for facilities of this type |
| **Minimum Closing Date EA:** | $400MM Minimum Excess Availability under the ABL Revolver at Closing |

# Estimated Closing Borrowing Base

| ($ in Millions) | Closing |
| --- | --- |
| **Borrowing Base Calculation** | |
| Gross Eligible Inventory | $1,553.0 |
| Total Ineligible[1] | (93.2) |
| **Net Eligible Inventory** | **$1,459.9** |
| % NOLV [2] | 83% |
| NOLV of Net Eligible Inventory | $1,211.7 |
| Advance Rate | 90% |
| **Inventory Available** | **$1,090.5** |
| Credit Card Receivables | 64.0 |
| *Advance Rate* | 90% |
| **Credit Card Receivables Availability** | **$57.6** |
| Pharmacy Receivables | 10.0 |
| *Advance Rate* | 85% |
| **Pharmacy  Receivables Availability** | **$8.5** |
| NOLV of Pharmacy Scripts | 27.0 |
| *Advance Rate* | 85% |
| **Pharmacy  Scripts Availability** | **$23.0** |
| **Gross Borrowing Base** | **$1,179.6** |
| Less: Current Reserve | (50.0) |
| **Total Borrowing Base** | **$1,129.6** |
| Less: Direct Borrowings | (360.0) |
| Less: L/Cs | (118.0) |
| Less: FILO Term Loan Outstanding | (250.0) |
| **Excess Availability** | **$401.6** |

_____
(1)   *Illustratively assumes 6.0% ineligible.*
(2)   *83% NOLV represents floor at close for purposes of satisfying Closing Date Minimum Excess Availability Condition.*

8

# Indicative Transaction Timeline

| January 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | **1** | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | **21** | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| February 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | **18** | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | | |

Bank Holiday      Key Date

| Date: | Activity: |
|---|---|
| Thursday, January 24 | • Lender Meeting |
| Wednesday, February 6 | • Commitments Due (12:00pm EST) |
| Thereafter | • Closing and Effectiveness |

9



New Sears Overview

# Synergistic and Interdependent Ecosystem



# New Sears at a Glance

- New Sears emerges positioned for success
  - Shrink retail footprint and grow 4-Wall EBITDA by eliminating unprofitable stores
  - Cut SG&A by approximately 50%
  - Healthier capital structure creates liquidity runway necessary to execute on the Go Forward Plan

| | OldCo[1] | New Sears |
|---|---|---|
| **Store Count** | 687 | 425 |
| **Total EBITDA** | ($621)M FY18E | $25M Projected 2019E |
| **4-Wall, Online, SAC, and SYW EBITDA** | $242M FY18E | $338M Projected 2019E (425 Stores) |
| **Inventory** | $2.7B as of Petition date | $1.6B |
| **SG&A** | $1.2B annual run rate | $656M 2019E annual run rate |
| **Debt** | $5.5B | $1.1B |
| **Supply Chain** | 140 Supply Chain Assets (includes DCs, RDCs, and MDOs) | 120 Supply Chain Assets, with opportunities for rationalization (includes DCs, RDCs, and MDOs) |
| **Kenmore & DieHard** | Subject to PBGC claim | Retain financial benefit of the brands |
| **Sears Home Services** | Part of SHC | Part of New Sears |
| **Protection Agreements** | Underwritten by company pre-petition, Assurant post-petition | New Sears will take existing liabilities; Assurant to write PAs for first three years then return to pre-petition structure |

**New Sears will have $400mm of excess availability at close, providing significant liquidity for the go forward business**

---

(1)   As of 10/15/18 (petition date).

12

# ESL Investment Thesis

**1** **Synergistic and Interdependent Ecosystem:**

- Strong physical presence and unique locations to support the digital showroom concept – which is important on big ticket and considered purchases – combined with online penetration, home services, credit, and delivery capabilities make for a powerful network value proposition

**2** **Strong Brand Recognition and Market Share in Key Segments:**

- Currently, Sears is the 3rd largest appliance retailer in the U.S. with a 15.3% market share
  - Lowes has 25.8% share; Home Depot has 17.1%; Best Buy has 13.7%

**3** **Competitive Advantage:**

- Sears is a leading B2C delivery & installation provider through its Innovel logistics business
  - Competitive advantage over other market participants with high barriers to entry
  - Amazon and others continue to seek to leverage Sears' capabilities through its Innovel network
- Expansive Financial Services platform with profitable Citi credit card agreement and multiple avenues for continued growth under the partnership

**4** **Reengaging in Strategic Initiatives:**

- Forge partnerships with strategic partners / investors who can bring complementary capabilities
- Ability to expand reach in hardline categories through scaling the small format concept

**5** **Highly Disciplined Focus on Leveraging Digital Platform:**

- Robust digital platform (Shop Your Way) which boasts 145MM total registered users including 49MM active users in the last 24 months, 33mm users in the last 15 months, and 15MM redeemers in the past 15 months
  - Personalize pricing capabilities at the member level driven by machine learning data and analytics platform

13

# Sears Retail Business Summary

## Business Overview

- Sears' Retail Business consists of its 223 Sears Stores, 202 Kmart Stores and their respective Online presences

- The business is broken into the primary categories below:

  - **Hardlines**: composed of Home Appliances (HA), Consumer Electronics, Tools, Lawn & Garden, Outdoor Living, Sporting Goods, Mattresses, and Monark businesses

  - **Softlines**: composed of Apparel, Footwear, Home, and Jewelry businesses; these businesses sell an assortment of proprietary brands as well as third-party retail options

  - **Sears Auto Centers**: a multi-channel automotive aftermarket service provider offering replacement tires, mechanical diagnostics and repair, vehicle maintenance products and services, batteries and battery-related accessories, as well as automotive accessories and chemicals for cars and light trucks

  - **Grocery & Drugstore, Pharmacy, and Children's Entertainment & Seasonal**: sells grocery, household and pet supplies, beauty care, OTC health & wellness, stationery, party supplies, children's entertainment products, seasonal merchandise, dispenses prescription drugs and performs clinical services

## Revenue by Segment



| Segment | % |
|---|---|
| SYW | 16% |
| SAC | 5% |
| Online | |
| Store | 79% |
| | 2% |

**FY 2019E Revenue: $5.8BN Revenue**

## Preliminary 2019E Forecasted Financials

| ($ mm) | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | FY19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *B&M Same Store Sales (% Change)* | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) | (1.0%) |
| Brick and Mortar Revenue | $295 | $381 | $306 | $365 | $446 | $322 | $334 | $383 | $301 | $450 | $639 | $358 | $4,581 |
| Sears Auto Center Revenue | 19 | 24 | 18 | 19 | 24 | 19 | 20 | 24 | 21 | 22 | 28 | 24 | 262 |
| Online Revenue | 62 | 75 | 59 | 74 | 93 | 57 | 68 | 80 | 34 | 80 | 83 | 62 | 826 |
| ShopYourWay | 6 | 11 | 6 | 7 | 10 | 7 | 7 | 9 | 6 | 7 | 15 | 7 | 100 |
| **Total Revenue** | **$382** | **$491** | **$390** | **$465** | **$573** | **$405** | **$429** | **$495** | **$362** | **$559** | **$765** | **$452** | **$5,768** |
| (-) COGS | (274) | (347) | (260) | (318) | (404) | (278) | (315) | (363) | (255) | (396) | (530) | (331) | (4,072) |
| **Gross Margin** | **$108** | **$144** | **$129** | **$147** | **$169** | **$127** | **$114** | **$132** | **$107** | **$163** | **$235** | **$121** | **$1,697** |
| *Margin (%)* | 28% | 29% | 33% | 32% | 29% | 31% | 27% | 27% | 30% | 29% | 31% | 27% | 29% |
| (-) Operating Expenses | ($103) | ($118) | ($99) | ($104) | ($122) | ($104) | ($106) | ($122) | ($104) | ($119) | ($137) | ($121) | ($1,359) |
| **Retail EBITDA** | **$5** | **$26** | **$30** | **$43** | **$47** | **$23** | **$9** | **$9** | **$3** | **$44** | **$97** | **$0** | **$338** |
| *Margin (%)* | 1% | 5% | 8% | 9% | 8% | 6% | 2% | 2% | 1% | 8% | 13% | 0% | 6% |

14

# Overview of Retail Footprint

- New Sears boasts 425 go-forward stores and 120 Supply Chain Assets (including DCs, RDCs, and MDOs) geographically distributed across the US and US territories
- Five states/territories – California, Florida, Pennsylvania, Puerto Rico, and New York – account for approximately 45% of the store count



*Attractive footprint with geographically diversified assets including retail, industrial and office assets*

15

# 425 Stores Delivered $317MM of EBITDA In 2015[1]



## Historical Revenue

**($ in Millions)**

## Historical Gross Margin

**($ in Millions)**

## Historical EBITDA

**($ in Millions)**

_____
(1)    Sears and Kmart store 4-wall financials only; excludes Sears Auto Center, Online and ShopYourWay.

16

# SSS Improved Significantly Pre-Filing

## Initiatives by Segment

### Softlines Initiatives

- ShopYourWay cashback offers are underway, plus prices have been adjusted upwards by lowering promotional marketing dollars to fund points and improve margin dollars
- Adjusting pricing further to lower promotional depth due to increased demand driven by SYW Points to improve margin dollars

  

### Hardlines Initiatives

- Investment in digital marketing (e.g. search engine marketing, data-feeds, affiliates, retargeting)
- Free delivery
- "Mores of Kenmore"
- Creative offers (e.g. bundled promotions; value-positioned product upgrades, etc.)
- Launch of "leasing online"
- Increased focus on shopping recaps (e.g. "abandoned carts" in store to drive purchase online after store visit)
- Leverage of Home Services data to find potential future home appliance buyers (e.g. higher frequency of service on existing old appliances and declined service estimates/quotes)
- Increased television marketing spend

  

## 2018 YTD Same Store Sales Comps (% Change) [1]



_____
*(1)    Same-store comps based on Company data. Includes online, excludes SAC, and is adjusted for the retail week calendar.*

17

# Apply Learnings from 2018 to Future Programs

**The Sears and Kmart Flywheel—Sales and Repeat**



**Points Earned Drive Frequency & Sales**

**FREQUENCY BRINGS CONSIDERATION**

Points usually get redeemed in frequency businesses such as apparel, footwear, home, food, grocery, drug, etc but can be redeemed anywhere in Sears and Kmart ecosystem, including Hardlines.

18

# Competitive Hardlines Promotional Strategy

**COMPETITIVE
PROMOTIONAL
MARKDOWN OFFER**
**+**
**ADDITIONAL VALUE
WITH SYW CREDIT CARD
(FUNDED BY CITI)**
**+**
**ADDED VALUE WITH SYW
POINTS TO DRIVE REPEAT VISITS
AT BOTH FORMATS**



# Shop Your Way

## Integrating & Digitizing the Sears Platform

**Shop Your Way is one of the most sophisticated data, analytics, marketing and rewards engine platforms in the United States. Its advanced data capabilities are the cornerstone of the new Sears experience.**

**KEY HIGHLIGHTS**

- **Shop Your Way leverages unique analytical capabilities and corporate partnerships to create a robust member experience**
  - Creating strong customer relationships is at the core of modern-day retail and building brand equity
  - By leveraging Shop Your Way data, the Company can actively cater to the latest customer trends and effectively plan for the future in an agile manner
- **Shop Your Way provides substantial intelligence to Sears Brick and Mortar Business, as well as its other core operating businesses**



**Data Insights**
Thousands of lifestyle and purchase segments used to create personalized communications and offers.

**Digital Platforms**
Seamlessly connecting the right channels at the right time to drive the desired member behavior.

**Points**
One currency earned across multiple partners to reward members for the things they do every day.

**Members**
Approximately fifty million members with billions of data elements stored at the most granular level – the individual.

**Machine Learning**
Using data insights to score members in real time, and power decisions and experiences through relevant marketing channels.

**Partner Network**
Creating a network that's valuable and rewarding for everyday earning – from gas, groceries, payroll, wireless, healthcare, travel, entertainment, and more.

20

# Shop Your Way

**SYW Offers a Large Network of Members Value Everyday**



| Membership at a Glance | Earn Points For Everyday Goods | Spend with Key Partners |

**49 MILLION**
24 MONTH ACTIVE MEMBERS

**33 MILLION**
15 MONTH ACTIVE MEMBERS

**15 MILLION**
MEMBERS REDEEMING POINTS – 15 MONTHS

Mobile | Subscriptions
Dining | Grocery

SHOP YOUR WAY
REWARDING MEMBERS THROUGH SYW POINTS EVERYDAY

Fuel | Travel
Retail | Entertainment
Financial Services

UBER | lendingtree
BURGER KING
UNDER ARMOUR | GROUPON

21

# E-Commerce Business

## Online Business in the SHC Ecosystem



**The Online business leverages and supports the Sears ecosystem by delivering a integrated retail experience for members**

- **Traffic:** Generate traffic by making investments in Points, Digital Marketing, and Owned Marketing (email, text, social)

- **Selection:** Online assortment consists of store assortment, online exclusive owned inventory, drop-ship vendors, and marketplace sellers

- **Fulfillment:** Integrated retail capability to ship from warehouse, ship from store, pickup in store, and deliver and install (Innovel)

| ($ in million) | 2018 Sales (FCST) | | Integrated Retail Channel % | | | |
|---|---|---|---|---|---|---|
| | Sales $ | % of Total SHC | Ship from DC% | Ship from Store % | Store Pickup % | Delivery (Innovel) % |
| Total Online | $1,449 | 16% | 13% | 14% | 13% | 50% |
| Sears.com | $1,170 | 22% | 12% | 11% | 22% | 55% |
| Kmart.com | $156 | 5% | 24% | 34% | 39% | 3% |
| Marketplace GMV | $122 | 0% | 0% | | | |

22

# Sears Home Services Business Summary

## Business Overview

- Sears Home Services ("SHS") provides repair services and service contracts for appliances, electronics, outdoor power equipment, residential heating & cooling systems, power tools and fitness equipment
- The largest provider of appliance and lawn & garden parts for the DIY community at 2x–3x the next largest competitor
  - The PartsDirect business has over 130k SKUs on Amazon and eBay marketplaces
  - 88% of customers that purchase on Amazon are new to Sears
- SHS provides a comprehensive suite of service contracts for single appliances or warranties for all appliances in the home
- The largest broad line provider of product repair services to SHC customers, manufacturers, third party administrators, insurance & warranty companies and general consumers
- Franchise services include carpet & upholstery care, air duct cleaning & indoor air quality, garage solutions, maid services and handyman solutions

## Revenue by Segment



Franchise
Parts Direct / PRC — 17%
Franchise — 1%
Service Contracts (incl. HW) — 42%
Repair — 42%

**FY 2019E Revenue: $1.7BN Revenue**

## Preliminary 2019E Forecasted Financials

| ($ mm) | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | | FY19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Home Services** | | | | | | | | | | | | | | |
| Revenue | $127 | $160 | $131 | $133 | $166 | $135 | $132 | $162 | $125 | $126 | $155 | $129 | | $1,681 |
| (-) COGS | ($32) | ($41) | ($36) | ($37) | ($46) | ($38) | ($38) | ($43) | ($30) | ($32) | ($39) | ($33) | | ($444) |
| **Gross Margin** | **$94** | **$119** | **$95** | **$96** | **$120** | **$97** | **$95** | **$119** | **$95** | **$94** | **$116** | **$96** | | **$1,237** |
| *Margin (%)* | *74%* | *74%* | *73%* | *72%* | *72%* | *72%* | *72%* | *73%* | *76%* | *75%* | *75%* | *75%* | | *74%* |
| (-) Operating Expenses | ($80) | ($97) | ($82) | ($83) | ($102) | ($84) | ($83) | ($100) | ($82) | ($82) | ($98) | ($81) | | ($1,053) |
| **EBITDA** | **$14** | **$22** | **$13** | **$14** | **$18** | **$13** | **$12** | **$19** | **$13** | **$12** | **$17** | **$15** | | **$183** |
| *Margin (%)* | *11%* | *14%* | *10%* | *10%* | *11%* | *10%* | *9%* | *12%* | *11%* | *9%* | *11%* | *12%* | | *11%* |

_Note: Excludes SHIP._

# Credit Card Portfolio Overview

## Overview of Current Program



| | | |
|---|---|---|
| **20mm Accounts** | **1.8mm New Accounts** | **$1,748mm New Account Spend** |
| **$4,408mm Internal Spend** | **$10,389mm External Spend** | **$13,660mm Avg. Receivables** |
| **$132mm Cash Payments to Sears** | **$221mm Other Program Economics[1]** | **Sears Share** *10.5 % / 17.5 %* 2017 Pre-Tax Income |

**ShopYourWay/ Private Label**

**Thank You/ Non Rewards**

| New Account Portfolios | | Legacy Portfolios | |
|---|---|---|---|
| **$4,332mm Spend** | **$1,543mm Spend** | **$8,923mm Spend** | |
| **$3,508mm Avg. Receivables** | **$1,768mm Avg. Receivables** | **$8,384mm Avg. Receivables** | |
| **$101mm Cash Payments to Sears** | | **$31mm Cash Payments to Sears** | |
| **$135mm Other Program Economics[1]** | | **$85mm Other Program Economics[1]** | |

## Terms & Economics

- 5-year extension through November 2025
  - Optional extension of 2 additional years through 11/27, predicated upon Sears meetings performance hurdles
- Sears has the option to repurchase / arrange for 3rd party repurchase of program assets
  - Repurchase option is only for SYW/PL program and eligible at the end of the 2-year extension (11/27)
- 2018 – 2020 Economics: Economic sharing largely in line with the current program agreement
- After 2020 Economics: Economic sharing predicated upon Sears opening new accounts / total program sales for SYW/PLCC and on total program sales for TY/NR
- Marketing support to include permanent support of SYW externalization; non-contractual support on good faith terms
- Continuation of Commercial Lending Program and Private Label program (subject to certain triggers) in full line stores

## Strategic Benefits

- Revenue sharing program with the Credit Card Partner (Citi)
- Synergy generated from the integration of the Credit Card portfolio with SYW
- Size and store footprint of New Sears will continue to drive the economics of the Credit Card Portfolio

24

# Credit Card Agreement Summary

## Business Overview

- The SYW Financial Services Business Unit ("SYWFS") provides credit, financial products, and payments through a number of retail formats, as well as online and commercial channels

- Diverse product portfolio includes:

    - Consumer Credit (Private Label and General Purpose Cards)

    - Third Party Payment Options (Visa, MasterCard, American Express, Discover, PIN Debit)

    - Layaway

    - Gift Card

    - Alternative Financial Services (Check Cashing, Bill Pay, etc.)

- Provides financing options to support customers' ability to pay and drive incremental visits and profits to SHC retail locations and increase loyalty and of customers to SHC via the SYW rewards program

- Citi card agreement also saves the Company ~$45MM of interchange fees which are not included as part of the business unit's EBITDA

## Revenue by Segment

**Store Related Revenue** [1]    **Non-Pass Through Revenue**



Store New Account Revenue — 43%
Store Credit Sales Revenue — 57%

Contractual Admin Fee — 11%
Other Income/One – Time — 3%
New Account Revenue — 10%
Leasing Income — 8%
Credit Sales Revenue — 14%
Accrued Interest — 53%

**FY 2019E Revenue: $49MN Revenue**

## Preliminary 2019E Forecasted Financials

| ($ mm) | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | FY19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Financial Services** | | | | | | | | | | | | | |
| Revenue | $3 | $4 | $3 | $4 | $5 | $3 | $4 | $4 | $3 | $5 | $7 | $4 | $49 |
| (-) Operating Expenses | ($0) | $0 | ($0) | ($0) | ($1) | ($0) | ($1) | ($1) | ($0) | ($1) | ($1) | ($0) | ($5) |
| **EBITDA** | **$3** | **$4** | **$3** | **$4** | **$4** | **$3** | **$3** | **$4** | **$3** | **$4** | **$6** | **$4** | **$44** |

_____
(1)   Revenue by segment based on LTM revenue as reported by the Company.



# Key Initiatives will Drive Margin & EBITDA Growth

| Initiative | Description |
|---|---|
| **SG&A:** | ■ Initiatives to reduce corporate SG&A expense from ~$1.2BN to an annual run-rate of ~$700MM by the end of 2019<br><br>■ Payroll reductions on over 1,000 positions in November – and reductions of over 650 positions in January of 2019<br><br>■ >$250MM in non-payroll reductions focused in marketing, IT, contracts, and professional services across back-office groups<br><br>■ Supply chain costs reduced by $73MM through a reduction in non-core distribution centers |
| **Assortment Optimization and In Stock & Replenishment:** | ■ Reduce the number of SKUs across the company – includes better use of distribution center storage and favorable vendor costs<br><br>■ Leverage brands between Kmart and Sears formats – includes rollout of Jaclyn Smith and Adam Levine product lines<br><br>■ Develop competitor data scraping capabilities to help identify pricing and trend opportunities early on<br><br>■ In-stock: continuously improve in-stocks while minimizing non-productive inventory<br><br>■ Replenishment: differentiation between basics and seasonal items and implementation of pack/size optimization |
| **SHS Initiatives:** | ■ Direct to Consumer ("D2C") – continued technician investment, improved pricing techniques, and optimized marketing efforts<br><br>■ Business to Business ("B2B") – improvements to pricing strategy, service quality, and job-completion turnover times<br><br>■ Parts Direct website rebuild – enable multi-touch marketing analytics to better understand and improve the customer journey |

# LTM Dec 2018 EBITDA to 2019E EBITDA Bridge



# Significant SG&A Run-Rate Impact From Reductions



**SG&A Home Office Bridge from FY2018E to Run-Rate FY2019E ($ in millions)**

Total Payroll Reductions: $250MM

Total Non-Payroll Reductions: $250MM

✓ Completed
◔ On-track
◑ Started
⧖ Timing Shift

Note: the 2019E $656mm is a run-rate number that includes full year savings from all reductions performed during 2019; the actual FY2019E is $712mm

2019E run-rate assumes full staffing and does not include a ~$29mm reduction in estimated vacancy [1]

Payroll Reductions          Non-Payroll Reductions

(1)  2018E September run-rate and 2019E run-rate assume full staffing (vacancy not included); September 2018 YTD average vacancy of 7.3% represents a $47.7mm reduction in the 2018E September run rate and $29.4mm in the 2019E run-rate; the average vacancy rate of October through December 2018 is 14.4%.
(2)  IT and Supply Chain migrating systems and facilities to lower cost solutions; Sourcing meeting held to kick off process.
(3)  ~$56mm of IT reductions are pro forma for reductions achieved through Q1 2020; uncertainty of a potential liquidation prevented the company from signing multi-year deals without a termination for convenience clause.
(4)  Primarily retailing and back office actions that are currently not part of wave 1 and 2.
(5)  Incremental margin from Innovel 3rd party revenue.

# Progress on SG&A Reductions Deliver Savings

- We have made material progress on SG&A right sizing initiative since November 2018, resulting in $141mm reduction in payroll costs
  - ✓ In November 2018, we actioned 1,059 positions for a total savings of $84 million
  - ✓ In January 2019, we actioned additional 686 positions for a total annual savings of $57 million
- We are on track to achieve additional $114mm in savings
  - Non payroll savings of $45mm by end of Jan through expense reductions in Back Office, Home Services and SAC
  - Supply Chain savings of $69mm of $74mm by July 2019 (Working to solve ~$5mm due to timing on IT implementation in the DART facility)
- In addition, we have started another workstream to drive $15mm of savings through Sourcing
- Due to the Chapter 11 process and the uncertainty of a potential liquidation, we believe it was prudent to not commit the Company to multi-year contracts without termination for convenience clause. This delay in signing of contracts pushed out run-rate reductions into Q4 of 2019
  - Consistent with our view in December, we would not replace inventory and financial systems in Q4, therefore pushing to February 2020. Delay from October 2019 to Feb 2020 will result in $5mm overrun/month for a total of ~$25mm. Bulk of reduction expenses are tied to the mainframe. As soon as we exit the mainframe, monthly costs drop by almost 50% – there is no gradual or partial reduction
  - Run-rate of $64mm will still be achieved but not until Q1 of 2020. Reduction delay will be mitigated by an estimated ~$29.4mm in vacancies that were not included in the forecasted $656mm FY19E run-rate

✓ Completed

 On-track

 Timing Shift

30

# IT Overhaul Reduces Overhead by $102MM

*~$30MM investment required to achieve a $102MM reduction in annual spend to an annual run-rate of $64MM*

## Strategy to Achieve Reduction

- Fundamental strategy change – replace legacy applications with SaaS solutions and exit internal data centers

    - Requires less FTEs to operate – less infrastructure heads and less developers ($6MM/month to $2.1MM)

- Deliverables:

    - Implementation of an ERP application – enables the deprecation of mainframes

    - Implementation of CRM and cloud based contact center – improves member experience as the agent will have a full 360 view of the member from a single screen and take out cost such as deprecation of legacy telephone infrastructure

    - Creation of a single product master (hierarchy) – simplifies the business. For example, same SKU used across all format. It also enables us to consolidate technology.
    For example, a single conveyable warehousing system, a single POS

    - Our Non FTE spend drops from $9MM/month to $2.5MM. ~ $5MM (65%) is mainframe + outsourced infrastructure support resources

- The key risks are the (1) company's ability to absorb so much change over a short time period. For example, many business processes will need to change; (2) we will discover something that we didn't foresee. We need to execute with military grade precision, extreme paranoia and issues should be surfaced and resolved in real time. Net, its all about execution

# Assortment Optimization & In Stock Replenishment

*Assortment Optimization and In-Stock & Replenishment Initiative Drives $80mm in Incremental EBITDA in FY2019*

## Assortment Optimization

**Reduce the Number of SKUs Across the Company**

- Reduce inventory levels at end of the season
- Optimize the fabric use through creation of a fabric library
- Leverage distribution storage capacity
- Negotiate better Free on Board ("FOB") costs with vendors
    - Apparel and footwear divisions reduced their respective SKU numbers by 31% in 2018 and 33% in 2017
    - 2019 SKU reduction is projected at 20%
    - Reduced FOB by $110MM since end of 2016 by moving receipt from domestic to import and increasing sourcing mix of Bangladesh and India
- Reduced markdown liability by $120MM in 2018

**Leverage Brands Between Kmart and Sears Formats**

- Expand Jaclyn Smith to Sears stores → started this year
- Expand Adam Levine to Sears → planning to be fully rolled out planned by end of 2018
- Simply Style moved from Sears to Kmart in Q3
- Plan to expand outdoor life to Kmart in early Q1

**Develop Competitor Data Scraping Capabilities**

- Leverage price opportunity by product category
- Identify color, style gap earlier in the season

## In-Stock & Replenishment

**Objective**

- Continuously improve in-stocks while minimizing non-productive inventory
- 95% in-stock goal by store & product vs. ~92% currently
- 52-week rolling forecast and refined planning algorithms

**Initiatives**

- **Lost Sales Reduction:** Lost sales improvement realized in both basic and seasonal areas through improved demand forecasting
- **Reduction of Aged Inventory:** Aged inventory including inventory greater than 80 days ("GT80") will be reduced, specifically demand forecasting improvement and incremental single item replenishment exposure
- **Supply Chain Savings:** Single item replenishment are balanced with the costs of picking vs replenishing size packs

**Impacts**

- Gains realized in basic replenishment and seasonal product
- Basics split between two tracks to accommodate packaging and replenishment differences
- Seasonal product focus will be on flowing product to maximize sales and minimize markdowns
- Pack size optimization enhances size; improvements to assortment mix
- EBITDA is compressed due to high distribution center costs from size pack to SIR (17% today)
- Single apparel distribution center with pick and pack will reduce costs to 5%



Historical Financials

# Historical Financials

**425 Stores -- LTM Period ended December 2018**

| ($ mm) | Dec 2017 | Jan 2017 | Feb 2018 | Mar 2018 | Apr 2018 | May 2018 | Jun 2018 | Jul 2018 | Aug 2018 | Sep 2018 | Oct 2018 | Nov 2018 | Dec 2018 | LTM Dec-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail (1) | 756 | 443 | 376 | 480 | 383 | 459 | 563 | 398 | 422 | 486 | 354 | 496 | 600 | 5,459 |
| Home Services | 160 | 158 | 129 | 166 | 135 | 142 | 186 | 151 | 144 | 166 | 119 | 121 | 136 | 1,753 |
| Financial Services | 3 | 5 | 3 | 3 | 2 | 2 | 6 | 4 | 4 | 4 | 4 | 4 | 4 | 46 |
| Other Businesses (2) | 48 | 44 | 41 | 45 | 34 | 37 | 48 | 45 | 45 | 58 | 35 | 27 | 30 | 490 |
| Adjustment | 4 | 19 | (5) | 6 | 6 | 4 | 9 | 4 | 1 | (3) | 7 | (7) | 14 | 55 |
| **Revenue** | **970** | **668** | **545** | **699** | **560** | **644** | **812** | **604** | **616** | **711** | **519** | **641** | **784** | **7,803** |
| Retail | 221 | 111 | 98 | 130 | 119 | 134 | 153 | 116 | 102 | 116 | 93 | 119 | 146 | 1,436 |
| Home Services | 118 | 117 | 94 | 120 | 95 | 100 | 134 | 107 | 101 | 118 | 89 | 89 | 101 | 1,265 |
| Financial Services | 3 | 5 | 3 | 3 | 2 | 2 | 6 | 4 | 4 | 4 | 4 | 4 | 4 | 46 |
| Other Businesses | 8 | 9 | 6 | 6 | 4 | 5 | 6 | 6 | 6 | 5 | 7 | 2 | 2 | 63 |
| Adjustment | 1 | 16 | 1 | (2) | (7) | (5) | (4) | 4 | (3) | (3) | 16 | 2 | 5 | 20 |
| **Gross Margin** | **350** | **258** | **202** | **257** | **213** | **238** | **296** | **237** | **209** | **242** | **206** | **216** | **257** | **2,830** |
| *% of revenue* | *36%* | *39%* | *37%* | *37%* | *38%* | *37%* | *36%* | *39%* | *34%* | *34%* | *40%* | *34%* | *33%* | *36.3%* |
| Retail | 86 | (4) | (1) | 15 | 21 | 30 | 30 | 15 | (4) | (7) | (8) | 14 | 20 | 121 |
| Home Services | 15 | 12 | 5 | 14 | 7 | 9 | 21 | 12 | 10 | 13 | 8 | 11 | 4 | 126 |
| Financial Services | 3 | 5 | 3 | 3 | 2 | 2 | 6 | 4 | 4 | 4 | 4 | 4 | 4 | 45 |
| Other Businesses | 0 | 2 | 0 | (0) | (3) | (0) | (0) | (1) | (1) | 1 | (4) | (5) | (4) | (16) |
| Adjustment | 14 | 27 | 12 | 12 | 11 | 6 | 9 | 13 | 8 | 6 | 27 | 9 | 16 | 156 |
| SG&A / Supply Chain & Logistics | (74) | (74) | (74) | (74) | (74) | (74) | (74) | (74) | (74) | (74) | (74) | (74) | (74) | (887) |
| **EBITDA** | **44** | **(32)** | **(54)** | **(31)** | **(36)** | **(28)** | **(8)** | **(31)** | **(58)** | **(57)** | **(46)** | **(40)** | **(34)** | **(457)** |
| *% of revenue* | *5%* | *-5%* | *-10%* | *-4%* | *-7%* | *-4%* | *-1%* | *-5%* | *-9%* | *-8%* | *-9%* | *-6%* | *-4%* | *(6%)* |

(1)   Retail relates to the go forward 425 stores, SAC, and SYWR.
(2)   Other Businesses relates to Kenmore and Monark.



Q&A



sears

kmart.

Appendix

# Kenmore Business Summary

## Business Overview

- Kenmore is broken into two business units
  - Major Home Appliance: Markets and sells refrigerators and freezers, laundry washers and dryers, cooking ranges and ovens, and dishwashers (#5 overall ranked leader in major appliances (11% U.S. sales share))
  - Small Appliance: Markets and sells small kitchen appliances, water softeners, electric air cleaners, vaporizers, vacuums, steam cleaners, room air conditioners, outdoor grills and over the counter microwaves
- The majority of its products manufactured via contracts with OEMs
- The majority of its current distribution via Sears-branded retail stores but with rapidly growing third-party distribution (e.g. Amazon)
- No. of Households: ~100MM as of 2017E (cumulative)

## Historical Revenue [1]



## Leading U.S. Market Share

**(2017E Sales Share by Brands, %)**



## Financial Overview

**(LTM Dec 2017 Sales)**





_____
(1)   Kenmore records revenue based on gross retail sales (included in Hardlines) or its license revenue from Sears sales of Kenmore branded products and third party sales.

# Kenmore Investment Highlights

| | Highlights | Externalization and Other Opportunities for Partner |
|---|---|---|
| **1** Iconic American Brand that is Synonymous with Quality | ▪ Earned 7 "Best of 2018", 4 #1 Products, 3 "Top Ten" and 2 "Best Buy" awards from Consumer Reports in 2018 | ▪ Further expand and externalize an already established, iconic American brand |
| **2** Industry Leadership in Major Appliances | ▪ Significant market share despite Sears performance and capital constraints | ▪ Recover share recently ceded as result of Sears store closures and comp sales performance |
| **3** Access to a Robust National Distribution Platform | ▪ Robust distribution and service platform supported by Sears service network (Innovel and Sears Home Services)<br>▪ Successful nationwide launch of major appliances on Amazon.com (first in the industry) | ▪ Accelerate externalization through other channels outside of Sears (e.g. mass discounters, big box specialty, online) |
| **4** Delivering Turn Key Solution to Retailers | ▪ Partnership with Innovel and Sears Home Services enables scalable, national network for "one-stop-shop" and "purchase-everyday use-replacement" coverage<br>▪ Success on Amazon.com demonstrates "Turn Key" potential for external channel expansion | ▪ Drive Amazon and future external retail partnerships with last-mile "through-the-door" delivery and expert installation services |
| **5** Significant Opportunity from Connected Home Strategy | ▪ Access to key data on customers' usage patterns and preferences across entire nation through smart products<br>▪ Smart data collected facilitates new targeted offers (for customer retention), after-sales service leads and other revenue opportunities | ▪ Gain sales, after-sales leads and other revenue opportunities generated by data from smart products<br>▪ Expand into other adjacent areas of home automation |
| **6** Track Record of Successful Innovation | ▪ A long history of successful product launches with patented intellectual property<br>▪ Strong product development pipeline with more than 290 new product launches in last two years | ▪ Expand R&D efforts and Innovation through strategic OEM partnership |
| **7** Strategic Supply Chain Relationships with Leading Vendors | ▪ 3 of 4 major OEM agreements secured through 2020 with 1 key OEM negotiation expected to conclude shortly | ▪ 1 of 3 major vendors secured through 2020, with other two key vendor negotiations expected to conclude in Q3 2018 |

**Kenmore**

(1)    Based on IBISWorld data.

38

# Sears Home Services Investment Highlights

**Total Addressable Home Services Spend is ~$270B[1]; SHS Is Positioned to Expand Services to Customers via a Comprehensive Nationwide Network**



**1  Difficult-to-Replicate National Repair Network**
- Leader in national appliance repair, utilizing Sears brand and A&E Factory Service (white label) workforce to complete ~5.2M repairs 2017
- Approximately 4,500 trained in-house service technicians complemented by over 650 active independent contractor firms within a 1,099 labor network

**2  Highly Attractive, Fragmented Marketplace with Strong Growth Potential**
- SHS is a leader in a fragmented marketplace
- ~$270B[1] total spend with 250M+ service events per annum; SHS directly participates in three-fourths of total available marketplaces
- Opportunity to further penetrate households within existing service capabilities and expand coverage by entering new service verticals

**3  Comprehensive Suite of Home Services**
- Complete services suite to attract business at point of sale (Protection Agreements), point of need (Home Warranty), DIY (Parts Direct) and full spectrum of in-home remodeling and maintenance services (Home Improvement and Franchise)
- Broadest diversity of offerings across competitive landscape

**4  Industry-Leading Selling Capabilities / Conversion**
- Superior training of customer-facing associates across sales channels
- Effective access to customers with robust retail and post purchase / point of need Protection Agreement ("PA") and Home Warranty selling network
- Attractive service contract attachment and best-in-class lead generation and customer conversion

**5  Attractive Customer Demographics**
- SHS caters to a diverse base of commercial and residential customers
- Provides fulfillment services for industry-leading retailers, OEMs and financial service firms
- Core residential customers are primarily affluent, married homeowners

**6  Strong Operational Expertise and Scalable Infrastructure**
- 125-year history of providing highest quality services
- Infrastructure investment in place to support future growth of service network
- 5-star customer ratings

(1)    Based on IBISWorld data.

39

# Sears Home Services Capabilities

**Sears Home Services ("SHS") provides Industry-Leading Products, Services and Fulfillment Capabilities. SHS provides repair services and service contracts for appliances, electronics, outdoor power equipment, residential heating & cooling systems, power tools and fitness equipment**



"House Experts for Homeowners"

| SHS | | | | | | How SHS Adds Network Value |
|---|---|---|---|---|---|---|
| **Current Services Portfolio** | **Protect (Service Contracts)** | **Fix (In-Home Repair)** | **Do-It-Yourself ("DIY") (Parts Direct)** | **Maintain (Franchise)** | **Improve (Home Improvement)** | |

**Protect (Service Contracts)**
- Protection Agreements
- Home Warranty
- Replacement Plans

**Fix (In-Home Repair)**
- In-Home Service & Repair

**Do-It-Yourself ("DIY") (Parts Direct)**
- Parts Sales

**Maintain (Franchise)**
- Carpet & Upholstery Cleaning
- Duct Cleaning
- Floor & Tile Cleaning
- Handyman & Maid

**Improve (Home Improvement)**
- Roofing, Siding, Windows
- Bath, Kitchen
- HVAC Service & Install
- Flooring & Garage Doors

**How SHS Adds Network Value**
- Continued customer relationship
- Provides opportunity for after market value
- Opportunity for technicians to make incremental sales

**Utilizing an end-to-end customer solution across a suite of services & product offerings is central to the broader Sears strategy**

## SHS: Growth in Home Warranty Sales



Home Warranty Sales have continued to grow over the last 36 months, with over 400,000 contracts now "in-force"

# Innovel Business Summary

## Innovel Overview

- World class third-party logistics provider with unique end-to-end nationwide capability to execute both the middle mile and final mile for Big and Bulky items

- Provide a variety of services including 2-day and next day delivery, complex installation, industry leading online fulfillment capability, U.S.-based customer service, commercial sales B2B support, transportation solutions and warehousing

- Substantial opportunity for profitable growth by continuing to centralize externalizing business

## Key Figures

- ~2,200 employees located across the country

- 11 middle mile distribution centers placed across the country

  — Collectively occupy ~9.3mm square feet and over 500 acres

- 3 offshore retail distribution centers

- 108 final mile cross-dock centers, capable of home delivery

  — Collectively occupy ~9.3mm square feet

## Next Day and 2 Day Capabilities



*24-48-hour delivery capability for 85% of households and 93% of orders*

24-Hour Turnaround

48-Hour Turnaround

42

# Innovel Investment Highlights

**Innovel has ample room for organic, profitable growth via externalization and footprint optimization**



**① Difficult-to-Replicate National Distribution Network**

- World-class distribution network, utilizing 11 up-to-date distribution facilities and 108 MDO facilities, collectively occupying ~9.3mm square feet and over 500 acres
- Approximately 2,200 employees and strong relationships with third party carriers, enabling industry-leading delivery times
- Strategically located footprint catered to middle mile and last mile fulfillment for store network

**② Ability to Strengthen Member Relationships**

- Superior instillation capabilities offers opportunity to develop stronger customer relationships and brand equity
- Can further leverage in-home instillation assignments to cross-sell additional Sears related products (e.g. protection agreements, Shop Your Way Credit Cards and Home Services offerings)

**③ Attainable 3rd Party Revenue Opportunity**

- Revenue externalization process has launched with success, quickly entering into new contracts with blue-chip clients
- Substantial capacity, especially with a right-sized store footprint, will allow for quick integration of 3rd party customers
- Highly-trained network of instillation and delivery professionals offers opportunity to expand into adjacent instillation services for 3rd party clients
- By 2021, total volume is expected to increase by ~80% from 2.9mm in 2018 to 5.3mm with increasing diversification away from Sears; decreased Sears exposure by ~55 percentage points from 2018 to 2021

**④ Achievable Opportunities To Cut Substantial Costs**

- Current capacity, given reduced Sears store footprint, provides opportunity to ramp up 3rd party business with virtually no additional infrastructure investment
- High degree of operating leverage is conducive to margin enhancing growth
- Management has identified several initiatives, such as IT investment, that will improve labor productivity and enhance long-term cost structure

**⑤ Strong Operational Expertise and Scalable Infrastructure**

- Strong, experienced management team with industry-leading knowledge and experience in logistics and supply-chain
- Management has demonstrated an ability to invest in new MDO's in key geographies in a capital efficient manner

43

# Shop Your Way

## The ShopYourWay Framework For Success

**SYW is built around a triumvirate framework focused on (i) Essentials (ii) Gift Giving and Celebration, and (iii) Considered Purchases**



| **Focus Areas** | **Member Journey** | **Member Experience** |

**Essentials**
- Prepared foods
- Wine / Beer
- Coffee / Tea
- Snacks
- Household Consumables

**Gift Giving and Celebration**
- Birthdays
- Anniversaries
- Graduations
- Weddings
- New Baby

**Considered Purchases**
- Refrigerators
- Washing Machines
- Dishwashers
- Fitness Equipment

Member Journey — Weekly Essentials, Moving / Relocation, Marriage, Having A Baby, Vacations, Pets, Bar Mitzvahs

Member Experience:
- Stores
- Call Centers
- Websites
- Email
- Credit Card / Payments
- Sales Associates
- Personal Shoppers
- Home Services Technicians
- Delivery & Installation Services
- Points Awards & Redemptions

**Machine learning capabilities embedded in the SYW architecture will allow the Company to deliver an unrivaled consumer experience**

# Shop Your Way

## SYW Targeted Offer Capabilities

| **Target Member Offers** | **Targeted Offer** | **Mass Offer** |
|---|---|---|

- Through the use of Targeted Offers through various members-facing channels such as email, text, and app experiences, SYW has the ability to cater individual member level offers at a broad level such as format (Sears & Kmart) or the ability to target directly to an individual item level (a specific model of refrigerator)

- This allows for the ability to drive a behavior/purchase at a member level and not allow for the remaining population of shoppers to be given a discount/points that does not drive an incremental trip or spend thus creating a higher ROI



■ Targeted based on propensity and members value able to scale up and down to control investment

**vs.**





- Offer available to all regardless of intent - higher incremental need to breakeven

45

# Sears Auto Center Business Summary

## Business Highlights

- One of the largest, scaled providers of automotive aftermarket services, with a nationwide footprint of 231 locations across 38 states and Puerto Rico
  - Stores are ~17,700 square feet on average with ~17 service bays
- Service offerings include tire replacement, rapid wheel alignment, precision brake service, battery replacement, comprehensive oil / fluid change and diagnostic & mechanical services
- Attractive, diverse customer base of individual consumers and commercial / corporate accounts
- Employs one of the most tenured labor networks in the industry, with 2,163 trained and accredited technicians across store base
- Executing multi-faceted strategy across operations, merchandise, marketing, real estate, customer base and sourcing to grow revenue and improve profitability
- FY2017A Sales (All Locations): $333mm
- FY2017A 4-Wall EBITDAR (All Locations): $26mm

## Customer Segmentation



**Commercial Customers** ⟶ **Key Customers**

8%

Retail / Individual Customers 92%

## FY2017A Revenue Breakdown

| Merchandise | Service |
| --- | --- |

## Key Brands Distributed



| Tires | Battery & Related |
| --- | --- |

OTC, Valves & Other

Undercar Parts

OTC, Valves & Other 12%

Battery & Related 17%

Tires 45%

Undercar 26%

Battery 5%

Mechanical / Undercar 20%

Tires 43%

Fluids / Other 32%

71% of Total Sales

29% of Total Sales

46

# Sears Auto Center Investment Highlights



**① Unique Industry Player With National Footprint**

- Large, national player with strong brand equity competing against mostly regional and local businesses
- Beneficiary of traffic to Sears FLS, giving the segment enhanced customer visibility
- Ability to leverage Sears' national supply chain contributes to enhanced lead times and customer service
- Base of 2,163 trained and accredited technicians provides unique opportunity to take advantage of excess capacity

**② Diverse Product Offering**

- Mix of service and merchandise product offering allows Sears Auto Center to be a one-stop-shop for automotive needs, leading to recurring revenue and high customer satisfaction
- Proven ability to cross-sell merchandise to customers seeking mechanical service (and vice-versa)
- Strong relationships with blue-chip vendors provides for attractive merchandise offering

**③ Leasing Opportunity**

- Only national retailer that offers leasing as a payment option for automotive products and services
- Ability to attract sub-prime customers with limited financing options, while maintaining no balance sheet risk due to strong financing relationships
- High margin opportunity with the ability to lease out under-utilized bays for DIY'ers
- Opportunity to create lease-based standalone Auto Centers in key markets

**④ Ride-Sharing Platform Exposure**

- Recently entered into partnerships with Uber and Lyft
  - Partnership is predicated on the creation of service stations for both ride-sharing platforms within Sears Auto Centers, where drivers can have their cars certified and purchase regular maintenance
- 5 Uber hub locations, generating 200-300 certifications per week each, as well as 10 Lyft locations, with expansion plans

**⑤ External Channel Growth Opportunity**

- Opportunity to leverage strong team of experienced associates to take advantage of tire instillation market
  - Online tire sales have grown over past few years, with vendors not having the appropriate network to complete instillation
- Recently rolled out partnership with Amazon, selling DieHard tires through the platform and installing at Sears Auto Center
  - Opportunity to expand through additional online mediums and install non-DieHard tires at store locations

47

# DieHard Business Summary

## Business Overview

- Leading provider of power solutions since 1967
- Current U.S. sales share of 4% for vehicle batteries
- Products sold primarily through Sears channels, with select external retail distribution
- All products are manufactured by leading contract manufacturers, required to comply with DieHard high quality standards
- Well-balanced portfolio of vehicle batteries, with well-developed strategies for new product introductions in adjacent and peripheral industries
    - Adjacent (Power): Connected Lighting Solutions, Solar Power Solutions
    - Peripheral (Lifestyle): Rugged Wear, Extreme Wear

## Revenue by Segment



Tires 8%
Other 4%
Footwear 28%
Batteries and Battery Accessories 60%

## Brand Awareness



| DieHard | ACDelco | DURACELL | Duralast | INTERSTATE BATTERIES |
|---------|---------|----------|----------|----------------------|
| 71% | 53% | 49% | 48% | 47% |

## Select Products





**Vehicle Batteries**
- Offered for Auto, Marine & RV, PowerSport and Lawn & Tractor

**Vehicle Battery Back Up**
- Various applications range from jumping a car battery to powering laptop within a car

**Portable Power and Lights**
- Categories include tool batteries, alkaline batteries, flashlights and LED lights

**Work Boots**
- High-performance boots, offered in both slip-ons and lace-ups

**Tires**
- Mid-Tier Passenger car tires manufactured by Kumho sold in SAC

**Consumer Electronics**
- Categories include Powerbanks, Chargers, Charging station, Phone cases and headsets

# Monark Business Summary

## Business Unit Overview

- Monark Premium Appliance Company and its affiliates form a nationwide distributor of premium home appliances that serve architects, builders, designers, developers and homeowners
- Monark represents a partnership between three leading distributors: Florida Builder Appliances, Westar Kitchen & Bath and Standards of Excellence
- Showrooms provide customers with premium cooking, cooling and cleaning appliances
- Monark operates within the larger Hardlines business Established June, 2015

## Store Locations

20 showrooms across Arizona, California, Florida and Nevada



## Select Brands



# Real Estate Breakdown

| ($ in 000's) | Property Count | Total Square Feet | Appraised Lit Value | Appraised Dark Value |
|---|---|---|---|---|
| **Owned** | | | | |
| Sears | 78 | 12,626,759 | $781,780 | $524,625 |
| Kmart | 12 | 1,298,102 | 135,452 | 98,400 |
| **Total Owned** | **90** | **13,924,861** | **$917,232** | **$623,025** |
| **Ground Lease** | | | | |
| Sears | 51 | 8,450,184 | $562,850 | $218,400 |
| Kmart | 14 | 2,071,316 | 39,790 | 14,000 |
| **Total Ground Lease** | **65** | **10,521,500** | **$602,640** | **$232,400** |
| **Leased** | | | | |
| Sears | 94 | 12,766,836 | $310,032 | N/A |
| Kmart | 176 | 16,315,242 | 155,781 | N/A |
| **Total Leased** | **270** | **29,082,078** | **$465,813** | **N/A** |
| **All Properties** | **425** | **53,528,439** | **$1,985,685** | **$855,425** |

# Sears Supply Chain Breakdown



Sears has 120 supply chain assets (DDCs, MDOs, and RDCs) strategically located in all major areas of operations

# Small Store Footprint

## Investment Highlights

**New Sears intends to increase investment in the smaller footprint strategy as it reduces its large box footprint**

| Store Overview |
|:---:|

- The Company has recently been testing the concept of opening smaller footprint digital stores, marketed as "Sears Appliances" to leverage and highlight their most popular and profitable categories
  - Small footprint stores range from 7,000 – 20,000 sq. feet, while typical Sears locations average ~138,000 sq. feet
    - Allows the company to substantially reduce rent expense and personnel costs
    - On-demand inventory helps the Company improve its cash conversion at the retail level
  - Locations have successfully opened in Texas, Colorado, Hawaii and Pennsylvania
  - Most orders are placed on demand and can be shipped to customers or store locations
  - Stores specialize in selling appliances, but also offer the ability for consumers to order all Sears products in-store

- Locations offer interactive displays and trained experts to assist customers with their appliance & non-appliance needs

52

# Small Store Footprint

## Expansion of Small Footprint

| Business Overview |
|---|

- Store size: 7,000 to 20,000 sq/ft (leased)
- Local personalized shopping experience benefiting the community through the Sears and ShopYourWay ecosystem
- Products & services tailored to the community:
  — Home Appliances
  — Home Services (Repair, Parts, Home Improvement)
  — Connected Solutions (IoT products)
  — Financing options for every member
    • ShopYourWay 5-3-2-1 card
    • Leasing
    • Layaway
  — Shop Your Way Products and Services
  — Mattresses (when over 10k ft$^2$)
  — Other community relevant products when space permits and based on local demographics and needs (seasonal product, tools, fitness, etc.)
- Highly trained consultative experts that focus on helping customers with
- large purchases and home solutions
- In-home support and consultation
- Unlimited service opportunities and solutions; Service Live

### Financial Summary (2018E)

**(4 Operating Stores), Proof of concept**

| ($000s) | 2018F |
|---|---|
| Sales | $23,882 |
| Gross Margin | 7,435 |
| *GM%* | *31%* |
| Operating Expenses | 5,557 |
| EBITDA | 1,878 |
| *EBITDA %* | *8%* |
| EBITDAR | 3,065 |
| *EBITDAR %* | *13%* |
| IRR | 36% |
| Payback | 3.75 yrs |

| Description | Store Economics |
|---|---|
| Gross SF | 7,000 to 20,000 |
| Selling SF | 6,750 to 18,000 |
| Annualized Sales | $4m - $8m |
| *Sales per/GSF* | *$400 - $500* |
| EBITDA $ | $0.4m - $1.0m |
| *EBITDA %* | *~8%* |
| EBITDAR $ | $0.6m - $1.4m |
| *EBITDAR %* | *~13%* |
| Capital Investment | $1.4m - $1.8m |
| IRR | 30%-60% |
| Payback | 3 - 4 yrs |

53



# Exhibit 13



**Subject to Material Change**

# Wind Down Recoveries

January 14th 2019

SEARS HOLDINGS

Confidential

# Wind Down Executive Summary

- **With assistance from its professionals, the Company has prepared wind-down recoveries showing a twelve-month orderly liquidation commencing 1/14/19**

  - The preliminary wind-down budget assumes that all assets are orderly liquidated in-place, including general merchandise inventory and real estate. Self-supporting business units are assumed to be sold as going concerns pursuant to section 363 of the bankruptcy code

  - The analysis is on a consolidated basis for the Company

  - At 1/14/19, we assume the Company will:

    - Commence liquidation of all remaining inventory in the stores and distribution centers (with final GOB sales beginning on 1/21/19)

    - Reject all remaining store and DC leases, other than valuable leases, which will be monetized

    - Reject all remaining non-essential contracts

    - Reduce management and staff to the minimum necessary to liquidate the collateral and perform transition services

    - Sell or monetize all remaining encumbered and unencumbered assets on a non-going concern basis

  - Substantial funding for the wind-down is provided by:

    - The gross proceeds from GOB sales of merchandise inventory. As this inventory is sold, expenses related to the inventory liquidation are deducted from proceeds, resulting in an assumed net orderly liquidation inventory value to the estate of ~90%

    - The first $240mm of previously unencumbered asset sale proceeds realized (which are segregated into a separate account), after which previously unencumbered asset sale proceeds are used to repay the $350mm Junior DIP in full; after the Junior DIP has been repaid in full, additional asset proceeds are used to pay administrative expenses and unsecured creditors

    - The imposition of a 4% charge on encumbered assets sold throughout the case pursuant to 506(c) of the Bankruptcy code, with the exception of the first lien and prepetition ABL collateral (including non-insider portions of the FILO and Citi L/C), and Junior DIP collateral, due to the 506(c) waivers granted to these lenders solely in their capacity as DIP lenders

    - Excess proceeds (proceeds above lien value) from sales of encumbered collateral

- **Prior to 1/14/19, the Company is assumed to operate in the ordinary course while transitioning from a 505 to 425 store footprint**

2

UCC_SEARS0002237

# Key Assumptions in Wind Down Recoveries

- **Operating Receipts**
  - Cash receipts are assumed to be generated through the following channels during the wind-down period:
    - Sales of merchandise in the normal course in the weeks leading up to the GOBs
    - Continued service revenues (direct-to-consumer repair services, B2B repair, warranty commissions)
    - Continued non-operating receipts (pass-through and non-pass-through) such as Citi credit card accrued interest sharing, insurance proceeds, dividends from foreign subsidiaries and litigation recoveries
    - Asset sales including both encumbered and unencumbered collateral
  - Same-store sales
    - Analysis assumes negative 15% same-store sales for all stores until the final GOB sales begins on 1/21/19
    - Stores are assumed to maintain a 29% gross margin throughout the projection period, excluding GOBs, which are assumed to run at a net negative margin resulting in an ~90% Net Orderly Liquidation Value
    - All sales shown net of taxes, including sales taxes, pass-through, and royalties
  - The wind-down recoveries assumes 4 waves of GOBs
    - Wave 1: 142 Stores beginning 10/28/18 ending 1/6/19
    - Wave 2: 40 Stores beginning 11/18/18 ending 1/26/19
    - Wave 3: 80 Stores starting on 1/3/2019
    - Wave 4: 425 Stores starting on 1/21/2019
  - Other Inflows
    - Minimal PA sales during GOB ($200k per week)
    - Negative 15% YoY declines in Other Revenues, including Service Revenues
- **Operating Disbursements**
  - COGS Disbursements
    - Merchandise vendors assumed to be primarily on cash-in-advance terms with 4-day average shipping time in the period leading up to the wind-down with some merch AP and non-merch AP based post-filing actuals;
      - Outstanding merchandise AP is paid down out during the case
    - Following the transition to the wind-down mode, no additional merchandise disbursements are made (last week of disbursements assumed to be the week ending 1/6/19) and merchant teams are immediately rationalized other than a small number of key employees to oversee vendor relations as the remaining on order inventory is shipped to the stores

3

Confidential

UCC_SEARS0002238

# Key Assumptions in Wind Down Recoveries (cont'd)

- **Operating Disbursements (Continued)**
  - SG&A Disbursements
    - Assumes all dark store leases are rejected immediately (Company rejected 234 leases on 10/16/18) and GOB leases are rejected at the end of the GOB sales period; as the last set of GOBs is projected to run from the week ending 1/26/19 to the week ending 4/13/19, lease payments would be made for March and rejected in April
    - Immediate RIF of non-core; non-key personnel beginning 1/15/19 – 60 days of WARN following RIF announcement
    - Uses the Company's detailed Payroll, Benefits, Non-Merch and Tax projection to project cost
      - Assumes logistics costs are right-sized to reflect lower score count
    - GOB store payroll and other expenses are removed at the end of the GOB sales
      - GOBs expected to last 11 weeks in line with historical actuals
    - Capex assumes historical levels of maintenance with reductions in line with store closures
- **Other Disbursements**
  - Assumes $10mm of utility deposits paid, and are subsequently forfeit during the wind-down
  - Assumes no additional spend on critical vendor payments during the post-petition period
  - Accrued professional fees estimated based on current carve out reserve amount
    - After case begins to wind down, professional fees drop to an eventual monthly run rate of ~$5mm
    - Professional fees (full projected pipeline to 1/15/19 + general carve-out + success fees) accrued in the carveout reserve until the wind-down begins; fees then paid for by the liquidation of the first lien collateral after the ABL, non-insider FILO and non-insider Citi L/C have been fully amortized
  - Assumes total severance of $41mm through December 2019 (exclusive of WARN notice costs)
- **Junior DIP**
  - Starting balance of $175mm Junior DIP, which is pro forma to reflect $75mm balance as of 1/5/19 plus $100mm draw on 1/10/19
    - Junior DIP facility assumed to have a lien junior only to the First Lien DIP facility on prepetition unencumbered collateral other than specified collateral; on specified collateral, the Junior DIP liens are pari passu with the First Lien DIP facility after the first $240mm of proceeds have gone to fund the earlier of a) the wind-down reserve or b) the wind-down of business operations
      - Interest Expense of L+1,000

4

UCC_SEARS0002239

# Key Assumptions in Wind Down Recoveries (cont'd)

- **Unencumbered Asset Values**
  - Credit Card Tort Claim: Assumes $35mm
  - Unencumbered Receivables: Assumes $63mm, estimated using 25% recovery on $251mm book value
  - Sears Auto Centers (SAC): Assumed to be immediately liquidated simultaneously with the stores, with proceeds reflected in GOB recoveries – no going concern value
  - Includes actual sale of SRAC MTNs for net proceeds of approximately $81mm, which is included in the wind-down reserve
  - Monark: No value assumed
  - Net Operating Losses: No value assumed
  - Initial estimates of the following assets used per consultation with Lazard
    - Sears Home Improvement: $45mm
    - Sears Parts Direct: $60mm
    - Sears Service Contracts: $80mm
    - TSA modeled in place for all going concern assets such that any and all costs incurred by wind-down entity are assumed to be passed through directly to the purchaser
- **Unencumbered Real Estate Values**
  - Recoveries assumes $561mm net of transaction costs
  - Values for unencumbered real estate updated to incorporate JLL appraisals received on 1/11/19
  - Excludes values for indications of interest on unencumbered real estate received to date, which totals in excess of $350mm

- **Encumbered Asset Values**
  - Sparrow real estate excludes from analysis
  - Dove real estate assumed to be sold at 70% of dark value and incur a 6% broker fee
  - IPGL GL real estate assumed to be sold at 70% of dark value and incur a 6% broker fee
  - IPGL IP collateral assumed to be sold for $50mm, which represents ~15% of the low-end estimate of distressed fair market value of $345mm as stated in the Ocean Tomo appraisal document dated 1/12/18

- **Kenmore and Diehard**
  - Excluded from the analysis
  - Excludes asserted KCD Royalty administrative claim of $112mm

- **Excludes any recoveries for avoidance actions and any potentially asserted claims against ESL**
- **Excludes any potential going concern value under one or more plans of reorganization including potential reorganization plans involving Sears Home Services, Innovel, and other business units, as well as attendant tax attributes distributed to creditors**

5

UCC_SEARS0002240

**Certain assumptions in this document may be subject to material change, including:**

- **Go-forward financial performance of the store base**
- **Go-forward financial performance of the non-store businesses**
- **Feasibility and timing of SG&A reductions**

- **Assets**
  - Certain island stores and the Guam stores may be sold as going concern stores which would change recoveries on those assets
  - Carry costs and timing of real estate liquidations
    - The analysis does not include real estate related expenses past the end of GOB periods for potential additional time and carrying costs that may be required to sell real estate assets
  - This document excludes all avoidance action recoveries and any recoveries for litigation related to prepetition transactions
  - Assumes no proceeds from collateral charges are paid to the estate from the Sparrow collateral

- **Claims**
  - 503(b)(9) and GUC claims as of the petition date are estimated by SHC; subject to change based on further inventory receipt reconciliation
  - The initial estimate of the size of the general unsecured claim pool may change materially
  - WARN, severance, and PTOs costs associated with RIFs occurring past 11/15/18 are based on average salary and benefits of employees, and will change as employees subject to future RIFs are finalized

- **PBGC Claim**
  - This analysis does not reflect any view or estimate regarding a) the size of the PBGC claim, b) the priority of the PBGC claim, or c) any proceeds associated with the liquidation or transfer of securities held by the PBGC
    - The PBGC is likely to have a significant unsecured claim, which is excluded from this analysis
    - The Company is still performing diligence on the plan termination claim

6

UCC_SEARS0002241

# Creditor Recovery Matrix
## *Wind-down / Orderly Liquidation (Debt and Other Starting Balances As of 1/5/2019)*

| Creditor Recovery Matrix | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **($ in millions)** | | | | | | Remaining Assets | | | | |
| **Creditors** | **Gross Claim[1] as of 1/5/19** | **1st Lien Collateral** | **Jr. DIP Collateral (Previously Unencumbered)** | **Sparrow R.E** | **Dove R.E.** | **IP/GL Collateral** | **Wind-down Reserve** | **Carve-Out** | **$ Recovery** | **% Recovery** |
| Admin and Other Priority Claims | $1,405 | ($551) | ($500) | – | ($19) | ($7) | ($240) | ($89) | $1,405 | 100% |
| DIP ABL [2] | 894 | (894) | – | – | – | – | – | – | 894 | 100% |
| Junior DIP [3] | 175 | – | (175) | – | – | – | – | – | 175 | 100% |
| FILO (1.5) | 125 | (125) | – | – | – | – | – | – | 125 | 100% |
| Citi LC Facility (1.75) | 271 | (271) | – | – | – | – | – | – | 271 | 100% |
| Adequate Protection - 507(b) [4a] | 331 | (136) [4b] | – | – | – | – | – | – | 136 | 41% |
| 2nd Lien Line of Credit Loans | 570 | – | – | – | – | – | – | – | – | – |
| ESL 2nd Lien Term Loan (PIK) | 320 | – | – | – | – | – | – | – | – | – |
| 2nd Lien Notes (PIK) | 175 | – | – | – | – | – | – | – | – | – |
| 2nd Lien Notes (2.5; Cash) | 89 | – | – | – | – | – | – | – | – | – |
| Dove Loans | 831 | – | – | – | (429) | – | – | – | 429 | 52% |
| Sparrow Loans [5] | NA | – | – | – | – | – | – | – | NA | NA |
| GL / IP Loan | 231 | – | – | – | – | (159) | – | – | 159 | 69% |
| **Total Secured Debt / Claims** | **$5,417** | **($1,976)** | **($675)** | **–** | **($448)** | **($166)** | **($240)** | **($89)** | **$3,594** | **66%** |
| Unsecured and Deficiency Claims [6] | 5,864 | – | – | – | – | – | – | – | – | – |
| **Total Unsecured Debt / Claims** | **$5,864** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** |

**Notes:**
(1) Gross claim does not mean such claim is allowed, unless allowed pursuant to a bankruptcy court order or otherwise
(2) Pro forma balance as of 1/5/19. Company has requested $100mm Jr. DIP draw for week ending 1/12/19 which would reduce the pro forma ABL balance to $894mm.
(3) Pro forma balance as of 1/5/19. Company has requested $100mm Jr. DIP draw for week ending 1/12/19 which will increase the Jr. DIP balance to $175mm.
(4a) Includes $331mm of claims under section 507(b) of the Bankruptcy Code for diminution in the value of second-lien collateral are shown based on advice from Weil. The ultimate value of these claims could vary materially given a number of factors including the use going concern or liquidation values, inclusion or exclusion of certain administrative costs such as professional fees that benefit from the Carve-Out and charges and the ultimate validity of the second-lien liens and claims. In addition, the validity and amount of such diminution claims is expected to be a disputed among the parties, including the debtors.
(4b) Recovery takes into account disputed nature of claim
(5) Sparrow entities are non-debtors and excluded from analysis.
(6) Draft estimate of gross liability per Deloitte of $3.4bn, plus ~$1bn of PA Liability, plus deficiency claims of ~$1.8bn.

Confidential

UCC_SEARS0002242

# Exhibit 14

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS



# SEARS HOLDINGS

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS - DISCUSSION MATERIALS

**November 12, 2018**



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Disclaimer

▪ The information herein has been prepared by the Sears Holdings Corporation (the "Company") and its advisors based upon information supplied by the Company or publicly available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by the Company with respect to the anticipated future performance of the Company. The advisors have relied upon the accuracy and completeness of the foregoing information, and have not assumed any responsibility for any independent verification of such information or any independent valuation or appraisal of any of the assets or liabilities of the Company, or any other entity, or concerning solvency or fair value of the Company or any other entity. With respect to financial forecasts, the advisors have assumed that they have been reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of management of the Company as to the future financial performance of the Company. The advisors assume no responsibility for and express no view as to such forecasts or the assumptions on which they are based. The information set forth herein is based upon economic, monetary, market and other conditions as in effect on, and the information made available to us as of, the date hereof, unless indicated otherwise.

▪ This presentation speaks only as of the date of the information herein and neither the Company nor its advisors has any obligation to update or correct any information contained herein, including any forward-looking statements as described below. This presentation shall not be deemed an indication of the state of affairs of the Company and is based on the currently available information to the Company and its advisors. This presentation shall not constitute an indication that there has been no change in the Company or affairs of the Company since the date hereof.

▪ This presentation may contain certain statements that may be deemed "forward-looking statements" as defined in the U.S. Private Securities Litigation Reform Act of 1995. All statements that address activities, events or developments that we intend, expect, plan, project, believe or anticipate will or may occur in the future are forward-looking statements. By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future.

Weil    LAZARD    M·III
PARTNERS

1

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Meeting Agenda

1. **Introduction**
2. **Preliminary Go-Forward Business Plan**
3. **Liquidity Update and Illustrative Store Footprint Scenarios**
4. **Break**
5. **Tax Update**
6. **DIP Financing Overview**
7. **KERP / KEIP Overview**
8. **Chapter 11 Timeline**



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Preliminary Go-Forward Business Plan

 

3

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Executive Summary

- Senior management with the assistance of M-III has produced the following go forward business plan for the Company that achieves profitability in 2019 through revenue growth initiatives and significant cost cutting

  - With negative same-store sales comps that turn positive in Q2 averaging 0.6% in 2019 and 100bps of margin rate increase with a 505 store footprint, the Company is projected to have $94mm of EBITDA in 2019, which continues to grow in 2020 and 2021

- From a variety of perspectives, including real estate value, profitability, and acquiror interest, management believes that maintaining 505 stores is a reasonable store base from which the Company can grow and achieve meaningful profitability

  - SHC realizes significant income from the Citi credit card agreement shown in financial services, cash discounts from vendors not included at the store level, and points income shown within the Shop Your Way business unit. When stores are closed, these income streams shown outside the stores decrease significantly

  - With continued B2B growth and a new Protection Agreement solution to sell in retail, Sears Home Services is projected to achieve $235mm of EBITDA in 2019 on $1.7bn of revenue

- Based upon pre-petition same-store sales comps trajectory, historical store performance, and the opportunity to capitalize on underinvested stores, the Company has substantial growth opportunities ahead

- Additionally, the Company has identified a plan to reduce home office and supply chain overhead expenses from ~$1.2bn today to a less than $600mm annual run-rate

  - We are projecting the home office and supply chain overhead expense to be ~$650mm in 2019 due to the pacing of the transformation

  - The first round of cuts is schedule to begin on November 15 with an estimated savings of $100mm in payroll annually



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Executive Summary *(cont'd)*

- Management is focused on several key areas for potential growth

  - Continued online growth through executing on basic metrics improvement, substantial initiatives, and operational excellence

  - Opening additional small footprint locations (upside opportunity as not included in base plan)

  - Further expansion into mobiles apps, which have a 2x conversion rate over the mobile web

  - Growing the already existing 28mm 12-month active member base through new member acquisition and enhanced retention strategies

- While the initial results of the plan are promising, there is still significant work ahead to be completed

  - The Company will be spending significant time investigating the brand proposition of Sears and Kmart along with formulating a go-forward plan

  - Management is prioritizing the best growth initiatives to pursue and forecasting the required capital expenditures needed including store rejuvenation

  - The first round of cuts has been identified and scheduled but the next rounds will be long and tough



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Why Sears can make it

- Sears is 3rd largest appliance retailer in the US with 15.3% market share

  - Lowes has 25.8% share; Home Depot has 17.1%; Best Buy has 13.7%

- Sears is the number one home service and direct delivery provider

  - Amazon and others are leveraging Sears' capabilities, which adds value to Innovel and Home Services; this is a unique strength that Sears has over other market competitors with high barriers to entry

- Sears has a physical presence and some unique locations to back up the showroom concept that is important on big ticket, considered purchases, which combined with our online, service, and delivery capabilities make for a powerful combination

  - Sears' current value proposition with increased focus and investment should command higher market share

- We have the ability to expand our reach in the Hardline categories through scaling the small format concept and further leveraging our overhead and unique capabilities

- Along with the Hardlines opportunity, Sears also has a strong and growing Softlines business which can complement its Hardlines opportunities, again making Sears unique in the market

- Robust digital platform with 145mm total registered users including 61mm contactable members and 28mm 12-month active users. Of the active users, 13.5mm have redeemed points in the last 12 months

- Expansive Financial Services platform with profitable Citi credit card agreement and multiple avenues for continued growth under the agreement

**To capture this opportunity, we will need to address our physical presence through store upgrades and a consumer confidence campaign, but the reason Sears can make it is that it still has a unique product and service offering that will make it relevant for years to come**

Weil    LAZARD    M-III PARTNERS

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Our business plan is powered by a robust, store-level financial model

## 2019 Plan Assumptions by Business Unit

| | Methodology | Assumptions |
|---|---|---|
| **Retail (Brick & Mortar, Sears Auto Center, Online & ShopYourWay)** | • <u>Brick and Mortar</u>: By store revenue and EBITDA build for Brick and Mortar retail<br>• <u>Online</u>: Based on historical financials<br>• <u>Sears Auto Center</u>: Based on historical financials<br>• <u>ShopYourWay</u>: Based on percentage of sales realized historically | • Footprint reduced to 505 total stores (266 Sears & and 239 Kmart)<br>• Forecast driven off LTM actual performance through September 2018<br>• Same store comps:<br>  – 2019 FY: 1% decrease in Feb 2019 ramping to a 2% increase in Jan 2020<br>  – 2020 FY +3%<br>  – 2021 FY +4%<br>• 2019-21 FY store level gross margin +100 bps<br>• Fixed operating expenses held flat in 2019; grown at 2% thereafter<br>• <u>Online</u>: 2019-2021 revenue growth of 5% per annum<br>• <u>Sears Auto Centers</u>: 2018 FY YTD actuals + budget reduced based on number of FLS stores closed; 3% same store comps thereafter (2020-21)<br>• <u>ShopYourWay</u>: ~1.9% of total online and retail sales (based on LTM actuals) |
| **Home Services** | • Underlying business segments forecasted based on key drivers; based on management team's detailed financial model | • Based on 2019 FY management forecast of business<br>• Assumes SHIP sold to stalking horse buyer and is excluded from forecast<br>• Assumes Protection Agreement business continues to originate policies through third party (Assurant) |
| **Other Businesses** | • Financial Services based on percentage of sales realized historically | • <u>Financial Services</u>: ~1.7% of total FLS retail sales (based on LTM actuals)<br>• <u>Kenmore / DieHard</u>: Based on management projections per sale process<br>• <u>Monark</u>: 2018 YTD actuals with budget held constant in 2019 |
| **Overhead, SG&A and Supply Chain & Logistics** | • Management forecast based on result of three-week long review of costs at each business unit by Office of the CEO and M-III | • <u>Home Office SG&A</u>: Reduced from ~$860mm current run-rate to ~$350mm on a going concern run-rate basis<br>• <u>Supply Chain & Logistics</u>: 9 conveyable distribution centers reduced to 5; assumes Innovel platform sold or reduced |



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# With modest positive same-store comps, SHC can return to profitability in 2019

## Consolidated Historical Financials and 2019-2021E Forecast

*($ in millions)*

| | 2015A | 2016A | 2017A | 2018A YTD [1] | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|
| **Revenue** | **$25,140** | **$21,893** | **$16,673** | **$8,913** | **$8,709** | **$8,858** | **$9,169** |
| (-) COGS | (16,886) | (14,585) | (10,824) | (5,713) | (5,481) | (5,669) | (5,909) |
| **Gross Margin** | **$8,254** | **$7,308** | **$5,848** | **$3,201** | **$3,228** | **$3,189** | **$3,259** |
| *Margin (%)* | *33%* | *33%* | *35%* | *36%* | *37%* | *36%* | *36%* |
| (-) Operating Expenses | (7,066) | (6,375) | (5,055) | (2,919) | (2,573) | (2,526) | (2,546) |
| (-) Supply Chain & Logistics | (483) | (389) | (326) | (219) | (197) | (202) | (208) |
| (-) Home Office SG&A | (1,573) | (1,378) | (1,071) | (666) | (365) | (296) | (302) |
| (+) SHC Level PA EBITDA Adjustment [2] | 33 | 36 | 46 | 30 | – | – | – |
| **EBITDA** | **($836)** | **($798)** | **($557)** | **($573)** | **$94** | **$165** | **$204** |
| *Margin (%)* | *(3%)* | *(4%)* | *(3%)* | *(6%)* | *1%* | *2%* | *2%* |

## 2019E EBITDA Sensitivity to Retail SSS Growth / (Decrease) and Margin Expansion / (Compression)

| | | Same Store Sales Growth / (Decrease) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | (10.0%) | (8.0%) | (6.0%) | (4.0%) | (2.0%) | 0.6% | 2.0% | 4.0% | 6.0% | 8.0% | 10.0% |
| Margin Expansion (bps) | (50) | ($147) | ($116) | ($85) | ($55) | ($24) | $17 | $39 | $70 | $100 | $131 | $162 |
| | – | (124) | (93) | (61) | (30) | 1 | 43 | 65 | 96 | 127 | 159 | 190 |
| | 50 | (101) | (69) | (38) | (6) | 26 | 68 | 91 | 122 | 154 | 186 | 218 |
| | 100 | (78) | (46) | (14) | 19 | 51 | 94 | 116 | 149 | 181 | 214 | 246 |
| | 150 | (56) | (23) | 10 | 43 | 76 | 119 | 142 | 175 | 208 | 241 | 274 |
| | 200 | (33) | 1 | 34 | 68 | 101 | 145 | 168 | 202 | 235 | 269 | 302 |
| | 250 | (10) | 24 | 58 | 92 | 126 | 170 | 194 | 228 | 262 | 296 | 330 |

 

(1) YTD 9-month actuals through October 2018.
(2) SHC level EBITDA adjustment related to the protection agreement business.

8

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Retail, Home Services, and Financial Services drive profitability

## Business Unit Historical Financials and 2019E Forecast

*($ in millions)*

|  | 2015A | 2016A | 2017A | 2018A YTD [1] | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|
| **Retail (4-Wall + Online + SYW)** | | | | | | | |
| Revenue | $21,381 | $18,492 | $13,531 | $6,144 | $6,578 | $6,794 | $7,072 |
| Gross Margin | $6,541 | $5,476 | $4,119 | $1,737 | $1,891 | $1,949 | $2,026 |
| EBITDA | $959 | $628 | $531 | $99 | $409 | $439 | $487 |
| **Home Services [2]** | | | | | | | |
| Revenue | $2,139 | $2,159 | $1,953 | $1,220 | $1,690 | $1,610 | $1,629 |
| Gross Margin | $1,582 | $1,592 | $1,433 | $868 | $1,222 | $1,122 | $1,112 |
| EBITDA | $195 | $266 | $222 | $90 | $235 | $210 | $211 |
| **Financial Services** | | | | | | | |
| Revenue | $66 | $68 | $74 | $67 | $49 | $51 | $53 |
| EBITDA | $55 | $59 | $68 | $65 | $44 | $46 | $48 |
| **Other Businesses** | | | | | | | |
| Kenmore / Craftsman / DieHard EBITDA | $11 | $11 | ($2) | ($4) | ($7) | ($7) | ($7) |
| Monark EBITDA | $7 | $3 | $3 | ($1) | ($3) | ($2) | ($1) |
| **Overhead and Adjustments** | | | | | | | |
| Supply Chain and Innovel | ($483) | ($389) | ($326) | ($194) | ($197) | ($202) | ($208) |
| PA Corporate Level EBITDA Adjustment [3] | 33 | 36 | 46 | 30 | – | – | – |
| Member Services Organization [4] | ($68) | ($57) | ($41) | ($22) | ($23) | ($24) | ($24) |
| Home Office / Corporate SG&A | ($1,573) | ($1,378) | ($1,071) | ($601) | ($365) | ($296) | ($302) |
| **Total SHC EBITDA** | **($836)** | **($798)** | **($557)** | **($539)** | **$94** | **$165** | **$204** |
| **Retail EBITDA Detail** | | | | | | | |
| 505 Store Go-Forward 4-Wall EBITDA | $406 | $223 | $185 | $58 | $184 | $204 | $240 |
| All Other 4-Wall EBITDA+ Online | 13 | (205) | (135) | (187) | (1) | 1 | 2 |
| Vendor Discounts & Other Adjustments | 239 | 304 | 238 | 95 | 94 | 97 | 101 |
| Sears Auto Center EBITDA | 152 | 117 | 83 | 37 | 41 | 44 | 47 |
| ShopYourWay EBITDA | 149 | 190 | 160 | 97 | 91 | 93 | 97 |
| **Total Retail EBITDA** | **$959** | **$628** | **$531** | **$99** | **$409** | **$439** | **$487** |

 

(1)   YTD 9-month actuals through October 2018.
(2)   Excludes SHIP in forecast.
(3)   SHC level EBITDA adjustment related to the protection agreement business.
(4)   Call center support allocated at corporate level.

9

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# We have assumed negative same-store comps turn positive in the 2nd quarter

## 2019E Monthly Budget by Business Unit

($ in millions)

| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | 2019E Total | 2020E Total | 2021E Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Retail (4-Wall + Online + SYW)** | | | | | | | | | | | | | | | |
| Same Store Sales (% Change) | (1.0%) | (1.0%) | (1.0%) | – | – | – | 1.0% | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 0.6% | 3.0% | 4.0% |
| Revenue | $447 | $525 | $463 | $538 | $613 | $461 | $492 | $536 | $468 | $680 | $850 | $506 | $6,578 | $6,794 | $7,072 |
| Gross Margin | 119 | 155 | 140 | 159 | 180 | 136 | 123 | 141 | 139 | 195 | 271 | 132 | 1,891 | 1,949 | 2,026 |
| EBITDA | 5 | 27 | 30 | 43 | 48 | 23 | 7 | 9 | 25 | 64 | 126 | 3 | 409 | 439 | 487 |
| **Home Services** | | | | | | | | | | | | | | | |
| Revenue | $131 | $163 | $130 | $129 | $163 | $135 | $132 | $163 | $125 | $129 | $159 | $131 | $1,690 | $1,610 | $1,629 |
| Gross Margin | 95 | 119 | 94 | 94 | 118 | 96 | 94 | 118 | 90 | 94 | 116 | 96 | 1,222 | 1,122 | 1,112 |
| EBITDA | 19 | 22 | 18 | 19 | 22 | 18 | 19 | 23 | 17 | 18 | 22 | 19 | 235 | 210 | 211 |
| **Financial Services** | | | | | | | | | | | | | | | |
| Revenue | $3 | $3 | $2 | $3 | $7 | $5 | $5 | $5 | $5 | $3 | $4 | $5 | $49 | $51 | $53 |
| EBITDA | 3 | 3 | 2 | 2 | 6 | 5 | 4 | 4 | 5 | 2 | 3 | 5 | 44 | 46 | 48 |
| **Other Businesses** | | | | | | | | | | | | | | | |
| Kenmore / Craftsman / DieHard EBITDA | ($1) | ($1) | ($0) | ($1) | ($1) | ($1) | ($1) | ($1) | ($1) | ($1) | ($1) | ($0) | ($7) | ($7) | ($7) |
| Monark EBITDA | (1) | 0 | (1) | (1) | (0) | 0 | 0 | 1 | (1) | (0) | (0) | (0) | (3) | (2) | (1) |
| **Overhead and Adjustments** | | | | | | | | | | | | | | | |
| Supply Chain and Innovel | ($15) | ($16) | ($15) | ($15) | ($18) | ($15) | ($15) | ($16) | ($15) | ($19) | ($23) | ($16) | ($197) | ($202) | ($208) |
| PA Corporate Level EBITDA Adjustment [1] | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Member Services Organization [2] | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (23) | (24) | (24) |
| Home Office / Corporate SG&A | (40) | (38) | (37) | (37) | (35) | (30) | (24) | (24) | (25) | (25) | (24) | (24) | (365) | (296) | (302) |
| **Total SHC EBITDA** | ($31) | ($6) | ($5) | $8 | $20 | ($1) | ($11) | ($7) | $3 | $38 | $101 | ($15) | $94 | $165 | $204 |
| **Retail EBITDA Detail** | | | | | | | | | | | | | | | |
| Brick and Mortar 4-Wall EBITDA | ($9) | $4 | $16 | $26 | $26 | $8 | ($10) | ($10) | $13 | $43 | $92 | ($14) | $184 | $204 | $240 |
| Vendor Discounts & Other Adjustments | 6 | 8 | 6 | 7 | 9 | 6 | 7 | 8 | 6 | 10 | 13 | 8 | 94 | 97 | 101 |
| Sears Auto Center EBITDA | 3 | 5 | 3 | 3 | 4 | 3 | 4 | 2 | 0 | 4 | 6 | 3 | 41 | 44 | 47 |
| Online EBITDA | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (1) | 1 | 2 |
| ShopYourWay EBITDA | 5 | 10 | 5 | 6 | 9 | 6 | 7 | 8 | 6 | 7 | 15 | 6 | 91 | 93 | 97 |
| **Total Retail EBITDA** | $5 | $27 | $30 | $43 | $48 | $23 | $7 | $9 | $25 | $64 | $126 | $3 | $409 | $439 | $487 |

(1) SHC level EBITDA adjustment related to the protection agreement business.
(2) Call center support allocated at corporate level.



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# A smaller but balanced Sears and Kmart footprint delivers $409mm of 4-wall EBITDA in 2019

## Business Overview

- Sears' Retail Business consists of its 266 Sears Stores, 239 Kmart Stores and their respective Online presences

- The business is broken into the primary categories below:

  - Hardlines – composed of Home Appliances (HA), Consumer Electronics, Tools, Lawn & Garden, Outdoor Living, Sporting Goods, Mattresses, and Monark businesses

  - Softlines – composed of Apparel, Footwear, Home, and Jewelry businesses; these businesses sell an assortment of proprietary brands as well as third-party retail options

  - Sears Auto Centers – a multi-channel automotive aftermarket service provider offering replacement tires, mechanical diagnostics and repair, vehicle maintenance products and services, batteries and battery-related accessories, as well as automotive accessories and chemicals for cars and light trucks

  - Grocery & Drugstore, Pharmacy, and Children's Entertainment & Seasonal – sells grocery, household and pet supplies, beauty care, OTC health & wellness, stationery, party supplies, children's entertainment products, seasonal merchandise, dispenses prescription drugs and performs clinical services

## Revenue by Segment



SAC, 5%
Online, 13%
Store, 82%

FY 2019E Revenue: $6.6bn Revenue

## Preliminary 2019E Forecasted Financials

| ($ mm) | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | FY19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Retail** | | | | | | | | | | | | | |
| Same Store Sales (% Change) | (1.0%) | (1.0%) | (1.0%) | – | – | – | 1.0% | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 0.6% |
| Brick and Mortar Revenue | $330 | $426 | $341 | $412 | $502 | $363 | $381 | $436 | $363 | $547 | $741 | $405 | $5,247 |
| Sears Auto Center Revenue | 27 | 34 | 26 | 27 | 32 | 25 | 25 | 29 | 21 | 27 | 33 | 23 | 329 |
| Online Revenue | 85 | 54 | 89 | 92 | 69 | 66 | 79 | 62 | 78 | 98 | 60 | 72 | 905 |
| ShopYourWay | 5 | 11 | 6 | 7 | 9 | 7 | 7 | 9 | 6 | 7 | 16 | 7 | 97 |
| **Total Revenue** | **$447** | **$525** | **$463** | **$538** | **$613** | **$461** | **$492** | **$536** | **$468** | **$680** | **$850** | **$506** | **$6,578** |
| (-) COGS | (328) | (369) | (322) | (379) | (433) | (324) | (368) | (394) | (329) | (485) | (579) | (375) | (4,687) |
| **Gross Margin** | **$119** | **$155** | **$140** | **$159** | **$180** | **$136** | **$123** | **$141** | **$139** | **$195** | **$271** | **$132** | **$1,891** |
| Margin (%) | 27% | 30% | 30% | 29% | 29% | 30% | 25% | 26% | 30% | 29% | 32% | 26% | 29% |
| (-) Operating Expenses | ($114) | ($129) | ($110) | ($116) | ($133) | ($113) | ($116) | ($133) | ($114) | ($131) | ($145) | ($128) | ($1,482) |
| **Retail EBITDA** | **$5** | **$27** | **$30** | **$43** | **$48** | **$23** | **$7** | **$9** | **$25** | **$64** | **$126** | **$3** | **$409** |
| Margin (%) | 1% | 5% | 7% | 8% | 8% | 5% | 2% | 2% | 5% | 9% | 15% | 1% | 6% |

Weil    LAZARD    M-III 

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Same-store sales comps were beginning to stabilize pre-petition



Note: Same-store comps based on Company data.

 

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## The 505 go-forward stores in the plan delivered over $7bn of revenue and over $400mm of EBITDA in 2015



Note: 505 go-forward Sears and Kmart store 4-wall financials only; excludes Sears Auto Center, Online and ShopYourWay.

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Apparel has demonstrated a major turnaround over the last year

**YTD Business Operating Profit Up $60mm vs. Adjusted LY and 2017 up $270mm Over Prior Year**

- **Right Size of the Buy**
  - Discipline around Seasonal buy by Category and by store
  - Sales plan target communicated to Merchandising team ahead of the oversea buying trip
  - Simulation done by Finance on expected In-Season and Post-Season revenue and margin for each of the Divisions and total Business Units
  - $64mm in lower markdowns vs. last year at the end of October

- **Assortment Rationalization and Brand Consolidation**
  - Number of SKUs has been reduced by 32% in FW18 vs. FW17 and by 61% vs 2016
  - Brand consolidation or expansion since we merged buying teams serving both Sears and Kmart in July 2017
  - Jaclyn Smith brand at Kmart rolled out to Sears
  - Key sellers rolled out into both formats (Basic Edition from Kmart into Sears)

- **Product Cost savings**
  - $12mm FOB savings in 2018 on top of $80mm in 2017 as a result of moving from Domestic to Import vendors
  - Receipts moved from 30% import to 60% vs. Domestic from 2016 to 2018
  - Built Cross-Sourcing capabilities, including vendor's direct design

- **Execution Excellence**
  - Implemented forecast by product and store by week since 2017
  - Put in place drilled-down reporting capabilities by key demographic, store, product, and day to identify exceptions and drive replenishment actions and inform allocation
  - Weekly Trading Meeting focused on immediate actions based on last week's results including members, store, pricing, inventory, and sourcing metrics
  - Implemented competitor data tool in order to identify assortment gap and pricing opportunities

 

14

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Part of Apparel's success is through stabilizing markdowns and points investment

## Apparel Financial Performance

- Apparel delivered $118mm in additional gross profit and $58mm in business operating profit vs. last year due to markdown savings and better sourcing cost
- Margin rate of 39.4% is 630bps improved vs. last year
- Gross margin dollars with points flat vs. last year from additional SYW investments

| ($ in millions) | October YTD | | |
|---|---|---|---|
| | 2017 | 2018 | Δ |
| **Apparel** | | | |
| Revenue | 1,435 | 1,505 | 70 |
| *% Growth* | | *4.9%* | |
| Markdowns | 414 | 350 | (64) |
| *% Markdowns* | *28.8%* | *23.2%* | *(5.6%)* |
| Gross Profit | 475 | 593 | 118 |
| *% Gross Profit* | *33.1%* | *39.4%* | *6.3%* |
| SYW | (87) | (173) | (86) |
| *% SYW* | *(6.0%)* | *(11.5%)* | *(5.4%)* |
| Gross Margin Dollars | 443 | 443 | 0 |
| *% Gross Margin Dollars* | *30.9%* | *29.5%* | *(1.4%)* |
| Expenses | 601 | 543 | (58) |
| *% Expenses* | *41.9%* | *36.1%* | *(5.8%)* |
| Business Operating Profit | (158) | (100) | 58 |
| *% Business Operating Profit* | *(11.0%)* | *(6.6%)* | *4.4%* |

Weil   LAZARD   M·III

15

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Management has significant growth initiatives to drive success in 2019

## Retail Revenue and Profitability Initiatives

| | Initiatives & Commentary | Revenue Impact | EBITDA Impact |
|---|---|---|---|
| **Margin Rate** | • In-Stock Improvements: In-stock on top items, sizing, single item replenishment, demand driven model<br>• Pricing to Fund Points: Reduction in promotional and clearance markdowns<br>• Vendor Management: Improved allowance collections by leveraging points marketing & consolidation of vendors<br>• Import Sourcing Strategy: Softlines import volume improvement in first cost | + $[225] | + $[100] |
| **Sears Stores** | • Hardlines Growth Initiatives: Free delivery, marketing, leasing & mores of Kenmore<br>• Softlines Growth Initiatives: Product initiatives, excluding replenishment enhancements<br>• Local Store Initiatives: Local strategic merchandising, promo, pricing & payroll management<br>• Lifestyles & Movers Member Journeys: Member journey category projections for lifestyles and new home/movers | + $[500] | + $[100] |
| **Kmart Stores** | • Softlines Growth Initiatives: Product initiatives, excluding replenishment enhancements<br>• Local Store Initiatives: Local strategic merchandising, promo, pricing & payroll management via simple store<br>• Toys & Other Hardlines Growth: Product initiatives in Toys, Sporting Goods & Outdoor Living<br>• Live Well/Get Fit Member Journeys: Member journey category projections for live well/get fit<br>• Own Brand Growth: Grocery and drug shift to private label brands | + $[180] | + $[50] |
| **Online** | • Exclusion of SYW Points on Free Ship: Currently members are allowed to use their SYW points for their entire purchase which includes the $35 dollar minimum threshold for free delivery<br>• eBay Member Launch: Have eBay offer a curated assortment on Sears; fill brand and assortment gaps which will drive incremental GMV<br>• Product Recommendations: Include store purchase data in recommendations online to improve recommendations for members that shop in-store and online<br>• Single Page Checkout: Customers often abandon cart / checkout due to a lengthy process; single Page Checkout will allow a customer to quickly checkout, increasing conversion<br>• Basket Building: Ability to message member when they are close to hitting a promo threshold to increase AOV and conversion | + $[100] | + $[15] |

Note: Initiatives are partially represented in the 2019 plan numbers, but not fully included.



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Large potential small footprint upside represents an opportunity to outperform the base 2019 plan as not included but will require capital investment

## Business Overview

- Targeting 100 locations by the end of 2020
- Store size: 7,500 to 20,000 sq/ft (leased)
- Local personalized shopping experience benefiting the community through the Sears and ShopYourWay ecosystem
- Products & services tailored to the community:
    - Home Appliances
    - Home Services (Repair, Parts, Home Improvement)
    - Connected Solutions (IoT products)
    - Financing options for every member
        - ShopYourWay 5-3-2-1 card
        - Leasing
        - Layaway
    - Shop Your Way Products and Services
    - Mattresses (when over 10k ft2)
    - Other community relevant products when space permits and based on local demographics and needs (seasonal product, tools, fitness, etc.)
- Highly trained consultative experts that focus on helping customers with
- large purchases and home solutions
- In-home support and consultation
- Unlimited service opportunities and solutions; Service Live

## Financial Summary (2018E)

*(4 Operating Stores)*

**Proof of Concept**

| ($ in 000s) | 2018F |
|---|---|
| Sales | $   23,882 |
| Gross Margin | 7,435 |
| GM % | 31% |
| Operating Expenses | 5,557 |
| EBITDA | 1,878 |
| EBITDA % | 8% |
| EBITDAR | 3,065 |
| EBITDAR % | 13% |
| IRR | 36% |
| Payback | 3.75 yrs |

* Assumes $475k for corporate home office expenses

| Description | Store Economics |
|---|---|
| Gross SF | 7,500 to 20,000 |
| Selling SF | 6,750 to 18,000 |
| Annualized Sales | $4M - $8M |
| Sales per/GSF | $400 - $500 |
| EBITDA $ | $.4m - $1.0m |
| EBITDA % | ~8% |
| EBITDAR $ | $.6m - $1.4m |
| EBITDAR % | ~13% |
| Capital Investment | $1.4m - $1.8m |
| IRR | 30% -60% |
| Payback | 3 - 4 yrs |

Weil   LAZARD   M-III
PARTNERS

17

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Opening small footprint stores represents a major growth opportunity



**Small Store Scale Opportunity**

Sales: 5 Yr CAGR +142%

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
|---|---|---|---|---|---|---|---|
| | $24 | $161 | $437 | $623 | $729 | $819 | |
| **Stores** | 4 | 40 | 56 | 20 | 18 | 16 | 154 |
| **Capital Investment *** | $6M | $64M | $90M | $32M | $29M | $25M | $246M |

*excludes working capital (inventory, etc.)





18

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# With a payback period of 3 – 4 years, small footprint stores have a high return on invested capital and can scale quickly

## Financial Summary

| ($ in 000s) | 2018 $ | 2019 $ | 2020 $ | 2021 $ | 2022 $ | 2023 $ | Total $ | % Sales |
|---|---|---|---|---|---|---|---|---|
| Store Count: | 4 | 44 | 100 | 120 | 138 | 154 | 154 | |
| **Net Sales** | $23,882 | $160,536 | $437,323 | $622,770 | $729,333 | $819,289 | $2,793,134 | |
| **Gross Margin** | **$7,435** | **$51,895** | **$141,368** | **$201,316** | **$235,763** | **$264,842** | **$902,619** | 32.3% |
| Fixed Payroll Expense | $526 | $3,815 | $10,393 | $14,801 | $17,333 | $19,471 | $66,339 | 2.4% |
| Variable Payroll Expense | $1,349 | $9,782 | $26,647 | $37,947 | $44,440 | $49,922 | $170,087 | 6.1% |
| Corporate Overhead | $478 | $3,211 | $8,746 | $12,455 | $14,587 | $16,386 | $55,863 | 2.0% |
| Other Expenses | $2,016 | $14,620 | $39,826 | $56,714 | $66,418 | $74,610 | $254,204 | 9.1% |
| **Expenses (Excl Rent, Depr)** | **$4,370** | **$31,427** | **$85,613** | **$121,917** | **$142,778** | **$160,388** | **$546,493** | 19.6% |
| **Rent, CAM & Tax** | $1,187 | $7,028 | $19,145 | $27,263 | $31,929 | $35,867 | $122,418 | 4.4% |
| Per Square Foot | 20 | 20 | 20 | 20 | 20 | 20 | 20 | |
| **EBITDA** | **$1,879** | **$13,439** | **$36,611** | **$52,136** | **$61,056** | **$68,587** | **$233,708** | 8.4% |
| **EBITDAR** | **$3,065** | **$20,467** | **$55,756** | **$79,399** | **$92,985** | **$104,454** | **$356,126** | 12.8% |
| Store Capital | $ 6,400 | $ 64,000 | $ 89,600 | $ 32,000 | $ 28,800 | $ 25,600 | $ 246,400 | |
| Depreciation | $ 200 | $ 1,800 | $ 6,200 | $ 10,200 | $ 11,700 | $ 12,500 | $ 42,600 | |

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# The Online team is focused on delivering significant growth to retail

## Online Growth Strategy

- The online growth plan emphasizes on driving 3 areas of focus:

  1. Improve the basics – visits, conversion rates, and average order value (AOV)

  2. Deliver needle mover initiatives

  3. Instill operational excellence

**To achieve this growth plan ($1.3bn incremental revenue by '21 and $3.5bn by '23), we will need to invest primarily in talent acquisition and technology improvements (redo); both to be defined**



Online Sales Growth (inc. Marketplace GMV)

## Key Growth Initiatives

- Improve conversion metrics over time to industry average (each 0.1 increase on a $1.5bn business equates to $150mm)

- Drive personalization with machine learning

- Leverage marketplace to accelerate selection growth with all core platform capabilities (e.g. leasing)

- Deliver a best-in-class experience for our best categories (Home Appliances and Apparel)

- Continue Mobile First – Accelerate app adoption (2x higher conversion rate than mobile web)

- Test new business models: test before you buy (apparel and footwear), appliance upgrade payment model (allow members to upgrade to latest innovation), subscription services (consumables, apparel, and other frequency categories)

- Reconfigure our fulfillment network to be "less dependent" on fusion sales

Weil    LAZARD    M·II

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Sears Home Services is a major EBITDA contributor to SHC

## Business Overview

- Sears Home Services ("SHS") provides repair services and service contracts for appliances, electronics, outdoor power equipment, residential heating & cooling systems, power tools and fitness equipment

- The largest provider of appliance and lawn & garden parts for the DIY community at 2-3x the next largest competitor

    – The PartsDirect business has over 130k SKUs on Amazon and eBay marketplaces

    – 88% of customers that purchase on Amazon are new to Sears

- SHS provides a comprehensive suite of service contracts for single appliances or warranties for all appliances in the home

- The largest broad line provider of product repair services to SHC customers, manufacturers, third party administrators, insurance & warranty companies and general consumers

- Franchise services include carpet & upholstery care, air duct cleaning & indoor air quality, garage solutions, maid services and handyman solutions

## Revenue by Segment



Parts Direct, 15%
Franchise, 1%
Service Contracts, 47%
Repair, 38%

FY 2019E Revenue: $1.7bn Revenue

## Preliminary 2019 Forecasted Financials

| ($ mm) | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | FY19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Home Services** | | | | | | | | | | | | | |
| Revenue | $131 | $163 | $130 | $129 | $163 | $135 | $132 | $163 | $125 | $129 | $159 | $131 | $1,690 |
| (-) COGS | ($36) | ($44) | ($36) | ($34) | ($45) | ($39) | ($38) | ($45) | ($36) | ($35) | ($43) | ($36) | ($468) |
| **Gross Margin** | **$95** | **$119** | **$94** | **$94** | **$118** | **$96** | **$94** | **$118** | **$90** | **$94** | **$116** | **$96** | **$1,222** |
| Margin (%) | 72% | 73% | 72% | 73% | 72% | 71% | 71% | 72% | 72% | 73% | 73% | 73% | 72% |
| (-) Operating Expenses | ($76) | ($97) | ($76) | ($75) | ($96) | ($77) | ($76) | ($95) | ($73) | ($75) | ($94) | ($77) | ($987) |
| **EBITDA** | **$19** | **$22** | **$18** | **$19** | **$22** | **$18** | **$19** | **$23** | **$17** | **$18** | **$22** | **$19** | **$235** |
| Margin (%) | 14% | 14% | 14% | 15% | 14% | 14% | 14% | 14% | 13% | 14% | 14% | 15% | 14% |

Note: Excludes SHIP.

  LAZARD M∗II

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## SHS Is Positioned for Growth with Industry-Leading Breadth of Products, Services, and Fulfillment Capabilities

*Focused on expanding SHS's position as a trusted partner for home service needs, delivering exceptional experiences through an integrated fulfillment model*



"House Experts for Homeowners"

| Current Services Portfolio | Protect (Service Contracts) | Fix (In-Home Repair) | Do-It-Yourself ("DIY") (Parts Direct) | Maintain (Franchise) |
|---|---|---|---|---|
| | • Protection Agreements<br>• Home Warranty<br>• Replacement Plans | • In-Home Service & Repair<br>• Direct to Consumer<br>• Support of Protection Agreements<br>• Serving the industry | • E-commerce site for appliances and lawn & garden parts<br>• Parts sold on 3rd party marketplaces | • Carpet & Upholstery Cleaning<br>• Duct Cleaning<br>• Floor & Tile Cleaning<br>• Handyman & Maid |

Source: Company management.

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# The SHS team sees significant opportunity to grow sales and profitability

## Included in the Forecast

**2018E**

**$1.4B Revenue**

**$165M EBITDA**

**$100M Revenue**

**Grow B2B Volume**

Significant opportunity to grow by 30% for the next two years as we reestablish relationships with B2B community

**$50M Revenue**

**Grow D2C Volume**

We have proven, through advertising and improved response times that we can grow D2C volume

**$100M Revenue**

**Invest in PD website rebuild and IHR mobile technology for techs**

Building best in class mobile centric PD website and deploying tech handheld technology

**2021E**

## Incremental Opportunities with Sufficient Capital

**2019**

**$25M EBITDA**

**Improved Contract Terms and Benefits**

Improved Financial Strength results in improved terms w/OEMs, reduced employee attrition, larger workforce & capacity, higher caliber employees

**2019**

**$60M EBITDA**

**Accelerate Market Share Growth**

Grow D2C, B2B, SHIP and HW Market Share through accelerating technician and sales capacity

**2020**

**$75M Revenue**

**Expand Service Contract Sales beyond Sears Ecosystem**

Increase Advertising and Distribution Channels to sell PA and HW to customers outside of Sears customer base

**2021**

**$40M Revenue**

**Expand Reach beyond**

Build or Buy a platform to expand reach into other trades (plumbing, electricians etc.) drive incremental revenue and to create opportunitie s to sell PA and HW

**2021E**

***Current and Incremental Opportunities to Grow Revenue and EBITDA***

sears HOME SERVICES

Weil LAZARD M-III PARTNERS

Note: Items depicted do not make up 100% of incremental revenue; 2018E excludes SHIP

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## There is a large opportunity to grow the B2B in-home repair business

### Business Overview

- In February 2018 shifted strategy to include a focus on serving the industry
  - OEMs, warranty companies, 3rd party administrators
  - There is more demand than supply in the marketplace
- Rationale was two fold:
  - Minimize dependency on Sears retail
  - Take advantage of nationwide reach and growing volume of external service call demand
- Initial skepticism in the marketplace
  - Sears pricing was much higher than the marketplace and quality was below par
- Through improved account management and pricing alignment Sears was given incremental "test" business to prove our commitment to the space
- Recently won 30% of large OEMs volume, up from 1% previously
- Large warranty provider has increased service volume awarded to SHS by 50%

### In-Home Call Volume

- B2B volume up 30% in the last 17 weeks of the year vs the first 17 week of the year
- However B2B call volume is up 44% over the last 12 weeks vs prior year and up 55% over the last 4 weeks vs prior year
- Continue to gradually increase B2B volume across the client base
- Plan for 30% volume increase in each of the next two fiscal years
- Currently have ~8% market share of the 8M+ annual B2B repair call market

B2B MARKET SIZE IS 8.6M ANNUAL REPAIRS



| B2B Type | Annual Repair Volumes (M) |
|---|---|
| OEMs | 3.1 |
| Lowes | 1.5 |
| TPAs | 1.9 |
| Home Warranty | 2.1 |
| Total | 8.6 |










24

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Assurant is providing a 3rd party protection agreement solution to ensure SHC can continue to sell protection agreements to its members

## Commentary

- Assurant has best overall economics (especially in the aftermarket), 3 year term, no upfront reserve payment, additional B2B service volume
- Pre-petition, we were collecting ~$12.5M of cash per week
  - Currently collecting ~$2.5M of cash per week due to suspended sales in 34 states
  - With Assurant solution, we will collect ~$5.5M of cash per week
- Margin impact over the life of a PA contract is $4 less than pre-petition
  - Year one (one time) 4x improvement to SHS PA contract EBITDA due to immediate revenue recognition; $8 increasing to $32 on a per policy basis
- Will be live in 39 states immediately after contract signing, final 11 states will have various timing depending on state procedures
  - Goal is to have all states live by Thanksgiving
- We will continue to use our existing programs, so no need for re-training or operational change other than collateral for term and conditions
  - Retail continues to get full commission on sales
- Sears Home Services retains ownership of the customer

## Summary of Terms

| No Underwriter | | | | | | Assurant | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Retail** | | | **Aftermarket** | | | **Retail - Sears** | | | **Aftermarket** | | |
| | Price | $200 | | Price | $144 | | Price | $200 | | Price | $144 |
| | | | | | | | | | | | |
| 25% | Loss cost | ($49) | 58% | Loss cost | ($84) | 25% | Loss cost | ($49) | 58% | Loss cost | ($84) |
| 100% | TLR | $0 | 100% | TLR | $0 | 90% | TLR | ($5) | 90% | TLR | ($9) |
| | Dealer Net | ($49) | | Dealer Net | ($84) | | Dealer Net | ($54) | | Dealer Net | ($93) |
| | | | | | | | | | | | |
| 4% | Admin Reserve | ($9) | 10% | Admin Reserve | ($15) | 4% | Admin Reserve | ($9) | 10% | Admin Reserve | ($15) |
| 0.0% | Risk/UW/IPT Fee | $0 | 0.0% | Risk/UW/IPT Fee | $0 | 6.5% | Risk/UW/IPT Fee | ($4) | 6.5% | Risk/UW/IPT Fee | ($6) |
| | Total Reserves | ($58) | | Total Reserves | ($99) | | Total Reserves | ($67) 16% | | Total Reserves | ($114) |
| | | | | | | | | | | | |
| | Revenue (Initial Cash) | $200 | | Revenue (Initial Cash) | $144 | | Revenue (Initial Cash) | $133 -33% | | Revenue (Initial Cash) | $30 |
| 50% | Retail | ($100) | 12% | Acquisition | ($17) | 50% | Retail | ($100) | 12% | Acquisition | ($17) |
| | SHS (Excess) | $100 | | SHS (Excess) | $127 | | SHS (Excess) | $33 | | SHS (Excess) | $12 |
| | | | | | | | | | | | |
| | Total Expenses | ($58) | | Total Expenses | ($99) | | Total Expenses | $0 | | Total Expenses | $0 |
| 100% | Profit Share | $0 | 100% | Profit Share | $0 | 80% | Profit Share | $4 | 80% | Profit Share | $7 |
| | Home Services | $42 | | Home Services | $28 | | Home Services | $38 -11% | | Home Services | $20 |
| | Sears Total (excl 9.5% comm) | $142 | | Sears Total | $28 | | Sears Total (excl 9.5% comm) | $138 -3% | | Sears Total | $20 |
| | Margin % | 71% | | Margin % | 19% | | Margin % | 69% | | Margin % | 14% |

Weil   LAZARD   M-III PARTNERS

25

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# The Citi credit card agreement drives incremental profitability for SHC

## Business Overview

- The SYW Financial Services Business Unit ("SYWFS") provides credit, financial products, and payments solutions through a number of retail formats, as well as in online and commercial channels

- Diverse product portfolio includes:
    - Consumer Credit (Private Label and General Purpose Cards)
    - Third Party Payment Options (Visa, MasterCard, American Express, Discover, PIN Debit)
    - Layaway
    - Gift Card
    - Alternative Financial Services (Check Cashing, Bill Pay, etc.)

- Provides financing options to support customers' ability to pay and drive incremental visits and profits to SHC retail locations and increase loyalty and of customers to SHC via the SYW rewards program

- Citi card agreement also saves the Company ~$45mm of interchange fees which are not included as part of the business unit's EBITDA

## Revenue by Segment



### Store Related Revenue [1]

43% / 57%

- Store Credit Sales Revenue
- Store New Account Revenue

### Non-Pass Through Revenue

3% / 11% / 10% / 8% / 14% / 53%

- Accrued Interest
- Credit Sales Revenue
- Leasing Income
- New Account Revenue
- Contractual Admin Fee
  Other Income / One-Time

FY 2019E Revenue: $49mm Revenue

## Preliminary 2019E Forecasted Financials

| ($ mm) | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Nov 2019 | Dec 2019 | Jan 2020 | FY19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Financial Services** | | | | | | | | | | | | | |
| Revenue | $3 | $3 | $2 | $3 | $7 | $5 | $5 | $5 | $5 | $3 | $4 | $5 | $49 |
| (-) Operating Expenses | ($0) | $0 | ($0) | ($0) | ($1) | ($0) | ($1) | ($1) | ($0) | ($1) | ($1) | ($0) | ($5) |
| **EBITDA** | **$3** | **$3** | **$2** | **$2** | **$6** | **$5** | **$4** | **$4** | **$5** | **$2** | **$3** | **$5** | **$44** |

(1) Revenue by segment based on LTM revenue as reported by the Company



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## SG&A reductions are already underway

**OCTOBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |  |  |  |

**NOVEMBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |  |

**DECEMBER**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |  |  |  |  |  |

**JANUARY**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |  |  |

Internal Date          Key Date

| DATE(S) | EVENT |
|---|---|
| October 29 | Commence wave 1 of store closures (142 stores) |
| October 30 | Initial SG&A reduction by month due from businesses with by month pacing including any investment if applicable |
| October 31 | Finalize SG&A reduction plan along with names of any initial cuts to be done before Thanksgiving. HR to begin RIF process |
| November 2 | HR submission of impacted names to Legal for review |
| November 8 | Potential buyer to notify which stores to purchase. All other stores to commence closure process |
| November 15 | SG&A wave 1 employee notices to begin |
| November 21 | Commence wave 2 of store closures [Store count TBU] |
| November 30 | SG&A wave 2 names of cuts due to HR |
| January 17 | SG&A wave 2 reduction to be completed |

Weil    LAZARD    MII PARTNERS

27

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# SHC will reduce ~$1.2bn of spend to a less than $600mm annual run-rate

| ($ in 000s) | Current Run-Rate | Run-Rate Target | Initial Cuts Identified Nov 1 | Pro Forma Run-Rate | % of Cuts Identified | % of Target Identified |
|---|---|---|---|---|---|---|
| **Core (Retailing)** | | | | | | |
| Buying Organization | 111,912 | 50,000 | (54,699) | 57,212 | 48.9% | 87.4% |
| Retail Services & Online | 89,928 | 50,000 | (40,906) | 49,022 | 45.5% | 102.0% |
| Marketing | 174,888 | 50,000 | (129,690) | 45,198 | 74.2% | 110.6% |
| **Total CORE (Retailing)** | **376,727** | **150,000** | **(225,296)** | **151,432** | **59.8%** | **99.1%** |
| **Back Office** | | | | | | |
| Legal | 33,218 | 11,207 | (17,502) | 15,716 | 52.7% | 71.3% |
| Accounting | 27,454 | 9,262 | (8,402) | 19,052 | 30.6% | 48.6% |
| FP&A | 1,759 | 593 | - | 1,759 | 0.0% | 33.7% |
| GM Team | 505 | 170 | (505) | - | 100.0% | NA |
| Internal Audit | 1,756 | 592 | (628) | 1,128 | 35.8% | 52.5% |
| Procurement | 4,940 | 1,667 | (3,410) | 1,530 | 69.0% | 108.9% |
| Risk Management | 1,453 | 490 | (298) | 1,155 | 20.5% | 42.5% |
| Treasury | 8,886 | 2,998 | (2,962) | 5,924 | 33.3% | 50.6% |
| Real Estate[1] | 28,406 | 9,583 | (1,485) | 26,921 | 5.2% | 35.6% |
| HR | 22,184 | 7,484 | (13,383) | 8,801 | 60.3% | 85.0% |
| IT | 165,500 | 55,837 | (102,650) | 62,850 | 62.0% | 88.8% |
| Holding Company & Other | 9,288 | 3,134 | (6,155) | 3,134 | 66.3% | 100.0% |
| **Total Back Office** | **305,357** | **103,018** | **(157,380)** | **147,978** | **51.5%** | **69.6%** |
| **Home Services and Other** | | | | | | |
| Home Services | 44,522 | 19,172 | (22,000) | 22,521 | 49.4% | 85.1% |
| Sears Auto Centers | 12,386 | 5,334 | (5,490) | 6,896 | 44.3% | 77.3% |
| Kenmore, Craftsman & Diehard | 11,727 | 5,050 | (6,677) | 5,050 | 56.9% | 100.0% |
| Contract Appliances | 367 | 158 | (209) | 158 | 56.9% | 100.0% |
| Builder Distributors | 930 | 400 | (529) | 400 | 56.9% | 100.0% |
| Connected Living | 1,125 | 484 | (640) | 484 | 56.9% | 100.0% |
| Service Live | 1,662 | 716 | (946) | 716 | 56.9% | 100.0% |
| **Total Home Services & Other Businesses** | **72,719** | **31,315** | **(36,493)** | **36,226** | **50.2%** | **86.4%** |
| **Shop Your Way** | **38,263** | **1,000** | **(32,449)** | **5,814** | **84.8%** | **17.2%** |
| **Gross Healthcare & Benefits** | **37,254** | **25,000** | **(12,254)** | **25,000** | **32.9%** | **100.0%** |
| Supply Chain Home Office | 11,844 | 11,480 | (364) | 11,480 | 3.1% | 100.0% |
| **Total Home Office** | **842,165** | **321,813** | **(464,235)** | **377,930** | **55.1%** | **85.2%** |
| **Call Centers[2]** | **31,733** | **23,188** | **(8,545)** | **23,188** | **26.9%** | **100.0%** |
| Supply Chain DC Operations[3] | 296,879 | 100,000 | (99,263) | 197,616 | 33.4% | 50.6% |
| **Total** | **1,170,777** | **445,001** | **(572,043)** | **598,734** | **48.9%** | **74.3%** |

*Notes:*

*(1) Real Estate current run-rate removes the $8.9mm EDA tax credit from the city of Hoffman Estates.*

*(2) $31.8mm of Call Centers is not allocated (primarily composed of $21mm of online); MSO reduction target based on the total reduction reported by the MSO team.*

*(3) Includes $73.0mm of total internal margin charge from the stores.*



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# With aggressive management, we will see over $500mm of savings in 2019

| ($ in 000s) | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **_Core (Retailing)_** | | | | | | | | | | | | | | | | | |
| Buying Organization | 9,326 | 9,326 | 8,036 | 6,747 | 6,747 | 6,747 | 6,747 | 6,747 | 4,768 | 4,768 | 4,768 | 4,768 | 4,768 | 4,768 | 4,768 | 67,107 | 57,212 |
| Retail Services & Online | 8,886 | 7,138 | 5,269 | 4,085 | 4,085 | 4,085 | 4,085 | 4,085 | 4,085 | 4,085 | 4,085 | 4,085 | 4,085 | 4,085 | 4,085 | 49,022 | 49,022 |
| Marketing | 11,861 | 12,094 | 11,318 | 3,358 | 3,358 | 3,358 | 3,358 | 3,358 | 3,358 | 3,358 | 3,358 | 3,358 | 4,991 | 4,991 | 4,991 | 45,198 | 45,198 |
| **Total CORE (Retailing)** | **30,073** | **28,558** | **24,623** | **14,190** | **14,190** | **14,190** | **14,190** | **14,190** | **12,211** | **12,211** | **12,211** | **12,211** | **13,844** | **13,844** | **13,844** | **161,327** | **151,432** |
| **_Back Office_** | | | | | | | | | | | | | | | | | |
| Legal | 1,693 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 1,310 | 15,716 | 15,716 |
| Accounting | 1,729 | 1,729 | 1,729 | 1,588 | 1,588 | 1,588 | 1,588 | 1,588 | 1,588 | 1,588 | 1,588 | 1,588 | 1,588 | 1,588 | 1,588 | 19,052 | 19,052 |
| FP&A | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 147 | 1,759 | 1,759 |
| GM Team | 53 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Internal Audit | 150 | 150 | 150 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 1,128 | 1,128 |
| Procurement | 126 | 245 | 245 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 1,530 | 1,530 |
| Risk Management | 114 | 114 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 1,155 | 1,155 |
| Treasury | 669 | 669 | 669 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 494 | 5,924 | 5,924 |
| Real Estate[1] | 2,188 | 2,402 | 2,236 | 2,267 | 2,463 | 2,067 | 2,088 | 2,239 | 2,216 | 2,064 | 2,374 | 2,297 | 2,052 | 2,380 | 2,243 | 26,750 | 26,921 |
| HR | 1,438 | 1,357 | 1,136 | 733 | 733 | 733 | 733 | 733 | 733 | 733 | 733 | 733 | 733 | 733 | 733 | 8,801 | 8,801 |
| IT | 15,427 | 14,017 | 14,660 | 16,269 | 15,680 | 15,728 | 15,747 | 15,323 | 12,252 | 6,824 | 6,689 | 6,685 | 5,237 | 5,207 | 5,238 | 126,879 | 62,858 |
| Holding Company & Other | 774 | 697 | 619 | 542 | 464 | 387 | 310 | 261 | 261 | 261 | 261 | 261 | 261 | 261 | 261 | 3,792 | 3,134 |
| **Total Back Office** | **24,508** | **22,836** | **22,997** | **23,667** | **23,197** | **22,771** | **22,734** | **22,411** | **19,318** | **13,738** | **13,913** | **13,832** | **12,139** | **12,436** | **12,331** | **212,486** | **147,978** |
| **_Home Services and Other_** | | | | | | | | | | | | | | | | | |
| Home Services | 2,428 | 2,166 | 1,732 | 1,732 | 2,166 | 1,732 | 1,732 | 2,166 | 1,732 | 1,732 | 2,166 | 1,732 | 1,732 | 2,166 | 1,732 | 22,521 | 22,521 |
| Sears Auto Centers | 85 | 252 | 534 | 622 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 575 | 6,943 | 6,896 |
| Kenmore, Craftsman & Diehard | 977 | 880 | 782 | 684 | 586 | 489 | 421 | 421 | 421 | 421 | 421 | 421 | 421 | 421 | 421 | 5,547 | 5,050 |
| Contract Appliances | 31 | 28 | 24 | 21 | 18 | 15 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 174 | 158 |
| Builder Distributors | 77 | 70 | 62 | 54 | 46 | 39 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 440 | 400 |
| Connected Living | 94 | 84 | 75 | 66 | 56 | 47 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 532 | 484 |
| Service Live | 138 | 125 | 111 | 97 | 83 | 69 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 786 | 716 |
| **Total HS & Other Businesses** | **3,830** | **3,604** | **3,320** | **3,277** | **3,531** | **2,966** | **2,874** | **3,308** | **2,874** | **2,874** | **3,308** | **2,874** | **2,874** | **3,308** | **2,874** | **36,943** | **36,226** |
| **Shop Your Way** | 738 | 189 | (264) | 481 | 413 | 662 | 565 | 304 | 764 | 553 | 369 | 718 | 256 | 233 | 497 | 5,814 | 5,814 |
| **Gross Healthcare & Benefits** | 3,104 | 2,856 | 2,608 | 2,359 | 2,111 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 25,304 | 25,000 |
| Supply Chain Home Office | 1,058 | 1,052 | 1,052 | 1,052 | 1,052 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 988 | 957 | 11,957 | 11,480 |
| **Total Home Office** | **63,312** | **59,095** | **54,336** | **45,026** | **44,493** | **43,661** | **43,435** | **43,285** | **38,240** | **32,448** | **32,872** | **32,707** | **32,186** | **32,893** | **32,587** | **453,831** | **377,930** |
| Call Centers[2] | 2,644 | 2,380 | 2,116 | 1,932 | 1,932 | 1,932 | 1,932 | 1,932 | 1,932 | 1,932 | 1,932 | 1,932 | 1,932 | 1,932 | 1,932 | 23,188 | 23,188 |
| Supply Chain DC Operations[3] | 21,730 | 28,542 | 18,361 | 16,021 | 17,617 | 18,957 | 16,204 | 17,443 | 14,087 | 15,149 | 17,536 | 15,053 | 15,857 | 18,580 | 15,807 | 198,311 | 197,616 |
| **Total** | **87,686** | **90,017** | **74,812** | **62,979** | **64,043** | **64,550** | **61,572** | **62,660** | **54,259** | **49,529** | **52,341** | **49,693** | **49,975** | **53,405** | **50,326** | **675,330** | **598,734** |

_Notes:_

_(1) Real Estate current run-rate removes the $8.9mm EDA tax credit from the city of Hoffman Estates._

_(2) $31.8mm of Call Centers is not allocated (primarily composed of $21mm of online); MSO reduction target based on the total reduction reported by the MSO team._

_(3) Includes $73.0mm of total internal margin charge from the stores._



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## We have already taken action on over 1,000 total corporate seats

| Business | Active Active | Active Total Salary | Active Average Salary | Open Positions Open | Open Positions Total Salary | Open Positions Average Salary | Total Positions | Total Total Salary | Total Average Salary |
|---|---|---|---|---|---|---|---|---|---|
| Home Services | 161 | 13,059,052 | 81,112 | 4 | 431,000 | 107,750 | 165 | 13,490,052 | 81,758 |
| Call Centers | 16 | 1,041,485 | 65,093 | - | - | NA | 16 | 1,041,485 | 65,093 |
| Retail (Central support) | 224 | 10,827,899 | 48,339 | 13 | 602,392 | 46,338 | 237 | 11,430,291 | 48,229 |
| Merchants-Off Price | 8 | 563,073 | 70,384 | 4 | 409,555 | 102,389 | 12 | 972,628 | 81,052 |
| Health and Wellness Solutions | 3 | 473,640 | 157,880 | 1 | 105,000 | 105,000 | 4 | 578,640 | 144,660 |
| Sourcing - US | 1 | 109,490 | 109,490 | - | - | NA | 1 | 109,490 | 109,490 |
| KCD | 7 | 856,200 | 122,314 | 4 | 315,000 | 78,750 | 11 | 1,171,200 | 106,473 |
| Human Resources | 28 | 1,680,000 | 60,000 | 5 | 300,000 | 60,000 | 33 | 1,980,000 | 60,000 |
| Legal | 20 | 1,803,906 | 90,195 | 11 | 986,500 | 89,682 | 31 | 2,790,406 | 90,013 |
| Finance | 13 | 1,322,804 | 101,754 | - | - | NA | 13 | 1,322,804 | 101,754 |
| Pricing | 3 | 349,500 | 116,500 | - | - | NA | 3 | 349,500 | 116,500 |
| Procurement | 16 | 1,356,901 | 84,806 | 2 | 250,000 | 125,000 | 18 | 1,606,901 | 89,272 |
| Asset Profit & Protection | 41 | 2,693,427 | 65,693 | 9 | 611,300 | 67,922 | 50 | 3,304,727 | 66,095 |
| Supply Chain/Innovel - Corp | - | - | NA | - | - | NA | - | - | NA |
| Inventory Mgmt | - | - | NA | 6 | 627,500 | 104,583 | 6 | 627,500 | 104,583 |
| Marketing/IMX/Studio | 54 | 4,292,210 | 79,485 | - | - | NA | 54 | 4,292,210 | 79,485 |
| Analytics | 6 | 627,244 | 104,541 | 2 | 392,000 | 196,000 | 8 | 1,019,244 | 127,406 |
| Online | 9 | 934,019 | 103,780 | 33 | 1,884,000 | 57,091 | 42 | 2,818,019 | 67,096 |
| Financial Services | 3 | 450,000 | 150,000 | 2 | 156,000 | 78,000 | 5 | 606,000 | 121,200 |
| Real Estate | 42 | 2,129,817 | 50,710 | 4 | 451,208 | 112,802 | 46 | 2,581,025 | 56,109 |
| Kenmore Direct - CS (Field) | 83 | 2,430,827 | 29,287 | 1 | 65,000 | 65,000 | 84 | 2,495,827 | 29,712 |
| Kenmore Direct - CD (Seattle) | 17 | 1,595,218 | 93,836 | - | - | NA | 17 | 1,595,218 | 93,836 |
| SYW* | 183 | 16,852,941 | 92,093 | 1 | 116,000 | 116,000 | 184 | 16,968,941 | 92,223 |
| MT | - | - | NA | - | - | NA | - | - | NA |
| SHI Analytics | 19 | 815,000 | 42,895 | - | - | NA | 19 | 815,000 | 42,895 |
| **Total Salary** | **957** | **66,264,653** | **69,242** | **102** | **7,702,455** | **75,514** | **1,059** | **73,967,108** | **69,846** |
| Assumed 14% Avg Benefits | 957 | 9,277,051 | 9,694 | 102 | 1,078,344 | 10,572 | 1,059 | 10,355,395 | 9,778 |
| **Total Salary & Benefits** | **957** | **75,541,704** | **78,936** | **102** | **8,780,799** | **86,086** | **1,059** | **84,322,503** | **79,625** |

* SYW has identified 80 positions to be impacted in Israel



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## IT is undergoing a major overhaul and reducing overhead from $166mm to $63mm

| ($ in 000s) | Monthly Pacing | | | | | | | | | | | | | | | FY 2019 | FY 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Jan-20 | FY 2019 | FY 2020 |
| **IT** | | | | | | | | | | | | | | | | | |
| Total Current Expenses | 16,061 | 16,280 | 15,178 | 16,442 | 17,391 | 14,440 | 14,392 | 13,978 | 14,024 | 13,928 | 13,729 | 13,688 | 13,779 | 13,616 | 12,333 | 171,738 | 158,911 |
| Less: Expense Reductions | (633) | (2,263) | (518) | (172) | (1,710) | 1,288 | 1,355 | 1,345 | (1,772) | (7,104) | (7,039) | (7,003) | (8,542) | (8,410) | (7,061) | (44,827) | (96,053) |
| **Go-Forward Expenses** | 15,427 | 14,017 | 14,660 | 16,269 | 15,680 | 15,728 | 15,747 | 15,323 | 12,252 | 6,824 | 6,689 | 6,685 | 5,237 | 5,207 | 5,271 | 126,912 | 62,858 |
| **CapEx Requirements** | - | - | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 2,504 | 30,044 | 30,044 |

~$30mm investment required to achieve a $96mm reduction in annual spend to an annual run-rate of $63mm

**Strategy to Achieve Reduction**

- Fundamental strategy change – replace legacy applications with SaaS solutions and exit internal data centers

    - Requires less FTEs to operate – less infrastructure heads and less developers ($6mm/month to $2.1mm)

- Deliverables achieved by Q3 2019:

    - Implementation of an ERP application – enables the deprecation of mainframes

    - Implementation of CRM and cloud based contact center – improves member experience as the agent will have a full 360 view of the member from a single screen and take out cost such as deprecation of legacy telephone infrastructure

    - Creation of a single product master (hierarchy) – simplifies the business. For example, same SKU used across all format. It also enables us to consolidate technology. For example, a single conveyable warehousing system, a single POS

    - Our Non FTE spend drops from $9mm/month to $2.5mm. ~ $5mm (65%) is mainframe + outsourced infrastructure support resources

- The key risks are the (1) company's ability to absorb so much change over a short time period. For example, many business processes will need to change; (2) we will discover something that we didn't foresee. We need to execute with military grade precision, extreme paranoia and issues should be surfaced and resolved in real time. Net, its all about execution.

Weil    LAZARD    M·III
PARTNERS

31

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# IT is performing an exhaustive contract review to take advantage of the chapter 11 contract rejection opportunity

## Detailed Contract Analysis

| | Reject | Eliminate | Reduce | Renegotiate | Review | Total |
|---|---|---|---|---|---|---|
| **MT Contracts** | | | | | | |
| Number | 1 | 102 | 17 | - | 7 | 127 |
| $ Value | $1,628,151 | $62,348,847 | $30,101,120 | - | $2,603,728 | $96,681,846 |
| Number Prepaid | - | 6 | 1 | - | - | 7 |
| $ Value Prepaid | - | $6,149,100 | $252,000 | - | - | $6,401,100 |
| | | | | | | |
| **Contracts that Cover MT & Non-MT** | | | | | | |
| Number | - | 2 | 13 | 1 | - | 16 |
| $ Value | - | $89,743 | $61,264,935 | $5,287,539 | - | $66,642,217 |
| Number Prepaid | - | - | - | - | - | - |
| $ Value Prepaid | - | - | - | - | - | - |
| | | | | | | |
| **Non-MT Contracts Managed by MT** | | | | | | |
| Number | - | 2 | 21 | 1 | 1 | 25 |
| $ Value | - | $8,047,945 | $13,460,133 | $1,313,264 | $582,530 | $23,403,872 |
| Number Prepaid | - | - | 1 | - | 1 | 2 |
| $ Value Prepaid | - | - | $6,353 | - | $4,253 | $10,606 |
| | | | | | | |
| **Total Contracts** | | | | | | |
| Number | 1 | 106 | 51 | 2 | 8 | 168 |
| $ Value | $1,628,151 | $70,486,535 | $104,826,188 | $6,600,803 | $3,186,258 | $186,727,935 |
| Number Prepaid | - | 6 | 2 | - | 1 | 9 |
| $ Value Prepaid | - | $6,149,100 | $258,353 | - | $4,253 | $6,411,706 |

## Summary

168 contracts reviewed with an annual expense of $187mm (out of 210 total contracts with spend of $198mm)

Summary Status:
- Reject – 1
- Eliminate – 106
- Reduce – 51
- Renegotiate – 2
- Review – 8

Key
- Reject – will reject contract
- Eliminate – will not renew
- Reduce – will reduce spend
- Renegotiate – will need to negotiate new terms – we cannot just reduce
- Review – decision not made

Weil    LAZARD    M-II PARTNERS

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Appendix



33

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Kenmore Business Summary

## Business Overview

- Kenmore is broken into two business units
  - Major Home Appliance: Markets and sells refrigerators and freezers, laundry washers and dryers, cooking ranges and ovens, and dishwashers (#5 overall ranked leader in major appliances (11% U.S. sales share))
  - Small Appliance: Markets and sells small kitchen appliances, water softeners, electric air cleaners, vaporizers, vacuums, steam cleaners, room air conditioners, outdoor grills and over the counter microwaves
- The majority of its products manufactured via contracts with OEMs
- The majority of its current distribution via Sears-branded retail stores but with rapidly growing third-party distribution (e.g. Amazon)
- No. of Households: ~100mm as of 2017E (cumulative)

## Historical Revenue[1]



($Ms)

- FY2015: $3,921
- FY2016: $3,477
- FY2017: $2,963

## Leading U.S. Market Share

*(2017E Sales Share by Brands, %)*

- Whirlpool: 17%
- GE Appliances: 15%
- Samsung: 14%
- LG: 11%
- Kenmore: 11%

## Financial Overview

*(LTM Dec 2017 Sales)*

**Major Home Appliance**

- Refrigeration 43%
- Laundry 34%
- Large Cooking 16%
- Dishwasher 7%

**$2.5bn in Sales**

**Small Appliance**

- Floorcare 27%
- Air Treatment 25%
- Microwave 17%
- Grills 17%
- Watershop 7%
- Small Cooking 7%

**$348M in Sales**

(1) Gross retail sales per CIM – Kenmore records revenue based on gross retail sales (included in Hardlines) or its license revenue from Sears sales of Kenmore branded products and third party sales

  

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# DieHard Business Summary

## Business Overview

- Leading provider of power solutions since 1967
- Current U.S. sales share of 4% for vehicle batteries
- Products sold primarily through Sears channels, with select external retail distribution
- All products are manufactured by leading contract manufacturers, required to comply with DieHard high quality standards
- Well-balanced portfolio of vehicle batteries, with well-developed strategies for new product introductions in adjacent and peripheral industries
    - Adjacent (Power): Connected Lighting Solutions, Solar Power Solutions
    - Peripheral (Lifestyle): Rugged Wear, Extreme Wear

## Revenue by Segment



- Batteries and Battery Accessories 60%
- Footwear 28%
- Tires 8%
- Other 4%

## Brand Awareness

- DieHard: 71%
- ACDelco: 53%
- DURACELL: 49%
- Duralast: 48%
- INTERSTATE BATTERIES: 47%

## Select Products



**Vehicle Batteries**
- Offered for Auto, Marine & RV, PowerSport and Lawn & Tractor

**Vehicle Battery Back Up**
- Various applications range from jumping a car battery to powering laptop within a car



**Portable Power and Lights**
- Categories include tool batteries, alkaline batteries, flashlights and LED lights



**Work Boots**
- High-performance boots, offered in both slip-ons and lace-ups



**Tires**
- Mid-Tier Passenger car tires manufactured by Kumho sold in SAC



**Consumer Electronics**
- Categories include Powerbanks, Chargers, Charging station, Phone cases and headsets



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Monark Business Summary

## Business Unit Overview

- Monark Premium Appliance Company and its affiliates form a nationwide distributor of premium home appliances that serve architects, builders, designers, developers and homeowners

- Monark represents a partnership between three leading distributors: Florida Builder Appliances, Westar Kitchen & Bath and Standards of Excellence

- Showrooms provide customers with premium cooking, cooling and cleaning appliances

- Monark operates within the larger Hardlines business

- Established June, 2015

## Store Locations

20 showrooms across Arizona, California, Florida and Nevada



## Select Brands

  

  



  

  

   

Weil   LAZARD   M-III

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# ShopYourWay Business Summary

## Business Unit Overview

- Shop Your Way (SYW) is an integrated B2C, B2B, and B2B2C platform that provides personalized data & insights, analytics, marketing and rewards capabilities to customers and partners

- Data and Insights platform draws on more than 100 billion data elements across 160 data sources and 4,000 variables enabling thousands of unique member segments

- Dynamic analytics engines & algorithms identify changes in behaviors, score members in real time, and power decisions through relevant marketing channels

- Targeted marketing capabilities optimize communications, offers, timing, and channel driving the desired member behavior

- Rewards program provides one currency earned across multiple partners to drive member loyalty

## Shop Your Way and the Sears Ecosystem



1. Compelling Value Prop + Easy Linkage drives sign-ups for programs, services, partners
2. Engagement in the ecosystem rewards members with SYW points and builds profiles for members
3. Personalization and Service platforms connect members to products and services
4. SYW Points and Partner Funding deliver value for members and create a multiplier/leveraged model for Sears/Kmart
5. Ecosystem Engagement provides feedback needed to expand / tailor the offering
6. Member Engagement / Redemption create more demand and performance for partners, which creates more opportunities for members and profitable growth
7. Journeys/ Categories creates and curate new product offerings (7a), develops the value proposition (7b), uses data to tag, target and deliver personalized offers (7c), and connects the online/instore experience (7d)
8. Markets Team drives the end-to-end system at a member, store, and community level, creating new capabilities for the go-forward integrated retail business

Weil    LAZARD    M·III

37

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# In Home Repair Overview

## Business Overview

- **In-Home Repair is a leading national provider of appliance repair services in the U.S.**

- **Provides B2C + B2B repair services for appliances, consumer electronics, outdoor power equipment, fitness equipment, power tools and HVAC systems under the Sears and A&E Factory Service brand names**

- Customers can book an appointment in-store or by phone / online and receive a preliminary diagnosis from trained professionals

- Appliance repairs are covered by a 90-day satisfaction guarantee

- **Approximately 4,500 trained in-house service techs complemented by over 800 independent contractor firms within 1099 labor network**

- Home Services has access to total network of 1.5M+ units of repair capacity via its 1099 network(1)

- **Over 40% of technicians have more than 10 years of experience**

- **Provides services in 50 states, the District of Columbia, Guam and Puerto Rico through ~50 district locations and other support locations**



## In-Home Call Volume

- B2C (Consumer Cash Pay) 27%
- B2B (Third Party Administrator) 16%
- Warranty / Protection Agreement 57%

## Appliance Repair Marketplace

- 1.4M Service Calls 6%
- 3.6M Service Calls 14%
- 4M Service Calls 16%
- 16M Service Calls 64%

- Consumer Paid (B2C)
- Third Party Admin. (B2B) *(Includes Home Services Protection Agreements)*
- In-Warranty (B2B)
- Home Warranty (B2B)

## Top B2B Customers

















38

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Service Contracts Overview

## Business Overview

•**Service Contracts: Leading national provider of service, replacement and home warranty contracts under the Sears, Kmart and A&E Factory Service brand names**

•**Two primary contracts: Protection Agreements and Home Warranty**

- Various coverage and term offers to meet customer repair and replacement needs

- Contracts cover appliances, consumer electronics, outdoor power equipment, fitness equipment, power tools, HVAC systems and select other merchandise

- In 2014, began offering the Sears Home Warranty Plan

  - Single protection plan that covers the repair or replacement of major home appliances and systems regardless of their age, brand or point of sale

•**Contracts sold via SHC retail locations (point of sale) and through post purchase / point of need channels, including telemarketing, direct mail, In-Home Repair Services technicians and call center associates**

- Currently approximately 10M contracts in force

•**In-Home: Provides repair services for appliances, consumer electronics, outdoor power equipment, fitness equipment, power tools and HVAC systems under the Sears and A&E Factory Service brand names**

- Approximately 5.2 million in-home repair and maintenance events performed for all major brands during 2017

•**Will begin offer Protection Agreements underwritten by Assurant in the coming weeks**

## Portfolio Mix (Service Contracts)



By Origin

By Contract Type

## In Home (by Repair Type)

*(Represents call volume by type)*



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# PartsDirect Overview

## Business Overview

- PartsDirect provides repair parts & accessories for most major brand appliances, outdoor power equipment, water heaters and treatment to DIY consumers

- Primarily offer OEM approved replacement parts, with accessories and maintenance products driving incremental sales

- Peak sales period: March through September, coinciding with the Spring and Lawn & Garden season

- Core business in consumer space (via website and phone), with growing marketplace / third party

## Channel Strategy

- Provide solutions via web, phone, commercial and third party marketplaces

- Fast-growing third party marketplaces (e.g., Amazon, eBay) primarily under the DIY Repairt Parts brand

- Monetization strategy to leverage parts catalog

- Digital and social media marketing strategy driving increased visits to SPD.com and website rebuild improving conversion rate of users

- ~640 dedicated expert advisors located in 8 call centers assist consumers by phone

## Customer / Need Overview

- 60% of customers primary reason for visiting site is to purchase a replacement part for their product (16% to research part replacement)

- 11.5% of purchasers are new to Parts Direct and 42% have done business with Parts Direct in the last 5 years

Note:
(1) As of FY2017

## Portfolio Business Mix(1)



### By Channel



### By Product

Note:
(1) As of FY2017



40

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Franchise Overview

## Business Overview

- Franchise services is a leading multi-service franchisor in the residential home service sector

- Services include carpet & upholstery care, air duct cleaning & indoor air quality, garage solutions, maid services and handyman solutions

- Franchise agreements are generally for a term of 10 years and are renewable

  - Revenue stream includes initial fee, royalty fee (6-10% of net revenue), monthly IT Support fee, renewal and transfer fee

- Franchise network managed through operational visits, phone calls, review of vendor statements and sales trends, customer satisfaction scores, background and insurance compliance and annual independent audits

- Over 390 active franchise territories across current franchise business models

  - In more than 375K homes annually

  - Approximately 76% service area coverage nationwide across business models

- In 2014, began offering handyman and maid services

- Approximately 40 corporate employees supporting the franchise network and branches

  - Functions include operations, IT, marketing and advertising, finance, customer service, R&D and search engine optimization

- Headquartered in Columbus, OH

## Business Mix



Handyman Solutions, 3%

Maid Services, 3%

Garage Solutions, 31%

Carpet & Air Duct Care, 63%

## Franchise Locations



KEY
- = Carpet & Air Duct Care
- = Garage Solutions
- = Handyman Solutions
- = Maid Services
- ★ = Headquarters (Columbus, OH)

Weil    LAZARD    M-III PARTNERS

41

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Liquidity Update and Illustrative Store Footprint Scenarios



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Executive Summary (cont.)

**In order to assess the potential liquidity requirements to continue to operate 505 stores, we have performed the following analysis:**

- Updated the baseline 410 store cash flow forecast through February 16, 2019 to include the following key revisions:
    - New Protection Agreement sales based on partnering with third-party underwriter to continue selling protection agreements across 34 currently suspended states earning 40% commission on gross sales
    - Revised budget includes updated inventory balances and anticipated expenses for the GOB sales
    - Revised Junior DIP financing assumptions to L+11.50%, and 3.0% upfront fee on $350M GACP loan in accordance with proposed term sheet
    - Reduction of the same store sales assumptions from a range of -12.5% to -15.0% to a flat -15.0% throughout the entire 18 week period for all go-forward stores
- Page 8 summarizes the changes in the 410 forecasts by line items; below are the key adjustments/impacts

($ in millions)

| Net Availability | February 16, 2019 Net Availability | Adjustments | Revised February 16, 2019 Net Availability |
|---|---|---|---|
| Approved Initial DIP Budget (including 3 weeks of Actual Results) | ($80.9) | | |
| Lower PA revenue and receipts | | (125.8) | |
| Additional Junior DIP Financing | | 50.0 | |
| Higher receipts in first 3 weeks | | 28.3 | |
| Lower operating expense disbursements | | 27.5 | |
| Higher interest and fees on Junior DIP | | (7.5) | |
| All Other Adjustments (capex, borrowing base, non-operating receipts, GOB, other) | | (20.7) | |
| Total Revised Assumptions Impact | | ($48.2) | |

**Revised 410 Forecast Final Total Liquidity**        ($129.2)

- Additionally, we prepared store footprint scenarios including: 505, 359 and 300 stores
    - GOB assumptions on 11/15: 505 store scenario - 40 stores, 359 scenario – 186 stores, 300 scenario – 245 stores
- We have included for reference, the 10/15/18 Budget with weeks 1-3 updated with actuals and timing variances rolled through ("10/15/18 DIP Budget with Actuals through 11/2/18") which assumed operating 410 stores

1. Max incremental availability capped at $600M

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Liquidity Summary

**The table below shows ending liquidity for three different time periods:**

*($ in millions)*

| Scenario | Total Liquidity (Net Availability + Available Cash) | | |
| --- | --- | --- | --- |
| | December 15, 2018 | December 29, 2018 | February 16, 2019 |
| 10/15/18 DIP Budget (410 Stores) * | $138.6 | $96.1 | ($61.2) |
| 10/15/18 DIP Budget with Actuals through 11/2/18 | 153.4 | 100.1 | (80.9) |
| Revised DIP Budget (410 Stores) ** | 137.4 | 164.8 | (129.2) |
| 505 Store Scenario | 102.7 | 114.6 | (198.8) |
| 359 Store Scenario | 153.3 | 189.8 | (97.5) |
| 300 Store Scenario | 179.1 | 226.1 | (53.8) |

**Based on the updated forecast assumptions, continuing to operate 505 stores through February 16, 2019 as opposed to the 410 stores included in the Initial DIP Budget would require an incremental $70M of liquidity:**

*($ in millions)*

| Comparison | Incremental Liquidity Cost to Maintain 505 Stores Until: | | |
| --- | --- | --- | --- |
| | December 15, 2018 | December 29, 2018 | February 16, 2019 |
| vs. Revised DIP Budget (410 Stores) | ($34.7) | ($50.2) | ($69.6) |
| vs. 359 Alternative Store Scenario | ($50.6) | ($75.2) | ($101.3) |
| vs. 300 Alternative Store Scenario | ($76.4) | ($111.5) | ($145.0) |

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 410 Store Footprint Comparison

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 10/15/18 DIP Budget (410 Stores)*

**Initial Approved Budget (Scenario - 410 GFS)**

| | Line Item | October |  |  | November |  |  |  | December |  |  |  |  | January |  |  |  | February |  | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month** | | | | | | | | | | | | | | | | | | | | |
| **Week** | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| **Retail Week EoP** | | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 1-18 |
| **Unique Week** | | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 1-18 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | | |
| [1] | Normal Course Net Merchandise Receipts | $107.9 | $110.6 | $104.8 | $91.7 | $95.1 | $112.8 | $161.8 | $77.8 | $96.8 | $97.5 | $123.8 | $163.8 | $88.8 | $75.1 | $64.1 | $61.8 | $56.5 | $56.4 | $1,747.0 |
| [2] | Plus: GOB Sales Receipts | 0.0 | 0.0 | 40.1 | 50.9 | 49.9 | 91.4 | 95.4 | 95.1 | 93.0 | 86.2 | 73.7 | 67.6 | 52.8 | 29.0 | 25.2 | 15.8 | 0.0 | 0.0 | 866.0 |
| [3] | Plus: Other Cash Receipts | 52.7 | 55.2 | 54.6 | 38.8 | 39.1 | 44.5 | 58.8 | 31.3 | 36.4 | 36.6 | 43.6 | 54.3 | 50.7 | 50.7 | 50.7 | 50.7 | 38.7 | 38.7 | 826.0 |
| [4] | Plus: Non-Operating Receipts | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 0.0 | 2.8 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 9.2 |
| [5] | Plus: TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Total Cash Receipts** | $160.6 | $165.8 | $201.8 | $181.5 | $184.1 | $248.7 | $318.8 | $204.1 | $226.1 | $220.2 | $241.1 | $287.2 | $192.3 | $154.8 | $140.0 | $130.6 | $95.1 | $95.1 | $3,448.2 |
| | **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| [6] | Merchandise Vendors | $64.7 | $77.9 | $80.0 | $74.3 | $61.0 | $79.0 | $80.9 | $45.2 | $55.0 | $87.8 | $80.0 | $53.6 | $54.3 | $49.5 | $46.7 | $44.8 | $41.1 | $44.5 | $1,120.3 |
| [7] | Occupancy | 0.0 | 0.0 | 0.0 | 13.2 | 1.5 | 0.0 | 0.0 | 11.0 | 3.7 | 0.0 | 0.0 | 0.0 | 14.7 | 0.0 | 0.0 | 0.0 | 11.0 | 3.7 | 58.8 |
| [8] | Payroll, Taxes, and Benefits | 47.5 | 30.9 | 73.8 | 32.0 | 61.1 | 32.6 | 74.3 | 40.3 | 41.9 | 34.0 | 46.3 | 33.2 | 43.1 | 29.2 | 29.3 | 43.1 | 32.4 | 35.5 | 760.3 |
| [9] | Other SG&A Disbursements | 77.9 | 81.5 | 61.5 | 73.3 | 60.2 | 66.3 | 82.7 | 75.3 | 54.6 | 73.1 | 67.3 | 65.6 | 72.3 | 68.1 | 65.3 | 61.9 | 58.9 | 52.5 | 1,228.1 |
| [10] | GOB Rent | 0.0 | 0.0 | 0.0 | 17.4 | 1.9 | 0.0 | 0.0 | 14.5 | 4.8 | 0.0 | 0.0 | 0.0 | 14.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 53.4 |
| [11] | GOB Add'l Expenses | 0.0 | 0.0 | 8.5 | 8.6 | 8.7 | 16.7 | 16.9 | 17.0 | 17.2 | 17.2 | 16.9 | 16.7 | 16.5 | 8.3 | 8.2 | 8.0 | 0.0 | 0.0 | 185.3 |
| [12] | GOB Liquidator Fees | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.6 |
| [13] | Less: GOB Store Level Expenses Add-Back | 0.0 | 0.0 | (4.8) | (4.8) | (4.8) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (10.7) | (10.7) | (10.7) | (14.8) | (14.8) | (155.6) |
| | **Total Operating Disbursements** | $190.1 | $190.2 | $219.0 | $214.2 | $189.6 | $184.6 | $244.9 | $193.5 | $177.3 | $202.2 | $200.5 | $159.2 | $205.6 | $144.3 | $138.8 | $147.1 | $128.6 | $121.4 | $3,251.2 |
| [14] | Less: CapEx | 1.4 | 1.7 | 1.1 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.6 | 1.7 | 22.2 |
| | **Net Cash Flow** | ($30.9) | ($26.2) | ($18.3) | ($34.4) | ($6.7) | $63.1 | $72.8 | $9.6 | $47.4 | $17.0 | $39.8 | $126.9 | ($14.4) | $9.6 | $0.1 | ($17.5) | ($35.1) | ($28.0) | $174.8 |
| | **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | |
| [15] | Utility Deposits | $6.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $6.7 |
| [16] | Less: Professional Fees | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 12.4 | 0.0 | 0.0 | 0.0 | 0.0 | 12.5 | 0.0 | 0.0 | 0.0 | 18.5 | 45.4 |
| [17] | Critical Vendor Payments | 19.6 | 9.8 | 9.8 | 9.8 | 9.8 | 9.8 | 9.8 | 9.8 | 9.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 |
| [18] | Insurance Payments | 1.4 | 1.4 | 1.4 | 0.7 | 0.7 | 0.7 | 0.7 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| [19] | Gift Card Redemptions | 1.3 | 1.3 | 1.3 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 14.9 |
| [20] | KEIP / KERP | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.5 |
| [21] | Credit Card Holdbacks | 2.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.2 |
| [22] | PTO | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 7.5 |
| [23] | Post-Petition TSA/CSA | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Chapter 11 Related** | $31.3 | $12.5 | $18.8 | $11.7 | $13.7 | $11.7 | $11.7 | $11.3 | $23.7 | $1.5 | $1.5 | $5.7 | $6.3 | $12.5 | $0.0 | $3.3 | $0.0 | $18.5 | $195.7 |
| [26] | Less: Cash Interest | 3.7 | 3.6 | 3.7 | 3.8 | 3.9 | 3.9 | 3.9 | 3.9 | 3.9 | 3.8 | 3.8 | 3.7 | 3.8 | 3.9 | 3.9 | 3.9 | 3.9 | 4.0 | 68.8 |
| [27] | Less: Financing Fees | 22.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 22.5 |
| | **Total Other Non-Operating Disbursements** | $26.2 | $3.6 | $3.7 | $3.8 | $3.9 | $3.9 | $3.9 | $3.9 | $3.9 | $3.8 | $3.8 | $3.7 | $3.8 | $3.9 | $3.9 | $3.9 | $3.9 | $4.0 | $91.3 |
| [28] | Unencumbered Leases | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| [29] | Unencumbered RE | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| | **Total Asset Sales** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $53.4 |
| [30] | Net Cash Flow Before ABL Paydown, ex TL | ($88.4) | ($42.3) | ($40.8) | ($49.9) | ($24.3) | $47.5 | $57.2 | ($5.6) | $19.9 | $11.7 | $34.5 | $117.5 | ($15.6) | $2.2 | $5.1 | ($15.8) | ($30.1) | ($41.6) | ($58.9) |
| [31] | Term Loan Draw | $111.9 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $111.9 |
| | **Net Cash Flow Before ABL Paydown, wTL** | $23.5 | ($42.3) | ($40.8) | ($49.9) | ($24.3) | $47.5 | $57.2 | ($5.6) | $19.9 | $11.7 | $34.5 | $117.5 | ($15.6) | $2.2 | $5.1 | ($15.8) | ($30.1) | ($41.6) | $53.0 |
| [32] | Other Financing | 32.4 | $42.3 | $40.8 | $49.9 | $24.3 | ($47.5) | ($57.2) | $5.6 | ($19.9) | ($11.7) | ($34.5) | ($117.5) | $15.6 | ($2.2) | ($5.1) | $15.8 | $30.1 | $41.6 | ($27.1) |
| | **Net Cash Flow** | ($86.0) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | ($86.0) |
| | Available Cash | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | $0.0 |
| | Net Availability | 278.4 | 241.3 | 312.7 | 231.3 | 183.0 | 154.7 | 237.3 | 175.1 | 138.6 | 99.0 | 96.1 | 133.4 | 85.1 | 69.0 | 36.1 | (10.5) | (27.3) | (61.2) | (61.2) |
| [33] | **Memo: Total Liquidity (Availability + Cash)** | $278.4 | $241.3 | $312.7 | $231.3 | $183.0 | $154.7 | $237.3 | $175.1 | $138.6 | $99.0 | $96.1 | $133.4 | $85.1 | $69.0 | $36.1 | ($10.5) | ($27.3) | ($61.2) | ($61.2) |
| | Memo: Window Reserve | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| | Memo: Merchandise COGS | 76.6 | 78.5 | 74.4 | 65.1 | 67.5 | 114.9 | 90.1 | 55.2 | 68.7 | 69.2 | 87.9 | 116.1 | 63.0 | 53.3 | 45.5 | 43.9 | $40.2 | $40.1 | 1,240.5 |
| | Memo: GOB COGS | 0.0 | 0.0 | 26.2 | 30.0 | 32.3 | 59.7 | 64.9 | 66.5 | 70.0 | 69.3 | 66.0 | 62.8 | 56.3 | 30.1 | 27.5 | 23.6 | $0.0 | $0.0 | 685.1 |

* Filed with Bankruptcy Court on 10/15/18

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 10/15/18 DIP Budget with Actuals through 11/2/18

### Project Blue - Rolling 13-Week DIP Budget (3 + 13)

| Month | October | | | November | | | | December | | | | | January | | | | February | | Total | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks | Weeks |
| Actual / Forecast | ACT | ACT | ACT | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | | |
| Week EoP | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 1-13 | 1-18 |
| Unique Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | | |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | | |
| [1] Normal Course Net Merchandise Receipts | $127.0 | $111.6 | 151.0 | $91.7 | $95.1 | $112.8 | $161.8 | $77.8 | $96.8 | $97.5 | $123.8 | $163.6 | $88.8 | $75.1 | $64.1 | $61.8 | $56.5 | $56.4 | $1,499.3 | $1,613.2 |
| [2] GOB Sales Receipts | 0.0 | 0.0 | 0.0 | 50.9 | 49.9 | 91.4 | 95.4 | 95.1 | 93.0 | 86.2 | 73.7 | 67.6 | 52.8 | 29.0 | 25.2 | 15.8 | 0.0 | 0.0 | 755.9 | 825.9 |
| [3] Other Cash Receipts | 64.7 | 56.9 | 41.1 | 38.8 | 39.1 | 44.5 | 58.8 | 31.3 | 36.4 | 36.5 | 43.6 | 54.3 | 50.7 | 50.7 | 50.7 | 50.7 | 38.7 | 38.7 | 596.9 | 826.4 |
| [4] Non-Operating Receipts | 0.0 | 0.0 | 4.9 | 0.0 | 0.0 | 0.0 | 2.8 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 9.5 | 11.8 |
| [5] TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Total Operating Receipts** | $191.7 | $168.5 | $197.0 | $181.5 | $184.1 | $248.7 | $318.8 | $204.2 | $226.2 | $220.2 | $241.1 | $287.3 | $192.3 | $154.8 | $140.0 | $130.6 | $95.2 | $95.1 | $2,861.6 | $3,477.4 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | |
| [6] Merchandise Vendors | $21.0 | $71.1 | $52.0 | $90.0 | $76.7 | $94.7 | $96.6 | $60.9 | $55.0 | $87.8 | $80.0 | $53.6 | $54.3 | $49.5 | $46.7 | $44.8 | $45.9 | $49.6 | $893.7 | $1,130.3 |
| [7] Occupancy | 0.0 | 0.0 | 0.0 | 13.2 | 1.5 | 0.0 | 0.0 | 11.0 | 3.7 | 0.0 | 0.0 | 0.0 | 14.7 | 0.0 | 0.0 | 0.0 | 11.0 | 3.7 | 44.1 | 58.8 |
| [8] Payroll, Taxes, and Benefits | 44.0 | 27.8 | 65.2 | 32.0 | 61.1 | 32.6 | 74.3 | 40.3 | 41.9 | 34.0 | 46.3 | 33.2 | 43.1 | 29.2 | 29.3 | 43.1 | 32.4 | 35.5 | 575.7 | 745.1 |
| [9] Other SG&A Disbursements | 15.9 | 52.9 | 46.1 | 94.2 | 81.1 | 87.2 | 103.6 | 96.2 | 64.6 | 73.1 | 67.3 | 65.6 | 72.3 | 68.1 | 65.3 | 61.9 | 58.9 | 52.5 | 920.0 | 1,226.7 |
| [10] GOB Rent | 0.0 | 0.0 | 0.0 | 17.4 | 1.9 | 0.0 | 0.0 | 14.5 | 4.8 | 0.0 | 0.0 | 0.0 | 14.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 53.4 | 53.4 |
| [10] GOB Add'l Expenses | 0.0 | 0.0 | 0.0 | 8.6 | 8.7 | 16.7 | 16.9 | 17.0 | 17.2 | 17.2 | 16.9 | 16.7 | 16.5 | 8.3 | 8.2 | 8.0 | 0.0 | 0.0 | 152.4 | 176.9 |
| [10] GOB Liquidator Fees | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.4 | 0.6 |
| [10] Less: GOB Store Level Expenses Add-Back | 0.0 | 0.0 | 0.0 | (4.8) | (4.8) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (9.9) | (10.7) | (10.7) | (10.7) | (10.7) | (10.4) | (89.1) | (142.4) |
| **Total Operating Disbursements** | $80.9 | $151.7 | $163.3 | $250.8 | $226.3 | $221.2 | $281.5 | $230.2 | $177.3 | $202.2 | $200.5 | $159.2 | $205.6 | $144.3 | $138.8 | $147.1 | $137.5 | $130.9 | $2,550.7 | $3,249.3 |
| [11] Less: CapEx | 0.0 | 0.0 | 0.0 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.6 | 1.7 | 11.5 | 17.9 |
| **Net Cash Flow** | $110.8 | $16.8 | $33.8 | ($71.0) | ($43.3) | $26.4 | $36.2 | ($27.0) | $47.5 | $17.0 | $39.8 | $127.0 | ($14.4) | $9.6 | $0.1 | ($17.5) | ($44.0) | ($37.5) | $299.5 | $210.1 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | | |
| [12] Utility Deposits | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 | $9.2 |
| [13] Professional Fees | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.9 | 0.0 | 0.0 | 0.0 | 23.5 | 19.4 | 58.8 |
| [14] Critical Trade Motion | 0.0 | 9.1 | 0.0 | 15.0 | 15.0 | 15.0 | 15.0 | 11.0 | 9.0 | 8.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 | 98.0 |
| [15] Insurance Payments | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 | 8.6 |
| [16] Gift Card Redemptions | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 | 10.9 |
| [17] KEIP / KERP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 | 12.6 |
| [18] Credit Card Holdbacks | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| PTO | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 4.2 | 7.5 |
| Post-Petition TSA/CSA | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Chapter 11 Related** | $0.0 | $9.1 | $0.0 | $16.2 | $31.8 | $26.8 | $16.2 | $12.2 | $27.6 | $10.1 | $11.2 | $5.4 | $6.3 | $15.9 | $0.0 | $3.3 | $0.0 | $23.5 | $162.9 | $205.6 |
| [19] Cash Interest | $0.9 | $1.1 | $1.1 | $4.0 | $4.0 | $3.9 | $3.9 | $4.0 | $4.0 | $4.0 | $4.0 | $3.9 | $4.0 | $4.0 | $4.0 | $4.0 | $4.1 | $4.1 | $42.8 | $63.1 |
| [20] Financing Fees | 10.3 | 0.0 | 0.0 | 0.0 | 13.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 23.8 | 23.8 |
| **Total Other Non-Operating Disbursements** | $11.2 | $1.1 | $1.1 | $4.0 | $17.5 | $3.9 | $3.9 | $4.0 | $4.0 | $4.0 | $4.0 | $3.9 | $4.0 | $4.0 | $4.0 | $4.0 | $4.1 | $4.1 | $66.6 | $86.9 |
| [21] Unencumbered Leases | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| [22] Unencumbered RE | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| **Total Asset Sales** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $53.4 |
| [24] Net Cash Flow Before ABL paydown, ex TL | $99.6 | $6.6 | $32.7 | ($91.2) | ($92.6) | ($4.3) | $16.0 | ($43.3) | $15.9 | $2.9 | $34.6 | $117.7 | ($15.7) | ($1.4) | $5.0 | ($16.0) | ($39.2) | ($56.2) | $78.9 | ($28.9) |
| TL Draws | $111.9 | $0.0 | $0.0 | $0.0 | $111.9 | $0.0 | $94.1 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $94.1 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $411.9 | $411.9 |
| **Net Cash Flow Before ABL paydown, w/ TL** | $211.5 | $6.6 | $32.7 | ($91.2) | $19.3 | ($4.3) | $110.1 | ($43.3) | $15.9 | $2.9 | $34.6 | $117.7 | $78.3 | ($1.4) | $5.0 | ($16.0) | ($39.2) | ($56.2) | $490.8 | $383.0 |
| [25] ABL Revolver Draws / (Paydowns) | $0.0 | $0.0 | $0.0 | $0.0 | ($262.7) | $0.0 | $110.1) | $43.3 | ($15.9) | ($2.9) | ($34.6) | ($117.7) | ($78.3) | $1.4 | ($5.0) | $16.0 | $39.2 | $56.2 | ($574.6) | ($466.8) |
| [26] **Net Cash Flow after Financing** | $211.5 | $6.6 | $32.7 | ($91.2) | ($243.3) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | ($83.8) | ($83.8) |
| [27] Available Cash | $295.3 | $301.9 | $334.6 | $243.3 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| [28] Net Availability | 155.5 | 115.0 | 66.5 | 93.7 | 329.1 | 247.8 | 289.5 | 189.6 | 153.4 | 104.0 | 100.1 | 137.0 | 91.1 | 73.5 | 39.7 | (8.1) | (36.3) | (80.9) | 91.1 | (80.9) |
| [29] **Memo: Total Liquidity (Availability + Cash)** | $450.8 | $416.9 | $401.1 | $337.1 | $329.1 | $247.8 | $289.5 | $189.6 | $153.4 | $104.0 | $100.1 | $137.0 | $91.1 | $73.5 | $39.7 | ($8.1) | ($36.3) | ($80.9) | $91.1 | ($80.9) |
| Wind-Down Reserve Balance | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $17.8 | $26.7 | $35.6 | $44.5 | $53.4 | $8.9 | $53.4 |
| Memo: Merchandise COGS | 133.0 | 135.2 | 133.7 | 65.1 | 67.5 | 114.9 | 80.1 | 55.2 | 68.7 | 69.2 | 87.9 | 116.1 | 63.0 | 53.3 | 45.5 | 43.9 | 40.1 | 40.1 | 1,189.8 | 1,412.7 |
| Memo: GOB COGS | NA | NA | NA | 30.0 | 32.3 | 59.7 | 64.9 | 66.5 | 70.0 | 69.3 | 66.0 | 62.8 | 56.3 | 30.1 | 27.5 | 23.6 | 0.0 | 0.0 | 577.7 | 658.8 |
| Memo: Borrowing Base | 1,798.5 | 1,757.9 | 1,709.4 | 1,736.7 | 1,709.3 | 1,632.4 | 1,564.0 | 1,507.3 | 1,455.2 | 1,403.0 | 1,364.5 | 1,283.7 | 1,159.5 | 1,143.3 | 1,104.5 | 1,072.7 | 1,083.6 | 1,095.2 | 1,159.5 | 1,095.2 |
| Memo: Sr DIP & 1L Borrowings | 1,642.9 | 1,642.9 | 1,642.9 | 1,642.9 | 1,380.3 | 1,384.6 | 1,274.5 | 1,317.7 | 1,301.9 | 1,299.0 | 1,264.4 | 1,146.7 | 1,068.4 | 1,069.7 | 1,064.8 | 1,080.7 | 1,119.9 | 1,176.1 | 1,068.4 | 1,176.1 |
| Memo: Jr DIP Borrowings | | | | | 111.9 | 111.9 | 206.0 | 206.0 | 206.0 | 206.0 | 206.0 | 206.0 | 300.0 | 300.0 | 300.0 | 300.0 | 300.0 | 300.0 | 300.0 | 300.0 |

SEARS HOLDINGS   sears   kmart   SHOP YOUR WAY

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Summary Bridge: (10/15/18 DIP Budget with 3 weeks of actual vs. Revised DIP Budget)

| | Actualized DIP Budget 18 Weeks | Updated 410 Budget 18 Weeks | Variance B / (W) 18 Weeks | Notes |
|---|---|---|---|---|
| **CASH RECEIPTS** | | | | |
| Normal Course Net Merchandise Receipts | $1,813.2 | $1,841.5 | $28.3 | Includes aggregated Wave 1 GOB sales (Actuals through Week 3) |
| Plus: GOB Sales Receipts | 825.9 | 811.6 | (14.3) | A portion of GOB sales are comingled with normal course receipts; to be updated when GOB reporitng in place |
| Plus: Other Cash Receipts | 826.4 | 700.7 | (125.8) | Change to PA sales plan and based on new underwriting partner and temporary sales dislocation |
| Plus: Non-Operating Receipts | 11.8 | 6.8 | (5.0) | Does not include 3 weeks of actuals aggregated into net other cash receipts |
| Plus: TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | Line now included for scenario analysis purposes - No assumption in baseline model |
| **Total Cash Receipts** | **$3,477.4** | **$3,360.6** | **($116.8)** | |
| **OPERATING DISBURSEMENTS** | | | | |
| Merchandise Vendors | $1,130.3 | $1,121.6 | $8.6 | Lower disbursements than forecast due to short-term transportation bottlenecks |
| Occupancy | 58.8 | 92.3 | (33.5) | Reclassification of DC rent to Occupancy cost |
| Payroll, Taxes, and Benefits | 745.1 | 743.8 | 1.3 | No material changes to forecast - *still pending update from SG&A team* |
| Other SG&A Disbursements | 1226.7 | 1208.7 | 17.9 | Includes: reclassification of DC rent to Occupancy cost, update of Company non-merch forecast, change in forecasting aggregation methodolgy, and captures yet-to-be-allocated GOB expenses |
| GOB Rent | 53.4 | 41.9 | 11.5 | To be updated following initial GOB reporting; potential offsets across other GOB expenses |
| GOB Add'l Expenses | 176.9 | 135.6 | 41.3 | A significant portion of GOB expenses are comingled with SG&A disbursements; to be updated when GOB reporting in place |
| GOB Liquidator Fees | 0.6 | 0.4 | 0.1 | No material changes to forecast |
| Less: GOB Store Level Expenses Add-Back | (142.4) | (128.0) | (14.4) | To be updated following initial GOB reporting |
| **Total Operating Disbursements** | **$3,249.3** | **$3,216.4** | **$32.9** | |
| Less: CapEx | 17.9 | 16.8 | 1.1 | Week 1-3 actuals lower than forecast - treated as permanent |
| **Net Cash Flow** | **$210.1** | **$127.4** | **($82.8)** | |
| **NON-OPERATING CASH FLOW** | | | | |
| Chapter 11 Related | 205.6 | 205.6 | 0.0 | *Weeks-1-3 variances treated as timing* |
| Less: Cash Interest | 63.1 | 68.4 | (5.3) | Reflects Junior DIP interest |
| Less: Financing Fees | 23.8 | 26.1 | (2.3) | Includes Junior DIP fees |
| **Total Other Non-Operating Disbursements** | **$86.9** | **$94.4** | **($7.5)** | |
| Unencumbered Assets | 53.4 | 53.4 | 0.0 | No material changes to assumptions in baseline model |
| Excess Proceeds | 0.0 | 0.0 | 0.0 | Line now included for scenario analysis purposes - No assumption in baseline model |
| **Total Asset Sales** | **$53.4** | **$53.4** | **$0.0** | |
| Net Cash Flow Before ABL Paydown, ex TL | (28.9) | (119.2) | (90.3) | Negative variance primarily attributable to reforecast of PA sales |
| Other Financing | (466.8) | (77.7) | 389.1 | Reclassification of $350mm Junior DIP + $95mm additional financing need due to cash burn |
| **Net Cash Flow** | **($83.8)** | **($85.0)** | **($1.2)** | |
| Available Cash - Ending | 0.0 | 0.0 | 0.0 | |
| Net Availability | (80.9) | (129.2) | (48.2) | |
| **Memo: Total Liquidity (Availability + Cash)** | **($80.9)** | **($129.2)** | **($48.2)** | |
| Memo: Wind-down Reserve Balance | 53.4 | 53.4 | 0.0 | |
| Memo: Merchandise COGS | 1,412.7 | 1,164.9 | (247.8) | |
| Memo: GOB COGS | 658.8 | 661.6 | 2.8 | |
| Memo: Borrowing Base | 1,095.2 | 1,086.1 | (9.1) | |
| Memo: Sr. DIP & 1L Borrowings | 1,176.1 | 1,215.2 | 39.1 | |

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Revised DIP Budget (410 Stores)

**Project Blue - Cash Flow Forecast, Go-Forward Same-Store Sales of (15.0%) with 410 Go-Forward Stores**

| Month | | October | | | November | | | | December | | | | | January | | | | February | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| Retail Week EoP | | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | |
| Unique Week | | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 1 - 18 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | | |
| Normal Course Net Merchandise Receipts | [1] | $133.1 | $111.6 | $151.0 | $94.4 | $111.2 | $81.8 | $167.7 | $81.9 | $102.2 | $100.1 | $125.6 | $168.2 | $91.1 | $76.5 | $65.6 | $63.2 | $58.2 | $58.0 | $1,841.5 |
| Plus: GOB Sales Receipts | [2] | 0.0 | 0.0 | 0.0 | 52.5 | 50.3 | 90.3 | 95.3 | 96.4 | 90.0 | 83.9 | 74.5 | 64.5 | 50.1 | 27.6 | 21.8 | 14.5 | 0.0 | 0.0 | 811.6 |
| Plus: PA Sales | [3] | 2.5 | 11.1 | 4.9 | 2.3 | 6.0 | 6.1 | 9.3 | 7.7 | 6.4 | 6.7 | 6.2 | 6.3 | 6.8 | 7.1 | 6.7 | 6.4 | 6.6 | 6.2 | 115.1 |
| Plus: Other Cash Receipts | [4] | 50.7 | 45.8 | 41.1 | 20.0 | 20.0 | 20.0 | 20.0 | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 585.5 |
| Plus: Non-Operating Receipts | [5] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 6.8 |
| Plus: TSA & CSA Receipts | [6] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Cash Receipts** | | **$186.3** | **$168.5** | **$197.0** | **$169.2** | **$187.6** | **$198.3** | **$295.1** | **$210.4** | **$223.1** | **$215.1** | **$230.8** | **$265.2** | **$189.0** | **$152.1** | **$134.9** | **$127.2** | **$105.6** | **$105.1** | **$3,360.6** |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | |
| Merchandise Vendors | [7] | $21.0 | $71.1 | $52.0 | $86.1 | $91.5 | $98.8 | $76.5 | $71.9 | $80.7 | $72.3 | $44.3 | $46.0 | $52.9 | $50.3 | $48.4 | $49.5 | $53.4 | $54.0 | $1,121.6 |
| Occupancy | [8] | 0.0 | 0.0 | 0.0 | 17.8 | 3.1 | 1.2 | 1.2 | 15.1 | 5.8 | 1.2 | 1.2 | 1.2 | 19.7 | 1.2 | 1.2 | 1.2 | 15.1 | 5.8 | 92.3 |
| Payroll, Taxes, and Benefits | [9] | 44.0 | 27.8 | 65.2 | 31.1 | 59.7 | 31.4 | 72.8 | 39.3 | 62.7 | 33.2 | 42.1 | 31.2 | 39.3 | 27.2 | 26.6 | 43.0 | 29.5 | 37.6 | 743.8 |
| Other SG&A Disbursements | [10] | 15.9 | 52.9 | 46.1 | 95.7 | 79.1 | 89.7 | 101.6 | 89.6 | 57.8 | 77.6 | 65.1 | 61.5 | 65.3 | 57.0 | 67.3 | 56.6 | 70.2 | 59.6 | 1,208.7 |
| GOB Rent | [11] | 0.0 | 0.0 | 0.0 | 14.0 | 1.6 | 0.0 | 0.0 | 11.7 | 3.9 | 0.0 | 0.0 | 0.6 | 10.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 41.9 |
| GOB Add'l Expenses | [11] | 0.0 | 0.0 | 0.0 | 6.8 | 6.8 | 12.9 | 13.1 | 13.2 | 13.3 | 13.2 | 13.1 | 12.9 | 12.6 | 6.1 | 5.9 | 5.8 | 0.0 | 0.0 | 135.6 |
| GOB Liquidator Fees | [11] | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| Less: GOB Store Level Expenses Add-Back | [11] | 0.0 | 0.0 | 0.0 | (5.5) | (5.5) | (10.6) | (10.6) | (9.4) | (9.4) | (9.4) | (9.4) | (9.4) | (8.0) | (8.0) | (8.0) | (8.0) | (8.2) | (8.2) | (128.0) |
| **Total Operating Disbursements** | | **$80.9** | **$151.7** | **$163.3** | **$246.2** | **$236.1** | **$223.5** | **$254.6** | **$231.4** | **$214.8** | **$189.1** | **$156.5** | **$143.5** | **$192.6** | **$133.7** | **$141.5** | **$148.1** | **$160.0** | **$148.9** | **$3,216.4** |
| Less: CapEx | [12] | 0.0 | 0.0 | 0.0 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.1 | 1.1 | 16.8 |
| **Net Cash Flow** | | **$105.4** | **$16.8** | **$33.8** | **($78.7)** | **($49.7)** | **($26.2)** | **$39.4** | **($22.0)** | **$6.9** | **$25.0** | **$73.5** | **$120.6** | **($4.7)** | **$17.5** | **($7.7)** | **($22.0)** | **($55.5)** | **($45.0)** | **$127.4** |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | | |
| Utility Deposits | [13] | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 |
| Less: Professional Fees | [14] | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.9 | 0.0 | 0.0 | 0.0 | 23.5 | 58.8 |
| Critical Vendor Payments | [15] | 0.0 | 9.1 | 0.0 | 15.0 | 15.0 | 15.0 | 15.0 | 11.0 | 9.0 | 8.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 |
| Insurance Payments | [16] | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| Gift Card Redemptions | [17] | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 |
| KEIP / KERP | [18] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 |
| Credit Card Holdbacks | [19] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| PTO | [20] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 7.5 |
| Post-Petition TSA/CSA | [21] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Chapter 11 Related** | | **$0.0** | **$9.1** | **$0.0** | **$16.2** | **$31.8** | **$26.8** | **$16.2** | **$12.2** | **$27.6** | **$10.1** | **$1.2** | **$5.4** | **$6.3** | **$15.9** | **$0.0** | **$3.3** | **$0.0** | **$23.5** | **$205.6** |
| Less: Cash Interest | [22] | $0.9 | $1.1 | $1.1 | $4.1 | $4.1 | $3.9 | $3.6 | $3.8 | $4.2 | $4.5 | $4.5 | $4.6 | $4.6 | $4.7 | $4.7 | $4.7 | $4.7 | $4.7 | $68.4 |
| Less: Financing Fees | [23] | 10.3 | 0.0 | 0.0 | 0.0 | 8.8 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.1 |
| **Total Other Non-Operating Disbursements** | | **$11.2** | **$1.1** | **$1.1** | **$4.1** | **$12.9** | **$3.9** | **$3.6** | **$3.8** | **$4.2** | **$11.5** | **$4.5** | **$4.6** | **$4.6** | **$4.7** | **$4.7** | **$4.7** | **$4.7** | **$4.7** | **$94.4** |
| Unencumbered Assets | [24] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| Excess Proceeds | [25] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Asset Sales** | | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$8.9** | **$8.9** | **$8.9** | **$8.9** | **$8.9** | **$8.9** | **$53.4** |
| Net Cash Flow Before ABL Paydown, ex TL | [26] | $94.2 | $6.6 | $32.7 | ($99.0) | ($94.4) | ($56.9) | $19.5 | ($38.0) | ($24.9) | $3.4 | $67.7 | $110.6 | ($6.6) | $5.9 | ($3.4) | ($21.0) | ($51.3) | ($64.3) | ($119.2) |
| Term Loan Draw | [27] | $111.9 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $111.9 |
| Net Cash Flow Before ABL Paydown, w/TL | [28] | $206.1 | $6.6 | $32.7 | ($99.0) | ($94.4) | ($56.9) | $19.5 | ($38.0) | ($24.9) | $3.4 | $67.7 | $110.6 | ($6.6) | $5.9 | ($3.4) | ($21.0) | ($51.3) | ($64.3) | ($7.3) |
| Other Financing | [29] | $0.0 | $0.0 | $0.0 | $0.0 | ($135.9) | $56.9 | ($19.5) | $38.0 | $24.9 | ($3.4) | ($67.7) | ($110.6) | $6.6 | ($5.9) | $3.4 | $21.0 | $51.3 | $64.3 | ($77.7) |
| **Net Cash Flow** | | **$206.1** | **$6.6** | **$32.7** | **($99.0)** | **($231.3)** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **$0.0** | **($85.0)** |
| Available Cash | [30] | 296.5 | 297.7 | 330.4 | 231.3 | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Availability | [31] | 155.5 | 115.0 | 66.5 | 82.1 | 173.5 | 89.5 | 160.4 | 204.3 | 137.4 | 100.0 | 164.8 | 177.9 | 49.4 | 41.1 | 5.5 | (41.4) | (79.7) | (129.2) | (129.2) |
| Memo: Total Liquidity (Availability + Cash) | [32] | $452.0 | $412.7 | $396.9 | $313.4 | $173.5 | $89.5 | $160.4 | $204.3 | $137.4 | $100.0 | $164.8 | $177.9 | $49.4 | $41.1 | $5.5 | ($41.4) | ($79.7) | ($129.2) | ($129.2) |
| Memo: Wind-down Reserve Balance | | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $17.8 | $26.7 | $35.6 | $44.5 | $53.4 | $53.4 |
| Memo: Merchandise COGS | | | 74.1 | 64.3 | 67.0 | 79.0 | 58.2 | 119.1 | 58.2 | 72.6 | 71.1 | 89.2 | 119.4 | 64.7 | 54.3 | 46.6 | 44.8 | 41.3 | 41.2 | 1,164.9 |
| Memo: GOB COGS | | | 0.0 | 28.5 | 30.7 | 31.5 | 58.3 | 64.4 | 65.8 | 67.2 | 66.4 | 66.0 | 58.5 | 53.1 | 27.8 | 23.5 | 21.7 | 0.0 | 0.0 | 661.6 |
| Memo: Borrowing Base | | 1,798.5 | 1,757.9 | 1,709.4 | 1,725.0 | 1,679.5 | 1,602.4 | 1,553.8 | 1,485.7 | 1,443.7 | 1,402.9 | 1,350.0 | 1,252.5 | 1,130.5 | 1,116.3 | 1,084.1 | 1,058.2 | 1,071.2 | 1,086.1 | |
| Memo: Sr. DIP & 1L Borrowings | | 1,642.9 | 1,642.9 | 1,642.9 | 1,642.9 | 1,506.0 | 1,502.9 | 1,393.4 | 1,281.4 | 1,306.3 | 1,302.9 | 1,185.2 | 1,074.5 | 1,081.1 | 1,075.2 | 1,078.6 | 1,099.6 | 1,150.9 | 1,215.2 | |
| Memo: Jr DIP Borrowings | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 300.0 | 300.0 | 300.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | |

1. Includes other cash receipts and SHS inflows due to one-week lag in allocation actualization process

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Additional Store Footprint Scenarios

   

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 505 Store Scenario

**Project Blue - Cash Flow Forecast, Go-Forward Same-Store Sales of (15.0%) with 505 Go-Forward Stores**

| Month | October | | | November | | | | December | | | | | January | | | | February | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| Retail Week EoP | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 1-18 |
| Unique Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 1-18 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | |
| [1] Normal Course Net Merchandise Receipts | 133.1 | 111.6 | 151.0 | 94.4 | 111.2 | 96.4 | 201.4 | 96.4 | 120.2 | 117.2 | 148.7 | 197.8 | 106.8 | 89.1 | 77.0 | 74.4 | 57.8 | 67.6 | 2,062.2 |
| [2] Plus: GOB Sales Receipts | 0.0 | 0.0 | 0.0 | 52.5 | 50.3 | 65.5 | 83.7 | 64.8 | 56.7 | 51.5 | 41.8 | 36.1 | 26.3 | 7.6 | 6.3 | 4.2 | 0.0 | 0.0 | 527.3 |
| [3] Plus: PA Sales | 2.5 | 11.1 | 4.9 | 2.3 | 6.0 | 6.1 | 9.3 | 7.7 | 6.4 | 6.7 | 6.2 | 6.3 | 6.8 | 7.1 | 6.7 | 6.4 | 6.6 | 6.2 | 115.1 |
| [4] Plus: Other Cash Receipts | 50.7 | 45.8 | 41.1 | 20.0 | 20.0 | 20.0 | 20.0 | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 585.5 |
| [5] Plus: Non-Operating Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 6.8 |
| [6] Plus: TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Cash Receipts** | 186.3 | 168.5 | 197.0 | 169.2 | 187.6 | 188.0 | 297.2 | 193.4 | 207.8 | 199.8 | 221.2 | 266.5 | 180.8 | 144.7 | 130.8 | 128.2 | 115.3 | 114.7 | 3,297.0 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| [7] Merchandise Vendors | 21.0 | 71.1 | 52.0 | 93.1 | 105.8 | 114.5 | 86.4 | 81.2 | 94.8 | 85.4 | 50.7 | 52.0 | 61.6 | 58.2 | 55.7 | 57.0 | 61.4 | 56.1 | 1,262.9 |
| [8] Occupancy | 0.0 | 0.0 | 0.0 | 21.5 | 3.5 | 1.2 | 1.2 | 18.2 | 6.9 | 1.2 | 1.2 | 1.2 | 23.8 | 1.2 | 1.2 | 1.2 | 18.2 | 6.9 | 108.8 |
| [9] Payroll, Taxes, and Benefits | 44.0 | 27.8 | 65.2 | 31.1 | 59.7 | 31.4 | 72.8 | 39.3 | 62.7 | 33.2 | 42.1 | 31.2 | 39.3 | 27.2 | 26.6 | 43.0 | 29.5 | 37.6 | 743.8 |
| [10] Other SG&A Disbursements | 15.9 | 52.9 | 46.1 | 95.7 | 79.1 | 89.7 | 101.6 | 89.6 | 57.8 | 77.6 | 66.1 | 61.5 | 65.3 | 57.0 | 67.3 | 56.6 | 70.2 | 59.6 | 1,208.7 |
| [11] GOB Rent | 0.0 | 0.0 | 0.0 | 10.3 | 1.1 | 0.0 | 0.0 | 8.6 | 2.9 | 0.0 | 0.0 | 0.0 | 6.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 29.5 |
| [11] GOB Add'l Expenses | 0.0 | 0.0 | 0.0 | 6.8 | 6.9 | 8.6 | 6.8 | 6.8 | 8.8 | 8.7 | 8.6 | 8.4 | 8.2 | 1.7 | 1.7 | 1.6 | 0.0 | 0.0 | 87.4 |
| [11] GOB Liquidator Fees | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| [11] Less: GOB Store Level Expenses Add-Back | 0.0 | 0.0 | 0.0 | (5.5) | (5.5) | (7.0) | (7.0) | (6.2) | (6.2) | (6.2) | (6.2) | (6.2) | (5.2) | (5.2) | (5.2) | (5.2) | (5.3) | (5.3) | (87.5) |
| **Total Operating Disbursements** | 80.9 | 151.7 | 163.3 | 251.3 | 250.5 | 238.6 | 263.9 | 239.6 | 227.7 | 199.9 | 161.6 | 149.2 | 199.5 | 140.1 | 147.4 | 154.2 | 174.0 | 160.9 | 3,354.2 |
| [12] Less: CapEx | 0.0 | 0.0 | 0.0 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.1 | 1.1 | 16.8 |
| **Net Cash Flow** | 105.4 | 16.8 | 33.8 | (83.8) | (64.1) | (51.7) | 32.2 | (47.3) | (21.2) | (1.2) | 58.7 | 116.2 | (19.8) | 3.7 | (17.7) | (27.0) | (59.7) | (47.3) | (74.0) |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | |
| [13] Utility Deposits | 0.0 | 0.0 | 0.0 | 0.0 | 9.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 9.2 |
| [14] Less: Professional Fees | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.9 | 0.0 | 0.0 | 0.0 | 23.5 | 58.8 |
| [15] Critical Vendor Payments | 0.0 | 9.1 | 0.0 | 15.0 | 15.0 | 15.0 | 15.0 | 11.0 | 9.0 | 9.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 |
| [16] Insurance Payments | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| [17] Gift Card Redemptions | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 |
| [18] KEIP / KERP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 |
| [19] Credit Card Holdbacks | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [20] PTO | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 7.5 |
| [21] Post-Petition TSA/CSA | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Chapter 11 Related** | 0.0 | 9.1 | 0.0 | 16.2 | 31.8 | 26.8 | 16.2 | 12.2 | 27.6 | 10.1 | 1.2 | 5.4 | 6.3 | 15.9 | 0.0 | 3.3 | 0.0 | 23.5 | 205.6 |
| [22] Less: Cash Interest | 0.0 | 1.1 | 1.1 | 4.1 | 4.1 | 3.9 | 3.7 | 3.8 | 3.4 | 3.4 | 4.7 | 4.8 | 4.8 | 4.9 | 4.9 | 4.9 | 5.0 | 5.0 | 70.6 |
| [23] Less: Financing Fees | 10.3 | 0.0 | 0.0 | 0.0 | 8.8 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.1 |
| **Total Other Non-Operating Disbursements** | 11.2 | 1.1 | 1.1 | 4.1 | 12.9 | 3.9 | 3.7 | 3.8 | 3.4 | 4.3 | 11.6 | 4.7 | 4.8 | 4.9 | 4.9 | 4.9 | 5.0 | 5.0 | 96.6 |
| [24] Unencumbered Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [25] Excess Proceeds | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Asset Sales** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [26] Net Cash Flow Before ABL Paydown, ex TL | 94.2 | 6.6 | 32.7 | (104.2) | (108.7) | (82.4) | 12.3 | (63.3) | (53.1) | (22.9) | 52.8 | 106.0 | (21.9) | (8.2) | (13.7) | (26.4) | (55.8) | (66.9) | (322.8) |
| [27] Term Loan Draw | 111.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 111.9 |
| [28] Net Cash Flow Before ABL Paydown, w/TL | 206.1 | 6.6 | 32.7 | (104.2) | (108.7) | (82.4) | 12.3 | (63.3) | (53.1) | (22.9) | 52.8 | 106.0 | (21.9) | (8.2) | (13.7) | (26.4) | (55.8) | (66.9) | (210.9) |
| [29] Other Financing | 0.0 | 0.0 | 0.0 | 0.0 | (117.4) | 82.4 | (12.3) | 63.3 | 53.1 | 22.9 | (52.8) | (106.0) | 22.9 | 38.2 | 33.2 | 26.4 | 55.8 | 66.9 | 125.9 |
| **Net Cash Flow** | 206.1 | 6.6 | 32.7 | (104.2) | (226.2) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (85.0) |
| [30] Available Cash | 296.5 | 297.7 | 330.4 | 226.2 | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [31] Net Availability | 155.5 | 115.0 | 66.5 | 83.0 | 170.5 | 75.4 | 157.8 | 186.9 | 102.7 | 53.5 | 114.6 | 126.0 | (13.6) | (25.0) | (62.7) | (107.1) | (147.1) | (198.8) | (198.8) |
| [32] Memo: Total Liquidity (Availability + Cash) | 452.0 | 412.7 | 396.9 | 309.2 | 170.5 | 75.4 | 157.8 | 186.9 | 102.7 | 53.5 | 114.6 | 126.0 | (13.6) | (25.0) | (62.7) | (107.1) | (147.1) | (198.8) | (198.8) |
| Memo: Wind-down Reserve Balance | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 17.8 | 26.7 | 35.6 | 44.5 | 53.4 | 53.4 |
| Memo: Merchandise COGS | | 74.1 | 64.3 | 67.0 | 79.0 | 68.4 | 143.0 | 68.4 | 85.4 | 83.2 | 105.6 | 140.4 | 75.8 | 63.2 | 54.7 | 52.9 | 48.2 | 48.0 | 1,321.6 |
| Memo: GOB COGS | | 0.0 | 26.5 | 30.7 | 31.5 | 41.8 | 45.2 | 46.6 | 45.4 | 43.1 | 40.5 | 38.3 | 31.9 | 7.8 | 6.6 | 6.1 | 0.0 | 0.0 | 439.1 |
| Memo: Borrowing Base | 1,798.5 | 1,757.9 | 1,709.4 | 1,725.9 | 1,669.9 | 1,683.3 | 1,693.3 | 1,545.7 | 1,514.6 | 1,468.4 | 1,446.7 | 1,352.0 | 1,234.3 | 1,231.0 | 1,207.1 | 1,189.0 | 1,204.8 | 1,220.0 | |
| Memo: Sr. DIP & 1L Borrowings | 1,642.9 | 1,642.9 | 1,642.9 | 1,642.9 | 1,525.5 | 1,607.9 | 1,445.5 | 1,358.8 | 1,412.0 | 1,434.9 | 1,332.1 | 1,226.0 | 1,247.9 | 1,250.1 | 1,269.8 | 1,296.1 | 1,351.9 | 1,418.9 | |
| Memo: Jr DIP Borrowings | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 300.0 | 300.0 | 300.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | |

1. Includes other cash receipts and SHS inflows due to one-week lag in allocation actualization process

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 359 Store Scenario

**Project Blue - Cash Flow Forecast, Go-Forward Same-Store Sales of (15.0%) with 359 Go-Forward Stores**

| Month | October | | | November | | | | December | | | | | January | | | | February | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| Retail Week EoP | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | |
| Unique Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 1-18 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | |
| [1] Normal Course Net Merchandise Receipts | 133.1 | 111.6 | 151.0 | 94.4 | 111.2 | 73.9 | 148.0 | 73.9 | 92.2 | 91.5 | 113.8 | 153.0 | 82.5 | 69.1 | 59.2 | 57.0 | 52.8 | 52.4 | 1,720.7 |
| [2] Plus: GOB Sales Receipts | 0.0 | 0.0 | 0.0 | 52.5 | 50.3 | 102.6 | 111.3 | 112.2 | 106.9 | 100.4 | 91.5 | 79.1 | 62.6 | 38.2 | 30.1 | 19.9 | 0.0 | 0.0 | 957.6 |
| [3] Plus: PA Sales | 2.5 | 11.1 | 4.9 | 2.3 | 6.0 | 6.1 | 9.3 | 7.7 | 6.4 | 6.7 | 6.2 | 6.3 | 5.8 | 7.1 | 6.7 | 6.4 | 6.6 | 6.2 | 115.1 |
| [4] Plus: Other Cash Receipts | 50.7 | 45.8 | 41.1 | 20.0 | 20.0 | 20.0 | 20.0 | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 585.5 |
| [5] Plus: Non-Operating Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 6.8 |
| [6] Plus: TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Cash Receipts** | 186.3 | 168.5 | 197.0 | 169.2 | 187.6 | 202.6 | 291.4 | 218.3 | 230.0 | 223.0 | 236.0 | 264.7 | 192.8 | 155.3 | 136.9 | 126.4 | 100.2 | 99.5 | 3,385.8 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| [7] Merchandise Vendors | 21.0 | 71.1 | 52.0 | 83.5 | 83.8 | 90.4 | 71.3 | 67.1 | 73.7 | 66.8 | 40.2 | 41.9 | 48.3 | 46.0 | 44.3 | 45.4 | 49.0 | 49.6 | 1,045.3 |
| [8] Occupancy | 0.0 | 0.0 | 0.0 | 16.1 | 2.9 | 1.2 | 1.2 | 13.6 | 5.4 | 1.2 | 1.2 | 1.2 | 17.7 | 1.2 | 1.2 | 1.2 | 13.6 | 5.4 | 84.6 |
| [9] Payroll, Taxes, and Benefits | 44.0 | 27.8 | 65.2 | 33.1 | 59.7 | 31.4 | 72.8 | 39.3 | 82.7 | 33.2 | 42.1 | 31.2 | 39.3 | 27.2 | 26.6 | 43.0 | 29.5 | 37.6 | 743.8 |
| [10] Other SG&A Disbursements | 15.9 | 52.9 | 46.1 | 95.7 | 79.1 | 89.7 | 101.8 | 89.6 | 57.8 | 77.6 | 65.1 | 61.5 | 65.3 | 57.0 | 67.3 | 58.6 | 70.2 | 59.6 | 1,208.7 |
| [11] GOB Rent | 0.0 | 0.0 | 0.0 | 15.8 | 1.8 | 0.0 | 0.0 | 13.1 | 4.4 | 0.0 | 0.0 | 0.0 | 12.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 47.7 |
| [11] GOB Add'l Expenses | 0.0 | 0.0 | 0.0 | 6.8 | 6.8 | 15.0 | 15.4 | 15.4 | 15.5 | 15.5 | 15.4 | 15.2 | 14.9 | 8.3 | 8.1 | 7.9 | 0.0 | 0.0 | 160.2 |
| [11] GOB Liquidator Fees | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| [11] Less: GOB Store Level Expenses Add-Back | 0.0 | 0.0 | 0.0 | (5.5) | (5.5) | (12.6) | (12.6) | (11.2) | (11.2) | (11.2) | (11.2) | (11.2) | (9.5) | (9.5) | (9.5) | (9.5) | (9.7) | (9.7) | (149.6) |
| **Total Operating Disbursements** | 80.9 | 151.7 | 163.3 | 243.5 | 228.5 | 215.2 | 249.7 | 227.2 | 208.3 | 183.2 | 153.0 | 140.0 | 188.7 | 130.2 | 138.0 | 144.6 | 152.7 | 142.4 | 3,141.1 |
| [12] Less: CapEx | 0.0 | 0.0 | 0.0 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.1 | 1.1 | 16.8 |
| **Net Cash Flow** | 105.4 | 16.8 | 33.8 | (76.1) | (42.1) | (13.7) | 40.6 | (9.9) | 20.3 | 38.7 | 82.1 | 123.6 | 3.0 | 24.3 | (2.3) | (19.2) | (53.5) | (44.1) | 227.9 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | |
| [13] Utility Deposits | 0.0 | 0.0 | 0.0 | 3.0 | 9.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 9.2 |
| [14] Less: Professional Fees | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.9 | 0.0 | 0.0 | 0.0 | 23.5 | 58.8 |
| [15] Critical Vendor Payments | 0.0 | 9.1 | 0.0 | 15.0 | 15.0 | 15.0 | 15.0 | 11.0 | 9.0 | 8.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 |
| [16] Insurance Payments | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| [17] Gift Card Redemptions | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 |
| [18] KEIP / KERP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 |
| [19] Credit Card Holdbacks | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [20] PTO | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 7.5 |
| [21] Post-Petition TSA/CSA | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Chapter 11 Related** | 0.0 | 9.1 | 0.0 | 16.2 | 31.8 | 26.8 | 16.2 | 12.2 | 27.6 | 10.1 | 1.2 | 5.4 | 6.3 | 15.9 | 0.0 | 3.3 | 0.0 | 23.5 | 205.6 |
| [22] Less: Cash Interest | 0.9 | 1.1 | 1.1 | 4.1 | 4.1 | 3.9 | 3.6 | 3.7 | 4.1 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.6 | 67.3 |
| [23] Less: Financing Fees | 10.3 | 0.0 | 0.0 | 0.0 | 8.8 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.1 |
| **Total Other Non-Operating Disbursements** | 11.2 | 1.1 | 1.1 | 4.1 | 12.9 | 3.9 | 3.6 | 3.7 | 4.1 | 11.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.6 | 93.3 |
| [24] Unencumbered Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [25] Excess Proceeds | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Asset Sales** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [26] Net Cash Flow Before ABL Paydown, ex TL | 94.2 | 6.6 | 32.7 | (96.4) | (86.7) | (44.3) | 20.8 | (25.8) | (11.4) | 17.1 | 76.5 | 113.7 | 1.2 | 12.8 | 2.1 | (18.1) | (49.1) | (63.3) | (17.5) |
| [27] Term Loan Draw | 111.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 111.9 |
| [28] Net Cash Flow Before ABL Paydown, w/TL | 206.1 | 6.6 | 32.7 | (96.4) | (86.7) | (44.3) | 20.8 | (25.8) | (11.4) | 17.1 | 76.5 | 113.7 | 1.2 | 12.8 | 2.1 | (18.1) | (49.1) | (63.3) | 94.4 |
| [29] Other Financing | 0.0 | 0.0 | 0.0 | 0.0 | (147.5) | 44.3 | (20.8) | 52.5 | 11.4 | (57.5) | (76.5) | (113.7) | (51.2) | (12.8) | (32.1) | 18.1 | 49.1 | 63.3 | (179.4) |
| **Net Cash Flow** | 206.1 | 6.6 | 32.7 | (96.4) | (234.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (85.0) |
| [30] Available Cash | 296.5 | 297.7 | 330.4 | 234.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [31] Net Availability | 155.5 | 115.0 | 66.5 | 81.6 | 175.3 | 96.7 | 160.6 | 211.7 | 153.3 | 122.3 | 189.8 | 204.1 | 81.0 | 72.2 | 35.1 | (14.9) | (49.5) | (97.5) | (97.5) |
| [32] Memo: Total Liquidity (Availability + Cash) | 452.0 | 412.7 | 396.9 | 315.6 | 175.3 | 96.7 | 160.6 | 211.7 | 153.3 | 122.3 | 189.8 | 204.1 | 81.0 | 72.2 | 35.1 | (14.9) | (49.5) | (97.5) | (97.5) |
| Memo: Wind-down Reserve Balance | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 17.8 | 26.7 | 35.6 | 44.5 | 53.4 | 53.4 |
| Memo: Merchandise COGS | | 74.1 | 64.3 | 67.0 | 79.0 | 52.5 | 105.1 | 52.5 | 65.5 | 54.9 | 80.8 | 108.6 | 58.6 | 49.1 | 42.1 | 40.5 | 37.5 | 37.2 | 1,079.2 |
| Memo: GOB COGS | | 0.0 | 0.0 | 26.5 | 30.7 | 31.5 | 66.7 | 74.0 | 75.3 | 78.1 | 78.2 | 79.2 | 70.3 | 63.9 | 38.2 | 32.2 | 29.9 | 0.0 | 774.5 |
| Memo: Borrowing Base | 1,798.5 | 1,757.9 | 1,709.4 | 1,724.5 | 1,671.0 | 1,636.7 | 1,529.8 | 1,456.8 | 1,406.7 | 1,361.6 | 1,302.6 | 1,203.2 | 1,059.5 | 1,023.0 | 993.1 | 1,004.6 | 1,019.4 | | |
| Memo: Sr. DIP & 1L Borrowings | 1,642.9 | 1,642.9 | 1,642.9 | 1,642.9 | 1,495.7 | 1,540.0 | 1,309.2 | 1,245.0 | 1,256.4 | 1,239.3 | 1,112.9 | 998.0 | 985.1 | 963.0 | 1,001.2 | 1,050.3 | 1,113.6 | | |
| Memo: Jr DIP Borrowings | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 300.0 | 300.0 | 300.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | |

1. Includes other cash receipts and SHS inflows due to one-week lag in allocation actualization process

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 300 Store Scenario

**Project Blue - Cash Flow Forecast, Go-Forward Same-Store Sales of (15.0%) with 300 Go-Forward Stores**

| Month | October | | | November | | | | December | | | | | January | | | | February | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| Retail Week EoP | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | |
| Unique Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 1-18 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | |
| [1] Normal Course Net Merchandise Receipts | $133.1 | $111.6 | $151.0 | $94.4 | $111.2 | $63.0 | $123.9 | $63.0 | $78.8 | $78.4 | $97.2 | $130.7 | $70.5 | $59.3 | $50.4 | $48.4 | $45.0 | $44.8 | $1,554.6 |
| [2] Plus: GOB Sales Receipts | 0.0 | 0.0 | 0.0 | 52.5 | 50.3 | 118.7 | 132.0 | 132.5 | 128.8 | 121.0 | 112.6 | 97.0 | 78.1 | 50.6 | 40.3 | 26.6 | 0.0 | 0.0 | 1,141.1 |
| [3] Plus: PA Sales | 2.5 | 11.1 | 4.9 | 2.3 | 6.0 | 6.1 | 9.3 | 7.7 | 6.4 | 6.7 | 6.2 | 8.3 | 6.8 | 7.1 | 6.7 | 6.4 | 6.4 | 6.2 | 115.1 |
| [4] Plus: Other Cash Receipts | 50.7 | 45.8 | 41.1 | 20.0 | 20.0 | 20.0 | 20.0 | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 585.5 |
| [5] Plus: Non-Operating Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 6.8 |
| [6] Plus: TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Cash Receipts** | $186.3 | $168.5 | $197.0 | $169.2 | $187.6 | $207.7 | $288.0 | $227.6 | $238.5 | $230.5 | $240.5 | $260.3 | $196.4 | $157.8 | $138.2 | $124.6 | $92.5 | $91.9 | $3,403.2 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| [7] Merchandise Vendors | $21.0 | $71.1 | $52.0 | $79.6 | $73.4 | $79.1 | $63.4 | $59.7 | $62.9 | $57.1 | $34.5 | $35.6 | $40.7 | $38.8 | $37.4 | $38.3 | $41.4 | $41.9 | $927.9 |
| [8] Occupancy | 0.0 | 0.0 | 0.0 | 12.1 | 2.4 | 1.2 | 1.2 | 10.3 | 4.3 | 1.2 | 1.2 | 1.2 | 13.3 | 1.2 | 1.2 | 1.2 | 10.3 | 4.3 | 66.9 |
| [9] Payroll, Taxes, and Benefits | 44.0 | 27.8 | 65.2 | 31.1 | 59.7 | 31.4 | 72.8 | 39.3 | 62.7 | 33.2 | 42.1 | 31.2 | 39.3 | 27.2 | 26.6 | 43.0 | 29.5 | 37.6 | 743.8 |
| [10] Other SG&A Disbursements | 15.9 | 52.9 | 46.1 | 95.7 | 79.1 | 89.7 | 101.6 | 89.6 | 57.8 | 77.6 | 65.1 | 81.5 | 65.3 | 57.6 | 67.3 | 56.6 | 70.2 | 59.6 | 1,208.7 |
| [11] GOB Rent | 0.0 | 0.0 | 0.0 | 19.7 | 2.2 | 0.0 | 0.0 | 16.5 | 5.5 | 0.0 | 0.0 | 0.0 | 17.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 81.0 |
| [11] GOB Add'l Expenses | 0.0 | 0.0 | 0.0 | 6.8 | 8.8 | 17.7 | 18.1 | 18.2 | 18.4 | 18.4 | 18.3 | 18.1 | 11.7 | 11.0 | 10.7 | 10.5 | 0.0 | 0.0 | 190.8 |
| [11] GOB Liquidator Fees | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| [11] Less: GOB Store Level Expenses Add-Back | 0.0 | 0.0 | 0.0 | (5.5) | (5.5) | (15.8) | (15.8) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (11.9) | (11.9) | (11.9) | (11.9) | (12.0) | (12.0) | (184.1) |
| **Total Operating Disbursements** | $80.9 | $151.7 | $163.3 | $239.7 | $218.1 | $203.5 | $241.4 | $219.7 | $197.6 | $173.6 | $147.3 | $133.7 | $161.6 | $123.3 | $131.5 | $137.8 | $139.4 | $131.3 | $3,015.4 |
| [12] Less: CapEx | 0.0 | 0.0 | 0.0 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.1 | 1.1 | 16.8 |
| **Net Cash Flow** | $105.4 | $16.8 | $33.8 | ($72.2) | ($31.7) | $3.2 | $45.5 | $6.9 | $39.5 | $55.9 | $92.4 | $125.5 | $13.7 | $33.7 | $5.6 | ($14.2) | ($48.1) | ($40.6) | $371.0 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | |
| [13] Utility Deposits | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 |
| [14] Less: Professional Fees | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.9 | 0.0 | 0.0 | 0.0 | 23.5 | 58.8 |
| [15] Critical Vendor Payments | 0.0 | 9.1 | 0.0 | 15.0 | 15.0 | 15.0 | 15.0 | 11.0 | 9.0 | 8.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 |
| [16] Insurance Payments | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| [17] Gift Card Redemptions | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 9.9 |
| [18] KERP / KERP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 |
| [19] Credit Card Holdbacks | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [20] PTO | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 7.5 |
| [21] Post-Petition TSA/CSA | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Chapter 11 Related** | $0.0 | $9.1 | $0.0 | $16.2 | $31.8 | $26.8 | $16.2 | $12.2 | $27.6 | $10.1 | $1.2 | $5.4 | $6.3 | $15.9 | $0.0 | $3.3 | $0.0 | $23.5 | $205.6 |
| [22] Less: Cash Interest | $0.9 | $1.1 | $1.1 | $4.1 | $4.1 | $3.9 | $3.6 | $3.7 | $4.1 | $4.4 | $4.3 | $4.4 | $4.3 | $4.4 | $4.4 | $4.3 | $4.3 | $4.4 | $65.7 |
| [23] Less: Financing Fees | 10.3 | 0.0 | 0.0 | 0.0 | 8.8 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.1 |
| **Total Other Non-Operating Disbursements** | $11.2 | $1.1 | $1.1 | $4.1 | $12.9 | $3.9 | $3.6 | $3.7 | $4.1 | $11.4 | $4.3 | $4.4 | $4.3 | $4.4 | $4.4 | $4.3 | $4.3 | $4.4 | $91.8 |
| [24] Unencumbered Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [25] Excess Proceeds | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Asset Sales** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $53.4 |
| [26] Net Cash Flow Before ABL Paydown, ex TL | $94.2 | $6.6 | $32.7 | ($92.5) | ($76.3) | ($27.5) | $25.7 | ($9.0) | $7.8 | $34.4 | $86.8 | $115.7 | $12.0 | $22.3 | $10.1 | ($13.0) | ($43.5) | ($59.6) | $127.0 |
| [27] Term Loan Draw | $111.9 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $111.9 |
| [28] Net Cash Flow Before ABL Paydown, w/TL | $206.1 | $6.6 | $32.7 | ($92.5) | ($76.3) | ($27.5) | $25.7 | ($9.0) | $7.8 | $34.4 | $86.8 | $115.7 | $12.0 | $22.3 | $10.1 | ($13.0) | ($43.5) | ($59.6) | $238.9 |
| [29] Other Financing | $0.0 | $0.0 | $0.0 | $0.0 | ($161.5) | $27.5 | ($25.7) | $9.0 | ($7.8) | ($34.4) | ($86.8) | ($115.7) | ($12.0) | ($22.3) | ($10.1) | $13.0 | $43.5 | $59.6 | ($323.9) |
| **Net Cash Flow** | $206.1 | $6.6 | $32.7 | ($92.5) | ($237.8) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | ($85.0) |
| [30] Available Cash | 296.5 | 297.7 | 330.4 | 237.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | |
| [31] Net Availability | 155.5 | 115.0 | 66.5 | 80.9 | 178.4 | 107.5 | 164.7 | 225.5 | 179.1 | 155.8 | 226.1 | 241.1 | 118.3 | 110.6 | 75.0 | 23.8 | (8.2) | (53.8) | |
| [32] Memo: Total Liquidity (Availability + Cash) | $452.0 | $412.7 | $396.9 | $318.7 | $178.4 | $107.5 | $164.7 | $225.5 | $179.1 | $155.8 | $226.1 | $241.1 | $118.3 | $110.6 | $75.0 | $23.8 | ($8.2) | ($53.8) | ($53.8) |
| Memo: Wind-down Reserve Balance | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $17.8 | $26.7 | $35.6 | $44.5 | $53.4 | $53.4 |
| Memo: Merchandise COGS | | 74.1 | 64.3 | 67.0 | 79.0 | 44.7 | 88.0 | 44.7 | 55.9 | 55.6 | 69.0 | 92.8 | 50.0 | 42.1 | 35.8 | 34.4 | 31.9 | 31.8 | 961.2 |
| Memo: GOB COGS | | 0.0 | 26.5 | 30.7 | 31.5 | 77.3 | 86.3 | 87.8 | 92.2 | 93.2 | 95.4 | 85.1 | 77.5 | 50.8 | 42.9 | 39.7 | 0.0 | 0.0 | 916.7 |
| Memo: Borrowing Base | 1,798.5 | 1,757.9 | 1,709.4 | 1,723.8 | 1,659.8 | 1,616.3 | 1,497.8 | 1,417.0 | 1,363.5 | 1,363.5 | 1,239.3 | 1,138.6 | 1,011.3 | 984.4 | 942.1 | 906.4 | 915.3 | 928.9 | |
| Memo: Sr. DIP & 1L Borrowings | 1,642.9 | 1,642.9 | 1,642.9 | 1,642.9 | 1,481.4 | 1,508.9 | 1,333.2 | 1,192.0 | 1,184.4 | 1,150.0 | 1,013.2 | 897.5 | 885.4 | 863.1 | 853.0 | 866.0 | 909.5 | 969.0 | |
| Memo: Jr DIP Borrowings | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 300.0 | 300.0 | 300.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | |

1. Includes other cash receipts and SHS inflows due to one-week lag in allocation actualization process

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Appendix– Additional GOB Models

  

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Supplemental Scenarios

- We have run an additional set of supplemental scenarios identical to the scenarios previously outlined (300 stores, 359 stores, 410 stores, 505 stores) but with the assumption that all remaining stores in each scenario begin GOB sales on December 29, 2018

- These scenarios assume a push of approximately $1.5M of distribution center inventory into each location during the GOB process with a resulting 89% NOLV recovery

- These scenarios differ slightly from the wind down budget which contemplates a full liquidation –

  - These scenarios are purely illustrative to assess relative near-term liquidity requirements

- These scenarios illustrate the fact that in full liquidation scenarios DIP financing requirements are significantly lower than in go forward scenarios

  - However, these scenarios do not address creditor recoveries based on asset dispositions which could be significantly higher with a going concern store footprint

| ($ in millions) | Total Liquidity (Net Availability + Available Cash) | | |
|---|---|---|---|
| Scenario | December 15, 2018 | December 29, 2018 | February 16, 2019 |
| 505 Store, 12/29 GOB Scenario | $55.5 | $67.6 | $388.9 |
| 410 Store, 12/29 GOB Scenario | 86.8 | 108.0 | 322.6 |
| 359 Store, 12/29 GOB Scenario | 111.0 | 137.2 | 312.6 |
| 300 Store, 12/29 GOB Scenario | 148.3 | 179.2 | 314.8 |

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 505 stores GOB on 12/29

Project Blue - Cash Flow Forecast, Go-Forward Same-Store Sales of (15.0%) with 505 Go-Forward Stores, then GOB all stores 12/29

| Month | | October | | | November | | | | December | | | | | January | | | | February | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| Retail Week EoP | | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | |
| Unique Week | | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 1-18 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | | |
| Normal Course Net Merchandise Receipts | [1] | 133.1 | 111.6 | 151.0 | 94.4 | 111.2 | 201.4 | 105.5 | 96.4 | 120.2 | 117.2 | 148.7 | 197.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,588.6 |
| Plus: GOB Sales Receipts | [2] | 0.0 | 0.0 | 0.0 | 52.5 | 50.3 | 65.5 | 63.7 | 64.8 | 56.7 | 51.5 | 41.8 | 196.4 | 231.3 | 204.4 | 221.9 | 203.1 | 200.3 | 168.5 | 1,872.6 |
| Plus: PA Sales | [3] | 2.5 | 11.1 | 4.9 | 2.3 | 6.0 | 6.1 | 9.3 | 7.7 | 6.4 | 6.7 | 6.2 | 6.3 | 6.8 | 7.1 | 6.7 | 6.4 | 6.6 | 6.2 | 115.1 |
| Plus: Other Cash Receipts | [4] | 50.7 | 45.8 | 41.1 | 20.0 | 20.0 | 20.0 | 20.0 | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 585.5 |
| Plus: Non-Operating Receipts | [5] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 6.8 |
| Plus: TSA & CSA Receipts | [6] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Cash Receipts** | | **186.3** | **168.5** | **197.0** | **169.2** | **187.6** | **292.9** | **201.3** | **193.4** | **207.8** | **199.8** | **221.2** | **426.7** | **279.0** | **252.4** | **269.4** | **252.7** | **247.8** | **215.6** | **4,168.6** |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | |
| Merchandise Vendors | [7] | 21.0 | 71.1 | 52.0 | 91.3 | 105.8 | 114.5 | 86.4 | 81.2 | 94.8 | 56.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 774.4 |
| Occupancy | [8] | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 18.6 |
| Payroll, Taxes, and Benefits | [9] | 44.0 | 27.8 | 65.2 | 31.1 | 59.7 | 31.4 | 72.8 | 39.3 | 62.7 | 33.2 | 42.1 | 31.2 | 39.3 | 27.2 | 26.6 | 43.0 | 29.5 | 37.6 | 743.8 |
| Other SG&A Disbursements | [10] | 15.9 | 52.9 | 46.1 | 95.7 | 79.1 | 89.7 | 101.6 | 89.6 | 57.8 | 77.6 | 65.1 | 61.5 | 65.3 | 57.0 | 67.3 | 56.6 | 70.2 | 59.8 | 1,208.7 |
| GOB Rent | [10] | 0.0 | 0.0 | 0.0 | 30.6 | 3.4 | 0.0 | 0.0 | 25.5 | 8.5 | 0.0 | 0.0 | 0.0 | 29.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.2 |
| GOB Add'l Expenses | [11] | 0.0 | 0.0 | 0.0 | 6.8 | 6.8 | 8.6 | 8.8 | 8.8 | 8.8 | 8.7 | 8.6 | 31.8 | 32.0 | 25.6 | 25.8 | 26.0 | 24.4 | 24.3 | 255.8 |
| GOB Liquidator Fees | [11] | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| Less: GOB Store Level Expenses Add-Back | [11] | 0.0 | 0.0 | 0.0 | (5.5) | (5.5) | (7.0) | (7.0) | (6.2) | (6.2) | (6.2) | (6.2) | (22.6) | (21.6) | (21.6) | (21.6) | (21.6) | (21.7) | (21.7) | (202.3) |
| **Total Operating Disbursements** | | **80.9** | **151.7** | **163.3** | **251.3** | **250.5** | **238.6** | **263.9** | **239.6** | **227.7** | **170.9** | **110.9** | **103.4** | **145.4** | **89.4** | **99.4** | **105.2** | **103.7** | **101.1** | **2,896.7** |
| Less: CapEx | [12] | 0.0 | 0.0 | 0.0 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.1 | 1.1 | 16.8 |
| **Net Cash Flow** | | **105.4** | **16.8** | **33.8** | **(83.8)** | **(64.1)** | **53.3** | **(63.7)** | **(47.3)** | **(21.2)** | **27.9** | **109.4** | **322.3** | **132.5** | **162.2** | **168.9** | **146.5** | **142.9** | **113.4** | **1,255.2** |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | | |
| Utility Deposits | [13] | 0.0 | 0.0 | 0.0 | 0.0 | 9.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 9.2 |
| Less: Professional Fees | [14] | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.9 | 0.0 | 0.0 | 0.0 | 23.5 | 58.8 |
| Critical Vendor Payments | [15] | 0.0 | 9.1 | 0.0 | 15.0 | 15.0 | 15.0 | 15.0 | 11.0 | 9.0 | 8.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.0 |
| Insurance Payments | [16] | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| Gift Card Redemptions | [17] | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 |
| KEIP / KERP | [18] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 |
| Credit Card Holdbacks | [19] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| PTO | [20] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 7.5 |
| Post-Petition TSA/CSA | [21] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Chapter 11 Related** | | **0.0** | **9.1** | **0.0** | **16.2** | **31.8** | **26.8** | **16.2** | **12.2** | **27.6** | **10.1** | **1.2** | **5.4** | **6.3** | **15.9** | **0.0** | **3.3** | **0.0** | **23.5** | **205.6** |
| Less: Cash Interest | [22] | 0.9 | 1.1 | 1.1 | 4.1 | 4.1 | 3.9 | 3.6 | 3.8 | 4.2 | 4.7 | 4.9 | 4.8 | 4.5 | 4.3 | 4.1 | 3.9 | 3.6 | 3.3 | 65.0 |
| Less: Financing Fees | [23] | 10.3 | 0.0 | 0.0 | 0.0 | 8.8 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.1 |
| **Total Other Non-Operating Disbursements** | | **11.2** | **1.1** | **1.1** | **4.1** | **12.9** | **3.9** | **3.6** | **3.8** | **4.2** | **11.7** | **4.9** | **4.8** | **4.5** | **4.3** | **4.1** | **3.9** | **3.6** | **3.3** | **91.1** |
| Unencumbered Assets | [24] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| Excess Proceeds | [25] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Asset Sales** | | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **8.9** | **8.9** | **8.9** | **8.9** | **8.9** | **8.9** | **53.4** |
| Net Cash Flow Before ABL Paydown, ex TL | [26] | 94.2 | 6.6 | 32.7 | (104.2) | (108.7) | 22.6 | (83.5) | (63.2) | (53.1) | 6.0 | 103.4 | 312.1 | 130.7 | 150.9 | 173.6 | 148.2 | 148.2 | 95.4 | 1,011.9 |
| Term Loan Draw | [27] | 111.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 111.9 |
| Net Cash Flow Before ABL Paydown, w/TL | [28] | 206.1 | 6.6 | 32.7 | (104.2) | (108.7) | 22.6 | (83.5) | (63.2) | (53.1) | 6.0 | 103.4 | 312.1 | 130.7 | 150.9 | 173.6 | 148.2 | 148.2 | 95.4 | 1,123.8 |
| Other Financing | [29] | 0.0 | 0.0 | 0.0 | 0.0 | (117.4) | (22.6) | 83.5 | 93.2 | 53.1 | (96.0) | (103.4) | (312.1) | (130.7) | (150.9) | (173.6) | (148.2) | (148.2) | (95.4) | (1,208.6) |
| **Net Cash Flow** | | **206.1** | **6.6** | **32.7** | **(104.2)** | **(226.2)** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **(85.0)** |
| Available Cash | [30] | 296.5 | 297.7 | 330.4 | 226.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Availability | [31] | 155.5 | 115.0 | 66.5 | 83.0 | 127.4 | 137.4 | 59.7 | 89.6 | 55.5 | 30.2 | 67.6 | 189.0 | 147.0 | 217.7 | 280.7 | 318.8 | 373.2 | 388.9 | 388.9 |
| **Memo: Total Liquidity (Availability + Cash)** | [32] | **452.0** | **412.7** | **396.9** | **309.2** | **127.4** | **137.4** | **59.7** | **89.6** | **55.5** | **30.2** | **67.6** | **189.0** | **147.0** | **217.7** | **280.7** | **318.8** | **373.2** | **388.9** | **388.9** |
| Memo: Wind-down Reserve Balance | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 17.8 | 26.7 | 35.6 | 44.5 | 53.4 | 53.4 |
| Memo: Merchandise COGS | | | 74.1 | 64.3 | 67.0 | 79.0 | 68.4 | 143.0 | 68.4 | 85.4 | 83.2 | 105.6 | 140.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 978.9 |
| Memo: GOB COGS | | | 0.0 | 26.5 | 30.7 | 31.5 | 41.8 | 45.2 | 46.6 | 45.4 | 43.1 | 40.5 | 130.1 | 152.2 | 134.2 | 146.2 | 154.2 | 154.0 | 141.4 | 1,372.7 |
| Memo: Borrowing Base | | 1,798.5 | 1,719.0 | 1,709.4 | 1,725.9 | 1,552.0 | 1,640.3 | 1,496.1 | 1,439.2 | 1,408.1 | 1,408.1 | 1,376.8 | 1,310.0 | 1,120.1 | 960.8 | 888.9 | 788.4 | 688.2 | 602.5 | 532.1 |
| Memo: Sr. DIP & 1L Borrowings | | 1,642.9 | 1,642.9 | 1,642.9 | 1,642.9 | 1,525.5 | 1,502.9 | 1,436.4 | 1,349.6 | 1,352.7 | 1,346.6 | 1,243.3 | 931.2 | 800.5 | 649.6 | 476.0 | 327.8 | 179.5 | 84.1 |
| Memo: Jr DIP Borrowings | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 300.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 |

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 410 stores GOB 12/29

Project Blue - Cash Flow Forecast, Go-Forward Same-Store Sales of (15.0%) with 410 Go-Forward Stores, then GOB all stores 12/29

| | October | | | November | | | | December | | | | | January | | | | February | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| Retail Week EoP | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | |
| Unique Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 1-18 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | |
| [1] Normal Course Net Merchandise Receipts | 133.1 | 111.6 | 151.0 | 94.4 | 111.2 | 167.7 | 88.8 | 81.9 | 102.2 | 100.1 | 125.6 | 168.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,435.9 |
| [2] Plus: GOB Sales Receipts | 0.0 | 0.0 | 0.0 | 52.5 | 50.3 | 90.3 | 95.3 | 96.4 | 90.0 | 83.9 | 74.5 | 227.0 | 257.2 | 226.6 | 239.7 | 215.1 | 201.2 | 169.1 | 2,169.0 |
| [3] Plus: PA Sales | 2.5 | 11.1 | 4.5 | 2.3 | 6.0 | 6.1 | 9.3 | 7.7 | 6.4 | 6.7 | 6.2 | 6.3 | 6.8 | 7.1 | 6.7 | 6.4 | 6.6 | 6.2 | 115.1 |
| [4] Plus: Other Cash Receipts | 50.7 | 45.8 | 41.1 | 20.0 | 20.0 | 20.0 | 20.0 | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 | 40.6 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 585.5 |
| [5] Plus: Non-Operating Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 1.6 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 6.8 |
| [6] Plus: TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Cash Receipts** | 186.3 | 168.5 | 197.0 | 169.2 | 187.6 | 284.1 | 216.2 | 210.4 | 223.1 | 215.1 | 230.8 | 427.7 | 305.0 | 274.6 | 297.3 | 264.7 | 248.7 | 216.2 | 4,312.4 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| [7] Merchandise Vendors | 21.0 | 71.1 | 52.0 | 86.1 | 91.5 | 98.8 | 76.5 | 81.9 | 80.7 | 48.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 697.6 |
| [8] Occupancy | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 18.8 |
| [9] Payroll, Taxes, and Benefits | 44.0 | 27.8 | 65.2 | 31.1 | 59.7 | 31.4 | 72.8 | 39.3 | 52.7 | 33.2 | 42.1 | 31.2 | 39.3 | 27.2 | 26.6 | 43.8 | 29.5 | 37.6 | 743.8 |
| [10] Other SG&A Disbursements | 15.9 | 52.9 | 46.1 | 95.7 | 79.1 | 89.7 | 101.6 | 89.6 | 57.8 | 77.6 | 65.1 | 61.5 | 65.3 | 57.0 | 67.3 | 56.6 | 70.2 | 59.6 | 1,208.7 |
| [11] GOB Rent | 0.0 | 0.0 | 0.0 | 30.6 | 3.4 | 0.0 | 0.0 | 25.5 | 8.5 | 0.0 | 0.0 | 0.0 | 29.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.2 |
| [11] GOB Add'l Expenses | 0.0 | 0.0 | 0.0 | 6.8 | 6.8 | 12.9 | 13.1 | 13.2 | 13.3 | 13.2 | 13.1 | 36.4 | 36.5 | 29.9 | 30.1 | 30.1 | 24.4 | 24.3 | 304.0 |
| [11] GOB Liquidator Fees | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| [11] Less: GOB Store Level Expenses Add-Back | 0.0 | 0.0 | 0.0 | (5.5) | (5.5) | (10.6) | (10.6) | (9.4) | (9.4) | (9.4) | (9.4) | (26.1) | (24.6) | (24.6) | (24.6) | (24.6) | (24.8) | (24.8) | (244.2) |
| **Total Operating Disbursements** | 80.9 | 151.7 | 163.3 | 246.2 | 236.1 | 223.5 | 254.6 | 231.4 | 214.8 | 163.9 | 112.2 | 104.4 | 146.9 | 90.7 | 100.6 | 106.3 | 100.6 | 98.0 | 2,826.2 |
| [12] Less: CapEx | 0.0 | 0.0 | 0.0 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.1 | 1.1 | 16.8 |
| **Net Cash Flow** | 105.4 | 16.8 | 33.8 | (78.7) | (49.7) | 59.6 | (39.5) | (22.0) | 6.9 | 50.2 | 117.8 | 322.2 | 157.0 | 183.0 | 195.5 | 157.3 | 147.0 | 117.1 | 1,469.5 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | |
| [13] Utility Deposits | 0.0 | 0.0 | 0.0 | 0.0 | 9.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 9.2 |
| [14] Less: Professional Fees | 0.0 | 0.0 | 0.0 | 6.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.9 | 0.0 | 0.0 | 0.0 | 23.5 | 58.8 |
| [15] Critical Vendor Payments | 0.0 | 9.1 | 0.0 | 15.0 | 15.0 | 16.0 | 15.0 | 11.0 | 9.0 | 8.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 |
| [16] Insurance Payments | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| [17] Gift Card Redemptions | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 |
| [18] KERP / KERP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 |
| [19] Credit Card Holdbacks | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [20] PTO | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 7.5 |
| [21] Post-Petition TSA/CSA | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Chapter 11 Related** | 0.0 | 9.1 | 0.0 | 16.2 | 31.8 | 26.8 | 16.2 | 12.2 | 27.6 | 10.1 | 1.2 | 5.4 | 16.3 | 15.9 | 0.0 | 3.3 | 0.0 | 23.5 | 205.6 |
| [22] Less: Cash Interest | 0.9 | 5.1 | 5.1 | 4.1 | 4.1 | 3.9 | 3.6 | 3.7 | 4.2 | 4.6 | 4.7 | 4.6 | 4.3 | 5.1 | 3.9 | 3.5 | 3.2 | 2.9 | 62.6 |
| [23] Less: Financing Fees | 10.3 | 0.0 | 0.0 | 0.0 | 8.8 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.1 |
| **Total Other Non-Operating Disbursements** | 11.2 | 5.1 | 5.1 | 4.1 | 12.9 | 3.9 | 3.6 | 3.7 | 4.2 | 11.6 | 4.7 | 4.6 | 4.3 | 5.1 | 3.9 | 3.5 | 3.2 | 2.9 | 88.7 |
| [24] Unencumbered Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [25] Excess Proceeds | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Asset Sales** | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [26] Net Cash Flow Before ABL Paydown, ex TL | 94.2 | 6.6 | 32.7 | (99.0) | (94.4) | 28.9 | (59.3) | (38.0) | (24.8) | 28.5 | 111.9 | 312.2 | 155.3 | 171.9 | 190.5 | 159.3 | 152.7 | 99.5 | 1,228.6 |
| [27] Term Loan Draw | 111.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [28] Net Cash Flow Before ABL Paydown, w/TL | 206.1 | 6.6 | 32.7 | (99.0) | (94.4) | 28.9 | (59.3) | (38.0) | (24.8) | 28.5 | 111.9 | 312.2 | 155.3 | 171.9 | 190.5 | 159.3 | 152.7 | 99.5 | 1,340.5 |
| [29] Other Financing | 0.0 | 0.0 | 0.0 | 0.0 | (136.9) | (28.9) | 59.3 | 38.0 | 24.8 | (28.5) | (111.9) | (312.2) | (155.3) | (171.9) | (190.5) | (159.3) | (152.7) | (99.5) | (1,425.5) |
| **Net Cash Flow** | 206.1 | 6.6 | 32.7 | (99.0) | (231.3) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (85.0) |
| [30] Available Cash | 296.5 | 297.7 | 330.4 | 231.3 | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [31] Net Availability | 155.5 | 115.0 | 66.5 | 82.1 | 130.0 | 131.8 | 59.0 | 103.7 | 86.8 | 70.1 | 108.0 | 223.0 | 193.7 | 271.6 | 341.0 | 380.0 | 402.5 | 322.6 | 322.6 |
| [32] Memo: Total Liquidity (Availability + Cash) | 452.0 | 412.7 | 396.9 | 313.4 | 130.0 | 131.8 | 59.0 | 103.7 | 86.8 | 70.1 | 108.0 | 223.0 | 193.7 | 271.6 | 341.0 | 380.0 | 402.5 | 322.6 | 322.6 |
| Memo: Wind-down Reserve Balance | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 17.8 | 26.7 | 35.6 | 44.5 | 53.4 | 53.4 |
| Memo: Merchandise COGS | | 74.1 | 64.3 | 67.0 | 79.0 | 58.2 | 119.1 | 58.2 | 72.6 | 71.1 | 89.2 | 119.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 872.1 |
| Memo: GOB COGS | | | 0.0 | 26.5 | 30.7 | 31.5 | 58.3 | 64.4 | 65.8 | 67.2 | 66.4 | 66.0 | 163.5 | 174.8 | 156.2 | 164.9 | 171.6 | 155.0 | 142.5 | 1,605.5 |
| Memo: Borrowing Base | 1,798.5 | 1,757.6 | 1,259.4 | 1,725.0 | 1,636.0 | 1,608.9 | 1,445.4 | 1,378.1 | 1,336.1 | 1,290.8 | 1,216.8 | 1,027.1 | 859.9 | 775.7 | 665.6 | 556.3 | 467.7 | 397.1 | |
| Memo: Sr. DIP & 1L Borrowings | 1,642.0 | 1,642.9 | 1,642.9 | 1,642.0 | 1,500.0 | 1,477.1 | 1,386.4 | 1,274.4 | 1,249.2 | 1,220.7 | 1,108.9 | 796.6 | 641.3 | 469.4 | 278.9 | 119.6 | 0.0 | 0.0 | |
| Memo: Jr DIP Borrowings | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 300.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | |

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 359 stores GOB 12/29

**Project Blue - Cash Flow Forecast, Go-Forward Same-Store Sales of (15.0%) with 359 Go-Forward Stores, then GOB all stores 12/29**

| Month | October | | | November | | | | December | | | | | January | | | | February | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| Retail Week EoP | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | 1-18 |
| Unique Week | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | |
| [1] Normal Course Net Merchandise Receipts | $133.1 | $111.6 | $151.0 | $94.4 | $111.2 | $148.0 | $79.8 | $73.9 | $92.2 | $91.5 | $113.8 | $153.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $1,353.6 |
| [2] Plus: GOB Sales Receipts | 0.0 | 0.0 | 0.0 | 52.5 | 50.3 | 102.6 | 111.3 | 112.2 | 106.9 | 100.4 | 91.5 | 228.1 | 252.2 | 220.0 | 229.8 | 202.6 | 183.1 | 153.2 | 2,196.7 |
| [3] Plus: PA Sales | 2.5 | 11.1 | 4.9 | 2.3 | 6.0 | 6.1 | 9.3 | 7.7 | 6.4 | 6.7 | 6.2 | 6.3 | 6.8 | 7.1 | 6.7 | 6.4 | 6.6 | 6.2 | 115.1 |
| [4] Plus: Other Cash Receipts | 50.7 | 45.6 | 41.1 | 20.0 | 20.0 | 20.0 | 20.0 | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 585.5 |
| [5] Plus: Non-Operating Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 6.8 |
| [6] Plus: TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Cash Receipts** | $186.3 | $168.5 | $197.0 | $169.2 | $187.6 | $276.8 | $223.2 | $218.3 | $230.0 | $223.0 | $236.0 | $413.7 | $300.0 | $268.0 | $277.3 | $252.2 | $230.6 | $200.3 | $4,257.8 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | |
| [7] Merchandise Vendors | $21.0 | $71.1 | $52.0 | $63.5 | $63.8 | $60.4 | $71.3 | $67.1 | $73.7 | $43.9 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $657.7 |
| [8] Occupancy | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 18.6 |
| [9] Payroll, Taxes, and Benefits | 44.0 | 27.8 | 65.2 | 31.1 | 59.7 | 31.4 | 72.8 | 39.3 | 62.7 | 33.2 | 42.1 | 31.2 | 39.3 | 27.2 | 26.6 | 43.0 | 29.5 | 37.6 | 743.8 |
| [10] Other SG&A Disbursements | 15.9 | 52.9 | 46.1 | 95.7 | 79.1 | 89.7 | 101.6 | 89.6 | 57.8 | 77.6 | 65.1 | 61.5 | 65.3 | 57.0 | 67.3 | 56.6 | 70.2 | 59.6 | 1,208.7 |
| [11] GOB Rent | 0.0 | 0.0 | 0.0 | 30.6 | 3.4 | 0.0 | 0.0 | 25.5 | 8.5 | 0.0 | 0.0 | 0.0 | 29.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.2 |
| [11] GOB Add'l Expenses | 0.0 | 0.0 | 0.0 | 6.8 | 6.8 | 15.0 | 15.4 | 15.4 | 15.5 | 15.5 | 15.4 | 36.7 | 36.7 | 30.2 | 30.2 | 30.3 | 22.4 | 22.3 | 314.7 |
| [11] GOB Liquidator Fees | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| [11] Less: GOB Store Level Expenses Add-Back | 0.0 | 0.0 | 0.0 | (5.5) | (5.5) | (12.6) | (12.6) | (11.2) | (11.2) | (11.2) | (11.2) | (26.4) | (24.7) | (24.7) | (24.7) | (24.7) | (24.9) | (24.9) | (256.3) |
| **Total Operating Disbursements** | $80.9 | $151.7 | $163.3 | $243.5 | $228.5 | $215.2 | $249.7 | $227.2 | $208.3 | $160.3 | $112.8 | $104.4 | $147.0 | $90.8 | $100.7 | $106.3 | $98.5 | $95.8 | $2,784.9 |
| [12] Less: CapEx | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.1 | 1.1 | 16.8 |
| **Net Cash Flow** | $105.4 | $16.8 | $33.8 | ($76.1) | ($42.1) | $60.4 | ($27.5) | ($9.9) | $20.3 | $61.6 | $122.4 | $308.2 | $151.9 | $176.3 | $175.5 | $144.8 | $131.0 | $103.3 | $1,456.1 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | |
| [13] Utility Deposits | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 |
| [14] Less: Professional Fees | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.6 | 0.0 | 0.0 | 0.0 | 23.5 | 58.8 |
| [15] Critical Vendor Payments | 0.0 | 0.0 | 9.1 | 15.0 | 15.0 | 15.0 | 15.0 | 11.0 | 9.0 | 8.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 |
| [16] Insurance Payments | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| [17] Gift Card Redemptions | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 |
| [18] KERP / KERP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 |
| [19] Credit Card Holdbacks | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [20] PTO | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 7.5 |
| [21] Post-Petition TSA/CSA | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Chapter 11 Related** | $0.0 | $9.1 | $0.0 | $16.2 | $31.8 | $26.8 | $16.2 | $12.2 | $27.6 | $10.1 | $1.2 | $5.4 | $6.3 | $15.9 | $0.0 | $3.3 | $0.0 | $23.5 | $205.6 |
| [22] Less: Cash Interest | $0.9 | $1.1 | $1.1 | $4.1 | $4.1 | $3.9 | $3.6 | $3.7 | $4.1 | $4.5 | $4.6 | $4.5 | $4.2 | $4.1 | $3.8 | $3.5 | $3.2 | $2.9 | $62.0 |
| [23] Less: Financing Fees | 10.3 | 0.0 | 0.0 | 0.0 | 8.8 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.1 |
| **Total Other Non-Operating Disbursements** | $11.2 | $1.1 | $1.1 | $4.1 | $12.9 | $3.9 | $3.6 | $3.7 | $4.1 | $11.5 | $4.6 | $4.5 | $4.2 | $4.1 | $3.8 | $3.5 | $3.2 | $2.9 | $88.0 |
| [24] Unencumbered Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [25] Excess Proceeds | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total Asset Sales** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $53.4 |
| [26] Net Cash Flow Before ABL Paydown, ex TL | $94.2 | $6.6 | $32.7 | ($96.4) | ($86.7) | $29.8 | ($47.3) | ($25.8) | ($11.4) | $39.9 | $116.5 | $298.3 | $150.3 | $165.3 | $180.6 | $146.9 | $136.7 | $85.7 | $1,215.9 |
| [27] Term Loan Draw | $111.9 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $111.9 |
| [28] Net Cash Flow Before ABL Paydown, w/TL | $206.1 | $6.6 | $32.7 | ($96.4) | ($86.7) | $29.8 | ($47.3) | ($25.8) | ($11.4) | $39.9 | $116.5 | $298.3 | $150.3 | $165.3 | $180.6 | $146.9 | $136.7 | $85.7 | $1,327.8 |
| [29] Other Financing | $0.0 | $0.0 | $0.0 | $0.0 | ($147.3) | ($29.8) | $47.3 | $25.8 | $11.4 | ($39.9) | ($116.5) | ($298.3) | ($150.3) | ($165.3) | ($180.6) | ($146.9) | ($136.7) | ($85.7) | ($1,412.8) |
| **Net Cash Flow** | $206.1 | $6.6 | $32.7 | ($96.4) | ($234.0) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | ($85.0) |
| [30] Available Cash | 296.5 | 297.7 | 330.4 | 234.0 | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [31] Net Availability | 155.5 | 115.0 | 66.5 | 81.6 | 135.6 | 131.1 | 67.6 | 119.4 | 111.0 | 98.8 | 137.2 | 241.1 | 208.2 | 279.5 | 341.1 | 370.7 | 384.5 | 312.6 | 312.6 |
| [32] Memo: Total Liquidity (Availability + Cash) | $452.0 | $412.7 | $396.9 | $315.6 | $135.6 | $131.1 | $67.6 | $119.4 | $111.0 | $98.8 | $137.2 | $241.1 | $208.2 | $279.5 | $341.1 | $370.7 | $384.5 | $312.6 | $312.6 |
| Memo: Wind-down Reserve Balance | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $17.8 | $26.7 | $35.6 | $44.5 | $53.4 | $53.4 |
| Memo: Merchandise COGS | | 74.1 | 64.3 | 67.0 | 79.0 | 52.5 | 105.1 | 52.5 | 65.5 | 64.9 | 80.8 | 108.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 814.3 |
| Memo: GOB COGS | | 0.0 | 26.5 | 30.7 | 31.5 | 66.7 | 74.0 | 75.3 | 78.1 | 78.2 | 79.2 | 166.2 | 175.2 | 150.2 | 161.7 | 166.9 | 140.8 | 129.7 | 1,636.8 |
| Memo: Borrowing Base | 1,798.5 | 1,757.0 | 1,709.4 | 1,724.5 | 1,631.3 | 1,597.0 | 1,430.8 | 1,358.4 | 1,311.4 | 1,259.2 | 1,181.1 | 997.6 | 831.7 | 747.4 | 639.4 | 532.7 | 451.6 | 388.2 | |
| Memo: Sr. DIP & 1L Borrowings | 1,642.9 | 1,642.9 | 1,642.9 | 1,642.9 | 1,495.7 | 1,465.9 | 1,363.2 | 1,239.0 | 1,200.4 | 1,160.5 | 1,043.9 | 745.6 | 595.4 | 430.1 | 249.5 | 102.8 | 0.0 | 0.0 | |
| Memo: Jr DIP Borrowings | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 300.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | |

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# 300 stores GOB 12/29

**Project Blue - Cash Flow Forecast, Go-Forward Same-Store Sales of (15.0%) with 300 Go-Forward Stores, then GOB all stores 12/29**

| Month | | October | | | November | | | | December | | | | | January | | | | February | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | Weeks |
| Retail Week EoP | | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 | 1/19/19 | 1/26/19 | 2/2/19 | 2/9/19 | 2/16/19 | |
| Unique Week | | 201837 | 201838 | 201839 | 201840 | 201841 | 201842 | 201843 | 201844 | 201845 | 201846 | 201847 | 201848 | 201849 | 201850 | 201851 | 201852 | 201901 | 201902 | 1-18 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | | | | | | |
| [1] | Normal Course Net Merchandise Receipts | $133.1 | $111.6 | $151.0 | $94.4 | $111.2 | $123.9 | $66.3 | $63.0 | $78.8 | $78.4 | $97.2 | $130.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $1,239.6 |
| [2] | Plus: GOB Sales Receipts | 0.0 | 0.0 | 0.0 | 52.5 | 50.3 | 118.7 | 132.0 | 132.5 | 128.8 | 121.0 | 112.6 | 225.2 | 241.0 | 206.3 | 211.9 | 182.5 | 156.0 | 129.7 | 2,201.2 |
| [3] | Plus: PA Sales | 2.5 | 11.1 | 4.9 | 2.3 | 6.0 | 6.1 | 9.3 | 7.7 | 6.4 | 6.7 | 6.2 | 6.3 | 6.8 | 7.1 | 6.7 | 6.4 | 6.6 | 6.2 | 115.1 |
| [4] | Plus: Other Cash Receipts | 50.7 | 45.8 | 41.1 | 20.0 | 20.0 | 20.0 | 20.0 | 24.5 | 24.5 | 24.5 | 24.5 | 24.5 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 40.9 | 585.5 |
| [5] | Plus: Non-Operating Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.7 | 0.0 | 0.0 | 0.0 | 0.0 | 1.8 | 0.0 | 0.0 | 0.0 | 2.3 | 0.0 | 0.0 | 6.8 |
| [6] | Plus: TSA & CSA Receipts | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Total Cash Receipts** | $186.3 | $168.5 | $197.0 | $169.2 | $187.6 | $268.7 | $230.3 | $227.6 | $238.5 | $230.5 | $240.5 | $388.5 | $288.8 | $254.3 | $259.5 | $232.1 | $203.5 | $176.8 | $4,148.2 |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | |
| [7] | Merchandise Vendors | $21.0 | $71.1 | $52.0 | $79.6 | $73.4 | $79.1 | $63.4 | $59.7 | $62.9 | $37.5 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $599.8 |
| [8] | Occupancy | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 18.6 |
| [9] | Payroll, Taxes, and Benefits | 44.0 | 27.8 | 65.2 | 31.1 | 59.7 | 31.4 | 72.8 | 39.3 | 62.7 | 33.2 | 42.1 | 31.2 | 39.3 | 27.2 | 26.6 | 43.0 | 29.5 | 37.6 | 743.8 |
| [10] | Other SG&A Disbursements | 15.8 | 52.9 | 46.1 | 95.7 | 79.1 | 89.7 | 101.6 | 89.6 | 57.5 | 77.6 | 65.1 | 61.5 | 65.3 | 57.0 | 67.3 | 56.6 | 70.2 | 59.6 | 1,208.7 |
| [11] | GOB Rent | 0.0 | 0.0 | 0.0 | 30.6 | 3.4 | 0.0 | 0.0 | 25.5 | 8.5 | 0.0 | 0.0 | 0.0 | 29.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 97.2 |
| [11] | GOB Add'l Expenses | 0.0 | 0.0 | 0.0 | 6.8 | 6.8 | 17.7 | 18.1 | 18.2 | 18.4 | 18.4 | 18.3 | 36.7 | 36.7 | 30.1 | 30.1 | 30.0 | 19.6 | 19.5 | 325.4 |
| [11] | GOB Liquidator Fees | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| [11] | Less: GOB Store Level Expenses Add-Back | 0.0 | 0.0 | 0.0 | (5.5) | (5.5) | (15.8) | (15.8) | (14.0) | (14.0) | (14.0) | (14.0) | (26.7) | (24.6) | (24.6) | (24.6) | (24.6) | (24.7) | (24.7) | (273.0) |
| | **Total Operating Disbursements** | $80.9 | $151.7 | $163.3 | $239.7 | $218.1 | $203.5 | $241.4 | $219.7 | $197.6 | $154.0 | $112.9 | $104.1 | $147.2 | $90.9 | $100.7 | $106.3 | $95.9 | $93.2 | $2,721.0 |
| [12] | Less: CapEx | 0.0 | 0.0 | 0.0 | 1.7 | 1.2 | 1.1 | 1.1 | 1.1 | 1.4 | 1.0 | 0.9 | 1.1 | 1.1 | 0.9 | 1.2 | 1.1 | 1.1 | 1.1 | 16.8 |
| | **Net Cash Flow** | $105.4 | $16.8 | $33.8 | ($72.2) | ($31.7) | $64.1 | ($12.1) | $6.9 | $39.5 | $75.5 | $126.8 | $283.3 | $140.6 | $162.5 | $157.7 | $124.8 | $106.6 | $82.4 | $1,410.5 |
| **NON-OPERATING CASH FLOW** | | | | | | | | | | | | | | | | | | | | |
| [13] | Utility Deposits | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $9.2 |
| [14] | Less: Professional Fees | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 0.0 | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 15.9 | 0.0 | 0.0 | 0.0 | 23.5 | 58.8 |
| [15] | Critical Vendor Payments | 0.0 | 9.1 | 0.0 | 15.0 | 15.0 | 15.0 | 15.0 | 11.0 | 9.0 | 8.9 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 98.0 |
| [16] | Insurance Payments | 0.0 | 0.0 | 0.0 | 0.0 | 4.3 | 4.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 |
| [17] | Gift Card Redemptions | 0.0 | 0.0 | 0.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 |
| [18] | KEIP / KERP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.6 |
| [19] | Credit Card Holdbacks | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [20] | PTO | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.2 | 0.0 | 0.0 | 0.0 | 3.3 | 0.0 | 0.0 | 7.5 |
| [21] | Post-Petition TSA/CSA | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Chapter 11 Related** | $0.0 | $9.1 | $0.0 | $16.2 | $31.8 | $26.8 | $16.2 | $12.2 | $27.6 | $10.1 | $1.2 | $5.4 | $6.3 | $15.9 | $0.0 | $3.3 | $0.0 | $23.5 | $205.6 |
| [22] | Less: Cash Interest | $0.9 | $1.1 | $1.1 | $4.1 | $4.1 | $3.9 | $3.5 | $3.6 | $4.1 | $4.5 | $4.5 | $4.4 | $4.1 | $4.0 | $3.7 | $3.4 | $3.2 | $3.0 | $61.3 |
| [23] | Less: Financing Fees | 10.3 | 0.0 | 0.0 | 0.0 | 8.8 | 0.0 | 0.0 | 0.0 | 0.0 | 7.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 26.1 |
| | **Total Other Non-Operating Disbursements** | $11.2 | $1.1 | $1.1 | $4.1 | $12.9 | $3.9 | $3.5 | $3.6 | $4.1 | $11.5 | $4.5 | $4.4 | $4.1 | $4.0 | $3.7 | $3.4 | $3.2 | $3.0 | $87.3 |
| [24] | Unencumbered Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 53.4 |
| [25] | Excess Proceeds | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | **Total Asset Sales** | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $8.9 | $53.4 |
| [26] | Net Cash Flow Before ABL Paydown, ex TL | $94.2 | $6.6 | $32.7 | ($92.5) | ($76.3) | $33.5 | ($31.9) | ($9.0) | $7.8 | $53.9 | $121.1 | $273.5 | $139.1 | $151.6 | $162.8 | $126.9 | $112.3 | $64.8 | $1,171.0 |
| [27] | Term Loan Draw | $111.9 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $111.9 |
| [28] | Net Cash Flow Before ABL Paydown, w/TL | $206.1 | $6.6 | $32.7 | ($92.5) | ($76.3) | $33.5 | ($31.9) | ($9.0) | $7.8 | $53.9 | $121.1 | $273.5 | $139.1 | $151.6 | $162.8 | $126.9 | $112.3 | $64.8 | $1,282.9 |
| [29] | Other Financing | $0.0 | $0.0 | $0.0 | $0.0 | ($161.5) | ($33.5) | $31.9 | $9.0 | ($7.8) | ($53.9) | ($121.1) | ($273.5) | ($139.1) | ($151.6) | ($162.8) | ($126.9) | ($112.3) | ($64.8) | ($1,367.9) |
| | **Net Cash Flow** | $206.1 | $6.6 | $32.7 | ($92.5) | ($237.8) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | ($85.0) |
| [30] | Available Cash | 296.5 | 297.7 | 330.4 | 237.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [31] | Net Availability | 155.5 | 115.0 | 66.5 | 80.9 | 144.4 | 134.4 | 83.2 | 144.7 | 148.3 | 141.0 | 179.2 | 265.1 | 224.6 | 284.3 | 333.1 | 348.7 | 374.7 | 314.8 | 314.8 |
| [32] | **Memo: Total Liquidity (Availability + Cash)** | $452.0 | $412.7 | $396.9 | $318.7 | $144.4 | $134.4 | $83.2 | $144.7 | $148.3 | $141.0 | $179.2 | $265.1 | $224.6 | $284.3 | $333.1 | $348.7 | $374.7 | $314.8 | $314.8 |
| | Memo: Wind-down Reserve Balance | | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $8.9 | $17.8 | $26.7 | $35.6 | $44.5 | $53.4 | $53.4 |
| | Memo: Merchandise COGS | | 74.1 | 64.3 | 67.0 | 79.0 | 44.7 | 88.0 | 44.7 | 55.9 | 55.6 | 69.0 | 92.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 735.2 |
| | Memo: GOB COGS | | 0.0 | 28.5 | 30.7 | 31.5 | 77.3 | 86.3 | 87.8 | 92.2 | 93.2 | 95.4 | 167.2 | 172.8 | 152.6 | 154.1 | 157.2 | 119.7 | 110.5 | 1,655.1 |
| | Memo: Borrowing Base | 1,796.5 | 1,757.9 | 1,709.4 | 1,723.8 | 1,625.5 | 1,502.3 | 1,413.1 | 1,333.5 | 1,279.3 | 1,218.2 | 1,135.3 | 962.6 | 799.8 | 717.5 | 613.8 | 512.5 | 442.8 | 390.1 | |
| | Memo: Sr. DIP & 1L Borrowings | 1,642.9 | 1,642.9 | 1,642.9 | 1,642.9 | 1,481.4 | 1,447.9 | 1,329.8 | 1,188.8 | 1,131.1 | 1,077.2 | 956.1 | 682.6 | 543.5 | 361.9 | 229.1 | 102.1 | 0.0 | 0.0 | |
| | Memo: Jr DIP Borrowings | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 150.0 | 300.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | 350.0 | |

SEARS HOLDINGS   sears   kmart   SHOP YOUR WAY

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Break



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Tax Update

 

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Overview of Sears' Tax Attributes*

*(all amounts are approximations)*

- As of February 3, 2018:
  - Consolidated federal net operating losses (NOLs): $5.0 billion
    - Amount does not reflect any FY2018 losses or deferred interest deductions (IRC Section 163(j)).
  - Consolidated federal tax credits: $900 million (most of which is foreign tax credits)
    - Tax basis in assets: $6.3 billion (includes current assets,** but excludes intercompany debt and US subsidiary stock basis)
  - Determining the stock basis and the status of the intercompany accounts for tax purposes is critical to understanding the potential tax consequences – both good and bad – of a sale of the assets of the company.
    - This is a substantial task Deloitte has been pursuing for only a few weeks and still has a lot of work to do, as described on the next slide.
  - As will be discussed, any acquisition of the tax attributes – whether in a stock acquisition under a Chapter 11 plan or pursuant to a BC Section 363 sale (in combination with a plan) – will be subject to reduction and limitation under the cancellation of debt ("COD") and change in ownership rules.
  - \* Based on information provided by the company and tax returns, as filed. Amounts are subject to material change. Slides prepared in conjunction with Deloitte.

  \*\* Includes inventory of $2.4 billion and cash of $460 million.

Weil LAZARD M–III PARTNERS

62

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Critical Tax Work Streams (Deloitte Tax/Weil)

- Development and refinement of amount of tax attributes
- Complexity of structure requires significant analysis
  - NOLs in multiple entities
    - Sears Holdings Corporation; Sears, Roebuck and Co; Kmart Corporation; Sears Holdings Management Corporation; and others
  - Debt and COD in multiple locations
    - Debtors: Sears Holdings Corporation; Sears, Roebuck and Co; Sears Roebuck Acceptance Corp.; Sears Reinsurance Company Ltd.
  - Intercompany debt account balances and settlement
- Work Streams
  - Assist in evaluating bidder/stalking horse proposals and tax consequences
  - Tax basis in both assets and stock by entity
  - Resolution of complex intercompany debt structure
  - NOL, COD, and attribute reduction by entity
  - Assist with development of Chapter 11 plan structures

Weil   LAZARD   M-II

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Reduction of Tax Attributes for Cancellation of Debt

− For any corporation in bankruptcy (for which COD is incurred pursuant to a court order or confirmed plan), any COD is excluded from taxable income <u>but</u> the corporation's tax attributes (including NOLs) must be reduced by the amount of the excluded COD income.

  • Within a consolidated group, the tax attributes of other group members are also subject to reduction.

− Remaining tax attributes are then subject to limitation or further reduction under the IRC Section 382 change in ownership rules, assuming that Sears or its successor undergoes a 50% ownership change.

− <u>Example</u>:  Based on an illustrative enterprise value of $1.5 billion (net of working capital) and third party debt of approx. [$5.5 billion], there would be $4.0 billion of COD, all excluded in the Chapter 11 case but resulting in attribute reduction. Following the reduction, the following "excess" tax attributes on a group wide basis would remain (subject to change in ownership limitations):*

  • Consolidated NOLs:       $1.0 billion, plus FY2018 losses

  • Consolidated tax credits:  $900 million**

  • Tax basis in assets (in excess of value):*** $1.8   billion   (*i.e.,*   $6.3   billion   of   tax   basis

    less $4.5 billion of gross asset value)

\* Actual results may vary materially because of the location of NOLs and COD income among members of the Sears group.

\*\* Foreign tax credits potential utility depends on various factors.

\*\*\* Assumes current assets valued at around $3 billion (book value), which does not include intercompany debt and US subsidiary stock basis. Assets with "excess" basis are to be determined.

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# If Section 382(l)(5) Applies: "Haircut" but No Annual Limitation

- Only available if pre-change shareholders and qualified creditors receive 50% or more of the reorganized company or its tax successor.

- A qualified creditor is any creditor holding "qualified" debt. Qualified debt generally is:

  - Debt outstanding since at least 18 months before the petition date, and continuously held since then by the same creditor;

  - Debt incurred in the debtor's ordinary course of business (such as trade debt), and continuously held by the same creditor; and

  - The above types of debt, <u>except that</u> the debt has traded and the creditor ends up with less than 5% (by value) of the stock of the reorganized equity.

- NOLs and likely any deferred interest deductions are reduced by the amount of interest deductions taken over the past 3-4 years with respect to the debt converted into stock.

  - If <u>all</u> debt were converted into stock, the combined NOL and likely deferred interest reduction potentially could be in the range of $1.0 billion (but is subject to continuing analysis) – significantly reducing NOLs. Also, not all debt may be converted. Tax Credits would be preserved. (Tax basis may be valuable without regard to Section 382(l)(5) qualification.)

- If a second ownership change occurs within 2 years of emergence, the annual limitation is zero (meaning any remaining NOL is generally of no further value thereafter).

  - Typically, the reorganized company's charter will restrict stock transfers to reduce this risk.

**Weil**   LAZARD   M·II
PARTNERS

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Section 382(l)(6) Annual Limitation: In General

– Section 382(l)(6) annual limitation applies if the debtor does not qualify for Section 382(l)(5) or if the debtor elects out of Section 382(l)(5).

– Annual limitation on the use of the remaining NOLs and tax credits (*i.e.,* remaining after COD reduction) is generally equal to:

  (i) the long-term tax-exempt rate (currently, 2.43%) <u>times</u>

  (ii) the lesser of (a) post-reorganization equity value and (b) pre-transaction gross asset value

This can be increased, for the first 5 years after emergence, by the portion of the debtors' net unrealized built-in gain (NUBIG) actually or deemed recognized during such period; <u>however</u>, current indications are that this adjustment would not be material.

  • A significant portion of the excess tax basis may not be subject to the annual limitation.

– Can enhance basic annual limitation by increasing the post-reorganization equity value of reorganized company, such as by merging with a third party or by other new investment as part of the Chapter 11 plan.

– If creditors receive at least half of the reorganized company's equity so as to potentially qualify under Section 382(l)(5), the decision whether to apply Section 382(l)(5) does not have to be made until the filing of the tax return for the taxable year of emergence.

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Potential Monetization Structures

- Chapter 11 plan structure vs. BC Section 363 sale:  General overview

  - In the context of a Chapter 11 plan, the existing debtors can be restructured (leaving the existing tax group intact, if desired), such that a new party alone or together with existing stakeholders can acquire the stock of the reorganized debtor group.

    - In such event, the tax attributes are indirectly acquired along with the assets of the restructured debtors.

    - A Chapter 11 plan structure for the entire company presents the least tax consequences, and puts less pressure on a refined understanding of intercompany debt and stock basis.

  - A 363 sale involves the acquisition of some or all of the debtor's assets by the bidder, which can be a creditor or group of creditors in whole or in part as a credit bid.

    - 363 sales can be effected on a group-wide basis or an entity-by-entity basis

    - As discussed below, a transfer of assets through a 363 sale can, under certain circumstances, qualify as a "tax" reorganization in which the tax attributes of the debtor travel with its assets, but with increased complexities and potential tax costs – due in part to the transfer of the tax attributes on the asset sale closing date even though there may be material taxable income incurred for the debtor/seller group after the transfer from the wind-up of the debtors.

      - <u>Looming possible impediment</u>:  There may be risk that the wind up could trigger existing deferred gains relating to intercompany stock transfers, and any "excess loss accounts" if determined to exist.

Weil  LAZARD  M-III

67

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Potential Chapter 11 Plan Examples

–   Stock of Sears Holdings acquired by an existing creditor or group of creditors, alone or together with a new third party cash investment (with cash distributed to creditors):

   •   Potentially qualifies for Section 382(l)(5): If so, there would be no limitation on the use of the tax attributes (including NOLs) so long as no subsequent ownership change occurs within 2 years, but NOLs and likely deferred interest deductions reduced by up to $1 billion, depending on amount of converted debt – leaving current year losses and preserving tax credits.

   •   If annual limitation applies, Section 382(l)(6): At most, assuming up to a $1.5 billion equity value (depending on capital structure), an annual limitation of up to approx. $36 million / year, at 21%+ tax rate, on losses and credits.

   •   In either instance, a substantial portion of excess tax basis would likely be available without limitation.

–   Stock of Sears Holdings acquired in a business combination with a third party, such as a merger with a third party or the contribution of the third party's business for the reorganized equity of Sears:

   •   Such a plan is unlikely to qualify under Section 382(l)(5).

   •   If annual limitation applies, Section 382(l)(6): If third party infuses a business sufficient to bring the reorganized equity value up to the pre-change gross asset value of approx. $4.5 billion (assuming no separate sales of business), the annual limitation could be up to approx. $110 million / year, at 21%+ tax rate, on losses and credits.

      –   The business combination effectively enhances the annual limitation by increasing the post-reorganization equity value to the extent permitted under regulations.

–   Debtor-by debtor acquisitions:

   •   Select members of the Sears group could be acquired by creditors based on a refined understanding of where the tax attributes are located within the group.

   •   In effect, the tax attributes and the above consequences could be divided up on an entity by entity basis; however, this may pose additional tax costs associated with subsidiary stock basis and treatment of intercompany accounts.

Weil   LAZARD   M·II

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## Potential 363 Sales as Tax Reorganizations

- A BC Section 363 sale of a corporate debtor's assets for a mix of acquirer stock and other consideration can potentially qualify (in whole or in part) for tax reorganization treatment. *To the extent it does, an acquiror may be able to achieve similar tax results as those described above under a Chapter 11 plan.*

- To qualify for tax reorganization treatment –

  - The sale of assets and subsequent distribution to creditors/shareholders of the sale proceeds must be pursuant to a single plan and arrangement for tax purposes.

    - The sales agreement would constitute such plan (and would so provide) and generally would require that the "liquidation" of the seller corporation be completed from a tax perspective within a specified period (whether under a Chapter 11 plan or otherwise).

  - In addition, qualification as a tax reorganization depends on the composition of the ultimate distribution of consideration to creditors/shareholders under the plan (stock vs. non-stock), as well as the satisfaction of certain other requirements.

  - Whether these various requirements could be satisfied depends on the facts and circumstances of the particular transaction, and becomes more complex in a multi-tier structure (as we have here).

- As previously indicated, however, there potentially could be significant tax costs not present in a Chapter 11 restructuring of the existing group.

Weil   LAZARD   M-III

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

## BC Section 363 Exchange: Tax Reorganization Example



Letter Ruling 201025018 illustrates a BC Section 363 exchange that included the following steps:

- Debtor is in bankruptcy.

- Debtor transferred the Company Assets, excluding the Unwanted Assets, to Newco in exchange for (i) common stock of Newco; (ii) the Instrument; (iii) credit bids of certain loans; (iv) the assumption by Newco of certain liabilities; and (v) Newco Series A Warrants (the "Exchange").

- Debtor attempted to sell or wind down the Unwanted Assets, and noted that it may sell the Newco common stock and Newco Series A Warrants that it received in the Exchange.

- Debtor then planned to liquidate, distributing its remaining assets to Debtor's claimholders.

- The IRS ruled that the Exchange and Debtor liquidation constituted a tax reorganization – as a result Newco acquired the tax attributes of the Debtor (after reduction for COD and subject to the change in ownership limitations of Section 382.

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Can't Sell it, Can Still Preserve it

- What do you do when you have sold most or substantially all of your assets, but there are still substantial tax attribute remaining that couldn't be sold?  Sometimes you can still preserve them for your stakeholders.
- There are variations to this.  But in the best circumstances, one or more businesses are retained, and then reorganize and distribute Sears Holdings to the creditors and/or shareholders.
- Under any of these variations, the tax attributes are principally of speculative value.
- Availability of tax attributes –
  - May qualify under Section 382(l)(5):  If so, the reorganized company would retain for future any remaining NOLs (after the reduction for COD and the "haircut").
    - This would include any additional tax losses due to the sale of assets that had "excess" tax basis.
    - Must retain more than an insignificant active trade or business.
  - Under certain circumstance, need not qualify for Section 382(l)(5):
    - If substantial tax losses are incurred from the sale of other assets, and a Chapter 11 plan can be implemented sufficiently early in the same taxable year, a portion of the tax losses might be allocated to the post-Effective Date portion of the tax year without limitation, thereby avoiding the Section 382 annual limitation as to that portion of the losses.
  - Should try to avoid triggering any income relating to stock basis and intercompany debt issues



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# DIP Financing Overview



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# DIP Financing Overview

- The (a) final hearing for the DIP ABL and (b) interim hearing for the Junior DIP is currently noticed for <u>November 27th at 1:30 pm (ET)</u>. The Company continues to finalize proposals and socialize such proposals with key stakeholders—including the DIP ABL Lenders and the Unsecured Creditors Committee.

- The Junior DIP process continues to be rigorous and exhaustive; Lazard has contacted almost 100 parties in interest, eventually executing approximately 35 NDAs, and sending incremental DIP process letters to approximately 25 parties.

    - To date, the following parties have submitted indicative proposals:

        - <u>ESL</u>: $350mm proposal (interest rescinded on 11/4)

        - <u>EFO</u>: $450mm proposal (interest rescinded on 11/7)

        - <u>Cyrus-led consort</u>ium: $375mm proposal

        - <u>Great American Capital led consortium</u>:

            - (a) $450mm proposal—later revised to a $350mm proposal, and

            - (b) $600mm proposal

- Although the Company continues to consider all available options, they have narrowed their focus to the Great American Capital $350mm proposal and the Cyrus-led $375mm proposal.  Both parties continue to conduct diligence and exchange term sheets with the Company's advisors.  The Company has shared the draft term sheets with the DIP ABL Lenders and the Unsecured Creditors Committee.

- The Company and its advisors continue to work around-the-clock responding to diligence requests, responding to inquiries, and turning mark-ups in a productive and swift manner.

- As of Friday, November 9, the Company has narrowed issues, particularly with respect to the Great American Capital $350mm proposal.

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Junior DIP: Process Summary

**Lazard conducted initial discussions with 97 potential Junior DIP financing providers, ultimately receiving conforming term sheets from two consortiums led by Great American Capital Partners ("GACP") and Cyrus Capital Partners ("Cyrus").**

- Also received one non-conforming proposal from EFO Financial
- See Appendix for detailed contact log



| Initial Outreach | NDA Requests | Executed NDA | Submitted Proposal |
|---|---|---|---|
| 98 Parties | 62 Parties | 34 Parties | 10 Parties (3 Consortiums) |

GACP Consortium[1]: GREAT AMERICAN CAPITAL PARTNERS, FARALLON, PEROT, FIRST PACIFIC, WHITEBOX, BLUE TORCH CAPITAL

Cyrus Consortium: CYRUS, MUDRICK CAPITAL, Fir Tree Partners

1.   Additional parties including PIMCO, Silverpoint and Apollo may join GACP consortium.

 Weil   LAZARD   M-III PARTNERS

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Junior DIP: Key Terms

### The following summarizes the latest terms of the GACP and Cyrus proposals

- Key business points in GACP proposal are generally agreed; Cyrus economics, collateral package and milestones subject to further negotiation, as outlined in the Appendix.

| | GACP (11/9/2018) | Cyrus Proposal (11/8/2018) |
|---|---|---|
| Lenders | • GA Capital and certain other institutions | • Cyrus, Mudrick, [Fir Tree] |
| Terms | • $350 million term loan<br>   Assumes ABL DIP commitment size and structure remains consistent with structure approved on an interim basis<br>• L+11.50% | • $375 million term loan<br>   Contemplates reduction of ABL DIP to $225 million incremental commitment<br>• L+12.00% |
| Duration | • Earlier of 8 months with a 4 month extension option, or the Maturity Date of ABL DIP | • Earlier of 7 months, with a 3-month extension option, and a second 3-month extension option; or the Maturity Date of the ABL DIP |
| Fees | • Closing Fee: 3.00% on interim and remainder at final approval<br>• Undrawn Fee: 0.75%<br>• Agent Monitoring Fee: $200,000<br>• Extension Fee: 1.25% with payment at maturity | • Upfront Fee: 3.00% on interim and remainder at final approval<br>• OID: 1.00%<br>• Undrawn Fee: 0.75%<br>• Extension Fees: 1.50%<br>• Prepayment Fee: 2.50% prior to March 15<br>• Agency Fee: $50,000 |
| Priority | • Junior lien on ABL collateral behind all first and second lien prepetition debt<br>• Junior lien behind ABL DIP on all previously unencumbered assets (except specified assets)<br>• Senior lien on specified assets *pari passu* with ABL DIP<br>• Junior lien behind ABL DIP and prepetition liens on previously encumbered assets | • Senior lien on all previously unencumbered assets<br>• Junior lien on all previously encumbered assets, behind ABL DIP, except on IP/GL collateral where lien is senior to DIP ABL<br>• Equity pledge of Sparrow Entity |
| Funding | • Multiple draw term loan facility<br>• Initial funding $150 million; subsequent draws to occur when Debtor's available cash is less than $50 million | • Multiple draw term loan facility<br>• Initial funding of $175 million; minimum draws of $50 million thereafter, up to $200 million |
| Winddown Reserve | • $200 million to be funded from first proceeds from previously unencumbered assets and any excess proceeds from the sale of any encumbered assets | • $200 million to be funded from first proceeds from previously unencumbered assets and any excess proceeds from the sale of any encumbered assets |

Note: Summary includes key business points; not comprehensive.



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Junior DIP: Key Terms (cont'd)

## The following summarizes the latest terms of the GACP and Cyrus proposals

| | GACP Proposal (11/9/2018) | Cyrus Proposal (11/8/2018) |
|---|---|---|
| **Store Maintenance Reserve** | • N/A | • Cash reserve of $[TBD] million created upon close from proceeds of Junior DIP to be held until such time as certain stores constituting DIP collateral have been sold |
| **Credit Bidding** | • Customary rights for junior creditors | • Can credit bid to the extent the Winddown Reserve is fully funded |
| **Milestones** | • Final Order to be entered no later than December 28, 2018; Final Closing Date to occur no later than January 5, 2018<br>• Other milestones same as ABL DIP | • Approval of DIP by December 20, 2018<br>• Other milestones same as ABL DIP with additional requirement to demonstrate plan of asset disposition by December 1, 2018<br>   Asset sale disposition plan milestone subject to further negotiation |
| **Covenants** | • Compliance with the Approved Budget, subject to permitted variances | • Compliance with the Approved Budget, subject to permitted variances |
| **Other** | • Retention of liquidation consultants and retail liquidation firm acceptable to the DIP agent | • No marketing of Junior DIP, subject to fiduciary out for inbound proposals |

Weil  LAZARD  M·II
PARTNERS

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# KERP / KEIP




HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# KERP Structure

- The KERP is a 12 months plan designed to retain key associates through the process of reorganization.  Unlike the KEIP, the KERP is payable based on remaining in role throughout the duration of the 12 month period

- Total Budget: $17 million

- Participants: 331 (4.1%) "critical associates" identified by executive leadership from an initial submission of 900 nominees out of 8000 total eligible associates

- Payment Structure*:
  - The full target award is set as a percent of base salary, ranging from 30-40% of annual salary
  - As designed, the maximum amount payable to any individual under the KERP will be no more than $150,000
  - Payment Frequency**:
    - 25% of target payable after 3 months from initial filing
    - 25% of target payable after 6 months from initial filing
    - 25% of target payable after 9 months from initial filing
    - 25% of target payable after 12 months from initial filing

- The Restructuring Committee, upon the recommendation of the Chief Restructuring Officer and the Office of the CEO, may reallocate any remaining amounts of the KERP Award Pool as one-time cash retention payments to a KERP Participant or to an employee in good standing who is not a KERP Participant.

*KERP Award will be subject to the KERP Participants executing a wavier of severance
**All KERP Payments shall be subject to the Clawback period (October 15, 2018 – October 15, 2019)

 

78

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# KEIP Structure

- The KEIP is a 12 months plan with Quarterly payment opportunities, subject to claw back if participants voluntarily leave the company (sooner of one year from filing or effective date of emergence plan)

- Total Maximum Cost of the KEIP shall be no more than $8.0 million

    - <u>KEIP 1</u>: Months 1-6 from filing
        - Represents 50% of the total KEIP budget: $4.0 million
        - Incentive payable IF SHC *exceeds* Net Operating Cash Flow against the DIP budget, as follows:
            - Below 110% of budget = 0 Payment
            - 110% of budget = 50% of Target Incentive
            - 115% of budget = 85% of Target Incentive
            - 120% of budget = 100% of Target Incentive

    - <u>KEIP 2</u>: 6-12 months from initial filing
        - Court approval will be sought for an additional $4.0 million
        - The performance metrics may be the same; net operating cash flow, or we may contemplate different targets, providing us motivational flexibility as we clearly identify necessary outcomes.

\*KEIP Award will be subject to the KEIP Participants executing a wavier of severance
\*\*All KEIP Payments shall be subject to the Clawback period (October 15, 2018 – October 15, 2019)

 

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Proposed KEIP Roster: 2016 -2018 Compensation History and Total Target Compensation

| | | 2016* | | | | | 2017** | | | | | 2018*** | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KEIP Roster | BaseDate | Base Salary | AIP Target $ | LTIP Target $ | Total Target Compensation | Total Delivered Compensation | Base Salary | Target AIP $ | Target LTIP $ | Total Target Comp | Total Delivered Compensation | Base Salary | Target AIP $ | Target LTIP $ | Total Target Comp |
| 1 | 06/18/2018 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $600,000 | $450,000 | $450,000 | $1,500,000 |
| 2 | 09/22/2018 | $375,000 | $187,500 | $187,500 | $750,000 | $406,425 | $375,000 | $187,500 | $187,500 | $750,000 | $468,750 | $500,000 | $375,000 | $187,500 | $1,062,500 |
| 3 | 11/07/2017 | $0 | $0 | $0 | $0 | $0 | $750,000 | $1,500,000 | $0 | $2,250,000 | $113,636 | $750,000 | $1,500,000 | N/A | $2,250,000 |
| 4 | 09/17/2018 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $400,000 | $300,000 | $300,000 | $1,000,000 |
| 5 | 10/22/2017 | $0 | $0 | $0 | $0 | $0 | $600,000 | $600,000 | $450,000 | $1,650,000 | $114,583 | $600,000 | $450,000 | $450,000 | $1,500,000 |
| 6 | 05/01/2017 | $600,000 | $450,000 | $450,000 | $1,500,000 | $915,172 | $700,000 | $700,000 | $525,000 | $1,925,000 | $904,498 | $700,000 | $525,000 | $525,000 | $1,750,000 |
| 7 | 03/06/2017 | $0 | $0 | $0 | $0 | $0 | $550,000 | $550,000 | $550,000 | $1,650,000 | $759,649 | $550,000 | $550,000 | $550,000 | $1,650,000 |
| 8 | 02/04/2013 | $475,000 | $332,500 | $475,000 | $1,282,500 | $755,637 | $475,000 | $356,250 | $475,000 | $1,306,250 | $630,325 | $475,000 | $332,500 | $332,500 | $1,140,000 |
| 9 | 04/21/2017 | $500,000 | $375,000 | $250,000 | $1,125,000 | $731,875 | $650,000 | $650,000 | $650,000 | $1,950,000 | $899,477 | $650,000 | $650,000 | $650,000 | $1,950,000 |
| 10 | 02/05/2018 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $500,000 | $375,000 | $375,000 | $1,250,000 |
| 11 | 04/25/2017 | $350,000 | $262,500 | $175,000 | $787,500 | $367,500 | $425,000 | $425,000 | $318,750 | $1,168,750 | $453,264 | $425,000 | $318,750 | $318,750 | $1,062,500 |
| 12 | 03/01/2012 | $420,000 | $315,000 | $315,000 | $1,050,000 | $540,750 | $420,000 | $315,000 | $420,000 | $1,155,000 | $560,752 | $420,000 | $315,000 | $315,000 | $1,050,000 |
| 13 | 10/01/2018 | $300,000 | $150,000 | $150,000 | $600,000 | $345,000 | $340,000 | $255,000 | $170,000 | $765,000 | $360,722 | $425,000 | $318,750 | $318,750 | $1,062,500 |
| 14 | 10/01/2018 | $250,000 | $125,000 | $125,000 | $500,000 | $353,858 | $285,000 | $142,500 | $142,500 | $570,000 | $394,831 | $340,000 | $255,000 | $255,000 | $850,000 |
| 15 | 06/04/2018 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $633,000 | $474,750 | $474,750 | $1,582,500 |
| 16 | 09/10/2018 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $525,000 | $393,750 | $393,750 | $1,312,500 |
| 17 | 01/03/2018 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $500,000 | $375,000 | $375,000 | $1,250,000 |
| 18 | 09/01/2016 | $0 | $0 | $0 | $0 | $280,000 | $450,000 | $450,000 | $225,000 | $1,125,000 | $769,710 | $450,000 | $450,000 | $225,000 | $1,125,000 |
| | | $3,270,000 | $2,197,500 | $2,127,500 | $7,595,000 | $4,696,217 | $6,020,000 | $6,131,250 | $4,113,750 | $16,265,000 | $6,430,197 | $9,443,000 | $8,408,500 | $6,496,000 | $24,347,500 |

* Exec 18 started in 2016

** Execs 3, 5, & 7 started in 2017

*** Execs 1, 4, 10, 15, 16, & 17 started in 2018

 

80

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Proposed KEIP Roster: 2016 -2018 Compensation History and Total Target Compensation (cont'd)

| KEIP Roster | 2018 Base Salary | 2018 Target AIP $ | 2018 Target LTIP $ | 2018 Total Target Comp | PROPOSED Base Salary | Change | Proposed KEIP as % of Base Salary | Proposed KEIP $ | Proposed Total Target Cash with KEIP |
|---|---|---|---|---|---|---|---|---|---|
| 1 | $600,000 | $450,000 | $450,000 | $1,500,000 | $600,000 | $0 | 75% | $450,000 | $1,050,000 |
| 2 | $500,000 | $375,000 | $187,500 | $1,062,500 | $500,000 | $0 | 75% | $375,000 | $875,000 |
| 3 | $750,000 | $1,500,000 | N/A | $2,250,000 | $750,000 | $0 | 100% | $750,000 | $1,500,000 |
| 4 | $400,000 | $300,000 | $300,000 | $1,000,000 | $400,000 | $0 | 75% | $300,000 | $700,000 |
| 5 | $600,000 | $450,000 | $450,000 | $1,500,000 | $975,000 | $375,000 | 100% | $975,000 | $1,950,000 |
| 6 | $700,000 | $525,000 | $525,000 | $1,750,000 | $975,000 | $275,000 | 50% | $487,500 | $1,462,500 |
| 7 | $550,000 | $550,000 | $550,000 | $1,650,000 | $550,000 | $0 | 100% | $550,000 | $1,100,000 |
| 8 | $475,000 | $332,500 | $332,500 | $1,140,000 | $500,000 | $25,000 | 100% | $500,000 | $1,000,000 |
| 9 | $650,000 | $650,000 | $650,000 | $1,950,000 | $975,000 | $325,000 | 100% | $975,000 | $1,950,000 |
| 10 | $500,000 | $375,000 | $375,000 | $1,250,000 | $500,000 | $0 | 75% | $375,000 | $875,000 |
| 11 | $425,000 | $318,750 | $318,750 | $1,062,500 | $500,000 | $75,000 | 75% | $375,000 | $875,000 |
| 12 | $420,000 | $315,000 | $315,000 | $1,050,000 | $450,000 | $30,000 | 75% | $337,500 | $787,500 |
| 13 | $425,000 | $318,750 | $318,750 | $1,062,500 | $425,000 | $0 | 75% | $318,750 | $743,750 |
| 14 | $340,000 | $255,000 | $255,000 | $850,000 | $375,000 | $35,000 | 75% | $281,250 | $656,250 |
| 15 | $633,000 | $474,750 | $474,750 | $1,582,500 | $633,000 | $0 | 40% | $253,200 | $886,200 |
| 16 | $525,000 | $393,750 | $393,750 | $1,312,500 | $525,000 | $0 | 40% | $210,000 | $735,000 |
| 17 | $500,000 | $375,000 | $375,000 | $1,250,000 | $500,000 | $0 | 75% | $375,000 | $875,000 |
| 18 | $450,000 | $450,000 | $225,000 | $1,125,000 | $450,000 | $0 | 40% | $180,000 | $630,000 |
| | $9,443,000 | $8,408,500 | $6,496,000 | $24,347,500 | $10,583,000 | $1,140,000 | | $8,068,200 | $18,651,200 |

Weil   LAZARD   M-III PARTNERS

HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS;
NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Chapter 11 Timeline



HIGHLY CONFIDENTIAL; SUBJECT TO FRE 408; FOR DISCUSSION PURPOSES ONLY; SUBJECT TO CONFIDENTIALITY PROVISIONS OF THE COMMITTEE BYLAWS; NOT FOR DISTRIBUTION BEYOND MEETING PARTICIPANTS

# Chapter 11 Timeline

## October 2018

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 30 | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |

## November 2018

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 28 | 29 | 30 | 31 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |

## December 2018

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 25 | 26 | 27 | 28 | 29 | 30 | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | 1 | 2 | 3 | 4 | 5 |

## January 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |

## February 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |

## March 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 24 | 25 | 26 | 27 | 28 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | 1 | 2 | 3 | 4 | 5 | 6 |

Weil  LAZARD  M·III

| Date | Event |
|------|-------|
| October 15 | • Chapter 11 filing<br>• File GOB Motion |
| October 17 | • Interim DIP Order approved |
| October 25 | • Hearing on GOB Motion |
| November 15 | • Second Day Hearing<br>• Secondary GOB Sales order approved<br>• SHIP, Global, and De Minimis Sale Procedures Hearing<br>• Hearing on MTN Sale Motion |
| November 27 | • Final Closing Date for DIP ABL Facility |
| November 27 | • Hearing on Final Order approving DIP ABL Facility and Final Cash Management Order |
| Late November | • Begin Chapter 11 Plan Discussions |
| December 11 | • SHIP Bid Deadline |
| December 13 | • SHIP Auction (if applicable) |
| December 13 | • Deadline to File Schedules/SOFAs (if no extension)<br>• 341 Meeting of Creditors |
| December 15 | • Deadline to Deliver Committed Financing for NewCo Transaction |
| December 18 | • SHIP Sale Hearing |
| December 20 | • Omnibus Hearing Date |
| Late December | • Target Date for Chapter 11 Plan Filing |
| January 2019 | • Target Disclosure Statement Hearing |
| Late January 2019 | • Deadline for Auction on NewCo |
| February 10, 2019 | • Deadline for Closing NewCo Transaction |
| February 11, 2019 | • End of Debtors' Initial Exclusive Period for Filing Plan (assuming no extension) |
| March 2019 | • Targeted Chapter 11 Plan Confirmation |