**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                                          :
                                                              :    **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.,*                      :
                                                              :    **Case No. 18-23538 (RDD)**
                                                              :
        Debtors.[1]                                           :    **(Jointly Administered)**
                                                              :
-------------------------------------------------------------x

**NOTICE OF DE MINIMIS ASSET SALE FOR SEARS
STORE # 1310 (ELYRIA, OH) AND KMART STORE # 9676 (STREETSBORO, OH)**

   **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to that certain *Order Authorizing and Establishing Procedures for De Minimis Asset Sales and De Minimis Asset Abandonments* entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (ECF No. 856) (the "**Sale and Abandonment Order**"), propose to sell or transfer certain assets of the Debtors (the "**Assets**") to Industrial Commercial Properties LLC (the "**Purchaser**") pursuant to an agreement dated July 25, 2018 and subsequently amended (together with all amendments thereto, the "**Purchase Agreement**"). This Notice is being provided in accordance with and sets forth the information required under the Sale and Abandonment Order.

   <u>Description of the Assets.</u>  The Assets consist of (i) a parcel of land consisting of approximately 17.94 acres, including all real property interest of the Debtors, located at 4900 Midway Mall in the City of Elyria, Lorain County, Ohio; and (ii) a parcel of land consisting of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

approximately 0.79 acres, including all real property interest of the Debtors, located at 9059 State Route #14 in the City of Streetsboro, Portage County, Ohio.

Relationship of the Purchaser to the Debtors. The Purchaser does not have any relationship with the Debtors.

Liens and Encumbrances on the Assets. The Debtors are not aware of any liens and/or encumbrances on the Assets other than those described in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (ECF No. 952), and the *Final Junior Dip Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (ECF No. 1436). To the extent that any party has liens or encumbrances on the Assets, any such lien or encumbrance will attach to the proceeds of the sale described herein.

The sale of any real estate Assets will not be free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets or rights that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "**Restrictive Covenants**") unless (i) the counterparties to a Restrictive Covenant agree otherwise or (ii) the Court so determines after specific notice that the Debtors are seeking to sell an Asset free and clear of an identified Restrictive Covenant, an opportunity for counterparties to object, and a hearing.

Material Economic Terms and Conditions of the Proposed Sale. The Debtors propose to sell or transfer the Assets to the Purchaser on an "as is" basis, free and clear of all liens or encumbrances therein, pursuant to section 363(f) of the Bankruptcy Code. The Purchaser has agreed to pay a purchase price of $2,550,001.00 for the Assets.[2] The Purchase Agreement is annexed hereto as **Exhibit 1**.

Commission, Fees, or other Similar Expenses: The Debtors are required to pay $182,500 in commission, fees, or other similar expenses in connection with the sale.

Procedures to Object to the Proposed Sale. Any objection to the proposed sale (an "**Objection**") must:    (i) be in writing; (ii) set forth the name of the objecting party; (iii) provide the basis for the Objection and the specific grounds therefor; (iv) be filed electronically with the Bankruptcy Court; and (v) be served on Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C., Esq.; Jacqueline Marcus, Esq.; Garrett A. Fail, Esq.; Sunny Singh, Esq.; and Jessica Liou, Esq.), as counsel to the

---

[2] The purchase price does not include the amounts to be paid by the Purchaser under the Purchase Agreement for the assets of non-Debtor affiliate Troy Coolidge No. 10, LLC. The proceeds of such portion of the sale, in the amount of $1,099,999.00, will be paid to Troy Coolidge No. 10, LLC.

WEIL:\96896897\7\73217.0004

Debtors **on or before February 12, 2019 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

If no Objections are filed with the Bankruptcy Court and served by the Objection Deadline in accordance with the terms of the Sale and Abandonment Order described above, then the Debtors may proceed with the sale in accordance with the terms of the Sale and Abandonment Order.

The Debtors may consummate the transaction prior to expiration of the applicable Objection Deadline if the Debtors obtain written consent to the transaction from (i) the Creditors' Committee; (ii) any known affected creditor(s), including counsel to any creditor asserting a lien, claim, or encumbrance on the relevant De Minimis Assets; and (iii) the DIP Agents' Counsel.

**If an Objection is timely received and cannot be resolved consensually, then the sale will not be consummated absent further order of the Court.**

Dated: February 1, 2019
      White Plains, New York

                 /s/ Jacqueline Marcus
                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York  10153
                Telephone:  (212) 310-8000
                Facsimile:  (212) 310-8007
                Ray C. Schrock, P.C.
                Jacqueline Marcus
                Garrett A. Fail
                Sunny Singh
                Jessica Liou

                *Attorneys for Debtors*
                *and Debtors in Possession*

**Exhibit 1**

**Store No. 1310 (Elyria, OH) and Store No. 9676 (Streetsboro, OH) Purchase Agreement**

### REAL ESTATE SALE CONTRACT
*Elyria, OH S1310 and Streetsboro, OH K9676*

**THIS REAL ESTATE SALE CONTRACT** ("**Contract**") is made as of July 25, 2018 (the "**Effective Date**"), by and between **Troy Coolidge No 10, LLC**, a Michigan limited liability company ("**Troy**"), **Kmart Corporation**, a Michigan corporation ("**Kmart**") and **Sears, Roebuck and Co.**, a New York corporation ("**Sears**"), (collectively, "**Seller**") and **Industrial Commercial Properties LLC**, an Ohio limited liability company ("**Purchaser**") (Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**").

**WHEREAS**, Sears is the owner of a parcel of land consisting of approximately 17.94 acres including the buildings and improvements thereon and any interest of Sears in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes ("**Sears Property**"), in the City of Elyria, Lorain County, Ohio legally described on **Exhibit "A-1"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Sears Property, and all rights, privileges and appurtenances pertaining to the Sears Property (collectively, the "**Sears Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Sears and associated with the ownership, operation or maintenance of the Sears Property and Sears Improvements, if any (collectively, the "**Sears Personal Property**"), and Sears right, title and interest as ground lessor or ground landlord pursuant to the terms and conditions of that certain Ground Lease dated October 16, 1991 by and between Sears and Red Lobster Hospitality LLC, a Delaware limited liability company ("**Ground Lease Tenant**") as amended, including pursuant to that certain First Amendment to Ground Lease dated August 1, 2017 (collectively the "**Assigned Lease**");

**WHEREAS**, Troy is the owner of a parcel of land consisting of approximately 6.068 acres including the buildings and improvements thereon and any interest of Troy in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes ("**Troy Property**"), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-2"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights, privileges and appurtenances pertaining to the Troy Property (collectively, the "**Troy Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Troy and associated with the ownership, operation or maintenance of the Troy Property and Troy Improvements, if any (collectively, the "**Troy Personal Property**");

**WHEREAS**, Kmart is the owner of a parcel of land consisting of approximately 0.79 acres including the buildings and improvements thereon and any interest of Kmart in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes ("**Kmart Property**"), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-3"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights, privileges and appurtenances pertaining to the Kmart Property (collectively, the "**Kmart Improvements**" together with the Sears Improvements and Troy Improvements shall collectively be referred to as the "**Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Kmart and associated with the ownership, operation or maintenance of the Kmart Property and Kmart Improvements, if any (collectively, the "**Kmart Personal Property**" together with the Sears Personal Property and Troy Personal Property shall collectively be referred to as the "**Personal Property**"). The Sears Property, Troy Property and Kmart Property, the Improvements and the Personal Property are collectively referred to as the "**Property**"); and

1

**WHEREAS**, Seller wants to sell and Purchaser wants to purchase the Property upon the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the Recitals set forth above, which are hereby incorporated by reference, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.    **PURCHASE AND SALE**

Subject to the terms and conditions set forth in this Contract, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Contract. On the Closing Date set forth in Section 7(a) of this Contract, Seller shall cause to be conveyed to Purchaser or Purchaser's Assignee (as that term is defined in Section 20) fee simple title to the Property by recordable Sears Deed, Troy Deed and Kmart Deed (as defined in Section 7(b)(i), Section 7(b)(ii) and Section 7(b)(iii), respectively, of this Contract) subject only to the Permitted Title Exceptions (as that term is defined in Section 4 of this Contract).

2.    **PURCHASE PRICE**

The Purchase Price of the Property shall be Three Million Six Hundred Fifty Thousand and No/100 Dollars ($3,650,000.00) and payable by Purchaser in United States currency in good and certifiable funds at Closing.   The Purchase Price shall be allocated as follows: (a) Two Million Five Hundred Fifty Thousand and No/100 Dollars ($2,550,000.00) to the Sears Property; (b) One Million Ninety Nine Thousand Nine Hundred Ninety Nine and No/100 Dollars ($1,099,999.00) to the Troy Property; and (c) One and No/100 Dollars ($1.00) to the Kmart Property.

3.    **EARNEST MONEY DEPOSIT**

Within five (5) business days of the Effective Date, Purchaser shall deposit with Old Republic National Title Insurance Company, 20 South Clark Street, Suite 2900, Chicago, Illinois 60603 Attention: Mike Frain, Telephone: (312) 641-7742, Email: mfrain@oldrepublictitle.com ("**Title Insurer**") the sum of Twenty Five Thousand and No/100 Dollars ($25,000.00) United States currency (the "**Earnest Money Deposit**") by means of a certified check, cashier's check or wire transfer, to be held by the Title Insurer in accordance with the terms of a strict joint order escrow instructions executed by the Parties attached hereto as **Exhibit "B"** and incorporated into this Contract by this reference (the "**Earnest Money Escrow Instructions**") and also the terms and conditions of this Contract.   Any escrow fees as set forth in the Earnest Money Escrow Instructions will be shared equally by Purchaser and Seller.  Purchaser may elect to direct the Title Insurer to invest the Earnest Money on its behalf in compliance with the Title Insurer's standard investment instructions, and Purchaser agrees that it shall be solely responsible for any investment fees charged by the Title Insurer.  The Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, at the time of Closing by wire transfer of immediately available funds. If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit by Purchaser, terminate this Contract, in which case this Contract shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

2

4.    **TITLE AND SURVEY REVIEW**

(a)    Within ten (10) days after the Effective Date, Seller shall deliver or cause to be delivered to Purchaser and Purchaser's counsel, at the addresses set forth in Section 14 of this Contract, at Seller's sole cost and expense, a title commitment for an ALTA Standard Form of Owner Policy of Title Insurance (the "**Title Commitment**") issued by Title Insurer covering title to the Property on or after the date hereof, showing Purchaser as the proposed insured and title to the Property in Seller subject only to the Permitted Title Exceptions. Except as provided below with respect to Monetary Liens, any exceptions to title shown on the Title Commitment to which Purchaser does not object in accordance with this Section 4(a) shall be **"Permitted Title Exceptions"**. If Purchaser objects to any exceptions to title shown in the Title Commitment (the "**Unpermitted Exceptions**"), Purchaser shall give Seller written notice of such objection within ten (10) days following the date of Purchaser's receipt of the Title Commitment and the Survey (as that term is defined in this Contract) (the "**Review Period**"). If Purchaser has given notice of objection identifying Unpermitted Exceptions within the Review Period, Seller shall, at its option, have fifteen (15) days from the date of receipt of Purchaser's notice of objection, to (i) have such Unpermitted Exceptions removed from the Title Commitment; (ii) commit to having such Unpermitted Exceptions removed from the Title Policy when issued, or (ii) to have Title Insurer commit to insure over such Unpermitted Exceptions and provide evidence thereof acceptable to Purchaser. If Seller fails to commit to having such Unpermitted Exceptions removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given within five (5) days following the expiration of said fifteen (15) day period, to either (i) terminate this Contract (in which event the Earnest Money Deposit shall be returned to Purchaser), or (ii) accept title to the Property subject to such Unpermitted Exceptions. If Purchaser fails to elect either (i) or (ii) above within such five (5) day period, Purchaser shall be deemed to have elected (i) above and this Agreement shall be deemed terminated. Notwithstanding the foregoing, any mortgage lien or other encumbrance securing the payment of money by Seller ("**Monetary Liens**") shall be deemed to be an Unpermitted Exception (whether or not objected to by Purchaser) that which Seller shall be obligated to remove, bond over or insure over at Closing. On the Closing Date, Seller shall cause the Title Insurer to issue, at Purchaser's sole cost and expense, a title policy (or title policies) in the aggregate amount of the Purchase Price insuring fee simple title to the Property in Purchaser or Purchaser's nominee as of the Closing Date, subject to the Permitted Title Exceptions (the "**Title Policy**"). It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before expiration of the Review Period, after the expiration of which, Purchaser shall be deemed to have satisfied itself as to the availability of all endorsements. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder. From the Effective Date through the Closing Date, Seller shall not create any encumbrances on the Property other than those listed in the Title Commitment or shown on the Survey or those that relate to real estate taxes not yet due or payable, without the prior consent of Purchaser.

(b)    No later than five (5) business days after the receipt of the Title Commitment, Purchaser, shall, at Purchaser's sole cost and expense, order a current ALTA/NSPS land title survey, with Table A inclusions as indicated by Purchaser (or an update of any survey provided by Seller, if any), of the Property meeting the 2016 ALTA/NSPS and Title Survey

3

standards, prepared by an Ohio licensed surveyor, certified in a form acceptable to Purchaser, Purchaser's lender (if any), Seller and Title Insurer (the **"Survey"**).

(c)     Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer. If the Title Commitment discloses exceptions other than the Permitted Title Exceptions, and other than those which Seller has agreed to discharge or have Title Insurer commit to insure over, then, unless Purchaser agrees to accept title as it then is, Seller may, at its option, terminate this Contract, in which event, upon providing proof to Seller that Purchaser has paid in full any third parties hired by or on behalf of the Purchaser to perform any actions which could result in a lien against the Property, the Earnest Money Deposit shall be returned to Purchaser as Purchaser's sole remedy under this Contract.

5.     **PRORATIONS AND EXPENSES**

(a)     The following prorations, except as specifically provided set forth in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date (**"Proration Date"**), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)     **Taxes.** All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on one hundred three percent (103%) multiplied by the most recent ascertainable tax information for tax parcel number(s) that is attributable to the Property. All prorations shall be final. Any installments of special or other assessments affecting the Property which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser.

(ii)     **Utilities.** Gas, water, electricity, heat, fuel, sewer and other utilities and operating expenses relating to the Property for any open billing due and owing through the Closing Date (to the extent not the responsibility of a tenant, if any) shall be paid by Seller and this provision shall survive Closing.

(iii)     Purchaser shall be entitled to a credit from Seller in an amount equal to any Security Deposit held under the Assigned Lease, to the extent there is any such Security Deposit. All rents and other charges payable under the Assigned Lease shall be prorated as of the Closing Date.

(iv)     **Miscellaneous.** If there are any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing. In the event that accurate prorations and other adjustments cannot be made at Closing because current bills are not

4

available or the amount to be adjusted is not yet ascertainable, the Parties shall prorate on the best available information. All prorations shall be final.

(b)      At Closing, Seller shall pay (i) one-half (1/2) of the cost of the Closing Escrow, (ii) the cost of the Title Commitment, (iii) the amount of any stamp or transfer tax imposed by any municipality and any county ordinance, and the State of Ohio, (iv) one-half of the cost of the Owner's Title Policy (excluding any Endorsements); and (v) the cost of removing, bonding over or insuring over the Monetary Liens. At Closing, Purchaser shall pay (i) one half (1/2) of the cost of the Closing Escrow; (ii) the cost of obtaining the Survey; (iii) one-half (1/2) of Owner's Title Policy and the full cost of any endorsements to the Title Policy; (iv) the cost of the Purchaser's Studies; (v) any costs related to any inspections by any municipality and repairs necessitated by any municipal, county and/or State inspections ("**Repairs**"), if any, and shall meet any other requirements as established by any municipal, county and/or State ordinance with regard to the transfer of real estate; (vi) all financing related fees; and (vii) all recording charges for the Deed and all documents pertaining to any purchase money financing. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable equally by the Parties at Closing. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.      **CONDITIONS TO CLOSING**

(a)      In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to close on Purchaser's purchase of the Property is subject to each and all of the following conditions precedent:

(i)      All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Seller shall, promptly upon becoming aware of same, advise Purchaser if it believes that any of the Purchaser's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Purchaser shall thereupon have a reasonable period to cure any purported breach of its representations and warranties; and

(ii)      All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Purchaser as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Seller may, after notice to Purchaser and Purchaser's failure to cure within the time period(s) set forth in this Contract, elect at any time thereafter, to terminate this Contract, provided that Seller is not itself in default beyond any applicable notice and cure period, and exercise such remedies as provided in Section 13 of this Contract.

(b)      In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent:

(i)      All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Purchaser shall, promptly upon becoming aware of same, advise Seller if it believes that any of

5

Seller's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Seller shall thereupon have a reasonable period to cure any purported breach of its representations and warranties;

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Seller as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Purchaser may, after notice to Seller and Seller's failure to cure within the time period(s) set forth in this Contract, provided that Purchaser is not itself in default beyond any applicable notice and cure period, elect at any time thereafter, to terminate this Contract and exercise such remedies as provided in Section 13 of this Contract.

7.    **CLOSING**

(a)    Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the **"Closing"**) shall take place at the downtown Chicago, Illinois office of Title Insurer within thirty (30) days after the satisfaction or waiver of the later to occur of the expiration of the Due Diligence Period or such other date mutually agreed to by Purchaser and Seller (the **"Closing Date"**).

(b)    On or before the Closing Date, Seller shall deliver or cause to be delivered to the Title Insurer the following Closing documents:

(i)    A Limited Warranty Deed for the Sears Property executed in proper form for recording so as to convey the title required by this Contract (the **"Sears Deed"**) to Purchaser, subject to the Permitted Title Exceptions applicable to the Sears Property, substantially in the form of **Exhibit "D"** attached hereto and made a part hereof;

(ii)    A Limited Warranty Deed for the Troy Property executed in proper form for recording so as to convey the title required by this Contract (the **"Troy Deed"**) to Purchaser, subject to the Permitted Title Exceptions applicable to the Troy Property, substantially in the form of **Exhibit "E"** attached hereto and made a part hereof;

(iii)    A Limited Warranty Deed for the Kmart Property executed in proper form for recording so as to convey the title required by this Contract (the **"Kmart Deed"**) to Purchaser, subject to the Permitted Title Exceptions applicable to the Kmart Property, substantially in the form of **Exhibit "F"** attached hereto and made a part hereof;

(iv)    A FIRPTA Affidavit in customary form duly executed by Seller;

(v)    Seller shall execute an assignment of documents of record transferring all of Seller's right, title and interest in any documents of record (**"Assignment and Assumption of Intangibles"**) substantially in the form of **Exhibit "G"** attached hereto and made a part hereof;

6

(vi)  Seller shall execute a Bill of Sale transferring all of Seller's right, title and interest in the Personal Property ("**Bill of Sale**") substantially in the form of **Exhibit "H"** attached hereto and made a part hereof;

(vii)  Seller shall execute an assignment of documents of record transferring all of Seller's right, title and interest in any documents of record ("**Assignment and Assumption of Agreements**") substantially in the form of **Exhibit "I"** attached hereto and made a part hereof;

(viii)  Seller shall execute an assignment of the Assigned Lease transferring all of Seller's right, title and interest in the Assigned Lease ("**Assignment and Assumption of Assigned Lease**") substantially in the form of **Exhibit "J"** attached hereto and made a part hereof;

(ix)  The Title Policy (or Title Policy Pro Forma);

(x)  An estoppel certificate from Ground Lease Tenant as required under the Assigned Lease, together with notice to the Ground Lease Tenant of the transfer of interest of the Sears Property; and

(xi)  Such other instruments, affidavits and transfer tax returns as are customarily executed by a seller of real property in the city, county and state where the Property is located.

(c)  On the Closing Date, Purchaser or Purchaser's Assignee shall deliver or cause to be delivered to the Title Insurer the following for Closing:

(i)  Balance of the Purchase Price, plus or minus prorations;

(ii)  The counterpart to the Assignment and Assumption of Intangibles;

(iii)  The counterpart to the Bill of Sale;

(iv)  The counterpart to the Assignment and Assumption of Agreements;

(v)  The counterpart to the Assignment and Assumption of Assigned Lease; and

(vi)  Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the city, county and state where the Property is located.

(d)  On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered an agreed closing proration statement and state, county and municipal transfer tax declarations and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

(e)  Except for the rights of the Ground Lease Tenant under the Assigned Lease, Seller shall deliver exclusive possession of the Property to Purchaser or Purchaser's Assignee on the Closing Date.

8. **CLOSING ESCROW**

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard escrow instructions utilized by the Title Insurer ("**Closing Escrow**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control.  All documents required to be provided by Purchaser or Purchaser's Assignee and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing.  Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

9. **DUE DILIGENCE PERIOD**

(a)    Purchaser and Purchaser's agents, employees and independent contractors shall have the right and privilege to enter upon the Property from and after the Effective Date to evaluate, survey and inspect the Property, including, but not limited to, the right to (i) review of the utility capacity for the Property, (ii) review the location of utilities and (iii) conduct an environmental assessment of the Property (collectively, "**Purchaser's Studies**"), all at Purchaser's sole cost and expense.  Prior to Purchaser or any agent, employee or independent contractor of Purchaser entering onto the Property to perform any inspections or tests, Purchaser shall enter into a "**Non-Invasive Inspection Agreement**" attached hereto as **Exhibit "K"** and incorporated into this Contract by this reference.  In the event that Purchaser terminates this Contract pursuant to the terms of this Contract, Copies of all of Purchaser's Studies shall be furnished to Seller promptly upon such termination.   Purchaser agrees not to disclose Purchaser's Studies or their results to any other persons or entities other than its employees, agents, attorneys, brokers, contractors, accountants, or other parties assisting Purchaser or Purchaser's lender, if any, with the transaction contemplated hereby without the Seller's prior written consent, which consent may be granted or withheld in the reasonable commercial discretion of Seller or unless Purchaser is required by law to disclose such information. Purchaser's obligations under this Contract are subject to and conditioned upon Purchaser's investigation and study of the Property and reasonable satisfaction with such aspects thereof deemed relevant by Purchaser.  Purchaser shall have forty five (45) days from the Effective Date (the "**Due Diligence Period**") in which to (a) make Purchaser's Studies with respect to the Property.  All of Seller's service contracts on the Property are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property to be released from such service contracts on or prior to the Closing Date.  In the event Purchaser in its sole discretion shall conclude that any aspect of the Property is not suitable for Purchaser in any respect, Purchaser shall have the right to elect, by written notice to Seller given prior to the 5:00 P.M. (Eastern Daylight Time) on the last day of the Due Diligence Period, to terminate this Contract and this Contract thereupon shall be deemed to be terminated and both Parties shall be released from any further liability hereunder. If Purchaser does give such notice of termination to Seller, upon providing proof to Seller that Purchaser has paid in full any third parties hired by or

8

on behalf of the Purchaser to perform any actions which could result in a lien against the Property, the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder. If Purchaser fails to give such notice of termination to Seller as provided in this Section 9(a) and subject to the terms and provisions of Section 9(b) below, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, and (ii) except as otherwise provided in this Contract, Purchaser agrees to accept the Property **"AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION"** and to release, defend, hold harmless, and indemnify Seller from the Closing Date, for all costs and expenses resulting from any claim, demand, liability or loss relating to the condition of the Property including but not limited to the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur. If Purchaser does not terminate the Contract in accordance with this Section 9(a), except as otherwise expressly provided in this Contract, the Earnest Money Deposit shall be non-refundable to the Purchaser but shall be credited towards the Purchase Price at Closing. Purchaser hereby covenants and agrees to defend, indemnify and hold harmless Seller and its respective members, officers, directors, employees, agents, representatives acting or purporting to act on behalf of Seller, beneficiaries, attorneys, subsidiaries, affiliates, partner, contractors, subcontractors, successors and assigns ("**Seller's Related Parties**"), from and against any and all loss, liability, cost, claim, demand, damage, lien, penalty, fine, interest and expense (collectively. "**Claims**") arising out of or in any manner related to the exercise by Purchaser of its rights under this Section 9, unless such Claim is a result of the gross negligence or willful misconduct of Seller, its agents, contractors or employees. If this transaction does not close, Purchaser shall, at its sole cost and expense, restore the Property to substantially the same condition as of the Effective Date. Notwithstanding anything to the contrary contained in this Contract, the terms, provisions, conditions and indemnifications of this Section 9(a) shall survive Closing and the delivery of the Deed or the termination of this Contract for a period of one (1) year without further need to document such agreement.

(b)     Within ten (10) days after the Effective Date, Seller shall deliver or make available to Purchaser (including, without limitation, by access to an electronic data site as the same may be updated from time to time) the following to the extent such documents exist and are in the possession and control of Seller as of the date of this Contract at its corporate office in Hoffman Estates, IL:

    (i)     Current tax assessment statements and copies of the most recent tax bills for the Property.

    (ii)     Copies of any title reports, title commitments, title insurance policies, or surveys of the Property.

    (iii)     Environmental reports and studies including all reports related to Hazardous Materials (collectively, the "**Environmental Reports**").

    (iv)     Site Plans, soil studies, plans and specifications, blue prints, engineering plans and studies and any similar report with respect to the Property or any property adjoining the Property.

    (v)     The Assigned Lease, all amendments thereto.

9

(vi)     Copies of all permits, certificates of occupancy or other licenses related to the Property.

(vii)    Any documents and agreements related to the acquisition of a portion of the Kmart Property for the POR Streetsboro Signals Project by the City of Streetsboro.

In the event this Contract is terminated, all materials provided by Seller to Purchaser shall be promptly returned to Seller or destroyed by Purchaser at no cost to Seller (the "**Due Diligence Materials**"). SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING THE ACCURACY OR COMPLETENESS OF THE DUE DILIGENCE MATERIALS OR THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME. SELLER'S FAILURE TO DELIVER ANY DUE DILIGENCE MATERIALS TO PURCHASER IN ACCORDANCE WITH THIS SECTION 9(b) SHALL NOT BE DEEMED A DEFAULT BY SELLER, IT BEING UNDERSTOOD THAT PURCHASER SHALL COMPLETE ITS OWN INSPECTIONS AND PURCHASER SHALL RELY SOLELY ON ITS OWN DUE DILIGENCE.

## 10.    **REPRESENTATIONS AND WARRANTIES**

(a)     Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)      Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto.

(ii)     Seller has title to the Real Property and the Improvements.

(iii)    As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of Cheryl Schwartz, Real Estate Manager, Acquisitions and Dispositions of Sears Holdings Corporation and shall not be construed to refer to the knowledge of any other officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(iv)     To Seller's actual knowledge, Seller has not commenced, within the meaning of Title 11 of the U.S. Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Seller an involuntary case, nor shall Seller have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Seller in an involuntary case or appoints a Custodian of Seller for all or any part of its property.

10

(v)     Prior to the Closing Date, Seller will not, without obtaining Purchaser's consent, which consent shall be at Purchaser's sole discretion but shall not be unreasonably conditioned or delayed, create any Leases, easements, liens, mortgages or other encumbrances with respect to the Property that will survive Closing.

(b)     Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)     Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained.   Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents.  The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii)    Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii)   This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)    Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(v)     This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the U.S. Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, under Bankruptcy Law, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)     Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions

11

precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 10 shall not merge with the transfer of title but shall survive Closing. If Purchaser delivers written notice to Seller within two (2) years of the Closing Date of a breach of any such representation or warranty, then Purchaser's sole remedy shall be an action at law for actual damages, which must be commenced, if at all, on or before the first day following the second (2nd) anniversary of the Closing Date. The cumulative, maximum amount of liability that Seller shall have to Purchaser, in the aggregate, for breaches of the representations and warranties under this Agreement shall not exceed $125,000.00.

11.    **AS IS/NO WARRANTIES**

(a)    Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Property without warranty or representation of any kind by Seller or any of Seller's Related Parties, including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Material. As used in this Contract, the term "**Hazardous Material**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any other federal, state or local environmental statute or regulation. Purchaser, hereby agrees to release, defend, hold harmless and indemnify Seller and Seller's Related Parties, with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source.

(b)    Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller. Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price. Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in Section 10 of this Contract:

(i)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof,

12

the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)  Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)  Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof. Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Property is located; and

(iv)  Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)  WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING SUBSECTIONS 11(a) AND 11(b), PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND SELLER'S RELATED PARTIES RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, OR (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)  Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or Seller's Related Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof. The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such

13

statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto. Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

## 12.    **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the **"Code"**), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section. At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

## 13.    **DEFAULT AND REMEDIES**

If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of notice of such default, Purchaser may either: (i) terminate this Contract, in which event the Earnest Money Deposit shall be paid to Purchaser, and Seller shall pay to Purchaser an amount equal to Purchaser's reasonable, documented out-of-pocket expenses along with final lien waivers, if applicable, paid to third parties that were incurred by Purchaser in connection with its investigations, site plan preparations and submittals, or other obligations under this Contract, including attorneys' fees and costs, incurred by Purchaser, such out-of-pocket expenses not to exceed Sixty Thousand and No/100 Dollars ($60,000.00) ("**Purchaser's Out-of-Pocket Expenses**"), and each of the parties hereto shall be relieved of any further rights and obligations to the other arising by virtue of this Contract (except for rights and obligations that are expressly intended to survive the termination of this Contract); or (ii) waive such satisfaction and performance and elect to consummate the purchase and sale of the Property, in which event all unsatisfied objections shall constitute Permitted Exceptions under this Agreement; or (iii) seek specific performance of Seller's obligations under this Contract, not including Purchaser's attorney's fees and costs in obtaining specific performance except as may be provided pursuant to Section 22, (and if Purchaser does not obtain specific performance, then Purchaser may receive the remedies set forth in Section 13(i) above). If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default, for any reason other than Seller's default hereunder, Seller's sole remedy shall be to terminate this Contract, in which event Seller shall be entitled to receive the Earnest Money Deposit as liquidated damages in lieu of all other remedies available to Seller and this Contract shall become null and void with neither Party having any further rights or liabilities hereunder, except as provided for in this Contract. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Earnest Money upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

## 14.    **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States

14

Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

| | |
|---|---|
| To Seller: | **Troy Coolidge No 10, LLC, a Michigan limited liability company, Kmart Corporation, a Michigan corporation and Sears, Roebuck and Co., a New York corporation**<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attn: SVP and President, Real Estate<br>Department 824RE |
| With copies to: | **Troy Coolidge No 10, LLC, a Michigan limited liability company, Kmart Corporation, a Michigan corporation and Sears, Roebuck and Co., a New York corporation**<br>3333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attn: Associate General Counsel, Real Estate<br>Department 824RE |
| To Purchaser: | **Industrial Commerical Properties, LLC**<br>6675 Parkland Boulevard, Ste. 100<br>Solon, Ohio 44139<br>Attn: Christopher Semarjian<br>E-mail:csemarjian@icpllc.com |
| With copies to: | Hurtuk & Daroff Co., LLP<br>6120 Parkland Boulevard, Ste. 100<br>Cleveland, Ohio 44124<br>Attn: Edward A. Hurtuk, Esq.<br>E-mail: ehurtuk@hurtukdaroff.com |

Notice of change of address for receipt of notices shall be sent in the manner set forth in this Section 14.

## 15. ENTIRE CONTRACT, AMENDMENTS AND WAIVERS

This Contract and the related Exhibits contain the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

## 16. FURTHER ASSURANCES

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction

contemplated hereby.

17. **SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing. Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

18. **CONFIDENTIALITY**

Purchaser agrees that all terms of this Contract as well as any information provided to Purchaser pertaining to Seller (the "**Confidential Information**") will remain confidential and will not be divulged by Purchaser without the written consent of Seller, except that Purchaser may disclose the Confidential Information without Seller's consent to Purchaser's respective officers, affiliates, and advisors (including, without limitation, attorneys, accountants, consultants, Lenders and financial advisors) and to any agency (governmental or public) in connection with Purchaser's pursuit of any entitlements and/or approvals deemed by Purchaser to be necessary for construction of the Property, so long as the confidentiality obligations of Purchaser are binding upon all of the foregoing and Purchaser informs the receiving parties of the confidential nature of the Confidential Information and directs the receiving parties to treat the Confidential Information confidentially in accordance with this Section 18 (to the extent permitted by applicable law). Notwithstanding anything contained in this Contract to the contrary, the obligation of confidentiality does not apply to (a) Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this Section 18 or breach of confidentiality by anyone bound under like terms of confidentiality to the Party making such public disclosure, (b) Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Seller in writing. If Purchaser seeks Seller's consent to the disclosure of the Confidential Information, Seller shall not unreasonably withhold its consent. Without limiting the foregoing, except for the Title Issuer Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Contract or its terms will be provided to any third party not subject to the same confidentiality obligation as Purchaser. In the event Purchaser breaches the terms of this Section, Purchaser acknowledges and agrees that Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this Section 18, in addition to all other rights and remedies available at law or in equity. Notwithstanding anything in this Contract to the contrary, Purchaser may divulge Confidential Information without Seller's consent to a proposed institutional mortgagee in connection with any financing by Purchaser of the Property (who, in turn, may disclose the Confidential Information to its officers, advisors, attorneys, appraisers and other consultants in connection with the approval and documentation of such financing).

19. **BROKERAGE**

Except Chris Seelig of Colliers International representing the Purchaser ("**Purchaser's Broker**") and Grant Chaney of Colliers International representing the Seller ("**Seller's Broker**" together with Purchaser's Broker shall collectively be referred to as the "**Brokers**"), each Party hereto

16

represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction.  Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including the Brokers), finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party provided that Purchaser shall have no obligation to indemnify Seller for any obligations to Brokers to be paid by Seller as provided in this Section 19.  Any commission or other compensation due the Seller's Broker shall be the sole responsibility of Seller, and Seller's Broker shall be paid at the Closing in accordance with separate agreements between Seller's Broker and Seller.  Purchaser's Broker shall be paid in accordance with a separate agreement between Seller's Broker and Purchaser's Broker.

20.    **ASSIGNMENT**

Purchaser may assign this Agreement and its rights under this Agreement to one or more entities (provided, however, that Purchaser shall not be released from liability as a result of such assignment and that such entity or entities are controlled by or affiliated with Purchaser) ("**Purchaser's Assignee**") with respect to the Property as a whole or any part thereof, including the Sears Property, the Troy Property and/or the Kmart Property.

21.    **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns, and no third party is intended to or shall have any rights hereunder.  This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

22.    **LITIGATION COSTS**

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "**Action**"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court.  The term "prevailing party" as used in this Section 22 includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it); or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled.  In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action.  It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

23.    **SEVERABILITY**

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be

17

construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

24. **GOVERNING LAW**

This Contract shall be construed and governed in accordance with the laws of the State of Ohio without regard to its conflicts of laws principles.

25. **COUNTERPARTS**

This Contract may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument. Any counterpart to which is attached the signatures of all Parties shall constitute an original of this Contract. The parties agree that the Purchaser shall be the first to execute this Contract.

26. **SUCCESSORS AND ASSIGNS**

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser may assign this Contract in accordance with the provisions of Section 20 of this Contract.

27. **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract. Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract and retain the Earnest Money Deposit.

28. **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days unless specifically stated. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State of Ohio are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State of Ohio are authorized or required to be closed. The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State of Ohio are authorized or required to be closed.

29. **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

30. **SECTION 1031 EXCHANGE**

At Seller's option, Purchaser agrees to cooperate with Seller in closing the sale of the Property as a like-kind exchange under Section 1031 of the Internal Revenue Code (the "**Code**"). Such cooperation shall include, without limitation, the substitution by Seller of an intermediary (the "**Intermediary**") to act in place of Seller as the Seller of the Property. If Seller so elects, Purchaser agrees to accept the Property and all other required performance from the Intermediary and to render Purchaser's performance of all of its obligations hereunder to the Intermediary. Purchaser agrees that performance by the Intermediary shall be deemed performance by Seller

18

and Seller agrees that Purchaser's performance to the Intermediary shall be deemed as performance to Seller. Notwithstanding the foregoing, Seller shall remain liable to Purchaser for each and every one of the representations, warranties, indemnities and obligations of Seller under this Contract and Purchaser may proceed directly against Seller without the need to join the Intermediary as a party to any action against Seller.

At Purchaser's option, Seller agrees to cooperate with Purchaser in closing the sale of the Property as a like-kind exchange under Section 1031 of the Code. Such cooperation shall include, without limitation, the substitution by Purchaser of an Intermediary to act in place of Purchaser as the Purchaser of the Real Property. If Purchaser so elects, Seller agrees to accept the Property and all other required performance from the Intermediary and to render Seller's performance of all of its obligations hereunder to the Intermediary. Seller agrees that performance by the Intermediary shall be deemed performance by Purchaser and Purchaser agrees that Seller's performance to the Intermediary shall be deemed as performance to Purchaser. Notwithstanding the foregoing, Purchaser shall remain liable to Seller for each and every one of the representations, warranties, indemnities and obligations of Purchaser under this Contract and Seller may proceed directly against Purchaser without the need to join the Intermediary as a party to any action against Purchaser.

31. **CONDEMNATION AND CASUALTY**

In the event of any taking by the power of eminent domain, or in the event notice of any potential taking of all or a substantial portion of the Sears Property, Kmart Property or Troy Property is given to Seller, Seller shall promptly deliver to Purchaser notice of such taking or a copy of such notice and Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of the notification of any such taking. If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Earnest Money Deposit, plus any interest accrued thereon, shall be promptly returned to Purchaser. If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation (including all rights to contest the same or litigate the value of such property), and Purchaser shall remain obligated to purchase) the Property with no reduction in the Purchase Price. Notwithstanding the foregoing, Purchaser shall have no right to terminate this Contract in accordance with this Section 31 due to the acquisition of a portion of the Kmart Property for the POR-Streetsboro Signals project by the City of Streetsboro more specifically outlined in **Exhibit "C"** attached hereto and made a part hereof ("**Signals Project**"). Seller hereby permits Purchaser to engage in discussions about the Signals Project with the City of Streetsboro and their agents in consultation with Seller. Prior to Closing, Seller shall not settle any such proceeding without Purchaser's prior written consent, which consent shall not be unreasonably withheld or delayed. At Closing, Seller shall assign all of Seller's right, title, and interest to all awards and compensation arising out of the taking of a portion of the Kmart Property for the Signals Project (including all rights to contest the same or litigate the value of such property).

If the Sears Property, the Troy Property or the Kmart Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof. If the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00), Purchaser may elect, by written notice delivered to Seller prior to the scheduled Closing Date, to:

19

(a)     Terminate this Contract by written notice to Seller, in which event this Contract shall become null and void and thereafter neither party shall have any liability or obligation to the other except that the Earnest Money Deposit shall be refunded or returned to Purchaser; or

(b)     Notify Seller that it desires to take title to the Property in its damaged condition, in which event the cost to repair the damage shall be credited against the Purchase Price at Closing.  All risks of loss to the Property are borne by Seller prior to Closing.

## 32.     SECTION HEADINGS

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

## 33.     INTERPRETATION

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

## 34.     JURY TRIAL

SELLER AND PURCHASER HEREBY RESPECTIVELY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS CONTRACT AND THE OBLIGATIONS AND CONTRACTS CONTAINED IN THIS CONTRACT.

## 35.     AMENDMENTS

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto.  However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

## 36.     ENTIRE CONTRACT

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller.  The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

## 37.     PATRIOT ACT

Seller certifies that its names are Troy Coolidge No 10, LLC, a Michigan limited liability company, Kmart Corporation, a Michigan corporation and Sears, Roebuck and Co., a New York

corporation, , and to Seller's knowledge, neither Seller nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.   Purchaser certifies that its name is Industrial Commercial Properties LLC, an Ohio limited liability company, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

38.    **EXCULPATION; LIMITATION OF LIABILITY**

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract.   Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages.   The provisions of this Section 38 shall survive the expiration of the term or any earlier termination of this Contract.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

J:\Semarjian\Industrial Commercial Properties LLC\Purchase of Midway Mall, Elyria and Kmart Streetsboro\PSA v5(S) (clean).doc

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**SELLER:**
**Troy Coolidge No 10, LLC,**
a Michigan limited liability company

         By: Kmart Corporation, a Michigan corporation, its sole member

         By: _JoAnn Catanese_____
         Name: JoAnn Catanese
         Its: Divisional Vice President, Real Estate

**Kmart Corporation,**
a Michigan corporation

By: _JoAnn Catanese_____
Name: JoAnn Catanese
Its: Divisional Vice President, Real Estate

**Sears, Roebuck and Co.,**
a New York corporation

By: _JoAnn Catanese_____
Name: JoAnn Catanese
Its: Divisional Vice President, Real Estate

**PURCHASER:**
**Industrial Commercial Properties LLC,**
an Ohio limited liability company

By: _____
    Christopher Semarjian, Manager

REAL ESTATE
LEGAL

**EXHIBITS**

Exhibit "A-1" - Legal Description of Sears Property
Exhibit "A-2" - Legal Description of Troy Property
Exhibit "A-3" - Legal Description of Kmart Property
Exhibit "B" - Earnest Money Escrow Instructions
Exhibit "C" – Streetsboro Signals Project
Exhibit "D" - Sears Deed
Exhibit "E" - Troy Deed
Exhibit "F" - Kmart Deed
Exhibit "G" - Assignment and Assumption of Intangibles
Exhibit "H" - Bill of Sale
Exhibit "I"-Assignment and Assumption of Agreements

Exhibit "J"-Assignment and Assumption of Assigned Lease
Exhibit "K"-Non-Invasive Inspection Agreement

**EXHIBIT "A-1"**

**LEGAL DESCRIPTION OF SEARS PROPERTY**

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## EXHIBIT "A-2"

## LEGAL DESCRIPTION OF TROY PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

**EXHIBIT "A-3"**

**LEGAL DESCRIPTION OF KMART PROPERTY**

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## EXHIBIT "B"

## EARNEST MONEY ESCROW INSTRUCTIONS

(please see attached)



**OLD REPUBLIC** NATIONAL TITLE INSURANCE COMPANY

20 South Clark Street, Suite 2000, Chicago, IL 60603
312-641-7799 Phone 312-205-0363 Fax

**ESCROW NUMBER:**

### STRICT JOINT ORDER ESCROW

Property Address:

9059 State Route #14, Streetsboro, OH 44241
4900 Midway Mall, Elyria, OH 44035

Deposits:

Certified, uncertified, cashier check(s) or wire(s) in the amount of $25,000.00  is hereby deposited with Old Republic National Title Insurance Company as ESCROWEE to be delivered by it only upon the joint written order of the undersigned or their respective legal representatives or assigns.

Old Republic National Title Insurance Company, as ESCROWEE, is hereby expressly authorized to disregard, in its sole discretion, any and all unilateral notices or warnings given by any of the parties hereto, or by any other person or corporation, but said ESCROWEE is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the said ESCROWEE obeys or complies with any such order, judgment or decree of any court it shall not be liable to any of the parties hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being entered without jurisdiction or being subsequently reversed, modified, annulled, set aside or vacated.

In case of any suit or proceeding regarding this escrow, to which said ESCROWEE is or may at any time become a party, it shall have a lien on the contents hereof for any and all costs, attorneys' and solicitors' fees, whether such attorneys or solicitors shall be regularly retained or specially employed, and any other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned jointly and severally agree to pay said ESCROWEE upon demand all such costs, fees and expenses so incurred.

1.

In no case shall the above-mentioned deposits be surrendered except on an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience of the process or order to court as aforesaid.

Deposits made pursuant to these instructions may be invested on behalf of any party or parties thereto: Provided, that any direction to ESCROWEE for such investment shall be expressed in writing and contain the consent of all other parties to these escrow and also provided that you are in receipt of the tax payer's identification number and investment forms as required. ESCROWEE will, upon request, furnish information concerning its procedures and fee schedules for investment.

Billing Instructions:

Escrow fee will be billed as follows: 50% to Purchaser and 50% to Seller.

An annual maintenance fee will be billed commencing: _____ 1, 2019.

Except as to deposits of funds for which ESCROWEE has received express written direction concerning investment to other handling, the parties hereto agree that the ESCROWEE shall be under no duty to invest or reinvest any deposits at any time held by it thereunder: and, further that ESCROWEE may commingle such deposits with other deposits or with its own funds in the manner provided for the administration of funds under Section 2-8 of the Corporate Fiduciary Act (ILL. Rev. State 1992 205ILES 620/2-8) and may use any part or all such funds for its own benefit without obligation to any party for interest or earning derived thereby, if any. Provided, however, nothing herein shall diminish Escrowee's obligation to apply the full amount of the deposits in accordance with the terms of the Agreement.

In the event the ESCROWEE is requested to invest deposits hereunder, Old Republic National Title Insurance Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of these escrow instructions.

1.

ESCROW NUMBER: _____

PURCHASER:

**Industrial Commercial Properties LLC**
an Ohio limited liability company

Signed By:_____

Address:_____
_____
_____

Phone:_____

SELLER:
**Troy Coolidge No 10, LLC,** a Michigan limited
liability company, **Kmart Corporation,** a
Michigan corporation and **Sears, Roebuck and
Co.,** a New York corporation ("**Sears**")

Signed By:_____

Address: 3333 Beverly Road
Dept. 824 RE

Phone:    847-286-8638 (Ivy Israel)

Old Republic National Title Insurance
Company

By:_____
Dated: _____

1.

**EXHIBIT "C"**

**STREETSBORO SIGNAL PROJECT**

EXHIBIT C



**ORC** REAL ESTATE SOLUTIONS FOR INFRASTRUCTURE

LPA
Rev. 4/11/2008

## APPROPRIATION LETTER

Date: 7/19/2018

Troy Coolidge No. 10, LLC, a Michigan limited liability company
Attn: Cheryl Schwartz
PO Box 927000
Hoffman Estates, Illinois 60179

RE:    POR-Streetsboro Signals                 KM9676
       Parcel # 4
       9059 State Route 14, Streetsboro, OH 44241

Dear Ms. Schwartz:

It is the sincere desire of the City of Streetsboro to arrive at a mutually satisfactory settlement with every property owner when rights of way need to be acquired. At times this goal is difficult to attain and we must turn to the courts for a jury determination of just compensation due the property owner. This action assures that the owner's rights will be fully protected and it will also permit the construction of the highway to proceed for the benefit of all.

Our offer to you in the amount of $ 9,045.00 represents the City of Streetsboro best estimate of the value of the property needed for the highway improvement and includes damages, if any, to your remaining property. This amount is based upon a valuation made of your property in accordance with standard procedures established, by the State of Ohio and the Federal government.

This letter notifies you that if the offer of compensation is not acceptable to you, that it will be necessary for the City of Streetsboro to initiate appropriation proceedings. As soon as the required papers can be prepared, a case will be filed in the courts. Upon the filing of an appropriation case, the law provides that the Mayor, Glenn Broska shall deposit with the court the amount he deems to be the value of the property in question, and thereupon the City of Streetsboro gains the right to enter upon the land. Meanwhile, should you decide to accept the LPA's offer, our negotiating agent will be happy to meet with you at your request.

If there are buildings on the land being acquired, the LPA will allow the owner (60) days to vacate and turn over possession after service of the notice to appropriate, as provided

in the law.  The owner may agree to accept the deposited money as full payment and the case will be closed.

If the owner is not satisfied with the amount of the deposit he must file an answer or appeal with the court in the manner and within the time specified on the summons which is served upon him by the court, requesting the amount due him to be determined according to law.  He may also apply to the court to withdraw the deposited money, and the court shall permit such withdrawal subject to the rights of other parties of interest.  Such withdrawal shall in no way interfere with the owner's right to have a jury determine the amount paid.  Interest does not accrue on any money deposited under this procedure.  If the money withdrawn from the court should exceed the final award, the owner will be required to return the excess payment.

It is desired to emphasize that this is not an arbitrary action, but one designed to protect your legal right as a property owner to have the value of the property independently determined by a jury, should you so desire.

If you have questions, please contact me.

Respectfully,


Benjamen Zera
Project Manager
O.R. Colan Associates
(440) 827-6116 ext. 205
bzera@orcolan.com



**ORC** REAL ESTATE SOLUTIONS
FOR INFRASTRUCTURE

April 18, 2018

REAL ESTATE DEPARTMENT

APR 2 3 2018

RECEIVED

Troy Coolidge No. 10, LLC, a Michigan limited liability company
P.O. Box 927000
Hoffman Estates, Illinois 60179

**Project: POR-Streetsboro Signals**
**Parcel:    004 WD**
**Address: 9059 State Route 14, Streetsboro, Ohio 44241**

To Whom It May Concern:

I am sending you this letter in reference to the POR-Streetsboro Signals project, within the City of
Streetsboro, Ohio and its impact on property owned by Troy Coolidge No. 10, LLC, a Michigan limited
liability company. The City of Streetsboro has retained the firm of O.R. Colan Associates to assist with
acquiring the right of way needed for this project and act as their representative. A portion of the real estate
located at 9059 State Route 14, Streetsboro, Ohio 44241 will need to be purchased.

I have been unsuccessful in locating contact information for the appropriate party to discuss this real estate
acquisition. I would request that you please call or email me as soon as possible.

I can be reached by phone at (440) 827-6116 Ext. 211 or email at lfalvey@orcolan.com. I look forward to
discussing this important matter and any questions you may have.

Respectfully,

Lauren K. Falvey
Lauren K. Falvey
Right of Way Agent

O.R. Colan Associates, LLC                22710 Fairview Center Drive                O: 440-827-6116
www.orcolan.com                              Fairview Park, OH 44126                  F: 440-827-6122





**SUMMARY OF ADDITIONAL RIGHT OF WAY**

**POR-STREETSBORO** — SIGNALS

| FEDERAL PROJECT NO. | PID NO. | STATE JOB NO. |
|---|---|---|
| E150330 | 99879 | 441485 |

GRANTEE: ALL RIGHT OF WAY ACQUIRED IN THE NAME OF THE CITY OF STREETSBORO UNLESS OTHERWISE SHOWN.

NET TAKE = GROSS TAKE − PRO IN TAKE
NET RESIDUE = RECORD AREA − TOTAL PRO − NET TAKE
ALL AREAS IN ACRES
(o) = CALCULATED AREA
# DENOTES ENCROACHMENT

TOTAL NUMBER OF:
13 OWNERSHIPS
15 PARCELS
0 TOTAL TAKES
0 OWNERSHIPS W/ STRUCTURES INVOLVED

| PARCEL NO. | OWNER | SHEET NO. | OWNERS RECORD | AUDITOR'S PARCEL | RECORD AREA | TOTAL P.R.O. | GROSS TAKE | P.R.O. IN TAKE | NET TAKE | STRUCT TAKE | NET RESIDUE LEFT | NET RESIDUE RIGHT | TYPE FUND | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-WD | STREETSBORO TOWNSHIP TRUSTEES | 7, 8-H | O.R. 4L PG. 498 | 33-045-00-00-042-000 | 2.846 | 0.0008 | 0.0947 | 0.0000 | 0.0947 | 32? | | 2.7893 | | STOP SIGN, THRU TRAFFIC SIGN |
| 2-WD | CAMPBELL PROPERTIES, INC. | 7, 8-P | O.R. 861 PG. 91 | 33-045-00-00-054-000 | 1.0000 | 0.5295 | 0.2924 | 0.2725 | 0.0199 | NO | 0.176 | | | POLE RACK; GRADING & DRIVE CONSTRUCTION, TREE, 4 BUSHES |
| 2-T | | 7, 8-Q | | | | | 0.981 | 0.0000 | 0.981 | 1 | | | | |
| 3-WD | ALIS INC, (OHIO) AN OHIO CORPORATION | 7, 13-H | INST. 200010105 | 33-055-00-00-000-007 | 2.850 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | | | 2.7468 | | |
| 4-WD | RICKY L. DONLEY, VICKI L. DONLEY, DALE DONLEY & BARBARA DONLEY | 7, 13-M | O.R. 461 PG. 275 | 33-060-00-00-206-000 / 33-060-00-00-207-000 | | 0.0000 | 0.0000 | 0.0000 | 0.0040 | | 0.2858 / 0.0075 / 0.2518 | | | |
| 5-WD | PIPPY CO., LLC. AN OHIO LIMITED LIABILITY COMPANY | 7, 13-H | INST. 200340295 | 33-086-00-00-205-000 | 0.6987 | 0.0000 | 0.0278 | 0.0278 | 0.0278 | | 0.6254 | | | |
| 6-WD | WESTERN RESERVE HOSPITALITY INVESTMENTS, LIMITED, AN OHIO LIMITED LIABILITY COMPANY | 7, 8-S | O.R. 51L PG. 849 | 33-049-00-00-253-000 / 33-049-00-00-231-000 | 0.2190 / 0.2668 / 0.040 | 0.0000 | 0.0088 / 0.0000 / 0.0000 | 0.0000 | 0.0088 / 0.0000 / 0.0089 | | 0.1931 / 0.1855 / 1.001 | | | NO TAKE FROM THIS PARCEL |
| 7-WD | GAY NELL E. SHOOK, TRUSTEE OF THE GAY NELL E. SHOOK REVOCABLE LIVING TRUST, DATED APRIL 17, 2008 | 7, 8-V | INST. 200868625 | 33-054-00-00-049-000 | 0.5597 | 0.0000 | 0.0006 | 0.0004 | 0.0002 | | 0.4550 | | | NO TAKE FROM THIS PARCEL |
| 8 | NOT USED | | | | | | | | | | | | | |
| 9 | NOT USED | | | | | | | | | | | | | |
| 10-WD | HOME SAVINGS & LOAN COMPANY OF YOUNGSTOWN, OHIO, AN OHIO SAVINGS BANK | 7, 13-B | INST. 200557744 | 33-055-00-00-094-000 | 1.050 | 0.2053 | 0.0000 | 0.0000 | 0.0053 | | 1.099 | | | |
| 11-WD | STREETSBORO PLAZA EQUITIES, LLC | 7, 8-W | INST. 200108654 | 33-045-00-00-063-000 | 6.9800 | 0.0470 | 0.0470 | 0.0000 | 0.0470 | | 6.5435 | | | |
| 12-WD | PATRICK R. SUPPLEE & SALLY A. SUPPLEE | 7, 8-Y | O.R. 345 PG. 91 | 33-050-00-00-269-000 / 33-050-00-00-269-000 | 0.1459 / 0.1143 / 1.0902 | 0.6625 / 0.7770 / 0.8664 | 0.405 / 0.605 / 0.615 | 0.0045 / 0.0000 / 0.2000 | 0.0090 / 0.0090 / 0.0090 | | 0.404 / 0.8664 / 0.9208 | | | NO TAKE FROM THIS PARCEL; NO TAKE FROM THIS PARCEL |
| 14-T | BERNARD NICHOLLS, SUCCESSOR TRUSTEE OF THE SAXONS TRUST, DATED JANUARY 28, 2005 | 7, 9-B | INST. 200312413 / INST. 200356658 | 33-045-00-00-066-000 / 33-045-00-00-066-000 | 0.8120 / 1.0367 / 1.2950 | 0.159 / 0.3961 / 0.3884 | 0.0000 / 0.0000 / 0.0030 | 0.0000 / 0.0000 / 0.0000 | 0.0000 / 0.0035 / 0.0000 | | | | | SIDEWALK CONSTRUCTION |
| 25-WD | IVAN PROPERTIES, LLC, A VIRGINIA LIMITED LIABILITY COMPANY | 7, 13-B | INST. 200110302 | 33-041-00-00-244-000 / 33-041-00-00-244-000 / 33-041-00-00-244-000 | 0.3660 / 0.2290 / 1.1640 / 0.1440 | 0.0000 / 0.0000 / 0.0000 / 0.0043 | 0.0000 / 0.0000 / 0.0000 / 0.0000 | 0.0000 / 0.0000 / 0.0000 / 0.0000 | 0.0000 / 0.0000 / 0.0008 / 0.0000 | | 1.6392 | | | NO TAKE FROM THIS PARCEL; NO TAKE FROM THIS PARCEL |
| 35-T | | 7, 5-6 | | 33-058-00-00-244-000 / 33-058-00-00-244-000 | | 0.815 / 0.834 / 0.8749 | 0.0000 / 0.0000 / 0.0006 | | 0.015 / 0.0034 / 0.0799 | | | | | 2 BUSHES, GRADING & DRIVE CONSTRUCTION |
| 16 | CITY OF STREETSBORO | 7, 2-13 | O.R. 14 PG. 458 | 33-058-00-00-241-001 | 0.7940 | 0.0000 | | | NO | | 0.7940 | | | NO TAKE FROM THIS PARCEL |

TYPES OF TITLE DEED:
WD = WARRANTY
T = TEMPORARY EASEMENT

NOTE: ALL TEMPORARY PARCELS TO BE 18 MONTHS DURATION.

NOTE: UNDER NO CIRCUMSTANCES ARE TEMPORARY EASEMENTS TO BE USED FOR STORAGE OF MATERIAL OR EQUIPMENT BY THE CONTRACTOR UNLESS NOTED OTHERWISE.

| REV BY DATE | DESCRIPTION | DATE |
|---|---|---|
| FIELD REVIEW STH RT | | 2/26/2007 |
| OWNERSHIP VERIFIED BY ALC | | 5/3/2008 |
| DATE COMPLETED: 10/14/2008 | | |







GENERAL NOTES

POR-STREETSBORO SIGNALS

## MAINTENANCE OF TRAFFIC GENERAL NOTES

**WORK HOUR DESCRIPTIONS**

OFF-PEAK HOURS ARE DEFINED AS ANY PERIOD OTHER THAN 6:00-9:00 AM AND 3:00-6:00 PM (MONDAY THRU FRIDAY) AND LEGAL HOLIDAYS.

NIGHTTIME HOURS ARE DEFINED AS 8:00 PM - 6:00 AM.

WEEKEND HOURS ARE DEFINED AS 8:00 PM FRIDAY - 6:00 AM MONDAY.

**SEQUENCE OF CONSTRUCTION**

THE INTERSECTIONS MAY BE COMPLETED IN ANY ORDER.

**S.R. 14 / MONDIAL PARKWAY / SINGLETARY DRIVE**

WESTBOUND S.R. 14, NORTHBOUND MONDIAL PARKWAY AND SOUTHBOUND SINGLETARY DRIVE TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS BY DRUMMING OFF THE RIGHT TURN CURB LANES. EASTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS BY DRUMMING OFF THE RIGHT CURB THROUGH LANE. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO ALL CORNERS OF THE INTERSECTION.

**S.R. 14 / CLASSIC DRIVE**

EASTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. WESTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-6 (TA-6) "SHOULDER WORK WITH MINOR ENCROACHMENT". CLASSIC DRIVE SHALL REMAIN IN THE EXISTING TRAFFIC PATTERN. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE SOUTHEAST AND SOUTHWEST CORNERS OF THE INTERSECTION.

**S.R. 14 / HOME DEPOT DRIVE**

EASTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. WESTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-6 (TA-6) "SHOULDER WORK WITH MINOR ENCROACHMENT". HOME DEPOT DRIVE SHALL REMAIN IN THE EXISTING TRAFFIC PATTERN. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE SOUTHEAST AND SOUTHWEST CORNERS OF THE INTERSECTION.

**S.R. 14 / BROOK VALLEY TRAIL/SHADY LAKE DRIVE**

EASTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. WESTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-6 (TA-6) "SHOULDER WORK WITH MINOR ENCROACHMENT". NORTHBOUND BROOK VALLEY TRAIL TRAFFIC SHALL BE SHIFTED TO THE SOUTH SIDE AND THE EXISTING LANE ASSIGNMENTS SHALL BE MAINTAINED. SOUTHBOUND SHADY LAKE DRIVE TRAFFIC SHALL BE MAINTAINED BY DRUMMING OFF THE THROUGH RIGHT CURB LANE. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE NORTHEAST, NORTHWEST AND SOUTHWEST CORNERS OF THE INTERSECTION.

**SEQUENCE OF CONSTRUCTION (CONTINUED)**

**S.R. 14 / MARKET SQUARE**

EASTBOUND AND WESTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. NORTHBOUND AND SOUTHBOUND MARKET SQUARE TRAFFIC SHALL BE SHIFTED TO EITHER SIDE WHERE ONE LANE OF TRAFFIC SHALL BE MAINTAINED IN EACH DIRECTION. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE SOUTHWEST, SOUTHEAST AND NORTHEAST CORNERS OF THE INTERSECTION.

WESTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN THE EXISTING TRAFFIC PATTERN EXCEPT THE THROUGH CURB LANE SHALL BE A RIGHT TURN LANE. TRAFFIC SHALL BE SHIFTED TO THE EAST SIDE OF MARKET SQUARE WHERE ONE LANE OF TRAFFIC SHALL BE MAINTAINED IN EACH DIRECTION. THE CONTRACTOR SHALL CONSTRUCT THE WIDENED PAVEMENT, CURB AND WALK IMPROVEMENTS TO THE NORTHWEST CORNER OF THE INTERSECTION. IMPROVEMENTS TO THE NORTH CORNER OF THE INTERSECTION SHALL BE COMPLETED DURING NIGHTTIME HOURS ONLY. THE CONTRACTOR SHALL MINIMIZE THE IMPACT TO WESTBOUND S.R. 14 TRAFFIC AT ALL TIMES. SEE DETAILED MAINTENACE OF TRAFFIC PLANS FOR ADDITIONAL DETAILS.

**S.R. 14 / STAPLES DRIVE**

EASTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE SOUTHEAST CORNER OF THE INTERSECTION.

**S.R. 14 / S.R. 303**

EASTBOUND AND WESTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. NORTHBOUND S.R. 303 TRAFFIC SHALL BE SHALL BE MAINTAINED BY USE OF THE EXISTING TRAFFIC PATTERN. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE SOUTHEAST CORNER OF THE INTERSECTION.

**S.R. 14 / S.R. 43**

EASTBOUND S.R. 14 AND SOUTHBOUND S.R. 43 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. NORTHBOUND S.R. 43 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS BY DRUMMING OFF THE RIGHT TURN CURB LANE. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE SOUTHEAST, SOUTHWEST AND NORTHWEST CORNERS OF THE INTERSECTION.

WESTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. EASTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED IN THE EXISTING TRAFFIC PATTERN, EXCEPT THAT THE EASTBOUND OUTSIDE LEFT TURN LANE TO NORTHBOUND S.R. 43 SHALL BE CLOSED. NORTHBOUND S.R. 43 TRAFFIC SHALL REMAIN IN THE EXISTING TRAFFIC PATTERN, EXCEPT ONLY ONE NORTHBOUND THROUGH LANE SHALL BE MAINTAINED NORTH OF THE S.R. 14 INTERSECTION. SOUTHBOUND S.R. 43 TRAFFIC SHALL REMAIN IN THE EXISTING TRAFFIC PATTERN. THE CONTRACTOR SHALL CONSTRUCT THE WIDENED PAVEMENT, CURB AND WALK IMPROVEMENTS TO THE NORTHEAST CORNER OF THE INTERSECTION. SEE DETAILED MAINTENACE OF TRAFFIC PLANS FOR ADDITIONAL DETAILS.

**SEQUENCE OF CONSTRUCTION (CONTINUED)**

**S.R. 14 / SUPERIOR AVENUE**

EASTBOUND AND WESTBOUND S.R. 14 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. SOUTHBOUND SUPERIOR AVENUE TRAFFIC SHALL BE MAINTAINED BY USE OF THE EXISTING TRAFFIC PATTERN. THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE SOUTHWEST, NORTHEAST AND NORTHWEST CORNERS OF THE INTERSECTION.

**S.R. 43 / CHEROKEE TRAIL / PIKE PARKWAY**

EASTBOUND CHEROKEE TRAIL TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS BY DRUMMING OFF THE RIGHT TURN CURB LANE. NORTHBOUND S.R. 43 TRAFFIC SHALL BE MAINTAINED DURING OFF PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-6 (TA-6) "SHOULDER WORK WITH MINOR ENCROACHMENT". THE CONTRACTOR SHALL CONSTRUCT THE CURB RAMP AND WALK IMPROVEMENTS TO THE SOUTHEAST AND SOUTHWEST CORNERS OF THE INTERSECTION.

**S.R. 43 / MARKET SQUARE / CECIL DRIVE**

NORTHBOUND AND SOUTHBOUND S.R. 43 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. EASTBOUND MARKET SQUARE TRAFFIC SHALL BE MAINTAINED DURING OFF PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-24 (TA-24) "HALF ROAD CLOSURE ON THE FAR SIDE OF AN INTERSECTION". WESTBOUND CECIL DRIVE TRAFFIC SHALL BE MAINTAINED DURING OFF PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-6 (TA-6) "SHOULDER WORK WITH MINOR ENCROACHMENT". THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE SOUTHEAST, SOUTHWEST AND NORTHEAST CORNERS OF THE INTERSECTION.

**S.R. 43 / SEASONS ROAD / COLONY DRIVE**

SOUTHBOUND S.R. 43 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-95.31. NORTHBOUND S.R. 43 TRAFFIC SHALL BE MAINTAINED DURING OFF PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-24 (TA-24) "HALF ROAD CLOSURE ON THE FAR SIDE OF AN INTERSECTION". WESTBOUND COLONY DRIVE TRAFFIC SHALL BE MAINTAINED DURING OFF PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-6 (TA-6) "SHOULDER WORK WITH MINOR ENCROACHMENT". THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO THE NORTHEAST AND NORTHWEST CORNERS OF THE INTERSECTION.

**S.R. 303 / MARKET SQUARE / TARGET DRIVE**

EASTBOUND S.R. 303 TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS BY DRUMMING OFF THE RIGHT TURN CURB LANE. NORTHBOUND TARGET DRIVE TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS BY DRUMMING OFF THE THROUGH RIGHT CURB LANE. WESTBOUND S.R. 303 AND SOUTHBOUND MARKET SQUARE TRAFFIC SHALL BE MAINTAINED DURING OFF PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-24 (TA-24) "HALF ROAD CLOSURE ON THE FAR SIDE OF AN INTERSECTION". THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO ALL CORNERS OF THE INTERSECTION.

**SEQUENCE OF CONSTRUCTION (CONTINUED)**

**S.R. 303 / SUPERIOR AVENUE / MOUNT VERNON DRIVE**

WESTBOUND S.R. 303, EASTBOUND S.R. 303, SOUTHBOUND MOUNT VERNON DRIVE AND NORTHBOUND SUPERIOR AVENUE TRAFFIC SHALL BE MAINTAINED DURING OFF PEAK HOURS UTILIZING THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FIGURE 6H-24 (TA-24) "HALF ROAD CLOSURE ON THE FAR SIDE OF AN INTERSECTION". THE CONTRACTOR SHALL CONSTRUCT THE CURB AND WALK IMPROVEMENTS TO ALL CORNERS OF THE INTERSECTION.

**SIGNAL REMOVAL AND RECONSTRUCTION**

CONSTRUCTION OF THE PROPOSED TRAFFIC SIGNALS AND REMOVAL OF THE EXISTING SIGNALS WHICH REQUIRES LANE CLOSURES SHALL BE PERMITTED DURING NIGHTTIME HOURS ONLY WHERE TWO-WAY, TWO-LANE TRAFFIC SHALL BE MAINTAINED IN ACCORDANCE WITH ODOT SCD MT-95.31 AND MT-95.32 AT THE FOLLOWING INTERSECTIONS:

S.R. 14 / MONDIAL PARKWAY / SINGLETARY DRIVE
S.R. 14 / CLASSIC DRIVE
S.R. 14 / HOME DEPOT DRIVE
S.R. 14 / BROOK VALLEY TRAIL/SHADY LAKE DRIVE
S.R. 14 / MARKET SQUARE
S.R. 14 / S.R. 303
S.R. 14 / S.R. 43
S.R. 14 / SUPERIOR AVENUE
S.R. 43 / MARKET SQUARE DRIVE / CECIL DRIVE
S.R. 43 / FIRE STATION DRIVE
S.R. 43 / SEASONS ROAD / COLONY DRIVE

CONSTRUCTION OF THE PROPOSED TRAFFIC SIGNALS AND REMOVAL OF THE EXISTING SIGNALS WHICH REQUIRES LANE CLOSURES SHALL BE PERMITTED DURING NIGHTTIME HOURS ONLY WHERE TWO-WAY, ONE-LANE TRAFFIC, UNDER FLAGGER CONTROL, SHALL BE MAINTAINED IN ACCORDANCE WITH ODOT SCD MT-97.10 AT THE FOLLOWING INTERSECTIONS:

S.R. 14 / PORTAGE POINTE DRIVE
S.R. 43 / CHEROKEE TRAIL / PIKE PARKWAY
S.R. 303 / MARKET SQUARE / TARGET DRIVE
S.R. 303 / SUPERIOR AVENUE / MOUNT VERNON DRIVE

AT NO TIME SHALL ANY EXISTING SIGNAL BE OUT OF SERVICE BEFORE THE PROPOSED SIGNAL HAS BEEN INSTALLED AND IS IN WORKING ORDER AND PASSED ALL TESTING. ONCE THE NEW SIGNAL IS ACTIVE, ANY EXISTING LOOP DETECTORS SHALL BE ABANDONED IN PLACE.

**PLACEMENT OF FINAL PAVEMENT MARKINGS**

THE CONTRACTOR SHALL PLACE FINAL PAVEMENT MARKINGS THROUGHOUT THE PROJECT LIMITS. TRAFFIC SHALL BE MAINTAINED DURING OFF-PEAK HOURS IN ACCORDANCE WITH ODOT SCD MT-99.20.

**RESTRICTIONS**

AT NO POINT SHALL WORK IN THE VICINITY OF THE INTERSECTION OF S.R. 43 AND FIRE STATION DR. IMPEDE THE FREE MOVEMENT OF EMERGENCY VEHICLES. COORDINATE ALL WORK IN THIS AREA WITH THE STREETSBORO FIRE DEPARTMENT.

POR-STREETSBORO SIGNALS

11 / 227

# MAINTENANCE OF TRAFFIC GENERAL NOTES

## POR-STREETSBORO SIGNALS

### NOTIFICATIONS AND CONTACTS

THE CONTRACTOR SHALL NOTIFY THE FOLLOWING ENTITIES IN WRITING AND VIA TELEPHONE AT LEAST FOURTEEN (14) DAYS PRIOR TO THE BEGINNING OF CONSTRUCTION ACTIVITIES:

1. OHIO DEPARTMENT OF TRANSPORTATION DISTRICT 4
   2088 SOUTH ARLINGTON ROAD
   AKRON, OH 44306
   (330) 786-3064

2. OHIO STATE PATROL
   RAVENNA PATROL POST
   6288 STATE ROUTE 14
   RAVENNA, OH 44266
   (330) 297-1441

3. STREETSBORO SERVICE DEPARTMENT
   9094 STATE ROUTE 303
   STREETSBORO, OH 44241
   (330) 626-4942

4. STREETSBORO POLICE DEPARTMENT
   8980 STATE ROUTE 303
   STREETSBORO, OH 44241
   (330) 626-4976

5. STREETSBORO FIRE DEPARTMENT
   9184 STATE ROUTE 43
   STREETSBORO, OH 44241
   (330) 626-4664

6. STREETSBORO CITY SCHOOLS
   9470 KIRBY LANE
   STREETSBORO, OH 44241
   (330) 626-4900

7. UNIVERSITY HOSPITALS STREETSBORO HEALTH CENTER
   9318 STATE ROUTE 14
   STREETSBORO, OH 44241
   (888) 844-8773

### ITEM 614 - MAINTAINING TRAFFIC

THIS ITEM SHALL CONSIST OF MAINTENANCE OF TRAFFIC ON EXISTING ROADWAYS IN ACCORDANCE WITH THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES FOR STREETS AND HIGHWAYS, CURRENT EDITION, LATEST REVISION, THE SPECIFICATIONS AND THE FOLLOWING:

1. A MINIMUM OF ONE TEN FOOT LANE IN EACH DIRECTION SHALL BE MAINTAINED ON THE EXISTING PAVEMENT OR COMPLETED PAVEMENT DURING CONSTRUCTION OF THE WORK.

2. THE CONTRACTOR SHALL OBTAIN THE DISTRICT OFFICE, ODOT TRAFFIC, AND THE CITY OF STREETSBORO, LEGAL BORDERS, EIGHTEEN (18) DAYS PRIOR TO THE BEGINNING OF WORK.

3. TRUCK MOUNTED ATTENUATORS (TMAs) SHALL BE USED AS SHOWN IN THE STANDARD CONSTRUCTION DRAWINGS.

4. ALL FULL DEPTH PAVEMENT REMOVAL AND REPLACEMENT OPERATIONS SHALL BE COMPLETED THE SAME DAY THE EXCAVATION IS MADE. IF THE CONTRACTOR CANNOT COMPLETE THE WORK, THE EXCAVATION SHALL BE BACKFILLED OR PROTECTED AS PER STANDARD CONSTRUCTION DRAWING MT-101.00.

5. UNDER NO CIRCUMSTANCES SHALL THE CONTRACTOR BE PERMITTED TO HAVE SUCCESSIVE WORK ZONES AND LANE CLOSURES SHALL NOT EXTEND BETWEEN INTERSECTIONS, UNLESS APPROVED BY THE ENGINEER.

6. DAY (1) DURING OFF-PEAK PERIODS SHALL THE EXCAVATION IS MADE. IF THE CONTRACTOR WILL RESET ALL TRAFFIC CONTROL OR REMOVED FROM THE WORK ZONE FOR EACH WORK ZONE.

7. PRIOR TO OPENING TO TRAFFIC EACH LANE SHALL BE IN A SAFE, PASSABLE CONDITION. ALL TRANSVERSE JOINTS SHALL EXTEND ACROSS THE FULL LANE AND SHOULDER WIDTH AND EACH LANE SHALL BE FREE FROM UNEVEN LONGITUDINAL JOINTS. IF THE CONTRACTOR CANNOT PROVIDE ASPHALT WEDGES FOR TRANSVERSE JOINTS (MAXIMUM ½ INCH) AS DETERMINED BY THE ENGINEER, SHALL NOT BE PERMITTED. THE LEVEL OF UTILIZATION OF MAINLINE PAVEMENT ELEVATION DIFFERENCES.

8. PEDESTRIAN TRAFFIC SHALL BE MAINTAINED PER STANDARD CONSTRUCTION DRAWING MT-110.01.

9. LENGTH AND DURATION OF LANE CLOSURE AND RESTRICTIONS SHALL BE AT THE APPROVAL OF THE ENGINEER TO MINIMIZE THE IMPACT TO THE TRAVELING PUBLIC. LANE CLOSURES OR RESTRICTIONS PER SEGMENTS OF THE PROJECT IN ANTICIPATION OF A REASONABLE TIME FRAME, AS DETERMINED BY THE ENGINEER, SHALL BE COMMENSURATE WITH THE WORK IN PROGRESS.

### ITEM 614 - MAINTAINING TRAFFIC (CONTINUED)

10. SIGNS FURNISHED SHALL BE IN NEW OR LIKE NEW CONDITIONS. LIKE NEW SIGNS SHALL BE SUBJECT TO THE APPROVAL OF THE PROJECT ENGINEER. THE CONTRACTOR SHALL BE RESPONSIBLE AT ALL TIMES FOR PROVIDING AND MAINTAINING LIGHTS, SIGNS, AND BARRICADES FOR THE MAINTENANCE OF TRAFFIC AND SAFETY OF NEIGHBOR WORK AT THE LOCATIONS SHOWN ON THESE PLANS OR AS DIRECTED BY THE ENGINEER.

11. IF IT IS NECESSARY TO STOP ALL TRAFFIC FOR THE ERECTION OF SPAN WIRE, THE WORK SHALL BE SO ARRANGED THAT THE STOPPAGE IS LESS THAN TEN (10) MINUTES IN ANY DUE TO THIS TEN (10) MINUTE PERIOD, NO STOPPAGE OF TRAFFIC SHALL OCCUR FOR THE ERECTION OF SIGNAL SUPPORTS, CUTTING AND INSTALLING LOOP DETECTOR WIRE, OR MANUAL SPAN WIRE AND SIGNAL HEADS. WITHOUT A LAW ENFORCEMENT OFFICER WITH A PATROL CAR AT THE SITE FOR ASSISTANCE IN CONTROLLING TRAFFIC. IT SHALL BE THE CONTRACTOR'S RESPONSIBILITY TO PROVIDE THE SERVICES AND SCHEDULING OF SAID LAW ENFORCEMENT OFFICER WITH PATROL CAR.

12. THE CONTRACTOR SHALL FURNISH AND MAINTAIN ALL FLAGS, CLASSERS, ATTENMERS, BARRICADES, SIGNS, SIGN SUPPORTS AND INCIDENTALS RELATED TO TRAFFIC CONTROL.

13. WHEN LANE CLOSURES ARE ORDERED, ALL ADVANCE WARNING SIGNS FOR ANY LANE CONDITION WHICH RESTRICTS TRAFFIC SHALL BE ERECTED BEFORE ANY SUCH RESTRICTION IS PUT INTO EFFECT, ALL SUCH SIGNS SHALL BE COVERED, OR REMOVED FROM THE VIEW OF TRAFFIC WHEN THEY ARE NOT APPLICABLE, AS DETERMINED BY THE ENGINEER.

14. IF THE CONTRACTOR FAILS TO COMPLY WITH THE PROVISIONS FOR TRAFFIC CONTROL AS SET FORTH IN THESE PLANS AND SPECIFICATIONS, OR THE DANGER AND THE FAILURE RESULTS IN A CONDITION AT THE WORK SITE WHICH IS UNSAFE FOR TRAFFIC, THE ENGINEER SHALL SUSPEND WORK UNTIL THE CONTRACTOR COMPLIES WITH THE NECESSARY REQUIREMENTS.

### ITEM 614 - MAINTAINING TRAFFIC (CONTINUED)

15. NO WORK SHALL BE PERFORMED AND A MINIMUM OF ONE LANE OF TRAFFIC SHALL BE MAINTAINED IN EACH DIRECTION DURING THE FOLLOWING DESIGNATED HOLIDAYS OR EVENTS:

CHRISTMAS
NEW YEARS
MEMORIAL DAY

THANKSGIVING
FOURTH OF JULY
LABOR DAY

THE PERIOD OF TIME THAT THE LANES ARE TO BE OPEN DEPENDS ON THE DAY OF THE WEEK ON WHICH THE HOLIDAY OR EVENT FALLS. THE FOLLOWING SCHEDULE SHALL BE USED TO DETERMINE THIS PERIOD:

| DAY OF HOLIDAY OR EVENT | TIME THAT ALL LANES MUST BE OPEN TO TRAFFIC |
|---|---|
| SUNDAY | 12:00N FRIDAY THRU 5:00AM MONDAY |
| MONDAY | 12:00N FRIDAY THRU 5:00AM TUESDAY |
| TUESDAY | 12:00N MONDAY THRU 5:00AM WEDNESDAY |
| WEDNESDAY | 12:00N TUESDAY THRU 5:00AM THURSDAY |
| THURSDAY | 12:00N WEDNESDAY THRU 5:00AM FRIDAY |
| THANKSGIVING AND FRIDAY | 12:00N WEDNESDAY THRU 5:00AM MONDAY |
| FRIDAY | 12:00N THURSDAY THRU 5:00AM MONDAY |
| SATURDAY | 12:00N FRIDAY THRU 5:00AM MONDAY |

SHOULD THE CONTRACTOR FAIL TO MEET ANY OF THESE REQUIREMENTS, THE CONTRACTOR SHALL BE ASSESSED A DISINCENTIVE IN THE AMOUNT OF $50 FOR EACH MINUTE THE LANES ARE CLOSED IN TRAFFIC. PAYMENT FOR THE LANE CLOSING RESTRICTIONS ARE VIOLATED.

ALL WORK AND TRAFFIC CONTROL DEVICES SHALL BE IN ACCORDANCE WITH OHMS 614 AND OTHER APPLICABLE PORTIONS OF THE SPECIFICATIONS, AS WELL AS THE OHIO MANUAL OF UNIFORM TRAFFIC CONTROL DEVICES, CURRENT EDITION, LATEST REVISION. PAYMENT FOR ALL LABOR, EQUIPMENT AND MATERIALS SHALL BE INCLUDED IN THE LUMP SUM CONTRACT PRICE FOR ITEM 614 - MAINTAINING TRAFFIC, UNLESS SEPARATELY ITEMIZED IN THE PLAN.

**MAINTENANCE OF TRAFFIC SIGNAL/FLASHER INSTALLATION**

THE CONTRACTOR SHALL BE RESPONSIBLE FOR MAINTAINING TRAFFIC SIGNAL/FLASHER INSTALLATIONS WITHIN THE PROJECT UNDER THE FOLLOWING CONDITIONS:

1. EXISTING SIGNAL/FLASHER INSTALLATIONS WHICH THE PLANS REQUIRE THE CONTRACTOR TO ADJUST, MODIFY, ADD ONTO OR REMOVE, OR WHICH THE CONTRACTOR ACTUALLY ADJUSTS, MODIFIES OR OTHERWISE DISTURBS. THE CONTRACTOR SHALL BE RESPONSIBLE FOR THE ENTIRE INSTALLATION (AT AN INTERSECTION) FROM THE TIME HIS OPERATIONS FIRST DISTURB THE INSTALLATION UNTIL THE INSTALLATION HAS BEEN SUBSEQUENTLY REMOVED OR MODIFIED AND THE WORK IS ACCEPTED.

2. NEW OR REUSED SIGNAL/FLASHER INSTALLATIONS OR DEVICES, INSTALLED BY THE CONTRACTOR. THE CONTRACTOR SHALL BE RESPONSIBLE FOR MAINTENANCE OF THESE FROM THE TIME OF INSTALLATION UNTIL THE WORK IS ACCEPTED.

THE CONTRACTOR SHALL CORRECT AS QUICKLY AS POSSIBLE ALL OUTAGES OR MALFUNCTIONS. HE SHALL PROVIDE THE MAINTAINING AGENCY AND THE ENGINEER SUCH ADDRESSES AND PHONE NUMBERS WHERE HIS MAINTENANCE FORCES CAN BE CONTACTED. THE CONTRACTOR SHALL PROVIDE ONE OR MORE PERSONS TO RECEIVE ALL CALLS AND DISPATCH THE NECESSARY MAINTENANCE FORCES TO CORRECT OUTAGES. SUCH A PERSON OR PERSONS MAY BE USED TO PERFORM OTHER DUTIES AS LONG AS PROMPT ATTENTION IS GIVEN TO THESE CALLS AND A PERSON IS READILY AVAILABLE CONTINUOUSLY 24 HOURS A DAY, 7 DAYS A WEEK. ALL LAMP OUTAGES, CABLE OUTAGES, ELECTRICAL FAILURES, EQUIPMENT MALFUNCTIONS AND MISALIGNED SIGNAL HEADS SHALL BE CORRECTED TO THE SATISFACTION OF THE ENGINEER WITH THE SIGNAL BACK TO SERVICE WITHIN FOUR HOURS AFTER THE CONTRACTOR HAS BEEN NOTIFIED OF THE OUTAGE.

IN THE EVENT NEW SIGNALS ARE DAMAGED PRIOR TO ACCEPTANCE, ALL DAMAGED EQUIPMENT EXCEPT POLES AND CONTROL EQUIPMENT SHALL BE REPLACED BY THE CONTRACTOR TO THE SATISFACTION OF THE ENGINEER WITH THE SIGNAL BACK IN SERVICE WITHIN 8 HOURS AFTER THE CONTRACTOR'S NOTIFICATION OF THE OUTAGE. THE CONTRACTOR SHALL ARRANGE FOR FULL TRAFFIC CONTROL UNTIL THE SIGNAL IS BACK IN OPERATION.

IF POLES AND/OR CONTROL EQUIPMENT ARE DAMAGED AND MUST BE REPLACED, THE CONTRACTOR SHALL MAKE TEMPORARY REPAIRS AS NECESSARY TO BRING THE SIGNAL BACK INTO FULL OPERATION WITHIN THE ALLOWED 8-HOUR PERIOD, AND SHALL MAKE PERMANENT REPAIRS OR REPLACEMENT AS SOON THEREAFTER AS POSSIBLE.

NONE OF THE ABOVE SHALL BE CONSTRUED AS COLLECTIVE OR CONSECUTIVE OUTAGE TIME PERIODS AT ANY ONE LOCATION. THAT IS, WHERE MORE THAN ONE OUTAGE OCCURS AT ANY ONE LOCATION THEN THE ALLOTTED TIME LIMIT SHALL BE FOR THE WORST SINGLE OUTAGE.

WHERE OUTAGES ARE THE DIRECT RESULT OF A VEHICLE ACCIDENT THE RESPONSE OF THE CONTRACTOR SHALL BE AS OUTLINED ABOVE. THE CONTRACTOR SHALL BE RESPONSIBLE FOR COLLECTION OF ANY COMPENSATION FOR THIS WORK FROM THOSE PARTIES RESPONSIBLE FOR THE DAMAGE.

**MAINTENANCE OF TRAFFIC SIGNAL/FLASHER INSTALLATION (CONTINUED)**

WHERE THE CONTRACTOR HAS FAILED TO, OR CANNOT RESPOND TO, AN OUTAGE OR SIGNAL EQUIPMENT MALFUNCTION, AT THESE LOCATIONS WITHIN HIS RESPONSIBILITY, WITHIN PERIODS AS SPECIFIED ABOVE, THE ENGINEER MAY INVOKE THE PROVISIONS OF SECTION 105.15 AND ANY SUBSEQUENT BILLINGS TO THE STATE OR THE CITY OF STREETSBORO FOR POLICE SERVICES AND MAINTENANCE SERVICES BY CITY FORCES SHALL BE DEDUCTED FROM MONIES DUE OR TO BECOME DUE THE CONTRACTOR IN ACCORDANCE WITH PROVISIONS OF SECTION 105.15.

THE CONTRACTOR SHALL PROVIDE THE MAINTENANCE SERVICE ENTIRELY WITH HIS FORCES OR HE MAY CHOOSE TO ENTER INTO A COOPERATIVE UNDERSTANDING WITH THE LOCAL MAINTAINING AGENCY TO PROVIDE THE MAINTENANCE. THE CONTRACTOR SHALL INFORM THE ENGINEER, IN WRITING, OF THE MAINTENANCE METHOD SELECTED.

THE CONTRACTOR SHALL BE RESPONSIBLE FOR ANY DAMAGE TO ANY TRAFFIC SIGNAL COMPONENTS REQUIRED TO BE HANDLED DURING THE RELOCATION OF POLES AND REVISIONS TO THE SIGNAL SYSTEM. WHEN A TRAFFIC SIGNAL MUST BE TAKEN OUT OF SERVICE BY THE CONTRACTOR, DUE TO CONSTRUCTION PROCEDURES, THIS OUTAGE SHALL NOT EXCEED 4 HOURS AND SHALL NOT OCCUR DURING PEAK HOURS. ANY SIGNALIZED INTERSECTION, WHERE THE SIGNAL IS OUT OF SERVICE DUE TO CONSTRUCTION PROCEDURES, OR DUE TO AN OUTAGE OR MALFUNCTION OF EQUIPMENT AS DESCRIBED ABOVE, SHALL BE PROTECTED, BY THE CONTRACTOR, BY THE INSTALLATION OF TEMPORARY "STOP" SIGNS, EXCEPT FOR THE FOLLOWING INTERSECTIONS WHICH SHALL BE PROTECTED BY OFF-DUTY CITY OF STREETSBORO POLICE, HIRED BY THE CONTRACTOR:

1. S.R. 14 / MONDIAL PKWY. / SINGLETARY DR.
2. S.R. 14 / CLASSIC DR.
3. S.R. 14 / HOME DEPOT DR.
4. S.R. 14 / BROOK VALLEY TR. / SHADY LAKE DR.
5. S.R. 14 / MARKET SQAURE
6. S.R. 14 / S.R. 303
7. S.R. 14 / S.R. 43
8. S.R. 14 / SUPERIOR AVE.
9. S.R. 14 / PORTAGE POINTE DR.
10. S.R. 43 / CHEROKEE TRAIL / PIKE PARKWAY
11. S.R. 43 / MARKET SQUARE / CECIL DR.
12. S.R. 43 / FIRE STATION DR.
13. S.R. 43 / SEASONS RD. / COLONY DR.
14. S.R. 303 / MARKET SQUARE / TARGET DR.
15. S.R. 303 / SUPERIOR AVE. / MOUNT VERNON DR.

ANY VEHICULAR TRAFFIC SIGNAL HEAD, EITHER NEW OR EXISTING WHICH WILL BE OUT OF OPERATION SHALL BE COVERED IN THE MANNER DESCRIBED IN 632.25.

**MAINTENANCE OF TRAFFIC SIGNAL/FLASHER INSTALLATION (CONTINUED)**

THE CONTRACTOR SHALL MAINTAIN COMPLETE RECORDS OF MALFUNCTIONS INCLUDING:

1. TIME OF NOTIFICATION OF MALFUNCTION;
2. TIME OF WORK CREWS ARRIVAL TO CORRECT THE MALFUNCTION;
3. ACTIONS TAKEN TO CORRECT THE MALFUNCTION, INCLUDING A LIST OF PARTS REPAIRED OR REPLACED;
4. A DIAGNOSIS OF REASON FOR THE MALFUNCTION AND PROBABILITY OF REOCCURRENCE;
5. TIME OF COMPLETION OF THE REPAIR AND SYSTEM RESTORED TO FULL SERVICE.

A COPY OF THESE RECORDS SHALL BE PROVIDED TO THE ENGINEER WITHIN THREE (3) WORKING DAYS FOLLOWING COMPLETION OF EACH REPAIR.

ALL COSTS RESULTING FROM THE ABOVE REQUIREMENTS SHALL BE CONSIDERED TO BE INCLUDED IN THE LUMP SUM PRICE BID FOR ITEM 614 - MAINTAINING TRAFFIC.

**ITEM 614 - LAW ENFORCEMENT OFFICER WITH PATROL CAR FOR ASSISTANCE DURING CONSTRUCTION OPERATIONS**

USE OF LAW ENFORCEMENT OFFICERS (LEOs) BY CONTRACTORS OTHER THAN THE USES SPECIFIED BELOW WILL NOT BE PERMITTED AT PROJECT COST. LEOs SHOULD NOT BE USED WHERE THE OMUTCD INTENDS THAT FLAGGERS BE USED.

IN ADDITION TO THE REQUIREMENTS OF C&MS 614 AND THE OMUTCD, A UNIFORMED LEO WITH AN OFFICIAL PATROL CAR (CAR WITH TOP-MOUNTED EMERGENCY FLASHING LIGHTS AND COMPLETE MARKINGS OF THE APPROPRIATE LAW ENFORCEMENT AGENCY) SHALL BE PROVIDED FOR THE FOLLOWING TRAFFIC CONTROL TASK:

DURING A TRAFFIC SIGNAL INSTALLATION WHEN IMPACTING THE NORMAL FUNCTION OF THE SIGNAL OR THE FLOW OF TRAFFIC OR WHEN TRAFFIC NEEDS TO BE DIRECTED THROUGH AN ENERGIZED TRAFFIC SIGNAL CONTRARY TO THE SIGNAL DISPLAY (E.G., DIRECTING MOTORISTS THROUGH A RED LIGHT).

FOR LANE CLOSURES: DURING INITIAL SET-UP PERIODS, TEAR DOWN PERIODS, SUBSTANTIAL SHIFTS OF A CLOSURE POINT, OR WHEN NEW LANE CLOSURE ARRANGEMENTS ARE INITIATED FOR LONG-TERM LANE CLOSURES/SHIFTS (FOR FIRST AND LAST DAY OF MAJOR CHANGES IN TRAFFIC CONTROL SETUP).

LEOs SHOULD NOT FORGO THEIR TRAFFIC CONTROL RESPONSIBILITIES TO APPREHEND MOTORISTS FOR ROUTINE TRAFFIC VIOLATIONS. HOWEVER, IF A MOTORIST'S ACTIONS ARE CONSIDERED TO BE RECKLESS, THEN PURSUIT OF THE MOTORIST IS APPROPRIATE.

IN GENERAL LEOs SHOULD BE POSITIONED IN ADVANCE OF AND ON THE SAME SIDE AS THE LANE RESTRICTION OR AT THE POINT OF ROAD CLOSURE, AND TO MANUALLY CONTROL TRAFFIC MOVEMENTS THROUGH SIGNALIZED INTERSECTIONS IN WORK ZONE.

**ITEM 614 - LAW ENFORCEMENT OFFICER WITH PATROL CAR FOR ASSISTANCE DURING CONSTRUCTION OPERATIONS (CONTINUED)**

THE LEOs WORK AT THE DIRECTION OF THE ENGINEER. THE CONTRACTOR IS RESPONSIBLE FOR SECURING THE SERVICES OF THE LEOs WITH THE APPROPRIATE AGENCIES AND COMMUNICATING THE INTENTIONS OF THE PLANS WITH RESPECT TO DUTIES OF THE LEOs. THE ENGINEER SHALL HAVE FINAL CONTROL OVER THE LEOs' DUTIES AND PLACEMENT, AND WILL RESOLVE ANY ISSUES THAT MAY ARISE BETWEEN THE TWO PARTIES.

THE LEO SHALL REPORT IN TO THE CONTRACTOR PRIOR TO THE START OF THE SHIFT, IN ORDER TO RECEIVE INSTRUCTIONS REGARDING SPECIFIC WORK ASSIGNMENTS DURING HIS/HER SHIFT. THE LEO IS EXPECTED TO STAY AT THE PROJECT SITE FOR THE ENTIRE DURATION OF HIS/HER SHIFT. THE LEO SHALL REPORT TO THE CONTRACTOR AT THE END OF HIS/HER SHIFT. ONCE THE LEO HAS COMPLETED THE DUTIES DESCRIBED ABOVE AND STILL HAS TIME REMAINING ON HIS/HER SHIFT, THE LEO MAY BE ASKED TO PATROL THROUGH THE WORK ZONE (WITH FLASHING LIGHTS OFF) OR BE PLACED AT A LOCATION TO DETER MOTORISTS FROM SPEEDING. SHOULD IT BE NECESSARY TO LEAVE THE PROJECT SITE, THE LEO SHALL NOTIFY THE ENGINEER. THE CONTRACTOR SHALL PROVIDE THE LEO WITH A TWO-WAY COMMUNICATION DEVICE WHICH SHALL BE RETURNED TO THE CONTRACTOR AT THE END OF HIS/HER SHIFT.

LEOs (WITH PATROL CAR) REQUIRED BY THE TRAFFIC MAINTENANCE TASKS ABOVE SHALL BE PAID FOR ON A UNIT PRICE (HOURLY) BASIS UNDER ITEM 614, LAW ENFORCEMENT OFFICER WITH PATROL CAR FOR ASSISTANCE. THE FOLLOWING ESTIMATED QUANTITIES HAVE BEEN CARRIED TO THE GENERAL SUMMARY:

ITEM 614, LAW ENFORCEMENT OFFICER WITH PATROL CAR FOR ASSISTANCE ____ HOURS

THE HOURS PAID SHALL INCLUDE ANY MINIMUM SHOW-UP TIME REQUIRED BY THE LAW ENFORCEMENT AGENCY INVOLVED.

ANY ADDITIONAL COSTS (ADMINISTRATIVE OR OTHERWISE) INCURRED BY THE CONTRACTOR TO OBTAIN THE SERVICES OF AN LEO ARE INCLUDED WITH THE BID UNIT PRICE FOR ITEM 614, LAW ENFORCEMENT OFFICER WITH PATROL CAR FOR ASSISTANCE.

MAINTENANCE OF TRAFFIC GENERAL NOTES

POR-STREETSBORO SIGNALS

CALCULATED RCS CHECKED

13
227

## MAINTENANCE OF TRAFFIC GENERAL NOTES

POR-STREETSBORO SIGNALS

### TRAFFIC CONTROL INSPECTOR

THE CONTRACTOR SHALL DESIGNATE AN INDIVIDUAL, OTHER THAN THE SUPERINTENDENT AND SUBJECT TO THE APPROVAL OF THE ENGINEER, TO CONTINUOUSLY INSPECT ALL TRAFFIC CONTROL DEVICES WHEN/OR CONSTRUCTION WORK IS BEING PERFORMED WITHIN THE WORK LIMITS OF THE PROJECT. THE DESIGNATED INDIVIDUAL SHALL ALSO INSPECT ALL TRAFFIC DEVICES AT THE END OF EACH WORK DAY. THE DESIGNATED INDIVIDUAL OR A QUALIFIED REPRESENTATIVE SHALL ALSO BE AVAILABLE ON AN AROUND THE CLOCK BASIS TO REPAIR AND/OR REPLACE DAMAGED OR MISSING TRAFFIC CONTROL DEVICES. THESE INDIVIDUALS SHALL BE EQUIPPED WITH CELLULAR PHONES AND THEIR NAMES AND PHONE NUMBERS SHALL BE GIVEN TO THE PROJECT ENGINEER AT THE PRE-CONSTRUCTION MEETING. THE ESTIMATED OCCASIONAL SHALL NOT BE ALTERED.

### TRENCH FOR SHORING

TRENCH EXCAVATION FOR BASE SHORING SHALL BE DAY ( ON ONE SIDE OF THE PAVEMENT AT A TIME. FROM THE TIME THE EXCAVATION BEGINS ON THE TRENCH MATERIAL, THE OPEN TRENCH SHALL BE ADEQUATELY MAINTAINED AND PROTECTED WITH DRUMS PLACED AT TEN (10) FOOT INTERVALS. THE LENGTH OF WIDENING OPEN AT ANY ONE TIME SHALL NOT BE GREATER THAN WHICH CAN BE COMPLETED WITHIN 14 CALENDAR DAYS. ALL PROPOSED BASE AND ITEM 302 ASPHALT CONCRETE BASE MATERIAL SHALL BE COMPLETED IN A CONTINUOUS OPERATION.

### FLOODLIGHTING

FLOODLIGHTING OF THE WORK SITE FOR OPERATIONS CONDUCTED DURING NIGHTTIME PERIODS SHALL BE ACCOMPLISHED SO THAT THE LIGHTS DO NOT CAUSE GLARE TO THE DRIVERS ON THE ROADWAY, TO ENSURE THE ADEQUACY OF THE FLOODLIGHT PLACEMENT, THE CONTRACTOR AND THE CONTRACTOR SHALL DRIVE THROUGH THE WORK SITE EACH NIGHT WHEN THE LIGHTING IS IN PLACE TO OPERATE PRIOR TO COMMENCING ANY WORK. IF GLARE IS DETECTED, THE LIGHT PLACEMENT AND SHIELDING SHALL BE ADJUSTED TO THE SATISFACTION OF THE ENGINEER BEFORE WORK PROCEEDS.

PAYMENT FOR ALL LABOR, EQUIPMENT AND MATERIALS SHALL BE INCLUDED IN THE LUMP SUM CONTRACT PRICE FOR ITEM 614 - MAINTAINING TRAFFIC.

### ITEM 614 - PORTABLE CHANGEABLE MESSAGE SIGN, AS PER PLAN

THE CONTRACTOR SHALL FURNISH, INSTALL, MAINTAIN AND REMOVE, WHEN NO LONGER NEEDED, A PORTABLE CHANGEABLE MESSAGE SIGN. THE SIGN SHALL BE OF A TYPE SHOWN ON A LIST OF APPROVED PCMS UNITS AVAILABLE ON THE OFFICE OF MATERIALS MANAGEMENT WEB PAGE. THE LIST CONTAINS THE CLASS A AND B UNITS WITH MINIMUM LEGIBILITY DISTANCE OF 600 FEET AND 500 FEET RESPECTIVELY.

EACH SIGN SHALL BE TRAILER MOUNTED AND EQUIPPED WITH A FLASHING SIGNAL, DESIGNED TO CAUTION AS SOON THAN SIGN DARKNESS AND A TAMPER AND VANDAL PROOF ENCLOSURE. EACH SIGN SHALL BE PROVIDED WITH APPROPRIATE TRAINING AND OPERATION INSTRUCTIONS TO ENABLE THE DEPARTMENT PERSONNEL TO OPERATE AND TROUBLESHOOT THE UNIT. THE SIGN SHALL ALSO BE CAPABLE OF BEING POWERED BY AN INTERNAL SOURCE FROM THE LOCAL UTILITY COMPANY. PCMS TRAILERS SHOULD BE DELINEATED.

PLACEMENT, OPERATION, MAINTENANCE AND ALL ACTIVATION OF THE SIGNS BY THE CONTRACTOR SHALL BE AS DIRECTED BY THE ENGINEER. THE PCMS SHALL BE LOCATED IN A HIGHLY VISIBLE POSITION BE PROTECTED FROM TRAFFIC. THE PCMS SHOULD NOT BE LOCATED IN THE MEDIAN OF THE HIGHWAY UNLESS IT IS PROTECTED FROM BOTH DIRECTIONS OF TRAFFIC. THE CONTRACTOR SHALL, AT THE DIRECTION OF THE ENGINEER, RELOCATE THE PCMS TO IMPROVE THE VISIBILITY OR ACCOMMODATE CHANGED CONDITIONS, WHICH MAY OCCUR. THE PCMS WILL BE LEFT OPERATIONAL WHEN NOT IN USE FOR EXTENDED PERIODS OF TIME. THE PCMS SHALL BE TURNED, FACING AWAY FROM ALL TRAFFIC, AND SHALL DISPLAY ONE OR MORE "FLAGS" OR YELLOW REFLECTIVE SHEETING SURFACES OF 9-INCH BY 9-INCH MINIMUM SIZE ON THE REAR.

PAYMENT SHALL BE MADE AT THE CONTRACT UNIT PRICE PER EACH FOR ITEM 614 PORTABLE CHANGEABLE MESSAGE SIGN AND OPERATION INSTRUCTIONS TO ENABLE PERSONNEL TO OPERATE AND TROUBLESHOOT THE UNIT AND TO REVISE SIGN MESSAGES, IF NECESSARY

ALL MESSAGES TO BE DISPLAYED ON THE SIGN WILL BE PROVIDED BY THE CONTRACTOR, A LIST OF ALL PROPOSED PREPROGRAMMED MESSAGES WILL BE GIVEN TO THE ENGINEER PRIOR TO CONSTRUCTION. THE SIGN SHALL HAVE THE CAPABILITY TO STORE UP TO 99 MESSAGES. MESSAGE MEMORY OR PRE-PROGRAMMED DISPLAYS SHALL NOT BE LOST AS A RESULT OF POWER FAILURES TO THE ON-BOARD COMPUTER. THE SIGN LEGEND SHALL BE CAPABLE OF BEING CHANGED BY THE FIELD. TIME LAPSE OR OPERATION FORMATS AS WELL AS THE MESSAGE FONTS SHALL BE ADJUSTABLE WITH THE USE OF EACH PHASE IN DISPLAY BE READ AT LEAST TWICE.

THE PCMS SHALL CONTAIN AN ACCURATE CLOCK AND CALENDAR. TIMERS SHALL ALLOW A PROPER MESSAGE TO BE ACTIVATED, DE-ACTIVATED OR MESSAGES CHANGED AUTOMATICALLY AT DIFFERENT TIMES OF THE DAY FOR DIFFERENT DAYS OF THE WEEK.

THE PCMS SHALL CONTAIN A CELLULAR TELEPHONE DATA LINK WITH ALLOWS REMOTE SIGN OPERATION, TROUBLE IDENTIFICATION, MESSAGE ADDITIONS AND REVISIONS TO TIME OF DAY PROGRAMS. THE SYSTEM SHALL ALSO PERMIT VERIFICATION OR CURRENT AND/OR PROGRAMMED MESSAGES.

### ITEM 614 - PORTABLE CHANGEABLE MESSAGE SIGN, AS PER PLAN (CONTINUED)

THE PCMS UNIT SHALL BE MAINTAINED IN GOOD WORKING ORDER BY THE CONTRACTOR IN ACCORDANCE WITH THE PROVISIONS OF 614.07. THE CONTRACTOR SHALL, PRIOR TO ACTIVATING THE UNIT, MAKE ARRANGEMENTS WITH AN AUTHORIZED SERVICE AGENT FOR THE PCMS TO ASSURE PROMPT SERVICE IN THE EVENT OF FAILURE. ANY FAILURE SHALL NOT RESULT IN THE SIGN BEING OUT OF SERVICE FOR MORE THAN 6 HOURS. IN LOSING WEEKENDS, FAILURE TO CORRECT THE SIGN MALFUNCTION AND/OR PLACE SIGNS ON ALL TRAFFIC LANES AND/OR IN THE DEPARTMENT SHALL APPROPRIATE ACTION TO SAFELY CONTROL TRAFFIC. THE ENTIRE COST TO CONTROL TRAFFIC, WHICH MAY BE REQUIRED DUE TO THE CONTRACTOR'S INABILITY TO MAINTAIN PROPER SIGNS, SHALL BE PAID FROM MONIES DUE, OR TO BECOME DUE THE CONTRACTOR ON THIS CONTRACT.

THE CONTRACTOR SHALL BE RESPONSIBLE FOR 24 HOURS PER DAY OPERATION AND MAINTENANCE OF THESE SIGNS ON THE PROJECT. AT THE DIRECTION OF THE ENGINEER THIS REQUIREMENT TO FURNISH, INSTALL, MAINTAIN AND REMOVE PORTABLE CHANGEABLE MESSAGE SIGN AND ALL LABOR, MATERIALS, EQUIPMENT, FUELS, LUBRICATION, OILS, SOFTWARE, HARDWARE AND INCIDENTALS TO PERFORM THE ABOVE DESCRIBED WORK.

ITEM 614, PORTABLE CHANGEABLE MESSAGE SIGN, AS PER PLAN ........... UNIT

### ACCESS TO PROPERTIES

ACCESS SHALL BE MAINTAINED TO ALL RESIDENTIAL AND COMMERCIAL PROPERTIES, EXCEPT WHEN A DRIVEWAY MUST BE CLOSED FOR CONSTRUCTION. ALL RESIDENTS AND PROPERTY OWNERS SHALL BE PROVIDED WRITTEN NOTIFICATION BY THE CONTRACTOR PRIOR TO THE ACTUAL CLOSURE. FOR THE CLOSURE, THE NOTICE SHALL LIST THE TIME THE CLOSURE WILL BE IN EFFECT AND SHALL LIST A MINOR EMERGENCY PHONE NUMBER THE CONTRACTOR MAINTAINS 7 x 24 FOR THE CLOSURE, THE TIMES SHALL BE COORDINATED WITH EACH RESIDENT AND PROPERTY OWNER. INDIVIDUAL DRIVE ACCESSES MAY BE EARLY CLOSED AS NEEDED FOR CONSTRUCTION ACTIVITIES. EVERY EFFORT MUST BE MADE TO ACCOMMODATE THE RESIDENT OR OWNER'S NEED FOR ACCESS. UNLESS ANT IS MANAGED WITH THE USE OF AGGREGATE OR STEEL PLATES.

WHEN A DRIVEWAY IS WIDE ENOUGH, THE CONTRACTOR SHALL CONSTRUCT THE DRIVEWAY PORTH-WIDTH WHILE MAINTAINING TRAFFIC. WHERE A DRIVEWAY IS NOT WIDE ENOUGH THE DRIVEWAY, DRIVES SHALL BE CONSTRUCTED ONE AT A TIME.

THE FOLLOWING ESTIMATED QUANTITIES ARE INCLUDED FOR USE AS DIRECTED BY THE ENGINEER FOR THE MAINTENANCE OF DRIVEWAYS:

ITEM 410, TRAFFIC COMPACTED SURFACES, TYPE A OR TYPE B ........... CY
ITEM 616, WATER ........... MGAL

### DUST CONTROL

THE CONTRACTOR SHALL FURNISH AND APPLY WATER FOR DUST CONTROL, AS DIRECTED BY THE ENGINEER. THE FOLLOWING ESTIMATED QUANTITIES HAVE BEEN INCLUDED FOR DUST CONTROL PURPOSES:

ITEM 616, WATER ........... MGAL

### PAVEMENT MARKINGS

THE FOLLOWING ESTIMATED QUANTITIES SHALL BE USED FOR THE MAINTENANCE OF TRAFFIC ON THIS PROJECT:

ITEM 614, WORK ZONE CENTER LINE, CLASS I ........... MILE
ITEM 614, WORK ZONE LANE LINE, CLASS I, 4" ........... MILE
ITEM 614, WORK ZONE CHANNELIZING LINE, CLASS I, 4" ........... FT
ITEM 614, WORK ZONE DOTTED LINE, CLASS I ........... FT
ITEM 614, WORK ZONE TRANSVERSE/DIAGONAL LINE, CLASS I ........... FT
ITEM 614, WORK ZONE ISLAND MARKING, CLASS I ........... SF
ITEM 614, WORK ZONE ARROW, CLASS I ........... EACH
ITEM 614, WORK ZONE WORD OR PAVEMENT, 72", CLASS I ...........





POR-STREETSBORO
SIGNALS

S.R. 14/ SUPERIOR AVE.
PAVEMENT MARKING REMOVAL PLAN

FOR TRAFFIC CONTROL LEGEND, SEE SHEET 53

EXISTING PAVEMENT
MARKINGS TO REMAIN

REMOVE STOP LINE
STA. 24+36

EXISTING PAVEMENT
MARKINGS TO REMAIN

REMOVE STOP LINE
STA. 23+91

REMOVE CROSSWALK
STA. 23+80

REMOVE CROSSWALK
STA. 23+55

REMOVE STOP LINE
STA. 23+33

REMOVE STOP LINE
STA. 24+91

REMOVE CROSSWALK
STA. 24+??

E. R/W SUPERIOR AVE.

EXISTING PAVEMENT
MARKINGS TO REMAIN

R/W & CONST. S.R. 14

EXISTING PAVEMENT
MARKINGS TO REMAIN



Revised 03-2015

VALUE ANALYSIS ($10,000 OR LESS)

| OWNER'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | **COUNTY** | POR | |
| | | | **ROUTE** | Streetsboro Signals | |
| Troy Coolidge No. 10, LLC | | | **SECTION** | | |
| | | | **PID#** | 99879 | |

Based on comparable sales, which are attached, the following compensation has been established.
Temporary taking(s) have been based on an 18 month period.

| Parcel # | Net Take Area | Land | Improvement | Remarks | Total |
|---|---|---|---|---|---|
| 4-WD | 0.0324 Ac.<br>1,411 SF | @ $6/SF =<br>$8,466.00 | 750 SF of asphalt @ $3/SF<br>depreciated 75% = $562.50 | Rounded to | $9,035 |
| 4-WD | | | 661 SF of grass @ $0.35/SF<br>= $231.35 | Rounded to | $235 |
| 4-WD | | | 35 LF of concrete curb @<br>$15/LF depreciated 75% =<br>$131.25 | Rounded to | $135 |
| | | | | | |
| | | | | | |
| | | | | Total | $9,405 |

**Conflict of Interest Certification** [49CFR 24.102(n) and OAC 5501:2-5-06(B)(3)(a)]

1. My engagement in this assignment was not contingent upon developing or reporting predetermined results
2. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this compensation recommendation.
3. I have no direct or indirect present or contemplated future personal interest in such property or in any benefit from the acquisition of such property valued, and no personal interest with respect to the parties involved.
4. In recommending the compensation for the property, I have disregarded any decrease or increase in the fair market value of the real property that occurred prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner.
5. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment

| | | |
|---|---|---|
| Tracy M Hauserman    04/15/2018 | | 4/17/18 |
| SIGNATURE OF PERSON PREPARING ANALYSIS    DATE<br>TYPED NAME: Tracy M. Hauserman | | REVIEWER'S CONCURRENCE    DATE<br>TYPED NAME:  Emily L. Braman, MAI, SRA, AI-GRS |
| NAME OF AGENCY (IF DIFFERENT FROM ODOT) | | |
| City of Streetsboro | | 04/19/18 |
| TITLE Mayor | | AGENCY SIGNATURE ESTABLISHING FMVE    DATE<br>TYPED NAME: Glenn Broska |
| ADMINISTRATIVE SETTLEMENT: | | F.M.V.E. AMOUNT _____ |
| | | ADDITIONAL AMOUNT _____ |
| SIGNATURE                              DATE | | TOTAL SETTLEMENT _____ |
| TYPED NAME: | | |

(SEE REVERSE SIDE FOR ADDITIONAL DOCUMENTATION)

Value Analysis (continued)
Revised 03-2015

| Describe the 5 year sales history of the subject property: | There have been no sales within the past 5 years. | | | |
|---|---|---|---|---|
| **Grantor** | **Grantee** | **Date** | **Price** | **Comments** |
| | | | | |
| Describe the influence on value, if any, of prior sales of the subject property. | | N/A | | |
| State any information available from the title report that may affect the valuation of the subject property. | | N/A | | |

**Identify the Larger Parcel:**
Considering unity of title, unity of use and contiguity, the subject's larger parcel consists of Auditor's parcel number 35-055-00-00-002-002. Per the right-of-way plans, the subject consists of a gross and net size of 6.068 acres (264,322 SF) with no portion of the parcel located within the P.R.O. My research indicates there are no other adjoining parcels with the same ownership or use as the subject and as such is deemed the larger parcel for this analysis. The subject is located at 9059 State Route 14, Streetsboro, Ohio 44241 and is located on the southwest corner of State Route 14 and Portage Pointe Drive. The site is irregular, has level topography and consists of a commercial structure. Based on flood maps provided by FEMA, the subject is in an area of minimal flood hazard (zone x). The property is owned by Troy Coolidge No. 10, LLC, and the property is in the Streetsboro City School District. The appraiser has not been informed of any current listing as of the effective date of this report.

**Zoning Code:**   B, Business District

**Code Definition:**
The purpose of the Business District is to provide or promote uses principally to accommodate the sale of retail goods, personal services and administrative establishments, thereby encouraging local or regional shopping areas. It is intended that the design of this district will encourage grouping of business establishments located on a unified site providing adequate off-street parking facilities as well as an efficient and safe method for handling vehicular and pedestrian traffic.

**Minimum Site Size:**
Minimum Site Size: 10,000 SF
Minimum Frontage: 50 feet
Front Setback: Adjacent to Industrial, Commercial or Residential District: 50 feet
Rear Setback: Adjacent to Industrial or Commercial District: 25 feet, adjacent to Residential District: 40 feet

Side Setback: Equal to the height of the proposed structure, but not less than 25 feet, except adjacent to Residential District which the minimum side setback is 50 feet
Maximum Building Height: 34 feet

**Utilities:**   All public utilities are available

**Highest and Best Use:**
The subject appears to be a legal nonconforming use, as the setbacks do not meet the minimum zoning requirements. As vacant, the subject site conforms to the minimum zoning requirements and therefore, is considered to be a buildable lot. New construction would be legally permissible. As vacant, the highest and best use for the subject is for commercial purposes.

**Valuation/Analysis of Sales:**

| Sale # | Location: | Sale Date: | Sale Price: | Area: | Unit Value: |
|---|---|---|---|---|---|
| 1 | 3522 Commercial Dr, Copley Township | 4/29/2015 | $841,076.92 | 2.8368 Ac. 123,571 SF | $296.488/Ac. $6.81/SF |
| 2 | State Route 14, Streetsboro | 2/21/2014 | $1,400,000 | 6.25 Ac. 272,250 SF | $224,000/Ac. $5.14/SF |
| 3 | 5901 E Royalton Rd, Broadview Heights | 11/20/2014 | $1,750,000 | 6.6132 Ac. 288,071 SF | $264,622/Ac. $6.07/SF |

*Hauserman Appraisal Services*

Page 2 of 21

Discussion:    Land valuation is based on the attached comparable sales, which are considered to have similar highest and best uses relative to the subject. Despite its size, Portage County is predominately rural except for a few small pockets including, Streetsboro, Kent, Ravenna and Aurora. The lack of commercial development has required an expanded geographic area for sales, going back further in time.

Sale 4 is located on the northeast side of State Route 14, just northwest of the project area. This site consists of a net land size of 6.25 acres and sold for $5.14/SF in February of 2014. It is also currently listed for sale at $7.33/SF.

Size and unit value are often inversely related because of economics of scale. Larger sites typically sell for lower unit values while smaller sites often sell for higher unit values. Sale 1 is smaller in size than the subject.

The comparable sales have a unit value range of $5.14 to $6.81 per square foot.

Reconciliation:    Based on market data, a reconciled unit value of $6 per square foot is considered reasonable and well supported by the comparable sales.

The Opinion of Value stated in this report is the value of the part acquired based on a unit value of the whole property plus the contributory value of the improvements located within the take area and any cost to cure, if applicable.

**Analysis of Site Improvements (support for contributory value):**

Compensable site improvements situated within the proposed acquisition(s) consist of 750 SF of asphalt @ $3/SF depreciated 75%, 661 SF of grass @ $0.35/SF and 35 LF of concrete curb @ $15/LF depreciated 75%. Replacement costs of the site improvements have been estimated by Marshall Valuation Service, Section 66.

All site improvements situated within the existing right-of-way are non-compensable in the State of Ohio; therefore, no compensation is warranted for these items.

**Summarize the effect of the take on the residue property:**

The project consists of reconstruction of the traffic signals, curb ramps, signing, pavement markings and the installation of new fiber optic interconnect and pre-emption along SR 14 from Singletary Rd to Portage Pointe Dr and SR 43 from Cherokee Trail to Seasons Rd within the City of Streetsboro.

The proposed warranty deed, 4-WD, consists of 0.0324 acres (1,411 SF). The take area is irregular in shape and is in the northwest corner of the property. Site improvements situated within the proposed warranty deed consist of asphalt, grass and concrete curb.

Once the proposed project is complete, the subject residue parcel will remain a legal nonconforming use and will consist of a gross and net size of 6.0356 acres (262,911 SF). Since the subject will continue to have a similar highest and best use after the acquisition, the subject property as vacant or as improved will not be adversely affected by the proposed project.

**Are there Severance Damages?**    YES:    NO: X

**Other Comments:** The individual signing this report made all conclusions and analysis as to the estimation of value.

**Subject Pictures**

Taken by: Tracy M. Hauserman on 03/14/2018



| | |
|---|---|
| Take area; facing southeast | SR 14; facing west |
| SR 14; facing east | |

## COMPARABLE SALES LOCATION MAP



**COMPARABLE SALES**

## COMMERCIAL VACANT LAND SALE #1

**PROPERTY DATA**
| | |
|---|---|
| LOCATION ADDRESS: | 3522 Commercial Drive |
| CITY/TOWNSHIP: | Copley Township |
| COUNTY: | Summit |
| PARCEL NUMBER: | 15-08298 |
| SCHOOL DISTRICT: | Copley/Fairlawn CSD |
| SPECIFIC LOCATION: | Southwest corner of Commercial Dr and S Cleveland Massillon Rd |

**SALE DATA**
| | |
|---|---|
| GRANTOR: | Marmont, LTD |
| GRANTEE: | Copley Care Group, LLC |
| DATE: | 04/29/2015 |
| SALE PRICE: | $841,076.92 |
| PRICE PER ACRE: | $296,488/Ac. |
| PRICE PER SQUARE FOOT: | $6.81/SF |
| FINANCING: | Cash to seller |
| CONDITION OF SALE: | Arm's length |
| MOTIVATION: | Purchased for commercial construction |
| DATA VERIFICATION: | Abram Schwarz, Lee & Associates, 216-282-2210 |
| VERIFIED ON: | 03/15/2018 |
| VERIFIED BY: | Tracy M. Hauserman |
| DATE INSPECTED | 03/14/2018 |

**LEGAL DATA**
| | |
|---|---|
| INSTRUMENT NUMBER: | 56-124502 |
| TYPE OF INSTRUMENT: | Limited Warranty Deed |

**LAND ANALYSIS**
| | |
|---|---|
| HIGHEST AND BEST USE: | Commercial |
| PRESENT USE: | Commercial |
| TOTAL AREA: | 2.8366 Ac. (Gross & Net)        123,571 SF (Gross & Net) |

| | |
|---|---|
| ENCUMBRANCES: | None noted |
| EASEMENTS: | Typical utility easements |
| DIMENSIONS: | Please see sketch |
| SHAPE: | Irregular |
| INTERIOR/CORNER: | Corner |
| ZONING: | C-OR, Commercial Office Retail District |
| UTILITIES: | All public available |
| TOPOGRAPHY: | Mostly level |
| FLOOD PLAIN DATA: | Zone X; 39153C0094F; 04/19/2016 |

**COMMENTS**
The gross and net land size has been confirmed with the Summit County Auditor's website and the
dimensions stated on the plat map have been confirmed with the Summit County GIS measuring tool.

---

*Hauserman Appraisal Services*                                               Page 6 of 21

**Picture and Plat Map**



Picture taken from Commercial Drive, facing southeast



## COMMERCIAL VACANT LAND SALE #2

**PROPERTY DATA**
| | |
|---|---|
| **LOCATION ADDRESS:** | State Route 14 |
| **CITY/TOWNSHIP:** | Streetsboro |
| **COUNTY:** | Portage |
| **PARCEL NUMBER:** | 35-034-10-00-001-006 |
| **SCHOOL DISTRICT:** | Streetsboro CSD |
| **SPECIFIC LOCATION:** | Northeast side of State Route 14 and northwest side of Shady Lake Drive. |

**SALE DATA**
| | |
|---|---|
| **GRANTOR:** | Shady Lake Apartments, Inc. |
| **GRANTEE:** | M7 Realty, LLC |
| **DATE:** | 02/21/2014 |
| **SALE PRICE:** | $1,400,000 |
| **PRICE PER ACRE:** | $224,000/Ac. |
| **PRICE PER SQUARE FOOT:** | $5.14/SF |
| **FINANCING:** | Cash or terms equivalent |
| **CONDITION OF SALE:** | Arm's length |
| **MOTIVATION:** | Willing buyer/seller |
| **DATA VERIFICATION:** | Terry Coyne, Newmark Grub Knight Frank, 216-453-3001 |
| **VERIFIED ON:** | 03/21/2018 |
| **VERIFIED BY:** | Tracy M. Hauserman |
| **DATE INSPECTED** | 03/14/2018 |

**LEGAL DATA**
| | |
|---|---|
| **INSTRUMENT NUMBER:** | 201402447 |
| **TYPE OF INSTRUMENT:** | Limited Warranty Deed |

**LAND ANALYSIS**
| | | |
|---|---|---|
| **HIGHEST AND BEST USE:** | Commercial | |
| **PRESENT USE:** | Vacant land | |
| **TOTAL AREA:** | 9.399 Ac. (Gross) | 409,420 SF (Gross) |
| | 6.25 Ac. (Net) | 272,250 SF (Net) |
| **ENCUMBRANCES:** | Approximately 3.149 Ac. retention basin | |
| **EASEMENTS:** | Typical utility easements | |
| **DIMENSIONS:** | Please see sketch | |
| **SHAPE:** | Irregular | |
| **INTERIOR/CORNER:** | Interior | |
| **ZONING:** | C-R, Commercial, Office, Residential District | |
| **UTILITIES:** | All public available | |
| **TOPOGRAPHY:** | Sloping | |
| **FLOOD PLAIN DATA:** | Zone X; 39133C0126D; 08/18/2009 | |

**COMMENTS**
The gross and net land size has been confirmed with the Portage County Auditor's website and the dimensions stated on the plat map have been confirmed with the Portage County GIS measuring tool. The property is currently for sale at $7.33/SF.

## Picture and Plat Map



Picture taken from SR 14, facing norheast



## COMMERCIAL VACANT LAND SALE #3

**PROPERTY DATA**

| | |
|---|---|
| LOCATION ADDRESS: | 5901 East Royalton Road |
| CITY/TOWNSHIP: | Broadview Heights |
| COUNTY: | Cuyahoga |
| PARCEL NUMBER: | 583-24-005 |
| SCHOOL DISTRICT: | Brecksville-Broadview Heights CSD |
| SPECIFIC LOCATION: | North side of Royalton Road, adjacent to Interstate 77 to the east |

**SALE DATA**

| | |
|---|---|
| GRANTOR: | Royalton 6001 Limited Partnership |
| GRANTEE: | University Hospitals Health System, Inc. |
| DATE: | 11/20/2014 |
| SALE PRICE: | $1,750,000 |
| PRICE PER ACRE: | $264,622/Ac. |
| PRICE PER SQUARE FOOT: | $6.07/SF |
| FINANCING: | Cash or terms equivalent |
| CONDITION OF SALE: | Arm's length |
| MOTIVATION: | Purchased for medical construction |
| DATA VERIFICATION: | Bob Nosal, Newmark Knight Frank, 216-453-3000 |
| VERIFIED ON: | 03/15/2018 |
| VERIFIED BY: | Tracy M. Hauserman |
| DATE INSPECTED | 03/14/2018 |

**LEGAL DATA**

| | |
|---|---|
| INSTRUMENT NUMBER: | 201411200562 |
| TYPE OF INSTRUMENT: | Limited Warranty Deed |

**LAND ANALYSIS**

| | |
|---|---|
| HIGHEST AND BEST USE: | Commercial |
| PRESENT USE: | Medical |
| TOTAL AREA: | 6.6132 Ac. (Gross & Net)        286,071 SF (Gross & Net) |
| ENCUMBRANCES: | None noted |
| EASEMENTS: | Typical utility easements |
| DIMENSIONS: | Please see sketch |
| SHAPE: | Irregular |
| INTERIOR/CORNER: | Corner |
| ZONING: | E-1, Office - Laboratory District |
| UTILITIES: | All public available |
| TOPOGRAPHY: | Sloping |
| FLOOD PLAIN DATA: | Zone X; 39035C0309E; 12/03/2010 |

**COMMENTS**

The gross and net land size as well as the dimensions stated on the plat map have been confirmed with the deed.

**Picture and Plat Map**





## SUBJECT PROPERTY AERIAL
### (not to scale)



The above sketch is based on the Portage County GIS measuring tool. These figures should be considered for illustrative purposes only.

**ACQUISITION SKETCHES**

**(not to scale)**





## EXHIBIT A

LPA RX 851 WD

Page 1 of 2
Rev. 06/09

Ver. Date   02/20/2018

PID    99879

### PARCEL    4-WD
### POR-STREETSBORO SIGNALS
### ALL RIGHT, TITLE AND INTEREST IN FEE SIMPLE
### IN THE FOLLOWING DESCRIBED PROPERTY
### WITHOUT LIMITATION OF EXISTING ACCESS RIGHTS
### IN THE NAME AND FOR THE USE OF THE
### CITY OF STREETSBORO, PORTAGE COUNTY, OHIO

Grantor/Owner, for himself and his heirs, executors, administrators, successors and assigns, reserves all existing rights of ingress and egress to and from any residual area (as used herein, the expression "Grantor/Owner" includes the plural, and words in the masculine include the feminine or neuter).

------
[Surveyor's description of the premises follows]

Situated in the State of Ohio, County of Portage, Streetsboro Township, Lot 56, City of Streetsboro, and being part of a tract conveyed to Troy Coolidge No. 10, LLC, a Limited Liability Company (hereinafter known as the "Grantor") by Instrument Number 200403642 of said county records.

Being a parcel of land lying on the right side of the centerline of right of way of State Route 14 as shown on the centerline plat of POR-Streetsboro Signals as recorded in Plat Book _____, Page _____ of the records of Portage County and being further described as follows:

Commencing, for reference, at a magnail (set) at the southeasterly corner of Lot 4 of Brugmann Acres, as recorded in Plat Book 7, Page 23, said corner being on the centerline of State Route 14 at station 23+29.30; thence, along said centerline, South 58 degrees 59 minutes 25 seconds East, a distance of 146.57 feet to a point at State Route 14 station 24+75.87; thence, leaving said centerline and being perpendicular to, South 31 degrees 00 minutes 35 seconds West, a distance of 40.00 feet to the northeasterly corner of a tract in the name of Aldi Inc. (Ohio), an Ohio Corporation, as recorded in Instrument Number 200310325 of said county records, said corner being on the southerly existing right of way of State Route 14, 40.00 feet right of State Route 14 station 24+75.87 and the Point of Beginning of the parcel herein described; Thence, clockwise along the following four (4) courses;

1.  Thence, along said existing right of way line, South 58 degrees 59 minutes 25 seconds East, a distance of 94.13 feet to a magnail (set) 40.00 feet right of State Route 14 station 25+70.00;

2.  Thence, leaving said existing right of way line, across the grantor's tract, South 31 degrees 00 minutes 35 seconds West, a distance of 15.00 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", 55.00 feet right of State Route 14 station 25+70.00;

## EXHIBIT A

**LPA RX 851 WD**

3. Thence, continuing across the grantor's tract, North 58 degrees 59 minutes 25 seconds West, a distance of 94.14 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", on the easterly line of said Aldi Inc. (Ohio) tract, 55.00 feet right of State Route 14 station 24+75.86;

4. Thence, along said property line, North 31 degrees 00 minutes 49 seconds East, a distance of 15.00 feet to the Point of Beginning, containing 0.0324 acres, of which the present road occupies 0.0000 acres, and is contained within Portage County Auditor's Permanent Parcel No. 35-055-00-00-002-002.

The bearings for this description are based on Grid North, of the Ohio State Plane Coordinate System, NAD83(2011), Ohio North Zone, established by using the Ohio Department of Transportation's Virtual Reference System (VRS) as part of a Global Positioning System (GPS) survey.

This description was prepared and reviewed under the supervision of Steven L. Mullaney, Professional Surveyor No. 7900 from a survey conducted for the City of Streetsboro, Portage County, Ohio in November, 2016.

Steven L. Mullaney, P.S.                    02/20/18
Professional Surveyor No. 7900              Date

STATE OF OHIO
STEVEN L. MULLANEY
S-7900
PROFESSIONAL
REGISTERED
SURVEYOR

Rev. 01/2016

# Parcel Impact Notes

This document is meant to be an aid for scoping and is absolutely not to be interpreted as steering or directing an appraiser
to an opinion that is not the appraisers. However, appraisers must comply with applicable appraiser standards, including
USPAP as appropriate, and ODOT's policies and procedures regarding appraisals

| Project C/R/S | POR-Streetsboro Signals | | |
|---|---|---|---|
| PID | 99879 | Construction Plans | N/A |
| Parcel | 4-WD    PPN: 35-055-00-00-002-002 | R/W Plans | 2/14/18 |
| Owner/Tenants: | Troy Coolidge No. 10 LLC | | |

| Take: | The take area contains 0.0324 acres (net) of land and site improvements. |
|---|---|
| What is in Take? | Concrete curb |
| Appraisal Issues / Significant Issues: | The appraisal is not complex. The property contains 6.068 acres (net). The City of Streetsboro proposes to acquire 0.0324 acres (net), leaving a net residue of 6.0356 acres. The property is improved with a retail store built in 1981.<br><br>The appraisal will consider the value of the underlying land and any site improvements to determine compensation for the part taken, consistent ODOT's Division of Real Estate, Policy and Procedures Manual. Research and analysis of comparable sales is needed to support the appraiser's opinion of value. The appraiser will utilize the most current template published by ODOT for the Value Analysis report and will be compliant with USPAP and ODOT's policies and procedures.<br><br>Upon completion of the report, the appraiser will deliver one electronic copy in .pdf format to the reviewer. If revisions are required, the appraiser will be notified once the appraisal is recommended for approval to send the final electronic copy of the appraisal to the reviewer. |

| The valuation (appraisal) problem is: | Simplistic | ☒ | Complex | ☐ |
|---|---|---|---|---|

| Recommended Appraisal Format: | Value Analysis |
|---|---|
| Review Appraiser Signature / Date Typed Name | Emily L. Branlan, MAI, SRA, AI-GRS   4/10/18 |
| Approved by Signature / Date Typed Name | Glen Broska, Mayor of Streetsboro, Ohio |
| Appraiser Acknowledgement | I have reviewed the right of way plans and other pertinent parts of the construction plans, have driven by the subject, have reviewed these Parcel Impact Notes and I have independently performed my own appraisal problem analysis. I am in agreement regarding the valuation (appraisal) problem, the determination of the complexity of this problem, and I agree that the recommended format is appropriate for use during the acquisition phase of this project. |
| Signature / Date Typed Name | Tracy M Hauserman    04/11/2018 |

Parcel 4 WD  (35-055-00-00-002-002)
Owner:  Troy Coolidge No. 10 LLC

Photo



Facing south showing the take area

Aerial Photo of the subject property



^North

**Hauserman Appraisal Services** | **Tracy M. Hauserman**
*Ohio Certified General Appraiser*

**EDUCATION**
B.A. Psychology
B.A. Sociology
Cleveland State University

**LICENSURE**
Certified General Appraiser
State of Ohio – 2015004838

**PROFESSIONAL AFFILIATIONS**
Practicing Affiliate of the Appraisal
Institute

**TRAINING**
Fair Housing Course (2012, Hondros)

15 hours of USPAP (2012, AI)

30 hours of Basic Appraisal Procedures
(2012, AI)

30 hours of Basic Appraisal Principles
(2012, AI)

30 hours of General Appraiser Site
Valuation and Cost Approach
(2012, AI)

15 hours of Statistics, Modeling and
Finance (2013, AI)

30 hours of General Sales Comparison
Approach (2013, AI)

30 hours of General Appraiser Income
Approach Part I (2013, AI)

30 hours of General Appraiser Income
Approach Part II (2013, AI)

5 hours of Appraisal 101, Federal and
State Laws & ODOT P/P
(2013, ODOT)

15 hours of Appraisal 102, Valuation of
Simplistic Acquisitions (2013, ODOT)

6 hours of Appraisal 122, Project Data
Book (2013, ODOT)

6 hours of Appraisal 105, Introduction to
Appraisal Review (2013, ODOT)

18 hours of Highway plan Reading
(2013, ODOT)

Ms. Tracy Hauserman is a Certified General Real Estate Appraiser for
the State of Ohio and has over 7 years of experience in appraisal. Ms.
Hauserman has had the opportunity to work with multiple appraisers
and review appraisers and has processed several right-of-way and
non-right-of-way appraisal reports for various property types, including
residential, multi-family, commercial, retail and industrial properties.
Over the years she has provided appraisal staff with significant real
property appraisal assistance, such as accompanying the appraisers
at the time of inspection, researching area and neighborhood
information, researching and confirming comparable sales, taking
photos, compiling information for inclusion in the reports, investigating
and verifying zoning, utilities and flood plain data. Ms. Hauserman is
currently Ohio Department of Transportation approved to complete
Value Analysis and Appraisal Reports.

**REPRESENTATIVE RIGHT-OF-WAY PROJECTS**
- CUY-42-0.00
- HUR-Prospect Street Bridge
- CUY-Bellaire Rd (CR 323)
- CUY-Pleasant Valley Rd (CR 39)/Bagley Rd (CR 27)
- CUY-Towpath Trail: Segment 3
- SCI-823-0.00: Segment C
- WAY-585-2.75
- NEORSD-CSO-049/050
- SUM-CR10-2.08
- LOR-57-19.42
- LAK-Vrooman Rd Bridge
- MED-42-18.98
- City of North Ridgeville – Lear Nagle Road
- MED-West Smith Road
- City of Sandusky – East End Sewer Improvements
- City of Hudson-Brandywine Bridge Rehab
- LOR–82-8.98 – Boone Road
- NEORSD–E. 140th Street Consolidation (Phases I, II & III)
- NEORSD–Cascades
- NEORSD–Doan Valley Tunnel
- CUY–Broadrock Court Drill Drop
- STA–93–Cherry/Locust
- SUM–CH-15-5.65
- CUY–Avery Road
- CRA–SR–0098-07.87
- POR–Frost Road (CR-197)
- FRA-COTA Sidewalks
- SUM-SR-93-New Franklin
- MED-18-13.54 (Cost Estimate)
- CUY-Opportunity Corridor
- SUM-76-5.62 (Phase I)
- NEORSD-Superior & Stones Levee Pump Stations
- RIC-C.R. 281-0.58 (Trimble Rd.)

**Hauserman Appraisal Services** | Tracy M. Hauserman
*Ohio Certified General Appraiser*

6 hours of Appraisal 104,
Right of Way Appraisal Report
(2014, ODOT)

30 hours of General Appraiser
Market
Analysis Highest and Best Use
(2014, McKissock)

30 hours General Report Writing &
Case Studies
(2015, McKissock)

15 hours Commercial Appraisal
Review (2015, McKissock)

7 hours 2014-2015 National USPAP
Update (2015, McKissock)

7 hours Land and Site Valuation
(2015, McKissock)

15 hours Expert Witness for
Commercial Appraisers
(2015, McKissock)

7 hours Residential Property
Inspection for Appraisers (2016,
McKissock)

7 hours The FHA Handbook 4000.1
(2016, McKissock)

7 hours 2018-2019 National USPAP
Update (2017, McKissock)

7 hours Understanding Residential
Construction (2017, McKissock)

- MED-57-17.67
- City of Wooster – Burbank Road Reconstruction
- City of Strongsville – Courtland Drive Culvert Replacement
- SUM-76-5.62 (Phase II)
- CUY-Fitch Road
- SUM-8-1.75
- City of Canton – Waterline Extension Project

## PREVIOUS APPRAISAL EXPERIENCE
**O.R. Colan Associates,** Fairview Park, OH (2013-2016)
Real Estate Appraiser (2016)
- Processed right-of-way appraisal reports
- Completed Value Analysis reports
- Trained office staff in the development of appraisal reports.

Real Estate Appraisal Assistant (2013-2015)
- Researched properties and provided appraisers with property
  information
- Researched and confirmed comparable sales
- Communicated with property owners and brokers to confirm data
- Organized and maintain inspection schedules and due dates
- Assisted appraisers during inspections
- Assisted in writing appraisal reports
- Entered property and comparable data into appraisal software
- Completed Value Analysis reports

**Butler Burgher Group,** *Westlake, OH (2012-2013)*
*Analyst*
- Researched properties and provided appraisers with property
  information
- Assisted in writing portions of appraisal reports
- Communicated with property owners and brokers to confirm data
- Entered data into appraisal software

**Hoke Appraisal Services,** *Bay Village, OH (2010-2012)*
*Residential Real Estate Appraisal Assistant*
- Provided appraisers with subject property information
- Processed reports using appraisal software
- Organized and maintain inspection schedules and due dates

---

## JURISDICTIONAL EXCEPTION DISCLOSURE

### Value Analysis Report

The appraisal waiver rule adopted by the FHWA allows agencies to determine when an appraisal is not needed if they first determine that the valuation problem was uncomplicated and has an estimated value less than the low-value defined in the rule. As such, the information provided in the development of the approved report format is not considered an appraisal. This specialized service was prepared by a disinterested and unbiased third party within the scope of the certificate holder's certification in compliance with Ohio Revised Code 4763.12.

This report was performed under the JURISDICTIONAL EXCEPTION RULE of the Uniform Standards of Professional Appraisal Practice (USPAP). The format is in compliance with Section 4200.02 B of the Policies and Procedures Manual of the Ohio Department of Transportation's (ODOT) Office of Real Estate. The format is also in compliance with Federal Law 49CFR 24.102 (c)(2), as well as the Ohio Administrative Code 5501:2-5-6 (B)(3)(h)(ii)(a) for the provisions for waiver of appraisals. The part or parts of USPAP which have been disregarded are STANDARDS 1-3, since this assignment is not considered to be appraisal or appraisal review. Refer to ADVISORY OPINION 21 of USPAP for illustration of the relationship between "valuation services" and "appraisal practice". The legal authority which justified this action was cited above under Federal and State law for the waiver of appraisal provision. The Value Analysis Report format was developed by ODOT in accordance with the waiver of the appraisal provision in both the Federal and State laws cited above. By definition, the Value Analysis Report format is not an appraisal when it is used in accordance with the Policies and Procedures of ODOT.

EXHIBIT "D"

SEARS DEED

Prepared by and after recording          )
return to:                                )
                                          )
Ivy D. Israel                )
Sears Holdings Corporation                          )
3333 Beverly Road, Dept. 824RE            )
Hoffman Estates, IL 60179                 )

## LIMITED WARRANTY DEED

**THIS LIMITED WARRANTY DEED** is made as of this ____ day of _____,
2018, by **SEARS, ROEBUCK AND CO.,** a New York corporation (**"Grantor"**), to
**[PURCHASER],** [Purchaser entity type and state of organization] (**"Grantee"**).

## W I T N E S S E T H:

Grantor, in consideration of the amount of Ten Dollars ($10.00) to it in hand paid by Grantee,
the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell and
convey, with limited warranty covenants, to Grantee, its successors and assigns, the real property
situated at 4900 Midway Mall, City of Elyria, County of Lorain, State of Ohio, as described in
**Exhibit "A"**, attached hereto and made a part hereof, together with (i) all rights, easements, interests,
privileges, tenements and hereditaments appurtenant thereto, (ii) all buildings, structures, fixtures and
improvements thereon, and (iii) all of Grantor's right, title and interest in any public rights-of-way or
roads abutting said real property.

Grantor warrants and will defend Grantee, and its successors and assigns, against any claim
hereafter arising by, through and under Grantor, but not otherwise, subject to all matters currently of
record against the premises described on Exhibit "B".

(Signature appears on following page)

EXHIBIT D

**IN WITNESS WHEREOF**, Grantor has caused its name to be signed to these presents as of the date and year first above written.

                                      **SEARS, ROEBUCK AND CO.,**
                                        a New York corporation,

                                        By: _____
                                        Name:_____
                                        Title:_____

STATE OF ILLINOIS         )
                          ) SS:
COUNTY OF COOK        )

**THE UNDERSIGNED**, a Notary Public, in and for said County, in the State aforesaid, DOES HEREBY CERTIFY that _____, personally known to me to be the _____ of **SEARS, ROEBUCK AND CO.**, a New York corporation, appeared before me this day in person and acknowledged that in such capacity he signed and delivered the said instrument pursuant to authority, as his free and voluntary act, and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth.

      **GIVEN** under my hand and official seal this ___ day of _____, 2018.

                                        _____
                                        Notary Public

My Commission Expires:

_____, _____.

EXHIBIT D

**EXHIBIT A**

**LEGAL DESCRIPTION**

[TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

EXHIBIT D

## **EXHIBIT B**

## **PERMITTED ENCUMBRANCES**

[TO BE INSERTED]

EXHIBIT D

EXHIBIT "E"

TROY DEED

Prepared by and after recording        )
return to:                             )
                                       )
Ivy D. Israel            )
Sears Holdings Corporation                    )
3333 Beverly Road, Dept. 824RE         )
Hoffman Estates, IL 60179              )

LIMITED WARRANTY DEED

THIS LIMITED WARRANTY DEED is made as of this ____ day of _____,
2018, by TROY COOLIDGE NO. 10, LLC, a Michigan limited liability company ("Grantor"), to
[PURCHASER], [Purchaser entity type and state of organization]  ("Grantee").

WITNESSETH:

Grantor, in consideration of the amount of Ten Dollars ($10.00) to it in hand paid by Grantee,
the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell and
convey, with limited warranty covenants, to Grantee, its successors and assigns, the real property
situated at 9059 State Route 14, City of Streetsboro, County of Portage, State of Ohio, as described in
Exhibit "A", attached hereto and made a part hereof, together with (i) all rights, easements, interests,
privileges, tenements and hereditaments appurtenant thereto, (ii) all buildings, structures, fixtures and
improvements thereon, and (iii) all of Grantor's right, title and interest in any public rights-of-way or
roads abutting said real property.

Grantor warrants and will defend Grantee, and its successors and assigns, against any claim
hereafter arising by, through and under Grantor, but not otherwise, subject to all matters currently of
record against the premises described on Exhibit "B".

(Signature appears on following page)

EXHIBIT E

**IN WITNESS WHEREOF**, Grantor has caused its name to be signed to these presents as of the date and year first above written.

<div align="center">

**TROY COOLIDGE NO. 10, LLC,**
a Michigan limited liability company

By:  **KMART CORPORATION,**
a Michigan corporation

</div>

By: _____
Name:_____
Title:_____

STATE OF ILLINOIS          )
                           ) SS:
COUNTY OF COOK             )

      **THE UNDERSIGNED**, a Notary Public, in and for said County, in the State aforesaid, DOES HEREBY CERTIFY that _____, personally known to me to be the _____ of KMART CORPORATION, a Michigan corporation, appeared before me this day in person and acknowledged that in such capacity he signed and delivered the said instrument pursuant to authority, as his free and voluntary act, and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth.

      **GIVEN** under my hand and official seal this ___ day of _____, 2018.


_____
Notary Public


My Commission Expires:


_____, _____.

<div align="center">

EXHIBIT E

</div>

## EXHIBIT A

### LEGAL DESCRIPTION

[TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## **EXHIBIT B**

### **PERMITTED ENCUMBRANCES**

[TO BE INSERTED]

**EXHIBIT "F"**

**KMART DEED**

| | |
|---|---|
| Prepared by and after recording | ) |
| return to: | ) |
| | ) |
| Ivy D. Israel                )| |
| Sears Holdings Corporation | ) |
| 3333 Beverly Road, Dept. 824RE | ) |
| Hoffman Estates, IL 60179 | ) |

## LIMITED WARRANTY DEED

  **THIS LIMITED WARRANTY DEED** is made as of this ____ day of _____, 2018, by **KMART CORPORATION**, a Michigan corporation ("**Grantor**"), to **[PURCHASER]**, [Purchaser entity type and state of organization]  ("**Grantee**").

## WITNESSETH:

  Grantor, in consideration of the amount of Ten Dollars ($10.00) to it in hand paid by Grantee, the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell and convey, with limited warranty covenants, to Grantee, its successors and assigns, the real property situated at 9059 State Route 14, City of Streetsboro, County of Portage, State of Ohio, as described in **Exhibit "A"**, attached hereto and made a part hereof, together with (i) all rights, easements, interests, privileges, tenements and hereditaments appurtenant thereto, (ii) all buildings, structures, fixtures and improvements thereon, and (iii) all of Grantor's right, title and interest in any public rights-of-way or roads abutting said real property.

  Grantor warrants and will defend Grantee, and its successors and assigns, against any claim hereafter arising by, through and under Grantor, but not otherwise, subject to all matters currently of record against the premises described on Exhibit "B".

(Signature appears on following page)

EXHIBIT F

**IN WITNESS WHEREOF**, Grantor has caused its name to be signed to these presents as of the date and year first above written.

<div align="center">

**KMART CORPORATION,**
a Michigan corporation

</div>

By: _____
Name:_____
Title:_____

STATE OF ILLINOIS      )
                          ) SS:
COUNTY OF COOK       )

**THE UNDERSIGNED**, a Notary Public, in and for said County, in the State aforesaid, DOES HEREBY CERTIFY that _____, personally known to me to be the _____ of KMART CORPORATION, a Michigan corporation, appeared before me this day in person and acknowledged that in such capacity he signed and delivered the said instrument pursuant to authority, as his free and voluntary act, and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth.

**GIVEN** under my hand and official seal this ___ day of _____, 2018.

_____
Notary Public

My Commission Expires:

_____, _____.

<div align="center">

EXHIBIT F

</div>

## EXHIBIT A

### LEGAL DESCRIPTION

[TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

**EXHIBIT "G"**

**ASSIGNMENT AND ASSUMPTION OF INTANGIBLES**

THIS ASSIGNMENT AND ASSUMPTION OF INTANGIBLES (this "**Assignment and Assumption**") is made as of the [**Closing Date**] between by and between **Troy Coolidge No 10, LLC,** a Michigan limited liability company ("**Troy**"), **Kmart Corporation,** a Michigan corporation ("**Kmart**") and **Sears, Roebuck and Co.,** a New York corporation ("**Sears**") (collectively, "**Assignor**"), and **Industrial Commercial Properties LLC,** an Ohio limited liability company ("**Assignee**").

<div align="center">Background</div>

WHEREAS, Sears is the owner of a parcel of land consisting of approximately 17.94 acres including the buildings and improvements thereon and any interest of Sears in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights including all easements for utilities and common roadway purposes ("**Sears Property**"), in the City of Elyria, Lorain County, Ohio legally described on **Exhibit "A-1"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Sears Property, and all rights, privileges and appurtenances pertaining to the Sears Property (collectively, the "**Sears Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Sears and associated with the ownership, operation or maintenance of the Sears Property and Sears Improvements, if any (collectively, the "**Sears Personal Property**") Sears right, title and interest as ground lessor or ground land lines pursuant to the terms and conditions of that certain Ground Lease dated October 16, 1991 by and between Sears and Red Lobster Hospitality LLC, a Delaware limited liability company ("**Ground Lease Tenant**") as amended, including pursuant to that certain First Amendment to Ground Lease dated August 1, 2017 (collectively the "**Assigned Lease**");

WHEREAS, Troy is the owner of a parcel of land consisting of approximately 6.068 acres including the buildings and improvements thereon and any interest of Troy in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes ("**Troy Property**"), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-2"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights, privileges and appurtenances pertaining to the Troy Property (collectively, the "**Troy Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Troy and associated with the ownership, operation or maintenance of the Troy Property and Troy Improvements, if any (collectively, the "**Troy Personal Property**");

WHEREAS, Kmart is the owner of a parcel of land consisting of approximately 0.79 acres including the buildings and improvements thereon and any interest of Kmart in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes ("**Kmart Property**"), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-3"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights, privileges and appurtenances pertaining to the Kmart Property (collectively, the "**Kmart Improvements**" together with the Sears Improvements and Troy Improvements shall collectively be referred to as the "**Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Kmart and associated with the ownership, operation or maintenance of the Kmart Property and Kmart Improvements, if any (collectively, the "**Kmart Personal Property**" together with the Sears

<div align="center">EXHIBIT G</div>

Personal Property and Troy Personal Property shall collectively be referred to as the "**Personal Property**"). The Sears Property, Troy Property and Kmart Property, the Improvements and the Personal Property are collectively referred to as the "**Property**"); and

On the date hereof, Assignor is conveying to Assignee the Property, pursuant to the terms and conditions of the Purchase and Sale Agreement dated as of _____, 2018, by and between Assignor, as seller, and Assignee, as buyer (as amended or otherwise modified as of the date hereof, the "**Agreement**"). All capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Agreement.

<div align="center">Assignment and Assumption</div>

In consideration of the purchase and sale of the Property, the mutual covenants contained herein, and other good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.    Assignor hereby assigns, transfers, sets over, conveys and quitclaims to Assignee, to the extent that the same are legally assignable, all of Assignor's right, title and interest (if any), in, to and under the all warranties and guaranties (express or implied), if any, issued to Assignor in connection with the Property (as hereinafter defined); all permits, licenses, approvals and authorizations issued by any United States national, federal, state or local government, governmental regulatory or administrative authority, agency, instrumentality or commission or any court, tribunal or judicial or arbitral body or self-regulated entity ("**Governmental Authority**") in connection with the Property; and any rights, title and interest (if any), in to and from acquisition of a portion of the Kmart Property for the POR-Streetsboro Signals project by the City of Streetsboro more specifically outlined in the Agreement, in each case if and only to the extent they are in effect as of the Closing Date and are transferable and may be assigned by Assignor without cost, charge or expense to or by Assignor or Assignee (the "**Intangibles**"), provided that, notwithstanding the foregoing, the Intangibles shall not include any intellectual property, trade secrets or other proprietary information or materials of whatsoever nature owned or licensed by Assignor, all of which shall be retained by Assignor (the "**Excluded Intangibles**") (collectively, the "**Assignment**").

2.    Assignee hereby accepts the Assignment and hereby assumes all duties and obligations to be performed by the Assignor and all liabilities of Assignor, but only to the extent first accruing with respect to the Intangibles from and after the date hereof.

3.    This Assignment and Assumption shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

4.    This Assignment and Assumption shall be construed in accordance with the laws of the State of Ohio, without regard to the application of choice of law principles.

5.    This Assignment and Assumption may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

<div align="center">EXHIBIT G</div>

6. Except as otherwise expressly set forth in the Agreement, this Assignment and Assumption is made on an "as is where is and with all faults" basis without any covenant, representation or warranty (express or implied) by, or recourse against, Assignor, the Related Parties or their respective successors and assigns, of any kind whatsoever. "**Related Parties**" means, Assignor's affiliates and the officers, directors, partners, members, shareholders, principals, employees, agents, representatives and attorneys of Assignor and Assignor's affiliates.

7. Assignee shall indemnify, defend, protect and hold Assignor harmless from and against any and all liability, loss or damage which it may or might incur by reason by Assignee's failure to perform under any obligations pursuant to Intangibles from and after the date hereof and from any and all claims and demands whatsoever arising from and after the date hereof which may be asserted against Assignor under or by reason of the Intangibles.

8. Assignor shall indemnify, defend, protect and hold Assignee harmless from and against any and all liability, loss or damage which it may or might incur by reason of Assignor's failure to perform any obligations pursuant to Intangibles prior to the date hereof and from any and all claims and demands whatsoever arising prior to the date hereof which may be asserted against Assignee under or by reason of the Intangibles.

[Signature pages follow]

EXHIBIT G

IN WITNESS WHEREOF, Assignor and Assignee have each executed this Assignment and Assumption of Intangibles as of date first written above.

**ASSIGNOR:**                                    **ASSIGNEE:**
**Troy Coolidge No 10, LLC,**              **Industrial Commercial Properties LLC,**
a Michigan limited liability company      an Ohio limited liability company

    By: Kmart Corporation, a Michigan corporation, its
    sole member

                                                By:_____
                                                Name:_____
                                                Its:_____

    By:_____
    Name:_____
    Its:_____

**Kmart Corporation,**
a Michigan corporation

By:_____
Name:_____
Its:_____

**Sears, Roebuck and Co.,**
a New York corporation

By:_____
Name:_____
Its:_____

EXHIBIT G

## EXHIBIT "A-1"

## LEGAL DESCRIPTION OF SEARS PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## EXHIBIT "A-2"

## LEGAL DESCRIPTION OF TROY PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

**EXHIBIT "A-3"**

**LEGAL DESCRIPTION OF KMART PROPERTY**

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

<div align="center">

**EXHIBIT "H"**

**BILL OF SALE**

</div>

**FOR VALUABLE CONSIDERATION,** the receipt and sufficiency of which are hereby expressly acknowledged, **Troy Coolidge No 10, LLC,** a Michigan limited liability company (**"Troy"**), **Kmart Corporation,** a Michigan corporation (**"Kmart"**) and **Sears, Roebuck and Co.,** a New York corporation (**"Sears"**) (collectively, **"Seller"**), and **Industrial Commercial Properties LLC,** an Ohio limited liability company (**"Buyer"**),

WHEREAS, Sears is the owner of a parcel of land consisting of approximately 17.94 acres including the buildings and improvements thereon and any interest of Sears in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights including all easements for utilities and common roadway purposes (**"Sears Property"**), in the City of Elyria, Lorain County, Ohio legally described on **Exhibit "A-1"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Sears Property, and all rights, privileges and appurtenances pertaining to the Sears Property (collectively, the **"Sears Improvements"**) and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Sears and associated with the ownership, operation or maintenance of the Sears Property and Sears Improvements, if any (collectively, the **"Sears Personal Property"**) Sears right, title and interest as ground lessor or ground land lines pursuant to the terms and conditions of that certain Ground Lease dated October 16, 1991 by and between Sears and Red Lobster Hospitality LLC, a Delaware limited liability company (**"Ground Lease Tenant"**) as amended, including pursuant to that certain First Amendment to Ground Lease dated August 1, 2017 (collectively the **"Assigned Lease"**);

WHEREAS, Troy is the owner of a parcel of land consisting of approximately 6.068 acres including the buildings and improvements thereon and any interest of Troy in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes (**"Troy Property"**), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-2"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights, privileges and appurtenances pertaining to the Troy Property (collectively, the **"Troy Improvements"**) and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Troy and associated with the ownership, operation or maintenance of the Troy Property and Troy Improvements, if any (collectively, the **"Troy Personal Property"**);

WHEREAS, Kmart is the owner of a parcel of land consisting of approximately 0.79 acres including the improvements thereon and any interest of Kmart in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes (**"Kmart Property"**), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-3"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights, privileges and appurtenances pertaining to the Kmart Property (collectively, the **"Kmart Improvements"** together with the Sears Improvements and Troy Improvements shall collectively be referred to as the **"Improvements"**) and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Kmart and associated with the ownership, operation or maintenance of the Kmart Property and Kmart Improvements, if any (collectively, the **"Kmart Personal Property"** together with the Sears Personal Property and Troy Personal Property shall collectively be referred to as the **"Personal Property"**). The Sears Property, Troy Property and Kmart Property, the Improvements and the Personal Property are collectively referred to as the **"Property"**); and

<div align="center">

EXHIBIT H

</div>

**FOR VALUABLE CONSIDERATION,** the receipt and sufficiency of which are hereby expressly acknowledged, Seller hereby grants and delivers to Buyer all of Seller's right, title and interest in and to the Improvements and Personal Property existing on the Property as of the date hereof.

Buyer's acceptance hereof acknowledges that:

1.      Buyer has inspected the Improvements and Personal Property and accepts the same in its **"AS IS"** condition and **"WITH ALL FAULTS."**

2.      Seller makes no warranty, express or implied, as to the physical condition or state of repair of the Improvements and Personal Property and, of visible or hidden aspects in material, workmanship or capacity, or in the merchantability or the fitness of the Improvements for any particular use or purpose.

        **IN WITNESS WHEREOF,** Seller has executed this Bill of Sale as of the **[Closing Date]**.

**SELLER:**                                      **BUYER:**
**Troy Coolidge No 10, LLC,**                    **Industrial Commercial Properties LLC,**
a Michigan limited liability company             an Ohio limited liability company

    By: Kmart Corporation, a Michigan corporation, its
    sole member
                                                 By:_____
                                                 Name:_____
                                                 Its:_____

    By:_____
    Name:_____
    Its:_____


**Kmart Corporation,**
a Michigan corporation



By:_____
Name:_____
Its:_____

**Sears, Roebuck and Co.,**
a New York corporation



By:_____
Name:_____
Its:_____

EXHIBIT H

## EXHIBIT "A-1"

## LEGAL DESCRIPTION OF SEARS PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## EXHIBIT "A-2"

## LEGAL DESCRIPTION OF TROY PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## EXHIBIT "A-3"

## LEGAL DESCRIPTION OF KMART PROPERTY

[LEGAL

EXHIBIT "I"

## ASSIGNMENT AND ASSUMPTION OF AGREEMENTS

THIS ASSIGNMENT AND ASSUMPTION OF AGREEMENTS (this "**Assignment and Assumption**") is made as of the [**Closing Date**] between by and between **Troy Coolidge No 10, LLC**, a Michigan limited liability company ("**Troy**"), **Kmart Corporation**, a Michigan corporation ("**Kmart**") and **Sears, Roebuck and Co.**, a New York corporation ("**Sears**") (collectively, "**Assignor**"), and **Industrial Commercial Properties LLC,** an Ohio limited liability company ("**Assignee**").

Background

WHEREAS, Sears is the owner of a parcel of land consisting of approximately 17.94 acres including the improvements and any interest of Sears in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Sears Property**"), in the City of Elyria, Lorain County, Ohio legally described on **Exhibit "A-1"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Sears Property, and all rights and appurtenances pertaining to the Sears Property (collectively, the "**Sears Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Seller and associated with the ownership, operation or maintenance of the Sears Property and Improvements, if any (collectively, the "**Sears Personal Property**");

WHEREAS, Troy is the owner of a parcel of land consisting of approximately 6.068 acres including the improvements and any interest of Troy in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Troy Property**"), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-2"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights and appurtenances pertaining to the Kmart Property (collectively, the "**Troy Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Seller and associated with the ownership, operation or maintenance of the Troy Property and Troy Improvements, if any (collectively, the "**Troy Personal Property**");

WHEREAS, Kmart is the owner of a parcel of land consisting of approximately 0.79 acres including the buildings and improvements and any interest of Troy and Kmart in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Kmart Property**"), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-3"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights and appurtenances pertaining to the Kmart Property (collectively, the "**Kmart Improvements**" together with the Sears Improvements and Troy Improvements shall collectively be referred to as the "**Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Seller and associated with the ownership, operation or maintenance of the Kmart Property and Improvements, if any (collectively, the "**Kmart Personal Property**" together with the Sears Personal Property and Troy Personal Property shall collectively be referred to as the "**Personal Property**"). The Sears Property, Troy Property and Kmart Property, the Improvements and the Personal Property are collectively referred to as the "**Property**");

EXHIBIT I

On the date hereof, Assignor is conveying to Assignee the Property, pursuant to the terms and conditions of the Purchase and Sale Agreement dated as of _____, 2018, by and between Assignor, as seller, and Assignee, as buyer (as amended or otherwise modified as of the date hereof, the "**Contract**"). All capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Contract.

<u>Assignment and Assumption</u>

In consideration of the purchase and sale of the Property (as defined below), the mutual covenants contained herein, and other good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.    Assignor does hereby assign, transfer and set over unto Assignee, all of Assignor's right, title and interest in and to any documents of record including but not limited to easements and triparty agreements and those set forth on the attached **Schedule A** (collectively, the "**Agreements**"), with respect to the Property.

2.    Assignee hereby accepts the foregoing assignment of the Agreements and hereby assumes all duties and obligations to be performed by the Assignee and all liabilities of the Assignor, but only to the extent first accruing under the Agreements from and after the date hereof.

3.    This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

4.    This Assignment shall be construed in accordance with the laws of the State of South Carolina, without regard to the application of choice of law principles.

5.    This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.    Except as otherwise expressly set forth in the Agreement, this Assignment and is made on an "as is where is and with all faults" basis without any covenant, representation or warranty (express or implied) by, or recourse against, Assignor, the Related Parties or their respective successors and assigns, of any kind whatsoever. "**Related Parties**" means, Assignor's affiliates and the officers, directors, partners, members, shareholders, principals, employees, agents, representatives and attorneys of Assignor and Assignor's affiliates.

7.    Assignee shall indemnify, defend, protect and hold Assignor harmless from and against any and all liability, loss or damage which it may or might incur by reason of Assignee's failure to perform under the Agreements from and after the date hereof and from any and all claims and demands whatsoever arising from and after the date hereof which may be asserted against Assignor under or by reason of the Agreements.

EXHIBIT I

8.      Assignor shall indemnify, defend, protect and hold Assignee harmless from and against any and all liability, loss or damage which it may or might incur by reason of Assignor's failure to perform under the Agreements prior to the date hereof and from any and all claims and demands whatsoever arising prior to the date hereof which may be asserted against Assignee under or by reason of the Agreements.

[Signature pages follow]

EXHIBIT I

IN WITNESS WHEREOF, Assignor and Assignee have each executed this Assignment and Assumption of Agreements as of date first written above.

**ASSIGNOR:**
**Troy Coolidge No 10, LLC,**
a Michigan limited liability company

    By: Kmart Corporation, a Michigan corporation, its
    sole member

    By:_____
    Name:_____
    Its:_____

**Kmart Corporation,**
a Michigan corporation

By:_____
Name:_____
Its:_____

**Sears, Roebuck and Co.,**
a New York corporation

By:_____
Name:_____
Its:_____

**ASSIGNEE:**
**Industrial Commercial Properties LLC,**
an Ohio limited liability company

By:_____
Name:_____
Its:_____

EXHIBIT I

## EXHIBIT "A-1"

## LEGAL DESCRIPTION OF SEARS PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

EXHIBIT I

**EXHIBIT "A-2"**

**LEGAL DESCRIPTION OF TROY PROPERTY**

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## EXHIBIT "A-3"

## LEGAL DESCRIPTION OF KMART PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

EXHIBIT I

**Schedule A**

EXHIBIT I

EXHIBIT "J"

## ASSIGNMENT AND ASSUMPTION OF ASSIGNED LEASE

THIS ASSIGNMENT AND ASSUMPTION OF ASSIGNED LEASE (this "**Assignment and Assumption**") is made as of the [•] day of [•], 2018 between **SEARS, ROEBUCK AND CO.,** a New York corporation ("**Assignor**"), and ••**INDUSTRIAL COMMERCIAL PROPERTIES LLC,** an Ohio limited liability company ("**Assignee**").

### Background

On the date hereof, Assignor is conveying to Assignee the property more particularly described on the attached **Exhibit A** (the "**Property**"), pursuant to the terms and conditions of the Purchase and Sale Agreement dated as of •_____, 2018, by and between Assignor, as seller, and Assignee, as buyer (as amended or otherwise modified as of the date hereof, the "**Agreement**"). All capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Agreement.

### Assignment and Assumption

In consideration of the purchase and sale of the Property, the mutual covenants contained herein, and other good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.      Assignor hereby assigns, transfers, sets over, conveys and quitclaims to Assignee, all of Assignor's right, title and interest (if any), in, to and under the Assigned Lease attached hereto as Exhibit B (the "**Assignment**").

2.      Assignee hereby accepts the Assignment and hereby assumes all duties and obligations to be performed by the Assignor and all liabilities of Assignor arising out of or accruing with respect to the Assigned Lease from and after the date hereof.

3.      This Assignment and Assumption shall be binding upon and inure to the benefit of Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns.

4.      This Assignment and Assumption shall be construed in accordance with the laws of the State where the Property is located, without regard to the application of choice of law principles.

5.      This Assignment and Assumption may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.      Except as otherwise expressly set forth in the Agreement, this Assignment and Assumption is made on an "as is where is and with all faults" basis without any covenant, representation or warranty (express or implied) by, or recourse against, Assignor, the Related Parties or their respective successors and assigns, of any kind whatsoever. "**Related Parties**"

EXHIBIT J

means, Assignor's affiliates and the officers, directors, partners, members, shareholders, principals, employees, agents, representatives and attorneys of Assignor and Assignor's affiliates.

IN WITNESS WHEREOF, Assignor and Assignee have each executed this Assignment and Assumption of Lease as of date

**ASSIGNOR:**
**Sears, Roebuck and Co.,**
a New York corporation

**ASSIGNEE:**
**Industrial Commercial Properties LLC,**
an Ohio limited liability company

By:_____
Name:_____
Its:_____

By:_____
Name:_____
Its:_____

EXHIBIT J

**EXHIBIT A**

**LEGAL DESCRIPTION**

**EXHIBIT B**

**ASSIGNED LEASE**

EXHIBIT J

**EXHIBIT "K"**

**NON-INVASIVE INSPECTION AGREEMENT**

(please see attached)

## NON-INVASIVE INSPECTION AGREEMENT
*Elyria, OH S1310 and Streetsboro, OH K9676*

**THIS NON-INVASIVE INSPECTION AGREEMENT** (this "**Agreement**") is made and entered into as of this _____ day of _____ ("**Effective Date**"), by and between **Industrial Commercial Properties LLC,** an Ohio limited liability company ("**Investigating Party**"), and **Troy Coolidge No 10, LLC,** a Michigan limited liability company**, Kmart Corporation,** a Michigan corporation **and Sears, Roebuck and Co.,** a New York corporation, (collectively, the "**Company**") in connection with site investigation and site assessment work to be performed on the property controlled by Company as more particularly described herein.

## RECITALS:

**WHEREAS,** Sears is the owner of a parcel of land consisting of approximately 17.94 acres including the buildings and improvements thereon and any interest of Sears in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes ("**Sears Property**"), in the City of Elyria, Lorain County, Ohio legally described on **Exhibit "A-1"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Sears Property, and all rights, privileges and appurtenances pertaining to the Sears Property (collectively, the "**Sears Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Sears and associated with the ownership, operation or maintenance of the Sears Property and Sears Improvements, if any (collectively, the "**Sears Personal Property**"), and Sears right, title and interest as ground lessor or ground landlord pursuant to the terms and conditions of that certain Ground Lease dated October 16, 1991 by and between Sears and Red Lobster Hospitality LLC, a Delaware limited liability company ("**Ground Lease Tenant**") as amended, including pursuant to that certain First Amendment to Ground Lease dated August 1, 2017 (collectively the "**Assigned Lease**");

**WHEREAS,** Troy is the owner of a parcel of land consisting of approximately 6.068 acres including the buildings and improvements thereon and any interest of Troy in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes ("**Troy Property**"), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-2"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights, privileges and appurtenances pertaining to the Troy Property (collectively, the "**Troy Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Troy and associated with the ownership, operation or maintenance of the Troy Property and Troy Improvements, if any (collectively, the "**Troy Personal Property**");

**WHEREAS,** Kmart is the owner of a parcel of land consisting of approximately 0.79 acres including the buildings and improvements thereon and any interest of Kmart in adjacent streets, alleys, easements, rights-of-way, strip and gores, mineral rights, including all easements for utilities and common roadway purposes ("**Kmart Property**"), in the City of Streetsboro, Portage County, Ohio legally described on **Exhibit "A-3"** attached hereto and made a part hereof together with all other improvements, structures and fixtures located on the Troy Property, and all rights, privileges and appurtenances pertaining to the Kmart Property (collectively, the "**Kmart Improvements**" together with the Sears Improvements and Troy Improvements shall collectively be referred to as the "**Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Kmart and associated with the ownership, operation or maintenance of the Kmart Property and Kmart Improvements, if any (collectively, the "**Kmart Personal Property**" together with the Sears

1

Personal Property and Troy Personal Property shall collectively be referred to as the "**Personal Property**"). The Sears Property, Troy Property and Kmart Property, the Improvements and the Personal Property are collectively referred to as the "**Property**"); and

WHEREAS, Company desires to sell the Property to Investigating Party;

WHEREAS, Investigating Party desires to buy the Property from Company;

WHEREAS, Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends; and

WHEREAS, Investigating Party desires to perform a site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

1.    Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property at reasonable times and upon not less than 2 business days prior notice to Company, at no cost to Company or its agents, consultants and contractors, and, at Company's option, accompanied by a representative of Company.

2.    The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: (a) Investigating Party shall walk the Property and inspect the Improvements, including without limitation the roof, all heating and cooling systems and any other mechanical equipment situated on the Property for the purpose of assessing its general condition and state of repair and (b) make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA (ASTM E1527-13) (the "**Phase I**" and, together with the work under clause (a), the "**Site Assessment Work**"). Invasive testing, including but not limited to borings, asbestos samplings, or any Phase II Environmental Assessment ("**Invasive Testing**"), may be performed at the Property subject to (i) Company's prior written approval of such Invasive Testing, which approval shall be at the reasonable commercial discretion of the Company if the Site Assessment Work recommends such Invasive Testing; and (ii) Investigating Party's execution of and agreement to abide by a Phase II Access License in the form of **Exhibit "B"** (the "**Phase II Access License**") attached hereto and made a part hereof. Company may elect to have its representative present during the Site Assessment Work and/or Invasive Testing, if any. If Company has such representative present at the times and dates scheduled by Investigating Party, then all Site Assessment Work and/or Invasive Testing as the case may be, shall be performed only in the presence of the Company's Representative. In the event that Investigating Party engages in activity outside of or beyond the Site Assessment Work including but not limited to Unauthorized Invasive Testing, except if such Invasive Testing is performed under the conditions set forth in a fully executed Phase II Access Agreement ("**Unauthorized Activity**"), the Parties agree that it would be difficult to ascertain the extent of damages caused to Company, and accordingly, the Parties agree that Company shall be entitled to a one-time liquidated damages payment of Ten Thousand and No/100 Dollars($10,000.00) from Investigating Party for any Unauthorized Activity. The Parties agree that such liquidated damages payment for Unauthorized Activity is in addition to , and does not limit in any manner whatsoever, any other actual damages, remedy or relief that otherwise might be available to the Parties herein.

2

**3.**    This Agreement shall terminate the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, (b) immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice and cure period, or (c) or the last day of the Due Diligence Period (as the same may be extended), in each such event Investigating Party shall promptly restore the Property as provided in Section 9 of this Agreement.

**4.**    Investigating Party agrees to provide Company with all test results and reports requested by the Company related to the Phase I, including all correspondence and draft reports prepared in connection with the Phase I.

**5.**    Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal, state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their counsel or environmental consultants, as applicable.  The foregoing restriction shall not be binding on Investigating Party following the closing under a Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this Section 5.

**6.**    Investigating Party agrees to defend and indemnify Company, its officers, directors, employees, and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement.  This indemnity shall survive the termination of this Agreement.

**7.**    Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies reasonably satisfactory to Company and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

(i)    Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

(ii)    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

(iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

(iv)    Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Company as an additional insured.

(v)    Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above. Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty. Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

8.    Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

9.    If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property and to restore the Property to substantially the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

10.    This Agreement shall be governed by and construed in accordance with the laws of the State in which the Property is located.

11.    By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

12.    Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company. Investigating Party agrees to conduct the Site Assessment Work in such a way as to minimize interference with the conduct of Company's business on the Property.

13.    This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

4

**IN WITNESS WHEREOF**, Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

<u>COMPANY</u>:                                                      <u>INVESTIGATING PARTY</u>:

**Troy Coolidge No 10, LLC,**                           **Industrial Commercial Properties LLC,**
a Michigan limited liability company            an Ohio limited liability company

    By: Kmart Corporation, a Michigan corporation, its
    sole member

                                                By:_____
                                                Name:_____
                                                Its:_____

    By:_____
    Name:_____
    Its:_____

**Kmart Corporation,**
a Michigan corporation

By:_____
Name:_____
Its:_____

**Sears, Roebuck and Co.**,
a New York corporation

By:_____
Name:_____
Its:_____

5

## EXHIBIT "A-1"

## LEGAL DESCRIPTION OF SEARS PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## EXHIBIT "A-2"

## LEGAL DESCRIPTION OF TROY PROPERTY

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

**EXHIBIT "A-3"**

**LEGAL DESCRIPTION OF KMART PROPERTY**

[LEGAL DESCRIPTION TO BE INSERTED UPON RECEIPT OF TITLE COMMITMENT]

## EXHIBIT "B" TO NON-INVASIVE INSPECTION AGREEMENT

## PHASE II ACCESS LICENSE
(please see attached)

## PHASE II ACCESS LICENSE

**THIS PHASE II ACCESS LICENSE** (the "**License**") is entered into as of the _____ day of _____, 2018, by and between **[SELLER]**, [Seller entity type and state of organization], ("**Licensor**"), and **Industrial Commercial Properties LLC,** an Ohio limited liability company ("**Licensee**") (Licensor and Licensee may also be collectively referred to in this License as the "**Parties**" and individually referred to in this License as a "**Party**".

### RECITALS

A.    Licensor of the certain real property located at [Street Address] in the City of [City] (the "**City**"), [County] County, Ohio (the "**Property**") as more particularly described on **Exhibit "A"**, has the authority to grant access to the Property.

B.    Licensor desires to sell the Property to the Licensee;

C.    Licensee desires to purchase the Property from Licensor;

D.    The Licensor and Licensee have entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends;

E.    Licensee desires to perform an invasive environmental investigation of the Property as part of its due diligence prior to purchasing the Property; and

F.    Licensee has requested access to the Property to perform a Phase II Environmental Assessment and Licensor has agreed to permit Licensee and/or Licensee's agent a revocable license to conduct the requested activity at the Property for the purposes set forth in this License.

**NOW THEREFORE**, in consideration of their mutual covenants and other valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

### AGREEMENT

1.    _Incorporation of Recitals_.    The foregoing recitals are true and correct and are incorporated into this License by reference.

2.    _Access_.  Licensor has agreed to permit Licensee to carry out a Phase II investigation in accordance with the terms and conditions of this License.  The Phase II investigation will consist of the work plan attached as **Exhibit "B"** and incorporated into this License (the "**Work Plan**") and all work will be performed in accordance with the Work Plan.

At reasonable times and upon reasonable prior notice to Licensor, Licensor hereby grants Licensee and the Licensee Entities (as defined below) reasonable access to the Property for the sole purpose of conducting the activities in the manner described in the Work Plan.  Any changes to the existing Work Plan shall be submitted to Licensor in writing for Licensor's prior approval, which approval shall not be unreasonably withheld.  If Licensor approves such proposal for additional or amended work on the Property, such additional work or amendments to the Work Plan shall be deemed to be a part of the Work Plan, and Licensee's implementation of such plan will be subject to the terms and conditions of this License.

3.    _Conduct of Investigation_.    Licensee, its employees, agents, contractors and

1

subcontractors (collectively "**Licensee Entities**") will not conduct any work or engage in any activities on the Property other than those set forth in the Work Plan.  In the event that the Licensee Entities engage in activity outside of or beyond the scope of the Work Plan ("Unauthorized Activity"), Licensor shall have a right to deny access for such unauthorized activity conducted beyond the Work Plan scope and the right to any other damages, remedy or relief that otherwise might be available.  All costs associated with the activities conducted by Licensee Entities on the Property shall be borne by Licensee.  The Work Plan shall be conducted in any event in a manner and at times that will not unreasonably interfere with Licensor's use of the Property and which comply with the terms and conditions of this License.  Licensor reserves all rights or claims which they may have at law or in equity against Licensee or Licensee Entities related to or arising from the environmental condition of the Property.

      4.    <u>Data and Reports</u>.  Licensee shall give reasonable advance notice to Licensor of any sampling, testing, drilling, or other on-site activities under the Work Plan, so as to allow a representative of the Licensor to observe such activity.  Licensor shall have the right to obtain split samples or conduct contemporaneous sampling when any sampling is conducted by Licensee or its Licensees Entities on the Property. Licensee shall transmit to Licensor in writing the results of samples taken pursuant to the Work Plan as soon as they are made available to Licensee and its Licensee Entities.  A copy of any correspondence, data, report, test or other communication with any agency relating to the environmental condition of the Property or the presence of any petroleum or other hazardous substances shall be simultaneously sent to Licensor.  As used in this License, the term "**Hazardous Substances**" shall mean any hazardous substance as defined in federal and state or local laws, regulations or ordinances.

      5.    <u>Repair</u>.  If any portion of the Property, including any improvements and/or personal property of Licensor, suffers damage by reason of the entry of Licensee or Licensee Entities on the Property, including but not limited to damage arising from any tests, investigations and/or monitoring conducted upon the Property, Licensee or Licensee entities shall, at its own cost and expense, repair such damage and restore the Property to as good a condition as before such damage occurred except for minor variations not involving structure, aesthetics or appearances of the Property that could not be reasonably avoided using customary industry standards applicable in Northern Ohio.  The taking of soil samples during any investigation shall not be deemed, in and of itself, to constitute disturbance or damage to the Property and the sample materials taken need not be returned or restored to the Property.  Repair of damage includes, without limitation, regrouting and resurfacing any holes, ditches, or other indentations, as well as any mounds or other inclines caused by any Licensee or Licensee Entities.  If the location of the equipment installed pursuant to the approved Work Plan shall in the future interfere or conflict with Licensor's use of the Property, Licensee or Licensee Entities shall upon receipt of a request from Licensor to do so, close, remove and/or relocate said equipment, including any monitoring wells set forth in the Work Plan, within a reasonable time after receipt by Licensee or Licensee Entities of such governmental approvals as may be required to close, remove or relocate said well or wells. Licensee and Licensee Entities shall use its best efforts to obtain all such required governmental approvals.

      6.    <u>Safety</u>.  Licensee shall be responsible for ensuring that the Licensee Entities comply with good safety and security practices in performing the Work Plan.  If monitoring wells are permitted in the Work Plan, Licensee shall install a locked cap on such wells, shall ensure that said caps are secure, and take all reasonable steps necessary to prohibit access to the recovery wells by Parties not authorized to do so by Licensee. As between Licensee and Licensor, Licensee is responsible for any contamination or damage caused by the authorized or unauthorized access to the recovery wells. Licensee agrees to ensure that its Licensee Entities also close any recovery wells upon the completion of the investigation or the termination of this License, whichever is sooner, and perform the Work Plan in accordance with federal, state and local laws, regulations and ordinances and prudent engineering principles.

7.    <u>Indemnification</u>.  Licensee shall indemnify, protect, defend and hold harmless Licensor, and its respective manager, members officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and subcontractors (collectively the "**<u>Indemnified Parties</u>**") against any and all costs, liabilities, claims, damages, including reasonable licensee and attorney's fees, losses, penalties, or suits resulting from (1) any release of Hazardous Substances on, in, under, or about the Property caused by the Licensee Entities during their entry on or use of the Property, (2) Licensee Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (3) the acts, omissions and/or willful misconduct of Licensee Entities during their entry upon and use of the Property or in performing the Work Plan under this License, and/or (4) a breach of the terms and conditions of this License by any Licensee Entity. Notwithstanding this indemnity, Licensor expressly reserves all rights it may have under the law to prosecute any claims or demands against either Licensee Entities arising out of or related to the environmental condition of the Property or otherwise. This indemnity shall survive until the earlier to occur of:  (i) the Closing under the Contract (as hereinafter defined); or (ii) one (1) year after the termination of the Contract.  This indemnity shall not include any claims or damages relating to:  (a) the mere discovery of any physical defects in the property; or (b) the discovery of the presence of any Hazardous Materials on, in or under the property or any adjacent parcels.

8.    <u>Compliance with Law/Permits</u>.  Licensee shall cause all Licensee Entities to comply with all applicable federal, state, and local laws and regulations in the performance of the investigation of the Property. Licensee shall obtain, at its own expense, and prior to any access to the Property by Licensee Entities under this License, all permits and authorizations of whatever nature from any and all governmental agencies necessary for conducting the investigation pursuant to this License, if any. Licensee shall ensure that Licensee Entities properly handle, sort, and dispose of at its own expense all Hazardous Substances on, in, under, or about the Property generated by Licensee Entities in the course of conducting the investigation under this License. If Licensee shall generate and dispose of Hazardous Substance requiring a manifest, Licensee agrees that it (or a Licensee Affiliate) shall be indentified as the generator of any such Hazardous Substances, and shall identify itself as the generator of such Hazardous Substances on any and all documentation, including without limitation all hazardous waste manifests, associated with the handling, storage, treatment, disposal or transportation of any and all Hazardous Substances generated in the course of the investigation.

9.    <u>Term</u>.  The term of this License shall be until the Closing under the Purchase Contract, unless the Purchase Contract is terminated earlier.

10.    <u>Upon Termination</u>.  Upon termination of this License, Licensee shall ensure that Licensee (1) promptly removes any of the equipment, fixtures, improvements and other property located on any portion of the Property which was installed during the term of this License, (2) closes all work performed by Licensee Entities including all wells, in compliance with applicable federal, state, and local laws, rules and regulations and/or to industry standards, and (3) restores the Property to substantially the same condition existing immediately prior to Licensee Entities' entry thereon.

11.    <u>Liens</u>.  Licensee shall discharge at once or bond or otherwise secure all liens and attachments which are filed in connection with Licensee's implementation of the Work Plan and shall indemnify and hold harmless the Indemnified Parties from and against any and all loss, damage, injury, liability, and claims thereof resulting directly or indirectly from such liens and attachments.

12.    <u>Insurance</u>.  Licensee shall ensure that the Licensee Entity that is the contractor responsible for performing the Work Plan shall maintain, at their sole cost and expense, the following

3

policies of insurance (or policies otherwise approved by Licensor) procured from insurance companies reasonably satisfactory to Licensor and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company (or otherwise approved by Licensor): (a) Workers Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the Property is located with a waiver of subrogation in favor of Licensor, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease; (b) Motor Vehicle Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage; (c) Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage; (d) Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate; and, (e) Any contractor hired to perform environmental tests at the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

All policies shall be issued by companies qualified to do business in the state where the Property is located, and shall be rated A-/VII or better in the most current edition of Best's Insurance Reports. Prior to execution of this License, Licensee shall provide the Licensor with certificates of insurance evidencing the insurance coverage required hereunder, and at the request of the Licensor, certified copies of such policies or portions thereof. All such insurance policies shall provide that they may not be materially changed, non-renewed or canceled without at least thirty (30) days' prior written notice to the Licensor. All such insurance policies, except worker's compensation and Motor Vehicle Insurance shall name Licensor and its affiliates as additional insureds and shall stipulate that Licensee's insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Licensor or its affiliates. Completed operations coverage shall continue to be maintained for at least one (1) year following the completion of the Work Plan, naming Licensor and its affiliates as additional insureds during such period of continuation.

13.    Binding Effect.  This instrument shall bind and inure to the benefit of the respective heirs, executors, administrators, other personal and legal representatives, grantees, successors and assigns of the Parties hereto.

14.    Entire Agreement: Modification.  This License between Licensee and Licensor contains the entire understanding and agreement among the Parties and supersedes all prior understandings and agreements between the Parties whether oral or written.  This instrument may be modified only by a writing signed by all Parties.

15.    Governing Law.  This instrument shall be governed by and shall be construed in accordance with the laws of the State of Ohio.

16.    Notice.  Any and all notices or other communication required or permitted by this License, or by law, to be delivered to, served on, or given to any Party to this License shall be in writing, and shall be deemed properly delivered, given or served when personally delivered to such Party, when electronically delivered with receipt acknowledged, or when mailed by United States mail, express, certified or registered with the return receipt signed, postage paid (or other overnight delivery service, charges prepaid), addressed as follows:

|                    |                                                  |
|--------------------|--------------------------------------------------|
| **To Licensor:**   | Bruce Kaye                                       |
|                    | Director Environmental Affairs                   |
|                    | **[SELLER]**                                     |
|                    | 3333 Beverly Road                                |
|                    | Hoffman Estates, IL 60179                        |
|                    |                                                  |
| **With copies to:**| **[SELLER]**                                     |
|                    | 3333 Beverly Road                                |
|                    | Hoffman Estates, IL  60179                       |
|                    | Attn:  Counsel, Environmental                    |
|                    |                                                  |
| **To Licensee:**   | **Industrial Commercial Properties LLC**         |
|                    | 6675 Parkland Boulevard, Ste. 100                |
|                    | Solon, Ohio 44139                                |
|                    | Attn:  Christopher Semarjian                     |
|                    | Email:                                           |
|                    |                                                  |
| **With copies to:**| Hurtuk & Daroff Co., LLP                         |
|                    | 6120 Parkland Boulevard, Ste. 100                |
|                    | Cleveland, Ohio 44124                            |
|                    | Attn:  Edward A. Hurtuk, Esq.                    |
|                    | Email:  ehurtuk@hurtukdaroff.com                 |

Any Party may change its address by giving ten (10) day advance written notice of such change to the other Parties in the manner provided in this Section.

17.    <u>Representation</u>.  Licensee represents and warrants that it does not need the consent of any other Party to enter into this License.

18.    <u>Severability</u>. If any term, provision, covenant, or condition of this License is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of this License shall remain in full force and effect and shall in no way be affected, impaired or invalidated, unless such ruling shall materially alter the economic effect of this License.

19.    <u>Survivability</u>.  All obligations and commitments by Licensee specified in this License (including, without limitation, the provisions of Sections 3 through 8 and 10 through 15), shall survive the expiration  or termination of this License for a period of one (1) year.

20.    <u>Assignment</u>.  Licensee may not assign, delegate or subcontract (by contract, operation of law or otherwise) its rights or obligations under this License, except with Licensor's prior written consent, and the failure of Licensee to obtain Licensor's prior written consent shall render any such attempt to assign, delegate, or subcontract of no force and effect.

21.    <u>No Waiver; Cumulative Remedies</u>.  The failure of any Party to insist, in any one or more instances, or the delay in insisting, upon the performance of any provision of this License or to exercise any right hereunder, does not constitute an election of remedies or waiver, and the obligations of the Parties with respect to such future performance will continue in full force and effect. Except as otherwise

5

provided in this License, the remedies in this License are cumulative with and not in lieu of other remedies available to a Party at law or in equity.

22.    <u>No Third Party Beneficiaries</u>.  Other than Licensor's affiliates, this License shall not be deemed to confer any rights to any other party (other than Licensee or any Licensee Entity) as a third party beneficiary or otherwise.

23.    <u>Exhibits</u>.  The terms and conditions of each exhibit referenced in this License are hereby incorporated into this License.  In the event of a conflict between this License and the exhibits, the terms and conditions of this License shall prevail. Any provisions of Licensee's proposals, contracts, invoices, billing statements, acknowledgement forms or any other document which are inconsistent with the provisions of this License shall be of no force or effect.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

**IN WITNESS WHEREOF**, the Parties have executed this Phase II Access License effective as of the date first above written.

| | |
|---|---|
| **LICENSOR:** | **LICENSEE:** |
| **[SELLER], [Seller entity type and state of organization]** | **Industrial Commercial Properties LLC,** an Ohio limited liability company |

By:_____            By:_____
Name:_____            Name:_____
Its:_____            Its:_____

### EXHIBIT "A" TO PHASE II ACCESS LICENSE
### LEGAL DESCRIPTION

[LEGAL DESCRIPTION]

**EXHIBIT "B" TO PHASE II ACCESS LICENSE
WORK PLAN**

**FIRST AMENDMENT TO REAL ESTATE SALE CONTRACT**
*Elyria, OH S1310 and Streetsboro, OH K9676*

This First Amendment to Real Estate Sale Contract ("**Amendment**") is made as of 5:00 P.M. (Eastern Daylight Time) on the 24th day of September, 2018, (the "**Effective Date**"), by and between Troy Coolidge No 10, LLC, a Michigan limited liability company ("**Troy**"), Kmart Corporation, a Michigan corporation ("**Kmart**") and Sears, Roebuck and Co., a New York corporation ("**Sears**"), (collectively, "Seller") and Industrial Commercial Properties LLC, an Ohio limited liability company ("**Purchaser**").

WHEREAS, Purchaser and Seller have entered into that certain Real Estate Sale Contract dated July 25, 2018 (the "**Agreement**") for the purchase of certain real and personal property located in the City of Elyria, Lorain County, Ohio and in the City of Streetsboro, Portage County, Ohio, which properties are collectively defined in the Agreement as the Property; and

WHEREAS, Purchaser and Seller desire to modify the terms and conditions of the Agreement as set forth herein.

NOW, THEREFORE, for good and valuable consideration, Purchaser and Seller agree as follows:

1. <u>Terms</u>. Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Agreement.

2. <u>Due Diligence Period</u>. Section 9(a) of the Agreement is hereby amended to provide that the Due Diligence Period shall be extended until 5:00 P.M. (Eastern Daylight Time) on November 1, 2018 solely with respect to Purchaser's environmental assessment of the Sears Property and Sears Improvements (collectively, the "**Sears Environmental Assessment**"). Purchaser hereby waives its right to terminate the Agreement under Section 9(a) thereof with respect to any Purchaser Studies other than the Sears Environmental Assessment, it being agreed that Purchaser shall have the right to elect to terminate the Agreement at any time prior to the expiration of the Due Diligence Period (as extended by this Section 2) if Purchaser is not completely satisfied with the results of the Sears Environmental Assessment. Seller acknowledges and agrees that Purchaser's waiver of its right to terminate the Agreement pursuant to Section 9(a), other than with respect to the Sears Environmental Assessment, shall not waive any of Purchaser's other rights under the Agreement including, without limitation, Purchaser's continuing review of title and survey matters during the Review Period, as provided in Section 4 of the Agreement.

3. <u>Troy Property and Kmart Property Title and Survey Review</u>. Section 4(a) of the Agreement is hereby amended to provide that Purchaser shall give Seller written notice of the Unpermitted Exceptions to the Troy Property and the Kmart Property within ten (10) days of the Effective Date.

4. <u>Closing Date</u>.    Section 7(a) of the Agreement is hereby amended by deleting "within thirty (30) days after the satisfaction or waiver of the later to occur of the expiration of the Due Diligence Period" and inserting "on November 16, 2018" in lieu thereof.

5. <u>Signals Project</u>.  The City of Streetsboro filed a Petition to Appropriate Property and to Fix Compensation naming Portage County Auditor, Sears and Troy as defendants/respondents (the "**Appropriation Lawsuit**") related to the Signals Project and is attached hereto as <u>Exhibit "C"</u> and made a part hereof. Purchaser acknowledges and accepts that neither Sears nor Troy intend to file an appearance in the Appropriation Lawsuit and will accept the findings of the Court of Common Pleas in Portage County, Ohio Probate Division.  Seller will assign all right, title and interest to all awards and compensation arising out of the Appropriation Lawsuit to Purchaser at Closing.

6. <u>Representations and Warranties</u>.  Section 10(a)(iv) shall be deleted in its entirety and the following shall be inserted in lieu thereof:

> Seller represents and warrants to Purchaser that (a) the amount of the "present fair saleable value" of the assets of Seller, as of date hereof, exceed the amount of all "liabilities of Seller, contingent or otherwise," as of the date hereof, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, and (b) Seller does not have, as of the date hereof, an unreasonably small amount of capital with which to conduct its business.

7. <u>Termination Notice</u>.  Purchaser's letter dated September 7, 2018 notifying Seller of its election to terminate the Agreement (the "**Termination Notice**") is hereby rescinded and is null and void.

8. <u>Counterparts; Conflicts</u>.  This Amendment may be executed in counterparts, which taken together shall constitute one and the same instrument and any one of the parties hereto may execute this Amendment by signing such counterpart. In the event of any inconsistency between the terms of the Agreement and this Amendment, the terms of this Amendment shall control.

9. <u>Severability</u>.  If any provision of this Amendment or the application thereof to any person or circumstances is or shall be deemed illegal, invalid, or unenforceable, the remaining provisions hereof shall remain in full force and effect and this Amendment shall be interpreted as if such illegal, invalid, or unenforceable provision did not exist herein.

10. <u>Agreement Binding</u>.  Except as expressly amended hereby, the Agreement shall remain in full force and effect and fully binding upon the parties hereto.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

J:\Semarjian\Industrial Commercial Properties LLC\Purchase of Midway Mall, Elyria and Kmart Streetsboro\Purchase Agreement\Amendment to PSA\First Amendment v3.docx

In witness whereof, Sellers and Purchaser have executed this Amendment.

**SELLER:**
**Troy Coolidge No 10, LLC,**
a Michigan limited liability company

By: Kmart Corporation, a Michigan corporation,
its sole member

By: _____
Name: _____
Its: _____
      Robert A. Riecker
      Chief Financial Officer

**Kmart Corporation,**
a Michigan corporation

By: _____
Name: _____
Its: _____
      Robert A. Riecker
      Chief Financial Officer

**Sears, Roebuck and Co.,**
a New York corporation

By: _____
Name: _____
Its: _____
      Robert A. Riecker
      Chief Financial Officer

**PURCHASER:**
**Industrial Commercial Properties LLC,**
an Ohio limited liability company

By: _____
    Christopher Semarjian, Manager

REAL ESTATE
LEGAL

3

In witness whereof, Sellers and Purchaser have executed this Amendment.

**SELLER:**                                              **PURCHASER:**
**Troy Coolidge No 10, LLC,**                            **Industrial Commercial Properties LLC,**
a Michigan limited liability company                      an Ohio limited liability company

By: Kmart Corporation, a Michigan corporation,
its sole member                                          By:_____
                                                              Christopher Semarjian, Manager

By:_____
Name:_____
Its:_____

**Kmart Corporation,**
a Michigan corporation

By:_____
Name:_____
Its:_____

**Sears, Roebuck and Co.,**
a New York corporation

By:_____
Name:_____
Its:_____

EXHIBIT "C"
SIGNAL PROJECT APPROPRIATION LAWSUIT

PROBATE COURT OF PORTAGE COUNTY, OHIO

**SUMMONS**

CASE NUMBER: 2018CV00012

·PORTAGE COUNTY
FILED

2018 SEP -7 PM 3: 55

ROBERT W BERGER. JUDGE
COMMON PLEAS COURT
PROBATE DIVISION

You are hereby notified that on the August 28, 2018, CITY OF STREETSBORO as Complainant/Plaintiff, filed a complaint with this Court against: TROY COOLIDGE NO. 10, LLC, SEARS ROEBUCK AND COMPANY AND PORTAGE COUNTY AUDITOR, Defendant(s).

A copy of said Complaint is attached and made a part hereof.

You are required to respond within twenty-eight (28) days after service is made upon you, exclusive of the day of service, by serving a copy of your answer on the Complainant/Plaintiff or the attorney of record, and then, within three (3) days, you will file said answer with the Court. The Court is located at: 203 W. Main St., Ravenna, Ohio 44266. Mailing address: P.O. Box 936, Ravenna, Ohio 44266.

In case of your failure to do so, judgment by default will be rendered against you for the relief demanded in the Complaint.

In Witness whereof, I have hereunto set my hand and affixed the seal of the Probate Court at Ravenna, Ohio, this September 7, 2018.

ROBERT W. BERGER, PROBATE JUDGE

By: _____
DEPUTY CLERK

Name and address of Attorney:

PAUL ARNO JANIS
CITY OF STREETSBORO
9184 S.R. 43
STREETSBORO, OH 44241

4

PORTAGE COUNTY
FILED

2018 AUG 28  PM 3: 33

ROBERT W BERGER, JUDGE
COMMON PLEAS COURT
PROBATE DIVISION

IN THE COURT OF COMMON PLEAS
PORTAGE COUNTY, OHIO
PROBATE DIVISION

| | |
|---|---|
| CITY OF STREETSBORO<br>9184 S.R. 43<br>Streetsboro, Ohio 44241 | ) CASE NO.<br>)<br>) JUDGE: ROBERT W. BERGER |
| | ) |
| Plaintiff/Petitioner, | ) **PETITION TO APPROPRIATE** |
| | ) **PROPERTY AND TO FIX** |
| vs. | ) **COMPENSATION** |
| | ) |
| TROY COOLIDGE NO. 10, LLC | ) |
| c/o its statutory agent: | ) |
| CT Corporation System | ) |
| 4400 Easton Commons Way, Suite 125 | ) |
| Columbus, Ohio 43219 | ) |
| | ) |
| AND | ) |
| | ) |
| SEARS, ROEBUCK AND CO. | ) |
| c/o its statutory agent: | ) |
| CT Corporation System | ) |
| 4400 Easton Commons Way, Suite 125 | ) |
| Columbus, Ohio 43219 | ) |
| | ) |
| AND | ) |
| | ) |
| PORTAGE COUNTY AUDITOR | ) |
| 449 S. Meridian Street | ) |
| Ravenna, Ohio 44266 | ) |
| | ) |
| Defendants/Respondents. | ) |
| | ) |
| | ) |

Now comes Plaintiff/Petitioner, City of Streetsboro (hereinafter "Plaintiff," "Petitioner"

or the "City"), by and through counsel, and for its Petition avers the following:

5

1.     Petitioner, City of Streetsboro, is a municipal corporation organized and existing under the Constitution and laws of the State of Ohio.

2.     The City is authorized under Article I, Section 19 of the Ohio Constitution and Chapter 163 of the Ohio Revised Code ("R.C.") to bring this action to appropriate property for a public use and to determine compensation and damages, if any, to the residue for this appropriation.

3.     The City intends to obtain permanent interests in the property being appropriated and to immediately take possession of and enter upon said property for the purpose of making, constructing, repairing or improving a roadway which shall be open to the public without charge, and for no other purposes.

4.     Attached hereto as Exhibit A, which is incorporated herein by reference, is a description of the property and the interest in the property being sought to be appropriated, also being known as certain portions of Portage County Parcel No. 35-055-00-00-002-002, said parcel being further known by its street address as 9059 S.R. 14, Streetsboro, Ohio.

5.     The appropriation is necessary for a public use, namely, the Streetsboro City-wide Traffic Signal Upgrade Project in the city of Streetsboro, Ohio.

6.     Attached hereto as Exhibit B, which is incorporated by reference, is a certified copy of Resolution No. 2018-98, adopted by the Streetsboro City Council, authorizing this action.

7.     The sole owner of the property sought to be appropriated is Troy Coolidge No. 10, LLC, a Michigan limited liability company.  The names and addresses of the other "owners" (as defined in R.C. §163.01) of the property sought to be appropriated, so far as they can be ascertained, have been determined, and each of them have been identified and named as Defendants in this action.

6

8.    More than thirty (30) days prior to the filing of this petition, the City delivered to
the owner a written Notice of Intent to Acquire and good faith offer to purchase the property for
the amount stated in the Plaintiff's Fair Market Value Estimate, which is attached hereto as
Exhibit C and incorporated by reference. The City obtained an appraisal of the property and
provided a copy of the appraisal to the owner.

9.    The requirements of R.C. §163.04(D) have been met in that the City has been
unable to agree upon a conveyance, or the terms of a conveyance, with the owner.

10.   Prior to or at the time of filing of this Petition, the City deposited with the Clerk of
Courts a sum of money equal to the amount that the City has determined to be the fair market
value of the property, and the rights, titles, interests, and estates therein, to be appropriated, and
damages, if any, to the residue thereof.

WHEREFORE, Plaintiff respectfully prays this Honorable Court:

A. Find that the Plaintiff/Petitioner has complied with R.C. §163.01 *et seq.* and is
entitled to appropriate the subject property,

B. Enter a judgment ordering the appropriation, possession and conveyance of fee
simple title to the real property described in Exhibit A to the City of Streetsboro,

C. Upon the failure of the owner to file an answer, pursuant to R.C. §163.09(A), declare
the value of the property or property interests appropriated herein and of the damages, if any, to
the residue, to be in the sum stated in City's Fair Market Value Estimate, attached hereto as
Exhibit C, or if the owner answers,

D. Cause a jury to be impaneled to make inquiry into and assess compensation to be
paid and damages, if any, to the residue, for the appropriation of the within described property
and property interests, and

E. Grant to the Plaintiff all such other relief to which Plaintiff may be entitled.

3

7

Respectfully submitted,

PAUL A. JANIS (Reg. No. 0034201)
Law Director
City of Streetsboro
9184 S.R. 43
Streetsboro, Ohio 44241
Telephone:    (330) 626-4942 x4125
Facsimile:    (234) 284-9036
E-Mail:        pjanis@cityofstreetsboro.com

Attorney for Plaintiff/Petitioner

## EXHIBIT A

LPA RX 851 WD

Ver. Date  02/20/2018

PID    99879

### PARCEL    4-WD
### POR-STREETSBORO SIGNALS
### ALL RIGHT, TITLE AND INTEREST IN FEE SIMPLE
### IN THE FOLLOWING DESCRIBED PROPERTY
### WITHOUT LIMITATION OF EXISTING ACCESS RIGHTS
### IN THE NAME AND FOR THE USE OF THE
### CITY OF STREETSBORO, PORTAGE COUNTY, OHIO

Grantor/Owner, for himself and his heirs, executors, administrators, successors and assigns, reserves all existing rights of ingress and egress to and from any residual area (as used herein, the expression "Grantor/Owner" includes the plural, and words in the masculine include the feminine or neuter).

_____ [Surveyor's description of the premises follows] _____

Situated in the State of Ohio, County of Portage, Streetsboro Township, Lot 56, City of Streetsboro, and being part of a tract conveyed to Troy Coolidge No. 10, LLC, a Limited Liability Company (hereinafter known as the "Grantor") by Instrument Number 200403642 of said county records.

Being a parcel of land lying on the right side of the centerline of right of way of State Route 14 as shown on the centerline plat of POR-Streetsboro Signals as recorded in Plat Book _____, Page _____ of the records of Portage County and being further described as follows:

Commencing, for reference, at a magnail (set) at the southeasterly corner of Lot 4 of Brugmann Acres, as recorded in Plat Book 7, Page 23, said corner being on the centerline of State Route 14 at station 23+29.30; thence, along said centerline, South 58 degrees 59 minutes 25 seconds East, a distance of 146.57 feet to a point at State Route 14 station 24+75.87; thence, leaving said centerline and being perpendicular to, South 31 degrees 00 minutes 35 seconds West, a distance of 40.00 feet to the northeasterly corner of a tract in the name of Aldi Inc. (Ohio), an Ohio Corporation, as recorded in Instrument Number 200310325 of said county records, said corner being on the southerly existing right of way of State Route 14, 40.00 feet right of State Route 14 station 24+75.87 and the Point of Beginning of the parcel herein described; Thence, clockwise along the following four (4) courses;

1.  Thence, along said existing right of way line, South 58 degrees 59 minutes 25 seconds East, a distance of 94.13 feet to a magnail (set) 40.00 feet right of State Route 14 station 25+70.00;

2.  Thence, leaving said existing right of way line, across the grantor's tract, South 31 degrees 00 minutes 35 seconds West, a distance of 15.00 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", 55.00 feet right of State Route 14 station 25+70.00;

## EXHIBIT A

LPA RX 851 WD

3. Thence, continuing across the grantor's tract, **North 58 degrees 59 minutes 25 seconds West**, a distance of **94.14 feet** to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", on the easterly line of said Aldi Inc. (Ohio) tract, 55.00 feet right of State Route 14 station 24+75.86;

4. Thence, along said property line, **North 31 degrees 00 minutes 49 seconds East**, a distance of **15.00 feet** to the Point of Beginning, containing 0.0324 acres, of which the present road occupies 0.0000 acres, and is contained within Portage County Auditor's Permanent Parcel No. 35-055-00-00-002-002.

The bearings for this description are based on Grid North, of the Ohio State Plane Coordinate System, NAD83(2011), Ohio North Zone, established by using the Ohio Department of Transportation's Virtual Reference System (VRS) as part of a Global Positioning System (GPS) survey.

This description was prepared and reviewed under the supervision of Steven L. Mullaney, Professional Surveyor No. 7900 from a survey conducted for the City of Streetsboro, Portage County, Ohio in November, 2016.

05/11/18

Steven L. Mullaney, P.S.                Date
Professional Surveyor No. 7900

STATE OF OHIO
STEVEN L
MULLANEY
S-7900
PROFESSIONAL SURVEYOR
REGISTERED

T-6541

## RECORD OF RESOLUTIONS

Resolution No. _____ 2018-98 _____          Passed _____ August 13, 2018 _____ xx

A RESOLUTION DECLARING THE NECESSITY OF AND INTENTION
TO APPROPRIATE CERTAIN INTERESTS IN REAL PROPERTY
NECESSARY FOR THE IMPROVEMENT OF TRAFFIC SIGNALS AT
VARIOUS INTERSECTIONS ON STATE ROUTES 14, 43, AND 303 IN
THE CITY OF STREETSBORO, AUTHORIZING THE FILING OF
PETITIONS FOR APPROPRIATION, AND DECLARING AN
EMERGENCY TO PERMIT TIMELY COMMENCEMENT OF THE
PROJECT.

WHEREAS, by way of Ord. No. 2016-17, passed January 25, 2016, this Council
authorized the Mayor and the City Engineer to cooperate with the Ohio Department of
Transportation ("ODOT") in the furtherance of Project No. PID 99879, the upgrade of traffic
signals at various intersections on State Routes 14, 43 and 303 in the City of Streetsboro (the
"Project" or the "Improvement"); and

WHEREAS, pursuant to Ord. Nos. 2016-17 and 2017-142, the City has agreed to
acquire and is responsible for the acquisition of right-of-way necessary for the completion of
the Project; and

WHEREAS, this Council finds and determines that the Project is a proper public use
for which private property may be taken as contemplated in Art. I, §19 of the Ohio
Constitution and that the acquisition of fee simple title and temporary construction easements
in furtherance of the Project by eminent domain is necessary and authorized by the
Constitution; and

WHEREAS, the conditions precedent to initiation of a petition for appropriation set
forth in Section 163.04 of the Ohio Revised Code ("R.C.") have been satisfied,

NOW, THEREFORE, BE IT RESOLVED by the Council of the City of Streetsboro,
Portage County, Ohio, that:

SECTION 1.  This Council considers it necessary and hereby declares its intention to
appropriate, for public purposes, certain temporary and permanent interests in real property
necessary for the improvement of traffic signals at various intersections on State Routes 14,
43 and 303 in the City of Streetsboro, namely, the property described as Parcels 4-WD, 11-
WD, 15-WD, 15-T, 10-WD, and 14 T in Exhibits A-1, A-2, A-3, A-4, A-5 and A-6 which are
attached hereto and incorporated as if fully rewritten herein.

SECTION 2.  This Council finds and determines that the acquisition of the interests in
real property as necessary to establish the mentioned public improvement is a proper public
use for which private property may be taken as contemplated in Art. I, §19 of the Ohio
Constitution.

SECTION 3.  The Law Director is hereby authorized to file a petition or petitions of
appropriation in a court of proper jurisdiction relative to each parcel of property described
herein, in conformance with R.C. §163.05, to acquire the mentioned parcels thereby, subject
to a deposit of the proposed compensation with the court, and to conduct such litigation as
necessary to determine the final amount of compensation for the property taken.

SECTION 4.  It is found and determined that all formal actions of this Council
concerning and relating to the adoption of this resolution were adopted in an open meeting of
this Council and that all deliberations of this Council and of any of its committees that
resulted in such formal action were in meetings open to the public, in compliance with all
legal requirements, to the extent applicable, including Chapter 107 of the Codified
Ordinances.

EXHIBIT B

## RECORD OF RESOLUTIONS

| | | | | |
|---|---|---|---|---|
| *Resolution No.* | 2018-98 | *Passed* | August 13, 2018 | 20 |

SECTION 5.   This resolution is hereby declared to be an emergency measure necessary for the preservation of the public peace, health, safety, convenience and welfare of the residents of this City for the reason that timely acquisition of right-of-way for road improvements is necessary for the project to proceed, and provided it received the affirmative vote of three-fourths of the members elected or appointed to Council, it shall take effect and be in force immediately upon its passage and approval by the Mayor.

PASSED:     8-13-18
            Date                          John Ruediger, President of Council

ATTEST:
            Caroline L. Kremer, Clerk of Council

APPROVED: 08/14/18
            Date                          Glenn Broska, Mayor

Prepared and approved as to legal content by:
                                          Paul A. Janis, Law Director

Date Submitted to Mayor for Approval: _8-14-18_   Returned: _8-14-18_

Sponsored by: City Engineer

I, Caroline Kremer, Clerk of Council of the City of Streetsboro, Portage County, Ohio and in whose custody the records of City Council are kept, do hereby certify that the attached is a true and correct copy of _Res. No. 2018-98_.

IN WITNESS WHEREOF, I have set my hand and affixed the official seal of the City of Streetsboro this 28th day of _August_, 20_18_.

            Caroline Kremer, Clerk of Council
                       Signature, Title

12

EXHIBIT A–1

<div align="right">
Page 1 of 2
</div>

LPA RX 851 WD

<div align="right">
Rev. 06/09
</div>

Ver. Date   02/20/2018

<div align="right">
PID    99879
</div>

### PARCEL    4-WD
### POR-STREETSBORO SIGNALS
### ALL RIGHT, TITLE AND INTEREST IN FEE SIMPLE
### IN THE FOLLOWING DESCRIBED PROPERTY
### WITHOUT LIMITATION OF EXISTING ACCESS RIGHTS
### IN THE NAME AND FOR THE USE OF THE
### CITY OF STREETSBORO, PORTAGE COUNTY, OHIO

Grantor/Owner, for himself and his heirs, executors, administrators, successors and assigns, reserves all existing rights of ingress and egress to and from any residual area (as used herein, the expression "Grantor/Owner" includes the plural, and words in the masculine include the feminine or neuter).

---

[Surveyor's description of the premises follows]

---

Situated in the State of Ohio, County of Portage, Streetsboro Township, Lot 56, City of Streetsboro, and being part of a tract conveyed to Troy Coolidge No. 10, LLC, a Limited Liability Company (hereinafter known as the "Grantor") by Instrument Number 200403642 of said county records.

Being a parcel of land lying on the right side of the centerline of right of way of State Route 14 as shown on the centerline plat of POR-Streetsboro Signals as recorded in Plat Book _____, Page _____ of the records of Portage County and being further described as follows:

Commencing, for reference, at a magnail (set) at the southeasterly corner of Lot 4 of Brugmann Acres, as recorded in Plat Book 7, Page 23, said corner being on the centerline of State Route 14 at station 23+29.30; thence, along said centerline, South 58 degrees 59 minutes 25 seconds East, a distance of 146.57 feet to a point at State Route 14 station 24+75.87; thence, leaving said centerline and being perpendicular to, South 31 degrees 00 minutes 35 seconds West, a distance of 40.00 feet to the northeasterly corner of a tract in the name of Aldi Inc. (Ohio), an Ohio Corporation, as recorded in Instrument Number 200310325 of said county records, said corner being on the southerly existing right of way of State Route 14, 40.00 feet right of State Route 14 station 24+75.87 and the Point of Beginning of the parcel herein described; Thence, clockwise along the following four (4) courses;

1.  Thence, along said existing right of way line, South 58 degrees 59 minutes 25 seconds East, a distance of 94.13 feet to a magnail (set) 40.00 feet right of State Route 14 station 25+70.00;

2.  Thence, leaving said existing right of way line, across the grantor's tract, South 31 degrees 00 minutes 35 seconds West, a distance of 15.00 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", 55.00 feet right of State Route 14 station 25+70.00;

## EXHIBIT A

LPA RX 851 WD

Page 2 of 2
Rev. 06/09

3. Thence, continuing across the grantor's tract, North 58 degrees 59 minutes 25 seconds West, a distance of 94.14 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", on the easterly line of said Aldi Inc. (Ohio) tract, 55.00 feet right of State Route 14 station 24+75.86;

4. Thence, along said property line, North 31 degrees 00 minutes 49 seconds East, a distance of 15.00 feet to the Point of Beginning, containing 0.0324 acres, of which the present road occupies 0.0000 acres, and is contained within Portage County Auditor's Permanent Parcel No. 35-055-00-00-002-002.

The bearings for this description are based on Grid North, of the Ohio State Plane Coordinate System, NAD83(2011), Ohio North Zone, established by using the Ohio Department of Transportation's Virtual Reference System (VRS) as part of a Global Positioning System (GPS) survey.

This description was prepared and reviewed under the supervision of Steven L. Mullaney, Professional Surveyor No. 7900 from a survey conducted for the City of Streetsboro, Portage County, Ohio in November, 2016.

05/11/18

Steven L. Mullaney, P.S.                Date
Professional Surveyor No. 7900

STATE OF OHIO
STEVEN L.
MULLANEY
S-7900
PROFESSIONAL SURVEYOR
REGISTERED

EXHIBIT A-2

LPA RX 851 WD

Page 1 of 2
Rev. 06/09

Ver. Date  05/10/2018                                    LKF                    PID    99879

### PARCEL   11-WD
#### POR-STREETSBORO SIGNALS
#### ALL RIGHT, TITLE AND INTEREST IN FEE SIMPLE
#### IN THE FOLLOWING DESCRIBED PROPERTY
#### WITHOUT LIMITATION OF EXISTING ACCESS RIGHTS
#### IN THE NAME AND FOR THE USE OF THE
#### CITY OF STREETSBORO, PORTAGE COUNTY, OHIO

Grantor/Owner, for himself and his heirs, executors, administrators, successors and assigns, reserves all existing rights of ingress and egress to and from any residual area (as used herein, the expression "Grantor/Owner" includes the plural, and words in the masculine include the feminine or neuter).

_____[Surveyor's description of the premises follows]_____

Situated in the State of Ohio, County of Portage, Streetsboro Township, Lot 46, City of Streetsboro, and being part of a tract conveyed to Streetsboro Plaza Equities, LLC (hereinafter known as the "Grantor") by Instrument Number 201319674 of said county records.

Being a parcel of land lying on the left side of the centerline of right of way of State Route 303 as shown on the centerline plat of POR-Streetsboro Signals as recorded in Plat Book _____, Page _____ of the records of Portage County and being further described as follows:

Commencing, for reference, at a magnail (set) at the southeasterly corner of Lot 46, the southwesterly corner of Lot 47, the northwesterly corner of Lot 57 and the northeasterly corner of Lot 56, said corner being at State Route 43 station 164+02.13; thence, on the northerly line of Lot 56, the southerly line of Lot 46 and the centerline of State Route 303, North 89 degrees 05 minutes 52 seconds West, a distance of 268.61 feet to a point at State Route 303 station 161+33.52; thence, leaving said centerline and said lot line, being perpendicular to, North 00 degrees 54 minutes 08 seconds East, a distance of 36.30 feet to a 5/8 inch rebar (set), with cap stamped "GPD", on the northerly existing right of way line of State Route 303, 36.30 feet left of State Route 303 station 161+33.52, 92.67 feet left of Mt. Vernon Avenue station 10+38.44 and the Point of Beginning of the parcel herein described; Thence, clockwise on the following two (2) courses;

1. Thence, through the Grantor's tract, North 60 degrees 30 minutes 26 seconds East, a distance of 32.62 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", on the west existing right of way of Mt. Vernon Avenue, 64.16 feet left of Mt. Vernon Avenue station 10+54.29 and 52.81 feet left of State Route 303 station 161+61.66;

## EXHIBIT A

LPA RX 851 WD

Page 2 of 2
Rev. 06/09

2. Thence, on said existing right of way line, Southwesterly, an arc distance of 33.65 feet, on the arc of a curve deflecting to the right, having a central angle of 49 degrees 26 minutes 26 seconds, a radius of 39.00 feet, and a chord that bears South 60 degrees 30 minutes 26 seconds West, a distance of 32.62 feet, to the Point of Beginning, containing 0.0018 acres, of which the present road occupies 0.0000 acres, and is contained within Portage County Auditor's Permanent Parcel No. 35-045-00-00-064-000.

The bearings for this description are based on Grid North, of the Ohio State Plane Coordinate System, NAD83(2011), Ohio North Zone, established by using the Ohio Department of Transportation's Virtual Reference System (VRS) as part of a Global Positioning System (GPS) survey.

This description was prepared and reviewed under the supervision of Steven L. Mullaney, Professional Surveyor No. 7900 from a survey conducted for the City of Streetsboro, Portage County, Ohio in November, 2016.

05/11/18

Steven L. Mullaney, P.S.                    Date
Professional Surveyor No. 7900

STATE OF OHIO
STEVEN L.
MULLANEY
S-7900
PROFESSIONAL SURVEYOR
REGISTERED

EXHIBIT A-3

LPA RX 851 WD

Page 1 of 2
Rev. 06/09

Ver. Date   02/14/2018

PID    99879

## PARCEL   15-WD
### FOR-STREETSBORO SIGNALS
### ALL RIGHT, TITLE AND INTEREST IN FEE SIMPLE
### IN THE FOLLOWING DESCRIBED PROPERTY
### WITHOUT LIMITATION OF EXISTING ACCESS RIGHTS
### IN THE NAME AND FOR THE USE OF THE
### CITY OF STREETSBORO, PORTAGE COUNTY, OHIO

Grantor/Owner, for himself and his heirs, executors, administrators, successors and assigns, reserves all existing rights of ingress and egress to and from any residual area (as used herein, the expression "Grantor/Owner" includes the plural, and words in the masculine include the feminine or neuter).

[Surveyor's description of the premises follows]

Situated in the State of Ohio, County of Portage, Streetsboro Township, Lot 45, City of Streetsboro, and being part of a tract conveyed to VSUN Properties, LLC, a Virginia Limited Liability Company (hereinafter known as the "Grantor") by Instrument Number 201313012 of said county records.

Being a parcel of land lying on the left side of the centerline of right of way of State Route 43 as shown on the centerline plat of POR-Streetsboro Signals as recorded in Plat Book _____, Page _____ of the records of Portage County and being further described as follows:

Commencing, for reference at a 5/8 inch rebar (found) inside of a monument box at the southwest corner of Lot 46, the southeast corner of Lot 45, the northeast corner of Lot 55 and the northwest corner of Lot 56, said corner being the centerline intersection of State Route 43 and State Route 14, said corner being State Route 43 station 1053+63.20 and also being State Route 14 station 175+67.84; thence, along the easterly line of Lot 45, the westerly line of Lot 46 and the centerline of State Route 43, North 00 degrees 38 minutes 32 seconds West, a distance of 461.81 feet to a point at State Route 43 station 1058+25.01; thence, leaving said centerline and being perpendicular to, South 89 degrees 21 minutes 28 seconds West, a distance of 37.50 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", on the westerly existing right of way line of State Route 43, 37.50 feet left of State Route 43 station 1058+25.00 and the Point of Beginning of the parcel herein described; Thence, clockwise along the following four (4) courses;

1. Thence, along said existing right of way line, South 00 degrees 38 minutes 32 seconds East, a distance of 27.70 feet to an angle point in said existing right of way line, 37.50 feet left of State Route 43 station 1057+97.30;

17

**EXHIBIT A**

LPA RX 851 WD

Page 2 of 2
Rev. 06/09

2. Thence, continuing along said existing right of way line, South 89 degrees 44 minutes 23 seconds West, a distance of 7.50 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", 45.00 feet left of State Route 43 station 1057+97.35;

3. Thence, leaving said existing right of way, across the grantor's tract, North 00 degrees 38 minutes 32 seconds West, a distance of 27.65 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", 45.00 feet left of State Route 43 station 1058+24.92;

4. Thence, continuing across the grantor's tract, North 89 degrees 21 minutes 28 seconds West, a distance of 7.50 feet the Point of Beginning, containing 0.0048 acres, of which the present road occupies 0.0000 acres, and is contained within Portage County Auditor's Permanent Parcel No. 35-045-00-00-044-003.

The bearings for this description are based on Grid North, of the Ohio State Plane Coordinate System, NAD83(2011), Ohio North Zone, established by using the Ohio Department of Transportation's Virtual Reference System (VRS) as part of a Global Positioning System (GPS) survey.

This description was prepared and reviewed under the supervision of Steven L. Mullaney, Professional Surveyor No. 7900 from a survey conducted for the City of Streetsboro, Portage County, Ohio in November, 2016.

05/11/18

Steven L. Mullaney, P.S.
Professional Surveyor No. 7900

Date

STATE OF OHIO
STEVEN L.
MULLANEY
S-7900
REGISTERED
PROFESSIONAL SURVEYOR

EXHIBIT A-4

LPA RX 887 T

Ver. Date  03/15/2018

Page 1 of 2
Rev. 07/09

PID  99879

LKF

## PARCEL  15-T
### POR-STREETSBORO
TEMPORARY EASEMENT FOR THE PURPOSE OF
PERFORMING THE WORK NECESSARY TO
PERFORM GRADING AND DRIVE CONSTRUCTION
FOR 18 MONTHS FROM DATE OF ENTRY BY THE
CITY OF STREETSBORO, PORTAGE COUNTY, OHIO

[Surveyor's description of the premises follows]

Situated in the State of Ohio, County of Portage, Streetsboro Township, Lot 45, City of Streetsboro, and being part of a tract conveyed to VSUN Properties, LLC, a Virginia Limited Liability Company (hereinafter known as the "Grantor") by Instrument Number 201313012 of said county records.

Being a parcel of land lying on the left side of the centerline of right of way of State Route 43 as shown on the centerline plat of POR-Streetsboro Signals as recorded in Plat Book _____, Page _____ of the records of Portage County and being further described as follows:

Commencing, for reference at a 5/8 inch rebar (found) inside of a monument box at the southwest corner of Lot 46, the southeast corner of Lot 45, the northeast corner of Lot 55 and the northwest corner of Lot 56, said corner being the centerline intersection of State Route 43 and State Route 14, said corner being State Route 43 station 1053+63.20 and also being State Route 14 station 175+67.84; thence, along the easterly line of Lot 45, the westerly line of Lot 46 and the centerline of State Route 43, North 00 degrees 38 minutes 32 seconds West, a distance of 461.81 feet to a point at State Route 43 station 1058+25.01; thence, leaving said centerline and being perpendicular to, South 89 degrees 21 minutes 28 seconds West, a distance of 37.50 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", on the westerly existing right of way line of State Route 43, 37.50 feet left of State Route 43 station 1058+25.00; thence, along said existing right of way line, South 00 degrees 38 minutes 32 seconds East, a distance of 27.70 feet to an angle point in said existing right of way line, 37.50 feet left of State Route 43 station 1057+97.30; thence, continuing along said existing right of way line, South 89 degrees 44 minutes 23 seconds West, a distance of 7.50 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", 45.00 feet left of State Route 43 station 1057+97.35 and the Point of Beginning of the easement herein described; Thence, clockwise along the following five (5) courses;

1.  Thence, continuing along said existing right of way, South 00 degrees 38 minutes 32 seconds East, a distance of 47.35 feet to a point 45.00 feet left of State Route 43 station 1057+50.00;

2.  Thence, leaving said existing right of way line, across the grantor's tract, North 64 degrees 04 minutes 38 seconds West, a distance of 11.18 feet to a point 55.00 feet left of State Route 43 station 1057+55.00;

**'EXHIBIT A**

LPA RX 887 T

Page 2 of 2
Rev. 07/09

3. Thence, continuing across the grantor's tract, South 89 degrees 21 minutes 28 seconds West, a distance of 15.00 feet to a point 70.00 feet left of State Route 43 station 1057+55.00;

4. Thence, continuing across the grantor's tract, North 00 degrees 38 minutes 32 seconds West, a distance of 42.35 feet to a point 70.00 feet left of State Route 43 station 1057+97.35;

5. Thence, continuing across the grantor's tract, North 89 degrees 21 minutes 37 seconds East, a distance of 25.00 feet to the Point of Beginning, containing 0.0249 acres, of which the present road occupies 0.0000 acres, of said 0.0249 acres, 0.0115 acres is contained within Portage County Auditor's Permanent Parcel No. 35-045-00-00-044-001 and the remaining 0.0134 acres is contained within Portage County Auditor's Permanent Parcel No. 35-045-00-00-044-003.

The bearings for this description are based on Grid North, of the Ohio State Plane Coordinate System, NAD83(2011), Ohio North Zone, established by using the Ohio Department of Transportation's Virtual Reference System (VRS) as part of a Global Positioning System (GPS) survey.

This description was prepared and reviewed under the supervision of Steven L. Mullaney, Professional Surveyor No. 7900 from a survey conducted for the City of Streetsboro, Portage County, Ohio in November, 2016.

05/11/18
Steven L. Mullaney, P.S.                    Date
Professional Surveyor No. 7900

STATE OF OHIO
STEVEN L.
MULLANEY
S-7900
REGISTERED
PROFESSIONAL SURVEYOR

EXHIBIT A-5

LPA RX 851 WD

Ver. Date  05/02/2017

LKF

## PARCEL   10-WD
### POR-STREETSBORO SIGNALS
### ALL RIGHT, TITLE AND INTEREST IN FEE SIMPLE
### IN THE FOLLOWING DESCRIBED PROPERTY
### WITHOUT LIMITATION OF EXISTING ACCESS RIGHTS
### IN THE NAME AND FOR THE USE OF THE
### CITY OF STREETSBORO, PORTAGE COUNTY, OHIO

Grantor/Owner, for himself and his heirs, executors, administrators, successors and assigns, reserves all existing rights of ingress and egress to and from any residual area (as used herein, the expression "Grantor/Owner" includes the plural, and words in the masculine include the feminine or neuter).

[Surveyor's description of the premises follows]

Situated in the State of Ohio, County of Portage, Streetsboro Township, Lot 55, City of Streetsboro, and being part of a tract conveyed to Home Savings and Loan Company of Youngstown, Ohio, an Ohio Savings Bank (hereinafter known as the "Grantor") by Instrument Number 200507244 of said county records.

Being a parcel of land lying on the right side of the centerline of right of way of State Route 303 as shown on the centerline plat of POR-Streetsboro Signals as recorded in Plat Book _____, Page _____ of the records of Portage County and being further described as follows:

Commencing, for reference, at a magnail (set) at the northwesterly of Lot 55, the southwesterly corner of Lot 45, the southeasterly corner of Lot 44 and the northeasterly corner of Lot 54, said corner being at State Route 303 station 103+03.91; thence, along the southerly line of Lot 45, the northerly line of Lot 55 and the centerline of State Route 303, South 89 degrees 33 minutes 52 seconds East, a distance of 80.38 feet to a point at State Route 303 station 103+84.29; thence, leaving said centerline and lot line, being perpendicular to, South 00 degrees 26 minutes 08 seconds West, a distance of 50.00 feet to the grantor's northwesterly corner, said corner being the intersection of the southerly existing right of way line of State Route 303 and the easterly line of a 80 feet wide dedicated right of way, recorded in Plat 2015-24 of said county records, 50.00 feet right of State Route 303 station 103+84.29, said corner also being the Point of Beginning of the parcel herein described; Thence, clockwise along the following four (4) courses;

1. Thence, along the southerly existing right of way line of State Route 303, South 89 degrees 33 minutes 52 seconds East, a distance of 30.71 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", 50.00 feet right of State Route 303 station 104+15.00;

21

## EXHIBIT A

LPA RX 851 WD

2. Thence, leaving said existing right of way line, across the grantor's tract, South 56 degrees 44 minutes 44 seconds West, a distance of 18.03 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", 60.00 feet right of State Route 303 station 104+00.00;

3. Thence, continuing across the grantor's tract, North 89 degrees 33 minutes 52 seconds West, a distance of 15.63 feet to a 5/8 inch by 30 inch rebar (set), with cap stamped "GPD", on the easterly line of said 80 feet wide dedicated right of way, 60.00 feet right of State Route 303 station 103+84.37;

4. Thence, along said existing right of way line, North 00 degrees 00 minutes 00 seconds East, a distance of 10.00 feet to the Point of Beginning, containing 0.0053 acres, of which the present road occupies 0.0000 acres, and is contained within Portage County Auditor's Permanent Parcel No. 35-055-00-00-039-013.

The bearings for this description are based on Grid North, of the Ohio State Plane Coordinate System, NAD83(2011), Ohio North Zone, established by using the Ohio Department of Transportation's Virtual Reference System (VRS) as part of a Global Positioning System (GPS) survey.

This description was prepared and reviewed under the supervision of Steven L. Mullaney, Professional Surveyor No. 7900 from a survey conducted for the City of Streetsboro, Portage County, Ohio in November, 2016.

05/11/18

Steven L. Mullaney, P.S.                    Date
Professional Surveyor No. 7900

STATE OF OHIO
STEVEN L.
MULLANEY
S-7900
PROFESSIONAL SURVEYOR
REGISTERED

EXHIBIT A-6

LPA RX 887 T

Page 1 of 2
Rev. 07/09

Ver. Date  02/20/2018                                          LKF        PID    99879

## PARCEL  14-T
### POR-STREETSBORO
### TEMPORARY EASEMENT FOR THE PURPOSE OF
### PERFORMING THE WORK NECESSARY TO
### PERFORM SIDEWALK CONSTRUCTION
### FOR 18 MONTHS FROM DATE OF ENTRY BY THE
### CITY OF STREETSBORO, PORTAGE COUNTY, OHIO

[Surveyor's description of the premises follows]

Situated in the State of Ohio, County of Portage, Streetsboro Township, Lot 45, City of Streetsboro, and being part of a tract conveyed to Bernard Nicholas DiGrino, Successor Trustee of the DiGrino Trust Dated January 26, 2005 (hereinafter known as the "Grantor") by Instrument Number 201223431 and Instrument Number 200506818 of said county records.

Being a parcel of land lying on the left side of the centerline of right of way of State Route 14 as shown on the centerline plat of POR-Streetsboro Signals as recorded in Plat Book _____, Page _____ of the records of Portage County and being further described as follows:

Commencing, for reference at a 5/8 inch rebar (found) inside of a monument box in the centerline of Market Square Drive (Width Varies) as dedicated in Plat Book 95, Page 35 at Market Square Drive station 20+55.17; thence, on the southwest line of Market Square Drive, North 45 degrees 39 minutes 19 seconds West, a distance of 51.19 feet to the intersection of the northerly existing right of way of State Route 14 and the westerly existing right of way of Market Square Drive, 55.00 feet left of State Route 14 station 151+45.83 and the Point of Beginning of the easement herein described; Thence, clockwise along the following four (4) courses;

1. Thence on the northerly existing right of way line of State Route 14, North 45 degrees 39 minutes 19 seconds West, a distance of 25.83 feet to a point 55.00 left of State Route 14 station 151+20.00;

2. Thence through the grantor's tract, North 44 degrees 20 minutes 41 seconds East, a distance of 5.00 feet to a point 60.00 feet left of State Route 14 station 151+20.00;

3. Thence, continuing through the grantor's tract, South 45 degrees 39 minutes 19 seconds East, a distance of 25.84 feet to the westerly existing right of way of Market Square Drive, 60.00 feet left of State Route 14 station 151+45.84;

4. Thence on the existing right of way line of Market Square Drive, South 44 degrees 23 minutes 16 seconds West, a distance of 5.00 feet to the Point of Beginning, containing 0.0030 acres, of which the present road occupies 0.0000 acres, and is contained within Portage County Auditor's Permanent Parcel No. 35-045-00-00-006-000.

LPA RX 887 T

## EXHIBIT A

Page 2 of 2
Rev. 07/09

The bearings for this description are based on Grid North, of the Ohio State Plane Coordinate System, NAD83(2011), Ohio North Zone, established by using the Ohio Department of Transportation's Virtual Reference System (VRS) as part of a Global Positioning System (GPS) survey.

This description was prepared and reviewed under the supervision of Steven L. Mullaney, Professional Surveyor No. 7900 from a survey conducted for the City of Streetsboro, Portage County, Ohio in November, 2016.

_____  05/11/18
Steven L. Mullaney, P.S.          Date
Professional Surveyor No. 7900

STATE OF OHIO
STEVEN L.
MULLANEY
S-7900
PROFESSIONAL SURVEYOR
REGISTERED
NAL SU

Revised 03-2015

VALUE ANALYSIS ($10,000 OR LESS)

| OWNER'S NAME | | COUNTY | POR |
| --- | --- | --- | --- |
| Troy Coolidge No. 10, LLC | | ROUTE | Streetsboro Signals |
| | | SECTION | |
| | | PID# | 99879 |

Based on comparable sales, which are attached, the following compensation has been established.
Temporary taking(s) have been based on an 18 month period.

| Parcel # | Net Take Area | Land | Improvement | Remarks | Total |
| --- | --- | --- | --- | --- | --- |
| 4-WD | 0.0324 Ac. 1,411 SF | @ $6/SF = $8,466.00 | 750 SF of asphalt @ $3/SF depreciated 75% = $562.50 | Rounded to | $9,035 |
| 4-WD | | | 661 SF of grass @ $0.35/SF = $231.35 | Rounded to | $235 |
| 4-WD | | | 35 LF of concrete curb @ $15/LF depreciated 75% = $131.25 | Rounded to | $135 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | Total | $9,405 |

Conflict of Interest Certification [49CFR 24.102(n) and OAC 5501:2-5-06(D)(2)(s)]

1.  My engagement in this assignment was not contingent upon developing or reporting predetermined results.
2.  My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this compensation recommendation.
3.  I have no direct or indirect present or contemplated future personal interest in such property or in any benefit from the acquisition of such property valued, and no personal interest with respect to the parties involved.
4.  In recommending the compensation for the property, I have disregarded any decrease or increase in the fair market value of the real property that occurred prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner.
5.  I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

| | |
| --- | --- |
| Tracy M Hauserman    04/15/2018 | [signature]    4/17/18 |
| SIGNATURE OF PERSON PREPARING ANALYSIS    DATE TYPED NAME: Tracy M. Hauserman | REVIEWER'S CONCURRENCE    DATE TYPED NAME:    Emily L. Braman, MAI, SRA, AI-GRS |
| NAME OF AGENCY (IF DIFFERENT FROM ODOT) | [signature]    04/19/18 |
| City of Streetsboro | |
| TITLE: Mayor | AGENCY SIGNATURE ESTABLISHING FMVE    DATE TYPED NAME: Glenn Broska |
| ADMINISTRATIVE SETTLEMENT: | F.M.V.E. AMOUNT ADDITIONAL AMOUNT |
| SIGNATURE    DATE TYPED NAME: | TOTAL SETTLEMENT |

(SEE REVERSE SIDE FOR ADDITIONAL DOCUMENTATION)

## SECOND AMENDMENT TO REAL ESTATE SALE CONTRACT AND ASSIGNMENT
*Elyria, OH S1310 and Streetsboro, OH K9676*

This Second Amendment to Real Estate Sale Contract and Assignment (this "**Amendment**") is entered into as of December 14, 2018 by and between **TROY COOLIDGE NO. 10, LLC**, a Michigan limited liability company ("**Troy**"), **KMART CORPORATION**, a Michigan corporation ("**Kmart**") and **SEARS, ROEBUCK AND CO.**, a New York corporation ("**Sears**"), collectively, "**Seller**") and **INDUSTRIAL COMMERCIAL PROPERTIES LLC**, an Ohio limited liability company ("**Purchaser**").

### WITNESSETH:

**WHEREAS**, Seller and Purchaser entered into that certain Real Estate Sale Contract, dated as of July 25, 2018, as amended by that certain First Amendment to Real Estate Sale Contract dated as of September 24, 2018 (collectively, the "**Original Contract**", as amended hereby and as further amended, restated, or otherwise modified from time to time, the "**Contract**"), pertaining to those certain properties located at Elyria, Ohio ("**Elyria Property**") and Streetsboro, Ohio ("**Streetsboro Property**") as specifically described in the Original Contract; and

**WHEREAS**, Seller and Purchaser desire to amend the Original Contract as provided below.

**NOW, THEREFORE,** the parties agree as follows:

1.    Defined Terms.  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Original Contract.

2.    Amendments to the Original Contract.

(a)    The term "Contract" or "this Contract" as used in the Original Contract shall hereinafter refer to the Original Contract, as hereby amended, and as the same may be further amended, restated or otherwise modified from time to time.

(b)    Subsection 4(c) is hereby deleted and shall be replaced with the following:

"(c)    The Approval Order (as hereinafter defined) shall provide that, to the fullest extent permitted under section 363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances. Notwithstanding anything to the contrary contained in this Contract (including any affirmative obligation of Seller to cure "Monetary Liens", if any, set forth in this Contract), Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer."

(c)    The following shall be added as new Subsection 6(c):

"(c)    In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is conditioned on the following:

(i)    The sale shall be authorized by and subject to that certain *Order Authorizing and Establishing Procedures For De Minimis Asset Sales and De Minimis Asset Abandonments* (ECF No. 856) entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on November 21, 2018 (the "**Approval Order**"); and

(ii)    The applicable debtor(s) in the chapter 11 cases assigned number 18-23538 and currently pending in the Bankruptcy Court shall have duly filed and served a notice of sale of the Property (the "**Sale Notice**") and, as required under the Approval Order, provided the requisite parties-in-interest at least seven (7) business days' notice of the sale of the Property. Either no objections to the Sale Notice were timely received or any such objections were withdrawn or overruled by the Bankruptcy Court pursuant to an order specifically approving the sale of the Property. In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property is authorized by and subject to the Approval Order or, solely in the event of an objection to the Sale Notice that was not withdrawn, such other order entered by the Bankruptcy Court specifically approving the sale of the Property."

(d)    Subsection 7(a) is hereby deleted and shall be replaced with the following:

"(a)    Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Title Insurer within forty-five (45) days after the expiration of the notice period required by the Approval Order for the Sale Notice or, in the event a timely objection to the Sale Notice is interposed, after entry of a final order specifically approving the sale of the Property, or such later date as reasonably requested by Seller (the "**Closing Date**"), but in no event shall the Closing Date be later than sixty (60) days from the filing and service of a Sale Notice or in the event a timely objection to the Sale Notice is interposed, sixty (60) days from entry of a final order specifically approving the sale of the Property."

(e)    Subsection 10(a)(i) is hereby deleted and replaced with the following:

"(i)    Subject to the Approval Order and Section 6(c) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to the terms of the Approval Order."

2

(f)     Subsection 10(a)(iv) is hereby deleted and shall be replaced with the following:

"(iv)   Intentionally Deleted."

(g)     The ultimate paragraph of Section 10 is hereby deleted and replaced with the following:

"The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Section 10 shall merge with the transfer of title and shall not survive Closing. If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown."

3.     _Assignment._ As of the date hereof, Purchaser does hereby assign its rights, title, interest and obligations under the Contract to Elyria Midway Mall LLC, a an Ohio limited liability company ("*Elyria Assignee*"), which will obtain title to the Elyria Property, and Streetsboro State Route 14 LLC, an Ohio limited liability company ("*Streetsboro Assignee*"; and together with Elyria Assignee, individually and collectively, the "*Assignee*"), which will obtain title to the Streetsboro Property. By executing this Amendment, Assignee consents to the assignment and assumes and agrees to perform all of the obligations of the Purchaser under the Contract, including, without limitation, any obligations to be performed after closing thereunder, and to indemnify Assignor and Seller against any loss, claim, damage or expense Assignor and/or Seller may incur by reason of Assignee's failure to perform the assumed obligations on a timely basis. As of the date hereof, the Purchaser under the Contract shall mean Elyria Midway Mall LLC, an Ohio limited liability company, and Streetsboro State Route 14 LLC, an Ohio limited liability company.

4.     _Counterparts._ This Amendment may be executed and delivered (including by facsimile transmission or in portable document format (PDF)) in one or more counterparts, each of which, when executed, shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement, with the same effect as if the signatures thereto and hereto were upon the same instrument.

5.     _Governing Law._ This Amendment shall be governed by, and construed in accordance with, the laws of the state of Ohio without regard to its conflicts of laws principles.

3

6.      No Modification.  Except as modified by this Amendment, all of the terms, covenants, conditions and provisions of the Original Contract shall remain and continue unmodified, in full force and effect. If and to the extent that any of the provisions of this Amendment conflict or are otherwise inconsistent with any provisions of the Original Contract, the provisions of this Amendment shall prevail.

7.      Amendment.  This Amendment cannot be modified in any manner except by a written agreement signed by Seller and Purchaser.

8.      Severability.  If any provision of this Amendment or the application thereof to any person or circumstances is or shall be deemed illegal, invalid, or unenforceable, the remaining provisions hereof shall remain in full force and effect and this Amendment shall be interpreted as if such illegal, invalid, or unenforceable provision did not exist herein.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

4

IN WITNESS WHEREOF, this Amendment has been duly executed and delivered by or on behalf of each of the parties as of the date first written above.

**SELLER:**

**TROY COOLIDGE NO. 10, LLC**,
a Michigan limited liability company

By:  Kmart Corporation, a Michigan corporation, its sole member

By: _____
    Name:  Jane Borden
    Title:  President, Real Estate

**KMART CORPORATION,**
a Michigan corporation

By: _____
    Name:  Jane Borden
    Title:  President, Real Estate

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By: _____
    Name:  Jane Borden
    Title:  President, Real Estate

**PURCHASER:**

**INDUSTRIAL COMMERCIAL PROPERTIES LLC,**
an Ohio limited liability company

By: _____
    Christopher Semarjian, Manager

IN WITNESS WHEREOF, this Amendment has been duly executed and delivered by or on behalf of each of the parties as of the date first written above.

**SELLER:**

**TROY COOLIDGE NO. 10, LLC,**
a Michigan limited liability company

By:_____
    Name:
    Title:

**KMART CORPORATION,**
a Michigan corporation

By:_____
    Name:
    Title:

**SEARS, ROEBUCK AND CO.,**
a New York corporation

By:_____
    Name:
    Title:

**PURCHASER:**

**INDUSTRIAL COMMERCIAL PROPERTIES LLC,**
an Ohio limited liability company

By: _____
    Christopher Semarjian, Manager

**CONSENTED TO BY:**

**ASSIGNEE**:

**ELYRIA MIDWAY MALL LLC**,
an Ohio limited liability company

By: NorthStar Transfer & Exchange, LLC,
  an Ohio limited liability company,
  its Member

By: _____
  Mary R. Porter, Manager

**STREETSBORO STATE ROUTE 14 LLC**,
an Ohio limited liability company

By: NorthStar Transfer & Exchange, LLC,
  an Ohio limited liability company,
  its Member

By: _____
  Mary R. Porter, Manager