UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
                                                  :
In re:                                            :    Chapter 11
SEARS HOLDINGS CORPORATION, et al.,¹              :
                                                  :    Case No. 18-23538-rdd
   Debtors.                        :              :
                                                  :    (Jointly Administered)
                                                  :
------------------------------------------------------------X
```

# ESL'S OMNIBUS RESPONSE
# IN SUPPORT OF THE GOING CONCERN SALE TRANSACTION

---

¹     The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ..................................................................................... 6

I.      ESL's Commitment to Sears ........................................................ 6

II.     ESL Has Cooperated with the Subcommittee's and the UCC's
        Investigations ............................................................................... 7

III.    ESL Has Engaged in Good Faith Negotiations with the Debtors
        Pursuant to Court-Approved Bidding Procedures ......................... 8

IV.     The Terms of the Proposed Sale Will Maximize Value for the
        Estates ....................................................................................... 15

RESPONSE ......................................................................................... 18

I.      The UCC Objection To The Proposed Sale Should Be Overruled ....... 18

A.      The Proposed Sale Is In The Best Interest of the Estates ................ 18

        i.      Legal Standard ............................................................... 18

        ii.     Independent Committees Approved The Proposed Sale ........... 21

        iii.    The Proposed Sale Is For A Fair Price And Maximizes
                Value For All Stakeholders .......................................... 22

        iv.     The Process That Led To The Proposed Sale Was Fair ........... 26

B.      The Buyer's Business Plan is Viable ........................................ 29

        i.      The Business Plan Positions the Buyer to Succeed Post-
                Bankruptcy .................................................................. 31

        ii.     The Business Plan Is Sufficient Under Any Standard ............. 35

C.      The UCC's Conditionality Concerns Are Irrelevant And
        Unfounded ................................................................................. 37

D.      The UCC's Adequate Assurance Arguments Should Be Rejected ....... 39

        i.      ESL has Demonstrated Adequate Assurance of Future
                Performance Under Section 365(f)(2) of the Bankruptcy
                Code .............................................................................. 39

-i-

ii. The Assumption and Assignment Provisions are Entirely Fair and Reasonable ................................................................ 42

II. ESL Properly Purchased A Release Of Certain Claims For Adequate Consideration; That Release Should Be Approved And ESL Should Be Allowed To Credit Bid ................................................ 44

A. The Credit Bid Release Should Be Approved ........................................ 46

i. There Is Ample Reason To Find That The Credit Bid Release Is Fair And Equitable And In The Best Interests Of The Estate ............................................................................... 48

B. ESL's Allowed Claims Permit It to Credit Bid, And The UCC's Pending Motion For Standing And Its Objection Do Not Prevent It .................... 53

C. There Is No Basis To Disallow Or Subordinate Portions Of ESL's Claims ................................................................................ 55

D. ESL Has Allocated Its Credit Bid to the Underlying Collateral ............................ 55

III. The UCC Should Not Be Allowed To Run Out The Clock On The Proposed Sale Should Its Objection Be Overruled ................................ 57

A. ESL is a Good Faith Purchaser ...................................................... 58

B. The Requirements For Waiving Bankruptcy Rule 6004(h) Are Met .................... 59

IV. The PBGC's Objections Are Without Merit ........................................ 60

V. The Service.com Objection Misunderstands The APA And Should Be Overruled ............................................................................ 61

VI. Any Objections to the Amounts of Cure Costs or Adequate Assurance of Future Performance Should be Overruled ...................................... 62

A. All Cure Cost Objections Have Been Adjourned .................................... 62

B. Landlord and Contract Counterparty Objections to Adequate Assurance Should Be Overruled .................................................... 62

i. Landlords Have Not Satisfied the Burden for 365(b)(3) to Apply, and Any Issue of Adequate Assurance for Such Leases is Not Ripe ............................................................. 64

ii. The Sale Does Not Require Counterparties to Provide Services to Multiple Parties .................................................... 65

iii.    The Court May Order that the Buyer Not be Required to
Pay Any Additional Deposit Pursuant to 365(l) or
Otherwise ................................................................................................ 66

CONCLUSION .............................................................................................................. 67

# TABLE OF AUTHORITIES

**Page(s)**

## Rules and Statutes

11 U.S.C. § 363 ........................................................................................................... 18, 61

11 U.S.C. § 365 ................................................................................................................. 41

11 U.S.C. § 507 ................................................................................................................. 25

Fed. R. Bankr. P. 6004(h) ................................................................................................. 59

Fed. R. Bankr. P. 9019 .............................................................................................. 3, 46, 50

## Cases

Androse Addocs. of Allaire, LLC v. Great Atl. & Pac. Tea Co. (In re
Great Atl. & Pac. Tea Co.),
472 B.R. 666 (S.D.N.Y. 2012) ..................................................................................... 40, 41

Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.),
269 F.3d 726 (6th Cir. 2001) ............................................................................................ 50

BH Sutton Mezz LLC v. Sutton 58 Assocs. LLC (In re BH Sutton Mezz LLC),
No. 16-10455 (SHL), 2016 WL 8352445 (Bankr. S.D.N.Y. Dec. 1, 2016) ..................... 48

Calma ex rel. Citrix Sys., Inc. v. Templeton,
114 A.3d 563 (Del. Ch. 2015) .......................................................................................... 20

Chase Manhattan Mortg. and Realty Tr. v. Bergman (In re Bergman),
585 F.2d 1171 (2d Cir. 1978) ........................................................................................... 36

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
722 F.2d 1063, 1071 (2d Cir. 1983) ................................................................................. 29

Cosoff v. Rodman (In re W.T. Grant Co.),
699 F.2d 599 (2d Cir. 1983) ............................................................................................. 47

Czyzewski v. Jevic Holding Corp.,
137 S.Ct. 973 (2017) ......................................................................................................... 24

**Page(s)**

Embraer S.A. v. Dougherty Air Tr., LLC,
No. 17 Civ. 850 (PAC), 2018 WL 6605541 (S.D.N.Y. Dec. 12, 2018),
appeal docketed, No. 19-171 (2d Cir. Jan. 16, 2019) .......................................................... 47

Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., L.L.C. (In re Brice
Rd. Devs., L.L.C.),
392 B.R. 274 (B.A.P. 6th Cir. 2008).................................................................................. 36

Gross v. Russo (In re Russo),
762 F.2d 239 (2d Cir. 1985) .............................................................................................. 20

In re Aéropostale, Inc.,
555 B.R. 369 (Bankr. S.D.N.Y. 2016)....................................................... 48, 49, 53, 55

In re Ames Dep't Stores, Inc.,
287 B.R. 112 (Bankr. S.D.N.Y. 2002).............................................................................. 42-43

In re Ames Dep't Stores, Inc.,
348 B.R. 91 (Bankr. S.D.N.Y. 1996)................................................................................ 64-65

In re Bidermann Indus. U.S.A., Inc.,
203 B.R. 547 (Bankr. S.D.N.Y. 1997) .............................................................................. 20

In re Boscov's, Inc.,
No. 08-11637 (KG), 2008 WL 4975882 (Bankr. D. Del. Nov. 21, 2008)........................ 60

In re Bygaph, Inc.,
56 B.R. 596 (Bankr. S.D.N.Y. 1986)........................................................................ 40-41, 42

In re Chrysler LLC,
405 B.R. 84 (Bankr. S.D.N.Y. 2009)................................................................................ 29, 43

In re CS Mining, LLC,
574 B.R. 259 (Bankr. D. Utah 2017) ................................................................................ 54

In re Daufuskie Island Props, LLC,
441 B.R. 60 (Bankr. D.S.C. 2010)..................................................................................... 54-55

In re Decora Indus., Inc.,
No. 00–4459 JJF, 2002 WL 32332749 (D. Del. May 20, 2002) ....................................... 59-60

**Page(s)**

In re Delphi Corp.,
No. 05-44481(RDD), 2009 WL 637315 (Bankr. S.D.N.Y. Mar. 10, 2009) ....................... 18

In re Drexel Burnham Lambert Grp., Inc.,
134 B.R. 493 (Bankr. S.D.N.Y. 1991) ................................................................. 48

In re Fisker Auto. Holdings, Inc.,
510 B.R. 55 (Bankr. D. Del. 2014) ..................................................................... 54

In re Genco Shipping & Trading Ltd.,
509 B.R. 455 (Bankr. S.D.N.Y. 2014) ................................................................. 20

In re Glob. Crossing Ltd.,
295 B.R. 726 (Bankr. S.D.N.Y. 2003) ............................................................. 22, 37

In re GSC, Inc.,
453 B.R. 132 (Bankr. S.D.N.Y. 2011) ............................................................. 29, 58

In re Gulph Woods Corp.,
No. 87-03093S, 1988 WL 134688 (Bankr. E.D. Pa. Dec. 13, 1988)................................. 19

In re HHH Choices Health Plan, LLC,
554 B.R. 697 (Bankr. S.D.N.Y. 2016) ................................................................. 23

In re ICL Holding Co.,
802 F.3d 547 (3d Cir. 2015)............................................................................. 23

In re Innkeepers USA Tr.,
442 B.R. 227 (Bankr. S.D.N.Y. 2010) ............................................................. 19, 20

In re Lafayette Radio Elec. Corp.,
9 B.R. 993 (Bankr. E.D.N.Y. 1981)..................................................................... 41

In re Los Angeles Dodgers LLC,
468 B.R. 652 (Bankr. D. Del. 2011) ................................................................... 59

In re M. Fine Lumber Co.,
383 B.R. 565 (Bankr. E.D.N.Y. 2008).................................................................. 41

In re Motors Liquidation Co.,
529 B.R. 510 (Bankr. S.D.N.Y. 2015) ................................................................. 57

**Page(s)**

In re Natco Indus., Inc.,
54 B.R. 436 (Bankr. S.D.N.Y. 1985) ..................................................................... 40

In re New Drexel Burnham Lambert Grp., Inc.,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............................................................... 36, 37

In re NII Holdings, Inc.,
536 B.R. 61 (Bankr. S.D.N.Y. 2015) ................................................................ 51, 52

In re Ormet Corp.,
No. 13-10334 (MFW), 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) ...................... 57

In re Peterson's Ltd.,
31 B.R. 524 (Bankr. S.D.N.Y. 1983) ..................................................................... 40

In re Prudential Energy Co.,
58 B.R. 857 (Bankr. S.D.N.Y. 1986) ................................................................. 35-36

In re Pudgie's Dev. of N.Y., Inc.,
202 B.R. 832 (Bankr. S.D.N.Y. 1996) ............................................................... 23-24

In re Residential Capital, LLC,
No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ........................ passim

In re RML Dev., Inc.,
528 B.R. 150 (Bankr. W.D. Tenn. 2014) ................................................................ 54

In re Rock 49th Rest. Corp.,
No. 09-14557(ALG), 2010 WL 1418863 (Bankr. S.D.N.Y. Apr. 7, 2010) ...................... 40

In re Sabine Oil & Gas Corp.,
555 B.R. 180 (Bankr. S.D.N.Y. 2016) ............................................................... 46-47

In re Vivaro Corp.,
541 B.R. 144 (Bankr. S.D.N.Y. 2015) ............................................................... 53-54

In re WCI Cable, Inc.,
282 B.R. 457 (Bankr. D. Or. 2002) .................................................................. 36, 37

In re Young Broad. Inc.,
430 B.R. 99 (Bankr. S.D.N.Y. 2010) ..................................................................... 35

**Page(s)**

Juniper Dev. Grp. v. Kahn (In re Hemingway Transp., Inc.),
993 F.2d 915 (1st Cir. 1993) ................................................................................... 53

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
843 F.2d 636 (2d Cir. 1988) ..................................................................................... 35

L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs.),
209 F.3d 291 (3d Cir. 2000) ..................................................................................... 65

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
126 F.3d 380 (2d Cir. 1997) ................................................................................. 57, 58

Matson v. Alpert (In re LandAmerica Fin. Grp., Inc.),
470 B.R. 759 (Bankr. E.D. Va. 2012) ...................................................................... 48

Motorola, Inc. v. Official Comm. of Unsecured Creditors and JPMorgan
Chase Bank, N.A. (In re Iridium Operating LLC),
478 F.3d 452 (2d Cir. 2007) ..................................................................................... 18

O'Toole v. McTaggart (In re Trinsum Grp., Inc.),
466 B.R. 596 (Bankr. S.D.N.Y. 2012) ..................................................................... 22

Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re
BH S & B Holdings LLC),
420 B.R. 112 (Bankr. S.D.N.Y. 2009) ..................................................................... 22

Official Unsecured Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc.
(In re Pa. Truck Lines, Inc.),
150 B.R. 595 (E.D. Pa. 1992) ................................................................................... 48

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),
4 F.3d 1095 (2d Cir. 1993) ....................................................................................... 18

Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.),
430 B.R. 65 (S.D.N.Y. 2010) ................................................................................... 18

Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson,
390 U.S. 414 (1968) .................................................................................................. 47

Renco Grp., Inc. v. Buchwald (In re Magnesium Corp. of Am.),
571 B.R. 534 (S.D.N.Y. 2017) ................................................................................. 58

**Page(s)**

Signature Apparel Grp. LLC v. Laurita (In re Signature Apparel Grp. LLC),
577 B.R. 54 (Bankr. S.D.N.Y. 2017) ..................................................................... 22

U.S. Bank N.A. v. The Vill. at Lakeridge, LLC,
138 S.Ct. 960 (2018) ........................................................................................... 19

**Other Authorities**

4 Collier on Bankruptcy ¶ 502.02 (16th ed. 2018) ............................................. 53

7 Collier on Bankruptcy ¶ 1129.02 (16th ed. 2018) ............................................ 36

10 Collier on Bankruptcy ¶ 6004.11 (16th ed. 2018) .......................................... 59

ESL Investments, Inc. and its affiliates (including JPP, LLC and JPP II, LLC, collectively, "ESL"), in their capacity as prepetition lenders to Sears Holdings Corporation and certain of its affiliates (collectively, "Sears" and with respect to its Chapter 11 affiliates, the "Debtors") hereby submit this response (the "Response") to the objections filed (collectively, the "Objections")[2] to the *Notice of Successful Bidder and Sale Hearing*, Dkt. No. 1730 (the "Notice of Successful Bidder"), and in support of entry of the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith and (IV) Granting Related Relief* (the "Amended Proposed Sale Order"):[3]

## PRELIMINARY STATEMENT[4]

1.      ESL's $5.2 billion going concern bid to operate 425 Sears and Kmart stores, employ 45,000 team members, assume over $1 billion in protection agreement obligations relating to Sears appliances and to assume another $700 million in liabilities (the "ESL Bid") was selected by the fiercely independent Restructuring Committee of the Debtors' Board of Directors (the "Restructuring Committee"), advised by a Subcommittee (the "Subcommittee") of the Restructuring Committee (together, the "Independent Committees"), after continuous and difficult negotiations as the highest or best offer for substantially all of Sears' operating assets. This decision and the ESL transaction, as demonstrated by overwhelming evidence, meets every

---

[2]      The Objections are summarized on a chart attached to the Debtors' Omnibus Reply.  As the Debtors note, they do not intend to proceed with any:  (1) Cure Cost Objections or (2) Objections relating to Additional Contracts or Designatable Leases at the February 4, 2019 hearing.  Further, in the event the numbering of the referenced paragraphs to the Amended Proposed Sale Order change, ESL will submit an addendum .

[3]      As filed by Debtors contemporaneously with their reply to the UCC's Objections.

[4]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Global Bidding Procedures Order (as defined herein), Amended Proposed Sale Order, Asset Purchase Agreements, Declaration of Kunal S. Kamlani, or the Notice of Successful Bidder.

applicable standard under section 363 of the Bankruptcy Code and should be approved.  The

UCC's bombastic opposition, distinguished by its theatrical attempts to argue inapplicable law

and irrelevant facts, is nothing more than further confirmation of their liquidate and litigate

strategy, which they have pursued single-mindedly since the UCC's formation.  It is hard to

understand how the UCC's pursuit of a strategy that, if successful, will destroy the assumption of

substantial of unsecured obligations owed to their constituents, is anything other than a breach of

their fiduciary duties.

2.      In considering the ESL Bid, particularly in light of the UCC's constant

misdirection, it is critically important that focus is maintained on what is—and what is *not*—at

issue in the Sale Hearing.

- Section 363 Sale; *not* Section 1129 Plan

    - The ESL Bid is a proposal to acquire substantially all of Sears' operating
      assets pursuant to a sale under section 363 of the Bankruptcy Code.

    - The ESL Bid is *not* a plan of reorganization under section 1129 of the
      Bankruptcy Code.

- Highest/Best; *not* Administrative Solvency

    - The Sale Hearing is about whether the ESL Bid is the highest or best bid
      received by the Debtors and will provide the Debtors with more value than
      any other alternative, including liquidation.

    - The Sale Hearing is *not* about whether the Debtors will or will not be
      administratively solvent after closing—even though that is highly likely.

- Adequate Assurance; *not* Buyer's Viability

    - The ESL Bid should be reviewed for its ability to provide adequate
      assurance of future performance to contractual counterparties.

    - The Sale Hearing is *not* a contested confirmation hearing about the
      wholesale viability of Buyer or its business plan.

- Rule 9019 Settlement of Limited Claims; *not* Assessment of Unreleased Claims

    - The ESL Bid requires the release of equitable subordination,
      recharacterization, and disallowance claims against ESL to permit credit

bidding, which release is subject to the business judgment standards of Bankruptcy Rule 9019.

- o The ESL Bid specifically preserves other claims, and the Sale Hearing is *not* the forum to assess any of the unsubstantiated claims in the UCC's Objection that attempt to poison the well for future litigation by walking through the merits of the unreleased claims (all of which ESL vigorously disputes).

- Summary Proceeding; *not* Mini-Trial on the Merits

  - o The Sale Hearing is a summary proceeding to review the business judgment of the Debtors, acting through the independent and separately-represented Restructuring Committee, to accept the ESL Bid.

  - o The Sale Hearing is *not* a mini-trial on the merits of each and every allegation made in the UCC's 139-page publicity-seeking Objection, which restates—virtually word for word—the UCC's motion for standing to pursue claims against ESL.

3. When viewed through the appropriate lens, there is no question that the ESL Bid meets and exceeds the standards for approval under section 363 and that the carefully defined releases contained within the ESL Bid meet and exceed the standards for approval under Bankruptcy Rule 9019.

4. Since 2005, when it first became a Sears shareholder, ESL believed in Sears. And, until the financial crisis hit in 2008 and sent the retail sector reeling, Sears was doing well—it experienced strong EBITDA growth, with a corresponding increase in its stock price. With the onset of the Great Recession, with traditional bricks and mortars facing declining foot traffic and increased online competition, Sears too struggled. But ESL's commitment to Sears did not waver. ESL did not divest its investment in Sears but rather worked to strengthen the company and return it to success. As Sears attempted to transform its business, ESL (alongside other lenders) stepped up to provide financing and other support. This was done with the review and approval of committees of independent directors counseled by independent, experienced financial and legal advisors. Ultimately, despite the best efforts of Sears and of ESL, the headwinds proved too strong; Sears filed for chapter 11 on October 15, 2018.

5.      Despite these challenges, ESL still believes that the Sears business, appropriately resized and with a lighter debt load, can and will succeed.  Since the petition date ESL remains prepared to put its money and resources at risk to help it do so.  ESL has dedicated substantial resources to forge a path toward a going concern solution, engaging with the Debtors and others about its vision that a going concern transaction will achieve the best outcome for all of the stakeholders.

6.      ESL has participated in good faith in the auction process established by the Debtors and approved by this Court, starting with the submission of an indication of interest on December 5, 2018.  Ultimately, after months of intense effort on the part of all of the parties, the Debtors reached an agreement with ESL, through Transform Holdco LLC (the "Buyer"), has agreed to purchase 425 of the Debtors' stores, as well as other related assets and businesses, on a going concern basis for $5.2 billion in value (the "Proposed Sale").  The Proposed Sale contemplates a substantial investment of cash and other value by ESL.

7.      Throughout the post-petition period, the UCC has opposed the Debtors' pursuit of a going concern solution.  Instead, it has acted to the detriment of other stakeholders, including many of its own constituents, and pursued a difficult to fathom set of narrow interests.[5]  Ignoring the fiduciary duties that it owes to *all* unsecured creditors, the UCC continues to assert falsely that Sears has no acceptable alternative to liquidation.  It also continues its efforts to poison the

---

[5]      Certain members of the UCC stand to benefit immensely from a liquidation.  For example, in his October 25, 2018 earnings call, David Simon, Chairman and Chief Executive Officer of UCC co-chair Simon Property Group ("Simon") stated, "we are going to be able to make money on [Sears' bankruptcy]" and explained Simon's intention that Sears' Stores be "torn down, redeveloped [and] re-leased."  See Weaver Decl. Ex. 3 (Q3 2018 Simon Property Group Inc. Earnings Call – Final, at 4 (Oct. 25, 2018)).  Similarly, in an October 30, 2018 earnings call, James M. Taylor, Chief Executive Officer of UCC member Brixmor Property ("Brixmor"), announced Brixmor's plan to "capitalize[] quickly on th[e] opportunity" created by Sears' bankruptcy to evict Sears and "meaningfully upgrade [its] centers."  See Weaver Decl. Ex. 4 Q3 2018 Brixmor Property Group Inc. Earnings Call – Final, at 4 (Oct. 30, 2018)).  It is obvious that, despite the harm liquidation would cause to the estates and their varied stakeholders, members of the UCC have only ever been concerned with their own narrow and self-interested financial goals.

4

well against ESL, filling page after page of its pleadings with smears and false narratives that are completely irrelevant to the only issue currently before this Court—the Proposed Sale.

8.    The UCC's Objection is simply the latest of its ceaseless attempts to stop the Proposed Sale at any cost.  Following more than forty pages of self-serving bombast, the UCC attempts to import into this section 363 sale the standards to confirm a plan of reorganization under a section 1129, complains at length about the non-dispositive and contested question of administrative insolvency, asks the Court to reject the Debtors' business judgment in selling a release of potential claims to ESL, and argues based on faulty assumptions and mischaracterized facts that the Court should force a liquidation of Sears against the considered assessment of the Debtors direct on this point by the Restructuring Committee, supported by multiple sets of experienced independent advisors.

9.    This is a section 363 sale.  The question before the Court is whether the Debtors exercised sound business judgment in approving the Proposed Sale.  The record abundantly demonstrates that they did.  The UCC's weak and unsupported objections should be overruled, and it should not be permitted to continue to stand in the way of the Proposed Sale, which is the only viable path forward for Sears, its creditors, its associates, and its many loyal members.  Any other result would cost thousands of jobs, lead to a substantial depreciation of estate value, and bring about the demise of a storied American retailer.

10.    Separately, the Pension Benefit Guaranty Corporation's ("PBGC") Objection (the "PBGC Objection") is based on a misunderstanding (or misstatement) of the terms of the Proposed Sale and should be rejected.[6]  The Adequate Assurance Objections, some of which

---

[6]    Likewise, the Service.com Objection makes arguments that are inconsistent with the actual structure of the Asset Purchase Agreement (the "APA"); further, ESL emphatically denies Service.com's meritless insinuations about its conduct.

have already been resolved, raise issues that have been addressed or can be addressed at a later time (if indeed they ever arise) and should not stand in the way of the Proposed Sale.  Finally, virtually all Cure Cost Objections have been adjourned and those not adjourned can be resolved through the cure reserve mechanic.

## **BACKGROUND**

### I.    **ESL's Commitment to Sears**

11.    Since the merger of Kmart and Sears into Sears Holdings Corporation in 2005, ESL has supported Sears' initiatives to seek to create value for a broad range of stakeholders.  In 2008, forces beyond Sears' or ESL's control caused Sears to experience substantial setbacks. First, the financial crisis that began in September 2008 sent shockwaves through every industry, and retail was no exception.  Second, competition from internet retailers became increasingly intense.[7]  Throughout this period, Sears worked diligently to improve its performance.

12.    The Sears Board established state-of-the-art corporate governance procedures on advice from its counsel at Wachtell Lipton Rosen & Katz.  Pursuant to these procedures, since December 2012, all related party transactions involving ESL have been reviewed by independent committees or sub-committees of the Board comprised of directors who were unaffiliated with ESL and supported by independent legal and financial advisors.  See also Kamlani Decl. ¶¶ 7-10.

13.    ESL never acquired any assets or businesses from Sears to the exclusion of other stockholders.  ESL did participate—on a *pro rata* basis along with other stockholders of Sears— in transactions in which Sears disposed of non-core businesses pursuant to spin-offs or rights offerings intended to generate liquidity for Sears and made available on the same terms to all

---

[7]    See Weaver Decl., Ex. 1 (Stephanie Rosenbloom, Retail Sales Are Weakest in 35 Years, N.Y. Times (Dec. 4, 2008)).

Sears stockholders. ESL also made loans or provided other financing to Sears, most cases

together with third-party lenders. These financing transactions were on fair and reasonable terms

(including as to documentation, collateral, interest rates, and fees), approved in each case by

directors unaffiliated with ESL and counseled by independent legal and financial advisors. ESL

has not acquired any assets from Sears as a result of these financing transactions, whether by

foreclosure on collateral or otherwise.[8]

## II.    ESL Has Cooperated with the Subcommittee's and the UCC's Investigations

14.    On October 10, 2018, the Sears Board of Directors adopted a resolution creating

the Restructuring Committee, comprised of independent directors to consider and evaluate

various strategic alternatives available to Sears and its affiliates, and empowered to recommend a

transaction to the Board.[9] The resolution also created the Restructuring Subcommittee, likewise

comprised of independent directors, for the purpose of reviewing potential causes of action in

connection with pre-petition transactions, and authorized the Subcommittee to prosecute or settle

potential claims and approve any post-petition transactions involving ESL.[10]

15.    On October 15, 2018, SHC and dozens of its subsidiaries filed a Chapter 11

petition. Following the filing, the UCC and Subcommittee filed motions seeking Rule 2004

discovery on November 6 and 9, 2018, respectively. Mot. of the Official Committee of

Unsecured Creditors of Sears Holdings Corporation for the Entry of an Order Pursuant to

---

[8]    In its Objection, the UCC spends approximately half of its 138-page brief rehashing the same allegations against ESL that it set forth in its 125-page standing motion and 109-page proposed complaint, both of which it incorporates by reference into its Objection. UCC Obj. p. 3 n.3. ESL entirely rejects the UCC's distorted and unsupported assertions about its conduct; as these assertions concern Seritage and Lands' End, among other preserved claims, they have no relevance here and ESL does not address them.

[9]    Weaver Decl., Ex. 5 (Press Release, Sears Holdings, Sears Holdings Announces Appointment Of New Independent Director (Oct. 9, 2018)); Weaver Decl., Ex. 5 (Press Release, Sears Holdings, Sears Holdings Initiates Process To Accelerate Strategic Transformation And Facilitate Financial Restructuring (Oct. 15, 2018)) (announcing appointment of Restructuring Committee).

[10]    Id.

Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure 2004, 9006, and 9016, Dkt. No. 484 (the "UCC Rule 2004 Motion"); Mot. of Subcommittee for Leave to Conduct Discovery Pursuant to Bankruptcy Rule 2004, Dkt. No. 609 (the "Subcommittee Rule 2004 Motion").  ESL cooperated fully with both the Subcommittee and the UCC.  To date, ESL has itself produced approximately 130,000 pages as part of the Investigation (including approximately 2,600 documents provided prior to the Rule 2004 Orders).  In addition, ESL's Chairman, Edward Lampert, and its President, Kunal Kamlani, each prepared and sat for full-day interviews with the Subcommittee and the UCC.  Subcommittee Rule 2004 Motion ¶ 20.

III.    **ESL Has Engaged in Good Faith Negotiations with the Debtors Pursuant to Court-Approved Bidding Procedures**

16.    ESL worked closely with its advisors to formulate each of the discrete bids that it submitted as part of the sale process spanning from the beginning of the case to January 17, 2019.  That process culminated in a formal four-day auction held from January 14 through 17 (the "Auction"), and after around-the-clock negotiating sessions, ESL's final bid (the "Winning Bid") was accepted, as reflected in the Asset Purchase Agreement submitted to this Court on January 18, 2019 (the "APA").

17.    Following months of rigorous and often contentious arm's-length negotiations with the Debtors (including the Subcommittee) and their advisors, the Winning Bid provides the Debtors with $5.2 billion in aggregate value, reflecting more than $800 million in consideration above ESL's December 28 bid.  Under the bid, ESL has agreed to credit bid, roll-over or discharge nearly $2 billion of its senior secured debt in Sears, and has effectively subordinated that debt—which otherwise would have enjoyed priority due to its secured status—to the claims of other creditors, putting its own funds at risk for the success of the Buyer's business plan.  The Winning Bid satisfies nearly all of the Debtors' senior secured debt and provides consideration

8

for other creditors (including unsecured creditors), eliminating the burden of billions of dollars of claims against the Debtors' estates.  The Winning Bid is also the only available opportunity to preserve the jobs of approximately 45,000 Sears employees, while returning severance pay to prepetition levels.

18.    The ESL Bid underwent numerous iterations in the months-long arms-length negotiations with the Debtors (including the Subcommittee) and their advisors pursuant to the court-approved bidding procedures.  ESL first submitted a written indication of interest in acquiring substantially all of the Debtors' assets as a going concern on December 5, 2018, including approximately 500 stores and related real estate interests, inventory, infrastructure, Sears Auto Centers, Shop Your Way, Kenmore, DieHard, Monark, Innovel, Sears Home Services and material related contracts.  ESL's bid offered $4.6 billion in total value, including up to $950 million in cash; a credit bid of approximately $1.8 billion; $500 million in a combination of cash, notes, equity and/or waiver or assignment of deficiency claims; roll-over of $271 million in cash collateral supporting the L/C Facility and the assumption of approximately $1.1 billion of liability with respect to Sears Home Services protection agreements, certain gift cards and Shop Your Way accrued points.

19.    Following the submission of ESL's expression of interest, the Debtors changed the assets that they were offering for sale, initiating a process to close an additional 80 Sears stores.  Three weeks later, on December 28, ESL submitted a definitive going concern bid, which was modified to account for the pending closure of the 80 Sears stores.  This definitive bid offered $4.4 billion in total value, including up to $900 million in cash, a credit bid of approximately $1.3 billion, the roll-over and release of the Debtors with respect to $501 million of senior indebtedness, the assumption of approximately $1.1 billion in additional liabilities, and

in exchange for certain releases, a total of $35 million in cash and the rights to purchase $100 million of non-voting securities in the new company.

20.    In the early evening of January 2, 2019, representatives of ESL met with three of the four members of Sears' Restructuring Committee to discuss ESL's going concern proposal. A few hours after that meeting concluded, ESL was informed that the December 28 Bid would not be designated a qualified bid.  After further discussions the next day, ESL worked to respond to issues raised by the Subcommittee.  On January 4, 2019, ESL presented an improved bid that included assuming responsibility for an additional approximately $225 million in administrative liabilities.  Despite this material improvement, the Debtors informed counsel for ESL that this improved proposal had also been rejected.

21.    ESL made a further improved proposal on the evening of January 5, 2019, which included the uncapped assumption of "cure costs," estimated to be as much as $180 million. Late in the afternoon of January 6, 2019, ESL was again told that its going concern proposal would not be qualified.  On January 7, 2019, ESL proposed to assume an additional $257 million of additional administrative liabilities and, in exchange, to acquire certain additional assets.  In total, between December 28, 2018 and January 7, 2019, ESL agreed to take responsibility for an additional $482 million in administrative claims, plus cure costs in an uncapped amount.  Even with these improvements, the Subcommittee rejected ESL's bid.

22.    Late at night on January 7, 2019, ESL's counsel sent a letter to the Sears Board demanding that it immediately override the Subcommittee's decision and that the failure to do so would constitute a breach of fiduciary duty.  Negotiations continued the next day, narrowing the gap between ESL and the Debtors to approximately $80 million.  After a chambers conference on January 8, 2019, ESL submitted a revised bid on January 9, 2019, improving its going

10

concern bid by over $600 million, increasing the total value of the bid to over $5 billion and

reducing the conditionality that was part of the December 28 bid.  The improved bid involved the

assumption of another $663 million in additional liabilities, including up to $166 million of

payment obligations with respect to goods ordered by Debtors prior to the closing of the

proposed transactions (but as to which goods Debtors have not yet taken delivery and title prior

to closing), up to $139 million of certain administrative priority claims, up to $135 million in

property taxes, and all cure costs related to assumed contracts, estimated to be up to $180

million.  The bid also included $35 million in cash and other good and valuable consideration to

settle certain potential claims and the right for ESL to credit bid.

23.    On January 9, as part of this bid, and as required by the Court, ESL submitted a

$120 million deposit, $17.9 million of which was designated as non-refundable, to cover what

the Debtors represented to be the cost of delaying liquidation until the Auction.  With this, the

Debtors designated ESL's improved bid as qualified under the court-approved bidding

procedures.  At the beginning of the Auction on January 14, ESL submitted yet another

improved bid, addressing the Debtors' concerns as to conditionality, adding the assumption of

liabilities related to environmental law and forfeiting its deposit in a situation where ESL failed

to close on certain financing.

24.    The final bid, submitted at the Auction on January 15, provided for over $5.2

billion in total consideration, including an additional $120 million in assumed liabilities

consisting of the junior DIP rollover, an obligation to pay up to $19 million in transfer taxes, the

assumption of $4 million in mechanics' liens, up to $17 million in cash to purchase the cash that

will be located in the stores following closing, as well as $35 million in cash and other good and

valuable consideration, all of which supports allowance of ESL's $2.4 billion in secured claims

and ESL's right to credit bid (the "Credit Bid Release").  In response to Debtors' concerns as to the conditionality of the bid, ESL:  (1) removed the condition precedent requiring an amendment to the Seritage master lease; (2) modified the closing conditions related to the delivery of inventory and receivables to make it easier for the Debtors to satisfy those conditions, (3) provided the estates with the benefit of any inventory and receivables in excess of amounts required to satisfy closing conditions; (4) subject to lender approval, removed the marketing period requirement and eased the required information delivery obligations for marketing the Buyer's financing; (5) accelerated the timing of assumed payment obligations; (6) removed the requirement that holders of protection agreements affirm their agreements before the Buyer assumes those obligations and (7) extended the obligation to continue employee compensation and benefits through the fiscal year ending in 2020.

25.    In short, over this limited period of time, the Debtors continued to make of aggressive responses to ESL's bids with the goal of encouraging ESL to offer additional consideration.  ESL did so and, on January 16, 2019, the Debtors selected ESL's final bid as the Winning Bid.  On January 17, 2019, the Debtors and ESL executed the APA.

26.    The APA includes several closing conditions, all of which ESL expects to be satisfied.  In particular, the applicable financing agreements require that $400 million in excess availability must be available under the Buyer's New ABL Loan (As described herein) at closing.  To facilitate this, the Debtors must deliver roughly $1.65 billion of inventory and receivables, and the amount of outstanding indebtedness that the Buyer will assume under the DIP Credit Agreement and Junior DIP Term Loan is capped at $850 million and $350 million, respectively, for a total of $1.2 billion.  ESL believes this condition will be satisfied.  If the Company's outstanding debt under the DIP Credit Agreement and Junior Term Loan is less than

$1.2 billion at closing, the Buyer will receive a credit against the liabilities it has committed to

assume under the APA.  Certain other conditions to closing have already been satisfied:  for

instance, as of January 30, 2019, the KCD IP, LLC Board of Managers has agreed to grant the

Trademark License Agreement to the Buyer.  ESL has not been asked by the Debtors to waive

any conditions to closing.

27.    ESL was transparent in its participation in the Auction at all times.  With each

iteration of its bid, ESL publicly filed a Schedule 13D with the Securities and Exchange

Commission, making the terms of each bid widely available to the public, including any

competing bidders.  The bids provided a benchmark for other parties to provide additional value

had any chosen to make a bid of their own and to compete with ESL's bid.  Ultimately, none did.

Given these contentious and transparent negotiations, it is hard to see how the UCC can argue

that there was anything other than a robust sales and negotiation process.  Furthermore, any

claim that ESL improperly attempted to interfere with its purchase of SHIP is entirely false, as

ESL did not discuss including SHIP in the APA until the final days of the Auction, when the

Debtors' advisors raised a concern that the proposed transaction with Service.com might not

close due to lack of financing.

28.    Under the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition*

*Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense*

*Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition*

*Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket

No. 955] (the "Final DIP Order"), by virtue of its status as a secured lender under the ABL,

FILO Facility, LC Facility and Second Lien Facilities, ESL was granted superpriority claims and

liens "to the extent of the aggregate net diminution in value of their interests in the Prepetition

ABL Collateral."[11]  ESL's superpriority claims attach to virtually all of the same collateral

securing the Prepetition ABL Collateral,[12] but are granted priority over other administrative and

other claims to the extent of the diminution in the value of ESL's interests in that collateral.

29.    ESL holds various positions in tranches of secured debt issued by Sears and its

subsidiaries as set forth in Exhibit G of the APA, including approximately $847 million in

second-lien debt secured by the ABL Collateral.  At the Petition Date, the ABL Collateral was

valued at $3.065 billion, of which $1.927 billion was encumbered by first-lien ABL debt.  As a

result, the total available ABL Collateral for second-lien debt at the Petition Date was $1.138

billion.  By closing, the total amount of ABL Collateral available for second-lien debt is

expected to decrease substantially in comparison to the amount at the petition date, giving rise to

substantial adequate protection claims in favor of the second-lien holders, including ESL and

Cyrus.

30.    ESL holds approximately $2.4 billion of senior secured debt of Sears.  In the

Buyer's capital structure, more than $1.3 billion of this debt will be converted into equity.  ESL

is investing over $300 million in cash to facilitate its credit bid, including buying out other senior

debt holders under the IP/Ground Lease, the FILO Facility, the Real Estate Loan 2020 and the

Sparrow mortgage debt.  Furthermore, ESL will be extending substantial long-term credit to

New Sears, including a minimum of $106 million of the New Letter of Credit Facility and $87.5

million as part of the three-year Real Estate Loan.  ESL therefore has much to lose if the Buyer's

go forward business plan is not successful.

---

[11]    Final DIP Order at 45-61.

[12]    Such collateral includes but is not limited to "inventory, credit card accounts receivables, pharmacy
receivables, prescription lists, deposit accounts, cash and cash equivalents, and proceeds, insurance claims and
supporting obligations of the foregoing, together with Cash Collateral."  Final DIP Order at 12.

## IV.    The Terms of the Proposed Sale Will Maximize Value for the Estates

31.    Following the Petition Date, and after ESL decided to pursue a going concern proposal, ESL prepared a go forward business plan for the assets ESL proposed to buy from the estate (the "Business Plan"). Kamlani Ex. A. The Business Plan was presented to the lending banks participating in the ABL facility to convince them to participate in that facility. In part based on the Business Plan, the lending banks agreed to participate in the ABL facility.

32.    The Business Plan was based on a business plan created by Company management and the Company's advisors shortly after Sears filed for bankruptcy to market the business for auction (the "Company Plan"). Kamlani Ex. C. The Company Plan was created completely independently of ESL, and its advisors.

33.    The Company Plan outlines a go forward business plan for a new company with a 505 store footprint with 2019 projected revenue of $8.55 billion, EBITDA of $117 million, and a $525 million reduction in SG&A. The Company Plan projects gross margin of 38.6% for 2019, and a difference of negative 2.4% in same store sales for 2019 compared to 2018.[13] The Company Plan projects days payable outstanding ("DPO") to grow from 5 days to 60 days in 2.5 years.

34.    The Business Plan, like the Company Plan, retains ownership or rights (via licensing arrangements) to use of Sears' marquee brands and operating businesses, including Kenmore, a historic brand of large and small home appliances; Sears Home Services, which provides home repair services and services contracts; and Innovel, a best in class logistics provider.

---

[13]    Company Plan at 12.

35.      ESL and its financial advisors from Moelis & Company ("Moelis") performed substantial due diligence on the Company Plan throughout November and December.  Among other things, ESL and advisors from Moelis attended intensive in-person sessions at the Company's headquarters in Hoffman Estates, Illinois from November 13, 2018 through November 15, 2018.  Also present were two representatives from the retail division of Citibank, a party under Sears' prior ABL facility, and a lender under the new ABL facility.  During those sessions, the Moelis team and ESL reviewed the data and strategies underlying the Company Plan with management and requested and reviewed a substantial amount of supporting documentation.  ESL had no greater access to the Company Plan and the due diligence materials than any other person interested in submitting a bid and willing to sign a non-disclosure agreement.

36.      The Business Plan, like the Company Plan, projects that the Buyer will have a capital structure to ensure that the company meets debts as they come due for the foreseeable future.  Some of the key assumptions in the Business Plan, like in the Company Plan, relate to same store sales growth, selling, general and administrative expenses, gross margin, and days payable outstanding.  All of those assumptions were modeled off of the Company Plan and, while not without risk, should be reasonably achievable.

37.      Finally, it is worth noting in assessing the viability the Business Plan the strength of businesses that the Buyer will own and the brands it will continue to license.  They include world class brands such as Sears Home Services, Kenmore, DieHard, Monark, Innovel and Sears Auto Centers.  These businesses all have the potential to operate in tandem to generate substantial value.  The Buyers will also acquire an extensive real estate portfolio, providing fundamental value and stability to the company going forward.  This stability, as well as

increased certainty around the size of the new footprint, and the healthier balance sheet will enhance Buyers' ability to form new partnerships and strengthen existing ones.  Thus, while it is impossible to predict the future and while no business plan can prescribe everything that will happen in the years to come, ESL has every reason to believe that the Buyer will thrive, for investors, creditors, associates, and other counterparts.  It is willing to invest its funds and its senior secured debt to obtain that result.

## RESPONSE

## I.    The UCC Objection To The Proposed Sale Should Be Overruled

### A.    The Proposed Sale Is In The Best Interest of the Estates

39.    The UCC asks this Court to undo the work of months of negotiation, reject the Debtors' considered business judgment, and block the Proposed Sale, dragging Sears kicking and screaming into a liquidation that will destroy value and destroy Sears.  The UCC's misguided and unsupported objections must be overruled.

#### i.    *Legal Standard*

40.    Under Section 363(b) of the Bankruptcy Code, a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).[14]  If the debtor shows a "sound business justification" for the proposed sale, the transaction should be approved.  See In re Residential Capital, LLC, No. 12-12020, 2013 WL 3286198, at *18 (Bankr. S.D.N.Y. June 27, 2013) (Glenn, J.); Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.), 430 B.R. 65, 83 (S.D.N.Y. 2010) ("The overriding consideration for approval of a Section 363 sale is whether a good business reason has been articulated.") (internal citation omitted); see also In re Iridium Operating LLC, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'") (quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re

---

[14]    The hearing contemplated by section 363 is intended to be a summary proceeding, and is "not the time or place for prolonged discovery or a lengthy trial with disputed issues." In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993); see also In re Delphi Corp., No. 05-44481(RDD), 2009 WL 637315, at *7 (Bankr. S.D.N.Y. Mar. 10, 2009) (Drain, J.) (noting the "Second Circuit's guidance in In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993), on the limited nature of summary proceedings, including those under Section 363(b)").

Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)).  When the debtor has articulated a

reasonable basis for its decision, the business judgment rule will shield it from the court's

second-guessing when the following are present:  "(1) a business decision, (2) disinterestedness,

(3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of

discretion or waste of corporate assets."  In re Innkeepers USA Tr., 442 B.R. 227, 231 (Bankr.

S.D.N.Y. 2010) (Chapman, J.).  This protection is formidable, as, once the reasonable basis is

articulated, "courts will generally not entertain objections to the debtor's conduct."  In re

Residential Capital, 2013 WL 3286198, at *18.

41.     The UCC asks the Court to instead apply the higher entire fairness standard

arguing that the proposed sale is an insider transaction due to ESL's "control over and

sufficiently close relationship to the Debtors."  UCC Obj. ¶ 81.[15]  This argument, however, is

contradicted by case law, as well as the facts and timeline of this sale.  The UCC's technical

argument about the definition of "insider" misses the point: "[t]he concept of 'insider' generally

rests on the presumption that a person or entity alleged to be an insider is so connected with the

debtor that any business conducted between them necessarily cannot be conducted at arm's

length."  U.S. Bank N.A. v. The Vill. at Lakeridge, LLC, 138 S.Ct. 960, 970 (2018) (J.

Sotomayor, concurring).  But that is not the case when, as here, the Debtors' side of the

negotiations is represented by independent and disinterested directors with sophisticated legal

and financial advisors.  This principle guided the court's approach in ResCap, where a

transaction with one of the debtors' statutory insiders was analyzed under the business judgment

standard because the debtors were represented by an independent fiduciary "not beholden to [the

---

[15]     The UCC reliance on In re Gulph Woods Corp., No. 87-03093S, 1988 WL 134688, at *4 (Bankr. E.D. Pa.
Dec. 13, 1988), UCC Obj. ¶ 92, to convince the Court falls flat.  In that non-binding case, the court found
"pervasive" and "undisclosed"  insider dealing, where the guarantor "made it clear that he had no intention of tying
up all of his assets."  These factors are not present here.

insider]," and the court was involved in setting the parameters of negotiations.  2013 WL 3286198, at *19 (approving the transaction).

42.      So too here.  The Debtors' independent Restructuring Committee and Subcommittee, which are represented by independent counsel and financial advisors, retained pursuant to orders of this Court, have been responsible for conducting the sales process and negotiating with ESL and had exclusive authority to approve the Proposed Sale, including the right to credit bid or grant releases.[16]

43.      Even if the UCC were correct (and it is not) that the entire fairness standard applies, the Proposed Sale easily meets it.  Under the entire fairness standard, the inquiry focuses on "fair dealing and fair price."  See Calma ex rel. Citrix Sys., Inc. v. Templeton, 114 A.3d 563, 577 (Del. Ch. 2015); In re: Genco Shipping & Trading Ltd., 509 B.R. 455, 466 (Bankr. S.D.N.Y. 2014) (Lane, J) (independent evaluation); In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547, 552-53 (Bankr. S.D.N.Y. 1997) (negotiation with third party prospective purchasers); In re Innkeepers USA Tr., 442 B.R. 227, 231 (Bankr S.D.N.Y. 2010) (Chapman, J.) (appearance of fairness).[17]  The Second Circuit has made clear that "[t]he integrity of the sale is the issue to be addressed—not any general past conduct of a bidder in relation to other matters."  In re Russo, 762 F.2d 239, 243 (2d Cir. 1985) (applied in context of sale to fiduciary by C & J Clark Am., Inc. v. Carol Ruth, Inc., (In re Wingspread Corp.), 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (Brozman, J.)).

---

[16]      Press Release, Sears Holdings, Sears Holdings Initiates Process To Accelerate Strategic Transformation And Facilitate Financial Restructuring (Oct. 15, 2018).

[17]      The UCC's suggestion that there must be a strong showing of the feasibility of the proposed transaction before a section 363 sale can be approved is not the law in this Circuit.  See UCC Obj. ¶ 84 (citing a 1988 case from E.D. Pa).

ii.    *Independent Committees Approved The Proposed Sale*

44.    As discussed <u>supra</u>, the Subcommittee is composed of two independent directors,

William Transier and Alan Carr, both of whom were appointed immediately preceding these

cases and are experienced in bankruptcy and restructuring matters. Hr'g Tr. 24:25-25:1, Oct. 15,

2018. The Subcommittee is wholly independent from ESL and is advised by its own financial

experts and represented by counsel from Paul, Weiss, Rifkind, Wharton & Garrison LLP ("<u>Paul

Weiss</u>"). Part of the Subcommittee mandate includes investigating pre-petition insider

transactions and taking necessary related actions. Weaver Decl., Ex. 8 (Sears Holdings Form 8-

K (October 15, 2018)). After its thorough investigation, the Subcommittee's members voted

with the other members of the Restructuring Committee to select ESL as the winning bidder, a

process that was the product of negotiations that were at times heated, but which have always

been conducted at arm's length and with the assistance of independent legal and financial

advisors. Kamlani Decl. ¶ 12-20, 21. In fact, the terms reflected in the Proposed Sale are not

those of the first bid that ESL submitted, nor the second, nor even the third. Kamlani Decl. ¶ 14-

16. The successful bid was the culmination of a series of bids, each one improving the terms

compared to the last, and is filled with hard-fought and hard-won concessions. Kamlani Decl. ¶

20. Between its first definitive bid on December 28, 2018 and its final bid on January 17, 2019,

ESL increased total consideration by over $800 million. Kamlani Decl. ¶ 13. In the end, the

Restructuring Committee picked ESL's bid because it was the highest or best option available to

the Debtors and not because of any relationship ESL had to the Debtors.

45.    The UCC has not pointed the Court to a single precedent where a court applied a

standard higher than business judgment to a transaction where one side was represented by

independent committee of directors, nor has it identified cases overturning the business judgment

of such committees, especially in circumstances similar to those found here. The UCC fails to

show that the Proposed Sale is "so far beyond the bounds of reasonable judgment that it seems

essentially inexplicable on any ground other than bad faith," or that any " substantial benefit"

would be conferred upon Debtors' independent directors.  O'Toole v. McTaggart (In re Trinsum

Grp., Inc.), 466 B.R. 596, 610 (Bankr. S.D.N.Y. 2012) (Gonzalez, J.) (internal citations omitted);

In re BH S & B Holdings LLC, 420 B.R. 112, 147 (Bankr. S.D.N.Y. 2009) (Glenn, J.)

(explaining that "in order for the court to apply an entire fairness standard of review, the plaintiff

must show that a majority of the directors were either self-interested or dominated by an

interested party, or the only explanation for their conduct is bad faith") (internal citations

omitted).  Thus the UCC's argument that the business judgement rule should not apply to the

Proposed Sale must fail.

> iii.    *The Proposed Sale Is For A Fair Price And Maximizes Value For All
> Stakeholders*

46.    Even though the entire fairness standard does not apply, the Proposed Sale meets

the standard.  The Debtors have a duty to maximize the value of the estates.  Signature Apparel

Grp. LLC v. Laurita (In re Signature Apparel Grp. LLC), 577 B.R. 54, 98 (Bankr. S.D.N.Y.

2017) (Grossman, J.); see also In re Glob. Crossing Ltd., 295 B.R. 726, 744 n.58 (Bankr.

S.D.N.Y. 2003) (Gerber, J.) ("It is a well-established principle of bankruptcy law that the

objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the

highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

Here, as discussed supra, execution of this duty is subject to the Debtors' business judgment.  In

re Glob. Crossing, 295 B.R. at 744 n.58.

47.    The Debtors fulfilled their duty when they chose the ESL bid.  ESL's offer

provides more value to the estate than any other option, while at the same time saving 45,000

jobs and being supported by the Debtors' largest creditors.  Hr'g Tr. 22:5-11 (Jan. 14, 2019);

Kamlani Decl. ¶ 13.  As the Debtors' own models show, in a liquidation scenario creditors would

receive only $3.56 billion, whereas ESL's Bid provides $5.2 billion in value to the estates,

including $4 billion in creditor recoveries.  Weaver Decl., Ex. 13 (Wind Down Recoveries

Presentation (Jan. 14, 2019)).[18]

48.    One issue that the UCC makes much of is administrative insolvency.  But under a

section 363 sale, administrative insolvency is not at issue.  See In re HHH Choices Health Plan,

LLC, 554 B.R. 697, 704–05 (Bankr. S.D.N.Y. 2016) (Wiles, J.) ("It is true that a *plan* cannot be

confirmed without paying administrative claims and without paying secured and priority

creditors, but we do not necessarily have to confirm a plan of reorganization here.") (emphasis

added); see also In re ICL Holding Co., 802 F.3d 547 (3d Cir. 2015) (where the same counsel

now representing the UCC in these cases helped obtain a decision from the Third Circuit—

including Judge Ambro—where the administrative insolvency of the debtor was irrelevant to the

decision); In re Real Mex Rests., Inc., No. 11-13122 (BLS), Hr'g Tr. (Bankr. D. Del. Feb. 14,

2012), Dkt. No. 93 at 192 (Shannon, J.) ("[W]hile I recognize that there is an administrative

insolvency at present in this case, and I have noted my hope and expectation with respect to the,

frankly, improvement via a sale in the prospects for all creditors in this case, I believe that it

would be much worse, and the administrative insolvency and the circumstances for all creditors

would be much worse without this sale."); In re Allen Family Foods, Inc., No. 11-11764 (KJC),

Hr'g Tr. (Bankr. D. Del. July 27, 2011), Dkt. No. 225 at 44 (Carey, J.) (approving sale pursuant

to section 363 despite administrative insolvency).  Although it is unfortunate that a risk of

administrative insolvency looms over the Debtors' estates, "virtually every . . . category of

---

[18]    ESL joins in the Debtors' arguments concerning the superior value of the Proposed Sale as articulated in
the Debtors' Response to the UCC Objection.

administrative creditor who extends credit or provides goods or services post-petition does so
voluntarily with knowledge of the degree of risk of administrative insolvency," In re Pudgie's
Dev. of N.Y., Inc., 202 B.R. 832, 836 (Bankr. S.D.N.Y. 1996) (Hardin Jr., J.), and thus it would
not make sense to hold a value maximizing sale hostage to cries of administrative insolvency.

49.     Even though the UCC raises concerns about administrative insolvency, it ignores
the fact that liquidation itself results in administrative insolvency.  The UCC claims, based on the
analysis of their advisors—primarily Saul Burian of Houlihan Lokey—that the Debtors'
administrative insolvency under the Proposed Sale would be much higher than a wind-down.
Burian Decl., Ex. B.  This analysis, however, assumes that ESL and Cyrus would not be entitled
to section 507(b) superpriority claims, claims that have a higher priority than general
administrative claims and must be paid in full for a chapter 11 plan to be confirmed.  Czyzewski
v. Jevic Holding Corp., 137 S.Ct. 973, 976 ("a court [] cannot confirm a plan that contains
priority-violating distributions over the objection of an impaired creditor class") (citing 11
U.S.C. § 1129(a)(7)).  In fact, the UCC's analysis demonstrates that the Debtors would be
administratively insolvent because the analysis assumes that the section 507(b) claims are not
senior to administrative claims, and as such would only be partially paid.  Burian Decl. Ex. B.
The same is true of the Debtors' liquidation model.  UCC Obj. at ¶¶ 231-45.

50.     Pursuant to the *Final Order (I) Authorizing the Debtors to (A) Obtain
Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority
Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate
Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and
(IV) Granting Related Relief* (Docket No. 955) ("Final DIP Order"), ESL was granted section
507(b) superpriority claims and liens as a Prepetition ABL Credit Party, 2018 FILO Lender,

24

Prepetition LC Facility Credit Party and Prepetition Second Lien Credit Party.  Section 507(b) claims are afforded priority over "every other claim allowable under such subsection." 11 U.S.C. § 507(b) (2018).  Echoing the Bankruptcy Code, the Final DIP Order provides "the Prepetition Second Lien Facilities Adequate Protection Claims shall have *priority over all administrative expense claims* and priority general unsecured claims. . . ."  Final DIP Order, ¶ 18(d), Dkt. No. 955 (emphasis added).  As such, the adequate protection claims are senior to all other administrative claims "now existing or hereafter arising." Id ¶ 18(a).

51.    The UCC claims that ESL would not be entitled to section 507(b) claims because the Debtors' chapter 11 cases have been run primarily for ESL's benefit and because it cannot establish the diminution in value of its collateral was not a necessary cost of preserving value for the estates.  UCC Obj. ¶¶ 236-37.  The first point is both provocative and ridiculous.  These cases have not been run for ESL's benefit, but rather to maximize value for the estates.  See Hr'g Tr. 42:3-22, Nov. 15, 2018 (Debtors' counsel agreeing with the Court that the goal of the auction process is to maximize value).  The cases cited by the UCC, UCC Obj. ¶¶ 237-39, are unpersuasive, standing for the unremarkable proposition that, if a creditor's own conduct causes a Section 507(b) claim to accrue, such claim may not be allowed.  That is simply not the case here.

52.    The UCC claims that the Debtors' wind-down analysis should account for a surcharge against ESL's (or any other secured lender's) collateral pursuant to Section 506(c) also fail.  UCC Obj. ¶¶ 240-45.  The Debtors do provide for a four percent surcharge against ESL's collateral in their Wind Down Recovery Analysis.  ESL does not agree with, and has not been consulted on, this surcharge, but it is included in the Debtors' analysis.

53.     Thus, the UCC's claim that the sale would render the estates administratively

insolvent is a red herring, intended to deflect attention from the UCC's own flawed

administrative insolvency analysis. Weaver Decl., Ex. 10 (Credit Recovery Side by Side

Analysis) (Jan 14, 2019)).  Indeed, the Proposed Sale is the estates' best chance of remaining

administratively solvent.  Under the Proposed Sale, the Debtors' estimate that their estates will

face administrative insolvency of $62 million, Riecker Dep. 164-65, but the Debtors' CRO has

testified there are opportunities to close this potential gap.  Meghji Dep. 211:4-11 (testifying that

the Debtors have identified over $200 million in savings that could eliminate any administrative

insolvency).  Moreover, to the extent that the Proposed Sale would leave the estates

administratively insolvent (and this is not certain), any such insolvency would be far smaller than

the administrative insolvency that would result from a liquidation.  See, e.g., Transier Dep.

133:9-14 ("There's lots of dials that can be turned if you're running the business correctly.  We

felt like this was in the realm of reasonableness in terms of being able to manage the business

accordingly to keep the estate administratively solvent.").

iv.     *The Process That Led To The Proposed Sale Was Fair*

54.     Unlike the insider transaction at issue in In re Innkeepers—which was analyzed

under both the entire fairness and business judgment standards—here, appropriate steps were

taken to ensure that the auction process would be conducted appropriately and in a manner

designed to obtain the best result for all stakeholders.  The Debtors conducted the auction with

"due care" when they delegated authority to the Subcommittee advised by independent counsel

and financial advisors.  ESL was part of a transparent and fair process with other potential

buyers.  ESL also engaged in a months-long negotiation over the terms of the ESL Bid and the

consideration to be paid.  The ESL Bid is the product of an "arm's length bargain" with "inherent

fairness from the viewpoint of" the interested parties.  Id.  ESL submitted numerous going

concern proposals between December 28, 2018, and January 16, 2019, when its final was offer

was accepted.  Each subsequent bid increased the value for the Debtors and represented

significant compromises achieved through heated negotiations.  At numerous points, including

up to the day of the final bid, it seemed like negotiations would not be successful.  Hr'g Tr.

67:17-68:23, Jan. 15 2019 (at the last day of auction, Subcommittee's counsel expressing regret

that the transaction would not close); Hr'g Tr. 71:15-72:19, Jan. 15, 2019 (appearing back on the

record, at 12:47 am, counsel for the Subcommittee and ESL explaining terms of ESL's final,

successful bid).  In parallel, during the course of negotiations, ESL cooperated with the

Subcommittee's investigation, producing thousands of pages of documents on a voluntary basis

and making their two most senior executives available for full-day interviews, further

demonstrating its good faith.[19]

55.    The UCC attacks the validity of the sale process, but this Court approved the

bidding procedures (the "Global Bidding Procedures") after notice and a hearing.  There was a

fair and open auction process conducted pursuant to those procedures.  The Proposed Sale was

the highest bid at the auction and represents the best option to maximize value.  The

Subcommittee and the Debtors, having been advised by their own legal and financial advisors,

have made an informed business decision to proceed with the sale.  The process was fair and the

price is fair.  The Proposed Sale, including the Credit Bid Release, thus satisfy both the business

judgment and entire fairness standards.

56.    Since October 15, 2018 the independent Subcommittee has been responsible for

matters relating to ESL.  The Subcommittee is composed of two independent directors, both

---

[19]    To the extent the UCC argues the Proposed Sale does not meet heightened scrutiny because the Buyer's business plan is "unsubstantiated and fanciful," UCC Obj. 45-46, that argument is not appropriately a part of the heightened scrutiny analysis.  In any event, the UCC's arguments are addressed herein.

experienced in bankruptcy and restructuring proceedings.  Weaver Decl., Ex. 8 (Sears Holdings

Form 8-K (Oct. 15, 2018)).  The Subcommittee is wholly independent from ESL and is advised

by its own financial experts and counsel from Paul Weiss.  Negotiations have been at times

heated, but they have always been conducted at arm's length and with the assistance of those

counsel and advisors.  Debtors selected ESL's bid after months of arm's length negotiations.

This was not the first bid that ESL submitted, nor the second, nor even the third.  The final,

successful bid was the culmination of a series of bids, each one improving the terms compared to

the last, and is filled with hard-fought and hard-won concessions.  Kamlani Decl. ¶ 13. Between

its first definitive bid on December 28, 2018 and its final bid on January 17, 2019, ESL increased

its total consideration by over $800 million.  Kamlani Decl. ¶ 13.  In the end, Debtors picked

ESL's proposed bid because it presented the highest and best value to the estates.

57.    The record shows that the Debtors' decision to select the ESL Bid was justified by

good and valid business reasons.  The ESL Bid maximizes the value of the estates, represents

significant concessions and compromises on the part of ESL, minimizes the risk of

administrative insolvency, preserves the Debtors' right to pursue certain specified claims while

settling others, ensures maximum recovery for the Debtors' secured creditors and saves an iconic

retailer that and with it thousands of jobs.  Taken together, these are more than adequate

justifications for this business decision.

58.    This Court should approve the Proposed Sale because the Debtors have

demonstrated that a sound business purpose justified their selection of the ESL Bid.  The sale is

the result of months of negotiations, "reflects a heavily negotiated resolution," is "far from the

type of interested party transactions that the courts in Innkeepers and Bidermann dealt with," and

"provides for enhanced recoveries for the Debtors' creditors far in excess of what such creditors

would otherwise obtain from the Debtors' estates." In re Residential Capital LLC, No. 12-12020, 2013 WL 3286198, at *20 (Bankr. S.D.N.Y. June 27, 2013) (distinguishing Innkeepers, where the debtors' investment banker was explicitly told not to pursue bidders or transactions other than those with insider creditor, and Biderman, where an insider attempted to conduct a leveraged buyout of the debtor). Moreover, as in Residential Capital, the agreement is "not manifestly unreasonable, nor has there been a showing of bad faith, self-interest or gross negligence." Id.

B.    The Buyer's Business Plan is Viable

59.    The UCC spills much ink arguing that the business plan for the Buyer will fail. The UCC plainly hopes to import into these section 363 sale proceedings a feasibility standard that applies in Chapter 11 approval proceedings. See In re Chrysler LLC, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009) (Gonzalez, J.). But a finding that Buyer's business plan is viable is not a prerequisite to approval of the ESL Bid. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (articulating a standard, not including viability); In re Chrysler, 405 B.R.at 95 (identifying factors, not including viability); In re GSC, Inc., 453 B.R. 132, 155, 184 (Bankr. S.D.N.Y. 2011) (Gonzalez, J.) (approving sale where "a good business reason for proceeding" existed, not requiring viability).

60.    In addition to having no legal merit, the UCC's arguments about the feasibility of the Business Plan prove only that it has failed to understand the Debtors' business, its historical difficulties, and ESL's plan to transform it. The Business Plan is supported by careful analysis, reasonable assumptions, and the experience and judgment of numerous experts and business professionals. Even under the UCC's erroneous standard, the claim that there is no viable Business Plan is unfounded. Buyer's business plan is largely modeled on the Company Plan, which the Debtors and their advisors developed based on their experience with, and deep

understanding of, Sears' business and the challenges that have hampered its success in recent years.  Kamlani Dep. 81:6-25; Kamlani Decl. ¶ 29.  At no point during the Debtors' development of their plan was it shared with Lampert or ESL.  Kamlani Decl. ¶ 29.

61.    The UCC asserts that the Business Plan is not viable and insists that the Proposed Sale is accordingly not the "highest or best alternative available to the Debtors."  UCC Obj. ¶¶ 94-95.  In so doing, the UCC attempts to paint a misleading picture of the Business Plan, disparaging it as "[u]nrealistic and [u]nreasonable."  UCC Obj. ¶ 51.  Nothing could be further from the truth.

62.    Working with advisors at Moelis, and using the Company Plan as a basis, ESL developed a go-forward business plan, Kamlani Decl. ¶ 29, which, while in totality similar to the Company Plan, Riecker Dep. 152:11-17, is, as described in detail below, even more conservative in certain respects, including reduction in the number of small footprint stores and projected SG&A costs.  Kamlani Decl. ¶ 30.  Notably, the Subcommittee's independent advisors have acknowledged that the Business Plan is reasonable.

63.    The UCC's critique of the Business Plan based on the Debtors' past difficulties misses the mark.  UCC Obj. ¶ 98-102.  Under the Business Plan, it provides operate on a new and improved model.

64.    Thus, the UCC's myopic focus on Sears' results before it filed its Chapter 11 petition ignores that the Business Plan enables the Buyer to emerge with a significantly healthier balance sheet and improved liquidity by eliminating approximately $4 billion in debt and pension obligations.  Kamlani Decl. ¶ 38.  These, in turn, will give the Buyer a better negotiating position with vendors, enable it to invest more capital in attractive new initiatives, and attract a

Chief Executive Officer ("CEO") with a proven track record in effectuating large scale dynamic transformations.  Kamlani Decl. ¶ 41.

65.     Along with its Objection, the UCC also submitted an expert report from Jan Kniffen (the "Kniffen Report"), a "self-described" retail expert.  Kniffen is no expert, being nothing more than a former retailer out of the industry for more than thirteen years, who serves as a cable-TV pundit.  Kniffen's report is replete with self-serving, non-expert statements, aimed at driving an outcome he has publicly espoused for years.[20]  As will be shown below, Kniffen offers numerous critiques of the Business Plan that overlook key features of the Buyer upon its emergence from bankruptcy, including its significantly lightened debt load and the expansion of initiatives that were driving positive results in the lead up to bankruptcy.  See generally, Kniffen Report.

            i.      The Business Plan Positions the Buyer to Succeed Post-Bankruptcy

66.     Under the Business Plan, the Buyer is expected to achieve positive EBITDA growth of $25 million in fiscal year 2019,[21] margin improvement of 1.25 percent[22] and a reduction in SG&A of $655 million.  Kamlani Decl. ¶¶ 39, 46.  These projections are reasonable in light of the Buyer's anticipated plan to leverage its synergistic and interdependent ecosystem of healthier stores, products, and service providers; capitalize on strong brand recognition and market share in key retail segments; maintain key competitive advantages in select market

---

[20]      See e.g., Weaver Decl., Ex. 2 (The worst is yet to come for retail stocks, says former department store executive Jan Kniffen").

[21]      Kniffen contends that the Buyer's lack of a strong CEO makes it implausible that the company will achieve positive EBITDAP in 2019.  Kniffen Report ¶ 67.  This bald assertion is premature prior to execution of the Proposed Sale.  Further, given that a future CEO would be armed with a healthy balance sheet with which to transform the business, Kniffen's claim that the Buyer will have difficulty retaining top level management is simply unsubstantiated speculation.  Kniffen Report ¶ 16.

[22]      Kniffen characterizes the Business Plan's gross margin improvements of 1.25 percent as unrealistic, Kniffen Report ¶¶ 87-91, but fails to note the target gross margin of twenty-nine percent is well within the average range for the retail industry and is in fact lower than that of most comparable retailers.  Kamlani Decl. ¶ 45.

segments; re-engage in certain strategic initiatives with existing partners to expand their reach; and undertake a highly disciplined focus on leveraging its digital Shop Your Way platform. Kamlani Decl. ¶¶ 31, 35, 47.

67.     The Buyer will emerge with a healthier balance sheet and improved liquidity, giving vendors greater confidence and the Buyer the opportunity for better payable and credit terms than the pre-petition Debtor, Kamlani Dep. 228:17-229:4.  Specifically, the Business Plan provides benefits from a revolving credit facility of $1.2 billion, with availability at closing of over $400 million.  Kamlani Decl. ¶ 23.  Moreover, and its importance cannot be overstated, the Buyer will carry only $1.1 billion in financial debt compared to the $5.5 billion carried by the legacy entity and no going forward pension obligations.  Remarkably, neither the UCC, nor Kniffen, appear to have considered the positive effect that these changes will have on the Buyer's business going forward.

68.     Under the Business Plan, SG&A will be cut by approximately half, reducing it to $656 million in 2019 through, among other things, employee layoffs and non-payroll reductions.[23]  In asserting that the Business Plan provides no explanation for how the Buyer will accomplish these reductions, UCC Obj. ¶ 96, the UCC fails to recognize that many of the adjustments necessary to the Business Plan's contemplated reductions in SG&A have already occurred.  See Weaver Decl., Ex. 14 at 27 (Official Committee of Unsecured Creditors— Discussion Materials, Nov. 12, 2018).

69.     Further, in the months leading up to the petition filing, Sears achieved improvement in same store sales figures moving from -15% in February and to -1% in September 2018, ultimately achieving near parity in September 2018 compared to September

---

[23]     Liquidity Analysis from Kunal's Testimony at 2.

2017 figures.  Kamlani Decl. ¶ 34.  The Business Plan anticipates building on this success.

Kamlani Decl. ¶ 36.  In asserting that the Business Plan's same store sales projections are overly-

aspirational, Kniffen mistakenly relies on post-petition sales numbers, see Kniffen Report,

ignoring that companies fare worse in bankruptcy than out of it, particularly with respect to the

types of products which make up much of Sears' sales (including, for example, heavy appliances

and related insurance products).  Kamlani Decl. ¶ 38.

70.    Emerging from Chapter 11 with a right-sized and flexible balance sheet, the

Buyer will expand upon its aforementioned success through its increased capacity to

appropriately invest capital in attractive new opportunities.  Kamlani Decl. ¶ 41.  And, in

recognition of the inevitable business risks associated with its efforts, the Buyer is planning

responsibly, such that certain aspects of the Business Plan are even more conservative than the

well-developed and realistic plan prepared by the Debtors.  For example:

- Externalizing Kenmore beyond Sears and Amazon.  Despite its previously
  constrained distribution, the Kenmore home appliances brand remains a leading
  brand with significant market share.  By forming new external partnerships and
  selling to mass discounters, big box specialty stores, and online retailers, the
  Buyer will be able to generate additional revenue from Kenmore.  Business Plan
  21-22.

- The Business Plan expects Kenmore third-party revenue from Amazon customers
  to increase from $80 million in 2018 to $300 million by 2021, which is
  approximately 50% less than the Company Plan's revenue expectation.

- Growing its relationships with third party customers including Amazon through
  expansion of Innovel logistics network.  Business Plan 21-22.  This third-party
  business can be expanded with minimal additional infrastructure investment.
  Business Plan at 33.  Further, ESL expects the Buyer to forge strategic
  partnerships across Sears Home Services, Innovel and other key assets to fill in
  known or expected gaps and unlock opportunities that Buyer cannot access alone.
  Kamlani Ex. A.  The Business Plan expects $300 million in Innovel revenue by
  2021 while the Debtors' plan expects $500 million by 2021.  Id.

- Tailoring the Shop Your Way program in a non-capital-intensive way.  Because
  the technological capabilities exist already, and the Buyer will continue to test
  marketing strategies as it gains an increasingly sophisticated understanding of its

members, the Business Plan indicates that the Buyer will be able to decrease its reliance on third-party digital marketing, and will accordingly save approximately $8 million in market costs in fiscal year 2019 alone.  In particular, the Business Plan proposes the Buyer will continue to leverage the benefits of the Shop Your Way platform with respect to the Shop Your Way credit card agreements, which is expected to bring $44 million in EBITDA in 2019.

- While both the Business Plan and Company Plan call for approximately the same amount of capital expenditure, the Company Plan included within this projection a plan to build 100 small footprint stores, while the Business Plan takes into account that funding for new small footprint stores will stem from proceeds accrued from closing certain large stores.  Compare Kamlani Ex. A with Kamlani Ex. C.

- The overall EBITDA projections in the Business Plan are more conservative in the near term than those in the Debtors' plan.  The Business Plan projects EBITDA of $25 million in 2019, $171 million in 2020, and $378 million in 2021 compared to $117 million, $204 million, and $311 million respectively in the Debtors' plan.  Kamlani Decl. ¶ 46.

- The Business Plan added approximately $10 to $15 million of SG&A to the Debtors' numbers in recognition of the need to complement the existing management team with new senior managers.  Kamlani Ex. A.

71.     The Buyer will emerge from the Chapter 11 process with 425 stores.  These 425 stores combined delivered $457 million of EBITDA in fiscal year 2018, compared to $317 million of EBITDA in 2015.  A majority of the operating stores generate a positive EBITDA, and, in the aggregate the 425 stores have been EBITDA positive since at least 2010.  Kamlani Decl. ¶ 35.  Contrary to Kniffen's contention that these projections are unrealistic, Kniffen Report ¶¶ 72-79, revenue projections at these stores are wholly consistent with historical performance, and in fact, the Business Plan's projections are, in many instances, below historical performance.

72.     In addition to its traditional large format retail stores, the Business Plan shows the Buyer will also continue to pursue a strategy that Sears has piloted in recent years involving small footprint digital stores, which would focus on driving sales of the most popular and profitable categories of appliances.  Kamlani Ex. A at 17.  As a result of these stores being

34

completely digital, with orders placed on demand and delivered directly to the customer, the small footprint format generates substantially lower rent expenses and personnel costs. Id. The Debtors have already rolled out four such state-of-the-art locations in Texas, Colorado, Hawaii, and Pennsylvania, to great success. Kamlani Dep. 155:6-7. Together, these four currently operating small footprint stores delivered approximately $1.8 million in EBITDA in 2018 and had an internal rate of return 36%. Weaver Decl., Ex. 12, (Sears Lender Presentation (Jan. 24, 2019)). Through sale of negative EBITDA stores and development of such smaller-footprint stores, the go-forward business will benefit from a higher proportion of open, EBITDA-positive stores.

73.    The Buyer will assume over one hundred dark properties that it plans to sell after closing, which should generate over $100 million. Seventy or eighty of these properties serve as collateral for outstanding real estate loans. Kamlani Dep. 112:22-113:8. The Business Plan indicates the Buyer will monetize additional real estate assets, for a total of $600 million in anticipated real estate sales over three years. Kamlani Ex. A.

ii.    *The Business Plan Is Sufficient Under Any Standard*

74.    Even the irrelevant and inapplicable standard under 11 U.S.C. § 1129, which the UCC has tried so hard to import into this section 363 sale, is easily met by the Business Plan. Under section 1129, a plan is feasible if it "offers a reasonable assurance of success." Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988). Courts have recognized that "[s]uccess need not be guaranteed, so long as the plan has a reasonable likelihood of success." In re Young Broad. Inc., 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010) (Gonzalez, J.) (citation omitted). As one court has observed, "[g]uaranteed success in the stiff winds of commerce without the protection

35

of the Code is not the standard under § 1129(a)(11)."  In re Prudential Energy Co., 58 B.R. 857,

862 (Bankr. S.D.N.Y. 1986) (Buschman, III, J.).

75.    The Second Circuit has held that the proper test for feasibility is "whether the

things which are to be done after confirmation can be done as a practical matter under the facts."

Chase Manhattan Mortg. and Realty Tr. v. Bergman (In re Bergman), 585 F.2d 1171, 1179 (2d

Cir. 1978).  In determining feasibility, "a relatively low threshold of proof will satisfy" Section

1129.  Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., L.L.C. (In re Brice Rd. Devs., L.L.C.),

392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) (quoting 7 Collier on Bankruptcy, at 1129).  In

particular, "[f]easibility can be established through the testimony of experts and those

knowledgeable of the [] debtor."  7 Collier on Bankruptcy, ¶ 1129.02[11] (16th ed. 2018).

76.    The evidence here offers more than sufficient proof of the Business Plan's

feasibility and, in particular, highlights the presence of several factors courts find to be probative.

As mentioned above, the Buyer will enter the marketplace as a company with only $1.1. billion

in debt and no pension obligations, compared to the $5 billion of funded debt (plus pension

obligations) carried by the Debtors heading into bankruptcy, and will have $400 million of

excess availability under its new asset based lending facility (the "New ABL Loan" ) at closing.

Kamlani Decl. ¶ 23; Meghji Dep. 126:12-18 (acknowledging reasonableness of the Business

Plan's liquidity projections); see also In re WCI Cable, Inc., 282 B.R. 457, 488 (Bankr. D. Or.

2002) (concluding that company's plan was feasible in part on the basis of its capital adequacy);

In re New Drexel Burnham Lambert Grp., Inc., 138 B.R. 723, 762-63 (Bankr. S.D.N.Y. 1992)

(Conrad, J.) (identifying capital adequacy as probative of feasibility).  Additionally, as noted

previously, the Business Plan projects positive EBITDA growth in the three years following its

exit from bankruptcy, which based on Sears' marked improvement in same store sales growth is

realistic.  Kamlani Decl. ¶¶ 34-38; see also In re Drexel, 138 B.R. at 762-63 (listing earning

power of business as factor in feasibility determination); In re WCI Cable, Inc, 282 B.R. at 487-

88 (finding that plan's projections of future earnings was plausible and therefore evidence of the

plan's feasibility).

    C.      The UCC's Conditionality Concerns Are Irrelevant And Unfounded

    77.     The UCC complains that the Proposed Sale is "fraught" with execution risk due to

the unsurprising fact that, like all asset purchase agreements, the APA contains conditions that

must be met in order for the deal to close.  UCC Obj. ¶¶ 130-34.  The UCC cites no law in

support of its contention that the purported "excessive" conditionality of the APA means that the

Proposed Sale is inferior to liquidation.  Id.  As the UCC is well aware, there is no requirement

that proposed transactions have no conditions.  See, e.g., In re Glob. Crossing Ltd., 295 B.R.

726, 746 (Bankr. S.D.N.Y. 2003) (Gerber, J.) (affirming plan containing regulatory approval

requirement because, while approval was not certain, "there is a sound basis for the Board

having proceeded under the assumption" of regulatory approval).  And, undercutting the UCC's

purported concern about the risk and costs of uncertainty is its relentless pursuit of liquidation, a

scenario far more uncertain and risky than the Proposed Sale.

    78.     The conditions in the APA are unexceptional and there is no evidence that ESL or

the Debtors believe they will prevent the Proposed Sale from closing on time.  Moreover, the

issues raised by the UCC with respect to conditions in the APA is unfounded.

- *First*, the UCC objects to and mischaracterizes the treatment of assets—
  intellectual property, notes, and certain equity interests—by non-debtor KCD IP,
  LLC ("KCD") requiring these non-debtor parties' consent.  UCC Obj. ¶ 131.
  First, the APA does not provide for the purchase of any IP held by any non-
  debtor.  Contrary to the UCC's assertions, Section 2.1(e) does not address any IP
  held by KCD; the references to the international Kenmore Marks and DieHard
  marks refer only to IP held by debtor entities.  The Buyer's rights to use the IP
  held by KCD are provided solely (not alternatively) by the licenses contemplated
  in Section 9.14.  Section 9.14, explicitly addresses conditionality concerns by

providing a waterfall of progressively easier to accomplish options for licensing the KCD IP—*any* of which would satisfy the condition in Section 10.8. In fact, KCD IP, LLC has already approved the grant of an exclusive license to the Buyer under Section 9.14(b)—the most "difficult" of the options. Thus this concern is illusory as this condition has already been satisfied.

- *Second*, the UCC objects to the provision that conditions Closing upon the expiration of a marketing period for ESL's financing. With no support for its claim, the UCC states that the marketing period could be interrupted, causing the Closing to be delayed until after the outside date. UCC Obj. ¶131. The UCC's concern with respect to the marketing period is illusory as the parties to the transaction expect the marketing period to progress uninterrupted and for the sale to close by the Outside Date. In fact, closing is targeted for February 8, which would provide over ten days of buffer before hitting the February 19 date. Assuming this Court's approval of the sale on February 8, the parties to this expect the sale to close as early as the following business day.

- *Third*, providing no explanation for their concern, the UCC states that it "may not be possible" for Sellers to obtain required documents by the Outside Date. UCC Obj. ¶131. The basis for the UCC's concern about parties' ability to deliver documents—a standard activity in all transactions—is unclear. Again, all parties intend and expect the sale to close in advance of the Outside Date and no party has expressed genuine concern that the agreements and documents required by the APA will not be timely delivered.

- *Fourth*, the UCC describes as "impossible" the condition requiring the delivery of a minimum amount of inventory and receivables at closing and the condition that requires existing indebtedness under the DIP not exceed $850 million and existing indebtedness under the Junior DIP not exceed $350 million. Objection ¶131. This is incorrect. First, the Debtors have spent less than the projected budget on the DIP. UCC Ex. 15 at 5-6 (Transform Transaction – Weekly Tracking, Jan. 23, 2019). In objecting to the requirement that inventory and accounts receivable total at least $1.657 billion, the UCC also ignores the fact that prior versions of the APA required the Debtors to provide a minimum amount of each of accounts receivable and inventory. As an improvement in conditionality for the Debtors, ESL agreed that the Debtors are to deliver a combined value of at least $1.657 billion in receivables and inventory; that is, rather than requiring a minimum for each category, ESL has agreed to allow the Debtors to combine the value of both. APA Section 10.9. As a further concession, the APA also provides that, if the receivables and inventory exceed $1.657 billion, the Debtors are permitted to transfer the excess to GOB stores, allowing the estate to retain the upside value if it successfully manages inventory beyond what is required to meet the condition. APA Section 10.9. The negotiations among the parties resulted in a provision that provides Debtors with the flexibility to elect how to allocate its inventory and receivable balances to reach the $1.657 billion total. APA Section 10.9; Kamlani Decl. 20. Further, contrary to the UCC's position that it will be "a challenge" to meet indebtedness thresholds under the DIP and Junior DIP facilities, the

Debtors' financial advisors at MIII have modeled multiple scenarios, which ESL's financial advisors at Moelis also reviewed, all of which have shown that the Debtors will be able to stay within the indebtedness levels provided in the DIP and Junior DIP.  Creditor Recovery Mix Side by Side Analysis (Jan. 14, 2019); UCC Ex. 13, Sears Lender Presentation (Jan. 24, 2019).

- *Fifth*, the UCC objects to certain milestone dates after which ESL would have the right to terminate.  UCC Obj. ¶131.  This condition is standard.  As described repeatedly <u>infra</u>, all parties expect and intend for the sale to close by the outside date and for the Court to approve of the sale by February 8.  The UCC's purported concern that these conditions would render the sale impossible is unfounded.

- *Sixth*, the UCC challenges the condition that assumed cure costs need not be paid until sixty days after the closing date.  Because the cure cost objections listed on Exhibit B to the Amended Proposed Sale Order have been adjourned, those objections should not hinder or delay the approval of the proposed sale as all parties will have an opportunity to be heard at a later time.  Therefore, this condition does not create an improper delay.

79.    Finally, the UCC's slanted portrayal of ESL as a villain is belied here, as elsewhere, by the evidence of ESL's actual conduct.  In this case, the record of the negotiations reflects that ESL addressed concerns about the conditionality of its bid multiple times, with each iteration of the APA reducing the conditionality and decreasing concomitant execution risk.  <u>See</u> <u>supra</u> Background Section.  Plainly, the conditions contained in the APA were analyzed and negotiated between the parties, whose confidence in the Buyer's ability to close should outweigh the UCC's underbaked concerns.

D.    <u>The UCC's Adequate Assurance Arguments Should Be Rejected</u>

i.    *ESL has Demonstrated Adequate Assurance of Future Performance Under Section 365(f)(2) of the Bankruptcy Code*

80.    ESL has sufficiently demonstrated adequate assurance of future performance under Section 365(f)(2) of the Bankruptcy Code, and the UCC's objections—to the extent at all relevant[24]—to such demonstration should be overruled.  The UCC attempts to distract the Court

---

[24]    The UCC makes no attempt to justify why it has standing to raise any concern regarding adequate assurance.  As a statutory body, the UCC is not a counterparty to any lease or contract that might be subject to

from the appropriate adequate assurance standard by making unfounded statements about the

feasibility of the Business Plan[25] and attempts to impose a higher burden of certainty beyond the

appropriate legal standard.

81.    Analyzing whether adequate assurance has been provided requires an evaluation

of the facts and circumstances of the case at hand.  See In re Great Atl. & Pac. Tea Co., 472 B.R.

at 674-75 (making clear that "whether adequate assurance of future performance has been

provided [in the context of § 365] is determined by the facts and circumstances of each case.")

(citation omitted); see also In re Rock 49th Rest. Corp., No. 09-14557(ALG), 2010 WL 1418863,

at *10 (Bankr. S.D.N.Y. Apr. 7, 2010) (Gropper, J.) ("To determine whether a debtor has

provided adequate assurance, a court must look at the facts and circumstances of each case.").

To prove adequate assurance, ESL need not demonstrate an absolute guarantee that it will thrive

and make a profit.  See In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(Buschman, III, J.) (noting that the standard does not require a debtor to prove that it "will thrive

and make a profit," but rather that it "appears" that it will meet its obligations);  see also In re

Peterson's Ltd., 31 B.R. 524, 527-28 (Bankr. S.D.N.Y. 1983) (Abram, J.) (noting that "assurance

does not require a 100% guarantee that the lease will be performed.  It merely requires

'adequate' assurance and that has been provided.").  Instead, the analysis should assess the

Buyer's general financial wherewithal.  See In re Rock 49th Rest. Corp., 2010 WL 1418863, at

*10 (holding that the debtor provided adequate assurance after considering that it did not have

outstanding monetary obligations except for one utility payment, the debtor proved its ability to

pay monthly expenses, and that it was operating at a profit); see also In re Bygaph, Inc., 56 B.R.

---

assumption or assignment.  As numerous counterparties have objected, the UCC's adequate assurance objections are
irrelevant and should be ignored.

[25]    As described above, the Buyer's business plan is well-substantiated and viable.

596, 605-06 (Bankr. S.D.N.Y. 1986) (Buschman, III, J.) (holding that a proposed assignee's

personal financial resources, willingness to fund the new business for a strong likelihood of

success combined with the assignee's experience in running restaurants demonstrated adequate

assurance).[26]  Adequate assurance of future performance provided should be measured against

reasonable commercial standards.  See In re Lafayette Radio Elec. Corp., 9 B.R. 993, 1000

(Bankr. E.D.N.Y. 1981).[27]

82.     On January 18, 2019, the Debtors, on behalf of the Buyer, provided a letter to all

contract and lease counterparties that was more than sufficient to demonstrate adequate

assurance of future performance.  As described in the adequate assurance information materials,

the Buyer will be supported by substantially all of the Debtors' assets and while maintaining a

smaller store footprint and will have approximately $1.1 billion in outstanding funded debt

obligations at closing as compared to the Debtors' over  $5 billion in outstanding funded debt

obligations.[28]  The Buyer will also have approximately $400 million in excess availability on the

closing date, as required under the New ABL Loan to provide sufficient liquidity to meet its

obligations.  The New ABL Loan that will also provide the Buyer with an additional $100

million in liquidity approximately three months following closing.  The Business Plan provides

---

[26]     In assessing adequate assurance of future performance under leases, courts have assessed the following
non-exhaustive list of factors to determine whether a landlord is adequately assured, including: (1) the debtor's
payment history, (2) the extent and history of defaults, (3) the presence of a guarantee and/or a security deposit,
(4) evidence of profitability, (5) a plan with earmarked funds exclusively for the landlord, (6) the general outlook in
the debtor's industry, and (7) whether the lease is at or below the prevailing market rate, to afford landlords with a
measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy.
In re Great Atl. & Pac. Tea Co., 472 B.R., at 675 (internal quotation marks omitted).  Moreover, the fact that the rent
under a lease to be assumed is significantly below market could serve as adequate assurance of future
performance.  In re M. Fine Lumber Co.,, 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008).

[27]     In addition, if the assignee is a newly formed entity, the financial wherewithal of the newly formed entity
need only be at least as strong as the Debtors' financial wherewithal at the time of the original lease.  11 U.S.C. §
365(b)(3).

[28]     Notably, of the 425 stores included in the Buyer's go-forward plan, the majority are individually EBITDA
positive.

for a smaller footprint, shedding less profitable (or unprofitable) stores and substantially

reducing overhead expenses.  Therefore, the Buyer has the financial wherewithal to perform

under the contracts and leases that are assumed and assigned to it, and the Buyer's balance sheet

is significantly stronger than the Debtors'.  In fact, both Bank of America and Cyrus, after

analyzing the Buyer's proposed business plan, agreed to roll over their debt, which demonstrates

their view that the business is viable and a group of banks led by BAML, Citi, and RBC have

committed, on the basis of the Business Plan, to provide the Buyer with $1.2 billion in new

financing.[29]

> ii.     *The Assumption and Assignment Provisions are Entirely Fair and
> Reasonable*

83.     The UCC's adequate assurance objection as it relates to the Designatable Leases

and Additional Contracts demonstrates a gross misunderstanding of the mechanics of the Asset

Purchase Agreement and the rights afforded to applicable counterparties set forth in the

Amended Proposed Sale Order.  UCC Obj. ¶ 115-16.  The UCC claims that contract

counterparties will not have an opportunity to object after the Buyer has made its designation

determinations and that the Buyer is obtaining statutory rejection rights under Section 365 that

may harm landlords.  See id. These assertions are false.

84.     As a preliminary matter, the sale of designation rights is not controversial and has

been approved by courts both within this district and outside of it.  See In re Ames Dep't Stores,

Inc., 287 B.R. 112, 117 (Bankr. S.D.N.Y. 2002) (Gerber, J.) (noting that sales of designation

---

[29]     In further support of its financial wherewithal, the Buyer submitted a declaration of Kunal Kamlani.  See
Kamlani Decl.  This information is sufficient to show that the Buyer will be capable of meeting its contractual
obligations to the landlords and other counterparties.  See In re Bygaph, Inc., 56 B.R. at 605-06.  The Buyer also
made additional efforts to assuage concerns from landlords and contract counterparties that requested additional
information by providing financial information showing the Buyer's revenue, EBITDA, operating cash flow and net
availability for three years to such parties.

rights have been approved in at least 15 instances and that they have never been disallowed); In

re Chrysler LLC, 405 B.R.84, 110 (Bankr. S.D.N.Y. 2009) (Gonzalez, J.); see also Order

Approving Sale of All or Substantially All of Debtor's Assets and Granting Related Relief, In re

Golfsmith Int'l Holdings, No. 16-12033 (Bankr. D. Del. Nov. 2, 2016), Dkt. No. 457

(Silverstein, J.); Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of

Certain Assets of the Debtors Outside of the Ordinary Court of Business, (II) Authorizing the

Sale of Assets Free and Clear of All Liens, (III) Authorizing the Assumption and Assignment tor

Rejection of Certain Executory Contracts and Unexpired Leases and (IV) Granting Related

Relief, In re RM Holdco LLC, No. 18-11795 (Bankr. D. Del. Sept. 28, 2018), Dkt. No. 288

(Walrath, J.).

       85.    Furthermore, designation rights may permit the acquirer to designate a itself, an

affiliate or a third party as assignee to any agreement.  See Debtor's Mot. for Order Approving

(I) Agreement with Stop & Shop Supermarket Company for Sale of Designation Rights in

Respect of Debtors' Right to Assume, Assign, and Sell Certain Unexpired Leases of

Nonresidential Real Property, Free and Clear of All Liens, Claims, Encumbrances, and Other

Interests, Pursuant to Section 105, 363(b), (f) and (m), 365, and 1146 of the Bankruptcy Code

and Bankruptcy Rules 2002 and 6004, and (II) Process for Subsequent Assumption, Assignment,

and Sale of Such Unexpired Leases, In re Ames Dep't Stores, Inc., No. 01-42217 (Bankr.

S.D.N.Y. Dec. 3, 2002), Dkt. No. 1479; Order Approving Lease and Contract Designation Rights

Procedures, In re Bon-Ton Stores, Inc., No. 18-10248 (Bankr. D. Del. May 17, 2018), Dkt. No.

726 (Walrath, J.); Order Approving Sale of All or Substantially All of Debtor's Assets and

Granting Related Relief, In re Golfsmith Int'l Holdings, No. 16-12033 (Bankr. D. Del. Nov. 2,

2016), Dkt. No. 457 (Silverstein, J.).

86.    The contract and lease counterparties are not prejudiced by the designation rights

for two reasons. *First*, despite the UCC's assertion that the contract counterparties will not be

given an opportunity to object to assignment to a third party, UCC Obj. ¶¶ 114-16, applicable

counterparties will be afforded an opportunity to object *following* receipt of a notice that the

Buyer intends to designate an agreement to an assignee.[30] See Notice of Successful Bidder and

Sale Hearing, Exhibit C, Sale Order ¶ 32, Dkt. No. 1730.[31] *Second*, pursuant to section 365(d)(4)

of the Bankruptcy Code, the Debtors will have had until May 3, 2019 to determine whether or

not to assume or reject the leases without obtaining landlord approval, and therefore the Buyer's

decision will not extend the timeline the Debtors already had to make the same choice.

Therefore, the procedures in place for the sale of the Designatable Leases and the Additional

Contracts are fair to, and do not prejudice, the counterparties to these agreements.

87.    Accordingly, each of the UCC's objections to adequate assurance of future

performance should be overruled.

## II.    ESL Properly Purchased A Release Of Certain Claims For Adequate Consideration; That Release Should Be Approved And ESL Should Be Allowed To Credit Bid

88.    ESL is the Debtors' largest creditor, having lent the Debtors more than

$2.6 billion in total, of which more than $2.4 billion is secured by valid and enforceable security

---

[30]    More specifically, the Designation Rights procedures, as set forth in both the Proposed Sale Order and the Amended Proposed Sale Order, lay out the appropriate process for objecting to the ultimate assignment and assumption of the Designatable Leases and Additional Contracts to a third party assignee. See Sale Order ¶ 29-36; Amended Proposed Sale Order ¶ 33-34. In accordance with these procedures, each counterparty to a Designatable Lease that is assigned to a third party will have eight (8) days from the Buyer Assumption Notice to object to such assignment and assumption. Sale Order ¶ 32; Amended Proposed Sale Order ¶ 39. In addition, parties to Additional Contracts that did not receive an Assumption and Assignment notice will have eight (8) days after the Section 2.9 Assumption Notice to object. See Sale Order ¶30; Amended Proposed Sale Order ¶ 34.

[31]    The Sale Order is listed as Exhibit C in the Notice of Successful Bidder and Sale Hearing but erroneously labeled Exhibit B in the actual filing. Whereas Exhibit A is the summary of material terms and Exhibit B is the Asset Purchase Agreement, the Sale Order should be considered Exhibit C in accordance with the Notice of Successful Bidder and Sale Hearing.

interests over much of the Debtors' assets (the "Secured Financing Transactions"). ESL has

filed 236 proofs of claim, each of which memorialized its claims against the Debtors and

evidenced their validity.

89.    As part of the Proposed Sale, ESL bargained for and purchased a release of

certain potential claims against it (the "Credit Bid Release"). APA § 9.13. The scope of the

Credit Bid Release is narrowly defined to cover equitable subordination, recharacterization, and

disallowance with respect to the Secured Financing Transactions. The Credit Bid Release does

not extend to any claims for breach of fiduciary duty, constructive or actual fraudulent transfer,

illegal dividend, certain claims that have been alleged in the CCAA proceedings of Sears

Canada, or any cause of action related to the Lands' End spinoff or the Seritage transaction.

Further, the APA precludes ESL from recovering any proceeds from any successful actions

relating to Seritage, Lands' End, or willful misconduct of ESL (together, "Specified Claims").

Id. Additionally, the APA imposes a $50 million cap on ESL's potential recoveries on account

of section 507(b) superpriority adequate protection claims to the extent such recoveries relate to

claims that are not Specified Claims. Any other recoveries by ESL are treated as unsecured

claims.

90.    Fundamentally, the Credit Bid Release facilitates ESL's ability to credit bid,

which is an essential part of ESL's Bid. Id., APA § 3.1(b). As part of the Proposed Sale, ESL's

claims are allowed as set forth in Exhibit G to the APA, and the assets acquired are vested in the

Buyer, free from any collateral attack, as with any sale under section 365(f). Any claims

retained by the estates may be asserted against ESL, but not against the Buyer. Such retained

claims include the Specified Claims, and also any illegal dividend or breach of fiduciary duty

claims, whether or not related to the Specified Claims. APA § 9.13(a). In consideration for the

Credit Bid Release, ESL agreed to pay $35 million and other good and valuable consideration and substantially increased the Buyer's assumption of liabilities.  Importantly, the Credit Bid Release is an integrated part of the entire holistic deal and cannot be lifted out or rewritten to suit the UCC without scuttling the Proposed Sale altogether.  APA § 1.1 ("Credit Bid Release Consideration").

A.    The Credit Bid Release Should Be Approved

91.    Courts may approve settlements under Bankruptcy Rule 9019 when they are "fair and equitable and in the best interests of the estate."  In re Sabine Oil & Gas Corp., 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016) (Chapman, J.).  The decision to approve a settlement is within the bankruptcy court's discretion.  Id.  (confirming settlement of claims in proposed Chapter 11 plan).  Settlements are "favored, because they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." Id. (citing HSBC Bank USA, N.A. v. Fane, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012) (Glenn, J.)).

92.    In deciding whether to approve a settlement under Bankruptcy Rule 9019, bankruptcy courts in the Second Circuit generally consider seven factors:  (1) the balance between the litigation's possibility of success and the benefits of settlement; (2) the likelihood of complex and protracted litigation; (3) the interests of creditors; (4) whether the other interested parties support the settlement; (5) the nature and breadth of releases to be obtained by directors and officers; (6) the competence and experience of counsel and the reviewing judge; and (7) the extent to which the settlement is the product of arm's-length negotiation.  Id. at 258 (citing In re Iridium Operating LLC, 478 F.3d 452, 462 (2d Cir. 2007)).  The court should take into account the views of the debtor In re Sabine Oil & Gas Corp., 555 B.R. 180, 258 (Bankr. S.D.N.Y. 2016) (Chapman, J.) ("Although in considering approval of a settlement of claims a court may not

substitute the debtor's judgment for its own . . . the court may nonetheless take into account the debtor's business judgment in recommending a settlement.").

93.    To determine whether a settlement is in the best interests of the estate, "it is not necessary for the court to conduct a mini-trial of the facts or the merits underlying the dispute." Embraer S.A. v. Dougherty Air Tr., LLC, No. 17 Civ. 850 (PAC), 2018 WL 6605541, at *8 (S.D.N.Y. Dec. 12, 2018) (emphasis added), appeal docketed, No. 19-171 (2d Cir. Jan. 16, 2019); see also Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (in determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather should "canvas[] the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'") (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)).  The Court need consider only the facts necessary to enable it to "form an educated estimate" of the complexity and expense of litigation.  See Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson, 390 U.S. 414, 424 (1968).  And it is not necessary for the court to find that the settlement was the best that a debtor could have obtained in order to approve it.  In re Sabine Oil, 555 B.R. at 257.

94.    The UCC argues in its Objection that the Credit Bid Release should not be approved because, according to the UCC, the Released Estate Claims are valuable and likely to succeed if litigated.  The UCC also argues that because it has objected to the validity of the claims, it has created a pending dispute that prevents them from being allowed or being credit bid.  UCC Obj. ¶¶ 15, 142; Mot. of the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al. for Entry of an Order Granting (I) Leave, Standing, and Authority To Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and (II) Non-Exclusive Settlement Authority in Respect of Such Claims 78-122, Dkt. No. 1765 (the "UCC

Standing Motion").[32]  Both arguments are deeply flawed and insufficient to overcome the many

factors weighing in favor of approving the settlement.

     i.     *There Is Ample Reason To Find That The Credit Bid Release Is Fair And Equitable And In The Best Interests Of The Estate*

95.     *First*, the Credit Bid Release avoids a lengthy, expensive litigation in which the

Debtors would not prevail.  The UCC's conclusory assertions about ESL's conduct, glaringly

unsupported by citations to evidence or testimony, do not support a finding that a plaintiff would

be likely to succeed in subordinating or recharacterizing ESL's claims, nor in subjecting them to

disallowance pursuant to section 502(d).[33]

96.     Equitable subordination is considered an "extraordinary remedy that is to be used

sparingly."  In re BH Sutton Mezz LLC, No. 16-10455 (SHL), 2016 WL 8352445, at *30

(Bankr. S.D.N.Y. Dec. 1, 2016) (Lane, J.) (citations omitted).  Equitable subordination requires a

showing of egregious inequitable conduct of a level that justifies the imposition of this

extraordinary remedy.  See In re LandAmerica Fin. Grp., Inc., 470 B.R. 759, 806 (Bankr. E.D.

Va. 2012).  In no way does the UCC plausibly suggest that ESL engaged in inequitable conduct,

and certainly not that it engaged in the egregious, conscience-shocking conduct that is required

for an equitable subordination or disallowance claim.  See In re Aéropostale, Inc., 555 B.R. 369,

398 (Bankr. S.D.N.Y. 2016) (Lane, J.).  ESL entered into the lending transactions with Sears on

---

[32]     The UCC asserts that courts subject settlements with an insider to "closer scrutiny."  UCC Obj. 107 n.54. The only case the UCC cites in support of this proposition is In re Drexel Burnham, 135 B.R. 493,497 (Bankr. S.D.N.Y. 1991) (Conrad, J.) (approving of the insider release at issue, holding it to be in the best interests of the estate).  That case's sole mention of closer scrutiny applied to insider releases does not articulate a standard, rather explaining that, prior to approving the release at issue, the court had "subjected the agreement to closer scrutiny" and noting that "closer scrutiny of insider agreements should be added to the cook book list of factors" used to determine the fairness of a settlement.  Id. at 498.  This observation is not binding, and no heightened scrutiny applies here.  See In re Pa. Truck Lines, Inc., 150 B.R. 595, 599 (E.D. Pa. 1992) ("Clearly, [Drexel Burnham's closer scrutiny language] is dicta."); see also Residential Capital, 2013 WL, at *19.

[33]     As noted supra, the UCC attempts to put before the Court with an irrelevant diatribe on ESL's purported conduct with respect to the Lands' End and Seritage transaction, among others.  UCC Obj. ¶ 3 n.3.  ESL vehemently denies the UCC's allegations; but it will not burden the Court, as it is neither the time nor the place.

a good faith basis, in each case providing liquidity to Sears under carefully negotiated and market standard documentation that provided security interests in specific, defined collateral. The mere fact that Sears was distressed and ESL was willing to lend is not evidence that ESL or the Board engaged in fraud or acted in bad faith. See, e.g., In re Aéropostale, Inc., 555 B.R. at 422 (finding that where "the Debtors sought out financing to fund its turnaround" it would "be inappropriate to penalize the Term Lenders for lending to a distressed company."). The terms were fair to Sears, ESL, and Sears' other creditors, and each of the lending transactions approved by a majority of independent directors and the Related Party Transactions Committee with advice from separate legal and financial advisors, of the transactions.

97.    Moreover, the underlying transactions did not cause harm to other creditors or give ESL an unfair advantage vis-a-vis other creditors. In fact, ESL's support enabled Sears' other creditors to substantially reduce their exposure to Sears credit risk and approximately $5 billion to be paid into Sears' pension plans. Weaver Decl., Ex. 9 (Sears Holdings Corp., Annual Report (Form 10-K) (Mar. 23, 2018)). Each of the transactions at issue was approved by an independent committee of Sears' majority-independent Board, with support from independent expert advisors. Id.

98.    The UCC's claim for recharacterization would also fail. Each financing transaction was intended to be debt that was subject to repayment, and as the UCC concedes, the financing transactions were all structured as textbook loans that were appropriately named and documented with fixed maturity dates and schedules of payments, as well as fixed interest rates and interest payments. Third party lenders such as Cyrus, Cascade, Great American, Kawa, and others were almost always involved in lending alongside ESL. Even the UCC's arguments, which seem to suggest that secured loans were made pre-bankruptcy in order to somehow strip

assets from Sears, recognize that ESL expected repayment of the funding—repayment which would be unexpected if their loans were intended to be equity infusions. ESL also received appropriate security for its advances, the loans were documented, the security interests perfected, and many of the transactions included outside lenders. In sum, none of the factors that would support recharacterization were present here. See In re AutoStyle Plastics, Inc., 269 F.3d 726, 751 (6th Cir. 2001).

99.      The UCC also attempts to invoke section 502(d) as a basis for disallowance. For all of the reasons described below, this argument likewise fails. The Debtors have determined to allow the ESL claims arising under the Secured Financing Transactions, released a specific set of claims, agreed to not collaterally attack the Buyer's purchase of the acquired asset, settled their potential 502(d) claims, as they relate to the Secured Financing Transactions, mooting the UCC's arguments. APA § 9.13(e)(ii); see Ex. A, Mot. for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving a Partial Settlement By and Between the Trustee and Alpha Prime Fund, Ltd. at 4, Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC, No. 08-01789 (SMB) (Feb. 1, 2018), Dkt. No. 17229-1 ("The Allowed Claim shall not be subject to any disallowance under section 502(d) of the Bankruptcy Code or otherwise."), settlement approved, Picard v. Alpha Prime Fund Ltd., No. 09-01364 (SMB) (Mar. 27, 2018), Dkt. No. 497 (Lane, J.) (approving a partial settlement of claims between the Trustee and the fund against whom he sought avoidance of transfers where, as here, the settlement contemplated settling only some of the claims, while still allowing the settling party to receive payment on its allowed claims, notwithstanding section 502(d)).

100.    Further, the costs of such litigation would have far outweighed any potential

benefit.  Had litigation been pursued, ESL would have vigorously defend itself over the long

term.  ESL and Lampert will never agree that there was anything improper about their good-faith

effort to help Sears succeed.  Litigating such claims would be neither simple nor fast, and the

professional fees associated with such litigation would not benefit the creditors or other

stakeholders.

101.    Although ESL has powerful factual and legal defenses that would ultimately have

prevailed, it chose to settle to avoid protracted, expensive litigation and to remove an obstacle

from the Proposed Sale.  Settlement of the Released Estate Claims will "further parties' interests

in expediting the administration of the bankruptcy estate." In re NII Holdings, Inc., 536 B.R. 61,

98 (Bankr. S.D.N.Y. 2015) (Chapman, J.) (citation omitted).

102.    *Second*, under the terms of the Proposed Sale, all creditors receive a greater

recovery, and most, if not all, administrative claims would be covered, such that if there is any

shortfall, it would be significantly less than the shortfall shown under the Debtors' liquidation

analysis, assuming that the payment waterfall complies with the priorities required by the law.

Weaver Decl., Ex. 10 at 3 (Project Transform—Creditor Recovery Side by Side Analysis (Jan.

14, 2019)).  Specifically, the creditors under the DIP ABL, the FILO, and Citi LC Facility would

receive a 100% recovery, while the Junior DIP would roll-over on a consensual basis avoiding

the need for a cash pay-down.  Id.  The total distributed value to creditors under the ESL Bid

would be $4 billion, $406 million more than the creditors receive under the Debtors' liquidation

analysis.  Id.  The amount of remaining unsecured claims without recovery would be $4.968

billion, $896 million less than under the Debtors' liquidation analysis.  In total, the ESL Bid

would result in approximately $1.3 billion in more value to the estates and creditors than the liquidation option.  Id.

103.    *Third*, the settlement was negotiated by competent counsel with years of experience.

104.    *Fourth*, the Credit Bid Release is narrowly drawn to facilitate ESL's credit bid and, by extension, the Proposed Sale.  It does not broadly release any and all claims the Debtors could seek to bring against ESL.  Instead, the Credit Bid Release merely provides that ESL's claims under certain agreements are allowed, and the Debtors will not seek to disallow or otherwise challenge them.  See supra.  Moreover, as described above, numerous potential claims are expressly carved out of the Credit Bid Release, among other significant limitations.  Id.

105.    *Fifth*, the settlement was the result of arm's length bargaining, arising after the production of hundreds of thousands of pages of documents, as well as the testimony of ESL's and Debtors' financial advisors, Debtors' CFO, and ESL's two principal officers.  ESL also presented its arguments, with factual and legal support, to Subcommittee's independent counsel, at the beginning of the case and again over the course of late December and early January.  Those presentations led to numerous meetings and negotiations, which led to the negotiated Credit Bid Release.

106.    Here, after extensive investigation, and aided by advice of experienced financial advisors and counsel, Debtors have determined that releasing the Released Estate Claims for valuable consideration is in the best interests of the estates.  See, e.g., Carr Dep. 29:20-30 (explaining that Subcommittee received advice from Evercore, its independent financial advisor, as to "whether the value received was sufficient to merit the release of the claims"); Transier Dep. 123:13-124:8 (stressing that negotiations over releases resulted in key changes which led

the Subcommittee to recommend ESL's bid).  There is more than sufficient reason for the Court

to agree.

B.     ESL's Allowed Claims Permit It to Credit Bid, And The UCC's Pending Motion For
       Standing And Its Objection Do Not Prevent It

107.    Section 363(k) permits a party to credit bid for property secured by a lien,

offsetting their claims against the purchase price of that property.  In effect, 363(k) operates to

"ensure[] that, if the bidding at the sale is less than the amount of the claim the collateral secures,

the secured creditor can . . . bid up the price to as high as the amount of its claim."  In re

Aéropostale, 555 B.R. at 414 (citation omitted).  A court may deny a creditor's right to credit

bid, but it may only do so for cause.  See id. at 414-15.  Denial of the right to credit bid is "the

extraordinary exception and not the norm."  Id.  (citing In re RML Dev., Inc., 528 B.R. 150, 156

(Bankr. W.D. Tenn. 2014)).  In this case, the Bidding Procedures permit a person or entity that

holds "a perfected security interest in Assets" to submit a credit bid "to the extent permitted by

applicable law and the documentation governing the Debtors' prepetition credit facilities."

Order Approving Global Bidding Procedures and Granting Related Relief ("Global Bidding

Procedures Order"), Ex. 1, Global Bidding Procedures at 12, Dkt. No. 816.

108.    So long as a proof of claim comports with the requirements of Bankruptcy Rule

3001(f), both the claim's validity and its amount are prima facie valid.  In re Hemingway

Transp., Inc., 993 F.2d 915, 925 (1st Cir. 1993).  Objectors to a presumptively valid claim must

present "substantial evidence" to overcome the presumption.  4 Collier on Bankruptcy ¶ 502.02

n.38 (citing In re Hemingway, 993 F.2d 915 (1st Cir. 1993) (a claim's presumptive validity is not

altered unless an objection is supported by substantial evidence)).  "If the objector does not

introduce evidence as to the invalidity of the claim or the excessiveness of its amount, the

claimant need offer no further proof of the merits of the claim." In re Vivaro Corp., 541 B.R.

144, 153-54 (Bankr. S.D.N.Y. Nov. 13, 2015) (Glenn, J.).

109.    The UCC has not offered *any* evidence that the amount of ESL's credit bid is

excessive.  And the UCC has not come anywhere near offering substantial evidence of the

invalidity of ESL's claims.  The UCC has done nothing beyond asserting that ESL's claims are

invalid because they may be subject to recharacterization, equitable subordination, or

disallowance.  As described supra, these assertions are weakly supported, and substantial

evidence provides ESL with powerful defenses to those claims.  In any event, these claims can

be settled by the Debtors and approved by the Court in accordance with the business judgment

standard.

110.    Furthermore, the cases cited by the UCC in support of its argument that it has

provided "cause" for this court to deny ESL its right to credit bid by attacking ESL's claims are

inapposite.  UCC Obj. ¶ 140.  The UCC cites to bankruptcy cases—notably, none in the Second

Circuit—where a creditor's right to credit bid was denied because of conditions not present

here.  In one case, the bidding procedures forbade pre-petition secured creditors from credit

bidding.  In re CS Mining, LLC, 574 B.R. 259, 285 (Bankr. D. Utah 2017).  Here, the Court has

expressly allowed credit bidding.  Bidding Procedures § 6(b)(4)(a).  In re Fisker is likewise of no

avail, as the court capped a credit bid at the value of the collateral securing of the creditor's

secured claim because, unlike here, the *debtors* agreed that the creditor's "claim is partially

secured, partially unsecured and of uncertain status for the remainder." In re Fisker Auto.

Holdings, Inc., 510 B.R. 55, 61 (Bankr. D. Del. 2014) (Gross, J.).  Similarly, the In re RML,

court capped the creditor's right to credit bid on the basis of the *debtor's* objection to a portion of

the creditor's claim, 528 B.R. 150, 156 (Bankr. W.D. Tenn. 2014), and the In re Daufuskie

Island Props, LLC, court did not allow the creditor to credit bid because the *trustee* disputed the creditor's claim. 441 B.R. 60, 63 (Bankr. D.S.C. 2010). Finally, the UCC cites In re Aéropostale, where the court allowed credit bidding, for the unremarkable proposition that credit bidding is not absolute, but it fails to note the court's holding on the same page that "modification or denial of credit bid rights should be the extraordinary exception and not the norm." 555 B.R. at 415.

C.     There Is No Basis To Disallow Or Subordinate Portions Of ESL's Claims

111.    Arguing in the alternative, the UCC suggests that if the Court rejects its other arguments and permits ESL to credit bid, it should do so only with respect to a portion of ESL's claim and subordinate or disallow the remaining balance. UCC Obj. ¶ 178-79. This argument also fails. The Credit Bid Release was a heavily negotiated provision of a larger agreement that represents a holistic resolution of issues surrounding ESL's ability to credit bid. An essential element of this bargain, as embodied in the APA, is the allowance of the ESL claims in the amounts set forth on Exhibit G to the APA. The UCC's request to unilaterally reduce the amount of those allowed claims would deprive ESL of the benefits of its bargain and ignore the reasonable exercise of the Restructuring Committee's and the Subcommittee's business judgment in determining to allow the ESL claims as part of the overall transaction.

D.     ESL Has Allocated Its Credit Bid to the Underlying Collateral

112.    In its final argument, the UCC claims that ESL has not allocated its credit bid to the assets securing its loans and asks that it be required to do so as part of any credit bid. UCC Obj. ¶¶ 181-85; see also PBGC Obj. 14. Section 363(k) provides that the sale of property under Section 363(b) "that is subject to a lien that secures an allowed claim" may "offset such claim against the purchase price of such property." That is, a party may credit bid on such property. Even though under Global Bidding Procedures Order, 10-11, 23, the Debtors may waive the

allocation provision, ESL has in fact allocated its credit bid. The presentation made to the

Debtors on December 30, 2018, expressly provides that the total credit bid would be

approximately $1.3 billion, which is allocated to the purchase of various groups of collateral

under each of those facilities. Weaver Decl., Ex. 11 (December 30, 2018, ESL Bid

Presentation). Thus, the Objectors already have all that they are entitled to—ESL has allocated

its credit bid to the underlying collateral.

| Facility | Credit Bid Amount |
|---|---|
| Real Estate Loan 2020 | $544,000,000 |
| IP/GL | $231,000,000 |
| FILO | $125,000,000 |
| Second Lien | $433,450,000 |

113.    The UCC has also misrepresented Kamlani's statements. UCC Obj. ¶ 101 (citing

Kamlani Dep. 80:11-18, Jan. 23, 2019 (stating that it "would be accurate" that ESL has not

"attempt[ed] to allocate in any way other non-credit bid consideration that is being used to

acquire the assets for which it is also credit bidding[.]")). Kamlani in fact explained that "by

virtue of credit bidding, we know we're credit bidding for inventory because you can only credit

bid second lien debt for inventory. We know what we're credit bidding for as relates to real

estate." Kamlani Dep. 54:4-9.

114.    Furthermore, to the extent the UCC claims the Proposed Sale does not provide

consideration for the encumbered assets, that argument is based on a mischaracterization of

events. UCC Obj. ¶ 101-102. First, with respect to the UCC's reliance on the statement of the

Subcommittee's counsel at the Auction, the UCC cites to a statement made prior to the final

offer being announced. UCC Obj. ¶ 102 (citing Auction Tr. 67:10-16, Jan. 15, 2019 ("The

analysis of the Subcommittee and its financial advisors is that while ESL is, in fact, assuming

liabilities, the unencumbered assets that they are receiving in exchange have a value that is

greater than the liabilities that ESL is assuming.")).  In fact, just a few pages later in the

transcript, made after hours of additional negotiations, ESL announced its final bid, including

material improvements for the Debtors and an increase in consideration by over $156 million.[34]

Moreover, to purchase unencumbered assets, the Buyer assumed more than $1.7 billion in

liabilities.  No other bidder offered such consideration for those assets.

## III.    The UCC Should Not Be Allowed To Run Out The Clock On The Proposed Sale Should Its Objection Be Overruled

115.    In the interest of finality, section 363(m) "maximizes the purchase price of assets"

by affirming the validity of a sale so that it is not "laden with the risk of risk of endless litigation

as to who has rights to estate property."  In re Gucci, 126 F.3d 380, 387 (2d Cir. 1997) (citations

omitted).  Section 363(m) accomplishes this by providing that the validity of a sale to a "good

faith" purchaser cannot be challenged on appeal.[35]  See Section 363(m).  For similar reasons,

courts waive Bankruptcy Rule 6004(h), which by default stays certain sales for 14 days, when an

"immediate closing is required to remedy the Debtors' precarious financial and business

position."  In re Ormet Corp., No. 13-10334 (MFW), 2014 WL 3542133, at *4 (Bankr. D. Del.

July 17, 2014) (citation omitted).

116.    ESL is a good faith purchaser entitled to the protections of section 363(m) and, as

the UCC is well aware, the Debtors are in an extremely precarious financial position.  Here, the

---

[34]    Specifically, in response to the Subcommittee's concerns, ESL provided that: (1) the Buyer would assume the entirety of the $350 million of the junior DIP, which was an increase of $120 million dollars; (2) the Buyer agreed to pay $19 million in transfer taxes; (3) the Buyer would assume $4 million in mechanics liens; (4) the Buyer agreed to purchase the cash and the store registers, which is approximately $17 million; (5) Debtors would retain $13 million in hurricane insurance proceeds; (6) the Buyer agreed to acquire the proceeds from the sale of SHIP to Service.com, and in the event such sale is not closed on January 22, the Buyer would acquire SHIP; and (7) ESL would pay $35 million and other good and valuable consideration in consideration for the Credit Bid Release.

[35]    Importantly, ESL's designation as a good faith purchaser "do[es] not go to whether or not a sale should be approved," and only "provide(s) safe harbors . . . on appeal."  In re Motors Liquidation Co., 529 B.R. 510, 567 n. 1 (Bankr. S.D.N.Y. 2015) (Gerber, J.).

APA must close promptly (likely February 8, 2018) to avoid the incurrence of additional administrative expenses and other risks to closing.  It is beyond any real dispute that without an on-time closing, the Proposed Sale will collapse and Sears' last chance for a going concern transaction will die with it.

A.  ESL is a Good Faith Purchaser

117.  "A good-faith purchaser is one who purchases the assets for value, in good faith and without notice of adverse claims.  A purchaser's good faith is shown by the integrity of his conduct during the course of the sale proceedings.  The absence of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  In re GSC, Inc., 453 B.R. 132, 180 (Bankr. S.D.N.Y. 2011) (Gonzalez, J.) (internal citations omitted).  As the Second Circuit has explained, "the good-faith analysis is focused on the purchaser's conduct in the course of the bankruptcy proceedings…[and] whether [the purchaser's] conduct was intended to control the sale price or take unfair advantage of prospective bidders."  In re Gucci, 126 F.3d at 390-91.

118.  As described supra, ESL's conduct throughout the sale process has been above-board, and the improvements that ESL made to its bid over the course of the negotiations demonstrate that those negotiations were truly arm's length and that ESL has always been interested in finding the best, value-maximizing outcome, and always committed to a fair process that would protect the interests of all parties.  "[T]he fact that the auction process improved the benefit to the bankruptcy estate further suggests that [ESL] was a good faith purchaser."  In re Magnesium Corp. of Am., 571 B.R. 534, 541 (S.D.N.Y. 2017) (citing In re Colony Hill, 111 F.3d 269, 276 (2d Cir. 1997) (noting that a good faith purchaser is someone who pays "value" for the auctioned property)).

58

119.    Apart from making a long series of conclusory assertions, the UCC fails to identify any conduct by ESL that suggests anything to the contrary, and does not even pretend to explain how exactly, during the course of the sale and auction, ESL committed fraud, colluded with any other party, or in any way took advantage of other bidders.  As for its half-hearted suggestion that, because ESL is an insider of Sears, its bad faith should be presumed, UCC Obj. ¶ 135-136, this finds no support in the law (and the UCC cites none).  Furthermore, the UCC's allegations presume that the Restructuring Committee, the Subcommittee, and their advisors (as well as the Debtors and their advisors) stood by or were complicit in fraudulent activity, and yet again, it cites zero evidence to support that proposition.

120.    Thus, the Court should find that ESL is a good faith purchaser and entitled to the protections of Section 363(m).

B.    The Requirements For Waiving Bankruptcy Rule 6004(h) Are Met

121.    The Amended Proposed Sale Order should be effective upon entry.  Under Bankruptcy Rule 6004(h), the Court is granted the equitable power to waive the automatic 14-day stay period.  See Fed. R. Bankr. P. 6004(h) ("An order… is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise.").  When an objecting party request a stay pending appeal, the Court must look at whether the "need to proceed sooner outweighs the objecting party's interest," particularly if an "immediate closing is required to remedy the Debtors' precarious financial and business position."  10 Collier on Bankruptcy ¶ 6004.11 (citing In re Ormet Corp., No. 13-10334 (MFW), 2014 WL 3542133, at *4 (Bankr. D. Del. July 17, 2014)).  Under Rule 6004(h), the Court should consider the time frame available to maintain the company's viability.  In re Los Angeles Dodgers LLC, 468 B.R. 652, 662 (Bankr. D. Del. 2011) (noting that because the Debtors were "operating within a small time frame," Rule 6004(h) could be waived).  Waiver has also been deemed appropriate where "immediate closing

59

is required to remedy the Debtors' precarious financial and business position," In re Decora Indus., Inc., 00–4459 JJF, 2002 WL 32332749 (D. Del. May 20, 2002), as is the case here.  And, as Judge Gross has noted, business exigency is inherent to retail operations and must be taken into account when debtors are retailers.  In re Boscov's, Inc., No. 08-11637 (KG), 2008 WL 4975882, at *2 (Bankr. D. Del. Nov. 21, 2008) (citing In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (Gerber, J.)) ("The Court finds that such a business exigency exists … Debtors' business, a retail chain…[demonstrates] there is sufficient cause to require that the Sale close in time…").

122.    The Debtors have demonstrated a clear business exigency for an immediate approval of the sale to satisfy relief from the 14-day confines of Rule 6004(h).  Amended Proposed Sale Order ¶ 41.  As the UCC itself repeatedly states, the Debtors are burning through millions of dollars per day.  UCC Motion for Standing Exhibit C – January 11, 2019 Letter, 1765-3 (noting "the staggering daily cash burn . . . in excess of $6 million a day.").  Indeed, the UCC is contributing to and exacerbating the very administrative shortfall they profess to care about.  The UCC's assertion that Debtors have not made a proper showing of a business exigency is laughable.  UCC Obj. ¶ 255.[36]

## IV.    The PBGC's Objections Are Without Merit

123.    Misreading the APA, the PBGC wrongly concludes that the Proposed Sale would result in a "free and clear" sale of certain assets (the KCD notes) from Sears Re to ESL.  Based

---

[36]    The UCC's request for a stay is ironic given its own contention that the Proposed Sale is subject to an unacceptable level of execution risk.  UCC Obj. ¶ 74.  That concern is revealed to be entirely bogus given the UCC's obvious desire to drag out any appeal until the Proposed Sale collapses.

on this misunderstanding, the PBGC argues that the Proposed Sale should not be approved.[37]  Its

objection is groundless and should be rejected.

124.    ESL does not dispute that section 363's "free and clear" sale provision only

applies to property of the Debtors' estates.  11 U.S.C. §§ 363(b)(1), (f).  Sears Re, the entity that

owns the KCD Notes, is a non-debtor whose property does not form part of the debtor's estate;

there is no question that ESL therefore cannot purchase the KCD Notes "free and clear" in a

section 363 sale.  Accordingly, the Amended Proposed Sale Order is not intended to cover the

purchase of the KCD Notes—it only applies to property that is part of the Debtors' estate.

Amended Proposed Sale Order, Dkt. No. 1730, Ex. B, ¶ F.  Furthermore, the Amended Proposed

Sale Order explicitly only provides for "free and clear" sales of property in the Debtors' estates.

Id. ¶¶ P, S.  The APA also provides that Sears Re will be the seller of the KCD Notes.  APA §

2.1(r).  In short, the express terms of the APA and of the Amended Proposed Sale Order

demonstrate that ESL is not attempting to make a "free and clear" purchase of the KCD Notes.

## V.    The Service.com Objection Misunderstands The APA And Should Be Overruled

125.    Service.com attempts to smear ESL by implying that ESL improperly attempted

to interfere with Service.com's purchase of SHIP.  Any such suggestion is entirely false.  Only

after this inability became clear to the Debtors did any discussion of including a construct

regarding SHIP in the APA occur.  Kunal Decl. ¶ 24.  Service.com's inability to secure financing

is not the fault of ESL.

126.    Moreover, the structure of the APA reflects that ESL is indifferent as to the

outcome of Service.com's unconsummated SHIP purchase.  See APA § 2.1 (z) (ESL agrees to

---

[37]        The PBGC also argues that ESL has failed to properly allocate its bid; this argument lacks merit for all of
the reasons discussed in Section IV supra.

purchase either SHIP, if the SHIP sale has not occurred prior to the Closing, or the proceeds of a

sale, if SHIP is sold before Closing); APA § 2.3 (m) (ESL assumes all SHIP Purchase

Agreement Liabilities if SHIP is not sold prior to Closing); APA 8.7 (Debtors shall not amend or

modify the SHIP Purchase Agreement or waive any rights thereunder without ESL's consent).

## VI.    Any Objections to the Amounts of Cure Costs or Adequate Assurance of Future Performance Should be Overruled

### A.    All Cure Cost Objections Have Been Adjourned

127.    All cure cost objections listed on Exhibit B to the Amended Proposed Sale Order

filed by the Debtors contemporaneously with this filing, have been adjourned, and will be

addressed, as needed, at a subsequent court hearing following the Sale Hearing. Establishing a

subsequent hearing date to address cure objections is consistent with paragraph 32 of the Global

Bidding Procedures Order, which permits adjourned cure objections to be resolved after the

closing of the Sale Transaction in the Debtors' discretion. See Global Bidding Procedures 16-17.

The Debtors have exercised such discretion here. The Buyer has agreed to post collateral in an

amount sufficient to address any cure disputes with respect to any executory contracts or leases

contemplated to be assumed and assigned as of the closing date of the sale to Buyer, and

therefore no contract or lease counterparties are prejudiced by the adjournment. See id;

Proposed Sale Order ¶29. Because the cure cost objections listed on Exhibit B to the Amended

Proposed Sale Order have been adjourned, those objections should not hinder or delay the

approval of the proposed sale as all parties will have an opportunity to be heard at a later time.

### B.    Landlord and Contract Counterparty Objections to Adequate Assurance Should Be Overruled

128.    In addition to the UCC's objections, certain landlords and contract counterparties

have submitted adequate assurance objections making similar arguments to those made by the

UCC. For all the reasons stated above, any objections based on adequate assurance brought by

the UCC, the landlords and other contract counterparties on the basis of adequate assurance of

future performance information should also be overruled.  Other landlords and contract

counterparties have submitted adequate assurance objections that present different and additional

arguments than those raised by the Committee, some of which have already been resolved.[38]

129.    As is evident from Amended Proposed Sale Order, the Initial Assigned

Agreements (as defined in the Asset Purchase Agreement) reflects only a fraction of the Potential

Transferred Agreements (as defined in the Asset Purchase Agreement) subject to assumption and

assignment.  See Exhibit B; compare Initial Notice of Cure Costs, Schedule A (listing 7775

contracts) and Schedule B (listing 359 leases), ECF 1731; Supplemental Notice of Cure Cost,

Exhibit A-1 (listing 671 additional executory contracts) and Exhibit B-1 (listing 467 additional

leases), ECF 1774.  Any executory contracts or unexpired leases that are subsequently assumed

and assigned to the Buyer will be treated as Designatable Leases or Additional Contracts.  See

APA, § 2.6, 2.9 and 2.7.  No decisions with regard to assumption and assignment of the

Designatable Leases or the Additional Contracts have yet been made, and, now is not the

appropriate time to decide on any objection to the assumption or assignment of a Designatable

---

[38]    Various objections have been resolved through the addition of language in the Amended Proposed Sale Order.  For example, certain landlords and contract counterparties have asserted that easements and covenants that run with the land or are not executory must not be extinguished by the sale.  These objections have been addressed by including language in the Amended Proposed Sale Order ¶ 59 permitting certain easements and covenants that run with the land to survive the sale with respect to owned properties.  The objections of various landlords that pertain to additional procedures with respect to cure costs have been addressed in the Amended Proposed Sale Order and resolved.  See Amended Proposed Sale Order ¶ 3.  In addition, the Debtors have resolved the objections of parties with respect to recoupment and set off rights through additions to the Amended Proposed Sale Order.  See Amended Proposed Sale Order ¶ 63-64.  Further resolutions are discussed in Debtors' reply filed contemporaneously herewith.

Certain landlords and contract counterparties assert that a particular contract or lease, or a group of contract or leases, must be assumed and assigned in their entirety or request clarification that the debtors intend to assume and assign a contract, or group of contracts, in their entirety including all applicable amendments.  To the extent a contract is found by the Court to be a single, integrated agreement, it would be assumed as a whole (or rejected as a whole), but the Buyer reserves its rights to contest the unitary nature of any contract or lease.  These issues can be addressed if and when such agreement is actually noticed for assumption and or assignment.

Lease or Additional Contract.  Addressing such issues at this time would force the parties and the

Court to expend effort and money addressing issues that may never actually arise because it is

possible that the Buyer will not designate many of these agreements for assumption at all.

Furthermore, as discussed above, the assumption and assignment procedures permit any

counterparty to a Designatable Lease or an Additional Contract to object on the basis of adequate

assurance after receipt of a subsequent notice indicating that such Designatable Lease or

Additional Contract has been selected for assignment to a third party.  Therefore, these issues

should not hinder approval of the sale at the sale hearing.

        i.     *Landlords Have Not Satisfied the Burden for 365(b)(3) to Apply, and Any*
               *Issue of Adequate Assurance for Such Leases is Not Ripe*

    130.    Certain landlords seek to invoke Section 365(b)(3) of the Bankruptcy Code,

which establishes a more rigorous adequate assurance standard for shopping center leases than

ordinarily applies under Section 365(f).  The landlord bears the burden of demonstrating that a

particular lease is a shopping center lease for purposes of Section 363(b)(3).  Notice of

Withdrawal of Limited Objection, In re Great Atl. & Pac. Tea Co., Inc., No. 10-24549 (Bankr.

S.D.N.Y. Jan. 14, 2016) Dkt. No. 2283 at 98 (Drain, J.) (citing In re Ames Stores, Inc., 121 B.R.

160, 163 (Bankr. S.D.N.Y. 1990) (Buschman, III, J.)).  The landlords have not met that burden

here and, in fact, many of them entirely failed to discuss any of the relevant factors to this

analysis.[39]  Even those that mention the necessary factors fail to engage with them and, instead,

---

[39]      To determine whether a property is a shopping center, courts look to the following non-exhaustive list of fourteen factors:  (1) whether there is a combination of leases; (2) whether all leases are held by a single landlord; (3) whether all tenants engaged in the commercial retail distribution of goods; (4) the presence of a common parking area; (5) the purposeful development of the premises as a shopping center; (6) the existence of a master lease; (7) the existence of fixed hours during which all stores are open; (8) the existence of joint advertising; (9) contractual interdependence of the tenants as evidenced by restrictive use provisions in their leases; (10) the existence of percentage rent provisions in the leases; (11) the right of the tenants to terminate their leases if the anchor tenant terminates its lease; (12) joint participation by the tenants in trash removal and other maintenance; (13) the existence of a tenant mix; and (14) the contiguity of the stores.  In re Ames Dept. Stores, Inc., 348 B.R. 91, 95 (Bankr. S.D.N.Y. 1996) (Gerber, J.).  The most important of these factors are: (1) whether there is a combination of leases

these landlords simply make blanket statements regarding the status of these leases as shopping center leases.[40]

131.    However, even if any of these leases were shopping center leases, the Buyer has and any applicable third-party will demonstrate sufficient adequate assurance to satisfy 365(b)(3)(A)-(D).  Regardless, any decision on adequate assurance should not be decided at this time for the reasons discussed above.[41]

      ii.    *The Sale Does Not Require Counterparties to Provide Services to Multiple Parties*

132.    Certain contract counterparties have objected to the sale to the extent it requires the counterparty to provide services to the Debtors and the Buyer simultaneously or otherwise provides benefits to the Buyer before actual assumption of the contract.  The Asset Purchase Agreement does not contemplate any overlap in the rights of the Debtors' rights and the Buyer's rights under the contract and therefore do not seek to require any such action and such objections should be overruled.[42]

---

which are (2) all held by a single landlord and (3) leased to a commercial retail distributor of goods with (4) the presence of a common parking area.  See Id. (citing In re Joshua Slocum, 922 F.2d 1081, 1087-88 (3d Cir. 1990)).

[40]    While the landlords have also made blanket assertions that shopping center leases require strict compliance with use clauses, radius and tenant mix provisions included in leases, this is not true.  Courts typically engage in a more detailed case-by-case factual analysis than suggested by the objectors.  See In re Rickel Home Centers, 209 F. 2d 291 (3d Cir. 2000) (approving assumption and assignment of a lease in a shopping center despite use and radius provisions).  Again, the landlords have failed to explain why such provisions are enforceable in the context of their leases.

[41]    Whereas these objections are based on Designatable Leases, the claims are still speculative and should not be decided at this time.  Notably, the extent that any of the use, radius and tenant mix provisions are enforceable, the Amended Proposed Sale Order provides that the Buyer will abide by such provisions of the lease, subject to the Bankruptcy Code's ability to override anti-assignment provisions pursuant to section 365(f) of the Bankruptcy Code and applicable law.  See Amended Proposed Sale Order ¶ 59.

[42]    See Asset Purchase Agreement, Section 2.6 ("For the avoidance of doubt, the sale, transfer, assignment and conveyance of the Designation Rights provided for herein on the Closing Date shall not effectuate a sale, transfer, assignment or conveyance of any Designatable Lease to the Buyer or any other Assignee, which shall only be effectuated on a Designation Assignment Date.").

      iii.     *The Court May Order that the Buyer Not be Required to Pay Any Additional Deposit Pursuant to 365(l) or Otherwise*

133.    Certain landlords have objected to language in the Sale Order that states that the Buyer is not required to pay additional deposits, including pursuant to section 365(l) but these landlords cite no case for this argument.  In fact, this Court has granted this type of the relief and therefore, these assertions are without merit.  See Order (I) Approving the Purchase Agreement Amount Sellers and Buyer (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith and (IV) Granting Related Relief, In re The Great Atl. & Pac. Tea Co., Inc., No 15-23007, (Bankr. S.D.N.Y. Dkt. No. 1055 at ¶ 36 (Drain, J.) (granting buyer relief from section 365(l)).

## CONCLUSION

For the reasons stated above, ESL requests that the Court overrule the Objections and approve the Sale Motion.  ESL reserves its right to raise additional arguments at hearing on this objection and all aspects of the Proposed Sale.

Dated:  February 1, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley
Lewis J. Liman
Sean A. O'Neal
Jennifer Kennedy Park
Rahul Mukhi
Andrew Weaver
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for ESL*