KELLEY DRYE & WARREN LLP
Robert L. LeHane
Maeghan J. McLoughlin
Randall L. Morrison, Jr.
101 Park Avenue
New York, New York 10178
Tel.: (212) 808-7800
Fax: (212) 808-7897
Email: rlehane@kelleydrye.com
        mmcloughlin@kelleydrye.com
        rmorrison@kelleydrye.com

*Counsel for Trustees of the Estate of Bernice*
*Pauahi Bishop, d/b/a Kamehameha Schools*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, INC., *et al.*,[1] | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**NOTICE OF HEARING ON MOTION OF TRUSTEES OF THE ESTATE OF BERNICE
PAUAHI BISHOP, D/B/A KAMEHAMEHA SCHOOLS, LLC TO COMPEL PAYMENT
OF POST-PETITION RENT AND RELATED LEASE OBLIGATIONS PURSUANT
TO 11 U.S.C. §§ 105(a), 363(e), 365(d)(3) AND 503(b)(1)(A) AND TO PAY ALL
SUBSEQUENT AMOUNTS OWED ON A TIMELY BASIS**

PLEASE TAKE NOTICE that a hearing on the motion of The Estate of Bernice
Pauahi Bishop, d/b/a Kamehameha Schools, LLC ("the Landlord") to *Compel Payment of Post-
Petition Rent and Related Lease Obligations Pursuant to 11 U.S.C. §§ 105(a), 363(e), 365(d)(3)
and 503(b)(1)(A)* (the "Motion"), will be held before the Honorable Robert D. Drain, United States
Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York,
Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "Bankruptcy
Court") on **March 21, 2019 at 10:00 a.m.** (Eastern Time) (the "Hearing"), or as soon thereafter
as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections
("Objections") to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy
Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be
filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing
system, electronically in accordance with General Order M–399 (which can be found at
http://www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text
searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in
accordance with the customary practices of the Bankruptcy Court and General Order M–399, to
the extent applicable, and served in accordance with General Order M-399, so as to be filed and
received upon the undersigned counsel no later than **March 14, 2019 at 4:00 p.m.** (Eastern Time)
(the "Objection Deadline").

2

4810-6588-8646v.7

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served, Landlord may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

PLEASE TAKE FURTHER NOTICE that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:   February 5, 2019
         New York, New York

KELLEY DRYE & WARREN LLP

By: /s/ *Robert L. LeHane*
Robert L. LeHane
Maeghan J. McLoughlin
Randall L. Morrison, Jr.
101 Park Avenue
New York, New York 10178
Tel.: (212) 808-7800
Fax: (212) 808-7897

*Counsel for Trustees of the Estate of Bernice*
*Pauahi Bishop, d/b/a Kamehameha Schools*

3

## <u>CERTIFICATE OF SERVICE</u>

On the 5th day of February, 2019, true and correct copies of the Notice of Hearing and Motion of *The Estate of Bernice Pauahi Bishop, d/b/a Kamehameha Schools, LLC to Compel Payment of Post-Petition Rent and Related Lease Obligations Pursuant to 11 U.S.C. §§ 105(a), 363(e), 365(d)(3) and 503(b)(1)(A)* were served via this Court's CM/ECF electronic filing system upon those parties requesting service and upon those parties listed below via United States first class mail:

Chambers of the Honorable Judge Robert D. Drain
United States Bankruptcy Court for the Southern District of New York
300 Quarropas Street, Room 248
White Plains, New York 10601

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates IL 60179
Attn: Stephen Sitley Esq.
     Luke J. Valentino, Esq.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Ray C. Schrock, Esq.
     Jacqueline Marcus, Esq.
     Garret A. Fail, Esq.
     Sunny Singh, Esq.

Office of the United States Trustee
201 Varick Street, Suite 1006
New York, NY 10014
Attn: Paul Schwartzberg, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036
Attn: Paul D. Leake, Esq.
     Shana A. Elberg, Esq.
     George R. Howard, Esq.

4810-6588-8646v.7

Davis Polk & Wardell LLP
450 Lexington Avenue
New York, NY, 10017
Attn: Marshall S. Huebner, Esq.
  Eli J. Vonnegut, Esq

Cleary, Gottlieb
One Liberty Plaza
New York, NY, 10006
Attn: Sean A. O'Neal, Esq.
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
Attn: Edward M. Fox, Esq.

Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10015
Attn: James Gadsden, Esq.

Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
Attn: Brian A. Raynor, Esq.

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
 New York, NY 10036
Attn: Philip C. Dublin, Esq.
  Ira Dizengoff, Esq.
  Sara Lynne Brauner, Esq

        */s/ Robert L. LeHane*
        Robert L. LeHane

4810-6588-8646v.7

KELLEY DRYE & WARREN LLP
Robert L. LeHane
Maeghan J. McLoughlin
Randall L. Morrison, Jr.
101 Park Avenue
New York, New York 10178
Tel.: (212) 808-7800
Fax: (212) 808-7897
Email: rlehane@kelleydrye.com
        mmcloughlin@kelleydrye.com
        rmorrison@kelleydrye.com

*Counsel for Trustees of the Estate of Bernice*
*Pauahi Bishop, d/b/a Kamehameha Schools*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, INC., *et al.*,[1] | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**MOTION OF TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP,
D/B/A KAMEHAMEHA SCHOOLS, LLC TO COMPEL PAYMENT OF
POST-PETITION RENT AND RELATED LEASE OBLIGATIONS PURSUANT
TO 11 U.S.C. §§ 105(a), 363(e), 365(d)(3) AND 503(b)(1)(A) AND TO PAY ALL
SUBSEQUENT AMOUNTS OWED ON A TIMELY BASIS**

The Trustees of the Estate of Bernice Pauahi Bishop, d/b/a Kamehameha Schools (the "Landlord"), through their undersigned counsel, hereby submit this *Motion to Compel Payment of Post-Petition Rent and Related Lease Obligations Pursuant to 11 U.S.C. §§ 105(a), 363(e), 365(d)(3) and 503(b)(1)(A)* (the "Motion"). In support of the Motion, the Landlord respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      Sears Roebuck and Co. (the "Debtor") is the tenant under a sublease for premises located in a shopping center[2] in Kaneohe, Hawaii. The Debtor has failed to pay the full rent due under the sublease for the current five-year term of the lease that commenced on July 1, 2018. The current base minimum rent under the sublease is $271,387.50 per month. The Debtor is required to pay other charges under the lease including, but not limited to, common area maintenance charges which are currently $17,740.85 per month. The Debtor, however, has only paid monthly rent of $92,747.79 since July 1, 2018, leaving approximately $1,227,423.63 in unpaid post-petition rent. The Landlord seeks immediate payment of the unpaid post-petition arrears and timely performance of the Debtors' obligations under the sublease going forward pursuant to sections 363(e) and 365(d)(3) of the Bankruptcy Code.

---

[2]      The leased retail space is located in a "shopping center" as that term is used in section 365(b)(3) of the Bankruptcy Code. *See In re Joshua Slocum*, Ltd., 922 F.2d 1081, 1086-87 (3d Cir. 1990).

4819-2131-3158v.10

## BACKGROUND

### The Sublease

2.     The Debtor leases from the Landlord a portion of a shopping center site located in Kaneohe, Hawaii (the "Leased Premises") pursuant to a written sublease, as amended (the "Sublease").  *See* Declaration of Gary Evora ("Evora Declaration") Ex. A.  The Sublease requires the Debtor to pay, among other charges, minimum monthly rent, amounts of which are subject to periodic adjustments, for its use and occupancy of the Leased Premises.

3.     The Landlord is the holder of the lessors' interest under the Sublease dated January 23, 1981, as amended by that certain unrecorded Amendment to and Extension of Lease and Agreements Regarding the REA dated May 31, 2011 (the "2011 Amendment"), *see* Evora Declaration Ex. B, and as further amended by the certain unrecorded Amendment of Lease dated August 26, 2015 (the "2015 Amendment").  *Id.* Ex. C.

4.     The Sublease had an initial term commencing on or about January 23, 1981, through June 30, 2011.

5.     Under the Sublease, the tenant of the Leased Premises "shall have the right and option to extend the term of the Sublease for six (6) consecutive extended terms" with each extension term lasting a period of five years.

6.     If the tenant chooses to exercise its right and option to extend the term of the Sublease, the minimum annual rent for each extension term is to be determined by the formula set out in Section 4.2(b) of the Sublease.

7.     Section 4.2(b) of the Sublease provides:

> For each Extension Term a minimum annual rent which is the greater of (i) One Hundred and Fifty Thousand Dollars ($150,000), or (ii) One Hundred and Fifty Thousand Dollars multiplied by the percentage of increase of (x) the annual

3

minimum rent agreed or finally determined to be payable under the Ground Lease for the year of the term thereof which coincides with the Extension Term year over and above the (y) the annual minimum rent payable under the Ground Lease during the third through twenty-eighth years thereof.

### The 2011 Amendment to the Sublease

8.      In 2011, the Debtor exercised the option to extend the term of the Sublease for the first five year extension period commencing on July 1, 2011, and ending on June 30, 2016, as contemplated in the Sublease.  The Debtor's exercise of the first option to extend the term of the Sublease was confirmed in the 2011 Amendment.  In the 2011 Amendment, the parties expressly agreed and confirmed that "if the [Subl]ease is further extended, the minimum annual rent for each succeeding Extension Term shall be set in accordance with Section 4.2(b)" of the Sublease.

9.      Pursuant to the express terms of the 2011 Amendment, the Debtor and the Landlord also agreed and acknowledged that, pursuant to Section 3.2 of the Sublease, the holder of the tenant's interest in the Sublease has the remaining option to extend the term of the Sublease for five (5) successive extension terms "of five (5) years each, on the terms set forth in the Sublease."

10.     Pursuant to the express terms of the 2011 Amendment, the Debtor and the Landlord further agreed that all other terms and conditions of the Sublease, except as modified in the 2011 Amendment, "shall remain unchanged and in full force and effect."

### The Debtor Exercises its Right to the Second Extension Term

11.     On or about August 26, 2015, the Debtor and the Landlord agreed to further amend the Sublease pursuant to the 2015 Amendment.

4

12.     In the 2015 Amendment, the Debtor and the Landlord agreed to extend the first extension term of the Sublease for an additional two years from July 1, 2016, through and including June 30, 2018.

13.     Pursuant to the express terms of the 2015 Amendment, the Debtor and the Landlord further agreed, among other matters, that all other terms and conditions of the Sublease, except as modified in the 2015 Amendment, "shall remain unchanged and in full force and effect."

14.     On or about June 20, 2017, the Debtor notified the Landlord of its election to extend the Sublease for an additional five-year term, commencing July 1, 2018, through and including June 30, 2023, pursuant to "terms, conditions, and rental as set forth in said Ground Sublease, as amended."  *See* Evora Declaration Ex. D.

15.     Pursuant to the formula in Section 4.2(b) of the Sublease, the minimum annual rent due to the Landlord for the Second Extension Term is $3,256,650.00, or a monthly rent in the amount of $271,387.50 from July 1, 2018, through June 30, 2023.  The Sublease also requires monthly payment of common area maintenance charges in the amount of $17,740.85 in addition to payment of water and other utility charges.

16.     The Debtor's obligations under the Sublease as amended by the 2011 Amendment and the 2015 Amendment are valid, enforceable, and binding on the Debtor.

**The Debtor Fails to Pay the Proper Monthly Rent**

17.     Despite repeated demands from the Landlord, the Debtor has failed and refused to pay the full monthly rent due during the Second Extension Term commencing on July 1, 2018.  *See id.* Ex. F.

18.     Notwithstanding the rent formula set forth in Section 4.2(b) of the Sublease and the Debtor's explicit acknowledgements and agreements in the 2011 Amendment and the 2015

4819-2131-3158v.10

Amendment, the Debtor has continued to pay only $92,747.79 per month for the months of July

2018, through and including January 2019.

19.       As a result, and as set forth in the detailed aging reports attached to the

Evora Declaration as Exhibit G, the pre-petition arrears under the Sublease total not less than

$690,552.53, and post-petition arrears under the Sublease total not less than $1,227,423.63.

20.       Prior to the Petition Date (as defined below), and on or about October 11,

2018, the Landlord commenced litigation against the Debtor in the Circuit Court of the First

Circuit, State of Hawaii seeking a judgment for the past-due rent that accrued from July 1, 2018,

through and including October 1, 2018.

21.       Since the Petition Date, the Debtor continues to use and occupy the Leased

Premises.

22.       Accordingly, the Landlord requests immediate payment of its accrued but

unpaid monthly rent in the amount of $1,227,423.63 pursuant to Bankruptcy Code sections 105(a),

363(e), 365(d)(3), and 503(b)(1)(A) and timely payment of full monthly rent as required by the

Sublease going forward.

## The Chapter 11 Bankruptcy Case

23.       On October 15, 2018 (the "Petition Date"), the Debtor and certain of its

affiliates (the "Debtors") filed respective voluntary petitions for relief pursuant to chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code").  The Debtors remain in possession of

their properties and continue to manage their businesses as debtors-in-possession pursuant to

Sections 1107 and 1108 of the Bankruptcy Code.

24.       On November 19, 2018, the Debtors sought and obtained Bankruptcy Court

approval of procedures for the sale of substantially all of the Debtors' assets (the "Bidding

Procedures") in accordance with the *Order Approving Global Bidding Procedures and Granting Related Relief*.[3]

25.    In connection with the Bidding Procedures, the Debtors' largest prepetition secured lender, ESL Investments Inc. and its affiliates established Transform Holdco LLC (the "Buyer") as a vehicle to acquire substantially all of the Debtors' assets at an auction.

26.    After a two-day auction, the Buyer was ultimately declared the winning bidder on January 16, 2019, and the *Notice of Successful Bidder and Sale Hearing* was filed on January 18, 2019.[4]

27.    Between January 18, 2019 and January 23, 2019, the Debtors filed two notices[5] which set forth the proposed cure amount for each of the Debtors' leases and contracts. The Debtors' proposed cure amount for the Sublease is $70,833.00.  On January 28, 2019, the Landlord filed an objection to the Debtors' notices of cure costs along with other similarly situated parties in interest.  On February 1, 2019, the Landlord filed a supplemental objection to the Debtors' notices of cure costs asserting an updated cure amount.[6]

28.    To date, the Sublease has neither been assumed nor rejected.

**JURISDICTION**

29.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in the Motion are sections 105(a), 363(e), 365(d)(3) and 503(b)(1) of the Bankruptcy Code.

---

[3]    Docket No. 816.

[4]    Docket No. 1730.

[5]    Docket Nos. 1731 and 1774.

[6]    Docket No. 2346.

7

**BASIS FOR RELIEF**

I.    **THE LANDLORD IS ENTITLED TO THE IMMEDIATE PAYMENT OF THE ACCRUED POST-PETITION RENT PURSUANT TO § 365(d)(3) OF THE BANKRUPTCY CODE**

30.    Section 365(d)(3) of the Bankruptcy Code provides that the trustee or debtor-in-possession is to timely perform all obligations of the debtor until the nonresidential real property lease is assumed or rejected.  The relevant part of the statute reads as follows:

> The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

31.    Congress adopted § 365(d)(3) in 1984 to balance the equities between a debtor lessee's retention of a leasehold interest in nonresidential real property during the pendency of its bankruptcy case, and the captive landlord's inability to dispossess such a debtor during the § 365(d)(4) period.  *See In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209-11 (3d Cir. 2001) (holding that Congress, in adopting § 365(d)(3), intended a debtor to perform all leasehold obligations as they came due under the terms of the lease); *In re Stone Barn Manhattan LLC*, 398 B.R. 359, 362 (Bankr. S.D.N.Y. 2008); *see also* 145 Cong. Rec. S8887, 8895 (daily ed. June 29, 1984) (statement of Sen. Hatch) (explaining that § 365(d)(3) would require the trustee to "perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease").

32.    Prior to 1984, a landlord who leased real property to a debtor-in-possession had to seek payment of rent and related obligations as administrative expenses under § 503 of the Bankruptcy Code.  *See Montgomery Ward*, 268 F.3d at 210 (citation omitted).  This proved to be unsatisfactory for landlords primarily because they were expected to provide current services for

8

use and occupancy of real property without the benefit of current payment. *Id.* Further, landlords were forced to observe the formal procedures of application, notice, and hearing, and prove that the debtor's use of its property was an actual and necessary cost of preserving the debtor's estate. Even then, landlords were paid only at the conclusion of a case. *See Stone Barn Manhattan*, 398 B.R. at 361-62.

33.    In its current form, the plain language of section 365(d)(3) requires debtors to timely perform all post-petition obligations due and owing under leases, including the payment of rent and related charges. There is no need for a hearing to determine whether the amount of money owed under the terms of a lease is reasonable, and the obligation to make payment arises at the time the rent obligation accrues, and not at the time other administrative expenses are paid pursuant to a Chapter 11 plan. *See id.* at 362 ("[Section] 365(d)(3) require[s] timely payment of rent, and … eliminate[s] the discretion that courts had previously exercised to establish a market rent for use and occupancy, fixing the amount payable for use and occupancy at the rate provided in the lease.") (citing *In re Ames Dep't Stores Inc.*, 306 B.R. 43, 68 (Bankr. S.D.N.Y. 2004)); *see also In re Barrister of Delaware, Ltd.*, 49 B.R. 446, 447 (Bankr. D. Del. 1985); *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 882-83 (Bankr. E.D.N.Y. 1986).

34.    It is well-settled that rent relating to a debtor's post-petition use of non-residential real property is entitled to allowance and treatment as an administrative expense. *See In re Garden Ridge Corp.*, 323 B.R. 136, 142 (Bankr. D. Del. 2005) ("When the debtor occupies and uses the premises, the landlord is entitled to an administrative expense claim equaling the fair market value of the premises."); *see also In re DVI, Inc.*, 308 B.R. 703, 707-08 (Bankr. D. Del. 2004). Section 503(b)(1) of the Bankruptcy code provides that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including . . . the actual and necessary costs and

9

expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1). To qualify as an "actual" and "necessary" administrative expense, (i) the claim must arise out of a post-petition transaction between the creditor and the debtor in possession, and (ii) the consideration supporting the claimant's right to payment must be supplied to and beneficial to the debtor in possession in the operation of the business. *See In re Health Diagnostic Lab., Inc.*, 557 B.R. 885, 894 (Bankr. E.D. Va. 2016). The fact that a debtor occupies the leased premises is sufficient to establish that payment for such occupancy is a necessary and actual expense of preserving the debtor's estate. *See In re Goody's Family Clothing, Inc.*, 392 B.R. 604, 614 (Bankr. D. Del. 2008) (citing *Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624, 627 (3rd Cir. 1990)).

35. However, merely declaring the rent to be an administrative expense is insufficient in that administrative expenses ordinarily do not have to be paid until the end of a case. *See Stone Barn Manhattan*, 398 B.R. at 361-62. Requiring a landlord to wait for the payment of post-petition rent would be inconsistent with the logic and rationale underlying section 365(d)(3), particularly if there is an administrative insolvency, which is not only possible, but plausible in this case. To avoid such a result, many courts "have found § 503(b)(1) to be superseded by § 365(d)(3); to hold otherwise would flout the intent of Congress in that the landlord would still be forced to provide current services while awaiting an evidentiary hearing to determine the actual amount the debtor owed it." *Id.*, 398 B.R. at 362.

## II. THE LANDLORD IS FURTHER ENTITLED TO ADEQUATE PROTECTION OF ITS INTEREST IN THE SUBLEASE PURSUANT TO § 363(e) OF THE BANKRUPTCY CODE

36. The Landlord is also entitled to payment of the post-petition arrears under section 363(e) of the Bankruptcy Code which mandates adequate protection to any party with an interest in property used by a debtor outside the ordinary course of business:

4819-2131-3158v.10

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

37.    Section 363(e) is straightforward and non-discretionary.  If a creditor with an "interest" in property used by a debtor makes a request for adequate protection, then the court "shall" prohibit or condition the use of such property on the provision of adequate protection.  11 U.S.C. § 363(e); *see In re Metromedia Fiber Network, Inc.*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("Section 363(e) is not permissive or discretionary….").

38.    A landlord undeniably holds an interest in the property that it owns and leases to a debtor, as well as an interest in the lease itself, the rents due under that lease, and the proceeds of the lease.  *See In re Ames Dep't Stores*, 136 B.R. at 359 ("Section 363(e) of the Bankruptcy Code reserves for bankruptcy courts the discretion to condition the time, place and manner of Store Closing Sales, thereby providing adequate safeguards to protect shopping center landlords and their other tenants, while allowing the Trustee to fulfill its fiduciary obligations").

39.    Section 361 of the Bankruptcy Code is clear that adequate protection may take one of three forms: a debtor may (i) tender an upfront cash payment or periodic cash payments, (ii) grant replacement liens, or (iii) grant other related relief (other than an administrative claim under section 503(b)(1) of the Bankruptcy Code) amounting to the unquestionable equivalent of the protected party's interest in the property.  Section 361(3) is also clear that adequate protection may not take the form of a deferred administrative claim.  Under section 361 of the Bankruptcy Code, only a contemporaneous transfer of value satisfies the requirements of adequate protection.  Therefore, in addition to the allowance of the Landlord's administrative expense claim, the

11

Landlord is entitled to adequate protection pursuant to sections 363(e) and 361 of the Bankruptcy Code.

40.    Accordingly, the Debtors should be required to pay immediately the post-petition unpaid rent and related charges in the amount of $1,227,423.63 together with late fees, interest, attorneys' fees and expenses incurred in connection with this motion pursuant to sections 363(e) and 365(d)(3) of the Bankruptcy Code.

WHEREFORE, the Landlord respectfully requests that the Court enter an order (i) compelling Debtors' immediate payment of post-petition rent under the Sublease in the amount of $1,227,423.63 together with late fees, interest, attorneys' fees and expenses incurred in connection with this motion pursuant to 11 U.S.C. §§ 105(a), 363(e), 365(d)(3) and 503(b)(1)(A); (ii) requiring the Debtors to pay full monthly rent as required by the Sublease on a timely basis going forward, or, in the alternative, the Debtor should be compelled to immediately cease operations, surrender the premises and reject the Sublease; and (iii) granting such other and further relief as the Court deems just and proper.

Dated:    February 5, 2019
         New York, New York

                    KELLEY DRYE & WARREN LLP

                    By: /s/ Robert L. LeHane
                    Robert L. LeHane
                    Maeghan J. McLoughlin
                    Randall L. Morrison, Jr.
                    101 Park Avenue
                    New York, New York 10178
                    Tel.: (212) 808-7800
                    Fax: (212) 808-7897

                    *Counsel for Trustees of the Estate of Bernice
                    Pauahi Bishop, d/b/a Kamehameha Schools*

4819-2131-3158v.10

**<u>PROPOSED ORDER</u>**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*,[1] | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

**ORDER GRANTING THE MOTION OF TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP, D/B/A KAMEHAMEHA SCHOOLS, LLC TO COMPEL PAYMENT OF POST-PETITION RENT AND RELATED LEASE OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105(a), 363(e), 365(d)(3) AND 503(b)(1)(A) AND TO PAY ALL SUBSEQUENT AMOUNTS OWED ON A TIMELY BASIS**

Upon the motion (the "Motion")[2] for an order compelling the payment of post-petition rent and related lease obligations pursuant to sections 105(a), 363(e), 365(d)(3), and 503(b)(1)(A) of the Bankruptcy Code; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); SHC Licensed Business LLC (3718); and SHC Promotions LLC (9626). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

and due and adequate notice of the Motion having been given under the circumstances, and no

other or further notice need be given; and after due deliberation and sufficient cause appearing

therefor,

## IT IS HEREBY ORDERED THAT:

1.       The Motion is GRANTED as set forth herein.

2.       The Debtors are directed to immediately pay the Landlord post-petition

unpaid rent and related charges in the amount of $1,227,423.63 together with late fees, interest,

attorneys' fees and expenses incurred in connection with the Motion pursuant to sections 105(a),

363(e), 365(d)(3), and 503(b)(1)(A) of the Bankruptcy Code.

3.       Notwithstanding any Bankruptcy Rule to the contrary, this Order shall be

immediately effective and enforceable upon its entry.

4.       The Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, or enforcement of this Order.


Dated: _____, 2019
        White Plains, New York

                                        _____
                                        HONORABLE ROBERT R. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>DECLARATION OF GARY EVORA</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SEARS HOLDINGS CORPORATION, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered) |

## DECLARATION OF GARY EVORA IN SUPPORT OF MOTION OF TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP, D/B/A KAMEHAMEHA SCHOOLS, LLC TO COMPEL PAYMENT OF POST-PETITION RENT AND RELATED LEASE OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105(a), 365(d)(3) AND 503(b)(1)(A) AND TO PAY ALL SUBSEQUENT AMOUNTS OWED ON A TIMELY BASIS

Gary Evora, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.    I am Senior Asset Manager, Commercial Real Estate with the Trustees of the Estate of Bernice Pauahi Bishop, d/b/a Kamehameha Schools, ("KS" or "Landlord") as successor-in-interest to Windward Mall Shopping Center, a California limited partnership.  I am authorized to execute this declaration on behalf of the Landlord.  In that capacity, I have

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

knowledge of the facts set forth herein based on my personal knowledge and a review of business records relating to Landlord's leasing of the premises discussed in this declaration.

2.     I submit this declaration in support of the Landlord's motion for an order (i) compelling Debtors' immediate payment of post-petition rent under the Lease in the amount of $1,227,423.63 together with late fees, interest, attorney fees and expenses incurred in connection with this motion pursuant to 11 U.S.C. §§ 105(a), 365(d)(3) and 503(b)(1)(A); (ii) requiring the Debtors to pay full monthly rent as required by the Sublease on a timely basis going forward, or, in the alternative, rejection of the lease immediately should the Debtor be unable to pay; and (iii) granting such other and further relief as the Court deems just and proper.

### The Sublease

3.     The Landlord is the holder of the lessors' interest in a sublease (the "Sublease") for a department store located in Kaneohe, Hawaii (the "Leased Premises"). Sears Roebuck and Co. (the "Debtor") is the tenant under the Sublease.

4.     A true and correct copy of the Sublease dated January 23, 1981 is annexed hereto as Exhibit A.

5.     The Sublease had an initial term commencing on or about January 23, 1981 through June 30, 2011. Under the Sublease, the tenant of the Leased Premises "shall have the right and option to extend the term of the Sublease for six (6) consecutive extended terms" with each term lasting a period of five years.

7.     If the tenant under the Sublease chooses to exercise its right to extend the term of the Sublease, the minimum annual rent for each extension term is to be determined by the formula set out in Section 4.2(b) of the Sublease.

2

8.      Section 4.2(b) of the Sublease states as follows:

> For each Extension Term a minimum annual rent which is
> the greater of (i) One Hundred and Fifty Thousand Dollars
> ($150,000), or (ii) One Hundred and Fifty Thousand
> Dollars multiplied by the percentage of increase of (x) the
> annual minimum rent agreed or finally determined to be
> payable under the Ground Lease for the year of the term
> thereof which coincides with the Extension Term year over
> and above the (y) the annual minimum rent payable under
> the Ground Lease during the third through twenty-eighth
> years thereof.

9.      The Sublease also requires monthly payment of common area maintenance

charges in the amount of $17,740.85 in addition to payment of water and other utility charges.

### The 2011 Amendment

10.     In 2011, the Landlord and the Debtor executed an Amendment to and Extension

of Lease and Agreements Regarding the REA dated May 31, 2011 (the "2011 Amendment").  A

true and correct copy of the 2011 Amendment is annexed hereto as Exhibit B.

11.     As set forth in the 2011 Amendment, the Debtor exercised its option to extend the

term of the Sublease for a first extension term commencing on July 1, 2011 through June 30,

2016.

12.     The 2011 Amendment states that "if the Lease is further extended, the minimum

annual rent for each succeeding Extension Term shall be set in accordance with Section

4.2(b)..." of the Sublease.

### The 2015 Amendment

13.     On or about August 26, 2015, the Landlord and the Debtor executed an

Amendment of Lease (the "2015 Amendment").  A true and correct copy of the 2015

Amendment is attached hereto as Exhibit C.

14.    In the 2015 Amendment, the Landlord and the Debtor agreed to extend the first extension term for an additional two years through June 30, 2018.

### The Debtor Exercises a Second Extension Term

15.    On or about June 20, 2017, the Debtor exercised its right and option to extend the Sublease for a second extension term of five years commencing July 1, 2018 through June 30, 2023. A true and correct copy of the Debtor's correspondence exercising its extension option is attached hereto as Exhibit D.

16.    Based on the formula in Section 4.2(b) of the Sublease, the minimum annual rent for the extension term is $150,000 multiplied by 2,171.1%. In this formula, the annual minimum rent payable under the Ground Lease for the year of the term thereof which coincides with the extension term year is $4,139,600.00. The annual minimum rent payable under the Ground Lease during the third through twenty-eighth years was, for the reasons described in the next paragraph, $190,668.00.

17.    Specifically, the third year of the Ground Lease commenced on July 1, 1981, and the twenty-eighth year of the Ground Lease ended on June 30, 2007 (the "26 Year Period"). The Ground Lease provides that the minimum annual rent payable during the 26 Year Period shall be as follows:

"(iii)    Except as hereinafter provided in subparagraph (iv), for the period commencing July 1, 1981, to and including June 30, 2011, the sum of ONE HUNDRED NINETY-SEVEN THOUSAND EIGHT HUNDRED THIRTY-TWO DOLLARS ($197,832.00) per annum.

(iv)    If at any time during the period July 1, 1980, to and including June 30, 2011, Alaloa Street shall be extended through the project and dedicated to an appropriate government authority, then and in that event the minimum rent provided in subparagraphs (ii) and (iii) supra shall be adjusted commencing on the first day of the month following such dedication by reducing such minimum rent as follows: From $98,916.00 to $95,334.00 and/or from $197,932.00 to $190,668.00, as the case may be."

4

Ground Lease at 3-4. Pursuant to a deed signed by the Trustees of KS on or about May 5, 1982 (the "Dedication Deed"), KS granted and conveyed to the City and County of Honolulu the real property comprising what I understand to be the balance of Alaloa Street that runs through the Windward Mall project. The Dedication Deed was filed in the Office of the Assistant Registrar of the Land Court of the State of Hawai'i as Document No. 1294516 on April 19, 1985. According to the express terms of the Ground Lease, the minimum annual rent during the 26 Year Period was required to be and was adjusted to $190,668.00 as a result of the dedication of Alaloa Street. I have not been able to locate any records in the KS files that confirm the exact date this adjustment occurred. It appears that the Ground Lease required this adjustment to occur some time toward the beginning of the 26 Year Period.

18.     Accordingly, pursuant to Section 4.2(b) of the Sublease, the annual rent for the extension term is $3,256,650.00 or $271,387.50 per month.

19.     The Debtor was notified of this annual rent for the extension term on or about March 19, 2018. A true and correct copy of the Landlord's correspondence to the Debtor is annexed hereto as Exhibit E.

### The Debtor Fails to Pay the Proper Monthly Rent

20.     Despite repeated demands from the Landlord, the Debtor has failed to pay the full monthly rent due during the second extension term commencing on July 1, 2018. A true and correct copy of the Landlord's demands to the Debtor is annexed hereto as Exhibit F.

21.     Notwithstanding the rent formula set forth in Section 4.2(b) of the Sublease, the Debtor continues to pay monthly rent in the amount of $92,747.79.

22.     Accordingly, the pre-petition arrears under the Sublease total $690,552.53 and post-petition arrears under the Sublease total $1,227,423.63. Attached hereto as Exhibit G is a true and correct copy of aging reports for the Leased Premises.

23.    The Debtor has continued to use and occupy the Leased Premises since October 15, 2018.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 2, 2019.

_____
Gary Evora

## **EXHIBIT A**

### **THE SUBLEASE**

GROUND SUBLEASE

(KANEOHE, HAWAII)

This Ground Sublease ("Lease") is made as of January 23,
1981, between WINDWARD MALL SHOPPING CENTER, a California limited
partnership ("Landlord") and SEARS, ROEBUCK AND CO., a New York
corporation, ("Tenant").

R E C I T A L S

A.  Pursuant to a certain Indenture (the "Ground Lease")
dated as of July 1, 1979, as amended, a Short Form Lease in respect
of which of even date therewith was filed as Land Court Document No.
960514 and recorded in Liber 13919 on Pages 91 to 107 on August 29,
1979 Landlord has ground leased from the Trustees of the Estate of
Bernice Pauahi Bishop and others that certain parcel of real pro-
perty situated in the City and County of Honolulu, Oahu, Hawaii,
which is described in Exhibit A attached hereto and hereby made
a part hereof and which is hereinafter referred to as the "Shop-
ping Center Site".

B.  Landlord desires to ground sublease to Tenant and Tenant
desires to hire from Landlord that portion of the Shopping Center
Site which is described in Exhibit B attached hereto and hereby
made a part hereof and which is hereinafter referred to as the
"Sears Tract".

C.  Also situated within the Shopping Center Site are (i)
the portion thereof ground subleased by Landlord to J.C. Penney
Properties, Inc., (ii) the portion thereof ground subleased by
Landlord to Liberty House, Inc., and (iii) the portion thereof
retained by Landlord (individually a "Tract" and collectively
including the Sears Tract, "Tracts").

D. Said Tracts are located as shown on the plot plan attached hereto as Exhibit C and hereby made a part hereof.

E. Simultaneously with the execution of this Lease, Tenant, Landlord, J.C. Penney Properties, Inc. and Liberty House, Inc. (the "Parties") have executed a Construction, Operation and Reciprocal Easement Agreement (the "REA").

F. The REA provides for the construction and operation of the Shopping Center Site as a regional, enclosed mall shopping center (the "Shopping Center"). Pursuant to the REA, the Parties will exchange certain easements and will enter into certain other covenants and agreements, more specifically set forth in the REA, in order to make integrated use of their Tracts in the Shopping Center Site.

G. Simultaneously with the execution of this Lease, Landlord and Tenant have executed a Supplemental Agreement (the "Supplemental Agreement") supplementing certain of the provisions of the REA.

In consideration of the respective covenants set forth herein, and for other good and valuable considerations, Landlord and Tenant agree as follows:

## ARTICLE 1

### REA AND SUPPLEMENTAL AGREEMENT

1.1 Definitions

Any term or word that is defined in the REA shall have the same meaning when it is used in this Lease, except when the context clearly indicates otherwise.

1.2 Reference to REA and Supplemental Agreement

There are various references in this Lease to the REA and the Supplemental Agreement. Unless the context clearly indicates otherwise, these references shall refer to the REA and the Supplemental Agreement as they each exist from time to time.

2.

### 1.3   Approval of REA

Windward Mall Shopping Center, acting solely in its capacity as Landlord under this Lease, and not in its capacity as ground lessee of the Developer Tract:

    (a)   hereby approves all of the provisions of the REA;

    (b)   hereby agrees that Tenant may take all actions with respect to the Sears Tract which Tenant deems reasonably necessary to comply with REA requirements; and

    (c)   hereby agrees to cooperate, at no expense to Tenant, with Tenant in signing and delivering all instruments (e.g., easements) reasonably necessary to enable Tenant to comply with those REA requirements relating to the Sears Tract.

### 1.4   Modification of REA

Tenant shall not agree to or execute any instrument modifying, cancelling, amending or otherwise changing the rights of the Parties under the REA unless it first secures the consent of the Person who is then the Landlord hereunder, which consent shall not be unreasonably withheld.  This section shall apply only to modifications, cancellations, amendments, or changes which would impose an obligation on Landlord, or create a lien or restrictions on the Landlord's reversionary estate in the Sears Tract or reduce a right of Landlord hereunder.

    This section shall be inapplicable so long as the same Person is both the Landlord under this Lease and a Party with respect to the Developer Tract under the REA.

### 1.5   Notices under REA

Tenant shall promptly forward to Landlord copies of all notices and other writings that Tenant gives or receives under the REA, but only if such notices affect Landlord in its capacity as Landlord under this Lease.

3.

This section shall be inapplicable so long as the same Person is both the Landlord under this Lease and a Party with respect to the Developer Tract under the REA.

1.6   Supremacy of REA, Supplemental Agreement or Lease

Landlord and Tenant recognize that the rights and obligations governing their relationship as Landlord and Tenant are different from the rights and obligations governing their relationship as Developer and Sears under the REA and the Supplemental Agreement. In the event of any conflict between the REA and the Supplemental Agreement, the Supplemental Agreement shall prevail. In the event of any conflict between this Lease and the REA, the REA shall control in those instances where Developer as Developer has assumed or is obligated to perform obligations of Sears as a Party under the REA which are otherwise obligations of Tenant under this Lease (for example: Developer is obligated pursuant to the REA to maintain public liability insurance on the entire Common Area of the Shopping Center for the benefit of the Parties, yet, pursuant to this Lease, Tenant is obligated to maintain such insurance on the Sears Tract; the effect of this clause is, in this illustration, that to the extent public liability insurance is required to be maintained on the Common Area of the Sears Tract, the REA shall control and such obligation shall be that of Developer); provided, however, that this sentence shall be applicable only for any period of time when Landlord has an interest in Developer or the Developer Tract and/or when Developer has an interest in Landlord or Landlord's reversionary estate. In the event the immediately preceding provision is not in effect, the rights and obligations of Landlord and Tenant under this Lease shall be independent from the rights and obligations of Sears and Developer under the REA and vice-versa.

4.

### 1.7   No Release

At various places herein, it is stated that named sections of this Lease shall be inapplicable so long as the same Person functions both as Landlord under this Lease and as a Party with respect to the Developer Tract under the REA.   These statements shall not in any way be deemed to release or relieve Tenant or Landlord (in its respective capacity as a Party to the REA) of any of their obligations under the REA to each other.

### ARTICLE 2

### SEARS TRACT

### 2.1   Lease of Sears Tract

Landlord hereby ground subleases the Sears Tract to Tenant, and Tenant hereby hires the Sears Tract from Landlord, subject, however, to the provisions of this Lease and the title exceptions listed on Exhibit D attached hereto and hereby made a part hereof.

As used herein, "Sears Tract" means:

(a)   the land described in Exhibit B;

(b)   all rights, interests, privileges, easements, tenements, and hereditaments appurtenant to the foregoing.

References in this Lease to the Sears Tract shall be deemed to refer to all or any part of the Sears Tract as the context may require.   The Sears Tract, as defined herein, does not include any Improvements made thereon.

### 2.2   Improvements

Tenant shall have at all times during the Term the right to construct, reconstruct, maintain and repair buildings and improvements on the Sears Tract, pursuant to and subject to all applicable provisions of the REA.   All buildings and other improvements on the Sears Tract, by whomever made, are herein collectively called "Improvements".   Improvements on the Sears Tract unless removed or razed pursuant to the provisions of the REA

shall become the property of Landlord without cost to it upon the expiration or termination of this Lease, but prior thereto shall not become part of the realty and shall be the property of Tenant.

### 2.3 Common Area and Other Improvements

Pursuant to the REA, Developer/Landlord is required to provide and construct certain on- and off-site improvements for the Shopping Center. In the event Developer/Landlord defaults in the performance of any such obligations relating to improvements on or serving the Sears Tract and/or the last sentence of Section 5.8, Tenant shall have the right to perform all or a portion of the obligations of Landlord for Landlord's account as such obligations relate to improvements on or serving the Sears Tract and shall, if it so elects to perform, have the right of immediate reimbursement for the cost of such performance.

### ARTICLE 3

### TERM

### 3.1 Initial Term

The Initial Term of this Lease commenced on the date hereof and shall end on June 30, 2011.

### 3.2 Extension Terms

Tenant is hereby granted six (6) separate and successive options to extend the Initial Term for separate, successive periods of five (5) years each. Each extension for which an option is exercised is herein called an "Extension Term".

Tenant may exercise an option to extend the Term only by giving Landlord notice of the extension at least one (1) year before the expiration of the Initial Term or the immediately preceding Extension Term, as the case may be, only if Tenant is not in default hereunder.

### 3.3   Lease Provisions During Extension Terms

Except for any Lease covenants, agreements or conditions that have expired by force of their own terms and except for the rent adjustment provided for in Article 4 hereof, each Extension Term shall be upon the same covenants, agreements and conditions as are provided for in this Lease from time to time.

### 3.4   "Term" Defined

"Term", "Term of this Lease", and "Lease Term", as used herein, mean the Initial Term and the Extension Terms.

### ARTICLE 4

### RENT

### 4.1   Lease Year; Rent, Etc.

The first "Lease Year" shall be the period commencing upon the date Tenant opens for business in its Store and ending on the immediately next succeeding January 31, after which the term "Lease Year" shall mean the periods from February 1 to the next succeeding January 31, except that the last Lease Year shall end on the last day of the Term.

### 4.2   Amount of Rent

During the Term of this Lease, Tenant shall pay to Landlord at its address for notices as in effect from time to time, as rental for the Sears Tract without abatement, off-set or deduction, except as otherwise specifically provided for in this Lease:

> (a)   For the Initial Term a minimum annual rent of One Hundred and Fifty Thousand Dollars ($150,000.00) payable in equal monthly installments on or before the first day of each calendar month, prorated for any fractioal month.

-7-

(b) For each Extension Term a minimum annual rent which is the greater of (i) One Hundred and Fifty Thousand Dollars ($150,000), or (ii) One Hundred and Fifty Thousand Dollars multiplied by the percentage of increase of (x) the annual minimum rent agreed or finally determined to be payable under the Ground Lease for the year of the term thereof which coincides with the Extension Term year over and above (y) the annual minimum rent payable under the Ground Lease during the third through twenty-eighth years thereof.

(c) In addition to the minimum annual rent to be paid by Tenant pursuant to Sections 4.2(a) and (b) above, Tenant shall pay to Landlord as the times and in the manner hereinafter specified an additional rental (if any) in an amount equal to Six Tenths of One Percent of Tenant's Net Sales made for each Lease Year in excess of Twenty-Five Million Dollars ($25,000,000), but less than Forty Million Dollars ($40,000,000), no percentage rent on Net Sales greater than Forty Million Dollars ($40,000,000) but less than Forty-Eight Million Dollars ($48,000,000), and One Tenth of One Percent of Tenant's Net Sales in excess of Forty-Eight Million Dollars ($48,000,000), in respect of the Initial Term and, in respect of each Lease Year during the Extension Terms, in excess of a Net Sales figure calculated by dividing the adjusted annual minimum rent payable for the Extension Term Lease Year in question by Six Tenths of One Percent and adjusting the breaks in percentage rent payments as provided above by the same adjustment factor. Notwithstanding the foregoing, should Tenant, as a result of a default by Landlord, pay rent directly to the landlord under the Ground Lease, then percentage rent on Net Sales in excess of Forty-Eight Million Dollars ($48,000,000) (as such figure is adjusted pursuant to the preceding sentence) shall increase to One Half of One Percent.

8.

## 4.3   "Net Sales" Defined

The term "Net Sales" as used in this Lease means the gross
The term "Net Sales", as used herein, means gross retail sales
retail sales of merchandise made upon the Leased Premises by Sears
deducting or excluding as the case may be:   (1) all returns and
other cancellations, and allowances;   (2) rental charges, including
but not limited to charges for or pursuant to rentals of automobiles,
tools and other merchandise and equipment;   (3) charges to custo-
mers for or pursuant to services, deluxing, delivery, installation
or inspection;   (4) amounts, debits or charges of, for or pursuant
to maintenance or service agreements (currently known as Maintenance
Agreements) or for replacement or repair parts or merchandise fur-
nished without additional charge in connection with repairs or re-
placements pursuant to warranties, guaranties, good will adjustments
or maintenance or service agreements;   (5) all sales ordered through
the use of or from Sears catalogs or filled through Sears catalog
or filled through Sears catalog channels regardless of the place of
order, payment or delivery (currently known as "Division 200 Sales");
(6) finance charges or other amounts in excess of Sears cash sales
price charged on, for or pursuant to sales made on credit or under
a time payment or lay-away plan;   (7) the amount of all sales, use,
excise, retailers' occupation or other similar taxes, imposed in a
specific amount or percentage upon, or determined by, the amount of
sales, or a sale, made on the Leased Premises;   (8) sales of depart-
ments, divisions or offices not located on the Leased Premises, even
through administratively controlled therefrom;   (9) amounts received
for or in connection with the making of personal loans and the render-
ing of other financial services, and premiums, proceeds, commissions,

9.

payments and other amounts received, collected or charged for or in connection with the sale of policies of insurance or investment fund shares and other securities, whether or not sold on or from the Leased Premises; (10) contract sales, as hereinafter defined, regardless of whether Sears maintains an office, showroom or samples for such merchandise, or whether made on or from the Leased Premises; (11) receipts from vending or weighing machines, amusement devices and public telephones; (12) receipts from sales of tickets for admission to entertainment, sporting or other similar events, from sales of licenses issued by governmental agencies and from collection of utility bills and check cashing; (13) receipts from the operating of eating facilities primarily available for employe use; (14) receipts from the sale of merchandise or gift certificates and purchase coupons; (15) fees for building and like permits in connection with sales of merchandise or services; (16) amounts credited on the purchase price of merchandise by reason of merchandise traded in or employe or other discounts; (17) commercial sales of truck tires amde through Sears truck tire division; (18) the amount of all governmentally required levies for parking if passed on to customers; and (19) sales made by Tenant's sublessees, concessionaires, and licensees occupying not more than 6,000 square feet of Floor Area of the Sears Store, such limitation being only to limit exclusions from Net Sales and not to limit the amount of Floor Area which may be sublet, concessioned, or licensed.

The phrase "contract sales" as herein used means sales of goods or merchandise made to persons or entities other than the general public and include but are not limited to, sales of merchandise made to industrial, commercial or institutional purchasers or to governmental or quasi-governmantal bodies, and also means sales of goods manufactured to the purchaser's specifications whether or not installed by Sears. Such sales are generally known as "Division 400 Sales".

10.

All of the terms utilized in this paragraph, including the terms "returns", "allowances", "Division 200 Sales", and "Division 400 Sales" shall have the meaning known to and used by Sears in the normal course of its business.

The specific deductions and exclusions listed in (1) through (19) shall not be deemed exclusive; it being the intent to exclude in all events all amounts received or receivable on account of trans- actions or items which are not "retail sales of merchandise made upon the leased premises by Tenant".

### 4.4  Annual Statements of Net Sales

Within forty-five (45) days after the end of each Lease Year Tenant shall furnish Landlord with a statement, certified as cor- rect by Tenant through an authorized officer or employee, setting forth the Net Sales for the Lease Year just concluded, and the amount of any authorized deductions therefrom.

### 4.5  Audit of Net Sales Statements

Landlord may, once with respect to each Lease Year and within two (2) years from the end thereof, whether during the Term or after the termination thereof, cause an audit of the business of Tenant conducted on the Sears Tract to be made by its authorized represen- tative or by a certified public accountant of Landlord's own selec- tion, and if the statements of Net Sales previously made by Tenant to Landlord shall be found to be understated by three percent (3%) or more of the amount of Tenant's Net Sales properly disclosed and accounted for by such audit, Tenant shall immediately pay the cost of such audit as well as the additional rental therein shown to be payable by Tenant to Landlord.  Otherwise, the cost of such audit shall be paid by Landlord.  The cost to Tenant of said audit, how- ever, shall in no event exceed 50% of the amount of the deficiency of percentage rent disclosed by said audit.

11.

### 4.6 <u>No Waiver:  Retention of Records</u>

Acceptance by Landlord of any moneys paid to Landlord by Tenant as additional rental, as shown by any yearly statement furnished by Tenant, shall not be an admission of the accuracy of said yearly statement or of the amount of said additional rental payment.  Tenant shall, for a period of two (2) years after the end of each Lease Year, keep safe and intact and available for such audit all of the records, books, accounts and other data which are regularly kept by Tenant in the ordinary course of its business to establish Tenant's Net Sales and any authorized exceptions and deductions therefrom as shown by any such statement.

### 4.7 <u>Confidentiality</u>

Landlord shall keep confidential, as a trade or business secret, the amount of Net Sales made by Tenant and all other information obtained by Landlord from Tenant by virtue of the statements provided for in Section 4.4 or Section 4.5 or an audit of Tenant's records pursuant to Section 4.6; provided, however, Landlord may use such information in the normal course of its business and disclose the same to bona fide lending institutions and/or purchasers and the landlord under the Ground Lease, provided Landlord receives a written agreement from such parties with respect to the confidentiality of said information, a copy of which shall be delivered to Tenant prior to any disclosure, and may use Tenant's annual statements of Net Sales in connection with any income tax audit conducted by authorized governmental agencies.

12.

### 4.8 General Excise Tax

Tenant will pay to Landlord as additional rent, at the time and together with each payment of minimum annual rent, percentage rent, additional rent, or any other charge (collectively, "rents") required by this Lease to be paid by Tenant to Landlord which is subject to the Hawaii general excise tax on gross income or any successor or similar tax assessed or based on gross income or any successor or similar tax assessed or based on gross income, an amount which, when added to the rents (whether actually or constructively received by Landlord), shall yield to Landlord, after deduction of all taxes payable by Landlord with respect to the rents, a net amount equal to that which Landlord would have realized therefrom had no taxes been imposed. For example, during such time as the Hawaii general excise tax remains at its present rate of four percent (4%) and so long as the compounding is limited as is presently the practice and no other taxes are imposed upon the receipt by Landlord of the rents and other sums reserved (other than Landlord's state or federal income taxes) such additional rent will be equal to 4.167% of all rents.

### 4.9 "Rent" and "Additional Rent" Defined

As used herein, "rent" means the sums that Tenant is required to pay under this Article and "additional rent" means all sums (other than the rent required by this Article) payable by Tenant under this Lease (e.g., Taxes).

### 4.10 Utility Charges

Tenant shall pay for all gas, water, telephone, electricity, and other utility service charges for utilities used on the Sears Tract.

13.

ARTICLE 5

TAXES

5.1  "Land Tax", "Improvement Tax", and "Taxes" Defined

As used herein, the following terms have the following meanings:

(a)  "Land Tax" — the amount of all real estate taxes, assessments, and special assessments imposed against the land portion of the Sears Tract, for any tax period occurring in whole or in part during the Term; provided that if it occurs only in part during the Term, it shall refer only to the period within the Term.

(b)  "Improvement Tax" - the amount of all real estate taxes, assessments and special assessments imposed against the Improvements located on the Sears Tract for any tax period occurring in whole or in part during the Term, provided that if it occurs only in part during the Term, it shall refer only to the period within the Term.

(c)  "Taxes" - the Land Tax and Improvement Tax, collectively.  The term "Taxes" shall not be deemed to include any income, corporation, inheritance, devolution, gift or estate taxes.

If any Taxes may be paid in installments, the term Taxes shall refer only to the installments payable during the Term.

5.2  Separate Tax Bills

Landlord shall at its expense promptly request the appropriate taxing authorities to assess the Sears Tract as a separate tax parcle.

5.3  Separate Assessment - Payment of Taxes

If the Sears Tract is separately assessed, Tenant shall pay the Taxes thereon before the delinquency date.  Tenant shall, upon request, furnish Landlord within sixty (60) days after the delinquency date reasonable evidence showing full payment of the Taxes then due.

14.

This paragraph is subject to the provisions of Section 5.6.

5.4   Allocations of Tenants Taxes If No Separate Assessment

During the periods when the Sears Tract is not separately assessed, Tenant shall pay Taxes in accordance with the provisions hereinafter set forth.

Tenant shall pay Land Taxes in an amount that bears the same ratio to the Land Taxes assessed against the land parcel which includes the land area of the Sears Tract as "A" bears to "B" where:

    (a)   "A" equals the land area of the Sears Tract (measured in square feet); and

    (b)   "B" equals the land area (measured in square feet) of the larger land parcel so assessed which includes the land area of the Sears Tract.

Tenant shall pay Improvement Taxes in an amount that bears the same ratio to the Improvement Taxes assessed against Improvements on any land parcel which includes land area of the Sears Tract as "X" bears to "Y" where:

    (a)   "X" equals the actual cost of construction and/or of reconstruction of the Improvements located on the Sears Tract (as those improvements exist on the official assessment date of the applicable taxing authorities); and

    (b)   "Y" equals the actual cost of construction and/or of reconstruction of the improvements located on the larger land parcel so assessed which includes the Sears Tract (as all of those improvements exist on the official assessment date of the applicable taxing authorities).

Landlord and Tenant shall determine the actual cost of construction of the improvements. Any disagreement about the costs of construction shall be referred to arbitration for determination.

15.

Notwithstanding the foregoing, if the assessor's records
(worksheets) disclose a separate allocation of the assessment
to the land area of the Sears Tract and/or the Improvements
thereon, such allocation shall control.

5.5    Payment of Taxes Where Allocation Required

Tenant shall pay Landlord the Taxes required by Section
5.4 within twenty (20) days after it received the following
from Landlord:

(a)    a statement showing in complete detail the
computation of Tenant's portion of the Land
Taxes and Improvement Taxes; and

(b)    a copy of the tax bill that Landlord used in
making its computations.

Notwithstanding the foregoing, Tenant shall not be required
to pay its portion of the Taxes to Landlord more than twenty (20)
days before their delinquency date.  Landlord must receive a tax
payment check from Tenant by the 20th day prior to tax payment
delinquency provided Tenant receives from Landlord the foregoing
items (a) and (b) at least twenty (20) days prior thereto.

At its election Tenant can make the payments of Taxes
required by this Section by delivering to Landlord a check
made payable to the order of Landlord and the appropriate
taxing authority.

This section is subject to the provisions of Section 5.7.

5.6    Contesting Taxes - Premises Separately Assessed

Tenant may, at its own cost and by appropriate proceedings,
protest, in respect of the Sears Tract, the assessed value placed
on land or Improvements and/or contest the validity, applicability
and/or the amount of any Taxes separately assessed against the
Sears Tract.  Nothing in this Article requires Tenant to pay any
such Taxes so long as (i) it protests the assessed value or con-
tests the validity, applicability and/or the amount thereof or
of the Taxes in good faith, and (ii) it does not allow the Sears

16.

Tract to be forfeited to the imposer of such Taxes as a result of their non-payment or result in the imposition of interest charges, penalties or fines.

    5.7  <u>Contesting Taxes - Premises Not Separately Assessed</u>

    If the Sears Tract is not separately assessed, Landlord shall furnish to Tenant, in no event later than thirty (30) days prior to the last day to file appeal on the assessed value, all notices and relevant data that established the assessment for the property in question and other similar information, and in no event later than thirty (30) days prior to the last day to contest the Taxes, the satement and tax bill referred to in Section 5.5. Should Landlord fail to do either of the above, Tenant shall pay the Taxes and if the Taxes are reduced the following year then Land- lord shall reimburse Tenant the difference between Taxes paid in the year in dispute and the Taxes paid in the suc- ceeding year or Tenant may deduct same from future Taxes.

    If the Sears Tract is not separately assessed, then Tenant may, by appropriate proceedings, protest the assessed value and/or contest the validity, applicability and/or amount of any Taxes on any parcel that includes the Sears Tract.

    In spite of the foregoing provisions of this Section, if Tenant wishes to contest the Taxes or protest the assessed value, Tenant shall so notify Landlord and shall pay its share of the Taxes to Landlord in accordance with the requirements of Section 5.5, and Landlord shall then pay the Taxes under protest or in such other manner as required by statute so as to avoid prejudice to Tenant's right to protest the assess- ment or contest the Taxes.

    If Tenant protests the assessment or contests Taxes under this Section:

17.

(a)  Landlord will, on Tenant's request, if it is
legally necessary to do so, appoint Tenant its
attorney-in-fact to protest the assessment and/or
contest the Taxes, and Landlord agrees to fully
cooperate with Tenant in the protest and/or contest.

(b)  Tenant shall prosecute the protest and/or contest
at its sole expense.

Landlord may join with Tenant, or, if Tenant does not
protest the assessed value or contest the Taxes, Landlord may
separately protest the assessed value and/or contest taxes for
that portion of the assessed value and/or taxes relating to
land and improvements other than the Sears Tract and the Improve-
ments thereon. In such event Landlord shall do so at no cost
to Tenant.

Should a protest or contest by Landlord and/or Tenant
result in a reduction of the Taxes, Landlord shall reimburse
to Tenant such reduction, if previously paid by Tenant in
accordance with this Section 5.7.

5.8  Proration of Taxes

Any Taxes imposed on the Sears Tract before the date of
commencement of the Term shall be adjusted between Landlord
and Tenant if they relate to a tax period that occurs in part
after such date. Landlord shall pay the portion of the Taxes
allocable to the period before the date of commencement and
Tenant shall pay the remainder.

Any Taxes imposed on the Sears Tract during the Term
that relates to a tax period that occurs in part after the date
of termination of this Lease shall be adjusted between Landlord
and Tenant. Tenant shall pay the portion of the Taxes allocable
to the period before the date of termination of this Lease and
Landlord shall pay the remainder. Landlord shall not seek out
or voluntarily join in any request for assessment districts or
improvements resulting in assessment districts affecting the
Premises without prior written consent of Tenant, which consent

18.

Tenant may grant or withhold at its absolute discretion. Landlord shall indemnify Tenant from and against any assessments levied against the Sears Tract if such assessments are in whole or in part for construction of on- or off-site improvements required to be made by Landlord under the REA.

### 5.9  Personal Property Taxes

Tenant shall be responsible for the payment of all personal property taxes levied on its furniture, fixtures, and stock in trade.

### 5.10  Change in Method of Taxation and Assessment

If at any time after the execution of this Lease, the present method of taxation or assessment by the State of Hawaii or any political subdivision thereof in which the Sears Tract is situated should be changed so that the whole or any part of the Taxes assessed or imposed upon the Sears Tract or the rental income thereof shall be modified or transposed, then and in such event, the parties hereto shall consider same as an in lieu tax and shall determine the manner in which such tax, as modified or transposed, whether levied against the real property, improvements or rentals or all of these, shall be allocated and paid between the Landlord and Tenant hereunder. In making such allocations, the parties recognize and agree it shall be their intention that the Landlord shall continue to be charged with that portion of the total taxes and assessments presently attributable to the income derived by Landlord from this Lease (unless taxes upon income shall be a substitution in whole or in part for the present method of ad valorem real estate taxation) and the Tenant shall continue to be charged with that portion of the total taxes and assessments presently attributable to the value of the real estate and all improvements thereon. In the event the parties cannot agree to such allocation, the controversy shall be settled by arbitration. Such arbitration shall be before three (3) disinterested arbitrators experienced in real estate and income taxes, one to be named by the Landlord, one named by the Tenant and one by the two thus chosen.

19.

The arbitrators shall determine the allocation of such taxes, assessments, levies and charges pursuant to and in accordance with the law of the State of Hawaii.

5.11  Assessments

Notwithstanding the foregoing:

(1)  In the event any assessment or portion thereof is based upon an improvement required to be made in whole or in part pursuant to the REA as a condition to the construction or development of the Shopping Center, Tenant may, at its option, require Landlord to pay the same or Tenant shall pay the same and upon payment of such assessment or any installment thereof Tenant shall send a copy of the paid tax bill to Landlord for reimbursement.

(2)  In the event any assessment or portion thereof is based upon an improvement made in whole or in part upon land or an interest in land acquired from Landlord by condemnation or deed in lieu thereof, Tenant may, upon Tenant's payment of such assessment or any installment thereof, send a copy of the paid assessment bill to Landlord for reimbursement.

5.12  Environmental Fees

For purposes of this Article 5, fees, charges or assessments arising out of or in any way related to treatment of the Shopping Center and/or the Common Area of the Shopping Center as sources of air pollution, traffic, storm water run-off or other adverse environmental impacts or effects and parking controls at any time imposed under any applicable law during the Term of this Lease shall be deemed to be real estate taxes and/or assessments for the purposes hereof.  If all or any portion of said charges are levied or assessed on an annual, semi-annual or any basis other than monthly, the charges shall be prorated and allocated on a monthly basis.

20.

ARTICLE 6

USE AND OPERATION OF SEARS TRACT

6.1   Uses

The Sears Tract and all Improvements thereon shall be used
and operated for any lawful purpose, and in accordance with the
provisions of the REA, during any periods to which the REA shall
apply.

6.2   Abandonment

A.   Should Tenant abandon the Sears Tract and/or terminate
its operations as permitted pursuant to the REA, and within 18
months thereafter not have entered into an agreement with a po-
tential sublessee or assignee to occupy the Sears Tract for pur-
poses permitted pursuant to the REA, Landlord shall have the right
to purchase the Improvements constituting real property on the
Sears Tract by giving Tenant notice of election to purchase within
ninety (90) days after the expiration of said 18-month period.

Such notice shall specify the date (which shall be no less
than 30 nor more than 60 days therafter) and the hour and place
in Honolulu, Hawaii, for the closing of such purchase.  At such
closing Tenant shall (i) by quitclaim deed, convey to Landlord
all improvements on the Sears Tract and by quitclaim deed convey
to Landlord the leasehold and all other interests Tenant has or
may have in the Sears Tract.  Tenant shall remove all Tenant's
trade fixtures, furniture, furnishings, merchandise and other
movable personalty prior to closing.  Title to the real property
so conveyed shall be subject to no other title exceptions than
those to which the demised premises were subject upon the execu-
tion of this Lease or which were placed thereon in accordance
with this Lease and/or the REA.  The purchase price shall be
determined by taking the then book value based upon a fifty year
life of the Improvements commencing upon the opening for business
of the Sears Store.

21.

Landlord and Tenant shall execute, deliver and record a termination of this Lease, terminating all unaccrued obligations of Tenant, including any obligation to pay rent and additional rent. If the REA or any continuing obligations thereunder are then in existence, Landlord shall deliver in recordable form an agreement assuming all such obligations and indemnifying Tenant therefor. Landlord's right under this Section 6.2 shall, if not exercised in accordance with this Section 6.2, be terminated and of no further force and effect.

B.   In the event that Landlord shall not commence the repair and reconstruction as provided in Article XIII or Article XVI of the REA (whether or not the REA shall be in effect) within three (3) years following the occurrence of the casualty or condemnation, then Tenant shall have the right to terminate this Lease by notifying Landlord in writing of its election to terminate.   In the event of a termination of this Lease pursuant to the preceding sentence, Tenant shall thereupon surrender the Sears Tract to Landlord as provided in this Lease, with equitable adjustment being made for sums paid in advance and not earned as of the date of termination and thereafter neither party shall have any further obligation to the other hereunder.

6.3   Uses Prohibited:  Compliance With Law

Tenant shall not do or permit anything to be done in or about the Sears Tract, nor bring nor keep anything therein which will in any way cause the Improvements thereon to be uninsurable with respect to the insurance required by this Lease or the REA or which shall constitute a nuisance.  Landlord and Tenant shall observe and perform all laws, ordinances, rules and regulations of all governmental authorities now in force or which may hereafter be in force applicable to the Shopping Center and the Sears Tract respectively, or any improvement thereon or the use thereof and will indemnify each other and the landlord under the Ground Lease against all actions, suits, damages and claims by whomever

22.

brought or made by reason of the non-observance or non-performance
of said laws, ordinances, rules and regulations or of this Article
on the Shopping Center or the Sears Tract, respectively.  Landlord
and Tenant will also observe any setback lines affecting the Shop-
ping Center and the Sears Tract.

ARTICLE 7

REA EASEMENTS

Landlord agrees that Tenant may grant such easements with
respect to its leasehold interest in the Sears Tract as are re-
quired or permitted by the provisions of the REA.  It shall be
immaterial that the rights granted by such easements shall ex-
tend beyond the date of termination of this Lease.  However, such
easements may impose no affirmative obligations on Landlord which
are not otherwise imposed by the REA.

When Tenant executes and delivers any easement under this
Section, it shall concurrently deliver true and accurate copies
of such easements to Landlord.

23.

ARTICLE 8

CONDEMNATION

8.1  Condemnation Defined

The term "condemnation" as used in this Lease means
the taking or appropriation of property or any interest therein,
in exercise of the power or right of eminent domain or such taking
for public or quasi-public use or any state of facts relating to
the taking or appropriation of property which, without any actual
taking or appropriation, shall result in direct or consequential
damages to the Sears Tract or this leasehold.  Said term shall also
be deemed to include to the extent not otherwise defined in this
Section 8.1, a temporary taking of the Sears Tract and the Sears
Store or any part thereof or the Improvements on the Sears Tract
for a period of one year or more, and the taking of the leasehold
interest hereby created.

8.2  Termination

In the event that the entire Sears Tract or such substan-
tial portion thereof as shall make it economically unfeasible in
Tenant's judgment reasonably exercised to continue to operate the
remaining portion for the purposes herein stated, shall be taken
by condemnation, this Lease shall terminate as of the date when
Tenant is required to vacate the Sears Tract by order of competent
authority.  If this Lease is terminated as provided in this Section
8.2, all rent and other charges shall be paid up to the date of such
termination and Landlord shall make an equitable refund of any sums
paid by Tenant in advance and not yet earned and thereafter neither
party shall have any further obligation to the other hereunder.

In the event that such portion of the Sears Tract shall
be taken by condemnation so that pursuant to the REA, the REA ter-
minates or Tenant has the right to terminate the REA as to the
Sears Tract, then Tenant shall have the option to terminate this
Lease on written notice to Landlord within sixty (60) days after
such termination of the REA.  In the event of any taking by con-

24.

demnation which does not terminate this Lease pursuant to the
provisions of this Section 8.2, or in the event Tenant does not
terminate this Lease as in the last sentence aforesaid, then all
of the provisions of this Lease shall remain in full force and effec

8.3   **Damages**

Any award for damages for any taking by condemnation
of the whole or any part of the Sears Tract and/or of any Improve-
ments on the Sears Tract, shall be divided in the following order
of priority:

(a)   Notwithstanding anything in the REA to the contrary,
Landlord shall be paid such portion of the proceeds of the award as
shall be attributable to the taking of or damage to the Land, in-
cluding the reversionary interests of Landlord and (as provided in
the Ground Lease) the landlord under the Ground Lease, if any,
(determined as if there were no Improvements thereon (other than as
expressly provided below) and attributable to the reversionary
interests, if any, of the Landlord and (as provided in the Ground
Lease) the landlord under the Ground Lease, in the Improvements,
computed to the end of the Term, including all possible Extension
Terms, and Tenant shall be paid the balance of the proceeds of the
award.   In the event of any such condemnation affecting the Common
Area, Tenant's rights shall be as set forth in the REA.

(b)   The leasehold mortgage, if any, shall be paid such
portion of the proceeds of the award as the amount of any leasehold
mortgage that remains on the Sears Tract.

In the event of controversy between the parties respecting
that part of an award for condemnation of property larger than
but including part of the Sears Tract which is allocable to the part
of the Sears Tract taken, or respecting the proper division between
the parties of the proceeds of any award or any part thereof rela-
tive to the Sears Tract and/or any Improvements thereon, either Land-
lord or Tenant may notify the other that it elects to submit the
matter to arbitration, whereupon, within ten (10) days thereafter
each party shall, by notice to the other, appoint an appraiser
having an M.A.I. Certificate who shall promptly meet and attempt

-25-

to resolve such controversy. If, however, said two (2) appraisers are unable to agree, they shall appoint a third appraiser also having an M.A.I. Certificate, and such three appraisers shall promp meet and attempt to resolve such controversy. The determination of such controversy by any two (2) of said three (3) appraisers or a unanimous determination shall be binding and conclusive upon Landlord and Tenant and judgment upon any such determination may be entered in any court with jurisdiction thereof. The arbitration rules contained in the REA are incorporated herein by this referenc

Notwithstanding Section 8.3, Landlord and Tenant shall first be entitled to reimbursement from the proceeds of any award payable to them for damages for any taking by condemnation of the whole or any part of any Improvements on the Sears Tract, for all reasonable costs, fees and expenses incurred in the determination and collection of any such award.

8.3  Temporary Taking

In the case of a temporary taking in which this Lease does not or is not terminated, this Lease shall remain in full force and effect and any award received for such temporary taking shall be equitably divided between Landlord and Tenant.

8.5  Voluntary Sale

A voluntary sale of all or a portion of the Sears Tract by Landlord, agreed to by Tenant, to any public or quasi-public body, agency or person, corporate or otherwise, having the power of condemnation, either under threat of condemnation or while condemnation proceedings are pending, shall be deemed to be a taking by condemnation for the purposes of this Article. Any amount received as a result of such a sale shall be distributed and paid over to Tenant and Landlord in accordance with Section 8.3 hereof.

-26-

8.6    <u>Tenant Participation in Condemnation Proceedings</u>

Tenant shall have the right in its own name to parti-
cipate in any and all condemnation proceedings with respect to
its interest in the whole or any part of the Sears Tract and
Tenant shall have the like right to participate with Landlord
in the negotiations concerning a voluntary sale by Landlord pur-
suant to the provisions of Section 8.5.

8.7    <u>Restoration</u>

Tenant shall restore the Sears Tract after any condem-
nation to the extent of Tenant's obligations pursuant to the REA.

ARTICLE 9

ASSIGNMENT AND SUBLETTING

9.1    <u>Limitations on Right to Assign or Sublease</u>

Except as provided otherwise herein, Tenant shall not assign
this Lease without first obtaining the consent of Landlord, which
consent shall not be unreasonably withheld.

9.2    <u>Exceptions</u>

Notwithstanding Section 9.1, Tenant may, without first
obtaining the consent of the Landlord:

(a)    Subject to the REA, sublet and/or license the use
of the Sears Tract or its Improvements.

(b)    Subject to the REA, assign this Lease pursuant to
mortgage or deed of trust financing of the lease-
hold estate created hereby.

(c)    Assign this Lease to any Affiliate of Tenant.
(As used herein, an Affiliate means any Person
that directly or indirectly controls or is di-
rectly or indirectly controlled by Tenant and
any Person that is controlled by the same Person
that controls Tenant); provided, however, that
the provisions of this Section 9.2(c) shall be
applicable only during such time that the Person
to whom this Lease has been assigned remains an

27.

Affiliate of Tenant.

(d)   Assign this Lease pursuant to any merger, consoli-
dation or other reorganization of Tenant, or pur-
suant to a sale of any or all of Tenant's assets.

(e)   Subject to the REA, sell and leaseback or mortgage
or deed in trust of the Improvements on the Sears
Tract in connection with the financing thereof.

9.3   Liability of Tenant After Assignment

Tenant shall not be released from liability under this
Lease by virtue of any actions taken pursuant to Section 9.2
except that if Tenant assigns this Lease under Section 9.2(d),
it will be released of all further liability hereunder upon
delivery to Landlord of a written instrument wherein the assignee
assumes and agrees to be bound by all of the provisions of this
Lease, provided that on such date the net worth of the assignee
is at least Forty Million and No/100 Dollars ($40,000,000.00).

ARTICLE 10

REPAIRS, ALTERATIONS, ADDITIONS AND IMPROVEMENTS

10.1   Construction, Etc. of Improvements

Subject to the affirmative requirements and the restric-
tions and limitations placed thereon by the REA:   (i) Tenant
shall construct or, in the case of the Common Area on the Sears
Tract, contribute to the cost of the construction thereof, as
provided in the Supplemental Agreement, the Improvements upon
the Sears Tract and (ii) Tenant may raze, relocate, alter, re-
model, or add to the whole or any part of such Improvements,
provided all such work shall conform in all respects with applic-
able governmental codes, regulations and orders; provided, however,
that no structural alterations which substantially affect the exteric
appearance of the Store, shall be made without the prior written cons
of Landlord, which consent Landlord shall not withhold unreasonably.
Any alterations or additions (except movable furniture and trade
fixtures) shall become the property of Landlord upon the termination
date of this Lease.

28.

### 10.2  All Work at Tenant's Expense

Subject to the REA and the Supplemental Agreement, all work done by Tenant on the Sears Tract shall be at Tenant's sole expense unless necessitated by the negligence of Landlord, its agents, employees and contractors, in which event such work to the extent so necessitated shall be at Landlord's sole expense.

### 10.3  Indemnity - Liens

Landlord, the Ground Lessor, and Tenant shall defend and indemnify each other and hold each other and the Sears Tract harmless from any mechanics' or materialmen's liens on the Sears Tract for labor or material furnished for or on the Sears Tract; provided, however, that any party may contest the validity and/or amount of any such lien.  Upon final determination of the validity and amount thereof, the party so contesting shall immediately pay any judgment rendered, with all proper costs and charges, and shall have the lien released at such party's expense.

### 10.4  Repairs

Tenant shall keep and maintain the Sears Tract and Improvements and every part thereof in a safe, clean, orderly and sanitary condition and repair, and in good appearance, excepting however, reasonable wear and tear, acts of God and destruction by unavoidable casualty not required by this Lease to be insured against.  Tenant will cause periodic inspections to be made by qualified persons of the Improvements for the purpose of ascertaining and curing infestation thereof by termites, rodents and other pests, and thereafter take all measures as may be resonably required to prevent any damage or destruction by such infestation.

### ARTICLE 11

#### SURRENDER OF SEARS TRACT

### 11.1  Surrender of Sears Tract and Improvements

Upon the termination or expiration of this Lease, Tenant shall peaceably deliver to Landlord possession of the Sears

Tract free and clear of all tenancies and, subject to Section
11.2, all Improvements shall become part of the realty of the
Sears Tract and shall become the property of Landlord in an
"as is" condition, subject to the requirements of Section 10.4.
If Tenant remains in possession of all or part of the Sears
Tract after the termination or expiration of this Lease with
Landlord's consent, then Tenant shall be deemed (in the absence
of a written agreement to the contrary) to be a tenant from month-
to-month at a monthly rental payable in advance equal to the
monthly rental payable in the month immediately preceding such
termination or expiration, subject to all other provisions of
this Lease, except as to the Term hereof, until such tenancy
is terminated by Landlord or Tenant upon at least 30 days notice
given to the other.

11.2  Removal of Personal Property

From time to time during the Term, Tenant may alter, remodel
and remove its trade fixtures, furniture, furnishings, equipment,
stock in trade or other personal property. Tenant may, within
the thirty (30) day period immediately following the date of ter-
mination of the Term, enter the Sears Tract in order to remove such
personal property as may be located thereon.

ARTICLE 12

BROKERS' FEES

Landlord and Tenant each represents to the other that it
has conducted no negotiations with any broker in connection
with the execution and delivery of this Lease. Landlord and
Tenant each covenants to indemnify and hold the other harmless
from all claims, damages, costs, expenses and liabilities
(resulting from the act or omission of the covenanting party)
for any brokers' or similar fee in connection with the nego-
tiation, execution and delivery of this Lease.

30.

## ARTICLE 13

### INSURANCE

### 13.1  Public Liability Insurance

Tenant, during the term of this Lease, shall at its expense
maintain or cause to be maintained in force and effect comprehen-
sive public liability insurance covering the Sears Tract, includ-
ing coverage for any accident resulting in personal injury to or
death of any person and consequential damages arising therefrom
and comprehensive property damage insurance, each with a minimum
limit of not less than $2,000,000 combined single limit per occur-
rence, or such other greater limit (i) as Landlord and Tenant may
jointly specify from time to time or (ii) as may be established
by the Landlord under the Ground Lease pursuant to the terms
thereof.  Simultaneously with any review of the insurance coverage
under the REA, Landlord and Tenant shall review the insurance
coverage provided for herein and adjust the same so as to match
the coverage carried under the REA.  The policy or policies shall
cover Tenant's and Landlord's legal liability for injuries or
damages arising out of Tenant's occupancy of or operations at or
from the Sears Tract or its Improvements.

### 13.2  Further Policy Requirements

The insurance required to be maintained pursuant to the
provisions of this Article shall:

    (a)  Be effected under a valid and enforceable policy
        or policies or contract or contracts issued by
        insurers of recognized responsibility authorized
        to do business in Hawaii; provided, however, that
        nothing contained in this Subsection (a) shall be
        deemed to prohibit the obtaining of blanket poli-
        cies or contracts of insurance which may cover
        any other property or properties real or personal
        of any Persons, in addition to the property

covered pursuant to Section 13.1 hereof or any

other liabilities or risks or perils of any

Persons, in addition to the liabilities or risks

or perils covered pursuant to Section 13.1.

(b) Name Landlord and the landlord under the Ground
Lease as additional insureds.

(c) Contain an agreement by such insurer or insurers
to give at least ten (10) days' prior written
notice to Landlord and the landlord under the
Ground Lease in the event of: (i) any change
in the scope or amount of coverage provided by
such insurance; (ii) cancellation of such insur-
ance coverage.

13.3  Certificates

Tenant shall, upon request, furnish Landlord and the landlord

under the Ground Lease with a certificate or certificates evidencing

the insurance coverage required to be maintained by it pursuant to

this Article, such certificate or certificates to be furnished

within ten (10) days after the date on which any such insurance

(or renewal thereof) shall become effective. If Tenant shall not

be self-insured, upon request, Tenant shall furnish to the landlord

under the Ground Lease a true copy of the policy or policies pro-

viding such coverage.

13.4  Common Area Insurance

The insurance required to be maintained pursuant to the

provisions of Section 13.1 shall, to the extent it relates to

Common Areas on the Sears Tract, be satisfied by policies ob-

tained by the Operator of the Common Areas of the Shopping

Center provided such policies meet all applicable require-

ments of Sections 13.1 and 13.3.

32.

13.5  Self-Insurance

Notwithstanding anything to the contrary that may be con-
tained in this Article, the insurance required of Tenant under
this Lease or any part or portion thereof, may be carried under
any plan or plans of self-insurance (including deductibles) at
any time and from time to time maintained by Tenant, provided
Tenant has adequate reserves or resources for the risks so
insured against (provided that in the event the adequacy of
the reserves or resources shall be disputed by Landlord, then
such dispute shall be referred to and determined in arbitration
as herein provided; and provided further that $40,000,000.00 in
net current assets shall be conclusively deemed adequate reserves
and resources).

### ARTICLE 14

### INDEMNIFICATION; WAIVER OF SUBROGATION

14.1  Indemnity by Tenant

Tenant shall defend, indemnify and hold Landlord and the
landlord under the Ground Lease harmless against all claims,
damages, costs, expenses (including reasonable attorneys' fees
and court costs) and liabilities (herein collectively called
"claims") arising from or out of the death of or any accident,
injury, property damage, wrongful death or other loss or damage
whatsoever caused to any Person or to any property arising from
Tenant's use of the Sears Tract or as shall occur during the
Lease Term on the Sears Tract.

14.2  Indemnity by Landlord

Landlord shall defend, indemnify and hold Tenant harmless
against all claims, damages, costs, expenses (including reason-
able attorneys' fees and court costs) and liabilities (herein
collectively called "claims") arising from or out of the death
of or any accident, injury, property damage, wrongful death or
other loss or damage whatsoever caused to any Person or to any
property arising from Landlord's use of the Developer Tract as

33.

shall occur during the Term on the portions of the Shopping
Center not ground subleased to other Persons except if it is
the Operator of the Common Areas located thereon.

14.3  Waiver

To the extent possible under then current law, Landlord and
Tenant each releases the other and, on behalf of its insurer(s),
waives any right of subrogation against the other for damage to
the Improvements, or damage to the improvements on the remainder
of the Shopping Center or any part thereof, as the case may be.

## ARTICLE 15

### COMPLIANCE WITH LAWS

15.1  Tenant to Comply With Laws

Tenant shall comply with all present and future statutes,
ordinances, rules, regulations, etc. (herein collectively called
"Laws") issued with respect to the Sears Tract or the use and
occupancy thereof, other than those rules, etc. which are Land-
lord's or Developer's responsibility pursuant to the REA, and
will indemnify Landlord and the landlord under the Ground Lease
against all actions, suits, damages and claims by whomsoever
brought or made by reason of the non-observance or non-performance
of said laws, ordinances, rules and regulations or of this covenant.

15.2  Contesting Laws

After giving notice to Landlord, Tenant may, by appropriate
legal proceedings, contest the validity and/or applicability of
any Laws.  In this regard, Tenant may delay observance and com-
pliance with the Laws until the final determination of the con-
test, provided such delay will not subject Landlord to any fine,
criminal liability or other adverse sanction, or place the Sears
Tract in jeopardy.

34.

## ARTICLE 16

### EXCUSE FOR NON-PERFORMANCE

Landlord and Tenant shall each be excused from performing any obligation provided for in this Lease so long as the performance of the obligation is prevented by an act of God, fire, earthquake, flood, explosions, actions of the elements, war, mob violence, inability to procure or a general shortage of labor, equipment, facilities, supplies or materials on the open market, failure of transportation, strikes, lockouts, actions of labor unions, condemnation, laws or orders of governmental authorities or for any other cause, whether similar or dissimilar to the foregoing, not within the reasonable control of Landlord or Tenant, as the case may be.

## ARTICLE 17

### DEFAULT

17.1  Definition of "Default"

Each of the following shall be deemed a default by Tenant and a breach of this Lease:

The dissolution or the liquidation or the commencement of any proceeding for the dissolution or liquidation of Tenant in connection with bankruptcy or other insolvency (whether instituted by or against Tenant) under the Federal Bankruptcy Act or any state bankruptcy act.

If the event described in this Section shall be involuntary on the part of Tenant, then the event shall not be deemed a default within the meaning of this Lease if it is removed by Tenant within six (6) months.

For the purpose of this Article 17, the word "Tenant" shall be deemed to mean only the holder of the leasehold interest under this Lease at the time or times referred to in this Section.

35.

## 17.2  "Default" Further Defined

Each of the following shall also be deemed a default and a breach of this Lease:

(a)  Non-payment of the rent herein reserved or non-payment of additional rent, for a period of thirty (30) days after written demand therefor has been made by Landlord and received by Tenant.

(b)  A failure to perform any other provision, covenant, or warranty of this Lease on the part of Tenant or Landlord to be performed for a period of thirty (30) days after written notice to the party failing to perform.

Any notice given under Subsection (b) shall specify in general terms the work required to prevent the occurrence of a default. For the purposes of this Section, no default in the performance of the work required to be performed shall be deemed to exist if steps have in good faith been commenced promptly to rectify the same, and shall be prosecuted to completion with diligence. Delays occasioned by causes listed in Article 16 shall not be included in calculating the above-mentioned thrity (30) day period.

## ARTICLE 18

## REMEDIES AND DAMAGES

### 18.1  Landlord's Remedy and Damages for Tenant Default

Except as set forth in Section 6.2 or Article 8, in the event of a default by Tenant, Landlord shall have no right to terminate this Lease or to reenter the Sears Tract. Landlord further waives all other rights it may have at law or in equity for Tenant's defaults except that Landlord's sole and exclusive remedy for a default by Tenant shall be an action for damages limited to collection of past due and unpaid Rent and Additional Rent and for interest at the rate of 1% over the then existing prime rate of interest charged by Citibank, N.A., New York, New York (but not to exceed the rate allowable by law) from the dates such amounts are respectively due to the date of payment thereof, plus costs and attorney fees in connection therewi

36.

18.2   <u>Tenant's Remedies and Damages for Landlord Default</u>

Landlord expressly covenants that in the event of a Default by Landlord, Tenant at its election, may exercise any remedies it may have at law or in equity, and shall have the right to cure any default by Landlord if Landlord has not cured such default within thirty days after written notice. Tenant shall have a lien on the Developer Tract as defined in the REA to secure any costs or expense incurred by Tenant in curing any Default by Landlord.

ARTICLE 19

ARBITRATION

19.1   <u>Arbitration Available Only When "Dispute" Exists</u>

This Article applies in all cases (and only in such cases) where this Lease provides for the submission of a dispute or controversy to arbitration. Such dispute and controversies are herein called "disputes".

19.2   <u>Notice as a Prerequisite to Arbitration Proceedings</u>

Either Landlord or Tenant may refer a dispute to arbitration if thirty (30) days have elapsed from the day when it first gave the other party notice that a dispute existed. When a dispute is referred to arbitration, Landlord and Tenant shall cooperate in obtaining arbitration. Landlord and Tenant shall each select one arbitrator and the arbitrators so selected shall select a third arbitrator. Such arbitrators shall be specifically qualified if so required by the provisions of this Lease. If the arbitrators selected by the parties cannot agree on the selection of a third arbitrator, the same shall be appointed by the presiding judge of the San Francisco California Superior Court in his personal capacity and not in his judicial capacity.

19.3   <u>Place of and Rules Governing Arbitration</u>

Any dispute submitted to arbitration shall be settled by a board of three (3) arbitrators and shall take place in San Francisco, California. Judgment upon the arbitration award so obtained may thereafter be entered in any court of competent jurisdiction.

37.

The arbitrators shall have no authority or discretion to pass upon
the validity or fairness of this Lease or any provision of this
Lease, nor to disregard any provision of this Lease, nor to add
or imply any provisions not in this Lease contained, nor to decide
any arbitrable issue not specifically set forth in the demand for
arbitration, nor to pass upon any issue of law.

19.4    Arbitration as a Prerequisite to Judicial Proceedings

Compliance with this Article shall, to the extent permitted
by law, be a condition precedent to the commencement by Landlord
or Tenant of any judicial proceeding arising out of a dispute.

19.5    Costs of Arbitration

The costs of arbitration shall be borne by Landlord and
Tenant in accordance with the arbitration award so obtained,
provided however that no attorneys' fees shall be awarded in
arbitration and each party shall bear its own attorneys' fees,
costs and expenses, and its own travel, lodging and similar
expenses.

ARTICLE 20

NOTICES

Each notice, demand, request, consent, approval or other
communication (all of the foregoing are herein referred to as
a "notice") that Landlord or Tenant is required to make or com-
municate to the other must be in writing and must be given or
made or communicated by United States registered or certified
mail, postage prepaid, return receipt requested, addressed in
the case of Landlord to:

                    Windward Mall Shopping Center
                    243 Kearney Street
                    San Francisco, CA  94108

with a copy thereof to:

                    WINMAR COMPANY, INC.
                    P.O. Box 21545
                    Seattle, WA  98111

and addressed in the case of Tenant to:

> Sears, Roebuck and Co.
> 900 South Fremont Avenue
> Alhambra, CA  91802
> Attention:  (1) Executive Vice President, and
>              (2) Territorial Facilities Planning Mgr.

with a copy thereof to:

> Sears, Roebuck and Co.
> Sears Tower
> Chicago, IL  60684
> Attention:  Vice President/Controller

or at such other address as Landlord or Tenant shall from time
to time designate by thirty (30) days' notice to the other.

Any notice sent in accordance with the provisions of this
Section shall be deemed to have been given, made or communicated
on the date that the same was delivered by registered or certified
United States mail, properly addressed, postage prepaid, as shown
on the return receipt.

Every notice given to Landlord or Tenant or to other Persons
must state (or must be accompanied by a cover letter that states):

(a)  the Article of this Lease pursuant to which the
notice is given;

(b)  the period of time within which the recipient of
the notice must respond thereto; and

(c)  if applicable, that the failure to object to the
notice within the stated time period will be deemed
to be the recipient's approval of and/or consent
to the subject matter of the notice.

In no event shall a recipient's approval of and/or consent
to the subject matter of a notice be deemed to have been given
by its failure to object thereto if such notice (or the accom-
panying cover letter) did not fully comply with the requirements
of Subsection (c) immediately proceeding.

ARTICLE 21

COVENANT OF QUIET ENJOYMENT

Landlord covenants and warrants that:

(a)   Tenant shall lawfully and quietly hold, occupy
and enjoy the Sears Tract, subject, however,
to the terms of this Lease, free from hindrance
from Landlord or anyone claiming by, through or
under Landlord or the landlord under the Ground
Lease.

(b)   There are no liens, encumbrances or other title
exceptions outstanding with respect to the Sears
Tract except as set forth in Exhibit D.

(c)   Landlord warrants that the Sears Tract and the
Shopping Center are zoned respectively to permit
the construction and operation of the Store and
of the Shopping Center pursuant to the REA, in
accordance with applicable governmental codes,
rules, regulations and orders; and that all en-
vironmental and other requirements have been
satisfied.

ARTICLE 22

RESTORATION

Restoration of the Sears Tract consequent upon any damage
or destruction or condemnation caused thereto shall be performed
in the manner provided for in the REA.

ARTICLE 23

MISCELLANEOUS

23.1   Exhibits

Each reference herein to an Exhibit refers to the applicable
Exhibit that is attached to this Lease. All such Exhibits consti-
tute a part of this Lease and by this Section are expressly made a

41.

part hereof.

23.2   Memorandum of Lease

Neither Landlord nor Tenant shall record this Lease unless
it first secures the consent of the other.  However, Landlord
and Tenant shall record a Memorandum of this Lease.

23.3   Withholding of Consent

Whenever Landlord or Tenant is requested to consent to or
approve of any matter with respect to which its consent or approval
is required by this Lease, such consent or approval shall not, ex-
cept as may otherwise be provided in this Lease, be unreasonably
withheld.

In any case in which this Lease provides that the exercise
of a right by, or the performance of an obligation of, or the
execution of an action by a party hereto (hereinafter in this
Section called the "Consentee") shall be subject to the consent
or approval of the other party hereto (hereinafter in this Section
called the "Consentor"), and that the consent or approval of the
Consentor shall not be unreasonably withheld and the Consentor
shall withhold its consent or approval, then Consentor in writing
shall state in detail the reasons for such withholding and such
determination shall be conclusive upon Consentee unless Consentee,
within thirty (30) days after notice from Consentor of its deter-
mination, shall elect to have the matter submitted for determina-
tion by arbitration in accordance with this Lease.

Consentor's failure, for a period of thirty (30) days after
receipt of Consentee's request therefor, to notify Consentee of
its determination shall be considered approval by Consentor.

The submission to arbitration shall be the sole remedy of
Consentee as respects Consentor's determination, and when any
matter is so submitted to arbitration, the sole issue shall be
whether the withholding of consent or approval by the Consentor
as stated was reasonable or unreasonable.  No reason unstated in

41.

the written statement of withholding shall be admissible in
evidence or form any part of the arbitration decision.  If a
determination is made that the withholding of consent or approval
was unreasonable, then the arbitrators shall annul such withhold-
ing of consent or approval and, in this event, such annulment shall
be Consentee's sole remedy, it being the intention of the Landlord
and Tenant that in no event shall any such withholding of consent
or approval by Consentor (or any decision and arbitration with
respect thereto):

       (a)  Impose any financial liability upon, or result
           in any damages to Consentor; and/or

       (b)  Create any right or remedy enforceable in favor
           of Consentee and against Consentor in law or in
           equity under any special statutory proceeding
           (except by arbitration as provided above).

Notwithstanding the foregoing, any decision by the arbitra-
tors may also include an assessment of the cost of the arbitration
proceeding as between Consentor and Consentee.

23.4  Covenants to Run With Land

Each covenant, warranty, agreement, promise or duty of either
Landlord or Tenant as set forth herein shall be construed as a
covenant and not as a condition.  These covenants, warranties,
agreements, promises and duties shall, to the fullest extent
legally possible, either run with the land or constitute equit-
able servitudes and they shall be appurtenant to the land to
which they pertain.

23.5  References to Articles and Sections

All references herein to a given Article or a given Section
refer to the applicable Article or Section of this Lease.

42.

23.6   Table of Contents and Captions

The table of contents and captions of this Lease are inserted only as a matter of convenience and for reference. They do not define, limit or describe the scope or intent of this Lease and they shall not affect the interpretation hereof.

23.7   Locative Adverbs

The locative adverbs "herein", "hereunder", "hereto", "hereby", "hereinafter", etc., wherever the same appear herein, mean and refer to this Lease in its entirety and not to any specific Article, Section or Subsection hereof.

23.8   No Waiver

Landlord's receipt of rent, with knowledge of any breach of this Lease or any default hereunder, shall not be deemed to be a waiver of any provision of this Lease.

No failure by Landlord or Tenant to enforce any provision herein contained and no waiver by Landlord or Tenant of any right hereunder shall discharge or invalidate the provision or affect the right of Landlord or Tenant to enforce the same in the event of any later breach of this Lease or default.

Landlord's receipt of any rent or other sum of money or any other consideration paid by Tenant after Termination Date, shall not reinstate, continue or extend the Term.

Neither acceptance of the keys to the Store nor any other act done by Landlord during the Term shall be deemed to be an acceptance of a surrender of the Sears Tract, excepting only an agreement in writing signed by Landlord accepting or agreeing to accept a surrender.

23.9   Rights Cumulative

The rights given to Landlord and Tenant herein are in addition to any rights that may be given to either by any statute or otherwise except to the extent limited and/or waived herein by such party (including but not limited to Section 18.1).

43.

23.10  Effect of Assignment

The term "Landlord" means the Person who from time to time
holds all of the original Landlord's right, title and interest
in and to the Sears Tract. In the event of an assignment of
all of Landlord's right, title and interest in and to the Sears
Tract and upon notice of such assignment given by both the
assignor and the assignee to Tenant:

(a)  The assignor shall be and hereby is entirely freed
     and relieved of all covenants and obligations of
     Landlord hereunder not theretofore accrued; and

(b)  The assignee of the preceding Landlord's right,
     title, and interest in and to the Sears Tract shall
     be deemed, without further agreement, to have assumed
     and agreed to carry out all covenants and obligations
     of Landlord hereunder whether accrued or not.

Tenant shall not be required to apy any rent or other pay-
ment to the assignee until thirty (30) days after the aforemen-
tioned notice, provided all rent due prior to the expiration of
such thirty (30) days period has been duly paid to the assignor.
If Landlord or Tenant is more than one Person, or if more than
one Person has an interest (whether legal or equitable) in the
leasehold estate, a majority of such Persons or a majority in
interest in and to such leasehold estate, as the case may be,
shall appoint one of their number residing in Hawaii or Calif-
ornia, as an agent to receive rent, to receive service of process,
to receive notices, to grant consents or approvals and otherwise
to exercise the rights of Landlord or Tenant under this Lease;
failing such appointment by Landlord, Winmar Company, Inc. shall
be deemed the agent of Landlord.

23.11   Net Lease

It is the parties' intention that the rent payable here-
under shall be net to Landlord, so that this Lease shall yield
to Landlord the net annual rent specified herein during the
Term, and that all costs, expenses and obligations of every
kind and nature whatsoever relating to the Sears Tract shall
be paid by Tenant, except as provided in the Supplemental
Agreement and the REA.

23.12   Mechanics' Liens

Notice is hereby given that Landlord shall not be liable
for any labor or materials furnished to Tenant upon credit,
and that no mechanics' or other liens for any such labor or
material shall attach to or otherwise affect the reversionary
estate of Landlord.

23.13   Governing Law

This Lease and the rights and duties of the parties here-
under shall be governed by the laws of the State of Hawaii.

23.14   Certificate of Lease Status

Landlord and Tenant shall, upon not less than fifteen (15)
days' prior notice by the other party, execute and deliver to
the requesting party a statement in writing certifying that:

    (a)   This Lease is unmodified and in full force (or, if
              there has been any modification, that the Lease is
              in full force as so modified and identifying each
              modifying instrument);

    (b)   There are no known outstanding defenses or offsets
              (or, if there be any, a list of the same);

    (c)   The party has no knowledge of any defaults (or, if
              there be any, a list of the defaults);

    (d)   No notice of default has been given that has not
              been cured, if such is the case; and

    (e)   The dates to which all amounts due hereunder have
              been paid in advance, if any.

Such statement shall not create any liability whatsoever
in, or give rise to any claims whatsoever against the party
or its agent giving such statement, notwithstanding the know-
ing negligent, or inadvertent, failure to give correct and/or
relevant information.

23.15 Attorneys' Fees

In the event of any law suits between Landlord and Tenant
to interpret or to enforce any of the provisions of this Lease,
the prevailing party shall be entitled to recover from the losing
party reasonable attorneys' fees and its cost of suit. For pur-
poses of this section a cross-complaint shall be deemed a separate
lawsuit.

23.16 Successors and Assigns

This Lease shall be binding upon and inure to the benefit
of the respective successors, successors in interest and assigns
of Landlord and Tenant.


ARTICLE 24

GROUND LEASE: RECOGNITION


24.1   Landlord represents and warrants that Landlord has
a leasehold interest in the Shopping Center as described in Exhibit
A by virtue of the Ground Lease.

Landlord agrees to faithfully perform and observe all of the
terms, covenants and conditions contained in said Ground Lease
on its part to be kept, performed and observed and to protect
Tenant against any act by Landlord which would constitute a
default which would provide for termination of said Ground Lease
or of Landlord's right of possession thereunder.

Concurrently herewith Landlord, the landlord under the


46.

Ground Lease and Tenant have executed and filed and recorded

a certain Recognition and Non-Disturbance Agreement with

Attornment Provisions with respect to this Lease.

24.2   Tenant acknowledges and represents that it is enter-

ing into this Lease with full knowledge of the state and condi-

tion of Landlord's interest under the Ground Lease and that both

parties hereto have entered into this Lease in reliance upon

acknowledgements, agreements, representations and indemnities

contained therein.   Tenant hereby acknowledges that it has re-

ceived a copy of the Ground Lease and has examined the same.

IN WITNESS WHEREOF, Landlord and Tenant have

executed this Lease as of the day and year first above written.

WINDWARD MALL SHOPPING CENTER

By Winmar of The Islands, Inc.
General Partner

By _____
VICE PRESIDENT

By _____
ASSISTANT SECRETARY

WINDWARD MALL, INC.
General Partner

By _____
VICE PRESIDENT

By _____

LEGAL
APPROVAL
7.6-80
12-20-90 2.B

SEARS, ROEBUCK AND CO.

By _____
TERRITORIAL FACILITIES
PLANNING MANAGER

EXHIBIT A

ALL those certain parcels of land situate at Heeia, District of Koolaupoko, City and County of Honolulu, State of Hawaii described as follows:

ITEM I:

FIRST:

| Lot No. | Area | Map | Land Court Application | Transfer Certificate of Title |
|---|---|---|---|---|
| 1656 | 4.802 acres | 189 | 1100 | 142,857 |
| 1659 | 36,017 sq. ft. | 190 | 1100 | 142,857 |
| 1745 | 3.151 acres | 199 | 1100 | 142,857 |
| 1746 | 0.554 acres | 199 | 1100 | 142,857 |
| 1747 | 4.435 acres | 199 | 1100 | 142,857 |
| 1748 | 5.773 acres | 199 | 1100 | 142,857 |
| 1749 | 1.318 acres | 199 | 1100 | 142,857 |
| 3 | 930 sq. ft. | 7 | 1225 | 28,657 |
| 4 | 37,006 sq. ft. | 7 | 1225 | 28,657 |
| C-2-A | 0.268 acres | 6 | 1342 | 29,680 |
| C-2-B | 0.371 acres | 6 | 1342 | 29,680 |
| 1-B | 0.227 acres | 3 | 1799 | 113,149 |

SECOND:

Parcel "C" (being a portion of R. P. 1025, L. C. Aw. 5435-B, to Keau, being also a portion of Exclusion 40 of Land Court Application 1100), containing an area of 12,185 square feet, more particularly described as follows:

Beginning at the East corner of this parcel of land and on the Northwest side of Mehana Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "Heeia" being 9107.10 feet South and 6417.91 feet East, and running thence by azimuths measured clockwise from true South:
1.  61° 42'  207.80 feet along the Northwest side of Mehana Street;
2.  151° 58'  48.44 feet along Lot 1650 of Land Court Application 1100;
3.  178° 20'  16.70 feet along same;
4.  244° 18'  200.00 feet along same;
5.  331° 23'  54.29 feet along same to the point of beginning.

### THIRD:

·Lots A, B and C (being portions of R. P. 1026, L. C.
Aw. 7528, Ap. 1 to Kimokeo, being also a portion of Exclusion
40 of Land Court Application 1100), containing an area of ·54,850
square feet, more particularly described as follows:

Beginning at the South·corner of Lot C and the West
corner of Lot 1242 of Land Court Application 1100, the coordi-.
nates of said point of. beginning referred to Government Survey
Triangulation Station "Heeia" being 9705.98 feet and 5887.64
feet East, and running thence by azimuths measured clockwise
from true South:

1.  153°  30'  238.34 feet along Lot 1243 of Land Court
                       Application 1100 and Lots 2-B-4,
                       2-B-3 and 2-B-2 of Land Court
                       Application· 1225;
2.  235°  09'  205.10 feet along Lot 1650 of Land Court
                       Application 1100;
3.  313°  13'  216.53 feet along Lot C-2 of Land Court
                       Application 1342 and Lot 1659 of
                       Land Court Application 1100;
4.  50°  20'  285.50 feet along Lots 1659, 1660 and 1242
                       of Land Court Application 1100 to
                       the point of beginning.

### FOURTH:

Lot 1-A-2 (being a portion of R. P. 1028, L. C. Aw.
2158, Ap. 1 to Alotailio, being also a portion of Exclusion 39
of Land Court Application 1100), containing an area of 2,109
square feet, more particularly described as follows:

Beginning at the North corner of this lot, the same
being the common corner of Lots 54-A-1-B-3-A and 1659 of Land
Court Application 1100 and Parcel "C-1", the coordinates of said
point of beginning referred to Government Survey Triangulation
Station "Heeia" being 9428.67 feet South and 6269.09 feet East,
and running thence by azimuths measured clockwise from true South:

1.  331°  42'  54.23 feet along Parcel "C-1" and Lot 1-C;
2.  54°  48'  36.07 feet along Lot 1-A-1;
3.  128°  56'  41.04 feet along Lot 1659 of Land Court
                       Application 1100;
4.  219°  51'  55.65 feet along same to the point of
                       beginning.

### FIFTH:

Portion of R. P. 1023, L. C. Aw. 5435, Ap. 2 to Kahuena
( ing also a portion of Exclusion 37 of Land Court Application
1100), containing an area of 10,593 square feet, more particularly
described as follows:

Beginning at the Northeast corner of this parcel of land,

the Northwest corner of Lot 1-B of Land Court Application 1799,
and on the Southeast side of Haiku Road, the coordinates of said
point of beginning referred to Government Survey Triangulation
"Heeia" being 8456.30 feet South and 6000.22 feet East, and run-
ning thence by azimuths measured clockwise from true South:

1. 333° 34' 00"  89.40 feet along Lot 1-B of Land Court
                       Application 1799;
2.  60° 14' 00"  57.50 feet along Lot 1650 of Land
                       Court Application 1100;
3.  66° 22' 00"  64.90 feet along same;
4. 154° 40' 00"  82.03 feet along same;
5. 240° 05' 50"  93.62 feet along the Southeast side of
                       Haiku Road;
6. 239° 35' 00"  27.27 feet along same to the point of
                       beginning.

#### SIXTH:

Portion of R. P. 1029, L. C. Aw. 7517, Ap. 1 to Kapule
and all of R. P. 1029, L. C. Aw. 7517, Ap. 2 to Kapule, being also
a portion of Exclusion 38 of Land Court Application 1100, contain-
ing an area of 1.037 acres, more particularly described as follows:

Beginning at the East corner of this parcel of land,
being also the East corner of R. P. 1029, L. C. Aw. 7517, Ap. 1
to Kapule, the coordinates of said point of beginning referred
to Government Survey Triangulation Station "Heeia" being 8554.30
feet South and 6196.02 feet East, and running thence by azimuths
measured clockwise from true South:

1.  46° 41'  283.00 feet along Lot 1650 of Land
                       Court Application 1100;
2. 320° 00'  110.34 feet along same;
3.  50° 00'  104.30 feet along same;
4. 140° 00'  104.30 feet along same;
5. 226° 41'   60.47 feet along the remainder of R. P.
                       1029, L. C. Aw. 7517, Ap. 1 to
                       Kapule;
6. 140° 00'  116.92 feet along same;
7. 235° 24'   76.13 feet along same;
8. 154° 40'   20.27 feet along same;
9. 235° 24'  223.00 feet along Lot 1650 of Land
                       Court Application 1100;
10. 305° 16'  92.50 feet along same;

#### SEVENTH:

Portion of R. P. 1029, L. C. Aw. 7517, Ap. 1 to Kapule,
being also a portion of Exclusion 38 of Land Court Application
1100, containing an area of 1.087 acres, more particularly
described as follows:

Beginning at the North corner of this parcel of land,
the coordinates of said point of beginning referred to Government
Survey Triangulation Station "Heeia" being 8627.52 feet South and

5936.94 feet East, and running thence by azimuths measured clock-
wise from true South:
1. 334° 40' 20.27 feet along the remainder of R. P.
1029, L. C. Aw. 7517, Ap. 1 to
Kapule;
2. 55° 24' 76.13 feet along same;
3. 320° 00' 116.92 feet along same;
4. 46° 41' 330.90 feet along R. P. 1029, L. C. Aw.
7517, Ap. 2 to Kapule and along
Lot 1650 of Land Court
Application 1100;
5. 153° 55' 148.50 feet along Lot 1650 of Land
Court Application 1100;
6. 223° 26' 191.40 feet along same;
7. 235° 24' 186.20 feet along same to the point of
beginning and containing an area
of 1.087 acres.

EIGHTH:

ALL of R. P. 1023, L. C. Aw. 5435, Ap. 1 to Kahuena,
being also a portion of Exclusion 40 of Land Court Application
1100, containing an area of 1.34 acres, more particularly de-
scribed as follows:

Beginning at a point in the middle of a ditch at the
East corner of this parcel of land and on the Northerly boundary
of Lot C-2 of Land Court Application 1342, the coordinates of
said point of beginning referred to Government Survey Triangu-
lation Station "Heeia" being 9261.82 feet South and 6137.15 feet
East, and running thence by azimuths measured clockwise from true
South:
Along the middle of ditch,
along Lot C-2 of Land Court
Application 1324, the direct
azimuth and distance being
1. 68° 26' 30" 135.89 feet;
2. 150° 00' 23.80 feet along Lot 1650 of Land
Court Application 1100;
3. 78° 00' 71.30 feet along same;
4. 130° 00' 66.00 feet along same;
5. 150° 30' 167.00 feet along same;
6. 235° 30' 213.10 feet along same;
7. 328° 00' 311.70 feet along same to the point
of beginning.

ITEM II:

Lot 1652, area 45,154 square feet or 1.037 acres, as
shown on Map 189 filed in the Office of the Assistant Registrar
of the Land Court of Hawaii with Land Court Application 1100,
and being all of the land described in Owners' Transfer Certif-
icate of Title No. _____.

Page 4 of 7

ITEM III:

Lot 1653, area 47,350 square feet or 1.087 acres, as shown on Map 189 filed in the Office of the Assistant Registrar of the Land Court of Hawaii with Land Court Application 1100, and being all of the land described in Owners' Transfer Certificate of Title No. 331491 .

ITEM IV:

FIRST:

Lot 1658, area 39,474 square feet, as shown on Map 190 filed in the Office of the Assistant Registrar of the Land Court of Hawaii with Land Court Application 1100, and being all of the land described in Owners' Transfer Certificate of Title No. 321536.

SECOND:

Lot 1-A-1 (being a portion of R. P. 1028, L. C. Aw. 2158, Ap. 1 to Alotailio, being also a portion of Exclusion 39 of Land Court Application 1100), containing an area of 18,896 square feet, more particularly described as follows:

Beginning at the North corner of this lot, the Southeast corner of Lot 1-C, and on the Southwest side of Kawa Street, the coordinates of said point of beginning referred to Government Survey Triangulation Station "Heeia" being 9407.19 feet South and 6423.34 feet East, and running thence by azimuths measured clockwise from true South:

| | | | |
|---|---|---|---|
| 1. | 331° 42' | 185.48 | feet along the Southwest side of Kawa Street; |
| 2. | 48° 42' | 42.40 | feet along Lot 1654 of Land Court Application 1100; |
| 3. | 131° 44' | 155.00 | feet along same; |
| 4. | 41° 29' | 63.40 | feet along same; |
| 5. | 128° 56' | 72.56 | feet along same; |
| 6. | 234° 48' | 36.07 | feet along Lot 1-A-2; |
| 7. | 241° 42' | 146.00 | feet along Lot 1-C to the point of beginning. |

ITEM V:

Lot 1651, area 26,632 square feet or 0.611 acre, as shown on Map 189 filed in the Office of the Assistant Registrar of the Land Court of Hawaii with Land Court Application 1100, and being all of the land described in Owners' Transfer Certificate of Title No. 321485 .

SUBJECT, HOWEVER, to the following which relate to the aforementioned ITEMS, delineated as follows:

1.    As to ITEM I only:

A.  Grant dated July 22, 1969, filed as Land Court Document No. 492742, in favor of the City and County of Honolulu, granting a perpetual easement for sanitary sewer purposes through, under and across Easement 210 as shown on Map 54, said Application 1100, affecting said Lot 1650.

B.  Grant dated April 29, 1974, filed as Land Court Document No. 698525, in favor of the City and County of Honolulu, granting a perpetual easement for sanitary sewer purposes through, under and across Easement 419, as shown on Map 103, said Application 1100, affecting said Lot 1650, and Easement 2, as shown on Map 3, said Application 1225, affecting said Lot 2-B-4.

C.  Grant dated August 20, 1973, filed as Land Court Document No. 744053, in favor of the City and County of Honolulu, granting a perpetual easement for storm drain purposes through, under and across Easement 420 as shown on Map 103, said Application 1100, affecting said Lot 1650.

D.  Grant dated April 28, 1975, filed as Land Court Document No. 724260, in favor of the City and County of Honolulu, granting a perpetual easement for storm drain purposes through, under and across Easements 544 and 545, as shown on Map 143, said Application 1100, affecting said Lot 1650.

E.  Grant dated June 30, 1976, filed as Land Court Document No. 828351, in favor of the City and County of Honolulu, granting a perpetual easement for sanitary sewer purposes through, under and across Easements 546, 547 and 548, as shown on Map 149, said Application 1100, affecting said Lots 1650, 1655 and 1656, Easement 3, as shown on Map 4, said Application 1225, affecting said Lot 2-B-1, and Easement 2, as shown on Map 4, said Application 1342, affecting said Lot C-2.

F.  Grant dated September 2, 1976, filed as Land Court Document No. 786453, in favor of Hawaiian Electric Company, Inc., granting a perpetual easement for guy wires and anchors, affecting said Lot 1650.

G.  Grant dated December 14, 1976, filed as Land Court Document No. 817131, in favor of the City and County of Honolulu, granting a perpetual easement for storm drain purposes through, under and across Easement 585, as shown on Map 176, said Application 1100, affecting said Lot 1655, and Easement 4, as shown on Map 5, said Application 1225, affecting said Lot 2-B-1.

H.  Grant dated June 16, 1972, filed as Land Court Document No. 597975, in favor of Hawaiian Electric Company, Inc. and Hawaiian Telephone Company, granting a perpetual easement for underground lines within Easement 402, as shown on Map 103, said Application 1100, affecting said Lots 1659 and 1660.

I.  Designation of Easement 602 (12 feet wide), as shown

on Map 189, Land Court Application 1100, as set forth by Land
Court Order No. _55575_, filed _1/31/50 (across Lot 1650)_.

J.  Designation of Easement 3 (12 feet wide), as shown
on Map _5_, Land Court Application 1342, as set forth by Land
Court Order No. _55615_, filed _3/4/50 (across Lot C-5)_.

K.  Grant dated May 18, 1976, recorded in said Bureau
in Liber 12156, page 408, in favor of the City and County of
Honolulu, granting as easement (10 feet wide) for sanitary sewer
purposes, affecting parcel THIRD.

L.  Unrecorded Tenancy No. 2414 to Roland P. and Alma
H. Ahuna dated November 22, 1977, comprising that parcel of land
described in Parcel THIRD.

2.    As to ITEM IV only:

A.  Grant dated August 20, 1973, filed as Land Court
Document No. 744053, in favor of the City and County of Honolulu,
granting a perpetual easement for storm drain purposes through,
under and across Easement 448 as shown on Map 114, said Applica-
tion 1100.

3.    As to ITEMS I, II, III, IV and V, the reservation in favor
of the State of Hawaii of all mineral and metallic mines.

Mar 02 2006 10:50AM   HP LASERJET FAX

## SEARS TRACT

All those certain parcels of land situate at Heeia, District of Koolaupoko, City and County of Honolulu, State of Hawaii, described as follows:

-FIRST:-    All of that certain parcel of land (portion of the land described in and covered by Royal Patent Number 1023, Land Commission Award Number 5435, Apana 2 to Kahuena) situate, lying and being at Heeia, District of Koolaupoko, City and County of Honolulu, State of Hawaii, being a PORTION OF EXCLUSION 37 of Land Court Application 1100, and thus bounded and described as per survey of Kataichi Ninomiya, Registered Professional Land Surveyor, dated July 9, 1981, to-wit:

Beginning at the Northwest corner of this piece of land and on the Southerly side of Haiku Road, the coordinates of said point of beginning referred to Government Survey Triangulation Station "HEEIA" being 8,518.10 feet South and 5,897.48 feet East, thence running by azimuths measured clockwise from true South:

| | | | | |
|---|---|---|---|---|
| 1. | 240° | 05' | 50" | 83.74 | feet along the Southerly side of Haiku Road; |
| 2. | 331° | 41' | | 88.95 | feet along the remainder of R. P. 1023, L. C. Aw. 5435, Ap. 2 to Kahuena; |
| 3. | 60° | 14' | | 23.30 | feet along Lot 1745 (Map 199) of Land Court Application 1100; |
| 4. | 66° | 22' | | 64.90 | feet along Lot 1745 (Map 199) of Land Court Application 1100; |
| 5. | 154° | 40' | | 82.03 | feet along Lot 1745 (Map 199) of Land Court Application 1100 to the point of beginning and containing an area of 7,417 square feet, more or less. |

-SECOND:-    All of that certain parcel of land (portion of the land described in and covered by Royal Patent Number 1029, Land Commission Award Number 7517, Apana 2 to Kapule) situate, lying and being at Heeia aforesaid, being a PORTION OF EXCLUSION 38 of Land Court Application 1100, and thus bounded and described as per survey of Kataichi Ninomiya, Registered Professional Land Surveyor, dated July 9, 1981, to-wit:

Beginning at the Northeast corner of this piece of land, the coordinates of said point of beginning referred to Government Survey Triangulation Station "HEEIA" being 8,517.77 feet South and 6,021.48 feet East, thence running by azimuths measured clockwise from true South:

| | | | | |
|---|---|---|---|---|
| 1. | 331° | 41' | | 111.30 | feet along remainder of R. P. 1029, L. C. Aw. 7517, Ap. 1 to Kapule; |

Exhibit B, Page 1 of 3

Mar 02 2006 10:50AM   HP LASERJET FAX

| | | | | |
|---|---|---|---|---|
| 2. | 58° | 58' | 249.87 | feet along remainder of R. P. 1029, L. C. Aw. 7517, Ap. 1 to Kapule; |
| 3. | 31° | 45' | 212.81 | feet along remainder of R. P. 1029, L. C. Aw. 7517, Ap. 1 to Kapule; |
| 4. | 46° | 41' | 40.17 | feet along Lot 1745 (Map 199) of Land Court Application 1100; |
| 5. | 153° | 55' | 148.50 | feet along Lot 1745 (Map 199) of Land Court Application 1100; |
| 6. | 223° | 26' | 191.40 | feet along Lot 1745 (Map 199) of Land Court Application 1100; |
| 7. | 235° | 24' | 286.95 | feet along Lot 1745 (Map 199) of Land Court Application 1100 to the point of beginning and containing an area of 54,267 square feet, more or less. |

-THIRD:-   All of that certain parcel of land situate at Heeia aforesaid, described as follows:

LOT 1745, area 3.151 acres, as shown on Map 199, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1100;

Being a portion of the premises described in Transfer Certificate of Title No. 142,857 issued to the Trustees under the Will and of the Estate of Bernice Pauahi Bishop, deceased.

-FOURTH:-   All of that certain parcel of land situate at Heeia aforesaid, described as follows:

LOT 1651, area 0.611 acre, as shown on Map 189, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1100;

Being the same premises described in Transfer Certificate of Title No. 221,489 issued to Ryoichi Takazono and Setsuko Takazono, husband and wife, as Tenants by the Entirety.

-FIFTH:-   All of that certain parcel of land situate at Heeia aforesaid, described as follows:

LOT 1652, area 1.037 acres, as shown on Map 189, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1100;

Being the same premises described in Transfer
Certificate of Title No. 221,490 issued to William Kalani
Johnston, husband of Julie Johnston, Hugh Gabriel Johnston,
husband of Jessie Johnston, Virginia Johnston Bly, wife of
James Bly, Ida Mae Ornellas, wife of George Ornellas, Ted Guy
Johnston, husband of Margaret Johnston, Dorothy Johnston Beyer,
wife of John Kalani Beyer, Edith Paahau Silva Henriques, wife
of Henry Henriques, and Paul Kaili Johnston, husband of Maureen
M. Johnston, as Tenants in Common.

   -SIXTH:-    All of that certain parcel of land situate at
                  Heeia aforesaid, described as follows:


LOT 1653, area 1.037 acres, as shown on Map 189,
filed in the Office of the Assistant Registrar of the Land
Court of the State of Hawaii with Land Court Application No.
1100;

Being the same premises described in Transfer
Certificate of Title No. 221,491 issued to Michael Kaiwilohia
Kukahiwa, unmarried.

Mar 02 2006 10:50AM   HP LASERJET FAX

Exhibit D

Title Exceptions

1. IMPROVEMENT ASSESSMENT: KAM HIGHWAY, UNIT 1

   DISTRICT NO. 235                    LOT NO. 7

   PAYABLE                  :  20 installments
   BALANCE                  :  $6,878.45
     INSTALLMENT NO. 8      :  $   529.11
     INTEREST 6-1/2%        :  $   447.10
     TOTAL                  :  $   976.21  DUE:  11/8/81

   Which Landlord covenants to pay as and when due.


2. -AS TO PARCELS FIRST AND SECOND ONLY:-
   Reservation in favor of the State of Hawaii of all mineral
   and metallic mines.


3. Unilateral Agreement for Conditional Zoning dated January
   20, 1978, recorded in Liber 12684 at Page 217, by and
   between the Trustees of the Estate of Bernice Pauahi
   Bishop, Deceased, as Owner, and George Mitsuji Hasegawa, as
   Developer, "Declarant", and City Council of the City and
   County of Honolulu, State of Hawaii, "Council"; re:
   provisions of Ordinance No. 4300, Bill No. 167(1973),
   relating to conditional zoning, considerations of change in
   zoning from R-3 to B-2, etc. (not noted on Transfer
   Certificates of Title Nos. 142,857, 221,489, 221,490 and
   221,491).


Exhibit "D"

Page 1 of 4

Mar 02 2006 10:50AM   HP LASERJET FAX

Exhibit D.

4.   Unrecorded LEASE dated as of July 1, 1979, entered into by
     and between THE TRUSTEES OF THE ESTATE OF BERNICE PAUAHI
     BISHOP; WILLIAM KALANI JOHNSTON, husband of Julie Johnston,
     HUGH GABRIEL JOHNSTON, husband of Jessie Johnston, VIRGINIA
     JOHNSTON BLY, wife of James Bly, IDA MAE ORNELLAS, wife of
     George Ornellas, TED GUY JOHNSTON, husband of Margaret
     Johnston, DOROTHY JOHNSTON BEYER, wife of John K. Beyer,
     EDITH PAAHAU SILVA HENRIQUES, wife of Henry Henriques, and
     PAUL KAILI JOHNSTON, husband of Maureen H. Johnston;
     MICHAEL KAIWILOEHA KUKAHIWA, unmarried; HERMAN JOSEPH CHOY,
     unmarried; and EDMUND WAH HIN CHOY, unmarried; and RYOICHI
     TAKAZONO, husband of Setsuko Takazono, and TAMI TAKAZONO,
     widow, as Lessors, and WINDWARD MALL SHOPPING CENTER, a
     California limited partnership, as Lessee, of which a SHORT
     FORM dated August 8, 1979, as of July 1, 1979, is filed as
     Document No. 960514, recorded in Liber 13949 at Page 91;
     leasing and demising the land described herein, besides
     other lands, for a term commencing on July 1, 1979 and
     continuing thereafter to and including the date sixty-two
     (62) years from July 1, 1979.  Said Lease was amended by
     instrument dated March 7, 1980, filed as Document No.
     1024524, recorded in Liber 14891 at Page 126; re:
     description.  Said Lease was further amended by Partial
     Surrender of Lease dated December 4, 1980, filed as
     Document No. 1055833 and further amended by instrument
     dated June 19, 1981, filed as Document No. 1083607,
     recorded in Liber 15803 at Page 394.  Said Lease, as
     amended, is subject to RECOGNITION AND NON-DISTURBANCE
     AGREEMENT WITH ATTORNMENT PROVISIONS between Lessors,
     Lessee and Sears, Roebuck and Co., dated June 19, 1981,
     filed and recorded on September 8, 1981 as Document No.
     1083615 and in Liber 15803 at Page 533, respectively.

5.   Agreement for Issuance of Special Use Permit under
     Ordinance No. 4451, Bill No. 40(1975) dated December 9,
     1980, recorded in Liber 15280 at Page 119, by Windward Mall
     Shopping Center, a California limited partnership , and the
     Trustees of the Estate of Bernice Pauahi Bishop, William
     Kalani Johnston, husband of Julie Johnston, Hugh Gabriel
     Johnston, husband of Jessie Johnston, Virginia Johnston
     Bly, wife of James Bly, Ida Mae Ornellas, wife of George
     Ornellas, Ted Guy Johnston, husband of Margaret Johnston,
     Dorothy Johnston Beyer, wife of John K. Beyer, Edith Paahau
     Silva Henriques, wife of Henry Henriques, Paul Kaili

Mar 02 2006 10:50AM    HP LASERJET FAX

Exhibit D


Johnston, husband of Maureen M. Johnston, Michael
Kaiwilohia Kukahiwa, unmarried, Herman Joseph Choy,
unmarried, Edmund Wah Hin Choy, unmarried, and Ryoichi
Takazono and Setsuko Takazono, husband and wife,
"Declarant"; re: this agreement is made pursuant to and in
compliance with the provisions of Ordinance No. 4451, Bill
No. 40(1975), relating to the joint development of two (2)
or more adjacent lots, etc. (not noted on Transfer
Certificates of Title Nos. 142,857, 221,489, 221,490 and
221,491).


Second Agreement for Issuance of Special Use Permit under
Ordinance No. 4451, Bill No. 40(1975) dated June 19, 1981,
recorded in Liber 15702 at Page 701, by Windward Mall
Shopping Center, a California limited partnership, and the
Trustees of the Estate of Bernice Pauahi Bishop, William
Kalani Johnston, husband of Julie Johnston, Hugh Gabriel
Johnston, husband of Jessie Johnston, Virginia Johnston
Bly, wife of James Bly, Ida Mae Ornellas, wife of George
Ornellas, Ted Guy Johnston, husband of Margaret Johnston,
Dorothy Johnston Beyer, wife of John K. Beyer, Edith Paahau
Silva Henriques, wife of Henry Henriques, Paul Kaili
Johnston, husband of Maureen M. Johnston, Michael
Kaiwilohia Kukahiwa, unmarried, Herman Joseph Choy,
unmarried, Edmund Wah Hin Choy, unmarried, and Ryoichi
Takazono and Setsuko Takazono, husband and wife,
"Declarant"; re: this agreement is made pursuant to and in
compliance with the provisions of Ordinance No. 4451, Bill
No. 40(1975), relating to the joint development of two (2)
or more adjacent lots, etc. (not noted on Transfer
Certificates of Title Nos. 142,857, 221,489, 221,490 and
221,491).


Exhibit "D"

Page 3 of 4

Exhibit D


7.  Construction, Operation and Reciprocal Easement Agreement
    dated as of June 1, 1981, filed as Document No. 1083617,
    and also recorded in Liber 15803 at Page 570, by and among
    Windward Mall Shopping Center, a California limited
    partnership, Sears, Roebuck and Co., a New York
    corporation, J. C. Penney Properties, Inc., a Delaware
    corporation, and Liberty House, Inc., a Hawaii corporation.

# EXHIBIT B

## THE 2011 AMENDMENT

AMENDMENT TO AND EXTENSION OF LEASE AND AGREEMENTS REGARDING THE REA
(Sears – Windward Mall)

THIS AMENDMENT TO AND EXTENSION OF LEASE AND AGREEMENTS REGARDING THE REA dated _____ May 31, ____, 2011 (this "**Amendment**"), by and between **CORBETT AARON KAMOHAIKIOKALANI KALAMA, JAMES DOUGLAS KEAUHOU ING, MICAH A. KANE, DIANE JOYCE PLOTTS, and JANEEN-ANN AHULANI OLDS, as Trustees of the Estate of Bernice Pauahi Bishop** (successor-in-interest to Windward Mall Shopping Center, a California limited partnership), whose place of business and post office address is 567 South King Street, Suite 200, Honolulu, Hawai'i 96813, hereinafter called the "**Landlord**" and **SEARS ROEBUCK AND CO., a New York corporation**, whose address is 3333 Beverly Road, B2-130B, Hoffman Estates, Illinois 60179, hereinafter called the "**Tenant.**"

W I T N E S S E T H:

WHEREAS, Landlord's predecessor-in-interest and Tenant entered into that certain unrecorded Ground Sublease (Kaneohe, Hawaii) dated January 23, 1981, of which a Memorandum of Ground Sublease (Kaneohe, Hawaii) dated January 23, 1981, is recorded in the Office of the Assistant Registrar of the Land Court of the State of Hawai'i (the "**Office of the Assistant Registrar**") as Document No. 1083613, and noted on Transfer Certificate of Title Nos. _____ 142,857, 286,916, 432,530, _____, and _____ 435,551 _____ (the "**TCTs**") and also recorded in the Bureau of Conveyance of the State of Hawai'i ("**Bureau**") in Book 15803, at Page 506, as may have been amended by unrecorded instruments (the "**Lease**"). Landlord acquired Landlord's interest in the Lease by an instrument dated September 4, 1991, recorded in the Office of the Assistant Registrar as Document No. 1848363 and noted on the TCTs, and also recorded in the Bureau as Document No. 91-120353. Capitalized terms not defined herein shall have the meanings set forth in the Lease.

WHEREAS, Landlord's predecessor-in-interest and Tenant are also parties to that certain Construction, Operation and Reciprocal Easement Agreement (Windward Mall) dated as of June 1, 1981, recorded in the Office of the Assistant Registrar as Document No. 1083617, and noted on, among other transfer certificates of title, the TCTs, and also recorded in the Bureau in Book 15803, at Page 570 (the "**Original REA**"), as amended by the following: (1) First Amendment to Construction, Operation and Reciprocal Easement Agreement dated as of June 24, 1986, recorded in the Office of the Assistant Registrar, as Document No. 1397492, and in the Bureau on November 13, 1986, in Book 20043, at Page 722; and (2) Second Amendment to Construction, Operation and Reciprocal Easement Agreement dated as of March 2, 1987, recorded in the Office of the Assistant Registrar as Document No. 1587027, and in the Bureau on October 19, 1988, in Book 22479, at Page 596 (all as noted on, among other transfer certificates of title, the TCTs). The Original REA and the amendments are collectively referred to herein as the "**REA.**" Landlord acquired Landlord's interest in the REA by instrument dated July 29, 1999, recorded in the Office of the Assistant Registrar as Document No. 2563676, and noted on Transfer Certificates of Title Nos. 142,857; 286,916; 411,565; 411,594; 411,748; 432,530; 435,551; & 922,920 and also recorded in the Bureau as Document No. 99-121831, and by an instrument dated September 4, 1991, recorded in the Office of the Assistant Registrar as Document No. 1848363 and noted on the TCTs, and also recorded in the Bureau as Document No. 91-120353.

WHEREAS, Tenant herein exercises its right to extend the Initial Term of the Lease and Landlord and Tenant have agreed to terms for the minimum annual rent and other terms for the Extension Term of the Lease.

NOW THEREFORE, in consideration of the premises and provisions herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

Lease agreements:

1.    Tenant hereby exercises its option to extend the Term of the Lease and Tenant and Landlord agree that the Term of the Lease is hereby extended for the first Extension Term commencing on July 1, 2011 and ending on June 30, 2016.

2.    Notwithstanding Section 4.2(b) of the Lease, the minimum annual rent payable for the first Extension Term shall be Eight Hundred Fifty Thousand Dollars ($850,000.00), payable in equal monthly installments of Seventy Thousand Eight Hundred Thirty-Three and Thirty-Three Cents ($70,833.33) on or before the first day of each calendar month.

3.    Landlord and Tenant agree that pursuant to the Lease the minimum annual rent for the first Extension Term is to be set based on a formula that includes the percentage of increase in the rent under the Ground Lease and the amount of the rent set under the Ground Lease as of July 1, 2011. The amount of the foregoing minimum annual rent is the result of negotiations by the parties without regard to the rent that is to be set under the Ground Lease as of July 1, 2011. As such, Landlord and Tenant agree and confirm that if the Lease is further extended, the minimum annual rent for each succeeding Extension Term shall be set in accordance with Section 4.2(b) of the Lease and shall not be affected by the forgoing minimum annual rent agreed to under this Amendment.

4.    Landlord and Tenant acknowledge that, pursuant to Section 3.2 of the Lease, Tenant has the remaining option to extend the Term of the Lease for five (5) successive Extension Terms of five (5) years each, on the terms set forth therein.

5.    Tenant agrees to pay the conveyance tax of $17,901.00 due on this Amendment. Landlord agrees to pay the recordation fee for recording a memorandum of this Amendment.

6.    Effective as of December 1, 2004, Tenant has not been required to pay, and has not been paying, any Enclosed Mall Operation and Maintenance Expense, as defined in the REA. Landlord confirms and agrees that during the first Extension Term, Tenant shall not be required to pay any Enclosed Mall Operation and Maintenance Expense.

7.    Landlord and Tenant acknowledge that the Land Tax and any Improvement Tax for the Sears Tract is the sum of the real property taxes and other assessments (if any) assessed for the parcels identified by Tax Map Key Nos. (1) 4-6-011: 041, 037, 038, and 039 and, notwithstanding Landlord's predecessor's requests, the City and County of Honolulu has refused to assess the Sears Tract as a separate tax parcel.

8.    Tenant confirms and agrees that the provisions of that certain unrecorded letter dated November 8, 2004, from Tenant to Landlord that imposed or purported to impose obligations on Landlord have been satisfied by Landlord, waived by Tenant, or expressly included in this Amendment or that certain Third Amendment to Construction, Operation and Reciprocal Easement Agreement (the **"Third Amendment to REA"**), which amendment to the REA is intended to be executed by Landlord and Tenant as a part of this Amendment. Upon the execution of this Amendment and the Third Amendment to REA, the November 8, 2004,

letter (if and to the extent it is an enforceable agreement) shall be deemed terminated and expired.

REA agreements:

9.    As to the Expansion Area referred to in the Third Amendment to REA, as long as Tenant is the tenant under the Lease (and has not assigned its interest in the Lease to any party), Landlord agrees not to lease space in the Expansion Area to the companies with the trade names of Target, Wal-mart, Home Depot, Lowes, or Best Buy or any other retailer whose primary business is the sale of appliances or electronics.

10.   Landlord and Tenant agree that parking ratio in Section X.C of the REA entitled "Automobile Parking" which currently provides "not less than 4.3 automobile parking spaces for each one thousand (1,000) square feet of Floor Area on its Tract," is amended to provide "not less than 3.5 automobile parking spaces for each one thousand (1,000) square feet of Floor Area on its Tract." The minimum number of stalls for the center of "2303 spaces" as described in such section is also amended to reflect such lower ratio. If and when Macy's West Stores, Inc., a Ohio corporation, as the other party to the REA agrees to the reduced parking ratio, then the REA shall be deemed amended to include the foregoing provision with no further action by Landlord or Tenant, provided, however, at the written request of Landlord, Tenant shall execute an amendment to the REA to memorialize the same in a separate instrument.

11.   Landlord agrees not to install an outside eating area for the IHOP restaurant without Tenant's prior written approval.

12.   Tenant agrees that Landlord, other anchors, and tenants of the Shopping Center may offer customers valet parking services and the same is permitted by the Lease and REA, provided however, no valet parking shall be allowed or placed on the Sears Tract, without Tenant's prior written approval.

General agreements:

13.   All other terms and conditions of the Lease and the REA, except as herein modified, shall remain unchanged and in full force and effect.

14.   The Lease, the REA, and this Amendment have been executed by or on behalf of the Trustees of the Estate of Bernice Pauahi Bishop in their fiduciary capacities as said Trustees, and not in their individual capacities. No personal liability or obligation under the Lease or this Amendment shall be imposed or assessed against said Trustees in their individual capacities.

15.   This Amendment may be executed in counterparts, each of which shall be deemed an original, and together shall constitute one and the same agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment the day and year first written above.

Landlord

Approved as to Content, Authority, and
Compliance with KS Policy:

_____
Manager

_____
Vice President/Director

Approved as to Form:

_____
Legal Group

_____
Retained Counsel

**TRUSTEES OF THE ESTATE OF BERNICE PAUAHI
BISHOP, AS AFORESAID**

By: _____
Name:    DANA SATO, Sr. Counsel
Their Attorney-in-Fact

By: _____
Name:    PAUL NAHOA LUCAS, Sr. Counsel
Their Attorney-in-Fact

Date: _____May 31, 2011_____

Tenant:

SEARS ROEBUCK AND CO, a New York corporation

By: _____
        J. Kal Gibron

Its: _____V.P. Real Estate_____

Date: _____5/16/11_____

REAL ESTATE
LEGAL

4

# EXHIBIT C

## THE 2015 AMENDMENT

AMENDMENT OF LEASE
(Sears —Windward Mall)

THIS AMENDMENT OF LEASE dated *August 26, 2015* (this "**Amendment**"), by and between **LANCE KEAWE WILHELM, ROBERT K.W.H. NOBRIGA, CORBETT AARON KAMOHAIKIOKALANI KALAMA, MICAH A. KANE, and JANEEN-ANN AHULANI OLDS, as Trustees of the Estate of Bernice Pauahi Bishop** (successor-in-interest to Windward Mall Shopping Center, a California limited partnership), whose place of business and post office address is 567 South King Street, Suite 200, Honolulu, Hawai`i 96813, hereinafter called the "*Landlord*" and **SEARS ROEBUCK AND CO., a New York corporation**, whose address is 3333 Beverly Road, B2-130B, Hoffman Estates, Illinois 60179, hereinafter called the "*Tenant*."

W I T N E S S E T H:

WHEREAS, Landlord's predecessor-in-interest and Tenant entered into that certain unrecorded Ground Sublease (Kaneohe, Hawaii) dated January 23, 1981, of which a Memorandum of Ground Sublease (Kaneohe, Hawaii) dated January 23, 1981, is recorded in the Office of the Assistant Registrar of the Land Court of the State of Hawai`i (the "*Office of the Assistant Registrar*") as Document No. 1083613, and noted on Transfer Certificate of Title Nos. 142,857; 286,916; 432,530; and 435,551 (collectively, the "*TCTs*") and also recorded in the Bureau of Conveyance of the State of Hawai`i ("*Bureau*") in Book 15803, at Page 506, as amended by that certain unrecorded Amendment to and Extension of Lease and Agreements Regarding the REA dated May 31, 2011 (the "*2011 Amendment*"), a short form of which was recorded in the Office of the Assistant Registrar as Document No. 4079017 and noted on the TCTs, and also recorded in the Bureau as Document No. 2011-092856, and as may have been amended by unrecorded instruments (the "*Lease*"). Landlord acquired Landlord's interest in the Lease by an instrument dated September 4, 1991, recorded in the Office of the Assistant Registrar as Document No. 1848363 and noted on the TCTs, and also recorded in the Bureau as Document No. 91-120353. Capitalized terms not defined herein shall have the meanings set forth in the Lease.

WHEREAS, Tenant exercised its right to extend the Initial Term of the Lease as memorialized in the 2011 Amendment, and Landlord and Tenant have agreed to further amend the Lease to extend the first Extension Term of the Lease for an additional two (2) years as set forth herein.

NOW THEREFORE, in consideration of the premises and provisions herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually agree as follows:

1.    Landlord and Tenant acknowledge that, pursuant to Section 3.2 of the Lease, and as set forth in the 2011 Amendment, Tenant exercised its option to extend the Term of the Lease, which first Extension Term commenced July 1, 2011 and ends on June 30, 2016.

2.    Landlord and Tenant hereby amend the Lease to extend the first Extension Term for an additional two (2) years. Therefore, the first Extension Term is amended to commence July 1, 2011 and end on June 30, 2018.

3.    Landlord and Tenant acknowledge that, pursuant to Section 3.2 of the Lease, Tenant has the remaining option to extend the Term of the Lease for five (5) successive Extension Terms of five (5) years each, on the terms set forth therein.

4.      Section 3.2 of the Lease provides: "Tenant may exercise an option to extend the Term only by giving Landlord notice of the extension at least one (1) year before the expiration of the Initial Term or the immediately preceding Extension Term, as the case may be, only if Tenant is not in default hereunder." Therefore, Landlord and Tenant agree that, if Tenant exercises its option to extend the Lease for a second Extension Term, such Extension Term would commence July 1, 2018 and end on June 30, 2023.

5.      Notwithstanding Section 4.2(b) of the Lease, minimum annual rent payable for the two additional years of the Extension Term (*i.e.* July 1, 2016 to June 30, 2017, and July 1, 2017 to June 30, 2018) shall be Eight Hundred Fifty Thousand Dollars ($850,000.00) per year, payable in equal monthly installments of Seventy Thousand Eight Hundred Thirty-Three and Thirty-Three Cents ($70,833.33) on or before the first day of each calendar month.

6.      Tenant agrees to pay the conveyance tax of $ 4,161.60 due on this Amendment. Landlord agrees to pay the recordation fee for recording a memorandum of this Amendment.

General agreements:

7.      All other terms and conditions of the Lease, except as herein modified, shall remain unchanged and in full force and effect.

8.      The Lease and this Amendment have been executed by or on behalf of the Trustees of the Estate of Bernice Pauahi Bishop in their fiduciary capacities as said Trustees, and not in their individual capacities. No personal liability or obligation under the Lease or this Amendment shall be imposed or assessed against said Trustees in their individual capacities.

9.      This Amendment may be executed in counterparts, each of which shall be deemed an original, and together shall constitute one and the same agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment the day and year first written above.

Approved as to Content, Authority, and
Compliance with KS Policy:

_____
Manager:

_____
Vice President/Director

Approved as to Form:

_____
Legal Group

_____
Retained Counsel

**TRUSTEES OF THE ESTATE OF BERNICE PAUAHI BISHOP, AS AFORESAID**

By: _____
Name:    SABRINA TOMA, Director
Their Attorney-in-Fact

By: _____
Name:    LEANNE NIKAIDO, Director
Their Attorney-in-Fact

Date: _____

*"Landlord"*

**SEARS ROEBUCK AND CO., a New York corporation**

By _____
Name:    James B. Terrell
Its: _____
         Vice President Real Estate

By _____
Name:    DEANN BOGNER
Its:    ASSISTANT SECRETARY

REAL ESTATE
LEGAL

*"Tenant"*

3

## **EXHIBIT D**

**FIVE-YEAR TERM EXTENSION**

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL 60179

# Fax

| To: | Commercial Real Estate Division<br>Trustees of the Estate of Bernice Pauahi Bishop<br>DBA: Kamehameha Schools | From: | Lynnette Meyer<br>847-286-4039 |
|---|---|---|---|
| Phone: | 808-235-1143 | Pages: | 2 (including cover) |
| Fax: | 808-235-3279 | Date: | June 21, 2017 |
| Re: | Sears #1738 – Kaneohe, HI<br>Lease Renewal | CC: | General Manager |

☐Urgent  ☐For Review  ☐ Please Comment ☐ Please Reply  ☐ Please Recycle

● Comments:

**The original letter was sent by first class certified mail to your attention.**

RECEIVED
JUN 2 1 2017
WINDWARD MALL

Disclaimer: This message and its contents (to include attachments) are the property of Sears Holding Corporation (SHC) and may contain confidential and proprietary information. You are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on information contained herein is strictly prohibited. Unauthorized use of information contained herein may subject you to civil and criminal prosecution and penalties. If you are not the intended recipient, you should delete this message immediately.

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL 60179

June 20, 2017

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0651 4232**

Trustees of the Estate of Bernice Pauahi Bishop
DBA: Kamehameha Schools
Attn: Commercial Real Estate Division
567 South King Street, Suite 200
Honolulu, HI 96813

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0653 1697**

Jones Lang LaSalle Americas, Inc., Agent
c/o Windward Mall
Mall Management Office
46-056 Kamehameha Highway, Suite 285
Kaneohe, HI 96744-6712
Attn: General Manager

Re:    Ground Sublease dated January 23, 1981, as amended,
for the premises located at 46-056 Kamehameha Highway,
Kaneohe, HI, and known as Sears Store No. 1738

Dear Landlord:

The undersigned hereby elects to extend the subject Ground Sublease for an additional term of five (5) years, commencing July 1, 2018, to and including June 30, 2023, upon the terms, conditions, and rental as set forth in said Ground Sublease, as amended.

Sincerely,

SEARS, ROEBUCK AND CO.,
a New York corporation

By: _JoAnn Catanese_
JoAnn Catanese
Divisional Vice President, Real Estate

JC/cm

cc:    S. Jeffrey Stollenwerck
Lease File

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0653 1703**

Jones Lang LaSalle Americas, Inc.
3344 Peachtree Road NE, Suite 1200
Atlanta, GA 30326
Attn: President and CEO, Retail

## <u>EXHIBIT E</u>

**GARY EVORA LETTER TO SEARS DATED MARCH 19, 2018**



KAMEHAMEHA SCHOOLS



March 19, 2018

Via Certified Mail
Return Receipt Requested
Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attention:  Executive Vice President and
Territorial Facilities Planning Manager

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attention:  Vice President /Controller

Re:     Windward Mall/Ground Sublease dated January 23, 1981, as amended (the "Sublease"),
between Trustees of the Estate of Bernice Pauahi Bishop, as Landlord ("Landlord"), and Sears
Roebuck and Co., a New York corporation, as Tenant ("Tenant" or "Sears"), demising the
premises defined in the Sublease as the "Sears Tract", located at 46-056 Kamehameha Highway,
Kaneohe, Hawaii (Sears Store No. 1748)

Ladies and Gentlemen:

Pursuant to a letter to Landlord dated June 20, 2017, from JoAnn Catanese, Divisional Vice
President, Real Estate, of Sears, Sears elected to extend the term of the above-referenced
Sublease for the second Extension Term (as defined in the Sublease) commencing on July 1,
2018 and ending on June 30, 2023, upon the terms, conditions and rental as set out in the
Sublease.

The minimum annual rent for each Extension Term of the Sublease is to be determined by the
formula set out in Section 4.2(b), which reads as follows:

> 4.2(b)  For each Extension Term a minimum annual rent which is the greater of (i) One
> Hundred and Fifty Thousand Dollars ($150,000), or (ii) One Hundred and Fifty Thousand
> Dollars multiplied by the percentage of increase of (x) the annual minimum rent agreed
> or finally determined to be payable under the Ground Lease for the year of the term
> thereof which coincides with the Extension Term year over and above the (y) the annual
> minimum rent payable under the Ground Lease during the third through twenty-eighth
> years thereof.

The Ground Lease referenced in Section 4.2(b) is the Lease dated July 1, 1979 (referred to in
Recital A of the Sublease) by and between the fee owners of the land under Windward Mall and

567 South King Street • Honolulu, Hawai'i 96813-3036 • Phone 808-523-6200

*Founded and Endowed by the Legacy of Princess Bernice Pauahi Bishop*

Sears, Roebuck and Co.
March 19, 2018
Page 2

Landlord, as amended. Based on this formula, the minimum annual rent for the Extension Term
from July 1, 2018 to June 30, 2023 would be the greater of

     (i)      $150,000, or

     (ii)     $150,000 multiplied by 2,171.1% [where (x) is $4,139,600 and (y) is $190,668.00
           which is equal to  $3,256,650.00

We understand that our leasing agent, Jones Lang LaSalle has advised Cary Coonce that under
the Section 4.2(b) Sublease formula, the minimum annual rent for the Extension Term from July
1, 2018 to June 30, 2023 is $3,256,650.00.

We also understand that Sears has indicated that the rent is not something Sears can afford but
has not objected to Landlord's calculation.

In lieu of extending the Sublease for the Extension Term, Landlord is willing to consider a lease
to Sears for the Extension Term demising only the ground floor of the building on the Sears
Tract, under a lease structure, and terms and conditions, including rent, to be negotiated.
Please let us know whether Sears is interested in such alternative lease, and if so, the terms and
conditions, including rent and floor to be demised by such lease.

Very truly yours,

Gary Evora
Senior Asset Manager
KAMEHAMEHA SCHOOLS

Enclosure

cc   JoAnn Catanese
     Cary Coonce
     Jones Lang LaSalle

**<u>EXHIBIT F</u>**

**DEMAND LETTERS**



VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED


August 10, 2018


Sears Holding Corporation
dba:  Sears Store No. 001738-1-B
Real Estate Department
3333 Beverly Road
Hoffman Estates, Illinois  60179-0001


Dear Sir or Madam:

### Re:      Demand for Payment of Outstanding Balance

This letter constitutes Landlord's formal notice of your failure to remit payment of rent and other amounts due under your lease.  Our records indicate that as of noon today, your rent account shows a delinquent balance of **$210,004.28** for your July 2018 rent and charges.  Demand is hereby made for your full payment of that amount immediately in order to cure this default and to avoid the necessity of our incurring further collection costs and attorney fees, for which you will be held responsible to reimburse us.

In the event that we do not receive full payment by means of a check payable to KAMEHAMEHA SCHOOLS and delivered to Windward Mall, MSC 61333, P.O. Box 1300, Honolulu, HI 96807-1300 by **August 20, 2018**, we will advise our attorneys to initiate proceedings to recover possession of the premises and judgment for all sums, damages and other relief to which we are entitled by reason of your default, with interest, costs and attorneys' fees, as provided in the lease and as otherwise permitted by law.

Time is of the essence.  I trust you will pay the amount demanded in the manner and by the time specified, and that the action otherwise contemplated against you may thus be avoided.  Please feel free to contact me if you have any questions.

Sincerely,


Cesar R. Topacio
General Manager


46-056 Kamehameha Highway, Suite 285 · Kaneohe, Hawaii  96744-6712
Telephone (808) 235-1143 · Fax (808) 235-3279



PAST DUE NOTICE #1

7/13/2018

SEARS HOLDING CORP
REAL ESTATE DEPT, SITE #001738-1-B
3333 BEVERLY ROAD
HOFFMAN ESTATES, IL  60179-0001

| | |
|---|---|
| Last Payment: | 74,171.00 |
| Payment Date: | 7/5/2018 |

Re:  Lease No. WWM00005, 16001-GG9763

Dear Merchant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | Invoice # | Description | | Charges | Payments | Balance Due |
|---|---|---|---|---|---|---|
| 7/1/2018 | 070118M | GRT | GRT-Base Rent | 271,387.50 | -70,833.33 | 200,554.17 |
| 7/1/2018 | 070118M | GET | 4.712 for GRT | 12,787.78 | -3,337.67 | 9,450.11 |

| Aging | Current 1-30 | 31-60 | 61-90 | Over 90 | Total Due |
|---|---|---|---|---|---|
| | 210,004.28 | 0.00 | 0.00 | 0.00 | 210,004.28 |

We would appreciate your prompt attention to this matter. Per your lease agreement, late fees may be charged to your account.

Make checks payable to **KAMEHAMEHA SCHOOLS**; MSC 61333; Windward Mall; P.O. Box 1300 Honolulu, HI  96807-1300.

If you have any questions, please call our office at the number below or email at accounting-windward@am.jll.com.

Sincerely,
Accounting Department



VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

September 7, 2018

Sears Holding Corporation
dba:  Sears Store No. 001738-1-B
Real Estate Department
3333 Beverly Road
Hoffman Estates, Illinois  60179-0001

Dear Sir or Madam:

### Re:    Demand for Payment of Outstanding Balance

This letter constitutes Landlord's formal notice of your failure to remit payment of rent and other amounts due under your lease.  Our records indicate that as of noon today, your rent account shows a delinquent balance of **$420,008.56** for your July and August 2018 rent and charges.  Demand is hereby made for your full payment of that amount immediately in order to cure this default and to avoid the necessity of our incurring further collection costs and attorney fees, for which you will be held responsible to reimburse us.

In the event that we do not receive full payment by means of a check payable to KAMEHAMEHA SCHOOLS and delivered to Windward Mall, MSC 61333, P.O. Box 1300, Honolulu, HI 96807-1300 by **September 17, 2018**, we will advise our attorneys to initiate proceedings to recover possession of the premises and judgment for all sums, damages and other relief to which we are entitled by reason of your default, with interest, costs and attorneys' fees, as provided in the lease and as otherwise permitted by law.

Time is of the essence.  I trust you will pay the amount demanded in the manner and by the time specified, and that the action otherwise contemplated against you may thus be avoided.  Please feel free to contact me at Cesar.Topacio@am.jll.com, if you have any questions.

Sincerely,

Cesar R. Topacio
General Manager

46-056 Kamehameha Highway, Suite 285 · Kaneohe, Hawaii  96744-6712
Telephone (808) 235-1143 · Fax (808) 235-3279



### PAST DUE NOTICE #2

8/15/2018

SEARS HOLDING CORP
REAL ESTATE DEPT, SITE #001738-1-B
3333 BEVERLY ROAD
HOFFMAN ESTATES, IL  60179-0001

| | |
|---|---|
| Last Payment: | 143,388.74 |
| Payment Date: | 8/9/2018 |

Re:  Lease No. WWM00005, 16001-GG9763

Dear Merchant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | Invoice # | Description | | Charges | Payments | Balance Due |
|---|---|---|---|---|---|---|
| 7/1/2018 | 070118M | GRT | GRT-Base Rent | 271,387.50 | -70,833.33 | 200,554.17 |
| 7/1/2018 | 070118M | GET | 4.712 for GRT | 12,787.78 | -3,337.67 | 9,450.11 |
| 8/1/2018 | 080118M | GRT | GRT-Base Rent | 271,387.50 | -70,833.33 | 200,554.17 |
| 8/1/2018 | 080118M | GET | 4.712 for GRT | 12,787.78 | -3,337.67 | 9,450.11 |

| Aging | Current 1-30 | 31-60 | 61-90 | Over 90 | Total Due |
|---|---|---|---|---|---|
| | 210,004.28 | 210,004.28 | 0.00 | 0.00 | 420,008.56 |

We would appreciate your prompt attention to this matter. Per your lease agreement, late fees may be charged to your account.

Make checks payable to **KAMEHAMEHA SCHOOLS**; MSC 61333; Windward Mall; P.O. Box 1300 Honolulu, HI  96807-1300.

If you have any questions, please call our office at the number below or email at accounting-windward@am.jll.com.

Sincerely,
Accounting Department



VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED


September 20, 2018


Sears Holding Corporation
dba:  Sears Store No. 001738-1-B
Real Estate Department
3333 Beverly Road
Hoffman Estates, Illinois  60179-0001

Dear Sir or Madam:

**Re:      Demand for Payment of Outstanding Balance**

This letter constitutes Landlord's formal notice of your failure to remit payment of rent and other amounts due under your lease.  Our records indicate that as of noon today, your rent account shows a delinquent balance of **$630,012.84** for your July, August and September 2018 rent and charges.  Demand is hereby made for your full payment of that amount immediately in order to cure this default and to avoid the necessity of our incurring further collection costs and attorney fees, for which you will be held responsible to reimburse us.

In the event that we do not receive full payment by means of a check payable to KAMEHAMEHA SCHOOLS and delivered to Windward Mall, MSC 61333, P.O. Box 1300, Honolulu, HI 96807-1300 by **October 1, 2018**, we will advise our attorneys to initiate proceedings to recover possession of the premises and judgment for all sums, damages and other relief to which we are entitled by reason of your default, with interest, costs and attorneys' fees, as provided in the lease and as otherwise permitted by law.

Time is of the essence.  I trust you will pay the amount demanded in the manner and by the time specified, and that the action otherwise contemplated against you may thus be avoided.  Please feel free to contact me at Cesar.Topacio@am.jll.com, if you have any questions.

Sincerely,



Cesar R. Topacio
General Manager


46-056 Kamehameha Highway, Suite 285 · Kaneohe, Hawaii  96744-6712
Telephone (808) 235-1143 · Fax (808) 235-3279



PAST DUE NOTICE #3

9/14/2018

SEARS HOLDING CORP
REAL ESTATE DEPT, SITE #001738-1-B                          Last Payment:        74,171.00
3333 BEVERLY ROAD                                           Payment Date:         9/4/2018
HOFFMAN ESTATES, IL  60179-0001

Re:  Lease No. WWM00005, 16001-GG9763
Dear Merchant:

We are writing to inform you that your account is currently past due.  Our records show that as of the above date the following items are outstanding:

| Date | Invoice # | Description | | Charges | Payments | Balance Due |
|---|---|---|---|---|---|---|
| 7/1/2018 | 070118M | GRT | GRT-Base Rent | 271,387.50 | -70,833.33 | 200,554.17 |
| 7/1/2018 | 070118M | GET | 4.712 for GRT | 12,787.78 | -3,337.67 | 9,450.11 |
| 8/1/2018 | 080118M | GRT | GRT-Base Rent | 271,387.50 | -70,833.33 | 200,554.17 |
| 8/1/2018 | 080118M | GET | 4.712 for GRT | 12,787.78 | -3,337.67 | 9,450.11 |
| 9/1/2018 | 090118M | GRT | GRT-Base Rent | 271,387.50 | -70,833.33 | 200,554.17 |
| 9/1/2018 | 090118M | GET | 4.712 for GRT | 12,787.78 | -3,337.67 | 9,450.11 |

| Aging | Current 1-30 | 31-60 | 61-90 | Over 90 | Total Due |
|---|---|---|---|---|---|
| | 210,004.28 | 210,004.28 | 210,004.28 | 0.00 | 630,012.84 |

We would appreciate your prompt attention to this matter. Per your lease agreement, late fees may be charged to your account.

Make checks payable to **KAMEHAMEHA SCHOOLS**; MSC 61333; Windward Mall; P.O. Box 1300 Honolulu, HI  96807-1300.

If you have any questions, please call our office at the number below or email at accounting-windward@am.jll.com.

Sincerely,
Accounting Department

**WINDWARD MALL**
46-056 Kamehameha Highway, Suite 285 Kaneohe HI 96744
Phone: (808) 235-1143 Fax (808) 235-3279
WWW.WINDWARDMALL.COM
Managed by Jones Lang LaSalle Americas

# EXHIBIT G

## AGING REPORTS

**SEARS**          GG9763    Rent                        Bankruptcy filed 10/15/2018
**WINDWARD MALL**  GG9764    CAM
                   GG9765    WATER

| DATE | BASE RENT | CAM | RPT | WATER | LATE CHR | OTHER | GET | TOTAL CHARGES | CK # | CHECK AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | | | | | | | (0.03) | | - | (0.03) |
| 10/1/2018 Charges (10/16-10/31/18) | 140,070.97 | | | | | - | 6,600.14 | 146,671.11 | | | 146,671.08 |
| 11/1/2018 Charges | 271,387.50 | 17,740.85 | | | | | 13,623.73 | 302,752.08 | | | 449,423.16 |
| 11/7/2018 Payment | | | | | | | | | 180723 | (92,747.79) | 356,675.37 |
| 12/1/2018 Charges | 271,387.50 | 17,740.85 | | | | | 13,623.73 | 302,752.08 | | | 659,427.45 |
| 12/1/2018 Charges (10/16-11/15/18) | | | | 1,423.20 | | | 67.06 | 1,490.26 | | | 660,917.71 |
| 12/10/2018 Payment | | | | | | | | | 181707 | (92,747.79) | 568,169.92 |
| 1/1/2019 Charges | 271,387.50 | 17,740.85 | | | | | 13,623.73 | 302,752.08 | | | 870,922.00 |
| 1/1/2019 Charges (11/16-12/14/18) | | | | 1,350.83 | | | 63.65 | 1,414.48 | | | 872,336.48 |
| 1/8/2019 Payment | | | | | | | | | 182688 | (92,747.79) | 779,588.69 |
| 2/1/2019 Charges | 271,387.50 | 17,740.85 | 136,936.30 | | | | 20,076.17 | 446,140.82 | | | 1,225,729.51 |
| 2/1/2019 Charges (12/15/18-1/15/19) | | | | 1,617.89 | | | 76.23 | 1,694.12 | | | 1,227,423.63 |
| | 1,225,620.97 | 70,963.40 | 136,936.30 | 4,391.92 | - | - | 67,754.44 | 1,505,667.00 | | (278,243.37) | 1,227,423.63 |