# <u>Exhibit A</u>

Supplemental Burian Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――――――――――――

|  |  |  |
|---|---|---|
| **In re** | : | Chapter 11 |
|  | : |  |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | Case No. 18-23538 (RDD) |
|  | : |  |
| **Debtors.**[1] | : | (Jointly Administered) |
|  | : |  |

-------------------------------------------------------

### SUPPLEMENTAL DECLARATION OF SAUL BURIAN IN SUPPORT OF THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO ESL INVESTMENTS, INC.

February 3, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1.      I am a Managing Director in Houlihan Lokey's Financial Restructuring Group and also Head of Houlihan Lokey's Real Estate Strategic Advisory Group.  In these chapter 11 cases, I have served as the financial advisor for the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al. (the "Creditors' Committee").

2.      On January 26, 2019, I submitted a declaration (the "Initial Burian Declaration") (attached hereto as Exhibit 1) in support of the *Objection of the Official Committee of Unsecured Creditors to Sale of Substantially All of the Debtors' Assets to ESL Investments, Inc.* (the "Objection").

3.      Attached as Exhibit 2 is a document I created which illustrates a conservative estimate of value for certain other non-real estate unencumbered assets of the estate. Exhibit 2 is a source document for the chart contained in paragraph 184 of the Objection. The Creditors' Committee produced Exhibit 2 in advance of my deposition.

4.      In accordance with my understanding of this Court's Chambers Rules, I respectfully submit this declaration along with Exhibits 1 and 2 (collectively the "Supplemental Burian Declaration") as my direct testimony on behalf of the Committee. If called to testify, I could and would testify competently to the facts stated in the Supplemental Burian Declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.


New York, New York
February 3, 2019                                    By:

                                                   _____
                                                   **Saul E. Burian**
                                                   Managing Director
                                                   Houlihan Lokey Capital, Inc.

2

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

In re                                           :    Chapter 11
                                                :
SEARS HOLDINGS CORPORATION, *et al.*,           :    Case No. 18-23538 (RDD)
                                                :
                                   Debtors.[1]  :    (Jointly Administered)
                                                :

-------------------------------------------------------------------

# DECLARATION OF SAUL BURIAN IN SUPPORT OF THE OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO ESL INVESTMENTS, INC.

January 26, 2019

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

1.      I am a Managing Director in Houlihan Lokey's Financial Restructuring Group and
also Head of Houlihan Lokey's Real Estate Strategic Advisory Group.  I have been an investment
banker at Houlihan Lokey for 17 years. During that time, I have represented more than 35
companies in distressed situations that have successfully reorganized or were sold as going
concerns.  I have also represented creditor groups in more than 20 situations, including official
committees of unsecured creditors and ad hoc groups of secured and unsecured lenders and
noteholders, and even official committees of equity security holders.

2.      In these chapter 11 cases, I have served as the financial advisor for the Official
Committee of Unsecured Creditors of Sears Holdings Corporation, et al. (the "Creditors'
Committee").  In this role, I and/or members of my team that I supervise, have interacted with,
among others, the Debtors, the Restructuring Committee of the Board of Directors of Holdings[2]
(the "Restructuring Committee"), the Restructuring Subcommittee of the Restructuring Committee
(the "Restructuring Subcommittee"), ESL Investments, Inc. ("ESL"), various prospective bidders
and each of their respective advisors.

3.      In this role, I have, among other things, attended numerous meetings, participated
in dozens of conference calls, and had countless individual phone and in-person communications
with the various stakeholders in the estates at issue in these chapter 11 cases.  I have been made
aware of the sale process run by the Debtors' financial advisors, and have held meetings and calls
with the Debtors and their advisors to understand how that process was run and the outcomes of
their marketing effort as it was ongoing.  My calls and meetings with the Debtors and their advisors
have been ongoing throughout the course of these chapter 11 cases and have allowed me to remain

---

[2] Capitalized terms used and not otherwise defined in this Declaration shall have the meanings ascribed to such terms
in the Objection.

informed of the events and processes that I describe in this declaration.  I have held conversations

and meetings with prospective bidders for certain of the Debtors' assets and their respective

advisors, and members of my team participated in due diligence sessions between the Debtors and

prospective bidders.

<u>The Sale Process Conducted by the Debtors Did Not Result
in a Competitive Auction for the Debtors' Assets</u>

4.      As the Court is aware, between January 14 and January 17, 2019, the Debtors

ostensibly conducted an auction of their assets.  The stated purpose of the auction was to allow the

Debtors to solicit bids for their assets, whether individually or collectively as a going concern, in

an effort to effectuate an asset sale or sales that would yield the highest and best price and provide

the greatest recovery to creditors.

5.      There was only ever one party interested in making a going concern bid for

substantially all of the Debtors' assets: ESL.  There were, however, many parties interested in

buying particular assets, and conceivably, if the Debtors had prepared for and conducted a robust

and fair process, the sum of the various bids for individual assets and businesses could have

exceeded ESL's going concern bid.  Unfortunately, as described herein, no such process took

place, and the so-called auction was nothing more than a bilateral negotiation between the Debtors

and ESL regarding the terms of ESL's bid.  No auction for individual assets ever took place.  This

was the direct result of a flawed sales process.

6.      The origins of this non-competitive process began at the Debtors' filing.  Upon

filing, the Debtors were not at all prepared to conduct a sale process for the individual assets and

operating businesses, and at no point during the bankruptcy process did the Debtors seriously

engage in efforts to conduct a meaningful sale process.  That, in turn, prevented interested third

parties from effectively conducting due diligence on certain operating businesses and real estate

3

assets.  This was reflected in the small number of bids and indications of interest received and the lowball nature of those bids.

7.      Ultimately, the "auction" process itself was exclusionary and noncompetitive, amounting to only a one-horse race to transfer Sears and its valuable assets and operating businesses to ESL in exchange for consideration that allowed the Debtors to get closer to administrative solvency and without regard to the significant value of unencumbered assets or distributions to the Debtors' general unsecured creditors.  At no time did the Debtors conduct a "sum of the parts" auction; the Debtors only compared successive ESL bids to hypothetical and conservative wind-down estimates.  It is unsurprising that the result of such a flawed process is that the ESL bid fails to provide value for unencumbered assets and will plunge the estates into administrative insolvency.

> **a. The Debtors possess a number of highly-valuable unencumbered assets, but they are not simple to market**

8.      At the outset, it is critical to understand the scope of the unencumbered assets held by the Debtors that theoretically should have been part of the sales process and "auction."  These assets include a diverse array of real properties as well as multiple unique, fully-functioning operating businesses.  These assets are complex and are not something that can be marketed and sold overnight.  Rather, considerable time and attention, meaningful advance planning, and specialized-treatment is required in order to truly maximize value of this diverse array of assets.

9.      **<u>Unencumbered Real Estate</u>**.  The Debtors possess a total of 957 unencumbered real estate assets.  These real estate assets include: (i) Sears stores, (ii) Kmart stores, (iii) distribution centers, (iv) logistics facilities, (v) home services centers, (vi) Sears Auto Centers, (vii) office buildings, (viii) warehouses, and (ix) other miscellaneous properties.  Certain of these properties are owned, others are leased, and others are subject to a ground lease.  The Creditors'

Committees' real estate valuation expert, Mr. Greenspan, has estimated that the sale of this
portfolio of properties would generate approximately $980 million to $1.28 billion in a properly-
conducted wind-down sales process.

10.     **Sears Home Services**.  The Debtors also own Sears Homes Services ("SHS"), a
multi-faceted, stand-alone business.  SHS is comprised of various sub-business lines including a
home warranty business, an appliance repair business, a home improvement and remodeling
service, a home improvement/maintenance business, and a business known as "Parts Direct" that
sells parts for different household appliance brands.  SHS earned $2.416 billion in revenues in
2017 and employs nearly 9,000 people.

11.     **Innovel**.  The Debtors also own Innovel, an end-to-end logistics solutions provider.
Innovel provides warehousing, transportation, installation and home delivery services to retail,
manufacturing and commercial clients, making more than four million deliveries annually with
1,100 trucks on the road daily.  Innovel is one of the largest warehousing and transportation
networks in the country, capable of providing both last-mile and end-to-end services.  Innovel
earned $438 million in revenues in 2017 and employs nearly 2,000 people.

12.     **Monark**.    The Debtors also own Monark Premium Appliance Company
("Monark").  Monark and its affiliates form a nationwide distributor of premium home appliances
that serve architects, builders, designers, developers and homeowners.  Monark's 20 showrooms
across Arizona, California, Florida and Nevada offer customers a high-end selection of cooking,
cooling and cleaning appliances from a variety of brands.  Monark earned $213 million in revenues
in 2017.

13.    **Other Assets**.  The Debtors possess a variety of other unencumbered assets that
should also have been subject to a robust sales process.  This includes the customer data owned by
the Debtors and Sears Auto Centers, among others.

> b.    **Upon filing, the Debtors were not prepared to facilitate a robust and
> competitive auction process that leveraged interested parties against
> each other to maximize the value of the Debtors' assets**

14.    Even before the Debtors filed for bankruptcy, they understood that it was critical
that the company provide financial information and diligence for specific operating businesses so
that in a sale scenario a prospective buyer could, among other things, discern quality of earnings,
determine how SG&A expenses were allocated, and assess the value of the marketed businesses
and assets on a standalone basis, including under a scenario where the Debtors no longer conducted
retail operations.

15.    The Debtors knew in advance that this would be necessary to maximize value in
any sale scenario of unencumbered assets.  For instance, Centerview Partners had advised the
Debtors in 2017 that bidders struggled to diligence and value SHS on a standalone basis during
the 2016 sale process conducted by Citibank. The problem was that the Debtors had not made any
progress towards trying to externalize that business.

16.    Rather than heed this lesson, at the time they filed for bankruptcy, the Debtors
appear to have done no advance planning whatsoever with respect to the marketing and sale of
their unencumbered assets.  Instead, the Debtors retained Lazard on the eve of filing and entered
bankruptcy unprepared to run the type of sale process for their operating businesses that would
allow third parties to perform the due diligence necessary to evaluate and finance these businesses
on a standalone basis.

17.    The Debtors' lack of planning is also evident in their approach to what should have
been an extremely thoughtful and complex effort to maximize the value of their unencumbered

6

real estate.  As discussed below and in the affidavit of Ron Greenspan of FTI, the Debtors did not

order appraisals until after the filing, ran a confusing initial seven-day process over the holidays

and did not even hire local corresponding brokers for most of their assets.  The result was that only

one entity understood the various unencumbered assets, including the real estate and the business

lines, well enough to submit a bid on the timeline necessitated by these proceedings: ESL.

> **c.   Non-ESL entities interested in bidding on any of the Debtors'
> operating businesses were not able to conduct necessary due diligence
> on those businesses**

18.     After entering into  these bankruptcy proceedings, it was incumbent on the Debtors

to do everything they could to run a robust sales process to realize the maximum possible value on

their unencumbered assets.  Unfortunately, the process run by the Debtors to market and solicit

bids for their various unencumbered business lines – including SHS, Innovel, and Monark – was

entirely inadequate.  The Debtors failed to meaningfully engage with prospective bidders other

than ESL, and as a result, non-ESL entities interested in bidding on the Debtors' operating

businesses were unable to conduct the necessary due diligence to commit to a firm purchase of the

complex assets for sale.  In addition, the Debtors' myopic focus on a whole company ESL

transaction, their short, shifting and unclear deadlines, and their lack of organized and clear

information, all discouraged third parties from spending the significant time and resources

necessary to commit to meaningful bids.  Ultimately, these issues discouraged potential third-party

bidders from participating in the sale process altogether.

19.     Two examples come to mind of firms that did try to engage but were frustrated by

the lack of engagement or information.  The first is the interest of ███████████████ in

the "Parts Direct" business within SHS.  ████ is a strategic buyer uniquely positioned to purchase

the Parts Direct business notwithstanding the deficit in information provided by the Debtors.  On

October 17, 2018, ████ submitted a fully financed offer for ██████████ to be the stalking horse

18-23538-rdd    Doc 2409-1    Filed 02/01/19    Entered 02/01/19 20:45:12    Exhibit A -
Burian Declaration (Redacted)    Pg 9 of 43



bidder for the Parts Direct business, along with a marked-up asset purchase agreement and proposed bidding procedures, representing that they had very limited due diligence remaining before their bid could be committed.  The Debtors failed to meaningfully engage with ███, and while the chapter 11 cases ran their course, ███ waited on the sideline.  On December 5, 2018 ███ submitted a new stalking horse bid for Parts Direct, now ████████, still fully financed.  Again, the Debtors failed to keep ███ engaged or advance the state of negotiations, ultimately resulting in ███ submitting a new bid for Parts Direct of ████████ on December 28, 2018.  Partially owing to the Debtors' failure to quickly engage and commit, the bids ███ submitted became progressively less attractive.  ███ was never afforded the opportunity to actually bid at the auction despite repeatedly stating its desire and willingness to increase its price if there was more certainty and/or structure around the actual process being run.

20.    Another notable failure by the Debtors to properly engage and follow-up with prospective buyers is highlighted in a January 8, 2019 email from ████████ ████████ to me and my colleagues at Houlihan Lokey.[3]  ████████ was exploring transaction structures related to SHS (including the treatment of protection agreement liabilities), yet they could not obtain the due diligence they needed (and which *any* prospective buyer *would* require) from the Debtors regarding standalone general and administrative expenses associated with that business.  According to ████████, Lazard uploaded just three files to a data room on December 27, 2018, and have provided nothing regarding those assets since that date, resulting in ████████ not having the information it needed to move forward.

---

[3] A true and correct copy of the referenced email is attached hereto as **Exhibit A**.

**d. Entities interested in bidding on the Debtors' real estate assets were
never provided a clear process and/or were not allowed to participate
in the auction**

21.    The inadequate sales process the Debtors ran with respect to their business lines
extended to their real estate assets as well.

22.    Advisors to the Creditors Committee, despite frequent requests, were never
apprised at any point of any meaningful marketing process undertaken by the Debtors with respect
to their real estate assets, and have serious concerns that no such process ever took place.  For
example, on a December 12, 2018 call with Debtors' advisor Jones Lang LaSalle Incorporated
("JLL") just sixteen days before indicative bids were due, it was clear that the Debtors had not
developed a marketing strategy or detailed insight into the sale process.  And despite our repeated
requests and receiving repeated assurances from the Debtors' advisors that marketing and progress
reports (including tracking reports and lists of parties contacted) would be forthcoming, only one
such report was ever actually provided.

23.    The process run by the Debtors was flawed in four primary respects.  First, the
Debtors conducted the process on an extremely brief timeline that did not allow for sufficient time
for prospective bidders to evaluate the Debtors' assets and submit bids.  At the outset of the
process, the Debtors only intended to market a small number of "non-core" properties for sale.
None of the properties constituting the 425 "go-forward stores" were included.  Subsequently, the
Debtors pivoted to a process whereby they would market the entirety of their real estate assets.
But because all indicative bids were due December 28, it was far too late to run a meaningful sales
process.  The solicitation process did not commence until December 2, 2018 when JLL first began
its outreach through an "email blast," which alerted potential buyers of the opportunity to submit
bids for the Debtors' real estate assets.  Then, on December 21, 2018 – just a week before indicative
bids were due – JLL launched official marketing websites and datarooms for the full set of Debtors'

real estate assets.  The Debtors apparently expected potential bidders – most of whom are local
and regional investors – to evaluate the opportunities available and to submit a bid within seven
days, over the Christmas holidays, of receiving access to an inadequate dataroom.  While the stated
intention was for bids received to be part of the go-forward sale process, it is difficult to conceive
how the timetable could permit bidders to engage in the necessary diligence and analysis to make
an informed bid or was otherwise conducive to a successful auction for the Debtors' real estate.

24.     Second, the process was disorganized and confusing to potential bidders.  Given
the abrupt change to the number of properties the Debtors were marketing, the tight timeframe,
and the lack of communication with the market generally, there was considerable confusion over
precisely which assets were actually for sale and which assets were subject to the December 28,
2018 deadline.  Indeed, members of the Creditors' Committee informed Houlihan Lokey that they
did not understand how to submit bids or even which properties were for sale.  Overhanging the
entire real estate process was the presence of ESL and the outcome of the Global Sale Process,
which had its own competing deadlines and likely depressed bids due to the uncertainty of success.
The fact that definitive bids for all of the Debtors' assets, including the real estate, were due on the
same day as indicative real estate bids, created additional confusion.  Potential real estate buyers
have been highly critical of the lack of information and organization regarding the Debtors'
auction, which is reflected in the quality and quantity of the bids received.

25.     Third, the scope of the Debtors' outreach was deficient.  It is my understanding,
based on conversations between the Creditors' Committee's advisors and the Debtors' advisors
that the Debtors never sought to market the properties broadly to any and all interested parties.
Instead, I understand that the Debtors contacted only parties who had previously bid on the assets,
and in the case of leased assets, certain landlords.  This is reflected in a report provided to the

Committee by the Debtors' advisors on December 18, 2018, just ten days before the indicative bid

deadline, which indicates that the Debtors had made only 350 points of contact in connection with

the marketing and sale of 1,168 separate properties.[4]    The Debtors' approach necessarily

constrained the potential universe of bidders and resulted in fewer and lower bids.

26.    Fourth, the Debtors failed to provide sufficient information to allow bidders the

opportunity to develop a fully-formed view of the properties.    At the time of its launch on

December 21, 2018, the dataroom lacked basic information such as individual asset financials and

marketing materials.    Even as of January 8, 2019, eleven days after the deadline for indicative bids

had passed, the dataroom was still being built and did not contain the customary real estate due

diligence materials for each property, such as updated title policies with underlying assets, existing

surveys, zoning reports, and environmental reports.    While additional information was provided

over time, that information came too late to make any meaningful difference in the bids received

by the Debtors.

27.    The result of these various deficiencies was that only a small number of potential

bidders were aware of what the Debtors were selling, had limited information on which to base a

decision to bid, and had very limited time to evaluate that information and decide whether and how

much to bid.    The sales process therefore attracted primarily opportunistic buyers who could

submit low-ball offers with no cost or penalty, and incentivized stakeholders, including landlords,

to submit placeholder bids as a means of expressing interest and opening a channel for

negotiations.    For example, the Debtors received fifty bids of either $0 or $1 for entire assets, and

only around 396 bids were received for a total of 258 assets (excluding the two bids received for

---

[4] The Debtors sought bids for 1,168 total real estate assets, including 957 unencumbered assets owned and leased by
Debtors, 97 encumbered assets owned and leased by Debtors, and 114 encumbered assets owned and leased by non-
Debtor affiliates.

all assets).  Given all of the flaws with the Debtors' sale process, these bids are not a reliable

indicators of the value of the properties.[5]

### e.  Unsurprisingly given the Debtors' sale process, ESL emerged as the winning bidder without a competitive auction ever taking place.

28.     Instead of working to market their individual assets for sale to potential third party-

bidders and working with bidders to maximize potential bids, the Debtors focused their efforts

during this bankruptcy process almost entirely on negotiations with ESL to purchase substantially

all the assets of the Debtors.  This back-and-forth with ESL consumed the Debtors' attention during

these bankruptcy proceedings to the detriment of any meaningful effort to pursue sales of

individual assets in a value-maximizing process.

29.     The efforts with ESL date back at least to December 5, 2018 when ESL submitted

an indicative bid pursuant to the Global Bidding Procedures.  The Debtors diligenced this bid and

discussed it with ESL and its advisors, but ultimately determined that it was non-actionable, both

legally and financially.  Subsequently, on December 28, 2018, ESL submitted a revised "definitive

bid" to acquire substantially all of the Debtors' go-forward retail footprint and other assets and

component businesses of Sears (the "ESL Definitive Bid").  Following submission of the ESL

Definitive Bid, the Debtors' advisors engaged with ESL and its advisors to discuss the infirmities

of the bid, ultimately determining that this bid was also not actionable.

30.     At this point, the Debtors indicated that they intended to pivot to a wind-down

process.  Instead, the Debtors resumed negotiations with ESL which, on January 9, 2019, submitted

a revised bid attempting to remedy the deficiencies in its prior two bids.  But as with ESL's prior

bids, all parties, including the Debtors, agreed that this bid would have left the Debtors

---

[5] The Greenspan Declaration addresses additional shortcomings in the Debtors' real estate sales process.

administratively insolvent and provided no value to unsecured creditors. Nevertheless, the Debtors

continued to engage in "around the clock" negotiation with ESL over the proposed bid.

31.    These negotiations between the Debtors and ESL continued into the

commencement of the so-called "auction" on January 14, 2019. As originally conceived, the

auction was supposed to be a forum where various parties would compete to bid on many if not

all of the Debtors' valuable assets. But the actual auction turned out to be little more than a venue

for the Debtors' continued bilateral negotiations with ESL. Interested bidders in real estate assets

who arrived at the auction on the first day were initially turned away by the Debtors. While the

Debtors continued to negotiate exclusively with ESL, third parties who wished to bid for discrete

assets literally wandered the offices of Debtors' legal counsel confused as to whether they would

even get a chance to bid in an auction.

32.    It is no exaggeration to state that no actual auction ever took place. Instead, over

the course of several days and nights, negotiations between the Debtors and ESL played out. After

additional back-and-forth between the Debtors and ESL over the first day and a half of the auction,

the Debtors continued to reject ESL's bid, admitting that the bid left the Debtors administratively

insolvent and $150 million short of even getting to closing. Counsel to the Restructuring

Subcommittee agreed that the bid did not provide sufficient cash to close the transaction and would

leave the Debtors administratively insolvent. Then ESL presented yet another offer. Although

this new bid – the infirmities of which are discussed in detail in the attached slide deck – failed to

remedy the fundamental problems with prior bids, the Debtors nevertheless accepted the bid (the

"ESL Bid") and declared ESL the "Successful Bidder" in the early morning hours of January 17,

2019.

13

33.    The Debtors have explained to me that the primary driver of their decision to accept this ESL Bid when they had just rejected a substantially similar bid hours earlier was that the new ESL Bid included an agreement by Cyrus Capital Partners to acquire and subsequently roll over the entire outstanding Junior DIP.  In the Debtors' view, Cyrus's agreement remedied an existing $120 million shortfall, thereby bringing the Debtors sufficiently close to administrative solvency to justify proceeding with the ESL Bid.  In my view, this argument is a red herring because no actual value was generated for the estate by Cyrus acquiring and rolling the outstanding Junior DIP.  The entirety of this new $120 million in value is allocated to paying the expenses associated with continuing to pursue the ESL Bid, meaning that it generated no more value to the Debtors' estate than if the Debtors had simply rejected the ESL Bid and pivoted to an orderly wind-down.  This is evidenced by the Debtors' analysis of an orderly wind-down scenario, which projects only $175 million of draws on the Junior DIP versus $350 million required to be drawn to fund the closing of the ESL Bid.  Put differently, only ESL benefited from this $120 million change by being able to prevail in the bidding process, while the Debtors themselves were no better off than if they had rejected the "improved" bid outright.

34.    Although it took several days of "around the clock" negotiations for the Debtors and ESL to strike their deal, the ultimate outcome was preordained.  The Debtors never seriously pursued or entertained any alternative to ESL.  Their focus during the 90 days between filing and the auction was on getting a deal with ESL to "save" the company.  Because they expended no meaningful effort on an orderly liquidation sales process, the ultimate result – a deal with ESL – was essentially a fait accompli.

14

## ESL's Bid Is Inadequate

35.    In the slide deck attached hereto as **Exhibit B**, I explain in detail why the final ESL

Bid is inadequate and inferior to an organized wind-down of the Debtors' retail operations and sale

of its other operating businesses and real estate in an organized process (the "Alternative Sale

Process"), even according to the Debtors' own analysis.  Unlike the ESL Bid, the Alternative Sale

Process provides value to unencumbered assets.  Moreover, unlike the ESL Bid, which renders the

Debtors administratively insolvent, the Alternative Sale Process ensures administrative solvency.

As such, it is superior to the ESL Bid, and the ESL bid should be rejected.

## Conclusion

36.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge.


New York, New York
January 26, 2019                                                    By:

_____
**Saul E. Burian**
Managing Director
Houlihan Lokey Capital, Inc.


15

18-23538-rdd    Doc 2309-1    Filed 01/31/19    Entered 01/31/19 20:45:52    Exhibit A -
Burian Declaration (Redacted)    Pg 17 of 43

# EXHIBIT A

 

**Subject:** Fwd: Sears
**Date:** Tuesday, January 8, 2019 4:28:08 PM

Begin forwarded message:



**Date:** January 8, 2019 at 4:20:37 PM EST

**Subject: RE: Sears**

You can look at the data room yourself.  They uploaded three files on 12/27/18 and nothing since.



**Sent:** Tuesday, January 8, 2019 3:32 PM

**Subject:** Sears

**[Warning: External]**

Spoke to Lazard, after you did.  Sounds like they think they provided a significant amount of the diligence and are willing to organize a call for tomorrow to figure out the rest.  We will be on





Please consider the environment before printing.

This e-mail message and any attachments are for the sole use of the intended
recipient(s) and may contain confidential information. If you are not an intended
recipient, or an intended recipient's authorized agent, you are hereby notified that
any dissemination, distribution or copying of this e-mail message or any
attachments is strictly prohibited. If you have received this message in error,
please notify the sender by reply e-mail and delete this e-mail message and any
attachments from your computer system.

18-23538-rdd    Doc 2309-1    Filed 01/30/19    Entered 01/30/19 20:45:52    Exhibit A -
Burian Declaration (Redacted)    Pg 23 of 43

# EXHIBIT B

HOULIHAN LOKEY

# In re: Sears Holdings Corporation et al.

ANALYSIS OF ESL BID AND DEBTORS' ALTERNATIVE SALE PROCESS

JANUARY 26, 2019 | CONFIDENTIAL

# Table of Contents

|    |                                                          | Page |
|----|----------------------------------------------------------|------|
| 1. | Introduction and Limiting Factors                        | 3    |
| 2. | Summary Observations                                     | 5    |
| 3. | ESL Bid and Debtors' Alternative Sale Process Analysis   | 8    |
| 4. | Appendix                                                 | 21   |

18-23538-shl    Doc 2409-1    Filed 02/06/19    Entered 02/06/19 00:45:52    Exhibit A -
Burian Declaration (Redacted)    Pg 26 of 48

|    | | Page |
|----|------------------------------------------------------|------|
| 1. | Introduction and Limiting Factors                    | 3    |
| 2. | Summary Observations                                 | 5    |
| 3. | ESL Bid and Debtors' Alternative Sale Process Analysis | 8    |
| 4. | Appendix                                             | 21   |

HOULIHAN LOKEY

# Introduction and Limiting Factors

- This analysis has been prepared by Saul E. Burian, Managing Director at Houlihan Lokey Capital, Inc. ("HL") in connection with the objection of the Official Committee of Unsecured Creditors (the "Committee" or the "UCC") to the sale of the assets of Sears Holdings Corporation ("Sears," and collectively with its debtor-affiliates, the "Debtors" or the "Company") before the Bankruptcy Court for the Southern District of New York

- In preparing this analysis, I have assumed and relied on the accuracy and completeness of all financial and other information furnished to me by the Company and other third parties, as well as publicly-available information, unless otherwise stated herein. I have not prepared an enterprise valuation analysis in connection with this report

- As and to the extent that the Committee receives additional information from the Debtors, or additional or different facts and circumstances become known to the Committee, I reserve the right to supplement the analysis and conclusions included in this analysis but am under no obligation to do so

| | | Page |
|---|---|---|
| 1. | Introduction and Limiting Factors | 3 |
| 2. | Summary Observations | 5 |
| 3. | ESL Bid and Debtors' Alternative Sale Process Analysis | 8 |
| 4. | Appendix | 21 |

HOULIHAN LOKEY | 6

# Scenarios Considered

The Debtors purported to conduct an auction starting on January 14th, 2019 (the "Auction"). In fact, the Debtors only seriously considered the ESL Investments, Inc. ("ESL") "going concern" bid (the "ESL Bid"). The ESL Bid was then compared to the Debtors' estimated proceeds from an orderly sale of the Debtors' assets (the "Alternative Sale Process")

■ Set forth in the following materials is an analysis of:

1) **ESL Bid** – the bid ultimately accepted by the Debtors at the Auction as described in the Asset Purchase Agreement filed ECF No. 1730 by the Debtors on January 18, 2019

2) **Alternative Sale Process** – the recovery analysis in an orderly sale of assets as set forth by the Debtors in connection with the Auction

3) **Adjusted Alternative Sale Process** – the Alternative Sale Process as adjusted to account for:

   a)   administrative expenses and priority claim allocation;

   b)   allowable claims and claim amounts; and

   c)   asset value assumptions

HOULIHAN LOKEY | 7

# Primary Observations

1) **Administrative Solvency**: By the Debtors' own admission, the ESL Bid leaves the estates administratively insolvent (see the Diaz Declaration). However, under the Debtors' analysis of the Alternative Sale Process all administrative and priority claims are shown to be paid in full

2) **Unsecured Creditor Recoveries**: As shown in the Adjusted Alternative Sale Process analysis, an orderly sale of the Debtors' assets should yield significant recoveries to unsecured creditors, while the ESL Bid arrogates to insiders all of the estates' unencumbered asset value

3) **Selection of ESL Bid**: The net difference between ESL's bid that the Debtors rejected midway through the "Auction" and the version ultimately accepted can be summarized in the following items:

   i.   The assumption of $120mm of additional Junior DIP, which is incurred solely to bridge to close the ESL Bid; and

   ii.  The limitation of the preserved adequate protection claims that the UCC does not believe are enforceable

4) **Debtors' Methodology**: The Debtors justified acceptance of a bid that provides no value to unsecured creditors by inexplicably modifying the following two winddown assumptions:

   i.   The allocation of administrative expenses among the secured and unsecured claims; and

   ii.  The amount and enforceability of second lien adequate protection claims

| | | Page |
|---|---|---|
| 1. | Introduction and Limiting Factors | 3 |
| 2. | Summary Observations | 5 |
| 3. | ESL Bid and Debtors' Alternative Sale Process Analysis | 8 |
| 4. | Appendix | 21 |

# ESL Bid vs. Alternative Sale Process

Set forth below is a comparative analysis of recoveries to various stakeholders under the ESL Bid (assuming underlying closing conditions are satisfied), the Alternative Sale Process (as detailed by the Debtors at the Auction), and the Adjusted Alternative Sale Process

HOULIHAN LOKEY

# ESL Assumptions Necessary to Close

Set forth below are certain conditions and assumptions that must be met for the ESL Bid to close

1) **ESL must purchase or otherwise satisfy certain secured claims which it currently does not own**

   ▪ The ESL Bid contemplates the credit bid of the entire $125mm Prepetition FILO

   ▪ ESL currently owns $70mm and therefore needs to purchase $55mm

   ▪ ESL owns the entire $723mm junior tranche of the Dove Facility (and contemplates credit bidding $544mm of that loan), and ESL
   must purchase the $108mm senior tranche of the Dove Facility, currently owned by Cascade, in order to close

2) **The Debtors must "manage down" the projected ABL DIP balance of $992mm[1] to $950mm by closing, without increasing
   administrative claims or decreasing ABL Collateral**

   ▪ The ESL Bid has a maximum New ABL commitment of $850mm

3) **The deal is premised on ESL's ability to acquire / license the Kenmore and DieHard brands from non-debtor KCD IP, LLC**

(1)  Figure is as of the latest available information at the Auction. We understand the Debtors have since updated this figure, however we have not yet been able to diligence the revised
figure

HOULIHAN LOKEY | 11

# ESL Bid – Consideration Analysis

Set forth below is a summary of the "value" of the ESL Bid as indicated by ESL and the adjusted value of the bid based upon the Debtors' estimates of underlying collateral values supporting the ESL debt

## ESL Bid Consideration Analysis

*($ in millions)*

| | Headline Consideration Per ESL | Adjusted Value Per Debtors [4] |
|---|---|---|
| Cash from New ABL ($1.3 billion total facility) | $850 | $850 |
| Dove Credit Bid | 544 | 448 |
| IP / GL Credit Bid – ESL & Cyrus | 231 | 166 |
| FILO Credit Bid – ESL & Cyrus | 70 | 70 |
| FILO Credit Bid – Non-ESL & Non-Cyrus | 55 | 55 |
| Second Lien Credit Bid | 434 | 136 |
| **Total Credit Bid** | **$1,334** | **$875** |
| LC Facility Roll-Over – ESL & Cyrus | 271 | 271 |
| Junior DIP Roll-Over [1] | 350 | 350 |
| **Total Roll-Over** | **$621** | **$621** |
| Assumption of Sparrow Liability | 592 | 513 |
| Assumption of PA Liability [2] | 1,009 | 430 |
| Assumption of SYW Points and Gift Card | 81 | – |
| **Total Assumption of Non-Administrative Liabilities** | **$1,682** | **$943** |
| 503(b)(9) | 139 | 139 |
| Postpetition Accounts Payable (Merchandise and Non-Merchandise) | 166 | 166 |
| Severance and WARN | 20 | 20 |
| Employee Claims | 8 | 8 |
| Property Taxes | 134 | 134 |
| Cure Costs | 200 | 200 |
| **Total Assumed Administrative Claims** | **$667** | **$667** |
| Cash for ESL Release [3] | 35 | 35 |
| Cash for Store Register Cash | 15 | 15 |
| **Total Bid Consideration** | **$5,204** | **$4,006** |

In the "Adjusted Value Per Debtors" column, the assumed Sparrow liability, Dove credit bid, and IP / GL credit bid are reduced to the Debtors' estimate the underlying collateral value

*Source: The ESL Bid Asset Purchase Agreement and Debtor estimates in the Windown Recoveries presentation dated January 14, 2019*
*(1) Contemplates Cyrus purchasing remaining portion of Junior DIP which it does not currently own*
*(2) Page 3 of the Debtors' Project Survivor – Scenario Discussion (December 2018)*
*(3) No consideration provided for Cyrus release*
*(4) Without applying collateral surcharges for administrative claims*

# ESL Bid Rejected vs. "Winning" ESL Bid

Set forth below is a comparison of the version of ESL's bid that was expressly rejected by the Debtors (and the restructuring subcommittee) and the ESL Bid that was ultimately accepted hours later

## Comparison of Administrative Claims Shortfall

ESL made virtually no financial change other than assuming the $120mm Junior DIP shortfall. The additional Junior DIP draw is only being incurred to bridge the ESL Bid to close

ESL actually reduced its bid by $13mm by taking $39m of SHIP sale proceeds (or SHIP itself if the contemplated sale does not close) as well as $10mm in utility deposit that ESL was not taking in the version of the ESL Bid that was rejected

| ($ in millions) | ESL Bid Rejected by Debtors[1] | ESL Bid Accepted by Debtors[2] | |
|---|---|---|---|
| Admin Claims Not Assumed by ESL (Excl. Pro Fees and 503(b)(9))[3] | $114 | $114 | |
| 503(b)(9) Claims | 34 | 34 | |
| Professional Fees | 108 | 108 | |
| Transfer Taxes | 19 | 19 | |
| Mechanics' Liens | 4 | 4 | |
| ABL DIP Shortfall | 100 | 100 | |
| Junior DIP Shortfall | 120 | – | |
| **Total Value Required** | **$499** | **$379** | |
| MTN Sale Proceeds | (81) | (81) | |
| Professional Fees Carve Out | (108) | (108) | Cash Retained by Debtors[4] |
| Cash - Banks | (64) | (54) | |
| SHIP Deposit | (6) | (6) | |
| U-Haul Proceeds | (7) | (7) | |
| Cash - Registers | (20) | – | |
| Utility Deposit | (10) | – | |
| SHIP Proceeds | (39) | (13) | |
| Hurricane Insurance | – | (13) | Assumed Liabilities |
| Transfer Taxes | – | (19) | |
| Mechanics' Liens | – | (4) | |
| **Total Value Required** | **$164** | **$87** | |
| Cash from ESL for Store Register Cash | – | (15) | |
| **Total Value Required** | **$164** | **$72** | |
| Additional DIP Outstanding to be "Managed Down" | 42 | 42 | |
| **Total Shortfall** | **$206** | **$114** | |
| Memo: KCD IP Royalties | $112 | $112 | |
| **Total Shortfall** | **$318** | **$226** | |

## Comparison of Other Key Terms

| | ESL Bid Rejected | "Winning" ESL Bid |
|---|---|---|
| ESL Release / Credit Bid Cash Consideration | $35mm | $35mm |
| ESL 2L 507(b) and Deficiency Claims | No Limitation | Partial Limitation[5] |

(1) Debtors estimate at auction per "Discussion Materials – Project Blue" prepared by Lazard and M-III Partners, on behalf of the Debtors, dated January 14, 2019

(2) "Discussion Materials – Project Blue" prepared by Lazard and M-III Partners, on behalf of the Debtors, dated January 16, 2019

(3) Deficit includes $30mm in ABL $4mm in Franchise and Property Taxes, and $80mm in Winddown Costs

(4) Left column represents Debtors' estimates at the time of the Auction and right column are Debtors' estimates after the Auction. Cash of $64mm revised down by Debtors. Many cash numbers subject to change (e.g., SHIP Deposit currently being contested by Service.com), which would increase the total shortfall

(5) ESL shall have no right to receive proceeds from litigation regarding Seritage, Lands End, or other acts of intentional conduct on behalf of any 507(b) and/or deficiency claim. In addition, ESL shall not be entitled to receive in excess of $50 million on account of its 507(b) claims, if any, from the proceeds of any other claims or causes of action of the Debtors' estates, with any ESL 507(b) claims in excess thereof being treated as general unsecured claims that are to receive pro rata recoveries with general unsecured claims

HOULIHAN LOKEY

12

18-23538-rdd   Doc 2409-1   Filed 02/06/19   Entered 02/06/19 20:21:52   Exhibit A -
Supplemental Burian Declaration (Redacted)   Pg 36 of 48

13

HOULIHAN LOKEY

# Debtors' Alternative Sale Process

## Recovery Matrix

Set forth below is a summary of the Debtors' Alternative Sale Process recovery matrix as provided by the Debtors on January 14, 2019 in which they inexplicably modified their administrative expense allocation methodology, by allocating first all administrative expenses to proceeds from unencumbered assets and also added, for the first time, adequate protection claims on behalf of the second lien notes

## Illustrative Debtors' Alternative Sale Process Waterfall

| ($ in millions) | Gross Claim[1] | ABL Collateral | Dove Real Estate | IP / GL Collateral | Unencumbered Assets | Total Recov ($) | Total Recov (%) | Deficiency Claim |
|---|---|---|---|---|---|---|---|---|
| **Secured Creditor(s)** | | | | | | | | $1,816 |
| **Total Value to be Distributed** | | $1,976 | $448 | $166 | $915 | $3,505 | | |
| Administrative Claims[2] | $1,316 | $551 | $19 | $7 | $740 | $1,316 | 100.0% | |
| ABL DIP[3] | 894 | 894 | - | - | - | 894 | 100.0% | |
| Prepetition FILO | 125 | 125 | - | - | - | 125 | 100.0% | |
| Prepetition LC | 271 | 271 | - | - | - | 271 | 100.0% | |
| Junior DIP[4] | 175 | - | - | - | 175 | 175 | 100.0% | |
| Prepetition 2nd Lien - Non-ESL | 220 | - | - | - | - | - | 0.0% | |
| Prepetition 2nd Lien - ESL | 842 | - | - | - | - | - | 0.0% | |
| 2nd Lien Adequate Protection - 507(b)[5] | 331 | 136 | - | - | - | 136 | 41.2% | |
| Prepetition 2nd Lien Notes (Cash) (Subordinated) | 89 | - | - | - | - | - | 0.0% | |
| Dove - Cascade | 108 | - | 108 | - | - | 108 | 100.0% | |
| Dove - JPP | 723 | - | 321 | - | - | 321 | 44.3% | |
| IP / GL Term Loan | 231 | - | - | 159 | - | 159 | 68.8% | |
| **Total (excluding 2nd Lien Adequate Protection - 507(b))[6]** | $4,996 | $1,976 | $448 | $166 | $915 | $3,505 | | $1,816 |
| Total Value Available for Unsecured Claims | | - | - | - | - | | | |
| **General Unsecured Creditor(s) (Including Secured Debt Deficiency Claims)** | | | | | | | | |
| GUC Claims / Recovery[7] | $5,864 | | - | - | - | - | 0.0% | $5,864 |

Note: Footnotes per Debtors' Winddown Recovery presentation dated Jan. 14, 2019 unless noted otherwise
(1)  Gross Claim does not mean such claim is allowed, unless allowed pursuant to a bankruptcy court order or otherwise
(2)  HL Footnote: Total Administrative Claims of $1,405mm reduced by carve-out account of $89mm
(3)  Pro forma balance of as 1/5/19. Company has requested $100mm Jr. DIP draw for week ending 1/12/19 which would reduce the pro forma ABL balance to $894mm
(4)  Pro forma balance of as 1/5/19. Company has requested $100mm Jr. DIP draw for week ending 1/12/19 to bring the Junior DIP balance from $75mm to $175mm
(5)  Includes $331mm of claims under section 507(b) of the Bankruptcy Code for diminution in the value of 2nd lien collateral are shown based on advice from Debtors' counsel. The ultimate value of these claims could vary materially given a number of factors including the use of going concern or liquidation values, inclusion or exclusion of certain administrative costs such as professional fees that benefit from the Carve-Out and charges and the ultimate validity of the 2nd lien liens and claims. In addition, the validity and amount of such diminution claims is expected to be a dispute among the parties, including the debtors. The recovery takes into the disputed nature of the claim
(6)  HL Footnote: $4,996mm adjusted to exclude the $331mm 2nd Lien Adequate Protection claim, which HL believes the Debtors double-counted in their Winddown Recovery presentation dated January 14, 2019. If included the total Secured Claims would be $5,327mm
(7)  Draft estimate of gross liability per Deloitte of $3.4 billion, plus ~$1 billion of PA Liability, plus deficiency claims of ~$1.8 billion (Note: HL believes the deficiency claims should be ~$1.5 billion once adjusted for the double-counted 2nd Lien Adequate Protection claim)

# Debtors' Alternative Sale Process

Adjustments to Methodology, Claims and Assets

Set forth below is a summary of adjustments that should be made to the Debtors' Alternative Sale Process analysis so that it can be properly compared to the ESL Bid

| | | Debtors' $ | Adj. $ | $ Delta | Commentary |
|---|---|---|---|---|---|
| **(1)** | **Administrative Claim Allocation** | | | | |
| | Allocation to ABL Collateral | $551mm | $892mm | $341mm | The expenses incurred for the benefit of the ABL collateral should be allocated to the ABL collateral. See page 18 for a detailed analysis of the adjusted allocation methodology |
| | Allocation to Unencumbered Assets | $740mm | $399mm | ($341mm) | The Debtors allocated a disproportionate amount of claims to the unencumbered assets. See page 18 for a detailed analysis of the adjusted allocation methodology |
| **(2)** | **Claims** | | | | |
| | 507(b) Claims | $331mm | NA | ($331mm) | While ESL has indicated that, in a winddown scenario, it would assert a 507(b) claim for its second lien position, the UCC believes that there is no basis for this claim, and it would be disallowed |
| | PA Liabilities | $1,009mm | $430mm | ($579mm) | The Debtors disclosed a much lower amount in other materials ($430mm) related to the "service liability going forward" rather than the $1,009mm gross figure included in the Debtors' analysis[1] |
| **(3)** | **Asset Values** | | | | |
| | Unencumbered Real Estate[2] | $582mm | $1,134mm | $552mm | The Debtors' analysis collected A&G Brokers Opinions of Values, JLL Appraisals, C&W Appraisals, and non-binding bids to estimate real estate value. These data points only covered 409 Unencumbered assets out of 957 and the remainder were assumed to have no value without further investigation. The Debtors then applied a liquidation discount factor to the values that ranged from 17% to 75%. HL incorporated the value from the Greenspan Declaration |
| | Credit Card Tort | $33mm | $99mm | $66mm | This adjustment reflects possible recovery scenarios if the estates retain the claim |
| | Other Unencumbered Assets | NA | TBD | NA | The analysis does not ascribe value to a variety of material unencumbered assets for a which a valuation has not yet been completed (e.g., NOLs, customer data, FF&E and augment proceeds, Sears Auto Centers, First Data refunds, prepetition cash deposits, litigation proceeds, etc.) |

(1)  Page 3 of the Debtors' Project Survivor – Scenario Discussion (December 2018)
(2)  Includes Specified Assets

# Debtors' Alternative Sale Process

## Debtors' Change to Analysis

Set forth below is a comparison of the waterfall analyses the Debtors presented on December 13, 2018 and January 14, 2019. In the January 14 iteration, to the detriment of unsecured creditors, the Debtors inexplicably: a) changed their administrative allocation method, and b) added 507(b) adequate protection claims which the Committee does not believe are enforceable

### Debtors' December 13, 2018 Analysis (Old Administrative Claim Allocation Method and No 507(b) Claim)

($ in millions)

| Creditors | Gross Claim | 1st Lien Collateral | Jr. DIP Collateral (Previously Unencumbered) | Sparrow R.E. | Dove R.E. | IP/GL Collateral | Wind-down Reserve | Carve-Out | $ Recovery | % Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| Admin and Other Priority Claims (1) | $1,421 | (a) ($1,110) | (a) ($103) | - | ($17) | ($9) | (a) ($137) | ($45) | $1,421 | 100% |
| DIP ABL (2) | 664 | (664) | - | - | - | - | - | - | 664 | 100% |
| Junior D P | 350 | - | (350) | - | - | - | - | - | 350 | 100% |
| FILO (1.5) | 125 | (125) | - | - | - | - | - | - | 125 | 100% |
| Citi LC Facility (1.75) (3) | 176 | (171) | - | - | - | - | - | - | 171 | 97% |
| 2nd Lien Line of Credit Loans | 570 | - | - | - | - | - | - | - | - | - |
| ESL 2nd Lien Term Loan (PIK) | 320 | - | - | - | - | - | - | - | - | - |
| 2nd Lien Notes (PIK) | 175 | - | - | - | - | - | - | - | - | - |
| 2nd Lien Notes (2.5; Cash) | 89 | - | - | - | - | - | - | - | - | - |
| Dove Loans | 831 | - | - | - | (389) | - | - | - | 389 | 47% |
| Sparrow Loans (4) | NA | - | - | - | - | - | - | - | NA | NA |
| GL / IP Loan | 241 | - | - | - | - | (186) | - | - | 186 | 77% |
| **Total Secured Debt / Admin Claims (5)** | **$4,963** | **($2,071)** | **($453)** | - | **($406)** | **($196)** | **($137)** | **($45)** | **$3,305** | **67%** |
| Unsecured Claims Inc. Deficiency Claims (6) | 4,982 | | (203) | | | | | | 203 | 4% |

### Debtors' January 14, 2019 Analysis (AKA "Alternative Sale Process")

($ in millions)

| Creditors | Gross Claim (1) as of 1/5/19 | 1st Lien Collateral | Jr. DIP Collateral (Previously Unencumbered) | Sparrow R.E. | Dove R.E. | IP/GL Collateral | Wind-down Reserve | Carve-Out | $ Recovery | % Recovery |
|---|---|---|---|---|---|---|---|---|---|---|
| Admin and Other Priority Claims (2) | $1,405 | (a) ($551) | (a) ($500) | - | ($19) | ($7) | (a) ($240) | ($89) | $1,405 | 100% |
| DIP ABL (2) | 894 | (894) | - | - | - | - | - | - | 894 | 100% |
| Junior DIP (3) | 175 | - | (175) | - | - | - | - | - | 175 | 100% |
| FILO (1.5) | 125 | (125) | - | - | - | - | - | - | 125 | 100% |
| Citi LC Facility (1.75) | 271 | (271) | - | - | - | - | - | - | 271 | 100% |
| Adequate Protection - 507(b) (4A) | 331 | (b) (136) (4b) | - | - | - | - | - | - | 136 | 41% |
| 2nd Lien Line of Credit Loans | 570 | - | - | - | - | - | - | - | - | - |
| ESL 2nd Lien Term Loan (PIK) | 320 | - | - | - | - | - | - | - | - | - |
| 2nd Lien Notes (PIK) | 175 | - | - | - | - | - | - | - | - | - |
| 2nd Lien Notes (2.5; Cash) | 89 | - | - | - | - | - | - | - | - | - |
| Dove Loans | 831 | - | - | - | (429) | - | - | - | 429 | 52% |
| Sparrow Loans (5) | NA | - | - | - | - | - | - | - | NA | NA |
| GL / IP Loan | 231 | - | - | - | - | (159) | - | - | 159 | 69% |
| **Total Secured Debt Claims** | **$5,417** | **($1,976)** | **($675)** | - | **($448)** | **($166)** | **($240)** | **($89)** | **$3,594** | **66%** |
| Unsecured Claims Inc. Deficiency Claims (6) | 5,864 | | | | | | | | | |
| Total Unsecured Debt / Claims | $5,864 | | | | | | | | | |

Note: Debtors' footnotes excluded

# Debtors' Alternative Sale Process

## Debtors' Allocation of Administrative Claims (New Method)

Shortly before the Auction, the Debtors dramatically changed their method of allocating administrative claims in the Alternative Sale Process

## Debtors' "New" Administrative Claims Allocation Method

Administrative Claims are satisfied as follows:

1. The Carve-Out Account is applied to professional fees

2. The first $240mm of proceeds from unencumbered asset sales is applied to administrative claims (Winddown Account)

3. Encumbered IP/GL and Dove asset sales are surcharged 4% (no surcharge to ABL collateral)

4. After repaying the Junior DIP, the balance of unencumbered asset sale proceeds is used to satisfy administrative claims

5. Any remaining administrative claims are satisfied by ABL Collateral proceeds

## Debtors' Unencumbered Asset Values

| Allocation of Unencumbered Asset Sale Proceeds | Debtors |
|---|---|
| Total Unencumbered Asset Sale Proceeds | $9 |
| Allocation to Winddown Reserve | (2 |
| Allocation to Jr. DIP | (1 |
| **Remaining Unencumbered Asset Proceeds** | $5 |

*The Debtors' allocation method uses all unencumbered asset proceeds to satisfy administrative claims, leaving no recovery for unsecured creditors*

## Debtors' Administrative Claims Allocation "Waterfall"

| Debtors' Methodology (Jan. 14, 2019) as Applied in the Debtors' Alternative Sale Process | | | | | | |
|---|---|---|---|---|---|---|
| | Total Admin Claim | DIP ABL Collateral | Dove Real Estate | IP / GL Collateral | Unencumbered Assets | Remaining |
| Total Administrative Claims (Includes all Winddown Expenses and Priority Claims) | $1,405 | | | | | $1,405 |
| Professional Fee Carve Out | | ❶ | | | | 1,316 |
| Winddown Reserve (Proceeds from Unencumbered Asset Sales) | | | | | ❷ 240 | 1,076 |
| Encumbered Asset Sale Surcharge | | 89 | ❸ 19 | ❸ 7 | | 1,050 |
| Additional Claims Charged to Unencumbered Asset Sales | | | | | ❹ 500 | 551 |
| Remainder Satisfied by ABL Collateral Proceeds | | ❺ 551 | | | | - |
| **Total** | $1,405 | $640 | $19 | $7 | $740 | - |

# 1 Debtors' Alternative Sale Process

Debtors' Allocation of Administrative Claims (Old Method)

Set forth below is the Debtors' prior method of allocating administrative claims in the Alternative Sale Process

## Debtors' "Old" Administrative Claims Allocation Method

Administrative Claims are satisfied as follows:

1. The Carve-Out Account is applied to professional fees

2. The first $240mm of proceeds from unencumbered asset sales is applied to administrative claims (Winddown Account)

3. Encumbered IP/GL and Dove asset sales are surcharged 4% (no surcharge to ABL collateral)

4. To the extent possible given the 506(c) waivers, most administrative claims related to GOB sales are allocated to the ABL Collateral

5. The remaining administrative claims are satisfied by unencumbered asset proceeds

## Debtors' Unencumbered Asset Values

| Allocation of Unencumbered Asset Sale Proceeds | Debtors |
| --- | --- |
| Total Unencumbered Asset Sale Proceeds | $7... |
| Allocation to Winddown Reserve | (1...) |
| Allocation to Jr. DIP | (3...) |
| **Remaining Unencumbered Asset Proceeds** | **$3...** |
| Allocation to Administrative Expenses | (1...) |
| **Remaining for Unsecured Creditors** | **$2...** |

*The Debtors' previous allocation method allowed for a recovery for unsecured creditors*

## Debtors' Administrative Claims Allocation "Waterfall"

| Debtors' Methodology (Dec. 13, 2018) | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Total Admin Claim | DIP ABL Collateral | Dove Real Estate | IP / GL Collateral | Unencumbered Assets | Remaining |
| Total Administrative Claims (Includes all Winddown Expenses and Priority Claims) | $1,421 | | | | | $1,421 |
| Professional Fee Carve Out | | ❶ | | | | 1,376 |
| Winddown Reserve (Proceeds from Unencumbered Asset Sales) | | 45 | | | ❷ 137 | 1,239 |
| Encumbered Asset Sale Surcharge | | | ❸ 17 | ❸ 9 | | 1,213 |
| GOB-Related Expenses Satisfied by ABL Collateral Proceeds | | ❹ 1,110 | | | | 103 |
| Additional Expenses Allocated to Unencumbered Assets | | | | | ❺ 103 | - |
| **Total** | **$1,421** | **$1,155** | **$17** | **$9** | **$240** | **-** |

# Debtors' Alternative Sale Process

## Adjustments to Administrative Claim Allocation Methodology

**Set forth below is a corrected allocation method for allocating administrative and priority expenses**

- The corrected method applies expenses to the assets being monetized based on HL's best estimate of the appropriate allocation given the information available. Additional diligence would be required to further refine the allocation (see p. 22)

| ($ in millions) | Total Claims Per Debtors [A] — Debtors' Administrative & Priority Claims Incurred Through + After the GOB Period(1) | Expenses during GOB [B] — Administrative & Priority Claims Incurred Through + After GOB Period | [C] — % Allocated to ABL Collateral | Allocation of Administrative Expenses [B] x [C] = [D] — Adj. Administrative & Priority Claims Allocated to ABL Collateral | [D] / [A] — As a % of Total | [E] = [A] - [D] — Adj. Administrative & Priority Claims Allocated to Unencumbered Assets | [E] / [A] — As a % of Total |
|---|---|---|---|---|---|---|---|
| **Expenses and Claims Related to ABL Collateral / GOB** | | | | | | | |
| Post-Petition Warranties(2) | $23 | $23 | 100.0% | $23 | 100.0% | - | 0.0% |
| Gift Card Redemptions | 10 | 10 | 100.0% | 10 | 100.0% | - | 0.0% |
| 503(b)(9) Claims(3) | 192 | 192 | 100.0% | 192 | 100.0% | - | 0.0% |
| Post-Petition AP(4) | 140 | 140 | 100.0% | 140 | 100.0% | - | 0.0% |
| Post-Petition TSA/CSA(5) | 40 | 40 | 100.0% | 40 | 100.0% | - | 0.0% |
| Cash Interest | 68 | 31 | 100.0% | 31 | 45.3% | 37 | 54.7% |
| **Total Expenses and Claims Related to ABL Collateral / GOB** | $473 | $436 | | $436 | 92.2% | $37 | 7.8% |
| **Other General Expenses / Claims** | | | | | | | |
| Home Office Payroll(6) | $268 | $239 | 75.0% | $179 | 67.1% | $88 | 32.9% |
| Logistics and SG&A(7) | 358 | 312 | 75.0% | 234 | 65.4% | 124 | 34.6% |
| KEIP / KERP | 19 | 13 | 75.0% | 9 | 50.0% | 9 | 50.0% |
| PTO | 8 | 8 | 75.0% | 6 | 75.0% | 2 | 25.0% |
| Non-Store Severance(8) | 13 | 7 | 75.0% | 5 | 37.5% | 8 | 62.5% |
| Tax Claims(9) | 114 | 29 | 75.0% | 22 | 19.4% | 92 | 80.6% |
| **Total Other General Expenses / Claims** | $779 | $607 | | $456 | 58.5% | $323 | 41.5% |
| Professional Fees(10) | 154 | 89 | Carve Out | 89 | 57.9% | 65 | 42.1% |
| **Gross Administrative + Priority Claims** | $1,405 | $1,133 | | $981 | 69.8% | $425 | 30.2% |
| Carve-Out Funding | (89) | (89) | 100.0% | (89) | 100.0% | - | 0.0% |
| **Total Administrative Claims** | $1,316 | $1,044 | | $892 | 67.7% | $425 | 32.3% |

| Allocation of Administrative Claims | Debtors' | Adjusted |
|---|---|---|
| ABL Collateral | $551 | $892 |
| Dove Real Estate | 19 | 19 |
| IP/GL Collateral | 7 | 7 |
| Unencumbered Assets | 740 | 399 |

*Source: Debtors' Winddown model received 1/12/19*
*Note: Footnotes per Debtors unless noted otherwise*
(1) HL Footnote. From January 5, 2019 to April 13, 2019
(2) The Debtors' estimated amount of protection agreements sold post-petition before the Assurant deal
(3) The Debtors' Windown budget's current actuals based on the Admin Claims presentation dated January 13, 2019
(4) Assumed additional critical vendor spend after January 1, 2019 per Debtors; allocated to the ABL Collateral per discussions with counsel
(5) The Debtors included TSA/CSA receipts in its ABL Collateral proceeds ("Other Receipts")
(6) Based on the Debtors' Windown budget; allocated pro rata based on the ratio of liquidation proceeds to net proceeds from the GOBs
(7) Does not include budgeted store-level GOB expenses of $489mm which are paid in the ordinary course of liquidation and are reflected in the net proceeds from the GOBs
(8) Based on revised bottom-up analysis of Home Office non-payroll costs necessary to operate the winddown per Debtors
(9) Non-store severance only, as $27mm of store severance is netted out of the GOB proceeds per Debtors
According to the Debtors, a portion of this number is attributable to claims that are due or accrue post-petition. The remainder are pre-petition priority claims presumed to be paid over 5 years pursuant to Section 1129(a)(9)(c) of the Bankruptcy Code. To the extent such taxes relate to unencumbered property, such claims will either be paid by the buyer if sold or paid over time if not sold
(9) Assumes any excess professional fees not covered by the carve-out account to be charged against the unencumbered assets

# Adjusted Alternative Sale Process

Set forth below is a summary of the Adjusted Alternative Sale Process with adjustments to: 1) administrative claim allocation methodology; 2) adequate protection and PA liability claims; and 3) unencumbered real estate and credit card tort claim asset values

- In an excess of caution, the analysis does not ascribe value to a variety of material unencumbered assets listed at the bottom of page 14 for which a valuation has not yet been completed

## Illustrative Debtors' Adjusted Alternative Sale Process Waterfall (Adjusted Scenario)

| ($ in millions) | Claims | ABL Collateral | Dove Real Estate | IP / GL Collateral | Unencumbered Assets | Total Recov ($) | Total Recov (%) | Deficiency Claim |
|---|---|---|---|---|---|---|---|---|
| **Secured Creditor(s)** | | | | | | | | |
| Total Value to be Distributed | | $1,976 | $448 | $166 | $915 | $3,505 | | |
| Administrative Claims (1) | $1,316 | $892 | $19 | $7 | $399 | $1,316 | 100.0% | |
| ABL DIP (2) | 894 | 894 | - | - | - | 894 | 100.0% | |
| Prepetition FILO | 125 | 125 | - | - | - | 125 | 100.0% | |
| Prepetition LC | 271 | 66 | - | - | - | 66 | 24.2% | |
| Junior DIP | 175 | - | - | - | 175 | 175 | 100.0% | |
| Prepetition 2nd Lien - Non-ESL (3) | 220 | - | - | - | - | - | 0.0% | |
| Prepetition 2nd Lien Notes (Cash) (Subordinated) - Non-ESL | 89 | - | - | - | - | - | 0.0% | |
| Prepetition 2nd Lien - ESL (3) | 842 | - | - | - | - | - | 0.0% | |
| Prepetition 2nd Lien Notes (Cash) (Subordinated) - ESL | | | | | | | | |
| 2nd Lien Adequate Protection - 507(b) | 108 | - | 108 | - | - | 108 | 100.0% | |
| Dove - Cascade | 723 | - | 321 | - | - | 321 | 44.3% | |
| Dove - JPP | 231 | - | - | 159 | - | 159 | 68.8% | |
| IP/Ground Lease Term Loan | | | | | | | | |
| **Total** | $4,996 | $1,976 | $448 | $166 | $574 | $3,164 | | $1,832 |
| *Remaining $ for Unsecured Claims* | | - | - | - | *$341* | *$341* | | |
| **General Unsecured Creditor(s) (Including Secured Debt Deficiency Claims)** | | | | | | | | |
| GUC Claims / Recovery before Asset Value Adjustments (4) | $5,296 | - | - | - | $341 | $341 | 6.4% | |
| *Unencumbered Real Estate Adjustment* | | | | | *$552* | *$552* | | |
| *Credit Card Tort Claim Adjustment* | | | | | *$66* | *$66* | | |
| *Other Unencumbered Assets* | | | | | *TBD* | *TBD* | | |
| **GUC Claims / Recovery after Asset Value Adjustments** | $5,296 | - | - | - | $959 | $959 | 18.1% | |

(1) Total Administrative Claims of $1,405mm reduced by carve-out account of $89mm
(2) ABL DIP balance is based on Debtors' projection as of January 5, 2019
(3) Includes $317mm of PIK Term Loan, $570mm of Line of Credit Loans, and $173mm of PIK Notes
(4) In addition to the adjustments previously described, the GUC claims also include updated deficiency claims due to the change in administrative claim allocation

# Adjusted Alternative Sale Process

Equitable Subordination / Recharacterization Considerations

Set forth below is a table illustrating the impact on unsecured recoveries based on different ESL equitable subordination / recharacterization outcomes

- ESL's claims are subject to equitable subordination and recharacterization claims

- In scenarios where a portion of ESL's claims are equitably subordinated / recharacterized, it is also assumed that a portion of ESL's ill-gotten interest[1] will be disgorged

- Any values initially used to satisfy ESL secured claims that are equitably subordinated / recharacterized fall directly to the unsecured creditors on a dollar for dollar basis

- The recoveries below do not include any litigation recoveries or the material unencumbered assets listed at the bottom of page 14 for which a valuation has not yet been completed

## Illustrative Recoveries to GUC Claims (Potential Equitable Subordination / Recharacterization Sensitivity Analysis)

|  | Debtors' Adjusted Scenario | |
| --- | --- | --- |
|  | Pre-asset Adjustment | Post-asset Adjustment |
| **Illustrative Recoveries (see page 19)** | **6.4%** | **18.1%** |
| **Illustrative Recoveries with Equitable Subordination / Recharacterization of ESL Claims** | | |
| 0.0% of ESL Debt Subordinated / Recharacterized | 6.4% | 18.1% |
| 10.0% of ESL Debt Subordinated / Recharacterized | 9.3% | 21.4% |
| 20.0% of ESL Debt Subordinated / Recharacterized | 12.1% | 24.7% |
| 30.0% of ESL Debt Subordinated / Recharacterized | 14.9% | 28.0% |
| 40.0% of ESL Debt Subordinated / Recharacterized | 17.7% | 31.3% |
| 50.0% of ESL Debt Subordinated / Recharacterized | 20.5% | 34.6% |
| 60.0% of ESL Debt Subordinated / Recharacterized | 23.3% | 37.9% |
| 70.0% of ESL Debt Subordinated / Recharacterized | 26.1% | 41.3% |
| 80.0% of ESL Debt Subordinated / Recharacterized | 28.9% | 44.6% |
| 90.0% of ESL Debt Subordinated / Recharacterized | 31.7% | 47.9% |
| 100.0% of ESL Debt Subordinated / Recharacterized | 34.6% | 51.2% |

[1]   Assumes a total of $400mm of interest

|  |  | Page |
|---|---|---|
| 1. | Introduction and Limiting Factors | 3 |
| 2. | Summary Observations | 5 |
| 3. | ESL Bid and Debtors' Alternative Sale Process Analysis | 8 |
| 4. | Appendix | 21 |

# Administrative and Priority Claim Allocation Methodology Support

Set forth below is a breakout of revenue and employees among encumbered and unencumbered assets. Approximately 75% to 80% of revenue and 80% of employees relate to encumbered assets. These percentages formed the basis for the selection of 75% (selected for conservatism) as the adjusted allocation percentage for estimated shared services / expenses shown on page 18

## Revenue and Employees among Encumbered and Unencumbered Assets

| ($ in millions) | 2017 Revenue | 2018E Revenue | # of Employees (5) |
|---|---|---|---|
| SHS(1) | $2,416 | $2,235 | 8,998 |
| Innovel(2) | 438 | 441 | 1,987 |
| Monark(3) | 213 | 227 | NA(6) |
| Unencumbered Real Estate | 0 | 0 | NA(7) |
| **Total Unencumbered** | **$3,067** | **$2,903** | **10,985** |
| Total Encumbered | 13,181 | 8,943 | 44,323 |
| Total Sears(4) | $16,248 | $11,846 | 55,308 |
| **Encumbered % of Total** | 81.1% | 75.5% | 80.1% |

(1)  Page 59 of 4.1.2. Sears Home Services Mgmt Presentation (October 2018)
(2)  Page 7 of 1.9.1 Innovel.11.13.2018 FINAL
(3)  Page 3 of 1.12.1 Monark 18 Plan_Finance
(4)  Page 12 of Debtors' Preliminary Business Plan (December 2018)
(5)  The total number of employees excludes the employees under KCD IP., LLC as it is a non-debtor
(6)  Unable to determine
(7)  Assumed to be minimal

CORPORATE FINANCE
FINANCIAL ADVISORY SERVICES
FINANCIAL RESTRUCTURING
STRATEGIC CONSULTING

HL.com

HOULIHAN LOKEY

# EXHIBIT 2

HIGHLY CONFIDENTIAL
ILLUSTRATIVE DRAFT
SUBJECT TO MATERIAL REVISION

**Sears — Select Unencumbered Assets**
*($ in millions)*

| | Illustrative Range | | Commentary |
|---|---|---|---|
| | Low | High | |
| Sears Home Services - PartsDirect | $60 | $100 | Low represents ▮ bid, which was fully financed and actionable. High represents ▮ bid. ▮ represented on numerous occasions a willingness to increase price with certainty around structure of auction process |
| Sears Home Services - Repair Business | 50 | 110 | Significant competitive interest in the asset; includes Cross Country receivable |
| Sears Home Services - SHIP | 60 | 60 | Reflects Service.com sale |
| Other Unencumbered Accounts Receivable | 60 | 80 | ~25% - 35% (this range reflects a significant discount to the actual value of the A/R to ESL in a going concern; Debtors' estimate in winddown analysis is 25%) of ~$250mm book value (excludes Cross Country receivable)[1] |
| Customer Data | 25 | 50 | 145mm total SYW registered users including 49mm active users in the last 24 months, 33mm users in the last 15 months, and 15mm point redeemers in the last 15 months[2] |
| NOLs | 25 | 50 | Over $5 billion in NOLs, including $1.2 billion at Sears Holdings Management Corporation, $2.6 billion at Sears, Roebuck and Co., and $409mm at Kmart Corporation[3] |
| Innovel | 5 | 15 | Last mile logistics provider (very few competitors with the same potential to scale) with approximately 2,000 employees and $78mm YTD (November 2018) third party revenue. Provides delivery and installation of "white goods"[4] |
| Furniture, Fixtures, and Equipment ("FF&E") | 5 | 10 | Conservative estimate based on $868mm gross value per 2017 10K |
| Monark Premium Appliance | 5 | 15 | Unique high-end appliance sales through 20 showrooms. $144mm YTD (November 2018) revenue[5] |
| Sears Auto Center | 5 | 10 | Conservative estimate of non-real estate components of the business (tires, batteries, brakes, oil, alignment, and other services) |
| **Illustrative Total** | **$300** | **$500** | |

(1) Per "Wind Down Recoveries" dated January 14, 2019
(2) "Project Transform – Business Plan" dated January 2019
(3) "Federal Tax Attributes CF Schedule (sent)" ("Project Blue – M&A" VDR Index 7.4.4)
(4) "Innovel 11.13.2018 FINAL" ("Project Blue – M&A" VDR Index 1.9.1)
(5) "Monark Business Summary" ("Project Blue – M&A" VDR Index 1.12.2)

Highly Confidential