# **Exhibit C**

Greenspan Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

In re:                                                  Chapter 11

SEARS HOLDINGS CORPORATION, *et al.*,                   Case No. 18-23538 (RDD)

                          Debtors.[1]                   (Jointly Administered)

----------------------------------------------------------------x

## DECLARATION OF RONALD F. GREENSPAN

   I, Ronald F. Greenspan, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty

of perjury, as follows:

   1.  I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a global

business advisory firm with several offices in the United States and abroad. I lead FTI's

Corporate Finance/Restructuring Practice in the Western United States and co-lead FTI's Global

Real Estate Solutions Practice.

   2.  I was retained by counsel for the Official Committee of Unsecured Creditors (the

"Committee") of Sears Holdings Corporation ("Sears," and together with its affiliated debtors and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

debtors in possession, the "Debtors") to, among other things, offer opinions with respect to (i) the

process undertaken by the Debtors to market certain of their real estate interests and their estimate

of the proceeds from such dispositions, and (ii) the fair market realizable value of the Debtors' real

estate interests in an orderly wind-down process.

3.    On January 26, 2019, I submitted an expert report (the "Greenspan Report")

outlining my opinions in this matter.

4.    In accordance with my understanding of this Court's Chambers Rules, I respectfully

submit this Declaration together with Exhibit A as my direct testimony on behalf of the Committee.

If called to testify, I could and would testify competently to the facts and opinions stated in the

Greenspan Report.


Dated:  February 2, 2019
        New York, New York

                                              By: _____
                                                   Ronald F. Greenspan

# EXHIBIT A

*In re Sears Holdings Corporation, et al.*, Debtors

---

Case No. 18-23538 (RDD)
United States Bankruptcy Court
Southern District of New York

---

Expert Report
of
Ronald F. Greenspan
Senior Managing Director, FTI Consulting, Inc.
January 26, 2019

*Table of Contents*

**A. Scope of Retention and Compensation**......................................................................................................3

**B. Summary of Qualifications**...............................................................................................................................4

**C. Summary of Opinions**..........................................................................................................................................5

**D. Debtors' Real Estate Portfolio** ....................................................................................................................5

**E. Debtors' Wind-Down Analysis**.....................................................................................................................7

**F. Bases for Opinions**..................................................................................................................................................8

**G. Conclusion** .........................................................................................................................................................20

*A. Scope of Retention and Compensation*

I have prepared this report ("Report") at the request of Akin Gump Strauss Hauer & Feld LLP ("Akin" or "Committee Counsel"), counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sears Holdings Corporation ("SHC") and its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Sears"), whose chapter 11 cases (the "Chapter 11 Cases") are pending before the United States Bankruptcy Court for the Southern District of New York (the "Court").

My analyses and opinions below address (i) the process undertaken by the Debtors to market certain of their real estate interests and their estimate of proceeds from such dispositions, and (ii) the fair market realizable value of the Debtors' real estate interests in an orderly wind-down process.

The opinions and conclusions expressed in this Report are based on my knowledge and experience in the real estate and restructuring industries, my review of the Debtors' valuation analyses and methodology used to support their wind-down analysis ("Debtors' Wind-down Analysis"), review of documents provided by the Debtors, market research and the application of accepted valuation methodologies and analytical methods. Appendix C contains a list of the documents I considered in connection with my analysis. FTI Consulting is being compensated for my time based on an hourly billing rate of $1,195 and this compensation is not contingent upon my findings or the outcome of this proceeding.

I reserve the right to update and supplement this Report as additional materials and information are provided or otherwise made available to me.

### B. Summary of Qualifications

I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"). I lead FTI's Corporate Finance/Restructuring Practice in the Western United States and co-lead FTI's Global Real Estate Solutions Practice, which we believe is the largest real estate consultancy outside of the Big 4 accounting firms. I have held this position at FTI (and its predecessor, PricewaterhouseCoopers Real Estate Restructuring Practice) since 1991.

I have over thirty-five years of experience across all aspects of the real estate industry, including the development, sale, financing, operation of and investment in real property including retail, residential, mixed-use, office, industrial, hospitality and other types of real property. I hold a Certificate in Distressed Business Valuation ("CDBV") from the Association of Insolvency and Restructuring Advisors, am a Fellow of the American College of Bankruptcy and hold both the Certified Insolvency and Restructuring Advisor and Certified Turnaround Professional designations. I have conducted many valuation analyses of real property interests, businesses and securities in distressed and non-distressed circumstances. I have lectured widely and have contributed articles to the American Bankruptcy Institute (ABI) Journal, American Banker and the Journal of the Urban Land Institute. I hold a J.D. from Harvard Law School and a B.A. in Economics from the University of California, Los Angeles.

I have been qualified as an expert and have presented testimony in state and federal courts throughout the United States, often involving issues associated with real property interests and the value thereof. My curriculum vitae and list of publications and prior testimony are attached as Appendix A of this Report.

## C. *Summary of Opinions*

After reviewing the Debtors' estimated proceeds of its real estate through a wind down, its support therefor and empirical data for the relevant markets, I have formed the following opinions:

**Opinion 1** – The Debtors' Wind-down Analysis, which shows expected proceeds from the disposition of real property assets of $1.15 billion (pre-transaction costs), substantially understates the value the Debtors would generate from the orderly disposition of their real estate interests. The Debtors' valuation analysis is replete with methodological errors, including punitively discounting or disregarding their own experts' valuation opinions, and assigning *zero value* to over 570 properties.

**Opinion 2** – A commercially reasonable disposition strategy for the Debtors' real estate assets would result in proceeds ranging from approximately $1.6 to $2.1 billion (pre-transaction costs).

## D. **Debtors' Real Estate Portfolio**

The Debtors' real estate portfolio is comprised of 1,054 owned and leasehold properties[1] that include (by the Debtors' count) 667 Sears or Kmart retail stores and auto centers and various other property types including industrial distribution and logistics facilities, the Debtors' corporate headquarters and offices. Exhibit 1 below classifies the Debtors' properties by asset type.

---

[1] This property count excludes 114 properties in non-Debtor entities encumbered by the Sparrow loan.

**Exhibit 1**
**Debtors' Properties by Asset Type**

| Sears Asset Format | |
|---|---|
| All | Asset Count |
| Appliance Builders Distributors (Monark) | 21 |
| Diehard Auto Center | 2 |
| Distribution Center | 28 |
| Home Services | 85 |
| Kmart | 320 |
| Logistics | 87 |
| Office | 13 |
| Sears Auto Center | 18 |
| Sears | 327 |
| Underutilized Property | 128 |
| Warehouse, Miscellaneous, or Other | 25 |
| Total | 1,054 |

Source: SHC

The forms of ownership of the above-referenced properties are summarized in Exhibit 2. Of the 1,054 assets, 187 are owned in fee and the other 867 are leasehold interests (including leasehold improvements and ground leaseholds).

**Exhibit 2**
**Debtors' Properties by Ownership Type**

| Ownership Type | |
|---|---|
| All | Asset Count |
| Owned | 187 |
| Leased | 769 |
| Ground Leased | 98 |
| Total | 1,054 |

Source: SHC

Exhibit 3 shows the number of Debtors' properties that are unencumbered and by entity subject to blanket encumbrances. 957 properties are unencumbered ("UE"), and 97 properties are encumbered by one of two loans from entities that include ESL affiliates.

**Exhibit 3**
**Debtors' Properties by Encumbrance**

| Unencumbered vs Encumbered | |
| --- | --- |
| All | Asset Count |
| Unencumbered | 957 |
| Encumbered Dove | 77 |
| Encumbered IP / GL | 20 |
| Total | 1,054 |

Source: SHC

### E.  Debtors' Wind-Down Analysis

On January 14, 2019, the Debtors provided a *Wind Down Recoveries* presentation to the Creditors' Committee.[2] The Debtors have updated their wind-down calculations since the January 14th presentation, and FTI's analysis herein is based on the detailed models used to estimate wind-down proceeds that were provided by the Debtors.[3] As discussed further in this report, the most recent calculations provided by the Debtors appear to utilize a realizable proceeds model which differs significantly from what is described in the January 14th presentation.

The Debtors incorporated (and then modified as discussed later in this Report) the following sources of real estate value estimates to model wind-down proceeds:

1) JLL 2018 appraisals ("JLL 2018 Appraisals"): market values of 128 owned and leasehold properties
2) A&G November 2018 valuations ("A&G 2018 Values"): values of 25 leasehold properties
3) Broker Opinions of Value ("JLL BOVs"): Broker's value opinions on 120 owned and leased properties
4) JLL January 2019 appraisals ("JLL 2019 Appraisals"): liquidation values of 297 leasehold properties[4]

---

[2] *2019-1-14 Wind Down Recoveries (ESL) (002) - FINAL_WEIL_96872332_2.pdf*

[3] *Sears Leased Assets Summary Sheet 2019.01.13.xlsx*

[4] The JLL 2019 Appraisals also include an estimated market value in addition to the liquidation value but the Debtors did not utilize the market value estimate in their wind-down proceeds forecast methodology. *Sears Leased Assets Summary Sheet 2019.01.13.xlsx.*

5) <u>Non-binding indications of interest ("non-binding IOIs")</u>: non-binding indications of interest received starting late December 2018 on 155 owned and leasehold properties

Exhibit 4 summarizes what I understand to be the Debtors' most recent estimated wind-down proceeds (pre-transaction costs) based on their models.

**Exhibit 4**
**Debtors' Estimated Wind-Down Proceeds**
**By Debtor Categorization, Included and Excluded**
*($ in millions)*

| Debtor Categorization | | | |
|---|---|---|---|
| **Included** | | **Asset Count** | **Debtors' Proceeds** |
| Unencumbered Leased Core | | 315 | $ 420 |
| Unencumbered Owned Core | | 14 | 48 |
| Unencumbered Non-Core & Pipeline | | 73 | 166 |
| Encumbered Dove | | 64 | 394 |
| Encumbered IP / GL | | 18 | 119 |
| | Total | 484 | $ 1,147 |
| | | | |
| **Excluded** | | **Asset Count** | **Debtors' Proceeds** |
| Unencumbered | | 555 | $ - |
| Encumbered Dove | | 13 | - |
| Encumbered IP / GL | | 2 | - |
| | Total | 570 | $ - |
| | | | |
| | Grand Total | 1,054 | $ 1,147 |

Source: SHC

Note: Unencumbered Non-Core & Pipeline removes duplicate for property 7439, which was double counted in the Debtors' analysis.

## F.  *Bases for Opinions*

**Opinion 1** – The Debtors' Wind-down Analysis, which shows expected proceeds from the disposition of real property assets of $1.15 billion (pre-transaction costs), substantially understates the recoverable value of those assets. Among other flaws in the Debtors' methodology (discussed below), their model disregards or discounts the valuation opinions of their own real estate experts, and assigns *zero value* to over 570 properties, most of which are unencumbered.

The results of the Debtors' valuation analysis are summarized in Exhibit 4.  As noted above, the methodologies relied upon by the Debtors for their valuation conclusions set forth in Exhibit 4 differ materially from, and supersede, the information provided in their *Wind Down Recoveries* presentation dated January 14, 2019 (the "Presentation").  The Presentation states (on page 5) that the estimate of unencumbered real estate proceeds does not rely upon non-binding IOIs.  However, in their updated valuation analysis, the Debtors' heavily weight non-binding IOIs in arriving at their valuation conclusion. Further, the Presentation states that encumbered Dove and IP/GL real estate is "assumed to be sold at 70% of dark value."  As explained further below, in the Debtors' updated valuation model this assumption is not applied.

In the Debtors most recent wind-down model, I have identified two major methodological flaws in their estimate of proceeds from the disposition of real estate assets.

### Flaw 1 – Debtors' Estimated Proceeds Excludes 570 Properties

The Debtors' Wind-down Analysis ascribes value to only 484 out of 1,054 properties owned or leased by the Debtors.  A total of 570 properties (54% of the portfolio by asset count), 555 of which are unencumbered, are ascribed *zero value* in the Debtors' model.  The Debtors' stated justification for this surprising conclusion is that, in the case of unencumbered properties, they claim to have little or no valuation information, and for the 15 encumbered properties, the valuation "likely" does not exceed the encumbrance or they did not receive a non-binding IOI.  With respect to 17 of the 555 unencumbered properties, the Debtors' statement is simply wrong as, in 2017 and 2018, Cushman & Wakefield ("C&W") performed appraisals which the Debtors have apparently decided to disregard.  The C&W appraisals on these 17 properties totaled $164 million in value.

The break-down by ownership type for the 570 properties that are ascribed *zero value* by the Debtors is summarized in Exhibit 5.

**Exhibit 5**
**Properties Excluded from Debtors' Wind-Down Proceeds**

| Ownership Type | |
| --- | --- |
| **Excluded** | **Asset Count** |
| **Owned** | 49 |
| **Leased** | 499 |
| **Ground Leased** | 22 |
| Total | 570 |

Source: SHC

The Debtors are wrong to ascribe zero value to properties for which they have little or no valuation information. Assuming a property has no value simply because the Debtors elected not to conduct an appraisal or evaluate any other market indicator of value is a deeply flawed valuation methodology. To the extent the Debtors might also justify ascribing zero value to such properties because no non-binding IOIs were received during the recently completed "sale process," that position should be viewed with extreme skepticism in light of the many flaws in that process which prevents it from being considered a conclusive indication of no actual market interest. The deeply flawed marketing process undertaken by the Debtors is discussed further below, and is also addressed in the declaration of Saul Burian.

**Flaw 2 – The Debtors adopt an illogical and unreliable valuation methodology that discounts the opinions of their third-party valuation professionals and incorporates lowball non-binding IOIs.**

The Debtors engaged reputable professional real estate valuation firms to prepare valuations including fair market and liquidation valuations (which opinions of liquidation value were frequently discounted by 50% from their opinions of market value). However, the Debtors, rather than relying upon the conclusions reached by these real estate professionals in their valuation work, instead took three further steps that resulted in the Debtors' valuation conclusions being substantially less than their

professionals' opinions of value.  These three steps, which are described below and shown for select properties in Exhibit 6, are as follows:

> ### Step 1 – Average JLL 2018 Appraisals and A&G 2018 market value estimates with non-binding IOIs (and ignore 2019 JLL Appraisal market values)

In arriving at their most recent valuation conclusions, the Debtors averaged (i) available market values from the JLL 2018 Appraisals and the A&G 2018 Values with (ii) non-binding IOIs they received as a result of the truncated and deficient marketing process (the unreliability of which is discussed below). Inexplicably, however, the Debtors disregarded in this analysis the more recent JLL 2019 Appraisals performed during the post-petition period.  The complete disregard of the most recent professional opinions of value, and reliance instead on older appraisals, is simply and entirely wrong as a matter of real estate valuation methodology.  Compounding this error, for many properties these older appraised values were reduced by averaging those values with lowball non-binding IOIs.  In some instances, this averaging reduced the appraised value of the property by nearly 50%.  In the many cases where the Debtors did not have a JLL 2018 Appraisal for a particular asset (which occurred for 162 of the 484 assets valued), they relied entirely upon the non-binding IOIs for their valuation conclusion.  As a matter of sound and generally accepted real estate valuation methodology, there is simply no justification to use as the sole basis to value real estate assets a non-binding IOI, particularly where (as here) the sales and marketing process itself was deeply flawed.

<u>Step 2 – Additional discount to already discounted value</u>

Even though Step 1 often substantially reduced estimated recoveries as compared to the conclusions reached by the Debtors' own professional valuations, the Debtors then applied *additional* discounts to these already reduced estimated proceeds according to the property group as follows:

| Debtor Categorization | | |
| --- | --- | --- |
| | Asset Count | Additional Discount |
| Unencumbered ("UE") Leased Core | 315 | 50% |
| Unencumbered ("UE") Owned Core | 14 | 16.63% |
| Unencumbered ("UE") Non-Core & Pipeline | 73 | 0% to 22.62% |
| Encumbered ("E") Dove | 64 | 17% |
| Encumbered ("E") IP / GL | 18 | 50% |

Source: SHC

For the 162 properties with no 2018 JLL Appraisal or A&G 2018 Value estimates, this step in the process discounts the non-binding IOIs, already likely much lower than realizable value, by up to an additionally 50%. Moreover, as can be seen in the above table, 333 of the 484 properties are assessed the additional 50% discount (after either already averaging down the valuation with the lowball non-binding IOI amount or using only the lowball non-binding IOI as the sole Step 1 valuation indicator). This process of applying an arbitrary additional 50% discount to the Step 1 conclusion simply has no support. Its arbitrariness is compounded by the fact that the 50% discount is applied regardless of how the undiscounted value was arrived at (i.e., by outdated 2018 appraisal or non-binding IOI or both).

<u>Step 3 – Averaging Debtors' Discounted Step 2 Value with JLL 2019 Liquidation Value</u>

The Debtors then averaged the results of Step 2 above with the corresponding JLL 2019 Appraisal liquidation value (where available), which liquidation value already applied a discount of 25%, 50%, or 75% (depending on the property) to JLL's market value. Once again, there is simply no basis in real estate valuation methodology to value properties in this manner. Over the entire course of my professional

career, I have never seen or even heard of such a process being applied to arrive at valuation conclusions for real estate assets.

Exhibit 6 depicts 10 specific examples of how the Debtors' flawed methodology slashes millions of dollars from its valuation professionals' projections of market and liquidation values.  I selected 10 examples for which JLL value estimates were available.  In these 10 examples alone, the Debtors' project proceeds of $98.4 million versus JLL estimated market values of $235.7 million, a reduction of $137.3 million (a 58% reduction).[5]  On the five properties where JLL opined on the liquidation value, the Debtors' estimated proceeds were $34.6 million (38%) lower than JLL's already-discounted liquidation values of $89.2 million.  Moreover, it should be noted that the differences were not due to the Debtors considering the actual attributes of specific properties or an error made by JLL with respect to a specific valuation since the differences are due exclusively to generalized formulaic adjustments on account of the indications of interest and across-the-board multiple discounts applied to each class of property.

The narrative in the Debtors' *Wind Down Recoveries* liquidation analysis presented to the Creditors' Committee on January 14th describes a real estate valuation process vastly different than the punitive analytic process which they apparently adopted subsequently, the likes of which I have never seen in 35 years of monetizing and valuing real estate.  I have received no explanation or rationale for the highly unusual approach adopted by the Debtors, and it has no known basis in any generally accepted valuation methodology that I have ever encountered over the course of my career.

---

[5] Throughout this report, when I use the term JLL "market value," I am referring to the JLL 2018 and 2019 Appraisals, which already assume and account for the vacating of the space by Debtors.

## Exhibit 6
## Illustration of Debtors' Valuation Discounts on Ten Properties

| Debtors' Categorization | UE Lease Core | UE Lease Core | UE Lease Core | UE Owned Core | UE Owned Core | Dove | Dove | IP / GL | IP / GL | IP / GL | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sears Unit ID | 8275 | 8273 | 1278 | 470 | 1475 | 1015 | 1023 | 1044 | 1368 | 1924 | |
| Name | Morrisville | Lawrence | Torrance | Manteno | Durham | Vero Beach | Loudoun/Dulles | Jersey City | Concord | Valley Stream | |
| Ownership | Leasehold | Leasehold | Leasehold | Owned | Owned | Owned | Owned | Leasehold | Leasehold | Leasehold | |
| Asset Type | Distribution Center | Distribution Center | Full Line Sears | Distribution Center | Full Line Sears | Full Line Sears | Full Line Sears | Full Line Sears | Full Line Sears | Full Line Sears | |
| **Step 1: Average Down 2018 Market Values w/ Indicative Bids (and Ignoring JLL 2019 Market Values)** | | | | | | | | | | | |
| JLL 2018 Appraisal Market Value | n/a | n/a | $46,800,000 | $24,600,000 | $17,200,000 | $9,380,000 | $8,810,000 | n/a | n/a | n/a | |
| A&G 2018 Value | n/a | n/a | 25,030,064 | n/a | 1,916,667 | n/a | n/a | na | na | na | |
| Indicative Bid | 1,000,000 | 3,200,000 | 500,000 | 10,659,597 | | 1,750,000 | 1,750,000 | 4,000,000 | 7,000,000 | 25,000,000 | |
| Average | $1,000,000 | $3,000,000 | $24,110,021 | $17,659,799 | $9,558,334 | $5,565,000 | $5,280,000 | $4,000,000 | $7,000,000 | $25,000,000 | |
| **Step 2: Additional Discount to Averaged Value** | | | | | | | | | | | |
| Debtor Discount (%) | -50.00% | -50.00% | -50.00% | -16.63% | -16.63% | -17.00% | -17.00% | -50.00% | -50.00% | -50.00% | |
| Debtor Discount ($) | (500,000) | (1,600,000) | (12,055,011) | (2,930,954) | (1,589,073) | (946,050) | (897,600) | (2,000,000) | (3,500,000) | (12,500,000) | |
| Debtors' Discounted Value | $500,000 | $1,600,000 | $12,055,011 | $14,698,844 | $7,969,261 | $4,618,950 | $4,382,400 | $2,000,000 | $3,500,000 | $12,500,000 | |
| **Step 3: Average Debtors' Discounted Value with JLL 2019 Liquidation Value** | | | | | | | | | | | |
| Debtors' Discounted Value (From Step 2) | 500,000 | 1,600,000 | 12,055,011 | 14,698,844 | 7,969,261 | 4,618,950 | 4,382,400 | 2,000,000 | 3,500,000 | 12,500,000 | |
| JLL 2019 Liquidation Value | 32,955,000 | 9,960,000 | n/a | n/a | n/a | n/a | n/a | 25,000,000 | 13,400,000 | 7,900,000 | |
| Average | $16,727,500 | $5,780,000 | $12,055,011 | $14,698,844 | $7,969,261 | $4,618,950 | $4,382,400 | $13,500,000 | $8,450,000 | $10,200,000 | |
| **Debtors' Estimated Proceeds** | $16,727,500 | $5,780,000 | $12,055,011 | $14,698,844 | $7,969,261 | $4,618,950 | $4,382,400 | $13,500,000 | $8,450,000 | $10,200,000 | $98,381,966 |
| *Memo* | | | | | | | | | | | |
| *JLL's Market Value Discount* | | | | | | | | | | | |
| JLL 2018 Appraisal Market Value | n/a | n/a | $46,800,000 | $24,600,000 | $17,200,000 | $9,380,000 | $8,810,000 | n/a | n/a | n/a | $94,190,000 |
| JLL 2019 Market Value | $50,700,000 | $16,600,000 | n/a | n/a | n/a | n/a | n/a | $33,300,000 | $17,800,000 | $10,500,000 | $128,500,000 |
| JLL 2019 Liquidation Value | $32,955,000 | $9,960,000 | n/a | n/a | n/a | n/a | n/a | $25,000,000 | $13,400,000 | $7,900,000 | $89,215,000 |
| *JLL Discount to JLL 2019 Market Value* | -35% | -40% | n/a | n/a | n/a | n/a | n/a | -25% | -25% | -25% | -31% |
| *Debtors' Impact to Value* | | | | | | | | | | | |
| Discount to JLL 2018 Appraisal Market Value ($) | n/a | n/a | $(34,744,989) | $(9,901,156) | $(9,230,739) | $(4,761,050) | $(4,427,600) | n/a | n/a | n/a | $(50,465,534) |
| *Debtors' Discount to JLL 2018 Market Value (%)* | n/a | n/a | -74% | -40% | -54% | -51% | -50% | n/a | n/a | n/a | n/a |
| Discount to JLL 2019 Market Value ($) | $(33,972,500) | $(10,820,000) | n/a | n/a | n/a | n/a | n/a | $(19,800,000) | $(9,350,000) | $(300,000) | $(74,242,500) |
| *Debtors' Discount to JLL 2019 Market Value (%)* | -67% | -65% | n/a | n/a | n/a | n/a | n/a | -59% | -53% | -3% | -58% |
| Discount to JLL 2019 Liquidation Value ($) | $(16,227,500) | $(4,180,000) | n/a | n/a | n/a | n/a | n/a | $(11,500,000) | $(4,950,000) | $2,300,000 | $(34,557,500) |
| *Debtors' Discount to 2019 JLL Liquidation Value (%)* | -49% | -42% | n/a | n/a | n/a | n/a | n/a | -46% | -37% | 29% | -39% |

Note: UE Non-Core & Pipeline example was not included as the properties only relied on one source of value and had no appraisal information.

Sources: Debtors' Estimated Proceeds Calculations and FTI Calculations

The Debtors' analysis relies heavily on non-binding IOIs received through a flawed marketing process. These non-binding IOIs should not be relied upon as any type of indicator of market value for the following reasons:

1) The Debtors did not run a robust real estate marketing sales process and, therefore, non-binding IOIs submitted as part of that process are simply not a reliable indicator of the market value of any properties. As described in the Declaration of Saul Burian, the Debtors' process was haphazard, rushed, and not well planned. A commercially reasonable disposition process would involve a proactive marketing effort with broad outreach to potential buyers, with sufficient information and time provided for buyer diligence to take place, the time for which would necessarily vary based on the complexity of the asset and its highest and best use. As the Debtors did not even attempt such a process, the limited number of bids received were not indicative of the true range of the potential interested parties and thus do not reflect market value or even reasonable liquidation value. It is inconsistent with generally accepted real estate valuation practice and methodology to rely, in the circumstances present in this case, on a non-binding indication of interest as an indicator of value (whether market value or liquidation value).

2) The non-binding, haphazard, and convoluted sale process fostered participation by opportunistic players who could submit lowball offers with no cost or penalty. Further, the Debtors' process incentivized stakeholders, particularly landlords, to submit what can best be described as placeholder bids as a means of expressing interest and opening a channel for negotiations (which if pursued by the Debtors could only result in higher not lower proceeds than the opening offer by the landlord). Notably, a significant number of the properties received just one (or none) non-binding IOI, which is another indicator of the deeply flawed nature of the Debtors rushed and haphazard sales process.

Absent a well-run marketing process, any opening indication of interest, particularly a non-binding IOI, bears no relationship to market value and cannot be relied upon as an indication of actual value. Nonetheless, the Debtors lowered the calculation of estimated proceeds every time they received a non-binding IOI that was lower than the professional's appraised value.[6]

Exhibit 7 illustrates the valuation flaws described above.  The chart represents the 69 UE Leased Core properties that had market value appraisals and non-binding IOIs.  These properties were isolated to show the effect of averaging the non-binding IOIs with the market value estimates.  Including the non-binding IOIs reduces market values by 28% from $540 million to $389 million.  The further multiple discounts applied by the Debtors cumulatively reduced the market values of these assets by 63% to $199 million.

---

[6] The lack of intellectual integrity in the Debtors' analytic process is shown by the fact that if no non-binding IOI was received, there is no downward adjustment to the estimated realizable proceeds; yet if a non-binding IOI was received, theoretically indicating more interest in such property than those with no non-binding IOIs, the Debtors adjusted downward the expected proceeds solely on account of receiving the non-binding IOI.

**Exhibit 7**
**Effect of Debtors' Valuation Discounts on Appraised Properties**



Sources: JLL and A&G Values Estimates, SHC Calculations, and FTI Calculations

**Opinion 2** – A commercially reasonable disposition strategy for the Debtors' real estate assets would result in proceeds ranging from approximately $1.6 to $2.1 billion (pre-transaction costs).

**Exhibit 8**
**Estimated Values and Range of Estimated Sales Proceeds**
**By Valuation Source**
*($ in millions)*

| Valuation Source | | | FTI Range of Estimated Proceeds | | |
|---|---|---|---|---|---|
| All | Asset Count | Market Value Estimate | Low | Mid | High |
| JLL 2019 Appraisals | 291 | $ 1,096 | $ 703 | $ 812 | $ 922 |
| JLL 2018 Appraisals | 68 | 677 | 444 | 512 | 579 |
| JLL BOVs | 86 | 162 | 112 | 129 | 145 |
| A&G 2018 Values | 1 | - | - | - | - |
| C&W Appraisals | 29 | 246 | 156 | 181 | 206 |
| FTI | 579 | 339 | 228 | 262 | 296 |
| Total | 1,054 | $ 2,521 | $ 1,643 | $ 1,895 | $ 2,148 |

Source: FTI

My methodology for estimating recovery proceeds incorporates (and discounts) the Debtors' own appraisals[7] and broker opinions of value ("BOV"), when available.  If the asset did not have a JLL Appraisal or A&G 2018 Value or BOV, but had a Cushman & Wakefield Appraisal, then I incorporated (and discounted) the Cushman & Wakefield "As If Dark" market value estimate (which accounts for Debtors vacating the premises).[8]

For the remaining assets – those for which the Debtors did not procure third-party appraisals or BOVs – I applied generally-accepted real estate valuation methodologies to estimate a value for these assets using Discounted Cash Flow, Direct Capitalization, and/or Sales Comparison techniques.  I valued these properties by applying market assumptions predicated on property-specific.  The assumptions (and hence values) were informed by data from actual Sears/Kmart transactions (of which there have been hundreds), market data extracted from relevant appraisals, other third-party sources, and CoStar data.[9]  My independent valuations represent only $339 million of $2.5 billion of total value, or 13%.  In other words, the Debtors' own professional valuations, as discounted, account for 87% of my valuation conclusions.  A summary of the methodology I employed is included in Appendix B.

---

[7]  It should be noted that FTI identified substantial computational (modeling) errors in the JLL 2019 Appraisals. Specifically, JLL's cash flow model had an input error that incorrectly modeled Tenant Improvements in the Market Rent column in all but seven of the 297 appraisals that had a higher than $0 value conclusion.  This resulted in valuation conclusions which were off by over 30%. JLL's cash flow analyses also erroneously deducted operating expenses from triple-net market rents without showing offsetting reimbursement revenue applicable to triple-net leases (a triple net lease is one where the tenant pays all ownership and operating costs—one needs to either not deduct these from rental income (because the tenant is paying them) or deduct them and have a separate income item for their reimbursement—JLL did neither.  FTI corrected these two very substantial errors by re-creating JLL cash flow analyses and inputting corrected numbers (still using all JLL inputs).  The Debtors appear not to have recognized these significant errors and, when they used the JLL valuations, they used the reported (uncorrected) valuation conclusions.

[8]  The "As if Dark" appraisal assumes that Sears vacates and the vacant property is then sold.

[9] The Debtor did no such analysis, including ignoring its own data from hundreds of asset dispositions in dozens of transactions over the prior few years.

After determining the market value of the properties (as dark), I then determined and applied an appropriate discount from market value to estimate expected proceeds in an orderly wind-down process and also to account for an appropriate risk that the market value is overstated (which risk I believe to be relatively low given the valuation methodology employed).  My assumption is that there will be adequate time for a marketing process to allow the properties to be sold at reasonable market value (as dark), rather than fire sale liquidation values.  I then calculated carrying costs for the real estate during this marketing period.  I believe that the assumption of an orderly monetization is appropriate and have calculated discount estimates accordingly.

My discount methodology is detailed in Exhibit 9.  I estimated Low, Medium and High discounts based on ownership and property type.  Property types that have the highest marketability in the current environment, such as distribution facilities, have the lowest discount percentage; property types that enjoy lower market interest currently, such as office (including the SHC Corporate Headquarters), have higher discounts.  These discount ranges were developed based on our experience in orderly property monetizations as well as familiarity with the valuation methodologies applied.

**Exhibit 9**
**FTI Range of Discounts**
**By Asset Type**

| FTI Discount | Leasehold | | | Owned | | |
|---|---|---|---|---|---|---|
| Asset Format | Low | Mid | High | Low | Mid | High |
| Dichard Auto Center | 40.0% | 30.0% | 20.0% | 30.0% | 20.0% | 10.0% |
| Distribution Center | 30.0% | 20.0% | 10.0% | 20.0% | 10.0% | 0.0% |
| Home Services | 30.0% | 20.0% | 10.0% | 20.0% | 10.0% | 0.0% |
| Kmart | 40.0% | 30.0% | 20.0% | 30.0% | 20.0% | 10.0% |
| Logistics | 30.0% | 20.0% | 10.0% | 20.0% | 10.0% | 0.0% |
| Office | 60.0% | 50.0% | 40.0% | 50.0% | 40.0% | 30.0% |
| Sears Auto Center | 40.0% | 30.0% | 20.0% | 30.0% | 20.0% | 10.0% |
| Sears | 40.0% | 30.0% | 20.0% | 30.0% | 20.0% | 10.0% |
| Underutilized Property | 40.0% | 30.0% | 20.0% | 30.0% | 20.0% | 10.0% |
| Warehouse, Miscellaneous, or Other | 30.0% | 20.0% | 10.0% | 20.0% | 10.0% | 0.0% |

Overall, the discount from Low to High ranges from 0% to 60%. The lowest range is a 0% to 20% discount for owned warehouse, distribution and logistics facilities. This is a property type which is currently experiencing high demand from buyers because of the growth of e-commerce and other factors. In fact, the national property data service CoStar reports that the large industrial market conditions have "never been stronger."[10] On the other hand, the highest discount range of 40% to 60% for leasehold office space reflects weaker market conditions for office product. The dollar-weighted average discount from market value to realizable value is 15% to 35% (before transaction and holding costs, which are excluded from the Debtors' estimated proceeds shown in this report). Holding costs for an estimated 18-month orderly sale period would reduce proceeds by an estimated 5% of market value, or about $126 million, based on my analysis of the Debtors' property taxes and common area maintenance obligations.

## G.  Conclusion

The Debtors' Wind-down Analysis reflecting potential real estate recoveries is fatally flawed and wholly unreliable. After presenting a different methodology to the Creditors' Committee on January 14, their model now uses non-market lowball non-binding IOIs and multiple discounts applied to already discounted professional opinions. This is not an accepted analytical process nor one that I have seen used elsewhere. It punitively depresses the forecasted proceeds and appears to be an "ends driven" process of applying serial discounts until one reaches a low value. This flawed process does not bear a likeness to the process described in writing by the Debtors to the Creditors' Committee just two weeks ago (which itself described an inadequate process and has never been changed or corrected). Further, the Debtors' analysis only included 46% of the Debtors' real estate portfolio (484 out of 1,054 properties); on that basis alone, it should be rejected. In sum, over the entire course of my career as a real estate valuation expert I have simply never seen a valuation methodology as employed by the Debtors. It bears no relationship

---

[10] Industrial Big Book, December 2018, published by CoStar, pg. 4

to any generally accepted real estate valuation methodology, and is arbitrary, flawed, and ultimately unreliable.

Where available, my analysis relies on Debtor-provided third-party appraisal and BOV information, which I then discount once to account for property type and risk.  For those properties for which the Debtors have no appraisals or BOVs, my approach uses generally-accepted valuation methodologies.  My methodologies include considering a wide-variety of real estate market data and multiple valuation approaches, including data from the Debtors' own substantial transactions.  My analysis concludes that properties not valued by the Debtors are likely to generate $245 to $321 million of proceeds (even after applying the wind-down discount) and reflects an appropriate level of conservatism to reflect market conditions in both its estimated market values and its discounts to estimate proceeds in an orderly monetization.  With respect to the 484 assets the Debtors did value, I found that their flawed and highly unusual approach, which relied heavily on totally unreliable non-binding IOIs, undervalued the assets by $251 to $680 million.  I forecast a range of likely total real estate proceeds to be $1.6 to $2.1 billion (before transaction and holding costs).

**Exhibit 10**
**Comparison of Debtor and FTI Estimated Proceeds**
**By Debtor Encumbrance, Included and Excluded**
*($ in millions)*

| Included by Debtor | Asset Count | Debtors' Estimated Proceeds | FTI Range of Estimated Proceeds | | |
|---|---|---|---|---|---|
| | | | Low | Mid | High |
| Unencumbered | 402 | $ 634 | $ 853 | $ 988 | $ 1,123 |
| Encumbered Dove | 64 | 394 | 394 | 448 | 502 |
| Encumbered IP / GL | 18 | 119 | 151 | 176 | 202 |
| Encumbered Sparrow | - | | - | - | - |
| Total | 484 | $ 1,147 | $ 1,398 | $ 1,613 | $ 1,827 |

| Excluded by Debtor | | | | | |
|---|---|---|---|---|---|
| Excluded | Asset Count | Debtors' Estimated Proceeds | Low | Mid | High |
| Unencumbered | 555 | $ - | $ 126 | $ 145 | $ 165 |
| Encumbered Dove | 13 | - | 117 | 136 | 154 |
| Encumbered IP / GL | 2 | - | 2 | 2 | 2 |
| Total | 570 | $ - | $ 245 | $ 283 | $ 321 |
| | | | | | |
| Grand Total | 1,054 | $ 1,147 | $ 1,643 | $ 1,895 | $ 2,148 |

-------------------------------- // \\ --------------------------------

I reserve the right to update or modify this Report as additional information comes to my attention, including information that was unavailable as of the date of this Report.

Executed this 26th day of January 2019, at Los Angeles, California.

Ronald F. Greenspan

**Appendix A – *Expert Qualifications***

**Ronald F. Greenspan, CIRA, CTP, CDBV**

Ronald Greenspan is a Senior Managing Director, co-leader of the Real Estate Solutions group and leader of the FTI Corporate Finance West Region. Mr. Greenspan is an internationally respected finance and business reorganization professional with 39 years of diverse, hands-on experience. Mr. Greenspan applies his broad background to a wide variety of consulting, litigation and bankruptcy engagements, including corporate turnarounds, financial restructurings and bankruptcies. He is experienced in advising all stakeholders, including debtors, creditors and equity interests. His particular area of expertise include:

- Structuring and negotiating complex asset acquisitions, dispositions and financings.
- Analyzing, structuring and implementing loan modification and workout agreements.
- Preparing cash flow, disposition and valuation analyses.
- Bankruptcy consulting, including development and/or feasibility analyses of Plans of Reorganization on behalf of secured creditors, unsecured creditor committees, debtors and trustees.

Prior to joining FTI, Mr. Greenspan was a partner with PricewaterhouseCoopers and led its Global Real Estate Restructuring Group. Prior to that, he held senior management positions as the chief operating officer of Los Angeles Land Companies, as the executive vice president of Brookside Savings & Loan Association and as the executive vice president of Heritage Group, a vertically integrated, national real estate investment and management company.

Mr. Greenspan has advised on some of the largest and most complex real estate restructurings, including advising the Debtor that owned Rockefeller Center, the largest Creditor in the Olympia & York bankruptcy, advising numerous nationwide homebuilders, and resolving over $1,800,000,000 of disputed credits and troubled real estate assets as the financial consultant on the first RTC Settlement Workout Asset Team (SWAT).

Mr. Greenspan has extended his distressed loan and securitization expertise to the international arena, by establishing the PwC financial advisory services office in Tokyo, which office became a leading financial advisor in Asian distressed debt and nascent commercial and residential securitization markets.

Mr. Greenspan holds a Bachelors degree in economics, summa cum laude from U.C.L.A. and a J.D. from Harvard Law School, magna cum laude.  He is also Member of the Urban Land Institute and a founding member of the Southern California Debt Enforcement and Restructuring Roundtable.  He is a Fellow of the American College of Bankruptcy, a Certified Insolvency and Restructuring Advisor, a Certified Turnaround Professional, holds a Certification in Distressed Business Valuations, and is the past-President of the Los Angeles Bankruptcy Forum.

Mr. Greenspan is one of the most recognized and respected experts in the area of restructuring real estate and real estate-secured debt enterprises.  He is sought as a speaker at prominent conferences such as the National Conference of Bankruptcy Judges, the Annual Meeting of the American Bankruptcy Institute, Annual Southeastern Regional Meeting, the Ninth Circuit Judicial Conference and the Chief Judges of the 9th Circuit.  In addition, he is frequently quoted by the media including the Wall Street Journal, Financial Times, Bloomberg News, New York Times, Business Week and Forbes.

Mr. Greenspan has given numerous speeches and presentations at conferences, seminars and forums over the past 20 years. His topics have included "Subprime Mortgages: Wrecking the Housing Market and U.S. Economy One Loan at a Time", "Are We So Far Down That Everything is Up From Here?", "Surviving The Real Estate Correction and Capitalizing On Circumstances: What To Do With Extra Debt And Dirt", "Evolving Chapter 11 Practice from Case Filing to Plan Filing", "Introduction to Restructurings & Reorganizations for Asset Based Lenders," "Subprime and Warehouse Lending," and "Introduction to Bankruptcy." He also taught classes as a visiting instructor on financial, restructuring and real estate issues at the Northwest Center for Continuing Education, UCLA and UC Irvine Extension, and USC's Graduate School of Business.



## Ronald F. Greenspan

Senior Managing Director — Corporate Finance/Restructuring

ron.greenspan@fticonsulting.com

**FTI Consulting**
633 West 5th Street
Suite 1600
Los Angeles, CA 90071
Tel: 213 689 1200
Fax: 213 689 1220

**Education**
B.A. in Economics,
summa cum laude,
University of California,
Los Angeles

J.D., magna cum laude,
Harvard Law School

**Certifications**
Certification in Distressed
Business Valuation

Certified Insolvency and
Restructuring Advisor

**Professional Affiliations**
American Bankruptcy
Institute

American College of
Bankruptcy, Fellow

Association of Insolvency
& Restructuring Advisors

California Bar Association
(Inactive)

Los Angeles Bankruptcy
Forum, Past President
and Director

Urban Land Institute

## Publications

- "Navigating the Structured Finance Waterfall: Smooth Sailing or a Barrel Ride Over the Falls?", CRE Finance World, October, 2012.

- "Money Changes Everything", *Daily Bankruptcy Review*, June 16, 2010.

- "2009 – It Was a Very _____ Year", *Daily Bankruptcy Review*, January 13, 2010.

- "Real Estate Workouts: Building a New Paradigm", *ABI Journal*, December, 2009.

- "Interview, Selection, Retention and Role of Financial Advisors", *Inside the Minds: The Role of Creditors' Committees in Chapter 11 Bankruptcies*, October, 2008.

- "Recovery in U.S. Homebuilding Sector is Likely to Take Several More Years", *Daily Bankruptcy Review*, April 16, 2008.

- "Predicting Corporate-Default Cycle Upended by History-Bucking Trends", *Daily Bankruptcy Review*, January 24, 2007.

- "Homebuilders: A Cycle Unlike Prior Cycles", *Daily Bankruptcy Review*, November 29, 2006.

- "KERPs Are Out, But Incentives Are In", *TMA Journal of Corporate Renewal*, 2006.

- "UnTill We Meet Again: Why Till Might Not Be the Last Word on Cram Down Interest Rates", *ABI Journal*, 2004.

- "The Un-real World of Troubled REITs", *ABI Journal*, 2001.

- 



CRITICAL THINKING
AT THE CRITICAL TIME™

## Expert Testimony and Depositions

| | DEPOSITION | TESTIMONY |
|---|---|---|
| Fidelity Bond vs. Brand<br>    USBC - Eastern District of Pennsylvania | X | X |
| In re Pacific American Mortgage Company<br>    USBC - Central District of California | | X |
| In re Maxicare, Inc.<br>    USBC - Central District of California | X | X |
| In re Aladdin Gaming LLC<br>    USBC – Nevada | | X |
| In re Sandpiper-Golf Trust LLC v. Sandpiper at SBCR, LLC<br>    JAMS - Oxnard, California | X | X |
| In re Sutter's Place, Inc., dba Bay 101, Petitioner in the City of San Jose, State of California, Gaming Control Administration | X | X |
| In re Sierra Hospitality<br>    US District Court - Northern District of California | X | X |
| In re New Hotels, Inc.<br>    Central District of California | X | |
| In re Peregrine Systems, Inc.<br>    USBC - District of Delaware | X | X |
| In re Ardent Communications, Inc.<br>    USBC - District of Columbia | X | |
| LaSalle Bank National Association v. Lehman Brothers Holdings, Inc.<br>    US District Court - Maryland | X | X |
| In re Maple Leaf Farms, Inc. v. American Appraisal Associates, Inc., et al<br>    US District Court - Central District of California | X | |
| California Hotel Acquisition Company, LLC v. The Community Redevelopment Agency of the City of Los Angeles, California<br>    Los Angeles Superior Court | X | |
| American West Homes, Incorporated v. SoCal Housing Partners, L.L.C.<br>    US District Court - Central District of California | X | X |
| In re Heilig-Meyers Company<br>    USBC – Eastern District of Virginia | X | X |
| United States of America v. State Street Bank & Trust Company<br>    USBC Case No. A-01-4605-KJC<br>    Delaware District of Delaware | X | X |

| | | |
|---|---|---|
| In re Commercial Money Center, Inc.<br>    USBC – Southern District of California | X | X |
| In re: Enron Corporation Securities Litigation<br>        MDL Docket No. 1446<br>        US District Court - Southern District of Texas<br>        (Houston Division) | X | |
| In re Defendant and Plaintiff-in-Counterclaim in connection with Blue Hills Office Park LLC (Plaintiff, Defendant-in-Counterclaim) v. J.P. Morgan Chase Bank as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trust") and CSFB 1999-C1 Royall Street, LLC (Defendants, Plaintiffs-in-Counterclaim) v. William Langelier and Gerald Finberg (Defendants-in-Counterclaim).<br>        US District Court – District of Massachusetts | X | |
| In re Plaintiff in connection with LaSalle Bank National Association (f/k/a LaSalle National Bank), as Trustee for the Certificateholders of Asset Securitization Corporation Commercial Mortgage Pass-Through Certificates Series 1997-D5 (Plaintiff) v. Nomura Asset Capital Corporation and Asset Securitization Corporation (Defendants)<br>        US Supreme Court of the State of New York<br>        County of New York | | X |
| In re Botanical Extracts, Inc., Hauser Technical Services, Inc., Zetapharm, Inc., d/b/a BI Nutriceuticals<br>        USBC – Central District of California | | X |
| In re Wells Fargo Bank Minnesota N.A. et al v. UBS Warburg Real Estate Securities and UBS Paine Webber<br>        US District Court - Dallas County, Texas | X | X |
| In re LaSalle Bank National Association et al v. UBS Warburg Real Estate Securities and UBS Paine Webber<br>        US District Court - Dallas County, Texas | | X |
| In re Wells Fargo Bank Minnesota N.A. et al v. Salomon Brothers Realty Corp., UBS Warburg Real Estate Securities, Inc., and Artesia Mortgage Capital Corporation<br>        US District Court - Dallas County, Texas | | X |
| In re Wells Fargo Bank Minnesota N.A. et al v. Lehman Brothers Holdings, Inc.<br>        US District Court - Dallas County, Texas | | X |

| | | |
|---|---|---|
| In re Brobeck, Phleger & Harrison LLP<br>    USBC Case No. 03-32715-DM7<br>    Northern District of California<br>    San Francisco Division | | X |
| In re People's Choice Home Loan, Inc., et al.,<br>    USBC Case No. SA-07-10765-RK<br>    Central District of California<br>    Santa Ana Division | | X |
| In re South Coast Property Company 96-A, L.P.<br>    USBC – Central District of California | X | X |
| In re Yellowstone Mountain Club, LLC<br>    USBC Case No. 08-61570-RBK<br>    USBC – District of Montana | X | X |
| In re Teachers Insurance & Annuity Association of America, et al<br>vs. Criimi Mae Services Limited Partnership, et al<br>    US District Court - Southern District of New York | X | |
| In re Westland Devco, LP<br>    US Bankruptcy Court – District of Delaware | X | X |
| In re Innkeepers USA Trust, et al.<br>    US Bankruptcy Court-Southern District of New York | | X |
| In re GTS 900 F, LLC, a California limited liability company, aka<br>Concerto<br>    US Bankruptcy Court – Central District of California<br>    Los Angeles Division | | X |
| In re Orleans Homebuilders, Inc., et al.<br>    USBC Case No. 10-10684 (PJW)<br>    US Bankruptcy Court – District of Delaware | | X |
| In re Wells Fargo Bank, National Association, a national banking<br>association, as the B Note Holder and predecessor Administrative<br>Agent and ATC Realty Sixteen, Inc., a California Corporation, as<br>Administrative Agent in their claims against Aareal Capital<br>Corporation, a Delaware corporation; MML RE Finance LLC, a<br>Delaware LLC; Munchener Hypothekenbank EG, a German<br>company; Deutsche Hypothekenbank AG, a German company,<br>Defendants and Counter-Plaintiffs<br>    Case No. 8:10-cv-00714-DOC-RNB<br>    US District Court - Central District of California | X | |
| In re Philadelphia Rittenhouse Developer, L.P.<br>    Case No. 10-31201<br>    US Bankruptcy Court–Eastern District of Pennsylvania | X | X |

| | | |
|---|---|---|
| In re Walter E. Wolf, an individual, Plaintiff vs. Paul J. Borden, an individual, CDS DEVCO, INC., a California corporation; CDS HOLDING CORPORATION, a California corporation, SAN ELIJO RANCH, INC., a California corporation; HOMEFED CORPORATION, a Delaware corporation, and DOES 1 through 10, Defendants<br>    Case No. 37-2009-00093090-CU-BC-CTL<br>    Superior Court of the State of California for the<br>    County of San Diego | X | |
| In re Workflow Management, Inc., et al.,<br>    Case No. 10-74617 (SCS)<br>    US Bankruptcy Court-Eastern District of Virginia<br>    Norfolk Division | | X |

| | | |
|---|---|---|
| In re ABN AMRO BANK N.V., et al vs. ERIC DINALLO, in his capacity as Superintendent of the New York State Insurance Department; the NEW YORK STATE INSURANCE DEPARTMENT; MBIA INC.; MBIA INSURANCE CORPORATION; and NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION (f/k/a MBIA INSURANCE CORP. OF ILLINOIS), | X | |
| In re MSR Resort Golf Course LLC, et al.,<br>    Case No. 11-10372 (SHL) Jointly Administered<br>    US Bankruptcy Court, Southern District of New York | X | X |
| In re R.E. LOANS, LLC, R.E. FUTURE, LLC and CAPITAL SALVAGE, a California corporation<br>    Case No. 11-35865-BJH Jointly Administered<br>    US Bankruptcy Court, Northern District Of Texas Dallas Division | | X |
| In re Gateway Metro Center, LLC<br>    Case No. 2:11-bk-47919-BR<br>    US Bankruptcy Court, Central District of California | X | |
| In re Transwest Resort Properties, Inc. jointly administered Case No. 4:10-bk-37134-EWH<br>    US Bankruptcy Court, District of Arizona | X | |
| In re The Village at Lakeridge, LLC<br>    Case No. BK-N-11-51994-BTB<br>    US Bankruptcy Court, District of Nevada | X | |
| In re Residential Capital, LLC, et al.,<br>    Case No. 12-12020<br>    US Bankruptcy Court, Southern District of New York | | X |

| | | |
|---|---|---|
| In re 207 Redwood, LLC<br>    Case No. 10-27968-NVA<br>    For The District of Maryland | X | |
| In re Circus and Eldorado Joint Venture, et al.,<br>    Case No. BK-12-51156<br>    US Bankruptcy Court, District of Nevada | X | |
| In re Lanes End, LLC, Plaintiff vs. Baldwin, Alfred E., Baldwin &<br>Sons, LLC<br>    Case No. 1240021217<br>    Superior Court of the State of California<br>    County of San Diego – Central Division | | X |
| U.S. Bank National Association, as Trustee for the Registered<br>Holders of Wachovia Bank Commercial Mortgage Trust,<br>Commercial Mortgage Pass-Through Certificates, Series 2006-<br>C28, acting by and through its Special Servicer, CWCapital Asset<br>Management LLC v. Dexia Real Estate Capital Markets<br>    Case No. 12-cv-09412-SAS<br>      US District Court for the Southern District of New<br>York | X | |
| In re 431 W. Ponce de Leon, LLC, Cartel Properties Spalding<br>Woods, LLC, 525 Moreland Avenue, LLC, Cartel Properties II,<br>LLC, Rohrig Investments, LP, and Rohrig Pollack, LLC<br>Residential Capital, LLC<br>    Case No. 13-53479-BEM<br>    Case No. 13-53480-BEM<br>    Case No. 13-53481-BEM<br>    Case No. 13-53482-BEM<br>    Case No. 13-53483-BEM<br>    Case No. 13-53485-BEM<br>    US Bankruptcy Court<br>    Northern District Georgia, Atlanta Division | X | X |
| Starr International Company, Inc. v. United States of America<br>and American International Group, Inc.<br>    Case No. 11-CV-00779- TCW<br>    United States Court of Federal Claims | X | |
| Jeffrey Soffer, et. al. v. Five Mile Capital Partners LLC, et. al.<br>    Case No. 2:12-cv-01407<br>      United States District Court for the District of Nevada | X | |

| | | |
|---|---|---|
| Fort Henry Mall Owner, LLC v. U.S. Bank, NA, as Trustee for the Registered Holders of ML-CFC Commercial Mortgage Trust 2007-5, Commercial Mortgage Pass-Through Certificates, Series 2007-5 et. al.<br><br>    Civil Action No. 2:11-cv-00287<br>    United States District Court For The Eastern District Of Tennessee At Greeneville | X | |
| Bank of America, National Association, as successor by merger to LaSalle Bank National Association v. LaSalle Commercial Mortgage Securities, Inc., Series 2006-MF4 Trust, acting by and through its Master and Special Servicer, Midland Loan Services, a division of PNC Bank National Association, and whose Trustee is Wells Fargo Bank, N.A.<br>    Case No. 12 cv 09612<br>LaSalle Commercial Mortgage Securities, Inc., Series 2006-MF4 Trust, acting by and through its Master and Special Servicer, Midland Loan Services, a division of PNC Bank National Association, and whose Trustee is Wells Fargo Bank, N.A. against Bank of America, N.A. as successor in interest to LaSalle Bank National Association<br>    Case No. 13 cv 05605<br>    United States District Court for the Northern District of Illinois<br>Cases consolidated for purposes of discovery. | X | |
| The Bank of New York Mellon, solely as Trustee for GE-WMC Mortgage Securities Trust 2006-1 v. WMC Mortgage LLC and GE Mortgage Holding, LLC<br>    Civil Action No. 12-CF-07096 (DLC)<br>    United States District Court<br>    Southern District of New York | X | |
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>v.<br>AEQUITAS MANAGEMENT, LLC, et. al.<br>Pending in the USDC Oregon | | X |

| | | |
|---|---|---|
| MEADE COMMUNITIES, LLC<br>Plaintiff/Counterclaim-Defendant<br>v.<br>AMBAC ASSURANCE CORPORATION<br>Defendant/Counterclaim-Plaintiff.<br>    Civil No. 02-cv-15-003745<br>        Circuit Court for Anne Arundel County, Maryland<br>        Civil Division | X | |
| MONTEREY BAY MILITARY HOUSING, LLC, et al. &<br>MONTEREY BAY LAND, LLC<br>Plaintiffs<br>v.<br>AMBAC ASSURANCE CORPORATION<br>Defendant<br>    Case No. 15CV000599<br>        Superior Court of the State of California, County of<br>        Monterey | X | |
| FIVE MILE CAPITAL WESTIN NORTH SHORE SPE LLC<br>Plaintiff<br>v.<br>BERKADIA COMMERCIAL MORTGAGE, LLC,<br>et al.<br>Defendant<br>    Case No. 12 CH 10805 | X | X |
| AMBAC ASSURANCE CORPORATION<br>Plaintiff<br>v.<br>RILEY COMMUNITIES, LLC<br>Defendant<br>    Case No. 2016-CV-000026<br>        District Court of Shawnee, County Kansas | X | |
| AMBAC ASSURANCE CORPORATION<br>Plaintiff<br>v.<br>FORT BLISS/WHITE SANDS MISSILE<br>RANGE HOUSING LP<br>Defendant<br>    Case No. 2016DCV0094<br>        El Paso County - 205th District Court | X | |

| | | |
|---|---|---|
| 499 Thornall Street Owner, LLC,<br>Plaintiff<br><br>vs.<br><br>CW Capital Asset Management LLC, Mission Peak Capital, Inc.,<br>BOF, LLC, BOF Metropark<br>Corporate Campus II, L.L.C., J. P. Morgan Chase Commercial<br>Mortgage Securities Trust<br>2006-LDP9, U.S. Bank National Association, as Trustee for the<br>registered holders of J.P.<br>Morgan Chase Commercial Mortgage Securities Trust 2006-<br>LDP9 Commercial Mortgage<br>Pass-Through Certificates, Series 2006-LDP9 and Midland Loan<br>Services, a division of PNC<br>Bank, National Association<br>Defendants<br><br>Superior Court of New Jersey,<br>Law Division: Middlesex County<br>Docket No: L-2148-16, L-6801-16 (Consolidated) | X | |
| WOODBRIDGE GROUP OF COMPANIES, LLC, et al., jointly<br>IN THE UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF DELAWARE<br>      Administered Case No. 17-12560 (KJC) | X | X |
| In re RAIT PREFERRED FUNDING II, LTD.<br><br>vs.<br><br>CWCAPITAL ASSET MANAGEMENT, LLC, U.S. BANK<br>NATIONAL ASSOCIATION, in its capacity as Trustee<br>Successor-In-Interest, and WELLS FARGO BANK NATIONAL<br>ASSOCIATION<br><br>SUPREME COURT OF THE STATE OF NEW YORK<br>COUNTY OF NEW YORK<br>Index No. 651729/2016 | X | |

**Appendix B – *Summary of FTI Valuation Methodology***

For the assets for which the Debtors' did not procure 3rd party value opinions, FTI employed standard valuation techniques to estimate proceeds for each asset. The depth of analysis for each asset was determined by criteria used to identify potential high-value assets. The values were informed by actual Sears/Kmart transaction data, market data gleaned from relevant appraisals and CoStar rent data for small properties.

FTI's value approach and key assumptions are summarized in the following table.

| Assets | Valuation Approach | Key Assumptions | Overlays |
|---|---|---|---|
| Owned | ■ Dark value methodology based on ability of buyer to re-tenant stores at market rents<br><br>■ Valued on a direct cap basis on Stabilized NOI or a $/SF basis<br><br>■ Stabilized NOI and/or $/SF estimated from complementary appraisals and/or CoStar reports | ■ Valued using cap rates from CoStar or complementary appraisals on Stabilized NOI<br><br>■ Cap Rate range between 6.0%-9.0%<br><br>■ Market rents were taken from CoStar and complementary appraisals<br><br>■ $/SF metrics were taken from historic sales of Sears/Kmart stores and complementary appraisals<br><br>■ Repositioning costs vary by product type and assume spaces are re-tenanted without changes to building layouts | ■ None |
| Lease / Ground Lease | ■ Dark value methodology based on ability to re-tenant stores at market rents<br><br>■ Allocated a repositioning expense required to achieve market rents<br><br>■ Valued on a DCF basis over the shorter of fully extended lease term or 50 years less contract rent | ■ Valued using a DCF of the rent arbitrage between rent expense and current market rents using a 12%-15% discount rate<br><br>■ Arrived at market rents PSF through complementary appraisals and other market data, adjusted for anchor/big box format via 40%-60% discount when appropriate<br><br>■ Repositioning costs vary by product type and assume spaces are re-tenanted without changes to building layouts<br><br>■ Market leasing assumptions include 5-year terms and 70% renewal probability | ■ No value ascribed if remaining lease term is less than 10 years<br><br>■ Values of non-REIT assets discounted by 50% if remaining lease term is between 10-15 years<br><br>■ No value ascribed to Seritage leases with 100% recapture rights<br><br>■ Values of remaining Seritage leases assume 50% recapture |

**Appendix C – Additional Portfolio Stratifications**

### FTI Estimated Market Values and Range of Estimated Sales Proceeds
### By Ownership Type
*($ in millions)*

| Ownership Type | | | FTI Range of Estimated Proceeds | | |
|---|---|---|---|---|---|
| All | Asset Count | Market Value Estimate | Low | Mid | High |
| Owned | 187 | $ 1,042 | $ 739 | $ 843 | $ 947 |
| Leased | 769 | 771 | 478 | 555 | 632 |
| Ground Leased | 98 | 708 | 427 | 497 | 568 |
| Total | 1,054 | $ 2,521 | $ 1,643 | $ 1,895 | $ 2,148 |

### FTI Estimated Market Values and Range of Estimated Sales Proceeds
### By SHC Format Type
*($ in millions)*

| Sears Asset Format | | | FTI Range of Estimated Proceeds | | |
|---|---|---|---|---|---|
| All | Asset Count | Market Value Estimate | Low | Mid | High |
| Appliance Builders Distributors (Monark) | 21 | $ - | $ - | $ - | $ - |
| Diehard Auto Center | 2 | 1 | 0 | 1 | 1 |
| Distribution Center | 28 | 372 | 281 | 318 | 355 |
| Home Services | 85 | 53 | 42 | 48 | 53 |
| Kmart | 320 | 531 | 333 | 386 | 440 |
| Logistics | 87 | 5 | 3 | 4 | 4 |
| Office | 13 | 89 | 45 | 54 | 63 |
| Sears Auto Center | 18 | 16 | 10 | 12 | 13 |
| Sears | 327 | 1,096 | 683 | 793 | 902 |
| Underutilized Property | 128 | 344 | 234 | 268 | 303 |
| Warehouse, Miscellaneous, or Other | 25 | 14 | 11 | 12 | 14 |
| Total | 1,054 | $ 2,521 | $ 1,643 | $ 1,895 | $ 2,148 |

**Appendix D– Documents Considered**

- Sears_RE_Valuation.xlsm
- JLL Value Correction Model No Op Ex 01 23 2019 5 30 pm.xlsx
- JLL January 2019 Appraisals (297)
- JLL 2018 Appraisals (XX)
- C&W Appraisals (XX)
- 2019-1-14 Wind Down Recoveries (ESL) (002) - FINAL_WEIL_96872332_2.pdf
- Broker Valuations UPD 12-17-18.xlsx
- DRAFT - UE CF estimate analysis v20190113.002.xlsx
- DRAFT encumbered analysis v20190114.002.pdf
- DRAFT encumbered analysis v20190114.002.xlsx
- DRAFT UE CF estimate analysis v20190113.002.pdf
- Encumbered Properties by Facility v20181029.001.xlsx
- Active unit and REID v20190108.xlsx
- Encumbered Real Estate_REVISED (as of 2018.10.29) (2).xlsx
- JLL A&G values v20181128.001.xlsx
- JLL Offer Summary 1-07-19.xlsx
- Sears Leased Assets Summary Sheet 2019.01.12.xlsx
- Sears Leased Assets Summary Sheet 2019.01.13.xlsx
- Sears Portfolio, 103 owned US assets.xlsx
- Unencumbered Properties v20181029.001.xlsx
- Unencumbered Real Estate_REVISED (as of 2018.10.29) (2).xlsx
- 300 Penry Rd Greensboro NC.pdf
- 901 N Federal Ft Lauderdale.pdf
- 1045 - Durham 1620 Guess Rd.pdf
- 1219 S Boone Aberdeen WA.pdf
- 2300 Hilltop.pdf
- 3456 Meyers Ave Memphis TN.pdf
- 6910 Fayetteville Durham NC.pdf
- Chicago Il Ind.pdf
- Durham NC.pdf
- East Bay CA.pdf
- Ft Lauderdale FL.pdf
- Greensboro NC Ind.pdf
- Groveport OH Ind 2.pdf
- Groveport OH Ind.pdf
- Memphis TN Ind.pdf
- Q3 2018 U.S. Retail Figures.pdf
- Sears Sales 4Q 2016 Cincinnati OH +.pdf
- Sears Sales 4Q216 Selected States 2.pdf
- Sears Sales 4Q2016 Bensalem PA.pdf
- Sears Sales 4Q2016 Bethesda MD.pdf
- Sears Sales 4Q2016 Cambridge MA.pdf
- Sears Sales 4Q2016 Goleta CA.pdf

- Sears Sales 4Q2016 Louisville KY.pdf
- Sears Sales 4Q2016 Pleasanton CA.pdf
- Sears Sales 4Q2016 Pompano Beach FL.pdf
- Sears Sales 4Q2016 Whitehall PA.pdf
- Sears Sales 12 01 2017.pdf
- Sears Sales Export v2.xlsm
- Sears Sales Export.xlsm
- Springfield MA.pdf
- Sears Sales 4Q2016 on Selected States.pdf
- CoStar Zip Code Markets.xlsx
- CoStar Retail Markets.xlsx
- 4 Properties.xlsx
- 181128 Real Estate - JLL (Owned + Subleases).xlsx
- 181129 U-Haul Transaction Memo.pdf
- Property file loan reconciliation v20181220.001.xlsx
- Property Sale History (March 2018).pdf
- R Puerto email.pdf
- RE_ #1678 Carlsbad - Lease expiration.pdf
- Re_ Amerco Transaction.pdf
- RE_ Discussion on Property Sale History.pdf
- RE_ FTI _ HL Diligence - 12_19_18 2.pdf
- RE_ FTI _ HL Diligence - 12_19_18.pdf
- Re_ PRIORITY_ Anchorage - ownership classification.pdf
- Re_ Property Values Discussion.pdf
- RE_ Sears_ Updated_Consolidated Requests.pdf
- RE_ Sears_ Vacant Land SF_Acreage - Immediate Need.pdf
- Sales History Questions_v2 - RP 12.23.18 2.docx
- Sales History Questions_v2 - RP 12.23.18.docx
- Sears Property Sale History 5-3-18_v1.xlsx
- Seritage Recapture Info_12.21.18.xlsx
- TRU - First Report of Fee Examiner 10.29.2018.docx
- UUC Questions - Manteno IL - Greensboro NC - Groveport OH.docx
- costarbigbookindustrial.pdf
- Email_Miii_20190113_1541EST.pdf
- Email_Miii_20190113_1746EST.pdf
- Email_Miii_20190114_2136EST.pdf
- PWC Real Estate Investor Survey 2018 Q2.pdf
- PWC Real Estate Investor Survey 2018 Q3.pdf
- RCA Capital Trends Retail Oct-2018.pdf
- RCA Commercial Property Price Indices Oct-2018.pdf
- RCA US All - Caps Yields and Spreads.xlsx
- RCA US All - Volume by TransType.xlsx
- RCA US Retail - Investor Composition.xlsx
- RCA US Retail - Market Stats.xlsx
- RCA US Retail - Volume and Pricing.xlsx
- Realty Rates Developer Survey 2018 Q1.pdf
- Realty Rates Investor Survey 2018 Q1.pdf

- Realty Rates Market Survey 2018 Q1.pdf
- Sale Listings - NJ - 6854.pdf
- Sales History Questions_v2 - RP 12.23.18.docx
- Sales History Questions_v2 - RP 12.23.18_A.docx
- Sales History Questions_v2 - RP 12.23.18_B.docx
- Sears Property Sale History 5-3-18.xlsx
- Sears Response to Questions re Property Rights.xlsx
- Sears Valuation Analysis - TI & LC Assumptions_RCA_v3.xlsx
- Sears_RE Bids Received_20181228_4871 & 6854.xlsx
- Supplemental Property Info - CA - 1268.pdf
- Supplemental Property Info - CA - 1388.pdf
- Supplemental Property Info - NJ - 6854.pdf
- UUC Questions - Manteno IL - Greensboro NC - Groveport OH.docx
- 4 Properties - Clarification from Sears.xlsx
- 181128 Real Estate - JLL (Owned + Subleases).xlsx
- A&G Rent Estimates - 7 Properties.xlsx
- C&W Capital Markets Update 11-28-18.pdf
- C&W Rate Summary.xlsx
- Comparable Sales & Listings - CA - Fresno Industrial.pdf
- Comparable Sales & Listings - NC - 3096100.pdf
- Comparable Sales & Listings - PR - Industrial.pdf
- Comparable Sales & Listings - PR - Retail.pdf
- Comparables Sales & Listings - PR.xlsx
- Costar Lease Comps Summary - CA - Santa Barbara.pdf
- Costar Lease Comps Summary - CA - Stockton.pdf
- Costar Lease Comps Summary - CO - Boulder.pdf
- Costar Lease Comps Summary - CO - Ft Collins.pdf
- Costar Lease Comps Summary - FL - Ft Walton.pdf
- Costar Lease Comps Summary - FL - Jacksonville.pdf
- Costar Lease Comps Summary - FL - Palm Beach.pdf
- Costar Lease Comps Summary - LA - New Orleans.pdf
- Costar Lease Comps Summary - MA - Boston.pdf
- Costar Lease Comps Summary - MI - Detroit.pdf
- Costar Lease Comps Summary - MO - Joplin.pdf
- Costar Lease Comps Summary - MO - St Louis.pdf
- Costar Lease Comps Summary - MS.pdf
- Costar Lease Comps Summary - NC - Charlotte.pdf
- Costar Lease Comps Summary - NC - Durham.pdf
- Costar Lease Comps Summary - NC - Raleigh.pdf
- Costar Lease Comps Summary - NY - Poughkeepsie.pdf
- Costar Lease Comps Summary - TN - Nashville.pdf
- Costar Lease Comps Summary - TX - El Paso.pdf
- Costar Lease Comps Summary - VA - Richmond.pdf
- Costar Lease Comps Summary - WA - Olympia.pdf
- Costar Lease Comps Summary - WA - Seattle.pdf
- Costar Lease Comps Summary - WA - Yakima.pdf
- Costar Underwriting Report - NC - 30961.pdf

- Costar Underwriting Report - TN - 446.pdf
- Cushman Wakefield Appraisal Summary (2018.08.20).xlsx
- Dispositions 2016-Present.xlsx
- FTI Calculations Model 12 05 2018.xlsx
- FTI Items - Jane Borden.xlsx
- FTI Holding Costs Calculations 01222019.xlsx
- TI Market Rent Comparables Analysis.xlsx
- FTI Preliminary Mkt Rent Estimate - #7259.xlsx
- FTI Preliminary Mkt Rent Estimates - Lease Rejections.xlsx
- FTI Preliminary Mkt Rent Estimates.xlsx
- Summary of Assets with Duplicate Unit #s.xlsx
- FTI Rate Summary.xlsx
- Jane Borden Email 12-24-18 re FTI & HL Due Dilligence.pdf
- Land Sizes - Jane Borden.pdf
- Lease Comps Supporting Docs - AZ - 1728.pdf
- Lease Comps Supporting Docs - CA - 3174.pdf
- Lease Comps Supporting Docs - CA - 3748.pdf
- Lease Comps Supporting Docs - CA - 4349.pdf
- Lease Comps Supporting Docs - CA - 8287.pdf
- Lease Comps Supporting Docs - CA - Inland Empire.pdf
- Lease Comps Supporting Docs - CA - Los Angeles.pdf
- Lease Comps Supporting Docs - CA - Sacramento.pdf
- Lease Comps Supporting Docs - CO - 8290.pdf
- Lease Comps Supporting Docs - CO.pdf
- Lease Comps Supporting Docs - CT.pdf
- Lease Comps Supporting Docs - FL.pdf
- Lease Comps Supporting Docs - HI - 8818.pdf
- Lease Comps Supporting Docs - HI.pdf
- Lease Comps Supporting Docs - IN.pdf
- Lease Comps Supporting Docs - LA - 4810.pdf
- Lease Comps Supporting Docs - MA - 1223.pdf
- Lease Comps Supporting Docs - MD.pdf
- Lease Comps Supporting Docs - MI - 1092.pdf
- Lease Comps Supporting Docs - MI - 3155.pdf
- Lease Comps Supporting Docs - MI - 9693.pdf
- Lease Comps Supporting Docs - MO - 1042.pdf
- Lease Comps Supporting Docs - MS - 1166.pdf
- Lease Comps Supporting Docs - NC - 3667.pdf
- Lease Comps Supporting Docs - NJ - 6854.pdf
- Lease Comps Supporting Docs - NV.pdf
- Lease Comps Supporting Docs - NY - Long Island.pdf
- Lease Comps Supporting Docs - NY - Manhattan.pdf
- Lease Comps Supporting Docs - NY - Newburgh.pdf
- Lease Comps Supporting Docs - OH.pdf
- Lease Comps Supporting Docs - PA.pdf
- Lease Comps Supporting Docs - SC.pdf
- Lease Comps Supporting Docs - TN - 1386.pdf

- Lease Comps Supporting Docs - TX - 447.pdf
- Lease Comps Supporting Docs - TX - 1317.pdf
- Lease Comps Supporting Docs - VA - 1274.pdf
- Lease Comps Supporting Docs - VA - 7259.pdf
- Lease Comps Supporting Docs - WA - 1139.pdf
- Lease Comps Supporting Docs - WA - 2029.pdf
- Property Sale History (March 2018).pdf