WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, : | |
| : | **Case No. 18-23538 (RDD)** |
| : | |
| **Debtors.**[1] : | **(Jointly Administered)** |

---------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**NOTICE OF FILING THIRD REVISED PROPOSED ORDER
(I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG
SELLERS AND BUYER (II) AUTHORIZING THE SALE OF CERTAIN
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF**

**PLEASE TAKE FURTHER NOTICE** that on February 3, 2019, the Debtors

filed the *Second Revised Proposed Order (I) Approving the Asset Purchase Agreement Among*

*Sellers and Buyer (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of*

*Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of*

*Certain Executory Contracts and Unexpired Leases in Connection Therewith and (IV) Granting*

*Related Relief* (ECF No. 2738) (the "**Second Revised Proposed Order**").

**PLEASE TAKE FURTHER NOTICE** that a further revised Proposed Order

(the "**Third Revised Proposed Order**") is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit B** is a

redline of the Third Revised Proposed Order reflecting changes made to the Second Revised

Proposed Order.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will appear on **February 6, 2019 at 9:00 a.m. (Eastern Time)** before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140, to continue the hearing on approval of the Asset Purchase Agreement and entry of the Revised Proposed Order.

Dated: February 6, 2019
      New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
 Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\96903998\3\73217.00044

### Exhibit A

**Second Revised Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

---------------------------------------------------------------x

## ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS AND BUYER, (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated November 1, 2018 (Docket No. 429) (the "Sale Motion"),[2] filed

by the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, the entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United

States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Motion.

6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and

Rules 6004-1, 6005-1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy

Court for the Southern District of New York (the "Local Rules"), authorizing and approving the

sale of the Acquired Assets and the assumption and assignment of certain executory contracts and

unexpired leases of the Debtors in connection therewith; and the Court having entered this Court's

prior order, dated November 19, 2018 (Docket No. 816) including the schedule as revised by the

*Global Bidding Procedures Process Letter* filed with the Bankruptcy Court on November 21, 2018

(Docket No. 862) (together, the "Bidding Procedures Order"), approving competitive bidding

procedures for the Acquired Assets (the "Bidding Procedures") and granting certain related relief;

and Transform Holdco LLC (the "Buyer") having submitted the highest or otherwise best bid for

the Acquired Assets, as reflected in the Asset Purchase Agreement (as defined below); and the

Court having conducted a hearing on the Sale Motion (the "Sale Hearing") commenced on

February 4, 2019, at which time all interested parties were offered an opportunity to be heard with

respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion and

the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of January 17, 2019 (as may be

amended, restated, amended and restated from time to time, the "Asset Purchase Agreement"), a

copy of which is attached hereto as Exhibit A, by and between Sellers and the Buyer, whereby the

Sellers have agreed, subject to Court approval, among other things, to sell the Acquired Assets to

the Buyer, including, without limitation, (x) the Assigned Agreements (including any Additional

Contracts) that will be assumed and assigned to Buyer or designated, as applicable, each on the

terms and conditions set forth in the Asset Purchase Agreement and (y) designation rights

("Designation Rights") for certain Designatable Leases (the sale of such Acquired Assets,

collectively, the "Sale Transaction"), (iii) the Bidding Procedures Order and the record of the

hearing before the Court on November 15, 2018 at which the Bidding Procedures Order was approved, (iv) the ability of the Buyer to submit its Credit Bid pursuant to Asset Purchase Agreement section 3.1(b) (the "Credit Bid"), and the record of the hearing before the Court commenced on February 4, 2019, at which the Court authorized the Buyer's Credit Bid (as approved pursuant to this Sale Order), and (v) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale Motion, the Asset Purchase Agreement, the Bidding Procedures Order, and the form of this order (the "Sale Order") having been provided in accordance with the Bidding Procedures Order and the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (Docket No. 405) (the "Amended Case Management Order"); and, except as otherwise provided for herein, all objections to the Sale Motion having been withdrawn, resolved, or overruled as provided in this Sale Order; and it appearing that the relief granted herein is in the best interests of the Debtors, their estates and creditors and all parties in interest in these chapter 11 cases; and upon the record of the Sale Hearing and these chapter 11 cases; and after due deliberation; and good cause appearing therefor, it is hereby

## FOUND AND DETERMINED THAT:

A.      **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court

3

during or at the conclusion of the Sale Hearing. This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

B. **Jurisdiction and Venue**. This Court has jurisdiction over the Sale Motion, the Sale Transaction and the property of the Debtors' estates, including the Acquired Assets, pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This matter is a core proceeding pursuant to 28 U.S.C. § 157. Venue of these chapter 11 cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C. **Statutory and Rule Predicates**. The statutory and other legal predicates for the relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Local Rules 6004-1, 6005-1 and 6006-1, and the Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order Number 383 in the United States Bankruptcy Court for the Southern District of New York.

D. **Final Order**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. In the absence of a stay pending appeal, Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset Purchase Agreement at any time after entry of this Sale Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

E. **Notice and Opportunity to Object**. Actual written notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Sale Motion, the

4

Sale Transaction, the sale of the Acquired Assets that are owned by the Debtors free and clear of any Claims (as defined below), the assumption and assignment of the Assigned Agreements, the Auction, the Bidding Procedures, and the relief requested in the Sale Motion has been given, as required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Amended Case Management Order, and the Bidding Procedures Order.

F.     **Title to the Acquired Assets**.  The Acquired Assets that are owned by the Debtors constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of such Acquired Assets that are owned by the Debtors with all right, title and interest to transfer and convey the Acquired Assets to the Buyer, and no other person has any ownership right, title, or interests therein.

G.     **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Sale Motion, the Sale Transaction, the Asset Purchase Agreement, and all related agreements (the "Related Agreements").  The Debtors' entry into and performance under the Asset Purchase Agreement and Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their estates, creditors and other parties in interest; and (iii) are reasonable and appropriate under the circumstances.  The Debtors have demonstrated compelling circumstances for the Sale Transaction outside: (i) the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code; and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the

value of the Debtors' estates.  Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Price set forth in the Asset Purchase Agreement constitutes the highest or otherwise best offer received for the Acquired Assets; (ii) the Asset Purchase Agreement and the transactions contemplated thereby present the best opportunity to maximize the value of the Acquired Assets, whether on a going concern basis or otherwise, and avoid decline and devaluation of the Acquired Assets that would occur in an immediate liquidation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase Agreement, recoveries to creditors will be diminished; and (iv) the value of the Debtors' estates will be maximized through the sale of the Acquired Assets pursuant to the Asset Purchase Agreement.

H.    **Compliance with Bidding Procedures**.    The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders, and were the result of arms'-length negotiations.  Further, the Bidding Procedures afforded notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Acquired Assets.  The Debtors, ESL, the Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects.  The Buyer subjected its bid to the competitive Bidding Procedures approved by this Court and the Buyer was found eligible to participate in the Auction and was the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance with the Bidding Procedures Order and Bidding Procedures.

I.    **Sale Process**.  (i) The Debtors and their advisors, including Lazard Frères & Co. LLC, engaged in a robust and extensive marketing and sale process through the postpetition sale

process pursuant to the Bidding Procedures Order and the Bidding Procedures; (ii) the Debtors and their advisors conducted a fair and open sale process; (iii) the sale process, the Bidding Procedures and the Auction were non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets; and (iv) the process conducted by the Debtors pursuant to the Bidding Procedures obtained the highest or otherwise best value for the Acquired Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result.

J.    **Fair Consideration; Highest or Best Value**.  The consideration to be paid by the Buyer under the Asset Purchase Agreement, including, without limitation, the Credit Bid Amount (as hereinafter defined) and the Credit Bid Release Consideration: (i) constitutes fair and reasonable consideration for the Acquired Assets; (ii) is the highest or best offer for the Acquired Assets; (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practically available alternative; (iv) constitutes fair and reasonably equivalent value and full and adequate consideration, under the Bankruptcy Code and the Uniform Fraudulent Transfer Act; (v) constitutes fair consideration under the Uniform Fraudulent Conveyance Act; and (vi) constitutes reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.  Such consideration constitutes the highest or best bid for the Acquired Assets.  Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets is fair and reasonable.  Pursuant to Section 3.1(c) of the Asset Purchase Agreement, the Purchase Price may include cash in the amount of the outstanding obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date under: (A) the IP/Ground Lease Term

Loan Facility (the "IP/Ground Lease Buyout Amount"); (B) the FILO Facility (the "FILO Facility Buyout Amount"); and (C) the Real Estate Loan 2020 (the "Real Estate Loan 2020 Buyout Amount", together with the IP/Ground Lease Buyout Amount and the FILO Facility Buyout Amount, the "Buyout Amounts") unless such lender(s) provide written confirmation to the Sellers that such cash payment and the obligations owed to lenders by the Sellers under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, are permanently waived and discharged against the Sellers.   Pursuant to Section 3.1 of the Asset Purchase Agreement, to the extent payable, each Buyout Amount, if applicable, shall be deposited and held in separate segregated accounts of the Debtors and the Liens of the lenders other than Buyer or its affiliates under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, shall attach to the cash proceeds held in the applicable designated segregated account in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two (2) business days following the Closing Date and shall not otherwise be used by the Debtors without further order of the Bankruptcy Court (the mechanic referred to in this sentence and the preceding sentence shall be referred to herein as the "Buyout Option").   Such Purchase Price, including the Credit Bid Amount, the Credit Bid Release Consideration, the Buyout Option, and other good and valuable consideration provided in connection with the Sale Transaction, constitutes the highest or best bid for the Acquired Assets.   Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets is fair and reasonable.

K.    **ESL Secured Claims**.  In accordance with the Asset Purchase Agreement, effective upon the Closing Date ESL's Claims (as defined below) against the Debtors arising under the: (i) IP/Ground Lease Term Loan Facility; (ii) FILO Facility; (iii) Real Estate Loan 2020;

(iv) Second Lien Term Loan; (v) Second Lien Line of Credit Facility; (vi) Second Lien PIK Notes;

and (vii) Citi L/C Facility (together with the security interests securing any of the Claims of ESL

described in the preceding sub-clauses (i)-(vii), collectively, the "ESL Claims"), shall each be

deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code in the

amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the Credit Bid set

forth in Section 3.1(b) of the Asset Purchase Agreement.  Pursuant to Section 363(k) of the

Bankruptcy Code and this Sale Order, ESL or, to the extent any of the ESL Claims are assigned to

Buyer prior to the Closing Date, Buyer is hereby authorized to credit bid (or cause to be credit bid)

the ESL Claims and to use such ESL Claims as a portion of the Purchase Price (the "ESL Credit

Bid Amount") as set forth in Section 3.1(b) of the Asset Purchase Agreement (subject, in the case

of the security interest securing the Claims described in subclauses (iv), (v) and (vi) of this

Paragraph K, anything in this Order to the contrary notwithstanding, to delivery of the written

consent of the Collateral Agent for such security interest).  In addition, the transfer of Acquired

Assets constituting "Collateral" under that certain Amended and Restated Security Agreement by

and among SHC and Wilmington Trust, National Association in its capacity as Collateral Agent

(the "Second Lien Collateral Agent") dated as of March 20, 2018 (as may be amended, restated,

amended and restated or otherwise modified in accordance with its terms from time to time) (the

"Second Lien Security Agreement") has been, or will be, directed by ESL as the "Required

Secured Parties" under the Second Lien Security Agreement pursuant to one or more direction

letters delivered to the Second Lien Collateral Agent (the "Second Lien Consent").  The Second

Lien Consent binds all parties holding debt under the Second Lien Term Loan, Second Lien Line

of Credit Facility and Second Lien PIK Notes in their capacity as such (collectively, the "Senior

Second Lien Creditors", and their claims against the Debtors under such debt document, the

9

"Senior Second Lien Claims"). The Senior Second Lien Claims shall be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid. Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, the Second Lien Collateral Agent is hereby authorized to credit bid the Senior Second Lien Claims as a portion of the Purchase Price (the "2L Credit Bid Amount", together with the ESL Credit Bid Amount (without duplication), the "Credit Bid Amount"). At the Auction, pursuant to the Asset Purchase Agreement, the Buyer agreed to pay the Purchase Price, which includes the Credit Bid Amount.

L.    **Cyrus Claims**. Effective upon the Closing Date, Cyrus' Claims (as defined below) arising under: (g) the Final Junior DIP Order[3] (the "Junior DIP Secured Obligations"[4]); (h) the Citi L/C Facility; (i) the Second Lien PIK Notes[5] (the "Cyrus Second Lien Notes Claims"); and (j) the IP/Ground Lease Term Loan Facility (the "Cyrus IP/GL Claims") together with the security interests securing any of the Claims described in the preceding sub-clauses (g)-(j), collectively the "Cyrus Claims"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid.

M.    **No Successor or Other Derivative Liability**. The sale and transfer of the Acquired Assets of the Debtors to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of the Assigned Agreements, will not subject the Buyer or ESL to any liability (including any successor liability) under any laws, including any

---

[3]    The "Final Junior DIP Order" shall mean the *Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1436).

[4]    The "Junior DIP Secured Obligations" shall have the meaning ascribed to it in the Final Junior DIP Order.

[5]    As such term is defined in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* (Docket No. 3).

bulk-transfer laws, or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories, with respect to the operation of the Debtors' business prior to the Closing, and for each Assigned Agreement, the applicable Assumption Effective Date, except that, upon the Closing or such other date as specified in the Asset Purchase Agreement, the Buyer shall become liable for the applicable Assumed Liabilities.  The Buyer: (i) is not, and shall not be considered or deemed a mere continuation of, or successor to, the Debtors in any respect; (ii) has not, *de facto* or otherwise, merged with or into the Debtors; and (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors and there is no continuity of enterprise between the Debtors and the Buyer.  Accordingly, the Buyer is not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement, and except with respect to any Assumed Liabilities or as otherwise set forth in the Asset Purchase Agreement, Buyer's acquisition of the Acquired Assets from the Debtors shall be free and clear of any "successor liability" claims of any nature whatsoever.  Buyer would not purchase the Acquired Assets but for the protections against any claims based upon "successor liability" theories as specified herein.

N.    **Transition Services Agreement**.  The Transition Services Agreement (as defined below), as contemplated by the Asset Purchase Agreement will be filed in accordance with paragraph FF.26 below.

O.    **Good Faith; No Collusion**.    The Asset Purchase Agreement and each of the Transactions were negotiated, proposed, and entered into by the Debtors, their management, their boards of directors or equivalent governing bodies, and representatives and the Buyer and its

management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, including ESL, in good faith, without collusion or fraud, and from arms'-length bargaining positions.  The Buyer is a "good faith purchaser" and the Buyer, and ESL are acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to all the protections afforded thereby.  In the absence of any Person obtaining a stay pending appeal, effective upon the Closing, it shall be deemed that neither the Debtors, ESL, nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  The Buyer and ESL have proceeded in good faith in all respects in that, among other things: (i) the Buyer, and ESL have recognized that the Debtors were free to deal with any other party in interest in acquiring the Acquired Assets; (ii) the Buyer, and ESL have complied with the applicable provisions of the Bidding Procedures Order; (iii) the Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Buyer and all other material agreements or arrangements entered into by the Buyer, ESL and the Debtors in connection with the Sale Transaction have been disclosed and are appropriate. The sale price in respect of the Acquired Assets was not controlled by any agreement among potential bidders and neither the Debtors, ESL nor the Buyer have engaged in collusion, fraud, or any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or that would prevent the application of section 363(m) of the Bankruptcy Code.   Accordingly, neither the Asset Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of

the Bankruptcy Code.  Specifically, neither ESL nor the Buyer has acted in a collusive manner with any Person or entity.

P.    **Notice**.  As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate, and sufficient notice of the Sale Motion, the Bidding Procedures (including the bidding process and the deadline for submitting bids and the Auction), the Sale Hearing, the Sale Transaction, the proposed Sale Order attached to the Asset Purchase Agreement, and the other relief requested in the Sale Motion was provided by the Debtors; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Bidding Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, the proposed Sale Order, or any of the relief requested in the Sale Motion, except as otherwise provided paragraphs FF.34 and FF.38 of this Sale Order, is required.   With respect to Persons whose identities are not reasonably ascertained by the Debtors, in accordance with the Bidding Procedures Order, a notice containing the results of the Auction was published on the Prime Clerk website on January 18, 2019 (Docket No. 1730).

Q.    **Cure Notice**.  As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Sale Hearing, the Assumption and Assignment Notice (as defined in the Bidding Procedures Order) on each counterparty to a Potential Transferred Agreement, dated January 18, 2019, January 23, 2019, and January 31, 2019, which provided the Debtors' intent to assume and assign such Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an executory contract or lease) and notice of the related proposed Cure Costs upon each non-debtor counterparty to such Potential Transferred Agreements.   The service of the Assumption and

Assignment Notice was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Assigned Agreements, including without limitation the Designatable Leases and any Additional Contracts that were listed as Potential Transferred Agreements; provided, however, that further notice is required as provided for in paragraphs FF.34 and FF.38 herein. *See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (Docket No. 1731); *see also Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (Docket No. 1774); *see also Affidavits of Service* (Docket Nos. 1969, 2132, 2162); *see also Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; see also Affidavit of Service* (Docket No. 2314); *see also Affidavit of Service* (Docket No. 2417) .   All non-debtor parties to the Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an executory contract or lease and was listed on the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* or *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction*) have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Assumption and Assignment Notice and, for Assigned Agreements other than Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts), to the assumption and assignment of the Assigned Agreements to the Buyer in accordance with the Bidding Procedures Order.

R.    **Satisfaction of Section 363(f) Standards**.  Except as expressly provided for in this

Sale Order, the Debtors may sell the Acquired Assets that are owned by the Debtors free and clear

of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the

Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests,

of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties,

conditional sales or title retention agreements, hypothecations, preferences, debts, easements,

suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign

domestic governmental entity, taxes (including foreign, state and local taxes), covenants,

restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for

reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other

interests of any kind or nature whatsoever against any of the Debtors or the Acquired Assets owned

by them, including, without limitation, any debts arising under or out of, in connection with, or in

any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual

commitments, restrictions, product liability claims, environmental liabilities, employment or labor

law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan

claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the

Debtors, any claims under, or trusts or liens created by, PACA,[6] and any derivative, vicarious,

transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes

of action (whether in law or in equity, under any law, statute, rule or regulation of the United

States, any state, territory, or possession thereof or the District of Columbia), whether arising prior

to or subsequent to the commencement of these chapter 11 cases, whether known or unknown,

---

[6]    "PACA" means The Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§499a, et seq.) or the Packers and Stockyards Act (7 U.S.C. §§181 et seq.) or any similar state laws.

contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material statutory or non-statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses before the effective time of the Closing and for each Assigned Agreement (subject to the payment of Cure Costs as required under section 365(b) of the Bankruptcy Code), the applicable Assumption Effective Date, pursuant to the Asset Purchase Agreement, or the transfer of any of the Debtors' interests in the Acquired Assets to the Buyer, and all Excluded Liabilities; (collectively, excluding any Assumed Liabilities, the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied; provided, however, that, nothing herein shall be deemed, or construed as, a ruling or determination by this Court that the Assumed Liabilities encumber the Acquired Assets. Without limiting the generality of the foregoing, "Claims" shall include any and all liabilities or obligations whatsoever arising under or out of, in connection with, or in any way relating to: (1) any of the employee benefit plans, including any Claims related to unpaid contributions or current or potential withdrawal or termination liability; (2) any of the Debtors' collective bargaining agreements; (3) the Worker Adjustment and Retraining Notification Act of 1988; and (4) any of the Debtors' current and former employees. Those holders of Claims who did not timely object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Acquired Assets could be compelled in a legal or

equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or

fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are

therefore adequately protected by having their Claims that constitute interests in the Acquired

Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the

property in which they have an interest, in the same order of priority and with the same validity,

force and effect that such holders had prior to the Sale Transaction, subject to any defenses of the

Debtors.  All Persons having Claims of any kind or nature whatsoever against the Debtors or the

Acquired Assets shall be forever barred, estopped and permanently enjoined from creating,

perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against

the Buyer or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.

S.      The Buyer would not have entered into the Asset Purchase Agreement and would

not consummate the transactions contemplated thereby if the sale of the Acquired Assets that are

owned by the Debtors was not free and clear of all Claims, if the Buyer would, or in the future

could, be liable for any such Claims, including, as applicable, certain liabilities related to the

Business that will not be assumed by the Buyer, as described in the Asset Purchase Agreement, or

if the Credit Bid Release or the Credit Bid were not components of the Sale Transaction.  A sale

of the Acquired Assets owned by the Debtors other than one free and clear of all Claims would

adversely impact the Debtors, their estates and their creditors, and would yield substantially less

value for the Debtors' estates, with less certainty than the Sale Transaction.

T.      The total consideration to be provided under the Asset Purchase Agreement reflects

the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the

Bankruptcy Code, with title to and possession of the Acquired Assets owned by the Debtors free

17

and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

U.      As of the Closing, the transfer of the Acquired Assets of the Debtors to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Buyer with all rights, title and interest of the Debtors in, and to, the Acquired Assets, free and clear of all Claims.

V.      **Assumption and Assignment of Assigned Agreements**.  The assumption and assignment of the Assigned Agreements are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Assigned Agreements (i) is necessary to sell the Acquired Assets to the Buyer, (ii) allows the Debtors to sell their business to the Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assigned Agreements, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Agreements.

W.      **Validity of the Transfer**.  As of the Closing, the transfer of the Acquired Assets to the Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims against the Debtors.  The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

X.    **Corporate Power and Authority.**  The Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate or other action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) upon entry of this Sale Order, other than as set forth in the Asset Purchase Agreement (including, without limitation, with respect to antitrust matters), need no consent or approval from any other person to consummate the Sale Transaction.

Y.    **Valid and Binding Contract.**  The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms. The Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia. None of the Debtors nor the Buyer is, or will be, entering into the Asset Purchase Agreement and transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose.  The Asset Purchase Agreement and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in these chapter

11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

Z.      The Sale Transaction does not constitute a *de facto* plan of reorganization or liquidation as it does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors; (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests or extend debt maturities.  Entry into the Asset Purchase Agreement and the Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan for the Debtors.  Entry into the Asset Purchase Agreement does not constitute a *sub rosa* chapter 11 plan.

AA.     **Valid and Binding Release**.  The proposed compromise and resolution embodied in the Credit Bid Release (as defined below and as reflected in Section 9.13 of the Asset Purchase Agreement) is reasonable and appropriate and a valid exercise of the Debtors' business judgment, and the consideration provided for in the Asset Purchase Agreement, including the Credit Bid Release Consideration and other good and valuable consideration provided to the Debtors and their Estates in connection with the Sale Transaction, constitutes fair and appropriate consideration for the Credit Bid Release.  The Credit Bid Release is required by the Buyer in order to enter into and perform in accordance with the Sale Transaction and providing such release is in the best interests of the Debtors, their estates, creditors and other parties in interest.  The Claims and causes of action released through the Credit Bid Release are complex and in the absence of the release would involve extended and expensive litigation, the outcome of which would be uncertain.

BB.    **Debtor Authorization of Non-Debtor Subsidiary Action or Inaction**.    The proposed Sale Transaction requires certain of the Debtors to take certain actions with respect to Sears Re, KCD IP, LLC, and the other Foreign Subsidiaries.  As further described in the Asset Purchase Agreement, the Sale Transaction contemplates the purchase of the KCD Notes effective upon receipt of the consent of the Bermuda Monetary Authority or any other applicable Bermuda regulatory authority, to authorize the Sears Re sale of the KCD Notes to Buyer (the "KCD Notes Purchase").  The Asset Purchase Agreement includes other conditions with respect to the KCD Notes that have been satisfied.  First, Sears Re has agreed to be bound by the terms of the Asset Purchase Agreement prior to the deadline described therein.  Additionally, as further described in Section 9.14 of the Asset Purchase Agreement, and to the extent provided for in and in accordance with the Asset Purchase Agreement, the Sale Transaction contemplates certain restrictions upon Sellers' and their Affiliates' (including KCD IP, LLC's) ability to sell, transfer, assign, encumber, license, sublicense or otherwise grant certain rights or take or fail to take certain actions related to the KCD IP or to amend, terminate, renew, or fail to take certain actions with respect to, certain Contracts related to the KCD IP (the "KCD IP Restrictions").  In accordance with Section 9.14 of the Asset Purchase Agreement, Sellers caused KCD IP, LLC to agree to grant, effective as of the Closing, the Exclusive License (the "KCD Exclusive License Right").  The terms of the KCD Exclusive License Right shall be set forth in an exclusive license agreement, which agreement shall be executed contemporaneous with the Closing.  Prior to such time that the BMA Consent is obtained and pursuant to the PA Liabilities Services Agreement, the Buyer shall provide services to the Sellers sufficient to perform the PA liability in exchange for which the Sellers shall pay certain consideration to the Buyer (the "KCD Servicing Right").  Pursuant to Section 9.14 of the Asset Purchase Agreement, the Debtors have agreed to certain restrictions on Sellers' and their

Affiliates ability to sell, assign, or transfer in any way any equity interests in KCD IP, LLC without requiring a condition that the purchaser in such sale, assignment or transfer agrees to the limitations set forth in Section 9.14 therein (the "<u>KCD Equity Transfer Restriction Right</u>" and together with the KCD IP Restrictions, and the KCD Exclusive License Right, the "<u>KCD IP Related Rights</u>"). The Sellers' obligation to transfer the KCD Notes and the Buyer's obligation to assume the PA liabilities is dependent upon obtaining the BMA Consent.  Furthermore, the Sellers have agreed to use reasonable best efforts to cause each of the Foreign Subsidiaries to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered to the Buyer or the applicable Assignee, all right, title and interest of each of the Foreign Subsidiaries in, to or under the Acquired Foreign Assets (the "<u>Foreign Assets Rights</u>").  Each of the KCD Notes Purchase, the KCD IP Related Rights and the Foreign Assets Rights are required by Buyer and are reasonable and appropriate exercises of the Debtors' business judgment and the consideration provided by the Buyer (including the assumption of the Assumed Liabilities) constitutes fair and appropriate consideration to the Debtors and the non-Debtor Sellers.

CC.    **<u>Waiver of Bankruptcy Rules 6004(h) and 6006(d)</u>**.  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Buyer intend to close the Sale Transaction as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement.  Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to this Sale Order, except with respect to adjourned matters.

DD.    **Personally Identifiable Information**.  As contemplated in the Bidding Procedures

Order, and subject to the terms of this Sale Order, the sale to the Buyer under the Asset Purchase

Agreement of any personally identifiable information (as such term is defined in section 101(41A)

of the Bankruptcy Code) and private health information about individuals is either consistent with

the privacy policy of the Debtors in effect on the date of commencement of these chapter 11 cases

or consistent with the recommendations of the consumer privacy ombudsman appointed in these

chapter 11 cases and satisfies the requirements of section 363(b)(1)(A).

EE.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and

at the Sale Hearing establish just cause for the relief granted herein.

FF.    **Necessity of Order.**  The Buyer would not consummate the transactions absent the

relief provided for in this Sale Order.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    **Motion is Granted**.  The Sale Motion and the relief requested therein to the extent

not previously granted by this Court pursuant to the Bidding Procedures Order is granted and

approved solely to the extent set forth herein.

2.    **Findings of Fact and Conclusions**.  The Court's findings of fact and conclusions

of law in the Bidding Procedures Order and the record of the hearing with respect to the Bidding

Procedures Order are incorporated herein by reference.

3.    **Objections Overruled**.  All objections, to the Sale Motion or the relief requested

therein, and any joinders thereto, that have not been withdrawn with prejudice, waived, settled, or

otherwise resolved as announced to the Court at the Sale Hearing or by stipulation filed with the

Court, and all reservations of rights included therein, are hereby overruled on the merits and with

prejudice; provided that the objections filed to the proposed Cure Costs for the Contracts and

Leases on the Initial Assigned Agreements list attached hereto as Exhibit B are preserved and will be treated in accordance with paragraph 29 of this Sale Order; provided further that: (i) all timely filed objections to the assumption and assignment of a Contract or Lease that is not an Initial Assigned Agreement, including, without limitation, as to adequate assurance of future performance and to the payment of all amounts due and owing and performance of all other obligations under a Contract or Lease, but not as to any other objections to approval of the Sale Transaction itself pursuant to section 363 of the Bankruptcy Code, are adjourned and all parties' rights as to such issues are fully preserved and will be determined if and to the extent the applicable Contract or Lease is designated for assumption and assignment pursuant to the procedures described in this Sale Order; (ii) no finding of fact or conclusion of law set forth herein with respect to the assumption and assignment of the Initial Assigned Agreements shall apply, be binding upon, be law of the case, or operate to collaterally estop any issue, with respect to the assumption and assignment of any other Contract or Lease other than as provided in the last sentence of this paragraph; (iii) no Contract or Lease with a Debtor other than the Initial Assigned Agreements as set forth in Exhibit B shall be part of the Acquired Assets unless and until assumption and assignment of such Contract or Lease is approved in accordance with the procedures in this Sale Order; (iv) notwithstanding anything to the contrary herein (other than the last sentence of paragraph 3 hereof), including, without limitation, paragraphs M, R, FF.27, and 28, nothing in this Sale Order shall be a determination of the terms and conditions of the assumption and assignment of any Contract or Lease not on Exhibit B, including, without limitation, the Assignee's obligations in connection with the same other than as provided in the last sentence of this paragraph; and (v) notwithstanding anything herein (other than the last sentence of paragraph 3 hereof) or in the Asset Purchase Agreement or any related document to the contrary, all parties' rights are fully

reserved with respect to (x) all issues relating to the Buyer's obligation to comply with all terms, conditions, covenants and obligations, whether related to the pre- or post-assignment period and (y) the issues set forth in clauses (a) and (b) of paragraph 59 of this Order (the "Reserved Lease Issues").  All holders of Claims or other persons and entities (including any counterparties to Initial Assigned Agreements identified on Exhibit B hereto) that failed to timely object, or withdrew their objections to the Sale Motion, the Sale Transaction, or this Sale Order are deemed to consent to the relief granted herein for all purposes, including pursuant to section 363(f)(2) of the Bankruptcy Code, except to the extent that the procedures described herein provide otherwise.  Each holder of any Claim against the Debtors, their estates, or any of the Acquired Assets: (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction; (ii) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such Claim; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Notwithstanding anything to the contrary in this Sale Order, any determination made by the Court in response to arguments made, including examination of witnesses by objecting parties at the Sale Hearing shall be binding as to such objecting parties.

4.    **Notice**.  Notice of the Sale Motion and the Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the Amended Case Management Order, and the Bidding Procedures Order.

5.    **Fair Purchase Price**.    The consideration provided by the Buyer under the Asset Purchase Agreement, including the portion of the Purchase Price that is the Credit Bid Amount, the Credit Bid Release Consideration, and the Buyout Option is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent

Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.  The Credit Bid constitutes a valid, duly authorized credit bid and is proper under the Bidding Procedures Order, sections 363(b) and 363(k) of the Bankruptcy Code, the applicable Prepetition Loan Documents (as defined in the Final DIP Order) and applicable law.  The consideration given by the Buyer shall constitute valid and valuable consideration for the Credit Bid Release.

6. **Approval of the Asset Purchase Agreement**.  Except as expressly provided herein with respect to the assumption and assignment of contracts and leases (other than Initial Assigned Agreements), the Asset Purchase Agreement, all ancillary documents filed therewith or described therein, the Credit Bid and all other transactions contemplated therein (including, but not limited to, all ancillary agreements contemplated thereby) and all of the terms and conditions thereof, including, without limitation, the Credit Bid pursuant to section 363(k) of the Bankruptcy Code of the Credit Bid Amount as described in the Asset Purchase Agreement, are hereby approved.  The failure specifically to include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement (including, but not limited to, all ancillary agreements and Related Agreements contemplated thereby) be authorized and approved in its entirety.

7. **Approval of the Credit Bid Release**.  As set forth in Section 9.13 of the Asset Purchase Agreement:

(a)    Effective upon the Closing, in consideration for the payment by Buyer of the Credit Bid Release Consideration, and other good and valuable consideration provided to the Debtors and their estates by ESL in connection with the Transactions, each Debtor,

for itself and its estate, and on behalf of each of its Subsidiaries and controlled Affiliates (each of the foregoing, a "Seller Releasing Party"), hereby absolutely, unconditionally and irrevocably: (i) releases and forever discharges ESL from any and all Released Estate Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge, dispute or collaterally attack the ESL Claims; provided, however, that the assertion of any Claim other than a Released Estate Claim shall not be deemed to violate Section 9.13(a)(ii) of the Asset Purchase Agreement.

(b)    Effective upon the Closing, the ESL Claims against the Debtors shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the credit bid set forth in Section 3.1(b) of the Asset Purchase Agreement.

(c)    After giving effect to the credit bid set forth in Section 3.1(b) of the Asset Purchase Agreement, ESL shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and their estates in the Chapter 11 Cases, provided that: (i) no Claims or causes of action of ESL shall have recourse to, or any other right of recovery from, any Claims or causes of action of the Debtors or their estates related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or cause of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing; (ii) any ESL Claims

27

arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the Claims and causes of action described in the preceding clause (c)(i); provided that, in the event that, in the absence of this clause (c)(ii), any such proceeds to the Debtors or their estates would have resulted in distributions in respect of such ESL Claims in excess of $50 million, the right, on account of the ESL Claims, to receive such distributions in excess of $50 million shall be treated as an unsecured claim and receive pro rata recoveries with general unsecured claims other than the Claims and causes of action described in the preceding clause (c)(i); and (iii) notwithstanding any order of the Bankruptcy Court to the contrary or section 1129 of the Bankruptcy Code, it shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part.

(d)     Section 9.13 of the Asset Purchase Agreement, and all statements or negotiations relating hereto, shall be governed by Federal Rule of Evidence 408 and any corresponding state rules of evidence.  Without limiting the foregoing, neither Section 9.13 of the Asset Purchase Agreement nor any statements or negotiations relating hereto shall be offered or received in evidence in any proceeding for any purpose other than to enforce the terms of Section 9.13.

(e)     The release set forth in Section 9.13 of the Asset Purchase Agreement and in paragraphs 7(a)-(d) hereof shall be referred to herein as the "Credit Bid Release".  The Credit Bid Release is hereby approved in its entirety, and the Credit Bid Release Consideration and the other consideration provided by Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration for the Credit Bid Release.  The Seller Releasing

28

Parties and ESL are authorized and directed to perform under the Credit Bid Release pursuant to its terms and to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising under the Credit Bid Release.

8.     **Approval of Cyrus Release**.  Effective upon the Closing, each Seller Releasing Party, hereby absolutely, unconditionally and irrevocably: (i) releases and forever discharges the Cyrus Related Parties from any and all Released Cyrus Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge dispute or collaterally attack the Cyrus Claims. "Released Cyrus Claims" shall mean any and all Claims and causes of action of the Debtors and their estates against the Cyrus Related Parties arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code; (ii) equitable principles of subordination or recharacterization; or (iii) any other applicable Law that could be asserted to challenge the allowance of the Cyrus Claims. Effective upon the Closing, the Cyrus Claims against the Debtors shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid.  After giving effect to the Credit Bid, the Cyrus Related Parties shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and their estates in the Chapter 11 Cases, subject to any defenses of the Debtors to any such claims that might be asserted by Cyrus or any claims of the Debtors against  Cyrus which are fully preserved (other than the Released Cyrus Claims).  The release set forth in this paragraph shall be referred to herein as the "Cyrus Release".  The Cyrus Release is hereby approved in its entirety

and the consideration provided by the Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration for the Cyrus Release.  The Seller Releasing Parties and the Cyrus Related Parties are authorized and directed to perform under the Cyrus Release pursuant to its terms and to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising under the Cyrus Release.

9.        **Discharge of Credit Bid Claims**.  Upon the Closing Date, the portion of the ESL Claims and the Cyrus Claims that is used as part of the Credit Bid shall be deemed discharged against the Debtors and satisfied in full.  For the avoidance of doubt, the ESL Claims and the Cyrus Claims shall remain outstanding against the Debtors and their estates with respect to all amounts other than the amount that is Credit Bid in accordance with Section 3.1(b) of the Asset Purchase Agreement.

10.        **Approval of Debtor Authorization of Non-Debtor Subsidiary Action or Inaction**.  The Debtors are authorized and directed to perform their obligations in accordance with the Asset Purchase Agreement, their obligations with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets Rights, including to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets Rights.  The Debtors are hereby authorized in accordance with section 105(a) of the Bankruptcy Code, to cause KCD IP, LLC to execute and deliver to Buyer, such documents or other instruments as may be necessary to license the KCD IP to the Buyer as provided in the Asset Purchase Agreement, subject in all respects to KCD's compliance with the terms of the KCD Prepetition Agreements and the KCD

Indenture. Notwithstanding anything provided for herein, nothing in this Order authorizes the assumption or assignment of any prepetition license agreements between KCD and any of the Sellers, as well as any agreements between KCD and Sears Holdings Management Corporation and/or Sears Brands Business Unit Corporation, or the Trademark Security Agreement between KCD and U.S. Bank, National Association ("KCD Indenture Trustee") (such agreements, collectively, the "KCD Prepetition Agreements"). In the event the Debtors seek to assume or assign any or all of the KCD Prepetition Agreements in the future, such assumption or assignment may only be approved on not less than ten (10) days' notice to the KCD Indenture Trustee and all parties to such KCD Pre-Petition Agreements (as the case may be), and an opportunity for the KCD Indenture Trustee and such parties to object to any such assumption and assignment and any proposed cure amounts. Furthermore, nothing in this Order in any way abridges, waives or modifies the rights of the KCD Indenture Trustee under or in connection the KCD Indenture or the collateral provided thereunder or under the KCD Pre-Petition Agreements. This Order is without prejudice to, and does not alter or amend the KCD Indenture Trustee's rights or ability to take any action consistent with its duties or obligations arising under the KCD Indenture or under the KCD Pre-Petition Agreements, and all such rights are expressly preserved. Further, nothing in this Order shall prejudice or impact the rights of the holders of the KCD Notes to exercise any rights they may have under the KCD Indenture, including without limitation their right to direct the KCD Indenture Trustee.

11.    **Consummation of Sale Transaction**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the Asset Purchase Agreement and the Related Agreements and to close and consummate the Sale

Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, the Related Agreements, and this Sale Order.

(a)     Approval of Conversion of Subsidiaries.  As set forth in Section 9.2(a) of the Asset Purchase Agreement, the Debtors are required (subject to certain qualifications and exceptions) to take actions as instructed by Buyer in order to secure and preserve the qualifications of certain of the transactions contemplated by the Asset Purchase Agreement as reorganizations for U.S. federal income tax purposes in connection with which Buyer bears responsibility for any consequential tax or costs.  In accordance with such instructions, the Debtors may be directed to convert any of the corporate subsidiaries of Sears Holding Corporation into limited liability companies whether on or before the Closing Date of the Asset Purchase Agreement or anytime afterwards.  The Debtors are hereby authorized to convert any such corporate subsidiaries of Sears Holding Corporation to limited liability companies as directed by Buyer in accordance with Section 9.2(a) of the Asset Purchase Agreement.

(b)     Approval of the Steps Described in Schedule 9.2.  As set forth in Section 9.2(a) of the Asset Purchase Agreement, the Debtors are required (subject to certain qualifications and exceptions) to take actions as instructed by Buyer in order to secure and preserve the qualifications of certain of the transactions contemplated by the Asset Purchase Agreement as reorganizations for U.S. federal income tax purposes in connection with which Buyer bears responsibility for any consequential tax or costs.  In accordance with such instructions, the Debtors are required to take the steps described in Schedule 9.2 of the Asset Purchase Agreement as soon

as practicable after the Closing.  The Debtors are hereby authorized to take the steps described in Schedule 9.2 of the Asset Purchase Agreement.

12.    The Debtors, their affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be necessary or desirable to implement the Asset Purchase Agreement and Related Agreements, including the transfer and the assignment of all the Acquired Assets, and the assumption and assignment of all the Assigned Agreements, and to take all further actions as may be (i) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to the Buyer's possession, the Acquired Assets or (ii) necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement or to implement the Sale Transaction, including pursuant to this Sale Order, all without further order of the Court.

13.    All Persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Buyer as of the Closing or at such later time as the Buyer reasonably requests.  To the extent required by the Asset Purchase Agreement, the Debtors agree to exercise commercially reasonable efforts to assist the Buyer in assuring that all Persons that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtors before the Closing Date or (ii) the Buyer on or after the Closing Date.

14.    All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; provided that the foregoing restriction shall not

prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

15.    Each Assignee has provided or will provide, as applicable, adequate assurance of future performance of and under the Assigned Agreements, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

16.    **Direction to Creditors and Parties in Interest**.    On the Closing, each of the Debtors' creditors and the holders of any Claims are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims in the Acquired Assets, if any, as such Claims may otherwise exist.

17.    **Direction to Government Agencies**.    Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Asset Purchase Agreement and approved by this Sale Order.    The Buyer and Seller are each authorized to designate a power of attorney regarding the conveyance of properties in Puerto Rico for recording purposes which properties may be described in such power of attorney including the following: (i) Fajardo: Property registered at page 178 of volume 514 of Fajardo, Registry of Property of Puerto Rico, property number 19,514; (ii) Guayama: Property registered at page 7 of volume 382 of Guayama, Registry of Property of Puerto Rico, property number 13,562; and (iii) Río Piedras site 8975 is composed of two properties: (x) property registered at page 221 of volume 466 of Monacillos,

Registry of Property of Puerto Rico San Juan V Section, property number 17,328, and (y) property registered at page 181 of volume 302 of Río Piedras, Registry of the Property of Puerto Rico San Juan V Section, property 9,717.

18.    **Assumption of Protection Agreement Obligations**.    Pursuant to and in accordance with Section 2.3(e) of the Asset Purchase Agreement, the Buyer has expressly assumed Sellers' obligations (the "Assumed Protection Agreement Obligations") with respect to warranties and protection agreements or other services contracts (other than warranties relating to Intellectual Property) for the goods and services of Sellers sold or performed prior to the Closing, including any obligations owed by Sears Re to any Seller in respect of reinsurance of such warranties and protection agreements (collectively, the "Assumed Protection Agreements").  To the fullest extent permitted by applicable law, the Buyer is authorized to operate in place of the Sellers with respect to the Assumed Protection Agreements and to take any actions contemplated to be taken by the Sellers thereunder, including collecting any amounts payable by any counterparty to any such Assumed Protection Agreement and performing the Assumed Protection Agreement Obligations. The Court hereby orders that the Sellers and all other parties in interest shall cooperate in respect of Buyer's operation in place of the Sellers under the Assumed Protection Agreements, including, without limitation, by furnishing such documents or records as are necessary to the Buyer to perform the Assumed Protection Agreement Obligations without interruption.  Moreover, except for good cause based on violations of Law unrelated to the assumption by the Buyer of the Assumed Protection Agreement Obligations occurring pursuant to the Asset Purchase Agreement and this Sale Order, no regulatory agency (including, without limitation, any state insurance regulator) shall interrupt Buyer's performance of the Assumed Protection Agreement Obligations from and after the Closing Date without first obtaining relief from this Court. The Buyer may

continue to perform the Assumed Protection Agreement Obligations under any existing licenses or permits of the Sellers, with no interruption of the right of the Buyer to so perform, until any required licenses and permits have been transferred to the Buyer by Sellers, or new licenses and permits have been issued to the Buyer.

19.     **Transfer of the Acquired Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets owned by the Debtors, including, without limitation, Designated Agreements (as defined below) in accordance with the terms of the Asset Purchase Agreement and this Sale Order. The Acquired Assets shall be transferred to the Buyer in accordance with the terms of the Asset Purchase Agreement and this Sale Order, and upon the Closing, such transfer shall: (i) be valid, legal, binding and effective; (ii) vest the Buyer with all right, title and interest of the Debtors in the Acquired Assets; and (iii) be free and clear of all Claims against the Debtors and the Acquired Assets owned by the Debtors (including Claims of any Governmental Authority) in accordance with section 363(f) of the Bankruptcy Code, with the net proceeds of the Sale Transaction from the Acquired Assets upon which the DIP ABL Lenders (as defined in the Final DIP Order) have a first lien being used to repay in full in cash all DIP ABL Secured Obligations (as defined in the Final DIP Order) on the Closing and all other Claims (including, without limitation, contingent indemnification obligations) that represent interests in property shall attach to the net proceeds of the Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing.  The cash portion of the Purchase Price, to the extent payable, that is paid in connection with a Buyout Option shall be deposited and held in segregated accounts in accordance with Section 3.1 of the Asset Purchase

Agreement with the Liens of any lenders other than Buyer or Affiliates attaching to the cash proceeds held in the applicable designated segregated account in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two (2) business days following the Closing Date and shall not otherwise be used by the Debtors without further order of the Bankruptcy Court. Notwithstanding anything to the contrary herein or in the Asset Purchase Agreement, nothing in this Order shall approve the sale or transfer of any Acquired Assets of non-Debtors free and clear of Claims pursuant to section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing or any other provision of this Sale Order or the Asset Purchase Agreement to the contrary, the transfer of the Acquired Assets to the Buyer shall not be free and clear of, and shall not impair in any respect, any (A) setoff or recoupment rights or other affirmative defenses to payment held by either: (1) any party to an Initial Assigned Agreement (other than the Debtors), including, without limitation, Cross Country Home Services, Inc., that timely filed an objection preserving such right or defense, pursuant to the terms of such Assigned Agreements and applicable law, including without limitation any valid return and credit rights under such Assigned Agreements; (2) any party to an Assigned Agreement (other than the Debtors) that is not an Initial Assigned Agreement on Exhibit B that filed a timely objection preserving such right or defense, including, without limitation, Cardinal Health 110, LLC ("CH 110"), Cardinal Health 112, LLC ("CH 112"), and Cardinal Health PR 120, Inc. ("CH PR 120," and together with CH 110 and CH 112, collectively hereinafter "Cardinal Health"), LG Electronics USA, Inc. ("LGEUS"), LG Electronics Alabama, Inc. (together with LGEUS, "LG"), and Valvoline LLC, pursuant to the terms of such Assigned Agreements and/or applicable law, including without limitation any valid return and credit rights under such Assigned Agreements, and subsequently provides a notice setting forth the monetary

amounts of rights of recoupment and setoff believed to be currently outstanding as of the time of

receipt of the applicable Designated Lease Notice or Designated Additional Contract Notice (with

any disputes over such amount resolved as provided in paragraph 35 of this Sale Order) to counsel

for the Debtors and the Buyer on or before eight (8) days after such non-Debtor counterparty's and

such counterparty's counsel's (if known) receipt of the applicable Designated Lease Notice or

Designated Additional Contract Notice (with any disputes over such amount resolved as provided

in paragraph 35 of this Sale Order), or (3) any party that filed a timely objection and is an obligor

on any Acquired Receivables (as defined in the Asset Purchase Agreement), including, without

limitation, Cardinal Health, and LG, pursuant to the terms of the contracts giving rise to such

Acquired Receivables and/or applicable law, whether or not such contracts are being assumed and

assigned by the Debtors to the Buyer, including, without limitation, all return, refund, rebate and

credit rights under such contracts and (B) rights of LGEUS to directly sell Sears Branded Products

Safety Stock (as defined in the Kenmore Supply Agreement) or Finished Goods (as defined in the

Kenmore Supply Agreement) solely in accordance with ¶8.C.ii and ¶8.F of the Kenmore Supply

Agreement (as defined in the Limited Objection and Reservation of Rights of LG Electronics USA,

Inc. and LG Electronics Alabama, Inc. to the Global Asset Sale Transaction; Notice of Cure Costs

and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in

Connection with Global Sale Transaction; and Supplemental Notice of Cure Costs and Potential

Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with

Global Sale Transactions, Docket No. 2079), including, without limitation, the obligations and

restrictions imposed on LGEUS thereunder.  Notwithstanding the foregoing, all rights are reserved

with respect to (i) all tenants' or subtenants' rights to assert validly enforceable rights under section

365(h) of the Bankruptcy Code (and Debtors' or Buyers' rights to contest such rights) and (ii) the

Debtors' rights to assume or reject a lease or sublease where the Debtor is the landlord or sub-landlord.

20.    This Sale Order: (i) shall be effective as a determination that, as of the Closing, all Claims against the Debtors have been unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyances and transfers described herein have been effected; and (ii) is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee and owner of the Acquired Assets free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers"). All Recording Officers are authorized and specifically directed to strike recorded Claims against the Acquired Assets owned by the Debtors recorded prior to the date of this Sale Order. A certified copy of this Sale Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Claims against the Acquired Assets recorded prior to the date of this Sale Order. All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

21.    Following the Closing, no holder of any Claim shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in these chapter 11 cases.

22.    Except as expressly set forth in the Asset Purchase Agreement, the Buyer Related

Parties and their successors and assigns shall have no liability for any Claim or Excluded

Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter arising,

whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego,

or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity,

including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or

labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare,

compensation or other employee benefit plans, agreements, practices and programs, including,

without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates

or predecessors or any current or former employees of any of the foregoing, including, without

limitation, the Employee Plans and any participation or other agreements related to the Employee

Plans, or the termination of any of the foregoing; (iii) the Debtors' business operations or the

cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee,

workers' compensation, occupational disease or unemployment or temporary disability related

law, including, without limitation, claims that might otherwise arise under or pursuant to: (A) the

Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards

Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E)

the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of

1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in

Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the

Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan

Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local

unemployment compensation laws or any other similar state and local laws; (M) state workers'

compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (U) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability; provided, however, that nothing herein shall limit the Buyer or any Assignee of a Contract or Lease with respect to the Reserved Lease Issues.

23.      If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Acquired Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Claims (collectively, the "Release Documents") the Person has with respect to the Debtors or the Acquired Assets or otherwise, then with regard to the Acquired Assets that are purchased by the Buyer pursuant to the Asset Purchase Agreement and this Sale Order: (i) the Debtors are hereby authorized and directed to, and the Buyer is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the Acquired Assets; (ii) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once

41

filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets; and (iii) the Buyer may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Acquired Assets other than liabilities expressly assumed under the Asset Purchase Agreement; provided that, notwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Sellers nor Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

24.      On the Closing Date, and subject to the terms of this Sale Order, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer by the Debtors of the Acquired Assets acquired under the Asset Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Debtors' right, title, and interest in and to the Acquired Assets to the Buyer.

25.      To the extent permitted by applicable Law and in accordance with the terms of the Asset Purchase Agreement and the Related Agreements, during the Management Services Period, the applicable Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective (the "Management Services"). Notwithstanding the foregoing, to

the fullest extent permitted by applicable Law, Buyer and its Affiliated Designees are appointed

as agent of such Seller to manage, control and operate each of: (i) the Acquired Properties; (ii)

Occupancy Leased Premises; and (iii) the Sparrow Properties (in the case of the Sparrow

Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which

Management Services are being provided (collectively, the "Managed Properties").  Pursuant to

their appointment as Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage,

control and operate each of the Managed Properties as they see fit in their sole discretion (in each

case, subject to the terms and conditions of any applicable leases or Restrictive Covenants (as

defined below)) and collect and retain all revenues generated by each Managed Property.  All

existing licenses or permits applicable to the business shall remain in place for the Buyer's or its

Applicable Designee or its Applicable Designee benefit until either new licenses and permits are

obtained or existing licenses and permits are transferred in accordance with applicable

administrative procedures and, in furtherance thereof, the Management Services to be provided to

the Buyer and its Affiliated Designees pursuant to Section 8.8(b) of the Asset Purchase Agreement

are hereby approved in their entirety.  Moreover, except for good cause based on violations of Law

unrelated to the assumption by the Buyer and its Affiliated Designees of the existing licenses and

permits applicable to the business occurring pursuant to the Asset Purchase Agreement and this

Sale Order, no licensing or permitting authority or other regulatory agency shall interrupt Buyer's

or any Affiliated Designee's operation of the business from and after the Closing Date without

first obtaining relief from this Court.

   26.    **Transition Services**.

          (a)    Pursuant to Section 8.8(a) of the Asset Purchase Agreement, the

Parties shall work together in good faith and use their respective reasonable best efforts to agree

as to the terms of, and execute, a transition services agreement ("Transition Services Agreement")

pursuant to which, effective as of the Closing Date, Sellers shall provide Buyer and Buyer shall

provide Sellers, as applicable, with certain services for a transitional period following the Closing

Date.   The Buyer and the Sellers are hereby authorized to execute and deliver any additional

documentation as contemplated by the Asset Purchase Agreement, and to perform all such other

and further acts as may be required under or in connection with the Transition Services Agreement,

including executing the Transition Services Agreement and performing and receiving services

thereunder.   The Debtors shall serve a copy of the Transition Services Agreement upon all parties

that provide services to the Debtors that are subject to the Transition Services Agreement within

two (2) Business Days of execution.   A form of the Transition Services Agreement (subject to

modification in advance of execution) will be filed with the Court.[7]   All such parties rights are

reserved, and if any such party raises an issue with respect to the terms of the Transition Services

Agreement, which cannot be resolved by agreement of the parties, such issue will be heard by the

Court on an expedited basis.

(b)      [Notwithstanding any other provision of this Sale Order, if the

Debtors, after the Closing, remain the owners of any pharmacy scripts, prescription lists or any

Inventory (as defined in the Asset Purchase Agreement) consisting of prepetition medication or

related Inventory (the "Pharmacy Collateral") or any other Acquired Assets [(excluding real

property leases)][8] solely to effect an orderly transition of such Acquired Assets to the Buyer (such

Acquired Assets, including any Pharmacy Collateral, the "Transition Assets"), including, without

limitation, to allow time to resolve regulatory or other legal issues, (i) such Transition Assets shall

---

[7] [NTD:  The form of Transition Services Agreement will be filed prior to the Closing Date.]

[8] [NTD: Under review]

be free and clear of any and all Claims in accordance with the terms of this Sale Order as if such Transition Assets were transferred to the Buyer as of the Closing and (ii) the Debtors are hereby authorized to grant to the agent, for the benefit of itself, (x) the lenders and the other credit parties under the ABL Financing (collectively, the "Transform Credit Parties"), continuing, valid, binding and non-avoidable, automatically and properly perfected first priority liens on and security interests in the applicable Transition Assets (the "Transition ABL Liens") as security for the full and prompt performance and payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations under the financing documents evidencing the ABL Financing (the "Transform Financing Documents") and the Debtors shall honor the Transition ABL Liens as if the Debtors were parties to the Transform Financing Documents and (y) the lenders under the Real Estate Financing (collectively, the "Real Estate Credit Parties"), continuing, valid, binding and non-avoidable, automatically and properly perfected first priority liens on and security interests in the applicable Transition Assets (the "Transition Real Estate Liens" and together with the Transition ABL Liens, the "Transition Liens") as security for the full and prompt performance when due (whether at stated maturity, by acceleration or otherwise) of all obligations under the financing documents evidencing the Real Estate Financing and the Debtors shall honor the Transition Real Estate Liens as if the Debtors were parties to the financing documents underlying the Real Estate Financing.  The Transition Liens granted by the Debtors shall be deemed automatically and properly perfected and enforceable simultaneously with the occurrence of Closing pursuant to the terms of this Sale Order without the necessity of the execution of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Credit Parties or the Real Estate Credit Parties, as applicable, of any Transition Assets.  The automatic stay imposed under

section 362(a) of the Bankruptcy Code is hereby modified as necessary to (a) permit the Debtors to grant the Transition Liens and (b) permit the Transform Credit Parties or the Real Estate Credit Parties, as applicale, to take any and all actions and exercise any and all remedies permitted by the Transform Financing Documents or the documents evidencing the Real Estate Financing; provided, however, that the Buyer shall bear any costs incurred by the Debtors in connection with participating in or responding to any enforcement actions taken by the Transform Credit Parties or the Real Estate Credit Parties with respect to the applicable Transition Assets or the Transition Liens.  Immediately upon transfer of any of the Transition Assets to the Buyer, (i) the Transition Assets so transferred shall become subject in all respects to the liens and security interests granted for the benefit of the Transform Credit Parties under the Transform Financing Documents and (ii) the respective Transition Lien over the applicable Transferred Transition Assets shall terminate and be of no further force or effect against the Debtors.  The Debtors and their successors and assigns are hereby prohibited from granting any lien, mortgage, encumbrance or any other interest, other than the Transition Liens, on all or a portion of the Transition Assets, and any lien, mortgage, encumbrance, or any other interest in contravention of this paragraph, including any liens or claims related to adequate protection under the Final DIP Order (as defined below), the Junior DIP Order or any other order of this Court, shall be void *ab initio.*  The Court shall retain jurisdiction to enforce the Transition Liens and any disputes among the Transform Credit Parties, the Real Estate Credit Parties, the Debtors and/or the Buyer with respect to the Transition Liens.

(c)    Any and all proceeds from the sale of Transition Assets, whenever arising, including all Pharmacy Receivables (as defined in the ABL Financing and the Transform Financing Documents) and Credit Card Receivables (collectively, the "Transition Proceeds") shall be treated as Acquired Assets and be free and clear of any and all liens and Claims in accordance

with the terms of this Sale Order as if such Transition Proceeds were transferred to the Buyer as of the Closing, and shall automatically and without any further action become subject to the first priority liens and security interests of the Transform Credit Parties under the Transform Financing Documents pursuant to the terms of this Sale Order without the necessity of the execution of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Credit Parties of any Transition Proceeds.][9]

27.    **No Successor or Other Derivative Liability**.  By virtue of the Sale Transaction, the Buyer Related Parties and their affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Buyer Related Parties have not assumed nor are they in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Assumed Liabilities. Except as expressly set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether

---

[9] [NTD: Under review by Debtors.]

asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors

or any obligations of the Debtors arising prior to the Closing Date, including, without limitation,

liabilities on account of any taxes or other Governmental Authority fees, contributions or

surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any

way relating to, the operation of the Acquired Assets prior to the Closing Date or arising based on

actions of the Debtors taken after the Closing Date; provided, however, that nothing herein shall

limit the liability of Buyer or any Assignee of a Contract or Lease with respect to the Reserved

Lease Issues.

28.    **Assumption and Assignment of Assigned Agreements**.  Subject to paragraph 29,

and conditioned upon the occurrence of the Closing Date and paragraphs 33 to 43 with respect to

Designatable Leases and Additional Contracts, the Debtors are hereby authorized in accordance

with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assigned

Agreements to the Buyer free and clear of all Claims to the extent set forth in this Sale Order, and

to execute and deliver to the Buyer such documents or other instruments as may be necessary to

assign and transfer the Assigned Agreements to the Buyer as provided in the Asset Purchase

Agreement.  With respect to each of the Assigned Agreements, the Buyer, in accordance with the

provisions of the Asset Purchase Agreement, has cured or will cure before the Closing Date or the

Assumption Effective Date, or have provided adequate assurance of the prompt cure after the

Closing of, any monetary default required to be cured with respect to the Assigned Agreements

under section 365(b)(1) of the Bankruptcy Code, and the Buyer has provided adequate assurance

of future performance under the Assigned Agreements in satisfaction of sections 365(b) and 365(f)

of the Bankruptcy Code to the extent that any such assurance is required and not waived by the

non-debtor counterparties to such Assigned Agreements.   Upon the applicable Assumption

Effective Date with respect to an Assigned Agreement, the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such Assigned Agreement and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to breach of such Assigned Agreement occurring after such assumption and assignment to Buyer as provided in section 365(k).  Buyer acknowledges and agrees that from and after the applicable Assumption Effective Date with respect to an Assigned Agreement, subject to and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each of such Assigned Agreement in its entirety, including any indemnification obligations expressly contained in such Assigned Agreement that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order or applicable bankruptcy law.  The assumption by the Debtors and assignment to the Buyer of any Assigned Agreement shall not be a default under such Assigned Agreement. In accordance with the terms of the Asset Purchase Agreement, with respect to liabilities from any Assumed 503(b)(9) Claims, Buyer shall not be obligated to make any payments in respect of such liabilities until the earlier of: (i) the date that is 120 days following the closing of the sale; and (ii) the date on which a chapter 11 plan is confirmed by the Court with respect to the Debtors; provided further in accordance with the terms of the Asset Purchase Agreement, that with respect to the liabilities from any Other Payables, Buyer shall not be obligated to make any payments in respect of such liabilities until the later of: (i) the Closing Date; and (ii) the date that the applicable obligation thereunder becomes due in the ordinary course of business; provided further, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Specified Payables, or any other administrative or priority claim of the Sellers pursuant to the terms of the

Asset Purchase Agreement is a general unsecured contractual obligation of the Buyer owed solely to the Sellers.

29.    Provided that assumption of a Contract has been approved by the Bankruptcy Court, all Cure Costs that have not been waived by, or as to which an objection has been filed by, or that have not been otherwise addressed in an alternate arrangement with, any non-debtor party to an Assigned Agreement shall be: (i) paid in cash by the Buyers, on or before the Assumption Effective Date as to the undisputed amounts and (ii) reserved against the establishment of a cash reserve as to any disputed cure amounts by Buyer at least two (2) days after the Assumption Effective Date (a "Cure Cost Reserve") and paid promptly upon resolution of any such disputed Cure Cost; provided that to the extent a new agreement by and between the Buyer and the counterparty to the applicable Assigned Agreement is entered into, such agreement shall provide for the Buyer's payment of applicable Cure Costs in an amount agreed to by the Buyer and the counterparty, and any such agreement shall require the counterparty's waiver of any and all prepetition claims against the Debtors based on the Assigned Agreement, and any damage claims arising out of the rejection of any such Assigned Agreement, and the Debtors shall have no liability therefor in accordance with the terms of the Asset Purchase Agreement on the applicable Assumption Effective Date to the extent provided in section 365(k) of the Bankruptcy Code.  Payment of Cure Costs as required under section 365(b) of the Bankruptcy Code with respect to the Initial Assigned Agreements identified on Exhibit B hereto (including the Citi Card Agreement (as defined below)), shall: (i) be in full satisfaction and cure of any and all defaults under these Assigned Agreements, whether monetary or non-monetary; and (ii) compensate the non-Debtor counterparty for any actual pecuniary loss resulting from such defaults.  For the avoidance of doubt, and pursuant to Section 8.9 of the Asset Purchase Agreement, notwithstanding that certain Amended and Restated Master

Lease Agreement (the "Sparrow Master Lease"), dated as of March 14, 2018, by and between certain of the Debtors, as lessee, and SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC, as lessors (collectively, the "Sparrow Entities") being designated an Initial Assigned Agreement, the Buyer reserves all of its rights with respect to any rent that was due and owing to the Sparrow Entities under the Sparrow Master Lease and that remains unpaid as of the Closing Date, and the Debtors reserve all of their rights and objections with respect thereto.

30.    The Debtors served all counterparties to the Initial Assigned Agreements, identified on Exhibit B hereto (including the Citi Card Agreement), with an Assumption and Assignment Notice and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Buyer has passed.  Accordingly, unless an objection to the proposed Cure Costs or Adequate Assurance Information with respect to the Buyer was filed and served before the applicable deadline, each non-Debtor party to an Initial Assigned Agreement is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

31.    Nothing in this Sale Order shall affect the rights of the Buyer, to the extent such rights are provided in the Asset Purchase Agreement, to add or remove any Potential Transferred Agreement to or from the list of Assigned Agreements set forth in the Asset Purchase Agreement in accordance with the terms thereof.  All of the requirements of sections 365(b) and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, solely with respect to the Initial Assigned Agreements identified on Exhibit B hereto (including the Citi Card Agreement).  The Buyer has

51

satisfied its adequate assurance of future performance requirements with respect to the Initial Assigned Agreements identified on Exhibit B hereto (including the Citi Card Agreement) and in connection therewith has presented sufficient evidence regarding the Buyer's business plan and demonstrated it is sufficiently capitalized to comply with the necessary obligations under the Initial Assigned Agreements, identified on Exhibit B hereto (including the Citi Card Agreement). All objections to Buyer's or any other Assignee's adequate assurance of financial performance that were timely filed (other than adequate assurance objections that related to the Initial Assigned Agreements identified on Exhibit B hereto (including the Citi Card Agreement) are fully reserved pending further hearing of this Court and nothing in this Sale Order shall limit such objections in any respect.

32.     To the extent a counterparty to an Assigned Agreement failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the Assumption and Assignment Notice and any such counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates.

33.     **Designation Rights Procedures**.  The Debtors are authorized, at the direction of the Buyer pursuant to the Asset Purchase Agreement, to seek to assume and to assign pursuant to sections 363 and 365 of the Bankruptcy Code, the Designatable Leases and any Additional Contracts that the Buyer designates for assumption and assignment in accordance with Section 2.7 and Section  2.9 of the Asset Purchase Agreement and this Sale Order to a designated Assignee. Each of the Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts) constitutes an unexpired lease or executory contract within the meaning of section 365 of the Bankruptcy Code and, at the Buyer's election, will be deemed assumed and

assigned by the Debtors on the Assumption Effective Date subject to compliance with and the procedures set forth in the Asset Purchase Agreement and herein.[10]    The assumption of any liabilities under a Designatable Lease or such Additional Contracts that are assumed by an Assignee shall constitute a legal, valid and effective delegation of all liabilities thereunder to the applicable Assignee and, following payment of all amounts required to be paid by agreement of the parties or an order of the Court, and except as expressly set forth in the Asset Purchase Agreement or this Sale Order, shall divest the Debtors of all liability with respect to such Designatable Lease or Additional Contract for any breach of such Designatable Lease occurring after the applicable Designation Assignment Date or any breach of such Additional Contract after the applicable date on which such Additional Contract is assigned to the applicable Assignee in accordance with Section 2.9 of the Asset Purchase Agreement, in each case, to the extent provided in section 365(k) of the Bankruptcy Code (the "Additional Contract Assignment Date").

34.    The Debtors served all counterparties to the Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts) listed as Potential Transferred Agreements ("Designatable Contract Counterparties") with an Assumption and Assignment Notice and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Buyer has passed.[11]    Accordingly, unless an objection to the

---

[10] In the case of any conflict between the provisions of the Asset Purchase Agreement and this Order, this Order shall govern.

[11] The Debtors served all counterparties to Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an executory contract or lease and was listed on the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction or Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction) with an Assumption and Assignment Notice and as of the date of entry of this Sale Order, the deadline to object to Cure Costs has passed.  See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction (Docket No. 1731); see also Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction (Docket No. 1774); see also Affidavits of Service (Docket Nos. 1969, 2132, 2162); see also Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with

proposed Cure Costs or Adequate Assurance Information with respect to the Buyer was filed and

served before the applicable deadline (a "Filed Objection"), the applicable Designatable Contract

Counterparty is forever barred from objecting to (i) the Cure Costs and from asserting any

additional cure or other amounts with respect to the applicable Designatable Lease or Additional

Contract in the event it is assumed and/or assigned by an Assignee, except to the extent such Cure

Costs further accrue (being subject to further credits, debits, and adjustments in accordance with

the terms of the applicable underlying Lease or Contract) following the Debtors' filing of the

applicable Assumption and Assignment Notice or (ii) adequate assurance of future performance

by the Buyer; provided, however, that in the event that an Additional Contract was not listed as a

Potential Transferred Agreement, and accordingly, no Assumption and Assignment notice was

served upon the applicable Designatable Contract Counterparty, such Designatable Contract

Counterparty shall have eight (8) days after the date on which the applicable supplemental

Assumption and Assignment Notice is filed with the Court and served on the applicable

Designatable Contract Counterparty (the "Supplemental Additional Contract Cure Objection

Deadline"), to: (a) object to the applicable proposed Cure Costs for such Additional Contract and

the assumption and assignment of the Additional Contract (the "Supplemental Additional Contract

Cure Cost Objection"); and (b) serve the Supplemental Additional Contract Cure Cost Objection

(by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and

the Buyer on or before the Supplemental Additional Contract Cure Objection Deadline; provided,

further, however that in the event that a Designatable Contract Counterparty timely asserted a Filed

Objection such counterparty shall be permitted to object solely on the basis of an objection to cure

---

Global Sale Transaction; see also Affidavit of Service (Docket No. 2314); see also Affidavit of Service (Docket No. 2417).]

costs for such Additional Contract or the assumption and assignment of the Additional Contract that could not have been raised in its prior objection, until the applicable Designatable Contract Assumption and Assignment Objection Deadline.

35.     With respect to any Filed Objection, to the extent that the applicable Contract or Lease is designated for assumption and assignment, a Designated Lease Notice or Designated Additional Contract Notice, as applicable, shall be served on the Designatable Contract Counterparty, and the Buyer and the applicable counterparty shall have authority to compromise, settle or otherwise resolve any Filed Objections without further order of the Court.  If the Debtors, the Buyer and the applicable counterparty determine that the objection cannot be resolved without judicial intervention, then the Filed Objection will be determined by the Court (following request for a hearing by the Debtors and/or the Buyer and/or the applicable counterparty filed with the Court and on no less than ten (10) days' notice to the other party).

36.     Except as set forth in paragraphs 29 to 35, all Designatable Contract Counterparties' rights under section 365 with respect to the assumption and assignment of the Designatable Leases and Additional Contracts pursuant to the Bankruptcy Code (including, without limitation, as to the provision of adequate assurance of future performance if the Designatable Leases are designated to a third party or with respect to the provision of adequate assurance of future performance of the Buyer if a Filed Objection was timely served) are reserved pending delivery of a notice from Seller to the applicable Designatable Contract Counterparty (i) pursuant to Section 5.2(b) of the Asset Purchase Agreement (a "Designated Lease Notice") following Sellers' receipt of a Buyer Assumption Notice or (ii) promptly following Sellers' receipt of a notice indicating that an Additional Contract has been designated for assignment or assumption and assignment pursuant

to Section 2.9 of the Asset Purchase Agreement (a "Designated Additional Contract Notice") and

are subject to the procedures and provisions set forth in Paragraphs 37 to 44 and 59 below.

37.      Each Designated Lease Notice will set forth the following information, to the best

of the Debtors' knowledge:  (a) the street address of the real property that is the subject of such

Designatable Lease; (b) the name and address of the counterparty of such Designatable Lease (and

their counsel, if known); (c) a description of the deadlines and procedures for filing objections to

the Designated Lease Notice; (d) the identity of the proposed assignee; (e) information intended

to provide the counterparty to the Designatable Lease with adequate assurance of future

performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy

Code, if and only if such Designatable Lease is proposed to be assigned to a third party and (f) the

proposed Cure Costs associated with such Designatable Lease; provided, however, that if adequate

assurance information is provided pursuant to this paragraph, such adequate assurance information

shall be kept strictly confidential and  not be used for any purpose other than to (a) evaluate whether

adequate assurance requirements under Bankruptcy Code section 365(f)(2)(B) and, if applicable,

Bankruptcy Code section 365(b)(3) have been satisfied, and (b) to support any objection to

adequate assurance provided by any party including the Buyer and its affiliates.

38.      During the Designation Rights Period, the Buyer may designate any Designatable

Lease or Additional Contract for assumption and assignment in accordance with the terms of the

Asset Purchase Agreement and this Sale Order.  In such event, the Debtors shall file with the Court

and serve on the applicable Designatable Contract Counterparty a Designated Lease Notice or

Designated Additional Contract Notice, together with any applicable Assignment and Assumption

of Lease or other applicable assignment agreement with respect to an Additional Contract.  If the

proposed Assignee is not the Buyer, the Debtors shall also deliver to the applicable Designatable

Contract Counterparty (and deliver by email or facsimile to counsel for the applicable Designatable Contract Counterparty, if such counsel has filed a notice of appearance in the Bankruptcy Cases) evidence of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code with respect to the applicable Designatable Lease or Additional Contract that is proposed to be assumed and assigned to such Assignee.

39.    Any party seeking to object to the assumption and assignment of any Designatable Lease or Additional Contract to a proposed Assignee that is not the Buyer on any basis other than the Cure Costs (including, but not limited to, objections to adequate assurance of future performance if such Designatable Leases are designated to a third party or with respect to the provision of adequate assurance of future performance of the Buyer if a Filed Objection was timely served), must (a) file a written objection in compliance with the Bankruptcy Rules and the Local Rules (a "Designatable Contract Assumption and Assignment Objection") with the Court, so that such objection is filed no later than eight (8) days after the date on which (i) the applicable Designated Lease Notice or Designated Additional Contract Notice is filed with the Court and (ii) evidence of adequate assurance of future performance required pursuant to the preceding sentence is served on the applicable Designatable Contract Counterparty (the "Designatable Contract Assumption and Assignment Objection Deadline"), and (b) serve the Designatable Contract Assumption and Assignment Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Buyer on or before the Designatable Contract Assumption and Assignment Objection Deadline.

40.    If no Filed Objection has been filed, or Designatable Contract Assumption and Assignment Objection has been filed by the Designatable Contract Assumption and Assignment Objection Deadline, this Sale Order shall serve as approval of the assumption and assignment of

the applicable Designatable Contract or Additional Contract.  If a Filed Objection has been filed, or a Designatable Contract Assumption and Assignment Objection is timely filed and not withdrawn or resolved, the Debtors, the Buyer and the objecting Designatable Contract Counterparty shall have authority to compromise, settle or otherwise resolve any objections without further order of the Court.  If the Debtors, the Buyer and the objecting Designatable Contract Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Designatable Lease or Additional Contract will be determined by the Court on a date to be scheduled by any of the Debtors, the Buyer or the objecting Designatable Contract Counterparty (which hearing date shall be no sooner than ten (10) business days following the date of filing of the Designated Lease Notice or Designated Additional Contract Notice), unless the Debtors, the Buyer and the applicable Designatable Contract Counterparty agree otherwise.

41.     Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, the Buyer shall, on the Designation Assignment Date or Additional Contract Assignment Date for a Designatable Lease or Additional Contract, cure all nonmonetary defaults solely to the extent required under section 365 of the Bankruptcy Code and pay to the applicable Designatable Contract Counterparty all undisputed Cure Costs and other such undisputed amounts required with respect to such Designatable Lease or Additional Contract, solely to the extent designated for assumption by the Sellers and assignment to Buyer by written notice from Buyer to Sellers delivered prior to the end of the Designation Rights Period (the "Designated Agreements").   Upon assumption and assignment of any Designated Agreement, the Debtors and the estates shall be relieved of any liability for breach of such Designated Agreement pursuant to section 365(k) of the Bankruptcy Code; provided that, except as expressly provided herein or in the Asset Purchase Agreement or

58

Related Agreements, and except for any obligations in respect of the Reserved Lease Issues, neither the Buyer (except to the extent such obligations constitute Cure Costs) nor the applicable Assignee shall have any obligations under any Designated Agreement that is an Acquired Lease or related Assigned Agreement in respect of any portion of any year-end (or other) adjustment (including, without limitation, for royalties, rents, utilities, taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under any of the Acquired Leases or any other Assigned Agreements for the calendar year in which the applicable Lease Assignment occurs attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y) for any previous calendar year, and the Sellers shall fully indemnify and hold harmless the Buyer and the applicable Assignee with respect thereto.

42.    Upon the applicable Assumption Effective Date, any provision in any Assigned Agreement that purports to declare a breach or default as a result of a change or transfer of control or any interest in respect of the Debtors is unenforceable and all Assigned Agreements shall remain in full force and effect notwithstanding assignment thereof.  No sections or provisions of any Assigned Agreements, that in any way purport to: (i) prohibit, restrict, or condition the Debtors' assignment of such Assigned Agreement (including, but not limited to, the conditioning of such assignment on the consent of any non-debtor party to such Assigned Agreement); (ii) provide for the cancellation, or modification of the terms of the Assigned Agreement based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such Assigned Agreement upon assignment thereof; or (iv) provide for any rights of first refusal on a contract counterparty's part, or any recapture or termination rights in favor of a contract counterparty, or any right of a Landlord

to take an assignment or sublease from a tenant, shall have any force or effect with respect to the grant and honoring of the Designation Rights or the rights under Section 2.9 of the Asset Purchase Agreement in accordance with this Sale Order and the Asset Purchase Agreement and assignments of Assigned Agreements by the Debtors in accordance therewith, because they constitute unenforceable antiassignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  Upon assumption and assignment of any Designatable Lease or Additional Contract pursuant to the procedures set forth herein and in the Asset Purchase Agreement, the applicable Assignee shall enjoy all of the rights and benefits, and shall assume all obligations, under each such Assigned Agreement as of the applicable Designation Assignment Date or Additional Contract Assignment Date.

43.    Upon the applicable Assumption Effective Date, except as otherwise expressly agreed by the Buyer and the applicable Designatable Contract Counterparty, notwithstanding any provision in any Designatable Lease that purports to prohibit, restrict or condition such action, upon the assumption and assignment of such Designatable Lease to an Assignee in accordance with the terms of the Asset Purchase Agreement, (x) the applicable Assignee shall be authorized to: (i) use the applicable Lease Premises (as defined in the Asset Purchase Agreement), subject to section 365(b)(3) of the Bankruptcy Code, as a retail store (and related goods and services) upon consummation of the assumption and assignment of such Designatable Lease to such Assignee in accordance with the terms of the Asset Purchase Agreement; (ii) operate such Lease Premises under the Buyer's trade name or any other trade name which the Buyer owns or is authorized to use (including any of the Debtors' trade names); (iii) make such alterations and modifications to the applicable Lease Premises (including signage, together with appropriate changes to existing tenant signage in the respective shopping center or mall, including panels on all pylons,

monuments, directional and other ground and off-premises signs where Sellers are presently represented) deemed necessary by such Assignee (subject to all applicable laws including all applicable municipal codes) as are necessary or desirable for such Assignee to conform such Lease Premises to the prototypical retail store (or such Assignee's typical retail store); (iv) remain "dark" with respect to such Lease Premises after such assumption and assignment until the date that is necessary to permit such Assignee to remodel, restock, re-fixture, change signage and/or until completion of the work described in clause (iii) above (so long as such date is not more than one hundred fifty (150) days after the applicable Designation Assignment Date) or such later date as may be reasonably required for the restoration of the such Lease Premises following any applicable Casualty / Condemnation Event; and (v) exercise, utilize or take advantage of any renewal options and any other current or future rights, benefits, privileges, and options granted or provided to the Debtors under such Designated Agreement (including all of the same which may be described or designated as, or purport to be, "personal" to the Debtors or to a named entity in such Designated Agreement or to be exercisable only by the Debtors or by a named entity or an entity operating under a specific trade name)  and (y) neither the Buyer nor the applicable Assignee shall have any responsibility or liability for any Excluded Asset-Sale Taxes and Excluded Asset-Reorganization Taxes.  For the avoidance of doubt, all rights of the counterparties to any applicable Designatable Lease are fully reserved in connection with any of the foregoing actions.

44.    To the extent that any IP License is designated for assumption and assignment pursuant to Section 2.9 of the Asset Purchase Agreement, on the Assumption Effective Date, such agreement, including the rights and obligations thereunder, will be deemed to have been assumed and assigned to the Buyer as of the Closing Date.

45.    ***Ipso Facto* Clauses Ineffective**.  Except as otherwise specifically provided for by order of this Court, the Assigned Agreements shall be transferred to, and remain in full force and effect for the benefit of, the Buyer or, for applicable Designated Agreements, the Assignee in accordance with their respective terms, including all obligations of the Buyer or, for applicable Designated Agreements, the Assignee as the assignee of the Assigned Agreements, notwithstanding any provision in any such Assigned Agreements (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no, and all non-Debtor parties to any Assigned Agreements are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer, any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assigned Agreements or the Closing.

46.    Except as otherwise specifically provided for by order of this Court, upon the Debtors' assignment of the Assigned Agreements to the Buyer under the provisions of this Sale Order and full payment of all Cure Costs as required under section 365(b) of the Bankruptcy Code, no default shall exist under any Assigned Agreements, and no counterparty to any Assigned Agreements shall be permitted to declare a default by any Debtor or the Buyer or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Agreement.  Any provision in an Assigned Agreement that prohibits or conditions the assignment or sublease of such Assigned Agreement (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, refuse to renew, or modify any term or condition upon such assignment or sublease, constitutes an

unenforceable anti-assignment provision that is void and of no force and effect.  The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Agreement shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Agreement.

47.    **Statutory Mootness**.  The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.  The Sale Transaction contemplated by the Asset Purchase Agreement is undertaken by the Buyer and ESL without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Acquired Assets owned by the Debtors to the Buyer, free and clear of Claims, unless such authorization is duly stayed before the Closing of the Sale Transaction pending such appeal.  The Debtors and the Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Sale Order.

48.    **No Avoidance of Asset Purchase Agreement**.  Neither the Debtors nor the Buyer Related Parties have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  Accordingly, the Asset Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreement or the Sale Transaction.

49.     **Waiver of Bankruptcy Rules 6004(h), 6006(d) and 7062**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  Time is of the essence in closing the Sale Transaction and the Debtors and the Buyer intend to close the Sale Transaction as soon as practicable.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal will be foreclosed as moot.  This Sale Order constitutes a final order upon which the Debtors and the Buyer are entitled to rely.  This paragraph 49 shall not apply to Reserved Lease Issues.

50.     **Personally Identifiable Information**.  After appointment of the consumer privacy ombudsman in these chapter 11 cases, in accordance with section 332 of the Bankruptcy Code, and after giving due consideration to the facts, circumstances and conditions of the Asset Purchase Agreement, as well as the report (as supplemented) of the consumer privacy ombudsman shared with the Buyer and then filed with the Court which Buyer agrees to comply with, no showing was made that the sale of personally identifiable information or private health information contemplated in the Asset Purchase Agreement, subject to the terms of this Sale Order, would violate applicable nonbankruptcy law; provided that pre-Closing costs of the consumer privacy ombudsman shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand, to the extent such costs are incurred in relation to the Transactions.

51.     **Distribution and Application of Sale Proceeds**.

(a)    At the Closing, the Buyer shall pay to the Sellers (in accordance with the terms of the Asset Purchase Agreement), the balance of the purchase price remaining due and owing under the Asset Purchase Agreement.  The proceeds of the Sale Transaction shall be applied as provided in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 955) ("Final DIP Order"), including to repay at the Closing the DIP ABL Secured Obligations (as defined in the Final DIP Order) in full in cash from the sale of those Acquired Assets upon which the DIP ABL Credit Parties have a first lien, including all costs and expenses of the DIP ABL Credit Parties set forth in the applicable pay off letter, without the need for any professional for the DIP ABL Credit Parties to deliver or serve any invoices to any other party (including those parties identified in paragraph 19(f) of the Final DIP Order).  Notwithstanding the foregoing the Securities Consideration shall be distributed as provided in Schedule 9.2 of the Asset Purchase Agreement. The methodology for allocation of proceeds shall be as set forth in the Asset Purchase Agreement.

(b)    With respect to the Cyrus Claims: (i) up to $350 million of Junior DIP Secured Obligations outstanding under the Junior DIP Order, including all fees, adequate protection amounts due and owing, and interest thereon, may be rolled into a new financing of the Buyer (the "Exit Financing Facility") on the Closing; and (ii) the Cyrus LC Facility Claims will be rolled over into a new letter of credit facility with the Buyer, and such claims shall be deemed satisfied and fully discharged against the Debtors.

(c)    If any order under section 1112 of the Bankruptcy Code is entered in the cases, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy

Code), that this Sale Order, including the rights granted to Buyer hereunder, shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest.  This Sale Order shall not be modified by any chapter 11 plan confirmed in the cases or by any subsequent orders of the Court.

52.     **Binding Effect of Sale Order**.  The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, non-debtor affiliates, any affected third parties, all holders of equity interests in the Debtors, all holders of any claims, whether known or unknown, against the Debtors, any holders of Claims against or on all or any portion of the Acquired Assets, including, but not limited to all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' chapter 11 cases, and each of their respective affiliates, successors and assigns.  The Asset Purchase Agreement and the Sale Order shall inure to the benefit of the Debtors, their estates and creditors, the Buyer and their respective successors and assigns.  The Asset Purchase Agreement, the Sale Transaction and this Sale Order shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

53.     **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order, the Asset Purchase Agreement and any documents executed in connection therewith shall govern, in that order.  Nothing contained in any chapter 11 plan hereafter confirmed in these chapter 11 cases, any order confirming such plan, or

in any other order of any type or kind entered in these chapter 11 cases (including, without limitation, any order entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

54.    **Modification of Asset Purchase Agreement**.  The Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; <u>provided</u> that any such modification, amendment or supplement does not materially change the terms of the Asset Purchase Agreement or Related Agreements, documents or other instruments.

55.    **Bulk Sales; Taxes**.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply in any way to the transactions contemplated by the Asset Purchase Agreement, the Sale Motion or this Sale Order.  Except as otherwise expressly provided in the Asset Purchase Agreement, all obligations of the Debtors relating to taxes, whether arising under any law, by the Asset Purchase Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

56.    **Lease Deposits and Security**.  The Buyer shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Initial Assigned Agreement to the extent not previously provided by the Debtors. All timely Filed Objections that have asserted requests pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Assigned Agreement other than the Initial Assigned Agreements are hereby adjourned to a hearing at a future date with all parties' rights reserved.

57.    **Automatic Stay**.  The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement, and Related Agreements, documents or other instruments.   The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

58.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Sale Order or the Asset Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

59.    **Restrictive Covenants; Master Leases**.

(a)    Nothing herein or in the Asset Purchase Agreement or any related document shall authorize, absent further order of the Court or agreement among the Debtors or the Buyer, on the one hand, and the applicable non-Debtor counterparty, on the other hand, the sale of any real estate property owned by any of the Debtors, free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants") that are not executory or that run with the land.  To the extent that the Debtors or any other party seek to assume and assign any real estate leases to which a Debtor is a party free and clear of any Restrictive Covenant, the Debtors or such party shall file a notice that describes the Restrictive Covenant that the party is seeking to extinguish or otherwise diminish

and any non-Debtor counterparty to a Restrictive Covenant will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any Lease, and all rights, remedies, and positions of all parties with respect to any such relief are preserved.

(b)    Nothing in this Sale Order, the Asset Purchase Agreement, or any other related agreements, documents or other instruments shall be deemed to authorize or shall be argued to permit the Debtors, the Buyer, or any Proposed Assignee, their agents or advisors to take any action in connection with an unexpired master lease of nonresidential real property to which a Debtor is a party (each such lease, a "Master Lease") that is not in compliance with, or that would result in a default or breach under, such Master Lease, without an amendment to or waiver under such Master Lease, in accordance with its terms and all consents required for such amendment or waiver under such Master Lease.  To the extent that the Debtors or any other party seek to sever a Master Lease for any reason prior to an assumption and assignment of such Master Lease in accordance with the terms of this Sale Order, the Debtors shall file a notice that describes with particularity the nature and reason of such severing, and any non-Debtor counterparty to such Master Lease will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any lease, and all rights, remedies, and positions of all parties with respect to any such relief are preserved.

60.    **Stand Alone L/C Facility**. As of the Closing Date, all obligations of the applicable Debtors with respect to the Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among such Debtors, Citibank, N.A., as administrative agent and issuing

bank (collectively, "Citi") and letter of credit lenders party thereto (the "LC lenders") (as amended

from time to time, the "Citi Letter of Credit Agreement") shall be assumed by the applicable Buyer

Affiliate, all obligations of any Debtor thereunder (other than any contingent obligations (including

contingent indemnification obligations) that are not yet due and payable) shall be terminated and

all collateral provided by the Debtors to secure such obligations shall be released (other than such

liens securing contingent indemnification obligations in respect of the Citi Letter of Credit

Agreement, which liens shall attach to the net proceeds of the Sale Transaction, in the same order

of their priority and with the same validity, force and effect which they now have against the

Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto,

in each case immediately before the Closing).

61.    **Existing Wells and BAML Letters of Credit**.    Notwithstanding the

termination of the DIP ABL Facility (as defined in the Final DIP Order), each of the outstanding

letters of credit issued by Bank of America and Wells Fargo Bank, National Association, pursuant

to the DIP ABL Facility, will either (1) remain outstanding after the Closing Date in accordance

with their respective terms so long as such letters of credit are fully cash collateralized by the

applicable Debtors in an amount of at least [__]% of the face amount of such letters of credit to

secure the reimbursement obligations of the Debtors (and their successors and assigns) pursuant

to a cash collateral agreement between such Debtors and each of Bank of America and Wells Fargo

Bank, National Association, as Issuing Lenders under the applicable cash collateral agreement

(such letters of credit, the "Cash Collateralized Letters of Credit"), (2) will be backstopped to

secure the reimbursement obligations of the Debtors with respect to such letters of credit on the

Closing Date (such letters of credit, the "Backstopped Letters of Credit") and/or (3) will be rolled

into the Buyer's new credit facilities on the Closing Date and deemed issued thereunder facilities

(such letters of credit, the "<u>Rolled Letters of Credit</u>").  The obligations of the Debtors under the DIP ABL Facility and security interest securing such obligations under the DIP ABL Facility with respect to each letter of credit issued pursuant the DIP ABL Facility, whether a Cash Collateralized Letter of Credit, a Backstopped Letter of Credit, or a Rolled Letter of Credit will be considered terminated so that the obligations of any Debtors under the DIP ABL Facility are no longer secured by the collateral and all such obligations of such Debtors under the DIP ABL Facility (other than any contingent obligations that are not yet due and payable.

62.    **<u>Direction to Creditors and Parties in Interest</u>**.

(a)    In connection with the Credit Bid, each agent, trustee, collateral agent or similar person (each, a "<u>Credit Bid Claim Agent</u>") that is party to an indenture, credit agreement, security agreement or any similar document or instrument (each, a "<u>Credit Bid Claim Document</u>") in respect of the credit bid claims is authorized to execute such documents and take all other actions, in accordance with, and subject to the terms of, the applicable Credit Bid Claim Document, as may be necessary to facilitate the Credit Bid, including, without limitation, the *pro rata* allocation and distribution of equity securities of the Buyer (pro rata within each class of creditors), to all creditors holding any obligations of any one or more of the Debtors which are the subject of the Credit Bid (including any principal, interest, fees and other obligations, the "<u>Credit Bid Obligations</u>"), including without limitation, the non-ESL holders of the Credit Bid Obligations, and the acknowledgment of the reduction in [principal] amount of the remaining Credit Bid Obligations as a result of, and in the amount of, the Credit Bid, such reduction to be made *pro rata* to all holders of the Credit Bid Obligations by class of creditor, including, without limitation, the non-ESL holders of the Credit Bid Obligations.  Each Credit Bid Claim Agent may rely fully on all amounts of equity securities of the Buyer delivered and allocated to it, and the

71

amount of the reduction in [the principal amount to be applied to the] Credit Bid Obligations for which the Credit Bid Claim Agent is acting in such capacity, as certified by ESL or the Buyer and the applicable Debtor(s) in a written certificate (the "Certificate") to be delivered to the relevant Credit Bid Claim Agent.  At the Closing, and the Credit Bid Claim Agent may, but shall not be obligated to, make any review or investigation of the accuracy of any of the calculations or numbers set forth in such certificate.  No later than three (3) business days following the Closing Date, Buyer shall pay to each Credit Bid Claim Agent the reasonable fees and expenses invoiced on or prior to the Closing Date (including its reasonable attorneys' fees and disbursements) incurred in connection with the facilitation of the Credit Bid.  Anything in this Sale Order to the contrary notwithstanding, nothing in this Order is intended to, or shall, modify or amend the terms and conditions of the Second Lien Security Agreement, all of which shall remain in full force and effect.

(b)     Each Credit Bid Claim Agent is hereby released and exculpated from any Claim, cause of action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Credit Bid and the facilitation thereof and any transaction contemplated in connection therewith, other than any such Claim, cause of action, obligation, suit, judgment, damage, demand, loss, or liability stemming from the actual fraud, willful misconduct, or gross negligence of any such Credit Bid Claims Agent.

63.     **Citibank Credit Card Agreements**.  Pursuant to this Order, the Debtors are assuming and assigning (i) that certain Second Amended and Restated Program Agreement, dated as of October 3, 2018 (the "Citibank Credit Card Program Agreement"), by and among Sears, Roebuck and Co., Sears Brands Business Unit Corporation, the Other Sears Parties (as defined

therein) that are parties thereto, and Citibank, N.A. ("Citi"), (ii) the New Merchant Agreement (as defined in the Citibank Credit Card Program Agreement) and (iii) the Marketing Agreement (as defined in the Citibank Credit Card Program Agreement). The Citibank Credit Card Program Agreement, the New Merchant Agreement, and the Marketing Agreement are collectively referred to as the "Citibank Credit Card Agreements." Nothing in this Order, the Asset Purchase Agreement or any other Sale Transaction document, and neither the Sale Transaction itself nor any act taken in connection with the Sale Transaction, shall impair, invalidate, limit, waive, forfeit or otherwise render ineffective any right of Citi arising under or recognized by any Citibank Credit Card Agreement, including any right in accordance with the terms and conditions of the Citibank Credit Card Agreements to (x) to draw on the "Eligible Letter of Credit" funded under the Citibank Credit Card Program Agreement, in Citi's sole discretion, (a) to discharge or satisfy contingent liabilities arising under any Integrated Agreement (as defined in the Citibank Credit Card Program Agreement) or (b) to otherwise reimburse Citi for any losses arising out of amounts owing under any Integrated Agreement, in each case of (a) or (b), whether arising prior to, on, or after the Closing Date and whether owed by Seller or Buyer; (y) if such Eligible Letter of Credit is not renewed or replaced in accordance with Section 8.8 of the Citibank Credit Card Program Agreement, to draw on such Eligible Letter of Credit and maintain the reserve by retaining the amount of such draw; and (z) to recoup, setoff or deduct amounts owing to Citi under any of the Citibank Credit Card Agreements in accordance with the terms thereof, in each case, whether such amounts owed arose prior to, on, or after the Closing Date and whether owed by Seller or Buyer.

64.    **Chubb**.  Notwithstanding anything to the contrary in the Motion, the Global Bidding Procedures, the Global Bidding Procedures Order, the Asset Purchase Agreement, any cure notice or assumption notice (including, but not limited to, any Assumption and Assignment

Notice), or this Sale Order (i) none of the insurance policies or any related agreements (collectively, the "Chubb Insurance Contracts") issued by any of ACE American Insurance Company, ACE Fire Underwriters Insurance Company, ACE Property and Casualty Insurance Company, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance Company, Westchester Fire Insurance Company, Illinois Union Insurance Company, Federal Insurance Company, or their respective affiliates or successors (collectively, the "Chubb Companies"), or, except as set forth herein, any rights, benefits, claims, rights to payment and/or recoveries under the Chubb Insurance Contracts shall be sold, assigned or otherwise transferred to the Buyer in connection with the Global Asset Sale Transaction; and (ii) nothing shall alter, modify or otherwise amend the terms or conditions of the Chubb Insurance Contracts; provided, however, that to the extent any claim seeking insurance policy proceeds under any insurance policies included in the Chubb Insurance Contracts arises with respect to the Business or any Acquired Assets, the Debtors may pursue such claims for such insurance proceeds in accordance with the terms of the insurance policies included in the Chubb Insurance Contracts (and shall pursue such claims if requested by Buyer), and, if applicable, turn over to the Buyer any proceeds in respect of such claims in accordance with section 2.1(q) of the Asset Purchase Agreement (each, a "Proceed Turnover"); provided, further, however, that the Chubb Companies shall not have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover except as provided in the Chubb Insurance Contracts.

65.    **Governmental Units**.  Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (including but not limited to environmental laws or regulations), and any associated liabilities for penalties, damages, cost recovery, or

injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Asset Purchase Agreement shall in any way  diminish the obligation of any entity, including the Debtors, to comply with environmental laws.  Nothing in this Order or the Asset Purchase Agreement authorizes the transfer to the Buyer of any licenses, permits, registrations, or governmental authorizations and approvals without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

66.    **SAP.**  No provision of this Sale Order, the Sale Motion, or the Asset Purchase Agreement shall authorize the Debtors or the Buyer as applicable to use any software or other intellectual property (the "<u>Proprietary Information</u>") owned by or licensed from, or any software-related services provided by, SAP Industries, Inc. or its affiliates SAP America, Inc. or Concur Technologies, Inc., to the benefit of any other party under any Transition Services Agreement or otherwise to the extent prohibited by the contracts governing such Proprietary Information or software-related services.

67.    **Consent.**  No provision of this Sale Order, the Sale Motion, or the Asset Purchase Agreement shall authorize the Debtors or the Buyer as applicable to transfer or sell any Proprietary Information to the Buyer licensed from SAP Industries, Inc. and its affiliates SAP America, Inc. and Concur Technologies, Inc. (collectively, "<u>SAP</u>"), Oracle America, Inc. including its partner Rimini Street (collectively, "<u>Oracle</u>"), Microsoft Corporation and its wholly-owned affiliates, Microsoft Licensing, GP, and Microsoft Online, Inc. (collectively, "<u>Microsoft</u>"), LinkedIn Corporation, as applicable, absent the consent of SAP, Oracle, Microsoft, or LinkedIn Corporation, as applicable, to the extent such consent is required under the applicable agreement and such provision is enforceable under applicable law.

Dated:  February _____, 2019
       White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Asset Purchase Agreement**

**<u>Exhibit B</u>**

**Initial Assigned Agreements**

**<u>Exhibit B</u>**

**Assumption and Assignment Notice
Initial Assumed Agreements**

**Schedule 1 – Executory Contracts**

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 1. | N/A | Sears Holdings Management Corporation | American Express Business Travel | Fin Services - American Express Card<br><br>Acceptance - Amendment | Cw2338277 | $00.00 | No Objection Filed. |
| 2. | N/A | Sears Holdings Management Corporation | American Express Business Travel | Fin - American Express Travel Related Services<br><br>Company Inc (Gbt Us Llc) - Master Services | Shclcw7058 | $00.00 | No Objection Filed. |
| 3. | N/A | Sears Holdings Management Corporation | American Express Travel Related Services<br><br>Company, Inc. | American Express Card Acceptance Agreement | N/A | $00.00 | No Objection Filed. |
| 4. | N/A | Sears Holdings Management Corporation | American Express Travel Related Services<br><br>Company, Inc. | Amendment To Agreement For American<br><br>Express Card Acceptance | N/A | $00.00 | No Objection Filed. |
| 5. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Tax Sharing Agreement | N/A | $00.00 | Not disputed in objection. |

[1] This column reflects the ECF number of any applicable objection filed by the counterparty.

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 6. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | | N/A | $00.00 | Not disputed in objection. |
| 7. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Syw - Sears Hometown And Outlet Stores Inc - Retail Establishment Agreement - 2016 | Cw2323625 | $00.00 | Not disputed in objection. |
| 8. | 1893 | Sears Holdings Management Corporation | Cross Country Home Services (HMW) | HS OPS-Cross Country Home Service Inc – Agreement - 2014 | SHCLCW3606 | $00.00 | Not disputed in objection. |
| 9. | 1893 | Sears Roebuck and Co. | Cross Country Home Services (HMW) | | CW2340683 | $00.00 | Not disputed in objection. |
| 10. | 1893 | Sears Roebuck and Co. | Cross Country Home Services, Inc. | Home Services Agreement 2016 | | $00.00 | Not disputed in objection. |
| 11. | 1893 | Sears Holdings Management Corporation | Cross Country Home Services, Inc., Homesure Of America, Inc., Homesure Protection of. | Amended and Restated Total Home Management Program Agreement 2017 | | $00.00 | Not disputed in objection. |
| 12. | 1893 | Sears Holdings Management Corporation | Cross Country Home Services, Inc., Homesure Of America, Inc., Homesure Protection of. | Guarantee and Security Agreement | | $00.00 | Not disputed in objection. |
| 13. | 1893 | Sears Holdings Management Corporation | Cross Country Home Services, Inc., Homesure Of America, Inc., Homesure Protection of California Inc. and Homesure OF Virginia, Inc. | Third Party Warranty Agreement | | $00.00 | Not disputed in objection. |

WEIL:\96901112\3\73217.0004

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 14. | 1893 | Sears Roebuck and Co. | Cross Country Home Services, Inc. | Fifth Amendment to Home Warranty Service Agreement | | $00.00 | Not disputed in objection. |
| 15. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Shop Your Way Rewards Retail Establishment Agreement & Amendment #2 | 396577 | $00.00 | Not disputed in objection. |
| 16. | 1835 | Sears, Roebuck And Co. | Sears Hometown And Outlet Stores, Inc. | Trademark License Agreement | 536493 | $00.00 | Not disputed in objection. |
| 17. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Office Space Lease | 431288 | $00.00 | Not disputed in objection. |
| 18. | 1835 | Innovel Solutions, Inc. | Sears Hometown And Outlet Stores, Inc. | Purchase Agreement For Excess And Salvage Merchandise | 534857 | $00.00 | Not disputed in objection. |
| 19. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Security Interest In Assets Of Sears Hometown And Outlet Stores, Inc. | N/A | $00.00 | Not disputed in objection. |
| 20. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment #1 To Employee Transition And Administrative Services Agreement | 509440 | $00.00 | Not disputed in objection. |
| 21. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Transition Of Sears Procurement Services | 546403 | $00.00 | Not disputed in objection. |
| 22. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Agreement And Authorization For Sho Franchisee Leasing Business | 537252 | $00.00 | Not disputed in objection. |
| 23. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 10 To Service Agreement | 543771 | $00.00 | Not disputed in objection. |
| 24. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Service Level Agreement Between Sears Holdings Corporation And Sho | 509456 | $00.00 | Not disputed in objection. |
| 25. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Shop Your Way Rewards Retail Establishment Agreement | N/A | $00.00 | Not disputed in objection. |

3

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 26. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 8 To Services Agreement | N/A | $00.00 | Not disputed in objection. |
| 27. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Services Agreement | | $00.00 | Not disputed in objection. |
| 28. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Services Agreement | | $00.00 | Not disputed in objection. |
| 29. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 2 To Services Agreement | | $00.00 | Not disputed in objection. |
| 30. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 3 To Services Agreement | | $00.00 | Not disputed in objection. |
| 31. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 4 To Services Agreement | | $00.00 | Not disputed in objection. |
| 32. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 5 To Services Agreement | | $00.00 | Not disputed in objection. |
| 33. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 6 To Services Agreement | | $00.00 | Not disputed in objection. |
| 34. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 7 To Services Agreement | | $00.00 | Not disputed in objection. |
| 35. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 9 To Services Agreement | | $00.00 | Not disputed in objection. |
| 36. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Employee Transition And Administrative Services Agreement | | $00.00 | Not disputed in objection. |
| 37. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Shop Your Way Rewards Retail Establishment Agreement | | $00.00 | Not disputed in objection. |

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 38. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment #2 To Shop Your Way Rewards Retail Establishment Agreement | | $00.00 | Not disputed in objection. |
| 39. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Separation Agreement | | $00.00 | Not disputed in objection. |
| 40. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Separation Agreement | | $00.00 | Not disputed in objection. |
| 41. | 1835 | Sears, Roebuck And Co. | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Trademark License Agreement | | $00.00 | Not disputed in objection. |
| 42. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Supplemental Agreement | | $00.00 | Not disputed in objection. |
| 43. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Supplemental Agreement | | $00.00 | Not disputed in objection. |
| 44. | 1835 | Sears Brands, L.L.C. | Sears Hometown And Outlet Stores, Inc. | License And Intellectual Property Management Agreement | N/A | $00.00 | Not disputed in objection. |
| 45. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Tax Sharing Agreement | N/A | $00.00 | Not disputed in objection. |
| 46. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | | N/A | $00.00 | Not disputed in objection. |
| 47. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Syw - Sears Hometown And Outlet Stores Inc - Retail Establishment Agreement - 2016 | Cw2323625 | $00.00 | Not disputed in objection. |
| 48. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Shop Your Way Rewards Retail Establishment Agreement & Amendment #2 | 396577 | $00.00 | Not disputed in objection. |
| 49. | 1835 | Sears, Roebuck And Co. | Sears Hometown And Outlet Stores, Inc. | Trademark License Agreement | 536493 | $00.00 | Not disputed in objection. |

WEIL:\96901112\3\73217.0004

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|-----|-----|--------|--------------|----------------|--------------|-------------|-----------------|
| 50. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Office Space Lease | 431288 | $00.00 | Not disputed in objection. |
| 51. | N/A | Sears Holdings Management Corporation | First Data Corporation- 1000623488 \ Telecheck Services Inc | Lp Ops - Telecheck Services Inc - Warranty Service Agreement - 2008 | Shclcw5528 | $ 277,962 | No Objection Filed. |
| 52. | 2024 | Kmart Corporation | Dfs Services Llc, Successor In Interest To Discover Card Services, Inc. | Notice Of Changes Of Fees Under Merchant Services Agreement Dates November 15, 1987 | N/A | N/A | Not disputed in objection. |
| 53. | 2024 | Kmart Corporation | Discover Financial Services | Letter Of Amendment Dated 9/8/04 To The November 15, 1987 Merchant Services | N/A | N/A | Not disputed in objection. |
| 54. | 2024 | Kmart Corporation | Discover Financial Services | Letter Of Amendment Dated 9/9/03 To The November 15, 1987 Merchant Services | N/A | N/A | Not disputed in objection. |
| 55. | 2024 | Kmart Corporation | Discover Financial Services, Inc. | Supplemental Agreement | N/A | N/A | Not disputed in objection. |
| 56. | 2072 | Sears Holdings Corporation | Stanley Black & Decker, Inc. | Acquired Ip License Agreement | N/A | $00.00 | Not disputed in objection. |
| 57. | 1835 | Sears, Roebuck And Co. | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Trademark License Agreement | 509438 | $00.00 | Not disputed in objection. |
| 58. | 1835 | Sears, Roebuck And Co. | Sears Hometown And Outlet Stores, Inc. | Amendment No. 3 To The Amended And Restated Merchandising Agreement | 537251 | $00.00 | Not disputed in objection. |
| 59. | 1992 | Sears Holdings Management Corporation | Oracle America, Inc. – 402651 | SYW – Oracle – OD for Email Marketing – 2018 | CW2339264 | $2,149,380.00 | Not disputed in objection. |
| 60. | 1992 | Sears Holdings Management Corporation | Oracle America, Inc. – 402651 | MKTG – Home Services – OracleMaxymiser – 2018 | CW2340060 | $00.00 | Not disputed in objection. |

6

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 61. | 1992 | Sears Holdings Management Corporation | Oracle America, Inc. – 402651 | SYW – Oracle – MSA – 2016 | CW2311500 | $00.00 | Not disputed in objection. |
| 62. | 1992 | Sears Holdings Management Corporation | Oracle America, Inc. – 402651 | HS-Oracle - OD for HS Email Services - 2018 | CW2339405 | $00.00 | Not disputed in objection. |
| 63. | 1992 | Sears Holdings Management Corporation | Oracle America, Inc. – 402651 | SYW – Oracle – OD - 2018 | CW2339388 | $00.00 | Not disputed in objection. |
| 64. | 1992 | Kmart Corporation; Sears, Roebuck and Co. | Oracle America, Inc | IT OPS – Oracle USA Inc – MSSA-2005 | SHCLCW1600 | $00.00 | Not disputed in objection. |
| 65. | 1992 | Sears Holdings Management Corporation | Oracle America, Inc | ITG – Oracle Amendment 2 to MSA-2005 | CW2309081 | $00.00 | Not disputed in objection. |
| 66. | 1992 | Sears Holdings Management Corporation | Oracle | IT – Oracle – Cloud Services Agreement – 20160531 | CW2318109 | $00.00 | Not disputed in objection. |
| 67. | 1992 | Sears Holdings Management Corporation | Oracle America, Inc. | Oracle Cloud Services Agreement US-CSA-OT600571 Effective 31-May-2016 | CW2340060 | $00.00 | Not disputed in objection. |
| 68. | 1992 | Sears Holdings Corporation | Oracle America | SYW-ORACLE-OD FOR DELIVERABILITY - 2018 | CW2335726 | $00.00 | Not disputed in objection. |
| 69. | 1992 | Sears Holdings Corporation | Oracle America | Oracle BI/Fusion 2018 Annual Maintenance | | $00.00 | Not disputed in objection. |
| 70. | 1992 | Sears Holdings Corporation | Oracle America | Oracle G-Log GC3 Bundle 2018 Annual Renewal | | $00.00 | Not disputed in objection. |
| 71. | 1992 | Sears Holdings Corporation | Oracle America | Oracle Weblogic OTM Renewal 2018 | | $00.00 | Not disputed in objection. |

WEIL:\96901112\3\73217.0004

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 72. | 1992 | Sears Holdings Corporation | Oracle America | Oracle Weblogic OTM 12K Renewal 2018 | | $00.00 | Not disputed in objection. |
| 73. | 1992 | Kmart Corporation; Sears, Roebuck and Co. | Rimini Street | IT-Rimini Street – Statement of Work 01 (Peoplesoft Support Services (2016) | CW2319307 | $00.00 | Not disputed in objection. |
| 74. | 1992 | Sears Holdings Management Corporation | Oracle America, Inc. – 402651 | SYW – Oracle – OD FOR DELIVERAB ILITY - 2018 | CW2335726 | $00.00 | Not disputed in objection. |
| 75. | 1995/ 2201 | Sears Holdings Management Corporation | Google Inc. | Online – Google – DFP Premium – 2018 | | $00.00 | $1,115,563.36[2] |
| 76. | 1995/ 2201 | Sears Holdings Management Corporation | Google Inc. | Home Service – Google – Suite360 – Order Form – 2018 | | $00.00 | See item 75. |
| 77. | 1995/ 2201 | Sears Holdings Management Corporation | Google Inc. | MKTG – Online – Google – ADSENSE – 2018 | | $00.00 | See item 75. |
| 78. | 1995/ 2201 | Sears Home & Business Franchise | Google Inc. | Google Advertising Service Agreement | | $00.00 | See item 75. |
| 79. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 9 To Services Agreement | 537250 | $00.00 | Not disputed in objection. |
| 80. | 1835 | Sears, Roebuck And Co. | Sears Hometown And Outlet Stores, Inc. | Amendment No. 2 To The Amended And Restated Merchandising Agreement | 534598 | $00.00 | Not disputed in objection. |
| 81. | 1835 | Sears, Roebuck And Co. | Sears Hometown And Outlet Stores, Inc. | Amendment To Amended And Restated Merchandising Agreement | 534596 | $00.00 | Not disputed in objection. |
| 82. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 8 To Services Agreement | 534593 | $00.00 | Not disputed in objection. |

---

[2]    Disputed amount represents disputed amount for all Google Inc. contracts.

8

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 83. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 7 To Services Agreement | 529128 | $00.00 | Not disputed in objection. |
| 84. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 5 To Services Agreement | 525479 | $00.00 | Not disputed in objection. |
| 85. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 6 To Services Agreement | 525037 | $00.00 | Not disputed in objection. |
| 86. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 3 To Services Agreement | 511414 | $00.00 | Not disputed in objection. |
| 87. | 1835 | Sears, Roebuck And Co. | Sears Hometown And Outlet Stores, Inc. | Amendment No. 4 To The Amended And Restated Merchandising Agreement | 509442 | $00.00 | Not disputed in objection. |
| 88. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 4 To Services Agreement | 509441 | $00.00 | Not disputed in objection. |
| 89. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 2 To Services Agreement | 459349 | $00.00 | Not disputed in objection. |
| 90. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Services Agreement | 444110 | $00.00 | Not disputed in objection. |
| 91. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Services Agreement | 396576 | $00.00 | Not disputed in objection. |
| 92. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment #2 To Shop Your Way Rewards Retail Establishment Agreement | 547382 | $00.00 | Not disputed in objection. |
| 93. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Shop Your Way Rewards Retail Establishment Agreement | 547382 | $00.00 | Not disputed in objection. |
| 94. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Supplemental Agreement | 509445 | $00.00 | Not disputed in objection. |

WEIL:\96901112\3\73217.0004

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 95. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Supplemental Agreement | 444115 | $00.00 | Not disputed in objection. |
| 96. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 1 To Separation Agreement | 444114 | $00.00 | Not disputed in objection. |
| 97. | 1835 | Sears Holdings Corporation | Sears Hometown And Outlet Stores, Inc. | Separation Agreement | 396575 | $00.00 | Not disputed in objection. |
| 98. | 1835 | Sears Holdings Management Corporation | Sears Hometown And Outlet Stores, Inc. | Amendment No. 8 To Services Agreement | (blank in notice) | $00.00 | Not disputed in objection. |
| 99. | N/A | Sears Brands Management Corporation | FLI Charge, Inc. | Patent License & Technology Agreement | N/A | $00.00 | No Objection Filed. |
| 100. | N/A | Kmart Corporation; Sears, Roebuck and Co. | ABG Sportcraft, L.L.C. | License Agreement, as amended through 4/5/2018 | | $00.00 | No Objection Filed. |
| 101. | 2000 | Sears Roebuck and Co. (as assignee from Kmart Corporation) | ICON DE Holdings (as successor to IP Holdings LLC) | License Agreement, as amended through 1/23/2018 | | $00.00 | $16,776.00 |
| 102. | 1981/ 2252 | Sears Holdings Management Corporation | Salesforce.com, Inc. | Invoice No. 1252781 | | $ 460,880 | $119,471.27[3] |
| 103. | 1981/ 2252 | Sears Holdings Management Corporation | Salesforce.com | Master Subscription Agreement | SHC-68113 | | See item 102. |
| 104. | 1981/ 2252 | Sears Holdings Management Corporation | Salesforce.com, Inc. | Invoice No. 1252781 | | | See item 102. |

---

[3]    Dispute amount represents disputed amount for all Salesforce.com and Salesforce.com, Inc. contracts.

10

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 105. | 1988 | Sears Holdings Management Corporation | Cisco Systems, Inc. | IT-Cisco Systems, Inc. – Master Procurement Agreement | SHCLCW52 | $ 424,905 | $94,255.56 (plus $94,703.02 after February 1, 2019) |
| 106. | 1988 | Sears Holdings Management Corporation | Cisco Systems, Inc. | Amendment 4 to MPA - 2018 | CW2338855 | $00.00 | See item 105. |
| 107. | 1842 | Sears Holdings Management Corporation | MICROSOFT CORP | Sub Agreement | CW2340816 | $00.00 | See item 109. |
| 108. | 1842 | Sears Holdings Management Corporation | MICROSOFT CORP | Sub Agreement | CW2340816 | $00.00 | See item 109. |
| 109. | 1842 | Sears, Roebucks and Co. | Microsoft Licensing GP -695814 | ITG- Microsoft Licensing GP Business Agreement | CS2212211 | $00.00 | $1581,584.41[4] |
| 110. | 1842 | Sears Holdings Management Corporation | Microsoft Corporation | IT MICROSOFT ENTERPRISE SERVICES WORK ORDER | CW2333269 | $00.00 | See item 109. |
| 111. | 1842 | Sears Holdings Management Corporation | Microsoft Corporation | IT MICROSOFT VOLUME LICENSING SIGNATURE FORM AND ORDER | CW2333336 | $00.00 | See item 109. |
| 112. | 1842 | Sears Holdings Management Corporation | Microsoft Corporation | IT - MICROSOFT - CW2320569 - ENTERPRISE SUBSCRIPTION ENROLLMENT (DIRECT) - 2011 | CW2320569 | $00.00 | See item 109. |
| 113. | 1842 | Sears Holdings Management Corporation | MICROSOFT ENTERPRISE SERVICES-569749 | IT - MICROSOFT - CW2320569 - ENTERPRISE SUBSCRIPTION ENROLLMENT (DIRECT) - 2011 | CW2320569 | $00.00 | See item 109. |
| 114. | 1842 | Sears Holdings Management Corporation | MICROSOFT ENTERPRISE SERVICES-569749 | IT MICROSOFT ENTERPRISE SERVICES WORK ORDER | CW2333269 | $00.00 | See item 109. |

---

[4]     Disputed amount represents disputed amount for all Microsoft contracts.

WEIL:\96901112\3\73217.0004

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 115. | 1852 | Sears Holdings Management Corporation | LinkedIn | THCS-LinkedIn Corporation-LinkedIn Corporation Subscription Agreement-2008 | SHCLCW3535 | $124,466.00 | $153,633.17[5] |
| 116. | 1852 | Sears Holdings Management Corporation | LinkedIn | LinkedIn 2018 Order Form to Corporate Subscription Agreement | CW2335071 | $00.00 | See item 115. |
| 117. | 1886 | Sears Holdings Management Corporation | Concur Technologies Inc-867262263 | SC – Concur Technologies – Master Software Agreement - 2009 | SHCLCW5873 | $92,474 | Not disputed in objection. |
| 118. | 1886 | Sears Holdings Management Corporation | Concur Technologies Inc-867262263 | FIN-CONCUR-SOW-2015 | CW2295022 | $00.00 | Not disputed in objection. |
| 119. | 1886 | Sears Holdings Management Corporation | Concur Technologies Inc-867262263 | FIN-CONCUR-SOF 9-OCTOBER 2017 | CW2332790 | $00.00 | Not disputed in objection. |
| 120. | 1886 | Sears Holdings Management Corporation | SAP America, Inc. | Support Selection Addendum (DIRECT) | | $00.00 | Not disputed in objection. |
| 121. | 1886 | Sears Holdings Management Corporation | SAP America, Inc. | Software End-User License Agreement | | $00.00 | Not disputed in objection. |
| 122. | 1842 | N/A | Microsoft Online, Inc. | Microsoft Bing Ads Agreement | | $00.00 | See item 109. |
| 123. | 1842 | Sears Holdings Management Corporation | MICROSOFT ENTERPRISE SERVICES-569749 | IT MICROSOFT VOLUME LICENSING SIGNATURE FORM AND ORDER | CW2333336 | $00.00 | See item 109. |
| 124. | 1821 | Sears Brands Management Corporation | Cleva North America, Inc. | License Agreement | N/A | $00.00 | Not disputed in objection with respect to this agreement. |

---

[5]     Disputed amount represents disputed amount for all LinkedIn contracts.

WEIL:\96901112\3\73217.0004

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 125. | N/A | Sears Brands Management Corporation | Drinkpod LLC | License Agreement | N/A | $1,675 | No Objection Filed. |
| 126. | N/A | Sears Brands Management Corporation | Permasteel, Inc. | License Agreement, as amended through August 28, 2017 | | | No Objection Filed. |
| 127. | N/A | Sears Brands Management Corporation | Gibson Overseas, Inc. | License Agreement | N/A | $7,889 | No Objection Filed. |
| 128. | N/A | Sears Brands Management Corporation | Algert Company | Distribution Agreement | | $00.00 | No Objection Filed. |
| 129. | N/A | Sears Brands Management Corporation | Globistic Co., Inc. | Distributorship Agreement | N/A | $00.00 | No Objection Filed. |
| 130. | N/A | Sears Brands Management Corporation | Homemart, S.A. | Retail Store License Agreement, as amended through [ ] | N/A | $00.00 | No Objection Filed. |
| 131. | N/A | Sears Brands Management Corporation | Distribuidora y Comercializadora Master Brands SpA – Chile | Distributorship Agreement | N/A | $00.00 | No Objection Filed. |
| 132. | N/A | Sears, Roebuck and Co. | Lands' End, Inc. and its Affiliates | Retail Operations Agreement | N/A | $00.00 | No Objection Filed. |
| 133. | N/A | Sears, Roebuck and Co.; Sears Brands Management Corporation | Sears, Roebuck de Mexico, S.A. de C.V. | Amended and Restated Trademark License Agreement, as Amended through Jan. 1, 2010 | N/A | $00.00 | No Objection Filed. |
| 134. | 1835 | Sears, Roebuck and Co. | Sears Authorized Hometown Stores, LLC and franchise sublicensees | Store License Agreement, as amended July 10, 2017 | | $00.00 | No Objection Filed. |
| 135. | 1835 | Sears Roebuck and Co. | Sears Outlet Stores, L.L.C. and its franchisees | Store License Agreement, as amended through May 1, 2016 | | $00.00 | No Objection Filed. |
| 136. | 2000 | Kmart Corporation | Icon NY Holdings LLC | License Agreement | N/A | $00.00 | $205,849.00 |

13

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 137. | 2009 | Kmart Corporation and its Affiliates | Adam Levine Productions, Inc. | Trademark License Agreement, as amended through 9/14/2018 | N/A | $180,854 | $210,037.09 (plus any additional post-petition quarterly payments due through the closing) |
| 138. | N/A | Kmart Corporation | Route 66 Holdings, LLC | Amended and Restated License Agreement as amended through 5/12/2010 | N/A | $00.00 | No Objection Filed. |
| 139. | 2000 | Kmart Corporation | Icon DE Holdings LLC (as successor to IP Holdings LLC) | License as amended through 8/1/2015 | N/A | $00.00 | $7,771,992.00 |
| 140. | N/A | Sears Brands Management Corporation | Ayla Networks | Master Subscription Agreement | CW2308670 | $00.00 | No Objection Filed. |
| 141. | N/A | Sears International Marketing, Inc. | Sears, Roebuck de Mexico, S.A. DE C.V. | Amendment to Merchandise Sale Agreement Dated April 17, 1997 | N/A | $00.00 | No Objection Filed. |
| 142. | N/A | Sears Roebuck and Co. | Sears Home Appliance Showrooms, LLC | Store License Agreement | 396580 | $00.00 | No Objection Filed. |
| 143. | N/A | Sears, Roebuck and Co. | Sears International Marketing, Inc. and Sears, Roebuck de Mexico, S.A. de C.V. | Amendment to Merchandise Service and Quality Control Agreement dated April 28, 1997 | N/A | $00.00 | No Objection Filed. |
| 144. | N/A | Sears, Roebuck and Co., Sears Brands Management Corporation; Sears | Roebuck de Mexico, S.A de C.V.; Sears International Marketing, Inc. | Second Amendment to Merchandise Service and Quality Control Agreement | N/A | $00.00 | No Objection Filed. |
| 145. | N/A | Sears, Roebuck and Co., Sears Brands Management Corporation; Sears, | Roebuck de Mexico, S.A de C.V.; Sears International Marketing, Inc. | Third Amendment to Merchandise Service and Quality Control Agreement | N/A | $00.00 | No Objection Filed. |

14

| No. | ECF No.[1] | Debtor | Counterparty | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|---|---|---|---|---|---|---|---|
| 146. | N/A | Sears, Roebuck and Co. | Sears International Marketing, Inc. and Sears, Roebuck de Mexico, S.A. de C.V. | Mexico Merchandise Service and Quality Control Agreement | N/A | $00.00 | No Objection Filed. |
| 147. | N/A | Sears Holdings Management Corporation | FIA Card Services NA | FIN- Bank of America N.A. – Statement of Work 1 to Card Service Agreement – 2011 | SHCLCW1617 | $00.00 | No Objection Filed. |
| 148. | N/A | Sears Holdings Management Corporation | FIA Card Services NA | FIN – Bank of America N.A. – Card Service Agreement - 2011 | SHCLCW1617 | $00.00 | No Objection Filed. |
| 149. | N/A | SEARS, ROEBUCK AND CO., AND SEARS BRANDS BUSINESS UNIT CORPORATION | CITIBANK, N.A. | AMENDED AND RESTATED MARKETING AGREEMENT | | $00.00 | No Objection Filed. |
| 150. | N/A | SEARS, ROEBUCK AND CO. | CITIBANK, N.A. | AMENDED AND RESTATED NEW MERCHANT AGREEMENT | | $00.00 | No Objection Filed. |
| 151. | N/A | SEARS BRANDS BUSINESS UNIT CORP; SEARS REOBUCK AND CO. | CITIBANK, N.A. | SECOND AMENDED AND RESTATED PROGRAM AGREEMENT[6] | | $00.00 | No Objection Filed. |

---

[6] For the avoidance of doubt, the reference to the Second Amended and Restated Program Agreement includes all Integrated Agreements (as such term is defined therein).

15

**Schedule 2 – Leases**

|      | ECF No. | Counterparty | Debtor | Contract Title | Contract No. | Cure Amount | Disputed Amount |
|------|---------|--------------|--------|----------------|--------------|-------------|-----------------|
| 152. | N/A     | SRC Facilities LLC | Kmart Corporation; Sears, Roebuck and Co. | Amended and Restated Master Lease Agreement | N/A | $00.00 | TBD[7] |
| 153. | N/A     | SRC O.P LLC  | Kmart Corporation; Sears, Roebuck and Co | Amended and Restated Master Lease Agreement | N/A | $00.00 | TBD[8] |

[7]     Sparrow entities reserve rights with respect to payment of post-petition rent under MLA with respect to dark stores.
[8]     Sparrow entities reserve rights with respect to payment of post-petition rent under MLA with respect to dark stores.

**<u>Exhibit B</u>**

**Redline to Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                       :           **Chapter 11**
                                            :
**SEARS HOLDINGS CORPORATION**, *et al.*,   :           **Case No. 18-23538 (RDD)**
                                            :
                                            :
          **Debtors.**[1]                   :           **(Jointly Administered)**
-------------------------------------------------------------x

## ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS AND BUYER, (II) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND LEASES IN CONNECTION THEREWITH AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated November 1, 2018 (Docket No. 429) (the "Sale Motion"),[2] filed

by the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, the entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2]  Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Motion.

United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 6004-1, 6005-1 and 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), authorizing and approving the sale of the Acquired Assets and the assumption and assignment of certain executory contracts and unexpired leases of the Debtors in connection therewith; and the Court having entered this Court's prior order, dated November 19, 2018 (Docket No. 816) including the schedule as revised by the *Global Bidding Procedures Process Letter* filed with the Bankruptcy Court on November 21, 2018 (Docket No. 862) (together, the "Bidding Procedures Order"), approving competitive bidding procedures for the Acquired Assets (the "Bidding Procedures") and granting certain related relief; and Transform Holdco LLC (the "Buyer") having submitted the highest or otherwise best bid for the Acquired Assets, as reflected in the Asset Purchase Agreement (as defined below); and the Court having conducted a hearing on the Sale Motion (the "Sale Hearing") commenced on February 4, 2019, at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of January 17, 2019 (as may be amended, restated, amended and restated from time to time, the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit A, by and between Sellers and the Buyer, whereby the Sellers have agreed, subject to Court approval, among other things, to sell the Acquired Assets to the Buyer, including, without limitation, (x) the Assigned Agreements (including any Additional Contracts) that will be assumed and assigned to Buyer or designated, as applicable, each on the terms and conditions set forth in the Asset Purchase Agreement and (y) designation rights ("Designation Rights") for

2

certain Designatable Leases (the sale of such Acquired Assets, collectively, the "Sale Transaction"), (iii) the Bidding Procedures Order and the record of the hearing before the Court on November 15, 2018 at which the Bidding Procedures Order was approved, (iv) the ability of the Buyer to submit its Credit Bid pursuant to Asset Purchase Agreement section 3.1(b) (the "Credit Bid"), and the record of the hearing before the Court commenced on February 4, 2019, at which the Court authorized the Buyer's Credit Bid (as approved pursuant to this Sale Order), and (v) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale Motion, the Asset Purchase Agreement, the Bidding Procedures Order, and the form of this order (the "Sale Order") having been provided in accordance with the Bidding Procedures Order and the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (Docket No. 405) (the "Amended Case Management Order"); and, except as otherwise provided for herein, all objections to the Sale Motion having been withdrawn, resolved, or overruled as provided in this Sale Order; and it appearing that the relief ~~requested in the Sale Motion~~granted herein is in the best interests of the Debtors, their estates and creditors and all parties in interest in these chapter 11 cases; and upon the record of the Sale Hearing and these chapter 11 cases; and after due deliberation; and good cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.    **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The

3

Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing. This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

B.     **Jurisdiction and Venue**. This Court has jurisdiction over the Sale Motion, the Sale Transaction and the property of the Debtors' estates, including the Acquired Assets, pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.). This matter is a core proceeding pursuant to 28 U.S.C. § 157. Venue of these chapter 11 cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.     **Statutory and Rule Predicates**. The statutory and other legal predicates for the relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Local Rules 6004-1, 6005-1 and 6006-1, and the Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order Number 383 in the United States Bankruptcy Court for the Southern District of New York.

D.     **Final Order**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement. In the absence of a stay pending appeal, Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset Purchase Agreement at any time after entry of this Sale Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

WEIL:\96902433\2\73217.0004

E.    **Notice and Opportunity to Object**.  Actual written notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Sale Motion, the Sale Transaction, the sale of the Acquired Assets that are owned by the Debtors free and clear of any Claims (as defined below), the assumption and assignment of the Assigned Agreements, the Auction, the Bidding Procedures, and the relief requested in the Sale Motion has been given, as required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Amended Case Management Order, and the Bidding Procedures Order.

F.    **Title to the Acquired Assets**.  The Acquired Assets that are owned by the Debtors constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of such Acquired Assets that are owned by the Debtors with all right, title and interest to transfer and convey the Acquired Assets to the Buyer, and no other person has any ownership right, title, or interests therein.

G.    **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Sale Motion, the Sale Transaction, the Asset Purchase Agreement, and all related agreements (the "Related Agreements").  The Debtors' entry into and performance under the Asset Purchase Agreement and Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their estates, creditors and other parties in interest; and (iii) are reasonable and appropriate under the circumstances.  The Debtors have demonstrated compelling circumstances for the Sale Transaction outside: (i) the ordinary course of business pursuant to

5

section 363(b) of the Bankruptcy Code; and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the value of the Debtors' estates.  Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Price set forth in the Asset Purchase Agreement constitutes the highest or otherwise best offer received for the Acquired Assets; (ii) the Asset Purchase Agreement and the transactions contemplated thereby present the best opportunity to maximize the value of the Acquired Assets, whether on a going concern basis or otherwise, and avoid decline and devaluation of the Acquired Assets that would occur in an immediate liquidation of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase Agreement, recoveries to creditors will be diminished; and (iv) the value of the Debtors' estates will be maximized through the sale of the Acquired Assets pursuant to the Asset Purchase Agreement.

H.    **Compliance with Bidding Procedures**.    The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders, and were the result of arms'-length negotiations.  Further, the Bidding Procedures afforded notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Acquired Assets.  The Debtors, ESL, the Buyer and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects.  The Buyer subjected its bid to the competitive Bidding Procedures approved by this Court and the Buyer was found eligible to participate in the Auction and was the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance with the Bidding Procedures Order and Bidding Procedures.

WEIL:\96902433\2\73217.0004

I.      **Sale Process**.  (i) The Debtors and their advisors, including Lazard Frères & Co. LLC, engaged in a robust and extensive marketing and sale process through the postpetition sale process pursuant to the Bidding Procedures Order and the Bidding Procedures; (ii) the Debtors and their advisors conducted a fair and open sale process; (iii) the sale process, the Bidding Procedures and the Auction were non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets; and (iv) the process conducted by the Debtors pursuant to the Bidding Procedures obtained the highest or otherwise best value for the Acquired Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result.

J.      **Fair Consideration; Highest or Best Value**.  The consideration to be paid by the Buyer under the Asset Purchase Agreement, including, without limitation, the Credit Bid Amount (as hereinafter defined) and the Credit Bid Release Consideration: (i) constitutes fair and reasonable consideration for the Acquired Assets; (ii) is the highest or best offer for the Acquired Assets; (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practically available alternative; (iv) constitutes fair and reasonably equivalent value and full and adequate consideration, under the Bankruptcy Code and the Uniform Fraudulent Transfer Act; (v) constitutes fair consideration under the Uniform Fraudulent Conveyance Act; and (vi) constitutes reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.  Such consideration constitutes the highest or best bid for the Acquired Assets.  Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets is fair and reasonable.  Pursuant to Section 3.1(c) of the Asset Purchase

Agreement, the Purchase Price may include cash in the amount of the outstanding obligations owed to lenders other than Buyer or its Affiliates as of the Closing Date under: (A) the IP/Ground Lease Term Loan Facility (the "IP/Ground Lease Buyout Amount"); (B) the FILO Facility (the "FILO Facility Buyout Amount"); and (C) the Real Estate Loan 2020 (the "Real Estate Loan 2020 Buyout Amount", together with the IP/Ground Lease Buyout Amount and the FILO Facility Buyout Amount, the "Buyout Amounts") unless such lender(s) provide written confirmation to the Sellers that such cash payment and the obligations owed to lenders by the Sellers under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, are permanently waived and discharged against the Sellers. Pursuant to Section 3.1 of the Asset Purchase Agreement, to the extent payable, each Buyout Amount, if applicable, shall be deposited and held in separate segregated accounts of the Debtors and the Liens of the lenders other than Buyer or its affiliates under the IP/Ground Lease Term Loan Facility, the FILO Facility or the Real Estate Loan 2020, as applicable, shall attach to the cash proceeds held in the applicable designated segregated account in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two (2) business days following the Closing Date and shall not otherwise be used by the Debtors without further order of the Bankruptcy Court (the mechanic referred to in this sentence and the preceding sentence shall be referred to herein as the "Buyout Option"). Such Purchase Price, including the Credit Bid Amount, the Credit Bid Release Consideration, the Buyout Option, and other good and valuable consideration provided in connection with the Sale Transaction, constitutes the highest or best bid for the Acquired Assets. Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Acquired Assets is fair and reasonable.

WEIL:\96902433\2\73217.0004

K.    **ESL Secured Claims**.    In accordance with the Asset Purchase Agreement, effective upon the Closing Date ESL's Claims (as defined below) against the Debtors arising under the: (i) IP/Ground Lease Term Loan Facility; (ii) FILO Facility; (iii) Real Estate Loan 2020; (iv) Second Lien Term Loan; (v) Second Lien Line of Credit Facility; (vi) Second Lien PIK Notes; and (vii) Citi L/C Facility (together with the security interests securing any of the Claims of ESL described in the preceding sub-clauses (i)-(vii), collectively, the "ESL Claims"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code in the amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the Credit Bid set forth in Section 3.1(b) of the Asset Purchase Agreement.  Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, ESL or, to the extent any of the ESL Claims are assigned to Buyer prior to the Closing Date, Buyer, is hereby authorized to credit bid (or cause to be credit bid) the ESL Claims and to use such ESL Claims as a portion of the Purchase Price (the "ESL Credit Bid Amount") as set forth in Section 3.1(b) of the Asset Purchase Agreement (subject, in the case of the security interest securing the Claims described in subclauses (iv), (v) and (vi) of this Paragraph K, anything in this Order to the contrary notwithstanding, to delivery of the written consent of the Collateral Agent for such security interest).  In addition, the transfer of Acquired Assets constituting "Collateral" under that certain Amended and Restated Security Agreement by and among SHC and Wilmington Trust, National Association in its capacity as Collateral Agent (the "Second Lien Collateral Agent") dated as of March 20, 2018 (as may be amended, restated, amended and restated or otherwise modified in accordance with its terms from time to time) (the "Second Lien Security Agreement") has been consented to, or will be, directed by ESL as the "Required Secured Parties" under the Second Lien Security Agreement pursuant to one or more direction letters delivered to the Second Lien

WEIL:\96902433\2\73217.0004

Collateral Agent (the "Second Lien Consent"). The Second Lien Consent binds all parties holding debt under the Second Lien Term Loan, Second Lien Line of Credit Facility and Second Lien PIK Notes in their capacity as such (collectively, the "Senior Second Lien Creditors", and their claims against the Debtors under such debt document, the "Senior Second Lien Claims"). The Senior Second Lien Claims shall be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid. Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, the Second Lien Collateral Agent is hereby authorized to credit bid the Senior Second Lien Claims as a portion of the Purchase Price (the "2L Credit Bid Amount", together with the ESL Credit Bid Amount (without duplication), the "Credit Bid Amount"). At the Auction, pursuant to the Asset Purchase Agreement, the Buyer agreed to pay the Purchase Price, which includes the Credit Bid Amount ~~transferred to the Buyer at or prior to the Closing Date~~.

L. **Cyrus Claims**. Effective upon the Closing Date, Cyrus' Claims (as defined below) arising under: (g) the Final Junior DIP Order[3] (the "Junior DIP Secured Obligations"[4]); (h) the Citi L/C Facility; (i) the Second Lien PIK Notes[5] (the "Cyrus Second Lien Notes Claims"); and (j) the IP/Ground Lease Term Loan Facility (the "Cyrus IP/GL Claims") together with the security interests securing any of the Claims described in the preceding sub-clauses (g)-

---

[3]   The "Final Junior DIP Order" shall mean the *Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (Docket No. 1436).

[4]   The "Junior DIP Secured Obligations" shall have the meaning ascribed to it in the Final Junior DIP Order.

[5]   As such term is defined in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York* (Docket No. 3).

WEIL:\96902433\2\73217.0004

(j), collectively the "Cyrus Claims"), shall each be deemed allowed for all purposes in these chapter 11 cases and under the Bankruptcy Code, as reduced by any amounts included in the Credit Bid.

M.    **No Successor or Other Derivative Liability**.    The sale and transfer of the Acquired Assets of the Debtors to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of the Assigned Agreements, will not subject the Buyer or ESL to any liability (including any successor liability) under any laws, including any bulk-transfer laws, or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories, with respect to the operation of the Debtors' business prior to the Closing, and for each Assigned Agreement, the applicable Assumption Effective Date, except that, upon the Closing or such other date as specified in the Asset Purchase Agreement, the Buyer shall become liable for the applicable Assumed Liabilities.    The Buyer: (i) is not, and shall not be considered or deemed a mere continuation of, or successor to, the Debtors in any respect; (ii) has not, *de facto* or otherwise, merged with or into the Debtors; and (iii) is not a continuation or substantial continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors and there is no continuity of enterprise between the Debtors and the Buyer.    Accordingly, the Buyer is not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement, and except with respect to any Assumed Liabilities or as otherwise set forth in the Asset Purchase Agreement, Buyer's acquisition of the Acquired Assets from the Debtors shall be free and clear of any "successor liability" claims of any nature whatsoever.    Buyer would not purchase the Acquired Assets but

11

for the protections against any claims based upon "successor liability" theories as specified herein.

N.    **Transition Services Agreement**.  The Transition Services Agreement (as defined below), as contemplated by the Asset Purchase Agreement will be filed in accordance with paragraph 26 below.

O.    **Good Faith; No Collusion**.  The Asset Purchase Agreement and each of the Transactions were negotiated, proposed, and entered into by the Debtors, their management, their boards of directors or equivalent governing bodies, and representatives and the Buyer and its management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers and representatives, including ESL, in good faith, without collusion or fraud, and from arms'-length bargaining positions.  The Buyer is a "good faith purchaser" and the Buyer, and ESL are acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to all the protections afforded thereby.   In the absence of any Person obtaining a stay pending appeal, effective upon the Closing, it shall be deemed that neither the Debtors, ESL, nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  The Buyer and ESL have proceeded in good faith in all respects in that, among other things: (i) the Buyer, and ESL have recognized that the Debtors were free to deal with any other party in interest in acquiring the Acquired Assets; (ii) the Buyer, and ESL have complied with the applicable provisions of the Bidding Procedures Order; (iii) the Buyer's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Buyer and all other material agreements or arrangements entered into by the Buyer, ESL and the Debtors in connection with

WEIL:\96902433\2\73217.0004

the Sale Transaction have been disclosed and are appropriate. The sale price in respect of the Acquired Assets was not controlled by any agreement among potential bidders and neither the Debtors, ESL nor the Buyer have engaged in collusion, fraud, or any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or that would prevent the application of section 363(m) of the Bankruptcy Code.  Accordingly, neither the Asset Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code.  Specifically, neither ESL nor the Buyer has acted in a collusive manner with any Person or entity.

P.    **Notice**.  As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate, and sufficient notice of the Sale Motion, the Bidding Procedures (including the bidding process and the deadline for submitting bids and the Auction), the Sale Hearing, the Sale Transaction, the proposed Sale Order attached to the Asset Purchase Agreement, and the other relief requested in the Sale Motion was provided by the Debtors; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Bidding Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, the proposed Sale Order, or any of the relief requested in the Sale Motion, except as otherwise provided paragraphs 34 and 38 of this Sale Order, is required.  With respect to Persons whose identities are not reasonably ascertained by the Debtors, in accordance with the Bidding Procedures Order, a notice containing the results of the Auction was published on the Prime Clerk website on January 18, 2019 (Docket No. 1730).

WEIL:\96902433\2\73217.0004

Q.   **Cure Notice**.  As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Sale Hearing, the Assumption and Assignment Notice (as defined in the Bidding Procedures Order) on each counterparty to a Potential Transferred Agreement, dated January 18, 2019, January 23, 2019, and January 31, 2019, which provided the Debtors' intent to assume and assign such Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an executory contract or lease) and notice of the related proposed Cure Costs upon each non-debtor counterparty to such Potential Transferred Agreements.  The service of the Assumption and Assignment Notice was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Assigned Agreements, including without limitation the Designatable Leases and any Additional Contracts that were listed as Potential Transferred Agreements; provided, however, that further notice is required as provided for in paragraphs 34 and 38 herein.  *See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (Docket No. 1731); *see also Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (Docket No. 1774); *see also Affidavits of Service* (Docket Nos. 1969, 2132, 2162); *see also Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; see also Affidavit of Service* (Docket No. 2314); *see also Affidavit of Service* (Docket No. ~~[   ]~~2417) .  All non-debtor parties to the Potential Transferred Agreements (to the extent the Potential Transferred Agreement is an executory contract or lease and was listed on the *Notice of Cure Costs and Potential Assumption*

WEIL:\96902433\2\73217.0004

*and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* or *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction*) have had a reasonable opportunity to object both to the Cure Costs listed on the applicable Assumption and Assignment Notice and, for Assigned Agreements other than Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts), to the assumption and assignment of the Assigned Agreements to the Buyer in accordance with the Bidding Procedures Order. ~~No defaults exist in the Debtors' performance under the Assigned Agreements as of the date of this Sale Order other than the failure to pay the Cure Costs or such defaults that are not required to be cured.~~

R.    **Satisfaction of Section 363(f) Standards**. <u>Except as expressly provided for in this Sale Order,</u> ~~T~~the Debtors may sell the Acquired Assets that are owned by the Debtors free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal, rights of offset or recoupment, royalties, conditional sales or title retention agreements, hypothecations, preferences, debts, easements, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity or exoneration, encumbrances and other interests of any kind or nature whatsoever against any of the Debtors or the Acquired Assets owned by them, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights,

15

contractual commitments, restrictions, product liability claims, environmental liabilities, employment or labor law claims or liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against any of the Debtors, any claims under, or trusts or liens created by, PACA,[6] and any derivative, vicarious, transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material statutory or  non-statutory, legal or equitable, and whether imposed by agreement, understanding, law, equity or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Acquired Assets, the operation of any of the Debtors' businesses before the effective time of the Closing and for each Assigned Agreement (subject to the payment of Cure Costs as required under section 365(b) of the Bankruptcy Code), the applicable Assumption Effective Date, pursuant to the Asset Purchase Agreement, or the transfer of any of the Debtors' interests in the Acquired Assets to the Buyer, and all Excluded Liabilities; (collectively, excluding any Assumed Liabilities, the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5)

---

[6]    "PACA" means The Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§499a, et seq.) or the Packers and Stockyards Act (7 U.S.C. §§181 et seq.) or any similar state laws.

WEIL:\96902433\2\73217.0004

of the Bankruptcy Code have been satisfied; provided, however, that, nothing herein shall be deemed, or construed as, a ruling or determination by this Court that the Assumed Liabilities encumber the Acquired Assets. Without limiting the generality of the foregoing, "Claims" shall include any and all liabilities or obligations whatsoever arising under or out of, in connection with, or in any way relating to: (1) any of the employee benefit plans, including any Claims related to unpaid contributions or current or potential withdrawal or termination liability; (2) any of the Debtors' collective bargaining agreements; (3) the Worker Adjustment and Retraining Notification Act of 1988; and (4) any of the Debtors' current and former employees. Those holders of Claims who did not timely object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Acquired Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Acquired Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors. All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against the Buyer or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.

WEIL:\96902433\2\73217.0004

S.      The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Acquired Assets that are owned by the Debtors was not free and clear of all Claims, if the Buyer would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities related to the Business that will not be assumed by the Buyer, as described in the Asset Purchase Agreement, or if the Credit Bid Release or the Credit Bid were not components of the Sale Transaction.  A sale of the Acquired Assets owned by the Debtors other than one free and clear of all Claims would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

T.      The total consideration to be provided under the Asset Purchase Agreement reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Acquired Assets owned by the Debtors free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

U.      As of the Closing, the transfer of the Acquired Assets of the Debtors to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the Buyer with all rights, title and interest of the Debtors in, and to, the Acquired Assets, free and clear of all Claims.

V.      **Assumption and Assignment of Assigned Agreements**.  The assumption and assignment of the Assigned Agreements are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Assigned Agreements (i) is necessary to sell the Acquired Assets to the Buyer, (ii) allows the

WEIL:\96902433\2\73217.0004

Debtors to sell their business to the Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assigned Agreements, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Agreements.

W.    **Validity of the Transfer**.  As of the Closing, the transfer of the Acquired Assets to the Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims against the Debtors.  The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

X.    **Corporate Power and Authority.**  The Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate or other action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) upon entry of this Sale Order, other than as set forth in the Asset Purchase Agreement (including, without limitation, with respect to antitrust matters), need no consent or approval from any other person to consummate the Sale Transaction.

Y.    **Valid and Binding Contract.**  The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its

WEIL:\96902433\2\73217.0004

terms.  The Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia.  None of the Debtors nor the Buyer is, or will be, entering into the Asset Purchase Agreement and transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose.  The Asset Purchase Agreement and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

Z.    The Sale Transaction does not constitute a *de facto* plan of reorganization or liquidation as it does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors; (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests or extend debt maturities. Entry into the Asset Purchase Agreement and the Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan for the Debtors.  Entry into the Asset Purchase Agreement does not constitute a *sub rosa* chapter 11 plan.

WEIL:\96902433\2\73217.0004

AA.    **Valid and Binding Release**.  The proposed compromise and resolution embodied in the Credit Bid Release (as defined below and as reflected in Section 9.13 of the Asset Purchase Agreement) is reasonable and appropriate and a valid exercise of the Debtors' business judgment, and the consideration provided for in the Asset Purchase Agreement, including the Credit Bid Release Consideration and other good and valuable consideration provided to the Debtors and their Estates in connection with the Sale Transaction, constitutes fair and appropriate consideration for the Credit Bid Release.  The Credit Bid Release is required by the Buyer in order to enter into and perform in accordance with the Sale Transaction and providing such release is in the best interests of the Debtors, their estates, creditors and other parties in interest.  The Claims and causes of action released through the Credit Bid Release are complex and in the absence of the release would involve extended and expensive litigation, the outcome of which would be uncertain.

BB.    **Debtor Authorization of Non-Debtor Subsidiary Action or Inaction**.  The proposed Sale Transaction requires certain of the Debtors to take certain actions with respect to Sears Re, KCD IP, LLC, and the other Foreign Subsidiaries.  As further described in the Asset Purchase Agreement, the Sale Transaction contemplates the purchase of the KCD Notes effective upon receipt of the consent of the Bermuda Monetary Authority or any other applicable Bermuda regulatory authority, to authorize the Sears Re sale of the KCD Notes to Buyer (the "KCD Notes Purchase").  The Asset Purchase Agreement includes other conditions with respect to the KCD Notes that have been satisfied.  First, Sears Re has agreed to be bound by the terms of the Asset Purchase Agreement prior to the deadline described therein.  Additionally, as further described in Section 9.14 of the Asset Purchase Agreement, and to the extent provided for in and in accordance with the Asset Purchase Agreement, the Sale Transaction contemplates certain

WEIL:\96902433\2\73217.0004

restrictions upon Sellers' and their Affiliates' (including KCD IP, LLC's) ability to sell, transfer, assign, encumber, license, sublicense or otherwise grant certain rights or take or fail to take certain actions related to the KCD IP or to amend, terminate, renew, or fail to take certain actions with respect to, certain Contracts related to the KCD IP (the "KCD IP Restrictions"). In accordance with Section 9.14 of the Asset Purchase Agreement, Sellers caused KCD IP, LLC to agree to grant, effective as of the Closing, the Exclusive License (the "KCD Exclusive License Right"). The terms of the KCD Exclusive License Right shall be set forth in an exclusive license agreement, which agreement shall be executed contemporaneous with the Closing. Prior to such time that the BMA Consent is obtained and pursuant to the PA Liabilities Services Agreement, the Buyer shall provide services to the Sellers sufficient to perform the PA liability in exchange for which the Sellers shall pay certain consideration to the Buyer (the "KCD Servicing Right").

Pursuant to Section 9.14 of the Asset Purchase Agreement, the Debtors have agreed to certain restrictions on Sellers' and their Affiliates ability to sell, assign, or transfer in any way any equity interests in KCD IP, LLC without requiring a condition that the purchaser in such sale, assignment or transfer agrees to the limitations set forth in Section 9.14 therein (the "KCD Equity Transfer Restriction Right" and together with the KCD IP Restrictions, and the KCD Exclusive License Right, the "KCD IP Related Rights"). The Sellers' obligation to transfer the KCD Notes and the Buyer's obligation to assume the PA liabilities is dependent upon obtaining the BMA Consent. Furthermore, the Sellers have agreed to use reasonable best efforts to cause each of the Foreign Subsidiaries to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered to the Buyer or the applicable Assignee, all right, title and interest of each of the Foreign Subsidiaries in, to or under the Acquired Foreign Assets (the "Foreign Assets Rights"). Each of the KCD Notes Purchase, the

WEIL:\96902433\273217.0004

KCD IP Related Rights and the Foreign Assets Rights are required by Buyer and are reasonable and appropriate exercises of the Debtors' business judgment and the consideration provided by the Buyer (including the assumption of the Assumed Liabilities) constitutes fair and appropriate consideration to the Debtors and the non-Debtor Sellers.

CC.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Buyer intend to close the Sale Transaction as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement.  Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to ~~the transactions contemplated by~~ this Sale Order, except with respect to adjourned matters.

DD.    **Personally Identifiable Information**.    As contemplated in the Bidding Procedures Order, and subject to the terms of this Sale Order, the sale to the Buyer under the Asset Purchase Agreement of any personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) and private health information about individuals is either consistent with the privacy policy of the Debtors in effect on the date of commencement of these chapter 11 cases or consistent with the recommendations of the consumer privacy ombudsman appointed in these chapter 11 cases and satisfies the requirements of section 363(b)(1)(A).

EE.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

WEIL:\96902433\2\73217.0004

FF.    **Necessity of Order.**  The Buyer would not consummate the transactions absent the relief provided for in this Sale Order.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    **Motion is Granted**.  The Sale Motion and the relief requested therein to the extent not previously granted by this Court pursuant to the Bidding Procedures Order is granted and approved ~~as~~solely to the extent set forth herein.

2.    **Findings of Fact and Conclusions**.  The Court's findings of fact and conclusions of law in the Bidding Procedures Order and the record of the hearing with respect to the Bidding Procedures Order are incorporated herein by reference.

3.    **Objections Overruled**.  All objections, to the Sale Motion or the relief requested therein, and any joinders thereto, that have not been withdrawn with prejudice, waived, settled, or otherwise resolved as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice; provided that the objections filed to the proposed Cure Costs for the Contracts and Leases on the Initial Assigned Agreements list attached hereto as Exhibit B are preserved and will be treated in accordance with paragraph ~~30~~ 29 of this Sale Order; provided further that: (i) all timely filed objections to the assumption and assignment of a Contract or Lease that ~~has not yet been designated~~is not an Initial Assigned Agreement, including, without limitation, as to adequate assurance ~~or to the proposed cure costs~~of future performance and to the payment of all amounts due and owing and performance of all other obligations under a Contract or Lease, but not as to any other objections to approval of the Sale Transaction ~~raised in such~~itself pursuant to ~~obj~~section~~s~~ 363 of the Bankruptcy Code, are adjourned and all parties' rights as to such issues are fully preserved and will be determined if and to the extent the applicable Contract or Lease is

24

designated for assumption and assignment pursuant to the procedures described in this Sale Order.; (ii) no finding of fact or conclusion of law set forth herein with respect to the assumption and assignment of the Initial Assigned Agreements shall apply, be binding upon, be law of the case, or operate to collaterally estop any issue, with respect to the assumption and assignment of any other Contract or Lease other than as provided in the last sentence of this paragraph; (iii) no Contract or Lease with a Debtor other than the Initial Assigned Agreements as set forth in Exhibit B shall be part of the Acquired Assets unless and until assumption and assignment of such Contract or Lease is approved in accordance with the procedures in this Sale Order; (iv) notwithstanding anything to the contrary herein (other than the last sentence of paragraph 3 hereof), including, without limitation, paragraphs M, R, 27, and 28, nothing in this Sale Order shall be a determination of the terms and conditions of the assumption and assignment of any Contract or Lease not on Exhibit B, including, without limitation, the Assignee's obligations in connection with the same other than as provided in the last sentence of this paragraph; and (v) notwithstanding anything herein (other than the last sentence of paragraph 3 hereof) or in the Asset Purchase Agreement or any related document to the contrary, all parties' rights are fully reserved with respect to (x) all issues relating to the Buyer's obligation to comply with all terms, conditions, covenants and obligations, whether related to the pre- or post-assignment period and (y) the issues set forth in clauses (a) and (b) of paragraph 59 of this Order (the "Reserved Lease Issues"). All holders of Claims or other persons and entities (including any counterparties to Initial Assigned Agreements identified on Exhibit B hereto) that failed to timely object, or withdrew their objections to the Sale Motion, the Sale Transaction, or this Sale Order are deemed to consent to the relief granted herein for all purposes, including pursuant to section 363(f)(2) of the Bankruptcy Code, except to the extent that the procedures described herein

WEIL:\96902433\2\73217.0004

provide otherwise.  Each holder of any Claim against the Debtors, their estates, or any of the Acquired Assets: (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction; (ii) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such Claim; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Notwithstanding anything to the contrary in this Sale Order, any determination made by the Court in response to arguments made, including examination of witnesses by objecting parties at the Sale Hearing shall be binding as to such objecting parties.

4.      **Notice**.          Notice of the Sale Motion and the Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the Amended Case Management Order, and the Bidding Procedures Order.

5.      **Fair Purchase Price**.  The consideration provided by the Buyer under the Asset Purchase Agreement, including the portion of the Purchase Price that is the Credit Bid Amount, the Credit Bid Release Consideration, and the Buyout Option is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.  The Credit Bid constitutes a valid, duly authorized credit bid and is proper under the Bidding Procedures Order, sections 363(b) and 363(k) of the Bankruptcy Code, the applicable Prepetition Loan Documents (as defined in the Final DIP Order) and applicable law.  The consideration given by the Buyer shall constitute valid and valuable consideration for the Credit Bid Release.

WEIL:\96902433\2\73217.0004

6. **Approval of the Asset Purchase Agreement**. ~~The~~Except as expressly provided herein with respect to the assumption and assignment of contracts and leases (other than Initial Assigned Agreements), the Asset Purchase Agreement, all ancillary documents filed therewith or described therein, the Credit Bid and all other transactions contemplated therein (including, but not limited to, all ancillary agreements contemplated thereby) and all of the terms and conditions thereof, including, without limitation, the Credit Bid pursuant to section 363(k) of the Bankruptcy Code of the Credit Bid Amount as described in the Asset Purchase Agreement, are hereby approved. The failure specifically to include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement (including, but not limited to, all ancillary agreements and Related Agreements contemplated thereby) be authorized and approved in its entirety.

7. **Approval of the Credit Bid Release**. As set forth in Section 9.13 of the Asset Purchase Agreement:

(a) Effective upon the Closing, in consideration for the payment by Buyer of the Credit Bid Release Consideration, and other good and valuable consideration provided to the Debtors and their estates by ESL in connection with the Transactions, each Debtor, for itself and its estate, and on behalf of each of its Subsidiaries and controlled Affiliates (each of the foregoing, a "Seller Releasing Party"), hereby absolutely, unconditionally and irrevocably: (i) releases and forever discharges ESL from any and all Released Estate Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge,

27

dispute or collaterally attack the ESL Claims; provided, however, that the assertion of any Claim other than a Released Estate Claim shall not be deemed to violate Section 9.13(a)(ii) of the Asset Purchase Agreement.

(b)    Effective upon the Closing, the ESL Claims against the Debtors shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G to the Asset Purchase Agreement, as reduced by the credit bid set forth in Section 3.1(b) of the Asset Purchase Agreement.

(c)    After giving effect to the credit bid set forth in Section 3.1(b) of the Asset Purchase Agreement, ESL shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and their estates in the Chapter 11 Cases, provided that: (i) no Claims or causes of action of ESL shall have recourse to, or any other right of recovery from, any Claims or causes of action of the Debtors or their estates related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), any Claim or cause of action involving any intentional misconduct by ESL, or the proceeds of any of the foregoing; (ii) any ESL Claims arising under Section 507(b) of the Bankruptcy Code shall be entitled to distributions of not more than $50 million from the proceeds of any Claims or causes of action of the Debtors or their estates other than the Claims and causes of action described in the preceding clause (c)(i); provided that, in the event that, in the absence of this clause (c)(ii), any such proceeds to the Debtors or their estates would have resulted in distributions in respect of such

WEIL:\96902433\2\73217.0004

ESL Claims in excess of $50 million, the right, on account of the ESL Claims, to receive such distributions in excess of $50 million shall be treated as an unsecured claim and receive pro rata recoveries with general unsecured claims other than the Claims and causes of action described in the preceding clause (c)(i); and (iii) notwithstanding any order of the Bankruptcy Court to the contrary or section 1129 of the Bankruptcy Code, it shall not be a condition to confirmation of any chapter 11 plan filed in the Bankruptcy Cases that any ESL Claims arising under Section 507(b) of the Bankruptcy Code be paid in full or in part.

(d)    Section 9.13 of the Asset Purchase Agreement, and all statements or negotiations relating hereto, shall be governed by Federal Rule of Evidence 408 and any corresponding state rules of evidence.  Without limiting the foregoing, neither Section 9.13 of the Asset Purchase Agreement nor any statements or negotiations relating hereto shall be offered or received in evidence in any proceeding for any purpose other than to enforce the terms of Section 9.13.

(e)    The release set forth in Section 9.13 of the Asset Purchase Agreement and in paragraphs 7(a)-(d) hereof shall be referred to herein as the "Credit Bid Release".  The Credit Bid Release is hereby approved in its entirety, and the Credit Bid Release Consideration and the other consideration provided by Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration for the Credit Bid Release.  The Seller Releasing Parties and ESL are authorized and directed to perform under the Credit Bid Release pursuant to its terms and to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising under the Credit Bid Release.

WEIL:\96902433\2\73217.0004

8.    **Approval of Cyrus Release**.  Effective upon the Closing, each Seller Releasing Party, hereby absolutely, unconditionally and irrevocably: (i) releases and forever discharges the Cyrus Related Parties from any and all Released Cyrus Claims, whether foreseen or unforeseen, contingent or actual, and whether now known or hereafter discovered, which any of the Seller Releasing Parties ever had or now may have; and (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge dispute or collaterally attack the Cyrus Claims. "Released Cyrus Claims" shall mean any and all Claims and causes of action of the Debtors and their estates against the Cyrus Related Parties arising under (i) sections 363(k), 502(a) or 510(c) of the Bankruptcy Code; (ii) equitable principles of subordination or recharacterization; or (iii) any other applicable Law that could be asserted to challenge the allowance of the Cyrus Claims. Effective upon the Closing, the Cyrus Claims against the Debtors shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code, as reduced by any amounts included in the ~~e~~Credit ~~b~~Bid ~~set forth in Section 3.1(b) of the Asset Purchase Agreement~~.  After giving effect to the ~~e~~Credit ~~b~~Bid ~~set forth in Section 3.1(b) of the Asset Purchase Agreement~~, the Cyrus Related Parties shall be entitled to assert any deficiency Claims, Claims arising under Section 507(b) of the Bankruptcy Code, or other Claims and causes of action that it may have against the Debtors and their estates in the Chapter 11 Cases, subject to any defenses of the Debtors to any such claims that might be asserted by Cyrus or any claims of the Debtors against  Cyrus which are fully preserved (other than the Released Cyrus Claims). The release set forth in this paragraph shall be referred to herein as the "Cyrus Release".  The Cyrus Release is hereby approved in its entirety and the consideration provided by the Buyer pursuant to the Asset Purchase Agreement is found to be fair consideration for the Cyrus Release.  The Seller Releasing Parties and the Cyrus Related Parties are authorized and directed

WEIL:\96902433\2\73217.0004

to perform under the Cyrus Release pursuant to its terms and to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising under the Cyrus Release.

9.    **Discharge of Credit Bid Claims**.  Upon the Closing Date, the portion of the ESL Claims and the Cyrus Claims that is used as part of the cCredit bBid shall be deemed discharged against the Debtors and satisfied in full.  For the avoidance of doubt, the ESL Claims and the Cyrus Claims shall remain outstanding against the Debtors and their estates with respect to all amounts other than the amount that is cCredit bBid in accordance with Section 3.1(b) of the Asset Purchase Agreement.

10.    **Approval of Debtor Authorization of Non-Debtor Subsidiary Action or Inaction**.  The Debtors are authorized and directed to perform their obligations in accordance with the Asset Purchase Agreement, their obligations with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets Rights, including to take any and all actions, including, without limitation, execution and delivery of any documents or papers as may be reasonably necessary to perform or appropriate to implement their obligations arising with respect to the KCD Notes Purchase, the KCD IP Related Rights, and the Foreign Assets Rights. The Debtors are hereby authorized in accordance with section 105(a) of the Bankruptcy Code, to cause KCD IP, LLC to execute and deliver to Buyer, such documents or other instruments as may be necessary to license the KCD IP to the Buyer as provided in the Asset Purchase Agreement, subject in all respects to KCD's compliance with the terms of the KCD Prepetition Agreements and the KCD Indenture.  Notwithstanding anything provided for herein, nothing in this Order authorizes the assumption or assignment of any prepetition license agreements

WEIL:\96902433\2\73217.0004

between KCD and any of the Sellers, as well as any agreements between KCD and Sears Holdings Management Corporation and/or Sears Brands Business Unit Corporation, or the Trademark Security Agreement between KCD and U.S. Bank, National Association ("KCD Indenture Trustee") (such agreements, collectively, the "KCD Prepetition Agreements"). In the event the Debtors seek to assume or assign any or all of the KCD Prepetition Agreements in the future, such assumption or assignment may only be approved on not less than ten (10) days' notice to the KCD Indenture Trustee and all parties to such KCD Pre-Petition Agreements (as the case may be), and an opportunity for the KCD Indenture Trustee and such parties to object to any such assumption and assignment and any proposed cure amounts. Furthermore, nothing in this Order in any way abridges, waives or modifies the rights of the KCD Indenture Trustee under or in connection the KCD Indenture or the collateral provided thereunder or under the KCD Pre-Petition Agreements. This Order is without prejudice to, and does not alter or amend the KCD Indenture Trustee's rights or ability to take any action consistent with its duties or obligations arising under the KCD Indenture or under the KCD Pre-Petition Agreements, and all such rights are expressly preserved. Further, nothing in this Order shall prejudice or impact the rights of the holders of the KCD Notes to exercise any rights they may have under the KCD Indenture, including without limitation their right to direct the KCD Indenture Trustee.

11.    **Consummation of Sale Transaction**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the Asset Purchase Agreement and the Related Agreements and to close and consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby

WEIL:\96902433\2\73217.0004

pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, the Related Agreements, and this Sale Order.

(a)    Approval of Conversion of Subsidiaries.  As set forth in Section 9.2(a) of the Asset Purchase Agreement, the Debtors are required (subject to certain qualifications and exceptions) to take actions as instructed by Buyer in order to secure and preserve the qualifications of certain of the transactions contemplated by the Asset Purchase Agreement as reorganizations for U.S. federal income tax purposes in connection with which Buyer bears responsibility for any consequential tax or costs.  In accordance with such instructions, the Debtors may be directed to convert any of the corporate subsidiaries of Sears Holding Corporation into limited liability companies whether on or before the Closing Date of the Asset Purchase Agreement or anytime afterwards.  The Debtors are hereby authorized to convert any such corporate subsidiaries of Sears Holding Corporation to limited liability companies as directed by Buyer in accordance with Section 9.2(a) of the Asset Purchase Agreement.

(b)    Approval of the Steps Described in Schedule 9.2.  As set forth in Section 9.2(a) of the Asset Purchase Agreement, the Debtors are required (subject to certain qualifications and exceptions) to take actions as instructed by Buyer in order to secure and preserve the qualifications of certain of the transactions contemplated by the Asset Purchase Agreement as reorganizations for U.S. federal income tax purposes in connection with which Buyer bears responsibility for any consequential tax or costs.  In accordance with such instructions, the Debtors are required to take the steps described in Schedule 9.2 of the Asset Purchase Agreement ~~immediately~~ as soon as practicable after the Closing.  The Debtors are hereby authorized to take the steps described in Schedule 9.2 of the Asset Purchase Agreement.

WEIL:\96902433\2\73217.0004

12.    The Debtors, their affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be necessary or desirable to implement the Asset Purchase Agreement and Related Agreements, including the transfer and the assignment of all the Acquired Assets, and the assumption and assignment of all the Assigned Agreements, and to take all further actions as may be (i) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to the Buyer's possession, the Acquired Assets or (ii) necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement or to implement the Sale Transaction, including pursuant to this Sale Order, all without further order of the Court.

13.    All Persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Buyer as of the Closing or at such later time as the Buyer reasonably requests.  To the extent required by the Asset Purchase Agreement, the Debtors agree to exercise commercially reasonable efforts to assist the Buyer in assuring that all Persons that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets will surrender possession of the Acquired Assets to either (i) the Debtors before the Closing Date or (ii) the Buyer on or after the Closing Date.

14.    All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order; provided that the foregoing restriction shall

WEIL:\96902433\2\73217.0004

not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

15.     Each Assignee has provided or will provide, as applicable, adequate assurance of future performance of and under the Assigned Agreements, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

16.     **Direction to Creditors and Parties in Interest**.  On the Closing, each of the Debtors' creditors and the holders of any Claims are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims in the Acquired Assets, if any, as such Claims may otherwise exist.

17.     **Direction to Government Agencies**.  Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Asset Purchase Agreement and approved by this Sale Order.  The Buyer and Seller are each authorized to designate a power of attorney regarding the conveyance of properties in Puerto Rico for recording purposes which properties may be described in such power of attorney including the following: (i) Fajardo: Property registered at page 178 of volume 5174 of Fajardo, Registry of Property of Puerto Rico, property number 19,514; (ii) Guayama: Property registered at page 87 of volume 382 of Guayama, Registry of Property of Puerto Rico, property number 13,562; and (iii) Río Piedras site 8975 is composed of two properties: (x) property registered at

WEIL:\96902433\2\73217.0004

page 2221 of volume 466 of Monacillos, Registry of Property of Puerto Rico San Juan V Section, property number 17,328, and (y) property registered at page 181 of volume 302 of Río Piedras, Registry of the Property of Puerto Rico San Juan V Section, property 9,717.

18. **Assumption of Protection Agreement Obligations**.  Pursuant to and in accordance with Section 2.3(e) of the Asset Purchase Agreement, the Buyer has expressly assumed Sellers' obligations (the "Assumed Protection Agreement Obligations") with respect to warranties and protection agreements or other services contracts (other than warranties relating to Intellectual Property) for the goods and services of Sellers sold or performed prior to the Closing, including any obligations owed by Sears Re to any Seller in respect of reinsurance of such warranties and protection agreements (collectively, the "Assumed Protection Agreements"). To the fullest extent permitted by applicable law, the Buyer is authorized to  operate in place of the Sellers with respect to the Assumed Protection Agreements and to take any actions contemplated to be taken by the Sellers thereunder, including collecting any amounts payable by any counterparty to any such Assumed Protection Agreement and performing the Assumed Protection Agreement Obligations.  The Court hereby orders that the Sellers and all other parties in interest shall cooperate in respect of Buyer's operation in place of the Sellers under the Assumed Protection Agreements, including, without limitation, by furnishing such documents or records as are necessary to the Buyer to perform the Assumed Protection Agreement Obligations without interruption.  Moreover, except for good cause based on violations of Law unrelated to the assumption by the Buyer of the Assumed Protection Agreement Obligations occurring pursuant to the Asset Purchase Agreement and this Sale Order, no regulatory agency (including, without limitation, any state insurance regulator) shall interrupt Buyer's performance of the Assumed Protection Agreement Obligations from and after the Closing Date without first

obtaining relief from this Court. The Buyer may continue to perform the Assumed Protection Agreement Obligations under any existing licenses or permits of the Sellers, with no interruption of the right of the Buyer to so perform, until any required licenses and permits have been transferred to the Buyer by Sellers, or new licenses and permits have been issued to the Buyer.

19.    **Transfer of the Acquired Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets owned by the Debtors, including, without limitation, Designated Agreements (as defined below) in accordance with the terms of the Asset Purchase Agreement and this Sale Order.  The Acquired Assets shall be transferred to the Buyer in accordance with the terms of the Asset Purchase Agreement and this Sale Order, and upon the Closing, such transfer shall: (i) be valid, legal, binding and effective; (ii) vest the Buyer with all right, title and interest of the Debtors in the Acquired Assets; and (iii) be free and clear of all Claims against the Debtors and the Acquired Assets owned by the Debtors (including Claims of any Governmental Authority) in accordance with section 363(f) of the Bankruptcy Code, with the net proceeds of the Sale Transaction from the Acquired Assets upon which the DIP ABL Lenders (as defined in the Final DIP Order) have a first lien being used to repay in full in cash all DIP ABL Secured Obligations (as defined in the Final DIP Order) on the Closing and all other Claims (including, without limitation, contingent indemnification obligations) that represent interests in property shall attach to the net proceeds of the Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing.  The cash portion of the Purchase Price, to the extent payable, that is paid in connection with a Buyout Option shall be deposited and held in segregated accounts in accordance with

Section 3.1 of the Asset Purchase Agreement with the Liens of any lenders other than Buyer or Affiliates attaching to the cash proceeds held in the applicable designated segregated account in the same order of priority and with the same validity, force and effect as the original Liens of such lenders, and such proceeds shall be released to such lenders within two (2) business days following the Closing Date and shall not otherwise be used by the Debtors without further order of the Bankruptcy Court.   Notwithstanding anything to the contrary herein or in the Asset Purchase Agreement, nothing in this Order shall approve the sale or transfer of any Acquired Assets of non-Debtors free and clear of Claims pursuant to section 363(f) of the Bankruptcy Code. Notwithstanding the foregoing or any other provision of this Sale Order or the Asset Purchase Agreement to the contrary, the transfer of the Acquired Assets to the Buyer shall not be free and clear of, and shall not impair in any respect, any (A) setoff or recoupment rights or other affirmative defenses to payment held by either: (1) any party to an Initial  Assigned Agreement (other than the Debtors), including, without limitation, Cross Country Home Services, Inc., that timely filed an objection preserving such right or defense, pursuant to the terms of such Assigned Agreements and applicable law, including without limitation any valid return and credit rights under such Assigned Agreements; (2) any party to an Assigned Agreement (other than the Debtors) that is not an Initial Assigned Agreement on Exhibit B that filed a timely objection preserving such right or defense, including, without limitation, Cardinal Health 110, LLC ("CH 110"), Cardinal Health 112, LLC ("CH 112"), and Cardinal Health PR 120, Inc. ("CH PR 120," and together with CH 110 and CH 112, collectively hereinafter "Cardinal Health"), LG Electronics USA, Inc. ("LGEUS"), LG Electronics Alabama, Inc. (together with LGEUS, "LG"), and Valvoline LLC, pursuant to the terms of such Assigned Agreements and/or applicable law, including without limitation any valid return and credit rights under such Assigned

Agreements, and subsequently provides a notice setting forth the monetary amounts of rights of recoupment and setoff believed to be currently outstanding as of the time of receipt of the applicable Designated Lease Notice or Designated Additional Contract Notice (with any disputes over such amount resolved as provided in paragraph 35 of this Sale Order) to counsel for the Debtors and the Buyer on or before ~~four~~eight (~~4~~8) days after such non-Debtor counterparty's and such counterparty's counsel's (if known) receipt of the applicable Designated Lease Notice or Designated Additional Contract Notice~~,~~ (with any disputes over such amount resolved as provided in paragraph 35 of this Sale Order), or (3) any party that filed a timely objection and is an obligor on any Acquired Receivables (as defined in the Asset Purchase Agreement), including, without limitation, Cardinal Health, and LG, pursuant to the terms of the contracts giving rise to such Acquired Receivables and/or applicable law, whether or not such contracts are being assumed and assigned by the Debtors to the Buyer, including, without limitation, all return, refund, rebate and credit rights under such contracts~~.~~ and (B) rights of LGEUS to directly sell Sears Branded Products Safety Stock (as defined in the Kenmore Supply Agreement) or Finished Goods (as defined in the Kenmore Supply Agreement) solely in accordance with ¶8.C.ii and ¶8.F of the Kenmore Supply Agreement (as defined in the Limited Objection and Reservation of Rights of LG Electronics USA, Inc. and LG Electronics Alabama, Inc. to the Global Asset Sale Transaction; Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; and Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transactions, Docket No. 2079), including, without limitation, the obligations and restrictions imposed on LGEUS thereunder. Notwithstanding the foregoing, all rights are reserved with respect to (i) all tenants' or

subtenants' rights to assert validly enforceable rights under section 365(h) of the Bankruptcy Code (and Debtors' or Buyers' rights to contest such rights) and (ii) the Debtors' rights to assume or reject a lease or sublease where the Debtor is the landlord or sub-landlord.

20.     This Sale Order: (i) shall be effective as a determination that, as of the Closing, all Claims against the Debtors have been unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyances and transfers described herein have been effected; and (ii) is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee and owner of the Acquired Assets free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers").   All Recording Officers are authorized and specifically directed to strike recorded Claims against the Acquired Assets owned by the Debtors recorded prior to the date of this Sale Order.  A certified copy of this Sale Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Claims against the Acquired Assets recorded prior to the date of this Sale Order.  All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

WEIL:\96902433\2\73217.0004

21.     Following the Closing, no holder of any Claim shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in these chapter 11 cases.

22.     Except as expressly set forth in the Asset Purchase Agreement, the Buyer Related Parties and their successors and assigns shall have no liability for any Claim or Excluded Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Employee Plans and any participation or other agreements related to the Employee Plans, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to: (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the

41

Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (U) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability; provided, however, that nothing herein shall limit the Buyer or any Assignee of a Contract or Lease with respect to the Reserved Lease Issues.

23.     If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Acquired Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Claims (collectively, the "Release Documents") the Person has with respect to the Debtors or the Acquired Assets or otherwise, then with regard to the Acquired Assets that are purchased by the Buyer pursuant to the Asset

42

Purchase Agreement and this Sale Order: (i) the Debtors are hereby authorized and directed to, and the Buyer is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the Acquired Assets; (ii) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets; and (iii) the Buyer may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Acquired Assets other than liabilities expressly assumed under the Asset Purchase Agreement; provided that, notwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Sellers nor Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

24.    On the Closing Date, and subject to the terms of this Sale Order, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer by the Debtors of the Acquired Assets acquired under the Asset Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Debtors' right, title, and interest in and to the Acquired Assets to the Buyer.

25.    To the extent permitted by applicable Law and in accordance with the terms of the Asset Purchase Agreement and the Related Agreements, during the Management Services

43

WEIL:\96902433\2\73217.0004

Period, the applicable Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective (the "Management Services"). Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, Buyer and its Affiliated Designees are appointed as agent of such Seller to manage, control and operate each of: (i) the Acquired Properties; (ii) Occupancy Leased Premises; and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties"). Pursuant to their appointment as Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion (in each case, subject to the terms and conditions of any applicable leases or Restrictive Covenants (as defined below)) and collect and retain all revenues generated by each Managed Property.  All existing licenses or permits applicable to the business shall remain in place for the Buyer's or its Applicable Designee or its Applicable Designee benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures and, in furtherance thereof, the Management Services to be provided to the Buyer and its Affiliated Designees pursuant to Section 8.8(b) of the Asset Purchase Agreement are hereby approved in their entirety. Moreover, except for good cause based on violations of Law unrelated to the assumption by the Buyer and its Affiliated Designees of the existing licenses and permits applicable to the business occurring pursuant to the Asset Purchase Agreement and this Sale Order, no licensing or

permitting authority or other regulatory agency shall interrupt Buyer's or any Affiliated Designee's operation of the business from and after the Closing Date without first obtaining relief from this Court.

26.    **Transition Services**.

(a)    ~~26.~~ Pursuant to Section 8.8(a) of the Asset Purchase Agreement, the Parties shall work together in good faith and use their respective reasonable best efforts to agree as to the terms of, and execute, a transition services agreement ("Transition Services Agreement") pursuant to which, effective as of the Closing Date, Sellers shall provide Buyer and Buyer shall provide Sellers, as applicable, with certain services for a transitional period following the Closing Date.  The Buyer and the Sellers are hereby authorized to execute and deliver any additional documentation as contemplated by the Asset Purchase Agreement, and to perform all such other and further acts as may be required under or in connection with the Transition Services Agreement, including executing the Transition Services Agreement and performing and receiving services thereunder.  The Debtors shall serve a copy of the Transition Services Agreement upon all parties that provide services to the Debtors that are subject to the Transition Services Agreement within two (2) Business Days of execution.  A form of the Transition Services Agreement (subject to modification in advance of execution) ~~has been~~will be filed with the Court.[7] ~~(Docket No. [•])~~ All such parties rights are reserved, and if any such party raises an issue with respect to the terms of the Transition Services Agreement, which cannot be resolved by agreement of the parties, such issue will be heard by the Court on an expedited basis.

---

[7] [NTD:  The form of Transition Services Agreement will be filed prior to ~~entry of~~ the ~~Court's order.~~Closing Date.]

45

WEIL:\96902433\2\73217.0004

(b)      [Notwithstanding any other provision of this Sale Order, if the Debtors, after the Closing, remain the owners of any pharmacy scripts, prescription lists or any Inventory (as defined in the Asset Purchase Agreement) consisting of prepetition medication or related Inventory (the "Pharmacy Collateral") or any other Acquired Assets [(excluding real property leases)][8] solely to effect an orderly transition of such Acquired Assets to the Buyer (such Acquired Assets, including any Pharmacy Collateral, the "Transition Assets"), including, without limitation, to allow time to resolve regulatory or other legal issues, (i) such Transition Assets shall be free and clear of any and all Claims in accordance with the terms of this Sale Order as if such Transition Assets were transferred to the Buyer as of the Closing and (ii) the Debtors are hereby authorized to grant to the agent, for the benefit of itself, (x) the lenders and the other credit parties under the ABL Financing (collectively, the "Transform Credit Parties"), continuing, valid, binding and non-avoidable, automatically and properly perfected first priority liens on and security interests in the applicable Transition Assets (the "Transition ABL Liens") as security for the full and prompt performance and payment when due (whether at stated maturity, by acceleration or otherwise) of all obligations under the financing documents evidencing the ABL Financing (the "Transform Financing Documents") and the Debtors shall honor the Transition ABL Liens as if the Debtors were parties to the Transform Financing Documents and (y) the lenders under the Real Estate Financing (collectively, the "Real Estate Credit Parties"), continuing, valid, binding and non-avoidable, automatically and properly perfected first priority liens on and security interests in the applicable Transition Assets (the "Transition Real Estate

---

[8] [NTD: Under review]

WEIL:\96902433\2\73217.0004

Liens" and together with the Transition ABL Liens, the "Transition Liens") as security for the full and prompt performance when due (whether at stated maturity, by acceleration or otherwise) of all obligations under the financing documents evidencing the Real Estate Financing and the Debtors shall honor the Transition Real Estate Liens as if the Debtors were parties to the financing documents underlying the Real Estate Financing.  The Transition Liens granted by the Debtors shall be deemed automatically and properly perfected and enforceable simultaneously with the occurrence of Closing pursuant to the terms of this Sale Order without the necessity of the execution of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Credit Parties or the Real Estate Credit Parties, as applicable, of any Transition Assets.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to (a) permit the Debtors to grant the Transition Liens and (b) permit the Transform Credit Parties or the Real Estate Credit Parties, as applicale, to take any and all actions and exercise any and all remedies permitted by the Transform Financing Documents or the documents evidencing the Real Estate Financing; provided, however, that the Buyer shall bear any costs incurred by the Debtors in connection with participating in or responding to any enforcement actions taken by the Transform Credit Parties or the Real Estate Credit Parties with respect to the applicable Transition Assets or the Transition Liens.  Immediately upon transfer of any of the Transition Assets to the Buyer, (i) the Transition Assets so transferred shall become subject in all respects to the liens and security interests granted for the benefit of the Transform Credit Parties under the Transform Financing Documents and (ii) the respective Transition Lien over the applicable Transferred Transition Assets shall terminate and be of no further force or effect against the Debtors.  The Debtors and their successors and assigns are hereby prohibited

47

from granting any lien, mortgage, encumbrance or any other interest, other than the Transition

Liens, on all or a portion of the Transition Assets, and any lien, mortgage, encumbrance, or any

other interest in contravention of this paragraph, including any liens or claims related to adequate

protection under the Final DIP Order (as defined below), the Junior DIP Order or any other

order of this Court, shall be void *ab initio*.  The Court shall retain jurisdiction to enforce the

Transition Liens and any disputes among the Transform Credit Parties, the Real Estate Credit

Parties, the Debtors and/or the Buyer with respect to the Transition Liens.

(c)    Any and all proceeds from the sale of Transition Assets, whenever

arising, including all Pharmacy Receivables (as defined in the ABL Financing and the Transform

Financing Documents) and Credit Card Receivables (collectively, the "Transition Proceeds")

shall be treated as Acquired Assets and be free and clear of any and all liens and Claims in

accordance with the terms of this Sale Order as if such Transition Proceeds were transferred to

the Buyer as of the Closing, and shall automatically and without any further action become

subject to the first priority liens and security interests of the Transform Credit Parties under the

Transform Financing Documents pursuant to the terms of this Sale Order without the necessity

of the execution of security agreements, control agreements, pledge agreements, financing

statements, mortgages, schedules or other similar documents, or the possession or control of the

Transform Credit Parties of any Transition Proceeds.][9]

27.    **No Successor or Other Derivative Liability**.  By virtue of the Sale Transaction,

the Buyer Related Parties and their affiliates, successors and assigns shall not be deemed or

---

[9] [NTD: Under review by Debtors.]

WEIL:\96902433\2\73217.0004

considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Buyer Related Parties have not assumed nor are they in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Assumed Liabilities.  Except as expressly set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Acquired Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date; provided, however, that nothing herein shall limit the liability of Buyer or any Assignee of a Contract or Lease with respect to the Reserved Lease Issues.

28.    **Assumption and Assignment of Assigned Agreements**.  Subject to paragraph 29, and conditioned upon the occurrence of the Closing Date and paragraphs 31 33 to 40 43 with

49

respect to Designatable Leases and Additional Contracts, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assigned Agreements to the Buyer free and clear of all Claims to the extent set forth in this Sale Order, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Agreements to the Buyer as provided in the Asset Purchase Agreement.   With respect to each of the Assigned Agreements, the Buyer, in accordance with the provisions of the Asset Purchase Agreement, has cured or will cure before the Closing Date or the Assumption Effective Date, or have provided adequate assurance of the prompt cure after the Closing of, any monetary default required to be cured with respect to the Assigned Agreements under section 365(b)(1) of the Bankruptcy Code, and the Buyer has provided adequate assurance of future performance under the Assigned Agreements in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the non-debtor counterparties to such Assigned Agreements.   Upon the applicable Assumption Effective Date with respect to an Assigned Agreement, the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such Assigned Agreement and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to breach of such Assigned Agreement occurring after such assumption and assignment to Buyer as provided in section 365(k).  Buyer acknowledges and agrees that from and after the applicable Assumption Effective Date with respect to an Assigned Agreement, subject to and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each of such Assigned Agreement in its entirety, including any indemnification obligations expressly contained in such Assigned Agreement that could arise as a result of events or omissions that occur from and after the

WEIL:\96902433\2\73217.0004

Closing, unless any such provisions are not enforceable pursuant to the terms of this Sale Order or applicable bankruptcy law.  The assumption by the Debtors and assignment to the Buyer of any Assigned Agreement shall not be a default under such Assigned Agreement.  In accordance with the terms of the Asset Purchase Agreement, with respect to liabilities from any Assumed 503(b)(9) Claims, Buyer shall not be obligated to make any payments in respect of such liabilities until the earlier of: (i) the date that is 120 days following the closing of the sale; and (ii) the date on which a chapter 11 plan is confirmed by the Court with respect to the Debtors; provided further in accordance with the terms of the Asset Purchase Agreement, that with respect to the liabilities from any Other Payables, Buyer shall not be obligated to make any payments in respect of such liabilities until the later of: (i) the Closing Date; and (ii) the date that the applicable obligation thereunder becomes due in the ordinary course of business; provided further, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Specified Payables, or any other administrative or priority claim of the Sellers pursuant to the terms of the Asset Purchase Agreement is a general unsecured contractual obligation of the Buyer owed solely to the Sellers.

29.     Provided that assumption of a Contract has been approved by the Bankruptcy Court, Aall Cure Costs that have not been waived by, or as to which an objection has been filed by, or that have not been otherwise addressed in an alternate arrangement with, any non-debtor party to an Assigned Agreement shall be: (i) paid in cash by the Buyers, on or before the Assumption Effective Date oras to the undisputed amounts and (ii) reserved against the establishment of a cash reserve as to any disputed cure amounts by Buyer at least two (2) days after the Assumption Effective Date (a "Cure Cost Reserve") and paid promptly upon resolution of any such disputed Cure Cost; provided that to the extent a new agreement by and between the

WEIL:\96902433\2\73217.0004

Buyer and the counterparty to the applicable Assigned Agreement is entered into, such agreement shall provide for the Buyer's payment of applicable Cure Costs in an amount agreed to by the Buyer and the counterparty, and any such agreement shall require the counterparty's waiver of any and all prepetition claims against the Debtors based on the Assigned Agreement, and any damage claims arising out of the rejection of any such Assigned Agreement, and the Debtors shall have no liability therefor in accordance with the terms of the Asset Purchase Agreement on the applicable Assumption Effective Date to the extent provided in section 365(k) of the Bankruptcy Code.  Payment of the Cure Costs as required under section 365(b) of the Bankruptcy Code with respect to the Initial Assigned Agreements identified on Exhibit B hereto (including the Citi Card Agreement (as defined below)), shall: (i) be in full satisfaction and cure of any and all defaults under these Assigned Agreements, whether monetary or non-monetary; and (ii) compensate the non-Debtor counterparty for any actual pecuniary loss resulting from such defaults.  For the avoidance of doubt, and pursuant to Section 8.9 of the Asset Purchase Agreement, notwithstanding that certain Amended and Restated Master Lease Agreement (the "Sparrow Master Lease"), dated as of March 14, 2018, by and between certain of the Debtors, as lessee, and SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC, as lessors (collectively, the "Sparrow Entities") being designated an Initial Assigned Agreement, the Buyer reserves all of its rights with respect to any rent that was due and owing to the Sparrow Entities under the Sparrow Master Lease and that remains unpaid as of the Closing Date, and the Debtors reserve all of their rights and objections with respect thereto.

30.     The Debtors served all counterparties to the Initial Assigned Agreements, identified on Exhibit B hereto (including the Citi Card Agreement), with an Assumption and Assignment Notice and the deadline to object to the Cure Costs and adequate assurance of future

performance with respect to the Buyer has passed.  Accordingly, unless an objection to the proposed Cure Costs or Adequate Assurance Information with respect to the Buyer was filed and served before the applicable deadline, each non-Debtor party to an Initial Assigned Agreement is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

31.    Nothing in this Sale Order shall affect the rights of the Buyer, to the extent such rights are provided in the Asset Purchase Agreement, to add or remove any Potential Transferred Agreement to or from the list of Assigned Agreements set forth in the Asset Purchase Agreement in accordance with the terms thereof.  All of the requirements of sections 365(b) and 365(f), including without limitation, the demonstration of adequate assurance of future performance ~~of~~and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, solely with respect to the Initial Assigned Agreements identified on Exhibit B hereto (including the Citi Card Agreement).  The Buyer has satisfied its adequate assurance of future performance requirements with respect to the Initial Assigned Agreements identified on Exhibit B hereto (including the Citi Card Agreement) and in connection therewith has presented sufficient evidence regarding the Buyer's business plan and demonstrated it is sufficiently capitalized to comply with the necessary obligations under the Initial Assigned Agreements, identified on Exhibit B hereto (including the Citi Card Agreement)~~, as well as any other Assigned Agreement~~.  All objections to Buyer's or any other Assignee's adequate assurance of financial performance that were timely filed (other than adequate assurance objections that related to the Initial Assigned Agreements identified on Exhibit B

WEIL:\96902433\2\73217.0004

hereto (including the Citi Card Agreement)) are fully reserved pending further hearing of this Court and nothing in this Sale Order shall limit such objections in any respect.

32.    To the extent a counterparty to an Assigned Agreement failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the Debtors' filing of the Assumption and Assignment Notice and any such counterparty shall be (i)barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost at any time, (ii) any proof of claim filed or to be filed with respect to any prepetition default under an Assigned Agreement shall be deemed expunged with prejudice, and (iii) each such counterparty is forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to the applicable Potential Transferred Agreement in the event it is assumed and/or assigned.as of such dates.

33.    **Designation Rights Procedures**.  The Debtors are authorized, at the direction of the Buyer pursuant to the Asset Purchase Agreement, to seek to assume and to assign pursuant to sections 363 and 365 of the Bankruptcy Code, the Designatable Leases and any Additional Contracts that the Buyer designates for assumption and assignment in accordance with Section 2.7 and Section 2.9 of the Asset Purchase Agreement and this Sale Order to a designated Assignee.  Each of the Designatable Leases and Additional Contracts (to the extent the Additional Contracts are executory contracts) constitutes an unexpired lease or executory contract within the meaning of section 365 of the Bankruptcy Code and, at the Buyer's election, will be deemed assumed and assigned by the Debtors on the Assumption Effective Date subject

54

WEIL:\96902433\2\73217.0004

to compliance with and the procedures set forth in the Asset Purchase Agreement and herein.[8][10]
The assumption of any liabilities under a Designatable Lease or such Additional Contracts that
are assumed by an Assignee shall constitute a legal, valid and effective delegation of all liabilities
thereunder to the applicable Assignee and, following payment of ~~any Cure Costs related
thereto~~all amounts required to be paid by agreement of the parties or an order of the Court, and
except as expressly set forth in the Asset Purchase Agreement or this Sale Order, shall divest the
Debtors of all liability with respect to such Designatable Lease or Additional Contract for any
breach of such Designatable Lease occurring after the applicable Designation Assignment Date
or any breach of such Additional Contract after the applicable date on which such Additional
Contract is assigned to the applicable Assignee in accordance with Section 2.9 of the Asset
Purchase Agreement, in each case, to the extent provided in section 365(k) of the Bankruptcy
Code (the "Additional Contract Assignment Date").

34.    The Debtors served all counterparties to the Designatable Leases and Additional
Contracts (to the extent the Additional Contracts are executory contracts) listed as Potential
Transferred Agreements ("Designatable Contract Counterparties") with an Assumption and
Assignment Notice and the deadline to object to the Cure Costs and adequate assurance of future
performance with respect to the Buyer has passed.[9][11] Accordingly, unless an objection to the

---

[8][10] In the case of any conflict between the provisions of the Asset Purchase Agreement and this Order, this Order
shall govern.

[9][11] The Debtors served all counterparties to Potential Transferred Agreements (to the extent the Potential
Transferred Agreement is an executory contract or lease and was listed on the Notice of Cure Costs and Potential
Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale
Transaction or Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory
Contracts and Unexpired Leases in Connection with Global Sale Transaction) with an Assumption and
Assignment Notice and as of the date of entry of this Sale Order, the deadline to object to Cure Costs has passed.
See Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired
Leases in Connection with Global Sale Transaction (Docket No. 1731); see also Supplemental Notice of Cure
Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection

WEIL:\96902433\2\73217.0004

proposed Cure Costs or Adequate Assurance Information with respect to the Buyer was filed and served before the applicable deadline (a "Filed Objection"), the applicable Designatable Contract Counterparty is forever barred from objecting to (i) the Cure Costs and from asserting any additional cure or other amounts with respect to the applicable Designatable Lease or Additional Contract in the event it is assumed and/or assigned by an Assignee, except to the extent such Cure Costs further accrue (being subject to further credits, debits, and adjustments in accordance with the terms of the applicable underlying Lease or Contract) following the Debtors' filing of the applicable Assumption and Assignment Notice or (ii) adequate assurance of future performance by the Buyer; provided, however, that in the event that an Additional Contract was not listed as a Potential Transferred Agreement, and accordingly, no Assumption and Assignment notice was served upon the applicable Designatable Contract Counterparty, such Designatable Contract Counterparty shall have eight (8) days after the date on which the applicable supplemental Assumption and Assignment Notice is filed with the Court and served on the applicable Designatable Contract Counterparty (the "Supplemental Additional Contract Cure Objection Deadline"), to: (a) object to the applicable proposed Cure Costs for such Additional Contract and the assumption and assignment of the Additional Contract (the "Supplemental Additional Contract Cure Cost Objection"); and (b) serve the Supplemental Additional Contract Cure Cost Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Buyer on or before the Supplemental Additional Contract Cure

---

see also Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction; see also Affidavit of Service (Docket No. 2314); see also Affidavit of Service (Docket No. [•]2417).]

WEIL:\96902433\2\73217.0004

Objection Deadline; provided, further, however that in the event that a Designatable Contract Counterparty timely asserted a Filed Objection such counterparty shall be permitted to object solely on the basis of an objection to cure costs for such Additional Contract or the assumption and assignment of the Additional Contract that could not have been raised in its prior objection, until the applicable Designatable Contract Assumption and Assignment Objection Deadline.

35.    With respect to any Filed Objection, to the ~~Debtors, the~~extent that the applicable Contract or Lease is designated for assumption and assignment, a Designated Lease Notice or Designated Additional Contract Notice, as applicable, shall be served on the Designatable Contract Counterparty, and the Buyer and the applicable counterparty shall have authority to compromise, settle or otherwise resolve any Filed Objections without further order of the Court. If the Debtors, the Buyer and the applicable counterparty determine that the objection cannot be resolved without judicial intervention, then the Filed Objection will be determined by the Court (following request for a hearing by the Debtors and/or the Buyer and/or the applicable counterparty filed with the Court and on no less than ten (10) days' notice to the other party).

36.    Except as set forth in paragraphs ~~30~~ 29 to ~~36~~35, all Designatable Contract Counterparties' rights under section 365 with respect to the assumption and assignment of the Designatable Leases and Additional Contracts pursuant to the Bankruptcy Code (including, without limitation, as to the provision of adequate assurance of future performance if the Designatable Leases are designated to a third party or with respect to the provision of adequate assurance of future performance of the Buyer if a Filed Objection was timely served) are reserved pending delivery of a notice from Seller to the applicable Designatable Contract Counterparty (i) pursuant to Section 5.2(b) of the Asset Purchase Agreement (a "Designated Lease Notice") following Sellers' receipt of a Buyer Assumption Notice or (ii) promptly following Sellers'

WEIL:\96902433\2\73217.0004

receipt of a notice indicating that an Additional Contract has been designated for assignment or assumption and assignment pursuant to Section 2.9 of the Asset Purchase Agreement (a "Designated Additional Contract Notice") and are subject to the procedures and provisions set forth in Paragraphs 35 37 to 44 and 36 59 below.

37.     Each Designated Lease Notice will set forth the following information, to the best of the Debtors' knowledge:  (a) the street address of the real property that is the subject of such Designatable Lease; (b) the name and address of the counterparty of such Designatable Lease (and their counsel, if known); (c) a description of the deadlines and procedures for filing objections to the Designated Lease Notice; (d) the identity of the proposed assignee; (e) information intended to provide the counterparty to the Designatable Lease with adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, if and only if such Designatable Lease is proposed to be assigned to a third party and (f) the proposed Cure Costs associated with such Designatable Lease; provided, however, that if adequate assurance information is provided pursuant to this paragraph, such adequate assurance information shall be kept strictly confidential and  not be used for any purpose other than to (a) evaluate whether adequate assurance requirements under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3) have been satisfied, and (b) to support any objection to adequate assurance provided by aany party including other than Buyer orand its affiliates.

38.     During the Designation Rights Period, the Buyer may designate any Designatable Lease or Additional Contract for assumption and assignment in accordance with the terms of the Asset Purchase Agreement and this Sale Order.  In such event, the Debtors shall file with the Court and serve on the applicable Designatable Contract Counterparty a Designated Lease

WEIL:\96902433\2\73217.0004

Notice or Designated Additional Contract Notice, together with any applicable Assignment and Assumption of Lease or other applicable assignment agreement with respect to an Additional Contract.  If the proposed Assignee is not ~~either the Buyer or an affiliate of~~ the Buyer, the Debtors shall also deliver to the applicable Designatable Contract Counterparty (and deliver by email or facsimile to counsel for the applicable Designatable Contract Counterparty, if such counsel has filed a notice of appearance in the Bankruptcy Cases) evidence of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code with respect to the applicable Designatable Lease or Additional Contract that is proposed to be assumed and assigned to such Assignee.

39.    Any party seeking to object to the assumption and assignment of any Designatable Lease or Additional Contract to a proposed Assignee that is not the Buyer ~~or an affiliate of the Buyer~~ on any basis other than the Cure Costs (including, but not limited to, objections to adequate assurance of future performance if such Designatable Leases are designated to a third party or with respect to the provision of adequate assurance of future performance of the Buyer if a Filed Objection was timely served), must (a) file a written objection in compliance with the Bankruptcy Rules and the Local Rules (a "Designatable Contract Assumption and Assignment Objection") with the Court, so that such objection is filed no later than eight (8) days after the date on which (i) the applicable Designated Lease Notice or Designated Additional Contract Notice is filed with the Court and (ii) evidence of adequate assurance of future performance required pursuant to the preceding sentence is served on the applicable Designatable Contract Counterparty (the "Designatable Contract Assumption and Assignment Objection Deadline"), and (b) serve the Designatable Contract Assumption and Assignment Objection (by email,

WEIL:\96902433\2\73217.0004

facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Buyer on or before the Designatable Contract Assumption and Assignment Objection Deadline.

40.    If no Filed Objection has been filed, or Designatable Contract Assumption and Assignment Objection has been filed by the Designatable Contract Assumption and Assignment Objection Deadline, this Sale Order shall serve as approval of the assumption and assignment of the applicable Designatable Contract or Additional Contract.  If a Filed Objection has been filed, or a Designatable Contract Assumption and Assignment Objection is timely filed and not withdrawn or resolved, the Debtors, the Buyer and the objecting Designatable Contract Counterparty shall have authority to compromise, settle or otherwise resolve any objections without further order of the Court.  If the Debtors, the Buyer and the objecting Designatable Contract Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Designatable Lease or Additional Contract will be determined by the Court on a date to be scheduled by any of the Debtors, the Buyer or the objecting Designatable Contract Counterparty (which hearing date shall be no sooner than ten (10) business days following the date of filing of the Designated Lease Notice or Designated Additional Contract Notice), unless the Debtors, the Buyer and the applicable Designatable Contract Counterparty agree otherwise.

41.    Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, the Buyer shall, on the Designation Assignment Date or Additional Contract Assignment Date for a Designatable Lease or Additional Contract, cure all nonmonetary defaults solely to the extent required under section 365 of the Bankruptcy Code and pay to the applicable Designatable Contract Counterparty all undisputed Cure Costs and other such undisputed amounts required with respect to such Designatable Lease or Additional Contract, solely to the extent designated

WEIL:\96902433\2\73217.0004

for assumption by the Sellers and assignment to Buyer by written notice from Buyer to Sellers delivered prior to the end of the Designation Rights Period (the "Designated Agreements"). Upon assumption and assignment of any Designated Agreement, the Debtors and the estates shall be relieved of any liability for breach of such Designated Agreement pursuant to section 365(k) of the Bankruptcy Code; provided that, except as expressly provided herein or in the Asset Purchase Agreement or Related Agreements, and except for any obligations in respect of the Reserved Lease Issues, neither the Buyer (except to the extent such obligations constitute Cure Costs) nor the applicable Assignee shall have any obligations under any Designated Agreement that is an Acquired Lease or related Assigned Agreement in respect of any portion of any year-end (or other) adjustment (including, without limitation, for royalties, rents, utilities, taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under any of the Acquired Leases or any other Assigned Agreements for the calendar year in which the applicable Lease Assignment occurs attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y) for any previous calendar year, and the Sellers shall fully indemnify and hold harmless the Buyer and the applicable Assignee with respect thereto.

42.     Upon the applicable Assumption Effective Date, any provision in any Assigned Agreement that purports to declare a breach or default as a result of a change or transfer of control or any interest in respect of the Debtors is unenforceable and all Assigned Agreements shall remain in full force and effect notwithstanding assignment thereof.  No sections or provisions of any Assigned Agreements, that in any way purport to: (i) prohibit, restrict, or condition the Debtors' assignment of such Assigned Agreement (including, but not limited to, the conditioning of such assignment on the consent of any non-debtor party to such Assigned

WEIL:\96902433\2\73217.0004

Agreement); (ii) provide for the cancellation, or modification of the terms of the Assigned Agreement based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such Assigned Agreement upon assignment thereof; or (iv) provide for any rights of first refusal on a contract counterparty's part, or any recapture or termination rights in favor of a contract counterparty, or any right of a Landlord to take an assignment or sublease from a tenant, shall have any force or effect with respect to the grant and honoring of the Designation Rights or the rights under Section 2.9 of the Asset Purchase Agreement in accordance with this Sale Order and the Asset Purchase Agreement and assignments of Assigned Agreements by the Debtors in accordance therewith, because they constitute unenforceable antiassignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code. Upon assumption and assignment of any Designatable Lease or Additional Contract pursuant to the procedures set forth herein and in the Asset Purchase Agreement, the applicable Assignee shall enjoy all of the rights and benefits, and shall assume all obligations, under each such Assigned Agreement as of the applicable Designation Assignment Date or Additional Contract Assignment Date.

43.    Upon the applicable Assumption Effective Date, except as otherwise expressly agreed by the Buyer and the applicable Designatable Contract Counterparty, notwithstanding any provision in any Designatable Lease that purports to prohibit, restrict or condition such action, upon the assumption and assignment of such Designatable Lease to an Assignee in accordance with the terms of the Asset Purchase Agreement, (x) the applicable Assignee shall be authorized to: (i) use the applicable Lease Premises (as defined in the Asset Purchase Agreement), subject to

WEIL:\96902433\2\73217.0004

section 365(b)(3) of the Bankruptcy Code, as a retail store (and related goods and services) upon consummation of the assumption and assignment of such Designatable Lease to such Assignee in accordance with the terms of the Asset Purchase Agreement; (ii) operate such Lease Premises under the Buyer's trade name or any other trade name which the Buyer owns or is authorized to use (including any of the Debtors' trade names); (iii) make such alterations and modifications to the applicable Lease Premises (including signage, together with appropriate changes to existing tenant signage in the respective shopping center or mall, including panels on all pylons, monuments, directional and other ground and off-premises signs where Sellers are presently represented) deemed necessary by such Assignee (subject to all applicable laws including all applicable municipal codes) as are necessary or desirable for such Assignee to conform such Lease Premises to the prototypical retail store (or such Assignee's typical retail store); (iv) remain "dark" with respect to such Lease Premises after such assumption and assignment until the date that is necessary to permit such Assignee to remodel, restock, re-fixture, change signage and/or until completion of the work described in clause (iii) above (so long as such date is not more than one hundred fifty (150) days after the applicable Designation Assignment Date) or such later date as may be reasonably required for the restoration of the such Lease Premises following any applicable Casualty / Condemnation Event; and (v) exercise, utilize or take advantage of any renewal options and any other current or future rights, benefits, privileges, and options granted or provided to the Debtors under such Designated Agreement (including all of the same which may be described or designated as, or purport to be, "personal" to the Debtors or to a named entity in such Designated Agreement or to be exercisable only by the Debtors or by a named entity or an entity operating under a specific trade name)  and (y) neither the Buyer nor the applicable Assignee shall have any responsibility or liability for any Excluded Asset-Sale

WEIL:\96902433\2\73217.0004

Taxes and Excluded Asset-Reorganization Taxes.  For the avoidance of doubt, all rights of the counterparties to any applicable Designatable Lease are fully reserved in connection with any of the foregoing actions.

44.     To the extent that any IP License is designated for assumption and assignment pursuant to Section 2.9 of the Asset Purchase Agreement, on the Assumption Effective Date, such agreement, including the rights and obligations thereunder, will be deemed to have been assumed and assigned to the Buyer as of the Closing Date.

45.     ***Ipso Facto* Clauses Ineffective**.  Except as otherwise specifically provided for by order of this Court, the Assigned Agreements shall be transferred to, and remain in full force and effect for the benefit of, the Buyer or, for applicable Designated Agreements, the Assignee in accordance with their respective terms, including all obligations of the Buyer or, for applicable Designated Agreements, the Assignee as the assignee of the Assigned Agreements, notwithstanding any provision in any such Assigned Agreements (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no, and all non-Debtor parties to any Assigned Agreements are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer, any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assigned Agreements or the Closing.

46.     Except as otherwise specifically provided for by order of this Court, upon the Debtors' assignment of the Assigned Agreements to the Buyer under the provisions of this Sale Order and full payment of all Cure Costs as required under section 365(b) of the Bankruptcy

WEIL:\96902433\2\73217.0004

Code, no default shall exist under any Assigned Agreements, and no counterparty to any Assigned Agreements shall be permitted to declare a default by any Debtor or the Buyer or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Assigned Agreement. Any provision in an Assigned Agreement that prohibits or conditions the assignment or sublease of such Assigned Agreement (including without limitation, the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, refuse to renew, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Agreement shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Agreement.

47.    **Statutory Mootness**. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code. The Sale Transaction contemplated by the Asset Purchase Agreement is undertaken by the Buyer and ESL without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Acquired Assets owned by the Debtors to the Buyer, free and clear of Claims, unless such authorization is duly stayed before the Closing of the Sale Transaction pending such

WEIL:\96902433\2\73217.0004

appeal. The Debtors and the Buyer will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Sale Order.

48.     **No Avoidance of Asset Purchase Agreement**.    Neither the Debtors nor the Buyer Related Parties have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.    Accordingly, the Asset Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreement or the Sale Transaction.

49.     **Waiver of Bankruptcy Rules 6004(h), 6006(d) and 7062**.    Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.    Time is of the essence in closing the Sale Transaction and the Debtors and the Buyer intend to close the Sale Transaction as soon as practicable.    Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal will be foreclosed as moot.    This Sale Order constitutes a final order upon which the Debtors and the Buyer are entitled to rely.    This paragraph 49 shall not apply to Reserved Lease Issues.

50.     **Personally Identifiable Information**.    After appointment of the consumer privacy ombudsman in these chapter 11 cases, in accordance with section 332 of the Bankruptcy Code, and after giving due consideration to the facts, circumstances and conditions

WEIL:\96902433\2\73217.0004

of the Asset Purchase Agreement, as well as the report (as supplemented) of the consumer privacy ombudsman shared with the Buyer and then filed with the Court which Buyer agrees to comply with, no showing was made that the sale of personally identifiable information or private health information contemplated in the Asset Purchase Agreement, subject to the terms of this Sale Order, would violate applicable nonbankruptcy law; provided that pre-Closing costs of the consumer privacy ombudsman shall be borne equally between Buyer, on the one hand, and Sellers, on the other hand, to the extent such costs are incurred in relation to the Transactions.

51.    **Distribution and Application of Sale Proceeds**.

(a)    At the Closing, the Buyer shall pay to the Sellers (in accordance with the terms of the Asset Purchase Agreement), the balance of the purchase price remaining due and owing under the Asset Purchase Agreement. The proceeds of the Sale Transaction shall be applied as provided in the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 955) ("Final DIP Order"), including to repay at the Closing the DIP ABL Secured Obligations (as defined in the Final DIP Order) in full in cash from the sale of those Acquired Assets upon which the DIP ABL ~~Lenders~~Credit Parties have a first lien ~~on the Closing~~, including all costs and expenses of the DIP ABL Credit Parties set forth in the applicable pay off letter, without the need for any professional for the DIP ABL Credit Parties to deliver or serve any invoices to any other party (including those parties identified in paragraph 19(f) of the Final DIP Order). Notwithstanding the foregoing the Securities Consideration shall be distributed as

provided in Schedule 9.2 of the Asset Purchase Agreement.  The methodology for allocation of proceeds shall be as set forth in the Asset Purchase Agreement.

(b)      With respect to the Cyrus Claims: (i) up to $350 million of Junior DIP Secured Obligations outstanding under the Junior DIP Order, including all fees, adequate protection amounts due and owing, and interest thereon, may be rolled into a new financing of the Buyer (the "Exit Financing Facility") on the Closing; and (ii) the Cyrus LC Facility Claims will be rolled over into a new letter of credit facility with the Buyer, and such claims shall be deemed satisfied and fully discharged against the Debtors.

(c)      If any order under section 1112 of the Bankruptcy Code is entered in the cases, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that this Sale Order, including the rights granted to Buyer hereunder, shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on parties in interest.  This Sale Order shall not be modified by any chapter 11 plan confirmed in the cases or by any subsequent orders of the Court.

52.    **Binding Effect of Sale Order**.  The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, non-debtor affiliates, any affected third parties, all holders of equity interests in the Debtors, all holders of any claims, whether known or unknown, against the Debtors, any holders of Claims against or on all or any portion of the Acquired Assets, including, but not limite to all contract counterparties, leaseholders, governmental units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of any

68

of the Debtors' chapter 11 cases, and each of their respective affiliates, successors and assigns. The Asset Purchase Agreement and the Sale Order shall inure to the benefit of the Debtors, their estates and creditors, the Buyer and their respective successors and assigns. The Asset Purchase Agreement, the Sale Transaction and this Sale Order shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

53. **Conflicts; Precedence**. In the event that there is a direct conflict between the terms of this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order, the Asset Purchase Agreement and any documents executed in connection therewith shall govern, in that order. Nothing contained in any chapter 11 plan hereafter confirmed in these chapter 11 cases, any order confirming such plan, or in any other order of any type or kind entered in these chapter 11 cases (including, without limitation, any order entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

54. **Modification of Asset Purchase Agreement**. The Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the Asset Purchase Agreement or Related Agreements, documents or other instruments.

55. **Bulk Sales; Taxes**. No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply

69

in any way to the transactions contemplated by the Asset Purchase Agreement, the Sale Motion or this Sale Order.  Except as otherwise expressly provided in the Asset Purchase Agreement, all obligations of the Debtors relating to taxes, whether arising under any law, by the Asset Purchase Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

56.    **Lease Deposits and Security**.  The Buyer shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Initial Assigned Agreement to the extent not previously provided by the Debtors.  All timely Filed Objections that have asserted requests pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Assigned Agreement other than the Initial Assigned Agreements are hereby adjourned to a hearing at a future date with all parties' rights reserved.

57.    **Automatic Stay**.  The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement, and Related Agreements, documents or other instruments. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

58.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Sale Order or the Asset Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

59.    **Restrictive Covenants; Master Leases.**

(a)    ~~59. Restrictive Covenants.~~    Nothing herein or in the Asset Purchase Agreement or any related document shall authorize, absent further order of the Court or agreement among the Debtors or the Buyer, on the one hand, and the applicable non-Debtor counterparty, on the other hand, the sale of any real estate property owned by any of the Debtors, free and clear of (and shall not extinguish or otherwise diminish) any interests, covenants, or rights applicable to such real estate assets ~~or rights~~ that limit or condition the permitted use of the property such as easements, reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, or permits (collectively, "Restrictive Covenants") that are not executory ~~and~~or that run with the land.  To the extent that the Debtors or any other party seek to assume and assign any real estate leases to which a Debtor is a party free and clear of any Restrictive Covenant, the Debtors or such party shall file a notice that describes ~~with particularity~~ the Restrictive Covenant that the party is seeking to extinguish or otherwise diminish and any non-Debtor counterparty to a Restrictive Covenant will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto~~.~~; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any Lease, and ~~A~~all rights, remedies, and positions of all parties with respect to any such relief are preserved.

(b)    Nothing in this Sale Order, the Asset Purchase Agreement, or any other related agreements, documents or other instruments shall be deemed to authorize or shall be argued to permit the Debtors, the Buyer, or any Proposed Assignee, their agents or advisors to take any action in connection with an unexpired master lease of nonresidential real property to which a Debtor is a party (each such lease, a "Master Lease") that is not in compliance with, or

71

that would result in a default or breach under, such Master Lease, without an amendment to or waiver under such Master Lease, in accordance with its terms and all consents required for such amendment or waiver under such Master Lease.  To the extent that the Debtors or any other party seek to sever a Master Lease for any reason prior to an assumption and assignment of such Master Lease in accordance with the terms of this Sale Order, the Debtors shall file a notice that describes with particularity the nature and reason of such severing, and any non-Debtor counterparty to such Master Lease will have fourteen (14) calendar days from the filing and service of notice of such requested relief to file and serve an objection thereto; any such issues shall be determined by the Court or otherwise resolved consensually prior to the effectiveness of the assignment of any lease, and all rights, remedies, and positions of all parties with respect to any such relief are preserved.

60.    **Stand Alone L/C Facility**. As of the Closing Date, all obligations of the applicable Debtors with respect to the Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016, among such Debtors, Citibank, N.A., as administrative agent and issuing bank (collectively, "Citi") and letter of credit lenders party thereto (the "LC lenders") (as amended from time to time, the "Citi Letter of Credit Agreement") shall be assumed by the applicable Buyer Affiliate, all obligations of any Debtor thereunder (other than any contingent obligations (including contingent indemnification obligations) that are not yet due and payable) shall be terminated and all collateral provided by the Debtors to secure such obligations shall be released (other than such liens securing contingent indemnification obligations in respect of the Citi Letter of Credit Agreement, which liens shall attach to the net proceeds of the Sale Transaction, in the same order of their priority and with the same validity, force and effect which

WEIL:\96902433\2\73217.0004

they now have against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing).

61. **Existing Wells and BAML Letters of Credit**. Notwithstanding the termination of the DIP ABL Facility (as defined in the Final DIP Order), each of the outstanding letters of credit issued by Bank of America and Wells Fargo Bank, National Association, pursuant to the DIP ABL Facility, will either (1) remain outstanding after the Closing Date in accordance with their respective terms so long as such letters of credit are fully cash collateralized by the applicable Debtors in an amount of at least 105[___]% of the face amount of such letters of credit to secure the reimbursement obligations of the Debtors (and their successors and assigns) pursuant to a cash collateral agreement between such Debtors and each of Bank of America and Wells Fargo Bank, National Association, as Issuing Lenders under the applicable cash collateral agreement (such letters of credit, the "Cash Collateralized Letters of Credit"), (2) will be backstopped to secure the reimbursement obligations of the Debtors with respect to such letters of credit on the Closing Date (such letters of credit, the "Backstopped Letters of Credit") and/or (3) will be rolled into the Buyer's new credit facilities on the Closing Date and deemed issued thereunder facilities (such letters of credit, the "Rolled Letters of Credit"). The obligations of the Debtors under the DIP ABL Facility and security interest securing such obligations under the DIP ABL Facility with respect to each letter of credit issued pursuant the DIP ABL Facility, whether a Cash Collateralized Letter of Credit, a Backstopped Letter of Credit, or a Rolled Letter of Credit will be considered terminated so that the obligations of any Debtors under the DIP ABL Facility are no longer secured by the collateral and all such obligations of such Debtors under the DIP ABL Facility (other than any contingent obligations that are not yet due and payable) will be terminated.

73

62.    **Direction to Creditors and Parties in Interest**.

(a)    In connection with the Credit Bid, each agent, trustee, collateral agent or similar person (each, a "Credit Bid Claim Agent") that is party to an indenture, credit agreement, security agreement or any similar document or instrument (each, a "Credit Bid Claim Document") in respect of the credit bid claims is authorized ~~and directed~~ to execute such documents and take all other actions, in accordance with, and subject to the terms of, the applicable Credit Bid Claim Document, as may be necessary to facilitate the Credit Bid, including, without limitation, the *pro rata* allocation and distribution of equity securities of the Buyer ~~in accordance with, and subject to the terms of, the applicable~~ (pro rata within each class of ~~C~~creditors ~~Bid Claim Document~~), to all creditors holding any obligations of any one or more of the Debtors which are the subject of the Credit Bid (including any principal, interest, fees and other obligations, the "Credit Bid Obligations"), including without limitation, the non-ESL holders of the Credit Bid Obligations, and the acknowledgment of the reduction in [principal ] amount of the remaining Credit Bid Obligations (~~*i.e.*, which were not the subject of the Credit Bid~~) as a result of, and in the amount of, the Credit Bid, such reduction to be made *pro rata* to all holders of the Credit Bid Obligations ~~within such~~by class of creditor, including, without limitation, the non-ESL holders of the Credit Bid Obligations.  Each Credit Bid Claim Agent may rely fully on all amounts of equity securities of the Buyer delivered and allocated to it, and the amount of the reduction in [the principal amount to be applied to the] Credit Bid Obligations for which the Credit Bid Claim Agent is acting in such capacity, ~~such amounts of equity securities and reduction in principal amount, to be~~as certified by ESL or the Buyer and the applicable Debtor(s) in a written certificate (the "Certificate") to be delivered to the relevant Credit Bid Claim Agent.  ~~The amounts of the equity securities to be delivered and the amount of the~~

74

~~reduction in principal amount, and any calculations thereof, set forth in the Certificate, shall be~~ ~~binding on all parties~~At the Closing, and the Credit Bid Claim Agent may, but shall not be obligated to, make any review or investigation of the accuracy of any of the calculations or numbers set forth in such certificate.  No later than three (3) business days following the Closing Date, Buyer shall pay to each Credit Bid Claim Agent the reasonable fees and expenses invoiced on or prior to the Closing Date (including its reasonable attorneys' fees and disbursements) incurred in connection with the facilitation of the Credit Bid.  Anything in this Sale Order to the contrary notwithstanding, nothing in this Order is intended to, or shall, modify or amend the terms and conditions of the Second Lien Security Agreement, all of which shall remain in full force and effect.

(b)    Each Credit Bid Claim Agent is hereby released and exculpated from any Claim, cause of action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Credit Bid and the facilitation thereof and any transaction contemplated in connection therewith, other than any such Claim, cause of action, obligation, suit, judgment, damage, demand, loss, or liability stemming from the actual fraud, willful misconduct, or gross negligence of any such Credit Bid Claims Agent.

63.    **Citibank Credit Card Agreements**.  Pursuant to this Order, the Debtors are assuming and assigning (i) that certain Second Amended and Restated Program Agreement, dated as of October 3, 2018 (the "Citibank Credit Card Program Agreement"), by and among Sears, Roebuck and Co., Sears Brands Business Unit Corporation, the Other Sears Parties (as defined therein) that are parties thereto, and Citibank, N.A. ("Citi"), (ii) the New Merchant Agreement (as defined in the Citibank Credit Card Program Agreement) and (iii) the Marketing

WEIL:\96902433\2\73217.0004

Agreement (as defined in the Citibank Credit Card Program Agreement). The Citibank Credit Card Program Agreement, the New Merchant Agreement, and the Marketing Agreement are collectively referred to as the "Citibank Credit Card Agreements." Nothing in this Order, the Asset Purchase Agreement or any other Sale Transaction document, and neither the Sale Transaction itself nor any act taken in connection with the Sale Transaction, shall impair, invalidate, limit, waive, forfeit or otherwise render ineffective any right of Citi arising under or recognized by any Citibank Credit Card Agreement, including any right in accordance with the terms and conditions of the Citibank Credit Card Agreements to (x) to draw on the "Eligible Letter of Credit" funded under the Citibank Credit Card Program Agreement, in Citi's sole discretion, (a) to discharge or satisfy contingent liabilities arising under any Integrated Agreement (as defined in the Citibank Credit Card Program Agreement) or (b) to otherwise reimburse Citi for any losses arising out of amounts owing under any Integrated Agreement, in each case of (a) or (b), whether arising prior to, on, or after the Closing Date and whether owed by Seller or Buyer; (y) if such Eligible Letter of Credit is not renewed or replaced in accordance with Section 8.8 of the Citibank Credit Card Program Agreement, to draw on such Eligible Letter of Credit and maintain the reserve by retaining the amount of such draw; and (z) to recoup, setoff or deduct amounts owing to Citi under any of the Citibank Credit Card Agreements in accordance with the terms thereof, in each case, whether such amounts owed arose prior to, on, or after the Closing Date and whether owed by Seller or Buyer.

64.    **Chubb**.  Notwithstanding anything to the contrary in the Motion, the Global Bidding Procedures, the Global Bidding Procedures Order, the Asset Purchase Agreement, any cure notice or assumption notice (including, but not limited to, any Assumption and Assignment Notice), or this Sale Order (i) none of the insurance policies or any related agreements

(collectively, the "Chubb Insurance Contracts") issued by any of ACE American Insurance Company, ACE Fire Underwriters Insurance Company, ACE Property and Casualty Insurance Company, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance Company, Westchester Fire Insurance Company, Illinois Union Insurance Company, Federal Insurance Company, or their respective affiliates or successors (collectively, the "Chubb Companies"), or, except as set forth herein, any rights, benefits, claims, rights to payment and/or recoveries under the Chubb Insurance Contracts shall be sold, assigned or otherwise transferred to the Buyer in connection with the Global Asset Sale Transaction; and (ii) nothing shall alter, modify or otherwise amend the terms or conditions of the Chubb Insurance Contracts; provided, however, that to the extent any claim seeking insurance policy proceeds under any insurance policies included in the Chubb Insurance Contracts arises with respect to the Business or any Acquired Assets, the Debtors may pursue such claims for such insurance proceeds in accordance with the terms of the insurance policies included in the Chubb Insurance Contracts (and shall pursue such claims if requested by Buyer), and, if applicable, turn over to the Buyer any proceeds in respect of such claims in accordance with section 2.1(q) of the Asset Purchase Agreement (each, a "Proceed Turnover"); provided, further, however, that the Chubb Companies shall not have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover ~~solely by virtue of entry of this Sale Order~~except as provided in the Chubb Insurance Contracts.

65.    **Governmental Units**.  Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (including but not limited to  environmental laws or regulations), and any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the

property after the date of entry of this Order. Nothing contained in this Order or in the Asset Purchase Agreement shall in any way diminish the obligation of any entity, including the Debtors, to comply with environmental laws. Nothing in this Order or the Asset Purchase Agreement authorizes the transfer to the Buyer of any licenses, permits, registrations, or governmental authorizations and approvals without the Buyer's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

66.    **SAP.**   No provision of this Sale Order, the Sale Motion, or the Asset Purchase Agreement shall authorize the Debtors or the Buyer as applicable to use any software or other intellectual property (the "Proprietary Information") owned by or licensed from, or any software-related services provided by, SAP Industries, Inc. or its affiliates SAP America, Inc. or Concur Technologies, Inc., to the benefit of any other party under any Transition Services Agreement or otherwise to the extent prohibited by the contracts governing such Proprietary Information or software-related services.

67.    **Consent.**    No provision of this Sale Order, the Sale Motion, or the Asset Purchase Agreement shall authorize the Debtors or the Buyer as applicable to transfer or sell any Proprietary Information to the Buyer licensed from SAP Industries, Inc. and its affiliates SAP America, Inc. and Concur Technologies, Inc. (collectively, "SAP"), Oracle America, Inc., or including its partner Rimini Street (collectively, "Oracle"), Microsoft Corporation and its wholly-owned affiliates, Microsoft Licensing, GP, and Microsoft Online, Inc. (collectively, "Microsoft"), LinkedIn Corporation, as applicable, absent the consent of SAP Industries, Inc., Oracle America, Inc.Microsoft, or MicrosoftLinkedIn Corporation, as applicable, to the extent such consent is required under the applicable agreement and such provision is enforceable under applicable law.

WEIL:\96902433\2\73217.0004

Dated:   February _____, 2019
         White Plains, New York

 

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

WEIL:\96902433\2\73217.0004

**<u>Exhibit A</u>**

**Asset Purchase Agreement**

**<u>Exhibit B</u>**

**Initial Assigned Agreements**