WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

------------------------------------------------------------x

**NOTICE OF EMPLOYEE LEASE AGREEMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

PLEASE TAKE NOTICE that on January 18, 2019, Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**") filed the *Notice of Successful Bidder and Sale Hearing* (ECF No. 1730) (the "**Notice**"), which attached as an exhibit a copy of the executed asset purchase agreement between the Debtors and the Buyer dated January 17, 2019 (as amended, the "**Asset Purchase Agreement**").[2]

PLEASE TAKE FURTHER NOTICE that attached hereto as **Exhibit A** is a substantially final draft of the "Employee Lease Agreement" as defined in the Asset Purchase Agreement (the "**Employee Lease Agreement**"), which is being negotiated by the parties and remains subject to a full reservation of rights among the parties.

PLEASE TAKE FURTHER NOTICE that the Debtors will appear on **February 7, 2019 at 9:00 a.m. (Eastern Time)** before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140, to continue the hearing for approval of the Asset Purchase Agreement and entry of the order approving the Asset Purchase Agreement.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Asset Purchase Agreement.

WEIL:\96908127\4\73217.00044

Dated: February 7, 2019
　　　New York, New York

　　　　　　　　　　　　　　　/s/ Sunny Singh_____
　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　767 Fifth Avenue
　　　　　　　　　　　　　　　New York, New York  10153
　　　　　　　　　　　　　　　Telephone:  (212) 310-8000
　　　　　　　　　　　　　　　Facsimile: (212) 310-8007
　　　　　　　　　　　　　　　Ray C. Schrock, P.C.
　　　　　　　　　　　　　　　Jacqueline Marcus
　　　　　　　　　　　　　　　Garrett A. Fail
　　　　　　　　　　　　　　　Sunny Singh
　　　　　　　　　　　　　　　Jessica Liou

　　　　　　　　　　　　　　　*Attorneys for Debtors*
　　　　　　　　　　　　　　　*and Debtors in Possession*

WEIL:\96908127\4\73217.00044

## Exhibit A

### Employee Lease Agreement

## EMPLOYEE LEASE AGREEMENT

This Employee Lease Agreement (this "Agreement") is entered into as of [●] (the "Effective Date"), by and between Sears Holding Corporation, a Delaware corporation ("Seller"), and Transform Holdco LLC, a limited liability company organized under the laws of Delaware ("Buyer"). Seller and Buyer are each individually referred to herein as a "Party" and are collectively herein referred to as "Parties." Certain terms are defined below and all other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement, dated as of January 17, 2019 (as may be amended, restated, supplemented or modified from time to time, the "Asset Purchase Agreement"), by and among Seller, certain of its Subsidiaries and Buyer.

## RECITALS

WHEREAS, on October 15, 2018, Seller and certain Seller Affiliates commenced voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Seller is a debtor-in-possession under the Bankruptcy Code and manages its properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller owns and operates, through direct and indirect Subsidiaries, the Business;

WHEREAS, pursuant to the Asset Purchase Agreement, Seller agreed to sell to Buyer, and Buyer agreed to purchase from Seller, the Designation Rights and Acquired Assets and Buyer agreed to assume, and Seller agreed to transfer the Assumed Liabilities, as more specifically provided in the Asset Purchase Agreement, subject to the approval of the Bankruptcy Court;

WHEREAS, on [the date hereof], the Bankruptcy Court issued the Sale Order authorizing Seller to consummate the transactions contemplated in the Asset Purchase Agreement;

WHEREAS, subject to Section 1.8 of this Agreement and pursuant to Section 9.7(a) of the Asset Purchase Agreement, Buyer desires to hire:

(A)    the Business Employees other than (i) the employees to be listed on Schedule A hereto, which Schedule shall be delivered to Seller at the Closing Date (the "Executive Business Employees"), (ii) the Business Employees engaged in the Home Services business (the "Repairs Employees"), (iii) the Business Employees whose ability to be employed by, and perform the essential functions of the job for which they were engaged with Seller for, Buyer or its Subsidiaries is subject to the approval of a Governmental Authority (the "Governmental Authority Employees"), and (iv) the Business Employees who are employed or engaged by the certain specified Foreign Subsidiaries set forth on Schedule B attached herein (for the purpose of this Agreement, including those employees situated in China

who are employed by a Foreign Enterprise Service Corporation ("FESCO") and seconded to Seller's China offices, and the term "employed" shall mean "engaged via FESCO secondment arrangement") (the "Foreign Employees"), effective as of the earlier of (x) May 4, 2019, and (y) such earlier date with respect to any such Business Employees as may be provided by Buyer, it being understood that such Business Employees may be hired individually or in groups as of a particular date within such window; and

(B)    the Repairs Employees and the Governmental Authority Employees, effective as of the earlier of (x) 90 days following the Closing Date and (y) such earlier date with respect to any such Repairs Employees or Governmental Authority Employees as may be provided by Buyer, it being understood that Repairs Employees and/or Governmental Authority Employees may be hired individually or in groups as of a particular date within such window; and

(C)    the Foreign Employees, effective as of the date that such Foreign Subsidiary is acquired by Buyer in accordance with Section 2.13 of the Asset Purchase Agreement (each such date, as applicable to such a Business Employee described in (A), (B) or (C), the "Hire Date");

WHEREAS, during the period between the Closing Date and ending at 11:59 p.m. on the day immediately prior to the Hire Date with respect to each Business Employee other than the Executive Business Employees, as applicable (the "Lease Expiration Date"), Buyer desires to lease from Seller and its Subsidiaries, and Seller and its Subsidiaries desire to lease to Buyer, the full time services of the Business Employees other than the Executive Business Employees (the "Leased Employees") on the terms and subject to the conditions hereinafter set forth (such period, the "Leasing Period");

WHEREAS, the Parties wish to enter into this Agreement setting out their rights and responsibilities with respect to such Leased Employees, who are to be leased from the Seller or one of its Subsidiaries to the Buyer or one of its Subsidiaries for the Leasing Period and who are then to be employed by the Buyer or one of its Subsidiaries in accordance with Section 9.7(a) of the Asset Purchase Agreement in connection with the sale of the Business; and

WHEREAS, the intent of this Agreement is for Buyer to make Seller whole for all claims against or any Liabilities of Seller and its Subsidiaries associated with the Leased Employees and any other Liabilities attributable to Leased Employees in connection with the Employee Services (as defined in Section 1.2 hereof), in all cases incurred or arising during or after the Leasing Period and whether discovered during the Leasing Period or thereafter, such that Seller is in the same economic position as if the Leased Employees had been hired by Buyer effective immediately following the Closing Date.

NOW, THEREFORE, in consideration of the foregoing and mutual covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

# ARTICLE I

# LEASED EMPLOYEES

1.1.    <u>Provision of Leased Employees</u>.  Subject to the terms and conditions of this Agreement, during the period of time beginning on the Closing Date and throughout the Leasing Period applicable to a Leased Employee, Seller or one of its Subsidiaries, as applicable, shall provide to Buyer the services of each Leased Employee, subject to Section 1.2 of this Agreement.  Seller shall remain the employer of the Leased Employees subject to the terms and conditions of this Agreement.  Seller may require the Leased Employees to comply with all lawful employment rules, policies and procedures, including all grants, authorizations, licenses, permits, variances, consents or certificates issued pursuant to any Governmental Authority, implemented and maintained by Seller that do not expressly conflict with the policies or instructions of the Buyer applicable to such Leased Employee.  Any Business Employee whose employment with Seller or one of its Subsidiaries terminates during the Leasing Period shall cease to be a Leased Employee as of such Leased Employee's termination date and Buyer shall have no obligation to hire such Business Employee.

1.2.    <u>Services of the Leased Employees</u>.  During the Leasing Period, Seller or one of its Subsidiaries shall make available to Buyer or its Subsidiaries the Leased Employees to devote their full time and energy to perform those duties, functions and services and at such locations, as Buyer may request of such Leased Employees, including performance of the "Services," as defined in that certain Services Agreement, dated as of the date hereof, entered into by the Parties hereto (the "<u>Services Agreement</u>" and such duties, functions and services, the "<u>Employee Services</u>").  Neither Seller nor any of its Subsidiaries shall relocate any Leased Employee during the Leasing Period except at the request of Buyer.  To the extent permitted by applicable laws, all Leased Employees, excluding any Represented Employees whose terms and conditions of employment shall be governed by any applicable collective bargaining agreements, shall, at all times during the Leasing Period, remain at-will employees of Seller or its Subsidiaries; provided, however, that Buyer shall have the right to reasonably request that Seller or one of its Subsidiaries, and Seller or its Subsidiary upon such request shall, terminate the employment of any Leased Employee for any good faith reason as reasonably determined by Buyer in consultation with Seller.  Subject to any applicable Laws or collective bargaining agreements, Buyer shall be responsible for the day to day supervision and management of the Leased Employees and the Seller shall direct each Leased Employee to comply with the Buyer's supervision and management.  Seller shall instruct the Leased Employees to provide the services as required under the Services Agreement.  Buyer may schedule the Leased Employees to work in accordance with the requirements of the Buyer, subject to any applicable Laws or collective bargaining agreements.  Seller shall ensure that, during the Leasing Period, the Leased Employees do not perform any services for, act on behalf of, nor represent Seller or its Subsidiaries in any circumstance, except as contemplated by the Services Agreement.  No action by Leased Employees shall waive or override this Section 1.2.

1.3.    <u>Compensation/Payroll</u>.  During the Leasing Period, Seller and its Subsidiaries shall be solely responsible for paying the Leased Employees' compensation through Seller's standard payroll process and in accordance with the existing pay practices of Seller on the regular payroll schedule throughout the Leasing Period.  During the Leasing Period, Seller or

one of its Subsidiaries shall pay the Leased Employees at the same base salary or hourly wage rate  (as applicable) that such Leased Employees were receiving as of the Closing Date, except as required by any applicable laws or collective bargaining agreement.  Seller or one of its Subsidiaries shall allow all Leased Employees' payroll withholding elections to remain the same during the Leasing Period as such elections were in effect as of the Closing Date, except to the extent a Leased Employee elects (in a manner permitted to employees and plan participants generally under the applicable benefit plans) to change any such election.

1.4.    Employee Benefits.  During the Leasing Period, Seller or one of its Subsidiaries shall ensure that each Leased Employee continues to be eligible to participate (and, if already participating, to continue to so participate) in all Employee Plans maintained by Seller or its Subsidiaries as amended from time to time in accordance with their terms and this Agreement, (the "Seller Plans"), in which such Leased Employee was eligible to participate as of the Closing Date.  Seller and its Subsidiaries may only amend, modify or terminate a Seller Plan, to the extent such amendment, modification or termination affects a Leased Employee, at the request or otherwise with the consent of the Buyer and only to the extent such amendment, modification or termination is applicable to all similarly-situated employees of Seller and its Subsidiaries.  Seller may not establish, adopt or enter into any Seller Plan with respect to any Leased Employee unless requested to do so by the Buyer.  Seller or its Subsidiaries shall be responsible for operating and administering all of the Seller Plans and all claims incurred pursuant to the terms and conditions of the applicable plans, including any requirement generally applicable to the submission of claims under such plans.

1.5.    Compliance with Law – Payroll and Employee Plan Matters.  Seller and one of its Subsidiaries shall be solely responsible for compliance with all operation, administration and legal obligations in respect of the Leased Employees relating to payroll and the Seller Plans.  Seller and its Subsidiaries shall respond to any questions and inquiries from all Governmental Authorities and any other federal, state, local and foreign agencies and other Persons regarding payroll and employment data and history relating to the Leased Employees and concerning the Leasing Period or any prior period of employment by Seller and its Subsidiaries.  In the event Buyer becomes aware of any compliance-related issues or any questions or inquiries from such Governmental Authorities, agencies or Persons regarding any Seller Plans in which the Leased Employees participate, Buyer shall promptly notify Seller of such matters and Seller or one of its Subsidiaries shall have the sole right and responsibility to respond thereto.  Buyer shall cooperate with Seller and its Subsidiaries (including by providing Seller and its Subsidiaries with all information, documents and data reasonably requested by Seller or any of its Subsidiaries) to enable Seller and its Subsidiaries to comply with their obligations under this Agreement (including their obligation to respond to any question or inquiry from federal, state, local and foreign agencies and other Persons regarding payroll and employment data and history relating to the Leased Employees and concerning the Leasing Period or any prior period of employment by Seller or one of its Subsidiaries).

1.6.    Compliance with Law – Other Matters.  To the extent that Leased Employees perform Employee Services on any premises owned or leased by Buyer or its Subsidiaries, Buyer and its Subsidiaries shall be responsible, at its sole cost and expense, for all obligations arising from or relating to the condition of such premises, including workplace safety and security, in compliance with all applicable federal, state and local health and safety laws,

regulations, rules, ordinances and directives.  In addition, Buyer and Seller shall each comply with all applicable foreign, federal, state, and local labor and employment Laws, including but not limited to, Title VII of the 1964 Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act, immigration laws and regulations, and state and/or local equivalent of the foregoing with respect to or in respect of Leased Employees.

   1.7. <u>Employee Records</u>.  During the Leasing Period, Buyer shall have the right to reasonably request access to employee records to the extent that such records relate to Leased Employees, and Seller shall not unreasonably deny any such request, subject to any applicable laws.

   1.8. <u>Transfer of Leased Employees</u>.  Upon any Lease Expiration Date, Seller and Buyer, and their respective Subsidiaries, shall take reasonable steps to effect an orderly transition of the Leased Employees whose employment is to be transferred on such date, and the employee records related thereto, to Buyer or its Subsidiaries.  Buyer shall hire Leased Employees in accordance with Section 9.7(a) of the Asset Purchase Agreement (or shall continue the employment of the Foreign Employees), and otherwise subject to the requirements of Article IX of the Asset Purchase Agreement, and this Agreement and such Leased Employees shall become employees of Buyer or its Subsidiaries as of the Hire Date.  Notwithstanding anything to the contrary in this Agreement, if, despite the reasonable best efforts of Buyer, the necessary permits, licenses, authorizations or other approvals as may be required by Law with respect to any Repairs Employee or Governmental Authority Employee in order for such Repairs Employee or Governmental Authority Employee to be employed by, and perform the essential functions of the job for which they were engaged with Seller for, Buyer or its Subsidiaries have not been received by Buyer or its Subsidiaries as of the 90th day following the Closing Date, Seller agrees that Buyer may delay the employment of such Repairs Employee or Governmental Authority Employee until the earlier of the date Buyer or its Subsidiaries receives such permit, license, authorization or other approvals or the first Business Day occurring on or after the 120th day following the Closing Date.

**ARTICLE II**

**REIMBURSEMENT BY BUYER FOR COSTS OF SERVICES; INDEMNIFICATION**

   2.1. <u>Reimbursement of Costs</u>.  Seller and Buyer acknowledge and agree that the intent of this Article II is for Buyer to make Seller whole for all claims against or any Liabilities of Seller and its Subsidiaries associated with the Leased Employees and any other Liabilities attributable to Leased Employees in connection with the Employee Services in all cases incurred or arising during the Leasing Period (whether discovered during the Leasing Period or thereafter) (the "<u>Employment Costs</u>").  In consideration for the Employee Services provided by the Leased Employees, Buyer shall, in accordance with the procedures in Section 2.2 hereof, pay to Seller an amount in cash sufficient to cover all Employment Costs. Without limiting the generality of the foregoing, Employee Costs shall include the following with respect to any Leased Employee during the applicable Leasing Period:

(i)      costs, expenses, premiums, payments, contributions, payroll taxes or claims payable to, payable on behalf of or in respect of the Leased Employees by Seller in respect of the Leasing Period and including costs, expenses, premiums, payments, contributions, payroll taxes or claims associated with Leased Employees;

(ii)      payroll costs such as salary, wages, overtime pay, incentive compensation, vacation and holiday pay, and bonuses, including amounts due under the Key Employee Retention Plan (the "KERP") to the extent attributable to the provision of services in the period commencing on the Closing Date and ending on such Leased Employees' Hire Date (the "Buyer KERP Portion");

(iii)      employment insurance employer contributions, workers' compensation, workplace safety and insurance premiums, and employer health tax and employer premiums;

(iv)      costs, expenses, shift and pay premiums;

(v)      payments, contributions to, under or in respect of any Seller Plan;

(vi)      costs of any perquisites provided to the Leased Employees;

(vii)      with respect to Leased Employees, including any terminated Leased Employees who elect COBRA continuation coverage which is effective during the Leasing Period, who are covered under any self-insured medical, dental or other employee welfare benefit plans of Seller or its Subsidiaries, the amount of actual medical, dental and other expenses of the Leased Employees and their dependents incurred during the Leasing Period under such plans; and

(viii)      severance (in such amount as determined in accordance with Section 9.7(e) of the Asset Purchase Agreement), termination pay, pay in lieu of notice and other costs (including legal costs) of terminating the employment of any Leased Employee during the Leasing Period and in accordance with this Agreement, including all taxes associated with any of the foregoing.

Notwithstanding the foregoing, Employment Costs shall not include current service costs or other contributions (direct or indirect) relating to any defined benefit pension plans, any amounts paid by the Seller and its Subsidiaries under the KERP other than the Buyer KERP Portion or the Key Employee Incentive Plan ("KEIP"), any retention bonus specified in an individual agreement, any bonus payments (including sales commission programs) to the extent they relate to periods of employment prior to the Closing Date and are not paid by Seller unless such bonus payments are otherwise approved in writing by the Buyer in advance of payment.  In addition, where any compensation or benefit plan, agreement, or arrangement under which compensation or benefits are paid or provided for in respect of services performed both prior to and following the Closing Date, Employment Costs shall include only the pro-rated portion of such compensation costs payable in respect of services performed following the Closing Date.

2.2.    Mechanics of Funding Employment Costs.

(a)    During the Leasing Period, each Leased Employee shall remain on the payroll of the Seller and shall continue to participate in the Seller Plans in which such Leased Employee participated as of the Closing Date.  Buyer shall pay all Employment Costs in respect of the Leased Employees that relate to the Leasing Period in accordance with this Section 2.2.

(b)    Buyer and Seller will cooperate in good faith to determine the amounts due in respect of Employment Costs as set forth in <u>Schedule C</u>. Buyer will pre-fund amounts as set forth on and in accordance with <u>Schedule C</u> to an account designated by Seller and dedicated to the satisfaction of Employment Costs (the "<u>Dedicated Account</u>"); <u>provided</u>, that notwithstanding anything to the contrary in <u>Schedule C</u>, Buyer shall only be required to remit amounts in respect of any Employment Costs to the extent there does not already exist sufficient cash in the Dedicated Account to satisfy Employment Costs that are due and payable (or becoming due and payable in accordance with the schedule set forth in <u>Schedule C</u>).  Prior to making payments in respect of the Employment Costs, Seller shall hold any amounts in the Dedicated Account as trustee, and shall not remove any amounts from the Dedicated Account other than to satisfy obligations with respect to the Employment Costs at such time as such Employment Costs become due and payable.

(c)    At the end of the Leasing Period, Seller and Buyer shall cooperate in good faith to create a report reconciling (i) the gross amount received by Seller pursuant to this Section 2.2 and (ii) the gross amount of Employment Costs reasonably and in good faith incurred by Seller (the "<u>True-Up Report</u>").  To the extent that the amount described in clause (i) of this sub-section exceeds the amount described in clause (ii) of this sub-section, Seller shall reimburse the Buyer for such amount.  To the extent that the amount described in clause (ii) of this sub-section exceeds the amount described in clause (i) of this sub-section, Buyer shall reimburse Seller for such amount.  Any payment made pursuant to this sub-section shall be made within seven (7) Business Days following the completion of the True-Up Report.

2.3.    <u>Indemnification</u>.  Subject to the limitations set forth in this Section 2.3, Buyer shall defend, indemnify and hold harmless Seller and its Subsidiaries and their respective successors and permitted assigns (collectively, the "<u>Seller Indemnitees</u>") from and against any and all Liabilities incurred or suffered by Seller Indemnitees of every kind and nature to the extent related to or arising out of Seller's and its Subsidiaries' performance of this Agreement except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries.  In addition, Buyer shall indemnify and hold harmless Seller Indemnitees from and against all Liabilities incurred or suffered by Seller Indemnitees of every kind and nature, including all Liabilities for bodily injury to or death of any person, damage to or destruction of any property, or any third-party claims to the extent arising from any act or omission on the part of the Buyer, its officers and directors, employees of Buyer or the Leased Employees during the Leasing Period, except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries, its officers and directors or any employee of Seller or its Subsidiaries, in each case who is not a Leased Employee.  Without limiting the generality of the foregoing, Buyer further agrees to indemnify and hold the Seller Indemnitees harmless from and against any and all Liabilities incurred or suffered by the Seller Indemnitees on account of any claim, demand, charge, suit, action, investigation or proceeding

made or brought against the Seller Indemnitees by any Person, including the Leased Employees, related to: (A) any misconduct of any Leased Employee who is performing services for Buyer during the Leasing Period, (B) any injuries to any Leased Employee arising out of the Employee Services and not otherwise covered by insurance, (C) any employment related Liabilities arising under applicable Laws governing workers compensation, discrimination, harassment, job loss, wrongful termination, wage and hour, mass layoffs, or any other laws, including any applicable laws relating to collective bargaining agreements, which govern the employment of the Leased Employees providing services to Buyer; (D) any Liabilities arising directly or indirectly out of the provision of benefits to the Leased Employees under this Agreement; and (E) any Liabilities arising directly or indirectly from any reclassification or re-characterization of the Leased Employees by any Government Authority, except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries, its officers and directors or any employee of Seller or its Subsidiaries, in each case who is not a Leased Employee.  The provisions of this Section 2.3 shall survive the expiration or other termination of this Agreement.

## ARTICLE III

## MISCELLANEOUS

3.1.    <u>Amendment; Waiver</u>.  This Agreement may only be amended or modified by a written instrument signed by each of the Parties.  Either Party may, in its sole discretion, (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto, or (iii) waive compliance with any of the agreements or conditions of the other Party contained herein.  Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument executed by the Party granting such extension or waiver.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

3.2.    <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other Party, and any purported assignment or delegation in contravention of this <u>Section 3.2</u> shall be null and void and of no force and effect.  Subject to the preceding sentences of this <u>Section 3.2</u>, this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the Parties and their respective successors and permitted assigns.

3.3.    <u>Notices</u>.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by electronic mail with confirmation to a Party at the address specified in the Asset Purchase Agreement, or at such address, to the attention of such other Person, and with such other copy as the recipient Party has specified by prior written notice to the sending party pursuant to the provisions of this Section 3.3.

3.4.    Public Announcements.  All public announcements regarding this Agreement are subject to Section 13.1 of the Asset Purchase Agreement as if such Section 13.1 is set forth herein mutatis mutandis.

3.5.    Survival.  Each term of this Agreement that would, by its nature, survive the termination or expiration of this Agreement shall so survive, including the obligation of either Party to pay all amounts accrued hereunder and including the provisions of Article II (Reimbursement by Buyer for Costs of Services; Indemnification); Section 3.3 (Notices); Section 3.4 (Public Announcements); Section 3.5 (Survival); Section 3.6 (No Third Party Beneficiaries); Section 3.7 (Illegality); Section 3.8 (Entire Agreement; Interpretation); Section 3.9 (Specific Performance); Section 3.10 (Conflict of Terms); Section 3.11 (No Agency); Section 3.12 (Construction and Interpretation); and Section 3.15 (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial).

3.6.    No Third Party Beneficiaries.  Except for the indemnification rights under this Agreement of any Seller Indemnitee or Buyer Indemnitee in their respective capacities as such, or unless otherwise specified herein, no provision of this Agreement is intended to confer upon any Person (other than the Parties) any rights or remedies hereunder.

3.7.    Illegality.  In case any provision of this Agreement, shall be invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect, unless the severance of such provision would be in opposition to the Parties' intent with respect to such provision or the economic or legal substance of the transactions contemplated hereby would be affected in any manner materially adverse to any Party.  Upon determination by a court of competent jurisdiction that any provision of this Agreement is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner to the end that the transactions contemplated hereby are consummated and the obligations and agreements of the Parties hereunder are fulfilled to the greatest extent possible.

3.8.    Entire Agreement; Interpretation.  Except as otherwise contemplated herein, this Agreement, together with the Asset Purchase Agreement and the Transaction Documents, constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties, with respect to the subject matter hereof (other than the Confidentiality Agreement).  The Parties acknowledge that all Parties participated in the drafting of this Agreement, the Asset Purchase Agreement and the Transaction Documents with the involvement of their respective counsel and agree that any rule of law or any legal decision that may or would require interpretation of any alleged ambiguities in this Agreement, the Asset Purchase Agreement or the Transaction Documents against the Party that drafted it has no application and is expressly waived.

3.9.    Specific Performance.  The Parties agree that time is of the essence, irreparable damage would occur in the event that any of the terms or provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or other legal remedies would not be an adequate remedy for any such damages.  It is accordingly agreed that, without posting a bond or other undertaking, prior to the termination of this Agreement, each of the Parties shall be entitled to injunctive or

other equitable relief to prevent or cure breaches of this Agreement and, in addition to any other remedy to which they are entitled at Law or in equity, to enforce specifically the terms and provisions hereof, such remedy being in addition to any other remedy to which any Party may be entitled at Law or in equity.  In the event that any Action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at Law.

3.10.   Conflict of Terms.  This Agreement and the Services Agreement are intended to operate in tandem and the parties agree to interpret their respective provisions in such a manner as to avoid, to the maximum extent possible, a conflict.  In the event of an express conflict between a term of this Agreement and the Services Agreement, the term of the Services Agreement shall govern and control, it being understood, however, that the terms of this Agreement are to be superseded only to the minimum extent necessary to resolve such express conflict.  Notwithstanding the foregoing, this Section 3.10 shall not apply to Section 2.3 of this Agreement, which Section 2.3 shall govern in all respects in the event of an inconsistency between the provisions of this Agreement and the Services Agreement.

3.11.   No Agency.  Nothing in this Agreement creates (or shall be claimed or intended to create) a relationship of agency, partnership, joint venturers or employer/employee between Seller and Buyer and it is the intent and desire of the Parties that the relationship be and be construed as that of independent contracting parties and not as agents, partners, joint venturers or a relationship of employer/employee.

3.12.   Construction and Interpretation.  For purposes of this Agreement, (a) the words "hereof," "herein," "hereby," "hereto" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) whenever the words "include," "includes" or "including" (or any variation thereof) are used in this Agreement, they shall be deemed to be followed by the words "without limitation"; (c) references herein to "days," unless indicated otherwise, are to consecutive calendar days; (d) references to specific Articles and Sections are to the Articles and Sections of this Agreement, unless specifically stated otherwise; (e) the terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa, and words denoting any gender shall include all genders; (f) all references to "dollars" or "$" shall mean "U.S. dollars" unless specifically stated otherwise; (g) all references to "written" or "in writing" shall include in electronic form; (h) all references herein to a particular "Annex" shall mean such annex as it is attached hereto; (i) references to "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not mean "if," references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or" unless otherwise specified; and (j) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

3.13.   Counterparts.  This Agreement and any amendments hereto may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall be considered one and the same instrument.

3.14.    <u>No Guarantee of Employment</u>.  This Agreement shall not change the at-will employment status of any employee of Seller or one of its Subsidiaries, excluding any Represented Employees whose terms and conditions of employment shall be governed by any applicable collective bargaining agreements.

3.15.    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed on the date first set forth above.

[_____]

By: _____
Name:  [●]
Title:


By: _____
Name:  [●]
Title:

**SCHEDULE A**
**EXECUTIVE BUSINESS EMPLOYEES**

[Buyer to provide to Seller on the Closing Date]

**SCHEDULE B**
**SPECIFIED FOREIGN SUBSIDIARIES**

1.    Sears Holdings Global Sourcing Limited (Jurisdiction: Hong Kong)

2.    International Sourcing & Logistics Limited (Jurisdiction: Hong Kong)

3.    Quality Assurance Laboratory Limited (Jurisdiction: Hong Kong)

4.    Sears Sourcing India Private Limited (Jurisdiction: India)

5.    Sears IT & Management Services India Private Limited (Jurisdiction: India)

6.    Sears Global Technologies India Private Limited (Jurisdiction: India)

**SCHEDULE C**
**PRE-FUNDING SCHEDULE**