WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

------------------------------------------------------------x

<u>**NOTICE OF SERVICES AGREEMENT**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

PLEASE TAKE NOTICE that on January 18, 2019, Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**") filed the *Notice of Successful Bidder and Sale Hearing* (ECF No. 1730) (the "**Notice**"), which attached as an exhibit a copy of the executed asset purchase agreement between the Debtors and the Buyer dated January 17, 2019 (as amended, the "**Asset Purchase Agreement**").[2]

PLEASE TAKE FURTHER NOTICE that attached hereto as **Exhibit A** is a substantially final draft of the "Services Agreement" as defined in the Asset Purchase Agreement (the "**Services Agreement**"), which is being negotiated by the parties and remains subject to a full reservation of rights among the parties.

PLEASE TAKE FURTHER NOTICE that the Debtors will appear on **February 7, 2019 at 9:00 a.m. (Eastern Time)** before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140, to continue the hearing for approval of the Asset Purchase Agreement and entry of the order approving the Asset Purchase Agreement.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Asset Purchase Agreement.

WEIL:\96908099\3\73217.00044

Dated: February 7, 2019
       New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors
and Debtors in Possession*

WEIL:\96908099\3\73217.00044

## **Exhibit A**

**Services Agreement**

## SERVICES AGREEMENT

This Services Agreement (this "<u>Agreement</u>"), dated as of February 8, 2019, is by and between Sears Holdings Corporation, a Delaware corporation ("<u>Seller</u>"), and Transform Holdco LLC, a Delaware limited liability company ("<u>Buyer</u>"). Seller and Buyer each are sometimes referred to herein as a "<u>Party</u>" and together sometimes referred to as the "<u>Parties</u>." Certain terms are defined below, while others are defined in <u>Annex I</u> (Defined Terms). All other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated as of January 17, 2019, by and between Seller, each of Seller's Subsidiaries party thereto and Buyer (as may be amended, restated, supplemented or modified, from time to time, the "<u>Asset Purchase Agreement</u>").

## RECITALS

WHEREAS, in connection with the Asset Purchase Agreement, the Parties desire to enter into this Agreement to set forth the terms and conditions pursuant to which each Party shall provide or cause to be provided the Services (as defined below) to the other Party and its Affiliates, in each case, as applicable for a transitional period from and after the Closing; and

WHEREAS, this Agreement is that certain "Services Agreement" as defined in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and mutual covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

## ARTICLE I

## SERVICES

Section 1.1    <u>Services to be Provided</u>.  Subject to the terms and conditions of this Agreement, during the Services Period, Seller shall provide, or cause one or more of its Affiliates or a Vendor contracted by Seller pursuant to <u>Section 1.9</u> to provide, to Buyer, its Affiliated Designees and their respective Affiliates, the services described on <u>Schedule A-1</u> attached hereto (each, a "<u>Seller Service</u>", and collectively, the "<u>Seller Services</u>").  Subject to the terms and conditions of this Agreement, during the Services Period, Buyer shall provide, or cause one or more of its Affiliates or a Vendor contracted by Buyer pursuant to <u>Section 1.9</u> to provide, to Seller and its Affiliates, the services described on <u>Schedule A-2</u> attached hereto (each, a "<u>Buyer Service</u>", and collectively, the "<u>Buyer Services</u>").  "<u>Services Period</u>" means the period commencing at the Effective Time and, subject to earlier termination pursuant to <u>ARTICLE III</u>, continuing until the date indicated for each such Service on <u>Schedule A</u> or any longer period mutually agreed to by the Parties.  In connection with the provision of certain legal services which are part of the Buyer Services, promptly following the Effective Date, the Parties shall use good faith efforts to enter into a common interest agreement.

Section 1.2    Quality and Nature of Services.

(a)    Except as otherwise provided in this Agreement, Service Provider shall provide, or shall cause one or more of its Affiliates or a Vendor to provide, the Services in a manner and at a level of service that is substantially similar to the manner and level of service with which such Services were provided to Service Recipient or its Affiliates or predecessors in interest (including, in the case of Buyer as Service Recipient, the Business) during the twelve (12) month period immediately prior to the Closing Date.  The Parties acknowledge and agree that, to the extent required, Buyer shall instruct the Leased Employees to perform the Services under this Agreement during the Leasing Period, as required in order for the Services to be performed as performed during the twelve (12) month period immediately prior to the Closing Date.  Subject to the first sentence of this Section 1.2(a) and subject to Section 1.9, Service Provider may make changes from time to time in the manner of performing the Services without Service Recipient's consent (including changes to its, its Affiliates' and its Personnel's systems) if (i) in circumstances where Buyer is Service Provider, Service Provider is making similar changes in the manner that it provides substantially similar services to itself and its Affiliates, (ii) Service Provider provides Service Recipient with reasonable prior written notice of any material change in the manner of providing the Services and (iii) Service Provider consults with Service Recipient in good faith to minimize the effect of such changes on the provision of such Services.

(b)    Notwithstanding anything to the contrary contained in this Agreement (but subject to Section 1.8), Service Provider shall not be obligated to provide any Service to the extent the provision of such Service would materially violate (i) any agreement or license with a Third Party or other contractual obligation, in each case, to which Service Provider or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law or Licenses and Permits; provided, however, that Service Provider shall provide Service Recipient written notice as promptly as practicable (and no later than ten (10) days) after Service Provider becomes aware of any Services that cannot be provided, which notice shall include an explanation of the anticipated violation.  In the event Service Provider is unable to provide a Service pursuant to the foregoing clauses (i) or (ii), Service Provider shall, if requested by Service Recipient, use its commercially reasonable efforts to determine an alternate method to provide such Service; provided, however, that Service Provider shall have no obligation to incur additional costs to provide such Service unless Service Recipient agrees in advance to reimburse Service Provider for such costs.

(c)    The Parties acknowledge and agree that initially, after the Effective Date, Services will be performed by either Vendors or Leased Employees acting at the direction of the Buyer, pursuant to the Employee Lease Agreement, and that despite such employees remaining the employees of Seller during the Leasing Period, Buyer will be responsible for directing the Leased Employees to perform all Services hereunder, to the extent such Leased Employees performed such services or similar services on behalf of Seller or its Affiliates during the twelve (12) month period immediately prior to the Closing Date.  Notwithstanding the separation of Services between Schedule A-1 and Schedule A-2, the Parties acknowledge that it is the Parties' intent that Leased Employees will continue to perform the same Services, no matter whether they are employed by Seller or Buyer at the relevant time, during the Leasing Period and thereafter.  To the extent any amendments are required to be made to Schedule A in order to fulfill this intent or to amend the Fees to align with the principles set forth in Section 2.1, the Single Point

of Contact of each Party shall discuss such necessary amendments and the Parties shall negotiate any such amendments in good faith in order to reflect the agreement of the Parties under this Section 1.2(c).

(d)    Notwithstanding the separation of Services between Schedule A-1 and Schedule A-2, the Parties acknowledge that it is the Parties' intent that during the Term, to the extent a Party is a party to any third party contract used to perform a Service for Seller or its Affiliates during the twelve (12) month period immediately prior to the Closing Date, such Party shall be the Service Provider for such Service under this Agreement.  To the extent any amendments are required to be made to Schedule A in order to fulfill this intent, the Single Point of Contact of each Party shall discuss such necessary amendments and the Parties shall negotiate any such amendments in good faith in order to reflect the agreement of the Parties under this Section 1.2(d).

(e)    Notwithstanding any other provision of this Agreement, if Seller remains the owner of any Acquired Assets, after the Closing, solely to effect an orderly transition of such Acquired Assets to Buyer, including, without limitation, to allow time to resolve regulatory or other legal issues, Seller is hereby authorized to grant, and if contemplated by any Seller Service in Schedule A-1 shall grant, the lenders under (i) the ABL Financing, (ii) the Citi L/C Facility as assumed by Buyer, (iii) the Real Estate Financing or (iv) the Cyrus Financing (the "Transform Lenders") liens on such assets (the "Transition Liens") and Seller shall honor the Transition Liens as if Seller was party to the financing documents underlying the ABL Financing (the "Transform Financing Documents"); provided, however, that Buyer shall bear any costs incurred by Seller in connection with granting or perfecting the Transition Liens, or participating in any enforcement actions taken by the Transform Lenders with respect to the Transition Liens.  The Transition Liens granted by Seller shall be deemed properly perfected and enforceable by entry of the Approval Order.  Upon transfer of the applicable Acquired Assets to Buyer, the respective Transition Lien shall terminate and be of no further force or effect against Seller.  The Bankruptcy Court shall retain jurisdiction to enforce any disputes among the Transform Lenders, Seller, and/or Buyer with respect to the Transition Liens.

Section 1.3    Changes in the Services.

(a)    If Service Recipient desires to make changes in this Agreement for different or additional services (each, a "Service Change") to be provided hereunder, the Parties shall comply with the following Service Change process:

(i)    Service Recipient shall prepare a written proposal for the Service Change, including a description of the applicable services, deliverables, schedule and term, in such detail as would be needed by an unaffiliated third party contractor to develop a competent proposal as to the cost to provide similar services, and a proposed fee.  For special project work that is within the scope of services covered by an hourly or unit rate in Schedule A, Service Recipient may use the hourly rate or unit rate stated in Schedule A in developing the cost for the proposal.

(ii)    Upon receipt of a written proposal for a Service Change, Service Provider shall promptly send to Service Recipient a written, good faith response in compliance

-3-

with this <u>Section 1.3</u> indicating whether Service Provider agrees to provide the different or additional services and, if so, (A) any proposed changes to the requested services, deliverables, schedule and term or (B) the proposed fees for the different or additional services, which shall not exceed the cost incurred by the Service Provider in providing such services.

(iii)    All Service Change proposals and responses must be delivered by a Party's Single Point of Contact to the other Party's Single Point of Contact.  Service Provider shall consider in good faith Service Recipient's written request and, if required pursuant to <u>Section 1.3(b),</u> shall agree thereto.  If Service Provider agrees to provide any different or additional services as contemplated by this <u>Section 1.3</u>, the Parties shall amend <u>Schedule A</u> hereto to document the relevant Service Change and shall obtain all necessary internal approvals prior to the execution of such amendment and any such different or additional services shall be deemed part of the Services.

(b)    Notwithstanding the foregoing, if Service Recipient, after the date hereof and during the first six (6) months following the Effective Time, identifies a service that prior to the Closing Date, (i) Seller or its Affiliates provided to the Business and at such time, Seller or its Affiliates have the persons, resources or assets to provide such services, or (ii) was provided to Seller and its Affiliates using persons, resources or assets transferred to Buyer under the Asset Purchase Agreement, as applicable, and in either case (i) or (ii) which service is required for Service Recipient to continue to operate the Business or the businesses of Seller and its Affiliates which remain after the Closing Date (the "<u>RemainCo Business</u>"), as applicable, after the Closing Date in substantially the same manner in which such business operated in the twelve (12) months prior to the Closing Date, and such service was not included on <u>Schedule A</u> or otherwise expressly stated herein and which Service Provider or its Affiliates are able to provide, the Parties shall negotiate in good faith and amend this Agreement and <u>Schedule A</u> as necessary to cause such additional service to be provided to Service Recipient on substantially the same terms and conditions as it was previously provided to the Business or the RemainCo Business prior to the Closing Date for fees not to exceed the cost incurred by the Service Provider in providing such services. After such six (6) month period, neither Party shall have any obligation to amend <u>Schedule A</u> to include additional services not included on <u>Schedule A</u> at such time; <u>provided</u> that the Parties will consider and negotiate any such request in good faith and if the Parties agree, shall further amend this Agreement and <u>Schedule A</u> as necessary to cause such additional services to be provided on agreed upon terms.

Section 1.4    <u>Transition Plan</u>.  Buyer shall use commercially reasonable efforts to expeditiously transition each Seller Service to Buyer's own internal organization or to obtain alternate Third Party sources to provide the Seller Services directly to Buyer. At Buyer's sole cost and expense, Seller shall provide Buyer with such information and assistance as is reasonably necessary to assist Buyer with such transition; <u>provided</u>, <u>however</u>, Seller shall not be obligated to provide any such information or assistance to the extent the provision of such information or assistance would materially violate (i) any agreement, license or other contractual obligation, in each case, with a Third Party to which Seller or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law or Licenses and Permits.

Section 1.5    <u>Knowledge Transfer for Benefit of Seller</u>.  During the Term and thereafter until completion of wind-down of Seller's estate, Buyer and its Affiliates shall use

reasonable best efforts to make those persons who were employed by Seller and its Affiliates immediately prior to the Closing Date and are employed by Buyer or one of its Affiliates after the Closing Date, reasonably available to Seller and its Affiliates to provide knowledge transfer and answer questions, including in connection with the wind-down of Seller's estate and claim administration, upon Seller's reasonable notice to Buyer. To the extent that any person must dedicate more than ten percent (10%) of his or her full time and energy to perform duties, functions and services on behalf of Seller, Seller shall pay Buyer an allocated portion of the wages and benefits associated with such employee. Seller acknowledges and agrees that such persons may leave the employment of Buyer or its Affiliates by their own volition or their employment may be terminated during the Term, at Buyer's sole discretion.

Section 1.6    <u>Standard of Care</u>.  Service Provider shall perform the Services in good faith and in compliance with all applicable Laws, without willful misconduct or gross negligence.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SERVICE PROVIDER MAKES NO, AND SERVICE RECIPIENT REPRESENTS THAT IT HAS NOT RECEIVED OR RELIED UPON, ANY OTHER GUARANTEE, REPRESENTATION OR WARRANTY OF ANY KIND (WHETHER EXPRESS OR IMPLIED) REGARDING ANY OF THE SERVICES PROVIDED HEREUNDER.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SERVICE PROVIDER EXPRESSLY DISCLAIMS ALL, AND SERVICE RECIPIENT EXPRESSLY REPRESENTS THAT IT HAS NOT AND IS NOT RELYING UPON, ANY OTHER GUARANTEES, REPRESENTATIONS AND WARRANTIES OF ANY NATURE WHATSOEVER, WHETHER STATUTORY, ORAL, WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.  SUBJECT TO THE OTHER PROVISIONS OF THIS AGREEMENT, SERVICE PROVIDER SHALL ONLY BE OBLIGATED TO PROVIDE SERVICES IN A MANNER SUBSTANTIALLY CONSISTENT WITH THE MANNER IN WHICH SUCH SERVICES WERE PROVIDED IN THE PAST.

Section 1.7    <u>Responsibility for Errors; Delays</u>.  Without limiting <u>Section 5.2</u>, Service Provider is responsible to Service Recipient for errors or omissions in Services caused by Service Provider or Vendor and as a non-exclusive remedy to Service Recipient, Service Provider shall re-perform or cause the re-performance of such Services or furnish correct information, payment or adjustments in the Services, in each case at no additional cost or expense to Service Recipient if Service Recipient promptly advises Service Provider of such error or omission.  Notwithstanding the foregoing, but without limiting <u>Section 5.2</u>, Service Provider shall not be obligated to re-perform or cause the re-performance of such Services or furnish correct information, payment or adjustments in the Services at no additional cost or expense to Service Recipient if the error or omission was directly or indirectly caused by the (i) provision of inaccurate or incomplete information by, or (ii) gross negligence or willful misconduct of, Service Recipient, its Affiliates or its or their Personnel.

Section 1.8    Cooperation; Alternatives.  Unless otherwise provided for in this Agreement, Seller and Buyer shall use reasonable best efforts to cooperate with each other in all matters relating to the provision and receipt of the Services, including to obtain any consents or licenses from Third Parties that Service Provider reasonably believes are necessary for the provision or receipt of the Services, as applicable, and each of Seller and Buyer shall each use their respective reasonable best efforts to cause each of their respective employees and contractors to reasonably cooperate to the extent required for effective delivery of the Services.

Section 1.9    Use of Affiliates and Vendors.  Service Provider may use any of its Affiliates or a qualified Third Party provider (a "Vendor") to provide the Services; provided, however, that (a) Service Provider shall remain responsible at all times for the performance of Services by its Affiliates or any Vendor under this Agreement and (b) a Vendor may only be used by Service Provider following the written consent of Service Recipient, such consent not to be unreasonably withheld, delayed or conditioned.  Service Recipient's prior written consent of a Vendor designation will not be required, however, if (x) the Vendor provided those Services to the Business or the businesses of the Service Recipient, as applicable, prior to the Closing Date; (y) the Vendor is a Third Party who provided the same services to Service Provider prior to the Closing Date and the Services would be provided by Vendor to Service Recipient on the same terms and subject to the same conditions as provided to Service Provider prior to the Closing Date or (z) Service Provider changes the Vendor used to provide the Services or similar services to Service Provider and the Services would be provided by Vendor to Service Recipient on the same terms or on terms no less favorable to Service Recipient, in each case as provided to Service Provider.

Section 1.10    Intellectual Property License.  Solely during the Service Period, and solely to the extent required for the provision or receipt, as applicable, of Services in accordance with this Agreement, each Party ("Licensor"), for itself and on behalf of its Affiliates, hereby grants to the other Party and its Affiliates ("Licensee") a non-exclusive, non-transferable, royalty-free, worldwide license for the term of this Agreement, to use any Intellectual Property (and any tangible embodiments thereof) owned by Licensor or its Affiliates, subject to any applicable restrictions, limitations and other instructions provided in writing to Licensee.  To the extent the foregoing license includes the use of any Trademarks, Licensee shall ensure that its use of such Trademarks shall only be with respect to goods and services of a level of quality equal to or greater than the quality of the goods and services with respect to which Sellers used such Trademarks prior to the Closing and that it shall not use such Trademarks in any manner that would reasonably damage or tarnish the goodwill associated therewith or the goodwill of the Licensor.  Any and all goodwill arising from Licensee's use of such Trademarks will inure solely to the benefit of Licensor.  Notwithstanding anything to the contrary contained in this Agreement, including in this Section 1.10, neither Party shall be obligated to license any Intellectual Property to the extent such license would violate (i) any agreement, license or other contractual obligation, in each case, with a Third Party to which such Party or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law.

Section 1.11    Ownership of Data and Other Assets.  Neither Party shall acquire under this Agreement any right, title or interest in any asset or Intellectual Property that is owned or licensed by the other Party or its Affiliates.  All data provided by or on behalf of a Party to the other Party or its Affiliates for the purpose of providing or receiving the Services shall remain

the property of the Party providing such data unless otherwise specified herein.  To the extent the provision of any Service involves Intellectual Property, each Party agrees that it and its Affiliates shall not copy, modify, reverse engineer, decompile or in any way alter any of such material, or otherwise use such material in a manner inconsistent with the terms and provisions of this Agreement or the Asset Purchase Agreement without the express written consent of the other Party.

Section 1.12    Data Privacy.  In this Section 1.12 the terms "personal data" and "processing" shall have the meanings ascribed to them under applicable data protection, privacy or similar applicable Laws (including all statutes, enacting instruments, common law, regulations and directives, concerning the protection or processing of personal data) (the "Data Protection Laws").  Each Party shall, and shall cause its Affiliates or Personnel to, comply with all applicable Data Protection Laws in relation to all personal data that is processed by it in the course of performing its obligations under this Agreement (the "Protected Data").  If in connection with this Agreement, either Party obtains access to any Protected Data, such Party shall, and shall cause each of its relevant Affiliates to, (a) implement and maintain appropriate technical and organization measures and security procedures and practices in respect of the Protected Data to prevent unauthorized or unlawful access, disclosure, use, or processing of the Protected Data that are no less protective than those used by such Party in the ordinary course of business, (b) keep accurate records relating to all processing of Protected Data in accordance with its applicable procedures and practices and, upon reasonable advanced written notice, permit the other Party to examine or audit such records with respect to compliance with Data Protection Laws, (c) reasonably cooperate with the other Party in connection with any complaints or investigations related to unauthorized use or disclosure of, access to, or other processing of Protected Data, (d) process Protected Data solely for the purposes of this Agreement or as otherwise required by applicable Law, (e) use and disclose the Protected Data in a manner that is consistent with Seller's past practices and policies and comply with all reasonable restrictions on the use, handling and disclosure of Protected Data imposed by the other Party (upon reasonable advance notice from such other Party) or by applicable Law and (f) notify the other Party in writing as soon as reasonably practicable, but in any event within forty-eight (48) hours after obtaining knowledge of any disclosure, or suspected disclosure, of Protected Data to a Third Party in a manner prohibited by applicable Law or the terms of this Agreement or of any other unauthorized access or misuse, or suspected unauthorized access or misuse, of Protected Data (to the extent not prohibited under applicable Law or recommendation of a Governmental Authority) and take reasonable actions to prevent further disclosure.  To the extent required by applicable Data Protection Laws or as deemed necessary by the Parties, the Parties (or their respective Affiliates) will enter into additional agreements with respect to the processing of Protected Data.

Section 1.13    Single Point of Contact.  Each Party shall designate a contact person (each, a "Single Point of Contact"), as set forth on Schedule B, to facilitate communications and performance with respect to this Agreement and the Services, including operational matters, and to ensure that this Agreement is fulfilled consistently with the intent of the Parties as of the Effective Date.  Unless otherwise authorized in writing or specified in the specific Schedule related to a Service, the Parties shall direct all communications relating to this Agreement and the Services to the Single Point of Contact for the other Party.  The Single Point of Contact for each Party shall meet (in person or via telephone or video conference) at least

monthly during the Term, or more often as otherwise determined necessary by the Parties, in order to discuss the progress of the Agreement and fulfilment of each Party's obligations hereunder. Each Party shall have the right at any time and from time to time to replace its Single Point of Contact by written notice to the other Party in accordance with Section 6.3, following which Schedule B shall be automatically amended to reflect such Party's new Single Point of Contact.

Section 1.14   Records.  During the term of this Agreement and for one (1) year thereafter (or such longer period as may be required by applicable Law), Service Provider and Service Recipient shall each use commercially reasonable efforts to maintain complete and accurate records related to any Service provided, Fees invoiced and payments made hereunder (the "Service Records"); provided that if Service Provider at any time offers in writing to transfer the Service Records in Service Provider's possession to Service Recipient, Service Recipient shall have sixty (60) days thereafter to take possession of the Service Records, after which Service Provider shall no longer have an obligation to retain, and may thereafter delete or destroy, such Service Records.  Upon reasonable advance notice, and subject to ARTICLE IV, each Party in possession of Service Records shall use commercially reasonable efforts to permit the other Party or its Representatives, as applicable, reasonable access to or, at the requesting Party's expense, copies of, such Service Records during regular business hours; provided that (a) such access shall not disrupt the normal operations of such first Party's business and (b) nothing herein shall require any Party to provide to the other Party, its Affiliates or its Representatives with access to or copies of any information to the extent that such access to or the provision of such information would violate any applicable Law or contractual obligation (including any Law or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information); provided, further, that such first Party and its Affiliates shall use commercially reasonable efforts to provide such information in a manner that does not violate such Law or is in accordance with such agreement.

Section 1.15   Employees and Contractors.  Service Provider shall be responsible for the appointment of the appropriate Personnel to carry out and perform the Services.  At all times during the provision of Services, Personnel (excluding Leased Employees) shall continue to be solely an employee, agent or contractor, as applicable, of Service Provider and shall not, unless otherwise agreed in writing by Service Provider and Service Recipient, become an employee, agent or contractor of Service Recipient, and such Personnel (Excluding Leased Employees) shall not be entitled to receive any compensation, benefits, perquisites or privileges from Service Recipient, unless otherwise agreed in writing by Service Provider and Service Recipient.  Service Provider or one or more of its Affiliates, as applicable, shall be responsible for paying all necessary employment taxes, salary and incidental appointment and employment costs, if any, as may be required by applicable Law with respect to any such Personnel (excluding Leased Employees).  The employment, direction, compensation and benefits of Leased Employees shall be subject to the terms of the Employee Lease Agreement.

Section 1.16   Access to Facilities.  If either Party, its Affiliates or its Personnel require access to the facilities of the other Party or its Affiliates (collectively, the "Facilities") in order to receive or perform the Services, then the Party controlling such access shall reasonably allow the other Party, its Affiliates or their respective Personnel such access in accordance with this Section 1.16 and Section 1.17.  The Party to whom such access is given shall (a) limit such

access to those of its and its Affiliates' Personnel who reasonably require such access in connection with this Agreement, (b) follow, and cause its Affiliates and their respective Personnel to follow, all rules and procedures for use of such Facilities, provided such rules and procedures are communicated to such Party in writing in advance, (c) not attempt to obtain access to, use or interfere with any systems or resources of the other Party, except to the extent permitted by the other Party and (d) not intentionally damage, disrupt or impair the normal operation of the Facilities.  Any evidenced damage caused by a Party, its Affiliates or their respective Personnel or agents in the Facilities of the other Party shall be repaired to the condition prior to such damage by or on behalf of such Party, in each case, at the damaging Party's sole cost and expense; provided that such costs and expenses are reasonable and documented.

Section 1.17   Computer Access.  If either Party, its Affiliates or its Personnel are given access, whether on-site or through remote facilities, to any communications, computer, or electronic data storage systems (each, an "Electronic Resource") of the other Party, its Affiliates or its Personnel in connection with this Agreement, then the Party to whom such access is given shall ensure that its Personnel's use of such access shall be solely limited to performance or exercise of such Party's duties and rights under this Agreement, and that such Personnel shall not attempt to access any Electronic Resources other than those specifically required for the performance of such duties or exercise of such rights.  The Party given access shall (a) limit such access to those of its and its Affiliates' Personnel who reasonably require such access in connection with this Agreement, (b) advise the other Party in writing of the name of each of such Personnel who shall be granted such access, (c) follow, and cause its Affiliates and its and Affiliates' Personnel to follow, all security rules and procedures for use of such Electronic Resources, provided such rules and procedures are communicated to such Party in writing, (d) not attempt to obtain access to, use or interfere with any Electronic Resource of the other Party, or any data owned, used or processed by the other Party, except to the extent permitted by the other Party and required to do so to provide or receive the Services and (e) not disable, damage or erase or disrupt or impair the normal operation of the Electronic Resource.  All user identification numbers and passwords disclosed to a Party's or its Affiliates' Personnel and any information obtained by such Party's or its Affiliates' Personnel as a result of its access to, and use of the other Party's, its Affiliates' or its Personnel's Electronic Resources shall be deemed to be, and shall be treated as, Confidential Information of the Party on behalf of whom such access is granted.  Each Party shall reasonably cooperate with the other Party in the investigation of any apparent unauthorized access by the other Party, its Affiliates or its Personnel to any Electronic Resources or unauthorized release of Confidential Information and take reasonable actions to prevent any further unauthorized access to any Electronic Resources or other unauthorized or unlawful conduct or activities related to the Electronic Resources.  Each Party shall notify the other Party in writing within forty-eight (48) hours of discovery of any actual or suspected unauthorized access to or disclosure of any Electronic Resource of the other Party, its Affiliates or its Personnel, to the extent reasonably practicable and not prohibited under applicable Law or recommendation of a Governmental Authority.  Notwithstanding anything in this Agreement to the contrary, nothing in this Section 1.17 shall in any way limit the obligations of either Party or any of its Affiliates or Personnel set forth in Section 1.12.

## ARTICLE II

## CHARGES AND PAYMENTS FOR SERVICES

Section 2.1    Compensation.

(a)    Seller Compensation. As consideration for the provision of the Seller Services, (i) during the sixty (60) day period after the Effective Date (the "Initial Period"), Buyer shall pay, or cause to be paid, to Seller or its designee(s) the fixed fee for the Seller Services specified on Schedule A-1 (the "Seller Administrative Fee") within five (5) Business Days after the Effective Date and thereafter on a monthly basis, prior to the monthly anniversary of the Effective Date, in addition to the Service-by-Service fees for the Seller Services specified on Schedule A-1 and (ii) the Parties shall negotiate in good faith prior to the end of the Initial Period and amend Schedule A-1 to reflect, the appropriate fees for the Seller Services that will continue to be provided by Seller after the Initial Period ((i) and (ii), collectively, the "Seller Fees"), each payable in accordance with Schedule A-1.  The Seller Fees negotiated by the Parties after the Effective Date with respect to the post-Initial Period shall be as agreed to by the Parties at such time or shall be equal to Seller's good faith estimate of the cost, including any income and other taxes, incurred by the Seller Entities in providing such services.  The Parties acknowledge and agree that the intent of this Section 2.1(a) is for Buyer to make Seller whole for the actual, costs and expenses paid or provided by Seller and its Affiliates in the performance of Seller Services. Other than the Seller Administrative Fee, in the event any Seller Fee specified on Schedule A-1 exceeds such amount or rates (as applicable), such Seller Fee shall be deemed to be reduced to such amount or rates (as applicable) with retroactive effect, unless otherwise agreed in writing by the Parties, and the Parties shall amend Schedule A-1 accordingly.  Upon termination of an individual Seller Service, Buyer shall pay a pro rata portion of the applicable Seller Fee specified on Schedule A-1, calculated based on the portion of the individual Seller Service actually performed, or expense actually incurred, through the date Seller, its Affiliates or its Vendors performed the Seller Service.  If the Seller Fees include charges for Seller Services performed by a Vendor and the Vendor's fees increase during the Service Period, then Seller shall be entitled to pass through the increased fees as an increase in the Seller Fees; provided that to the extent that Seller uses the same Vendor to provide similar services to itself or its Affiliates, each of the Parties shall be responsible for their pro rata portion of the increased amount in accordance with the level of services such Party receives (directly or indirectly) from such Vendor.  In the event of any such increase in a Vendor's fees, Seller shall provide Buyer with prompt written notice thereof (to the extent reasonably practicable, at least ten (10) Business Days prior to such increase going into effect).

(b)    Buyer Compensation. As consideration for the provision of the Buyer Services (i) during the Initial Period, Seller shall pay, or cause to be paid, to Buyer or its designee(s) the fees for the Buyer Services specified on Schedule A-2 (the "Buyer Fees") within five (5) Business Days after the Effective Date and thereafter on a monthly basis, prior to the monthly anniversary of the Effective Date, and (ii) the Parties shall negotiate in good faith prior to the end of the Initial Period and amend Schedule A-2 to reflect, the appropriate fees for the Buyer Services that will continue to be provided by Buyer after the Initial Period ((i) and (ii), collectively, the "Buyer Fees"), each payable in accordance with Schedule A-2.  The Buyer Fees negotiated by the Parties after the Effective Date with respect to the post-Initial Period shall be as

agreed to by the Parties at such time or shall be equal to Buyer's good faith estimate of the cost, including any income and other taxes, incurred by the Buyer Entities in providing such services. The Parties acknowledge and agree that the intent of this Section 2.1(b) with respect to Buyer Fees post-Initial Period is for Seller to make Buyer whole for the actual, costs and expenses paid or provided by Buyer and its Affiliates in the performance of Buyer Services.  Other than the Buyer Administrative Fee, in the event any Buyer Fee negotiated post-Initial Period and specified on Schedule A-2 exceeds such amount or rates (as applicable), such Buyer Fee shall be deemed to be reduced to such amount or rates (as applicable) with retroactive effect, unless otherwise agreed in writing by the Parties, and the Parties shall amend Schedule A-2 accordingly.  Following the Initial Period, upon termination of an individual Buyer Service, Seller shall pay a pro rata portion of the applicable Buyer Fee specified on Schedule A-2, calculated based on the portion of the individual Buyer Service actually performed, or expense actually incurred, through the date Buyer, its Affiliates or its Vendors performed the Buyer Service.  If the Buyer Fees applicable post-Initial Period include charges for Buyer Services performed by a Vendor and the Vendor's fees increase during the Service Period, then Buyer shall be entitled to pass through the increased fees as an increase in the Buyer Fees; provided that to the extent that Buyer uses the same Vendor to provide similar services to itself or its Affiliates, each of the Parties shall be responsible for their pro rata portion of the increased amount in accordance with the level of services such Party receives (directly or indirectly) from such Vendor.  In the event of any such increase in a Vendor's fees, Buyer shall provide Seller with prompt written notice thereof (to the extent reasonably practicable, at least ten (10) Business Days prior to such increase going into effect).

Section 2.2    Payments.

(a)    Payment for Seller Services.  Buyer shall pay (or cause to be paid) the Fees relevant to the Seller Services in advance in accordance with Section 2.1(a) and this Section 2.2(a); provided that, whenever possible, Buyer shall pay (or cause to be paid) the Fees due to Vendors directly to such Vendor or other applicable third-party not prohibited from receiving such direct payments (each, a "Direct Recipient") to such Direct Recipients in accordance with Schedule A-1.  Unless otherwise provided on Schedule A-1, the Parties shall perform the process set forth in the remainder of this Section 2.2(a) for payment of Seller Services.  Within ten (10) Business Days prior to the first Business Day of each month during the Term, Seller shall provide to Buyer a reasonable estimate of the Seller Fees forecasted for the Seller Services for each week of the upcoming month (the "Weekly Forecasted Fees").  Seller may revise the Weekly Forecasted Fees for a given week at any point up until Buyer has made a payment pursuant to this Section 2.2(a) in connection with such week's Weekly Forecasted Fees.  On every [Friday] during the Term, Buyer shall pay Seller or, if applicable, its designee(s), Affiliates or Vendors by electronic transfer of immediately available funds to a segregated bank account designated by such Person from time to time, the Weekly Forecasted Fees corresponding to the subsequent week, less any amount of such week's Weekly Forecasted Fees as paid, or may be paid, to a Direct Recipient.  Within two (2) weeks after the end of each month during the Term, Seller shall provide Buyer with an invoice of all Fees relevant to the Seller Services during the preceding month actually paid or payable by Seller and the Parties shall promptly reconcile the difference between the total of the month's Weekly Forecasted Fees and the invoiced Fees plus Fees paid to any Direct Recipient (the "Reconciliation Amount"), if any.  A Party who owes monies to the other Party as a result of such reconciliation shall pay the undisputed

Reconciliation Amount within thirty (30) days following Buyer's dated invoice of Fees actually paid or payable. All undisputed amounts remaining unpaid for more than thirty (30) days after their respective due date(s) shall accrue one and one-half percent (1.5%) interest per month until paid in full. Notwithstanding anything set forth herein, Seller may suspend performance of any applicable Service for the following month until such time as it receives the Weekly Forecasted Fees from Buyer to enable it to perform such Service(s) and any non-performance during such time shall not constitute a breach of this Agreement.

(b)    Payment for Buyer Services. Seller shall pay (or cause to be paid) the Buyer Fees in accordance with Section 2.1(b). Unless otherwise mutually agreed in writing or otherwise set forth on Schedule A-2, all undisputed amounts payable under this Agreement shall be paid monthly by Seller to Buyer or, if applicable, its designee(s), Affiliates or Vendors by electronic transfer of immediately available funds to a bank account designated by such Person from time to time, within thirty (30) days following receipt of an invoice for such amount. All undisputed amounts remaining unpaid for more than thirty (30) days after their respective due date(s) set forth in an invoice statement shall accrue one and one-half percent (1.5%) interest per month until paid in full.

Section 2.3    Taxes.

(a)    Service Provision Taxes. The Parties hereby acknowledge that the Fees specified in Schedule A do not include applicable taxes. Subject to Section 1.15, Service Recipient shall be responsible for the payment of all taxes payable in connection with the Services, including sales, use, excise, value-added, business, service, goods and services, consumption, withholding and other similar taxes or duties, including taxes incurred on transactions between and among Service Provider, its Affiliates and its Vendors, along with any related interest and penalties, in each case, imposed, assessed or payable with respect to such taxes (together, such amounts, the "Service Provision Taxes"). Service Recipient shall be responsible only for the payment of Service Provision Taxes payable as a result of its or its Affiliates' receipt of the Services. Service Recipient shall reimburse Service Provider for any deficiency relating to Service Provision Taxes that are Service Recipient's responsibility under this Agreement. Notwithstanding anything in this Section 2.3 to the contrary, each Party shall be responsible for its own income, gross receipts and franchise taxes, employment taxes and real or personal property taxes, except as provided in the Asset Purchase Agreement. The Parties shall cooperate in good faith to minimize Service Provision Taxes to the extent legally permissible. Each Party shall provide to the other Party any resale exemption, multiple points of use certificates, treaty certification and other exemption information reasonably requested by the other Party.

(b)    Withholding. The Parties acknowledge that payments made hereunder by Service Recipient to Service Provider shall not be subject to deduction and withholding of any Taxes under applicable Law.

**ARTICLE III**

**TERMINATION**

-12-

Section 3.1    Termination of an Individual Service for Convenience by Service Recipient.  Except as otherwise set forth on Schedule A and subject to the next sentence, Service Recipient, upon thirty (30) days' prior written notice to Service Provider, may reduce or terminate for Service Recipient's convenience any individual Service.  Service Recipient may not reduce or terminate an individual Service if such early reduction or termination would prevent Service Provider, its Affiliates or Vendors from performing another Service that is not also being terminated.  If Service Recipient's early reduction or termination of any Service results in Service Provider having to pay any out-of-pocket fees or expenses to a Third Party (including termination charges), Service Recipient shall reimburse Service Provider for such charges, if Service Recipient is notified prior to the incurrence of such charges.  Upon notification of such charges, Service Recipient, at its sole discretion, may choose to continue, reduce or terminate the applicable Service.  In connection with any early reduction or termination of Services by Service Recipient in accordance with the provisions of this Section 3.1, Service Recipient and Service Provider shall coordinate in good faith regarding the early termination or continuation of preexisting service contracts with Vendors.

Section 3.2    Mutual Termination Rights.

(a)    Subject to the next sentence, either Party may terminate (i) an individual Service in the event of a material breach of this Agreement with respect to such Service by the other Party if such material breach is curable by the breaching Party and the breaching Party fails to cure the breach within thirty (30) days following its receipt of written notice of the breach from the non-breaching Party or (ii) this Agreement in the event of an assignment with respect to which the non-assigning Party has not consented in accordance with Section 6.2.  If a material breach is not curable by the breaching Party, the non-breaching Party may immediately terminate any Service to which the breach relates following the non-breaching Party's delivery of notice to the breaching Party pursuant to Section 6.3.  Notwithstanding anything herein to the contrary, Service Recipient's failure to pay (or cause to be paid) any Fees when due and payable shall not constitute a breach of the terms of this Agreement if there exists a good faith disagreement regarding such Fees.

(b)    Except as otherwise provided herein, the obligation of Service Provider to provide, or cause to be provided, any Service shall cease on the earliest to occur of (i) the expiration of the Services Period applicable to such Service or (ii) the date on which such Service is terminated in accordance with the terms of this ARTICLE III.  This Agreement shall automatically terminate without notice, and all provisions of this Agreement shall become null and void and of no further force and effect, except for the provisions set forth in Section 6.5, on the date on which neither Party has any obligations to provide any Service under this Agreement.

Section 3.3    Obligations on Termination.  Upon termination of this Agreement, Service Provider shall invoice Service Recipient for all outstanding Fees rendered through the effective date of termination of this Agreement and, within thirty (30) days following receipt of such invoice, Service Recipient shall pay all outstanding Fees.  Undisputed payments not made within thirty (30) days after termination of this Agreement shall be subject to the late charges as provided in Section 2.2.

Section 3.4    Termination of an Individual Service by Service Provider. If, during the Term, (a) with respect to a Service provided by a Vendor of Service Provider at the Effective Time, such Vendor is unwilling or unable to provide the Service, or (b) with respect to a Service provided by Service Provider at the Effective Time, Service Provider is unable to continue providing the Service using commercially reasonable efforts, in each case (i) and (ii), Service Provider, upon providing thirty (30) days' prior written notice to Service Recipient, may terminate the affected Service. Such termination of the affected Service shall have no effect upon the provision of the Services to Service Recipient unless other Services are dependent on that terminated Service, in which case the Parties will cooperate and use commercially reasonable efforts to promptly determine and implement a reasonable alternative arrangement for the affected Services. Notwithstanding the foregoing, Buyer may not terminate any Buyer Service listed on Schedule A-2 as "Required for GOB" prior to the end of all GOB Periods for all GOB Stores.

## ARTICLE IV

## CONFIDENTIALITY

Section 4.1    Confidential Information. "Confidential Information" means any nonpublic information whether disclosed in oral, written, visual, electronic or other form, that (a) one Party or one of its Affiliates (the "Disclosing Party") discloses to the other Party or one of its Affiliates (the "Receiving Party"), including information received as a result of data or system access during the term of this Agreement, (b) relates to or is disclosed in connection with this Agreement and (c) is or reasonably should be understood by the Receiving Party to be confidential or proprietary to the Disclosing Party (whether or not such information is marked "Confidential" or "Proprietary"). Confidential Information of the Business is the Confidential Information of Buyer.

Section 4.2    Treatment of Confidential Information. The Receiving Party shall (a) restrict disclosure of the Disclosing Party's Confidential Information to its and its Affiliates' Personnel with a need to know such Confidential Information to fulfill its obligations under this Agreement, (b) instruct those Personnel of their obligation not to disclose the Confidential Information or use the Confidential Information except to fulfill the Receiving Party's obligations under this Agreement and (c) protect the Confidential Information, and require those Personnel to protect it, using the same degree of care as the Receiving Party uses with its own Confidential Information, but no less than reasonable care. The Receiving Party shall notify the Disclosing Party as soon as reasonably practicable after obtaining knowledge of any disclosure, or suspected disclosure, of any Confidential Information to a Third Party in a manner prohibited by applicable Law or the terms of this Agreement.

Section 4.3    Liability for Unauthorized Disclosure. The Receiving Party shall be liable to the Disclosing Party for any unauthorized disclosure of Confidential Information in violation of this Agreement by it, its Affiliates and any of its or its Affiliates' current or former Personnel.

Section 4.4    Return or Destruction. Without limiting the foregoing, when any Confidential Information is no longer needed for the purposes contemplated by this Agreement,

the Receiving Party shall, promptly upon the request of the Disclosing Party, either return such Confidential Information in tangible form or certify to the other Party that it has destroyed such Confidential Information.

Section 4.5    Exceptions to Confidential Treatment.  The obligations under Section 4.2 do not apply to any information that the Receiving Party can demonstrate (a) was disclosed to the Receiving Party by a Third Party without an obligation of confidentiality to the Disclosing Party, its Affiliates or any other Third Party, as applicable, (b) is or becomes available to the public other than by disclosure by the Receiving Party or its Affiliates in violation of this Agreement or (c) was or is independently developed by the Receiving Party or its Affiliates without use of the Disclosing Party's Confidential Information.  Notwithstanding anything to the contrary, with respect to the Seller and its Affiliates, Confidential Information relating to the Business that existed as of the Effective Time shall not be subject to the foregoing exceptions (a) and (c).

Section 4.6    Protective Arrangement.  A Receiving Party may disclose the Disclosing Party's Confidential Information upon the advice of the Receiving Party's legal counsel that (a) such information is required to be disclosed by Law or the rules and regulations of any applicable Governmental Authority and the Receiving Party has complied with this Section 4.6 or (b) such information is required to be disclosed in response to a valid subpoena or Order of a court or other Governmental Authority of competent jurisdiction or other valid legal process and the Receiving Party has complied with this Section 4.6.  Prior to any such disclosure, the Receiving Party shall give the Disclosing Party, to the extent legally permitted and reasonably practicable, prompt prior written notice of such disclosure and an opportunity to contest such disclosure, and the Receiving Party shall use commercially reasonable efforts to cooperate, at the expense of the Receiving Party, in seeking any reasonable protective arrangements requested by the Disclosing Party.  If such appropriate protective order or other remedy is not obtained, the Receiving Party may furnish, or cause to be furnished, only that portion of such information that the Receiving Party is advised by legal counsel is legally required to be disclosed.  The Receiving Party shall take commercially reasonable steps to ensure that confidential treatment is accorded such information.

Section 4.7    Ownership of Information.  Except as otherwise provided in this Agreement, all Confidential Information provided by or on behalf of a Party (or its Affiliates) that is provided to the other Party or its Affiliates shall remain the property of the Disclosing Party and nothing herein shall be construed as granting or conferring rights of license or otherwise in any such Confidential Information.

# ARTICLE V

# INDEMNIFICATION; LIMITATION OF LIABILITY

Section 5.1    Indemnification by Service Recipient.  Notwithstanding anything to the contrary in Section 5.5, Service Recipient shall defend, indemnify and hold harmless Service Provider and its Affiliates and its Vendors and Personnel (each, a "Service Provider Indemnitee") from and against any and all Losses actually incurred or suffered by Service Provider Indemnitee of every kind and nature to the extent caused by or resulting from a third

party claim arising from or relating to: (a) a breach of any provision of this Agreement by Service Recipient or its Affiliates or any of their respective Personnel; or (b) the gross negligence, willful misconduct or fraud of Service Recipient or its Affiliates or their respective Personnel (collectively, the "Service Recipient Claims"). Notwithstanding the obligations set forth above in this Section 5.1, Service Recipient shall not defend, indemnify or hold harmless Service Provider Indemnitees to the extent that such Service Recipient Claims were caused by: (i) a breach of any provision of this Agreement by Service Provider (including pursuant to Section 1.9), its Affiliates or its Vendors or any of their respective Personnel; (ii) the gross negligence, willful misconduct or fraud of Service Provider or its Affiliates or its Vendors or any of their respective Personnel in the performance (or non-performance) of this Agreement; or (iii) actual or alleged infringement, misappropriation or other violation by Service Provider, its Affiliates or its Vendors or any of their respective Personnel or by Service Recipient or its Affiliates of the Intellectual Property of a Third Party in connection with Service Provider's, its Affiliates' or its Vendors' or any of their respective Personnel's provision, or Service Recipient's or its Affiliates' receipt, of Services.

Section 5.2    Indemnification by Service Provider. Notwithstanding anything to the contrary in Section 5.5, Service Provider shall defend, indemnify and hold harmless Service Recipient and its Affiliates and Personnel (each, a "Service Recipient Indemnitee") from and against any and all Losses actually incurred or suffered by Service Recipient Indemnitee of every kind and nature to the extent caused by or resulting from a third party claim arising from or relating to: (a) a breach of any provision of this Agreement by Service Provider (including pursuant to Section 1.9), its Affiliates, its Vendors or any of their respective Personnel; (b) the gross negligence, willful misconduct or fraud of Service Provider, its Affiliates or its Vendors or any of their respective Personnel in the performance (or non-performance) of the Services; or (c) actual or alleged infringement, misappropriation or other violation by Service Provider, its Affiliates or its Vendors or any of their respective Personnel or by Service Recipient or its Affiliates of the Intellectual Property of a Third Party in connection with Service Provider's, its Affiliates' or its Vendors' or any of their respective Personnel's provision, or Service Recipient's or its Affiliates' receipt, of Services (together, the "Service Provider Claims"). Notwithstanding the obligations set forth above in this Section 5.2, Service Provider shall not defend, indemnify or hold harmless Service Recipient Indemnitees to the extent that such Service Provider Claims set forth in clauses (a)-(c) of this Section 5.2 were caused by: (i) a breach of any provision of this Agreement by Service Recipient, its Affiliates or any of their respective Personnel or (ii) the gross negligence, willful misconduct or fraud of Service Recipient, its Affiliates or Personnel in the performance (or non-performance) of this Agreement. Service Recipient Claims and Service Provider Claims are each individually referred to as a "Claim." Notwithstanding the inclusion of Leased Employees as "Personnel" of Buyer in Sections 5.1 and 5.2, no Seller Entity shall be required to indemnify Buyer, its Affiliates, Vendors or Personnel for any Claims which are caused by or result from the acts or omissions of any Leased Employee during the Leasing Period (a "Leased Employee Claim"). Buyer shall defend, indemnify and hold harmless Seller, its Affiliates, Vendors and Personnel for any such Leased Employee Claim.

Section 5.3    Procedure. In the event of a Claim that arises from a Third Party claim, the indemnified Party shall give the indemnifying Party prompt notice in writing of the Claim; but the failure to provide such notice shall not release the indemnifying Party from any of its obligations under this ARTICLE V, except to the extent the indemnifying Party is materially

-16-

prejudiced by such failure.  Upon receipt of such notice, the indemnifying Party shall be entitled to assume and control the defense of the Claim at its expense and through counsel of its choice that is reasonably satisfactory to the indemnified Party, and shall give notice of its intention to do so to the indemnified Party within thirty (30) days of the receipt of such notice from the indemnified Party; provided, however, that the indemnifying Party shall not, without the prior written consent of the indemnified Party, (a) enter into any settlement or compromise with respect to any Claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to applicable Service Provider Indemnitee or Service Recipient Indemnitee of a written release from all liability in respect of the Claim or (b) enter into any settlement or compromise with respect to any Claim in any manner that may adversely affect the applicable Service Provider Indemnitee or Service Recipient Indemnitee other than as a result of money damages or other monetary payments that are indemnified hereunder. The applicable Service Provider Indemnitee or Service Recipient Indemnitee shall have the right at its own cost and expense to employ separate counsel and participate in the defense of any Claim.

Section 5.4    Independent Obligation.  The obligations of each Party to defend, indemnify and hold harmless, the other Parties' indemnitees under this ARTICLE V are independent of each other and any other obligation of the Parties under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, if, in accordance with this Agreement, Seller performs or is the recipient of any Service which violates any agreement or license with a Third Party or other contractual obligation, Buyer shall defend, indemnify and hold harmless Seller and its Affiliates and Personnel from and against any and all Losses actually incurred or suffered by such Seller Entities of every kind and nature to the extent caused by or resulting from a third party claim arising from or relating to provision or receipt of such Service.

Section 5.5    Limitation of Liability.  EXCEPT FOR (A) LIABILITIES THAT ARE PAYABLE BY THE APPLICABLE INDEMNIFIED PARTY IN CONNECTION WITH A THIRD PARTY CLAIM OR (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY, NOR ITS AFFILIATES OR ITS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES, BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES OR LOST PROFITS HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING IN ANY WAY OUT OF THIS AGREEMENT.  EXCEPT AS OTHERWISE LIMITED IN THIS SECTION 5.5, EACH PARTY'S AND ITS AFFILIATES' LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO (1) SERVICE PROVIDER'S OBLIGATION TO RE-PERFORM A SERVICE (IF SERVICE PROVIDER IS THEN CAPABLE OF PROVIDING SUCH SERVICE PURSUANT TO THE TERMS OF THIS AGREEMENT) OR FURNISH CORRECT INFORMATION, PAYMENT OR ADJUSTMENT IN THE SERVICES AT NO ADDITIONAL COST OR EXPENSE TO SERVICE RECIPIENT IF SERVICE RECIPIENT PROMPTLY ADVISES SERVICE PROVIDER OF SUCH ERROR OR OMISSION, (2) OTHER SPECIFIC PERFORMANCE (OR OTHER EQUITABLE RELIEF) AS PROVIDED IN SECTION 6.9 AND (3) THE PAYMENT OF MONETARY DAMAGES, NOT TO EXCEED, FOR ALL CLAIMS IN THE AGGREGATE, THE AGGREGATE AMOUNT OF FEES ACTUALLY PAID (OR OTHERWISE PAYABLE) TO SUCH PARTY AS SERVICE PROVIDER UNDER THIS AGREEMENT.

# ARTICLE VI

# MISCELLANEOUS

Section 6.1    Amendment; Waiver.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 6.2    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other Party, and any purported assignment or delegation in contravention of this Section 6.2 shall be null and void and of no force and effect. Notwithstanding the preceding sentence, either Party may assign any or all of its rights and obligations under this Agreement (a) to an Affiliate, so long as the assigning Party will remain liable to the non-assigning Party for the performance of the assigning Party's obligations hereunder, or (b) with respect to Buyer, in connection with a sale or disposition of any assets or lines of business to which this Agreement relates; provided that in the case of (b), the transferee of such assets shall agree in writing to be bound by the terms of this Agreement as if named as a "Party" hereto.  Subject to the preceding sentences of this Section 6.2, this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the Parties and their respective successors and permitted assigns.

Section 6.3    Notices.  Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) via e-mail or (c) by a nationally recognized courier for overnight delivery service. A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if via e-mail, on the date of successful transmission and (iii) if by nationally recognized courier, one Business Day after delivery to such courier. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

If to Seller, then to:

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179
Attention:  General Counsel

-18-

E-mail:  counsel1@searshc.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Ray C. Schrock, P.C., Ellen J. Odoner, Gavin Westerman and
Sunny Singh
E-mail:  Ray.Schrock@weil.com; Ellen.Odoner@weil.com;
Gavin.Westerman@weil.com; Sunny.Singh@weil.com

If to Buyer, then to:

Transform Holdco LLC
c/o ESL Partners, Inc.
1170 Kane Concourse, Suite 200
Bay Harbor Islands, FL 33154
Attention:  Kunal S. Kamlani and Harold Talisman
Facsimile:  (305) 864-1370
E-mail: kunal@eslinvest.com; harold@eslinvest.com

with a copy (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention:  Christopher E. Austin, Benet J. O'Reilly, Sean A. O'Neal
Facsimile:  (212) 225-3999
E-mail: caustin@cgsh.com; boreilly@cgsh.com; soneal@cgsh.com

Section 6.4    Publicity.  All publicity regarding this Agreement is subject to Section 13.1 of the Asset Purchase Agreement.

Section 6.5    Survival.  Each term of this Agreement that would, by its nature, survive the termination or expiration of this Agreement shall so survive, including the obligation of either Party to pay all amounts accrued hereunder and including the provisions of Section 1.5 (Knowledge Transfer for Benefit of Seller); Section 1.7 (Responsibility for Errors; Delays); Section 1.11(Ownership of Data and Other Assets); Section 1.12 (Data Privacy); Section 1.14 (Records); Section 3.3 (Obligations on Termination); ARTICLE IV (Confidentiality); ARTICLE V (Indemnification; Limitation of Liability); Section 6.3 (Notices); Section 6.4 (Publicity); Section 6.5 (Survival); Section 6.6 (No Third Party Beneficiaries); Section 6.7 (Severability); Section 6.8 (Entire Agreement; Interpretation); Section 6.11 (No Agency); Section 6.12 (Construction and Interpretation); Section 6.13 (Dispute Resolution); Section 6.15 (Precedence of Agreements); and Section 6.16 (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial).

Section 6.6      Parties in Interest; No Third Party Beneficiaries.  Except for the indemnification rights under this Agreement of any Service Provider Indemnitee or Service Recipient Indemnitee in their respective capacities as such, or unless otherwise expressly specified herein, nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or permitted assignee of a Party.

Section 6.7      Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 6.8      Entire Agreement; Interpretation. This Agreement (including the Annex and Schedules hereto), together with the Asset Purchase Agreement, the Employee Lease Agreement and the Occupancy Agreement, contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. In the event of any inconsistency between the provisions of this Agreement and the Employee Lease Agreement, the terms and provisions of this Agreement shall govern and control. Notwithstanding the foregoing, and for the avoidance of doubt, the preceding sentence shall not apply to Sections 5.1 or 5.2 of this Agreement, which Section 2.3 (Indemnification) of the Employee Lease Agreement shall govern in all respects in the event of an inconsistency between the provisions of this Agreement and Section 2.3 of the Employee Lease Agreement.  Each of the Parties acknowledge that it has been represented by legal counsel in connection with this Agreement, the Asset Purchase Agreement, the Employee Lease Agreement and the Occupancy Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement, the Asset Purchase Agreement the Employee Lease Agreement and the Occupancy Agreement against the drafting party has no application and is expressly waived.  In the event of a conflict or inconsistency between the terms of the Asset Purchase Agreement (including the representations, warranties, covenants and indemnification provisions thereof) and the terms of any other documents delivered or required to be delivered in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement (including this Agreement), the Parties acknowledge and agree that the terms of the Asset Purchase Agreement shall supersede such conflicting or inconsistent terms in such other documents and the terms of the Asset Purchase Agreement shall define the rights and obligations of the Parties and their respective officers, directors, employees, stockholders and Affiliates with respect to the subject matter of such conflict or inconsistency.

Section 6.9      Specific Performance. The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in

accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement by the breaching Party or Parties. If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at Law.

Section 6.10    Force Majeure.  Service Provider shall use commercially reasonable efforts to provide, or cause to be provided, the Services without interruption. Notwithstanding the foregoing, neither Party shall be responsible to the other for any delay in or failure of performance of its obligations under this Agreement, to the extent such delay or failure is caused by events or circumstances outside of such Party's control which could not be avoided or otherwise mitigated using commercially reasonable efforts to perform, including if attributable to any act of God, act of terrorism, fire, war, embargo or other governmental act or riot (each, a "Force Majeure Event"); provided, however, that the Party affected thereby gives the other Party prompt written notice of the occurrence of any event which is likely to cause (or has caused) any delay or failure setting forth its best estimate of the length of any delay and any possibility that it shall be unable to resume performance; provided, further, that said affected Party shall use its commercially reasonable efforts to prevent, mitigate and expeditiously overcome the effects of that event and resume performance.  Neither Party is required to pay for those Services that are not performed, to the extent such Services are not performed, due to excused performance in a Force Majeure Event or otherwise.

Section 6.11    No Agency.  Nothing in this Agreement creates (or shall be claimed or intended to create) a relationship of agency, partnership or employer/employee between Seller and Buyer and it is the intent and desire of the Parties that the relationship be and be construed as that of independent contracting parties and not as agents, partners, joint venturers or a relationship of employer/employee.

Section 6.12    Construction and Interpretation. For purposes of this Agreement, (a) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day; (b) any reference in this Agreement to "dollars" or to "$" means U.S. dollars; (c) any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa; (d) the provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified; (e) words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires; (f) the word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if"; (g) the word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it

follows to the specific or similar items or matters immediately following it; and (h) references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or."

Section 6.13   Dispute Resolution.

(a)   Negotiation.  If a dispute, controversy or claim ("Dispute") arises between the Parties relating to the interpretation or performance of this Agreement, within fifteen (15) days from a written request from a Single Point of Contact of a Party to the Single Point of Contact of the other Party, such Single Points of Contact, who shall have the authority to resolve the matter, shall meet to attempt in good faith to negotiate a resolution of the Dispute prior to pursuing other available remedies.  The date of the initial meeting between the Single Points of Contact shall be referred to herein as the "Dispute Resolution Commencement Date."  Any discussions and correspondence relating to trying to resolve such Dispute by meetings between Single Points of Contact shall be treated as Confidential Information developed for the purpose of settlement and shall be exempt from any discovery or production, if any, in connection with any resolution of such Dispute and shall not be admissible as evidence in such Dispute resolution.  If any Dispute is not resolved by the Single Points of Contact within sixty (60) days from the Dispute Resolution Commencement Date pursuant to this Section 6.13(a), the Dispute shall be resolved by the courts set forth in Section 13.8(b) of the Asset Purchase Agreement.

(b)   Continuity of Service and Performance.  Unless otherwise agreed in writing, the Parties shall continue to provide Services, to make payments, and to honor all other commitments under this Agreement during the course of Dispute resolution pursuant to the provisions of this Section 6.13.

Section 6.14   Counterparts.  This Agreement may be executed in any number of counterparts (including via electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party. Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 6.15   Precedence of Agreements.  Each Schedule attached to or referenced in this Agreement is hereby incorporated into and shall form a part of this Agreement by reference; provided that the terms contained in such Schedule shall only apply with respect to the Service(s) provided under that Schedule.  In the event of a conflict between the terms contained in an individual Schedule and the terms in the body of this Agreement, the terms in the individual Schedule shall take precedence with respect to the Service(s) under such Schedule.

Section 6.16   Governing Law; Jurisdiction and Forum; Waiver of Jury Trial.  Subject to Section 6.13 of this Agreement, Section 13.8 (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) of the Asset Purchase Agreement shall apply to this Agreement as if set forth herein, *mutatis mutandis*.

*[Remainder of page left intentionally blank]*

IN WITNESS WHEREOF, the Parties have caused their respective duly authorized representatives to execute this Agreement effective as of the date first written above.

SEARS HOLDINGS CORPORATION


By:_____
      Name:
      Title:


TRANSFORM HOLDCO LLC


By:_____
      Name:
      Title:

*[Signature Page to Services Agreement]*

**Annex I**

**DEFINED TERMS**

The following defined terms used in this Agreement will have the meanings ascribed to them below.  Other terms are defined in the body of this Agreement to which this Annex I is attached.  All defined terms include the singular and the plural form of such terms.

"Buyer Entities" means, collectively, Buyer, its Affiliated Designees and their respective Affiliates.

"Employee Lease Agreement" means that certain Employee Lease Agreement, dated as of the date hereof and entered into by and between the Parties hereto.

"Executive Business Employee" shall have the meaning set forth in the Employee Lease Agreement.

"Leasing Period" shall have the meaning set forth in the Employee Lease Agreement.

"Leased Employee" shall have the meaning set forth in the Employee Lease Agreement.

"Licenses and Permits" means all grants, authorizations, licenses, permits, variances, consents or certificates issued pursuant to any Governmental Authority.

"Losses" means actual, losses, damages, costs and expenses, including reasonable attorneys' fees, without duplication.

"Personnel" means the officers, managers, directors, employees, agents, suppliers, licensors, licensees, contractors, subcontractors, advisors (including attorneys, accountants, technical consultants or investment bankers) and other representatives, from time to time, of a Party and its Affiliates; provided that the Personnel of any Buyer Entity shall not be deemed Personnel of any Seller Entity and the Personnel of any Seller Entity shall not be deemed Personnel of any Buyer Entity, except that Leased Employees performing Services under this Agreement shall be deemed Personnel of Buyer for purposes of this Agreement.

"Seller Entities" means, collectively, Seller and all of its Affiliates.

"Service Provider" means, with respect to any Service, the Person providing such Service hereunder.

"Service Recipient" means, with respect to any Service,  the Person receiving such Service hereunder.

"Services" means (a) the Seller Services when the Service Provider is a Seller Entity or a Vendor contracted by Seller, or (b) the Buyer Services when the Service Provider is a Buyer Entity or a Vendor contracted by Buyer, as the case may be and context requires.

# SCHEDULE A: SERVICES SCHEDULES

**To the Services Agreement, dated as of February 8, 2019, between**

**Sears Holdings Corporation and Transform Holdco LLC**

- **Schedule A-1: Seller Services**

  o   Critical Contract Services
  o   Critical Procurement Services
  o   Pharmacy Services
  o   Repair Services
  o   Insurance Services
  o   Other Credit Services
  o   Human Resources / Payroll Services
  o   International Entity Services

- **Schedule A-2: Buyer Services**

  o   Service Contract Services
  o   Payroll Processing
  o   Benefits Administration
  o   Accounting Services
  o   Tax – Required Tax Services
  o   "As-Needed" Tax Services
  o   IT (Accounting/PoS/etc.)
  o   Real Estate
  o   Contracts Support
  o   Cash Management
  o   Compliance/Data

- o Loss Prevention
- o Facilities Maintenance
- o Associate Relation
- o Disbursements
- o Reporting Services
- o Risk Management & Insurance
- o Compliance – Environmental
- o Payment Clearing and Related Financial Services
- o Legal
- o Supply Chain
- o Customer Complaints
- o Home Services
- o Parts Direct
- o Product Safety
- o Pricing
- o P-Card

**Schedule A-1**

**SELLER SERVICES**

[See document to be separately provided.]

## Schedule A-1: Seller Services

In addition to the fees described below, Buyer will pay the Seller Administrative Fee of $250,000 per month, as described in Section 2.1(a) of the Services Agreement.

*Critical Contract Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of critical contract services | Seller (via the Leased Employees) will use commercially reasonable efforts to maintain its relationships with critical Vendors and contract counterparties, and allow Buyer to receive the benefit of such services provided by such Vendors and contract counterparties, in the following, but not exclusive, categories of services:<br>• HVAC<br>• Housekeeping<br>• Merchandise Delivery<br>• Supplies and Consumables<br>• Armored Cars<br>• Marketing<br>• Signage<br>• Yard Jockeys<br>• Software / Software Maintenance / IT Services<br>• Automotive<br>• Alarm Monitoring<br>• Repairs and Maintenance<br>• Environmental Services<br>• Call Centers<br>• Leasing | 60 days.<br><br>If, during this Service Period, any such contracts are assigned to Buyer, Buyer will provide this Seller Service as a Buyer Service to Seller, as set forth on Schedule A-2. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall make payment in accordance with Section 2.2(a). |

| | | | | |
|---|---|---|---|---|
| | | • Materials Handling<br><br>• Waste Services and Recycling<br><br>• Pest Control<br><br>• Telecom<br><br>• Security and Loss Prevention<br><br>• Printing and Reproduction<br><br>• Landscaping and Snow Removal<br><br>• Utilities<br><br>• Appliance Haul Away<br><br>• Contract Labor and Temps | | |

*Critical Procurement Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of critical procurement services | Seller (via the Leased Employees) will use commercially reasonable efforts to maintain its relationships with critical Vendors and contract counterparties, and allow Buyer to receive the benefit of such merchandise and other goods sold by such Vendors and contract counterparties | 60 days.<br><br>If, during this Service Period, any such contracts are assigned to Buyer, Buyer will provide this Seller Service as a Buyer Service to Seller, as set forth on Schedule A-2. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall make payment in accordance with Section 2.2(a). |

*Pharmacy Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Seller acts as Buyer's agent with respect to pharmaceutical licenses | Seller shall retain ownership of all pharmacies until such time as Buyer obtains appropriate licenses to operate each pharmacy.  To the extent located in a property owned or leased by Buyer, each pharmacy shall (during the service period as to such pharmacy) lease such space from Buyer.<br><br>Seller (via the Leased Employees) will operate pharmacies, in the ordinary course of business, as Buyer's "agent," pending approval or transfer of all licenses and permits to operate the pharmaceutical business to Buyer. Pharmacy operations will transition to Buyer (including the transfer of all related assets) on a rolling basis as the appropriate licenses are obtained to operate such pharmacy.<br><br>Inventory would be calculated as of February 8, 2019 for the purposes of the consolidated inventory calculation, however title in such inventory shall not pass to Buyer until all applicable pharmacy licenses and permits are approved or transferred. Seller shall grant a Transition Lien to the Transform Lenders with respect to all pharmacy Inventory during this Service Period prior to title passing to Buyer. | From Closing Date until the earlier of (i) three (3) months and (ii) date on which Buyer obtains all required licenses.<br><br>As licenses are obtained, pharmacies shall be removed from coverage under this service on a rolling basis. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall make payment in accordance with Section 2.2(a).<br><br>Sellers shall assign any pharmacy receivables to Buyer promptly upon generation of such receivables.<br><br>Pharmacies operated by Seller requiring leased space from Buyer shall pay rent to Buyer and in consideration of a portion of the fixed fee payable by Seller to Buyer for Buyer Services under this Agreement, Buyer waives the first three (3) months of any such pharmacy rent amount.  Thereafter, pharmacy rent shall be based on market rates as agreed between Buyer and Seller. |

*Repair, Home Improvement and Installation Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Seller to act as Buyer's agent with respect to licenses required to perform customers' in-home repair services ("<u>Home Repair Field Operations Business</u>") | Seller (via the Leased Employees) continues to operate the Home Repair Field Operations Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits, including any master qualifier license, required for Buyer to operate the Home Repair Field Operations Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, Home Repair Field Operations Business employees who hold licenses ("<u>Home Repair Licensed Employees</u>") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee License Agreement, at the end of this Service Period, Home Repair Licensed Employees will transfer to Buyer in a single closing. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall make payment in accordance with Section 2.2(a). |
| 2. | Seller to act as Buyer's agent with respect to licenses required to perform home improvement services ("<u>SHIP Business</u>") | Seller (via the Leased Employees) continues to operate the SHIP Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits required for Buyer to operate the SHIP Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, SHIP Business employees who hold licenses or whose work requires Buyer to have a license (e.g. home improvement sales personnel) ("<u>SHIP Licensed Employees</u>") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee Lease Agreement, at end of this Service Period, SHIP Licensed Employees will transfer to Buyer in a single closing. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall make payment in accordance with Section 2.2(a). |
| 3. | Seller to act as Buyer's agent with respect to licenses required to perform appliance installation services | Seller (via the Leased Employees) continues to operate the Appliance Installation Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits required for Buyer to operate the Appliance Installation Business independent of Seller. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer |

7

| | | | | |
|---|---|---|---|---|
| | in customers' homes ("<u>Appliance Installation Business</u>") | Subject to the terms of the Employee License Agreement, Appliance Installation Business employees who hold licenses ("<u>Installation Licensed Employees</u>") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | Employee Lease Agreement, at the end of this Service Period, Appliance Installation Business employees who hold licenses will transfer to Buyer in a single closing. | shall make payment in accordance with Section 2.2(a). |
| 4. | Seller to act as Buyer's agent with respect to licenses required to perform customers' auto repair services ("<u>Auto Repairs Business</u>") | Seller (via the Leased Employees) continues to operate the Auto Repairs Business in the ordinary course of business, acting as Buyer's agent, pending approval and transfer all necessary licenses and permits, including any master qualifier license, required for Buyer to operate the Auto Repairs Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, Auto Repairs Business technicians and auto center managers who are named on licenses ("<u>Auto Repairs Licensed Employees</u>") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee Lease Agreement, at the end of this Service Period, Auto Repairs Licensed Employees will transfer to Buyer in a single closing. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall make payment in accordance with Section 2.2(a). |
| 5. | Protection Agreement Services | Seller (via the Leased Employees) shall continue to operate its service contract business (where a subsidiary of Seller is the obligor) in the ordinary course, including performing all reasonably necessary or appropriate services required under the protection agreements in effect during the Service Period and administrative services, including but not limited to: maintenance of files, retention of records, full claims adjudication according to the terms and conditions of the contracts and applicable state law and servicing in response to contract holders, and legal and regulatory services. | [•] | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall make payment in accordance with Section 2.2(a). |

*Insurance Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Endorsement of Buyer and BAML, Citi and Cantor Fitzgerald under existing insurance policies | Seller endorses Buyer (specifically, Transform Midco LLC and its Subsidiaries) under the following insurance programs and Seller agrees to extend coverage under the following insurance programs in order to provide benefits to Buyer:<br>-    Primary Casualty Insurance<br>-    Excess (Umbrella) Liability<br>-    Property Insurance<br>-    Miscellaneous other policies as needed<br>BAML, Citi and Cantor Fitzgerald to be endorsed as additional insured and loss payees. | Until earlier of (i) expiration date of current policy and (ii) date on which Buyer has obtained replacement policy with respect Acquired Assets.<br><br>If, during this Service Period, any insurance programs are assigned to Buyer, Buyer will provide this Service as a Buyer Service, as set forth on Schedule A-2. | Buyer to reimburse Seller for its proportion of any premiums, deductibles or other costs related to Buyer's insured assets or operations during the Service Period in accordance with Section 2.2 of this Agreement. |
| 2. | Addition of Buyer as Alternate Employer | Addition of Buyer as an alternate employer to provide Workers Compensation insurance, as necessary, under the Employee Lease Agreement. | From Closing Date until conclusion of the Leasing Period. | Buyer to reimburse Seller for its proportion of any premiums, deductibles or other costs during the term in accordance with Section 2.2 of this Agreement. |

9

*Other Credit Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Use of Atlantic Specialty/One Beacon Bond Program (includes "Customs Bond") plus other smaller miscellaneous bonds (collectively, "One Beacon Bonds") | Seller to provide Buyer with coverage under existing Customs Bonds with respect to any import activities of Buyer as to which Department of Commerce requires posting of a Customs Bond.<br><br>Seller to provide Buyer with benefit of existing Surety Bonds with respect to guarantee payments, contractor license bonds and various other permits.<br><br>Seller shall grant a Transition Lien to the Transform Lenders with respect to the One Beacon Bonds during the service term. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Customs Bond during the Service Period in accordance with Section 2.2 of this Agreement.<br><br>[Any amounts returned to Seller under the Customs Bond shall be allocated to either Buyer, Seller or both as a result of good faith discussions between the Parties.] |
| 2. | Use of Liberty Mutual Insurance Company, XL Specialty Insurance Company, Travelers Property Casualty Group and RLI Group surety bonds ("Surety Bonds") | Seller to provide Buyer with benefit of existing Surety Bonds with respect to workers' compensation, court bonds, guarantee payment, performance bond, contractor license bonds and various other permit bonds. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Surety Bonds during the Service Period in accordance with Section 2.2 of this Agreement. |
| 3. | Use of Argonaut Insurance Company medical surety bonds ("Medical Bond") plus other miscellaneous bonds included in bond program | Seller to provide Buyer with benefit of existing Medical Bond with respect to pharmacy bonds required by Medicare.<br><br>Seller to provide Buyer with benefit of existing Surety Bonds with respect to guarantee payments, court bonds and various other license and permit bonds. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Medical Bond during the Service Period in accordance with Section 2.2 of this Agreement. |
| 4. | Use of utility bonds with various utility providers in multiple jurisdictions from various surety companies ("Utility | Seller to provide Buyer with benefit of existing Utility Bonds with respect to payment of utility expenses. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Utility Bonds during the Service Period in accordance with Section 2.2 of this Agreement. |

| | Bonds") | | | |
|---|---|---|---|---|

*Human Resources / Payroll Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of employee medical benefits | Seller to provide employee medical benefits to Transferred Employees. | Beginning at the end of the Leasing Period until Buyer establishes its own medical plans, after which time Buyer will provide this Service as a Buyer Service as set forth on Schedule A-2. | Base Cost $240,008 per month (flat rate)<br><br>COBRA eligible $69.15/Year or $5.76 per month<br><br>CAM Services  - $0.19 per eligible<br><br>Advocacy Services – $0.5 per medical enrolled per month<br><br>FSA/HSA Count – $3.5  per enrolled per month<br><br>Commuter Benefits – $3.80 per enrolled per month<br><br>QMCSO Services – $300 per order<br><br>Buyer shall reimburse Seller in accordance with Section 2.2 of this Agreement |
| 2. | Administration of employee payroll | Seller (via the Leased Employees) will administer payroll services to the Leased Employees during the Leasing Period. | For the Leasing Period, after which time Buyer will provide this Service as a Buyer Service as set forth on Schedule A-2. | Buyer shall reimburse Seller for its proportion of any costs and expenses in accordance with Section 2.2 of this Agreement. |

*International Entity Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of call center and other operational services | Without duplication of the employee services provided pursuant to the Employee Lease Agreement, Seller shall cause to be provided to Buyer any services comparable to those provided to the Business as immediately prior to the Closing Date by the following entities under Sellers' control:<br>- Sears Holdings Global Sourcing Limited<br>- Sears Sourcing India Private Limited<br>- International Sourcing & Logistics Limited<br>- Quality Assurance Laboratory Limited<br>- Sears Global Technologies India Private Limited | As to each International Entity, from the Closing Date until the date that ownership of such entity is transferred to Buyer. | Buyer shall reimburse Seller at cost for any costs beyond employee time (which is separately addressed through the Employee Lease Agreement) in accordance with Section 2.2 of this Agreement. |

**Schedule A-2**

**BUYER SERVICES**

[See document to be separately provided.]

## Schedule A-2: Buyer Services

### *Service Contract Services*

| No. | Buyer Service | Buyer Service Description | Service Period | Fees |
|-----|---------------|--------------------------|----------------|------|
| 1. | Service Contract Services | Buyer shall backstop, with its full faith and credit, the performance of Seller Service entitled "Protection Agreement Services" on Schedule A-1, including payment of all claims. | From the Closing Date until the date of transfer of the KCD Notes and PA Liabilities in accordance with the Asset Purchase Agreement. | In addition to any amounts paid via the backstop, an amount equal to the aggregate of all amounts paid by Buyer to Sellers with respect to any licenses under which Buyer licenses the KCD IP (in an amount not to exceed $500,000 per month). |

See attached Excel spreadsheet incorporated herein to Schedule A-2.

## Schedule A-2: Buyer Services - CGSH DRAFT 2/7/19

All Buyer Services provided during the GOB Period shall be provided for an all-in fixed fee of $1,250,000 per month.

| | Services | Details | Service Period | | Required For: | |
|---|---|---|---|---|---|---|
| | | | Start | End | GOB | Estate |
| 1 | Payroll Processing[1] | Buyer will process payroll for the GOB store employees and any other OldCo employees, other than Leased Employees:<br>• Manage the associate time and attendance system and process;<br>• Manage the creation and reporting of payroll payment processing regardless of method – electronic, paper, pay card, etc. This includes exempt and non-exempt associate population;<br>• Administer garnishment process;<br>• Calculate associate commission income and administer the reporting for commission payments;<br>• Manage payroll taxes and related deductions;<br>• Manage the processing and distribution of W-2 statements | Closing Date | Completion of wind-down of the estate | X | X |
| 2 | Benefits Administration[2] | Buyer to maintain and support benefits for GOB store employees and any other OldCo employees, other than Leased Employees[3]:<br>• Maintain relationships with insurance providers (healthcare, dental, life, STD/LTD);<br>• Administer 401K plan, retirement savings plan, WorkLife solutions;<br>• Manage voluntary benefits program and maintain company programs for service healthcare, dental, life, STD/CTD and other welfare plans<br>• Maintain administrative processes for associate communications and HR Policy development. | Closing Date | Completion of wind-down of the estate | X | X |
| 3 | Accounting Services | • Continue to support A/P and any A/R<br>• Perform daily, weekly and monthly transaction processing of all entries and feeds into the general ledger system. Compile and load general ledger information for OldCo into Essbase financial reporting databases, EIS and Financial Transaction Databases to be used for internal reporting and analysis by OldCo. OldCo will inform NewCo of any processing errors or data feed issues which would impact the financial results of OldCo.<br>• Accounts Payable – Process all invoices and purchase orders for OldCo.<br>• Fixed Asset Management – maintain all OldCo fixed assets in the NewCo finance fixed asset system.<br>• Prepare/distribute statements which summarize results of operations and financial position<br>• Data extraction (FTD) financial transaction data base and financial, management and external reporting<br>• Maintain PeopleSoft accounting system and SL (stock ledger) merchandise and margin systems<br>• Maintain Essbase reporting databases which warehouse financial information<br>• Data extraction for general ledger (PS), Fixed Assets and Capital tracking.<br>• Maintain general ledger and supporting records as necessary | Closing Date | Completion of wind-down of the estate | X | X |
| 4 | Tax - Required Tax Services | 1. Federal income tax<br>  a. Prepare return and remit tax due<br>  b. Prepare estimated tax and extension filings and remit tax due<br>  c. Prepare LIFO tax calculations<br>  d. Prepare supporting work papers<br>  e. Prepare tax elections<br>  f. Foreign tax credit calculations<br>2. State income and sales tax<br>  a. Prepare returns and remit tax due<br>  b. Prepare estimated tax and extension filings and remit tax due<br>  c. Prepare supporting work papers<br>  d. Prepare tax allocations for periods when part of SHLD unitary returns<br>3. Financial Accounting<br>  a. Quarterly tax provision, effective tax rate calculations, tax accounting journal entry support<br>  b. Analysis of uncertain tax positions and quarterly tax reserve calculations and journal entry support (if necessary)<br>  c. Return-to-accrual calculations and necessary journal entry support<br>4. Sales and use tax<br>  a. Prepare tax returns and remit taxes due<br>  b. Maintain tax tables in POS system (if continue to use Sears POS system)<br>5. Property tax<br>  a. Personal property tax filings<br>  b. Real estate tax filings; landlord reimbursements<br>  c. Accrual estimates<br>  d. Monthly summary of tax bills paid along with recommended changes in current monthly estimate of tax liability per location<br>  e. Appeals and audit defense, where appropriate<br>6. POS Environmental Fees/Deposits for Product Sales at GOB stores<br>7. Business license filings; gross receipts tax filings and accrual estimates<br>8. Annual report/franchise tax filings<br>9. Foreign tax (Puerto Rico, Guam)<br>  a. Work with OldCo outside tax advisors in preparing necessary tax returns, estimated tax filings and extension filings (e.g., income; property, gross receipts) and facilitating payment of tax<br>  b. Work with OldCo outside tax advisors, when appropriate, to prepare supporting tax work papers and accounting method changes and tax elections<br>  c. For Statutory requirements, prepare audited financial statements and tax schedules to support necessary tax returns<br>  d. OldCo will engage a third party tax advisor to prepare its Guam and Puerto Rico tax filings and estimated tax filings; to provide any necessary audit defense; and to provide any other foreign tax services that may be required. | Closing Date | Completion of wind-down of the estate | X | X |
| 5 | "As-Needed" Tax Services | 1. Audit support<br>2. Bankruptcy tax claim administration<br>3. $10,000 cash receipts reporting (when necessary; based on information provided by business)<br>4. Federal excise tax return (if applicable)<br>5. Maintain tax tables in POS system (if new POS system implemented) | Closing Date | Completion of wind-down of the estate | X | X |
| | | Provide access to or services under General Ledger system, PoS, HR systems<br>Business Strategy & Operations:<br>• Enterprise Learning & Development<br>• Enterprise Process Management<br>• Enterprise Project / Program Management<br>Information Analytics & Innovation:<br>• BI Administration<br>• BI Application Support<br>• BI Data Monitoring<br>• BI Delivery Administration<br>• BI License Management & Support<br>• Supply Chain Management<br>Network & Security Services:<br>• Compliance | | | | |

| # | Service | Description | | | | |
|---|---|---|---|---|---|---|
| 6 | IT (Accounting/PoS/etc.) | • Media Services<br>• Non-retail Asset Maintenance<br>• Retail Asset Maintenance<br>• Security<br>• Telecom Provisioning & Management<br>• Telecommunications Data<br>• Telecommunications Voice<br>Operational Services:<br>• Associate & Customer Desktop Support<br>• Data Center Operational Services<br>• Distributed Environment Services<br>• Storage Services<br>Retail Services:<br>• Core Retailing Transaction Support<br>• Customer Facing Transaction Support<br>• Hardware Support Services<br>Service Management<br>• Administration<br>• Business Continuity<br>• IT&G Service Quality Management<br>• IT&G Service Support<br>• IT&G Service Support – Corporate Desktop Support<br>• Learning & Development<br>• Performance & Service Management<br>IT Support Services<br>Development & Support Services:<br>• Fixed team minimum to support and maintain services, multiple enhancements, external variable charged, as needed<br>• PCI Compliance for Home Services technicians, SHIP and GOB stores | Closing Date | Completion of wind-down of the estate | X | X |
| 7 | Real Estate | **Lease Administration:**<br>• Document Abstracting<br>**Finance:**<br>• Prepare CAM Reconciliations | Closing Date | End of GOB Period | X | |
| 8 | Contracts Support | Provide access to, or services under non-merchandise contracts that are assigned to NewCo but are required for OldCo operations, including waste management, facilities management, armored car, credit card processing and other services | Closing Date | End of GOB Period | X | |
| 9 | Cash Management | • Cash Management services, including but not limited to maintaining existing bank accounts, daily consolidation of funds, calculation of daily cash position, movement of funds as necessary, reconciliation of accounts and maintenance of balances, development of funding forecasts and future cash needs, support for banking and armored car services, administration of users access to Treasury website and banking software, ordering deposit slips and stamps from service providers, approving armored car purchase orders<br>· Cash settlement as currently handled by OldCo<br>· Cash clearing accounts<br>· Financial and cash forecasting<br>· Cash flow | Closing Date | Completion of wind-down of the estate | X | X |
| 10 | Compliance/Data | • Support for ethics hotline services re: OldCo/ Estate<br>• Data privacy services for GOB stores and OldCo businesses to ensure data at those businesses and stores is collected, shared, and used consistent with applicable law and privacy policies.<br>• Data security services for GOB stores and OldCo businesses such as data incident prevention (e.g. use of NewCo credit card encryption services) and data incident response (e.g. remediating a data incident affecting consumers at GOB stores).<br>• Record keeping support, including coordinating the appropriate retention and storage of business and employee records for OldCo stores and businesses. | Closing Date | Completion of wind-down of the estate | X | X |
| 11 | Loss Prevention | **Provide Loss Prevention ("LP") Database Administration and LP System Support Services to OldCo including but not limited to**<br>• Case/incident management<br>• Refund management support<br>• Content management for LP related materials<br>• Management of LP audit solution<br>• Fraud mitigation & investigation of NewCo supported e-commerce and payment systems<br>• Reporting and application environments for LP related content<br>• New applications or system enhancement | Closing Date | End of GOB Period | X | |
| 12 | Facilities Maintenance | NewCo agrees to provide the following services to OldCo:<br>• Utilities | Closing Date | End of GOB Period | X | |
| 13 | Associate Relations | · Provide use of call center to receive associate inquiries.<br>· Manage the reporting and support of associate change requests and other employment-related questions.<br>· Assist management in managing employee relations cases, including leave management<br>· Assist management in establishing an associate termination process including termination decision matrix and termination process (return of assets, exit interview, final pay, data security, etc.).<br>Assist management in establishing an expense reimbursement process within NewCo. | Closing Date | End of GOB Period | X | |
| 14 | Disbursements | · Process accounts payable<br>• Match merchandise receipt to invoice<br>• Approve invoices<br>• Cutting checks to and receiving checks from vendors<br>• Correspond with vendors<br>• Retain records<br>• AP write-offs by vendor by department<br>• Receivable collection related to AP accounts<br>• Import reconciliation<br>• Process other disbursements<br>• Pay approved disbursements<br>• Process travel and entertainment<br>• Lease Payment System(LPS)<br>• Data Extraction for Invoice Processing System (IPS), payment processing (NAP), mechanized R&D (NDJ), Purchase Order Writing System (POWS) and LPS<br>• General Ledger<br>• Process journal entries<br>• Maintain integrity of balances<br>• Monthly reconciliation of balance sheet accounts<br>• Annual recording of book-to-physical inventory adjustments<br>• Variance analysis of unit income statement balances and identify potential errors<br>• Maintain fixed asset records | Closing Date | Completion of wind-down of the estate | X | X |
| 15 | Reporting Services | · Compile and produce Monthly, Quarterly, and Annual External financial statements (as needed) including, but not limited to Income Statements, Balance Sheets, and Statement of Cash Flows. In addition, the Quarterly and Annual financial statements will include all notes, tables and supplemental information necessary for external audit requirements.<br>· Compile and produce any bankruptcy-related reporting and requests as required by the Bankruptcy court. | Closing Date | Completion of wind-down of the estate | X | X |
| | | **Risk Management Insurance:**<br>1. Data Extraction and Tracking and Administration of:<br>• Workmen's Comp<br>• Auto Insurance<br>• General Liability | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 16 | Risk Management & Insurance | • Property Insurance<br>• D&O Insurance<br>2. Claims management, including<br>  • Adjust Property Claims and pursue recovery from responsible 3rd parties<br>  • Provide oversight of third party claim handler for Workers Compensation claims<br><br>3. Maintain insurance claims records and provide access to tools for viewing this information, for the following types of insurance:<br>  • General Liability<br>  • Workers' Compensation<br>  • Auto Liability<br>  • Property Insurance<br>  • D&O Insurance<br>4. Consultation in connection with the purchase of insurance | Closing Date | Completion of wind-down of the estate | X | X |
| 17 | Compliance - Environmental | NewCo will continue to provide OldCo services and support for Environmental Affairs at an agreed upon rate plus the direct cost for any necessary 3rd party services required to address and resolve Environmental Issues attributed to OldCo<br>1. Asbestos Management , Lead Paint, Indoor Air Quality and Mold Assistance<br>2. Environmental permitting/registration preparation and management (e.g. hazardous materials, wastewater and hazardous waste),<br>3. Regulatory report preparation and submittal,<br>4. Review and Processing environmental permitting and reporting fees,<br>5. Spill response and cleanup,<br>6. Addressing regulatory issues (such as historical releases and Notices of Violation of Environmental Requirements),<br>7. Coordination of hazardous and special waste removal and disposal/recycling,<br>8. Addressing property owner inquiries regarding environmental issues (such as, environmental due diligence requests related to refinancing or real estate transactions),<br>9. Work to assess and address environmental risks during store leasing activities (such as, Phase I environmental assessments or other environmental investigations)<br>10. Support for other environmental issues that may arise (e.g. newly discovered releases, wastewater, storm water, hazardous waste),<br>11. Hazardous and Special Waste Removal and Disposal/Recycling,<br>12. Environmental Hotline and Safety Data Sheet and Poison Control Support,<br>13. Environmental Management System Maintenance and Usage<br>14. Engineering Consultant Support (when necessary to assist with complex issues),<br>15. Asbestos Abatement Contractors (as needed to support renovation and maintenance activities). | Closing Date | Completion of wind-down of the estate | X | X |
| 18 | Payment Clearing and Related Financial Service[4] | **Third Party Payment Acceptance:** Financial Services manages the payment acceptance process of authorization and settlement for the acceptance of third party credit and debit cards through contracts with Discover, American Express, and First Data (for the acceptance of Visa and MasterCard-branded cards). In addition, Financial Services will manage OldCo's Telecheck relationship for the acceptance and settlement of checks. Sears Financial Services manages third-party partner SLA performance, PCI and regulatory compliance, technical enhancements and tender optimization<br><br>Each tender type accepted for payment at OldCo has an interchange rate associated with it, which rates OldCo will pay on a pass-through basis.<br><br>**Citi:** SFS manages Private Label and Mastercard credit card process through agreement with Citi.<br>**Leasing Program:** SFS manages the Leasing form for purchase process of authorization and settlement through agreement with Tempoe/WNLI (WhyNotLeaseIt).<br>**Gift Card:** SFS manages gift card processing through agreement with ValueLink. | Closing Date | End of GOB Period | X | |
| 19 | Legal | For discussion, will NewCo Legal department be asked to provide certain services to OldCo, including:<br>• Assist in litigation management of docket that remain with the Estate, i.e., converting litigation matters to Proofs of Claim<br>• Provide operations and employment advice and counsel for three months to assist HR/BUs on 80 GOB stores, the four DCs, as well as for Home Services<br>• Licensing and other regulatory (primarily for HS)<br>• Remaining securities issues with closing the Estate? | Closing Date | Completion of wind-down of the estate | X | X |
| 20 | Supply Chain | • Support in regard to any issues that arise on unliquidated entries including addressing customs or governmental inquiries on unliquidated entries.<br>• Provide support for goods currently in transit including carrier management during the transition from OldCo to NewCo.<br>• Provide support for warehousing and inventory management in DC's and RRC's.<br>• Managing outstanding transportation claims for goods previously lost, stolen, damaged during transit. | Closing Date | End of GOB Period | X | |
| 21 | Customer Complaints | • Support regarding customer complaints and regulatory inquiries relating to OldCo's and GOB sales | Closing Date | End of GOB Period | X | |
| 22 | Home Services | • Repair services for GOB store stock<br>**PA Sales in GOB Stores**<br>• Commission payments for selling Protection Agreements in GOB stores (Sales Commission of 50%)<br>• Marketing/Sales support for selling Protection Agreements in GOB stores | Closing Date | End of GOB Period | X | |
| 23 | Parts Direct | • Commission of $5.00 per water filter subscription sold at GOB store<br>• Fulfill store charge orders (parts ordered by the store)<br>• Customer support for store associates with part related questions | Closing Date | End of GOB Period | X | |
| 24 | Product Safety | • Recall and stop sale support for the GOB stores<br>• Product safety incidents tracking and reporting to CPSC, FDA,  and other regulatory agencies | Closing Date | End of GOB Period | X | |
| 25 | Pricing | • Effectuate weekly price changes at GOB stores | Closing Date | End of GOB Period | X | |
| 26 | P-Card | • Buyer to permit continued use of p-cards, employee travel cards and fleet cards by Seller employees at GOB stores under Bank of America program. | Closing Date | End of GOB Period | X | |

**Schedule B**

**SINGLE POINT OF CONTACT**

For Seller:

Name:  Mohsin Meghji and Brian Griffith, M-III Partners, LP

Email:  mmeghji@miiipartners.com and bgriffith@miiipartners.com

Phone: (212) 716-1492 and (212) 716-1494


For Buyer:

Name:  [●]

Email:  [●]

Phone:  [●]

B-1