# EXHIBIT A

# (Gildea Declaration)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>**SEARS HOLDINGS CORPORATION,** *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered) |

**DECLARATION OF JOSEPH P. GILDEA IN SUPPORT OF LIMITED OBJECTION OF
INTERACTIONS CORPORATION TO NOTICE AND SUPPLEMENTAL NOTICE OF
CURE COSTS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND  UNEXPIRED LEASES IN
<u>CONNECTION WITH GLOBAL SALE TRANSACTION</u>**

I, Joseph P. Gildea, pursuant to 28 U.S.C. § 1746 declare:

1.      I am a Senior Vice President Finance and Administration at Interaction LLC ("<u>Interactions</u>"), and have served in this position since 2012.

2.      Since the departure of Interactions' in-house general counsel on December 31, 2018, I have taken on the limited role of overseeing the status of the Agreements in connection with theses bankruptcy cases.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

3.      I submit this delectation in support of the *Limited Objection of Interactions Corporation to Notice and Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction* (the "Limited Objection").[2]

4.      On December 29, 2014, Interaction and Sears Holdings Management Corporation, on behalf of itself and for the benefit of its affiliates ("Sears" together with Interaction, the "Parties"), entered into a certain Master "Software as Service" Managed Services Agreement, dated December 29, 2014 (collectively with all other supporting or related agreement, amendments, addendums, exhibits, and/or schedules to the foregoing,  "Master Agreement").  A true and correct copy of the Master Agreement is attached here to as **Exhibit 1**.

5.      Under the Master Agreement, the Parties entered into a number of Statements of Work,[3] setting forth certain specific goods or services to be provided or performed by Interaction under the Master Agreement.  Specifically, (i) Statement of Work No. 1, effective December 29, 2014; (ii) Statement of Work No. 2, effective September 14, 2015; (iii) Statement of Work No. 3, effective January 1, 2018; and (iv) Statement of Work No. 4, effective October 4, 2018 (together with the Master Agreement, the "Agreements"). Due to the voluminous size of the documentation, copies were not attached to this Declaration, but copies of the original documentation can be made available upon request.

6.      Upon review of books and records, as of the Petition Date, Sears owed Interaction $795,197.47 under the Agreements (the "Interaction Cure Amount").  A true and correct summary of the invoices submitted to Sears is attached here to as **Exhibit 2**.  Due to the

---

[2]     Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the Objection.

ACTIVE/98242928.7

voluminous size of the supporting documentation, a summary has been attached.  Copies of the original supporting documentation can be made available upon request.

7.      In addition to the Interaction Cure Amount, as of February 1, 2019, Sears owes Interaction the sum of $335,684.72 for all post-petition invoices for work performed under the Agreements (the "Post-Petition Interaction Invoice Claims").  A true and correct summary of the post-petition invoices submitted to Sears is attached hereto as **Exhibit 2**.  These amounts have been invoiced, but are not yet due under the terms of the Agreements.  These amounts will be part of any cure if unpaid prior to closing of the pending sale.  Due to the voluminous size of the supporting documentation, a summary has been attached.  Copies of the original supporting documentation can be made available upon request.

*[Remainder of the Page Left Intentionally Blank]*

ACTIVE/98242928.7

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Dated: February 6, 2019
New York, New York

Name: Joseph P. Gildea

# Exhibit 1

## (Master Agreement)

## MASTER "SOFTWARE AS A SERVICE" MANAGED SERVICES AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is entered into, to be effective as of December 29, 2014 ("**Effective Date**"), by and between Interactions Corporation ("**Service Provider**"), with its principal place of business located at 31 Hayward Street, Suite E, Franklin MA 02038 and **SEARS HOLDINGS MANAGEMENT CORPORATION** with its principal place of business located at 3333 Beverly Road, Hoffman Estates, IL 60179, on behalf of itself and for the benefit of its Affiliates, (collectively "**Customer**").  For purposes of this Agreement "Affiliate(s)" means any individual, entity (e.g., corporation, L.L.C., etc.) that, at the applicable time, directly or indirectly controls, is controlled with or by or is under common control with, a party. Notwithstanding the foregoing, only entities directly or indirectly controlled by Sears Holdings Corporation shall be deemed Affiliates of Customer for purposes of this Agreement.

### RECITALS

**WHEREAS**, Customer requires hosted third-party "software as a service" (the "**Hosted Services**," as further described herein) with respect to certain of its information technology needs;

**WHEREAS**, Service Provider has experience and expertise in the business of providing the Hosted Services;

**WHEREAS**, based on Service Provider's knowledge and experience relating to such Hosted Services, Customer has selected Service Provider to manage and provide the Hosted Services;

**WHEREAS**, Service Provider wishes to perform the Hosted Services and acknowledges that the successful performance of the Hosted Services and that the security and availability of Customer Data (as defined in Section 10.2) are critical to the operation of Customer's business; and,

**WHEREAS**, Service Provider has agreed to provide the Hosted Services to Customer, all on the terms and conditions set forth herein.

**NOW**, **THEREFORE**, in consideration of the mutual covenants and representations set forth in this Agreement, the parties hereby agree as follows:

1.    **PROCUREMENT DOCUMENTS**

    1.1    **Purchase Orders and Statements of Work**.  If Customer elects to procure Hosted Services, access to software, Maintenance Services, implementation professional services ("Implementation Services") or other services (collectively, the "Services") from Service Provider on the terms and conditions contained in this Agreement, then Customer will issue a purchase order (as further described below, each a "Purchase Order") or a statement of work (as further described below, each a "SOW") to Service Provider for such Services.  SOWs and Purchase Orders are collectively referred to herein as "Procurement Documents".  Any orders for: (a) Services other than Maintenance Services, and (b) Services subject to terms and conditions in addition to or different from those contained in this Agreement (other than price), will be subject to the execution of a SOW.  All Services provided by Service Provider will be subject to the

terms of this Agreement (regardless of whether a SOW is actually signed, or a Purchase Order issued). Neither Customer nor its Affiliates will be under any obligation to compensate Service Provider for Services provided by Service Provider that are not set forth in a Procurement Document.

    1.2    **Relationship Between Contract Documents**. Each Procurement Document will be subject to the terms and conditions of this Agreement.

        1.2.1    **Purchase Orders**. Other than: (a) a description of the Services being procured, (b) price, (c) quantity and (d) Specifications, a Purchase Order will not contain any additional or different terms or conditions and this Agreement and any SOW issued in connection with such Services will control over any inconsistent terms in a Purchase Order.

        1.2.2    **SOWs**. SOWs may include additional or different terms and conditions than this Agreement; <u>provided</u> that in order for any such terms to control over this Agreement, they must be expressly stated in such SOW.

        1.2.3    **Change Order Procedure**. Customer may request changes to a Procurement Document, at any time ("Change Request"). Within four days after Customer's request, Service Provider will submit to Customer a proposed amendment (each an "Amendment") to such Procurement Document describing the impact of the change, if any, on the compensation, schedule and other terms of the applicable Procurement Document and this Agreement. An Amendment must be signed by both parties in order to be effective. Service Provider represents to Customer that it has factored into Service Provider's fees adequate contingencies for de minimis Amendments. An Amendment will prevail over any inconsistent terms of the Procurement Document or this Agreement. Absent the execution of such an Amendment, the parties must fulfill their obligations under the Procurement Document and this Agreement without change.

    1.3    **Ordering Affiliates**. Affiliates of Customer may procure Services from Service Provider under the terms and conditions of this Agreement; <u>provided</u> that Service Provider and such Affiliate enter into a Procurement Document governing such purchase (or Service Provider accepts such Affiliates Purchase Order for such Services). Any Affiliate who enters into such a Procurement Document with Service Provider will be deemed to be "Customer" hereunder for purposes of such procurement; <u>provided</u> Service Provider will look solely to such Affiliate (and not to Customer) for satisfaction of any liability arising under or relating to such Procurement Document.

    1.4    **Authorized Resellers**. To the extent that Customer or its Affiliates procure any Services from Service Provider's authorized resellers, Customer rights and remedies will be governed by this Agreement, and such reseller will be deemed to be Service Provider's agent.

**2.    THE SERVICES.**

    2.1    **General Description**. This Agreement contains the terms upon which Customer may procure Services from Service Provider. Customer makes no

DocuSign Envelope ID: 5354EB7E-0CC7-4B65-A7D2-A9C3AFF9E649

representations as to the amount of business Service Provider can expect under this Agreement.

2.2    **Purpose and Term**.  This Agreement sets forth the terms and conditions under which Service Provider agrees to license certain hosted "software as a service" and provide all other services, data import/export, monitoring, support, backup and recovery, change management, technology upgrades, implementation and training necessary for Customer's productive use of such software (the "Services"), as further set forth on Exhibit A attached hereto or in other SOWs containing substantially similar information as that in Exhibit A.

2.2.1    **Authorized Users**.  As a part of the Service, Authorized Users (as defined below) that have a need to use the Services for the benefit of Customer shall have the right to operate and use the same.  Service Provider shall be responsible for all user identification and password change management. As used in this Agreement, unless otherwise limited on an SOW, "**Authorized User(s)**" means: (a) Company, (b) Company's Affiliates, (c) each subsidiary and each business that is divested by Company or its Affiliates but only for a period of five years following the divestiture, (d) each individual and each entity that (i) is licensed to do business using the Company's or its Affiliates' name (e.g., Sears Hometown Stores and Company franchisees), or (ii) does business with one of Company's or its Affiliates' retail businesses (e.g., licensed businesses), and (e) all of the Personnel of each of the foregoing entities.. As used in this Agreement, "**Personnel**" means the directors, officers, employees, partners, agents, advisers, independent Service Providers, subcontractors and outsourcers of a party and its Affiliates, or another entity, as applicable; provided that the Personnel of Service Provider and its Affiliates will not be deemed to be Personnel of Customer.

2.3    **Control of Services**.  The method and means of providing the Services shall be under the exclusive control, management, and supervision of Service Provider, giving due consideration to the requests of Customer.

2.4    **Changes in the Services Environment**.  Service Provider will not make any changes to the Hosted Services that materially adversely affects Customer's use of or access to the Hosted Services or the costs incurred by Customer in utilizing the Hosted Services without the prior written consent of Customer.

2.5    **Time of Service Provider Performance of Services**.  For the term of the applicable SOW, as the same may be amended, Service Provider shall provide the Services during the applicable Service Windows and in accordance with the applicable Service Levels, each as described in an SOW, time being of the essence.

2.6    **Backup and Recovery of Customer Data**.  As a part of the Services, Service Provider is responsible for maintaining a backup of Customer Data, for an orderly and timely recovery of such data in the event that the Services may be interrupted.

DocuSign Envelope ID: 5354E87E-0CC7-4B65-A7D4-A9C3AF68E648

2.7    **Non-exclusivity**.  Nothing herein shall be deemed to preclude Customer
from retaining the services of other persons or entities undertaking the same or similar
functions as those undertaken by Service Provider hereunder.

2.8    **Subcontractors**.  Service Provider shall not enter into any subcontracts
for the performance of the Services, or assign or transfer any of its rights or obligations
under this Agreement, without Customer's prior written consent, and any attempt to do so
shall be void and without further effect; provided, however, that the following
subcontractors are hereby approved:

(i) Arise Virtual Solutions, Inc.
(ii) Working Solutions, LLC
(iii) LiveOps, Inc.
(iv) Serco Inc.
(v) Neusoft Corporation

Customer's consent to Service Provider's right to subcontract any of the Services shall
not relieve Service Provider of any of its duties or obligations under this Agreement, and
Service Provider shall indemnify and hold Customer harmless from any payment
required to be paid to any such subcontractors. There shall be no additional costs incurred
by Customer for the use of permitted subcontractors, and Service Provider shall be solely
responsible for payments due to any subcontractors. Service Provider shall remain fully
responsible for the performance of its subcontractors' obligations under this Agreement
to the same extent as if Service Provider had provided the Services.

2.9    **Change Control Procedure**.  Customer may, upon written notice, request
increases or decreases to the scope of the Services under an SOW.  If Customer requests
an increase in the scope, Customer shall notify Service Provider, and, not more than five
(5) business days (or other mutually agreed upon period) after receiving the request,
Service Provider shall notify Customer whether or not the change has an associated cost
impact.  If Customer approves, Customer shall issue a change control, which will be
executed by the Service Provider.  Customer shall have the right to decrease the scope,
and the fee for an SOW will be reduced accordingly and the parties shall document any
decrease in scope in writing pursuant to Section 1.2.3 (Change Order Procedure).

2.10    **Acceptance**.  The initial SOW will contain acceptance procedures that
relate to testing and acceptance of the Implementation Services prior to using the
Services in a production environment.  Once Customer begins using the Services in a
production environment, Customer will have a 90-day period from the date the Service is
fully operational in a production environment ("Acceptance Period"), to inspect and test
the Service to determine whether it meets the applicable Specifications in a production
environment. If Customer discovers a Defect (as defined in Exhibit C) in the Service,
Customer will provide, in reasonable detail, a notice of such Defect to Service Provider's
project manager (or other representative). Once such notice has been given, the
Acceptance Period will be suspended, and Service Provider will have a reasonable period
(not to exceed 30 days) to correct the Services. Once Service Provider has delivered the
corrected Services to Customer, the Acceptance Period will resume; provided that, if

DMLIB-#467924-v4-Interactions_Corporation_SaaS_Agreement

4

required, the Acceptance Period will be extended to provide Customer with a minimum of 30 days to accept or reject the Services after delivery of such corrected Services by Service Provider. If Service Provider fails to correct a material Defect (*cf.* the last sentence of Section 9 (On-Site Support) of Exhibit C (Support & Maintenance Services)), Customer may reject the Service, terminate this Agreement and receive a refund of all fees paid for the Services.

3.    **TERM AND TERMINATION.**

    3.1    **Term**.  Unless this Agreement is terminated earlier in accordance with the terms set forth in this Agreement, the term of this Agreement (the "Initial Term") shall commence on the Effective Date and continue for twelve (12) months thereafter. FOLLOWING THE INITIAL TERM, CUSTOMER MAY UNILATERALLY ELECT TO RENEW THIS AGEEMENT FOR SUCCESSIVE ONE-YEAR TERMS (EACH, A "RENEWAL TERM") UPON WRITTEN NOTICE TO SERVICE PROVIDER. The term of each SOW ("**SOW Term**") shall commence on the Start Date specified in the SOW and expire on the specified End Date, unless terminated earlier in accordance with this Agreement, and may be renewed for one-year renewal terms upon mutual agreement of the parties in writing.

    3.2    **Termination for Convenience**. Customer shall have the right to terminate this Agreement or any SOW, in whole or in part, without cause or penalty by providing sixty (60) days written notice to Service Provider. Termination of this Agreement for convenience shall result in the immediate termination for convenience of all SOWs herein.

    3.3    **Termination for Cause**.  If either party materially breaches any of its duties or obligations hereunder, including two periods of successive failure of Service Provider to met a Service Level, and such breach is not cured, or the breaching party is not diligently pursuing a cure to the non-breaching party's sole satisfaction, within thirty (30) calendar days after written notice of the breach, then the non-breaching party may terminate this Agreement or an SOW for cause as of a date specified in such notice.

    3.4    **Payments Upon Termination**.  Upon the expiration or termination of this Agreement or an SOW for any reason, Customer shall pay to Service Provider all undisputed amounts due and payable hereunder.

    3.5    **Return of Materials**.  Upon expiration or earlier termination of this Agreement or an SOW, each party shall: (a) promptly return to the other party, or certify the destruction of any of the following of the other party held in connection with the performance of this Agreement or the Services: (i) all Confidential Information; and, (ii) any other data, programs, and materials; and, (b) return to the other party, or permit the other party to remove, any properties of the other party then situated on such party's premises.  In the case of Customer Data, Service Provider shall, immediately upon termination of this Agreement or an SOW, destroy and certify the destruction of any Customer Data within the possession of Service Provider.  This Section 3 shall survive the termination of this Agreement.

DocuSign Envelope ID: 5354EB7E-0CC7-4B65-A7D2-A9C3AE68E648

## 4.    TERMINATION ASSISTANCE SERVICES.

Provided that this Agreement or an SOW has not been terminated by Service Provider due to Customer's failure to pay any undisputed amount due Service Provider, Service Provider will provide to Customer and/or to the supplier selected by Customer (such supplier shall be known as the "Successor Service Provider"), at Customer's sole cost and expense at agreed-upon rates, but no more than Service Provider's standard hourly professional services rates, assistance reasonably requested by Customer in order to effect the orderly transition of the applicable Services, in whole or in part, to Customer or to Successor Service Provider (such assistance shall be known as the "Termination Assistance Services) during the ninety (90) calendar day period prior to, and/or following, the expiration or termination of this Agreement or an SOW, in whole or in part (such period shall be known as the "Termination Assistance Period").  Provided that Service Provider and Customer agree as to price and scope of Service Provider's provisioning of Termination Assistance Services, such Termination Assistance Services may include:

4.1    developing a plan for the orderly transition of the terminated or expired Services from Service Provider to Customer or the Successor Service Provider;

4.2    providing reasonable training to Customer staff or the Successor Service Provider in the performance of the functional services then being performed by Service Provider;

4.3    using commercially reasonable efforts to assist Customer, at Customer's sole cost and expense, in acquiring any necessary rights to legally and physically access and use any third-party technologies and documentation then being used by Service Provider in connection with the Services;

4.4    using commercially reasonable efforts to make available to Customer, pursuant to mutually agreeable terms and conditions, any third-party services then being used by Service Provider in connection with the Services; and,

4.5    such other activities upon which the parties may agree.

4.6    The provisions of this Section 4 shall survive the termination of this Agreement.

## 5.    SERVICES LEVELS.

5.1    **Service Levels Reviews**.  Service Provider and Customer will meet as often as shall be reasonably requested by Customer, but no more than monthly, to review the performance of Service Provider as it relates to the Service Levels further described in Exhibit B.

5.2    **Failure to Meet Service Levels**.  As further described in Exhibit B, in the event Service Provider does not meet any of the requisite Service Levels, Service Provider shall: (a) reduce the applicable monthly invoice to Customer by the amount of the applicable service credits set forth in Exhibit B ("Service Credits") as a credit, and not as liquidated damages; and, (b) use its best efforts to ensure that any unmet Service Level is subsequently met.  Notwithstanding the foregoing, Service Provider will use

commercially reasonable efforts to minimize the impact or duration of any outage, interruption, or degradation of Service.

## 6.    FEES AND EXPENSES.

The compensation for all Services ("Service Fees") will be set forth in the applicable Procurement Document and will remain in effect for the term thereof. Service Provider will not be entitled to any compensation or reimbursement in connection with the Services unless such amounts are explicitly set forth in the applicable Procurement Document. Reimbursable expenses, if any, must be reasonable and will be: (a) subject to Customer's expense reimbursement policy, as delivered to Service Provider from time to time; and (b) billed at Service Provider's actual out of pocket cost.

6.1    **Method of Payment and Timing**. Unless otherwise provided for under an <u>SOW</u>, Customer will initiate payment on Service Provider's properly submitted invoices sixty (60) days after receipt of invoice. Customer has no obligation to pay any fees or expenses invoiced more than six months after they accrue. Customer is not required to pay any disputed charge until after the resolution of the dispute. Service Provider agrees to establish, implement and maintain "Electronic Funds Transfer" (EFT) in accordance with Company's policies and requirements as communicated to Service Provider, as the only means to receive payments from Company during the term of this Agreement.

6.2    **Setoff**. Customer will have the right to set off any amounts due Customer or its Affiliates against any amounts owed to Service Provider.

6.3    **Invoice**. Service Provider will provide to Customer, in a form reasonably acceptable to Customer, monthly invoices with reasonably detailed documentation of expenses. Invoices will be delivered to the location specified by Customer.

6.4    **Service Credits**. Service Credits, if any, set forth in Exhibit C, will be deducted from amounts due to Service Provider, and will be deemed an adjustment to the fee for Services. The parties agree that any Service Credits are not damages nor are they intended to be punitive in nature, but rather are measurement tools used to highlight the lower level of performance received by Customer.

6.5    **Non-binding Terms**. Any terms and conditions that are included in a Service Provider invoice shall be deemed to be solely for the convenience of the parties, and no such term or condition shall be binding upon Customer.

6.6    **Taxes**. In addition to the Service Fees, should state and local sales and use taxes ("taxes") result from charges pursuant to this agreement or future statement of work, Service Provider will separately state taxes for each jurisdiction on the invoice provided to Customer by tax category (e.g., taxable and non-taxable services will be separately stated) and Customer will pay such taxes to Service Provider and Service provider will remit tax to the applicable taxing authority. Service Provider agrees that Customer is not responsible to collect or withhold any federal, state, and local

employment taxes, including income tax withholding and social security contributions, for Service Provider.

6.7  **Records**.  Service Provider will: (a) retain records to reasonably document the Services provided and fees paid or payable by Customer under this Agreement until the later of: (i) five (5) years after billing (or such longer period as required by law), and (ii) final resolution of any actively pending disputes between the parties relating to Service Provider's charges; and (b) upon five days notice from Customer, provide Customer's Personnel with reasonable access to such records and documents.  Service Provider will, at Customer's election, either deliver copies of such records to Customer or provide access to such records at Service Provider's facility.  Service Provider and Customer will each bear their own costs associated with the review.

## 7.    CUSTOMER RESOURCES AND SERVICE PROVIDER RESOURCES.

In accordance with the terms set forth in the applicable SOW, each party shall provide certain resources ("Customer Resources" and "Service Provider Resources", as the case may be) to the other party as Customer and Service Provider may mutually deem necessary to perform the Services.

7.1  **Customer Resources**.  If so described in an <u>SOW</u>, where Customer provides resources (e.g., technology equipment) to Service Provider that are reasonably required for the exclusive purpose of providing the Services, Service Provider agrees to keep such resources in good order and not permit waste (ameliorative or otherwise) or damage to the same.  Service Provider shall return the resources to Customer in substantially the same condition as when Service Provider began using the same, ordinary wear and tear excepted.  Customer shall provide the Customer Resources, if any, described in an <u>SOW</u>.

7.2  **Service Provider Resources**.  In addition to any Service Provider Resources described in an <u>SOW</u>, the Service Provider shall, at a minimum; (a) provide all of the resources necessary to ensure that the Services continue uninterrupted, considering the applicable Service Windows and Service Levels, and that Customer Data is secure to the standards and satisfaction of Customer; and (b) provide for an optimal response time for Customer's users of the Services.  Where Service Provider fails to provide such minimal Service Provider Resources, Customer shall have the right to immediately terminate this Agreement or the applicable <u>SOW</u>, in whole or in part, without liability.

## 8.    REPRESENTATIONS AND WARRANTIES.

8.1  **Mutual Representations and Warranties**.  Each of Customer and Service Provider represent and warrant that:

8.1.1  it is a business duly incorporated, validly existing, and in good standing under the laws of its state of incorporation;

8.1.2  it has all requisite corporate power, financial capacity, and authority to execute, deliver, and perform its obligations under this Agreement;

8.1.3   this Agreement, when executed and delivered, shall be a valid and binding obligation of it enforceable in accordance with its terms;

8.1.4   the execution, delivery, and performance of this Agreement has been duly authorized by it and this Agreement constitutes the legal, valid, and binding agreement of it and is enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganizations, moratoriums, and similar laws affecting creditors' rights generally and by general equitable principles;

8.1.5   it shall comply with all applicable federal, state, local, international, or other laws and regulations applicable to the performance by it of its obligations under this Agreement and shall obtain all applicable permits and licenses required of it in connection with its obligations under this Agreement; and,

8.1.6   there is no outstanding litigation, arbitrated matter or other dispute to which it is a party which, if decided unfavorably to it, would reasonably be expected to have a potential or actual material adverse effect on its ability to fulfill its obligations under this Agreement.

8.2    **By Service Provider**.  Service Provider represents and warrants that:

8.2.1   Service Provider is possessed of superior knowledge with respect to the Services;

8.2.2   Service Provider will:  (a) perform all Services in a competent and workmanlike manner in accordance with industry standards; and (b) utilize sufficient personnel possessing the skills, experience and abilities to perform the Services all in accordance with such additional requirements as may be reasonably imposed by Customer from time to time;

8.2.3   Service Provider has the experience and is qualified to perform the tasks involved with providing the Services in an efficient and timely manner. Service Provider acknowledges that Customer is relying on Service Provider's representation of its experience and expertise, and that any substantial misrepresentation may result in damage to Customer;

8.2.4   Service Provider: (i) will at all times conform to the highest professional and ethical standards in its performance of this Agreement; (ii) will utilize due care and commercially reasonable efforts in its performance of this Agreement; and (iii) is under no obligation or restriction that would conflict with Service Provider's provision of Services. Service Provider must immediately disclose to Customer any actual or potential conflict of interest that may arise during the Service Provider's performance of this Agreement;

8.2.5   The Services will achieve in all material respects the functionality described in an <u>SOW</u> and the documentation of Service Provider ("Specifications"), and that such functionality shall be maintained during the Term.  For purposes of this Agreement, Specifications shall consist of: (a) any

DocuSign Envelope ID: 5354EB7E-0CC7-4865-A7D4-A9C3AE68E648

specifications and Customer's requirements contained in the Procurement Document, (b) the requirement that each Service provided by Service Provider be compatible with Customer provided hardware and software listed in the applicable Procurement Document(s), unless otherwise stated in such Procurement Documents or the applicable Specifications, (c) any technical specifications and documentation that Service Provider makes publicly available and that are in effect as of the effective date of the applicable Procurement Document (or the date any Enhancement, as defined in Exhibit C, is provided to Customer). In the event of any inconsistency between the "Specifications" contained in the Procurement Document and any Specifications Service Provider makes generally available, the Specifications in the Procurement Document will control. Upon Customer's request, Service Provider will provide copies of all applicable Specifications. No limitations contained within the publicly available "Specifications" which conflict with the scope of the license granted herein will apply (e.g. limitations on the number of users, etc.); unless such terms are stated in the applicable Procurement Document;

8.2.6    From the date of Acceptance and during the remainder of the Term of this Agreement (the "Warranty Period"), the Services will contain the functionality contained within, will operate in accordance with, and will conform to, the applicable Specifications. Service Provider will correct any failure of the applicable Service to operate in accordance with this warranty by providing additional software, equipment and/or services to Customer at no additional cost to Customer. In the event Service Provider is unable to correct such a Defect within 30 calendar days, Service Provider will replace the defective Service with a Service that functions properly or, at Customer option, Customer may terminate this Agreement, and then Service Provider will promptly refund to Customer all of the fees paid by Customer for: (a) such Service and (b) any related services;

8.2.7    No additional third party licenses or license fees other than those specifically itemized in the applicable Procurement Document are required in order for Customer and its Authorized Users to use the Services;

8.2.8    Service Provider will use its best efforts to ensure that no computer viruses, malware, or similar items (collectively, the "Virus") or Unauthorized Code are introduced into Customer's computer and network environment while performing or providing the Services, that Service Provider will adhere to Customer's then current procedures to protect against the same, and that, where Service Provider transfers such Virus or Unauthorized Code to Customer through the Services, Service Provider shall reimburse Customer the actual cost incurred by Customer to remove or recover from the Virus, including the costs of persons employed by Customer. "Unauthorized Code" means any feature, routine or device that is intended or designed, either automatically, upon the occurrence of a certain event, upon the taking of or failure to take a certain action or under the control of a third person to disrupt the operation of, destroy, erase, damage or

otherwise render inoperable the Service or any other Customer electronic system; and

8.2.9   The Services and any deliverable provided hereunder are either owned by Service Provider or licensed to Service Provider with the right to sublicense to Customer and its Authorized Users or are in the public domain, and the use of such Services by Customer and its Authorized Users will not infringe or misappropriate any proprietary rights (including but not limited to any U.S. or foreign patent, copyright, trademark, trade secret right) of any third party. Further, that there is no action, suit, claim, investigation or proceeding pending, or to Service Provider's knowledge threatened, against, by or affecting Service Provider, any Service which, if adversely decided, might adversely affect:  (a) Service Provider's ability to enter into this Agreement; (b) Service Provider's performance of its obligations herein; or (c) Customer's use of the Services; nor to Service Provider's knowledge is their any basis for such an action.

8.3     Service Provider hereby assigns to Customer all assignable warranties, representations, covenants and indemnities granted to Service Provider by third parties in the Services, any deliverables or any components thereof, and all remedies for breach of such warranties, representations, covenants and indemnities.  To the extent that Service Provider is not permitted to assign any of such protections to Customer, Service Provider will enforce such protections on behalf of Customer to the extent Service Provider is permitted to do so under the terms of the applicable third party agreements.

8.4     Consistent with Service Provider's obligations hereunder, Service Provider and its technology partners will regularly monitor the performance of the Service Provider Materials in order to maximize performance of the Services.  As part of this process Service Provider and its technology partners will review and analyze raw and non-contextualized call utterances in order to improve Service Provider's speech recognition capabilities, including the overall speech engine infrastructure maintained by Service Provider and its technology partners.  Service Provider shall ensure that its technology partners are under confidentiality obligations consistent with the confidentiality terms and conditions of this Agreement and shall remain fully responsible for the acts and omissions of its technology partners to the same extent as Service Provider.

## 9.     CONFIDENTIALITY.

9.1     **Definition**.  Each party agrees that all non-public information (including the terms of this Agreement) received by such party, its Affiliates and their Personnel (the "**Receiving Party**") relating to the other party, its customers, or its Authorized Users (the "**Disclosing Party**") in connection with this Agreement, including all: business plans, strategies, forecasts, analyses financial information; employee information, information technology information, and other proprietary information (collectively, "**Confidential Information**"), regardless of the manner or medium in which it is furnished to or otherwise obtained by the Receiving Party, its Affiliates and their Personnel, will be held in confidence by the Receiving Party, its Affiliates and their

Personnel. This Section 9 (Confidentiality) also applies to any information exchanged between the parties regarding proposed business, regardless of whether the parties enter into a Procurement Document or other contract regarding such proposed business.

9.2     **Use of Confidential Information**.

9.2.1     <u>Restrictions</u>.     The Receiving Party, its Affiliates and their Personnel will use all reasonable efforts to avoid disclosure, publication or dissemination of any Confidential Information. Further, the Receiving Party: (a) may use the Confidential Information only as necessary to perform the Services, use the Services and otherwise perform its other obligations under this Agreement, (b) may not disclose the Confidential Information except to its Personnel who have a need to know such Confidential Information in connection with this Agreement, and (c) must restrict disclosure of Confidential Information to its Personnel who have executed a written agreement by which they agree to be bound by terms substantially similar to this Section. The Receiving Party is liable for any unauthorized disclosure or use of Confidential Information by its Affiliates and its Personnel.

9.2.2     <u>Exceptions</u>.     The obligations under this Section 9.2.2 do not apply to any Confidential Information that the Receiving Party can demonstrate: (i) Receiving Party possessed, without an obligation of confidentiality, prior to disclosure in connection with this Agreement; (ii) is or becomes public through no fault of the Receiving Party, its Affiliates and their Personnel; (iii) is independently developed by the Receiving Party without use of any Confidential Information; or (iv) is received by Receiving Party from a third party (other than Receiving Party's Personnel) that does not have an obligation of confidentiality to the Disclosing Party.

9.2.3     <u>Disclosure</u>. If, in the reasonable opinion of its legal counsel, the Receiving Party is required by applicable laws or court orders to disclose any Confidential Information in connection with any legal proceeding, then the Receiving Party may disclose such information to the arbitrator, court or other governmental authority, as the case may be; <u>provided</u>, in each case, the Receiving Party notifies the Disclosing Party a reasonable time prior to such disclosure (in order to permit the Disclosing Party to seek appropriate protective measures); and the Receiving Party requests and supports the Disclosing Party's efforts to seek appropriate protective measures.

9.2.4     <u>Receiving Party Notification</u>.     The Receiving Party must immediately notify the Disclosing Party upon the discovery of the loss, unauthorized disclosure or unauthorized use of any Confidential Information and cooperate with the Disclosing Party, at no additional charge, in the investigation of any such unauthorized disclosure.

9.2.5     <u>Return or Destruction of Confidential Information.</u> Within ten (10) days following the earlier of: (a) termination or expiration of this Agreement, or (b) completion of a project for which the Confidential Information has been

provided, the Receiving Party must, at Disclosing Party's discretion, either return to Disclosing Party all Confidential Information (including all copies/derivatives thereof); or certify in writing to Disclosing Party that such Confidential Information (including all copies/derivatives thereof) have been destroyed in such a manner that it cannot be retrieved.

9.3     **Special Rules for Confidential Personal Information**.

     9.3.1    <u>Definition</u>. The following information (which is a subset of Confidential Information) must be held in the strictest confidence by Service Provider: all information regarding Customer's individual customers and employees, including but not limited to names, addresses, telephone numbers, account numbers, social security numbers, customer lists, and demographic, financial and transaction information ("Confidential Personal Information").

     9.3.2    <u>Additional Restrictions</u>. In addition to the restrictions set forth above, Service Provider may not: (x) disclose Confidential Personal Information to any third parties (including Affiliates) without Customer's prior written permission, nor (y) duplicate or incorporate the Confidential Personal Information into its own records or databases. In addition, Service Provider must establish and maintain written policies and procedures and conduct its operations to ensure: (i) the security, confidentiality and proper disposal of the Confidential Personal Information; (ii) protection against any anticipated threats or hazards to the security or integrity of such information; and (iii) protection against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer. Copies of such policies and procedures will be provided to Customer upon Customer's request.

     9.3.3    <u>Confidential Personal Information Exceptions</u>. The exceptions to Service Provider's obligations set forth in Section 9.2.2 (Exceptions) shall not apply to Confidential Personal Information. However, the restrictions on Confidential Personal Information do not apply to information independently developed by Service Provider without the use of Confidential Personal Information; <u>provided</u> that Service Provider is not using such information on Customer's behalf.

     9.3.4    <u>Customer Audit Rights</u>. Service Provider must permit Customer to audit Service Provider's compliance with the provisions of this Section 9.3 at any time during Service Provider's regular business hours.

     9.3.5    <u>Service Provider Breach</u>. A breach of this Section 9.3 is grounds for immediate termination of this Agreement. In addition, Customer is entitled to the recovery of any pecuniary gain realized by Service Provider from the unauthorized use or disclosure of Confidential Personal Information.

**10.**    **PROPRIETARY RIGHTS.**

     10.1    **Service Provider Materials**. Customer acknowledges that, in the course of performing the Services, Service Provider will use software and related processes,

instructions, methods, and techniques that have been previously or independently developed by Service Provider (collectively, the "**Service Provider Materials**") and that same shall remain the sole and exclusive property of Service Provider.

      10.2  **Data of Customer**. Customer's information, or any derivatives thereof, contained in any Service Provider repository (the "Customer Data," which shall also be known and treated by Service Provider as Confidential Information) shall be and remain the sole and exclusive property of Customer. Service Provider is provided a license to Customer Data hereunder for the sole and exclusive purpose of providing the Services, including a license to store, record, transmit, maintain, and display Customer Data only to the extent necessary in the provisioning of the Services.  Service Provider may retain audio recordings and call detail records (non-audio), which are a subset of Customer Data, for each call processed by the Services.  Audio recordings, except for portions of calls that contain Protected Information (as defined below), will be retained for a minimum period of thirty (30) days or the expiration or termination of the Agreement or relevant SOW, whichever comes first.  Call detail records (non-audio), except for data elements that contain Confidential Personal Information, will be retained for a minimum period of twelve (12) months or the expiration or termination of the Agreement or relevant SOW, whichever comes first. Upon Customer request and execution of a Change Order for the Interactions professional services and fees associated therewith, audio recordings and call detail records may be transferred to Customer for back up and archiving.

      10.3  **No License**. Except as expressly set forth herein, no license is granted by either party to the other with respect the Confidential Information, Service Provider Materials, or Customer Data.  Nothing in this Agreement shall be construed to grant to either party any ownership or other interest in the Confidential Information, Service Provider Materials, or Customer Data, except as may be provided under a license specifically applicable to such Confidential Information, Service Provider Materials, or Customer Data.

      10.4  The provisions of this Section 10 shall survive the termination of this Agreement.

## 11.  INFORMATION SECURITY.

Where Service Provider has access to Customer Data, Service Provider acknowledges and agrees to the following:

      11.1  **Undertaking by Service Provider**. Without limiting Service Provider's obligation of confidentiality as further described herein, Service Provider shall be responsible for establishing and maintaining an information security program that is designed to: (i) ensure the security and confidentiality of the Customer Data; (ii) protect against any anticipated threats or hazards to the security or integrity of the Customer Data; (iii) protect against unauthorized access to or use of the Customer Data; (iv) ensure the proper disposal of Customer Data; and, (v) ensure that all permitted subcontractors of Service Provider, if any, comply with all of the foregoing.  In no case shall the safeguards

DocuSign Envelope ID: 5354E87E-0CC7-4B65-27D24A9C3AE58648

of Service Provider's information security program be less stringent than the information security safeguards set forth as Exhibit D.

11.2     **Right of Audit by Customer**.  Customer shall have the right to review Service Provider's information security program prior to the commencement of Services and from time to time during the term of this Agreement.  During the performance of the Services, on an ongoing basis from time to time and without notice, Customer, at its own expense, shall be entitled to perform, or to have performed, an on-site audit of Service Provider's information security program.  In lieu of an on-site audit, upon request by Customer, Service Provider agrees to complete, within forty-five (45) days of receipt, an audit questionnaire provided by Customer regarding Service Provider's information security program.

11.3     **Audit by Service Provider**.  No less than annually, Service Provider shall conduct an independent third-party audit of its information security program and provide such audit findings to Customer.

11.4     **Audit Findings**.  Service Provider shall implement any reasonably required safeguards as identified by Customer or information security program audits.

11.5     **Indemnification by Service Provider**.  Without limiting Service Provider's other obligations of indemnification herein, Service Provider shall defend, indemnify, and hold Customer Indemnified Parties (as defined in Section 13.1) harmless from and against any and all Claims, including reasonable expenses suffered by, accrued against, or charged to or recoverable from any Customer Indemnified Parties, on account of the failure of Service Provider to perform its obligations imposed in this Section 11.

12.    **INSURANCE.**

12.1     **Required Insurance**.  Service Provider will, at its own expense, obtain and maintain the following insurance:

12.1.1 Commercial General Liability, with coverage including, but not limited to, premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of at least $3,000,000 per occurrence for bodily injury and property damage combined.  Customer shall be named as an additional insured, with the standard "separation of Insureds" provision or an endorsement for cross-liability coverage.  The policy shall be endorsed with forms CG 20 10 07 04 and CG 20 37 07 04 or their equivalent, to state that coverage is primary, and non-contributory with other available coverage.  Except where prohibited by law, the insurance carrier shall waive all rights of subrogation that the insurer may have against Customer and the Indemnified Parties.  Service Provider warrants that its subcontractors will maintain Commercial General Liability insurance, and Service Provider shall indemnify Customer for any loss, cost, liability, expense and/or damage suffered by Customer as a result of failure of its subcontractors to maintain such insurance.  Service Provider further warrants that, if a subcontractor does not maintain Commercial General Liability insurance, Service Provider's Commercial General Liability insurance shall insure the subcontractor.  Limits of liability

DocuSign Envelope ID: 5354E87E-0CC7-4B65-A7D2-A0C3AFE3E648

requirements may be satisfied by a combination of Commercial General Liability and Umbrella Excess Liability policies.

12.1.2  If any persons are employed, or uninsured independent Service Providers are hired, by Service Provider at any time during the term of this Agreement, Workers' Compensation insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Service Provider, for all states in which the Service Provider will perform services for Customer, and Employer's Liability insurance with limits of liability of at least $100,000 per accident or disease and $500,000 aggregate by disease. Except where prohibited by law, the insurance carrier shall waive all rights of subrogation that the insurer may have against Customer and the Indemnified Parties.  Such insurance shall contain an Alternate Employer Endorsement naming Customer as the alternate employer. Service Provider warrants that its subcontractors will maintain Workers' Compensation and Employer's Liability insurance, and Service Provider shall indemnify Customer for any loss, cost, liability, expense and/or damage suffered by Customer as a result of failure of its subcontractors to maintain such insurance.  Service Provider further warrants that, if a subcontractor does not maintain Workers' Compensation insurance, Service Provider's Workers' Compensation insurance shall insure the subcontractor.  Service Providers may self-insure Workers' Compensation only in states where the governing state bureau has issued to the Service Provider a qualified self-insurance license for Workers' Compensation.

12.1.3  Automobile Liability insurance for owned, non-owned and hired vehicles, with limits of at least $1,000,000 per occurrence for bodily injury and property damage combined.  If no vehicles are owned or leased, the Commercial General Liability insurance shall be extended to provide insurance for non-owned and hired automobiles in lieu of separate Automobile Liability insurance. Limits of liability requirements may be satisfied by a combination of Automobile Liability and Umbrella Excess Liability policies.

12.1.4  Professional Liability or Errors & Omissions Insurance with limits of not less than $3,000,000 per claim and annual aggregate, covering all acts, errors, omissions, negligence, infringement of intellectual property (except patent and trade secret) and network risks (including coverage for unauthorized access, failure of security, breach of privacy perils, as well as notification costs and regulatory defense) in the performance of services for Customer or on behalf of Customer hereunder. The policy shall contain an affirmative coverage grant for contingent bodily injury and property damage emanating from the failure of the technology services or an error or omission in the content/information provided. Such insurance shall be maintained in force at all times during the term of the agreement and for a period of 3 years thereafter for services completed during the term of the agreement. Customer shall be given at least 30 days notice of the cancellation or expiration of the aforementioned insurance for any reason.

12.2    **Policies**.  Insurance shall be purchased from companies having a rating of A- VII or better in the current Best's Insurance Reports published by A.M. Best Customer.  Insurance policies shall not be cancelled or materially changed without at least 30 days prior written notice to Customer.  Evidence of insurance shall be submitted in advance of or concurrent with the execution of this Agreement, on each insurance policy renewal thereafter, and annually for two years after this Agreement ends.

12.3    **Coverage**.  If Service Provider does not provide Customer with such evidence of insurance or such policies do not afford adequate protection for Customer, Customer will so advise Service Provider, but Customer failure to do so is not a waiver of these insurance requirements.  If Service Provider does not furnish evidence of acceptable coverage within 15 days, Customer shall have the right, in its sole discretion, to (a) withhold payments from the Service Provider until evidence of adequate coverage is provided, or (b) immediately terminate this Agreement.

12.4    Failure to obtain and maintain required insurance or failure by Customer to notify Service Provider shall not relieve Service Provider of any obligation contained in this Agreement.  Additionally, any approval by Customer of any of Service Provider's insurance policies shall not relieve Service Provider of any obligation contained in this Agreement, including liability for claims in excess of described limits.

13.    **INDEMNIFICATION.**

13.1    **Third Party Claims**.  To the fullest extent permitted by law: Service Provider must defend, indemnify and hold harmless Customer, its Affiliates, and their respective present, former, and future: shareholders, Authorized Users successors and assigns (collectively, the "Indemnified Parties") against all damages, losses, costs, expenses (including attorneys' fees, costs and expenses) and other liabilities arising out of any claims, demands, suits, or causes of action by third parties (collectively, "Claims"), arising out of or in connection with this Agreement (including claims of negligence by the Personnel of either Party) which result or are claimed to result in whole or in part from (i) any act or omission of Service Provider, its Affiliates or their Personnel; (ii) any breach of this Agreement  by Service Provider, its Affiliates or their Personnel; (iii) the violation of any intellectual property rights of third parties caused by Service Provider, its Affiliates or their Personnel or resulting from Customer's use of the Services or any deliverable, or (iv) the violation by Service Provider, its Affiliates or their Personnel of any law or regulation.  Notwithstanding the foregoing, Service Provider will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Customer or its Authorized Users or by Customer's breach of this Agreement.

13.2    **Infringement**.  In the event the Services are held or are likely to be held to constitute an infringement, Service Provider, at its own expense, will first use reasonable and prompt efforts to:  (a) procure for Customer the right to continue to use the Services; (b) modify the Services so that they are non-infringing and of at least equivalent performance and functionality; or (c) upon adequate showing to Customer that both of the foregoing options are not commercially feasible, to either provide functionally

DocuSign Envelope ID: 5354E87E-0CC7-4B65-27B2-A9C3AF68E648

equivalent replacement Services to Customer or reimburse Customer for all costs and expenses (including any software license, maintenance, installation fees and/or other expenses) of obtaining and implementing such replacement software. Customer's rights under this Section 13 will be in addition to and will not limit Customer's rights hereunder.

13.3    **Procedures**. Service Provider has the right to control the defense of any Claim; <u>provided</u> however, that Customer may, at its election and at any time, take control of the defense and investigation of any Claim at the cost and expense of Service Provider. Upon Service Provider's request, Customer will reasonably cooperate in such defense and Service Provider must reimburse Customer for its reasonable out-of-pocket expenses in providing such cooperation. Customer will provide prompt notification of any Claim; <u>provided</u> however, that any delay by Customer in giving such notice will not relieve Service Provider of its obligations pursuant to this Section, except to the extent that Service Provider demonstrates actual damage caused by such delay.

13.4    **Independent Obligation**. The obligations of Service Provider to defend, indemnify and hold harmless, the Indemnified Parties under this Section 13 are independent of each other and any other obligation of the parties under this Agreement.

## 14.    LIMITATION OF LIABILITY.

14.1    **Limitation on Certain Damages**. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, NEITHER PARTY (NOR SUCH PARTY'S AFFILIATES NOR THEIR SHAREHOLDERS, AUTHORIZED USERS OR PERSONNEL) WILL BE LIABLE FOR (i) ANY CONSEQUENTIAL, INDIRECT, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS) ARISING IN CONNECTION WITH THIS AGREEMENT OR THE PERFORMANCE, OMISSION OF PERFORMANCE, OR TERMINATION HEREOF WITHOUT REGARD TO THE NATURE OF THE CLAIM (E.G., BREACH OF CONTRACT, NEGLIGENCE OR OTHERWISE), EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; or (ii) any liability arising out of or relating to this Agreement, including without limitation on account of performance or non-performance of the Services or other obligations hereunder, regardless of the form of the cause of action, whether in contract, tort (including without limitation negligence), breach of warranty, statute or otherwise, which exceeds the fees paid or payable to Service Provider under this Agreement during the twelve (12) month period preceding the act(s) or omission(s) giving rise to the liability. The foregoing limitation is cumulative with all payments being aggregated to determine satisfaction of the limit. The existence of one or more claims will not enlarge the limit.

14.2    **Exclusions From Limitations of Liability**. Notwithstanding anything contained herein to the contrary, the limitations of liability contained in this Section 14 will not apply to: (a) Each party's obligations under Section 9 (Confidentiality) and Service Provider's obligations under Section 13 (Indemnification); (b) personal injury, including death, and damage to tangible property caused by the negligent or intentional acts of a party, its Affiliates or their Personnel; or (c) either party's obligation to pay

DocuSign Envelope ID: 5354FB7E-0CC7-4B65-97D2-A9C3AF68E648

litigation costs and attorneys' fees incurred by the other party in enforcing the terms of this Agreement.

14.3   **Disclaimer**.  EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT EACH PARTY DISCLAIMS ALL OTHER EXPRESS OR IMPLIED REPRESENTATIONS,   WARRANTIES   AND   COVENANTS.   FURTHER, CUSTOMER AND SERVICE PROVIDER EACH AGREE THAT RELIANCE ON ANY REPRESENTATION, WARRANTY OR COVENANT NOT CONTAINED IN THIS AGREEMENT (OR ANY SOWS HERETO) WOULD NOT BE REASONABLE.

## 15.   GENERAL.

15.1   **Electronic Systems**.  If Service Provider has access, whether on-site or through remote facilities, to any of Customer's hardware, software, electronic data storage systems or other electronic systems (each an "Electronic System"), in connection with this Agreement, Service Provider will limit its access and use solely to: (a) the Service Provider Personnel who have a need to access such systems to perform the Services, (b) those Electronic Systems that Customer has authorized Service Provider to access and (c) the performance of its obligations under this Agreement.  Service Provider will immediately cease using such Electronic Systems upon termination or expiration of the applicable Procurement Document.  Upon Customer's request, Service Provider will notify Customer in writing of the names of its Personnel who have accessed such systems. Service Provider is responsible for any unauthorized access or unauthorized use by its Personnel.  All user identification numbers and passwords disclosed to Service Provider and any information obtained from use of Customer Electronic Systems will be Customer's Confidential Information and Service Provider will cooperate with Customer in investigating any apparent unauthorized access by Service Provider or its Personnel of Customer's computer or Electronic Systems.  Service Provider acknowledges that to the extent it receives cardholder data in connection with the Agreement, Service Provider is responsible for the security of the cardholder data Service Provider possesses, and Service Provider will comply with current Payment Card Industry ("PCI") Data Security Standards (as updated by PCI from time to time).  In the event of a data breach of Customer's cardholder information involving Service Provider or Service Provider's environment, Service Provider will notify Customer within twenty-four (24) hours of the identified breach and cooperate fully with Customer and/or industry/government officials in a review and/or forensic investigation of Service Provider's environment and/or processes.

15.2   **Disablement of Systems**.  Except during and in conjunction with maintenance services or any other authorized servicing or support, in no event will Service Provider, its Personnel, or anyone acting on its behalf, disable or otherwise impair the functionality or performance of (or permit or cause any embedded mechanism to disable or impair the functionality or performance of) the Service or any other electronic system owned or utilized by Customer or its Authorized Users without the written permission of a corporate officer of Customer. Service Provider waives and disclaims any right or remedy it may have to disable the Service or any portion thereof without due process of law.

DMLIB-#467924-v4-Interactions_Corporation_SaaS_Agreement

15.3    **Security Policies**. Service Provider will (and will require its Personnel to) follow Customer's facility safety and security rules.

15.4    **Independent Service Provider**.    Service Provider is an independent Service Provider in the performance of this Agreement, and nothing contained in this Agreement shall be construed to create or constitute a joint venture, partnership, agency, franchise, lease, or any other arrangement other than as expressly granted in this Agreement. Service Provider is responsible for its own operation. Service Provider must exercise control over its employees, agents, representatives, subcontractors, and suppliers and is solely responsible for the verification of identity and employment eligibility, for the payment of any wages, salaries, benefits or other remuneration of its employees, agents, representatives, subcontractors, and suppliers, and for the payment of any payroll taxes, contributions for unemployment or workers compensation, social security, pensions, or annuities that are imposed as a result of the employment of Service Provider's employees, agents, representatives, subcontractors, and suppliers. Service Provider's Personnel are not employees of Customer or its Affiliates and are not eligible to participate in any employment benefit plans or other conditions of employment available to Customer or its Affiliates' employees. Service Provider must not pledge, credit, incur any obligation or liability, hire any employee, nor purchase any merchandise or services in the name of Customer. Unless otherwise provided in this Agreement, all costs, charges, and expenses incurred in connection with Service Provider's performance of this Agreement must be borne by Service Provider.

15.5    **Severability**.  If any provision of this Agreement is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, then such provision shall be deemed modified to the extent necessary to make such provision enforceable by such court, and the invalidity in whole or in part of any portion of this Agreement shall not impair or affect the validity or enforceability of the remaining provisions of this Agreement.

15.6    **No Waiver**.    No waiver by either party shall be effective unless in writing.  Any waiver by either party of any default, delinquency or other breach by the other party shall not be deemed to be a waiver of any other or subsequent default, delinquency or breach.  "Approval" or "acceptance" by Customer of any Services shall neither be construed as an endorsement by Customer as to the technical means Service Provider has selected to achieve the required results, nor as a waiver of any of Customer's rights or Service Provider's obligations under this Agreement.  Service Provider acknowledges that Customer is relying upon Service Provider's technical expertise in providing such Services or other deliverables.

15.7    **Cumulative Remedies**.  In the event Service Provider breaches any of the representations, warranties or covenants in this Agreement, Customer may exercise all rights and remedies available under this Agreement (including any SOW's hereto), at law or in equity.  All rights and remedies are cumulative, and the exercise of any right or remedy shall be without prejudice to the right to exercise any other right or remedy provided herein, at law or in equity.

DocuSign Envelope ID: 5354EB7E-0CC7-4B65-A7D24-A9C3AFE8E648

15.8    **Interpretation**.    The term this "Agreement" includes any SOW's, Procurement Documents, Purchase Orders, or Appendixes to this Agreement. In this Agreement: (a) section headings are for reference only and do not affect the interpretation of this Agreement, (b) defined terms include the plural as well as the singular, and (c) "include" and its derivatives ("including," "e.g." and others) mean "including but not limited to."

15.9    **Governing Law**.    This Agreement, and all other aspects of the business relationship between the parties, is construed, interpreted, and enforced under and in accordance with the laws of Illinois without regard to conflict of law provisions. Service Provider agrees, with respect to any litigation arising directly or indirectly out of, or that in any way relates to, this agreement, the business relationship or any other transaction, matter, or issue between the parties, to commence it exclusively in the State of Illinois Courts of Cook County, Illinois or the United States District Court, and Service Provider by this Agreement consents to the jurisdiction of these courts.

15.10    **Dispute Resolution**.    In the event of any dispute or disagreement between the parties with respect to the interpretation of any provision of this Agreement, or with respect to the performance of either party hereunder, Customer and Service Provider project managers will meet for the purpose of resolving the dispute. If the parties are unable to resolve the dispute within five (5) working days, or as otherwise agreed, either project manager will have the right to submit the dispute to Service Provider's vice president level and Customer's second vice president level (the "Representatives") who will meet as often as the parties reasonably deem necessary in order to gather and furnish to each other all essential, non-privileged information that the parties believe germane to resolution of the matter at issue. During the course of these non-judicial dispute resolution procedures, documents used to resolve the dispute shall be limited to essential, non-privileged information. All requests shall be made in good faith and be reasonable in light of the economics and time efficiencies intended by the dispute resolution procedures. The Representatives may mutually agree to appoint a neutral advisor to facilitate negotiations and, if requested by both parties, to render non-binding opinions. No formal proceedings for the judicial resolution of any dispute may be commenced until sixty (60) calendar days following initiation of negotiations under this Section 15.10 or for such shorter period as the parties may mutually agree to in writing. Either party may then seek whatever remedy is available in law or in equity. The provisions of this Section 15.10 will not apply to any dispute relating to the parties' obligations of non-disclosure and confidentiality as further described herein.

15.11    **Compliance With Laws**.    Both parties agree to comply with all applicable federal, state, and local laws, executive orders and regulations issued, where applicable. Service Provider shall comply with Customer policies and procedures, to the extent applicable to Service Provider, that are conspicuously posted, conveyed, or otherwise made available to Service Provider.

15.12    **Cooperation**.    Where agreement, approval, acceptance, consent or similar action by either party hereto is required by any provision of this Agreement, such action shall not be unreasonably delayed or withheld. Each party will cooperate with the other

DocuSign Envelope ID: 5354EB7E-0CC7-4B65-27B24A9C3AE68648

by, among other things, making available, as reasonably requested by the other, management decisions, information, approvals, and acceptances in order that each party may properly accomplish its obligations and responsibilities hereunder. Service Provider will cooperate with any Customer supplier performing services, and all parties supplying hardware, software, communication services, and other services and products to Customer, including, without limitation, the Successor Service Provider. Service Provider agrees to cooperate with such suppliers, and shall not commit or permit any act which may interfere with the performance of services by any such supplier.

15.13 **Export Controls**. Customer acknowledges that Customer may have an obligation (independent of this Agreement), to comply with export laws of the United States in connection with its use of the Services. Service Provider will comply with all applicable export control laws of the United States with respect to the Services. Upon Customer's request, Service Provider will identify which export laws (and the applicable classifications related thereto) apply to Service Provider's Services. Service Provider will cooperate with Customer in obtaining any regulatory approvals, permits, or licenses that are necessary to enable Customer to exercise its rights herein.

15.14 **Force Majeure**. Neither party shall be liable for delays or any failure to perform the Services or this Agreement due to causes beyond its reasonable control. Such delays include, but are not limited to, fire, explosion, flood or other natural catastrophe, governmental legislation, acts, orders, or regulation, strikes or labor difficulties, to the extent not occasioned by the fault or negligence of the delayed party. Any such excuse for delay shall last only as long as the event remains beyond the reasonable control of the delayed party. However, the delayed party shall use its best efforts to minimize the delays caused by any such event beyond its reasonable control. Where Service Provider fails to use its best efforts to minimize such delays, the delays shall be included in the determination of Service Level achievement. The delayed party must notify the other party promptly upon the occurrence of any such event, or performance by the delayed party will not be considered excused pursuant to this Section, and inform the other party of its plans to resume performance. A force majeure event does not excuse Service Provider from providing Services and fulfilling its responsibilities relating to the requirements of backup and recovery of Customer Data. Configuration changes, other changes, viruses or malware, or other errors or omissions introduced, or permitted to be introduced, by Service Provider that result in an outage or inability for Customer to use the Services shall not constitute a force majeure event.

15.15 **Advertising and Publicity**. Service Provider will not reveal the existence of this Agreement or disclose that Customer is client of Service Provider's in any advertising, promotional activities, sales presentations or publicity releases without the Customer's prior written consent

15.16 **Notices**. Any notice given pursuant to this Agreement shall be in writing and shall be given by personal service or by nationally recognized next business carrier prepaid to the addresses appearing at the end of this Agreement, or as changed through written notice to the other party. Notice given by personal service shall be deemed

DocuSign Envelope ID: 5354EB7E-0CC7-4B65-2024-A9C3AFE8E648

18-23538-shl    Doc 2464-1    Filed 02/07/19    Entered 02/07/19 12:17:29    Exhibit A -
Declaration of Joseph P. Gildea    Pg 29 of 48

effective on the date it is delivered to the addressee, and notice sent by carrier shall be deemed effective on the next business day following its deposit with said carrier.

15.17  **Assignment of Agreement**.  This Agreement and the obligations of Service Provider hereunder are personal to Service Provider and its staff.  Neither Service Provider nor any successor, receiver, or assignee of Service Provider shall directly or indirectly assign this Agreement or the rights or duties created by this Agreement, whether such assignment is effected in connection with a sale of Service Provider's assets or stock or through merger, an insolvency proceeding or otherwise, without the prior written consent of Customer.  This Agreement will be binding upon and inure to the benefit of Service Provider and its heirs, permitted successors and permitted assigns. Any attempted assignment or transfer in violation of this Section 15.17 will be null and void, and will entitle Customer to terminate this Agreement, at its option.  Any Change in Control of Service Provider shall constitute an assignment of this Agreement, for which Customer's prior written consent is required.  For purposes of this Agreement, a "Change in Control" means a sale of all or substantially all of the assets of Service Provider, whether in a single transaction or a series of transactions, a merger, consolidation, or any other transaction or arrangement the effect of which is that 50% or more of the total voting power entitled to vote in the election of Service Provider's board of directors is held by a person or persons other than the shareholders of Service Provider, who, individually or as a group, held 50% or more of such voting power immediately prior to such event.

15.18  **Counterparts; Facsimile**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.  The parties agree that a facsimile signature may substitute for and have the same legal effect as the original signature.

15.19  **Attorneys' Fees**.  In the event of an alleged breach of this Agreement, the prevailing party will be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, costs and expenses incurred in connection with such dispute, claim or litigation, including any appeal therefrom.  For purposes of this Section, the determination of which party is to be considered the prevailing party will be decided by the court of competent jurisdiction or independent party (i.e., mediator or arbitrator) that resolves such dispute, claim or litigation.

15.20  **Vendor Code of Conduct**. The Sears Holdings Corporation Code of Vendor Conduct ("**Code of Conduct**") is hereby incorporated into the Agreement by reference which may be amended from time to time. Service Provider agrees to adhere to such Code of Conduct.
http://www.searsholdings.com/govern/SHCCodeofVendorConduct.pdf

15.21  Survival.  Any terms of this Agreement that would, by their nature, survive the termination of this Agreement will so survive including **Section** Error! Reference source not found. (Term and Termination), **Section** Error! Reference source not found. (Termination Assistance Services), **Section 6** (Fees and Expenses), **Section 8** (Representations and Warranties), **Section 9** (Confidentiality), **Section 10** (Proprietary

Rights), **Section 12** (Insurance), **Section 13** (Indemnification), **Section 14** (Limitation of Liability), and **Section 15** (General).

15.22    **Electronic Communications.**

15.22.1If required by Customer, in order to more effectively communicate electronically with one another and automate various operations between Customer and Service Provider, the parties shall utilize Customer's third party e-commerce service provider, currently Ariba Supplier Network, or as otherwise identified by Customer to Service Provider from time to time ("E-Commerce Provider"). This will allow the parties to transmit to one another various documents and communications, including but not limited to, purchase orders, work orders, change requests, advance ship notices, delivery schedules and receipt confirmations, requests for proposals, invoices, acknowledgements, catalogs, catalog punch-outs, portal usage, fees, discount rates, acceptances of discounts, reports provided by Service Provider to Customer, product literature and information, parts lists, notices as required or allowed hereunder, clarifications and confirmations (E-Documents").

15.22.2Customer and Service Provider shall be individually responsible for purchasing or acquiring a license to install and/or use any software application, host site, support services agreement, equipment, maintenance service agreement or any other process or service deemed necessary by Customer, and any renewals thereof, in order to access and utilize the E-Commerce Provider's electronic communications portal, record retention system and any other modules or accessory applications deemed necessary by Customer (the "**E-Network**"). Customer shall not be responsible for Service Provider's failure to pay fees due to the E-Commerce Provider or Service Provider's failure to adhere to the terms of use of the E-Network. Service Provider shall adhere to the terms and conditions of its agreements with the E-Commerce Provider. In the event that Service Provider fails to maintain a relationship or breaches or defaults on its agreements with the E-Commerce Provider, such failure may result in a cross-default of this Agreement, and the cancellation by Customer of purchase orders or work orders placed with Service Provider with no liability to Customer for any such cancellation.

15.22.3Service Provider shall be solely responsible for the purchase price or licensing fees, transaction fees, renewal fees, etc. assessed by the E-Commerce Provider, and Service Provider shall not pass along any such fees to Customer. Service Provider shall also be responsible for the training of its employees or agents in utilizing the E-Network and for their proper use of the E-Network and any associated user IDs and passwords. Service Provider shall maintain current email addresses and other contact information in the E-Network so to maintain the timely and efficient routing of all E-Documents with Customer.

15.22.4The transmission of E-Documents via the E-Network shall have the same validity and enforceability as if they were delivered as signed, written

DocuSign Envelope ID: 5354E87E-0CC7-4B65-27B3-A9C3AFE8E648

18-23538-shl    Doc 2464-1    Filed 02/07/19    Entered 02/07/19 12:17:29    Exhibit A -
Declaration of Joseph P. Gildea    Pg 31 of 48

paper documents or communications. If Customer submits its purchase orders or work orders to Service Provider via the E-Network then Service Provider shall submit its invoices under those purchase orders or work orders to Customer via the E-Network. If Service Provider fails to do so, then Customer may give Service Provider notice with a thirty (30) day period to cure if Customer deems Service Provider's invoices submitted by Service Provider outside the E-Network to be unacceptable. The party submitting its E-Document via the E-Network is responsible to confirm the transmission of the E-Document and its availability on the E-Network to the other party, and to resubmit its E-Document in the event of any transmission or submission error, due to whatever cause. Neither party shall use the failure, crash or temporary unavailability of the E-Network as a basis or excuse for any breach it commits under this Agreement.

15.23 **Entire Agreement**. This Agreement, together with all exhibits, schedules and statements of work or other attachments to this Agreement ("Attachments") constitutes the complete and final agreement of the parties and supersedes all prior agreements, understandings, negotiations and discussions. No modification or rescission of this Agreement shall be binding unless executed in writing by the parties. In the event of any conflict between the terms and conditions of this Agreement and any Attachment, the terms and conditions of the Attachment shall prevail. Notwithstanding the foregoing, if the parties have executed an agreement of confidentiality or nondisclosure prior to or contemporaneously with this Agreement, the provisions of non-disclosure agreement shall remain in force, except to the extent that the terms and conditions of this Agreement shall impose stricter requirements or standards, in which case the stricter terms and conditions of this Agreement shall control the Service Provider's duties and obligations. This Agreement also supersedes, and Customer and its Authorized Users will not be bound by, any "shrink wrap license" which is bundled with the Services or any deliverable or any "disclaimers" or "click to approve" terms or conditions contained in any Service application or any web site which Customer, or its Authorized Users use in connection with Service Provider's Services now or in the future.

Executed on the dates set forth below by the undersigned authorized representatives of the parties to be effective as of the Effective Date.

**SEARS HOLDINGS MANAGEMENT**          **INTERACTIONS CORPORATION**
**CORPORATION** ("Customer")                    ("Service Provider")


By: _Leena Munjal_____        By: _Joe Gildea_____
        406246DAE8AE469...                              BF3E5B4913A74CA...

Name: [Customer Signatory Name]             Name: [Other Party Signatory Name]

Title:  [Customer Signatory Title]              Title:   [Other Party Signatory Title]


DMLIB-#467924-v4-Interactions_Corporation_SaaS_Agreement

DocuSign Envelope ID: 5354E87F-0CC7-4B65-27B2-A0C3AFE8E648

18-23538-shl    Doc 2464-1    Filed 02/07/19    Entered 02/07/19 12:17:29    Exhibit A -
Declaration of Joseph P. Gildea    Pg 32 of 48

Date: 1/6/2015 _____    Date: 1/5/2015 _____

**Address for Notice:**                    **Address for Notice:**
Sears Holdings Management Corporation      Attention:
3333 Beverly Road, Mail Station _____
Hoffman Estates, IL 60179

with a copy to:
Sears Holdings Management Corporation
3333 Beverly Road, Mail Station:  B6-210B
Hoffman Estates, Illinois 60179
Attn.:  General Counsel
Facsimile:  (847) 286-2471

**EXHIBIT A- SOW  [Note to Draft – Interactions to Provide]**

**Service Provider's Software as a Service Statement of Managed Services**

This Software as a Service Statement of Work shall be incorporated in and governed by the terms of that certain Master "Software as a Service" Managed Services Agreement by and between **Sears Holdings Management Corporation** ("Customer"), on behalf of itself and for the benefit of its Affiliates and **[OTHER PARTY NAME]** ("Service Provider") dated _____ __, _____, as amended (the "Agreement"). Unless expressly provided for in this SOW, in the event of a conflict between the provisions contained in the Agreement and those contained in this SOW, the provisions contained in the Agreement shall prevail.

| | |
|---|---|
| **Services Description:** | |
| **Support Description:** | |
| **Training Description:** | |
| **Backup Requirements:** | |
| **Service Windows:** | |
| **Performance Credits for Missed Service Levels:** | |
| **Customer Resources:** | |
| **Service Provider Resources:** | |
| **Responsibilities, Deliverables, and/or Activities:** | |
| **Services Fees or Rate:** | |
| **Start Date:** | |
| **End Date:** | |
| **Service Level:** | See Exhibit B. |
| **Support Services:** | See Exhibit C. |
| **Additional Customer Requirements:** | |

Executed on the dates set forth below by the undersigned authorized representatives of the parties to be effective as of the Start Date.

<table>
<tr><td align="center"><b>CUSTOMER</b><br>("Customer")</td><td align="center"><b>[OTHER PARTY NAME]</b><br>("Service Provider")</td></tr>
</table>

DMLIB-#467924-v4-Interactions_Corporation_SaaS_Agreement

DocuSign Envelope ID: 5354E87E-0CC7-4B65-27B2-A9C3AE68E648

18-23538-shl    Doc 2464-1    Filed 02/07/19    Entered 02/07/19 12:17:29    Exhibit A -
Declaration of Joseph P. Gildea    Pg 34 of 48

By: _____     By: _____

Name: **FOR REFERENCE ONLY**     Name: **FOR REFERENCE ONLY**

Title:   **FOR REFERENCE ONLY**     Title:   **FOR REFERENCE ONLY**

Date:_____     Date:_____

**EXHIBIT B - Service Levels [Note to Draft – Interactions to Provide]**

1. **Service Availability**.  The Services will be available in all material respects (i.e. capable of displaying information and conducting transactions as contemplated in the ordinary course of business) 90% of the time during any 24 hour period, 95% of the time during any 7 day period, and 98% of the time during any 30 day period; and there will be no period of interruption in such public accessibility that exceeds 1 continuous hour] [will be available over the Internet at least 90% of the time during any 30-day period, excluding scheduled maintenance times].

2. **Response Time**.  The average time required for the Services to respond (i.e.: commence transmitting a web page)  after a request from Customer's system, measured over each 24 hour day, will not exceed _____ seconds from the time such request reaches the Service servers. Service Provider will not be responsible for delays that occur beyond the point of connection of Service Provider's servers to the Internet.

3. **Bandwidth**.  The bandwidth representing the Service Provider servers' connection to the Internet will be operating at peak capacity no more than 10 minutes in any 24 hour period and at greater than 50% of peak capacity no more than 60 minutes of any 24 hour period.

4. **Security**. Service Provider will use reasonable efforts to prevent unauthorized access to restricted areas of its servers and any databases or other material generated from or used in conjunction with the Services, but in no event less than generally accepted industry standards.  In addition, Service Provider will immediately take action to remedy any known security breaches or holes in the Services.

5. **Browser Compatibility**.  The Services will be compatible with Microsoft Internet Explorer ___ and higher, Apple Safari ___ and higher, and _____.

6. **Redundancy**. The Services will operate with redundancy of the data store, application servers, and web servers.  Service Provider will use reasonable efforts to monitor the status and availability of all components associated with the delivery of the Services, and document problem reports for all service impacting issues encountered during the delivery of the Services.

7. **Latency**.  The latency of an HTTP request is the elapsed time between a request and when data return is complete. 95% of all responses (when Access Service is available) will be less than 2 seconds per page, measured in blocks of 24 hours.  The remaining 5% of responses should not be more than 15 seconds per page.  This measurement will be made from a reasonably utilized high speed data line of not less than T1 to a mutually agreed upon dynamic page (or set of pages) on Service Provider's system.  Any 15-minute period of time in which consecutive responses are above the 15-second timeout will be counted as unscheduled downtime unless the network outage originates from within the Service Provider's co-location facility. Latency is a measurement of both network and system efficiency. Service Provider will use all reasonably available data, including trace route and ping measurements, to pinpoint which part of the network is the cause of any excess latency.

DocuSign Envelope ID: 5354EB7E-0CC7-4B65-27B2-A9C3AE68E648

18-23538-shl    Doc 2464-1    Filed 02/07/19    Entered 02/07/19 12:17:29    Exhibit A -
Declaration of Joseph P. Gildea    Pg 36 of 48

8.    **Remedy**.  If any of the performance standards set forth above are not met, Service Provider shall credit to Customer [describe amount]. If any of the performance standards set forth above are not met for 2 consecutive months, Customer may terminate this Agreement.  Such termination will be Customer's sole remedy for failure of Service Provider to adhere to the above standards; provided, however, that the foregoing will not limit Customer's remedies in the event Service Provider fails to use reasonable efforts to adhere to such standards.

DocuSign Envelope ID: 5354E87E-0CC7-4B65-27A2-A9C3AE5E848

## EXHIBIT C - Support &  Maintenance Services

1.    **GENERAL**.  During the Warranty Period, and thereafter during all times Customer has engaged Service Provider to provide the Services, Service Provider will provide the following maintenance Services ("Maintenance Services") in accordance with this Exhibit.

2.    **TELEPHONE SUPPORT**.  Service Provider will, at no additional cost, provide to Customer unlimited telephone support (via a toll-free telephone number) relating to the installation, implementation, configuration, use and operation of the Services or any problems therewith.  Telephone support will be available on a continuous (24 hours per day, 7 days per week) basis.

3.    **SERVICE ASSISTANCE**. In addition, Service Provider will answer questions by Customer Personnel regarding the day-to-day operation of the Services and the development and implementation by Customer and its Personnel of interfaces with the Services ("Know-How"). Know-How may include any of the following:

3.1.    Data files, file and data definitions and relationships, data definition Specifications, data models, interfaces, program architecture, program structure, sequence and organization, screen displays, reference and user manuals, design and functional Specifications relating to the Services;

3.2.    Maintenance, support utilities and tools relating to the Services;

3.3.    Security requirements and methodologies relating to the Services;

3.4.    Such other material as Customer may reasonably request.

To the extent such Know-How is generally available within Service Provider's or its Affiliates' organizations, or is generally provided to Service Provider's maintenance subscribers, Service Provider will provide such Know-How at no additional charge (other than the maintenance fees set forth in the applicable Procurement Document, if any), otherwise Service Provider shall complete a Change Request. Attendance at Service Provider's training programs are not included within the definition of the term "Know How" and will be separately documented in a Procurement Document if requested by Customer.

4.    **ENHANCEMENTS**.  Service Provider will provide to Customer, without additional charge, the Services and copies of the Specifications revised to reflect any and all Enhancements to the Services made by Service Provider during the Maintenance Services period, as soon as such Enhancements are offered to any other Service Provider customers. As used in this Agreement, "Enhancement(s)" means any new Services releases, improvements, modifications, upgrades (e.g., ver. 1 to ver 1.1, 1.1.1 or 2.1), updates, patches, updated data, fixes and additions to the Services that Service Provider markets or makes available to its customers who are eligible to receive maintenance or support services from time-to-time to correct deficiencies and/or improve or extend the capabilities, including, but not limited to, increases in the speed, efficiency or ease of operation of the Services.

DocuSign Envelope ID: 5354E87E-0CC7-4B65-27B2-A9C3AF68E648

18-23538-shl    Doc 2464-1    Filed 02/07/19    Entered 02/07/19 12:17:29    Exhibit A -
Declaration of Joseph P. Gildea    Pg 38 of 48

5.    **CATEGORIES OF DEFECTS**.  All Defects will be categorized by Customer according to the category definitions outlined below.  In the event Service Provider disagrees with Customer's classification of any Defect, such dispute will be resolved in accordance with a mutually agreed upon dispute resolution process.

    5.1.    <u>**Severity 1 Defect**</u>.  A Severity 1 Defect arises when the Services are unable to function properly in a production environment due to a failure of the Services to conform to the Specification and/or Specifications.

    5.2.    <u>**Severity 2 Defect**</u>.  A Severity 2 (production environment) Defect arises when a Services problem exists which materially impacts Customer's business operations, although the Services are substantially operational.

    5.3.    <u>**Severity 3 Defect**</u>.  A Severity 3 Defect arises when a production environment Services problem exists which does not materially impact Customer's business operation.

    5.4.    <u>**Severity 4 Defect**</u>.  A Severity 4 Defect arises when a Defect exists, but the impact on Customer's business operations is de minimis.

6.    **INITIAL RESPONSE; INTERIM RESOLUTION; FINAL RESOLUTION**.  For purposes of this Appendix:

    6.1.    "**Initial Response**" means the time it takes from Customer's initial fax, e-mail or telephone call notification of the Defect until Service Provider responds to the appropriate Customer Personnel.

    6.2.    "**Interim Resolution**" means the time it takes Service Provider to apply a functional resolution to the reported Defect measured from the time at which the initial notification was made, meaning Service Provider provides Customer with a temporary fix or workaround that solves a reported Defect and that can be used by Customer with minimal inconvenience and minimal impact on Customer's business operations.

    6.3.    "**Final Resolution**" means Service Provider provides a final correction or modification of the Services that corrects the Defect.

7.    **DEFECT RESPONSE AND RESOLUTION PROCEDURE**.  For purposes of the table below:

    7.1.    "**Effort**" means continuous and uninterrupted commercially reasonable efforts during normal business hours.

    7.2.    "**Hours**" means consecutive hours during normal business hours.

| Severity Level | Initial Response | Interim Resolution | Final Resolution |
|---|---|---|---|
| Severity 1 Defect | Within 3 Hours | 6 Hours | 24 Hours |
| Severity 2 Defect | Within 6 Hours | 12 Hours | 5 business days |
| Severity 3 Defect | Within 8 Hours | N/A | 30 calendar days |

| Severity 4 Defect | Within 2 business days | N/A | Within the next release, or as otherwise agreed to by the parties |
|---|---|---|---|

8.      **SERVICE CREDITS**.  The Service Credits, if any, will be credited by Service Provider to Customer as set forth in the following tables:

| Severity Level | Initial Response Service Credit | Maximum Monthly Initial Response Service Credit | Final Resolution Service Credit | Maximum Monthly Final Resolution Service Credit |
|---|---|---|---|---|
| **Severity 1 Defect** | 2% of monthly Service Fees | 10% of monthly Service Fees | 10% of monthly Service Fees | 50% of monthly Service Fees |
| **Severity 2 Defect** | 1% of monthly Maintenance Service Fees | 5% of monthly Service Fees | 10% of monthly Service Fees | 50% of monthly Service Fees |
| **Severity 3 Defect** | 0.5% of monthly Service Fees | 2.5% of monthly Service Fees | 10% of monthly Service Fees | 30% of monthly Service Fees |
| **Severity 4 Defect** | N/A | N/A | N/A | N/A |

For each hour after the expiration of the time periods set forth in the table above for which Service Provider fails to provide an Initial Response for a Severity 1 Defect, Severity 2 Defect or Severity 3 Defect, Service Provider will grant Customer a credit in an amount equal to the percentage of Customer's monthly Service Fee specified in the Initial Response Service Credit column in the table above ("Initial Response Service Credit").  Such Initial Response Service Credit will be in addition to any other applicable Final Resolution Service Credit and to any other remedies available to Customer at law, in equity or under this Agreement.  The maximum amount of Initial Response Service Credits that Customer may accrue will be limited to the percentage of monthly Service Fees identified in the Maximum Monthly Initial Response Service Credit column in the table above ("Maximum Monthly Initial Response Service Credit").

For each calendar day after the expiration of the time periods set forth in the table above for which Service Provider fails to satisfactorily complete a Final Resolution for a Severity 1 Defect, Severity 2 Defect or a Severity 3 Defect, Service Provider will grant Customer a credit in an amount equal to the percentage of Customer's monthly Service Fee specified in the Final Resolution Service Credit column in the table above ("Final Resolution Service Credit").  Such Final Resolution Service Credit will be in addition to any applicable Initial Response Service Credit and any other remedies available to Customer at law, in equity or under this Agreement. The maximum amount of Final Resolution Service Credits that Customer may accrue will be limited to the percentage of monthly Service Fees identified in the Maximum Monthly Final

Resolution Service Credit column in the table above ("Maximum Monthly Final Resolution Service Credits").

9.      **ON-SITE SUPPORT**.  Upon request of Customer, Service Provider will provide on-site support within 24 hours or within a mutually agreed time frame between the parties, not to exceed five (5) calendar days, where telephone support fails to correct any material error, malfunction or nonconformity within the time periods set forth herein.  Service Provider will provide qualified Service Provider Personnel to work exclusively to correct Defects until such Defects are corrected.  For purposes of this Agreement "Defects" mean any failure of the Services to contain or execute the functionality, operate in accordance with and/or conform to the applicable Specifications.

## EXHIBIT D – Information Security

At a minimum and as specified herein, Service Provider shall provide security for all data and communication systems in support of the Agreement or Procurement Document to which this Appendix is attached ("**Appendix**").  This Appendix should be a part of any contract with a Service Provider that will store, transmit (send/receive/pass-through) or process Company/SHMC data.

Service Provider's security efforts will include, without limitation:

**Logical Access Controls**: Service Provider agrees to employ effective logical access control measures over all systems used to create, transmit, or process SHMC Confidential Information), including but not limited to:

- User authentication must use unique identifiers ("**User ID's**") consistent with individual accountability; shared User ID's do not provide the level of accountability required by SHMC;
- A complex password policy, including the prohibition of clear-text credentials must be enforced;
- User access rights/privileges to information resources containing SHMC Confidential Information must be granted on a need-to-know basis consistent with role-based authorization.
- User access to SHMC Confidential Information must be removed immediately upon user separation or role transfer eliminating valid business need for continued access.
- Default passwords and security parameters must be changed in third-party products/applications used to support SHMC Confidential.

**Network Security Architecture:** Service Provider agrees to employ effective network security control measures over all systems used to create, transmit, or process SHMC Confidential Information including but not limited to:

- Firewalls shall be operational at all times and shall be installed at the network perimeter between Service Provider's internal (private) and public (Internet) networks.
- Properly configured and monitored IDS (Intrusion Detection  Systems) must be used on Service Provider's network.
- Databases must be logically or physically separated from the web server, and the database may not reside on the same host as the web server, where applicable.
- The database and other information systems used for the purposes of processing SHMC Confidential Information must have only those services/processes and ports enabled to perform routine business. All other services/processes on the host must be disabled.

DocuSign Envelope ID: 5354E87E-1CC7-4B65-2702-A9C3AFE8E648

18-23538-shl    Doc 2464-1    Filed 02/07/19    Entered 02/07/19 12:17:29    Exhibit A -
Declaration of Joseph P. Gildea    Pg 42 of 48

- All information systems, repositories, etc. used for SHMC by Service Provider, or its business partners, must be physically located in controlled center environments used for the purpose of protecting information systems.
- Secure channels (e.g., SSL, SFTP, SSH, IPSEC, etc.) must be used at all times.

**Physical Access Controls:** Service Provider agrees to maintain servers, databases, and other hardware and/or software components that store information related to SHMC's business activities in an access controlled and consistently monitored Data Center secured by appropriate alarm systems, which will not be commingled with another unrelated party's software or information. The facility storing SHMC data must follow best practices for infrastructure systems to include fire extinguishing, temperature control and employee safety.

**Risk Assessment/Audit:** At no additional cost, Service Provider agrees to provide responses to a risk assessment questionnaire (if provided by SHMC), participate in vulnerability scans of their network and / or application (upon notification).
- Service Provider agrees to perform regular security vulnerability assessments and shall provide SHMC with sanitized results of a current security assessment by an accredited third-party (e.g., penetration test results of internet-facing devices, SSAE 16-Type II reports, ISO 27001 certification, etc.) as well as action plans describing how Service Provider will address all identified security vulnerabilities affecting systems used to store, process or otherwise access SHMC Confidential Information.
- To the extent applicable, Service Provider agrees to maintain appropriate PCI certifications of its data security controls.
- Service Provider will permit SHMC or its designee to conduct audits of SHMC's data maintained or stored by the Service Provider.

**Security Policy:** Service Provider agrees to maintain and enforce security policies consistent with security best practices, and all applicable regulatory and legal security and privacy requirements,, including but not limited to Massachusetts 201 CMR 17.00 et. seq. "Standards for the Protection of Personal Information of Residents of the Commonwealth". Upon request, Service Provider shall provide copy of current security policy and standards as well as security architecture. Service Provider shall comply with SHMC's Privacy Policy with respect to any SHMC customer personal information it receives.

**Training and Awareness:** Service Provider agrees to provide necessary training to ensure security awareness in Service Provider personnel that are directly or indirectly engaged in handling SHMC Information and systems, onsite or remotely.

**Protection of SHMC Confidential Information**: In addition to what may be described in the Agreement or Procurement Document to which this Appendix is attached, where applicable, Service Provider agrees to protect SHMC Confidential Information as it would its own. For purposes of clarity, SHMC Confidential Information may include, but is not limited to, the following:
- Credit Card numbers

DMLIB-#467924-v4-Interactions_Corporation_SaaS_Agreement

DocuSign Envelope ID: 5354EB7E-0CC7-4B65-27D2-A9C3AFC8E648

- Credit Card Validation Codes
- Personal Identification (PIN) numbers
- Loyalty Card Numbers with or without any associated PIN or Access Code
- Checking Account number (alone or in combination with checking account routing information)
- Bank Account number (alone or in combination with routing information)
- Drivers License Number or State-issued Identification Card Number
- Customer or Employee Names, in whole or in part
- Customer or Employee Postal Address
- Customer or Employee email address
- Date of Birth
- Social Security Numbers
- Health Insurance Card or Policy Identification Number
- Medical or Health Information
- Personal Telephone Number (when used with a customer/employee name or address)

Additionally, Service Provider agrees to adhere to the following controls surrounding the use and protection of SHMC Confidential Information:

- SHMC Confidential Information must be encrypted with key sizes of 256-bit for symmetric and 2048-bit for asymmetric encryption.
- Clear text (ftp, telnet, etc.) protocols may not be used to access or transfer SHMC Confidential information. SHMC Confidential Information must be encrypted when stored on portable media, which by way of example shall include USB Sticks, Portable hard drives, Laptops, DVD/CDs, and when transmitted on wireless networks or across public networks.
- SHMC Confidential Information may not be copied, sold or used for solicitation purposes by the Service Provider or its business partners. SHMC Confidential Information may only be used in conjunction with and within the scope of the Procurement Document or the Agreement to which this Appendix is attached.
- SHMC Confidential Information (data) must be segregated from other Service Provider customers, systems, or applications unrelated to SHMC. Appropriate data security controls must be used over data at rest, including, access controls and encryption.
- Where applicable, Payment Card information must be masked on display rendering in a manner consistent with the Payment Card Industry Data Security

DocuSign Envelope ID: 5354E87E-0CC7-4B65-A7D24A9C3AE85648

Standard (PCI-DSS), the Fair and Accurate Credit Transaction Act (FACTA) and all other applicable laws and regulations.

- Service Provider must disclose where SHMC data will be stored and processed. Storage and Processing of SHMC Confidential Information shall take place within the United States.

**System Monitoring**: Service Provider agrees to regularly audit and monitor information systems processing SHMC's business activities to ensure the protection of SHMC's information. Monitoring includes, but is not limited to, potential breaches or hacking activity and access to devices. Service Provider must have defined processes for security alerting, escalation and remediation that are consistent with the Services procured pursuant to the Agreement. Service Provider must ensure that event logs with SHMC data are not provided to other subscribers. If Service Provider using virtual machines, it must ensure there is granular monitoring of traffic that is crossing the virtual machine backplanes.

**Vulnerability Management Controls**: Service Provider agrees to employ effective vulnerability management control measures over all of its systems used to create, transmit, or process SHMC Confidential Information, including; but, not limited to:

- Third-party vulnerability scans or audits of any external-facing (public) infrastructure devices.

- Deploy and maintain currency of up-to-date commercially available anti-virus, anti-spam, anti-malware software on all information system components including personal computers, laptops, and interconnecting networks, where applicable, used for the purpose of managing SHMC Confidential Information. Additionally, provide for regular scanning for viral infections and update virus signature files frequently.

- Maintain a standard patch management process and practice to ensure the protection of any devices used to access, process or store SHMC Confidential Information. Service Provider agrees to provide SHMC a summary of patch management program upon request.

- Regularly auditing and monitoring to ensure the protection of SHMC Confidential Information.

- Any security breach that involves SHMC Confidential Information must be reported to SHMC in accordance with the Notice provision of the Agreement without unreasonable delay. Service Provider shall immediately perform a root cause analysis as well as provide detailed information about measures taken by the Service Provider to prevent future breaches. All efforts to rectify or resolve the situation must include subsequent and regular notification for the reported incident.

- Service Provider agrees to provide full cooperation with SHMC and in the event of a data breach involving SHMC Confidential Information including, but not limited to: server log information showing network and application traffic..

DocuSign Envelope ID: 5354EB7E-0CC7-4B65-A7D9-A9C3AE68E648

- Vulnerabilities discovered by the SHMC's or Service Provider's Security Scanning tools must be resolved by following the schedule outlined below (the level of vulnerability will be determined by SHMC):

  o *P1 Vulnerabilities*: A successful exploit of this vulnerability may result in catastrophic and significant physical or property damage or loss. Or, there may be a catastrophic and significant loss of revenue or productivity (e.g., Denial of Service Attack, exploit 'kits' exist, buffer overflows high jacking, or source code exposure, etc.). Such a vulnerability must be resolved before a site launch or within 8 hours of discovery if the application is currently publically available.

  o *P2 Vulnerabilities*: A successful exploit of this vulnerability may result in moderate physical or property damage, or, there may be a moderate loss of revenue or productivity to the organization (e.g., Weak encryption, or possible phishing opportunity, etc.). Such vulnerability must be resolved within 7days of site launch or within 4 hours of discovery if the application is currently publically available.

  o *P3 Vulnerabilities*: A successful exploit of this vulnerability may result in minor physical or property damage. Or, there may be a minor loss of revenue or productivity to the organization (e.g., FTP use or missing service pack, etc.). Such vulnerability must be resolved within 30 days of a site launch or within 8 hours of discovery if the application is currently publically available.

**Data Recovery and Availability**:  Service Provider must provide disaster recovery and business continuity plans that support the pre-defined recovery time objective (RTO) / recovery point objective (RPO) requirements defined by SHMC.

- Service Provider must utilize industry best practices for data, services, and communications recoverability. Data and applications must be replicated across multiple independent sites and alternate communication channels must be available.

- Service Provider is expected to validate and verify their existing capabilities through realistic scenario testing.  Service Provider must agree to participate in periodic recovery testing with SHMC. Proof of successful testing of the Service Provider plan must be provided to SHMC upon request.

- Service Provider systems must be device (computer machine) and provider independent in order to ensure portability and successful recovery of applications and backup or restoration services, or both.

- Service Provider must provide company name, address, and contact information on all third-party relationships as well as services provided by each wherever those services create, transmit or process SHMC Confidential Information.

**Data Destruction:** Service Provider shall ensure that residual magnetic, optical, or electrical representation of SHMC Confidential Information that has been deleted may not be retrieved or reconstructed when storage media is transferred, become obsolete or is no longer usable or required by SHMC.

DMLIB-#467924-v4-Interactions_Corporation_SaaS_Agreement

DocuSign Envelope ID: 5354E87E-0CC7-4B65-27B34A9C3AE63E646

- Service Provider data retention and destruction must comply with applicable laws or regulations.
- SHMC information stored on Service Provider media (e.g., hard drive, optical discs, digital media, tapes, paper, etc.) must be rendered unreadable or unattainable using the NIST Guidelines for Media Sanitization (Special Pub 800-88), prior to the media being recycled, disposed of, or moved off-site.

**Application Service Provider:**    This section applies to the Service Providers that provide application software hosted at SHMC or offsite at the Service Provider facility.  Service Provider agrees to adhere to the following controls surrounding application development:

1. Service Provider must provide supporting documentation that commonly accepted web application security guidelines and frameworks are used for developing Internet-facing applications (e.g. Open Web Application Security Project [OWASP], SANS).
2. Service Provider must provide a data flow diagram that demonstrates all security controls in place.
3. Service Provider must demonstrate how Internet-facing applications are tested for security vulnerabilities and remediated prior to the source code being promoted to production.
4. Service Provider must allow penetration testing and/or application source code review to be performed by a third party to perform the same.
5. Service Provider must provide supporting documentation describing how fraud is detected and prevented when requested by SHMC.
6. Service Provider agrees to supply within the requested timeframe, and demonstrate full cooperation with SHMC, pertaining to all inquires deemed necessary by SHMC to determine the risk of any third-party systems and procedures related to and affecting SHMC. This includes, but is not be limited to, inquiries pertaining to s, server logs sanitized of sensitive information but showing application traffic, operating systems, applications, databases, network configuration, data encryption algorithms being utilized, fraud detection and prevention controls, physical inspection of facilities, incident response procedures, and disaster recovery measures.
7. Service Provider agrees to allow all relevant sites to be monitored by a mutually agreeable third-party for availability and performance.

**Personnel Roles and Responsibilities:**  Service Provider agrees to identify in writing the person who will be responsible for overall security of the application development, management, and update process throughout the Contract period. The person identified shall be a single technical resource serving as project Security Lead. The Security Lead shall confirm in writing the security of each deliverable. The Security Lead shall confirm to SHMC in writing that the software meets the security requirements, all security activities have been performed, and all identified security issues have been documented and resolved. Any exceptions to the confirmation status must be fully documented with the delivery.

DMLIB-#467924-v4-Interactions_Corporation_SaaS_Agreement

# **Exhibit 2**

## **(Summary of Pre- and Post-Petition Invoices)**

| Business Unit | Invoice Date | Due Date | Invoice Number | Pre-Bakruptcy Outstanding | Post-Bankruptcy Outstanding |
|---|---|---|---|---|---|
| Online/Delivery | 5/31/2018 | 7/30/2018 | CINV-005510 | 10,512.37 | - |
| Online/Delivery | 7/31/2018 | 9/29/2018 | CINV-005648 | 93,624.71 | - |
| Home Services | 7/31/2018 | 9/29/2018 | CINV-005647 | 127,674.96 | - |
| Online/Delivery | 8/31/2018 | 10/30/2018 | CINV-005751 | 86,681.88 | - |
| Home Services | 8/31/2018 | 10/30/2018 | CINV-005750 | 124,102.60 | - |
| Online/Delivery | 9/30/2018 | 11/29/2018 | CINV-005854 | 83,719.70 | - |
| Home Services | 9/30/2018 | 11/29/2018 | CINV-005853 | 103,696.28 | - |
| All | 10/31/2018 | 12/30/2018 | CINV-005923 | 81,559.97 | - |
| Online/Delivery | 12/31/2018 | 3/1/2019 | CINV-006165 | - | 70,308.79 |
| Home Services | 12/31/2018 | 3/1/2019 | CINV-006164 | - | 89,531.85 |
| Online/Delivery | 1/31/2019 | 4/1/2019 | CINV-006262 | - | 56,549.00 |
| Home Services | 1/31/2019 | 4/1/2019 | CINV-006261 | - | 103,295.08 |
| All | 8/1/2018 | 9/30/2018 | CINV-005652 | 15,000.00 | - |
| All | 9/20/2018 | 11/19/2018 | CINV-005810 | 68,625.00 | - |
| All | 1/1/2019 | 3/2/2019 | CINV-006136 | - | 8,000.00 |
| All | 2/1/2019 | 4/2/2019 | CINV-006191 | - | 8,000.00 |