**Hearing Date and Time: February 14, 2019, at 10:00 a.m. (Eastern Time)**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Susheel Kirpalani
Jonathan E. Pickhardt
Andrew S. Corkhill
Matthew Scheck
Ellison Ward Merkel

*Attorneys for OCO Capital Partners, L.P.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>SEARS HOLDINGS CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered) |

**OCO CAPITAL PARTNERS L.P.'S LIMITED OBJECTION TO THE EX-PARTE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 1103 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004 AND 9016 <u>AUTHORIZING THE EXAMINATION OF THE CDS PARTICIPANTS</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

OCO Capital Partners, L.P., on behalf of itself and its managed funds ("**OCO**")[2] respectfully submits this limited objection to the *Ex-Parte Motion Of The Official Committee Of Unsecured Creditors For The Entry Of An Order Pursuant To Bankruptcy Code Sections 105 And 1103 And Federal Rules Of Bankruptcy Procedure 2004 And 9016 Authorizing The Examination Of The CDS Participants* (the "**2004 Motion**") [ECF No. 1557], and in support hereof states as follows:

## PRELIMINARY STATEMENT

1.      But for the actions of OCO, the Debtors would never have realized $82.5 million in value for their otherwise effectively worthless MTNs.[3] It was OCO that alerted the Debtors to the value of the MTNs in the unique context of the ISDA auction, and it was OCO that pushed both Debtors and the Creditors' Committee to sell the MTNs in a manner that would maximize their value for the estate. Having reaped the benefits of OCO's actions, the Creditors' Committee now seeks approval to investigate why the Debtors' windfall was not even greater.

2.      There is no need to impose burdensome and costly discovery on OCO—which will further deplete the estate's diminishing assets—in order to understand why OCO and other buyers of CDS protection referencing SRAC (together, the "**Buy-Side CDS Participants**") ultimately elected not to submit a competing bid for the MTNs on December 31, 2018. The explanation is straightforward. As the Debtors and the Creditors' Committee have acknowledged, from the outset, the Buy-Side CDS Participants were interested in acquiring the MTNs for the sole purpose of mitigating potential losses on their SRAC CDS. As the Creditors' Committee has also

---

[2] The CDS positions at issue were held at all relevant times by OCO Opportunities Master Fund, L.P., which was managed by Omega Advisors, Inc. prior to January 1, 2019. OCO is also a creditor of SRAC, having purchase $600,000 in notes issued by SRAC on November 21, 2018.

[3] Capitalized terms used but not defined herein have the meanings given to those terms in the 2004 Motion. For avoidance of doubt, Cyrus is not included in the definition of "Buy-Side CDS Participants."

1

acknowledged, there were numerous risks and hurdles associated with this strategy, not least of which was the Buy-Side CDS Participants' ability to put together a bid for the MTNs that would satisfy the stringent requirements imposed by the Debtors. Ultimately, in light of these risks and hurdles, the Buy-Side CDS Participants elected to mitigate potential losses on their SRAC CDS by entering into offsetting CDS trades, which obviated any need to try to acquire the MTNs. Meanwhile, the Debtors still closed on the sale of the MTNs to Cyrus, thus receiving an unexpected windfall of $82.5 million. Based on these uncontested facts, the Creditors' Committee knows all it needs to know to conclude that the conduct of OCO and the other Buy-Side CDS Participants was neither improper nor actionable.

3. If—notwithstanding this straightforward explanation of the Buy-Side CDS Participants' conduct—the Court is nevertheless minded to grant the Creditors' Committee's 2004 Motion, OCO respectfully requests that the scope of discovery be properly limited to the stated purpose of the Motion: "investigating the MTN Transactions to determine whether any improper conduct occurred that halted further bidding." More open-ended discovery—which is currently being sought by the Creditors' Committee—serves no legitimate purpose, and will impose unjustified and unnecessary costs on both OCO and the estate. The discovery sought by the Creditors' Committee exceeds the stated purpose of its investigation in three key respects.

4. *First*, the temporal scope of the Creditors' Committee's requests for production ("**Proposed RFPs**," attached here as Exhibit A) significantly exceeds the time period at issue in the 2004 Motion. The Creditors' Committee requests approval to investigate what happened over an 11-day period between December 20, 2018—when the Buy-Side CDS Participants presented a competing bid for the MTNs that expired that day—and December 31, 2018, when no further objection to the existing sale or competing bid was made. The Proposed RFPs, however, seek

2

documents dating back to November 1, 2018. In the absence of any reasoned explanation for this significantly broader time period, OCO should not be subjected to the additional cost and burden associated with collecting documents for the period from November 1 through December 19, 2018.

5. *Second*, while the Creditors' Committee seeks approval to "investigat[e] the MTN Transactions," the Proposed RFPs are much broader in scope. For example, the Creditors' Committee seeks all communications between the Buy-Side CDS Participants (regardless of whether they relate in any way to the MTNs); all communications between OCO and any broker-dealer concerning any Sears securities (not just MTNs); and all documents and communications concerning any CDS contract or short position taken by OCO (regardless of whether it has anything to do with Sears). To the extent discovery is permitted, it should be limited to documents and communications concerning the MTNs and SRAC CDS.

6. *Third*, the Creditors' Committee should not at this stage be permitted to depose representatives of OCO regarding the MTN Transactions (or any other subject). Given the threadbare nature of the Creditors' Committee's allegations and the straightforward explanation for the Buy-Side CDS Participants' conduct—which will be confirmed by OCO's documents—it is premature for the Creditors' Committee to seek depositions, which impose material costs and burdens above and beyond a targeted document production. If, after reviewing OCO's documents, the Creditors' Committee believes it has good cause to seek a deposition of an OCO representative, the matter can be revisited at that stage.

7. Accordingly, OCO objects to the 2004 Motion and the accompanying Proposed RFPs to the extent they seek (1) documents and communications before December 20, 2018, (2) documents and communications not related to the MTNs or CDS referencing SRAC, and

3

(3) depositions from any OCO employee prior to review of documents produced in response to reasonably targeted discovery and a showing of good cause why the deposition is necessary.

## BACKGROUND

### A.    OCO's Interest In The MTNs Arose Solely From Its CDS Position

8.      OCO's interest in purchasing the MTNs was "to protect its position as a participant in credit default swaps," as both the Creditors' Committee and the Debtors have repeatedly told this Court. *Debtors' Objection To Motion Of Omega Advisors Inc. Regarding Sale Of Medium-Term Intercompany Notes* ("**Debtors' Objection**") ¶ 1 [ECF No. 1196]; *see also id.* ¶¶ 31, 41; *Joinder Of The Official Committee Of Unsecured Creditors To Debtors' Objection To Motion Of Omega Advisors Inc. Regarding Sale Of Medium-Term Intercompany Notes* ("**Committee Joinder**") ¶ 1 [ECF No. 1214]. OCO was upfront about that from the beginning. *See Motion Of Omega Advisors Inc. Pursuant To Sections 105 And 363 Of The Bankruptcy Code To Enforce The Court's November 19, 2018 Sale Order And Invalidate The Ultra Vires Sale And Lockup Of Medium-Term Intercompany Notes* ("**Enforcement Motion**") ¶ 15 [ECF No. 1077]; Hr'g Tr. 97:10–12 (Dec. 20, 2018). Indeed, it is undisputed that OCO held CDS referencing debt issued by SRAC and that it was attempting to purchase MTNs in advance of an ISDA auction to protect its CDS position in that auction. *See* Debtors' Objection ¶ 14.

9.      A CDS is a contract between two parties that transfers the credit risk associated with a nonparty reference entity from the CDS buyer to the CDS seller. The CDS buyer, like OCO here, agrees to make periodic payments to the CDS seller. In exchange for these periodic payments, the CDS seller agrees to make a one-time payment to the CDS buyer if the reference entity experiences a credit event, like defaulting on its payment obligations.

10.     Here, the Debtors' bankruptcy filing was a credit event under SRAC CDS, which entitled OCO and other CDS buyers to a credit-protection payment from CDS sellers. Under the

4

CDS contract, the amount of the credit-protection payment made to CDS buyers is set by an auction of SRAC debt obligations—referred to as "**Deliverable Obligations**"—overseen by the ISDA Determinations Committee ("**DC**"). The ISDA auction determines the credit-protection payment by determining the value of the Deliverable Obligations. If the Deliverable Obligations' value is below par, the credit-protection payment is equal to the amount needed to reach par. Under their terms, CDS contracts like OCO's are generally not settled until the ISDA auction is held, the credit-protection payment price is set, and the CDS seller makes the required payment. However, it is often the case that parties to CDS contracts unwind their CDS positions prior to the auction by, among other things, terminating the CDS contract with the consent of their counterparty or entering into offsetting CDS contracts.

11. In advance of the ISDA auction, OCO and other CDS buyers learned that Cyrus, which was the most significant CDS seller, was seeking to acquire all (or a significant portion) of the available Deliverable Obligations. If this occurred, it may have caused the ISDA auction to clear at a higher price, which would in turn have decreased the amount of the protection payment owed on SRAC CDS. The Creditors' Committee and the Debtors both correctly have recognized that counteracting Cyrus' attempt to limit available Deliverable Obligations was the sole motivation for OCO and other Buy-Side CDS Participants to acquire the MTNs. Committee Joinder ¶ 1 (adopting Debtors' Objection ¶¶ 1, 31, 41).

    **B.**    **The Sale Motion And Sale Order**

12. After being alerted by OCO and other Buy-Side CDS Participants to the temporary value in the Debtors' MTNs, the Debtors sought emergency authorization for the expedited sale of their MTNs on November 9, 2018. *Emergency Motion Of Debtors For Order Approving Sale Of Medium Term Notes* ("**Sale Motion**") ¶ 6 [ECF No. 642]. The emergency resulted from the approaching ISDA auction, which, at the time of the Sale Motion, was scheduled for November

5

14, 2018. *See id.* ¶ 12. The Debtors sought approval to sell the MTNs expeditiously because "[t]he specter of the [ISDA] Auction creates a demand for the MTNs and confers a value that is greater than a value derived simply from the collectability of the MTNs and their relative priority in the Debtors' capital structure." *Id.* ¶ 11. As the Debtors recognized, "there is an opportunity for the Debtors to monetize their interest in the MTNs at a favorable price—an opportunity that likely will be gone after the [ISDA] Auction is concluded." *Id.*; Hr'g Tr. 80:24–81:1 (Nov. 15, 2018) ("[I]f the Debtors are going to maximize the value of the MTNs, they have to run a sale process and close a sale transaction before the ISDA auction …."). The ISDA DC later resolved to postpone the auction to "no earlier than November 26th." Hr'g Tr. 80:10–11 (Nov. 15, 2018).

13. On November 19, 2018, after two hearings on the motion, the Court entered an order authorizing the Debtors, "in consultation with the Creditors' Committee, to sell the MTNs to the party or parties that provide the highest or best offer." *Order Authorizing Debtors To Sell Medium Term Notes* ("**Sale Order**") ¶ 3 [ECF No. 826].

### C. The Debtors' Auction

14. The next day, the Debtors issued an auction notice stating that they would "conduct an auction on no more than [$]251,245,000 SRAC Medium Term Notes Today at 12PM EST." Enforcement Motion Ex. B ("**Auction Notice**"). The Debtors reported that they received "nine bids for the MTNs by the bid deadline." Debtors' Objection ¶ 20.

15. OCO bid in the Debtors' auction. *See id.* Ex. B. Other Buy-Side CDS Participants also bid separately in the auction. *Id.* The Debtors selected Cyrus' bid as the winning bid. The sale to Cyrus included all $880 million in aggregate principal amount of MTNs that the Debtors held for $82.5 million. *See Notice Of Results Of Auction Of Medium Term Notes* ¶ 3 [ECF No. 1019]. Also, as a condition to the Cyrus sale, the Debtors agreed to lockup all remaining MTNs— including the $1.4 billion held by non-Debtor Sears Re. *Id.* ¶ 6.

6

### D. OCO's Objection To The MTN Auction

16. A sale on these terms surprised OCO, because it did not comport with the auction notice or the Sale Order. On December 6, 2018, OCO moved the Court to enforce the Sale Order and invalidate the ultra vires sale and lockup of the MTNs. *See* Enforcement Motion.

17. The Debtors and the Creditors' Committee objected to OCO's Enforcement Motion. According to the Creditors' Committee, "[a]fter thorough and careful consideration of the bids received, the Creditors' Committee determined to support the sale of the MTNs to Cyrus as the most value-maximizing option available to the Debtors." Committee Joinder ¶ 2. The Creditors' Committee endorsed the Debtors' "sound business judgment in conducting the auction for, and selecting Cyrus as the purchaser of, the MTNs," even after learning that all of the MTNs held by Sears Re had been locked up as part of the deal, and thus would generate no additional value for the estates. *Id.* ¶ 3. The Creditors' Committee argued that OCO and other Buy-Side CDS Participants presented "execution risk," *id.* ¶ 2, because their bids were "contingent upon the deliverability of the MTNs into the ISDA auction." *Reservation Of Rights Of The Official Committee Of Unsecured Creditors Regarding Approval Of Sale Of Medium Term Intercompany Notes To Cyrus Capital Partners, L.P.* ("**Committee Reservation of Rights**") ¶ 1 [ECF No. 1459]. The Creditors' Committee also supported the Debtors' conclusion that the Sale Order did not "restrict, in any way, the sale of MTNs held by non-Debtor affiliate Sears Re," Committee Joinder ¶ 2, though it later told the Court that it was "troubled" by the lockup. Committee Reservation of Rights ¶ 1.

18. The Court heard argument on the Enforcement Motion on December 20, 2018. At that time, OCO and other Buy-Side CDS Participants were prepared to participate in a new auction if the Court ordered it. Counsel for both OCO and Och-Ziff told the court, and the Debtors and the Creditors' Committee confirmed, that Barclays had provided a firm commitment to the Debtors

7

that it could make an executable offer on behalf of several bidders. Hr'g Tr. (Dec. 20, 2018) 115:18–22, 130:7–14, 134:4–7, 156:4–8, 168:21–25, 169:16–23. Counsel for OCO told the Court that collectively these bidders had made an offer that would pay "materially more than what Cyrus had paid." *Id.* 115:18–22. By its terms, that offer expired at 5:00 PM on December 20, 2018. *Id.* 134:4–7.

19. After argument, the Court concluded that "there is a serious concern here that the sale, as a whole, since the Sears Re part of it is an integral part of it, was not authorized by the Court." *Id.* 182:8–10. The Court therefore "direct[ed] that the Debtors provide notice and an opportunity for a hearing on the Sears Re aspect of the deal," noting that because the Sears Re portion of the deal was so integral, this notice and hearing "will include the whole deal." *Id.* 183:9–11.

20. The Debtors filed the *Notice Of Hearing For Approval Of Sale Of Medium Term Intercompany Notes To Cyrus Capital Partners L.P.* ("**Sale Approval Notice**") [ECF No. 1396] on December 21, 2018. The Sale Approval Notice stated that "[t]o the extent that any party who files an Objection wishes to make a competing bid for the MTNs, they should provide the terms of a binding and non-contingent bid, ***including evidence of committe[d] financing***, prior to the Objection Deadline." *Id.* ¶ 6 (emphasis added).

E.  **OCO And Other Buy-Side CDS Participants Decide Not To Submit A Competing Bid**

21. Shortly after the Sale Approval Notice was filed, OCO and other Buy-Side CDS Participants learned that Barclays had unwound its SRAC CDS position in a privately negotiated transaction. Committee Reservation of Rights ¶ 6. In the wake of this transaction, with no further economic exposure, Barclays informed the consortium of Buy-Side CDS Participants who were intending to make a bid for the MTNs that they were now unable to act as organizer on behalf of

8

the consortium, which left the Buy-Side CDS Participants without an investment bank who could provide committed financing for the bid. Over the next 10 days, the Buy-Side CDS Participants undertook efforts to find a replacement investment bank that could provide evidence of committed financing, but those efforts proved unsuccessful. As of the late morning of December 31, 2018, the Buy-Side CDS Participants still had not located any bank willing to act as organizer for any committed financing.

22. Beginning on Thursday, December 27, 2018—and continuing on Friday, December 28 and Monday, December 31—there were offers wanted in competition ("**OWICS**") being circulated by all of the major CDS broker-dealers for SRAC CDS. An OWIC is an expression of interest by a market participant to buy CDS protection. Faced with the risk that any bid submitted by the Buy-Side CDS Participants would be rejected as non-compliant with the terms of the Sale Approval Notice, or would simply not be sufficient to carry the day, the Buy-Side CDS Participants elected to respond to an OWIC issued by Credit Suisse. Ultimately, the Buy-Side CDS Participants sold CDS protection on SRAC to Credit Suisse on December 31, 2018, which had the effect of offsetting substantially all of their SRAC CDS exposure.[4] Having offset that exposure, the Buy-Side CDS Participants no longer had an interest in purchasing the MTNs, and thus did not object to the Sale Approval Notice.

23. On January 2, 2019, the Court held a hearing to address the Sale Approval Notice. Having received no objections to the Sale Approval Notice, the Court denied the Enforcement Motion and approved the Sears Re lockup portion of the Debtors' sale of MTNs to Cyrus for $82.5 million, retroactive to November 19, 2018. *Order Denying Motion To Invalidate The Sale And*

---

[4] OCO understands that Credit Suisse also entered into an offsetting transaction with Cyrus for the same amount of CDS.

9

*Lockup Of Medium-Term Intercompany Notes And Granting Retroactive Approval Of Lockup Provision* ¶ 3 [ECF No. 1481].

### F.    The Creditors' Committee's Demand For An Investigation

24.    The Creditors' Committee filed its Committee Reservation of Rights on January 1, 2019.  The Creditors' Committee advised that it "intends to investigate fully the events that transpired *between the December 20 Hearing and the Objection Deadline* to determine if any party engaged in inappropriate conduct with respect to the transactions contemplated by the MTN Sale Order."  Committee Reservation of Rights ¶ 7 (emphasis added).  According to the Creditors' Committee, "[i]n view of the substantial interest and time that [OCO], Och-Ziff and other CDS counterparties invested in pursuing the acquisition of MTNs, as well as the representations made *during the December 20 Hearing and subsequent communications* with counsel for such parties, the Creditors' Committee fully expected the Debtors to receive competing bids for the MTNs that potentially could result in more value for the Debtors' estates."  *Id.* ¶ 5 (emphasis added).  Instead, the Creditors' Committee claimed to be "surprised" that the CDS participants had decided to unwind their positions, and thus were no longer interested in purchasing MTNs.  *Id.* ¶¶ 5–6.

25.    The Creditors' Committee's assertions are inexplicable, given that just two weeks earlier the Creditors' Committee opposed reopening the MTN auction.  *See* Committee Joinder.  The Creditors' Committee took its original position, even though it knew that all of the MTNs had been locked up by Cyrus, including those held by non-Debtor Sears Re.  The Creditors' Committee agreed with the Debtors that OCO and other CDS participants were trying only to protect their positions in the ISDA auction and that any deal with them thus had significant "execution risk."  *Id.* ¶ 2.  Because of this, the Creditors' Committee stated that "[a]fter thorough and careful consideration of the bids received," it supported the Cyrus deal (including the lockup of all MTNs) as "the most value-maximizing option available to the Debtors."  *Id.*

10

26.     The Creditors' Committee filed its 2004 Motion on January 12, 2019, seeking authority to examine Cyrus, OCO, Och-Ziff Capital Structure Arbitrage Master Fund, Ltd., Barclays, and "the other participants of the Barclays Consortium." 2004 Motion, at 2. According to the Creditors' Committee, it seeks to "investigate the facts of what transpired and [to] figure out if there was something improper in light of issues regarding collusion and bids and the like, whether parties were inclined not to bid for some reasons other than something as appropriate." 2004 Motion ¶ 25 (quoting Hr'g Tr. 8:17-22 (Jan. 2, 2019)). Yet, the only "collusion" the Creditors' Committee alleges are the CDS transactions entered into by the Buy-Side CDS Participants to unwind their SRAC CDS transactions:

> As set forth in more detail in the Creditors' Committee's Reservation of Rights, the Creditors' Committee learned that, following the December 20 Hearing, the CDS Participants, and potentially others, began settling their CDS exposure. The MTN Transactions had the effect of eliminating the demand for the sale of further MTNs and, thereby, forestalling a potential new auction that would have inured to the benefit of the Debtors' estates. Although consideration changed hands among CDS Participants, the Debtors were unable to realize any of that value.

2004 Motion ¶ 22. The Creditors' Committee does not allege that OCO or any other Buy-Side CDS Participants had any interest in the MTNs other than to mitigate potential losses on their CDS positions. The Creditors' Committee also does not allege—nor could it—that OCO and other Buy-Side CDS Participants were somehow barred from independently unwinding their CDS positions without purchasing MTNs from the Debtors. In other words, the Creditors' Committee cannot possibly be taking the position that OCO's filing of the Enforcement Motion resulted in an affirmative injunction against it, barring OCO from independently unwinding its CDS positions, and instead forcing it to bid.

11

**OBJECTION**

### THE CREDITORS' COMMITTEE HAS NOT ESTABLISHED GOOD CAUSE FOR THE BREADTH OF ITS REQUESTED RULE 2004 DISCOVERY

27.  A party seeking to conduct a Rule 2004 examination must show good cause, including that the proposed examination "is necessary to establish the claim of the party seeking the examination, or ... [that] denial of such request would cause the examiner undue hardship or injustice." *ePlus, Inc. v. Katz* (*In re Metiom, Inc.*), 318 B.R. 263, 268 (S.D.N.Y. 2004); *accord In re AOG Entm't, Inc.*, 558 B.R. 98, 109 (Bankr. S.D.N.Y. 2016); *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991). The scope of a Rule 2004 examination "is not limitless; the examination should not be so broad as to be more disruptive and costly to the [party] than beneficial to the creditor." *In re Texaco Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987). A court evaluating a Rule 2004 discovery request "must 'balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination.'" *AOG Entm't*, 558 B.R. at 108 (quoting *Drexel Burnham*, 123 B.R. at 712). "Relevance alone is not sufficient to justify a Rule 2004 request." *In re SunEdison, Inc.*, 572 B.R. 482, 489 (Bankr. S.D.N.Y. 2017). The party seeking Rule 2004 discovery "must show that [it] need[s] the discovery for some appropriate purpose, or that the failure to get the discovery will result in hardship or injustice." *Id.* at 490. "[T]he spirit of proportionality is consistent with the historic concerns regarding the burden on the producing party and is relevant to the determination of cause." *Id.* (quoting *In re SunEdison, Inc.*, 562 B.R. 243, 250 (Bankr. S.D.N.Y 2017)). Here, the Creditors' Committee has not shown good cause to support the breadth of the discovery it requests.

   **A.   The Creditors' Committee Has Not Shown Good Cause For Seeking Documents And Communications Prior To December 20, 2018**

28.  The Creditors' Committee expressly acknowledges that its 2004 Motion results from what it calls a "sudden and unexpected lack of interest in the MTNs" that resulted "during

the span of only 11 days." 2004 Motion ¶¶ 4–5. The Creditors' Committee acknowledges that "during the December 20 Hearing and *subsequent* communications with counsel …, the Creditors' Committee fully expected the Debtors to receive competing bids for the MTNs that potentially could result in more value for the Debtors' estates." Committee Reservation of Rights ¶ 5 (emphasis added). Notwithstanding that the Creditors' Committee recognizes that the start date for its inquiry is no sooner than the date of the hearing on OCO's Enforcement Motion, December 20, 2018, it seeks this Court's authorization to demand information stretching back seven weeks earlier than that date.

29.    The Creditors' Committee provides no explanation for why good cause exists to demand documents and communications from OCO dated November 1, 2018, through December 19, 2018. The documents or communications dated prior to December 20, 2018, do not relate to the Creditors' Committee's stated purpose in seeking Rule 2004 discovery to "investigate fully the events that transpired **between the December 20 Hearing and the Objection Deadline** to determine if any party engaged in inappropriate conduct with respect to the transactions contemplated by the MTN Sale Order." Committee Reservation of Rights ¶ 7. Indeed, during the 48 days between November 1, 2018, and December 20, 2018, all parties agree that OCO expressed an ardent interest in purchasing the MTNs and made repeated offers and bids that, if accepted, would have bound OCO to buy the MTNs. Because the Creditors' Committee does not identify an appropriate purpose for seeking documents prior to December 20, 2018, its 2004 Motion should be limited to the 11-day period between December 20, 2018, and December 31, 2018.

**B.    The Creditors' Committee Has Not Shown Good Cause For Seeking Documents Unrelated To The MTNs And CDS Referencing SRAC**

30.    The Creditors' Committee has also not shown that good cause exists to seek documents beyond those related to the MTNs or CDS referencing SRAC. Though the Creditors'

13

Committee ostensibly seeks authorization "to determine if any party engaged in inappropriate conduct with respect to the transactions contemplated by the MTN Sale Order," Committee Reservation of Rights ¶ 7, the Proposed RFPs demand documents and communications covering an entire universe of which the target transactions are but one star.

31.   For example, the Creditors' Committee demands documents and communications on topics as broad as: "All Communications between and among [OCO], Cyrus, Barclays, Och-Ziff and/or any other member of the Consortium Concerning the Debtors," "All Communications between [OCO] and any broker-dealers Concerning securities issued by or otherwise Concerning the Debtors," and "All Documents and Communications Concerning any transactions, actual or contemplated, that are in any way related to the MTNs, CDS Contracts and short positions taken by [OCO], Cyrus, Barclays, Och-Ziff or any other members of the Consortium during the Time Period." Exhibit A (Request Nos. 1, 2, 7). As written, these demands range far afield from the "transactions contemplated by the MTN Sale Order" and into any communications about any of the Debtors (not just SRAC) and any documents in any way related to OCO's CDS contracts or short positions (not just SRAC or, even, just the Debtors).

32.   The Creditors' Committee offers no support for why good cause exists for such expansive demands. That these documents, in the Creditors' Committee's view, may somehow be relevant is not enough. *See SunEdison*, 572 B.R. at 482. The Creditors' Committee "has not placed reasonable limits on the sources or types of information that [OCO] must search for and retrieve." *SunEdison*, 562 B.R. at 251–52. Requiring OCO to look for, locate, review, and produce documents and communications on far-reaching topics unrelated to the MTNs and CDS referencing SRAC does not accomplish the purpose of investigating the transactions contemplated by the Sale Order. As a result, the Proposed RFPs are unduly burdensome on OCO and should be

14

limited so that the Creditors' Committee can fulfill its purpose without disproportionately disrupting OCO's business or running up outsized costs for compliance. The 2004 Motion thus should be denied to the extent the Creditors' Committee seeks documents and communications that are not related to the MTNs and CDS referencing SRAC.

        **C.    The Creditors' Committee Has Not Shown Good Cause For Seeking To Depose Any OCO Employee At This Time**

33.    The 2004 Motion also seeks authorization from the Court to "take depositions of representatives of the CDS Participants and other entities involved in or having knowledge of the MTN Transactions and other related transactions." 2004 Motion ¶ 26. This request is at best premature. The 2004 Motion does not provide any additional detail to explain the topics that the proposed depositions would cover, how many depositions the Creditors' Committee would take, or what "representatives of the CDS Participants and other entities involved in or having knowledge of the MTN Transactions and other related transactions" the Creditors' Committee would depose. Absent these details, the Creditors' Committee cannot show why good cause exists to take these depositions. Indeed, no portion of the 2004 Motion addresses why the Creditors' Committee views depositions as necessary at this stage in its investigation.

34.    OCO believes that the documents and communications reasonably targeted at the purpose of the Creditors' Committee's investigation will conclusively show that OCO was not involved in anything more than appropriate transactions to unwind its CDS position. But even if the Creditors' Committee disagrees, its broad request to "take depositions" without further detail supporting why specific depositions of identified individuals on disclosed topics are necessary to achieve the purpose of its investigation does not support a good-cause finding necessary under Rule 2004. As a result, the Creditors' Committee's request to take depositions should be denied at this time.

**CONCLUSION**

WHEREFORE, for the reasons set forth herein, OCO respectfully requests that the Court deny the 2004 Motion except with respect to demands that seek only documents and communications from OCO with respect to the MTNs or CDS referencing SRAC for the time period beginning December 20, 2018, through and including December 31, 2018.

Dated: February 7, 2019  
      New York, New York

QUINN EMANUEL URQUHART  
  & SULLIVAN, LLP

By: /s/ Jonathan E. Pickhardt  
Susheel Kirpalani  
Jonathan E. Pickhardt  
Andrew S. Corkhill  
Matthew Scheck  
Ellison Ward Merkel

51 Madison Avenue, 22nd Floor  
New York, New York 10010  
Telephone: (212) 849-7000  
Facsimile: (212) 849-7100

*Attorneys for OCO Capital Partners, L.P.*