Hearing Date and Time: February 14, 2019 at 10:00 a.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                              :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

**DEBTORS' OBJECTION TO MOTION**
**FOR ORDER DECLARING AUTOMATIC STAY**
**INAPPLICABLE TO NON-RESIDENTIAL REAL PROPERTY**
<u>**LEASE (2280 NORTH OCEAN AVENUE, FARMINGVILLE, NEW YORK)**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation, Kmart Corporation ("**Kmart**" or "**Tenant**"), and certain of their affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), submit this objection (the "**Objection**") in response to the *Motion for Order Declaring Automatic Stay Inapplicable to Non-Residential Real Property Lease*, dated November 29, 2018 (ECF No. 932) (the "**Motion**"),[2] filed by Midwood Management Corp., as agent for Expressway Plaza I, LLC and Farmingville Associates Phase 1, LLC, as tenants in comment (the "**Landlord**").  In support of the Objection, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    The Motion seeks entry of an order declaring that the automatic stay imposed under section 362 of the Bankruptcy Code does not apply to actions taken by the Landlord against the Debtors, including a proposed eviction of Kmart from the leased premises located at 2280 North Ocean Avenue, Farmingville, New York (the "**Leased Premises**").  The Motion should be denied for several reasons.

2.    As a threshold matter, the relief requested in the Motion is entirely premised on a factual inaccuracy.  Indeed, the issue before the Court is not whether the automatic stay is applicable to a terminated lease – – because the Landlord's unilateral attempt to terminate the Lease was not valid.  As described more fully below, the Landlord (i) exaggerated certain maintenance conditions to manufacture circumstances needed to allege defaults under the Lease, (ii) failed to respond to the Debtors' dispute of the alleged defaults, (iii) issued default letters

---

[2] Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

demanding that the Debtors satisfy illusory cure obligations, and (iv) ultimately sought to terminate the Lease on the eve of the Debtors' bankruptcy filing in a blatant attempt to wrest a valuable asset from the Debtors' estates. The Debtors believe that further evidentiary findings will substantiate their position that the Landlord's prepetition and postpetition actions invalidate the purported termination of the Lease.

3.    The Motion should also be denied because it fails to address the applicability of the automatic stay to circumstances, such as these, in which a debtor retains a possessory interest in property. Kmart undeniably remains in possession of the Leased Premises and it is well established in this District that a debtor's possessory interest in property triggers operation of the automatic stay. Accordingly, the Landlord must show cause to modify the automatic stay before seeking to exercise any remedies under the Lease. The Motion is void of any reference to the standard for relief under section 362(d)(1) of the Bankruptcy Code or the Landlord's evidentiary burden thereunder.

4.    On February 7, 2019, the Court approved the Debtors' sale of substantially all of their assets to ESL Investments, Inc. (together with its principals and affiliates, "**ESL**") for approximately $5.2 billion in the form of cash and non-cash consideration. Under the related asset purchase agreement, the Lease is listed as a "Designatable Lease." Although the store operated on the Premises is one of the 425 so-called "go forward stores," ESL has not yet determined whether it will request that the Debtors assume and assign the Lease. If ESL designates the Lease for acquisition, the Landlord would have the opportunity to contest whether the Lease can be assumed and assigned to ESL. Conversely, if ESL decides to not acquire the Lease, the Debtors may elect to reject the Lease pursuant to section 365 of the Bankruptcy Code and the Motion would, therefore, be rendered moot. In any event, the Debtors believe a determination as to whether the

Lease was validly terminated is premature at this time and, given that the Debtors continue to perform under the Lease, including by payment of rent, the Landlord is not prejudiced by a deferred ruling.

5.      The balance of the equities favor the Debtors and, for the reasons set forth herein, the Debtors respectfully request that the Motion be denied.

## **Background**

### *The Debtors' Chapter 11 Cases*

6.      Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On October 24, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in these chapter 11 cases.

8.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

9.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (ECF No. 3).

10.      On December 27, 2018, in connection with the Debtors' Court-approved global sale process, the Landlord submitted a bid for the Lease without prejudice to its position in the Motion that the Lease has terminated.

WEIL:\96862488\10\73217.0004

11.     The Debtors have continued to pay monthly rent to the Landlord pursuant to the terms of the Lease.  The Landlord, by agreement with the Debtors, has accepted such rent payments without prejudice to its position set forth in the Motion that the Lease has terminated.

*The Lease*

12.     Kmart has been a tenant at the Leased Premises for twenty-seven years.  The rent provided for under the Lease is below market and the Lease is valuable to the Debtors, their estates, and their creditors.  The Landlord has made several offers to Kmart to recapture the Lease ranging from $750,000 to $1 million since February 2017 and as recently in November 2017.  Kmart declined the Landlord's offer.  A copy of the e-mail, dated November 15, 2017, declining the Landlord's offer and reflecting the rejection of the offers made by the Landlord in February 2017, April 2017, May 2017, and November 2017, is annexed hereto as **Exhibit A.**

13.     Article 25(A) of the Lease provides, in pertinent part:

Landlord's Remedies.

A.      Events of Default, for which Landlord shall have the rights specified in Article 25B, are as follows:

(iii)    if (a) Tenant shall fail to perform or observe any other covenant on Tenant's part to be performed or observed under this Lease and (b) such failure has continued for 30 days after written notice of such failure from Landlord to Tenant except where such failure is governed by clause (iv) below; or

(iv)    if Tenant shall fail to perform or observe any other covenant on Tenant's part to be performed or observed under this Lease, and more than 30 days would be reasonably required to cure such failure, and (a) Tenant has failed to commence to cure such failure within 30 days after such notice of failure from Landlord to Tenant or (b) having so commenced to cure such failure, Tenant shall fail diligently to prosecute the curing of such failure to completion.

14.     Article 25(B) of the Lease, which is a conditional limitation clause, provides, in pertinent part:

WEIL:\96862488\10\73217.0004

Upon the occurrence of an Event of Default, Landlord shall thereafter have and is hereby given the right to serve upon Tenant a notice of cancellation of this Lease at the end of 10 days from the date such notice is given, and upon the expiration of such 10 day period this Lease shall wholly cease and expire (with the delivery of any further notice) . . . .

15.     Article 25(F) of the Lease provides, in pertinent part:

In the event of any breach hereunder by Tenant, Landlord may, following the aforesaid notice period for Tenant's curing of the same (provided no notice will be required in the event of an emergency) elect, in the alternative to terminating this Lease, to cure such breach for the account and at the expense of Tenant.  Any sums so expended by Landlord shall be deemed additional rent hereunder and shall be reimbursed by Tenant upon demand . . . .

16.     On November 8, 2017, the Landlord served a notice on the Debtors requesting certain maintenance work to be performed to the parking lot of the Leased Premises by November 21, 2017 (the "**2017 Maintenance Notice**").  The 2017 Maintenance Notice states, in pertinent part, that "Landlord hereby exercises its right pursuant to Section 25(F) of the Lease to perform Tenant's obligations at the cost and expense of Tenant and, given the timing imposed by the Town of Brookhaven, this constitutes an emergency under Section 25(F) which does not permit Tenant the cure period provided by the Lease."

17.     On November 14, 2017, Mr. Bradley Pukas, the Debtors' Real Estate Manager, spoke with Mr. Peter Pollani, the Landlord's portfolio manager, to discuss the 2017 Maintenance Notice.  During such conversation, Mr. Pukas advised Mr. Pollani that Kmart needed (i) photos substantiating the alleged conditions of the parking lot and driving lanes, (ii) an itemization of the costs associated with resurfacing the parking lot and driving lanes, and (iii) any correspondence from the City of Farmingville directing the work to be completed in 2017.  Mr. Pukas memorialized his conversation with Mr. Pollani, and reiterated the requests for certain documentation in e-mail correspondence sent to Mr. Pollani's attention. A copy of Mr. Pukas's

6

e-mail, together with related e-mails between Messrs. Pukas and Pollani, is annexed hereto as

**Exhibit B**.

18.     On November 19, 2017, in response to the requests for additional information made by Mr. Pukas, Mr. Pollani submitted certain photos of the work described in the 2017 Maintenance Notice but noted that the photos were not inclusive of all "emergency work" needed and he also provided a detailed proposal of costs associated with the maintenance work to be performed.  Additionally, Mr. Pollani submitted a diagram identifying areas that an inspector for the city of Farmingville allegedly required needed to be immediately repaired.

19.     On November 20, 2017, Mr. Pukas informed Mr. Pollani that further review of the Landlord's maintenance requests was underway by Kmart's facilities team; however, the documentation provided demonstrated that no "emergency repair" was needed and there is no justification for putting Kmart in default.  Mr. Pukas further noted that the 2017 Maintenance Notice was the first communication by the Landlord that there were any concerns about the condition of the parking lot and/or drive lanes associated with the Leased Premises.  Mr. Pukas repeated Kmart's request for documentation from the municipality confirming its mandate that the work to be completed immediately.  *See* Exhibit B.  The Landlord did not respond.

20.     In light of the correspondence, it is evident that the Landlord was well aware of Kmart's position with respect to the 2017 Maintenance Notice; the Landlord's allegation that Kmart did not respond to the September Default Notice (as defined below) is a veiled attempt to mischaracterize the facts and circumstances.  *See* Motion, ¶ 7 and Brown Declaration, ¶ 8.

21.     Thirteen days after issuing the 2017 Maintenance Notice and before the expiration of Kmart's thirty day cure period provided for under Article 25(A) of the Lease, the

WEIL:\96862488\10\73217.0004

Landlord performed the repairs referenced therein. *See* Exhibit B (Mr. Pollani, in his e-mail on November 19, 2017, stated that the work will commence on November 21, 2018).

22.    Five months after the Landlord performed the alleged maintenance repairs, on April 4, 2018, the Landlord sent invoices to Kmart requesting payment in the aggregate amount of $215,426.88 (the "**April Invoices**") for Kmart's alleged portion of costs due for the work undertaken by the Landlord in connection with the 2017 Maintenance Notice.

23.    On September 12, 2018, at a time when there was rampant speculation about the Debtors' viability, the Landlord issued a notice of default and informed Kmart that, pursuant to the terms of the Lease, it had fifteen (15) days from service of the notice to pay all amounts sought under the April Invoices (the "**September Default Notice**"). The September Default Notice did not reference Kmart's dispute asserted in November 2017 that the work performed by the Landlord in connection with the 2017 Maintenance Notice was not an "emergency" and it did not provide any support for the Landlord's exercise of self-help before expiration of the time allotted under the Lease for Kmart to cure any alleged defaults. Instead, it merely restated the same issues Kmart had addressed five months prior.

24.    On October 11, 2018 (the "**Termination Notice**"), four (4) days before the commencement of these chapter 11 cases, the Landlord served the Termination Notice on Kmart. The Landlord alleges that the Termination Notice automatically terminated the Lease on October 23, 2018. Motion, ¶ 24.

25.    Kmart remains in possession of the Leased Premises.

## The Motion Should be Denied

26.    The Debtors do not dispute the legal proposition that section 362(b)(10) of the Bankruptcy Code renders the automatic stay inapplicable to "any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term

of the lease before the commencement of or during a case under chapter 11 to obtain possession of such property." 11 U.S.C. § 362(b)(10). The Debtors also do not dispute that a validly terminated nonresidential real property lease is not property of a debtor's estate pursuant to section 541(b)(2) of the Bankruptcy Code if the debtor is no longer in possession of the property. *See* 11 U.S.C. § 541(b)(2). The Debtors, however, believe that neither of the above-referenced sections of the Bankruptcy Code is apposite, because the Lease was not validly terminated and, thus, remains property of the Debtors' estates. Moreover, the automatic stay is applicable because the Debtors have an equitable interest in the Leased Premises by virtue of their possession and such possession is protected by the stay.

**A.    The Automatic Stay Applies Because of the Debtors' Equitable Possessory Interest in the Leased Premises**

27.    Section 362(a)(3) of the Bankruptcy Code provides, in pertinent part, that the filing of a bankruptcy petition:

> . . . operates as a stay, applicable to all entities, of

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

11 U.S.C. § 362(a)(3). The automatic stay affords "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Protection*, 474 U.S. 494, 503 (1986). The purpose of the automatic stay is to allow a debtor to focus all attention on reorganization efforts without the distraction of having to defend against outside litigation. *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 32 (S.D.N.Y. 1990). Importantly, the automatic stay maintains the status quo to protect the debtor's ability to control the sale or other disposition of property of the estate. It is axiomatic that the automatic stay applies

9

to cases, such as this, where a party is seeking the obtain possession of the Debtors' property. *See* 11 U.S.C. § 362(a)(3).

28.    The Landlord seeks to set aside the automatic stay based on its belated attempt to exercise its rights under the "conditional limitation clause" set forth in Article 25(B) of the Lease.    *See In re Family Showtime Theatres, Inc.*, 72 B.R. 38, 41 (E.D.N.Y), *aff'd*, 819 F.2d 1130 (2d Cir. 1987) (noting that a conditional limitation exists where, upon the occurrence of an event, "the lease expires as if the lease by its terms had been limited to that time."). The Landlord relies heavily on *In re Policy Realty*, 242 B.R. 121 (S.D.N.Y 1999), *aff'd, Policy Realty Corp. v. Trever Realty LLC*, 2000 U.S. App, LEXIS 8846 (2d Cir. May 2, 2000), for the proposition that the automatic stay is not applicable to a lease terminated postpetition by operation of a conditional limitation clause.  Motion, ¶¶ 28–29.  However, *Policy Realty* is clearly distinguishable from the matter before the Court due to the critical fact that, in that case, the debtor did not have possessory interest in the leased premises because the debtor was not in possession of the commercial space. 242 B.R. at 123.[3]

29.    In fact, as noted by the Court in *Policy Realty*, "[a] mere possessory interest in real property, without any accompanying legal interest, is sufficient to trigger the protection of the automatic stay."  242 B.R. at 128 (internal citations omitted).  *See also 48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 430 (2d Cir. 1987) ("Indeed, a mere possessory interest in real property, without any accompanying legal

---

[3] In *Super Nova 330 LLC v. Gazes*, 693 F.3d 138 (2d Cir. 2012), the Second Circuit held that state law determines the status of a lease and a terminated lease can nevertheless be "unexpired" for purposes of Section 365 if state law permits reinstatement.  The Court noted that under New York law, until a landlord obtains a writ of possession, the debtor has a right to vacate a judgment of possession by curing the rent default and paying interest and costs, which would revive the lease.  Accordingly, given that the only default alleged by the Landlord in connection with its purported termination of the Lease is payment of additional rent, the Lease is subject to assumption and assignment to ESL and, even if the Termination Notice were valid, curing the default might result in reinstating the Lease.

10

interest, is sufficient to trigger the protection of the automatic stay."); *In re Sweet N Sour 7th Ave Corp.*, 431 B.R. 63, 67 (Bankr. S.D.N.Y. 2010) (holding that case law is clear "that if a debtor remains in possession . . . the debtor retains an equitable possessory interest in the leasehold sufficient to trigger the protection of the bankruptcy automatic stay."); *In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 399 (Bankr. S.D.N.Y. 2001) (noting the principle recognized by the Second Circuit that "a debtor, whose legal rights have terminated, nonetheless has an equitable interest based on bare possession which is afforded the protections of the automatic stay.") (internal citations omitted).

30.    As the Landlord has acknowledged, Kmart remains in possession of the Leased Premises. *See* Motion, ¶ 11. As a result, even if the Court were to find that the Landlord properly exercised its rights under the conditional limitations clause set forth in Article 25(B) of the Lease, it is well-established in the Second Circuit that Kmart's continued possession of the Leased Premises triggers the automatic stay imposed by section 362 of the Bankruptcy Code.

**B.    The Landlord Has Not Sought Relief From the Automatic Stay and, In Any Event, Cannot Meet the Burden Required for Such Relief**

31.    Importantly, despite the applicability of the automatic stay, the Motion fails to request modification of the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code. Moreover, even if the Landlord were to amend the Motion to seek such relief, any request for such relief in this case should be denied.

32.    The Second Circuit established a set of twelve factors in *Sonnax* (the "**Sonnax Factors**") that have become the standard by which courts in the Second Circuit consider whether to modify the automatic stay.[4]  *See In re Lehman Bros. Holdings Inc.*, 435 B.R. 122, 138

---

[4] The *Sonnax* Factors are:
(1) whether relief would result in a partial or complete resolution of the issues;
(2) lack of any connection with or interference with the bankruptcy case;

WEIL:\96862488\10\73217.0004

(S.D.N.Y. 2010) ("*Sonnax* . . . is routinely referenced as the leading relief from stay precedent in this Circuit."), *aff'd sub nom. Suncal Cmtys. I LLC v. Lehman Commercial Paper, Inc.,* 402 F. App'x 634 (2d Cir. 2010).

33.    Although the *Sonnax* Court outlined twelve factors, courts need not consider each factor, but may consider only the factors that are relevant to the particular case. *See In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 526 (Bankr. S.D.N.Y. 1996) ("A court should . . . use only the factors that are deemed relevant . . . ."). In fact, the *Sonnax* Court itself considered only four of the twelve factors as relevant in that case. *Sonnax,* 907 F.2d at 1286. Additionally, courts need not assign equal weight to each factor, and have discretion in weighing the factors against one another. *RCM Global*, 200 B.R. at 526 ("A court should apply these factors on a case-by-case basis . . . assigning to each factor whatever weight the court feels is appropriate.").

34.    The Second Circuit has held that the party seeking to lift or modify the automatic stay bears the initial burden to show cause as to why the stay should be modified or lifted and "[i]f the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Sonnax,* 907 F.2d at 1285. Once the movant has shown cause, the party opposing the motion must show

---

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

*Sonnax*, 907 F.2d at 1286.

WEIL:\96862488\10\73217.0004

that it is entitled to the continuing protections of the automatic stay. *See In re Enron Corp.*, 306 B.R. 465, 476 (Bankr. S.D.N.Y. 2004) (citing *In re M.J. & K. Co.*, 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993)); *see also RCM Global*, 200 B.R. at 526.

35.     Given the Landlord's utter failure to satisfy its burden to show cause for such modification, the Motion should be denied.  Nevertheless, even if the Court were to apply the *Sonnax* factors it is clear that automatic stay should not be modified.

### (i)     *Whether Relief Would Result in a Partial or Complete Resolution of the Issues* (**First** *Sonnax* **Factor**)

36.     The first *Sonnax* factor concerns whether granting relief from the automatic stay would result in partial or complete resolution of the issues.   Lifting the automatic stay to permit the Landlord to exercise its remedies under the Lease, including commencing a state court action to obtain a writ of possession evicting Kmart, would not result in complete resolution of the dispute.  Indeed, any claims of the Landlord for prepetition monetary amounts owed by the Debtors under the Lease are subject to the core jurisdiction of this Court.  As a result, lifting the automatic stay at this time would only provide piecemeal relief, if any.  *See In re Worldcom*, No. 05 CIV 5704 (RPP), 2006 WL 2270379, at 8 (S.D.N.Y. Aug. 4, 2006) (affirming that the bankruptcy court properly weighed the first factor against the movant when the claim could not be fully adjudicated in a state court); *see also In re Schick*, 232 B.R. 589, 601 (Bankr. S.D.N.Y. 1999) (declining to lift the automatic stay because the state court could not afford complete relief on all claims arising from the same conduct).

37.     The first *Sonnax* factor, therefore, weighs in favor of denying relief from the automatic stay.

(ii)    ***Lack of Any Connection With or Interference With the Bankruptcy Case* (Second *Sonnax* Factor)**

38.    The second *Sonnax* factor, lack of any connection with or interference with the bankruptcy case, weighs against providing the Landlord with relief from the automatic stay. The treatment of the Debtors' nonresidential real property leases, including the Lease, is one of the most fundamental aspects of a chapter 11 case, particularly for a large retail debtor with hundreds of non-residential real property leases.  Moreover, the Lease is subject to designation by ESL in connection with the Court approved sale of substantially all of the Debtors' assets.

39.    Furthermore, if the Motion were granted, it is possible that other landlords would file similar motions, thus disrupting the Debtors' sale to ESL and the orderly administration of the chapter 11 cases.  *See In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 623 (Bankr. S.D.N.Y. 2009) (denying a motion for relief from the automatic stay where "granting relief could open the floodgates to a multitude of similar motions causing further interference with the bankruptcy case"); *In re Northwest Airlines Corp.*, No. 05-17930 (ALG), 2006 WL 687163, at 2 (Bankr. S.D.N.Y. Mar. 10, 2006) (denying a motion for relief from stay under the *Sonnax* factors where "lifting the automatic stay . . . would open the floodgates for similar motions and cause the Debtors to refocus their energies on litigation before other courts rather than emergence from Chapter 11.").  The automatic stay was intended to prevent the race to the courthouse and the inevitable damage to the Debtors' reorganization efforts.

40.    The second *Sonnax* factor weighs in favor of continuing the automatic stay.

(iii)    ***Whether the Other Proceeding Involves the Debtor as a Fiduciary* (Third *Sonnax* Factor)**

41.    The third *Sonnax* factor addresses whether there is another proceeding that involves Kmart as a fiduciary.  "[G]enerally, proceedings in which the debtor is a fiduciary . . . need not be stayed because they bear no relationship to the purpose of the automatic stay, which

WEIL:\96862488\10\73217.0004

is debtor protection from his creditors." *In re Curtis*, 40 B.R. 795, 799 (Bankr. Utah 1984) (internal citation omitted).  There is no other proceeding with respect to the Lease involving Kmart and the Landlord and, in any such proceeding, Kmart would not be acting as a fiduciary.  Consequently, the third *Sonnax* factor weighs in favor of continuing the automatic stay.

> **(iv)    *No Specialized Tribunal Has Been Established to Address Landlord's Exercise of the Termination Provision* (Fourth *Sonnax* Factor)**

42.    The fourth *Sonnax* factor weighs in favor of denying the Motion.  A specialized tribunal is not necessary to address whether the Lease was validly terminated or any resulting damages.  The interpretation of the provisions of the Lease and the remedies the Landlord is seeking to exercise under the Lease are governed by state law and Courts in this District have recognized on numerous occasions that they can interpret and apply state law in resolving claims. *See, e.g.*, *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 624 (Bankr. S.D.N.Y. 2009) ("[t]his Court has significant experience in applying state law …."); *In re WorldCom, Inc.*, No. 05 Civ. 5704 (RPP), 2006 WL 2270379, at 31–32 (S.D.N.Y. Aug. 4, 2006) (affirming bankruptcy court's holding that California state court was a court of general jurisdiction, not a "specialized tribunal" within the meaning of the fourth *Sonnax* factor and noting that "[b]ankruptcy courts are often called upon to apply state laws in resolving claims against the estate").  This Court is the proper forum and well equipped to address the status of the Lease.

43.    Given the jurisdiction of this Court and the fact that no specialized tribunal will hear the Landlord's lease-related claims, the fourth *Sonnax* factor also weighs in favor of denying relief from the automatic stay.

> **(v)    *No Insurer Has Assumed Responsibility for Any of the Actions* (Fifth *Sonnax* Factor)**

44.    No insurer has assumed responsibility for the dispute, and the Debtors would, therefore, need to pay all expenses in defending themselves in an action commenced by

WEIL:\96862488\10\73217.0004

the Landlord. As a result, the fifth *Sonnax* factor does not support granting relief from the automatic stay.

### (vi)    *Whether The Action Primarily Involves Third Parties* (**Sixth** *Sonnax* **Factor**)

45.    The sixth *Sonnax* factor addresses circumstances in which the debtor/defendant is a party to another action and it functions only as a bailee or conduit for the proceeds in question. The Landlord does not assert that any other party is involved in this dispute. Kmart is the only party involved and, as stated above, there is no other action commenced against Kmart or any other Debtor in connection with the Lease. *See In re Residential Capital, LLC*, No. 12-12020 MG, 2012 WL 3556912, at 3 (Bankr. S.D.N.Y. Aug. 16, 2012) ("The court should not grant relief from the stay under the sixth *Sonnax* Factor if the debtor is the main party to the litigation.") (internal citations omitted); *City Ins. Co. v. Mego Int'l, Inc. (In re Mego Int'l)*, 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying motion to lift the automatic stay where the debtor was more than a mere conduit for the flow of proceeds and the action impacted the "property and administration of [the debtor's] estate, suggesting that continuance of the [automatic] stay was proper.").

46.    Accordingly, the sixth *Sonnax* factor weighs in favor of the Debtors.

### (vii)    *Whether litigation in another forum would prejudice the interests of other creditors* (**Seventh** *Sonnax* **Factor**)

47.    Requiring the Debtors to address any of the Landlord's lease-related claims in another forum would upset the "strong bankruptcy code policy that favors centralized and efficient administration of all claims in the bankruptcy court." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 117 (2d Cir. 1992). The disruption, delay, and expense attendant to litigating whether the Lease was terminated would effectively be borne by all of Kmart's other creditors.

16

48.    The seventh *Sonnax* factor, therefore, leads to the conclusion that relief from the stay, if sought by the Landlord, should be denied.

**(viii)    *Whether the Judgment Claim Arising From the Other Action is Subject to Equitable Subordination* (Eighth *Sonnax* Factor)**

49.    The eighth *Sonnax* factor is inapplicable.

**(ix)    *Whether the Movant's Success in the Other Proceeding Would Result in a Judicial Lien Avoidable by the Debtor* (Ninth *Sonnax* Factor)**

50.    The ninth *Sonnax* factor is inapplicable.

**(x)    *The Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation* (Tenth *Sonnax* Factor)**

51.    The Landlord waited nearly a year to declare a default under the Lease for the work it purportedly did pursuant to the 2017 Maintenance Notice.  The Landlord's motives in belatedly seeking to declare a default under these circumstances are questionable, at best. Modifying the automatic stay to allow the Landlord to commence state court proceedings for a determination that the Lease was terminated and to evict Kmart would divert resources from the Debtors' administration of these chapter 11 cases so that they may defend their interests in New York State Court.  Further, any resolution of the status of the Lease or the Landlord's right to terminate the Lease will be more expeditious in this Court.  As noted above, this Court is better suited to rule on the issues raised by the Landlord in the Motion and appropriately take into consideration the impact on Kmart's estate.

52.    The tenth *Sonnax* factor, therefore, militates in favor of denying relief from the automatic stay.

WEIL:\96862488\10\73217.0004

      (xi)    ***Whether the Parties Are Ready for Trial in the Other Proceeding (Eleventh* Sonnax *Factor)***

53.    The Landlord has not commenced any prepetition action against Kmart in connection with the defaults alleged in the September Default Notice. Given that the there is no pending state court proceeding the eleventh *Sonnax* factor weighs in favor of denying relief from the automatic stay.

      (xii)    ***Impact of the Stay on the Balance of Harms (Twelfth Sonnax Factor)***

54.    The balance of the harms weighs decisively against granting relief from the automatic stay. If relief from the stay is granted and the state court determines that the lease has terminated, Kmart's estate will have lost the benefit of a valuable long term lease.

55.    In comparison, there is minimal harm to the Landlord in having the automatic stay remain in place. As an initial matter, as noted, Landlord has been paid all of the postpetition rent to which it is entitled under the Lease and will continue to be paid such rent during the 60 day designation rights period. If ESL designates the Lease for assumption and assignment, any defaults under the Lease would be cured pursuant to section 365 of the Bankruptcy Code at the time of assumption. Accordingly, any harm to the Landlord for the period of time ESL is granted to exercise its designation rights to the expiration of the Debtors' time to determine the treatment of the Lease is nominal in comparison to the harm to the Debtors resulting from lifting the automatic stay.

56.    The twelfth *Sonnax* factor weighs against granting relief from the automatic stay.

## C.    The Landlord's Claim That the Lease Has Terminated Should Not Be Decided By Summary Proceeding

57.    At its core, the Landlord's requested relief is an attempt to recover property or to determine an interest in property. The Landlord seeks a declaration regarding its interest in

18

the Leased Premises that (i) the automatic stay is inapplicable to Landlord's efforts to regain possession of the Leased Premises; and (ii) the Lease is not property of the Debtors' estates. Such relief is governed by Bankruptcy Rules 7001(1) and (2), and must be sought through an adversary proceeding.

58.    Fed. R. Bankr. P. 7001, provides, in relevant part, that:

> [t]he following are adversary proceedings: (1) a proceeding to recover money or property . . . (2) a proceeding to determine … [an] interest in property . . . (9) a proceeding to obtain a declaratory judgment relating to any of the foregoing . . . .

Failure to adhere to the requirements of Bankruptcy Rule 7001 entitles the Court to disregard procedurally deficient and ineffective motions. *See In re Harry C. Partridge, Jr. & Sons, Inc.*, 43 B.R. 669, 672 (Bankr. S.D.N.Y. 1984) (holding that motion for breach of contract was procedurally deficient and ineffective because it constitutes an adversary proceeding pursuant to Bankruptcy Rule 7001(1)).

59.    Furthermore, by the Landlord's own admission, the alleged default under the Lease occurred in November 2017, yet the Landlord took no further action until April 2018, and then failed to follow through on the alleged default until it issued the September Default Notice and the Termination Notice on the eve of the commencement of the Debtors' chapter 11 cases. Surely, equity supports a finding that the Landlord should not be permitted to summarily and belatedly exercise its rights under the conditional limitation clause by declaring a Kmart in default for failing to pay disputed amounts.

60.    The egregious circumstances presented by the Landlord's conduct and purported termination of the Lease require a full trial on the merits. *See*, *e.g.*, *KDT Industries, Inc.*, 32 B.R. 852 (Bankr. S.D.N.Y. 1983) (conducting an adversary proceeding to adjudicate the landlord's requested relief for, in relevant part, possession of and termination of a lease with the

WEIL:\96862488\10\73217.0004

debtor).  Certainly, the Debtors' substantive and state law rights cannot be determined through a summary proceeding.  *See In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993) (holding that litigation of complex, prepetition, state law breach of contract claims should not be heard in a summary context).

61.    The Landlord should not be permitted to seek the relief it seeks by motion rather than by adversary proceeding because it is procedurally deficient and ineffective.  As such, if the Court does not deny the relief requested based on the legal arguments set forth above, it should require the Landlord to file an adversary proceeding to obtain the relief it is seeking.

## <u>CONCLUSION</u>

For the foregoing reasons, the Motion should be denied.

Dated: February 8, 2019
       New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors
and Debtors in Possession*

WEIL:\96862488\10\73217.0004

**Exhibit A**

**<u>Exhibit A-1</u>**

**Landlord February 2017 Offer**

## Coonce, Cary

| | |
|---|---|
| **From:** | Ron Bondy <rbondy@midwoodid.com> |
| **Sent:** | Monday, February 27, 2017 1:28 PM |
| **To:** | Coonce, Cary |
| **Subject:** | Re: KMart - Expressway Plaza - Farmingville, NY |

Thanks Cary. I heard Eastdil has been retained to evaluate the portfolio. I am confident they will determine that the lease holds little or no market value for Sears/KMart.
We do not have replacement deals in place but have received some interest from retailers as a potential sub-divide.
Those retailers will not fully engage until we have some relative clarity on timing due to other immediate opportunities in the market.
Let me know if you would like to discuss further Best regards

Ron
602-680-9170

Sent from my iPhone

> On Feb 27, 2017, at 2:18 PM, Coonce, Cary <Cary.Coonce@searshc.com> wrote:
>
> Thanks for following up.  You may have heard that we have a lot going on right now.  Regardless, we do still this in the "under review" group with our analyst.  What do you intend to do with the property?  Who is your replacement tenant?
>
> Thanks.
>
> Ms. Cary Coonce, CCIM
> Senior Director of Real Estate Strategy Sears Holdings Management
> Corporation
> 3333 Beverly Road, BC-097B
> Hoffman Estates, IL  60179
> Phone:  847-286-5704  /  Fax:  847-286-2286
> Email:  cary.coonce@searshc.com
>
> Except where an express statement to the contrary is contained in this communication, (a) nothing in this communication is to be regarded or construed as an electronic signature, nor is this communication intended to be "signed," (b) nothing in this communication is to be regarded as an offer, an acceptance, or an undertaking to negotiate, and (c) any agreement, commitment, representation, warranty, undertaking, or waiver binding Sears or any affiliate may only be evidenced by a separate signed writing.
>
>
> -----Original Message-----
> From: Ron Bondy [mailto:rbondy@midwoodid.com]
> Sent: Wednesday, February 01, 2017 3:44 PM
> To: Coonce, Cary
> Subject: KMart - Expressway Plaza - Farmingville, NY
>
> Cary,
> I hope you are well and that the year has gotten off to a good start
> for you. Per our recent conversation, the following represents terms
> acceptable to Midwood for the early termination of your KMart store at
> Expressway Plaza in Farmingville, NY
>
> Termination date: 12/31/17
>
> Terms: Midwood would pay a sum of $750,000 to KMart/Sears within 30 days following the return of possession of the premises to Midwood with all trade fixtures removed and in broom-clean condition.
>

> I know there are other things to work through but the above represents the key elements. I am happy to discuss the above terms at your convenience. My contact information is below.
>
> I look forward to speaking with you
>
> Best regards
>
> Ron
>
> Ron S Bondy
> Director of Leasing
> Midwood Investment and Development
> 430 Park Ave. Suite 505
> New York, NY 10022
> Ph: (602) 680-9170
>
>
> This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.
>

**<u>Exhibit A-2</u>**

**Landlord April 2017 Email**

## Coonce, Cary

| | |
|---|---|
| **From:** | Ron Bondy <rbondy@midwoodid.com> |
| **Sent:** | Thursday, April 27, 2017 12:28 PM |
| **To:** | Coonce, Cary |
| **Subject:** | RE: KMart - Expressway Plaza -  Farmingville, NY |

Cary,
I left a voice mail for you earlier. It has been close to 3 months since we made Sears/Kmart an offer for early termination of its lease in Farmingville, NY. To-date we have not received the promised response  to our offer. As I mentioned when we spoke last about a month ago, the proposed replacement (for 1/2 the building) is growing antsy as to status and does not want to lose another opportunity in the market.
We are at a critical point now and would appreciate any feedback you can as to whether early termination is of interest for this Kmart location or not.
Happy to discuss at your convenience.

Thank you

Ron


Ron S. Bondy
Executive Vice President, Leasing
Midwood Investment and Development
430 Park Avenue  Suite 505
New York, NY 10022
O)646-292-4936
C) 602-680-9170
rbondy@midwoodid.com



-----Original Message-----
From: Coonce, Cary [mailto:Cary.Coonce@searshc.com]
Sent: Monday, February 27, 2017 2:18 PM
To: Ron Bondy <rbondy@midwoodid.com>
Subject: RE: KMart - Expressway Plaza - Farmingville, NY

Thanks for following up.  You may have heard that we have a lot going on right now.  Regardless, we do still this in the "under review" group with our analyst.  What do you intend to do with the property?  Who is your replacement tenant?

Thanks.

Ms. Cary Coonce, CCIM
Senior Director of Real Estate Strategy
Sears Holdings Management Corporation
3333 Beverly Road, BC-097B
Hoffman Estates, IL  60179
Phone:  847-286-5704  /  Fax:  847-286-2286
Email:  cary.coonce@searshc.com


Except where an express statement to the contrary is contained in this communication, (a) nothing in this communication is to be regarded or construed as an electronic signature, nor is this communication intended to be "signed," (b) nothing in this communication is to be regarded as an offer, an acceptance, or an undertaking to negotiate, and (c) any agreement, commitment, representation, warranty, undertaking, or waiver binding Sears or any affiliate may only be evidenced by a separate signed writing.

-----Original Message-----
From: Ron Bondy [mailto:rbondy@midwoodid.com]
Sent: Wednesday, February 01, 2017 3:44 PM
To: Coonce, Cary
Subject: KMart - Expressway Plaza - Farmingville, NY

Cary,

I hope you are well and that the year has gotten off to a good start for you. Per our recent conversation, the following represents terms acceptable to Midwood for the early termination of your KMart store at Expressway Plaza in Farmingville, NY

Termination date: 12/31/17

Terms: Midwood would pay a sum of $750,000 to KMart/Sears within 30 days following the return of possession of the premises to Midwood with all trade fixtures removed and in broom-clean condition.

I know there are other things to work through but the above represents the key elements. I am happy to discuss the above terms at your convenience. My contact information is below.

I look forward to speaking with you

Best regards

Ron

Ron S Bondy
Director of Leasing
Midwood Investment and Development
430 Park Ave. Suite 505
New York, NY 10022
Ph: (602) 680-9170

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

## **Exhibit A-3**

**Landlord May 2017 Offer**

## Coonce, Cary

| | |
|---|---|
| **From:** | Ron Bondy <rbondy@midwoodid.com> |
| **Sent:** | Wednesday, May 31, 2017 4:37 PM |
| **To:** | Coonce, Cary |
| **Subject:** | RE: KMart - Expressway Plaza -  Farmingville, NY |

| | |
|---|---|
| **Follow Up Flag:** | FollowUp |
| **Flag Status:** | Completed |

Cary,
Per our recent conversation, the following represents revised terms for Sears/Kmart to consider for the termination of the Kmart store on N Ocean Ave in Farmingville, NY

Termination date: 1/31/18

Terms: Midwood would pay a sum of $1,000,000 to KMart/Sears within 30 days following the return of possession of the premises to Midwood with all trade fixtures removed and in broom-clean condition.

Hopefully we can make this work as the Kmart option notice is quickly approaching with only 15 years of additional term and little wiggle room for an exit strategy given lease-imposed restrictions

I look forward to speaking with you

Best regards

Ron

Ron S Bondy
Director of Leasing
Midwood Investment and Development
430 Park Ave. Suite 505
New York, NY 10022
Ph: (602) 680-9170

**<u>Exhibit A-4</u>**

**Kmart November 15, 2017 Email**

**Coonce, Cary**

| | |
|---|---|
| **From:** | Ron Bondy <rbondy@midwoodid.com> |
| **Sent:** | Friday, November 17, 2017 8:05 AM |
| **To:** | Coonce, Cary |
| **Subject:** | Re: Farmingville |

Will you be at NY ICSC ?

Ron S Bondy
EVP Leasing
Midwood Investment and Development
430 Park Ave. Suite 505
New York, NY 10022
C) 602-680-9170
O) 646-292-4936
rbondy@midwoodid.com

> On Nov 15, 2017, at 7:04 PM, Coonce, Cary <Cary.Coonce@searshc.com> wrote:
>
> I circled back to management and they don't want to issue a counter.  Aside from our store performance, the area is
good and the RE is viewed as valuable.  For now, we will operate our store.  If something changes, I will reach out.
>
> Thanks.
>
> Ms. Cary Coonce, CCIM
> Senior Director of Real Estate Strategy Sears Holdings Management
> Corporation
> 3333 Beverly Road, BC-097B
> Hoffman Estates, IL  60179
> Phone:  847-286-5704  /  Fax:  847-286-2286
> Email:  cary.coonce@searshc.com
>
> Except where an express statement to the contrary is contained in this communication, (a) nothing in this
communication is to be regarded or construed as an electronic signature, nor is this communication intended to be
"signed," (b) nothing in this communication is to be regarded as an offer, an acceptance, or an undertaking to negotiate,
and (c) any agreement, commitment, representation, warranty, undertaking, or waiver binding Sears or any affiliate may
only be evidenced by a separate signed writing.
>
> -----Original Message-----
> From: Ron Bondy [mailto:rbondy@midwoodid.com]
> Sent: Thursday, November 02, 2017 9:12 AM
> To: Coonce, Cary <Cary.Coonce@searshc.com>
> Subject: RE: Farmingville
>
> We have made you two unilateral offers to-date. The last time we
> spoke, you were going to discuss sending us a counter and then I never
> heard back from you
>
> -----Original Message-----
> From: Coonce, Cary [mailto:Cary.Coonce@searshc.com]
> Sent: Thursday, November 2, 2017 10:10 AM
> To: Ron Bondy <rbondy@midwoodid.com>
> Subject: RE: Farmingville
>
> I know that - and it didn't move forward.  What are you offering now?
>
> Ms. Cary Coonce, CCIM

1

> Senior Director of Real Estate Strategy Sears Holdings Management
> Corporation
> 3333 Beverly Road, BC-097B
> Hoffman Estates, IL  60179
> Phone:  847-286-5704  /  Fax:  847-286-2286
> Email:  cary.coonce@searshc.com
>
> Except where an express statement to the contrary is contained in this communication, (a) nothing in this communication is to be regarded or construed as an electronic signature, nor is this communication intended to be "signed," (b) nothing in this communication is to be regarded as an offer, an acceptance, or an undertaking to negotiate, and (c) any agreement, commitment, representation, warranty, undertaking, or waiver binding Sears or any affiliate may only be evidenced by a separate signed writing.
>
>
> -----Original Message-----
> From: Ron Bondy [mailto:rbondy@midwoodid.com]
> Sent: Thursday, November 02, 2017 9:08 AM
> To: Coonce, Cary <Cary.Coonce@searshc.com>
> Subject: Re: Farmingville
>
> We offered you $1M in May
>
> Ron S Bondy
> EVP Leasing
> Midwood Investment and Development
> 430 Park Ave. Suite 505
> New York, NY 10022
> C) 602-680-9170
> O) 646-292-4936
> rbondy@midwoodid.com
>
>> On Nov 2, 2017, at 10:06 AM, Coonce, Cary <Cary.Coonce@searshc.com> wrote:
>>
>> What are you offering as the termination fee?
>>
>> Ms. Cary Coonce, CCIM
>> Senior Director of Real Estate Strategy Sears Holdings Management
>> Corporation
>> 3333 Beverly Road, BC-097B
>> Hoffman Estates, IL  60179
>> Phone:  847-286-5704  /  Fax:  847-286-2286
>> Email:  cary.coonce@searshc.com
>>
>> Except where an express statement to the contrary is contained in this communication, (a) nothing in this communication is to be regarded or construed as an electronic signature, nor is this communication intended to be "signed," (b) nothing in this communication is to be regarded as an offer, an acceptance, or an undertaking to negotiate, and (c) any agreement, commitment, representation, warranty, undertaking, or waiver binding Sears or any affiliate may only be evidenced by a separate signed writing.
>>
>> -----Original Message-----
>> From: Ron Bondy [mailto:rbondy@midwoodid.com]
>> Sent: Thursday, November 02, 2017 8:48 AM
>> To: Coonce, Cary <Cary.Coonce@searshc.com>
>> Subject: Farmingville
>>
>> Any interest in re-engaging on Farmingville K-Mart ? Sounds like the
>> company needs cash
>>
>> Ron S Bondy
>> EVP Leasing
>> Midwood Investment and Development

>> 430 Park Ave. Suite 505
>> New York, NY 10022
>> C) 602-680-9170
>> O) 646-292-4936
>> rbondy@midwoodid.com
>> This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.
>>
> This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.
>
> This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.
>

## Exhibit B

**Pukas and Pollani Emails**

WEIL:\96862488\10\73217.0004

## Jasinowski, Dennis

| | |
|---|---|
| **From:** | Pukas, Bradley |
| **Sent:** | Tuesday, October 02, 2018 3:55 PM |
| **To:** | Valerie Haugh JD |
| **Cc:** | Jasinowski, Dennis |
| **Subject:** | FW: Kmart #4871 Farmingville, NY   Expressway Plaza / Kmart Parking Lot and Drive Lane Paving 11/20-11/23 and 11/27-11/29 |

This was the last communication I had with LL until recent default notice. I never received documentation mandating work from municipality.

**From:** Pukas, Bradley
**Sent:** Monday, November 20, 2017 8:18 AM
**To:** Peter Pollani <ppollani@midwoodid.com>; Kern, John <John.Kern@searshc.com>; Jasinowski, Dennis <Dennis.Jasinowski@searshc.com>; Thomas Jr., Leon <Leon.ThomasJr@searshc.com>; Sulejmani, Ersen <Ersen.Sulejmani@searshc.com>
**Cc:** Mehul Patel <mpatel@midwoodid.com>; Michael Gurary <mgurary@midwoodid.com>; Steven Brown <SBrown@midwoodid.com>; Ryan Frederick <rf@midwoodid.com>; Mary Warren <mwarren@midwoodid.com>
**Subject:** RE: Kmart #4871 Farmingville, NY Expressway Plaza / Kmart Parking Lot and Drive Lane Paving 11/20-11/23 and 11/27-11/29

Peter –

My Facilities team will be reviewing the information you provided and will likely have questions, but my feeling is there is nothing here that warrants an "emergency repair" nor justification of putting Kmart into a default situation. Landlord's notice of default dated November 8, 2017 was the first communication that there were any concerns about the condition of the parking lot and/or drive lanes.

Additionally, I'm going to need documentation from the municipality confirming their mandate of this work to be completed immediately.

Brad Pukas
Real Estate Asset Manager
Sears Holdings Corporation
3333 Beverly Road  BC-093A
Hoffman Estates, IL  60179
Phone: (847) 286-6852
Fax: (847) 286-7976

The content of this email and the opinions and conclusions expressed herein may not be complete or comprehensive and the Sears Real Estate Department accepts no liability for the content of this email, or for the consequences of any actions taken on the basis of the information provided, unless that information is subsequently confirmed in writing by the Sears Real Estate legal group.  Any views or opinions presented in this email are solely those of the author.

**From:** Peter Pollani [mailto:ppollani@midwoodid.com]
**Sent:** Sunday, November 19, 2017 8:27 PM
**To:** Pukas, Bradley <Bradley.Pukas@searshc.com>; Kern, John <John.Kern@searshc.com>; Jasinowski, Dennis <Dennis.Jasinowski@searshc.com>; Thomas Jr., Leon <Leon.ThomasJr@searshc.com>; Sulejmani, Ersen <Ersen.Sulejmani@searshc.com>
**Cc:** Mehul Patel <mpatel@midwoodid.com>; Michael Gurary <mgurary@midwoodid.com>; Steven Brown <SBrown@midwoodid.com>; Ryan Frederick <rf@midwoodid.com>; Mary Warren <mwarren@midwoodid.com>
**Subject:** Re: Expressway Plaza / Kmart Parking Lot and Drive Lane Paving 11/20-11/23 and 11/27-11/29

Mr. Pukas,

It was a pleasure speaking with you earlier in the week.

Below are my responses in regards to your request for information:

1) Photos of drive lanes showing exiting conditions that are requiring immediate/emergency work (please see attached)  *** These photos are not all inclusive of the emergency work, nor do they include the general parking area and rear drive lane which also need to be addressed by Kmart in the Spring of '18 as per the default notice***  I would advise that a qualified Kmart representative thoroughly document the entire area in order to address the remaining areas as included in the default notice.

2) Costs of this work (Detailed proposal and cost breakdown attached)

3) Documentation from City of Farmingville directing this scope of work required to be completed this year  (As per my walkthrough last week with DOB Town Inspector Bruce Schaal, the attached diagram indicates areas that were identified by the inspector for immediate reconstruction. The inspector further noted that additional repairs would be required within the Kmart general parking area and rear drive lane, but as these were not affecting the main drive lanes, they could wait for the early Spring.)

Work will commence tomorrow 11/20 and run through 11/23 for the reconstructive portions (outlined in red on the last attachment). All remaining repairs will take place the following week of 11/27 and be staggered to minimize disruption.

We apologize for the timing and will make every effort to re-direct your staff and visitors to any one of our other property entrances at N. Ocean Avenue and Horseblock Road during the initial reconstructive portion.

Please do not hesitate to contact me directly with any questions or concerns regarding the aforementioned.

Regards,

**Peter Pollani, FMP**
**Portfolio Manager**
**Midwood Investment & Development**
430 Park Avenue, 2nd Floor
New York, NY 10022
Direct: 212.682.4924
Mobile: 516.732.8977
ppollani@midwoodid.com

\*\*\*MIDWOOD HAS MOVED! Same building, different floor.  Please note our new address and update your records.\*\*\*

Peter –

It was nice speaking with you this morning regarding the parking lot paving required at Kmart #4871 Farmingville, NY.

Recapping our conversation, you are going to provide the following:
1) Photos of drive lanes showing exiting conditions that are requiring immediate/emergency work
2) Costs of this work
3) Documentation from City of Farmingville directing this scope of work required to be completed this year

Also as we discussed, the remainder of the parking lot repairs to be done within the Kmart parking field can wait to be completed next spring.

Thanks Peter!

-Brad-

Brad Pukas
Real Estate Asset Manager
Sears Holdings Corporation
3333 Beverly Road  BC-093A
Hoffman Estates, IL  60179
Phone: (847) 286-6852
Fax: (847) 286-7976

The content of this email and the opinions and conclusions expressed herein may not be complete or comprehensive and the Sears Real Estate Department accepts no liability for the content of this email, or for the consequences of any actions taken on the basis of the information provided, unless that information is subsequently confirmed in writing by the Sears Real Estate legal group.  Any views or opinions presented in this email are solely those of the author.

This message, including any attachments, is the property of Sears Holdings Corporation and/or one of its subsidiaries. It is confidential and may contain proprietary or legally privileged information. If you are not the intended recipient, please delete it without reading the contents. Thank you.

# PROPOSAL



**DuMOR CONSTRUCTION INC.**
PARKING AREA SPECIALISTS

DATE   11/3/2017
ESTIMA...   2017-0768

NAME / ADDRESS

Midwood Management
430 Park Avenue
Suite 505
New York, NY  10022
Attn: Mr. Peter Pollani

42 Grant Avenue
Bay Shore, New York 11706
(631) 586-7200 • Fax (631) 586-7208

PROJECT

Estimate #2

Job site Contact

Mr. Peter Poll...

Job Phone

(516).732.8977

| Phone | 212 682-9595 | TERMS | 35%down, bal. @ completion | REP | D J | Fax | 212 983-9697 |

| ITEM | DESCRIPTION | TOTAL |
|---|---|---|
| Rebrick drywell | `REBRICK DRAIN COVER: Five Covers (5)<br>1) Saw cut & remove asphalt around drywell cover and dispose of asphalt.<br>2) Excavate area and remove casting.<br>3) Remove and replace bricks as necessary.<br>4) Backfill. Install RCA base blend and compact. | |
| PATCH - R & R | PATCH: Remove and replace 10,200 sf in 14 areas.<br>1) Saw cut asphalt and remove or mill area down.<br>2) Add recycled crushed concrete base blend as needed and compact.<br>3) Patch areas with 2 1/2" of NY State Type 6F asphalt compacted to an average depth of 2".<br>4) Apply hot tar to seams of patches to prevent water infiltration. | |
| Walk | 1) Remove and replace sidewalk in 2 areas approximately 10 sf | |
| Curbs | 2) Remove and replace curbing approximately 26 lf in 2 areas. | |
| Total | Total price for taxable portion of job, not including NYS sales tax | 54,300.00T |
| Reconstruct Parking Area | RECONSTRUCT PARKING AREA: Drive Lane 2 area approximately 54500 sf<br>SEE Diagram<br>Job to include:<br>1) Mill existing pavement and dispose of off site.<br>2) Add RCA as necessary.<br>3) Regrade base blend and compact.<br>4) Adjust steel manhole covers and drains as necessary to new grade.<br>5) Pave area with:<br>2" of binder asphalt after compaction<br>1 1/2" of NY State Top asphalt after compaction<br>6) Restripe parking area.<br>NOTE: Price based on existing asphalt being no more than 2" thick | 184,468.75 |

Retain this copy for your records.

**TOTAL**

SIGNATURE

# PROPOSAL

## DuMOR
## CONSTRUCTION INC.
### PARKING AREA SPECIALISTS

| | |
|---|---|
| DATE | 11/3/2017 |
| ESTIMA... | 2017-0768 |

42 Grant Avenue
Bay Shore, New York 11706
(631) 586-7200 • Fax (631) 586-7208

**NAME / ADDRESS**

Midwood Management
430 Park Avenue
Suite 505
New York, NY 10022
Attn: Mr. Peter Pollani

PROJECT

*Estimate #2*

Job site Contact

Mr. Peter Poll...

Job Phone

(516).732.8977

| Phone | 212 682-9595 | TERMS | 35%down, bal. @ completion | REP | D J | Fax | 212 983-9697 |
|---|---|---|---|---|---|---|---|

| ITEM | DESCRIPTION | TOTAL |
|---|---|---|
| | Dumor Construction Inc will call for a utility mark out as required by law. There may be utilities consumer owned (not owned by utility company, owned by property owner) that may not be marked out. If deemed necessary, a private markout company can be hired and the cost passed along to our customer, usually about $500.00 for a smaller job. There may be permits required (depending on Towns requirements) for a total restripe of lot. Site plan may be needed as well. DuMOR Construction Inc and any of our subcontractors will not be responsible for any underground wiring, pipes or utilities and or any other conditions buried under the existing pavement. Including, but not limited to sprinklers, site lighting, electric gate wires or traffic light actuator (traffic light loops). There may also be concrete covers buried under pavement due to improper abandoned cesspools, etc. Additional cost to repair any under pavement damage will be the responsibility of the owner of property, not the contractor or subcontractor. | |
| | Sales Tax - Suffolk County | 4,683.38 |

Retain this copy for your records.

**TOTAL**      $243,452.13

SIGNATURE



















































**MIDWOOD MANAGEMENT
EXPRESSWAY PLAZA
2350 North Ocean Ave.
Farmingville, NY**

**RED RECONSTRUCT 2 AREAS
approx. 54,500sf total**

2017 DuMOR Construction Inc.