

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9              Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    January 18, 2019

17                    10:09 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   JUSTIN

1    HEARING re Notice of Agenda of Matters Scheduled for Hearing

2    on January 18, 2019 at 10:00 a.m. ( document # 1602)

3

4    HEARING re Debtors' Motion for Approval of Global Bidding

5    Procedures (document #429)

6

7    HEARING re Motion Of Certain Utility Companies To Determine

8    Adequate Assurance Of Payment Pursuant To Section 366(c) Of

9    The Bankruptcy Code (document #1395)

10

11   HEARING re Application of Debtors for Entry of Order

12   Approving Amendment to Terms and Conditions of the Debtors'

13   Employment and Retention of Lazard Freres & Co. LLC as

14   Investment Banker (document #1435)

15

16   HEARING re Notice of Intent to Conduct Store Closing Sales

17   (document #1444)

18

19   HEARING re Motion of Greenhorn Ventures LLC for Order (I)

20   Compelling the Debtor to Reject a Non-residential Real

21   Property Lease Pursuant to 11 U.S.C. §365(d)(2); or in the

22   Alternative (II) Establishing a Deadline by Which the Debtor

23   Must Assume and Cure all Defaults or Reject the Lease; and

24   (III) Modifying the Automatic Stay to Permit Greenhorn

25   Venture to Pursue its Rights, Including those Related to the

Page 3

1   Debtors Continuing Defaults under the Lease Pursuant to 11

2   U.S.C. §362(d)(1) together exhibits ( document #969)

3

4   HEARING re Motion for Relief from Stay to Allow Civil

5   Litigation in Action (1) and for Action, (2) To Proceed, and

6   for the Parties to Proceed with Alternative Dispute

7   Resolution (ADR) and Settlement Negations to which had Begun

8   Since July 27, 2018, with Certificate of Service (document

9   #1006)

10

11  HEARING re Motion for Relief from Stay (related

12  document(s)1) filed by Cynthia L Pollick on behalf of Karen

13  Smith ( document # 1126)

14

15  HEARING re Motion of Debtors for Entry of an Order Extending

16  the Automatic Stay to Certain Non-Debtor Parties (document

17  #924)This matter is going forward on a contested basis

18  solely with respect to the Objections of Karen Smith

19  (document #s 1298,  #1335, and #1559) The objection of Qazim

20  B. Krasniqui (document #1187) has been adjourned to March

21  21, 2019. The remainder of objections have been adjourned to

22  February 14, 2019 at 10:00 AM.

23

24

25  Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Sears

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  RAY C. SCHROCK

9         CANDACE ARTHUR

10        JACQUELINE MARCUS

11        JESSICA LIOU

12        OLGA F. PESHKO

13        GARRETT FAIL

14

15   PENSION BENEFIT GUARANTY CORPORATION

16        1200 L Street MW

17        Washington, DC 20005

18

19   BY:  MICHAEL I. BAIRD

20

21   THE EMPLOYMENT LAW FIRM

22        363 Laurel Street

23        Pittston, PA 18640

24

25   BY:  CYNTHIA L. POLLICK

Page 5

1    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

2        Attorneys for the DIP ABL Agent

3        4 Times Square

4        New York, NY 10036

5

6    BY:  SHANA A. ELBERG

7        PAUL LEAKE

8

9    DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP

10        Attorneys for Greenhorn Ventures LLC

11        One North Lexington Avenue

12        White Plains, NY 10601

13

14    BY:  DAWN KRIBY

15

16    SEYFARTH SHAW LLP

17        Attorneys for Wilmington Trust, NA as Indenture Trustee

18        and Collateral Agent

19        620 Eighth Avenue

20        New York, NY 10018

21

22    BY:  EDWARD M. FOX

23

24

25

Page 6

```
 1    SHEARMAN & STERLING LLP

 2         Attorneys for Sears Hometown & Outlet Stores Inc.

 3         599 Lexington Avenue

 4         New York, NY 10022

 5

 6    BY:  FOTEINI TELONI

 7

 8    CHOATE

 9         Attorneys for Wells Fargo

10         Two International Place

11         Boston, MA 02110

12

13    BY:  KEVIN J. SIMARD

14

15    KELLEY DRYE & WARREN LLP

16         Attorneys for Landlords Brookfield Properties,

17         Benderson Development, SITE, LBA Realty, TLM, Gray

18         Enterprises, WRI, JLL

19         101 Park Avenue

20         New York, NY 10178

21

22    BY:  ROBERT L. LEHANE

23

24

25
```

```
                                                    Page 7

1    ZEICHNER ELLMAN & KRAUSE LLP

2         Attorneys for AIG Insurance Cos.

3         1211 Avenue of the Americas

4         New York, NY 10036

5

6    BY:  YOAV M. GRIVER

7

8    MILBANK, TWEED, HADLEY & MCCLOY LLP

9         Attorneys for Cyrus Capital Partners

10        28 Liberty Street

11        New York, NY 10005

12

13   BY:  ERIC R. REIMER

14

15   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

16        Attorneys for Seritage Growth Properties

17        One New York Plaza

18        New York, NY 10004

19

20   BY:  SCOTT B. LUFTGLASS

21

22   ALSO PRESENT TELEPHONICALLY:

23

24   ARLENE R. ALVES

25   JOSEPH BADTKE-BERKOW
```

Page 8

1    NEGISA BALLUKU

2    RYAN M. BARTLEY

3    ELIZABETH A. BEITLER

4    DANIEL BESIKOF

5    LAUREN N. BESLOW

6    SOMA BISWAS

7    ALIX BROZMAN

8    JULIAN BULAON

9    JONATHAN D. CANFIELD

10   PATRICK W. CAROTHERS

11   GERARD T. CICERO

12   BRYAN M. CIMALA

13   R. JOHN CLARK

14   SARA COELHO

15   PATRICK T. COLLINS

16   ANDREW DIAZ

17   JASON DIBATTISTA

18   TED A. DILLMAN

19   MARK E. FELGER

20   ROBERT E. FITZGERALD

21   DEBORAH L. FLETCHER

22   STEPHANIE J. GLEASON

23   IVAN M. GOLD

24   SUSAN D. GOLDEN

25   MICHAEL S. GREGER

1   MARC HANKIN

2   TAYLOR B. HARRISON

3   CATHERINE HEITZENRATER

4   MICHAEL HERZ

5   LAUREN HIRSCH

6   CHRISTOPHER ISIDORE

7   RUSSELL R. JOHNSON, III

8   GERALD P. KENNEDY

9   MATTHEW KOCH

10   NICHOLAS KRISLOV

11   THOMAS LABUDA JR.

12   ZACHARY D. LANIER

13   FERNAND L. LAUDUMIEY

14   ZACHARY D. LEVINE

15   LAWRENCE A. LICHTMAN

16   DONNA LIEBERMAN

17   MARK LIGHTNER

18   TERESA LII

19   MICHAEL G. LINN

20   KATHERINE E. MASSEY

21   DENNIS D. MILLER

22   STEPHEN MILLER

23   MICHAEL MITTELMAN

24   PATRICK MOHAN

25   KEVIN M. NEWMAN

1   RYAN O'CONNOR

2   THOMAS ONDER

3   RICHARD PEDONE

4   JON PRUCHANSKY

5   NAVAID QURESHI

6   RYAN REINERT

7   STEVEN J. REISMAN

8   ROBERT RITACCO

9   DAVID ROSENZWEIG

10   CHRISTOPHER SAFAYA

11   JOHN F. SAUL

12   COURTNEY A. SCHAEL

13   MICHAEL L. SCHEIN

14   PAUL SCHWARTZBERG

15   WENDY SIMKULAK

16   MICHAEL J. SMALL

17   STEVEN SMITH

18   FREDRIC SOSNICK

19   CHRIS STAUBLE

20   DAN SWETNAM

21   EMILY TOMLINSON

22   AUSTIN H. VINY

23   ROBERT WEISBERG

24   EVAN J. ZUCKER

25   LAUREN E. ZUMBACH

1              P R O C E E D I N G S

2              THE COURT:  Please be seated.  Okay, good morning.

3    In Re. Sears Holding Corporation.

4              MR. SCHROCK:  Good morning, Your Honor.  Ray

5    Schrock of Weil, Gotshal & Manges on behalf of the Debtors.

6    I'm here with my partners today and colleagues from Weil,

7    along with Mo Meghi, the Debtors' CRO, as well as Brandon

8    Aebersold, the Debtors' lead investment banker.

9              THE COURT:  Okay.

10             MR. SCHROCK:  Thank you for making time available

11   today, Your Honor, before the hearing for a chambers

12   conference.

13             I'll try and keep my remarks brief in terms of the

14   results of the auction.  But in short, I'm extremely pleased

15   to report to the Court that at roughly 3:00 a.m. yesterday,

16   we closed the auction record with ESL being declared the

17   successful bidder for the sale of substantially all the

18   Debtors' assets.

19             There is a 111-page APA that's very detailed,

20   that's been fully negotiated between the parties, and that

21   will be filed with the Court later today, along with a

22   notice of a successful bid.  And I would encourage parties

23   to take their time looking through the contract because

24   there are many nuanced provisions that are included in

25   there.

Page 12

1            But in short, it provides for a retail footprint,

2    you know, of approximately 425 stores under the Sears and

3    Kmart brands, that target businesses include the network of

4    specialty stores including Sears Auto Centers, the Shop Your

5    Way membership program, Monarch Premium Appliance Company,

6    Innovel, and Sears Home Services, including the parts direct

7    business and material contracts related thereto.

8            This is an extremely important moment for Sears

9    and its 45,000 employees, and the restructuring committee

10   has worked extremely hard to come to the right decision for

11   the benefit of all stakeholders.  We completely understand

12   that not everybody is going to agree with the company's

13   decision, but we do believe firmly that this is in the

14   estate's, the company's, and all stakeholders' best

15   interests, and we've come to the best result possible for

16   all concerned.

17           I think that we'll -- we're going to have a meet

18   and confer later today with the Official Committee of

19   Unsecured Creditors regarding discovery issues.  As the

20   Court saw, they did file a standing motion, they filed --

21   and they do intend to object to the sale, and we very much

22   look forward to putting on our case for the benefit of

23   Sears.

24           In terms of scheduling, Your Honor, as we

25   discussed in chambers, we would -- we do think it would make

Page 13

1    sense to start the hearing on February 4th, so that the

2    Debtors could file their reply on February 1st, along with

3    the evidence that will be required to approve the sale for

4    the Court to consider the sale.  But we think giving, you

5    know, the Court, then parties-in-interest the weekend would

6    be, you know, the better route, rather than starting on

7    February 1st.

8              THE COURT:  Okay.  I dug out the November 19 order

9    approving global bidding procedures.  And from what you told

10   me, it looks like you've done, or will be doing right after

11   this hearing, the first couple of things that are required

12   under that order, which is to file the transaction documents

13   and provide the notice.

14             And I just want to make sure you all go through

15   that order again to make sure you provide the other notices

16   that are contemplated there, including the assumption of

17   assignment notices, which also include the date for any

18   objections to be filed and served.

19             The hearing scheduling that you've suggested makes

20   sense to me.  I'd originally reserved today for the 1st with

21   some time, not a full day, on the 4th, but we can start

22   instead on the 4th and then have a full day on the 6th.  The

23   4th may or may not be more than a couple of hours.  The

24   clerk's office, to sort of help arrange for my calendar,

25   gets notice from Debtors' law firms as to whether they are

1    contemplating filing a case.  And as you all know, since you

2    represent debtors a lot, frequently those days get moved

3    because people are talking, and they file later.

4            So right now, it's possible that a case will be

5    filed that requires a hearing that day.  If that doesn't

6    happen, then obviously, I'll have a lot more time on the

7    4th, but I have a full day on the 6th.

8            Other thing I want to say is that my normal

9    practice for contested evidentiary hearings, and I

10   contemplate these hearings to be evidentiary and, at least

11   for now based on my understanding, there will be at least

12   one objection to them and perhaps more to the relief sought

13   by the Debtor.

14           My practice for contested evidentiary hearings is

15   to take direct testimony by witnesses who are under the

16   parties' control by declaration or affidavit, to have that

17   be submitted with sufficient time so that the parties can

18   review it and I can review it, as the direct testimony here.

19   I would think that should have to come in on the 1st and be

20   delivered in chambers on the 1st during business hours.  And

21   then to have the witness be present for redirect.

22           Obviously, if someone is not under your control,

23   you're going to have to subpoena them and get them, get them

24   here, and I'll hear them live on direct.

25           If anyone intends to submit expert testimony -- I

1    don't know if they do; this isn't a valuation case, but

2    conceivably, there may be expert testimony -- the expert

3    report can serve as the direct testimony with just a, you

4    know, one-page, one paragraph, frankly -- declaration or

5    affidavit saying this would constitute my direct testimony.

6         And as far as exhibits are concerned, my normal

7    practice is to require the parties to meet and confer and

8    try to agree on the admissibility of as many exhibits as

9    they can, and to do that well in advance of the time when

10   they would be submitting a joint exhibit book to chambers,

11   which, again, should be on the 1st during business hours,

12   which will require you to meet before then to discuss

13   exhibits.

14        If the parties can't agree on the admissibility of

15   a particular exhibit, put it in, or all of them, in a

16   different binder.  And I generally -- I'd prefer

17   admissibility issues at the evidentiary hearing and

18   discourage motions in limine.

19        If knowing the answer on a motion in limine really

20   will change your whole trial strategy, I guess you can

21   submit one and I'll hear it.  But given the short timeframe

22   here, I think you should assume that it's more likely that

23   I'll just rule on an evidentiary objection when it comes up.

24        Lastly, there is some time for depositions.  If

25   parties want to designate deposition testimony, I strongly

Page 16

1    urge them to do two things: one, to highlight it so that I

2    won't be pouring through the whole deposition to figure out

3    what it is that you want me to focus on; and for the other

4    side to highlight it, you know, anything that they want to

5    have in a different colored marker.

6              And also -- and I think this is equally important

7    -- point out to me why you believe that this deposition

8    testimony is relevant and why you're introducing it, which

9    leads to the last point.

10             I normally do not take opening arguments unless

11   the parties just simply want to identify the issues, but I

12   generally can figure that out from the submissions.  But I

13   do give party the change -- parties the chance to give

14   closing arguments, and that's when you would tell me why you

15   think any deposition testimony is relevant and why.  I

16   should think so.

17             And I generally rule from the bench in matters

18   that are time sensitive, and so you should assume that that

19   might well happen.

20             MR. SCHROCK:  Thank you very much, Your Honor.

21   Yeah, we are familiar with your standard operating

22   procedure.  We'll intend to follow that.  And certainly,

23   from the Debtors' perspective, we do not intend on

24   presenting opening arguments; just moving straight to the

25   evidence.

Page 17

1           THE COURT:  Okay.  And, you know, obviously, there

2     are leases and contracts that are contemplated to be assumed

3     and assigned as part of this transaction.  I see counsel for

4     certain landlords who are here, but others may not, so you

5     should make sure they understand those ground rules.  They

6     can get the CD for today's hearing and play it back if they

7     want to, but just make sure they're aware of that too.

8           MR. SCHROCK:  And, Your Honor, just one more point

9     just on the substance of the transaction.  Importantly from,

10    you know, from the Debtors' perspective, the people should

11    take a careful look through the release provisions and the

12    asset purchase agreement because it's the Debtors' intent

13    that although there is in effect the ability for ESL and its

14    related parties to credit bid, that there's otherwise not a

15    release that's contemplated under the terms of that

16    document.

17          And we are -- even though we're in the mode of

18    having to get this sale approved and litigated with the

19    Creditors' Committee on an expedited basis, we're not going

20    to give up trying to, you know, garner their support.  And

21    we will -- we'll continue those efforts in anticipation of

22    the hearing.

23          THE COURT:  Okay.  Well, again, I haven't seen the

24    document and it will speak for itself.  I suppose that there

25    needs to be some form of disclosure; maybe ESL has already

Page 18

1  made some disclosure because it's a reporting company or the

2  like.

3        MR. SCHROCK:  Yes, they did file a 13(d), Your

4  Honor.

5        THE COURT:  All right, but the document will speak

6  for itself.  And people that want to understand the

7  transaction need to read the document because that's the key

8  thing.

9        MR. DIZENGOFF:  Good morning, Your Honor.  Again,

10  Ira Dizengoff, Akin Gump Strauss Hauer & Feld, on behalf of

11  the Official Committee of Unsecured Creditors.

12        I rise just to reiterate to you what we've

13  previously discussed with the Court and with the Debtors.

14  We have concerns about this, but I'm not going to go into

15  any substance about that; that's for trial, and we'll lay

16  out those issues together with you.

17        The documentation is lengthy.  We've digested it

18  summarily.  But just to comment on one thing that Ray said

19  about the release provisions.  They speak for themselves;

20  they're also always subject to interpretation.  We'll

21  articulate to you the concerns that we have about that, and

22  we'll discuss that another day in connection with the trial.

23        But the Committee has had concerns about prior to

24  the transaction; that's part of the evidentiary record that

25  we'll put in front of you.  And then the end of the day,

1    we'll tell you why we don't think this deal makes sense.

2              THE COURT:  Okay.

3              MR. DIZENGOFF:  Thank you.

4              THE COURT:  And that's fine.  Everyone's rights

5    are obviously reserved under -- so the lawyers understand

6    this -- under the global bidding procedures order, the

7    auction results are to be announced, but it's subject to the

8    hearing that will be an evidentiary hearing that I'm going

9    to have early next month.  And parties-in-interest will have

10   their opportunity to object under the applicable standards

11   on that basis.

12             MR. BAIRD:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MR. BAIRD:  Michael Baird of behalf of Pension

15   Benefit Guaranty Corporation.  I'll keep my remarks brief.

16   I just wanted to educate the Court that we do intend to

17   object to the ESL bid.  We share the concerns of the

18   Committee.  And for avoidance of doubt, we reserve all

19   rights and remedies.  Thank you, Your Honor.

20             THE COURT:  Okay, that's fine.  I obviously don't

21   know the basis for the objection.  I am pleased to see at

22   least the possibility of preserving this business as a going

23   concern, including tens of thousands of jobs.  I obviously

24   want to make sure that that prospect is a real one.  I would

25   hate to see the equivalent of a sellout that Citi Field be

Page 20

1    suddenly out of work, if you can visualize that, and I hope

2    that doesn't happen.

3              And ultimately, this will be decided on legal

4    standards, not on personalities; the press and perhaps some

5    of those very employees may not understand that.  But the

6    real issue is not whether you like or dislike the individual

7    ultimately behind the ESL bid, in large measure, but whether

8    the bid is the best for this company, the people that work

9    for it, the United States government through the PBGC, and

10   the other creditors.

11             MR. SCHROCK:  Thank you, Your Honor.

12             THE COURT:  Okay.

13             MR. SCHROCK:  Your Honor, if we could just take

14   the next item out of order, the Lazard motion to amend their

15   retention application.

16             THE COURT:  Okay.  Let me, let me --

17             MR. SCHROCK:  It's Item 3, instead of what's here.

18             THE COURT:  Right.  I'm going to go to that tab.

19   So where going to generally follow the agenda.

20             MR. SCHROCK:  We're going to follow, correct,

21   except for this one.

22             THE COURT:  Well, actually, I think --

23             MR. SCHROCK:  We're hoping it's not a long

24   hearing.

25             THE COURT:  I think this is the next one.  Because

Page 21

1    as I understand it, the utility matter is adjourned, right?

2    This is just a status conference.  So we'll talk about the

3    status conference, but let's move to the -- to the Lazard

4    proposed amendment.

5           MR. SCHROCK:  And, Your Honor, I believe that Mr.

6    Schwartzberg from the Office of the United States Trustee

7    was planning on appearing telephonically.

8           THE COURT:  Okay.  Are you on the phone, Mr.

9    Schwartzberg?  I know their office has been, unfortunately,

10   pinched by the --

11          MR. SCHROCK:  By the shutdown.

12          THE COURT:  -- by the shutdown.  They have been

13   appearing in cases, however.  Mr. Schwartzberg, I just want

14   to make -- can you make sure that the phone is on?  Okay.

15   Mr. Schwartzberg, are you on the phone?

16          MR. SCHROCK:  He did inform us, Your Honor, that

17   he was appearing telephonically.

18          THE COURT:  Okay.  Well, was this going to go

19   forward or --

20          MR. SCHROCK:  Yeah.  Yes, it is going to go

21   forward.  It's the only objection that was from the Office

22   of the United States Trustee.

23          THE COURT:  Okay.

24          MR. SCHROCK:  There was some confusion just around

25   the -- I don't know if -- I think your chambers had been

Page 22

1   dialing the separate -- they had been dialing the separate

2   line.  They thought there was another line.  I just want to

3   make sure that people are actually on the line.  Perhaps,

4   Your Honor, maybe we take this out of order.

5              THE COURT:  Yeah.

6              MR. SCHROCK:  And we can try and raise Mr.

7   Schwartzberg.

8              THE COURT:  Can you send an email to directly get

9   ahold of Mr. -- email Mr. Schwartzberg and have him dial in?

10  Okay.  So let's, why don't we do No. 4 then.

11             MR. SCHROCK:  Okay, very good.

12             THE COURT:  Well, actually, why don't we go back

13  to No. 2.

14             MR. SCHROCK:  Back to No. 2.

15             THE COURT:  Yeah, which I think was just a status

16  conference.

17             MS. LIOU:  Good morning, Your Honor.  Jessica Liou

18  from Weil, Gotshal & Manges on behalf of the Debtors.

19  Agenda Item No. 2 is the contested motion of certain

20  utilities to determine adequate assurance of payment

21  pursuant to Section 366(c) of the Bankrtupcy Code, filed at

22  ECF 1395.  It's been joined by Jackson EMC, filed at 15 --

23  ECF 1533.

24             THE COURT:  Right.

25             MS. LIOU:  It is just --

1           THE COURT:  Can I just interrupt you?  Do you have

2     anyone on the phone for this motion, their 366 motion?

3           [OFF MIC]

4           THE COURT:  And maybe everyone is on.

5           [OFF MIC]

6           MS. LIOU:  That's right, because we were informed

7     by opposing counsel that they would be making an appearance

8     telephonically.

9           THE COURT:  And so, I'm going to -- at least

10    boring the people who are in the courtroom or having them

11    have a deja vu moment, I'm going to summarize the first item

12    that we did discuss on the agenda before I realized that,

13    for some reason, the Court Call had you all on hold.

14           The first item on the agenda is a status

15    conference on the global bidding procedures.  As you all

16    remember, I entered an order on November 19th setting forth

17    global bidding procedures for all or substantially all of

18    the Debtors' assets.  The Debtors' counsel, Mr. Schrock,

19    announced that at 3:00 a.m. yesterday?

20           MR. SCHROCK:  Yes.

21           THE COURT:  Yesterday, the Debtors closed the

22    auction, which I had authorized them at their request to

23    continue for another day, having accepted an improved bid

24    from ESL and other entities working with it.  The bid has

25    been documented in a roughly 110-page purchase agreement

Page 24

1    that will be filed this morning.

2           The Debtors also will file or have filed a notice

3    of sale.  Both of those filings are contemplated by the

4    November 19th order.  I said to Mr. Schrock that there are -

5    - there's at least one other notice that needs to go out in,

6    I think, five days dealing with contracts to be assumed --

7    contracts and leases to be assumed and assigned under the

8    transaction.

9           I'd originally scheduled February 1st as the

10   hearing on the proposed sale, to give parties a little more

11   time.  In light of the fact that that will be an evidentiary

12   hearing, and probably will be a contested evidentiary

13   hearing, we will instead start the sale hearing on February

14   4th and continue it on February 6th.  On February 4th, I may

15   only have a couple of hours; it depends on at least one

16   other matter that may or may not have to be heard in the

17   afternoon that day.

18          I also went through the customary procedures that

19   I have for handling evidentiary hearings, and I noted that

20   the Debtors should make those procedures clear to any party

21   that's not present today, either in person or by phone.

22          They are to take direct testimony by declaration

23   or affidavit, with the witness to be present in the

24   courtroom live for cross and re-direct.  Obviously, parties'

25   witnesses who are not under their control, they need to

Page 25

1    ensure that they're there for live testimony.

2          Any expert testimony would be in the form of the

3    expert report with a one-paragraph statement that this would

4    constitute the expert's testimony.

5          I also require the parties to meet and confer,

6    having identified their proposed exhibits, and meet and

7    confer to agree on the admissibility of as many of those as

8    possible and to submit a joint exhibit book to chambers.

9    Both the exhibit book and the declarations should be

10   submitted on the first during normal business hours, 1st of

11   February.

12         Any exhibits, the admissibility which the parties

13   dispute, should be put in a separate binder and submitted to

14   chambers.  And I will, in all likelihood, rule on their

15   admissibility during the hearing, as opposed to encouraging

16   any motions in limine.

17         I stand ready to hear the parties on any discovery

18   disputes, but I require the parties to, you know, use their

19   best efforts to resolve the dispute before setting up a

20   discovery call by an email to chambers.  And that's the

21   first thing I'll ask, obviously, is what efforts have been

22   made to resolve the dispute.

23         You should designate any deposition excerpts or

24   transcripts in highlighted marker and submit those to

25   chambers with the declarations, and be sure to highlight why

Page 26

1      an oral argument at the close of the evidentiary hearing,

2      why you believe those expert -- excerpts are relevant.

3              Lastly, because this is obviously a time-sensitive

4      matter, it's likely that I will rule from the bench.  And I

5      won't take opening arguments.  I'm assuming the parties'

6      pleadings will lay out what they believe the issues are, but

7      I do give parties the chance to give me a brief closing

8      argument commenting on the evidence.

9              The counsel for the Debtor, I think wisely,

10     decided not to summarize the proposed transaction in

11     anything more than the most general terms; instead, invited

12     the parties to review the document which will be on file.

13     He did state, and I agreed with him, that it would be a very

14     good thing if the Debtors could reorganize in a way that

15     would save all or substantially all of the remaining jobs of

16     the workforce, which have been described as anywhere between

17     45,000 and 50,000 people.

18              But other than that, the parties really should

19     focus on the terms of the transaction, which are detailed,

20     including the aspects of the transaction that preserve

21     claims against, or potential claims, against ESL and

22     affiliated entities.

23              The Creditors' Committee and one member of the

24     Committee, the PBGC, rose to reserve their rights.  And we

25     had had a chambers conference before this hearing where it

Page 27

1    was made clear to me that, in all likelihood, there will be

2    some form of objection to the transaction; and that's why

3    we're discussing, in some detail, the ground rules for the

4    hearing.

5           I don't know if anyone wants to add anything to

6    that.  You're certainly free on the phone -- and I apologize

7    again for the -- for having you all on hold during that

8    discussion.  But you're certainly free to get the CD

9    recording or certainly the transcript, but the CD recording

10   will happen a lot faster, of this hearing.

11          So anything else to say on that?

12          MR. SCHROCK:  I think that was a great summary,

13   Judge.

14          THE COURT:  Okay.

15          MR. SCHROCK:  Nothing here.

16          THE COURT:  All right.  So then we'll -- we will

17   go to turn then, Mr. Schwartzberg, to the Debtors' motion to

18   amend the terms of Lazard's retention.

19          MR. SCHWARTZBERG:  Yes, Your Honor.

20          THE COURT:  Okay.

21          MR. SCHROCK:  Thank you.  Thank you, Your Honor,

22   and, once again, good morning.

23          So Item No. 3 on the agenda is the Debtors'

24   request to amend the terms, the engagement letter of their

25   investment bankers, Lazard Freres; that's at ECF #1435.

Page 28

1          With me in court this morning are Brandon

2  Aebersold, the managing director of Lazard, who is the lead

3  investment banker on this engagement, and the Debtors' Chief

4  Restructuring Officer, Mo Meghi of M3 Partners, who

5  submitted declaration in support of the application, which

6  can be found at docket entry #1580.

7          The only objection to the application is the

8  objection of the United States Trustee at ECF #41454.  And

9  as we've heard, Mr. Schwartzberg is participating by phone.

10          In an effort to resolve the objection, essentially

11  provided the additional detail that is in our reply to the

12  U.S. Trustee; and, unfortunately, that information was not

13  deemed sufficient by the U.S. Trustee.

14          And I need to provide a little bit of background,

15  Your Honor, for why we moved to amend Lazard's engagement

16  letter.  When Lazard was engaged by the Debtors, they had a

17  provision in their engagement letter that was really heavily

18  negotiated, two of them that were particularly heavily

19  negotiated:

20          One was the overall fee cap of $12.5 million,

21  which for a case of this size is very -- you know, we

22  thought was a very good deal, frankly, for the estate; and

23  then the second was that that Lazard had discretion as to

24  whether or not to undertake a particular sale assignment.

25          THE COURT:  Where does that appear?  I see the fee

Page 29

1    cap, but I don't see the discretion point.

2             MR. SCHROCK:  It's in Paragraph 1(k).  Okay, it's

3    in (indiscernible).

4             THE COURT:  Oh, I see.  Subject to Lazard's

5    agreement so to act, assisting the company in identifying

6    and evaluating candidates for any potential sale

7    transaction.

8             MR. SCHROCK:  Exactly.

9             THE COURT:  Advising the company in connection

10   with negotiations and aiding in the consummation of any sale

11   transaction.

12            MR. SCHROCK:  And the reason -- and the sale fee

13   is substantially below market.  But the reason that was in

14   there is the Debtors were not sure if they were going to use

15   Lazard for sale transactions, or whether or not they would,

16   in fact, be engaging another investment banker for

17   particular, for a particular asset sale.

18            So the back and forth between the parties was

19   really, you know, the trade effectively was we'll have a

20   lower sale cap, but, you know, they're going to have to have

21   discretion around the sale transaction fee.

22            And in November and, you know, in October post-

23   petition going into early November, there were extensive

24   negotiations with the restructuring committee and Lazard

25   around the fact that they were going to have to put -- that

Page 30

1   if one, that the restructuring committee asked them to

2   handle a number of other asset sales, including the

3   individual assets sales of Sears Home Services, Parts

4   Direct, Innovel.  Marketing other substantial business units

5   contemporaneously is what's contemplated under the global

6   asset sale procedures.

7           So in exchange for -- you know, after, you know,

8   quite a bit of negotiation, in exchange for eliminating the

9   discretion under the engagement letter and having Lazard,

10  you know, act as the Debtors' investment banker in

11  connection with all of those sales, Lazard put at least two

12  additional investment banking teams on the mandate to work

13  with on evaluating all of the liquidation proposals, to work

14  on the -- a number of the retail individual sales.  And they

15  ran full processes contemporaneous with the global sale for

16  those individual business units.

17          The trade on that was to increase the fee cap by

18  $7 million.  And the Debtors, their view was, listen, this

19  is still a very good deal.  We consulted with the Creditors'

20  Committee in going through this.  We talked to the other

21  consultation parties.

22          But, you know, I know that the motions just up

23  now, Your Honor, but, you know, Lazard has been acting in

24  good faith ever since that deal was struck in November.  We

25  believe that the fee is still well within -- and, frankly,

Page 31

1    for a case of this size, below market standards.

2            THE COURT:  Well, could I just make -- you're not

3    changing 2(e), which sets the 55 basis points fee.

4            MR. SCHROCK:  We're not, Your Honor.

5            THE COURT:  You're raising the cap.

6            MR. SCHROCK:  We're just raising the cap; that's

7    it, Your Honor.  So we still get the benefit of very below-

8    market asset sale fee, which normally, I would see, you

9    know, a hundred basis points on fees.

10           THE COURT:  And you're representing the, even the

11   motion is dated December 28th, that Lazard really was doing

12   the, quote "extra work" after this cap increase was

13   negotiated?

14           MR. SCHROCK:  Yes.  They were -- there was quite a

15   negotiation before the Thanksgiving Day holiday on this

16   particular issue.  They were able to reach a resolution, you

17   know, with the restructuring -- with the restructuring

18   committee.  And we, you know, they put those people, you

19   know, on the matter.

20           And, you know, listen, we were doing -- obviously,

21   we've been pretty busy in the case.  We've documented it as

22   quickly as we could, and we put it up.  But due to the

23   holiday, this was the holiday, this was the next omnibus

24   hearing by the time we were able to file the documentation.

25           THE COURT:  Okay.  So it's really not -- I mean, I

1    can see -- I can see how the U.S. Trustee made the

2    objection, because it's hard to know what it was that was

3    cut from the documents, and even from the motion what it was

4    that Lazard was originally contemplated to do with respect

5    to sales, which you just admitted they included within the

6    cap, original cap of 12.5 million, and what was new that was

7    negotiated in return for them doing the -- accepting, as

8    they had the right, on your 1(k) to not accept additional

9    work.

10           MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

11   for the U.S. Trustee's Office.

12           THE COURT:  Yes.

13           MR. SCHWARTZBERG:  I'd just point out, as Mr.

14   Schrock pointed out, 1(k) allows them to agree to do the

15   work or not.

16           THE COURT:  Right.

17           MR. SCHWARTZBERG:  2(e) provides the method or the

18   way to calculate their fee.  But 2(f) indicates that if they

19   do it and the fees are calculated and they are subject to

20   2(e), that their capped at 12.5.  So it appears that 2(f)

21   already contemplated the method by which they were going to

22   be paid and their ability to accept or reject.

23           THE COURT:  Well, if they do the work.  I

24   understand that, but they also have the right not to do it.

25           MR. SCHWARTZBERG:  Yes.

1           THE COURT:  And, I guess, Mr. Schrock's point is

2     that because things were being done in real time, they were

3     asked to do -- they agreed to do the extra work.  It would

4     have been less work that they had the right to opt out of.

5     They agreed to do the extra work, and -- but that was

6     premised upon raising the cap.

7           MR. SCHROCK:  Yeah.  And I'll represent to the

8     Court, listen, without this, the cap being raised, you know,

9     we would have been in front of you asking for approval of,

10    frankly, a separate --

11          THE COURT:  Immediately.

12          MR. SCHROCK:  Yeah, separate engagement, you know,

13    of a new, of a new banker to handle some of these individual

14    asset sales that were taking place contemporaneously with

15    the global asset sale procedures.

16          THE COURT:  Okay.  So I interrupted you, Mr.

17    Schwartzberg, but go ahead.

18          MR. SCHWARTZBERG:  Oh, well, my point was, it

19    appears they had originally negotiated a cap of 12.5, and it

20    contemplated -- and essentially 2(f) contemplated that they

21    were going to get paid under 2(e), they were subject to that

22    cap.  So it seems that they right reached the deal, and now

23    they realize it might take more work, so they want to

24    increase that deal.

25          THE COURT:  That's why I wanted to highlight 1(k).

1    The deal also included they're not doing the certain work,

2    any work they chose not to do, so I think that's the

3    important distinction here.  Look, I mean, 328(a) works both

4    ways: it works to provide, subject to a very limited right

5    to adjust, the professional with comfort that they will get

6    paid; it also, subject to only a very limited right to

7    adjust, gives the professional -- it sticks the professional

8    with that deal and nothing more.

9            But, ultimately, it's a matter of contract

10   interpretation, because we're really not talking here about

11   the exception to 328(a), which is circumstances that could

12   not have been anticipated at the time.  So what you fall

13   back on is contract interpretation, which is what Judge

14   Walrath in In Re. Washington Mutual, Inc., 2018 B.R. Lexus

15   291, (B.R. Delaware, February 2, 2018).

16           And it seems to me when we take into account the

17   relevant exceptions of the agreement, which is the basis for

18   the 328(a) retention, you have to read them all together,

19   and that includes 1(k).

20           So it appears to me that under these facts, based

21   on the record before me, this is not a re-trade, but rather

22   what the parties contemplated in terms of playing out the

23   terms of their agreement, which include Section 1(k) and

24   mandating Lazard to do the work.

25           The actual compensation under 2(e), which is that

Page 35

```
 1   55 basis points, has not been attacked by anyone, so it

 2   really is just whether raising the cap is permitted by the

 3   contract.  And I believe it is under 1(k) as a quick pro quo

 4   for them actually doing the work, agreeing to do the work

 5   that they had the right not to do, and that it's a fair cap.

 6          And I think the former has been established by the

 7   record; as to the latter, no one has objected to that.  And,

 8   frankly, I'm focusing on the 55 basis points anyway, which I

 9   don't think is -- I mean, no one has suggested that that was

10   an unfair compensation term.

11          So I'll grant the motion and overrule the

12   objection.  Again, I had many of the same questions you had,

13   Mr. Schwartzberg, but I think based on the record before me,

14   they've been answered.

15          MR. SCHROCK:  Thank you, Your Honor.

16          MR. SCHWARTZBERG:  Thank you, Your Honor.

17          THE COURT:  Okay.

18          MS. LIOU:  Good morning, Your Honor.  For the

19   record again, Jessica Liou, Weil, Gotshal & Manges on behalf

20   of the Debtors.  Agenda Item No. 2, which we've taken out of

21   order, is the contested motion of certain utilities for

22   adequate assurance payment under Section 366(c) of

23   Bankrtupcy Code; that's been filed at ECF 1395.  It's been

24   joined by Jackson EMC, who's filing at ECF 1533.

25          This is only moving forward as a status conference
```

1    today.

2              THE COURT:  Let me just -- let me interrupt you.

3    Is there anyone on the phone who wants to be heard on this

4    matter too, so I should get your appearance?

5              MR. JOHNSON:  Yes, Your Honor.  Russel Johnson on

6    behalf of Appalachian Power Company and the other utilities.

7    Just to note those pleadings at Docket #1395 and 1533.

8              THE COURT:  All right.  Good morning.

9              MR. JOHNSON:  Good morning.

10             THE COURT:  Okay.  And the agenda letter for this

11   hearing says that this will be simply a status conference on

12   this motion.  I think that's what you were about to tell me,

13   right?

14             MS. LIOU:  Yes, that's right, Your Honor.

15             THE COURT:  Okay.

16             MS. LIOU:  The parties remain in ongoing

17   settlement discussions.  To the extent that we need to move

18   forward on a contested basis, we are adjourning this matter

19   to February 14th.  And we have established a consensual

20   extension of the Debtors' objection deadline to the motion

21   to Monday, February 4th, and the reply deadline for opposing

22   counsel will be February 12th.

23             THE COURT:  Okay.  Is that your understanding too

24   on the phone?

25             MR. JOHNSON:  Yes, Your Honor.  Russel Johnson for

Page 37

1    the utilities.  That is correct, Your Honor.

2           THE COURT:  Okay.  Thanks, Mr. Johnson.  It

3    appears to me that that's obviously a good idea.  The motion

4    was complicated, even though it's made on behalf of many

5    utilities, many of them are in different -- very different

6    factual circumstances.  And my utility order sort of

7    authorized the Debtors to engage in negotiations as well, so

8    I encourage you to do that.

9           MS. LIOU:  We will continue those discussions,

10   Your Honor.  If you have no further questions, I'll cede the

11   podium to my colleague, Candace Arthur --

12          THE COURT:  Okay.

13          MS. LIOU:  -- who will be handling the next item

14   on the agenda.

15          THE COURT:  Okay, thank you.

16          MS. ARTHUR:  Good morning, Your Honor.  For the

17   record, Candace Arthur, Weil, Gotshal & Manges on behalf of

18   Sears Holdings Corporations and its affiliated debtors.

19          Your Honor, the next item on the agenda speaks to

20   the Debtors' GOB notice.  The parties have actually resolved

21   it by stipulation that we submitted to your chambers this

22   morning.

23          THE COURT:  Right.  I saw that, with Libby Dial

24   Enterprises.

25          MS. ARTHUR:  Yes, Your Honor.

          1                THE COURT:  But that, that objection was withdrawn

          2      with prejudice.

          3                MS. ARTHUR:  Exactly, Your Honor.

          4                THE COURT:  Okay.

          5                MS. ARTHUR:  So even though it's appearing on the

          6      agenda letter, that's just the status update for that

          7      particular item.

          8                THE COURT:  Okay.  And the one remaining limited

          9      objection was adjourned to the 14th.

         10                MS. ARTHUR:  Yes, Your Honor.

         11                THE COURT:  By One (indiscernible) Park Boulevard.

         12                MS. ARTHUR:  Yes.

         13                THE COURT:  Okay.

         14                MS. ARTHUR:  The next item on the agenda is

         15      actually filed by Greenhorn Ventures LLC.  I don't know if

         16      counsel is in the courtroom today.  I will cede the podium

         17      to counsel.

         18                THE COURT:  Okay.

         19                MS. KIRBY:  Good morning, Your Honor.  Greenhorn

         20      Ventures is a landlord of one of the Idaho properties.  The

         21      basis for the motion to lift the automatic say has four

         22      points.

         23                Number one, the December and January rent has been

         24      unpaid.  There was, Greenhorn is a new owner of the

         25      property.  They purchased the property in November 2018.

Page 39

```
 1    They sent several letters notifying the Debtor of their

 2    address.  They didn't receive their rent.  They have been in

 3    communication with the lease administrator.

 4              THE COURT:  That actually wasn't alleged in the

 5    original motion.

 6              MS. KIRBY:  Correct, Your Honor.

 7              THE COURT:  I think that's a recent development,

 8    right?

 9              MS. KIRBY:  That's correct.

10              THE COURT:  Okay.

11              MS. KIRBY:  Since the motion was filed in

12    November, the December and January rent have not been

13    received.  But I'm letting the Court know that we have been

14    in contact with the lease administrator, who indicates that

15    the rent will be paid sometime in February, but we haven't

16    received it yet.

17              THE COURT:  Okay.  There was some indication it

18    was paid to the prior lessor.

19              MS. KIRBY:  The checks were sent to the wrong

20    place.  Correct, the checks were sent to the wrong place.

21              THE COURT:  Okay.

22              MS. KIRBY:  The second --

23              THE COURT:  So that doesn't seem like a reason to

24    terminate the lease and lift the stay.

25              MS. KIRBY:  Well, I'll leave that to Your Honor's
```

Page 40

1    discretion.

2          THE COURT:  Okay.  Well, that's my discretion.

3          MS. KIRBY:  Yes, absolutely.  Your Honor, the

4    second ground for the motion also arose, since the second

5    ground to lift the stay arose since the motion was filed in

6    November, which was on December 10th, a mechanic's lien was

7    filed against the property in the amount of $135,000, which

8    accrues under Idaho law at the rate of 21 percent interest.

9          The lease, as pointed out in the opposition to --

10   the lease provides 30 days to cure; that 30 days has passed.

11   And to my -- I've been in communication with Debtors'

12   counsel who said they -- the business folks were planning to

13   talk to the mechanic's lienor to try to resolve it.  But to

14   my knowledge, the 30-day period in which they had to cure

15   has passed, and I'm unaware of any resolution of that.

16         THE COURT:  Is this a pre- or post-petition debt

17   that the mechanic's lien law is asserting?

18         MS. KIRBY:  Pre.

19         THE COURT:  Pre, okay.  All right.  So they would

20   need to get stay relief to do anything.

21         MS. KIRBY:  The lienor?

22         THE COURT:  Yeah.

23         MS. KIRBY:  I don't think so.  The lien is against

24   the property as to Greenhorn, so they certainly could pursue

25   the owner of the property in a foreclosure action.

Page 41

1              THE COURT:  But it's to enforce -- it's to enforce

2      a debt against the Debtor ultimately, right?

3              MS. KIRBY:  That's -- well, they can collect that

4      from the owner of the property.  And under Idaho law, the

5      mechanic's lien relates back to when the work was done,

6      which was before Greenhorn purchased the property;

7      therefore, they're in first position on the property, and

8      they certainly could bring a foreclosure of their lien.

9              THE COURT:  But wouldn't they be naming the

10     Debtors as part of a foreclosure action, since the Debtor is

11     the tenant?

12             MS. KIRBY:  I don't --

13             THE COURT:  Wouldn't they be looking to kick out

14     the Debtor?

15             MS. KIRBY:  They would be looking to foreclose on

16     their mechanic's lien against the property, correct.

17             THE COURT:  Right, which would include the

18     Debtors' interest as the tenant.

19             MS. KIRBY:  I assume so, Your Honor.

20             THE COURT:  Okay.

21             MS. KIRBY:  I do know from debtor cases that I've

22     handled, that the lienors can proceed against the owner of

23     the property because the automatic stay doesn't cover the

24     owner of the property.

25             THE COURT:  Yes, but the means of proceeding, I

1    think, would include the Debtor, which would -- they need to

2    get stay relief on.

3              MS. KIRBY:  I don't think so.

4              THE COURT:  All right.

5              MS. KIRBY:  But I'm not a hundred percent sure.

6              THE COURT:  Okay.

7              MS. KIRBY:  And the two other grounds for the

8    request for stay relief were set forth in the original

9    November motion, which are the oil tanks, which the Debtor

10   has responded to; that the concern with the filing at the

11   local environmental IDEQ --

12             THE COURT:  Right.

13             MS. KIRBY:  -- was the regulatory body, indicated

14   that it was a mistake on their website, and they've cured

15   it.

16             THE COURT:  Right.

17             MS. KIRBY:  So that situation has been cleared up.

18   And the other is the encroachment of an expansion of the

19   property by the Debtor onto the neighboring property owner.

20   The Debtor couches this and something that happened long ago

21   and why are we complaining of it now.  It was discovered in

22   connection with the purchase of the property, which was

23   recent, so it was recently discovered.

24             THE COURT:  But has the property owner raised any

25   issues?  I mean, I don't know whether they got notice in the

Page 43

1    Kmart bankruptcy or not, but I just, you know.

2              MS. KIRBY:  There is no litigation pending at this

3    time.

4              THE COURT:  There's nothing pressing from the

5    property -- the neighboring property owner.

6              MS. KIRBY:  There's no -- they have not commenced

7    any litigation against Greenhorn, Your Honor.

8              THE COURT:  Okay.  Thank you.  So you're giving up

9    on the 365(d)(2) aspect of the motion.

10             MS. KIRBY:  That's right, Your Honor.

11             THE COURT:  Okay.

12             MS. ARTHUR:  Good morning, Your Honor.  For the

13   record again, Candace Arthur, Weil, Gotshal & Manges.  Your

14   Honor, nothing that counsel has said today represented in

15   any of its three pleadings, supports the relief that the

16   landlord is seeking.

17             Kmart has been a tenant of the premises for nearly

18   50 years.  And when you think about the alleged default that

19   the landlord is asserting, as well as the legal hurdles that

20   they have to face, the way we view it is that the landlord

21   is merely trying to recapture a lease that is below market,

22   admittedly so.

23             With the Court's indulgence, I'd like to address

24   the three alleged defaults that they've -- that they assert

25   are grounds to either compel the Debtor to reject the lease,

Page 44

1    or at least to lift the automatic stay in order for them to

2    seek remedies pursuant to the lease.

3              So, Your Honor, the first claim that they've

4    provided or set forth in mid-November in the November

5    pleading is that the Kmart is encroaching on a neighboring

6    retailer's property, (indiscernible).

7              In 1989, the parties had entered into a lease

8    amendment; and pursuant to that lease, Kmart was going to

9    build an expansion, and that expansion included a portion of

10   the neighboring -- the neighbor's parcel of land, McCain

11   Foods property.  Kmart entered into a purchase agreement

12   with (indiscernible) providing for them to purchase the

13   additional piece of land.

14             So two things could have happened 28 years ago:

15   either Kmart encroached on the property inadvertently and,

16   due to the passage of time, it's now Kmart's property; or

17   the encroachment that the landlord is alleging isn't an

18   encroachment at all, and it's actually exactly what the

19   parties intended, which was Kmart building on not only it's

20   land, but a portion of (indiscernible) property as well.

21             THE COURT:  Okay.  Well, there's no evidence that

22   the party who has the right to complain, a neighbor, isn't

23   at all concerned about this.  So that's not a basis for --

24             MS. ARTHUR:  We agree, Your Honor.

25             THE COURT:  -- lifting the stay to proceed with an

1   eviction action.

2            MS. ARTHUR:  Your Honor, we absolutely agree.  The

3   next issue spoke to the underground oil tanks.

4            THE COURT:  That's been resolved.

5            MS. ARTHUR:  Counsel notes that's been resolved.

6            THE COURT:  Right.

7            MS. ARTHUR:  And the last --

8            THE COURT:  They were phantom tanks; they didn't

9   exist.

10           MS. ARTHUR:  Yes, Your Honor.

11           THE COURT:  Okay.

12           MS. ARTHUR:  The last item is the mechanic's lien.

13           THE COURT:  Right.

14           MS. ARTHUR:  The Debtors are, the Debtors are in

15   conversations with the vendor in connection with the lien.

16   Pursuant to the language of the lease, the Debtors have 30

17   days to discharge the lien, to the extent it is uncontested.

18   The Debtors do contest certain amounts that the lienor is

19   asserting, and we are hopeful that it will be discharged.

20           But to the extent -- and resolved -- but to the

21   extent that it's not, Greenhorn does have a remedy available

22   to it: it could actually pay the lien itself, and it has a

23   reimbursement claim pursuant to the, pursuant to the terms

24   of the lease.

25           THE COURT:  Did -- has the Debtor given Greenhorn

1    any notice of what it contests?

2            MS. ARTHUR:  We have not, Your Honor.

3            THE COURT:  I think you should do that so that

4    they understand that you're acting within your rights under

5    the provision of the lease.

6            MS. ARTHUR:  Happy to do so, Your Honor, yes.

7            THE COURT:  And I don't know if there's any -- in

8    those discussions, have you alerted the mechanic's lienor

9    the risk of proceeding with a foreclosure action, as to

10   whether that would violate the stay?

11           MS. ARTHUR:  I don't believe, Your Honor, the

12   business people have reached that level of discussions.

13           THE COURT:  Okay.

14           MS. ARTHUR:  The mechanic's, the lienor has

15   actually -- has been amenable to resolving the matter and

16   settling it.

17           THE COURT:  All right.

18           MS. ARTHUR:  So it hasn't reached that level yet.

19           THE COURT:  Okay.

20           MS. ARTHUR:  But we will make sure that the

21   mechanic's lienor is aware.

22           THE COURT:  Well, I think you should at least tell

23   them that they run the risk of violating the stay if they

24   took action to foreclose.  And then that way, the landlord

25   can know that, you know, there's got to be some check on

Page 47

1   self-help.

2          MS. ARTHUR:  We'll do, Your Honor.  I think the

3   last item ended up being --

4          THE COURT:  I ruled that that --

5          MS. ARTHUR:  Yeah, that one's --

6          THE COURT:  I mean, obviously, 365 does require

7   the Debtor to, in essence, make the monthly payments post-

8   petition, but the evidence suggests that the Debtors fully

9   intends to that.  And the only reason it hasn't is that this

10  lease was purchased so recently that the Debtor thought the

11  old landlord was the proper recipient of the payments.

12         MS. ARTHUR:  That's absolutely true, Your Honor.

13         THE COURT:  Okay.

14         MS. ARTHUR:  And payment is forthcoming; the check

15  has been sent out, so that should be received next week.

16         THE COURT:  All right.  So I'm going to deny the

17  motion without prejudice for -- you know, I would say this

18  with any motion -- for relief from the stay to renew if the

19  facts change.

20         MS. KIRBY:  Your Honor, would you consider, to

21  avoid my client having to pay the costs of another motion;

22  would you consider a conditional order?

23         THE COURT:  No.

24         MS. KIRBY:  Okay.  Thank you.

25         THE COURT:  I don't -- given the grounds for the

Page 48

1    stay motion here, I don't trust the landlord to act on the

2    conditional order in the way that it should.

3           MS. KIRBY:  Thank you, Your Honor.

4           THE COURT:  Okay.

5           MS. ARTHUR:  Thank you, Your Honor.

6           THE COURT:  Okay.

7           MS. PESHKO:  Good morning, Your Honor.  Olga

8    Peshko, Weil, Gotshal & Manges for the Debtors.

9           THE COURT:  Good morning.

10          MS. PESHKO:  The next item on the agenda is a

11   motion by Brian Coke Ng, ECF #1006.

12          THE COURT:  That's Ng for the court reporters.

13          MS. PESHKO:  That's right.  We became aware this

14   morning at 10:15 an additional document was filed by Mr. Ng,

15   as a late-filed reply to the Debtors' objection.  We have

16   obviously not had a chance to review that and respond

17   accordingly, Your Honor.

18          THE COURT:  Okay.  I think he's representing

19   himself.  Mr. Ng, are you on the phone?

20          MR. NG:  I'm right here.

21          THE COURT:  Oh, you can come up.

22          MR. NG:  Good morning, Your Honor.

23          THE COURT:  Good morning.  And you're Mr. Ng,

24   right?

25          MR. NG:  Yes.  Yes, Your Honor.

Page 49

1              THE COURT:  Okay.

2              MR. NG:  Yes.  I'm here because I received the

3      defendant -- the Debtors' objection, and I would like to

4      respectfully submit a reply brief.  I sent an email to them

5      yesterday, to everybody on the list.  And I'm here because

6      I'm not feeling too well, and I would like the Court to

7      accept my brief.

8              THE COURT:  Well, you can file it, but I'm not

9      going to read it now.  It looks like it's pretty voluminous.

10     But let me just get -- and I appreciate you representing

11     yourself, and you're not a lawyer, right?

12             MR. NG:  No, no.

13             THE COURT:  Okay.  So as I understand it, you're

14     looking for relief from the automatic stay --

15             MR. NG:  Yes.

16             THE COURT:  -- to proceed with a lawsuit that's

17     pending in New York State Supreme Court, and you attached

18     the amended complaint --

19             MR. NG:  Yes.

20             THE COURT:  -- to your motion.  And it's really a,

21     as I gather it, a lawsuit that's against a number of

22     parties, but including Kmart Pharmacy; it's mostly in

23     connection with the data breach?

24             MR. NG:  Yes.

25             THE COURT:  Okay.

```
 1              MR. NG:  It's not too much of a data breach; it's
 2      alteration of the medical, my medical records.
 3              THE COURT:  Okay.  It relates to -- it's not a
 4      personal injury suit; it's more of a medical records related
 5      action.
 6              MR. NG:  Yes.
 7              THE COURT:  Okay.  And originally when you brought
 8      the motion, you stated that you were prepared to limit
 9      recovery in the lawsuit to available insurance.
10              MR. NG:  Yes.
11              THE COURT:  You know, the motion says Movant is
12      not seeking to recovery anything directly from the Debtors
13      or their bankruptcy estates.
14              MR. NG:  Yes.
15              THE COURT:  And the Debtors have responded saying,
16      we have insurance that might have covered this claim, but
17      it's been used up; the limits have been exceeded.  And
18      there's no separate obligation under the insurance policy
19      for the insurer to defend us.
20              So, in essence, we're -- this is really, unlike
21      the statement in the motion, the only way that there would
22      be a recovery in connection with a claim against Kmart
23      Pharmacy here would be from the Debtor.
24              MR. NG:  Well, with respect to that, that's why I
25      made a reply brief, because the objection itself, it
```

Page 51

1   referenced insurance that they made in their objection does

2   not go directly to the claim that I have that was -- the

3   insurance that they make reference to has not covered period

4   that met my claim is about.

5           THE COURT:  So do you think there is other

6   insurance?

7           MR. NG:  Yes.  I have stated it in my reply brief.

8           THE COURT:  All right.  So that's what your brief

9   covers?

10          MR. NG:  Yes, yes.

11          THE COURT:  All right.  So I'll adjourn this so

12  that you can file that.

13          MR. NG:  Yes.

14          THE COURT:  And if you've identified insurance

15  that the Debtors haven't, I imagine they'll stipulate to the

16  relief.

17          MR. NG:  Thank you.

18          THE COURT:  But if not, I think the motion should

19  be denied because clearly, this is just a claim that would

20  otherwise be dealt with in the process of doing the pre-

21  bankruptcy claims.  And at this point in the case, it's way

22  too early to spend hundreds of dollars on liquidating those

23  types of claims.

24          MR. NG:  And that's why, Your Honor, I laid

25  everything out in here --

1           THE COURT:  All right.

2           MR. NG:  -- and exhibits.

3           THE COURT:  Okay.  So I'll adjourn this to the

4    next omnibus day, which is -- is it February 14th, is that

5    the next omnibus day?  But I'm going to ask you, if the

6    Debtors show you that this insurance doesn't really cover

7    your claim and you agree, then you should withdraw the

8    motion because I'm not going to grant it otherwise.

9           If they agree with you that it's covered by

10   insurance and you're limiting, they'll give you a

11   stipulation that says the stay is lifted and you'll only

12   recover for insurance.  But if neither of those things are

13   agreed, then we'll have the hearing on the 14th.

14          MR. NG:  Well, at least pertaining here.

15          THE COURT:  So you should file -- I don't know if

16   you filed it yet, but you should file it on the docket.

17          MR. NG:  Yes.  I will do so upstairs.

18          THE COURT:  Okay.  All right, very well.

19          MR. NG:  Appreciate it, Your Honor.

20          THE COURT:  Thank you.

21          MS. PESHKO:  Thank you, Your Honor.  The next two

22   items on the agenda are the motion and objection filed by

23   Ms. Smith.  The motion is for relief from the stay with

24   respect to a prepetition action.  With respect to the same

25   prepetition action, Ms. Smith filed an objection to the

Page 53

1    Debtors' motion to extend the automatic stay to certain non-

2    debtor parties.

3              THE COURT:  All right.

4              MS. PESHKO:  I just wanted to note for the Court

5    that the Debtors objected to the motion filed by Ms. Smith.

6    And the Debtors seek in their reply to adjourn the

7    objection, the motion with respect to the objection, to

8    extend the automatic stay until further notice, Your Honor,

9    indefinitely.  And I will cede the floor.

10             THE COURT:  Why do -- I mean, it's been briefed.

11   Why do want to adjourn it?

12             MS. PESHKO:  Sure, Your Honor.  So there's nothing

13   happening in the prepetition action until July, which is

14   when the pretrial conference is going to be happening; all

15   discovery has been completed.  The actual trial is currently

16   scheduled until September; however, that adjournment

17   happened pending the Bankrtupcy Court, this Court's

18   adjudication of the motion to lift the stay with respect to

19   the Debtors.

20             THE COURT:  How do we know that?  Is there some

21   order from the State Court saying that all matters are

22   stayed until the Court rules on the lift stay motion?

23             MS. PESHKO:  This happened over a conference call,

24   Your Honor, so I'm not sure.

25             THE COURT:  Okay.

1           MS. PESHKO:  But we can get it from them.

2           THE COURT:  All right.  Is anyone here for Ms.

3    Smith?

4           MS. POLLICK:  Yes, Your Honor.

5           THE COURT:  Okay.  Oh, I have one other question

6    for you, either of you can answer this.  The order granting

7    the motion to extend the automatic stay had a list of

8    actions and third parties who would be protected by that

9    order.  Was this particular action on that list, or was it -

10   - or is this one that the Debtors sought to add to the list?

11          MS. PESHKO:  This one was on the motion

12   originally, Your Honor, but we removed it when we adjourned

13   this objection.

14          THE COURT:  Okay.  But is it in the order?

15          MS. PESHKO:  It is not in the order, Your Honor.

16          THE COURT:  Okay.  All right.  So in essence, it's

17   subject to that notice period, that the order contemplates,

18   although it's not teed up, I guess, so that I could decide

19   it today.

20          MS. PESHKO:  Your Honor, we adjourned the motion

21   with respect to the objection of Ms. Smith --

22          THE COURT:  Okay.

23          MS. PESHKO:  -- until today.

24          THE COURT:  Right, until today.

25          MS. PESHKO:  That's right.

1          THE COURT:  All right.  Okay, very well.

2          MS. POLLICK:  Thank you, Your Honor.  My name is

3    Cynthia Pollick, and I represent Karen Smith, who's a

4    creditor in this matter.  One of the interesting things that

5    we found out, based on the filings of the Debtor, is that

6    actually all three parties that are named in the state

7    action -- Sears Logistics, Inc., Tim McCann and Scott Walsh

8    -- all three are not a debtor.  It is -- they've not been

9    named as a debtor in the action.

10         THE COURT:  Right.

11         MS. POLLICK:  So, therefore, as to --

12         THE COURT:  Well, what -- you mean in this case?

13         MS. POLLICK:  Yes.

14         THE COURT:  Yes.

15         MS. POLLICK:  And so actually, I didn't even have

16   to file a motion to lift, but the attorneys in the state

17   action did.  They suggest that --

18         THE COURT:  Well, your motion to lift was as to,

19   as far as the Debtor.  The Debtor is a defendant, too.

20         MS. POLLICK:  Here.  But I hadn't -- that's based

21   on the fact that the attorneys for -- in the state action

22   filed a suggestion of bankruptcy in the state action.  So I

23   believed, but then based on the filings, especially the

24   seeking of the automatic stay to extend to non-debtors --

25         THE COURT:  Right.

1         MS. POLLICK:  -- it lists the three parties that

2   are named in my state action, which confirms that none of

3   those three parties are actually a debtor in this

4   proceeding.

5         THE COURT:  I'm sorry.  Is Sears Logistics

6   Services, Inc. the debtor in front of me?

7         MS. PESHKO:  Yes, Your Honor.  It is the former

8   name of Innovel Solutions, Inc.

9         THE COURT:  All right.  So Sears Logistics

10  Services is a debtor in front of me.

11        MS. POLLICK:  Well --

12        THE COURT:  So you needed to make the motion for

13  relief from the stay.

14        MS. POLLICK:  In regards to one party.

15        THE COURT:  Right.

16        MS. POLLICK:  One party, which would have been if

17  it was considered.  It was Sears Logistic I sued; I did not

18  sue until the --

19        THE COURT:  But if it's the f/k/a, it's the same

20  entity.

21        MS. POLLICK:  Okay, Your Honor.  I'm just making

22  that argument.  Obviously, I'm not fully aware of all the

23  little bankrtupcy intricacies because --

24        THE COURT:  It's not a bankruptcy intricacy.  It's

25  a corporate -- it's another -- if Sears Logistics Services,

Page 57

1   Inc. is today a debtor in a different -- as a successor to

2   Sears Logistics, Inc.  Put it differently, if you were on

3   against Sears Logistics, Inc. and there's nothing there

4   because it's all now -- what's the name? --

5           MS. PESHKO:  Innovel.

6           THE COURT:  -- Innovel, then I don't know what

7   good it would do you.  So I think it's Innovel that you're

8   really suing today.  You have to fix the caption, but it's

9   the same entity.

10          MS. POLLICK:  Okay, Your Honor.  What really, I

11  think that the Court could do for us today, is to make sure

12  that the automatic stay does not go to the two individuals

13  that are low-level employees.

14          And I have case law that it's well established,

15  stays pursuant to Section 362(a) are limited to the debtor

16  and do not encompass non-bankrtupcy co-defendants.  And in

17  this case, I have two low-level managers; there is no

18  indemnity agreement, no nothing.  They, again, are low

19  level, have no protection.  And I have filed supplemental

20  case law and have shown the Court that those two

21  individuals, I should be able to proceed; there should be no

22  extension.

23          Contrary to your order on the other cases that you

24  already entered an order saying it's covered, they were

25  companies; they weren't individuals that have low level and

Page 58

```
 1    are not -- there's no indemnity agreement or anything like

 2    that.

 3            So we request that the Court entertain our

 4    adjournment; they certainly had time to address.  They

 5    addressed 300 cases last time they were here before you, so

 6    certainly, they have had time to address this.  And we seek

 7    the Court's permission to not have the stay cover the two

 8    individuals.

 9            THE COURT:  So you're opposing their request for

10    the adjournment.

11            MS. POLLICK:  Absolutely.

12            THE COURT:  Okay.  Let me -- the Complaint in the

13    Luzerne County action is attached as Exhibit A to your

14    objection to the extension.  Do you have that there?  I note

15    in the Complaint that it states in Paragraph 5, both

16    defendant McCann and defendant Walsh, who -- by the way,

17    those are the two people that you want to proceed against,

18    right? --

19            MS. POLLICK:  Correct.

20            THE COURT:  -- were employed by Sears Logistics

21    Services, Inc.  And then it says, and at all time acted

22    within the scope of their employment and as agents for Sears

23    Logistics Services, Inc., right?

24            And then in Paragraph 11, it says that again,

25    McCann and Walsh were acting as defendant Sears Logistics
```

1    agents when they made the damning false statement that

2    plaintiff was guilty of fraud, stealing and theft, and

3    defendant Sears Logistics is vicariously liable or acting,

4    responding at (indiscernible) for their defaming conduct.

5    Right?

6              MS. POLLICK:  And one thing, I had filed a

7    supplemental repose because I -- they actually assert in

8    their defenses that the individual employees were acting

9    outside of their scope.  I filed that, and it's East --

10             THE COURT:  I'm sorry.  Who is this?

11             MS. POLLICK:  The defendants in my --

12             THE COURT:  McCann and Walsh say they were acting

13   outside of the scope of their employment?

14             MS. POLLICK:  Yes.  All three are represented by

15   the same --

16             THE COURT:  I find that to be hard to believe.

17             MS. POLLICK:  I have filed it, and I'm surprised

18   that the Debtor didn't --

19             THE COURT:  Do you have a copy of it?

20             MS. POLLICK:  Yes, absolutely.

21             THE COURT:  Okay.

22             MS. POLLICK:  May I approach?

23             THE COURT:  Yeah, that's fine.  I don't see where

24   it says that.  I'm sorry.

25             MS. POLLICK:  It's actually --

Page 60

```
 1              THE COURT:  Which defense is it?

 2              MS. POLLICK:  I believe it's 8.

 3              THE COURT:  Oh, I see it.  Well, that's

 4    interesting.  Have you seen this?

 5              MS. POLLICK:  Yes, I filed it on --

 6              THE COURT:  I don't see how counsel could have

 7    done that, frankly.

 8              MS. PESHKO:  Your Honor, I would like --

 9              THE COURT:  I don't know why it didn't -- well,

10    she didn't have a credible conflict of interesting in saying

11    that, in other words.

12              MS. PESHKO:  First, I want to point out that --

13              THE COURT:  It's not you guys.  I understand that.

14              MS. PESHKO:  Sure, sure.  I just want to point out

15    that line of pursuit individuals.  It doesn't specifically

16    name these parties as having been the employees outside the

17    scope of the claim, Your Honor.

18              THE COURT:  Okay.

19              MS. PESHKO:  In addition, Your Honor, we're here -

20    - we have a joint defense agreement in place.  And so --

21              THE COURT:  No, that's a separate.

22              MS. PESHKO:  -- at the same time --

23              THE COURT:  Look, I -- you have -- ma'am, you have

24    cited me the law, which is the general law on this issue,

25    which is that the automatic stay does not apply to third
```

Page 61

1    parties; however, there are three very clear exceptions to

2    that.  And the clearest, because it really doesn't involve a

3    lot of nuance, is, quote, "Where there is such identity

4    between the debtor and the third-party defendant that the

5    debtor may be said to be the real party defendant, and that

6    a judgment against the third-party defendant will, in

7    effect, be a judgment or finding against the debtor.

8            See in other cases.  Well, that's a quote from In

9    Re. A.h. Robins Company from the Fourth Circuit.  But it's

10   also noted by then-Judge Sotomayor in Queenie Ltd v. Nygard

11   International, 321 F.3d 282, 288.  And by me in In Re.

12   Congregation Birchos Yosef, 535 B.R. 629, 633 (B.R. SDNY

13   2015), as well as In Re. Gucci American, Inc., 328 F.Supp.

14   2d at 441.

15           And the distinction is really discussed very

16   cogently by the District Court in DeSouza v. Plusfunds

17   Group, Inc., 2006 U.S. District Lexus, 53392 (SDNY 2006).

18   There, the stay was sought to be extended to individual

19   defendants who were former executives, or maybe even current

20   executives, of the debtor.  The contention was they're

21   really being sued because of their role as executives of the

22   debtor.  The District Court said that's a legitimate reason

23   to extend the stay.

24           But here, the Complaint was for intentional

25   personal misconduct in their own capacity and was not

Page 62

1    subject to indemnification under Delaware corporate law

2    because there's an exemption for intentional fraud.

3           There are a lot of other cases that deal with this

4    exception, beyond the material impact that's covered by the

5    Queenie case, including In. Re. North Star Contracting

6    Corp., 125 B.R. 368 (SDNY 1991), and In Re. Lomas Financial,

7    117 B.R. 64 (SDNY 1990), and bench ruling by me in the

8    Delphi case, Case No. 05-4481 (RDD May 22, 2007, Docket

9    7995).

10          So just based on the Complaint, which alleges that

11   they're acting as Sears agent, it falls right within the

12   exception.  Now, in addition to that, you've now shown me

13   the answer.  But your own Complaint basically says they're

14   acting as Sears -- put it differently, your Complaint

15   doesn't say that after Ms. Smith was accused of fraud,

16   stealing and theft the day in question when she was escorted

17   from the office.  Was she a former employee?

18          MS. POLLICK:  She's a former employee of over 20

19   years.

20          THE COURT:  Okay.  All right.  So, I mean, and so

21   she's just escorted from the office for that reason for

22   being -- and that was why she was fired.  The Complaint

23   doesn't go on to say that thereafter, other than a report to

24   the police department, these two people, you know, published

25   the alleged defendant or statements anywhere.  It just says

Page 63

1    they're acting in Sears' behalf as its agent, so it falls

2    right into the exception.

3            So you have put in -- you have shown me the

4    answer, which might constitute some sort of admission,

5    although it's a little ambiguous.  And, frankly, I don't see

6    how, again, counsel for all three of them could have made

7    that statement.

8            But in light of that and given the fact that we're

9    not, unless you can tell me otherwise, anywhere close to any

10   activity in the case for a few months.  It sounds like we

11   should adjourn this to get to the bottom of the answer.

12           MS. POLLICK:  Well, Your Honor, first of all, the

13   only reason -- we have pretrial stuff actively to do; that's

14   the only reason why it was extended because of the fact the

15   court has the pretrial --

16           THE COURT:  Right.

17           MS. POLLICK:  -- you know, whatnot.  But the

18   evidence in this case actually shows that they went, the

19   human resource manager actually admitted that they were not

20   allowed to go to the police station and make --

21           THE COURT:  Well, I don't have any of that, so you

22   could supplement it.  I'm just going by your Complaint, and

23   the Complaint is suing them as agents.  So it would seem to

24   me that any judgment against these two individuals would be

25   a judgment against Sears, I mean, under -- because Sears

Page 64

1    could be collaterally estopped.  So just, it falls right

2    into the exception to the general rule.

3            THE COURT:  And I would just argue that there's a

4    Southern District New Jersey -- I mean, New York case, In

5    Re. Wolf, that says in limited instances, courts have

6    extended the stay prosecution of civil actions against

7    officers and employees.

8            THE COURT:  Oh, look, just because they're not an

9    officer -- I mean, frankly, I'm more sympathetic to them

10   because they're not an officer.  That's, you know, the whole

11   point is that they're acting on behalf of Sears, at least

12   under the Complaint.

13           MS. POLLICK:  And I --

14           THE COURT:  They're being sued because they were

15   acting as Sears' people, not because they, you know, did

16   something different.  And I would like you all to discuss

17   the answer, and I'd like you all to discuss how conceivable

18   it could be to be severed.  I mean, I don't know it could be

19   severed because it sounds to me like a lot of the activity

20   here, maybe all of it, was, you know, on the day in question

21   or go into the police department and that was it.

22           So, I mean, I would like to know how the trial

23   would work without implicating Sears as part of collateral

24   estoppel.

25           MS. POLLICK:  If we could sever it because I've

Page 65

1    named them individually.

2            THE COURT:  I'd like you to show me the rules for

3    Pennsylvania on collateral estoppel.  I don't think that

4    answers my question.  Collateral estoppel applies to

5    privies, people in privity generally.  I mean, in New York,

6    it does; I'm assuming it does generally.  So I'm going to

7    adjourn this so you all can talk about it and further brief

8    it if you want to.

9            MS. POLLICK:  Okay.  Thank you, Your Honor.

10           THE COURT:  Okay.

11           MS. PESHKO:  Your Honor, with respect to the

12   motion to lift the stay as to the debtors.

13           THE COURT:  Well, that's denied.  I mean, it's

14   just as to insurance.

15           MS. PESHKO:  Right.

16           THE COURT:  Again, the timing is such that there's

17   no emergency here.  This is not a personal injury case; it's

18   really a prepetition claim.  There's really no reason to

19   lift the stay as to Sears.

20           MS. PESHKO:  We will submit an order to the Court,

21   Your Honor.  Thank you.

22           THE COURT:  Okay.

23           MS. PESHKO:  That is the last item on the agenda,

24   Your Honor.

25           THE COURT:  Okay.  I also note that motion, like

Page 66

1    Mr. Ng's motion, assume that there might be insurance.

2    Unlike Mr. Ng, there's no response saying well, there still

3    might be insurance notwithstanding what the Debtors say.

4    So, again, there's no real basis under Sonnax to lift the

5    stay here.

6              MS. PESHKO:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              (Whereupon these proceedings were concluded at

9    11:31 AM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **I N D E X**

2

3                        RULINGS

4                                              Page        Line

5

6     Debtors' motion to amend the terms of

7     Lazard's retention Granted                35          11

8

9     Greenhorn Ventures LLC Motion Denied      47          16

10

11    Motion to Lift the Stay Denied            65          13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 68

1               C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2019.01.21 14:36:55 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 21, 2019