Hearing Date:  February 14, 2019 at 10:00 a.m. (Eastern Time)

HERRICK, FEINSTEIN, LLP
Two Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500
Sean E. O'Donnell
Stephen B. Selbst
Steven B. Smith

*Proposed Special Conflicts Counsel to the Official Committee of
Unsecured Creditors of Sears Holdings Corporation, et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | Case No. 18-23538 (RDD) |
| **Debtors.**[1] | (Jointly Administered) |

**OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS IN SUPPORT OF ITS MOTION FOR THE ENTRY OF AN
ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 1103
AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004 AND 9016
AUTHORIZING THE EXAMINATION OF THE CDS PARTICIPANTS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc.(4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sears Holdings Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby respectfully submits this Omnibus Reply in further support of the Creditors' Committee's Rule 2004 Motion,[2] and in reply to (i) the Response of Cyrus Capital Partners, L.P. ("Cyrus") [Dkt. 2470] (the "Cyrus Response"), and (ii) the Limited Objection of OCO Capital Partners L.P. ("OCO"), [Dkt. 2471] (the "OCO Limited Objection"), joined by Och-Ziff Capital Structure Arbitrage Master Fund, Ltd. ("Och-Ziff"), [Dkt. 2474] (the "Och-Ziff Joinder," and collectively with the Cyrus Response and the OCO Limited Objection, the "Responses"). There have been no other responses or objections to the 2004 Motion.[3]

## ARGUMENT

1. No party disputes the broad discovery generally afforded by Bankruptcy Rule 2004. "Cyrus does not oppose the Rule 2004 Motion."[4] And OCO's Limited Objection states the uncontroversial proposition that "[t]he scope of the Rule 2004 examination 'is not limitless; the examination should not be so broad as to be more disruptive and costly to the [party] than beneficial to the creditor." *OCO Limited Objection* at ¶ 27. We agree. The discovery sought by the Creditors' Committee, concerning the sale of more than $2 billion of MTNs, is limited to only four parties, covers only a 60-day period, and is narrowly tailored to examine how it is that more

---

[2] Unless otherwise defined herein, capitalized terms shall have the same meaning as in the *Ex-Parte Motion by the Official Committee of Unsecured Creditors for the Entry of an Order Pursuant to Bankruptcy Code Sections 105 and 1103 and Bankruptcy Rules 2004 and 9016 Authorizing the Examination of the CDS Participants* [Dkt. No. 1557] (the "Rule 2004 Motion").

[3] Notably, Barclays did not file any objection or response to the 2004 Motion and is thereby deemed to have consented to the discovery requested by the Creditors' Committee.

[4] *See*, *Cyrus Response* at ¶ 1.

2

than $100 million of new value—trumpeted to the Court by OCO and Och-Ziff at the hearing held on December 20, 2018—vanished in the blink of an eye.

2. OCO's Limited Objection, which is longer than the 2004 Motion itself, essentially tells the Court and the estate to "move along, there is nothing to see here," based upon its unsupported rendition of the facts contained in its memorandum of law. OCO tells a somewhat story of "risks and hurdles" faced by it and other CDS Participants, causing them to "[u]ltimately . . . mitigate potential losses on their SRAC CDS by entering into offsetting CDS trades, which obviated any need to try to acquire the MTNs." *Id*. at ¶ 2. According to OCO, "the Creditors' Committee knows all it needs to know to conclude that the conduct of OCO and the other Buy-Side CDS Participants was neither improper or actionable." *Id*. Not so. First, glaringly absent from any of the Responses, including OCO's Limited Objection, is any sworn statement as to what actually happened. To date, there is virtually no evidence before the Court as to what transpired. There are only attorney testimonials made at the podium and in their memoranda of law, which do not constitute evidence.

3. Second, neither OCO or Och-Ziff filed any response by the December 31 deadline explaining why they did not intend to bid at the re-opened MTN auction, notwithstanding (i) their rebuke of the Debtors and the Creditors' Committee at the December 20 hearing for not maximizing the value of the MTNs at the initial auction, and (ii) their bids, made on the record in open court, for in excess of $160 million in additional value for the estates should the Court reopen the auction.

4. In other words, the Creditors' Committee does not "know all it needs to know" about the sale of billions of dollars of MTNs and how it is that the swell of interest professed to the Court by counsel for OCO, Och-Ziff and others suddenly disappeared. This is precisely why

3

the Creditors' Committee, in keeping with its fiduciary duties, preserved its right to seek an investigation of these matters.[5]

5.    Nor, as OCO contends, should the scope of discovery be limited to 11 days (from December 20, 2018 (when the CDS Participants promised more than $100 million of new value to the estate) and December 31, 2018 (when no new bids were made)). *See*, *OCO Limited Objection* at ¶¶ 2, 22. While it's not evidence, the OCO Limited Objection itself refers to relevant events that took place in early-to-mid-November. And the *Motion of Omega Advisors Inc. Pursuant To Sections 105 And 363 Of The Bankruptcy Code To Enforce The Court's November 19, 2018 Sale Order And Invalidate The Ultra Vires Sale And Lockup Of Medium-Term Intercompany Notes* dated December 6, 2018 [Dkt No. 1077] similarly speaks to happenings that occurred in November and early December, relating to the efforts of each of the CDS Participants to acquire the MTNs which are certainly relevant to the events leading up to whatever "de-risking transactions" transpired between Cyrus and the other CDS Participants, causing millions of dollars of estate value to disappear.

6.    Balancing the interests at bar, the scales heavily weigh in favor of the limited discovery sought by the Creditors' Committee. Again, there is no dispute that more than $100 million of value disappeared during an auction process—which was extended in response to the objections filed by OCO, Och-Ziff and other CDS Participants. The relevant time period and materials to be examined relate to what happened during that auction process and the brief period leading up to it.

---

[5] *See*, (i) *Order Authorizing Debtors To Sell Medium Term Notes*, dated November 19, 2018 [Dkt. No. 826] at ¶ 7; (ii) *Dec. 20 Hr'g Tr.* at 147:3-8, 10-13, (iii) *Reservation Of Rights Of The Official Committee Of Unsecured Creditors Regarding Approval Of Sale Of Medium Term Intercompany Notes To Cyrus Capital Partners, L.P.*, dated January 1, 2019 [Dkt. No. 1459]; and (iv) *Jan. 2 Hr'g Tr.* at 8:17-9:9.

7.     OCO's Limited Objection should be overruled, without prejudice to the scope of discovery. The scope of discovery can be revisited with the Court in the unlikely event that the parties are unable to resolve their differences. This is the approach being undertaken between Cyrus and the Creditors' Committee. We are optimistic that the same approach will work for OCO and Och-Ziff. (Prior to the February 14 hearing, the Creditors' Committee will arrange for a discovery meet and confer among the respective parties with the goal of obviating any need to further burden the Court with disputes concerning the scope of discovery in this matter.)

I.     **Bankruptcy Rule 2004 Authorizes Broad And Unfettered Discovery To Uncover Misconduct And Claims Which Could Benefit The Estates**

8.     As the court recognized in *In re Enron Corp.*, 281 B.R. 836 (Bankr. S.D.N.Y. 2002), the discovery permitted under Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") is broad and unfettered:

> As a general proposition, Rule 2004 examinations are appropriate for revealing the nature and extent of the bankruptcy estate, see *Bennett Funding*, 203 B.R. at 28, and for "discovering assets, examining transactions, and determining whether wrongdoing has occurred." *In re Strecker*, 251 B.R. 878, 882 (Bankr. D.Colo. 2000) (citing *In re Duratech Indus., Inc.*, 241 B.R. 283, 289 (E.D.N.Y. 1999)). In this regard, courts have recognized that Rule 2004 examinations are broad and unfettered and in the nature of fishing expeditions. E.g., *In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr.D.Mass.1983).

*Id*. at 840.

9.     The *Enron* court further explained that: "The scope of an examination permitted by Bankruptcy Rule 2004 may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, *or to any matter which may affect the administration of the bankruptcy estate*." *Id.* at 840 (emphasis added).

10.    The investigation by the Creditors' Committee into the MTN Transactions is in complete accord with the law. It not seeking to conduct a fishing expedition. Nor is it seeking

5

broad and unfettered discovery. Rather, the discovery sought is narrowly tailored to the express and specific purpose of determining whether (i) the CDS Participants engaged in misconduct in connection with the Court approved sale process of the MTNs, and (ii) whether such misconduct, if any, gives rise to any claims and causes of action which may inure to the benefit these estates.

11. Again, the discovery sought by the Creditors' Committee relates to a small group of distinct and identifiable parties—just four targets, to start—and only seeks discovery for a limited period of approximately 60 days; beginning from the period just prior to the Debtors filing of their Sale Motion.

II. **The Requested Discovery Is Proportionate And Narrowly Tailored**

12. The OCO Limited Objection complains about three things concerning the scope of discovery sought by the Creditors' Committee. First, OCO contends that the time period covered by the requests should begin on December 20, 2018, not November 1, 2018. Second, OCO argues that the discovery requests should be limited to documents and communications concerning the MTNs and SRAC CDS. Third, no depositions should be authorized at this stage. We address each item, in turn, below.

    A. Good Cause Exists To Seek Discovery Beginning On November 1, 2018

13. As set forth above, it is a general principle that the examining party under Rule 2004 is granted broad latitude to conduct an appropriate investigation. *In re Enron Corp.*, 281 B.R. at 840; *see also In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y. 2007); *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *In re Mavashev*, 559 B.R. 332 (Bankr. E.D.N.Y. 2016).

14. Here, the 60-day period requested by the Creditors' Committee is manifestly reasonable and warranted given the facts and circumstances of the case. First, the Creditors'

Committee is investigating whether the CDS Participants engaged in conduct which could give rise to a claim for collusion under Bankruptcy Code Section 363(n) and other related claims. *See*, *2004 Motion* at ¶ 25. Assuming, *arguendo*, that one or more of the CDS Participants engaged in such collusive behavior, there is no way for the Committee to know, without conducting Rule 2004 discovery, whether such behavior began on or after December 20 or at an earlier point of the CDS Participants' involvement in the MTN Transactions during the first week of November 2018, or at some other point in between.

15. What the Creditors' Committee does know, however, is that OCO, Och-Ziff and Cyrus were each involved in the MTN Transactions well before December 20.[6] OCO, itself, refers to relevant events that took place prior to December 20, including efforts by Cyrus, "in advance of the ISDA auction," "to acquire all (or a significant portion) of the available Deliverable Obligations," which could have "caused the ISDA auction to clear at a higher price [and] decreased the amount of the protection payment owed on SRAC CDS." *See*, *OCO Limited Objection* at ¶ 11. According to OCO, "counteracting Cyrus' attempt to limit available Deliverable Obligations was the sole motivation for OCO and other Buy-Side CDS Participants to acquire the MTNs." *Id*. Much, if not all, of this took place in November 2018 by OCO's own admission. *Id*. at ¶ 12. And, according to OCO's "straightforward explanation," they "[u]ltimately . . . elected to mitigate potential losses on their SRAC CDS by entering into offsetting CDS trades, which obviated any need to try and acquire the MTNs." *Id*. at ¶ 2.

16. In order to assess the propriety of the offsets and the actions taken therewith, it is necessary to fully understand the risks and events leading up to the offsetting trades, which OCO

---

[6] The Creditors' Committee does not know when Barclays Capital first became involved with the MTN Transactions, which all the more justifies the Creditors' Committee's request for discovery, especially in light of Barclays' bid, on behalf of a consortium of interested bidders, of in excess of $100 million for the MTNs made at the December 20 hearing.

7

admits took place in November and December 2018. According to OCO, it was involved in the MTN Transactions from the earliest possible opportunity, when, as it claims, it alerted the Debtors to the opportunity to monetize the MTNs in the first week of November.[7] Second, Cyrus initially objected to the Sale Motion on November 14, 2018 [*See*, Dkt. No. 722] but later was selected as the winning bidder at the Auction [*See*, Dkt. No. 1019]. Finally, Och-Ziff was involved in the initial MTN Auction held on November 20, 2018.[8] While much remains unknown today about these behind-the-scenes trading activities, we know for certain that they took place in both November and December.

17. While the events that took place between December 20 and December 31 are certainly relevant to the Creditors' Committee's investigation, that period does not even cover the entire auction, and it completely excludes the relevant events leading up to the auction. Yet the steps taken by the parties in connection with the auction are highly relevant to understanding the offsetting CDS trades and whether or not they were as "straightforward" as OCO now claims.

18. We recognize that discovery is not without expense, but the disconnect concerns only a matter of weeks. Whatever cost savings could perhaps be achieved by cutting the discovery to only an 11-day period (we are left to guess, because neither OCO or any of the CDS Participants provide any estimate of the expense increase caused by a more appropriate start date of November 1) is greatly outweighed by the need for the Creditors' Committee and the Court to understand what actually happened during the auction period, and the limited time period beforehand, which

---

[7] *See, OCO Limited Objection* at ¶¶ 12-15.

[8] *See*, *Joinder of Och-Ziff Capital Structure Arbitrage Master Fund, Ltd. To The Motion of Omega Advisors Inc. To Enforce The Court's November 19, 2019 Sale Order And Invalidate The Ultra Vires Sale And Lockup Of Medium-Term Intercompany Notes* dated December 12, 2018 [Dkt. 1177] at ¶ 4.

8

resulted in the complete disappearance of bids—despite the contrary and manifest representations made to the Court by OCO's counsel and others.

      B.    <u>The Scope Of The Discovery Requested Is Tailored And Appropriate</u>

19.    While the Creditors' Committee is not entirely sure what OCO and Och-Ziff mean when they argue that discovery sought by the Creditors' Committee should relate only to "the MTNs and SRAC CDS," we expect that the parties can reach agreement on the issue. Generally speaking, we agree with the scope of discovery, provided it covers all documents and communications relating to (i) the auction, the MTNs *or* SRAC CDS, (ii) the "de-risking and/or offsetting transactions referenced in the *Response of Cyrus Capital Partners, L.P. To Debtors' Notice Of Hearing For Approval Of Sale Of Medium Term Intercompany Notes To Cyrus Capital Partners, L.P.* dated December 31, 2018 [Dkt. No. 1455] at ¶ 28, and in the OCO Limited Objection at ¶ 2, and (iii) the Barclays Consortium offer.

      C.    <u>The Creditors' Committee Should Be Authorized to Conduct Depositions In Aid Of Its Investigation</u>

20.    OCO's and Och-Ziff's contention that depositions should not be permitted at this stage is contrary to the plain language of Rule 2004, and rejected by controlling caselaw. Rule 2004(c) provides in pertinent part that: "The attendance of an entity for examination…may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial." *Fed. R. Bankr. P. 2004(c)*. And, in a recent case, this Court recently denied a similar objection. *See In re Transmar Comm. Group,* 2018 WL 4006324 (Bankr. S.D.N.Y. August 17, 2018), first observing that "[i]t is well settled that the scope of a Rule 2004 examination can be very broad," and then holding that "courts routinely permit the examination of witnesses having knowledge of the debtor's acts, conduct liabilities, assets, etc[.]" *Id.* at 9. *See, also, In re Orion Healthcorp., Inc.*, 2019 WL 332703 (Bankr. E.D.N.Y. January 24, 2019) (in chapter 11 cases, depositions proper if

related to acts, conduct, property, liabilities or financial condition of debtor); *St.Clair v. Cadles of Grassy Meadows, LLC*, 550 B.R. 655 (Bankr. E.D.N.Y. 2016) (scope of deposition under Rule 2004 "is wider than that allowed under the Federal Rules of Civil Procedure'); *In re Ecam Publications, Inc.*, 131 B.R. 556 (Bankr. S.D.N.Y. 1991)(motion to quash deposition denied; court cited broad reach of permissible Rule 2004 examination).

21. Not surprisingly, OCO and Och-Ziff cite no caselaw supporting their position that permitting depositions is premature.

22. Further, the Creditors' Committee respectfully submits that deposition testimony, in addition to documentary testimony, is absolutely critical here. Rarely do documents, on their own, tell a complete story. Particularly, where, as here, the investigation surrounds complex matters concerning credit default swaps and other derivative trading. Testimony will be necessary to put the documents into context.

III. **The Creditors' Committee Fully Reserved Its Rights To Investigate The MTN Transactions**

23. Finally, contrary to what may be construed from OCO's Limited Objection, the Creditors' Committee fully preserved its rights to investigate potential misconduct relating to the sale by the Debtors of the MTNs. The Court similarly expressed surprise and concern when there were no competing bids at the January 2 hearing, *Jan. 2 Hr'g Tr.* at 12:9-21, and it has been made it clear at recent hearings concerning the Debtors' proposed sale of substantially all their assets, that the MTN claims are preserved.[9]

24. As shown in the 2004 Motion, the Creditors' Committee intends to commence a prompt, focused but thorough investigation to determine the facts and circumstances regarding the

---

[9] *See*, *ESL Sale Order*, dated February 8, 2019 [Dkt. No. 2507] at ¶ 8.

actions of the CDS Participants and their failure to submit competing bids despite their prior assurances to the contrary.

## CONCLUSION

WHEREFORE, the Creditors' Committee respectfully request that the Court (i) grant the relief requested in the 2004 Motion in its entirety; (ii) overrule each of the objections to the 2004 Motion, and (iii) grant such other and further relief as may be just and equitable.

Dated: New York, New York
February 11, 2019

                                        Respectfully submitted,

                                        HERRICK, FEINSTEIN LLP

                                        By: /s/
                                        Sean E. O'Donnell
                                        Stephen B. Selbst
                                        Steven Smith
                                        Two Park Avenue
                                        New York, New York 10016
                                        Telephone: (212) 592-1400
                                        Facsimile: (212) 592-1500
                                        E-mail: sodonnell@herrick.com
                                                 sselbst@herrick.com
                                                 ssmith@herrick.com

                                        *Proposed Special Conflicts Counsel to the Official Committee of Unsecured Creditors of Sears Holdings Corporation, et al.*

.