WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |

-------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## NOTICE OF FILING EXECUTED
## (I) EMPLOYEE LEASE AGREEMENT, (II) SERVICES AGREEMENT,
## AND (III) AMENDMENT NO. 1 TO THE ASSET PURCHASE AGREEMENT

**PLEASE TAKE NOTICE** that on February 7, 2019, the Debtors filed a substantially final drafts of (i) the "Employee Lease Agreement" as defined in the Asset Purchase Agreement (as defined below) (the "**Employee Lease Agreement**") (ECF No. 2453), (ii) the "Services Agreement" as defined in the Asset Purchase Agreement (the "**Services Agreement**") (ECF No. 2455), and (iii) the first amendment to the Asset Purchase Agreement (the "**APA Amendment**") (ECF No. 2456).

**PLEASE TAKE FURTHER NOTICE** that on February 8, 2019, the Court in the above-captioned chapter 11 cases entered the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, and Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "**Order**"), which attached as an exhibit a copy of the executed asset purchase agreement between the Debtors and the Buyer dated January 17, 2019 (as amended, the "**Asset Purchase Agreement**").[2]

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is the executed Employee Lease Agreement (the "**Executed Employee Lease Agreement**")

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit B** a redline of the Executed Employee Lease Agreement reflecting changes made to the Employee Lease Agreement.

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Asset Purchase Agreement.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit C</u>** is the executed Services Agreement (the "**Executed Services Agreement**").

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit D</u>** is a redline of the Executed Services Agreement reflecting changes made to the Services Agreement.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit E</u>** is the executed APA Amendment (the "**Executed APA Amendment**").

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit F</u>** is a redline of the Executed APA Amendment reflecting changes made to the APA Amendment.

Dated: February 14, 2019
      New York, New York

*/s/* Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

3

**<u>Exhibit A</u>**

**Executed Employee Lease Agreement**

WEIL:\96918199\1\73217.0004

*EXECUTION VERSION*

## EMPLOYEE LEASE AGREEMENT

This Employee Lease Agreement (this "Agreement") is entered into as of February 11, 2019 (the "Effective Date"), by and between Sears Holding Corporation, a Delaware corporation ("Seller"), and Transform Holdco LLC, a limited liability company organized under the laws of Delaware ("Buyer"). Seller and Buyer are each individually referred to herein as a "Party" and are collectively herein referred to as "Parties." Certain terms are defined below and all other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement, dated as of January 17, 2019 (as may be amended, restated, supplemented or modified from time to time, the "Asset Purchase Agreement"), by and among Seller, certain of its Subsidiaries and Buyer.

## RECITALS

WHEREAS, on October 15, 2018, Seller and certain Seller Affiliates commenced voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Seller is a debtor-in-possession under the Bankruptcy Code and manages its properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller owns and operates, through direct and indirect Subsidiaries, the Business;

WHEREAS, pursuant to the Asset Purchase Agreement, Seller agreed to sell to Buyer, and Buyer agreed to purchase from Seller, the Designation Rights and Acquired Assets and Buyer agreed to assume, and Seller agreed to transfer the Assumed Liabilities, as more specifically provided in the Asset Purchase Agreement, subject to the approval of the Bankruptcy Court;

WHEREAS, on February [8], 2019, the Bankruptcy Court issued the Sale Order authorizing Seller to consummate the transactions contemplated in the Asset Purchase Agreement;

WHEREAS, subject to Section 1.8 of this Agreement and pursuant to Section 9.7(a) of the Asset Purchase Agreement, Buyer desires to hire:

(A)     the Business Employees other than (i) the employees to be listed on Schedule A hereto, which Schedule shall be delivered to Seller at the Closing Date (the "Executive Business Employees"), (ii) the Business Employees engaged in the Home Services business (the "Repairs Employees"), (iii) the Business Employees whose ability to be employed by, and perform the essential functions of the job for which they were engaged with Seller for, Buyer or its Subsidiaries is subject to the approval of a Governmental Authority (the "Governmental Authority Employees"), and (iv) the Business Employees who are employed or engaged by the certain specified Foreign Subsidiaries set forth on Schedule B attached herein (for the purpose of this Agreement, including those employees situated in China

who are employed by a Foreign Enterprise Service Corporation ("FESCO") and seconded to Seller's China offices, and the term "employed" shall mean "engaged via FESCO secondment arrangement") (the "Foreign Employees"), effective as of the earlier of (x) May 4, 2019, and (y) such earlier date with respect to any such Business Employees as may be provided by Buyer, it being understood that such Business Employees may be hired individually or in groups as of a particular date within such window; and

(B)    the Repairs Employees and the Governmental Authority Employees, effective as of the earlier of (x) 90 days following the Closing Date and (y) such earlier date with respect to any such Repairs Employees or Governmental Authority Employees as may be provided by Buyer, it being understood that Repairs Employees and/or Governmental Authority Employees may be hired individually or in groups as of a particular date within such window; and

(C)    the Foreign Employees, effective as of the date that such Foreign Subsidiary is acquired by Buyer in accordance with Section 2.13 of the Asset Purchase Agreement (each such date, as applicable to such a Business Employee described in (A), (B) or (C), the "Hire Date");

WHEREAS, during the period between the Closing Date and ending at 11:59 p.m. on the day immediately prior to the Hire Date with respect to each Business Employee other than the Executive Business Employees, as applicable (the "Lease Expiration Date"), Buyer desires to lease from Seller and its Subsidiaries, and Seller and its Subsidiaries desire to lease to Buyer, the full time services of the Business Employees other than the Executive Business Employees (the "Leased Employees") on the terms and subject to the conditions hereinafter set forth (such period, the "Leasing Period");

WHEREAS, the Parties wish to enter into this Agreement setting out their rights and responsibilities with respect to such Leased Employees, who are to be leased from the Seller or one of its Subsidiaries to the Buyer or one of its Subsidiaries for the Leasing Period and who are then to be employed by the Buyer or one of its Subsidiaries in accordance with Section 9.7(a) of the Asset Purchase Agreement in connection with the sale of the Business; and

WHEREAS, the intent of this Agreement is for Buyer to make Seller whole for all claims against or any Liabilities of Seller and its Subsidiaries associated with the Leased Employees and any other Liabilities attributable to Leased Employees in connection with the Employee Services (as defined in Section 1.2 hereof), in all cases incurred or arising during or after the Leasing Period and whether discovered during the Leasing Period or thereafter, such that Seller is in the same economic position as if the Leased Employees had been hired by Buyer effective immediately following the Closing Date.

NOW, THEREFORE, in consideration of the foregoing and mutual covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

# ARTICLE I

# LEASED EMPLOYEES

1.1.    <u>Provision of Leased Employees</u>.  Subject to the terms and conditions of this Agreement, during the period of time beginning on the Closing Date and throughout the Leasing Period applicable to a Leased Employee, Seller or one of its Subsidiaries, as applicable, shall provide to Buyer the services of each Leased Employee, subject to Section 1.2 of this Agreement.  Seller shall remain the employer of the Leased Employees subject to the terms and conditions of this Agreement.  Seller may require the Leased Employees to comply with all lawful employment rules, policies and procedures, including all grants, authorizations, licenses, permits, variances, consents or certificates issued pursuant to any Governmental Authority, implemented and maintained by Seller that do not expressly conflict with the policies or instructions of the Buyer applicable to such Leased Employee.  Any Business Employee whose employment with Seller or one of its Subsidiaries terminates during the Leasing Period shall cease to be a Leased Employee as of such Leased Employee's termination date and Buyer shall have no obligation to hire such Business Employee.

1.2.    <u>Services of the Leased Employees</u>.  During the Leasing Period, Seller or one of its Subsidiaries shall make available to Buyer or its Subsidiaries the Leased Employees to devote their full time and energy to perform those duties, functions and services and at such locations, as Buyer may request of such Leased Employees, including performance of the "Services," as defined in that certain Services Agreement, dated as of the date hereof, entered into by the Parties hereto (the "<u>Services Agreement</u>" and such duties, functions and services, the "<u>Employee Services</u>").  Neither Seller nor any of its Subsidiaries shall relocate any Leased Employee during the Leasing Period except at the request of Buyer.  To the extent permitted by applicable laws, all Leased Employees, excluding any Represented Employees whose terms and conditions of employment shall be governed by any applicable collective bargaining agreements, shall, at all times during the Leasing Period, remain at-will employees of Seller or its Subsidiaries; <u>provided</u>, <u>however</u>, that Buyer shall have the right to reasonably request that Seller or one of its Subsidiaries, and Seller or its Subsidiary upon such request shall, terminate the employment of any Leased Employee for any good faith reason as reasonably determined by Buyer in consultation with Seller.  Subject to any applicable Laws or collective bargaining agreements, Buyer shall be responsible for the day to day supervision and management of the Leased Employees and the Seller shall direct each Leased Employee to comply with the Buyer's supervision and management.  Seller shall instruct the Leased Employees to provide the services as required under the Services Agreement.  Buyer may schedule the Leased Employees to work in accordance with the requirements of the Buyer, subject to any applicable Laws or collective bargaining agreements.  Seller shall ensure that, during the Leasing Period, the Leased Employees do not perform any services for, act on behalf of, nor represent Seller or its Subsidiaries in any circumstance, except as contemplated by the Services Agreement.  No action by Leased Employees shall waive or override this Section 1.2.

1.3.    <u>Compensation/Payroll</u>.  During the Leasing Period, Seller and its Subsidiaries shall be solely responsible for paying the Leased Employees' compensation through Seller's standard payroll process and in accordance with the existing pay practices of Seller on the regular payroll schedule throughout the Leasing Period.  During the Leasing Period, Seller or

one of its Subsidiaries shall pay the Leased Employees at the same base salary or hourly wage rate  (as applicable) that such Leased Employees were receiving as of the Closing Date, except as required by any applicable laws or collective bargaining agreement.  Seller or one of its Subsidiaries shall allow all Leased Employees' payroll withholding elections to remain the same during the Leasing Period as such elections were in effect as of the Closing Date, except to the extent a Leased Employee elects (in a manner permitted to employees and plan participants generally under the applicable benefit plans) to change any such election.

1.4.    Employee Benefits.  During the Leasing Period, Seller or one of its Subsidiaries shall ensure that each Leased Employee continues to be eligible to participate (and, if already participating, to continue to so participate) in all Employee Plans maintained by Seller or its Subsidiaries as amended from time to time in accordance with their terms and this Agreement, (the "Seller Plans"), in which such Leased Employee was eligible to participate as of the Closing Date.  Seller and its Subsidiaries may only amend, modify or terminate a Seller Plan, to the extent such amendment, modification or termination affects a Leased Employee, at the request or otherwise with the consent of the Buyer and only to the extent such amendment, modification or termination is applicable to all similarly-situated employees of Seller and its Subsidiaries.  Seller may not establish, adopt or enter into any Seller Plan with respect to any Leased Employee unless requested to do so by the Buyer.  Seller or its Subsidiaries shall be responsible for operating and administering all of the Seller Plans and all claims incurred pursuant to the terms and conditions of the applicable plans, including any requirement generally applicable to the submission of claims under such plans.

1.5.    Compliance with Law – Payroll and Employee Plan Matters.  Seller and one of its Subsidiaries shall be solely responsible for compliance with all operation, administration and legal obligations in respect of the Leased Employees relating to payroll and the Seller Plans.  Seller and its Subsidiaries shall respond to any questions and inquiries from all Governmental Authorities and any other federal, state, local and foreign agencies and other Persons regarding payroll and employment data and history relating to the Leased Employees and concerning the Leasing Period or any prior period of employment by Seller and its Subsidiaries.  In the event Buyer becomes aware of any compliance-related issues or any questions or inquiries from such Governmental Authorities, agencies or Persons regarding any Seller Plans in which the Leased Employees participate, Buyer shall promptly notify Seller of such matters and Seller or one of its Subsidiaries shall have the sole right and responsibility to respond thereto.  Buyer shall cooperate with Seller and its Subsidiaries (including by providing Seller and its Subsidiaries with all information, documents and data reasonably requested by Seller or any of its Subsidiaries) to enable Seller and its Subsidiaries to comply with their obligations under this Agreement (including their obligation to respond to any question or inquiry from federal, state, local and foreign agencies and other Persons regarding payroll and employment data and history relating to the Leased Employees and concerning the Leasing Period or any prior period of employment by Seller or one of its Subsidiaries).

1.6.    Compliance with Law – Other Matters.  To the extent that Leased Employees perform Employee Services on any premises owned or leased by Buyer or its Subsidiaries, Buyer and its Subsidiaries shall be responsible, at its sole cost and expense, for all obligations arising from or relating to the condition of such premises, including workplace safety and security, in compliance with all applicable federal, state and local health and safety laws,

regulations, rules, ordinances and directives.  In addition, Buyer and Seller shall each comply with all applicable foreign, federal, state, and local labor and employment Laws, including but not limited to, Title VII of the 1964 Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act, immigration laws and regulations, and state and/or local equivalent of the foregoing with respect to or in respect of Leased Employees.

1.7.    <u>Employee Records</u>.  During the Leasing Period, Buyer shall have the right to reasonably request access to employee records to the extent that such records relate to Leased Employees, and Seller shall not unreasonably deny any such request, subject to any applicable laws.

1.8.    <u>Transfer of Leased Employees</u>.  Upon any Lease Expiration Date, Seller and Buyer, and their respective Subsidiaries, shall take reasonable steps to effect an orderly transition of the Leased Employees whose employment is to be transferred on such date, and the employee records related thereto, to Buyer or its Subsidiaries.  Buyer shall hire Leased Employees in accordance with Section 9.7(a) of the Asset Purchase Agreement (or shall continue the employment of the Foreign Employees), and otherwise subject to the requirements of Article IX of the Asset Purchase Agreement, and this Agreement and such Leased Employees shall become employees of Buyer or its Subsidiaries as of the Hire Date.  Notwithstanding anything to the contrary in this Agreement, if, despite the reasonable best efforts of Buyer, the necessary permits, licenses, authorizations or other approvals as may be required by Law with respect to any Repairs Employee or Governmental Authority Employee in order for such Repairs Employee or Governmental Authority Employee to be employed by, and perform the essential functions of the job for which they were engaged with Seller for, Buyer or its Subsidiaries have not been received by Buyer or its Subsidiaries as of the 90th day following the Closing Date, Seller agrees that Buyer may delay the employment of such Repairs Employee or Governmental Authority Employee until the earlier of the date Buyer or its Subsidiaries receives such permit, license, authorization or other approvals or the first Business Day occurring on or after the 120th day following the Closing Date.

**ARTICLE II**

**REIMBURSEMENT BY BUYER FOR COSTS OF SERVICES; INDEMNIFICATION**

2.1.    <u>Reimbursement of Costs</u>.  Seller and Buyer acknowledge and agree that the intent of this Article II is for Buyer to make Seller whole for all claims against or any Liabilities of Seller and its Subsidiaries associated with the Leased Employees and any other Liabilities attributable to Leased Employees in connection with the Employee Services in all cases incurred or arising during the Leasing Period (whether discovered during the Leasing Period or thereafter) (the "<u>Employment Costs</u>").  In consideration for the Employee Services provided by the Leased Employees, Buyer shall, in accordance with the procedures in Section 2.2 hereof, pay to Seller an amount in cash sufficient to cover all Employment Costs. Without limiting the generality of the foregoing, Employee Costs shall include the following with respect to any Leased Employee during the applicable Leasing Period:

(i)    costs, expenses, premiums, payments, contributions, payroll taxes or claims payable to, payable on behalf of or in respect of the Leased Employees by Seller in respect of the Leasing Period and including costs, expenses, premiums, payments, contributions, payroll taxes or claims associated with Leased Employees;

(ii)    payroll costs such as salary, wages, overtime pay, incentive compensation, vacation and holiday pay, and bonuses, including amounts due under the Key Employee Retention Plan (the "KERP") to the extent attributable to the provision of services in the period commencing on the Closing Date and ending on such Leased Employees' Hire Date (the "Buyer KERP Portion");

(iii)    employment insurance employer contributions, workers' compensation, workplace safety and insurance premiums, and employer health tax and employer premiums;

(iv)    costs, expenses, shift and pay premiums;

(v)    payments, contributions to, under or in respect of any Seller Plan;

(vi)    costs of any perquisites provided to the Leased Employees;

(vii)    with respect to Leased Employees, including any terminated Leased Employees who elect COBRA continuation coverage which is effective during the Leasing Period, who are covered under any self-insured medical, dental or other employee welfare benefit plans of Seller or its Subsidiaries, the amount of actual medical, dental and other expenses of the Leased Employees and their dependents incurred during the Leasing Period under such plans; and

(viii)    severance (in such amount as determined in accordance with Section 9.7(e) of the Asset Purchase Agreement), termination pay, pay in lieu of notice and other costs (including legal costs) of terminating the employment of any Leased Employee during the Leasing Period and in accordance with this Agreement, including all taxes associated with any of the foregoing.

Notwithstanding the foregoing, Employment Costs shall not include current service costs or other contributions (direct or indirect) relating to any defined benefit pension plans, any amounts paid by the Seller and its Subsidiaries under the KERP other than the Buyer KERP Portion or the Key Employee Incentive Plan ("KEIP"), any retention bonus specified in an individual agreement, any bonus payments (including sales commission programs) to the extent they relate to periods of employment prior to the Closing Date and are not paid by Seller unless such bonus payments are otherwise approved in writing by the Buyer in advance of payment.  In addition, where any compensation or benefit plan, agreement, or arrangement under which compensation or benefits are paid or provided for in respect of services performed both prior to and following the Closing Date, Employment Costs shall include only the pro-rated portion of such compensation costs payable in respect of services performed following the Closing Date.

2.2.    Mechanics of Funding Employment Costs.

(a)    During the Leasing Period, each Leased Employee shall remain on the payroll of the Seller and shall continue to participate in the Seller Plans in which such Leased Employee participated as of the Closing Date.  Buyer shall pay all Employment Costs in respect of the Leased Employees that relate to the Leasing Period in accordance with this Section 2.2.

(b)    Buyer and Seller will cooperate in good faith to determine the amounts due in respect of Employment Costs as set forth in Schedule C. Buyer will pre-fund amounts as set forth on and in accordance with Schedule C to an account designated by Seller and dedicated to the satisfaction of Employment Costs (the "Dedicated Account"); provided, that notwithstanding anything to the contrary in Schedule C, Buyer shall only be required to remit amounts in respect of any Employment Costs to the extent there does not already exist sufficient cash in the Dedicated Account to satisfy Employment Costs that are due and payable (or becoming due and payable in accordance with the schedule set forth in Schedule C).  Prior to making payments in respect of the Employment Costs, Seller shall hold any amounts in the Dedicated Account as trustee, and shall not remove any amounts from the Dedicated Account other than to satisfy obligations with respect to the Employment Costs at such time as such Employment Costs become due and payable.

(c)    At the end of the Leasing Period, Seller and Buyer shall cooperate in good faith to create a report reconciling (i) the gross amount received by Seller pursuant to this Section 2.2 and (ii) the gross amount of Employment Costs reasonably and in good faith incurred by Seller (the "True-Up Report").  To the extent that the amount described in clause (i) of this sub-section exceeds the amount described in clause (ii) of this sub-section, Seller shall reimburse the Buyer for such amount.  To the extent that the amount described in clause (ii) of this sub-section exceeds the amount described in clause (i) of this sub-section, Buyer shall reimburse Seller for such amount.  Any payment made pursuant to this sub-section shall be made within seven (7) Business Days following the completion of the True-Up Report.

2.3.    Indemnification.  Subject to the limitations set forth in this Section 2.3, Buyer shall defend, indemnify and hold harmless Seller and its Subsidiaries and their respective successors and permitted assigns (collectively, the "Seller Indemnitees") from and against any and all Liabilities incurred or suffered by Seller Indemnitees of every kind and nature to the extent related to or arising out of Seller's and its Subsidiaries' performance of this Agreement except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries.  In addition, Buyer shall indemnify and hold harmless Seller Indemnitees from and against all Liabilities incurred or suffered by Seller Indemnitees of every kind and nature, including all Liabilities for bodily injury to or death of any person, damage to or destruction of any property, or any third-party claims to the extent arising from any act or omission on the part of the Buyer, its officers and directors, employees of Buyer or the Leased Employees during the Leasing Period, except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries, its officers and directors or any employee of Seller or its Subsidiaries, in each case who is not a Leased Employee.  Without limiting the generality of the foregoing, Buyer further agrees to indemnify and hold the Seller Indemnitees harmless from and against any and all Liabilities incurred or suffered by the Seller Indemnitees on account of any claim, demand, charge, suit, action, investigation or proceeding

made or brought against the Seller Indemnitees by any Person, including the Leased Employees, related to: (A) any misconduct of any Leased Employee who is performing services for Buyer during the Leasing Period, (B) any injuries to any Leased Employee arising out of the Employee Services and not otherwise covered by insurance, (C) any employment related Liabilities arising under applicable Laws governing workers compensation, discrimination, harassment, job loss, wrongful termination, wage and hour, mass layoffs, or any other laws, including any applicable laws relating to collective bargaining agreements, which govern the employment of the Leased Employees providing services to Buyer; (D) any Liabilities arising directly or indirectly out of the provision of benefits to the Leased Employees under this Agreement; and (E) any Liabilities arising directly or indirectly from any reclassification or re-characterization of the Leased Employees by any Government Authority, except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries, its officers and directors or any employee of Seller or its Subsidiaries, in each case who is not a Leased Employee.  The provisions of this Section 2.3 shall survive the expiration or other termination of this Agreement.

## ARTICLE III

## MISCELLANEOUS

3.1.    <u>Amendment; Waiver</u>.  This Agreement may only be amended or modified by a written instrument signed by each of the Parties.  Either Party may, in its sole discretion, (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto, or (iii) waive compliance with any of the agreements or conditions of the other Party contained herein.  Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument executed by the Party granting such extension or waiver.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

3.2.    <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other Party, and any purported assignment or delegation in contravention of this <u>Section 3.2</u> shall be null and void and of no force and effect.  Subject to the preceding sentences of this <u>Section 3.2</u>, this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the Parties and their respective successors and permitted assigns.

3.3.    <u>Notices</u>.  All demands, notices, communications and reports provided for in this Agreement shall be in writing and shall be either sent by electronic mail with confirmation to a Party at the address specified in the Asset Purchase Agreement, or at such address, to the attention of such other Person, and with such other copy as the recipient Party has specified by prior written notice to the sending party pursuant to the provisions of this Section 3.3.

3.4.    <u>Public Announcements</u>.  All public announcements regarding this Agreement are subject to Section 13.1 of the Asset Purchase Agreement as if such Section 13.1 is set forth herein mutatis mutandis.

3.5.    <u>Survival</u>.  Each term of this Agreement that would, by its nature, survive the termination or expiration of this Agreement shall so survive, including the obligation of either Party to pay all amounts accrued hereunder and including the provisions of <u>Article II</u> (Reimbursement by Buyer for Costs of Services; Indemnification); <u>Section 3.3</u> (Notices); <u>Section 3.4</u> (Public Announcements); <u>Section 3.5</u> (Survival); <u>Section 3.6</u> (No Third Party Beneficiaries); <u>Section 3.7</u> (Illegality); <u>Section 3.8</u> (Entire Agreement; Interpretation); <u>Section 3.9</u> (Specific Performance); <u>Section 3.10</u> (Conflict of Terms); <u>Section 3.11</u> (No Agency); <u>Section 3.12</u> (Construction and Interpretation); and <u>Section 3.15</u> (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial).

3.6.    <u>No Third Party Beneficiaries</u>.  Except for the indemnification rights under this Agreement of any Seller Indemnitee or Buyer Indemnitee in their respective capacities as such, or unless otherwise specified herein, no provision of this Agreement is intended to confer upon any Person (other than the Parties) any rights or remedies hereunder.

3.7.    <u>Illegality</u>.  In case any provision of this Agreement, shall be invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect, unless the severance of such provision would be in opposition to the Parties' intent with respect to such provision or the economic or legal substance of the transactions contemplated hereby would be affected in any manner materially adverse to any Party.  Upon determination by a court of competent jurisdiction that any provision of this Agreement is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner to the end that the transactions contemplated hereby are consummated and the obligations and agreements of the Parties hereunder are fulfilled to the greatest extent possible.

3.8.    <u>Entire Agreement; Interpretation</u>.  Except as otherwise contemplated herein, this Agreement, together with the Asset Purchase Agreement and the Transaction Documents, constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties, with respect to the subject matter hereof (other than the Confidentiality Agreement).  The Parties acknowledge that all Parties participated in the drafting of this Agreement, the Asset Purchase Agreement and the Transaction Documents with the involvement of their respective counsel and agree that any rule of law or any legal decision that may or would require interpretation of any alleged ambiguities in this Agreement, the Asset Purchase Agreement or the Transaction Documents against the Party that drafted it has no application and is expressly waived.

3.9.    <u>Specific Performance</u>.  The Parties agree that time is of the essence, irreparable damage would occur in the event that any of the terms or provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or other legal remedies would not be an adequate remedy for any such damages.  It is accordingly agreed that, without posting a bond or other undertaking, prior to the termination of this Agreement, each of the Parties shall be entitled to injunctive or

other equitable relief to prevent or cure breaches of this Agreement and, in addition to any other remedy to which they are entitled at Law or in equity, to enforce specifically the terms and provisions hereof, such remedy being in addition to any other remedy to which any Party may be entitled at Law or in equity.  In the event that any Action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at Law.

3.10.   <u>Conflict of Terms</u>.  This Agreement and the Services Agreement are intended to operate in tandem and the parties agree to interpret their respective provisions in such a manner as to avoid, to the maximum extent possible, a conflict.  In the event of an express conflict between a term of this Agreement and the Services Agreement, the term of the Services Agreement shall govern and control, it being understood, however, that the terms of this Agreement are to be superseded only to the minimum extent necessary to resolve such express conflict.  Notwithstanding the foregoing, this Section 3.10 shall not apply to Section 2.3 of this Agreement, which Section 2.3 shall govern in all respects in the event of an inconsistency between the provisions of this Agreement and the Services Agreement.

3.11.   <u>No Agency</u>.  Nothing in this Agreement creates (or shall be claimed or intended to create) a relationship of agency, partnership, joint venturers or employer/employee between Seller and Buyer and it is the intent and desire of the Parties that the relationship be and be construed as that of independent contracting parties and not as agents, partners, joint venturers or a relationship of employer/employee.

3.12.   <u>Construction and Interpretation</u>.  For purposes of this Agreement, (a) the words "hereof," "herein," "hereby," "hereto" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) whenever the words "include," "includes" or "including" (or any variation thereof) are used in this Agreement, they shall be deemed to be followed by the words "without limitation"; (c) references herein to "days," unless indicated otherwise, are to consecutive calendar days; (d) references to specific Articles and Sections are to the Articles and Sections of this Agreement, unless specifically stated otherwise; (e) the terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa, and words denoting any gender shall include all genders; (f) all references to "dollars" or "$" shall mean "U.S. dollars" unless specifically stated otherwise; (g) all references to "written" or "in writing" shall include in electronic form; (h) all references herein to a particular "Annex" shall mean such annex as it is attached hereto; (i) references to "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not mean "if," references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or" unless otherwise specified; and (j) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

3.13.   <u>Counterparts</u>.  This Agreement and any amendments hereto may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall be considered one and the same instrument.

3.14.   <u>No Guarantee of Employment</u>.  This Agreement shall not change the at-will employment status of any employee of Seller or one of its Subsidiaries, excluding any Represented Employees whose terms and conditions of employment shall be governed by any applicable collective bargaining agreements.

3.15.   <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed on the date first set forth above.

**TRANSFORM HOLDCO LLC**

By: _____
Name:  Edward S. Lampert
Title: Chief Executive Officer

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed on the date first set forth above.

**Sears Holdings Corporation**

By: _____
Name: Robert A. Riecker
Title: Chief Financial Officer

[Signature Page to Employee Leasing Agreement]

## SCHEDULE A
## EXECUTIVE BUSINESS EMPLOYEES

None.

**SCHEDULE B**
**SPECIFIED FOREIGN SUBSIDIARIES**

1.      Sears Holdings Global Sourcing Limited (Jurisdiction: Hong Kong)

2.      International Sourcing & Logistics Limited (Jurisdiction: Hong Kong)

3.      Quality Assurance Laboratory Limited (Jurisdiction: Hong Kong)

4.      Sears Sourcing India Private Limited (Jurisdiction: India)

5.      Sears IT & Management Services India Private Limited (Jurisdiction: India)

6.      Sears Global Technologies India Private Limited (Jurisdiction: India)

**SCHEDULE C**
**PRE-FUNDING SCHEDULE**

| Schedule C Lease Agreement | | | |
|---|---|---|---|
| **Funding Cadence** | **Category** | **Pre-Funding Timeline** | **Payment Due Dates** |
| | | | |
| Weekly | 1. BCBS<br>2. Payroll (except for non-monthly and non-semi-monthly salaried employees)<br>3. Optum Rx<br>4. Alight Premium Reporting<br>5. Payroll Tax<br>6. Other "Misc" Non-Payroll | 1. Weekly forecast submitted to NewCo by Monday 12 pm EST for payment due the following week<br>2. Review and approval by Monday 5 pm EST<br>3. Weekly pre-funding by 1 pm EST on Tuesday for payments due the following week<br>4. Reconciliation process to occur on Tuesday afternoon | Daily payments will be remitted (Mon-Fri) of the following week when items are due |
| Semi-Monthly | 1. Payroll (monthly and semi-monthly salaried employees) | 1. Weekly forecast submitted 5 business days prior to funding<br>2. Review and approve 5 business day prior to funding<br>3. NewCo Pre-funding 2 business days prior to when funds are due to ADP (4 business days prior to the 15th and last day of the month)<br>4. Reconciliation (if needed) 1 business day after payments remitted | 15th and last day of the month |

**<u>Exhibit B</u>**

**Redline of Executed Employee Lease Agreement**

EXECUTION VERSION

## EMPLOYEE LEASE AGREEMENT

This Employee Lease Agreement (this "Agreement") is entered into as of [●]February 11, 2019 (the "Effective Date"), by and between Sears Holding Corporation, a Delaware corporation ("Seller"), and Transform Holdco LLC, a limited liability company organized under the laws of Delaware ("Buyer"). Seller and Buyer are each individually referred to herein as a "Party" and are collectively herein referred to as "Parties." Certain terms are defined below and all other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement, dated as of January 17, 2019 (as may be amended, restated, supplemented or modified from time to time, the "Asset Purchase Agreement"), by and among Seller, certain of its Subsidiaries and Buyer.

## RECITALS

WHEREAS, on October 15, 2018, Seller and certain Seller Affiliates commenced voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Seller is a debtor-in-possession under the Bankruptcy Code and manages its properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller owns and operates, through direct and indirect Subsidiaries, the Business;

WHEREAS, pursuant to the Asset Purchase Agreement, Seller agreed to sell to Buyer, and Buyer agreed to purchase from Seller, the Designation Rights and Acquired Assets and Buyer agreed to assume, and Seller agreed to transfer the Assumed Liabilities, as more specifically provided in the Asset Purchase Agreement, subject to the approval of the Bankruptcy Court;

WHEREAS, on February [the date hereof8], 2019, the Bankruptcy Court issued the Sale Order authorizing Seller to consummate the transactions contemplated in the Asset Purchase Agreement;

WHEREAS, subject to Section 1.8 of this Agreement and pursuant to Section 9.7(a) of the Asset Purchase Agreement, Buyer desires to hire:

(A)    the Business Employees other than (i) the employees to be listed on Schedule A hereto, which Schedule shall be delivered to Seller at the Closing Date (the "Executive Business Employees"), (ii) the Business Employees engaged in the Home Services business (the "Repairs Employees"), (iii) the Business Employees whose ability to be employed by, and perform the essential functions of the job for which they were engaged with Seller for, Buyer or its Subsidiaries is subject to the approval of a Governmental Authority (the "Governmental Authority Employees"), and (iv) the Business Employees who are employed or engaged by the certain specified Foreign Subsidiaries set forth on Schedule B attached herein

(for the purpose of this Agreement, including those employees situated in China

who are employed by a Foreign Enterprise Service Corporation ("FESCO") and seconded to Seller's China offices, and the term "employed" shall mean "engaged via FESCO secondment arrangement") (the "Foreign Employees"), effective as of the earlier of (x) May 4, 2019, and (y) such earlier date with respect to any such Business Employees as may be provided by Buyer, it being understood that such Business Employees may be hired individually or in groups as of a particular date within such window; and

(B)     the Repairs Employees and the Governmental Authority Employees, effective as of the earlier of (x) 90 days following the Closing Date and (y) such earlier date with respect to any such Repairs Employees or Governmental Authority Employees as may be provided by Buyer, it being understood that Repairs Employees and/or Governmental Authority Employees may be hired individually or in groups as of a particular date within such window; and

(C)     the Foreign Employees, effective as of the date that such Foreign Subsidiary is acquired by Buyer in accordance with Section 2.13 of the Asset Purchase Agreement (each such date, as applicable to such a Business Employee described in (A), (B) or (C), the "Hire Date");

WHEREAS, during the period between the Closing Date and ending at 11:59 p.m. on the day immediately prior to the Hire Date with respect to each Business Employee other than the Executive Business Employees, as applicable (the "Lease Expiration Date"), Buyer desires to lease from Seller and its Subsidiaries, and Seller and its Subsidiaries desire to lease to Buyer, the full time services of the Business Employees other than the Executive Business Employees (the "Leased Employees") on the terms and subject to the conditions hereinafter set forth (such period, the "Leasing Period");

WHEREAS, the Parties wish to enter into this Agreement setting out their rights and responsibilities with respect to such Leased Employees, who are to be leased from the Seller or one of its Subsidiaries to the Buyer or one of its Subsidiaries for the Leasing Period and who are then to be employed by the Buyer or one of its Subsidiaries in accordance with Section 9.7(a) of the Asset Purchase Agreement in connection with the sale of the Business; and

WHEREAS, the intent of this Agreement is for Buyer to make Seller whole for all claims against or any Liabilities of Seller and its Subsidiaries associated with the Leased Employees and any other Liabilities attributable to Leased Employees in connection with the Employee Services (as defined in Section 1.2 hereof), in all cases incurred or arising during or after the Leasing Period and whether discovered during the Leasing Period or thereafter, such that Seller is in the same economic position as if the Leased Employees had been hired by Buyer effective immediately following the Closing Date.

NOW, THEREFORE, in consideration of the foregoing and mutual covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

# ~~ARTICLE I~~

# ARTICLE I LEASED

# EMPLOYEES

1.1.    Provision of Leased Employees.  Subject to the terms and conditions of this Agreement, during the period of time beginning on the Closing Date and throughout the Leasing Period applicable to a Leased Employee, Seller or one of its Subsidiaries, as applicable, shall provide to Buyer the services of each Leased Employee, subject to Section 1.2 of this Agreement. Seller shall remain the employer of the Leased Employees subject to the terms and conditions of this Agreement. Seller may require the Leased Employees to comply with all lawful employment rules, policies and procedures, including all grants, authorizations, licenses, permits, variances, consents or certificates issued pursuant to any Governmental Authority, implemented and maintained by Seller that do not expressly conflict with the policies or instructions of the Buyer applicable to such Leased Employee. Any Business Employee whose employment with Seller or one of its Subsidiaries terminates during the Leasing Period shall cease to be a Leased Employee as of such Leased Employee's termination date and Buyer shall have no obligation to hire such Business Employee.

1.2.    Services of the Leased Employees. During the Leasing Period, Seller or one of its Subsidiaries shall make available to Buyer or its Subsidiaries the Leased Employees to devote their full time and energy to perform those duties, functions and services and at such locations, as Buyer may request of such Leased Employees, including performance of the "Services," as defined in that certain Services Agreement, dated as of the date hereof, entered into by the Parties hereto (the "Services Agreement" and such duties, functions and services, the "Employee Services"). Neither Seller nor any of its Subsidiaries shall relocate any Leased Employee during the Leasing Period except at the request of Buyer. To the extent permitted by applicable laws, all Leased Employees, excluding any Represented Employees whose terms and conditions of employment shall be governed by any applicable collective bargaining agreements, shall, at all times during the Leasing Period, remain at-will employees of Seller or its Subsidiaries; provided, however, that Buyer shall have the right to reasonably request that Seller or one of its Subsidiaries, and Seller or its Subsidiary upon such request shall, terminate the employment of any Leased Employee for any good faith reason as reasonably determined by Buyer in consultation with Seller. Subject to any applicable Laws or collective bargaining agreements, Buyer shall be responsible for the day to day supervision and management of the Leased Employees and the Seller shall direct each Leased Employee to comply with the Buyer's supervision and management. Seller shall instruct the Leased Employees to provide the services as required under the Services Agreement.  Buyer may schedule the Leased Employees to work in accordance with the requirements of the Buyer, subject to any applicable Laws or collective bargaining agreements.  Seller shall ensure that, during the Leasing Period, the Leased Employees do not perform any services for, act on behalf of, nor represent Seller or its Subsidiaries in any circumstance, except as contemplated by the Services Agreement. No action by Leased Employees shall waive or override this Section 1.2.

WEIL:\96908196\1\73217.0004

1.3.    <u>Compensation/Payroll</u>. During the Leasing Period, Seller and its Subsidiaries shall be solely responsible for paying the Leased Employees' compensation through Seller's standard payroll process and in accordance with the existing pay practices of Seller on the regular payroll schedule throughout the Leasing Period.  During the Leasing Period, Seller or

one of its Subsidiaries shall pay the Leased Employees at the same base salary or hourly wage rate (as applicable) that such Leased Employees were receiving as of the Closing Date, except as required by any applicable laws or collective bargaining agreement. Seller or one of its Subsidiaries shall allow all Leased Employees' payroll withholding elections to remain the same during the Leasing Period as such elections were in effect as of the Closing Date, except to the extent a Leased Employee elects (in a manner permitted to employees and plan participants generally under the applicable benefit plans) to change any such election.

1.4.    Employee Benefits. During the Leasing Period, Seller or one of its Subsidiaries shall ensure that each Leased Employee continues to be eligible to participate (and, if already participating, to continue to so participate) in all Employee Plans maintained by Seller or its Subsidiaries as amended from time to time in accordance with their terms and this Agreement, (the "Seller Plans"), in which such Leased Employee was eligible to participate as of the Closing Date. Seller and its Subsidiaries may only amend, modify or terminate a Seller Plan, to the extent such amendment, modification or termination affects a Leased Employee, at the request or otherwise with the consent of the Buyer and only to the extent such amendment, modification or termination is applicable to all similarly-situated employees of Seller and its Subsidiaries. Seller may not establish, adopt or enter into any Seller Plan with respect to any Leased Employee unless requested to do so by the Buyer. Seller or its Subsidiaries shall be responsible for operating and administering all of the Seller Plans and all claims incurred pursuant to the terms and conditions of the applicable plans, including any requirement generally applicable to the submission of claims under such plans.

1.5.    Compliance with Law – Payroll and Employee Plan Matters. Seller and one of its Subsidiaries shall be solely responsible for compliance with all operation, administration and legal obligations in respect of the Leased Employees relating to payroll and the Seller Plans. Seller and its Subsidiaries shall respond to any questions and inquiries from all Governmental Authorities and any other federal, state, local and foreign agencies and other Persons regarding payroll and employment data and history relating to the Leased Employees and concerning the Leasing Period or any prior period of employment by Seller and its Subsidiaries. In the event Buyer becomes aware of any compliance-related issues or any questions or inquiries from such Governmental Authorities, agencies or Persons regarding any Seller Plans in which the Leased Employees participate, Buyer shall promptly notify Seller of such matters and Seller or one of its Subsidiaries shall have the sole right and responsibility to respond thereto. Buyer shall cooperate with Seller and its Subsidiaries (including by providing Seller and its Subsidiaries with all information, documents and data reasonably requested by Seller or any of its Subsidiaries) to enable Seller and its Subsidiaries to comply with their obligations under this Agreement (including their obligation to respond to any question or inquiry from federal, state, local and foreign agencies and other Persons regarding payroll and employment data and history relating to the Leased Employees and concerning the Leasing Period or any prior period of employment by Seller or one of its Subsidiaries).

1.6.    Compliance with Law – Other Matters. To the extent that Leased Employees perform Employee Services on any premises owned or leased by Buyer or its Subsidiaries, Buyer and its Subsidiaries shall be responsible, at its sole cost and expense, for all obligations arising from or relating to the condition of such premises, including workplace safety and security, in compliance with all applicable federal, state and local health and safety laws,

WEIL:\96908196\1\73217.0004

regulations, rules, ordinances and directives.  In addition, Buyer and Seller shall each comply with all applicable foreign, federal, state, and local labor and employment Laws, including but not limited to, Title VII of the 1964 Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act, immigration laws and regulations, and state and/or local equivalent of the foregoing with respect to or in respect of Leased Employees.

1.7.    Employee Records.- During the Leasing Period, Buyer shall have the right to reasonably request access to employee records to the extent that such records relate to Leased Employees, and Seller shall not unreasonably deny any such request, subject to any applicable laws.

1.8.    Transfer of Leased Employees.- Upon any Lease Expiration Date, Seller and Buyer, and their respective Subsidiaries, shall take reasonable steps to effect an orderly transition of the Leased Employees whose employment is to be transferred on such date, and the employee records related thereto, to Buyer or its Subsidiaries.  Buyer shall hire Leased Employees in accordance with Section 9.7(a) of the Asset Purchase Agreement (or shall continue the employment of the Foreign Employees), and otherwise subject to the requirements of Article IX of the Asset Purchase Agreement, and this Agreement and such Leased Employees shall become employees of Buyer or its Subsidiaries as of the Hire Date.- Notwithstanding anything to the contrary in this Agreement, if, despite the reasonable best efforts of Buyer, the necessary permits, licenses, authorizations or other approvals as may be required by Law with respect to any Repairs Employee or Governmental Authority Employee in order for such Repairs Employee or Governmental Authority Employee to be employed by, and perform the essential functions of the job for which they were engaged with Seller for, Buyer or its Subsidiaries have not been received by Buyer or its Subsidiaries as of the 90th day following the Closing Date, Seller agrees that Buyer may delay the employment of such Repairs Employee or Governmental Authority Employee until the earlier of the date Buyer or its Subsidiaries receives such permit, license, authorization or other approvals or the first Business Day occurring on or after the 120th day following the Closing Date.

## ~~ARTICLE II~~ ARTICLE II

## REIMBURSEMENT BY BUYER FOR COSTS OF SERVICES; INDEMNIFICATION

2.1.    Reimbursement of Costs.- Seller and Buyer acknowledge and agree that the intent of this Article II is for Buyer to make Seller whole for all claims against or any Liabilities of Seller and its Subsidiaries associated with the Leased Employees and any other Liabilities attributable to Leased Employees in connection with the Employee Services in all cases incurred or arising during the Leasing Period (whether discovered during the Leasing Period or thereafter) (the "Employment Costs").- In consideration for the Employee Services provided by the Leased Employees, Buyer shall, in accordance with the procedures in Section 2.2 ~~2.2~~ hereof, pay to Seller an amount in cash sufficient to cover all Employment Costs. Without limiting the generality of the foregoing, Employee Costs shall include the following with respect to any Leased Employee during the applicable Leasing Period:

(i)      costs, expenses, premiums, payments, contributions, payroll taxes or claims payable to, payable on behalf of or in respect of the Leased Employees by Seller in respect of the Leasing Period and including costs, expenses, premiums, payments, contributions, payroll taxes or claims associated with Leased Employees;

(ii)      payroll costs such as salary, wages, overtime pay, incentive compensation, vacation and holiday pay, and bonuses, including amounts due under the Key Employee Retention Plan (the "KERP") to the extent attributable to the provision of services in the period commencing on the Closing Date and ending on such Leased Employees' Hire Date (the "Buyer KERP Portion");

(iii)      employment insurance employer contributions, workers' compensation, workplace safety and insurance premiums, and employer health tax and employer premiums;

(iv)      costs, expenses, shift and pay premiums;

(v)      payments, contributions to, under or in respect of any Seller Plan;

(vi)      costs of any perquisites provided to the Leased Employees;

(vii)      with respect to Leased Employees, including any terminated Leased Employees who elect COBRA continuation coverage which is effective during the Leasing Period, who are covered under any self-insured medical, dental or other employee welfare benefit plans of Seller or its Subsidiaries, the amount of actual medical, dental and other expenses of the Leased Employees and their dependents incurred during the Leasing Period under such plans; and

(viii)      severance (in such amount as determined in accordance with Section 9.7(e) of the Asset Purchase Agreement), termination pay, pay in lieu of notice and other costs (including legal costs) of terminating the employment of any Leased Employee during the Leasing Period and in accordance with this Agreement, including all taxes associated with any of the foregoing.

Notwithstanding the foregoing, Employment Costs shall not include current service costs or other contributions (direct or indirect) relating to any defined benefit pension plans, any amounts paid by the Seller and its Subsidiaries under the KERP other than the Buyer KERP Portion or the Key Employee Incentive Plan ("KEIP"), any retention bonus specified in an individual agreement, any bonus payments (including sales commission programs) to the extent they relate to periods of employment prior to the Closing Date and are not paid by Seller unless such bonus payments are otherwise approved in writing by the Buyer in advance of payment. In addition, where any compensation or benefit plan, agreement, or arrangement under which compensation or benefits are paid or provided for in respect of services performed both prior to and following the Closing Date, Employment Costs shall include only the pro-rated portion of such compensation costs payable in respect of services performed following the Closing Date.

2.2.    Mechanics of Funding Employment Costs.

(a)    During the Leasing Period, each Leased Employee shall remain on the payroll of the Seller and shall continue to participate in the Seller Plans in which such Leased Employee participated as of the Closing Date.- Buyer shall pay all Employment Costs in respect of the Leased Employees that relate to the Leasing Period in accordance with this Section 2.2.

(b)    Buyer and Seller will cooperate in good faith to determine the amounts due in respect of Employment Costs as set forth in <u>Schedule C</u>. Buyer will pre-fund amounts as set forth on and in accordance with <u>Schedule C</u> to an account designated by Seller and dedicated to the satisfaction of Employment Costs (the "<u>Dedicated Account</u>"); <u>provided</u>, that notwithstanding anything to the contrary in <u>Schedule C</u>, Buyer shall only be required to remit amounts in respect of any Employment Costs to the extent there does not already exist sufficient cash in the Dedicated Account to satisfy Employment Costs that are due and payable (or becoming due and payable in accordance with the schedule set forth in <u>Schedule C</u>).- Prior to making payments in respect of the Employment Costs, Seller shall hold any amounts in the Dedicated Account as trustee, and shall not remove any amounts from the Dedicated Account other than to satisfy obligations with respect to the Employment Costs at such time as such Employment Costs become due and payable.

(c)    At the end of the Leasing Period, Seller and Buyer shall cooperate in good faith to create a report reconciling (i) the gross amount received by Seller pursuant to this Section 2.2 and (ii) the gross amount of Employment Costs reasonably and in good faith incurred by Seller (the "<u>True-Up Report</u>").  To the extent that the amount described in clause (i) of this sub-section exceeds the amount described in clause (ii) of this sub-section, Seller shall reimburse the Buyer for such amount.- To the extent that the amount described in clause (ii) of this sub-section exceeds the amount described in clause (i) of this sub-section, Buyer shall reimburse Seller for such amount.- Any payment made pursuant to this sub-section shall be made within seven (7) Business Days following the completion of the True-Up Report.

2.3.    <u>Indemnification</u>.- Subject to the limitations set forth in this Section 2.3, Buyer shall defend, indemnify and hold harmless Seller and its Subsidiaries and their respective successors and permitted assigns (collectively, the "<u>Seller Indemnitees</u>") from and against any and all Liabilities incurred or suffered by Seller Indemnitees of every kind and nature to the extent related to or arising out of Seller's and its Subsidiaries' performance of this Agreement except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries.- In addition, Buyer shall indemnify and hold harmless Seller Indemnitees from and against all Liabilities incurred or suffered by Seller Indemnitees of every kind and nature, including all Liabilities for bodily injury to or death of any person, damage to or destruction of any property, or any third-party claims to the extent arising from any act or omission on the part of the Buyer, its officers and directors, employees of Buyer or the Leased Employees during the Leasing Period, except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries, its officers and directors or any employee of Seller or its Subsidiaries, in each case who is not a Leased Employee.- Without limiting the generality of the foregoing, Buyer further agrees to indemnify and hold the Seller Indemnitees harmless from and against any and all Liabilities incurred or suffered by the Seller Indemnitees on account of any claim, demand, charge, suit, action, investigation or proceeding

WEIL:\96908196\1\73217.0004

made or brought against the Seller Indemnitees by any Person, including the Leased Employees, related to: (A) any misconduct of any Leased Employee who is performing services for Buyer during the Leasing Period, (B) any injuries to any Leased Employee arising out of the Employee Services and not otherwise covered by insurance, (C) any employment related Liabilities arising under applicable Laws governing workers compensation, discrimination, harassment, job loss, wrongful termination, wage and hour, mass layoffs, or any other laws, including any applicable laws relating to collective bargaining agreements, which govern the employment of the Leased Employees providing services to Buyer; (D) any Liabilities arising directly or indirectly out of the provision of benefits to the Leased Employees under this Agreement; and (E) any Liabilities arising directly or indirectly from any reclassification or re-characterization of the Leased Employees by any Government Authority, except to the extent related to or arising out of a breach of any provision of this Agreement by Seller or one of its Subsidiaries or the gross negligence, willful misconduct or fraud of Seller or one of its Subsidiaries, its officers and directors or any employee of Seller or its Subsidiaries, in each case who is not a Leased Employee.- The provisions of this Section 2.3 shall survive the expiration or other termination of this Agreement.

<span style="color:red">~~**ARTICLE III**~~</span>

<span style="color:blue">**ARTICLE III**</span>

**MISCELLANEOU**

**S**

3.1.    <u>Amendment; Waiver</u>.  This Agreement may only be amended or modified by a written instrument signed by each of the Parties.- Either Party may, in its sole discretion, (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto, or (iii) waive compliance with any of the agreements or conditions of the other Party contained herein.- Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument executed by the Party granting such extension or waiver.- No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

3.2.    <u>Assignment</u>.- Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other Party, and any purported assignment or delegation in contravention of this <u>Section 3.2</u> shall be null and void and of no force and effect.- Subject to the preceding sentences of this <u>Section 3.2</u>, this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the Parties and their respective successors and permitted assigns.

3.3.    <u>Notices</u>.  All demands, notices, communications and reports provided for
in this Agreement shall be in writing and shall be either sent by electronic mail with confirmation
to a Party at the address specified in the Asset Purchase Agreement, or at such address, to the
attention of such other Person, and with such other copy as the recipient Party has specified by
prior written notice to the sending party pursuant to the provisions of this Section 3.3.

3.4.    Public Announcements.- All public announcements regarding this Agreement are subject to Section 13.1 of the Asset Purchase Agreement as if such Section 13.1 is set forth herein mutatis mutandis.

3.5.    Survival.  Each term of this Agreement that would, by its nature, survive the termination or expiration of this Agreement shall so survive, including the obligation of either Party to pay all amounts accrued hereunder and including the provisions of Article II (Reimbursement by Buyer for Costs of Services; Indemnification); Section 3.3 (Notices); Section 3.4 (Public Announcements); Section 3.5 (Survival); Section 3.6 (No Third Party Beneficiaries); Section 3.7 (Illegality); Section 3.8 (Entire Agreement; Interpretation); Section 3.9 (Specific Performance); Section 3.10 (Conflict of Terms); Section 3.11 (No Agency); Section 3.12 (Construction and Interpretation); and Section 3.15 (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial).

3.6.    No Third Party Beneficiaries.- Except for the indemnification rights under this Agreement of any Seller Indemnitee or Buyer Indemnitee in their respective capacities as such, or unless otherwise specified herein, no provision of this Agreement is intended to confer upon any Person (other than the Parties) any rights or remedies hereunder.

3.7.    Illegality.- In case any provision of this Agreement, shall be invalid, illegal or unenforceable, all other provisions of this Agreement shall remain in full force and effect, unless the severance of such provision would be in opposition to the Parties' intent with respect to such provision or the economic or legal substance of the transactions contemplated hereby would be affected in any manner materially adverse to any Party.- Upon determination by a court of competent jurisdiction that any provision of this Agreement is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner to the end that the transactions contemplated hereby are consummated and the obligations and agreements of the Parties hereunder are fulfilled to the greatest extent possible.

3.8.    Entire Agreement; Interpretation.  Except as otherwise contemplated herein, this Agreement, together with the Asset Purchase Agreement and the Transaction Documents, constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties, with respect to the subject matter hereof (other than the Confidentiality Agreement).- The Parties acknowledge that all Parties participated in the drafting of this Agreement, the Asset Purchase Agreement and the Transaction Documents with the involvement of their respective counsel and agree that any rule of law or any legal decision that may or would require interpretation of any alleged ambiguities in this Agreement, the Asset Purchase Agreement or the Transaction Documents against the Party that drafted it has no application and is expressly waived.

3.9.    Specific Performance.- The Parties agree that time is of the essence, irreparable damage would occur in the event that any of the terms or provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that money damages or other legal remedies would not be an adequate remedy for any such damages.- It is accordingly agreed that, without posting a bond or other undertaking, prior to the termination of this Agreement, each of the Parties shall be entitled to injunctive or

other equitable relief to prevent or cure breaches of this Agreement and, in addition to any other remedy to which they are entitled at Law or in equity, to enforce specifically the terms and provisions hereof, such remedy being in addition to any other remedy to which any Party may be entitled at Law or in equity. In the event that any Action is brought in equity to enforce the provisions of this Agreement, no Party will allege, and each Party hereby waives the defense or counterclaim, that there is an adequate remedy at Law.

3.10.    Conflict of Terms. This Agreement and the Services Agreement are intended to operate in tandem and the parties agree to interpret their respective provisions in such a manner as to avoid, to the maximum extent possible, a conflict. In the event of an express conflict between a term of this Agreement and the Services Agreement, the term of the Services Agreement shall govern and control, it being understood, however, that the terms of this Agreement are to be superseded only to the minimum extent necessary to resolve such express conflict. Notwithstanding the foregoing, this Section 3.10 shall not apply to Section 2.3 of this Agreement, which Section 2.3 shall govern in all respects in the event of an inconsistency between the provisions of this Agreement and the Services Agreement.

3.11.    No Agency. Nothing in this Agreement creates (or shall be claimed or intended to create) a relationship of agency, partnership, joint venturers or employer/employee between Seller and Buyer and it is the intent and desire of the Parties that the relationship be and be construed as that of independent contracting parties and not as agents, partners, joint venturers or a relationship of employer/employee.

3.12.    Construction and Interpretation. For purposes of this Agreement, (a) the words "hereof," "herein," "hereby," "hereto" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) whenever the words "include," "includes" or "including" (or any variation thereof) are used in this Agreement, they shall be deemed to be followed by the words "without limitation"; (c) references herein to "days," unless indicated otherwise, are to consecutive calendar days; (d) references to specific Articles and Sections are to the Articles and Sections of this Agreement, unless specifically stated otherwise; (e) the terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa, and words denoting any gender shall include all genders; (f) all references to "dollars" or "$" shall mean "U.S. dollars" unless specifically stated otherwise; (g) all references to "written" or "in writing" shall include in electronic form; (h) all references herein to a particular "Annex" shall mean such annex as it is attached hereto; (i) references to "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not mean "if," references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or" unless otherwise specified; and (j) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

3.13.    Counterparts. This Agreement and any amendments hereto may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall be considered one and the same instrument.

3.14.   <u>No Guarantee of Employment</u>.- This Agreement shall not change the <u>at-</u> ~~at-~~ will employment status of any employee of Seller or one of its Subsidiaries, excluding any Represented Employees whose terms and conditions of employment shall be governed by any applicable collective bargaining agreements.

3.15.   <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other Law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

DocuSign Envelope ID: 45C9564B-697F-4FEB-B5A9-932F1C31055F

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed on the
date first set forth above.

[————————————]

By: _____
Name:  [●]
Title:

By: _____
Name:  [●]
Title:


**TRANSFORM HOLDCO LLC**
(Add)

By: _____    Name:  Edward S. Lampe
Title: Chief Executive Officer

[*Signature Page to Employee Leasing Agreement*]

executed on

IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be the date first set forth above.

**Sears Holdings Corporation**



Name : Robert A. Riecker
Title : Chief Financial Officer

[Signature Page to Employee Leasing Agreement]

**SCHEDULE
A EXECUTIVE BUSINESS
EMPLOYEES**

[Buyer to provide to Seller on the Closing Date] None.

## SCHEDULE B
## SPECIFIED FOREIGN
## SUBSIDIARIES

1.    Sears Holdings Global Sourcing Limited (Jurisdiction: Hong Kong)

2.    International Sourcing & Logistics Limited (Jurisdiction: Hong Kong)

3.    Quality Assurance Laboratory Limited (Jurisdiction: Hong Kong)

4.    Sears Sourcing India Private Limited (Jurisdiction: India)

5.    Sears IT & Management Services India Private Limited (Jurisdiction: India)

6.    Sears Global Technologies India Private Limited (Jurisdiction: India)

**SCHEDULE C**
~~PRE-FUNDING~~
~~SCHEDULE~~**PRE-FUNDING**
**SCHEDULE**

| Schedule C Lease | | | |
|---|---|---|---|
| **Funding Cadence** | **Category** | **Pre-Funding Timeline** | **Payment Due Dates** |
| Weekly | 1. BCBS <br> 2. Payroll (except for non-monthly and non-semi-monthly salaried employees) <br> 3. Optum Rx <br> 4. Alight Premium Reporting <br> 5. Payroll Tax <br> 6. Other "Misc" Non-Payroll | 1. Weekly forecast submitted to NewCo by Monday 12 pm EST for payment due the following week <br> 2. Review and approval by Monday 5 pm EST <br> 3. Weekly pre-funding by 1 pm EST on Tuesday for payments due the following week <br> 4. Reconciliation process to occur on Tuesday afternoon | Daily payments will be remitted (Mon-Fri) of the following week when items are due |
| Semi-Monthly | 1. Payroll (monthly and semi-monthly salaried employees) | 1. Weekly forecast submitted 5 business days prior to funding <br> 2. Review and approve 5 business day prior to funding <br> 3. NewCo Pre-funding 2 business days prior to when funds are due to ADP (4 business days prior to the 15th and last day of the month) <br> 4. Reconciliation (if needed) | 15th and last day of the month |

## **Exhibit C**

**Executed Services Agreement**

## SERVICES AGREEMENT

This Services Agreement (this "Agreement"), dated as of February 11, 2019 (the "Effective Date"), is by and between Sears Holdings Corporation, a Delaware corporation ("Seller"), Transform Holdco LLC, a Delaware limited liability company and Transform SR Holdings LLC, a Delaware limited liability company (collectively, "Buyer"). Seller and Buyer each are sometimes referred to herein as a "Party" and together are sometimes referred to as the "Parties." Certain terms are defined below, while others are defined in Annex I (Defined Terms). All other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated as of January 17, 2019, by and between Seller, each of Seller's Subsidiaries party thereto and Buyer (as may be amended, restated, supplemented or modified, from time to time, the "Asset Purchase Agreement").

## RECITALS

WHEREAS, in connection with the Asset Purchase Agreement, the Parties desire to enter into this Agreement to set forth the terms and conditions pursuant to which each Party shall provide or cause to be provided the Services (as defined below) to the other Party and its Affiliates, in each case, as applicable for a transitional period from and after the Closing; and

WHEREAS, this Agreement is that certain "Services Agreement" as defined in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and mutual covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

## ARTICLE I

## SERVICES

Section 1.1    Services to be Provided. Subject to the terms and conditions of this Agreement, during the Services Period, Seller shall provide, or cause one or more of its Affiliates or a Vendor contracted by Seller pursuant to Section 1.9 to provide, to Buyer, its Affiliated Designees and their respective Affiliates, the services described on Schedule A-1 attached hereto (each, a "Seller Service", and collectively, the "Seller Services"). Subject to the terms and conditions of this Agreement, during the Services Period, Buyer shall provide, or cause one or more of its Affiliates or a Vendor contracted by Buyer pursuant to Section 1.9 to provide, to Seller and its Affiliates, the services described on Schedule A-2 attached hereto (each, a "Buyer Service", and collectively, the "Buyer Services"). "Services Period" means the period commencing at the Effective Date and, subject to earlier termination pursuant to ARTICLE III, continuing until the date indicated for each such Service on Schedule A or any longer period mutually agreed to by the Parties. In connection with the provision of certain legal services which are part of the Buyer Services, promptly following the Effective Date, the Parties shall use good faith efforts to enter into a common interest agreement.

Section 1.2    Quality and Nature of Services.

(a)    Except as otherwise provided in this Agreement, Service Provider shall provide, or shall cause one or more of its Affiliates or a Vendor to provide, the Services in a manner and at a level of service that is substantially similar to the manner and level of service with which such Services were provided to Service Recipient or its Affiliates or predecessors in interest (including, in the case of Buyer as Service Recipient, the Business) during the twelve (12) month period immediately prior to the Closing Date.  The Parties acknowledge and agree that, to the extent required, Buyer shall instruct the Leased Employees to perform the Services under this Agreement during the Leasing Period, as required in order for the Services to be performed as performed during the twelve (12) month period immediately prior to the Closing Date.  Subject to the first sentence of this Section 1.2(a) and subject to Section 1.9, Service Provider may make changes from time to time in the manner of performing the Services without Service Recipient's consent (including changes to its, its Affiliates' and its Personnel's systems) if (i) in circumstances where Buyer is Service Provider, Service Provider is making similar changes in the manner that it provides substantially similar services to itself and its Affiliates, (ii) Service Provider provides Service Recipient with reasonable prior written notice of any material change in the manner of providing the Services and (iii) Service Provider consults with Service Recipient in good faith to minimize the effect of such changes on the provision of such Services.  During the Services Period, each Party shall maintain the administrative capacity necessary to provide Services to the other Party as required under this Agreement.

(b)    Notwithstanding anything to the contrary contained in this Agreement (but subject to Section 1.8), Service Provider shall not be obligated to provide any Service to the extent the provision of such Service would materially violate (i) any agreement or license with a Third Party or other contractual obligation, in each case, to which Service Provider or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law or Licenses or Permits; provided, however, that Service Provider shall provide Service Recipient written notice as promptly as practicable (and no later than ten (10) days) after Service Provider becomes aware of any Services that cannot be provided, which notice shall include an explanation of the anticipated violation.  In the event Service Provider is unable to provide a Service pursuant to the foregoing clauses (i) or (ii), Service Provider shall, if requested by Service Recipient, use its commercially reasonable efforts to determine an alternate method to provide such Service; provided, however, that Service Provider shall have no obligation to incur additional costs to provide such Service unless Service Recipient agrees in advance to reimburse Service Provider for such costs.

(c)    The Parties acknowledge and agree that initially, after the Effective Date, Services will be performed by either Vendors or Leased Employees acting at the direction of the Buyer, pursuant to the Employee Lease Agreement, and that despite such employees remaining the employees of Seller during the Leasing Period, Buyer will be responsible for directing the Leased Employees to perform all Services hereunder, to the extent such Leased Employees performed such services or similar services on behalf of Seller or its Affiliates during the twelve (12) month period immediately prior to the Closing Date.  Notwithstanding the separation of Services between Schedule A-1 and Schedule A-2, the Parties acknowledge that it is the Parties' intent that Leased Employees will continue to perform the same Services, no matter whether they

-2-

are employed by Seller or Buyer at the relevant time, during the Leasing Period and thereafter. To the extent any amendments are required to be made to Schedule A in order to fulfill this intent or to amend the Fees to align with the principles set forth in Section 2.1, the Single Point of Contact of each Party shall discuss such necessary amendments and the Parties shall negotiate any such amendments in good faith in order to reflect the agreement of the Parties under this Section 1.2(c).

(d)     Notwithstanding the separation of Services between Schedule A-1 and Schedule A-2, the Parties acknowledge that it is the Parties' intent that during the Services Period, to the extent a Party is a party to any Third Party contract used to perform a Service for Seller or its Affiliates during the twelve (12) month period immediately prior to the Closing Date, such Party shall be the Service Provider for such Service under this Agreement.  To the extent any amendments are required to be made to Schedule A in order to fulfill this intent, the Single Point of Contact of each Party shall discuss such necessary amendments and the Parties shall negotiate any such amendments in good faith in order to reflect the agreement of the Parties under this Section 1.2(d).

(e)     Notwithstanding any other provision of this Agreement, if Seller remains the owner of any Acquired Assets, after the Closing, solely to effect an orderly transition of such Acquired Assets to Buyer, including, without limitation, to allow time to resolve regulatory or other legal issues, Seller is hereby authorized to grant, pursuant to and as more fully set forth in paragraph [26] of the Approval Order (as defined in the Asset Purchase Agreement), and if contemplated by any Seller Service in Schedule A-1 shall grant, the lenders under (i) the ABL Financing, (ii) the Citi L/C Facility as assumed by Buyer, (iii) the Real Estate Financing or (iv) the Cyrus Financing (the "Transform Financing Facilities") liens on such assets, in each case to the extent such Acquired Assets would constitute "Collateral" (or any similar term with equivalent meaning) under the applicable Transform Financing Document (as defined below) (the "Transition Liens") and Seller shall honor the Transition Liens as if Seller was party to the financing documents underlying the applicable Transform Financing Facility (the "Transform Financing Documents"); provided, however, that Buyer shall bear any costs incurred by Seller in connection with granting or perfecting the Transition Liens, or participating in any enforcement actions taken by the secured parties under the applicable Transform Financing Facility (the "Transform Secured Parties") with respect to the Transition Liens.  The Transition Liens granted by Seller shall be deemed properly perfected and enforceable by entry of the Approval Order. Upon transfer of the applicable Acquired Assets to Buyer, the respective Transition Lien shall terminate and be of no further force or effect against Seller.  The Bankruptcy Court shall retain jurisdiction to enforce any disputes among the Transform Secured Parties, Seller, and/or Buyer with respect to the Transition Liens. The Parties agree that any and all proceeds from the sale of Transition Assets, whenever arising, including all Pharmacy Receivables (as defined in the ABL Financing and the Transform Financing Documents) and Credit Card Receivables (collectively, the "Transition Proceeds") shall be automatically conveyed to Buyer as Acquired Assets without the need to execute any bill of sale, assignment, or similar conveyance document or take any further action and shall be free and clear of any and all liens and Claims in accordance with the terms of the Approval Order as if such Transition Proceeds were transferred to the Buyer as of the Closing, and, pursuant to paragraph [26] of the Approval Order shall automatically become subject to the first priority liens and security interests of the Transform Secured Parties under the

-3-

applicable Transform Financing Documents pursuant to the terms of paragraph [26] of the Approval Order without the necessity of the execution of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Secured Parties of any Transition Proceeds.  For the avoidance of doubt, any liens which a Debtor is authorized to grant or which a Debtor shall grant pursuant to this paragraph shall be granted under the Approval Order, and shall not be granted by this Agreement.

Section 1.3    Changes in the Services.

(a)    If Service Recipient desires to make changes in this Agreement for different or additional services (each, a "Service Change") to be provided hereunder, the Parties shall comply with the following Service Change process:

(i)    Service Recipient shall prepare a written proposal for the Service Change, including a description of the applicable services, deliverables, schedule and term, in such detail as would be needed by an unaffiliated third party contractor to develop a competent proposal as to the cost to provide similar services, and a proposed fee.  For special project work that is within the scope of services covered by an hourly or unit rate in Schedule A, Service Recipient may use the hourly rate or unit rate stated in Schedule A in developing the cost for the proposal.

(ii)    Upon receipt of a written proposal for a Service Change, Service Provider shall promptly send to Service Recipient a written, good faith response in compliance with this Section 1.3 indicating whether Service Provider agrees to provide the different or additional services and, if so, (A) any proposed changes to the requested services, deliverables, schedule and term or (B) the proposed fees for the different or additional services, which shall not exceed the cost incurred by the Service Provider in providing such services.

(iii)    All Service Change proposals and responses must be delivered by a Party's Single Point of Contact to the other Party's Single Point of Contact.  Service Provider shall consider in good faith Service Recipient's written request and, if required pursuant to Section 1.3(b), shall agree thereto.  If Service Provider agrees to provide any different or additional services as contemplated by this Section 1.3, the Parties shall amend Schedule A hereto to document the relevant Service Change and shall obtain all necessary internal approvals prior to the execution of such amendment and any such different or additional services shall be deemed part of the Services.

(b)    Notwithstanding the foregoing, if Service Recipient, after the date hereof and during the first six (6) months following the Effective Date, identifies a service that prior to the Closing Date, (i) Seller or its Affiliates provided to the Business and at such time, Seller or its Affiliates have the persons, resources or assets to provide such services, or (ii) was provided to Seller and its Affiliates using persons, resources or assets transferred to Buyer under the Asset Purchase Agreement, as applicable, and in either case (i) or (ii) which service is required for Service Recipient to continue to operate the Business or the businesses of Seller and its Affiliates which remain after the Closing Date (the "RemainCo Business"), as applicable, after the Closing Date in substantially the same manner in which such business operated in the twelve (12) months

-4-

prior to the Closing Date, and such service was not included on Schedule A or otherwise expressly stated herein and which Service Provider or its Affiliates are able to provide, the Parties shall negotiate in good faith and amend this Agreement and Schedule A as necessary to cause such additional service to be provided to Service Recipient on substantially the same terms and conditions as it was previously provided to the Business or the RemainCo Business prior to the Closing Date for fees not to exceed the cost incurred by the Service Provider in providing such services. After such six (6) month period, neither Party shall have any obligation to amend Schedule A to include additional services not included on Schedule A at such time; provided that the Parties will consider and negotiate any such request in good faith and if the Parties agree, shall further amend this Agreement and Schedule A as necessary to cause such additional services to be provided on agreed upon terms.

Section 1.4    Transition Plan.  Buyer shall use commercially reasonable efforts to expeditiously transition each Seller Service to Buyer's own internal organization or to obtain alternate Third Party sources to provide the Seller Services directly to Buyer. At Buyer's sole cost and expense, Seller shall provide Buyer with such information and assistance as is reasonably necessary to assist Buyer with such transition; provided, however, Seller shall not be obligated to provide any such information or assistance to the extent the provision of such information or assistance would materially violate (i) any agreement, license or other contractual obligation, in each case, with a Third Party to which Seller or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law or Licenses and Permits.

Section 1.5    Knowledge Transfer for Benefit of Seller.  During the Services Period and thereafter until completion of wind-down of Seller's estate, Buyer and its Affiliates shall use reasonable best efforts to make those persons who were employed by Seller and its Affiliates immediately prior to the Closing Date and are employed by Buyer or one of its Affiliates after the Closing Date, reasonably available to Seller and its Affiliates to provide knowledge transfer and answer questions, including in connection with the wind-down of Seller's estate and claim administration, upon Seller's reasonable notice to Buyer. To the extent that any person must dedicate more than ten percent (10%) of his or her full time and energy to perform duties, functions and services on behalf of Seller, Seller shall pay Buyer an allocated portion of the wages and benefits associated with such employee. Seller acknowledges and agrees that such persons may leave the employment of Buyer or its Affiliates by their own volition or their employment may be terminated during the Services Period, at Buyer's sole discretion.

Section 1.6    Standard of Care.  Service Provider shall perform the Services in good faith and in compliance with all applicable Laws, without willful misconduct or gross negligence.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SERVICE PROVIDER MAKES NO, AND SERVICE RECIPIENT REPRESENTS THAT IT HAS NOT RECEIVED OR RELIED UPON, ANY OTHER GUARANTEE, REPRESENTATION OR WARRANTY OF ANY KIND (WHETHER EXPRESS OR IMPLIED) REGARDING ANY OF THE SERVICES PROVIDED HEREUNDER.  EXCEPT AS SET FORTH IN THIS AGREEMENT, SERVICE PROVIDER EXPRESSLY DISCLAIMS ALL, AND SERVICE RECIPIENT EXPRESSLY REPRESENTS THAT IT HAS NOT AND IS NOT RELYING UPON, ANY OTHER GUARANTEES, REPRESENTATIONS AND WARRANTIES OF ANY NATURE WHATSOEVER, WHETHER STATUTORY, ORAL, WRITTEN, EXPRESS OR IMPLIED,

INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A
PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM COURSE OF
DEALING OR USAGE OF TRADE.  SUBJECT TO THE OTHER PROVISIONS OF THIS
AGREEMENT, SERVICE PROVIDER SHALL ONLY BE OBLIGATED TO PROVIDE
SERVICES IN A MANNER SUBSTANTIALLY CONSISTENT WITH THE MANNER IN
WHICH SUCH SERVICES WERE PROVIDED IN THE PAST.

     Section 1.7  <u>Responsibility for Errors; Delays</u>.  Without limiting <u>Section 5.2</u>,
Service Provider is responsible to Service Recipient for errors or omissions in Services caused by
Service Provider or Vendor and as a non-exclusive remedy to Service Recipient, Service
Provider shall re-perform or cause the re-performance of such Services or furnish correct
information, payment or adjustments in the Services, in each case at no additional cost or
expense to Service Recipient if Service Recipient promptly advises Service Provider of such
error or omission.  Notwithstanding the foregoing, but without limiting <u>Section 5.2</u>, Service
Provider shall not be obligated to re-perform or cause the re-performance of such Services or
furnish correct information, payment or adjustments in the Services at no additional cost or
expense to Service Recipient if the error or omission was directly or indirectly caused by the (i)
provision of inaccurate or incomplete information by, or (ii) gross negligence or willful
misconduct of, Service Recipient, its Affiliates or its or their Personnel.

     Section 1.8  <u>Cooperation; Alternatives</u>.  Unless otherwise provided for in this
Agreement, Seller and Buyer shall use reasonable best efforts to cooperate with each other in all
matters relating to the provision and receipt of the Services, including to obtain any consents or
licenses from Third Parties that Service Provider reasonably believes are necessary for the
provision or receipt of the Services, as applicable, and each of Seller and Buyer shall each use
their respective reasonable best efforts to cause each of their respective employees and
contractors to reasonably cooperate to the extent required for effective delivery of the Services.

     Section 1.9  <u>Use of Affiliates and Vendors</u>.  Service Provider may use any of its
Affiliates or a qualified Third Party provider (a "<u>Vendor</u>") to provide the Services; <u>provided</u>,
<u>however</u>, that (a) Service Provider shall remain responsible at all times for the performance of
Services by its Affiliates or any Vendor under this Agreement and (b) a Vendor may only be used
by Service Provider following the written consent of Service Recipient, such consent not to be
unreasonably withheld, delayed or conditioned.  Service Recipient's prior written consent of a
Vendor designation will not be required, however, if (x) the Vendor provided those Services to
the Business or the businesses of the Service Recipient, as applicable, prior to the Closing Date;
(y) the Vendor is a Third Party who provided the same services to Service Provider prior to the
Closing Date and the Services would be provided by Vendor to Service Recipient on the same
terms and subject to the same conditions as provided to Service Provider prior to the Closing
Date or (z) Service Provider changes the Vendor used to provide the Services or similar services
to Service Provider and the Services would be provided by Vendor to Service Recipient on the
same terms or on terms no less favorable to Service Recipient, in each case as provided to
Service Provider. If Service Provider determines in good faith that the burden of providing
Services that it is obligated to provide hereunder exceeds the reasonable capacity of such Service
Provider's available resources, the Parties shall negotiate in good faith the engagement of
Vendors to provide such Services and the allocation of additional costs for such Services, if any.

Section 1.10    Intellectual Property License.  Solely during the Service Period, and solely to the extent required for the provision or receipt, as applicable, of Services in accordance with this Agreement, each Party ("Licensor"), for itself and on behalf of its Affiliates, hereby grants to the other Party and its Affiliates ("Licensee") a non-exclusive, non-transferable, royalty-free, worldwide license for the term of this Agreement, to use any Intellectual Property (and any tangible embodiments thereof) owned by Licensor or its Affiliates, subject to any applicable restrictions, limitations and other instructions provided in writing to Licensee.  To the extent the foregoing license includes the use of any Trademarks, Licensee shall ensure that its use of such Trademarks shall only be with respect to goods and services of a level of quality equal to or greater than the quality of the goods and services with respect to which Sellers used such Trademarks prior to the Closing and that it shall not use such Trademarks in any manner that would reasonably damage or tarnish the goodwill associated therewith or the goodwill of the Licensor.  Any and all goodwill arising from Licensee's use of such Trademarks will inure solely to the benefit of Licensor.  Notwithstanding anything to the contrary contained in this Agreement, including in this Section 1.10, neither Party shall be obligated to license any Intellectual Property to the extent such license would violate (i) any agreement, license or other contractual obligation, in each case, with a Third Party to which such Party or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law.

Section 1.11    Ownership of Data and Other Assets.  Neither Party shall acquire under this Agreement any right, title or interest in any asset or Intellectual Property that is owned or licensed by the other Party or its Affiliates.  All data provided by or on behalf of a Party to the other Party or its Affiliates for the purpose of providing or receiving the Services shall remain the property of the Party providing such data unless otherwise specified herein.  To the extent the provision of any Service involves Intellectual Property, each Party agrees that it and its Affiliates shall not copy, modify, reverse engineer, decompile or in any way alter any of such material, or otherwise use such material in a manner inconsistent with the terms and provisions of this Agreement or the Asset Purchase Agreement without the express written consent of the other Party.

Section 1.12    Data Privacy.  In this Section 1.12 the terms "personal data" and "processing" shall have the meanings ascribed to them under applicable data protection, privacy or similar applicable Laws (including all statutes, enacting instruments, common law, regulations and directives, concerning the protection or processing of personal data) (the "Data Protection Laws").  Each Party shall, and shall cause its Affiliates or Personnel to, comply with all applicable Data Protection Laws in relation to all personal data that is processed by it in the course of performing its obligations under this Agreement (the "Protected Data").  If in connection with this Agreement, either Party obtains access to any Protected Data, such Party shall, and shall cause each of its relevant Affiliates to, (a) implement and maintain appropriate technical and organization measures and security procedures and practices in respect of the Protected Data to prevent unauthorized or unlawful access, disclosure, use, or processing of the Protected Data that are no less protective than those used by such Party in the ordinary course of business, (b) keep accurate records relating to all processing of Protected Data in accordance with its applicable procedures and practices and, upon reasonable advanced written notice, permit the other Party to examine or audit such records with respect to compliance with Data Protection Laws, (c) reasonably cooperate with the other Party in connection with any

WEIL:\96889465\20\73217.0004

complaints or investigations related to unauthorized use or disclosure of, access to, or other processing of Protected Data, (d) process Protected Data solely for the purposes of this Agreement or as otherwise required by applicable Law, (e) use and disclose the Protected Data in a manner that is consistent with Seller's past practices and policies and comply with all reasonable restrictions on the use, handling and disclosure of Protected Data imposed by the other Party (upon reasonable advance notice from such other Party) or by applicable Law and (f) notify the other Party in writing as soon as reasonably practicable, but in any event within forty-eight (48) hours after obtaining knowledge of any disclosure, or suspected disclosure, of Protected Data to a Third Party in a manner prohibited by applicable Law or the terms of this Agreement or of any other unauthorized access or misuse, or suspected unauthorized access or misuse, of Protected Data (to the extent not prohibited under applicable Law or recommendation of a Governmental Authority) and take reasonable actions to prevent further disclosure. To the extent required by applicable Data Protection Laws or as deemed necessary by the Parties, the Parties (or their respective Affiliates) will enter into additional agreements with respect to the processing of Protected Data.

Section 1.13    Single Point of Contact.  Each Party shall designate a contact person (each, a "Single Point of Contact"), as set forth on Schedule B, to facilitate communications and performance with respect to this Agreement and the Services, including operational matters, and to ensure that this Agreement is fulfilled consistently with the intent of the Parties as of the Effective Date.  Unless otherwise authorized in writing or specified in the specific Schedule related to a Service, the Parties shall direct all communications relating to this Agreement and the Services to the Single Point of Contact for the other Party.  The Single Point of Contact for each Party shall meet (in person or via telephone or video conference) at least monthly during the Services Period, or more often as otherwise determined necessary by the Parties, in order to discuss the progress of the Agreement and fulfilment of each Party's obligations hereunder.  Each Party shall have the right at any time and from time to time to replace its Single Point of Contact by written notice to the other Party in accordance with Section 6.3, following which Schedule B shall be automatically amended to reflect such Party's new Single Point of Contact.

Section 1.14    Records.  During the term of this Agreement and for one (1) year thereafter (or such longer period as may be required by applicable Law), Service Provider and Service Recipient shall each use commercially reasonable efforts to maintain complete and accurate records related to any Service provided, Fees invoiced and payments made hereunder (the "Service Records"); provided that if Service Provider at any time offers in writing to transfer the Service Records in Service Provider's possession to Service Recipient, Service Recipient shall have sixty (60) days thereafter to take possession of the Service Records, after which Service Provider shall no longer have an obligation to retain, and may thereafter delete or destroy, such Service Records.  Upon reasonable advance notice, and subject to ARTICLE IV, each Party in possession of Service Records shall use commercially reasonable efforts to permit the other Party or its Representatives, as applicable, reasonable access to or, at the requesting Party's expense, copies of, such Service Records during regular business hours; provided that (a) such access shall not disrupt the normal operations of such first Party's business and (b) nothing herein shall require any Party to provide to the other Party, its Affiliates or its Representatives with access to or copies of any information to the extent that such access to or the provision of

-8-

such information would violate any applicable Law or contractual obligation (including any Law or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information); provided, further, that such first Party and its Affiliates shall use commercially reasonable efforts to provide such information in a manner that does not violate such Law or is in accordance with such agreement.

Section 1.15    Employees and Contractors.  Service Provider shall be responsible for the appointment of the appropriate Personnel to carry out and perform the Services.  At all times during the provision of Services, Personnel (excluding Leased Employees) shall continue to be solely an employee, agent or contractor, as applicable, of Service Provider and shall not, unless otherwise agreed in writing by Service Provider and Service Recipient, become an employee, agent or contractor of Service Recipient, and such Personnel (Excluding Leased Employees) shall not be entitled to receive any compensation, benefits, perquisites or privileges from Service Recipient, unless otherwise agreed in writing by Service Provider and Service Recipient.  Service Provider or one or more of its Affiliates, as applicable, shall be responsible for paying all necessary employment taxes, salary and incidental appointment and employment costs, if any, as may be required by applicable Law with respect to any such Personnel (excluding Leased Employees).  The employment, direction, compensation and benefits of Leased Employees shall be subject to the terms of the Employee Lease Agreement.

Section 1.16    Access to Facilities.  If either Party, its Affiliates or its Personnel require access to the facilities of the other Party or its Affiliates (collectively, the "Facilities") in order to receive or perform the Services, then the Party controlling such access shall reasonably allow the other Party, its Affiliates or their respective Personnel such access in accordance with this Section 1.16 and Section 1.17.  The Party to whom such access is given shall (a) limit such access to those of its and its Affiliates' Personnel who reasonably require such access in connection with this Agreement, (b) follow, and cause its Affiliates and their respective Personnel to follow, all rules and procedures for use of such Facilities, provided such rules and procedures are communicated to such Party in writing in advance, (c) not attempt to obtain access to, use or interfere with any systems or resources of the other Party, except to the extent permitted by the other Party and (d) not intentionally damage, disrupt or impair the normal operation of the Facilities.  Any evidenced damage caused by a Party, its Affiliates or their respective Personnel or agents in the Facilities of the other Party shall be repaired to the condition prior to such damage by or on behalf of such Party, in each case, at the damaging Party's sole cost and expense; provided that such costs and expenses are reasonable and documented.

Section 1.17    Computer Access.  If either Party, its Affiliates or its Personnel are given access, whether on-site or through remote facilities, to any communications, computer, or electronic data storage systems (each, an "Electronic Resource") of the other Party, its Affiliates or its Personnel in connection with this Agreement, then the Party to whom such access is given shall ensure that its Personnel's use of such access shall be solely limited to performance or exercise of such Party's duties and rights under this Agreement, and that such Personnel shall not attempt to access any Electronic Resources other than those specifically required for the performance of such duties or exercise of such rights.  The Party given access shall (a) limit such access to those of its and its Affiliates' Personnel who reasonably require such access in

-9-

connection with this Agreement, (b) advise the other Party in writing of the name of each of such Personnel who shall be granted such access, (c) follow, and cause its Affiliates and its and Affiliates' Personnel to follow, all security rules and procedures for use of such Electronic Resources, provided such rules and procedures are communicated to such Party in writing, (d) not attempt to obtain access to, use or interfere with any Electronic Resource of the other Party, or any data owned, used or processed by the other Party, except to the extent permitted by the other Party and required to do so to provide or receive the Services and (e) not disable, damage or erase or disrupt or impair the normal operation of the Electronic Resource.  All user identification numbers and passwords disclosed to a Party's or its Affiliates' Personnel and any information obtained by such Party's or its Affiliates' Personnel as a result of its access to, and use of the other Party's, its Affiliates' or its Personnel's Electronic Resources shall be deemed to be, and shall be treated as, Confidential Information of the Party on behalf of whom such access is granted.  Each Party shall reasonably cooperate with the other Party in the investigation of any apparent unauthorized access by the other Party, its Affiliates or its Personnel to any Electronic Resources or unauthorized release of Confidential Information and take reasonable actions to prevent any further unauthorized access to any Electronic Resources or other unauthorized or unlawful conduct or activities related to the Electronic Resources.  Each Party shall notify the other Party in writing within forty-eight (48) hours of discovery of any actual or suspected unauthorized access to or disclosure of any Electronic Resource of the other Party, its Affiliates or its Personnel, to the extent reasonably practicable and not prohibited under applicable Law or recommendation of a Governmental Authority.  Notwithstanding anything in this Agreement to the contrary, nothing in this <u>Section 1.17</u> shall in any way limit the obligations of either Party or any of its Affiliates or Personnel set forth in <u>Section 1.12</u>.

**ARTICLE II**

**CHARGES AND PAYMENTS FOR SERVICES**

Section 2.1    <u>Compensation</u>.

-10-

(a)    <u>Seller Compensation</u>. As consideration for the provision of the Seller Services, (i) during the four (4) month period after the Effective Date (the "<u>Seller Initial Period</u>"), Buyer shall pay, or cause to be paid, to Seller or its designee(s) the fixed fee for the Seller Services specified on <u>Schedule A-1</u> (the "<u>Seller Administrative Fee</u>") within five (5) Business Days after the Effective Date and thereafter on a monthly basis, prior to the monthly anniversary of the Effective Date, in addition to the Service-by-Service fees for the Seller Services specified on <u>Schedule A-1</u> and (ii) the Parties shall negotiate in good faith prior to the end of the Seller Initial Period and amend <u>Schedule A-1</u> to reflect, the appropriate fees for the Seller Services that will continue to be provided by Seller after the Seller Initial Period ((i) and (ii), collectively, the "<u>Seller Fees</u>"), each payable in accordance with <u>Schedule A-1</u>.  The Seller Fees negotiated by the Parties after the Effective Date with respect to the post-Seller Initial Period shall be as agreed to by the Parties at such time or shall be equal to Seller's good faith estimate of the cost, including any income and other taxes, incurred by the Seller Entities in providing such services.  The Parties acknowledge and agree that the intent of this <u>Section 2.1(a)</u> is for Buyer to make Seller whole for the actual, costs and expenses paid or provided by Seller and its Affiliates in the performance of Seller Services.  Other than the Seller Administrative Fee, in the event any Seller Fee specified on <u>Schedule A-1</u> exceeds such amount or rates (as applicable), such Seller Fee shall be deemed to be reduced to such amount or rates (as applicable) with retroactive effect, unless otherwise agreed in writing by the Parties, and the Parties shall amend <u>Schedule A-1</u> accordingly.  Upon termination of an individual Seller Service, Buyer shall pay a pro rata portion of the applicable Seller Fee specified on <u>Schedule A-1</u>, calculated based on the portion of the individual Seller Service actually performed, or expense actually incurred, through the date Seller, its Affiliates or its Vendors performed the Seller Service.  If the Seller Fees include charges for Seller Services performed by a Vendor and the Vendor's fees increase during the Service Period, then Seller shall be entitled to pass through the increased fees as an increase in the Seller Fees; <u>provided</u> that to the extent that Seller uses the same Vendor to provide similar services to itself or its Affiliates, each of the Parties shall be responsible for their pro rata portion of the increased amount in accordance with the level of services such Party receives (directly or indirectly) from such Vendor.  In the event of any such increase in a Vendor's fees, Seller shall provide Buyer with prompt written notice thereof (to the extent reasonably practicable, at least ten (10) Business Days prior to such increase going into effect).

-11-

(b)    Buyer Compensation. As consideration for the provision of the Buyer Services (i) during the during the sixty (60) day period after the Effective Date (the "Buyer Initial Period"), Seller shall pay, or cause to be paid, to Buyer or its designee(s) the all-in fee for the Buyer Services specified on Schedule A-2 (the "Buyer Initial Fees") within five (5) Business Days after the Effective Date and thereafter on a monthly basis, prior to the monthly anniversary of the Effective Date, and (ii) prior to the end of the Buyer Initial Period, the Parties may mutually agree to extend the Buyer Initial Period and Buyer Initial Fees payable at such time for additional thirty (30) day periods; provided that if the Parties do not agree to extend the Buyer Initial Period at the same Buyer Initial Fees, the Parties shall negotiate in good faith prior to the end of the Buyer Initial Period and amend Schedule A-2 to reflect, the appropriate fees for the Buyer Services that will continue to be provided by Buyer after the Buyer Initial Period ((i) and (ii), collectively, the "Buyer Fees"), each payable in accordance with Schedule A-2.  The Buyer Fees negotiated by the Parties after the Effective Date with respect to the post-Buyer Initial Period shall be as agreed to by the Parties at such time or shall be equal to Buyer's good faith estimate of the cost, including any income and other taxes, incurred by the Buyer Entities in providing such services.  The Parties acknowledge and agree that the intent of this Section 2.1(b) with respect to Buyer Fees post-Buyer Initial Period is for Seller to make Buyer whole for the actual, costs and expenses paid or provided by Buyer and its Affiliates in the performance of Buyer Services.  Other than the Buyer Initial Fee, in the event any Buyer Fee negotiated post-Buyer Initial Period and specified on Schedule A-2 exceeds such amount or rates (as applicable), such Buyer Fee shall be deemed to be reduced to such amount or rates (as applicable) with retroactive effect, unless otherwise agreed in writing by the Parties, and the Parties shall amend Schedule A-2 accordingly.  Following the Buyer Initial Period, upon termination of an individual Buyer Service, Seller shall pay a pro rata portion of the applicable Buyer Fee specified on Schedule A-2, calculated based on the portion of the individual Buyer Service actually performed, or expense actually incurred, through the date Buyer, its Affiliates or its Vendors performed the Buyer Service.  If the Buyer Fees applicable post-Buyer Initial Period include charges for Buyer Services performed by a Vendor and the Vendor's fees increase during the Service Period, then Buyer shall be entitled to pass through the increased fees as an increase in the Buyer Fees; provided that to the extent that Buyer uses the same Vendor to provide similar services to itself or its Affiliates, each of the Parties shall be responsible for their pro rata portion of the increased amount in accordance with the level of services such Party receives (directly or indirectly) from such Vendor.  In the event of any such increase in a Vendor's fees, Buyer shall provide Seller with prompt written notice thereof (to the extent reasonably practicable, at least ten (10) Business Days prior to such increase going into effect).

Section 2.2    Payments.

WEIL:\96889465\20\73217.0004

(a)     <u>Payment for Seller Services</u>.  Buyer shall pay (or cause to be paid) the Fees relevant to the Seller Services in advance in accordance with <u>Section 2.1(a)</u> and this Section <u>2.2(a)</u>; <u>provided</u> that, whenever possible, Buyer shall pay (or cause to be paid) the Fees due to Vendors directly to such Vendor or other applicable third-party not prohibited from receiving such direct payments (each, a "<u>Direct Recipient</u>") to such Direct Recipients in accordance with <u>Schedule A-1</u>. Unless otherwise provided on <u>Schedule A-1</u>, the Parties shall perform the process set forth in the remainder of this <u>Section 2.2(a)</u> for payment of Seller Services.  Within ten (10) Business Days prior to the first Business Day of each month during the Services Period, Seller shall provide to Buyer a reasonable estimate of the Seller Fees forecasted for the Seller Services for each week of the upcoming month (the "<u>Weekly Forecasted Fees</u>"). Seller may revise the Weekly Forecasted Fees for a given week at any point up until Buyer has made a payment pursuant to this <u>Section 2.2(a)</u> in connection with such week's Weekly Forecasted Fees. On every Tuesday during the Services Period, Buyer shall pay Seller or, if applicable, its designee(s), Affiliates or Vendors by electronic transfer of immediately available funds to a segregated bank account designated by such Person from time to time, the Weekly Forecasted Fees corresponding to the subsequent week, less any amount of such week's Weekly Forecasted Fees as paid, or may be paid, to a Direct Recipient.  Within two (2) weeks after the end of each month during the Services Period, Seller shall provide Buyer with an invoice of all Fees relevant to the Seller Services during the preceding month actually paid or payable by Seller and the Parties shall promptly reconcile the difference between the total of the month's Weekly Forecasted Fees and the invoiced Fees plus Fees paid to any Direct Recipient (the "<u>Reconciliation Amount</u>"), if any. A Party who owes monies to the other Party as a result of such reconciliation shall pay the undisputed Reconciliation Amount within thirty (30) days following Buyer's dated invoice of Fees actually paid or payable.  All undisputed amounts remaining unpaid for more than thirty (30) days after their respective due date(s) shall accrue one and one-half percent (1.5%) interest per month until paid in full.  Notwithstanding anything set forth herein, Seller may suspend performance of any applicable Service for the following month until such time as it receives the Weekly Forecasted Fees from Buyer to enable it to perform such Service(s) and any non-performance during such time shall not constitute a breach of this Agreement.

(b)     <u>Payment for Buyer Services</u>.  Seller shall pay (or cause to be paid) the Buyer Fees in accordance with <u>Section 2.1(b)</u>.  Unless otherwise mutually agreed in writing or otherwise set forth on <u>Schedule A-2</u>, all undisputed amounts payable under this Agreement shall be paid monthly by Seller to Buyer or, if applicable, its designee(s), Affiliates or Vendors by electronic transfer of immediately available funds to a bank account designated by such Person from time to time, within thirty (30) days following receipt of an invoice for such amount.  All undisputed amounts remaining unpaid for more than thirty (30) days after their respective due date(s) set forth in an invoice statement shall accrue one and one-half percent (1.5%) interest per month until paid in full.

Section 2.3     <u>Taxes</u>.

-13-

(a)    Service Provision Taxes.  The Parties hereby acknowledge that the Fees specified in Schedule A do not include applicable taxes.  Subject to Section 1.15, Service Recipient shall be responsible for the payment of all taxes payable in connection with the Services, including sales, use, excise, value-added, business, service, goods and services, consumption, withholding and other similar taxes or duties, including taxes incurred on transactions between and among Service Provider, its Affiliates and its Vendors, along with any related interest and penalties, in each case, imposed, assessed or payable with respect to such taxes (together, such amounts, the "Service Provision Taxes").  Service Recipient shall be responsible only for the payment of Service Provision Taxes payable as a result of its or its Affiliates' receipt of the Services.  Service Recipient shall reimburse Service Provider for any deficiency relating to Service Provision Taxes that are Service Recipient's responsibility under this Agreement.  Notwithstanding anything in this Section 2.3 to the contrary, each Party shall be responsible for its own income, gross receipts and franchise taxes, employment taxes and real or personal property taxes, except as provided in the Asset Purchase Agreement.  The Parties shall cooperate in good faith to minimize Service Provision Taxes to the extent legally permissible.  Each Party shall provide to the other Party any resale exemption, multiple points of use certificates, treaty certification and other exemption information reasonably requested by the other Party.

(b)    Withholding.  The Parties acknowledge that payments made hereunder by Service Recipient to Service Provider shall not be subject to deduction and withholding of any Taxes under applicable Law.

## ARTICLE III

## TERMINATION

Section 3.1    Termination of an Individual Service for Convenience by Service Recipient.  Except as otherwise set forth on Schedule A and subject to the next sentence, Service Recipient, upon thirty (30) days' prior written notice to Service Provider, may reduce or terminate for Service Recipient's convenience any individual Service.  Service Recipient may not reduce or terminate an individual Service if such early reduction or termination would prevent Service Provider, its Affiliates or Vendors from performing another Service that is not also being terminated.  If Service Recipient's early reduction or termination of any Service results in Service Provider having to pay any out-of-pocket fees or expenses to a Third Party (including termination charges), Service Recipient shall reimburse Service Provider for such charges, if Service Recipient is notified prior to the incurrence of such charges. Upon notification of such charges, Service Recipient, at its sole discretion, may choose to continue, reduce or terminate the applicable Service.  In connection with any early reduction or termination of Services by Service Recipient in accordance with the provisions of this Section 3.1, Service Recipient and Service Provider shall coordinate in good faith regarding the early termination or continuation of preexisting service contracts with Vendors.

Section 3.2    Mutual Termination Rights.

(a)    Subject to the next sentence, either Party may terminate (i) an individual Service in the event of a material breach of this Agreement with respect to such Service by the

-14-

other Party if such material breach is curable by the breaching Party and the breaching Party fails to cure the breach within thirty (30) days following its receipt of written notice of the breach from the non-breaching Party or (ii) this Agreement in the event of an assignment with respect to which the non-assigning Party has not consented in accordance with Section 6.2. If a material breach is not curable by the breaching Party, the non-breaching Party may immediately terminate any Service to which the breach relates following the non-breaching Party's delivery of notice to the breaching Party pursuant to Section 6.3. Notwithstanding anything herein to the contrary, Service Recipient's failure to pay (or cause to be paid) any Fees when due and payable shall not constitute a breach of the terms of this Agreement if there exists a good faith disagreement regarding such Fees.

(b)    Except as otherwise provided herein, the obligation of Service Provider to provide, or cause to be provided, any Service shall cease on the earliest to occur of (i) the expiration of the Services Period applicable to such Service or (ii) the date on which such Service is terminated in accordance with the terms of this ARTICLE III. This Agreement shall automatically terminate without notice, and all provisions of this Agreement shall become null and void and of no further force and effect, except for the provisions set forth in Section 6.5, on the date on which neither Party has any obligations to provide any Service under this Agreement.

Section 3.3    Obligations on Termination. Upon termination of this Agreement, Service Provider shall invoice Service Recipient for all outstanding Fees rendered through the effective date of termination of this Agreement and, within thirty (30) days following receipt of such invoice, Service Recipient shall pay all outstanding Fees. Undisputed payments not made within thirty (30) days after termination of this Agreement shall be subject to the late charges as provided in Section 2.2.

Section 3.4    Termination of an Individual Service by Service Provider. If, during the Services Period, (a) with respect to a Service provided by a Vendor of Service Provider at the Effective Date, such Vendor is unwilling or unable to provide the Service, or (b) with respect to a Service provided by Service Provider at the Effective Date, Service Provider is unable to continue providing the Service using commercially reasonable efforts, in each case (i) and (ii), Service Provider, upon providing thirty (30) days' prior written notice to Service Recipient, may terminate the affected Service. Such termination of the affected Service shall have no effect upon the provision of the Services to Service Recipient unless other Services are dependent on that terminated Service, in which case the Parties will cooperate and use commercially reasonable efforts to promptly determine and implement a reasonable alternative arrangement for the affected Services. Notwithstanding the foregoing, Buyer may not terminate any Buyer Service listed on Schedule A-2 as "Required for GOB" prior to the end of all GOB Periods for all GOB Stores.

## ARTICLE IV

## CONFIDENTIALITY

Section 4.1    Confidential Information. "Confidential Information" means any nonpublic information whether disclosed in oral, written, visual, electronic or other form, that (a) one Party or one of its Affiliates (the "Disclosing Party") discloses to the other Party or one of its

-15-

Affiliates (the "Receiving Party"), including information received as a result of data or system access during the term of this Agreement, (b) relates to or is disclosed in connection with this Agreement and (c) is or reasonably should be understood by the Receiving Party to be confidential or proprietary to the Disclosing Party (whether or not such information is marked "Confidential" or "Proprietary"). Confidential Information of the Business is the Confidential Information of Buyer.

Section 4.2    Treatment of Confidential Information.  The Receiving Party shall (a) restrict disclosure of the Disclosing Party's Confidential Information to its and its Affiliates' Personnel with a need to know such Confidential Information to fulfill its obligations under this Agreement, (b) instruct those Personnel of their obligation not to disclose the Confidential Information or use the Confidential Information except to fulfill the Receiving Party's obligations under this Agreement and (c) protect the Confidential Information, and require those Personnel to protect it, using the same degree of care as the Receiving Party uses with its own Confidential Information, but no less than reasonable care. The Receiving Party shall notify the Disclosing Party as soon as reasonably practicable after obtaining knowledge of any disclosure, or suspected disclosure, of any Confidential Information to a Third Party in a manner prohibited by applicable Law or the terms of this Agreement.

Section 4.3    Liability for Unauthorized Disclosure.  The Receiving Party shall be liable to the Disclosing Party for any unauthorized disclosure of Confidential Information in violation of this Agreement by it, its Affiliates and any of its or its Affiliates' current or former Personnel.

Section 4.4    Return or Destruction.  Without limiting the foregoing, when any Confidential Information is no longer needed for the purposes contemplated by this Agreement, the Receiving Party shall, promptly upon the request of the Disclosing Party, either return such Confidential Information in tangible form or certify to the other Party that it has destroyed such Confidential Information.

Section 4.5    Exceptions to Confidential Treatment.  The obligations under Section 4.2 do not apply to any information that the Receiving Party can demonstrate (a) was disclosed to the Receiving Party by a Third Party without an obligation of confidentiality to the Disclosing Party, its Affiliates or any other Third Party, as applicable, (b) is or becomes available to the public other than by disclosure by the Receiving Party or its Affiliates in violation of this Agreement or (c) was or is independently developed by the Receiving Party or its Affiliates without use of the Disclosing Party's Confidential Information.  Notwithstanding anything to the contrary, with respect to the Seller and its Affiliates, Confidential Information relating to the Business that existed as of the Effective Date shall not be subject to the foregoing exceptions (a) and (c).

Section 4.6    Protective Arrangement.  A Receiving Party may disclose the Disclosing Party's Confidential Information upon the advice of the Receiving Party's legal counsel that (a) such information is required to be disclosed by Law or the rules and regulations of any applicable Governmental Authority and the Receiving Party has complied with this Section 4.6 or (b) such information is required to be disclosed in response to a valid subpoena or Order of a court or other Governmental Authority of competent jurisdiction or other valid legal

-16-

process and the Receiving Party has complied with this <u>Section 4.6</u>.  Prior to any such disclosure, the Receiving Party shall give the Disclosing Party, to the extent legally permitted and reasonably practicable, prompt prior written notice of such disclosure and an opportunity to contest such disclosure, and the Receiving Party shall use commercially reasonable efforts to cooperate, at the expense of the Receiving Party, in seeking any reasonable protective arrangements requested by the Disclosing Party.  If such appropriate protective order or other remedy is not obtained, the Receiving Party may furnish, or cause to be furnished, only that portion of such information that the Receiving Party is advised by legal counsel is legally required to be disclosed.  The Receiving Party shall take commercially reasonable steps to ensure that confidential treatment is accorded such information.

Section 4.7    <u>Ownership of Information</u>.  Except as otherwise provided in this Agreement, all Confidential Information provided by or on behalf of a Party (or its Affiliates) that is provided to the other Party or its Affiliates shall remain the property of the Disclosing Party and nothing herein shall be construed as granting or conferring rights of license or otherwise in any such Confidential Information.

<b>ARTICLE V</b>

<b>INDEMNIFICATION; LIMITATION OF LIABILITY</b>

Section 5.1    <u>Indemnification by Service Recipient</u>.  Notwithstanding anything to the contrary in <u>Section 5.5</u>, Service Recipient shall defend, indemnify and hold harmless Service Provider and its Affiliates and its Vendors and Personnel (each, a "<u>Service Provider Indemnitee</u>") from and against any and all Losses actually incurred or suffered by Service Provider Indemnitee of every kind and nature to the extent caused by or resulting from a Third Party claim arising from or relating to:  (a) a breach of any provision of this Agreement by Service Recipient or its Affiliates or any of their respective Personnel; or (b) the gross negligence, willful misconduct or fraud of Service Recipient or its Affiliates or their respective Personnel (collectively, the "<u>Service Recipient Claims</u>").  Notwithstanding the obligations set forth above in this <u>Section 5.1</u>, Service Recipient shall not defend, indemnify or hold harmless Service Provider Indemnitees to the extent that such Service Recipient Claims were caused by: (i) a breach of any provision of this Agreement by Service Provider (including pursuant to <u>Section 1.9</u>), its Affiliates or its Vendors or any of their respective Personnel; (ii) the gross negligence, willful misconduct or fraud of Service Provider or its Affiliates or its Vendors or any of their respective Personnel in the performance (or non-performance) of this Agreement; or (iii) actual or alleged infringement, misappropriation or other violation by Service Provider, its Affiliates or its Vendors or any of their respective Personnel or by Service Recipient or its Affiliates of the Intellectual Property of a Third Party in connection with Service Provider's, its Affiliates' or its Vendors' or any of their respective Personnel's provision, or Service Recipient's or its Affiliates' receipt, of Services.

Section 5.2    <u>Indemnification by Service Provider</u>.  Notwithstanding anything to the contrary in <u>Section 5.5</u>, Service Provider shall defend, indemnify and hold harmless Service Recipient and its Affiliates and Personnel (each, a "<u>Service Recipient Indemnitee</u>") from and against any and all Losses actually incurred or suffered by Service Recipient Indemnitee of every kind and nature to the extent caused by or resulting from a Third Party claim arising from or relating to: (a) a breach of any provision of this Agreement by Service Provider (including

-17-

pursuant to Section 1.9), its Affiliates, its Vendors or any of their respective Personnel; (b) the gross negligence, willful misconduct or fraud of Service Provider, its Affiliates or its Vendors or any of their respective Personnel in the performance (or non-performance) of the Services; or (c) actual or alleged infringement, misappropriation or other violation by Service Provider, its Affiliates or its Vendors or any of their respective Personnel or by Service Recipient or its Affiliates of the Intellectual Property of a Third Party in connection with Service Provider's, its Affiliates' or its Vendors' or any of their respective Personnel's provision, or Service Recipient's or its Affiliates' receipt, of Services (together, the "Service Provider Claims").  Notwithstanding the obligations set forth above in this Section 5.2, Service Provider shall not defend, indemnify or hold harmless Service Recipient Indemnitees to the extent that such Service Provider Claims set forth in clauses (a)-(c) of this Section 5.2 were caused by: (i) a breach of any provision of this Agreement by Service Recipient, its Affiliates or any of their respective Personnel or (ii) the gross negligence, willful misconduct or fraud of Service Recipient, its Affiliates or Personnel in the performance (or non-performance) of this Agreement.  Service Recipient Claims and Service Provider Claims are each individually referred to as a "Claim."  Notwithstanding the inclusion of Leased Employees as "Personnel" of Buyer in Sections 5.1 and 5.2, no Seller Entity shall be required to indemnify Buyer, its Affiliates, Vendors or Personnel for any Claims which are caused by or result from the acts or omissions of any Leased Employee during the Leasing Period (a "Leased Employee Claim").  Buyer shall defend, indemnify and hold harmless Seller, its Affiliates, Vendors and Personnel for any such Leased Employee Claim.

Section 5.3    Procedure.  In the event of a Claim that arises from a Third Party claim, the indemnified Party shall give the indemnifying Party prompt notice in writing of the Claim; but the failure to provide such notice shall not release the indemnifying Party from any of its obligations under this ARTICLE V, except to the extent the indemnifying Party is materially prejudiced by such failure.  Upon receipt of such notice, the indemnifying Party shall be entitled to assume and control the defense of the Claim at its expense and through counsel of its choice that is reasonably satisfactory to the indemnified Party, and shall give notice of its intention to do so to the indemnified Party within thirty (30) days of the receipt of such notice from the indemnified Party; provided, however, that the indemnifying Party shall not, without the prior written consent of the indemnified Party, (a) enter into any settlement or compromise with respect to any Claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to applicable Service Provider Indemnitee or Service Recipient Indemnitee of a written release from all liability in respect of the Claim or (b) enter into any settlement or compromise with respect to any Claim in any manner that may adversely affect the applicable Service Provider Indemnitee or Service Recipient Indemnitee other than as a result of money damages or other monetary payments that are indemnified hereunder. The applicable Service Provider Indemnitee or Service Recipient Indemnitee shall have the right at its own cost and expense to employ separate counsel and participate in the defense of any Claim.

Section 5.4    Independent Obligation.  The obligations of each Party to defend, indemnify and hold harmless, the other Parties' indemnitees under this ARTICLE V are independent of each other and any other obligation of the Parties under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, if, in accordance with this Agreement, Seller performs or is the recipient of any Service which violates any agreement or

-18-

license with a Third Party or other contractual obligation, Buyer shall defend, indemnify and hold harmless Seller and its Affiliates and Personnel from and against any and all Losses actually incurred or suffered by such Seller Entities of every kind and nature to the extent caused by or resulting from a Third Party claim arising from or relating to provision or receipt of such Service.

Section 5.5    Limitation of Liability.  EXCEPT FOR (A) LIABILITIES THAT ARE PAYABLE BY THE APPLICABLE INDEMNIFIED PARTY IN CONNECTION WITH A THIRD PARTY CLAIM OR (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY, NOR ITS AFFILIATES OR ITS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES, BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES OR LOST PROFITS HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING IN ANY WAY OUT OF THIS AGREEMENT.  EXCEPT AS OTHERWISE LIMITED IN THIS SECTION 5.5, EACH PARTY'S AND ITS AFFILIATES' LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO (1) SERVICE PROVIDER'S OBLIGATION TO RE-PERFORM A SERVICE (IF SERVICE PROVIDER IS THEN CAPABLE OF PROVIDING SUCH SERVICE PURSUANT TO THE TERMS OF THIS AGREEMENT) OR FURNISH CORRECT INFORMATION, PAYMENT OR ADJUSTMENT IN THE SERVICES AT NO ADDITIONAL COST OR EXPENSE TO SERVICE RECIPIENT IF SERVICE RECIPIENT PROMPTLY ADVISES SERVICE PROVIDER OF SUCH ERROR OR OMISSION, (2) OTHER SPECIFIC PERFORMANCE (OR OTHER EQUITABLE RELIEF) AS PROVIDED IN SECTION 6.9 AND (3) THE PAYMENT OF MONETARY DAMAGES, NOT TO EXCEED, FOR ALL CLAIMS IN THE AGGREGATE, THE AGGREGATE AMOUNT OF FEES ACTUALLY PAID (OR OTHERWISE PAYABLE) TO SUCH PARTY AS SERVICE PROVIDER UNDER THIS AGREEMENT.

Section 5.6    Special Indemnity for Cash Management Services.  Notwithstanding the limitations in Section 5.5, Seller and Buyer jointly and severally agree to indemnify and hold harmless Bank of America, N.A. and its Affiliates (collectively, the "Special Indemnified Parties") for any and all claims, damages, losses and liabilities of any kind or nature and reasonable, documented and invoiced out of pocket expenses (including the reasonable, documented and invoiced fees, disbursements and other charges of one firm of counsel for all Special Indemnified Parties, taken as a whole (which on the Effective Date shall be Skadden, Arps, Slate, Meagher & Flom LLP) and, if necessary, one firm of local counsel in each relevant jurisdiction for all Special Indemnified Parties, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Special Indemnified Party affected by such conflict informs you of such conflict and thereafter retains its own counsel, of another firm of counsel (and local counsel, if applicable)) for such affected Special Indemnified Party) that may be incurred by or asserted or awarded against any Special Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) providing to Seller, Buyer, or any of their respective Subsidiaries cash management services, including, without limitation, ACH, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, foreign exchange facilities, credit card processing services and private

-19-

label letters of credit, credit or debit cards, and purchase cards, in each case, in connection with the implementation of this Agreement; provided, that the foregoing indemnity will not, as to any Special Indemnified Party, apply to claims, damages, losses and liabilities to the extent they arise from the willful misconduct, bad faith or gross negligence of Special Indemnified Party, as determined by a final non-appealable judgment of a court of competent jurisdiction.

# ARTICLE VI

## MISCELLANEOUS

Section 6.1    Amendment; Waiver.  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 6.2    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other Party, and any purported assignment or delegation in contravention of this Section 6.2 shall be null and void and of no force and effect. Notwithstanding the preceding sentence, either Party may assign any or all of its rights and obligations under this Agreement (a) to an Affiliate, so long as the assigning Party will remain liable to the non-assigning Party for the performance of the assigning Party's obligations hereunder, or (b) with respect to Buyer, in connection with a sale or disposition of any assets or lines of business to which this Agreement relates; provided that in the case of (b), the transferee of such assets shall agree in writing to be bound by the terms of this Agreement as if named as a "Party" hereto.  Subject to the preceding sentences of this Section 6.2, this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the Parties and their respective successors and permitted assigns.

Section 6.3    Notices.  Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) via e-mail or (c) by a nationally recognized courier for overnight delivery service. A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if via e-mail, on the date of successful transmission and (iii) if by nationally recognized courier, one Business Day after delivery to such courier. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

-20-

If to Seller, then to:

> Sears Holdings Corporation
> 3333 Beverly Road
> Hoffman Estates, IL 60179
> Attention:  General Counsel
> E-mail:  counsel@searshc.com

with a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention:  Ray C. Schrock, P.C., Ellen J. Odoner, Gavin Westerman and Sunny Singh
> E-mail:  Ray.Schrock@weil.com; Ellen.Odoner@weil.com; Gavin.Westerman@weil.com; Sunny.Singh@weil.com

If to Buyer, then to:

> Transform Holdco LLC and Transform SR Holdings LLC
> c/o ESL Partners, Inc.
> 1170 Kane Concourse, Suite 200
> Bay Harbor Islands, FL 33154
> Attention:  Kunal S. Kamlani and Harold Talisman
> Facsimile:  (305) 864-1370
> E-mail: kunal@eslinvest.com; harold@eslinvest.com

with a copy (which shall not constitute notice) to:

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York 10006
> Attention:  Christopher E. Austin, Benet J. O'Reilly, Sean A. O'Neal
> Facsimile:  (212) 225-3999
> E-mail: caustin@cgsh.com; boreilly@cgsh.com; soneal@cgsh.com

Section 6.4    Publicity.  All publicity regarding this Agreement is subject to Section 13.1 of the Asset Purchase Agreement.

Section 6.5    Survival.  Each term of this Agreement that would, by its nature, survive the termination or expiration of this Agreement shall so survive, including the obligation of either Party to pay all amounts accrued hereunder and including the provisions of Section 1.5 (Knowledge Transfer for Benefit of Seller); Section 1.7 (Responsibility for Errors; Delays); Section 1.11(Ownership of Data and Other Assets); Section 1.12 (Data Privacy); Section 1.14 (Records); Section 3.3 (Obligations on Termination); ARTICLE IV (Confidentiality); ARTICLE V (Indemnification; Limitation of Liability); Section 6.3 (Notices); Section 6.4 (Publicity);

-21-

Section 6.5 (Survival); Section 6.6 (No Third Party Beneficiaries); Section 6.7 (Severability); Section 6.8 (Entire Agreement; Interpretation); Section 6.11 (No Agency); Section 6.12 (Construction and Interpretation); Section 6.13 (Dispute Resolution); Section 6.15 (Precedence of Agreements); and Section 6.16 (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial).

        Section 6.6     Parties in Interest; No Third Party Beneficiaries.  Except for the indemnification rights under this Agreement of any Service Provider Indemnitee or Service Recipient Indemnitee in their respective capacities as such, or unless otherwise expressly specified herein, nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or permitted assignee of a Party.

        Section 6.7     Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

        Section 6.8     Entire Agreement; Interpretation. This Agreement (including the Annex and Schedules hereto), together with the Asset Purchase Agreement, the Employee Lease Agreement and the Occupancy Agreement, contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. In the event of any inconsistency between the provisions of this Agreement and the Employee Lease Agreement, the terms and provisions of this Agreement shall govern and control. Notwithstanding the foregoing, and for the avoidance of doubt, the preceding sentence shall not apply to Sections 5.1 or 5.2 of this Agreement, which Section 2.3 (Indemnification) of the Employee Lease Agreement shall govern in all respects in the event of an inconsistency between the provisions of this Agreement and Section 2.3 of the Employee Lease Agreement.  Each of the Parties acknowledge that it has been represented by legal counsel in connection with this Agreement, the Asset Purchase Agreement, the Employee Lease Agreement and the Occupancy Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement, the Asset Purchase Agreement the Employee Lease Agreement and the Occupancy Agreement against the drafting party has no application and is expressly waived.  In the event of a conflict or inconsistency between the terms of the Asset Purchase Agreement (including the representations, warranties, covenants and indemnification provisions thereof) and the terms of any other documents delivered or required to be delivered in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement (including this Agreement), the Parties acknowledge and agree that the terms of the Asset Purchase Agreement shall supersede such conflicting or inconsistent terms in such other documents and the terms of the Asset Purchase Agreement shall define the rights and obligations of the Parties and their respective

WEIL:\96889465\20\73217.0004

officers, directors, employees, stockholders and Affiliates with respect to the subject matter of such conflict or inconsistency.

Section 6.9    Specific Performance.  The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement by the breaching Party or Parties. If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at Law.

Section 6.10    Force Majeure.  Service Provider shall use commercially reasonable efforts to provide, or cause to be provided, the Services without interruption. Notwithstanding the foregoing, neither Party shall be responsible to the other for any delay in or failure of performance of its obligations under this Agreement, to the extent such delay or failure is caused by events or circumstances outside of such Party's control which could not be avoided or otherwise mitigated using commercially reasonable efforts to perform, including if attributable to any act of God, act of terrorism, fire, war, embargo or other governmental act or riot (each, a "Force Majeure Event"); provided, however, that the Party affected thereby gives the other Party prompt written notice of the occurrence of any event which is likely to cause (or has caused) any delay or failure setting forth its best estimate of the length of any delay and any possibility that it shall be unable to resume performance; provided, further, that said affected Party shall use its commercially reasonable efforts to prevent, mitigate and expeditiously overcome the effects of that event and resume performance.  Neither Party is required to pay for those Services that are not performed, to the extent such Services are not performed, due to excused performance in a Force Majeure Event or otherwise.

Section 6.11    No Agency.  Nothing in this Agreement creates (or shall be claimed or intended to create) a relationship of agency, partnership or employer/employee between Seller and Buyer and it is the intent and desire of the Parties that the relationship be and be construed as that of independent contracting parties and not as agents, partners, joint venturers or a relationship of employer/employee.

Section 6.12    Construction and Interpretation. For purposes of this Agreement, (a) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day; (b) any reference in this Agreement to "dollars" or to "$" means U.S. dollars; (c) any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa; (d) the provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement

WEIL:\96889465\20\73217.0004

unless otherwise specified; (e) words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires; (f) the word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if"; (g) the word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; and (h) references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or."

Section 6.13    Dispute Resolution.

(a)    Negotiation.  If a dispute, controversy or claim ("Dispute") arises between the Parties relating to the interpretation or performance of this Agreement, within fifteen (15) days from a written request from a Single Point of Contact of a Party to the Single Point of Contact of the other Party, such Single Points of Contact, who shall have the authority to resolve the matter, shall meet to attempt in good faith to negotiate a resolution of the Dispute prior to pursuing other available remedies.  The date of the initial meeting between the Single Points of Contact shall be referred to herein as the "Dispute Resolution Commencement Date."  Any discussions and correspondence relating to trying to resolve such Dispute by meetings between Single Points of Contact shall be treated as Confidential Information developed for the purpose of settlement and shall be exempt from any discovery or production, if any, in connection with any resolution of such Dispute and shall not be admissible as evidence in such Dispute resolution. If any Dispute is not resolved by the Single Points of Contact within sixty (60) days from the Dispute Resolution Commencement Date pursuant to this Section 6.13(a), the Dispute shall be resolved by the courts set forth in Section 13.8(b) of the Asset Purchase Agreement.

(b)    Continuity of Service and Performance.  Unless otherwise agreed in writing, the Parties shall continue to provide Services, to make payments, and to honor all other commitments under this Agreement during the course of Dispute resolution pursuant to the provisions of this Section 6.13.

Section 6.14    Counterparts.  This Agreement may be executed in any number of counterparts (including via electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party. Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 6.15    Precedence of Agreements.  Each Schedule attached to or referenced in this Agreement is hereby incorporated into and shall form a part of this Agreement by reference; provided that the terms contained in such Schedule shall only apply with respect to the Service(s) provided under that Schedule.  In the event of a conflict between the terms contained in an individual Schedule and the terms in the body of this Agreement, the terms in the individual Schedule shall take precedence with respect to the Service(s) under such Schedule.

-24-

Section 6.16    <u>Governing Law; Jurisdiction and Forum; Waiver of Jury Trial</u>. Subject to <u>Section 6.13</u> of this Agreement, Section 13.8 (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) of the Asset Purchase Agreement shall apply to this Agreement as if set forth herein, *mutatis mutandis*.

*[Remainder of page left intentionally blank]*

-25-

IN WITNESS WHEREOF, the Parties have caused their respective duly authorized representatives to execute this Agreement effective as of the date first written above.

**SEARS HOLDINGS CORPORATION**

By: _____

Name:    Robert A. Riecker
Title:    Chief Financial Officer

IN WITNESS WHEREOF, the Parties have caused their respective duly
authorized representatives to execute this Agreement effective as of the date first written above.

TRANSFORM HOLDCO LLC

By: _____

Name: Edward S. Lampert
Title: Chief Executive Officer

*[Signature Page to Services Agreement]*

IN WITNESS WHEREOF, the Parties have caused their respective duly
authorized representatives to execute this Agreement effective as of the date first written above.

TRANSFORM SR HOLDINGS LLC

By: _____

Name: Harold Talisman
Title: Chief Financial Officer

*[Signature Page to Services Agreement]*

**Annex I**

**DEFINED TERMS**

The following defined terms used in this Agreement will have the meanings ascribed to them below. Other terms are defined in the body of this Agreement to which this <u>Annex I</u> is attached. All defined terms include the singular and the plural form of such terms.

"<u>Buyer Entities</u>" means, collectively, Buyer, its Affiliated Designees and their respective Affiliates.

"<u>Employee Lease Agreement</u>" means that certain Employee Lease Agreement, dated as of the date hereof and entered into by and between the Parties hereto.

"<u>Executive Business Employee</u>" shall have the meaning set forth in the Employee Lease Agreement.

"<u>Leasing Period</u>" shall have the meaning set forth in the Employee Lease Agreement.

"<u>Leased Employee</u>" shall have the meaning set forth in the Employee Lease Agreement.

"<u>Licenses and Permits</u>" means all grants, authorizations, licenses, permits, variances, consents or certificates issued pursuant to any Governmental Authority.

"<u>Losses</u>" means actual, losses, damages, costs and expenses, including reasonable attorneys' fees, without duplication.

"<u>Personnel</u>" means the officers, managers, directors, employees, agents, suppliers, licensors, licensees, contractors, subcontractors, advisors (including attorneys, accountants, technical consultants or investment bankers) and other representatives, from time to time, of a Party and its Affiliates; provided that the Personnel of any Buyer Entity shall not be deemed Personnel of any Seller Entity and the Personnel of any Seller Entity shall not be deemed Personnel of any Buyer Entity, except that Leased Employees performing Services under this Agreement shall be deemed Personnel of Buyer for purposes of this Agreement.

"<u>Seller Entities</u>" means, collectively, Seller and all of its Affiliates.

"<u>Service Provider</u>" means, with respect to any Service, the Person providing such Service hereunder.

"<u>Service Recipient</u>" means, with respect to any Service, the Person receiving such Service hereunder.

"Services" means (a) the Seller Services when the Service Provider is a Seller Entity or a Vendor contracted by Seller, or (b) the Buyer Services when the Service Provider is a Buyer Entity or a Vendor contracted by Buyer, as the case may be and context requires.

WEIL:\96889465\20\73217.0004

**Schedule A-1**

**SELLER SERVICES**

[See document to be separately provided.]

WEIL:\96889465\20\73217.0004

-

# SCHEDULE A: SERVICES SCHEDULES

**To the Services Agreement, dated as of February 11, 2019, among**

**Sears Holdings Corporation, Transform Holdco LLC and Transform SR Holdings LLC**

- **Schedule A-1: Seller Services**

  - Critical Contract Services
  - Critical Procurement Services
  - Pharmacy Services
  - Repair Services
  - Insurance Services
  - Other Credit Services
  - Human Resources / Payroll Services
  - International Entity Services

- **Schedule A-2: Buyer Services**

  - Service Contract Services
  - Payroll Processing
  - Benefits Administration
  - Accounting Services
  - Tax – Required Tax Services
  - "As-Needed" Tax Services
  - IT (Accounting/PoS/etc.)
  - Real Estate
  - Contracts Support
  - Cash Management
  - Compliance/Data

1

- Loss Prevention
- Facilities Maintenance
- Associate Relation
- Disbursements
- Reporting Services
- Risk Management & Insurance
- Compliance – Environmental
- Payment Clearing and Related Financial Services
- Legal
- Supply Chain
- Customer Complaints
- Home Services
- Parts Direct
- Product Safety
- Pricing
- P-Card

# Schedule A-1: Seller Services

In addition to the fees described below, Buyer will pay the Seller Administrative Fee of $250,000 per month, as described in Section 2.1(a) of the Services Agreement.

*Critical Contract Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|-----|----------------|---------------------------|----------------|------|
| 1. | Provision of critical contract services | Seller (via the Leased Employees) will use commercially reasonable efforts to maintain its relationships with critical Vendors and contract counterparties, and allow Buyer to receive the benefit of such services provided by such Vendors and contract counterparties, in the following, but not exclusive, categories of services:<br>• HVAC<br>• Housekeeping<br>• Merchandise Delivery<br>• Supplies and Consumables<br>• Armored Cars<br>• Marketing<br>• Signage<br>• Yard Jockeys<br>• Software / Software Maintenance / IT Services<br>• Automotive<br>• Alarm Monitoring<br>• Repairs and Maintenance<br>• Environmental Services<br>• Call Centers<br>• Leasing<br>• Materials Handling<br>• Waste Services and Recycling<br>• Pest Control<br>• Telecom<br>• Security and Loss Prevention<br>• Printing and Reproduction<br>• Landscaping and Snow Removal<br>• Utilities<br>• Appliance Haul Away | 60 days.<br><br>If, during this Service Period, any such contracts are assigned to Buyer, Buyer will provide this Seller Service as a Buyer Service to Seller, as set forth on Schedule A-2. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds. |

3

| | | • Contract Labor and Temps | | |
|---|---|---|---|---|

*Critical Procurement Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of critical procurement services | Seller (via the Leased Employees) will use commercially reasonable efforts to maintain its relationships with critical Vendors and contract counterparties, and allow Buyer to receive the benefit of such merchandise and other goods sold by such Vendors and contract counterparties | 60 days.<br><br>If, during this Service Period, any such contracts are assigned to Buyer, Buyer will provide this Seller Service as a Buyer Service to Seller, as set forth on Schedule A-2. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds. |

*Pharmacy Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|-----|----------------|---------------------------|----------------|------|
| 1. | Seller acts as Buyer's agent with respect to pharmaceutical licenses | Seller shall retain ownership of all pharmacies until such time as Buyer obtains appropriate licenses to operate each pharmacy.  To the extent located in a property owned or leased by Buyer, each pharmacy shall (during the service period as to such pharmacy) lease such space from Buyer.<br><br>Seller (via the Leased Employees) will operate pharmacies, in the ordinary course of business, as Buyer's "agent," pending approval or transfer of all licenses and permits to operate the pharmaceutical business to Buyer. Pharmacy operations will transition to Buyer (including the transfer of all related assets) on a rolling basis as the appropriate licenses are obtained to operate such pharmacy.<br><br>Inventory would be calculated as of February 11, 2019 for the purposes of the consolidated inventory calculation, however title in such inventory shall not pass to Buyer until all applicable pharmacy licenses and permits are approved or transferred. Seller shall grant a Transition Lien to the Transform Lenders with respect to all pharmacy Inventory during this Service Period prior to title passing to Buyer. | From Closing Date until the earlier of (i) three (3) months and (ii) date on which Buyer obtains all required licenses.<br><br>As licenses are obtained, pharmacies shall be removed from coverage under this service on a rolling basis. | To the extent permissible, Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly upon the first payment or to the extent such payments are not permitted, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds.<br><br>Sellers shall assign any pharmacy receivables to Buyer promptly upon generation of such receivables.<br><br>Pharmacies operated by Seller requiring leased space from Buyer shall pay rent to Buyer and in consideration of a portion |

6

| | | | | of the fixed fee payable by Seller to Buyer for Buyer Services under this Agreement, Buyer waives the first three (3) months of any such pharmacy rent amount. Thereafter, pharmacy rent shall be based on market rates as agreed between Buyer and Seller. |
|---|---|---|---|---|

*Repair, Home Improvement and Installation Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|-----|----------------|---------------------------|----------------|------|
| 1. | Seller to act as Buyer's agent with respect to licenses required to perform customers' in-home repair services ("Home Repair Field Operations Business") | Seller (via the Leased Employees) continues to operate the Home Repair Field Operations Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits, including any master qualifier license, required for Buyer to operate the Home Repair Field Operations Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, Home Repair Field Operations Business employees who hold licenses ("Home Repair Licensed Employees") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee License Agreement, at the end of this Service Period, Home Repair Licensed Employees will transfer to Buyer in a single closing. | Buyer shall receive all cash receipts from operations and shall make all required disbursements (either directly to Vendors when due in accordance with Vendor's terms or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds). |
| 2. | Seller to act as Buyer's agent with respect to licenses required to perform home improvement services ("SHIP Business") | Seller (via the Leased Employees) continues to operate the SHIP Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits required for Buyer to operate the SHIP Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, SHIP Business employees who hold licenses or whose work requires Buyer to have a license (e.g. home improvement sales personnel) ("SHIP Licensed | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee Lease Agreement, at end of this Service Period, SHIP Licensed Employees will transfer to Buyer in a single closing. | Buyer shall receive all cash receipts from operations and shall make all required disbursements (either directly to Vendors when due in accordance with Vendor's terms or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of |

| | | | | |
|---|---|---|---|---|
| | | Employees") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | | such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds). |
| 3. | Seller to act as Buyer's agent with respect to licenses required to perform appliance installation services in customers' homes ("Appliance Installation Business") | Seller (via the Leased Employees) continues to operate the Appliance Installation Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits required for Buyer to operate the Appliance Installation Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, Appliance Installation Business employees who hold licenses ("Installation Licensed Employees") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee Lease Agreement, at the end of this Service Period, Appliance Installation Business employees who hold licenses will transfer to Buyer in a single closing. | Buyer shall receive all cash receipts from operations and shall make all required disbursements (either directly to Vendors when due in accordance with Vendor's terms or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the Payments; and (iii) Seller shall make such payments when due, drawing from such funds). |

| | | | |
|---|---|---|---|
| 4. | Seller to act as Buyer's agent with respect to licenses required to perform customers' auto repair services ("Auto Repairs Business") | Seller (via the Leased Employees) continues to operate the Auto Repairs Business in the ordinary course of business, acting as Buyer's agent, pending approval and transfer all necessary licenses and permits, including any master qualifier license, required for Buyer to operate the Auto Repairs Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, Auto Repairs Business technicians and auto center managers who are named on licenses ("Auto Repairs Licensed Employees") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee Lease Agreement, at the end of this Service Period, Auto Repairs Licensed Employees will transfer to Buyer in a single closing. | Buyer shall receive all cash receipts from operations and shall make all required disbursements (either directly to Vendors when due in accordance with Vendor's terms or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the Payments; and (iii) Seller shall make such payments when due, drawing from such funds). |
| 5. | Protection Agreement Services | Seller (via the Leased Employees) shall continue to operate its service contract business (where a subsidiary of Seller is the obligor) in the ordinary course, including performing all reasonably necessary or appropriate services required under the protection agreements in effect during the Service Period and administrative services, including but not limited to: maintenance of files, retention of records, full claims adjudication according to the terms and conditions of the contracts and applicable state law and servicing in response to contract holders, and legal and regulatory services. | Earlier of (i) 60 days and (ii) date on which Buyer obtains requisite licenses/registrations. In the event that Buyer is unable to obtain requisite licenses/registrations within the 60 days after the Closing Date for fewer than five states, through no fault or delay of its own, the Parties will discuss in good faith extending this Service Period to allow Buyer additional time. | Buyer shall receive all cash receipts from operations and shall make all required disbursements (either directly to Vendors when due in accordance with Vendor's terms or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including |

| | | | | the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the Payments; and (iii) Seller shall make such payments when due, drawing from such funds). |

*Insurance Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|-----|----------------|---------------------------|----------------|------|
| 1. | Endorsement of Buyer and BAML, Citi and Cantor Fitzgerald under existing insurance policies | Seller endorses Buyer (specifically, Transform Midco LLC and its Subsidiaries) under the following insurance programs and Seller agrees to extend coverage under the following insurance programs in order to provide benefits to Buyer: <br> - Primary Casualty Insurance <br> - Excess (Umbrella) Liability <br> - Property Insurance <br> - Miscellaneous other policies as needed <br> BAML, Citi and Cantor Fitzgerald to be endorsed as additional insured and loss payees. | Until earlier of (i) expiration date of current policy and (ii) date on which Buyer has obtained replacement policy with respect Acquired Assets. <br><br> If, during this Service Period, any insurance programs are assigned to Buyer, Buyer will provide this Service as a Buyer Service, as set forth on Schedule A-2. | Buyer to reimburse Seller for its proportion of any premiums, deductibles or other costs related to Buyer's insured assets or operations during the Service Period in accordance with Section 2.2 of this Agreement. |
| 2. | Addition of Buyer as Alternate Employer | Addition of Buyer as an alternate employer to provide Workers Compensation insurance, as necessary, under the Employee Lease Agreement. | From Closing Date until conclusion of the Leasing Period. | Buyer to reimburse Seller for its proportion of any premiums, deductibles or other costs during the term in accordance with Section 2.2 of this Agreement. |

*Other Credit Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Use of Atlantic Specialty/One Beacon Bond Program (includes "Customs Bond") plus other smaller miscellaneous bonds (collectively, "One Beacon Bonds") | Seller to provide Buyer with coverage under existing Customs Bonds with respect to any import activities of Buyer as to which Department of Commerce requires posting of a Customs Bond.<br><br>Seller to provide Buyer with benefit of existing Surety Bonds with respect to guarantee payments, contractor license bonds and various other permits.<br><br>Seller shall grant a Transition Lien to the Transform Lenders with respect to the One Beacon Bonds during the service term. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Customs Bond during the Service Period in accordance with Section 2.2 of this Agreement.<br><br>Any amounts returned to Seller under the Customs Bond and/or from the bonding company that issued such customs bond (to the escrow deposit account maintained at Citibank, N.A. by the Agent for further credit to CBNA f/b/o Sears Holdings Corp.) shall be allocated and paid promptly to either Buyer (to an account at Citi to be designated by Buyer), Seller or both as a result of good faith discussions between the Parties. |
| 2. | Use of Liberty Mutual Insurance Company, XL Specialty Insurance Company, Travelers Property Casualty Group and RLI Group surety bonds ("Surety Bonds") | Seller to provide Buyer with benefit of existing Surety Bonds with respect to workers' compensation, court bonds, guarantee payment, performance bond, contractor license bonds and various other permit bonds. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Surety Bonds during the Service Period in accordance with Section 2.2 of this Agreement. |
| 3. | Use of Argonaut Insurance Company medical surety bonds ("Medical Bond") plus other miscellaneous bonds | Seller to provide Buyer with benefit of existing Medical Bond with respect to pharmacy bonds required by Medicare.<br><br>Seller to provide Buyer with benefit of existing Surety Bonds with respect to guarantee payments, court bonds | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Medical Bond during the Service Period in accordance with Section 2.2 of this Agreement. |

| | included in bond program | and various other license and permit bonds. | | |
|---|---|---|---|---|
| 4. | Use of utility bonds with various utility providers in multiple jurisdictions from various surety companies ("Utility Bonds") | Seller to provide Buyer with benefit of existing Utility Bonds with respect to payment of utility expenses. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Utility Bonds during the Service Period in accordance with Section 2.2 of this Agreement. |

*Human Resources / Payroll Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of employee medical benefits | Seller to provide employee medical benefits to Transferred Employees. | Beginning at the end of the Leasing Period until Buyer establishes its own medical plans, after which time Buyer will provide this Service as a Buyer Service as set forth on Schedule A-2. | Base Cost $240,008 per month (flat rate)<br><br>COBRA eligible $69.15/Year or $5.76 per month<br><br>CAM Services - $0.19 per eligible<br><br>Advocacy Services – $0.5 per medical enrolled per month<br><br>FSA/HSA Count – $3.5 per enrolled per month<br><br>Commuter Benefits – $3.80 per enrolled per month<br><br>QMCSO Services – $300 per order<br><br>Buyer shall reimburse Seller in accordance with Section 2.2 of this Agreement |
| 2. | Administration of employee payroll | Seller (via the Leased Employees) will administer payroll services to the Leased Employees during the Leasing Period. | For the Leasing Period, after which time Buyer will provide this Service as a Buyer Service as set forth on Schedule A-2. | Buyer shall reimburse Seller for its proportion of any costs and expenses in accordance with Section 2.2 of this Agreement. |

*International Entity Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of call center and other operational services | Without duplication of the employee services provided pursuant to the Employee Lease Agreement, Seller shall cause to be provided to Buyer any services comparable to those provided to the Business as immediately prior to the Closing Date by the following entities under Sellers' control:<br>- Sears Holdings Global Sourcing Limited<br>- Sears Sourcing India Private Limited<br>- International Sourcing & Logistics Limited<br>- Quality Assurance Laboratory Limited<br>- Sears Global Technologies India Private Limited | As to each International Entity, from the Closing Date until the date that ownership of such entity is transferred to Buyer. | Buyer shall reimburse Seller at cost for any costs beyond employee time (which is separately addressed through the Employee Lease Agreement) in accordance with Section 2.2 of this Agreement. |

**Schedule A-2**

**BUYER SERVICES**

[See document to be separately provided.]

WEIL:\96889465\20\73217.0004

## Schedule A-2: Buyer Services

*Service Contract Services*

| No. | Buyer Service | Buyer Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Service Contract Services | Buyer shall backstop, with its full faith and credit, the performance of Seller Service entitled "Protection Agreement Services" on Schedule A-1, including payment of all claims. | From the Closing Date until the date of transfer of the KCD Notes and PA Liabilities in accordance with the Asset Purchase Agreement. | In addition to any amounts paid via the backstop, an amount equal to the aggregate of all amounts paid by Buyer to Sellers with respect to any licenses under which Buyer licenses the KCD IP (in an amount not to exceed $500,000 per month). |

See attached Excel spreadsheet incorporated herein to Schedule A-2.

## Schedule A-2: Buyer Services

All Buyer Services provided during the Buyer Initial Period shall be provided for an all-in fixed fee of $1,250,000 per month.

| | Services | Details | Service Period | | Required For: | |
|---|---|---|---|---|---|---|
| | | | Start | End | GOB | Estate |
| 1 | Payroll Processing[1] | Buyer will process payroll for the GOB store employees and any other OldCo employees, other than Leased Employees:<br>• Manage the associate time and attendance system and process;<br>• Manage the creation and reporting of payroll payment processing regardless of method – electronic, paper, pay card, etc. This includes exempt and non-exempt associate population;<br>• Administer garnishment process;<br>• Calculate associate commission income and administer the reporting for commission payments;<br>• Manage payroll taxes and related deductions;<br>• Manage the processing and distribution of W-2 statements | Closing Date | Completion of wind-down of the estate | X | X |
| 2 | Benefits Administration[2] | Buyer to maintain and support benefits for GOB store employees and any other OldCo employees, other than Leased Employees [3]:<br>• Maintain relationships with insurance benefits providers (healthcare, dental, life, STD/LTD);<br>• Administer 401K plan, retirement savings plan, WorkLife solutions;<br>• Manage voluntary benefits programs and maintain company programs for service healthcare, dental, life, STD/CTD and other welfare plans<br>• Maintain administrative processes for associate communications and HR Policy development.<br>• Assist Seller to administer pension plans until fully terminated and assist in transition of pension plans to PBGC | Closing Date | Completion of wind-down of the estate | X | X |
| 3 | Accounting Services | • Continue to support A/P and any A/R<br>• Perform daily, weekly and monthly transaction processing of all entries and feeds into the general ledger system. Compile and load general ledger information for OldCo into Essbase financial reporting databases, EIS and Financial Transaction Databases to be used for internal reporting and analysis by OldCo. OldCo will inform NewCo of any processing errors or data feed issues which would impact the financial results of OldCo.<br>• Accounts Payable – Process all invoices and purchase orders for OldCo.<br>• Fixed Asset Management – maintain all OldCo fixed assets in the NewCo finance fixed asset system.<br>• Prepare/distribute statements which summarize results of operations and financial position<br>• Data extraction (FTD) financial transaction data base and financial, management and external reporting<br>• Maintain PeopleSoft accounting system and SL (stock ledger) merchandise and margin systems<br>• Maintain Essbase reporting databases which warehouse financial information<br>• Data extraction for general ledger (PS), Fixed Assets and Capital tracking.<br>• Maintain general ledger and supporting records as necessary<br>• Provide assistance to Seller to manage claims administration, including reconciliations with vendors, payment of 503(b)9 claims, as well as any other payments. | Closing Date | Completion of wind-down of the estate | X | X |
| 4 | Tax - Required Tax Services | 1.   Federal income tax<br>    a.  Prepare return and remit tax due<br>    b.  Prepare estimated tax and extension filings and remit tax due<br>    c.  Prepare LIFO tax calculations<br>    d.  Prepare supporting work papers<br>    e.  Prepare tax elections<br>    f.  Foreign tax credit calculations<br>2.   State income and sales tax<br>    a.  Prepare returns and remit tax due<br>    b.  Prepare estimated tax and extension filings and remit tax due<br>    c.  Prepare supporting work papers<br>    d.  Prepare tax allocations for periods when part of SHLD unitary returns<br>3.   Financial Accounting<br>    a.  Quarterly tax provision, effective tax rate calculations, tax accounting journal entry support<br>    b.  Analysis of uncertain tax positions and quarterly tax reserve calculations and journal entry support (if necessary)<br>    c.  Return-to-accrual calculations and necessary journal entry support<br>4.   Sales and use tax<br>    a.  Prepare tax returns and remit taxes due<br>    b.  Maintain tax tables in POS system (if continue to use Sears POS system)<br>5.   Property tax<br>    a.  Personal property tax filings<br>    b.  Real estate tax filings; landlord reimbursements<br>    c.  Accrual estimates<br>    d.  Monthly summary of tax bills paid along with recommended changes in current monthly estimate of tax liability per location<br>    e.  Appeals and audit defense, where appropriate<br>6.   POS Environmental Fees/Deposits for Product Sales at GOB stores<br>7.   Business license filings; gross receipts tax filings and accrual estimates<br>8.   Annual report/franchise tax filings<br>9.   Foreign tax (Puerto Rico, Guam)<br>    a.  Work with OldCo outside tax advisors in preparing necessary tax returns, estimated tax filings and extension filings (e.g., income, property, gross receipts) and facilitating payment of tax<br>    b.  Work with OldCo outside tax advisors, when appropriate, to prepare supporting tax work papers and accounting method changes and tax elections<br>    c.  For Statutory requirements, prepare audited financial statements and tax schedules to support necessary tax returns<br>    d.  OldCo will engage a third party tax advisor to prepare its Guam and Puerto Rico tax filings and estimated tax filings; to provide any necessary audit defense; and to provide any other foreign tax services that may be required. | Closing Date | Completion of wind-down of the estate | X | X |
| 5 | "As-Needed" Tax Services | 1.   Audit support<br>2.   Bankruptcy tax claim administration<br>3.   $10,000 cash receipts reporting (when necessary; based on information provided by business)<br>4.   Federal excise tax return (if applicable)<br>5.   Maintain tax tables in POS system (if new POS system implemented) | Closing Date | Completion of wind-down of the estate | X | X |
| | | Provide access to or services under General Ledger system, PoS, HR systems<br>Business Strategy & Operations:<br>  • Enterprise Learning & Development<br>  • Enterprise Process Management<br>  • Enterprise Project / Program Management<br>Information Analytics & Innovation:<br>  • BI Administration<br>  • BI Application Support<br>  • BI Data Monitoring<br>  • BI Delivery Administration<br>  • BI License Management & Support<br>  • Supply Chain Management<br>Network & Security Services:<br>  • Compliance | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 6 | IT (Accounting/PoS/etc.) | • Media Services<br>• Non-retail Asset Maintenance<br>• Retail Asset Maintenance<br>• Security<br>• Telecom Provisioning & Management<br>• Telecommunications Data<br>• Telecommunications Voice<br>Operational Services:<br>• Associate & Customer Desktop Support<br>• Data Center Operational Services<br>• Distributed Environment Services<br>• Storage Services<br>Retail Services:<br>• Core Retailing Transaction Support<br>• Customer Facing Transaction Support<br>• Hardware Support Services<br>Service Management<br>• Administration<br>• Business Continuity<br>• IT&G Service Quality Management<br>• IT&G Service Support<br>• IT&G Service Support – Corporate Desktop Support<br>• Learning & Development<br>• Performance & Service Management<br>IT Support Services<br>Development & Support Services:<br>• Fixed team minimum to support and maintain services, multiple enhancements, external variable charged, as needed<br>• PCI Compliance for Home Services technicians, SHIP and GOB stores | Closing Date | Completion of wind-down of the estate | X | X |
| 7 | Real Estate | **Lease Administration:**<br>• Document Abstracting<br>**Finance:**<br>• Prepare CAM Reconciliations | Closing Date | End of GOB Period | X | |
| 8 | Contracts Support | Provide access to, or services under non-merchandise contracts that are assigned to NewCo but are required for OldCo operations, including waste management, facilities management, armored car, credit card processing and other services | Closing Date | End of GOB Period | X | |
| 9 | Cash Management | Cash Management services, including but not limited to maintaining existing bank accounts, daily consolidation of funds, calculation of daily cash position, movement of funds as necessary, reconciliation of accounts and maintenance of balances, development of funding forecasts and future cash needs, support for banking and armored car services, administration of users access to Treasury website and banking software, ordering deposit slips and stamps from service providers, approving armored car purchase orders<br>· Cash settlement as currently handled by OldCo<br>· Cash clearing accounts<br>· Financial and cash forecasting<br>· Cash flow | Closing Date | Completion of wind-down of the estate | X | X |
| 10 | Compliance/Data | •Support for ethics hotline inquiries re: OldCo/ Estate<br>• Data privacy services for GOB stores and OldCo businesses to ensure data at those businesses and stores is collected, shared, and used consistent with applicable law and privacy policies.<br>• Data security services for GOB stores and OldCo businesses such as data incident prevention (e.g. use of NewCo credit card encryption services) and data incident response (e.g. remediating a data incident affecting consumers at GOB stores).<br>• Record keeping support, including coordinating the appropriate retention and storage of business and employee records for OldCo stores and businesses. | Closing Date | Completion of wind-down of the estate | X | X |
| 11 | Loss Prevention | **Provide Loss Prevention ("LP") Database Administration and LP System Support Services to OldCo including but not limited to:**<br>• Case/incident management<br>• Refund management support<br>• Content management for LP related materials<br>• Management of LP audit solution<br>• Fraud mitigation & investigation of NewCo supported e-commerce and payment systems<br>• Reporting and application environments for LP related content<br>• New applications or system enhancement | Closing Date | End of GOB Period | X | |
| 12 | Facilities Maintenance | NewCo agrees to provide the following services to OldCo:<br>· Utilities | Closing Date | End of GOB Period | X | |
| 13 | Associate Relations | · Provide use of call center to receive associate inquiries.<br>· Manage the reporting and support of associate change requests and other employment-related questions.<br>· Assist management in managing employee relations cases, including leave management<br>· Assist management in establishing an associate termination process including termination decision matrix and termination process (return of assets, exit interview, final pay, data security, etc.).<br>Assist management in establishing an expense reimbursement process within NewCo. | Closing Date | End of GOB Period | X | |
| 14 | Disbursements | · Process accounts payable<br>• Match merchandise receipt to invoice<br>• Approve invoices<br>• Cutting checks to and receiving checks from vendors<br>• Correspond with vendors<br>• Retain records<br>• AP write-offs by vendor by department<br>• Receivable collection related to AP accounts<br>• Import reconciliation<br>• Process other disbursements<br>• Pay approved disbursements<br>• Process travel and entertainment<br>• Lease Payment System(LPS)<br>• Data Extraction for Invoice Processing System (IPS), payment processing (NAP), mechanized R&D (NDJ), Purchase Order Writing System (POWS) and LPS<br>• General Ledger<br>• Process journal entries<br>• Maintain integrity of balances<br>• Monthly reconciliation of balance sheet accounts<br>• Annual recording of book-to-physical inventory adjustments<br>• Variance analysis of unit income statement balances and identify potential errors<br>• Maintain fixed asset records | Closing Date | Completion of wind-down of the estate | X | X |
| 15 | Reporting Services | · Compile and produce Monthly, Quarterly, and Annual External financial statements (as needed) including, but not limited to Income Statements, Balance Sheets, and Statement of Cash Flows. In addition, the Quarterly and Annual financial statements will include all notes, tables and supplemental information necessary for external audit requirements.<br>· Compile and produce any bankruptcy-related reporting and requests as required by the Bankruptcy court.<br>**Risk Management  Insurance:**<br>1.    Data Extraction and Tracking and Administration of:<br>• Workmen's Comp<br>• Auto Insurance<br>• General Liability<br>• Property Insurance<br>• D&O Insurance | Closing Date | Completion of wind-down of the estate | X | X |

| | | | | | |
|---|---|---|---|---|---|
| 16  Risk Management & Insurance | 2. Claims management, including<br>• Adjust Property Claims and pursue recovery from responsible 3rd parties<br>• Provide oversight of third party claim handler for Workers Compensation claims<br><br>3. Maintain insurance claims records and provide access to tools for viewing this information, for the following types of insurance:<br>• General Liability<br>• Workers' Compensation<br>• Auto Liability<br>• Property Insurance<br>• D&O Insurance<br>4. Consultation in connection with the purchase of insurance | Closing Date | Completion of wind-down of the estate | X | X |
| 17  Compliance - Environmental | NewCo will continue to provide OldCo services and support for Environmental Affairs at an agreed upon rate plus the direct cost for any necessary 3rd party services required to address and resolve Environmental Issues attributed to OldCo<br>1. Asbestos Management , Lead Paint, Indoor Air Quality and Mold Assistance<br>2. Environmental permitting/registration preparation and management (e.g. hazardous materials, wastewater and hazardous waste),<br>3. Regulatory report preparation and submittal,<br>4. Review and Processing environmental permitting and reporting fees,<br>5. Spill response and cleanup,<br>6. Addressing regulatory issues (such as historical releases and Notices of Violation of Environmental Requirements),<br>7. Coordination of hazardous and special waste removal and disposal/recycling,<br>8. Addressing property owner inquiries regarding environmental issues (such as, environmental due diligence requests related to refinancing or real estate transactions),<br>9. Work to assess and address environmental risks during store leasing activities (such as, Phase I environmental assessments or other environmental investigations)<br>10. Support for other environmental issues that may arise (e.g. newly discovered releases, wastewater, storm water, hazardous waste),<br>11. Hazardous and Special Waste Removal and Disposal/Recycling,<br>12. Environmental Hotline and Safety Data Sheet and Poison Control Support,<br>13. Environmental Management System Maintenance and Usage<br>14. Engineering Consultant Support (when necessary to assist with complex issues),<br>15. Asbestos Abatement Contractors (as needed to support renovation and maintenance activities). | Closing Date | Completion of wind-down of the estate | X | X |
| 18  Payment Clearing and Related Financial Service[4] | **Third Party Payment Acceptance:** Financial Services manages the payment acceptance process of authorization and settlement for the acceptance of third party credit and debit cards through contracts with Discover, American Express, and First Data (for the acceptance of Visa and MasterCard-branded cards). In addition, Financial Services will manage OldCo's Telecheck relationship for the acceptance and settlement of checks. Sears Financial Services manages third-party partner SLA performance, PCI and regulatory compliance, technical enhancements and tender optimization<br>Each tender type accepted for payment at OldCo has an interchange rate associated with it, which rates OldCo will pay on a pass-through basis.<br>**Citi:** SFS manages Private Label and Mastercard credit card process through agreement with Citi.<br>**Leasing Program:** SFS manages the Leasing form for purchase process of authorization and settlement through agreement with Tempoe/WNLI (WhyNotLeaseIt).<br>**Gift Card:** SFS manages gift card processing through agreement with ValueLink. | Closing Date | End of GOB Period | X | |
| 19  Legal | For discussion, will NewCo Legal department be asked to provide certain services to OldCo, including:<br>• Assist in litigation management of docket that remain with the Estate, i.e., converting litigation matters to Proofs of Claim<br>• Provide operations and employment advice and counsel for three months to assist HR/BUs on 80 GOB stores, the four DCs, as well as for Home Services<br>• Licensing and other regulatory (primarily for HS)<br>• Remaining securities issues with closing down the Estate? | Closing Date | Completion of wind-down of the estate | X | X |
| 20  Supply Chain | • Support in regard to any issues that arise on unliquidated entries including addressing customs or governmental inquiries on unliquidated entries.<br>• Provide support for goods currently in transit including carrier management during the transition from OldCo to NewCo.<br>• Provide support for warehousing and inventory management in DC's and RRC's.<br>• Managing outstanding transportation claims for goods previously lost, stolen, damaged during transit. | Closing Date | End of GOB Period | X | |
| 21  Customer Complaints | • Support regarding customer complaints and regulatory inquiries relating to OldCo's and GOB sales | Closing Date | End of GOB Period | X | |
| 22  Home Services | • Repair services for GOB store stock<br>**PA Sales in GOB Stores**<br>• Commission payments for selling Protection Agreements in GOB stores (Sales Commission of 50%)<br>• Marketing/Sales support for selling Protection Agreements in GOB stores | Closing Date | End of GOB Period | X | |
| 23  Parts Direct | • Commission of $5.00 per water filter subscription sold at GOB store<br>• Fulfill store charge orders (parts ordered by the store)<br>• Customer support for store associates with part related questions | Closing Date | End of GOB Period | X | |
| 24  Product Safety | • Recall and stop sale support for the GOB stores<br>• Product safety incidents tracking and reporting to CPSC, FDA, and other regulatory agencies | Closing Date | End of GOB Period | X | |
| 25  Pricing | • Effectuate weekly price changes at GOB stores | Closing Date | End of GOB Period | X | |
| 26  P-Card | • Buyer to permit continued use of p-cards, employee travel cards and fleet cards by Seller employees at GOB stores under Bank of America program. | Closing Date | End of GOB Period | X | |
| 27  Use of existing letters of credit listed on Exhibit [A] ("Existing LCs") | • Buyer to provide Seller with the benefit of credit support of the Existing LCs.<br>• Buyer and Seller to use reasonable best efforts to identify which Existing LCs (and in what proportion) were incurred in connection with or support, as applicable, (x) Acquired Assets or Acquired Liabilities, as applicable, or (y) Excluded Assets or Excluded Liabilities.<br>• With respect to each Existing LC, Buyer shall not replace such Existing LC with a letter of credit for less than the face value of such Existing LC without Seller's prior written consent (not to be unreasonably withheld, delayed or conditioned).<br>• Seller shall use reasonable best efforts to (1) provide Buyer with copies of any and all notices and other communications delivered under any Existing LC, (2) provide information reasonably necessary for Buyer to maintain in effect the Existing LCs, (3) assist Buyer in its efforts to either (a) terminate each Existing LC that are not required for (x) Buyer to operate the going concern business or (y) Seller to conduct its wind-down efforts or (b) replace each Existing LC with, unless otherwise consented to by Seller (such consent not to be unreasonably withheld, delayed or conditioned), a replacement letter of credit agreement with a face amount no less than the applicable replaced Existing LC and (4) assist Buyer in ensuring the beneficiary of each Existing LC does not draw such Existing LC (it being understood that this clause (4) shall not require any payment on the part of Seller) | Closing Date | With respect to each Existing LC issued by Wells Fargo Bank National Association, the earlier of (x) the expiration or termination of such Existing LC, as applicable, and (y) the date that is 90 days following the Closing Date. With respect to each Existing LC issued by Bank of America, N.A. (x) the expiration or termination of such Existing LC, as applicable, and (y) the date that is 150 days following the Closing Date. | | X |

---

[1] Seller is to fund its portion; if funds are not available Buyer will not be responsible for delays in payroll or inability of employees to utilize medical benefits

[2] Benefits Administration transition services are under review based on expectation for the assumption of benefit plans

[3] Buyer will maintain relationships with vendors but will not negotiate terms and conditions or represent GOB stores in regards to cash funding disputes that may arise with regard to employee benefits

**Schedule B**

**SINGLE POINT OF CONTACT**

For Seller:

Name:  Mohsin Meghji and Brian Griffith, M-III Partners, LP

Email:  mmeghji@miiipartners.com and bgriffith@miiipartners.com

Phone: (212) 716-1492 and (212) 716-1494


For Buyer:

Name:  Kunal Kamlani

Email:  kunal@eslinvest.com

Phone: (305) 702-2100

WEIL:\96889465\20\73217.0004

**<u>Exhibit D</u>**

**Redline of Executed Services Agreement**

# SERVICES AGREEMENT

This Services Agreement (this "Agreement"), dated as of February 811, 2019 (the "Effective Date"), is by and between Sears Holdings Corporation, a Delaware corporation ("Seller"), and Transform Holdco LLC, a Delaware limited liability company (and Transform SR Holdings LLC, a Delaware limited liability company (collectively, "Buyer"). Seller and Buyer each are sometimes referred to herein as a "Party" and together are sometimes referred to as the "Parties." Certain terms are defined below, while others are defined in Annex I (Defined Terms). All other capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated as of January 17, 2019, by and between Seller, each of Seller's Subsidiaries party thereto and Buyer (as may be amended, restated, supplemented or modified, from time to time, the "Asset Purchase Agreement").

# RECITALS

WHEREAS, in connection with the Asset Purchase Agreement, the Parties desire to enter into this Agreement to set forth the terms and conditions pursuant to which each Party shall provide or cause to be provided the Services (as defined below) to the other Party and its Affiliates, in each case, as applicable for a transitional period from and after the Closing; and

WHEREAS, this Agreement is that certain "Services Agreement" as defined in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and mutual covenants and agreements in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties hereby agree as follows:

# ARTICLE I

# SERVICES

Section 1.1    Services to be Provided. Subject to the terms and conditions of this Agreement, during the Services Period, Seller shall provide, or cause one or more of its Affiliates or a Vendor contracted by Seller pursuant to Section 1.9 to provide, to Buyer, its Affiliated Designees and their respective Affiliates, the services described on Schedule A-1 attached hereto (each, a "Seller Service", and collectively, the "Seller Services"). Subject to the terms and conditions of this Agreement, during the Services Period, Buyer shall provide, or cause one or more of its Affiliates or a Vendor contracted by Buyer pursuant to Section 1.9 to provide, to Seller and its Affiliates, the services described on Schedule A-2 attached hereto (each, a "Buyer Service", and collectively, the "Buyer Services"). "Services Period" means the period commencing at the Effective TimeDate and, subject to earlier termination pursuant to ARTICLE III, continuing until the date indicated for each such Service on Schedule A or any longer period mutually agreed to by the Parties. In connection with the provision of certain legal services which are part of the Buyer Services, promptly following the Effective Date, the Parties shall use good faith efforts to enter into a common interest agreement.

WEIL:\96889465\16\73217.0004

Section 1.2 <u>Quality and Nature of Services.</u>

(a)    Except as otherwise provided in this Agreement, Service Provider shall provide, or shall cause one or more of its Affiliates or a Vendor to provide, the Services in a manner and at a level of service that is substantially similar to the manner and level of service with which such Services were provided to Service Recipient or its Affiliates or predecessors in interest (including, in the case of Buyer as Service Recipient, the Business) during the twelve (12) month period immediately prior to the Closing Date. The Parties acknowledge and agree that, to the extent required, Buyer shall instruct the Leased Employees to perform the Services under this Agreement during the Leasing Period, as required in order for the Services to be performed as performed during the twelve (12) month period immediately prior to the Closing Date. Subject to the first sentence of this <u>Section 1.2(a)</u> and subject to <u>Section 1.9</u>, Service Provider may make changes from time to time in the manner of performing the Services without Service Recipient's consent (including changes to its, its Affiliates' and its Personnel's systems) if (i) in circumstances where Buyer is Service Provider, Service Provider is making similar changes in the manner that it provides substantially similar services to itself and its Affiliates, (ii) Service Provider provides Service Recipient with reasonable prior written notice of any material change in the manner of providing the Services and (iii) Service Provider consults with Service Recipient in good faith to minimize the effect of such changes on the provision of such Services. <u>During the Services Period, each Party shall maintain the administrative capacity necessary to provide Services to the other Party as required under this Agreement.</u>

(b)    Notwithstanding anything to the contrary contained in this Agreement (but subject to <u>Section 1.8)</u>, Service Provider shall not be obligated to provide any Service to the extent the provision of such Service would materially violate (i) any agreement or license with a Third Party or other contractual obligation, in each case, to which Service Provider or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law or Licenses and Permits; <u>provided, however,</u> that Service Provider shall provide Service Recipient written notice as promptly as practicable (and no later than ten (10) days) after Service Provider becomes aware of any Services that cannot be provided, which notice shall include an explanation of the anticipated violation. In the event Service Provider is unable to provide a Service pursuant to the foregoing clauses (i) or (ii), Service Provider shall, if requested by Service Recipient, use its commercially reasonable efforts to determine an alternate method to provide such Service; <u>provided, however,</u> that Service Provider shall have no obligation to incur additional costs to provide such Service unless Service Recipient agrees in advance to reimburse Service Provider for such costs.

(c)    The Parties acknowledge and agree that initially, after the Effective Date, Services will be performed by either Vendors or Leased Employees acting at the direction of the Buyer, pursuant to the Employee Lease Agreement, and that despite such employees remaining the employees of Seller during the Leasing Period, Buyer will be responsible for directing the Leased Employees to perform all Services hereunder, to the extent such Leased Employees performed such services or similar services on behalf of Seller or its Affiliates during the twelve (12) month period immediately prior to the Closing Date. Notwithstanding the separation of Services between <u>Schedule A-1</u> and <u>Schedule A-2,</u> the Parties acknowledge that it is the Parties' intent that Leased Employees will continue to perform the same Services, no matter whether they

are employed by Seller or Buyer at the relevant time, during the Leasing Period and thereafter. To the extent any amendments are required to be made to Schedule A in order to fulfill this intent or to amend the Fees to align with the principles set forth in <u>Section 2.1,</u> the Single Point

of Contact of each Party shall discuss such necessary amendments and the Parties shall negotiate any such amendments in good faith in order to reflect the agreement of the Parties under this Section 1.2(c).

(d)    Notwithstanding the separation of Services between Schedule A-1 and Schedule A-2, the Parties acknowledge that it is the Parties' intent that during the ~~Term~~Services Period, to the extent a Party is a party to any ~~t~~Third ~~p~~Party contract used to perform a Service for Seller or its Affiliates during the twelve (12) month period immediately prior to the Closing Date, such Party shall be the Service Provider for such Service under this Agreement. To the extent any amendments are required to be made to Schedule A in order to fulfill this intent, the Single Point of Contact of each Party shall discuss such necessary amendments and the Parties shall negotiate any such amendments in good faith in order to reflect the agreement of the Parties under this Section 1.2(d).

(e)    Notwithstanding any other provision of this Agreement, if Seller remains the owner of any Acquired Assets, after the Closing, solely to effect an orderly transition of such Acquired Assets to Buyer, including, without limitation, to allow time to resolve regulatory or other legal issues, Seller is hereby authorized to grant, pursuant to and as more fully set forth in paragraph [26] of the Approval Order (as defined in the Asset Purchase Agreement), and if contemplated by any Seller Service in Schedule A-1 shall grant, the lenders under (i) the ABL Financing, (ii) the Citi L/C Facility as assumed by Buyer, (iii) the Real Estate Financing or (iv) the Cyrus Financing (the "Transform ~~Lenders~~Financing Facilities") liens on such assets, in each case to the extent such Acquired Assets would constitute "Collateral" (or any similar term with equivalent meaning) under the applicable Transform Financing Document (as defined below) (the "Transition Liens") and Seller shall honor the Transition Liens as if Seller was party to the financing documents underlying the ~~ABL~~applicable Transform Financing Facility (the "Transform Financing Documents"); provided, however, that Buyer shall bear any costs incurred by Seller in connection with granting or perfecting the Transition Liens, or participating in any enforcement actions taken by the secured parties under the applicable Transform ~~Lenders~~Financing Facility (the "Transform Secured Parties") with respect to the Transition Liens. The Transition Liens granted by Seller shall be deemed properly perfected and enforceable by entry of the Approval Order. Upon transfer of the applicable Acquired Assets to Buyer, the respective Transition Lien shall terminate and be of no further force or effect against Seller. The Bankruptcy Court shall retain jurisdiction to enforce any disputes among the Transform ~~Lenders~~Secured Parties, Seller, and/or Buyer with respect to the Transition Liens. The Parties agree that any and all proceeds from the sale of Transition Assets, whenever arising, including all Pharmacy Receivables (as defined in the ABL Financing and the Transform Financing Documents) and Credit Card Receivables (collectively, the "Transition Proceeds") shall be automatically conveyed to Buyer as Acquired Assets without the need to execute any bill of sale, assignment, or similar conveyance document or take any further action and shall be free and clear of any and all liens and Claims in accordance with the terms of the Approval Order as if such Transition Proceeds were transferred to the Buyer as of the Closing, and, pursuant to paragraph [26] of the Approval Order shall automatically become subject to the first priority liens and security interests of the Transform Secured Parties under the

applicable Transform Financing Documents pursuant to the terms of paragraph [26] of the Approval Order without the necessity of the execution of security agreements, control agreements, pledge agreements, financing statements, mortgages, schedules or other similar documents, or the possession or control of the Transform Secured Parties of any Transition Proceeds. For the avoidance of doubt, any liens which a Debtor is authorized to grant or which a Debtor shall grant pursuant to this paragraph shall be granted under the Approval Order, and shall not be granted by this Agreement.

Section 1.3    Changes in the Services.

(a)    If Service Recipient desires to make changes in this Agreement for different or additional services (each, a "Service Change") to be provided hereunder, the Parties shall comply with the following Service Change process:

(i)    Service Recipient shall prepare a written proposal for the Service Change, including a description of the applicable services, deliverables, schedule and term, in such detail as would be needed by an unaffiliated third party contractor to develop a competent proposal as to the cost to provide similar services, and a proposed fee. For special project work that is within the scope of services covered by an hourly or unit rate in Schedule A, Service Recipient may use the hourly rate or unit rate stated in Schedule A in developing the cost for the proposal.

(ii)    Upon receipt of a written proposal for a Service Change, Service Provider shall promptly send to Service Recipient a written, good faith response in compliance

with this <u>Section 1.3</u> indicating whether Service Provider agrees to provide the different or additional services and, if so, (A) any proposed changes to the requested services, deliverables, schedule and term or (B) the proposed fees for the different or additional services, which shall not exceed the cost incurred by the Service Provider in providing such services.

(iii)     All Service Change proposals and responses must be delivered by a Party's Single Point of Contact to the other Party's Single Point of Contact. Service Provider shall consider in good faith Service Recipient's written request and, if required pursuant to <u>Section 1.3(b),</u> shall agree thereto. If Service Provider agrees to provide any different or additional services as contemplated by this <u>Section 1.3</u>, the Parties shall amend <u>Schedule A</u> hereto to document the relevant Service Change and shall obtain all necessary internal approvals prior to the execution of such amendment and any such different or additional services shall be deemed part of the Services.

(b)     Notwithstanding the foregoing, if Service Recipient, after the date hereof

and during the first six (6) months following the Effective ~~Time~~Date, identifies a service that prior to the Closing Date, (i) Seller or its Affiliates provided to the Business and at such time, Seller or its Affiliates have the persons, resources or assets to provide such services, or (ii) was provided to Seller and its Affiliates using persons, resources or assets transferred to Buyer under the Asset Purchase Agreement, as applicable, and in either case (i) or (ii) which service is required for Service Recipient to continue to operate the Business or the businesses of Seller and its Affiliates which remain after the Closing Date (the "<u>RemainCo Business</u>"), as applicable, after the Closing Date in substantially the same manner in which such business operated in the twelve (12) months

prior to the Closing Date, and such service was not included on Schedule A or otherwise expressly stated herein and which Service Provider or its Affiliates are able to provide, the Parties shall negotiate in good faith and amend this Agreement and Schedule A as necessary to cause such additional service to be provided to Service Recipient on substantially the same terms and conditions as it was previously provided to the Business or the RemainCo Business prior to the Closing Date for fees not to exceed the cost incurred by the Service Provider in providing such services. After such six (6) month period, neither Party shall have any obligation to amend Schedule A to include additional services not included on Schedule A at such time; provided that the Parties will consider and negotiate any such request in good faith and if the Parties agree, shall further amend this Agreement and Schedule A as necessary to cause such additional services to be provided on agreed upon terms.

Section 1.4 Transition Plan. Buyer shall use commercially reasonable efforts to expeditiously transition each Seller Service to Buyer's own internal organization or to obtain alternate Third Party sources to provide the Seller Services directly to Buyer. At Buyer's sole cost and expense, Seller shall provide Buyer with such information and assistance as is reasonably necessary to assist Buyer with such transition; provided, however, Seller shall not be obligated to provide any such information or assistance to the extent the provision of such information or assistance would materially violate (i) any agreement, license or other contractual obligation, in each case, with a Third Party to which Seller or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law or Licenses and Permits.

Section 1.5 Knowledge Transfer for Benefit of Seller. During the ~~Term~~Services Period and thereafter until completion of wind-down of Seller's estate, Buyer and its Affiliates shall use

reasonable best efforts to make those persons who were employed by Seller and its Affiliates immediately prior to the Closing Date and are employed by Buyer or one of its Affiliates after the Closing Date, reasonably available to Seller and its Affiliates to provide knowledge transfer and answer questions, including in connection with the wind-down of Seller's estate and claim administration, upon Seller's reasonable notice to Buyer. To the extent that any person must dedicate more than ten percent (10%) of his or her full time and energy to perform duties, functions and services on behalf of Seller, Seller shall pay Buyer an allocated portion of the wages and benefits associated with such employee. Seller acknowledges and agrees that such persons may leave the employment of Buyer or its Affiliates by their own volition or their employment may be terminated during the ~~Term~~Services Period, at Buyer's sole discretion.

Section 1.6    Standard of Care. Service Provider shall perform the Services in good faith and in compliance with all applicable Laws, without willful misconduct or gross negligence. EXCEPT AS SET FORTH IN THIS AGREEMENT, SERVICE PROVIDER MAKES NO, AND SERVICE RECIPIENT REPRESENTS THAT IT HAS NOT RECEIVED OR RELIED UPON, ANY OTHER GUARANTEE, REPRESENTATION OR WARRANTY OF ANY KIND (WHETHER EXPRESS OR IMPLIED) REGARDING ANY OF THE SERVICES PROVIDED HEREUNDER. EXCEPT AS SET FORTH IN THIS AGREEMENT, SERVICE PROVIDER EXPRESSLY DISCLAIMS ALL, AND SERVICE RECIPIENT EXPRESSLY REPRESENTS THAT IT HAS NOT AND IS NOT RELYING UPON, ANY OTHER GUARANTEES, REPRESENTATIONS AND WARRANTIES OF ANY NATURE WHATSOEVER, WHETHER STATUTORY, ORAL, WRITTEN, EXPRESS OR IMPLIED,

INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE. SUBJECT TO THE OTHER PROVISIONS OF THIS AGREEMENT, SERVICE PROVIDER SHALL ONLY BE OBLIGATED TO PROVIDE SERVICES IN A MANNER SUBSTANTIALLY CONSISTENT WITH THE MANNER IN WHICH SUCH SERVICES WERE PROVIDED IN THE PAST.

    Section 1.7 <u>Responsibility for Errors; Delays.</u> Without limiting <u>Section 5.2,</u> Service Provider is responsible to Service Recipient for errors or omissions in Services caused by Service Provider or Vendor and as a non-exclusive remedy to Service Recipient, Service Provider shall re-perform or cause the re-performance of such Services or furnish correct information, payment or adjustments in the Services, in each case at no additional cost or expense to Service Recipient if Service Recipient promptly advises Service Provider of such error or omission. Notwithstanding the foregoing, but without limiting <u>Section 5.2,</u> Service Provider shall not be obligated to re-perform or cause the re-performance of such Services or furnish correct information, payment or adjustments in the Services at no additional cost or expense to Service Recipient if the error or omission was directly or indirectly caused by the (i) provision of inaccurate or incomplete information by, or (ii) gross negligence or willful misconduct of, Service Recipient, its Affiliates or its or their Personnel.

Section 1.8    Cooperation; Alternatives. Unless otherwise provided for in this Agreement, Seller and Buyer shall use reasonable best efforts to cooperate with each other in all matters relating to the provision and receipt of the Services, including to obtain any consents or licenses from Third Parties that Service Provider reasonably believes are necessary for the provision or receipt of the Services, as applicable, and each of Seller and Buyer shall each use their respective reasonable best efforts to cause each of their respective employees and contractors to reasonably cooperate to the extent required for effective delivery of the Services.

Section 1.9 Use of Affiliates and Vendors. Service Provider may use any of its Affiliates or a qualified Third Party provider (a "Vendor") to provide the Services; provided, however, that (a) Service Provider shall remain responsible at all times for the performance of Services by its Affiliates or any Vendor under this Agreement and (b) a Vendor may only be used by Service Provider following the written consent of Service Recipient, such consent not to be unreasonably withheld, delayed or conditioned. Service Recipient's prior written consent of a Vendor designation will not be required, however, if (x) the Vendor provided those Services to the Business or the businesses of the Service Recipient, as applicable, prior to the Closing Date; (y) the Vendor is a Third Party who provided the same services to Service Provider prior to the Closing Date and the Services would be provided by Vendor to Service Recipient on the same terms and subject to the same conditions as provided to Service Provider prior to the Closing Date or (z) Service Provider changes the Vendor used to provide the Services or similar services to Service Provider and the Services would be provided by Vendor to Service Recipient on the same terms or on terms no less favorable to Service Recipient, in each case as provided to Service Provider. If Service Provider determines in good faith that the burden of providing Services that it is obligated to provide hereunder exceeds the reasonable capacity of such Service Provider's available resources, the Parties shall negotiate in good faith the engagement of Vendors to provide such Services and the allocation of additional costs for such Services, if any.

Section 1.10 <u>Intellectual Property License.</u> Solely during the Service Period, and solely to the extent required for the provision or receipt, as applicable, of Services in accordance with this Agreement, each Party ("Licensor"), for itself and on behalf of its Affiliates, hereby grants to the other Party and its Affiliates ("Licensee") a non-exclusive, non-transferable, royalty-free, worldwide license for the term of this Agreement, to use any Intellectual Property (and any tangible embodiments thereof) owned by Licensor or its Affiliates, subject to any applicable restrictions, limitations and other instructions provided in writing to Licensee. To the extent the foregoing license includes the use of any Trademarks, Licensee shall ensure that its use of such Trademarks shall only be with respect to goods and services of a level of quality equal to or greater than the quality of the goods and services with respect to which Sellers used such Trademarks prior to the Closing and that it shall not use such Trademarks in any manner that would reasonably damage or tarnish the goodwill associated therewith or the goodwill of the Licensor. Any and all goodwill arising from Licensee's use of such Trademarks will inure solely to the benefit of Licensor. Notwithstanding anything to the contrary contained in this Agreement, including in this <u>Section 1.10,</u> neither Party shall be obligated to license any Intellectual Property to the extent such license would violate (i) any agreement, license or other contractual obligation, in each case, with a Third Party to which such Party or any of its Affiliates is subject as of the date of this Agreement or (ii) any applicable Law.

Section 1.11 <u>Ownership of Data and Other Assets.</u> Neither Party shall acquire under this Agreement any right, title or interest in any asset or Intellectual Property that is owned or licensed by the other Party or its Affiliates. All data provided by or on behalf of a Party to the other Party or its Affiliates for the purpose of providing or receiving the Services shall remain

the property of the Party providing such data unless otherwise specified herein. To the extent the provision of any Service involves Intellectual Property, each Party agrees that it and its Affiliates shall not copy, modify, reverse engineer, decompile or in any way alter any of such material, or otherwise use such material in a manner inconsistent with the terms and provisions of this Agreement or the Asset Purchase Agreement without the express written consent of the other Party.

Section 1.12 Data Privacy. In this Section 1.12 the terms "personal data" and "processing" shall have the meanings ascribed to them under applicable data protection, privacy or similar applicable Laws (including all statutes, enacting instruments, common law, regulations and directives, concerning the protection or processing of personal data) (the "Data Protection Laws"). Each Party shall, and shall cause its Affiliates or Personnel to, comply with all applicable Data Protection Laws in relation to all personal data that is processed by it in the course of performing its obligations under this Agreement (the "Protected Data"). If in connection with this Agreement, either Party obtains access to any Protected Data, such Party shall, and shall cause each of its relevant Affiliates to, (a) implement and maintain appropriate technical and organization measures and security procedures and practices in respect of the Protected Data to prevent unauthorized or unlawful access, disclosure, use, or processing of the Protected Data that are no less protective than those used by such Party in the ordinary course of business, (b) keep accurate records relating to all processing of Protected Data in accordance with its applicable procedures and practices and, upon reasonable advanced written notice, permit the other Party to examine or audit such records with respect to compliance with Data Protection Laws, (c) reasonably cooperate with the other Party in connection with any

complaints or investigations related to unauthorized use or disclosure of, access to, or other processing of Protected Data, (d) process Protected Data solely for the purposes of this Agreement or as otherwise required by applicable Law, (e) use and disclose the Protected Data in a manner that is consistent with Seller's past practices and policies and comply with all reasonable restrictions on the use, handling and disclosure of Protected Data imposed by the other Party (upon reasonable advance notice from such other Party) or by applicable Law and (f) notify the other Party in writing as soon as reasonably practicable, but in any event within forty-eight (48) hours after obtaining knowledge of any disclosure, or suspected disclosure, of Protected Data to a Third Party in a manner prohibited by applicable Law or the terms of this Agreement or of any other unauthorized access or misuse, or suspected unauthorized access or misuse, of Protected Data (to the extent not prohibited under applicable Law or recommendation of a Governmental Authority) and take reasonable actions to prevent further disclosure. To the extent required by applicable Data Protection Laws or as deemed necessary by the Parties, the Parties (or their respective Affiliates) will enter into additional agreements with respect to the processing of Protected Data.

Section 1.13 <u>Single Point of Contact.</u> Each Party shall designate a contact person (each, a <u>"Single Point of Contact"),</u> as set forth on <u>Schedule B,</u> to facilitate communications and performance with respect to this Agreement and the Services, including operational matters, and to ensure that this Agreement is fulfilled consistently with the intent of the Parties as of the Effective Date. Unless otherwise authorized in writing or specified in the specific Schedule related to a Service, the Parties shall direct all communications relating to this Agreement and the Services to the Single Point of Contact for the other Party. The Single Point of Contact for each Party shall meet (in person or via telephone or video conference) at least

monthly during the ~~Term~~Services Period, or more often as otherwise determined necessary by the Parties, in order to discuss the progress of the Agreement and fulfilment of each Party's obligations hereunder. Each Party shall have the right at any time and from time to time to replace its Single Point of Contact by written notice to the other Party in accordance with Section 6.3, following which Schedule B shall be automatically amended to reflect such Party's new Single Point of Contact.

Section 1.14 Records. During the term of this Agreement and for one (1) year thereafter (or such longer period as may be required by applicable Law), Service Provider and Service Recipient shall each use commercially reasonable efforts to maintain complete and accurate records related to any Service provided, Fees invoiced and payments made hereunder (the "Service Records"); provided that if Service Provider at any time offers in writing to transfer the Service Records in Service Provider's possession to Service Recipient, Service Recipient shall have sixty (60) days thereafter to take possession of the Service Records, after which Service Provider shall no longer have an obligation to retain, and may thereafter delete or destroy, such Service Records. Upon reasonable advance notice, and subject to ARTICLE IV, each Party in possession of Service Records shall use commercially reasonable efforts to permit the other Party or its Representatives, as applicable, reasonable access to or, at the requesting Party's expense, copies of, such Service Records during regular business hours; provided that (a) such access shall not disrupt the normal operations of such first Party's business and (b) nothing herein shall require any Party to provide to the other Party, its Affiliates or its Representatives with access to or copies of any information to the extent that such access to or the provision of such information would violate any applicable Law or contractual obligation (including any Law or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of personally identifiable information); provided, further, that such first Party and its Affiliates shall use commercially reasonable efforts to provide such information in a manner that does not violate such Law or is in accordance with such agreement.

Section 1.15 Employees and Contractors. Service Provider shall be responsible for the appointment of the appropriate Personnel to carry out and perform the Services. At all times during the provision of Services, Personnel (excluding Leased Employees) shall continue to be solely an employee, agent or contractor, as applicable, of Service Provider and shall not, unless otherwise agreed in writing by Service Provider and Service Recipient, become an employee, agent or contractor of Service Recipient, and such Personnel (Excluding Leased Employees) shall not be entitled to receive any compensation, benefits, perquisites or privileges from Service Recipient, unless otherwise agreed in writing by Service Provider and Service Recipient. Service Provider or one or more of its Affiliates, as applicable, shall be responsible for paying all necessary employment taxes, salary and incidental appointment and employment costs, if any, as may be required by applicable Law with respect to any such Personnel (excluding Leased Employees). The employment, direction, compensation and benefits of Leased Employees shall be subject to the terms of the Employee Lease Agreement.

Section 1.16 Access to Facilities. If either Party, its Affiliates or its Personnel require access to the facilities of the other Party or its Affiliates (collectively, the "Facilities") in order to receive or perform the Services, then the Party controlling such access shall reasonably allow the other Party, its Affiliates or their respective Personnel such access in accordance with this Section 1.16 and Section 1.17. The Party to whom such access is given shall (a) limit such

access to those of its and its Affiliates' Personnel who reasonably require such access in connection with this Agreement, (b) follow, and cause its Affiliates and their respective Personnel to follow, all rules and procedures for use of such Facilities, provided such rules and procedures are communicated to such Party in writing in advance, (c) not attempt to obtain access to, use or interfere with any systems or resources of the other Party, except to the extent permitted by the other Party and (d) not intentionally damage, disrupt or impair the normal operation of the Facilities. Any evidenced damage caused by a Party, its Affiliates or their respective Personnel or agents in the Facilities of the other Party shall be repaired to the condition prior to such damage by or on behalf of such Party, in each case, at the damaging Party's sole cost and expense; provided that such costs and expenses are reasonable and documented.

Section 1.17 Computer Access. If either Party, its Affiliates or its Personnel are given access, whether on-site or through remote facilities, to any communications, computer, or electronic data storage systems (each, an "Electronic Resource") of the other Party, its Affiliates or its Personnel in connection with this Agreement, then the Party to whom such access is given shall ensure that its Personnel's use of such access shall be solely limited to performance or exercise of such Party's duties and rights under this Agreement, and that such Personnel shall not attempt to access any Electronic Resources other than those specifically required for the performance of such duties or exercise of such rights. The Party given access shall (a) limit such access to those of its and its Affiliates' Personnel who reasonably require such access in

connection with this Agreement, (b) advise the other Party in writing of the name of each of such Personnel who shall be granted such access, (c) follow, and cause its Affiliates and its and Affiliates' Personnel to follow, all security rules and procedures for use of such Electronic Resources, provided such rules and procedures are communicated to such Party in writing, (d) not attempt to obtain access to, use or interfere with any Electronic Resource of the other Party, or any data owned, used or processed by the other Party, except to the extent permitted by the other Party and required to do so to provide or receive the Services and (e) not disable, damage or erase or disrupt or impair the normal operation of the Electronic Resource. All user identification numbers and passwords disclosed to a Party's or its Affiliates' Personnel and any information obtained by such Party's or its Affiliates' Personnel as a result of its access to, and use of the other Party's, its Affiliates' or its Personnel's Electronic Resources shall be deemed to be, and shall be treated as, Confidential Information of the Party on behalf of whom such access is granted. Each Party shall reasonably cooperate with the other Party in the investigation of any apparent unauthorized access by the other Party, its Affiliates or its Personnel to any Electronic Resources or unauthorized release of Confidential Information and take reasonable actions to prevent any further unauthorized access to any Electronic Resources or other unauthorized or unlawful conduct or activities related to the Electronic Resources. Each Party shall notify the other Party in writing within forty-eight (48) hours of discovery of any actual or suspected unauthorized access to or disclosure of any Electronic Resource of the other Party, its Affiliates or its Personnel, to the extent reasonably practicable and not prohibited under applicable Law or recommendation of a Governmental Authority. Notwithstanding anything in this Agreement to the contrary, nothing in this <u>Section 1.17</u> shall in any way limit the obligations of either Party or any of its Affiliates or Personnel set forth in <u>Section 1.12</u>.

**ARTICLE II**

**CHARGES AND PAYMENTS FOR SERVICES**

Section 2.1      <u>Compensation.</u>

(a)    <u>Seller Compensation.</u> As consideration for the provision of the Seller Services, (i) during the ~~sixty~~four (~~60~~4) ~~day~~month period after the Effective Date (the "<u>Seller Initial Period</u>"), Buyer shall pay, or cause to be paid, to Seller or its designee(s) the fixed fee for the Seller Services specified on <u>Schedule A-1</u> (the "<u>Seller Administrative Fee</u>") within five (5) Business Days after the Effective Date and thereafter on a monthly basis, prior to the monthly anniversary of the Effective Date, in addition to the Service-by-Service fees for the Seller Services specified on <u>Schedule A-1</u> and (ii) the Parties shall negotiate in good faith prior to the end of the <u>Seller</u> Initial Period and amend <u>Schedule A-1</u> to reflect, the appropriate fees for the Seller Services that will continue to be provided by Seller after the <u>Seller</u> Initial Period ((i) and (ii), collectively, the "<u>Seller Fees</u>"), each payable in accordance with <u>Schedule A-1</u>. The Seller Fees negotiated by the Parties after the Effective Date with respect to the <u>post-Seller</u> ~~post-~~Initial Period shall be as agreed to by the Parties at such time or shall be equal to Seller's good faith estimate of the cost, including any income and other taxes, incurred by the Seller Entities in providing such services. The Parties acknowledge and agree that the intent of this <u>Section 2.1(a)</u> is for Buyer to make Seller whole for the actual, costs and expenses paid or provided by Seller and its Affiliates in the performance of Seller Services. Other than the Seller Administrative Fee, in the event any Seller Fee specified on <u>Schedule A-1</u> exceeds such amount or rates (as applicable), such Seller Fee shall be deemed to be reduced to such amount or rates (as applicable) with retroactive effect, unless otherwise agreed in writing by the Parties, and the Parties shall amend <u>Schedule A-1</u> accordingly. Upon termination of an individual Seller Service, Buyer shall pay a pro rata portion of the applicable Seller Fee specified on <u>Schedule A-1</u>, calculated based on the portion of the individual Seller Service actually performed, or expense actually incurred, through the date Seller, its Affiliates or its Vendors performed the Seller Service. If the Seller Fees include charges for Seller Services performed by a Vendor and the Vendor's fees increase during the Service Period, then Seller shall be entitled to pass through the increased fees as an increase in the Seller Fees; <u>provided</u> that to the extent that Seller uses the same Vendor to provide similar services to itself or its Affiliates, each of the Parties shall be responsible for their pro rata portion of the increased amount in accordance with the level of services such Party receives (directly or indirectly) from such Vendor. In the event of any such increase in a Vendor's fees, Seller shall provide Buyer with prompt written notice thereof (to the extent reasonably practicable, at least ten (10) Business Days prior to such increase going into effect).

(b)    <u>Buyer Compensation.</u> As consideration for the provision of the Buyer Services (i) during the during the sixty (60) day period after the Effective Date (the "Buyer Initial Period"), Seller shall pay, or cause to be paid, to Buyer or its designee(s) the all-in fees for the Buyer Services specified on <u>Schedule A-2</u> (the "<u>Buyer</u> <u>Initial</u> Fees") within five (5) Business Days after the Effective Date and thereafter on a monthly basis, prior to the monthly anniversary of the Effective Date, and (ii) prior to the end of the Buyer Initial Period, the Parties may mutually agree to extend the Buyer Initial Period and Buyer Initial Fees payable at such time for additional thirty (30) day periods; provided that if the Parties do not agree to extend the Buyer Initial Period at the same Buyer Initial Fees, the Parties shall negotiate in good faith prior to the end of the <u>Buyer</u> Initial Period and amend <u>Schedule A-2</u> to reflect, the appropriate fees for the Buyer Services that will continue to be provided by Buyer after the <u>Buyer</u> Initial Period ((i) and (ii), collectively, the "<u>Buyer Fees</u>"), each payable in accordance with <u>Schedule A-2.</u> The Buyer Fees negotiated by the Parties after the Effective Date with respect to the post-Buyer post-Initial Period shall be as

agreed to by the Parties at such time or shall be equal to Buyer's good faith estimate of the cost, including any income and other taxes, incurred by the Buyer Entities in providing such services. The Parties acknowledge and agree that the intent of this Section 2.1(b) with respect to Buyer Fees post-Buyer ~~post~~ Initial Period is for Seller to make Buyer whole for the actual, costs and expenses paid or provided by Buyer and its Affiliates in the performance of Buyer Services. Other than the Buyer ~~Administrative~~Initial Fee, in the event any Buyer Fee negotiated post-Buyer ~~post~~ Initial Period and specified on Schedule A-2 exceeds such amount or rates (as applicable), such Buyer Fee shall be deemed to be reduced to such amount or rates (as applicable) with retroactive effect, unless otherwise agreed in writing by the Parties, and the Parties shall amend Schedule A-2 accordingly. Following the Buyer Initial Period, upon termination of an individual Buyer Service, Seller shall pay a pro rata portion of the applicable Buyer Fee specified on Schedule A-2, calculated based on the portion of the individual Buyer Service actually performed, or expense actually incurred, through the date Buyer, its Affiliates or its Vendors performed the Buyer Service. If the Buyer Fees applicable post-Buyer ~~post~~ Initial Period include charges for Buyer Services performed by a Vendor and the Vendor's fees increase during the Service Period, then Buyer shall be entitled to pass through the increased fees as an increase in the Buyer Fees; provided that to the extent that Buyer uses the same Vendor to provide similar services to itself or its Affiliates, each of the Parties shall be responsible for their pro rata portion of the increased amount in accordance with the level of services such Party receives (directly or indirectly) from such Vendor. In the event of any such increase in a Vendor's fees, Buyer shall provide Seller with prompt written notice thereof (to the extent reasonably practicable, at least ten (10) Business Days prior to such increase going into effect).

Section 2.2 Payments.

(a)    Payment for Seller Services. Buyer shall pay (or cause to be paid) the Fees relevant to the Seller Services in advance in accordance with Section 2.1(a) and this Section 2.2(a); provided that, whenever possible, Buyer shall pay (or cause to be paid) the Fees due to Vendors directly to such Vendor or other applicable third-party not prohibited from receiving such direct payments (each, a "Direct Recipient") to such Direct Recipients in accordance with Schedule A-1. Unless otherwise provided on Schedule A-1, the Parties shall perform the process set forth in the remainder of this Section 2.2(a) for payment of Seller Services. Within ten (10) Business Days prior to the first Business Day of each month during the ~~Term~~Services Period, Seller shall provide to Buyer a reasonable estimate of the Seller Fees forecasted for the Seller Services for each week of the upcoming month (the "Weekly Forecasted Fees"). Seller may revise the Weekly Forecasted Fees for a given week at any point up until Buyer has made a payment pursuant to this Section 2.2(a) in connection with such week's Weekly Forecasted Fees. On every [Friday]Tuesday during the ~~Term~~Services Period, Buyer shall pay Seller or, if applicable, its designee(s), Affiliates or Vendors by electronic transfer of immediately available funds to a segregated bank account designated by such Person from time to time, the Weekly Forecasted Fees corresponding to the subsequent week, less any amount of such week's Weekly Forecasted Fees as paid, or may be paid, to a Direct Recipient. Within two (2) weeks after the end of each month during the ~~Term~~Services Period, Seller shall provide Buyer with an invoice of all Fees relevant to the Seller Services during the preceding month actually paid or payable by Seller and the Parties shall promptly reconcile the difference between the total of the month's Weekly Forecasted Fees and the invoiced Fees plus Fees paid to any Direct Recipient (the "Reconciliation Amount"), if any. A Party who owes monies to the other Party as a result of such reconciliation shall pay the undisputed

Reconciliation Amount within thirty (30) days following Buyer's dated invoice of Fees actually paid or payable. All undisputed amounts remaining unpaid for more than thirty (30) days after their respective due date(s) shall accrue one and one-half percent (1.5%) interest per month until paid in full. Notwithstanding anything set forth herein, Seller may suspend performance of any applicable Service for the following month until such time as it receives the Weekly Forecasted Fees from Buyer to enable it to perform such Service(s) and any non-performance during such time shall not constitute a breach of this Agreement.

(b)    <u>Payment for Buyer Services.</u> Seller shall pay (or cause to be paid) the Buyer Fees in accordance with <u>Section 2.1(b).</u> Unless otherwise mutually agreed in writing or otherwise set forth on <u>Schedule A-2,</u> all undisputed amounts payable under this Agreement shall be paid monthly by Seller to Buyer or, if applicable, its designee(s), Affiliates or Vendors by electronic transfer of immediately available funds to a bank account designated by such Person from time to time, within thirty (30) days following receipt of an invoice for such amount. All undisputed amounts remaining unpaid for more than thirty (30) days after their respective due date(s) set forth in an invoice statement shall accrue one and one-half percent (1.5%) interest per month until paid in full.

Section 2.3    Taxes.

———

(a)    Service Provision Taxes. The Parties hereby acknowledge that the Fees specified in Schedule A do not include applicable taxes. Subject to Section 1.15, Service Recipient shall be responsible for the payment of all taxes payable in connection with the Services, including sales, use, excise, value-added, business, service, goods and services, consumption, withholding and other similar taxes or duties, including taxes incurred on transactions between and among Service Provider, its Affiliates and its Vendors, along with any related interest and penalties, in each case, imposed, assessed or payable with respect to such taxes (together, such amounts, the "Service Provision Taxes"). Service Recipient shall be responsible only for the payment of Service Provision Taxes payable as a result of its or its Affiliates' receipt of the Services. Service Recipient shall reimburse Service Provider for any deficiency relating to Service Provision Taxes that are Service Recipient's responsibility under this Agreement. Notwithstanding anything in this Section 2.3 to the contrary, each Party shall be responsible for its own income, gross receipts and franchise taxes, employment taxes and real or personal property taxes, except as provided in the Asset Purchase Agreement. The Parties shall cooperate in good faith to minimize Service Provision Taxes to the extent legally permissible. Each Party shall provide to the other Party any resale exemption, multiple points of use certificates, treaty certification and other exemption information reasonably requested by the other Party.

(b)    Withholding. The Parties acknowledge that payments made hereunder by Service Recipient to Service Provider shall not be subject to deduction and withholding of any Taxes under applicable Law.

**ARTICLE III**

**TERMINATION**

Section 3.1   <u>Termination of an Individual Service for Convenience by Service Recipient.</u> Except as otherwise set forth on <u>Schedule A</u> and subject to the next sentence, Service Recipient, upon thirty (30) days' prior written notice to Service Provider, may reduce or terminate for Service Recipient's convenience any individual Service. Service Recipient may not reduce or terminate an individual Service if such early reduction or termination would prevent Service Provider, its Affiliates or Vendors from performing another Service that is not also being terminated. If Service Recipient's early reduction or termination of any Service results in Service Provider having to pay any out-of-pocket fees or expenses to a Third Party (including termination charges), Service Recipient shall reimburse Service Provider for such charges, if Service Recipient is notified prior to the incurrence of such charges. Upon notification of such charges, Service Recipient, at its sole discretion, may choose to continue, reduce or terminate the applicable Service. In connection with any early reduction or termination of Services by Service Recipient in accordance with the provisions of this <u>Section 3.1,</u> Service Recipient and Service Provider shall coordinate in good faith regarding the early termination or continuation of preexisting service contracts with Vendors.

Section 3.2 <u>Mutual Termination Rights.</u>

(a)    Subject to the next sentence, either Party may terminate (i) an individual Service in the event of a material breach of this Agreement with respect to such Service by the

other Party if such material breach is curable by the breaching Party and the breaching Party fails to cure the breach within thirty (30) days following its receipt of written notice of the breach from the non-breaching Party or (ii) this Agreement in the event of an assignment with respect to which the non-assigning Party has not consented in accordance with Section 6.2. If a material breach is not curable by the breaching Party, the non-breaching Party may immediately terminate any Service to which the breach relates following the non-breaching Party's delivery of notice to the breaching Party pursuant to Section 6.3. Notwithstanding anything herein to the contrary, Service Recipient's failure to pay (or cause to be paid) any Fees when due and payable shall not constitute a breach of the terms of this Agreement if there exists a good faith disagreement regarding such Fees.

(b)    Except as otherwise provided herein, the obligation of Service Provider to provide, or cause to be provided, any Service shall cease on the earliest to occur of (i) the expiration of the Services Period applicable to such Service or (ii) the date on which such Service is terminated in accordance with the terms of this ARTICLE III. This Agreement shall automatically terminate without notice, and all provisions of this Agreement shall become null and void and of no further force and effect, except for the provisions set forth in Section 6.5, on the date on which neither Party has any obligations to provide any Service under this Agreement.

Section 3.3 Obligations on Termination. Upon termination of this Agreement, Service Provider shall invoice Service Recipient for all outstanding Fees rendered through the effective date of termination of this Agreement and, within thirty (30) days following receipt of such invoice, Service Recipient shall pay all outstanding Fees. Undisputed payments not made within thirty (30) days after termination of this Agreement shall be subject to the late charges as provided in Section 2.2.

Section 3.4 <u>Termination of an Individual Service by Service Provider.</u> If, during the ~~Term~~<u>Services Period</u>, (a) with respect to a Service provided by a Vendor of Service Provider at the Effective ~~Time~~<u>Date</u>, such Vendor is unwilling or unable to provide the Service, or (b) with respect to a Service provided by Service Provider at the Effective ~~Time~~<u>Date</u>, Service Provider is unable to continue providing the Service using commercially reasonable efforts, in each case (i) and (ii), Service Provider, upon providing thirty (30) days' prior written notice to Service Recipient, may terminate the affected Service. Such termination of the affected Service shall have no effect upon the provision of the Services to Service Recipient unless other Services are dependent on that terminated Service, in which case the Parties will cooperate and use commercially reasonable efforts to promptly determine and implement a reasonable alternative arrangement for the affected Services. Notwithstanding the foregoing, Buyer may not terminate any Buyer Service listed on <u>Schedule A-2</u> as "Required for GOB" prior to the end of all GOB Periods for all GOB Stores.

## ARTICLE IV

## CONFIDENTIALITY

Section 4.1    <u>Confidential Information.</u> "Confidential Information" means any nonpublic information whether disclosed in oral, written, visual, electronic or other form, that (a) one Party or one of its Affiliates (the <u>"Disclosing Party"</u>) discloses to the other Party or one of its

Affiliates (the "Receiving Party"), including information received as a result of data or system access during the term of this Agreement, (b) relates to or is disclosed in connection with this Agreement and (c) is or reasonably should be understood by the Receiving Party to be confidential or proprietary to the Disclosing Party (whether or not such information is marked "Confidential" or "Proprietary"). Confidential Information of the Business is the Confidential Information of Buyer.

Section 4.2 Treatment of Confidential Information. The Receiving Party shall (a) restrict disclosure of the Disclosing Party's Confidential Information to its and its Affiliates' Personnel with a need to know such Confidential Information to fulfill its obligations under this Agreement, (b) instruct those Personnel of their obligation not to disclose the Confidential Information or use the Confidential Information except to fulfill the Receiving Party's obligations under this Agreement and (c) protect the Confidential Information, and require those Personnel to protect it, using the same degree of care as the Receiving Party uses with its own Confidential Information, but no less than reasonable care. The Receiving Party shall notify the Disclosing Party as soon as reasonably practicable after obtaining knowledge of any disclosure, or suspected disclosure, of any Confidential Information to a Third Party in a manner prohibited by applicable Law or the terms of this Agreement.

Section 4.3    Liability for Unauthorized Disclosure. The Receiving Party shall be liable to the Disclosing Party for any unauthorized disclosure of Confidential Information in violation of this Agreement by it, its Affiliates and any of its or its Affiliates' current or former Personnel.

Section 4.4 Return or Destruction. Without limiting the foregoing, when any Confidential Information is no longer needed for the purposes contemplated by this Agreement,

the Receiving Party shall, promptly upon the request of the Disclosing Party, either return such Confidential Information in tangible form or certify to the other Party that it has destroyed such Confidential Information.

Section 4.5 <u>Exceptions to Confidential Treatment.</u> The obligations under <u>Section</u> 4.2 do not apply to any information that the Receiving Party can demonstrate (a) was disclosed to the Receiving Party by a Third Party without an obligation of confidentiality to the Disclosing Party, its Affiliates or any other Third Party, as applicable, (b) is or becomes available to the public other than by disclosure by the Receiving Party or its Affiliates in violation of this Agreement or (c) was or is independently developed by the Receiving Party or its Affiliates without use of the Disclosing Party's Confidential Information. Notwithstanding anything to the contrary, with respect to the Seller and its Affiliates, Confidential Information relating to the Business that existed as of the Effective ~~Time~~<u>Date</u> shall not be subject to the foregoing exceptions (a) and (c).

Section 4.6 <u>Protective Arrangement.</u> A Receiving Party may disclose the Disclosing Party's Confidential Information upon the advice of the Receiving Party's legal counsel that (a) such information is required to be disclosed by Law or the rules and regulations of any applicable Governmental Authority and the Receiving Party has complied with this <u>Section</u> <u>4.6</u> or (b) such information is required to be disclosed in response to a valid subpoena or Order of a court or other Governmental Authority of competent jurisdiction or other valid legal

process and the Receiving Party has complied with this <u>Section 4.6.</u> Prior to any such disclosure, the Receiving Party shall give the Disclosing Party, to the extent legally permitted and reasonably practicable, prompt prior written notice of such disclosure and an opportunity to contest such disclosure, and the Receiving Party shall use commercially reasonable efforts to cooperate, at the expense of the Receiving Party, in seeking any reasonable protective arrangements requested by the Disclosing Party. If such appropriate protective order or other remedy is not obtained, the Receiving Party may furnish, or cause to be furnished, only that portion of such information that the Receiving Party is advised by legal counsel is legally required to be disclosed. The Receiving Party shall take commercially reasonable steps to ensure that confidential treatment is accorded such information.

Section 4.7 <u>Ownership of Information.</u> Except as otherwise provided in this Agreement, all Confidential Information provided by or on behalf of a Party (or its Affiliates) that is provided to the other Party or its Affiliates shall remain the property of the Disclosing Party and nothing herein shall be construed as granting or conferring rights of license or otherwise in any such Confidential Information.

**ARTICLE V**

**INDEMNIFICATION; LIMITATION OF LIABILITY**

Section 5.1    <u>Indemnification by Service Recipient.</u> Notwithstanding anything to

the contrary in <u>Section 5.5,</u> Service Recipient shall defend, indemnify and hold harmless Service Provider and its Affiliates and its Vendors and Personnel (each, a "<u>Service Provider Indemnitee</u>") from and against any and all Losses actually incurred or suffered by Service Provider Indemnitee of every kind and nature to the extent caused by or resulting from a Third Party

party claim arising from or relating to: (a) a breach of any provision of this Agreement by Service Recipient or its Affiliates or any of their respective Personnel; or (b) the gross negligence, willful misconduct or fraud of Service Recipient or its Affiliates or their respective Personnel (collectively, the "Service Recipient Claims"). Notwithstanding the obligations set forth above in this Section 5.1, Service Recipient shall not defend, indemnify or hold harmless Service Provider Indemnitees to the extent that such Service Recipient Claims were caused by: (i) a breach of any provision of this Agreement by Service Provider (including pursuant to Section 1.9), its Affiliates or its Vendors or any of their respective Personnel; (ii) the gross negligence, willful misconduct or fraud of Service Provider or its Affiliates or its Vendors or any of their respective Personnel in the performance (or non-performance) of this Agreement; or (iii) actual or alleged infringement, misappropriation or other violation by Service Provider, its Affiliates or its Vendors or any of their respective Personnel or by Service Recipient or its Affiliates of the Intellectual Property of a Third Party in connection with Service Provider's, its Affiliates' or its Vendors' or any of their respective Personnel's provision, or Service Recipient's or its Affiliates' receipt, of Services.

Section 5.2 Indemnification by Service Provider. Notwithstanding anything to the contrary in Section 5.5, Service Provider shall defend, indemnify and hold harmless Service Recipient and its Affiliates and Personnel (each, a "Service Recipient Indemnitee") from and against any and all Losses actually incurred or suffered by Service Recipient Indemnitee of every kind and nature to the extent caused by or resulting from a tThird pParty claim arising from or relating to: (a) a breach of any provision of this Agreement by Service Provider (including

pursuant to Section 1.9), its Affiliates, its Vendors or any of their respective Personnel; (b) the gross negligence, willful misconduct or fraud of Service Provider, its Affiliates or its Vendors or any of their respective Personnel in the performance (or non-performance) of the Services; or (c) actual or alleged infringement, misappropriation or other violation by Service Provider, its Affiliates or its Vendors or any of their respective Personnel or by Service Recipient or its Affiliates of the Intellectual Property of a Third Party in connection with Service Provider's, its Affiliates' or its Vendors' or any of their respective Personnel's provision, or Service Recipient's or its Affiliates' receipt, of Services (together, the "Service Provider Claims"). Notwithstanding the obligations set forth above in this Section 5.2, Service Provider shall not defend, indemnify or hold harmless Service Recipient Indemnitees to the extent that such Service Provider Claims set forth in clauses (a)-(c) of this Section 5.2 were caused by: (i) a breach of any provision of this Agreement by Service Recipient, its Affiliates or any of their respective Personnel or (ii) the gross negligence, willful misconduct or fraud of Service Recipient, its Affiliates or Personnel in the performance (or non-performance) of this Agreement. Service Recipient Claims and Service Provider Claims are each individually referred to as a "Claim." Notwithstanding the inclusion of Leased Employees as "Personnel" of Buyer in Sections 5.1 and 5.2, no Seller Entity shall be required to indemnify Buyer, its Affiliates, Vendors or Personnel for any Claims which are caused by or result from the acts or omissions of any Leased Employee during the Leasing Period (a "Leased Employee Claim"). Buyer shall defend, indemnify and hold harmless Seller, its Affiliates, Vendors and Personnel for any such Leased Employee Claim.

    Section 5.3 Procedure. In the event of a Claim that arises from a Third Party claim, the indemnified Party shall give the indemnifying Party prompt notice in writing of the Claim; but the failure to provide such notice shall not release the indemnifying Party from any of its obligations under this ARTICLE V, except to the extent the indemnifying Party is materially

    prejudiced by such failure. Upon receipt of such notice, the indemnifying Party shall be entitled to assume and control the defense of the Claim at its expense and through counsel of its choice that is reasonably satisfactory to the indemnified Party, and shall give notice of its intention to do so to the indemnified Party within thirty (30) days of the receipt of such notice from the indemnified Party; provided, however, that the indemnifying Party shall not, without the prior written consent of the indemnified Party, (a) enter into any settlement or compromise with respect to any Claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to applicable Service Provider Indemnitee or Service Recipient Indemnitee of a written release from all liability in respect of the Claim or (b) enter into any settlement or compromise with respect to any Claim in any manner that may adversely affect the applicable Service Provider Indemnitee or Service Recipient Indemnitee other than as a result of money damages or other monetary payments that are indemnified hereunder. The applicable Service Provider Indemnitee or Service Recipient Indemnitee shall have the right at its own cost and expense to employ separate counsel and participate in the defense of any Claim.

    Section 5.4 Independent Obligation. The obligations of each Party to defend, indemnify and hold harmless, the other Parties' indemnitees under this ARTICLE V are independent of each other and any other obligation of the Parties under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, if, in accordance with this Agreement, Seller performs or is the recipient of any Service which violates any agreement or

license with a Third Party or other contractual obligation, Buyer shall defend, indemnify and hold harmless Seller and its Affiliates and Personnel from and against any and all Losses actually incurred or suffered by such Seller Entities of every kind and nature to the extent caused by or resulting from a ~t~Third ~p~Party claim arising from or relating to provision or receipt of such Service.

Section 5.5 Limitation of Liability. EXCEPT FOR (A) LIABILITIES THAT ARE PAYABLE BY THE APPLICABLE INDEMNIFIED PARTY IN CONNECTION WITH A THIRD PARTY CLAIM OR (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY, NOR ITS AFFILIATES OR ITS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, CONTRACTORS OR REPRESENTATIVES, BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES OR LOST PROFITS HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY ARISING IN ANY WAY OUT OF THIS AGREEMENT. EXCEPT AS OTHERWISE LIMITED IN THIS SECTION 5.5, EACH PARTY'S AND ITS AFFILIATES' LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO (1) SERVICE PROVIDER'S OBLIGATION TO RE-PERFORM A SERVICE (IF SERVICE PROVIDER IS THEN CAPABLE OF PROVIDING SUCH SERVICE PURSUANT TO THE TERMS OF THIS AGREEMENT) OR FURNISH CORRECT INFORMATION, PAYMENT OR ADJUSTMENT IN THE SERVICES AT NO ADDITIONAL COST OR EXPENSE TO SERVICE RECIPIENT IF SERVICE RECIPIENT PROMPTLY ADVISES SERVICE PROVIDER OF SUCH ERROR OR OMISSION, (2) OTHER SPECIFIC PERFORMANCE (OR OTHER EQUITABLE RELIEF) AS PROVIDED IN SECTION 6.9 AND (3) THE PAYMENT OF MONETARY DAMAGES, NOT TO EXCEED, FOR ALL CLAIMS IN THE AGGREGATE, THE AGGREGATE AMOUNT OF FEES ACTUALLY PAID (OR OTHERWISE PAYABLE) TO SUCH PARTY AS SERVICE PROVIDER UNDER THIS AGREEMENT.

Section 5.6 Special Indemnity for Cash Management Services. Notwithstanding the limitations in Section 5.5, Seller and Buyer jointly and severally agree to indemnify and hold harmless Bank of America, N.A. and its Affiliates (collectively, the "Special Indemnified Parties") for any and all claims, damages, losses and liabilities of any kind or nature and reasonable, documented and invoiced out of pocket expenses (including the reasonable, documented and invoiced fees, disbursements and other charges of one firm of counsel for all Special Indemnified Parties, taken as a whole (which on the Effective Date shall be Skadden, Arps, Slate, Meagher & Flom LLP) and, if necessary, one firm of local counsel in each relevant jurisdiction for all Special Indemnified Parties, taken as a whole (and, in the case of an actual or perceived conflict of interest where the Special Indemnified Party affected by such conflict informs you of such conflict and thereafter retains its own counsel, of another firm of counsel (and local counsel, if applicable)) for such affected Special Indemnified Party) that may be incurred by or asserted or awarded against any Special Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) providing to Seller, Buyer, or any of their respective Subsidiaries cash management services, including, without limitation, ACH, controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, foreign exchange facilities, credit card processing services and private

label letters of credit, credit or debit cards, and purchase cards, in each case, in connection with the implementation of this Agreement; provided, that the foregoing indemnity will not, as to any Special Indemnified Party, apply to claims, damages, losses and liabilities to the extent they arise from the willful misconduct, bad faith or gross negligence of Special Indemnified Party, as determined by a final non-appealable judgment of a court of competent jurisdiction.

## ARTICLE VI

## MISCELLANEOUS

Section 6.1 Amendment; Waiver. No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 6.2 Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other Party, and any purported assignment or delegation in contravention of this Section 6.2 shall be null and void and of no force or effect. Notwithstanding the preceding sentence, either Party may assign any or all of its rights and obligations under this Agreement (a) to an Affiliate, so long as the assigning Party will remain liable to the non-assigning Party for the performance of the assigning Party's obligations hereunder, or (b) with respect to Buyer, in connection with a sale or disposition of any assets or lines of business to which this Agreement relates; provided that in the case of (b), the transferee of such assets shall agree in writing to be bound by the terms of this Agreement as if named as a "Party" hereto. Subject to the preceding sentences of this Section 6.2, this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the Parties and their respective successors and permitted assigns.

Section 6.3 Notices. Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) via e-mail or (c) by a nationally recognized courier for overnight delivery service. A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if via e-mail, on the date of successful transmission and (iii) if by nationally recognized courier, one Business Day after delivery to such courier. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

If to Seller, then to:

     Sears Holdings Corporation
     3333 Beverly Road
     Hoffman Estates, IL 60179
     Attention: General Counsel

E-mail: counsel@searshc.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C., Ellen J. Odoner, Gavin Westerman and
Sunny Singh
E-mail: Ray.Schrock@weil.com; Ellen.Odoner@weil.com;
Gavin.Westerman@weil.com; Sunny.Singh@weil.com

If to Buyer, then to:

Transform Holdco LLC and Transform SR Holdings LLC
c/o ESL Partners, Inc.
1170 Kane Concourse, Suite 200
Bay Harbor Islands, FL 33154
Attention: Kunal S. Kamlani and Harold Talisman
Facsimile: (305) 864-1370
E-mail: kunal@eslinvest.com; harold@eslinvest.com

with a copy (which shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention: Christopher E. Austin, Benet J. O'Reilly, Sean A. O'Neal
Facsimile: (212) 225-3999
E-mail: caustin@cgsh.com; boreilly@cgsh.com; soneal@cgsh.com

Section 6.4 Publicity. All publicity regarding this Agreement is subject to
Section 13.1 of the Asset Purchase Agreement.

Section 6.5     Survival. Each term of this Agreement that would, by its nature,
survive the termination or expiration of this Agreement shall so survive, including the obligation
of either Party to pay all amounts accrued hereunder and including the provisions of Section 1.5
(Knowledge Transfer for Benefit of Seller); Section 1.7 (Responsibility for Errors; Delays);
Section 1.11(Ownership of Data and Other Assets); Section 1.12 (Data Privacy); Section 1.14
(Records); Section 3.3 (Obligations on Termination); ARTICLE IV (Confidentiality); ARTICLE
V (Indemnification; Limitation of Liability); Section 6.3 (Notices); Section 6.4 (Publicity);

Section 6.5 (Survival); Section 6.6  (No Third Party Beneficiaries); Section 6.7 (Severability); Section 6.8 (Entire Agreement; Interpretation); Section 6.11 (No Agency); Section 6.12 (Construction and Interpretation); Section 6.13 (Dispute Resolution); Section 6.15 (Precedence of Agreements); and Section 6.16 (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial).

Section 6.6 <u>Parties in Interest; No Third Party Beneficiaries.</u> Except for the indemnification rights under this Agreement of any Service Provider Indemnitee or Service Recipient Indemnitee in their respective capacities as such, or unless otherwise expressly specified herein, nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or permitted assignee of a Party.

Section 6.7 <u>Severability.</u> The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 6.8 <u>Entire Agreement; Interpretation.</u> This Agreement (including the Annex and Schedules hereto), together with the Asset Purchase Agreement, the Employee Lease Agreement and the Occupancy Agreement, contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. In the event of any inconsistency between the provisions of this Agreement and the Employee Lease Agreement, the terms and provisions of this Agreement shall govern and control. Notwithstanding the foregoing, and for the avoidance of doubt, the preceding sentence shall not apply to <u>Sections 5.1</u> or <u>5.2</u> of this Agreement, which Section 2.3 (Indemnification) of the Employee Lease Agreement shall govern in all respects in the event of an inconsistency between the provisions of this Agreement and Section 2.3 of the Employee Lease Agreement. Each of the Parties acknowledge that it has been represented by legal counsel in connection with this Agreement, the Asset Purchase Agreement, the Employee Lease Agreement and the Occupancy Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this

Agreement, the Asset Purchase Agreement the Employee Lease Agreement and the Occupancy Agreement against the drafting party has no application and is expressly waived. In the event of a conflict or inconsistency between the terms of the Asset Purchase Agreement (including the representations, warranties, covenants and indemnification provisions thereof) and the terms of any other documents delivered or required to be delivered in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement (including this Agreement), the Parties acknowledge and agree that the terms of the Asset Purchase Agreement shall supersede such conflicting or inconsistent terms in such other documents and the terms of the Asset Purchase Agreement shall define the rights and obligations of the Parties and their respective

officers, directors, employees, stockholders and Affiliates with respect to the subject matter of such conflict or inconsistency.

Section 6.9 <u>Specific Performance.</u> The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in

accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be
available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement by the breaching Party or Parties. If any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at Law.

Section 6.10 <u>Force Majeure.</u> Service Provider shall use commercially reasonable efforts to provide, or cause to be provided, the Services without interruption. Notwithstanding the foregoing, neither Party shall be responsible to the other for any delay in or failure of performance of its obligations under this Agreement, to the extent such delay or failure is caused by events or circumstances outside of such Party's control which could not be avoided or otherwise mitigated using commercially reasonable efforts to perform, including if attributable to any act of God, act of terrorism, fire, war, embargo or other governmental act or riot (each, a "Force Majeure Event"); provided, however, that the Party affected thereby gives the other Party prompt written notice of the occurrence of any event which is likely to cause (or has caused) any delay or failure setting forth its best estimate of the length of any delay and any possibility that it shall be unable to resume performance; provided, further, that said affected Party shall use its commercially reasonable efforts to prevent, mitigate and expeditiously overcome the effects of that event and resume performance. Neither Party is required to pay for those Services that are not performed, to the extent such Services are not performed, due to excused performance in a Force Majeure Event or otherwise.

Section 6.11 <u>No Agency.</u> Nothing in this Agreement creates (or shall be claimed or intended to create) a relationship of agency, partnership or employer/employee between Seller and Buyer and it is the intent and desire of the Parties that the relationship be and be construed as that of independent contracting parties and not as agents, partners, joint venturers or a relationship of employer/employee.

Section 6.12 <u>Construction and Interpretation.</u> For purposes of this Agreement, (a) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day; (b) any reference in this Agreement to "dollars" or to "$" means U.S. dollars; (c) any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa; (d) the provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement

unless otherwise specified; (e) words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires; (f) the word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if"; (g) the word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; and (h) references to "any" shall mean "any and all," and "or" is used in the inclusive sense of "and/or."

Section 6.13 <u>Dispute Resolution.</u>

(a)      <u>Negotiation.</u> If a dispute, controversy or claim (<u>"Dispute"</u>) arises

between the Parties relating to the interpretation or performance of this Agreement, within fifteen (15) days from a written request from a Single Point of Contact of a Party to the Single Point of Contact of the other Party, such Single Points of Contact, who shall have the authority to resolve the matter, shall meet to attempt in good faith to negotiate a resolution of the Dispute prior to pursuing other available remedies. The date of the initial meeting between the Single Points of Contact shall be referred to herein as the <u>"Dispute Resolution Commencement Date."</u> Any discussions and correspondence relating to trying to resolve such Dispute by meetings between Single Points of Contact shall be treated as Confidential Information developed for the purpose of settlement and shall be exempt from any discovery or production, if any, in connection with any resolution of such Dispute and shall not be admissible as evidence in such Dispute resolution. If any Dispute is not resolved by the Single Points of Contact within sixty (60) days from the Dispute Resolution Commencement Date pursuant to this <u>Section 6.13(a),</u> the Dispute shall be resolved by the courts set forth in Section 13.8(b) of the Asset Purchase Agreement.

(b)      <u>Continuity of Service and Performance.</u> Unless otherwise agreed in writing, the Parties shall continue to provide Services, to make payments, and to honor all other commitments under this Agreement during the course of Dispute resolution pursuant to the provisions of this <u>Section 6.13.</u>

Section 6.14 <u>Counterparts.</u> This Agreement may be executed in any number of counterparts (including via electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party. Delivery of an executed counterpart hereof by means of electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 6.15 <u>Precedence of Agreements.</u> Each Schedule attached to or referenced in this Agreement is hereby incorporated into and shall form a part of this Agreement by reference; <u>provided</u> that the terms contained in such Schedule shall only apply with respect to the Service(s) provided under that Schedule. In the event of a conflict between the terms contained in an individual Schedule and the terms in the body of this Agreement, the terms in the individual Schedule shall take precedence with respect to the Service(s) under such Schedule.

Section 6.16 <u>Governing Law; Jurisdiction and Forum; Waiver of Jury Trial.</u> Subject to <u>Section 6.13</u> of this Agreement, Section 13.8 (Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver) of the Asset Purchase Agreement shall apply to this Agreement as if set forth herein, *mutatis mutandis*.

*[Remainder of page left intentionally blank]*

IN WITNESS WHEREOF, the Parties have caused their respective duly authorized representatives to execute this Agreement effective as of the date first written above.

**SEARS HOLDINGS CORPORATION**

By: _____

Name: Robert A. Riecker

Title:      Chief Financial Officer

IN WITNESS WHEREOF, the Parties have caused their respective duly authorized representatives to execute this Agreement effective as of the date first written above.

TRANSFORM HOLDCO LLC

By:

Name: Edward S. Lampert   Title: Chief Executive Officer

*[Signature Page to Services Agreement]*

*[Signature Page to Services Agreement]*

IN WITNESS WHEREOF, the Parties have caused their respective duly authorized representatives to execute this Agreement effective as of the date first written above.

TRANSFORM SR HOLDINGS LLC

By: _____    _____

    Name: Harold Talisman
    Title: Chief Financial Officer

**Annex I**

**DEFINED TERMS**

The following defined terms used in this Agreement will have the meanings ascribed to them below. Other terms are defined in the body of this Agreement to which this Annex I is attached. All defined terms include the singular and the plural form of such terms.

"Buyer Entities" means, collectively, Buyer, its Affiliated Designees and their respective Affiliates.

"Employee Lease Agreement" means that certain Employee Lease Agreement, dated as of the date hereof and entered into by and between the Parties hereto.

"Executive Business Employee" shall have the meaning set forth in the Employee Lease Agreement.

"Leasing Period" shall have the meaning set forth in the Employee Lease Agreement.

"Leased Employee" shall have the meaning set forth in the Employee Lease Agreement.

"Licenses and Permits" means all grants, authorizations, licenses, permits, variances, consents or certificates issued pursuant to any Governmental Authority.

"Losses" means actual, losses, damages, costs and expenses, including reasonable attorneys' fees, without duplication.

"Personnel" means the officers, managers, directors, employees, agents, suppliers, licensors, licensees, contractors, subcontractors, advisors (including attorneys, accountants, technical consultants or investment bankers) and other representatives, from time to time, of a Party and its Affiliates; provided that the Personnel of any Buyer Entity shall not be deemed Personnel of any Seller Entity and the Personnel of any Seller Entity shall not be deemed Personnel of any Buyer Entity, except that Leased Employees performing Services under this Agreement shall be deemed Personnel of Buyer for purposes of this Agreement.

"Seller Entities" means, collectively, Seller and all of its Affiliates.

"Service Provider" means, with respect to any Service, the Person providing such Service hereunder.

"Service Recipient" means, with respect to any Service, the Person receiving such Service hereunder.

"Services" means (a) the Seller Services when the Service Provider is a Seller Entity or a Vendor contracted by Seller, or (b) the Buyer Services when the Service Provider is a Buyer Entity or a Vendor contracted by Buyer, as the case may be and context requires.

- 2 -

WEIL:\96889465\20\73217.0004

**Schedule A-1**

**SELLER SERVICES**

[See document to be separately provided.]

-

# SCHEDULE A: SERVICES SCHEDULES

**To the Services Agreement, dated as of February ~~8~~11, 2019, ~~between~~among**

**Sears Holdings Corporation ~~and~~, Transform Holdco LLC and Transform SR Holdings LLC**

- **Schedule A-1: Seller Services**

  - o   Critical Contract Services
  - o   Critical Procurement Services
  - o   Pharmacy Services
  - o   Repair Services
  - o   Insurance Services
  - o   Other Credit Services
  - o   Human Resources / Payroll Services
  - o   International Entity Services

- **Schedule A-2: Buyer Services**

  - o   Service Contract Services
  - o   Payroll Processing
  - o   Benefits Administration
  - o   Accounting Services
  - o   Tax – Required Tax Services
  - o   "As-Needed" Tax Services
  - o   IT (Accounting/PoS/etc.)
  - o   Real Estate
  - o   Contracts Support
  - o   Cash Management
  - o   Compliance/Data

- Loss Prevention
- Facilities Maintenance
- Associate Relation
- Disbursements
- Reporting Services
- Risk Management & Insurance
- Compliance – Environmental
- Payment Clearing and Related Financial Services
- Legal
- Supply Chain
- Customer Complaints
- Home Services
- Parts Direct
- Product Safety
- Pricing
- P-Card

**Schedule A-1**

**SELLER SERVICES**

[See document to be separately provided.]

A-1

## Schedule A-1: Seller Services

In addition to the fees described below, Buyer will pay the Seller Administrative Fee of $250,000 per month, as described in Section 2.1(a) of the Services Agreement.

### *Critical Contract Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of critical contract services | Seller (via the Leased Employees) will use commercially reasonable efforts to maintain its relationships with critical Vendors and contract counterparties, and allow Buyer to receive the benefit of such services provided by such Vendors and contract counterparties, in the following, but not exclusive, categories of services:<br><br>☐ HVAC<br>• Housekeeping<br>• Merchandise Delivery<br>• Supplies and Consumables<br>• Armored Cars<br>   ⊟ Marketing<br>   ⊟ Signage<br>⊟ Yard Jockeys •<br>   ⊟ Software / Software Maintenance / IT Services<br>• Automotive<br>• Alarm Monitoring<br>• Repairs and Maintenance<br>• Environmental Services<br>• Call Centers<br>• Leasing<br>• Materials Handling<br>• Waste Services and Recycling<br>• Pest Control<br>• Telecom<br>• Security and Loss Prevention<br>• Printing and Reproduction<br>• Landscaping and Snow Removal<br>• Utilities | 60 days.<br><br>If, during this Service Period, any such contracts are assigned to Buyer, Buyer will provide this Seller Service as a Buyer Service to Seller, as set forth on Schedule A-2. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall ~~make payment in accordance with Section 2.2(a)~~provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing |

| | | • Appliance Haul Away | | from such funds. |
| | | | | |

| | | | | |
|---|---|---|---|---|
| | | <ul><li>Materials Handling</li><li></li><li>Waste Services and Recycling</li><li>Pest Control</li></ul><br><ul><li>Security and Loss Prevention</li><li>Printing and Reproduction</li><li>Landscaping and Snow Removal</li><li>Utilities</li><li>Appliance Haul Away</li><li>Contract Labor and Temps</li></ul> | | |

Contract Labor and Temps

*Critical Procurement Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of critical procurement services | Seller (via the Leased Employees) will use commercially reasonable efforts to maintain its relationships with critical Vendors and contract counterparties, and allow Buyer to receive the benefit of such merchandise and other goods sold by such Vendors and contract counterparties | 60 days.<br><br>If, during this Service Period, any such contracts are assigned to Buyer, Buyer will provide this Seller Service as a Buyer Service to Seller, as set forth on Schedule A-2. | Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall ~~make payment in accordance with Section 2.2(a)~~provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds. |

*Pharmacy Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Seller acts as Buyer's agent with respect to pharmaceutical licenses | Seller shall retain ownership of all pharmacies until such time as Buyer obtains appropriate licenses to operate each pharmacy. To the extent located in a property owned or leased by Buyer, each pharmacy shall (during the service period as to such pharmacy) lease such space from Buyer.<br><br>Seller (via the Leased Employees) will operate pharmacies, in the ordinary course of business, as Buyer's "agent," pending approval or transfer of all licenses and permits to operate the pharmaceutical business to Buyer. Pharmacy operations will transition to Buyer (including the transfer of all related assets) on a rolling basis as the appropriate licenses are obtained to operate such pharmacy.<br><br>Inventory would be calculated as of February 811, 2019 for the purposes of the consolidated inventory calculation, however title in such inventory shall not pass to Buyer until all applicable pharmacy licenses and permits are approved or transferred. Seller shall grant a Transition Lien to the Transform Lenders with respect to all pharmacy Inventory during this Service Period prior to title passing to Buyer. | From Closing Date until the earlier of (i) three (3) months and (ii) date on which Buyer obtains all required licenses.<br><br>As licenses are obtained, pharmacies shall be removed from coverage under this service on a rolling basis. | To the extent permissible, Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor upon the first payment or to the extent such payments are not permitted, then Buyer shall make payment in accordance with Section 2.2(a).provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds.<br><br>Sellers shall assign any pharmacy receivables to Buyer promptly upon generation of such receivables.<br><br>Pharmacies operated by Seller requiring leased space from |

10

| | | | | Buyer shall pay rent to Buyer and in consideration of a portion ~~of the fixed fee payable by Seller to Buyer for Buyer Services under this Agreement, Buyer waives the first three (3) months of any such pharmacy rent amount. Thereafter, pharmacy rent shall be based on market rates as agreed between Buyer and Seller.~~ |
|---|---|---|---|---|

| | | | | of the fixed fee payable by Seller to Buyer for Buyer Services under this Agreement, Buyer waives the first three (3) months of any such pharmacy rent amount. Thereafter, pharmacy rent shall be based on market rates as agreed between Buyer and Seller. |
|---|---|---|---|---|

*Repair, Home Improvement and Installation Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|-----|----------------|---------------------------|----------------|------|
| 1. | Seller to act as Buyer's agent with respect to licenses required to perform customers' in-home repair services ("Home Repair Field Operations Business") | Seller (via the Leased Employees) continues to operate the Home Repair Field Operations Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits, including any master qualifier license, required for Buyer to operate the Home Repair Field Operations Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, Home Repair Field Operations Business employees who hold licenses ("Home Repair Licensed Employees")<br>continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee License Agreement, at the end of this Service Period, Home Repair Licensed Employees will transfer to Buyer in a single closing. | Buyer shall receive all cash receipts from operations and shall make all ~~payments~~required disbursements (either directly to Vendors when due in accordance with Vendor's terms~~.~~ ~~If~~ or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall ~~make payment in accordance with Section 2.2(a)~~provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds). |

| 2. | Seller to act as Buyer's agent with respect to licenses required to perform home improvement services ("SHIP Business") | Seller (via the Leased Employees) continues to operate the SHIP Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits required for Buyer to operate the SHIP Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, SHIP Business employees who hold licenses or whose work requires Buyer to have a license (e.g. home improvement sales personnel) ("SHIP Licensed ~~Employees") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer.~~ | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee Lease Agreement, at end of this Service Period, SHIP Licensed Employees will transfer to Buyer in a single closing. | Buyer shall receive all cash receipts from operations and shall make all ~~payments~~required disbursements (either directly to Vendors when due in accordance with Vendor's terms~~. If~~ or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall ~~make payment in accordance with Section 2.2(a).~~provide notice to Seller in advance of |
| ~~3.~~ | ~~Seller to act as Buyer's agent with respect to licenses required to perform appliance installation services~~ | ~~Seller (via the Leased Employees) continues to operate the Appliance Installation Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits required for Buyer to operate the Appliance Installation Business independent of Seller.~~ | ~~From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.~~<br><br>~~Subject to the terms of the~~ | ~~Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer~~ |

| | | Employees") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | | such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the payments; and (iii) Seller shall make such payments when due, drawing from such funds). |
|---|---|---|---|---|
| 3. | Seller to act as Buyer's agent with respect to licenses required to perform appliance installation services in customers' homes ("Appliance Installation Business") | Seller (via the Leased Employees) continues to operate the Appliance Installation Business in the ordinary course of business, acting as Buyer's agent, pending Buyer obtaining necessary licenses and permits required for Buyer to operate the Appliance Installation Business independent of Seller.<br><br>Subject to the terms of the Employee License Agreement, Appliance Installation Business employees who hold licenses ("Installation Licensed Employees") continue to | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee Lease Agreement, at the end of this Service Period, Appliance Installation Business employees who hold licenses will transfer to Buyer in a single closing. | Buyer shall receive all cash receipts from operations and shall make all required disbursements (either directly to Vendors when due in accordance with Vendor's terms or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the Payments; and (iii) Seller shall make such payments when due, drawing from such funds).shall make payment in accordance with Section 2.2(a). |

15

| | | be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 4. | Seller to act as Buyer's agent with respect to licenses required to perform customers' auto repair services ("Auto Repairs | Seller (via the Leased Employees) continues to operate the Auto Repairs Business in the ordinary course of business, acting as Buyer's agent, pending approval and transfer all necessary licenses and permits, including any master qualifier license, required for Buyer to operate the Auto Repairs Business independent of Seller. | From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits.<br><br>Subject to the terms of the Employee Lease Agreement, at | Buyer shall receive all cash receipts from operations and shall make all required disbursements (either directly to Vendors when due in accordance with Vendor's terms or if Buyer discovers that it is unable to |
| ~~4.~~ | ~~Seller to act as Buyer's agent with respect to licenses required to perform customers' auto repair services ("Auto Repairs~~Business") ~~Business")~~ | ~~Seller (via the Leased Employees) continues to operate the Auto Repairs Business in the ordinary course of business, acting as Buyer's agent, pending approval and transfer all necessary licenses and permits, including any master qualifier license, required for Buyer to operate the Auto Repairs Business independent of Seller.~~ Subject to the terms of the Employee License Agreement, Auto Repairs Business technicians and auto center ~~managers who are named on licenses ("Auto Repairs~~ managers who are named on licenses ("Auto Repairs Licensed Employees") continue to be employed by Seller until end of this Service Period, at which point those employees will be transferred to Buyer. | ~~From Closing Date until the earlier of (i) 120 days and (ii) date on which Buyer obtains all required licenses and permits. Subject to the terms of the Employee Lease Agreement, at~~ the end of this Service Period, Auto Repairs Licensed Employees ~~will transfer to Buyer in a single closing.~~ will transfer to Buyer in a single closing. | ~~Buyer shall make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to~~ make payments directly to Vendor, then Buyer shall ~~make payment in accordance with Section 2.2(a)~~ provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall provide on a weekly basis an ACH file of required payments for the following week, including the amount to be paid Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the Payments; and (iii) Seller shall make such payments when due, drawing from such funds). |
| 5. | Protection ~~Agreement Services~~ | Seller (via the Leased Employees) shall continue to ~~operate its service contract business (where a subsidiary of Seller is the obligor) in the ordinary course, including performing all reasonably necessary or appropriate services required under the protection agreements in effect during the Service Period and administrative services, including but not limited to: maintenance of files,~~ | ~~[*]~~Earlier of (i) 60 days and (ii) date | Buyer shall ~~make all payments direct to Vendor when due in accordance with Vendor's terms. If Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall make payment in accordance with~~ |

| | | ~~retention of records, full claims adjudication according to the terms and conditions of the contracts and applicable state law and servicing in response to contract holders, and legal and regulatory services.~~ | | ~~Section 2.2(a).~~receive all cash |
|---|---|---|---|---|
| | Agreement Services | operate its service contract business (where a subsidiary of Seller is the obligor) in the ordinary course, including performing all reasonably necessary or appropriate services required under the protection agreements in effect during the Service Period and administrative services, including but not limited to: maintenance of files, retention of records, full claims adjudication according to the terms and conditions of the contracts and applicable state law and servicing in response to contract holders, and legal and regulatory services. | on which Buyer obtains requisite licenses/registrations. In the event that Buyer is unable to obtain requisite licenses/registrations within the 60 days after the Closing Date for fewer than five states, through no fault or delay of its own, the Parties will discuss in good faith extending this Service Period to allow Buyer additional time. | receipts from operations and shall make all required disbursements (either directly to Vendors when due in accordance with Vendor's terms or if Buyer discovers that it is unable to make payments directly to Vendor, then Buyer shall provide notice to Seller in advance of such payment being due and then and thereafter, (i) Buyer shall ACH file of required payments for the following week, |

| | | | the amount to be paid and Vendor account to be paid, (ii) on every Tuesday during the Services Period, Buyer will transfer such funds for the subsequent week to Seller to make the Payments; and (iii) Seller shall make such payments when due, drawing from such funds). |
| --- | --- | --- | --- |

*Insurance Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Endorsement of Buyer and BAML, Citi and Cantor Fitzgerald under existing insurance policies | Seller endorses Buyer (specifically, Transform Midco LLC and its Subsidiaries) under the following insurance programs and Seller agrees to extend coverage under the following insurance programs in order to provide benefits to Buyer:<br>- Primary Casualty Insurance<br>- Excess (Umbrella) Liability<br>- Property Insurance<br><br>- Miscellaneous other policies as needed<br>BAML, Citi and Cantor Fitzgerald to be endorsed as additional insured and loss payees. | Until earlier of (i) expiration date of current policy and (ii) date on which Buyer has obtained replacement policy with respect Acquired Assets.<br><br>If, during this Service Period, any insurance programs are assigned to Buyer, Buyer will provide this Service as a Buyer Service, as set forth on Schedule A-2. | Buyer to reimburse Seller for its proportion of any premiums, deductibles or other costs related to Buyer's insured assets or operations during the Service Period in accordance with Section 2.2 of this Agreement. |
| 2. | Addition of Buyer as Alternate Employer | Addition of Buyer as an alternate employer to provide Workers Compensation insurance, as necessary, under the Employee Lease Agreement. | From Closing Date until conclusion of the Leasing Period. | Buyer to reimburse Seller for its proportion of any premiums, deductibles or other costs during the term in accordance with Section 2.2 of this Agreement. |

*Other Credit Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Use of Atlantic Specialty/One Beacon Bond Program (includes "Customs Bond") plus other smaller miscellaneous bonds (collectively, "One Beacon Bonds") | Seller to provide Buyer with coverage under existing Customs Bonds with respect to any import activities of Buyer as to which Department of Commerce requires posting of a Customs Bond.<br><br>Seller to provide Buyer with benefit of existing Surety Bonds with respect to guarantee payments, contractor license bonds and various other permits.<br><br>Seller shall grant a Transition Lien to the Transform Lenders with respect to the One Beacon Bonds during the service term. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Customs Bond during the Service Period in accordance with Section 2.2 of this Agreement.<br><br>[Any amounts returned to Seller under the Customs Bond and/or from the bonding company that issued such customs bond (to the escrow deposit account maintained at Citibank, N.A. by the Agent for further credit to CBNA f/b/o Sears Holdings Corp.) shall be allocated and paid promptly to either Buyer (to an account at Citi to be designated by Buyer), Seller or both as a result of good faith discussions between the Parties.] |
| 2. | Use of Liberty Mutual Insurance Company, XL Specialty Insurance Company, Travelers Property Casualty Group and RLI Group surety bonds ("Surety Bonds") | Seller to provide Buyer with benefit of existing Surety Bonds with respect to workers' compensation, court bonds, guarantee payment, performance bond, contractor license bonds and various other permit bonds. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Surety Bonds during the Service Period in accordance with Section 2.2 of this Agreement. |
| 3. | Use of Argonaut Insurance Company medical surety bonds ("Medical Bond") plus other | Seller to provide Buyer with benefit of existing Medical Bond with respect to pharmacy bonds required by Medicare.<br><br>Seller to provide Buyer with benefit of existing Surety Bonds with respect to guarantee payments, court bonds and various other license and permit bonds. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Medical Bond during the Service Period in accordance with Section 2.2 of this Agreement. |

21

| | miscellaneous bonds included in bond program | | | |
|---|---|---|---|---|
| 4. | Use of utility bonds with various utility providers in multiple jurisdictions from various surety companies ("Utility miscellaneous bonds | Seller to provide Buyer with benefit of existing Utility Bonds with respect to payment of utility expenses. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Utility Bonds during the Service Period in accordance with Section 2.2 of this Agreement. |

| | Bonds") | | | |
|---|---|---|---|---|
| | included in bond program | and various other license and permit bonds. | | |
| 4. | Use of utility bonds with various utility providers in multiple jurisdictions from various surety companies ("Utility Bonds") | Seller to provide Buyer with benefit of existing Utility Bonds with respect to payment of utility expenses. | Earlier of (i) 120 days and (ii) date on which Buyer obtains its own bond. | Buyer to reimburse Seller for proportionate fees of Utility Bonds during the Service Period in accordance with Section 2.2 of this Agreement. |

*Human Resources / Payroll Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|---|---|---|---|---|
| 1. | Provision of employee medical benefits | Seller to provide employee medical benefits to Transferred Employees. | Beginning at the end of the Leasing Period until Buyer establishes its own medical plans, after which time Buyer will provide this Service as a Buyer Service as set forth on Schedule A-2. | Base Cost $240,008 per month (flat rate)<br><br>COBRA eligible $69.15/Year or $5.76 per month<br><br>CAM Services - $0.19 per eligible<br><br>Advocacy Services – $0.5 per medical enrolled per month<br><br>FSA/HSA Count – $3.5 per enrolled per month<br><br>Commuter Benefits – $3.80 per enrolled per month<br><br>QMCSO Services – $300 per order<br><br>Buyer shall reimburse Seller in accordance with Section 2.2 of this Agreement |
| 2. | Administration of employee payroll | Seller (via the Leased Employees) will administer payroll services to the Leased Employees during the Leasing Period. | For the Leasing Period, after which time Buyer will provide this Service as a Buyer Service as set forth on Schedule A-2. | Buyer shall reimburse Seller for its proportion of any costs and expenses in accordance with Section 2.2 of this Agreement. |

24

*International Entity Services*

| No. | Seller Service | Seller Service Description | Service Period | Fees |
|-----|----------------|---------------------------|----------------|------|
| 1. | Provision of call center and other operational services | Without duplication of the employee services provided pursuant to the Employee Lease Agreement, Seller shall cause to be provided to Buyer any services comparable to those provided to the Business as immediately prior to the Closing Date by the following entities under Sellers' control:<br>- Sears Holdings Global Sourcing Limited<br>- Sears Sourcing India Private Limited<br>- International Sourcing & Logistics Limited<br>- Quality Assurance Laboratory Limited<br>- Sears Global Technologies India Private Limited | As to each International Entity, from the Closing Date until the date that ownership of such entity is transferred to Buyer. | Buyer shall reimburse Seller at cost for any costs beyond employee time (which is separately addressed through the Employee Lease Agreement) in accordance with Section 2.2 of this Agreement. |

## Schedule A-2

## BUYER SERVICES

[See document to be separately provided.]

WEIL:\96889465\1620\73217.000

26

4

## Schedule A-2: Buyer Services
Schedule A-2: Buyer Services

### *Service Contract Services*

| No. | Buyer Service | Buyer Service Description | Service Period | Fees |
|-----|---------------|--------------------------|----------------|------|
| 1. | Service Contract Services | Buyer shall backstop, with its full faith and credit, the performance of Seller Service entitled "Protection Agreement Services" on Schedule A-1, including payment of all claims. | From the Closing Date until the date of transfer of the KCD Notes and PA Liabilities in accordance with the Asset Purchase Agreement. | In addition to any amounts paid via the backstop, an amount equal to the aggregate of all amounts paid by Buyer to Sellers with respect to any licenses under which Buyer licenses the KCD IP (in an amount not to exceed $500,000 per month). |

See attached Excel spreadsheet incorporated herein to Schedule A-2.

**Schedule A-2: Buyer Services**

Schedule A-2: Buyer Services – CGSH DRAFT 2/7/19

All Buyer Services provided during the ~~GOB~~ Buyer Initial Period shall be provided for an all-in fixed fee of $1,250,000 per month.

| Services | Details | Service Period | | Required For: | |
|---|---|---|---|---|---|
| | | Start | End | GOB | Estate |
| 1 Payroll Processing[1] | Buyer will process payroll for the GOB store employees and any other OldCo employees, other than Leased Employees:<br>•  Manage the associate time and attendance system and process;<br>•  Manage the creation and reporting of payroll payment processing regardless of method – electronic, paper, pay card, etc.<br>This includes current and non-exempt associate population;<br>• Administer garnishment process;<br><br>•  Calculate associate commission income and administer the reporting for commission payments;<br>•  Manage payroll taxes and related deductions;<br>•  Manage the processing and distribution of W-2 statements | Closing Date | Completion of wind-down of the estate | X | X |
| 2 Benefits Administration[2]   2 Benefits Administration   • [3] | Buyer to maintain and support benefits for GOB store employees and any other OldCo employees, other than Leased Employees :[4]<br>•  Maintain relationships with insurance benefits providers (healthcare, dental, life, STD/LTD);<br>•  Administer 401K plan, retirement savings plan, WorkLife solutions;<br>•  Manage voluntary benefits programs and maintain company programs for service healthcare, dental, life, STD/CTD and other welfare plans<br>•  Maintain administrative processes for associate communications and HR Policy development.<br>•  Assist Seller to administer pension plans until fully terminated and assist in transition of pension plans to PBGC | Closing Date | Completion of wind-down down of the estate | X | X |
| 3 Accounting Services   Data extraction (FTD)   transaction   and   management and external reporting | •  Continue to support A/P and any A/R<br>•  Perform daily, weekly and monthly transaction processing of all entries and feeds into the general ledger system. Compile and load general<br>ledger information for OldCo into Essbase financial reporting databases, EIS and Financial Transaction Databases to be used for internal<br>reporting and analysis by OldCo. OldCo will inform NewCo of any processing errors or data feed issues which would impact the financial results of OldCo.<br>•  Accounts Payable – Process all invoices and purchase orders for OldCo.<br>•  Fixed Asset Management – maintain all OldCo fixed assets in the NewCo finance fixed asset system.<br>•  Prepare/distribute statements which summarize results of operations and financial position 3 Accounting Services<br>•  Data extraction (FTD) financial transaction data base and financial, management and external reporting<br>•  Maintain PeopleSoft accounting system and SL (stock ledger) merchandise and margin systems<br>•  Maintain Essbase reporting databases which warehouse financial information<br>•  Data extraction for general ledger (PS), Fixed Assets and Capital tracking.<br>•  Maintain general ledger and supporting records as necessary<br>•  Provide assistance to Seller to manage claims administration, including reconciliations with vendors, payment of 503(b)9 claims, as well as any other payments. | Closing Date | Completion of wind-down of the estate | X | X |
| 4 Tax - Required Tax Services | 1.  Federal income tax<br>   a.  Prepare return and remit tax due<br>   b.  Prepare estimated tax and extension filings and remit tax due<br>   c.  Prepare LIFO tax calculations<br>   d.  Prepare supporting work papers<br>   e.  Prepare tax elections<br>   f.  Foreign tax credit calculations<br>2.  State income and sales tax<br>   a.  Prepare returns and remit tax due<br>   b.  Prepare estimated tax and extension filings and remit tax due<br>   c.  Prepare supporting work papers<br>   d.  Prepare tax allocations for periods when part of SHLD unitary returns<br>3.  Financial Accounting<br>   a.  Quarterly tax provision, effective tax rate calculations, tax accounting journal entry support<br>   b.  Analysis of uncertain tax positions and quarterly tax reserve calculations and journal entry support (if necessary)<br>   c.  Return-to-accrual calculations and necessary journal entry support<br>4.  Sales and use tax<br>   a.  Prepare tax returns and remit taxes due<br>   b.  Maintain tax tables in POS system (if continue to use Sears POS system)<br>5.  Property tax<br>   a.  Personal property tax filings<br>   b.  Real estate tax filings; landlord reimbursements<br>   c.  Accrual estimates<br>   d.  Monthly summary of tax bills paid along with recommended changes in current monthly estimate of tax liability per location<br>   e.  Appeals and audit defense, where appropriate<br>6. POS Environmental Fees/Deposits for Product Sales at GOB stores<br>7.  Business license filings; gross receipts tax filings and accrual estimates<br>8.  Annual report/franchise tax filings<br>9.  Foreign tax (Puerto Rico, Guam)<br>   a.  Work with OldCo outside tax advisors in preparing necessary tax returns, estimated tax filings and extension filings (e.g., income, property, gross receipts) and facilitating payment of tax<br>   b.  Work with OldCo outside tax advisors, when appropriate, to prepare supporting tax work papers and accounting method changes and tax elections<br>   c.  For Statutory requirements, prepare audited financial statements and tax schedules to support necessary tax returns<br>   d.  OldCo will engage a third party tax advisor to prepare its Guam and Puerto Rico tax filings and estimated tax filings; to provide any necessary audit defense; and to provide any other foreign tax services that may be required. | Closing Date | Completion of wind-down down of the estate | X | X |
| 5 "As-Needed" Tax Services provided   cash receipts reporting (when necessary; | 1.  Audit support<br>2.  Bankruptcy tax claim administration<br>3.  $10,000 cash receipts reporting (when necessary; based on based   information   on   provided   by business)<br>4.  Federal excise tax return (if applicable)<br>5.  Maintain tax tables in POS system (if new POS system implemented) | Closing Date | Completion of wind-down of the estate | X | X |
| | Provide access to or services under General Ledger system, PoS, HR systems<br>Business Strategy & Operations:<br>•  Enterprise Learning & Development<br>•  Enterprise Process Management<br>•  Enterprise Project / Program Management<br>Information Analytics & Innovation: | | | | |

| | | | | |
|---|---|---|---|---|
| • BI Administration<br>• BI Application Support<br>• BI Data Monitoring<br>• BI Delivery Administration<br>• BI License Management & Support<br>• Supply Chain Management<br>Network & Security Services:<br>• Compliance | | | | |

| | | | | |
|---|---|---|---|---|
| 6 IT (Accounting/PoS/etc.) | • Media Services<br>• Non-retail Asset Maintenance<br>• Retail Asset Maintenance<br>• Security<br>• Telecom Provisioning & Management<br>• Telecommunications Data<br>• Telecommunications Voice<br><br>Operational Services:<br>• Associate & Customer Desktop Support<br>• Data Center Operational Services<br>• Distributed Environment Services<br>• Storage Services<br>Retail Services:<br>• Core Retailing Transaction Support<br>• Customer Facing Transaction Support<br>• Hardware Support Services<br>Service Management<br>• Administration<br>• Business Continuity<br>• IT&G Service Quality Management<br>• IT&G Service Support<br>• IT&G Service Support – Corporate Desktop Support<br>• Learning & Development<br>• Performance & Service Management<br>IT Support Services<br>• Fixed team minimum to support and maintain services, multiple enhancements, external variable charged, as needed<br>• PCI Compliance for Home Services technicians, SHIP and GOB stores | Closing Date | Completion of wind-~~down~~ **down** of the estate | X | X |
| 7 Real Estate | **Lease Administration:**<br>• Document Abstracting<br><br>**Finance:**<br>• Prepare CAM Reconciliations | Closing Date | End of GOB Period | X | |
| 8  Contracts | Provide access to, or services under non-merchandise contracts that are assigned to NewCo but are required for OldCo operations, including<br>Support waste management, facilities management, armored car, credit card processing and other services | Closing Date | End of GOB Period | X | |
| 9 Cash Management | Cash Management services, including but not limited to maintaining existing bank accounts, daily consolidation of funds, calculation of daily cash position, movement of funds as necessary, reconciliation of accounts and maintenance of balances, development of funding forecasts and future cash needs, support for banking and armored car services, administration of users access to Treasury website and banking software, ordering deposit slips and stamps from service providers, approving armored car purchase orders<br>- Cash settlement as currently handled by OldCo<br>- Cash clearing accounts<br>- Financial and cash forecasting<br>- Cash flow | Closing Date | Completion of wind-~~down~~ **down** of the estate | X | X |
| 10 Compliance/Data | • Support for ethics hotline inquiries re: OldCo/ Estate<br>• Data privacy services for GOB stores and OldCo businesses to ensure data at those businesses and stores is collected, shared, and used consistent with applicable law and privacy policies.<br>~~10 Compliance/Data •~~ Data security services for GOB stores and OldCo businesses such as data incident prevention (e.g. use of NewCo credit card encryption<br>services) and data incident response (e.g. remediating a data incident affecting consumers at GOB stores).<br>• Record keeping support, including coordinating the appropriate retention and storage of business and employee records for OldCo stores and<br>businesses. | Closing Date | Completion of wind-~~down~~ **down** of the estate | X | X |
| 11 Loss Prevention | **Provide Loss Prevention ("LP") Database Administration and LP System Support Services to OldCo including but not limited to:**<br>• Case/incident management<br>• Refund management support<br>• Content management for LP related materials<br>- Management of LP audit solution<br>- Fraud mitigation & investigation of NewCo supported e-commerce and payment systems<br>- Reporting and application environments for LP related content<br>- New applications or system enhancement | Closing Date | End of GOB Period | X | |
| 12 Facilities Maintenance | NewCo agrees to provide the following services to OldCo:<br>• Utilities | Closing ~~Date~~<br>End of GOB Period<br>**Date** | | X | |
| 13 Associate Relations | - Provide use of call center to receive associate inquiries.<br>- Manage the reporting and support of associate change requests and other employment-related questions.<br>- Assist management in managing employee relations cases, including leave management<br>- Assist management in establishing an associate termination process including termination decision matrix and termination process (return ~~of~~ ~~of~~ assets, exit interview, final pay, data security, etc.)<br>Assist management in establishing an expense reimbursement process within NewCo. | Closing Date | End of GOB Period | X | |
| 14 Disbursements | - Process accounts payable<br>• Match merchandise receipt to invoice<br>• Approve invoices<br>• Cutting checks to and receiving checks from vendors<br>• Correspond with vendors<br>• Retain records<br>• AP write-offs by vendor by department<br>• Receivable collection related to AP accounts<br>• Import reconciliation<br>• Process other disbursements<br>• Pay approved disbursements<br>• Process travel and entertainment<br>• Lease Payment System(LPS)<br>• Data Extraction for Invoice Processing System (IPS), payment processing (NAP), mechanized R&D (NDJ), Purchase Order Writing System (POWS) and LPS<br>• General Ledger<br>• Process journal entries<br>• Maintain integrity of balances<br>• Monthly reconciliation of balance sheet accounts<br>• Annual recording of book-to-physical inventory adjustments<br>• Variance analysis of unit income statement balances and identify potential errors<br>• Maintain fixed asset records | Closing Date | Completion of wind-~~down~~ **down** of the estate | X | X |

| | | Closing Date | Completion of wind-down ~~down of~~ the estate | X | X |
|---|---|---|---|---|---|
| 15 Reporting Services | · Compile and produce Monthly, Quarterly, and Annual External financial statements (as needed) including, but not limited to Income Statements, Balance Sheets, and Statement of Cash Flows. In addition, the Quarterly and Annual financial statements will include all notes, tables and supplemental information necessary for external audit requirements. <br> · Compile and produce any bankruptcy-related reporting and requests as required by the Bankruptcy court. | | | | |
| **Risk Management Insurance:** | | | | | |
| | 1.    Data Extraction and Tracking and Administration of: <br> •    Workmen's Comp <br> •    Auto Insurance <br> •    General Liability <br> •    Property Insurance <br> •    D&O Insurance | | | | |

| | | Closing Date | Completion of wind-down of the estate | X | X |
|---|---|---|---|---|---|
| | • Property Insurance<br>• D&O Insurance<br>2. Claims management, including<br>  • Adjust Property Claims and pursue recovery from responsible 3rd parties<br>  • Provide oversight of third party claim handler for Workers Compensation claims<br>3. Maintain insurance claims records and provide access to tools for viewing this information, for the following types of insurance:<br>  • General Liability<br>  • Workers' Compensation<br>  • Auto Liability<br>  • Property Insurance<br>  • D&O Insurance<br>4. Consultation in connection with the purchase of insurance | | | | | |
| 17 Compliance - Environmental | NewCo will continue to provide OldCo services and support for Environmental Affairs at an agreed upon rate plus the direct cost for any necessary 3rd party services required to address and resolve Environmental Issues attributed to OldCo<br>1. Asbestos Management , Lead Paint, Indoor Air Quality and Mold Assistance<br>2. Environmental permitting/registration preparation and management (e.g. hazardous materials, wastewater and hazardous waste),<br>3. Regulatory report preparation and submittal,<br>4. Review and Processing environmental permitting and reporting fees,<br>5. Spill response and cleanup,<br>6. Addressing regulatory issues (such as historical releases and Notices of Violation of Environmental Requirements),<br>17 Compliance - Environmental  7.  Coordination of hazardous and special waste removal and disposal/recycling,<br>8. Addressing owner inquiries regarding environmental issues (such as, environmental due diligence requests related to refinancing or real estate transactions),<br>9. Work to assess and address environmental risks during store leasing activities (such as, Phase I environmental assessments or other environmental investigations)<br>10.Support for other environmental issues that may arise (e.g. newly discovered releases, wastewater, storm water, hazardous waste),<br>11.Hazardous and Special Waste Removal and Disposal/Recycling,<br>12.Environmental Hotline and Safety Data Sheet and Poison Control Support,<br>13.Environmental Management System Maintenance and Usage<br>14.Engineering Consultant Support (when necessary to assist with complex issues),<br>15.Asbestos Abatement Contractors (as needed to support renovation and maintenance activities). | Closing Date | Completion of wind-down of the estate | X | X |
| 18 Payment Clearing and Related Financial Services | **Third Party Payment Acceptance:** Financial Services manages the payment acceptance process of authorization and settlement for the acceptance of third party credit and debit cards through contracts with Discover, American Express, and First Data (for the acceptance of Visa and MasterCard-branded cards). In addition, Financial Services will manage OldCo's Telecheck relationship for the acceptance and settlement of checks. Sears Financial Services manages third-party partner SLA performance, PCI and regulatory compliance, technical enhancements and tender optimization<br><br>Financial Services     Each tender type accepted for payment at OldCo has an interchange rate associated with it, which rates OldCo will pay on a pass-through basis.<br><br>Citibasis ™Citi: SFS manages Private Label and Mastercard credit card process through agreement with Citi.<br><br>**Leasing Program:** SFS manages the Leasing form for purchase process of authorization and settlement through agreement with Tempoe/WNLI (WhyNotLeaseIt).<br>**Gift Card:** SFS manages gift card processing through agreement with ValueLink. | Closing Date | End of GOB Period | X | |
| 19 Legal | For discussion, will NewCo Legal department be asked to provide certain services to OldCo, including:<br>  • Assist in litigation management of docket that remain with the Estate, i.e., converting litigation matters to Proofs of Claim<br>  • Provide operations and employment advice and counsel for three months to assist HR/BUs on 80 GOB stores, the four DCs, as well as for<br><br>Home Services<br>  • Licensing and other regulatory (primarily for HS)<br>  • Remaining securities issues with closing down the Estate? | Closing Date | Completion of wind-down of the estate | X | X |
| 20 Supply Chain goods | • Support in regard to any issues that arise on unliquidated entries including addressing customs or governmental inquiries on unliquidated entries.<br>• Provide support for goods currently in transit including carrier management during the transition from OldCo to NewCo.<br>• Provide support for warehousing and inventory management in DC's and RRC's.<br>• Managing outstanding transportation claims for goods previously lost, stolen, damaged during transit. | Closing Date | End of GOB Period | X | |
| 21 Customer Complaints | • Support regarding customer complaints and regulatory inquiries relating to OldCo's and | Closing Date• | End of GOB Period | X | |
| 22 Home Services | • Repair services for GOB store stock<br>**PA Sales in GOB Stores**<br>  • Commission payments for selling Protection Agreements in GOB stores (Sales Commission of 50%)<br>  • Marketing/Sales support for selling Protection Agreements in GOB stores | Closing Date | End of GOB Period | X | |
| 23 Parts Direct | • Commission of $5.00 per water filter subscription sold at GOB stores<br>• Fulfill store charge orders (parts ordered by the store)<br>  • Customer support for store associates with part related questions | Closing Date• | End of GOB Period | X | |
| 24 Product Safety | •Recall and stop sale support for the GOB stores<br>  • Product safety incidents tracking and reporting to CPSC, FDA, and other regulatory agencies | Closing Date | End of GOB Period | X | |
| 25 Pricing | • Effectuate weekly price changes at GOB stores | Closing Date | End of GOB Period | X | |
| 26 P-Card | • Buyer to permit continued use of p-cards, employee travel cards and fleet cards by Seller employees at GOB stores under Bank of America program. | Date With | End of GOB Period | X | |

| | | | | | |
|---|---|---|---|---|---|
| (Add)<br>16 Risk Management & Insurance | 2.   Claims management, including<br>• Adjust Property Claims and pursue recovery from responsible 3rd parties<br><br>3.   Maintain insurance claims records and provide access to tools for viewing this information, for the following types of insurance:<br>• General Liability<br>• Workers' Compensation<br>• Auto Liability<br>• Property Insurance<br>• D&O Insurance | | | Closing Date  Completion of wind-down of the estate | X | X |

| | | | | |
|---|---|---|---|---|
| Use of existing letters of credit | 27 | Buyer to provide Seller with the benefit of credit support of the Existing LCs.<br>• Buyer and Seller to use reasonable best efforts to identify which Existing LCs (and in what proportion) were incurred in connection with or support, as applicable, (x) Acquired Assets or Acquired Liabilities, as applicable, or (y) Excluded Assets or Excluded Liabilities.<br>• With respect to each Existing LC, Buyer shall not replace such Existing LC with a letter of credit for less than the face value of such Existing LC without Seller's prior written consent (not to be unreasonably withheld, delayed or conditioned).<br>• Seller shall use reasonable best efforts to (1) provide Buyer with copies of any and all notices and other communications delivered under any Existing LC, (2) provide information reasonably necessary for Buyer to maintain in effect the Existing LCs, (3) assist Buyer in its efforts to either (a) terminate each Existing LCs that are not required for (x) Buyer to operate the going concern business or (y) Seller to conduct its wind-down efforts or (b) replace each Existing LC with, unless otherwise consented to by Seller (such consent not to be unreasonably withheld, delayed or conditioned), a replacement letter of credit agreement with a face amount no less than the applicable replaced Existing LC and (4) assist Buyer in ensuring the beneficiary of each Existing LC does not draw such Existing LC (it being understood that this clause (4) shall not require any payment on the part of Seller) | Closing Date | respect to each Existing LC issued by Wells Fargo Bank National Association, the earlier of (x) the expiration or termination of such Existing LC, as applicable, and (y) the date that is 90 days following the Closing Date. With respect to each Existing LC issued by Bank of America, N.A. (x) the expiration or termination of such Existing LC, as applicable, and (y) the date that is 150 days following the Closing Date. | X |

₁ Seller is to fund its portion; if funds are not available Buyer will not be responsible for delays in payroll or inability of employees to utilize medical benefits

₂ Benefits Administration transition services are under review based on expectation for the assumption of benefit plans

₃ Buyer will maintain relationships with vendors but will not negotiate terms and conditions or represent GOB stores in regards to cash funding disputes that may arise with regard to employee benefits

**Schedule B**

**SINGLE POINT OF CONTACT**

For Seller:
Name: Mohsin Meghji and Brian Griffith, M-III Partners, LP Email:

mmeghji@miiipartners.com and bgriffith@miiipartners.com Phone:

(212) 716-1492 and (212) 716-1494

For Buyer:

Name: [9]Kunal Kamlani
Email: [9]kunal@eslinvest.com

Phone: [9](305) 702-2100

B-1

4

| Summary report: Litéra® Change-Pro TDC 10.1.0.800 Document comparison done on 2/13/2019 11:40:22 AM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Sears - Notice of Services Agreement-96908099-v3 (Filed 2-7-19).pdf | |
| **Modified filename:** Transform - TSA compiled (EXECUTION VERSION).pdf | |
| **Changes:** | |
| Add | 502 |
| Delete | 252 |
| Move From | 6 |
| Move To | 6 |
| Table Insert | 45 |
| Table Delete | 9 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 820 |

**<u>Exhibit E</u>**

**Executed APA Amendment**

WEIL:\96918199\1\73217.0004

*Execution Copy*

# AMENDMENT NO. 1 TO

# ASSET PURCHASE AGREEMENT

This Amendment No. 1, dated as of February 11, 2019 (this "<u>Amendment</u>"), to the Asset Purchase Agreement (the "<u>Purchase Agreement</u>"), dated as of January 17, 2019, by and among Transform Holdco LLC, a Delaware limited liability company (together with any applicable Affiliated Designee, "<u>Buyer</u>"), Sears Holdings Corporation ("<u>SHC</u>" or the "<u>Seller</u>" and together with each of its Subsidiaries party to the Purchase Agreement, the "<u>Sellers</u>") is entered into by and among Buyer and each Seller.  Terms capitalized but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Sellers have previously entered into the Purchase Agreement pursuant to which, among other things, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, Buyer and the Sellers desire to amend the Purchase Agreement in accordance with Section 13.3 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the representations, warranties, covenants and agreements set forth in the Purchase Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I    AMENDMENTS

<u>SECTION 1.01.</u>    Section 1.1 of the Purchase Agreement is amended as follows:

(a) The definition of "<u>Acquired Inventory</u>" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"<u>Acquired Inventory</u>" shall mean (i) with respect to any Operating Leased Property, all Inventory which is located at, on or in transit to the applicable Operating Lease Property as of the Closing Date, (ii) with respect to any Operating Owned Property, all Inventory which is located at, on or in transit to the Operating Owned Property as of the Closing Date, (iii) with respect to any IP/Ground Lease Property, all Inventory which is located at, on or in transit to the IP/Ground Lease Property as of the Closing Date, (iv) with respect to any Operating Sparrow Properties, all Inventory located at, on or in transit to the Operating Sparrow Properties, and (v) all other Inventory Related to the Business other than Inventory included in clause (ii) of the definition of Excluded Inventory.

(b) The definition of "<u>Buyer Party Release</u>" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(c) The definition of "Designatable Lease" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Designatable Lease" shall mean each of (i) the GOB Leases, the Operating Leases, the Landlord Leases and the Sparrow Subleases and (ii) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords under any of the Leases (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders.

(d) The following is added as a new defined term:

"Employee Lease Agreement" shall mean the agreement substantially in the form of Exhibit H.

(e) The definition of "Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Expenses" shall mean (i) the Buyer Occupancy Costs, if applicable, and (ii) the reasonable and documented out-of-pocket fees, costs and expenses or other disbursements borne by any Seller or its Affiliates incurred or accruing (a) during the Designation Rights Period, to the extent Related to the Operating Leases, Operating Leased Stores, Landlord Leases or Sparrow Leases, (b) to the extent Related to the GOB Leases or GOB Leased Stores following the GOB Period for each such GOB Lease or GOB Leased Store, (c) to the extent Related to the GOB Owned Stores following the GOB Period for such GOB Owned Store, (d) after the Closing, to the extent related to an Additional Contract or any Operating Lease, Operating Leased Store, Landlord Lease or Sparrow Lease or (e) as a result of the Sellers being the tenant or landlord under the Designatable Lease or Additional Contract during, with respect to the GOB Leased Stores, the period commencing after the GOB Period for each such GOB Leased Store and ending at the expiration of the Designation Rights Period, and with respect to any Operating Leased Property, Landlord Lease or Sparrow Lease, during the Designation Rights Period, and any reasonable and documented fees, costs and expenses incurred by any Seller or its Affiliates in connection with any transfer of a Designatable Lease to Purchaser following the Designation Rights Period, but in each case shall not, for the avoidance of doubt, include rejection damages or Cure Costs.

(f) The definition of "GOB Period" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"GOB Period" shall mean with respect to each GOB Store, the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such GOB Store, as applicable, has been completed and all inventory of the Sellers has been removed from such GOB Store, as applicable. For the avoidance of doubt, the Sellers may deliver any such notice on or prior to the Closing Date.

2

(g) The definition of "GOB Stores" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"GOB Stores" shall mean, individually or collectively as the context may require, the GOB Leased Stores, the GOB Sparrow Properties and the GOB Owned Stores.

(g) The following is hereby added as a new defined term:

"Landlord Leases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the Owned Real Property under which any Seller is the lessor (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(h) The definition of "Occupancy Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Occupancy Expenses" shall mean, with respect to any Lease Premises, Owned Real Property or Sparrow Property, all liquidated costs, expenses, obligations and liabilities under or in connection with the applicable Lease payable or paid by any Seller, including any and all mortgage payments, base rent, percentage rent, additional rent, CAM, utilities, Property Taxes and assessments, costs of continuing the level of maintenance and security required by this Agreement, a pro rata portion of insurance (including public liability and casualty insurance) attributable to such Lease or Lease Premises, Owned Real Property or Sparrow Property and all other categories of expenses, obligations and liabilities arising or accruing under or in connection with such Lease (whether or not billed by the applicable counterparty to such Lease), Owned Real Property or Sparrow Property.  For the avoidance of doubt, Occupancy Expenses shall not include any Seller's costs and expenses of (a) any professionals retained in connection with the Bankruptcy Cases or (b) counsel of any kind except to the extent counsel is retained with respect to a Lease, Owned Real Property or Sparrow Property and not the Sellers' other operations.

(i) The definition of "PA Liabilities Services Agreement" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(j) The following is hereby added as a new defined term:

"Proration Date" shall have the meaning given in Section 9.11(a).

(k) The definition of "Securities Consideration" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Securities Consideration" shall mean the securities described in Schedule 9.2.

(l) The following is hereby added as a new defined term:

"Services Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit I.

(m) The following are hereby added as new defined terms:

"Sparrow Leases" shall mean the Sparrow Subleases together with the lease listed in Schedule 1.1(r).

"Sparrow Subleases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the Sparrow Properties under which any Seller is the lessor (including the leases listed on Schedule 1.1(s)) (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(n) The definition of "Store Cash" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Store Cash" shall mean any cash of the Sellers in the registers or otherwise held at any Operating Lease Property, any Operating Owned Property or any Sparrow Property, in an amount not to exceed $17,000,000.

(o) The definition of "Second Lien Line of Credit Facility" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Second Lien Line of Credit Facility" shall mean each line of credit facility granted pursuant to an amendment to the Second Lien Credit Agreement.

SECTION 1.02.    Section 2.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(p)    any and all Actions or Claims (other than returns of merchandise for warranty claims (except, for the avoidance of doubt, to the extent Related to Acquired Inventory or comprising Assumed Liabilities)) of Sellers as of the Closing that (i) constitute Acquired Assets under any other subsection of this Section 2.1, or (ii) are against vendors, counterparties to leases, licenses or other contracts, customers, Transferred Employees or parties to other commercial relationships of the Business, in each case as of immediately prior to the Closing, that arose in connection with the ownership of the Acquired Assets or the operation of the Business or the Acquired Assets, excluding (in each case) any Actions or Claims that are, or are Related to, an Excluded Asset or Excluded Liability;"

4

SECTION 1.03.    Section 2.1(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(r)    the KCD Notes;"

SECTION 1.04.    Section 2.1(t) of the Purchase Agreement is hereby deleted in its entirety on the basis that its subject matter is addressed by Section 2.1(p) of the Purchase Agreement.

SECTION 1.05.    Section 2.1(v) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(v)    the release of the Released Estate Claims in accordance with Section 9.13;"

SECTION 1.06.    Section 2.1(bb) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.1(cc) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.1(dd) of the Purchase Agreement:

"(dd)    subject to Section 2.13, any Acquired Foreign Assets; and"

SECTION 1.07.    The following is hereby added as Section 2.1(ee) of the Purchase Agreement:

"(ee)    any bank accounts of the Sellers as may be agreed by Buyer and the Sellers prior to the Closing Date (but, for the avoidance of doubt, not including any cash in any such bank accounts)."

SECTION 1.08.    Section 2.2(i) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(i)    all Claims, Proceedings, and causes of action of Sellers other than Claims described in any subsection of Section 2.1. Notwithstanding anything to the contrary in Section 2.1(p) or elsewhere, the Excluded Assets shall include (A) all Claims, Proceedings and causes of action of Sellers against vendors, counterparties to leases, licenses or other contracts, customers, Transferred Employees or parties to other commercial relationships of the Business, in each case as of immediately prior to the Closing, that that did not arise in connection with the ownership of the Acquired Assets or the operation of the Business or the Acquired Assets; (B) all Avoidance Actions; (C) all Released Estate Claims; and (D) all Claims, Proceedings, and causes of action described in the second sentence of Section 9.13(e)(ii) (other than in clause (a) thereof), including any Claims against the Sellers or their directors, officers, insiders or shareholders under any applicable Law arising from any pre-petition transaction including for breach of fiduciary duty, fraudulent conveyance, or illegal dividend. Nothing in this Section 2.2(i) or in any subsection of Section 2.1 shall affect the scope of the Released Estate Claims or Section 9.13, and in the event of any conflict between

5

Section 2.2(i) and any subsection of Section 2.1, on the one hand, and Section 9.13, on the other hand, Section 9.13 shall govern;"

SECTION 1.09.    Section 2.2(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    all bank accounts (except as otherwise provided in Section 2.1(ee);"

SECTION 1.10.    Section 2.2(p) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section and Section 2.2(q) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(q)    the SHIP Purchase Agreement Assets (if the SHIP Closing shall have occurred prior to the Closing Date); and"

SECTION 1.11.    In Section 2.3(i) of the Purchase Agreement, the reference to "Section 9.2" is revised to refer to "Section 9.2(a)".

SECTION 1.12.    Section 2.3(j) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(j)    all Liabilities with respect to the Transferred Employees (i) to the extent arising as a result of an event, action or omission that occurs on or following the Closing Date or (ii) expressly assumed by Buyer and its Subsidiaries pursuant to Section 9.7 (including under the Employee Lease Agreement);"

SECTION 1.13.    Section 2.3(n) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.3(o) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.3(p) of the Purchase Agreement:

"(p)    the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5; and"

SECTION 1.14.    The following is hereby added as Section 2.3(q) of the Purchase Agreement:

"(q)    all fee and reimbursement obligations in connection with any Backstopped Letter of Credit."

SECTION 1.15.    Section 2.3(k)(x) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(x)    Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers;"

SECTION 1.16.    Section 2.4(p) of the Purchase Agreement is hereby amended to add the word "and" at the conclusion of such Section, Section 2.4(q) of the Purchase Agreement is hereby amended to replace "; and" at the conclusion of such Section with a period and Section 2.4(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(r)    [Reserved]."

SECTION 1.17.    The final paragraph of Section 2.4 is revised to read as follows:

"For the avoidance of doubt, (i) all Taxes of any Seller shall be Assumed Liabilities, regardless of the time and circumstances giving rise to any such Taxes, except for any Tax expressly excluded under Section 2.4(h) or Section 2.4(i) and (ii) the Liabilities of any entity that is an Acquired Foreign Asset shall not be Excluded Liabilities."

SECTION 1.18.    Section 2.6 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.6    Purchase and Sale of Designation Rights.  Upon the terms and subject to the conditions of this Agreement and the Approval Order, on the Closing Date, Sellers shall sell, transfer, assign and convey, or cause to be sold, transferred, assigned and conveyed, to Buyer, and Buyer shall purchase from Sellers, the Designation Rights. For the avoidance of doubt, the sale, transfer, assignment and conveyance of the Designation Rights provided for herein on the Closing Date shall not effectuate a sale, transfer, assignment or conveyance of any Designatable Lease to Buyer or any other Assignee, which shall only be effectuated on a Designation Assignment Date; provided, that, notwithstanding the foregoing, Buyer shall be responsible for all Expenses arising under or related to any Designatable Lease from and after the Closing Date until, if applicable, the rejection of such Designatable Lease in accordance with this Agreement. Subject to the terms and conditions of this Agreement, the Approval Order and the requirements of section 365(b) of the Bankruptcy Code, Buyer shall have the right to designate itself or any other Person as the Assignee to which a Designatable Lease is to be assumed and assigned.  The Designation Rights shall terminate upon the expiration of the Designation Rights Period."

SECTION 1.19.    Section 2.8(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    Notwithstanding anything to the contrary contained in this Agreement, the Sellers shall not transfer the KCD Notes to Buyer, and Buyer shall not assume the PA Liabilities from the Sellers, unless and until the Sellers have received the requisite consent of the Bermuda Monetary Authority or any other applicable Bermuda regulatory authority to the transfer of the KCD Notes (the "BMA Consent").  The Sellers shall cooperate with Buyer in determining the manner in which such transfer pursuant to Section 2.1(r) shall take place as soon as practicable after the Closing.  The Sellers shall

7

use reasonable best efforts to obtain the BMA Consent and Buyer shall cooperate in such efforts. Immediately following receipt of the BMA Consent, the transfer of the KCD Notes and the assumption of the PA Liabilities shall take place simultaneously. From the Closing Date until such time as the transfer of the KCD Notes and the assumption of the PA Liabilities occurs, pursuant to the Services Agreement, (i) Buyer shall provide services to the applicable Sellers sufficient to enable Sellers to perform the PA Liabilities and (ii) in consideration for such services, Sellers shall pay to Buyer an amount equal to the aggregate of all amounts paid by Buyer to Sellers with respect to any licenses under which Buyer licenses the KCD IP."

SECTION 1.20.    Section 2.9 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.9    If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019 (the "Designation Deadline"), Buyer so determines as to any Contract that is Related to the Acquired Assets or is an IP License, in each case but is not an Initial Assigned Contract (other than (i) any lease of non residential real property and (ii) any Excluded Asset set forth in Section 2.2) (each, an "Additional Contract"), Buyer may elect, after consultation with the Sellers, by written notice delivered to the Sellers, to designate for assignment or assumption and assignment any Additional Contract for no additional consideration. Upon the designation of any such Additional Contract as an Assigned Agreement pursuant to this Section 2.9, the Sellers will use their reasonable best efforts to assume and assign to the applicable Assignee such Additional Contract so long as the Buyer pays all Expenses accrued post-Closing and all Cure Costs associated with such Additional Contract; provided, however, that nothing herein shall be deemed or construed to obligate the Sellers to retain, or refrain from rejecting or terminating any Lease or Contract after the Designation Deadline that does not constitute an Assigned Agreement. Notwithstanding anything to the contrary herein, the Sellers shall not be obligated to assume and assign any Contract pursuant to this Section 2.9 with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance or for which Consent is required to assume and assign such Additional Contract and such Consent has not been obtained, provide that the Parties shall use their reasonable best efforts to obtain all such Consents. Without duplication of any amounts payable under the Services Agreement, Buyer shall pay all Expenses accrued after the Closing with respect to any Additional Contract that is not ultimately designated as an Assigned Agreement if and to the extent Buyer receives a benefit under such Additional Contract. If the Sellers also receive a benefit under such Additional Contract after the Closing, Buyer and the Sellers shall allocate a proportionate amount of the Expenses with respect to such Additional Contract to the Sellers (including by netting against amounts owed by Buyer)."

SECTION 1.21.    Section 2.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.11    Rejection of Outbound IP Licenses. Within seven (7) Business Days after the Closing Date, subject to section 365(n) of the Bankruptcy Code, the Sellers shall file a motion to reject, and take all actions (including actions required

under section 365 of the Bankruptcy Code) reasonably necessary to reject any Outbound IP Licenses that (i) are executory Contracts and (ii) are designated by Buyer for rejection at any time prior to the second (2nd) Business Day prior to the Closing Date (such Contracts, "Closing Date Rejected Licenses"). Without limiting the foregoing, promptly following the Designation Deadline, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject, any Outbound IP Licenses that (x) are not Closing Date Rejected Licenses, (y) are executory Contracts and (z) are not designated by Buyer for assignment or assumption and assignment as an Assigned Agreement in accordance with the terms of this Agreement or for solely assumption pursuant to Section 9.14(d)."

SECTION 1.22.    Section 2.13(a) and Section 2.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    On the Closing Date, (i) the Sellers shall use reasonable best efforts to cause each of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall use reasonable best efforts to purchase, all right, title and interest of each of the Foreign Subsidiaries, in, to or under all assets, properties and rights Related to the Business (other than the Excluded Assets) and any other assets of the type that would have been Acquired Assets had they had been owned by the Sellers as of the Closing Date or minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and the Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) (collectively, the "Acquired Foreign Assets"), in each case free and clear of any and all Encumbrances of any kind, nature or description and any Claims, other than Permitted Post-Closing Encumbrances and (ii) subject to and to the extent of the transfer of the Acquired Foreign Assets, Buyer shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms all Liabilities (other than Excluded Liabilities) of the type that would have been Assumed Liabilities had the applicable Foreign Subsidiary been a Seller as of the Closing Date.  If the transfer of any Acquired Foreign Assets does not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated.  If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a), then the Sellers shall use reasonable best efforts to transfer such equity interests, which equity interests shall be deemed to be Acquired Foreign Assets.  If (i) the proposed transfer of any Acquired Foreign Assets triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting

9

from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable Acquired Foreign Asset).

(b)    If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire other minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) so as to ensure that Buyer or the applicable Assignee shall be able to secure the benefit of the applicable Acquired Foreign Assets, Buyer may elect, by written notice delivered to the Sellers, to acquire such other minority equity interests directly from the Seller it being agreed by the Parties that such equity interests will be deemed to be Acquired Foreign Assets for the purposes of this Agreement.  Following any such election, Buyer and the Seller shall promptly execute all documentation required to effectuate the purchase and sale of such other minority equity interests under applicable Law.  If (i) the proposed transfer of any such other minority equity interests triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable other minority equity interests)."

SECTION 1.23.    Section 3.1(a)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    an amount in cash equal to the Store Cash as of 12:01 a.m. New York City time on the Closing Date (the "Store Cash Payment Amount"); *plus*;"

SECTION 1.24.    The following proviso is hereby added at the end of Section 3.1(a):

"provided, that to the extent any portion of the Closing Payment Amount will be used by Sellers to satisfy the existing indebtedness of Sellers under the DIP Credit Agreement with respect to outstanding letters of credit, Buyer shall assume, cash collateralize or backstop any such letters of credit (any such assumed, cash collateralized or backstopped letters of credit, the "Backstopped Letters of Credit").  The obligation of Buyer to pay the cash portion of the Closing Payment Amount shall be reduced on a dollar for dollar basis by the face amount of the Backstopped Letters of Credit.  Sellers shall notify Buyer on the Business Day prior to the Closing Date as to any amounts outstanding under the DIP Credit Agreement as to which Buyer shall be required to assume or backstop letters of credit."

SECTION 1.25.    Section 3.1(b)(iv) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(iv)    obligations held by, or credit bid at the direction of, Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes,"

SECTION 1.26.    Section 3.3 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 3.3                Closing Payment.

(a)    At the Closing, Buyer shall:

(i) pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Closing Payment Amount *less* the Deposit Amount *less* the Store Cash Payment Amount *plus* any amounts payable pursuant to Section 3.1(c); and

(ii) deliver the Securities Consideration to the Sellers.

(b)    Within one (1) Business Day following the Closing Date, the Sellers shall deliver a statement to Buyer setting forth the Store Cash Payment Amount.  On the third (3rd) Business Day following the Closing Date, Buyer shall pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Store Cash Payment Amount."

SECTION 1.27.    Section 4.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.1    Closing Date.  The closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights and the Sellers' right, title and interest in, to and under the Acquired Assets by the Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or at such other place or time as Buyer and the Sellers may mutually agree, on the third (3rd) Business Day following satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing).  Notwithstanding the immediately preceding sentence, if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), then the Closing shall occur instead on the date that is the earlier to occur of (x) any Business Day as may be specified by Buyer on no less than two (2) Business Days' prior written notice to the Sellers and (y) two (2) Business Days following the final day of the Marketing Period. The date on which the Closing actually occurs is referred to as the "Closing Date", and for all purposes under this Agreement and any Transaction Document (including the Occupancy Agreement and the Seller Retained Occupancy Agreement), the Closing Date

shall be deemed to be 12:01 a.m., New York City time on the date on which Closing actually occurs."

SECTION 1.28.    Section 4.2(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    the Employee Lease Agreement and the Services Agreement, each duly executed by Buyer; and"

SECTION 1.29.    Section 4.3(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    a quit claim deed to be recorded with respect to the Owned Real Property (or with respect to Owned Real Property in Puerto Rico, a deed of purchase and sale with no warranty other than the warranty of title, subject to all matters of record, as such matters are affected by the Approval Order (or if a deed of purchase and sale with such no warranty is not acceptable to the title insurer to receive insurable title in Puerto Rico, such other form of deed of purchase and sale as is reasonably acceptable to Sellers, Buyer and the title insurer to receive insurable title in Puerto Rico)), or if a quit claim deed is not acceptable to the title insurer to receive insurable title in a particular jurisdiction, a no-warranty deed;"

SECTION 1.30.    Section 4.3(h) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(h)    all tangible embodiments of the Acquired Intellectual Property, including all (i) Software object code and source code related thereto, (ii) all materials and documentation (in electronic and editable form, to the extent existing in such form) necessary for the use, modification, manufacture, sale and other exploitation of the Acquired Intellectual Property, to the extent not included in Intellectual Property Related Documentation, (iii) all content made available on or through any websites and webpages accessed through any Domain Names or Media Accounts included in the Acquired Intellectual Property and all other audio-visual or written materials (including such archival materials) produced by or on behalf of the Sellers, (iv) all Labeling and Marketing Materials and (v) all Product Catalogs and Manuals;"

SECTION 1.31.    Section 4.3(k) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(k)    a counterpart of each Short Form Assignment provided by Buyer to Seller as of February 5, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute all other jurisdiction-specific Short Form Assignments provided by Buyer to Seller unless otherwise agreed in writing by the Parties);"

SECTION 1.32.    Section 4.3(l) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(l)    a counterpart of each IP Power of Attorney provided by Buyer to Seller as of February 5, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute all other jurisdiction-specific IP Powers of Attorney provided by Buyer to Seller unless otherwise agreed in writing by the Parties);"

SECTION 1.33.    Section 4.3(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    the Employee Lease Agreement and the Services Agreement, each duly executed by the Sellers;"

SECTION 1.34.    Section 4.4 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.4    Local Sale Agreements.  Subject to the terms and conditions hereof, to the extent necessary or desirable to effect the Closing on the terms hereof, Buyer or applicable Assignee and relevant Sellers shall, enter into such agreements or instruments, including a sale agreement and no-warranty deed for the Owned Real Property (or with respect to Owned Real Property in Puerto Rico, a deed of purchase and sale with no warranty other than the warranty of title, subject to all matters of record, as such matters are affected by the Approval Order  (or if a deed of purchase and sale with such no warranty is not acceptable to the title insurer to receive insurable title in Puerto Rico, such other form of deed of purchase and sale as is reasonably acceptable to Sellers, Buyer and the title insurer to receive insurable title in Puerto Rico)), or if a quit claim deed is not acceptable to the title insurer to receive insurable title in a particular jurisdiction, a no-warranty deed, and bills of sale and/or assignment and assumption agreements, providing for the sale, transfer, assignment or other conveyance to Buyer or applicable Assignee, in accordance with the requirements of applicable local Law.  The Sellers and Buyer acknowledge and agree that to the extent applicable law imposes requirements for transferring assets of record, the Parties will reasonably cooperate to satisfy such requirements as to transfer such assets as promptly as reasonably practical after Closing."

SECTION 1.35.    Section 5.1(c)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    The operation of the GOB Owned Stores during the GOB Period and the Sparrow Properties set forth on Schedule 5.1(c)(ii) (collectively, the "GOB Sparrow Properties" and the Sparrow Properties other than the GOB Sparrow Properties, the "Operating Sparrow Properties") during the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such Sparrow Properties has been completed and all inventory of the Sellers has been removed from such Sparrow Properties shall be governed by the Seller Retained Occupancy Agreement and the Seller shall conduct such operation pursuant to such Seller Retained Occupancy Agreement as the Seller determines in its sole discretion."

SECTION 1.36.    Section 5.2(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Within five (5) Business Days following the date upon which Buyer delivers a Buyer Assumption Notice to the Sellers with respect to any Designatable Lease, together with a related assignment agreement substantially in the form attached hereto as Exhibit E (the "Assignment and Assumption of Lease") executed by the applicable Assignee, the Sellers shall (1) deliver to Buyer and such Assignee a fully executed Assignment and Assumption of Lease and (2) file with the Bankruptcy Court and serve on the applicable lessor(s) and other appropriate notice parties (as applicable) a notice, and shall seek entry by the Bankruptcy Court of the Approval Order in respect of the Designatable Leases subject to such Buyer Assumption Notice.  As of the applicable Designation Assignment Date, except for such obligations and liabilities with respect to such Designatable Leases and the related Lease Premises arising during the Designation Rights Period and except for Buyer's obligations specifically set forth in this Agreement, as between Buyer and the Assignee, Buyer shall have no further obligation or Liability with respect to such Designatable Lease or the related Lease Premises (including any obligation to continue to pay Expenses with respect thereto) and Assignee shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Designatable Lease or the related Lease Premises; provided, however, that nothing in this sentence shall affect the Sellers' rights against Buyer with respect to such Designatable Lease or the Lease Premises as set forth in this Agreement.;"

SECTION 1.37.    Section 6.6(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    Except as would not, individually or in the aggregate, reasonably be expected to  have a Material Adverse Effect, the Sellers have good and marketable fee title to the Owned Real Property, free and clear of all liens (except for Permitted Encumbrances).  None of the Owned Real Property is subject to any leases or tenancies or other rights of occupancy other than the Landlord Leases;"

SECTION 1.38.    Section 8.8(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    [Reserved]."

SECTION 1.39.    Section 8.8(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    To the extent permitted by applicable Law, during the Management Services Period, the applicable the Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain

effective  (the "Management Services").  Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, each of the Sellers hereby appoints Buyer and its Affiliated Designees as agent of such Seller to manage, control and operate each of (i) the Acquired Properties, (ii) Occupancy Leased Premises and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties").  Pursuant to their appointment as the Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion and collect and retain all revenues generated by each Managed Property.  In furtherance thereof, the Parties acknowledge and agree that the Sellers shall have no economic interest in the Managed Properties other than the right to receive the Management Services Reimbursements.  As consideration for the provision of the Management Services, Buyer shall reimburse the Sellers, or cause the Sellers to be reimbursed, for any reasonable and documented out-of-pocket costs, fees and expenses incurred at any time in providing the Management Services, including any income and other taxes incurred by the Seller and its Subsidiaries in respect of the payment and receipt of such reimbursement (the "Management Services Reimbursements") and indemnify the Sellers from any Liability arising from the provision of the Management Services, except for any such Liability arising from gross negligence or willful misconduct of the Sellers. For the avoidance of doubt, all employees of the Managed Properties shall be employed by Buyer or its Affiliated Designee and no Seller shall have any authority to take action as an employer with respect to any such employee or to enter into any Contract on behalf of Buyer or any Affiliated Designee except to the extent otherwise provided for pursuant to any arrangement entered into in accordance with Section 9.7(a);"

SECTION 1.40.    The following is hereby added as Section 8.10 of the Purchase Agreement:

"Section 8.10    Sparrow Master Lease.  The Parties hereby agree that the lease set forth on Schedule 1.1(r) shall be assumed by the Sellers and assigned to the Buyer on the Closing Date."

SECTION 1.41.    Section 9.2(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    Unless Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer): (1) Buyer shall provide to the Sellers detailed instructions as to steps to take (or not take) in order to secure and preserve the qualification of any of the transactions set forth in this Agreement as a Tax Reorganization (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller) and to achieve the Tax Result, including with respect to (i) repayment, cancellation or settlement of, or other actions with respect to, intercompany accounts after the approval of the Bankruptcy Plan and on or before the Closing Date, (ii) the merger of any of the Sellers' Subsidiaries with another Sellers' Subsidiaries after the approval of the Bankruptcy Plan

15

and on or before the Closing Date or conversion of any of the Sellers' Subsidiaries into limited liability companies, (iii) the filing of any Tax elections to treat any such Subsidiaries as disregarded entities for U.S. federal income tax purposes, or otherwise taking an action to establish that such Subsidiaries have liquidated for tax purposes, (iv) implementation of the Distribution Requirement in a manner that is consistent with section 507 of the Bankruptcy Code, (v) satisfaction of the ownership requirements set forth in section 382(l)(5)(A)(ii) of the Code, (vi) the manner in which the transfer of the KCD Notes shall take place, and (vii) any other instructions that in the reasonable opinion of tax counsel for Buyer are necessary or desirable to ensure the qualification of the Tax Reorganization and the achievement of the Tax Result, and the Sellers shall follow such instructions; provided that (A) such instructions shall not limit the Sellers' discretion or actions in respect of (x) operating the Business and its other Assets in the Ordinary Course of Business and in compliance with the other provisions of this Agreement for all periods through the Closing Date, (y) disposing of any of its Assets if and to the extent permitted under the other provisions of this Agreement (z) taking or refraining from taking any action required by this Agreement or by Law, including if such actions would be inconsistent with its obligations under the Bankruptcy Code or other applicable Law, (B) if requested by the Sellers, Buyer's tax counsel shall deliver to the Sellers a Tax Opinion that each and any such transaction (other than any Designated Sale Transactions) qualifies as a Tax Reorganization, and (C) nothing herein shall affect Buyer's  liability for Taxes that are Assumed Liabilities; (2) subject to the preceding clause (1), the Sellers agree to cooperate with Buyer in order that, for federal income Tax purposes, the transactions effected pursuant to this Agreement, together with the distributions made by, and liquidation of, the Sellers pursuant to the Bankruptcy Plan, are treated as one or more plans of reorganization under section 368 of the Code and as qualifying as one or more reorganizations under section 368(a)(1)(G) of the Code (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller); (3) any Tax Return in respect of a Tax imposed on any Seller for which Buyer is liable hereunder shall be prepared by Buyer, a copy of such Tax Return shall be provided to SHC at least thirty (30) days prior to the due date thereof, Buyer shall consider in good faith any reasonable comments provided by the Sellers, the Sellers shall, if necessary for filing, properly execute any such Tax Return, and Buyer shall timely and properly file any such Tax Return and pay the amount of any Taxes shown due on any such Tax Return; and (4) immediately following the Closing, subject to applicable Law, the Sellers shall take the steps with respect to the Securities Consideration described in Schedule 9.2. Consistent with and subject to the foregoing, the Seller shall convert any of the Sellers' Subsidiaries as shall be designated by Buyer to a limited liability company pursuant to instructions provided by Buyer."

SECTION 1.42.    Section 9.3(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(d)    As soon as practicable (and in any event within ninety (90) days) after the Closing Date, Buyer shall deliver to the Sellers a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Acquired Assets for Tax purposes) (the "Allocation Schedule"). The Allocation Schedule shall allocate the

Purchase Price among the Sellers and among the Acquired Assets acquired from each Seller, and shall be prepared in accordance with Section 1060 of the Code if Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer), and in any case shall be prepared in accordance with applicable law to the extent necessary to comply with reporting in respect of applicable Transfer Taxes. The Allocation Schedule shall be deemed final unless the Sellers notify Buyer in writing that the Sellers object to one or more items reflected in the Allocation Schedule within forty-five (45) days after delivery of the Allocation Schedule.  In the event of any such objection, Buyer and the Sellers shall negotiate in good faith to resolve such dispute; provided, however, that if Buyer and the Sellers are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days after the delivery of the Allocation Schedule, such dispute shall be resolved by the CPA Firm.  The fees and expenses of the CPA Firm in connection therewith shall be borne equally by Buyer and the Sellers.  Each of Buyer and the Sellers agrees to file its respective federal, state and local Tax returns in accordance with the Allocation Schedule, and any adjustments to the Purchase Price pursuant to this Section 9.3 shall be allocated in a manner consistent with the Allocation Schedule. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the parties do not agree with respect to such determination, such matter shall be resolved in accordance with the determination of the CPA Firm; provided further, that such Tax Return will be adjusted, as applicable, consistent with the procedures described above, to reflect any adjustments to the allocated Purchase Price.  Notwithstanding the foregoing, in the case of any asset for which an allocation of Purchase Price is required earlier than contemplated by the foregoing, the time frame for determination of the allocation of Purchase Price to those assets shall be fixed by the Parties to accommodate such requirement, provided that any such allocation may thereafter be revised for other purposes as appropriate and necessary to reflect the overall final allocation of Purchase Price in the Allocation Schedule."

SECTION 1.43.    Section 9.7 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 9.7        Employment Offers.

(a)    Buyer shall make an offer of employment to any Business Employee represented by a labor union and whose terms and conditions of employment are covered by a collective bargaining agreement ("Represented Employees") using reasonable best efforts to comply with the requirements of any such collective bargaining agreement.  For any Business Employee not represented by a labor union ("Non-Represented Employees"), Buyer shall, or shall cause any of its Subsidiaries to, (i) no later than five (5) days prior to the date determined under the Employee Lease Agreement (the "Offer Effective Date"), use reasonable best efforts to provide a written offer of employment in a comparable position to, effective as of 11:59 p.m., local time, on the Offer Effective Date, each of such Business Employees, or (ii) to the extent required by and in accordance with applicable Law, enter into employment agreements with each of such Business Employees. Those

Business Employees, including both Represented Employees and Non-Represented Employees, who accept such offer of employment on or before the Offer Effective Date in accordance with the provisions of such offer and continue employment with Buyer or any of its Subsidiaries, shall be referred to as "Transferred Employees." At the Closing, Buyer and the Seller shall enter into the Employee Lease Agreement pursuant to which Buyer shall, at Buyer's cost, have the benefit of the Business Employees' (the "Leased Employees") services during the period from the Closing Date through the Offer Effective Date (the "Lease Period") such that Buyer may carry on the operation of the Business from and after the Closing Date. In accordance with the Employee Lease Agreement, and for the avoidance of doubt, Buyer shall timely advance to the Seller the actual, out-of-pocket expenses to be paid or provided by the Seller and its Subsidiaries for wages and benefits associated with the Leased Employees during the Lease Period and any other liabilities attributable to Leased Employees that are incurred by the Seller and its Subsidiaries in connection with the Employee Services (as defined in the Employee Lease Agreement) during the Lease Period such that the Seller is in the same economic position as if the Leased Employees had been hired by Buyer as of the Closing. For the avoidance of doubt, during the Lease Period, the Seller and its Subsidiaries shall continue to provide to each of the Leased Employees compensation and benefits on the same basis as they were provided to such Leased Employee immediately prior to the Closing Date.

(b)     Subject to the last sentence of this Section 9.7(b) and except as otherwise expressly provided in this Section 9.7(b), with respect to each Transferred Employee who remains employed by Buyer or any of its Subsidiaries, Buyer shall, or shall cause any of its Subsidiaries to, provide for the period commencing on the Offer Effective Date and ending on the last day of the Sellers' fiscal year ending in 2020, subject to such Transferred Employee's continued employment with Buyer or any of its Subsidiaries (as applicable) (i) (A) base salary or hourly wage rate and (B) a target short-term cash incentive opportunity, in each of (A) and (B), that is at least equal to the base salary or wages and target short-term cash incentive opportunity, respectively, provided to such Transferred Employee immediately prior to the Closing Date and (ii) a group health and welfare plan and, subject to and in accordance with Section 9.7(k), a 401(k) plan, qualified under Sections 401(a) and 401(k) of the Code ("401(k) Plan"), that are substantially comparable in the aggregate to the group health and welfare plan and 401(k) Plan under which such Transferred Employee participates as of the date hereof. For the avoidance of doubt, (x) the terms of this Section 9.7(b) shall apply notwithstanding anything to the contrary in any non-solicitation or similar agreement currently entered into by Buyer or any of its Affiliates and the Sellers and (y) from and after the date hereof, no such non-solicitation or similar agreement by Buyer and any Seller or any Affiliate thereof entered into prior to the date hereof shall prevent Buyer from hiring (or seeking to hire) any employee of the Sellers. The Parties agree to cooperate in good faith to coordinate the establishment of benefit plans and arrangements so as to satisfy the obligations set forth in this Section 9.7(b)(ii).

(c)     Except as otherwise provided under the terms of the applicable Employee Plan, each Transferred Employee shall be given credit for all service with the Sellers under all employee benefit plans, programs and policies and fringe benefits of the Business or Buyer or any of its Subsidiaries in which they become participants (i) for purposes of eligibility, participation, and vesting (but not benefit accruals), and (ii) with respect to any

vacation and severance plans, programs or arrangements of Buyer or its Subsidiaries, for purposes of determining the level of benefits except to the extent such crediting would result in duplication of benefits with respect to the same period of service.

(d)      If a Transferred Employee becomes eligible to participate in a medical, dental or health plan of Buyer (or its Subsidiaries), Buyer shall, or shall cause its Subsidiaries to, to the extent permitted by (x) applicable Law and (y) the terms of the applicable medical, dental or health plan of Buyer or any of its Subsidiaries in which the Transferred Employee participates following the Closing, cause the plan provider of such plan to (i) waive any preexisting condition limitations to the extent such pre-existing condition limitations would not have been applicable under the applicable medical, dental or health plans of the Sellers as of immediately prior to the Closing Date and (ii) credit any complete or partial satisfaction of any deductible and out-of-pocket expenses incurred by the Transferred Employee and his or her dependents under the applicable Seller's or its Subsidiaries' medical, dental or health plans during the portion of the calendar year in which the Closing Date occurs.  Buyer agrees to use commercially reasonable efforts to cause a medical, dental and health plan provider to provide such waivers and credits contemplated by the first (1st) sentence of this Section 9.7(d).  If a Transferred Employee becomes eligible to participate in a group term life insurance plan maintained by Buyer or its Subsidiaries, Buyer shall use commercially reasonable efforts to cause such plan to waive any medical certification for such Transferred Employee up to the amount of coverage the Transferred Employee had under the life insurance plan of the Sellers (but subject to any limits on the maximum amount of coverage under Buyer's life insurance plan).

(e)      Except as required by Law or an applicable bargaining agreement or as otherwise agreed in writing by the Parties, Buyer or any of its Subsidiaries shall provide severance and other separation benefits to each Leased Employee and Transferred Employee terminated by Buyer or any of its Subsidiaries within the period commencing on the Closing Date and ending on the last day of the Sellers' fiscal year ending in 2020 that are at least equal to the severance and other separation benefits provided by the Seller and its Subsidiaries to such Leased Employee and Transferred Employee as in effect immediately prior to the Petition Date, it being understood that such severance and other separation benefits do not include any long-term incentive, equity incentive, defined benefit pension or retiree welfare or life insurance benefits.

(f)      Except as prohibited by applicable Law, each offer letter shall provide that by accepting employment with Buyer the Business Employee is acknowledging that Buyer is assuming, and Buyer shall assume all vacation days and other paid time off accrued but not yet taken by each Transferred Employee through the Offer Effective Date, in accordance with their terms as of the date hereof.  To the extent that applicable Law prohibits a Transferred Employee's vacation from being assumed by Buyer and requires that a Transferred Employee to be paid for any vacation days and other paid time off accrued but not yet taken by such Transferred Employee as of the Offer Effective Date without regard to any acknowledgement by such Transferred Employee to the contrary, the Sellers shall pay each Transferred Employee for such vacation days.

19

(g)    The Sellers agree to pay to the Transferred Employees any bonus (including any related payroll Taxes) that such Transferred Employees would have been paid had they remained employees of the Sellers through the date the bonus in respect of the fiscal year ending February 2, 2019.

(h)    Buyer and the Seller agree to cooperate in good faith to ensure that Transferred Employees do not experience a break in health coverage from and after the Closing Date. Buyer shall take commercially reasonable efforts to provide or make available the health coverage required by Section 4980B of the Code available with respect to any individual who is an "M&A Qualified Beneficiary" (as defined in Treasury Regulation Section 54.49806-9 (Q&A 4) of the Code) as the result of the consummation of the Transactions. Notwithstanding the foregoing, Buyer shall take all actions reasonably necessary to ensure that all Leased Employees shall transfer to Buyer's health and welfare plans effective as of the Offer Effective Date, provided, that if any such employee continues coverage under COBRA under the health and welfare benefit plans maintained by the Seller or its Subsidiaries, Buyer shall reimburse the Seller for the positive difference, if any, between (x) the claims incurred and paid under such plan attributable to such employee and any eligible dependents, and (y) the COBRA coverage premiums paid by such employee, with such amount to be determined on a monthly basis. The Seller and Buyer shall negotiate in good faith to agree upon the timing for and the mechanics of reimbursement of all fees, costs and expenses incurred by the Seller pursuant to the immediately foregoing sentence.

(i)    From and after the Closing Date, subject in all respects to the limitations set forth in <u>Section 2.3(k)</u>, Buyer shall, within thirty (30) days following written demand by the Seller, with such supporting documentation as Buyer shall reasonably request, reimburse the Sellers for the payment of any cash severance or other cash separation pay, and the Sellers' or their Subsidiaries' portion of any related employment and payroll Taxes, made by any Seller or any Subsidiary of a Seller to any employee of any Seller or their Subsidiaries whose employment with any of the Sellers or their Subsidiaries terminated following the Petition Date or terminates on, or following the Closing Date (it being understood that this does not include any Transferred Employees who shall have become the employees of Buyer and its Subsidiaries and shall be covered by Buyer's obligations as set forth in <u>Section 9.7(b)</u>), to the extent of the cash severance or other cash separation pay that has been paid on or following the Petition Date and prior to the Closing Date or would have been due and payable had such employee's employment been terminated by any of the Sellers or their Subsidiaries immediately prior to the date hereof (the reimbursement Liabilities of Buyer set forth in this Section 9.7<u>(i)</u>, including with respect to any related employment and payroll Taxes, the "<u>Severance Reimbursement Obligations</u>").

(j)    The Sellers shall retain liability for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of the Sellers prior to the Closing.  Buyer shall be liable for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Buyer or any of its Subsidiaries on or after the Employee Effective Date.  For purposes of this <u>Section 9.7(j)</u>, a claim shall be deemed to have been

incurred on the date on which the medical or other treatment or service was rendered and not the date of the inception of the related illness or injury or the date of submission of a claim related thereto; <u>provided</u>, that claims relating to a hospital confinement that begins on or before the Closing but continues thereafter shall be treated as incurred before the Closing.

(k)    U.S. Savings Plan.

(i)    As soon as practicable following the Closing Date, Buyer shall, or shall cause its Subsidiaries to, establish a new savings plan or designate an existing savings plan qualified under Section 401(a) of the Code and including a cash or deferred feature under Section 401(k) of the Code and a related trust thereunder which shall be exempt under Section 501(a) of the Code ("Buyer's Savings Plan") that will permit participation by all Transferred Employees who are participating in the Seller's or its Subsidiaries' 401(k) Plan ("Seller's Savings Plan") as of the Closing Date.

(ii)    No assets or liabilities of Seller's Savings Plan shall be transferred to Buyer's Savings Plan, other than in connection with a rollover of a Transferred Employee's account balance under Seller's Savings Plan.  Except as could reasonably be expected to cause the Buyer's Savings Plan to cease to qualify under Section 401(a) and 401(k) of the Code or cause the trust to cease to be qualified under Section 501(a) of the Code or otherwise result in the Buyer or its Affiliates incurring any penalties thereunder, Buyer shall permit the Transferred Employees to roll over into Buyer's Savings Plan any rollover distribution (in cash or loan notes of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code)).  Effective as of the Closing, the Seller shall and shall cause it Subsidiaries to take any action necessary to ensure that the accounts of each Transferred Employee in Seller's Savings Plan shall be fully vested and nonforfeitable.

(l)    The Parties acknowledge and agree that all provisions contained in this Section 9.7 are included for the sole benefit of the respective Parties and shall not create any right (i) in any other person, including any Business Employees, Transferred Employees, current or former employees of the Seller, any participant in any Employee Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries or any beneficiary thereof or (ii) in any other person, to continued employment with Buyer or its Subsidiaries or particular compensation or benefits coverage in any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries.  The provisions of this Section 9.7 shall not constitute an amendment to any Employee Plan or any plan, program, agreement or arrangement maintained by Buyer or any of its Subsidiaries.

(m)    The Sellers and Buyer hereby agree to follow the "alternate procedure" for employment tax reporting as provided in Section 5 of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 for each Transferred Employee and to cooperate with each other in furtherance thereof. Provided that the Sellers provide Buyer with all necessary payroll records for the calendar

year which includes the date on which the Transferred Employee commences employment with Buyer, Buyer, and not the Sellers, shall furnish a Form W-2 to each Transferred Employee, disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom.

(n)    Effective as of the Offer Effective Date, Buyer shall assume the collective bargaining agreements listed on Schedule 6.9(a)."

SECTION 1.44.    Section 9.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 9.11 Apportionments.

(a) The Sellers and Buyer shall prorate all items of revenue and expense with respect to the Owned Real Property, the Lease Premises, the lease identified in Schedule 1.1(r) and the Sparrow Properties as of the Closing Date with the Sellers being entitled to all revenues and responsible for all fees, costs and expenses accrued or apportioned up to but not including the Closing Date and Buyer being entitled to all revenues and responsible for all fees, costs and expenses from the Closing Date forward; provided, however, that with respect to the GOB Stores the proration date for each GOB Store will be the date that is the first day after the end of the GOB Period for each such GOB Store.  As used herein, the "Proration Date" shall mean the Closing Date with respect to any Owned Real Property, Lease Premises or Sparrow Property that is not a GOB Store and for any GOB Store shall mean the date that is the first day after the end of the GOB Period for such GOB Store.  In order to effectuate the foregoing the following shall apply:

(i) with respect to Owned Real Properties and any Sparrow Properties that are owned in fee, all rental income will be prorated on a daily basis for the month in which the proration date occurs based on the amounts of rent due for the month in which the Proration Date occurs;

(ii) with respect to all Lease Premises, all Sparrow Properties that are leased, the lease described in Schedule 1.1(r) and all Sparrow Subleases, all rental payments will be prorated on a daily basis for the month in which the proration date occurs based on the amount of rent paid and all rental income will be prorated on a daily basis based on the rental amounts due for the month in which the Proration Date occurs; provided, however, that there shall be no proration of rent with respect to each of SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC that are "dark" stores as all parties reserve their rights with respect thereto as described in Section 8.9;

(iii) for all Properties and the Sparrow Properties (1) all utilities (including telephone service, water, sewer rents, heat, steam, electric power, gas and CAM payments with respect thereto) will be prorated on a daily basis for the month in which the Proration Date occurs based on the budgeted amounts for each such item set forth in the Sellers' utility plan for each such Property delivered to Buyer prior to the Closing Date (which budgeted amounts shall be based on prior actual use for such Property), (2) payments due under all third party Contracts will be prorated on a daily basis for the

month in which the Proration Date occurs based on the amounts due under each such Contract for such month. With respect to all maintenance performed with respect to the Properties and Sparrow Properties in the ordinary course and common area maintenance performed by the Sellers required to be performed by the Sellers under any third-party Contract, to the extent performed by the Sellers the actual third-party costs and expenses incurred by the Sellers with respect to such maintenance will be prorated based on the average amounts thereof for the same calendar month in the past three years for each such respective Property;

(iv) for all Owned Properties, Lease Premises, Sparrow Properties, Sparrow Subleases and the lease described in Schedule 1.1(r) all payments and premiums with respect to property, casualty and liability insurance will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts paid by the Sellers;

(v) Buyer and Seller shall prorate Property Taxes pursuant to Section 9.2(d), with Seller responsible for the period up to the Closing Date and Buyer responsible for the Closing Date forward; provided, however, that if the net amount that would otherwise be paid by Sellers and/or credited to Buyer is in the aggregate $135,000,000 or less, then such amount shall be borne by Buyer as an Assumed Property Tax Liability and no further charge shall be taken into account in the proration schedules with respect to any Property Taxes. If such amount exceeds $135,000,000 in the aggregate, then Sellers shall be charged for such excess in the prorations, and Buyer shall assume and pay directly all unpaid Property Taxes (taking into account the fact that Sellers will have been charged in the prorations for the amount in excess of $135,000,000 of Assumed Property Taxes); and

(vi) Sellers shall be charged for the amount of any underlying mechanics' liens with respect to any Owned Real Property (other those identified in Section 2 of Schedule 6.5) that are not paid, discharged by order of the Bankruptcy Court or bonded over in a manner reasonably acceptable to Buyer; provided, however, that the amount to be prorated pursuant to this subparagraph (vi) shall not be reflected or taken into account in the Initial Proration Schedule or the initial proration but shall be reflected in the Final Proration Schedule.

(b) Nothing contained in this Section 9.11 shall limit or affect any Party's rights or obligations under the Occupancy Agreement or the Seller Retained Occupancy Agreement.

(c) With respect to the Citi L/C Facility, all letter of credit commitment fees shall be prorated on a daily basis for the month in which the Closing Date occurs based on the amounts paid. All amounts unreimbursed as of the Closing Date under the Citi L/C Facility with respect to drawn letters of credit, along with any accrued interest thereon, will be allocated to the Sellers.

(d) The prorations set forth in this Section 9.11 shall be settled as follows:

(i)       the Seller shall provide Buyer, prior to the Closing Date, a schedule setting forth each item to be prorated pursuant to this Section 9.11, including the total amount and a calculation of such proration to be on account or credit to Buyer and the Seller (the "Initial Prorations Schedule");

(ii)       following the Closing, to the extent the Seller receives any additional invoices with respect to items set forth in this Section 9.11, the Seller shall promptly (but in no event more than five (5) Business Days after receipt) deliver all such invoices to Buyer;

(iii)       during the seven (7) Business Day period following the Closing Date, Buyer and Seller shall work in good faith to account for each of the items set forth in the Initial Prorations Schedule (taking into account any additional invoices, payments and requests for payment received during such period) and shall reasonably cooperate to agree to agree on an updated calculation of such prorations to be on account or credit to Buyer and Seller (the "Post-Closing Prorations Schedule");

(iv)       if the net amount of prorations set forth in the Post-Closing Prorations Schedule results in a payment due from Buyer to Seller then Buyer shall make such payment to Seller within one (1) Business Day after the end of such seven (7) Business Day period following Closing.  If the net amount of prorations set forth in the Updated Prorations Schedule results in a payment due from Seller to Buyer then Seller shall make such payment to Buyer within one (1) Business Day after the end of such seven (7) day period following Closing;

(v)       seventy-five (75) days following the Closing Date, Buyer shall deliver to Seller an updated calculation of the Post-Closing Prorations Schedule setting forth all updated proration items reflecting all invoices and payments received within the period following Closing and accounting for all amounts owed by Buyer and Seller pursuant to the Occupancy Agreement and the Seller Occupancy Agreement (the "Final Prorations Schedule"); and

(vi)       if the net amount of prorations set forth in the Final Prorations Schedule results in a payment due from Buyer to Seller (taking into account any credit or payment made following the Post-Closing Prorations Schedule) then Buyer shall make such payment to Seller within 1 Business Day after delivery of the Post-Closing Prorations Schedule.  If the net amount of prorations set forth in the Final Prorations Schedule results in a payment due from Seller to Buyer (taking into account any credit or payment made following the Final Prorations Schedule) then Seller shall make such payment to Buyer within 1 Business Day after delivery of the Final Prorations Schedule.

(e) For the avoidance of doubt, (A) to the extent the Seller is obligated to make a payment prior to Closing (including with respect to a Leased Premises) or receives an invoice prior to Closing with respect to any item to be prorated that is due prior to Closing, the Seller shall make such payment and (B) the extent Buyer receives an invoice following Closing, an amount becomes due with respect to an Acquired Asset following Closing, or the Seller receives an invoice prior to Closing that is due and payable following Closing, Buyer shall

make all such required payments.  All such payments will be taken into account in the forgoing prorations.  The prorations effected pursuant to this Section 9.11 shall be final and not subject to further adjustment."

SECTION 1.45.    Section 9.13 of the Purchase Agreement is hereby amended as follows:

(a) Section 9.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (b)(i)-(vii), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit bid set forth in Section 3.1(b).  The allowance of any ESL Claims shall not limit or preclude any claim under any applicable Law or doctrine of collateral estoppel, res judicata, claim or issue preclusion, or otherwise."

(b) Section 9.13(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)  For the purposes of this Section 9.13, the terms set out below shall be defined as follows:

(i)    "Debtors" means each of the debtors and debtors in possession in the Bankruptcy Cases, including the Sellers.

(ii)    "Released Estate Claims" means any and all Claims and causes of action of the Debtors and their estates (i) against ESL arising under sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) against ESL arising under equitable principles of subordination or recharacterization, (iii) against ESL challenging the allowance of the ESL Claims pursuant to Section 9.13(c); or (iv) against Buyer as a subsequent holder of any Claims in respect of the debt described on Exhibit G.  For the avoidance of doubt the Released Estate Claims do not include (a) any Claims or causes of action that are Acquired Assets under any subsection of Section 2.1; or (b) any Claims or causes of action of the Debtors or their estates against ESL or any other Person not specifically described in the preceding sentence, including any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b), 548 or 550(a) or any applicable state or federal Law, for breach of fiduciary duty, or for illegal dividend under 8 Del. C. 170-174 or any other state Law (including, but not limited to, any Claims for damages or equitable relief (other than disallowance of the ESL Claims) in connection with the incurrence of any

debt described on Exhibit G); (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted (or may be asserted in connection with these Claims and causes of action) by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.: CV-17-11846-00CL; and in the cases captioned Sears Canada Inc., by its Court-appointed Litigation Trustee, J. Douglas Cunningham, Q.C. v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611214-00CL; Morneau Shepell Ltd. in its capacity as administrator of the Sears Canada Inc. Registered Pension Plan v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611217-00CL; FTI Consulting Canada Inc., in its capacity as Court-appointed monitor in proceedings pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. c-36 v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611219-00CL; and 1291079 Ontario Ltd. v. Sears Canada Inc., *et al.*, Ont. Sup. Ct. J. No.: 4114/15CP."

SECTION 1.46.    The following is hereby added as Section 10.11 of the Purchase Agreement:

"Section 10.11    Pay-Down of Real Estate 2020 Loan.  To the extent not previously provided, on the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* [Docket No. 1393]."

SECTION 1.47.    Section 11.8 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 11.8    [Reserved]."

SECTION 1.48.        The following Exhibits and Schedules are hereby added to the Purchase Agreement or amended as follows:

(a)        Schedule 1.1(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(n) of Exhibit A of this Amendment;

(b)        Schedule 1.1(m) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(m) of Exhibit A of this Amendment;

(c)        Schedule 1.1(o) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(o) of Exhibit A of this Amendment;

(d)        Schedule 1.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(p) of Exhibit A of this Amendment;

(e)        "Schedule 1.1(r): Sparrow Master Leases" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 1.1(r) of Exhibit A of this Amendment;

(f)        "Schedule 1.1(s): Sparrow Subleases" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 1.1(s) of Exhibit A of this Amendment;

(g)        "Schedule 5.1(c)(ii): GOB Sparrow Properties" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 5.1(c)(ii) of Exhibit A of this Amendment;

(h)        Schedule 6.6(a)(2) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 6.6(a)(2) of Exhibit A of this Amendment;

(i)        Schedule 6.6(c)(2) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 6.6(c)(2) of Exhibit A of this Amendment;

(j)        Schedule 6.6(a)(4) is hereby amended to add the following:

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|-------|------|-----------------|------------|------------|-------------------------------------|
| 9944 | Baltimore | MD | | | Universal Vending |

(k)        Schedule 6.6(e)(3) is hereby amended to add the following:

| STORE NO. | STATE | CITY | ADDRESS | DESCRIPTION |
|-----------|-------|------|---------|-------------|
| 1430 | Ohio | Middleburg Hts. | | Alleged slip-and-fall outside of the store on 2/2/2017. |

(l)    "Schedule 9.2: Securities Consideration" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit B of this Amendment;

(m)    Exhibit G of the Purchase Agreement is hereby deleted in its entirety and replaced with Exhibit C of this Amendment;

(n)    Annex 1 to the Schedules to the Purchase Agreement is hereby modified in the following respects:

(i)    the listed Trademark registration number for U.S. Trademark application number 87/245749 for the Trademark "SHOP YOUR WAY RELAY" is hereby deleted and replaced with U.S. registration number "5640230";

(ii)    the listed Owner of U.S. Trademark registration number 2729666 for the Trademark "METAPHOR" is hereby deleted and replaced with "SEARS BRANDS, L.L.C.";

(iii)    the listed Owner of U.S. Trademark registration number 649324 for the Trademark "SEARS-O-PEDIC" is hereby deleted and replaced with "SEARS BRANDS, L.L.C.";

(iv)    the listed Owner of U.S. Trademark registration number 2495828 for the Trademark "WEATHERBEATER ULTRA" is hereby deleted and replaced with "SEARS BRANDS, L.L.C.";

(o)    Annex 3 to the Schedules to the Purchase Agreement is hereby deleted in its entirety and replaced with Exhibit D of this Amendment;

(p)    Annex 4 to the Schedules to the Purchase Agreement is hereby modified in the following respects:

(i)    the listed Owner of U.S. Copyright registration number PA0000228198, titled "USArt--the gift of ourselves / produced by Universal Studios ; produced by Bruce Seth Green ; written, directed, and edited by Stephen Judson" is hereby deleted and replaced with "Sears Brands, L.L.C. (legal owner); Sears-Roebuck Foundation (record owner)";

(ii)    the listed Owner of U.S. Copyright registration number PA0000108820, titled "Growing up, growing older / produced by Richard Whiting ; directed by Phil Alden Robinson" is hereby deleted and replaced with "Sears Brands, L.L.C. (legal owner); Sears-Roebuck Foundation (record owner)";

(iii)    the following copyright registrations are hereby added to Annex 4

| Owner | Full Title | Registration Number | Registration Date |
|---|---|---|---|
| Sears, Roebuck and Company | Home repair know how saves you money / prepared for Sears, Roebuck, and Company. | TX0000593525 | 1980 |
| Sears, Roebuck and Company | Kenmore microwave cooking. | TX0000860819 | 1981 |
| Sears, Roebuck and Company. | Sears, Roebuck catalog of houses, 1926 : an unabridged reprint / Sears, Roebuck, and Company. | TX0003156863 | 1991 |

(q)    Annex 5 to the Schedules to the Purchase Agreement is hereby modified by deleting all references to "Sears Canada Inc." as a Domain Name Owner and replacing such references with "SEARS BRANDS, L.L.C. (legal owner); Sears Canada Inc. (record owner)".

## ARTICLE II   MISCELLANEOUS

SECTION 2.01.    This Agreement (including the Exhibits), the Confidentiality Agreement and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the parties hereto relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the parties hereto or their representatives, oral or written, respecting such subject matter.  The terms of this Amendment shall constitute a waiver of the Purchase Agreement only with respect to the specific amendments herein and shall in no way impair the rights of any Party in any other respect.

SECTION 2.02.    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile, email in "portable document format" (".pdf") form, or by other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

SECTION 2.03.    The signature page of each party to this Amendment who was not a Party to the Purchase Agreement on the date of the Purchase Agreement shall indicate such party's agreement to be bound by all of the terms of the Purchase Agreement as a Seller thereunder as if such party were a Party on the date of the Purchase Agreement.  In the case of KMart Stores of Illinois LLC, the signature of such party to this Amendment shall also be

deemed to replace the signature page for "KMart of Illinois LLC" to the Asset Purchase Agreement.

SECTION 2.04.    Except as otherwise provided herein, the Purchase Agreement shall remain unchanged and in full force and effect.  On and after the date hereof, each reference in the Purchase Agreement to "this Agreement", "herein", "hereof", "hereunder" or words of similar import shall mean and be a reference to the Purchase Agreement as amended hereby, although it shall not alter the dates as of which any provision of the Purchase Agreement speaks.  For example, phrases such as "as of the date hereof" and "as of the date of this Agreement" shall continue to refer to January 17, 2019, the date that the Purchase Agreement was originally executed.

SECTION 2.05.    Article XIII of the Purchase Agreement shall, to the extent not already set forth in this Amendment, apply *mutatis mutandis* to this Amendment.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed and delivered on its behalf by its duly authorized officer as of the date and year first written above.

**Transform Holdco LLC**

By: _____

Name: Edward S. Lampert
Title: Chief Executive Officer

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**Sears Holdings Corporation**

By:

Name:       Robert A. Riecker

Title:        Chief Financial Officer

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Kmart Holding Corporation**

By:

Name:        Robert A. Riecker

Title:         Chief Financial Officer &
              Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Kmart Operations LLC**

By: _____

Name:        Robert A. Riecker

Title:        Chief Financial Officer &
             Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Operations LLC**

By:

Name:    Robert A. Riecker

Title:    Chief Financial Officer &
Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears, Roebuck and Co.**

By:  _____

Name:    Robert A. Riecker

Title:    Chief Financial Officer,
President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**ServiceLive, Inc.**

By:

Name:      Robert A. Riecker

Title:      Chief Financial Officer &
Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**SHC Licensed Business LLC**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Offier of Kmart
Corporation, its Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**A&E Factory Service, LLC**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**A&E Home Delivery, LLC**

By:

Name:      Robert A. Riecker

Title:       Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**A&E Lawn & Garden, LLC**

By:

Name:          Robert A. Riecker

Title:         Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**A&E Signature Service, LLC**

By: _____

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**FBA Holdings Inc.**

By: _____

Name:    Robert A. Riecker

Title:    Chief Financial Officer &
         Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Innovel Solutions, Inc.**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Officer &
Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Kmart Corporation**

By: _____

Name:    Robert A. Riecker

Title:    Chief Financial Officer &
Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**MaxServ, Inc.**

By: _____

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Private Brands, Ltd.**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Development Co.**

By: _____

Name:     Robert A. Riecker

Title:     President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Holdings Management Corporation**

By: _____

Name:     Robert A. Riecker

Title:     President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Home & Business Franchises, Inc.**

By: _____

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Home Improvement Products, Inc.**

By: _____

Name:       Robert A. Riecker

Title:       President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Insurance Services, L.L.C.**

By: _____

Name:      Robert A. Riecker

Title:       Chief Financial Officer

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Procurement Services, Inc.**

By: _____

Name:      Robert A. Riecker

Title:      Vice President

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Protection Company**

By: _____

Name:    Robert A. Riecker

Title:    Vice President

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Protection Company (PR), Inc.**

By:

Name:        Robert A. Riecker

Title:        Vice President

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Roebuck Acceptance Corp.**

By: _____

Name:    Robert A. Riecker

Title:    Chief Financial Officer &
         Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears, Roebuck de Puerto Rico, Inc.**

By: _____

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**SYW Relay LLC**

By: _____

Name:        Robert A. Riecker

Title:        Chief Financial Officer of
             Sears, Roebuck and Co., its
             Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Wally Labs LLC**

By: _____

Name:      Robert A. Riecker

Title:      Vice President

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**SHC Promotions LLC**

By:

Name:     Robert A. Riecker

Title:     Chief Financial Officer

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Big Beaver of Florida Development, LLC**

By: _____

Name:        Robert A. Riecker

Title:          President

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**California Builder Appliances, Inc.**

By: _____

Name:     Robert A. Riecker

Title:     Chief Financial Officer &
          Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Florida Builder Appliances, Inc.**

By: _____

Name:   Robert A. Riecker

Title:   Chief Financial Officer &
Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**KBL Holding Inc.**

By:

Name:          Robert A. Riecker

Title:          Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Kmart of Michigan, Inc.**

By:

Name:     Robert A. Riecker

Title:      Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Kmart of Washington LLC**

By:

Name:    Robert A. Riecker

Title:    Chief Financial Officer of
Kmart Corporation, its Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Kmart of Illinois LLC**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Officer of
             Kmart Corporation, its Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Kmart Stores of Texas LLC**

By:

Name:      Robert A. Riecker

Title:      Chief Financial Officer of
Kmart Corporation, its Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**MyGofer LLC**

By: _____

Name:    Robert A. Riecker

Title:    Chief Financial Officer of
Kmart Corporation, its Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Brands Business Unit Corporation**

By: _____

Name:    Robert A. Riecker

Title:    Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Holdings Publishing Company, LLC**


By:

Name:        Robert A. Riecker

Title:        Vice President

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Protection Company (Florida), L.L.C.**

By: _____

Name:    Robert A. Riecker

Title:    Vice President

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**SHC Desert Springs, LLC**

By: _____

Name:     Robert A. Riecker

Title:     Chief Financial Officer of
Kmart Corporation, its Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**SOE, Inc.**

By: _____

Name:        Robert A. Riecker

Title:        President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**StarWest, LLC**

By: _____

Name:          Robert A. Riecker

Title:          President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**STI Merchandising, Inc.**

By:

Name:     Robert A. Riecker

Title:     President & Director

**Troy Coolidge No. 13, LLC**

By:

Name:        Robert A. Riecker

Title:        Chief Financial Officer of
             Kmart Corporation, its Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**BlueLight.com, Inc.**

By: _____

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Brands, L.L.C.**

By:

Name:        Robert A. Riecker

Title:         Vice President & Manager

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Buying Services, Inc.**

By:

Name:      Robert A. Riecker

Title:       President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Kmart.com LLC**

By: _____

Name:    Robert A. Riecker

Title:    Vice President of
BlueLight.com, Inc., its
Member

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Brands Management Corporation**

By:

Name:       Robert A. Riecker

Title:       Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**KLC, Inc.**

By:

Name:      Robert A. Riecker

Title:      Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**SRe Holding Corporation**

By:

Name:        Robert A. Riecker

Title:        Vice President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**SRC Sparrow 2 LLC**

By:

Name:       Robert A. Riecker

Title:        President & Director

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**Sears Reinsurance Company Ltd.**

By: _____

Name:        Wanette Vann

Title:        Vice President

Its duly authorized officer

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**EXHIBIT A**

**GOB Owned**

**Schedule 1.1(n)**

| Store # | City | State |
|---------|------|-------|
| 1075 | Daytona Beach | FL |
| 1475 | Durham | NC |
| 2092 | Appleton | WI |
| 2191 | Lincoln | NE |
| 2885 | Port Richey | FL |

1

**Schedule 1.1(m)**

**GOB Leases**

| **Number** | **City** | **State** | **O L GL** |
|---|---|---|---|
| 4996 | Tucson | AZ | GL |
| 9608 | Auburn | CA | Lease |
| 3834 | Burbank | CA | Lease |
| 3174 | Stockton | CA | Lease |
| 1221 | Chapel Hills | CO | Lease |
| 1111 | Colorado Springs | CO | GL |
| 3216 | Vernon | CT | Lease |
| 4893 | Ellenton | FL | Lease |
| 2145 | Port Charlotte | FL | Lease |
| 1585 | Tallahassee | FL | GL |
| 1745 | Tampa/Westshore | FL | Lease |
| 2505 | Gainesville | GA | Lease |
| 2422 | Sioux City | IA | Lease |
| 1640 | Fairview Heights | IL | GL |
| 2990 | Rockford-Cherryvale | IL | Lease |
| 9030 | Peru | IN | Lease |
| 1161 | Wichita-Town East | KS | GL |
| 1226 | Metairie | LA | Lease |
| 4810 | Metairie | LA | Lease |
| 3256 | Baltimore | MD | Lease |
| 1773 | Prince Frederick | MD | Lease |
| 1722 | Bloomington | MN | GL |
| 4351 | Rochester | MN | Lease |
| 9353 | Crystal City | MO | Lease |
| 9520 | Gulfport | MS | Lease |

2

| Number | City | State | O L GL |
|---|---|---|---|
| 3886 | Asheville | NC | Lease |
| 1045 | Durham-Northgate | NC | Lease |
| 9619 | Morehead City | NC | Lease |
| 9549 | Morganton | NC | Lease |
| 4022 | Grand Forks | ND | Lease |
| 9319 | Alliance | NE | Lease |
| 1041 | Omaha | NE | GL |
| 3071 | Toms River | NJ | Lease |
| 1328 | Las Vegas(Blvd) | NV | Lease |
| 9274 | Greenwich | NY | Lease |
| 7065 | Horseheads | NY | Lease |
| 1894 | Rochester | NY | GL |
| 7677 | Wellsville | NY | Lease |
| 3013 | Cleveland | OH | Lease |
| 9096 | Fostoria | OH | Lease |
| 1210 | Polaris | OH | Lease |
| 3839 | Corvallis | OR | Lease |
| 2179 | Medford | OR | Lease |
| 2494 | Altoona | PA | Lease |
| 4113 | Erie | PA | Lease |
| 1714 | Greensburg | PA | GL |
| 1644 | Lancaster | PA | GL |
| 7062 | Sumter | SC | Lease |
| 4170 | Rapid City | SD | Lease |
| 1386 | Goodlettsville | TN | GL |
| 2036 | Jackson | TN | Lease |
| 9735 | Sevierville | TN | Lease |

67314844.3

| **Number** | **City** | **State** | **O L GL** |
|---|---|---|---|
| 1387 | Amarillo | TX | Lease |
| 2487 | Killeen | TX | Lease |
| 2637 | Port Arthur | TX | Lease |
| 1207 | Richardson | TX | Lease |
| 1367 | Waco | TX | Lease |
| 2435 | Charlottesville | VA | Lease |
| 2329 | Kennewick(Pasco) | WA | Lease |
| 2329 | Richland | WA | Lease |
| 3692 | Oconomowoc | WI | Lease |

4

**Schedule 1.1(o)**

**Operating Leases**

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 8722 | Anchorage (SUR) | AK | Lease |
| 2027 | Wasilla | AK | GL |
| 8706 | Birmingham | AL | Lease |
| 2306 | Gadsden | AL | Lease |
| 2796 | Tuscaloosa | AL | GL |
| 2126 | Hot Springs | AR | Lease |
| 8941 | Little Rock | AR | Lease |
| 1206 | North Little Rock | AR | Lease |
| 30957 | Springdale | AR | Lease |
| 1798 | Glendale | AZ | Lease |
| 30938 | Glendale | AZ | Lease |
| 3707 | Lake Havasu City | AZ | Lease |
| 7088 | Mesa | AZ | Lease |
| 8778 | Phoenix | AZ | Lease |
| 2218 | Prescott | AZ | Lease |
| 5865 | Scottsdale | AZ | Lease |
| 61901 | Scottsdale | AZ | GL |
| 49028 | Tempe | AZ | Lease |
| 5880 | Tempe | AZ | Lease |
| 1728 | Tucson | AZ | GL |
| 49011 | Tucson | AZ | Lease |
| 8937 | Tucson | AZ | Lease |
| 5866 | Tucson (Marana) | AZ | Lease |
| 4762 | Antioch | CA | Lease |
| 7619 | Atascadero | CA | Lease |
| 1018 | Baldwin Hills | CA | Lease |
| 78723 | Beacon Falls | CA | Lease |
| 8901 | Benicia | CA | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 7653 | Big Bear Lake | CA | Lease |
| 7756 | Bishop | CA | Lease |
| 1008 | Boyle | CA | Lease |
| 1638 | Brea | CA | Lease |
| 1268 | Buena Park | CA | Lease |
| 1838 | Burbank | CA | GL |
| 7165 | Camarillo | CA | Lease |
| 1678 | Carlsbad | CA | GL |
| 3086 | Chico | CA | Lease |
| 1358 | Chula Vista | CA | Lease |
| 1098 | Clovis | CA | Lease |
| 1368 | Concord | CA | GL |
| 7098 | Concord | CA | Lease |
| 5798 | Concord-Mcphails | CA | Lease |
| 1388 | Costa Mesa | CA | Lease |
| 4047 | Costa Mesa | CA | Lease |
| 5382 | Costa Mesa | CA | Lease |
| 1309 | Downey | CA | GL |
| 2728 | Downey | CA | GL |
| 1758 | Escondido | CA | GL |
| 2628 | Eureka | CA | Lease |
| 3725 | Freedom | CA | GL |
| 1208 | Fresno | CA | Lease |
| 8366 | Fresno | CA | Lease |
| 8913 | Fresno | CA | Lease |
| 1088 | Glendale | CA | GL |
| 9746 | Grass Valley | CA | Lease |
| 2656 | Hanford | CA | Lease |
| 1248 | Hayward | CA | Lease |
| 4457 | Hayward | CA | GL |
| 5689 | Hayward | CA | Lease |
| 2028 | Hemet | CA | GL |

6

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 3748 | Hollister | CA | GL |
| 1598/26720 | Industry, City of | CA | Lease |
| 4819 | Lakeport | CA | Lease |
| 8258 | Lakewood | CA | Lease |
| 3982 | Lemoore | CA | Lease |
| 9328 | Long Beach | CA | GL |
| 8253 | Mcclellan | CA | Lease |
| 7390 | Mckinleyville | CA | Lease |
| 8868 | Milpitas | CA | Lease |
| 8780 | Mira Loma | CA | Lease |
| 8928 | Mira Loma(Jurupa Vl) | CA | Lease |
| 3345 | Modesto | CA | Lease |
| 1748 | Montclair | CA | Lease |
| 1998 | Montebello | CA | Lease |
| 1868 | Moreno Vly | CA | Lease |
| 1168 | No Hollywood | CA | Lease |
| 4421 | North Hollywood | CA | Lease |
| 1508 | Northridge | CA | Lease |
| 3842 | Oakdale | CA | Lease |
| 3483 | Ontario | CA | Lease |
| 8287 | Ontario | CA | Lease |
| 8729 | Ontario | CA | Lease |
| 1378 | Orange | CA | GL |
| 1968 | Palm Desert | CA | Lease |
| 2798 | Palm Desert | CA | GL |
| 9551 | Paradise | CA | Lease |
| 1048 | Pasadena | CA | GL |
| 3501 | Petaluma | CA | Lease |
| 3531 | Pinole | CA | Lease |
| 7471 | Placerville | CA | Lease |
| 1019 | Pleasanton | CA | Lease |
| 3678 | Ramona | CA | Lease |

67314844.3

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 5668 | Rancho Cordova | CA | Lease |
| 1818 | Rancho Cucamonga | CA | GL |
| 4349 | Redwood City | CA | Lease |
| 1788 | Richmond | CA | Lease |
| 1298 | Riverside | CA | Lease |
| 4706 | Riverside | CA | Lease |
| 7175 | Riverside | CA | Lease |
| 5784 | Rohnert Park | CA | Lease |
| 8768 | Sacramento | CA | Lease |
| 1688 | Salinas | CA | Lease |
| 3412 | Salinas | CA | Lease |
| 1398 | San Bernardino | CA | Lease |
| 1478 | San Bruno | CA | Lease |
| 62529 | San Diego | CA | Lease |
| 8748 | San Diego | CA | Lease |
| 31882 | San Diego | CA | Lease |
| 5000 | San Francisco | CA | Lease |
| 38112 | San Francisco | CA | Lease |
| 8398 | San Jose | CA | Lease |
| 38734 | San Jose | CA | Lease |
| 1488 | San Jose-Eastridge | CA | Lease |
| 30969 | San Leandro | CA | Lease |
| 5787 | San Rafael - Mcphails | CA | Lease |
| 8369 | Santa Ana | CA | Lease |
| 8808 | Santa Ana | CA | Lease |
| 5764 | Santa Clara | CA | Lease |
| 2088 | Santa Maria | CA | Lease |
| 7639 | Santa Paula | CA | Lease |
| 9797 | Scotts Valley | CA | GL |
| 9153 | South Lake Tahoe | CA | Lease |
| 1288 | Stockton | CA | GL |
| 8708 | Stockton | CA | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 8758 | Sylmar | CA | Lease |
| 4751 | Tehachapi | CA | Lease |
| 1108 | Temecula | CA | Lease |
| 3127 | Temple City | CA | Lease |
| 1278 | Torrance | CA | GL |
| 2059 | Tracy | CA | Lease |
| 62538 | Tustin | CA | Lease |
| 3018 | Valencia | CA | Lease |
| 1148 | Ventura | CA | Lease |
| 2829 | Victorville | CA | Lease |
| 2068 | Visalia | CA | Lease |
| 9761 | Visalia | CA | Lease |
| 1189 | West Covina | CA | Lease |
| 3235 | West Covina | CA | Lease |
| 9489 | West Hills | CA | Lease |
| 1149 | Whittier | CA | Lease |
| 2238 | Yuba City | CA | Lease |
| 1141 | Aurora | CO | Lease |
| 8290 | Brighton | CO | Lease |
| 1131 | Centennial | CO | Lease |
| 4224 | Denver | CO | Lease |
| 1467 | Ft Collins | CO | GL |
| 7329 | Loveland | CO | Lease |
| 4453 | Pueblo | CO | Lease |
| 1303 | Danbury | CT | Lease |
| 1014 | Enfield | CT | Lease |
| 1134 | Milford | CT | Lease |
| 3495 | Milford | CT | Lease |
| 7109 | Watertown | CT | Lease |
| 4807 | Bear | DE | Lease |
| 4456 | Bridgeville | DE | Lease |
| 2654 | Dover | DE | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 7725 | Rehoboth Beach | DE | Lease |
| 3873 | Wilmington | DE | Lease |
| 3317 | Boca Raton | FL | Lease |
| 5958 | Bonita Springs Showroom | FL | Lease |
| 6820 | Boynton Beach | FL | GL |
| 7321 | Bradenton | FL | Lease |
| 1007 | Brandon | FL | Lease |
| 2485 | Brooksville | FL | GL |
| 1125 | Coral Gables | FL | Lease |
| 1715 | Doral(Miami) | FL | Lease |
| 7067 | Fort Myers | FL | Lease |
| 1195 | Ft Lauderdale | FL | GL |
| 1495 | Ft Myers | FL | Lease |
| 5863 | Ft Myers | FL | Lease |
| 8972 | Ft Myers | FL | Lease |
| 8990 | Ft Pierce | FL | Lease |
| 3424 | Gainesville | FL | Lease |
| 1345 | Hialeah/Westland | FL | Lease |
| 3818 | Hollywood | FL | Lease |
| 425 | Jacksonville | FL | Lease |
| 7979 | Jacksonville | FL | Lease |
| 9614 | Key Largo | FL | Lease |
| 2215 | Key West | FL | Lease |
| 4725 | Key West | FL | Lease |
| 49012 | Lake Mary | FL | Lease |
| 3269 | Lantana | FL | Lease |
| 2745 | Leesburg | FL | Lease |
| 9224 | Marathon | FL | Lease |
| 3074 | Miami | FL | Lease |
| 3793 | Miami | FL | Lease |
| 4728 | Miami | FL | Lease |

67314844.3

| Store# | City | State | Fee Type |
|---|---|---|---|
| 8065 | Miami | FL | Lease |
| 5991 | Miami - Showroom | FL | Lease |
| 1365 | Miami/Cutler Rdg | FL | Lease |
| 2056 | Mry Est/Ft Wltn Bch | FL | Lease |
| 2695 | Naples | FL | Lease |
| 8864 | Ocala | FL | Lease |
| 1456 | Oviedo | FL | GL |
| 1765 | Palm Beach Gardens | FL | GL |
| 2805 | Panama City | FL | Lease |
| 1775 | Pembroke Pines | FL | Lease |
| 31918 | Pembroke Pines | FL | Lease |
| 8066 | Pensacola | FL | Lease |
| 8957 | Pensacola | FL | Lease |
| 1205 | Pompano Beach | FL | Lease |
| 5962 | Pompano Beach | FL | Lease |
| 5976 | Sarasota | FL | Lease |
| 4355 | St. Petersburg | FL | Lease |
| 8815 | Sunrise | FL | Lease |
| 8895 | Tampa | FL | Lease |
| 1066 | The Avenues | FL | Lease |
| 7294 | Vero Beach | FL | Lease |
| 5959 | West Palm Bch | FL | Lease |
| 5185 | Winter Park | FL | Lease |
| 8825 | Winter Park | FL | Lease |
| 1385 | Atlanta | GA | Lease |
| 4931 | Augusta | GA | Lease |
| 3713 | Covington | GA | Lease |
| 3978 | Peachtree City | GA | Lease |
| 8872 | Pendergrass | GA | Lease |
| 1305 | Savannah | GA | Lease |
| 8902 | Savannah | GA | Lease |
| 1578 | Aiea Oahu-Pearl Rdg | HI | Lease |

11

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 8049 | Hilo | HI | GL |
| 2388 | Hilo(Sur) | HI | Lease |
| 1681 | Honolulu | HI | Lease |
| 8158 | Honolulu | HI | GL |
| 2148 | Kahului Maui(Sur) | HI | GL |
| 1738 | Kaneohe(Sur) | HI | GL |
| 8818 | Pearl City | HI | GL |
| 9220 | Algona | IA | Lease |
| 7767 | Charles City | IA | Lease |
| 9222 | Cherokee | IA | Lease |
| 3447 | Clive | IA | Lease |
| 3097 | Council Bluffs | IA | Lease |
| 45113 | Des Moines | IA | Lease |
| 8711 | Boise | ID | Lease |
| 7033 | Lewiston | ID | Lease |
| 7006 | Twin Falls | ID | Lease |
| 8844 | Bloomington | IL | Lease |
| 4381 | Bridgeview | IL | Lease |
| 2936 | Chicago | IL | GL |
| 37914 | Chicago | IL | Lease |
| 4214 | Des Plaines | IL | Lease |
| 36950 | Elgin | IL | Lease |
| 8555 | Elk Grove Village | IL | Lease |
| 8730 | Granite City | IL | Lease |
| 440 | Manteno | IL | Lease |
| 8720 | Melrose Park | IL | Lease |
| 1212 | N Riverside | IL | Lease |
| 8262 | Naperville | IL | Lease |
| 1290 | Niles | IL | Lease |
| 9348 | Norridge | IL | Lease |
| 1300 | Oakbrook | IL | Lease |
| 4433 | Quincy | IL | Lease |

67314844.3

| Store# | City | State | Fee Type |
|---|---|---|---|
| 8871 | Romeoville | IL | Lease |
| 8934 | Romeoville | IL | Lease |
| 7289 | Steger | IL | Lease |
| 8017 | Elwood | IN | Lease |
| 9124 | Elwood | IN | Lease |
| 8013 | Fort Wayne | IN | Lease |
| 1830 | Ft Wayne | IN | Lease |
| 1470 | Greenwood | IN | Lease |
| 9354 | Griffith | IN | Lease |
| 3251 | Indianapolis | IN | GL |
| 8750 | Indianapolis | IN | Lease |
| 3823 | Jasper | IN | Lease |
| 7243 | Kokomo | IN | Lease |
| 7246 | Richmond | IN | Lease |
| 8014 | South Bend | IN | Lease |
| 2600 | Terre Haute | IN | Lease |
| 7042 | Valparaiso | IN | GL |
| 9122 | Warsaw | IN | Lease |
| 4215 | Kansas City | KS | Lease |
| 8273 | Lawrence | KS | Lease |
| 8420 | Olathe | KS | Lease |
| 7169 | Salina | KS | Lease |
| 8081 | Wichita | KS | Lease |
| 2546 | Bowling Green | KY | Lease |
| 3029 | Erlanger | KY | Lease |
| 7229 | Grayson | KY | Lease |
| 24015 | Louisville | KY | Lease |
| 8920 | Louisville | KY | Lease |
| 1790 | Louisville-Okolona | KY | Lease |
| 3941 | Russell Springs | KY | Lease |
| 7255 | Somerset | KY | Lease |
| 8896 | Gonzales | LA | Lease |

67314844.3

| Store# | City | State | Fee Type |
|---|---|---|---|
| 8736 | Harahan | LA | Lease |
| 7223 | Metairie | LA | Lease |
| 7104 | Acton | MA | Lease |
| 1213 | Auburn | MA | Lease |
| 3288 | Billerica | MA | Lease |
| 1283 | Braintree | MA | GL |
| 4407 | Brockton | MA | Lease |
| 4444 | Fitchburg | MA | Lease |
| 1243 | Hanover | MA | Lease |
| 2323 | Hyannis | MA | Lease |
| 3040 | Hyannis | MA | Lease |
| 1133 | Leominster | MA | Lease |
| 2373 | No Dartmouth | MA | Lease |
| 1053 | Saugus | MA | Lease |
| 3486 | Somerville | MA | Lease |
| 9692 | Webster | MA | Lease |
| 8851 | Westwood | MA | Lease |
| 1725 | Annapolis | MD | Lease |
| 9944 | Baltimore | MD | Lease |
| 2823 | Baltimore/E Pt. | MD | Lease |
| 1374 | Bel Air | MD | GL |
| 8814 | Columbia | MD | Lease |
| 2774 | Cumberland | MD | Lease |
| 7713 | Edgewater | MD | Lease |
| 2664 | Frederick | MD | Lease |
| 3131 | Frederick | MD | Lease |
| 1754 | Gaithersburg | MD | Lease |
| 1013 | Glen Burnie | MD | GL |
| 3172 | Hagerstown | MD | Lease |
| 3798 | Hyattsville | MD | Lease |
| 3654 | Oxon Hill | MD | Lease |
| 3807 | Prince Frederick | MD | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 1304 | Silver Spring | MD | GL |
| 4399 | Silver Spring | MD | Lease |
| 7673 | Stevensville | MD | Lease |
| 2963 | Westminster | MD | Lease |
| 3021 | Auburn | ME | Lease |
| 7133 | Augusta | ME | Lease |
| 2203 | Brunswick | ME | Lease |
| 3155 | Belleville | MI | Lease |
| 3820 | Charlevoix | MI | Lease |
| 9557 | Grayling | MI | Lease |
| 3819 | Hastings | MI | Lease |
| 2050 | Jackson | MI | Lease |
| 3308 | Lake Orion | MI | Lease |
| 1170 | Lansing | MI | Lease |
| 8830 | Livonia | MI | Lease |
| 3841 | Marshall | MI | Lease |
| 7031 | Menominee | MI | GL |
| 7068 | Midland | MI | Lease |
| 9593 | Oscoda | MI | Lease |
| 6232 | Roseville | MI | Lease |
| 8982 | Saginaw | MI | Lease |
| 3379 | Waterford Twp. | MI | Lease |
| 8949 | Wayland | MI | Lease |
| 8134 | Wyoming | MI | Lease |
| 8162 | Eden Prairie | MN | Lease |
| 9689 | International Falls | MN | Lease |
| 3405 | Minneapolis | MN | GL |
| 3059 | St. Paul | MN | Lease |
| 30956 | West St. Paul | MN | GL |
| 7021 | Cape Girardeau | MO | Lease |
| 7323 | Fenton | MO | Lease |
| 3239 | Kansas City | MO | GL |

15

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 7324 | O'Fallon | MO | Lease |
| 8701 | Riverside | MO | Lease |
| 62707 | Springfield | MO | GL |
| 4026 | St. Joseph | MO | Lease |
| 7719 | Columbus | MS | Lease |
| 88776 | Olive Branch | MS | Lease |
| 9808 | Hamilton | MT | Lease |
| 7030 | Kalispell | MT | Lease |
| 4112 | Asheville | NC | Lease |
| 2105 | Burlington | NC | Lease |
| 8319 | Charlotte | NC | Lease |
| 8822 | Charlotte | NC | Lease |
| 7208 | Clemmons | NC | Lease |
| 1405 | Fayetteville | NC | Lease |
| 2225 | Goldsboro | NC | Lease |
| 1335 | Greensboro | NC | GL |
| 8704 | Greensboro | NC | Lease |
| 30961 | Greensboro | NC | Lease |
| 2755 | Jacksonville | NC | Lease |
| 3744 | Kill Devil Hills | NC | GL |
| 1646 | Pineville | NC | Lease |
| 3667 | Raleigh | NC | Lease |
| 4450 | Raleigh | NC | Lease |
| 7385 | Raleigh | NC | Lease |
| 3808 | Statesville | NC | Lease |
| 7626 | Waynesville | NC | Lease |
| 3116 | Wilmington | NC | Lease |
| 4272 | Bismarck | ND | Lease |
| 4057 | Fargo | ND | Lease |
| 4353 | Minot | ND | Lease |
| 45114 | Omaha | NE | Lease |
| 2023 | Concord | NH | Lease |

67314844.3

| Store# | City | State | Fee Type |
|---|---|---|---|
| 3175 | Hooksett | NH | Lease |
| 8703 | Kingston | NH | Lease |
| 2443 | Manchester | NH | Lease |
| 1313 | Nashua | NH | Lease |
| 1003 | Salem | NH | Lease |
| 4448 | Salem | NH | Lease |
| 7048 | West Lebanon | NH | Lease |
| 3438 | Avenel | NJ | Lease |
| 7177 | Belleville | NJ | Lease |
| 1204 | Freehold | NJ | Lease |
| 3393 | Glassboro | NJ | Lease |
| 1094 | Hackensack | NJ | GL |
| 1044 | Jersey Cty/Newport | NJ | GL |
| 3499 | Kearny | NJ | Lease |
| 1494 | Moorestown | NJ | GL |
| 78714 | Secaucus | NJ | Lease |
| 9463 | Somers Point | NJ | GL |
| 8835 | Swedesboro | NJ | Lease |
| 4478 | Trenton | NJ | Lease |
| 7602 | Wall | NJ | Lease |
| 8380 | Wall Township | NJ | Lease |
| 1434 | Wayne | NJ | Lease |
| 3056 | Wayne | NJ | Lease |
| 4470 | West Long Branch | NJ | Lease |
| 9413 | West Orange | NJ | Lease |
| 3202 | Westwood | NJ | Lease |
| 1684 | Woodbridge | NJ | GL |
| 8905 | Albuquerque | NM | Lease |
| 2597 | Farmington | NM | Lease |
| 7035 | Farmington | NM | Lease |
| 7016 | Hobbs | NM | Lease |
| 2527 | Las Cruces | NM | Lease |

17

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 3301 | Santa Fe | NM | Lease |
| 1709 | Henderson | NV | GL |
| 2754 | Henderson | NV | GL |
| 3592 | Las Vegas | NV | Lease |
| 5864 | Las Vegas | NV | Lease |
| 8970 | Las Vegas | NV | Lease |
| 1668 | Las Vegas(Meadows) | NV | Lease |
| 5779 | Reno - Mcphails | NV | Lease |
| 26741 | Amherst | NY | GL |
| 4741 | Batavia | NY | Lease |
| 9589 | Bath | NY | Lease |
| 3862 | Bohemia | NY | GL |
| 9423 | Bridgehampton | NY | Lease |
| 7654 | Bronx | NY | GL |
| 9420 | Bronx | NY | Lease |
| 1114 | Brooklyn | NY | GL |
| 3415 | Buffalo | NY | Lease |
| 1984 | Buffalo/Hamburg | NY | Lease |
| 8854 | Cheektowaga | NY | Lease |
| 2626 | College Point | NY | GL |
| 4871 | Farmingville | NY | GL |
| 2744 | Horseheads/Elmira | NY | GL |
| 2584 | Lakewood | NY | Lease |
| 9415 | Mahopac | NY | Lease |
| 1404 | Massapequa | NY | GL |
| 2741 | Massapequa | NY | GL |
| 4034 | Mattydale | NY | Lease |
| 8959 | Menands | NY | Lease |
| 7749 | New York | NY | Lease |
| 7777 | New York | NY | Lease |
| 2593 | Newburgh | NY | Lease |
| 4123 | Niagara Falls | NY | Lease |

67314844.3

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 1333 | Poughkeepsie | NY | GL |
| 8102 | Rochester | NY | Lease |
| 3600 | Schenectady | NY | Lease |
| 7676 | Sidney | NY | Lease |
| 1624 | Staten Island | NY | Lease |
| 8753 | Syosset | NY | Lease |
| 1924 | Valley Stream | NY | GL |
| 1584 | Victor | NY | Lease |
| 9392 | West Seneca | NY | Lease |
| 1674 | White Plains | NY | Lease |
| 9416 | White Plains | NY | Lease |
| 1733 | Yonkers | NY | Lease |
| 9414 | Yorktown Heights | NY | Lease |
| 7383 | Barberton | OH | Lease |
| 3286 | Brunswick | OH | Lease |
| 1410 | Canton | OH | Lease |
| 1810 | Cincinnati-Eastgate | OH | Lease |
| 8790 | Cleveland | OH | Lease |
| 8712 | Columbus | OH | Lease |
| 8862 | Columbus | OH | Lease |
| 1560 | Dayton Mall | OH | Lease |
| 7209 | East Liverpool | OH | Lease |
| 7595 | Gahanna | OH | Lease |
| 7397 | Grove City | OH | Lease |
| 30962 | Groveport | OH | Lease |
| 7644 | Harrison | OH | Lease |
| 1081 | Heath | OH | GL |
| 7477 | Marietta | OH | Lease |
| 1430 | Middleburg Heights | OH | Lease |
| 4257 | Middleburg Heights | OH | Lease |
| 8918 | Monroe | OH | Lease |
| 1564 | Niles | OH | Lease |

19

| Store# | City | State | Fee Type |
|---|---|---|---|
| 3243 | North Canton | OH | Lease |
| 3243 | North Canton | OH | Lease |
| 1280 | Springdale | OH | GL |
| 2104 | St Clairsville | OH | Lease |
| 3142 | Tallmadge | OH | Lease |
| 4782 | Clinton | OK | Lease |
| 8931 | Oklahoma City | OK | Lease |
| 4363 | Tulsa | OK | Lease |
| 4455 | Beaverton | OR | Lease |
| 8883 | Eugene | OR | Lease |
| 1119 | Happy Valley | OR | Lease |
| 8228 | Portland | OR | Lease |
| 8841 | Portland | OR | Lease |
| 2715 | Salem | OR | Lease |
| 2119 | Salem(Lancaster) | OR | Lease |
| 3888 | The Dalles | OR | Lease |
| 3361 | Allentown | PA | Lease |
| 8744 | Allentown | PA | Lease |
| 4150 | Altoona | PA | Lease |
| 8875 | Altoona | PA | Lease |
| 1454 | Bensalem/Crnwls Hts | PA | Lease |
| 9161 | Berwick | PA | Lease |
| 24411 | Bridgeville | PA | Lease |
| 1711 | Camp Hill | PA | Lease |
| 3225 | Chambersburg | PA | Lease |
| 8781 | Chambersburg | PA | Lease |
| 7293 | Clifton Heights | PA | Lease |
| 3911 | Columbia | PA | Lease |
| 3737 | Doylestown | PA | Lease |
| 2124 | Dubois | PA | Lease |
| 7192 | Easton | PA | Lease |
| 3266 | Edwardsville | PA | Lease |

67314844.3

| Store# | City | State | Fee Type |
|---|---|---|---|
| 3963 | Elizabethtown | PA | Lease |
| 9662 | Ephrata | PA | Lease |
| 1073 | Exton | PA | GL |
| 8873 | Gouldsboro | PA | Lease |
| 2244 | Hanover | PA | Lease |
| 3597 | Holmes | PA | Lease |
| 7470 | Hummelstown | PA | Lease |
| 1064 | Langhrn/Oxford Vly | PA | Lease |
| 7699 | Lebanon | PA | Lease |
| 7372 | Leechburg | PA | Lease |
| 3884 | Matamoras | PA | Lease |
| 1654 | Media | PA | GL |
| 433 | Middletown | PA | Lease |
| 8275 | Morrisville | PA | Lease |
| 7083 | New Castle | PA | Lease |
| 4054 | New Kensington | PA | Lease |
| 1834 | North Wales | PA | GL |
| 9409 | Phoenixville | PA | Lease |
| 4010 | Pittsburgh | PA | Lease |
| 8724 | Pittsburgh | PA | Lease |
| 9438 | Pleasant Hills | PA | Lease |
| 1034 | Ross Park | PA | Lease |
| 8976 | Royersford | PA | Lease |
| 3136 | Shillington | PA | Lease |
| 2605 | State College | PA | Lease |
| 8962 | Steelton | PA | Lease |
| 9539 | Thorndale | PA | Lease |
| 4713 | Towanda | PA | Lease |
| 3954 | Walnutport | PA | Lease |
| 2114 | Washington | PA | Lease |
| 7374 | West Chester | PA | Lease |
| 1154 | Whitehall | PA | Lease |

67314844.3

| Store# | City | State | Fee Type |
|---|---|---|---|
| 443 | Wilkes-Barre | PA | Lease |
| 3268 | Wilkes-Barre | PA | Lease |
| 3390 | Williamsport | PA | Lease |
| 3810 | Willow Street | PA | Lease |
| 3949 | Wind Gap | PA | Lease |
| 4732 | Aguadilla | PR | Lease |
| 7566 | Arecibo | PR | Lease |
| 1915 | Bayamon | PR | GL |
| 7570 | Bayamon | PR | Lease |
| 7788 | Bayamon | PR | Lease |
| 1085 | Caguas | PR | Lease |
| 7419 | Caguas | PR | Lease |
| 1925 | Carolina | PR | Lease |
| 7665 | Carolina | PR | Lease |
| 7446 | Cayey | PR | Lease |
| 2085 | Fajardo | PR | Lease |
| 2675 | Guayama | PR | Lease |
| 7768 | Guaynabo | PR | Lease |
| 2355 | Hatillo(Arecibo) | PR | GL |
| 1905 | Hato Rey | PR | GL |
| 7783 | Hato Rey | PR | GL |
| 7842 | Hato Rey | PR | Lease |
| 3993 | Juana Diaz | PR | Lease |
| 1935 | Mayaguez | PR | GL |
| 1935 | Mayaguez | PR | Lease |
| 3882 | Mayaguez | PR | Lease |
| 2385 | Naranjito | PR | Lease |
| 1945 | Ponce | PR | Lease |
| 7741 | Ponce | PR | Lease |
| 4844 | Rio Piedras | PR | Lease |
| 4494 | Trujillo Alto | PR | Lease |
| 7784 | Vega Alta | PR | Lease |

22

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 7752 | Yauco | PR | Lease |
| 30941 | Sioux Falls | SD | GL |
| 4016 | Greenville | SC | Lease |
| 8846 | Greenville | SC | Lease |
| 8858 | Ladson | SC | Lease |
| 7616 | Lexington | SC | Lease |
| 7274 | Mauldin | SC | Lease |
| 4141 | West Columbia | SC | Lease |
| 7241 | Bartlett | TN | Lease |
| 1115 | Chattanooga | TN | Lease |
| 8037 | Chattanooga | TN | Lease |
| 2335 | Clarksville | TN | Lease |
| 2265 | Johnson City | TN | Lease |
| 7460 | Knoxville | TN | Lease |
| 8947 | Knoxville | TN | Lease |
| 9621 | Lebanon | TN | Lease |
| 8756 | Memphis | TN | Lease |
| 8206 | Nashville | TN | Lease |
| 1395 | West Town | TN | Lease |
| 1137 | Austin | TX | Lease |
| 1327 | Baytown | TX | Lease |
| 30954 | Brownsville | TX | Lease |
| 8870 | Dallas | TX | Lease |
| 8021 | El Paso | TX | Lease |
| 447 | Garland | TX | Lease |
| 8907 | Garland | TX | Lease |
| 8807 | Grapevine | TX | Lease |
| 2537 | Harlingen | TX | Lease |
| 2247 | Laredo | TX | Lease |
| 4389 | Mcallen | TX | Lease |
| 7972 | Mcallen | TX | Lease |
| 1067 | Memorial | TX | Lease |

67314844.3

| Store# | City | State | Fee Type |
|---|---|---|---|
| 8922 | Pflugersville | TX | Lease |
| 1629 | Pharr | TX | Lease |
| 9767 | Plano | TX | Lease |
| 1097 | San Antonio | TX | Lease |
| 8747 | San Antonio | TX | Lease |
| 9507 | San Antonio | TX | Lease |
| 1127 | Shepherd | TX | Lease |
| 2077 | Tyler | TX | Lease |
| 2617 | Victoria | TX | Lease |
| 8948 | Salt Lake Cty | UT | Lease |
| 9794 | St. George | UT | Lease |
| 1888 | West Jordan | UT | Lease |
| 1284 | Alexandria | VA | Lease |
| 3471 | Chesapeake | VA | Lease |
| 8838 | Chesapeake | VA | Lease |
| 1274 | Chesterfield | VA | GL |
| 8823 | Dulles | VA | Lease |
| 1814 | Fairfax | VA | Lease |
| 1024 | Falls Church | VA | Lease |
| 2694 | Fredericksburg | VA | Lease |
| 2395 | Manassas | VA | GL |
| 8836 | Richmond | VA | Lease |
| 7415 | Springfield | VA | Lease |
| 3785 | Tabb | VA | Lease |
| 7717 | Waynesboro | VA | Lease |
| 7259 | Williamsburg | VA | Lease |
| 2784 | Winchester | VA | Lease |
| 7413 | Frederiksted | VI | Lease |
| 3972 | St. Croix | VI | Lease |
| 3829 | St. Thomas | VI | Lease |
| 7793 | St. Thomas | VI | Lease |
| 1463 | Burlington | VT | GL |

24

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 45061 | Colchester | VT | Lease |
| 3133 | Bellingham | WA | Lease |
| 2049 | Everett | WA | Lease |
| 8709 | Kent | WA | Lease |
| 8897 | Kent | WA | Lease |
| 2330 | Puyallup | WA | Lease |
| 36692 | Seattle | WA | Lease |
| 8004 | Spokane | WA | Lease |
| 9480 | Spokane | WA | Lease |
| 7034 | Walla Walla | WA | Lease |
| 2092 | Appleton | WI | GL |
| 8968 | Janesville | WI | Lease |
| 7648 | Mauston | WI | Lease |
| 8220 | New Berlin | WI | Lease |
| 3851 | Racine | WI | Lease |
| 7649 | Ripon | WI | Lease |
| 8725 | Vandenbroek | WI | Lease |
| 3750 | Waupaca | WI | Lease |
| 8782 | Waupaca | WI | Lease |
| 6375 | Bridgeport | WV | Lease |
| 4442 | Charleston | WV | Lease |
| 3484 | Elkview | WV | Lease |
| 3724 | Scott Depot | WV | Lease |
| 2304 | Westover/Morgantown | WV | Lease |
| 2341 | Casper | WY | Lease |
| 7139 | Jackson | WY | Lease |
| 9711 | Russellville | AR | Lease |
| 1169 | Chandler | AZ | Lease |
| 1078 | Mesa/East | AZ | Lease |
| 1768 | Paradise Vly | AZ | Lease |
| 1708 | Phoenix-Desert Sky | AZ | Lease |
| 2047 | Sierra Vista | AZ | Lease |

67314844.3

| Store# | City | State | Fee Type |
|---|---|---|---|
| 2078 | Yuma | AZ | Lease |
| 1318 | Bakersfield | CA | Lease |
| 1518 | Cerritos | CA | Lease |
| 3945 | Delano | CA | Lease |
| 1988 | El Centro | CA | Lease |
| 1408 | Florin | CA | Lease |
| 2298 | Merced | CA | Lease |
| 1618 | Modesto | CA | Lease |
| 2138 | Santa Barbara | CA | Lease |
| 1658 | Santa Rosa | CA | Lease |
| 3828 | Temecula | CA | GL |
| 1071 | Lakewood | CO | Lease |
| 1193 | Waterford | CT | Lease |
| 1755 | Boynton Beach | FL | Lease |
| 2565 | Bradenton | FL | Lease |
| 2315 | Jensen Bch(Stuart) | FL | Lease |
| 1955 | Lakeland | FL | Lease |
| 2245 | Melbourne | FL | Lease |
| 1006 | Ocala | FL | Lease |
| 9309 | Webster City | IA | Lease |
| 1229 | Boise | ID | Lease |
| 2278 | Idaho Falls | ID | Lease |
| 3371 | Chicago | IL | Lease |
| 1740 | Joliet | IL | Lease |
| 4297 | Mokena | IL | Lease |
| 1403 | Natick | MA | Lease |
| 1424 | Bethesda | MD | Lease |
| 2034 | Bowie | MD | Lease |
| 1844 | Columbia | MD | Lease |
| 9521 | Madawaska | ME | Lease |
| 3380 | Waterville | ME | Lease |
| 1390 | Ann Arbor | MI | Lease |

26

| Store# | City | State | Fee Type |
|---|---|---|---|
| 1250 | Lincoln Park | MI | Lease |
| 1112 | Minnetonka | MN | Lease |
| 1052 | St Paul | MN | Lease |
| 4304 | Florissant | MO | Lease |
| 2106 | Tupelo | MS | Lease |
| 1375 | Winston Salem | NC | Lease |
| 2421 | Grand Island | NE | Lease |
| 2663 | Portsmouth | NH | Lease |
| 1464 | Deptford | NJ | Lease |
| 1574 | Middletown | NJ | Lease |
| 1287 | Coronado | NM | Lease |
| 1828 | Las Vegas | NV | GL |
| 9381 | Huntington | NY | Lease |
| 1414 | Nanuet | NY | Lease |
| 2173 | Saratoga | NY | Lease |
| 2683 | Watertown | NY | Lease |
| 1944 | Yorktown Hts. | NY | Lease |
| 2001 | Piqua | OH | GL |
| 2311 | Norman | OK | Lease |
| 1151 | Tulsa Woodland Hls. | OK | Lease |
| 1079 | Washington Sq. | OR | Lease |
| 7746 | Carlisle | PA | Lease |
| 4064 | North Versailles | PA | Lease |
| 3527 | Philadelphia | PA | Lease |
| 1484 | Reading | PA | Lease |
| 2074 | Stroudsburg | PA | Lease |
| 4858 | Caguas | PR | Lease |
| 3896 | San German | PR | Lease |
| 4490 | San Juan | PR | Lease |
| 7043 | Rock Hill | SC | Lease |
| 2807 | Rock Hill | SC | Lease |
| 1146 | Cordova | TN | Lease |

67314844.3

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 2156 | Maryville | TN | Lease |
| 2226 | Murfreesboro | TN | Lease |
| 1357 | Austin/Barton Creek | TX | Lease |
| 1080 | Frisco | TX | Lease |
| 1277 | Ingram | TX | Lease |
| 2147 | Irving | TX | Lease |
| 2557 | Longview | TX | Lease |
| 1247 | Lubbock | TX | Lease |
| 1227 | Southwest Ctr. | TX | Lease |
| 1575 | Hampton | VA | Lease |
| 1130 | Janesville | WI | GL |
| 4188 | Charleston | WV | Lease |
| 4736 | Casper | WY | Lease |

67314844.3

## Schedule 1.1(p)

## Operating Owned Properties

| Store# | City | State |
|---|---|---|
| 8106 | Birmingham | AL |
| 1136 | Riverchase | AL |
| 68235 | Phoenix | AZ |
| 1588 | Phoenix Metro Ctr. | AZ |
| 2288 | Antioch | CA |
| 1268[1] | Buena Park | CA |
| 1598 | City of Industry | CA |
| 449 | Delano | CA |
| 4857 | Desert Hot Springs | CA |
| 8038 | El Cajon | CA |
| 1248[2] | Hayward | CA |
| 4457 | Hayward | CA |
| 1209 | Long Beach | CA |
| 1068 | Palmdale | CA |
| 3368 | Redlands | CA |
| 1788 | Richmond | CA |
| 8098 | San Bernardino | CA |
| 1278[3] | Torrance | CA |
| 3968 | Wasco | CA |
| 2451 | Greeley | CO |
| 1271 | Littleton/Denver | CO |
| 1443 | Manchester | CT |
| 1853 | Wilmington | DE |
| 1255 | Citrus Park | FL |
| 1055 | Coral Springs | FL |

---

[1] Sears, Roebuck and Co. and Searsvale Acquisition LLC, a non-debtor entity, and other entities that are not Affiliates of Seller hold their individual ownership interests as Tenants in Common ("TIC").

[2] Sears, Roebuck and Co. and Searsvale Acquisition LLC, a non-debtor entity, and other entities that are not Affiliates of Seller are TIC.

[3] Sears, Roebuck and Co. and other entities that are not Affiliates of Seller are TIC.

67314844.3

| | | |
|---|---|---|
| 31930 | Hialeah | FL[4] |
| 7435 | Hialeah | FL |
| 1635 | Jacksonville | FL |
| 4019 | Melbourne | FL |
| 1175 | Merritt Island | FL |
| 8292 | Ocala | FL |
| 1485 | Orange Pk | FL |
| 1285 | Orlando-South | FL |
| 1555 | Sanford | FL |
| 2135 | Sebring | FL |
| 8245 | Seminole | FL |
| 1015 | Vero Beach | FL |
| 2815 | Albany | GA |
| 2065 | Brunswick | GA |
| 8035 | College Park | GA |
| 7705 | Tamuning | GU |
| 7439 | Council Bluff | IA |
| 61510 | Calumet City | IL |
| 26987 | Chicago | IL |
| 30920 | Chicago | IL |
| 61030 | Chicago | IL |
| 2632 | Fairview Hts | IL |
| 490 | Hoffman Est | IL |
| 30927 | Macomb | IL |
| 470 | Manteno | IL |
| 8289 | Manteno | IL |
| 30900 | New Lenox | IL |
| 31914 | Round Lake Beach | IL |
| 31900 | Sterling | IL |
| 6062 | Tinley Park | IL |

---

[4] Big Beaver Development Corporation, a Michigan Corporation, wholly owned by Kmart Corporation, has an interest in Red Road Joint Venture, which is identified by the title company as holding fee simple title.

| 30936 | Tinley Park | IL |
|---|---|---|
| 26185 | Clarksville | IN |
| 61540 | Indianapolis | IN |
| 8171 | Overland Park | KS |
| 3433 | Holyoke | MA |
| 9255 | Palmer | MA |
| 1093 | Springfield | MA |
| 6303 | Bangor | ME |
| 2183 | So. Portland | ME |
| 9385 | Clio | MI |
| 1100 | Flint | MI |
| 30918 | Jackson | MI |
| 1460 | Livonia | MI |
| 1590 | Saginaw | MI |
| 38480 | Troy | MI |
| 4206 | Warren | MI |
| 1032 | Brooklyn Center | MN |
| 2500 | Duluth | MN |
| 1121 | Independence | MO |
| 61106 | Jackson | MS |
| 30949 | Natchez | MS |
| 3213 | Southaven | MS |
| 2242 | Billings | MT |
| 30961 | Greensboro | NC |
| 1744 | Ocean | NJ |
| 2374 | Vineland | NJ |
| 6298 | Sparks | NV |
| 1353 | De Witt/Syracuse | NY |
| 4726 | Jamestown | NY |
| 1364 | Lake Grove | NY |
| 1514 | Niagara Falls | NY |
| 8254 | Rochester | NY |
| 1370 | Eastland | OH |

67314844.3

| 2940 | Franklin | OH |
|---|---|---|
| 1610 | Northgate | OH |
| 8305 | Warren | OH |
| 1261 | Midwest City | OK |
| 1224 | Harrisburg | PA |
| 1863 | Johnstown | PA |
| 1293 | Robinson Twp | PA |
| 1354 | Willow Grove | PA |
| 9394 | Fajardo | PR |
| 3853 | Guayama | PR |
| 8935 | Rio Piedras | PR |
| 8975 | Rio Piedras | PR |
| 1795 | Myrtle Beach | SC |
| 1675 | Knoxville East Town | TN |
| 30934 | Memphis | TN |
| 26596 | Memphis/Hickory | TN |
| 1216 | Memphis/Southland | TN |
| 1437 | Arlington/Parks | TX |
| 8247 | Dickinson | TX |
| 61237 | Houston | TX |
| 6874 | Houston | TX |
| 8137 | Houston | TX |
| 8167 | Houston | TX |
| 49027 | Round Rock | TX |
| 2332 | San Antonio | TX |
| 1023 | Loudoun/Dulles | VA |
| 26717 | Newport News | VA |
| 1974 | Roanoke | VA |
| 3544 | Salem | VA |
| 8345 | Virginia Beach | VA |
| 2299 | Aberdeen | WA |
| 3722 | Burlington | WA |
| 6579 | Spokane | WA |

67314844.3

| | | |
|---|---|---|
| 4395 | Cudahy | WI |
| 3088 | Kenosha | WI |
| 2432 | La Crosse | WI |
| 2232 | Madison-East | WI |
| 1804 | Barboursville | WV |

33

## <u>Schedule 1.1(r)</u>

### Sparrow Master Lease

That certain Amended and Restated Master Lease Agreement dated as of March 14, 2018 between: (i) SRC O.P. LLC, as Delaware limited liability company, SRC Facilities LLC, a Delaware limited liability company, and SRC Real Estate (TX), LLC, a Delaware limited liability company, all as lessors and (ii) Sears, Roebuck and Co., a New York corporation, and Kmart Corporation, a Michigan corporation, as lessees, as the same may have been amended from time to time

### Schedule 1.1(s)

**Sparrow Subleases**

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1011 | Grandville | MI | Lands' End, Inc. | 4,621 | 2014 | 1/31/2020 |
| 1012 | Des Moines | IA | ABBELL CREDIT CORPORATION | | | 11/5/2028 |
| 1012 | Des Moines | IA | LAMAR COMPANY LLC | 300 | | 11/5/2028 |
| 1029 | Spokane | WA | Price Spokane Limited Partnership | | 1999 | 9/26/2040 |
| 1074 | Waldorf/St Charles | MD | Lands' End, Inc. | 8,771 | 2014 | 1/31/2020 |
| 1077 | Shreveport | LA | Mall St Vincent LP | | | 12/31/2024 |
| 1092 | Westland(Detroit) | MI | Auto Accessories USA | 15,324 | 2018 | 4/30/2022 |
| 1110 | Portage | MI | Lands' End, Inc. | 5,178 | 2014 | 1/31/2020 |
| 1120 | Columbus | OH | Lands' End, Inc. | 8,374 | 2014 | 1/31/2020 |
| 1139 | Tukwila | WA | Lands' End, Inc. | 7,216 | 2014 | 1/31/2020 |
| 1171 | Springfield | MO | Lands' End, Inc. | 4,748 | 2014 | 1/31/2020 |
| 1187 | Mesquite | TX | Boot Barn (FKA Sheplers, Inc.) | | 1981 | 7/31/2020 |
| 1192 | Muskegon | MI | Lands' End, Inc. | 4,261 | 2014 | 1/31/2020 |
| 1297 | Hurst | TX | Simon Property Group (Texas) LP | 1.788 acres | 1999 | 8/2/2038 |
| 1297 | Hurst | TX | Chesapeake Exploration LLC | 10.875 acres | 2011 | 5/10/2038 |
| 1314 | New Brunswick | NJ | OTB Acquisitions | 1.56 acres | 1996 | 2/28/2023 |
| 1314 | New Brunswick | NJ | HOP New Brunswick (DBA "Houlihan's") | | 2002 | 11/30/2023 |
| 1314 | New Brunswick | NJ | Lands' End, Inc. | 7,107 | 2014 | 1/31/2020 |
| 1314 | New Brunswick | NJ | Cellco Partnership (DBA "Verizon Wireless") | 13 | 2014 | 1/31/2020 |

35

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1317 | El Paso | TX | Celina Development Company | 3,856 | 1981 | 6/30/2020 |
| 1407 | Beaumont | TX | Parkdale Mall | | | |
| 1447 | Hulen | TX | Xto Energy Inc. | 14.11 acres | 2008 | 10/22/2050 |
| 1570 | Schaumburg | IL | Namco entertainment Inc. (DBA "Level 257") | 41,960 | 2013 | 2/28/2025 |
| 1570 | Schaumburg | IL | Lands' End, Inc. | 6,552 | 2014 | 1/31/2020 |
| 1595 | Greenville | SC | Forever 21Retail, Inc. (Winter 2014) | 15,481 | 2012 | 8/31/2023 |
| 1634 | Baltimore | MD | Security Square Associates | | 1997 | 9/30/2022 |
| 1650 | Merrillville | IN | Gary Joint Venture | | 1987 | 9/17/2039 |
| 1710 | North Olmsted | OH | Steak and Ale of OH, Inc. | | | |
| 1710 | North Olmsted | OH | George Group-Great Northern Ltd (DBA "Harry Buffalo Restaurant & Lounge") | 6,342 | 2009 | 8/31/2019 |
| 1710 | North Olmsted | OH | Star-West Great Northern Mall LLC | | 2013 | 11/30/2023 |
| 1710 | North Olmsted | OH | Lands' End, Inc. | 8,789 | 2014 | 1/31/2020 |
| 1764 | Rockaway | NJ | Raymours Furniture Company, Inc. | 38,678 | 2015 | 8/31/2026 |
| 1800 | Mishawaka | IN | Lands' End, Inc. | 5,927 | 2014 | 1/31/2020 |
| 1854 | Parkville | MD | Lands' End, Inc. | 7,928 | 2014 | 1/31/2020 |
| 2290 | Michigan City | IN | First Source Bank | 40,950 | | 12/31/2022 |
| 2309 | Silverdale | WA | Kitsap Mall, LLC | 1.75 acres | 1984 | 8/7/2024 |
| 2497 | Brownsville | TX | CBL & Asssociates Management Inc.  (parking lot) | 119,790 | 2000 | |
| 2934 | Taunton | MA | Silver City Galleria | | | 10/31/2055 |
| 7979 | Jacksonville | FL | Sears Outlet Stores, LLC | 14,932 | | 12/31/2022 |

36

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 7979 | Jacksonville | FL | Sears Home Improvement Products | 270 | | |
| 8217 | Ft. Worth | TX | Sears Home Improvement Products, Inc. (Embedded) | 3,500 | | |
| 8702 | Minneapolis | MN | Rail Way Restoration Inc. | 10,500 | 2003 | 8/31/2019 |
| 8702 | Minneapolis | MN | Oopegard Vending | 835 | 2007 | 4/30/2019 |
| 8702 | Minneapolis | MN | Sears Home Improvement Products, Inc. (Embedded) | 15,300 | | |
| 8717 | Houston | TX | Holliday Door & Gate, LLC | 12,000 | 2003 | 2/28/2019 |
| 8717 | Houston | TX | Sears Outlet Stores, LLC | 82,593 | 2012 | 12/31/2022 |
| 8755 | Tucker | GA | Sears Outlet Stores, LLC | 133,404 | 2012 | 12/31/2022 |

67314844.3

## Disclosure Schedule 5.1(c)

### GOB Sparrow Stores

| Store # | City | State | 10K Own/L/GL |
|---------|------|-------|--------------|
| 1120 | Tuttle Crossing | OH | Owned |
| 1192 | Muskegon | MI | Owned |
| 1281 | Pueblo | CO | Owned |
| 1307 | Abilene | TX | Owned |
| 1760 | Novi | MI | Owned |
| 2390 | Springfield | OH | Owned |

38

## Schedule 6.6(a)(2)

1. Schedule 6.5 is incorporated herein by reference.

2. The following is a list of tenancies applicable to the Owned Real Property:

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 490 | Hoffman Estates | IL | Board of Trustees of Northern Illinois University (d/b/a Niu Parking) | N/A | 2016 | 6/30/2020 |
| 490 | Hoffman Estates | IL | Sprintcom Inc. (DBA "Sprint") | | 2000 | 11/7/2018* |
| 490 | Hoffman Estates | IL | Kum Cha Truscott (DBA "Evergreen Cleaners") | 626 | 2003 | 11/30/2018* |
| 490 | Hoffman Estates | IL | Sears Auto Center (Atrium) | 656 | 2007 | MTM |
| 490 | Hoffman Estates | IL | Hairstylist Management Systems, Inc. | 983 | 2009 | MTM |
| 490 | Hoffman Estates | IL | International Business Machines Corporation | 210 | 1999 | 12/31/2019 |
| 490 | Hoffman Estates | IL | Sedgwick Claims Management Services, Inc. | 23,350 | 2009 | 7/31/2021 |
| 490 | Hoffman Estates | IL | Hoffman Estates Latus, LLC (DBA "Sbarro") | 1,000 | 2011 | 11/30/2021 |
| 490 | Hoffman Estates | IL | Panda Express, Inc. | 1,000 | 2011 | 7/24/2021 |
| 490 | Hoffman Estates | IL | Sears Hometown & Outlet Stores, Inc. | 35,942 | 2012 | 10/31/2022 |
| 490 | Hoffman Estates | IL | RH Tax and Financial Services d/b/a "Jackson Hewitt" | 366 | 2015 | 8/31/2020 |
| 490 | Hoffman Estates | IL | Sears Hometown & Outlet Stores, Inc. | 5,017 | 2016 | MTM |
| 490 | Hoffman Estates | IL | Squadhelp, Inc. (DBA "Leapmatrix Inc.") | 365 | 2016 | 12/31/2018* |
| 490 | Hoffman Estates | IL | David L. Templer Insurance Agency, LLC | 462 | 2008 | 9/30/2020 |
| 490 | Hoffman Estates | IL | Bright Horizon's | 19,500 | 2017 | 8/31/2022 |
| 490 | Hoffman Estates | IL | Fifth Third Bank | | 2017 | 12/31/2020 |
| 490 | Hoffman Estates | IL | (DBA "ST Messaging Services (formerly Skytel)") | | | MTM |
| 490 | Hoffman Estates | IL | T-Mobile | N/A | 3/1/2016 | 1/31/2021 |

39

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1011 | Grandville | MI | Lands' End, Inc. | 4,621 | 2014 | 1/31/2020 |
| 1023 | Dulles/ Loudoun County | VA | Lands' End, Inc. | 9,535 | 2014 | 1/31/2019 |
| 1029 | Spokane | WA | Price Spokane Limited Partnership | | 1999 | 9/26/2040 |
| 1029 | Spokane | WA | Lands' End, Inc. | 6,049 | 2014 | 1/31/2019 |
| 1033 | North Attleboro | MA | Lands' End, Inc. | 7,609 | 2014 | 1/31/2019 |
| 1068 | Palmdale | CA | Antelope Valley Mall Developers | 983,699 | 1989 | 12/31/2059 |
| 1068 | Palmdale | CA | Metro Floors Inc. | 18,000 | 1996 | 10/31/2022 |
| 1074 | Waldorf/St Charles | MD | Lands' End, Inc. | 8,771 | 2014 | 1/31/2020 |
| 1110 | Portage | MI | Lands' End, Inc. | 5,178 | 2014 | 1/31/2020 |
| 1120 | Columbus | OH | Lands' End, Inc. | 8,374 | 2014 | 1/31/2020 |
| 1136 | Hoover (Birmingham ) | AL | Lands' End, Inc. | 4,215 | 2014 | 1/31/2020 |
| 1120 | Dublin | OH | AT&T | 2,435 | | 3/31/2028 |
| 1120 | Dublin | OH | Sport Clips | 1,200 | | 4/30/2028 |
| 1120 | Dublin | OH | Starbucks | 2,050 | | 1/31/2029 |
| 1120 | Dublin | OH | Zoup! | 2,100 | | 12/31/2028 |
| 1192 | Muskegon | MI | Lands' End, Inc. | 4,261 | 2014 | 1/31/2020 |
| 1224 | Harrisburg | PA | Penrac, LLC (DBA "Enterprise Rent-A-Car") | 29 Parking Spaces | 2007 | 4/30/2022 |
| 1224 | Harrisburg | PA | Rare Hospitality International, Inc. c/o Darden Restaurants Inc. (DBA "Longhorn Steakhouse") | 14,132 | 2012 | 4/30/2024 |
| 1224 | Harrisburg | PA | Lands' End, Inc. | 7,435 | 2014 | 1/31/2019 |
| 1268 | Buena Park | CA | Newkoa, LLC | 542 Parking | 1980 | 9/30/2049 |

40

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| | | | | Spaces | | |
| 1268 | Buena Park | CA | Newkoa, LLC | | 2013 | 9/30/2019 |
| 1271 | Littleton | CO | Lands' End, Inc. | 5,885 | 2014 | 1/31/2020 |
| 1278 | Torrance | CA | Fourth Searsvale Properties Inc | | 1979 | |
| 1278 | Torrance | CA | Del Amo Mills LP | 87,800 | 1980 | 6/30/2049 |
| 1278 | Torrance | CA | First States Investors Realty LLC | 35,000 | 1983 | 6/30/2019 |
| 1278 | Torrance | CA | Lands' End, Inc. | 7,489 | 2014 | 1/31/2020 |
| 1285 | Orlando-South | FL | Promenade II (DBA "Florida Mall Hotel") | | 2011 | 10/31/2022 |
| 1297 | Hurst | TX | Simon Property Group (Texas) LP | 1.788 acres | 1999 | 8/2/2038 |
| 1297 | Hurst | TX | Chesapeake Exploration LLC | 10.875 acres | 2011 | 5/10/2038 |
| 1314 | New Brunswick | NJ | OTB Acquisitions | 1.56 acres | 1996 | 2/28/2023 |
| 1314 | New Brunswick | NJ | HOP New Brunswick (DBA "Houlihan's") | | 2002 | 11/30/2023 |
| 1314 | New Brunswick | NJ | Lands' End, Inc. | 7,107 | 2014 | 1/31/2020 |
| 1314 | New Brunswick | NJ | Cellco Partnership (DBA "Verizon Wireless") | 13 | 2014 | 1/31/2020 |
| 1354 | Willow Grove | PA | Lands' End, Inc. | 8,635 | 2014 | 1/31/2019 |
| 1354 | Willow Grove | PA | Primark Us Corp. | 77,615 | 2014 | 10/30/2024 |
| 1364 | Lake Grove | NY | Lands' End, Inc. | 7,133 | 2014 | 1/31/2019 |
| 1407 | Beaumont | TX | Parkdale Mall | | | |
| 1443 | Manchester | CT | Lands' End, Inc. | 6,482 | 2014 | 1/31/2019 |
| 1447 | Hulen | TX | Xto Energy Inc | 14.11 acres | 2008 | 10/22/2050 |
| 1447 | Ft Worth | TX | Lands' End, Inc. | 4,387 | 2014 | 1/31/2019 |
| 1460 | Livonia | MI | Lands' End, Inc. | 5,116 | 2014 | 1/31/2020 |

67314844.3

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1475 | Durham | NC | Lands' End, Inc. | 7,596 | 2014 | 1/31/2020 |
| 1570 | Schaumburg | IL | Namco entertainment Inc. (DBA "Level 257") | 41,960 | 2013 | 2/28/2025 |
| 1570 | Schaumburg | IL | Lands' End, Inc. | 6,552 | 2014 | 1/31/2020 |
| 1590 | Saginaw | MI | Central Florida Restaurants Inc | 86,876 | 2001 | 11/30/2021 |
| 1595 | Greenville | SC | Forever 21Retail, Inc. (Winter 2014) | 15,481 | 2012 | 8/31/2023 |
| 1595 | Greenville | SC | Lands' End, Inc. | 5,742 | 2014 | 1/31/2019 |
| 1605 | Raleigh | NC | Lands' End, Inc. | 7,204 | 2014 | 1/31/2019 |
| 1614 | Livingston | NJ | Lands' End, Inc. | 8,270 | 2014 | 1/31/2019 |
| 1634 | Baltimore | MD | Security Square Associates | | 1997 | 9/30/2022 |
| 1650 | Merrillville | IN | Gary Joint Venture | | 1987 | 9/17/2039 |
| 1710 | North Olmsted | OH | Steak and Ale of OH, Inc. | | | |
| 1710 | North Olmsted | OH | George Group-Great Northern Ltd (DBA "Harry Buffalo Restaurant & Lounge") | 6,342 | 2009 | 8/31/2019 |
| 1710 | North Olmsted | OH | Star-West Great Northern Mall LLC | | 2013 | 11/30/2023 |
| 1710 | North Olmsted | OH | Lands' End, Inc. | 8,789 | 2014 | 1/31/2020 |
| 1760 | Novi | MI | Lands' End, Inc. | 8,769 | 2014 | 1/31/2019 |
| 1764 | Rockaway | NJ | Raymours Furniture Company, Inc | 38,678 | 2015 | 8/31/2026 |
| 1800 | Mishawaka | IN | Lands' End, Inc. | 5,927 | 2014 | 1/31/2020 |
| 1804 | Barboursville | WV | Lands' End, Inc. | 8,441 | 2014 | 1/31/2019 |
| 1853 | Wilmington | DE | Lands' End, Inc. | 8,415 | 2014 | 1/31/2019 |
| 1854 | Parkville | MD | Lands' End, Inc. | 7,928 | 2014 | 1/31/2020 |
| 1974 | Roanoke | VA | Cheddars Casual Café | 20,447 | 2010 | 10/31/2020 |

67314844.3

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 2092 | Appleton | WI | Lands' End, Inc. | 5,792 | 2014 | 1/31/2020 |
| 2183 | S Portland | ME | Maine Mall | | 1982 | |
| 2183 | S Portland | ME | OTB Acquisition LLC (DBA "On the Border #146") | 6,585 | 1999 | 11/30/2019 |
| 2183 | So Portland | ME | Lands' End, Inc. | 5,564 | 2014 | 1/31/2019 |
| 2191 | Lincoln | NE | Bair / Superior Pointe? | See docs | See docs | See docs |
| 2191 | Lincoln | NE | McDonald's Corporation | | 1981 | 8/4/2081 |
| 2191 | Lincoln | NE | A.T. Thomas Jewelers | 5,000 | 2005 | 6/30/2025 |
| 2191 | Lincoln | NE | GMRI, Inc. | 2.01 acres | 2012 | 10/31/2022 |
| 2309 | Silverdale | WA | Kitsap Mall, LLC | 1.75 acres | 1984 | 8/7/2024 |
| 2309 | Silverdale | WA | Lands' End, Inc. | 4,226 | 2014 | 1/31/2019 |
| 2497 | Brownsville | TX | CBL & Associates Management Inc. | 119,790 | 2000 | |
| 3088 | Kenosha | WI | Albor Restaurant Group, LLC (DBA "Taco Bell") | 2,646 | 1994 | 4/30/2031 |
| 3088 | Kenosha | WI | Dollar Tree Stores, Inc. #3811 | 10,520 | 2002 | 5/31/2018* |
| 3088 | Kenosha | WI | Limitless PCS, Inc. (DBA "Metro PCS") | 1,600 | 2015 | 3/3/2020 |
| 3433 | Holyoke | MA | D'Angelo's Restaurant | 1,800 | 1983 | 6/30/2024 |
| 3433 | Holyoke | MA | Taco Bell | 2,850 | 2010 | 11/30/2030 |
| 3433 | Holyoke | MA | Sears Outlet Stores, LLC | 18,012 | 2012 | 12/31/2018* |
| 3722 | Burlington | WA | Payless Shoe Source, Inc. #653 | 3,600 | 1989 | 6/30/2020 |
| 3722 | Burlington | WA | Phan Thuy Anh & Nguyen Vu Tan (DBA "Hi-Tek") | 1,200 | 2008 | 6/30/2021 |
| 3722 | Burlington | WA | Rent-A-Center West, Inc. | 1,720 | 2011 | 3/31/2021 |
| 3722 | Burlington | WA | PACIFIC NW PROPERTIES I | 3,600 | 2016 | 1/31/2099 |
| 4857 | Desert Hot Springs | CA | Yucaipa Trading Co., Inc. (DBA "Rio Ranch Market") | 27,917 | 2017 | 1/31/2027 |

43

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 6298 | Sparks | NV | Sears Outlet Stores, LLC | 20,098 | 2012 | 12/31/2022 |
| 8702 | Minneapolis | MN | Rail Way Restoration Inc | 10,500 | 2003 | 8/31/2019 |
| 8702 | Minneapolis | MN | Oopegard Vending | 835 | 2007 | 4/30/2019 |
| 8702 | Minneapolis | MN | Sears Home Improvement Products, Inc. (Embedded) | 15,300 | | |
| 8717 | Houston | TX | Holliday Door & Gate, LLC | 12,000 | 2003 | 2/28/2019 |
| 8717 | Houston | TX | Sears Outlet Stores, LLC | 82,593 | 2012 | 12/31/2022 |
| 8755 | Tucker | GA | Sears Outlet Stores, LLC | 133,404 | 2012 | 12/31/2022 |
| 8975 | Rio Piedras | PR | Sears Outlet Stores, LLC | 36,472 | 2012 | 12/31/2022 |
| 9255 | Palmer | MA | Gil's Gym and Racquet Health Club LLC | 18,512 | 2006 | 11/30/2018* |
| 9394 | Fajardo | PR | AutoZone Puerto Rico, Inc. | 10,530 | 2013 | 1/31/2024 |
| 1610 | Cincinnati Northgate | OH | Lands' End, Inc. | 5,933 | | 1/31/2019 |
| 3544 | Salem (Store Closing) | VA | West Main Hair Salon | 1,120 | | 1/31/2019 |
| 3544 | Salem (Store Closing) | VA | Sally Beauty Company, Inc. | 1,600 | | 11/30/2020 |
| 3544 | Salem (Store Closing) | VA | Ups Store | 1,600 | | 9/30/2018* |
| 3544 | Salem (Store Closing) | VA | Chick-Fil-A Inc. | 33,799 | | 4/30/2022 |
| 4395 | Cudahy | WI | Sears Outlet Stores, LLC | 21,070 | | 12/31/2020 |
| 8245 | St. Petersburg | FL | Sears Outlet Stores, LLC | 58,617 | | 9/30/2022 |
| 8935 | Rio Piedras | PR | Sears Home Improvement Products, Inc. (Embedded) | 4,813 | | |
| 26185 | Clarksville | IN | Peddlers Mall | 108,813 | | 12/31/2019 |
| 30934 | N Memphis | TN | First Tennessee Bank | 4,338 | | 1/31/2022 |
| 30961 | Grensboro | NC | National Distribution Centers, LLC | 1,546,815 | | 1/31/2022 |
| 61540 | Indianapolis | IN | Cinema Veterans LLC – Keep For Tax Tracking Purpose | 236,190 | | |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1012 | Des Moines | IA | ABBELL CREDIT CORPORATION | | | 11/5/28 |
| 1012 | Des Moines | IA | LAMAR COMPANY LLC | 300 | | 11/5/28 |
| 1077 | Shreveport | LA | Mall St Vincent LP | | | 12/31/24 |
| 1730 | Florence | KY | Lands' End, Inc. | 6,338 | | 1/31/19 |
| 2290 | Michigan City | IN | First Source Bank | 40,950 | | 12/31/22 |
| 2934 | Taunton | MA | Silver City Galleria | | | 10/31/55 |
| 8217 | Ft. Worth | TX | Sears Home Improvement Products, Inc. (Embedded) | 3,500 | | |

*Recently Expired

45

## Schedule 6.6(c)(2)

1.  Seller has made available leases and security deposit documents in Intralinks.

2.  The following is a list of tenancies applicable to the Lease Premises.

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1013 | Glen Burnie | MD | Lands' End, Inc. | 8,050 | 2014 | 1/31/2020 |
| 1024 | Falls Church | VA | Bill Page Imports, Inc. | 200 Parking Spaces | 2014 | 9/30/2020 |
| 1024 | Falls Church | VA | Lands' End, Inc. | 7,472 | 2014 | 1/31/2020 |
| 1044 | Jersey Cty/Newport | NJ | Lands' End, Inc. | 5,411 | 2014 | 1/31/2020 |
| 1048 | Pasadena | CA | FR Hastings Ranch, LLC | | 1984 | 4/29/2024 |
| 1048 | Pasadena | CA | HomeGoods, Inc. | 28,113 | 2012 | 4/29/2024 |
| 1048 | Pasadena | CA | Lands' End, Inc. | 7,168 | 2014 | 1/31/2020 |
| 1053 | Saugus | MA | Lands' End, Inc. | 5,565 | 2014 | 1/31/2020 |
| 1073 | Exton | PA | Lands' End, Inc. | 9,039 | 2014 | 10/5/2019 |
| 1088 | Glendale | CA | Star Parking Management, Inc. | | 2015 | 4/30/2021 |
| 1092 | Westland(Detroit) | MI | Auto Accessories USA | 15,324 | 2018 | 4/30/2022 |
| 1094 | Hackensack | NJ | ALDI Inc (Pennsylvania) | 55,718 | 2014 | 5/31/2032 |
| 1111 | Colorado Spgs | CO | Univest-Btc S&R LLC | | 2004 | 11/30/2025 |
| 1125 | Miami | FL | Goodwill Industries Of South Florida | 208 | 2014 | 2/28/2019 |
| 1133 | Leominster | MA | Lands' End, Inc. | 7,483 | 2014 | 1/31/2020 |
| 33496 | Baltimore | MD | Sears Outlet Stores, LLC (Outlet #9944) | 41,000 | 2012 | 2/28/2024 |
| 1139 | Tukwila | WA | Lands' End, Inc. | 7,216 | 2014 | 1/31/2020 |
| 1148 | Ventura | CA | Lands' End, Inc. | 6,691 | 2014 | 1/31/2020 |
| 1154 | Whitehall | PA | Lands' End, Inc. | 7,401 | 2014 | 1/31/2020 |
| 1170 | Lansing | MI | Lands' End, Inc. | 9,553 | 2014 | 11/30/2019 |

67314844.3

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1195 | Ft Lauderdale | FL | Greenstar Corp | 26,000 | 1954 | 2/28/2026 |
| 1210 | Columbus/Polaris | OH | Lands' End, Inc. | 6,611 | 2014 | 1/31/2020 |
| 1213 | Auburn | MA | Lands' End, Inc. | 7,269 | 2014 | 1/31/2019 |
| 1221 | Colorado Springs | CO | Lands' End, Inc. | 5,076 | 2014 | 1/31/2019 |
| 1243 | Hanover | MA | Lands' End, Inc. | 11,168 | 2014 | 1/31/2019 |
| 1248 | Hayward | CA | Wells Fargo Bank | 4,247 | 1975 | 10/1/2018 |
| 1248 | Hayward | CA | Sears Outlet Stores, LLC | 48,434 | 2012 | 1/31/2022 |
| 1268 | Buena Park | CA | Newkoa, LLC | 542 Parking Spaces | 1980 | 9/30/2049 |
| 1268 | Buena Park | CA | Newkoa, LLC | | 2013 | 9/30/2019 |
| 1274 | Richmond/Chesterfield | VA | Lands' End, Inc. | 7,551 | 2014 | 1/31/2020 |
| 1278 | Torrance | CA | Fourth Searsvale Properties Inc | | 1979 | |
| 1278 | Torrance | CA | Del Amo Mills LP | 87,800 | 1980 | 6/30/2049 |
| 1278 | Torrance | CA | First States Investors Realty LLC | 35,000 | 1983 | 6/30/2019 |
| 1278 | Torrance | CA | Lands' End, Inc. | 7,489 | 2014 | 1/31/2020 |
| 1283 | Braintree | MA | Lands' End, Inc. | 8,694 | 2014 | 1/31/2020 |
| 1283 | Braintree | MA | Primark Us Corp. | 70,816 | 2014 | 11/30/2024 |
| 1284 | Alexandria | VA | Lands' End, Inc. | 9,608 | 2014 | 1/31/2020 |
| 1288 | Stockton | CA | Weberstown Mall LLC | 3,480 | 1985 | 1/31/2023 |
| 1304 | Silver Spring | MD | Lands' End, Inc. | 4,973 | 2014 | 1/31/2019 |
| 1309 | Downey | CA | Macerich Stonewood LLC | | 2002 | 1/31/2051 |
| 1313 | Nashua | NH | Lands' End, Inc. | 7,573 | 2014 | 1/31/2019 |
| 1317 | El Paso | TX | Celina Development Company | 3,856 | 1981 | 6/30/2020 |

67314844.3

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1333 | Poughkeepsie | NY | Lands' End, Inc. | 5,523 | 2014 | 1/31/2019 |
| 1335 | Greensboro | NC | Chick-Fil-A Inc. | 54,450 | 2001 | 1/31/2023 |
| 1335 | Greensboro | NC | Whole Foods Market Inc. | 34,364 | 2010 | 1/31/2028 |
| 1335 | Greensboro | NC | Lands' End, Inc. | 5,856 | 2014 | 1/31/2020 |
| 1368 | Concord | CA | Thomas A Morabito Trustee & Francis J Morabito, Trustee of the Morabito Family Trust Dated 4-14-88 | 18,000 | 1985 | 10/30/2061 |
| 1368 | Concord | CA | Sun Valley Associates | | 2005 | 10/19/2026 |
| 1368 | Concord | CA | Lands' End, Inc. | 9,947 | 2014 | 1/31/2019 |
| 1374 | Bel Air | MD | Macy's, Inc. | 24,599 | 2003 | 9/30/2021 |
| 1374 | Bel Air | MD | Lands' End, Inc. | 6,517 | 2014 | 1/31/2020 |
| 1375 | Winston Salem | NC | Land's End, Inc. | 10.406 | | 1/31/2020 |
| 1378 | Orange | CA | The Village at Orange, LLC | 28,600 | 1993 | 5/31/2024 |
| 1378 | Orange | CA | 24 Hour Fitness USA Inc. | 54,462 | 2011 | 2/29/2024 |
| 1378 | Orange | CA | Lutheran High School of Orange County | 100 Parking Spaces | 2012 | 6/30/2019 |
| 1404 | Massapequa | NY | Lands' End, Inc. | 6,997 | 2014 | 1/31/2020 |
| 1463 | Burlington | VT | Lands' End, Inc. | 7,315 | 2014 | 1/31/2020 |
| 1478 | San Bruno | CA | Lands' End, Inc. | 8,698 | 2014 | 1/31/2019 |
| 1494 | Moorestown | NJ | Lands' End, Inc. | 8,126 | 2014 | 1/31/2020 |
| 1644 | Lancaster | PA | Lands' End, Inc. | 8,635 | 2014 | 1/31/2020 |
| 1654 | Media | PA | Lands' End, Inc. | 8,919 | 2014 | 1/31/2020 |
| 1654 | Media | PA | Granite Run Buick GMC | | 2017 | 12/31/2018 |
| 1684 | Woodbridge | NJ | Cellco Partnership | 8,070 | 1987 | 7/31/2021 |

67314844.3

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1722 | Bloomington | MN | Lands' End, Inc. | 8,564 | 2014 | 1/31/2020 |
| 1725 | Annapolis | MD | Lands' End, Inc. | 8,588 | 2014 | 1/31/2019 |
| 1733 | Yonkers | NY | Lands' End, Inc. | 6,664 | 2014 | 1/31/2020 |
| 1754 | Gaithersburg | MD | Lands' End, Inc. | 8,839 | 2014 | 1/31/2020 |
| 1754 | Gaithersburg | MD | Sears Home Improvement Products, Inc. (Embedded) | 10,000 | | |
| 1810 | Cincinnati | OH | Lands' End, Inc. | 8,305 | 2014 | 1/31/2020 |
| 1834 | North Wales | PA | Lands' End, Inc. | 9,819 | 2014 | 1/31/2020 |
| 1984 | Buffalo/Hamburg | NY | Lands' End, Inc. | 8,118 | 2014 | 1/31/2019 |
| 2023 | Concord | NH | Lands' End, Inc. | 6,718 | 2014 | 1/31/2019 |
| 2027 | Wasilla | AK | Lands' End, Inc. | 7,063 | 2014 | 1/31/2019 |
| 2049 | Everett | WA | Brixton Everett, LLC | | 2008 | 12/31/2018 |
| 2049 | Everett | WA | Brixton Everett, LLC | | 2015 | 6/30/2019 |
| 2085 | Fajardo | PR | Sears, Roebuck de Puerto Rico, Inc. | 24,536 | 1986 | 9/30/2023 |
| 2373 | No Dartmouth | MA | Lands' End, Inc. | 4,076 | 2014 | 1/31/2019 |
| 2395 | Manassas | VA | Lands' End, Inc. | 7,407 | 2014 | 6/14/2019 |
| 2435 | Charlottesville | VA | Lands' End, Inc. | 6,125 | 2014 | 1/31/2020 |
| 2694 | Fredericksburg | VA | Lands' End, Inc. | 5,347 | 2014 | 1/31/2020 |
| 3029 | Erlanger | KY | Sinkula Investments, Ltd. | 3,500 | 1984 | 10/31/2022 |
| 3029 | Erlanger | KY | EDGEWOOD PLAZA HOLDINGS, LLC | | | 11/30/2022 |
| 3040 | Hyannis | MA | The Paper Store, LLC | | 2017 | 3/31/2023 |
| 3074 | Miami | FL | Split rent for AmFoods | | 0 | 6/30/2022 |

49

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 3074 | Miami | FL | AmFoods LLLC | 2,430 | 1987 | 6/30/2022 |
| 3127 | Temple City | CA | H. Demirjian, Inc. | 5,151 | 2014 | 11/30/2022 |
| 3136 | Shillington | PA | Amelia's LLC | | 2013 | 7/31/2019 |
| 3172 | Hagerstown | MD | Fazou's Restaurant | 3,246 | 2000 | 9/30/2019 |
| 3235 | West Covina | CA | Sears Outlet Stores, LLC | 17,310 | 2012 | 4/20/2022 |
| 3235 | West Covina | CA | Filza Khan | 3,400 | 2015 | 3/31/2022 |
| 3286 | Brunswick | OH | GREF II REIT,LLC | | 0 | 12/31/2019 |
| 3286 | Brunswick | OH | Jud's Best Discount Muffler & Brake, Inc. | 3,035 | 2010 | 3/30/2020 |
| 3379 | Waterford | MI | Lou Dallo | 3,701 | 2008 | 2/28/2021 |
| 3412 | Salinas | CA | Rexfor Title, Inc. | | 2013 | 1/31/2034 |
| 3471 | Chesapeake | VA | Sears Outlet Stores, LLC | 33,137 | 2012 | 10/31/2020 |
| 3499 | Kearny | NJ | Modell's NJ II., Inc. | | 2013 | 4/30/2021 |
| 3725 | Watsonville/Freedom | CA | Dora M. Espindola (DBA "Designing Cut") | 1,050 | 1994 | 6/30/2018 |
| 3725 | Watsonville/Freedom | CA | Advance America, Cash Advance Centers of California LLC | 1,400 | 1998 | 1/31/2021 |
| 3725 | Watsonville/Freedom | CA | Foodmaker, Inc. (DBA "Jack in the Box") | 2,800 | 1998 | 7/30/2019 |
| 3725 | Watsonville/Freedom | CA | Louis Hong D.D.S (DBA "Freedom Dental") | 1,750 | 2000 | 7/31/2020 |
| 3725 | Watsonville/Freedom | CA | Richard E. Turner and Joanne K. Turner (DBA "The 99 Cent Store") | 2,800 | 2007 | 10/31/2018 |
| 3725 | Watsonville/Freedom | CA | Tina Dang (DBA "D&L Nails") | 1,366 | 2007 | 1/31/2021 |

50

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 3725 | Watsonville/Freedom | CA | Hein Thuy le and Hoa Le (DBA "Whispering Pines Dry Cleaners") | 1,200 | 2014 | 2/28/2019 |
| 3725 | Watsonville/Freedom | CA | Split rent for The 99 Cent Store | | | 10/31/2018 |
| 3748 | Hollister | CA | Crystal TV, Inc. / Radio Shack Licensed Dealer | 2,300 | 2007 | 3/31/2020 |
| 3748 | Hollister | CA | VIP Wireless, Inc., MetroPCS Authorized Dealer | 2,800 | 2016 | 10/21/2020 |
| 3785 | Tabb | VA | Chick-Fil-A Inc. | 54,860 | 2000 | 3/31/2021 |
| 3785 | Tabb | VA | Kroger Limited Partnership I | 92,348 | 2014 | 9/30/2033 |
| 3785 | Tabb | VA | Kroger Limited Partnership I | 37,268 | 2014 | 9/30/2033 |
| 3785 | Tabb | VA | Restaurant Property Investors II LLC c/o Burger Busters Inc. (DBA "Taco Bell") | 38,768 | 2015 | 9/30/2033 |
| 4022 | Grand Forks | ND | Hometown Automotive Repair LLC | 4,620 | 2010 | 8/31/2019 |
| 4057 | Fargo | ND | NDM Restaurants (DBA "Burger King") | 5,000 | 1976 | 6/30/2018 |
| 4057 | Fargo | ND | Dakota Tire Service, Inc | 4,000 | 2004 | 3/31/2019 |
| 4113 | Erie | PA | Erie Physicians Network ~ UPMC, Inc | 7,760 | 2008 | 11/30/2020 |
| 4170 | Rapid City | SD | MTS Enterprises LLC (DBA "Tiretech") | 2,914 | 2010 | 2/28/2019 |
| 4214 | Des Plaines | IL | (DBA "Eddies Restaurant CO") | 3,205 | 1988 | 7/31/2022 |
| 4214 | Des Plaines | IL | The Twins Group, Inc. (DBA "Taco Bell") | | 1988 | 10/31/2018 |
| 4214 | Des Plaines | IL | (DBA "Quick Service Auto") | 4,192 | 2008 | 11/30/2022 |
| 4214 | Des Plaines | IL | Split rent w/ ML for Eddie's Restaurant | | | 7/31/2022 |

51

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| | | | Co.- Lasalle Bank Na Trust #54625 D | | | |
| 4272 | Bismarck | ND | McDonalds Corp. | 5,000 | 1984 | 8/20/2020 |
| 4272 | Bismarck | ND | Split rent for Mc Donald's | | | 10/31/2019 |
| 4351 | Rochester | MN | Salvation Army | 20,000 | 2004 | 11/30/2020 |
| 4381 | Bridgeview | IL | Sears Outlet Stores, LLC | 11,576 | 2012 | 1/31/2021 |
| 4389 | Mc Allen | TX | Big Lots Stores Inc #01544B | 22,755 | 2000 | 11/30/2019 |
| 4399 | Silver Springs | MD | DavCo Food, Inc. (DBA "Wendy's") | 2,453 | 1990 | 10/31/2018 |
| 4421 | North Hollywood | CA | Successor in interest to Pic N Save (DBA "Big Lots Stores Inc.") | 20,000 | 1970 | 3/31/2021 |
| 4421 | North Hollywood | CA | Paul Jardin of USA, Inc. (DBA "3 Day Suit Broker") | 11,000 | 1986 | 3/30/2021 |
| 4478 | Trenton/Hamilton | NJ | Brixmor Operating Partnership | | | 6/30/2020 |
| 4494 | Trujillo Alto | PR | RD Management Corporation | 4,100 | 1985 | 5/31/2024 |
| 7030 | Kalispell | MT | Burger King Corporation | 4,000 | 1999 | 5/5/2020 |
| 7030 | Kalispell | MT | Split Rent for Burger King Sublease | | 1999 | 5/5/2020 |
| 7030 | Kalispell | MT | Evergreen Chamber of Commerce | | 2013 | 7/31/2019 |
| 7033 | Lewiston | ID | Split rent for Wendy's outlot | | 0 | 2/28/2015 |
| 7033 | Lewiston | ID | Dale F. Nagy/Picadilly Investment Properties (DBA "Wendy's") | 3,000 | 1984 | 2/28/2015 |
| 7042 | Valparaiso | IN | BR Associates Inc (DBA "Long John Silver Seafood Shoppes") | 35,875 | 1977 | 12/31/2018 |
| 7783 | San Juan (Hato Rey) | PR | Marketing & Printing Solutions, Inc. | 695 | 2010 | 11/30/2018 |

52

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 7979 | Jacksonville | FL | Sears Outlet Stores, LLC | 14,932 | | 12/31/2022 |
| 7979 | Jacksonville | FL | Sears Home Improvement Products | 270 | | |
| 8206 | Nashville | TN | Sears Outlet Stores, LLC | 70,227 | 2012 | 12/31/2022 |
| 8262 | Naperville | IL | Dart Warehouse Corporation | | 2011 | 12/31/2020 |
| 8273 | Lawrence | KS | (DBA "Berry Plastics Corporation") | 100 Parking Spaces | 2013 | 10/15/2018 |
| 8724 | Pittsburgh | PA | Sears Outlet Stores, LLC | 44,215 | 2012 | 12/31/2022 |
| 8744 | Allentown | PA | Fedex Ground Package System Inc | 50 Trailers | 2015 | 1/31/2019 |
| 8768 | Sacramento | CA | Sears Outlet Stores, LLC | 43,063 | 2012 | 12/31/2018 |
| 8818 | Pearl City | HI | Bethany Korean United Methodist Church | 9,096 | 2011 | 4/30/2021 |
| 8818 | Pearl City | HI | Sears Outlet Stores, LLC | 28,978 | 2012 | 12/31/2022 |
| 8937 | Tucson | AZ | Sims Recycling Solutions Inc. | 6,000 | 2012 | 12/31/2020 |
| 9413 | West Orange | NJ | Dollar Tree Stores, Inc. #3811 | 10,280 | 1981 | 1/31/2022 |
| 9413 | West Orange | NJ | Eyeglass Service Industries, Inc. | 800 | 1981 | 10/31/2014 |
| 9413 | West Orange | NJ | Staples, Inc. #0168 | 19,740 | 1988 | 2/28/2017 |
| 9420 | Bronx | NY | David's Check Cashing, Inc. | 722 | 2008 | 11/20/2018 |
| 9420 | Bronx | NY | G-Maxx Home of Bruckner, LLC | 5,138 | 2009 | 10/31/2014 |
| 9420 | Bronx | NY | Sears, Roebuck and Co. | 2,736 | 2018 | 11/30/2023 |
| 9420 | Bronx | NY | Burlington Coat Factory of California LLC | | 2018 | |
| 9423 | Bridgehampton | NY | Lands' End, Inc. | | 2014 | 1/31/2016 |
| 9693 | Marine City | MI | Frank Koehldorfer (DBA "Marine City Auto Care") | 3,216 | 2010 | 2/28/2019 |

53

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1280 | Springdale | OH | Tri-County Mall LLC | 4,316 | | 7/31/2024 |
| 2138 | Santa Barbara | CA | Sprint PCS Assets, LLC | | | 6/30/2019 |
| 3018 | Valencia | CA | Magic Auto Center | 4,406 | | 3/30/2022 |
| 3018 | Valencia | CA | McDonalds Corp L/C 004-1368 | 5,000 | | 5/31/2022 |
| 3018 | Valencia | CA | Simply Discount Furniture | 79,699 | | 5/31/2022 |
| 3116 | Wilmington (Store Closing) | NC | Jack A. Sneeden Corporation | 5,604 | | 6/30/2023 |
| 3239 | Kansas City | MO | Zeller Auto Repair | 4,201 | | 8/31/2020 |
| 3239 | Kansas City | MO | Advance America | 1,480 | | 1/31/2020 |
| 3239 | Kansas City | MO | Barbers Plus | 1,600 | | 12/31/2018* |
| 3239 | Kansas City | MO | H & R Block | 2,400 | | 4/30/2019 |
| 3239 | Kansas City | MO | Big Bowl Pho | 2,400 | | 4/30/2022 |
| 3239 | Kansas City | MO | Papa John's | 2,000 | | 6/30/2021 |
| 3239 | Kansas City | MO | Tasty Thai | 2,000 | | 3/31/2020 |
| 3361 | Allentown | PA | Floreff LLC & Nathan & Alison LLC | | | 5/31/2023 |
| 3371 | Chicago | IL | AGC Addison Owner, LLC | | | 4/1/2019 |
| 3447 | Clive | IA | At Home Stores, LLC | 90,000 | | 1/31/2021 |
| 3483 | Ontario | CA | Wolf Family Series LP | 11,000 | | 5/31/2020 |
| 3793 | Miami | FL | Goodwill | 208 | | 9/30/2019 |
| 4064 | N Versailles | PA | Burger King Corporation | 2,750 | | 11/24/2020 |
| 4215 | Kansas City | KS | Xiao Jun Song and Liu Y Lin | 11,408 | | 1/31/2019 |
| 4433 | Quincy | IL | Gengenbacher Ice Shack | | | 10/31/2018* |
| 4450 | Raleigh | NC | Choice Auto Repair | 4,581 | | 9/30/2021 |

54

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 4450 | Raleigh | NC | Grand Slam USA | 20,000 | | 9/30/2021 |
| 4455 | Beaverton | OR | Glowing Greens, LLC | 20,000 | | 7/31/2018 |
| 4455 | Beaverton | OR | Beaverton Mart Company | | | 8/31/2022 |
| 4455 | Beaverton | OR | Carr Auto Group | | | 4/30/2019 |
| 7067 | Ft. Meyers | FL | Floor & Decor | 75,200 | | 8/31/2026 |
| 7259 | Williamsburg | VA | New Oriental Crafts, LLC | 3,200 | | 10/31/2019 |
| 7259 | Williamsburg | VA | H & R Block | 1,600 | | 4/30/2019 |
| 7259 | Williamsburg | VA | International Styles | 1,200 | | 9/30/2019 |
| 7259 | Williamsburg | VA | New Oriental Crafts, LLC | 2,000 | | 10/31/2019 |
| 7259 | Williamsburg | VA | Tu Tienda and Gifts | 5,160 | | 8/30/2019 |
| 7259 | Williamsburg | VA | Williamsburg Peking Corp | 9,560 | | 9/30/2019 |
| 7274 | Mauldin | SC | Mauldin at Butler, LLC (Hughes Development) | | | 3/31/2019 |
| 7324 | O'Fallon | MO | At Home Stores, LLC | 87,314 | | 11/29/2020 |
| 8065 | Miami | FL | Miami Hotel Enterprise LLC | 50 Parking Spaces | | 11/14/2019 |
| 8065 | Miami | FL | Sears Home Improvement Products, Inc. (Embedded) | 1,000 | | |
| 8398 | San Jose | CA | Beacon Sales Acquisition, Inc. | 37,500 | | 10/31/2023 |
| 9348 | Norridge | IL | Darden/Longhorn Steakhouse | | | 3/31/2021 |
| 9354 | Griffin | IN | El Centro Mall, Ltd. | | | |
| 30936 | Tinley Park | IL | Bettenhausen Automotive | 250 Parking Spaces | | 8/6/2018* |
| 30936 | Tinley Park | IL | Ziegler Nissan of Orland Park | 250 Parking | | 3/20/2019 |

55

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| | | | | Spaces | | |
| 30938 | Glendale | AZ | Living Spaces | 126,164 | | 4/30/2024 |
| 30961 | Greensboro | NC | National Distribution Centers, LLC | Parking Lot | | 1/31/2022 |
| 30969 | San Leandro | CA | Living Spaces | 91,905 | | 11/30/2022 |
| 31882 | San Diego | CA | Lucky Star Seafood Restaurant | 11,000 | | 4/30/2019 |
| 31882 | San Diego | CA | Northgate Gonzalez Markets | 41,371 | | 7/31/2023 |
| 31882 | San Diego | CA | Burlington Coat Factory | 63,900 | | 2/28/2025 |
| 61901 | Scottsdale | AZ | Living Spaces Furniture, LLC | 133,120 | | 9/30/2024 |
| 62529 | San Diego | CA | Zion Market San Diego Inc. | 94,500 | | 12/31/2023 |
| 62707 | Springfield | MO | David's Bridal Inc | 12,370 | | 1/31/2019 |

67314844.3

## **EXHIBIT B**

**SCHEDULE 9.2: SECURITIES CONSIDERATION**

*Attached.*

## Schedule 9.2:  Securities Consideration

1. The Securities Consideration shall comprise 3,000 Class B Preferred Units of Newco, with an aggregate liquidation preference of $300,000 and otherwise subject to the terms and conditions set forth in the Amended and Restated Limited Liability Company Operating Agreement of Newco as in effect on the Closing Date and as may be amended from time to time thereafter.

2. The Securities Consideration delivered to the Sellers pursuant to Section 3.3 of the Agreement shall be allocated among the Sellers that are Debtors in accordance with the Allocation Schedule. The Allocation Schedule shall identify the amount of cash, Securities Consideration (including any fractional units) and credit bid debt that is allocable to each transfer of Acquired Assets contemplated by the Agreement (a "Transfer").

3. As soon as practicable after the Closing, each Seller other than SHC shall distribute the Securities Consideration received by it (whether directly in respect of a Transfer by it or pursuant to the Distribution Requirement from a direct or indirect subsidiary) to its equityholder(s) pursuant to the Distribution Requirement, subject to item 5 below.

4. As soon as practicable thereafter (and effective as of the Closing Date), SHC shall distribute the aggregate Securities Consideration received by it (whether directly in respect of a Transfer by it or pursuant to the Distribution Requirement from a direct or indirect subsidiary) ratably to holders of Senior Second Lien Obligations pursuant to the Amended and Restated Security Agreement, dated as of March 20, 2018, among SHC and certain of its Subsidiaries, as Grantors, and Wilmington Trust, National Association, as Collateral Agent, with any fractional preferred units otherwise determined for any single holder being rounded up or down to the nearest whole unit, subject to (x) item 5 below and (y) with respect to each holder, receipt of evidence reasonably satisfactory to SHC of an exemption under applicable securities Laws for the transfer of the applicable pro rata portion of the Securities Consideration to such holder.

5. In the case of any Transfer that is deferred until after the Closing, the Securities Consideration relating thereto shall be delivered pursuant to item 2 at the time of such Transfer and distributed pursuant to items 3 and 4 above as soon as practicable after such Transfer.

6. For tax purposes, all Transfers that are intended to constitute "G reorganizations" shall be deemed to take place simultaneously.  The Distribution Requirement shall be satisfied sequentially, starting with the lowest-tier Seller and moving up the chain of Sellers.

# EXHIBIT C

## EXHIBIT G: CREDIT BID RELEASE EXHIBIT

*Attached.*

### Exhibit G
### ESL's Allowed Claims Against the Debtors

| Loan Facility | Allowed Amount Owed to ESL (as Defined in the Asset Purchase Agreement) Amounts as of October 15, 2018[1] |
|---|---|
| IP/Ground Lease Term Loan Facility | $186,189,719.91[2] |
| FILO Facility | $70,539,333.24 |
| Real Estate Loan 2020 | $726,483,196.21 |
| Second Lien Term Loan | $318,481,532.89 |
| Second Lien Line of Credit Facility | $507,072,878.33 |
| Second Lien PIK Notes | $21,346,945.00 |
| Citi L/C Facility | $108,410,464.44 |

---

[1] Amounts owed to ESL as to each claim listed are not less than the amounts set forth herein and may include additional claims for post-petition interest and all reasonable out-of-pocket expenses, including legal fees incurred by ESL by reason of the enforcement and protection of its rights in accordance with the applicable loan terms, plus any contingent and/or unliquidated claims not presently ascertainable.  In the event that the Buyer or its affiliates purchase any additional obligations outstanding under any of the debt facilities listed in this Exhibit G prior to the Closing, the allowed amount in the right hand column shall be increased by the amount of the additional purchased debt obligations.

[2] On January 3, 2019, ESL purchased $31,887,343 of obligations outstanding under the IP/ Ground Lease Term Loan Facility, which amount is included in the total of amount of ESL's allowed claim on this Exhibit G

# **EXHIBIT D**

## **ANNEX 3: PATENTS**

*Attached.*

| Country | Application Number | Application Date | Patent Number | Grant Date | Owner | Title |
|---|---|---|---|---|---|---|
| United States | 13/926383 | 06/25/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR SCAN, TRY AND BUY |
| United States | 14/620311 | 02/12/2015 | 10148502 | 12/04/2018 | SEARS BRANDS, L.L.C. | SYSTEM, APPARATUS, AND MEDIA FOR CHANGING STATE OF AN INTERNET OF THINGS (IOT) DEVICE |
| United States | 14/943192 | 11/17/2015 | 10161646 | 12/25/2018 | SEARS BRANDS, L.L.C. | SENSOR FOR DETECTING PRESENSE, OCCUPANCY, AND/OR MOTION AND RELATED SYSTEMS AND METHODS |
| United States | 15/236077 | 08/12/2016 | 10178093 | 01/08/2019 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR ONLINE FRAUD DETECTION |
| United States | 15/293273 | 10/13/2016 | | | SEARS BRANDS, L.L.C. | SMART HOME DELIVERY SERVICES |
| United States | 15/295822 | 10/17/2016 | 10181255 | 01/15/2019 | SEARS BRANDS, L.L.C. | BROADCASE MODE FOR NON-PAIRED DEVICES AND CRITICAL MESSAGES |
| United States | 15/652781 | 07/18/2017 | | | SEARS BRANDS, L.L.C. | OBJECT DRIVEN NEWSFEED |
| United States | 09/943095 | 08/30/2001 | 6519874 | 02/18/2003 | SEARS BRANDS, L.L.C. | SHOCK ABSORBENT FOOTWEAR ASSEMBLY |
| United States | 09/636181 | 08/10/2000 | 6523840 | 02/25/2003 | SEARS BRANDS, L.L.C. | COMBINED SHOPPING CART/STROLLER |
| United States | 09/894157 | 06/27/2001 | 6543601 | 04/08/2003 | SEARS BRANDS, L.L.C. | UNLOADING APPARATUS |
| United States | 09/750529 | 12/28/2000 | 6557285 | 05/06/2003 | SEARS BRANDS, L.L.C. | HANGING SIGN AND SUPPORT |
| United States | 09/833329 | 04/12/2001 | 6677689 | 01/13/2004 | SEARS BRANDS, L.L.C. | STORE FIXTURE POWER DISTRIBUTION SYSTEM |
| United States | 10/340024 | 01/10/2003 | 6679506 | 01/20/2004 | SEARS BRANDS, L.L.C. | COMBINED SHOPPING CART/STROLLER |
| United States | 09/833316 | 04/12/2001 | 6698597 | 03/02/2004 | SEARS BRANDS, L.L.C. | VERTICAL MERCHANDISE DISPLAY UNIT |
| United States | 10/155977 | 05/28/2002 | 6708874 | 03/23/2004 | SEARS BRANDS, L.L.C. | CARTON WITH FINGER HOLES |
| United States | 10/350656 | 01/24/2003 | 6725599 | 04/27/2004 | SEARS BRANDS, L.L.C. | UNLOADING APPARATUS |
| United States | 09/713868 | 11/16/2000 | 6980969 | 12/27/2005 | SEARS BRANDS, L.L.C. | METHOD AND APPARATUS FOR ALLOWING INTERNET BASED PURCHASES BASED ON TEMPORARY CREDIT CARD NUMBER |
| United States | 10/278343 | 10/23/2002 | 7072884 | 07/04/2006 | SEARS BRANDS, L.L.C. | COMPUTER SYSTEM AND METHOD OF DISPLAYING PRODUCT SEARCH RESULTS |
| United States | 10/877131 | 06/25/2004 | 7152343 | 12/26/2006 | SEARS BRANDS, L.L.C. | FOOTWEAR SYSTEM |
| United States | 10/462240 | 06/16/2003 | 7334852 | 02/26/2008 | SEARS BRANDS, L.L.C. | MULTIPLE CONFIGURATION SHELVING SYSTEM FOR DISPLAYING AUDIO VISUAL COMPONENTS |
| United States | 12/038315 | 02/27/2008 | 7963441 | 06/21/2011 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PROVIDING SELF SERVICE CHECKOUT AND PRODUCT DELIVERY USING A MOBILE DEVICE |
| United States | 12/539219 | 08/11/2009 | 8015068 | 09/06/2011 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR MANAGING ORDERS MADE VIA A COMPUTER NETWORK |
| United States | 11/809825 | 06/01/2007 | 8033034 | 10/11/2011 | SEARS BRANDS, L.L.C. | SHOE WITH DETACHABLE AND FLEXIBLE HEEL STRAP |
| United States | 12/360879 | 01/28/2009 | 8146268 | 04/03/2012 | SEARS BRANDS, L.L.C. | SHOE HAVING AN AIR CUSHIONING SYSTEM |
| United States | 12/500924 | 07/10/2009 | 8215500 | 07/10/2012 | SEARS BRANDS, L.L.C. | HANGING DEVICE FOR RESEALABLE STORAGE BAGS |
| United States | 13/194406 | 07/29/2011 | 8301504 | 10/30/2012 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR MANAGING ORDERS MADE VIA A COMPUTER NETWORK |
| United States | 12/175298 | 07/17/2008 | 8417552 | 04/09/2013 | SEARS BRANDS, L.L.C. | ELECTRONIC SELECT PROVIDER NETWORK |
| United States | 12/268103 | 11/10/2008 | 8438070 | 05/07/2013 | SEARS BRANDS, L.L.C. | EXCHANGING VALUE BETWEEN A SERVICE BUYER AND A SERVICE PROVIDER |
| United States | 13/191918 | 07/27/2011 | 8566167 | 10/22/2013 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING DATA POINTS COLLECTED FROM A CUSTOMER TO PROVIDE CUSTOMER SPECIFIC OFFERINGS |
| United States | 13/086903 | 04/14/2011 | 8590786 | 11/26/2013 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING A MOBILE DEVICE TO LOCATE A FOLLOWED ITEM IN A RETAIL STORE |
| United States | 13/298762 | 11/17/2011 | 8626348 | 01/07/2014 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR COMMUNITY ENERGY MANAGEMENT |
| United States | 12/476370 | 06/02/2009 | 8651374 | 02/18/2014 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PAYMENT CARD INDUSTRY ENTERPRISE ACCOUNT NUMBER ELIMINATION |
| United States | 13/004331 | 01/11/2011 | 8676660 | 03/18/2014 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PROVIDING A STREAMLINED CHECKOUT PROCESS |
| United States | 13/889023 | 05/07/2013 | 8744921 | 06/03/2014 | SEARS BRANDS, L.L.C. | EXCHANGING VALUE BETWEEN A SERVICE BUYER AND A SERVICE PROVIDER |
| United States | 12/850722 | 08/05/2010 | 8789750 | 07/29/2014 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING A MOBILE DEVICE TO FOLLOW A PRICE FOR AN ITEM |
| United States | 12/180247 | 07/25/2008 | 8813398 | 08/26/2014 | SEARS BRANDS, L.L.C. | THREE-DIMENSION GIFT CARD ASSEMBLY |
| United States | 12/962947 | 12/08/2010 | 8818876 | 08/26/2014 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR FACILITATING THE PURCHASE OF PRODUCTS DETERMINED TO BE USEFUL IN THE PERFORMANCE OF A TASK |
| United States | 12/579913 | 10/15/2009 | 8863409 | 10/21/2014 | SEARS BRANDS, L.L.C. | SHOE HAVING AN AIR CUSHIONING BED |
| United States | 13/494758 | 06/12/2012 | 8930134 | 01/06/2015 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR HIGH-PRECISION INDOOR POSITIONING, NAVIGATION AND SHOPPING BEHAVIOR PROFILING |
| United States | 13/584540 | 08/13/2012 | 9037559 | 05/19/2015 | SEARS BRANDS, L.L.C. | FILE SYSTEM QUEUE |
| United States | 13/756206 | 01/31/2013 | 9047631 | 06/02/2015 | SEARS BRANDS, L.L.C. | CUSTOMER ASSISTANCE PLATFORM |
| United States | 13/589689 | 08/20/2012 | 9058367 | 06/16/2015 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR STAGING AND PROPAGATING DATA |
| United States | 12/645639 | 12/23/2009 | 9141989 | 09/22/2015 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR USING A SOCIAL NETWORK TO PROVIDE PRODUCT RELATED INFORMATION |
| United States | 13/273459 | 10/14/2011 | 9143896 | 09/22/2015 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING A DISTRIBUTED MOBILE CALL CENTER FOR A SERVICE ESTABLISHMENT |
| United States | 13/545243 | 07/10/2012 | 9256472 | 02/09/2016 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR ECONOMICAL MIGRATION OF LEGACY APPLICATIONS FROM MAINFRAME AND DISTRIBUTED PLATFORMS |
| United States | 14/183123 | 02/18/2014 | 9256872 | 02/09/2016 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PAYMENT CARD INDUSTRY ENTERPRISE ACCOUNT NUMBER ELIMINATION |
| United States | 13/442501 | 04/09/2012 | 9256902 | 02/09/2016 | SEARS BRANDS, L.L.C. | NON-TRANSITORY COMPUTER-READABLE MEDIA FOR PRESENTING PRODUCT RECOMMENDATIONS |
| United States | 14/039955 | 09/27/2013 | 9294554 | 03/22/2016 | SEARS BRANDS, L.L.C. | INTEGRATED EXPERIENCE FOR APPLICATIONS WITHIN A MOBILE APPLICATION |
| United States | 13/826128 | 03/14/2013 | 9330413 | 05/03/2016 | SEARS BRANDS, L.L.C. | CHECKOUT AND/OR ORDERING SYSTEMS AND METHODS |
| United States | 12/718376 | 03/05/2010 | 9361637 | 06/07/2016 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PROVIDING DIAGNOSTIC SERVICES |
| United States | 13/971431 | 08/20/2013 | 9390459 | 07/12/2016 | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR USER BASED ROUTING |
| United States | 14/663805 | 03/20/2015 | 9443262 | 09/13/2016 | SEARS BRANDS, L.L.C. | MERCHANDISE RESERVATION SYSTEM, APPARATUS, AND MEDIA |
| United States | 13/364441 | 02/02/2012 | 9451576 | 09/20/2016 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING LOCATION BASED ASSISTANCE VIA A MOBILE DEVICE |
| United States | 12/622803 | 11/20/2009 | 9460422 | 10/04/2016 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR MANAGING TO-DO LIST TASK ITEMS TO AUTOMATICALLY SUGGEST AND ADD PURCHASING ITEMS VIA A COMPUTER NETWORK |
| United States | 14/476935 | 09/04/2014 | 9558503 | 01/31/2017 | SEARS BRANDS, L.L.C. | MATCHING MOBILE DEVICE TO TRANSACTION AND/OR CUSTOMER ACCOUNT |
| United States | 12/886060 | 09/20/2010 | 9576323 | 02/21/2017 | SEARS BRANDS, L.L.C. | SYSTEM FOR FACILITATING MULTI-CHANNEL PURCHASE OF FSA ELIGIBLE ITEMS |
| United States | 13/523050 | 06/14/2012 | 9672559 | 06/06/2017 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR A DIGITAL INTERFACE FOR DISPLAYING RETAIL SEARCH RESULTS |
| United States | 13/494426 | 06/12/2012 | 9704166 | 07/11/2017 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING CUSTOM ERROR PAGES FOR RETAIL APPLICATIONS |
| United States | 13/886065 | 05/02/2013 | 9710844 | 07/18/2017 | SEARS BRANDS, L.L.C. | OBJECT DRIVEN NEWSFEED |
| United States | 13/757485 | 02/01/2013 | 9799057 | 10/24/2017 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR CREATING AND MANAGING MARKETING APPLICATIONS, EVENTS, PROMOTIONS, AND PUBLICATIONS |
| United States | 15/177570 | 06/09/2016 | 9811853 | 11/07/2017 | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR USER BASED ROUTING |
| United States | 14/330894 | 07/14/2014 | 9898771 | 02/20/2018 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR FACILITATING THE PURCHASE OF PRODUCTS DETERMINED TO BE USEFUL IN THE PERFORMANCE OF A TASK |
| United States | 13/547910 | 07/12/2012 | 9959567 | 05/01/2018 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS OF TARGETED INTERACTIONS FOR INTEGRATED RETAIL APPLICATIONS |

| | | | | | |
|---|---|---|---|---|---|
| United States | 13/248155 | 09/29/2011 | 9971388 | 05/15/2018 | SEARS BRANDS, L.L.C. | ENERGY MANAGEMENT UNIT WITH DIAGNOSTIC CAPABILITIES |
| United States | 14/206913 | 03/12/2014 | 9972042 | 05/15/2018 | SEARS BRANDS, L.L.C. | RECOMMENDATIONS BASED ON EXPLICIT USER SIMILARITY |
| United States | 13/483959 | 05/30/2012 | 9978048 | 05/22/2018 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR CONNECTED SALES ASSOCIATE SERVICES |
| United States | 15/084001 | 03/29/2016 | 9996889 | 06/12/2018 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING PERSONAL SHOPPING SERVICES |
| United States | 15/175740 | 06/07/2016 | 10064062 | 08/28/2018 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR AUTOMATICALLY AND SECURELY REGISTERING AN INTERNET OF THINGS DEVICE |
| United States | 14/705570 | 05/06/2015 | 10089588 | 10/02/2018 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD SUPPORTING ONGOING WORKER FEEDBACK |
| United States | 14/933243 | 11/05/2015 | 10107709 | 10/23/2018 | SEARS BRANDS, L.L.C. | WATER SENSORS WITH MULTI-VALUE OUTPUTS AND ASSOCIATED SYSTEMS AND METHODS |
| United States | 14/966701 | 12/11/2015 | 10127590 | 11/13/2018 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS SUPPORTING ONLINE SHOPPING AS A SHARED AND SOCIAL ACTIVITY |
| United States | 14/087601 | 11/22/2013 | 10135749 | 11/20/2018 | SEARS BRANDS, L.L.C. | MAINFRAME MIGRATION TOOLS |
| United States | 15/077792 | 03/22/2016 | 10135912 | 11/20/2018 | SEARS BRANDS, L.L.C. | INTEGRATED EXPERIENCE FOR APPLICATIONS WITHIN A MOBILE APPLICATION |
| United States | 29/147600 | 08/31/2001 | D494346 | 08/17/2004 | SEARS BRANDS, L.L.C. | PATTERN ON A SHOE SOLE |
| United States | 29/209636 | 07/19/2004 | D509654 | 09/20/2005 | SEARS BRANDS, L.L.C. | CARD HOLDER |
| United States | 29/209221 | 07/12/2004 | D563086 | 03/04/2008 | SEARS BRANDS, L.L.C. | TREAD PATTERN |
| United States | 29/280236 | 05/22/2007 | D571089 | 06/17/2008 | SEARS BRANDS, L.L.C. | FOOTWEAR OUTSOLE |
| United States | 29/288177 | 06/01/2007 | D584032 | 01/06/2009 | SEARS BRANDS, L.L.C. | SHOE UPPER WITH DETACHABLE AND FLEXIBLE HEEL STRAP |
| United States | 29/296842 | 10/30/2007 | D597748 | 08/11/2009 | SEARS BRANDS, L.L.C. | GARMENT HANGER |
| United States | 29/337956 | 06/02/2009 | D619603 | 07/13/2010 | SEARS BRANDS, L.L.C. | COMPUTER USER INTERFACE FOR A DISPLAY SCREEN |
| United States | 29/337957 | 06/02/2009 | D619604 | 07/13/2010 | SEARS BRANDS, L.L.C. | COMPUTER USER INTERFACE FOR A DISPLAY SCREEN |
| United States | 29/337959 | 06/02/2009 | D619605 | 07/13/2010 | SEARS BRANDS, L.L.C. | COMPUTER USER INTERFACE FOR A DISPLAY SCREEN |
| United States | 29/337960 | 06/02/2009 | D619606 | 07/13/2010 | SEARS BRANDS, L.L.C. | COMPUTER USER INTERFACE FOR A DISPLAY SCREEN |
| United States | 29/337964 | 06/02/2009 | D619607 | 07/13/2010 | SEARS BRANDS, L.L.C. | COMPUTER USER INTERFACE FOR A DISPLAY SCREEN |
| United States | 29/337962 | 06/02/2009 | D620021 | 07/20/2010 | SEARS BRANDS, L.L.C. | COMPUTER USER INTERFACE FOR A DISPLAY SCREEN |
| United States | 29/357461 | 03/12/2010 | D633570 | 03/01/2011 | SEARS BRANDS, L.L.C. | IN-STORE DISPLAY SIGN |
| United States | 29/358023 | 03/22/2010 | D644649 | 09/06/2011 | SEARS BRANDS, L.L.C. | USER INTERFACE FOR A SCHEDULER |
| United States | 29/344266 | 09/25/2009 | D669087 | 10/16/2012 | SEARS BRANDS, L.L.C. | COMPUTER DISPLAY SCREEN PORTION WITH GRAPHICAL USER INTERFACE FOR MANAGING A COMPUTER-SUPPORTED TO-DO-LIST |
| United States | 29/423926 | 06/06/2012 | D681325 | 05/07/2013 | SEARS BRANDS, L.L.C. | HOLSTER FOR A MOBILE DEVICE |
| United States | 29/417672 | 04/06/2012 | D698136 | 01/28/2014 | SEARS BRANDS, L.L.C. | SHOE SOLE INSERT |
| United States | 29/417677 | 04/06/2012 | D717033 | 11/11/2014 | SEARS BRANDS, L.L.C. | SHOE OUTSOLE AND INSERT |
| United States | 29/417680 | 04/06/2012 | D718921 | 12/09/2014 | SEARS BRANDS, L.L.C. | SHOE MIDSOLE AND INSERT |
| United States | 29/417673 | 04/06/2012 | D724296 | 03/17/2015 | SEARS BRANDS, L.L.C. | SHOE OUTSOLE |
| United States | 29/462243 | 07/31/2013 | D730399 | 05/26/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/453694 | 05/01/2013 | D731540 | 06/09/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462327 | 08/01/2013 | D731551 | 06/09/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462232 | 07/31/2013 | D731553 | 06/09/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462347 | 08/01/2013 | D733743 | 07/07/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH A SET OF ICONS |
| United States | 29/462352 | 08/01/2013 | D733749 | 07/07/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462241 | 07/31/2013 | D733755 | 07/07/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462325 | 08/01/2013 | D734345 | 07/14/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462343 | 08/01/2013 | D734767 | 07/21/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462344 | 08/01/2013 | D734777 | 07/21/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462345 | 08/01/2013 | D734778 | 07/21/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/453693 | 05/01/2013 | D736805 | 08/18/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462986 | 08/12/2013 | D737322 | 08/25/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/465600 | 08/29/2013 | D739436 | 09/22/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ANIMATED GRAPHICAL USER INTERFACE |
| United States | 29/464419 | 08/15/2013 | D739876 | 09/29/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/453690 | 05/01/2013 | D741883 | 10/27/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462329 | 08/01/2013 | D746298 | 12/29/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462334 | 08/01/2013 | D746299 | 12/29/2015 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462331 | 08/01/2013 | D746842 | 01/05/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462341 | 08/01/2013 | D746843 | 01/05/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462349 | 08/01/2013 | D748117 | 01/26/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462328 | 08/01/2013 | D750657 | 03/01/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/537079 | 08/21/2015 | D752642 | 03/29/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/537083 | 08/21/2015 | D753180 | 04/05/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462326 | 08/01/2013 | D755813 | 05/10/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462311 | 08/01/2013 | D758379 | 06/07/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 29/462308 | 08/01/2013 | D759035 | 06/14/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 29/462310 | 08/01/2013 | D759036 | 06/14/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 29/462324 | 08/01/2013 | D759037 | 06/14/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 29/462337 | 08/01/2013 | D759038 | 06/14/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 29/464418 | 08/15/2013 | D759112 | 06/14/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462296 | 08/01/2013 | D759715 | 06/21/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462303 | 08/01/2013 | D761848 | 07/19/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462306 | 08/01/2013 | D761849 | 07/19/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |

| United States | 29/462323 | 08/01/2013 | D761850 | 07/19/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
|---|---|---|---|---|---|---|
| United States | 29/462354 | 08/01/2013 | D761851 | 07/19/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462355 | 08/01/2013 | D761852 | 07/19/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462357 | 08/01/2013 | D761853 | 07/19/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462249 | 07/31/2013 | D762235 | 07/26/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH A SET OF ICONS |
| United States | 29/462351 | 08/01/2013 | D763313 | 08/09/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462333 | 08/01/2013 | D764537 | 08/23/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/462245 | 07/31/2013 | D764545 | 08/23/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/550609 | 01/05/2016 | D765123 | 08/30/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/462342 | 08/01/2013 | D771121 | 11/08/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/554484 | 02/11/2016 | D773516 | 12/06/2016 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554476 | 02/11/2016 | D789946 | 06/20/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554480 | 02/11/2016 | D789947 | 06/20/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554492 | 02/11/2016 | D789948 | 06/20/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554493 | 02/11/2016 | D789949 | 06/20/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/550612 | 01/05/2016 | D789961 | 06/20/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554483 | 02/11/2016 | D789984 | 06/20/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH TRANSITIONAL GRAPHICAL USER INTERFACE |
| United States | 29/554501 | 02/11/2016 | D790587 | 06/27/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH TRANSITIONAL GRAPHICAL USER INTERFACE |
| United States | 29/554470 | 02/11/2016 | D791168 | 07/04/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554489 | 02/11/2016 | D791169 | 07/04/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554494 | 02/11/2016 | D791170 | 07/04/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554503 | 02/11/2016 | D791171 | 07/04/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554459 | 02/11/2016 | D791180 | 07/04/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 29/554469 | 02/11/2016 | D791181 | 07/04/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 29/554481 | 02/11/2016 | D791816 | 07/11/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH TRANSITIONAL GRAPHICAL USER INTERFACE |
| United States | 29/554487 | 02/11/2016 | D791817 | 07/11/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH TRANSITIONAL GRAPHICAL USER INTERFACE |
| United States | 29/554497 | 02/11/2016 | D791818 | 07/11/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH TRANSITIONAL GRAPHICAL USER INTERFACE |
| United States | 29/554496 | 02/11/2016 | D792445 | 07/18/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH TRANSITIONAL GRAPHICAL USER INTERFACE |
| United States | 29/554500 | 02/11/2016 | D792446 | 07/18/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH TRANSITIONAL GRAPHICAL USER INTERFACE |
| United States | 29/462987 | 08/12/2013 | D792454 | 07/18/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH A SET OF ICONS |
| United States | 29/462305 | 08/01/2013 | D792461 | 07/18/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/554475 | 02/11/2016 | D793425 | 08/01/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554479 | 02/11/2016 | D793426 | 08/01/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554499 | 02/11/2016 | D793427 | 08/01/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554843 | 02/16/2016 | D795287 | 08/22/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/583673 | 11/08/2016 | D795924 | 08/29/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| United States | 29/554472 | 02/11/2016 | D797117 | 09/12/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 29/554463 | 02/11/2016 | D801388 | 10/31/2017 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 29/556548 | 03/01/2016 | D815122 | 04/10/2018 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| United States | 12/011106 | 01/23/2008 | | | SEARS BRANDS, L.L.C. | SOCIAL NETWORK SEARCHING WITH BREADCRUMBS |
| United States | 12/175250 | 07/17/2008 | | | SEARS BRANDS, L.L.C. | ESTABLISHING A BUYER/SERVICE PROVIDER RELATIONSHIP ELECTRONICALLY |
| United States | 12/175210 | 07/17/2008 | | | SEARS BRANDS, L.L.C. | PROFILING SERVICE PROVIDER COMPANIES & TECHNICIANS |
| United States | 11/875354 | 10/19/2007 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR MAKING THIRD PARTY PICKUP AVAILABLE TO RETAIL CUSTOMERS |
| United States | 13/086949 | 04/14/2011 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR HANDLING AN OFFER TO PURCHASE A FOLLOWED ITEM |
| United States | 12/261441 | 10/30/2008 | | | SEARS BRANDS, L.L.C. | GROUPING SERVICE ORDERS IN AN ELECTRONIC SERVICES MARKETPLACE |
| United States | 12/755702 | 04/07/2010 | | | SEARS BRANDS, L.L.C. | ONLINE SOCIAL NETWORKING SYSTEM FOR CONDUCTING COMMERCE |
| United States | 12/859625 | 08/19/2010 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING A MULTI-CHANNEL RETAIL LAYAWAY SERVICE |
| United States | 14/060327 | 10/22/2013 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING DATA POINTS COLLECTED FROM A CUSTOMER TO PROVIDE CUSTOMER SPECIFIC OFFERINGS |
| United States | 13/284162 | 10/28/2011 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING DATA POINTS COLLECTED FROM A CUSTOMER TO PROVIDE CUSTOMER SPECIFIC OFFERINGS |
| United States | 13/323037 | 12/12/2011 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DISTRIBUTING CUSTOMIZABLE AND SHAREABLE TIERED OFFERS |
| United States | 13/249588 | 09/30/2011 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PROVIDING LOCALIZED PRODUCT OFFERINGS PUBLICATIONS |
| United States | 13/248513 | 09/29/2011 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR MANAGING RETURNS OR EXCHANGES MADE VIA A COMPUTER NETWORK |
| United States | 13/486831 | 06/01/2012 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR CONNECTED SALES ASSOCIATE SERVICES |
| United States | 13/443613 | 04/10/2012 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING ONLINE GROUP SHOPPING SERVICES |
| United States | 13/668256 | 11/03/2012 | | | SEARS BRANDS, L.L.C. | GIFT REGISTRY |
| United States | 13/526013 | 06/18/2012 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR REPORTING ORGANIZATIONAL HIERARCHY |
| United States | 13/495228 | 06/13/2012 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DETERMINING OFFER ELIGIBILITY USING A PREDICATE LOGIC TREE AGAINST SETS OF INPUT DATA |
| United States | 13/664104 | 10/30/2012 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR EMERGENT DATA PROCESSING |
| United States | 13/956978 | 08/01/2013 | | | SEARS BRANDS, L.L.C. | CONTESTS AND SWEEPSTAKES |
| United States | 14/218319 | 03/18/2014 | | | SEARS BRANDS, L.L.C. | OUT-OF-STORE PURCHASE ROUTING SYSTEMS, METHODS, AND MEDIA |
| United States | 13/910216 | 06/05/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING AN E-COMMERCE SLIP CART |
| United States | 13/896841 | 05/17/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR MANAGING LAYAWAY PAYMENTS |
| United States | 14/831218 | 08/20/2015 | | | SEARS BRANDS, L.L.C. | ORDER FULFILLMENT SYSTEMS AND METHODS WITH CUSTOMER LOCATION TRACKING |
| United States | 14/321450 | 07/01/2014 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR AN E-COMMERCE PROMOTIONS PLATFORM |

| United States | 14/034875 | 09/24/2013 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR PROVIDING ALTERNATIVE RESULT FOR AN ONLINE SEARCH PREVIOUSLY WITH NO RESULT |
|---|---|---|---|---|---|---|
| United States | 14/036359 | 09/25/2013 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR GESTURE-BASED CROSS CHANNEL COMMERCE AND MARKETING |
| United States | 14/750507 | 06/25/2015 | | | SEARS BRANDS, L.L.C. | SALES PROMOTION USING PRODUCT COMPARISON |
| United States | 14/024318 | 09/11/2013 | | | SEARS BRANDS, L.L.C. | APPLICATIONS ON TOP OF A WEB SITE |
| United States | 14/815524 | 07/31/2015 | | | SEARS BRANDS, L.L.C. | SOCIAL PRODUCT PROMOTION |
| United States | 14/062040 | 10/24/2013 | | | SEARS BRANDS, L.L.C. | SCALABLE TRAINING |
| United States | 13/800722 | 03/13/2013 | | | SEARS BRANDS, L.L.C. | PROXIMITY NAVIGATION |
| United States | 13/770142 | 02/19/2013 | | | SEARS BRANDS, L.L.C. | TRUCK INVENTORY LOCATOR |
| United States | 13/844814 | 03/16/2013 | | | SEARS BRANDS, L.L.C. | E-PUB CREATOR |
| United States | 14/202980 | 03/10/2014 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING AND ACCESSING VISUAL PRODUCT REPRESENTATIONS OF A PROJECT |
| United States | 14/212977 | 03/14/2014 | | | SEARS BRANDS, L.L.C. | JOINT GIFT REGISTRY |
| United States | 14/268425 | 05/02/2014 | | | SEARS BRANDS, L.L.C. | LEARNING MANAGEMENT SYSTEM |
| United States | 14/288530 | 05/28/2014 | | | SEARS BRANDS, L.L.C. | CONSUMER GAME SYSTEM |
| United States | 14/025336 | 09/12/2013 | | | SEARS BRANDS, L.L.C. | PLANOGRAM ATTRIBUTE RESOLUTION |
| United States | 14/059204 | 10/21/2013 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR OPTIMIZING VALUE OF CONSUMER OFFERS |
| United States | 14/335540 | 07/18/2014 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR MIGRATING DATA BETWEEN SYSTEMS WITHOUT DOWNTIME |
| United States | 14/496794 | 09/25/2014 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR USING SOCIAL MEDIA FOR PREDICTIVE ANALYTICS IN AVAILABLE-TO-PROMISE SYSTEMS |
| United States | 29/611042 | 07/18/2017 | | | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH A SET OF ICONS |
| United States | 14/136095 | 12/20/2013 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR CREATING STEP BY STEP PROJECTS |
| United States | 14/075121 | 11/08/2013 | | | SEARS BRANDS, L.L.C. | WIRELESS IDENTIFIER DEVICE ENABLED INTERACTIVE CONSUMER EXPERIENCE |
| United States | 14/148042 | 01/06/2014 | | | SEARS BRANDS, L.L.C. | CONSUMER GAME |
| United States | 14/166064 | 01/28/2014 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR AUTOMATED SELECTION OF TARGETED PRIZES |
| United States | 14/178348 | 02/12/2014 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR DETERMINING LEVEL OF INFLUENCE IN A SOCIAL E-COMMERCE ENVIRONMENT |
| United States | 14/104070 | 12/12/2013 | | | SEARS BRANDS, L.L.C. | PRODUCT AND CONTENT ASSOCIATION |
| United States | 14/083815 | 11/19/2013 | | | SEARS BRANDS, L.L.C. | HEURISTIC CUSTOMER CLUSTERING |
| United States | 14/084903 | 11/20/2013 | | | SEARS BRANDS, L.L.C. | CUSTOMER CLUSTERING USING INTEGER PROGRAMMING |
| United States | 14/321328 | 07/01/2014 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PERSONALIZED ADD-ON PURCHASE |
| United States | 14/693263 | 04/22/2015 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PROVIDING DYNAMIC PRODUCT OFFERINGS |
| United States | 14/286270 | 05/23/2014 | | | SEARS BRANDS, L.L.C. | MERCHANDISE PICKUP SYSTEM, METHOD, AND MEDIA FOR ALLIED MERCHANTS |
| United States | 14/201363 | 03/07/2014 | | | SEARS BRANDS, L.L.C. | MERCHANDISE RETURN AND/OR EXCHANGE SYSTEMS, METHODS, AND MEDIA |
| United States | 14/638256 | 03/04/2015 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD PROVIDING EXPERT AUDIENCE TARGETING |
| United States | 14/444457 | 07/28/2014 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR AUTOMATED TARGETED POLLING VIA AN E-COMMERCE PROMOTIONS PLATFORM |
| United States | 14/660034 | 03/17/2015 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD PROVIDING PERSONALIZED RECOMMENDATIONS |
| United States | 14/509777 | 10/08/2014 | | | SEARS BRANDS, L.L.C. | MEMBER PROFILES AND ASSOCIATED SYSTEMS, METHODS, AND MEDIA |
| United States | 14/940389 | 11/13/2015 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS SUPPORTING CROWD-SOURCED PROXY SHOPPING VIA AN E-COMMERCE PLATFORM |
| United States | 14/644689 | 03/11/2015 | | | SEARS BRANDS, L.L.C. | LOYALTY PROGRAM SYSTEM, APPARATUS, AND MEDIA |
| United States | 15/010891 | 01/29/2016 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING CROWDSOURCED PERSONALIZED RECOMMENDATIONS |
| United States | 14/800111 | 07/15/2015 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR ON-LINE GAME BASED ON CONSUMER WISH LIST |
| United States | 15/147537 | 05/05/2016 | | | SEARS BRANDS, L.L.C. | REQUEST FULFILLMENT SYSTEM, METHOD, AND MEDIA |
| United States | 15/153965 | 05/13/2016 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM ENABLING CROWDSOURCED PEER TO PEER PRODUCT RENTAL |
| United States | 14/928460* | 42307 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR PROVIDING BENEFITS TO RETAIL CONSUMERS |
| United States | 29/554467* | 02/11/2016 | | | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH ICON |
| United States | 62/594196* | 12/04/2017 | | | SEARS BRANDS, L.L.C. | AIR AGITATOR NOZZLE SYSTEM |
| United States | 15/665308 | 07/31/2017 | | | SEARS BRANDS, L.L.C. | PRESENCE DETECTION BASED ON SIGNAL DATA |
| United States | 15/968271 | 5/1/2018 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS OF TARGETED INTERACTIONS FOR INTEGRATED RETAIL APPLICATIONS |
| United States | 15/980396 | 5/15/2018 | | | SEARS BRANDS, L.L.C. | RECOMMENDATIONS BASED UPON EXPLICIT USER SIMILARITY |
| United States | 16005944 | 6/12/2018 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING PERSONAL SHOPPING SERVICES |
| United States | 16107051 | 8/21/2018 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR AUTOMATICALLY AND SECURELY REGISTERING AN INTERNET OF THINGS DEVICE |
| United States | 15986171 | 5/22/2018 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR CONNECTED SALES ASSOCIATE SERVICES |
| United States | 15989076 | 5/24/2018 | | | SEARS BRANDS, L.L.C. | DEMAND FORECAST |
| United States | 15483571 | 4/10/2017 | | | SEARS BRANDS, L.L.C. | MOTION DETECTION AND LIGHTING SYSTEM |
| United States | 15598099 | 5/17/2017 | | | SEARS BRANDS, L.L.C. | PERFORMANCE UTILITIES FOR MOBILE APPLICATIONS |
| United States | 15615667 | 6/6/2017 | | | SEARS BRANDS, L.L.C. | CONTEXTUAL APPLICATION INTERACTIONS WITH CONNECTED DEVICES |
| United States | 15411141 | 1/20/2017 | | | SEARS BRANDS, L.L.C. | INTERFACING EVENT DETECTORS WITH A NETWORK INTERFACE |
| United States | 15173100 | 6/3/2016 | | | SEARS BRANDS, L.L.C. | NOZZLE ASSEMBLY FOR VACUUM CLEANER INCLUDING WAND RELEASE LEVER |
| United States | 15/153965 | 5/13/2016 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM ENABLING CROWDSOURCED PEER TO PEER PRODUCT RENTAL |
| United States | 15/667,514 | 08/02/2017 | | | SEARS BRANDS, L.L.C. | AUTOMATICALLY SWITCHING COMMUNICATION PATHWAYS BETWEEN CONNECTED DEVICES |
| United States | 16/111883 | 8/24/2018 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD SUPPORTING ONGOING WORKER FEEDBACK |
| United States | 16/126029 | 9/10/2018 | | | SEARS BRANDS, L.L.C. | WATER SENSORS WITH MULTI-VALUE OUTPUTS AND ASSOCIATED SYSTEMS AND METHODS |
| United States | 16/186969 | 11/12/2018 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS SUPPORTING ONLINE SHOPPING AS A SHARED AND SOCIAL ACTIVITY |
| United States | 16/194522 | 11/19/2018 | | | SEARS BRANDS, L.L.C. | MAINFRAME MIGRATION TOOLS |
| United States | 16/195920 | 11/20/2018 | | | SEARS BRANDS, L.L.C. | INTEGRATED EXPERIENCE FOR APPLICATIONS WITHIN A MOBILE APPLICATION |
| United States | 16/209644 | 12/4/2018 | | | SEARS BRANDS, L.L.C. | STICK VACUUM WITH INDEXING VACUUM HEAD ASSEMBLY |
| United States | 16/209669 | 12/4/2018 | | | SEARS BRANDS, L.L.C. | TWO-IN-ONE UPRIGHT VACUUM |

| United States | 16/209700 | 12/4/2018 | | | SEARS BRANDS, L.L.C. | AIR AGITATOR NOZZLE SYSTEM |
|---|---|---|---|---|---|---|
| United States | 16/229432 | 12/21/2018 | | | SEARS BRANDS, L.L.C. | SENSORS FOR DETECTING PRESENCE, OCCUPANCY, AND/OR MOTION AND RELATED SYSTEMS AND METHODS |
| United States | 16/232029 | 12/25/2018 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR CONNECTED SALES ASSOCIATE SERVICES |
| United States | 16/236778 | 12/31/2018 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM TO DYNAMICALLY OBFUSCATE A WEB SERVICES INTERFACE |
| United States | 16/242394 | 1/8/2019 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHODS FOR ONLINE FRAUD DETECTION |

*Items denoted with an asterisk are assigned solely to the extent of Sellers' right, title or interest therein.  No representation or warranty is made with respect to the Patents denoted with an asterisk

| Country | Status | Application Number | Application Date | Patent Number | Grant Date | Owner | Title |
|---|---|---|---|---|---|---|---|
| Australia | FILED | 2013274744 | 05/29/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DETERMINING OFFER ELIGIBILITY USING A PREDICATE LOGIC TREE AGAINST SETS OF INPUT DATA |
| Australia | FILED | 2018256665 | 05/29/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DETERMINING OFFER ELIGIBILITY USING A PREDICATE LOGIC TREE AGAINST SETS OF INPUT DATA |
| Australia | FILED | 2015215908 | 08/20/2015 | | | SEARS BRANDS, L.L.C. | MATCHING MOBILE DEVICE TO TRANSACTION AND/OR CUSTOMER ACCOUNT |
| Australia | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| Australia | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| Australia | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER SPLASH GUARD |
| Brazil | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| Brazil | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| Brazil | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER SPLASH GUARD |
| Canada | FILED | 2883081 | 05/02/2013 | | | SEARS BRANDS, L.L.C. | OBJECT DRIVEN NEWSFEED |
| Canada | GRANTED | 2715547 | 09/27/2010 | 2715547 | 01/02/2018 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING A MOBILE DEVICE TO FOLLOW A PRICE FOR AN ITEM |
| Canada | FILED | 2714783 | 09/14/2010 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR USING A SOCIAL NETWORK TO PROVIDE PRODUCT RELATED INFORMATION |
| Canada | GRANTED | 2744629 | 06/28/2011 | 2744629 | 10/11/2016 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING A MULTI-CHANNEL RETAIL LAYAWAY SERVICE |
| Canada | GRANTED | 2756215 | 10/24/2011 | 2756215 | 02/28/2017 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR FACILITATING THE PURCHASE OF PRODUCTS DETERMINED TO BE USEFUL IN THE PERFORMANCE OF A TASK |
| Canada | GRANTED | 2756174 | 10/24/2011 | 2756174 | 11/08/2016 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PROVIDING A STREAMLINED CHECKOUT PROCESS |
| Canada | FILED | 2771743 | 03/19/2012 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR DEVICE MANAGEMENT WITH SHARING AND PROGRAMMING CAPABILITIES |
| Canada | FILED | 2853789 | 10/19/2012 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING DATA POINTS COLLECTED FROM A CUSTOMER TO PROVIDE CUSTOMER SPECIFIC OFFERINGS |
| Canada | GRANTED | 2771745 | 03/19/2012 | 2771745 | 10/11/2016 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR COUPON SERVICE APPLICATIONS |
| Canada | FILED | 2860020 | 01/29/2013 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING PERSONAL SHOPPING SERVICES |
| Canada | FILED | 2853459 | 10/19/2012 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DISTRIBUTING CUSTOMIZABLE AND SHAREABLE TIERED OFFERS |
| Canada | GRANTED | 2792131 | 10/11/2012 | 2792131 | 10/25/2016 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING A DISTRIBUTED MOBILE CALL CENTER FOR A SERVICE ESTABLISHMENT |
| Canada | FILED | 2862861 | 02/01/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHOD FOR CREATING AND MANAGING MARKETING APPLICATIONS, EVENTS, PROMOTIONS, AND PUBLICATIONS |
| Canada | FILED | 2880895 | 04/08/2013 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PRESENTING PRODUCT RECOMMENDATIONS |
| Canada | GRANTED | 147791 | 10/04/2012 | 147791 | 10/10/2013 | SEARS BRANDS, L.L.C. | COMBINED SHOE OUTSOLE AND INSERT |
| Canada | GRANTED | 147792 | 10/04/2012 | 147792 | 10/10/2013 | SEARS BRANDS, L.L.C. | SHOE SOLE INSERT |
| Canada | GRANTED | 147793 | 10/04/2012 | 147793 | 10/10/2013 | SEARS BRANDS, L.L.C. | SHOE OUTSOLE |
| Canada | GRANTED | 147794 | 10/04/2012 | 147794 | 10/10/2013 | SEARS BRANDS, L.L.C. | COMBINED SHOE OUTSOLE AND INSERT |
| Canada | FILED | 2878463 | 04/09/2013 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING ONLINE GROUP SHOPPING SERVICES |
| Canada | FILED | 2841332 | 01/30/2014 | | | SEARS BRANDS, L.L.C. | CUSTOMER ASSISTANCE PLATFORM |
| Canada | GRANTED | 148884 | 12/04/2012 | 148884 | 07/24/2014 | SEARS BRANDS, L.L.C. | HOLSTER FOR A MOBILE DEVICE |
| Canada | FILED | 2876423 | 05/29/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DETERMINING OFFER ELIGIBILITY USING A PREDICATE LOGIC TREE AGAINST SETS OF INPUT DATA |
| Canada | FILED | 2880492 | 08/01/2013 | | | SEARS BRANDS, L.L.C. | CONTESTS AND SWEEPSTAKES |
| Canada | GRANTED | 2853639 | 06/05/2014 | 2853639 | 11/07/2017 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING AN E-COMMERCE SLIP CART |
| Canada | GRANTED | 2853029 | 05/30/2014 | 2853029 | 10/24/2017 | SEARS BRANDS, L.L.C. | ORDER FULFILLMENT SYSTEMS AND METHODS WITH CUSTOMER LOCATION TRACKING |
| Canada | GRANTED | 2855476 | 07/02/2014 | 2855476 | 01/03/2017 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR SWEEPSTAKES PLATFORM |
| Canada | FILED | 2853035 | 05/30/2014 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR SCAN, TRY AND BUY |
| Canada | FILED | 2846025 | 03/13/2014 | | | SEARS BRANDS, L.L.C. | RECOMMENDATIONS BASED ON EXPLICIT USER SIMILARITY |
| Canada | GRANTED | 2845268 | 03/10/2014 | 2845268 | 03/28/2017 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING AND ACCESSING VISUAL PRODUCT REPRESENTATIONS OF A PROJECT |
| Canada | FILED | 2850938 | 05/05/2014 | | | SEARS BRANDS, L.L.C. | LEARNING MANAGEMENT SYSTEM |
| Canada | GRANTED | 153722 | 11/01/2013 | 153722 | 08/18/2014 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| Canada | GRANTED | 153721 | 11/01/2013 | 153721 | 08/18/2014 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| Canada | GRANTED | 153723 | 11/01/2013 | 153723 | 08/18/2014 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| Canada | FILED | 2868196 | 10/21/2014 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR OPTIMIZING VALUE OF CONSUMER OFFERS |
| Canada | GRANTED | 2869053 | 10/30/2014 | 2869053 | 01/02/2018 | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR CREATING STEP BY STEP PROJECTS |
| Canada | FILED | 2935414 | 01/05/2015 | | | SEARS BRANDS, L.L.C. | CONSUMER GAME |
| Canada | FILED | 2880206 | 01/27/2015 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR AUTOMATED SELECTION OF TARGETED PRIZES |
| Canada | FILED | 2874614 | 12/12/2014 | | | SEARS BRANDS, L.L.C. | PRODUCT AND CONTENT ASSOCIATION |
| Canada | GRANTED | 2901395 | 08/24/2015 | 2901395 | 10/24/2017 | SEARS BRANDS, L.L.C. | MATCHING MOBILE DEVICE TO TRANSACTION AND/OR CUSTOMER ACCOUNT |
| Canada | FILED | 2898218 | 07/23/2015 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR AUTOMATED TARGETED POLLING VIA AN E-COMMERCE PROMOTIONS PLATFORM |
| Canada | FILED | 2907052 | 10/05/2015 | | | SEARS BRANDS, L.L.C. | MEMBER PROFILES AND ASSOCIATED SYSTEMS, METHODS, AND MEDIA |
| Canada | FILED | 2936121 | 07/14/2016 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR ON-LINE GAME BASED ON CONSUMER WISH LIST |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | OVATION STAND MIXER |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER SPLASH GUARD |
| China P.R. | FILED | 2014105156514 | 09/29/2014 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR USING SOCIAL MEDIA FOR PREDICTIVE ANALYTICS IN AVAILABLE-TO-PROMISE SYSTEMS |
| China P.R. | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| China P.R. | DOCKETED | | | | | SEARS BRANDS, L.L.C. | OVATION STAND MIXER |
| China P.R. | FILED | 2018306626893 | 11/21/2018 | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| China P.R. | FILED | 2018306627330 | 11/21/2018 | | | SEARS BRANDS, L.L.C. | SPLASH GUARD |
| EPC | FILED | 13784468.4 | 05/02/2013 | | | SEARS BRANDS, L.L.C. | OBJECT DRIVEN NEWSFEED |
| EPC | FILED | 18206602.7 | 05/02/2013 | | | SEARS BRANDS, L.L.C. | OBJECT DRIVEN NEWSFEED |
| EPC | FILED | 13744232.3 | 02/01/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHOD FOR CREATING AND MANAGING MARKETING APPLICATIONS, EVENTS, PROMOTIONS, AND PUBLICATIONS |
| EPC | FILED | 13776283.7 | 04/08/2013 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PRESENTING PRODUCT RECOMMENDATIONS |
| EPC | FILED | 13776245.6 | 04/09/2013 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING ONLINE GROUP SHOPPING SERVICES |
| EPC | FILED | 14153301.8 | 01/30/2014 | | | SEARS BRANDS, L.L.C. | CUSTOMER ASSISTANCE PLATFORM |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EPC | FILED | 13804077.9 | 05/29/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DETERMINING OFFER ELIGIBILITY USING A PREDICATE LOGIC TREE AGAINST SETS OF INPUT DATA |
| EPC | FILED | 13831386.1 | 06/07/2013 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR STAGING AND PROPAGATING DATA |
| EPC | FILED | 14158945.7 | 03/11/2014 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING AND ACCESSING VISUAL PRODUCT REPRESENTATIONS OF A PROJECT |
| EPC | FILED | 15182750.8 | 08/27/2015 | | | SEARS BRANDS, L.L.C. | MATCHING MOBILE DEVICE TO TRANSACTION AND/OR CUSTOMER ACCOUNT |
| EPC | FILED | 15157798.8 | 03/05/2015 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD PROVIDING EXPERT AUDIENCE TARGETING |
| European Community Design | GRANTED | 001388631-0001 | 11/01/2013 | 001388631-0001 | 11/01/2013 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| European Community Design | GRANTED | 001388631-0002 | 11/01/2013 | 001388631-0002 | 11/01/2013 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| European Community Design | GRANTED | 001388631-0003 | 11/01/2013 | 001388631-0003 | 11/01/2013 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| European Community Design | GRANTED | 001388631-0004 | 11/01/2013 | 001388631-0004 | 11/01/2013 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH GRAPHICAL USER INTERFACE |
| European Community Design | GRANTED | 001388631-0005 | 11/01/2013 | 001388631-0005 | 11/01/2013 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| European Community Design | GRANTED | 001388631-0006 | 11/01/2013 | 001388631-0006 | 11/01/2013 | SEARS BRANDS, L.L.C. | DISPLAY SCREEN OR PORTION THEREOF WITH AN ICON |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | OVATION STAND MIXER |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER SPLASH GUARD |
| India | FILED | 6458/DELNP/2014 | 02/01/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHOD FOR CREATING AND MANAGING MARKETING APPLICATIONS, EVENTS, PROMOTIONS, AND PUBLICATIONS |
| India | FILED | 199/DELNP/2015 | 07/01/2013 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR ECONOMICAL MIGRATION OF LEGACY APPLICATIONS FROM MAINFRAME AND DISTRIBUTED PLATFORMS |
| India | FILED | 2046/DEL/2014 | 07/19/2014 | 2046/DEL/2014 | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR MIGRATING DATA BETWEEN SYSTEMS WITHOUT DOWNTIME |
| India | FILED | 3718/DEL/2015 | 11/13/2015 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS SUPPORTING CROWD-SOURCED PROXY SHOPPING VIA AN E-COMMERCE PLATFORM |
| India | FILED | 201614008678 | 03/11/2016 | | | SEARS BRANDS, L.L.C. | LOYALTY PROGRAM SYSTEM, APPARATUS, AND MEDIA |
| Mexico | GRANTED | MX/a/2014/012278 | 04/09/2013 | n/a | 05/04/2018 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING ONLINE GROUP SHOPPING SERVICES |
| Mexico | FILED | MX/a/2014/002932 | 03/11/2014 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING AND ACCESSING VISUAL PRODUCT REPRESENTATIONS OF A PROJECT |
| Mexico | FILED | MX/a/2015/009659 | 07/27/2015 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR AUTOMATED TARGETED POLLING VIA AN E-COMMERCE PROMOTIONS PLATFORM |
| Mexico | FILED | MX/a/2016/009277 | 07/15/2016 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR ON-LINE GAME BASED ON CONSUMER WISH LIST |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | OVATION STAND MIXER |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER SPLASH GUARD |
| PCT | FILED | PCT/US2013/039307 | 05/02/2013 | | | SEARS BRANDS, L.L.C. | OBJECT DRIVEN NEWSFEED |
| PCT | FILED | PCT/US2012/061021 | 10/19/2012 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING DATA POINTS COLLECTED FROM A CUSTOMER TO PROVIDE CUSTOMER SPECIFIC OFFERINGS |
| PCT | FILED | PCT/US2013/023551 | 01/29/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DISCLOSING TARGET ELEMENTS IN HIGH DEFINITION IMAGES |
| PCT | FILED | PCT/US2013/023563 | 01/29/2013 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING PERSONAL SHOPPING SERVICES |
| PCT | FILED | PCT/US2012/061024 | 10/19/2012 | | | SEARS BRANDS, L.L.C. | SHAREABLE TIERED OFFERS |
| PCT | FILED | PCT/US2012/069064 | 12/12/2012 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DISTRIBUTING CUSTOMIZABLE AND SHAREABLE TIERED OFFERS |
| PCT | FILED | PCT/US2013/024326 | 02/01/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHOD FOR CREATING AND MANAGING MARKETING APPLICATIONS, EVENTS, PROMOTIONS, AND PUBLICATIONS |
| PCT | FILED | PCT/US2013/035591 | 04/08/2013 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PRESENTING PRODUCT RECOMMENDATIONS |
| PCT | FILED | PCT/US2013/035708 | 04/08/2013 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING ONLINE GROUP SHOPPING SERVICES |
| PCT | FILED | PCT/US2013/042994 | 05/29/2013 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR DETERMINING OFFER ELIGIBILITY USING A PREDICATE LOGIC TREE AGAINST SETS OF INPUT DATA |
| PCT | FILED | PCT/US2013/053218 | 08/01/2013 | | | SEARS BRANDS, L.L.C. | CONTESTS AND SWEEPSTAKES |
| PCT | FILED | PCT/US2013/048926 | 07/01/2013 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR ECONOMICAL MIGRATION OF LEGACY APPLICATIONS FROM MAINFRAME AND DISTRIBUTED PLATFORMS |
| PCT | FILED | PCT/US2013/053968 | 08/07/2013 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR STAGING AND PROPAGATING DATA |
| PCT | FILED | PCT/US2015/010150 | 01/05/2015 | | | SEARS BRANDS, L.L.C. | CONSUMER GAME |
| PCT | FILED | PCT/US2017/051144 | 09/12/2017 | | | SEARS BRANDS, L.L.C. | REFRIGERATION DEVICE WITH GESTURE-CONTROLLED DISPENSER |
| South Africa | FILED | A2018/01740 | 11/12/2018 | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| South Africa | FILED | A2018/01741 | 11/12/2018 | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| South Africa | FILED | A2018/01736 | 11/12/2018 | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| South Africa | FILED | A2018/01742 | 11/12/2018 | | | SEARS BRANDS, L.L.C. | MIXER SPLASH GUARD |
| Australia | | | | 150144* | 12/16/2002 | SEARS BRANDS, L.L.C. | INSOLE CUSHION |
| EPC | | | | 14199354.3* | 12/19/2014 | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR CREATING STEP BY STEP PROJECTS |
| Mexico | | | | MX/a/2015/014120* | 10/07/2015 | SEARS BRANDS, L.L.C. | MEMBER PROFILES AND ASSOCIATED SYSTEMS, METHODS, AND MEDIA |
| PCT | | | | PCT/US2015/060982* | 11/17/2015 | SEARS BRANDS, L.L.C. | SENSOR FOR DETECTING PRESENSE, OCCUPANCY, AND/OR MOTION AND RELATED SYSTEMS AND METHODS |
| PCT | | | | PCT/US2015/059175* | 11/05/2015 | SEARS BRANDS, L.L.C. | WATER SENSORS WITH MULTI-VALUE OUTPUTS AND ASSOCIATED SYSTEMS AND METHODS |

*- items denoted with an asterisk are assigned solely to the extent of Sellers' right, title or interest therein.  No representation or warranty is made with respect to the Patents denoted with an asterisk.

| Country | Application Number | Application Date | Patent Number | Grant Date | Owner | Title |
|---------|-------------------|-----------------|---------------|-----------|-------|-------|
| United States | 15/967017 | 04/30/2018 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR ENABLING WIRELESS CONTROL IN TOOLS BY USE OF PORTABLE POWER SUPPLY SYSTEMS WITH EMBEDDED COMMUNICATION COMPONENTS |
| United States | 16/020237 | 06/27/2018 | | | SEARS BRANDS, L.L.C. | DOOR ALARM SYSTEM AND REFRIGERATION DEVICE |
| United States | 16/158952 | 10/12/2018 | | | SEARS BRANDS, L.L.C. | CHARGER, CHARGE INDICATOR, AND ASSOCIATED METHODS |
| United States | 62/594472 | 12/04/2017 | | | SEARS BRANDS, L.L.C. | PERSONAL HEATER |
| United States | 62/593593 | 12/01/2017 | | | SEARS BRANDS, L.L.C. | HEATING DEVICE |
| United States | 16/012317 | 06/19/2018 | | | SEARS BRANDS, L.L.C. | SIMPLE AND ASSISTED MECHANISM FOR REGISTERING AN INTERNET-OF-THINGS (IOT) DEVICE |
| United States | 29/648576 | 05/22/2018 | | | SEARS BRANDS, L.L.C. | EGG SEPARATOR |
| United States | 29/648578 | 05/22/2018 | | | SEARS BRANDS, L.L.C. | MIXER FUNNEL |
| United States | 29/648579 | 05/22/2018 | | | SEARS BRANDS, L.L.C. | GRATER |
| United States | 29/663880 | 09/19/2018 | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| United States | 29/663882 | 09/19/2018 | | | SEARS BRANDS, L.L.C. | STAND MIXER |
| United States | 29/664089 | 09/21/2018 | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| United States | 13/998540 | 11/07/2013 | | | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR DEVICE MANAGEMENT WITH SHARING AND PROGRAMMING CAPABILITIES |
| United States | 13/735865 | 01/07/2013 | | | SEARS BRANDS, L.L.C. | PROGRAMMABLE POWER TOOL WITH BRUSHLESS DC MOTOR |
| United States | 13/953436 | 07/29/2013 | | | SEARS BRANDS, L.L.C. | SLIDABLE BIN WITHIN A REFRIGERATOR DRAWER |
| United States | 16/029902 | 07/09/2018 | | | SEARS BRANDS, L.L.C. | SLIDE BATTERY AND POWER TOOL FOR USE WITH BOTH SLIDE AND POST BATTERIES |
| United States | 14/559692 | 12/03/2014 | | | SEARS BRANDS, L.L.C. | BUCKET WASHING ATTACHMENT |
| United States | 14/927932 | 10/30/2015 | | | SEARS BRANDS, L.L.C. | POSITION FEEDBACK CONTROL METHOD AND POWER TOOL |
| United States | 15/820664 | 11/22/2017 | | | SEARS BRANDS, L.L.C. | LAWN MOWING APPARATUS WITH MOWER DECK ALIGNMENT SENSORS |
| United States | 14/980369 | 12/28/2015 | | | SEARS BRANDS, L.L.C. | APPARATUS WITH HAND GRIP AND METHOD MOUNTING HAND GRIP |
| United States | 15/041434 | 02/11/2016 | | | SEARS BRANDS, L.L.C. | MULTI-MODE AIR COMPRESSOR PRESSURE POWER SWITCH |
| United States | 15/413664 | 01/24/2017 | | | SEARS BRANDS, L.L.C. | REDUNDANT ACTUATION LOCK DECOUPLING SYSTEM AND METHODS OF USE |
| United States | 15/471514 | 03/28/2017 | | | SEARS BRANDS, L.L.C. | PORTABLE POWER TOOL, BATTERY PACK, AND CELL CONFIGURATIONS FOR SAME |
| United States | 15/486130 | 04/12/2017 | | | SEARS BRANDS, L.L.C. | ERGONOMIC GRIPPING MECHANISMS OF A HANDHELD AIR MOVEMENT APPARATUS |
| United States | 15/486148 | 04/12/2017 | | | SEARS BRANDS, L.L.C. | ERGONOMIC GRIPPING MECHANISMS OF AN ELECTRIC CUTTING APPARATUS |
| United States | 15/581843 | 04/28/2017 | | | SEARS BRANDS, L.L.C. | POWER TOOL WITH INTEGRATED MEASUREMENT DEVICE AND ASSOCIATED METHODS |
| United States | 14/517640 | 10/17/2014 | | | SEARS BRANDS, L.L.C. | BUCKET MIXER INSERT |
| United States | 13/438592 | 04/03/2012 | 10163064 | 12/25/2018 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR CONNECTED SALES ASSOCIATE SERVICES |
| United States | 15/205298 | 07/08/2016 | 10171443 | 01/01/2019 | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM TO DYNAMICALLY OBFUSCATE A WEB SERVICE INTERFACE |
| United States | 15/408686 | 01/18/2017 | | | SEARS BRANDS, L.L.C. | COMPRESSIBLE CONTACTS FOR INTERFACING CHARGER |
| United States | 09/161335 | 09/25/1998 | 6202425 | 03/20/2001 | SEARS BRANDS, L.L.C. | NON-COMPRESSION CASCADE REFRIGERATION SYSTEM FOR CLOSED REFRIGERATED SPACES |
| United States | 12/778269 | 05/12/2010 | 8349430 | 01/08/2013 | SEARS BRANDS, L.L.C. | PADDING SYSTEM FOR PROTECTING A HOME APPLIANCE |
| United States | 12/476721 | 06/02/2009 | 8362906 | 01/29/2013 | SEARS BRANDS, L.L.C. | REMOTE CONTROL DEVICE THAT USES COLOR TO INDICATE CHANGE IN STATUS |
| United States | 12/728389 | 03/22/2010 | 8397406 | 03/19/2013 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING COLOR TO INDICATE A STATE OF A HOME APPLIANCE, SUCH AS AN IRON |
| United States | 13/692321 | 12/03/2012 | 8558686 | 10/15/2013 | SEARS BRANDS, L.L.C. | REMOTE CONTROL DEVICE THAT USES COLOR TO INDICATE CHANGE IN STATUS |
| United States | 12/841592 | 07/22/2010 | 8683645 | 04/01/2014 | SEARS BRANDS, L.L.C. | VACUUM CLEANING DEVICE WITH AIR QUALITY MONITORING SYSTEM |
| United States | 13/692016 | 12/03/2012 | 8752311 | 06/17/2014 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR USING COLOR TO INDICATE A STATE OF A HOME APPLIANCE, SUCH AS AN IRON |
| United States | 13/351918 | 01/17/2012 | 8761361 | 06/24/2014 | SEARS BRANDS, L.L.C. | MANAGEMENT UNIT WITH MICROPHONE |
| United States | 12/851340 | 08/05/2010 | 8813287 | 08/26/2014 | SEARS BRANDS, L.L.C. | AUTOMATED LAUNDRY SYSTEM |
| United States | 12/951883 | 11/22/2010 | 8876366 | 11/04/2014 | SEARS BRANDS, L.L.C. | THROUGH-HEAD STAND MIXER |
| United States | 13/421603 | 03/15/2012 | 9129302 | 09/08/2015 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR COUPON SERVICE APPLICATIONS |
| United States | 13/351880 | 01/17/2012 | 9203263 | 12/01/2015 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR PROVIDING AN APPLIANCE HYBRID MODE |
| United States | 13/661762 | 10/26/2012 | 9206985 | 12/08/2015 | SEARS BRANDS, L.L.C. | INTEGRATED COOKTOP ASSEMBLY |
| United States | 13/283943 | 10/28/2011 | 9225766 | 12/29/2015 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING SMART APPLIANCES |
| United States | 13/421423 | 03/15/2012 | 9438678 | 09/06/2016 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR APPLIANCE COMMUNITY SERVICE MANAGEMENT |
| United States | 13/834157 | 03/15/2013 | 9474430 | 10/25/2016 | SEARS BRANDS, L.L.C. | FIXED FULL COVERAGE WASH SYSTEM FOR DISHWASHERS |
| United States | 12/852250 | 08/06/2010 | 9585520 | 03/07/2017 | SEARS BRANDS, L.L.C. | STAND MIXER WITH CORDLESS KITCHEN APPLIANCE |
| United States | 14/332136 | 07/15/2014 | 9617675 | 04/11/2017 | SEARS BRANDS, L.L.C. | AUTOMATED LAUNDRY SYSTEM |
| United States | 15/355551 | 11/18/2016 | 9774195 | 09/26/2017 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING CONDUCTIVE CHARGING WITH MULTIPLE TERMINAL CONSTELLATIONS |
| United States | 14/840893 | 08/31/2015 | 9778010 | 10/03/2017 | SEARS BRANDS, L.L.C. | RETRACTABLE TAPE MEASURE AND SECURING SAME |
| United States | 14/970047 | 12/15/2015 | 9810524 | 11/07/2017 | SEARS BRANDS, L.L.C. | POWER TOOL WITH OPTICAL MEASUREMENT DEVICE |
| United States | 15/000486 | 01/19/2016 | 9844175 | 12/19/2017 | SEARS BRANDS, L.L.C. | LAWN MOWING APPARATUS WITH MOWER DECK ALIGNMENT SENSORS |
| United States | 13/462474 | 05/02/2012 | 9953278 | 04/24/2018 | SEARS BRANDS, L.L.C. | SYSTEM AND METHODS FOR INTERACTING WITH NETWORKED HOME APPLIANCES |
| United States | 14/491703 | 09/19/2014 | 9958893 | 05/01/2018 | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR ENABLING WIRELESS CONTROL IN TOOLS BY USE OF PORTABLE POWER SUPPLY SYSTEMS WITH EMBEDDED COMMUNICATION COMPONENTS |
| United States | 15/485930 | 04/12/2017 | 9970229 | 05/15/2018 | SEARS BRANDS, L.L.C. | GARAGE DOOR OPENER SYSTEM WITH AUTO-CLOSE |
| United States | 15/260635 | 09/09/2016 | 10010955 | 07/03/2018 | SEARS BRANDS, L.L.C. | MITER SAW ASSEMBLY WITH DETACHABLE CIRCULAR SAW |
| United States | 14/146450 | 01/02/2014 | 10027078 | 07/17/2018 | SEARS BRANDS, L.L.C. | SLIDE BATTERY AND POWER TOOL FOR USE WITH BOTH SLIDE AND POST BATTERIES |
| United States | 15/147588 | 05/05/2016 | 10036588 | 07/31/2018 | SEARS BRANDS, L.L.C. | DOOR ALARM SYSTEM AND REFRIGERATION DEVICE |
| United States | 15/355345 | 11/18/2016 | 10128668 | 11/13/2018 | SEARS BRANDS, L.L.C. | CHARGER, CHARGE INDICATOR, AND ASSOCIATED METHODS |
| United States | 29/321001 | 07/09/2008 | D593509 | 06/02/2009 | SEARS BRANDS, L.L.C. | REMOTE CONTROL |

| United States | 29/320998 | 07/09/2008 | D594423 | 06/16/2009 | SEARS BRANDS, L.L.C. | REMOTE CONTROL |
|---|---|---|---|---|---|---|
| United States | 29/321000 | 07/09/2008 | D595670 | 07/07/2009 | SEARS BRANDS, L.L.C. | REMOTE CONTROL |
| United States | 29/321004 | 07/09/2008 | D595671 | 07/07/2009 | SEARS BRANDS, L.L.C. | REMOTE CONTROL |
| United States | 29/320999 | 07/09/2008 | D597038 | 07/28/2009 | SEARS BRANDS, L.L.C. | REMOTE CONTROL |
| United States | 29/321002 | 07/09/2008 | D600216 | 09/15/2009 | SEARS BRANDS, L.L.C. | REMOTE CONTROL |
| United States | 29/341573 | 08/07/2009 | D612195 | 03/23/2010 | SEARS BRANDS, L.L.C. | STAND MIXER |
| United States | 29/341569 | 08/07/2009 | D613009 | 03/30/2010 | SEARS BRANDS, L.L.C. | WASHING MACHINE |
| United States | 29/343685 | 09/17/2009 | D614012 | 04/20/2010 | SEARS BRANDS, L.L.C. | APPLIANCE HANDLE |
| United States | 29/343694 | 09/17/2009 | D614013 | 04/20/2010 | SEARS BRANDS, L.L.C. | APPLIANCE HANDLE |
| United States | 29/335848 | 04/23/2009 | D614925 | 05/04/2010 | SEARS BRANDS, L.L.C. | DUAL WHEEL PIZZA CUTTER |
| United States | 29/341605 | 08/10/2009 | D617512 | 06/08/2010 | SEARS BRANDS, L.L.C. | WASHING MACHINE |
| United States | 29/341604 | 08/10/2009 | D618871 | 06/29/2010 | SEARS BRANDS, L.L.C. | WASHING MACHINE |
| United States | 29/355331 | 02/05/2010 | D623468 | 09/14/2010 | SEARS BRANDS, L.L.C. | STAND MIXER HEAD |
| United States | 29/366653 | 07/28/2010 | D631691 | 02/01/2011 | SEARS BRANDS, L.L.C. | STAND MIXER |
| United States | 29/368384 | 08/23/2010 | D645484 | 09/20/2011 | SEARS BRANDS, L.L.C. | ICE DISPENSER PADDLE |
| United States | 29/341572 | 08/07/2009 | D646859 | 10/11/2011 | SEARS BRANDS, L.L.C. | WASHING MACHINE DOOR AND WINDOW |
| United States | 29/368385 | 08/23/2010 | D654516 | 02/21/2012 | SEARS BRANDS, L.L.C. | ICE DISPENSER PADDLE |
| United States | 29/385306 | 02/11/2011 | D654757 | 02/28/2012 | SEARS BRANDS, L.L.C. | GRILL |
| United States | 29/385309 | 02/11/2011 | D654758 | 02/28/2012 | SEARS BRANDS, L.L.C. | GRILL |
| United States | 29/390665 | 04/28/2011 | D683739 | 06/04/2013 | SEARS BRANDS, L.L.C. | APPLIANCE DISPLAY SCREEN WITH A GRAPHICAL USER INTERFACE |
| United States | 29/390667 | 04/28/2011 | D683740 | 06/04/2013 | SEARS BRANDS, L.L.C. | APPLIANCE DISPLAY SCREEN WITH A GRAPHICAL USER INTERFACE |
| United States | 29/446428 | 02/22/2013 | D693175 | 11/12/2013 | SEARS BRANDS, L.L.C. | COOKTOP |
| United States | 29/446430 | 02/22/2013 | D694581 | 12/03/2013 | SEARS BRANDS, L.L.C. | COOKTOP - MULTIPLE BURNER |
| United States | 29/391504 | 05/10/2011 | D695977 | 12/17/2013 | SEARS BRANDS, L.L.C. | WASHING MACHINE |
| United States | 29/449478 | 03/15/2013 | D709725 | 07/29/2014 | SEARS BRANDS, L.L.C. | MOBILE GRILLING UNIT |
| United States | 29/468858 | 10/03/2013 | D715044 | 10/14/2014 | SEARS BRANDS, L.L.C. | HOLSTER FOR A MOBILE DEVICE |
| United States | 29/341555 | 08/07/2009 | D721918 | 02/03/2015 | SEARS BRANDS, L.L.C. | COLORED ACCENT FOR AN APPLIANCE USER INTERFACE |
| United States | 29/448645 | 03/13/2013 | D739618 | 09/22/2015 | SEARS BRANDS, L.L.C. | DISHWASHER CONTROL PANEL |
| United States | 29/528358 | 05/28/2015 | D764230 | 08/23/2016 | SEARS BRANDS, L.L.C. | WARMER DRAWER |
| United States | 29/528307 | 05/28/2015 | D764890 | 08/30/2016 | SEARS BRANDS, L.L.C. | APPLIANCE HANDLE |
| United States | 29/528342 | 05/28/2015 | D765469 | 09/06/2016 | SEARS BRANDS, L.L.C. | COOKTOP |
| United States | 29/528308 | 05/28/2015 | D767326 | 09/27/2016 | SEARS BRANDS, L.L.C. | COOKTOP |
| United States | 29/528304 | 05/28/2015 | D767648 | 09/27/2016 | SEARS BRANDS, L.L.C. | REFRIGERATOR |
| United States | 29/528367 | 05/28/2015 | D769673 | 10/25/2016 | SEARS BRANDS, L.L.C. | MICROWAVE |
| United States | 29/528397 | 05/28/2015 | D770839 | 11/08/2016 | SEARS BRANDS, L.L.C. | OVEN |
| United States | 29/528382 | 05/28/2015 | D773232 | 12/06/2016 | SEARS BRANDS, L.L.C. | OVEN |
| United States | 29/528339 | 05/28/2015 | D773917 | 12/13/2016 | SEARS BRANDS, L.L.C. | OVEN KNOB |
| United States | 29/528355 | 05/28/2015 | D776703 | 01/17/2017 | SEARS BRANDS, L.L.C. | DISHWASHER GRAPHICAL USER INTERFACE |
| United States | 29/528311 | 05/28/2015 | D778099 | 02/07/2017 | SEARS BRANDS, L.L.C. | COOKTOP |
| United States | 29/528310 | 05/28/2015 | D778111 | 02/07/2017 | SEARS BRANDS, L.L.C. | COOKTOP GRATE |
| United States | 29/568155 | 06/15/2016 | D779303 | 02/21/2017 | SEARS BRANDS, L.L.C. | OVEN KNOB |
| United States | 29/528374 | 05/28/2015 | D781127 | 03/14/2017 | SEARS BRANDS, L.L.C. | APPLIANCE HANDLE ENDCAP |
| United States | 29/465402 | 08/27/2013 | D781510 | 03/14/2017 | SEARS BRANDS, L.L.C. | WASHING MACHINE |
| United States | 29/528354 | 05/28/2015 | D781648 | 03/21/2017 | SEARS BRANDS, L.L.C. | OVEN CONTROL PANEL |
| United States | 29/528337 | 05/28/2015 | D782873 | 04/04/2017 | SEARS BRANDS, L.L.C. | RADIANT COOKTOP |
| United States | 29/569849 | 06/30/2016 | D786651 | 05/16/2017 | SEARS BRANDS, L.L.C. | OVEN KNOB |
| United States | 29/528402 | 05/28/2015 | D789740 | 06/20/2017 | SEARS BRANDS, L.L.C. | OVEN CONTROL PANEL |
| United States | 29/528371 | 05/28/2015 | D790946 | 07/04/2017 | SEARS BRANDS, L.L.C. | APPLIANCE HANDLE |
| United States | 29/571792 | 07/21/2016 | D795312 | 08/22/2017 | SEARS BRANDS, L.L.C. | REFRIGERATOR DISPENSER |
| United States | 29/528391 | 05/28/2015 | D797504 | 09/19/2017 | SEARS BRANDS, L.L.C. | OVEN COOKTOP GRATE |
| United States | 29/528377 | 05/28/2015 | D798108 | 09/26/2017 | SEARS BRANDS, L.L.C. | OVEN COOKTOP |
| United States | 29/528345 | 05/28/2015 | D798661 | 10/03/2017 | SEARS BRANDS, L.L.C. | COOKTOP GRATE |
| United States | 29/528347 | 05/28/2015 | D798662 | 10/03/2017 | SEARS BRANDS, L.L.C. | COOKTOP |
| United States | 29/573448 | 08/05/2016 | D802230 | 11/07/2017 | SEARS BRANDS, L.L.C. | DISHWASHER |
| United States | 29/586727 | 12/06/2016 | D817066 | 05/08/2018 | SEARS BRANDS, L.L.C. | OVEN |
| United States | 29/583675 | 11/08/2016 | D817067 | 05/08/2018 | SEARS BRANDS, L.L.C. | OVEN |
| United States | 29/648605 | 05/22/2018 | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| United States | 29/648572 | 05/22/2018 | | | SEARS BRANDS, L.L.C. | SPLASH GUARD |
| United States | 29/472441 | 11/12/2013 | D748431 | 02/02/2016 | SEARS BRANDS, L.L.C. | COOKTOP |
| United States | 14/323585* | 07/03/2014 | | | SEARS BRANDS, L.L.C. | REFRIGERATOR WITH A TOP SURFACE HAVING A NOTCHED PROFILE FOR PROVIDING ADDITIONAL STORAGE CAPACITY |
| United States | 15/637250* | 06/29/2017 | | | SEARS BRANDS, L.L.C. | ONBOARD MEASURING SYSTEM FOR MITER SAWS |

| United States | 62/594328* | 12/04/2017 | | | SEARS BRANDS, L.L.C. | STICK VACUUM WITH INDEXING VACUUM HEAD ASSEMBLY |
|---|---|---|---|---|---|---|
| United States | 62/594211* | 12/04/2017 | | | SEARS BRANDS, L.L.C. | TWO-IN-ONE UPRIGHT VACUUM |
| United States | 14/948575* | 11/23/2015 | | | SEARS BRANDS, L.L.C. | INTEGRATED COOKTOP ASSEMBLY |

*- items denoted with an asterisk are assigned solely to the extent of Sellers' right, title or interest therein.   No representation or warranty is made with respect to the Patents denoted with an asterisk.

| Country | Status | Application Number | Application Date | Patent Number | Grant Date | Owner | Title |
|---------|--------|-------------------|-----------------|---------------|-----------|-------|-------|
| Australia | FILED | 2015258168 | 11/16/2015 | | | SEARS BRANDS, L.L.C. | ONBOARD MEASURING SYSTEM FOR MITER SAWS |
| Australia | FILED | 2016222406 | 08/31/2016 | | | SEARS BRANDS, L.L.C. | RETRACTABLE TAPE MEASURE AND SECURING SAME |
| Australia | FILED | 2016244217 | 10/11/2016 | | | SEARS BRANDS, L.L.C. | HORIZONTAL-REEL TAPE MEASURE |
| Australia | FILED | 2016250420 | 10/27/2016 | | | SEARS BRANDS, L.L.C. | POSITION FEEDBACK CONTROL METHOD AND POWER TOOL |
| Australia | FILED | 2016273904 | 12/14/2016 | | | SEARS BRANDS, L.L.C. | POWER TOOL WITH OPTICAL MEASUREMENT DEVICE |
| Australia | FILED | 2017200518 | 01/25/2017 | | | SEARS BRANDS, L.L.C. | REDUNDANT ACTUATION LOCK DECOUPLING MECHANISM |
| Australia | DOCKETED | | | | | SEARS BRANDS, L.L.C. | EGG SEPARATOR |
| Australia | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER FUNNEL |
| Australia | DOCKETED | | | | | SEARS BRANDS, L.L.C. | GRATER |
| Brazil | DOCKETED | | | | | SEARS BRANDS, L.L.C. | EGG SEPARATOR |
| Brazil | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER FUNNEL |
| Brazil | DOCKETED | | | | | SEARS BRANDS, L.L.C. | GRATER |
| Canada | GRANTED | 136371 | 07/15/2010 | 136371 | 02/07/2011 | SEARS BRANDS, L.L.C. | WASHING MACHINE DOOR AND WINDOW |
| Canada | GRANTED | 136370 | 07/15/2010 | 136370 | 02/07/2011 | SEARS BRANDS, L.L.C. | WASHING MACHINE |
| Canada | GRANTED | 136376 | 07/15/2010 | 136376 | 02/07/2011 | SEARS BRANDS, L.L.C. | WASHING MACHINE DOOR AND WINDOW |
| Canada | GRANTED | 141174 | 06/28/2011 | 141174 | 01/20/2012 | SEARS BRANDS, L.L.C. | GRILL |
| Canada | GRANTED | 141173 | 06/28/2011 | 141173 | 01/20/2012 | SEARS BRANDS, L.L.C. | GRILL |
| Canada | GRANTED | 2714804 | 09/14/2010 | 2714804 | 04/25/2017 | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR PROVIDING DIAGNOSTIC SERVICES |
| Canada | GRANTED | 2744650 | 06/28/2011 | 2744650 | 08/12/2014 | SEARS BRANDS, L.L.C. | VACUUM CLEANING DEVICE WITH AIR QUALITY MONITORING SYSTEM |
| Canada | GRANTED | 137295 | 09/27/2010 | 137295 | 04/28/2011 | SEARS BRANDS, L.L.C. | STAND MIXER (WITH BOWL LIFT) |
| Canada | GRANTED | 2722201 | 11/23/2010 | 2722201 | 02/10/2015 | SEARS BRANDS, L.L.C. | THROUGH-HEAD STAND MIXER |
| Canada | GRANTED | 2754233 | 09/29/2011 | 2754233 | 11/24/2015 | SEARS BRANDS, L.L.C. | ENERGY MANAGEMENT UNIT WITH DIAGNOSTIC CAPABILITIES |
| Canada | FILED | 2788352 | 08/30/2012 | | | SEARS BRANDS, L.L.C. | SYSTEM AND METHOD FOR REMOVING DENTS FROM A DENTED SURFACE |
| Canada | GRANTED | 142795 | 10/20/2011 | 142795 | 05/16/2012 | SEARS BRANDS, L.L.C. | WASHING MACHINE |
| Canada | GRANTED | 142796 | 10/20/2011 | 142796 | 05/16/2012 | SEARS BRANDS, L.L.C. | WASHING MACHINE |
| Canada | GRANTED | 2758814 | 11/18/2011 | 2758814 | 07/14/2015 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR COMMUNITY ENERGY MANAGEMENT |
| Canada | GRANTED | 2771471 | 03/19/2012 | 2771471 | 04/25/2017 | SEARS BRANDS, L.L.C. | METHODS AND SYSTEMS FOR APPLIANCE COMMUNITY SERVICE MANAGEMENT |
| Canada | GRANTED | 2756475 | 10/31/2011 | 2756475 | 05/24/2016 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING SMART APPLIANCES |
| Canada | GRANTED | 2800792 | 01/04/2013 | 2800792 | 10/25/2016 | SEARS BRANDS, L.L.C. | PROGRAMMABLE PORTABLE POWER TOOL WITH BRUSHLESS DC MOTOR |
| Canada | FILED | 2941582 | 01/04/2013 | | | SEARS BRANDS, L.L.C. | PROGRAMMABLE PORTABLE POWER TOOL WITH BRUSHLESS DC MOTOR |
| Canada | GRANTED | 2801725 | 01/14/2013 | 2801725 | 05/17/2016 | SEARS BRANDS, L.L.C. | MANAGEMENT UNIT WITH MICROPHONE |
| Canada | GRANTED | 2912079 | 11/16/2015 | 2912079 | 12/12/2017 | SEARS BRANDS, L.L.C. | ONBOARD MEASURING SYSTEM FOR MITER SAWS |
| Canada | GRANTED | 2940626 | 08/30/2016 | 2940626 | 10/02/2018 | SEARS BRANDS, L.L.C. | RETRACTABLE TAPE MEASURE AND SECURING SAME |
| Canada | GRANTED | 2944209 | 10/04/2016 | 2944209 | 10/02/2018 | SEARS BRANDS, L.L.C. | HORIZONTAL-REEL TAPE MEASURE |
| Canada | FILED | 2946915 | 10/28/2016 | | | SEARS BRANDS, L.L.C. | POSITION FEEDBACK CONTROL METHOD AND POWER TOOL |
| Canada | FILED | 2951613 | 12/13/2016 | | | SEARS BRANDS, L.L.C. | POWER TOOL WITH OPTICAL MEASUREMENT DEVICE |
| Canada | FILED | 2955963 | 01/24/2017 | | | SEARS BRANDS, L.L.C. | REDUNDANT ACTUATION LOCK DECOUPLING SYSTEM AND METHODS OF USE |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | EGG SEPARATOR |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER FUNNEL |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | GRATER |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | UPPER PORTION OF MIXER IN LOWERED AND RAISED POSITION |

| Country | Status | App. No. | App. Date | Patent No. | Grant Date | Owner | Title |
|---|---|---|---|---|---|---|---|
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER (LOWER PORTION) |
| Canada | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| China P.R. | FILED | 2015106051069 | 09/21/2015 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR ENABLING WIRELESS CONTROL IN TOOLS BY USE OF PORTABLE POWER SUPPLY SYSTEMS WITH EMBEDDED COMMUNICATION COMPONENTS |
| China P.R. | FILED | 2015107925991 | 11/17/2015 | | | SEARS BRANDS, L.L.C. | ONBOARD MEASURING SYSTEM FOR MITER SAWS |
| China P.R. | FILED | 201610798018X | 08/31/2016 | | | SEARS BRANDS, L.L.C. | RETRACTABLE TAPE MEASURE AND SECURING SAME |
| China P.R. | FILED | 2016108877561 | 10/11/2016 | | | SEARS BRANDS, L.L.C. | HORIZONTAL-REEL TAPE MEASURE |
| China P.R. | FILED | 2015108502778 | 11/27/2015 | | | SEARS BRANDS, L.L.C. | POSITION FEEDBACK CONTROL |
| China P.R. | FILED | 2016111613643 | 12/15/2016 | | | SEARS BRANDS, L.L.C. | POWER TOOL WITH OPTICAL MEASUREMENT DEVICE |
| China P.R. | FILED | 2017100632522 | 01/25/2017 | | | SEARS BRANDS, L.L.C. | A REDUNDANT ACTUATION LOCK APPARATUS |
| China P.R. | FILED | N/A | 09/12/2017 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING CONDUCTIVE CHARGING WITH MULTIPLE TERMINAL CONSTELLATIONS |
| China P.R. | FILED | N/A | 09/12/2017 | | | SEARS BRANDS, L.L.C. | CHARGER, CHARGE INDICATOR, AND ASSOCIATED METHODS |
| China P.R. | DOCKETED | | | | | SEARS BRANDS, L.L.C. | EGG SEPARATOR |
| China P.R. | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER FUNNEL |
| China P.R. | FILED | 2018306627877 | 11/21/2018 | | | SEARS BRANDS, L.L.C. | GRATER |
| EPC | GRANTED | 11187324.6 | 10/31/2011 | 2448220 | 09/27/2017 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING SMART APPLIANCES |
| EPC | FILED | 15156791.4 | 02/26/2015 | | | SEARS BRANDS, L.L.C. | MITER SAW ASSEMBLY WITH DETACHABLE CIRCULAR SAW |
| EPC | GRANTED | 16172686.4 | 02/26/2015 | 3088113 | 08/22/2018 | SEARS BRANDS, L.L.C. | MITER SAW ASSEMBLY WITH DETACHABLE CIRCULAR SAW |
| EPC | FILED | 16172700.3 | 02/26/2015 | | | SEARS BRANDS, L.L.C. | MITER SAW ASSEMBLY WITH DETACHABLE CIRCULAR SAW |
| EPC | FILED | 15185473.4 | 09/16/2015 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM FOR ENABLING WIRELESS CONTROL IN TOOLS BY USE OF PORTABLE POWER SUPPLY SYSTEMS WITH EMBEDDED COMMUNICATION COMPONENTS |
| EPC | FILED | 15194982.3 | 11/17/2015 | | | SEARS BRANDS, L.L.C. | ONBOARD MEASURING SYSTEM FOR MITER SAWS |
| EPC | FILED | 16186661.1 | 08/31/2016 | | | SEARS BRANDS, L.L.C. | RETRACTABLE TAPE MEASURE AND SECURING SAME |
| EPC | GRANTED | 16193401.3 | 10/11/2016 | 3165871 | 07/25/2018 | SEARS BRANDS, L.L.C. | HORIZONTAL-REEL TAPE MEASURE |
| EPC | FILED | 16195989.5 | 10/27/2016 | | | SEARS BRANDS, L.L.C. | POSITION FEEDBACK CONTROL METHOD AND POWER TOOL |
| EPC | FILED | 16204082.8 | 12/14/2016 | | | SEARS BRANDS, L.L.C. | POWER TOOL WITH OPTICAL MEASUREMENT DEVICE |
| EPC | FILED | 17153121.3 | 01/25/2017 | | | SEARS BRANDS, L.L.C. | REDUNDANT ACTUATION LOCK DECOUPLING MECHANISM |
| EPC | FILED | N/A | 09/12/2017 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING CONDUCTIVE CHARGING WITH MULTIPLE TERMINAL CONSTELLATIONS |
| EPC | FILED | N/A | 09/12/2017 | | | SEARS BRANDS, L.L.C. | CHARGER, CHARGE INDICATOR, AND ASSOCIATED METHODS |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | EGG SEPARATOR |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER FUNNEL |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | GRATER |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | UPPER PORTION OF MIXER IN LOWERED AND RAISED POSITION |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER (LOWER PORTION) |
| European Community Design | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| Germany | GRANTED | 602011041858.0 | 10/31/2011 | 2448220 | 09/27/2017 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING SMART APPLIANCES |
| Germany | GRANTED | 16172686.4 | 02/26/2015 | 602015015290.5 | 08/22/2018 | SEARS BRANDS, L.L.C. | MITER SAW ASSEMBLY WITH DETACHABLE CIRCULAR SAW |
| Germany | GRANTED | 16193401.3 | 10/11/2016 | 602016004262.2 | 07/25/2018 | SEARS BRANDS, L.L.C. | HORIZONTAL-REEL TAPE MEASURE |
| Great Britain | GRANTED | 11187324.6 | 10/31/2011 | 2448220 | 09/27/2017 | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING SMART APPLIANCES |
| India | FILED | 201611007792 | 03/05/2016 | | | SEARS BRANDS, L.L.C. | METHOD AND SYSTEM TO DYNAMICALLY GENERATE A WEB SERVICES INTERFACE THEREBY PREVENTING UNSOLICITED REQUESTS FROM REACHING THE WEB SERVICE RUNNING IN APPLICATION SERVER AND NEGATIVELY IMPACTING THE APPLICATION PERFORMANCE |
| Mexico | FILED | MX/a/2015/015865 | 11/17/2015 | | | SEARS BRANDS, L.L.C. | ONBOARD MEASURING SYSTEM FOR MITER SAWS |
| Mexico | FILED | MX/a/2016/011269 | 08/31/2016 | | | SEARS BRANDS, L.L.C. | RETRACTABLE TAPE MEASURE AND SECURING SAME |
| Mexico | FILED | MX/a/2016/013316 | 10/10/2016 | | | SEARS BRANDS, L.L.C. | HORIZONTAL-REEL TAPE MEASURE |
| Mexico | FILED | MX/a/2016/014196 | 10/28/2016 | | | SEARS BRANDS, L.L.C. | POSITION FEEDBACK CONTROL METHOD AND POWER TOOL |

| Mexico | GRANTED | MX/a/2016/016559 | 12/14/2016 | n/a | 09/10/2018 | SEARS BRANDS, L.L.C. | POWER TOOL WITH OPTICAL MEASUREMENT DEVICE |
|--------|---------|------------------|------------|-----|------------|---------------------|---------------------------------------------|
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | EGG SEPARATOR |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER FUNNEL |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | GRATER |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | UPPER PORTION OF MIXER IN LOWERED AND RAISED POSITION |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | STAND MIXER (LOWER PORTION) |
| Mexico | DOCKETED | | | | | SEARS BRANDS, L.L.C. | MIXER BOWL |
| PCT | FILED | PCT/US2017/027581 | 04/14/2017 | | | SEARS BRANDS, L.L.C. | ERGONOMIC GRIPPING MECHANISMS OF A HANDHELD AIR MOVEMENT APPARATUS |
| PCT | FILED | PCT/US2017/027585 | 04/14/2017 | | | SEARS BRANDS, L.L.C. | ERGONOMIC GRIPPING MECHANISMS OF AN ELECTRIC CUTTING APPARATUS |
| PCT | FILED | PCT/US2017/051100 | 09/12/2017 | | | SEARS BRANDS, L.L.C. | SYSTEMS AND METHODS FOR PROVIDING CONDUCTIVE CHARGING WITH MULTIPLE TERMINAL CONSTELLATIONS |
| PCT | FILED | PCT/US2017/51103 | 09/12/2017 | | | SEARS BRANDS, L.L.C. | CHARGER, CHARGE INDICATOR, AND ASSOCIATED METHODS |
| PCT | FILED | PCT/US2018/027044 | 04/11/2018 | | | SEARS BRANDS, L.L.C. | POWER TOOL WITH INTEGRATED MEASUREMENT DEVICE AND ASSOCIATED METHODS |
| PCT | FILED | PCT/US2018/12023 | 01/02/2018 | | | SEARS BRANDS, L.L.C. | COMPRESSIBLE CONTACTS FOR INTERFACING CHARGER |
| PCT | FILED | PCT/US2018/026880 | 04/10/2018 | | | SEARS BRANDS, L.L.C. | GARAGE DOOR OPENER SYSTEM WITH AUTO-CLOSE |
| South Africa | FILED | A2018/01737 | 11/12/2018 | | | SEARS BRANDS, L.L.C. | EGG SEPARATOR |
| South Africa | FILED | A2018/01738 | 11/12/2018 | | | SEARS BRANDS, L.L.C. | MIXER FUNNEL |
| South Africa | FILED | A2018/01743 | 11/12/2018 | | | SEARS BRANDS, L.L.C. | GRATER |
| South Korea | FILED | 10-2015-0094992 | 07/03/2015 | | | SEARS BRANDS, L.L.C. | REFRIGERATOR WITH A TOP SURFACE HAVING A NOTCHED PROFILE FOR PROVIDING ADDITIONAL STORAGE CAPACITY |
| EPC | FILED | 13849710.2 | 10/04/2013 | | | SEARS BRANDS, L.L.C. | INTEGRATED COOKTOP ASSEMBLY |
| PCT | FILED | PCT/US2013/063395 | 10/04/2013 | | | SEARS BRANDS, L.L.C. | INTEGRATED COOKTOP ASSEMBLY |

## **Exhibit F**

### **Redline of Executed APA Amendment**

**AMENDMENT NO. 1 TO**

**ASSET PURCHASE AGREEMENT**

This Amendment No. 1, dated as of February [●]11, 2019 (this "Amendment"), to the Asset Purchase Agreement (the "Purchase Agreement"), dated as of January 17, 2019, by and among Transform Holdco LLC, a Delaware limited liability company (together with any applicable Affiliated Designee, "Buyer"), Sears Holdings Corporation ("SHC" or the "Seller" and together with each of its Subsidiaries party to the Purchase Agreement, the "Sellers") is entered into by and among Buyer and each Seller. Terms capitalized but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

WHEREAS, Buyer and the Sellers have previously entered into the Purchase Agreement pursuant to which, among other things, Buyer will acquire the Acquired Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, Buyer and the Sellers desire to amend the Purchase Agreement in accordance with Section 13.3 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing, the representations, warranties, covenants and agreements set forth in the Purchase Agreement and this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

ARTICLE I    AMENDMENTS

SECTION 1.01.    Section 1.1 of the Purchase Agreement is amended as follows:

(a) The definition of "Acquired Inventory" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Acquired Inventory" shall mean (i) with respect to any Operating Leased Property, all Inventory which is located at, on or in transit to the applicable Operating Lease Property as of the Closing Date, (ii) with respect to any Operating Owned Property, all Inventory which is located at, on or in transit to the Operating Owned Property as of the Closing Date, (iii) with respect to any IP/Ground Lease Property, all Inventory which is located at, on or in transit to the IP/Ground Lease Property as of the Closing Date, (iv) with respect to any Operating Sparrow Properties, all Inventory located at, on or in transit to the Operating Sparrow Properties, and (v) all other Inventory Related to the Business other than Inventory included in clause (ii) of the definition of Excluded Inventory.

(b) The definition of "Buyer Party Release" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(c) The definition of "Designatable Lease" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Designatable Lease" shall mean each of (i) the GOB Leases, the Operating Leases, the Landlord Leases and the Sparrow Subleases and (ii) to the extent applicable to such leases and lease agreements, all non-disturbance agreements with fee owners or senior landlords, subordination, non-disturbance and attornment agreements, waivers and consents in favor of any Seller,  estoppel certificates from landlords under any of the Leases (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset-based lenders.

(d) The following is added as a new defined term:

"Employee Lease Agreement" shall mean the agreement substantially in the form of Exhibit H.

(e) The definition of "Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Expenses" shall mean (i) the Buyer Occupancy Costs, if applicable, and (ii) the reasonable and documented out-of-pocket fees, costs and expenses or other disbursements borne by any Seller or its Affiliates incurred or accruing (a) during the Designation Rights Period, to the extent Related to the Operating Leases, Operating Leased Stores, Landlord Leases or Sparrow Leases, (b) to the extent Related to the GOB Leases or GOB Leased Stores following the GOB Period for each such GOB Lease or GOB Leased Store, (c) to the extent Related to the GOB Owned Stores following the GOB Period for such GOB Owned Store, (d) after the Closing, to the extent related to an Additional Contract or any Operating Lease, Operating Leased Store, Landlord Lease or Sparrow Lease or (e) as a result of the Sellers being the tenant or landlord under the Designatable Lease or Additional Contract during, with respect to the GOB Leased Stores, the period commencing after the GOB Period for each such GOB Leased Store and ending at the expiration of the Designation Rights Period, and with respect to any Operating Leased Property, Landlord Lease or Sparrow Lease, during the Designation Rights Period, and any reasonable and documented fees, costs and expenses incurred by any Seller or its Affiliates in connection with any transfer of a Designatable Lease to Purchaser following the Designation Rights Period, but in each case shall not, for the avoidance of doubt, include rejection damages or Cure Costs.

(f) The definition of "GOB Period" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"GOB Period" shall mean with respect to each GOB Store, the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such GOB Store, as applicable, has been completed and all inventory of the Sellers has been removed from

such GOB Store, as applicable. For the avoidance of doubt, the Sellers may deliver any such notice on or prior to the Closing Date.

(g) The definition of "GOB Stores" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"GOB Stores" shall mean, individually or collectively as the context may require, the GOB Leased Stores, the GOB Sparrow Properties and the GOB Owned Stores.

(g) The following is hereby added as a new defined term:

"Landlord Leases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the Owned Real Property under which any Seller is the lessor (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(h) The definition of "Occupancy Expenses" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Occupancy Expenses" shall mean, with respect to any Lease Premises, Owned Real Property or Sparrow Property, all liquidated costs, expenses, obligations and liabilities under or in connection with the applicable Lease payable or paid by any Seller, including any and all mortgage payments, base rent, percentage rent, additional rent, CAM, utilities, Property Taxes and assessments, costs of continuing the level of maintenance and security required by this Agreement, a pro rata portion of insurance (including public liability and casualty insurance) attributable to such Lease or Lease Premises, Owned Real Property or Sparrow Property and all other categories of expenses, obligations and liabilities arising or accruing under or in connection with such Lease (whether or not billed by the applicable counterparty to such Lease), Owned Real Property or Sparrow Property.  For the avoidance of doubt, Occupancy Expenses shall not include any Seller's costs and expenses of (a) any professionals retained in connection with the Bankruptcy Cases or (b) counsel of any kind except to the extent counsel is retained with respect to a Lease, Owned Real Property or Sparrow Property and not the Sellers' other operations.

(i) The definition of "PA Liabilities Services Agreement" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety.

(j) The following is hereby added as a new defined term:

"Proration Date" shall have the meaning given in Section 9.11(a).

(k) The definition of "Securities Consideration" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Securities Consideration" shall mean the securities described in Schedule 9.2.

(l) The following is hereby added as a new defined term:

"Services Agreement" shall mean the agreement substantially in the form attached hereto as Exhibit I.

(m) The following are hereby added as new defined terms:

"Sparrow Leases" shall mean the Sparrow Subleases together with the lease listed in Schedule 1.1(r).

"Sparrow Subleases" shall mean each of (i) those leases or lease agreements (including ground leases) related to the Sparrow Properties under which any Seller is the lessor (including the leases listed on Schedule 1.1(s)) (together with all amendments, modifications, supplements and renewals thereof), and (ii) to the extent applicable to such leases and lease agreements, all non disturbance agreements with fee owners or senior landlords, subordination, non disturbance and attornment agreements, waivers and consents in favor of any Seller, estoppel certificates from landlords under any such leases and lease agreements (to the extent assignable), and landlord waivers or other collateral access agreements in favor of any Seller or any asset based lenders.

(n) The definition of "Store Cash" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Store Cash" shall mean any cash of the Sellers in the registers or otherwise held at any Operating Lease Property, any Operating Owned Property or any Sparrow Property, in an amount not to exceed $17,000,000.

(o) The definition of "Second Lien Line of Credit Facility" contained in Section 1.01 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Second Lien Line of Credit Facility" shall mean each line of credit facility granted pursuant to an amendment to the Second Lien Credit Agreement.

SECTION 1.02.    Section 2.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(p)        any and all Actions or Claims (other than returns of merchandise for warranty claims (except, for the avoidance of doubt, to the extent Related to Acquired Inventory or comprising Assumed Liabilities)) of Sellers as of the Closing that (i) constitute Acquired Assets under any other subsection of this Section 2.1, or (ii) are against vendors, counterparties to leases, licenses or other contracts, customers, Transferred Employees or parties to other

4

commercial relationships of the Business, in each case as of immediately prior to the Closing, that arose in connection with the ownership of the Acquired Assets or the operation of the Business or the Acquired Assets, excluding (in each case) any Actions or Claims that are, or are Related to, an Excluded Asset or Excluded Liability;"

SECTION 1.03.    Section 2.1(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(r)    the KCD Notes;"

SECTION 1.04.    Section 2.1(t) of the Purchase Agreement is hereby deleted in its entirety on the basis that its subject matter is addressed by Section 2.1(p) of the Purchase Agreement.

SECTION 1.05.    Section 2.1(v) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(v)    the release of the Released Estate Claims in accordance with Section 9.13;"

SECTION 1.06.    Section 2.1(bb) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.1(cc) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.1(dd) of the Purchase Agreement:

"(dd)    subject to Section 2.13, any Acquired Foreign Assets; and"

SECTION 1.07.    The following is hereby added as Section 2.1(ee) of the Purchase Agreement:

"(ee)    any bank accounts of the Sellers as may be agreed by Buyer and the Sellers prior to the Closing Date (but, for the avoidance of doubt, not including any cash in any such bank accounts)."

SECTION 1.08.    Section 2.2(i) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(i)    all Claims, Proceedings, and causes of action of Sellers other than Claims described in any subsection of Section 2.1.  Notwithstanding anything to the contrary in Section 2.1(p) or elsewhere, the Excluded Assets shall include (A) all Claims, Proceedings and causes of action of Sellers against vendors, counterparties to leases, licenses or other contracts, customers, Transferred Employees or parties to other commercial relationships of the Business, in each case as of immediately prior to the Closing, that that did not arise in connection with the ownership of the Acquired Assets or the operation of the Business or the Acquired Assets; (B) all Avoidance Actions; (C) all Released Estate Claims; and (D) all Claims, Proceedings, and causes of action

5

described in the second sentence of Section 9.13(e)(ii) (other than in clause (a) thereof), including any Claims against the Sellers or their directors, officers, insiders or shareholders under any applicable Law arising from any pre-petition transaction including for breach of fiduciary duty, fraudulent conveyance, or illegal dividend.  Nothing in this Section 2.2(i) or in any subsection of Section 2.1 shall affect the scope of the Released Estate Claims or Section 9.13, and in the event of any conflict between Section 2.2(i) and any subsection of Section 2.1, on the one hand, and Section 9.13, on the other hand, Section 9.13 shall govern;"

SECTION 1.09.      Section 2.2(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)      all bank accounts (except as otherwise provided in Section 2.1(ee);"

SECTION 1.10.      Section 2.2(p) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section and Section 2.2(q) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(q)      the SHIP Purchase Agreement Assets (if the SHIP Closing shall have occurred prior to the Closing Date); and"

SECTION 1.11.      In Section 2.3(i) of the Purchase Agreement, the reference to "Section 9.2" is revised to refer to "Section 9.2(a)".

SECTION 1.12.      Section 2.3(j) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(j)      all Liabilities with respect to the Transferred Employees (i) to the extent arising as a result of an event, action or omission that occurs on or following the Closing Date or (ii) expressly assumed by Buyer and its Subsidiaries pursuant to Section 9.7 (including under the Employee Lease Agreement);"

SECTION 1.13.      Section 2.3(n) of the Purchase Agreement is hereby amended to remove the word "and" at the conclusion of such Section, Section 2.3(o) of the Purchase Agreement is hereby amended to replace the period at the conclusion of such Section with a semicolon and the following is hereby added as Section 2.3(p) of the Purchase Agreement:

"(p)      the claims underlying the mechanics' liens identified in Section 2 of Schedule 6.5; and"

SECTION 1.14.      The following is hereby added as Section 2.3(q) of the Purchase Agreement:

"(q)      all fee and reimbursement obligations in connection with any Backstopped Letter of Credit."

SECTION 1.15.    Section 2.3(k)(x) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(x)    Notwithstanding anything to the contrary herein or in the Approval Order, and for the avoidance of doubt, the Buyer's agreement to pay Assumed 503(b)(9) Claims, Other Payables, or any other administrative or priority claim of the Sellers pursuant to the terms hereof is a general unsecured contractual obligation of the Buyer owed solely to the Sellers;"

SECTION 1.16.    Section 2.4(p) of the Purchase Agreement is hereby amended to add the word "and" at the conclusion of such Section, Section 2.4(q) of the Purchase Agreement is hereby amended to replace "; and" at the conclusion of such Section with a period and Section 2.4(r) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(r)    [Reserved]."

SECTION 1.17.    The final paragraph of Section 2.4 is revised to read as follows:

"For the avoidance of doubt, (i) all Taxes of any Seller shall be Assumed Liabilities, regardless of the time and circumstances giving rise to any such Taxes, except for any Tax expressly excluded under Section 2.4(h) or Section 2.4(i) and (ii) the Liabilities of any entity that is an Acquired Foreign Asset shall not be Excluded Liabilities."

SECTION 1.18.    Section 2.6 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.6    Purchase and Sale of Designation Rights.  Upon the terms and subject to the conditions of this Agreement and the Approval Order, on the Closing Date, Sellers shall sell, transfer, assign and convey, or cause to be sold, transferred, assigned and conveyed, to Buyer, and Buyer shall purchase from Sellers, the Designation Rights. For the avoidance of doubt, the sale, transfer, assignment and conveyance of the Designation Rights provided for herein on the Closing Date shall not effectuate a sale, transfer, assignment or conveyance of any Designatable Lease to Buyer or any other Assignee, which shall only be effectuated on a Designation Assignment Date; provided, that, notwithstanding the foregoing, Buyer shall be responsible for all Expenses arising under or related to any Designatable Lease from and after the Closing Date until, if applicable, the rejection of such Designatable Lease in accordance with this Agreement. Subject to the terms and conditions of this Agreement, the Approval Order and the requirements of section 365(b) of the Bankruptcy Code, Buyer shall have the right to designate itself or any other Person as the Assignee to which a Designatable Lease is to be assumed and assigned.  The Designation Rights shall terminate upon the expiration of the Designation Rights Period."

7

SECTION 1.19.    Section 2.8(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    Notwithstanding anything to the contrary contained in this Agreement, the Sellers shall not transfer the KCD Notes to Buyer, and Buyer shall not assume the PA Liabilities from the Sellers, unless and until the Sellers have received the requisite consent of the Bermuda Monetary Authority or any other applicable Bermuda regulatory authority to the transfer of the KCD Notes (the "BMA Consent").  The Sellers shall cooperate with Buyer in determining the manner in which such transfer pursuant to Section 2.1(r) shall take place as soon as practicable after the Closing.  The Sellers shall use reasonable best efforts to obtain the BMA Consent and Buyer shall cooperate in such efforts.  Immediately following receipt of the BMA Consent, the transfer of the KCD Notes and the assumption of the PA Liabilities shall take place simultaneously.  From the Closing Date until such time as the transfer of the KCD Notes and the assumption of the PA Liabilities occurs, pursuant to the Services Agreement, (i) Buyer shall provide services to the applicable Sellers sufficient to enable Sellers to perform the PA Liabilities and (ii) in consideration for such services, Sellers shall pay to Buyer an amount equal to the aggregate of all amounts paid by Buyer to Sellers with respect to any licenses under which Buyer licenses the KCD IP."

SECTION 1.20.    Section 2.9 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.9    If, at any time prior to the date that is sixty (60) days after the Closing Date, but in no event later than May 3, 2019 (the "Designation Deadline"), Buyer so determines as to any Contract that is Related to the Acquired Assets or is an IP License, in each case but is not an Initial Assigned Contract (other than (i) any lease of non residential real property and (ii) any Excluded Asset set forth in Section 2.2) (each, an "Additional Contract"), Buyer may elect, after consultation with the Sellers, by written notice delivered to the Sellers, to designate for assignment or assumption and assignment any Additional Contract for no additional consideration.  Upon the designation of any such Additional Contract as an Assigned Agreement pursuant to this Section 2.9, the Sellers will use their reasonable best efforts to assume and assign to the applicable Assignee such Additional Contract so long as the Buyer pays all Expenses accrued post-Closing and all Cure Costs associated with such Additional Contract; provided, however, that nothing herein shall be deemed or construed to obligate the Sellers to retain, or refrain from rejecting or terminating any Lease or Contract after the Designation Deadline that does not constitute an Assigned Agreement.  Notwithstanding anything to the contrary herein, the Sellers shall not be obligated to assume and assign any Contract pursuant to this Section 2.9 with respect to which Buyer fails to satisfy the Bankruptcy Court as to adequate assurance of future performance or for which Consent is required to assume and assign such Additional Contract and such Consent has not been obtained, provide that the Parties shall use their reasonable best efforts to obtain all such Consents.  Without duplication of any amounts payable under the Services Agreement, Buyer shall pay all Expenses accrued after the Closing with respect to any Additional Contract that is not ultimately designated as an Assigned Agreement if and to the extent Buyer receives a

benefit under such Additional Contract.  If the Sellers also receive a benefit under such Additional Contract after the Closing, Buyer and the Sellers shall allocate a proportionate amount of the Expenses with respect to such Additional Contract to the Sellers (including by netting against amounts owed by Buyer)."

SECTION 1.21.    Section 2.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 2.11    Rejection of Outbound IP Licenses.  Within seven (7) Business Days after the Closing Date, subject to section 365(n) of the Bankruptcy Code, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject any Outbound IP Licenses that (i) are executory Contracts and (ii) are designated by Buyer for rejection at any time prior to the second (2nd) Business Day prior to the Closing Date (such Contracts, "Closing Date Rejected Licenses"). Without limiting the foregoing, promptly following the Designation Deadline, the Sellers shall file a motion to reject, and take all actions (including actions required under section 365 of the Bankruptcy Code) reasonably necessary to reject, any Outbound IP Licenses that (x) are not Closing Date Rejected Licenses, (y) are executory Contracts and (z) are not designated by Buyer for assignment or assumption and assignment as an Assigned Agreement in accordance with the terms of this Agreement or for solely assumption pursuant to Section 9.14(d)."

SECTION 1.22.    Section 2.13(a) and Section 2.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    On the Closing Date, (i) the Sellers shall use reasonable best efforts to cause each of the Foreign Subsidiaries to sell, transfer, assign, convey and deliver, or cause to be sold, transferred assigned, conveyed and delivered to Buyer or the applicable Assignee, and Buyer or such applicable Assignee shall use reasonable best efforts to purchase, all right, title and interest of each of the Foreign Subsidiaries, in, to or under all assets, properties and rights Related to the Business (other than the Excluded Assets) and any other assets of the type that would have been Acquired Assets had they had been owned by the Sellers as of the Closing Date or minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and the Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) (collectively, the "Acquired Foreign Assets"), in each case free and clear of any and all Encumbrances of any kind, nature or description and any Claims, other than Permitted Post-Closing Encumbrances and (ii) subject to and to the extent of the transfer of the Acquired Foreign Assets, Buyer shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms all Liabilities (other than Excluded Liabilities) of the type that would have been Assumed Liabilities had the applicable Foreign Subsidiary been a Seller as of the Closing Date.  If the transfer of any Acquired Foreign Assets does not occur at the Closing Date, Seller and Buyer shall use reasonable best efforts to complete such transfer as promptly as practicable and shall enter into such agreements as may be reasonably required to provide Buyer or the applicable Assignee the benefit of such assets until such transfer is consummated.  If, at any time prior to the date that is

9

sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire all of the equity interests in any Foreign Subsidiary in lieu of the acquisition of assets and assumption of liabilities contemplated by the first sentence of this Section 2.13(a), then the Sellers shall use reasonable best efforts to transfer such equity interests, which equity interests shall be deemed to be Acquired Foreign Assets.  If (i) the proposed transfer of any Acquired Foreign Assets triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable Acquired Foreign Asset).

(b)    If, at any time prior to the date that is sixty (60) days after the Closing Date, Buyer determines (in its sole discretion) and notifies the Seller that it is necessary or desirable to acquire other minority equity interests in non-U.S. Persons held by Subsidiaries of the Seller (other than any Subsidiary who is a Seller (including, if agreed between Buyer and Sellers, through transferring the equity of any such Subsidiaries holding such minority equity interests)) so as to ensure that Buyer or the applicable Assignee shall be able to secure the benefit of the applicable Acquired Foreign Assets, Buyer may elect, by written notice delivered to the Sellers, to acquire such other minority equity interests directly from the Seller it being agreed by the Parties that such equity interests will be deemed to be Acquired Foreign Assets for the purposes of this Agreement.  Following any such election, Buyer and the Seller shall promptly execute all documentation required to effectuate the purchase and sale of such other minority equity interests under applicable Law.  If (i) the proposed transfer of any such other minority equity interests triggers any right of first offer, right of first refusal or other preemptive right by a third party and (ii) such third party exercises such right of first offer, right of first refusal or other preemptive right, then the Sellers shall pay or cause to be paid to Buyer any consideration received by the Sellers or their Subsidiaries resulting from such exercise (and such transfer shall be deemed to satisfy the Sellers' obligation to sell, transfer, assign, convey or deliver the applicable other minority equity interests)."

SECTION 1.23.    Section 3.1(a)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    an amount in cash equal to the Store Cash as of 12:01 a.m. New York City time on the Closing Date (the "Store Cash Payment Amount"); *plus*;"

SECTION 1.24.    The following proviso is hereby added at the end of Section 3.1(a):

"provided, that to the extent any portion of the Closing Payment Amount will be used by Sellers to satisfy the existing indebtedness of Sellers under the DIP Credit Agreement with respect to outstanding letters of credit, Buyer shall assume, cash collateralize or backstop any such letters of credit (any such assumed, cash collateralized or backstopped letters of credit, the "Backstopped Letters of

Credit"). The obligation of Buyer to pay the cash portion of the Closing Payment Amount shall be reduced on a dollar for dollar basis by the face amount of the Backstopped Letters of Credit. Sellers shall notify Buyer on the Business Day prior to the Closing Date as to any amounts outstanding under the DIP Credit Agreement as to which Buyer shall be required to assume or backstop letters of credit."

SECTION 1.25.    Section 3.1(b)(iv) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(iv)    obligations held by, or credit bid at the direction of, Buyer and its Affiliates as of the Closing Date in an aggregate amount equal to $433,450,000 under (x) the Second Lien Term Loan; (y) the Second Lien Line of Credit Facility; and (z) the Second Lien PIK Notes,"

SECTION 1.26.    Section 4.13.3 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 3.3            Closing Payment.

(a)    At the Closing, Buyer shall:

(i) pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Closing Payment Amount *less* the Deposit Amount *less* the Store Cash Payment Amount *plus* any amounts payable pursuant to Section 3.1(c); and

(ii) deliver the Securities Consideration to the Sellers.

(b)    Within one (1) Business Day following the Closing Date, the Sellers shall deliver a statement to Buyer setting forth the Store Cash Payment Amount. On the third (3rd) Business Day following the Closing Date, Buyer shall pay to Sellers by wire transfer of immediately available funds into one or more accounts designated by Sellers an amount in cash equal to the Store Cash Payment Amount."

SECTION 1.27.    Section 4.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.1    Closing Date. The closing of the sale, transfer, assignment, conveyance and delivery of the Designation Rights and the Sellers' right, title and interest in, to and under the Acquired Assets by the Sellers to Buyer contemplated hereby (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, or at such other place or time as Buyer and the Sellers may mutually agree, on the third (3rd) Business Day following satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). Notwithstanding the

immediately preceding sentence, if the Marketing Period has not ended at the time of the satisfaction or waiver of the conditions set forth in Article X and Article XI (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), then the Closing shall occur instead on the date that is the earlier to occur of (x) any Business Day as may be specified by Buyer on no less than two (2) Business Days' prior written notice to the Sellers and (y) two (2) Business Days following the final day of the Marketing Period. The date on which the Closing actually occurs is referred to as the "Closing Date", and for all purposes under this Agreement and any Transaction Document (including the Occupancy Agreement and the Seller Retained Occupancy Agreement), the Closing Date shall be deemed to be 12:01 a.m., New York City time on the date on which Closing actually occurs."

SECTION 1.28.    SECTION 1.27. Section 4.2(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    the Employee Lease Agreement and the Services Agreement, each duly executed by Buyer; and"

SECTION 1.29.    SECTION 1.28. Section 4.3(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)    a quit claim deed to be recorded with respect to the Owned Real Property (or with respect to Owned Real Property in Puerto Rico, a deed of purchase and sale with no warranty other than the warranty of title, subject to all matters of record, as such matters are affected by the Approval Order (or if a deed of purchase and sale with such no warranty is not acceptable to the title insurer to receive insurable title in Puerto Rico, such other form of deed of purchase and sale as is reasonably acceptable to Sellers, Buyer and the title insurer to receive insurable title in Puerto Rico)), or if a quit claim deed is not acceptable to the title insurer to receive insurable title in a particular jurisdiction, a no-warranty deed;"

SECTION 1.30.    SECTION 1.29. Section 4.3(h) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(h)    all tangible embodiments of the Acquired Intellectual Property, including all (i) Software object code and source code related thereto, (ii) all materials and documentation (in electronic and editable form, to the extent existing in such form) necessary for the use, modification, manufacture, sale and other exploitation of the Acquired Intellectual Property, to the extent not included in Intellectual Property Related Documentation, (iii) all content made available on or through any websites and webpages accessed through any Domain Names or Media Accounts included in the Acquired Intellectual Property and all other audio-visual or written materials (including such archival materials) produced by or on behalf of the Sellers, (iv) all Labeling and Marketing Materials and (v) all Product Catalogs and Manuals;"

SECTION 1.31.    ~~SECTION 1.30.~~ Section 4.3(k) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(k)    a counterpart of each Short Form Assignment provided by Buyer to Seller as of February 5, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute all other jurisdiction-specific Short Form Assignments provided by Buyer to Seller unless otherwise agreed in writing by the Parties);"

SECTION 1.32.    ~~SECTION 1.31.~~ Section 4.3(l) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(l)    a counterpart of each IP Power of Attorney provided by Buyer to Seller as of February 5, 2019, duly executed by each applicable Seller (it being understood that post-Closing, the Parties will, in good faith, continue to prepare and execute all other jurisdiction-specific IP Powers of Attorney provided by Buyer to Seller unless otherwise agreed in writing by the Parties);"

SECTION 1.33.    ~~SECTION 1.32.~~ Section 4.3(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(n)    the Employee Lease Agreement and the Services Agreement, each duly executed by the Sellers;"

SECTION 1.34.    ~~SECTION 1.33.~~ Section 4.4 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 4.4    Local Sale Agreements.  Subject to the terms and conditions hereof, to the extent necessary or desirable to effect the Closing on the terms hereof, Buyer or applicable Assignee and relevant Sellers shall, enter into such agreements or instruments, including a sale agreement and no-warranty deed for the Owned Real Property (or with respect to Owned Real Property in Puerto Rico, a deed of purchase and sale with no warranty other than the warranty of title, subject to all matters of record, as such matters are affected by the Approval Order  (or if a deed of purchase and sale with such no warranty is not acceptable to the title insurer to receive insurable title in Puerto Rico, such other form of deed of purchase and sale as is reasonably acceptable to Sellers, Buyer and the title insurer to receive insurable title in Puerto Rico)), or if a quit claim deed is not acceptable to the title insurer to receive insurable title in a particular jurisdiction, a no-warranty deed, and bills of sale and/or assignment and assumption agreements, providing for the sale, transfer, assignment or other conveyance to Buyer or applicable Assignee, in accordance with the requirements of applicable local Law.  The Sellers and Buyer acknowledge and agree that to the extent applicable law imposes requirements for transferring assets of record, the Parties will reasonably cooperate to satisfy such requirements as to transfer such assets as promptly as reasonably practical after Closing."

SECTION 1.35.    ~~SECTION 1.34.~~ Section 5.1(c)(ii) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(ii)    The operation of the GOB Owned Stores during the GOB Period and the Sparrow Properties set forth on Schedule 5.1(c)(ii) (collectively, the "GOB Sparrow Properties" and the Sparrow Properties other than the GOB Sparrow Properties, the "Operating Sparrow Properties") during the period commencing on the Closing Date and ending on the date that the Seller delivers written notice to Buyer that the "going-out-of-business" sale with respect to such Sparrow Properties has been completed and all inventory of the Sellers has been removed from such Sparrow Properties shall be governed by the Seller Retained Occupancy Agreement and the Seller shall conduct such operation pursuant to such Seller Retained Occupancy Agreement as the Seller determines in its sole discretion."

SECTION 1.36.    ~~SECTION 1.35.~~ Section 5.2(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Within five (5) Business Days following the date upon which Buyer delivers a Buyer Assumption Notice to the Sellers with respect to any Designatable Lease, together with a related assignment agreement substantially in the form attached hereto as Exhibit E (the "Assignment and Assumption of Lease") executed by the applicable Assignee, the Sellers shall (1) deliver to Buyer and such Assignee a fully executed Assignment and Assumption of Lease and (2) file with the Bankruptcy Court and serve on the applicable lessor(s) and other appropriate notice parties (as applicable) a notice, and shall seek entry by the Bankruptcy Court of the Approval Order in respect of the Designatable Leases subject to such Buyer Assumption Notice.  As of the applicable Designation Assignment Date, except for such obligations and liabilities with respect to such Designatable Leases and the related Lease Premises arising during the Designation Rights Period and except for Buyer's obligations specifically set forth in this Agreement, as between Buyer and the Assignee, Buyer shall have no further obligation or Liability with respect to such Designatable Lease or the related Lease Premises (including any obligation to continue to pay Expenses with respect thereto) and Assignee shall thereafter be solely responsible for all amounts payable or other obligations or liabilities that may be owed in connection with such Designatable Lease or the related Lease Premises; provided, however, that nothing in this sentence shall affect the Sellers' rights against Buyer with respect to such Designatable Lease or the Lease Premises as set forth in this Agreement.;"

SECTION 1.37.    ~~SECTION 1.36.~~ Section 6.6(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    Except as would not, individually or in the aggregate, reasonably be expected to  have a Material Adverse Effect, the Sellers have good and marketable fee title to the Owned Real Property, free and clear of all liens (except for Permitted Encumbrances).  None of the Owned Real Property is subject to any leases or tenancies or other rights of occupancy other than the Landlord Leases;"

SECTION 1.38.    ~~SECTION 1.37.~~ Section 8.8(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    [Reserved]."

SECTION 1.39.    ~~SECTION 1.38.~~ Section 8.8(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    To the extent permitted by applicable Law, during the Management Services Period, the applicable the Sellers shall remain the manager, controller or operator of each Acquired Property, Occupancy Leased Premise and Sparrow Property solely to the limited extent required for any Permit applicable to such Acquired Property, Occupancy Leased Premise or Sparrow Property (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) to remain effective  (the "Management Services").  Notwithstanding the foregoing, to the fullest extent permitted by applicable Law, each of the Sellers hereby appoints Buyer and its Affiliated Designees as agent of such Seller to manage, control and operate each of (i) the Acquired Properties, (ii) Occupancy Leased Premises and (iii) the Sparrow Properties (in the case of the Sparrow Properties, solely to the extent of any Sellers' rights related to the Sparrow Properties) at which Management Services are being provided (collectively, the "Managed Properties").  Pursuant to their appointment as the Sellers' agent, Buyer and its Affiliated Designees shall be entitled to manage, control and operate each of the Managed Properties as they see fit in their sole discretion and collect and retain all revenues generated by each Managed Property.  In furtherance thereof, the Parties acknowledge and agree that the Sellers shall have no economic interest in the Managed Properties other than the right to receive the Management Services Reimbursements.  As consideration for the provision of the Management Services, Buyer shall reimburse the Sellers, or cause the Sellers to be reimbursed, for any reasonable and documented out-of-pocket costs, fees and expenses incurred at any time in providing the Management Services, including any income and other taxes incurred by the Seller and its Subsidiaries in respect of the payment and receipt of such reimbursement (the "Management Services Reimbursements") and indemnify the Sellers from any Liability arising from the provision of the Management Services, except for any such Liability arising from gross negligence or willful misconduct of the Sellers. For the avoidance of doubt, all employees of the Managed Properties shall be employed by Buyer or its Affiliated Designee and no Seller shall have any authority to take action as an employer with respect to any such employee or to enter into any Contract on behalf of Buyer or any Affiliated Designee except to the extent otherwise provided for pursuant to any arrangement entered into in accordance with Section 9.7(a);"

SECTION 1.40.    ~~SECTION 1.39.~~ The following is hereby added as Section 8.10 of the Purchase Agreement:

"Section 8.10    Sparrow Master Lease.  The Parties hereby agree that the lease set forth on Schedule 1.1(r) shall be assumed by the Sellers and assigned to the Buyer on the Closing Date."

15

SECTION 1.41.    ~~SECTION 1.40.~~ Section 9.2(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(a)    Unless Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer): (1) Buyer shall provide to the Sellers detailed instructions as to steps to take (or not take) in order to secure and preserve the qualification of any of the transactions set forth in this Agreement as a Tax Reorganization (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller) and to achieve the Tax Result, including with respect to (i) repayment, cancellation or settlement of, or other actions with respect to, intercompany accounts after the approval of the Bankruptcy Plan and on or before the Closing Date, (ii) the merger of any of the Sellers' Subsidiaries with another Sellers' Subsidiaries after the approval of the Bankruptcy Plan and on or before the Closing Date or conversion of any of the Sellers' Subsidiaries into limited liability companies, (iii) the filing of any Tax elections to treat any such Subsidiaries as disregarded entities for U.S. federal income tax purposes, or otherwise taking an action to establish that such Subsidiaries have liquidated for tax purposes, (iv) implementation of the Distribution Requirement in a manner that is consistent with section 507 of the Bankruptcy Code, (v) satisfaction of the ownership requirements set forth in section 382(l)(5)(A)(ii) of the Code, (vi) the manner in which the transfer of the KCD Notes shall take place, and (vii) any other instructions that in the reasonable opinion of tax counsel for Buyer are necessary or desirable to ensure the qualification of the Tax Reorganization and the achievement of the Tax Result, and the Sellers shall follow such instructions; provided that (A) such instructions shall not limit the Sellers' discretion or actions in respect of (x) operating the Business and its other Assets in the Ordinary Course of Business and in compliance with the other provisions of this Agreement for all periods through the Closing Date, (y) disposing of any of its Assets if and to the extent permitted under the other provisions of this Agreement (z) taking or refraining from taking any action required by this Agreement or by Law, including if such actions would be inconsistent with its obligations under the Bankruptcy Code or other applicable Law, (B) if requested by the Sellers, Buyer's tax counsel shall deliver to the Sellers a Tax Opinion that each and any such transaction (other than any Designated Sale Transactions) qualifies as a Tax Reorganization, and (C) nothing herein shall affect Buyer's  liability for Taxes that are Assumed Liabilities; (2) subject to the preceding clause (1), the Sellers agree to cooperate with Buyer in order that, for federal income Tax purposes, the transactions effected pursuant to this Agreement, together with the distributions made by, and liquidation of, the Sellers pursuant to the Bankruptcy Plan, are treated as one or more plans of reorganization under section 368 of the Code and as qualifying as one or more reorganizations under section 368(a)(1)(G) of the Code (except if and to the extent Buyer determines otherwise, in accordance with Section 2.12(b), in respect of a given transaction or a particular Seller); (3) any Tax Return in respect of a Tax imposed on any Seller for which Buyer is liable hereunder shall be prepared by Buyer, a copy of such Tax Return shall be provided to SHC at least thirty (30) days prior to the due date thereof, Buyer shall consider in good faith any reasonable comments provided by the Sellers, the Sellers shall, if necessary for filing, properly execute any such Tax Return, and Buyer

shall timely and properly file any such Tax Return and pay the amount of any Taxes shown due on any such Tax Return; and (4) immediately following the Closing, subject to applicable Law, the Sellers shall take the steps with respect to the Securities Consideration described in Schedule 9.2. Consistent with and subject to the foregoing, the Seller shall convert any of the Sellers' Subsidiaries as shall be designated by Buyer to a limited liability company pursuant to instructions provided by Buyer."

SECTION 1.42.    ~~SECTION 1.41.~~ Section 9.3(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(d)    As soon as practicable (and in any event within ninety (90) days) after the Closing Date, Buyer shall deliver to the Sellers a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Acquired Assets for Tax purposes) (the "Allocation Schedule"). The Allocation Schedule shall allocate the Purchase Price among the Sellers and among the Acquired Assets acquired from each Seller, and shall be prepared in accordance with Section 1060 of the Code if Buyer makes the election under Section 2.12(b) to treat all the transactions described in Article II as Designated Sale Transactions (resulting in no transfer of the Sellers' Tax attributes to Buyer), and in any case shall be prepared in accordance with applicable law to the extent necessary to comply with reporting in respect of applicable Transfer Taxes. The Allocation Schedule shall be deemed final unless the Sellers notify Buyer in writing that the Sellers object to one or more items reflected in the Allocation Schedule within forty-five (45) days after delivery of the Allocation Schedule.  In the event of any such objection, Buyer and the Sellers shall negotiate in good faith to resolve such dispute; provided, however, that if Buyer and the Sellers are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days after the delivery of the Allocation Schedule, such dispute shall be resolved by the CPA Firm.  The fees and expenses of the CPA Firm in connection therewith shall be borne equally by Buyer and the Sellers.  Each of Buyer and the Sellers agrees to file its respective federal, state and local Tax returns in accordance with the Allocation Schedule, and any adjustments to the Purchase Price pursuant to this Section 9.3 shall be allocated in a manner consistent with the Allocation Schedule. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the parties do not agree with respect to such determination, such matter shall be resolved in accordance with the determination of the CPA Firm; provided further, that such Tax Return will be adjusted, as applicable, consistent with the procedures described above, to reflect any adjustments to the allocated Purchase Price.  Notwithstanding the foregoing, in the case of any asset for which an allocation of Purchase Price is required earlier than contemplated by the foregoing, the time frame for determination of the allocation of Purchase Price to those assets shall be fixed by the Parties to accommodate such requirement, provided that any such allocation may thereafter be revised for other purposes as appropriate and necessary to reflect the overall final allocation of Purchase Price in the Allocation Schedule."

SECTION 1.43.   SECTION 1.42. Section 9.7 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 9.7          Employment Offers.

(a)     Buyer shall make an offer of employment to any Business Employee represented by a labor union and whose terms and conditions of employment are covered by a collective bargaining agreement ("Represented Employees") using reasonable best efforts to comply with the requirements of any such collective bargaining agreement.  For any Business Employee not represented by a labor union ("Non-Represented Employees"), Buyer shall, or shall cause any of its Subsidiaries to, (i) no later than five (5) days prior to the date determined under the Employee Lease Agreement (the "Offer Effective Date"), use reasonable best efforts to provide a written offer of employment in a comparable position to, effective as of 11:59 p.m., local time, on the Offer Effective Date, each of such Business Employees, or (ii) to the extent required by and in accordance with applicable Law, enter into employment agreements with each of such Business Employees. Those Business Employees, including both Represented Employees and Non-Represented Employees, who accept such offer of employment on or before the Offer Effective Date in accordance with the provisions of such offer and continue employment with Buyer or any of its Subsidiaries, shall be referred to as "Transferred Employees."  At the Closing, Buyer and the Seller shall enter into the Employee Lease Agreement pursuant to which Buyer shall, at Buyer's cost, have the benefit of the Business Employees' (the "Leased Employees") services during the period from the Closing Date through the Offer Effective Date (the "Lease Period") such that Buyer may carry on the operation of the Business from and after the Closing Date. In accordance with the Employee Lease Agreement, and for the avoidance of doubt, Buyer shall timely advance to the Seller the actual, out-of-pocket expenses to be paid or provided by the Seller and its Subsidiaries for wages and benefits associated with the Leased Employees during the Lease Period and any other liabilities attributable to Leased Employees that are incurred by the Seller and its Subsidiaries in connection with the Employee Services (as defined in the Employee Lease Agreement) during the Lease Period such that the Seller is in the same economic position as if the Leased Employees had been hired by Buyer as of the Closing. For the avoidance of doubt, during the Lease Period, the Seller and its Subsidiaries shall continue to provide to each of the Leased Employees compensation and benefits on the same basis as they were provided to such Leased Employee immediately prior to the Closing Date.

(b)     Subject to the last sentence of this Section 9.7(b) and except as otherwise expressly provided in this Section 9.7(b), with respect to each Transferred Employee who remains employed by Buyer or any of its Subsidiaries, Buyer shall, or shall cause any of its Subsidiaries to, provide for the period commencing on the Offer Effective Date and ending on the last day of the Sellers' fiscal year ending in 2020, subject to such Transferred Employee's continued employment with Buyer or any of its Subsidiaries (as applicable) (i) (A) base salary or hourly wage rate and (B) a target short-term cash incentive opportunity, in each of (A) and (B), that is at least equal to the base salary or wages and target short-term cash incentive opportunity, respectively, provided to such

Transferred Employee immediately prior to the Closing Date and (ii) a group health and welfare plan and, subject to and in accordance with Section 9.7(k), a 401(k) plan, qualified under Sections 401(a) and 401(k) of the Code ("401(k) Plan"), that are substantially comparable in the aggregate to the group health and welfare plan and 401(k) Plan under which such Transferred Employee participates as of the date hereof.  For the avoidance of doubt, (x) the terms of this Section 9.7(b) shall apply notwithstanding anything to the contrary in any non-solicitation or similar agreement currently entered into by Buyer or any of its Affiliates and the Sellers and (y) from and after the date hereof, no such non-solicitation or similar agreement by Buyer and any Seller or any Affiliate thereof entered into prior to the date hereof shall prevent Buyer from hiring (or seeking to hire) any employee of the Sellers.  The Parties agree to cooperate in good faith to coordinate the establishment of benefit plans and arrangements so as to satisfy the obligations set forth in this Section 9.7(b)(ii).

(c)    Except as otherwise provided under the terms of the applicable Employee Plan, each Transferred Employee shall be given credit for all service with the Sellers under all employee benefit plans, programs and policies and fringe benefits of the Business or Buyer or any of its Subsidiaries in which they become participants (i) for purposes of eligibility, participation, and vesting (but not benefit accruals), and (ii) with respect to any vacation and severance plans, programs or arrangements of Buyer or its Subsidiaries, for purposes of determining the level of benefits except to the extent such crediting would result in duplication of benefits with respect to the same period of service.

(d)    If a Transferred Employee becomes eligible to participate in a medical, dental or health plan of Buyer (or its Subsidiaries), Buyer shall, or shall cause its Subsidiaries to, to the extent permitted by (x) applicable Law and (y) the terms of the applicable medical, dental or health plan of Buyer or any of its Subsidiaries in which the Transferred Employee participates following the Closing, cause the plan provider of such plan to (i) waive any preexisting condition limitations to the extent such pre-existing condition limitations would not have been applicable under the applicable medical, dental or health plans of the Sellers as of immediately prior to the Closing Date and (ii) credit any complete or partial satisfaction of any deductible and out-of-pocket expenses incurred by the Transferred Employee and his or her dependents under the applicable Seller's or its Subsidiaries' medical, dental or health plans during the portion of the calendar year in which the Closing Date occurs.  Buyer agrees to use commercially reasonable efforts to cause a medical, dental and health plan provider to provide such waivers and credits contemplated by the first (1st) sentence of this Section 9.7(d).  If a Transferred Employee becomes eligible to participate in a group term life insurance plan maintained by Buyer or its Subsidiaries, Buyer shall use commercially reasonable efforts to cause such plan to waive any medical certification for such Transferred Employee up to the amount of coverage the Transferred Employee had under the life insurance plan of the Sellers (but subject to any limits on the maximum amount of coverage under Buyer's life insurance plan).

(e)     Except as required by Law or an applicable bargaining agreement or as otherwise agreed in writing by the Parties, Buyer or any of its Subsidiaries shall provide severance and other separation benefits to each Leased Employee and Transferred Employee terminated by Buyer or any of its Subsidiaries within the period commencing on the Closing Date and ending on the last day of the Sellers' fiscal year ending in 2020 that are at least equal to the severance and other separation benefits provided by the Seller and its Subsidiaries to such Leased Employee and Transferred Employee as in effect immediately prior to the Petition Date, it being understood that such severance and other separation benefits do not include any long-term incentive, equity incentive, defined benefit pension or retiree welfare or life insurance benefits.

(f)     Except as prohibited by applicable Law, each offer letter shall provide that by accepting employment with Buyer the Business Employee is acknowledging that Buyer is assuming, and Buyer shall assume all vacation days and other paid time off accrued but not yet taken by each Transferred Employee through the Offer Effective Date, in accordance with their terms as of the date hereof.  To the extent that applicable Law prohibits a Transferred Employee's vacation from being assumed by Buyer and requires that a Transferred Employee to be paid for any vacation days and other paid time off accrued but not yet taken by such Transferred Employee as of the Offer Effective Date without regard to any acknowledgement by such Transferred Employee to the contrary, the Sellers shall pay each Transferred Employee for such vacation days.

(g)     The Sellers agree to pay to the Transferred Employees any bonus (including any related payroll Taxes) that such Transferred Employees would have been paid had they remained employees of the Sellers through the date the bonus in respect of the fiscal year ending February 2, 2019.

(h)     Buyer and the Seller agree to cooperate in good faith to ensure that Transferred Employees do not experience a break in health coverage from and after the Closing Date. Buyer shall take commercially reasonable efforts to provide or make available the health coverage required by Section 4980B of the Code available with respect to any individual who is an "M&A Qualified Beneficiary" (as defined in Treasury Regulation Section 54.49806-9 (Q&A 4) of the Code) as the result of the consummation of the Transactions. Notwithstanding the foregoing, Buyer shall take all actions reasonably necessary to ensure that all Leased Employees shall transfer to Buyer's health and welfare plans effective as of the Offer Effective Date, provided, that if any such employee continues coverage under COBRA under the health and welfare benefit plans maintained by the Seller or its Subsidiaries, Buyer shall reimburse the Seller for the positive difference, if any, between (x) the claims incurred and paid under such plan attributable to such employee and any eligible dependents, and (y) the COBRA coverage premiums paid by such employee, with such amount to be determined on a monthly basis. The Seller and Buyer shall negotiate in good faith to agree upon the timing for and the mechanics of reimbursement of all fees, costs and expenses incurred by the Seller pursuant to the immediately foregoing sentence.

(i)     From and after the Closing Date, subject in all respects to the limitations set forth in Section 2.3(k), Buyer shall, within thirty (30) days following written demand

by the Seller, with such supporting documentation as Buyer shall reasonably request, reimburse the Sellers for the payment of any cash severance or other cash separation pay, and the Sellers' or their Subsidiaries' portion of any related employment and payroll Taxes, made by any Seller or any Subsidiary of a Seller to any employee of any Seller or their Subsidiaries whose employment with any of the Sellers or their Subsidiaries terminated following the Petition Date or terminates on, or following the Closing Date (it being understood that this does not include any Transferred Employees who shall have become the employees of Buyer and its Subsidiaries and shall be covered by Buyer's obligations as set forth in <u>Section 9.7(b)</u>), to the extent of the cash severance or other cash separation pay that has been paid on or following the Petition Date and prior to the Closing Date or would have been due and payable had such employee's employment been terminated by any of the Sellers or their Subsidiaries immediately prior to the date hereof (the reimbursement Liabilities of Buyer set forth in this Section 9.7<u>(i)</u>, including with respect to any related employment and payroll Taxes, the "<u>Severance Reimbursement Obligations</u>").

(j)     The Sellers shall retain liability for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of the Sellers prior to the Closing.  Buyer shall be liable for all medical, dental and health claims incurred by Transferred Employees (and their dependents) under the employee welfare benefit plans of Buyer or any of its Subsidiaries on or after the Employee Effective Date.  For purposes of this <u>Section 9.7(j)</u>, a claim shall be deemed to have been incurred on the date on which the medical or other treatment or service was rendered and not the date of the inception of the related illness or injury or the date of submission of a claim related thereto; <u>provided</u>, that claims relating to a hospital confinement that begins on or before the Closing but continues thereafter shall be treated as incurred before the Closing.

(k)     <u>U.S. Savings Plan</u>.

(i)     As soon as practicable following the Closing Date, Buyer shall, or shall cause its Subsidiaries to, establish a new savings plan or designate an existing savings plan qualified under Section 401(a) of the Code and including a cash or deferred feature under Section 401(k) of the Code and a related trust thereunder which shall be exempt under Section 501(a) of the Code ("<u>Buyer's Savings Plan</u>") that will permit participation by all Transferred Employees who are participating in the Seller's or its Subsidiaries' 401(k) Plan ("<u>Seller's Savings Plan</u>") as of the Closing Date.

(ii)     No assets or liabilities of Seller's Savings Plan shall be transferred to Buyer's Savings Plan, other than in connection with a rollover of a Transferred Employee's account balance under Seller's Savings Plan.  Except as could reasonably be expected to cause the Buyer's Savings Plan to cease to qualify under Section 401(a) and 401(k) of the Code or cause the trust to cease to be qualified under Section 501(a) of the Code or otherwise result in the Buyer or its Affiliates incurring any penalties thereunder, Buyer shall permit the Transferred Employees to roll over into Buyer's Savings Plan any rollover distribution (in cash

or loan notes of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code)).  Effective as of the Closing, the Seller shall and shall cause it Subsidiaries to take any action necessary to ensure that the accounts of each Transferred Employee in Seller's Savings Plan shall be fully vested and nonforfeitable.

(l)    The Parties acknowledge and agree that all provisions contained in this Section 9.7 are included for the sole benefit of the respective Parties and shall not create any right (i) in any other person, including any Business Employees, Transferred Employees, current or former employees of the Seller, any participant in any Employee Plan or any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries or any beneficiary thereof or (ii) in any other person, to continued employment with Buyer or its Subsidiaries or particular compensation or benefits coverage in any compensation or benefit plan, program, agreement or arrangement of Buyer or its Subsidiaries.  The provisions of this Section 9.7 shall not constitute an amendment to any Employee Plan or any plan, program, agreement or arrangement maintained by Buyer or any of its Subsidiaries.

(m)    The Sellers and Buyer hereby agree to follow the "alternate procedure" for employment tax reporting as provided in Section 5 of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 for each Transferred Employee and to cooperate with each other in furtherance thereof. Provided that the Sellers provide Buyer with all necessary payroll records for the calendar year which includes the date on which the Transferred Employee commences employment with Buyer, Buyer, and not the Sellers, shall furnish a Form W-2 to each Transferred Employee, disclosing all wages and other compensation paid for such calendar year, and taxes withheld therefrom.

(n)    Effective as of the Offer Effective Date, Buyer shall assume the collective bargaining agreements listed on Schedule 6.9(a)."

SECTION 1.44.    SECTION 1.43. Section 9.11 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 9.11 Apportionments.

(a) The Sellers and Buyer shall prorate all items of revenue and expense with respect to the Owned Real Property, the Lease Premises, the lease identified in Schedule 1.1(r) and the Sparrow Properties as of the Closing Date with the Sellers being entitled to all revenues and responsible for all fees, costs and expenses accrued or apportioned up to but not including the Closing Date and Buyer being entitled to all revenues and responsible for all fees, costs and expenses from the Closing Date forward; provided, however, that with respect to the GOB Stores the proration date for each GOB Store will be the date that is the first day after the end of the GOB Period for each such GOB Store.  As used herein, the "Proration Date" shall mean the Closing Date with respect to any Owned Real Property, Lease Premises or Sparrow Property that is not a GOB Store and for any GOB Store shall mean the date that is

the first day after the end of the GOB Period for such GOB Store.  In order to effectuate the foregoing the following shall apply:

(i) ~~W~~with respect to Owned Real Properties and any Sparrow Properties that are owned in fee, all rental income will be prorated on a daily basis for the month in which the proration date occurs based on the amounts of rent due for the month in which the Proration Date occurs;

(ii) ~~W~~with respect to all Lease Premises, all Sparrow Properties that are leased, the lease described in Schedule 1.1(r) and all Sparrow Subleases, all rental payments will be prorated on a daily basis for the month in which the proration date occurs based on the amount of rent paid and all rental income will be prorated on a daily basis based on the rental amounts due for the month in which the Proration Date occurs; provided, however, that there shall be no proration of rent with respect to each of SRC O.P. LLC, SRC Facilities LLC and SRC Real Estate (TX), LLC that are "dark" stores as all parties reserve their rights with respect thereto as described in Section 8.9;

(iii) ~~F~~for all Properties and the Sparrow Properties (1) all utilities (including telephone service, water, sewer rents, heat, steam, electric power, gas and CAM payments with respect thereto) will be prorated on a daily basis for the month in which the Proration Date occurs based on the budgeted amounts for each such item set forth in the Sellers' utility plan for each such Property delivered to Buyer prior to the Closing Date (which budgeted amounts shall be based on prior actual use for such Property), (2) payments due under all third party Contracts will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts due under each such Contract for such month. With respect to all maintenance performed with respect to the Properties and Sparrow Properties in the ordinary course and common area maintenance performed by the Sellers required to be performed by the Sellers under any third-party Contract, to the extent performed by the Sellers the actual third-party costs and expenses incurred by the Sellers with respect to such maintenance will be prorated based on the average amounts thereof for the same calendar month in the past three years for each such respective Property;

(iv) ~~F~~for all Owned Properties, Lease Premises, Sparrow Properties, Sparrow Subleases and the lease described in Schedule 1.1(r) all payments and premiums with respect to property, casualty and liability insurance will be prorated on a daily basis for the month in which the Proration Date occurs based on the amounts paid by the Sellers;

(v)  Buyer and Seller shall prorate Property Taxes pursuant to Section 9.2(d), with Seller responsible for the period up to the Closing Date and Buyer responsible for the Closing Date forward~~, except~~; provided, however, that~~: If~~ if the net amount that would otherwise be paid by Sellers and/or credited to Buyer is in the aggregate $135,000,000 or less, then such amount shall be borne by Buyer as an Assumed Property Tax Liability and no further charge shall be taken into account in the proration schedules with respect to any Property Taxes.  If such amount exceeds $135,000,000 in the aggregate, then Sellers shall be charged for such excess in the prorations, and Buyer

shall assume and ~~be responsible for~~pay directly all unpaid Property Taxes (taking into account the fact that Sellers will have been charged in the prorations for the amount in excess of $135,000,000 of Assumed Property Taxes); and

(vi)  Sellers shall be charged for ~~any~~the amount of any underlying mechanics' liens with respect to any ~~Potential Acquired Assets (other than~~Owned Real Property (other those identified in Section 2 of Schedule 6.5)~~.~~ that are not paid, discharged by order of the Bankruptcy Court or bonded over in a manner reasonably acceptable to Buyer; provided, however, that the amount to be prorated pursuant to this subparagraph (vi) shall not be reflected or taken into account in the Initial Proration Schedule or the initial proration but shall be reflected in the Final Proration Schedule.

(b) Nothing contained in this Section 9.11 shall limit or affect any Party's rights or obligations under the Occupancy Agreement or the Seller Retained Occupancy Agreement.

(c) With respect to the Citi L/C Facility, all letter of credit commitment fees shall be prorated on a daily basis for the month in which the ~~Proration~~Closing Date occurs based on the amounts paid.  All amounts unreimbursed as of the Closing Date under the Citi L/C Facility with respect to drawn letters of credit, along with any accrued interest thereon, will be allocated to the Sellers.

(d) The prorations set forth in this Section 9.11 shall be settled as follows:

(i)  the Seller shall provide Buyer, prior to the Closing Date, a schedule setting forth each item to be prorated pursuant to this Section 9.11, including the total amount and a calculation of such proration to be on account or credit to Buyer and the Seller (the "Initial Prorations Schedule");

(ii)  following the Closing, to the extent the Seller receives any additional invoices with respect to items set forth in this Section 9.11, the Seller shall promptly (but in no event more than five (5) Business Days after receipt) deliver all such invoices to Buyer;

(iii)  during the seven (7) Business Day period following the Closing Date, Buyer and Seller shall work in good faith to account for each of the items set forth in the Initial Prorations Schedule (taking into account any additional invoices, payments and requests for payment received during such period) and shall reasonably cooperate to agree to agree on an updated calculation of such prorations to be on account or credit to Buyer and Seller (the "Post-Closing Prorations Schedule");

(iv)  if the net amount of prorations set forth in the Post-Closing Prorations Schedule results in a payment due from Buyer to Seller then Buyer shall make such payment to Seller within one (1~~-~~) Business Day after the end of such seven (7) Business Day period following Closing.  If the net amount of prorations set forth in the Updated Prorations Schedule results in a payment due from Seller to Buyer then Seller

shall make such payment to Buyer within one (1-) Business Day after the end of such fifteenseven (157) day period following Closing;

(v)    seventy-five (75) days following the Closing Date, Buyer shall deliver to Seller an updated calculation of the Post-Closing Prorations Schedule setting forth all updated proration items reflecting all invoices and payments received within the period following Closing and accounting for all amounts owed by Buyer and Seller pursuant to the Occupancy Agreement and the Seller Occupancy Agreement (the  "Final Prorations Schedule"); and

(vi)    if the net amount of prorations set forth in the Final Prorations Schedule results in a payment due from Buyer to Seller (taking into account any credit or payment made following the Post-Closing Prorations Schedule) then Buyer shall make such payment to Seller within 1 Business Day after delivery of the Post-Closing Prorations Schedule.  If the net amount of prorations set forth in the Final Prorations Schedule results in a payment due from Seller to Buyer (taking into account any credit or payment made following the Final Prorations Schedule) then Seller shall make such payment to Buyer within 1 Business Day after delivery of the Final Prorations Schedule.

(e) For the avoidance of doubt, (A) to the extent the Seller is obligated to make a payment prior to Closing (including with respect to a Leased Premises) or receives an invoice prior to Closing with respect to any item to be prorated that is due prior to Closing, the Seller shall make such payment and (B) the extent Buyer receives an invoice following Closing, an amount becomes due with respect to an Acquired Asset following Closing, or the Seller receives an invoice prior to Closing that is due and payable following Closing, Buyer shall make all such required payments.  All such payments will be taken into account in the forgoing prorations.  The prorations effected pursuant to this Section 9.11 shall be final and not subject to further adjustment."

SECTION 1.45.    SECTION 1.44. Section 9.13 of the Purchase Agreement is hereby amended as follows:

(a) Section 9.13(b) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(b)    Effective upon the Closing, ESL's Claims against the Debtors arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (b)(i)-(vii), collectively, the "ESL Claims") shall each be deemed allowed for all purposes in the Bankruptcy Cases and under the Bankruptcy Code in the amounts set forth on Exhibit G, as reduced by the credit bid set forth in Section 3.1(b).  The allowance of any ESL Claims shall not limit or preclude any claim under any applicable Law or doctrine of collateral estoppel, res judicata, claim or issue preclusion, or otherwise."

(b) Section 9.13(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"(e)  For the purposes of this Section 9.13, the terms set out below shall be defined as follows:

(i)      "Debtors" means each of the debtors and debtors in possession in the Bankruptcy Cases, including the Sellers.

(ii)      "Released Estate Claims" means any and all Claims and causes of action of the Debtors and their estates (i) against ESL arising under sections 363(k), 502(a) or 510(c) of the Bankruptcy Code, (ii) against ESL arising under equitable principles of subordination or recharacterization, (iii) against ESL challenging the allowance of the ESL Claims pursuant to Section 9.13(c); or (iv) against Buyer as a subsequent holder of any Claims in respect of the debt described on Exhibit G.  For the avoidance of doubt the Released Estate Claims do not include (a) any Claims or causes of action that are Acquired Assets under any subsection of Section 2.1; or (b) any Claims or causes of action of the Debtors or their estates against ESL or any other Person not specifically described in the preceding sentence, including any Claims or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C. 544(b), 548 or 550(a) or any applicable state or federal Law, for breach of fiduciary duty, or for illegal dividend under 8 Del. C. 170-174 or any other state Law (including, but not limited to, any Claims for damages or equitable relief (other than disallowance of the ESL Claims) in connection with the incurrence of any debt described on Exhibit G); (ii) that are related to Lands' End, Inc., the "spin-off" (as such term is defined in the Information Statement of Lands' End, Inc. dated March 18, 2014), Seritage Growth Properties, Inc., Seritage Growth Properties, L.P, or the "Transaction" (as that term is defined in the registration statement on Form S-11 filed by Seritage Growth Properties, which registration statement became effective on June 9, 2015), or (iii) that have been asserted (or may be asserted in connection with these Claims and causes of action) by or on behalf of any party in interest in the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 cases captioned In the Matter of a Plan of Compromise or Arrangement of Sears Canada Inc., 9370-2751 Quebec Inc., 191020 Canada Inc., The Cut Inc., Sears Contact Services Inc., Initium Logistics Services Inc., Initium Commerce Labs Inc., Initium Trading and Sourcing Corp., Sears Floor Covering Centers Inc., 173470 Canada Inc., 2497089 Ontario Inc., 6988741 Canada Inc., 10011711 Canada Inc., 1592580 Ontario Limited, 955041 Alberta Ltd., 4201531 Canada Inc., 168886 Canada Inc., and 3339611 Canada Inc., Ontario Superior Court of Justice Court File No.: CV-17-11846-00CL; and in the cases captioned Sears Canada Inc., by its Court-appointed Litigation Trustee, J. Douglas Cunningham, Q.C. v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial

List) No.: CV-18-00611214-00CL; Morneau Shepell Ltd. in its capacity as administrator of the Sears Canada Inc. Registered Pension Plan v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611217-00CL; FTI Consulting Canada Inc., in its capacity as Court-appointed monitor in proceedings pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. c-36 v. ESL Invs. Inc., *et al.*, Ont. Sup. Ct. J. (Commercial List) No.: CV-18-00611219-00CL; and 1291079 Ontario Ltd. v. Sears Canada Inc., *et al.*, Ont. Sup. Ct. J. No.: 4114/15CP."

SECTION 1.46.    SECTION 1.45. The following is hereby added as Section 10.11 of the Purchase Agreement:

"Section 10.11        Pay-Down of Real Estate 2020 Loan.  To the extent not previously provided, at least one (1) Business Day prior to the Closing Date, the Sellers shall provide to the agent under the Real Estate 2020 Loan all proceeds from the sale or other disposition of collateral pledged to secure the Real Estate 2020 Loan that were closed prior to the Closing Date, including the proceeds held in a segregated account pursuant to paragraph 27 of the *Order (I) Approving the Sale of Certain Real Property, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases in Connection therewith, and (III) Granting Related Relief* [Docket No. 1393]."

SECTION 1.47.    SECTION 1.46. Section 11.8 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Section 11.8        [Reserved]."

SECTION 1.48.    SECTION 1.47. The following Exhibits and Schedules are hereby added to the Purchase Agreement or amended as follows:

(a)    Schedule 1.1(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(n) of Exhibit A of this Amendment;

(b)    Schedule 1.1(m) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(m) of Exhibit A of this Amendment;

(c)    Schedule 1.1(o) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(o) of Exhibit A of this Amendment;

(d)    Schedule 1.1(p) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 1.1(p) of Exhibit A of this Amendment;

(e)    "Schedule 1.1(r): Sparrow Master Leases" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 1.1(r) of Exhibit A of this Amendment;

(f)    "Schedule 1.1(s): Sparrow Subleases" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 1.1(s) of Exhibit A of this Amendment;

(g)    "Schedule 5.1(c)(ii): GOB Sparrow Properties" shall be added as a new Schedule to the Purchase Agreement as set forth on Schedule 5.1(c)(ii) of Exhibit A of this Amendment;

(h)    Schedule 6.6(a)(2) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 6.6(a)(2) of Exhibit A of this Amendment;

(i)    Schedule 6.6(c)(2) of the Purchase Agreement is hereby deleted in its entirety and replaced with Schedule 6.6(c)(2) of Exhibit A of this Amendment;

(j)    Schedule 6.6(a)(4) is hereby amended to add the following:

| RE ID | City | State/ Locality | SHC Format | Close Date | Active Licensed Businesses in Store |
|---|---|---|---|---|---|
| 9944 | Baltimore | MD |  |  | Universal Vending |

(k)    Schedule 6.6(e)(3) is hereby amended to add the following:

| STORE NO. | STATE | CITY | ADDRESS | DESCRIPTION |
|---|---|---|---|---|
| 1430 | Ohio | Middleburg Hts. |  | Alleged slip-and-fall outside of the store on 2/2/2017. |

(l)    (j)  "Schedule 9.2: Securities Consideration" shall be added as a new Schedule to the Purchase Agreement as set forth on Exhibit B of this Amendment; and

(m)    (k) Exhibit G of the Purchase Agreement is hereby deleted in its entirety and replaced with Exhibit C of this Amendment.;

(n)    Annex 1 to the Schedules to the Purchase Agreement is hereby modified in the following respects:

(i)    the listed Trademark registration number for U.S. Trademark application number 87/245749 for the Trademark "SHOP YOUR WAY RELAY" is hereby deleted and replaced with U.S. registration number "5640230";

(ii)    the listed Owner of U.S. Trademark registration number 2729666 for the Trademark "METAPHOR" is hereby deleted and replaced with "SEARS BRANDS, L.L.C.";

(iii)    the listed Owner of U.S. Trademark registration number 649324 for the Trademark "SEARS-O-PEDIC" is hereby deleted and replaced with "SEARS BRANDS, L.L.C.";

(iv)    the listed Owner of U.S. Trademark registration number 2495828 for the Trademark "WEATHERBEATER ULTRA" is hereby deleted and replaced with "SEARS BRANDS, L.L.C.";

(o)    Annex 3 to the Schedules to the Purchase Agreement is hereby deleted in its entirety and replaced with Exhibit D of this Amendment;

(p)    Annex 4 to the Schedules to the Purchase Agreement is hereby modified in the following respects:

(i)    the listed Owner of U.S. Copyright registration number PA0000228198, titled "USArt--the gift of ourselves / produced by Universal Studios ; produced by Bruce Seth Green ; written, directed, and edited by Stephen Judson" is hereby deleted and replaced with "Sears Brands, L.L.C. (legal owner); Sears-Roebuck Foundation (record owner)";

(ii)    the listed Owner of U.S. Copyright registration number PA0000108820, titled "Growing up, growing older / produced by Richard Whiting ; directed by Phil Alden Robinson" is hereby deleted and replaced with "Sears Brands, L.L.C. (legal owner); Sears-Roebuck Foundation (record owner)";

(iii)    the following copyright registrations are hereby added to Annex 4

| Owner | Full Title | Registration Number | Registration Date |
|---|---|---|---|
| Sears, Roebuck and Company | Home repair know how saves you money / prepared for Sears, Roebuck, and Company. | TX0000593525 | 1980 |
| Sears, Roebuck and Company | Kenmore microwave cooking. | TX0000860819 | 1981 |
| Sears, Roebuck and Company. | Sears, Roebuck catalog of houses, 1926 : an unabridged reprint / Sears, Roebuck, and Company. | TX0003156863 | 1991 |

(q)    Annex 5 to the Schedules to the Purchase Agreement is hereby modified by deleting all references to "Sears Canada Inc." as a Domain Name Owner and replacing

such references with "SEARS BRANDS, L.L.C. (legal owner); Sears Canada Inc. (record owner)".

## ARTICLE II   MISCELLANEOUS

SECTION 2.01.    This Agreement (including the Exhibits), the Confidentiality Agreement and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the parties hereto relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the parties hereto or their representatives, oral or written, respecting such subject matter.  The terms of this Amendment shall constitute a waiver of the Purchase Agreement only with respect to the specific amendments herein and shall in no way impair the rights of any Party in any other respect.

SECTION 2.02.    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile, email in "portable document format" (".pdf") form, or by other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

SECTION 2.03.    The signature page of each party to this Amendment who was not a Party to the Purchase Agreement on the date of the Purchase Agreement shall indicate such party's agreement to be bound by all of the terms of the Purchase Agreement as a Seller thereunder as if such party were a Party on the date of the Purchase Agreement.  In the case of KMart Stores of Illinois LLC, the signature of such party to this Amendment shall also be deemed to replace the signature page for "KMart of Illinois LLC" to the Asset Purchase Agreement.

SECTION 2.04.    Except as otherwise provided herein, the Purchase Agreement shall remain unchanged and in full force and effect.  On and after the date hereof, each reference in the Purchase Agreement to "this Agreement", "herein", "hereof", "hereunder" or words of similar import shall mean and be a reference to the Purchase Agreement as amended hereby, although it shall not alter the dates as of which any provision of the Purchase Agreement speaks.  For example, phrases such as "as of the date hereof" and "as of the date of this Agreement" shall continue to refer to January 17, 2019, the date that the Purchase Agreement was originally executed.

SECTION 2.05.    Article XIII of the Purchase Agreement shall, to the extent not already set forth in this Amendment, apply *mutatis mutandis* to this Amendment.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed and delivered on its behalf by its duly authorized officer as of the date and year first written above.

**Transform Holdco LLC**

By: _____
Name:
Title:

**Sears Holdings Corporation**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Holding Corporation**


By: _____

Name:

Title:

*[Signature Page to Amendment No. 1 to Asset Purchase Agreement]*

**Kmart Operations LLC**


By:  _____

Name:

Title:

**Sears Operations LLC**


By: _____

Name:

Title:

**Sears, Roebuck and Co.**

By: _____

Name:

Title:

**ServiceLive, Inc.**


By: _____

Name:

Title:

**SHC Licensed Business LLC**


By: _____

Name:

Title:

**A&E Factory Service, LLC**


By: _____

Name:

Title:

**A&E Home Delivery, LLC**


By:        _____

Name:

Title:

**A&E Lawn & Garden, LLC**

By: _____

Name:

Title:

**A&E Signature Service, LLC**


By: _____

Name:

Title:

**FBA Holdings Inc.**


By:                    _____

Name:

Title:

**Innovel Solutions, Inc.**


By: _____

Name:

Title:

**Kmart Corporation**


By:    _____

Name:

Title:

**MaxServ, Inc.**


By: _____

Name:

Title:

**Private Brands, Ltd.**


By: _____

Name:

Title:

**Sears Development Co.**

By: _____

Name:

Title:

**Sears Holdings Management Corporation**

By: _____

Name:

Title:

**Sears Home & Business Franchises, Inc.**


By:          _____

Name:

Title:

**Sears Home Improvement Products, Inc.**

By: _____

Name:

Title:

**Sears Insurance Services, L.L.C.**


By:                              _____

Name:

Title:

**Sears Procurement Services, Inc.**

By:          _____

Name:

Title:

**Sears Protection Company**

By:     _____

Name:

Title:

**Sears Protection Company (PR), Inc.**


By:            _____

Name:

Title:

**Sears Roebuck Acceptance Corp.**

By: _____

Name:

Title:

**Sears, Roebuck de Puerto Rico, Inc.**


By:          _____

Name:

Title:

**SYW Relay LLC**

By: _____

Name:

Title:

**Wally Labs LLC**


By: _____

Name:

Title:

**SHC Promotions LLC**


By:               _____

Name:

Title:

**Big Beaver of Florida Development, LLC**


By: _____

Name:

Title:

**California Builder Appliances, Inc.**

By: _____

Name:

Title:

**Florida Builder Appliances, Inc.**


By: _____

Name:

Title:

**KBL Holding Inc.**


By: _____

Name:

Title:

**Kmart of Michigan, Inc.**

By: _____

Name:

Title:

**Kmart of Washington LLC**

By: _____

Name:

Title:

**Kmart Stores of Illinois LLC**


By: _____

Name:

Title:

**Kmart Stores of Texas LLC**

By: _____

Name:

Title:

**MyGofer LLC**


By: _____

Name:

Title:

**Sears Brands Business Unit Corporation**

By: _____

Name:

Title:

**Sears Holdings Publishing Company, LLC**

By: _____

Name:

Title:

**Sears Protection Company (Florida), L.L.C.**

By:     _____

Name:

Title:

**SHC Desert Springs, LLC**

By: _____

Name:

Title:

**SOE, Inc.**

By: _____

Name:

Title:

**StarWest, LLC**


By: _____

Name:

Title:

**STI Merchandising, Inc.**

By: _____

Name:

Title:

**Troy Coolidge No. 13, LLC**


By: _____

Name:

Title:

**BlueLight.com, Inc. .**


By: _____

Name:

Title:

**Sears Brands, L.L.C.**


By: _____

Name:

Title:

**Sears Buying Services, Inc.**

By: _____

Name:

Title:

**Kmart.com LLC**


By: _____

Name:

Title:

**Sears Brands Management Corporation**


By: _____

Name:

Title:

**KLC, Inc.**

By: _____

Name:

Title:

**SRe Holding Corporation**

By: _____

Name:

Title:

**SRC Sparrow 2 LLC**


By:                    _____

Name:

Title:

**Sears Reinsurance Company Ltd.**


By: _____

Name:

Title:

Its duly authorized officer

Troy Coolidge No. 30, LLC

By: _____

Name:

Title:

                    Its duly authorized officer

**EXHIBIT A**

**REAL ESTATE SCHEDULES**

*Attached.*

**EXHIBIT B**

**Troy Coolidge No. 42, LLC**


By: _____

Name:

Title:

        Its duly authorized officer

**SCHEDULE 9.2: SECURITIES CONSIDERATION**

*Attached.*

**EXHIBIT C**

**EXHIBIT G: CREDIT BID RELEASE EXHIBIT**

*Attached.*

**EXHIBIT D**

**ANNEX 3: PATENTS**

*Attached.*

| Summary report: Litéra® Change-Pro TDC 10.1.0.800 Document comparison done on 2/13/2019 12:35:13 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Transform - Draft Amendment No. 1 to Asset Purchase Agreement (for filing).DOCX | |
| **Modified filename:** Project Blue - Amendment No. 1 to the APA EXECUTION VERSION 02.10.19 11.30AM_WEIL_96912041_2.DOCX | |
| **Changes:** | |
| Add | 105 |
| Delete | 46 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 3 |
| Table Delete | 2 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 156 |

**REAL ESTATE SCHEDULES**
*Attached.*EXHIBIT A

[AM_ACTIVE 401058988_11]
WEIL:\96906318\2\73217.0003

**<u>EXHIBIT A</u>**

**GOB Owned**

**Schedule 1.1(n)**

| Store # | City | State |
|:---:|:---:|:---:|
| 1075 | Daytona Beach | FL |
| 1475 | Durham | NC |
| 2092 | Appleton | WI |
| 2191 | Lincoln | NE |
| 2885 | Port Richey | FL |

**Schedule 1.1(m)**

**GOB Leases**

| Number | City | State | O L GL |
|--------|------|-------|--------|
| 4996 | Tucson | AZ | GL |
| 9608 | Auburn | CA | Lease |
| 3834 | Burbank | CA | Lease |
| 3174 | Stockton | CA | Lease |
| 1221 | Chapel Hills | CO | Lease |
| 1111 | Colorado Springs | CO | GL |
| 3216 | Vernon | CT | Lease |
| 4893 | Ellenton | FL | Lease |
| 2145 | Port Charlotte | FL | Lease |
| 1585 | Tallahassee | FL | GL |
| 1745 | Tampa/Westshore | FL | Lease |
| 2505 | Gainesville | GA | Lease |
| 2422 | Sioux City | IA | Lease |
| 1640 | Fairview Heights | IL | GL |
| 2990 | Rockford-Cherryvale | IL | Lease |
| 9030 | Peru | IN | Lease |
| 1161 | Wichita-Town East | KS | GL |
| 1226 | Metairie | LA | Lease |
| 4810 | Metairie | LA | Lease |
| 3256 | Baltimore | MD | Lease |
| 1773 | Prince Frederick | MD | Lease |
| 1722 | Bloomington | MN | GL |
| 4351 | Rochester | MN | Lease |
| 9353 | Crystal City | MO | Lease |
| 9520 | Gulfport | MS | Lease |

| Number | City | State | O L |
|--------|------|-------|-----|
| 3886 | Asheville | NC | Lease |
| 1045 | Durham-Northgate | NC | Lease |
| 9619 | Morehead City | NC | Lease |
| 9549 | Morganton | NC | Lease |
| 4022 | Grand Forks | ND | Lease |
| 9319 | Alliance | NE | Lease |
| 1041 | Omaha | NE | GL |
| 3071 | Toms River | NJ | Lease |
| 1328 | Las Vegas(Blvd) | NV | Lease |
| 9274 | Greenwich | NY | Lease |
| 7065 | Horseheads | NY | Lease |
| 1894 | Rochester | NY | GL |
| 7677 | Wellsville | NY | Lease |
| 3013 | Cleveland | OH | Lease |
| 9096 | Fostoria | OH | Lease |
| 1210 | Polaris | OH | Lease |
| 3839 | Corvallis | OR | Lease |
| 2179 | Medford | OR | Lease |
| 2494 | Altoona | PA | Lease |
| 4113 | Erie | PA | Lease |
| 1714 | Greensburg | PA | GL |
| 1644 | Lancaster | PA | GL |
| 7062 | Sumter | SC | Lease |
| 4170 | Rapid City | SD | Lease |
| 1386 | Goodlettsville | TN | GL |
| 2036 | Jackson | TN | Lease |
| 9735 | Sevierville | TN | Lease |

| Number | City | State | O L |
|--------|------|-------|-----|
| 1387 | Amarillo | TX | Lease |
| 2487 | Killeen | TX | Lease |
| 2637 | Port Arthur | TX | Lease |
| 1207 | Richardson | TX | Lease |
| 1367 | Waco | TX | Lease |
| 2435 | Charlottesville | VA | Lease |
| 2329 | Kennewick(Pasco) | WA | Lease |
| 2329 | Richland | WA | Lease |
| 3692 | Oconomowoc | WI | Lease |

**Schedule 1.1(o)**

**Operating Leases**

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 8722 | Anchorage (SUR) | AK | Lease |
| 2027 | Wasilla | AK | GL |
| 8706 | Birmingham | AL | Lease |
| 2306 | Gadsden | AL | Lease |
| 2796 | Tuscaloosa | AL | GL |
| 2126 | Hot Springs | AR | Lease |
| 8941 | Little Rock | AR | Lease |
| 1206 | North Little Rock | AR | Lease |
| 30957 | Springdale | AR | Lease |
| 1798 | Glendale | AZ | Lease |
| 30938 | Glendale | AZ | Lease |
| 3707 | Lake Havasu City | AZ | Lease |
| 7088 | Mesa | AZ | Lease |
| 8778 | Phoenix | AZ | Lease |
| 2218 | Prescott | AZ | Lease |
| 5865 | Scottsdale | AZ | Lease |
| 61901 | Scottsdale | AZ | GL |
| 49028 | Tempe | AZ | Lease |
| 5880 | Tempe | AZ | Lease |
| 1728 | Tucson | AZ | GL |
| 49011 | Tucson | AZ | Lease |
| 8937 | Tucson | AZ | Lease |
| 5866 | Tucson (Marana) | AZ | Lease |
| 4762 | Antioch | CA | Lease |
| 7619 | Atascadero | CA | Lease |
| 1018 | Baldwin Hills | CA | Lease |
| 78723 | Beacon Falls | CA | Lease |
| 8901 | Benicia | CA | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 7653 | Big Bear Lake | CA | Lease |
| 7756 | Bishop | CA | Lease |
| 1008 | Boyle | CA | Lease |
| 1638 | Brea | CA | Lease |
| 1268 | Buena Park | CA | Lease |
| 1838 | Burbank | CA | GL |
| 7165 | Camarillo | CA | Lease |
| 1678 | Carlsbad | CA | GL |
| 3086 | Chico | CA | Lease |
| 1358 | Chula Vista | CA | Lease |
| 1098 | Clovis | CA | Lease |
| 1368 | Concord | CA | GL |
| 7098 | Concord | CA | Lease |
| 5798 | Concord-Mcphails | CA | Lease |
| 1388 | Costa Mesa | CA | Lease |
| 4047 | Costa Mesa | CA | Lease |
| 5382 | Costa Mesa | CA | Lease |
| 1309 | Downey | CA | GL |
| 2728 | Downey | CA | GL |
| 1758 | Escondido | CA | GL |
| 2628 | Eureka | CA | Lease |
| 3725 | Freedom | CA | GL |
| 1208 | Fresno | CA | Lease |
| 8366 | Fresno | CA | Lease |
| 8913 | Fresno | CA | Lease |
| 1088 | Glendale | CA | GL |
| 9746 | Grass Valley | CA | Lease |
| 2656 | Hanford | CA | Lease |
| 1248 | Hayward | CA | Lease |
| 4457 | Hayward | CA | GL |
| 5689 | Hayward | CA | Lease |
| 2028 | Hemet | CA | GL |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 3748 | Hollister | CA | GL |
| 1598/26720 | Industry, City of | CA | Lease |
| 4819 | Lakeport | CA | Lease |
| 8258 | Lakewood | CA | Lease |
| 3982 | Lemoore | CA | Lease |
| 9328 | Long Beach | CA | GL |
| 8253 | Mcclellan | CA | Lease |
| 7390 | Mckinleyville | CA | Lease |
| 8868 | Milpitas | CA | Lease |
| 8780 | Mira Loma | CA | Lease |
| 8928 | Mira Loma(Jurupa Vl) | CA | Lease |
| 3345 | Modesto | CA | Lease |
| 1748 | Montclair | CA | Lease |
| 1998 | Montebello | CA | Lease |
| 1868 | Moreno Vly | CA | Lease |
| 1168 | No Hollywood | CA | Lease |
| 4421 | North Hollywood | CA | Lease |
| 1508 | Northridge | CA | Lease |
| 3842 | Oakdale | CA | Lease |
| 3483 | Ontario | CA | Lease |
| 8287 | Ontario | CA | Lease |
| 8729 | Ontario | CA | Lease |
| 1378 | Orange | CA | GL |
| 1968 | Palm Desert | CA | Lease |
| 2798 | Palm Desert | CA | GL |
| 9551 | Paradise | CA | Lease |
| 1048 | Pasadena | CA | GL |
| 3501 | Petaluma | CA | Lease |
| 3531 | Pinole | CA | Lease |
| 7471 | Placerville | CA | Lease |
| 1019 | Pleasanton | CA | Lease |
| 3678 | Ramona | CA | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 5668 | Rancho Cordova | CA | Lease |
| 1818 | Rancho Cucamonga | CA | GL |
| 4349 | Redwood City | CA | Lease |
| 1788 | Richmond | CA | Lease |
| 1298 | Riverside | CA | Lease |
| 4706 | Riverside | CA | Lease |
| 7175 | Riverside | CA | Lease |
| 5784 | Rohnert Park | CA | Lease |
| 8768 | Sacramento | CA | Lease |
| 1688 | Salinas | CA | Lease |
| 3412 | Salinas | CA | Lease |
| 1398 | San Bernardino | CA | Lease |
| 1478 | San Bruno | CA | Lease |
| 62529 | San Diego | CA | Lease |
| 8748 | San Diego | CA | Lease |
| 31882 | San Diego | CA | Lease |
| 5000 | San Francisco | CA | Lease |
| 38112 | San Francisco | CA | Lease |
| 8398 | San Jose | CA | Lease |
| 38734 | San Jose | CA | Lease |
| 1488 | San Jose-Eastridge | CA | Lease |
| 30969 | San Leandro | CA | Lease |
| 5787 | San Rafael - Mcphails | CA | Lease |
| 8369 | Santa Ana | CA | Lease |
| 8808 | Santa Ana | CA | Lease |
| 5764 | Santa Clara | CA | Lease |
| 2088 | Santa Maria | CA | Lease |
| 7639 | Santa Paula | CA | Lease |
| 9797 | Scotts Valley | CA | GL |
| 9153 | South Lake Tahoe | CA | Lease |
| 1288 | Stockton | CA | GL |
| 8708 | Stockton | CA | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 8758 | Sylmar | CA | Lease |
| 4751 | Tehachapi | CA | Lease |
| 1108 | Temecula | CA | Lease |
| 3127 | Temple City | CA | Lease |
| 1278 | Torrance | CA | GL |
| 2059 | Tracy | CA | Lease |
| 62538 | Tustin | CA | Lease |
| 3018 | Valencia | CA | Lease |
| 1148 | Ventura | CA | Lease |
| 2829 | Victorville | CA | Lease |
| 2068 | Visalia | CA | Lease |
| 9761 | Visalia | CA | Lease |
| 1189 | West Covina | CA | Lease |
| 3235 | West Covina | CA | Lease |
| 9489 | West Hills | CA | Lease |
| 1149 | Whittier | CA | Lease |
| 2238 | Yuba City | CA | Lease |
| 1141 | Aurora | CO | Lease |
| 8290 | Brighton | CO | Lease |
| 1131 | Centennial | CO | Lease |
| 4224 | Denver | CO | Lease |
| 1467 | Ft Collins | CO | GL |
| 7329 | Loveland | CO | Lease |
| 4453 | Pueblo | CO | Lease |
| 1303 | Danbury | CT | Lease |
| 1014 | Enfield | CT | Lease |
| 1134 | Milford | CT | Lease |
| 3495 | Milford | CT | Lease |
| 7109 | Watertown | CT | Lease |
| 4807 | Bear | DE | Lease |
| 4456 | Bridgeville | DE | Lease |
| 2654 | Dover | DE | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 7725 | Rehoboth Beach | DE | Lease |
| 3873 | Wilmington | DE | Lease |
| 3317 | Boca Raton | FL | Lease |
| 5958 | Bonita Springs Showroom | FL | Lease |
| 6820 | Boynton Beach | FL | GL |
| 7321 | Bradenton | FL | Lease |
| 1007 | Brandon | FL | Lease |
| 2485 | Brooksville | FL | GL |
| 1125 | Coral Gables | FL | Lease |
| 1715 | Doral(Miami) | FL | Lease |
| 7067 | Fort Myers | FL | Lease |
| 1195 | Ft Lauderdale | FL | GL |
| 1495 | Ft Myers | FL | Lease |
| 5863 | Ft Myers | FL | Lease |
| 8972 | Ft Myers | FL | Lease |
| 8990 | Ft Pierce | FL | Lease |
| 3424 | Gainesville | FL | Lease |
| 1345 | Hialeah/Westland | FL | Lease |
| 3818 | Hollywood | FL | Lease |
| 425 | Jacksonville | FL | Lease |
| 7979 | Jacksonville | FL | Lease |
| 9614 | Key Largo | FL | Lease |
| 2215 | Key West | FL | Lease |
| 4725 | Key West | FL | Lease |
| 49012 | Lake Mary | FL | Lease |
| 3269 | Lantana | FL | Lease |
| 2745 | Leesburg | FL | Lease |
| 9224 | Marathon | FL | Lease |
| 3074 | Miami | FL | Lease |
| 3793 | Miami | FL | Lease |
| 4728 | Miami | FL | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 8065 | Miami | FL | Lease |
| 5991 | Miami - Showroom | FL | Lease |
| 1365 | Miami/Cutler Rdg | FL | Lease |
| 2056 | Mry Est/Ft Wltn Bch | FL | Lease |
| 2695 | Naples | FL | Lease |
| 8864 | Ocala | FL | Lease |
| 1456 | Oviedo | FL | GL |
| 1765 | Palm Beach Gardens | FL | GL |
| 2805 | Panama City | FL | Lease |
| 1775 | Pembroke Pines | FL | Lease |
| 31918 | Pembroke Pines | FL | Lease |
| 8066 | Pensacola | FL | Lease |
| 8957 | Pensacola | FL | Lease |
| 1205 | Pompano Beach | FL | Lease |
| 5962 | Pompano Beach | FL | Lease |
| 5976 | Sarasota | FL | Lease |
| 4355 | St. Petersburg | FL | Lease |
| 8815 | Sunrise | FL | Lease |
| 8895 | Tampa | FL | Lease |
| 1066 | The Avenues | FL | Lease |
| 7294 | Vero Beach | FL | Lease |
| 5959 | West Palm Bch | FL | Lease |
| 5185 | Winter Park | FL | Lease |
| 8825 | Winter Park | FL | Lease |
| 1385 | Atlanta | GA | Lease |
| 4931 | Augusta | GA | Lease |
| 3713 | Covington | GA | Lease |
| 3978 | Peachtree City | GA | Lease |
| 8872 | Pendergrass | GA | Lease |
| 1305 | Savannah | GA | Lease |
| 8902 | Savannah | GA | Lease |
| 1578 | Aiea Oahu-Pearl Rdg | HI | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 8049 | Hilo | HI | GL |
| 2388 | Hilo(Sur) | HI | Lease |
| 1681 | Honolulu | HI | Lease |
| 8158 | Honolulu | HI | GL |
| 2148 | Kahului Maui(Sur) | HI | GL |
| 1738 | Kaneohe(Sur) | HI | GL |
| 8818 | Pearl City | HI | GL |
| 9220 | Algona | IA | Lease |
| 7767 | Charles City | IA | Lease |
| 9222 | Cherokee | IA | Lease |
| 3447 | Clive | IA | Lease |
| 3097 | Council Bluffs | IA | Lease |
| 45113 | Des Moines | IA | Lease |
| 8711 | Boise | ID | Lease |
| 7033 | Lewiston | ID | Lease |
| 7006 | Twin Falls | ID | Lease |
| 8844 | Bloomington | IL | Lease |
| 4381 | Bridgeview | IL | Lease |
| 2936 | Chicago | IL | GL |
| 37914 | Chicago | IL | Lease |
| 4214 | Des Plaines | IL | Lease |
| 36950 | Elgin | IL | Lease |
| 8555 | Elk Grove Village | IL | Lease |
| 8730 | Granite City | IL | Lease |
| 440 | Manteno | IL | Lease |
| 8720 | Melrose Park | IL | Lease |
| 1212 | N Riverside | IL | Lease |
| 8262 | Naperville | IL | Lease |
| 1290 | Niles | IL | Lease |
| 9348 | Norridge | IL | Lease |
| 1300 | Oakbrook | IL | Lease |
| 4433 | Quincy | IL | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 8871 | Romeoville | IL | Lease |
| 8934 | Romeoville | IL | Lease |
| 7289 | Steger | IL | Lease |
| 8017 | Elwood | IN | Lease |
| 9124 | Elwood | IN | Lease |
| 8013 | Fort Wayne | IN | Lease |
| 1830 | Ft Wayne | IN | Lease |
| 1470 | Greenwood | IN | Lease |
| 9354 | Griffith | IN | Lease |
| 3251 | Indianapolis | IN | GL |
| 8750 | Indianapolis | IN | Lease |
| 3823 | Jasper | IN | Lease |
| 7243 | Kokomo | IN | Lease |
| 7246 | Richmond | IN | Lease |
| 8014 | South Bend | IN | Lease |
| 2600 | Terre Haute | IN | Lease |
| 7042 | Valparaiso | IN | GL |
| 9122 | Warsaw | IN | Lease |
| 4215 | Kansas City | KS | Lease |
| 8273 | Lawrence | KS | Lease |
| 8420 | Olathe | KS | Lease |
| 7169 | Salina | KS | Lease |
| 8081 | Wichita | KS | Lease |
| 2546 | Bowling Green | KY | Lease |
| 3029 | Erlanger | KY | Lease |
| 7229 | Grayson | KY | Lease |
| 24015 | Louisville | KY | Lease |
| 8920 | Louisville | KY | Lease |
| 1790 | Louisville-Okolona | KY | Lease |
| 3941 | Russell Springs | KY | Lease |
| 7255 | Somerset | KY | Lease |
| 8896 | Gonzales | LA | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 8736 | Harahan | LA | Lease |
| 7223 | Metairie | LA | Lease |
| 7104 | Acton | MA | Lease |
| 1213 | Auburn | MA | Lease |
| 3288 | Billerica | MA | Lease |
| 1283 | Braintree | MA | GL |
| 4407 | Brockton | MA | Lease |
| 4444 | Fitchburg | MA | Lease |
| 1243 | Hanover | MA | Lease |
| 2323 | Hyannis | MA | Lease |
| 3040 | Hyannis | MA | Lease |
| 1133 | Leominster | MA | Lease |
| 2373 | No Dartmouth | MA | Lease |
| 1053 | Saugus | MA | Lease |
| 3486 | Somerville | MA | Lease |
| 9692 | Webster | MA | Lease |
| 8851 | Westwood | MA | Lease |
| 1725 | Annapolis | MD | Lease |
| 9944 | Baltimore | MD | Lease |
| 2823 | Baltimore/E Pt. | MD | Lease |
| 1374 | Bel Air | MD | GL |
| 8814 | Columbia | MD | Lease |
| 2774 | Cumberland | MD | Lease |
| 7713 | Edgewater | MD | Lease |
| 2664 | Frederick | MD | Lease |
| 3131 | Frederick | MD | Lease |
| 1754 | Gaithersburg | MD | Lease |
| 1013 | Glen Burnie | MD | GL |
| 3172 | Hagerstown | MD | Lease |
| 3798 | Hyattsville | MD | Lease |
| 3654 | Oxon Hill | MD | Lease |
| 3807 | Prince Frederick | MD | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 1304 | Silver Spring | MD | GL |
| 4399 | Silver Spring | MD | Lease |
| 7673 | Stevensville | MD | Lease |
| 2963 | Westminster | MD | Lease |
| 3021 | Auburn | ME | Lease |
| 7133 | Augusta | ME | Lease |
| 2203 | Brunswick | ME | Lease |
| 3155 | Belleville | MI | Lease |
| 3820 | Charlevoix | MI | Lease |
| 9557 | Grayling | MI | Lease |
| 3819 | Hastings | MI | Lease |
| 2050 | Jackson | MI | Lease |
| 3308 | Lake Orion | MI | Lease |
| 1170 | Lansing | MI | Lease |
| 8830 | Livonia | MI | Lease |
| 3841 | Marshall | MI | Lease |
| 7031 | Menominee | MI | GL |
| 7068 | Midland | MI | Lease |
| 9593 | Oscoda | MI | Lease |
| 6232 | Roseville | MI | Lease |
| 8982 | Saginaw | MI | Lease |
| 3379 | Waterford Twp. | MI | Lease |
| 8949 | Wayland | MI | Lease |
| 8134 | Wyoming | MI | Lease |
| 8162 | Eden Prairie | MN | Lease |
| 9689 | International Falls | MN | Lease |
| 3405 | Minneapolis | MN | GL |
| 3059 | St. Paul | MN | Lease |
| 30956 | West St. Paul | MN | GL |
| 7021 | Cape Girardeau | MO | Lease |
| 7323 | Fenton | MO | Lease |
| 3239 | Kansas City | MO | GL |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 7324 | O'Fallon | MO | Lease |
| 8701 | Riverside | MO | Lease |
| 62707 | Springfield | MO | GL |
| 4026 | St. Joseph | MO | Lease |
| 7719 | Columbus | MS | Lease |
| 88776 | Olive Branch | MS | Lease |
| 9808 | Hamilton | MT | Lease |
| 7030 | Kalispell | MT | Lease |
| 4112 | Asheville | NC | Lease |
| 2105 | Burlington | NC | Lease |
| 8319 | Charlotte | NC | Lease |
| 8822 | Charlotte | NC | Lease |
| 7208 | Clemmons | NC | Lease |
| 1405 | Fayetteville | NC | Lease |
| 2225 | Goldsboro | NC | Lease |
| 1335 | Greensboro | NC | GL |
| 8704 | Greensboro | NC | Lease |
| 30961 | Greensboro | NC | Lease |
| 2755 | Jacksonville | NC | Lease |
| 3744 | Kill Devil Hills | NC | GL |
| 1646 | Pineville | NC | Lease |
| 3667 | Raleigh | NC | Lease |
| 4450 | Raleigh | NC | Lease |
| 7385 | Raleigh | NC | Lease |
| 3808 | Statesville | NC | Lease |
| 7626 | Waynesville | NC | Lease |
| 3116 | Wilmington | NC | Lease |
| 4272 | Bismarck | ND | Lease |
| 4057 | Fargo | ND | Lease |
| 4353 | Minot | ND | Lease |
| 45114 | Omaha | NE | Lease |
| 2023 | Concord | NH | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 3175 | Hooksett | NH | Lease |
| 8703 | Kingston | NH | Lease |
| 2443 | Manchester | NH | Lease |
| 1313 | Nashua | NH | Lease |
| 1003 | Salem | NH | Lease |
| 4448 | Salem | NH | Lease |
| 7048 | West Lebanon | NH | Lease |
| 3438 | Avenel | NJ | Lease |
| 7177 | Belleville | NJ | Lease |
| 1204 | Freehold | NJ | Lease |
| 3393 | Glassboro | NJ | Lease |
| 1094 | Hackensack | NJ | GL |
| 1044 | Jersey Cty/Newport | NJ | GL |
| 3499 | Kearny | NJ | Lease |
| 1494 | Moorestown | NJ | GL |
| 78714 | Secaucus | NJ | Lease |
| 9463 | Somers Point | NJ | GL |
| 8835 | Swedesboro | NJ | Lease |
| 4478 | Trenton | NJ | Lease |
| 7602 | Wall | NJ | Lease |
| 8380 | Wall Township | NJ | Lease |
| 1434 | Wayne | NJ | Lease |
| 3056 | Wayne | NJ | Lease |
| 4470 | West Long Branch | NJ | Lease |
| 9413 | West Orange | NJ | Lease |
| 3202 | Westwood | NJ | Lease |
| 1684 | Woodbridge | NJ | GL |
| 8905 | Albuquerque | NM | Lease |
| 2597 | Farmington | NM | Lease |
| 7035 | Farmington | NM | Lease |
| 7016 | Hobbs | NM | Lease |
| 2527 | Las Cruces | NM | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 3301 | Santa Fe | NM | Lease |
| 1709 | Henderson | NV | GL |
| 2754 | Henderson | NV | GL |
| 3592 | Las Vegas | NV | Lease |
| 5864 | Las Vegas | NV | Lease |
| 8970 | Las Vegas | NV | Lease |
| 1668 | Las Vegas(Meadows) | NV | Lease |
| 5779 | Reno - Mcphails | NV | Lease |
| 26741 | Amherst | NY | GL |
| 4741 | Batavia | NY | Lease |
| 9589 | Bath | NY | Lease |
| 3862 | Bohemia | NY | GL |
| 9423 | Bridgehampton | NY | Lease |
| 7654 | Bronx | NY | GL |
| 9420 | Bronx | NY | Lease |
| 1114 | Brooklyn | NY | GL |
| 3415 | Buffalo | NY | Lease |
| 1984 | Buffalo/Hamburg | NY | Lease |
| 8854 | Cheektowaga | NY | Lease |
| 2626 | College Point | NY | GL |
| 4871 | Farmingville | NY | GL |
| 2744 | Horseheads/Elmira | NY | GL |
| 2584 | Lakewood | NY | Lease |
| 9415 | Mahopac | NY | Lease |
| 1404 | Massapequa | NY | GL |
| 2741 | Massapequa | NY | GL |
| 4034 | Mattydale | NY | Lease |
| 8959 | Menands | NY | Lease |
| 7749 | New York | NY | Lease |
| 7777 | New York | NY | Lease |
| 2593 | Newburgh | NY | Lease |
| 4123 | Niagara Falls | NY | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 1333 | Poughkeepsie | NY | GL |
| 8102 | Rochester | NY | Lease |
| 3600 | Schenectady | NY | Lease |
| 7676 | Sidney | NY | Lease |
| 1624 | Staten Island | NY | Lease |
| 8753 | Syosset | NY | Lease |
| 1924 | Valley Stream | NY | GL |
| 1584 | Victor | NY | Lease |
| 9392 | West Seneca | NY | Lease |
| 1674 | White Plains | NY | Lease |
| 9416 | White Plains | NY | Lease |
| 1733 | Yonkers | NY | Lease |
| 9414 | Yorktown Heights | NY | Lease |
| 7383 | Barberton | OH | Lease |
| 3286 | Brunswick | OH | Lease |
| 1410 | Canton | OH | Lease |
| 1810 | Cincinnati-Eastgate | OH | Lease |
| 8790 | Cleveland | OH | Lease |
| 8712 | Columbus | OH | Lease |
| 8862 | Columbus | OH | Lease |
| 1560 | Dayton Mall | OH | Lease |
| 7209 | East Liverpool | OH | Lease |
| 7595 | Gahanna | OH | Lease |
| 7397 | Grove City | OH | Lease |
| 30962 | Groveport | OH | Lease |
| 7644 | Harrison | OH | Lease |
| 1081 | Heath | OH | GL |
| 7477 | Marietta | OH | Lease |
| 1430 | Middleburg Heights | OH | Lease |
| 4257 | Middleburg Heights | OH | Lease |
| 8918 | Monroe | OH | Lease |
| 1564 | Niles | OH | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 3243 | North Canton | OH | Lease |
| 3243 | North Canton | OH | Lease |
| 1280 | Springdale | OH | GL |
| 2104 | St Clairsville | OH | Lease |
| 3142 | Tallmadge | OH | Lease |
| 4782 | Clinton | OK | Lease |
| 8931 | Oklahoma City | OK | Lease |
| 4363 | Tulsa | OK | Lease |
| 4455 | Beaverton | OR | Lease |
| 8883 | Eugene | OR | Lease |
| 1119 | Happy Valley | OR | Lease |
| 8228 | Portland | OR | Lease |
| 8841 | Portland | OR | Lease |
| 2715 | Salem | OR | Lease |
| 2119 | Salem(Lancaster) | OR | Lease |
| 3888 | The Dalles | OR | Lease |
| 3361 | Allentown | PA | Lease |
| 8744 | Allentown | PA | Lease |
| 4150 | Altoona | PA | Lease |
| 8875 | Altoona | PA | Lease |
| 1454 | Bensalem/Crnwls Hts | PA | Lease |
| 9161 | Berwick | PA | Lease |
| 24411 | Bridgeville | PA | Lease |
| 1711 | Camp Hill | PA | Lease |
| 3225 | Chambersburg | PA | Lease |
| 8781 | Chambersburg | PA | Lease |
| 7293 | Clifton Heights | PA | Lease |
| 3911 | Columbia | PA | Lease |
| 3737 | Doylestown | PA | Lease |
| 2124 | Dubois | PA | Lease |
| 7192 | Easton | PA | Lease |
| 3266 | Edwardsville | PA | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 3963 | Elizabethtown | PA | Lease |
| 9662 | Ephrata | PA | Lease |
| 1073 | Exton | PA | GL |
| 8873 | Gouldsboro | PA | Lease |
| 2244 | Hanover | PA | Lease |
| 3597 | Holmes | PA | Lease |
| 7470 | Hummelstown | PA | Lease |
| 1064 | Langhrn/Oxford Vly | PA | Lease |
| 7699 | Lebanon | PA | Lease |
| 7372 | Leechburg | PA | Lease |
| 3884 | Matamoras | PA | Lease |
| 1654 | Media | PA | GL |
| 433 | Middletown | PA | Lease |
| 8275 | Morrisville | PA | Lease |
| 7083 | New Castle | PA | Lease |
| 4054 | New Kensington | PA | Lease |
| 1834 | North Wales | PA | GL |
| 9409 | Phoenixville | PA | Lease |
| 4010 | Pittsburgh | PA | Lease |
| 8724 | Pittsburgh | PA | Lease |
| 9438 | Pleasant Hills | PA | Lease |
| 1034 | Ross Park | PA | Lease |
| 8976 | Royersford | PA | Lease |
| 3136 | Shillington | PA | Lease |
| 2605 | State College | PA | Lease |
| 8962 | Steelton | PA | Lease |
| 9539 | Thorndale | PA | Lease |
| 4713 | Towanda | PA | Lease |
| 3954 | Walnutport | PA | Lease |
| 2114 | Washington | PA | Lease |
| 7374 | West Chester | PA | Lease |
| 1154 | Whitehall | PA | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 443 | Wilkes-Barre | PA | Lease |
| 3268 | Wilkes-Barre | PA | Lease |
| 3390 | Williamsport | PA | Lease |
| 3810 | Willow Street | PA | Lease |
| 3949 | Wind Gap | PA | Lease |
| 4732 | Aguadilla | PR | Lease |
| 7566 | Arecibo | PR | Lease |
| 1915 | Bayamon | PR | GL |
| 7570 | Bayamon | PR | Lease |
| 7788 | Bayamon | PR | Lease |
| 1085 | Caguas | PR | Lease |
| 7419 | Caguas | PR | Lease |
| 1925 | Carolina | PR | Lease |
| 7665 | Carolina | PR | Lease |
| 7446 | Cayey | PR | Lease |
| 2085 | Fajardo | PR | Lease |
| 2675 | Guayama | PR | Lease |
| 7768 | Guaynabo | PR | Lease |
| 2355 | Hatillo(Arecibo) | PR | GL |
| 1905 | Hato Rey | PR | GL |
| 7783 | Hato Rey | PR | GL |
| 7842 | Hato Rey | PR | Lease |
| 3993 | Juana Diaz | PR | Lease |
| 1935 | Mayaguez | PR | GL |
| 1935 | Mayaguez | PR | Lease |
| 3882 | Mayaguez | PR | Lease |
| 2385 | Naranjito | PR | Lease |
| 1945 | Ponce | PR | Lease |
| 7741 | Ponce | PR | Lease |
| 4844 | Rio Piedras | PR | Lease |
| 4494 | Trujillo Alto | PR | Lease |
| 7784 | Vega Alta | PR | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 7752 | Yauco | PR | Lease |
| 30941 | Sioux Falls | SD | GL |
| 4016 | Greenville | SC | Lease |
| 8846 | Greenville | SC | Lease |
| 8858 | Ladson | SC | Lease |
| 7616 | Lexington | SC | Lease |
| 7274 | Mauldin | SC | Lease |
| 4141 | West Columbia | SC | Lease |
| 7241 | Bartlett | TN | Lease |
| 1115 | Chattanooga | TN | Lease |
| 8037 | Chattanooga | TN | Lease |
| 2335 | Clarksville | TN | Lease |
| 2265 | Johnson City | TN | Lease |
| 7460 | Knoxville | TN | Lease |
| 8947 | Knoxville | TN | Lease |
| 9621 | Lebanon | TN | Lease |
| 8756 | Memphis | TN | Lease |
| 8206 | Nashville | TN | Lease |
| 1395 | West Town | TN | Lease |
| 1137 | Austin | TX | Lease |
| 1327 | Baytown | TX | Lease |
| 30954 | Brownsville | TX | Lease |
| 8870 | Dallas | TX | Lease |
| 8021 | El Paso | TX | Lease |
| 447 | Garland | TX | Lease |
| 8907 | Garland | TX | Lease |
| 8807 | Grapevine | TX | Lease |
| 2537 | Harlingen | TX | Lease |
| 2247 | Laredo | TX | Lease |
| 4389 | Mcallen | TX | Lease |
| 7972 | Mcallen | TX | Lease |
| 1067 | Memorial | TX | Lease |
| 8922 | Pflugersville | TX | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 1629 | Pharr | TX | Lease |
| 9767 | Plano | TX | Lease |
| 1097 | San Antonio | TX | Lease |
| 8747 | San Antonio | TX | Lease |
| 9507 | San Antonio | TX | Lease |
| 1127 | Shepherd | TX | Lease |
| 2077 | Tyler | TX | Lease |
| 2617 | Victoria | TX | Lease |
| 8948 | Salt Lake Cty | UT | Lease |
| 9794 | St. George | UT | Lease |
| 1888 | West Jordan | UT | Lease |
| 1284 | Alexandria | VA | Lease |
| 3471 | Chesapeake | VA | Lease |
| 8838 | Chesapeake | VA | Lease |
| 1274 | Chesterfield | VA | GL |
| 8823 | Dulles | VA | Lease |
| 1814 | Fairfax | VA | Lease |
| 1024 | Falls Church | VA | Lease |
| 2694 | Fredericksburg | VA | Lease |
| 2395 | Manassas | VA | GL |
| 8836 | Richmond | VA | Lease |
| 7415 | Springfield | VA | Lease |
| 3785 | Tabb | VA | Lease |
| 7717 | Waynesboro | VA | Lease |
| 7259 | Williamsburg | VA | Lease |
| 2784 | Winchester | VA | Lease |
| 7413 | Frederiksted | VI | Lease |
| 3972 | St. Croix | VI | Lease |
| 3829 | St. Thomas | VI | Lease |
| 7793 | St. Thomas | VI | Lease |
| 1463 | Burlington | VT | GL |
| 45061 | Colchester | VT | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 3133 | Bellingham | WA | Lease |
| 2049 | Everett | WA | Lease |
| 8709 | Kent | WA | Lease |
| 8897 | Kent | WA | Lease |
| 2330 | Puyallup | WA | Lease |
| 36692 | Seattle | WA | Lease |
| 8004 | Spokane | WA | Lease |
| 9480 | Spokane | WA | Lease |
| 7034 | Walla Walla | WA | Lease |
| 2092 | Appleton | WI | GL |
| 8968 | Janesville | WI | Lease |
| 7648 | Mauston | WI | Lease |
| 8220 | New Berlin | WI | Lease |
| 3851 | Racine | WI | Lease |
| 7649 | Ripon | WI | Lease |
| 8725 | Vandenbroek | WI | Lease |
| 3750 | Waupaca | WI | Lease |
| 8782 | Waupaca | WI | Lease |
| 6375 | Bridgeport | WV | Lease |
| 4442 | Charleston | WV | Lease |
| 3484 | Elkview | WV | Lease |
| 3724 | Scott Depot | WV | Lease |
| 2304 | Westover/Morgantown | WV | Lease |
| 2341 | Casper | WY | Lease |
| 7139 | Jackson | WY | Lease |
| 9711 | Russellville | AR | Lease |
| 1169 | Chandler | AZ | Lease |
| 1078 | Mesa/East | AZ | Lease |
| 1768 | Paradise Vly | AZ | Lease |
| 1708 | Phoenix-Desert Sky | AZ | Lease |
| 2047 | Sierra Vista | AZ | Lease |
| 2078 | Yuma | AZ | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 1318 | Bakersfield | CA | Lease |
| 1518 | Cerritos | CA | Lease |
| 3945 | Delano | CA | Lease |
| 1988 | El Centro | CA | Lease |
| 1408 | Florin | CA | Lease |
| 2298 | Merced | CA | Lease |
| 1618 | Modesto | CA | Lease |
| 2138 | Santa Barbara | CA | Lease |
| 1658 | Santa Rosa | CA | Lease |
| 3828 | Temecula | CA | GL |
| 1071 | Lakewood | CO | Lease |
| 1193 | Waterford | CT | Lease |
| 1755 | Boynton Beach | FL | Lease |
| 2565 | Bradenton | FL | Lease |
| 2315 | Jensen Bch(Stuart) | FL | Lease |
| 1955 | Lakeland | FL | Lease |
| 2245 | Melbourne | FL | Lease |
| 1006 | Ocala | FL | Lease |
| 9309 | Webster City | IA | Lease |
| 1229 | Boise | ID | Lease |
| 2278 | Idaho Falls | ID | Lease |
| 3371 | Chicago | IL | Lease |
| 1740 | Joliet | IL | Lease |
| 4297 | Mokena | IL | Lease |
| 1403 | Natick | MA | Lease |
| 1424 | Bethesda | MD | Lease |
| 2034 | Bowie | MD | Lease |
| 1844 | Columbia | MD | Lease |
| 9521 | Madawaska | ME | Lease |
| 3380 | Waterville | ME | Lease |
| 1390 | Ann Arbor | MI | Lease |
| 1250 | Lincoln Park | MI | Lease |

| Store# | City | State | Fee Type |
|--------|------|-------|----------|
| 1112 | Minnetonka | MN | Lease |
| 1052 | St Paul | MN | Lease |
| 4304 | Florissant | MO | Lease |
| 2106 | Tupelo | MS | Lease |
| 1375 | Winston Salem | NC | Lease |
| 2421 | Grand Island | NE | Lease |
| 2663 | Portsmouth | NH | Lease |
| 1464 | Deptford | NJ | Lease |
| 1574 | Middletown | NJ | Lease |
| 1287 | Coronado | NM | Lease |
| 1828 | Las Vegas | NV | GL |
| 9381 | Huntington | NY | Lease |
| 1414 | Nanuet | NY | Lease |
| 2173 | Saratoga | NY | Lease |
| 2683 | Watertown | NY | Lease |
| 1944 | Yorktown Hts. | NY | Lease |
| 2001 | Piqua | OH | GL |
| 2311 | Norman | OK | Lease |
| 1151 | Tulsa Woodland Hls. | OK | Lease |
| 1079 | Washington Sq. | OR | Lease |
| 7746 | Carlisle | PA | Lease |
| 4064 | North Versailles | PA | Lease |
| 3527 | Philadelphia | PA | Lease |
| 1484 | Reading | PA | Lease |
| 2074 | Stroudsburg | PA | Lease |
| 4858 | Caguas | PR | Lease |
| 3896 | San German | PR | Lease |
| 4490 | San Juan | PR | Lease |
| 7043 | Rock Hill | SC | Lease |
| 2807 | Rock Hill | SC | Lease |
| 1146 | Cordova | TN | Lease |
| 2156 | Maryville | TN | Lease |

| Store# | City | State | Fee Type |
|---|---|---|---|
| 2226 | Murfreesboro | TN | Lease |
| 1357 | Austin/Barton Creek | TX | Lease |
| 1080 | Frisco | TX | Lease |
| 1277 | Ingram | TX | Lease |
| 2147 | Irving | TX | Lease |
| 2557 | Longview | TX | Lease |
| 1247 | Lubbock | TX | Lease |
| 1227 | Southwest Ctr. | TX | Lease |
| 1575 | Hampton | VA | Lease |
| 1130 | Janesville | WI | GL |
| 4188 | Charleston | WV | Lease |
| 4736 | Casper | WY | Lease |

**Schedule 1.1(p)**

**Operating Owned Properties**

| Store# | City | State |
|--------|------|-------|
| 8106 | Birmingham | AL |
| 1136 | Riverchase | AL |
| ~~30957~~ | ~~Springdale~~ | ~~AR~~ |
| 68235 | Phoenix | AZ |
| 1588 | Phoenix Metro Ctr. | AZ |
| 2288 | Antioch | CA |
| 1268[1] | Buena Park | CA |
| 1598 | City of Industry | CA |
| 449 | Delano | CA |
| 4857 | Desert Hot Springs | CA |
| 8038 | El Cajon | CA |
| 1248[2] | Hayward | CA |
| 4457 | Hayward | CA |
| 1209 | Long Beach | CA |
| 1068 | Palmdale | CA |
| 3368 | Redlands | CA |
| 1788 | Richmond | CA |
| 8098 | San Bernardino | CA |
| 1278[3] | Torrance | CA |
| 3968 | Wasco | CA |
| 2451 | Greeley | CO |
| 1271 | Littleton/Denver | CO |
| 1443 | Manchester | CT |
| 1853 | Wilmington | DE |
| 1255 | Citrus Park | FL |

---

[1] Sears, Roebuck and Co. and Searsvale Acquisition LLC, a non-debtor entity, and other entities that are not Affiliates of Seller hold their individual ownership interests as Tenants in Common ("TIC").

[2] Sears, Roebuck and Co. and Searsvale Acquisition LLC, a non-debtor entity, and other entities that are not Affiliates of Seller are TIC.

[3] Sears, Roebuck and Co. and other entities that are not Affiliates of Seller are TIC.

| Store# | City | State |
|--------|------|-------|
| 1055 | Coral Springs | FL |

~~Sears, Roebuck and Co. and Searsvale Acquisition LLC, a non-debtor entity, and other entities that are not Affiliates of Seller hold their individual ownership interests as Tenants in Common ("TIC").~~
~~This information is being verified. Sears, Roebuck and Co. and Searsvale Acquisition LLC, a non-debtor entity, and other entities that are not Affiliates of Seller are TIC.~~
~~This information is being verified. Sears, Roebuck and Co. and other entities that are not Affiliates of Seller TIC.~~

| Store# | City | State |
|---|---|---|
| 31930 | Hialeah | FL[4] |
| 7435 | Hialeah | FL |
| 1635 | Jacksonville | FL |
| 4019 | Melbourne | FL |
| 1175 | Merritt Island | FL |
| 8292 | Ocala | FL |
| 1485 | Orange Pk | FL |
| 1285 | Orlando-South | FL |
| 1555 | Sanford | FL |
| 2135 | Sebring | FL |
| 8245 | Seminole | FL |
| 1015 | Vero Beach | FL |
| 2815 | Albany | GA |
| 2065 | Brunswick | GA |
| 8035 | College Park | GA |
| 7705 | Tamuning | GU |
| 7439 | Council Bluff | IA |
| 61510 | Calumet City | IL |
| 26987 | Chicago | IL |
| 30920 | Chicago | IL |
| 61030 | Chicago | IL |
| 2632 | Fairview Hts | IL |
| 490 | Hoffman Est | IL |
| 30927 | Macomb | IL |
| 470 | Manteno | IL |
| 8289 | Manteno | IL |
| 30900 | New Lenox | IL |
| 31914 | Round Lake Beach | IL |
| 31900 | Sterling | IL |
| 6062 | Tinley Park | IL |

---

[4]  Big Beaver Development Corporation, a Michigan Corporation, wholly owned by Kmart Corporation, has an interest in Red Road Joint Venture, which is identified by the title company as holding fee simple title.

| 30936 | Tinley Park | IL |
| 26185 | Clarksville | IN |

| Store# | City | State |
|--------|------|-------|
| 61540 | Indianapolis | IN |
| 8171 | Overland Park | KS |
| 3433 | Holyoke | MA |
| 9255 | Palmer | MA |
| 1093 | Springfield | MA |
| 6303 | Bangor | ME |
| 2183 | So. Portland | ME |
| 9385 | Clio | MI |
| 1100 | Flint | MI |
| 30918 | Jackson | MI |
| 1460 | Livonia | MI |
| 1590 | Saginaw | MI |
| 38480 | Troy | MI |
| 4206 | Warren | MI |
| 1032 | Brooklyn Center | MN |
| 2500 | Duluth | MN |
| 1121 | Independence | MO |
| 61106 | Jackson | MS |
| 30949 | Natchez | MS |
| 3213 | Southaven | MS |
| 2242 | Billings | MT |
| 30961 | Greensboro | NC |
| 1744 | Ocean | NJ |
| 2374 | Vineland | NJ |
| 6298 | Sparks | NV |
| 1353 | De Witt/Syracuse | NY |
| 4726 | Jamestown | NY |
| 1364 | Lake Grove | NY |
| 1514 | Niagara Falls | NY |
| 8254 | Rochester | NY |
| 1370 | Eastland | OH |
| 2940 | Franklin | OH |
| 1610 | Northgate | OH |
| 8305 | Warren | OH |

| 1261 | Midwest City | OK |
|---|---|---|
| 1224 | Harrisburg | PA |
| 1863 | Johnstown | PA |
| 1293 | Robinson Twp | PA |
| 1354 | Willow Grove | PA |
| 9394 | Fajardo | PR |
| 3853 | Guayama | PR |
| 8935 | Rio Piedras | PR |
| 8975 | Rio Piedras | PR |
| 1795 | Myrtle Beach | SC |
| 1675 | Knoxville East Town | TN |
| 30934 | Memphis | TN |
| 26596 | Memphis/Hickory | TN |
| 1216 | Memphis/Southland | TN |
| 1437 | Arlington/Parks | TX |
| 8247 | Dickinson | TX |
| 61237 | Houston | TX |
| 6874 | Houston | TX |
| 8137 | Houston | TX |
| 8167 | Houston | TX |
| 49027 | Round Rock | TX |
| 2332 | San Antonio | TX |
| 1023 | Loudoun/Dulles | VA |
| 26717 | Newport News | VA |
| 1974 | Roanoke | VA |
| 3544 | Salem | VA |
| 8345 | Virginia Beach | VA |
| 2299 | Aberdeen | WA |
| 3722 | Burlington | WA |
| 6579 | Spokane | WA |
| 4395 | Cudahy | WI |
| 3088 | Kenosha | WI |
| 2432 | La Crosse | WI |
| 2232 | Madison-East | WI |
| 1804 | Barboursville | WV |

| Store# | City | State |
|---|---|---|
| 1610 | Northgate | OH |
| 8305 | Warren | OH |
| 1261 | Midwest City | OK |
| 1224 | Harrisburg | PA |
| 1863 | Johnstown | PA |
| 1293 | Robinson Twp | PA |
| 1354 | Willow Grove | PA |
| 9394 | Fajardo | PR |
| 3853 | Guayama | PR |
| 8935 | Rio Piedras | PR |
| 8975 | Rio Piedras | PR |
| 1795 | Myrtle Beach | SC |
| 30941 | Sioux Falls | SD |
| 1675 | Knoxville East Town | TN |
| 30934 | Memphis | TN |
| 26596 | Memphis/Hickory | TN |
| 1216 | Memphis/Southland | TN |
| 1437 | Arlington/Parks | TX |
| 8247 | Dickinson | TX |
| 61237 | Houston | TX |
| 6874 | Houston | TX |
| 8137 | Houston | TX |
| 8167 | Houston | TX |
| 49027 | Round Rock | TX |
| 2332 | San Antonio | TX |
| 1023 | Loudoun/Dulles | VA |
| 26717 | Newport News | VA |
| 1974 | Roanoke | VA |
| 3544 | Salem | VA |
| 8345 | Virginia Beach | VA |
| 2299 | Aberdeen | WA |
| 3722 | Burlington | WA |

| Store# | City | State |
|--------|------|-------|
| 6579 | Spokane | WA |
| 4395 | Cudahy | WI |
| 3088 | Kenosha | WI |
| 2432 | La Crosse | WI |
| 2232 | Madison East | WI |
| 8725 | Vandenbroek | WI |
| 1804 | Barboursville | WV |

## Schedule 1.1(r)

### Sparrow Master Lease

That certain Amended and Restated Master Lease Agreement dated as of March 14, 2018 between: (i) SRC O.P. LLC, as Delaware limited liability company, SRC Facilities LLC, a Delaware limited liability company, and SRC Real Estate (TX), LLC, a Delaware limited liability company, all as lessors and (ii) Sears, Roebuck and Co., a New York corporation, and Kmart Corporation, a Michigan corporation, as lessees, as the same may have been amended from time to time

**Schedule 1.1(s)**

**Sparrow Subleases**

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| | | | | ~~Sq. Ft~~ | ~~Lease Year Executed~~ | ~~Lease Expiration Date~~ |
| 1011 | Grandville | MI | Lands' End, Inc. | 4,621 | 2014 | 1/31/2020 |
| 1012 | Des Moines | IA | ABBELL CREDIT CORPORATION | | | 11/5/2028 |
| 1012 | Des Moines | IA | LAMAR COMPANY LLC | 300 | | 11/5/2028 |
| 1029 | Spokane | WA | Price Spokane Limited Partnership | | 1999 | 9/26/2040 |
| 1074 | Waldorf/St Charles | MD | Lands' End, Inc. | 8,771 | 2014 | 1/31/2020 |
| 1077 | Shreveport | LA | Mall St Vincent LP | | | 12/31/2024 ~~12/31/2024~~ |
| 1092 | Westland(~~De~~ ~~De~~troit) | MI | Auto Accessories USA | 15,324 | 2018 | 4/30/2022 |
| 1110 | Portage | MI | Lands' End, Inc. | 5,178 | 2014 | 1/31/2020 |
| 1120 | Columbus | OH | Lands' End, Inc. | 8,374 | 2014 | 1/31/2020 |
| 1139 | Tukwila | WA | Lands' End, Inc. | 7,216 | 2014 | 1/31/2020 |
| 1171 | Springfield | MO | Lands' End, Inc. | 4,748 | 2014 | 1/31/2020 |
| 1187 | Mesquite | TX | Boot Barn (FKA Sheplers, Inc.) | | 1981 | 7/31/2020 |
| 1192 | Muskegon | MI | Lands' End, Inc. | 4,261 | 2014 | 1/31/2020 |
| 1297 | Hurst | TX | Simon Property Group (Texas) LP | 1.788 acres | 1999 | 8/2/2038 |
| 1297 | Hurst | TX | Chesapeake Exploration LLC | 10.875 acres | 2011 | 5/10/2038 |
| 1314 | New Brunswick | NJ | OTB Acquisitions | 1.56 acres | 1996 | 2/28/2023 |
| 1314 | New Brunswick | NJ | HOP New Brunswick (DBA "Houlihan's") | | 2002 | 11/30/2023 ~~11/30/2023~~ |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| | New Brunswick | NJ | Lands' End, Inc. | 7,107 | 2014 | 1/31/2020 |
| 1314 | New Brunswick | NJ | Cellco Partnership (DBA "Verizon Wireless") | 13 | 2014 | 1/31/2020 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1317 | El Paso | TX | Celina Development Company | 3,856 | 1981 | 6/30/2020 |
| 1407 | Beaumont | TX | Parkdale Mall | | | |
| 1447 | Hulen | TX | Xto Energy Inc. | 14.11 acres | 2008 | 10/22/2050 10/22/2050 |
| 1570 | Schaumburg | IL | Namco entertainment Inc. (DBA "Level 257") | 41,960 | 2013 | 2/28/2025 |
| 1570 | Schaumburg | IL | Lands' End, Inc. | 6,552 | 2014 | 1/31/2020 |
| 1595 | Greenville | SC | Forever 21Retail, Inc. (Winter 2014) | 15,481 | 2012 | 8/31/2023 |
| 1634 | Baltimore | MD | Security Square Associates | | 1997 | 9/30/2022 |
| 1650 | Merrillville | IN | Gary Joint Venture | | 1987 | 9/17/2039 |
| 1710 | North Olmsted | OH | Steak and Ale of OH, Inc. | | | |
| 1710 | North Olmsted | OH | George Group-Great Northern Ltd (DBA "Harry Buffalo Restaurant & Lounge") | 6,342 | 2009 | 8/31/2019 |
| 1710 | North Olmsted | OH | Star-West Great Northern Mall LLC | | 2013 | 11/30/2023 11/30/2023 |
| 1710 | North Olmsted | OH | Lands' End, Inc. | 8,789 | 2014 | 1/31/2020 |
| 1764 | Rockaway | NJ | Raymours Furniture Company, Inc. | 38,678 | 2015 | 8/31/2026 |
| 1800 | Mishawaka | IN | Lands' End, Inc. | 5,927 | 2014 | 1/31/2020 |
| 1854 | Parkville | MD | Lands' End, Inc. | 7,928 | 2014 | 1/31/2020 |
| 2290 | Michigan City | IN | First Source Bank | 40,950 | | 12/31/2022 12/31/2022 |
| 2309 | Silverdale | WA | Kitsap Mall, LLC | 1.75 acres | 1984 | 8/7/2024 |
| 2497 | Brownsville | TX | CBL & Asssociates Management Inc. (parking lot) | 119,790 | 2000 | |
| 2934 | Taunton | MA | Silver City Galleria | | | 10/31/2055 10/31/2055 |
| 7979 | Jacksonville | FL | Sears Outlet Stores, LLC | 14,932 | | 12/31/2022 12/31/2022 |

| Store | City | ST | Tenant Legal Entity | Tenant Sq. Ft | Tenant Lease Year Execute | Tenant Lease Expiration Date |
|-------|------|----|---------------------|---------------|---------------------------|------------------------------|
| 7979 | Jacksonville | FL | Sears Home Improvement Products | 270 | | |
| 8217 | Ft. Worth | TX | Sears Home Improvement Products, Inc. (Embedded) | 3,500 | | |
| 8702 | Minneapolis | MN | Rail Way Restoration Inc. | 10,500 | 2003 | 8/31/2019 |
| 8702 | Minneapolis | MN | Oopegard Vending | 835 | 2007 | 4/30/2019 |
| 8702 | Minneapolis | MN | Sears Home Improvement Products, Inc. (Embedded) | 15,300 | = | = |
| 8717 | Houston | TX | Holliday Door & Gate, LLC | 12,000 | 2003 | 2/28/2019 |
| 8717 | Houston | TX | Sears Outlet Stores, LLC | 82,593 | 2012 | 12/31/2022 12/31/2022 |
| 8755 | Tucker | GA | Sears Outlet Stores, LLC | 133,404 | 2012 | 12/31/2022 12/31/2022 |

## Disclosure Schedule 5.1(c)

### GOB Sparrow Stores

| Store # | City | State | 10K Own/L/GL |
|---------|------|-------|--------------|
| 1120 | Tuttle Crossing | OH | Owned |
| 1192 | Muskegon | MI | Owned |
| 1281 | Pueblo | CO | Owned |
| 1307 | Abilene | TX | Owned |
| 1760 | Novi | MI | Owned |
| 2390 | Springfield | OH | Owned |

**Schedule 6.6(a)(2)**

1.  Schedule 6.5 is incorporated herein by reference.

2.  The following is a list of tenancies applicable to the Owned Real Property:

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---------|------|----|--------------------------|---------------|----------------------------|------------------------------|
| | | | | ~~Sq. Ft~~ | ~~Lease Year Executed~~ | ~~Lease Expiration Date~~ |
| 490 | Hoffman Estates | IL | Board of Trustees of Northern Illinois University (d/b/a Niu Parking) | N/A | 2016 | 6/30/2020 |
| 490 | Hoffman Estates | IL | Sprintcom Inc. (DBA "Sprint") | | 2000 | 11/7/2018* |
| 490 | Hoffman Estates | IL | Kum Cha Truscott (DBA "Evergreen Cleaners") | 626 | 2003 | 11/30/2018* |
| 490 | Hoffman Estates | IL | Sears Auto Center (Atrium) | 656 | 2007 | MTM |
| 490 | Hoffman Estates | IL | Hairstylist Management Systems, Inc. | 983 | 2009 | MTM |
| 490 | Hoffman Estates | IL | International Business Machines Corporation | 210 | 1999 | 12/31/2019 |
| 490 | Hoffman Estates | IL | Sedgwick Claims Management Services, Inc. | 23,350 | 2009 | 7/31/2021 |
| 490 | Hoffman Estates | IL | Hoffman Estates Latus, LLC (DBA "Sbarro") | 1,000 | 2011 | 11/30/2021 |
| 490 | Hoffman Estates | IL | Panda Express, Inc. | 1,000 | 2011 | 7/24/2021 |
| 490 | Hoffman Estates | IL | Sears Hometown & Outlet Stores, Inc. | 35,942 | 2012 | 10/31/2022 |
| 490 | Hoffman Estates | IL | RH Tax and Financial Services d/b/a "Jackson Hewitt" | 366 | 2015 | 8/31/2020 |
| 490 | Hoffman Estates | IL | Sears Hometown & Outlet Stores, Inc. | 5,017 | 2016 | MTM |
| 490 | Hoffman Estates | IL | Squadhelp, Inc. (DBA "Leapmatrix Inc.") | 365 | 2016 | 12/31/2018* |
| 490 | Hoffman Estates | IL | David L. Templer Insurance Agency, LLC | 462 | 2008 | 9/30/2020 |
| 490 | Hoffman Estates | IL | Bright Horizon's | 19,500 | 2017 | 8/31/2022 |
| 490 | Hoffman Estates | IL | Fifth Third Bank | | 2017 | 12/31/2020 |
| 490 | Hoffman | IL | (DBA "ST Messaging Services | | | MTM |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| | Estates | | (formerly Skytel)") | | | |
| 490 | Hoffman Estates | IL | T-Mobile | N/A | 3/1/2016 | 1/31/2021 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1011 | Grandville | MI | Lands' End, Inc. | 4,621 | 2014 | 1/31/2020 |
| 1023 | Dulles/ Loudoun County | VA | Lands' End, Inc. | 9,535 | 2014 | 1/31/2019 |
| 1029 | Spokane | WA | Price Spokane Limited Partnership | | 1999 | 9/26/2040 |
| 1029 | Spokane | WA | Lands' End, Inc. | 6,049 | 2014 | 1/31/2019 |
| 1033 | North Attleboro | MA | Lands' End, Inc. | 7,609 | 2014 | 1/31/2019 |
| 1068 | Palmdale | CA | Antelope Valley Mall Developers | 983,69 9983,6 9 9 | 1989 | 12/31/2059 |
| 1068 | Palmdale | CA | Metro Floors Inc. | 18,000 | 1996 | 10/31/2022 |
| 1074 | Waldorf/St Charles | MD | Lands' End, Inc. | 8,771 | 2014 | 1/31/2020 |
| 1110 | Portage | MI | Lands' End, Inc. | 5,178 | 2014 | 1/31/2020 |
| 1120 | Columbus | OH | Lands' End, Inc. | 8,374 | 2014 | 1/31/2020 |
| 1136 ⁷1120 | Hoover (Birmingham ) | AL | Lands' End, Inc. | 4,215 | 2014 | 1/31/2020 |
| 1120 | Dublin | OH | AT&T | 2,435 | | 3/31/2028 |
| 1120 | Dublin | OH | Sport Clips | 1,200 | | 4/30/2028 |
| 1120 | Dublin | OH | Starbucks | 2,050 | | 1/31/2029 |
| 1120 | Dublin | OH | Zoup! | 2,100 | | 12/31/2028 |
| 1192 | Muskegon | MI | Lands' End, Inc. | 4,261 | 2014 | 1/31/2020 |
| 1224 | Harrisburg | PA | Penrac, LLC (DBA "Enterprise Rent-A-Car") | 29 Parking Spaces | 2007 | 4/30/2022 |
| 1224 | Harrisburg | PA | Rare Hospitality International, Inc. c/o Darden Restaurants Inc. (DBA "Longhorn Steakhouse") | 14,132 | 2012 | 4/30/2024 |
| 1224 | Harrisburg | PA | Lands' End, Inc. | 7,435 | 2014 | 1/31/2019 |
| 1268 | Buena Park | CA | Newkoa, LLC | 542 Parking Spaces | 1980 | 9/30/2049 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft Spaces | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1268 | Buena Park | CA | Newkoa, LLC | | 2013 | 9/30/2019 |
| 1271 | Littleton | CO | Lands' End, Inc. | 5,885 | 2014 | 1/31/2020 |
| 1278 | Torrance | CA | Fourth Searsvale Properties Inc | | 1979 | = |
| 1278 | Torrance | CA | Del Amo Mills LP | 87,800 | 1980 | 6/30/2049 |
| 1278 | Torrance | CA | First States Investors Realty LLC | 35,000 | 1983 | 6/30/2019 |
| 1278 | Torrance | CA | Lands' End, Inc. | 7,489 | 2014 | 1/31/2020 |
| 1285 | Orlando-South Orlando South | FL | Promenade II (DBA "Florida Mall Hotel") | | 2011 | 10/31/2022 |
| 1297 | Hurst | TX | Simon Property Group (Texas) LP | 1.788 acres | 1999 | 8/2/2038 |
| 1297 | Hurst | TX | Chesapeake Exploration LLC | 10.875 acres | 2011 | 5/10/2038 |
| 1314 | New Brunswick | NJ | OTB Acquisitions | 1.56 acres | 1996 | 2/28/2023 |
| 1314 | New Brunswick | NJ | HOP New Brunswick (DBA "Houlihan's") | | 2002 | 11/30/2023 |
| 1314 | New Brunswick | NJ | Lands' End, Inc. | 7,107 | 2014 | 1/31/2020 |
| 1314 | New Brunswick | NJ | Cellco Partnership (DBA "Verizon Wireless") | 13 | 2014 | 1/31/2020 |
| 1354 | Willow Grove | PA | Lands' End, Inc. | 8,635 | 2014 | 1/31/2019 |
| 1354 | Willow Grove | PA | Primark Us Corp. | 77,615 | 2014 | 10/30/2024 |
| 1364 | Lake Grove | NY | Lands' End, Inc. | 7,133 | 2014 | 1/31/2019 |
| 1407 | Beaumont | TX | Parkdale Mall | | | |
| 1443 | Manchester | CT | Lands' End, Inc. | 6,482 | 2014 | 1/31/2019 |
| 1447 | Hulen | TX | Xto Energy Inc | 14.11 acres | 2008 | 10/22/2050 |
| 1447 | Ft Worth | TX | Lands' End, Inc. | 4,387 | 2014 | 1/31/2019 |
| 1460 | Livonia | MI | Lands' End, Inc. | 5,116 | 2014 | 1/31/2020 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | ~~Tenant Lease Year Executed~~ | ~~Tenant Lease Expiration Date~~ |
|---------|------|----|--------------------------|---------------|--------------------------------|-----------------------------------|
| 1475 | Durham | NC | Lands' End, Inc. | 7,596 | 2014 | 1/31/2020 |
| 1570 | Schaumburg | IL | Namco entertainment Inc. (DBA "Level 257") | 41,960 | 2013 | 2/28/2025 |
| 1570 | Schaumburg | IL | Lands' End, Inc. | 6,552 | 2014 | 1/31/2020 |
| 1590 | Saginaw | MI | Central Florida Restaurants Inc | 86,876 | 2001 | 11/30/2021 |
| 1595 | Greenville | SC | Forever 21Retail, Inc. (Winter 2014) | 15,481 | 2012 | 8/31/2023 |
| 1595 | Greenville | SC | Lands' End, Inc. | 5,742 | 2014 | 1/31/2019 |
| 1605 | Raleigh | NC | Lands' End, Inc. | 7,204 | 2014 | 1/31/2019 |
| 1614 | Livingston | NJ | Lands' End, Inc. | 8,270 | 2014 | 1/31/2019 |
| 1634 | Baltimore | MD | Security Square Associates | | 1997 | 9/30/2022 |
| 1650 | Merrillville | IN | Gary Joint Venture | | 1987 | 9/17/2039 |
| 1710 | North Olmsted | OH | Steak and Ale of OH, Inc. | | | |
| 1710 | North Olmsted | OH | George Group-Great Northern Ltd (DBA "Harry Buffalo Restaurant & Lounge") | 6,342 | 2009 | 8/31/2019 |
| 1710 | North Olmsted | OH | Star-West Great Northern Mall LLC | | 2013 | 11/30/2023 |
| 1710 | North Olmsted | OH | Lands' End, Inc. | 8,789 | 2014 | 1/31/2020 |
| 1760 | Novi | MI | Lands' End, Inc. | 8,769 | 2014 | 1/31/2019 |
| 1764 | Rockaway | NJ | Raymours Furniture Company, Inc | 38,678 | 2015 | 8/31/2026 |
| 1800 | Mishawaka | IN | Lands' End, Inc. | 5,927 | 2014 | 1/31/2020 |
| 1804 | Barboursville | WV | Lands' End, Inc. | 8,441 | 2014 | 1/31/2019 |
| 1853 | Wilmington | DE | Lands' End, Inc. | 8,415 | 2014 | 1/31/2019 |
| 1854 | Parkville | MD | Lands' End, Inc. | 7,928 | 2014 | 1/31/2020 |
| 1974 | Roanoke | VA | Cheddars Casual Café | 20,447 | 2010 | 10/31/2020 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 2092 | Appleton | WI | Lands' End, Inc. | 5,792 | 2014 | 1/31/2020 |
| 2183 | S Portland | ME | Maine Mall | | 1982 | = |
| 2183 | S Portland | ME | OTB Acquisition LLC (DBA "On the Border #146") | 6,585 | 1999 | 11/30/2019 |
| 2183 | So Portland | ME | Lands' End, Inc. | 5,564 | 2014 | 1/31/2019 |
| 2191 | Lincoln | NE | Bair / Superior Pointe? | See docs | See docs | See docs |
| 2191 | Lincoln | NE | McDonald's Corporation | | 1981 | 8/4/2081 |
| 2191 | Lincoln | NE | A.T. Thomas Jewelers | 5,000 | 2005 | 6/30/2025 |
| 2191 | Lincoln | NE | GMRI, Inc. | 2.01 acres | 2012 | 10/31/2022 |
| 2309 | Silverdale | WA | Kitsap Mall, LLC | 1.75 acres | 1984 | 8/7/2024 |
| 2309 | Silverdale | WA | Lands' End, Inc. | 4,226 | 2014 | 1/31/2019 |
| 2497 | Brownsville | TX | CBL & Associates Management Inc. | 119,790 ~~119,799~~ ~~0~~ | 2000 | = |
| 3088 | Kenosha | WI | Albor Restaurant Group, LLC (DBA "Taco Bell") | 2,646 | 1994 | 4/30/2031 |
| 3088 | Kenosha | WI | Dollar Tree Stores, Inc. #3811 | 10,520 | 2002 | 5/31/2018* |
| 3088 | Kenosha | WI | Limitless PCS, Inc. (DBA "Metro PCS") | 1,600 | 2015 | 3/3/2020 |
| 3433 | Holyoke | MA | D'Angelo's Restaurant | 1,800 | 1983 | 6/30/2024 |
| 3433 | Holyoke | MA | Taco Bell | 2,850 | 2010 | 11/30/2030 |
| 3433 | Holyoke | MA | Sears Outlet Stores, LLC | 18,012 | 2012 | 12/31/2018* |
| ~~3699~~ | ~~Apple~~ | ~~CA~~ | ~~Blessing Nails~~ | ~~800~~ | ~~1994~~ | ~~12/31/2021~~ |
| ~~3699~~ | ~~Apple~~ | ~~CA~~ | ~~Mina Patel d/b/a Smoke 4 Less~~ | ~~800~~ | ~~2007~~ | ~~10/31/2021~~ |
| ~~3699~~ | ~~Apple~~ | ~~CA~~ | ~~Ye Old Tyme Barber Shoppe~~ | ~~1,000~~ | ~~2006~~ | ~~9/30/2022~~ |
| 3722 | Burlington | WA | Payless Shoe Source, Inc. #653 | 3,600 | 1989 | 6/30/2020 |
| 3722 | Burlington | WA | Phan Thuy Anh & Nguyen Vu Tan (DBA "Hi-Tek") | 1,200 | 2008 | 6/30/2021 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 3722 | Burlington | WA | Rent-A-Center West, Inc. | 1,720 | 2011 | 3/31/2021 |
| 3722 | Burlington | WA | PACIFIC NW PROPERTIES I | 3,600 | 2016 | 1/31/2099 |
| 4857 | Desert Hot Springs | CA | Yucaipa Trading Co., Inc. (DBA "Rio Ranch Market") | 27,917 | 2017 | 1/31/2027 |
| 6298 | Sparks | NV | Sears Outlet Stores, LLC | 20,098 | 2012 | 12/31/2022 |
| 8702 | Minneapolis | MN | Rail Way Restoration Inc | 10,500 | 2003 | 8/31/2019 |
| 8702 | Minneapolis | MN | Oopegard Vending | 835 | 2007 | 4/30/2019 |
| 8702 | Minneapolis | MN | Sears Home Improvement Products, Inc. (Embedded) | 15,300 | | |
| 8717 | Houston | TX | Holliday Door & Gate, LLC | 12,000 | 2003 | 2/28/2019 |
| 8717 | Houston | TX | Sears Outlet Stores, LLC | 82,593 | 2012 | 12/31/2022 |
| 8755 | Tucker | GA | Sears Outlet Stores, LLC | 133,404~~133,404~~ | 2012 | 12/31/2022 |
| 8975 | Rio Piedras | PR | Sears Outlet Stores, LLC | 36,472 | 2012 | 12/31/2022 |
| 9255 | Palmer | MA | Gil's Gym and Racquet Health Club LLC | 18,512 | 2006 | 11/30/2018* |
| 9394 | Fajardo | PR | AutoZone Puerto Rico, Inc. | 10,530 | 2013 | 1/31/2024 |
| ~~1310~~ | ~~Elyria~~ | ~~OH~~ | ~~Red Lobster~~ | ~~59,300~~ | | ~~8/31/2027~~ |
| 1610 | Cincinnati Northgate | OH | Lands' End, Inc. | 5,933 | | 1/31/2019 |
| 3544 | Salem (Store Closing) | VA | West Main Hair Salon | 1,120 | | 1/31/2019 |
| 3544 | Salem (Store Closing) | VA | Sally Beauty Company, Inc. | 1,600 | | 11/30/2020 |
| 3544 | Salem (Store Closing) | VA | Ups Store | 1,600 | | 9/30/2018* |
| 3544 | Salem (Store Closing) | VA | Chick-Fil-A Inc. | 33,799 | | 4/30/2022 |
| 4395 | Cudahy | WI | Sears Outlet Stores, LLC | 21,070 | | 12/31/2020 |
| 8245 | St. Petersburg | FL | Sears Outlet Stores, LLC | 58,617 | | 9/30/2022 |
| 8935 | Rio Piedras | PR | Sears Home Improvement Products, Inc. (Embedded) | 4,813 | | |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 26185 | Clarksville | IN | Peddlers Mall | 108,813 108,813 | | 12/31/2019 |
| 30934 | N Memphis | TN | First Tennessee Bank | 4,338 | | 1/31/2022 |
| 30961 | Grensboro | NC | National Distribution Centers, LLC | 1,546,815 1,546,815 | | 1/31/2022 |
| 61540 | Indianapolis | IN | Cinema Veterans LLC – Keep For Tax Tracking Purpose | 236,190 236,190 | | |
| 1012 | Des Moines | IA | ABBELL CREDIT CORPORATION | | | 11/5/28 |
| 1012 | Des Moines | IA | LAMAR COMPANY LLC | 300 | | 11/5/28 |
| 1077 | Shreveport | LA | Mall St Vincent LP | | | 12/31/24 |
| 1730 | Florence | KY | Lands' End, Inc. | 6,338 | | 1/31/19 |
| 2290 | Michigan City | IN | First Source Bank | 40,950 | | 12/31/22 |
| 2934 | Taunton | MA | Silver City Galleria | | | 10/31/55 |
| 8217 | Ft. Worth | TX | Sears Home Improvement Products, Inc. (Embedded) | 3,500 | | |

*Recently Expired

**Schedule 6.6(c)(2)**

1. ~~1.~~     Seller has made available leases and security deposit documents in Intralinks.

2. ~~2.~~     The following is a list of tenancies applicable to the Lease Premises.

| Store # | City | ST | Tenant Legal Entity Name ~~Entity Name~~ | Tenant Sq. Ft ~~Sq. Ft~~ | Tenant Lease Year Executed ~~Lease Year Executed~~ | Tenant Lease Expiration Date ~~Lease Expiration Date~~ |
|---|---|---|---|---|---|---|
| 1013 | Glen Burnie | MD | Lands' End, Inc. | 8,050 | 2014 | 1/31/2020 |
| 1024 | Falls Church | VA | Bill Page Imports, Inc. | 200 Parking Spaces | 2014 | 9/30/2020 |
| 1024 | Falls Church | VA | Lands' End, Inc. | 7,472 | 2014 | 1/31/2020 |
| 1044 | Jersey Cty/Newport | NJ | Lands' End, Inc. | 5,411 | 2014 | 1/31/2020 |
| 1048 | Pasadena | CA | FR Hastings Ranch, LLC | | 1984 | 4/29/2024 |
| 1048 | Pasadena | CA | HomeGoods, Inc. | 28,113 | 2012 | 4/29/2024 |
| 1048 | Pasadena | CA | Lands' End, Inc. | 7,168 | 2014 | 1/31/2020 |
| 1053 | Saugus | MA | Lands' End, Inc. | 5,565 | 2014 | 1/31/2020 |
| 1073 | Exton | PA | Lands' End, Inc. | 9,039 | 2014 | 10/5/2019 |
| 1088 | Glendale | CA | Star Parking Management, Inc. | | 2015 | 4/30/2021 |
| 1092 | Westland(Detroit) | MI | Auto Accessories USA | 15,324 | 2018 | 4/30/2022 |
| 1094 | Hackensack | NJ | ALDI Inc (Pennsylvania) | 55,718 | 2014 | 5/31/2032 |
| 1111 | Colorado Spgs | CO | Univest-Btc S&R LLC | | 2004 | 11/30/2025 |
| 1125 | Miami | FL | Goodwill Industries Of South Florida | 208 | 2014 | 2/28/2019 |
| 1133 | Leominster | MA | Lands' End, Inc. | 7,483 | 2014 | 1/31/2020 |
| 33496 | Baltimore | MD | Sears Outlet Stores, LLC (Outlet #9944) | 41,000 | 2012 | 2/28/2024 |
| 1139 | Tukwila | WA | Lands' End, Inc. | 7,216 | 2014 | 1/31/2020 |
| 1148 | Ventura | CA | Lands' End, Inc. | 6,691 | 2014 | 1/31/2020 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| | Whitehall | PA | Lands' End, Inc. | 7,401 | 2014 | 1/31/2020 |
| 1170 | Lansing | MI | Lands' End, Inc. | 9,553 | 2014 | 11/30/2019 |
| 1195 | Ft Lauderdale | FL | Greenstar Corp | 26,000 | 1954 | 2/28/2026 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1210 | Columbus/Polaris | OH | Lands' End, Inc. | 6,611 | 2014 | 1/31/2020 |
| 1213 | Auburn | MA | Lands' End, Inc. | 7,269 | 2014 | 1/31/2019 |
| 1221 | Colorado Springs | CO | Lands' End, Inc. | 5,076 | 2014 | 1/31/2019 |
| 1243 | Hanover | MA | Lands' End, Inc. | 11,168 | 2014 | 1/31/2019 |
| 1248 | Hayward | CA | Wells Fargo Bank | 4,247 | 1975 | 10/1/2018 |
| 1248 | Hayward | CA | Sears Outlet Stores, LLC | 48,434 | 2012 | 1/31/2022 |
| 1268 | Buena Park | CA | Newkoa, LLC | 542 Parking Spaces | 1980 | 9/30/2049 |
| 1268 | Buena Park | CA | Newkoa, LLC | | 2013 | 9/30/2019 |
| 1274 | Richmond/Chesterfield | VA | Lands' End, Inc. | 7,551 | 2014 | 1/31/2020 |
| 1278 | Torrance | CA | Fourth Searsvale Properties Inc | | 1979 | |
| 1278 | Torrance | CA | Del Amo Mills LP | 87,800 | 1980 | 6/30/2049 |
| 1278 | Torrance | CA | First States Investors Realty LLC | 35,000 | 1983 | 6/30/2019 |
| 1278 | Torrance | CA | Lands' End, Inc. | 7,489 | 2014 | 1/31/2020 |
| 1283 | Braintree | MA | Lands' End, Inc. | 8,694 | 2014 | 1/31/2020 |
| 1283 | Braintree | MA | Primark Us Corp. | 70,816 | 2014 | 11/30/2024 |
| 1284 | Alexandria | VA | Lands' End, Inc. | 9,608 | 2014 | 1/31/2020 |
| 1288 | Stockton | CA | Weberstown Mall LLC | 3,480 | 1985 | 1/31/2023 |
| 1304 | Silver Spring | MD | Lands' End, Inc. | 4,973 | 2014 | 1/31/2019 |
| 1309 | Downey | CA | Macerich Stonewood LLC | | 2002 | 1/31/2051 |
| 1313 | Nashua | NH | Lands' End, Inc. | 7,573 | 2014 | 1/31/2019 |
| 1317 | El Paso | TX | Celina Development Company | 3,856 | 1981 | 6/30/2020 |
| 1333 | Poughkeepsie | NY | Lands' End, Inc. | 5,523 | 2014 | 1/31/2019 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1335 | Greensboro | NC | Chick-Fil-A Inc. | 54,450 | 2001 | 1/31/2023 |
| 1335 | Greensboro | NC | Whole Foods Market Inc. | 34,364 | 2010 | 1/31/2028 |
| 1335 | Greensboro | NC | Lands' End, Inc. | 5,856 | 2014 | 1/31/2020 |
| 1368 | Concord | CA | Thomas A Morabito Trustee & Francis J Morabito, Trustee of the Morabito Family Trust Dated 4-14-88 | 18,000 | 1985 | 10/30/2061 |
| 1368 | Concord | CA | Sun Valley Associates | | 2005 | 10/19/2026 |
| 1368 | Concord | CA | Lands' End, Inc. | 9,947 | 2014 | 1/31/2019 |
| 1374 | Bel Air | MD | Macy's, Inc. | 24,599 | 2003 | 9/30/2021 |
| 1374 | Bel Air | MD | Lands' End, Inc. | 6,517 | 2014 | 1/31/2020 |
| 1375 | Winston Salem | NC | Land's End, Inc. | 10.406 | | 1/31/2020 |
| 1378 | Orange | CA | The Village at Orange, LLC | 28,600 | 1993 | 5/31/2024 |
| 1378 | Orange | CA | 24 Hour Fitness USA Inc. | 54,462 | 2011 | 2/29/2024 |
| 1378 | Orange | CA | Lutheran High School of Orange County | 100 Parking Spaces | 2012 | 6/30/2019 |
| 1404 | Massapequa | NY | Lands' End, Inc. | 6,997 | 2014 | 1/31/2020 |
| 1463 | Burlington | VT | Lands' End, Inc. | 7,315 | 2014 | 1/31/2020 |
| 1478 | San Bruno | CA | Lands' End, Inc. | 8,698 | 2014 | 1/31/2019 |
| 1494 | Moorestown | NJ | Lands' End, Inc. | 8,126 | 2014 | 1/31/2020 |
| 1644 | Lancaster | PA | Lands' End, Inc. | 8,635 | 2014 | 1/31/2020 |
| 1654 | Media | PA | Lands' End, Inc. | 8,919 | 2014 | 1/31/2020 |
| 1654 | Media | PA | Granite Run Buick GMC | | 2017 | 12/31/2018 |
| 1684 | Woodbridge | NJ | Cellco Partnership | 8,070 | 1987 | 7/31/2021 |
| 1722 | Bloomington | MN | Lands' End, Inc. | 8,564 | 2014 | 1/31/2020 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 1725 | Annapolis | MD | Lands' End, Inc. | 8,588 | 2014 | 1/31/2019 |
| 1733 | Yonkers | NY | Lands' End, Inc. | 6,664 | 2014 | 1/31/2020 |
| 1754 | Gaithersburg | MD | Lands' End, Inc. | 8,839 | 2014 | 1/31/2020 |
| 1754 | Gaithersburg | MD | Sears Home Improvement Products, Inc. (Embedded) | 10,000 | | |
| 1810 | Cincinnati | OH | Lands' End, Inc. | 8,305 | 2014 | 1/31/2020 |
| 1834 | North Wales | PA | Lands' End, Inc. | 9,819 | 2014 | 1/31/2020 |
| 1984 | Buffalo/Hamburg | NY | Lands' End, Inc. | 8,118 | 2014 | 1/31/2019 |
| 2023 | Concord | NH | Lands' End, Inc. | 6,718 | 2014 | 1/31/2019 |
| 2027 | Wasilla | AK | Lands' End, Inc. | 7,063 | 2014 | 1/31/2019 |
| 2049 | Everett | WA | Brixton Everett, LLC | | 2008 | 12/31/2018 |
| 2049 | Everett | WA | Brixton Everett, LLC | | 2015 | 6/30/2019 |
| 2085 | Fajardo | PR | Sears, Roebuck de Puerto Rico, Inc. | 24,536 | 1986 | 9/30/2023 |
| 2373 | No Dartmouth | MA | Lands' End, Inc. | 4,076 | 2014 | 1/31/2019 |
| 2395 | Manassas | VA | Lands' End, Inc. | 7,407 | 2014 | 6/14/2019 |
| 2435 | Charlottesville | VA | Lands' End, Inc. | 6,125 | 2014 | 1/31/2020 |
| 2694 | Fredericksburg | VA | Lands' End, Inc. | 5,347 | 2014 | 1/31/2020 |
| 3029 | Erlanger | KY | Sinkula Investments, Ltd. | 3,500 | 1984 | 10/31/2022 |
| 3029 | Erlanger | KY | EDGEWOOD PLAZA HOLDINGS, LLC | | | 11/30/2022 |
| 3040 | Hyannis | MA | The Paper Store, LLC | | 2017 | 3/31/2023 |
| 3074 | Miami | FL | Split rent for AmFoods | | 0 | 6/30/2022 |
| 3074 | Miami | FL | AmFoods LLLC | 2,430 | 1987 | 6/30/2022 |

| Store | City | ST | Tenant Legal Entity Name | Tenan Sq. Ft | Tenant Lease Year Execute | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 3127 | Temple City | CA | H. Demirjian, Inc. | 5,151 | 2014 | 11/30/2022 |
| 3136 | Shillington | PA | Amelia's LLC | | 2013 | 7/31/2019 |
| 3172 | Hagerstown | MD | Fazou's Restaurant | 3,246 | 2000 | 9/30/2019 |
| 3235 | West Covina | CA | Sears Outlet Stores, LLC | 17,310 | 2012 | 4/20/2022 |
| 3235 | West Covina | CA | Filza Khan | 3,400 | 2015 | 3/31/2022 |
| 3286 | Brunswick | OH | GREF II REIT,LLC | | 0 | 12/31/2019 |
| 3286 | Brunswick | OH | Jud's Best Discount Muffler & Brake, Inc. | 3,035 | 2010 | 3/30/2020 |
| 3379 | Waterford | MI | Lou Dallo | 3,701 | 2008 | 2/28/2021 |
| 3412 | Salinas | CA | Rexfor Title, Inc. | | 2013 | 1/31/2034 |
| 3471 | Chesapeake | VA | Sears Outlet Stores, LLC | 33,137 | 2012 | 10/31/2020 |
| 3499 | Kearny | NJ | Modell's NJ II., Inc. | | 2013 | 4/30/2021 |
| 3725 | Watsonville/Freedom | CA | Dora M. Espindola (DBA "Designing Cut") | 1,050 | 1994 | 6/30/2018 |
| 3725 | Watsonville/Freedom | CA | Advance America, Cash Advance Centers of California LLC | 1,400 | 1998 | 1/31/2021 |
| 3725 | Watsonville/Freedom | CA | Foodmaker, Inc. (DBA "Jack in the Box") | 2,800 | 1998 | 7/30/2019 |
| 3725 | Watsonville/Freedom | CA | Louis Hong D.D.S (DBA "Freedom Dental") | 1,750 | 2000 | 7/31/2020 |
| 3725 | Watsonville/Freedom | CA | Richard E. Turner and Joanne K. Turner (DBA "The 99 Cent Store") | 2,800 | 2007 | 10/31/2018 |
| 3725 | Watsonville/Freedom | CA | Tina Dang (DBA "D&L Nails") | 1,366 | 2007 | 1/31/2021 |
| 3725 | Watsonville/Freedom | CA | Hein Thuy le and Hoa Le (DBA "Whispering Pines Dry Cleaners") | 1,200 | 2014 | 2/28/2019 |

| Store | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Execute | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| | | | Dry Cleaners") | | | |
| 3725 | Watsonville/Freedom | CA | Split rent for The 99 Cent Store | | | 10/31/2018 |
| 3748 | Hollister | CA | Crystal TV, Inc. / Radio Shack Licensed Dealer | 2,300 | 2007 | 3/31/2020 |
| 3748 | Hollister | CA | VIP Wireless, Inc., MetroPCS Authorized Dealer | 2,800 | 2016 | 10/21/2020 |
| 3785 | Tabb | VA | Chick-Fil-A Inc. | 54,860 | 2000 | 3/31/2021 |
| 3785 | Tabb | VA | Kroger Limited Partnership I | 92,348 | 2014 | 9/30/2033 |
| 3785 | Tabb | VA | Kroger Limited Partnership I | 37,268 | 2014 | 9/30/2033 |
| 3785 | Tabb | VA | Restaurant Property Investors II LLC c/o Burger Busters Inc. (DBA "Taco Bell") | 38,768 | 2015 | 9/30/2033 |
| 4022 | Grand Forks | ND | Hometown Automotive Repair LLC | 4,620 | 2010 | 8/31/2019 |
| 4057 | Fargo | ND | NDM Restaurants (DBA "Burger King") | 5,000 | 1976 | 6/30/2018 |
| 4057 | Fargo | ND | Dakota Tire Service, Inc | 4,000 | 2004 | 3/31/2019 |
| 4113 | Erie | PA | Erie Physicians Network ~ UPMC, Inc | 7,760 | 2008 | 11/30/2020 |
| 4170 | Rapid City | SD | MTS Enterprises LLC (DBA "Tiretech") | 2,914 | 2010 | 2/28/2019 |
| 4214 | Des Plaines | IL | (DBA "Eddies Restaurant CO") | 3,205 | 1988 | 7/31/2022 |
| 4214 | Des Plaines | IL | The Twins Group, Inc. (DBA "Taco Bell") | | 1988 | 10/31/2018 |
| 4214 | Des Plaines | IL | (DBA "Quick Service Auto") | 4,192 | 2008 | 11/30/2022 |
| 4214 | Des Plaines | IL | Split rent w/ ML for Eddie's Restaurant Co.- Lasalle Bank Na Trust #54625 D | | | 7/31/2022 |

| Store | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Execute | Tenant Lease Expiration Date |
|-------|------|-----|------|------|------|------|
| 4272 | Bismarck | ND | McDonalds Corp. | 5,000 | 1984 | 8/20/2020 |
| 4272 | Bismarck | ND | Split rent for Mc Donald's | | | 10/31/2019 |
| 4351 | Rochester | MN | Salvation Army | 20,000 | 2004 | 11/30/2020 |
| 4381 | Bridgeview | IL | Sears Outlet Stores, LLC | 11,576 | 2012 | 1/31/2021 |
| 4389 | Mc Allen | TX | Big Lots Stores Inc #01544B | 22,755 | 2000 | 11/30/2019 |
| 4399 | Silver Springs | MD | DavCo Food, Inc. (DBA "Wendy's") | 2,453 | 1990 | 10/31/2018 |
| 4421 | North Hollywood | CA | Successor in interest to Pic N Save (DBA "Big Lots Stores Inc.") | 20,000 | 1970 | 3/31/2021 |
| 4421 | North Hollywood | CA | Paul Jardin of USA, Inc. (DBA "3 Day Suit Broker") | 11,000 | 1986 | 3/30/2021 |
| 4478 | Trenton/Hamilton | NJ | Brixmor Operating Partnership | | | 6/30/2020 |
| 4494 | Trujillo Alto | PR | RD Management Corporation | 4,100 | 1985 | 5/31/2024 |
| 7030 | Kalispell | MT | Burger King Corporation | 4,000 | 1999 | 5/5/2020 |
| 7030 | Kalispell | MT | Split Rent for Burger King Sublease | | 1999 | 5/5/2020 |
| 7030 | Kalispell | MT | Evergreen Chamber of Commerce | | 2013 | 7/31/2019 |
| 7033 | Lewiston | ID | Split rent for Wendy's outlot | | 0 | 2/28/2015 |
| 7033 | Lewiston | ID | Dale F. Nagy/Picadilly Investment Properties (DBA "Wendy's") | 3,000 | 1984 | 2/28/2015 |
| 7042 | Valparaiso | IN | BR Associates Inc (DBA "Long John Silver Seafood Shoppes") | 35,875 | 1977 | 12/31/2018 |
| 7783 | San Juan (Hato Rey) | PR | Marketing & Printing Solutions, Inc. | 695 | 2010 | 11/30/2018 |
| 7979 | Jacksonville | FL | Sears Outlet Stores, LLC | 14,932 | | 12/31/2022 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | ~~Tenant Lease Year Executed~~ | ~~Tenant Lease Expiration Date~~ |
|---------|------|----|--------------------------|---------------|----------------------------------|------------------------------------|
| 7979 | Jacksonville | FL | Sears Home Improvement Products | 270 | | |
| 8206 | Nashville | TN | Sears Outlet Stores, LLC | 70,227 | 2012 | 12/31/2022 |
| 8262 | Naperville | IL | Dart Warehouse Corporation | | 2011 | 12/31/2020 |
| 8273 | Lawrence | KS | (DBA "Berry Plastics Corporation") | 100 Parking Spaces | 2013 | 10/15/2018 |
| 8724 | Pittsburgh | PA | Sears Outlet Stores, LLC | 44,215 | 2012 | 12/31/2022 |
| 8744 | Allentown | PA | Fedex Ground Package System Inc | 50 Trailers | 2015 | 1/31/2019 |
| 8768 | Sacramento | CA | Sears Outlet Stores, LLC | 43,063 | 2012 | 12/31/2018 |
| 8818 | Pearl City | HI | Bethany Korean United Methodist Church | 9,096 | 2011 | 4/30/2021 |
| 8818 | Pearl City | HI | Sears Outlet Stores, LLC | 28,978 | 2012 | 12/31/2022 |
| 8937 | Tucson | AZ | Sims Recycling Solutions Inc. | 6,000 | 2012 | 12/31/2020 |
| 9413 | West Orange | NJ | Dollar Tree Stores, Inc. #3811 | 10,280 | 1981 | 1/31/2022 |
| 9413 | West Orange | NJ | Eyeglass Service Industries, Inc. | 800 | 1981 | 10/31/2014 |
| 9413 | West Orange | NJ | Staples, Inc. #0168 | 19,740 | 1988 | 2/28/2017 |
| 9420 | Bronx | NY | David's Check Cashing, Inc. | 722 | 2008 | 11/20/2018 |
| 9420 | Bronx | NY | G-Maxx Home of Bruckner, LLC | 5,138 | 2009 | 10/31/2014 |
| 9420 | Bronx | NY | Sears, Roebuck and Co. | 2,736 | 2018 | 11/30/2023 |
| 9420 | Bronx | NY | Burlington Coat Factory of California LLC | | 2018 | |
| 9423 | Bridgehampton | NY | Lands' End, Inc. | | 2014 | 1/31/2016 |
| 9693 | Marine City | MI | Frank Koehldorfer (DBA "Marine City Auto Care") | 3,216 | 2010 | 2/28/2019 |
| 1280 | Springdale | OH | Tri-County Mall LLC | 4,316 | | 7/31/2024 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 2138 | Santa Barbara | CA | Sprint PCS Assets, LLC | | | 6/30/2019 |
| 3018 | Valencia | CA | Magic Auto Center | 4,406 | | 3/30/2022 |
| 3018 | Valencia | CA | McDonalds Corp L/C 004-1368 | 5,000 | | 5/31/2022 |
| 3018 | Valencia | CA | Simply Discount Furniture | 79,699 | | 5/31/2022 |
| 3116 | Wilmington (Store Closing) | NC | Jack A. Sneeden Corporation | 5,604 | | 6/30/2023 |
| 3239 | Kansas City | MO | Zeller Auto Repair | 4,201 | | 8/31/2020 |
| 3239 | Kansas City | MO | Advance America | 1,480 | | 1/31/2020 |
| 3239 | Kansas City | MO | Barbers Plus | 1,600 | | 12/31/2018* |
| 3239 | Kansas City | MO | H & R Block | 2,400 | | 4/30/2019 |
| 3239 | Kansas City | MO | Big Bowl Pho | 2,400 | | 4/30/2022 |
| 3239 | Kansas City | MO | Papa John's | 2,000 | | 6/30/2021 |
| 3239 | Kansas City | MO | Tasty Thai | 2,000 | | 3/31/2020 |
| 3361 | Allentown | PA | Floreff LLC & Nathan & Alison LLC | | | 5/31/2023 |
| 3371 | Chicago | IL | AGC Addison Owner, LLC | | | 4/1/2019 |
| 3447 | Clive | IA | At Home Stores, LLC | 90,000 | | 1/31/2021 |
| 3483 | Ontario | CA | Wolf Family Series LP | 11,000 | | 5/31/2020 |
| 3793 | Miami | FL | Goodwill | 208 | | 9/30/2019 |
| 4064 | N Versailles | PA | Burger King Corporation | 2,750 | | 11/24/2020 |
| 4215 | Kansas City | KS | Xiao Jun Song and Liu Y Lin | 11,408 | | 1/31/2019 |
| 4433 | Quincy | IL | Gengenbacher Ice Shack | | | 10/31/2018* |
| 4450 | Raleigh | NC | Choice Auto Repair | 4,581 | | 9/30/2021 |
| 4450 | Raleigh | NC | Grand Slam USA | 20,000 | | 9/30/2021 |

| Store # | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 4455 | Beaverton | OR | Glowing Greens, LLC | 20,000 | | 7/31/2018 |
| 4455 | Beaverton | OR | Beaverton Mart Company | | | 8/31/2022 |
| 4455 | Beaverton | OR | Carr Auto Group | | | 4/30/2019 |
| 7067 | Ft. Meyers | FL | Floor & Decor | 75,200 | | 8/31/2026 |
| 7259 | Williamsburg | VA | New Oriental Crafts, LLC | 3,200 | | 10/31/2019 |
| 7259 | Williamsburg | VA | H & R Block | 1,600 | | 4/30/2019 |
| 7259 | Williamsburg | VA | International Styles | 1,200 | | 9/30/2019 |
| 7259 | Williamsburg | VA | New Oriental Crafts, LLC | 2,000 | | 10/31/2019 |
| 7259 | Williamsburg | VA | Tu Tienda and Gifts | 5,160 | | 8/30/2019 |
| 7259 | Williamsburg | VA | Williamsburg Peking Corp | 9,560 | | 9/30/2019 |
| 7274 | Mauldin | SC | Mauldin at Butler, LLC (Hughes Development) | | | 3/31/2019 |
| 7324 | O'Fallon | MO | At Home Stores, LLC | 87,314 | | 11/29/2020 |
| 8065 | Miami | FL | Miami Hotel Enterprise LLC | 50 Parking Spaces | | 11/14/2019 |
| 8065 | Miami | FL | Sears Home Improvement Products, Inc. (Embedded) | 1,000 | | |
| 8398 | San Jose | CA | Beacon Sales Acquisition, Inc. | 37,500 | | 10/31/2023 |
| 9348 | Norridge | IL | Darden/Longhorn Steakhouse | | | 3/31/2021 |
| 9354 | Griffin | IN | El Centro Mall, Ltd. | | | |
| 30936 | Tinley Park | IL | Bettenhausen Automotive | 250 Parking Spaces | | 8/6/2018* |
| 30936 | Tinley Park | IL | Ziegler Nissan of Orland Park | 250 Parking Spaces | | 3/20/2019 |

| Store | City | ST | Tenant Legal Entity Name | Tenant Sq. Ft | Tenant Lease Year Executed | Tenant Lease Expiration Date |
|---|---|---|---|---|---|---|
| 30938 | Glendale | AZ | Living Spaces | 126,164 | | 4/30/2024 |
| 30961 | Greensboro | NC | National Distribution Centers, LLC | Parking Lot | | 1/31/2022 |
| 30969 | San Leandro | CA | Living Spaces | 91,905 | | 11/30/2022 |
| 31882 | San Diego | CA | Lucky Star Seafood Restaurant | 11,000 | | 4/30/2019 |
| 31882 | San Diego | CA | Northgate Gonzalez Markets | 41,371 | | 7/31/2023 |
| 31882 | San Diego | CA | Burlington Coat Factory | 63,900 | | 2/28/2025 |
| 61901 | Scottsdale | AZ | Living Spaces Furniture, LLC | 133,120 | | 9/30/2024 |
| 62529 | San Diego | CA | Zion Market San Diego Inc. | 94,500 | | 12/31/2023 |
| 62707 | Springfield | MO | David's Bridal Inc | 12,370 | | 1/31/2019 |

| Summary report: | |
|---|---|
| **Litéra® Change-Pro TDC 10.1.0.800 Document comparison done on 2/13/2019 10:45:18 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Project Blue - APA Amendment - Exhibits.pdf | |
| **Modified filename:** Project Blue Amendment No. 1 to the APA - Exhbit A (Revised 2.13.19)-c.docx | |
| **Changes:** | |
| Add | 110 |
| Delete | 322 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 41 |
| Table Delete | 193 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 666 |

## SCHEDULE 9.2: SECURITIES CONSIDERATION

*Attached.*

**Schedule 9.2: Securities**      **EXHIBIT C**     **Consideration**

1.  The Securities Consideration shall comprise 3,000 Class B Preferred Units of Newco, with an aggregate liquidation preference of $300,000 and otherwise subject to the terms and conditions set forth in the Amended and Restated Limited Liability Company Operating Agreement of Newco as in effect on the Closing Date and as may be amended from time to time thereafter.

2.  The Securities Consideration delivered to the Sellers pursuant to Section 3.3 of the Agreement shall be allocated among the Sellers that are Debtors in accordance with the Allocation Schedule. The Allocation Schedule shall identify the amount of cash, Securities Consideration (including any fractional units) and credit bid debt that is allocable to each transfer of Acquired Assets contemplated by the Agreement (a "Transfer").

3. As soon as practicable after the Closing, each Seller other than SHC shall distribute the Securities Consideration received by it (whether directly in respect of a Transfer by it or pursuant to the Distribution Requirement from a direct or indirect subsidiary) to its equityholder(s) pursuant to the Distribution Requirement, subject to item 5 below.

4.  As soon as practicable thereafter (and effective as of the Closing Date), SHC shall distribute the aggregate Securities Consideration received by it (whether directly in respect of a Transfer by it or pursuant to the Distribution Requirement from a direct or indirect subsidiary) ratably to holders of Senior Second Lien Obligations pursuant to the Amended and Restated Security Agreement, dated as of March 20, 2018, among SHC and certain of its Subsidiaries, as Grantors, and Wilmington Trust, National Association, as Collateral Agent, with any fractional preferred units otherwise determined for any single holder being rounded up or down to the nearest whole unit, subject to (x) item 5 below and (y) with respect to each holder, receipt of evidence reasonably satisfactory to SHC of an exemption under applicable securities Laws for the transfer of the applicable pro rata portion of the Securities Consideration to such holder.

5.  In the case of any Transfer that is deferred until after the Closing, the Securities Consideration relating thereto shall be delivered pursuant to item 2 at the time of such Transfer and distributed pursuant to items 3 and 4 above as soon as practicable after such Transfer.

6. For tax purposes, all Transfers that are intended to constitute "G reorganizations" shall be deemed to take place simultaneously. The Distribution Requirement shall be satisfied

sequentially, starting with the lowest-tier Seller and moving up the chain of Sellers.

## __EXHIBIT C__

## EXHIBIT G: CREDIT BID RELEASE EXHIBIT

*Attached.*

## Exhibit G
## ESL's Allowed Claims Against the Debtors

| Loan Facility | Allowed Amount Owed to ESL (as Defined in the Asset Purchase Agreement) Amounts as of October 15, 2018[1] |
|---|---|
| IP/Ground Lease Term Loan Facility | $186,189,719.91[2] |
| FILO Facility | $70,539,333.24 |
| Real Estate Loan 2020 | $726,483,196.21 |
| Second Lien Term Loan | $318,481,532.89 |
| Second Lien Line of Credit Facility | $507,072,878.33 |
| Second Lien PIK Notes | $21,346,945.00 |
| Citi L/C Facility | $108,410,464.44 |

---

[1] Amounts owed to ESL as to each claim listed are not less than the amounts set forth herein and may include additional claims for post-petition interest and all reasonable out-of-pocket expenses, including legal fees incurred by ESL by reason of the enforcement and protection of its rights in accordance with the applicable loan terms, plus any contingent and/or unliquidated claims not presently ascertainable. In the event that the Buyer or its affiliates purchase any additional obligations outstanding under any of the debt facilities listed in this Exhibit G prior to the Closing, the allowed amount in the right hand column shall be increased by the amount of the additional purchased debt obligations.

[2] On January 3, 2019, ESL purchased $31,887,343 of obligations outstanding under the IP/ Ground Lease

# EXHIBIT C

Term Loan Facility, which amount is included in the total of amount of ESL's allowed claim on this Exhibit G

[AM_ACTIVE 401053901_2]

| **Summary report:** | |
| --- | --- |
| **Litéra® Change-Pro TDC 10.1.0.800 Document comparison done on 2/13/2019 12:38:17 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Project Blue - APA Amendment - Exhibits.pdf | |
| **Modified filename:** Project Blue - APA Amendment - Exhibits A B and C UPDATED 02.07.pdf | |
| **Changes:** | |
| Add | 142 |
| Delete | 149 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 18 |
| Table Delete | 30 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 339 |