Presentment Date and Time: February 27, 2019 at 10:00 a.m. (Eastern Time)
Objection Deadline: February 26, 2019 at 4:00 p.m. (Eastern Time)
Hearing Date and Time (Only if Objection Filed): March 21, 2019 at 10:00 a.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
In re                                    :
                                         :      Chapter 11
SEARS HOLDINGS CORPORATION, et al.,      :
                                         :      Case No. 18-23538 (RDD)
                                         :
                    Debtors.1            :      (Jointly Administered)
                                         :
----------------------------------------------------------------x
```

# NOTICE OF PRESENTMENT OF
## STIPULATION, AGREEMENT, AND ORDER REGARDING
### PROPERTY AT 2300 MADISON STREET, CLARKSVILLE, TENNESSEE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), will present the attached Stipulation, Agreement, and Order (the "**Stipulation, Agreement, and Order**") to the Honorable Robert D. Drain, United States Bankruptcy Judge, for signature on **February 27, 2019 at 10:00 a.m. (Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that, unless a written objection to the Stipulation, Agreement, and Order with proof of service, is served and filed with the Clerk of the Court and a courtesy copy is delivered to the undersigned and to the chambers of the Honorable Robert D. Drain so as to be received by **February 26, 2019 at 4:00 p.m. (Eastern Time)**, there will not be a hearing and the Stipulation, Agreement, and Order may be signed.

**PLEASE TAKE FURTHER NOTICE** that, if a written objection is timely filed and served, a hearing (the "**Hearing**") will be held to consider the Stipulation, Agreement, and Order on **March 21, 2019 at 10:00 a.m. (Eastern Time)** before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601.

WEIL:\96898076\12\73217.0004

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend

the Hearing and failure to appear may result in relief being granted or denied upon default.

Dated: February 19, 2019
      New York, New York

          /s/ Jacqueline Marcus
          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York  10153
          Telephone:  (212) 310-8000
          Facsimile:   (212) 310-8007
          Ray C. Schrock, P.C.
          Jacqueline Marcus
          Garrett A. Fail
          Sunny Singh
          Jessica Liou

          *Attorneys for Debtors*
          *and Debtors in Possession*

WEIL:\96898076\12\73217.0004

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

--------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## STIPULATION, AGREEMENT, AND ORDER REGARDING
## PROPERTY AT 2300 MADISON STREET, CLARKSVILLE, TENNESSEE

This stipulation, agreement, and proposed order (the "**Stipulation, Agreement, and Order**") is entered into by and among Kmart Corporation ("**Kmart**"), as debtor and debtor-in-possession in the above captioned chapter 11 cases, Troy Coolidge No. 7, LLC, a non-Debtor affiliate of Kmart ("**Troy Coolidge**"), and RP Clarksville Commons, LLC, ("**Purchaser**"). Kmart, Troy Coolidge, and Purchaser are collectively referred to in this Stipulation, Agreement, and Order as the "**Parties**" and each as a "**Party**." The Parties hereby stipulate and agree and follows:

### RECITALS

A.      Kmart and Clarksville II Associates ("**Clarksville II**") entered into a lease agreement, dated July 18, 1980 (together with any amendments, modifications, renewals and guaranties, the "**Lease**"), pursuant to which Clarksville II leased to Kmart a completed building and site improvements together with land, situated in Clarksville, Tennessee (together with any improvements, structures, fixtures and personal property, "**Parcel A**"). Troy Coolidge is successor in interest to Clarksville II under the Lease and the fee simple owner of Parcel A.

B.      Kmart and Clarksville Venture No. One ("**Clarksville Venture**") entered into a ground lease agreement, dated October 1, 1990 (together with any amendments, modifications, renewals and guaranties, the "**Ground Lease**"), pursuant to which Clarksville Venture leased to Kmart a certain parcel of land adjacent to Parcel A containing approximately half an acre, located at 2300 Madison Street, Clarksville, Tennessee (together with any improvements, "**Parcel B**" and, together with Parcel A, the "**Leased Premises**"). Daniel G. Kamin Clarksville Commons Enterprises (the "**Landlord**") is the successor in interest to Clarksville Venture. Kmart refers to the Leased Premises as "Store 7461."

C.      In April 2016, Kmart ceased operating a store at the Leased Premises. The Leased Premises have been vacant for more than two years and since such time Kmart has continued

to pay fixed annual rent in the amount of $38,021 payable in equal monthly installments of $3,168.42.

D.      On May 23, 2018, Kmart, Troy Coolidge, and Rise Holdings, LLC ("**Original Purchaser**") entered into that certain Real Estate Sale Contract (the "**Initial Sale Contract**"), a copy of which is annexed hereto as **Exhibit A**, pursuant to which, among other things, the parties agreed that: (i) Kmart shall assign all of its rights, title and interests under the Ground Lease to Original Purchaser, in exchange for the Original Purchaser assuming and agreeing to perform all of Kmart's liabilities, obligations, and responsibilities under the Ground Lease; and (ii) Original Purchaser would pay Troy Coolidge $2.5 million in consideration for Troy Coolidge conveying its fee simple title to Parcel A.  On October 26, 2018, the Original Purchaser assigned the Initial Sale Contract to the Purchaser and, in conjunction therewith, Purchaser assumed all of Original Purchaser's obligations thereunder.

E.      Beginning on October 15, 2018 and continuing thereafter, Kmart and each of its debtor affiliates (collectively, the "**Debtors**") commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

F.      On November 15, 2018, the Landlord executed the Landlord's Estoppel Certificate (the "**Estoppel Certificate**"), a copy of which is annexed hereto as **Exhibit B**, which, among other things, states that no default exists under the Lease and, if a default exists, the Landlord waives such default and agrees that Purchaser shall continue under the Lease without condition or payment of any past-due items.

G.      The Parties have agreed, subject to approval by the Bankruptcy Court, to: (i) enter into an Amendment to Real Estate Sale Contract, a copy of which is annexed hereto as

WEIL:\96898076\12\73217.0004

**Exhibit C** (the "**Amendment**" and, together with the Initial Sale Contract, the "**Sale Contract**"); and (ii) consummate the transactions (the "**Transactions**") described in the Sale Contract, including, without limitation: (x) Purchaser's payment to Troy Coolidge of approximately $2.4 million for Parcel A; (y) Kmart's rejection of the Lease; and (z) Kmart's assumption and assignment of the Ground Lease to Purchaser, pursuant to that certain Assignment and Assumption of Ground Lease annexed hereto as **Exhibit D** (the "**Assignment Agreement**").

H.  Inasmuch as the Debtors have ceased operating at the Leased Premises and are currently paying rent for such property, the payments due under the Lease and the Ground Lease are unnecessary expenses and of no value to the Debtors and their estates.  The Debtors believe that the consideration received for the Assignment is fair and the highest and best offer available for their interests in the Ground Lease.  The Debtors, in an exercise of sound business judgement, believe that the Assignment of the Ground Lease to Purchaser, and the rejection of the Lease, as provided for under this Stipulation, Agreement, and Order, are in the best interests of the Debtors, their estates, and their creditors.

I.  In connection with the foregoing matter, the Parties have agreed, subject to approval by the Bankruptcy Court, to the terms set forth herein.

**NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT IS HEREBY STIPULATED AND AGREED, BY AND BETWEEN THE PARTIES, THROUGH THEIR UNDERSIGNED COUNSEL, AND, UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED THAT:**

## AGREEMENT

1.  This Stipulation, Agreement, and Order shall have no force or effect unless and until the date it is approved by the Bankruptcy Court (the "**Effective Date**").

2.  Upon the Effective Date, the Parties may proceed with the Transactions in accordance with the terms of the Sale Contract and this Stipulation, Agreement, and Order.

WEIL:\96898076\12\73217.0004

3.      This Stipulation, Agreement, and Order constitutes the Debtors' notice of their intent to reject the Lease, and upon the Effective Date, the Lease shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code.  Troy Coolidge waives any claim for damages that it may have against the Debtors in connection with the Debtors' rejection of the Lease.

4.      By no later than the Closing Date, as defined in the Amendment, Purchaser shall pay Troy Coolidge two million three hundred sixty-nine thousand two hundred and fifty dollars ($2,369,250) in cash, less any amount agreed upon between the Purchaser and Troy Coolidge solely on account of a recent theft at Parcel A.

5.      Pursuant to the Assignment Agreement, Kmart shall assume the Ground Lease and assign all of its rights, title and interests thereunder to Purchaser (the "**Assignment**"), in exchange for (a) Purchaser's payment of one hundred thirty thousand seven hundred fifty dollars ($130,750) (the "**Assignment Fee**") and (b) Purchaser assuming and agreeing to perform all of Kmart's liabilities, obligations, and responsibilities under the Ground Lease, in accordance with the terms and conditions set forth in the Assignment Agreement.  By no later than the Closing Date, as defined in the Amendment, Purchaser shall remit to Kmart the Assignment Fee in cash.

6.      Upon the Effective Date, Kmart is authorized to assume and assign the Ground Lease to Purchaser pursuant to sections 365(a) and 365(f) of the Bankruptcy Code, Rule 6006 of the Federal Rules of Bankruptcy Procedure, and Rule 6006-1 of the Local Bankruptcy Rules for the Southern District of New York.

7.      As of the Effective Date, the Ground Lease, including all of Kmart's rights, title, interest, benefits, privileges, obligations, liabilities, claims and demands in, to and under the Ground Lease, shall be deemed assigned to Purchaser, its successors and assigns, pursuant to the Assignment Agreement, and the Ground Lease shall remain in full force and effect for the benefit of Purchaser.  Purchaser shall assume and agree to accept such assignment and to assume the liabilities and obligations of Kmart under the Ground Lease.

8.      Consistent with the Estoppel Certificate, as of the Effective Date, Kmart shall not be required to cure any defaults under the Ground Lease pursuant to section 365(b)(1) of the Bankruptcy Code, provide any adequate assurance of future performance by Purchaser pursuant to section 365(f)(2) of the Bankruptcy Code, or satisfy any liabilities under the Ground Lease after the Effective Date pursuant to section 365(k) of the Bankruptcy Code.

9.      Upon the Effective Date, Purchaser shall accept the Leased Premises in "as-is," "where is," and "with all faults" condition.  Kmart has not made any express or implied, verbal or written, representations, warranties or statements to Purchaser, with respect to any matter whatsoever, except as expressly set forth in the Assignment Agreement.

10.     Subject to compliance with the terms of this Stipulation, Agreement, and Order, as of the Effective Date, the Parties are authorized and directed to execute and deliver the Assignment Agreement, all other instruments and documents, and take all other actions as may be necessary or appropriate to execute, implement, consummate and effectuate the Assignment.

11.     Each person who executes this Stipulation, Agreement, and Order on behalf of a Party hereto represents that he or she is duly authorized to execute this Stipulation, Agreement, and Order on behalf of such Party.

12.     This Stipulation, Agreement, and Order contains the entire agreement among the Parties and supersedes all prior discussions, agreements, and undertakings between the Parties relating to the subject matter hereof.

13.     This Stipulation, Agreement, and Order shall be filed and become part of the record in the Debtors' chapter 11 cases.

14.     This Stipulation, Agreement, and Order may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation, Agreement, and Order to present any copy, copies, electronic copies, or facsimiles signed by the Parties.

WEIL:\96898076\12\73217.0004

15.    This Stipulation, Agreement, and Order shall not be modified, altered, amended or vacated without the written consent of all parties hereto or by further order of the Bankruptcy Court.

16.    Notwithstanding the applicability of Bankruptcy Rule 6006(d), the terms and provisions of this Stipulation, Agreement, and Order shall be immediately effective and enforceable upon the Effective Date.

17.    This Stipulation, Agreement, and Order shall be governed by, and construed in accordance with, the laws of the State of New York, except to the extent that the Bankruptcy Code applies, without regard to principles of conflicts of law that would require the application of laws of another jurisdiction.   The Bankruptcy Court shall retain jurisdiction to resolve any disputes or controversies arising from this Stipulation, Agreement, and Order.

Dated: February 19, 2019

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Troy Coolidge No. 7 and
Debtors and Debtors in Possession*

Dated: February 19, 2019

/s/ Jeffrey Maddux
Jeffrey Maddux
CHAMBLISS, BAHNER & STOPHEL, P.C.
Liberty Tower
605 Chestnut Street, Suite 1700
Chattanooga, TN 37450
(423) 757-0296

*Attorneys for Purchaser*

SO ORDERED this ___ day of February 2019

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

WEIL:\96898076\12\73217.0004

## **Exhibit A**

**Initial Sale Contract**

WEIL:\96898076\12\73217.0004

# REAL ESTATE SALE CONTRACT

by and between

## KMART CORPORATION,

a Michigan corporation, as owner of the Ground Leasehold Interest of .440 acres approximately
and

## TROY COOLIDGE NO. 7, LLC,

a Michigan limited liability company, as fee simple owner of 7.974 acres approximately

collectively, as Seller

and

## RISE HOLDINGS, LLC

a Delaware limited liability company

as Purchaser

Property:  Kmart #7461
2300 Madison Street
Clarksville, Tennessee  37043

Date:  May 23, 2018

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

# REAL ESTATE SALE CONTRACT
## *{Kmart #7461; Clarksville, Tennessee}*

**THIS REAL ESTATE SALE CONTRACT ("Contract")** is made as of the 23rd day of May, 2018 (the "**Effective Date**"), by and between **KMART CORPORATION**, a Michigan corporation, as owner of the Ground Leasehold Interest of .440 acres approximately ("**Kmart**") and **TROY COOLIDGE NO. 7, LLC**, a Michigan limited liability company, as fee simple owner of 7.974 acres approximately ("**Troy**") (at times, Kmart and Troy shall collectively be referred to as "**Seller**") and **RISE HOLDINGS, LLC**, a Delaware limited liability company, ("**Purchaser**" or "**Assignee**") (Seller and Purchaser are also collectively referred to in this Contract as the "**Parties**" and individually referred to in this Contract as a "**Party**"). Seller and Purchaser agree as follows:

## 1. PURCHASE AND SALE

(a) Kmart is the lessee under that certain ground lease dated October 1, 1990, ("**Lease**"), pursuant to which DANIEL G. KAMIN, CLARKSVILLE COMMONS ENTERPRISES, a Pennsylvania business trust, as successor-in-interest to Clarksville Venture No. One, a Texas joint venture ("**Lessor**"), leases to Kmart certain real property containing approximately .440 acres (a portion of County Tax Parcel # 11-081-05.05-000-063-135 and City Tax Parcel # 11-081-.050.05-000-063-135) commonly known as 2300 Madison Street in the City of Clarksville, Montgomery County, State of Tennessee, as described and set forth in the Lease (the "**Demised Premises**"). A copy of the executed Lease along with all amendments, modifications and addenda to the Lease, will be delivered to Purchaser pursuant to **Section 9(b)** hereunder and is a part hereof. The Demised Premises, including all land, and improvements as may be located thereon, is hereinafter referred to collectively as the "**Premises**." The Demised Premises is improved with a one story building containing approximately 15,062 square feet.

(b) Troy is the owner of a parcel of land consisting of approximately 7.974 acres (County Tax Parcel #11-081-081-050.04-000-063-135 and City Tax Parcel #11-081-081-050.04-000-063-135) including any interest of Seller in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes ("**Real Property**"), commonly known as 2300 Madison Street in the City of Clarksville (the "**City**"), Montgomery County, Tennessee legally described on **Exhibit "A"** attached hereto and made a part hereof , improved with a building of approximately 72,897 square feet (the "**Building**"), together with all other improvements, structures and fixtures located on the Real Property, and all rights and appurtenances pertaining to the Real Property (together with the Building, collectively, the "**Improvements**") and all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by Seller and associated with the ownership, operation or maintenance of the Real Property and Improvements, if any

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

(collectively, the "**Personal Property**"). The Real Property, the Improvements and the Personal Property are sometimes collectively called the "**Property**".

(c)    The Premises and the Property adjoin each other.

(d)    Subject to the terms and conditions set forth in this Contract, Kmart agrees to assign all of its rights, title, interest, benefits, privileges, obligations and liabilities, claim and demand in, to and under the Lease, and Assignee agrees to accept such assignment and to assume and accept from Kmart the liabilities and obligations of Kmart under the Lease and all personal property, contracts, permits, plans, records, and intangible property related to the leasehold ownership, use, operation, and maintenance of the Premises owned by Kmart (the "**Ground Leasehold Interest")**," other than (a) those vendor contracts which Assignee requires to be terminated at Closing (defined below), and (b) any rights in and to the names "Kmart," "Sears," or any derivatives thereof at the Purchase Price set forth in **Section 2** of this Contract. On the Closing Date set forth in **Section 7** of this Contract, Kmart shall cause to be conveyed to Purchaser a leasehold interest in and to the Premises by an enforceable Assignment and Assumption of Lease (as that term is defined in this Contract) and recordable Memorandum of Assignment and Assumption of Lease (as that term is defined in this Contract).

(e)    Subject to the terms and conditions set forth in this Contract, Troy agrees to sell to Purchaser and Purchaser agrees to purchase from Troy the Property at the Purchase Price set forth in **Section 2** of this Contract. On the Closing Date set forth in **Section 7** of this Contract, Troy shall cause to be conveyed to Purchaser fee simple title to the Property by recordable Deed (as that term is defined in this Contract) subject to the Permitted Title Exceptions (as defined in **Section 4** of this Contract).

(f)    The transactions contemplated in **subsections (d) and (e)** above are considered one transaction hereunder such that, the consummation of either transaction requires the consummation of the other even though the above transactions involve two different entities and two different ownership interests.

## 2.    **PURCHASE PRICE**

(a)    The Purchase Price of the Property and Ground Leasehold Interest shall be Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00) and payable by Purchaser in United States currency in good and certifiable funds at Closing.

(b)    Purchaser tenders to Seller and Seller acknowledges receipt of the sum of $100.00 as independent and non-refundable contract consideration for any options granted in this Contract. This independent consideration is in addition to any other deposits made under this Contract, is earned by Seller upon its execution of this Contract, and will not be credited against the Purchase Price.

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

3.    **EARNEST MONEY DEPOSIT**

Within three (3) business days of the Effective Date, Purchaser shall deposit with Chicago Title Insurance Company, 10 South LaSalle Street, suite 3100, Chicago, Illinois 60603 Attention: Cheri L. Sutton, Telephone: (312) 223-2958, Fax: (312) 223-5801, Email: Cheri.Sutton@ctt.com om ("**Title Insurer**") the sum of Fifty Thousand and No/100 Dollars ($50,000.00) United States currency (the "**Earnest Money Deposit**") by means of a certified check, cashier's check or wire transfer, to be held by the Title Insurer in accordance with the terms of those escrow instructions executed by the Parties attached hereto as **Exhibit "B"** and incorporated into this Contract by this reference (the "**Earnest Money Escrow Instructions**") and also the terms and conditions of this Contract. Any escrow fees as set forth in the Earnest Money Escrow Instructions will be paid by Purchaser. Purchaser may elect to direct the Title Insurer to invest the Earnest Money on its behalf in compliance with the Title Insurer's standard investment instructions, and Purchaser agrees that it shall be solely responsible for any investment fees charged by the Title Insurer. Subject to the terms and conditions as otherwise set forth in this Contract, the Earnest Money Deposit shall be paid to the Purchaser at Closing. The Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, at the time of Closing by wire transfer of immediately available funds. If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit, terminate this Contract, in which case this Contract shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Contract.

4.    **TITLE AND SURVEY REVIEW**

(a)    Within ten (10) days from the Effective Date, Seller shall provide to Purchaser, at Purchaser's expense, a title commitment for an ALTA Standard Form of Owner Policy of Title Insurance for the Property and an ALTA Standard Form of Leasehold Policy of Title Insurance for the Premises (collectively, the "**Title Commitment**") issued by Title Insurer showing Purchaser as the proposed insured, subject only to the Permitted Title Exceptions. Any exceptions to title shown on the Title Commitment to which Purchaser does not object in accordance with this **Section 4(a)** shall be "**Permitted Title Exceptions**". If Purchaser objects to any exceptions to title shown in the Title Commitment (the "**Unpermitted Exceptions**"), Purchaser shall give Seller written notice of such objection within twenty (20) days following the date of Purchaser's receipt of the Title Commitment and the Survey (as that term is defined in this Contract (the "**Review Period**"). If Purchaser has given notice of objection identifying Unpermitted Exceptions within the Review Period, Seller shall, at its option, have fifteen (15) days from the date of receipt of Purchaser's notice of objection, to (i) have such Unpermitted Exceptions removed from the Title Commitment; (ii) commit to having such Unpermitted Exceptions removed from the Title Policy when issued, or (ii) to have Title Insurer commit to insure over such Unpermitted Exceptions and provide evidence thereof acceptable to Purchaser. If Seller fails

to commit to having such Unpermitted Exceptions removed (or insured over), Purchaser may elect, as its sole remedy, by written notice to Seller given within ten (10) days following the expiration of said fifteen (15) day period, to either (i) terminate this Contract (in which event the Earnest Money Deposit shall be returned to Purchaser), or (ii) accept title to the Property and ownership of the Ground Leasehold Interest subject to such Unpermitted Exceptions. If Purchaser fails to elect either (i) or (ii) above within such ten (10) day period, Purchaser shall be deemed to have elected (ii) above and Purchaser shall remain obligated to close this transaction in accordance with the terms hereof. Notwithstanding the foregoing, Seller shall have an obligation to cause all voluntary monetary liens (i.e. mortgages, deeds of trust or similar liens) and any undisputed monetary liens encumbering the Property created by, through or under Seller (other than general real estate taxes and assessments not yet due and payable) to be released at or insured over at Closing such that those liens shall not be an exception to Purchaser's Title Policy (collectively, "**Monetary Liens**"). On the Closing Date, Seller shall cause the Title Insurer to issue to Purchaser, at Purchaser's sole cost and expense, (i) a leasehold title policy insuring the Ground Leasehold Interest in the Premises and (ii) an owner's title policy insuring the fee simple title to the Property, collectively in at least the amount of the Purchase Price, issued as of the Closing Date, and subject to the Permitted Title Exceptions (the "**Title Policy**"). It shall be the responsibility of Purchaser to seek any such endorsements it may desire and to satisfy any conditions to the issuance of said endorsements on or before expiration of the Review Period, after the expiration of which, Purchaser shall be deemed to have satisfied itself as to the availability of all endorsements. A failure by Purchaser to satisfy any conditions to, or undertake any action necessary for, the issuance of a requested endorsement shall not excuse Purchaser from its obligations hereunder. From the Effective Date through the Closing Date, Seller shall not create any encumbrances on the Property or the Premises other than those listed in the Title Commitment or shown on the Survey or those that relate to real estate taxes not yet due or payable, without the prior consent of Purchaser.

(b)     Purchaser shall have the right to obtain, at Purchaser's sole cost and expense, obtain a current ALTA/NSPS land title survey, with Table A inclusions as indicated by Purchaser, of the Property meeting the 2016 ALTA/NSPS and Title Survey standards, prepared by a Tennessee licensed surveyor, certified in a form acceptable to Purchaser, Purchaser's lender (if any), Seller and Title Insurer (the "**Survey**"). Should Purchaser chose not to obtain a Survey, Purchaser shall not be entitled to raise as Unpermitted Exceptions those exceptions which could be deleted or insured over with the production of a Survey.

(c)     Notwithstanding anything to the contrary contained in this Contract, Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer (except for Monetary Liens, which Seller does have an affirmative obligation to remove). If the Title Commitment discloses exceptions other than the Permitted Title Exceptions, and other than

those which Seller has agreed to discharge or have Title Insurer commit to insure over, then, unless Purchaser agrees to accept title as it then is, Seller may, at its option, terminate this Contract, in which event the Earnest Money Deposit shall be returned to Purchaser as Purchaser's sole remedy under this Contract upon providing proof to Seller that Purchaser has paid in full any third parties hired by or on behalf of the Purchaser to perform any actions which could result in a lien against the Property or the Premises (provided that Seller acknowledges that a representation from Purchaser shall be deemed sufficient proof).

## 5. PRORATIONS AND EXPENSES

(a)    The following prorations, except as specifically provided in this Contract to the contrary, shall be made as of 12:01 a.m. on the Closing Date ("**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)    **Taxes.** All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Property or the Premises not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel number(s) that is attributable to the Property and Premises. All prorations shall be final. Any installments of special or other assessments affecting the Property or the Premises which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any installments of special or other assessments affecting the Property or the Premises which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this **Section 5(a)(i)** includes general assessments, including, without limitation, regular annual assessments payable to any property owners association - but does not include rollback or deferred taxes which shall be paid by the Seller without contribution from the Purchaser.

(ii)    **Miscellaneous.** If there are any other items, including rent and other payments under the Lease, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Property, such items shall be prorated at the Closing. All prorations shall be final.

(b)    At Closing, Seller shall pay (i) one-half (1/2) of the cost of the Closing Escrow, (ii) the amount of any stamp or transfer tax imposed by the City and any county ordinance, and the State of Tennessee and (iii) rollback taxes assessed against the Property, if any. At Closing, Purchaser shall pay (i) one half (1/2) of the cost of the Closing Escrow; (ii) the cost of obtaining the Survey; (iii) the cost of the Title Commitment, (iv) Title Commitment search and exam fees, if any; (v) Owner's Title Policy and the cost of any endorsements to the Title Policy; (vi) the cost of the Purchaser's Studies; (vii) all financing related fees; (viii) all recording charges

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

for the Deed and all documents pertaining to any purchase money financing; and (ix) the cost of recording the Memorandum of Assignment and Assumption of Lease, the Collateral Assignment of Lease and any leasehold mortgage. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Contract, will be payable equally by the Parties at Closing. Except as otherwise provided for in this Contract, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

6.    **CONDITIONS TO CLOSING**

(a)    In addition to any other conditions and/or contingencies set forth in this Contract, Seller's obligation to close on Purchaser's purchase of the Property and the Ground Leasehold Interest is subject to each and all of the following conditions precedent:

(i)    All of Purchaser's representations and warranties contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Seller shall, promptly upon becoming aware of same, advise Purchaser if it believes that any of the Purchaser's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Purchaser shall thereupon have a reasonable period to cure any purported breach of its representations and warranties; and

(ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Purchaser as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Seller may, after notice to Purchaser and Purchaser's failure to cure within the time period(s) set forth in this Contract, elect at any time thereafter, to terminate this Contract, provided that Seller is not itself in default beyond any applicable notice and cure period, and exercise such remedies as provided in **Section 13** of this Contract.

(b)    In addition to any other conditions and/or contingencies set forth in this Contract, Purchaser's obligation to close the purchase of the Property and the Ground Leasehold Interest is subject to each and all of the following conditions precedent:

(i)    All of Seller's representations contained in this Contract shall be true and correct as of the Closing in all material respects; provided however Purchaser shall, promptly upon becoming aware of same, advise Seller if it believes that any of Seller's representations and warranties contained in this Contract are not true and correct as of the Closing in all material respects, and Seller shall thereupon have a reasonable period to cure any purported breach of its representations and warranties;

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Seller as set forth in this Contract has not been fulfilled and satisfied on or before the Closing Date, Purchaser may, after notice to Seller and Seller's failure to cure within the time period(s) set forth in this Contract, provided that Purchaser is not itself in default beyond any applicable notice and cure period, elect at any time thereafter, to terminate this Contract and exercise such remedies as provided in **Section 13** of this Contract.

(iii)    At least twenty (20) days before expiration of the Initial Due Diligence Period (The "**Lessor Estoppel Deadline**"), Seller has provided to Purchaser an executed estoppel certificate, in form reasonably approved by Purchaser, from Lessor in favor of Purchaser, which certifies that (i) the Lease is in full effect (or, if there have been modifications, that the Lease is in full effect as modified, and setting forth such modifications), the then-amount of Basic Rent (as defined in the Lease), and the dates to which Basic Rent, Additional Rent (as defined in the Lease) and other sums payable under the Lease have been paid. Seller will request that the estoppel certify that either no default exists under the Lease, or whether or not a default exists, that Lessor shall waive any prior defaults and allow Purchaser to continue under the Lease without condition or payment of any penalties or past-due items (a "**Statement on Default**"). Since Lessor is not obligated by the Lease to make a Statement on Default, Seller is not obligated hereunder to provide an estoppel certificate which provides a Statement on Default, but if the estoppel does not include a Statement on Default, then Purchaser shall have the right to terminate this Agreement by written notice to Seller within ten (10) days after Purchaser's receipt of the estoppel certificate, subject to the terms of subsection (c) below. Notwithstanding the foregoing, Seller is under no obligation to pay Lessor or agree to any provisions under which Lessor will agree to provide such estoppel certificate.

(iv)    Seller has provided to Purchaser an executed estoppel certificate, in favor of Purchaser and in form reasonably approved by Purchaser, from the other party or parties (the "**REA Parties**") to the Reciprocal Easement Agreement recorded at Book 309, Page 803 in the Register's Office for Montgomery County, Tennessee ("**REA**"), which certifies that there are no known defaults on the part of any party to the REA, or if there are defaults, specifying the particulars of such defaults and the action required to remedy them, and certifying that there are no setoffs or defenses to the enforcement of the terms of the REA, or if there are, specifying the particulars of such setoffs or defenses.

(c)    Purchaser agrees that, so long as Seller sends written request for the estoppel certificates described in **Sections 6(b)(iii) and (iv)** to Lessor and the REA Parties

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

within twenty (20) days after the Effective Date, then Seller shall have the right to (i) extend Closing for up to thirty (30) days if the REA Parties fail to execute and return the respective estoppel prior to Closing, and (ii) extend the Initial Due Diligence Period for up to thirty (30) days if Lessor fails to execute and return the estoppel prior to the Lessor Estoppel Deadline. However, as long as Seller sends written request for the estoppel certificates, then in no event will Seller be deemed in default for failure to obtain said estoppel certificates.

7.    **CLOSING**

(a)    Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the **"Closing"**) shall take place at the downtown Chicago, Illinois office of Title Insurer within fifteen (15) days after the satisfaction or waiver of the later to occur of the expiration of the Due Diligence Period or such other date mutually agreed to by Purchaser and Seller (the **"Closing Date"**).

(b)    On or before the Closing Date, Seller shall deliver or cause to be delivered to the Title Insurer the following Closing documents:

(i)    A Special Warranty Deed executed in proper form for recording so as to convey the title required by this Contract (the **"Deed"**) to Purchaser, subject to the Permitted Title Exceptions and Reservation;

(ii)    A FIRPTA Affidavit in customary form duly executed by Seller;

(iii)    Seller shall execute a Bill of Sale transferring all of Seller's right, title and interest in the Personal Property (**"Bill of Sale"**);

(iv)    Seller shall execute an assignment of documents of record transferring all of Seller's right, title and interest in any documents of record relating to the Property and Premises (**"Assignment and Assumption Agreement"**);

(v)    The Title Policy (or Title Policy Pro Forma);

(vi)    An executed copy of the Assignment and Assumption of Lease in the form attached to and made a part hereof as **Exhibit "D"** as may be amended by the Parties before expiration of the Due Diligence Period (the **"Assignment and Assumption of Lease"**);

(vii)    An executed copy of the Memorandum of Assignment and Assumption of Lease in the form attached to and made a part hereof as **Exhibit "E"** as may be amended by the Parties before expiration of the Due Diligence Period (the **"Memorandum of Assignment and Assumption of Lease"**);

(viii)    An executed copy of the Collateral Assignment and Assumption of Lease Rights in the form attached to and made a part hereof as **Exhibit "F"** as

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

may be amended by the Parties before expiration of the Initial Due Diligence Period (the "**Collateral Assignment and Assumption of Lease**");

(ix)     Notice to Lessor of assignment and assumption of Ground Leasehold Interest by Purchaser;

(x)      Such other instruments, affidavits and transfer tax returns as are customarily executed by a seller of real property in the city, county and state where the Property is located; and

(xi)     Termination/Release of Memorandum of Lease by and between Seller and Kmart Corporation, a Michigan corporation, recorded in Volume 309, Page 819, as amended by the Memorandum of Lease Modification Agreement No. 1 recorded in Volume 309, Page 829, both in the Register's Office for Montgomery County, Tennessee.

(c)    On the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

(i)      Balance of the Purchase Price, plus or minus prorations;

(ii)     The counterpart to the Bill of Sale;

(iii)    The counterpart to the Assignment and Assumption Agreement;

(iv)     The counterpart to the Assignment and Assumption of Lease;

(v)      The counterpart to the Memorandum of Assignment and Assumption of Lease;

(vi)     The counterpart to the Collateral Assignment and Assumption of Lease Rights;

(vii)    The counterpart to the Notice to Lessor of assignment and assumption of Ground Leasehold Interest by Purchaser; and

(viii)   Such other documents, certificates, instruments, affidavits and transfer tax returns as are customarily executed by a purchaser of real property in the city, county and state where the Property is located.

(d)    On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered an agreed closing proration statement and state, county and municipal transfer tax declarations and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Contract.

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

(e)    The Deed, Bill of Sale, Assignment and Assumption Agreement, and Assignment and Assumption of Lease shall be referred to collectively as the "**Conveyance Documents**."

## 8.    CLOSING ESCROW

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**Closing Escrow**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Contract; provided, however, in the event of a conflict between the terms of this Contract and the Closing Escrow, the terms of this Contract shall control. All documents required to be provided by Purchaser and Seller pursuant to this Contract and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Contract shall be delivered to the Title Insurer, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

## 9.    DUE DILIGENCE PERIOD

(a)    Purchaser's agents, employees and independent contractors shall have the right and privilege to enter upon the Property and Premises (subject to Lessor's written approval) from and after the Effective Date to survey and inspect the Property and Premises, including, but not limited to, the right to (i) review of the utility capacity for the Property and Premises, (ii) review the location of utilities, (iii) conduct an environmental assessment, and (iv) conduct an assessment and/or inspections related to the Premises, subject to Lessor's written approval (collectively, "**Purchaser's Studies**"), all at Purchaser's sole cost and expense. Prior to Purchaser or any agent, employee or independent contractor of Purchaser entering onto the Property to perform any inspections or tests, Purchaser shall enter into a "**Non-Invasive Inspection Agreement**" attached hereto as **Exhibit "C"** and incorporated into this Contract by this reference. Copies of all of Purchaser's Studies shall be furnished to Seller promptly upon receipt thereof by Purchaser. Purchaser agrees not to disclose Purchaser's Studies or their results to any other persons or entities other than its employees, agents, attorneys, brokers, contractors, accountants, or other parties assisting Purchaser with the transaction contemplated hereby without the Seller's prior written consent, which consent may be granted or withheld in the absolute discretion of Seller or unless Purchaser is required by law to disclose such information. Purchaser's obligations under this Contract are subject to and conditioned upon Purchaser's investigation and study of the Property and reasonable satisfaction with the Property in Purchaser's sole

11 | P a g e

discretion. Purchaser shall have ninety (90) days from the Effective Date (the "**Initial Due Diligence Period**") in which to make Purchaser's Studies with respect to the Property. Notwithstanding anything to the contrary set forth herein and provided that Purchaser provides written notice to Seller prior to the expiration of the Initial Due Diligence Period (the "**Extension Notice**"), Purchaser shall have the right to extend the Initial Due Diligence Period solely for Phase I Environmental Assessment and/or Phase II Environmental Assessment related issues for two (2) periods of thirty (30) days each (the "**Extended Environmental Due Diligence Period**" and collectively with the Initial Due Diligence Period, the "**Due Diligence Period**"). The Extension Notice shall require Purchaser to tender to Seller the non-refundable sum of $10,000.00 for each thirty (30) day extension (the "**Extension Fee**"). Although non-refundable, the Extension Fee shall be credited against the Purchase Price at the time of Closing. Failure to deliver the Extension Fee to Seller on or before the expiration of the applicable Due Diligence Period shall not be construed as a valid exercise of this provision and such Extension Notice will have no effect. All of Seller's service contracts on the Property and Premises are national contracts and will not be assigned to or assumed by Purchaser, and Seller will cause the Property and Premises to be released from such service contracts on or prior to the Closing Date. Purchaser shall have the right to elect, by written notice to Seller given prior to the expiration of the Due Diligence Period, for any reason or no reason, to terminate this Contract, and this Contract thereupon shall be deemed to be terminated and both Parties shall be released from any further liability hereunder. If Purchaser does give such notice of termination to Seller, upon providing proof to Seller that Purchaser has paid in full any third parties hired by or on behalf of the Purchaser to perform any actions which could result in a lien against the Property or Premises (provided that Seller acknowledges that a representation from Purchaser shall be deemed sufficient proof), the Earnest Money Deposit shall be delivered to Purchaser and the Parties shall have no further obligation hereunder. If Purchaser fails to give such notice of termination to Seller as provided in this **Section 9(a)** and subject to the terms and provisions of **Section 9(b)** below, (i) Purchaser shall be conclusively deemed to have irrevocably waived any objections to the condition of the Property, Premises and Ground Leasehold Interest, and (ii) except as otherwise provided in this Contract, Purchaser agrees to accept the Property and Premises in "**AS IS**" "**WHERE IS**" "**WITH ALL FAULTS CONDITION**" and to release, defend, hold harmless, and indemnify Seller from and after the Closing Date, for all costs and expenses resulting from any claim, demand, liability or loss relating to the condition of the Property, Premises and Ground Leasehold Interest including but not limited to the condition of the soil, regardless of when such condition occurred, or who created the condition or allowed it to occur. If Purchaser does not terminate the Contract in accordance with this **Section 9(a)**, the Earnest Money Deposit shall be non-refundable to the Purchaser but shall be credited towards the Purchase Price at Closing. Purchaser hereby covenants and agrees to defend, indemnify and hold harmless Seller and its respective officers, directors, employees, agents, representatives acting or purporting to act on behalf of Seller, beneficiaries,

12 | P a g e

attorneys, subsidiaries, affiliates, partner, contractors, subcontractors, successors and assigns ("**Seller's Related Parties**"), from and against any and all loss, liability, cost, claim, demand, damage, lien, penalty, fine, interest and expense (collectively, "**Claims**") arising out of or in any manner related to the exercise by Purchaser of its rights under this **Section 9**, unless such Claim is a result of the gross negligence or willful misconduct of Seller, its agents, contractors or employees. If this transaction does not close, Purchaser shall, at its sole cost and expense, restore any damage to the Property and Premises caused by or in connection with Purchaser's Studies such that the Property and Premises return to their condition as of the Effective Date. Notwithstanding anything to the contrary contained in this Contract, the terms, provisions, conditions and indemnifications of this **Section 9(a)** shall survive Closing and the delivery of the Deed or the termination of this Contract without further need to document such agreement.

(b)     Within fifteen (15) days after the Effective Date, Seller shall provide to Purchaser the following to the extent such documents exist and are in the possession and control of Seller at its corporate office in Hoffman Estates, IL  as of the date of this Contract:

        (i)     Current tax assessment statements and copies of the most recent tax bills for the Property and Premises;

        (ii)     Copies of any surveys affecting the Property or Premises;

        (iii)     Environmental reports and studies affecting the Property or Premises (collectively, the "**Environmental Reports**");

        (iv)     A copy of the most recent title policy for the Property and Premises; and

        (v)     A copy of the fully executed Lease.

In the event this Contract is terminated, all materials provided by Seller to Purchaser (the "**Due Diligence Materials**") shall be promptly returned by Purchaser to Seller at no cost to Seller. EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT OR THE CONVEYANCE DOCUMENTS, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, REGARDING THE ACCURACY OR COMPLETENESS OF THE DUE DILIGENCE MATERIALS OR THE QUALIFICATIONS OF THE PERSONS PREPARING THE SAME.

## 10.    **REPRESENTATIONS AND WARRANTIES**

(a)     Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

        (i)     Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents

13 | P a g e

to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto.

(ii)    To Seller's actual knowledge, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property, and other than the Lease, of the Premises. The lease dated July 18, 1980, by and between Troy and Kmart expired August 31, 2016.

(iii)   Seller has title to the Property and the Improvements.

(iv)    There are no foreclosure proceedings, receiver appointments, attachments, executions, assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy or under any applicable debtor relief law or statute, or any litigation contemplated by or pending or, to Seller's actual knowledge, threatened against Seller or the Property or Premises.

(v)     As used in this Contract, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of the undersigned signatory on behalf of Seller, and shall not be construed to refer to the knowledge of any other officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b)    Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i)     Purchaser has full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. Neither the execution of this Contract nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

(ii)    Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Contract.

(iii)    This Contract and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv)    As of the Closing Date, Purchaser shall not have commenced, within the meaning of Title 11 of the U.S. Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(v)    Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Property or Premises.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder.    All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time.    Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this **Section 10** shall not merge with the transfer of title but shall survive Closing for a period of six (6) months.    If Purchaser delivers written notice of any breach of representation or warranty within such six (6) month period, then Purchaser's sole remedy shall be an action at law for actual damages, which must be commenced, if at all, on or before the first day following the second (2nd) anniversary of the Closing Date. The cumulative, maximum amount of liability that Seller shall have to Purchaser, in the aggregate, for breaches of the representations and warranties under this Agreement shall not exceed $125,000.00.

11.    **AS IS/NO WARRANTIES**

(a)    Purchaser expressly acknowledges that Purchaser is buying the Property and Ground Leasehold Interest in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Property without warranty or representation of any kind by Seller or any of Seller's Related Parties, including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Material.  As used in this Contract, the

15 | P a g e

term "**Hazardous Material**" shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), and (d) any other federal, state or local environmental statute or regulation. Purchaser, hereby agrees to release, defend, hold harmless and indemnify Seller and Seller's Related Parties, with regard to any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, arising from (x) any Hazardous Materials currently located or which come to be located upon the Property or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was caused by Seller, its employees, agents or contractors) or (y) any Hazardous Materials which have migrated, leached, or traveled onto or off of the Property, from any source.

(b)     Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property and Ground Leasehold Interest in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller. Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property and Ground Leasehold Interest in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price. Without in any way limiting the generality of the immediately preceding sentences, except as otherwise provided for in the representations and warranties in **Section 10** of this Contract, Purchaser and Seller further acknowledge and agree that in entering into this Contract and closing the transactions hereunder:

(i)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the Premises, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)     Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof. Such inquiries and

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property or the Premises, the environmental condition of the Property or the Premises, the condition of repair of the Property or the Premises, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Property and Premises are located; and, and upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof.   Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property or the Premises, the environmental condition of the Property or the Premises, the condition of repair of the Property or the Premises, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Property and Premises are located; and

(c)     WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING **SUBSECTIONS 11(A) AND 11(B)**, PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND SELLER'S RELATED PARTIES RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY OR PREMISES, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY OR PREMISES, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY OR PREMISES, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY OR PREMISES, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY OR PREMISES, OR (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE REAL PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY OR PREMISES.

(d)     Except as expressly set forth in this Contract, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or Seller's Related Parties as to the condition or repair of the Property or Premises or the value, expense of operation, or income potential thereof or as to any other fact or condition which has or might affect the Property or Premises or the condition, repair, value, expense of operation or income potential of the Property o or Premises or any portion thereof.   The Parties agree that all understandings and contracts heretofore made between them or their respective

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

agents or representatives are merged in this Contract and the Exhibits hereto annexed, which alone fully and completely express their Contract, and that this Contract has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Contract or the Exhibits annexed hereto. Purchaser acknowledges that Seller has requested that Purchaser inspect the Property or Premises fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

## 12.    NON-FOREIGN SELLER CERTIFICATION

Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the **"Code"**), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section. At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

## 13.    DEFAULT AND REMEDIES

If Seller fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Seller of notice of such default, for any reason other than Purchaser's default hereunder and failure to diligently complete or cure Purchaser shall have as its sole and exclusive remedies (i) the right to terminate the Contract, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon, and the Contract shall be terminated and of no further force or effect except as provided for in this Contract; or (ii) the right to specific performance. If Purchaser fails or refuses to comply with the terms of this Contract within fifteen (15) days of receipt by Purchaser of notice of such default, for any reason other than Seller's default hereunder, Seller's sole remedy shall be to terminate this Contract, in which event Seller shall be entitled to receive the Earnest Money Deposit as liquidated damages in lieu of all other remedies available to Seller and this Contract shall become null and void with neither Party having any further rights or liabilities hereunder, except as provided for in this Contract. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Contract; and (iii) retention by Seller of the Earnest Money upon Purchaser's default hereunder shall not constitute a penalty or forfeiture. Seller and Purchaser waive the defense of mutuality of remedies.

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

14.   **NOTICES**

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

To Seller:       **KMART CORPORATION**
                 3333 Beverly Road
                 Hoffman Estates, Illinois  60179
                 Attn: SVP and President, Real Estate
                 Department 824RE

                 AND

                 **TROY COOLIDGE NO. 7, LLC**
                 3333 Beverly Road
                 Hoffman Estates, Illinois  60179
                 Attn: SVP and President, Real Estate
                 Department 824RE

With copies to:  **KMART CORPORATION**
                 3333 Beverly Road
                 Hoffman Estates, Illinois  60179
                 Attn:  Associate General Counsel, Real Estate
                 Department 824RE

                 AND

                 **TROY COOLIDGE NO. 7, LLC**
                 3333 Beverly Road
                 Hoffman Estates, Illinois  60179
                 Attn: Associate General Counsel, Real Estate
                 Department 824RE

To Purchaser:    **RISE HOLDINGS, LLC**
                 832 Georgia Avenue
                 Suite 507
                 Chattanooga, Tennessee 37402

With copies to:  **CHAMBLISS, BAHNER & STOPHEL P.C.**
                 605 Chestnut Street, Suite 1700
                 Chattanooga, Tennessee 37450
                 Attn: Kirby Yost

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

Notice of change of address for receipt of notices shall be sent in the manner set forth in this **Section 14**.

## 15.  ENTIRE CONTRACT, AMENDMENTS AND WAIVERS

This Contract contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

## 16.  FURTHER ASSURANCES

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Contract and to fully consummate and effect the transaction contemplated hereby.

## 17.  SURVIVAL AND BENEFIT

Except to the extent specifically stated to the contrary elsewhere in this Contract, all representations, warranties, agreements and obligations of the Parties contained in this Contract shall be merged with the Deed at Closing. Wherever in this Contract there is a reference to termination of this Contract, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Contract which by their terms to the extent specifically stated in this Contract shall survive termination of this Contract.

## 18.  CONFIDENTIALITY

Purchaser agrees that all terms of this Contract as well as any information provided to Purchaser pertaining to Seller (the "**Confidential Information**") will remain confidential and will not be divulged by Purchaser without the written consent of Seller, except that Purchaser may disclose the Confidential Information without Seller's consent to Purchaser's respective officers, affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) and to any agency (governmental or public) in connection with Purchaser's pursuit of any entitlements and/or approvals deemed by Purchaser to be necessary for construction of the Property, so long as the confidentiality obligations of Purchaser are binding upon all of the foregoing and Purchaser informs the receiving parties of the confidential nature of the Confidential Information and directs the receiving parties to treat the Confidential Information confidentially in accordance with this **Section 18**. Notwithstanding anything contained in this Contract to the contrary, the obligation of confidentiality does not apply to (a) Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this **Section 18** or breach of confidentiality by anyone bound under like terms of confidentiality to the Party making such public disclosure, (b) Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Seller in writing. If Purchaser seeks Seller's consent to the disclosure of the Confidential Information, Seller shall not unreasonably

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

withhold its consent. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Contract or its terms will be provided to any third party not subject to the same confidentiality obligation as Purchaser. In the event Purchaser breaches the terms of this Section, Purchaser acknowledges and agrees that Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this **Section 18**, in addition to all other rights and remedies available at law or in equity. Notwithstanding anything in this Contract to the contrary, Purchaser may divulge Confidential Information without Seller's consent to a proposed institutional mortgagee in connection with any financing by Purchaser of the Property (who, in turn, may disclose the Confidential Information to its officers, advisors, attorneys, appraisers and other consultants in connection with the approval and documentation of such financing).

19.    **BROKERAGE**

Except for Mifflin Real Estate representing the Purchaser ("**Purchaser's Broker**") and Gary Shanks of The Shopping Center Group representing the Seller ("**Seller's Broker**" together with Purchaser's Broker shall collectively be referred to as the "**Brokers**"), each Party hereto represents and warrants to the other that it has dealt with no other brokers or finders in connection with this transaction. Seller and Purchaser each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (including the Brokers), finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party. Any commission or other compensation due the Seller's Broker shall be the responsibility of Seller, and Seller's Broker shall be paid at the Closing in accordance with separate agreements between Seller's Broker and Seller. Purchaser's Broker shall be paid in accordance with a separate agreement between Seller's Broker and Purchaser's Broker.

20.    **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Contract without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Contract without Seller's consent in connection with a tax-deferred exchange or to an entity in which Purchaser (or Purchaser's principals) has a majority ownership interest or has at least co-control over provided that written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing. No transfer or assignment by Purchaser in violation of the provisions hereof shall be valid or enforceable.

21.    **NO THIRD PARTY BENEFITS**

This Contract is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns, and no third party is intended to or shall

have any rights hereunder.  This Contract is binding upon and inures to the benefit of the successors and assigns of the Parties.

## 22.   LITIGATION COSTS

In the event of any legal action or other proceeding between the Parties regarding this Contract (an "**Action**"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court.  The term "prevailing party" as used in this **Section 22** includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it); or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled.  In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action.  It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Contract, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

## 23.   SEVERABILITY

In the event that any one or more of the provisions contained in this Contract shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Contract, and this Contract shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Contract.

## 24.   GOVERNING LAW

This Contract shall be construed and governed in accordance with the laws of the State of Tennessee without regard to its conflicts of laws principles.

## 25.   COUNTERPARTS

This Contract may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.  Any counterpart to which is attached the signatures of all Parties shall constitute an original of this Contract.  The Parties agree that the Purchaser shall be the first to execute this Contract.

## 26.   SUCCESSORS AND ASSIGNS

This Contract shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Contract; provided, however, that Purchaser

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

may only assign this Contract in accordance with the provisions of **Section 20** of this Contract.

27.  **NO RECORDING**

Purchaser agrees not to record this Contract or any memorandum or short form of this Contract. Any such recording by Purchaser shall be a default under this Contract and shall entitle Seller to terminate this Contract and retain the Earnest Money Deposit.

28.  **TIME FOR PERFORMANCE**

All references in this Contract to "days" shall mean calendar days unless specifically stated. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Contract falls on a Saturday, Sunday, or other day on which national banks in the State of Tennessee are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State of Tennessee are authorized or required to be closed.  The term "business day" as used in this Contract means any day that is not a Saturday, Sunday, or other day on which national banks in the State of Tennessee are authorized or required to be closed.

29.  **TIME OF THE ESSENCE**

Time is of the essence of this Contract.

30.  **SECTION 1031 EXCHANGE**

At Seller's option, Purchaser agrees to cooperate with Seller in closing the sale of the Property as a like-kind exchange under Section 1031 of the Internal Revenue Code (the "**Code**"). Such cooperation shall include, without limitation, the substitution by Seller of an intermediary (the "**Intermediary**") to act in place of Seller as the Seller of the Property.  If Seller so elects, Purchaser agrees to accept the Property and all other required performance from the Intermediary and to render Purchaser's performance of all of its obligations hereunder to the Intermediary.  Purchaser agrees that performance by the Intermediary shall be deemed performance by Seller and Seller agrees that Purchaser's performance to the Intermediary shall be deemed as performance to Seller. Notwithstanding the foregoing, Seller shall remain liable to Purchaser for each and every one of the representations, warranties, indemnities and obligations of Seller under this Contract and Purchaser may proceed directly against Seller without the need to join the Intermediary as a party to any action against Seller.

At Purchaser's option, Seller agrees to cooperate with Purchaser in closing the sale of the Property as a like-kind exchange under Section 1031 of the Code.  Such cooperation shall include, without limitation, the substitution by Purchaser of an Intermediary to act in place of Purchaser as the Purchaser of the Real Property.  If Purchaser so elects, Seller agrees to accept the Property and all other required performance from the Intermediary and to render Seller's performance of all of its obligations hereunder to the Intermediary. Seller agrees that performance by the Intermediary shall be deemed performance by

23 | P a g e

Purchaser and Purchaser agrees that Seller's performance to the Intermediary shall be deemed as performance to Purchaser. Notwithstanding the foregoing, Purchaser shall remain liable to Seller for each and every one of the representations, warranties, indemnities and obligations of Purchaser under this Contract and Seller may proceed directly against Purchaser without the need to join the Intermediary as a party to any action against Purchaser.

## 31.    CONDEMNATION AND CASUALTY

In the event of any taking, or notice is given of the intention to take, the Real Property or Premises by the exercise of the power of eminent domain of all or a substantial portion of the Real Property or Premises prior to the Closing Date, such portion as would materially impair or otherwise materially affect Purchaser's intended use of the Real Property or Premises will be deemed "substantial," Purchaser shall have the right to terminate this Contract by giving written notice to Seller within thirty (30) days after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Contract, all awards and compensation arising out of said condemnation shall be the property of Seller and the Deposit, plus any interest accrued thereon, shall be promptly returned to Purchaser. If Purchaser elects not to terminate this Contract or fails to give Seller notice of termination within said thirty (30) day period, said right to terminate shall be deemed waived and Purchaser shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation, and Purchaser shall remain obligated to purchase the Property and Ground Leasehold Interest with no reduction in the Purchase Price.

If the Property or Premises suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof. If the cost to repair such damage is greater than Fifty Thousand Dollars ($50,000.00), Purchaser may elect, by written notice delivered to Seller prior to the scheduled Closing Date, to:

(a)    Terminate this Contract by written notice to Seller, in which event this Contract shall become null and void and thereafter neither party shall have any liability or obligation to the other except that the Earnest Money Deposit shall be refunded or returned to Purchaser; or

(b)    Notify Seller that it desires to take title to the Property or Premises in its damaged condition, in which event the cost to repair the damage, up to a maximum amount of One Hundred Fifty Thousand and no/100 Dollars ($150,000.00) shall be credited against the Purchase Price at Closing. All risks of loss to the Property or Premises are borne by Seller prior to Closing.

## 32.    SECTION HEADINGS

The section headings contained in this Contract are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

33.    **INTERPRETATION**

Whenever used in this Contract, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

34.    **JURY TRIAL**

SELLER AND PURCHASER HEREBY RESPECTIVELY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS CONTRACT AND THE OBLIGATIONS AND CONTRACTS CONTAINED IN THIS CONTRACT.

35.    **AMENDMENTS**

No agreement, amendment, modification, understanding or waiver of or with respect to this Contract or any term, provision, covenant or condition hereof, nor any approval or consent given under or with respect to this Contract, shall be effective for any purpose unless contained in writing and executed by each Party hereto.    However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

36.    **ENTIRE CONTRACT**

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller.    The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Contract shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Contract.

37.    **PATRIOT ACT**

Seller certifies that its name is **KMART CORPORATION**, a Michigan corporation, and to Seller's knowledge, neither Seller nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Purchaser certifies that its name is **RISE HOLDINGS, LLC**, a Delaware limited liability company, and to Purchaser's knowledge, neither Purchaser or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

## 38.   EXCULPATION; LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Contract, no officer, director, shareholder, employee, agent, manager, member or partner of Seller or Purchaser shall have any personal liability with respect to any of the obligations contained in this Contract.   Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this **Section 38** shall survive the expiration of the term or any earlier termination of this Contract.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

## Seller's Signature Page

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

### SELLER:

**KMART CORPORATION**, a Michigan corporation, as owner of the Ground Leasehold Interest



By: _____

Name:  JoAnn Catanese

Its:  Divisional Vice President, Real Estate

**TROY COOLIDGE NO. 7, LLC**, a Michigan limited liability company, as fee simple owner

By: *Kmart Corporation, a Michigan corporation, its sole member*

By: _____

Name:  JoAnn Catanese

Its:  Divisional Vice President, Real Estate

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

### Purchaser's Signature Page

**IN WITNESS WHEREOF**, the Parties have executed this Real Estate Sale Contract as of the date first above written.

**PURCHASER:**

**RISE HOLDINGS, LLC**, a Delaware limited liability company

By: _____
Name: _____
Its: _____

### EXHIBITS

Exhibit "A"-Legal Description of Property
Exhibit "B"-Earnest Money Escrow Instructions
Exhibit "C"-Non-Invasive Inspection Agreement
Exhibit "D"-Assignment and Assumption of Ground Lease
Exhibit "E"-Memorandum of Assignment and Assumption of Ground Lease
Exhibit "F"-Collateral Assignment and Assumption of Ground Lease

DMLIB #539743 v5
27265_00/1802/KWY-3316399_8

## EXHIBIT "A"

## LEGAL DESCRIPTION OF PROPERTY

Land lying and being in the 11th Civil District of Montgomery County, Tennessee (within the corporate limits of Clarksville), said land to be known as "Demised Premises" for future reference herein and being more fully described as follows:

To find the point of BEGINNING, commence at a point in the southern line of U. S. Highway 41-A (Madison Street) where said line is intersected by the western line of that property of James R. Davidson as described by deed of record in Deed Book 104, Page 830 in the Register's Office of Montgomery County, Tennessee; run thence north seventy-eight (78) degrees, two (02) minutes, sixteen (16) seconds west along the southern line of said U. S. Highway 41-A sixty-four and six-tenths (64.6) feet to a concrete monument; thence north eighty (80) degrees, forty-two (42) minutes, twenty-three (23) seconds west continuing along the southern line of said U. S. Highway 41-A, five hundred one and fifty-six hundredths (501.56) feet to the true point of BEGINNING of the property herein described; thence south nine (09) degrees, seventeen (17) minutes thirty-seven (37) seconds west eighty-four and seventy-seven hundredths (84.77) feet to a point; thence south sixty-six (66) degrees, -thirty-seven (37) minutes, thirty-seven (37) seconds west, one hundred seventy-six and twenty-four hundredths (176.24) feet to a point; thence south twenty-three (23) degrees, twenty two (22) minutes, twenty-three (23) seconds east two hundred fifty and five-tenths (250.5) feet to a point; thence south sixty-six (66) degrees, thirty-seven (37,) minutes, thirty-seven (37) seconds west, sixty-six and no-tenths (66:0) feet to a point; thence south twenty-three (23) degrees, twenty-two (22) minutes, twenty-three (23) seconds east, three hundred ten and seventeen hundredths (310.17) feet to a point; thence south sixty-six (66) degrees, thirty-seven (37) minutes, thirty-seven (37) seconds west, five hundred two and no-tenths (502.0) feet to a point in the eastern line of that property of Mary E. Muse as described by deed of record in Deed Book 169, Page 72, in the aforesaid Register's Office; thence north thirteen (13) degrees, eighteen (18) minutes, thirty (30) seconds west along the eastern line of the said Muse property continuing along the eastern line of the property of Yames G. Holleman, Jr., and William M. Mabry as described by deed of record in Deed Book 169, Page 56, in the aforesaid Register's Office, a total distance of six hundred five and no-tenths (605.0) feet to a concrete monument in the eastern line of U. S. Highway 41-A Bypass; thence north twenty (20) degrees, thirty-six (36) minutes, thirty-six (36) seconds east along the eastern line of said Bypass, one hundred sixty-seven and nine-hundredths (167.09) feet to a concrete monument; thence north twenty (20) degrees, fifty-eight (58)-minutes, eight (08) seconds east continuing along the eastern line of said Bypass, one hundred twenty-five and thirty-five hundredths (125.35) feet to a concrete monument; thence north forty-two (42) degrees, forty-one (41) minutes, forty-one (41) seconds east continuing along the eastern line of said Bypass, one hundred twenty and ninety-eight hundredths (120.98) feet to a concrete monument marking its intersection with the southern line of the aforesaid U. S. Highway 41-A; thence south eighty-four (84) degrees, fifty-eight (58) minutes, twenty-six (26) seconds east along the southern line of said U. S. Highway 4l-A, eighty and no-tenths (80.0) feet to a point;, thence south twenty-three (23) degrees, twenty-two (22) minutes, twenty-three (23) seconds east, two hundred twenty and ninety-two hundredths (220.92) feet to a point; thence north sixty-six (65) degrees, thirty-seven (37) minutes, thirty-seven (37) seconds east, one hundred ninety-three and eight hundredths (193.08) feet to a point; thence

north thirty-four (34) degrees, fifty (50) minutes east, twenty-three and four-tenths (23.4) feet to a point; thence north nine (09) degrees, seventeen (17) minutes, thirty-seven (37) seconds east sixty-seven and no-tenths (67,0) feet to a point in the southern line of the aforesaid U. S. Highway 41-A; south eighty (80) degrees, forty-two (42) minutes, twenty-three (23) seconds east along the southern line of said U. S. Highway 41-A, sixty and no-tenths (60.0) feet to the point of BEGINNING, containing eight and two hundred eighty-seven thousandths (8.287) acres, more or less.

TOGETHER WITH AND SUBJECT TO the rights, easements, and appurtenances set forth in the deed to Clarksville II Associates of record in Book 309, Page 789, Register's Office of Montgomery County, Tennessee.

TOGETHER WITH AND SUBJECT TO the Reciprocal Easement Agreement recorded in Book 309, Page 803 of the aforesaid register's office.

TOGETHER WITH AND SUBJECT TO the rights, easements, and appurtenances set forth in the Party Wall Agreement of record in Book 479, Page 1918, said register's office.

Being the same property conveyed to Troy Coolidge No. 7, LLC, a Michigan limited liability company, by deed of record in Volume 948, Page 893, in the Register's Office of Montgomery County, Tennessee.

INCLUDED IN THE ABOVE LEGAL DESCRIPTION BUT EXPRESSLY EXCLUDED HEREFROM is that property conveyed to the State of Tennessee by the Warranty Deed of record in Volume 1299, Page 2839, in the Register's Office of Montgomery County, Tennessee.

# EXHIBIT "B"

## EARNEST MONEY ESCROW INSTRUCTIONS

(see attached)

EXHIBIT B- 1

# CHICAGO TITLE AND TRUST COMPANY

# 10 S. LASALLE, STE 3100, CHICAGO, IL 60603

Refer to: Krystina Cozzie
Phone no.: 312-223-3366
Fax no: 312-223-2076

## STRICT JOINT ORDER #1 ESCROW TRUST INSTRUCTIONS (EARNEST MONEY)

ESCROW TRUST NO:   .                                                    DATE:

To: Chicago Title and Trust Company, Escrow Trustee:

Customer Identification:

Seller: **KMART CORPORATION**, a Michigan corporation, as owner of the Ground Leasehold Interest of .440 acres approximately and **TROY COOLIDGE NO. 7, LLC**, a Michigan limited liability company, as fee simple owner of 7.974 acres approximately

Purchaser: **RISE HOLDINGS, LLC**, a Delaware limited liability company

Property Address: 2300 Madison Street, Clarksville, Tennessee 37043

Project Reference:

Proposed Disbursement Date:

Deposits:

1. The sum of $50,000.00                   by        CHECK/WIRE
Representing: INITIAL EARNEST MONEY

2. The sum of $                            by        CHECK/WIRE
Representing: (Additional)

***PLEASE NOTE: Uncertified checks are held for ten business days after date of deposit. No funds can be dispensed before 10 business days limit expires. To avoid delays, use Cashier's or Certified checks or wire transfer.***

Funds:

( ) WILL    ( ) WILL NOT BE INVESTED

EXHIBIT B- 2

NOTE: If funds are to be invested, an investment package will be sent. Please complete and return to Escrow Trustee as soon as possible in order to begin accruing interest.

Delivery of Deposits:

The above-referenced escrow trust deposits ("deposits") are deposited with the escrow trustee to be delivered by it only upon the receipt of a joint order of the undersigned or their respective legal representatives or assigns.

In no case shall the above-mentioned deposits be surrendered except upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in obedience to the court order described below.

Billing Instructions:

Escrow trust fee will be deducted as follows: $300 escrow fee. If the transaction closes in the Chicago Title Loop office, the escrow fee will be waived. Any overnight delivery or wire fee will be $35.
The parties acknowledge that beginning after a period of one year from the date of this agreement, Chicago Title and Trust Company will impose an administrative maintenance fee equivalent to the fee set forth on the Company's then current rate schedule.

This fee may be deducted from the outstanding escrow balance or billed.

PLEASE NOTE: The escrow trust fee for these joint order escrow trust instructions is due and payable within 30 days from the projected disbursement date (which may be amended by joint written direction of the parties hereto). In the event no projected disbursement date is ascertainable, said escrow trust fee is to be billed at acceptance and is due and payable within 30 days from the billing date. Chicago Title and Trust Company, at its sole discretion, may reduce or waive the escrow trust fee for these joint order escrow instructions in the event the funds on deposit herein are transferred to or disbursed in connection with sale escrow trust instructions or an agency closing transaction established at Chicago Title.

Standard Provisions:

Investment:

Deposits made pursuant to these instructions may be invested on behalf of any party or parties hereto; provided that any direction to escrow trustee for such investment shall be expressed in writing and contain the consent of all parties to this escrow, and also provided that escrow trustee is in receipt of the taxpayer's identification number and investment forms as required. Escrow trustee will, upon request, furnish information concerning its procedures and fee schedules for investment.

In the event the escrow trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred

EXHIBIT B- 3

as a result of making the investments or redeeming said investment for the purposes of these escrow trust instructions.

Direction Not to Invest/Right to Commingle:

Except as to deposits of funds for which escrow trustee has received express written direction concerning investment or other handling, the parties hereto direct the escrow trustee NOT to invest any funds deposited by the parties under the terms of this escrow and waive any rights which they may have under Section 2-8 of the Corporate Fiduciary Act (205 ILCS 620/2-8) to receive interest on funds deposited hereunder. In the absence of an authorized direction to invest funds, the parties hereto agree that the escrow trustee shall be under no duty to invest or reinvest any such funds at any time held by it hereunder; and, further, that escrow trustee may commingle such funds with other deposits or with its own funds in the manner provided for the administration of funds under said Section 2-8 and may use any part or all of such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Further, even with appropriate instructions to invest Escrow Deposits, Escrow Trustee may commingle the Escrow Deposits with other funds in a trust account in order to facilitate placing the Escrow Deposits into a segregated interest bearing account and to disburse the Escrow Deposits once they have been removed from such segregated interest bearing account as required by the terms of this Agreement. Provided, however, nothing herein shall diminish escrow trustee's obligation to apply the full amount of such funds in accordance with the terms of these escrow instructions.

Compliance With Court Order:

The undersigned authorize and direct the escrow trustee to disregard any and all notices, warnings or demands given or made by the undersigned (other than jointly) or by any other person. The said undersigned also hereby authorize and direct the escrow trustee to accept, comply with, and obey any and all writs, orders, judgments or decrees entered or issued by any court with or without jurisdiction; and in case the said escrow trustee obeys or complies with any such writ, order, judgment or decree of any court, it shall not be liable to any of the parties hereto or any other person, by reason of such compliance, notwithstanding any such writ, order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated. In case the escrow trustee is made a party defendant to any suit or proceedings regarding this escrow trust, the undersigned, for themselves, their heirs, personal representatives, successors and assigns, jointly and severally, agree to pay to said escrow trustee, upon written demand, all costs, attorney's fees, and expenses incurred with respect thereto. The escrow trustee shall have a lien on the deposit(s) herein for any and all such costs, fees and expenses. If said costs, fees and expenses are not paid, then the escrow trustee shall have the right to reimburse itself out of the said deposit(s).

Disputes/Circumstance not contemplated:

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Agent is unsure as to its duties as a result, Escrow Agent may continue to hold said funds until

EXHIBIT B- 4

either in receipt of a joint order from the parties or a court order directing payment. In such instance, Escrow Agent may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Agent for any action taken by it in good faith in the execution of its duties hereunder. The parties further agree that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties. Notwithstanding the foregoing, where a party to this escrow agreement has been placed in default and the period to cure such default has lapsed, without cure, upon the delivery to Escrow Agent of commercially reasonable documentation evidencing the same, Escrow agent shall, without delay, release the Escrow Deposit to the non-defaulting party entitled to receive such Escrow Deposit without direction from a court or delivery of a joint order from the parties to this escrow agreement.

Disclaimer Re: Validity of Documentation:

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person. Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

*[Signature Page to Follow]*

EXHIBIT B- 5

Execution:

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

For Seller:

**KMART CORPORATION**, a
Michigan corporation, as owner of the
Ground Leasehold Interest

By: _JoAnn Catanese_
Name: _JoAnn Catanese_
Its: _Divisional Vice President, Real Estate_

For Purchaser:

**RISE HOLDINGS, LLC**, a Delaware limited
liability company

By: _____
Name: _Jeffrey Smith_
Its: _Manager_

**TROY COOLIDGE NO. 7, LLC**, a
Michigan limited liability company, as
fee simple owner _By: Kmart Corporation_
_a Michigan Corporation, its sole member_

By: _JoAnn Catanese_
Name: _JoAnn Catanese_
Its: _Divisional Vice President, Real Estate_

Address: 3333 Beverly Road
Dept. 824RE
Hoffman Estates, Illinois  60179
Phone:

Address:

Phone:

Legal Representative:

Name: Marianne L. Simonini, Esq
Phone: 847-286-5987
Email:
marianne.simonini@searshc.com

Signature: _ATTEST/LEGAL Marianne Simonini_

Legal Representative:

Name: Chambliss, Bahner & Stophel, P.C.
Kirby W. Yost, Esq.
Address: 605 Chestnut Street, Suite 1700
Chattanooga, TN  37450
Phone: 423-757-0254
Email: kyost@chamblisslaw.com

Signature: _Kirby Yost_

Accepted: Chicago Title and Trust Company, as Escrow Trustee

By: _____    Date: _____

**\*Upon receipt of the funds, the escrow agreement becomes effective.**

EXHIBIT B- 6

# EXHIBIT "C"

## NON-INVASIVE INSPECTION AGREEMENT

(see attached)

EXHIBIT C

27265_00/1802/KWY-3316399_8

# NON-INVASIVE INSPECTION AGREEMENT

*{Kmart #7461; Clarksville, Tennessee}*

**THIS NON-INVASIVE INSPECTION AGREEMENT** (this "**Agreement**") is made and entered into as of this _17th_ day of _May_____, 2018 ("**Effective Date**"), by and between **RISE HOLDINGS, LLC**, a Delaware limited liability company ("**Investigating Party**"), and **KMART CORPORATION**, a Michigan corporation, as owner of the Ground Leasehold Interest of .440 acres approximately ("**Kmart**") and **TROY COOLIDGE NO. 7, LLC**, a Michigan limited liability company, as fee simple owner of 7.974 acres approximately (Troy and Kmart are collectively referred to herein as "**Company**") in connection with site investigation and site assessment work to be performed on the property owned or controlled by Company located at 2300 Madison Street in the City of Clarksville (the "**City**"), Montgomery County, Tennessee (the "**Property**"), as more particularly described on **Exhibit "A"** attached hereto and made a part hereof.

## RECITALS

A.      Company desires to sell the Property and Ground Leasehold Interest to Investigating Party;

B.      Investigating Party desires to buy the Property and Ground Leasehold Interest from Company;

C.      Investigating Party and Company has entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends; and

D.      Investigating Party desires to perform a non-invasive site investigation and/or site assessment of the Property as part of its due diligence as a precondition to purchase the Property.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Investigating Party and Company agree as follows:

1.      Company agrees to cooperate with and permit Investigating Party and its agents, consultants and contractors to have reasonable access to the Property at reasonable times and upon not less than 2 business days prior notice to Company, at no cost to Company or its agents, consultants and contractors, and, at Company's option, accompanied by a representative of Company.

2.      The scope of the site investigation and site assessment work to be performed at the Property shall be limited to the following: Investigating Party shall walk the Property and inspect the roof, all heating and cooling systems and any other mechanical equipment situated on the Property and make general, non-invasive investigations and inquiries in furtherance of a Phase I Environmental Assessment ESA ASTM E1527-13 (the "**Site Assessment Work**"). Invasive testing, including but not limited to borings, asbestos

samplings, or any Phase II Environmental Assessment ("**Invasive Testing**"), may be performed at the Premises and Property subject to (i) Lessor's prior written approval as to the Premises, which approval for such Invasive Testing shall be at the sole discretion of the Lessor; (ii) Company's prior written approval as to the Premises and Property, which approval for such Invasive Testing shall be at the sole discretion of the Company; and (iii) Investigating Party's execution of and agreement to abide by a Phase II Access License in the form of **Exhibit "B"** (the "**Phase II Access License**") attached hereto and made a part hereof. Company shall provide written approval or disapproval for such Invasive Testing within five (5) days after Investigating Party sends written request for approval along with all accompanying documentation reasonably required by Company or its environmental consultants (the "**Phase II Request Date**"); failure of Company to respond to such request within five (5) days after the Phase II Request Date shall be deemed approval of the Invasive Testing. If Company elects to have its representative present during the Site Assessment Work and/or Invasive Testing, if any, and has such representative present at the times and dates scheduled by Investigating Party, then all Site Assessment Work and/or Invasive Testing as the case may be, shall be performed only in the presence of the Company's local manager or any other such person assigned by Company. Investigating Party shall not: (i) take photographs of store contents or any items owned or sold by Company; or (ii) perform tests, work or investigations not included in scope of the Site Assessment Work without the prior written consent of Company, in Company's sole discretion. In the event Investigating Party engages in activity outside of or beyond the Site Assessment Work including but not limited to Invasive Testing, except if such Invasive Testing is performed under the conditions set forth in a fully executed Phase II Access Agreement ("**Unauthorized Activity**"), the Parties agree that it would be difficult to ascertain the extent of damages caused to Company, and accordingly, the Parties agree that Company shall be entitled to a one-time liquidated damages payment of Ten Thousand and No/100 Dollars ($10,000.00) from Investigating Party for any Unauthorized Activity. The Parties agree that such liquidated damages payment for Unauthorized Activity is in addition to , and does not limit in any manner whatsoever, any other actual damages, remedy or relief that otherwise might be available to the Parties herein. Provided further, that in the event Investigating Party engages in Unauthorized Activity, Company shall have the right to terminate access to the Property for such Unauthorized Activity.

3.   This Agreement shall terminate upon the earlier of: (a) the Closing on the Property under the Contract, or such earlier date that the Contract is terminated in accordance with its terms, or (b) immediately on breach by Investigating Party of any covenant of this Agreement beyond any applicable notice and cure period, or (c) 90 days from the Effective Date.

4.   Within seven (7) days after receipt by Investigating Party, Investigating Party agrees to provide Company with all test results and reports, including all correspondence and draft reports prepared in connection with the Site Assessment Work. This provision shall survive the termination of this Agreement.

5.   Unless otherwise required by law, Investigating Party agrees to not disclose the results of the Site Assessment Work to any third party, including, but not limited to, any federal,

state and/or local governmental entity, but excluding Investigating Party's counsel, lending officers and their consultants or environmental consultants, as applicable. The foregoing restriction shall not be binding on Investigating Party following the closing under a Contract, if it occurs. Investigating Party agrees that it will require all parties performing any portion of the Site Assessment Work to agree in writing to comply with the terms of this **Section 5**.

6.    Investigating Party agrees to defend and indemnify Company, its officers, directors, employees and invitees from any and all loss, liability, damage and expense for personal injury, bodily injury, tort, contract or property damage and mechanic's liens and claims, arising out of the Site Assessment Work or any other work performed by Investigating Party pursuant to this Agreement, except to the extent any such loss, liability damage, or expense resulted from the gross negligence or intentional misconduct of Company. This indemnity shall survive the termination of this Agreement.

7.    Investigating Party shall maintain, at its own cost and expense, or Investigating Party's contractor performing such work shall maintain, at its sole cost and expense, the following policies of insurance procured (or policies as otherwise approved by Company) from insurance companies reasonably satisfactory to Company and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company or a rating otherwise approved by Company:

   (i)    Workers' Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the property is located with a waiver of subrogation in favor of Company, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease.

   (ii)    Motor Vehicle Liability Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage.

   (iii)    Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage naming Company as an additional insured.

   (iv)    Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate, naming Company as an additional insured.

   (v)    Any contractor hired to perform environmental tests to the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

27265_00/1802/KWY-3316399_8

Investigating Party warrants that, in the event that it retains a contractor to perform any Site Assessment Work, the contractor will maintain insurance as set forth above. Investigating Party further agrees to indemnify, defend and hold Company harmless from any loss, cost, liability, expense and damage suffered by Company as a result of Investigating Party's breach of this warranty. Investigating Party shall not enter into the Property or commence any portion of the Site Assessment Work prior to delivering to Company an insurance certificate evidencing that it has the foregoing insurance.

8.    Investigating Party agrees that the Site Assessment Work shall be done in accordance with any and all applicable laws, ordinances, statutes, governmental regulations and recorded restrictions on the Property.

9.    If Investigating Party does not acquire the Property pursuant to the Contract, Investigating Party agrees to promptly repair any damage to the Property and to restore the Property to the same condition that it was found prior to the commencement of the Site Assessment Work all at the sole cost and expense of Investigating Party.

10.    This Agreement shall be governed by and construed in accordance with the laws of the State in which the Property is located.

11.    By executing this Agreement, the Parties acknowledge that they have had adequate time to reflect upon, consider and consult with legal counsel concerning the terms of this Agreement, and execute the same voluntarily and free from improper influence or duress.

12.    Investigating Party agrees that the Site Assessment Work will be coordinated with Company's local manager or any other such person assigned by Company. Investigating Party agrees to conduct the Site Assessment Work in such a way as to minimize interference with the conduct of Company's business on the Property.

13.    This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement by signing any such counterpart delivery of an executed signature page of this Agreement by any Party hereto by facsimile or .pdf transmission; and such facsimile or .pdf shall be binding on the delivering Party as if the original had been delivered.

14.    Any capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to them in the Contract.

15.    Neither party shall be liable to the other for loss of profits or revenue; loss of use or opportunity; loss of good will; cost of substitute facilities, goods, or services; or cost of capital.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF**, Investigating Party and the Company have executed this Non-Invasive Inspection Agreement as of the date first above stated.

<u>**INVESTIGATING PARTY:**</u>

**RISE HOLDINGS, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

<u>**COMPANY:**</u>

**KMART CORPORATION**, a Michigan corporation, as owner of the Ground Leasehold Interest

By: _____
Name: ___JoAnn Catanese___
Title: ___Divisional Vice President, Real Estate___

**TROY COOLIDGE NO. 7, LLC**, a Michigan limited liability company, as fee simple owner

By: Kmart Corporation, a Michigan corporation, Its sole member

By: _____
Name: ___JoAnn Catanese___
Title: ___Divisional Vice President, Real Estate___

**EXHIBIT "A" TO NON-INVASIVE INSPECTION AGREEMENT**

**LEGAL DESCRIPTION**

27265_00/1802/KWY-3316399_8

## EXHIBIT "B" TO NON-INVASIVE INSPECTION AGREEMENT

## PHASE II ACCESS LICENSE

(see attached)

27265_00/1802/KWY-3316399_8

# PHASE II ACCESS LICENSE
## *{Kmart #7461; Clarksville, Tennessee}*
### *[subject to review and change by Lessor, as necessary]*

THIS PHASE II ACCESS LICENSE (the "**License**") is entered into as of the _____ day of _____, 2018, by and between **KMART CORPORATION**, a Michigan corporation, as owner of the Ground Leasehold Interest of .440 acres approximately ("**Kmart**") and **TROY COOLIDGE NO. 7, LLC**, a Michigan limited liability company, as fee simple owner of 7.974 acres approximately ("**Troy**") (Kmart and Troy are collectively referred to herein as "**Licensor**"), **RISE HOLDINGS, LLC**, a Delaware limited liability company ("**Licensee**") (Licensor and Licensee may also be collectively referred to in this License as the "**Parties**" and individually referred to in this License as a "**Party**".

## RECITALS

A.    Licensor, as owner of the Property, has the authority to grant access to the Property.

B.    Licensor desires to sell the Property to the Licensee;

C.    Licensee desires to purchase the Property from Licensor;

D.    The Licensor and Licensee have entered or will enter into a Real Estate Sales Contract (the "**Contract**") to further such ends;

E.    Licensee desires to perform an invasive environmental investigation of the Property as part of its due diligence prior to purchasing the Property; and

F.    Licensee has requested access to the Property to perform a Phase II Environmental Assessment and Licensor has agreed to permit Licensee and/or Licensee's agent a revocable license to conduct the requested activity at the Property for the purposes set forth in this License.

**NOW THEREFORE**, in consideration of their mutual covenants and other valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

1.    Incorporation of Recitals.  The foregoing recitals are true and correct and are incorporated into this License by reference.

2.    Access.  Licensor has agreed to permit Licensee to carry out a Phase II investigation in accordance with the terms and conditions of this License.  The Phase II investigation will consist of the work plan attached as **Exhibit "A"** and incorporated into this License (the "**Work Plan**") and all work will be performed in accordance with the Work Plan.

At reasonable times and upon reasonable prior notice to Licensor, Licensor hereby grants Licensee reasonable access to the Property for the sole purpose of conducting the activities in the manner described in the Work Plan. Any changes to the existing Work Plan shall be submitted to Licensor in writing for Licensor's prior approval, which approval shall not be unreasonably withheld. If Licensor approves such proposal for additional or amended work on the Property, such additional work or amendments to the Work Plan shall be deemed to be a part of the Work Plan, and Licensee's implementation of such plan will be subject to the terms and conditions of this License.

3.     <u>Conduct of Investigation</u>.   Licensee, its employees, agents and subcontractors (collectively "**<u>Licensee Entities</u>**") will not conduct any work or engage in any activities on the Property other than those set forth in the Work Plan. In the event that the Licensee Entities engage in activity outside of or beyond the scope of the Work Plan ("**<u>Unauthorized Activity</u>**"), Licensor shall have a right to deny access for such unauthorized activity conducted beyond the Work Plan scope and the right to any other damages, remedy or relief that otherwise might be available. All costs associated with the activities conducted by Licensee Entities on the Property shall be borne by Licensee. The Work Plan shall be conducted in any event in a manner and at times that will not unreasonably interfere with Licensor's use of the Property and which comply with the terms and conditions of this License. Licensor reserves all rights or claims which they may have at law or in equity against Licensee or Licensee Entities related to or arising from the environmental condition of the Property.

4.     <u>Data and Reports</u>.   Licensee shall give reasonable advance notice to Licensor of any sampling, testing, drilling, or other on-site activities under the Work Plan, so as to allow a representative of the Licensor to observe such activity. Licensor shall have the right to obtain split samples or conduct contemporaneous sampling when any sampling is conducted by Licensee or its Licensees Entities on the Property. Licensee shall transmit to Licensor in writing the quality-assured results of samples taken pursuant to the Work Plan as soon as they are made available to Licensee and its Licensee Entities. A copy of any correspondence, data, report, test or other communication with any agency relating to the environmental condition of the Property or the presence of any petroleum or other hazardous substances shall be simultaneously sent to Licensor. As used in this License, the term "**<u>Hazardous Substances</u>**" shall mean any hazardous substance as defined in federal and state or local laws, regulations or ordinances.

5.     <u>Repair</u>.   If any portion of the Property, including any improvements and/or personal property of Licensor, suffers damage by reason of the entry of Licensee or Licensee Entities on the Property, including but not limited to damage arising from any tests, investigations and/or monitoring conducted upon the Property, Licensee or Licensee entities shall, at its own cost and expense, repair such damage and restore the Property to as good a condition as before such damage occurred. Repair of damage includes, without limitation, regrouting and resurfacing any holes, ditches, or other indentations, as well as any mounds or other inclines caused by any Licensee or Licensee Entities. If the location of the equipment installed pursuant to the approved Work Plan shall in the future interfere or conflict with Licensor's use of the Property, Licensee or Licensee Entities shall upon receipt of a request from Licensor to do so, close, remove and/or relocate said equipment, including any monitoring wells set forth in the Work Plan, within a reasonable time after receipt by Licensee or Licensee Entities

of such governmental approvals as may be required to close, remove or relocate said well or wells. Licensee and Licensee Entities shall use its best efforts to obtain all such required governmental approvals.

6.    Safety.    Licensee shall be responsible for ensuring that the Licensee Entities comply with good safety and security practices in performing the Work Plan. If monitoring wells are permitted in the Work Plan, Licensee shall install a locked cap on such wells, shall ensure that said caps are secure, and take all reasonable steps necessary to prohibit access to the recovery wells by Parties not authorized to do so by Licensee. As between Licensee and Licensor, Licensee is responsible for any contamination or damage caused by the authorized or unauthorized access to the recovery wells. Licensee agrees to ensure that its Licensee Entities also close any recovery wells upon the completion of the investigation or the termination of this License, whichever is sooner, and perform the Work Plan in accordance with federal, state and local laws, regulations and ordinances and prudent engineering principles.

7.    Indemnification.    Licensee shall indemnify, protect, defend and hold harmless Licensor, and its respective officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and subcontractors (collectively the "**Indemnified Parties**") against any and all costs, liabilities, claims, damages, including reasonable licensee and attorney's fees, losses, penalties, or suits resulting from (1) any release of Hazardous Substances on, in, under, or about the Property caused by the Licensee Entities during their entry on or use of the Property, (2) Licensee Entities' failure to remediate any such release according to the standards, laws and regulations as required by any governmental agency or agencies as those standards, laws and regulations may be changed, revised, or amended from time to time, (3) the negligent acts, omissions and/or willful misconduct of Licensee Entities during their entry upon and use of the Property or in performing the Work Plan under this License, and/or (4) a breach of the terms and conditions of this License by any Licensee Entity. Notwithstanding this indemnity, Licensor expressly reserves all rights it may have under the law to prosecute any claims or demands against either Licensee Entities arising out of or related to the environmental condition of the Property or otherwise.

8.    Compliance with Law/Permits.    Licensee shall cause all Licensee Entities to comply with all applicable federal, state, and local laws and regulations in the performance of the investigation of the Property. Licensee shall obtain, at its own expense, and prior to any access to the Property by Licensee Entities under this License, all permits and authorizations of whatever nature from any and all governmental agencies necessary for conducting the investigation pursuant to this License. Licensee shall ensure that Licensee Entities properly handle, sort, and dispose of at its own expense all Hazardous Substances on, in, under, or about the Property generated by Licensee Entities in the course of conducting the investigation under this License. Licensee agrees that it shall be the licensee and/or generator of any and all Hazardous Substances generated in the course of conducting the Investigation authorized in this Li, and shall identify itself as the licensee and/or generator of such Hazardous Substances on any and all documentation, including without limitation all hazardous waste manifests, associated with the handling, storage, treatment, disposal or transportation of any and all Hazardous Substances generated in the course of the investigation.

9.    Term.  The term of this License shall be until the Closing under the Purchase Contract, unless the Purchase Contract is terminated earlier.

10.    Upon Termination.  Upon termination of this License, Licensee shall ensure that Licensee (1) immediately removes any of the equipment, fixtures, improvements and other property located on any portion of the Property which was installed during the term of this License, (2) closes all work performed by Licensee Entities including all wells, in compliance with applicable federal, state, and local laws, rules and regulations and/or to industry standards, and (3) restores the Property to its condition existing immediately prior to Licensee Entities' entry thereon.

11.    Liens.  Licensee shall discharge at once or bond or otherwise secure all liens and attachments which are filed in connection with Licensee's implementation of the Work Plan and shall indemnify and hold harmless the Indemnified Parties from and against any and all loss, damage, injury, liability, and claims thereof resulting directly or indirectly from such liens and attachments.

12.    Insurance.  Licensee shall ensure that the Licensee Entity that is the contractor responsible for performing the Work Plan shall maintain, at their sole cost and expense, the following policies of insurance (or policies otherwise approved by Licensor) procured from insurance companies reasonably satisfactory to Licensor and rated "A-VII" or better by the current edition of Bests Insurance Reports published by the A.M. Best Company (or otherwise approved by Licensor):  (a)  Workers Compensation Insurance providing statutory benefits and limits which shall fully comply with all state and federal requirements applying to this insurance in the state where the Property is located with a waiver of subrogation in favor of Licensor, and employer's liability insurance with limits of not less than $100,000.00 per accident or disease and $500,000.00 aggregate by disease;  (b)  Motor Vehicle Insurance with coverage for all owned, non-owned and hired vehicles with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage; (c)  Commercial General Liability Insurance including, but not limited to, coverage for products/completed operations, premises/operations, contractual and personal/advertising injury liabilities with combined single limits of not less than $1,000,000.00 per occurrence for bodily injury and property damage; (d)   Environmental Impairment or Pollution Liability Insurance, including clean up costs, with limits of not less than $1,000,000.00 per claim and $2,000,000.00 in the aggregate; and, (e)  Any contractor hired to perform environmental tests at the Property shall maintain errors and omissions or professional liability insurance covering injury or damage arising out of the rendering or failing to render professional services with limits of at least $1,000,000.00 per claim.

All policies shall be issued by companies qualified to do business in the state where the Property is located, and shall be rated A-/VII or better in the most current edition of Best's Insurance Reports.  Prior to execution of this License, Licensee shall provide the Licensor with certificates of insurance evidencing the insurance coverage required hereunder, and at the request of the Licensor, certified copies of such policies or portions thereof.  All such insurance policies shall provide that they may not be materially changed, non-renewed or canceled without at least thirty (30) days' prior written notice to the Licensor.    All such insurance policies, except worker's compensation and Motor Vehicle Insurance shall name Licensor and its affiliates as additional

insureds and shall stipulate that Licensee's insurance is primary to, and not contributing with, any other insurance carried by, or for the benefit of, Licensor or its affiliates. Completed operations coverage shall continue to be maintained for at least one (1) year following the completion of the Work Plan, naming Licensor and its affiliates as additional insureds during such period of continuation.

13.    Binding Effect.  This instrument shall bind and inure to the benefit of the respective heirs, executors, administrators, other personal and legal representatives, grantees, successors and assigns of the Parties hereto.

14.    Entire Agreement: Modification.  This License between Licensee and Licensor contains the entire understanding and agreement among the Parties and supersedes all prior understandings and agreements between the Parties whether oral or written. This instrument may be modified only by a writing signed by all Parties.

15.    Governing Law.  This instrument shall be governed by and shall be construed in accordance with the laws of the State of Tennessee.

16.    Notice.  Any and all notices or other communication required or permitted by this License, or by law, to be delivered to, served on, or given to any Party to this License shall be in writing, and shall be deemed properly delivered, given or served when personally delivered to such Party, when electronically delivered with receipt acknowledged, or when mailed by United States mail, express, certified or registered with the return receipt signed, postage paid (or other overnight delivery service, charges prepaid), addressed as follows:

| | |
|---|---|
| **To Licensor:** | Bruce Kaye<br>Director Environmental Affairs<br>**KMART CORPORATION/TROY**<br>**COOLIDGE NO. 7**<br>3333 Beverly Road<br>Hoffman Estates, IL 60179 |
| **With copies to:** | **KMART CORPORATION/TROY**<br>**COOLIDGE NO. 7**<br>3333 Beverly Road<br>Hoffman Estates, IL  60179<br>Attn:  Counsel, Environmental |
| **To Licensee:** | **RISE HOLDINGS, LLC** |
| **With copies to:** | |

Any Party may change its address by giving ten (10) day advance written notice of such change to the other Parties in the manner provided in this Section.

17.    Representation.  Licensee represents and warrants that it does not need the

27265_00/1802/KWY-3316399_8

consent of any other Party to enter into this License.

18.    <u>Severability</u>. If any term, provision, covenant, or condition of this License is held by a court of competent jurisdiction to be invalid, void or unenforceable, the rest of this License shall remain in full force and effect and shall in no way be affected, impaired or invalidated, unless such ruling shall materially alter the economic effect of this License.

19.    <u>Survivability</u>. All obligations and commitments by Licensee specified in this License (including, without limitation, the provisions of **Sections 3 through 8 and 10 through 15**, shall survive the expiration or termination of this License.

20.    <u>Assignment</u>. Licensee may not assign, delegate or subcontract (by contract, operation of law or otherwise) its rights or obligations under this License, except with Licensor's prior written consent, and the failure of Licensee to obtain Licensor's prior written consent shall render any such attempt to assign, delegate, or subcontract of no force and effect.

21.    <u>No Waiver; Cumulative Remedies</u>. The failure of any Party to insist, in any one or more instances, or the delay in insisting, upon the performance of any provision of this License or to exercise any right hereunder, does not constitute an election of remedies or waiver, and the obligations of the Parties with respect to such future performance will continue in full force and effect. Except as otherwise provided in this License, the remedies in this License are cumulative with and not in lieu of other remedies available to a Party at law or in equity.

22.    <u>No Third Party Beneficiaries</u>. Other than Licensor's affiliates, this License shall not be deemed to confer any rights to any other party (other than Licensee or any Licensee Entity) as a third party beneficiary or otherwise.

23.    <u>Exhibits</u>. The terms and conditions of each exhibit referenced in this License are hereby incorporated into this License. In the event of a conflict between this License and the exhibits, the terms and conditions of this License shall prevail. Any provisions of Licensee's proposals, contracts, invoices, billing statements, acknowledgement forms or any other document which are inconsistent with the provisions of this License shall be of no force or effect.

24.    Any capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to them in the Contract.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

**IN WITNESS WHEREOF**, the Parties have executed this Phase II Access License effective as of the date first above written.

**LICENSEE:**

**RISE HOLDINGS, LLC**, a Delaware
limited liability company


By: _____
Name: _____
Title: _____




**LICENSOR:**


**KMART CORPORATION**, a Michigan
corporation, as owner of the Ground Leasehold
Interest

By: _____
Name: _____
Title: _____


**TROY COOLIDGE NO. 7, LLC**, a Michigan
limited liability company, as fee simple owner


By: _____
Name: _____
Title: _____

27265_00/1802/KWY-3316399_8

**<u>EXHIBIT "A" TO PHASE II ACCESS LICENSE</u>**

**<u>WORK PLAN</u>**

(see attached)

## EXHIBIT "D"

## ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

(see attached)

# [SUBJECT TO FURTHER REVISION AFTER REVIEW OF GROUND LEASE]

## ASSIGNMENT AND ASSUMPTION OF GROUND LEASE
### *{Kmart #7461; Clarksville, Tennessee}*

THIS ASSIGNMENT AND ASSUMPTION OF GROUND LEASE (this "**Agreement**") is made as of the _____ day of _____, 2018, ("**Effective Date**") by and between **KMART CORPORATION**, a Michigan corporation ("**Assignor**"), and **RISE HOLDINGS, LLC**, a Delaware limited liability company ("**Assignee**").

### RECITALS

**WHEREAS**, Assignor is the lessee under that certain ground lease dated October 1, 1990, ("**Lease**"), pursuant to which DANIEL G. KAMIN, CLARKSVILLE COMMONS ENTERPRISES, a Pennsylvania business trust, as successor-in-interest to Clarksville Venture No. One, a Texas joint venture ("**Lessor**"), leases to Kmart certain real property containing approximately .440 acres (a portion of County Tax Parcel # 11-081-05.05-000-063-135 and City Tax Parcel # 11-081-050.05-000-063-135) commonly known as 2300 Madison Street in the City of Clarksville, Montgomery County, State of Tennessee, as described and set forth in the Lease (the "**Demised Premises**"). A copy of the Lease is attached hereto as **Exhibit "A"** and made a part hereof. The Demised Premises, including all land, and improvements as may be located thereon, is hereinafter referred to collectively as the "**Premises**." The Demised Premises is improved with a one story building containing approximately 15,062 square feet.

**WHEREAS**, in accordance with the terms and conditions of this Agreement, Assignor has agreed to assign all of its rights, title, interest, benefits, privileges, obligations and liabilities, claim and demand in, to and under the Lease, and Assignee has agreed to accept such assignment and to assume the liabilities and obligations of the Assignor under the Lease.

### AGREEMENT

**NOW, THEREFORE**, for and in consideration of the covenants contained herein, Assignor and Assignee agree as follows:

1.    The foregoing Recitals are hereby incorporated as if fully rewritten and restated at length herein. Capitalized terms used, but not defined in this Agreement, shall have the same meaning ascribed to such capitalized and defined terms in the Lease.

2.    Subject to the terms of this Agreement, effective upon the Effective Date, Assignor hereby assigns and transfers to Assignee all of Assignor's rights, title, interest, benefits, privileges, obligations, liabilities, claim and demand as tenant in, to and under the Lease.

3.    Assignee hereby accepts the foregoing assignment from Assignor and assumes all liabilities and obligations of Assignor under the Lease that arise on or after the Effective Date and agrees to pay, perform, and discharge, as and when due, all of the agreements, duties, obligations

and liabilities of Assignor arising under the Lease that are to be performed or that become due on or after the Effective Date (except for those obligations arising due to acts or omissions occurring prior to the Effective Date).

4.      Assignee acknowledges that if Assignee desires to extend the term of the Lease following the expiration of the current term of the Lease, it may only do so after receiving prior written consent from Assignor, which shall not be unreasonably withheld, conditioned, or delayed. If Assignee gives written notice to Assignor that it desires to extend the term of the Lease and requests Assignor's consent, and if Assignor has not responded within thirty (30) days after Assignor's receipt of Assignee's request, Assignor's consent shall be deemed to have been granted. If Assignor grants its consent to the extension of the term of the Lease, or such consent is deemed to have been granted, Assignee shall be solely responsible for providing Landlord with written notice of such extension pursuant to the Lease.  Assignee's right to exercise extensions of the term of the Lease shall also be subject to the terms and conditions of the Lease.

5.      On the date hereof, Assignee has delivered to Assignor an executed Collateral Assignment of Ground Lease ("**Collateral Assignment**") in the form attached hereto as **Exhibit "B"** and incorporated herein by this reference, to secure Assignee's obligations hereunder.

6.      Rent, common area charges, utility charges, real estate taxes and any other charge payable by tenant under the Lease shall be apportioned and reconciled between Assignor and Assignee on a per diem basis as of the date hereof and assumed hereafter by Assignee in accordance with the Real Estate Sale Contract dated_____, 2018, by and between Assignor and Assignee.

7.      Assignee acknowledges and accepts the Premises in its "AS-IS, WHERE IS, WITH ALL FAULTS CONDITION."

8.      Assignee hereby agrees to indemnify, defend and hold Assignor harmless from and against any claim, cost, charge or liability, including, without limitation, court costs and reasonable attorneys' fees, asserted, brought against or incurred by Assignor arising from or related to: (i) any obligation or liability of the "tenant" under the Lease arising on or after the Effective Date relating to acts or omissions occurring on or after the Effective Date; and (ii) any breach of any of the representations or covenants made by Assignee in this Agreement (the foregoing obligations of Assignee to indemnify, defend and hold Assignor harmless are referred to herein collectively as the "**Assignee's Obligations**"). If Assignee fails to timely perform Assignee's Obligations or breaches any of the representations or covenants made by Assignee in this Agreement, Assignor may pursue any and all remedies at law or in equity available to Assignor, including, but not limited to, acceleration of rent due Landlord under the Lease (but only in the event that Landlord exercises any right it may have to accelerate rent), performance of self-help as provided for in this Agreement, or enforcement of the terms of the Collateral Assignment, or any combination of the foregoing.  All rights and remedies provided to Assignor under this Agreement are cumulative and may be pursued singularly, in any combination, and in any order.  The failure of Assignor to enforce any of the terms and provisions contained herein shall in no event be deemed to be a waiver of the right to thereafter strictly enforce the terms and provisions hereof.

9.      Assignor hereby agrees to indemnify, defend and hold Assignee harmless from and against any claim, cost, or liability, including, without limitation, court costs and reasonable attorneys' fees, asserted, brought against or incurred by Assignee arising from or related to: (i) any obligation or liability of the "tenant" under the Lease arising prior to the Effective Date relating to acts or omissions occurring before the Effective Date; and (ii) any breach of any of the representations or covenants made by Assignor in this Agreement (the foregoing obligations of Assignor to indemnify, defend and hold Assignee harmless are referred to herein collectively as the "**Assignor's Obligations**").  In the event Assignor fails to timely perform Assignor's Obligations or breaches any of the representations or covenants made by Assignor in this Agreement, Assignee may pursue any and remedies at law.  All rights and remedies provided to Assignee under this Agreement are cumulative and may be pursued singularly, in any combination, and in any order. The failure of Assignee to enforce any of the terms and provisions contained herein shall in no event be deemed to be a waiver of the right to thereafter strictly enforce the terms and provisions hereof.

10.      Assignee covenants and agrees that it shall provide Assignor with copies of any notices of default given or received by Assignee under the Lease within five (5) days after Assignee has given or received any such notice.  Ten (10) days following Assignor's receipt of any such notice of default and delivery of written notice to Assignee, Assignor shall have the right, but not the obligation, to cure any default of Assignee (a "**default**" being a default creating liability of Assignor on behalf of Assignee).  Within thirty (30) days after receipt of an invoice therefor, Assignee shall reimburse Assignor for all costs and expenses incurred by Assignor in connection with the cure of such default, including, but not limited to, reasonable attorneys' fees.

11.      Assignee may, subject to the prior written consent of Assignor (except that such consent shall not be required if such consent is deemed to have been granted as described in **Section 4** above), extend the Term of the Lease by exercising options, unless (i) Assignee desires to exercise more than one option at a time, (ii) Assignee desires to exercise an option more than one year in advance of the expiration of the then-current term of the Lease, or (iii) Assignee is in default under the Lease.  At least twelve (12) months prior to the expiration of the then-current Term of the Lease, Assignee shall provide written notice to Assignor specifying whether Assignee desires to extend the Term of the Lease for the next five (5) year period pursuant to the Lease.

12.      Assignee shall have no right, at any time, to assign its rights under the Lease or to sublease all or a portion of the Premises without Assignor's consent, which consent may be withheld in Assignor's sole and absolute discretion.

13.      Assignee shall:

(a)      Provide Assignor with copies of any written notice of any correspondence Assignee receives from Landlord or Landlord's lender, including, but not limited to, notices of default, common area maintenance statements, and estoppel or subordination requests within ten (10) days after Assignee's receipt of same.  Notwithstanding the foregoing, Assignee shall provide written copies of any notices of default to Assignor within five (5) days after Assignee's receipt of same.

(b)    In addition to all other obligations under the Lease, obtain and maintain insurance coverage **[ASSIGNOR NEEDS TO REVIEW THE PROPOSED INSURANCE COVERAGE]**, on the date hereof and annually thereafter, provide Assignor with a certificate of insurance evidencing such coverage and naming Assignor as an additional insured with respect to its liability insurance policies.

**14.**    Except as otherwise permitted by this Agreement, (a) neither the Lease nor any of its provisions may be changed, waived, discharged or terminated, and (b) Assignee may not execute or otherwise consent to any modification or termination of the Lease without the prior written consent of Assignor, which consent may be withheld in Assignor's sole discretion.

**15.**    The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.

**16.**    If any one or more provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

**17.**    This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee.

**18.**    This Agreement may be signed in counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.

**19.**    Notices to each party shall be in writing and shall be deemed properly served A) three (3) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or B) the next business day after being deposited with a reputable overnight express carrier (e.g., Federal Express, UPS) for guaranteed next business day delivery or C) upon receipt if personally delivered. Notices shall be addressed as follows:

| | |
|---|---|
| Assignor: | **KMART CORPORATION**<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois  60179<br>Attn:   SVP and President-Real Estate |
| Copy to: | **KMART CORPORATION**<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois  60179<br>Attn:   Deputy General Counsel, Real Estate |
| Assignee: | **RISE HOLDINGS, LLC**<br>832 Georgia Avenue |

Suite 507
Chattanooga, Tennessee 37402

Copy to:        **CHAMBLISS, BAHNER & STOPHEL P.C.**
605 Chestnut Street, Suite 1700
Chattanooga, Tennessee 37450
Attn: Kirby Yost

or to any other address furnished in writing by any of the foregoing. However, any change of addresses furnished shall comply with the Notice requirements of this Section and shall include a complete outline of all current notice of addresses to be used for all parties associated with the party requesting the change.

20.     Assignor and Assignee each represents to the other that each has the full power and authority to assign and assume the Lease as provided herein.

21.     Each party represents and warrants to the other that it has not employed, retained or consulted a broker, agent or finder in carrying on the negotiations in connection with this Agreement. Assignor and Assignee each hereby indemnifies and agrees to defend and hold the other harmless from and against any and all claims, demands, causes of action, debts, liabilities, judgments and damages (including, without limitation, court costs and attorneys' fees, inclusive of fees incurred in connection with enforcement of this indemnity and fees on appeal) that may be asserted or recovered against the indemnified party on account of any brokerage fee, commission or other compensation arising by reason of the indemnitor's breach of these representations and warranties (the foregoing indemnities being herein referred to as the "Brokerage Indemnities"). The Brokerage Indemnities shall survive the Effective Date.

22.     This Agreement shall not be recorded, but Assignor and Assignee agree to record the Memorandum.

*{Signatures appear on the following pages}*

**Assignor Signature Page**

**IN WITNESS WHEREOF,** the parties hereto have executed this Assignment and Assumption of Lease on the day and year first above written.

**ASSIGNOR**:

**KMART CORPORATION,** a Michigan corporation

By:_____
Name:_____
Its:_____

**Assignee Signature Page**

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment and Assumption of Lease on the day and year first above written.

**ASSIGNEE**:

**RISE HOLDINGS, LLC**, a Delaware limited liability company

By:_____

Name:_____

Its:_____

# EXHIBIT "A"

# GROUND LEASE

(see attached)

27265_00/1802/KWY-3316399_8

# EXHIBIT "B"

## FORM OF COLLATERAL ASSIGNMENT

(see attached)

# EXHIBIT "E"

## MEMORANDUM OF ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

(see attached)

DMLIB #539743 v1
27265_00/1802/KWY-3316399_8

Prepared by and after recording
return to:

Sears Holdings Corporation
3333 Beverly Road
Dept. 824RE
Hoffman Estates, Illinois 60179
Marianne L. Simonini, Esq.
BC-126B

# [SUBJECT TO FURTHER REVISION AFTER REVIEW OF GROUND LEASE]

[This space reserved for recording purposes]

=========================================================

# MEMORANDUM OF ASSIGNMENT AND ASSUMPTION OF LEASE
*{Kmart #7461; Clarksville, Tennessee}*

**THIS MEMORANDUM OF ASSIGNMENT AND ASSUMPTION OF LEASE** (this "**Memorandum**") is made and entered into effective as of the _____ day of _____, 2018, by and between **KMART CORPORATION**, a Michigan corporation ("**Assignor**"), whose address is 3333 Beverly Road, Department 824RE, Hoffman Estates, Illinois 60179, and **RISE HOLDINGS, LLC**, a Delaware limited liability company ("**Assignee**"), whose address is _____.

## RECITALS

**WHEREAS**, Assignor is the lessee under that certain ground lease dated October 1, 1990, ("**Lease**"), pursuant to which DANIEL G. KAMIN, CLARKSVILLE COMMONS ENTERPRISES, a Pennsylvania business trust, as successor-in-interest to Clarksville Venture No. One, a Texas joint venture ("**Lessor**"), leases to Kmart certain real property containing approximately .440 acres (a portion of County Tax Parcel # 11-081-05.05-000-063-135 and City Tax Parcel # 11-081-050.05-000-063-135) commonly known as 2300 Madison Street in the City of Clarksville, Montgomery County, State of Tennessee, as described and set forth in the Lease (the "**Demised Premises**"). The Demised Premises, including all land, and improvements as may be located thereon, is hereinafter referred to collectively as the "**Premises**." The Demised Premises is improved with a one story building containing approximately 15,062 square feet.

**WHEREAS**, Assignor and Assignee have entered into that certain Assignment and Assumption of Lease (the "**Assignment**") dated as of the date hereof(the "**Effective Date**"),

13 | P a g e

whereby Assignor assigned all of its rights, title, interest, benefits, privileges, obligations and liabilities, claim and demand in, to and under the Lease Documents, and Assignee agreed to accept such assignment and to assume the liabilities and obligations of the Assignor under the Lease, all upon the terms and conditions more particularly set forth in the Assignment.

**WHEREAS**, Assignor and Assignee desire to execute this Memorandum to provide record notice of the Assignment.

## AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    The recitals set forth above are true and correct and are incorporated herein by this reference.

2.    On the Effective Date, Assignor assigned and transferred to Assignee all of Assignor's rights, title, interest, benefits, privileges, obligations, liabilities, claim and demand as tenant in, to and under the Lease, all upon the terms and conditions more particularly set forth in the Assignment.

3.    Assignee accepted the foregoing assignments from Assignor and assumed all liabilities and obligations of Assignor under the Lease that arise on or after the Effective Date and agreed to pay, perform, and discharge, as and when due, all of the agreements, duties, obligations and liabilities of Assignor arising under the Lease that are to be performed or which become due on or after the Effective Date (except for those obligations arising due to acts or omissions occurring prior to the Effective Date).

4.    Assignee's rights with respect to assignments of the Lease and to subleases of all or any portion of the Premises are governed by the terms and conditions of Section 11 of the Assignment.

5.    The Assignment provides that except as otherwise permitted by the Assignment, (a) neither the Lease nor any of its provisions may be changed, waived, discharged or terminated, and (b) Assignee may not execute or otherwise consent to any modification or termination of the Lease without the prior written consent of Assignor, which consent may be withheld in Assignor's sole discretion.

6.    This Memorandum is not a complete summary of the Assignment, nor shall any provisions of this Memorandum be used in interpreting the provisions of the Assignment. In the event of any conflict between the terms of this Memorandum and the terms of the Assignment, the Assignment shall control.

7.    This Memorandum shall bind and inure to the benefit of the parties hereto and their respective successors and assigns, subject however to the provisions of the Assignment regarding assignment and subletting.

14 | P a g e

8.      This Memorandum may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*{Remainder of this page intentionally left blank; signature pages follow.}*

DMLIB #539743 v1
27265_00/1802/KWY-3316399_8

**ASSIGNOR:**

**KMART CORPORATION**, a Michigan corporation

By: _____

Name: _____
Its: _____

STATE OF ILLINOIS          )
                           ) SS:
COUNTY OF COOK             )

       The undersigned, a Notary Public, in and for the County and State aforesaid, does hereby certify that _____, personally known to me to be the _____ of **KMART CORPORATION**, a Michigan corporation, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that as such _____ he/she signed and delivered the said instrument pursuant to authority duly given to him/her by said corporation.

Given under my hand and seal this _____ day of _____, 2018.

_____          _____

_____                Notary Public

My Commission Expires: _____

16 | P a g e

**ASSIGNEE**:


**RISE HOLDINGS, LLC**, a Delaware limited
liability company

By: _____
Name: _____
Its: _____

STATE OF _____ )
                          ) SS:
COUNTY OF _____ )

     The undersigned, a Notary Public, in and for the County and State aforesaid, does hereby certify that _____, personally known to me to be the _____ of **RISE HOLDINGS, LLC**, a Delaware limited liability company, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged under oath that as such _____ he/she signed and delivered the said instrument pursuant to authority duly given to him/her by said corporation.

Given under my hand and seal this _____ day of _____, 2018.


                          _____
                          Notary Public

My Commission Expires:


_____

DMLIB #539743 v1
27265_00/1802/KWY-3316399_8

## EXHIBIT "A"

## LEGAL DESCRIPTION

(see attached)

## EXHIBIT "F"

## COLLATERAL ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

(see attached)

DMLIB #539743 v1
27265_00/1802/KWY-3316399_8

Prepared by and after recording
return to:

Sears Holdings Corporation
3333 Beverly Road
Dept. 824RE
Hoffman Estates, Illinois 60179
Marianne L. Simonini, Esq.
BC-126B

2. **[SUBJECT TO FURTHER REVISION AFTER REVIEW OF GROUND LEASE]**

[This space reserved for recording purposes]

=====================================================================

# COLLATERAL ASSIGNMENT OF GROUND LEASE
### *{Kmart #7461; Clarksville, Tennessee}*

THIS **COLLATERAL ASSIGNMENT OF GROUND LEASE** (this "**Collateral Assignment**") made this _____ day of _____, 2018, by and between **KMART CORPORATION**, a Michigan corporation whose address is 3333 Beverly Road, Hoffman Estates, Illinois 60179 ("**Assignee**"), and **RISE HOLDINGS, LLC**, a Delaware limited liability company whose address is _____ ("**Assignor**").

## RECITALS

**WHEREAS**, Assignor is the lessee under that certain ground lease dated October 1, 1990, ("**Lease**"), pursuant to which DANIEL G. KAMIN, CLARKSVILLE COMMONS ENTERPRISES, a Pennsylvania business trust, as successor-in-interest to Clarksville Venture No. One, a Texas joint venture ("**Lessor**"), leases to Kmart certain real property containing approximately .440 acres (a portion of County Tax Parcel # 11-081-05.05-000-063-135 and City Tax Parcel # 11-081-050.05-000-063-135) commonly known as 2300 Madison Street in the City of Clarksville, Montgomery County, State of Tennessee, as described and set forth in the Lease (the "**Demised Premises**"). The Demised Premises, including all land, and improvements as may be located thereon, is hereinafter referred to collectively as the "**Premises**." The Demised Premises is improved with a one story building containing approximately 15,062 square feet.

**WHEREAS**, that Assignor, as security for that certain Assignment and Assumption of Lease dated as of the date hereof, by and between Assignor and Assignee (as may be amended, the "**Lease Assignment**"), whereby Assignee assigned to Assignor all of its rights, title and

20 | P a g e

interest as tenant in the Lease, as defined below, in the Premises, and Assignor assumed all obligations of Assignee, as tenant, under the Lease. The Lease, and all other agreements assigned to Assignee as of the date hereof, are referred to herein as the "**Collateral Documents**".

## AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**The foregoing Recitals are hereby incorporated as if fully rewritten and restated at length herein.**
**Assignor covenants with Assignee, its successors and assigns, while this Collateral Assignment remains in effect, as follows (each a "Covenant"):**
To perform all of the terms, covenants and conditions of this Collateral Assignment and the Lease Assignment, whether now, heretofore or hereafter existing and all amendments, modifications or extensions hereto or thereto.

To perform all of the obligations of Assignor under the Collateral Documents, as and when required by the terms thereof, so as to maintain the Collateral Documents and Assignor's interest thereunder in full force and effect.

**The following shall be an "Event of Default":**

(a)     Assignor shall (i) fail to fully comply with a Covenant and (ii) such failure is not cured within ten (10) days following written notice from Assignee to Assignor, or

(b)     Assignor shall breach any of the following terms of the Lease Assignment: (i) exercise of renewal options without Assignee's consent, as required by the terms of Section 4 of the Lease Assignment, (ii) assign the Lease or sublease the Premises in violation of the terms of Section 11 of the Lease Assignment, (iii) failure to provide copies of the documentation or failure to maintain insurance coverage, as required in the Lease Assignment, or (v) change, waive or terminate the Lease without Assignee's consent in violation of the Lease Assignment.

4.     Should an Event of Default occur hereunder then, in addition to all other rights and remedies available to Assignee, Assignee shall have the right of immediate possession of the Premises and shall not be required to pursue any judicial or administrative processes in doing so, and Assignor shall immediately surrender possession of and vacate the Premises upon notice from Assignee; further, if an Event of Default occurs hereunder, Assignee shall have the right to enforce this Collateral Assignment of the Collateral Documents. The rights, remedies and powers granted herein by Assignor to Assignee shall not reduce, diminish or abrogate any other rights, remedies, powers and agreements granted and given by Assignor to Assignee, but shall be in addition thereto, and Assignee may pursue such other legal or equitable remedies or actions as may be provided to it by statute, or otherwise, or under any instrument evidencing or securing Assignee's obligations.

**Assignor hereby consents, agrees, represents, warrants and covenants with and to Assignee as follows:**

21 | P a g e

Assignor shall give prompt notice to Assignee of any breach or default by a third party under a Collateral Document and shall, upon request of Assignee, promptly commence and diligently exercise the rights and remedies available to it under the applicable Collateral Document.   In addition, Assignor hereby designates and appoints the Assignee its lawful attorney for it, and in its name, place and stead to exercise the rights and remedies available to Assignor under the Collateral Documents in the event Assignor fails to do so in a timely manner provided, however, Assignee may exercise its rights under this appointment only following the occurrence of an Event of Default, and Assignee agrees to exercise reasonable business judgment in exercise of such rights and remedies; and

(b)      Assignor will execute and deliver to Assignee, all financing statements, assignments, schedules and such other documentation that Assignee may reasonably request, to perfect and consummate the transaction contemplated hereunder.

**The Assignee acknowledges that this Collateral Assignment is for security purposes only and that, until the occurrence of an Event of Default, only Assignor shall have the right to enforce its rights under the Lease.  Following Assignee's enforcement of this Collateral Assignment, all rights under the Lease shall be prosecuted and enforced solely by and through Assignee.  In the event that Assignor causes Landlord to terminate the Lease without penalty or to release Assignee from liability under the Lease, as permitted by the Lease Assignment, Assignee will execute and deliver to Assignor a release of this Collateral Assignment in form and substance reasonably acceptable to Assignor. The terms, covenants, conditions, rights and benefits hereof shall inure to, and shall be binding upon, the respective successors and assigns of the parties hereto, but only to successors and assigns of Assignor that are permitted by Assignee under the Lease Assignment. If more than one person joins in the execution hereof as Assignor, the obligation of such persons shall be joint and several.  The pronouns and relative words used herein may be read as if written in the singular or the plural, or in the masculine, feminine or neuter gender as the context may require.  All references in this Collateral Assignment shall mean and include all Collateral Documents, now or hereafter existing.   The rights and remedies given to Assignee under this Collateral Assignment shall be cumulative and in addition to, and not in substitution of, any other right or remedy available to Assignee for the enforcement of the Lease Assignment secured hereby.  Any future assignment, sublease, encumbrance or lien upon the Lease shall be subject to and subordinate to this Collateral Assignment. Nothing herein contained shall be construed to bind Assignee to perform any of the terms of the Lease or to impose any of the obligations thereof upon Assignee.  The terms of this Collateral Assignment shall not confer rights upon any third party.**

*{Signature on following page}*

DMLIB #539743 v1
27265_00/1802/KWY-3316399_8

**IN WITNESS WHEREOF**, Assignor has caused this Collateral Assignment of Lease to be executed as of the date first written above.

**RISE HOLDINGS, LLC**, a Delaware limited
liability company

By: _____
Name: _____
Its:_____

STATE OF _____   )
                          ) ss.
COUNTY OF _____   )

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____ the _____of **RISE HOLDINGS, LLC**, a Delaware limited liability company, on behalf of such corporation.  He/she is personally known to me or has produced a driver's license as identification.

_____
Notary Public

My Commission Expires:_____

23 | P a g e

# EXHIBIT "A"

## LEGAL DESCRIPTION

### (see attached)

## **Exhibit B**

### **Estoppel Certificate**

WEIL:\96898076\12\73217.0004

# LANDLORD'S ESTOPPEL CERTIFICATE
## *{Kmart #7461; Clarksville, Tennessee}*

RP Clarksville Commons, LLC ("**Purchaser**")
a Delaware limited liability company
832 Georgia Avenue
Suite 507
Chattanooga, Tennessee  37402

Chicago Title Insurance Company ("**Title Company**")
10 South LaSalle St.
Suite 3100
Chicago, IL 60603

FirstBank ("**Lender**")
319 Manufacturers Road
Chattanooga, Tennessee 37405

RE:    2300 Madison Street
       Clarksville, Tennessee

The undersigned, Daniel G. Kamin Clarksville Commons Enterprises, a Pennsylvania business trust, ("**Landlord**"), under that certain Lease Agreement dated October 1, 1990 (the "**Lease**"), by and between Landlord and Kmart Corporation, a Michigan corporation, ("**Tenant**"), for the lease by Tenant of the premises commonly known as Kmart Store #7461, containing approximately .440 acres and commonly known as 2300 Madison Street in the City of Clarksville, Montgomery County, State of Tennessee and as more particularly described in the Lease, hereby certifies to Purchaser, Lender and Title Company to its knowledge that as of the date below:

1.    The Lease is in full effect (or, if there have been modifications, that the Lease is in full effect as modified, and such modifications are as follows:_____None_____);

2.    The current amount of Basic Rent (as defined in the Lease); $3,168.42/Mth, $38,021.00/Yr.

3.    The dates to which Basic Rent, Additional Rent (as defined in the Lease) and other sums payable under the Lease have been paid are as follows: rent has been paid through _November 30,_____2018_____; and

4.    The parties understand that Landlord has not conducted any investigation of the covenants contained herein, and that the results of such an investigation could vary the statements below but with that in mind, Landlord states No default exists under the Lease (or, if a default exists, that

Landlord hereby waives any prior defaults and allows Purchaser to continue under the Lease without condition or payment of any penalties or past-due items).

5.      If Purchaser closes on the contemplated purchase and sale and takes an assignment of Lease (in accordance with the Lease), then any language throughout the Lease, which refers to "Kmart Corporation" shall be amended to refer to "Lessee," specifically including, but not limited to Section 20 of the Lease, related to Lessee default.

This Landlord's Estoppel Certificate is given solely for the information of the party or parties to whom addressed, and it may not be relied upon by any other person or entity. This Landlord's Estoppel Certificate shall not create any liability in, or provide any right of action against Landlord, its officers, directors, agents, employees and representatives, but shall only act to estop Landlord from making any claims or statements against the party or parties to whom this Landlord's Estoppel Certificate is addressed which are contrary to those made herein.

*{Signature on following page}*

**DANIEL G. KAMIN CLARKSVILLE COMMON ENTERPRISES,**
a Pennsylvania business trust

By _____
            Daniel G. Kamin, Trustee

Date: _____

**<u>Exhibit C</u>**

**Amendment**

## AMENDMENT TO REAL ESTATE SALE CONTRACT
*Clarksville, TN; K #7461*

This Amendment to Real Estate Sale Contract (this "**Amendment**") is entered into as of February __, 2019, by and between KMART CORPORATION, a Michigan corporation, as owner of the Ground Leasehold Interest of .440 acres approximately ("**Kmart**") and TROY COOLIDGE NO. 7, LLC, a Michigan limited liability company, as fee simple owner of 7.974 acres approximately ("**Troy**") (at times, Kmart and Troy shall collectively be referred to as "**Seller**") and RP CLARKSVILLE COMMONS, LLC, a Tennessee limited liability company ("**Purchaser**" or "**Assignee**").

## W I T N E S S E T H :

**WHEREAS,** Seller and Rise Holdings, LLC entered into that certain Real Estate Sale Contract, dated as of May 23, 2018, as previously assigned to Purchaser (the "**Original Contract**", as amended hereby and as further amended, restated, or otherwise modified from time to time, the "**Contract**"), pertaining to the Premises and Property located in the City of Clarksville, Montgomery County, State of Tennessee (Store Number 7461); and

**WHEREAS,** Seller and Purchaser desire to amend the Original Contract as provided below.

**NOW, THEREFORE,** the parties agree as follows:

1. <u>Defined Terms</u>. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Original Contract.

2. <u>Amendments to the Original Contract</u>.

(a)    The term "Contract" or "this Contract" as used in the Original Contract shall hereinafter refer to the Original Contract, as hereby amended, and as the same may be further amended, restated or otherwise modified from time to time.

(b)    Section 2(a) shall be modified to add the following final sentence: "Of the foregoing Purchase Price, 94.77% shall be allocable to the sale of the Property and 5.23% shall be allocable to the transfer of the Premises and Ground Leasehold Interest."

(c)    Section 3 shall be modified to add "94.77% shall be allocable to the sale of the Property and 5.23% shall be allocable to the transfer of the Premises and Ground Leasehold Interest" after the words "Fifty Thousand and No/100 Dollars ($50,000.00)" and before the words "United States currency (the "**Earnest Money Deposit**").

(d)    Subsection 4(c) shall apply only to the Property. As to the Premises, Subsection 4(c) shall be deemed deleted.

(e)    The following shall be added as new Subsection 4(d):

"(d)    The Stipulation (as hereinafter defined) shall provide that, as to the Ground Leasehold Interest, to the fullest extent permitted under section

363(f) of title 11 of the United States Code, this sale is free and clear of all liens, claims and encumbrances.  As to the Ground Leasehold Interest only, notwithstanding anything to the contrary contained in this Contract (including any affirmative obligation of Seller to cure "Monetary Liens", if any, set forth in this Contract), Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from the Title Commitment or insured over by Title Insurer."

(e)    The words "or Ground Leasehold Interest in" shall be inserted in the first sentence of Subsection 5(a)(ii) between the words "ownership of " and "the Property".

(f)    Subsections 6(b)(iii) and 6(b)(iv) and Subsection 6(c) are hereby deleted.

(g)    The following shall be added as new Subsection 6(d):

"(d)    In addition to any other conditions and/or contingencies set forth in this Contract, each Party's obligation to close on the sale of the Property and the Premises/Ground Leasehold Interest is conditioned on the following:  The *Stipulation, Agreement, and Order for Unexpired Nonresidential Real Estate Property Lease (2300 Madison Street, Clarksville, Tennessee)*, substantially in the form annexed hereto as Exhibit G (the "**Stipulation**") shall have been "so ordered" by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**")."

(h)    Subsection 7(a) is hereby deleted and shall be replaced with the following:

"(a)    **Closing Date**. Provided all conditions and/or contingencies to Closing described in this Contract have been fulfilled or waived, the Closing (the "**Closing**") shall take place at the office of the Escrow Agent no later than February 28, 2019 (the "**Closing Date**")."

(i)    Subsection 7(b)(iii) is hereby deleted and replaced with the following:

(iii) Seller shall execute a Bill of Sale and General Assignment, transferring all of Seller's right, title, and interest in the Personal Property, specifically including the underground storage tanks located at the Property, and assigning (to the extent assignable) any intangible rights and interests related to operation of the Property, such as warranties, permits, licenses (the "**Bill of Sale**").

(j)    Subsections 7(b)(iv) and 7(b)(viii) are hereby deleted.

(k)    Subsection 7(b)(vi) and (vii) are hereby deleted and replaced with the following:

(i)    An executed copy of the Assignment and Assumption of Lease in the

2

form attached to and made a part hereof as <u>Exhibit "D"</u> as may be amended by the Parties before Closing (the "**Assignment and Assumption of Lease**'");

(ii)      An executed copy of the Memorandum of Assignment and Assumption of Lease in the form attached to and made a part hereof as <u>Exhibit "E"</u> as may be amended by the Parties before Closing (the "**Memorandum of Assignment and Assumption of Lease**");

(l)      Subsection 10(a)(i) is hereby deleted and replaced with the following:

"(i)      Subject to the Stipulation and to Section 6(d) of this Contract, Seller has, or will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Contract and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Contract and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to the terms of the Stipulation."

(m)      Subsection 10(a)(iv) is hereby deleted.

(n)      The ultimate paragraph of <u>Section 10</u> is hereby deleted and replaced with the following:

"The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Contract shall be continuing and shall be true and correct on and as of the Closing Date in all material respects with the same force and effect as if made at that time. *Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this <u>Section 10</u> shall merge with the transfer of title and the transfer of the Ground Leasehold Interest and shall not survive Closing. If the Closing takes place, Seller shall have no liability with respect to any claim which Purchaser may have against Seller for a breach of any such representation or warranty, whether such breach is known or unknown.*"

(o)      <u>Termination Event.</u>      Notwithstanding anything to the contrary set forth in the Contract, the Contract may be terminated at any time prior to the Closing Date by Purchaser if the Stipulation is not "*so ordered*" by the Bankruptcy Court by February 27, 2019. In the event of such termination, Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon, and the Contract shall be terminated and of no further force or effect except as provided for in this

3

Contract.

(p)    <u>PILOT</u>.  Seller acknowledges that Purchaser has pursued and received approval for an agreement with the Industrial Development Board of the County of Montgomery ("**IDB**") regarding payment in lieu of taxation, and that, notwithstanding anything potentially to the contrary in this Amendment or the Contract, the IDB will be the grantee under the Deed at Closing.

3.    <u>Counterparts</u>.  This Amendment may be executed and delivered (including by facsimile transmission or in portable document format (PDF)) in one or more counterparts, each of which, when executed, shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement, with the same effect as if the signatures thereto and hereto were upon the same instrument.

4.    <u>No Modification</u>.  Except as modified by this Amendment, all of the terms, covenants, conditions and provisions of the Original Contract shall remain and continue unmodified, in full force and effect.   If and to the extent that any of the provisions of this Amendment conflict or are otherwise inconsistent with any provisions of the Original Contract, the provisions of this Amendment shall prevail.

5.    <u>Amendment</u>.  This Amendment cannot be modified in any manner except by a written agreement signed by Seller and Purchaser.

4

IN WITNESS WHEREOF, this Amendment has been duly executed and delivered by or on behalf of each of the parties as of the date first written above.

**SELLER:**

KMART CORPORATION,
a Michigan corporation,
as owner of the Ground Leasehold Interest

By: _____
     Name:
     Title:

TROY COOLIDGE NO. 7, LLC,
a Michigan limited liability company,
as fee simple owner

By: KMART Corporation, a Michigan corporation, its sole member

By: _____
     Name:
     Title:

**PURCHASER:**

RP CLARKSVILLE COMMONS, LLC
a Tennessee limited liability company

By: _____
     Name:
     Title:

**Exhibit G**

The Stipulation

[attached]

**Exhibit D**

**Assignment Agreement**

# ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

### *{Kmart #7461; Clarksville, Tennessee}*

**THIS ASSIGNMENT AND ASSUMPTION OF GROUND LEASE** (this "**Agreement**") is made as of the _____ day of _____, 2019, ("**Effective Date**") by and between **KMART CORPORATION,** a Michigan corporation ("**Assignor**"), and **RP CLARKSVILLE COMMONS, LLC**, a Tennessee limited liability company ("**Assignee**").

## RECITALS

**WHEREAS**, Assignor is the lessee under that certain ground lease dated October 1, 1990 (as previously amended, the "**Lease**"), pursuant to which DANIEL G. KAMIN CLARKSVILLE COMMONS ENTERPRISES, a Pennsylvania business trust, as successor-in-interest to Clarksville Venture No. One, a Texas joint venture ("**Lessor**"), leases to Kmart certain real property containing approximately .440 acres (a portion of County Tax Parcel # 081 050 05 000 and City Tax Parcel # 081 050 05 000) commonly known as 2300 Madison Street in the City of Clarksville, Montgomery County, State of Tennessee, as described and set forth in the Lease (the "**Demised Premises**"). A copy of the Lease is attached hereto as **Exhibit "A"** and made a part hereof. The Demised Premises, including all land, and improvements as may be located thereon, is hereinafter referred to collectively as the "**Premises**." The Demised Premises is improved with a one story building containing approximately 15,062 square feet.

**WHEREAS**, Assignee acquired Assignor's interest in the Lease pursuant to that certain Real Estate Sale Contract, dated May 23, 2018, by and between Assignor and Assignee (as the same may have been amended and assigned, the "**Sale Contract**");

**WHEREAS**, Assignor filed Chapter 11 bankruptcy on October 15, 2018, as Case No. 18-23538, in the United States Bankruptcy Court, Southern District of New York (the "**Bankruptcy Court**").

**WHEREAS,** the Bankruptcy Court has approved this Assignment and Assumption of Ground Lease pursuant to Order No. _____ ;

**WHEREAS**, in accordance with the terms and conditions of this Agreement, Assignor has agreed to assign all of its rights, title, interest, benefits, privileges, obligations and liabilities, claim and demand in, to and under the Lease, and Assignee has agreed to accept such assignment and to assume the liabilities and obligations of the Assignor under the Lease.

## AGREEMENT

**NOW**, **THEREFORE**, for and in consideration of the covenants contained herein, Assignor and Assignee agree as follows:

**1.** The foregoing Recitals are hereby incorporated as if fully rewritten and restated at length herein. Capitalized terms used, but not defined in this Agreement, shall have the same meaning ascribed to such capitalized and defined terms in the Lease.

2.      Assignor hereby assigns and transfers to Assignee, and Assignee accepts and assumes, all of Assignor's rights, title, interest, benefits, privileges, obligations, liabilities, claims and demands as lessee in, to and under the Lease; and Assignee hereby agrees to pay, perform, and discharge, as and when due, all of the agreements, duties, obligations and liabilities of Assignor arising under the Lease, or otherwise attributable to any period, on or after the Effective Date.

3.      Rent, common area charges, utility charges, real estate taxes and any other charge payable by lessee under the Lease shall be apportioned as provided under the Sale Contract.

4.      Assignee acknowledges and accepts the Premises in its "AS-IS, WHERE IS, WITH ALL FAULTS CONDITION."

5.      Assignee hereby agrees to indemnify, defend and hold Assignor harmless from and against any claim, cost, charge or liability, including, without limitation, court costs and reasonable attorneys' fees, asserted, brought against or incurred by Assignor arising from or related to: (i) any obligation or liability assumed by the Assignee hereunder; and (ii) any breach of any of the representations or covenants made by Assignee in this Agreement (the foregoing obligations of Assignee to indemnify, defend and hold Assignor harmless are referred to herein collectively as the "**Assignee's Obligations**"). If Assignee fails to timely perform Assignee's Obligations or breaches any of the representations or covenants made by Assignee in this Agreement and Assignor remains liable under the Lease, then Assignor may pursue any and all remedies at law or in equity available to Assignor.

6.      Assignor hereby agrees to indemnify, defend and hold Assignee harmless from and against any claim, cost, charge or liability, including, without limitation, court costs and reasonable attorneys' fees, asserted, brought against or incurred by Assignee arising from or related to: (i) any obligation or liability of the "Lessee" under the Lease arising or relating to acts or omissions of Assignor occurring before the Effective Date; and (ii) any breach of any of the representations or covenants made by Assignor in this Agreement (the foregoing obligations of Assignor to indemnify, defend and hold Assignee harmless are referred to herein collectively as the "**Assignor's Obligations**").

7.      In the event either party hereto fails to timely perform its obligations under Paragraphs 5 or 6 herein, as applicable, or breaches any of the representations or covenants made by such party in this Agreement, the performing/non-breaching party may pursue any remedies available at law or in equity.   All rights and remedies provided under this Agreement are cumulative and may be pursued singularly, in any combination, and in any order.  The failure of any party to enforce any of the terms and provisions contained herein shall in no event be deemed to be a waiver of the right to thereafter strictly enforce the terms and provisions hereof.

8.      The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.

9.      If any one or more provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or

unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

10.     This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee.

11.     This Agreement may be signed in counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.

12.     Notices to each party shall be in writing and shall be deemed properly served A) three (3) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or B) the next business day after being deposited with a reputable overnight express carrier (e.g., Federal Express, UPS) for guaranteed next business day delivery or C) upon receipt if personally delivered.  Notices shall be addressed as follows:

|  |  |
|---|---|
| Assignor: | **KMART CORPORATION**<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois  60179<br>Attn:   SVP and President-Real Estate |
| Copy to: | **KMART CORPORATION**<br>3333 Beverly Road<br>Department 824RE<br>Hoffman Estates, Illinois  60179<br>Attn:   Deputy General Counsel, Real Estate |
| Assignee: | **RP CLARKSVILLE COMMONS, LLC**<br>832 Georgia Avenue<br>Suite 507<br>Chattanooga, Tennessee 37402 |
| Copy to: | **CHAMBLISS, BAHNER & STOPHEL P.C.**<br>605 Chestnut Street, Suite 1700<br>Chattanooga, Tennessee 37450<br>Attn: Kirby Yost |

or to any other address furnished in writing by any of the foregoing.

11.     Assignor and Assignee each represents to the other that each has the full power and authority to assign and assume the Lease as provided herein.

12.     Each party represents and warrants to the other that it has not employed, retained or consulted a broker, agent or finder in carrying on the negotiations in connection with this Agreement. Assignor and Assignee each hereby indemnifies and agrees to defend and hold the other harmless from and against any and all claims, demands, causes of action, debts, liabilities, judgments and

damages (including, without limitation, court costs and attorneys' fees, inclusive of fees incurred in connection with enforcement of this indemnity and fees on appeal) that may be asserted or recovered against the indemnified party on account of any brokerage fee, commission or other compensation arising by reason of the indemnitor's breach of these representations and warranties (the foregoing indemnities being herein referred to as the "**Brokerage Indemnities**").  The Brokerage Indemnities shall survive the Effective Date.

**13.**     This Agreement shall not be recorded, but Assignor and Assignee agree to record a Memorandum of Assignment and Assumption of Lease reflecting certain material terms herein.

**14.**     This Agreement is expressly made subject to the provisions of Section 18 of the Lease.

*{Signatures appear on the following pages}*

**Clarksville, TN #7461 – Parcel B**

**IN  WITNESS  WHEREOF**, the parties hereto have executed this Assignment and Assumption of Lease on the day and year first above written.

**ASSIGNOR**:

**KMART CORPORATION,**
a Michigan corporation

By:_____
Name:_____
Its:_____

**[Assignor Signature Page - Clarksville, TN #7461 – Parcel B]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment and Assumption of Lease on the day and year first above written.

**ASSIGNEE**:

**RP CLARKSVILLE COMMONS, LLC**,
a Tennessee limited liability company

By:_____
Name:_____
Its:_____

**[Assignee Signature Page – Clarksville, TN #7461]**

## EXHIBIT "A"

## DESCRIPTION OF GROUND LEASE

Ground Lease dated October 1, 1990, originally by and between Clarksville Venture No. One, a Texas joint venture, lessor, and KMART Corporation, a Michigan corporation, lessee, as extended by those certain letters of extension dated February 18, 2011 and February 17, 2016.