

Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 18-23538-rdd

4  - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  SEARS HOLDINGS CORPORATION,

8

9        Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                 United States Bankruptcy Court

13                 300 Quarropas Street, Room 248

14                 White Plains, NY 10601

15

16                 February 4, 2019

17                 10:59 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  RAI

Page 2

1    HEARING re Notice of Agenda of Matters Scheduled for Hearing

2    on February 4,2019 at 10:00 a.m.

3

4    Debtors' Motion for Approval of Global Bidding Procedures

5    (ECF #429)

6

7    Objection and Reservation of Rights of Pension Benefit

8    Guaranty Corporation to Debtors' Sale Motion (ECF #2002)

9    Objection of Service.com (ECF #2029,2037, and 2130)

10

11   Objection of the Official Committee of Unsecured Creditors

12   to Sale of Substantially All of the Debtors' Assets to ESL

13   Investments, Inc. (Unredacted ECF #2309)

14

15   Preliminary Omnibus Objection of the Official Committee of

16   Unsecured Creditors to ESL Proofs of Claim (ECF #2025)

17

18   Responses to Cure Amounts and Adequate Assistance:

19   Objection of Waste Management National Services, Inc. and

20   its Affiliates (ECF #1783)

21

22   Limited Objection of Sears Hometown and Outlet Stores, Inc.

23   (ECF 1835)

24

25   Cure Objection by Microsoft (ECF #1842)

Page 3

1   Cure Objection by LinkedIn (ECF #1852)

2

3   Ramco Jackson Crossing SPE, LLC's Limited Objection and

4   Reservation of Rights (ECF #1859)

5

6   Limited Objection of National Distribution Centers, LLC (ECF

7   #1864)

8

9   Objection of Little Caesar Enterprises, Inc. (ECF #1865)

10

11   Objection of Blue Cross and Blue Shield of Illinois (ECF

12   #1876)

13

14   Limited Objection and Reservation of Rights of SAP

15   Industries, Inc. (ECF #1886)

16

17   Limited Objection of Cross Country Home Services, Inc.

18   (ECF#1893)

19

20   Limited Objection of Realtor Carl Ireland, Administrator of

21   the Estate of James Carbe (ECF#1931)

22

23   Response of Everlast World's Boxing Headquarters

24   Corp.(ECF#1980)

25

Page 4

1    Limited Objection of Salesforce.com, Inc. (ECF#1881)

2

3    Supplemental Objection of Salesforce.com(ECF#2252)

4

5    Objection of Cisco System (ECF#1988)

6

7    Cure and Adequate Assurance Objection by Brooks Shopping

8    Center Partners, LLC (ECF#1990)

9

10   Sales, Cure, and Adequate Assurance Objection by Westfield,

11   LLC and Certain of its Affiliates (ECF#1991)

12

13   Oracle's Limited Objection (ECF#1992)

14

15   Google LLC's Limited Objection (ECF #1995)

16

17   Limited Objection of Icon DE Holdings LLC and Icon NY

18   Holdings LLC (ECF#2000)

19

20   Objection of Bonnier Corporation (ECF#2005)

21

22   Objection of Adam Levine Productions, Inc.. (ECF#2009)

23

24   Limited Objection of Luxottica Retail North America

25   Inc.(ECF#2011)

Page 5

1    Objection of Santa Rosa Mall, LLC (ECF #2013)

2

3    Royal Consumer Products, LLC's Objection (ECF#2014)

4

5    Limited Objection of DPS Services LLC (#2024)

6

7    Objection of Site Centers Corp., et A1 (ECF #2069)

8

9    Objection of Stanley Black & Decker (ECF #2072)

10

11   Limited Objection of Simon Property Group, L.P. (ECF #2082

12   and #2214)

13

14   Response of Wilmington Trust, National Association, as

15   Collateral Agent (ECF#2089)

16

17   Supplemental Objection of Weingarten Realty Investors

18   (ECF#2093)

19

20   Declaration of Lee Brody (ECF#2218)

21

22   Limited Objection of Acadia Realty Limited Partnership, et

23   al (ECF #2153)

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

```
 1    A P P E A R A N C E S :

 2

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for Sears

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8    BY:  GARRETT FAIL

 9         JARED R. FRIEDMANN

10         JESSIE MICHKIN

11         DAVID J. LENDER

12         PAUL R. GENENDER

13         RAY C. SCHROCK

14         SUNNY SINGH

15

16    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

17         Attorneys for Restructuring Subcommittee

18         1285 Ave of the Americas

19         New York, NY 10019

20

21    BY:  LEWIS CLAYTON

22         SUSANNA BUERGEL

23         PAUL M. BASTA

24         BOB BRITTON

25
```

Page 7

1  FROST BROWN TODD LLC

2       Attorney for  Washington Prime Group Inc

3       3300 Great American Tower

4       301 East Fourth Street

5       Cincinnati, Ohio 45202

6

7  BY:  RONALD E. GOLD

8

9  BLANK ROME LLP

10       Attorney for Kin Properties, Inc

11       1825 Eye Street NW

12       Washington DC 20006

13

14  BY:  JEFFREY RHODES

15       EVAN J. ZUCKER

16

17  COHEN, WEISS AND SIMON LLP

18       Attorney for International Union (UAW), United

19       Steelworkers (USW), and Workers United (WU)

20       900 Third Avenue, 21st Floor

21       New York NY 10022.4869

22

23  BY:  RICHARD M. SELTZER

24       MELISSA S. WOODS

25

Page 8

```
1    BROWN RUDNICK

2         Attorney for Primark U.S. Corp

3         7 Times Square

4         New York, NY 10036

5

6    BY:  GERARD T. CICERO

7

8    LOCKE LORD LLP

9         Attorney for PBGC

10        111 South Wacker Drive

11        Chicago, IL 60606

12

13   BY:  P. RUSSELL PERDEW

14        BRIAN A. RAYNOR

15

16   PENSION BENEFIT GUARANTY CORPORATION

17        1200 L Street MW

18        Washington, DC 20005

19

20   BY:  MICHAEL I. BAIRD

21        KELLY CUSICK

22        GARTH D. WILSON

23

24

25
```

Page 9

1    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

2        Attorneys for the DIP ABL Agent

3        4 Times Square

4        New York, NY 10036

5

6    BY:  SHANA A. ELBERG

7

8    HALPERIN BATTAGLIA BENZIJA, LLP

9        Attorney for Relator Carl Ireland, Administrator

10        the Estate of James Garbe

11        40 Wall Street, 37th Floor

12        New York NY 10005

13

14    BY:  DONNA H. LIEBERMAN

15

16    SEYFARTH SHAW LLP

17        Attorneys for Wilmington Trust, NA as Indenture Trustee

18        and Collateral Agent

19        620 Eighth Avenue

20        New York, NY 10018

21

22    BY:  EDWARD M. FOX

23

24

25

Page 10

```
 1   GOODWIN PROCTER LLP

 2          Attorney for Urban Edge

 3          The New York Times Building

 4          620 Eighth Avenue

 5          New York, NY 10018

 6

 7   BY:  MICHAEL H. GOLDSTEIN

 8

 9   CHOATE

10          Attorneys for Wells Fargo

11          Two International Place

12          Boston, MA 02110

13

14   BY:  KEVIN J. SIMARD

15

16   CADWALADER, WICKERSHAM & TAFT LLP

17          Attorney for Argonaut Insurance

18          200 Liberty Street

19          New York, New York 10281

20

21   BY:  ANTHONY DE LEO

22

23

24

25
```

1    CRAVATH, SWAINE & MOORE LLP

2         Attorney for Stanley Black & Decker, Inc.

3         and affiliated entities

4         Worldwide Plaza

5         825 Eighth Avenue

6         New York NY 10019

7

8    BY:  PAUL H. ZUMBRO

9

10   SULLIVAN & CROMWELL LLP

11        Attorney for Fairholme Capital Management, LLC,

12        and the Fairholme Funds, Inc.

13        125 Broad Street

14        New York, NY 10004.2498

15

16   BY:  ALLISON H. WEISS

17        MICHAEL SULLIVAN

18        CLARK FREEMAN

19

20   AKIN GUMP STRAUSS HAUER & FELD LLP

21        Attorney to Official Committee of Unsecured

22        Creditors of Sears Holdings Corporation, et al.

23        One Bryant Park

24        New York NY 10036

25

Page 12

1    BY:  IRA S. DIZENGOFF

2         LACY LAWRENCE

3         JOSEPH SORKIN

4         ABID QURESHI

5

6    STARK & STARK

7         Attorney for Levin Management Corporation, Phillips

8         Edison & Company, Conopco Inc. dba Unilever

9         P.O. Box 5315

10        Princeton NJ 08543

11

12   BY:  JOSEPH H. LEMKIN

13

14   CHOI & PARK, LLC

15        Attorney for Winiadaewoo Electronics America, Inc.

16        11 Broadway Suite 615

17        New York NY 10004

18

19   BY:  HYUN SUK CHOI

20

21

22

23

24

25

Page 13

1   K&L GATES

2        Attorneys for Amazon.com Services Inc. and

3        Affiliates

4        599 Lexington Avenue

5        New York, NY 10022

6

7   BY:  ROBERT T. HONEYWELL

8

9   ALLEN MATKINS

10        Attorney for LBA Realty, Weingarten Realty

11        And other landlords

12        3 Embarcadero Center, 12th Floor

13        San Francisco, CA 94111-4074

14

15   BY:  IVAN GOLD

16

17   CLEARY GOTTLIEB STEEN & HAMILTON LLP

18        Attorney for ESL

19        One Liberty Plaza

20        New York, NY 10006-1470

21

22   BY:  SEAN A. O'NEAL

23        JAMES L. BROMLEY

24

25

```
 1   LOWENSTEIN SANDLER LLP

 2        1251 Avenue of the Americas

 3        New York, NY 10020

 4

 5   BY:  ERIC S. CHAFETZ

 6

 7   BARCLAY DAMON LLP

 8        Attorney for Creditors at docket numbers

 9        2246, 2247, 2248, 2251, 2253, 2255

10        2293 and 2294

11        125 East Jefferson Street

12        Syracuse, New York 13202

13

14   BY:  KEVIN M. NEWMAN

15

16   BALLARD SPAHR LLP

17        Attorney for Brixman Property Group,

18        Federal Realty, et al

19        52nd Floor . Mellon Bank Center

20        1735 Market Street

21        Philadelphia PA 19103

22

23   BY:  DAVID L. POLLACK

24

25
```

```
 1   LATHAM & WATKINS LLP

 2        Attorney for Simon Property Group

 3        885 Third Avenue

 4        New York NY 10022

 5

 6   BY:  TED AUSTIN DILLMAN

 7

 8   ROPES & GRAY LLP

 9        Attorney for Cross Country Home Services, Inc.

10        Prudential Tower

11        800 Boylston Street

12        Boston, MA 02199-3600

13

14   BY:  JAMES M. WILTON

15

16   KELLEY DRYE & WARREN LLP

17        Attorneys for Landlords Brookfield Properties,

18        Benderson Development, SITE, LBA Realty, TLM, Gray

19        Enterprises, WRI, JLL

20        101 Park Avenue

21        New York, NY 10178

22

23   BY:  ROBERT L. LEHANE

24

25
```

```
 1   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

 2        Attorneys for Seritage Growth Properties

 3        One New York Plaza

 4        New York, NY 10004

 5

 6   BY:  SCOTT B. LUFTGLASS

 7        PETER B. SIROKA

 8

 9   ALSO PRESENT TELEPHONICALLY:

10   JOHN DUBUC

11   ELIZABETH A. BEITLER

12   DONALD K. LUDMAN

13   RYAN P. QUINN

14   PRASHANT RAI

15   ROBERT M. SASLOFF

16   PENNY R. STARK

17   RAFAEL ZAHRAIDDIN-ARAVENA

18   ARLENE R. ALVES

19   LAURA E. APPLEBY

20   SAM N. ASHURAEY

21   JOSEPH BADTKE-BERKOW

22   KEREK J. BAKER

23   RYAN M. BARTLEY

24   BARRY BAZIAN

25   NADAV BESNER
```

Page 17

1   PHILLIP W. BOH.

2   DUSTIN T. BRANCH

3   ALIX BROAMAN

4   JULIAN BULAON

5   JONATHAN D. CANFIELD

6   PATRICIA CHEN

7   STEVEN H. CHURCH

8   BRYAN M. CIMALA

9   SARA COELHO

10   TED A. COHEN

11   SONIA E. COLON

12   EVAN COREN

13   BRANDON J. CORY

14   ANNE D'INNOCENZIO

15   ANDREW DIAZ

16   DREW DILLWORTH

17   SEAN FARLEY

18   ALAN M. FELD

19   WILLIAM P. FENNELL

20   ROBERT E. FITZGERALD

21   ADAM FLETCHER

22   DEBORAH L. FLETCHER

23   CHRISTOPHER

24   GARMAN

25   KIMBERLY B. GIANIS

Page 18

1    ALISTAIR R. GRAY

2    THOMAS HALS

3    CATHERINE HELZENRATER

4    PATRICK J. HOLOHAN

5    STEPHEN IACOVO

6    CHRISTOPER ISIDORE

7    VLADIMIR JELISAVCIC

8    WILLIAM M. JONES

9    GERALD P. KENNEDY

10   KELLY E. KLEIST

11   MATTHEW KOCH

12   STEVEN KOSSON

13   MATTHEW I. KRAMER

14   JEFFREY KURTZMAN

15   ZACHARY D. LANIER

16   ROBERT LAPOWSKY

17   FERNAND L. LAUDURNIEY

18   BERNICE C. LEE

19   ZACHARY D. LEVINE

20   LAWRENCE A.LICHTMAN

21   MARK LIGHTNER

22   TERESA LII

23   MICHAESL G. LINN

24   CATHERINE LOTEMPIO

25   COLLEEN MAKER

1    KATHERINE E. MASSEY

2    MAEGHAN J. MCLOUGHLIN

3    STEPHEN MILLER

4    ROBERT MINKOFF

5    MICHAEL MITTLEMAN

6    PATRICK MOHAN

7    DAN MOSS

8    GARRETT A. NEIL

9    BRYANT OBERG

10    LAWRENCE PARK

11    RICHARD PEDONE

12    CAROL ANN RICH

13    RITA MARIE RITROVATO

14    LILLIAN A. RIZZO

15    ADAM L. ROSEN

16    CHRISTOPHER SAFAYA

17    JOSEPH E. SARACHEK

18    MICHAEL L. SCHEIN

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.  Good morning.  In

3       RE: Sears Holdings Corporation, et al.

4              MR. SCHROCK:  Good morning, Your Honor.  Ray

5       Schrock of Weil, Gotshal, and Manges on behalf of the

6       Debtors.  I'm here with my partners today, Sunny Singh,

7       David Lender, Paul Genender, and Jared Friedmann.

8              THE COURT:  Okay.  Good morning.

9              MR. SCHROCK:  Your Honor, thank you for seeing us

10      and as you know, today's a very -- and over the next couple

11      of days are very important days for Sears, its tens of

12      thousands of employees, and other stakeholders.

13             Before we get into -- I know that Your Honor

14      wanted to go through a few preliminary items before we get

15      started, but just for the benefit of parties in interest,

16      our understanding of the schedule today is that we're going

17      to go until I think about 1:30 or so today and then we have

18      a full day scheduled for beginning at 9 a.m. on Wednesday.

19             THE COURT:  That's correct.

20             MR. SCHROCK:  And then I know you had a couple of

21      hours reserved for us on Thursday to the extent needed.

22      We've been discussing with the Creditors' Committee just

23      given the time sensitivity and the Debtors do intend and

24      hope to close the sale if the Court approves it on this

25      Friday, but given the time sensitivity we were talking about

Page 21

1    how do we make sure we have equal time here and we have

2    enough time to put it on, our suggestion was just having a

3    four-hour clock for each side and then that way it'll keep

4    it moving.  So if somebody's asking questions, we can start

5    clicking it off.  We think that we're certainly going to be

6    done well within that four-hour timeframe and if we wanted

7    to -- I think the Creditors' Committee asked if we could

8    have closing on Thursday.  We're fine with that, just having

9    closing arguments on Thursday morning.  If --

10              THE COURT:  I contemplated Thursday just to be

11   closing arguments.

12              MR. SCHROCK:  Yes.

13              THE COURT:  Not for any evidentiary --

14              MR. SCHROCK:  Right.

15              THE COURT:  -- portion.

16              MR. SCHROCK:  And, Your Honor, if we finished

17   early on Wednesday, we're also amenable to closing on

18   Wednesday, but again, it's not -- we're fine closing on

19   Thursday morning as well.

20              THE COURT:  Okay.

21              MR. SCHROCK:  Is that okay, Abid?

22              MR. QUERESHI:  Sure.  Good morning, Your Honor.

23              THE COURT:  Morning.

24              MR. QUERESHI:  For the record, Abid Qureshi, Akin

25   Gump, on behalf of the Committee.  We would prefer closing

Page 22

1    on Thursday regardless of what time we happen to get through

2    the evidence by Wednesday.  I think the plan --

3              THE COURT:  Well, let's see where we are.  I mean,

4    if you all finish by 2 on Wednesday then, you know, I might

5    say take a couple hours and come back to me at 4.  We'll

6    see.  But right now, that time's available and I'm assuming

7    that I'll hear closing arguments then.

8              MR. QUERESHI:  Okay.  I mean, from our

9    perspective, Your Honor, we think it would just allow for

10   more efficient presentations to the Court to have the

11   benefit of overnight Wednesday to Thursday.  Beyond that,

12   Your Honor, I think it is our expectation that we will be

13   able to move through the witnesses in the time allotted.  We

14   don't think the strict chess clock is really the kind of

15   thing that works --

16             THE COURT:  Well, I'll just keep an eye on things.

17   I mean, I have the witness declarations which I've reviewed

18   and I'll just -- you know, if I think people are going over

19   old ground or going over ground that I don't need to hear,

20   I'll cut you short.

21             MR. QUERESHI:  Precisely.

22             THE COURT:  Both of you.

23             MR. QUERESHI:  Your Honor, just a couple more

24   logistical items.  So we have, I believe, three witnesses

25   where we have agreed to designate deposition testimony.

Page 23

1           THE COURT:  Okay.

2           MR. QUERESHI:  And we will have that to Your Honor

3     that contains the designations of both sides by this

4     evening.  Certainly, Your Honor will have it by tomorrow.

5           THE COURT:  Okay.  And one will be blue magic

6     marker and one'll be --

7           MR. QUERESHI:  Exactly.

8           THE COURT:  -- yellow or --

9           MR. QUERESHI:  It will be clearly distinguished as

10    to who is designating what.

11          THE COURT:  Okay.

12          MR. QUERESHI:  Only one of those witnesses, Your

13    Honor, is a witness that had been scheduled to testify live

14    and that's Jan Kniffen, the Committee's expert with respect

15    to the business plan.  Both ESL and the Debtors have agreed

16    to, as I understand it, way of cross of examination and in

17    lieu of that just designate from the deposition testimony,

18    and so with respect to Mr. Kniffen, the only question is

19    whether the Court or any other parties would like Mr.

20    Kniffen present to be available for cross examination on

21    Wednesday.  Otherwise, we would not ask him to be

22    (indiscernible).

23          THE COURT:  All right.  Well, you should let

24    counsel -- if there's anyone out there that wants that, you

25    should let counsel know today.

1          MR. QURESHI:  Thank you, Your Honor.

2          THE COURT:  Okay.

3          MR. SCHROCK:  Your Honor, just very quickly in

4    terms of preliminaries, we did file a revised sale order

5    last night with an initial list of contracts that the

6    Debtors intend to designate for assumption and then there's

7    an extended period, a 60-day period, pursuant to which

8    parties can review -- the buyer can review and decide

9    whether to assume any other pertinent contracts.

10         THE COURT:  Is that order the same that was in my

11   binder or is it another order?

12         MR. SCHROCK:  It's another one, Your Honor.

13         THE COURT:  Okay.

14         MR. SCHROCK:  It has some changes to it and some

15   resolutions to objections.

16         THE COURT:  Is it blacklined against the one that

17   was in my binder or against the original?

18         MR. SCHROCK:  Yes, it is --

19         THE COURT:  The former?

20         MR. SCHROCK:  Yes.

21         THE COURT:  Okay.  All right.

22         MR. SCHROCK:  And, Your Honor, I'm happy, to the

23   extent it's helpful, we can -- I could read a list at least

24   of those objections that we have scheduled to either go

25   forward or have resolved just for the benefit of parties; or

1    would you like to just get started with the evidence?

2              THE COURT:  Well, I have the agenda.

3              MR. SCHROCK:  Yes.

4              THE COURT:  And I have your chart of objections

5    and responses.

6              MR. SCHROCK:  Yes.

7              THE COURT:  So are there changes from that, of

8    more that have been resolved?

9              MR. SCHROCK:  Yes, Your Honor, there are a few --

10             THE COURT:  Okay.

11             MR. SCHROCK:  -- that have been --

12             THE COURT:  Well, maybe you should set those out

13   just so --

14             MR. SCHROCK:  Okay.  Yeah, let's --

15             THE COURT:  -- we're clear on that.

16             MR. SCHROCK:  We can go ahead and do that.  So

17   these are the objections that we have listed as going

18   forward because there being designated for assumption and

19   assignment or we're otherwise planning to deal with the

20   objection during the sale hearing.  If we don't read the

21   name of the party on this list, then at least from the

22   Debtors' perspective, we presume that that objection is

23   being adjourned because it relates primarily to a cure issue

24   or a contract that is being -- is not currently being

25   designated for assumption.

Page 26

1          THE COURT:  Okay.

2          MR. SCHROCK:  So the first one that we have as

3    pending is Waste Management National Services.  That's at

4    ECF Number 1783.  That is still pending and intend to go

5    forward.  One that's been resolved, Microsoft Corporation

6    and Affiliates.  That -- the cure issue has been adjourned

7    but the assumption and assignment objection has been

8    resolved.  LinkedIn Corporation at ECF Number 1852, the cure

9    has been adjourned but the assumption and assignment

10   objection remains pending.

11         THE COURT:  I have on your chart that that one was

12   resolved.

13         MR. SCHROCK:  It has.  LinkedIn --

14         THE COURT:  Yeah.

15         MR. SCHROCK:  It is -- yeah, that is still pending

16   but we're working on resolving it, Your Honor.

17         THE COURT:  Okay.  All right.

18         MR. SCHROCK:  Also ECF 1859 which is Ramco Jackson

19   Crossing SPE, LLC.  That objection has been resolved.

20   National Distribution Centers, LLC at ECF Number 1864 and a

21   supplemental objection at 2376.  That objection remains

22   pending.  Next is Blue Cross and Blue Shield of Illinois at

23   ECF Number 1876.  That objection has been resolved.  Number

24   7, SAP Industries, SAP America, Inc., and Concur Technology,

25   Inc., which is ECF Number 1886; that has been resolved.

Page 27

1          Cross Country Home Services, Inc. at ECF Number

2     1893 has been resolved.  Chubb Companies which is at ECF

3     Number 1900 remains pending.  Carl Ireland, Administrator of

4     the Estate of James Garbe, G-A-R-B-E, remains pending.

5     (indiscernible) Insurance Company, ECF Number 1943, remains

6     pending.  SalesForce.com at ECF Number 1981 and supplemental

7     at 2252, the cure objection is adjourned.  The other

8     objections relating to assumption and assignment and

9     adequate assurance remain pending.

10          Cisco Systems at ECF Number 1988 has -- the cure

11    objection has been adjourned.  The assumption and assignment

12    objection and adequate assurance remains pending.  Brooks

13    Shopping Center Partners, LLC at ECF Number 1990 has been

14    adjourned but there is one issue, I believe, that remains

15    pending which is just relating to adequate assurance.

16    Westfield, LLC which is ECF Number 1991, certain that the

17    cure and other issues have been adjourned but there's a

18    pending objection relating to designation procedures.

19          Oracle which is at 1992 has been resolved in part

20    but still has assumption and assignment and adequate

21    assurance pending.  Google, LLC at ECF Number 1995 has been

22    adjourned.  Adam Levine Productions, Inc. at ECF Number 2009

23    has -- the cure objection has been adjourned, but adequate

24    assurance is pending.  Luxottica Retail North America, Inc.

25    at ECF Number 2011 has been resolved.

Page 28

1            Santa Rosa Mall, LLC at 2013 remains pending.

2     Royal Consumer Products, LLC at 2014 remains pending.  DF

3     Services, LLC at ECF Number 2024 remains pending.

4     (Indiscernible) Development Company, LLC and Affiliates at

5     ECF Number 2069 and a supplemental objection at 2093 has

6     been adjourned in part but remains pending as to designation

7     procedures and other issues.

8            Stanley Black & Decker, Inc. at ECF Number 2072

9     remains pending.  Simon Property Group, LP which is at ECF

10    Number 2082 and ECF Number 2214 has been adjourned and

11    remains -- has been adjourned or resolved in total.

12    Wilmington Trust, N.A. which is at ECF Number 2089 has been

13    resolved.  Acadia Realty Limited at ECF Number 2153 remains

14    pending and adjourned in part.  Mien Company, M-I-E-N,

15    Company Limited, Helen Andrews, Strong Progress Garment

16    Company, Limited, and (indiscernible) Solutions at ECF

17    Number 2318 has been adjourned.

18            Icon Delaware Holdings at ECF Number 2000 with a

19    supplemental objection at 2370 is adjourned with a -- I'm

20    sorry, with one clarification.  That there's just part of

21    this -- part of their objection that remains pending.  And

22    then of course the objection of the UCC, the PBGC, and

23    Services.com, all of those objections remain pending.

24            So in large part, Your Honor, what we've tried to

25    do is we've tried to just resolve those objections that we

1    can, cure objections, of course, that are for contracts that

2    have been designated for assumption and assignment that have

3    been adjourned and the buyer is just reserving for those

4    issues.  We also are working with a group of landlords that

5    are either formally or informally represented by Mr. Lehane

6    on working out a set of procedures related to -- to try and

7    resolve issues, so we're going to be working through those

8    issues over today and tomorrow, and so we'll hope to be able

9    to report that those issues are, in fact, adjourned.

10          But unless we called out a specific objector, we

11   have designated the objection as being adjourned and we were

12   not planning on dealing with the issue.  To the extent

13   parties have questions or issues, our colleagues from Weil

14   are here and we can talk to you about whether or not and

15   hopefully try and clear up some of the ancillary objections

16   to the sale.

17          THE COURT:  Okay.  What I would ask those who

18   think that they may still have a (indiscernible) objection

19   that was not addressed by Mr. Schrock, if you can speak to

20   one of the Weil Gotshal lawyers about that before we resume

21   tomorrow morning.

22          MR. SCHROCK:  Wednesday morning.

23          THE COURT:  I'm sorry, Wednesday morning.  We're

24   not going to get to most of these objections today, if any

25   of them.  I think we're just going to get through a partial

Page 30

1    -- portion of the Debtors' case.

2         MR. SCHROCK: Yeah, so we were intending just to

3    move straight into the evidence and then have legal argument

4    at the conclusion of the evidentiary hearing from here, Your

5    Honor.

6         THE COURT:  Okay.

7         MR. SCHROCK:  So with that, Your Honor, I'll turn

8    the podium over to my partner, Mr. Lender or Mr.

9    (indiscernible).  Have him take it from here.  Okay.

10        MR. QUERESHI:  Apologize, Your Honor.  Again for

11   the record, Abid Qureshi.  Our understanding was that before

12   we get to the evidence this morning, we would address issues

13   concerning the release and we are prepared to do that.  I'd

14   like to do that, whether before or after the Debtor, I

15   think.

16        THE COURT:  Well, I actually have questions on the

17   document --

18        MR. QUERESHI: Sure.

19        THE COURT:  -- as it pertains to the release, so

20   why don't I go through those and then we can see whether

21   there's --

22        MR. QUERESHI:  Yeah.

23        THE COURT:  -- in response to that, whether

24   there's anything more to discuss on that.

25        MR. SCHROCK:  And, Your Honor, I also had just a

Page 31

```
 1    couple updates on just where we are in relation to closing

 2    the supervised parties, which issues have been resolved.

 3    But yeah, let's go through the release.

 4              THE COURT:  Okay.  I -- this is really just on how

 5    the asset purchase agreement works, not on the merits of the

 6    release.  It's just on how the asset purchase agreement

 7    works.  So I confess I'm using the originally filed version

 8    because I don't think it's changed as to this language.

 9              MR. SCHROCK:  It has not.

10              THE COURT:  Okay.

11              MR. BASTA:  It has not, Your Honor.  There is some

12    language that is going back -- Your Honor, our view is that

13    the release --

14              THE COURT:  Can you state your name for the

15    record?

16              MR. BASTA:  Yes, Your Honor.  Paul Basta from

17    Paul, Weiss on behalf of the Subcommittee.

18              THE COURT:  Right.

19              MR. BASTA:  Where we are with ESL is that we think

20    the release language works.  There's this concept of

21    purchased assets which -- where they're purchasing

22    essentially causes of action --

23              THE COURT:  Well, there.  That's just where I --

24    let me cover that, then.

25              MR. BASTA:  Okay.
```

1          THE COURT:  If you look at the definitions here,

2   the term action includes any Claim -- upper case C, Claim --

3   and claims is also defined quite broadly, basically follows

4   the bankruptcy definition of a claim under 1015 and then

5   when you get to the purchased assets, it includes actions.

6          MR. BASTA:  Right.

7          THE COURT:  So there is a specific carveout for

8   avoidance actions --

9          MR. BASTA:  Right.

10          THE COURT:  -- but the claims that are not

11   released include more than avoidance actions.

12          MR. BASTA:  Right.

13          THE COURT:  So that really needs to be clarified.

14          MR. BASTA:  So, Your Honor, that is the topic of

15   language that's been going back and forth.

16          THE COURT:  I hope that's an optimistic sign, that

17   that's to be resolved.  All right.  All right.  I'm sorry.

18   There (indiscernible) people on the phone and someone

19   must've taken it off their mute button.

20          MR. BASTA:  Your Honor, there was language going

21   back and forth between the Subcommittee and ESL which is an

22   amendment to that language --

23          THE COURT:  Right.

24          MR. BASTA:  -- to make it clear that the concept

25   of purchased assets doesn't --

1           THE COURT:  Include any non-released claim.

2           MR. BASTA:  -- any non-released claims.

3           THE COURT:  Okay.

4           MR. BASTA:  And that language is going back.  It's

5    not quite finished yet --

6           THE COURT:  All right.

7           MR. BASTA:  -- but we are working on it and will

8    show it to the Committee.

9           THE COURT:  Okay.

10           MR. BASTA:  But we agreed with the Court that that

11    needs to be clarified.

12           THE COURT:  All right, well I'm glad that we're on

13    the same page on that.  Now, when you turn to the release

14    language which is in Section 9.13, I think I understand the

15    intent of this, but I am concerned about a couple of points

16    in Section 9.13 and how they relate to each other.

17           MR. BASTA:  Okay.

18           THE COURT:  There's a -- as I understand the

19    structure of this, there are certain claims that are

20    released, in essence tied to the right to credit bid, and in

21    addition certain claims of ESL are allowed in some cases

22    with a cap.  And then there's a carveout of everything else

23    and then there's for the avoidance of doubt language that

24    includes specific things that have been identified.

25           I guess the point I want to make sure of here is

Page 34

1    that it's clear that the allowance for credit bid purposes

2    and the allowance generally, even with the cap, will not

3    have any collateral estoppel or res judicata effect on the

4    other preserved causes of action.  Grounds for equitable

5    subordination, for example, can include breach of fiduciary

6    duty, so I just want to make sure that there's no back door

7    argument.

8              MR. BASTA:  That's certainly the intent, Your

9    Honor.

10             THE COURT:  Right.

11             MR. BASTA:  We will --

12             THE COURT:  And that's what I understood, but I

13   just want the document to be -- I think it should be made

14   clear on that point and those were my two points.

15             MR. BASTA:  Your Honor, you referred to a cap.

16             THE COURT:  Well, that's on the 507.

17             MR. BASTA:  On the 507(b) --

18             THE COURT:  Right.

19             MR. BASTA:  -- but we're not allowing 507(b)

20   claims.

21             THE COURT:  I understand.

22             MR. BASTA:  But if someone wants --

23             THE COURT:  But if it is allowed, it's capped.

24             MR. BASTA:  If it is allowed, it's capped.

25             THE COURT:  But the unsecured claims are allowed.

Page 35

1          MR. BASTA:  The unsecured claims --

2          THE COURT:  The deficiency claim.

3          MR. BASTA:  -- are allowed.  The deficiency claim

4    is allowed and the deal on that was it was because the

5    assets that are remaining in the estate is the litigation.

6    It was dealt through --

7          THE COURT:  Rights to recover from that mediation.

8          MR. BASTA:  -- rights to recover.  Right.

9          THE COURT:  I understand.  But one could

10   conceivably argue that that allowance might be -- have a

11   preclusive effect on the other --

12         MR. BASTA:  We will --

13         THE COURT:  -- the other cause of action that are

14   specifically preserved for the benefit of Sears' estate.

15         MR. BASTA:  We will get that clarified with ESL

16   during the course of the hearing.

17         THE COURT:  Okay.  All right.  So I don't know if

18   you had other document points to raise on that issue.

19         MR. QURESHI:  I do, Your Honor.

20         THE COURT:  Okay.

21         MR. QURESHI:  And if I could, we have just a

22   couple of pages where we've extracted some of the language

23   that we're concerned about.

24         THE COURT:  Okay.

25         MR. QURESHI:  And what I'd like to do is walk the

1  Court through that and I think this is quite simply a

2  situation where if we're reading the language wrong, ESL and

3  the Debtors can make that clarification on the record and

4  then we can get what we think would be necessary amends to

5  the APA to make it clear.

6          THE COURT:  Okay.

7          MR. QURESHI:  May I approach, Your Honor?

8          THE COURT:  Sure.  Thanks.

9          MR. QURESHI:  So, Your Honor, if I can jump ahead

10 a little bit here.  The language that is of concern to us

11 which is extracted on the first page here is the covenant

12 that precludes a challenge dispute or collateral attack on

13 the ESL plans.

14         THE COURT:  Right.

15         MR. QURESHI:  We're simply uncertain as to what

16 the intent of that provision is and exactly what it means,

17 and perhaps the best way to illustrate this, Your Honor, is

18 if the Court jumps ahead all the way to Page 7.

19         THE COURT:  Of your --

20         MR. QURESHI:  Of the demonstrative.

21         THE COURT:  -- exhibit here?

22         MR. QURESHI:  Right.  And what we've included on

23 Page 7 are the counts in the proposed complaint that we

24 attached to our standing motion.  And our understanding of

25 which of those claims have been released as against ESL,

Page 37

1    because our standing motion and complaint is just claims

2    against ESL and which have been preserved, and I think

3    principally where the area of dispute is concerns two.  If

4    Your Honor sees there the 2016 to 2018 ESL contributions, so

5    that's the defined term we use in the complaint.

6            Those are primarily real estate loans that are in

7    Count 6 and 7 of the complaint, our read of -- we are

8    uncertain whether the way this release functions the

9    Committee, the estate, would still be able to sue ESL and/or

10   its principals on account of those loans which we have

11   alleged to be either constructive or actual fraudulent

12   conveyances or whether that claim would be precluded based

13   on the collateral attack language that is included in the

14   release.

15           THE COURT:  See?  I mean, this is the -- it's kind

16   of a (indiscernible) on my point.  I viewed the allowance

17   and release simply tied to letting -- one, letting ESL

18   credit bid, and two -- so the credit bid is never going to

19   be challenged.  You can't undo the transaction because that

20   happens.  And two, the allowance of ESL's deficiency claim.

21   But to me, all other rights are preserved.

22           MR. QUERESHI:  Right.  So, Your Honor --

23           THE COURT:  Is that the Debtors' understanding?

24           MR. QUERESHI:  Please.

25           THE COURT:  All of the claims.

Page 38

1                    MR. BASTA:  Yes, Your Honor.  We'd asked the

2       Committee to give us whatever comments they had --

3                    THE COURT:  Right.

4                    MR. BASTA:  -- to the release, so if they have

5       these questions which they would've told us before today --

6                    THE COURT:  Well, it's good to clear it up.  I

7       mean, I -- that's fine.

8                    MR. QUERESHI:  We actually did --

9                    MR. BASTA:  Yeah, well --

10                   MR. QUERESHI:  -- different answers.

11                   MR. BASTA:  Well, the answer is everything is

12      preserved.  Now --

13                   THE COURT:  Well, not everything, because --

14                   MR. BASTA:  Not everything.

15                   THE COURT:  -- the right to credit bid and there's

16      no right to reach back and say that that credit bid was --

17      should be undone because of equitable subordination or

18      recharacterization or whatever other reason.

19                   MR. BASTA:  If Your Honor looks at Page 7 of the

20      Committees' demonstrative --

21                   THE COURT:  Right.

22                   MR. BASTA:  And you go down and you say, equitable

23      subordination and recharacterization are released.

24                   THE COURT:  Right.

25                   MR. BASTA:  Then you get to the fraudulent

1    transfer.

2              THE COURT:  Right, all the other Xs.

3              MR. BASTA:  And you go to these other Xs.

4              THE COURT:  Right.

5              MR. BASTA:  And the right to credit bid cannot be

6    undone.

7              THE COURT:  Right.

8              MR. BASTA:  So you can see if the estate went to

9    ESL and said it was a fraudulent conveyance, if the remedy

10   that you were seeking --

11             THE COURT:  The credit bid itself was a fraudulent

12   conveyance?

13             MR. BASTA:  No, if the loan that was used --

14             THE COURT:  Right.

15             MR. BASTA:  -- to credit bid --

16             THE COURT:  Right.

17             MR. BASTA:  -- was a fraudulent conveyance, our

18   view is that claim is preserved, you just can't recover from

19   NewCo to unwind the transaction.

20             THE COURT:  Right.

21             MR. BASTA:  But your fraudulent conveyance claim -

22   -

23             THE COURT:  You can recover from ESL --

24             MR. BASTA:  -- on ESL is still preserved.

25             THE COURT:  That's how -- that's certainly how I

1    interpret it.

2            MR. BASTA:  That's the way --

3            THE COURT:  Mr. Bromley, is that the meaning here?

4            MR. BROMLEY:  Well, Your Honor, yes.

5            THE COURT:  Okay.

6            MR. BROMLEY:  But I have to say, we've just been

7    handed this and haven't had any --

8            THE COURT:  Right.

9            MR. BROMLEY:  -- conversations with the Committee

10   about this, so I don't know right now is the right time to

11   be doing --

12           THE COURT:  Well, I want you to -- I mean, I think

13   it's hand in glove with my two points which is that the

14   release is a release of the claims for purposes of credit

15   bidding and recovery in this case.

16           MR. BROMLEY:  That's correct.

17           THE COURT:  The claims of ESL.  However, while the

18   estate cannot challenge ESL's claims in this case or the

19   credit bid, the estate has affirmative claims, all are

20   preserved, in any other way against ESL.

21           MR. BROMLEY:  Yes.  I think we're complicating

22   these things a fair bit; right?  There are three effective

23   allegations that the Committee has made against ESL.  One

24   relates to the Land's End transaction.

25           THE COURT:  Well, but it's not transactions

Page 41

1   specific.

2           MR. BROMLEY:  No, but I think it's worthwhile to

3   understand the framework, Your Honor, because that informs

4   the actual language; right?  So -- and that's exactly what

5   appears to be on Page 7 of this which I've just been handed;

6   right?  There are three things that have been going on that

7   have been challenged.  One relates to Land's End; second

8   relates to Seritage; and the third relates to the funding

9   transactions that have taken place.  It's the funding

10  transactions which are related to this sale; right?  The

11  $2.6 billion that my client has lent to the Debtors.  That -

12  - the challenges to those transactions are the ones that are

13  being released.

14          THE COURT:  Well, not all of them, though.  Again,

15  if -- that's just as to the credit bid.  But if it was a

16  breach of fiduciary duty, for example, to have added into

17  the funding transaction even though the credit bid stands,

18  ESL could be liable for breach of fiduciary duty.  The

19  remedy is limited to a claim against ESL as opposed to

20  against the NewCo or ESL's claim in this bankruptcy case.

21          MR. BROMLEY:  Your Honor, you're correct that once

22  this sale takes place, assuming it does, and the credit

23  bidding is allowed and the claims are allowed, that the sole

24  recourse is against ESL --

25          THE COURT:  Right.

1          MR. BROMLEY:  -- with respect to any claims that

2     they may have; right?

3          THE COURT:  On those points.

4          MR. BROMLEY:  On those points --

5          THE COURT:  Right.

6          MR. BROMLEY:  -- as well as with respect to Land's

7     End and Seritage.

8          THE COURT:  Okay.

9          MR. BROMLEY:  It is not -- once NewCo take

10    possession of these assets, NewCo has these assets, once the

11    sale closes, there's no challenge with respect to NewCo or

12    anything that has taken place to facilitate the transaction

13    that we're talking about here.

14         THE COURT:  Okay.

15         MR. QUERESHI:  Your Honor, again for the record,

16    Abid Qureshi on behalf of the Committee.  I think it is

17    clear that there are no claims that can be brought against

18    reorganized Sears.

19         THE COURT:  Right.

20         MR. QUERESHI:  Where we struggle is with this

21    collateral attack --

22         THE COURT:  No, but I think -- that's why I just

23    want to get this on the record.

24         MR. QUERESHI:  Right.

25         THE COURT:  And similarly, I didn't want there to

1    be some sort of --

2            MR. QUERESHI:  Sure.

3            THE COURT:  -- collateral estoppel --

4            MR. QUERESHI:  Right.

5            THE COURT:  -- argument that because of the

6    release, these other claims somehow go by the board.

7            MR. QUERESHI:  And it's not just collateral

8    estoppel, Your Honor, or --

9            THE COURT:  It could be (indiscernible) agreement,

10   too.

11           MR. QUERESHI:  Right, or the ability to sue for

12   breach of fiduciary duty.  It's the ability to bring a claim

13   against ESL --

14           THE COURT:  Right.

15           MR. QUERESHI:  -- for a constructive or

16   intentionally fraudulent transfer.

17           THE COURT:  I agree.  I think we're all on the

18   same page.

19           MR. QUERESHI:  Okay.  So then we do think there is

20   some clarification to the language --

21           THE COURT:  I agree.

22           MR. QUERESHI:  -- necessary --

23           THE COURT:  Although, I think everyone knows now

24   how to clarify it.

25           MR. QUERESHI:  It should be clear, Your Honor.

1           THE COURT:  Okay.

2           MR. QUERESHI:  We will propose a markup, Your

3    Honor.  Thank you.

4           THE COURT:  Okay.  So you had something else?  I

5    mean, this doesn't stop at Page 7.  Is the rest --

6           MR. QUERESHI:  Your Honor --

7           THE COURT:  Was that the point?

8           MR. QUERESHI:  It's all really derivative of --

9           THE COURT:  Okay.

10           MR. QUERESHI:  -- that point.

11           THE COURT:  All right.

12           MR. QUERESHI:  It's the financing transactions and

13    even though they're being credit bid --

14           THE COURT:  Well, it doesn't -- I mean, its not

15    limited to that.

16           MR. QUERESHI:  It is not limited --

17           THE COURT:  I know that you and the Special

18    Committee have been working very hard for the last three

19    months but conceivably you find something else out there.

20           MR. QUERESHI:  That's absolutely right.

21           THE COURT:  Okay.

22           MR. QUERESHI:  Your Honor, one further issue and

23    it's not directly related to this and I supposed we can deal

24    with it at the end, but the sale order that has been filed

25    with the Court includes a new release which is for --

1          THE COURT:  No, I -- we'll go over the sale order

2     at the right time.  Okay.

3          MR. SCHROCK:  Your Honor, again, Ray Schrock, Weil

4     Gotshal, for the record.  While we were going through some

5     of these issues a couple of the parties that were read that

6     we, in fact, resolved the objection, let me know that we

7     weren't quite, in fact, resolved so I'll just state --

8          THE COURT:  Okay.

9          MR. SCHROCK:  -- for the record, everybody's

10    rights are reserved.  Come approach us over here and we'll

11    confirm in fact that if your issue has been resolved.  And

12    Your Honor, just -- you did ask that we just update you

13    briefly --

14         THE COURT:  That's (indiscernible) interrupt you.

15    So maybe the thing to do there is hopefully before tomorrow

16    --

17         MR. SCHROCK:  Yeah.

18         THE COURT:  -- just submit a revised agenda.

19         MR. SCHROCK:  We will.

20         THE COURT:  File it and give it to chambers that

21    will reflect what's left.

22         MR. SCHROCK:  We will do so, Your Honor.

23         THE COURT:  Okay.

24         MR. SCHROCK:  Your Honor, in terms of closing

25    condition, just to let you know how we're progressing to

Page 46

1    closing in terms of what's open and closed at least in the

2    view of the Debtors, just a few issues here.  On the KCD IP

3    license --

4              THE COURT:  Right.

5              MR. SCHROCK:  -- pursuant to the APA we're

6    required to deliver one of a number of alternatives and we

7    did want to note that on January 30th, 2019, the board of

8    managers of KCD did approve the exclusive license pursuant

9    to the sale transaction.

10             THE COURT:  Right.

11             MR. SCHROCK:  On inventory and accounts payable,

12   pursuant to Section 10.9 of the APA, we were required to

13   deliver an aggregate amount as of the closing day per

14   inventory value, the amounts due to the seller respect to

15   credit card accounts receivable and pharmacy receivables

16   being at least $1.657 billion.  We believe that as of

17   February 3rd, the Debtors' project as of the closing date,

18   the inventory balance will be approximately $1.597 million -

19   - or billion and that we believe there'll be approximately

20   $33 million of mitigating items such that in the aggregate

21   the Debtors will have a balance of 1707 -- $1.707 billion

22   for above the necessary, so we'll satisfy that condition.

23   So we've been tracking it daily and it's very tight

24   transaction, but we believe we'll satisfy it.

25             Similarly on the DIP financing, we are required to

Page 47

1    deliver and aggregate amount that's no greater than $850

2    million under the DIP and $350 million under the Junior DIP.

3    We believe that the DIP, ABL facility balance as of the

4    closing date, and that's this Friday, would be $940 million

5    and 350 but we believe there's essentially mitigating items

6    that we've identified related to -- that we'll be able to

7    bring the DIP balance down to below the 850 so we don't

8    forecast that being an issue for having the DIP balance.

9              And then finally, Your Honor, there was, I

10   believe, a revised business plan/budget that was filed by

11   ESL last evening and just in terms of full disclosure to the

12   Court, there was a footnote where ESL had raised that there

13   was $166 million of assumed liabilities that the Debtors'

14   view is yes, that's the deal, they're picking them up and

15   we're happy to walk through it if necessary and I think ESL

16   had said, listen, we're not sure that's the way the

17   agreement reads and so we've been talking about that issue.

18             Listen, we're happy to proceed to closing with the

19   agreement as drafted but if we don't resolve that we're

20   going to have to talk to Your Honor about that particular

21   issue.  It is $166 million issue, so ESL and the Debtors

22   wanted to make sure that you were aware of that, but we

23   think the agreement's very clear as drafted and there's

24   effects -- schedules of liabilities relating to these items,

25   but hopefully we can just resolve it, but to the extent we

Page 48

1   don't, when it comes to Thursday, we will be addressing that

2   item with you.

3           THE COURT:  Okay.

4           MR. SCHROCK:  With that, I'll turn the podium over

5   to my partner, Paul -- sure.

6           MR. QURESHI:  Again, for the record, Abid Qureshi

7   on behalf of the Committee.  With respect to this most

8   recent issue that Mr. Schrock identified, we were quite

9   surprised late last night to receive this liquidity update

10  and business plan update from ESL.  As we understand it,

11  Your Honor, if ESL is correct in its interpretation that it

12  is not taking this liability, that increases the

13  administrative insolvency hole by $166 million.

14          So respectfully, Your Honor, we think we're

15  entitled to know what the deal is before we prosecute this

16  objection to the sale.  But for Mr. Schrock to stand before

17  the Court and say we're fine working it out after the sale -

18  -

19          THE COURT:  Well, there's a signed contract.

20          MR. QURESHI:  Well --

21          MR. SCHROCK:  There is.  We're fine enforcing the

22  agreement as written, Your Honor, and we know the way the

23  agreement works.  We negotiated it.  We just signed it a

24  couple weeks ago and we're happy to live with it.  I think

25  that that's what we're here seeking approval for.  It's our

1    motion and we'd like to move forward.

2              THE COURT:  Okay.

3              MR. SCHROCK:  So with that, Your Honor, I'll turn

4    it over to Paul Genender.

5              MR. GENENDER:  Good morning, Your Honor. Paul

6    Genender, Weil, Gotshal, and Manges for the Debtors.  I'm

7    going to be brief in this regard.  We have -- if I can

8    approach, I have a schedule of the witnesses in order that

9    might be useful to the Court.

10             THE COURT:  Okay.

11             MR. GENENDER:  The best news, as Mr. Qureshi said,

12   is that the last witness, Mr. Kniffen, will not be presented

13   live.  That'll be done by deposition.  We anticipate having

14   the other witnesses appear live for cross examination.

15   Also, Your Honor, at this point I wanted to offer into the

16   record the declaration of Sunny Singh which proves up the

17   auction-related materials.  It's at ECF 2344.  For the

18   Court's information, would offer that into the record at

19   this point.  I don't anticipate there would be cross

20   examination of Mr. Singh on that regard.

21             THE COURT:  Okay.

22             MR. GENENDER:  Although, several might enjoy the

23   opportunity.

24             THE COURT:  Okay.  Well, that's Tab 45 in my

25   binder; right?

Page 50

 1                MR. GENENDER:  Yes.

 2                THE COURT:  And that attaches, as you said, a

 3      number of documents related to the auction itself.  Any

 4      objection to that -- the admission of the declaration and

 5      the exhibits thereto?

 6                MR. BROMLEY:  No objection, Your Honor.

 7                THE COURT:  Okay, so that's admitted as D-1.

 8           (Debtors' Exhibit D-1 Entered Into Evidence)

 9                MR. GENENDER:  And then, Your Honor, logistically,

10      the parties worked hard on exhibits and I think I see in

11      front of you joint -- you should have a joint exhibit list.

12      Those reflect exhibits that the parties have agreed would be

13      admitted, and then anything else would be taken up at that

14      time with the party objecting to the admission of an

15      exhibit.

16                THE COURT:  Okay.

17                MR. GENENDER:  With that, I'm going to turn the

18      podium over to my partner, Jared Friedmann, who's going to

19      call our first witness.

20                THE COURT:  Okay.

21                MR. GENENDER:  Thank you.

22                MR. FRIEDMANN:  Thank you, Your Honor.  Jared

23      Friedmann, Weil, Gotshal and Manges on behalf of the

24      Debtors.  Debtors call Brandon Aebersold, Lazard and

25      respectfully submit into the record his declaration which

Page 51

1    was filed as ECF 2335.  It should be Tab 40 in your binder.

2    Mr. Aebersold is in the courtroom today and available should

3    there be any cross examination required.

4              THE COURT:  Okay.  I've reviewed that declaration.

5    Does anyone want to cross examine Mr. Aebersold on his

6    declaration?

7              MR. SORKIN:  Yes, Your Honor.

8              THE COURT:  Okay, so if you could come up and sit

9    over here, please.  Just have a seat.  Could you raise your

10   right hand, please?  Do you swear or affirm to tell the

11   truth, the whole truth, and nothing but the truth, so help

12   you God?

13             MR. AEBERSOLD:  I do.

14             THE COURT:  And it's A-E-B-E-R-S-O-L-D?

15             MR. AEBERSOLD:  That's correct.

16             THE COURT:  Okay.  All right.  Before we get into

17   cross, Mr. Aebersold, I have your declaration here.  I

18   appreciate that it is quite recent, dated February 1st,

19   2019, but sitting here today, would this constitute your

20   direct testimony?

21             MR. AEBERSOLD:  Yes, indeed.

22             THE COURT:  Okay.  All right, so you can go ahead

23   on cross.

24             MR. SORKIN:  Thank you, Your Honor.  For the

25   record, Joseph Sorkin from Akin Gump on behalf of the

Page 52

1    Creditors' Committee.

2              CROSS EXAMINATION OF BRANDON AEBERSOLD

3    By MR. SORKIN:

4    Q    Good morning, Mr. Aebersold.

5    A    Good morning, Mr. Sorkin.

6              MR. SORKIN:  Your Honor, if I might, we have

7    prepared witness (indiscernible) for Mr. Aebersold so we

8    don't have to flip through the larger exhibit binders.

9              THE COURT:  Okay.

10             MR. SORKIN:  Can I approach, Your Honor?

11             THE COURT:  Yes.  Do you have one for him?  Okay.

12   Q    Mr. Aebersold, you were retained or Lazard was retained

13   by the Debtors as of October 11th, 2018 in connection with

14   this particular engagement; correct?

15   A    That's correct.

16   Q    And if you look at what is Tab 1 in the binder I just

17   handed you, that has been marked Joint Exhibit 146.

18   A    I see it.

19   Q    And Mr. Aebersold, is Joint Exhibit 146 Lazard's

20   engagement letter in this matter?

21   A    Yes it is, prior to the amendment.

22   Q    And that amendment was an amendment approved by the

23   Court in December or January of this year; that's correct?

24   A    That's correct.

25   Q    And pursuant to the engagement letter Mr. Aebersold,

Page 53

1    Lazard agreed to serve as the Debtors' investment banker to

2    provide general restructuring advice and advise in

3    connection with any restructuring, financing, and if

4    mutually agreed by the Debtors and Lazard, any sale

5    transaction; correct?

6    A    That's correct.

7    Q    And Lazard had not been asked to run the sales process

8    by the Restructuring Committee as of the date of the

9    engagement letter, October 11, 2018; is that correct?

10   A    That's correct.  I'm not actually sure the

11   restructuring committee had been formed by -- as of October

12   11th.  I don't believe so.

13   Q    Okay.  And Lazard had a role in negotiating the

14   economic terms of the consideration being provided by ESL in

15   their successful bid that is the subject of today's hearing;

16   correct?

17   A    That's correct.

18   Q    And why don't we start with the issue that was just

19   raised.

20          MR. SORKIN:  Your Honor, if we could mark as --

21   just for the record, Joint Exhibit 178.  Your Honor, Joint

22   Exhibit 178 is Bates marked ESLUCC-00006747 and this is the

23   liquidity forecast that Mr. Schrock referred to earlier and

24   we received late last night.  If I might approach the

25   witness and the Court, Your Honor?

Page 54

```
 1                    THE COURT:  Okay.

 2    Q    Mr. Aebersold, if you could take a minute to look at

 3    Exhibit 178 and tell me if you've seen this document before

 4    today?

 5    A    I have not.

 6    Q    Before you heard Mr. Schrock talk about the issue with

 7    respect to the $166 million in accounts payable liabilities,

 8    were you aware of that issue, or a dispute, or a potential

 9    dispute between ESL and the Debtors on that issue?

10    A    Generally, yes.

11    Q    And can you tell me what your understanding of that

12    dispute is?

13                    MR. GOLD:  Objection, Your Honor, to the extent

14    that it calls for privileged communications.

15                    THE COURT:  Okay.  If you can do that without

16    revealing privileged communications, you can answer that.

17    Otherwise, I'll sustain the objection.

18                    MR. AEBERSOLD:  I'm tangentially aware of it, as

19    it's been an issue discussed as it relates to conversations

20    related to the APA.  In our view, that is informed by the

21    view of counsel.

22                    THE COURT:  Okay.  So, you don't need to answer

23    that question, then.

24    Q    Mr. Aebersold, if you could look at the first -- excuse

25    me -- in the binder I handed you, it's actually prior to
```

Page 55

1    half -- there's a copy of your declaration.  Do you see

2    that?

3    A    I do.  Thank you.

4    Q    Can you turn to Paragraph 37, please?

5    A    Okay.

6    Q    Okay.  In Paragraph 37, he outline a number of items

7    that set forth the consideration that ESL has agreed to

8    commit as consideration in connection with the successful

9    bid before the Court, correct?

10   A    That's correct.

11   Q    And if you look at (iv), there are a number of

12   administrative liabilities that are being assumed.  Do you

13   see that?

14   A    Yes.

15   Q    And one of those is accounts payable.  Do you see that?

16   A    I do.

17   Q    And in terms of the accounts payable, pursuant to the

18   APA, ESL agreed to assume up to $166 million of accounts

19   payable, correct?

20   A    That's correct.

21   Q    And it's your understanding that those accounts payable

22   were with respect to items that had been ordered and

23   received by the Debtors post-petition and pre-close,

24   correct?

25   A    Could you repeat that for me?

Page 56

1    Q    Sure.  And let me ask it a little more broadly.  It's

2    your understanding that the $166 million in accounts payable

3    could be used to pay for up to $166 million of accounts

4    payable, whether goods or services, obtained by the Debtors

5    post-petition and pre-closing, correct?

6    A    I believe so, yes.

7    Q    There, in your mind, was not any limitation with

8    respect to when an item or a service was received, other

9    than in that time period, correct?

10   A    I don't believe so.

11   Q    Can you tell me what your understanding is?  Maybe

12   there was a negative in there that you and I talked past

13   each other.

14   A    Yeah.

15   Q    I think you might have agreed with me.

16   A    I think I do agree with you why I am -- I'm not trying

17   to be coy here.  The reason I'm delayed in terms of these

18   responses is as it relates to the asset purchase agreement

19   and that language, again, that would be privileged because

20   that's their view of the contract.

21             Sitting there when we were negotiating that

22   provision, the way you explained it is generally how I

23   interpreted it at the time.

24   Q    And just so we're clear today, as we discussed during

25   your deposition, I'm not asking for your interpretation of

Page 57

1    the APA.  I want to understand your businessperson's

2    understanding of the deal that was struck between ESL and

3    the Debtors.  Can we have that agreement?

4    A    Yes.

5    Q    Okay.  And if you look at what's now been marked as

6    Exhibit 178, can you flip to Slide 7?

7    A    Tab 7?

8    Q    No.  I'm sorry, Slide 7 on Exhibit 178.

9    A    Apologies.  Thank you.

10   Q    And I apologize for doing this.  I'm going to have to

11   get my glasses.  I'm going to direct you to Footnote 10, and

12   it foots to a change in A/P, accounts payable.  And if you

13   could look at Footnote 10 and tell me if you can read that?

14   A    I can read the footnote, but where is the footnote in

15   the table?

16   Q    If you look up under the budget overview, it is the

17   10th line down.

18   A    I see it.

19   Q    And Mr. Aebersold, can you read Footnote 10 into the

20   record, please?

21   A    "Debtors have asserted that the APA obligates buyer to

22   assume up to $166 million in accounts payable with respect

23   to, 1, inventory already included in the $1.553 billion of

24   inventory acquired a closing, and 2, expenses the Debtor has

25   incurred prior to closing.

Page 58

1              Buyer disputes this interpretation of the APA and

2    any obligations to assume accounts payable that relate to

3    any of the $1.553 billion of inventory acquired a closing,

4    or any such expenses incurred prior to closing.

5              The amount reflects accounts payable of $126.3

6    million in February of 2019, $31.4 million in March 2019,

7    and $8 million in April 2019, as well as a corresponding

8    receipt of merchandise inventory in respect thereof after

9    the closing date."

10             I was not prepared for an eye exam today and I may

11   have missed a few, but some small print there.

12   Q    And Mr. Aebersold, is your understanding of the

13   business agreement that the Debtors struck with ESL

14   consistent with what ESL indicates is the Debtors' assertion

15   in Footnote 10 in the first sentence?

16   A    Yeah, I think I agree with their assertion of what we

17   believe.

18   Q    And can you take a minute to look at Paragraph 37 in

19   your declaration?

20   A    Okay.

21   Q    It appears to me that the Debtors and ESL don't have a

22   meeting of the minds with respect to the accounts payable

23   consideration identified in Paragraph 37.  Are there any

24   other provisions in Paragraph 37 a thinking you think you

25   think you have a good day off that sitting here today you're

1  aware of the Debtors and ESL don't have a meeting of the

2  minds on?

3  A    I don't believe so.

4           THE COURT:  Well, I'm sorry.  What you mean by

5  meeting of the minds?  There's a contract?  So, you're

6  talking about positions that people have taken as to how to

7  interpret the contract?

8           MR. SORKIN:  Let me ask the question a little bit

9  differently, Your Honor.

10  Q    Mr. Aebersold, are you aware of any other disputes with

11  respect to what the agreement was with respect to any of the

12  other items of consideration in Paragraph 37?

13           MR. GOLD:  Objection again.  Clarity as to whether

14  or not the question about what the agreement was or the

15  agreement is, given that we have a signed contract at this

16  point?

17           THE COURT:  We're still at it, right, what the

18  agreement is?

19           MR. GOLD:  (indiscernible)

20           MR. SORKIN:  Not that I'm aware of.

21           THE COURT:  Okay.

22  Q    Okay.  Mr. Aebersold, let's actually stay on Paragraph

23  37 and walk through.  Item 1, you identify, is a cash

24  payment of $885 million.  Do you see that?

25  A    Yes.

Page 60

1   Q     That the $850 million in the ABL DIP that will be part

2   of the new ABL facility, correct?

3   A     Part of that, correct?

4   Q     The $35 million is the consideration for the credit bid

5   release, correct?

6   A     Yes, correct?

7   Q     You were not involved in the negotiations of the $35

8   million consideration for the credit bid release, correct?

9   A     I was not.

10  Q     And the next item, if we move to 2, we're now talking

11  about the credit bid that was part of that and quite a bit

12  of secured DIP facilities totaling $1.3 billion.  Do you see

13  that?

14  A     Yes, I do.

15  Q     In addition to the $1.3 billion credit bid, there is

16  also an additional hundreds of millions of dollars of ESL

17  claims that are allowed in connection with the agreement to

18  allow them to credit bid, correct?

19  A     Yeah, to formulate a credit bid.  Yes, that's the case.

20  Q     And your understanding, though, is the credit bid

21  amount is $1.3 billion.  In addition, there were claims

22  above and beyond $1.3 billion of ESLs that were allowed in

23  connection with the $35 million release, correct?

24  A     They have claims in excess of $1.3 billion.  Whether or

25  not they're allowed or how you characterize them, I can't be

Page 61

1   sure.

2   Q    And that was a negotiation that was handled by the

3   Restructuring Subcommittee, and not part of what you did,

4   correct?

5   A    Which piece of it?  The ability to credit bid or what

6   this amount is?

7   Q    The $35 million, the credit bid, the release, and then

8   the allowed claims associated with that.

9   A    I was confused because you asked me about the size of

10  the credit bid and the $1.3 billion, whether there were

11  claims in excess of that amount.  We did have a role in that

12  $1.3 billion credit bid.  And the negotiation on the $35

13  million with respect to being able to credit bid, we were

14  not a part of that.

15  Q    If you move forward to (iii), an assumption of secured

16  debt totaling $621 million, do you see that?

17  A    I do.

18  Q    And that is made up of the $271 million standalone LC

19  facility, correct?  Part of it?

20  A    Yes, part of it.

21  Q    And the other part is the $350 million Junior DIP,

22  correct?

23  A    That's correct.

24  Q    And is any part of that $621 million being credited?

25  A    I don't believe so.

Page 62

```
 1   Q     In connection with the agreement, the negotiations as

 2   to your business understanding, was there a release for

 3   Cyrus agreed to as part of those negotiations at the

 4   auction?

 5   A     I'm not aware.

 6   Q     You're not aware one way or the other, or you don't

 7   believe there was?

 8   A     I'm not aware one way or the other.

 9   Q     If we can look now at the assumption of administrative

10   liabilities in (iv)?  Do you see that?

11   A     Yes, I do.

12   Q     Okay.  The first category, severance obligations and

13   other employee claims, what are those?

14   A     I believe the company has severed employees post-

15   petition.  So, there are severance obligations that would be

16   administrated claims, that are a portion of that, as well as

17   other employee claims.

18   Q     Okay.  And ESL agreed to assume up to $43 million of

19   those liabilities, correct?

20   A     I don't have the number here in front of me, but it was

21   up to some amount.

22   Q     If it helps, you can flip in your binder to Tab 2,

23   which has been marked Joint Exhibit 35.  It is the material

24   terms of the successful bid.  Have you seen Joint Exhibit

25   35, Mr. Aebersold?
```

Page 63

1   A    Yes, I have

2   Q    And if you turn to Page 3 -- excuse me, Page 5, I

3   apologize -- in (ix), which is a carryover from the prior

4   page assumption of liabilities, do you see that the

5   severance reimbursement obligation shall not exceed $43

6   million in the aggregate?  Do you see that?

7   A    I do.

8   Q    Does that refresh your recollection that $43 million

9   was the amount agreed to?

10  A    Yes, it does.  Thank you.

11  Q    In terms of other employee claims, are you aware of

12  what's contained in other employee claims that the buyer is

13  assuming?

14  A    Not specifically.

15  Q    At the time of the auction, do you know what the

16  Debtors estimated the severance obligations and other

17  employee claims to be?

18  A    Sitting here today, no.  I know that we had provided --

19  we had a schedule of those amounts that we have discussed.

20  But I can't recall off the top of my head.

21  Q    If you could flip in your binder to Tab 8, which has

22  been marked Joint Exhibit 141?  Mr. Aebersold, can you take

23  a minute to look at Joint Exhibit 141 and tell me what that

24  is, please?

25  A    This is a presentation prepared by Lazard that was sent

Page 64

1    to the Restructuring Committee on the Wednesday evening,

2    which was January 16th, related to the ESL bid.

3    Q    And Mr. Aebersold, if you look at Slide 1 of Exhibit

4    141, on Slide 1, the administrative another priority claims

5    estimated by the Debtors at the time of the auction is shown

6    on the left side of the table, correct?

7    A    Correct.

8    Q    And underneath, there are other priority claims.  So,

9    it's administrative claims at the top, other claims that the

10   bottom.  Do you see that?

11   A    Yes.

12   Q    And then on the right side is additional value and

13   sources of value that are required.  Do you see that?

14   A    Yes.

15   Q    And at the time of the auction, a pro forma additional

16   value required in the gold box listed on Slide 1 was $62

17   million, correct?

18   A    Yes.

19   Q    Okay.  And if we go back to the severance obligations

20   that we were talking about, you'll see on the left-hand

21   side, there's a $20 million number, correct?

22   A    Correct.

23   Q    And then underneath it, employee claims is $8 million?

24   A    Yes.

25   Q    And you don't know how those numbers were determined at

1    the time of the auction, do you?

2    A    Well, let's back up a second here.  I think this

3    presentation and this template, we had become accustomed to

4    using with the Restructuring Committee as we were gauging

5    what's the shortfall for cash to close the transaction, as

6    well as this point of administrative solvency, both of which

7    were important.

8            The build upon administrative claims had been a

9    work in progress since the time of filing.  And so,

10   throughout the pendency of the case, there's constantly

11   updates in schedules being produced, again, that feed into

12   the company model, which we understood all those numbers

13   came together.

14           But to put this together in the 20 and the 8,

15   again, we asked for an updated number, looking at the

16   company's most recent number, understanding where those

17   numbers came from.  And that is what informed our view of

18   administrative claims on January 16th.

19           So, the numbers being generated by the company in

20   their current model, that's the most -- as of that time, the

21   best and most current estimate of what those numbers were.

22   Q    And Mr. Aebersold, I understand you're familiar with

23   documents that Lazard prepared in the course of its

24   engagement with Sears.  What I'm asking specifically is, the

25   $20 million and the $8 million, you don't know specifically

Page 66

1    how those numbers were determined, what the specific buildup

2    is, do you?

3    A    Sitting here today, I don't.  But I could assure you,

4    we have seen a schedule of that buildup and talked with the

5    company's management about how they're estimating that.

6    Q    Do you know what those claims are estimated at now?

7    A    I can't recall specifically.  I know it's a number

8    we've been tracking, but what the latest estimate is, I

9    don't remember.

10   Q    With respect to how those claims will get paid post-

11   close, you don't know what the mechanics are of that,

12   correct?

13   A    Are you asking whether ESL pays, or NewCo pays it

14   directly, or if the estate is to pay it directly?  Is that

15   the question?

16   Q    I'm asking you the mechanics of how those claims get

17   paid, whether the Debtors are responsible for first paying

18   the claims and then seeking a reimbursement from ESL, or

19   whether ESL is actually assuming those liabilities and there

20   is a direct claim from an employee as against ESL?

21   A    Understood.  Those specific mechanics, I'm not aware.

22   I can't speak to that.

23   Q    Okay.  And that's the case, isn't it, with respect to

24   all of the administrative claims that are being assumed in

25   (iv) Paragraph 35 in your declaration, correct?

Page 67

1    A    So, which tab was that?

2    Q    That's in the front, actually, before the tabs.

3    A    Tab 0?

4    Q    Tab 0.

5    A    That was Paragraph 37?

6    Q    Correct.

7    A    That's correct.

8    Q    Specifically with respect to the category employee

9    claims of $8 million on Slide 1, those employee claims don't

10   include any payroll obligations that the Debtors have to pay

11   at close, do they?

12   A    I'm not sure.

13   Q    And do you know -- if I'm looking at the same

14   information in your declaration, the severance obligations

15   and other employee claims, those don't include employee

16   payroll obligations that the Debtors will have to pay at

17   close, do they?

18   A    I don't believe so

19   Q    Do you know what the Debtors' estimated payroll

20   obligations are at close?

21   A    I do not

22   Q    Do you recall, having been involved in the

23   negotiations, whether there was an agreement as between ESL

24   and the Debtors as to who would pay any outstanding employee

25   payroll claims of the Debtors at close?

1          MR. GOLD:  Objection.  He's asking for an

2    agreement outside of the written transaction agreement.

3          MR. SORKIN:  I'm asking if he has any

4    understanding of any -- I'll rephrase the question.

5    Q    Are you aware of any negotiations at or before the

6    auction with respect to whether or not ESL or the Debtors

7    would be responsible for paying employee payroll claims at

8    close?

9    A    At any time?  I can't be sure.

10   Q    You don't recall the specific discussion about those

11   claims, do you?

12   A    I do not.  Not specifically.

13   Q    Similarly, do you recall any discussion with respect to

14   employee benefits that the Debtors might have that would

15   have accrued pre-close, but not be known until public close?

16   Are you familiar with any negotiations with respect to those

17   obligations?

18   A    I can remember discussions about those potential

19   claims.

20   Q    Okay.  Tell me what you recall about those discussions.

21   A    I can remember just in the discussion their assumption

22   of liabilities, post-petition employee claims, as you

23   stated, being a discussion topic in our estimate of it, and

24   a conversation generally around could there be additional

25   claims that would arise post-close.

1   Q     And --

2   A     That's the extent.  I mean, again, this is pretty high

3   level in terms of -- I can remember the discussion around

4   it.

5   Q     And what was your businessperson's understanding of

6   what the agreement was, if any, with respect to those

7   obligations?

8   A     Yeah, I can't recall specifically.

9   Q     So, would have to look to the APA to know what the

10  agreement ultimately was?

11  A     That's right.

12  Q     Okay.  Do you have any understanding of what the

13  estimate of those potential claims are?

14  A     I do not.

15  Q     With respect to 503(b)(9) claims that are listed --

16  again, we can stick on Slide 1 of Exhibit 141.  The

17  503(b)(9) claims, the agreement was that buyer, ESL, would

18  assume a maximum of $139 million in 503(b)(9) claims, right?

19  A     That's correct.

20  Q     And the Debtors' estimate of those 503(b)(9)

21  liabilities at the time of the auction was $173 million,

22  correct?

23  A     At this particular time of the auction, yes, that's

24  correct.

25  Q     With respect to specifically how that number was

Page 70

1   determined, the $173 million number, you don't know how that

2   was determined, correct, at the time of the auction?

3   A    No, that's not the case, because again, these were

4   updated numbers, were the best of what we, the company, knew

5   at that time.  But certainly, we had had involvement

6   throughout the course of the bankruptcy of trying to help

7   estimate the 503(b)(9) claims.

8           And so, this particular day for 10:20 on January

9   16th, did I re-review a schedule?  No.  Unlikely that I

10  would have.  However, throughout the pendency of the case,

11  we certainly had reviewed schedules in terms of the buildup

12  of that number.

13  Q    Sitting here today, can you describe for me what is

14  included and what process has been employed to determine the

15  $173 million number by the Debtors?  In other words, has

16  there been a reconciliation with the potential 503(b)(9)

17  claims on the books and what's been filed on the docket,

18  would be one example?

19  A    if I were to describe the process, that would not have

20  been the process by which we at this point in time and

21  throughout the pendency of the case were tracking 503(b)(9)

22  claims.  But again, it was a pretty robust exercise on

23  account of members of the management team and M3 to go back

24  and look at prepetition payables to have as best estimate as

25  we could.  And we updated that number during the auction on

1    more than one occasion.

2    Q    And you're aware that no bar date has been set by which

3    these claims must be asserted against the Debtors, correct?

4    A    I don't believe so.

5    Q    Right.  And so additional 503(b)(9) claims may be

6    asserted in the future, correct?

7    A    Hypothetically, yeah.

8    Q    You're also aware, as part of the negotiations, that

9    ESL negotiated an extended period of time after close, where

10   they could pay 503(b)(9) claims, correct?

11   A    I remember a discussion around timing with respect to

12   the mechanics of that, yes.

13   Q    And what was your businessperson's understanding of the

14   agreement that was reached between the Debtors and ESL with

15   respect to timing of payment for 503(b)(9) claims?

16   A    If I remember correctly, the formulation was some date

17   certain in the future or the timing of a confirmation of a

18   plan of reorganization.  I believe it was the earlier of the

19   two dates, if I'm not mistaken.

20   Q    Do you know what that --

21   A    I can't be sure about that.

22   Q    Do you know what that date -- the amount of time for

23   that date future was?

24   A    I can recall specifically.

25   Q    With respect to accounts payable, were accounts payable

Page 72

1    included in the agreements between the Debtors and ESL to

2    have some extended amount of time for ESL to pay those

3    claims?

4              THE COURT:  Is this in the contract?  I don't see

5    why we're asking this.  And the contract speaks for itself.

6    Q    Mr. Aebersold, with respect to the property taxes that

7    are identified on Slide 1 -- and I may have asked this

8    earlier, I apologize -- but you don't have an understanding

9    of at what point in time or the mechanism by which those

10   property tax obligations will become due and payable by ESL,

11   do you?

12   A    The mechanics, no.

13   Q    With respect to the items identified in Paragraph 37

14   and (iv), you indicate that that's up to $482 million in

15   assumed administrative liabilities, correct?

16   A    Sorry, that was at Tab 0?

17   Q    Correct.

18   A    Yes, correct.

19   Q    Do you have any understanding, sitting here today, as

20   to what the actual amount of those liabilities that will be

21   assumed is, based on the current estimates of the Debtors,

22   assuming a February 8th close?

23   A    No.

24   Q    Any amount less than that would be an amount that is

25   not taken over, that is not paid as consideration by ESL,

Page 73

1   correct?

2          MR. GOLD:  Object to form.  Again, it goes to how

3   that is dealt with under the APA, which is all written in

4   the agreement --

5          THE COURT:  Well, it's a totality.  It says, up

6   to.  Obviously, if there's less, there's less.

7   Q   We can move on to the next sentence.  You identified

8   certain items that the successful bid provides the

9   additional benefits to the Debtors.  Do you see that?

10  A   Yes.

11  Q   The first one is including offers of employment to tens

12  of thousands of employees, correct?

13  A   Correct.

14  Q   What was your understanding of a businessperson's

15  agreement with respect to the obligation that ESL would take

16  on with respect to those tens of thousands of employees?

17         MR. GOLD:  Objection, Your Honor.  It's the same

18  line of questioning.  We're asking this witness to recount

19  his recollection of what the APB provides or doesn't

20  provide, all of which is before the Court already.

21         THE COURT:  Sustained.

22         MR. SORKIN:  Your Honor, if I might be heard, as

23  we've seen already this morning, there are a number of

24  provisions that appear to be clearly set forth in the APA,

25  and ESL --

1              THE COURT:  He's already testified that he's not

2      aware of any other disputes.  So, you spent 20 minutes going

3      over stuff that is unnecessary.

4      Q    Are you aware that ESL is planning to cut jobs in 2019?

5      A    No.

6      Q    Are you aware that ESL is planning to sell stores in

7      2019?

8      A    I do know that they plan to sell some stores.

9      Q    Do you know what -- have you been told by ESL or anyone

10     else what the plan is with respect to the employees of the

11     stores they intend to sell?

12     A    No.

13     Q    Do you know how many employees will lose their jobs

14     over the course of 2019 as a result of the plans that ESL

15     has?

16             MR. GOLD:  Objection, Your Honor.  Asked and

17     answered.

18             THE COURT:  Sustained.

19     Q    Let's go to (ii), assuming an additional $1 billion of

20     protection agreement liabilities related to consumer

21     warranties sold by Sears Home Services.  Do you see that?

22     A    Yes, I do.

23     Q    Can you tell me how the $1 billion in liabilities is

24     calculated?

25     A    Sets the face amounts of liabilities that are currently

1     held up at Sears Re, and the genesis of those is in Sears

2     stores, Sears sales protection agreements on appliances it

3     is selling.

4          So, you can imagine, there's a family buys a

5     dishwasher, they're buying a protection agreement where

6     Sears is obligated to service and repair that.  The

7     liabilities are at an non-debtor entity, Sears Re, but it

8     certainly relates to the Sears company.

9          The face amount is $1 billion; however, we

10    estimate the net present value of the cost to service those

11    liabilities closer to $430 million.

12    Q    So, you're not representing in your declaration or to

13    the Court that there's actually $1 billion in liabilities

14    and actual liabilities that ESL will be responsible for

15    going forward.

16    A    Well, let me pick that apart, if I may.  It is $1

17    billion of liability.  However, we think to service those

18    liabilities, it would cost less than $1 billion.  But also

19    note that specifically why it's broken out into the "in

20    addition" sentence, because if they're assuming liabilities

21    and the company would no -- if the company ceased to exist,

22    we wouldn't be paying $1 billion because those claims are

23    worth a billion -- worth less than $1 billion.  I'm sorry.

24    Q    Just to be clear so that I understand it.  The $1

25    billion is the notional value, in other words, the amount

1    that has been paid by customers to purchase those protection

2    agreements, correct?

3    A    It is the notional amount, correct?

4    Q    Okay.  And the amount on the books of the Debtors with

5    respect to what it would cost to actually service those

6    liabilities is roughly somewhere in the neighborhood of $430

7    million, correct?

8    A    That's correct.

9    Q    And the actual experience, the actual claims

10   experience, in terms of historically what it costs, you

11   don't know what that historical claims experience of actual

12   costs is, do you?

13   A    That's not correct.  That's actually what the 430 from

14   which it is derived.  That's how we estimated what the net

15   present value of actually servicing that liability is.

16   Q    The next category, cure costs.  Your understanding is

17   that ESL has agreed to assume the cure costs for all leases

18   for which they assume, correct?

19   A    That's correct.

20   Q    And the estimate by the Debtors at the time of the

21   auction was that that would be $200 million?

22   A    If I may flip back to the other exhibit?  Flipping back

23   to Joint Exhibit 141, we have a $200 million estimate in

24   here for that number.  That's correct.

25   Q    Okay.  Do you know how many properties are included in

Page 77

1    that $200 million estimate?

2    A    I do not.

3    Q    Do you know what the breakdown is as between the

4    encumbered and the unencumbered properties in connection

5    with that $200 million asset?

6    A    I do not.  But I think the salient point here is this

7    estimate, which was our best estimate at the time, the key

8    from our perspective in analyzing this is that would be an

9    obligation of NewCo.

10            So, whether it's $198 million or $120 million, for

11   that matter, the key from our perspective in analyzing this,

12   because this is the page to say, will we be able to close

13   and can we maintain administrative solvency?

14            I think the key takeaway here is that's a

15   liability that's being assumed by NewCo.

16   Q    Understood, Mr. Aebersold.  My question was just do you

17   know how that's broken down as between encumbered and

18   unencumbered real estate?

19   A    I do not, sitting here today.

20   Q    Sitting here today, do you know whether ESL has assumed

21   any leases with respect to the 425 go forward stores?

22   A    Are they assuming?

23   Q    Have they assumed?

24            THE COURT:  Obviously not.  I haven't approved it.

25   Q    Are you aware of a list of the stores that ESL intends

1    to assume going forward?

2    A    And not spea -- well, I have to be careful here because

3    there is the notion that they can assign a lease for this

4    period for up to 60 days post-closing.  I have not seen a

5    list of what they attend to assume or assign.  But for the

6    most part, we've reviewed a number of schedules in terms of

7    the assets that are included in their bid, and that includes

8    leases.

9    Q    Okay.  And your understanding of the designation rights

10   is that ESL has up to 60 days post-close to designate or

11   assign or tell the Debtors to whom to assign any particular

12   lease in the 425 stores, correct?

13            MR. GOLD:  Objection, Your Honor.  Again, we're

14   getting into asking this witness to recount what's in the

15   APA, which is before the Court.

16            THE COURT:  (indiscernible)

17            MR. SORKIN:  There is, Your Honor.

18   Q    With respect to the benefit in a decision to assign a

19   particular lease to a third party, who receive the benefit

20   of any increase in received rent as a result of that

21   assignment?

22   A    I would assume NewCo.

23   Q    And during the course of the negotiations, did you have

24   an understanding as to why NewCo wanted the ability to have

25   the 60 days to assign the lease?

1   A    Not specifically.  They never articulated, here's why

2   we want this and here is our precise plan.  It was a

3   negotiated point and they asked for it.  We did ask for some

4   sharing of any value that was derived from those assets.  We

5   were unable to get that.

6   Q    And your understanding was that they wanted that

7   additional time to market those leases, correct?

8   A    Actually, no.  I don't know if they're planning to

9   market.

10  Q    With respect to the consideration identified in

11  Paragraph 37, at any point have you Seen a Document that

12  sets forth the specific consideration being provided by ESL

13  in connection with the proposed sale and the assets being

14  acquired, or proposed to be acquired, by ESL?

15  A    Have I seen a document?

16  Q    Yes.

17  A    The bid summary that you directed me to earlier, as

18  well as the asset purchase agreement.

19  Q    Understood.  And what I'm asking more specifically --

20  and I apologize if I wasn't clear -- is you haven't seen an

21  allocation of value associated with the consideration being

22  paid and the specific assets being acquired, have you?

23  A    I have not seen an allocation of their bid.

24  Q    In terms of going back very quickly to Tab 1, which was

25  the engagement letter, if you look at -- the easiest number

Page 80

1    is at the top, Page 29 of 58 -- and you'll see 1(k)

2    description of services.

3    A    Okay.

4    Q    There's a discussion about Lazard's agreements

5    (indiscernible) in connection with the sales process.  Do

6    you see that?

7    A    I do.

8    Q    And you began -- Lazard began marketing assets in mid-

9    October in connection with Exhibit 146, correct?

10   A    Yeah.  And the reason being we were raising -- as early

11   as October 10th, and maybe even days before, we were seeking

12   debtor-in-possession financing.

13            The structure with the Senior DIP and the Junior

14   DIP is one that we had come up with.  And obviously, the

15   Junior DIP was being raised for what was prepetition

16   unencumbered collateral.  And so, there was a tremendous

17   undertaking to market those assets initially in order to try

18   to raise that $350 million.

19   Q    And understood.  My question was simply that began in

20   mid-October, correct?

21   A    That's correct.  Well, at least Lazard's role in doing

22   so, yes, mid-October.

23   Q    In connection with a provision in the APA -- and again,

24   I'm not asking you about the APA; I'm asking you about a

25   specific provision in your business understanding -- you're

1    aware, aren't you, that in connection with the negotiations

2    there was an agreement with respect to the ABL Dip and the

3    Junior Dip that the full $1.2 billion would be drawn at the

4    time of close, and if not, there were consequences one way

5    or the other, either over or under, correct?

6    A    Sure.

7    Q    With respect to -- in the situation where the amount

8    drawn on the ABL DIP and the Junior DIP was under $1.2

9    billion, your understanding is that ESL would receive a

10   reduction in the amount of liabilities assumed, correct?

11   A    That's correct.  They were in offset.  If the amount

12   drawn under the DIPS were less than the stated amount, there

13   was a mechanism to offset liabilities that they were

14   assuming.  That's correct.

15   Q    And with respect to your understanding, the reduction

16   in the amount drawn is actually, in your eyes, a situation

17   where the Debtors had succeeded in managing costs and drawn

18   down less on the DIP, correct?  On the Junior DIP and the

19   ABL DIP?

20        MR. GOLD:  Object to form and vagueness.  I'm not

21   sure what's asked about in his eyes versus someone else's

22   eyes, or -- you know, if you have an agreement, really Your

23   Honor's eyes are the only ones ultimately will matter in

24   terms of interpreting it.  So, I don't understand where this

25   question is going, and I object to the vagueness.

Page 82

1              THE COURT:  Did you understand the question?

2              MR. AEBERSOLD:  I generally do.

3     A    We were working extremely hard to manage that DIP

4     balance to meet our condition precedent to closing.  I think

5     the company's done an extraordinary job.  Sitting here

6     today, we feel pretty good we're going to hit it.

7              To the extent that we do achieve that and beat it

8     by however many million, it's a high-class problem, if you

9     will.  The net benefit of doing so would accrue to ESL.

10    Q    And you would view that as over performance on the

11    projections with respect to the Debtors, correct?

12    A    I would say overachieving what we need to deliver,

13    sure.

14    Q    And your understanding, though, is as a business

15    understanding, that the offset would simply be a reduction

16    in liabilities, not both a reduction in liabilities and a

17    reduction in purchase price, correct?

18    A    That's correct.

19    Q    Mr. Aebersold, you haven't seen any analysis, or you

20    can't recall any analysis showing how any additional costs

21    that would result in the event of a delay to closing beyond

22    February 8th would be funded, is that correct?

23    A    Not entirely.  And, again, we went through this line of

24    questions in my deposition.  We -- in the exhibit that I was

25    shown in my deposition, there was analysis in terms of if

1    there was a delay to close, how much would be outstanding

2    under both DIP facilities.

3          And we looked at liquidity projections in the past

4    -- so that you have an understanding of what it would mean

5    for this company to delay closing.  I haven't seen a

6    specific analysis that says here's what this one week in

7    aggregate's going to cost to a decimal point.  But I think a

8    few of the variables we do understand.  And I have a view.

9    Q    Mr. Aebersold, you mentioned the deposition that

10   occurred last Thursday.  And I'm looking now at Page 128 of

11   that deposition, Line 21.  And I'll simply ask you, did I

12   ask this question and did you give this answer?

13         Question:  Are you aware of any analysis performed

14   by any of the Debtors or any of their professionals with

15   respect to how any additional cost that would result from a

16   delay in closing would be funded?

17         Answer:  I can't recall any.

18         Did I ask that question and did you give that

19   answer?

20   A    Yes, you did and I did give that answer.  But that's

21   with respect to --

22   Q    Thank you, Mr. Aebersold.  No further questions.

23         THE COURT: Does anyone else have questions for

24   this witness?

25         MR. GOLD:  Thank you, Your Honor.  I'm Ivan Gold

Page 84

1    of Allen Matkins and I represent a number of the Debtor's

2    landlords, and I have a very brief set of clarifying

3    questions regarding Mr. Aebersold's testimony.

4              In the interest of time, obviously we'll be

5    working with the Debtors on a number of these issues but

6    rather than do everybody out of order, this is my

7    opportunity, so if I may?  Thank you.

8              DIRECT EXAMINATION OF BRANDON AEBERSOLD

9    BY MR. GOLD:

10   Q    Mr. Aebersold, I guess good afternoon.

11   A    Good afternoon.

12   Q    I want to ask you a question about the

13   interrelationship of a couple of the cost estimates that

14   were used in your valuation.  The first is the 200 million

15   cure cost estimate the committee counsel asked you about.

16   Do you know who calculated that estimate?

17   A    I'm not trying to be clever here, but you said our

18   valuation of that number?

19   Q    Well, that's a component of the valuation, is what ESL

20   was taking and what ESL is not assuming, correct?

21   A    Not necessarily.  We have not done a valuation here.

22   Q    Okay.

23   A    So, I apologize because the word valuation to an

24   investment banker has a totally different meaning.

25   Q    Okay.  That's fine.

Page 85

1          THE COURT:  In other words, your declaration

2     doesn't put a number on the cure cost?  (indiscernible)

3          MR. AEBERSOLD:  That's correct.

4     Q    Okay, so what is your -- that estimate, the 200

5     million?  Where did that come from?

6     A    That came from the company's management.  An analysis

7     by in three -- which Lazard had reviewed.  Again, it is a

8     preliminary estimate.

9     Q    Okay.  As part of your review, do you have any

10    awareness of whether that includes just prepetition amounts

11    with the definition of cure cost?  Or does it include any

12    amounts that were not paid post-petition?

13    A    I'm not sure.

14    Q    Okay.  And what is the relationship between the $200

15    million in cure cost and the 135 million which you also

16    asked about for real property taxes?

17    A    I'm not sure.

18    Q    Do you have an understanding of whether cures can

19    include real property taxes?

20    A    Theoretically, I guess they could.

21    Q    Well, are you aware under the Debtor's triple-net

22    operating leases they're responsible either directly on a

23    monthly basis or on a semiannual or annual basis, depending

24    on the state, for the payment of property taxes on the

25    properties that they lease?

Page 86

1   A    That could be the case.

2   Q    And if those are unpaid, that would be part of the cure

3   that would be necessary to assume those leases?

4   A    Okay, I don't think I'm the right person to ask about

5   this.

6   Q    Okay.  Well, you don't have an understanding of how --

7   whether the 135 and the 200, to a certain extent, amount to

8   double counting?

9   A    I'm not sure if there's an overlap between the two.

10  Q    Okay.  Now, with respect to these two numbers, do you

11  understand that these are caps on the (indiscernible)

12  liability?  In other words, if the 200 million for cure cost

13  turns out to be 230, whose problem is that?

14          THE COURT: (indiscernible)

15          MR. GOLD:  Actually, Your Honor, 2.5 of the APA.

16  I'm not sure it does.

17          THE COURT:  (indiscernible)

18          MR. GOLD:  I understand.  I'm just...

19  Q    Was that part of the negotiation, that these are caps

20  or are these just estimates?

21  A    I can't recall specifically.  If you want to direct me

22  -- the numbers, are you referring to the Lazard analysis

23  that I was --

24  Q    Yes.  (indiscernible) was 41.

25  A    Is that Tab 7?

Page 87

1    Q    These are just your two numbers that you were asked

2    about on initial cross by the committee.  So, a 200 million

3    cure cost estimate and 135 real estate estimates.  141, I'm

4    sorry.  Tab 7.  Tab 8.

5    A    I can't recall if this were a cap or not.  As I noted

6    on cure cost, that was still a developing number.  And then

7    the property taxes, I'm looking at the footnote -- property

8    tax is -- property taxes estimate is preliminary subject to

9    further review.  I don't believe that number's a cap.  I

10   think that if they're assuming the underlying property, that

11   they're paying the property taxes.  But, again, I'd need to

12   refer to the APA.

13   Q    Okay.  And, again, you have no knowledge, even looking

14   at the footnotes, of how the property taxes might be

15   included in cure or not?  That they could overlap?

16           MR. CICERO:  Objection, Your Honor.  Asked and

17   answered.

18           THE COURT:  (indiscernible)

19   A    I don't know.  They could overlap.

20           MR. GOLD:  That's all I have, Your Honor.  Thank

21   you.

22           MR. CICERO:  For the record, Your Honor, Gerard

23   Cicero from Brown Rudnick, on behalf of Primark USA Corp.

24   I'll be very quick.  Just a few questions.

25           DIRECT EXAMINATION OF BRANDON AEBERSOLD

Page 88

1    BY MR. CICERO:

2    Q    I believe that you testified that you -- in negotiating

3    the APA, you had seen schedules of what go-forward stores

4    are going to be acquired or could be acquired, assumed, or

5    assigned by ESL?

6    A    Yes.

7    Q    And do you know about how many stores are part of that

8    go-forward package?

9    A    Well, in terms of the -- as the deal moved, they

10   assumed more properties, so the list of what's remaining

11   with the estate is actually pretty short in the successful

12   bid.

13   Q    And are you aware of whether Sears -- in part of that

14   group of go-forward stores that may be taken on by ESL, are

15   you aware of whether Sears owns any of those stores in fee

16   or whether it leases all of those stores from landlords?

17   A    They do own certain of those fee simple.

18   Q    Okay.  And so as part of this sale transaction, those

19   fee simple stores will be acquired by ESL as part of this --

20   the global transaction?

21   A    My understanding is if not all the overwhelming

22   majority will be acquired.

23   Q    And are you aware of whether Sears -- any of those

24   stores that Sears owns in fee, whether they lease those

25   stores to any tenants?

Page 89

1   A     The question is for its stores that they own fee

2   simple, whether they're the landlord in certain of those?

3   Q     Yes.

4   A     I'm not sure about that.

5            MR. CICERO:  Thank you, Your Honor.

6            THE COURT:  Redirect?

7            MR. GOLD?:  Yes, Your Honor.  Redirect -- just a

8   couple points of clarification.

9            REDIRECT EXAMINATION OF BRANDON AEBERSOLD

10  BY MR. GOLD?:

11  Q     First, Mr. Aebersold, at the end of Mr. Sorkin's

12  examination, he asked you about a reported inconsistency

13  between what you testified to today and the answer you gave

14  at your deposition regarding the extent to which you were

15  aware of any analysis performed by any of the Debtors or any

16  of their professionals with respect to how any additional

17  costs would result from a delay in closing would be funded.

18  Can you elaborate?  I know you were trying to explain the

19  difference in the questions and your answers.  Can you

20  please do so?

21  A     Well, yeah, in my deposition the question was do you

22  have any sense of what it would cost if there were a delay?

23  And at the time, I had a document in front of me that

24  actually showed one of the main inputs is what would be

25  outstanding on the DIP balance if we were to go past the

1    closing date, and so I referenced that.

2         The follow-up question was how is the estate going

3    to fund that amount?  And, from my perspective, we've got a

4    wind-down reserve, we have a number of assets -- when we're

5    looking at administrative solvency and ability to close the

6    transaction, there are a number of buckets.  But I haven't

7    seen the matching of -- if there's excess in the wind-down

8    reserve, how much that would be, and if it would go to fund

9    these amounts.

10        And we're also talking about an environment --

11   it's no surprise.  We actually, at this point in time, have

12   showed a shortfall in that amount.  And that's been a huge

13   issue here.  We've been trying to bridge that.  And so, I

14   think the question in my deposition was specifically around

15   how are you going to fund those?  Not necessarily what is it

16   going to cost?

17   Q    Thank you.  One other point I wanted to clarify.  You

18   may have misspoken.  You testified that liability under

19   protection agreements is with Sears Re, and were you

20   referring to Sears Re as the customer-facing insured?  Or do

21   you mean it then as a reinsure?

22   A    As the reinsure.

23   Q    Okay, thank you.

24        MR. GOLD?:  Nothing further, Your Honor.  Thank

25   you.

1          THE COURT:  (indiscernible)

2          MR. SERKIN:  Your Honor, nothing further on that.

3    Just a housekeeping matter.  I don't believe that with

4    respect to the joint exhibits, we were moving them in

5    wholesale.  So I was going to move in certain of those

6    exhibits.

7          THE COURT:  They're all in.

8          MR. SERKIN:  They're all in.  Okay.

9          THE COURT:  (indiscernible)

10          MR. SERKIN:  Thank you, Your Honor.

11          MR. GENENDER:  Your Honor, Paul Genender, for the

12    Debtors.  We would at this time call William Transier.  His

13    declaration is before Your Honor.  It's ECF2336.  I'm sorry,

14    that's not correct.  It's ECF2341 and it is in Tab 42, Your

15    Honor.

16          THE COURT:  Does anyone want to cross-examine Mr.

17    Transier?

18          MR. AUERSHI:  Your Honor, again, for the record,

19    Abid Qureshi of Akin Gump.  My partner Lacy Lawrence will be

20    handling the cross-examination, Your Honor.  She's from our

21    Dallas office.  We do have a pro hac vice application that's

22    been filed with the Court.  Thank you.

23          CLERK:  Would you raise your right hand, please?

24    Do you swear or affirm to tell the truth, the whole truth,

25    and nothing but the truth, so help you God?

Page 92

1          MR. TRANSIER:  I do.

2          THE COURT:  It's T-R-A-N-S-I-E-R?

3          MR. TRANSIER:  Yes, sir.

4          THE COURT:  So, Mr. Transier, I have your

5     declaration, which is dated...

6          MR. TRANSIER:  February 1st?

7          THE COURT:  February 1st.  Sitting here today,

8     does that constitute your direct testimony?

9          MR. TRANSIER:  Yes.

10         THE COURT:  Do you want to change that?

11         MR. TRANSIER:  No.

12         THE COURT:  (indiscernible)

13         MS. LAWRENCE:  Thanks, Your Honor.

14         CROSS-EXAMINATION OF WILLIAM TRANSIER

15    BY MS. LAWRENCE:

16    A    Good afternoon, Mr. Transier.

17    Q    Good afternoon.

18    A    As a reminder, I'm Lacy Lawrence from Akin Gump, here

19    on behalf of the Unsecured Creditors Committee.  We met at

20    your deposition, is that right?

21    Q    That's correct.

22         MS. LAWRENCE:  Now, Your Honor, as with Mr.

23    Aebersold, we've got witness notebooks for this witness as

24    well.  May I approach?

25         THE COURT:  (indiscernible)

1    Q    Mr. Transier, you currently serve as an independent

2    director on the Sears Holdings board of directors, is that

3    correct?

4    A    Yes.

5    Q    Now, you joined the board on October 11, 2018, is that

6    correct?

7    A    Yes.

8    Q    So that's just a few days before the Debtors filed

9    these Chapter 11 cases, is that right?

10   A    That's correct.

11   Q    Now, before being appointed to the board, you met with

12   Mr. Tish as part of your selection, is that correct?

13   A    That's correct.  Mr. Tish was the chairman of the

14   Nominating & Governance Committee, and I interviewed with

15   him to -- prior to being selected to come on the board.

16   Q    You anticipated my next question.  Now, you understand

17   that Mr. Tish is a minority equity holder in the buyer, is

18   that correct?

19   A    I understand that, yes.

20   Q    Now, Mr. Transier, you were brought on the board for

21   the express purpose of serving as an independent director on

22   the Restructuring Committee and the Restructuring

23   Subcommittee, is that correct?

24   A    Yes.

25   Q    Now, the Restructuring Committee's purpose is a few --

Page 94

1    has a few purposes.  One was general oversight of the

2    restructuring process, is that correct?

3    A    That was one item.

4    Q    And also to review any of the restructuring

5    transactions in that process, correct?

6    A    Yes.

7    Q    As well as overseeing the negotiations of any

8    restructuring deals, is that right?

9    A    That is correct.

10   Q    And also -- you're also a member of the Restructuring

11   Subcommittee, is that correct?

12   A    Yes.

13   Q    Now, the subcommittee has an additional purpose, and

14   that's to investigate and prosecute estate causes of action,

15   is that correct?

16   A    That was one item.

17   Q    Now, those causes of action that you're investigating,

18   the subcommittee is investigating, included estate causes of

19   action against ESL and its affiliates, is that correct?

20   A    Yes.

21   Q    Now, as part of your role, you were also set to approve

22   or disapprove of the credit bid transaction with ESL, is

23   that right?

24   A    That's correct.

25   Q    And the credit bid fell within the scope of the

1   Restructuring Committee because it involved ESL financings

2   that had been approved by other board members previously, is

3   that right?

4   A    Could you ask that question again so I'm clear exactly

5   what you're trying to get at?

6   Q    Right.  So one of the functions of the Restructuring

7   Committee has been to approve, or assess, or disapprove of

8   the credit bid with ESL, is that correct?

9   A    Yes.

10  Q    Okay.  And the reason that credit bid fell to the

11  Restructuring Committee was because it involved financings

12  that other board members had been involved in, is that

13  correct?

14  A    No, I believe that that was the responsibility of the

15  subcommittee.

16  Q    Correct.  The -- if I --

17  A    You said committee.

18  Q    I apologize.  So that's the responsibility --

19  A    It's the subcommittee's responsibility.

20  Q    Okay.  I'm sure I misspoke.  So, the credit bid issue

21  is the subcommittee responsibility, correct?

22  A    That's correct.

23  Q    And that's because it involves ESL financings that were

24  approved by other board members, is that right?

25  A    That was part of the reason, yes.

Page 96

1   Q    Okay.  Now, part of your job on the Restructuring

2   Committee was to oversee the marketing of the Debtor's

3   assets in connection with the sale process, is that right?

4   A    Yes.

5   Q    And you understood that the company was planning to

6   pursue bids for both going concern transactions as well as

7   the possibility of selling some of the Debtor's assets

8   separately, is that correct?

9   A    Yes.

10  Q    Now, you viewed the marketing of the Debtor's assets

11  separately as putting the cart before the horse, is that

12  correct?

13  A    No, I don't believe I said that.

14  Q    Okay.  Now, do you recall in your deposition describing

15  it as "cart before the horse?"

16  A    If I did, I'd like to look at my deposition and see --

17  but ask your question, please.

18  Q    Okay, well, let me get at it this way.  Selling the

19  assets separately was a little premature given that they

20  could be part of the going concern bid, is that correct?

21  A    I think in my deposition, when asked that question, the

22  question regarded around the valuations that were there.

23  And I was commenting as a side comment that in trying to

24  sell some of these assets while we were trying to do a going

25  concern bid, you might not get a complete view of what the

Page 97

1    market clearing prices were on those.

2              But, in fact, the Restructuring Committee had

3    oversight over the Lazard process that include not only the

4    going concern business but several components of the

5    business along the way.  And, in fact, we dealt with several

6    of those independently during the course of our

7    Restructuring Committee activities.

8    Q    Speaking specifically to real estate, do you agree with

9    me that it's important to market real estate assets if you

10   want to achieve the highest value for those assets, correct?

11   A    If you're assuming that you're going to sell all of

12   those individual pieces of real estate, yes, they should be

13   market.

14   Q    And your opinion is that the marketing process for

15   Sears real estate would take years, is that correct?

16   A    I think I said in my deposition that the market

17   conditions today have an oversupply of big box real estate -

18   - my term -- and that it could be difficult to sell these

19   individual assets, and it might take an extended period of

20   time.

21   Q    Now, without going through a marketing process, you

22   would not expect to get the highest value you possibly could

23   for those real estate assets, is that correct?

24   A    I think that a marketing process is necessary to be

25   able to market the real estate assets.  The way you asked

1    the question is different than the way I think about it.  We

2    were going -- the Restructuring Committee was overseeing a

3    simultaneous process that included not only Lazard but a

4    real estate consulting expert that was capturing indications

5    of interest for some of these real estate properties as we

6    were doing the work on the going concern bit.

7    Q    And so it's important to market the real estate assets

8    because that's the way you achieve the highest value you can

9    for selling those assets, correct?

10             MR. GENENDER:  Objection.  Asked and answered,

11   Your Honor.

12             THE COURT:  What do you mean by...?  It sounds

13   like a tautology to me.  I mean, there's got to be something

14   more specific than that if you're going to ask it again.

15             MS. LAWRENCE:  Fair enough.  But let me shift a

16   little.

17   Q    You do not have a lot of confidence in the JLL

18   indicative bids that were received for the real estate

19   assets, is that correct?

20   A    I think we had been advised by JLL and the rest of our

21   advisors in the Restructuring Committee meetings that we

22   had, that those indications of interest -- and there was a

23   number of them and we saw a log of all those activities --

24   that we shouldn't take a lot of confidence in those because

25   of the nature in which we were in in trying to look at

Page 99

1    restructuring transactions for Sears in total.

2    Q    And you would agree with me that, as a businessperson

3    sitting on the Restructuring Committee, it would be

4    difficult to go out and market real estate assets if

5    somebody on the other side was thinking that those assets

6    were going to be part of a going concern?

7    A    No, I think when asked this question in my deposition,

8    I said exactly the opposite.  I said, if we were in a wind-

9    down or a liquidation mode, I thought it would be very

10   difficult to get market clearing prices.  In fact, I think

11   just the opposite would be true in a going concern.  If you

12   had those assets, there would be a higher level of

13   confidence in and around those assets and you should expect

14   something better.  But I answered that question in respect

15   to a liquidation or a wind-down.

16   Q    I want to shift to the ESL bid that was submitted on

17   December 28th.  Do you recall that, that bid?

18   A    I do.

19   Q    Now, the short version of it is that the Restructuring

20   Committee decided not to qualify that bid.  Do you recall

21   that?

22   A    I do.

23   Q    And one of the issues with the December 28, 2018 bid

24   that you had identified was that ESL had still not complied

25   with the global bidding procedures requirement to allocate

Page 100

1    its bid, is that correct?

2    A    That's correct.

3    Q    Now, following the Restructuring Committee's decision

4    not to qualify ESL's December 28th bid, there was a chambers

5    conference, do you recall that?

6    A    I do.

7    Q    Okay, and that was held on January 4th, is that right?

8    A    I think that is correct.

9    Q    Now, your understanding from the chambers conference

10   was that the judge instructed the parties to keep working on

11   the deal, is that correct?

12   A    That was the feedback that we received from the

13   advisors at our Restructuring Committee meeting.

14   Q    And, in fact, your understanding was that the judge had

15   given the parties marching orders to go on and keep working

16   on the deal, is that correct?

17   A    I think that's the terms I used in my deposition, yes.

18   Q    Okay.  It was also reported to you that if the

19   Restructuring Committee found a way to solve this, the Court

20   would push back on the UCC pretty firmly.  Do you recall

21   that?

22            MR. GENENDER:  I object.  Hearsay and relevance.

23            THE COURT:  I don't see where it's going.

24            MS. LAWRENCE:  Your Honor, the perception this

25   witness has of what the Court would expect or what the Court

Page 101

1    would want to see the parties accomplish influences the

2    deliberations and the negotiation of the Restructuring

3    Committee.

4            MR. GENENDER:  Your Honor, I'd also like to

5    (indiscernible) to the extent they're seeking privileged

6    information (indiscernible) privileged.  That's the source

7    (indiscernible)...

8            MS. LAWRENCE:  So, Your Honor, this witness has

9    testified previously about what he was told by his advisor

10   regarding the chambers conference.  It appears in his

11   deposition, it also appears in board minutes.  So I think

12   the privileged claim here is a little late.

13           THE COURT:  Okay.  And it's not really hearsay; it

14   was just your understanding, right?  It's not for the truth

15   of what was said.  This is what you understood?

16           MR. TRANSIER:  Yes, Your Honor.

17           THE COURT:  Okay, you can answer that question.

18   A    It was my understanding that on the basis of the

19   chambers conference and the responses that came back from

20   the advisors who were there in attendance at those chambers

21   conferences, that they encouraged us to keep negotiating

22   with ESL to try to get the highest and/or best offer for the

23   estate.  I think that was common sense in terms of what we

24   were trying to do on the Restructuring Committee, and I

25   think it was good guidance for all of us involved in this

Page 102

1   case to keep working hard to see what the ultimate limits

2   were of any deal that might be accomplished.

3   Q    And so you understood that the Court would want to find

4   a way to save jobs, is that correct?

5   A    Say that question to me again?

6   Q    Yeah.  You understood that the Court would want to find

7   a way to save jobs, is that correct?

8   A    I think the Restructuring Committee had a strong desire

9   to try to save the business and jobs along the way, and it

10  was motivated by conversations that occurred, to my

11  understanding, in the judge's chambers that came back to us

12  as the Restructuring Committee.

13  Q    Now, I want to shift our attention to the auction.  The

14  many long nights and days you had.  That started on January

15  14th.  Does that sound about right?

16  A    It does.

17  Q    Now, you understood walking in to the auction on

18  January 14, 2019 that the focus of the auction was

19  negotiations with ESL on its going concern bid, is that

20  correct?

21  A    We had indications that the only party that would be in

22  the auction process talking about a going concern bid would

23  be ESL.

24  Q    Okay, so there were no other going concern bids,

25  correct?

Page 103

1    A     That's correct.

2    Q     And the sum-of-the-parts bidders were not the priority

3    for the auction, is that correct?

4    A     I wouldn't say that they weren't a priority.  I believe

5    that we went to the auction knowing that we were going to

6    end up primarily dealing with ESL.

7    Q     Now, in terms of attendance at the auction, you do not

8    know whether any parties seeking entry into the auction were

9    turned away, do you?

10   A     I don't know.

11   Q     Okay.  Now, January 14th, to give you a little date and

12   time -- January 14th, the Restructuring Committee made a

13   proposal and called it its proposed final ask.  Do you

14   recall that?

15   A     I do.

16   Q     Okay.  And the morning of January 15th, ESL rejected

17   that proposal.  Do you recall that?

18   A     I remember that.

19   Q     Now, after ESL rejected the Restructuring Committee's

20   final ask, there was another chambers conference with the

21   Court, do you recall that?

22   A     Yes.

23   Q     Now, at that time, the Debtors were prepared to close

24   the auction, correct?

25   A     I can't say directly but we didn't close the auction.

Page 104

1    We did not.

2    Q    Okay.  But following ESL's rejection of the

3    Restructuring Committee's proposed final ask, you understand

4    that the Debtors were prepared to close the auction subject

5    to the chambers conference.  Do you recall that?

6    Q    What I remember the Weil attorneys telling us, the

7    Restructuring Committee, was that they went to have the

8    chambers conference with the judge and they were going to

9    inform him that we couldn't get to a going concern bid.  And

10   I took that as they were giving a heads up of where we were

11   in the auction process and that the likely scenario would be

12   that we would close the auction thereafter.

13   Q    Now, from that chambers conference, your advisors

14   reported that the parties were given very strong

15   encouragement by the judge to make a last attempt to get to

16   the finish line that night.  Do you recall that?

17   A    Well, those are your words.  My words are that what I

18   remember being feedback to us was that upon notification to

19   the judge in regards to where we were in the negotiations

20   with ESL -- the term I remember was from I think it was Mr.

21   Schrock that represents the company, was that the judge felt

22   like we were close and we should take one more kind of round

23   of discussions with ESL to see if we could close the gap.

24   Q    Now, Mr. Transier, you said those were my words.  I

25   want to be very clear.  They were not my words.  Will you

Page 105

1    turn to Tab 6 in the notebook in front of you?

2    A    Tab 6?

3    Q    And I'll direct your attention to Joint Exhibit 149.

4    And you see in Joint Exhibit 149 you should have a set of

5    January 16, 2019 Minutes of the Meeting of the Restructuring

6    Committee of the Board of Directors of Sears Holding

7    Corporation.  Do you see that?

8    A    Yes.

9    Q    Now, under Committee Members Present it lists you as

10   being present in person.  Do you see that?

11   A    That was I was present, yes.

12   Q    Okay.  Now, if you look toward the bottom of that first

13   page of Joint Exhibit 149, you see a paragraph that beings

14   with "Mr. Schrock reported that..." Do you see that?

15   A    Yes.

16   Q    And it says, "Mr. Schrock reported that during the

17   chambers conference earlier that day, ESL through their

18   counsel and the committee..." -- that refers to the

19   Restructuring Committee through its counsel -- "were given

20   very strong encouragement by the judge to make a last

21   attempt to get to the finish line that night with

22   documentation to be completed, if necessary, the following

23   day." Do you see that?

24   A    I do.

25   Q    And you don't have any reason to disagree with that, do

Page 106

1    you?

2    A    No.  This is the minutes from the meeting.

3    Q    Now, moving forward a little bit later in time, late in

4    the evening of January 15th and early in the morning of

5    January 16th, ESL made what it described to be its final

6    proposal.  Do you recall that?

7    A    Generally, yes.

8    Q    Okay.

9    A    The days ran together.

10   Q    No, I'm --

11   A    And I was there the entire time.

12   Q    I'm sure.  Now, the Restructuring Committee ultimately

13   voted to accept that proposal, correct?  The ESL final

14   proposal on January 15th?

15   A    I don't recall if exactly ESL's proposal was the one

16   that was accepted or there was other negotiations that

17   occurred, but ultimately we came to a deal with ESL.

18   Q    Okay, fair enough.  Now, in your direct testimony, your

19   declaration, you noted that the January 15th bid from ESL --

20   so the one that was accepted -- included substantial

21   improvements from the initial ESL bid.  Do you recall that

22   testimony?

23   A    I do.

24   Q    Now, I want to walk through just a couple of those

25   improvements.  One that you mention in your direct testimony

Page 107

1    is this:  That ESL took on more liabilities to substantially

2    narrow the gap on the administration solvency risk.  Do you

3    recall that?

4    A    I do.

5    Q    Now you say "narrow the gap" and I want to understand

6    what you meant by that.  Throughout the Restructuring

7    Committee's deliberations, there had been discussion and a

8    consideration of administrative solvency, is that correct?

9    A    Yes.

10   Q    Now, despite this importance that the committee had

11   placed on administrative solvency, the ESL bid did not close

12   that gap, correct?

13   A    It didn't close the gap completely, no.

14   Q    Correct.  And even -- in fact, even at the time you

15   voted to accept the ESL bid, your advisors had told you that

16   there was a $62 million administrative claim shortfall, is

17   that correct?

18   A    Based upon the calculation that they put in front of

19   us, yes, there was a $62 million shortfall.

20   Q    Okay.  But you viewed that 62 million to be within the

21   realm of reasonableness, is that correct?

22   A    Yes.  And it was based upon conversations during our

23   Restructuring Committee meeting with all of the advisors,

24   both the advisors for the company as well as the advisors

25   for the subcommittee.  And I think I specifically asked to

Page 108

```
 1    those folks, including our chief restructuring officer, you

 2    know, what they felt like...

 3           This is a huge corporation with billions of

 4    dollars flowing through it.  I used to run a company, so I

 5    know that there are lots of things that you can manage in

 6    the process.  The question was have we identified the big

 7    items, and has it been narrowed down to a number?

 8           That 62 million at one point was several hundred

 9    million dollars, and the chief restructuring officer as well

10    as the representative from Lazard who spoke earlier, as well

11    as the chief financial officer all felt like this was a

12    reasonable number to be able to try to manage on behalf of

13    the estate going forward.

14           So on the basis of everybody understanding what we

15    had in terms of this amount, we all felt like that we had

16    worked the number to a point that was reasonable to accept.

17           And I'd just add one other thing, including

18    we've had about 60 Restructuring Committee meetings since I

19    joined this company.  We had another one last night and got

20    an update just last night from the chief restructuring

21    officer, and that number has come down now.  The best

22    estimate is 35 million.  That number will obviously vary

23    because there's just a lot of moving parts as we've talked

24    about here today.

25    Q    Now with that 62 million shortfall that you were told
```

Page 109

```
 1    about in connection or at the end of the auction, you were

 2    also told by your advisors that there might be amounts due

 3    in connection with the KCD royalties.  Do you recall that?

 4    A    I do.

 5    Q    And that amount totaled approximately 112 million; is

 6    that correct?

 7    A    We had a footnote on that schedule, as I recall, that

 8    -- that had 112 million.  I think that was considered to be

 9    the max or the -- the -- the biggest potential exposure on

10    that.  But we had seen numbers in the course of the time

11    frame that we had been looking at this issue from 30 million

12    on the low side to 112.

13         If I recall, what was given to us as advice during the

14    course of that was that it was something that the attorneys

15    felt like that they could manage their way through.

16    Q    Now another one of the material changes in your view

17    was ESL's agreement to let the Debtors keep the $6 million

18    ship deposit.  Do you recall that?

19    A    I don't remember saying that that was a significant

20    item.  It was $6 million, though.

21    Q    Okay.  Now you understand that Service.com is

22    challenging the Debtor's ability to keep that deposit,

23    correct?

24    A    I've been told that, yes.

25    Q    Okay.  And you understand that they are challenging it
```

Page 110

1   based at least in part on ESL's conduct; is that correct?

2   A    I don't know though for a fact.

3   Q    Okay.  And that $6 million that could be used to close

4   the gap, you understand that the Debtors may never see a

5   penny of it; is that correct?

6   A    I can't -- I can't speak to that.  I think we have the

7   deposits, so it's a question of whether we have to give it

8   back.

9   Q    Now we mentioned this earlier, but allocation of the

10  big has come up.  And you understand that the bidding

11  procedures approved by the Court require allocation,

12  correct?

13  A    I recall that the original bidding procedures approved

14  by the Court had a provision in there to provide for

15  allocation, and I viewed that as the opportunity to

16  understand for components of the bid that you could compare

17  that to along the way.

18  Q    Now I believe that you've acknowledged that you haven't

19  focused on the allocation issues.  Instead, your focus was

20  on the total bid amount; is that correct?

21  A    Yeah, the totality of the bid.

22  Q    So at least as of your deposition, you had not seen an

23  allocation for the ESL bid, correct?

24  A    That's correct.

25  Q    And sitting here today you have not seen anything

Page 111

1    showing how each piece of ESL's credit bid was allocated to

2    specific assets that ESL was purchasing; is that correct?

3    A    I had not.

4    Q    Now, when ESL made what it described as its final

5    proposal, the Restructuring Committee had a board meeting,

6    correct, or had a meeting?

7    A    Yes.

8    Q    And, in fact, that's what we just looked at, the

9    minutes for that meeting were Joint Exhibit 149.  Now during

10   that meeting, the Restructuring Committee advisors were

11   there; is that right?

12   A    Yes, they were.

13   Q    And Mr., excuse me for messing this one up, but Mr.

14   Meghji was there; is that correct?

15   A    Yes,

16   Q    And he's --

17   A    -- our chief restructuring officer.

18   Q    -- the CRO, correct?  Now he noted at that meeting that

19   administrative solvency could not be assured with the ESL

20   final bid; is that correct?

21   A    Is that what it says in the minutes?  If you'll point

22   me to it.

23            THE COURT:  Let's assume they said that.  Why

24   don't you go to your next question?

25            MS. LAWRENCE:  Okay.

Page 112

1  BY MS. LAWRENCE:

2  Q    And you also understand that Mr. Aebersold from Lazard

3  was there, correct?

4  A    Yes.

5  Q    Now he indicated that there was a risk that there would

6  not be enough cash to close the transaction in order to

7  become administratively solvent, correct?

8  A    He -- I remember him saying that, but he also went on

9  to say that he thought it was not an unreasonable risk to

10  take this on in this -- in this circumstance.

11  Q    And then let me direct you on Joint Exhibit 149, the

12  second page.  If you look at the paragraph in the middle of

13  that page that begins "Mr. Aebersold."  Do you see that?

14  A    Yes.

15  Q    And the last sentence of that paragraph says, "Mr.

16  Aebersold expressed disappointment, however, with the ESL

17  final bid."  Do you see that?

18  A    I see that.

19  Q    Okay.  Now before accepting the revised ESL bid, you

20  agree with me that the Restructuring Committee did not

21  consult with the UCC board before accepting that bid?

22  A    Say that question one more time.  I don't think I agree

23  with you, but say it again.

24  Q    Sure.  Before accepting that final bid from ESL, so the

25  Restructuring Committee gets the ask from ESL, deliberates,

Page 113

1    and accepts it, you agree with me that the Restructuring

2    Committee did not consult with the UCC at that time?

3    A    I -- I can't answer directly.  I -- I know that the UCC

4    and all of their advisors were in the hallways with us 'til

5    the wee hours of multiple mornings in a row.  I know that

6    there was lots of communications going on between the

7    attorneys and the UCC, but I -- you know, in terms of this

8    specific ask, I don't -- I think they were, but I -- I don't

9    know for sure.

10   Q    Okay.  Sitting here today, you do not know for sure

11   whether the UCC was consulted before the Restructuring

12   Committee accepted that final ask, correct?

13   A    The UCC and you and your colleagues were involved in

14   everything we did for -- from the very beginning of this

15   thing all the way to the conclusion.  So if you're asking

16   about that specific ask, I know we ended up going into the

17   auction room and everything was spelled out there, so I

18   don't -- I don't know for sure.

19   Q    I want to shift gears to the go-forward business plan

20   presented to you.  So in early January, you and others had a

21   call with Mr. Lampert to discuss the recent ESL bid; is that

22   correct?

23   A    We did.  We had a joint meeting between the

24   Restructuring Committee and ESL.

25   Q    Now that meeting was focused on the bid but also

Page 114

1    discussed the business plan for the go-forward business; is

2    that correct?

3    A    I believe I asked during the course of the meeting for

4    -- to Mr. Lampert directly for him to talk about what his

5    plans were for the go-forward business.

6    Q    So there was a high-level discussion at that meeting,

7    correct, or during that call, correct?

8    A    There was.

9    Q    But you did not have a copy of the business plan from

10   ESL at that time; is that correct?

11   A    We did not.  I -- I actually asked for it during the

12   course of that conversation.

13   Q    Now the day before the auction started on the afternoon

14   of January 13th, the Restructuring Committee received a copy

15   of the go-forward business plan for the first time; is that

16   correct?

17   A    That's correct.

18   Q    Now this was the -- scratch that.  Between the time you

19   received the business plan and then accepted the ESL bid,

20   you did not have any diligence sessions with ESL to discuss

21   aspects of the business plan or the underlying assumptions

22   for that business plan, correct?

23   A    We -- we did not have any conversations with ESL, but I

24   would say that we reviewed it as members of the

25   Restructuring Committee.  And I had asked as one of the

Page 115

1    members of the Restructuring Committee for our advisors to

2    review that, including our chief restructuring officer.  It

3    was important because that presentation that was given to us

4    which was relayed to us during the conversation with Mr.

5    Lampert that night was this was a business plan presented to

6    a group of the potential lenders in the new code going

7    forward.  And to me, it was important to understand what had

8    been presented to them.  And then we had our advisors take a

9    look at it, as well as I did.

10   Q    Upon receiving that business plan letter before

11   accepting the ESL bid, you did not have the opportunity to

12   walk through that business plan with ESL; is that correct?

13   A    We did not.

14   Q    Now when you got this business plan the day before the

15   auction, you became aware of ESL's plan to close three

16   stores each month in 2019; is that correct??

17   A    I think that was disclosed in that business plan, yes.

18   Q    And you described that at your deposition as running

19   the business property; do you recall that?

20   A    I said that it didn't surprise me that -- that the

21   business plan would have an assumption in there that they

22   would close up to three stores a year going forward.  I

23   viewed that as their oversight of running the business on a

24   go-forward basis.

25   Q    Now you have no idea which stores are going to close,

1    correct?

2    A    I do not.

3    Q    And you have no idea how many employees that will

4    impact, correct?

5    A    I do not.

6    Q    And let me just clarify because I want to make sure I

7    heard it correctly.  It's three stores each month in 2019,

8    correct, not just three stores for the year?

9    A    I remember that the three stores, and we could get the

10    business plan out.  I can't remember exactly how

11    (indiscernible), but I remembered three stores.

12    Q    So sitting here today, you're unclear whether the

13    business plan required three stores --

14    A    Let's -- let's take a look at it right quick, and we

15    can tell you, okay?  I think you've got it someplace.

16    Q    I do, as a matter of fact.

17    A    But in either case, their ability to run the business

18    properly going forward, it should -- should be their

19    responsibility.

20    Q    But you have no idea which stores are going to close,

21    correct?

22    A    I do not.

23    Q    And you have no idea how many stores during 2019 are

24    going to close, correct?

25    A    During 2019, I do not.

Page 117

```
 1    Q     Okay.  And you have no idea how many employees that

 2    will impact; do you?

 3    A     I do not.

 4    Q     And you have no idea how many stores after 2019 would

 5    close, correct?

 6    A     I don't.

 7    Q     Now from this business plan, you also became aware of

 8    ESL's plan to sell 200 million of real estate each year for

 9    the next three years; do you recall that?

10    A     I remember that being in the business plan as -- as an

11    assumption.

12    Q     Okay.  Now that's -- if my math's right, 600 million

13    over three years, correct?

14    A     That's correct.

15    Q     Now you have no idea what that means in terms of

16    employee reductions, correct?

17    A     No.

18    Q     Or whether that $200 million number, that $200 million

19    per year number could be higher, correct?

20    A     It could be higher; it could be lower.

21    Q     Now you also understand from the ESL business plan that

22    there are planned head-count reductions, correct?

23    A     Ask that question one more time.

24    Q     Yeah.  You understand from the ESL business plan that

25    there are planned head-count reductions, correct?
```

1    A    Yes.

2    Q    But sitting here today, you don't know the magnitude of

3    those planned reductions; do you?

4    A    I do not.

5    Q    And you understand that the APA does not have a

6    guarantee of continued employment, correct?

7    A    It does not.

8    Q    Now as part of the subcommittee, one of the things you

9    were tasked with is investigating certain pre-petition

10    conduct; do you recall that?

11    A    Yes.

12    Q    Now that includes certain spinoff transactions,

13    correct?

14    A    Yes.

15    Q    Like the Lands' End transaction, right?

16    A    That's correct.

17    Q    As well as the rights offering involving Seritage,

18    correct?

19    A    Yes.

20    Q    Now in connection with both of those transactions,

21    Lands' End and Seritage, the subcommittee is investigating

22    certain acts by ESL, correct?

23    A    Yes.

24    Q    As well as certain acts by Mr. Lampert, correct?

25    A    Yes.

Page 119

```
 1    Q     Now when you joined the Restructuring Committee and

 2    subcommittee on October 11th, 2018, you had never met Mr.

 3    Lampert; is that correct?

 4    A     That's correct.

 5    Q     Now shortly after you joined the Board or maybe right

 6    at the same time that you joined the Board but right before

 7    the company filed for bankruptcy, you attended a board

 8    meeting where you heard Mr. Lampert speak, correct?

 9    A     Yes.

10    Q     And that was the board meeting ultimately where it was

11    decide that the company should file for bankruptcy, correct?

12    A     That's correct.

13    Q     Now flip in your notebook to what was marked as Joint

14    Exhibit 148.  So that would be Tab 5.

15          Are you there, Mr. Transier?

16    A     Yes.

17    Q     So Tab 5 of your notebook is Joint Exhibit 148, which

18    is an email exchange between you and Mr. Lampert; do you see

19    that?

20    A     I do.

21    Q     And the date of the email is October 15th, 2018; do you

22    see that?

23    A     Yes.

24    Q     And the subject line of the email was "Very impressed;"

25    do you see that?
```

Page 120

```
 1   A    I do.

 2   Q    Now the first line of the email says, "Just a note to

 3   say how impressed I was personally in the way you handled

 4   the board meeting last night."  Do you see that?

 5   A    Yes.

 6   Q    And then it goes on to say in the very last line, "All

 7   my best for a continued" -- or "all my best for success as

 8   you and Sears move through this next phase in their 125-year

 9   history.  With your leadership, I am optimistic that there

10   are good things to come."  Do you see that?

11   A    I do.

12   Q    Now you sent this email to Mr. Lampert after the board

13   meeting authorizing the Chapter 11 filing, correct?

14   A    Yes.

15   Q    Now you testified that you felt compelled to send it

16   because of your own personal experience with deciding to

17   file Chapter 11, correct?

18   A    That's correct.  I was -- I was compassionate for the

19   gentleman that was part of the decision process to get

20   there.  And I think I explained at my deposition to you that

21   I had in a prior life been the CEO of an international oil

22   and gas company that I put the original capital into and

23   then ultimately because of a natural disaster and some other

24   things, the company was -- had to go into Chapter 11.  I

25   know how painful that is as a CEO.
```

Page 121

```
 1            And I thought that -- that evening I was actually in

 2    Italy, so it was early in the morning that I was listening

 3    in on this -- this call and I thought the way that it was

 4    handled by Mr. Lampert was -- and there was one other thing

 5    that happened during the course of that meeting was that he

 6    stepped down as CEO and they created the office of the CEO.

 7    A very tough thing to do no matter who you are and when lots

 8    of employees that you've been associated with for a long

 9    period of time.

10            Obviously, I was new to the board and to me, this

11    was just a matter of a cheering-up comment from one former

12    CEO to a current -- to a newly former CEO, Mr. Lampert.

13    Q    And based on this email marked as Joint Exhibit 148,

14    you believed that Mr. Lampert acted with integrity, correct?

15    A    I do.  During the --

16    Q    And grace?

17    A    -- course of that meeting, yes.

18    Q    And grace, correct?

19    A    Yes.

20    Q    Now this is the same Mr. Lampert that the subcommittee

21    at that time and currently is investigating, correct?

22    A    That's correct.

23    Q    But the purpose of your email was to give Mr. Lampert

24    some positive feedback, correct?

25    A    It was.
```

Page 122

1   Q    Because, as you put it, sometimes as a CEO, you don't

2   get much positive feedback; is that correct??

3   A    That's correct.

4           MS. LAWRENCE:  I'll pass the witness, Your Honor.

5           THE COURT:  Okay.

6           MR. PERDEW:  Your Honor, my name is Russell

7   Perdew.  I'm here on behalf of the Pension and Benefit

8   Guaranty Corporation.  We filed a motion for my pro hac vice

9   admission.  Obviously, it was just last week.  You've not

10  had a chance to read it yet.  May I proceed?

11          THE COURT:  Actually I think I've read all the pro

12  hacs through Friday, so.

13          MR. PERDEW:  Very good.

14          THE COURT:  But you can go ahead.

15          MR. PERDEW:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17  BY MR. PERDEW:

18  Q    Mr. Transier, you were asked some questions about the

19  KCD $112 million line item.  Do you remember that?

20  A    I do.

21  Q    And is that in addition to the $62 million

22  administrative shortfall that you mentioned earlier?

23  A    It could be, yes.

24  Q    Okay.  Right.  I understand there was -- the 112 was a

25  range.  And you said that the $62 million you felt was

Page 123

1    reasonable and manageable given the size of the company; is

2    that right?

3    A    That's correct.

4    Q    If you added the 112 million to it, would that number

5    still be something that was manageable and reasonable in

6    your opinion?

7    A    I would say yes because of the feedback that we got

8    from the advisors during our Restructuring Committee meeting

9    that I don't sit here today and quite understand all the

10   legal issues involved with that royalty payment and stuff,

11   but the attorneys felt like that there was a way in which to

12   negotiate a settlement and handle that.

13        So it was considered that evening, but it was an

14   unknown there that evening when we made our decision.

15   Q    And you had said before the attorneys told you that

16   that KCD claim was manageable; is that right?

17   A    I think I just said that, yes.

18   Q    And was that the Weil Gotshal firm?

19   A    I think they were one of the advisors that said that,

20   but all the advisors were in the room with us that -- that

21   --

22   Q    Okay.

23   A    -- that night.

24   Q    And did the Weil Gotshal attorneys say how they plan to

25   manage the KCD claim?

Page 124

1    A    They did not.

2              UNIDENTIFIED SPEAKER:  (Indiscernible), Your

3    Honor.

4              MR. PERDEW:  Your Honor, ten years ago I would

5    have been quick enough to get up.  I'm not as young as I

6    used to be.

7              THE COURT:  So it's moot?

8              MR. PERDEW:  Yeah.  Thank you.  Nothing further,

9    Your Honor.

10             THE COURT:  Okay.  I don't know how long this is

11   going to be, but I only have about ten more minutes.  Okay.

12             MR. GOLDSTEIN:  I'll do it.

13             THE COURT:  Okay.

14             MR. GOLDSTEIN:  Good afternoon, Your Honor.

15   Michael Goldstein, Goodwin Procter, attorney for Urban Edge.

16   We -- Urban Edge, our landlord owned four properties.  Your

17   Honor, I have questions for the witness with respect to one

18   of the paragraphs in his declaration.

19             THE COURT:  Okay.

20             MR. GOLDSTEIN:  I suspect it'll take longer than

21   ten minutes, but I'm happy to start.

22             THE COURT:  Well, why don't you start.  We'll see.

23                       DIRECT EXAMINATION

24   BY MR. GOLDSTEIN:

25   Q    Mr. Transier, did I pronounce that correctly?

Page 125

1    A    It's Transier.

2    Q    Transier.

3    A    Yes.

4    Q    Excuse me.  I've been sitting in the back with the --

5    A    It's okay.

6    Q    -- (indiscernible) and can't hear exactly.  I also have

7    almost as much gray hair as you, so I'm catching up slowly.

8    I haven't done for a while, though, I'm hoping we can get

9    through this pretty quickly.

10       Do you have before you your declaration that you

11    submitted?

12    A    I do not.

13             MR. GOLDSTEIN:  I apologize, Your Honor.  I don't

14    have copies of the exhibit binder.  But if somebody could --

15    BY MR. GOLDSTEIN:

16    Q    Okay.  It's the first tab in your binder, Mr. Transier,

17    if we could turn to that.  Do you see that?

18    A    Okay.

19    Q    You'll see a declaration.

20    A    Yes.

21    Q    And if you would turn to Page -- and I'm going to see

22    if it's actually been marked by pages numbers.  It's not

23    marked by page numbers, so it would be Page 17, Paragraph 37

24    of your declaration.   Have you gotten there?

25    A    I am.

Page 126

```
 1   Q    Okay.  And if I could turn your attention to the last

 2   sentence of that paragraph of your declaration starting

 3   with, "After carefully considering."  Do you see that

 4   sentence?

 5   A    Give me just a second to read it, please.

 6   Q    Yeah.  I was going to ask you to do that, so please go

 7   ahead and do so.

 8        (Pause)

 9           MR. TRANSIER:  Yes.

10           MR. GOLDSTEIN:  And I should have asked, Your

11   Honor, I assume you have a copy of that.

12           THE COURT:  I have it.

13           MR. GOLDSTEIN:  Thank you.

14   BY MR. GOLDSTEIN:

15   Q    Mr. Transier, in that sentence that you just read, do

16   you state in part, "Analyzing the same with the Debtor's

17   advisors."  Could you identify for me who are the Debtor's

18   advisors that you're specifically referring to in that

19   sentence of your declaration?

20   A    Well, I think I was referring to all of them, but

21   primarily, it would have been Lyle Bradshaw, the Lazard

22   folks, as well as M3 who were our financial advisors.

23   Q    So Lyle, Lazard, and M3.  Any other of the Debtor's

24   advisors that you were --

25   A    I know we -- I know we also had under engagement a real
```

1   estate firm called JLL, but we -- and the subcommittee also

2   had its own set of advisors.  But you're talking the --

3   Q    Excuse me.  You're not referring to the subcommittee;

4   are you?

5   A    I am not.

6   Q    Thank you.

7   A    But they were all in the room.

8   Q    Thank you.  But you're not referring to them here in

9   this sentence, correct?  It says the Debtor's advisors.

10  A    Yes.

11  Q    Thank you.  Now when you say, "analyzing the same with

12  the Debtor's advisors," specifically, what analysis are you

13  referring to?  I'm not asking for the details, Mr. Transier,

14  but what was the subject matter of that analysis?

15  A    I'm not sure what exactly you're getting at and I -- I

16  would go back to this entire paragraph.  We -- in these

17  meetings, we had various presentations to us which have been

18  talked about here today.

19  Q    So were you referring to a specific presentation by one

20  of the Debtor's advisors?

21  A    I -- I don't recall.

22  Q    Okay.  So something else specific in terms of the

23  analysis that you can recall that you're referring to in

24  this sentence?

25  A    I think in general in this -- in my declaration, I was

Page 128

1    referring to --

2    Q    Excuse me, Mr. Transier.  Please, I'd hate to disrupt

3    --

4            THE COURT:  He is answering it.

5            MR. GOLDSTEIN:  I'm asking about a specific

6    paragraph, Your Honor, not this entire declaration.

7            THE COURT:  Yeah.  It's Paragraph 37, the last two

8    sentences.  And he's responding to it.

9            MR. GOLDSTEIN:  Then I apologize.

10           MR. TRANSIER:  I was just trying to --

11           THE COURT:  "The Restructuring Committee also

12   analyzed and discussed the differences between the ESL

13   business plan and the company's historical business plans,"

14   et cetera.  Plus their commitment to third party financing.

15   So the lawyer wants to know if there's a specific written

16   analysis of that or whether it was discussed.

17           MR. TRANSIER:  Yes, sir.  What I was trying to say

18   was that we used one of these presentations that had been

19   talked about previously that spoke to the overall analysis

20   of the -- the bid from ESL and the things that we talked

21   about her earlier that the administrative solvency gap as

22   well as this KCD thing, that's in general what I was

23   referring to.

24           THE COURT:  I think he's -- I think this counsel's

25   interested in the adequate assurance issue.

Page 129

1          MR. TRANSIER:  Okay.

2          MR. GOLDSTEIN:  We'll get there, Your Honor.

3    Thank you.

4    BY MR. GOLDSTEIN:

5    Q    And I appreciate -- Judge Drain is correct.  I was

6    focusing, Mr. Transier, on a specific written presentation.

7    Perhaps, let me ask you more specifically there.  With

8    respect to the advice you got from the Debtor's advisors,

9    did you receive a specific written presentation with respect

10   to the estimated sources and uses of cash at the closing of

11   this transaction?

12   A    At this particular time, we --

13   Q    Yes.

14   A    -- we had along the series of meetings that we had, we

15   had several of those that we looked at.

16   Q    Do you have an understanding, Mr. Transier, of how many

17   -- how much assumed liabilities ECL, the buyer is assuming

18   that they'll have to pay post-closing, the total dollar

19   amount is?

20   A    We could look back at that schedule, but I -- if I

21   recall, there was seven, eight hundred million dollars.

22   Q    So you were here in the courtroom when Mr. Aebersold

23   was testifying earlier, correct?

24   A    I was.

25   Q    And he talked about the in Paragraph 37 of his

Page 130

1    declaration, the assumption of various liabilities including

2    a number for payables and taxes of up to $482 million.  Do

3    you recall that?

4    A    I remember that discussion.

5    Q    And do you also recall there was a discussion about

6    assumption of protection agreements, liabilities?

7    A    I do.

8    Q    And you recall the discussion around that where Mr.

9    Aebersold testified that the approximate book net of the

10   value of that liability is approximately $400 million?

11   A    I don't know that he called it a book net present

12   value.  As I recall his testimony here earlier, he talked

13   about the protection agreement's nominal amounts were a

14   billion dollars, roughly.  And he said that the present

15   value calculation of that, not net book value, was by those

16   large estimates and maybe the company's estimates 440

17   million or 438 million.

18   Q    Thank you, Mr. Transier.  Your position on the

19   accounting terminology is much better than mine.  I

20   appreciate that clarification.  And do you also recall Mr.

21   Aebersold's testimony when he talked about cure costs that

22   would be assumed of up to $200 million?

23   A    Yes.

24   Q    Okay.  So if my simple math is correct, it would be

25   over a billion dollars approximately of assumed liabilities?

Page 131

1    A    I don't think that's the way that you would do the

2    math.  I think you would take the -- but there was a --

3    you're talking about cure costs now, and there's -- there's

4    other things that were included in this bid, right?

5    Q    I'm just talking about the dollar amount for assumed

6    liabilities.  What was the total amount of the assumed

7    liabilities if the buyer is the one who has to pay in cash

8    post-closing?

9    A    Yeah.  Can we get the schedule out and we'll go through

10   them one by one?  How's that?

11   Q    Sure.

12         MR. GOLDSTEIN:  Your Honor, if I can --

13         MR. TRANSIER:  'Cause there was property taxes.

14   There was severance.

15         THE COURT:  I'm going to take a break, and you

16   should prepare more.  And you can come -- when we come back

17   tomorrow morning, you can resume.  Please be a little more

18   focused, all right?

19         MR. GOLDSTEIN:  Thank you.

20            (Proceedings concluded at 1:31 p.m.)

21

22

23

24

25

Page 132

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya                    Digitally signed by Sonya Ledanski
                              Hyde
                              DN: cn=Sonya Ledanski Hyde, o,
     Ledanski Hyde            ou, email=digital1@veritext.com,
7                             c=US
                              Date: 2019.02.05 16:32:38 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 5, 2019