# Exhibit 1

FILED
10/10/2018 4:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH12683

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| COMMUNITY UNIT SCHOOL DISTRICT 300, an Illinois school district, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| VILLAGE OF HOFFMAN ESTATES, an Illinois municipal corporation; and SEARS HOLDINGS CORPORATION, a Delaware corporation, | ) ) ) ) ) |
| Defendants. | ) ) ) |

2018CH12683

**<u>VERIFIED COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF</u>**

NOW COMES the Plaintiff, Community Unit School District 300 ("District"), by and through its attorneys the Law Office of Kory Atkinson and Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., and for the District's Verified Complaint for Declaratory, Injunctive and Other Relief, hereby alleges as follows:

**PARTIES**

1.      The Village of Hoffman Estates ("Village") is an Illinois municipal corporation located primarily in Cook County, Illinois.  The Village's principal address is 1900 Hassell Road, Hoffman Estates, Illinois.  The Village has a mayor and a six member board of trustees that is elected at large.

2.      Defendant Sears Holdings Corporation is incorporated in Delaware.  Its headquarters is located in the Village at 3333 Beverly Road, Hoffman Estates, Illinois.  The predecessor of Sears was Sears, Roebuck & Co., which was a New York corporation.  Unless

796372v1

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

otherwise noted, Sears Holdings Corporation and its predecessor Sears, Roebuck & Co. are referred to as "Sears."

3.    Community Unit School District 300 ("District") is an Illinois school district with its administrative offices located at 2550 Harnish Drive, Algonquin, Illinois.  The District has an enrollment of over 21,000 students at nineteen elementary schools, seven middle schools and five high schools.  The headquarters of Sears is located entirely within the boundaries of District 300.

## BACKGROUND

4.    In 1989, as part of generous efforts to keep Sears from moving out of the State of Illinois as Sears was threatening to do, a law was passed known as the Economic Development Area and Tax Increment Allocation Act, 20 ILCS 620/1 et seq. (the "Sears EDA Act"), which was designed to specifically incentivize Sears to relocate its headquarters from downtown Chicago to undeveloped farmland in the Village.

5.    In 1990, the Village and Sears entered into an Economic Development Agreement pursuant to the Sears EDA Act.  Among other things, the 1990 Agreement provided considerable financial assistance and subsidies for Sears to develop its corporate campus in the Village.  The 1990 Agreement enabled Sears to recapture a large portion of the property taxes paid on its corporate campus to cover the cost incurred for development of its corporate campus.  A copy of the 1990 Economic Development Agreement is attached hereto and incorporated herein as Exhibit 1.

6.     The term of the 1990 Agreement was structured to last for a 23 period, the maximum length of time such an agreement could be under the Sears EDA Act.

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

7.      Under the 1990 Agreement, the definition of "Developer" was "Sears, Roebuck and Co., a New York corporation."

8.      Under the 1990 Agreement, millions of taxpayer dollars, much of which would have gone to the District, were instead diverted to Sears.  In exchange, Sears agreed, among other things, to create or maintain a minimum number of jobs and cause a specific amount of private investment to occur in the designated project area.

9.      For two decades following the 1990 Agreement, the District saw millions of tax dollars diverted to Sears, while Sears and the Village assured the District that when the 1990 Agreement under the Sears EDA Act expired in 2012 the District would experience substantial benefits with Sears' property in the Village fully back on the tax rolls.  Those assurances never materialized.

10.     Instead, in 2011 when Sears was about to lose  EDA Act subsidies, Sears again started scaring lawmakers with the possibility of large scale job losses in the area by threatening to move its headquarters out of Illinois.  Sears sought a new package of subsidies in exchange for staying put in the Village.

11.     In 2012, faced with the threats by Sears to move out of state and the loss of thousands of jobs and economic activity that would entail, Illinois legislators passed an amendment to the Sears EDA Act that effectively extended the 1990 Agreement, but included certain provisions about the amount of subsidies for Sears and the manner in which subsidies would be distributed.

12.     Also included in the 2012 Amendments to the Sears EDA Act was a requirement that Sears create or retain not less than 4,250 full-time equivalent jobs at its headquarters in the

3

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

Village, and provisions providing for recapture of subsidies received by Sears in the event Sears fails to live up to the jobs requirement.

13.    In the event that Sears fails to live up to the requirement that it create and/or maintain 4,250 jobs, the 2012 Amendments provide a formula for recapture of the subsidies based on the amount of time that Sears failed to comply with the jobs requirement.

14.    In addition to receiving subsidies under the Sears EDA Act, part of the package Illinois put together in the 2011-2012 timeframe to keep Sears in state included incentives under an Act titled the Economic Development for a Growing Economy Tax Credit Act (the "EDGE Act"), 35 ILCS 10/5-1.

15.    The EDGE Act is administered by the State of Illinois Department of Commerce and Economic Opportunity ("Department of Commerce").

16.    Pursuant to the EDGE Act, Sears and the Department of Commerce entered into an agreement on October 26, 2012 called the EDGE Tax Credit Agreement (the "EDGE Agreement").

17.    The EDGE Agreement required Sears to, among other things, create and/or maintain at least 4,250 jobs at its locations in the Village and in downtown Chicago, and the EDGE Agreement required Sears to submit documentation showing satisfaction of the jobs requirement.

**SEARS FAILS TO COMPLY WITH JOBS REQUIREMENTS**

18.    In March of 2017 Sears submitted requests to the Department of Commerce for Sears' 2016 tax subsidies, but with Sears having recently announced plans to lay off over 100 corporate employees, the Department of Commerce began questioning whether Sears was in compliance with the jobs requirement under the EDGE Agreement.

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

19.     The Department of Commerce asked Sears to demonstrate that it complied with the jobs requirement in the EDGE Agreement.  Sears responded telling the Department of Commerce that Sears had satisfied the jobs requirement.

20.     Nevertheless, shortly after Sears' assurances that it satisfied the jobs requirement in the EDGE Agreement, media reports surfaced where Sears acknowledged that, in fact, it did not satisfy the jobs requirement of the EDGE Agreement.  For a June 12, 2017 *Crain's Chicago Business* article entitled "With layoffs, Sears loses state tax credits," Sears spokesman Howard Riefs wrote that "For the first time since our agreement was enacted in 2011, we recently dropped below the required retained job figure for the Edge credit.."  A copy of the article is attached hereto as <u>Exhibit 2</u>.

21.      In June 2017 the Department of Commerce told Sears that the EDGE Agreement was suspended, and Sears thereafter threatened legal action.

22.     With litigation a real possibility, Sears and the Department of Commerce entered into an agreement titled "Settlement Agreement Regarding EDGE Tax Credit Agreement" (the "Settlement Agreement") a copy of which is attached hereto as <u>Exhibit 3</u>.

23.     In the Settlement Agreement, Sears admits falling short of the jobs requirement at least as of May 31, 2017 and admits that it continued to fall short of the jobs requirement at least through December 15, 2017, the date of the Settlement Agreement.

24.     Around the same time that Sears was admitting to the Department of Commerce that it failed to live up to the jobs requirement in the EDGE Agreement, Sears was telling a totally different story to the Village.

25.     In a November 27, 2017 correspondence to the Village Manager from Jonathan Bredemeier, who is Senior Director of Real Estate and Corporate Services at Sears, Sears told

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

the Village that "as of the date of this letter, over 4,250 jobs exist at the Sears Holdings' campus

in Hoffman Estates." Mr. Bredemeier continued stating that "at no time in 2017 did the number

of jobs dip below the requisite 4250 jobs." A copy of the November 27, 2017 correspondence is

attached hereto as Exhibit 4.

26.    Copied on the November 27, 2017 correspondence was the Corporation Counsel

and Assistant Corporation Counsel for Sears.

27.    The November 27, 2017 correspondence provided no documentation or other

evidence to corroborate the unverified claims that "over 4250 jobs exist at the Sears Holdings'

campus" and that "at no time in 2017 did the number of jobs dip below the requisite 4250 jobs."

28.    Based on information and belief, other than annual letters to the Village similar to

the November 27, 2017 letter of Mr. Bredemeier, Sears provides no information to the Village

analyzing and demonstrating that it satisfies the jobs requirement in the Sears EDA Act.

29.    Despite the claims of Mr. Bredemeier, media reports from 2017 and early 2018

indicate that Sears was hemorrhaging hundreds of jobs at its corporate headquarters in the

Village.

30.    Media reports on January 31, 2018, indicated that Sears laid off 220 employees at

its corporate headquarters in the Village.   See CNBC article attached hereto as Exhibit 5.

31.    Thus, Sears currently fails to maintain 4,250 jobs as required by the Sears EDA

Act and has failed to maintain the requisite number of jobs since at least May 31, 2017.

32.    Given the millions of dollars that the District has had to forgo in order to

subsidize Sears and keep Sears from taking thousands of corporate jobs out of state, the District

was justifiably alarmed by reports that Sears was cutting hundreds of jobs and failing to comply

with Sears' obligations with the State of Illinois under the EDGE Agreement.

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

33.    On July 30, 2018, the District wrote to Jonathan Bredemeier at Sears.    The District stated that it was concerned about the proper administration of the Sears EDA Act given that millions of property tax dollars are diverted from schools and other local governments based on the promise that Sears will maintain 4,250 jobs at its headquarters.    A copy of the July 30, 2018 correspondence from the District is attached hereto as <u>Exhibit 6</u>.

34.    The District's correspondence requested, quite reasonably, that Sears provide corroborating evidence to support its assertion that it maintained 4,250 jobs during calendar year 2017.

35.    Additionally, the District asked for a commitment from Sears that Sears provide corroborating evidence in support of any assertion as to the number of jobs maintained during 2018 prior to any distribution of funds under the Sears EDA Act for 2018.

36.    In closing, the District emphasized that it welcomed open communication with Sears about the administration of the Sears EDA Act.

37.    The District never received a response from Mr. Bredemeier or from anyone else at Sears.    Sears never engaged with the District on the important issues raised and certainly never took up the District's request for open communication.    Instead, on August 24, 2018, the District received a response from one of Sears' outside property tax attorneys David Martin.

38.    Concerning the District's request for corroborating evidence from Sears and to engage in open and constructive communication with Sears, Mr. Martin's terse letter states that "Sears has no obligation to provide School District 300 with any information regarding 'jobs' within the EDA.  Sears has not provided this information to School District 300 in the past and sees no reason to begin doing so now."    A copy of the August 24, 2018 correspondence is attached hereto as <u>Exhibit 7</u>.

## COUNT I – DECLARATORY JUDGMENT

39.    The District restates paragraphs 1 through 38 for Count I as though fully set forth in this paragraph.

40.    For three decades Sears' headquarters in the Village has been located in an economic development project area and has been the subject of an economic development plan pursuant to the Sears EDA Act.

41.    The Sears EDA Act, as amended in 2012 by Public Act 97-636, requires Sears to create or retain not less than 4,250 full-time equivalent jobs at its corporate headquarters in the Village.

42.    Pursuant to the Sears EDA Act, Sears receives subsidies in the form of millions of dollars in property tax rebates.  Property taxes that Sears receives are diverted from the District and other taxing districts that levy taxes on the Sears property.  The loss of the property tax revenue has and continues to negatively impact the District's ability to educate the students in the District including but not limited to hiring sufficient staff, adequately funding student programs and properly maintaining District facilities.

43.    Beginning at least May 31, 2017 and continuing to date, Sears has failed to maintain the requisite 4,250 jobs at its corporate campus in the Village.

44.    So important was the jobs requirement in the Sears EDA Act that when the law was amended in 2012 in an effort to keep Sears from leaving Illinois, a new section 4.5, 20 ILCS 620/4.5 titled "Recapture" was added and subsection b of section 4.5 specifically provides what happens in the event Sears maintains some but not all of the required jobs.

8

45.     Section 4.5(b) of the Sears EDA Act specifically provides as follows:

(b) In the event the developer fails to maintain 4,250 jobs at any time before the termination of the economic development project area….the developer shall forfeit an amount of its allocations from the special tax allocation fund for that time period in which the developer failed to maintain 4,250 jobs. The amount forfeited shall equal the percentage of the year that the developer failed to maintain 4,250 jobs multiplied by the amount the developer would have received if they maintained 4,250 jobs for the entire year. Any funds that are forfeited shall be distributed to the taxing districts in the same manner and proportion as the most recent distribution by the county collector to those taxing districts (inclusive of the municipality) in the economic development project area.

46.     Thus, the District has a legal tangible interest in this matter because a forfeiture of Sears per Section 4.5(b) results in a distribution of the forfeited amount to the taxing districts, including the District.

47.     For 2017, Sears failed to maintain the requisite number of jobs from at least May 31, 2017 to December 31, 2017.  In other words, for at least 59% of calendar year 2017, Sears failed to maintain the requisite number of jobs per the Sears EDA Act.

48.     Accordingly, 59% of the amount that Sears received or would have received if Sears had maintained 4,250 jobs for the entire calendar year of 2017 should be deemed forfeited and distributed to the taxing districts in the same manner and proportion as the most recent distribution of the Cook County Treasurer.

49.     To date in 2018, Sears has failed to maintain the requisite number of jobs required by the Sears EDA Act.  In other words, for 100% of calendar year 2018 to date, Sears has failed to maintain the requisite number of jobs per the Sears EDA Act.

50.     Accordingly, 100% of the amount that Sears would have received if Sears had maintained 4,250 jobs for the entire calendar year of 2018 should be deemed forfeited and distributed to the taxing districts in the same manner and proportion as the most recent distribution of the Cook County Treasurer.

9

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

51.    The District has prepared worksheet calculations of the amount forfeited by Sears and payable to the taxing districts and is prepared to provide said calculations to the court along with supporting documentation.

52.    The Village is a defendant in this matter because it receives tax monies in a special fund under the Sears EDA Act called the "special tax allocation fund."  Subsidies to Sears under the Sears EDA Act are paid from the special tax allocation fund in the amounts pursuant to 20 ILCS 620/4(g).

53.    Among the relief sought by the District is injunctive relief preventing any further distributions to by the Village from the Village's special tax allocation fund until the rights of the parties are declared by this court.

54.    Any orders entered concerning forfeiture of amounts by Sears and changed distributions will necessarily affect the Village's administration of the special tax allocation fund and the Village is therefore named as a defendant.

WHEREFORE, the District, prays that this Court enter an order:

A.    Declaring that Sears has failed to maintain the number of jobs required of it under the Sears EDA Act;

B.    Declaring that at least 59% of the amount that Sears received or would have received if Sears had maintained 4,250 jobs for the entire calendar year of 2017 should be deemed forfeited and distributed to the taxing districts in the same manner and proportion as the most recent distribution of the Cook County Treasurer;

C.    Declaring that 100% of the amount that Sears would have received if Sears had maintained 4,250 jobs for the entire calendar year of 2018 to date should be deemed forfeited and distributed to the taxing districts in the same manner and proportion as the most recent distribution of the Cook County Treasurer;

D.    Declare the specific amounts forfeited by Sears and the specific amounts payable to the taxing districts;

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

E.    Enter an order requiring Sears to repay any amounts disbursed to Sears that should not have been paid as a result of Sears failing to comply with the jobs requirement of the Sears EDA Act;

F.    Enter an injunction as to the Village of Hoffman Estates preventing any further distributions by the Village from the Village's special tax allocation fund until the rights of the parties are declared by this court;

G.    Retain jurisdiction over this matter for the purpose of enforcing the provisions of its judgment or decree; and

H.    Granting any other relief that this Court deems appropriate.

Respectfully submitted,

COMMUNITY UNIT SCHOOL DISTRICT 300

By: ___/s/ Kenneth M. Florey_____
        One of its Attorneys

Kory Atkinson
**Law Office of Kory Atkinson**
236 West Lake Street, Suite 100
Bloomingdale, IL 60108
630-980-9100 (ph)
kaa@koryatkinson.com
Cook County No. 44788

Kenneth M. Florey
M. Neal Smith
**Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.**
631 E. Boughton Road, Suite 200
Bolingbrook, IL 60440
630-929-3639 (ph)
kflorey@robbins-schwartz.com
nsmith@robbins-schwartz.com
Cook County No. 91219

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

STATE OF ILLINOIS    )
                          ) SS.
COUNTY OF COOK    )

## VERIFICATION

Susan Harkin, being first duly sworn on oath, hereby deposes and states that she is the Chief Operating Officer for Community Unit School District 300, that she has read the foregoing Verified Complaint for Declaratory, Injunctive and Other Relief, and that the facts contained therein are true and accurate to the best of her knowledge and belief.

_____
Susan Harkin
Chief Operating Officer

SUBSCRIBED AND SWORN TO
BEFORE ME THIS _10_ DAY OF
___October___, 2018

_____
Notary Public

GAYLE SEATON
Official Seal
Notary Public – State of Illinois
My Commission Expires Sep 15, 2021

2018CH12683

FILED
10/10/2018 4:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH12683

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

ECONOMIC DEVELOPMENT AGREEMENT

BY AND BETWEEN

THE VILLAGE OF HOFFMAN ESTATES

AND

SEARS, ROEBUCK AND CO.

**EXHIBIT
1**

## TABLE OF CONTENTS

**ARTICLE**                                                              **PAGE**

DEFINITIONS.................................................    1

RECITALS...................................................   15

ARTICLE 1.    INCORPORATION OF RECITALS....................   17

ARTICLE 2.    GOALS, MUTUAL ASSISTANCE AND COOPERATION......   17

    2.1. Goals and Mutual Assistance..............   17

    2.2. Cooperation in Seeking Financial Aid
        and Assistance.........................   18

ARTICLE 3.    DEVELOPMENT OF THE SUBJECT PROPERTY...........   19

    3.1. Phase I Development......................   19
        (a)   General..........................   19
        (b)   Permits..........................   20
        (c)   Preliminary Grading..............   21
        (d)   Submission of Development
            Documentation....................   22
        (e)   Construction of Phase I Develop-
            ment Public Site Improvements.......   26
        (f)   SMG Occupancy Date...............   29

    3.2. Phase II Development.....................   29
        (a)   General..........................   29
        (b)   Construction of Phase II Develop-
            ment Public Site Improvements.......   30

    3.3. Construction of Public Works and
        Improvements...........................   32

    3.4. Covenant to Run With Land Regarding Uses
        of the Subject Property................   32

    3.5. Insurance...............................   33

    3.6. Compliance of Plats, Plans and Construc-
        tion Activities with Village Ordinance....   34

ARTICLE 4.    COSTS OF THE DEVELOPMENT CONSTITUTING "PROJECT
        COSTS" WHICH ARE TO BE PAID OR FINANCED PURSUANT TO
        THE PROVISIONS OF THIS AGREEMENT...............   35

    4.1. General.................................   35

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

**PAGE**

4.2. Project Costs Agreed Upon as the Date of
this Agreement............................. 35

4.3. Project Costs Incurred in Connection With
the Construction of Public Site Improvements
Identified by the Village After the Date of
this Agreement............................. 38

4.4. Determining "Reasonable or Necessary"·
Costs..................................... 42

ARTICLE 5.     SPECIAL TAX ALLOCATION FUND.................. 42

5.1. Deposit of Monies into Fund............... 42

5.2. Accounting of Monies Deposited in Fund.... 42

5.3. Investment of Monies Deposited in the
Fund...................................... 43

ARTICLE 6.     PAYMENT AND FINANCING OF PROJECT COSTS......... 43

6.1. Project Costs Other Than Village Project
Costs..................................... 43

6.2. Payment and Financing of Village Project
Costs..................................... 44

6.3. Issuance of Bonds/Execution and Delivery
of Notes.................................. 45

6.4. Limited Liability of the Village......... 47

6.5. Developer Advances....................... 47

6.6. Procedure for Payment and Reimbursement to
the Developer of Project Costs........... 48

ARTICLE 7.     UTILIZATION OF TAX INCREMENT REVENUES.......... 50

7.1. Tax Increment Revenues Received Prior to
the Phase I Tax Increment Revenue
Commencement Date........................ 50

7.2. Tax Increment Revenues Received On
and Subsequent to Phase I Tax
Increment Revenue Commencement Date....... 50

02/27/90-H.E.              ii

PAGE

7.3. The Village's Distribution of The Phase
I Allocated Tax Increment
Revenue Amounts........................... 52

ARTICLE 8.    BONDS AND NOTES............................... 54

8.1. Issuance, Execution and Delivery.......... 54

8.2. Interest Payment, Maturity, Priorities and
Credit Enhancements....................... 55

8.3. Tax-Exempt Issues......................... 56

8.4. SMG Completion Guaranty Note.............. 56

ARTICLE 9.    TAX PROTESTS AND APPEALS/PAYMENT OF REAL ESTATE
TAXES......................................... 57

9.1. Tax Protests and Appeals.................. 57

9.2. Miscellaneous............................. 58

ARTICLE 10.    SPECIFIC DEVELOPER ADVANCES AND DONATIONS...... 58

10.1. Developer Advance for Costs of Administer-
ing the Economic Development Plan......... 58

10.2. Developer Advance for Police and Fire
Personnel................................. 59

10.3. Donation of Village Municipal Site........ 60

10.4. Donations Relating to Redevelopment of
PCMT Property............................. 61
    (a)  Loss of Contracted Service Income.... 61
    (b)  Reductions in Equalized
         Assessed Value...................... 62
    (c)  Municipal Entertainment Tax.......... 63

10.5. Developer Advance for Miscellaneous
Village Project Costs..................... 63

10.6. No Other Donations........................ 64

ARTICLE 11.    NOTICES....................................... 65

ARTICLE 12.    MEMORANDUM OF AGREEMENT....................... 66

ARTICLE 13.    PERMITTED DELAYS.............................. 67

02/27/90-H.E.                iii

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

**PAGE**

ARTICLE 14.    MORTGAGE HOLDERS............................... 67

14.1. Rights and Obligations................... 67

14.2. Notice/Assumption of Obligations......... 68

14.3. Village Right to Cure Defaults........... 70

ARTICLE 15.    NO DISCRIMINATION-CONSTRUCTION................ 71

ARTICLE 16.    NO DISCRIMINATION-USE........................ 71

ARTICLE 17.    REMEDIES-LIABILITY........................... 72

17.1. Developer Remedies...................... 72

17.2. Village Remedies........................ 73

17.3. Defaults-Rights to Cure................. 74

17.4. Acts and Omissions of Default........... 75

17.5. Dispute Resolution...................... 75

17.6. Right to Continue Construction
      Activities.............................. 77

ARTICLE 18.    ASSIGNMENT    OF    DEVELOPER    RIGHTS    AND
               OBLIGATIONS/CONVEYANCES OF THE SUBJECT
               PROPERTY..................................... 78

18.1. Assignment of Developer Rights and
      Obligations............................. 78

18.2. Conveyances of the Subject Property..... 82

18.3. ...................................... 85

ARTICLE 19.    DEDICATIONS AND EASEMENTS.................... 85

ARTICLE 20.    DEVELOPER INDEMNIFICATION.................... 85

ARTICLE 21.    AMENDMENT/INTEGRATION........................ 87

ARTICLE 22.    DUPLICATE ORIGINALS.......................... 88

ARTICLE 23.    TIME IS OF THE ESSENCE....................... 88

ARTICLE 24.    TERM......................................... 88

02/27/90-H.E.                    iv

                                                                    **PAGE**

ARTICLE 25.    INTERPRETATION................................. 88

ARTICLE 26.    SEVERABILITY................................... 88

ARTICLE 27.    CAPTIONS AND PRONOUNS.......................... 88

LIST OF EXHIBITS      ........................................ 91

02/27/90-H.E.                            v

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1
2
3
4          **ECONOMIC DEVELOPMENT AGREEMENT**

4          **THIS ECONOMIC DEVELOPMENT AGREEMENT** is made by and entered

5     into on the _____ day of _____, 1990, by and between the

6     **VILLAGE OF HOFFMAN ESTATES,** an Illinois home rule municipal

7     corporation located in Cook and Kane Counties, Illinois, and **SEARS,**

8     **ROEBUCK AND CO.,** a New York corporation.

9                              **DEFINITIONS**

10         The following words and terms used in this Agreement shall

11    have the following meanings unless the context or use indicates

12    another or different meaning:

| | |
|---|---|
| **ACQUISITION CONTRACTS** | The sale/purchase contracts which have been executed by Developer, or Developer's nominee, that provide for the Developer's acquisition of the Subject Property. A summary of the Acquisition Contracts is attached hereto as Exhibit "A". |
| **ACT** | The Economic Development Area Tax Increment Allocation Act, Ill.Rev.Stat. (1989) Ch.67 1/2,SS1001 et seq., as amended from time to time. |
| **AGREEMENT** | This Economic Development Agreement and all exhibits attached hereto, as the same may be amended from time to time by the Parties in accordance with the terms hereof. |
| **ALLOCATED TAX INCREMENT REVENUE AMOUNTS** | The amounts of Tax Increment Revenues which are to be paid to the Village and the other Taxing Districts, consisting of the "Phase I Allocated Tax Increment Revenue Amounts" set forth on Exhibit "B" attached hereto, and the "Phase II Allocated Tax Increment Revenue Amounts," as determined by using the percentages set forth on Exhibit "C" attached hereto. |
| **AMENDMENT TO THE ANNEXATION AGREEMENTS** | Such amendment to the Beverly Annexation Agreement and the Nederlander Annexation Agreement as the Parties may execute in order to further the development of the Subject |

02/27/90-H.E.                    1

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

|  |  |  |
|---|---|---|
| 44 |  | Property.  The Amendment to the Annexation |
| 45 |  | Agreements may also constitute the annexation |
| 46 |  | agreement for the portion of the Subject |
| 47 |  | Property that is commonly described as the |
| 48 |  | "Studz Parcel". |
| 49 |  |  |
| 50 | **BEVERLY** | That certain annexation agreement dated |
| 51 | **ANNEXATION** | January 19, 1981 and approved by the Village |
| 52 | **AGREEMENT** | by Village Ordinance No. 1248-1981, as |
| 53 |  | amended. |
| 54 |  |  |
| 55 | **BOARD OF TRUSTEES** | The Board of Trustees of the Village holding |
| 56 |  | office from time to time. |
| 57 |  |  |
| 58 | **BONDS** | The Revenue Bonds and the General Obligation |
| 59 |  | Bonds. |
| 60 |  |  |
| 61 | **CORPORATE** | The President and Board of Trustees of the |
| 62 | **AUTHORITIES** | Village holding office from time to time. |
| 63 |  |  |
| 64 | **DEPARTMENT** | The State's Department of Commerce and |
| 65 |  | Community Affairs. |
| 66 |  |  |
| 67 | **DESIGNATED** | The Village Manager of the Village holding |
| 68 | **OFFICER** | office from time to time. |
| 69 |  |  |
| 70 | **DEVELOPER** | Sears, Roebuck and Co., a New York |
| 71 |  | corporation. |
| 72 |  |  |
| 73 | **DEVELOPER** | The advances made to or on behalf of the |
| 74 | **ADVANCES** | Village by the Developer in order to pay |
| 75 |  | Project Costs, which advances shall be |
| 76 |  | reimbursed to the Developer by the Village, in |
| 77 |  | accordance with the provisions of this |
| 78 |  | Agreement and the Act. |
| 79 |  |  |
| 80 | **DEVELOPMENT** | The Phase I Development and Phase II |
| 81 |  | Development. |
| 82 |  |  |
| 83 | **ECONOMIC** | The economic development plan dated August 4, |
| 84 | **DEVELOPMENT** | 1989, entitled "Hoffman Estates Economic |
| 85 | **PLAN** | Development Project Area Plan and Project" |
| 86 |  | which constitutes the comprehensive program of |
| 87 |  | the Village for the Project Area, as approved |
| 88 |  | by the Corporate Authorities by Village |
| 89 |  | Ordinance No. 2106-1989, adopted on September |
| 90 |  | 11, 1989, together with any amendments |
| 91 |  | thereto. |
| 92 |  |  |
| 93 | **ECONOMIC** | The economic development project approved by |
| 94 | **DEVELOPMENT** | the Corporate Authorities by Village Ordinance |
| 95 | **PROJECT** | No. 2106-1989, adopted on September 11, 1989, |

02/27/90-H.E.                          2

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

| | | |
|---|---|---|
| 96 | | in furtherance of the objectives of the |
| 97 | | Economic Development Plan. |
| 98 | | |
| 99 | **FUND** | The Special Tax Allocation Fund. |
| 100 | | |
| 101 | **GENERAL** | Those general obligation bonds which the |
| 102 | **OBLIGATION** | Village may issue pursuant to the terms of |
| 103 | **BONDS** | this Agreement. |
| 104 | | |
| 105 | **NEDERLANDER** | That certain annexation and development |
| 106 | **ANNEXATION** | agreement dated August 22, 1978 and approved |
| 107 | **AGREEMENT** | by the Village by Village Ordinance No. 1039- |
| 108 | | 1978, as amended. |
| 109 | | |
| 110 | **NOTE(S)** | The economic development project tax increment |
| 111 | | revenue note(s) authorized to be issued by the |
| 112 | | Village pursuant to the terms of this |
| 113 | | Agreement, including Notes to evidence |
| 114 | | Developer Advances, Notes to evidence |
| 115 | | obligations to reimburse private financing |
| 116 | | costs and Notes evidencing obligations to any |
| 117 | | credit enhancers. |
| 118 | | |
| 119 | **OBLIGATIONS** | The Bonds, the Notes, special service area |
| 120 | | bonds and any other instrument evidencing the |
| 121 | | obligation of the Village to pay money in |
| 122 | | furtherance of the Economic Development Plan |
| 123 | | and the development of the Subject Property |
| 124 | | (including, without limitation, bonds, notes, |
| 125 | | installment or financing contracts, |
| 126 | | certificates, tax anticipation warrants or |
| 127 | | notes, vouchers, and any other evidence of |
| 128 | | indebtedness). |
| 129 | | |
| 130 | **PCMT PROPERTY** | The real estate upon which the Poplar Creek |
| 131 | | Music Theater is situated. The PCMT Property |
| 132 | | is legally described on Exhibit "C" to the |
| 133 | | Nederlander Annexation Agreement. |
| 134 | | |
| 135 | **PARTIES** | The Village and the Developer. |
| 136 | | |
| 137 | **PHASE I** | That development occurring during the life of |
| 138 | **DEVELOPMENT** | the Economic Development Project either within |
| 139 | | or outside the boundaries of the Project Area |
| 140 | | (including, without limitation, site |
| 141 | | preparation, the construction of buildings, |
| 142 | | structures, utility installations, roadways |
| 143 | | and other improvements) which is undertaken |
| 144 | | on, in connection with, or in furtherance of |
| 145 | | the use, occupancy and development of the |
| 146 | | Phase I Site. |
| 147 | | |

02/27/90-H.E.                      3

| | | |
|---|---|---|
| 148<br>149<br>150<br>151<br>152<br>153<br>154<br>155<br>156<br>157<br>158 | **PHASE II**<br>**DEVELOPMENT** | That development occurring during the life of the Economic Development Project either within or outside the boundaries of the Project Area (including, without limitation, site preparation, the construction of buildings, structures, utility installations, roadways and other improvements) which is undertaken on, in connection with, or in furtherance of the use, occupancy and development of the Phase II Site. |
| 159<br>160<br>161<br>162<br>163<br>164<br>165 | **PHASE I SITE** | That portion of the Subject Property, consisting of approximately two hundred (200) acres, which is located in the northwest corner of the Subject Property. The Phase I Site is legally described on Exhibit "D" attached hereto. |
| 166<br>167<br>168<br>169<br>170<br>171<br>172 | **PHASE II SITE** | The Subject Property, exclusive of the Phase I Site. The Phase II Site consists of approximately five hundred eighty-eight (588) acres and includes the PCMT Property. The Phase II Site is legally described on Exhibit "E" attached hereto. |
| 173<br>174<br>175<br>176<br>177<br>178<br>179<br>180<br>181<br>182<br>183<br>184 | **PHASE I TAX**<br>**INCREMENT**<br>**REVENUES** | The ad valorem taxes levied upon taxable real property within the Phase I Site by any and all Taxing Districts having the power to tax real property in the Phase I Site, which taxes are attributable to the increase in the then current equalized assessed valuation of each taxable lot, block, tract, or parcel of real property in the Phase I Site over and above the initial equalized assessed value of each such lot, block, tract or parcel of real property. |
| 185<br>186<br>187<br>188<br>189<br>190 | **PHASE I TAX**<br>**INCREMENT**<br>**REVENUE**<br>**COMMENCEMENT**<br>**DATE** | The date on which the Phase I Tax Increment Revenues received and deposited in the Fund reflect a full year's assessment of the SMG Home Office Complex. |
| 191<br>192<br>193<br>194<br>195<br>196<br>197<br>198<br>199 | **PHASE II TAX**<br>**INCREMENT**<br>**REVENUES** | The ad valorem taxes levied upon taxable real property within the Phase II Site by any and all Taxing Districts having the power to tax real property in the Phase II Site, which taxes are attributable to the increase in the then current equalized assessed valuation of each taxable lot, block, tract or parcel of real property in the Phase II Site over and above the initial equalized assessed value of |

02/27/90-H.E.                               4

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

200
201
202
203    **PROJECT AREA**
204
205
206
207
208
209
210
211
212
213    **PROJECT COSTS**
214
215
216
217
218
219
220
221
222
223
224
225
226
227
228
229
230
231
232
233
234
235
236
237
238
239
240
241
242
243
244
245
246
247
248
249
250
251

each such lot, block, tract or parcel of real property.

The Hoffman Estates Economic Development Project Area, which is legally and commonly described on Exhibit "F" attached hereto, and pictorially depicted on Exhibit "G" attached hereto, as heretofore established by the Corporate Authorities by Village Ordinance No. 2107-1989, adopted September 11, 1989, and as certified by the Department on October 6, 1989.

The reasonable or necessary costs incurred by the Village incidental to the Economic Development Project. Project Costs shall include, without limitation, "economic development project costs", as defined in the Act as of the date of this Agreement, and the following:

(a)    Costs of studies, surveys, development of plans and specifications, implementation and administration of the Economic Development Plan, including, but not limited to, personnel and professional service costs for architectural, engineering, legal, marketing, financial, planning, police, fire, public works or other services, provided, however, that no charges for professional services may be based on a percentage of the incremental tax revenues;

(b)    Property assembly costs within the Project Area, including, but not limited to, acquisition of land and other real or personal property, or rights or interests therein, and specifically including payments to the Developer and other nongovernmental parties as reimbursement for, respectively, Property Assembly Costs and the property assembly costs incurred by such other nongovernmental parties;

(c)    Site preparation costs, including, but not limited to, clearance of any area within the

02/27/90-H.E.                    5

Project Area by demolition or
removal of existing buildings,
structures, fixtures, utilities and
improvements, and clearing and
grading; and including installation,
repair, construction,
reconstruction, or relocation of
public streets, public utilities,
and other public site improvements
(and the acquisition of necessary
rights-of-way and easements
therefor) within or outside the
boundaries of the Project Area which
are essential to the preparation of
the Project Area for use in
accordance with the Economic
Development Plan; and specifically
including payments to the Developer
and other nongovernmental parties as
reimbursement for site preparation
costs incurred by the Developer or
such other nongovernmental parties;

(d)    Costs of renovation, rehabilitation,
reconstruction, relocation, repair
or remodeling of any existing public
or private buildings, improvements
and fixtures within the Project
Area, and specifically including
payments to the Developer or other
nongovernmental parties as
reimbursement for such costs
incurred by the Developer or such
other nongovernmental parties;

(e)    Costs of construction within the
Project Area of public works or
improvements, including but not
limited to, buildings, structures,
works, utilities or fixtures;

(f)    Financing costs, including, but not
limited to, all necessary and
incidental expenses related to the
issuance of any Obligations, payment
of any interest on any Obligations
issued hereunder which accrues
during the estimated period of
construction of the part of the
Economic Development Project for
which such Obligations are issued
and for not exceeding thirty-six

02/27/90-H.E.                    6

(36) months thereafter, and any reasonable reserves related to the issuance of such Obligations;

(g) All or a portion of a Taxing District's capital costs resulting from the Economic Development Project necessarily incurred or estimated to be incurred by a Taxing District in the furtherance of the objectives of the Economic Development Plan and Economic Development Project, to the extent the Village, by written agreement, accepts and approves such costs;

(h) Relocation costs to the extent that the Village determines that relocation costs shall be paid or is required to make payment of relocation costs by federal or State law;

(i) The estimated tax revenues from real property in the Project Area acquired by the Village which, according to the Economic Development Plan, is to be used for a private use and which any Taxing District would have received had the Village not adopted tax increment allocation financing for the Project Area and which would result from such Taxing District's levies made after the time of the adoption by the Village of tax increment allocation financing to the time the current equalized assessed value of real property in the Project Area exceeds the Total Initial Equalized Assessed Value of real property in said area;

(j) Costs of job training, advanced vocational or career education, including, but not limited to, courses in occupational, semi-technical or technical fields leading directly to employment, incurred by one or more Taxing Districts, provided that such costs are related to the establishment and

356           maintenance of additional job
357           training, advanced vocational
358           education or career education
359           programs for persons employed or to
360           be employed by employers located in
361           the Project Area and further
362           provided that when such costs are
363           incurred by a Taxing District or
364           Taxing Districts other than the
365           Village they shall be set forth in a
366           written agreement by or among the
367           Village and the Taxing District or
368           Taxing Districts, which agreement
369           describes the program to be
370           undertaken, including, but not
371           limited to, the number of employees
372           to be trained, a description of the
373           training and services to be
374           provided, the number and type of
375           positions available or to be
376           available, itemized costs of the
377           program and sources of funds to pay
378           the same, and the term of the
379           agreement. Such costs include,
380           specifically, the payment by
381           community college districts of costs
382           pursuant to SS3-37,3-38, 3-40 and 3-
383           40.1 of the Public Community College
384           Act (Ill.Rev.Stat.Ch.103, S103
385           et.seq.) and by school districts of
386           costs pursuant to SS10-22.20a and
387           10-23.3a of The School Code
388           (Ill.Rev.Stat.Ch. 122);
389
390      (k)   Private financing costs incurred by
391           the Developer or other
392           nongovernmental parties in
393           connection with the Economic
394           Development Project, and
395           specifically including payments to
396           the Developer or other
397           nongovernmental parties as
398           reimbursement for such costs
399           incurred by the Developer or such
400           other nongovernmental parties,
401           provided that:
402
403          (i)   private financing costs shall
404             be paid or reimbursed by the
405             Village only pursuant to the
406             prior official action of the
407             Village evidencing an intent to

02/27/90-H.E.             8

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

|       |       | pay or reimburse such private financing costs; |
|-------|-------|--------|
|       | (ii)  | except as provided in subparagraph (iv), the aggregate amount of such costs paid or reimbursed by the Village in any one year shall not exceed 30% of such costs paid or incurred by the Developer or such other nongovernmental parties in that year; |
|       | (iii) | private financing costs shall be paid or reimbursed by the Village solely from the Special Tax Allocation Fund established pursuant to the Act and shall not be paid or reimbursed from the proceeds of any Obligations issued by the Village; |
|       | (iv)  | if there are not sufficient funds available in the Special Tax Allocation Fund in any year to make such payment or reimbursement in full, any amount of such interest cost remaining to be paid or reimbursed by the Village shall accrue and be payable when funds are available in the Special Tax Allocation Fund to make such payment; and |
|       | (v)   | in connection with its approval and certification of the Economic Development Project pursuant to Section 5 of the Act, the Village shall forward a copy of this Agreement to the Department; |
| (l)   |       | Other eligible expenses, as permitted by the Act; and |
| (m)   |       | Developer Advances made to satisfy or pay any of the foregoing Project Costs (other than those identified in paragraph (k) above). |

02/27/90-H.E.                                  9

| 460 | **PROPERTY** | The purchase price that is to be paid for the |
| 461 | **ASSEMBLY COSTS** | Subject Property pursuant to the Acquisition |
| 462 | | Contracts, and all reasonable title and survey |
| 463 | | charges; reasonable brokerage fees; reasonable |
| 464 | | attorneys fees; reasonable escrow charges; and |
| 465 | | all reasonable costs of soil, engineering and |
| 466 | | other "due diligence" tests and studies |
| 467 | | incurred in connection with the acquisition of |
| 468 | | the Subject Property. |
| 469 | | |
| 470 | **PUBLIC** | The Public Site Improvements and the Public |
| 471 | **IMPROVEMENTS** | Works and Improvements. |
| 472 | | |
| 473 | **PUBLIC** | The public streets, public utilities and other |
| 474 | **SITE** | public site improvements consisting of the |
| 475 | **IMPROVEMENTS** | Phase I Development Public Site Improvements, |
| 476 | | all of which are set forth on Exhibit "H" |
| 477 | | attached hereto and the Phase II Development |
| 478 | | Public Site Improvements, all of which are set |
| 479 | | forth on Exhibit "I" attached hereto, which |
| 480 | | are constructed, or to be constructed, by the |
| 481 | | Village or the Developer, and all reasonable |
| 482 | | or necessary activities which are undertaken |
| 483 | | in connection with such construction, within |
| 484 | | the Project Area (or outside the boundaries of |
| 485 | | the Project Area but essential to the |
| 486 | | preparation of the Project Area for use in |
| 487 | | accordance with the Economic Development |
| 488 | | Plan), which will result in the Village's incurring |
| 489 | | "site preparation costs", as defined by |
| 490 | | Section 3(e)(3) of the Act. Exhibits "H" and |
| 491 | | "I" may be amended by the Parties, from time |
| 492 | | to time, pursuant to the provisions of this |
| 493 | | Agreement. Natural gas, electric and |
| 494 | | telephone service shall not be included within |
| 495 | | the definition of "public utilities", as used |
| 496 | | above and as used in Section 4.3 of this |
| 497 | | Agreement, except to the extent that they |
| 498 | | relate to natural gas, electric and telephone |
| 499 | | service improvements which are to be dedicated |
| 500 | | to, and owned by, the Village (e.g. public |
| 501 | | street lights). |
| 502 | | |
| 503 | **PUBLIC WORKS** | Those public improvements (including, but not |
| 504 | **AND** | limited to, buildings, structures, works, |
| 505 | **IMPROVEMENTS** | utilities or fixtures) identified on Exhibit |
| 506 | | "J" attached hereto which are constructed, or |
| 507 | | to be constructed, by the Village, and all |
| 508 | | activities which are undertaken in connection |
| 509 | | with such construction, which are authorized |
| 510 | | by this Agreement and the Economic Development |
| 511 | | Plan which result in the Village's incurring |

02/27/90-H.E.                    10

FILED DATE: 10/10/2018 4:46 PM  2018CH12683

| | | |
|---|---|---|
| 512<br>513<br>514<br>515<br>516 | | "costs of construction", as defined by Section 3(e)(5) of the Act. Exhibit "J" may be amended by the Parties, from time to time, pursuant to the provisions of this Agreement. |
| 517<br>518<br>519<br>520<br>521 | **REVENUE**<br>**BONDS** | The economic development project tax increment revenue bonds authorized to be issued by the Village pursuant to the terms of Section 6.3(b) and Article 8 of this Agreement. |
| 522<br>523<br>524<br>525<br>526<br>527 | **SANITARY SEWER**<br>**IMPROVEMENTS** | The sanitary sewer interceptor and related facilities which, pursuant to the terms of this Agreement, are to be constructed by the Village in order to provide sanitary sewer service to the Project Area. |
| 528<br>529<br>530 | **SMG** | Sears Merchandise Group, a group of Sears, Roebuck and Co., a New York corporation. |
| 531<br>532<br>533<br>534<br>535<br>536<br>537<br>538<br>539 | **SMG**<br>**HOME OFFICE**<br>**COMPLEX** | The mixed use complex of no less than 1,600,000 square feet of low to mid-rise development which is to be constructed on a portion of the Phase I Site for purposes of housing Developer's Merchandise Group home office and related uses. The location of such portion of the Phase I Site is generally depicted on Exhibit "K" attached hereto. |
| 540<br>541<br>542<br>543<br>544<br>545<br>546 | **SMG OCCUPANCY DATE** | The date the Developer substantially completes the SMG Home Office Complex and applies to the Village, in accordance with Village ordinances, for issuance of a temporary or permanent certificate of occupancy for the SMG Home Office Complex. |
| 547<br>548<br>549<br>550<br>551<br>552<br>553<br>554<br>555 | **SMG OCCUPANCY**<br>**DATE NOTICE** | The written notice which the Developer is to deliver to the Village confirming that the Developer has received the last governmental permit or approval necessary to the Developer's commencement of construction of the SMG Home Office Complex. The SMG Occupancy Date Notice shall be substantially in the form of Exhibit "L" attached hereto. |
| 556<br>557<br>558<br>559<br>560<br>561<br>562<br>563 | **SPECIAL TAX**<br>**ALLOCATION**<br>**FUND**<br>**(OR FUND)** | The 1989 Hoffman Estates Economic Development Project Area Special Tax Allocation Fund, which is a special fund established pursuant to the provisions of the Act and created by Village Ordinance No. 2108-1989, adopted by the Corporate Authorities on September 11, 1989, which shall be the repository for: (i) the Tax Increment Revenues; (ii) the other |

02/27/90-H.E.                              11

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

564           monies which are to be deposited in the Fund
565           pursuant to the Act or this Agreement; and
566           (iii) the income earned on the investment of
567           the monies deposited in the Fund.
568
569  SUBJECT         That certain parcel of real estate under the
570  PROPERTY        ownership   or   control   of   the   Developer
571           consisting of approximately 788 acres, bounded
572           generally on the north by Higgins Road, on the
573           east by Route 59, on the south by I-90 and on
574           the   west   by   Beverly   Road   (excluding   the
575           approximately 44 acres located east of Old
576           Sutton Road and north of the corporate limits
577           of the Village).   The Subject Property is
578           legally  described  on  Exhibit  "M"  attached
579           hereto.
580
581  TAX INCREMENT    The sum of the Phase I Tax Increment Revenues
582  REVENUES        and the Phase II Tax Increment Revenues.
583
584  TAXING DISTRICTS  Counties,   townships,   municipalities,   and
585           school,   road,   park,   library,   sanitary,
586           mosquito abatement, forest preserve, public
587           health, fire protection, river conservancy,
588           tuberculosis   sanitarium   and   any   other
589           municipal corporations or districts with the
590           power to levy taxes on real property located
591           in the Project Area.
592
593  TOTAL INITIAL    The total initial equalized assessed value of
594  EQUALIZED       the taxable real property within the Project
595  ASSESSED VALUE   Area, as determined by the County Clerk of
596           Cook County in accordance with the provisions
597           of the Act.
598
599  TOTAL MINIMUM    That amount of the assessed valuation of the
600  ASSESSED        Subject Property for a given levy year which,
601  VALUATION       when taken together with the applicable tax
602           rate and state equalization factor for such
603           levy year, will be required to produce Tax
604           Increment Revenues sufficient:  (i) to satisfy
605           the   debt   service   requirements,   including
606           additions to required reserves, on outstanding
607           Revenue Bonds for the next succeeding year, as
608           required   by   then   outstanding   Village
609           ordinances  authorizing  issuance  of  such
610           Revenue  Bonds;  and  (ii)   to  pay  the
611           appropriate Allocated Tax Increment Revenue
612           Amounts for the next succeeding year, as set
613           forth on Exhibits "B" and "C" attached hereto.
614
615

02/27/90-H.E.                    12

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

| 616 | **VILLAGE** | The Village of Hoffman Estates, an Illinois |
| 617 | | home rule municipal corporation. |
| 618 | | |
| 619 | **VILLAGE MUNICIPAL** | The municipal service facility which is to be |
| 620 | **FACILITY** | constructed on the Village Municipal Site |
| 621 | | which may include offices, a Village fire |
| 622 | | station, a Village police station and an |
| 623 | | interior public works area. A "Village Green" |
| 624 | | may adjoin the Village Municipal Facility and |
| 625 | | be located on the Village Municipal Site. |
| 626 | | |
| 627 | **VILLAGE** | That certain fifteen (15) acre portion of the |
| 628 | **MUNICIPAL SITE** | Subject Property which is to be agreed upon |
| 629 | | and identified by the Parties on the |
| 630 | | conceptual land use plan submitted pursuant to |
| 631 | | Section 3.1(d)(1)(iv) of this Agreement. |
| 632 | | |
| 633 | **VILLAGE PROJECT** | Those Project Costs incurred at any time by |
| 634 | **COSTS** | the Village which shall include, and be |
| 635 | | limited to, the following (to the extent |
| 636 | | permitted under the Act): |

637

638      (a)   Costs of studies, surveys,
639             development of plans and
640             specifications, and administration,
641             personnel and professional service
642             costs related to the Village's
643             implementation and administration of
644             the Economic Development Plan and
645             Economic Development Project,
646             (including, but not limited to,
647             personnel and professional costs for
648             administrative, engineering, legal,
649             marketing, financial, planning,
650             public works or other services);

651

652      (b)   Costs of providing police and fire
653             protection to the Development and
654             the Project Area;

655

656      (c)   Costs of development, construction,
657             maintenance, repair and replacement
658             of the Public Works and Improvements
659             (including, without limitation, the
660             Village Municipal Facility and the
661             Village Water Tank);

662

663      (d)   Costs of: (i) maintenance and repair
664             of the Public Site Improvements
665             after their conveyance to, and
666             acceptance by, the Village; and
667             Village-owned water lines and sewer

02/27/90-H.E.                    13

668                              lines existing as of the date of
669                              this Agreement either within or
670                              outside the boundaries of the
671                              Project area; and (ii) replacement
672                              of Public Site Improvements after
673                              their conveyance to, and acceptance
674                              by, the Village in accordance with
675                              Village ordinance; and
676
677                (e)    All financing costs related to the
678                              costs identified in (a) through (d)
679                              above, including, but not limited
680                              to, all necessary and incidental
681                              expenses related to the issuance of
682                              those Village Obligations (including
683                              the General Obligation Bonds) which
684                              are issued to pay the costs
685                              identified in (a) through (d) above;
686                            payment of any interest on any such
687                              Village Obligations which accrue
688                              during the estimated period of
689                              construction of the part of the
690                              Economic Development Project for
691                              which such Village Obligations are
692                              issued and for not exceeding thirty-
693                              six (36) months thereafter; and any
694                              reasonable reserves related to the
695                              issuance of such Village
696                              Obligations.
697
698    **VILLAGE WATER TANK**    The water storage tank which is to be
699                              constructed by the Village within the Project
700                              Area or within the vicinity of the Project
701                              Area for purposes of furthering the use of the
702                              Project Area in accordance with the Economic
703                              Development Plan.  The Village Water Tank is
704                              to provide storage for not less than seven
705                              hundred fifty thousand (750,000) gallons of
706                              water.
707
708
709
710
711
712

FILED DATE: 10/10/2018 4:46 PM  2018CH12683

713                                **RECITALS**

714        A.    Pursuant to the Act and to the terms of the Economic

715   Development Plan, the Village proposed the Economic Development

716   Project for economic development of certain designated areas either

717   within its municipal limits or pending annexation to the Village.

718   The site proposed for the Economic Development Project is the

719   Project Area.  The Project Area includes the Subject Property.  The

720   Economic  Development  Plan  sets  forth  a  mixture  of  land  use

721   activities within the Project Area.

722        B.    On September 11, 1989, the Village adopted Ordinance No.

723   2108-1989  adopting  tax  increment  allocation  financing  for  the

724   Project Area.   Such ordinance provides that the Tax Increment

725   Revenues which are realized within the Project Area are to be paid

726   to the Village for deposit in the Special Tax Allocation Fund in

727   order to pay Project Costs and principal and interest obligations

728   coming due on the Obligations.

729        C.    The  Corporate  Authorities,  after  due  and  careful

730   consideration, have concluded that the development of the Project

731   Area, as provided in this Agreement and in the Economic Development

732   Plan, will: (i) create or retain not less than 2,000 full-time

733   equivalent jobs; (ii) cause private investment in an amount of not

734   less  than  $100,000,000  to  occur  in  the  Project  Area;  (iii)

735   encourage the increase of commerce and industry within the State of

736   Illinois, thereby reducing the evils attendant upon unemployment

737   and increasing opportunities for personal income; (iv) increase or

738   maintain the property, sales and income tax bases of the Village

      02/27/90-H.E.                    15

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

739    and of the State of Illinois and enable the Village to control the

740    development of the Subject Property; and (v) otherwise be in the

741    best interests of the Village.

742    D.    Subject to the terms and provisions of the Act and this

743    Agreement: (i) the Developer intends to acquire, or to cause its

744    nominee to acquire, the Subject Property, and the Village intends

745    to reimburse the Developer for the Property Assembly Costs the

746    Developer incurs, or to pay the Developer's Property Assembly

747    Costs, out of Tax Increment Revenues (other than the Allocated Tax

748    Increment Revenue Amounts), or other monies deposited in the Fund,

749    the proceeds of Revenue Bonds, and the proceeds of Developer

750    Advances; (ii) the Developer intends to develop the Phase I Site

751    with at least the SMG Home Office Complex; (iii) the Developer may

752    hereafter develop the Phase II Site with the uses specified in the

753    Economic Development Plan; and (iv) the Village intends to

754    reimburse the Developer for the Project Costs the Developer pays,

755    incurs or advances to, or on behalf of, the Village out of Tax

756    Increment Revenues (other than the Allocated Tax Increment Revenue

757    Amounts), other monies deposited in the Fund, or from the proceeds

758    of Revenue Bonds.

759    E.    The Parties acknowledge that the purchase price

760    established by the Acquisition Contracts for the Subject Property

761    is reasonable.

762    F.    The development of the Subject Property, and the

763    fulfillment generally of the terms and provisions of this

764    Agreement, are in the vital and best interest of the Village and

02/27/90-H.E.    16

765    the health, safety, and welfare of its residents and taxpayers.

766        G.    The Parties intend to enter into this Agreement under the

767    authority of the Act and pursuant to the Village's home-rule

768    authority.

769        **NOW, THEREFORE,** in consideration of the foregoing Recitals,

770    and the mutual agreements set forth below, it is hereby agreed by

771    and between the Parties as follows:

772        **ARTICLE 1.        INCORPORATION OF RECITALS**

773        The representations set forth in the foregoing Recitals are

774    material to this Agreement and are hereby incorporated into and

775    made a part of this Agreement as though they were fully set forth

776    in this Article 1.

777        **ARTICLE 2.        GOALS, MUTUAL ASSISTANCE AND COOPERATION**

778        **2.1. Goals and Mutual Assistance**

779        The Parties acknowledge that it is their mutual goal and

780    desire to further the objectives of the Economic Development Plan

781    and Economic Development Project, to further the improvement and

782    development of the Project Area, and to finance all costs of the

783    Development as Project Costs (to the fullest extent permitted by

784    law and in the most economically efficient manner) pursuant to the

785    provisions of this Agreement.  Accordingly, the Parties shall do

786    all things necessary or appropriate to carry out the terms and

787    provisions of this Agreement and to aid and assist each other in

788    furthering the objectives of this Agreement and the intentions of

789    the Parties as reflected by said terms.  Specifically, if it shall

790    become necessary, the Village: (i) shall assist the Developer in

02/27/90-H.E.                        17

791    acquiring portions of the Subject Property (whether or not such

792    portions are the subject of the Acquisition Contracts); and (ii) at

793    the request of the Developer, shall attempt to acquire properties,

794    rights-of-way and easements necessary to the development of the

795    Project Area by the use of its power of eminent domain (provided,

796    however, that the Village makes no representation or warranty

797    regarding its ability to acquire any such portions of the Subject

798    Property, or any of such properties, rights-of-way or easements by

799    use of its power of eminent domain, and provided further that the

800    Developer shall pay and satisfy all purchase prices, settlements,

801    judgments, orders or other costs and expenses incurred by the

802    Village in the exercise of such powers by making a Developer

803    Advance in the amount of such costs and expenses).  In the event

804    the Village acquires all or any portion of the Subject Property

805    through the use of its power of eminent domain as set forth above,

806    it shall convey the same to the Developer immediately thereafter

807    for one dollar ($1.00).

808        **2.2. Cooperation in Seeking Financial Aid and Assistance**

809        The Parties shall cooperate with each other in seeking

810    financial or other aid and assistance required for or useful to the

811    construction of roadway, highway and utility improvements

812    (including a two million three hundred thousand dollar

813    ($2,300,000.00) "Build Illinois" infra-structure grant for the

814    construction of the Sanitary Sewer Improvements) within the Project

815    Area or outside the boundaries of the Project Area (but essential

816    to the preparation of the Project Area for use in accordance with

02/27/90-H.E.                    18

817    the Economic Development Plan) from all appropriate governmental

818    bodies (whether Federal, State, County or local).  In addition, in

819    order to gain the Department's certification of the Village's

820    designation of the Project Area as an "Enterprise Zone" for the

821    maximum statutory term pursuant to the Illinois Enterprise Zone Act

822    (Ill.Rev.Stat.  Ch.  67  1/2,SS601 et  seq.),  the  Village,  in

823    accordance with the provisions of said statute and within sixty

824    (60) days of the date of this Agreement, shall: (i) pass an

825    ordinance designating the Project Area as an "Enterprise Zone";

826    (ii) submit a complete written application to the Department

827    seeking the Department's certification of the Village's designation

828    of the Project Area as an "Enterprise Zone"; and (iii) take such

829    other actions as may be necessary or appropriate under the

830    provisions of said statute to gain certification by the Department

831    of the Project Area as an "Enterprise Zone".  The Village, pursuant

832    to said statute or other applicable state statutes or local

833    ordinances, shall also consent to local sales tax exemption for

834    construction  materials  purchased  in  connection  with  the

835    Development.

836         **ARTICLE 3.        DEVELOPMENT OF THE SUBJECT PROPERTY**

837         **3.1. Phase I Development**

838         (a)  **General.**

839              The Phase I Development shall be the first priority of

840              the Parties.  The first stage of that development shall

841              encompass the construction of the SMG Home Office

842              Complex.   The  SMG  Home  Office  Complex  shall  be

         02/27/90-H.E.                    19

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

843    constructed in a manner consistent with the goals and

844    objectives of the Economic Development Plan and shall be

845    of a quality that is consistent with other first-class

846    office facilities located in the Greater Chicagoland

847    Metropolitan Area.

848    **(b)**    **Permits.**

849    Before commencement of construction of any portion of the

850    SMG Home Office Complex, the Developer, at its expense,

851    shall secure, or cause to be secured, all permits or

852    approvals which may be required by the Village and other

853    governmental agencies having jurisdiction over such

854    construction, in whole or in part, including, without

855    limitation, all permits required, if any, from the U.S.

856    and Illinois Environmental Protection Agencies, the

857    Metropolitan Water Reclamation District, the U.S. Army

858    Corps of Engineers, the Illinois Department of

859    Transportation and all other local, Federal and State

860    agencies having or exercising any jurisdiction over such

861    construction or over the portion of the Project Area that

862    is affected by such construction.  The Village shall

863    provide all proper assistance to the Developer in

864    securing such permits and shall promptly execute all

865    permits and permit applications which require or benefit

866    from such execution provided such permits and permit

867    applications (and the plans relating thereto) are in

868    proper form and comply with all lawful requirements.  The

02/27/90-H.E.                    20

869    Village shall promptly issue all permits required to be

870    issued by the Village provided such permits (and the

871    permit applications and plans relating thereto) are in

872    proper form and comply with all lawful requirements.

873    (c)    **Preliminary Grading.**

874    Notwithstanding the provisions of the foregoing paragraph

875    (b), and provided the public hearings described in

876    Section 3.1(d) have commenced, the Board of Trustees

877    shall authorize issuance to the Developer of a site

878    development permit for mass grading and storm water

879    management installation and other similar excavation-

880    related tasks on the Subject Property prior to receipt of

881    all of the foregoing permits, prior to final Village

882    approval of the Amendment to the Annexation Agreements

883    and prior to approval of final engineering plans for the

884    Phase I Development provided that:

885    (1)    The Developer satisfies the Village staff and Board

886    of Trustees that the Developer is providing the

887    necessary erosion and sedimentation control

888    measures to satisfy the principles set forth in

889    Sub-Section A of Section 10-8-6 of the Village's

890    Municipal Code (Erosion and Sedimentation Control);

891    and

892    (2)    The Board of Trustees receives a tree survey from

893    the Developer showing all trees having a four inch

894    (4") caliper or more and the Board approves a tree

02/27/90-H.E.                    21

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

895          preservation plan satisfying the principles set

896          forth in Sub-section D in Section 10-8-11 of the

897          Hoffman Estates Municipal Code and issues or

898          directs the Village staff to issue any necessary

899          tree removal permits; and

900     (3)  That such grading and other work shall be

901          undertaken at the Developer's sole cost and risk

902          and the Developer, pursuant to Article 20 of this

903          Agreement, shall indemnify the Village against,

904          and hold the Village harmless from, all costs,

905          expenses,  reasonable  attorney  fees,  losses,

906          liabilities and damages that may be suffered or

907          sustained by the Village as a result of Developer's

908          undertaking such grading and other work.

909     (4)  That the President and Board of Trustees shall find

910          that provisions C - (1), (2) and (3) above are

911          satisfied and grant approval for such preliminary

912          grading.

913  **(d)  Submission of Development Documentation**

914     (1)  On or before March 1, 1990, the Developer shall

915          submit  the  following  to  the  Village  for  the

916          Village's review and approval:

917          (i)   A Community Impact Statement for the Subject

918                Property  submitted  pursuant  to  Village

919                Ordinance No. 914-1977;

920          (ii)  An application for approval by the Corporate

        02/27/90-H.E.              22

921          Authorities of the Amendment to the Annexation

922          Agreements;

923    (iii)    An application for the granting of the relief

924          provided for in the Amendment to the

925          Annexation Agreements;

926    (iv)    A conceptual land use plan for the Subject

927          Property (which plan identifies, among other

928          things, estimates of square footage, proposed

929          land uses, internal roadway plans and the

930          proposed location of the Village Municipal

931          Site); and

932    (v)    A preliminary site plan, preliminary plat of

933          subdivision, preliminary engineering plans,

934          preliminary landscaping plans and other

935          appropriate preliminary documentation for the

936          Phase I Development.

937          Within thirty (30) days of the Village's receipt of

938    the last of the foregoing submittals (provided such

939    submittals are complete and in a form acceptable to the

940    Village), the Village shall schedule, and give all

941    notices required to be given for, all public hearings

942    required to be conducted by the Corporate Authorities,

943    the Board of Trustees, the Plan Commission, the Zoning

944    Board of Appeals and all other commissions and committees

945    of the Village for purposes of considering the

946    Developer's applications, plats and plans.  Such public

02/27/90-H.E.                    23

947    hearings shall be conducted by the Village in an
948    expeditious manner and, to the extent practicable, but in
949    the sole discretion of the Village, such public hearings
950    shall be conducted concurrently before the aforesaid
951    entities, commissions and committees. The Developer, at
952    any of such public hearings, shall have the right, at the
953    Developer's option, to present preliminary and final
954    plats and plans concurrently or to bypass the submittal
955    of preliminary plats and plans entirely in favor of
956    proceeding directly with the review and approval of final
957    plats and plans.

958    (2)    Not later than sixty (60) days after the Village's
959            adoption of the ordinances and resolutions
960            authorizing the execution of the Amendment to the
961            Annexation Agreements and granting the relief
962            provided for in the Amendment to the Annexation
963            Agreements, the Developer shall submit the
964            following to the Village for the Village's review
965            and approval:

966        (i)    A final plat of subdivision for the Phase I
967                Development;

968        (ii)   Final grading, utility and roadway plans for
969                the construction of the SMG Home Office
970                Complex;

971        (iii)  Final engineering plans for the Public Site
972                Improvements which are to be constructed as

02/27/90-H.E.                    24

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

973          part of the Phase I Development (as identified

974          on Exhibit "H" to this Agreement), which

975          improvements shall include all Public Site

976          Improvements necessary to the construction,

977          use and occupancy of the SMG Home Office

978          Complex; and

979    (iv)    Such other documentation as the Village may

980          reasonably request as a condition precedent to

981          the issuance of a building permit for the SMG

982          Home Office Complex.

983          The Village's staff and representatives, during the

984    time the Developer is preparing all such final plats and

985    plans, shall meet with the Developer, and its

986    representatives, to coordinate the preparation of such

987    plats and plans and their submission to, and review by,

988    the Village.  The Village and the Developer shall

989    communicate and consult informally with each other as

990    frequently as is necessary to insure that the review,

991    processing and approval of all such plats and plans

992    receives prompt consideration by the Village.

993          The Board of Trustees shall approve or disapprove

994    all such final plats and plans within thirty (30) days of

995    their submission to the Village provided: (i) such plats

996    and plans are complete, have been reviewed by the Plan

997    Commission upon an expedited schedule that shall be

998    provided for in the Amendment to the Annexation

999    Agreements, and are in a form acceptable to the Village;

1000    (ii) the Amendment to the Annexation Agreements has then

1001    been approved by the Corporate Authorities and executed

1002    by the Parties; (iii) all annexation and zoning

1003    ordinances provided for in the Amendment to the

1004    Annexation Agreements have been adopted by the Village;

1005    and (iv) such plats and plans substantially conform to

1006    the preliminary plats and plans.  If such plats or plans

1007    are disapproved, as soon as reasonably possible

1008    thereafter, the Developer shall submit revised plats and

1009    plans to the Village.

1010    (e)    **Construction of Phase I Development Public Site**
1011    **Improvements.**

1012    (1)    The Developer is hereby appointed as the Village's

1013    sole and exclusive agent for purposes of managing

1014    and overseeing the engineering, design and

1015    construction of those Public Site Improvements

1016    which are to be constructed as part of the Phase I

1017    Development (as identified on Exhibit "H" to this

1018    Agreement), provided, however, that: (i) before

1019    either the Village or the Developer enters into any

1020    contract for construction or construction services

1021    relating to the construction of such Public Site

1022    Improvements, the Developer shall select a

1023    contractor and the Village shall approve such

1024    contractor provided the conditions of this Section

1025    3.1(e) are met and further provided the contractor

02/27/90-H.E.    26

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1026    can complete the improvements in such a manner and

1027    in accordance with such a timetable as may be

1028    agreed to by the Parties; and (ii) all such

1029    contracts shall be executed by the Village to the

1030    extent necessary to further the goals of this

1031    Agreement.   The Developer shall not be required to

1032    advertise for bids or to submit multiple bids to

1033    the Village prior to entering into such contracts.

1034    (2)   The Board of Trustees shall receipt all contracts

1035    submitted to it by the Developer in order to

1036    review:  (i) that the contractors which are to

1037    perform work pursuant to such contracts are

1038    sufficiently experienced in doing the size and type

1039    of work required for the construction of the

1040    improvements to be constructed; (ii) that all such

1041    contracts accurately reflect the cost of completing

1042    such improvements; and (iii) that no purpose would

1043    be served in the Village's obtaining further bids

1044    for the construction of such improvements.   The

1045    Board of Trustees shall have twenty-one (21) days

1046    to review and approve or disapprove the contracts

1047    submitted to it by the Developer.   If disapproved,

1048    the Village Manager shall give reasons, in writing,

1049    to the Developer for such disapproval.   All

1050    construction contracts shall provide for payment in

1051    accordance with the provisions of this Agreement.

02/27/90-H.E.                    27

1052    With respect to such construction contracts, and
1053    where the provisions of this Section 3.1(e) are
1054    satisfied, the Board of Trustees, in accordance
1055    with Ill.Rev.Stat. Ch. 24, S8-9-1 (1987), shall
1056    hereafter waive any advertising for bids by the
1057    Village.

1058    Notwithstanding the foregoing, the Village hereby
1059    approves those contracts which have been entered into as
1060    of the date of this Agreement or which are to be entered
1061    into, by or on behalf of the Developer, with the parties
1062    and for the services identified on Exhibit "N" to this
1063    Agreement; waives advertising for bids for the services
1064    to be provided by such contracts; and acknowledges that
1065    all costs incurred pursuant to those contracts shall be
1066    considered Project Costs that relate directly to Public
1067    Improvements or Public Site Improvements or Property
1068    Assembly Costs as Project Costs and both the Village and
1069    Sears agree that Chapman & Cutler as Bond Counsel for the
1070    Village will determine what costs in Exhibit "N" qualify
1071    as Project Costs under the Act.   The provisions of
1072    Section 17.5 of this Agreement, Dispute Resolution shall
1073    not apply to the determination made by Chapman & Cutler
1074    relating to Exhibit "N" which are to be paid or
1075    reimbursed pursuant to the terms of this Agreement.

1076    (3)  Notwithstanding the provisions of the foregoing
1077        paragraphs (1) and (2), the Village retains the

02/27/90-H.E.              28

1078        right and the obligation to undertake the

1079        engineering, design and construction of the

1080        Sanitary Sewer Improvements and agrees to

1081        substantially complete, or cause the substantial

1082        completion of, the construction of the Sanitary

1083        Sewer Improvements by the SMG Occupancy Date.

1084    (f)    **SMG Occupancy Date.**

1085        The Developer shall deliver the SMG Occupancy Date

1086        Notice to the Village not more than sixty (60) days after

1087        the date of the Amendment to the Annexation Agreements,

1088        and the Developer shall substantially complete, or cause

1089        the substantial completion of, the SMG Home Office

1090        Complex, and cause the SMG Occupancy Date to occur, not

1091        later than thirty (30) months after the date the

1092        Developer delivers the SMG Occupancy Date Notice to the

1093        Village provided the Village has completed construction

1094        of the Village Water Tank and the Sanitary Sewer

1095        Improvements.

1096    3.2.    **Phase II Development**

1097    (a)    **General.**

1098        The Phase II Development shall be constructed in

1099        accordance with the terms and provisions of the Economic

1100        Development Plan and shall include amenities, facilities

1101        and landscaping that are of a similar quality to other

1102        first-class office and mixed use developments located in

1103        the Greater Chicagoland Metropolitan Area. The Phase II

02/27/90-H.E.                    29

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1104    Development may occur in stages or phases.  The Developer

1105    shall not be obligated to commence construction of the

1106    Phase II Development, or any portion thereof, at any

1107    time.

1108    (b)    **Construction of Phase II Development Public Site**
1109        **Improvements.**

1110    (1)    The Village retains the right to manage and oversee

1111        the engineering, design and construction of those

1112        Public Site Improvements which are to be

1113        constructed as part of the Phase II Development

1114        (except those Phase II Development Public Site

1115        Improvements identified on Exhibit "I" which are to

1116        be constructed upon the Subject Property), provided

1117        that the Village shall coordinate such engineering,

1118        design and construction with the Developer.  The

1119        Developer shall act as the Village's agent for

1120        purposes of managing and overseeing the

1121        engineering, design and construction of the Phase

1122        II Development Public Site Improvements identified

1123        on Exhibit "I" to this Agreement which are to be

1124        constructed on the Subject Property provided,

1125        however, that: (i) before either the Village or the

1126        Developer enters into any contract for construction

1127        or construction services relating to the

1128        construction of such Phase II Development Public

1129        Site Improvements, the Developer shall select a

1130        contractor and the Village shall approve such

02/27/90-H.E.                    30

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1131               contractor provided the conditions of this Section

1132               3.2(b) are met and further provided the contractor

1133               can complete the improvements in such a manner and

1134               in accordance with such a timetable as may be

1135               agreed to by the Parties; and (ii) all such

1136               contracts shall be executed by the Village to the

1137               extent necessary to further the goals of this

1138               Agreement.  The Developer shall not be required to

1139               advertise for bids or to submit multiple bids to

1140               the Village.

1141    (2)    The Board of Trustees shall receipt all contracts

1142               submitted to it by the Developer in connection with

1143               the construction of the Phase II Development Public

1144               Site Improvements identified on Exhibit "I" to this

1145               Agreement in order to review: (i) that the

1146               contractors which are to perform work pursuant to

1147               such contracts are sufficiently experienced in

1148               doing the size and type of work required for the

1149               construction of the improvements to be constructed;

1150               (ii) that all contracts accurately reflect the cost

1151               of completing such improvements; and (iii) that no

1152               purpose would be served in the Village's obtaining

1153               bids for the construction of such improvements.

1154               The Board of Trustees shall have twenty-one (21)

1155               days to review and approve or disapprove the

1156               contracts submitted to it by the Developer.  If

02/27/90-H.E.               31

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1157   disapproved, the Village Manager shall give

1158   reasons, in writing, to the Developer for such

1159   disapproval. All construction contracts shall

1160   provide for payment in accordance with the

1161   provisions of this Agreement. With respect to such

1162   construction contracts and where the provisions of

1163   this Section 3.2(b) are satisfied, the Board of

1164   Trustees, in accordance with Ill.Rev.Stat.

1165   Ch.24,S8-9-1(1987), shall hereafter waive any

1166   advertising for bids by the Village.

1167   **3.3. <u>Construction of Public Works and Improvements</u>**

1168   The Village retains the right to manage and oversee the

1169   engineering, design and construction of the Public Works and

1170   Improvements. The design and location of the Village Water Tank

1171   and the parameters for the design and construction of the Village

1172   Municipal Facility and the Village Water Tank shall be provided for

1173   in the Amendment to the Annexation Agreements.

1174   **3.4. <u>Covenant to Run With Land Regarding Uses of the Subject</u>**
1175   **<u>Property.</u>**

1176   The Developer hereby covenants that, for the term of the

1177   Economic Development Plan, the Subject Property shall be devoted

1178   only to the uses specified in the Economic Development Plan. Such

1179   covenant shall constitute a covenant running with the land which

1180   shall terminate upon expiration of the Economic Development Plan.

1181   At the request of the Village, the Developer shall execute, and

1182   record in the Cook County Recorder of Deeds Office, a Declaration

1183   of Covenants that confirms such covenant and that subjects the

02/27/90-H.E.                    32

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1184    Subject Property to the terms of this Agreement and the Economic

1185    Development Plan.

1186        3.5. **Insurance**

1187        Prior to the commencement of construction of any portion of

1188    the Development, the Developer shall furnish, or cause to be

1189    furnished, to the Village certificates of insurance evidencing the

1190    procurement of comprehensive bodily injury and property damage

1191    liability insurance policies in the amount of at least two million

1192    dollars ($2,000,000.00) for any injury or death to persons, five

1193    million dollars ($5,000,000.00) for any injury or death to any

1194    number of persons arising out of any aggregate occurrence and five

1195    hundred thousand dollars ($500,000.00) for property damage, which

1196    certificates confirm the naming of the Village, its officials,

1197    agents and employees as "additional insureds" under all such

1198    policies.  The Developer shall have the option to provide the

1199    required insurance in a combined single limit form of not less than

1200    $5,000,000.00. All such policies shall provide for at least thirty

1201    (30) days' notice to the Village of the cancellation or termination

1202    of such policies.  Liability under the Illinois Structural Work Act

1203    and contractual liability for indemnification of the Village, its

1204    officials, agents and employees, shall be fully insured under these

1205    policies for the limits set forth above.  The Developer shall cause

1206    such insurance to be maintained in force for so long as the

1207    Developer is undertaking the construction of any improvements on

1208    the Subject Property.  Provided the Developer delivers to the

1209    Village documents that provide assurances to the Village equivalent

02/27/90-H.E.                33

1210    to the assurances provided by the certificates of insurance as
1211    required above, the Developer shall have the right to self-insure
1212    for any or all of the losses described above.

1213    **3.6. Compliance of Plats, Plans and Construction Activities
1214    with Village Ordinances.**

1215    (a)    All plats and plans submitted to the Village for the
1216            Village's review and approval shall comply with the codes
1217            and ordinances of the Village that are in effect at the
1218            time of such submittal except to the extent such codes or
1219            ordinances conflict with, or are made inapplicable to the
1220            Subject Property by, the Beverly Annexation Agreement,
1221            the Nederlander Annexation Agreement or the Amendment to
1222            the Annexation Agreements.

1223    (b)    All construction activities undertaken on the Subject
1224            Property by, or under the direction of, the Developer
1225            shall be undertaken in compliance with the codes and
1226            ordinances of the Village that are in effect at the time
1227            of such construction except to the extent such codes or
1228            ordinances conflict with, or are made inapplicable to the
1229            Subject Property by, the Beverly Annexation Agreement,
1230            the Nederlander Annexation Agreement, the Amendment to
1231            the Annexation Agreements or this Agreement.

1232

1233

02/27/90-H.E.                    34

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

ARTICLE 4.   **COSTS OF THE DEVELOPMENT CONSTITUTING "PROJECT COSTS" WHICH ARE TO BE PAID OR FINANCED PURSUANT TO THE PROVISIONS OF THIS AGREEMENT**

**4.1. General**

To the fullest extent permitted by law, but subject to the provisions of Section 4.3 of this Article 4, all costs incurred by the Parties in furtherance of the Economic Development Plan and the Economic Development Project and the Development shall be deemed Project Costs and such costs shall be paid for or financed pursuant to the provisions of Article 6 of this Agreement.

**4.2. Project Costs Agreed Upon as of the Date of this Agreement.**

As of the date of this Agreement, the Parties acknowledge the following costs to be Project Costs which are to be paid for or financed pursuant to the provisions of this Agreement:

(a)   All reasonable or necessary Property Assembly Costs (including, without limitation, those costs identified on Exhibit "O" attached hereto) and both the Village and Sears agree that Chapman & Cutler as Bond Counsel for the Village will determine what costs in Exhibit "O" qualify as Project Costs under the Act.   The provisions of Section 17.5 of this Agreement, Dispute Resolution shall not apply to the determination made by Chapman & Cutler relating to Exhibit "O";

(b)   All reasonable or necessary costs of construction of the Public Improvements (including, without limitation, those costs identified on Exhibit "P" attached hereto) and both the Village and Sears agree that Chapman & Cutler as Bond

02/27/90-H.E.                    35

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1262               Counsel for the Village will determine what costs in

1263               Exhibit "P" qualify as Project Costs under the Act.  The

1264               provisions of Section 17.5 of this Agreement, Dispute

1265               Resolution shall not apply to the determination made by

1266               Chapman & Cutler relating to Exhibit "P";

1267     (c)   All reasonable or necessary costs of preparation of

1268               surveys, development of plans and specifications,

1269               implementation and administration of the Economic

1270               Development Plan, and retention of personnel and

1271               professionals for architectural, engineering, legal,

1272               marketing, financial, planning, police, fire, public

1273               works and other services;

1274     (d)   All reasonable or necessary financing costs (including,

1275               without limitation, all necessary and incidental expenses

1276               related to the issuance of the Obligations, payment of

1277               any interest on any such Obligations which accrues during

1278               the estimated period of construction of the Economic

1279               Development Project for which such Obligations are issued

1280               and for not exceeding thirty-six (36) months thereafter,

1281               and any reasonable reserves related to the issuance of

1282               such Obligations);

1283     (e)   All reasonable or necessary Village Project Costs; and

1284     (f)   All reasonable or necessary private financing costs

1285               incurred by the Developer in furtherance of the Economic

1286               Development Plan, the Economic Development Project and

1287               the Development, and specifically including payments to

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1288   the Developer as reimbursement for such costs incurred by

1289   the Developer, provided that:

1290   (1)   Such private financing costs shall be paid or

1291   reimbursed by the Village only pursuant to the

1292   prior official action of the Village evidencing an

1293   intent to pay or reimburse the Developer for such

1294   private financing costs (which action shall be

1295   deemed to have been taken by the Corporate

1296   Authorities' adoption of an ordinance authorizing

1297   the Village's execution of this Agreement);

1298   (2)   Except as provided in subparagraph (4) hereof, the

1299   aggregate amount of such costs paid or reimbursed

1300   by the Village to the Developer in any one year

1301   shall not exceed thirty percent (30%) of such costs

1302   paid or incurred by the Developer in that year;

1303   (3)   Private financing costs shall be paid or reimbursed

1304   by the Village solely from the Special Tax

1305   Allocation Fund and shall not be paid or reimbursed

1306   from the proceeds of Obligations issued by the

1307   Village;

1308   (4)   If there are not sufficient funds available in the

1309   Special Tax Allocation Fund in any year to make

1310   such payment or reimbursement in full, any amount

1311   of such interest cost remaining to be paid or

1312   reimbursed by the Village shall accrue, and, at

1313   Developer's request, be evidenced by the execution

FILED DATE: 10/10/2018 4:46 PM  2018CH12683

1314    and delivery of a Note, and be payable when funds

1315    are available in the Fund to make such payment (and

1316    any such payment shall be made without regard to

1317    the limitations contained in subparagraph (2)

1318    hereof); and

1319    (5)   In connection with the Department's approval and

1320    certification of the Economic Development Project

1321    pursuant to Section 5 of the Act, the Village shall

1322    forward a copy of this Agreement to the Department.

1323    **4.3.**   **Project Costs Incurred in Connection With the**
1324    **Construction of Public Site Improvements Identified by**
1325    **the Village After the Date of this Agreement.**

1326    (a)  If:

1327    (1)   After the date of this Agreement, the Village

1328    determines that a public street, public utility or

1329    other public improvement that is not identified on

1330    either Exhibit "H" or Exhibit "I" to this Agreement

1331    must be constructed in order to further the

1332    Economic Development Project and the Development;

1333    and

1334    (2)   The Developer accepts and agrees with such

1335    determination;

1336    then such public street, public utility or public

1337    improvement shall be deemed a "Public Site Improvement"

1338    and the entire cost of constructing such Public Site

1339    Improvement shall be deemed a Project Cost which is to be

1340    paid for or financed pursuant to the provisions of

02/27/90-H.E.          38

Article 6 of this Agreement.

(b) If:

(1) After the date of this Agreement, the Village determines that a public street, public utility or other public improvement that is not identified on either Exhibit "H" or Exhibit "I" to this Agreement must be constructed in order to further the Economic Development Project and the Development; and

(2) The Developer believes that such public street, public utility or other public improvement provides a material benefit to areas outside the boundaries of the Project Area;

then, subject to the provisions of paragraph (d) of this Section 4.3, such public street, public utility or public improvement shall be deemed a "Public Site Improvement" and that portion, and only that portion, of the cost of constructing such Public Site Improvement which is specifically and uniquely attributable to the Development shall be deemed a Project Cost which is to be paid for or financed pursuant to the provisions of Article 6 of this Agreement.

(c) Not less than 30 days after the Village makes a determination pursuant to the foregoing paragraph (a) or paragraph (b) that a public street, public utility or public improvement must be constructed in order to

02/27/90-H.E.                39

1367            further  the  Economic  Development  Project  and  the
1368            Development,  the  Village  shall  deliver  notice  to  the
1369            Developer identifying:

1370            (1)  The  public  street,  public  utility  or  public
1371                 improvement  and  the  basis  for  the  Village's
1372                 determination  that  such  public  street,  public
1373                 utility  or  public  improvement  must  be  constructed
1374                 in  order  to  further  the  Economic  Development
1375                 Project and the Development;

1376            (2)  The Village's determination of the anticipated cost
1377                 of constructing such public street, public utility
1378                 or public improvement;

1379            (3)  The  Village's  determination  as  to  whether  or  not
1380                 such  public  street,  public  utility  or  public
1381                 improvement  provides  a  material  benefit  to  areas
1382                 outside the boundaries of the Project Area; and

1383            (4)  The  Village's  determination  as  to  the  portion  of
1384                 the cost of constructing such public street, public
1385                 utility or public improvement which is specifically
1386                 and uniquely attributable to the Development.

1387       (d)  If the Developer agrees with the Village's determinations
1388            made pursuant to the foregoing paragraph (c), then the
1389            portion of the cost of constructing such public street,
1390            public  utility  or  public  improvement  which  is
1391            specifically and uniquely attributable to the Development
1392            shall  be  deemed  a  Project  Cost.    If  the  Developer

       02/27/90-H.E.                    40

1393                    disagrees with any determination made by the Village

1394                    pursuant to the provisions of this Section 4.3, then the

1395                    following process shall occur:

1396        (1)    The Developer shall deliver notice to the Village

1397                    identifying the specific Village determination with

1398                    which the Developer disagrees;

1399        (2)    The Village, at the Village's cost, shall retain a

1400                    consultant to provide evidence which supports the

1401                    Village's    determination    and    shall    submit    that

1402                    evidence,    with    a    report    that    summarizes    the

1403                    consultant's methodologies and conclusions, to the

1404                    Developer;

1405        (3)    If the Developer disagrees with such consultant's

1406                    evidence, methodologies or conclusions, then the

1407                    Developer, at the Developer's cost, shall retain a

1408                    consultant to provide evidence which supports the

1409                    Developer's conclusions relative to the Village's

1410                    determination and shall submit that evidence, with

1411                    a    report    that    summarizes    such    consultant's

1412                    methodologies and conclusions, to the Village; and

1413        (4)    If the Parties are thereafter unable to resolve

1414                    their difference of opinion, then the Village's

1415                    consultant and the Developer's consultant shall

1416                    jointly choose a third consultant, at a cost to be

1417                    shared equally by the Village and the Developer,

1418                    who shall make a final determination as to the

02/27/90-H.E.                    41

1419          matter in dispute, and such determination shall be

1420          final and binding on the Parties.

1421     4.4. **Determining "Reasonable or Necessary" Costs**

1422     Determinations of the Parties as to what costs are "reasonable

1423 or necessary" costs that are incidental to the Economic Development

1424 Project, as such terms are used in the Act and this Agreement,

1425 shall be consistent with the provisions of Sections 2.1 and 4.1 of

1426 this Agreement.

1427     **ARTICLE 5.     SPECIAL TAX ALLOCATION FUND**

1428     5.1. **Deposit of Monies into Fund**

1429     In accordance with the Act, the Village Treasurer shall

1430 promptly deposit in the Special Tax Allocation Fund, upon receipt,

1431 all Tax Increment Revenues, all other monies required by the Act or

1432 this Agreement to be deposited in the Fund, and all earnings

1433 realized upon the investment of such monies. Monies deposited in

1434 the Fund shall be used only for the purposes, and in the manner,

1435 specified in this Agreement and the Act.

1436     5.2. **Accounting of Monies Deposited in Fund**

1437     The Village shall establish such accounts and keep such books

1438 and records as are necessary to implement the provisions of this

1439 Agreement, the Act and the ordinances adopted in connection with

1440 each issue of Bonds.  From and after the date of this Agreement,

1441 the Village shall provide the Developer with its annual financial

1442 report which shall include a statement of monies deposited into and

1443 disbursed from the Fund.  Such report shall be undertaken in

1444 accordance with generally accepted auditing standards by a

02/27/90-H.E.                    42

1445    certified public accounting firm designated by the Village.  The

1446    Developer shall have the right to review the books and records of

1447    the Village which relate to the Fund and any fund or account

1448    holding proceeds of Revenue Bonds and Notes. At the request of the

1449    Developer, a separate compliance audit shall be performed to

1450    provide sufficient detail to enable the Parties to determine

1451    whether or not there has been compliance with the provisions of

1452    this Agreement and the Act.  Both the accounting records and all

1453    financial audits of the Fund shall separately identify Phase I Tax

1454    Increment Revenues and Phase II Tax Increment Revenues.  If the

1455    Developer requests a separate compliance audit of the Fund, the

1456    cost of such compliance audit shall not be a Village Project Cost

1457    unless the compliance audit indicates material non-compliance; in

1458    that event, the cost shall be a Village Project Cost.

1459        **5.3. Investment of Monies Deposited in the Fund**

1460        The Village shall invest monies in the Fund from  time to time

1461    only in those investment vehicles as are identified, as of the date

1462    of this Agreement, in Section 2 of "An Act Relating to Certain

1463    Investments of Public Funds by Public Agencies"

1464    (Ill.Rev.Stat.Ch.85,SS902).  All income earned on the investment of

1465    such monies shall be deposited in the Fund pursuant to Section 5.1

1466    of this Article 5.  The Village shall not transfer or loan monies

1467    deposited in the Fund to other Village funds.

1468        **ARTICLE 6.**    **PAYMENT AND FINANCING OF PROJECT COSTS**

1469        **6.1.  Project Costs Other Than Village Project Costs**

1470        The Village shall pay and finance those Project Costs

02/27/90-H.E.            43

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1471    identified in Article 4 of this Agreement other than Village

1472    Project Costs solely from Tax Increment Revenues, the proceeds of

1473    Obligations, the proceeds of Developer Advances, grants from the

1474    State of Illinois or other monies made available for such purposes

1475    pursuant to the Act or the provisions of this Agreement. The

1476    Village shall reimburse the Developer for the Project Costs

1477    identified in Article 4 of this Agreement which the Developer has

1478    paid or incurred out of Tax Increment Revenues or other monies

1479    deposited in the Fund, the proceeds of Revenue Bonds, or other

1480    monies made available for such purposes pursuant to the Act or the

1481    provisions of this Agreement. The foregoing provision shall not

1482    preclude the Parties, as provided in Article 2 of this Agreement,

1483    from seeking and securing other funding sources for the

1484    construction of public improvements which are deemed reasonable or

1485    necessary to the implementation of the Economic Development Plan

1486    and the furtherance of the Economic Development Project.

1487    **6.2. Payment and Financing of Village Project Costs**

1488    All Village Project Costs shall be paid out of, or financed

1489    by, the Village's portion of the Phase I Allocated Tax Increment

1490    Revenue Amounts (as identified in Column 2 of Exhibit "B" attached

1491    hereto); those Developer Advances and donations specified in

1492    Sections 10.1, 10.2 and 10.5 of this Agreement, or the proceeds of

1493    General Obligation Bonds or Village Obligations secured solely by

1494    the Village's portion of the Phase I Allocated Tax Increment

1495    Revenue Amounts.  Debt service on Village Obligations which are

1496    issued to pay Village Project Costs shall be paid solely out of the

02/27/90-H.E.                    44

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1497    Village's portion of the Phase I Allocated Tax Increment Revenue

1498    Amounts and such other monies as may be available to the Village

1499    for such purposes.  Any portion of the Village's portion of the

1500    Phase I Allocated Tax Increment Revenue Amounts (as identified in

1501    Column 2 of Exhibit "B" attached hereto) which is not used or

1502    encumbered to pay or finance Village Project Costs or to pay such

1503    debt service shall be paid by the Village to the Cook County

1504    Collector for distribution to the Village and the affected Taxing

1505    Districts in accordance with the surplus distribution provisions of

1506    the Act.  The portion of the Phase II Allocated Tax Increment

1507    Revenue Amounts which are distributed to the Village pursuant to

1508    Article 7 of this Agreement need not be used by the Village to pay

1509    or finance Village Project Costs.  Notwithstanding any other

1510    provisions of this Agreement, the estimated three million dollar

1511    ($3,000,000.00) cost for constructing the Sanitary Sewer

1512    Improvements shall not be considered a Village Project Cost

1513    although the Parties acknowledge the Village's intention to secure

1514    the "Build Illinois" grant referenced in Section 2.2 of this

1515    Agreement and the Village's agreement to apply the proceeds of such

1516    grant, if and when received, to the construction of the Sanitary

1517    Sewer Improvements.  The Developer shall have no obligation to pay

1518    Village Project Costs, or to make Developer Advances for the

1519    purpose of paying Village Project Costs, except to the extent

1520    provided for in Sections 10.1, 10.2 and 10.5 of this Agreement.

1521        6.3. <u>Issuance of Bonds/Execution and Delivery of Notes</u>

1522        The Village shall issue Bonds and execute and deliver Notes,

02/27/90-H.E.                    45

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1523    as necessary to fulfill its obligations under the terms of this

1524    Agreement, as follows:

1525    (a)    From time to time, the Village, in its sole discretion,

1526         may issue its General Obligation Bonds, and tax increment

1527         revenue bonds secured solely by the Village's portion of

1528         the Phase I Allocated Tax Increment Revenue Amounts, in

1529         amounts sufficient to satisfy and pay for Project Costs,

1530         including without limitation Village Project Costs.

1531         Notwithstanding the foregoing, the Village shall not

1532         issue any General Obligation Bonds until it has received

1533         the SMG Occupancy Date Notice from the Developer;

1534    (b)    From time to time, the Village pursuant to the terms of

1535         this Agreement and after it has received the SMG

1536         Occupancy Date Notice from the Developer, shall issue

1537         economic development project tax increment revenue bonds

1538         in amounts sufficient to satisfy and pay for the Project

1539         Costs described in Article 4 of this Agreement other than

1540         Village Project Costs (but in no event shall private

1541         financing costs incurred by the Developer in connection

1542         with the Economic Development Project be paid or

1543         reimbursed from the proceeds of Revenue Bonds);

1544    (c)    To the extent:

1545         (1)    The proceeds of Revenue Bonds are not sufficient to

1546              satisfy, or cannot be used to satisfy, the Project

1547              Costs described in Article 4 of this Agreement; and

1548         (2)    The Tax Increment Revenues (other than the

02/27/90-H.E.                46

1549                Allocated Tax Increment Revenue Amounts) then

1550                deposited in the Fund, are not, and will not be,

1551                sufficient or available to satisfy such Project

1552                Costs; and

1553        (3)  Such Project Costs do not constitute Village

1554             Project Costs;

1555    the Developer, to the extent permitted by the Act, shall make a

1556    Developer Advance to satisfy such Project Costs and the Village

1557    shall execute and deliver its Note to evidence such Developer

1558    Advance.  Notwithstanding the foregoing, the Developer shall not

1559    advance, or be required to advance, monies needed to satisfy debt

1560    service requirements on the Obligations, to establish reserves for

1561    the debt service requirements of the Obligations or to retire or

1562    redeem any Obligations and no Developer Advance shall be used for

1563    such purpose.

1564        **6.4. <u>Limited Liability of the Village</u>**

1565        The Village shall not be required to pay and finance any of

1566    those Project Costs identified in Article 4 of this Agreement

1567    (other than Village Project Costs) unless funds for such purposes

1568    are available from Tax Increment Revenues (other than Allocated Tax

1569    Increment Revenue Amounts), the proceeds of Obligations, the

1570    proceeds of Revenue Bonds, the proceeds of Developer Advances,

1571    grants from the State of Illinois or other monies made available

1572    for such purposes pursuant to the Act or the provisions of this

1573    Agreement.  The Village shall not be required to reimburse the

1574    Developer for such Project Costs unless funds for such purposes are

02/27/90-H.E.                    47

FILED DATE: 10/10/2018 4:46 PM  2018CH12683

1575 available from Tax Increment Revenues (other than Allocated Tax

1576 Increment Revenue Amounts), or other monies deposited from time to

1577 time in the Fund, the proceeds of Revenue Bonds or other monies

1578 made available for such purposes pursuant to the Act or the

1579 provisions of this Agreement.

1580    **6.5. Developer Advances**

1581    All monies paid to the Village by the Developer in furtherance

1582 of the Economic Development Project and pursuant to the provisions

1583 of this Agreement shall be accounted for separately within the Fund

1584 and all such advances shall be deemed Developer Advances, unless

1585 provided otherwise in this Agreement.  All Developer Advances made

1586 in connection with the incurring of various Project Costs may be

1587 paid to the Village prior to or subsequent to the incurring of such

1588 Project Costs.  All Developer Advances shall be evidenced by the

1589 Village's execution and delivery of a Note in accordance with the

1590 provisions of Article 8 of this Agreement.  The Developer shall

1591 advance the funds necessary to pay any such Project Costs within

1592 fourteen (14) days of its receipt of a written request therefor

1593 from the Village Manager.  Notwithstanding the foregoing, the

1594 Developer shall not be required to make any Developer Advance until

1595 the terms and conditions and the form of the Note which is to be

1596 executed and delivered to evidence such Developer Advance have been

1597 agreed upon by the Parties, which terms, conditions and form shall

1598 be consistent with the terms of this Agreement.

1599    **6.6. Procedure for Payment and Reimbursement to the Developer**
1600    **of Project Costs**

1601    All payment and reimbursement requests of the Developer in the

    02/27/90-H.E.                    48

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1602   amount of four thousand dollars ($4,000.00) or less, and all

1603   payment or reimbursement requests of the Developer of more than

1604   four thousand dollars ($4,000.00) made pursuant to contracts which

1605   have been previously approved by the Board of Trustees (whether

1606   pursuant to this Agreement or otherwise) shall be undertaken

1607   pursuant to the authorization of the Village Manager.  In order to

1608   effect such payment or reimbursement (whether being made to the

1609   Developer or others), the Developer shall submit to the Village

1610   Manager, for his review and approval (which approval shall not be

1611   unreasonably withheld or delayed), all affidavits, lien waivers and

1612   other documentation as may be necessary to effect such payment or

1613   reimbursement.  The Village Manager shall inform the appropriate

1614   Village financial officer of such approval within ten (10) working

1615   days of receipt of such documentation or, within said period, shall

1616   provide the Developer with a specific written explanation of his

1617   reasons for disapproving such request.  Such Village financial

1618   officer shall effect payment or reimbursement within five (5)

1619   working days of receipt of the Village Manager's approval of any

1620   request for payment or reimbursement. All payment or reimbursement

1621   requests of the Developer of more than four thousand dollars

1622   ($4,000.00) which are not being made pursuant to a contract which

1623   has been previously approved by the Board of Trustees shall be

1624   submitted to the Board of Trustees for its review and approval

1625   (which approval shall not be unreasonably withheld or delayed).

1626

1627

02/27/90-H.E.                      49

1628        **ARTICLE 7.        UTILIZATION OF TAX INCREMENT REVENUES**

1629        **7.1.  <u>Tax Increment Revenues Received Prior to the</u>**
1630                **<u>Phase I Tax Increment Revenue Commencement Date.</u>**

1631            Prior to the Phase I Tax Increment Revenue Commencement Date,

1632    the Village from time to time shall disburse or allocate Tax

1633    Increment Revenues as they are received and deposited in the Fund,

1634    subject to the provisions of any ordinance authorizing the issuance

1635    of Revenue Bonds, as follows:

1636            (1)    First, the Village shall pay, or allocate amounts

1637                    sufficient to satisfy, debt service requirements

1638                    (and any increases in required reserves) due in the

1639                    current year and coming due in the following year

1640                    on all outstanding Revenue Bonds; and

1641            (2)    The balance, if any, shall be reserved by the

1642                    Village to pay Project Costs (other than Village

1643                    Project Costs) to be incurred within the next three

1644                    (3) years and to provide reserves needed to secure

1645                    outstanding Revenue Bonds and Notes.

1646        **7.2.  <u>Tax Increment Revenues Received On and Subsequent to</u>**
1647                **<u>Phase I Tax Increment Revenue Commencement Date.</u>**

1648            Commencing with the Phase I Tax Increment Revenue Commencement

1649    Date and continuing thereafter as Tax Increment Revenues are

1650    received and deposited in the Fund, the Village from time to time

1651    shall disburse or allocate Tax Increment Revenues, subject to the

1652    provisions of any ordinance authorizing the issuance of Revenue

1653    Bonds, as follows:

1654            (1)    First, subject to the last sentence of Section 8.2

            02/27/90-H.E.                    50

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1655               of this Agreement, the Village shall: (i) disburse

1656               or allocate Phase I Allocated Tax Increment Revenue

1657               Amounts to the Village up to the maximum amounts

1658               set forth in Column 1 of Exhibit "B" to this

1659               Agreement; and (ii) disburse or allocate the Phase

1660               II Allocated Tax Increment Revenue Amounts to the

1661               Village and the affected Taxing Districts in an

1662               aggregate amount that is determined by multiplying

1663               the percentages set forth on Exhibit "C" to this

1664               Agreement times the amount of Phase II Tax

1665               Increment Revenues received and deposited in the

1666               Fund, which Phase II Allocated Tax Increment

1667               Revenue Amounts shall be distributed to the Village

1668               and the affected Taxing Districts in accordance

1669               with the surplus distribution provisions of the

1670               Act;

1671        (2)   Next, the Village shall pay, or allocate amounts

1672               sufficient to satisfy, debt service requirements

1673               due in the current year and coming due in the

1674               following year on all outstanding Revenue Bonds,

1675               and to provide reserves needed to secure

1676               outstanding Revenue Bonds;

1677        (3)   Next, the Village shall pay, or allocate amounts

1678               sufficient to satisfy, debt service requirements

1679               due in the current year and coming due in the

1680               following year on all outstanding Notes (unless the

02/27/90-H.E.           51

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

holder of such Notes agrees, in writing, to defer
such payment);

    (4)   Next, the Village shall pay, or allocate amounts
sufficient to pay, outstanding Project Costs (other
than Village Project Costs); and

    (5)   Next, the Village shall pay, or allocate amounts
sufficient to pay Project Costs (other than Village
Project Costs) to be incurred within three (3)
years, or to purchase or redeem all or a portion of
the outstanding Notes or Revenue Bonds, as the
Parties by mutual agreement shall annually
determine.

    (6)   The balance, if any, shall be paid to the Cook
County Collector for distribution to the Village
and the affected Taxing Districts, for deposit in
their appropriate accounts, in accordance with the
surplus distribution provisions of the Act.

**7.3.** **The Village's Distribution of The Phase I Allocated Tax
Increment Revenue Amounts**

Upon receipt, the Village, subject to the provisions of any
ordinance authorizing the issuance of General Obligation Bonds, and
from time to time shall disburse or allocate the Phase I Allocated
Tax Increment Revenue Amounts as follows:

    (1)   First, the Village may pay, or allocate an amount
sufficient to satisfy, debt service requirements
due in the current year and coming due in the
following year on any outstanding Village

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1708    Obligations;

1709    (2)    Next, the Village shall pay, or allocate an amount

1710    sufficient to satisfy, outstanding Village Project

1711    Costs;

1712    (3)    Next, the Village shall pay, or allocate an amount

1713    sufficient to reimburse the Village for, Village

1714    Project Costs which have been theretofore paid or

1715    incurred by the Village;

1716    (4)    The balance, if any, shall be paid to the Cook

1717    County Collector for distribution to the Village

1718    and the affected Taxing Districts, for deposit in

1719    their appropriate accounts, in accordance with the

1720    surplus distribution provisions of the Act,

1721    provided, however, that the amount of Phase I Tax Increment Revenue

1722    Amounts paid to, or allocated by, the Village annually pursuant to

1723    paragraphs (1), (2), and (3) above shall not exceed the amounts

1724    specified in Column 2 of Exhibit "B" to this Agreement.

1725

1726

1727

1728

02/27/90-H.E.                53

1729    **ARTICLE 8.    BONDS AND NOTES**

1730    **8.1. Issuance, Execution and Delivery**

1731    The Parties acknowledge that the acquisition of the Subject

1732    Property and the Development, and the construction of the Public

1733    Improvements, as provided in the Economic Development Plan and this

1734    Agreement, necessitate the use of proceeds from one or more issues

1735    or series of Revenue Bonds and from the execution and delivery of

1736    one or more Notes to pay Project Costs as provided in the Economic

1737    Development Plan and in this Agreement.    Accordingly, the Village

1738    shall issue Revenue Bonds and execute and deliver Notes to finance

1739    Project Costs pursuant to the Act and the terms of this Agreement.

1740    Such Revenue Bonds shall be in the aggregate amounts which

1741    reasonably can be sold based upon the security which can be

1742    provided to the purchasers of such Revenue Bonds under the

1743    provisions of this Agreement.    Such Revenue Bonds and Notes shall

1744    not be secured by the full faith and credit of the Village.    One or

1745    more issues or series of Revenue Bonds to pay for Project Costs

1746    (other than Village Project Costs) may be sold at one or more times

1747    in order to implement the Economic Development Plan and the

1748    Economic Development Project, provided that the Village shall not

1749    be required to issue such Revenue Bonds until necessary credit

1750    enhancements and security, as may reasonably be deemed necessary by

1751    the Village, have been established.    The amount of each series of

1752    Revenue Bonds to be issued by the Village shall be supported by a

1753    feasibility report prepared by, or at the direction of, the

1754    Developer, which shall reasonably determine the amount of each

02/27/90-H.E.                    54

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

1755    series of such Revenue Bonds which can be issued and which shall be

1756    satisfactory to the Village.    Such report shall analyze the

1757    projected cash flows (from Tax Increment Revenues and other

1758    sources), credit enhancements and other security provisions related

1759    to the issuance of such series of such Revenue Bonds, all then

1760    outstanding Revenue Bonds and all Revenue Bonds expected to be

1761    issued thereafter.

1762        **8.2.  Interest Payment, Maturity, Priorities and Credit**
1763            **Enhancements**

1764        All Bonds issued pursuant to this Agreement shall bear

1765    interest at prevailing market rates for similar instruments and

1766    shall be subject to such other terms and conditions as are agreed

1767    to by the Village and the Developer, subject to the Village

1768    ordinances  authorizing issuance of such Bonds and the provisions

1769    of this Agreement applicable at the time of issuance of the Bonds.

1770    All taxable Notes executed and delivered pursuant to this Agreement

1771    shall bear interest at the rate of interest announced from time to

1772    time by Continental Bank N.A. at Chicago, Illinois, as its "prime

1773    rate".    If, for any reason, Continental Bank N.A. shall cease to

1774    announce a "prime rate" then such taxable Notes shall bear interest

1775    at the rate of interest announced from time to time by The First

1776    National Bank of Chicago at Chicago, Illinois, as its "prime rate"

1777    or "base rate".    The Parties shall agree upon the interest rate to

1778    apply to any tax-exempt Notes executed and delivered pursuant to

1779    this Agreement and prior to their execution and delivery.    All

1780    Bonds and Notes shall mature on or before September 11, 2012 and in

1781    any event within 20 years of the date of issuance or execution and

02/27/90-H.E.                    55

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1782    delivery thereof.  All Revenue Bonds issued, and all Notes executed

1783    and delivered, pursuant to this Agreement shall be limited

1784    obligations of the Village payable solely from Tax Increment

1785    Revenues (subject to the last sentence of this Section 8.2) and the

1786    other monies deposited from time to time in the Fund as a result of

1787    the investment of such Tax Increment Revenues, as and to the extent

1788    available for such purposes, and by such capitalized interest, debt

1789    service reserves and sinking funds or other available credit

1790    enhancements as may be provided by the ordinances adopted by the

1791    Village from time to time in conjunction with each issue of Revenue

1792    Bonds and each delivery of Notes.   Revenue Bonds issued and

1793    outstanding pursuant to this Agreement shall be secured by a first

1794    priority pledge of amounts in the Fund subsequent and subordinate

1795    only to the obligation to make the payments due under Section

1796    7.2(1) (unless the Village shall have agreed upon an alternative

1797    mechanism to provide for the payments which are otherwise to be

1798    made under Section 7.2(1).)

1799        **8.3.  <u>Tax-Exempt Issues</u>**

1800        The Village, as issuer of the Obligations, and the Developer

1801    shall cooperate with each other in an attempt to ensure that

1802    interest paid on the Obligations is exempt from Federal income

1803    taxes, provided that the Village shall not be required to take any

1804    action that is inconsistent with the provisions of this Agreement

1805    or the Village's rights herein.

1806        **8.4.  <u>SMG Completion Guaranty Note.</u>**

1807        Upon the Village's issuance of any General Obligation Bonds

02/27/90-H.E.                          56

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1808    pursuant to Section 6.3(a) of this Agreement, the Developer shall

1809    execute and deliver to the Village a note guaranteeing substantial

1810    completion of the SMG Home Office Complex by the end of the

1811    calendar year in which the SMG Occupancy Date is to occur (as

1812    established by the SMG Occupancy Date Notice) and providing for the

1813    payment to the Village when due of liquidated damages to be agreed

1814    upon by the Parties.  Notwithstanding the foregoing, the Village

1815    shall not issue any General Obligation Bonds until the Village has

1816    received the SMG Occupancy Date Notice from the Developer.

1817    **ARTICLE 9.**     **TAX PROTESTS AND APPEALS/PAYMENT OF REAL ESTATE**
1818              **TAXES**

1819    **9.1. <u>Tax Protests and Appeals</u>**

1820        The Parties acknowledge that certain assumptions will be made

1821    relative to the future assessed valuations of the Subject Property

1822    as and when the Development occurs and as and when Bonds are issued

1823    by the Village in connection with the Development.   The Parties

1824    further acknowledge that attaining and maintaining said assessed

1825    valuations will have a material effect on the revenue available to

1826    pay debt service on such Bonds. Accordingly, for so long as such

1827    Bonds are outstanding, neither the Developer nor its agents,

1828    representatives, successors, assigns, tenants or transferees of any

1829    portion of the Subject Property shall initiate, take or perform any

1830    acts attempting to reduce the assessed valuation of any portion of

1831    the Subject Property if such reduction will cause the then-current

1832    total assessed valuation of the Subject Property to be less than

1833    the Total Minimum Assessed Valuation.   The Total Minimum Assessed

1834    Valuation of the Subject Property shall be established, in writing,

02/27/90-H.E.                        57

1835    by the Parties from time to time as Bonds are issued in connection

1836    with the development of the Subject Property.  The foregoing shall

1837    not preclude or prohibit the Developer from protesting the assessed

1838    value of the SMG Home Office Complex for the limited purpose of

1839    establishing a partial year assessment of the building assessment

1840    for the year in which the SMG Occupancy Date occurs.

1841        **9.2. <u>Miscellaneous</u>**

1842        Except as otherwise expressly set forth in this Article 9, the

1843    Developer shall have the same right to challenge real estate taxes

1844    as is offered to the taxpayers and owners of other real property

1845    situated within Cook County, Illinois, but no such challenge shall

1846    be made without notice to the Village.  The Developer further

1847    agrees, that to the extent it is obligated to pay any portion of

1848    the real estate tax bills for the Subject Property, it shall pay

1849    such taxes promptly before the date of delinquency of such tax

1850    bills.  The Developer shall file necessary documentation with the

1851    appropriate governmental authorities in order to cause the Phase I

1852    Site, the Phase II Site and the PCMT Property to be identified by

1853    separate permanent tax index numbers so that the provisions of this

1854    Agreement can be given effect.

1855        **ARTICLE 10.    SPECIFIC DEVELOPER ADVANCES AND DONATIONS**
1856

1857        **10.1.    Developer Advance for Costs of Administering the**
1858                **Economic Development Plan**

1859        The Developer shall advance to the Village the sum of two

1860    hundred ten thousand dollars ($210,000) to be used by the Village

1861    to pay for one (1) new employee and for clerical support to be

1862    hired  specifically  for  the  purpose  of  implementing  and

1863    administering   the   Economic   Development   Plan   and . Economic

1864    Development Project during the period commencing with the date of

1865    this Agreement and terminating on September 30, 1992.   This sum

1866    shall be advanced to the Village in three (3) equal installments of

1867    seventy   thousand   dollars   ($70,000.00)   each,   with   the   first

1868    installment being advanced upon execution of this Agreement; the

1869    second installment being advanced on November 1, 1990; and the

1870    third installment being advanced on November 1, 1991.   Funds

1871    advanced to the Village pursuant to this Section 10.1 shall be

1872    considered Developer Advances.  Principal and interest obligations

1873    coming due on the Notes executed by the Village to evidence such

1874    Developer Advances shall not be paid out of the Village's portion

1875    of   the   Phase   I   Allocated   Tax   Increment   Revenue   Amounts   (as

1876    identified in Column 2 of Exhibit "B" attached hereto).

1877        **10.2.       Developer Advance for Police and Fire Personnel**

1878        The  Developer shall advance to the Village the sum of one

1879    million, two hundred twenty-five thousand dollars ($1,225,000)

1880    which the Developer agrees shall be used by the Village to pay the

1881    cost   of   hiring   and   training   sufficient   police   officers   and

1882    firefighters in the sole discretion of the Village, to serve the

1883    Development upon the Developer's occupancy of the SMG Home Office

1884    Complex.  This sum shall be advanced to the Village as follows:  an

1885    initial installment of five hundred twenty-five thousand dollars

1886    ($525,000.00) shall be advanced to the Village on January 1, 1991;

1887    and the balance of seven hundred thousand dollars ($700,000.00)

1888    shall be advanced to the Village on January 1, 1992.   In addition,

02/27/90-H.E.                    59

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1889    commencing January 1, 1993 and continuing on the first day of each

1890    month thereafter through and including April 1 of the calendar year

1891    in which the Phase I Tax Increment Revenue Commencement Date is to

1892    occur, the Developer shall advance an amount which is not more than

1893    sixty-three thousand eight hundred dollars ($63,800.00), which

1894    amount shall be increased by 10% on January 1, 1994 and by 10% on

1895    each January 1 thereafter, in order to reimburse the Village for

1896    police and fire personnel costs incurred by the Village for that

1897    period of time subsequent to the SMG Occupancy Date established by

1898    the SMG Occupancy Date Notice through and including April 30 of the

1899    calendar year in which the Phase I Tax Increment Revenue

1900    Commencement Date occurs.  Notwithstanding the above, the Developer

1901    shall not be obligated to make monthly payments after January 1,

1902    1993 for any months wherein the delay of the Phase I Tax Increment

1903    Revenue Commencement Date is due to breach by the Village as

1904    provided in Article 17 of this Agreement. Funds advanced to the

1905    Village pursuant to this Section 10.2 shall be considered Developer

1906    Advances.   Principal and interest obligations coming due on the

1907    Notes executed by the Village to evidence such Developer Advances

1908    shall not be paid out of the Village's portion of the Phase I

1909    Allocated Tax Increment Revenue Amounts (as identified in Column 2

1910    of Exhibit "B" attached hereto).

1911        **10.3.    Donation of Village Municipal Site**

1912        The Developer shall donate and convey the Village Municipal

1913    Site to the Village, or cause such donation and conveyance to be

1914    made to the Village.  Such donation and conveyance shall occur not

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1915    more than thirty (30) days after the date the Developer, or the

1916    Developer's nominee, acquires title to the portion of the Subject

1917    Property which contains the Village Municipal Site, and, in any

1918    event, such donation and conveyance shall occur prior to issuance

1919    of the first building permit for a structure which is to be

1920    constructed on the Subject Property.  The donation of the Village

1921    Municipal Site shall constitute the donation of land required to be

1922    made to the Village for municipal purposes pursuant to the Beverly

1923    Annexation Agreement.

1924    **10.4.**          **Donations Relating to Redevelopment of PCMT**
1925                      **Property**

1926    **(a)**   **Loss of Contracted Service Income.**

1927          If, during the Term of this Agreement, the Poplar Creek

1928          Music Theater is permanently closed due to the

1929          redevelopment of the PCMT Property (hereafter referred to

1930          as "closure"), and provided such redevelopment occurs at

1931          the request of the Developer, the Developer shall make a

1932          one-time donation to the Village of the sum of four

1933          hundred fifty thousand dollars ($450,000.00) for deposit

1934          in its general fund to compensate for loss of income to

1935          the Village for contracted services. Such donation shall

1936          be made on June 1 of the first year following the date of

1937          the Poplar Creek Music Theater closure as aforesaid.

1938          Funds donated to the Village pursuant to this Section

1939          10.4(a) shall not be considered Developer Advances and

1940          such sums shall not be paid out of Tax Increment Revenues

1941          or out of the proceeds of Revenue Bonds.

02/27/90-H.E.                    61

1942      **(b)**   **Reductions in Equalized Assessed Value.**

1943            If, as a result of the Poplar Creek Music Theater closure

1944            and the redevelopment of the PCMT Property, provided such

1945            redevelopment occurs at the request of the Developer, the

1946            equalized assessed value of that property, during the

1947            period of redevelopment, falls below the portion of the

1948            Total   Initial   Equalized   Assessed   Value   which   was

1949            attributable to the property, the Developer shall pay to

1950            the Village an amount equal to the Village's loss in real

1951            property tax revenue occasioned by said closure.   Such

1952            loss in real property tax revenue shall be computed by

1953            multiplying: (i) the difference between that portion of

1954            the Total Initial Equalized Assessed Value which was

1955            attributable to the property and the then equalized

1956            assessed value of such property; by (ii) the Village's

1957            real estate tax rate for the applicable tax year.   This

1958            donation   shall   be   recomputed   every   year   and   shall

1959            continue for so long as the Village realizes a loss in

1960            real property tax revenue as a result of the closure of

1961            the Poplar Creek Music Theater (as computed above) or

1962            until this Agreement terminates, whichever first occurs.

1963            Funds   paid   to   the   Village   pursuant   to   this   Section

1964            10.4(b)   may   be   used   by   the   Village   for   any   legal

1965            purposes.   Such funds shall not be considered Developer

1966            Advances and such funds shall not be paid out of Tax

1967            Increment Revenues or out of the proceeds of Revenue

1968    Bonds.    Notwithstanding the foregoing, no such funds

1969    shall be paid to the Village unless the Village shall

1970    first have obtained the opinion of a nationally

1971    recognized bond counsel that such payment will not affect

1972    the tax-exempt status of any outstanding Bonds.

1973    (c)    **Municipal Entertainment Tax.**

1974    If, as a result of the closure of the Poplar Creek Music

1975    Theater and the redevelopment of the PCMT Property,

1976    provided such redevelopment occurs at the request of the

1977    Developer, then the Developer shall pay to the Village an

1978    amount equal to the amount of municipal entertainment tax

1979    revenue which was realized by the Village in the year

1980    immediately preceding such closure provided, however,

1981    that the Developer shall only be required to pay such

1982    sums to the Village for so long as the Village shall be

1983    entitled to receive funds under Section 10.4(b).    Funds

1984    paid to the Village pursuant to this Section 10.4(c) may

1985    be used by the Village for any legal purposes.    Such

1986    funds shall not be considered Developer Advances and such

1987    funds shall not be paid out of Tax Increment Revenues or

1988    out of the proceeds of Revenue Bonds.

1989    **10.5.**    **Developer Advance for Miscellaneous Village Project**
1990    **Costs**

1991    The Developer shall advance to the Village, within thirty (30)

1992    days of the date of this Agreement, the sum of fifty-eight thousand

1993    three hundred dollars ($58,300.00) in order to reimburse the

1994    Village for the fees of Chapman & Cutler (in the amount of

02/27/90-H.E.                    63

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

1995 $40,000.00) and the fees of Teska & Associates, Inc. (in the amount

1996 of $18,300.00), which fees were incurred by the Village in

1997 establishing the Economic Development Project and preparing the

1998 Economic Development Plan. Funds advanced to the Village pursuant

1999 to this Section 10.5 shall be considered a Developer Advance.

2000 Principal and interest obligations coming due on the Note executed

2001 by the Village to evidence such Developer Advance shall not be paid

2002 out of the Village's portion of the Phase I Allocated Tax Increment

2003 Revenue Amounts (as identified in Column 2 of Exhibit "B" attached

2004 hereto).

2005  **10.6.**  <u>**No Other Donations**</u>

2006  In consideration of the donations which the Developer has

2007 agreed to make in accordance with the provisions of this Article

2008 10, and in further consideration of the fact that the Parties

2009 contemplate satisfying and financing all public costs of developing

2010 the Subject Property pursuant to the provisions of this Agreement,

2011 the Developer shall not be required by the Village, directly or

2012 indirectly, to make any other donations of land or cash to the

2013 Village or any other public body as a result of the Development of

2014 the Subject Property or in furtherance of the Economic Development

2015 Project. Specifically, but without limitation, the Developer shall

2016 not be required by the Village: (i) to pay any impact fees for

2017 Village Project Costs, or for improvements which are to be financed

2018 pursuant to this Agreement (other than customarily and uniformly

2019 imposed sewer and water connection and user charges, building and

2020 occupancy permit fees and engineering inspection and plan review

02/27/90-H.E.     64

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

2021  fees); or (ii) to make any donations of land or cash to the Village

2022  for school, park, library or other public purposes (whether

2023  pursuant to the Beverly Annexation Agreement, the Nederlander

2024  Annexation Agreement, or otherwise).

2025  ARTICLE 11.   <u>**NOTICES**</u>

2026  All notices required or permitted to be given pursuant to the

2027  provisions of this Agreement shall be in writing and shall be

2028  served on the Parties, either personally, with evidence of receipt,

2029  or by certified or registered mail, return receipt requested, as

2030  follows:

2031  **if to the Village:**        Village of Hoffman Estates
2032                               1200 North Gannon Drive
2033                               Hoffman Estates, Illinois 60196
2034                               Attn:  Village Manager
2035
2036  **with copies to:**          Village of Hoffman Estates
2037                               1200 North Gannon Drive
2038                               Hoffman Estates, Illinois 60196
2039                               Attn:  Corporation Counsel
2040
2041                               Burke & Ryan
2042                               33 North Dearborn Street
2043                               Suite 402
2044                               Chicago, Illinois 60602
2045                               Attn:  William E. Ryan, Esq.
2046
2047  **if to the Developer:**     Sears, Roebuck and Co.
2048                               Sears Tower
2049                               Chicago, Illinois 60684
2050                               Attn:  Senior Vice President
2051                                      Resources and Administration,
2052                                      Department 707
2053
2054  **with copies to:**          Sears, Roebuck and Co.
2055                               Sears Tower
2056                               Chicago, Illinois 60684
2057                               Attn:   General Counsel
2058                                       Merchandise Group
2059                                       Department 766
2060
2061
2062

02/27/90-H.E.                          65

```
2063                              Tully & Weinstein
2064                              77 West Washington Street
2065                              Suite 1500
2066                              Chicago, Illinois 60602
2067                              Attn:  Thomas Tully, Esq.
2068
2069                                       and
2070
2071                              Rudnick & Wolfe
2072                              203 North LaSalle Street
2073                              Suite 1800
2074                              Chicago, Illinois 60601
2075                              Attn:    J. Kevin Garvey, Esq.
2076                                       Harold W. Francke, Esq.
2077
```

2078   Either party's address may be changed from time to time by such

2079   party giving notice, as provided above, to the other party.

2080   Notices delivered personally shall be deemed given on receipt.

2081   Notices delivered by certified or registered mail shall be deemed

2082   given two (2) business days after the date of post-marking.

2083       **ARTICLE 12.     <u>MEMORANDUM OF AGREEMENT</u>**

2084       Neither of the Parties shall record this Agreement, but each

2085   party agrees to execute and to deliver to the other party, when

2086   this Agreement is executed and delivered, multiple copies of a

2087   Memorandum of this Agreement in a form acceptable to their

2088   respective counsel.  Either of the Parties, at its sole expense,

2089   may record such Memorandum in the Office of the Recorder of Deeds

2090   of Cook County, Illinois.  Such Memorandum shall recite the

2091   covenants contained in Article 9 of this Agreement and such

2092   covenants shall run with the land and be binding upon the Developer

2093   and its agents, representatives, successors, assigns, tenants and

2094   transferees for so long as any Bonds are issued and outstanding.

2095   If and when the Bonds have been paid in full and redeemed (other

2096   than by a refunding), the covenants contained in Article 9 of this

02/27/90-H.E.                    66

2097  Agreement shall become null and void and the Village shall issue a

2098  release of such covenants in recordable form and deliver such

2099  release to the Developer for recording in the Office of the Cook

2100  County Recorder of Deeds.

2101  **ARTICLE 13.    PERMITTED DELAYS**

2102  Neither of the Parties shall be deemed to be in default

2103  hereunder in the performance of any obligation where delays or

2104  defaults in such performance are due to war, insurrection, strikes,

2105  lockouts, riots, floods, earthquakes, fires, casualties, acts of

2106  God, acts of the public enemy, epidemics, quarantine restrictions,

2107  freight embargoes and lack of transportation, or the inability to

2108  secure, or the revocation or suspension of, necessary governmental

2109  licenses, permits, authorizations and approvals or the failure of

2110  the other party to this Agreement to keep and perform the covenants

2111  and obligations on its part to be kept and performed.  An extension

2112  of time for any such cause shall be for the period of the delay,

2113  which period shall commence to run from the time of the

2114  commencement of the cause, provided that written notice by the

2115  party claiming such extension is sent to the other party not more

2116  than twenty (20) days after the commencement of such cause.

2117  **ARTICLE 14.    MORTGAGE HOLDERS**

2118  **14.1.    Rights and Obligations**

2119  The holder of any mortgage, deed of trust or other security

2120  interest, the lessor under any ground lease, and the grantee under

2121  any other conveyance for financing, shall not be obligated by the

2122  provisions of this Agreement to construct or complete the

02/27/90-H.E.                    67

2123     improvements which are contemplated by this Agreement or the

2124     Economic Development Plan or to guarantee such construction or

2125     completion, notwithstanding the collateral assignment of this

2126     Agreement to such party by the Developer.   Nothing in this

2127     Agreement shall be deemed to permit or authorize any such holder,

2128     lessor or grantee to devote the Subject Property to  any uses, or

2129     to construct any improvements thereon, other than those uses or

2130     improvements provided for or authorized by this Agreement or the

2131     Amendment to the Annexation Agreements, any such unauthorized use

2132     or improvements being expressly prohibited.

2133         **14.2.    <u>Notice/Assumption of Obligations</u>**

2134         Whenever the Village shall deliver any notice or demand to the

2135     Developer with respect to any alleged breach or default by the

2136     Developer hereunder, the Village, at the same time, shall deliver

2137     to each holder of record of any mortgage, deed of trust or other

2138     security interest, and to the lessor of any ground lease and to the

2139     grantee under any other conveyance for financing, a copy of such

2140     notice or demand, provided the Village has been advised in writing

2141     by the Developer, or such holder, lessor, or grantee, of the name

2142     and address of any such holder, lessor or grantee.  Each such

2143     holder, lessee or grantee (insofar as the rights of the Village are

2144     concerned) shall have the same right to cure or remedy, or to

2145     commence to cure or remedy, any such default, provided, however,

2146     that in the event of a default by the Developer hereunder which is

2147     not curable by such holder, lessor or grantee (e.g., insolvency or

2148     bankruptcy of the Developer), such holder, lessor or grantee shall

2149   be deemed to have cured such noncurable defaults by its execution

2150   of the assumption agreement contemplated in the later portions of

2151   this Section 14.2.   Nothing contained in this Agreement shall be

2152   deemed to permit or authorize such holder, lessor or grantee to

2153   undertake or continue the construction or completion of the

2154   improvements contemplated by this Agreement (beyond the extent

2155   necessary to conserve or protect the improvements or construction

2156   already made) without first having expressly assumed the

2157   Developer's obligations (with respect to the portion of the Subject

2158   Property on which the holder, lessor or grantee has a security

2159   interest) to the Village by written agreement satisfactory to the

2160   Village.   In such event, the holder, lessor or grantee shall agree

2161   to complete, in the manner provided in this Agreement, the

2162   improvements to which the security interest of such holder, lessor

2163   or grantee relates, and submit evidence satisfactory to the Village

2164   that it has the qualifications and financial responsibility

2165   necessary to perform such obligations.   The assumption agreement

2166   shall provide that such holder, lessor or grantee shall only be

2167   deemed to have assumed the Developer's obligations for as long as

2168   they have a security interest in the Subject Property, and that the

2169   Village's sole and exclusive remedy for a breach of the assumption

2170   agreement is forfeiture of the equity interest of such holder,

2171   lessor or grantee in the Subject Property.   No such assumption

2172   agreement shall relieve the Developer of any of its obligations

2173   under this Agreement.   Any such holder, lessor or grantee properly

2174   completing such improvement shall be entitled, upon written request

02/27/90-H.E.                    69

2175    made to the Village, to a certificate of occupancy from the Village

2176    with respect to such improvements.  To the extent of a conflict,

2177    ambiguity or inconsistency between the provisions of this Section

2178    14.2 and the provisions of any underlying agreement between the

2179    Developer and a holder, lessor or grantee of any security interest

2180    in the Subject Property, the former shall control.

2181    **14.3.    <u>Village Right to Cure Defaults</u>**

2182    In the event the Developer, or any entity acquiring title to

2183    the Subject Property, or any portion thereof, defaults in the

2184    construction or completion of construction of the improvements

2185    contemplated by the provisions of this Agreement, and such default

2186    is also a default under any mortgage, deed of trust, other security

2187    instrument or lease-back or obligation to the grantee under any

2188    other conveyance for financing, and the holder, lessor or grantee,

2189    as the case may be, elects not to exercise its option to cure such

2190    default, the Village may cure such default, or cause the same to be

2191    cured, prior to completion of any foreclosure, termination of lease

2192    or other remedial proceeding as a result of such default.  In such

2193    event, the Village, or its nominee, shall be entitled to

2194    reimbursement from the Developer, or such other entity, of all

2195    reasonable costs and expenses incurred by the Village in curing the

2196    default (including reasonable attorney's fees).  The Village shall

2197    also be entitled to a lien upon the Subject Property to the extent

2198    of such reasonable costs and expenses (including reasonable

2199    attorneys' fees).  Any such lien shall be subject to the lien of

2200    the mortgages, deeds of trust and other security instruments, and

02/27/90-H.E.                        70

2201   to the prior interests of a lessor under any lease-back or ground

2202   lease, executed for the purpose of obtaining funds to purchase or

2203   develop the Subject Property, to construct the improvements

2204   contemplated by this Agreement, to finance the costs of such

2205   construction or to pay the costs reasonably related to the

2206   Developer's performing its obligations under this Agreement.

2207   **ARTICLE 15.**   **NO DISCRIMINATION-CONSTRUCTION**

2208   The Developer, in connection with the development of the

2209   Subject Property, shall not discriminate against any employee or

2210   applicant for employment because of race, color, religion, sex or

2211   national origin.  The Developer shall take affirmative action to

2212   require that applicants are employed, and that employees are

2213   treated during employment, without regard to their race, color,

2214   religion, sex or national origin.  Such action shall include, but

2215   not be limited to, the following:  employment upgrading, demotion,

2216   or transfer; recruitment or recruitment advertising, solicitations

2217   or advertisements for employees; layoff or termination; rates of

2218   pay or other forms of compensation; and selection for training,

2219   including apprenticeship.  The Developer agrees to post in

2220   conspicuous places, available to employees and applicants for

2221   employment, notices which may be provided by the Village setting

2222   forth the provisions of this non-discrimination clause.

2223   **ARTICLE 16.**   **NO DISCRIMINATION-USE**

2224   The Developer shall not discriminate against any person, or

2225   group of persons, on account of sex, race, color, religion or

2226   national origin in the sale, lease, sublease, transfer, use,

02/27/90-H.E.                          71

FILED DATE: 10/10/2018 4:46 PM 2018CH12683

2227    occupancy, tenure or enjoyment of the Subject Property, nor shall

2228    the Developer establish or permit, or knowingly allow any person

2229    claiming under or through the Developer to establish or permit, any

2230    such practice or practices of discrimination with reference to the

2231    selection, location, number, use, or occupancy of tenants, lessees,

2232    subtenants, sublessees, or vendees of any portion of the Subject

2233    Property.

2234    **ARTICLE 17.    REMEDIES-LIABILITY**

2235    **17.1.    Developer Remedies**

2236    The sole remedies of the Developer in the event of a breach by

2237    the Village in any of the terms of this Agreement shall be: (i) to

2238    institute legal action for specific performance, mandamus or

2239    mandatory injunction against the Village (including the right to

2240    require the Village to make any payment required to be made by this

2241    Agreement and to issue Revenue Bonds); and (ii) to maintain an

2242    action at law for the Developer's actual (but not consequential or

2243    punitive) damages, provided, however, that such right to maintain

2244    an action for actual damages shall be limited to a Village default

2245    in the performance of one or more of the following Village

2246    obligations, which default results in a breach of the terms of this

2247    Agreement:

2248    (a)    The obligation to issue Revenue Bonds, to the extent and

2249    when provided for by the provisions of this Agreement;

2250    (b)    The obligation to make payments to the Developer or

2251    others on construction contracts which have been approved

2252    by the Board of Trustees pursuant to the provisions of

02/27/90-H.E.                    72

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

2253                    this Agreement; and

2254        (c)    The obligation to reimburse the Developer for Project

2255                Costs which the Developer has paid or incurred, to the

2256                extent and when provided for by the provisions of this

2257                Agreement.

2258    In the event the Developer obtains a final non-appealable judgment

2259    against the Village for either legal or equitable relief as

2260    provided above, as a result of a breach of this Agreement by the

2261    Village, the Developer shall be entitled to recover the reasonable

2262    attorneys fees and court costs it has incurred in securing such

2263    judgment.

2264        Notwithstanding the foregoing, the Developer shall have the

2265    right to terminate this Agreement at any time before it occupies

2266    any part of the SMG Home Office Complex upon paying the Village all

2267    costs, expenses, claims, liabilities and all fees including

2268    attorneys fees that the Village has incurred that relate directly

2269    to the creation of the Economic Development Project, the

2270    preparation and adoption of the Economic Development Plan and this

2271    Agreement, as more fully set forth in Article 20.

2272    **17.2.    Village Remedies**

2273        The Village shall have all remedies at law or equity against

2274    the Developer for any breach by the Developer in any of the terms

2275    of this Agreement including the right to reasonable attorneys fees

2276    and court costs, subject to the Developer's right to terminate this

2277    Agreement as set forth in Section 17.1.    Notwithstanding the

2278    foregoing, the Village shall not have the right to maintain an

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

2279    action against the Developer for consequential or punitive damages.

2280        **17.3.**        <u>**Defaults-Rights to Cure**</u>

2281        Subject to the extensions of time set forth in Article 13 of

2282    this Agreement, failure or delay by either party to perform any

2283    term or provision of this Agreement shall constitute a default

2284    under this Agreement.  The party who so fails or delays must, upon

2285    receipt of written notice of the existence of such default,

2286    immediately commence to cure, correct or remedy such default and

2287    thereafter proceed with diligence to cure such default.  The party

2288    claiming such default shall give written notice of the alleged

2289    default to the party alleged to be in default specifying the

2290    default complained of by the injured party.  Except as required to

2291    protect against further damages, and except as otherwise expressly

2292    provided in this Agreement, the injured party may not institute

2293    proceedings against the party in default until thirty (30) days

2294    after giving such notice.  If such default is cured within such

2295    thirty (30) day period, the default shall not be deemed to

2296    constitute a breach of this Agreement.  If the default is one which

2297    cannot reasonably be cured within thirty (30) days, and if the

2298    defaulting party shall commence to cure the same within such thirty

2299    (30) day period, said thirty (30) day period shall be extended for

2300    such time as is reasonably necessary for the curing of the same, so

2301    long as the defaulting party diligently proceeds to cure such

2302    default.  If such default is cured within such extended period, the

2303    default shall not be deemed to constitute a breach of this

2304    Agreement.  However, a default not cured as provided above shall

02/27/90-H.E.                    74

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

2305   constitute a breach of this Agreement.    Except as otherwise

2306   expressly provided in this Agreement, any failure or delay by

2307   either party in asserting any of its rights or remedies as to any

2308   default or alleged default or breach shall not operate as a waiver

2309   of any such default or breach or any rights or remedies it may have

2310   as a result of such default or breach.

2311        **17.4.    <u>Acts and Omissions of Default</u>**

2312        At the option of the Village, each of the following acts or

2313   omissions of the Developer shall constitute a default under this

2314   Agreement:

2315        (a)   The Developer transfers, or suffers any involuntary

2316              transfer of, the Subject Property in violation of the

2317              terms of Article 18 of this Agreement;

2318        (b)   The Developer files a petition seeking any debtor relief

2319              or executes any instrument for the purpose of effecting

2320              a composition of creditors;

2321        (c)   The Developer makes an assignment for the benefit of

2322              creditors; or

2323        (d)   The Developer is adjudicated as bankrupt.

2324        **17.5.    <u>Dispute Resolution</u>**

2325        (a)   If, at any time during the Term of this Agreement, the

2326              Parties do not agree on any of the following three

2327              issues:

2328              (i)   Whether or not a given Project Cost which is

2329                    to be paid or financed pursuant to the terms

2330                    of this Agreement is "reasonable or necessary"

2331                                       to the Economic Development Project;

2332            (ii)    Whether a given Project Cost constitutes a

2333                    Village Project Cost; or

2334            (iii)   Whether the Parties have fulfilled their

2335                    respective obligations under this Agreement

2336                    relative to the issuance of Revenue Bonds;

2337        then, at the option of either the Village or the

2338        Developer, the Parties shall attempt to resolve such

2339        disagreement pursuant to the provisions of this Section

2340        17.5.  If either the Village or the Developer seeks to

2341        exercise such option, notice of such election shall be

2342        given to the other party within thirty (30) days of the

2343        date it first becomes apparent to the Parties that such

2344        disagreement exists.

2345    (b)    If, pursuant to the provisions of the foregoing paragraph

2346        (a), either of the Parties shall seek to resolve a

2347        disagreement that pertains to one of the issues described

2348        in said paragraph (a), such party shall select an expert,

2349        at such party's cost, who shall have the responsibility

2350        to consider the issue in dispute and render an opinion,

2351        within twenty-one (21) days, relative to the resolution

2352        of such disagreement.  If, following the receipt of such

2353        opinion, the other party wishes to retain its own expert,

2354        such other party shall have the right to do so, at such

2355        party's cost, and, in such event, such expert shall also

2356        proceed to consider the issue in dispute and render an

02/27/90-H.E.                       76

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

2357          opinion, within twenty-one (21) days, relative to the

2358          resolution of such disagreement.  If, after receipt of

2359          the foregoing opinions, the Parties are still unable to

2360          resolve their disagreement, the Parties' respective

2361          experts shall jointly designate a third expert, at a cost

2362          to be shared equally by the Parties, who shall have the

2363          responsibility to consider the issue in dispute and

2364          render such expert's opinion, within twenty-one (21)

2365          days, relative to the resolution of such disagreement.

2366          None of the opinions rendered by any of the foregoing

2367          experts shall be binding on the Parties unless both

2368          Parties agree otherwise.

2369     (c)  Either of the Parties shall have the right, after

2370          completing the procedure provided for in paragraph (b)

2371          above, to seek the resolution of a disagreement in a

2372          trial de novo before the Circuit Court of Cook County.

2373          No damages (actual, consequential or punitive) shall be

2374          claimed by either of the Parties during the period the

2375          Parties are attempting to resolve, or as a result of the

2376          Parties' attempt to resolve, a disagreement pursuant to

2377          the  provisions of the foregoing paragraph (b).

2378     **17.6.**    <u>**Right to Continue Construction Activities**</u>

2379     The Parties acknowledge that one of the primary objectives of

2380 this Agreement is the Developer's timely completion of the SMG Home

2381 Office Complex.  Accordingly, the Village shall not take any action

2382 to delay, hinder or prevent the construction of the SMG Home Office

02/27/90-H.E.                    77

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

2383    Complex, or the construction of any of the Public Site

2384    Improvements, notwithstanding any actual or alleged breach or

2385    default by the Developer in any of the obligations imposed on the

2386    Developer by the terms of this Agreement that relate to the payment

2387    or financing of Project Costs, and notwithstanding the pendency of

2388    any dispute resolution or court proceeding under Section 17.5

2389    hereof.  The foregoing shall not preclude the Village from taking

2390    any action against the Developer in the event of a violation of any

2391    law, ordinance or regulation or the exercise of the Village's

2392    police powers in the public interest.

2393    **ARTICLE 18.   ASSIGNMENT   OF   DEVELOPER   RIGHTS   AND**
2394    **OBLIGATIONS/CONVEYANCES OF THE SUBJECT PROPERTY**

2395    **18.1.    Assignment of Developer Rights and Obligations**

2396    The rights and obligations of the Developer under this

2397    Agreement shall not be assigned except as provided by this Section

2398    18.1.

2399    (a)   The term "Developer", as used in this Section 18.1, shall

2400    mean only:

2401    (i)   Sears, Roebuck and Co., a New York

2402    corporation;

2403    (ii)   Any entity which is a parent, controlling

2404    shareholder (i.e. owning fifty-one percent

2405    (51%) or more of the capital stock), or fifty-

2406    one percent (51%) or more owned subsidiary of

2407    Sears, Roebuck and Co.;

2408    (iii)   Any entity which is owned, to the extent of at

2409    least a fifty-one percent (51%) controlling

02/27/90-H.E.                    78

2410                    interest, by Sears, Roebuck and Co. or an

2411                    entity described in the foregoing paragraph

2412                    (ii); and

2413         (iv)     Any entity to whom the Developer has conveyed

2414                    a portion of the Subject Property consisting

2415                    of one hundred (100) acres or more and

2416                    assigned its rights under this Agreement

2417                    pursuant to Section 18.2.

2418    (b)     Except as provided in paragraph (c) of this Section 18.1,

2419         all rights of the Developer established by the terms of

2420         this Agreement shall inure solely to the benefit of the

2421         Developer and shall not be subject to assignment by the

2422         Developer and, specifically but without limitation, the

2423         Village shall not be required to issue Revenue Bonds in

2424         order to satisfy and pay for Project Costs except for the

2425         Developer.

2426    (c)     The following rights established by the terms of this

2427         Agreement shall inure to the benefit of: (i) the

2428         Developer; and (ii) any assignee of such rights acquiring

2429         an ownership interest in the Subject Property pursuant to

2430         a sale or conveyance of a portion of the Subject Property

2431         (or pursuant to an assignment of an interest in a

2432         corporation, partnership or land trust) that does not

2433         violate Section 18.2 of this Agreement:

2434         (i)      The right to have costs incurred in

2435                  furtherance of the Economic Development Plan

2436           and the Development deemed Project Costs (to

2437           the fullest extent permitted by law) and,

2438           subject to the rights of holders of any

2439           Obligations and subject to the provisions of

2440           paragraph (b) above, to have such Project

2441           Costs paid for, financed or reimbursed

2442           pursuant to Article 6 of this Agreement;

2443      (ii)    The right to challenge real estate taxes (as

2444           provided in Section 9.2 of this Agreement);

2445      (iii)   The right to develop the Subject Property

2446           without regard to then existing Village

2447           donation requirements (as provided in Section

2448           10.6 of this Agreement);

2449      (iv)    The right to maintain an action against the

2450           Village and to only recover reasonable

2451           attorneys fees and court costs from the

2452           Village in the event of a Village default

2453           under the provisions of this Agreement (as

2454           provided in Section 17.1 of this Agreement);

2455           and

2456      (v)     The right to sell, convey, mortgage, lease and

2457           otherwise transfer interests in and to the

2458           Subject Property (subject to the limitations

2459           of, and as provided for in, Section 18.2 of

2460           this Agreement).

2461    (d)   Except as provided in paragraph (e) of this Section 18.1,

02/27/90-H.E.             80

FILED DATE: 10/10/2018 4:46 PM  2018CH12683

all obligations, including Developer's indemnification
obligations under Article 20 of this Agreement, of the
Developer established by the terms of this Agreement
shall be solely the obligations of the Developer.

(e)    With respect to the development of the various portions
of the Subject Property, the following obligations shall
be the obligations of the party or entity undertaking
such development or causing such development to be
undertaken:

    (i)    The obligation to devote such portion of the
Subject Property as is being developed to only
the uses specified in the Economic Development
Plan (as provided in Section 3.4 of this
Agreement);

    (ii)    The obligation to procure and maintain
insurance covering construction on such
portion of the Subject Property (as provided
in Section 3.5 of this Agreement);

    (iii)    The obligation to submit plats and plans, and
to undertake construction, in accordance with
the codes and ordinances of the Village (as
provided in Section 3.6 of this Agreement);

    (iv)    The obligation to refrain from protesting real
estate taxes or assessed valuations of the
Subject Property (as provided in Section 9.1
of this Agreement);

02/27/90-H.E.                    81

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

|      |       |                                                                      |
|------|-------|----------------------------------------------------------------------|
| 2488 | (v)   | The obligation to grant and provide                                  |
| 2489 |       | dedications, easements and rights of way                             |
| 2490 |       | necessary to the development of such portion                         |
| 2491 |       | of the Subject Property (as provided in                              |
| 2492 |       | Article 19 of this Agreement); and                                   |
| 2493 | (vi)  | The obligation to indemnify the Village                              |
| 2494 |       | against costs and expenses incurred by the                           |
| 2495 |       | Village as a result of construction activities                       |
| 2496 |       | on such portion of the Subject Property and as                       |
| 2497 |       | a result of the negligence of general                                |
| 2498 |       | contractors, subcontractors and their                                |
| 2499 |       | respective employees (as provided in Article                         |
| 2500 |       | 20 of this Agreement).                                                |

2501 **18.2.    Conveyances of the Subject Property**

2502    The Developer shall have the right to sell, convey, mortgage,

2503 lease and otherwise transfer interests in and to the Subject

2504 Property without limitation and without the approval of the Village

2505 provided, however, that:

|      |     |                                                                     |
|------|-----|---------------------------------------------------------------------|
| 2506 | (a) | The Developer shall not sell or transfer any interest in            |
| 2507 |     | and to that portion of the Phase I Site on which the SMG            |
| 2508 |     | Home Office Complex is to be constructed until issuance              |
| 2509 |     | by the Village of the first occupancy permit for the SMG           |
| 2510 |     | Home Office Complex and until after the Developer's                 |
| 2511 |     | Merchandise Group, or another entity, division or group            |
| 2512 |     | controlled or owned by Developer, shall have occupied the          |
| 2513 |     | SMG Home Office Complex for at least ten (10) years                 |

02/27/90-H.E.                    82

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

2514        following the SMG Occupancy Date; and

2515    (b)  If:

2516        (1)  The Developer seeks to sell, transfer or convey any

2517             portion of the Subject Property consisting of one

2518             hundred (100) acres or more; and

2519        (2)  The Developer seeks to be relieved of liability

2520             under this Agreement with respect to such portion

2521             of the Subject Property; and

2522        (3)  Bonds are outstanding;

2523        then the Village shall have the right to require that any

2524        purchaser/grantee of such portion of the Subject Property

2525        satisfy the following conditions and meet the following

2526        standards:

2527        (i)   Any  such  purchaser/grantee  shall  have  the

2528              experience   and   financial   responsibility

2529              necessary   to   fulfill   the   Developer's

2530              obligations  under  this  Agreement  (to  the

2531              extent  applicable  to  such  portion  of  the

2532              Subject Property);

2533        (ii)  Any such purchaser/grantee shall have expressly

2534              assumed,   in   writing,   the   Developer's

2535              obligations  under  this  Agreement  (to  the

2536              extent  applicable  to  such  portion  of  the

2537              Subject Property);

2538        (iii) All   instruments   confirming   the   matters

2539              specified in the foregoing paragraphs (i) and

02/27/90-H.E.                    83

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

2540                    (ii) Shall be submitted to the Village for

2541                    review and approval (which approval shall not

2542                    be unreasonably withheld or delayed).

2543        Upon the occurrence of a sale or conveyance that satisfies the

2544    foregoing conditions and meets the foregoing standards, the

2545    Developer shall be relieved of all liability under this Agreement

2546    (to the extent applicable to such portion of the Subject Property).

2547    No conveyance of a portion of the Subject Property consisting of

2548    one hundred (100) acres or more that fails to satisfy the foregoing

2549    conditions or meet the foregoing conditions, shall be deemed to

2550    relieve the Developer of any of its obligations under this

2551    Agreement with respect to such portion of the Subject Property.

2552        The provisions of this Section 18.2 are intended to be

2553    applicable to a sale and assignment of a beneficial interest in a

2554    land trust, a sale and assignment of partnership interests, a sale

2555    and transfer of capital stock in a corporation, and other

2556    comparable transactions which would effectively frustrate the

2557    spirit and intent of these provisions. However, the provisions of

2558    this Section 18.2 are not intended to preclude or be applicable to,

2559    and such provisions shall not preclude or be applicable to, the

2560    financing, refinancing, sale-leaseback or leasing of any portion of

2561    the Subject Property by the Developer; the sale or transfer of any

2562    interest in and to the Subject Property to an entity controlled or

2563    owned by the Developer; or an assignment of a beneficial interest

2564    in a land trust to, the assignment of partnership interests to, or

2565    the transfer of capital stock in a corporation to an entity

02/27/90-H.E.                    84

2566   controlled or owned by the Developer.  Any entity in which the

2567   Developer holds more than a fifty percent (50%) interest shall be

2568   considered to be controlled or owned by the Developer for purposes

2569   of this Section 18.2.

2570   **18.3.**    The terms and provisions of this Agreement shall be

2571   binding upon and inure to the benefit of the Corporate Authorities

2572   (including successor Corporate Authorities).

2573   **ARTICLE 19.    DEDICATIONS AND EASEMENTS**

2574   The Developer, at no cost to the Village, shall grant and

2575   provide all reasonable street dedications and permanent and

2576   temporary easements and rights-of-way reasonably requested by the

2577   Village in connection with the Development, including, but not

2578   limited to, easements and rights-of-way for vehicular access,

2579   pedestrian access, parking facilities, sanitary sewers, storm

2580   drains, water lines, street lighting, and electrical power,

2581   telephone, cable TV and natural gas lines.

2582   **ARTICLE 20.    DEVELOPER INDEMNIFICATION**

2583   (a)   The Developer shall indemnify and hold harmless the

2584   Village, its agents, officers and employees, against all

2585   injuries, deaths, losses, damages, claims, suits,

2586   liabilities (including any liability under the Illinois

2587   Structural Work Act, known as the Scaffolding Act),

2588   judgments, costs and any reasonable expenses of

2589   consultants, lawyers and other reasonable expenses of any

2590   type, except Village Project Costs, that are directly or

2591   indirectly related to the creation of the Economic

02/27/90-H.E.                    85

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

2592    Development Project, the preparation or adoption of the

2593    Economic Development Plan and this Agreement, including,

2594    but not limited to any breach of the terms of this

2595    Agreement by the Developer; the sale and use of any Bonds

2596    pursuant to this Agreement (other than General Obligation

2597    Bonds and other Village Obligations secured solely by the

2598    Village's portion of the Allocated Tax Increment Revenue

2599    Amounts); the Developer's improvement of the Subject

2600    Property and construction of the Development, and from

2601    any negligence or reckless misconduct of the Developer,

2602    its general contractor or its employees and agents, or of

2603    a  subcontractor  of  the  general  contractor  or  his

2604    employees,  if  any,  in  connection  therewith,  and  the

2605    Developer shall, at its own expense, appear, defend and

2606    pay all charges of attorneys and costs and other expenses

2607    arising  therefrom  or  incurred  in  connection  with  any

2608    claim for which the Developer is responsible hereunder,

2609    and,  if  any  judgment  shall  be  rendered  against  the

2610    Village, its agents, officials or employees in any such

2611    action  involving  any  claim  for  which  the  Developer  is

2612    responsible hereunder, the Developer shall, at its own

2613    expense, satisfy and discharge the same.  The Developer

2614    expressly  understands  and  agrees  that  the  insurance

2615    protection required by Section 3.5 of this Agreement

2616    shall in no way limit the responsibility to indemnify,

2617    hold  harmless  and  defend  as  herein  provided  in  this

02/27/90-H.E.                    86

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

2618                Article 20, but to the extent a particular claim, action

2619                or liability is covered by such insurance, the Developer

2620                shall be released of liability hereunder.

2621     (b)    The    indemnification    obligations    of    the    Developer

2622                contained in the foregoing paragraph (a) shall not extend

2623                to injuries, deaths, losses, damages, claims, suits,

2624                liabilities, judgments, costs and expenses incurred as a

2625                result of or arising out of: (i) the negligence or

2626                reckless misconduct of the Village, its officers, agents,

2627                employees and contractors; (ii) obligations which the

2628                Village has agreed to pay or incur pursuant to the

2629                provisions of this Agreement; (iii) the Village's breach

2630                in any of the terms of this Agreement; (iv) the Village's

2631                construction of the Public Works and Improvements and the

2632                Sanitary Sewer Improvements; and (iv) the Village's

2633                improvement and use of the Village Municipal Site.

2634    **ARTICLE 21.**    **AMENDMENT/INTEGRATION**

2635        This Agreement, and any exhibits attached hereto, may be

2636  amended only by the mutual consent of the Parties with, on the part

2637  of the Village, the adoption of an ordinance or resolution of the

2638  Board of Trustees approving said amendment, as provided by law, and

2639  by the execution of said amendment by the Parties or their

2640  successors in interest.  The Amendment to the Annexation Agreements

2641  and this Agreement, when both are fully executed by the Parties,

2642  shall constitute the entire understanding and agreement of the

2643  Parties relative to the subject matter hereof superseding all prior

02/27/90-H.E.            87

2644  agreements, negotiations and discussions relative to such subject

2645  matter. All exhibits to this Agreement are expressly incorporated

2646  herein by this reference thereto.

2647  **ARTICLE 22.    DUPLICATE ORIGINALS**

2648  This Agreement is executed in four (4) duplicate originals,

2649  each of which is deemed to be an original.

2650  **ARTICLE 23.    TIME IS OF THE ESSENCE**

2651  Time is of the essence of this Agreement.

2652  **ARTICLE 24.    TERM**

2653  This Agreement shall remain in full force and effect until

2654  termination of the Project Area and the Economic Development Plan

2655  or until otherwise terminated pursuant to the terms hereof.

2656  **ARTICLE 25.    INTERPRETATION**

2657  The laws of the State of Illinois shall govern the

2658  interpretation and enforcement of the terms and provisions of this

2659  Agreement.

2660  **ARTICLE 26.    SEVERABILITY.**

2661  In the event any phrase, paragraph, article or portion of this

2662  Agreement is found to be invalid, illegal or unenforceable by any

2663  court of competent jurisdiction, such finding of invalidity,

2664  illegality or unenforceability as to that phrase, paragraph,

2665  article or portion shall not affect the validity, legality or

2666  enforceability of the remaining portions of this Agreement.

2667  **ARTICLE 27.    CAPTIONS AND PRONOUNS.**

2668  The captions and headings of the various articles and sections

2669  of this Agreement are for convenience only, and are not to be

02/27/90-H.E.                    88

2670    construed as confining, defining, expanding or limiting in any way

2671    the scope or intent of the provisions hereof.  Whenever the context

2672    requires or permits, the singular shall include the plural, the

2673    plural shall include the singular, and the masculine, feminine and

2674    neuter shall be freely interchangeable.

2675

02/27/90-H.E.                    89

2676      **IN WITNESS WHEREOF** this Agreement has been duly authorized and

2677  approved by the President and Board of Trustees of the Village of

2678  Hoffman Estates, Cook and Kane Counties, Illinois, and executed by

2679  the Parties as of the day and year first above set forth.

2680

2681                    **VILLAGE:**

2682

2683                    **VILLAGE OF HOFFMAN ESTATES,** an

2684                    Illinois home rule municipal

2685                    corporation

2686

2687

2688                    By:

2689                      Its:    Village President

2690

2691  **ATTEST:**

2692

2693

2694  By:

2695        Its:  Village Clerk

2696        (Seal)

2697

2698                    **DEVELOPER:**

2699

2700                    **SEARS, ROEBUCK AND CO.,** A New

2701                    York corporation

2702

2703

2704                    By:

2705                      Its:  Chairman and Chief

2706                              Executive Officer

2707                              Merchandise Group

2708

2709

2710  **ATTEST:**                                  APPROVED:

2711

2712

2713  By:

2714        Its:  Assistant Secretary

2715        (Seal)

2716

2717

2718

2719

2720

2721

2722

2723

02/27/90-H.E.                  90

## LIST OF EXHIBITS

EXHIBIT A          Summary of Acquisition Contracts

EXHIBIT B          Phase I – Allocated Tax Increment Revenue Amounts

EXHIBIT C          Phase II – Allocated Tax Increment Revenue Amounts

EXHIBIT D          Legal Description of the Phase I Site

EXHIBIT E          Legal Description of the Phase II Site

EXHIBIT F          Legal Description of the Hoffman Estates Economic Development Project Area

EXHIBIT G          Depiction of the Hoffman Estates Economic Development Project Area

EXHIBIT H          Phase I Development Public Site Improvements

EXHIBIT I          Phase II Development Public Site Improvements

EXHIBIT J          Public Works and Improvements

EXHIBIT K          General Depiction of Portion of Phase I Site to Contain SMG Home Office Complex

EXHIBIT L          SMG Occupancy Date Notice

EXHIBIT M          Legal Description of Subject Property

EXHIBIT N          Contracts in Existence or To Be Let by the Developer

EXHIBIT O          Property Assembly Costs Paid, Incurred, or Known by the Developer as of the Date of this Agreement

EXHIBIT P          Project Costs Paid or Incurred by the Developer as of the Date of this Agreement in Connection with Construction of the Public Site Improvements

02/27/90-H.E.          91

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

## EXHIBIT A

## SUMMARY OF ACQUISITION CONTRACTS

1.  **Origer Property** – Two (2) Contracts – Approximately 520 acres

    I.    Date of Contracts:  June 23, 1989

    II.   Owners:

        1.  Approximately 360 acres are owned by two (2) land trusts having as beneficiary The Thomas J. Origer Inter-Vivos Trust;

        2.  Approximately 160 acres are owned by two (2) land trusts with beneficial owners being the children of Thomas J. Origer (seven individuals).

    III.  Purchase Price:

        1.  $ * per square foot;

        2.  $ * (in the aggregate)

    IV.   Closing Date:  The thirtieth (30th) day following the earlier to occur of: (i) satisfaction of zoning contingency; and (ii) June 23, 1990.  If extended the Closing Date shall be no later than October 24, 1990.

B.  **Nederlander Property** – Two (2) Contracts – Approximately 221 acres

    I.    Date of Contracts:  June 24, 1989.

    II.   Owner:  LaSalle National Bank Trust No. 54757 having as beneficiary Ned-Prop, an Illinois joint venture.

    III.  Purchase Price:

        1.  $ * per square foot;

        2.  $ * (in the aggregate)

    IV.   Closing Date:  The thirtieth (30th) day following the earlier to occur of: (i) satisfaction of zoning contingency; and (ii) June 25, 1990.  If extended the Closing Date shall be no later than September 24, 1990.

    V.    Leaseback:  Poplar Creek Music Theatre is to be leased to the Seller at closing for an initial period (with renewal rights provided it does not interfere with Sears' development) for a rent of $1.00 per year.

---

\*  Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

C.   **Studz Property** - Approximately 40 acres

    I.   Date of Contract:  June 25, 1989

    II.  Owner:  Charter Bank and Trust Company Trust No. 769 having as benefi-
ciary Ruth Studz

    III. Purchase Price:

        1.   $___*___ per square foot (based on 40 acres);

        2.   $_____*_____ (in the aggregate)

    IV.  Closing Date:  the thirtieth (30th) day following the earlier to occur of: (i)
satisfaction of zoning and annexation contingency; and (ii) June 25, 1990.
If extended the Closing Date shall be no later than October 24, 1990.

D.   **"Watson" Property** - Approximately 7 acres

    I.   Date of Contract:  June 26, 1989

    II.  Owner:  Sutton Road Partnership, an Illinois general partnership (Con-
tract Buyer)

    III. Purchase Price:

        1.   $___*___ per square foot

        2.   $_____*_____ in the aggregate

    IV.  Closing Date:  Property was acquired on September 7, 1989.

E.   **Totals:**

    Acreage:  Approximately 788 acres

    Purchase Price:  Approximately $_____*_____ or $___*___ per square foot

---

\*   Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the
Illinois Revised Statutes.

FILED DATE: 10/10/2018 4:46 PM  2018CH12683

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

## EXHIBIT B

### PHASE I
### ALLOCATED TAX INCREMENT REVENUE AMOUNTS

| YEAR | COLUMN 1<br>Total Amount of Phase I<br>Tax Increment Revenues<br>which are to be Received<br>and Deposited in Fund<br>for Benefit of Village<br>and Other Taxing Districts | COLUMN 2<br><br>Portions of<br>Column 1 Amounts<br>which are Subject<br>to Disbursement<br>to the Village |
|---|---|---|
| 1st Year of Payment | $2,000,000 | $1,500,000 |
| 2nd | 2,100,000 | 1,575,000 |
| 3rd | 2,205,000 | 1,653,750 |
| 4th | 2,315,250 | 1,736,438 |
| 5th | 2,431,013 | 1,823,260 |
| 6th | 3,000,000 | 2,250,000 |
| 7th | 3,150,000 | 2,362,500 |
| 8th | 3,307,500 | 2,480,625 |
| 9th | 3,472,875 | 2,604,656 |
| 10th | 3,646,519 | 2,734,889 |
| 11th | 3,828,845 | 2,871,634 |
| 12th | 4,020,287 | 3,015,215 |
| 13th | 4,221,301 | 3,165,976 |
| 14th | 4,432,366 | 3,324,275 |
| 15th | 4,653,985 | 3,490,488 |
| 16th | 4,886,684 | 3,665,013 |
| 17th | 5,131,018 | 3,848,264 |
| 18th | 5,387,569 | 4,040,677 |
| 19th | 5,656,947 | 4,242,711 |
| 20th | 5,939,795 | 4,454,846 |

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

EXHIBIT C

PHASE II
ALLOCATED TAX INCREMENT REVENUE AMOUNTS

| YEAR | PERCENTAGE OF PHASE II TAX INCREMENT REVENUES WHICH ARE TO BE PAID TO TAXING DISTRICTS |
|------|------|
| 1st year of payment | 15 |
| 2nd | 15 |
| 3rd | 15 |
| 4th | 15 |
| 5th | 15 |
| 6th | 20 |
| 7th | 20 |
| 8th | 20 |
| 9th | 20 |
| 10th | 20 |
| 11th | 25 |
| 12th | 25 |
| 13th | 25 |
| 14th | 25 |
| 15th | 25 |
| 16th | 30 |
| 17th | 30 |
| 18th | 30 |
| 19th | 30 |
| 20th | 30 |

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

## EXHIBIT D

## LEGAL DESCRIPTION OF THE PHASE I SITE

That part of the Northeast 1/4 of Section 31, and that part of the Northwest 1/4 of Section 32, all in Township 42 North, Range 9 East of the Third Principal Meridian, more particularly described as follows:

Commencing at the Southwest corner of the Northwest 1/4 of said Section 32, thence Westerly along the Southline of the Northeast 1/4 of said Section 31, North 89 degrees 42 minutes 57 seconds West, a distance of 1,320.70 feet to a point on the West line of the East 1/2 of the Northeast 1/4 of said Section 31, said point being the point of beginning; thence Northerly along said West line, North 00 degrees 25 minutes 04 seconds East, a distance of 2,432.03 feet to a point on the Southwesterly line of Higgins Road (Route 72) as recorded per documents: No. 12079013, recorded November 8, 1937, No. 12284905, recorded March 20, 1939, No. 12309896, recorded May 10, 1939, and No. 12647599, recorded March 27, 1941, the following three courses:

(1)    A distance of 189.90 feet along an arc of a circle, convex to the Southwest, having a radius of 10,257.06 feet, and whose chord of 189.90 feet bears South 82 degrees 59 minutes 46 seconds East;

(2)    South 83 degrees 31 minutes 35 seconds East, a distance of 2,317.28 feet;

(3)    A distance of 1,239.98 feet along an arc of a circle, convex to the Northeast, having a radius of 9,965.07 feet, and whose chord of 1,239.18 feet bears South 79 degrees 57 minutes 42 seconds East;

Thence South 13 degrees 53 minutes 26 seconds West, 29.15 feet; thence Southerly along a curve tangent to the last described course, concave Easterly having a radius of 1,550.00 feet, an arc distance of 582.50 feet, and whose chord bears South 03 degrees 07 minutes 28 seconds West, a distance of 579.08 feet; thence South 07 degrees 38 minutes 30 seconds East, tangent to the last described course, a distance of 150.00 feet; thence Southwesterly along a curve concave Northwesterly having a radius of 1,350.00 feet, an arc distance of 2,402.00 feet, and whose chord bears South 43 degrees 19 minutes 50 seconds West, a distance of 2,097.46 feet; thence North 85 degrees 41 minutes 51 seconds West, tangent to the last described course, a distance of 150.00 feet; thence Northwesterly along a curve concave Northeasterly having a radius of 3,450.00 feet, an arc distance of 539.63 feet, and whose chord bears North 81 degrees 12 minutes 59 seconds West, a distance of 539.08 feet; thence North 76 degrees 44 minutes 08 seconds West, tangent to the last described course, a distance of 170.49 feet; thence Northwesterly along a curve concave Southwesterly having a radius of 3,550.00 feet, an arc distance of 789.05 feet and whose chord bears North 83 degrees 06 minutes 11 seconds West, a distance of 787.43 feet; thence North 89 degrees 28 minutes 15 seconds West, a distance of 642.09 feet to a point on the West line of the East 1/2 of the Northeast 1/4 of aforementioned Section 31; thence Northerly along said West line, North 00 degrees 31 minutes 45 seconds East a distance of 116.16 feet to the point of beginning all in Cook County, Illinois. Containing 8,762,404 square feet (201.157 acres) of land, more or less.

## EXHIBIT E

### LEGAL DESCRIPTION OF THE PHASE II SITE

The Phase II Site is legally described as that certain real property legally described on Exhibit M as the Subject Property excepting therefrom that certain real property legally described on Exhibit D as the Phase I Site.

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

## EXHIBIT F

### LEGAL DESCRIPTION OF THE HOFFMAN ESTATES
### ECONOMIC DEVELOPMENT PROJECT AREA

That part of the East 1/2 of the East 1/2 of Section 31, lying South of the Northerly line of Higgins Road (S.R. 72) and North of the Southerly line of Section 31, and excluding property owned by the Northwest Tollroad; also that part of Section 32, lying South of the Northerly line of Higgins Road; North of the Southerly line of the Section 32 and excepting those portions of right-of-way (100' wide) belonging to E. J. & E. Railway (except the southerly 300' within the Northeast 1/4 of Section 32); and excluding property owned by the Northwest Tollway; also that part of the Southwest 1/4 of the Northwest 1/4 and the West 1/2 of the Southwest 1/4 of Section 33 lying south of the Northerly line of Higgins Road and North of the Southerly line of Section 33 except that portion of property owned by the Northwest Tollway; also the entire right-of-way of Beverly Road from the Northerly Line of Higgins Road to the Southerly Line of Section 31; also, that part of the east 1/2 of the Southwest 1/4 of Section 33 along with the Southeast 1/4 of the Northwest 1/4 of Section 33 lying south of the southerly line of Higgins Road right-of-way, except that portion of property owned by the Northwest Tollway, all of the above being in Township 42 North, Range 9, West of the Third Principal Meridian, in Cook County, Illinois. Also, that part of Section 4 lying Easterly of the Easterly right of way line of the Elgin, Joliet and Eastern Railroad Company and North of the Northerly Line of the Northern Illinois State Toll Highway Commission right of way, and that part of the West half of the West Half of Section 3, Township 41, North, Range 9, East of the Third Principal Meridian, lying North of the. Northerly line of the Northern Illinois State Toll Highway Commission right of way, in Cook County, Illinois, and that part of the East half of the West half of fractional Section 3, lying North of the Northerly right of way line of the Northern Illinois State Toll Highway, excepting therefrom that part thereof conveyed to the Northern Illinois State Toll Highway Commission by instrument recorded May 13, 1957, as document 16902251 in Township 41 North, Range 9, East of the Third Principal Meridian, in Cook County, Illinois, and also except the following described parcels located in Township 42 North, Range 9, West of the Third Principal Meridian in Cook County, Illinois.

That part of the South 20.04 chains of the East 1/2 of the South-west 1/4 of Section 33 lying South and East of the Northwesterly line of property owned by the Northwest Tollroad (Interstate 90) and lying south and East of New Sutton Road (S.R. 59);

Also that part of the Northeast 1/4 of the Southwest 1/4 of Section 33 lying West of the Westerly line of the New Sutton Road (S.R. 59) Right of Way;

Also that part of the Southeast 1/4 of the Northwest 1/4 of Section 33 lying South of the Southerly line of the Higgins Road (S.R. 72) Right of Way.

FILED DATE: 10/10/2018 4:46 PM    2018CH12683



ECONOMIC DEVELOPMENT PROJECT BOUNDARY
HOFFMAN ESTATES
ECONOMIC DEVELOPMENT AREA

VILLAGE OF HOFFMAN ESTATES



TESKA
ASSOCIATES
INC.

**EXHIBIT G**

DEPICTION OF THE HOFFMAN ESTATES ECONOMIC
DEVELOPMENT PROJECT AREA

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

## EXHIBIT H

### PHASE I DEVELOPMENT PUBLIC SITE IMPROVEMENTS

The following is a description of the Phase I Development Public Site Improvements, as that term is used in the Agreement. The Phase I Development Public Site Improvements consist of those public streets, public utilities and other public site improvements which are constructed, or to be constructed, by, or under the direction of, the Developer, and all activities which are undertaken in connection with such construction: (i) within the Phase I Site; or (ii) outside the boundaries of the Phase I Site but within the Project Area and in connection with, or in furtherance of, the use, occupancy, and development of the Phase I Site; or (iii) outside the boundaries of the Project Area (to the extent such public streets, public utilities and public improvements are essential to the preparation of the Project Area in accordance with the Economic Development Plan). Natural gas, electric and telephone service shall not be included within the definition of "public utilities", as used above, except to the extent that they relate to natural gas, electric and telephone service improvements which are to be dedicated to, and owned by, the Village (e.g. public street lights).

The Phase I Site encompasses that portion of the Subject Property consisting of approximately two hundred (200) acres, which is located in the northwest corner of the Subject Property.

Specifically, the Phase I Development Public Site Improvements consist of the following:

A.   **DEMOLITION**

Demolition and removal of existing structures within the Phase I Site and removal of all waste piles, underground storage tanks, if any, and similar conditions.

B.   **EARTHWORK**

Earth-moving and grading within the Project Area to prepare for the construction and installation of the Phase I Development Public Site Improvements and construction of necessary storm water management improvements.

C.   **WETLANDS MITIGATION**

Processing of necessary wetlands regulatory applications, satisfaction of all wetlands regulatory requirements, wetlands protection, and engineering and implementation of wetlands mitigation plans for the Subject Property.

D.   **SANITARY SEWER**

Construction of necessary sanitary sewer mains and lines; lifts station and appurtenances; and acquisition of the easements and rights-of-way necessary to such construction. These improvements include, without limitation, essential trunk sewer mains from existing Metropolitan Water

Reclamation District lines to the Project Area; sewer mains and lines through the Phase II Site and to the Phase I Site; and arterial sewer lines, and feeder lines from arterial sewer lines to structures, as required throughout the Phase I Site.

E.   **WATER MAINS**

Construction of necessary potable water mains and lines and appurtenant facilities, and acquisition of the easements and rights-of-way necessary to such construction. This includes the construction of trunk mains located outside the Project Area that connect the Project Area to existing Village or Joint Area Water Association (JAWA) water mains; and the construction of arterial water lines through the Phase II Site, as necessary to connect the Subject Property to the existing municipal water system.

F.   **ROADWAYS**

Construction of necessary roadways and ancillary roadway improvements and acquisition of the easements and right-of-ways necessary to such construction. These roadways and ancillary roadway improvements shall include the following (or their equivalents):

(a)   *

(b)   *

(c)   *

(d)   *

Construction of each of the foregoing roadway improvements may include, but shall not be limited to: (i) levelling and grading of earth; (ii) preparation of roadbed; (iii) paving; (iv) construction of curbs, sidewalks and gutters; (v) landscaping of medians and shoulders; (vi) installation of storm sewers; (vii) installation of street lighting; and (viii) installation of traffic signals.

G.   **PIPELINE RELOCATION**

Relocation of existing pipeline(s) so as to permit construction of infrastructure and structures.

H.   **INDIRECT COSTS**

Permit costs and fees related to the construction of all Phase I Development Public Site Improvements.

---

*   Document on file. Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

**EXHIBIT I**

## PHASE II DEVELOPMENT PUBLIC SITE IMPROVEMENTS

The following is a description of the Phase II Development Public Site Improvements, as that term is used in the Agreement.  The Phase II Development Public Site Improvements consist of those public streets, public utilities and other public site improvements which are constructed, or to be constructed, by, or under the direction of, either the Village or the Developer, and all activities which are undertaken in connection with such construction:  (i) within the Phase II Site; or (ii) outside the boundaries of the Phase II Site but within the Project Area and in connection with, or in furtherance of, the use, occupancy, and development of the Phase II Site; or (iii) outside the boundaries of the Project Area (to the extent such public streets, public utilities and public improvements are essential to the preparation of the Project Area for use in accordance with the Economic Development Plan).  Natural gas, electric and telephone service shall not be included within the definition of "public utilities", as used above, except to the extent that they relate to natural gas, electric and telephone service improvements which are to be dedicated to, and owned by, the Village (e.g. public street lights).

The Phase II Site consists of the Subject Property, exclusive of the Phase I Site.  The Phase II Site consists of approximately five hundred eighty-eight (588) acres and includes the PCMT Property.

Specifically, the Phase II Development Public Site Improvements consist of the following:

A.   **DEMOLITION**

Demolition and removal of the remaining structures within the Project Area.

B.   **EARTHWORK**

Earth-moving and grading within the Project Area to prepare for the construction and installation of the Phase II Development Public Site Improvements and construction of necessary storm water management improvements.

C.   **SANITARY SEWER**

Construction of necessary sanitary sewer mains and lines, lift station and appurtenances, and acquisition of the easements and right-of-ways necessary to such construction.  This includes, without limitation, construction of sanitary sewer mains and lines throughout the Phase II Site; construction of arterial lines from sanitary sewer trunk mains to structures located within the Phase II Site; and construction of all other sanitary sewer mains and lines, lift station and appurtenances that are essential to the preparation of the Project Area in accordance with the Economic Development Plan (except for those sewer mains and lines, lift stations and appurtenances constructed as Phase I Development Public Site Improvements).

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

D.  **WATER MAINS**

Construction of necessary potable water mains and lines and appurtenant facilities, and acquisition of the easements and rights-of-way necessary to such construction.  This includes, without limitation, construction of feeder lines from arterial lines to structures located within the Phase II Site; and all other water mains and lines and other appurtenant facilities essential to the preparation of the Project Area in accordance with the Economic Development Plan (except for those water mains and lines and appurtenant facilities constructed as Phase I Development Public Site Improvements).

E.  **ROADWAYS**

Construction of necessary roadways and ancillary roadway improvements and acquisition of the easements and rights-of-way necessary to such construction.  These roadways and ancillary roadway improvements shall include the following (or their equivalents):

(a)  *

(b)  *

(c)  *

(d)  *

(e)  *

(f)  *

(g)  *

(h)  *

(i)  *

(j)  *

Construction of each of the foregoing roadway improvements may include, but shall not be limited to: (i) levelling and grading of earth; (ii) preparation of roadbed; (iii) paving; (iv) construction of curbs, sidewalks and gutters; (v) landscaping of medians and shoulders; (vi) installation of storm sewers; (vii) installation of street lighting; and (viii) installation of traffic signals.

F.  **INDIRECT COSTS**

Permit costs and fees related to the construction of all Phase II Development Public Site Improvements.

---

*  Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

Exhibit "J"
1 of 1

## PUBLIC WORKS AND IMPROVEMENTS

The following is a list of Public Works and Improvements which are to be constructed, by or on behalf of the Village and all activities which are undertaken in connection with such construction, which are authorized by this Agreement and the Economic Development Plan which the Parties agree are reasonable or necessary.  This Exhibit may be amended by the parties, from time to time, pursuant to the provisions of this Agreement.

1.   **VILLAGE MUNICIPAL FACILITY**

2.   **VILLAGE WATER TANK**

3.   **INDIRECT COSTS**

   Fees related to the construction of Public Works and Improvements listed herein or as otherwise allowed by the provisions of this Agreement.

Exhibit J

FILED DATE: 10/10/2018 4:46 PM   2018CH12683



FILED DATE: 10/10/2018 4:46 PM    2018CH12683

## SMG OCCUPANCY DATE NOTICE

Village of Hoffman Estates                    Village of Hoffman Estates
1200 North Gannon Drive                       1200 North Gannon Drive
Hoffman Estates, IL  60196                    Hoffman Estates, IL  60196
Attn:  Village Manager                        Attn:  Corporation Counsel

     Re:    SMG Occupancy Date Notice Given Pursuant to
           Economic Development Agreement Dated By and Between
           the Village of Hoffman Estates and Sears, Roebuck
           and Co., ("Agreement")

           Date: _____

Ladies and Gentlemen:

This will confirm that Sears, Roebuck and Co., as Developer under the Agreement, has received the last governmental permit or approval necessary to its commencement of construction of the SMG Home Office Complex.

All terms not otherwise defined herein shall have the meanings given them in the Agreement.

               SEARS, ROEBUCK AND CO., a
               New York Corporation

               By: _____
               Its: _____

CC:   Senior Vice President - Sears/Resources and Administration
       General Counsel - Sears Merchandise Group
       Thomas Tully, Esq.
       J. Kevin Garvey, Esq.
       Harold W. Francke, Esq.

Exhibit L

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

## EXHIBIT M

### LEGAL DESCRIPTION OF SUBJECT PROPERTY

THAT PART OF THE EAST ½ OF SECTION 31, AND THAT PART OF SECTION 32, AND THAT PART OF THE WEST ½ OF SECTION 33, ALL IN TOWNSHIP 42 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, AND ALSO THAT PART OF FRAC-TIONAL SECTION 3, AND FRACTIONAL SECTION 4, BOTH IN TOWNSHIP 41 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST ¼ OF SAID SECTION 32;
THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST ¼ OF SAID SECTION 32, NORTH 89°41'27" WEST, A DISTANCE OF 1343.48 FEET;
THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF TOLLWAY I-90 AS CONVEYED TO THE ILLINOIS STATE TOLL HIGHWAY COMMISSION, PER DOCUMENT NO. 17 400 695, RECORDED DECEMBER 10, 1958, THE FOLLOWING FIVE COURSES:
(1)    NORTH 73°44'44" WEST, A DISTANCE OF 291.20 FEET;
(2)    NORTH 53°26'13" WEST, A DISTANCE OF 372.02 FEET;
(3)    NORTH 89°41'27" WEST, A DISTANCE OF 550.00 FEET;
(4)    SOUTH 54°08'29" WEST, A DISTANCE OF 461.68 FEET;
(5)    SOUTH 87°54'36" WEST, A DISTANCE OF 612.13 FEET;
THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼ OF SAID SECTION 31, NORTH 89°33'24" WEST, A DISTANCE OF 350.18 FEET;
THENCE ALONG THE EASTERLY RIGHT-OF-WAY LINE OF BEVERLY ROAD, AS RECORDED DECEMBER 18, 1956, PER DOCUMENT NO. 16 783 799, THE FOLLOWING FOUR COURSES:
(1)    NORTH 19°28'22" WEST, A DISTANCE OF 93.54 FEET;
(2)    A DISTANCE OF 379.80 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHWEST, HAVING A RADIUS OF 1087.92 FEET, AND WHOSE CHORD OF 377.87 FEET BEARS NORTH 9°28'19" WEST;
(3)    NORTH 7°32'23" WEST, A DISTANCE OF 178.10 FEET;
(4)    NORTH 89°28'14" WEST, A DISTANCE OF 33.00 FEET;
THENCE ALONG THE WEST LINE OF THE EAST ½ OF THE SOUTHEAST ¼ OF SAID SECTION 31, NORTH 0°31'46" EAST, A DISTANCE OF 1997.96 FEET;
THENCE ALONG THE WEST LINE OF THE EAST ½ OF THE NORTHEAST ¼ OF SAID SECTION 31, NORTH 0°25'04" EAST, A DISTANCE OF 2432.02 FEET;
THENCE ALONG THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD (ROUTE 72), AS PER DOCUMENTS: NO. 12 079 013, RECORDED NOVEMBER 8, 1937, NO. 12 284 905, RECORDED MARCH 20, 1939, NO. 12 309 896, RECORDED MAY 10, 1939, NO. 12 647 599, RECORDED MARCH 27, 1941, AND NO. 12 288, RECORDED FEBRUARY 20, 1939, THE FOLLOWING FOUR COURSES:
(1)    A DISTANCE OF 189.90 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHWEST, HAVING A RADIUS OF 10,257.06 FEET, AND WHOSE CHORD OF 189.90 FEET BEARS SOUTH 82°59'46" EAST;
(2)    SOUTH 83°31'35" EAST, A DISTANCE OF 2317.28 FEET;
(3)    A DISTANCE OF 2532.01 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE NORTHEAST, HAVING A RADIUS OF 9965.06 FEET, AND WHOSE CHORD OF 2525.20 FEET BEARS SOUTH 76°14'50" EAST;
(4)    SOUTH 68°58'05" EAST, A DISTANCE OF 1233.00 FEET;

THENCE ALONG THE NORTHWESTERLY RIGHT-OF-WAY LINE OF ELGIN, JOLIET AND EASTERN RAILROAD, AS RECORDED JULY 1, 1889, PER DOCUMENT NO. 1 123 185, SOUTH 11°12'47" WEST, A DISTANCE OF 3844.25 FEET;
THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼, OF SAID SECTION 32, NORTH 89°42'33" WEST, A DISTANCE OF 1425.69 FEET TO THE POINT OF BEGINNING;

AND ALSO:
COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 32;
THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼ OF SAID SECTION 32, NORTH 89°42'33" WEST, A DISTANCE OF 1111.55 FEET TO THE POINT OF BEGINNING;

THENCE ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID ELGIN, JOLIET AND EASTERN RAILROAD, NORTH 11°12'47" EAST, A DISTANCE OF 3807.64 FEET;
THENCE ALONG THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD (ROUTE 72), SOUTH 68°58'05" EAST, A DISTANCE OF 1336.48 FEET;
THENCE SOUTH 0°07'09" WEST, A DISTANCE OF 178.58 FEET;
THENCE SOUTH 89°52'51" EAST, A DISTANCE OF 185.00 FEET;
THENCE NORTH 0°07'09" EAST, A DISTANCE OF 12.00 FEET;
THENCE SOUTH 89°52'51" EAST, A DISTANCE OF 141.20 FEET;
THENCE NORTH 01°07'09" EAST, A DISTANCE OF 41.94 FEET;
THENCE ALONG SAID SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD, SOUTH 68°58'05" EAST, A DISTANCE OF 135.51 FEET;
THENCE AS MONUMENTED AND OCCUPIED, SOUTH 0°07'09" WEST, A DISTANCE OF 1769.21 FEET;
THENCE ALONG A LINE PARALLEL WITH, AND 1323.61 FEET NORTH OF THE SOUTH LINE, OF THE SOUTHWEST ¼ OF SAID SECTION 33, SOUTH 89°44'52" EAST, A DISTANCE OF 1210.76 FEET;

THENCE ALONG THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 59 (NEW SUTTON ROAD), AS RECORDED AUGUST 30, 1934, PER DOCUMENT NO. 11 451 859, A DISTANCE OF 83.94 FEET ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHEAST, HAVING A RADIUS OF 1458.06 FEET, AND WHOSE CHORD OF 83.93 FEET BEARS SOUTH 18°01'24" WEST;
THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF TOLLWAY I-90, RECORDED MAY 13, 1957 PER DOCUMENT NO. 16 902 251, AS MONUMENTED AND OCCUPIED, THE FOLLOWING TEN COURSES:
(1)    SOUTH 32°03'22" WEST, A DISTANCE OF 312.00 FEET;
(2)    SOUTH 40°38'44" WEST, A DISTANCE OF 517.39 FEET;
(3)    NORTH 49°12'41" WEST, A DISTANCE OF 70.00 FEET;
(4)    NORTH 89°52'22" WEST, A DISTANCE OF 635.00 FEET;
(5)    SOUTH 0°28'49" WEST, A DISTANCE OF 237.60 FEET;
(6)    SOUTH 50°39'29" WEST, A DISTANCE OF 501.20 FEET;
(7)    SOUTH 74°15'09" WEST, A DISTANCE OF 472.21 FEET;
(8)    NORTH 89°44'13" WEST, A DISTANCE OF 1513.85 FEET;
(9)    NORTH 0°23'47" EAST, A DISTANCE OF 15.00 FEET;
(10)   NORTH 89°44'13" WEST, A DISTANCE OF 81.60 FEET;
THENCE ALONG SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF ELGIN, JOLIET AND EASTERN RAILROAD, NORTH 11°12'47" EAST, A DISTANCE OF 44.75 FEET, TO THE POINT OF BEGINNING, ALL IN COOK COUNTY, ILLINOIS.

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

FILED DATE: 10/10/2018 4:46 PM - 2018CH12683

# EXHIBIT N

## CONTRACTS IN EXISTENCE OR TO BE LET BY THE DEVELOPER[1]

| CONSULTANT | SCOPE OF WORK |
|---|---|
| Barton-Aschman | Traffic Analysis and Consultation |
| Ludlow & Associates | Surveying |
| Tornrose Campbell | Civil Engineering (including civil engineering on Phase II Site which supports Phase I Development) |
| STS Consultants | Geotechnical Analysis |
| Hey & Associates | Environmental Studies |
| Schal Associates | Value Engineering |
| Donohue Associates[2] | Civil Engineering/Planning/Landscape (including civil engineering, planning and landscape on Phase II Site which supports Phase I Development) |
| Perkins & Will | Master Planning[3] 788 Acres |
| Homart Development Co. | Project Coordinator |

1    The Village reserves the right to confirm that dollar amounts expended under contracts relate to property assembly costs, site preparation costs, and costs of construction of the Public Improvements, all as defined in the Act.

2    Includes subcontract to Johnson, Johnson & Roy.

3    Does not include costs for master planning of Phase I Site (200 acre), which costs are not deemed to be a "Project Cost".

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

## EXHIBIT O

### PROPERTY ASSEMBLY COSTS PAID, INCURRED
### OR KNOWN AS OF THE DATE OF THIS AGREEMENT

I.  **CONSULTANT COSTS**

| **CONSULTANT** | **SCOPE OF WORK**[1] | **EDA COSTS**[2] |
|---|---|---|
| Ludlow | ALTA Survey[3] | |
| Coldwell Banker | | |
|   Commercial | Brokerage | |
| Tornrose Campbell | Preliminary Civil | |
| STS Consultants | Preliminary Soils | * |
| Rudnick & Wolfe | Property Assemblage, | |
| |   Zoning, Environmental, | |
| |   Economic Development | |

    **Subtotal**                                                  **$1,550,000.00**

II.  **PURCHASE PRICE**

                                                       **EDA COSTS**

   (1)   Origer Estate                                       *
   (2)   Origer Children
   (3)   Studz
   (4)   Nederlander:
             73 acre parcel[4]
             148 acre parcel[4]
   (5)   Watson[5]

       **Subtotal**                                               **$87,368,618.00**

III.  **TITLE AND SEARCHES**[3]

                                                        **EDA COSTS**[2]

   (1)   Origer Estate:
       (a)     Title[6]                                           *
       (b)     Searches

   (2)   Origer Children:
       (a)     Title[6]                                           *
       (b)     Searches

   (3)   Studz: Purchaser to receive a credit for:
       (a)     Title[6]                                           *
       (b)     Searches

*  Document on file.  Confidentiality protected by Chapter 24, Section 207(s) of the Illinois Revised Statutes.

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

(4)    Nederlander: For both parcels:
    (a)    Title[6]                                          *
    (b)    Searches

(5)    Watson:[5]
    (a)    Title                                            *
    (b)    Searches

        **Subtotal**                              **$40,000.00**

IV.    **ESCROW CHARGES**[3]

                                 **EDA COSTS**[2]

(1)    Origer Estate and Origer Children                  *
(2)    Nederlander
(3)    Studz

        **Subtotal**                               **$5,000.00**

[1]    Contracts are subject to execution of change orders.

[2]    Costs are estimated and are not intended to be final.

[3]    Subject to credits pursuant to Acquisition Contracts.

[4]    Provided the initial closing date is not extended. If the initial closing date is extended beyond June 29, 1990, Sears must deliver into the strict joint order escrow at Ticor Title Insurance Company an additional $_____ per parcel, of which $_____ per parcel will not be credited against the purchase price for each parcel.

[5]    Acquisition closed on September 7, 1989. All charges related to such closing have been paid in full.

[6]    This quote from Ticor Title Insurance Company is based on a title insurance premium of $.40 per $1,000.00 and a zoning 3.0 endorsement fee of $.05 per $1,000.00. No other endorsements are included in the quote, nor is the cost of reinsurance included.

*    Document on file. Confidentiality protected by Chapter 24, Section 207(s) of the Illinois Revised Statutes.

## EXHIBIT P

### PROJECT COSTS PAID OR INCURRED BY THE DEVELOPER
### AS OF THE DATE OF THIS AGREEMENT IN CONNECTION WITH
### THE CONSTRUCTION OF THE PUBLIC SITE IMPROVEMENTS

I.    **PROJECT COSTS PAID OR INCURRED BY THE DEVELOPER**

| CONSULTANT | EDA COSTS[1] | DESCRIPTION OF WORK |
|---|---|---|
| **Planning** | | |
| Barton-Aschman | $278,332 | Traffic impact analysis; roadway design |
| Perkins & Will | 244,152 | Site and master planning |
| Subtotal | $522,484 | |
| | | |
| **Engineering** | | |
| Ludlow & Associates | $173,000 | Surveying; topographic studies |
| STS Consultants | 97,742 | Geotechnical studies |
| Tornrose Campbell | 65,328 | Utility design |
| Hey & Associates | 152,080 | Environmental studies |
| Chicago Area Transport-ation Study | 2,248 | Traffic data |
| Subtotal | $490,398 | |

1    Costs are not intended to be final; additional Project Costs are expected to be incurred.

FILED DATE: 10/10/2018 4:46 PM  2018CH12683

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

Mayor
**MICHAEL J. O'MALLEY**

Village Clerk
**VIRGINIA M. HAYTER**

Village Manager
**PETER T. BURCHARD**



**HOFFMAN              ESTATES**

Board of Trustees
**BRUCE C. LIND**
**WILLIAM D. McLEOD**
**SUSAN H. KENLEY**
**MICHAEL D. FRIESEN**
**RICHARD A. COCHRAN**
**LOUIS G. DESRUISSEAUX**

March 19, 1990

Mr. Michael Bozic
Chairman and Chief Executive Officer
Sears Merchandise Group
Sears Tower
Chicago, IL  60684

Re:   **Letter of Clarification of Intent of Village Board Amendment of February 26, 1990 Prior to Approval of Economic Development Agreement By and Between The Village of Hoffman Estates and Sears, Roebuck and Co.**

Dear Mr. Bozic:

On February 26, 1990, the Village Board of the Village of Hoffman Estates approved, by Ordinance No. 2161-1990, the above referenced Economic Development Agreement. Prior to such approval, amendments to Sections 3.1-(e)-(2), 4.2(a) and 4.2(b) were made which stated that in regard to service contracts (Exhibit "N"), property assembly costs (Exhibit "O") and costs of construction activities (Exhibit "P"), that "both the Village and Sears agree that Chapman and Cutler as Bond Counsel for the Village, will determine what costs. . .qualify as Project costs under the Act".

In order to clarify the scope of such determination, please be advised that, after discussion with Corporation Counsel and the Board of Trustees, I can represent that the intent of such amendment was not to have Chapman and Cutler determine specific dollar amounts of expenditures or the reasonableness or necessity of any given expenditure. Rather, the Village's intent is to make Chapman and Cutler the party responsible for determining if the amounts payable under such service contracts, as well as the amount payable as "property

assembly costs", as "site preparation costs", and as costs of construction of the Public Improvements (as defined in the Agreement), qualify as "economic development project costs" under the State Statute referenced as the "Act" in the Agreement.

Specifically, with respect to Exhibit "N", it is understood that, to the extent service contracts relate to construction activities which do not constitute "site preparation costs" as that term is defined in the Act, or costs of construction of Public Improvements as that term is defined in the Agreement, then to such extent the costs incurred under such service contracts shall not be deemed to qualify under the Act and under the Agreement as a "Project Cost".

However, it remains the Village's intention to have the prorated share of the "qualified" portions of service contracts, property assembly costs, site preparation costs and costs of construction of the Public Improvements and to have the reasonableness or necessity of the "qualified" portions of service contracts, property assembly costs, site preparation costs and cost of construction of the Public Improvements determined under the provisions of Sections 4.3, 4.4 and 17.5 of the Agreement.

If this is your understanding and agreement, please sign one copy and return.

Sincerely,

Michael J. O'Malley
Village President

MJO/ds

Understood and Agreed to:

Michael   Bozic
Chairman and Chief Executive Officer
Sears Merchandise Group

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

FILED
10/10/2018 4:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH12683

# CRAIN'S CHICAGO BUSINESS

June 12, 2017 07:00 PM

## With layoffs, Sears loses state tax credits

BRIGID SWEENEY  



Bloomberg

Sears' Hoffman Estates headquarters.

The 400 jobs being cut put the retailer below the employment threshold required for tax breaks—but Sears gets to keep the millions it has already received.

The announcement this morning that Sears Holdings has cut about 400 jobs, mostly at its Hoffman Estates headquarters, puts the company under the employment threshold required to receive the annual tax breaks it brokered in a 2011 deal with the state.

The deal, struck under the Edge program (short for Economic Development for a Growing Economy), provided Sears with state income tax credits worth $15 million a year for 10 years. In order to keep the deal, Sears agreed to stop shopping for a new

**EXHIBIT
2**

headquarters location out of state and to keep at least 4,250 local corporate jobs in Hoffman Estates.

"For the first time since our agreement was enacted in 2011, we recently dropped below the required retained job figure for the Edge credit," Sears spokesman Howard Riefs wrote in an email to Crain's. He said the company was allowed to count only certain types of jobs under the agreement.

A separate property tax agreement, reached at the same time, extended existing tax credits for 15 years, or until the company recovered $125 million. That agreement also includes a 4,250 job requirement, but the definition of jobs that count is broader than the one within the Edge agreement. Sears remains in compliance with the property tax deal and will continue to receive those credits, according to spokesman Chris Brathwaite.

The retailer had a property tax break dating back to 1992, when it first moved to Hoffman Estates from the formerly namesake Loop skyscraper now named Willis Tower. That agreement was intended to reimburse Sears for the $200 million it spent to build its suburban campus. Only about $75 million was recaptured in property tax credits through 2011, according to Brathwaite. The extension was intended to pay back the remainder of Sears' investment.

At the time of the Edge and property tax deals in December 2011, Sears employed about 6,100 people at its headquarters, including full-time and contract workers. Brathwaite declines to provide the number currently employed at Sears headquarters. Though the number of Edge-qualifying employees is now below 4,250, that number does not include contractors, he said. Neither the Edge nor property tax deals count store-level Sears and Kmart employees in Illinois.

***Read more:***

• Special Report: Sears—where America shopped

• With Sears' future in doubt, vendors begin pulling back

• Sears' media-shy CEO lashes out at suppliers

Under the Edge deal, Sears was required to spend $60 million in infrastructure investment by 2015 and $100 million before 2018 to begin collecting credits. The credits are paid two years in arrears. Sears met those requirements and first collected about $20 million in tax credits in 2016 for the 2014 calendar year. It is currently collecting credits for meeting conditions in 2015. Sears also met conditions in 2016, he said, which means it would be paid out next year.

In the last five years, Brathwaite said, Sears has paid more than $680 million in taxes, invested more than $260 million in its headquarters campus and worked with thousands of vendors across the state.

The state's Department of Commerce & Economic Opportunity, which oversees the Edge agreement, confirmed that Sears will fall below the minimum number of employees required to receive the credits.

"The department is planning a books and records examination to ensure taxpayers are not on the hook for an out-of-compliance Edge agreement," spokeswoman Jacquelyn Reineke wrote in an email.

Sears is one of eight companies that received so-called "special" Edge agreements through a program amendment filed in 2011. CME Group also received one around the same time as Sears. Mitsubishi, which closed its plant in Normal in 2015 and no longer operates in Illinois, received another.

Unlike regular Edge agreements, tax credits already issued under special Edge deals cannot be clawed back if a company falls out of compliance, Reineke said.

Gov. Bruce Rauner has worked to add taxpayer protections to the Edge program, she added.

---

**Source URL:** *https://www.chicagobusiness.com/article/20170613/NEWS07/170619964/with-layoffs-sears-loses-edge-tax-credits*

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

### SETTLEMENT AGREEMENT REGARDING EDGE TAX CREDIT AGREEMENT

**THIS SETTLEMENT AGREEMENT REGARDING EDGE TAX CREDIT AGREEMENT** (the "Settlement Agreement") is entered into as of this 15th day of December, 2017 by and between the State of Illinois, acting by and through its Department of Commerce and Economic Opportunity (the "Department") and Sears Holdings Management Corporation ("Sears Holdings"), together with its other direct and indirect subsidiaries that now or hereafter exist (collectively, the "Company"), and together with the Department, the "Parties."

### RECITALS

A. The Department and the Company entered into the EDGE Tax Credit Agreement dated October 26, 2012 (the "Original Agreement") and the First Amendment to the EDGE Tax Credit Agreement dated June 14, 2017 (the "First Amendment"; the Original Agreement and the First Amendment are hereafter referred to as the "Agreement"), wherein the Department agreed to award an EDGE tax credit to the Company pursuant to Public Act 91-476, titled the Economic Development for a Growing Economy ("EDGE") Tax Credit Act, 35 ILCS 10/5-1, *et seq.*, subject to the terms and conditions set forth therein.

B. The Agreement required the Company to, among other things, retain a minimum of 4,250 Full-Time Employees at certain specified locations as set forth in the Agreement.

C. On March 15, 2017, the Company submitted its request for the Certificate of Verification for Taxable Year 2016.

D. On May 31, 2017, the number of Retained Employees fell below 4,250, and as of the date of this Settlement Agreement the number of Retained Employees remains below 4,250.

E. To resolve and settle certain disputes that arose between the Parties regarding issuance of the Certificates of Verification for Taxable Year 2016 and Fiscal Year 2017, the Department and the Company desire to enter into this Settlement Agreement.

F. As used herein, the below terms have the following meanings:

    a. "Settlement Agreement" refers to the agreement herein entered into by the Parties on this 15th day of December, 2017.

    b. "Fiscal Year 2017" means the Company's fiscal year ending January 31, 2018.

    c. "Certified" refers to issuance by the Department of a Certificate of Verification for a given Taxable Year.

    d. Capitalized terms used herein but not defined shall have the respective meanings ascribed to them in the Agreement.

EXHIBIT
3

NOW, THEREFORE, in consideration of the mutual covenants, obligations, and stipulations set forth herein, the receipt and sufficiency of which are hereby acknowledged and agreed to, the Parties hereto agree as follows:

1.  Recitals.   The Recitals set forth above are hereby incorporated into and made a part of this Settlement Agreement.

2.  Issuance of Certificate of Verification for Taxable Year 2016: Use of Credits. Concurrently with the execution of this Settlement Agreement, the Department shall issue the Certificate of Verification for Taxable Year 2016 to the Company. Notwithstanding the provisions of Section 2E of the Agreement, the Company may use the Credits issued and carryforward any Unused Credits Certified and unused as of the date of this Settlement Agreement even though the number of Retained Employees remains below 4,250, so long as the Company uses any such Unused Credits by September 30, 2019. After October 1, 2019, the Company may not claim any Unused Credits against its obligation to pay over withholding under Section 704A of the Illinois Income Tax Act unless, and until, the Company comes back into compliance with the terms and conditions of the Agreement as set forth in Section 2E.

3.  Certificate of Verification for Fiscal Year 2017. The Department shall have no obligation to issue any Certificate of Verification for Fiscal Year 2017. The Company expressly waives and agrees to not seek any Certificate of Verification or other Credit for Fiscal Year 2017.

4.  Release of Claims for Taxable Year 2016 and Fiscal Year 2017. As the purpose of this Settlement Agreement is to resolve certain disputes that arose between the Parties regarding issuance of the Certificates of Verification and use of Credits for Taxable Year 2016 and Fiscal Year 2017, the Company hereby releases the Department from all causes of action, claims or demands, whether known or unknown, with respect to issuance of the Certificates of Verification and use of Credits for Taxable Year 2016 and Fiscal Year 2017.

5.  Authority to Bind.   The Company hereby represents and warrants as of the date hereof: (a) this Settlement Agreement has been duly authorized, executed and delivered by the Company and is the legal, valid and binding obligation of the Company enforceable in accordance with its terms; (b) the Company has full power and authority to execute, deliver and perform the Agreement, as agreed to hereby, and any ancillary documents and to perform its obligations thereunder, and to consummate the transactions contemplated hereby; and (c) the execution and delivery of this Settlement Agreement and any ancillary documents, the performance by the Company of its obligations under the Agreement, as agreed to hereby, and the consummation by the Company of the transactions contemplated by the Agreement, as agreed to hereby, will not: (i) contravene any provision of the articles of incorporation of bylaws of the Company; (ii) violate or conflict with any law, statute, ordinance, rule, regulation, decree, writ, injunction, judgment or court order of any governmental body or of any arbitration award which is either applicable to, binding upon or enforceable against the Company; (iii) conflict with, result in any breach of, or constitute a default (or an event which would, with the passage

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

of time or the giving of notice or both, constitute a default) under any other agreement which is applicable to, binding upon or enforceable against the Company; or (iv) require the consent, approval, authorization or permit of, or filing with or notification to, any governmental body, any court or tribunal or any other Person. The signatory for the Company represents that he or she has been duly authorized to execute this Settlement Agreement on behalf of the Company.

6. No Other Amendment; Conflicts. Except as otherwise expressly agreed to hereby, the Agreement shall remain unmodified and in full force and effect. In the event of any conflicts between the Agreement and this Settlement Agreement, this Settlement Agreement shall control.

7. No Construction Bias. Each of the Parties hereto cooperated in the drafting and preparation of this Settlement Agreement. Hence, this Settlement Agreement shall not be construed as an admission of liability, wrongdoing or responsibility by any party.

8. Binding Upon Successors and Assigns. This Settlement Agreement, and all representations, agreements, covenants and releases set forth herein, shall be binding upon, and shall inure to the benefit of, the Parties and their respective predecessors, successors, heirs and assigns.

9. Partial Invalidity. In the event that any provisions of this Settlement Agreement should be held to be void or unenforceable, the remaining portions hereof shall remain in full force and effect.

10. Governing Law. This Settlement Agreement shall be construed in accordance with and governed by the laws of the State of Illinois, notwithstanding its choice of law rules to the contrary or any other state's choice of law rules and suit, if any, must be brought in the State of Illinois.

11. Counterparts. This Settlement Agreement may be executed in counterparts, it being understood that all such counterparts, taken together, shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Parties, by their duly authorized representatives, have executed this Settlement Agreement on the date set forth above.

[Remainder of Page Intentionally Left Blank; Signature Page Follows]

EAST\148594379.1

[Signature Page to Settlement Agreement to EDGE Tax Credit Agreement]

**SEARS HOLDINGS MANAGEMENT
CORPORATION, a Delaware corporation**

By: ███████████████████

Its: _General Counsel_

Date: _12/15/17_

**THE STATE OF ILLINOIS, ACTING
BY AND THROUGH ITS
DEPARTMENT OF COMMERCE AND
ECONOMIC OPPORTUNITY**

By: ███████████████████

Its:  Director

Date: _12/15/17_

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

# SEARS HOLDINGS

Jonathan Bredemeier
Sr. Director, Real Estate and Corporate
Services

Sears Holdings Management Corporation
3333 Beverly Road BC-154A
Hoffman Estates, IL  60179
(847) 286-8358
Fax (847) 286-3470
Email Jon.Bredemeier@searshc.com

November 27, 2017

James H. Norris
Village Manager
Village of Hoffman Estates
1900 Hassell Road
Hoffman Estates, IL  60169

Re:  EDA Distribution

Dear Mr. Norris:

Thank you for your letter dated November 7, 2017 regarding the EDA distribution for 2017. Please be advised that, pursuant to Public Act 097-0636, as of the date of this letter, over 4250 jobs exist at the Sears Holdings' campus in Hoffman Estates.  Please be further advised that at no time in 2017 did the number of jobs dip below the requisite 4250 jobs.

Sears Holdings appreciates the ongoing relationship we enjoy with the Village of Hoffman Estates and the surrounding community.  As one of the State's largest employers and taxpayers, we are proud of the positive impact we have had on the area for more than two decades: hundreds of millions in infrastructure development dollars have been invested plus thousands of direct jobs (thousands more ancillary jobs) have been created and maintained.

Should you have any further questions, please do not hesitate to ask.

Sincerely,

Jonathan Bredemeier
Sr. Director, Real Estate
and Corporate Services

cc:   Jason Pollak, Assistant General Counsel
      Arthur Janura, Corporation Counsel

**EXHIBIT 4**

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

## RETAIL

| APPAREL | DISCOUNTERS | DEPARTMENT STORES | E-COMMERCE | FOOD AND BEVERAGE | RESTAURANTS | HOUSEHOLD PRODUCTS |

# Sears lays off 220 employees at corporate offices

- Sears is laying off 220 employees primarily at the company's corporate headquarters.

 
MARKETS


BUSINESS NEWS


CNBC TV

MENU

- The moves are part of the department store chain's ongoing restructuring plan.

**BREAKING NEWS**

Lauren Thomas | Lauren Hirsch

Published 2:56 PM ET Wed, 31 Jan 2018 | Updr  8 PM ET Wed, 31 Jan 2018




**Sears lays off 220 employees at corporate offices**
6:14 PM ET Wed, 31 Jan 2018 | 00:42

Sears Holdings on Wednesday laid off 220 employees primarily at the company's corporate headquarters in Hoffman Estates, Illinois, effective immediately.

The job cuts impacted various business units and roles across the retail organization, a spokesman told CNBC. The moves are part of the department store chain's ongoing restructuring plan, announced earlier this month, to streamline operations and get back to profitability.

"The company continues to achieve significant progress in our restructuring program, with actions taken in fiscal year 2017 to

FROM THE WEB      Sponsored Links by Taboola

**Top Surgeon: How To Properly Flush Out Your Bowels**
Gundry MD

**Reclusive Millionaire Warns: "Get Out Of Cash Now"**
Investing Outlook

**3 Ways Your Cat Asks For Help**
Dr. Marty

**U.S. Cardiologist: It's Like a Insides**
Health Headlines

EXHIBIT
5

FILED DATE: 10/10/2018 4:46 PM  2018CH12683

realize $1.25 billion in annualized cost savings," the spokesman said.

Earlier this month, the retailer also outlined its plans to shutter more than 100 locations under the Sears and Kmart banners, impacting hundreds of other part-time positions as those stores go dark.

The company has said it will offer severance and transition assistance to those employees who are eligible. It wasn't immediately clear how many people still work at Sears' corporate headquarters, and the company declined to comment.

Coming off a disappointing holiday season, Sears is looking for ways to drive sales and is considering further monetizing some of its other assets, including the Kenmore and DieHard brands, and Sears Home Services.



MARKETS     BUSINESS NEWS

MENU

**BREAKING NEWS**

efforts fail

consider 'all options' if refinancing

f





**Sears warns it will consider 'all options' if efforts to refinance $1 billion fail**

11:05 AM ET Wed, 10 Jan 2018 | 01:06



**Lauren Thomas**
Retail Reporter

**Lauren Hirsch**
Retail Reporter for CNBC.com

**RELATED SECURITIES**

| Symbol | Price | Change | %Change |
|--------|-------|--------|---------|
| SHLD | 0.5851 ▼ | -0.0373 | -5.99% |

by Taboola

Why you should buy a used car—and pay a lot less money than you think

The Kavanaugh decision might have cost businesses $9 billion — so far

Elon Musk asks this tricky interview question that most people can't answer

You should feel dumb if you're not getting this interest rate on your savings account, expert says

If you're married and near retirement, consider this tax-saving strategy

Mattress Firm is the latest retailer to go bankrupt. Here are others that went bust this year.

**TRENDING NOW**



**1.** Once you hit this credit score, going higher is a 'waste of time,' expert says



**2.** Stocks making the biggest move premarket: IP, AMZN, TRV, NIO, PG & more



**3.** Elon Musk asks this tricky interview question that most people can't answer



**4.** Voter registrations skyrocket after Taylor Swift's get-out-the-vote push

Listen to the IMF's new warning,

FILED DATE: 10/10/2018 4:46 PM   2018CH12683



| | |
|---|---|
| **LAW OFFICE OF** ⟩ **Kory Atkinson** | 236 West Lake Street, Suite 100   P: 630.980.9100   kaa@koryatkinson.com<br>Bloomingdale, IL 60108   F: 630.980.9120   www.koryatkinson.com |

July 30, 2018

Jonathan Bredemeier
Senior Director, Real Estate and Corporate Services
Sears Holdings Management Corporation
3333 Beverly Road, BC-154A
Hoffman Estates, IL 60179

**RE:    Economic Development Area**
**Sears Headquarters Campus Job Count**

Dear Mr. Bredemeier:

I am an attorney for Community Unit School District 300. Pursuant to the Illinois Economic Development Area Tax Increment Allocation Act (20 ILCS 620/1 *et seq.*) (the "Act"), Sears Holdings Management Corporation (Sears) annually informs the Village of Hoffman Estates as to the number of jobs maintained at the Sears headquarters campus in Hoffman Estates. Under the Act, Sears is required to maintain at least 4,250 jobs at the campus in order to qualify to receive millions of dollars in property tax proceeds generated by the Economic Development Area ("EDA").

Media reports over the past year have raised legitimate concern as to the number of jobs maintained in the EDA. Such reports suggest that Sears may no longer qualify for Economic Development for a Growing Economic (EDGE) tax credits because it no longer has 4,250 employees at the headquarters campus. Media reports following Sears' most recent announcement that it is again cutting hundreds of jobs at its headquarters indicated that a Sears' spokesperson declined to say how may jobs at now at the Sears headquarters campus.

School District 300 is understandably concerned about the proper administration of the EDA. Millions of property tax dollars are diverted from the school district and other local governments based on the promise that Sears will maintain 4,250 jobs at its headquarters. In light of the ongoing media coverage, School District 300 requests that Sears provide corroborating evidence to support its assertion that it maintained 4,250 jobs during calendar year 2017. In addition, the school district asks for a commitment from Sears that it will provide corroborating evidence in support of any assertion as to the number of jobs maintained during 2018 prior to any distribution of funds under the EDA for 2018.

School District 300 welcomes open communication with Sears about the administration of the EDA. Clarification and corroboration on whether and how Sears is maintaining the requisite 4,250 jobs in the face of continuing layoffs is a critical concern for the school district.

**EXHIBIT
6**

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

LAW
OFFICE **Kory Atkinson**
OF

236 West Lake Street, Suite 100    P: 630.980.9100    kaa@koryatkinson.com
Bloomingdale, IL 60108    F: 630.980.9120    www.koryatkinson.com

Jonathan Bredemeier
Sears Holdings Management Corporation
July 30, 2018
Page 2

I appreciate your prompt attention and response to this letter.

Sincerely,

Kory A. Atkinson

cc:    Jason Pollak, Assistant General Counsel, Sears Holdings Management Corporation
Arthur Janura, Corporation Counsel, Village of Hoffman Estates
Fred Heid, Superintendent, Community Unit School District 300
Susan Harkin, Chief Operating Officer/CSBO, Community Unit School District 300

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

 **NEAL GERBER EISENBERG**

August 24, 2018

David S. Martin
Attorney at Law

Tel 312.269.8011
Fax 312.578.1544
dmartin@nge.com

Via Email and US Mail

Mr. Kory Atkinson
236 West Lake Street, Suite 100
Bloomingdale, Illinois 60108

Re:   Sears Property Tax

Dear Kory:

Thank you for your email that attached your letter to Jonathan Bredemeier.  Regarding whether Sears would reconsider and accept notes in lieu of a tax refund the answer is no.  I assume School District 300 is aware that its appraisal and expert opinion supports a refund of about $4,600,000 for each of the pending PTAB appeals 2013 through 2015.  Sears expert opines a value that would generate a refund of about $8,400,000 for each of the 3 years.  Sears is open to a set off for property tax deemed illegal by a settlement, which it has previously received pursuant to an annual increment allocation.  Sears is also open to discussing refunds being paid incrementally.  However, if settlement is not reached refunds would be paid in full at one time and it is presumed that based on the parties expert opinions the refund amount would be between $4,600,000 and $8,400,000 for each year.

Regarding the letter to Jonathan Bredemeier that was attached to your email, I offer the following observations.

- First, any issue relating to the number of jobs maintained within the EDA are unrelated to the property tax appeals pending at the PTAB.  These 2 matters are wholly independent of each other and will be treated as such by Sears.

- Secondly, Sears has no obligation to provide School District 300 with any information regarding "jobs" within the EDA.  Sears has not provided this information to School District 300 in the past and sees no reason to begin doing so now.

I look forward to further discussions relating to the pending PTAB appeals.

Very truly yours,

David S. Martin

DSM:kb
014311.0002:28253491.2

**EXHIBIT 7**

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

FILED
10/10/2018 4:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH12683

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| **Summons - Alias Summons** | **(08/01/18) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Community Unit School District 300

(Name all parties)

v.

Village of Hoffman Estates

Case No.     2018CH12683

☑ **SUMMONS** ☐ **ALIAS SUMMONS**

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

**Summons - Alias Summons**                                    **(08/01/18) CCG 0001 B**

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 91219

Atty Name: Kenneth M. Florey

Atty. for: Community Unit School District 300

Address: 631 E. Boughton Road, Suite 200

City: Bolingbrook

State: IL    Zip: 60440

Telephone: 630.929.3639

Primary Email: kflorey@robbins-schwartz.com

Witness: _____
10/10/2018 4:46 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

Richard J Daley Center
50 W Washington
Chicago, IL 60602

District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

Domestic Violence Court
555 W Harrison
Chicago, IL 60607

Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

## Daley Center Divisions/Departments

Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

FILED
10/10/2018 4:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH12683

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |

Summons - Alias Summons    (08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Community Unit School District 300

(Name all parties)

v.

Sears Holdings Corporation

Case No. 2018CH12683

### ☑ SUMMONS  ☐ ALIAS SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons,** not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

**Summons - Alias Summons**                                    (08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 91219

Atty Name: Kenneth M. Florey

Atty. for: Community Unit School District 300

Address: 631 E. Boughton Road, Suite 200

City: Bolingbrook

State: IL    Zip: 60440

Telephone: 630.929.3639

Primary Email: kflorey@robbins-schwartz.com

Witness: _____

10/10/2018 4:46 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

FILED DATE: 10/10/2018 4:46 PM    2018CH12683

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

Richard J Daley Center
50 W Washington
Chicago, IL 60602

District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

Domestic Violence Court
555 W Harrison
Chicago, IL 60607

Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

## Daley Center Divisions/Departments

Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

FILED DATE: 10/10/2018 4:46 PM   2018CH12683

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

FILED
10/10/2018 4:46 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH12683

COMMUNITY UNIT SCHOOL DISTRICT 300

_____
Plaintiff

v.

VILLAGE OF HOFFMAN ESTATES and SEARS HOLDING CORPORATION

_____
Defendant

2018CH12683

No. _____

## CHANCERY DIVISION CIVIL COVER SHEET
## GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be filed with the initial complaint in all actions filed in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

0005 ☐ Administrative Review
0001 ☐ Class Action
0002 ■ Declaratory Judgment
0004 ■ Injunction

0007 ☐ General Chancery
0010 ☐ Accounting
0011 ☐ Arbitration
0012 ☐ Certiorari
0013 ☐ Dissolution of Corporation
0014 ☐ Dissolution of Partnership
0015 ☐ Equitable Lien
0016 ☐ Interpleader
0017 ☐ Mandamus
0018 ☐ Ne Exeat

0019 ☐ Partition
0020 ☐ Quiet Title
0021 ☐ Quo Warranto
0022 ☐ Redemption Rights
0023 ☐ Reformation of a Contract
0024 ☐ Rescission of a Contract
0025 ☐ Specific Performance
0026 ☐ Trust Construction
☐ Other (specify) _____

By: Kenneth M. Florey
_____
■ Atty. No.: 91219        ☐ Pro se 99500
Name: Kenneth M. Florey
Atty. for: Community Unit School District 300
Address: 631 E. Boughton Rd, Suite 200
City/State/Zip: Bolingbrook, IL 60440
Telephone: 630.929.3639
Primary Email: kflorey@robbins-schwartz.com
Secondary Email: jmiller@robbins-schwartz.com
Tertiary Email: _____

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice from the **Clerk's Office** for this case at this Email address:

_____

FILED DATE: 10/10/2018 4:46 PM  2018CH12683