**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                                                    :

                                                         :          **Chapter 11**

**SEARS HOLDINGS CORPORATION,** *et al.,*          :

                                                         :          **Case No. 18-23538 (RDD)**

                                                         :

          Debtors.[1]                                    :          **(Jointly Administered)**

---------------------------------------------------------------x

## AFFIDAVIT OF PUBLICATION

I, Jesse Offenhartz, depose and say that I am employed by Prime Clerk LLC ("***Prime Clerk***"), the claims and noticing agent for the Debtors in the above-captioned chapter 11 cases.

This Affidavit of Publication includes sworn statements verifying that the Notice of Deadline For Filing Proofs of Claim as conformed for publication, was published in the *New York Times* on March 4, 2019, as described on **Exhibit A** attached hereto.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Dated: March 5, 2019

Jesse Offenhartz

State of New York
County of New York

Subscribed and sworn to (or affirmed) before me on March 5, 2019, by Jesse Offenhartz, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:

PAUL PULLO
Notary Public, State of New York
No. 01PU6231078
Qualified in Nassau County
Commission Expires Nov. 15, 2022

31251

2

## Exhibit A



The New York Times
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

MAR    5        2019

I, Alice Weber, in my capacity as a Principal Clerk of the Publisher of *The New York Times*, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of *The New York Times* on the following date or dates, to wit on

MAR 0 4 2019        B6 NATIONAL

*Alice Weber*

Sworn before me the
5th day of May, 2019

*Michelle M Sci*

Notary Public

MICHELLE M. SCIBILIA
Notary Public, State of New York
Registration #01SC6281145
Qualified In Nassau County
Commission Expires May 13, 2021

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re SEARS HOLDINGS | Chapter 11 |
| CORPORATION, et al., | Case No.: 18-23538 (RDD) |
| Debtors, | (Jointly Administered) |

## NOTICE OF DEADLINE FOR FILING PROOFS OF CLAIM

Chapter 11 bankruptcy cases concerning the debtors listed below were filed on October 15, 2018. You may be a debtor of one of the debtors. On February 22, 2019, the United States Bankruptcy Court for the Southern District of New York (the "Court"), having jurisdiction over the chapter 11 cases of Sears Holdings Corporation and certain of its affiliates as debtors and debtors in possession (collectively, the "Debtors"), entered an order (the "Bar Date Order") establishing (i) April 10, 2019 at 5:00 p.m. (Eastern Time) as the last date and time for each person and entity (including individuals, partnerships, corporations, joint ventures, and trusts but not governmental units (as defined in section 101(27) of title 11 of the United States Code (the "Bankruptcy Code"), "Governmental Units")) to file a proof of claim (each, "Proof of Claim") in respect of a prepetition claim (as defined in section 101(5) of the Bankruptcy Code), including for the avoidance of doubt, secured claims, priority claims, and claims arising under section 503(b)(9) of the Bankruptcy Code, against any of the Debtors listed below (the "General Bar Date"), and (2) September 3, 2019 at 5:00 p.m. (Eastern Time) as the last date and time for each Governmental Unit to file a Proof of Claim in respect of a prepetition claim against any of the Debtors listed below (the "Governmental Bar Date," and, together with the General Bar Date, the "Bar Dates").

The Bar Date Order, the Bar Dates, and the procedures set forth below for the filing of Proofs of Claim apply to all claims against the Debtors other than those set forth below as being specifically excluded) that arose prior to October 15, 2018, the date on which the Debtors commenced their cases under chapter 11 of the Bankruptcy Code.

If you have any questions relating to this Notice, please feel free to contact the Debtors' Court-approved claims agent Prime Clerk LLC ("Prime Clerk") at (844) 384-4460 (toll free) or by e-mail at searsinfo@primeclerk.com.

YOU SHOULD CONSULT AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER YOU SHOULD FILE A PROOF OF CLAIM.

NOTE: The staff of the Office of the Clerk of the Bankruptcy Court, the Office of the United States Trustee and Prime Clerk cannot give legal advice.

Name of Debtors, Case Number, Tax Identification Number: Sears Holdings Corporation, 18-23538 (RDD), 20-1920748; Kmart Holding Corporation, 18-23539 (RDD), 32-0027513; Kmart Operations LLC, 18-23540 (RDD), 32-0456546; Sears Operations LLC, 18-23541 (RDD), 35-2524515; Sears, Roebuck and Co, 18-23537 (RDD), 36-1750680; ServiceLive, Inc, 18-23542 (RDD), 36-4616774; SHC Licensed Business LLC, 18-23616 (RDD), 37-1783718; A&E Factory Service, LLC, 18-23543 (RDD), 36-4486695; A&E Home Delivery, LLC, 18-23544 (RDD), 37-1502025; A&E Lawn & Garden, LLC, 18-23545 (RDD), 13-4215328; A&E Signature Service, LLC, 18-23546 (RDD), 37-1500204; FBA Holdings Inc, 18-23547 (RDD), 36-4186537; Innovel Solutions, Inc, 18-23548 (RDD), 36-1857180; Kmart Corporation, 18-23549 (RDD), 38-0729500; MaxServ, Inc, 18-23550 (RDD), 74-2927626; Private Brands, Ltd, 18-23551 (RDD), 35-0544024; Sears Development Co, 18-23552 (RDD), 36-4250208; Sears Holdings Management Corporation, 18-23554 (RDD), 20-3392748; Sears Home & Business Franchises, Inc, 18-23555 (RDD), 08-0742542; Sears Home Improvement Products, Inc, 18-23556 (RDD), 25-1868597; Sears Insurance Services, L.L.C., 18-23557 (RDD), 36-4287782; Sears Procurement Services, Inc., 18-23558 (RDD), 30-0093859; Sears Protection Company, 18-23559 (RDD), 36-4471250; Sears Protection Company (PR), Inc., 18-23559 (RDD), 66-0704861; Sears Roebuck Acceptance Corp, 18-23560 (RDD), 51-0080615; Sears, Roebuck de Puerto Rico, Inc., 18-23561 (RDD), 66-0236526; SYW Relay LLC, 18-23562 (RDD), 35-2561870; Wally Labs LLC, 18-23563 (RDD), None; SHC Promotions LLC, 18-23564 (RDD), 26-4209626; Big Beaver of Florida Development, LLC, 18-23544 (RDD), None; California Builder Appliances, Inc, 18-23565 (RDD), 68-0406527; Florida Builder Appliances, Inc., 18-23566 (RDD), 36-3619133; KBL Holding Inc, 18-23567 (RDD), 26-0053295; KLC, Inc., 18-23568 (RDD), 75-2490839; Kmart of Michigan, Inc., 18-23576 (RDD), 38-3551696; Kmart of Washington LLC, 18-23570 (RDD), 61-1448889; Kmart Stores of Illinois LLC, 18-23571 (RDD), 61-1448891; Kmart Stores of Texas LLC, 18-23572 (RDD), 61-1448915; MyGofer LLC, 18-23573 (RDD), 26-4005531; Sears Brands Business Unit Corporation, 18-23574 (RDD), 42-1546658; Sears Holdings Publishing Company, LLC, 18-23575 (RDD), 26-0075554; Sears Protection Company (Florida), L.L.C., 18-23569 (RDD), 20-0224239; SHC Desert Springs, LLC, 18-23577 (RDD), None; SOE, Inc., 18-23578 (RDD), 63-0396616; StarWest, LLC, 18-23579 (RDD), 37-1495379; STI Merchandising, Inc., 18-23580 (RDD), 38-2766598; Troy Coolidge No. 13, LLC, 18-23581 (RDD), None; BlueLight.com, Inc., 18-23582 (RDD), 77-0527024; Sears Brands, L.L.C., 18-23583 (RDD), 42-1564664; Sears Buying Services, Inc, 18-23584 (RDD), 36-3256533; Kmart.com LLC, 18-23585 (RDD), 77-0529222; Sears Brands Management Corporation, 18-23586 (RDD), 36-2355365; SRC Holding Corporation, 19-22031 (RDD), 46-4344816.

Attorneys for Debtors: Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153-0119, Ray C. Schrock, P.C., Jacqueline Marcus, Garrett A. Fail, Sunny Singh. Address of the Office of the Clerk of the Bankruptcy Court: Clerk of the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601, Vito Genna, Clerk of the Bankruptcy Court, Hours Open: 8:30 a.m.—5:00 p.m.

**1.  WHO MUST FILE A PROOF OF CLAIM. You MUST file a Proof of Claim** to vote on a chapter 11 plan filed by the Debtors or to share in any distributions from the Debtors' estates if you have a claim that arose prior to **October 15, 2018**, and your claim is not one of the types of claims described in Section 2 below. Claims based on acts or omissions of the Debtors that occurred before **October 15, 2018**, must be filed on or prior to the applicable Bar Date, even if such claims are not now fixed, liquidated, or certain or did not mature or become fixed, liquidated, or certain before **October 15, 2018**.

Pursuant to section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. Further, claims include unsecured claims, secured claims, and priority claims.

**2.  WHO NEED NOT FILE A PROOF OF CLAIM. You need not file a Proof** of Claim if:

• Your claim is listed in the debtors' schedules of assets and liabilities (the "Schedules") and (i) is not listed in the Schedules as "disputed," "contingent," or "unliquidated," (ii) you do not dispute the amount, nature, and priority of the claim as set forth in the Schedules, and (iii) you do not dispute that the claim is an obligation of the specific Debtor against which the claim is listed in the Schedules;

• Your claim has been paid in full or will be paid in full under an agreement

entered into by the Debtors pursuant to the Final Critical Vendors Order;

• Your claim consists of an equity security interest in the Debtors, which interest exclusively is based upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants, options, or rights to purchase, sell, or subscribe to such a security or interest; provided that if you hold such security interest and wish to assert a claim (as opposed to an ownership interest) against the Debtors (including a claim relating to an equity interest or the purchase or sale of such equity interest), a Proof of Claim must be filed on or before the applicable Bar Date as set forth in this Notice;

• You hold a claim that is allowable under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an administrative expense (other than a claim under section 503(b)(9) of the Bankruptcy Code);

• You hold a claim that heretofore has been allowed by an order of the Court or subsequently is allowed by an order of the Court entered on or before the applicable Bar Date;

• You hold a claim for which payment has been previously made by the Debtors in full or in the ordinary course of business;

• You hold a claim for which you already filed a Proof of Claim with the Office of the Clerk of the Bankruptcy Court or Prime Clerk against any of the Debtors, utilizing a claim form that substantially conforms to the form provided with this Notice (the "Proof of Claim Form") or Official Bankruptcy Form 410 ("Official Form 410"), so long as you do not wish to assert such claim against a Debtor who was not named in the original Proof of Claim, in which case another Proof of Claim must be filed;

• You are a person or entity whose claim arises out of any warranties, protection agreements, or other service contracts for the goods and services of the Debtors sold or performed prior to the Commencement Date;

• You are a person or entity whose claim exclusively is limited to the repayment of principal, interest, and other fees and expenses (the "First Lien Credit Agreement Obligations") under or in connection with that certain Third Amended and Restated Credit Agreement, dated as of July 21, 2015 (as thereafter amended, supplemented, or modified from time to time, the "First Lien Credit Agreement"), provided that any person or entity wishing to assert a claim arising out of or relating to the First Lien Credit Agreement, other than a claim for the First Lien Credit Agreement Obligations, shall be required to file a Proof of Claim with respect to such claim on or before the applicable Bar Date, unless another exception identified herein applies;

• You are a person or entity whose claim exclusively is limited to the repayment of principal, interest, and other fees and expenses (the "Second-Alone LC Obligations") under or in connection with that certain Letter of Credit and Reimbursement Agreement, dated as of December 28, 2016 (as thereafter amended, supplemented, or modified from time to time, the "Stand-Alone L/C Facility"), provided that any person or entity wishing to assert a claim arising out of or relating to the Stand-Alone L/C facility, other than a claim for the Stand-Alone L/C Obligations, shall be required to file a Proof of Claim with respect to such claim on or before the applicable Bar Date, unless another exception identified herein applies;

• You are a person or entity whose claim exclusively is limited to the repayment of principal, interest, and other fees and expenses (the "Second Lien Credit Facility Obligations") under or in connection with that certain Second Lien Credit Agreement, dated as of September 1, 2016 (as thereafter amended, supplemented, or modified from time to time, the "Second Lien Credit Facility"), provided that any person or entity wishing to assert a claim arising out of or relating to the Second Lien Credit Agreement, other than a claim for the Second Lien Credit Agreement Obligations, shall be required to file a Proof of Claim with respect to such claim on or before the applicable Bar Date, unless another exception identified herein applies;

• You are a person or entity whose claim exclusively is limited to the repayment of principal, interest, and other fees and expenses (the "Second Lien Notes Obligations") under or in connection with that certain Indenture for 6.625% Senior Secured Notes due 2018, dated October 12, 2010 (as thereafter amended, supplemented, or modified from time to time, the "Second Lien Notes"), provided that any person or entity wishing to assert a claim arising out of or relating to the Second Lien Notes Indenture, other than a claim for the Second Lien Notes Obligations, shall be required to file a Proof of Claim with respect to such claim on or before the applicable Bar Date, unless another exception identified herein applies;

• You are a person or entity whose claim exclusively is limited to the repayment of principal, interest, and other fees and expenses (the "Holdings Unsecured Notes Obligations") under or in connection with that certain Indenture for 8% Senior Unsecured Notes due 2019, dated November 21, 2014 (as thereafter amended, supplemented, or modified from time to time, the "Holdings Unsecured Notes"), provided that any person or entity wishing to assert a claim arising out of or relating to the Holdings Unsecured Notes, other than a claim for the Holdings Unsecured Notes Obligations, shall be required to file a Proof of Claim with respect to such claim on or before the applicable Bar Date, unless another exception identified herein applies;

• You are a person or entity whose claim exclusively is limited to the repayment of principal, interest, and other fees and expenses (the "Holdings Unsecured PIK Notes Obligations") under or in connection with that certain Second Supplemental Indenture for 8% Senior Unsecured Convertible PIK Notes due 2019, dated as of March 20, 2018 (as thereafter amended, supplemented, or modified from time to time, the "Holdings Unsecured PIK Notes"), provided that any person or entity wishing to assert a claim arising out of or relating to the Holdings Unsecured PIK Notes, other than a claim for the Holdings Unsecured PIK Notes Obligations, shall be required to file a Proof of Claim with respect to such claim on or before the applicable Bar Date, unless another exception identified herein applies; or

• You are a person or entity whose claim exclusively is limited to the repayment of principal, interest, and other fees and expenses (the "SRAC Unsecured Notes Obligations") under or in connection with that certain Indenture for 7%/7.5% PIK-Toggle Notes due 2028, dated as of May 15, 1995 (as thereafter amended, supplemented, or modified from time to time, the "SRAC Unsecured PIK Notes"), or that certain Indenture for certain notes having various interest rates, dated October 1, 2002 (as thereafter amended, supplemented, or modified from time to time, the "SRAC Unsecured Notes") provided that any person or entity wishing to assert a claim arising out of or relating to the SRAC Unsecured PIK Notes or the SRAC Unsecured Notes, other than a claim for the SRAC Unsecured Notes Obligations, shall be required to file a Proof of Claim with respect to such claim on or before the applicable Bar Date, unless another exception identified herein applies.

YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS.

**3.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES. If you hold a** claim arising from the rejection of an executory contract or unexpired lease, you must file a Proof of Claim based on such rejection by the later of (i) the applicable Bar Date and (ii) the date that is thirty (30) days following the date of entry of the Court order approving the rejection of such executory contract or unexpired lease, or you will be forever barred from so doing. Notwithstanding the foregoing, if you are a party to an executory contract or unexpired lease and you wish to assert a claim with respect to unpaid amounts accrued and outstanding as of October 15, 2018, pursuant to such executory contract or unexpired lease (other than a rejection dam-

ages claim), you must file a Proof of Claim for such amounts on or before the applicable Bar Date unless another exception identified herein applies.

**4.  WHEN AND WHERE TO FILE.** Except as provided for herein, all Proofs of Claim either must be filed (I) electronically through Prime Clerk's website using the interface available on such website located at https://restructuring.primeclerk.com/sears under the link entitled "Submit a Claim" (the "Electronic Filing System") or (ii) by delivering the original Proof of Claim form by hand or mailing the original Proof of Claim form on or before the applicable Bar Date as follows: If by first-class mail: Sears Holdings Corporation Claims Processing Center, c/o Prime Clerk LLC, Grand Central Station, PO Box 4708, New York, NY 10163-4708; OR if by overnight courier or hand delivery: Sears Holdings Corporation Claims Processing Center, c/o Prime Clerk LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; OR if by hand delivery: United States Bankruptcy Court, Southern District of New York, 300 Quarropas Street, White Plains, NY 10601.

Proofs of Claim will be deemed timely filed only if actually received by Prime Clerk or the Court as set forth in Section 4 above, in each case, on or before the applicable Bar Date. Proofs of Claim sent by facsimile, telecopy, or electronic mail transmission (other than Proofs of Claim filed electronically through the Electronic Filing System) will not be accepted.

**5.  WHAT TO FILE.** If you file a Proof of Claim, your filed Proof of Claim must: (i) be written in the English language; (ii) be denominated in the lawful currency of the United States (using the exchange rate, if applicable, as of the date of the commencement of the chapter 11 case by the applicable Debtor); (iii) substantially conform to the Proof of Claim Form or Official Form 410; (iv) specify by name and case number the Debtor against which the Proof of Claim is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include supporting documentation for the claim or an explanation as to why such documentation is not available; and (vii) be signed by the claimant or (if the claimant is not an individual) by an authorized agent of the claimant under penalty of perjury.

IF YOU ARE ASSERTING A CLAIM AGAINST MORE THAN ONE DEBTOR, YOU MUST FILE SEPARATE PROOFS OF CLAIM AGAINST EACH DEBTOR, AND YOU MUST IDENTIFY ON YOUR PROOF OF CLAIM THE SPECIFIC DEBTOR AGAINST WHICH YOU ARE ASSERTING A CLAIM AND THE CASE NUMBER OF THAT DEBTOR'S BANKRUPTCY CASE. A LIST OF THE NAMES OF THE DEBTORS AND THEIR RESPECTIVE CASE NUMBERS IS SET FORTH ABOVE.

Your Proof of Claim form must not contain complete social security numbers or taxpayer identification numbers (only include the last four digits), complete birth dates (only include the year), the names of minors (only include the minor's initials), or financial account numbers (only include the last four digits of such financial account).

Official Form 410 can be found at http://www.uscourts.gov/sites/default/files/form_b_410_0.pdf. Additional Proof of Claim forms can be obtained at https://restructuring.primeclerk.com/sears/EPOC-Index.

YOU SHOULD ATTACH TO YOUR COMPLETED PROOF OF CLAIM FORM COPIES OF ANY DOCUMENTS UPON WHICH YOUR CLAIM IS BASED. IF THE DOCUMENTS ARE VOLUMINOUS, YOU SHOULD ATTACH A SUMMARY.

**6.  CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE. ANY HOLDER OF A CLAIM THAT IS NOT EXCEPTED FROM THE REQUIREMENTS OF THE BAR DATE ORDER, AS SET FORTH IN SECTION 2 ABOVE, AND THAT FAILS TO TIMELY FILE A PROOF OF CLAIM IN THE APPROPRIATE FORM WILL BE FOREVER BARRED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTORS AND THEIR CHAPTER 11 ESTATES, FROM VOTING ON ANY PLAN OF REORGANIZATION FILED IN THESE CHAPTER 11 CASES, AND FROM PARTICIPATING IN ANY DISTRIBUTION IN THE DEBTORS' CASES ON ACCOUNT OF SUCH CLAIM.**

**7.  THE DEBTORS' SCHEDULES, ACCESS THERETO, AND CONSE-QUENCES OF AMENDMENT THEREOF.** You may be listed as the holder of a claim against the Debtors in the Schedules. To determine if and how you are listed in the Schedules, please refer to the descriptions set forth on the enclosed Proof of Claim Form regarding the nature, amount, and status of your claim(s). If you received postpetition payments from the Debtors (as authorized by the Court) on account of your claim, the enclosed Proof of Claim Form will reflect the net amount of your claims. If the Debtors believe that you hold claims against more than one Debtor, you will receive multiple Proof of Claim Forms; each Proof of Claim Form will reflect the nature and amount of your claim against each Debtor as listed in the Schedules.

As set forth above, if you agree with the nature, amount, and status of your claim as listed in the Debtors' Schedules and if your claim is not listed in the Schedules as "disputed," "contingent," or "unliquidated," you need not file a Proof of Claim. Otherwise, or if you decide to file a Proof of Claim, you must do so before the applicable Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted (I) on the website established by Prime Clerk for the Debtors' cases at https://restructuring.primeclerk.com/sears and (II) on the Court's website at http://www.nysb.uscourts.gov. (A username and password for the Court's Public Access to Court Electronic Records ("PACER") account are required to access the information on the Court's website and can be obtained through PACER at https://pacer.psc.uscourts.gov/psco/cgi-bin/regform.pl). Copies of the Schedules also may be examined between the hours of 8:30 a.m. and 5:00 p.m. (Eastern Time), Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, NY 10601. Copies of the Debtors' Schedules also may be obtained by request in Prime Clerk at the address and telephone number set forth below: Sears Holdings Corporation Claims Processing Center, c/o Prime Clerk LLC, Grand Central Station, PO Box 4708, New York, NY 10163-4708, US Toll Free: (844) 384-4460, International: +1 (929) 955-2419.

In the event that the Debtors amend or supplement their Schedules subsequent to the date of entry of the Bar Date Order, the Debtors shall give notice of any such amendment or supplement to the holders of claims affected thereby, such holders shall have until the later of (i) the applicable Bar Date and (ii) thirty (30) days from the date of such notice to file a Proof of Claim or be forever barred from so doing. And the Debtors shall give notice of such deadline to the holders of claims affected by such amendment or supplement.

A holder of a possible claim against the Debtors should consult an attorney if such holder has any questions regarding this Notice, including whether the holder should file a Proof of Claim.

Dated: White Plains, New York
February 22, 2019

BY ORDER OF THE COURT

The Debtors filed their Schedules on January 17, 2019 [ECF Nos. 1609, 1611, 1613, 1615, 1617, 1619, 1621, 1623, 1625, 1627, 1629, 1631, 1633, 1635, 1637, 1639, 1641, 1643, 1645, 1647, 1649, 1651, 1653, 1655, 1657, 1659, 1661, 1663, 1665, 1667, 1668, 1673, 1675, 1677, 1679, 1681, 1683, 1685, 1687, 1689, 1691, 1693, 1695, 1697, 1699, 1701, 1703, 1705, 1707, 1709, 1711, 1713].

See Order Granting Motion (i) Authorizing Debtors to Pay Certain Prepetition Obligations to Critical Vendors, (II) Approving Procedures to Address Vendors Who Repudiate and Refuse to Honor Their Contractual Obligations to The Debtors and (III) Granting Related Relief [ECF No. 793] (the "Final Critical Vendors Order").

MEDIA | INTERNATIONAL



Luminary subscribers will have access to over 40 exclusive podcasts for $8 a month. Above, Matt Sacks, a co-founder, at the company's office in New York.

AN JUNG XU/FOR THE NEW YORK TIMES

## Podcast Start-Up Tests Paid Subscriptions

FROM FIRST BUSINESS PAGE

nary is offering large upfront payment guarantees in exchange for exclusive rights to distribute their work, reducing the risk of a concept and, hopefully, encouraging greater creativity and higher production values. Luminary will also pay creators bonuses if their shows reach certain listening thresholds.

"For podcasting to grow, creators must be able to take risks on more conceptual ideas, and the Luminary model provides that comfort," Mr. Davidson said.

Most podcast creators make money by selling ads. Podcasts are expected to generate $514 million in ad sales this year, a sum projected to rise to $659 million in 2020, according to the Interactive Advertising Bureau and PwC.

As with radio or broadcast television, which are also reliant on ad sales, reaching the biggest audience possible is the goal. As a result, the same kinds of mass-appeal podcasts tend to get made. That means news shows, sports commentary and lots of chat.

Making a living by advertising, as many podcasters have discovered (like YouTube stars before them), is harder than it looks. The scramble is constant. An advertiser could pour in money one

month and vanish the next. With podcasting in particular, it is difficult to measure how many people listen to the ads. More podcast apps offer ad-skipping buttons.

The Luminary app will not be totally absent of ads. It will also offer a free area, where listeners can play any of the estimated 690,000 ad-supported and nonexclusive podcasts in the market.

"Matt has figured out a smart and sustainable way to push the business forward — better discovery for listeners, allowing creators to focus on creating the highest-quality content possible and stop worrying about selling ads," Liza Landsman, a partner at New Enterprise Associates, a venture capital firm that has invested in Luminary, said of Mr. Sacks.

Luminary has 70 employees in New York and Chicago, about 40 of whom are engineers. The company is beginning a marketing campaign on Monday that includes outdoor advertising in New York, Los Angeles and Austin, Tex.

To some degree, of course, all media start-ups think they are going to be the next Netflix. The test for Luminary will come in the execution. And there are plenty of challenges. Subscription-based businesses are hot at the moment,

but analysts say that consumers will begin pushing back and asking, How many entertainment services do I really need to be paying for every month?

Luminary is also entering an increasingly crowded field.

Apple devices have long dominated the podcast market, despite what analysts describe as a largely ambivalent approach; Apple has improved its podcasting app over the years, but it has never felt like a priority. That could change now that Google has reintroduced a podcast player and music streaming services like Spotify are looking to podcasting for growth.

Last month, Spotify paid a reported $230 million for Gimlet Media, a producer of audio dramas like "Homecoming" and "Crimetown." Spotify also offers free listening with ads and a premium version for subscribers who pay a $10 monthly fee. And Spotify offers some exclusive podcast shows from stars like Amy Schumer and the rapper Joe Budden.

Other podcast platforms include Stitcher, Pocket Casts, Overcast and Castbox. Among startups, Himalaya Media, a San Francisco start-up backed by the Chinese audio giant Ximalaya FM, announced last month that it had

raised $100 million and would introduce a podcast-distribution app with exclusive shows and a feature that would allow listeners to leave gratuities. Its stated goal? "To climb to the peak of the global podcast space."

Mr. Sacks brushed off the competition.

"Just like in the premium television space, there is more than enough room for multiple offerings to thrive," he said.

"What sets Luminary apart," he continued, "is our exclusive content right off the bat. Nobody comes close."

Still, the project that probably best demonstrates where Luminary would like to go is Mr. Mitchell's new musical.

"Hedwig," the story of an East German transgender rocker, made its debut Off Broadway in 1998 and became a cultural phenomenon. Mr. Mitchell's new show, "Anthem: Homunculus," written with Bryan Weller, is not a sequel, although it contains material that was originally intended for one. The musical is set in a small town and finds Mr. Mitchell's character battling a brain tumor and running out of insurance. He stages an audio-telethon to raise money for his treatment.

In addition to Ms. LuPone, the cast includes six Tony Award winners, including Glenn Close, who wails a punk song while ostensibly nailed to a cross. Produced by Topic Studios, the company behind the hit podcast "Missing Richard Simmons," the musical includes 31 original songs and will unspool over 10 episodes, stretching roughly six hours in total.

"I'm very interested in pushing podcasts to a cinematic level of storytelling," Mr. Mitchell said. "We had other suitors for this project, but none had the imagination of Luminary. Matt understood what I wanted to do immediately." Also drawing Mr. Mitchell's attention: Luminary intends to aggressively market individual podcasts to make them feel more like individual films.

As set for above, if you agree with the nature, amount and basis of the Debtors' Claim against you, as stated in the Debtors' Schedules, and if your claim is not listed in the Schedules as "disputed," "contingent," or "unliquidated," you need not file a Proof of Claim. Otherwise, or if you decide to file a Proof of Claim, you must do so before the applicable Bar Date and in accordance with the procedures set forth in this Notice.

FROM FIRST BUSINESS PAGE

out any deals. After their first meeting, 15 months earlier, North Korea had agreed to stop test-firing its missiles.

"For 15 months, they haven't tested weapons because of this negotiation but over those same 15 months they have not stopped their cyber activity," said Victor Cha, the Korea chairman at the Center for Strategic and International Studies in Washington.

With the help of an unnamed foreign law enforcement agency, the McAfee researchers gained access to one of the main computer servers used by the North Korean hackers to stage their attacks.

The McAfee researchers said they watched, in real time, as the North Koreans attacked the computer networks of more than a hundred companies in the United States and around the globe. Last month, they expanded their targets to companies in Turkey, operating from a block of internet addresses traced to Namibia, one of the few countries that still maintains friendly relations with Pyongyang.

"They are very, very, very, very. It's been nonstop," said Raj Samani, McAfee's chief scientist. "We've seen them hit in excess of 100 victims."

The exact motive of the attacks was not clear. They were well-researched and highly focused and, in many cases, aimed at engineers and executives who had broad access to their companies' computer networks and intellectual property.

McAfee, which is based in Santa Clara, Calif., would not name the targets of the attacks and said it would be alerting victims and government authorities on Monday. But the firm did provide a map of North Korean hackers' targets.

The vast majority were in the United States, with the most frequent marks in Houston, an oil and gas hub, and New York, a finance hub. Other major targets included London, Madrid, Tokyo, Tel Aviv, Rome, Bangkok, Taipei, Seoul and Hong Kong. Russia and China, two countries that have maintained cordial relations with North Korea, were relatively untouched.

North Korea, like the United States and many other countries, has long been accused of using hackers to further its national intentions. In 2014, apparently in retaliation for a movie that mocked Mr. Kim, North Korean hackers hit Sony Pictures Entertainment. They destroyed Sony's computer servers, paralyzed the studio's operations and eventually leaked embarrassing emails from executives, in what would become a playbook for the Russian attacks and leaks of emails ahead of the 2016 elections.

North Korean hackers have been tied to attacks on banks all around the world for financial gain — a rarity among government-affiliated hackers but not

surprising for a country ravaged by economic sanctions. The "WannaCry" attack, which paralyzed more than 150 organizations around the globe in 2017, was also traced to North Korea.

Mr. Cha, of the Center for Strategic and International Studies, said cyberattacks remained the "third leg" of North Korea's overall military strategy. "They're never going to compete with the United States and South Korea soldier to soldier, tank for tank," he said. "So they have moved to an asymmetric strategy of nuclear weapons, ballistic missiles and the third leg is cyber, that we really didn't become aware of until Sony."

Since the Sony attack, McAfee's researchers said North Korea's hackers had significantly improved their capabilities: They are much better at hiding their tracks and researching their targets. And in many of the attacks McAfee witnessed, North Korean hackers had done their homework.

They scoured the Microsoft-owned business site LinkedIn, for example, to find the profiles of industry job recruiters. They sent emails that appeared to come from those recruiters' accounts, often in perfect English, promoting job opportunities.

When a target clicked on an attachment or link in the email, the hackers gained access to the target's computer.

"The campaign was clearly really well prepared," said Christiaan Beek, McAfee's senior principal engineer and lead scientist. "It was very well researched and very targeted. They knew the individuals they were going after, and they drafted emails in such a way that their targets clicked on them."

The tools they used to implant malware in the recent attacks, which McAfee's researchers called "Rising Sun" because of a reference in the code, were also starkly improved.

Though the implants shared code with previous North Korean attacks, McAfee's researchers said the hackers added new functions to bits and cast off older machines. They also went to great lengths to delete their digital movements and encrypt their traffic.

Mr. Beek and Mr. Samani said their team at McAfee was able to follow the hackers' movements only because of their access to the North Koreans' server. "The more code we saw, the more links we could see to more and more attacks," Mr. Beek said.

Considering other recent North Korean hacking campaigns that McAfee's researchers have tracked — notably against the 2018 Winter Olympics and a separate spate of attacks on banks last year — Mr. Beek said North Korea showed no signs of slowing this activity.

Security experts said the attacks would have to be addressed at some point if the two countries should resume talks.

"Their very aggressive cyber-activity will have to be addressed in future discussions," Mr. Cha said. "They are extremely active and, it's clear to me at least, they've stopped missile testing because of the ongoing negotiations, but they're not stopping in cyber."

---

# North Korean Hacking Against U.S. Companies Continued During Talks

'They are very, very, very active,' a security expert said. 'It's been nonstop.'



Companies in financial hubs like New York were targets for North Korean hackers over the last 18 months, according to the security firm McAfee.

TODD HEISLER/THE NEW YORK TIMES

Spend Sunday With The Times.



Changes for Sprint Gift Cards issued by CARDCO
February 22, 2019

The Debtors filed their Schedules on January 17, 2019 (ECF Nos. 1669, 1670, 1671, 1672, 1673, 1674, 1675, 1677, 1678, 1679, 1680, 1681, 1682, 1683, 1684, 1685, 1686, 1687, 1688, 1689, 1690, 1691, 1692, 1693...