Alan M. Feld, Esq.
Ted Cohen, Esq. *Admitted Pro Hac Vice*
**SHEPPARD MULLIN RICHTER & HAMPTON, LLP**
30 Rockefeller Plaza
New York, NY 10112
Tel:  (212) 653-8700
Fax: (212) 653-8701

*Counsel for Everlast World's Boxing Headquarters Corp.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SEARS, *et. al.*[1],<br><br>              Debtors. | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>Jointly Administered<br><br>Hearing Date:       March 21, 2019, 10:00 a.m. ET<br>Objection Deadline:  March 15, 2019, 4:00 p.m. ET |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**DECLARATION OF MARGARET KIVETT IN SUPPORT OF EVERLAST WORLD'S BOXING HEADQUARTERS CORP.'S MOTION UNDER BANKRUPTCY CODE SECTIONS 365(d)(2) AND 363(e) TO COMPEL: (1) ASSUMPTION OR REJECTION OF LICENSE AGREEMENT FORTHWITH, AND (2) PAYMENT OF ADMINISTRATIVE CLAIM AS ADEQUATE PROTECTION**

Pursuant to 28 U.S.C. Section 1746, I, Margaret Kivett, hereby declare as follows:

1.      I am over the age of 18 and competent to testify.  I have personal, first hand knowledge of the facts set forth herein.  I submit this declaration in support of the motion of Everlast Worldwide's Boxing Headquarters Corp. ("Everlast" or "Licensor") to compel: (i) assumption or rejection of the License Agreement (defined below), and (ii) payment of Licensor's administrative expense claim as adequate protection.

3.      I am the Senior Vice President, Licensing – IBML (International Brand Management & Licensing) Americas.  I am also the Account Executive for Licensor.  I am the main business contact for Licensor under the License Agreement (defined below), principally responsible for administering the licensing relationship described herein between Everlast as licensor and debtors Sears, Roebuck and Co. ("Sears") and Kmart Corporation (collectively with Sears, "Licensees") as licensees of the "Everlast" and related trademarks owned by Licensor (the "Everlast Marks").

4.      On August 18, 2010, Licensor and Licensees entered into that certain Trademark License Agreement (as amended by amendments dated October 8, 2013 and November 11, 2015, the "License Agreement").  True and correct copies of the Trademark License Agreement and the two amendments thereto collectively comprising the License Agreement are attached hereto as Exhibit "1".  Pursuant to the License Agreement, among other things:

a.      Licensees, through February 1, 2020, are authorized, on an exclusive basis, to promote, distribute and sell specified products bearing the Everlast Marks in the United States and its territories (License Agreement, Section 2);

- 2 -

b.      The fiscal year under the License Agreement runs from February 1 through January 31.  Licensees shall pay Licensor a royalty on Everlast branded products equal to (i) 2.75% of sales revenue in each fiscal year up to $100 million, (ii) 2.25% of sales revenue in each fiscal year between $100.01 million and $200 million, and (iii) 2% of sales revenue in each fiscal year above $200 million (License Agreement, definition of "Royalty").

c.      The License Agreement also has annual minimum guaranteed royalty payments ("AMGR").  For fiscal year 2018 (which ran from February 1, 2018 through January 31, 2019), the AMGR was $4,500,000 (License Agreement, Schedule 4).

d.      Licensees are required to work with Licensor, and obtain Licensor's consent, to present business plans and obtain Licensor's design and manufacturing approval of Everlast branded products.  Licensor also has oversight over the standard of quality of Everlast branded products (License Agreement, Sections 5, 7, 8).

e.      On a quarterly basis for a given fiscal year, within 30 days after the end of each quarter, Licensees are required to provide royalty reporting and make royalty payments for the preceding quarter.  In particular, for the quarter February 1 through April 30, the royalty payment and reporting are due by May 30; for the quarter May 1 through July 30, the royalty payment and reporting are due by August 30; for the quarter August 1 through October 30, the royalty payment and reporting are due by November 30; and for the quarter November 1 through January 31, the royalty payment and reporting are due by March 2 (License Agreement, Sections 4.1, 6).  If the due date falls on a non-business day, the due date is extended to the next business day.

f.      In addition, at the same time that the quarterly royalty payment and reporting are due for the quarter November 1 through January 31, Licensees must pay Licensor

the difference, if any, between the AMGR and royalties on actual sales revenues for the preceding fiscal year (the "AMGR Shortfall") (License Agreement, Section 4.2).

5.      By providing Licensees with an exclusive (as opposed to a non-exclusive) license, Licensor is precluded from licensing the Everlast Marks in the United States and its territories to anyone else for the types of products authorized under the License Agreement.  This of course limits Licensor's ability to generate income from the Everlast Marks.  Licensor was willing to grant an exclusive license to Licensees based on Licensees' representations as to the amount of revenues they could generate from sales under the License Agreement, as manifested in the AMGR.  In other words, Licensor's willingness to grant Licensees exclusivity was based in significant part on the amount of the AMGR - - if Licensees did not achieve their projections, they would still have to pay a minimum royalty.

6.      I have reviewed the royalty reports provided by Licensees, including those for the first three quarters of fiscal year 2018.  I have created two charts from those reports, which are attached hereto as Exhibit "2".  As reflected on the first chart attached hereto as part of Exhibit 2, royalties for actual revenues for the first three quarters of fiscal year 2018 totaled $2,341,143.45. The third quarter straddled Licensees' bankruptcy petition date of October 15, 2018.  As further reflected on the first chart appended hereto, Licensees have paid Licensor a total of $1,748,960.06 toward those royalties.  The portion of the $2,341,143.45 remaining unpaid, all of which was for pre-petition periods, totals $592,183.39.  This is the unsecured portion of Licensor's claim.

7.      As detailed below, while the fourth and final quarter of fiscal year 2018 ended on January 31, 2019, and the fourth quarter royalty report, fourth quarter royalty payment, and AMGR shortfall were due on March 4, 2019 (March 2, 2019 was a Saturday), as of today,

- 4 -

Licensees have not provided to Licensor the fourth quarter royalty report, fourth quarter royalty payment, or AMGR Shortfall. Therefore, Licensor does not know what Licensees' royalties based on actual revenues for the fourth quarter of fiscal year 2018 are and Licensees are in post-petition breach of the License Agreement.

8.      The AMGR for fiscal year 2018 is $4,500,000. Licensees have already paid Licensor $1,748,960.06 for the first three quarters of fiscal year 2018. As reflected on the second chart attached hereto as part of Exhibit "2", the difference between those amounts is $2,751,039.94. Assuming that actual royalties owed on actual revenues for the fourth quarter of fiscal year 2018 are $2,751,039.94 or less, the amount owed to Licensor through January 31, 2019 is $2,751,039.94[2], $592,183.39 of which is pre-petition. That leaves a balance of $2,158,856.55 owed post-petition, and in post-petition default.

9.      Moreover, royalties continue to accrue on and after February 1, 2019. For example, Licensees will owe Licensor royalties based on the sale of Everlast branded products to Transform Holdco LLC ("Buyer") in the sale to Buyer that closed on February 11, 2019 (the "Sale"), as well as royalties based on Licensees' other sales of Everlast branded products from and after February 1, 2019. And the AMGR for fiscal year 2019 is $4,500,000.

10.     Prior to the February 11, 2019 sale to Buyer, Wendy Ewing at Sears had been Licensor's primary contact for royalty reporting under the License Agreement. Shana Crews is a Financial Analyst at Licensor. In the normal process and at my direction, on January 31, 2019, before the Sale to Buyer, Ms. Crews emailed Ms. Ewing the royalty reporting template to be completed for the fourth quarter of fiscal year 2018 (November 1, 2018 through January 31,

---

[2] This assumes that royalties based on actual revenues for all of fiscal year 2018 are equal to or less than the $4,500,000 AMGR. If royalties for all of fiscal year 2018 based on actual revenues for all of fiscal year 2018 are higher than $4,500,000, then the fourth quarter payment due would be higher.

2019).  A true and correct copy of the email is attached hereto as Exhibit "3".  I checked with

Ms. Crews, and Ms. Ewing never responded to the request to complete the royalty reporting

template.  Moreover, Licensor has not received from anyone the royalty report for the fourth

quarter of fiscal year 2018, and has not received payment of any of the AMGR Shortfall.

11.     Prior to the Sale to Buyer, Licensor's primary business contact at Sears was Andy

Leismer.  Mr. Leismer informed me that he was moving out of the business, and is no longer

with Sears.  Around the time of the Sale to Buyer, we were contacted by Franck Gourlin and

Elissa Robertson.  While we had heard of Mr. Gourlin before the Sale to Buyer, we did not know

whether Mr. Gourlin and Ms. Robertson worked for Licensees, Buyer or both.  Mark Hunter and

Les Page of Licensor, our consultant Ben Gardener, and I met in person with Ms. Robertson (Mr.

Gourlin attended by telephone) on February 25, 2019, and had a follow-up call with both of them

on February 28, 2019.  During the meeting and the subsequent telephone call, Ms. Robertson and

Mr. Gourlin stated and confirmed that:

a.      Ms. Robertson, Mr. Gourlin and Ms. Ewing no longer work for Sears, and

only work for Buyer, having been hired by Buyer in connection with the Sale.  They speak for

and represent only Buyer, and do not speak for or represent Sears.

b.      Ms. Robertson and Mr. Gourlin do not know who Licensor can contact at

Sears to obtain, among other things, (i) the royalty report for the fourth quarter of fiscal year

2018, (ii) payment of the AMGR Shortfall, (iii) a list of the Everlast branded product that was

sold to Buyer in the Sale, or (iv) what additional Everlast branded product, if any, Licensees

intend on ordering moving forward.

c.      Ms. Robertson and Mr. Gourlin do not know what or how much Everlast

branded product Buyer acquired in the Sale.

      d.      Ms. Robertson acknowledged that Buyer does not have the right to order the manufacture of Everlast branded products.

      e.      Buyer does not want to assume the License Agreement and Licensor will have to obtain payment of the AMGR Shortfall from Licensees.

12.      During our meeting and call with Ms. Robertson and Mr. Gourlin, we also discussed potential terms of a new license between Licensor and Buyer. We reminded Ms. Robertson and Mr. Gourlin that so long as the License Agreement between Licensor and Licensees is still in effect, Licensor cannot enter into a new license of the Everlast Marks with Buyer.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed March 7, 2019, at New York, New York.

_____
Margaret Kivett

# EXHIBIT 1

Confidential

**THIS AGREEMENT** is made the 18th day of August 2010

**PARTIES:**

(1)    **EVERLAST WORLD'S BOXING HEADQUARTERS CORP.**, a company incorporated under the laws of the State of New York, United States, whose registered office is at 183 Madison Avenue, Suite 1701, New York, NY 10016, USA (and PO BOX 1809, New York NY 10156 – 1809, USA) ('**Licensor**') and

(2)    **SEARS, ROEBUCK AND CO.** a company incorporated under the laws of New York, United States (**"Sears"**), and **KMART CORPORATION**, a company incorporated under the laws of Michigan, United States (**"Kmart"**) each of whose principal place of business is at 3333 Beverly Road, Hoffman Estates, Illinois, 60179, USA.  Sears and Kmart are individually and collectively ('**Licensee**').

**RECITALS:**

Licensor is the proprietor of and has the right to license the use of the Trade Marks (defined below) and wishes to permit Licensee to use the Trade Marks in respect of the Products (defined below) on and subject to the terms of this Agreement.

**Operative provisions:**

1.    **Definitions**

1.1    In this Agreement except where the context otherwise requires the following words and expressions shall have the following meanings:

'**ACCESSORIES**' means the following four (4) categories: (i) underwear (excluding socks); (ii) bags; (iii) headwear; and (iv) belts;

'**ADVERTISING MATERIALS**' means any or all advertising, marketing, public relations and/or promotional materials and/or trade literature of any kind whatsoever, whether now or hereafter existing, prepared by or for Licensee and relating in any way whatsoever to the Products including without limitation radio and television commercials, print advertising (including newspaper circulars), on-line, email and social media advertising, outdoor, direct mail, direct response, shopping bags, gift cards, debit cards and credit cards and in-store signage;

'**AFFILIATE**' means:

(a)    in relation to Licensee, in respect of any body corporate a body corporate which is its subsidiary, holding company or ultimate holding company, or a body corporate which is a subsidiary of that holding company or ultimate holding company, and each such body corporate (each a '**Direct Affiliate**') (b) any entity that is managed, operated or directed by Licensee (or its Direct Affiliate), is licensed to do business using Licensee's (or its Direct Affiliates') name, or does business within Licensee's (or its Direct Affiliate's) store; and (c) any businesses divested or spun-off by Retailer (or its Direct Affiliate) for a period of 24 months following such divestiture or spin-off.   Notwithstanding the foregoing, only entities directly or indirectly controlled by Sears Holdings Corporation shall be deemed Direct Affiliates of Licensee for the purposes of this Agreement;

(b)    in relation to Licensor, in respect of any body corporate a body corporate which is its subsidiary, holding company or ultimate holding company, or a body corporate which is a subsidiary of that holding company or ultimate holding company, and each such body corporate ; and

(c)    in relation to the Manufacturer, in respect of any body corporate a body corporate which is its subsidiary, holding company or ultimate holding company, or a body corporate which is a subsidiary of that holding company or ultimate holding company, and each such body corporate;

1

Confidential

and **'AFFILIATES'** shall be construed accordingly;

**'AGREEMENT'** means this agreement and any amendments and variations made in writing to this agreement and executed by the Parties.

**'ANNUAL MINIMUM GUARANTEED ROYALTY'** means the minimum amount of Royalty that Licensee is required to pay in each Year, as set out in **Schedule 4**;

**'BESPOKE ADVERTISING MATERIALS'** means any and all Advertising Materials which include the Products and Trade Marks only;

**'BRAND MANUAL'** means the Licensor's manual as updated from time to time, consistently with the current manual as of the Commencement Date (which is found at http://everlast.ibml-usa.com (username - Marc.Passalacqua@searshc.com; password - 9034), incorporating, amongst other things, its guidelines for the use of the Trade Marks on the Products, Product Packaging and Advertising Materials. The Brand Manual for EVERLAST SPORT will be as agreed by the parties;

**'BUSINESS DAY'** means any week day except a Saturday, Sunday and/or bank or public holiday in the United States of America or its territories;

**'BUSINESS-TO-BUSINESS'** means a channel of trade exclusively between one business and another for the purposes of joint corporate event promotions and for the avoidance of doubt excludes direct trade with the general public, or wholesalers that supply to the general public or retail trade or where it is thought reasonably likely that products will be sold, or caused to be sold to the retail trade or general public;

**'COMMENCEMENT DATE'** means the date first indicated above;

**'COMPETENT AUTHORITY'** means any national or local government agency, authority, department, or professional body having jurisdiction over either any of the activities contemplated by this Agreement or the Parties;

**'CONTINUITY COMPANIES'** are companies who operate marketing programs in which retailers benefit from increased footfall or frequency of customer visits to their retail outlets. The customer usually benefits by receiving coupons, or similar, from the retailer which can be collected and redeemed for goods at a greatly reduced price or free of charge;

**'DISTRIBUTION CHANNELS'** means all stores, catalogs, web sites, or other channels of distribution of products of all kinds that are in existence or may arise after the date hereof; except that, solely with respect to brick and mortar stores, EVERLAST branded Products (as opposed to EVERLAST SPORT branded Products) may be sold in such stores only if they are branded, in whole or in part, with the name "Sears" or variation thereof, including, Sears, Sears Grand, Sears Essentials and Sears Outlet Stores;

**'EXCLUDED CHANNELS'** means those channels of distribution set out in **Schedule 7**;

**'FISCAL YEAR'** means Licensee's fiscal year ending each year on the Saturday closest to January 31st and **'Fiscal'** in relation to any period shall mean the fiscal period of Licensee within such Fiscal Year;

**'FORCE MAJEURE'** means any delay, interruption or failure in performance of a Party's obligations under this Agreement caused directly or indirectly by fire, flood, earthquake, explosion or other casualty, strike or labor dispute, disruption of telecommunication systems, inability to obtain supplies, fuel, raw materials, labor, transportation or power, war or other violence, accident, malfunction of machinery or apparatus, any law, order, injunction, proclamation, regulation, ordinance, demand or requirement of any government agency, act of God or any similar cause or condition, which is beyond the reasonable control of the affected Party and which has a material adverse effect on its ability to perform its obligations under this Agreement;

**'INTELLECTUAL PROPERTY'** means all copyrights, patents, trade marks, designs, design rights, database rights and any other intellectual property rights or rights of a similar nature

Confidential

including registered and unregistered rights and any applications for registration, renewal, extension, division or reissue of the foregoing, in any jurisdiction;

**'LIABILITIES'** means any and all claims, demands, actions, awards, compensation, costs (including reasonable legal costs and disbursements), expenses, damages, losses, fines and other liabilities of whatsoever nature;

**'MANUFACTURER'** means any manufacturer used or proposed to be used (as the case may be) by Licensee;

**'OUTGOING LICENSEES'** means Licensor's licensees of certain of the Products whose licence agreements expire on 31 December 2010 and who have rights to sell off Products on a non-exclusive basis for as much as six (6) months thereafter;

**'OVERRUNS'** means Products manufactured by the Manufacturer in excess of the quantity ordered or purchased by Licensee;

**'PARTY'** means each of Licensor and Licensee;

**'PERSONNEL'** shall mean employees, agents, attorneys, consultants or contractors;

**'PERFORMANCE MARKS'** means the technology icons that are included in the Brand Manual, including EverFresh, EverDri and EverCool;

**'PRODUCT PACKAGING'** means all packaging, labels, hang tags or similar materials used for the Products;

**'PRODUCTS'** means the various items described in **Schedule 1** which incorporate the Trade Marks and comply with the Standard of Quality;

**'QUARTER'** means each successive Fiscal quarter occurring during the Term save for the period immediately prior to the date of termination of this Agreement which may be shorter than three months and **'QUARTERLY'** shall be construed accordingly;

**'REGULATORY REQUIREMENT'** means any applicable requirement of law or regulation or of any Competent Authority and includes all legislation, statutory instruments, regulations, orders, directions and codes of practice;

**'ROYALTY'** shall mean an amount equivalent to: (i) two and three quarters of a percent (2.75%) of Sales Revenue in any Year of between $0 and $100m; (ii) two and a quarter of a percent (2.25%) of Sales Revenue in any Year of between $100.01m and $200m; and (iii) two percent (2%) of Sales Revenue in any Year of more than $200m;

**'SALES REVENUE'** means the cumulative total of the actual selling price (net of sales taxes and other taxes passed on to customer, and net of shipping and related charges relating to sales through remote or online Distribution Channels) of all Products sold by Licensee through the Distribution Channels, less the actual selling price (net of sales taxes and other taxes passed on to customers, and net of shipping and related charges relating to sales through remote or online Distribution Channels) of all Products returned to Licensee;

**'SECONDS'** means Products containing manufacturing, fabric or other defects;

**'STANDARD OF QUALITY'** shall mean that the quality of the Products shall equal or exceed the overall quality and workmanship level of similar products sold by Licensee;

**'TERM'** shall mean the Initial Term, the Second Term (if any) and the Third Term (if any), in each case as defined in **Clause 3**;

**'TERRITORY'** means the country or countries specified in **Schedule 3**;

**'TRADE MARKS'** means the trade mark(s) set out in **Schedule 2**; and

**'YEAR'** means the period from the Commencement Date through 28 January 2012 and thereafter, each successive Fiscal Year.

Confidential

1.2    In this Agreement:

    1.2.1    words in the singular includes the plural and vice versa;

    1.2.2    unless the context otherwise indicates, references to Clauses, Sub-clauses, Recitals and Schedules are to clauses and sub-clauses of, and recitals and schedules to, this Agreement;

    1.2.3    the Schedules to this Agreement are an integral part of this Agreement and obligations in the Schedules bind the Parties as if they were in the main body of the Agreement;

    1.2.4    headings to clauses in this Agreement are included for the purpose of ease of reference only and shall have no effect on the construction or the interpretation of this Agreement;

    1.2.5    references in this Agreement to any statute or statutory provision shall include any statute or statutory provision which amends, extends, consolidates or replaces the same and shall include any orders, regulations, instruments or other subordinate legislation made under the relevant statute; and

    1.2.6    references to any words following the words "include" or "including" are to be construed without limitation to the generality of the preceding words.

## 2. Grant of License

2.1    Licensor grants to Licensee, subject to the provisions set out in this Agreement:

    2.1.1    the exclusive right to promote, distribute and sell Products bearing the Trade Marks in the Territory through the Distribution Channels, including the right to, and to authorize its third-party contractors to, import such Products into the Territory and to produce Advertising Materials and Product Packaging in connection with the promotion of such Products; and

    2.1.2    the non-exclusive right to, and to authorize third parties to, design and manufacture the Products in and outside of the Territory.

    2.1.3    the right to authorize its Affiliates to do any of the foregoing to the full extent that Licensee is entitled to do so pursuant to this Agreement.    For administrative purposes it is understood that upon such an authorization, the term "Licensee" as used herein shall be deemed to include such authorized Affiliates for the purposes hereof, including, without limitation, the inclusion of any Product sold by such Affiliate for the purposes of determining Sales Revenue and the calculation and payment of Royalties with respect thereto. For the avoidance of doubt, any and all acts or omissions on the part of such Affiliates shall be deemed to be acts or omissions of Licensee.

2.2    In addition Licensor agrees that it will not during the Term authorize or permit the use by any other person in the Territory (save for the Outgoing Licensees as described in **Clause 2.3** below) of any trade mark including the word "Everlast", or otherwise similar to the Trade Marks, on or in connection with the design, manufacture, importation, marketing or sale of products included within the Products.    Notwithstanding the foregoing and the grant of an exclusive license by Licensor to Licensee pursuant to the terms of this Agreement, Licensee acknowledges and agrees that Licensor specifically reserves and shall have the non-exclusive right to manufacture, distribute, sell or otherwise use, or license or authorize others to so use, the Trade Marks on or in connection with products identical or similar to the Products, during the Term and in the Territory without obligation to Licensee: (i) in connection with premiums, tie-ins, giveaways or similar promotional arrangements generally offering products for free or at cost; (ii) in connection with the supply of Products to boxers, athletes or any other individuals in the sports or entertainment sectors; (iii) through the Excluded Channels; and (iv) in connection with Business to Business and Continuity Companies; except that an item included under clause (i) or to be offered by a Continuity Company may not be offered by or with any of the following retailers: JC Penny, Kohl's, Walmart and Target.

4

Confidential

2.3  Licensor represents and warrants that none of the rights granted to the Outgoing Licensees will prevent Licensee from exercising the rights granted it pursuant hereto; provided that (i) Licensee agrees that it will not sell, market or promote any Products in the Territory developed by it pursuant to this Agreement until after December 31, 2010; and (ii) Licensee acknowledges that the Outgoing Licensee may continue to sell products included within the Products from the Commencement Date until 31 December 2010 and on a non-exclusive basis for as much as six (6) months after December 31, 2010. For the avoidance of doubt, it is understood that the foregoing shall not prevent the sale, marketing or promotion by Licensee of such Products on or before December 31, 2010 if those Products are purchased by Licensee from an Outgoing Licensee.  It is understood that Licensee may rely on the foregoing notwithstanding any knowledge or review of the licenses for the Outgoing Licensees by Licensee.

2.4  Licensee shall be entitled to market and sell the Products using the internet; provided that Licensee shall ensure that any sales made through its websites are sales to customers in the Territory only.

2.5  Licensor does not permit Licensee to register an internet name and/or domain name incorporating the Trade Marks in any country.

2.6  Nothing in this Agreement shall be deemed in any way to grant to Licensee any right or entitlement of any kind whatsoever to distribute the Products free of charge or sell any Product by way of tie-in sales (e.g., as a gift with purchase) or use the Products as premiums (whether free of charge or not), except with the prior written approval of Licensor.

2.7  The Licensor hereby agrees to discuss with Licensee a potential licence of the Performance Marks, on terms to be agreed in writing.  The Licensor further agrees that should those discussions not lead to a licence agreement which has been executed by the Parties, Licensor will not grant to any third party during the Term any rights in or to the Performance Marks in the Territory for any products included in the Products.  Notwithstanding the provisions of this **Clause 2.7**, Licensee hereby acknowledges and agrees that: (i) the Outgoing Licensees are entitled to manufacture, import, distribute, promote, advertise and sell Products in the Territory bearing the Performance Marks for the unexpired portion of their respective licence agreements; and (ii) the Licensor shall be entitled to grant rights in or to the Performance Marks in the Territory to an authorized licensee of Licensor for the non-exclusive Products referred to in **Schedule 1**.

3.  **Duration**

3.1  Subject to **Clauses 3.2** and **3.3**, this Agreement shall commence on the Commencement Date and shall continue through the end of the 2013 Fiscal Year (February 1, 2014) (subject to earlier termination as provided under this Agreement) ('**Initial Term**').

3.2  Licensee may elect, in its sole discretion, to renew the Initial Term for a further three (3) Year period (from February 2, 2014 through January 28, 2017, subject to earlier termination as provided under this Agreement (hereafter defined as the '**Second Term**')) upon written notice to the Licensor given at least six (6) months prior to the expiration of the Initial Term; except that, if Licensee shall have failed to achieve at least $30m of Sales Revenue of EVERLAST branded Products or Licensee shall have failed to achieve at least $30m of Sales Revenue of EVERLAST SPORT branded Products, in each case during the Fiscal 12 month period ending July 6, 2013 (the '**First Measurement Period**'), then Licensee's rights to such brand or brands, as the case may be, in such Second Term shall be solely on a non-exclusive basis.  In addition, if during the First Measurement Period Licensee shall have failed to achieve at least $750,000 of Sales Revenue of EVERLAST branded Products in an Accessories category then Licensee's rights to EVERLAST branded Products in such category may thereafter continue during the Second Term only on a non-exclusive basis.  In addition, if during the First Measurement Period Licensee shall have failed to achieve at least $3m of Sales Revenue of EVERLAST branded footwear then Licensee's rights with respect to EVERLAST branded footwear may thereafter continue during the Second Term only on a non-exclusive basis.

3.3  Licensee may renew the Initial Term for a further three (3) Year period (from January 29, 2017 through February 1, 2020, subject to earlier termination as provided under this Agreement (hereafter defined as the '**Third Term**')) upon written notice to the Licensor given at least six (6) months prior the expiration of the Second Term, except that if Licensee

5

Confidential

shall have failed to achieve at least $30m of Retail Sales of EVERLAST branded Products or Licensee shall have failed to achieve at least $30m of Retail Sales of EVERLAST SPORT branded Products, in each case during the Fiscal 12 month period ending July 2, 2016 (the '**Second Measurement Period**'), then Licensee's rights to such brand or brands, as the case may be, in such Third Term shall be solely on a non-exclusive basis.   In addition, if during the Second Measurement Period License shall have failed to achieve at least $750,000 of Sales Revenue of EVERLAST branded Products in an Accessories category then Licensee's rights with respect to EVERLAST branded Products in such category may thereafter continue during the Third Term only on a non-exclusive basis.   In addition, if during the Second Measurement Period Licensee shall have failed to achieve at least $5m of Sales Revenue of EVERLAST branded footwear then Licensee's rights with respect to EVERLAST branded footwear may thereafter continue during the Third Term only on a non-exclusive basis.

**4.    Financial Provisions**

4.1    In consideration of the rights granted under **Clause 2,** Licensee shall pay the Royalty to Licensor.   Licensee will initiate payment of the Royalty within thirty (30) days (or the next Business Day thereafter if the 30th day is not a Business Day) following the closing date of each Quarter during each Year for the Sales Revenue that has occurred during such Quarter.

4.2    In addition, Licensee shall pay the shortfall (if any) between the total Royalty earned in any Year and the Annual Minimum Guaranteed Royalty for that Year.   Licensee will initiate payment of such shortfall, if any, within thirty (30) days (or the next business day thereafter if the 30th day is not a business day) following the closing date of such Year. Notwithstanding the foregoing, as an advance against the Royalty and any Annual Minimum Guaranteed Royalty in the first Year, Licensee shall pay to Licensor the amount of $500,000 by March 26, 2011.

4.3    Licensee may elect to purchase Product from an Outgoing Licensee or another authorized licensee of Licensor for Products that are non-exclusive to Licensee as described herein (each an '**Other Licensee**').   Licensee shall pay and report the Royalty, and, for the avoidance of doubt, may apply such Royalty against the Annual Minimum Guaranteed Royalty, for all Sales Revenue resulting from the sales of such Products for any Products that are sold after January 1, 2011; provided that Licensor shall collect no royalty from such Other Licensee with respect thereto.   Licensor will communicate the foregoing to each of the Other Licensees.   It is understood that any of such Products purchased from an Outgoing Licensee shall be deemed approved hereunder.

4.4    In addition, Licensee may elect to purchase socks products from an authorized licensee of Licensor that are branded with the Trade Marks.   In such event, Licensee may calculate the Sales Revenue for such products and apply such Sales Revenue against the Sales Revenue thresholds for the calculation of the Royalty percentages as specified in **Clause 1.1** and the Sales Revenue thresholds for EVERLAST and EVERLAST SPORT branded products as specified in **Clauses 3.2** and **3.3**.   In addition, such Sales Revenue for each Year (multiplied by the applicable Royalty percentage) may be applied against the Annual Minimum Guaranteed Royalty for such Year; provided that, for the avoidance of doubt, no Royalty payments will be due from Licensee with respect to the sale of socks products and Licensor will look solely to its authorized licensee with respect to such payments and any and all other obligations relating to such license.   If requested by Licensee, Licensor shall permit its sock licensee to brand socks products with the Trade Mark EVERLAST SPORT; provided that such branded products may only be sold to Licensee.

4.5    All payments due under this Agreement shall be paid to the following bank account, unless otherwise specified by Licensor in writing pursuant to **Clause 18**:

      Everlast World's Boxing Headquarters
      183 Madison Avenue, Suite 1701, New York, NY 10016, USA
      HSBC Bank
      ABA# 021001088
      Acct# 007 921519

All amounts described herein shall be paid in U.S. Dollars.

6

Confidential

**5.      Product Packaging, Advertising and Marketing**

5.1    Licensee shall submit samples of Product Packaging and Bespoke Advertising Materials to Licensor for Licensor's prior written approval and Licensee shall not use any Product Packaging and Bespoke Advertising Materials until the same have been so approved. Licensor shall approve or disapprove any items submitted for approval pursuant hereto within five (5) Business Days. Any items not objected to within such period shall be deemed approved. Any approvals by Licensor required hereby shall not be unreasonably withheld. Any items approved may be re-used as many times thereafter as Licensee determines, save where they contain imagery of models wearing the Products, in which case such items may only be re-used after they have been approved by Licensor pursuant hereto.

5.2    All other Advertising Materials (as opposed to Bespoke Advertising Materials), to the extent any include the Trade Marks, shall utilize the Trade mark consistently with the trade mark usage guidelines as are reasonably required by Licensor and included in the Brand Manual. Upon request from time to time, Licensee shall submit such Advertising Materials used hereto so that Licensor may review Licensee's compliance with the foregoing. To the extent any of such Advertising Materials do not materially comply with the foregoing, Licensee will correct such non-compliance with the next available production run of such materials.

5.3    Provided Licensee has (at its cost on each occasion) made Product samples available to Licensor at least ten (10) Business Days prior to any mutually agreed shooting date (or such shorter period as Licensor shall approve in writing), at least twice each Year and prior to each season (as described in **Clause 7.1**), Licensor will, at its cost, provide sufficient photographic images of the Products and models wearing the Products for Licensee's use in connection with the production of Advertising Materials and Product Packaging for the relevant season (**'Vendor Materials'**). Subject to **Clauses 5.1 and 5.2**, Licensee shall have the right, without any additional expense, to use such Vendor Materials to produce, or have its independent contractors produce, Advertising Materials and Product Packaging and to use such Advertising Materials and Product Packaging, without limitation (except for possible period of use limitations for certain model images as may be expressly disclosed by Licensor and acknowledged by Licensee in writing at the time of the presentation of such images by Licensor for possible use by Licensee), in the Territory in connection with the promotion of the Products through the Term and any Sell-Off Period. Licensor will be responsible for securing such rights for the benefit of Licensee. The Vendor Materials will be consistent with a marketing plan to be developed in connection therewith, including concept boards, to be provided by Licensor in advance of each season, and such marketing plan and the Vendor Materials will be subject to Licensee's approval in its reasonable discretion.

**6.      Reporting**

6.1    With each payment of Royalties for each Quarter, as provided in **Clause 4.1**, Licensee shall furnish to Licensor a complete and accurate Royalty and Net Sales Statement for such Quarter, as per **Schedule 8** hereto. Receipt or acceptance by Licensor of any Royalty and Net Sales Statement furnished, or of any sums paid to Licensor pursuant to this Agreement shall not preclude Licensor from questioning the correctness thereof at any time within thirty (30) months of the date of such Royalty and Net Sales Statement. Without prejudice to **Clause 6.4** below, in the event that any inconsistencies or mistakes are discovered in Royalty and Net Sales Statements or Royalty or other payments, they shall be rectified promptly and the appropriate payment made by Licensee.

6.2    Licensee agrees to keep accurate, complete and up-to-date books of account and records of all transactions relating to the calculation of the Royalties pursuant to this Agreement (the **'Records'**). The Records shall be maintained for at least thirty (30) months following the date of the Royalty and Net Sales Statement to which they relate.

6.3    Licensor shall have the right to retain an independent auditor, reasonably acceptable to Licensee, for the purpose of auditing, examining, reviewing and copying the Records, at any time during the Term of this Agreement (and for two (2) Years thereafter) but not more than once each Year. Such audit shall be at a time mutually convenient to the Parties but in any event not more than forty-five (45) days following notice in writing to Licensee and not at any time during Licensee's fourth Quarter. Such audit shall be completed within a maximum of five (5) Business Days, subject to Licensee's reasonable cooperation therewith. The Records and copies of such Records will at all times be treated as Licensee's Confidential Information in accordance with the provisions of **Clause 19** below.

Confidential

6.4    In the event of a discrepancy regarding Royalties paid and those actually owed, the applicable Party shall promptly pay the amount of such overpayment or underpayment, as the case may be, to the other. Also, in the event that following the audit referred to in **Clause 6.3** it is determined that the Licensee has underpaid the Royalty by five percent (5%) or greater, Licensee shall pay to Licensor on an indemnity basis the reasonable costs and expenses of the independent auditor in carrying out the audit and interest for all amounts in excess of such five percent (5%) in an amount equal to 0.75% per month calculated on a non-compounding basis from the date that the Royalty should have been paid through the date that such amount is claimed. Such payments shall be made within thirty (30) days of receipt of an appropriate invoice from Licensor.

**7.    Design Approval; Business Plan**

7.1    Licensee will present to Licensor at least twice each Year in advance of the Spring/Summer and Fall/Holiday seasons, for Licensor's review, the proposed elements of the Product Direction for the upcoming seasons. As used herein, the '**Product Direction**' shall mean: (i) the brand concepts (including the overall target market or customer profiles) and (ii) the proposed Product design direction (meaning the overall color direction, style direction, fabric direction (types of fabrics generally to be used) and print and/or design direction) for the new Products proposed to be produced and sold for the upcoming seasons. The Product Direction may be presented to Licensor at a meeting at Licensee's offices in San Francisco (or in Hoffman Estates in respect of footwear); or, at Licensee's option and expense, shall be sent to Licensor's offices in New York (or such other location as Licensor may direct in writing). Licensor shall promptly review and respond within five (5) Business Days with any proposed changes to the Product Direction as proposed by Licensee. In the event that Licensor proposes any changes to the Product Direction during such period, a conference call or meeting shall be scheduled within the next three (3) Business Days during which Licensor and Licensee shall review and discuss Licensor's proposed changes in good faith. If the Parties are unable to agree during such follow-up call or meeting on changes to the Product Direction to address Licensee's proposals (and Licensor elects to disapprove certain elements of the Product Direction), Licensee may elect to refrain from offering the Products for which such Product Direction has not been agreed and such action shall not affect the exclusivity rights to such Products or related categories as described herein.

7.2    Following the approval of the Product Direction, Licensee shall proceed with the design of Products materially consistent with the Product Direction and the Standard of Quality. Thereafter in advance of each of the Spring/Summer and Fall/Holiday seasons Licensee shall present to Licensor prototype samples of each proposed new Product for the upcoming seasons (or Product sketches to the extent a sample is not then available) to permit Licensor to review and approve the sketches and/or samples to ensure that they are materially consistent with the Product Direction, the Standard of Quality and the Trade Mark usage guidelines reasonably required by Licensor and included in the Brand Manual. Prototype samples (or sketches) for new Products may be presented to Licensor at a sample review meeting at Licensee's offices in San Francisco (or in Hoffman Estates in respect of footwear) or, at Licensee's option and expense, shall be sent to Licensor at Licensor's offices in New York (or such other location as Licensor may direct in writing). Upon receipt of such sample (or sketch), Licensor shall have five (5) Business Days to specify any material deviations in the same from the approved Product Direction, the Standard of Quality or the Brand Manual. Any such deviations shall be discussed by the Parties and, if agreed to exist, corrected by Licensee, unless the parties agree to such deviations or other changes. Any such corrected or modified sketches or prototype samples shall be similarly resubmitted and responded to by Licensor pursuant to the same process. Licensee's obligation to submit prototype samples or sketches to Licensor under this Agreement shall be deemed to require Licensee to present to Licensor a prototype sample (or sketch if the sample is not then available) of each new or materially modified Product. Each Party shall bear its own expenses in connection with any meetings held pursuant hereto.

7.3    Licensor shall approve or disapprove any items submitted for approval pursuant hereto within the time periods specified in **Clauses 7.1 and 7.2**, or where no time period is specified, within five (5) Business Days. Any items not objected to with such period, or other period specified above, shall be deemed approved. Any approvals by Licensor required hereby shall not be unreasonably withheld.

7.4    Licensee will use commercially reasonable efforts to provide to Licensor, twice each Year upon completion of each season's (i.e., Fall/Holiday and Spring/Summer) buy plans for the

Confidential

Products, a twelve month forecast of Licensee's planned sales, margin and receipts for the Products, it being understood that such forecasts are being provided for informational purposes only, are non-binding and may be changed by Licensee at any time thereafter in Licensee's sole discretion.

**8.    Manufacturing; Sourcing**

8.1    Licensee agrees that the Products or any part thereof to be sold by Licensee shall conform in all material respects to samples (or sketches) approved pursuant to **Clause 7.2** and the Standard of Quality.  Licensee may not sell, nor authorize its manufacturers to sell, Products that are Seconds, nor may Licensee authorize its Manufacturers to sell Overruns, without the prior written approval of Licensor.

8.2    Licensee has developed and will maintain policies and procedures to evaluate and monitor the compliance by its Manufacturers with all Regulatory Requirements applicable to the manufacturing of the Products, including labor and employment, health and safety, customs and country of origin regulations, together with appropriate human rights standards and considerations as Licensee may require from time to time.  In furtherance thereof, Licensee agrees that its Manufacturers will be in substantial compliance with the requirements of Licensee's Code of Vendor Conduct (a current copy of which is attached hereto at **Schedule 5**) as such requirements may be modified from time to time by Licensee provided they remain substantially similar to the copy attached hereto.  If any Manufacturer fails to so comply, or if any such Manufacturer otherwise commits any act, which if committed by Licensee would be a material breach of this Agreement, Licensor shall have the right as its sole remedy against Licensee to require Licensee to use commercially reasonable efforts to bring the Manufacturer into compliance, or if the problem cannot be corrected or cannot be corrected within a commercially reasonable period of time, to terminate Licensee's use of the Manufacturer as promptly as commercially reasonable.   For the avoidance of doubt, it is understood that the foregoing shall not prevent Licensor from bringing an infringement action against a Manufacturer for an act taken by such Manufacturer that is not authorized pursuant to this Agreement and Licensee shall cooperate with any reasonable request relating thereto.

8.3    With each Royalty and Net Sales Statement provided pursuant to **Clause 6.1**, Licensee shall provide a list containing the name and location of each Manufacturer of the Products and, if requested, copies of any audits conducted by it of such Manufacturer.  In addition, upon the reasonable request of Licensor, Licensee shall as soon as commercially practicable conduct an audit of a Manufacturer and provide Licensor with copies of the results of such audit or, at Licensee's option, Licensee may permit Licensor and/or its representative to conduct such audit and provide copies of the results of such audit to Licensee.

**9.    Use of the Trade Marks**

9.1    Licensee may only use the Trade Marks in a form specified in the Brand Manual or as otherwise approved in writing by Licensor, and shall observe any reasonable directions given as are contained therein as to colors and size of representations of the Trade Marks and their manner and disposition in relation to the Products, Product Packaging and all Advertising Materials.

9.2    Licensee shall only make use of the Trade Marks for the purposes authorized in this Agreement.

9.3    Whenever the Trade Marks are used by Licensee such use shall be accompanied by wording reasonably requested by Licensor and included in the Brand Manual to show that these are Trade Marks used by Licensee with the permission of Licensor.

9.4    Licensee acknowledges that Licensor is the owner of the Trade Marks.  Licensee agrees that all goodwill generated by its use of the Trade Marks in respect of the Products shall inure to the benefit of Licensor.  Licensee will not make any representation or do any act which may be taken to indicate that it has any right, title or interest in or to the ownership or use of the Trade Marks except under the provisions of this Agreement.  Licensee acknowledges that Licensor may at any time call for a confirmatory assignment of such goodwill to Licensor and Licensee agrees to promptly execute it.

9

Confidential

9.5    Licensee shall on request from time to time, give to Licensor and/or its authorized representative(s) any information as to Licensee's use of the Trade Marks which Licensor may require, and shall otherwise render any assistance reasonably requested by Licensor in maintaining the registration of the Trade Marks.

## 10.    Formal License

10.1    Should either Party so require, the Parties shall execute a formal license of the Trade Marks to be registered with the relevant trade marks registry and or local trade mark or financial body and the costs associated with such registration shall be borne by the requiring Party.

10.2    In the event of any inconsistency between a provision of this Agreement and a provision of the formal license, the provision of this Agreement shall prevail to the extent of the inconsistency.

10.3    In the event that a formal license is recorded or registered under this Clause the Licensee agrees that:

10.3.1    such recordal shall not provide Licensee with greater rights than are under this Agreement;

10.3.2    Licensor may assign any Trade Mark under which the formal license is registered or recorded without the consent of Licensee; and

10.3.3    Licensor may cancel any registration or recordal at any time and Licensee shall assist Licensor to effect cancellation.

## 11.    Ownership

11.1    Other than the Trade Marks and the Vendor Materials, all Product designs, fabric designs, package designs, advertising materials, ideas, phrases, words or other materials, produced by Licensee, its Affiliates or its or their Personnel and whether or not contributed to, changed, altered, amended or modified by Licensor, its Affiliates or its or their Personnel (**'Company Work Product'**), that are used on or in connection with the Products, Advertising Materials or Product Packaging, together with any Intellectual Property relating thereto will be and remain, as between Licensor and Licensee, the absolute and exclusive property of Licensee, or its designated Affiliate, forever.    Any copyrightable aspects of Company Work Product are "works made for hire" to the full extent permitted by law.    If any Company Work Product is not considered a work made for hire, or is not otherwise copyrightable, Licensor hereby assigns all right, title and interest to any of such Work Product to Licensee or its designated Affiliates.    Licensor shall execute any documents in connection with such assignment that Licensee may reasonably request.    Licensor shall enter into agreements with its Affiliates and its or their Personnel as necessary to establish Licensee's (or its designated Affiliate's) ownership in Company Work Product as provided pursuant hereto, and, if requested, provide Licensee with copies of such agreements. Licensor hereby appoints Licensee its attorney-in-fact to execute assignments of, and register all rights to, the Work Product.    This appointment is coupled with an interest.

## 12.    Infringement of the Trade Marks; Registration

12.1    Licensor shall have control of all proceedings relating to possible infringements of the Trade Marks and shall in its reasonable judgement decide what action (including litigation, arbitration or compromise (provided such compromise does not modify the rights of Licensee as provided herein and shall take into account the losses suffered by Licensee arising therefrom)) if any to take in respect of any infringement or alleged infringement of the Trade Marks or palming off or any other claim or counterclaim brought or threatened in respect of the use of the Trade Marks.    Any award received by Licensor in respect of the Trade Marks in any action taken by it shall be shared equally with Licensee, after the deduction of the costs and expenses incurred by each Party in connection therewith.

12.2    Each Party shall at its own cost and at the request of the other, give all commercially reasonable co-operation and assistance to the other (including the provision of documentation and making relevant people available) in any action, claim or proceedings brought or threatened in respect of the Trade Marks.

10

Confidential

12.3    At its expense, Licensor shall: (i) maintain all current registrations for the Trade Marks, a full and compete list of which is included in **Schedule 2A**; and (ii) shall file applications and diligently pursue such applications and shall maintain any registrations for the EVERLAST SPORT trade mark.  In addition, if Licensee develops Products which it reasonably believes are not covered by such registrations and applications, Licensor shall at its expense file and diligently pursue in the Territory trade mark applications relating thereto.   Licensee shall cooperate with any reasonable requests of Licensor in connection with its prosecution of the foregoing.

## 13.    Representations and Warranties

13.1    Licensor represents and warrants to Licensee that (i) Licensor or its permitted assignee is the owner of the Trade Marks in the Territory; and Licensor has the full right and authority to enter into this Agreement, to perform its obligations as contemplated herein and to grant the rights granted by it hereby; (ii) the execution, delivery and performance of this Agreement by Licensor has been duly and properly authorized by all necessary corporate actions; this Agreement constitutes the valid and binding obligation of Licensor, enforceable in accordance with its terms; (iii) the use by Licensee as contemplated herein of the Trade Marks and the Vendor Materials will not infringe upon or otherwise violate the rights of any person; and (iv) Licensor will comply with all Regulatory Requirements material to the performance of its obligations as set forth herein.

13.2    Licensee represents and warrants to Licensor that (i) it has the full right and authority to enter into this Agreement and to perform its obligations as contemplated herein; (ii) the execution, delivery and performance of this Agreement by Licensee has been duly and properly authorized by all necessary corporate actions; this Agreement constitutes the valid and binding obligation of Licensee, enforceable in accordance with its terms; and (iii) Licensee will comply with all Regulatory Requirements material to the performance of its obligations as set forth herein.

## 14.    Defense and Indemnity

14.1    Licensor will defend Licensee, its Affiliates and each of their respective Personnel, directors and shareholders (the '**Licensee Indemnified Parties'**) against, and indemnify and hold harmless the Licensee Indemnified Parties for, all Liabilities arising from, any claim by any third party resulting or claimed to result from (i) a breach of this Agreement by Licensor, including any breach of any representation or warranty made by it pursuant hereto; or (ii) the use of the Trade Marks or the Vendor Materials in accordance herewith, including, without limitation, claims that such use violates or infringes any Intellectual Property right of any person.

14.2    Licensee will defend Licensor, its Affiliates and each of their respective Personnel, directors and shareholders (the '**Licensor Indemnified Parties'**) against, and indemnify and hold harmless the Licensor Indemnified Parties for, all Liabilities arising from, any claim by any third party resulting or claimed to result from (i) a breach of this Agreement by Licensee, including any breach of any representation or warranty made by it pursuant hereto; (ii) personal injury or property damage resulting from the use of the Products sold by Licensee pursuant hereto; or (iii) any claim that the Products, Advertising Materials or the Product Packaging sold or used by Licensee, as applicable, pursuant hereto, (A) infringe any Intellectual Property right of any third party (subject to **Clause 14.1(ii)**) or (B) violate any Regulatory Requirement.

14.3    The Party having the obligation to defend a claim pursuant to this **Clause 14** (the '**Indemnifying Party'**) shall be accorded full control of the defense and/or settlement of such claim; provided that:

14.3.1    the Indemnified Parties give the Indemnifying Party notice as soon as practicable of a claim, such notice to specify in reasonable detail the nature of the relevant claim; however, the failure to provide prompt notice shall not relieve the Indemnifying Party of its obligations hereunder, expect to the extent it can demonstrate it was prejudiced thereby;

14.3.2    the Indemnified Parties make no admission of liability, agreement or compromise in relation to the relevant claim without the prior written consent of the Indemnifying Party (such consent not to be unreasonably conditioned, withheld or delayed);

Confidential

14.3.3    the Indemnified Parties give the Indemnifying Party and its professional advisers reasonable access to their Personnel and to any relevant assets, accounts, documents and records within the power or control of the Indemnified Parties and their professional advisers to examine such persons, assets, accounts, documents and records, and to take copies of the same, at its expense, for the purpose of assessing the merits of the relevant claim and otherwise reasonably co-operate with the Indemnifying Party in the defense thereof; however, the failure to do so shall not relieve the Indemnifying Party of its obligations hereunder, expect to the extent it can demonstrate it was prejudiced thereby; and

14.3.4    the Indemnified Parties may participate in such defense at their own cost and expense.

14.4    The obligations to defend and indemnify under this **Clause 14** shall be independent of each other and any other obligation of such party hereunder.  This **Clause 14** shall survive the expiration or termination of this Agreement.

## 15.    Liability

15.1    Sears and Kmart ('**Co-obligors'**) shall be jointly and severally liable for their respective obligations and liabilities arising under this Agreement and Licensor may take action against, or release or compromise the liability of, either Co-obligor, or grant time or other indulgence, without affecting the liability of the other Co-obligor.

## 16.    Termination

16.1    A Party may terminate this Agreement immediately by written notice to the other Party in the event that:

16.1.1    the other Party ceases to carry on business;

16.1.2    the other Party goes into liquidation;

16.1.3    a receiver, administrator or similar officer is appointed over the assets or business of the other Party;

16.1.4    the other Party enters into a voluntary arrangement with its creditors or suffers any similar insolvency process or process which affords the other Party protection from its creditors;

16.1.5    the other Party materially breaches this Agreement (in whole or in part) and if the material breach is capable of remedy, termination shall only occur if the material breach shall not have been remedied within thirty (30) days of the other Party having been given notice in writing specifying the breach and requiring it to be remedied;

16.1.6    A Petition in Bankruptcy is filed against a Party, which Petition is not dismissed within ninety (90) days of its filing.

16.2    Licensor may terminate this Agreement if Licensee fails to pay the undisputed portion of any amount under this Agreement when due, provided that such amount:

16.2.1    is overdue for a period of at least thirty (30) days at the date of the service of the demand pursuant to **Clause 16.2.2** below;

16.2.2    has been the subject of a demand made on Licensee which demand shall specify the amount due, state that the amount is overdue and that it is Licensor's intention to terminate this Agreement at the end of the ten (10) Business Day period following service of the demand if the amount due is not paid; and

16.2.3    remains overdue for ten (10) Business Days after service of the demand referred to in **Clause 16.2.2** above.

12

16.3    Termination of this Agreement shall not affect any of the Parties' accrued rights or Liabilities.

16.4    The provisions of this Agreement for whatever reason which in order to give effect to their meaning need to survive its termination or expiration shall remain in full force and effect thereafter including where applicable **Clauses 1** (Definitions), **4** (Financial Provisions), **6** (Reporting), **12** (Infringement), **14** (Defense and Indemnity), **15** (Liability), **16** (Termination), **17** (Consequences of Termination), **18** (Notices), **19** (Confidential Information), **20** (Force Majeure), **21** (Assignment), **22** (Entire Agreement), **23** (Relationship Between the Parties), **24** (Insurance) and **25** (General).

## 17.    Consequences of Termination

17.1    The Parties shall do all such things as may be necessary to cancel any formal license and Licensee shall co-operate with Licensor to secure the removal of the name of Licensee as a licensee at every trade marks registry and or local trade mark or financial body where such formal licence has been registered.

17.2    Licensee acknowledges that, except as expressly provided in this Agreement, Licensee has no right, title or interest nor will it acquire or attempt to acquire any rights of any kind whatsoever in or to any of the Trade Marks.

17.3    Within thirty (30) days of the date of expiry or termination of this Agreement Licensee shall submit to Licensor an inventory of all Products and Product components which are in its possession or under its control or are on order with its Manufacturers at the date of the said inventory.

17.4    After the expiry or termination of this Agreement, Licensee shall be entitled to a nine (9) Fiscal month sell off period (the '**Sell-Off Period**') during which Licensee may sell and market, including the use of Advertising Materials (including any Vendor Materials previously supplied) on a non-exclusive basis, the Products on order or in its inventory as of the date of expiration or termination. At the end of the Sell-Off Period, Licensee shall use commercially reasonably efforts to remove from inventory and destroy, or procure the destruction of, all Products and Product components within its power, possession, custody or control, and instruct its Manufacturers to do the same; provided, however, that Licensee may maintain and use sample Products, Advertising Materials and Product Packaging as may be necessary to satisfy any Regulatory Requirement and for internal and archival purposes. Licensee's sales of Products during the Sell-Off Period will continue to be subject to the requirements of this Agreement applicable thereto, including that such Products will comply with the approval and Standard of Quality requirements as provided in **Clause 8.1** and that Licensee shall be required to report and pay any Royalties after the end of each Quarter during the Sell Off Period for all Products sold during such Quarter as provided in **Clause 4.1 and 6.1** (and for the avoidance of doubt, it is understood that Licensee shall not be entitled to credit any Annual Minimum Guaranteed Royalty paid by it against such Royalties).

## 18.    Notices

18.1    Any notice or other communication to be given under or in connection with this Agreement shall be in writing and shall be sent by facsimile or nationally-recognized, prepaid overnight courier to:

18.1.1    in the case of Licensor:

Head of Licensing
Everlast World's Boxing Headquarters Corp.
183 Madison Avenue,
Suite 1701,
New York,
NY 10016,
USA
Fax: (646) 794 0294

with a copy (which shall not constitute notice) to be sent to:

International Brand Management Limited, Legal Department
Fourth Floor

Confidential

120 New Cavendish Street
London
W1W 6XX
United Kingdom
Fax: + 44 (0) 845 129 9291

18.1.2   in the case of Licensee, to

Sears Holdings Management Corporation
760 Market Street, 6th Floor
San Francisco, California  94120
Attn:  EVP, Apparel and Home
Fax: (415)-658-2222

With a copy (which shall not constitute notice) to:

Sears Holdings Management Corporation
3333 Beverly Road, B6-260A
Hoffman Estates, Illinois  60179
Attn:  VP and Chief Counsel
Fax:  (847)286-0266

or to such other address or fax number as may otherwise be specified by Licensor or Licensee (as the case may be) from time to time in accordance with the provisions of **Clause 18.3**.

18.2   Any notice given pursuant to this **Clause 18** shall be deemed to have been received by the addressee:

18.2.1   if delivered by prepaid overnight courier, at the time of delivery; or

18.2.2   if sent by facsimile, on the date of confirmed delivery (or the next Business Day thereafter if the transmission is completed on a day other than a Business Day or on a Business Day but after 1700 hours local time on such Business Day).

18.3   A Party may notify the other Party of a change to its name, relevant person, address or facsimile number for the purposes of **Clause 18.1** provided that such notification shall be delivered as provided above and shall only be effective on:

18.3.1   the date specified in the notification as the date on which the change is to take place; or

18.3.2   if no date is specified or the date specified is less than five (5) Business Days after the date on which notice is deemed to have been served, the date falling five (5) Business Days after notice of any such change is deemed to have been received.

## 19.   Confidential Information

19.1   A Party ("**Recipient Party**") shall hold as confidential both during the continuance of this Agreement and for one (1) year following the expiry or termination of this Agreement and shall not use for any purpose other than as necessary for the purposes of performance of the obligations of this Agreement, any information concerning the provisions of this Agreement, the clients, assets, business or affairs of the other Party ("**Confidential Information**") which it receives from that Party ("**Disclosing Party**") and shall neither disclose nor knowingly permit either directly or indirectly the disclosure of the same to any other person, firm or company without the prior written consent of the Disclosing Party, except to its Affiliates as required in each Party's discretion and as may be necessary to its and its Affiliates' agents, attorneys, consultants and contractors who have a need to receive such information to perform their obligations for the Recipient Party (each a '**Permitted Disclosee**'). The Recipient Party shall ensure that all of such Permitted Disclosees are legally bound to protect the confidentiality of such information. The Recipient Party shall be responsible for any disclosures by any of its Permitted Disclosees in violation hereof.

14

19.2   Confidential Information shall only include information which (1) if in tangible form or other media that can be converted to readable form, is marked clearly as "CONFIDENTIAL" or "PROPRIETARY" when disclosed, or (2) if oral or visual, is identified as confidential prior to disclosure and is summarized in writing marked "CONFIDENTIAL" or "PROPRIETARY" and delivered within ten (10) days following the oral or visual disclosure; provided, however, that any sales, forecast, product development, marketing or financial information of Licensee, including, without limitation, the Product Direction, the planned Advertising Materials or the planned Product Packaging, or any financial information of Licensor, shall be deemed to be Confidential Information without the need to separately mark it as such.  The obligations of confidentiality in **Clause 19.1** shall not extend to any information which the Receiving Party can show was already known to it or was previously acquired (other than from a third party who is in breach of a like obligation to any party) or to any information from time to time in the public domain or which is required to be disclosed by law or any regulatory authority provided always that in such circumstances such disclosure shall be only to the extent so required and shall where practical be subject to prior consultation with the other Party with a view to agreeing timing and content of such disclosure.

19.3   The obligations of this **Clause 19** shall survive expiry or termination of this Agreement.

19.4   The Parties understand and agree that remedies and damages may be inadequate to protect against any breach of the provisions of this **Clause 19** by either Party.  Accordingly each Party shall be entitled to the grant of interim and final injunctive relief by a court of competent jurisdiction in its discretion against any action that constitutes any breach of this **Clause 19.**

**20.    Force Majeure**

20.1   If and to the extent any Party is prevented or delayed by Force Majeure from performing any of its obligations under this Agreement, it shall promptly notify the other Party, specifying:

> (a)   the matters constituting Force Majeure together with such evidence in verification thereof as it can reasonably give;
>
> (b)   the period for which it estimates that the prevention or delay will continue; and
>
> (c)   the steps it has taken to avoid the Force Majeure which steps that Party is obliged to take provided they are reasonable.

20.2   Having complied with **Clause 20** above, the Party so affected shall be relieved of liability to the other for failure to perform or for delay in performing such obligations (as the case may be) but only as directly resulting from the Force Majeure, but shall nevertheless use all commercially reasonable efforts to resume full performance.

**21.    Assignment**

21.1   Neither Party may assign or otherwise transfer this Agreement or any right hereunder, or delegate any duties, or any portion of the foregoing, without the express written consent of the other Party.

21.2   Notwithstanding the foregoing, either Party may assign or otherwise transfer this Agreement or any of the rights granted it hereunder, or delegate any of its duties, in whole or in part, with or without the other Party's consent, to an Affiliate of the assigning Party or to a purchaser, who is not a competitor of the non-assigning Party, of all or substantially all of the assigning Party's assets; provided that with respect to an assignment, in each case that (A) the assigning Party shall remain responsible for any breach of this Agreement by any permitted assignee; and (B) as respects any permitted assignee of Licensor, such permitted assignee has been assigned the Trade Marks, together with all registrations relating thereto.

**22.    Entire Agreement**

22.1   This Agreement constitutes the entire agreement and understanding of the Parties, and supersedes any previous agreements or arrangements between the Parties relating to the subject matter of this Agreement.

Confidential

22.2 Each Party acknowledges and agrees that in entering into this Agreement it does not rely on, and shall have no remedy in respect of any statement, representation, warranty or understanding (whether negligently or innocently made) of any person (whether party to this Agreement or not) other than as expressly set out in this Agreement.

### 23.    Relationship between the Parties

23.1 The relationship between Licensor and Licensee under this Agreement is that of independent contractors and nothing in this Agreement shall be deemed to create a relationship of joint venture, partnership or agency between the Parties or constitute any Party the partner, agent or legal representative of the other.

### 24.    Insurance

24.1 Licensee, at its sole expense, shall obtain and maintain during the Term and for a period of twelve (12) months thereafter "Commercial General Liability" insurance naming Licensor and its Affiliates as an additional insureds thereon and including, but not limited to, coverage for personal and advertising injury, products and completed operations liability and contractual liability with limits of not less than $5,000,000 combined single limits for bodily injury and property damage per occurrence. The limits of liability required in this **Clause 24.1** can be satisfied by a combination of Commercial General Liability and an Umbrella Excess Liability. Notwithstanding the foregoing, Licensee may self-insure all or any part of the insurance required to be maintained by it hereunder.

24.2 Licensor, at its sole expense, shall obtain:

    24.2.1 "Commercial General Liability" insurance naming Licensee and its Affiliates as additional insureds thereof and including, but not limited to, coverage for personal and advertising injury, products and completed operations liability and contractual liability of not less than $5,000,000 combined single limits for bodily injury and property damage per occurrence. The limits of liability required in these subparagraphs can be satisfied by a combination of Commercial General Liability and an Umbrella Excess Liability.

    24.2.2 "Workers' Compensation" insurance, including coverage for all costs, benefits and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Licensor, for all states in the Territory, and Employer's Liability insurance with limits of liability of not less than $100,000 per accident or disease (each employee) and $1,000,000 aggregate by disease. Such insurance will contain a waiver of subrogation in favor of Retailer unless such waivers are not available under applicable law.

### 25.    General

25.1 If any provision or term of this Agreement shall become or be declared illegal, invalid or unenforceable for any reason whatsoever and such term or provision shall according to applicable legal principles be severable from this Agreement, it shall be deemed to be deleted from this Agreement provided always that if such deletion substantially affects or alters the commercial basis of this Agreement the Parties shall negotiate in good faith in an attempt to amend and modify the provisions of this Agreement as may be necessary or desirable in the circumstances so as to achieve so far as possible the same economic effect.

25.2 No relaxation, forbearance, delay or indulgence by either Party in enforcing any of the provisions of this Agreement, or the granting of time by either Party, shall prejudice, affect or restrict the rights and powers of that Party under this Agreement nor shall any waiver by either Party of any breach of this Agreement operate as a waiver of or in relation to any subsequent or any continuing breach of this Agreement.

25.3 Each Party shall, at the cost of the requesting Party, co-operate with such other Party and execute and deliver to such other Party such instruments and documents and take all such other actions in each case as may be reasonably requested from time to time in order to give full effect to this Agreement and securing to such requesting Party the full benefit of the rights, powers and remedies conferred upon it under this Agreement.

Confidential

25.4    No amendment or other variation to this Agreement shall be effective unless it is in writing, is dated and is signed by a duly authorized representative of each Party.

25.5    A person who is not a Party to this Agreement has no right to enforce any term of this Agreement but this does not affect any right or remedy of a third party which exists or is available under law.

25.6    Each Party shall bear its own costs and expenses in connection with the negotiation and preparation of this Agreement.

25.7    No press releases or other announcements shall be made by either Party in relation to this Agreement without the prior written consent of both Parties.

25.8    This Agreement may be executed in any number of counterparts, and by the Parties on separate counterparts, but shall not be effective until each Party has executed at least one counterpart.   Each counterpart shall constitute an original of this Agreement, but all the counterparts shall together constitute one and the same instrument.

25.9    Except as otherwise expressly provided in this Agreement, each and all of the rights and remedies provided in this Agreement, and each and all of the remedies allowed at law or in equity, shall be cumulative, and the exercise of one right or remedy shall not be exclusive of the right to exercise or resort to any and all other rights or remedies provided in this Agreement, at law or in equity.

25.10    This Agreement shall be interpreted and construed in accordance with laws of the State of New York without regard to its choice of law principles.  The Parties agree that any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims), shall be brought exclusively in the federal or state courts located in New York County, New York and the Parties for this purpose hereby submit to the exclusive jurisdiction and venue of such courts.

Confidential

**IN WITNESS** of which the parties have caused this Agreement to be executed by their duly authorised representative the day and year first before written.

**SIGNED FOR AND ON BEHALF OF**
**EVERLAST WORLD'S BOXING HEADQUARTERS CORP.**

By:        DAVE FORSEY

Title:        DIRECTOR

Signature:

Date:        1ST SEPT 2010


**SIGNED FOR AND ON BEHALF OF**
**SEARS, ROEBUCK AND CO.**
**KMART CORPORATION**
**By: SEARS HOLDINGS MANAGEMENT CORP., their agent**

By:        John D. Goodman

Title:        EVP Apparel & Home

Signature:

Date:        9/3/10

18

Confidential

## SCHEDULE 1

### Products

The following Products:

1.    Clothing (excluding socks)

2.    Footwear

3.    Accessories (as defined in **Clause 1**)

Notwithstanding the grant of an exclusive license by Licensor to Licensee pursuant to the terms of this Agreement, Licensee acknowledges and agrees that Licensee's rights shall be expressly non-exclusive in relation to all clothing, footwear and Accessories specifically designed for "Amateur" (meaning either Golden Gloves or Olympic boxing) and professional level boxing, martial arts, mixed martial arts, wrestling and other fight sports including without limitation, the following items:

- boxing robes;
- boxing trunks;
- boxing jerseys;
- boxing tracksuits;
- board shorts;
- rash guards;
- wrestling singlets;
- martial arts gis and uniforms;
- gym bags;
- equipment gym bags;
- glove gym bags; and
- handwrap bags.

Confidential

## SCHEDULE 2

### The Trade Marks

**All registered and unregistered rights in the Territory in the following marks (registration details below):**







G R E A T N E S S   I S   W I T H I N

**EVERLAST**

**EVERLAST SPORT**

The registration details are set out in **Schedule 2A.**

**For the avoidance of doubt:**



1.                    can only be used on footwear Products if it is accompanied by the EVERLAST Trade Marks as is represented in the first Trade Mark of this Schedule.

2.       GREATNESS IS WITHIN cannot be used on bag Products.

Confidential

## SCHEDULE 2A

**The Trade Marks – Registration Details**


INTERNATIONAL BRAND MANAGEMENT

# Full Case Report - External

**Trade Mark:** EVERLAST (WORD MARK)    **Territory:** United States    **Ref.:**    TMI3022US25

**Status:**    Registered/Granted

---

**Applicant / Registrant:** Everlast World's Boxing Headquarters Corporation

| | | |
|---|---|---|
| **Application No:** 73430174 | **Appl Date:** | 13/06/1983 |
| **Priority Country:** | **Priority Date:** | |
| **Priority No:** | **Registration Date:** | 21/08/1984 |
| **Registration No:** 1291250 | **Renewal Date:** | 21/08/2014 |

**Classes:**    25
**List of Goods:** 25: Clothing-namely, shoes, shirts, trunks, warm-up suits and robes


INTERNATIONAL BRAND MANAGEMENT

# Full Case Report - External

**Trade Mark:** EVERLAST (WORD MARK)     **Territory:** United States     **Ref.:**   TMI3022US18

**Status:**   Registered/Granted

**Applicant / Registrant:** Everlast World's Boxing Headquarters Corporation

| | | | |
|---|---|---|---|
| **Application No:** | 73586337 | **Appl Date:** | 06/03/1986 |
| **Priority Country:** | | **Priority Date:** | |
| **Priority No:** | | **Registration Date:** | 17/02/1987 |
| **Registration No:** | 1429227 | **Renewal Date:** | 17/02/2017 |

**Classes:**     18

**List of Goods:** 18:  Luggage, namely tote bags, duffle bags, gym bags, all-purpose sport bags and backpacks

Printed:    23/08/2010



INTERNATIONAL BRAND MANAGEMENT

# Full Case Report - External

---

**Trade Mark:** E (STYLIZED DIAMOND E)          **Territory:** United States          **Ref.:** TMI3005US25

**Status:** Registered/Granted



---

**Applicant / Registrant:** Everlast World's Boxing Headquarters Corporation

**Application No:** 77219197                          **Appl Date:** 29/06/2007
**Priority Country:**                                 **Priority Date:**
**Priority No:**                                      **Registration Date:** 06/04/2010
**Registration No:** 3772065                          **Renewal Date:** 06/04/2020

---

**Classes:** 25

**List of Goods:** 25:  Clothing, namely, men's pants, robes, shirts, shorts, and underwear; women's pants, robes, shirts, shorts, and underwear; girls' and boys', pants, shirts and underwear; boxing jerseys, briefs, exercise suits, jackets, jogging suits, knit headwear, muscle shirts, sauna suits, socks, sweatpants, sweatshirts, t-shirts, boxing trunks



INTERNATIONAL BRAND MANAGEMENT

# Full Case Report - External

---

**Trade Mark:** E (STYLIZED DIAMOND E)    **Territory:** United States    **Ref.:**    TMI3005US18

**Status:**    Registered/Granted



---

**Applicant / Registrant:** Everlast World's Boxing Headquarters Corporation

| | | |
|---|---|---|
| **Application No:** 77259126 | **Appl Date:** | 20/08/2007 |
| **Priority Country:** | **Priority Date:** | |
| **Priority No:** | **Registration Date:** | 14/04/2009 |
| **Registration No:** 3606812 | **Renewal Date:** | 14/04/2019 |

---

**Classes:**    18

**List of Goods:** 18:   Luggage, namely tote bags, duffle bags, gym bags, all-purpose sport bags and backpacks; sports luggage and gym bags



INTERNATIONAL BRAND MANAGEMENT

# Full Case Report - External

---

**Trade Mark:** EVERLAST (stylized) + E (stylized) (Diamond E)    **Territory:** United States    **Ref.:** TMI3020US25

**Status:** Registered/Granted



---

**Applicant / Registrant:** Everlast World's Boxing Headquarters Corporation

| | | |
|---|---|---|
| **Application No:** 77219282 | **Appl Date:** | 29/06/2007 |
| **Priority Country:** | **Priority Date:** | |
| **Priority No:** | **Registration Date:** | 06/04/2010 |
| **Registration No:** 3772067 | **Renewal Date:** | 06/04/2020 |

---

**Classes:** 25

**List of Goods:** 25: Clothing, namely, men's footwear, pants, robes, shirts, shorts, and underwear; women's footwear, pants, robes, shirts; girls' and boys' pants, shirts; boxing jerseys, boxing shoes, briefs, exercise suits, jackets, jogging suits, knit headwear, muscle shirts, sauna suits, socks, sweatpants, sweatshirts, t-shirts, boxing trunks



# Full Case Report - External

**Trade Mark:** GREATNESS IS WITHIN          **Territory:** United States          **Ref.:**   TMI3029US25

**Status:**   Registered/Granted

**Applicant / Registrant:** Everlast World's Boxing Headquarters Corporation

| | | |
|---|---|---|
| **Application No:**   77191997 | **Appl Date:** | 29/05/2007 |
| **Priority Country:** | **Priority Date:** | |
| **Priority No:** | **Registration Date:** | 30/09/2008 |
| **Registration No:**   3509497 | **Renewal Date:** | 30/09/2018 |

**Classes:**   25

**List of Goods:** 25:   Clothing, namely men's footwear, pants, robes, shirts, shorts, sleepwear and underwear; women's blouses, footwear, pants, robes, shirts, shorts, sleepwear, sweaters and underwear; girls' and boys' blouses, footwear, pants, shirts, shorts, sleepwear, sweaters and underwear; toddlers' and infants' footwear, pants, shirts, shorts, sleepwear and sweaters; boxing jerseys, boxing shoes, briefs, elastic belts, exercise suits, gloves, jackets, jogging suits, knit headwear, knit scarves, mittens, muscle shirts, sauna suits, socks, stockings, sweatpants, sweatshirts, swimwear, t-shirts, thermal underwear, boxing and bathing trunks

Confidential

## SCHEDULE 3

### Territory

USA, its territories and possessions, including Puerto Rico and also including United States military bases.

Confidential

## SCHEDULE 4

### Annual Minimum Guaranteed Royalty

| Year | Annual Minimum Guaranteed Royalty (US$) |
|------|------------------------------------------|
| 1 | 2,000,000 |
| 2 | 2,250,000 |
| 3 | 2,500,000 |
| 4 | 3,500,000 |
| 5 | 4,500,000 |
| 6 | 4,500,000 |
| 7 | 4,500,000 |
| 8 | 4,500,000 |
| 9 | 4,500,000 |

Confidential

**SCHEDULE 5**

**Code of Conduct**

## SEARS HOLDINGS
### GLOBAL COMPLIANCE PROGRAM

Sears Holdings Management Corporation Code of Vendor Conduct

| SEARS HOLDINGS | SEARS HOLDINGS MANAGEMENT CORPORATION AND SEARS CANADA INC. Code of Vendor Conduct |  |
|---|---|---|

Sears Holdings Management Corporation (collectively, "Sears Holdings" and all retail formats operating under Sears, Kmart, and Lands' End, including but not limited to: Sears, Sears Roebuck and Co., Sears Essentials, Sears Grand, the great indoors, Kmart, Super K, Lands' End (catalog) and Lands' End (retail stores)) is committed to conducting its business in accordance with a high standard of business ethics and in compliance with all applicable laws. Sears Holdings expects its vendors to do the same. Moreover, Sears Holdings conducts its business with a regard for human rights and seeks vendors that have similar standards.

While Sears Holdings recognizes that different cultural, legal and ethical systems exist in the countries in which merchandise purchased by Sears Holdings is manufactured, this Code of Vendor Conduct sets forth certain basic requirements that all Sears Holdings's vendors and their subcontractors--domestic and foreign-- must satisfy as a condition of doing business with Sears Holdings.

Compliance with the Law and Code of Vendor Conduct. Sears Holdings will deal only with vendors of merchandise that Sears Holdings considers reputable and whose business and labor practices conform to the requirements of applicable law and the key requirements of the Sears Holdings Code of Vendor Conduct. Where the Code of Vendor Conduct sets a higher standard, the Code of Vendor Conduct will prevail. Sears Holdings will not do business with companies that violate the law, and will terminate vendors that do.

Safety and Health. Conditions in all work and residential facilities must be safe, clean, and consistent with all applicable laws and regulations and the provisions of this Code of Vendor Conduct.

Child Labor. No worker shall be employed under the age of 15, or under the age of completion of compulsory education, or under the minimum age for employment in the country of manufacture, whichever is greater.

Forced Labor. The use of forced or compulsory labor is unacceptable.

Harassment or Abuse. The factory shall ensure that no worker is subject to any physical, sexual, psychological, or verbal harassment or abuse.

Discrimination. Discrimination in employment, including recruitment, hiring, training, working conditions, job assignments, pay, benefits, promotions, discipline, termination, or retirement on the basis of gender, race, ethnicity, social origin, religion, age, disability, sexual orientation, national origin, or political opinion is prohibited.

Working Hours. Except in extraordinary business circumstances, workers shall not be required to work (inclusive of overtime) more than the legally prescribed limits or 60 hours, whichever is less, and one day off in every seven day period shall be provided. Vendors shall comply with applicable laws that entitle workers to vacation time, leave periods and holidays.

Wages and Benefits. Wages are essential for meeting the basic needs of workers. Vendors shall compensate their workers by providing wages, including overtime pay, and benefits that satisfy all applicable laws and regulations.

Freedom of Association. Vendors are required to respect the rights of workers to establish and join a legal organization of their own choosing without being penalized for the non-violent exercise of these rights.

Environmental Compliance. Vendors must comply with all local laws protecting the environment. Sears Holdings encourages its vendors to conduct business so as to minimize the impact on the environment, including reducing waste and maximizing recycling initiatives.

Notice and Record Keeping. Sears Holdings may require Vendors to post this Code of Vendor Conduct in a location accessible to their workers (in the appropriate local language). Vendors must maintain current sufficiently detailed records to enable Sears Holdings to determine their compliance with this Code of Vendor Conduct, and make these records available to Sears Holdings representatives upon request.

Violations
To report suspected violations of this Policy, contact Sears Holdings Office of Ethics and Business Policy at 1 (800) 827-7478 or Sears Canada Inc. at 1 (416) 941-3530 or via e-mail (laborc@searshc.com).

Questions: please email laborc@searshc.com          Updated on October 2007
or call 1-847-286-7424 (USA) or 852-2733-6233 (Hong Kong)

Confidential

## SCHEDULE 6

**[Intentionally Omitted.]**

Confidential

**SCHEDULE 7**

**EXCLUDED CHANNELS**

**The following bricks and mortar and/or online stores and/or channels**

EVERLAST branded stores, to the extent owned or licensed by Licensor; provided such stores are free-standing (i.e., not a store within a store), do not exceed more than 2000 square feet and are no more than 200 in number in the Territory at any given time

The EVERLAST shop in Paragon Sporting Goods

www.everlast.com and associated catalogues, to the extent owned or licensed by Licensor

www.ringside.com and associated catalogues

www.combatsports.com and associated catalogues

Gyms

All fight sports specialty retailers, such as MMA Warehouse, Golden Tiger and Title

Federated Department Stores (Bloomingdales)

Neiman Marcus

Saks Fifth Avenue

Nordstroms

Barneys

Barneys Coop

Fred Segal

Bodega Classics

Kicks

Distant Replay

Kitson

www.no-mas.com

Confidential

**SCHEDULE 8**

**ROYALTY REPORTING FORM**

| Territory | Channel | Category | Item # | Item Description | Unit Sales / Total Sales | Price/Unit | Sales Amount | % Royalty | Royalty Amount | FX/USD | $ Royalty Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |
| | | | | | | | 0.00 | | 0.00 | 1.00 | 0.00 |

Licensee Name:

Contract #/Category:
Date:
Quarter:

Contractual Minimums (USD):
Quarterly
Over/(Under) Contractual Minimums                0

Total Royalty Due:                0.00

DATED      8th october      2013

**EVERLAST WORLD'S BOXING HEADQUARTERS CORP.**

**- and -**

**SEARS, ROEBUCK AND CO. AND KMART CORPORATION**

---

**FIRST AMENDMENT IN RESPECT OF A TRADE MARK
LICENCE AGREEMENT DATED 18 AUGUST 2010**

**THIS AMENDMENT** is made the  day of *october*                    2013

**BETWEEN**

(1)    **EVERLAST WORLD'S BOXING HEADQUARTERS CORP.,** a company incorporated under the laws of the State of New York, United States, whose registered office is at 183 Madison Avenue, Suite 1701, New York, NY 10016, USA (and PO Box 1809, New York, NY 10156-1809, USA ('**Licensor**')

(2)    **SEARS, ROEBUCK AND CO.** a company incorporated under the laws of New York, United States **("Sears"),** and **KMART CORPORATION,** a company incorporated under the laws of Michigan, United States **("Kmart")** each of whose principal place of business is at 3333 Beverly Road, Hoffman Estates, Illinois, 60179, USA.  Sears and Kmart are individually and collectively ('**Licensee**')

**RECITALS**

(A)    Licensor and Licensee entered into an agreement dated 18 August 2010 ('**Licence Agreement**') governing the granting of certain trade mark rights to the Licensee.

(B)    The parties now wish to amend the Licence Agreement on the terms and conditions set out below.

**AGREEMENT**

**1.        Amendments**

1.1      With effect from the date of this amendment, Licensor and Licensee agree the following amendments:

Clause 1.1

The definition of Term shall be deleted in its entirety and replaced with the following:

*'**TERM**' shall mean the Initial Term and the Second Term (if any), in either case as defined in* ***Clause 3;***

Clause 3

Clause 3 shall be deleted in its entirety and replaced with the following:

***3.        Duration***

*3.1      Subject to Clause 3.2, this Agreement shall commence on the Commencement Date and shall continue through the end of the 2016 Fiscal Year (January 28, 2017) (subject to earlier termination as provided under this Agreement) ('Initial Term').*

*3.2      Licensee may renew the Initial Term for a further three (3) Year period (from January 29, 2017 through February 1, 2020, subject to earlier termination as provided under this Agreement (hereafter defined as the 'Second Term')) upon written notice to the Licensor given at least six (6) months prior the expiration of the Initial Term, except that if Licensee shall have failed to achieve at least $30m of Retail Sales of EVERLAST branded Products or Licensee shall have failed to achieve at least $30m of Retail Sales of EVERLAST SPORT branded Products, in each case*

*during the Fiscal 12 month period ending July 2, 2016 (the 'Measurement Period'), then Licensee's rights to such brand or brands, as the case may be, in such Second Term shall be solely on a non-exclusive basis.    In addition, if during the Measurement Period, Licensee shall have failed to achieve at least $750,000 of Sales Revenue of EVERLAST branded Products in an Accessories category then Licensee's rights with respect to EVERLAST branded Products in such category may thereafter continue during the Second Term only on a non-exclusive basis.    In addition, if during the Measurement Period Licensee shall have failed to achieve at least $5m of Sales Revenue of EVERLAST branded footwear then Licensee's rights with respect to EVERLAST branded footwear may thereafter continue during the Second Term only on a non-exclusive basis.*

Schedule 4

The Annual Minimum Guaranteed Royalty amounts for Years 4-6 in the table in Schedule 4 shall be deleted and replaced with the following amounts:

| Year | Annual Minimum Guaranteed Royalty (US$) |
|------|------------------------------------------|
|      |                                          |
| 4    | 3,000,000                                |
| 5    | 3,200,000                                |
| 6    | 3,400,000                                |

1.2    In all other respects the Licence Agreement shall remain in full force and effect.

1.3    In the event that the terms of this amendment conflict with the terms of the Licence Agreement then these terms shall prevail but only to the extent that there is a conflict.

**2.    Counterparts**

This amendment may be executed in any number of counterparts, and by the parties on separate counterparts, but shall not be effective until each party has executed at least one counterpart.  Each counterpart shall constitute an original of this amendment, but all the counterparts shall together constitute one and the same instrument.

**3.    Governing law**

This amendment shall be interpreted and construed in accordance with laws of the State of New York without regard to its choice of law principles.  The Parties agree that any dispute or claim arising out of or in connection with this amendment or its subject matter or formation (including non-contractual disputes or claims), shall be brought exclusively in the federal or state courts located in New York County, New York and the Parties for this purpose hereby submit to the exclusive jurisdiction and venue of such courts.

IN WITNESS of which the parties have caused this Agreement to be executed by their duly authorised representative the day and year first before written.

**SIGNED FOR AND ON BEHALF OF
EVERLAST WORLD'S BOXING HEADQUARTERS CORP.**

By:                         Dave Forsey

Position:                   Director

Signature:

In the presence of:

Name of witness:            Emma Morley

Signature of
Witness:                    E Morley

**SIGNED FOR AND ON BEHALF OF SEARS, ROEBUCK AND CO.
KMART CORPORATION
By: SEARS HOLDINGS MANAGEMENT CORP., their agent**

By:                         Lana Krauter

Position:                   SVP  President of Sears Apparel

Signature:                  Lana Krauter

In the presence of:

Name of witness:            Andrew Leismer

Signature of
Witness:

DATED        11 November                                                      2015

EVERLAST WORLD'S BOXING HEADQUARTERS CORP.

- and -

SEARS, ROEBUCK AND CO

---

SECOND  SUPPLEMENTAL DEED OF AMENDMENT IN RESPECT OF A TRADE MARK
LICENCE AGREEMENT DATED 18 AUGUST 2010 IN RESPECT VARIOUS PRODUCTS FOR THE
USA

**THIS DEED** is made the ~~11th~~ day of ~~November~~ 2015

**BETWEEN**

(1)   **Everlast World's Boxing Headquarters Corp.,** a company incorporated under the laws of the State of New York, United States, whose registered office is at 183 Madison Avenue, Suite 1701, New York, NY 10016, USA (and PO BOX 1809, New York NY 10156 – 1809, USA) ('**Licensor**') and

(2)   **Sears, Roebuck and Co**, a company incorporated under the laws of New York, United States ('**Sears**') and **Kmart Corporation**, a company incorporated under the laws of Michigan, United States ('**Kmart**') each of whose principal place of business is at 3333 Beverly Road, Hoffman Estates, Illinois, 60179, USA. Sears and Kmart are individually and collectively ('**Licensee**').

**RECITALS**

(A)   The Licensor and Licensee entered into an agreement dated 18 August 2010 governing the granting of certain trade mark rights to the Licensee ('**Licence Agreement**').

(B)   The parties varied the terms of the Licence Agreement by way of a supplemental deed of amendment dated 8 October 2013.

(C)   The parties now wish to amend the Licence Agreement on the terms and conditions set out below.

**AGREEMENT**

**1.        Amendments**

1.1     From the date of execution of this deed (as indicated on the front page), the parties agree that:

> 1.1.1  'socks' are added into the Product definition in **Schedule 1** of the Licence Agreement with respect to the Trade Marks (excluding EVERLAST SPORT), but the grant to promote, distribute and sell 'socks' bearing the Trade Marks (excluding EVERLAST SPORT) in the Territory is on a non-exclusive basis. For clarity, these products may only be sold through the Distribution Channels.

> 1.1.2  **Clause 4.4** of the Licence Agreement is hereby deleted in its entirety and replaced with the following:

> "4.4 In addition, Licensee may elect to purchase socks product, that are branded with the EVERLAST SPORT trade mark only, from an authorized licensee of Licensor. In such event, Licensee may calculate the Sales Revenue for such products and apply such Sales Revenue against the Sales Revenue thresholds for the calculation of the Royalty percentages as specified in **Clause 1.1** and the Sales Revenue thresholds for EVERLAST SPORT branded products as specified in **Clause 3.2.** In addition, such Sales Revenue for each Year (multiplied by the applicable Royalty percentage) may be applied against the Annual Minimum Guaranteed Royalty for such Year; provided that, for the avoidance of doubt, no Royalty payments will be due from Licensee with respect to the sale of socks product bearing the EVERLAST SPORT trade mark and Licensor will look solely to its authorized licensee with respect to such payments and any and all other obligations relating to such license.   In order to effect the foregoing, Licensor shall (if it has not already done so) authorize its sock licensee to apply the EVERLAST SPORT mark to socks (in accordance with the terms of that

licensee's licence agreement with Licensor), provided the such products may only be sold to Licensee "

1.2     In all other respects the Licence Agreement shall remain in full force and effect.

1.3     In the event that the terms of this deed conflict with the terms of the Licence Agreement then these terms shall prevail but only to the extent that there is a conflict.

**2.      Counterparts**

This deed may be executed in any number of counterparts, and by the parties on separate counterparts, but shall not be effective until each party has executed at least one counterpart.  Each counterpart shall constitute an original of this deed, but all the counterparts shall together constitute one and the same instrument.

**3.      Governing law**

This deed shall be interpreted and construed in accordance with the laws of the State of New York without regard to its choice of law principles. The parties agree that any dispute or claim arising out of or in connection with this deed or its subject matter or formation (including non-contractual disputes or claims), shall be brought exclusively in the federal or state courts located in New York County, New York and the parties for this purpose hereby submit to the exclusive jurisdiction of such courts.

EXECUTED and delivered as a deed on the date of this document.

**EXECUTED FOR AND ON BEHALF OF**
**EVERLAST WORLD'S BOXING HEADQUARTERS CORP.**

By:          *Cameron Olsen*

Title:        *Attorney*

Signature:    *[signature]*

Date:        *11/4/2015*

In the presence of:

Name of witness:    *Kimberley Evans*

Signature of
Witness:        *[signature]*

**EXECUTED FOR AND ON BEHALF OF**
**SEARS, ROEBUCK AND CO**
**KMART CORPORATION**
**BY: SEARS HOLDINGS MANAGEMENT CORP., their agent**

By:          *Liz Simon*

Title:        *Apparel President - Sears*

Signature: _____

Date: 10.14.15

In the presence of:

Name of witness: Andrew Lechner

Signature of
Witness: _____

# EXHIBIT 2

| Sears/Kmart Monies Owed Under Everlast Worldwide License | Earned Amount* | Amount Paid/Collected | Amount Still Owed |
|---|---|---|---|
| Q1 (Feb-April 2018) | $786,671.33 | $785,236.90 | $1,434.43 |
| Q2 (May-July 2018) | $770,232.34 | $769,634.40 | $597.94 |
| Q3 (Aug - Oct 2018) | $784,239.78 | $194,088.76  ** | $590,151.02 |
| Total | $2,341,143.45 | $1,748,960.06 | $592,183.39 |

* Under the License Agreement, Sears/Kmart has annual minimum guaranteed royalty payment of $4,500,000.00

** Sears/Kmart paid $194k for post  Chap 11 petition earned royalties (Oct 15 - Oct 31, 2018).

**Sears/Kmart**
**Monies Owed Under Everlast Worldwide License**

| | AMGR Owed | Earned Amount | Amount Paid/Collected | AMGR Difference* |
|---|---|---|---|---|
| Total | $4,500,000.00 | $2,341,143.45 | $1,748,960.06 | $2,751,039.94 |

* $4,500,000 less $1,748,960.06

# EXHIBIT 3

| | |
|---|---|
| **From:** | Shana Crews |
| **To:** | Wendy.Ewing@searshc.com |
| **Cc:** | Licensing Department; Shannon Keith; Harrison Mui; Eddie Ban; Juhi Trivedi |
| **Subject:** | Sears / Kmart Royalty Template CY2018 Q4 |
| **Date:** | Thursday, January 31, 2019 2:47:36 PM |
| **Attachments:** | Sears Kmart Brands Quarterly Template - CY 2018 Q4.xlsx |

Dear Wendy,

**Attached is the Everlast Sales & Royalty Template to be completed for the period of November 2018 January 2019.**
Please complete all tabs within the Template, as the instructions read. Also included in the workbook is a Sales & Summary tab that outlines how the 2018 Minimums are calculated. Be sure to identify the sales channel i.e. E-commerce or Brick Mortar. Please review and forward me any questions you may have.

Upon completion, please return this completed template to all of the parties listed on this email and Cc Harrison Mui (Harrison.Mui@everlast.com) by end of day, Thursday February 28th, 2019.

Please ensure all reported data pertains to product within the scope of the agreement and any applicable amendments.

Also, please remember to include (by email attachment) any applicable documentation to support advertising expenditure and insurance paperwork, particularly if it has expired since the last royalty audit.

Feel free to reach out if you have any questions or concerns.


Thank you

Best regards,

**Shana Crews**
Financial Analyst

Everlast Worldwide
42 West 39th Street, 3rd Floor
New York, NY 10018
MAIN 212-239-0990
DIRECT 646-794-0269
FAX 646-794-0369
http://www.everlast.com

This email may contain information that is privileged, confidential or otherwise protected from disclosure. Distribution or copying of this email or the information herein by anyone other than the intended recipient is prohibited. Prior to the full execution of a written license agreement, you must not act in reliance on this email or any representations. If you have received this email in error, please contact the undersigned via return email.