WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re                                                       :
                                                            :
**SEARS HOLDINGS CORPORATION,** *et al.*,                   :
                                                            :
                                                            :
                                                            :
          **Debtors.**                                      :
------------------------------------------------------------x

**DECLARATION OF MOHSIN Y. MEGHJI IN SUPPORT OF DEBTORS'
(I) MOTION TO (A) ENFORCE ASSET PURCHASE AGREEMENT AND
AUTOMATIC STAY AGAINST TRANSFORM HOLDCO LLC AND (B) COMPEL
TURNOVER OF ESTATE PROPERTY, AND (II) RESPONSE TO TRANSFORM
HOLDCO LLC'S MOTION TO ASSIGN MATTER TO MEDIATION**

I, Mohsin Meghji, make this declaration under 28 U.S.C. § 1746:

1. I submit this declaration ("**Declaration**") in support of the *Debtors'*

*(I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform*

*Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco*

*LLC's Motion to Assign Matter to Mediation* [ECF No. 2796] ("**Motion to Enforce**").[1]

---

[1] Capitalized terms used but not defined in this Declaration shall have the respective meanings ascribed to such terms in the *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation*, filed concurrently with this Declaration, and/or the *Declaration of Robert A. Riecker pursuant to Rule 1007-2 of Local Bankruptcy Rules for the Southern District of New York* (ECF No. 3), as applicable.

**DECLARATION OF MOHSIN Y. MEGHJI – Page 1**

2.      I am the Chief Restructuring Officer ("**CRO**") of Sears Holdings Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**").[2] I am also the Managing Partner of M-III Advisory Partners, LP ("**M-III**"). In October 2018, the Debtors retained M-III to provide the Debtors with a CRO and to provide the Debtors and their other professionals with financial advisory services in connection with the Debtors' evaluation and development of strategic alternatives to wind-down and liquidation.

3.      As CRO, I provide strategic business advice to the Restructuring Committee of the Debtors' Board of Directors in connection with the Debtors' chapter 11 cases. Further, I am responsible for carrying out the Debtors' chapter 11 strategy and objectives, including liquidity management. I am knowledgeable about and familiar with: the Debtors' (i) day-to-day operations prior to closing the transaction with Transform Holdco LLC ("**Closing**"); (ii) business and financial affairs; and (iii) books and records, as well as (iv) the circumstances leading to the commencement of these chapter 11 cases. I have more than 25 years of financial restructuring,

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

interim management, turnaround, and management consulting experience across a wide variety of industries, including, but not limited to, the retail and real estate industries.

4. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge of the Debtors' pre-Closing operations and finances gleaned during the course of my engagement with the Debtors; my discussions with the Debtors' senior management, other members of the M-III team, and the Debtors' other advisors; my review of relevant documents; and my views based upon my experience. If called to testify, I would testify competently to each of the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of M-III for the Debtors.

## *Background*

5. On January 14, 2019, the Debtors conducted an auction for the sale of certain assets. On January 17, 2019, the Debtors, in consultation with their advisors, selected the bid submitted by ESL Investments, Inc., to enter a transaction by and between the Debtors and certain of their subsidiaries and Transform Holdco LLC (the "**Buyer**"), as the "highest or best offer." The Court began hearings on the contested sale on February 4, 2019, ultimately approving the sale on February 8, 2019. Effective February 11, 2019, at 12:01 a.m. ET, the sale closed pursuant to the APA, which was filed with the Court on February 14, 2019.

## *The Debtors' Cash Management System*

6. Prior to the time of Closing, the Buyer advised that it had not done the work necessary to implement its own cash management system or set up its own bank accounts. The Buyer explained to me that it could not close without assuming control of the Debtors' cash management system. Given the extremely compressed timeframe in which the Debtors and the Buyer closed the transaction, it was not feasible for the Buyer to implement its own cash

management system—a system by which the Debtors controlled their incoming receivables and outgoing payables, and included the Debtors' bank accounts.

7. As a concession to the Buyer—in order to alleviate the risk to Closing and in an effort to help facilitate a seamless transition of the going-concern business in the interests of, among others, the Debtors' employees and key stakeholders—the Debtors agreed to give the Buyer possession and control of the Debtors' cash management system, including its bank accounts as of the Closing Date.

8. Certain issues needed to be addressed, however, before the Buyer took control of the system. For example, when any transaction occurs in a Sears store—whether it be a cash transaction or credit card payment—there is always some lag time before those funds arrive in the relevant Sears bank account. With respect to cash transactions, it often takes a number of days before an armored truck picks up those proceeds for deposit (and this is especially true for proceeds collected over a weekend). Credit card transactions can take as many as three business days before they post in the relevant bank account.

9. This Closing, in particular, presented additional challenges with respect to outstanding and in-transit proceeds and cash in the cash management system. For instance, at Closing, the Debtors would be in the process of sweeping cash from regional and foreign bank accounts. The Debtors knew it would not be possible to move all cash from store bank accounts to regional bank accounts, to the concentration accounts and then, ultimately, to the newly-formed segregated bank accounts for all sales that occurred prior to Closing before control of the accounts was ceded to the Buyer. Further, the Debtors were in the process of migrating cash collection accounts and credit card routing to the new segregated accounts to collect Going Out of Business ("**GOB**") proceeds for the benefit of the Debtors' Estates. The Debtors knew that certain of these

proceeds would enter the transferred accounts post-Closing. However, in the interest of ensuring the timely close of the transaction and mitigating Closing risk, the Debtors, per the Buyer's request, agreed to cede control of the accounts at Closing and work with the Buyer's financial advisors, Ernst & Young ("**E&Y**"), to implement a post-Closing reconciliation process for cash and credit card proceeds that were ultimately the property of the Debtors and the Debtors' Estates (the "**E&Y Memo**").[3]

10. The E&Y Memo set forth the following principles:

- Cash flow receipts generated prior to February 11, 2019, at 12:01 am ET at the 425 go–forward stores and non-store locations (includes Sears Appliance, Sears Auto (detached), Sears Home Services, Sears Call Centers, Sears Home Office locations, and Sears Home Improvement) are property of the Debtors;

- Cash flow receipts generated at the 80 GOB locations will remain property of the Debtors; and

- If the Debtors' existing indebtedness under the DIP Credit Agreement is equal to or below $850,000,000 as of 12:01 am ET on February 11, 2019, all cash credited overnight will be transferred to the Debtors' post-close bank accounts.

11. The Debtors worked extensively with the Buyer's advisors to get comfortable that there were mechanisms in place to reconcile and recover assets of the Debtors that would still be in-transit at Closing. In the two weeks leading up to the Closing, my associates at M-III and I were involved in daily meetings and discussions with the Debtors' treasury and finance teams, along with the Buyer's advisors, to identify issues associated with the transfer of the cash management system and ways to ensure that all property of the Estate would be clearly identified and returned to the Debtors' Estate in an efficient manner. Discussions regarding the

---

[3] *See* attachment to E-mail correspondence between E&Y and M-III from February 7 to February 11, 2019; a true and correct copy of which is attached to this Declaration as **Exhibit A**.

**DECLARATION OF MOHSIN Y. MEGHJI** – Page 5

E&Y Memo began on January 30, 2019, and the final version of the E&Y Memo was shared with the Debtors on February 11, 2019. My team and I worked in good faith with the Buyer's advisors on these issues. However, to date, we have not been provided with any cash or credit reconciliations from the Buyer or its advisors.

12. I also voiced my concern—on numerous occasions—that any delay could jeopardize the Debtors' ability to meet its post-Closing obligations under the APA and Sale Order. The Buyer gave numerous assurances that the funds in the cash management system would promptly be reconciled and remitted to the Debtors' Estates. Reasonably relying upon the Buyer's assurances, as well as our interest in a seamless transition of the business operations at Closing, we agreed to provide the Buyer with control of the Debtors' cash management system.

13. In sum, as a condition of handing the Buyer the transferred accounts and control of the cash management system, the Buyer understood and agreed that the Buyer would remit to the Debtors all funds currently in, or that subsequently came into, that cash management system that were not acquired by the Buyer under the APA and therefore remained assets of the Estate. But the Buyer now is refusing to remit these Estate assets to the Estate, despite the Debtors' repeated demands for the same.[4]

14. The assets owed to the Debtors in the cash management system total approximately $41.3 million, and include:

- approximately $14.6 million in credit card proceeds from transactions that occurred prior to Closing;

---

[4] On Friday, March 8, 2019, the Buyer offered to transfer to the Estate approximately $3.4 million of cash from Israeli bank accounts as well as approximately $3.3 million from GOB proceeds, but only if the Estate simultaneously releases to the Buyer pharmacy receipts from an account that has remained with Kmart until the Buyer can get its own pharmacy licenses. *See* E-mail correspondence from Cleary Gottlieb to Weil, dated Mar. 8, 2019; a true and correct copy of which is attached to this Declaration as **Exhibit B**.

- approximately $18.5 million in cash proceeds from transactions that occurred prior to Closing, but that were still in transit from regional banks or the stores until after Closing;

- approximately $4.5 million of cash in transit from the Debtors' Israeli bank accounts prior to Closing; and

- approximately $3.7 million in credit card proceeds for GOB Store proceeds.

15. Each of these categories is cash or proceeds from transactions that occurred pre-Closing but that have not yet arrived in the Debtors' bank accounts, which are not Acquired Assets under the APA and remain Estate property. The Buyer also is withholding GOB Store proceeds that, likewise, were not acquired by the Buyer under the APA. To be clear, the Buyer has refused to provide the information and reconciliations to confirm these funds and, therefore, refused to remit the funds in each of the categories it discussed with the Debtors during the pre-Closing discussions of the cash management system.

16. Had the Debtors not provided this accommodation to the Buyer (despite the Buyer's assurances that the Estate would not be prejudiced), $41.3 million would now be under the Debtors' control.

### *Rent Proration Payment*

17. In addition to this $41.3 million, the Buyer also is withholding an approximately $16.2 million Rent Proration payment for February 2019. Because the Debtors had already paid rent for the full month of February as of the Closing Date, the APA entitles the Debtors to a prorated rent payment from the Buyer for February 2019 for the portion of the month after Closing during which the Debtors were no longer in possession of certain leased premises. Prior to the Closing, the Debtors' advisors provided the Buyer's advisors with a copy of the rent proration schedule required under the APA (later finalizing the schedule, as contemplated under the APA). On February 20, 2019, the Buyer's own advisors confirmed that the rent proration

schedule was satisfactory and that payments to the Debtors should be made by February 22, 2019, as set forth in the APA.[5]

19. Despite the Debtors' adherence to the scheduling and notice requirements under the APA, as well as the Buyer's advisors' agreement that the payment would be made, the Buyer now refuses to make the rent proration payment ten business days after it was due under the APA.

19. The Buyer has taken inconsistent positions when the Debtors have tried to acquire those funds. In the Buyer's February 25, 2019 letter, it claims to be withholding this payment "because [the Debtors] did not timely deliver the Initial Prorations Schedule prior to Closing."[6] The Buyer asserted a new basis for why it had failed to timely transfer the Rent Proration, now claiming in response that "[t]he $16.2 million in respect of February rent proration is not yet final and, among other things, does not include proration of amounts paid by the Buyer after the Closing."[7]

20. The Buyer's purported concerns regarding amounts it may have paid after Closing are baseless. The APA expressly provides for a two-part proration process: first, initial settlement on the eighth business day after the Closing Date based on proration items asserted prior to the Closing Date or within the first seven Business Days thereafter; and then, for a true-up to be made 75 days after the Closing Date to address any additional post-Closing payments or other post-Closing proration items.

---

[5] *See* E-mail correspondence between E&Y, M-III, and Sears from Feb. 19 to Feb. 20, 2019; a true and correct copy of which is attached to this Declaration as **Exhibit C**.

[6] *See* "Exhibit A" to the *Declaration of Katherine R. Lynch in Support of Transform Holdco LLC's Motion to Assign Matter to Mediation*, dated March 6, 2019 [ECF No. 2767] ("**Lynch Decl.**").

[7] *See* E-mail correspondence between Cleary Gottlieb, Weil, and Paul Weiss on Mar. 6, 2019; a true and correct copy of which is attached to this Declaration as **Exhibit D**.

### *The Total Amounts Owed to the Debtors*

21. The total amounts owed to the Debtors, approximately $57.5 million, are set out below:

| *Description* | *Amount (mm)* |
|---|---|
| Credit card proceeds from transactions that occurred prior to Closing | **$14.6** |
| Cash proceeds from transactions that occurred prior to Closing | **$18.5** |
| Cash in transit from Israeli bank accounts | **$4.5** |
| Credit card proceeds for GOB Store proceeds | **$3.7** |
| February Rent Proration payment | **$16.2** |
| **Amount Owed to the Debtors** | **$57.5** |

22. The Debtors have made repeated attempts to recover the Estate assets from the Buyer, most recently in a March 6, 2019 letter (the "**March 6 Letter**"),[8] which also addressed all the unrelated post-Closing issues raised by the Buyer in a letter to the Debtors on February 25, 2019. The March 6 Letter stated that the Debtors' immediate concern was to collect the Estate assets, but that the Debtors were willing to work through the Buyer's issues in good faith once those assets were received.[9]

Dated: March 11, 2019  
       New York, New York

By: /s/ Mohsin Y. Meghji  
    Mohsin Y. Meghji  
    Chief Restructuring Officer  
    Debtors and Debtors in Possession

---

[8] A copy of the March 6 Letter is attached to the Buyer's declaration in support of its Motion to Mediate.
[9] *See* Lynch Decl. at "Exhibit D."

**DECLARATION OF MOHSIN Y. MEGHJI – Page 9**