Parties

THIS LEASE made and entered into as of this  15th    day of October    , 1973  ,
between MALAN CONSTRUCTION COMPANY,

a  Michigan    corporation having its principal office at  17356 Northland Park
Court, Southfield, Michigan 48075,
(herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having
its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084 (herein referred to as
"Tenant"),

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth,
Landlord and Tenant do hereby covenant, promise and agree as follows:

Demised
Premises

1. Landlord does demise unto Tenant and Tenant does take from Landlord for the lease term the
following property: Tenant's completed building or buildings (designated K mart)
together with site improvements to be constructed as hereinafter specified by Landlord at its expense
together with land comprising not less than eight and four-tenths ( 8. 4 ) acres described in Exhibit "A"
attached hereto and made a part hereof, and situated in the   City    of Kansas City,
, County of Platte      , State of Missouri       ; said building or
buildings to be in the locations depicted on Exhibit "B" attached hereto and made a part hereof,
and of the following dimensions:

K-Mart Store Building:  401 feet  4    inches in width by  209  feet
9   inches in depth, total square area
84,180    square feet

In addition, Landlord shall provide a fenced garden shop area having
the dimensions of  51   feet  3   inches  x  102  feet  0   inches.

Said land, completed buildings and site improvements, together with all licenses, rights, privileges
and easements, appurtenant thereto shall be herein collectively referred to as the "demised premises".

Term

2. The term of this lease shall commence upon the "date of occupancy by Tenant", as that term
is defined in Article 11 hereof, and shall terminate upon such date as shall be twenty-five ( 25  )
years from the last day of the month in which said date of occupancy by Tenant shall occur; provided,
however, the term of this lease may be extended as provided in Article 13 hereof. The phrase "lease
term", as used in this lease, shall be the term of this lease and any extension thereof pursuant to said
Article 13.

Annual
Minimum
Rental

3. Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall designate
in writing from time to time, an annual minimum rental of TWO HUNDRED SIXTY THOU-
SAND TWO HUNDRED SEVENTY-FOUR and 00/100--------------DOLLARS
($260,274.00     ), unless abated or diminished as hereinafter provided, in equal monthly install-
ments on the first day of each month, in advance, commencing upon the first day of the lease term;
provided, however, in the event the first day of the lease term shall not be the first day of a calendar
month, then the rental for such month shall be prorated upon a daily basis.

Additional
Rental

4. In addition to the aforesaid annual minimum rental, with respect to any lease year during
the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of
NINE MILLION TWO HUNDRED THOUSAND and 00/100------------------
----------------DOLLARS ($9,200,000.00  ). Tenant shall pay to Landlord as additional
rental an amount equal to five-tenths of one percent (.5%) of gross sales for such lease year exceeding
NINE MILLION TWO HUNDRED THOUSAND and 00/100-------------------
-------------------------------------------DOLLARS ($9,200,000.00 ).

CT (SEMI-GROSS) 5/23/72

EXHIBIT B

Additional
Rental
(continued)

Said additional rental shall be paid on or before the forty-fifth (45th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall on or before the forty-fifth (45th) day following the end of each lease year or lesser period, deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be. In the event of any abatement of the annual minimum rental aforesaid, by reason of damage or destruction to the demised premises, the dollar amounts referred to in the preceding paragraph shall be reduced proportionately.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 12 shall have been fulfilled, or an opening for business under Article 11 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within six (6) months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of the demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of the demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on the demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a) Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b) Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

(c) Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d) Service and interest charges for time payment accounts and charge accounts;

(e) All sales of merchandise or services made by any food market which shall occupy any portion or portions of the demised premises; and

(f) All sales of automotive gasoline or diesel fuel.

(SEMI GROSS) 5/23/72

Additional
Rental
(continued)

Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within ninety (90) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said ninety (90) day period and the Tenant shall be released from any further liability under this lease.

Notwithstanding the foregoing, however, if LANDLORD shall have assigned to any mortgagee of the demised premises, the Lessor's interest in and to this Lease as additional collateral security for the performance of the mortgagor's obligations to said mortgagee, then, in such event, mortgagor, its successors or assigns, shall not have the right to exercise said option to cancel and terminate this Lease unless it shall have obtained the consent thereto of the mortgagee. Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 3, and the word "minimum" in said Article 3 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraph of this article shall be of no further force and effect; provided, however, in the event Tenant later resumes operation of said store, the additional rental provision contained in this Article will become reinstated and operative, the word "minimum" shall be reinstated in said Article 3 as originally set forth therein, and all of the covenants and provisions contained in the preceding paragraph of this Article shall again be in full force and effect.

Real
Estate
Taxes

5. Tenant shall pay and discharge all ad valorem real estate taxes, which shall be levied against the taxable premises during the lease term. Said taxes shall be prorated at the beginning and ending of the lease term so that the TENANT shall be required to bear said ad valorem tax expense only for the period covered by the term of the Lease. TENANT shall also pay all improvement taxes (special assessments) which shall be levied against the taxable premises during the lease term, excluding therefrom payment of assessments which are incurred or levied as a result of Landlord's activity in developing the demised premises for Tenant's occupancy.

If the taxable premises shall have been separately assessed and, in the event any such assessment shall be payable in a lump sum or on an installment basis, Tenant shall have the sole right to elect the basis of payment of such special assessments against the taxable premises. If Tenant shall elect to pay such assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the lease term. Any such installments due and payable in the years in which this lease commences and terminates shall be prorated proportionately. If, however, separate assessments shall not have been received for the taxable premises, and if LANDLORD shall not have elected to pay any such special assessments on an installment basis, TENANT shall pay its prorata share of all such total special assessments, and, upon termination of the term of this Lease by expiration or earlier termination, LANDLORD shall pay to TENANT such sum as is equal to such portion of such special assessment paid by TENANT to LANDLORD which TENANT would not have been required to pay if LANDLORD had elected to pay such assessment on the installment basis; provided, however, if TENANT shall elect to extend the term of this Lease, TENANT shall not, by reason of this provision, be entitled to any refund for the portion of such special assessment which would have been payable on the installment basis during such extended term.

Tenant shall not be chargeable with nor be obligated to pay any tax of any kind whatsoever which may be imposed on the Landlord, the rents payable hereunder or the demised premises except the ad valorem real estate taxes and assessments mentioned in the first paragraph of this Article 5.

-3-

**Real Estate Taxes (continued)**

The taxable premises, as defined below, shall be separately assessed if practicable from any contiguous lands and from any additional lands and improvements incorporated into the demised premises in the future.

In the event Tenant constructs, as provided in Article 16 hereof, additional buildings or structures on any portion of the land described in Exhibit "A", said additional buildings or structures shall be excluded from the taxable premises. Said additional buildings or other structures shall be separately assessed and all ad valorem taxes and assessments levied thereon shall be paid and discharged by Tenant and shall not be deductible from additional rentals as provided herein.

The Tenant shall have the right to participate in all negotiations of tax assessments. Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises. Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises, the Tenant will cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax and assessment liability against the taxable premises, the Tenant shall be entitled to receive all refunds paid by the taxing authorities. After payment of all of Landlord's and Tenant's expenses incurred in any such proceeding in which a refund is paid, the Tenant shall pay to the Landlord either the balance of such refund or, alternatively, Tenant shall pay to the Landlord that part of the excess tax payment which may have been deducted from additional rent in the tax year for which the refund was granted, whichever amount shall be the lesser. Any balance of said refund remaining after such payment to Landlord shall belong to the Tenant. If no refund shall be secured in any given proceeding, the party instituting the proceeding shall bear the entire cost. Tenant will, upon request, furnish Landlord or holder of any first mortgage written evidence of payment of taxes, assessments and other such charges.

The term "taxable premises", as used in this lease, shall be that certain land described in Exhibit "A" together with such buildings and other improvements required by Tenant to be constructed thereon by Landlord under the terms of this lease.

**New Building by Landlord**

6. Tenant's said buildings and site improvements shall be completed and delivered to Tenant promptly and with due diligence. If the performance by Landlord of any of its obligations hereunder is delayed by reason of the act or neglect of Tenant, act of God, strike, labor dispute, boycott, governmental restrictions, scarcity of material, fire or other casualty, riot, insurrection, war, catastrophe, or act of the public enemy, the period for the commencement or completion thereof shall be extended for a period equal to such delay, sometimes hereinafter referred to as "excusable delays". Landlord warrants that a general contract for construction of said buildings and improvements referred to in Articles 1 and 12 hereof shall be let, rough site grading shall completed and foundations and footings commenced not later than                . If for any reason whatever Landlord shall fail to comply fully with this warranty, Landlord shall so notify Tenant in writing and in such event, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease within sixty (60) days thereafter by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with working drawings and specifications prepared by Landlord as approved in writing by Tenant's Construction Department, and possession thereof tendered to Tenant prior to                then Tenant shall, within one hundred twenty days (120), have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically terminated without further act of either party hereto.

-4-

**Drawings and Specifications**

7. Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole cost and expense, in accordance with the working drawings and specifications prepared by Landlord which shall, with respect to standards of construction and division of responsibility for supplying materials and equipment, substantially satisfy the provisions of Tenant's typical store drawings and specifications, prior receipt of which Landlord hereby acknowledges and which are identified as Set No. 2062, containing such additions, changes and modifications as are more particularly set forth in certain letters dated May 15, 1973 and October 26, 1973, written by James A. Kilgore of Tenant's Construction Department to E. N. Maisel and Associates, 21675 Coolidge Highway, Oak Park, Michigan 48237, copies of which are attached hereto and marked Exhibits "C" and "C-1", respectively.

(a) Said working drawings are subject to the following exceptions and such other deviations as may be approved in writing by Tenant's Construction Department.

(b) Changes of type and standards of construction and of arrangement to the extent as shall be required by applicable laws, codes or ordinances.

Said working drawings and specifications shall be submitted to Tenant for approval prior to commencement of construction and such approval shall not be unreasonably withheld. Within sixty (60) days after receipt of such working drawings and specifications, Tenant shall in writing, inform Landlord of required revisions or corrections thereto which are necessary to conform said working drawings and specifications to the Tenant's typical store drawings and specifications hereinbefore referred to, and Landlord shall make such revisions or corrections and resubmit them for Tenant's final approval. In the event Tenant shall not inform Landlord of such desired revisions or corrections within said sixty (60) days, said working drawings and specifications shall be deemed approved and accepted for the purposes hereof.

Said typical drawings and specifications, and working drawings and specifications as approved by Tenant shall constitute a part of this lease.

**Guarantee of Materials**

8. Landlord shall unconditionally guarantee all work performed by or for Landlord in the construction of Tenant's buildings and site improvements against defective workmanship and materials for the period of one (1) year from the commencement of the lease term. Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it may receive covering guaranties beyond one (1) year.

**Advance Possession for Fixturing**

9. For a period of thirty (30) days prior to completion of Tenant's buildings by Landlord, as set forth in Article 11(b), Tenant shall have the privilege, rent free, of entering said buildings for the purposes of installing storage bins, storing merchandise, and other of Tenant's construction activities in conjunction with Landlord's preparation for Tenant's acceptance of said buildings, which shall not create unreasonable interference with the work of the Landlord. Such entry shall not be construed as an acceptance of the demised premises by the Tenant under the provisions of this lease or as a waiver of any of the provisions hereof.

**Parking and Other Common Areas**

10. Prior to commencement of the lease term, Landlord shall construct, in accordance with said working drawings and specifications approved by Tenant, on the premises described in Exhibit "A", all of the sidewalks, service drives, parking areas, driveways, streets, curbs, directional signs (not Tenant's pylon) and related improvements, substantially as shown on said working drawings and specifications (all of which improvements, together with all such improvements now or hereafter constructed on the premises described in Exhibit "B-1", shall hereinafter, along with the land thereon constructed, be referred to as the "common areas"). The demised premises are located within the premises described in Exhibit "B-1" (which said premises described in Exhibit "B-1" are sometimes herein referred to as "shopping center"), and LANDLORD shall have the right to lease, alter and maintain said shopping center, exclusive of said demised premises, (said shopping center, exclusive of said demised premises, being sometimes hereinafter referred to as "adjoining premises") and to grant occupants of the adjoining premises the right to temporarily from time to time use limited portions of the adjoining premises for special promotional events, including truck and trailer sales, provided that said

-5-

**Parking and Other Common Areas (continued)** use of said common areas does not interfere with the operations of the shopping center or of the other lessees and occupants thereof.

Landlord shall also construct or cause to be constructed upon certain property or rights-of-way contiguous to the premises described in Exhibit "A", all sidewalks, driveways, streets, curbs, acceleration, deceleration and stacking lanes, traffic controls, and signals, directional signs and related improvements in accordance with said working drawings and specifications and the requirements of any governmental bodies, provided, however, until completion of the improvements on the adjoining premises, LANDLORD shall be required to complete only such items on the adjoining premises as are necessary to provide adequate ingress and egress to the demised premises as contemplated by said working drawings and specifications approved by TENANT.

All common areas, sidewalks, service drives, parking areas, driveways, streets, accessways for ingress and egress and related improvements on the demised premises and on the adjoining premises shall be used by TENANT in common with the present and future occupants and lessees of the entire shopping center, and their customers, guests, agents, invitees and employees. In addition thereto, the occupants and lessees of the areas designated on Exhibit "B" as Outlot(s) 1 and 2 shall also have common use of such service drives, driveways, streets and accessways. Notwithstanding anything herein contained to the contrary, however, if the areas designated on Exhibit "B" as Future Construction Area No. 1 shall hereafter be improved by the construction of any building or buildings thereon, simultaneously with the construction of any such improvements, additional parking shall be improved, if necessary, so that the ratio of building space to parking shall not be less than five (5) parking spaces for each one thousand (1,000) square feet of usable building space.

Landlord covenants and represents that at the commencement of the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways, as shown on said working drawings and specifications.

Landlord further covenants that the aggregate area provided for the parking of automobiles shall during the lease term be sufficient to accommodate not less than Four Hundred Forty-Five ( 445 ) automobiles on basis of arrangement depicted on Tenant's plot plan, which is Exhibit "B", attached hereto. Subject to the rights of termination under Article 21 hereof, any reduction of such parking area below said amount which shall have resulted from expropriation or taking thereof by eminent domain, condemnation, or by public or quasi-public authority, shall not be deemed a violation of this Article 10; nor shall any loss of parking area be deemed a violation if it shall have resulted from any alterations, additions or changes made to the demised premises by TENANT pursuant to the rights granted TENANT under Article 16, regardless of whether or not any such lost parking spaces are covered by additional buildings or structures or are used for walkways, service drives, accessways, roadways, loading areas or any other purposes.

-6-

arking and
:ner Com-
on Areas
Cont'd.)

At least sixty (60) days prior to the commencement of the lease term, Landlord shall provide paved driveways running from the adjoining public streets around the front, sides and rear of Tenant's buildings in order to secure convenient ingress and egress from said public streets to the front and rear entrances of Tenant's buildings for the purpose of receiving and delivering fixtures, merchandise and other property. Such driveways shall be of sufficient width to permit the passage, unloading, and if necessary, the turning around of trailer trucks and other commercial vehicles.

During the lease term, Landlord shall keep Tenant insured against all statutory and common law liabilities for damages on account of damage to property or injuries and loss of life sustained by any person or persons within said common areas, in a policy or policies in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) with respect to injury to any one person and in the amount of One Million Dollars ($1,000,000.00) with respect to any one accident or disaster, and in the amount of One Hundred Thousand Dollars ($100,000.00) with respect to damage to property; and Landlord shall also indemnify and save Tenant harmless against any such liability. Any such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now or at any future time located beyond the limits of the land described in Exhibit "A" utilize the demised premises for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall at its sole expense, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Should Tenant, at any time, utilize portions of the common areas for outdoor shows, entertainment or such other uses which in Tenant's judgment tend to attract the public, Tenant shall give Landlord notification of such intended use, a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against damage to property, injuries to persons and loss of life sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

Store
Opening

11. The term "date of occupancy by Tenant", as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty (60) days (plus a period of time not to exceed ninety (90) additional days, equal to any delays due to excusable delays beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working drawing and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 12 shall be fulfilled: except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 11, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working drawings and specifications within ninety (90) days after Tenant opens for business, subject to excusable delays, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct, or remedy in all or part any such deficiency, and the cost therof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.

Landlord's
Represent-
ations and
Warranties

12. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common areas in accordance with the provisions of Article 10 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B".

Notwithstanding the foregoing, however, LANDLORD shall have the right at LANDLORD'S option, to construct building improvements containing up to 30,000 square feet upon the area designated on Exhibit "B" as Future Construction Area No. 1, ~~building improvements containing up to _____ square feet upon the area designated on Exhibit "B" as Future Construction Area No. 2, and building improvements containing up to _____ square feet upon the area designated on Exhibit "B" as Future Construction Area No. 3~~, and nothing contained in this Lease shall limit

-7-

**Landlord's Represent-ations and Warranties (Cont'd.)**

or restrict any future·building(s), improvements or construction on the areas designated on Exhibit "B" as Outlot(s) ___1 and 2___ .

Landlord further represents, warrants and covenants that the land described in Exhibit "A" will, at the time of the commencement of construction by Landlord and at the time of the commencement of the lease term, be properly zoned for Tenant's intended use, and that all necessary governmental consents, permits and approvals for such use shall have been obtained. Further, Landlord shall deliver to Tenant a Certificate of Occupancy prior to commencement of the lease term.

The lease term shall not commence and said annual minimum rental and other charges payable under this lease shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided, further, in lieu thereof, Tenant shall pay monthly in arrears one percent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental set forth in Articles 3 and 4 hereof, and the lease term as provided in Article 2 hereof shall be-gin at that time.

If the term of this Lease commenced on the date provided for in the preceding sentence, then the term of this Lease shall terminate upon such date as shall be twenty-five (25) years from the last day of the month in which such lease term commences.

In the event Landlord's said representations and warranties shall not be fulfilled within ninety (90) days after commencement of the lease term, Tenant thereafter shall have the option of either completing said representations and warranties at Landlord's cost and expense, or, alternatively, Tenant shall have an option to terminate this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Options to Extend Lease**

13. (a) Tenant shall have ten (10) successive options to extend the term of this lease for an additional period of five (5) years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and the same terms and conditions as herein set forth shall apply to each such extended term. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less·than six (6) months prior to the expiration of the term of this lease or of this lease as extended.

(b) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than six (6) months prior to the expiration of the term of this lease or any extension thereof. Tenant's rental during this option period shall be the same rental payable under the terms of this lease at the time Tenant notifies Landlord of its intention to exercise this option.

**First Refusal to Purchase Option**

14. Anything in this lease contained to the contrary notwithstanding, and without in any manner affecting or limiting any of the rights, privileges, options or estates granted to Tenant under this lease, it is agreed that if the Landlord at any time during the term of this lease (excepting the first lease year) receives one or more bona fide offers from third parties to purchase the demised premises or property of which the demised premises are a part, and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration contained in the bona fide offer for the price and under the terms and conditions of such offer. If Tenant does not elect to purchase said property and Landlord thereafter sells the property, the purchaser shall take the property, subject to and burdened with all the terms, provisions and conditions of this lease, including this Article 14 and the rights of the Tenant under this lease as against the new owner shall not be lessened or diminished by reason of the change of ownership. Tenant's failure at any time to exercise its option under this Article 14 shall not affect this lease or the con-tinuance of Tenant's rights and options under this Article 14 or any other article.

-8-

First
Refusal to
Purchase
Option
(continued)

In the event Tenant elects to purchase the property as provided in this lease, then Landlord shall, within thirty (30) days after receipt of such notice of election by Tenant, deliver to Tenant a title insurance policy in the amount of the consideration set forth in such offer, issued by a responsible title guarantee company, showing a good and marketable title in Landlord. If Landlord fails or refuses to furnish the title policy, then Tenant may, at its election, procure the same at Landlord's expense, and in the amount of the purchase price, and deduct the cost thereof from the cash consideration to be paid for the property. Tenant shall have thirty (30) days after receipt of the title policy in which to examine the title and notify the Landlord whether or not the title is acceptable to Tenant. If Tenant is willing to accept Landlord's title and consummate the purchase, then Landlord shall, within ten (10) days after written notice thereof from Tenant, convey the premises to Tenant by full warranty deed, free and clear of all liens and encumbrances except highway easements, private road easements and restrictions of record which were of record as of the date of Tenant's acceptance of the premises hereunder or incorporated in an amendment to this lease, if any, and deliver such deed to Tenant upon tender of the consideration.

Notwithstanding any other provisions of this lease, the provisions of this Article 14 will not apply to any sale of the demised premises or any property of which the demised premises are a part at foreclosure, and shall not be binding upon any purchaser at foreclosure, any mortgagee in possession, or any holder of a deed in lieu of foreclosure or the successors or assigns of any of the foregoing, or to any sale of the demised premises by Landlord in connection with sale and leaseback financing.

If Tenant is not willing to accept Landlord's title, Tenant shall make any objections thereto in writing to Landlord and Landlord shall be allowed one hundred twenty (120) days to utilize its best efforts to make such title acceptable to Tenant. If such title is not rendered marketable within one hundred twenty (120) days from the date of said written objections thereto, Tenant may, at its election, take such action, including instigation of legal process (in which the Landlord agrees to participate) to remedy any such defect in title making such acceptable to Tenant, and to deduct all costs thereof from the cash consideration to be paid for the property. If the Tenant is unable to correct such defects in title or elects not to attempt such remedy, neither party shall be held liable for damages to the other party and both parties shall be released of all liabilities and obligations under this Article 14.

Repairs
and
Main-
tenance

15. Tenant shall make and pay for all maintenance, replacement and repair necessary to keep the demised premises in a good state of repair and tenantable condition, except for the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility:

(a) all maintenance, replacement and repair to the roof, outer walls and structural portion of the buildings which shall be necessary to maintain the buildings in a safe, dry and tenantable condition and in good order and repair; and

(b) all repairs, maintenance or replacement of or to the demised premises, including but not limited to, underground utility installations and underground electrical conduit and wire, which are occasioned by settlement of the premises or a portion thereof, or caused by soil conditions; and

(c) all repairs and replacement (exclusive of sweeping, striping, snow and ice removal, maintenance of landscaping on demised premises, and Tenant's pro-rata share of landscape maintenance of retention pond, if any) necessary to maintain all driveways, sidewalks, street and parking areas free of all settling, clear of standing water, and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks.

In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed Two Thousand Dollars ($2,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

LANDLORD shall pay for the installation of all fire alarm systems and during the lease term TENANT will use, service and maintain the fire alarm system and will pay all maintenance and monthly service and use charges in connection therewith. At such time as the ordinance requiring such a system or the insurance requirement necessitating this arrangement is no longer operative then, in such event, this obligation will cease.

Alterations
and
Additional
Construction

16. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to drawings and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural integrity of the buildings will not be impaired by such work. The term "structural changes", as used herein, shall not include moving of non-loadbearing partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant.

No new construction, alteration, addition or change, structural or otherwise, shall be undertaken until TENANT shall have procured and paid for, so far as the same may be required from time to time, all permits and authorizations of all municipal departments and governmental subdivisions having jurisdiction. Any construction involving an estimated cost of more than THREE HUNDRED THOUSAND DOLLARS ($300,000.00) shall be conducted under the supervision of an architect and/or engineer selected by TENANT, and no such new construction, alteration, addition or change shall be made except in accordance with detailed plans and specifications and cost estimates prepared and approved in writing by such architect and/or engineer and by LANDLORD (the approval of LANDLORD not to be unreasonably withheld). Any change or alteration shall, when completed, be of such a character as to not reduce the value of the demised premises below its value immediately before such change or alteration. Any change or alteration shall be made promptly (excusable delays excepted) and in a good workmanlike manner and in compliance with all applicable plans and specifications. The cost of any new construction, alteration, addition or change shall be paid in cash or its equivalent, so that the demised premises shall at all times be free of liens for labor and materials supplied or claimed to have been supplied to the demised premises, and any such change or alteration involving an estimated cost of more than THREE HUNDRED THOUSAND DOLLARS ($300,000.00) shall not be commenced if the net worth of TENANT is less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00), unless TENANT provides LANDLORD with security reasonably satisfactory to LANDLORD covering the cost of any such change, alteration or addition.

Utilities

17. Landlord covenants and agrees that the demised premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements as of the commencement of the lease term. Tenant shall pay all charges for utility services furnished to the demised premises during the lease term.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition at its sole expense.

Governmental
Regulations

18. Tenant shall observe and comply with all requirements of rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said demised premises including the making of non-structural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes, including but not limited to, the erection of a fire escape or exit, or (b) require non-structural changes which would have been required irrespective of the nature of the tenancy, then in either such event, the same shall be complied with by Landlord at its sole expense.

Exculpation

.19. Anything to the contrary in this lease notwithstanding the covenants contained in this lease to be performed by Landlord shall not be binding personally, but instead said covenants are made for the purpose of binding only the fee simple or leasehold estate which Landlord owns in the demised premises; provided, however, the obligations imposed by Article 8 of this lease shall be personally binding upon Landlord.

-10-

Damage to
Demised
Premises

20. From and after the date on which Tenant shall be privileged to enter upon the demised premises for the purposes specified in Article 9 hereof, Landlord shall insure the buildings depicted on Exhibit "B", including Tenant's buildings, against damage or destruction by fire and other casualties insurable under a standard extended coverage endorsement, and, in addition, shall secure extended coverage to reimburse TENANT for rental payments made during such time as part or all of the premises are untenantable. Said insurance shall be in an amount equal to full replacement value of the permanent improvements thereof; said replacement value to be determined every three (3) years by appropriate insurance underwriters. All such policies shall bear endorsements to the effect that TENANT shall be notified not less than thirty (30) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from TENANT. Copies of such insurance policies or certificates evidencing the existence thereof, so endorsed, shall be promptly delivered to TENANT.

If TENANT is so notified of modification or cancellation of the insurance policies required herein, TENANT shall pay the applicable premiums on the policies.

The policies procured pursuant to this Article shall assure and be payable to LANDLORD, TENANT and mortgagee and shall provide that proceeds payable to TENANT shall be used for restoration of the demised premises. TENANT may deduct from rentals subsequently accruing hereunder the required insurance premiums paid by TENANT providing that such diminution or abatement in rental payments would not cause a default by the mortgagor with respect to any first mortgage subordinated to such rental payments.

Irrespective of the cause thereof, TENANT shall not at any time be liable for any loss or damage to said buildings resulting from fire, explosion or other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire or any other casualty insurable under a standard fire and extended coverage endorsement Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Twenty-five Thousand Dollars ($25,000.00), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 13 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and upon the exercise of any such option (other than the option set forth in paragraph (b) of Article 13) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the said permanent improvements as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction by fire, the elements or any other casualty whatsoever, and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole provided that the abatement or diminution in rental would not cause a default by the mortgagor with respect to any first mortgage subordinated to such rental payment. The term "date of reoccupancy by Tenant", as used herein, shall be the first to

-11-

Damage to
Demised
Premises
(continued)

occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's buildings rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

In the event that, at any time during the lease term except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; or Landlord may, at its option, elect to raze any buildings so damaged or destroyed and pave the area formerly occupied by said buildings so as to provide additional parking facilities, said areas to be paved, marked, lighted, drained and maintained in the same manner as required in Articles 10 and 15 hereof for other parking areas in the demised premises.

Each party hereto has hereby remised, released and discharged the other party hereto and any officer, agent, employee or representative of such party of and from any liability whatsoever hereafter arising from loss, damage or injury caused by fire or other casualty for which insurance (permitting waiver of liability and containing a waiver of subrogation) is carried by the party at the time of such loss, damage or injury to the extent of any recovery by the injured party under such insurance.

Eminent
Domain

21. In the event all of Tenant's buildings constructed by Landlord shall be expropriated, taken by condemnation or taken by any public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived thereof.

In the event that less than the whole but more than ten percent (10%) of Tenant's buildings constructed by Landlord shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

In the event of an expropriation of any portion of Tenant's buildings, constructed by Landlord, and if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and the dollar amounts set forth in the first paragraph of Article 4 shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that any of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Landlord shall make every effort to substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". If Landlord shall be unable to substitute such lands and if one or more expropriations shall in total deprive Tenant of the use of more than ten percent (10%) of the land described in Exhibit "A", in such event, the Tenant shall have the option to terminate this lease at any time within twelve (12) months after such deprivation becomes effective by giving notice to Landlord.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign, subject to rights of any mortgagee of the demised premises, to Tenant that portion of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerato

**Eminent
Domain
(continued)**

of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

In the event of cancellation of the Lease caused by eminent domain proceedings, the award or proceeds shall be payable to the mortgagee up to the then unpaid balance of the mortgage loan.  If the condemnation award is not adequate to extinguish the mortgage loan, TENANT will pay to the mortgagee the balance of the money owing and due the mortgagee. TENANT shall be an active participant in any eminent domain proceedings due to the possibility of such a financial outlay.

Tenant shall not be entitled to share in any award made by reason of expropriation of Landlord buildings on the demised premises, or any part thereof, by public or quasi-public authority, except as set forth in the preceding paragraph relative to unamortized expenditures by Tenant and then only if the award for such unamortized expenditures shall be made by the expropriating authority in addition to the award for the land, buildings and other improvements (or portions thereof) comprising the demised premises; however, the Tenant's right to receive compensation for damages or to share in any award shall not be affected in any manner hereby if said compensation, damages, or award is made by reason of the expropriation of the land or buildings or improvements constructed or made by Tenant.

**Use,
Assignment
and
Subletting**

22. The premises hereby demised may be used for any lawful purpose. Tenant may assign this lease or sublet the whole or any part of the demised premises, but if it does so, it shall remain liable and responsible under this lease.

TENANT shall also have the right to temporarily, from time to time use the sidewalks and common areas on the demised premises for special promotional events, including truck and trailer sales, provided that such temporary use of said sidewalk and said common area does not unreasonably interfere with the operations of the shopping center or of the other tenants and occupants thereof.

**Signs**

23. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the demised premises signs of such height and other dimensions as Tenant shall determine, bearing such legend or inscription as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect;  provided, however, said right to use said lighting standards shall be limited to the aforesaid area designated for its special promotional events.

Landlord shall not permit any other signs, billboards or posters to be displayed on any portion of the demised premises;  provided, however, nothing herein contained shall be deemed to limit or restrict LANDLORD'S right to (a) construct and maintain signs on the areas designated on Exhibit "B" as Future Construction Area No(s). 1 _____

and Outlot(s)   1 and 2 _____ , provided such signs

-13-

.shall be used solely for the purpose of promoting or advertising the business or activities being conducted on each such respective parcel; (b) construct, maintain or replace any place in the demised premises are located, of (i) the usual "For Sale" or "For Lease" signs, (ii) signs of contractors, subcontractors, mortgage companies or mortgage agents, during the course of construction, who shall supply services or materials in connection with such construction, (iii) any and all signs and notices required by any governmental agency or authority or by any insurer of said premises, including, but not limited to, signs designating construction areas, danger areas, walkways and hard hat areas, and (iv) such traffic control signs and other informational signs and notices as LANDLORD may deem appropriate in connection with the safe and reasonable operation of the shopping center. It is further agreed that TENANT will permit one lessee of Future Construction Area No. __1__ to erect and maintain a sign on TENANT'S pylon, subject, however, to the following conditions: (a) such sign shall be placed below TENANT'S sign; (b) the character and appearance of such sign shall be subject to approval of TENANT'S Design Department; (c) the nature of the business designated by said sign shall be of a type normally found in a first-class shopping center; and (d) TENANT shall be paid such lessee's pro rata share of the pylon construction and maintenance costs, which such share shall be computed by multiplying the pylon costs and expenses by a fraction of which the numerator is the square inch area of such lessee's sign attached to the pylon, and the denominator is the total square inch area of all signs attached to the pylon. In addition to the foregoing, both TENANT and any such lessee shall each separately pay the separate costs and expenses of maintaining and operating their respective signs on the pylon.

**Ingress and Egress**

24. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide ingress and egress facilities to the adjoining public streets and highways in the number and substantiall in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**

25. If Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of such default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter the demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies. Landlord shall not have the right to exercise the above-mentioned remedies without the consent of the mortgagee, if any.

**Bankruptcy**

26. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all of the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant.**
**of Title**

27. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple or has a good and marketable leasehold title to the land described in Exhibit "A", free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof), except as follows:

(a) Public utility easements not impairing Tenant's use of the demised premises.

(b) All lessees and occupants of any portion of the shopping center and their employees, agents, customers, licensees, invitees, suppliers and concessionaires shall have the non-exclusive right to use the common areas in common with TENANT, its employees, agents, customers, licensees, invitees, suppliers and concessionaires, for parking of vehicles and for ingress and egress to and from the public roadways.

(c) From time to time LANDLORD shall have the right to install, maintain, use, repair and replace pipes, conduits and wires beneath the demised premises so long as such activities will not materially interfere with TENANT'S use thereof. Any damage to the demised premises or to the buildings and improvements located on the demised premises which may be caused by such activity of LANDLORD shall be replaced, repaired and reconstructed by LANDLORD at LANDLORD'S cost and expense.

(d) See Rider attached hereto.

LANDLORD covenants, represents and warrants that it will obtain two title insurance policies in a company acceptable to the TENANT and the Mortgagee, insuring the title to the demised premises as is represented in accordance with the terms and conditions set forth in Article 27. The two policies shall be written, each in an amount equal to the original amount of the mortgage, one for the benefit of the mortgagee and the other for the benefit of the TENANT. In the event of any failure of title which interferes with TENANT'S quiet enjoyment of the premises, TENANT shall be permitted to exercise all rights under both policies referred to herein, under the express condition that all proceeds collected shall first be applied toward the retirement of the first mortgage encumbering the property, without penalty for prepayment. Thereupon, after the first mortgage is retired, TENANT shall have all remedies available to it pursuant to the terms of this Lease and Article 30 of this Lease shall be cancelled and of no further force or effect.

Landlord shall, without expense to Tenant and within thirty (30) days after written request by Tenant, furnish (a) a certification by an attorney or a certification from a reputable

-15-

title company acⅽptable to Tenant that Landlord's title is herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A", (b) a survey by a licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event Landlord's estate is derived from a leasehold interest in a ground lease, Landlord shall, prior to the commencement of construction of the improvements required hereunder, deliver to Tenant an agreement executed by the fee owner of the demised premises wherein the fee owner recognizes this lease and Tenant's rights hereunder and agrees that, notwithstanding any default by the Landlord and subsequent termination of said ground lease, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such fee owner unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

<u>Mortgage
Subor-
dination</u>    28. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

In the event the mortgagee notifies TENANT of the pertinent facts of such loan at the place and in the manner provided in Paragraph 33 hereof, TENANT and LANDLORD agree, for the express benefit of the mortgagee, that (a) if requested by mortgagee, TENANT will make all payments to become due hereunder direct to mortgagee or to such third party as the mortgagee and LANDLORD may mutually designate in writing; (b) LANDLORD and/or TENANT will cause the mortgagee to be named as an insured as its interests may appear under all policies of insurance required thereunder; (c) TENANT will mail to the mortgagee copies of all formal notices sent to LANDLORD respecting this Lease or its tenancy hereunder; and (d) this Lease, without any further instrument, shall at all times, be subject and subordinate to such encumbrances (as provided above) and to all advances made or that may be made upon the security thereof and to all renewals, modifications, replacements and extensions thereof, upon express condition that if the holder of such encumbrance becomes the owner of the fee or of the demised premises or if the demised premises shall be sold as a result of any action or proceeding for foreclosure of such encumbrance, this Lease shall continue in full force and effect (provided, however, that if it shall have been previously modified to provide for increased annual payments, such increased payments shall also so continue in full force and effect) as a direct new lease and relationship of LANDLORD and TENANT between TENANT and the then owner of such fee or the purchaser of the demised premises, as the case may be, upon all of the obligations of this Lease and as if this Lease had been entered into between TENANT and such owner or purchaser, as the case may be, as of the date of this Lease and upon the terms and conditions provided herein, and upon such conditions TENANT hereby agrees to such new lease and relationship, and that TENANT will not assert as prior in right to, or on a parity with such encumbrance (initial long term first mortgage), any legal relationship created or claimed to be created in and by this Lease. Notwithstanding the foregoing, however, in the event of a mortgage foreclosure or conveyance in lieu of foreclosure, and provided that this Lease, immediately prior to such mortgage foreclosure or conveyance in lieu of foreclosure shall have been in full force and effect and TENANT shall not then be in default thereunder beyond any grace period therein provided for curing the same, then in any of such events, TENANT shall not be made a party in any action or proceeding to remove or evict TENANT or to disturb its possession, nor shall the leasehold estate of TENANT created by this Lease be affected in any

way, and this L_se shall continue in full force _l effect as a direct lease between TENANT and mortgagee.

**rtgage, Sub-**
**-dination**
**Cont'd.)**

       TENANT agrees that, should such owner or purchaser elect, this Lease shall be amended to become a one hundred per cent (100%) net lease with an annual rental for each year of the remainder of the initial lease term, and during any renewals, equal to the amount of said initial annual payments under such encumbrances (initial long term first mortgage). After the initial encumbrance term, TENANT shall have a right to deduct on a cumulative basis from monthly rental all such sums owing to TENANT from LANDLORD under this Lease, excepting therefrom, seventy-five per cent (75%) of the amount of the monthly payment which had been required under the initial mortgage, subject only to deduction as provided in Article 30 hereof.

       LANDLORD and TENANT agree that, in consideration of the mortgagee having made such a loan, that until such loan has been paid in full, this Lease may not be altered, amended or modified and no condition may be waived without the written consent of the mortgagee.

       Attached hereto as Exhibit "D" is a certified excerpt from the by-laws of TENANT duly authorizing any Vice-President of TENANT to execute leases on behalf of TENANT and pursuant to which this Lease has been executed.

**Tenant**
**Indemnifies**
**Landlord**

29. During the lease term Tenant shall indemnify and save Landlord and Landlord's ground lessor, if any, harmless against all penalties, claims, or demands of whatsoever nature arising from Tenant's use of the Tenant's buildings except those which shall result, in whole or in part, directly or indirectly, from the default or negligence of Landlord or Landlord's ground lessor, if any.

**Tenant's**
**Right to**
**Cure**
**Landlord's**
**Defaults**

30. In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of seven per-cent (7%) per annum or the then current prime rate, whichever is the higher, and Tenant may to the extent necessary withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

       In the event LANDLORD shall fail to perform any obligation under Articles 10, 15, 17, 18, 20, 21, 23, 24 or 27 of this Lease, TENANT shall not have the right to cancel this Lease but may, on be-half of and at the expense of LANDLORD do all necessary work and make all necessary payments in connection therewith and deduct the amount of the same from monthly rental payments; provided that (a) in no event shall TENANT'S remedies give TENANT the right to deduct offsets from any monthly rental payments due which would reduce the rental payment to less than SEVENTEEN THOUSAND FOUR HUNDRED NINETY-NINE DOLLARS     ($17,499.00   ), the sum which is required to service the debt evidenced by the promissory note secured by the First Mort-gage or Deed of Trust encumbering the property; (b) TENANT'S right to deduct shall be cumulative and any amount which it cannot deduct in one (1) month because of the foregoing limitation may be deducted in the succeeding month or months; and (c) when the initial note and first mortgage have been paid in full, TENANT'S right to off-sets from rental payments due shall apply to all rental provided in Ar-ficles 3 and 4 hereof.

-17-

enant's
:gnt to
ure Land-
:rd's De-
:ults
(Cont'd.)

> In no event shall TENANT'S remedies give TENANT the right to cancel this Lease until the unpaid balance of the debt evidenced by the first mortgage shall have been paid in full.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall provide such holder with a duplicate copy of any notice sent to Landlord covering a default hereunder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

Condition
of Premises
at Termi-
nation

31. At the expiration or earlier termination of the lease term Tenant shall surrender the demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty. All furniture and trade fixtures installed in said buildings at the expense of Tenant or such other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at the expiration of the lease term or earlier termination of the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option the property specified in said notice shall be the property of Landlord.

> Any items not removed by TENANT on or before the date of expiration or earlier termination of the lease term shall be deemed to have been relinquished by TENANT and shall then become the property of LANDLORD.

Holding
Over

32. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of the demised premises after the expiration of the lease term, it shall so remain as a tenant, from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

Notices

33. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid and to such other address as Landlord shall designate, or to Tenant at its principal office in Troy, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be the date on which such notice is deposited in a post office of the United States Postal Service.

Captions
and
Definitions

34. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provision thereof. The necessary grammatical changes which shall be required to make the provision of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

Successors
and
Assigns

35. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memor-
andum of
Lease**

36. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate as of the day and year first above written.

WITNESSES:

MALAN CONSTRUCTION COMPANY,
a Michigan Corporation,

By: _____ President

Attest: _____ Secretary

S. S. KRESGE COMPANY

By: _____
    J. P. Johnson,    Vice President

Attest: _____
    Assistant Secretary

-19-

ACKNOWLEDGMENTS

STATE OF           }ss:
COUNTY OF

     I do hereby certify that on this       day of         , 19     , before me,
, a Notary Public in and for the
County and State aforesaid, residing therein and duly commissioned, personally appeared
                                      and
known to me to be the President and Secretary of MALAN CONSTRUCTION COMPANY,
a Michigan Corporation,
who, being by me duly sworn, did depose and say that they reside in

respectively; that they are the President and Secretary respectively of MALAN CONSTRUC-
TION COMPANY,
the corporation described in and which executed the foregoing instrument; that they know the seal of
said corporation; that the seal affixed to said instrument is the corporate seal of said corporation;
that, on behalf of said corporation and by order of its board of directors, they signed, sealed and de-
livered said instrument for the uses and purposes therein set forth, as its and their free and voluntary
act; and that they signed their names thereto by like order.

     In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year
in this certificate first above written.

My commission expires:_____      _____
                                                     Notary Public



STATE OF MICHIGAN }ss:
COUNTY OF OAKLAND

     I do hereby certify that on this       day of         , 19     , before me,
, a Notary Public in and for the
County and State aforesaid, residing therein and duly commissioned, personally appeared
J. P. Johnson                       and
known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by
me duly sworn, did depose and say that they reside in Grosse Pointe Woods, Michigan,
and in
respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge
Company, the corporation described in and which executed the foregoing instrument; that they know
the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corpora-
tion; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and
delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary
act; and that they signed their names thereto by like order.

     In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year
in this certificate first above written.

My commission expires:_____      _____
                                                     Notary Public

RIDER ATTACHED TO LEASE DATED OCTOBER
15, 1973, BY AND BETWEEN MALAN CONSTRUC-
TION COMPANY, AS LANDLORD, and S. S.
KRESGE COMPANY, AS TENANT

ovenant of
itle
Article 27
(Cont'd.)

(d)          Easement granted the KANSAS CITY POWER &
LIGHT COMPANY, filed FEBRUARY 2, 1945, recorded in
Book 141, Page 379, affecting a six-foot strip of land.

(e)          Lease dated SEPTEMBER 19, 1973, between ALLEN
B. KIPPER, RAYMOND E. GROVE and AUDREY F. GROVE,
as Landlord, and E. N. MAISEL and ASSOCIATES, as De-
veloper, as amended by First Amendment thereto between
ALLEN B. KIPPER, RAYMOND E. GROVE and AUDREY F.
GROVE, as Landlord, and MALAN CONSTRUCTION COM-
PANY, as Developer.

(f)          Terms and conditions of Agreement filed JULY 10,
1944, recorded in Book 141, Page 147, involving the right
and privilege to go upon, around, cross over, enjoy and
otherwise use lake which is located in part on premises here-
in and in part on premises lying Southerly thereof; this right
and privilege to inure to the benefit of the present and any
future owners whose land shall actually abut on the water or
shore line of said lake.    The cost of repairing and maintain-
ing said dam (after its present completion by Allen G. Eckert
and Mary Jane Eckert) or lake to be borne equally by all of
the respective owners of any land adjoining and fronting on
said lake.    Agreement to remain in force and effect for a
period of thirty (30) years from MAY 26, 1944.

(g)          Absence of access to U. S. Highway 71 as conveyed
through instrument filed MAY 22, 1952, recorded in Book
174, Page 289.

(h)          Rights of the public in and to the property located
within the boundaries of Linden Road as shown on Plat Survey
by Campbell, Barber, Lambeth & Associates, P.A., dated
SEPTEMBER 21, 1973, Job Number 925-73.

EXHIBIT "D"

I hereby certify that the following is a true copy of those portions of the By-Laws of S. S. KRESGE COMPANY, a Corporation organized and doing business under and by virtue of the laws of the State of Michigan, relating to the execution by the Company of contracts and other instruments and defining the powers and authority of the officers to execute such instruments on behalf of the Company.

## ARTICLE III

### OFFICERS

Section 4. The President. The President shall have authority to execute on behalf of the Company, any and all contracts, agreements, deeds and mortgages, leases and other instruments of conveyance, and may draw against the funds of the Company in any bank by check, draft, or otherwise, and sign and endorse any and all promissory notes, checks, or other obligations of the Company. Either the President or a Vice President, with the Treasurer or an Assistant Treasurer, or with the Secretary or an Assistant Secretary shall sign all certificates of stock of the Company.

Section 5. The Vice Presidents. In the absence or incapacity of the President, one of the Vice Presidents in such succession or order as shall be determined by the Board of Directors shall perform the duties of that officer. The Vice President shall also perform such other duties and be vested with such other powers as the Board of Directors may from time to time prescribe. Any Vice President shall have authority to draw against the funds of the Company in any bank by check, draft or otherwise, and to sign and endorse any and all promissory notes, checks or other obligations of the Company, and shall have authority to execute on behalf of the Company, any and all contracts, agreements, deeds, mortgages, leases or other instruments of conveyance.

Section 7. The Secretary. ** He shall have the custody of the seal of the Company, and shall attach the same to instruments required to be executed under the seal of the Company.

Section 8. Assistants. The Assistant Secretary or Assistant Secretaries and Assistant Treasurer or Assistant Treasurers shall perform such duties as shall be assigned to them by the Board of Directors or by the Secretary or Treasurer, respectively.

_Beatrice L McGaw_
Assistant Secretary - S. S. KRESGE COMPANY
Beatrice L. McGaw

A Michigan Corporation

Troy,
Dated - ~~Detroit~~, Michigan ___August 29,___ , 19 73

(100)

EXHIBIT "D"

"EXHIBIT E"

MEMORANDUM OF LEASE

In consideration of the rents, covenants and agreements
contained in an Indenture of Lease entered into concurrently
herewith, Landlord leases to Developer the following described
land in Kansas City, Platte County, Missouri, to-wit:

> A tract of land located in the Northwest Quarter of
> Section 19, Township 51, Range 33, Kansas City, Platte
> County, Missouri, described as follows:  Commencing at
> the Northwest corner of said Northwest Quarter; thence
> North 89 degrees 31' 30" East along the North line of
> said Northwest Quarter a distance of 1,686.38 feet;
> thence South 0 degrees 25' 30" East a distance of 215.69
> feet to the point of beginning; thence North 89 degrees
> 34' 30" East a distance of 245.00 feet; thence North
> 54 degrees 20' 00" East a distance of 85.58 feet; thence
> South 35 degrees 40' 00" East a distance of 660.49 feet;
> thence South 0 degrees 25' 30" East a distance of 148.26
> feet; thence South 46 degrees 26' 21" West a distance
> of 230.00 feet; thence South 43 degrees 33' 39" East
> a distance of 200.00 feet; thence South 76 degrees
> 16' 34" East a distance of 25.80 feet; thence South
> 20 degrees 50' 00" West a distance of 82.00 feet; thence
> North 43 degrees 33' 39" West a distance of 227.15 feet;
> thence South 74 degrees 00' 29" West a distance of
> 249.04 feet; thence South 89 degrees 34' 30" West a
> distance of 265.00 feet; thence North 0 degrees 25' 30"
> West a distance of 925.33 feet to the point of begin-
> ning;  And,

> A Driveway Access Easement - a tract of land located in
> the Northwest Quarter of Section 19, Township 51, Range
> 33, Kansas City, Platte County, Missouri, described as
> follows:  Commencing at the Northwest corner of said
> Northwest Quarter, thence North 89 degrees 31' 30" East
> along the North line of said Northwest Quarter a dis-
> tance of 1,686.38 feet; thence South 0 degrees 25' 30"
> East a distance of 30.00 feet to the point of b eginning;
> thence South 0 degrees 25' 30" East a distance of 291.00
> feet; thence South 89 degrees 31' 30" West a distance of
> 42.03 feet; thence North 0 degrees 31' 55" West a dis-
> tance of 291.00 feet; thence North 89 degrees 31' 30"
> East a distance of 42.57 feet to the point of beginning;

for a base term of thirty-five (35) years with provision for
eight successive five-year options thereafter.  The commence-
ment of the term of said Lease and the amount of rental to be
paid, as well as other terms and conditions, are contained in
an Indenture of Lease executed concurrently herewith.

IN WITNESS WHEREOF, the parties hereto have set their

hands and seals this _30th_ day of _September_,
197_4_.


LANDLORD:

_____
Allen B. Kipper

_____
Raymond E. Grove

_____
Audrey F. Grove


DEVELOPER:

MALAN CONSTRUCTION COMPANY

By _____
President

ATTEST:

_____
Asst. – Secretary


STATE OF MISSOURI  )
                   ) SS.
COUNTY OF JACKSON  )

On this _30th_ day of _September_, 197_4_, before me,
the undersigned, a Notary Public, personally appeared Allen
B. Kipper to me known to be the person described in and who
executed the foregoing instrument, and acknowledged that he
executed the same as his free act and deed.  And the said Allen
B. Kipper further declared himself to be single and unmarried.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed
my official seal at my office in Kansas City, Missouri, the day
and year last above written.

_____
Notary Public

My commission expires _Aug 31, 1977_.

STATE OF MISSOURI  )
                   ) SS.
COUNTY OF JACKSON  )

On this _30th_ day of _September_, 197_4_, before me, the
undersigned, a Notary Public, personally appeared Raymond E.
Grove and Audrey F. Grove, his wife, to me known to be the persons

-2-

described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal at my office in Kansas City, Missouri, the day and year last above written.

_Elaine Lynn_
(.    Notary Public

My commission expires _Aug 31, 1977_ .


STATE OF MICHIGAN    )
                     ) SS.
COUNTY OF _Oakland_  )

On this _25th_ day of _September_ , 197_4_ , before me appeared _Robert A. Lander_ to me personally known, who being by me duly sworn, did say that he is the President of Malan Construction Company, a corporation, and that the seal affixed to the foregoing instrument is the corporate seal of said corporation and that said instrument was signed and sealed in behalf of said corporation by authority of its Board of Directors, and said _Robert A. Lander_ acknowledged said instrument to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at my office in _Southfield_ , Michigan, the day and year last above written.

_Mabel Diane Buckloh_
Notary Public _Wayne County_
(Acting in Oakland County)

My commission expires _April 12, 1978_ .

"EXHIBIT F"

CONSENT TO CANCELLATION OF LEASE

For good and valuable consideration, we, the undersigned, E. N. Maisel and Associates, a Michigan co-partnership, being the named Developer in a Lease dated September 19, 1973, including a letter of modification of even date therewith, and Allen B. Kipper, a single man, and Raymond E. Grove and Audrey F. Grove, his wife, as the named Landlord, whereby Landlord leased to Developer certain land in Kansas City, Platte County, Missouri, more fully described on Exhibit "A" which is attached hereto and made a part hereof, do hereby consent to the cancellation of said Lease and paragraphs 2 and 3 of the letter of even date therewith, and agree that the Lease shall be null and void and paragraphs 2 and 3 of the letter of even date shall be null and void as of the date of the execution of a Lease between the same parties as Landlord and Malan Construction Company, a Michigan corporation, as Developer, covering the same land together with additions thereto, said Lease being attached hereto and made a part hereof.

IN WITNESS WHEREOF, the parties have hereunto set their hands this _30th_ day of _September_, 197_4_.

_____
Allen B. Kipper

_____
Raymond E. Grove

_____
Audrey F. Grove

E. N. MAISEL AND ASSOCIATES,
A Michigan Co-partnership

By _____
General Partner

## ATTORNMENT AGREEMENT

THIS AGREEMENT Made and entered into this _30ᵗʰ_ day
of _September_ , 197_4_ , between ALLEN B. KIPPER, a
single man, and RAYMOND E. GROVE and AUDREY F. GROVE, his wife,
individuals, Owners, c/o James E. Campbell, Suite 414, 4901
Main Street, Kansas City, Missouri, MALAN CONSTRUCTION COMPANY,
a Michigan corporation licensed to do business in the State of
Missouri, of 17356 Northland Park Court, Southfield, Michigan,
Tenant, and S. S. KRESGE COMPANY, a Michigan corporation, of
3100 West Big Beaver Road, Troy, Michigan, Subtenant.

WITNESSETH THAT:

WHEREAS, the Owners, by lease dated the _30ᵗʰ_ day of
_September_ , 197_4_ , hereinafter called "Overlease,"
leased to Malan Construction Company a parcel of land herein-
after called "Overleased Premises," situated in Kansas City,
Platte County, Missouri, as is more particularly described
herein, for a term of thirty-five (35) years plus certain
renewal options as contained therein; and,

WHEREAS, the Tenant, by lease dated the 15th day of Octo-
ber, 1973, (hereinafter called "Sublease") leased to S. S.
Kresge Company a portion of said Overleased Premises as is
more particularly described herein, for a term of twenty-five
(25) years plus certain renewal options as contained therein;
and,

WHEREAS, Owners are the owners in fee of the Overleased
Premises together with the Lessor's interest in the Overlease
and have full authority to execute and deliver this agreement;
and,

WHEREAS, Tenant is the holder of the Lessee's interest in
the Overlease with Owners and is the holder of Lessor's inter-
est in the Sublease to Subtenant and has full authority to
execute and deliver this agreement; and,

WHEREAS, the Overlease has been at all times since its commencement date and now is in full force and effect, and no default has occurred either in the payment of rent or in the performance of any other covenant of Tenant thereunder; and,

WHEREAS, the Sublease has been at all times since its commencement date and now is in full force and effect, and no default has occurred either in the payment of rent or in the performance of any other covenant of Subtenant thereunder; and,

WHEREAS, a copy of said Sublease has been exhibited to the Owners and Owners are willing to consent to said Sublease and to approve the terms, covenants and conditions thereof, and the Owners, Tenant and Subtenant are willing to agree that the Sublease shall remain in effect in the event of termination of the Overlease.

NOW THEREFORE, in consideration of the above, the parties hereto mutually covenant and agree as follows:

1.   Owners hereby consent to the execution and delivery of the Sublease by and between the Tenant and Subtenant.

2.   Owners agree with the Tenant and Subtenant that no act which Subtenant or Tenant is required or permitted to do under the terms of the Sublease shall constitute a default under the Overlease.

3.   Tenant and Subtenant agree with the Owners that they will conform and comply with all of the terms, covenants and conditions of the Sublease which are binding upon them respec-tively.   Tenant agrees with Subtenant that Tenant will perform and comply with  all of the terms, covenants and conditions of the Overlease which are binding upon Tenant.

4.   Owners and Tenant agree with Subtenant that in the event, for any reason whatsoever, the Overlease is terminated, expires or comes to an end during the term of the Sublease, the Sublease shall remain in full force and effect in accordance

with its terms as a direct lease with the Owners as Landlord.

5.    Wherever and whenever in this agreement or in the
Overlease or Sublease it shall be required or permitted that
notice or demand shall be given and served upon all parties to
this agreement, such notice or demand shall be given or served
and shall not be deemed to have been given or served unless in
writing and forwarded by certified mail, return receipt re-
quested, to the above referred to addresses for the respective
parties.  Such addresses may be changed from time to time by
any party by serving notice as above provided.

6.    Owners and Tenant will, subject to the terms of the
Overlease and Sublease, subordinate the demised property for
real estate mortgage purposes for the construction and/or for
improvements of the buildings on said premises and/or site
improvements or for subsequent purchase purposes, including
interim and long-term mortgage financing, and will enter into
and join in the execution of any such mortgage, mortgages,
assignments of lease and other documents required by any such
mortgagee or mortgagees for the purpose of granting to such
mortgagees a valid mortgage, encumbrance and lien in and to
the mortgaged premises; provided, however, nothing herein con-
tained shall require Owners or Tenant to become personally
liable for the payment of the indebtedness secured by such
mortgage or mortgages.

7.    The obligation of the parties hereunder shall, from
and after the execution and delivery hereof, be binding upon
and shall inure to the benefit of the parties hereto, their
respective heirs, representatives, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have signed and
sealed this instrument, all as of the day and year first above
written.

OWNERS:

_____
Allen B. Kipper

_____
Raymond E. Grove

_____
Audrey F. Grove

TENANT:

MALAN CONSTRUCTION COMPANY,

By_____
President

ATTEST:

_____
Secretary

SUBTENANT:

S. S. KRESGE COMPANY,

By_____

Title_____

ATTEST:

_____
Secretary

STATE OF MISSOURI  )
                   ) SS.
COUNTY OF JACKSON  )

On this _30th_ day of _September_, 197_4_, before me, the undersigned, a Notary Public, personally appeared Allen B. Kipper to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed. And the said Allen B. Kipper further declared himself to be single and unmarried.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at my office in Kansas City, Missouri, the day and year last above written.

_____
Notary Public

My commission expires _Aug 31, 1977_.

STATE OF MISSOURI   )
                    ) SS.
COUNTY OF JACKSON   )

On this _30th_ day of _September_, 197_4_, before me,
the undersigned, a Notary Public, personally appeared Raymond
E. Grove and Audrey F. Grove, his wife, to me known to be the
persons described in and who executed the foregoing instrument,
and acknowledged that they executed the same as their free act
and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and
affixed my official seal at my office in Kansas City, Missouri,
the day and year last above written.

_Elaine Lynn_
                              Notary Public

My commission expires _Aug. 31, 1977_.


STATE OF MICHIGAN   )
                    )
COUNTY OF OAKLAND   )

On this _25th_ day of _September_, 197_4_, before me
appeared _Robert A. Lander_ to me personally known, who
being by me duly sworn, did say that he is the President of
Malan Construction Company, a corporation, and that the seal
affixed to the foregoing instrument is the corporate seal of
said corporation and that  said instrument was signed and sealed
in behalf of said corporation by authority of its Board of
Directors, and said _Robert A. Lander_ acknowledged said instru-
ment to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed
my notarial seal at my office in _Southfield_,
Michigan, the day and year last above written.

_Mabel Anne Buckholz_
                           Notary Public
                  (Acting in Oakland County)

My commission expires _Apr. 10, 1978_.

STATE OF MICHIGAN   )
                    ) SS.
COUNTY OF OAKLAND   )

On this_____day of_____, 197___, before me

appeared_____to me personally known, who

being by me duly sworn, did say that he is the_____

of S. S. Kresge Company, a corporation, and that the seal affixed

to the foregoing instrument is the corporate seal of said cor-

poration and that said instrument was signed and sealed · in

behalf of said corporation by authority of its Board of Directors,

and said_____acknowledged said instrument to

be the free act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed

my notarial seal at my office in Troy, Michigan, the day and year

last above written.

_____
                    Notary Public

My commission expires_____.