FERRAIUOLI LLC
390 N. Orange Avenue
Suite 2300
Orlando, Florida 32801
Telephone: (407) 982-7310
Facsimile: (787) 766-7001
Email: scolon@ferraiuoli.com
Email: gchico@ferraiuoli.com

Counsel for *Santa Rosa Mall, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SEARS HOLDINGS CORPORATION,<br>*et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered) |

**REPLY *TO DEBTOR'S OBJECTION TO MOTION FOR ENTRY OF ORDER COMPELLING DEBTOR TO DISCLOSE STATUS OF INSURANCE CLAIM AND DEPOSIT ANY INSURANCE PROCEEDS INTO SEPARATE ACCOUNT (SANTA ROSA MALL, PUERTO RICO)***
(Related Docket No. 2512)

TO THE HONORABLE COURT:

COMES NOW Santa Rosa Mall, LLC ("Santa Rosa Mall"), by and through its undersigned attorneys, and hereby states and prays as follows:

Background

1. On December 14, 2018, Santa Rosa filed a *Motion for Entry of Order for the Debtor to: (i) Disclose Status of Insurance Claim; (ii) Deposit Any Insurance Proceed into Separate Account to Be Used Exclusively to Repair the Insured Demised Premises; and (iii) Alternatively, Find the Automatic Stay Inapplicable to the Insurance Proceeds* (the "*Motion for Entry of Order*", Docket No. 1240).

- 1 -

2.  Section 6.01 of the *Lease Agreement* (the "*Lease Agreement*", Docket No. 1240-1, p. 29) between Sears and Santa Rosa requires Sears to "maintain at [its] sole cost and expense, for the benefit of [Santa Rosa Mall] and [Sears], insurance with respect to the Demised Premises" for risks, including "windstorm".

3.  In addition, Section 6.02(a) of the *Lease Agreement* requires Sears to "secure[] [such insurance policy or policies] promptly" and furnish the certificates thereof to Santa Rosa. *Lease Agreement*, ¶ 6.02(a), Docket No. 1240-1, p. 30. More importantly, such insurance "policies **shall contain <u>loss payable clause</u> to [Santa Rosa Mall] and [Sears]**". Id., § 6.02(a), pp. 30 (emphasis and underline added). Renewals of the insurance policies are also subject to the foregoing. Id., § 6.02(b), p. 30.

4.  In the *Motion for Entry of Order,* Santa Rosa sustained that pursuant to the obligations under the *Lease Agreement* (Docket No. 1240-1) and the evidence provided by Sears, Santa Rosa was a "loss payee" under insurance policy no. PTNAM1701557 (*Certificate of Property Insurance*, Docket No. 1240-2). As a loss payee and third-party beneficiary, Santa Rosa Mall sustains that the insurance proceeds are not part of the bankruptcy estate under applicable case law.

5.  On February 8, 2019, the Debtor filed an *Objection to "Motion for Entry of Order Compelling Debtor to Disclose Status of Insurance Claim and Deposit Any Insurance Proceeds into Separate Account (Santa Rosa Mall, Puerto Rico)* (the "*Objection*", Docket No. 2512). In spite of the evidence Sears had provided Santa Rosa regarding its status as a loss payee, Sears' core argument is that Santa Rosa is <u>not</u> a loss payee under Insurance Policy No. PTNAM1701557, that there is no endorsement to the policy designating Santa Rosa as a loss payee (in spite of Sears' obligations to that effect under § 6.02(a) of the *Lease Agreement*) and that the Insurance Policy without endorsements ---and only the Insurance Policy--- is dispositive.

6. The foregoing reply is strictly limited to address Sears' arguments in the *Objection*. Santa Rosa will not rehash its previous arguments in the *Motion for Entry of Order* (Docket No. 1240) and instead adopts them by reference as if fully transcribed herein.

Applicable Law and Discussion

(A) *This Court must consider that the Lease Agreement, the contract resulting in the purchase of the insurance policy, requires Sears to include Santa Rosa a loss payee under Insurance Policy No. PTNAM1701557, and the Certificate of Insurance provided to Santa Rosa is consonant with such obligation*

7. Santa Rosa had no reason to doubt of Sears' good faith and compliance with the *Lease Agreement* because the *Certificate of Insurance* for Insurance Policy No. PTNAM1701557 provided to Santa Rosa Mall expressly stated that Santa Rosa is a loss payee (Docket No. 1240-2, p. 3). Accordingly, the *Certificate of Insurance* is consonant with the provisions in Sections 6.01 and 6.02(a) of the *Lease Agreement* (Docket No. 1240-1, pp. 29-30).

8. Surprisingly, Sears suddenly purports in its *Objection* for the very first time that the *Certificate of Insurance* for Insurance Policy No. PTNAM1701557 provided to Santa Rosa, which expressly states that Santa Rosa is a loss payee (Docket No. 1240-2, p. 3), is erroneous and that it "is not determinative of the extent of coverage under the Insurance Policy", despite Sears' obligations under the *Lease Agreement*. Sears' *Objection*, Docket No. 2512, p. 10, ¶ 24.

9. But contrary to Sears' contention, courts have recognized that a party's right to receive and keep the insurance policy's proceeds is not only limited by the 4 corners of the insurance contract. Courts also consider the contractual provisions resulting in the purchase of the policy. See *e.g.* In re Jones, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("the Debtor's rights to the proceeds of his policy are inevitably subject to the contractual restrictions in his insurance policy and mortgage agreement" resulting in the purchase of such insurance); 17A Am. Jur. 2d Contracts § 442 (the rights of a loss payee depend upon the substantive rights under the contracts).

10. For instance, in In re Amiel Restaurant Partners, LLC, 510 B.R. 744 (Bankr. D.N.J. 2014), the Court carefully analyzed the rights and obligations under the lease agreement between the debtor and the landlord to determine which had a cognizable right to receive the insurance proceeds. In that case, the debtor and landlord Morgan Realty & Development, LLC ("Morgan") entered into a commercial lease. The lease in that case required the debtor to maintain seven types of insurance coverage, including property insurance. Similar to the *Lease Agreement* with Santa Rosa in the instant case, all such policies in the case of Amiel:

> [S]hall include a waiver by the insurer(s) of the right of subrogation against Landlord, its agents, representatives, and affiliates. Tenant's insurance shall provide primary coverage to Landlord when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstances Landlord's policy will be excess over Tenant's policy. Tenant shall furnish to Landlord certificates of such insurance and such other evidence satisfactory to Landlord of the maintenance of all insurance coverage required hereunder.

In re Amiel, 510 B.R. at 746. Additionally, Morgan's right under paragraph 23 of the lease to recover the premises with its contents at the termination of the lease afforded Morgan "a reasonable expectation of deriving pecuniary benefit from the preservation of the property". Id., at 752. As such, the Court determined that Morgan had an insurable interest in property for which it had been endorsed on the flood insurance policy as an additional insured:

> The Lease between Morgan Realty & Development, LLC, and Debtor Amiel Restaurant Partners, LLC, mandated that, "at the expiration or earlier termination" of the Lease the Debtor would deliver the premises to [Landlord] "with all Alterations, additions, improvements, fixtures, trade fixtures, furniture, equipment and other property" which the Debtor used in its operations and which would become the "sole property" of the landlord, irrespective of any default by the Debtor and independent of any action or election by the Debtor []. **Under the property rights created in [Landlord] by the Lease, the proceeds of the [] flood insurance property are not property of the estate, and [Landlord] is entitled to payment of those proceeds which issued** [].

In re Amiel, 510 B.R. at 753 (emphasis added).

11. It is undisputed that Santa Rosa Mall has an insurable interest over the Demised Properties, *i.e.,* Store No. 1915, and its prompt repair and reopening. Moreover, Section 6.01 of the *Lease Agreement* (Docket No. 1240-1, p. 29), which is the contractual provision resulting in the purchase Insurance Policy No. PTNAM1701557, expressly requires Sears to obtain and "maintain at [its] sole cost and expense, for the benefit of [Santa Rosa Mall] and [Sears], insurance with respect to the Demised Premises" for risks, including "windstorm". In addition, Section 6.02(a) of the *Lease Agreement* requires Sears to "secure[] [such insurance policy or policies] promptly" and furnish the certificates thereof to Santa Rosa Mall as proof of insurance. *Lease Agreement*, ¶ 6.02(a), Docket No. 1240-1, p. 30. And more importantly, the Lease Agreement mandates that such insurance "policies **[] contain [a] <u>loss payable clause</u> to [Santa Rosa Mall] and [Sears]"**. Id., p. 30, § 6.02(a) (emphasis and underline added). And of course, renewals of Sears' insurance policies are also subject to the foregoing requirements. Id., p. 30, § 6.02(b).

*(B)    Even if Sears omitted to include as a loss payee, the Court has authority to reform Insurance Policy No. PTNAM1701557 to include Santa Rosa Mall as loss payee pursuant to the obligations under the Lease Agreement*

12. As stated, to consider who has a right to receive insurance proceeds, courts look not only at the insurance policy *per se*, but also to the contracts leading up to the purchase of the insurance policy, in the instant case, the *Lease Agreement*.

13. If a lessee like Sears agrees to obtain insurance on property with loss payable clause in favor of the lessor but fails to do so, equity will treat the policy as having contained the loss payable provision. For instance, in <u>OneBeacon America Ins. Co. v. Travelers Indem. Co. of IL</u>, 465 F.3d 38 (1st Cir. 2006), the Court was called to reconcile an insurance policy that differed from the parties' earlier covenants in a lease agreement executed between them. To reconcile the dispute, the Court held that "equity favors reforming the policy to reflect the contracting parties' intent." <u>Id.</u> at 46. "When a party asks for reformation of a contract, it is not asking the court to

- 5 -

interpret the contract but rather to change it to conform to the parties' intent. [] Accordingly, the usual restrictions on contract interpretation, [] do not apply to a court's inquiry into the parties' intent []. In a reformation case, it does not matter that a contract unambiguously says one thing. A court still will accept extrinsic evidence in evaluating a claim that both parties to the contract intended it to say something else." Id. at 41.

14.    The U.S. Court of Appeals for the Fifth Circuit has recently adopted a similar posture. In Sierra Equipment, Incorporated v. Lexington Insurance Company, 890 F.3d 555 (5th Cir. 2018), the Court of Appeals held that if a lessee agrees to obtain insurance on property with loss payable to the lessor but then fails to do so, equity will treat the policy as having contained the loss payable provision and entitle the mortgagee or lessor to recover under the policy. Courts have consistently taken into account whether the parties have agreed on the inclusion of a loss payable clause in an insurance policy, prior to the procurement of such insurance, in deciding whether to apply the equitable doctrine:

> See, *e.g.*, Michael E. Black Profit Sharing Plan v. Stephens, 973 S.W.2d 451, 452–53 (Tex. App.—Amarillo 1998, reh'g overruled) (stating that the third party was a stranger to the policy unless it showed that the policy was issued after the policyholder agreed to procure insurance with a loss payable clause in its favor); Cable Commc'ns Network, Inc. v. Aetna Cas. & Sur. Co., 838 S.W.2d 947, 950 (Tex. App.—Houston [14th Dist.] 1992, no writ) ("Likewise, if a lessee agrees to obtain insurance on property with loss payable to the lessor but fails to do so, equity will treat the policy as having contained the loss payable provision and entitle the mortgagee or lessor to recover under the policy."); State Farm Fire & Cas. Co. v. Leasing Enters., Inc., 716 S.W.2d 553, 554 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ("Where a mortgagor or lessee is charged with the duty of obtaining insurance on property with loss payable to the mortgagee or lessor, but the policy does not contain such a provision, equity will treat the policy as having contained the loss payable provision ...."); Duval Cty., 663 S.W.2d at 632 ("There is an exception or corollary to this general rule in such instances as those where a mortgagor or lessee is charged with the duty of procuring such a policy with loss payable to the mortgagee or lessor, as the case may be."); Abilene White Truck Co. v. Petrey, 384 S.W.2d 211, 213 (Tex. Civ. App.—Fort Worth 1964, writ ref'd n.r.e.) (holding that the equitable lien doctrine applied where the mortgagor "was charged with the duty of obtaining a policy of insurance with loss payable to the [mortgagee]"); see also Conway v. Beltline Venture Partners, 2000 WL 254296, at *4 (Tex. App.—Dallas Mar. 8, 2000,

> no pet.) (unpublished) ("Where the security agreement requires the mortgagor to have a provision in the insurance policy that makes the proceeds payable to the mortgagee, equity will treat the policy as having contained such a provision."). But see Tillerson v. Highrabedian, 503 S.W.2d 398, 399–400 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) (holding, without considering a possible agreement between the parties on a loss payable clause but where both parties testified that they considered the non-named insured to be covered by the policy, that the non-named insured was entitled to the proceeds of the policy).

Sierra Equipment, Incorporated v. Lexington Insurance Company, 890 F.3d at 558, n. 2.

15.     In the instant case, the *Lease Agreement* is clear as to the intentions of Sears and Santa Rosa Mall to keep the Demised Premises insured with a loss payable clause in favor of Santa Rosa Mall. As such, this Court may reform Insurance Policy No. PTNAM1701557 to conform it to the parties' express intent in the *Lease Agreement*.

*(C)     In the alternative, this Court may impose an equitable lien over the insurance proceeds in favor of Santa Rosa Mall*

16.     If the Court declines to reform Insurance Policy No. PTNAM1701557 to treat it as having contained the loss payable provision, it may in the alternative impose an equitable lien over the insurance proceeds pertaining to Store No. 1915 in favor of Santa Rosa Mall.

17.     In In re ATCORP I, Inc., 25 B.R. 340 (B.A.P. 1st Cir. 1982), the Bankruptcy Appellate Panel for the First Circuit considered the following insurance rules regarding interest on the payment of insurance proceeds to a mortgagee in equity when mortgagor has promised to insure property for mortgagee's benefit but the insurance policy did not:

> if the mortgagor covenants to keep the mortgaged property insured for the better security of the mortgagee, the latter will have an equitable lien upon the proceeds of insurance carried by the mortgagor, in case of loss, to the extent of his interest in the property destroyed, even though the policy contains no mortgagee clause and is payable to the mortgagor. Couch on Insurance 2d § 29:82 at 366.

> That rule is applicable in situations where the insurance proceeds are not payable to the mortgagee, but the mortgagor had promised to insure the property for the mortgagee's benefit, and thus, in equity, the proceeds should be payable to the mortgagee. Brown v. First National Bank of Dewey, 617 F.2d 581 (10th Cir.1980).

In re ATCORP I, Inc., 25 B.R. at 344.

20. In In re Natale, 174 B.R. 362, 364 (Bankr. D.R.I. 1994), the mortgage agreement required that: "[i]nsurance against loss by fire, flood where required ... shall be kept and maintained on the buildings and improvements on the premises ... and that the policy or policies of such insurance shall [] made payable in case of loss to, and held by Mortgagee as collateral security." Id. at 363. The debtors obtained fire and casualty insurance on the property but did not list mortgagee as a lienholder or as a loss payee in contravention with the obligations in the mortgage agreement. The Court held as follows:

> Courts addressing this problem have acknowledged the equitable rights of the mortgagee, even where the mortgagor has elected to ignore those rights. If the "mortgagor covenants in the mortgage to keep the property insured as further security for the payment of the mortgage debt, then the mortgagee is entitled to an equitable lien upon the insurance proceeds, even though the policy is in the name of the mortgagor alone." Freshwater v. Colonial Production Credit Ass'n, 286 S.C. 387, 334 S.E.2d 142, 144 (Ct. App. 1985) (citing Blackwell v. State Farm Mutual Automobile Insurance Co., 237 S.C. 649, 118 S.E.2d 701 (1961)); Nichols v. Baxter, 5 R.I. 491 (1858). [] Based on these authorities and the undisputed facts in the instant case, we conclude that **this Court has the authority, and indeed the duty, to impose an equitable lien in favor of [mortgagee] on the insurance proceeds in question**, and it is so ORDERED. Additionally, and quite aside from equitable considerations, we conclude that pursuant to paragraph 5 of the mortgage agreement [mortgagee] also has a contractual lien on the funds in question.

In re Natale, 174 B.R. at 364-365 (emphasis added).

21. Courts in New York have also ruled in a similar fashion. In Rosario-Paolo v C & M Pizza Restaurant, 84 N.Y.2d 379, 643 N.E.2d 85, 618 N.Y.S. 2d 766 (1994), the issue presented was whether plaintiff holds an equitable lien in the insurance proceeds to the extent of its security interest in the insured premises to permit recovery. The plaintiff in that case sold the premises, a pizza restaurant, to defendant [C & M Pizza Restaurant]. In partial consideration of the purchase price, defendant executed a series of promissory notes. The parties entered into a security agreement pursuant to which defendant agreed to keep the premises insured against loss by fire,

- 8 -

theft and other hazards, to name the plaintiff as a beneficiary; and to deposit certificates of insurance with plaintiff.  But despite the express provision in the security agreement, the defendant failed to list any loss beneficiary under the insurance policy.  After a catastrophic fire, the plaintiff notified the insurer of its claim to any proceeds from the fire loss.  The insurer issued a check endorsed by an owner of defendant and deposited into an individual account.  The plaintiff demanded payment from defendant to satisfy the outstanding indebtedness but the defendant refused to remit any moneys.  The plaintiff notified the insurer of its equitable stake before the insurer paid defendant's claim and requested "that none of the proceeds of said policy are to be paid to the insured unless the check is also to the order of [plaintiff] as loss payee." Rosario-Paolo, 84 N.Y.2d at 382-383.  The insurance carrier ignored the notice and issued payment directly to defendant without regard to plaintiff's interest.  The Court ruled as follows:

> **The insurance against fire loss was procured by C&M to protect both its interest and plaintiff's interest in the secured property.**  C&M's covenant under the security agreement to insure the premises against fire loss for plaintiff's benefit gives plaintiff an equitable lien in any proceeds to the extent of its interest—in this case, the remaining unpaid portion of the purchase price.  Because Investors [the insurer] had notice of plaintiff's equitable claim but nevertheless satisfied a claim without regard to its interest, plaintiff can recover to the extent of its equitable lien in an action at law.
>
> **C&M's failure to name plaintiff as a loss beneficiary did not extinguish plaintiff's interest in the secured property**, nor did it impair plaintiff's status as an equitable lienholder. In this regard, an insurance policy that contains a loss payable clause is not a separate insurance of the debt but a separate security for the debt.
>
> **Because of the promise to insure for plaintiff's benefit that is embodied in the security agreement between plaintiff and C&M, plaintiff is entitled to enforce its covenant with C&M to recover damages to the extent of its equitable lien** [].

Rosario-Paolo, 84 N.Y.2d at 383 (emphasis added, citations omitted).

22. In Weinreb v. M & S Bagels, 254 N.Y.S.2d 158, 159 (1964), a chattel mortgage contained a clause requiring the mortgagor to keep the chattels insured against loss and damage by fire for the benefit of the mortgagee.  Contrary to previous agreement, the mortgagor obtained

an insurance policy which did not name the mortgagee as an insured. The court held that the mortgagee was entitled to the insurance proceeds under the policy, even though the policy did not contain a mortgagee clause. The Court concluded as follows:

> Defendant Webster is the holder of the purchase-money mortgage covering the chattels which were destroyed by the fire. [] **The mortgage contained a clause requiring the mortgagor to carry fire insurance for the benefit of the mortgagee**. In fact insurance was carried but **the [] mortgagee clause was not included in the policy**. It would not have cost anything additional to include such clause and I deem its absence an inadvertent oversight. **The owner having been obligated to have a provision inserted in the policy in favor of the mortgagee, equity may treat the policy as having contained such a provision**). That this was the clear intent of the parties is evidenced by the fact that such a provision was inserted but not until the day after the fire. []
>
> Had there been no provision in the mortgage for insurance in favor of the mortgagee, the result might well be different since the owner could not make a preferential assignment of the proceeds of the fire loss to one creditor. Of course, as between the owner and the mortgagee under a mortgage in which the mortgagor covenants to keep the property insured for the benefit of the mortgagee, the latter has an equitable lien upon the proceeds of insurance even though the policy contains no mortgagee clause [] The defendant Webster is entitled to the proceeds of the fire loss and since the proceeds are less than the amount due on the mortgage there is nothing to which plaintiffs' claims can attach.

Weinreb v. M & S Bagels, 254 N.Y.S.2d at 161-162 (emphasis added).

*(D)    Urgency of the request and continuing damages to Santa Rosa Mall*

23.    The *Motion for Entry of Order* was filed on December 14, 2018 (Docket No. 1240). Prior to that, Santa Rosa had made good faith attempts with Sears' counsel to avoid judicial intervention to no avail, which led to the filing of the motion that initiated the instant contested matter.

24.    Sears avers that because it has made continuing payments of rent to Santa Rosa Mall under the *Lease Agreement*, Santa Rosa Mall "is not prejudiced by a deferred ruling". Sears' *Objection*, Docket No. 2512, p. 4, ¶ 6.

25.    We proceed to explain why Sears' statements completely ignore the reality of Santa Rosa Mall, especially after Hurricane Maria.

26.    Since 1965, Sears Store No. 1915 is, has been, and continues to be the "anchor store" and the largest store at Santa Rosa Mall. As such, two (2) of the four (4) main entrances to Santa Rosa Mall are through Sears, which directly impedes traffic flow. Moreover, out of a total of approximately 505,641 square feet that comprises Santa Rosa Mall, the Demised Premises constitute 220,640 square feet  See Declaration of Yvette Melendez, **Exhibit I** at ¶¶ 4-5

27.    Sears is also the main driver of customers for other tenants. Store No. 1915's presence in Santa Rosa is so essential that lease agreements for other tenants include co-tenancy clauses directly related to Sears' operations, meaning that if Sears closes, other tenants at the mall have a right to terminate their leases and/or if Sears closes operations for a determined period, other tenants at the mall have the right to have their rents significantly reduced. See Declaration of Yvette Melendez, **Exhibit I** at ¶ 6.

28.    Since the passing of Hurricane Maria in Puerto Rico on September 20, 2017, the Demised Premises have remained closed and unrepaired (with the exception of a car servicing area that appears to have partially resumed in the basement of the Demised Premises). See Declaration of Yvette Melendez, **Exhibit I** at ¶ 7.

29.    Santa Rosa relied on Sears' representations regarding compliance with the *Lease Agreement*. Id. at ¶ 10.

30.    In regard to the insurance proceeds, Section 6.03(b)(3) of the *Lease Agreement* requires as follows:

> The net sums recovered by [Santa Rosa Mall] and·[Sears] on account of loss or damage whether under the policies taken out as aforesaid, or under other insurance policies taken out by [Sears] and indemnifying for physical loss (as distinguished from the loss of use and occupancy. or profits), shall by deposited in a special account in the name of [Santa Rosa Mall] separate and distinct from all other funds of [Santa

- 11 -

> Rosa Mall] in a bank or trust company of the City of San Juan, Puerto Rico, approved by [Santa Rosa Mall] and [Sears] to be applied on account of the cost of such restoration or rebuilding, as the case may be, as the work of restoration or rebuilding progresses, and [Sears] shall pay any and all additional moneys required in such restoration or rebuilding in excess of said net sums recovered, and shall be entitled to receive any surplus, if any, remaining of said deposit after such restoration .. or rebuilding has been completed as aforesaid, provided, however, that should the aforesaid damage by fire or other casualty occur within the last three years of the initial term or any extended term this lease, [Sears] shall have the option to surrender the proceeds of any insurance to [Santa Rosa Mall] and vacate the premises.

*Lease Agreement*, Docket No. 1240-1, pp. 31-32.

31. In spite of its obligations under the *Lease Agreement*, Sears recently averred that for Insurance Policy No. PTNAM170177 (which provides coverage for the damages caused by Hurricane Maria in 2017) "there is no endorsement that lists [Santa Rosa] as "loss payee". Sears' *Objection*, Docket No. 2512, p. 7, ¶ 16.

32. This has serious and direct impact for Santa Rosa. First, upon the expiration of the Lease Agreement, the Demised Property along with its restorations will ultimately belong to Santa Rosa, and failure to restrict and use the insurance proceeds for the purpose for which they were required will leave the Demised Property without the repairs being done. See *Lease Agreement*, Docket No. 1240-1, § 15.01, p. 44. This is the essence and main reason of the "loss payee" requirement in Section 6.02(a) of the *Lease Agreement* and the other insurance provisions in Sections 6.01-6.05. Id., pp. 26-30. The insurance proceeds must only be used to fix the Demised Premises after the substantial physical damages caused by Hurricane Maria back in September 20, 2017. See Declaration of Yvette Melendez, **Exhibit I** at ¶ 13.

33. As it is customary in the shopping mall industry, pursuant to Sections 2.01 and 2.02 of the *Lease Agreement*, Sears is required to pay a fixed rent and additional percentage rent to be calculated on Sears' sales in excess of $15,000,000. See Docket No. 1240-1, p. 14-17. Since the passing of Hurricane Maria about a year and half ago, Sears has only been paying fixed rent and,

because Store No. 1915 is not operating, Sears has not paid any percentage rent whatsoever. This reduction in monthly rent reduces Santa Rosa's cash flow and operations. This is critical especially because of the length of time since the passing of Hurricane Maria, that is, September 20, 2017, and when one compares it with the amount of percentage rent Sears paid in the previous years. For example, the amount of overage rent Sears paid in the last three years was the following:

| | |
|---|---|
| Oct 2014 - Sep 2015 | $224,874.42 |
| Oct 2015 - Sep 2016 | $ 192,479.02 |
| Oct 2016 - Sep 2017 | $ 161,855.58 |

For the period between October 2017 through September 2018, Sears has not paid any overage because it has been closed. See Declaration of Yvette Melendez, **Exhibit I** at ¶ 14.

34.  Sears initially commenced repairs to Store No. 1915 but as of the filing of the bankruptcy petition have been completely halted. See Declaration of Yvette Melendez, **Exhibit I** at 15.

35.  The damages to Store No. 1915 by Hurricane Maria are substantial. The repairs of such damages to bring Store No. 1915 back to functional may take an additional six (6) months at best. This would mean that Santa Rosa's most profitable shopping seasons will be directly affected by Sears' closing, including Mother's Day, Father's Day, Fourth of July, Back to School, Labor Day Weekend, Halloween, Black Friday and Christmas. Id. at ¶ 16.

36.  Sears further alleges that on February 7, 2019, the Court approved the Debtors' sale of substantially all of their assets to ESL Investments, Inc. (and/or its subsidiaries). Given the fact that under the Asset Purchase Agreement, ESL will either cure defaults under the Lease on or prior to assumption or provide adequate assurance that it will promptly cure such defaults it designates the Lease Agreement, Sears claims that it is premature to make a determination as to whether the Insurance Proceeds have to be segregated and exclusively used to reconstruct the store at this time. Sears notes that given the short period of time afforded to ESL to exercise its designation rights,

and the Debtors' continued payment of rent under the Lease, Santa Rosa is allegedly not prejudiced by a deferred ruling." Sears' *Objection,* Docket No. 2512, p. 4, ¶ 6.

37. Despite Debtors' allegations, the fact is that Santa Rosa is in fact suffering damages as evidenced by the Declaration of Yvette Melendez attached hereto as **Exhibit I,** and that a prompt determination should be made as to whether Santa Rosa is a loss payee as to the insurance proceeds which Sears may have claimed under the Insurance Policy which it acquired pursuant to the terms of the Lease Agreement, and which, upon information and belief, it received for the damages caused to the Demised Property by Hurricane Maria.

38. In its Objection, Sears alleges that Santa Rosa is not suffering any damage because it is receiving rent and because pursuant to the court order approving the Assert Purchase Agreement (Docket No. 2505), once the purchase designates the lease agreement, the purchaser has to set aside the funds to cure the same.

39. First, Sears' allegation that Santa Rosa is not suffering any damages because it is paying a fixed rent obviates the fact that Sears has not paid any overage rent since October 2017 because it has not been operating Store No. 1915. See Declaration of Yvette Melendez, **Exhibit I** at ¶ 14. The average of overage rent during the past three years fluctuated from $161,855.58 to $224,874.42. Id. This reduction in monthly rent reduces Santa Rosa's cash flow and operations. Id.

40. Second, during the February 7, 2019 hearing to approve the sale, the Court expressly held that Santa Rosa's rights as to the insurance proceeds were preserved as "you cannot sell what is not yours." That is, if the insurance proceeds are not part of the bankruptcy estate, Sears cannot sell or transfer them to anyone. Upon information and belief, the insurance proceeds to repair the Demised Premises in Santa Rosa Mall have already been disbursed to Sears, which is currently in

possession of such funds. Sears' possession of these insurance proceeds is precisely why a judicial determination as to who is entitled to them is urgent at this juncture.

41. Thus, Sears cannot deny Santa Rosa Mall's rights to the insurance proceeds which Sears claimed and upon information and belief, already received to repair the damages to the Demised Premises caused by Hurricane Maria on the guise that it is merely paying the base rent and that the purchaser may designate the Lease Agreement.

### Prayer for Relief

WHEREFORE, Santa Rosa Mall, LLC respectfully requests that the Court deny Sears' *Objection for Entry of Order Compelling Debtor to Disclose Status of Insurance Claim and Deposit Any Insurance Proceeds into Separate Account* (Docket No. 2512); and Santa Rosa Mall's *Motion for Entry of Order* (Docket No. 1240) and further grant the foregoing motion in its entirety and (i) find that Santa Rosa is a loss payee under Insurance Policy No. PTNAM170177 and the Certificate of Insurance provided to Santa Rosa is consonant with such obligation; (ii) reform the Policy No. PTNAM1701557 to include Santa Rosa Mall as loss payee pursuant to the obligations under the Lease Agreement; or (iii) impose an equitable lien over the insurance proceeds in favor of Santa Rosa Mall; and (iv) grant Santa Rosa such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Respectfully submitted.<br>Orlando, Florida.<br>Dated: March 13, 2019 | **Ferraiuoli** LLC<br>390 N. Orange Avenue<br>Suite 2300<br>Orlando, Florida 32801<br>Phone: (407) 982-7310<br>Fax: (787) 766-7001<br><br>-and-<br><br>221 Ponce de León Avenue<br>5th Floor, San Juan, PR 00917 |

- 16 -

Phone: (787) 766-7000
Facsimile: (787) 766-7001

*/s/ Sonia E. Colon Colon*
Sonia E. Colón Colón
Admitted *Pro Hac Vice*
USDC-PR No. 213809
scolon@ferraiuoli.com

*/s/ Gustavo A. Chico-Barris*
Gustavo A. Chico-Barris
USDC-SDNY 929147
gchico@ferraiuoli.com

Attorneys for
*Santa Rosa Mall, LLC*