Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 18-23538-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   SEARS HOLDINGS CORPORATION,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  December 20, 2018

17                  10:24 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:   JUSTIN

Page 2

1    HEARING re Motion to Compel / Motion of Omega Advisors Inc.

2

3    HEARING re Objection to Motion/ Claimant/creditors Objection

4    to Bankruptcy Discharge and Proof of Claim (related

5    document( s )924)

6

7    HEARING re Objection to Motion/ Letter (via email) dated

8    12/17/2018 to Judge Drain Objecting to Motion and Requesting

9    Permission to Respond After Deadline (related

10   document( s )924)

11

12   HEARING re Statement Joinder of Och-Ziff Capital Structure

13   Arbitrage Master Fund, Ltd. to the Motion of Omega Advisors

14   Inc. Pursuant to Sections 105 and 363 of the Bankruptcy Code

15   to Enforce the Courts November 19, 2018 Sale Order

16   Invalidate the Ultra Vires Sale and Lockup of Medium-Term

17   Intercompany (related documents(s)

18

19   HEARING re Motion for Relief from Stay : Notice of Motion

20   and Motion of Community Unit School District 300 for Relief

21   From the Automatic Stay or, in the Alternative, for

22   Abstention

23

24

25

Page 3

1    HEARING re Response to Motion Sante Marcoccias Response in

2    Opposition to Motion of Debtors for Entry of an Order

3    Extending the Automatic Stay to Certain Non-Debtor Parties

4    (related document(s)924)

5

6    HEARING re Notice of Proposed Order/ Notice of Filing of

7    Revised Proposed Order In Connection With, and Declarations

8    In Support of, Application of GA Capital for Allowance and

9    Payment of Fees and Expenses Pursuant to Bankruptcy Code

10   Sections 503(b)(3)(D) and 503(b)(4) (related

11   document(s)1102)

12

13   HEARING re Motion for Payment of Administrative Expenses /

14   Application of GA Capital for Allowance and Payment of Fees

15   and Expenses Pursuant to Bankruptcy Code Sections

16   503(b)(3)(D) and 503(b)(4).

17

18   HEARING re Motion to Shorten Time/ Motion of GA Capital for

19   Order Shortening Notice Period With Respect to Application

20   of GA Capital for Allowance and Payment of Fees and Expenses

21   Pursuant to Bankruptcy Code Sections 503(b)(3)(D) and

22   503(b)(4) (related document(s)1 102)

23

24

25

1    HEARING re Motion to Allow/Motion Seeking Entry of and Order

2    Allowing Administrative Expense Claim Pursuant to 11 U.S.C.

3    Section 503(b)(9)

4

5    HEARING re Notice of Hearing on Motion for Relief from the

6    Automatic Stay (related document(s)849)

7

8    HEARING re Motion for Relief from Stay

9

10   HEARING re Notice of Proposed Order (I) Approving the Sale

11   of Certain Real Property, (II) Authorizing the Assumption

12   and Assignment of Certain Unexpired Leases in Connection

13   Therewith, and (III) Granting Related Relief (related

14   document(s)938)

15

16   HEARING re Motion to Approve : Motion of Debtors for Entry

17   of an Order (I) Approving the Sale of Certain Real Property,

18   (II) Authorizing the Assumption and Assignment of Certain

19   Unexpired Leases in Connection Therewith, and (III) Granting

20   Related Relief

21

22

23

24

25

Page 5

1   HEARING re Interim Junior DIP Order Signed on 11/30/2018

2   (1)Authorizing The Debtors to (A) Obtain Post-Petition

3   Financing and (B) Granting Secured Priming Liens and

4   Superpriority Administrative Expense Claims; (II) Modifying

5   The Automatic Stay Scheduling Final Hearing to be held on

6   12/20/2018 at 10:00 AM at Courtroom 118, White Plains

7   Courthouse (related document(s)872).

8

9   HEARING re Motion to Confirm Termination or Absence of Stay

10  Motion for Order Declaring Automatic Stay Inapplicable to

11  Non-Residential Real Property Lease

12

13  HEARING re Motion to Approve / Motion of Debtors for Entry

14  of an Order (I) Approving Debtors Incentive and Retention

15  Programs for Certain Key Employees and (II) Granting Related

16  Relief

17

18  HEARING re Motion for Relief from Stay or, in the

19  Alternative, for an Order Compelling Assumption or Rejection

20  of an Executory Contract

21

22

23

24

25

Page 6

1    HEARING re Notice of Hearing : Notice of (I) Withdrawal of

2    Motion of Debtors to Shorten Notice with Respect to Motion

3    of Debtors for Entry of an Order Authorizing Entry into

4    Administration Agreement and (II) Hearing on Motion of

5    Debtors for Entry of an Order Authorizing Entry into

6    Administration Agreement (related document(s)870, 871)

7

8    HEARING re Motion to Extend Automatic Stay : Motion of

9    Debtors for Entry of an Order Extending the Automatic Stay

10   to Certain Non-Debtor Parties

11

12   HEARING re Objection to Motion / Limited Objection of Cross

13   Country Home Services, Inc. to Debtors Motion for Entry of

14   an Order Authorizing Entry into Administration Agreement

15   (related document(s)870)

16

17   HEARING re Motion to Extend Deadline to File Schedules or

18   Provide Required Information / Motion of Debtors for Entry

19   of Order Further Extending Time to File Schedules of Assets

20   and Liabilities, Statements of Financial Affairs, and Rule

21   2015.3 Financial Reports

22

23

24

25

1    HEARING re Notice of Hearing: Notice of Final Hearing on

2    Debtors Motion for Authority to (A) Obtain Postpetition

3    Financing, (B) Use Cash Collateral, (C) Grant Certain

4    Protections to Prepetition Secured Parties, and (D) Schedule

5    Second Interim Hearing and Final Hearing (With Respect to

6    Junior DIP Financing) (related document(s)7, 872)

7

8    HEARING re Notice of Agenda of Matters Scheduled for Hearing

9    on December 20, 2018 at 10:00 a.m.

10

11    HEARING re Motion to Reject Lease or Executory Contract /

12    Omnibus Motion of Debtors for Order Approving Rejection of

13    Certain Executory Contracts

14

15    HEARING re Motion to Extend Time / Motion of Debtors for

16    Entry of Order Enlarging Time Within Which to File Notices

17    of Removal of Related Proceedings

18

19    HEARING re Notice of Hearing Motion for Relief from Stay

20    (related document(s)383)

21

22    HEARING re Notice of Hearing

23

24    HEARING re Objection to Motion (related document(s)7)

25

1    HEARING re Notice of Motion to Set Hearing (related

2    document(s)987)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

**Page 9**

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for the Debtor

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8   BY:  GARRETT FAIL

 9         SUNNY SINGH

10         RAY C. SCHROCK

11         JACQUELINE MARCUS

12         JESSIE B. MISHKIN

13         CANDACE ARTHUR

14         NATASHA S. HWANGPO

15

16   QUINN EMANUEL URQUHART & SULLIVAN, LLP

17         Attorneys for Omega Advisors Inc.

18         51 Madison Avenue, 22nd Floor

19         New York, NY 10010

20

21   BY:  SUSHEEL KIRPALANI

22

23

24

25
```

Page 10

1   STROOCK & STROOCK & LAVAN LLP

2        Attorneys for Och-Ziff Capital Structure Arbitrage

3        Master Fund, Ltd.

4        180 Maiden Lane

5        New York, NY 10038

6

7   BY:  ISAAC S. SASSON

8        JONATHAN D. CANFIELD

9        KRISTOPHER M. HANSEN (TELEPHONICALLY)

10

11  THOMPSON HINE LLP

12       Attorneys for Assurant, Inc.

13       335 Madison Avenue, 12th Floor

14       New York, NY 10017

15

16  BY:  CURTIS L. TUGGLE

17

18  MILBANK, TWEE, HADLEY & MCCLOY LLP

19       Attorneys for Cyrus Capital Partners

20       2029 Century Park East, 33rd Floor

21       Los Angeles, CA 90067

22

23  BY:  ERIC R. REIMER

24

25

Page 11

1   NORTON ROSE FULBRIGHT US LLP

2        Attorneys for Living Spaces Furniture, LLC

3        1301 Avenue of the Americas

4        New York, NY 10019

5

6   BY:  DAVID A. ROSENZWEIG

7

8   WHITE and WILLIAMS LLP

9        Attorneys for Amerco Real Estate Company

10       7 Times Square, Suite 2900

11       New York, NY 10036

12

13  BY:  STEVEN E. OSTROW

14

15  DEBEVOISE & PLIMPTON

16       Attorneys for Cascade Investment, LLC & SL Agent, LLC

17       919 Third Avenue

18       New York, NY 10022

19

20  BY:  ERICA S. WEISGERBER

21       MY CHI TO

22

23

24

25

1   VEDDER PRICE

2        Attorneys for Village of Hoffman Estates

3        1633 Broadway, 312st Floor

4        New York, NY 10019

5

6   BY:  MICHAEL L. SCHEIN

7

8   PAUL HASTINGS LLP

9        Attorneys for GA Capital

10       200 Park Avenue

11       New York, NY 10146

12

13  BY:  ANDREW TENZER

14

15  ARCHER & GREINER, P.C.

16       Attorneys for Community Unit School District 300

17       630 Third Avenue

18       New York, NY 10017

19

20  BY:  ALLEN G. KADISH

21

22

23

24

25

Page 13

```
 1   ROBBINS SCHWARTZ

 2        Attorneys for Community Unit School District 300

 3        55 West Monroe, Suite 800

 4        Chicago, IL 60603

 5

 6   BY:  KENNETH M. FLOREY

 7

 8   AKIN GUMP STRAUSS HAUER & FELD LLP

 9        Attorneys for Unsecured Creditors Committee

10        One Bryant Park

11        New York, NY 10036

12

13   BY:  PHILIP C. DUBLIN

14        SARA L. BRAUNER

15

16   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

17        Attorneys for DIP ABL Agent

18        4 Times Square

19        New York, NY 10036

20

21   BY:  SHANA A. ELBERG

22

23

24

25
```

1    SEYFARTH SHAW LLP

2        Attorneys for Wilmington Trust, National Association as

3        Indenture Trusts and Collateral Agent

4        620 8th Avenue

5        New York, NY 10018

6

7    BY:  EDWARD M. FOX

8

9    COURT STREET LAW

10        Attorneys for Qazim B. Krasniqi

11        16 Court Street, 28th Floor

12        Brooklyn, NY 11241

13

14    BY:  RICHARD A. KLASS

15        HILLARY F. SCHULTZ

16

17

18

19

20

21

22

23

24

25

1    ALSO PRESENT TELEPHONICALLY:

2

3    JAMIE L. AGNEW

4    JOSEPH BADTKE-BERKOW

5    RYAN M. BARTLEY

6    TED A. DILLMAN

7    MATTHEW T. GENSBURG

8    CATHERINE HEITZENRATER

9    JEREMY C. KLEINMAN

10   ZACHARY D. LEVINE

11   SARAH J. SALANIC

12   MEGAN WASSON

13   RAPHAEL ANDREWS

14   NEGISA BALLUKU

15   LAUREN N. BESLOW

16   STEPHEN J. BLAUNER

17   GREGORY CASS

18   JONATHAN CHO

19   SARA COELHO

20   ANTHONY DELEO

21   JASON DIBATTISTA

22   ROBERT E. FITZGERALD

23   SCOTT FLEISCHER

24   CHRISTOPHER GARTMAN

25   KRISTOPHER M. HANSEN

Page 16

1    TAYLOR B. HARRISON

2    VLADIMIR JELISAVCIC

3    MATTHEW KOCH

4    NICHOLAS KRISLOV

5    ZACHARY LANIER

6    TERESA LII

7    MICHAEL G. LINN

8    KATHERINE E. MASSEY

9    MICHAEL MITTELMAN

10   BRYANT OBERG

11   LAWRENCE PARK

12   JASON M. PIERCE

13   RYAN REINERT

14   STEVEN J. REISMAN

15   LILLIAN A. RIZZO

16   JASON B. SANJANA

17   COURTNEY A. SCHAEL

18   PAUL SCHWARTZBERG

19   MICHELLE E. SHIRIRO

20   CHRIS STAUBLE

21   RICHARD A. STIEGLITZ

22   BRAD SWEENEY

23   EMILY THOMLISON

24   DAVID R. ZYLBERBERG

25

Page 17

1                 P R O C E E D I N G S

2            THE COURT:  Please be seated.

3            MR. FAIL:  Good morning, Your Honor.

4            THE COURT:  Good morning.  In re Sears Holding

5     Corp et. al.

6            MR. FAIL:  Yes, Good morning, Your Honor.  Garret

7     Fail, Weil, Gotshal & Manges for the Debtors.  Just begin by

8     thanking Your Honor and its chambers for accommodating a

9     busy calendar and a moving agenda for this morning's

10    hearing.

11           THE COURT:  Sure.

12           MR. FAIL:  There are a number of uncontested

13    matters and with the Court's permission we'll take number

14    two on the agenda first which is the Debtors' motion for

15    entry of an order authorizing entry into an administration

16    agreement.

17           Your Honor may recall we filed this motion prior

18    to thanksgiving -- prior to the bankruptcy as the Debtors'

19    offered their customers an opportunity to purchase

20    protection agreements or extended warranties under policies

21    and programs that were underwritten by the Debtors.

22    Subsequent to the filing, the Debtors stopped selling those

23    in the majority of their locations and platforms and looked

24    to replete what was a stable source of liquidity and revenue

25    both as a stand-alone product but also attending to the home

Page 18

1    services business end and other products that sold including

2    home appliances.

3          So the Debtors worked, as was announced at a prior

4    hearing, to negotiate an agreement and subsequently did

5    enter into the agreement that was filed with Assurant

6    Services Protection, Inc., Federal Warranty Service

7    Corporation, and United Service Protection, Inc.  Your

8    Honor, the Debtors believed it was an ordinary course

9    transaction.

10         There were no objections other than one limited

11   objection that was filed by Cross Country.  That objection

12   was withdrawn this morning.  As was noted in the motion and

13   set forth in the Assurant Agreement, there was a carve out

14   for existing obligations from the exclusive arrangement that

15   was reached with Assurant.

16         The Debtors and Assurant have entered into a

17   modification of the language to make it more clear.  Both

18   Assurant, the Debtors, and CCHS have agreed on that

19   language.  And accordingly CCHS has withdrawn its objection.

20         THE COURT:  Okay.  Have I seen that language?

21         MR. FAIL:  Your Honor --

22         THE COURT:  I saw the language that the objector

23   proposed, but I don't think I've seen the --

24         MR. FAIL:  Right --

25         THE COURT:  -- final language.

1            MR. FAIL:  -- Your Honor, and they've withdrawn

2     their objection, so the order would not be amended from the

3     one that was proposed.  I can submit --

4            THE COURT:  So this is just the agreement?

5            MR. FAIL:  The agreement was amended.

6            THE COURT:  All right.

7            MR. FAIL:  It's a third amendment, Your Honor, for

8     disclosure.  The first amendment extended the drop-dead

9     date.  Your Honor may recall there was an earlier drop-dead

10    date.  The second amended, a pricing term.  And the third

11    fixed the exclusivity.

12            THE COURT:  So this is an agreement by Assurant

13    and the Debtors that acknowledges the rights that the --

14            MR. FAIL:  Cross Country.

15            THE COURT:  -- Cross Country has under its

16    agreement?

17            MR. FAIL:  Well, Cross Country's agreement is an

18    executory contract that hasn't been assumed yet.

19            THE COURT:  Right.

20            MR. FAIL:  But it is clear from -- we thought it

21    was clear before -- it's even more clear now that the Cross

22    Country agreement would not cause a default or violate the

23    Assurant agreement.

24            THE COURT:  Okay.  That's the nature of the

25    language.

Page 20

1              MR. FAIL:  Yes.

2              THE COURT:  I just didn't want to create

3      additional rights for Cross Country.

4              MR. FAIL:  Neither did we, Your Honor.

5              THE COURT:  Okay.  Based on that record, does

6      anyone have anything to say on this motion?  All right.

7      I'll grant the motion, which is now unopposed and is

8      supported by good business reasons as laid out in the motion

9      and further the objection has been resolved on terms that

10     simply acknowledge -- as I understand it -- the existing

11     agreement under -- including under the third amendment with

12     --

13             MR. FAIL:  One clarification, Your Honor.  It's

14     not that the third amendment of CCHS.  That one that they

15     referenced in their objection has not been signed.

16             THE COURT:  That has not been signed.

17             MR. FAIL:  There's a third amendment to the

18     Assurant agreement.

19             THE COURT:  All right.  This is the third

20     amendment to the Assurant agreement?

21             MR. FAIL:  Right.

22             THE COURT:  But it -- this just acknowledges the

23     Cross Country Home Services, Inc. agreement and says that

24     the Assurant agreement -- the existence of that agreement

25     doesn't breach the Assurant agreement?

1       MR. FAIL:  Correct.

2       THE COURT:  Okay.  All right.  So I will grant

3  that motion and you can email that order to chambers.

4       MR. FAIL:  Thank you very much.  I'll turn the

5  podium over to Mr. Singh for the next items on the agenda.

6       THE COURT:  Okay.

7       MR. SINGH:  Good morning, Your Honor.  Sunny

8  Singh, Well, Gotshal on behalf of the Debtors.

9       THE COURT:  Good morning.

10       MR. SINGH:  Your Honor, the next item on the

11  agenda is the cash management motion at ECF 5, Your Honor.

12  We do have an interim order that was entered and as we

13  announced at the last hearing in connection with the DIP, we

14  were going to work together with the parties to make some

15  modifications to the interim order for cash management that

16  sort of incorporate the understanding of the parties.

17       THE COURT:  Right.

18       MR. SINGH:  So, Your Honor, we have done that.  I

19  do have a revised form of order that we literally just

20  finalized this morning before the start of the hearing.  I

21  can hand up a copy of the redline, Your Honor, if I may

22  approach.

23       THE COURT:  Okay.  That's fine.

24       MR. SINGH:  So, Your Honor, just working through

25  the order.  As we said in the DIP and the DIP order covers,

Page 22

1    any transfers between Debtors on a post-petition basis are

2    now secured and they have the priorities as set forth in the

3    DIP order.

4           Here, what we've done is really try to deal with

5    transfers by Debtors to non-Debtor affiliates.  And that

6    includes foreign affiliates as well as domestic affiliates.

7           Your Honor, so in Paragraph 6 is really where the

8    changes are, and we've made clear here that transfers by

9    Debtors to non-Debtor foreign affiliates shall not exceed $1

10   million per month or need to be budgeted in a budget for a

11   foreign Debtor -- foreign non-Debtor affiliates that we are

12   finalizing with the parties.

13          So there will be a budget and if it's a budgeted

14   expense that people have signed off on, we can do it,

15   otherwise, it will not exceed $1 million without notice to--

16   without notice to the Creditors' Committees and the DIP

17   lenders.

18          And Your Honor, with respect to Debtor affiliates

19   this is at the bottom of Page 6 -- excuse me, domestic

20   affiliates -- I apologize, Your Honor.  The Debtors cannot

21   transfer to domestic affiliates and its domestic non-Debtor

22   affiliates in excess of $1 million per week or $5 million in

23   the aggregate to all non-Debtor domestic affiliates for the

24   case without giving notice to the Creditors' Committees and

25   the DIP lenders.

Page 23

```
 1                THE COURT:  Okay.

 2                MR. SINGH:  And, Your Honor, and the loans are

 3    going to be secured and they're going to be pursuant to

 4    promissory notes and inter-company notes that we are

 5    finalizing, and it contemplates that the parties will

 6    continue to finalize the notes and they have to be

 7    reasonably acceptable.  And we'll make commercially

 8    reasonable efforts to record, et cetera when it makes sense

 9    to do so.  Particularly with respect to foreign

10    jurisdiction.  In some cases, it may not.

11                THE COURT:  Okay.

12                MR. SINGH:  So we'll continue to work that out.

13    And Judge, just one thing I would note, the numbers in the--

14                THE COURT:  Well, could I -- and then --

15                MR. SINGH:  Yeah.

16                THE COURT:  -- Paragraph 9 -- new Paragraph 9

17    syncs this order up with the DIP orders.

18                MR. SINGH:  Exactly.  This is --

19                THE COURT:  Okay.  Including the junior DIP order.

20                MR. SINGH:  Exactly, Your Honor.  This deals with

21    --

22                THE COURT:  Okay.

23                MR. SINGH:  -- intercompany Debtor to Debtor

24    transfers --

25                THE COURT:  And their rights --
```

1          MR. SINGH:  -- on a post-petition basis.

2          THE COURT:  -- vis-à-vis other liens?

3          MR. SINGH:  Exactly.

4          THE COURT:  Okay.

5          MR. SINGH:  Exactly.  So we just incorporated by

6    reference so as to not restate anything here.

7          Your Honor, we've also agreed to reporting in

8    Paragraph 10 and maintaining intercompany transaction

9    records.  So we'll continue to comply with that.

10         Judge, just one change.  If you see Paragraph 11

11   that we literally just -- I just wrote in as we were -- as

12   Your Honor was taking the bench.  This deals with Sears Re

13   and we -- if Your Honor recalls, we are not making any cash

14   payments to Sears Re, continuing not to do so.  But we are

15   honoring warranty payments as part of the business.

16         And so this just makes clear that if the warranty

17   payments or any cash transfers need to be made to Sears Re

18   we'll have to get the consent of the parties to do so.

19   Currently, the way the warranty payments are honored are

20   it's a set off against the company's net receivable --

21   against the Debtors' net receivables.

22         We're not sending cash, but we are maintaining

23   books and records and reducing the amount that's due to the

24   Debtors.

25         THE COURT:  So that's not in my Paragraph 11.  You

Page 25

1   wrote that in?

2              MR. SINGH:  Yes, that's words that I just -- that

3   I just -- so Your Honor, the change would be the "Debtors

4   are authorizing the power to pay and honor any amounts due

5   with respect to warranty payments provided that nothing

6   herein shall authorize the Debtors to make any cash

7   transfers to Sears Re Insurance Company" --

8              THE COURT:  You struck the word other?

9              MR. SINGH:  Exactly.

10             THE COURT:  Right.  Okay.

11             MR. SINGH:  "Without the consent of the Creditors'

12   Committee or the DIP agents."

13             THE COURT:  Okay.

14             MR. SINGH:  So that's the change and we will

15   submit a revised order.

16             THE COURT:  That's fine.

17             MR. SINGH:  Your Honor, I think that's it.  unless

18   there's any questions you have or anything else.

19             THE COURT:  I mean, I think this did address the

20   issues that the committee had raised in its supplemental

21   filing.  And I shared -- I wanted to make sure that the DIP

22   agreements aligned themselves with this order, which now

23   they do.  So I am comfortable with these changes.  And in

24   the light of there being no continuing opposition to the

25   entry of this order -- the cash management order -- I'll

Page 26

1    grant the motion on a final basis --

2              MR. SINGH:  Thank you, Your Honor.

3              THE COURT:  -- on these terms as laid out on the

4    record today and in this black line.

5              MR. SINGH:  Okay.  Thank you, Judge.  We will

6    submit a revised order to chambers.

7              THE COURT:  Okay.

8              MR. SINGH:  Your Honor, if I could just -- we have

9    resolved one of the matters that was contested for this

10   morning's agenda.  We resolved it just before the hearing.

11   If I could take that matter up now.

12             THE COURT:  Okay.

13             MR. SINGH:  that is the motion by Great American

14   for substantial contribution.  And the parties have resolved

15   it and if I can read the resolution -- Your Honor, recite

16   the resolution.  So basically the parties have agreed that

17   Great American will have a substantial contribution claim

18   for $1.25 million all-in for all of the professional's

19   costs, expenses that they have asserted in connection with

20   the junior DIP financing.

21             The Parties will exchange, the Debtors and Great

22   American, will exchange full releases of anything associated

23   with the junior DIP.  You know, they have other claims.

24   We're not dealing with anything there.  Of course, they have

25   pre-petition claims.

Page 27

1          And just one point, Your Honor, the UCC just in

2     terms of how we would do this from a timing perspective, Mr.

3     Dublin needs to go back obviously to the UCC to make sure

4     they're okay with this, so what we would propose is to

5     adjourn the matter to the next hearing date in January.  But

6     we believe we'll be able to submit an order probably

7     tomorrow or the day after.

8          THE COURT:  Well, I think you should do it by

9     notice of presentment.

10          MR. SINGH:  Okay.

11          THE COURT:  You know, the law firm time records

12     weren't submitted until after the company had objected.  And

13     I'm not saying that this isn't necessarily a fair

14     settlement, I just think people should have a little more

15     notice of it.

16          MR. SINGH:  Certainly, Your Honor.  So we'll file

17     a revised order and notice of presentment with the Court.

18          THE COURT:  Okay.

19          MR. SINGH:  Okay.  And I think that -- so that

20     will resolve --

21          MR. TENZER:  Good morning, Your Honor.  Andrew

22     Tenzer of Paul Hastings on behalf of Great American Capital.

23          Debtors' counsel has described accurately a

24     resolution that we have reached, and we will obviously work

25     out the language of the order with the Debtors and

Page 28

1   Creditors' Committee and submit it to the Court on notice of

2   presentment.

3         THE COURT:  Okay.  that's fine.  I mean, I

4   obviously had prepared for this because I didn't know that

5   you all had just recently settled it and had come to the

6   preliminary conclusion that that some administrative expense

7   was warranted.  At least in respect of documenting the final

8   documents, which as Mr. Tenzer's paper said, the DIP lender

9   that ultimately was chosen, stepped into.

10        But, you know, again, it's not clear to me how far

11  beyond that a settlement would go.  Obviously, there are

12  litigation costs, et cetera.  So I just think it should be

13  noticed.

14        MR. TENZER:  Thank you, Your Honor.

15        THE COURT:  Okay.

16        MR. SINGH:  Thank you, Your Honor.  I think we --

17  I can turn it over to Candace Arthur to handle the next

18  matter.

19        THE COURT:  Okay.

20        MS. ARTHUR:  Good morning, Your Honor.  For the

21  record, Candace Arthur, Weil, Gotshal & Manges on behalf of

22  Sears Holdings Corporation and its affiliated Debtors.

23        Your Honor, the item on the agenda that I will be

24  handling is the Debtors' motion to sell 13 parcels of non-

25  residential real property and assign five unexpired leases

Page 29

1    to AMERCO Real Estate Company.  Your Honor may note that in

2    the motion we did list that there are going to be six

3    unexpired leases that will be subject to the purchase

4    agreement.  One of the leases expired in connection with the

5    lessee's bankruptcy that was pending in Illinois pursuant to

6    the termination of D65 D4 deadlines.  So only five will be

7    going forward --

8              THE COURT:  Okay.

9              MS. ARTHUR:  -- in terms of the assignment.

10             The motion was filed in November 29th and is

11   reflected on the docket as ECF number 938.  In support of

12   the motion, the Debtors also filed a declaration of Roger

13   Puerto, their head of real estate transactions.  Mr. Puerto

14   is in the court room this morning.  The declaration is

15   reflected on the docket at ECF number 1053.

16             The Debtors also filed a revised proposed order

17   yesterday afternoon, Your Honor, reflecting comments

18   received from the Creditors' Committee, the ABL DIP lenders,

19   Cardtronics USA, Inc., and other parties and interests.  The

20   revised proposed order is reflected in the docket at ECF

21   number 1350.  With the Court's indulgence, I can provide

22   some high-level points as to the transaction.

23             The Debtors engaged in a robust marketing effort

24   in connection with monetizing these assets.  They started

25   from early 2018 and in at least with respect to one of the

Page 30

1   properties, they've been marketing it since 2014.  None of

2   the assets are material to the Debtors' ongoing operations

3   or revenue generating capacity.

4           And ultimately, Your Honor, the purchase price

5   offered by AMERCO is in the aggregate higher or better than

6   any other offers received for the assets.  The value

7   allocated to the majority of the assets is higher than the

8   appraised value of the applicable asset.  And the Debtors

9   did engage in several months of arm's length negotiations

10  with AMERCO.

11          We submit that proceeding with the sale as set

12  forth in the purchase agreement is in the best interest of

13  the Debtors' estates and creditors and a sound exercise of

14  their business judgment.

15          I do want to note for Your Honor that consummating

16  the transaction will generate proceeds for the benefit of

17  the Debtors' creditors and estates.  Specifically, two of

18  the parcels are unencumbered and will generate approximately

19  $7.2 million towards the wind down account.  Seven of the

20  thirteen parcels being sold for a total amount of

21  approximately $32 million are collateral securing the

22  Cascade loan.  The remaining four parcels that are being

23  sold for a total of over $5.23 million are non-Debtor

24  collateral securing the REMIC loan.

25          The liens of the respective creditors will attach

Page 31

1    to the sale proceeds.  So Your Honor no party objected to

2    the sale of the assets pursuant to the terms of the purchase

3    agreement.  The sale itself is uncontested.

4            However, as you may note, or to the extent you had

5    a chance to review this morning, SL Agent LLC, the agent

6    under the Cascade loan, did file a limited objection to the

7    motion.  And they're requesting that the Debtors either use

8    the proceeds from the sale of the Cascade properties to pay

9    down Note A which is -- has approximately $100 million

10   outstanding or the Court order the Debtors to segregate the

11   sale proceeds pending further order.

12           The Debtors believe that the relief that the

13   Cascade agent is requesting would in fact create a slippery

14   slope that will render administering these Chapter 11 cases

15   unmanageable and have very detrimental effects on the

16   estates.  As an initial matter, the Cascade loan is

17   bifurcated into two notes.  Note A is a first out tranche

18   and there's approximately $720 million outstanding under

19   Note B which is held by JPP.

20           Counsel for JPP has confirmed that they have no

21   issue with the Debtors selling $30 million of the collateral

22   placing a lien on the proceeds of the sale and putting the

23   proceeds of the sale under cash management system for use

24   during the pendency of these Chapter 11 cases.

25           I'm only highlighting, Your Honor, the position of

Page 32

1    the holders of Note B because it would mean that the Cascade

2    agent is in fact arguing, surprising to the Debtors, that

3    the holders of Note A are not adequately protected.  First,

4    Your Honor, the holders of Note A are over secured.  There's

5    a significant equity cushion.  After the sale --

6              THE COURT:  Okay.  can I interrupt you?

7              MS. ARTHUR:  Yes.

8              THE COURT:  It's cash collateral, though, right?

9              MS. ARTHUR:  Pardon, Your Honor?

10             THE COURT:  It's cash collateral?

11             MS. ARTHUR:  Yes, Your Honor.

12             THE COURT:  So you either need to get their

13   consent or make a motion for its use.  So I think that until

14   I granted such a motion, or you've gotten their consent, you

15   should hold the money.

16             MS. ARTHUR:  Your Honor, the Debtors believe that

17   in connection with its -- particularly with the junior

18   interim DIP order that the protections that the Cascade

19   agent wanted in connection with the use of cash collateral--

20             THE COURT:  It's just there's no motion in front

21   of me.  You can make it on an expedited basis.  But they

22   have a right to look at what you're offering and say, you

23   know, we're still not adequately protected.

24             MS. ARTHUR:  That's fine, Your Honor.  We'll make

25   a motion.

Page 33

1          THE COURT:  Yeah.  And again, I can -- I mean, if

2     you -- if the companies -- the company needs the money

3     before the next interim -- the next omnibus hearing, you can

4     make a motion on shortened notice under the, you know, the

5     bankruptcy rules for an expedited determination of that.

6          MS. ARTHUR:  Okay.  I -- Your Honor, I'm happy to

7     comply with that.  And we will do so.  To the extent you

8     have any further questions --

9          THE COURT:  No, I don't.  I looked at Mr. Puerto's

10     declaration.  I assume because this is the only -- you

11     resolved the other one.  You resolved the --

12          MS. ARTHUR:  Cardtronics.

13          THE COURT:  -- Cardtronics objection.  So I think

14     this objection is resolved by what we just said.  DSL agent

15     objection.  And let me just, for the record, does anyone

16     want to cross-examine Mr. Puerto on his declaration?

17          THE COURT:  Okay.  I'll grant the motion then with

18     the liens to attach to the sale proceeds.

19          MS. ARTHUR:  Thank you, Your Honor.  So with

20     respect to the Cascade -- the proceeds for that --

21          THE COURT:  Well, maybe there are people who want

22     to --

23          MS. ARTHUR:  -- we'll set it aside.

24          THE COURT:  -- I didn't realize there were people

25     who wanted to speak who are standing behind you.

1           MR. OSTROW:  Good morning, Your Honor.  Steven

2    Ostrow, White and Williams.  I'm counsel for the purchaser,

3    AMERCO Real Estate Company.

4           THE COURT:  Right.

5           MR. OSTROW:  I didn't realize that counsel for the

6    Debtors was going to indicate that one of the leases that

7    had been rejected in the tenant's bankruptcy was going to be

8    removed from the sale.  We would -- we still want that lease

9    signed -- assigned to us even though we recognize that it's

10   been rejected by the -- by that tenant party.

11          THE COURT:  So the Debtors -- to the extent -- I

12   guess what you -- I mean, I don't want to put words in your

13   mouth.  But let me suggest this.  Is it what you're saying

14   which is that to the extent that the Debtors have any rights

15   in that lease that's being assigned?

16          MR. OSTROW:  correct.

17          THE COURT:  That's fine, right?

18          MR. OSTROW:  Yes.

19          MS. ARTHUR:  Absolutely, Your Honor.

20          THE COURT:  okay.

21          MR. OSTROW:  Thank you, Your Honor.

22          THE COURT:  That's fine.  I imagine that the

23   Debtor you're talking about or the trustee would be happy to

24   go along with that.  But --

25          MR. OSTROW:  They won't be significant, but

Page 35

1    whatever they are --

2            THE COURT:  Right.

3            MR. OSTROW:  -- it gives us some control over that

4    portion of the property.

5            THE COURT:  Sure.  Okay.

6            MS. CHI TO:  Good morning, Your Honor.

7            THE COURT:  Good morning.

8            MS. CHI TO:  My Chi To of Debevoise & Plimpton on

9    behalf of SL Agent LLC.  We thank you for your ruling this

10   morning and obviously agree with it and we'll look forward

11   to working out the revised form of order reflecting it with

12   --

13           THE COURT:  Well, I don't think there -- nothing

14   needs to be -- I don't think anything needs to be revised.

15   Were liens attached to the proceeds in the, you know, in the

16   same amount priority extent et cetera that they existed at

17   the closing.  And then it's cash collateral.  So then 363

18   and 362 govern.

19           MS. CHI TO:  Your Honor, the revised form of order

20   that was submitted yesterday had paragraphs that proposed

21   that all the proceeds of the sale be used in accordance with

22   the budget.  And therefore we would need --

23           THE COURT:  Okay.  well, that would have to be

24   changed.

25           MS. CHI TO:  Yes.  That's what I meant.

Page 36

```
 1                THE COURT:  Okay.

 2                MS. CHI TO:  Thank you, Your Honor.

 3                THE COURT:  With respect to your collateral.

 4     Because I assume everyone else has consented?

 5                MS. CHI TO:  That's right.

 6                THE COURT:  Okay.

 7                MS. CHI TO:  Thank you.

 8                MR. O'NEAL:  Your Honor, Sean O'Neal on behalf of

 9     JPP, Cleary Gotlieb.

10                I just wanted to clarify, I think the statement

11     was made that the -- that JPP as a lender holding the Note B

12     does not have any issue with the motion or with the relief

13     requested.  I would just clarify that we have no objection

14     to it.

15                THE COURT:  Okay.  All right.  Well, --

16                MR. O'NEAL:  We actually have -- we've --

17                THE COURT:  That's more precise, I suppose, so --

18                MR. O'NEAL:  Yes, it is, Your Honor.

19                THE COURT:  Okay.  All right.  But that includes

20     the order's provision for using the cash?

21                MR. O'NEAL:  Your Honor, under our inter-creditor

22     agreement, the Note A holder, the agent, has all kind of

23     bankruptcy related rights so that's why I made the

24     statement.

25                THE COURT:  I see.  Okay.
```

Page 37

1              MS. ARTHUR:  Okay, Your Honor.  In that case I

2       will move to the next item on the agenda.  I'm going to

3       introduce Mr. Susheel Kirpalani.

4              THE COURT:  Okay.  I was wondering if we could put

5       this towards the end.

6              MS. ARTHUR:  We can do that.

7              THE COURT:  I think this will take more time

8       unless someone is time pressed?

9              MS. HWANGPO:  That would be me, Your Honor.

10             THE COURT:  You are time pressed?

11             MS. HWANGPO:  Yes. (indiscernible)

12             THE COURT:  All right.  So maybe we could move --

13             MS. ARTHUR:  We can move the item, Your Honor --

14             THE COURT:  Yeah.

15             MS. ARTHUR:  -- to the extent you prefer to the

16      interim -- to the junior DIP order.  And to that extent I'll

17      cede the podium to my colleague, Natasha Hwangpo.

18             THE COURT:  Okay.

19             MS. HWANGPO:  Your Honor, for the record, Natasha

20      Hwangpo, Weil, Gotshal & Manges for the Debtors.  Moving on

21      to agenda number five which I believe is the Debtors' junior

22      DIP motion.

23             The junior DIP motion seeks approval of the $350

24      million junior DIP facility on a final basis.  Your Honor,

25      we believe it is imperative that the Debtors get final

Page 38

1    relief at this juncture and as Your Honor may remember, the

2    junior DIP is the product of rigorous negotiations which

3    took place all the way to the court house lobby on the

4    morning of the interim junior DIP hearing.  And ultimately

5    culminated in a global settlement with the junior -- or

6    excuse me -- the Debtors' key stake holders, including their

7    Creditors' Committee.

8             In light of such a global settlement, the Debtors

9    have received no informal objections, and four formal

10   objections.  They were filed by the second lien indenture

11   trustee, Mien Co, Luxottica and the Texas Taxing

12   Authorities.  The Debtors filed an omnibus reply at docket

13   number 1297 responding to all formal objections.  And as

14   noted in the reply, we've resolved the Texas Taxing

15   Authorities objection.  And they will be seeking clearer

16   language and sales order as necessary.

17           THE COURT:  Okay.

18           MS. HWANGPO:  This leaves three remaining

19   objections, which again, as stated in the reply, the Debtors

20   believe should be overruled and the motion granted on a

21   final basis.

22           But, Your Honor, I did want to note that the

23   Debtors also filed a final junior DIP order as Exhibit A to

24   the reply and a redline against the interim junior DIP order

25   as Exhibit B.

1          THE COURT:  And that's the redline in the binder,

2    correct?

3          MS. HWANGPO:  That's correct, Your Honor.

4          THE COURT:  Okay.  so I've reviewed that.

5          MS. HWANGPO:  And those changes are really just to

6    reflect changes that need to be made as a final order.

7          THE COURT:  Right.

8          MS. HWANGPO:  And the only substantive change was

9    the removal of the Luxottica language in Paragraph 66 as

10    they are objecting to the DIP.

11          THE COURT:  But you're happy to put it back in?

12          MS. HWANGPO:  Should we come to a resolution.

13          THE COURT:  Okay.

14          MS. HWANGPO:  Unless Your Honor has any questions,

15    I'm happy to cede the podium to anyone who would like to be

16    heard.

17          THE COURT:  Okay.  Well, why don't we take the

18    lien agent first.

19          MR. FOX:  Good morning, Your Honor.  Edward Fox

20    from Seyfarth Shaw on behalf of Wilmington Trust National

21    Association, as indenture trustee and collateral agent for

22    the senior secured notes due to six and five-eighths percent

23    senior secured notes due 2018.

24          Your Honor, I think I can make this brief.  I

25    noticed that after the Great American motion for approval of

Page 40

1   their fees, the Great American representative has left.

2            THE COURT:  They left.

3            MR. FOX:  I assume that means that they have no

4   further interest in pursuing the junior DIP which would make

5   moot the issues that we raised at this point.  And so on

6   that basis, I think we can just withdraw the objection.

7            THE COURT:  that's fine.  The record will reflect

8   that.  Anyone here from the Texas ad valorem taxing

9   jurisdictions?  Then I'll take counsel's representation that

10  that matter's been resolved.  And that leaves -- I don't

11  know if you pronounce it Mean Co or Me-an Co.

12           MR. SARACHEK:  Yes.  Mean.

13           THE COURT:  Am I --

14           MR. SARACHEK:  I know.

15           THE COURT:  Maybe they want to change it to Me-an.

16           (Laughter in the Courtroom)

17           MR. SARACHEK:  Good morning, Your Honor.  Joe

18  Sarachek on behalf of Mean.  Your Honor, thank you.

19           THE COURT:  Good morning.

20           MR. SARACHEK:  Your Honor -- Thank you.  And Happy

21  Holidays.  Your Honor, Mean is a trade vendor.  They are an

22  administrative claim holder.  And internally, they believe

23  that their analysts have looked at what they think the

24  shipments that Sears received in the month prior -- and more

25  specifically, in the 20 days prior to the bankruptcy filing

Page 41

1   -- and that number could be something like $350 million.

2   For Your Honor's, you know, information, there have already

3   been about $35 million of administrative claims that have

4   traded.  And the issue really is this is costing significant

5   --

6           THE COURT:  Is that based on filings under the

7   bankruptcy rules?

8           MR. SARACHEK:  Based on 3001 filings.

9           THE COURT:  Okay.

10          MR. SARACHEK:  The issue really is is that the

11  $240 million in the wind down account -- and I've

12  communicated with Sears' counsel, I showed up at the 341

13  meeting, and it's not just Mean.  There are many other

14  administrative creditors who are really, really suffering,

15  Your Honor.  When I say really suffering, the issue is Mean

16  is owed a total of $4 million, they have about $484,000 and

17  we're just simply asking --

18          THE COURT:  I'm sorry.  Which is it?  $4 million

19  or 480 --

20          MR. SARACHEK:  No, no.  They're owed a total --

21  I'm sorry.  Let me be specific.  They're owed $484,000 in

22  the 20-day period --

23          THE COURT:  Okay.

24          MR. SARACHEK:  -- prior to.

25          THE COURT:  Right.

1           MR. SARACHEK:  Their total claim is $4 million.

2    This is a small business.  And basically, they don't want to

3    sell their claim.  They're still supplying Sears.  But they

4    need -- they have lenders, they have vendors.  And believe

5    it or not, China isn't as like kind as the U.S. when it

6    comes to your obligations.  They're getting -- and the

7    Debtors are aware -- I've spoken to Mr. Fail about this --

8    they're getting serious threats from their vendors about

9    their ability to repay.

10          Obviously, they understand the $4 million -- the

11   unsecured claims is the lowest priority -- but with respect

12   to the 503(b)(9), that obviously has a higher priority.

13          They can't afford to sell this at 60 cents on the

14   dollar which is where the market is today.  The issue really

15   is that Sears needs to come clean and say, look, we know we

16   got $350 million.  This isn't a hard exercise.  We know we

17   got $350 million -- $200 million -- whatever the number is

18   within the 20-day period and we are administratively solvent

19   or we're not administratively solvent.  And by doing that --

20   by doing that, Your Honor, it will greatly, greatly help the

21   existing vendors.

22          Mean is an existing vendor.  They are providing

23   goods.  This is putting a lot of pressure, not just on Mean.

24   I also represent an organization, Helen Andrews, putting a

25   lot of pressure on these vendors.  And what we're asking

Page 43

1   for, Your Honor, is for Sears to provide the information,

2   provide some assurances that $240 million in the wind-down

3   account, because here's their response, Sears' response, and

4   I'll let them speak, of course.  But their response is,

5   well, we think that should be adequate.  Well, no attorney

6   would ever operate, "Well, maybe my fees are going to get

7   paid; maybe they're not."  No attorney would every operate

8   that way.  Why should the vendors operate that way?

9          THE COURT:  I come across many who operate that

10  way.

11          (Laughter in the Courtroom)

12          MR. SARACHEK:  That's not a good way to operate.

13          THE COURT:  Well, I mean it's a business model for

14  people that represent small and medium-size Debtors, so ...

15  But I'm going across -- off the point.  But I want to bring

16  you back to the point -- I understand your clients concern.

17  But I don't see how it ties into this particular motion.

18          MR. SARACHEK:  Because what hap -- what -- in this

19  motion there is a $240 million wind-down account that's

20  referenced.  And if that is inadequate, if that wind-down

21  account is inadequate, that kind of implies -- not kind of,

22  that implies that Sears is administratively insolvent.

23          We are on the back of another case, which I'm sure

24  you're familiar with, Toys R Us, where vendors,

25  administrative claim vendors, recently have paid 15.5

1   percent of their post-petition claims.  So, just bringing

2   this back, that 350 either is adequate or it's not adequate.

3   And the 240 that's part of the 350 is either adequate or

4   it's not.  And we're simply asking for there to be a process

5   that discloses what the 20-day shipments were.

6           THE COURT:  Again, every piece of information I

7   have from the prior hearing on this, as well as the motion

8   papers, makes it pretty clear that they need the money now.

9           MR. SARACHEK:  We agree.

10          THE COURT:  And that it does take the Debtors

11  through the sale process that has also been set up by orders

12  that I've entered, to either sell a substantial or all of

13  their remaining businesses as a going concern, or

14  substantially, all of it is part of one liquidation sale or

15  piecemeal sales.

16          And I guess while I -- again, I think I fully

17  appreciate your client's concerned and I think that it

18  should be addressed in some way.  I don't think it

19  necessarily, or properly applies to this particular

20  determination I'm being asked to make today.

21          I mean, I assume that the Debtors will be

22  establishing a bar date for admin claims that include

23  503(b)(9) claims, or bar date for all claims, and that that

24  will be done promptly.  And claimants themselves have their

25  rights to file claims, separate and apart from that.

1          MR. SARACHEK:  They have filed the claims and

2    there is a motion right now from one claimant to compel, but

3    Your Honor, can I suggest something?

4          THE COURT:  And I assume the Debtors' response to

5    that motion will be we want to do this in an orderly fashion

6    and we're going to set up procedures so that it can -- I

7    mean, so that Debtors have done in countless other retail

8    cases, to deal with those types of claims.

9          MR. SARACHEK:  Can I make a suggestion, Your

10   Honor, which is, what if, in connection with this junior DIP

11   financing, there was an affidavit that basically said this

12   is the amount we got within the 20 days and the $240 million

13   is sufficient to cover that.

14         THE COURT:  Well, I'll think about that.

15         MR. SARACHEK:  Thank you.

16         THE COURT:  Okay.  Let's address that one first

17   and then I'll hear the Luxottica.

18         MS. HWANGPO:  Your Honor, as you stated, we do

19   believe that this is not the right time to be dealing with

20   Mean Co's objection.  I don't think it's related to the DIP.

21         But we did want to state for the record that at

22   the 341 meeting, the Debtors did say that the Debtors did

23   state that they are administratively solvent and that we'd

24   continue to pay our administrative expenses as they come

25   due.

1          Also, the Debtors will be filing their SOFAs and

2     statements, set up a bar date and they do intend to create

3     an orderly process in which claims, including the 503(b)(9)

4     claims will be settled or reconciled.

5          THE COURT:  Okay.  I think you should do that

6     promptly.

7          MS. HWANGPO:  We will, Your Honor.

8          THE COURT:  Either a separate 503(b)(9) procedures

9     motion or including it within a bar date.  You don't

10    necessarily have to do the bar date right away, but I think

11    it is important to get a grip on the 503(b)(9) claims

12    because people will start asserting them and generally the

13    response to that focus is on an orderly way to deal with

14    them so that no one is unduly rewarded for coming first or

15    unduly prejudiced for not coming first.

16         MS. HWANGPO:  Understood, Your Honor.

17    (indiscernible)

18         THE COURT:  Okay.

19         MR. ALLERDING:  Good morning, Your Honor.  John

20    Allerding on behalf of Thompson Hine on behalf of Luxottica

21    Retail North America Inc.

22         As Your Honor knows, we are here on our objection

23    to the junior DIP motion.  We do not want to stand in the

24    way of this financing, but we cannot continue to sit back

25    while the Debtors engage in post-petition conversion of

Page 47

1    Luxottica's funds.

2            Your Honor, this is, our objection, is closely

3    tied into the issues we raised in our motion for relief from

4    stay and our motion to compel assumption or rejection, both

5    of which are also before the Court today.

6            Your Honor, these are funds generated by

7    Luxottica's sale of Luxottica's goods and Luxottica's

8    services.  Sears has no right or title to these funds other

9    than a small portion which is considered a company fee.

10           The license agreement specifically states that the

11   company and licensee agree and intend for the funds

12   reflected in the cash, checks and credit sales documents

13   minus a company fee to be held by the company for the

14   benefit of and in trust for licensee and that title to such

15   a fund shall not pass to the company.

16           Your Honor, there is no dispute that these assets

17   or these funds are held in trust.

18           THE COURT:  I think there is a dispute, isn't

19   there?

20           MAN 2:  Yes, Your Honor, there is.

21           MR. ALLERDING:  Your Honor, my understanding was

22   that there isn't a dispute that the funds are held in trust,

23   it's a dispute of whether or not the holding the funds in

24   trust requires segregation and requires the Debtors to avoid

25   co-mingling.  That was my understanding of the Debtors'

Page 48

1    position.  Your Honor, Luxottica's motion does not --

2         THE COURT:  But aren't -- don't those tie into

3    each other?  I mean, in one paragraph of the agreement -- in

4    the same paragraph, actually, 9.3., there's a whole

5    mechanism for using, making the payments to Sears, Sears

6    Roebuck and Company, and using he Sears POS terminals, and

7    no mention of any segregation.

8         MR. ALLERDING:  Understood, Your Honor --

9         THE COURT:  And then there's the amendment, which

10   you quoted.  But the amendment doesn't really specify how

11   the funds are to be dealt with.  So, look, this is a summary

12   proceeding.  I'm not prepared or authorized to determine, in

13   that context, whether this is -- this arrangement, which may

14   include the party's course of dealing with each other too,

15   which I have no evidence on, is one that creates and

16   maintains a trust, or not.  And that's something that needs

17   to be decided in a proper procedural context.  That's what

18   the Second Circuit said in Orion Pictures and I said in A&P

19   and Judge Chapman said in Sabine.

20        So, I think what we're dealing with here is

21   something that's more narrow, which is preserving, to the

22   extent they exist, Luxottica's rights under the agreement.

23   And your point, of course, is that if we continue the

24   procedure that Sears is proposing, which is to continue the

25   comingling, now that you've raised the issue, your rights

1  actually may be prejudiced because, at least on a go-forward

2  basis, since you've raised the issue -- and I don't know

3  when you first raised the issue.  I mean that's a factual,

4  but you've clearly raised it in this case.  So, there needs

5  to be some way to protect those rights at this point.

6           MR. ALLERDING:  That is correct, Your Honor, and--

7           THE COURT:  Without determining what they are.

8  And you're saying that co-mingling doesn't necessarily do

9  that.

10          MR. ALLERDING:  Correct, Your Honor.  At the last

11  -- at the senior DIP financing hearing, Your Honor made very

12  clear that the Debtors cannot grant a lien on property that

13  is not estate property, and we agree.  The problem is, by

14  co-mingling these funds, they're engaging in conversion,

15  which is arguably subjecting --

16          THE COURT:  Well, maybe.  Well, that's not really

17  the issue, I think.  The issue is whether your rights,

18  whatever your client's rights, whatever they are, are now

19  diminished as a result of that.

20          So, the Debtor has offered up, in a couple of

21  different places -- I'm quoting now from their response to

22  the lift stay motion, but I think it's the same offer -- in

23  Paragraph 7 in their response they say, "With respect to the

24  proceeds of post-petition sales, the Debtors are willing to

25  provide Luxottica arrangements, similar to the ones extended

Page 50

1    to the consignment vendors as reflected in the GOB order.

2         Specifically, the Debtors are willing to establish

3    a segregated account similar to the reserve account for the

4    consignment vendors, except that the proposed segregated

5    account will hold only Luxottica's funds."  And then they

6    say, "The Debtor has further proposed that such account will

7    hold a balance equal to Luxottica's average unremitted sales

8    between payments, less the Debtors' commissions.  In

9    addition, the Debtors have been and will continue to remit

10   the proceeds of post-petition sales, debt or the Debtors'

11   commissions, to Luxottica on a weekly basis consistent with

12   the license agreement."

13         I guess -- notwithstanding the fact that it says,

14   "Will hold in a segregated account only Luxottica's funds,"

15   you're saying that that's really not what they're proposing?

16         MR. ALLERDING:  That is not what they're

17   proposing, Your Honor.  They are proposing to take

18   Luxottica's funds, continue comingling it with their own,

19   continue transferring those funds to the DIP lender.  And

20   then, at some point, presumably about a week later, the

21   funds come back from the DIP lender into this now segregated

22   account, and then flip through to Luxottica.

23         THE COURT:  Right.

24         MR. ALLERDING:  And to address the pre-funding

25   issue, Your Honor, their position is that there are between

Page 51

1    one and six days of exposure during the week, and each day

2    it increases by a day.

3            And they're proposing to pre-fund it by three and

4    a half days, so, on days four, five, six and seven, we are

5    not, there's not enough money in that account to cover

6    Luxottica's trust funds.

7            THE COURT:  Let me -- I think there are two --

8    correct me if I'm wrong -- I think there are two concerns

9    that you have with regard to that proposal.  The first is

10   that the very fact that they put back in not the same funds,

11   but different funds, may somehow diminish your argument that

12   these are trust funds.  That can be done -- that can be

13   dealt with by wording.  You can say in the order that it

14   will be deemed that these are the same monies that came out.

15   Then you're worried about credit exposure, right, that at

16   some point that account won't be replenished with the actual

17   amount.

18           MR. ALLERDING:  That is correct, Your Honor, yes.

19           THE COURT:  And I guess, on that score -- I'm not

20   sure which of the lawyers for Weil Gotshal is handling

21   this, so I don't know who to look to.

22           But I think the truism that the Debtors can't

23   grant a lien on property that they don't own, doesn't

24   necessarily answer Luxottica's credit concern because the

25   money they -- I mean, it's conceivable that the money may be

Page 52

1    spent and there's no fungible cash collateral that could

2    equal the shortfall if it's determined that Luxottica does

3    have a trust interest in this property that the Debtors

4    couldn't grant a lien on, that will never be caught up.

5           So, I don't know if there's a way to bridge that

6    gap somehow.

7           MR. SINGH:  Yes, you know.  Sunny Singh, Weil

8    Gotshal on behalf of the Debtors.  Your Honor, we did

9    propose and created a technical and (indiscernible)

10   settlement (indiscernible) is fine.  We did propose that it

11   would be funded twice a week so that it is -- we would be

12   making payments to them twice a week so that their exposure

13   is only three and a half days, and that it would be pre-

14   funded with the average three-and-a-half days spent.  I

15   don't know how much better we can get than that, Your Honor.

16   They want precisely that as the money's coming in we're sort

17   of reporting each dollar and then be able to transfer that.

18   We just simply can't do that as an administrative matter

19   because these sales don't come in through a separate

20   Luxottica account.  It's within the Sears --

21          THE COURT:  Let me just -- I mean, based on,

22   including what your colleague said to me on the last motion,

23   the Debtors are not projecting administrative insolvency,

24   let alone being short on the DIP loan

25          MR. SINGH:  Right.

1          THE COURT:  So, it would seem to me that there

2     should be a way to grant a priming replacement interest in

3     the DIP collateral to the extent that the DIP lenders have

4     used -- advanced by a ruling by me, so it's not wrongful for

5     them to have used it -- trust fund money.  And if there's

6     any suggestion that there will ever be a shortfall, then you

7     give them notice and, you know, they can, at that point you

8     have to eventually change the POS system so the money stays

9     in the account.

10          MR. SINGH:  And Your Honor, there basically

11     already is a mechanic for that, it's permitted prior liens.

12     They're not --

13          THE COURT:  So, would they be included in that?

14          MR. SINGH:  Within the DIP?  If I can just check--

15     one second.

16          THE COURT:  Well, if not, you can expressly

17     include them.  I mean it's not really a lien, it's an

18     ownership interest.  So, if that's within the definition

19     then it's easy enough to do.

20          MR. SINGH:  So Judge, that's right.  It's not a

21     lien.  Excuse me, if it's not our property, they're not

22     getting a lien on it in the first instance.

23          THE COURT:  Right.

24          MR. SINGH:  So, if we need a clarification that to

25     the extent it's later determined that they got trust funds,

1    you know, and that wasn't the Debtors --

2            THE COURT:  Same portion -- the same amount of

3    what would otherwise be the DIP lender's collateral would go

4    to Luxottica.

5            MR. SINGH:  Right, they'd have to -- assuming they

6    prove --

7            THE COURT:  Oh, yeah, they'd have to establish all

8    that.  Correct.

9            MR. SINGH:  All of those things they have a right

10   to come in.

11           THE COURT:  Right.

12           MR. SINGH:  Right, which I don't think the DIP

13   order precludes I think a reservation of rights on that.

14           THE COURT:  Well, I think we should just clarify

15   that they would -- that that's how it would work.

16           MR. SINGH:  Right.

17           THE COURT:  The permitted liens would preclude a

18   trust fund interest that would take this property out of --

19   this cash out of property of the estate.

20           MR. SINGH:  Right.

21           THE COURT:  Okay.

22           MR. SINGH:  If I could just have a minute to

23   confer.

24           THE COURT:  Okay.

25           (Off the Record Conversation)

1           MR. SINGH:  Your Honor, I think that's fine.  We

2     would just have to -- we basically just want to make sure

3     we're setting up the same mechanic, the DIP lenders want to

4     make sure, as the consignment vendors so that we're

5     reporting to them Luxottica's sales so that they can take an

6     appropriate reserve against it.

7           THE COURT:  That's fine.

8           MR. SINGH:  And the only addition that we're

9     adding --

10          THE COURT:  No, you'll definitely want to do that.

11          MR. SINGH:  Yeah, exactly.  And the only addition

12    that we're adding is that to the extent it's ever later

13    determined that somebody was paid trust funds that were not

14    property of the estate, then rights would be reserved to

15    come back and seek to get those monies back from --

16          THE COURT:  Well, not reserved, that the lead

17    won't extend to an equal amount of money.

18          MR. SINGH:  Right.  That they would have -- right,

19    and that the lenders would have to pay that back.

20          THE COURT:  Right.  Correct, out of what would

21    otherwise be their collateral.

22          MR. SINGH:  Exactly.  Okay, I think that should be

23    fine, Your Honor.

24          THE COURT:  Okay.  And you're nodding too, sir, so

25    I think that resolves it.

Page 56

1              MR. ALLERDING:  I am, Your Honor.  I appreciate

2    the suggestion and I do believe that addresses our concerns.

3    Again, it sounds like we won't be subject to losing the

4    trust fund argument regardless of any type of co-mingling,

5    regardless of whether the funds reside with the DIP lenders

6    or somewhere within Sears.

7              THE COURT:  Well, at least as of the date that you

8    raised this issue.  There may be an issue before that.

9              MR. ALLERDING:  Understood, Your Honor, and that

10   we won't be subject to any type of tracing or other

11   equitable arguments of the DIP lenders or Sears.

12             THE COURT:  As of this --

13             MR. ALLERDING:  As of the date we raised it.  Yes,

14   Your Honor.  Thank you.

15             THE COURT:  Right, okay.  I mean, look, I'm not

16   encouraging litigation over this.  I think at the right

17   point the parties will focus on this, but, you know, I also

18   note that this trust fund language came in, in 2015.  I

19   don't know what the financial condition of the Debtor was at

20   that time, but it clearly improved Luxottica's rights at

21   that point.  So, there are issues here that I'm not in the

22   position to decide today and couldn't do so even if I was

23   because of the requirements of Orion Pictures.

24             MR. SINGH:  Your Honor, the DIP lenders just

25   wanted me to clarify that they would not be liable --

1            THE COURT:  No, no, it's not out of pocket, it's

2    that their collateral would be reduced by an equal amount of

3    the shortfall that Luxottica would have --

4            MR. SINGH:  Exactly.

5            THE COURT:  -- if it's turned out to be not

6    property of the estate, the trust money.

7            MR. SINGH:  Exactly.

8            THE COURT:  Okay.

9            MR. SINGH:  So, I think that's it on the junior

10   DIPs.

11           THE COURT:  Okay.  Does that resolve your stay

12   motion too?

13           MR. ALLERDING:  I believe it does, Your Honor.  If

14   I can have a moment to go back and think about that.

15           THE COURT:  Okay, that's fine.

16           MR. ALLERDING:  Thank you.

17           MR. SINGH:  Thank you, Your Honor.  So, Your

18   Honor, I guess that's it on the objections to the junior

19   DIP.

20           THE COURT:  The only loose end, I think, was the

21   suggestion that I compel the Debtors to submit an affidavit

22   before I approve the DIP agreement, or even as a condition

23   subsequent to approval of the DIP agreement.  And I'm not

24   prepared to do that.  I think that -- obviously, judges have

25   a concern about approving cash collateral use and/or Debtor-

Page 58

1    in-possession financing if they're a bridge to nowhere or,

2    in other words, that the Debtor is incurring substantial new

3    debt or using up cash collateral while a shortfall grows for

4    administrative expense creditors.

5            They're not covered by the caveats in 364 that

6    protect existing lien holders.  So, that concern that courts

7    have is not mandated by section 364 of the Bankruptcy Code

8    when you consider it a DIP loan.  Nevertheless, courts are

9    concerned, as part of the business judgment analysis, when

10   they look at a proposed DIP loan as to whether the Debtor is

11   administratively insolvent or will be rendered

12   administratively insolvent.

13           But the record before me really does suggest that

14   this money is needed to maximize the value of the Debtors'

15   estate.

16           The Creditors' Committee which represents all

17   unsecured creditors has supported with the changes that

18   they've negotiated hard for, this DIP loan.  And it would

19   appear to me that the recoveries by all creditors including

20   administrate the expense creditors are increased by this

21   funding.

22           That being said, I think the Debtors should, among

23   all the other things they're doing, and I appreciate they

24   have a full plate, promptly put out proposed procedures for

25   dealing with 503(b)(9) claims so that there can be some

Page 59

1    assurance to the vendor community that there's a mechanism

2    there to deal with them, and in connection with that they

3    can, I think, probably state some views without promising

4    perfection as to the administrative solvency of their estate

5    or estates.

6              MR. SINGH:  Understood Your Honor.  Thank you.

7              THE COURT:  Thank you.

8              MR. SINGH:  Your Honor, I think the next item that

9    we show on the agenda is Item 6, the motion to extend the

10   automatic stay to certain non-debtor parties and I'll be

11   turning it over to my colleague, Garrett Fail.

12             THE COURT:  Okay.

13             MR. FAIL:  Good morning again, Your Honor, Garret

14   Fail, Weil Gotshal.

15             THE COURT:  I'm sorry, can I interrupt you just

16   for a second?  This matter, I think you took off of the

17   agenda, which is the motion to retain McAndrews, Held and

18   Malloy, Limited, as IP counsel because you worked out an

19   agreement with the US Trustee on it.

20             MR. FAIL:  That's right, Your Honor.

21             THE COURT:  I'm not sure I have, if there is such

22   a thing, as their retainer agreement that lays out their

23   fees.  The binder didn't have it.

24             MR. FAIL:  The schedule up there of the rates for

25   this particular circumstance?

Page 60

1          THE COURT:  Yes.  It's not just their rates, they

2    have a fixed fee.  They have a -- depending on the work

3    they're doing, they have a fixed fee and an hourly fee.  The

4    hourly fee I'm not so concerned about because I can deal

5    with that in a fee application.  But the fixed fee, I'm

6    being asked to approve under 328(a) and I just didn't --

7          MR. FAIL:  I think the agreement with the US -- I

8    thought the agreement with the U.S. trustee was rather than

9    disclose the whole schedule of rates that -- with respect to

10   those that were charged and used, they would be disclosed in

11   connection with the fee application and sought --

12         THE COURT:  But they're still asking for 328

13   approval, I think, which I can't do unless I can see their

14   fees.

15         MR. FAIL:  We're happy to provide --

16         THE COURT:  I can change it to 330, but you know,

17   it's -- I just wanted to raise that issue before --

18         MR. FAIL:  We can certainly provide it to --

19         MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg

20   from the US Trustee's Office.

21         THE COURT:  Yes.

22         MR. SCHWARTZBERG:  The flat fees are subject to

23   330.  It's only -- which will be disclosed in the fee

24   allocation.  It's only the fixed fee, I think it's $43,000,

25   which is subject to 328, subject to the US Trustee carve out

Page 61

1    and any (indiscernible) the carve out.

2                THE COURT:  Is that fixed fee a one-time fee or is

3    it for a cap on various matters?

4                MR. SCHWARTZBERG:  I will leave that to the Debtor

5    but I understand it to be a monthly $43,500.

6                THE COURT:  All right.  So, there's no separate

7    set of, you know, $5,000 for this type of work, $10,000 for

8    this type of work structure?

9                MR. FAIL:  Not that's being preapproved.

10               THE COURT:  It's not being preapproved.  It's just

11   a -- so, it's basically a monthly retainer, but it's not a

12   retainer, it's a monthly fee.

13               MR. FAIL:  That's a monthly -- there's a

14   (indiscernible).

15               THE COURT:  And that was disclosed?

16               MR. FAIL:  Yes.

17               THE COURT:  All right, okay.  Good.  I saw your

18   agreement today and I was going to raise this issue anyway.

19               MR. FAIL:  It was a very long negotiation, Your

20   Honor.

21               THE COURT:  Right.  No, that's fine.  So, I think

22   the record is clear on that, that the only 328 approval is

23   of that monthly fee which is disclosed in the application.

24   Okay.  So, you could email that order to chambers too.

25               MR. FAIL:  Thank you, Your Honor.

Page 62

1              THE COURT:  So, then you were going to do the

2      motion to extend the stay.

3              MR. FAIL:  That's right, Your Honor, Docket 924.

4      We're seeking, in accordance with precedent in this Court

5      and in this district, to extend the automatic stay the

6      actions against the Debtors and non-Debtors to those non-

7      Debtor parties where there is an identity of an interest,

8      where there's indemnification or an agreement to defend and

9      a claim against the non-Debtor would directly immediately

10     affect a claim against the Debtors.

11             Your Honor, there were five objections that were

12     filed.  We've spoken with a number of the parties, and I'll

13     go through and we've agreed to adjourn with respect to those

14     parties other than one that refused to adjourn.  So, we've

15     adjourned and spoken to the attorneys for Marcoccia, ECF

16     1194; Catalfamo and Meriwether 1197; Karen Smith we spoke

17     to, we agreed to adjourn.

18             I saw additional pleadings filed this morning.  We

19     received service, but we're not going to go forward with

20     respect to that one as well. And Alex Carey filed late as

21     well.  Seems like they withdrew pleadings this morning after

22     ten o'clock this morning, but given the late timing of those

23     filings, we're going to adjourn and not push forward with

24     respect to Smith, Carey, Catalfamo, Meriwether or Marcoccia.

25             We'll speak with those parties, hopefully give

Page 63

1    them information and resolve the objections, if any, and

2    then we'll back before Your Honor on that.  Leaving only Mr.

3    Krasniqi's objection to be the contested matter this morning.

4              The motion, you know, Your Honor, we would suggest

5    should be granted with respect to all other parties.  With

6    respect to Mr. Krasniqi's --

7              THE COURT:  Before we go to that, let me just --

8    is anyone present or on the phone for Karen Smith, Sante

9    Marcoccia, Robert Catalfamo and Lavarita Meriwether or Alex

10   Carey?  Okay, so I think they got the message about the

11   adjournment.

12             MR. FAIL:  Our intent was not to prejudice any

13   party, Your Honor, with respect to timing --

14             THE COURT:  I mean, I think a couple of those

15   actually had commenced prepetition litigation against only

16   the Debtors, so you might want to point that out to them.

17   This motion doesn't even apply to them.  I don't think it

18   applies to Mr. Carey, for example, who is just looking to

19   have a claim against the Debtors.

20             MR. FAIL:  We're fielding a lot of calls, Your

21   Honor, and trying to explain the facts and circumstances.

22   And, Your Honor, where there is true third-party insurance,

23   the Debtors will investigate and likely stipulate to the --

24             THE COURT:  That was the Smith issue.

25             MR. FAIL:  Well, a lot of the parties believe that

1     there's insurance, but not necessarily the Smith one.  Ones

2     where there's an auto accident there may be true third-party

3     insurance.  So, I don't think it's Ms. Smith, but we'll find

4     out and address it.

5              THE COURT:  Okay.  No, no, I'm saying that I think

6     she may have believed there was insurance.

7              MR. FAIL:  And, Your Honor, the Debtors did

8     maintain insurance as was required.  Unfortunately, as with

9     Mr. Krasniqi's instance, the availability of any third-party

10    insurance was exhausted.  With respect to Mr. Krasniqi, he

11    raised two points.  One was a lack of service.  We think we

12    responded to that adequately in our reply with Mr.

13    Krasniqi's attorney.  These cases certainly received notice

14    in advance to file his objection.  We served Mr. Krasniqi

15    himself at his home address in Manhattan and filed an

16    affidavit of service disclosing that address.  We served his

17    prepetition counsel, and those addresses are now on file and

18    disclosed with an affidavit of Prime Clerk.

19              THE COURT:  I saw that affidavit.

20              MR. FAIL:  But I think that's not the issue, Your

21    Honor, because there's an objection on file so we should get

22    to the substance.  And on the substance, we've now disclosed

23    that there is no third-party insurance and we've disclosed

24    the nature of the indemnification obligation that applies to

25    the non-Debtor defendant in his case, an escalator repair

Page 65

1    company.  And so, we think that there's adequate basis to

2    extend the automatic stay in this case.

3            Mr. Krasniqi has also filed a motion to lift stay.

4    We asked that he adjourn this motion to that date, he

5    refused, so we would request that that motion be denied on

6    the same basis and not be forced to return.

7            There simply is no available insurance, no grounds

8    to lift the automatic stay and ample ground to extend the

9    automatic stay for the whole action.

10           THE COURT:  Okay.  Is counsel here for Mr.

11   Krasniqi?

12           MS. SCHULTZ:  Yes.

13           THE COURT:  Okay.

14           MS. SCHULTZ:  Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MS. SCHULTZ:  Hillary Schultz from Richard Klass'

17   office.  We represent Mr. Krasniqi.  He was a plaintiff who

18   suffered injury as a result of an elevator accident.

19           There actually is a fundamental jurisdictional

20   issue here, because we believe -- the reason why we wouldn't

21   adjourn was because it doesn't appear that the attorneys of

22   record in this case were served with this motion.

23           THE COURT:  Well, when you say the attorneys of

24   record -- in the bankruptcy case or in the ...?

25           MS. SCHULTZ:  No, in the personal injury case.

Page 66

1           THE COURT:  But they have an --

2           MS. SCHULTZ:  And our client does not live in

3    Manhattan.  He lives in Staten Island, so he was not served.

4           THE COURT:  Well, you filed an objection.  I don't

5    understand.  They served -- did your firm file a notice of

6    appearance?

7           MS. SCHULTZ:  Well, just by random block, the one

8    he -- Yes.

9           THE COURT:  And they served you?

10           MS. SCHULTZ:  No.  Actually, what happened was it

11    just randomly happened that someone was scanning the docket

12    with the 1,000 items that were in the docket.

13           THE COURT:  All right, so we should adjourn this

14    so that you can have proper service.  We'll adjourn it to

15    the next hearing date.

16           MS. SCHULTZ:  Thank you.

17           THE COURT:  Okay.

18           MR. FAIL:  Okay, Your Honor, so now all contested

19    aspects of this motion have been adjourned to the next

20    hearing.  Unless Your Honor has any questions --

21           THE COURT:  Well, I did have one question.  All of

22    the matters on the list, you've used the phrase "indemnity"

23    or "indemnification agreement", and that does appear to be

24    the language in the Krasniqi one, for example, with the

25    elevator company.  I just want to make sure, you're not

Page 67

1    using indemnity to cover guarantees?  Or are you?  If

2    someone just has a guarantee, like a financial guarantee,

3    this wouldn't apply to preclude a suit of that person, would

4    it?

5              MR. FAIL:  Your Honor, I'd have to go through the

6    full list to ensure that.  It is my understanding of the --

7    it has to be the vast majority or simply prepetition tort

8    lawsuits or --

9              THE COURT:  And they're suing the Debtor's

10   employees or officers instead of the -- I just want to -- I

11   don't think that I should grant this motion today with

12   respect to any lawsuit where the third-party is a mere

13   guarantor -- not only primarily, or independently liable as

14   a guarantor.  And I do that for two reasons.

15             One, I don't think the case law supports it, and

16   two, I don't think the motion is clear that that's who would

17   be covered.  Because I think an indemnity is different than

18   a subrogation right, or a contribution right.  And that's

19   always been -- those types of issues, dealing with

20   subrogation and contribution rights have always been the

21   most difficult to resolve in the context of applying Queenie

22   v. Nygard and the other cases.

23             Most of the cases precede Queenie v. Nygard, but

24   there are plenty of cases that do precede it that say you

25   can't enjoin a lawsuit against a guarantor.

1          MR. FAIL:  We'll go through before we submit the

2     proposed order and ensure that there's none that of that

3     categorization.

4          THE COURT:  All right.  And if you still want to

5     pursue -- I'm not denying today, I just think you just have

6     to have more notice and explain why they would be covered.

7     There may be extraneous facts.  There may be other things

8     that would make the determination of a claim against the

9     third party one that would directly and immediately impact

10    the Debtor's reorganization or just the Debtors, in the

11    language of Queenie and the other cases.

12         MR. FAIL:  We'll adjourn if there are any that I

13    do identify and supplement the record or withdraw our

14    request with respect to those, Your Honor, to the extent

15    (indiscernible).  Your Honor, I think --

16         THE COURT:  Okay.  Someone's standing behind you.

17         MS. SCHULTZ:  Hillary Schultz again.  The Debtors,

18    in their responses indicate that there was a claim sharing

19    agreement but they never attached a copy of it.

20         THE COURT:  All the more reason to adjourn it, so

21    they can show that to you.

22         MS. SCHULTZ:  Thank you.

23         MR. FAIL:  Your colleague refused to adjourn so we

24    didn't have a chance.  We have to share it with you.

25         THE COURT:  Does anyone have anything further to

Page 69

1    say on this motion?  All right.

2         I will grant the motion insofar as it's unopposed

3    and consistent with the carve out, without prejudice that I

4    just went through with Mr. Fail on the record.  The motion

5    seeks to have the automatic stay apply to or enjoin to the

6    extent of the automatic stays, protections, lawsuits and

7    claims against third parties.  The motion specifically

8    identifies a number of such lawsuits to which it would

9    immediately apply if I granted it, and also sets up a

10   procedure if the Debtors learn of another such lawsuit or

11   claim.

12        It's well established that stays pursuant to

13   section 362(a) are limited to Debtors in bankruptcy and do

14   not encompass non-bankruptcy codefendants.  See Teachers

15   Insurance and Annuity Association v. Butler, 803 F.2d 61,

16   (Second Circuit 1986).

17        However, the circuit here and in other

18   jurisdictions recognize an exception to that general rule

19   where non-Debtor claim -- a claim against the non-Debtor,

20   excuse me -- can be accorded the protection of the automatic

21   stay, sometimes phrased as extending the automatic stay or

22   entering an injunction under a section 105(a) and in

23   furtherance of the automatic stay to protect the third party

24   in quote, "unusual circumstances," as stated by then Judge

25   Sotomayor in Queenie Limited v. Nygard International 321 F.

Page 70

1    3d, 282-288 Second Circuit 2003.  See also Desouza v. Plus

2    Funds Group, 2006 US District Lexus 53392 at page six, (SDNY

3    2006).

4             Queenie v. Nygard laid out the circumstances in

5    which courts have extended the stay or imposed an injunction

6    co-terminus with the stay to protect non-Debtors, with an

7    overall statement that that really should be granted, quote,

8    "Only when a claim against the non-Debtor will have an

9    immediate adverse economic consequence for the Debtor's

10   estate," close quote.  That's Queenie v. Nygard at 321 F.3d

11   at 287.

12            Although those economic consequences have been

13   construed to include any perceptible economic harm to a non-

14   party Debtor's tangible or intangible property interest in

15   re Adler, 494 BR 43-57, Bankruptcy EDNY 2013 affirmed, Ng v.

16   Adler 518 BR 2-28, (EDNY 2014).

17            But that's just the start.  It has to be a direct

18   and immediate and adverse economic consequence.  In

19   addition, courts will extend the stay where there's a

20   session identity between the Debtor and the third-party

21   defendant that the Debtor may be said to be the real party

22   defendant and that a judgment against the third-party

23   defendant will, in effect, be a judgement or finding against

24   the Debtor.  See, again, Queenie at 288 as well as in re

25   Congregation Birchos Yosef, 535 BR 629, 633, (Bankruptcy

Page 71

1    SDNY 2015).

2            And it appears to me, based on my review of the

3    motion in the chart, that most of the third-party claims

4    fall under that category where employees, officers and/or

5    board members of Sears are being sued based on their running

6    of Sears as opposed to some independent cause of action that

7    might exist against them that wouldn't overlap, would be

8    terminus with a claim against Sears.

9            And lastly, courts have enjoined actions against

10   third parties where the action against the non-Debtor party

11   threatens to adversely affect the Debtor's reorganization

12   efforts in a significant way, again, as discussed in

13   Queenie.  That may or may not include instances where a

14   decision will necessarily collaterally estop the Debtor,

15   depending on the facts.

16           Here, the motion was adequately noticed, I

17   believe, based on the certificates of service, on the

18   parties that did not object.  They've not raised an

19   objection.  And I believe that as a facial matter, in the

20   absence of any objection, the averments in the motion

21   establish sufficient basis for the Debtors to carry their

22   burden of proof, which they have here, to the extent of the

23   automatic stay.  So, I'll grant the relief.

24           MR. FAIL:  Thank you, Your Honor.  The next item

25   on today's agenda is number nine.  It's a motion for relief

Page 72

1    from stay by Joyce Franklin, ECF 383.  I don't know if the

2    attorney for Ms. Franklin is here today.

3         MS. AGNEW:  Yes, this is Jaime Agnew on behalf of

4    Joyce Franklin, appearing by phone.

5         THE COURT:  Good morning.

6         MS. AGNEW:  Good morning.

7         THE COURT:  So, let me just turn to that --

8         MR. FAIL:  Tab number 9.

9         THE COURT:  Right.  I'm looking at my own notes on

10   this.  Okay, and this is for relief from the automatic stay

11   with respect to, I believe, a personal injury action against

12   one of the Debtors that's currently pending in Ohio.

13        The Debtor's response to this states that the

14   applicable insurance policy here, that the paid losses under

15   that policy have already exceeded the amount of the policy.

16   So, the Debtors are not able to do what they would normally

17   do, which is lift the stay to permit the pursuit of

18   insurance proceeds, since there aren't any.  When was this

19   action commenced?

20        MS. AGNEW:  Your Honor, this was commenced in

21   September by Ms. Franklin filing in the Lucas County Court

22   of Common Pleas.  That was September 24th of 2018.

23        THE COURT:  Okay, so it's very recent. Right, so,

24   it's September of this --

25        MS. AGNEW:  However, the Debtors were put on

Page 73

1    notice of this action back in August, August 2nd, actually

2    2017.

3              THE COURT:  I'm going to a different point, which

4    is, I'm trying to figure out how far along the litigation

5    is, how familiar the Ohio court is, whether there's been a

6    lot of activity in that court.  If I heard you right, it was

7    filed in September of 2018?

8              MS. AGNEW:  That's correct, Your Honor.

9              MR. FAIL:  September 24th, Your Honor.

10             THE COURT:  I'm sorry?

11             MR. FAIL:  September 24th.  Two weeks.

12             THE COURT:  September 24th, so, has there been any

13   activity in the Ohio court?  Has there even a pretrial

14   conference?

15             MS. AGNEW:  Not in the court itself, Your Honor.

16   Our argument is based on the fact that we've had

17   negotiations with Sedgwick claims, which represents the

18   Debtor, then, approximately August of 2017.  And records

19   were submitted back in February of 2018, that would be a

20   complete list of records needed to negotiate and hopefully

21   resolve the matter.

22             THE COURT:  Okay.  But that could be done in the

23   context of the claim process in this case.  What you're

24   proposing is to have a full-blown litigation in state court

25   on this.  And under the Sonnax Factors, given that that

Page 74

1    court hasn't expended any judicial resources on it, it's

2    nowhere near trial, it doesn't seem to me that this would be

3    an appropriate instance where I should lift the stay to let

4    a court that's already put in a lot of work on a matter and

5    that's close to being tried, to let it be tried.  Rather, it

6    should go through the claim process and be dealt with in

7    that context, particularly in a case where it's really not

8    clear what unsecured creditors will recover.

9           MS. AGNEW:  And that's why we ask, Your Honor, in

10   the reply to the Debtor's objections, we have asked for a

11   redress in the form of an alternative, which would be to

12   allow the computation for this debt to be considered

13   liquidated, and that we would not object to an expert if

14   that would be deemed necessary by the Court, so, to make

15   sure that there is a redress for Mrs. Franklin.

16          THE COURT:  Well, there will be a redress.  I mean

17   that's what bankruptcy is all about.  But I don't know

18   whether Sears is the type of company that has lots and lots

19   and lots of personal injury claims.

20          I've become familiar with grocery stores and I'm

21   amazed at the number of people that fall down in grocery

22   stores.  But I have often, in the past, approved procedures

23   for liquidating personal injury claims in large retail cases

24   that have been remarkably successful.  In A&P there were

25   literally thousands of personal injury claims.

Page 75

1          I don't believe one went to trial.  I think they

2     all went through those procedures which included a

3     streamlined claims form, preliminary offers, review that

4     would escalate through just dealing with a claims agent and

5     then to a mediator and then to an arbitrator.  It's too

6     early in the case to mandate a specific approach for a

7     specific claimant.  And just as I urged the Debtors to focus

8     on 503(b)(9) claims procedures, I would hope that they would

9     be doing so with regard to PI procedures, although since

10    those are unsecured, general unsecured claims, I'm not going

11    to force them to do it on an expedited basis.  It's just in

12    terms of prioritizing the work that's something that should

13    be done reasonably soon but is just not required to be done

14    right away.

15          MS. AGNEW:  And that's understandable, Your Honor.

16    I just would make the argument though too that, because they

17    had the record since February 2018, we do make the argument

18    that we believe this is capable of ready determination and

19    should have been already reviewed by Sedgwick claims and

20    there possibly, based on their email communication, was made

21    prior to the commencement of the actual filing in Lucas

22    County, that this would be ascertainable as to a number to

23    come up with, which would allow it to be considered

24    liquidated rather than unliquidated.

25          MR. FAIL:  Your Honor, there have been no bar

Page 76

1    dates set.  The Debtors have not filed a schedule SOFA.  Ms.

2    Franklin has not alleged a dollar amount in a proof of

3    claim.  She has not filed a proof of claim.  File the proof

4    of claim, and when -- the Debtor's position is that when

5    it's reasonable to spend money to reconcile general

6    unsecured claims, they will proceed to do so promptly and

7    efficiently.

8              THE COURT:  And that's a reasonable position for a

9    Debtor to take.  One of the -- I mean, obviously, the

10   automatic stay is, along with the discharge, the primary

11   Debtor protection.  One of the reasons for it is a simple

12   cost benefit analysis.  It's not just to prevent races to

13   the courthouse, it's to, in the context of the collective

14   resolution of all the claims against all the assets of the

15   Debtors, to come up with an efficient way to deal with all

16   of the claims that make sense.  And it's really too early in

17   the case to do it on an ad hoc basis.

18             MS. AGNEW:  And, Your Honor, I --

19             THE COURT:  The money is better spent elsewhere.

20             MS. AGNEW:  Okay, so --

21             THE COURT:  I was just affirmed on this yesterday.

22   So, you can look at in re Chitter on it, Judge Hellerstein.

23             MR. FAIL:  Your Honor, all of that said, the

24   Debtors will be filing motions probably shortly within the

25   new year to get authority to settle both those petition

Page 77

1   actions and prepetition claims within thresholds with the

2   UCC's consent up to different thresholds as Your Honor has

3   approved in other cases.

4           THE COURT:  On PI claims?

5           MR. FAIL:  On all claims, Your Honor.  On all

6   actions.

7           THE COURT:  On all claims, okay.

8           MR. FAIL:  Just to make it more efficient and a

9   better use of judicial resources.

10          THE COURT:  Okay, very well.  I'm going to deny

11  this motion.  It's, as with any denial of a lift stay

12  motion, it's without prejudice to your right to seek relief

13  from the stay in the future on changed circumstances.  But I

14  don't see a basis under the Sonnax case in the case law for

15  lifting the stay.

16          MS. AGNEW:  And that includes the hinder, delay or

17  defraud provision of 727(a)(2), Your Honor?

18          THE COURT:  Well, that doesn't apply to this

19  Debtor.  That's a Chapter 7 provision.

20          MS. AGNEW:  All right.  Thank you, Your Honor.

21          MR. FAIL:  Your Honor, the next item on the agenda

22  is the motion of the Community Unit School District 300 for

23  relief from the automatic stay.  I'll turn the podium over

24  to the Movants.  Thank you, Your Honor.

25          THE COURT:  Okay.

1          MR. KADISH:  Good morning, Your Honor, Allen

2     Kadish, Archer & Greiner, for Community Unit School District

3     300.  With me Ken Florey who is principal counsel in

4     Illinois, for the school district.

5          MR. FLOREY:  Good morning, Judge, Ken Florey on

6     behalf of the School District 300

7          MR. KADISH:  And on the phone, Matt Gensburg, also

8     in Chicago.

9          THE COURT:  Okay.

10          MR. KADISH:  Matt, do you want to make your

11     appearance.

12          MR. GENSBURG:  Good morning, Your Honor, Matthew

13     Gensburg on behalf of the School District.

14          THE COURT:  Good morning.

15          MR. KADISH:  Your Honor, this is a more unique

16     motion to lift stay.  Let me start this way, the purpose of

17     this hearing is to make sure that when we come back in

18     January we have a substantive hearing and we can ask for a

19     definitive ruling.  And the reason we're anxious to get to a

20     definitive ruling is because there's a fund of about $16

21     million --

22          THE COURT:  I'm sorry, ruling on what?  I don't

23     know what's scheduled for next month.

24          MR. KADISH:  On this motion for relief from stay.

25          THE COURT:  I though that's what was on for today.

1          MR. KADISH:  We're here today -- well, we'll take

2     the ruling today for sure.  But, we're here today after

3     discussions with Weil Gotshal for a preliminary or a status

4     hearing so that we can come back in January for a

5     substantive hearing and a ruling.

6          There's a fund of $16 million sitting with the

7     village, also represented here this morning.  55 percent of

8     that fund is in dispute in action that we have pending at

9     the School District in Illinois.  That's about $8.8 million,

10    and that's what is before the Illinois court.

11         There's about 45 percent of that money, $7.2

12    million which is due to local governments, which is really

13    not put in dispute in the Illinois action.

14         We have tried to discuss whether we can separate

15    what's in dispute and what's not in dispute.  There was a

16    reference in the Debtor's response that we were trying to

17    work on some interim resolution as to pieces of this, but

18    we're just not there, Your Honor.

19         So, we're prepared to proceed with our motion.  In

20    January we filed an affidavit of a witness so that the

21    Debtors understand really what our position is and what our

22    factual presentation would be in support of the Sonnax

23    Factors and --

24         THE COURT:  Okay.  And I do see that this was

25    moved to being a status conference, so I -- well, I guess

Page 80

1    ... I do not -- I think you're going to have to make clear

2    to me whether this is -- and this applies to the abstention

3    portion of the motion too, whether this is a litigation that

4    pertains to a claim or the allocation of tax money that is

5    all attributable to the post-petition period.  I think

6    that's important.  And, obviously, I'll be asking about the

7    status of the litigation in Illinois.  I think it's pretty

8    recent.

9             MR. KADISH:  It's pretty recent, and it's recent

10   because the money is now funded and susceptible to

11   distribution.

12            THE COURT:  Okay, so, I mean if it's a claim, I'm

13   not quite sure why it wouldn't be dealt with here, because

14   it's a claim against the estate, but we could deal with that

15   at the next omnibus date.

16            And then, just as far as the conduct of the

17   hearing is concerned, my normal practice is to take direct

18   testimony by declaration under penalty of perjury or an

19   affidavit and then to have the witness here for cross-

20   examination and redirect and to have the parties submit a

21   joint exhibit book a week before the hearing, of having

22   agreed on as many -- the admissibility of as many exhibits

23   as they can, in good faith.  And if there's some exhibit

24   that you can't agree on the admissibility of, just put it in

25   a separate binder.

1           I really don't encourage motions in limine unless

2     it really affects your whole hearing strategy, so I'll

3     probably just rule on the -- if there is an exhibit that's

4     in dispute at the hearing.  But this is just regular state

5     court, right?  This is not a special tax court or anything

6     like that

7           MR. KADISH:  Right.

8           THE COURT:  So, to me the issue is more an

9     abstention issue than a stay issue.  Just as a head's up, I

10    don't think you're going to get relief from the stay unless

11    -- but I'm not sure -- I don't think I know enough about

12    this litigation to know whether it's something that I should

13    abstain on.  And, of course, there's the timeliness issue

14    too, but that's why I'm asking about whether this is a claim

15    against the Debtor or whether this is the Debtor trying to

16    get money from you all.

17          MR. KADISH:  And, Your Honor, I hear how you've

18    mapped it out, but just not to leave the record suspended

19    for today, these are funds sitting, waiting for

20    disbursement.  So, I think our perspective is that this is

21    not -- and I hear you and I understand you, not so much

22    wrapped up in the claim question, but is Sears entitled to a

23    distribution today of the money that's sitting, literally,

24    sitting in an account, if they don't qualify for it.

25          THE COURT:  But that's not a lift stay motion,

Page 82

1    that's a determination on the merits.

2         MR. KADISH:  Well, and our lift stay is so that we

3    can go into the state court and continue the TRO and the

4    proceedings in front of the state court to determine that

5    question.

6         THE COURT:  But again, if it's fundamentally the

7    taxing authorities -- I'm sorry, not the taxing authorities,

8    the villages -- but if they're holding it rather than

9    distributing it to Sears because they say they have a claim

10   to it, then I don't see how I would abstain because it's

11   core.  It's fundamentally --

12        MR. KADISH: Yeah, I don't think --

13        THE COURT:  -- the issue.  Well, that's the issue.

14        MR. KADISH:  I don't think that's the focus.

15        THE COURT:  I'm not trying to prejudge it. I'm

16   just saying that's the issue.  On the other hand, if this is

17   something that gets done every four months and we're in the

18   post-petition period and it's the four-month calculation,

19   then it's probably a different issue.

20        MR. GENSBURG:  Judge, Matt Gensburg.  If I could

21   just provide some clarity here on one point.

22        There's two aspects to this.  One aspect is

23   there's a pool of funds held by the village that Sears only

24   has a claim to if it complied with the Illinois EDA Act.

25   And they haven't complied with the Illinois EDA Act.  It's

Page 83

1    not property of the estate.  They have no claim to it and it

2    should be disbursed to other taxing authorities.

3            There's also an issue, Your Honor, with respect to

4    funds that they've previously received.  There is an

5    argument that's been made by the school district that those

6    funds were disbursed to them on a prepetition basis when

7    they weren't complying with the Illinois EDA Act, and

8    there's consequences to that.

9            So this issue has two aspects, and what's

10   compounding it all is that the funds held by the village

11   presently also include 45 percent that's right now due to

12   the other taxing authorities, and those funds are being held

13   up also.  And those funds are funds that have been budgeted

14   by these school districts and taxing authorities, library

15   districts --

16           THE COURT:  Well, I --

17           MR. GENSBURG:  -- for their --

18           THE COURT:  Let me just interrupt you.  I hope you

19   could have a resolution on those, but I'm not going to deal

20   with that today.  As to the other two points, I mean, the

21   latter point, if you're trying to get something back from

22   the Debtor, that, to me, sounds pretty much like a claim.

23   And on the first point, I can see where lawyers can phrase

24   the question to make it either a claim or not a claim, and

25   I'll have to decide.

1          But on the -- if everyone agrees that 45 percent

2     of this money really doesn't belong to either Sears or the

3     people who are holding it, but should go to other parties,

4     then I don't know why that can't be agreed to.

5          MR. KADISH:  We've been trying to get there.

6          THE COURT:  Okay.  Good.

7          MS. MISHKIN:  Your Honor, Jessie Mishkin from Weil

8     Gotschal on behalf of Debtors.

9          THE COURT:  Good morning.

10          MS. MISHKIN:  Good morning.  Notwithstanding that

11     this is a status conference, I'll just respond very briefly.

12          As reflected in our reply papers, and as we would

13     demonstrate at a substantive hearing, we don't believe that

14     the school district has met its burden on the Sonnax Factors

15     or on abstention.

16          Just to respond to what I do believe is a

17     mischaracterization of why the 45 percent of the

18     distribution is being held by the village and why there is

19     not yet agreement, respectfully, it's the school district's

20     complaint, which was filed on October 10th, that caused in

21     our understanding the village to be concerned and withhold

22     the entirety of the 45 percent distribution to the district.

23          THE COURT:  That's fine.  I don't want to get into

24     that.  I just -- if there's a -- as long as the Debtor isn't

25     giving up rights, I could think the Debtor should be able to

Page 85

1    agree to do something to facilitate that money going to

2    someone else.  That's all I'm saying.

3              MS. MISHKIN:  Your Honor, we're certainly --

4    respectfully, have been and will continue to try and work

5    that out.  Thank you.

6              MR. SCHEIN:  Good morning, Your Honor.  Just

7    briefly, Michael Schein, Vedder Price, on behalf of the

8    Village of Hoffman Estates.

9              We're the parties kind of caught in the middle

10   between this dispute.  The funds that we hold are not

11   village property.  They are property that either go to Sears

12   or the other districts including District 300.

13             THE COURT:  Well, if it goes to Sears, then that's

14   a different story.

15             MR. SCHEIN:  Correct, Your Honor.  The issue we

16   have is the village operates by statute.  Statute obligates

17   the village to make those distributions.  It doesn't have a

18   timeline, but course of dealing is those distributions are

19   made twice a year including one now at the end of December.

20             Because of the dispute in the litigation and

21   pending Your Honor's actions, the village is holding all

22   that money, but some portion of that money, about 30 percent

23   of the 45, doesn't belong to either the District 300 or

24   Sears.  It belongs to other districts who are entitled --

25             THE COURT:  Well, if people can all agree on that,

1    then I don't see why --

2              MR. SCHEIN:  Correct, Your Honor.

3              THE COURT:  -- that can't be resolved.

4              MR. SCHEIN:  We're just raising it to you because

5    one of the issues the village faces, at some point, they

6    have to make a distribution or they face their own

7    liability.

8              THE COURT:  Well, there is something called the

9    Supremacy Clause and I think that would excuse them from

10   that liability.

11             MR. SCHEIN:  Absolutely, Your Honor, and I'm only

12   saying that because at some point we hope this Court, if we

13   have to, will make a decision on to where those funds go.

14   We just want you to be aware.

15             THE COURT:  Well, but it's not just the decision

16   on where they go but even before then, 362 trumps Illinois

17   law on this issue, so --

18             MR. SCHEIN:  Correct.  And we haven't made any

19   distribution just for that reason.

20             THE COURT:  Good.

21             MR. SCHEIN:  Thank you, Your Honor.

22             THE COURT:  Okay.

23             MR. KADISH:  And Your Honor, just last on the

24   hearing management is we're going to need a date not the

25   next omnibus on January 18th, I believe.  We're going to

Page 87

1    need a different date.

2              THE COURT:  All right.

3              MR. KADISH:  So I'll leave that to Weil Gotshal to

4    help us --

5              THE COURT:  Well, is that because I'll be taking

6    evidence and testimony, you think?

7              MR. KADISH:  Well, also our witness is unavailable

8    on that date.

9              THE COURT:  All right.

10             MR. KADISH:  We've had discussions.  We've tried

11   to find some dates, so I assume they'll be in touch with

12   chambers to work out a date.

13             THE COURT:  All right.  Well, if it's a non -- if

14   it's an evidentiary hearing but not a major evidentiary

15   hearing, I'd like to do it on an omnibus date because that's

16   why we have omnibus dates.  If it's a full-blown evidentiary

17   hearing, which I'm not sure it will be, then you should have

18   a separate date and you can talk to Ms. Lee about that.

19             MR. KADISH:  I think this is not a many hours

20   hearing, but our witness will not be available on the 18th.

21             THE COURT:  So it should probably be the February

22   date, then.

23             MR. KADISH:  I don't know, again, dealing with all

24   these pressures that we can wait until February.

25             THE COURT:  Well, that's why I'm urging you to try

Page 88

1    to work out the now maybe 30 percent that isn't claimed by

2    either of the two parties to this particular dispute.  Okay.

3    All right, and is counsel for Luxottica, have you decided

4    whether this either resolves it or leads you to want to just

5    adjourn it and think about it some more?

6              MR. ALLERDING:  Yes, Your Honor.  Thank you for

7    giving me time to think about the issue.  I do believe that

8    there is a remaining issue under the motion for relief from

9    stay which is $198,000 shortfall that the Debtors failed --

10             THE COURT:  Plus which, there's money that you're

11   holding.

12             MR. ALLERDING:  There is, under defensive

13   recoupment.

14             THE COURT:  Which I learned about in the objection

15   to your motion.

16             MR. ALLERDING:  Understood, Your Honor.  As we

17   noted in our reply, we have asserted that equitable

18   defensive recoupment with respect to those funds which all

19   arise under a single integrated agreement.

20             THE COURT:  Well, the agreement does have its

21   internal set-off provision.  I mean, I don't know why this

22   can't be worked out.

23             MR. ALLERDING:  Your Honor, I don't know why the

24   whole thing can't be worked out.

25             THE COURT:  Well, but on this point, I mean, I

1    don't know.  I think it's probably because everyone was --

2    wanted to see what would happen today.  But I think the

3    agreement has a method in there for accounting and I -- as

4    long as the terms of the agreement are complied with, I

5    don't even think you need Court approval for it.  You just

6    resolve the two claims.

7              MR. ALLERDING:  My understanding, Your Honor, that

8    we can exercise rights under the contract --

9              THE COURT:  Well, depends if it's pre or post.

10             MR. ALLERDING:  -- with respect to set-off.

11             THE COURT:  If it's post, certainly.

12             MR. ALLERDING:  Okay.

13             THE COURT:  If it's pre, that's a different issue.

14             MR. ALLERDING:  Okay, Your Honor.  And then I

15   guess I would --

16             THE COURT:  And I don't know why you're not

17   sending the rest back right away.

18             MR. ALLERDING: I'm sorry?

19             THE COURT:  You claim they owe you less than I

20   think you owe them.  So I don't know why you don't send them

21   back the rest.

22             MR. ALLERDING:  The equitable defensive

23   recoupment, Your Honor, is asserted against -- it's not

24   subject to the automatic stay, so --

25             THE COURT:  No, but --

```
1              MR. SINGH:  Your Honor, they're applying it to

2      their prepetition claim.

3              THE COURT:  Well, that's an issue.  I mean, the

4      agreement says set-off.  It doesn't say recoupment.  So I

5      don't know if this is a running account or not.  So you all

6      should discuss that.

7              MR. ALLERDING:  We can discuss that, Your Honor.

8              THE COURT:  Okay.

9              MR. ALLERDING:  I would ask the Court then --

10             THE COURT:  I mean, you have a lien on it anyway,

11     so that's why you'd probably resolve it.

12             MR. ALLERDING:  I'm sorry, Your Honor?

13             THE COURT:  If you have a valid set-off right, you

14     would have a lien but then there's the pre and post issue.

15     The mutuality issue.

16             MR. ALLERDING:  With respect to set-off, there is.

17     Yes, Your Honor.

18             THE COURT:  Yeah, right.

19             MR. ALLERDING:  Your Honor --

20             THE COURT:  And I think that's the word the

21     agreement uses, set-off.

22             MR. ALLERDING:  I don't have it off the top of my

23     head, but I'm not --

24             THE COURT:  I checked.  Set-off.

25             MR. ALLERDING:  I would suggest, Your Honor, that
```

1    I don't believe that we lose --

2            THE COURT:  I should look through it and see a

3    running account. And maybe that's how the parties have dealt

4    with it, but I think you and Mr. Singh can probably resolve

5    that.

6            MR. ALLERDING:  Understood, Your Honor.

7            THE COURT:  Okay.

8            MR. ALLERDING:  I do think that then we would ask

9    the Court to hold the motion in abeyance with respect to the

10   post-petition co-mingling issue that we discussed before

11   such that Luxottica could move for relief on an expedited

12   basis should there be a shortfall in the DIP collateral.  We

13   would also ask that the Court in its --

14           THE COURT:  Well, I don't want to just carry it

15   sine die?.  I think you should just make a new motion, if

16   that happens and you can get it on in an expedited basis.

17           MR. ALLERDING: Okay, Your Honor.  We would also

18   ask that in addition to the claim which we discussed before

19   that this could be clear that the language we discussed

20   regarding the carveout, for lack of better word, apply to

21   both the senior DIP financing objection that Luxottica still

22   has pending and the junior DIP objections that's currently

23   before the Court today.  And also that the order contain

24   language providing that the Debtors -- that at the time that

25   the Debtors first distribute the DIP collateral, if this

Page 92

1    issue is not resolved that the Debtors will establish a

2    reserve in the amount owed to Luxottica and will not --

3         THE COURT:  If you're paying them out completely?

4         MR. ALLERDING:  I'm sorry?

5         THE COURT:  You mean if at the time that the

6    Debtors would be satisfying the DIP completely?

7         MR. ALLERDING: Well, my understanding was that we

8    would recover before the DIP lenders --

9         THE COURT:  If --

10        MR. ALLERDING:  -- for the amount --

11        THE COURT:  If -- I'm just trying to figure out

12   the timing.  There'll be lots of times when there'll be

13   collateral paid to the DIP lenders.  I don't want this to

14   happen every time.  It's the last time; right?  The last

15   time when they're about to --

16        MR. ALLERDING:  I think that will work, Your

17   Honor.

18        THE COURT:  -- they're about to be paid off.

19        MR. ALLERDING:  Yes, Your Honor.

20        THE COURT:  That's fine.  That's fine.  But on the

21   other point, I mean, I guess that's okay as long as the ABL

22   lenders preserve their rights.  I mean, there was an issue

23   as to whether the trust language is subject to their lien,

24   because their lien came first.  So as long as they preserve

25   their rights, I don't have an issue with that.

1          MR. ALLERDING:  Your Honor, I confirm.  And the

2     way we dealt with it in the senior order was that we're

3     continuing to work this issue out so it was preserved.

4          THE COURT:  Okay.

5          MR. ALLERDING:  So I think that's fine and the

6     same sort of recitation I read earlier would apply.

7          THE COURT:  All right.

8          MR. ALLERDING:  Your Honor, I do just want to make

9     sure that we're not going to be spending a lot of time

10    negotiating language, because we do want to get the junior

11    DIP order entered.

12         THE COURT:  No, the record is clear on this.

13    People can rely on the record, and it's consistent with the

14    reservation of rights.  So all we're really talking about --

15    you can get the language right out of the transcript and

16    just put that in.

17         MR. ALLERDING:  Exactly.  Thank you, Your Honor.

18         THE COURT:  Okay.  So as far as this lift stay

19    motion, I'm going to deny it without prejudice to your right

20    to bring another on in the future and I think if you're

21    looking to recoup, it's better to seek permission because it

22    may not be recoupment, unless you resolve it.

23         MR. ALLERDING:  Understood, Your Honor.

24         THE COURT:  Okay. All right.

25         MR. ALLERDING:  Okay.  Thank you, Judge.

1            THE COURT:  Okay, so does that just leave the

2    Omega --

3            MR. ALLERDING:  I think we're just back to --

4            THE COURT:  Omega motion?

5            MR. ALLERDING:  Yes, that's right, Your Honor.

6            THE COURT:  So everyone who was here for something

7    else, you're certainly free to leave or get off the phone or

8    whatever.

9            MR. GENSBURG:  Your Honor, Matt Gensburg again for

10   the school district.  I apologize for piping up a little out

11   of turn here, but it's difficult to participate

12   telephonically.

13           THE COURT:  Right.

14           MR. GENSBURG:  I'd just like to get some clarity

15   on the timing issue with respect to the subsequent hearing.

16           THE COURT:  Well --

17           MR. GENSBURG:  There's really two issue --

18           THE COURT:  Okay.

19           MR. GENSBURG:  There's really two issues that

20   drive the timing a bit, Your Honor.  One involves the 55

21   percent and the need that this be resolved before the

22   village disburses those funds one way or the other.  And as

23   long as the village agrees to hang onto those funds pending

24   a ruling by the Court, we're fine with the February hearing,

25   I guess.

Page 95

1          On the 45 percent, it's very different.  And if

2    there's not an agreement with Sears -- because I don't

3    believe they're asserting a claim to that, but they'll get

4    back to us more definitively on that point.

5          There's real budgetary issues that involve

6    contracting with vendors and construction companies that

7    need to be resolved and if this hearing takes place on that

8    aspect of this in February, that means we won't have the

9    funds for purposes of contract and budgeting until March or

10   April which will affect the whole school year.  And that's

11   why there's some urgency here and that's why the school

12   district filed for a TRO in the State of Illinois to get

13   this resolved as quickly as possible.

14         THE COURT:  Well, if the -- if we're just talking

15   about that issue, I don't see why you need a witness for

16   that.  We could have that on the omnibus day in January.

17         MR. GENSBURG:  Possibly, Your Honor.  The only

18   real factual issue in my mind from the Sonix perspective is

19   a weighing of the burdens between Sears and the school

20   district with respect to modifying the State of Illinois to

21   decide an issue as to whether the EDA Act has been complied

22   with or whether Sears, in fact, has any interest in the 45

23   percent.  Other than that, I see this as largely a legal

24   argument and a legal issue.

25         Susan Harkin whose affidavit we provided is just

1    not available on the 18th of January.

2            THE COURT:  All right.  Well, I don't know what

3    her testimony is, but if it looks like we need to bifurcate

4    these issues and we can go ahead on one that is time

5    sensitive without her, because her testimony would go to

6    something else, then we can have it on -- that part of it in

7    January.

8            MS. MISHKIN:  Your Honor, Jessie Mishkin for the

9    Debtors again.

10           I just want to, again, make clear that Debtors are

11   not interested in standing in the way of the distribution of

12   the 45 percent.  We think the 55 percent should be

13   distributed, too, and the claims process as to that take

14   place.  I was just speaking with Mr. Gensburg's colleagues

15   outside.  We agreed to continue discussions tomorrow to try

16   --

17           THE COURT:  Okay.  So hopefully we can resolve it

18   even before that hearing -- that issue.

19           MS. MISHKIN:  That's the goal, Your Honor.

20           THE COURT:  Okay.  Very well.

21           MS. MISHKIN:  Thank you.

22           THE COURT:  Okay.  If not, speak to yourselves

23   about scheduling it for January with minimal testimony.

24           MS. MISHKIN:  Thank you, Your Honor.

25           THE COURT:  Okay.  All right.

1          MR. KIRPALANI:  Good afternoon, Your Honor.

2    Susheel Kirpalani from Quinn, Emanuel, Urquhart, and

3    Sullivan on behalf of Omega advisors.  With me in the

4    courtroom today are my colleagues Jon Pickhardt and Andrew

5    Soler.

6          I know one thing that judges hate is not being

7    told the truth about what is really motivating the conduct

8    of the parties before them, so here goes from my

9    perspective.

10          Your Honor, Omega is an interested bidder for the

11    Debtors' medium-term notes because it bought a significant

12    amount of credit default swap protection on SRAC bonds.

13    Cyrus is the largest seller of that protection and under the

14    ISDA rules, Cyrus can require a buyer of CDS to physically

15    deliver the bonds as a condition to honoring its CDS

16    commitments.

17          Thus, there is a temporary, albeit uncorrelated

18    value of the MTNs to purchasers of CDS protection up until

19    the time Cyrus demands delivery.  You might think, Judge, as

20    I did before I got involved in this about 10 days ago that

21    an insurer of bonds simply pays the difference between the

22    amount the Debtor distributes and the amount that was owed

23    on the bond, but for practical reasons, the CDS market

24    doesn't work that way.

25          They don't wait until there's a plan or an

Page 98

1    ultimate bond holder recovery.  Instead, ISDA tries to

2    approximate the recovery value on the Debtors' bonds by

3    seeing what people are willing are willing to pay for it --

4    for the bonds in the open market.

5              But what if the seller of CDS protection tries to

6    take all the bonds off the market or at least all of the

7    bonds that ISDA would consider deliverable obligations.  It

8    comes down to basic supply and demand, Your Honor.

9              Buyers of protection would find themselves

10   scrambling to overpay for whatever bonds may be available

11   for sale.  It reminds me of when I was a kid and the little

12   Cabbage Patch dolls were way overpriced at Christmas.  But

13   that is precisely what's happening right now and led to the

14   Debtors' decision to sell otherwise worthless bonds, and it

15   was a good decision at that.

16             Whether or not it is legal for CDS sellers to buy

17   up bonds to artificially inflate the price of the remaining

18   bonds is a separate question for a different Court on

19   another day.  But while the short squeeze is happening, the

20   Debtors should benefit from it if at all possible.  And

21   knowing the true motivations of bankruptcy participants has

22   been a concern of this Court for many years.

23             Indeed, I remember a city bar association panel

24   over a decade ago where Your Honor or Judge Gerber or maybe

25   both of you talked about the perverse incentives that lurk

Page 99

1   beneath the surface in big Chapter 11 cases and Your Honor

2   and other judges urge that Rule 2019 should require

3   disclosure of all derivative positions such as short

4   positions, CDS, and the like so that Courts can clearly see

5   what is going on.

6          And it certainly took a lot of effort, but change

7   did happen in 2011, as Your Honor knows, and the rule was

8   expanded.

9          This one, Judge, this case may be the first of its

10  kind.  The first time when the rules and behavior of the CDS

11  market have actually directly impacted the value of the

12  Debtors' estate.  And once again, this Court is in the best

13  position to act to remedy an abuse.

14         We filed Omega's motion because what happened here

15  was wrong and it's not wrong in just one way.  It's wrong in

16  the one way that the bankruptcy code forbids, the sale and

17  use of property without proper notice and without authority

18  by the Court.

19         In leading up to today, I've been struggling as to

20  why am I fighting with the Debtors and the Creditors'

21  Committee, for that matter.  There's so obviously a

22  transaction that was never authorized that everyone in this

23  courtroom, even Cyrus, as a self-proclaimed longstanding

24  creditor of Sears should agree is void and that will

25  generate an additional $60 million for Sears, money that

Page 100

1    from the looks of things from the bleachers is sorely needed

2    in this case.  I'm of course referring to lockup agreement

3    over the MTNs that are owned by a wholly-owned non-Debtor,

4    Sears Re.

5            Judge, in terms of context, at the conclusion of

6    the auction conducted by the Debtors, well before anyone

7    knew the details of what actually happened or what was

8    negotiated, our client submitted a written offer to Sears Re

9    to pay 40 cents on the dollar for $150 million of their $1.4

10   billion of medium-term notes.  That's $60 million that's

11   still on the table as I stand here before you.

12           And the Debtors have conceded that Sears Re's MTNs

13   were never part of the relief they were seeking.  The

14   problem, of course, is that the Debtors have contractually

15   bound themselves to prevent Sears Re from monetizing those

16   MTNs until after the ISDA option when they're worthless and

17   no one will buy them.

18           The fact is that the Debtors did enter into an

19   extraordinary agreement which has never been filed with the

20   Court which they had no authority to sign in response to an

21   overreach by a bidder that had them over a barrel.  But that

22   bidder knew absolutely well that no authority had been

23   sought from the Court with respect to those bonds from its

24   participation before you in the sale motion proceedings.  So

25   the Debtors and Cyrus today have no choice but to back

Page 101

1    themselves up and try to argue that Section 363 isn't

2    implicated because no one technically sold Sears Re's bonds.

3            But it cannot seriously be disputed that as a

4    matter of law, the lockup agreement signed by the Debtors --

5    not talking about Sears Re -- by the Debtors in connection

6    with a sale was a use of property outside the ordinary

7    course of business.  Indeed, according to the Debtors and

8    Cyrus, it was an integral part of the benefit of the whole

9    bargain that unquestionably was outside the ordinary course

10   both under the vertical test and the horizontal test as well

11   as the indisputable transcript of proceedings before the

12   Court as to what creditors expected was going to be done

13   with respect to those non-Debtor owned MTNs.  And the never

14   got Court approval for that allegedly integral part.

15           By ordering that the Debtors today had no

16   authority sign an agreement to shackle its wholly-owned

17   subsidiary, this Court could unlock $60 million of value.

18           THE COURT:  How is that?

19           MR. KIRPALANI:  Because our client is still

20   prepared to consummate the transaction and the offer for the

21   $60 million, it's for $150 million of the MTNs that are

22   owned by Sears Re.  It has nothing to do with the actual

23   bonds purchased.  This has to go with whether or not they

24   are shackled and prevented from selling those and whether or

25   not the Debtors are going to continue to prevent their

Page 102

1    wholly owned subsidiary from monetizing that asset.

2           So the Court could actually take the two forms of

3    relief we're seeking -- there are three forms.  One, the

4    non-Debtor assets just -- we're not part of this.  I think

5    everyone agrees with that, that any restriction that the

6    Debtors put on that is void under In RE: Lavigne, Second

7    Circuit case, 114 F.3d 379, as well as the record before

8    this Court that they're not being treated.  And the Debtors

9    will be better off.  The unsecured creditors, the

10   administrative creditors, everyone will be better off by $60

11   million and there's no unwinding of any bonds that actually

12   changed hands.

13          We have two other forms of relief that we're

14   seeking.  The fact that there were over $600 million of MTNs

15   owned by the Debtors that were not noticed for sale because,

16   frankly Your Honor, there was a botched notice with respect

17   to the Debtor owned MTNs, the sale or use of which the Court

18   certainly did authorize.  Our motion just seeks application

19   of black-letter law and the basics of bankruptcy practice.

20          Judge, I know you know that I was blessed with

21   great mentors.  They drilled into my head that every word in

22   the bankruptcy notice needs to be right.  It needs to be

23   precise.  That's because notice is the critical component of

24   due process.  It's the underpinning of finality of

25   bankruptcy sales.  In fact, typically approvals of all kinds

Page 103

1   of bankruptcy notices come before you and they're sought

2   even before they're sent out.  Certainly at a minimum in a

3   bankruptcy sale, the notice has to match what is being sold.

4          That didn't happen here, meaning that bidders

5   other than Cyrus were affirmatively misinformed about what

6   was up for sale and the Debtors could have but chose not to

7   rectify the misinformation during the auction.  So what is

8   the Debtors' answer to that?  They say we didn't click on

9   all the available hyperlinks on the electronic notice.  The

10  Debtors can't be serious that bidders should have performed

11  hyperlink gymnastics to see what was going to be sold to

12  Cyrus.  Frankly, this isn't a case about failed bidder due

13  diligence.  Everyone knew how many MTNs the Debtors actually

14  owned.

15         What they were doing, though, was reading the sale

16  notice that the Debtors actually sent.  The fact is, there

17  was a total imbalance of information and it is because the

18  notice was botched.  The Debtors could have fixed it but

19  didn't.  They barreled ahead with Cyrus and then they kept

20  mum about it until my partners threatened to bring it to

21  your attention and then they said they would file a Form 8-K

22  and that's how we learned of it.

23         In conclusion, Judge, I have to mention the third

24  part of relief that we're seeking which has to do with

25  Cyrus' misconduct.  I have to talk about good faith.  I've

Page 104

1    read all the transcripts and I understand how we got to

2    where we are in terms of the sale order, but there is

3    something fundamentally wrong with Cyrus lying in the weeds

4    as it slipped purportedly innocent language in the sale

5    order that it uniquely knew would chill bidding and that had

6    its intended effect.

7              THE COURT:  Can you just go through what that

8    language is?

9              MR. KIRPALANI:  Yes, Your Honor.  It's in the sale

10   order.  It was the language that Your Honor had a colloquy

11   with Debtors' counsels about when Cyrus announced it was

12   withdrawing its objection as long as this innocent

13   boilerplate language got put in, and it appears in a couple

14   of places.  Let me just find my order, Your Honor.  I'm

15   sorry.

16             So at the Court's order, it's Docket 826 and so it

17   first appears in Paragraph 6 in the proviso.  Mr. Pickhardt

18   will correct me if I'm wrong, but I believe it's the

19   proviso.  "Provided, however, that the MTNs are not being

20   sold free and clear of any liens or claims of SRAC including

21   without limitation any counterclaim, defense, or right of

22   offset held or that may be asserted by SRAC or it's estate

23   and nothing in this order shall impair or prejudice in any

24   way any rights, claims, or defenses that SRAC or its estate

25   may have in connection with the MTNs."

Page 105

1           And that language, I think, is parroted later in

2     the next paragraph as well.  This language was put before

3     you on the supposition that they're just restating what's

4     the general obligations law.  But Cyrus uniquely knew

5     something because Cyrus -- which I don't even know if the

6     Court knew -- is a member, a voting member of the ISDA

7     Determinations Committee.  That committee propounds rules

8     for when bonds are considered deliverable obligations -- in

9     other words, they'd be worth something to the Debtors -- or

10    not deliverable obligations -- in other words, no bidder

11    would bother trying to buy it.  And that language tracks

12    almost verbatim the ISDA rules on what is a disqualified or

13    an excluded obligation.  And I'm not just --

14          THE COURT:  I don't understand.  You have to

15    explain that to me.  I mean, it's inherent in the bond that

16    if there's -- it's inherent in any general obligation's --

17          MR. KIRPALANI:  Right.

18          THE COURT:  -- transfer.

19          MR. KIRPALANI:  Right.  But when marketable bonds,

20    when they are sold in an ISDA auction, there is to be

21    nothing other than what is presumed in the law.  When that

22    language was included in the sale order the night before the

23    auction, market participants including Bloomberg wrote

24    articles.  And I can show them to the Court.  I have copies

25    for everybody -- saying this language that was put into the

Page 106

1   order, that's going to really spook bidders because --

2           THE COURT:  But why?

3           MR. KIRPALANI:  Because the ISDA guidelines say if

4   a bond is subject to these -- almost verbatim the same

5   words, it will not be considered a deliverable obligation.

6           THE COURT:  Why?

7           MR. KIRPALANI:  I do not know.

8           THE COURT:  I mean, that's the law.

9           MR. KIRPALANI:  I do not know.

10          THE COURT:  I mean, every bond has that unwritten

11  proviso.

12          MR. KIRPALANI:  I think -- I can't disagree with

13  what you're saying, Your Honor, about what a restatement of

14  the law is.  What I am suggesting is that there was never an

15  opportunity for the Court to understand from someone who was

16  in a unique position to absolutely understand.  The reason

17  it's withdrawing its objection to a sale that it was

18  fighting is because they got what they needed anyway by

19  putting this language in. Now the market will be chilled for

20  the bids. The next day, they will talk to --

21          THE COURT: I thought that they confirmed that they

22  weren't going to pursue any -- I thought as part of the

23  bidding --

24          MR. KIRPALANI: Yes.

25          THE COURT:  -- they'd said that they weren't going

1    -- SRAC said there are no objections.

2         MR. KIRPALANI:  Yes, Your Honor.  Actually, that

3    was in response to our efforts to tell the Debtors' counsel,

4    because we were trying to help the Debtors, that you don't

5    understand what you just did.  By including that language

6    you're actually spooking a lot of participants in the

7    market.

8         You should call ISDA.  You should clarify there

9    are -- there is no such hair on these bonds, and otherwise,

10   no one's going to bid, and they did but the damage had been

11   done because we have a timeline, too, Your Honor, of exactly

12   how quickly things had to happen on the morning of the 20th

13   from 8:40 in the morning until noon when the bid deadline

14   was.  And yes, the Debtors did the best they could under the

15   circumstances, but the question really, Judge, when it comes

16   to good faith is --

17        THE COURT:  Well, do I have any evidence that this

18   chilled bidding?

19        MR. KIRPALANI:  Well, there's no evidentiary

20   hearing before you today, Your Honor.

21        THE COURT:  Right.  Is there anything in the

22   record to suggest that?

23        MR. KIRPALANI:  There -- I mean, affidavits could

24   be submitted.

25        THE COURT:  I mean, you'd think that the people

Page 108

1    that are bidding this who engage in this market would've

2    read the general obligations law which has been quoted in

3    bankruptcy cases dealing with what they also thought chilled

4    claims trading and were educated otherwise for the last 15

5    years, including KB Toys.  So I just -- it's kind of bizarre

6    to me that people would be that ignorant who are dealing

7    with so much money.  But I guess you learn every day.

8              MR. KIRPALANI:  Your Honor, I certainly am no

9    expert in the CDS market.  What I will tell you is that

10   right after the Court entered the order that included the

11   language, there was an article in Bloomberg November 19th by

12   people who are experts in this area who have no interest in

13   this dispute and the article is quoting, "They may be trying

14   to create some uncertainty, said Julia Lu, a partner at

15   Richards, Kibbe, and Orbe."

16             Whether or not justified, people may be hesitant

17   in assuming they can deliver those notes into the auction

18   precisely because the language tracks the ISDA guidelines.

19             THE COURT:  Well, she didn't say that and that's

20   just some lawyer responding to some --

21             MR. KIRPALANI:  That may be.

22             THE COURT: -- report.

23             MR. KIRPALANI:  That may be, Your Honor.  Isn't

24   the real question, though, when it comes to motivations,

25   there is a reason I started with that today, is why was

1   Cyrus willing to withdraw its objection to a sale with just

2   the inclusion of seemingly innocent boilerplate, general

3   obligations language?  Why was Cyrus then taking that

4   language and with it, pointing to it during the auction,

5   which they admit in their papers, that they may have engaged

6   in some "market chatter" about whether the MTNs in light of

7   that language will be deliverable obligations.

8           They call it market chatter.  Judge, whether you

9   call it market chatter, locker room banter, or any of these

10  kinds of phrases that people say when they're being

11  defensive about their conduct, it's not market chatter when

12  it's an ISDA committee member who is voting the day of the

13  Determinations Committee's determination to say, hey, take a

14  look at this language.  Can't be so sure they're going to be

15  deliverable.

16          And we know.  We attached the results of the votes

17  the say of the Debtors' auction by the ISDA DC members, and

18  of course, Cyrus did vote against deliverability.  Doesn't

19  it make you scratch your head, Your Honor, to say you were

20  trying to vote to make these bonds worthless at the same

21  time you were bidding to buy the bonds?  You wanted them to

22  be worthless?  It doesn't add up.  There is absolute attempt

23  by Cyrus to use its influence on the DC --

24          THE COURT:  But doesn't it only matter if the

25  price was affected?

Page 110

1          MR. KIRPALANI:  But the price was affected, Your

2     Honor.

3          THE COURT:  Well, I don't...

4          MR. KIRPALANI:  The price was affected.

5          THE COURT:  That's hard for me to see.

6          MR. KIRPALANI:  But a transaction is a moment in

7     time.  You know, it's always hard.  And the second Circuit

8     found it very hard to go back after General Motors.  You

9     don't know what would have happened had things been done

10    properly, fairly --

11         THE COURT:  I understand your first two points.

12    It's just the latter one.  It just seems like a bit of a

13    stretch.

14         MR. KIRPALANI:  My point on the latter --

15         THE COURT:  There was no doubt that if they had

16    their druthers, these wouldn't be sold in the first place.

17         MR. KIRPALANI:  Right.

18         THE COURT:  But they lost on that point, and

19    you're saying that they snuck something in.  But what they

20    snuck in, I think anyone with half a brain would've figured

21    out, is meaningless.  And then there's the notice on the

22    actual auction which says SRAC's waived any of these rights.

23         MR. KIRPALANI:  All I'm saying, Your Honor, is

24    that the time pressures on bidders -- we bid.  We stand by

25    our bid.  We bid after the auction for the bonds we believed

1    and we still believe are available for sale.  There

2    definitely was chilled bidding in our view, Your Honor.  I

3    understand you don't have evidence on that.  All I'm saying

4    is that for Cyrus to point to an advanced finding by the

5    Court that a bidder who participates --

6                THE COURT:  Well, no, there's also --

7                MR. KIRPALANI:  -- in the auction --

8                THE COURT:  There's another proviso here that

9    says, "Provided further nothing contained in this order

10   shall waive any rights of the Debtors, the Committee, or any

11   other party or governmental entity to the extent it is

12   determined that a party engaged in inappropriate conduct

13   with respect to the transactions contemplated by this

14   order."

15               MR. KIRPALANI:  Yes.  We greatly appreciate that

16   language, Your Honor.  You know, in conclusion, we do not

17   believe contrary to the Debtors' citation to the sanctity of

18   finality of sales, contrary to Cyrus' self-proclamations of

19   being longstanding supporter of the Debtors by being a

20   creditor that there's any good bankruptcy policy that is

21   promoted by allowing Cyrus to get away with what it did

22   here.  I've given Your Honor different ways to skin the cat,

23   if you will.

24               THE COURT:  Well, let me --

25               MR. KIRPALANI:  There is relief --

1           THE COURT:  Originally when this motion was

2    brought on, it was brought on on very short notice and then

3    that was extended because the time pressure was off to some

4    extent.  But at least with regard to Sears Re is concerned,

5    you're basically looking to undo that sale so that there can

6    be another auction and my question is, is there even time to

7    -- is there time to do that before the ISDA auction.

8           MR. KIRPALANI:  So let me tell you what I know and

9    as I mentioned, my partner is an expert in the CDS spaces

10   here.  If I make a mistake, he'll correct me.  Mr. Hansen's

11   also here who's much more experienced in this area than I

12   am, too, on behalf of Och-Ziff.

13          But my understanding is that the CDS auction is

14   actually going to take place in January so yes, there's

15   time, and in terms of unwinding the sale, no.  with respect

16   to the Sears Re MTNs, and this is why I started with it.  In

17   terms of least disruption to rectify a wrong, the Sears Re

18   bonds were never sold.  All that has happened is the

19   Debtors' contractually shackled themselves to prevent their

20   --

21          THE COURT:  Well, I mean, no.  I --

22          MR. KIRPALANI:  --subsidiary from selling.

23          THE COURT:  No.  I could.  If the ISDA auction

24   were to take place --

25          MR. KIRPALANI:  It's in January.

Page 113

1          THE COURT:  -- tomorrow, I could elicit testimony

2    or representations that the actual Swiss Re deal was a good

3    deal for the Debtors and determine that in that context.

4          MR. KIRPALANI:  Yes.

5          THE COURT:  I could determine it even if the

6    auction was to take place in January, so the fact that there

7    wasn't Court approval of the forbearance or the caused Swiss

8    Re to act a certain way, doesn't necessarily mean that I

9    wouldn't approve it retroactively.

10         MR. KIRPALANI:  That certainly would get the $60

11   million of value --

12         THE COURT:  No, no.  Not the $60 million, the deal

13   that actually happened.  But I mean, in a way, the $60

14   million point is a, I think, a red herring because you're

15   basic -- you're making two points, but they both come down

16   to the auction wasn't conducted fairly and if that's the

17   case, I shouldn't -- I should have a do over.  I shouldn't

18   have, like, you and Och-Ziff say okay, well, then it

19   devolves to us.

20         MR. KIRPALANI:  I understand now what you're

21   saying, Your Honor.

22         THE COURT:  There should be -- instead, it should

23   be done in a way where it's transparent and the notice is

24   clear as to what can be bid on and the like.

25         MR. KIRPALANI:  We'd welcome that opportunity,

Page 114

1    too, Your Honor, and I do believe in terms of, the Debtors

2    can address this themselves as I haven't seen it, but I do

3    believe that there's no risk to the Debtors that by

4    reopening the auction, they won't even get at least $82.5

5    million that Cyrus pays.

6            THE COURT:  Well, it's not just $82.5 million.

7    They're waiving claims, too.

8            MR. KIRPALANI:  Waiving claims, Judge, but from an

9    entity -- waiving recoveries from an entity that may not

10   even distribute any value.  So if that can be worked out

11   between the Committee and the Debtors --

12           THE COURT:  I don't know.

13           MR. KIRPALANI:  I would think so.

14           THE COURT:  They're not -- the Committee and the

15   Debtors are not the ones waiving the claims --

16           MR. KIRPALANI:  No, what I'm saying --

17           THE COURT:  -- under the deal that was on the --

18           MR. KIRPALANI:  What I'm saying is the following.

19   Let's assume that SRAC pays its unsecured creditors 8 cents

20   on the dollar.  Let's just pick that number because I

21   believe that's what SRAC debt trades at right now without

22   this -- what I allege to be manipulation.  It's 8 cents on

23   the dollar.  Obviously, receiving more than 8 cents on the

24   dollar per bond is accretive if it is shared with SRAC for

25   the benefit of its creditors and the seller.  That's all I'm

Page 115

1    saying.

2              THE COURT:  Okay. All right.

3              MR. KIRPALANI:  There's a way to work it out, to

4    true it up.

5              THE COURT:  Well, there's a way -- I don't know if

6    there's a way to true it up, but there's definitely a way to

7    evaluate the consideration that's on the table that came

8    through Swiss Re.

9              MR. KIRPALANI:  And to ensure that no third-party

10   creditor is actually harmed, but actually everyone is

11   benefited by it.  Yes.

12             THE COURT:  Okay.

13             MR. KIRPALANI:  Thank you, Your Honor.

14             THE COURT:  Why should I believe that there --

15   that if I opened it up and had a do over which included

16   Swiss Re's ownership, potentially, that there would be a

17   better deal?

18             MR. KIRPALANI:  I believe the Debtors are in

19   possession of a firm commitment from Barclays that has the

20   assurance that they will pay their consortium of people who

21   are interested in this, pay materially more than what Cyrus

22   had paid.  There's no --

23             THE COURT:  For the whole Cyrus proposal or just

24   the Cyrus portion?

25             MR. KIRPALANI:  The --

Page 116

1          THE COURT:  Because I'm assuming if I opened it

2    up, Cyrus would go back to square one.

3          MR. KIRPALANI:  Let me see if I can answer this.

4    The details of that consortium bid is confidential because

5    until there is a new process, nobody wants to give Cyrus an

6    advantage.

7          There are ways that the Debtors could take $82.5

8    million from Cyrus and there are ways they could take

9    incremental more than $82 million from others.  Whether

10   Cyrus wants to -- I hear laughter from the back, so --

11         THE COURT:  Yeah, I don't think Cyrus would agree

12   to that.

13         MR. KIRPALANI:  Whether Cyrus is interested in

14   that deal --

15         THE COURT:  Their whole point was that they locked

16   everything up.

17         MR. KIRPALANI:  That's their whole point and

18   that's actually my point, too, Your Honor.

19         THE COURT:  Okay.  But if that value that they

20   paid for locking up is better than what I would project the

21   Debtors getting, even if the auction was screwed up, I'm not

22   sure it matters.

23         MR. KIRPALANI: But that's what I'm trying to tell

24   you, that that won't be the case.  And we could -- I mean,

25   we could do it this afternoon, but we could have a hearing

Page 117

1   on that.  But I have nothing further unless Your Honor has

2   questions for me.

3                THE COURT:  Okay.

4                MR. HANSEN:  Good afternoon, Your Honor.  Kris

5   Hansen on behalf of Och-Ziff with Stroock & Stroock & Lavan.

6   It's good to see you again.

7                I'll try not to be too repetitive of Mr.

8   Kirpalani's presentation.  I just wanted to point out a

9   couple of things.

10               You cited it correctly.  The motion seeking

11  authorization said it would be a fair, transparent and

12  competitive process and I think the briefs all demonstrate

13  that there was some lack of transparency for sure and that

14  lack of transparency resulted in what we believe is a not

15  competitive process.  And ironically, Cyrus was -- when they

16  were --

17               THE COURT:  Is it -- let me see if I can summarize

18  your argument.  I think it's Omega's argument, too.  Your

19  clients took the view based on the notice that the auction

20  would be run by Jefferies, would be only for $245 million of

21  Debtor MTNs.  And your client formulated its strategy not

22  just for bidding on those 245, but also for bidding on other

23  MTNs that either the Debtors or Sears Re owned, and assuming

24  that you'd be able to bid on them in the future.  Anything

25  above 245 or anything at all owned by Swiss Re.  Is that how

Page 118

1    you say it was -- the auction was not fair?

2            MR. HANSEN:  Yeah.  You're right, Your Honor.  The

3    primary basis of the argument is when you look at the notice

4    that Jefferies sent out.  So the Debtors said fair,

5    transparent, competitive, and we're going to have Jefferies

6    do the whole thing and they're going to handle the notice,

7    they're going to take the bids in.  We have an ultimate

8    approval right.

9            So Jefferies sends out a notice that has as its

10   subject line, Sears Series BMTN Auction, approximately $250

11   million, due today at 12 p.m. noon, see below.

12           You go below and it says, "Sears Holdings

13   Corporation intends to conduct an auction on no more than

14   $251 million."  And then if you go down further in that

15   actual notice, below the hyperlink that the Debtors cite, it

16   actually lists three notes.  You add the total of those

17   three notes, it comes up to 251.  So from Och-Ziff's

18   perspective, yeah.  Our way to proceed in this auction was,

19   well, we'll take a shot at those 251.

20           We don't know if the Debtor is going to sell the

21   other 650 at some point.  We don't know.  If they do, then

22   we'll take a shot at those as well.  But because of the way

23   that the sale motion and the order was written, it says

24   specifically they note in the motion that Sears Re, the

25   foreign non-Debtor subsidiary, controls about $1.4 billion

Page 119

1    in MTNs and they say these are not being included here.

2    This is for the Debtors only.

3           And when you go to the order, it says Debtors

4    only.  So our perspective was even if we didn't have an

5    opportunity to succeed in connection with the $251 million

6    auction, we would at least have a fair shot to have a dialog

7    with Sears Re.  So the auction concludes.  It's kind of

8    murky, but there's market chatter about what the results

9    were, only after Omega essentially forces the Debtor to put

10   out the auction notice -- via discovery request -- gets them

11   to put it out and lo and behold, the auction notice says,

12   well, we didn't just sell 250, the Debtors actually went

13   beyond --

14           THE COURT:  No, I understand that, but I guess --

15           MR. HANSEN:  -- and then Sears Re got locked up,

16   too.

17           THE COURT:  But --

18           MR. HANSEN:  And, Your Honor, just to give you

19   some --

20           THE COURT:  No, but can I -- I'm trying to figure

21   out whether there was any bidder that would actually have

22   bid more, if they'd known what was actually for sale.  All

23   I'm hearing is that you might've bid on the other notes, but

24   those weren't necessarily for sale, so I don't know how you

25   wouldn't have put your best foot forward on the 245.

Page 120

1          MR. HANSEN:  But -- Judge, understood, but there's

2     only one way to know the answer to that, which is to redo

3     the auction.

4          THE COURT:  No, but --

5          MR. HANSEN:  You can't speculate and say I think a

6     whole marketplace would've not reacted any differently if

7     they thought $2.3 billion of MTNs were for sale as opposed

8     to $251 million of MTNs.  You can't --

9          THE COURT:  I guess that's --

10         MR. HANSEN:  And, by the way --

11         THE COURT:  But it wasn't for sale.

12         MR. HANSEN:  And -- but it got sold.  That's the

13    problem.  They all got sold, and when the Debtors and Cyrus

14    say, well, Sears Re didn't sell anything, that's not true.

15    What was sold by the Debtors was a contractual right that

16    prevented Sears Re from engaging with anybody.  We reached

17    out to Sears Re's counsel in Bermuda, made a proposal to

18    them, and they responded we're not allowed to talk to you.

19    And we said, who is.  We've never heard back to this day.

20         So there's clearly an attempt to use the 363(m)

21    protection which people had talked about in the responses to

22    protect the process.  But Cyrus' objection is quite telling.

23    Before they resolved their objection through the insertion

24    of that language in the order, their objection said most

25    sale hearings, you get bidding procedures that get approved,

Page 121

1    you get a winner, we come back, we approve them.  So you

2    can't do this because you're just going to release people to

3    be trusted.

4           And we didn't have a problem with it because we

5    said, sure, we trust the Debtors to run a fair process.  The

6    way they laid it out is Jefferies is going to sell these

7    bonds.  They'll give notice to the market.  Market

8    participants will react.  And then after the fact, we found

9    out they couldn't be trusted, because what happened was not

10   what they told people would happen.

11          And so the result does not at all comport with

12   the process that they laid out, so people can't hide behind

13   363(m) and say, hey, you preapproved it and we really can't

14   be called to task for that no matter what the process was.

15   And it's not -- so from our perspective, Cyrus was trying to

16   be very smart in the way that they approached the process.

17   So when we looked at it, we said the whole process is

18   tainted.  That's why you can't hide behind 363(m)

19   protection.

20          THE COURT:  Did your clients ask Jefferies before

21   the auction whether there were any more Sears MTNs for sale

22   than the 251?

23          MR. HANSEN:  I don't know the answer to it, Your

24   Honor, but from my perspective and my conversations with the

25   client, I think the answer is no because they had no reason

Page 122

1    to.  The auction notice said no more than 250.  So we

2    assumed no more than 250 meant no more than 250 until we

3    found out that no more than 250 meant $2.3 billion.

4             THE COURT:  Okay.  Can I -- Mr. Kirpalani, can I

5    ask the same question of you?  Did they ask?

6             MR. KIRPALANI:  No, Your Honor.

7             THE COURT:  Okay.  All right.

8             MR. HANSEN:  So, Your Honor, again --

9             THE COURT:  Can I ask, your client actually owned

10   Sears debt before the auction?

11            MR. HANSEN:  Yes, Your Honor.

12            THE COURT:  Okay.

13            MR. HANSEN:  And we still own Sears debt.  And

14   it's -- we own second lien claims.

15            THE COURT:  And did -- and your client made bids

16   at the auction -- a bid?

17            MR. HANSEN:  We did.  Yes, Your Honor.  And again,

18   that's why the only way to know what the right result would

19   be is to have another auction and when we look at it, we say

20   there are -- as Mr. Kirpalani pointed out, there are various

21   ways to do it, but with respect to Sears --

22            THE COURT:  But can I -- I'm going to take Mr.

23   Kirpalani up on his remarks about motivations here.  Both

24   your client and his client want the price to be low, right,

25   ultimately, notwithstanding that your client's a creditor of

Page 123

1    Sears?

2              MR. HANSEN:  It -- I mean, it depends, Your Honor,

3    right?  Because if it's low then obviously we get paid on

4    the insurance that we have.

5              THE COURT:  Right.

6              MR. HANSEN:  But if the price rises and we have

7    more deliverables then we get paid out on all of those and

8    it all depends on the price we paid for those.  So, like,

9    the auction --

10             THE COURT:  Well, you always want to buy low and

11   sell high, and you have another motivation to have it be low

12   here which is you have a third party that's guaranteed the

13   difference.  So why -- I mean, you want to open it up to bid

14   more, but your bidding would be lower.

15             MR. HANSEN:  We have -- well, Your Honor, you're

16   saying I'm standing here only in front of you wearing my CDS

17   purchaser had.  I'm not.  I'm wearing my CDS purchaser hat

18   and Och-Ziff is also wearing its hat as a creditor in the

19   estate, and we'd like to see more value come into the

20   estate.

21             THE COURT:  How much debt does it hold?

22             MR. HANSEN:  It's like $44 million of second lien

23   notes.  And so I think it's around $44 million, second lien

24   notes.

25             And Your Honor, the issue -- and those are issued

Page 124

1    by Sears Holdings and guaranteed by SRAC, so obviously

2    they're to the extent that SRAC has more assets to be able

3    to pay off claims with that, it works to our benefit as well

4    and it also inures the benefit of creditors junior to us if

5    we get paid off elsewhere.  And from Sears Re's perspective,

6    as we pointed out in our pleadings, right, it's an insurer

7    for the company and obviously I believe handles some of

8    their workers' comp liability.

9            THE COURT:  But did anyone bid at this auction

10   that -- it's odd to me that Omega would've bid at this

11   auction.  I mean, unless it just wanted to get a low price,

12   and then sell its notes higher, because it wants a lower

13   price.  Why's it even trying to bid?

14           MR. HANSEN:  The CDS auction dynamic changes

15   depending upon how the parties participate in it, but if the

16   auction price rises higher than parties who have requested a

17   physical settlement can put in their paper and get paid par

18   on that, so it's effectively -- depending on where they

19   bought it, it's a substitute for the insurance that you

20   purchased.

21           Obviously if the auction clears lower, then the

22   insurer who's the seller has to pay a higher price.  So the

23   dynamic isn't as simple as, like, buy low, sell high.  I

24   mean, that is one aspect of it, but it also deals with this

25   context of -- or concept of deliverability.

Page 125

1          But from the Debtors' perspective, again, we

2     agreed with them.  There is a temporary artificial market

3     for these notes where they can benefit from them and the

4     estate should benefit from them.  But it's got to be a fair

5     process, and --

6          THE COURT:  But I guess --

7          MR. HANSEN:  -- if they knew they had --

8          THE COURT:  There are two guiding principles

9     behind reopening an auction.  One is to maximize the value

10    of the estate, and the reason, generally speaking, people

11    don't reopen auctions is because you don't want to create

12    uncertainty over auctions, because if you do you don't

13    maximize value of the estate anymore.

14          The other principle is to be fair in the conduct

15    of the auction.  But if the fairness that you're asking me

16    to be driven by is simply to be fair to people that want the

17    price to be lower, then I'm violating the first principle.

18          MR. HANSEN:  No, but that's not -- Your Honor,

19    that's not the motivation.  The motivation is not to reopen

20    the auction to drive the price of the MTNs down.

21          THE COURT:  Why?

22          MR. HANSEN:  Because the MTNs are a deliverable

23    product in the auction.  So as they get delivered into the

24    auction, there -- it could take a while but I could explain

25    the multiple phases of an auction and how pricing is set

Page 126

1    within it, but there is, effectively, a bid and offer phase

2    of the CDS auction if there is an open interest that's

3    created by the seller who requests physical settlement in

4    the CDS auction.

5           If they do request that, right, for the amount of

6    CDS that they've sold -- make it up and use an example.  If

7    they've sold $100 million of CDS, they can go into the CDS

8    auction in the first phase and say I would like to

9    physically settle $100 million, which basically means I'll

10   buy $100 million of bonds because it has to be opposite of

11   the position they have.

12          And in the second phase of the auction, limit

13   orders get placed and those limit orders can either be bids

14   to buy or offers to sell.  People sell into that open

15   interest, if you will, and when that open interest gets

16   filled at the highest price, maxing out at par for purposes

17   of the auction, that's where your price gets set and then

18   the CDS contracts say I pay out basically going off of

19   wherever that price got set.

20          If there is a residual open interest to buy,

21   because there are not enough deliverables to put in, the

22   auction goes to par and it closes at 100 cents and the

23   sellers have no obligation to pay and the buyers collect

24   nothing from the insurance contract that they purchased.

25   However, if that open interest gets filled by orders that

Page 127

1    people have, bonds that they own, that say, look, I'll put

2    in and I'll sell in this auction.

3           The price rises throughout the CDS auction, having

4    no impact upon the Debtor's estate.  This all takes place in

5    the other world, as my kids would say, the upside down,

6    right?  It's like it's out there somewhere.  And so that

7    process by which you put in bonds and deliver, some people

8    will start out and say well, I'll put them in at 25 cents

9    because I paid 20 for them.  But it can rise and candidly,

10   Your Honor, it can go all the way up to par and some people

11   can even put in if the open interest isn't filled, above par

12   and the party that requested the open interest in the

13   beginning, like that put in the physical settlement request

14   on the sale side has to buy them.  That's how the auction

15   works.

16          So it's not that the bidders here are all saying

17   we want to reopen the auction so we can drive the price of

18   the MTNs down.  We all want to bid for them.  By the way, I

19   would love to hear Cyrus come back up here and say if you

20   reopened the auction, we're going to lower our bid.  We know

21   what they bid, so obviously there's some price discovery

22   that's already been taken place, but it shouldn't be thought

23   of as a bad thing for them because we think that they and

24   the Debtors kind of had a bad auction, if you will.

25          So from our perspective, we want the auction to be

Page 128

1    transparent.  We want it to be competitive and we want it to

2    be fair.  It wasn't any of those three things.  And when you

3    look at Sears Re, which is another hugs slug of potentially

4    deliverable obligations, right, in connection with the

5    auction, Sears Re is a non-Debtor.  They're not covered by

6    any of these orders.  And the Debtors said, yeah, you're

7    right.  They're not covered. And they're free to transact

8    after the auction is over.

9              Those statements themselves make no sense, because

10   what they show you is that the Debtors themselves entered

11   into an agreement to prevent Sears Re from being able to

12   sell its bonds until after the auction closed.  That

13   standing alone, on its own, is outside of what you ordered.

14   That can't be something that continues, because it

15   essentially just blocked a whole category of value.  And so

16   now, if there are much more from a deliverable perspective -

17   -

18              THE COURT:  Well, that's what you're assuming, and

19   I've been probing to see whether that's true, that it blocks

20   a whole category of value.

21              MR. HANSEN:  The Sears Re bonds are deliverable

22   into -- the bonds held by Sears Re are deliverable into the

23   auction, so they have inherent value based upon that

24   deliverability.

25              THE COURT:  Right.  But there's a price that Cyrus

1    paid for preventing that.

2           MR. HANSEN:  Well, but the Debtor sold them

3    something that they didn't have the right to sell them.

4           THE COURT:  That's a separate point.  I can

5    authorize them to do it, but I'm trying to figure out

6    whether that would make sense.

7           MR. HANSEN:  But there's only one way to find out

8    if it makes sense and that's to have a fair --

9           THE COURT:  No.

10          MR. HANSEN:  -- transparent auction.

11          THE COURT:  Not really.  I think people would --

12   maybe could give me answer on that.  I've heard you on that.

13   I've heard your explanation on it.

14          MR. HANSEN:  Absolutely, Your Honor.  I don't

15   really have anything else. I just -- I wanted to make sure

16   that I added those points.

17          THE COURT:  Okay.

18          MR. HANSEN:  Thank you, Your Honor.

19          MR. KIRPALANI:  I just want to clarify one thing.

20   Judge, for the record, Susheel Kirpalani from Omega.  So I

21   just want to make something very, very clear.  Of course, my

22   mom wanted to pay as little as possible for the Cabbage

23   Patch doll, too.  But when you need something and you want

24   something, you'll pay whatever you've got to pay in

25   competition.

1          My client bid 40 cents on the dollar per bond.

2    That compares with 10 cents on the dollar per bond that

3    Cyrus ultimately won the auction with.  I understand what

4    Your Honor's going to say, which is, but your client didn't

5    bid for all $880 million.  I get that.  So what has happened

6    is -- that's what I was referring to earlier.

7          Barclay's has amassed a consortium of people who

8    want to buy in camera -- I wish Kramer Levin were here,

9    because they represent Barclays, but in camera, we're happy

10   to reveal to the Court and give the Court comfort that this

11   offer is materially higher in the aggregate without diluting

12   with additional claims any more than the $251 million that

13   was agreed to.  It's apples to apples higher.  I'm not

14   playing games here, Your Honor.

15          THE COURT:  All right.  And why did your client

16   have to bid?

17          MR. KIRPALANI:  Well, Your Honor, our client has

18   bought protection on a certain number of bonds, we need to

19   deliver -- if Cyrus, the seller of the protection says we're

20   not paying on this insurance unless you show me the bonds,

21   right, so we need to have those bonds in order to show them.

22   That's what makes them valuable, right?

23          THE COURT:  But all things being equal, you'd

24   rather pay less than more for those?

25          MR. KIRPALANI:  All things being equal, sure.  But

Page 131

1    we also live in the real world.

2              THE COURT:  And the Cyrus would pay more, so --

3    but if it pays more, I'm not -- I guess it pays then and not

4    later, each way.

5              MR. KIRPALANI:  Yes.  Yes.

6              THE COURT:  Okay.

7              MR. KIRPALANI:  Thank you, Your Honor.

8              THE COURT:  All right.

9              MS. MARCUS:  Good afternoon, Your Honor.

10   Jacqueline Marcus, Weil, Gotschal, and Manges on behalf of

11   Sears Holding Corporation and its affiliated Debtors.

12   You're read a lot in the papers. You've heard a lot this

13   morning about what Omega and Och-Ziff believe was wrong with

14   the auction process.  But you haven't heard them refute

15   several incontrovertible facts.

16             Fact one, and this is one that I feel very

17   passionate about, so pardon me.  At the November 15th

18   hearing, when I advised the Court that, "the $1.4 billion

19   owned by Sears Re is not part of this," that was at the

20   transcript at 96, there was no inkling that there would be a

21   proposed transaction with Cyrus, let alone one that would

22   restrict the sale of the Sears Re MTNs.

23             The statement to the Court was true and Omega's

24   repeated allegations about misrepresentations made to the

25   Court are flat out wrong and frankly insulting.  I, too, had

1    very famous mentors and they taught me never to misrepresent

2    to the Court.

3            Fact two, the order approving the sale of the MTNs

4    owned by the Debtors did not limit the amount of the MTNs

5    that the Debtors were authorized to sell.

6            Fact three, both Omega and Och-Ziff participated

7    in the auction.  Omega bid 40 cents for $70 million of MTNs,

8    conditioned upon a decision by the ISDA determination

9    committee that the MTNs would be final -- on the final

10   deliverables list.  Och-ziff bid between 9 and 25 percent

11   for $14 million of MTNs, but provided that the offer would

12   be automatically canceled if prior to the conclusion of the

13   auction ISDA made a determination that the MTNs were not

14   deliverable.  On the day of the auction, bidders other than

15   Cyrus did not even offer to buy the $251 million of MTNs

16   that were identified in the Jefferies notice.

17           Fact four, on the day of the auction, the Debtors

18   consulted with advisors to the Creditors' Committee

19   regarding the offers that were received.

20           Fact five, the offer made by Cyrus of $82.5

21   million plus waiver of collections on approximately $630

22   million was the highest offer in terms of absolute dollars

23   that was available on that day and that was not contingent.

24           Fact six, the Debtors have not sold any of the

25   MTNs held by Sears Re.  Sears Re still holds $1.4 billion of

Page 133

```
 1   MTNs.
 2            Fact seven, Sears --
 3            THE COURT:  But the Debtors have both agreed and
 4   also have the power to deliver on that agreement to cause
 5   Sears Re not to sell.
 6            MS. MARCUS:  That's correct, Your Honor.
 7            THE COURT:  Okay.
 8            MS. MARCUS:  The Debtors as many Debtors who have
 9   non-Debtor subsidiaries act in their capacity as board
10   members and owners and have some -- call it lower seat
11   control over the acts of their subsidiaries.  We did
12   include, by the way, in the note purchase agreement
13   provisions for dealing with the fact that Sears Re itself
14   might ultimately become the subject of a proceeding in
15   Bermuda, and obviously we couldn't fine them in those
16   circumstances.
17            Fact eight, on the afternoon of November 20th, the
18   ISDA determination committee made its determination that the
19   MTNs are deliverable in connection with the ISDA auction.
20            And fact nine is the sale of the approximately
21   $880 million of the MTNs owned by the Debtors closed on
22   November 28th.
23            Omega's motion is nothing more than a classic
24   attempt by a losing bidder to attack a sale process, when it
25   underestimated how much it would have to pay to be the
```

Page 134

1    winner.  But the integrity of the bankruptcy sale process in

2    this case and others would be undermined if Omega's motion

3    were granted.

4             An example of that is this morning at 9:37 a.m. we

5    did receive an email from Barclays indicating that they are

6    offering to purchase the MTNs.  They wouldn't tell us the

7    price, but that offer expires at 5 p.m. this afternoon.

8             Importantly, Judge, in evaluating what occurred on

9    November 20th, the Court must put itself into the position

10   that the Debtors were in on that date, and not engage in the

11   20/20 hindsight that Omega's approach entails.  On that

12   date, there was uncertainty regarding whether the MTNs would

13   qualify for the ISDA auction.  That uncertainty was as a

14   result of numerous characteristics of the MTNs including the

15   fact that they were intercompany obligations.

16            And as an aside, Your Honor, the language that was

17   added into the order on that day that I read into the record

18   was really, I would say, almost invited by self at the

19   November 15th hearing because the one part of Cyrus' then

20   objection to the sale motion that I found somewhat

21   convincing, frankly, was the fact that we couldn't have a

22   sale free and clear of SRAC's defenses as part of the 363

23   sale and in fact, I had offered to clarify that as Your

24   Honor indicated.  It's black-letter law that you can't sell

25   what you don't have, and that's where that language came

Page 135

1    from.

2         On November 20th, other than the Cyrus bid, the

3    Debtors received offers ranging from 15 cents to 40 cents

4    for up to $177 million in aggregate amount of MTNs and most

5    of those bids were contingent.

6         On November 20th, a decision by the ISDA

7    Determinations Committee was imminent and an adverse

8    determination could've eliminated any prospect for recovery

9    on the MTNs.

10        In short, on that day the Debtors and their

11   advisors in consultation with the Creditors' Committee

12   determined that the Cyrus bid was in the best interests of

13   the Debtors' estates and that the additional conditions

14   imposed by Cyrus were justified by the substantial

15   incremental value of the Cyrus bid.

16        Omega is trying to persuade the Court that may be

17   as much as $60 million available to the Court if the Court

18   grants the release -- the relief requested.  However, it

19   ignores several important considerations.  The Court cannot

20   grant the relief requested -- and you alluded to this, Your

21   Honor -- and permit the Debtors to keep the $82.5 million

22   paid by Cyrus for the MTNs.  At best, therefore, the relief

23   sought would require the Debtors to forego the $82.5

24   million, bear the Jefferies' commission that it already paid

25   on the MTN sale, and only get back $60 million if Omega buys

Page 136

1    the $150 million of MTNs.

2           That makes no sense from the Debtors' perspective.

3    And the proverbial egg cannot be unscrambled here.  Even if

4    the Court were inclined to require the parties to redo the

5    auction, they can't.  The Determinations Committee has

6    already ruled on the deliverability of the MTNs and

7    therefore the market dynamics have changed completely.  It

8    would be manifestly unfair to Cyrus which put its money on

9    the line and agreed to a noncontingent arrangement to undo a

10   consummated transaction.

11          Finally, Your Honor, both Omega and -- not

12   finally, actually.  Both Omega and Och-Ziff purport to speak

13   on behalf of the Debtors' creditors, when we all know that

14   they are participants in the credit default swaps regarding

15   SRAC debt.  They bet against the Debtors and therefore

16   they're simply trying to protect their own parochial

17   interests.  Tellingly, the real representatives of the

18   unsecured creditors in these cases, the Creditors'

19   Committee, participated in the evaluation of the auction

20   bids and opposes the relief requested by Omega.

21          I would like to respond to a couple of additional

22   points, Your Honor, that were made earlier.  First, Your

23   Honor, in terms of the Jefferies notice, the Jefferies

24   notice was not a Court mandated notice.  It was the manner

25   in which Jefferies as our broker expert determined to

Page 137

1    publicize the sale.

2            I can't deny that the face of the notice said that

3    they were selling $250 million of MTNs but I think one thing

4    probably everyone in this courtroom can agree on is that the

5    players in the CDS market are not shy.  If anybody wanted

6    more, they would have asked Jefferies or made a bid for

7    more, as Cyrus, frankly, did.  Nobody solicited Cyrus and

8    asked them to bid on more; they simply did it because it

9    frankly was in their best interest to do so.

10           The -- I talked a little bit earlier about the

11   language in the sale order and how that came to be.  I think

12   it's also telling that notwithstanding the language in the

13   sale order, the Determinations Committee did approve the

14   MTNs as being deliverable in connection with the auction.

15           Your Honor asked whether there was any evidence

16   that Cyrus' alleged activities chilled bidding or that the

17   language, I think, in the proposed order chilled the

18   bidding.  There is no evidence.  We received nine bids and

19   they were on the low side and that's what led us to accept

20   the Cyrus bid.

21           Somebody asked why Cyrus is willing to withdraw

22   the objection.  I think Cyrus is willing to withdraw the

23   objection because it was very clear from Your Honor's

24   reaction at the November 15th hearing that they were not

25   likely to prevail and therefore they withdrew their

Page 138

1    objection.

2          Omega's counsel referred to the concept of there's

3    a moment in time that you can't recreate.  I think that is

4    actually very appropriate here and I don't think that the

5    Court can now do something which recreates the situation as

6    it existed on November 20th.

7          THE COURT:  Well, can I cut through this?  There

8    are two points that are, I think, really worth seriously

9    considering in the motion by Omega.  The first is that the

10   auction notice was misleading in that it pretty clearly says

11   that $250, approximately million of bonds would be

12   auctioned.  The second point is that the Debtors did take an

13   action to lock up the Sears Re MTNs without any separate

14   Court approval.

15         On the first point, though, I had pressed pretty

16   hard on the effect of that notice on bidders, and the

17   caselaw is pretty clear that if you change the rules of an

18   auction without telling the parties to the auction that

19   you've changed them, you run the risk notwithstanding the

20   strong policy going back to Gil-Burn of the finality of

21   auction sales to have the auction reopened.

22         But here, it still is not clear to me that given

23   the nature of the facts at the time opening up -- saying

24   clearly during the auction, we've changed the rule. We're

25   not selling $251, we're selling as many as we can and this

Page 139

1    includes causing Sears Re to do what we tell them to do with

2    respect to these bonds, that there would've been any

3    different result.  And you're saying to me, I think, that

4    there wouldn't have been because the people bidding at the

5    auction actually weren't bidding for more than $250.  They

6    were bidding for a lot less than 250.

7              MS. MARCUS:  That's exactly right, Your Honor, and

8    nobody -- I don't know what the respective positions of

9    Omega and Och-Ziff are in the CDS, but it would only make

10   economic sense for them to bid to the extent of their open

11   positions on the credit default swaps, so they weren't

12   bidding for 880.  That wouldn't have made economic sense

13   from their perspective.

14             THE COURT:  So the second point is the Sears Re

15   point and it's true that Sears Re is not a Debtor, but I

16   think, clearly, the Debtor's making a decision to cause

17   Sears Re in return for valuable consideration, to take an

18   action could well be viewed as being out of the ordinary

19   course.

20             The caselaw is not that well developed on that

21   issue, but I think that's because most people sort of know

22   it, sort of know when you exert that level of authority it

23   is out of the ordinary course and when it is, and sometimes

24   courts honor that type of analysis to actually maximize

25   value, for example, where the entity that you're selling

Page 140

1    can't go into bankruptcy but the shareholder can and so you

2    run the auction through the shareholders causing the entity

3    to be sold.

4           But just accept for the moment that -- without

5    agreeing -- that it is out the ordinary course to have

6    caused Swiss Re to -- I mean, Sears Re to do that.  As I

7    said, I fully believe I can retroactively authorize it, but

8    that in essence gives you through Sears Re, a second look

9    which is different than the auction point.  It basically

10   does give the Debtors a chance to have a do over on today's

11   facts.

12          Why is it that the Debtors believe on today's

13   facts sticking with the Cyrus deal is a good business

14   decision?  I understand that that would involve potentially

15   undoing the Cyrus deal in whole.  I don't think you could

16   divide it into two pieces, but I think that's a separate

17   issue than saying that the auction itself should be reopened

18   because it was not conducted efficiently or fairly or

19   whatever, which I'm leaning the Debtors' way on that issue.

20   This is a separate issue.

21          MS. MARCUS:  So you asked me -- I think you asked

22   me not to debate whether or not it was ordinary course, so I

23   won't.

24          THE COURT:  Right.

25          MS. MARCUS:  And I do believe and was very

Page 141

1   involved for a period of two weeks with this -- do believe

2   we ran a pristine process.  From the Debtors' point of view,

3   again to be frank with the Court, if somebody could

4   guarantee that there would be more than $82.5 million plus

5   whatever the value of the waiver of the claim were worth --

6            THE COURT:  Right.

7            MS. MARCUS:  -- and that there would be no damage

8   to the Debtors' estate, it would be foolish of me to say

9   that's not ultimately better for the Debtors.

10           THE COURT:  Well, is that the facts today?

11           MS. MARCUS:  I don't know that anybody's

12  guaranteed us any amount of money.  We have an email that we

13  got at 9:37 this morning that doesn't even have a price.

14           THE COURT:  Well, maybe since I don't have

15  anything before me seeking approval of the Swiss -- of the

16  Sears Re deal, maybe you should do a motion for that.

17           MS. MARCUS:  May I make an oral motion to approve

18  --

19           THE COURT:  I'm not sure.

20           MS. MARCUS:  Well, to the extent that it's

21  necessary, I --

22           THE COURT: Well, I'm not sure you know.  I mean,

23  to be honest, I don't think that's been fully explored and I

24  can see why you wouldn't.  I fully understand why you would

25  not have fully explored it until after this hearing.

Page 142

1        MS. MARCUS:  You asked me not to debate it so I
2   won't.  I really don't think --
3        THE COURT:  No, I --
4        MS. MARCUS:  -- that it was necessary --
5        THE COURT:  I'm going to let you come back to the
6   -- you can come back to the ordinary course point.  You can
7   come back to that.
8        MS. MARCUS:  Right.  But --
9        THE COURT:  I'm just raising -- I wanted to know
10   what the answer to that question was.
11        MS. MARCUS:  My job is to get the most money for
12   the estate, right?
13        THE COURT:  Right.
14        MS. MARCUS:  And with the least amount of risk.
15        THE COURT:  Right.
16        MS. MARCUS:  And so if it were real and it were in
17   the bank, so to speak, it would be difficult for me to take
18   a different position.
19        THE COURT:  Okay, but we don't know that today.
20        MS. MARCUS:  I don't know that today.
21        THE COURT:  But on the other hand, I don't have a
22   motion before me today either on that issue.
23        MS. MARCUS:  That's correct.  Your Honor, I would
24   point out that Paragraph 10 of the order does say the
25   Debtors can take all actions necessary to effectuate the

Page 143

1    relief granted in the order.

2              THE COURT:  I know, but the relief granted in the

3    order is to authorize the sale of the Debtors' MTNs.

4              MS. MARCUS:  That's correct, Your Honor.

5              MR. DUBLIN:  Good afternoon, Your Honor.

6              THE COURT:  I'm sorry -- I really, I was just

7    asking that as a discrete hypothetical question.  You're

8    free to try to convince me that it was in the ordinary

9    course and didn't need court approval.

10             MS. MARCUS:  I thought you asked me not to.

11             THE COURT:  No, I said -- just while I was asking

12   that question.  That's all.  But you can tell me now why you

13   think so.

14             MS. MARCUS:  I think it was, because it was an

15   action by the Debtor not wearing its Debtor hat, wearing its

16   hat as a board member or officer of a non-Debtor entity and

17   at least in my experience when you have non-Debtor

18   subsidiaries, they just operate the way they always operate.

19   Their assets don't -- you don't need Court approval to sell

20   their assets.  You don't need Court approval to do anything

21   with respect to those entities, and therefore the Debtor --

22   don't call it the Debtor right now, call it --

23             THE COURT:  The board members.

24             MS. MARCUS:  The board member who said, okay, I

25   agree to that, I think that's in the best interests of the

Page 144

1    company.

2            THE COURT:  But the agreement wasn't with the

3    board members.

4            MS. MARCUS:  But the board members were acting on

5    behalf of the Debtors and the board members --

6            THE COURT:  Well --

7            MS. MARCUS:  -- were doing --

8            THE COURT:  Yeah, they were.

9            MS. MARCUS:  They were acting on behalf of the

10   Debtors and the non-Debtors and in order to maximize the

11   value when we added up the bids that were -- the non-buyers'

12   bids --

13           THE COURT:  That's a separate issue.

14           MS. MARCUS:  Okay.

15           THE COURT:  Again, I understand at the time, it

16   made sense.  The problem was whether there was permission to

17   do it.

18           MS. MARCUS:  But Sears -- right now, Your Honor,

19   Sears Re, again, is not a Debtor here or in Bermuda and it

20   is operating --

21           THE COURT:  No, no, I -- look.  It is -- I guess

22   what a motion for approval would look like is for approval

23   of Sears to cause Sears Re -- it's for that -- be more

24   specific.  It's for the approval of the provision in the

25   agreement with Cyrus that Sears is bound by that deals with

Page 145

1    the Sears Re point.  So that would be the action and I think

2    that -- I mean, I think Sears Re's board would then be free

3    to decide what to do if I determine that Court approval of

4    that contractual provision would be granted or denied, one

5    way or the other.  Sears Re's board would then have the

6    ability to make the decision what to do with the notes.

7              MS. MARCUS:  The issue that I have with that, Your

8    Honor, is that it becomes a very slippery slope as to how a

9    Debtor --

10             THE COURT:  I agree.

11             MS. MARCUS:  --- manages its non-Debtor --

12             THE COURT:  I agree completely.

13             MS. MARCUS:  -- affiliates.

14             THE COURT:  But there is a contract here that is

15   with Sears, not with the board members.  I mean, that's why

16   the caselaw in this area is so sparse.  I think the Maine

17   case that -- State of Maine case, that is, that Omega cites,

18   for example, is kind of -- takes kind of 36,000-foot view of

19   it.

20             But there are other times when -- well, I'll give

21   you -- when I was in private practice, I represented the

22   owner of the Baltimore Orioles.  He would never put the

23   Baltimore Orioles into bankruptcy, but his bankruptcy

24   required the resolution of his ownership and so we sold his

25   decision on selling the Orioles and Judge Blackshear set up

1   an auction and approved it.  So, I mean -- anyway.  I -- but

2   I understand that's a close call --

3          MS. MARCUS:  Well, we --

4          THE COURT:  I understand.   That's a close call,

5   too. I appreciate that.

6          MS. MARCUS:  We didn't think --

7          THE COURT:  And I also appreciate that you deal

8   with the facts that you have at the time.

9          MS. MARCUS:  I mean, we didn't think Court

10  approval was necessary.  We still don't think it's

11  necessary, and I would urge you to remember that the parties

12  who are objecting have their own agenda here.

13         THE COURT:  That's why I was trying to figure out

14  whether this even makes sense as a business matter.

15         MS. MARCUS:  That's correct, Your Honor.  Thank

16  you, Your Honor.

17         MR. DUBLIN:  Good afternoon, Your Honor.  Phil

18  Dublin, Akin Gump, for the Committee.  I'll be brief.

19         I just want to give Your Honor some color on how

20  the Committee viewed this, the auction that took place on

21  the 20th and when the Committee was evaluating the

22  information that was provided by Jefferies and the Debtors

23  to us at that time, the decision process that the committee

24  went through to choose the Cyrus bid, and I'll also touch on

25  the Sears Re issue because I have a difference of opinion

Page 147

1   there based on the facts that were provided to us at the

2   time.

3           So obviously, Your Honor, we were before you on

4   the 19th of November when the sale order was entered and it

5   was the Committee that insisted on language in the order

6   that remained in the order with respect to the ability to go

7   look back after the fact to see if anybody engaged in any

8   inappropriate conduct.

9           THE COURT:  Right.

10          MR. DUBLIN:  So that order still stands and

11  regardless what happens today or after, that still stands,

12  so people will continue to have the opportunity to look at

13  the facts.  But we all knew on the 19th that Jefferies was

14  going to conduct the auction on the 20th, and when the

15  auction was going to be conducted on the 20th, there was no

16  expectation that there would be any other auction of any

17  other MTNs, whether by the Debtors or by any other party.

18          So nobody was assuming that there would be

19  anything offered after the 20th by the Debtors or by Sears

20  Re with respect to these notes, and we did consult with the

21  Debtors with respect to how many notes should be put out

22  there from the Debtors' side as to get the best price.

23  Because the Committee was focused on multiple things.  One,

24  getting as much value as possible, but we were also focused

25  on what's going to be the impact on SRAC at the end of the

Page 148

1    day with the increased amount of claims that would be

2    asserted there.

3           We have the true up mechanism included in the sale

4    order, but again, that's a little uncertain as to ultimately

5    what would happen with respect to the true up, so whatever

6    competing interests that we were focused on and we didn't

7    want a gazillion dollars' worth of MTNs to be sold.  We

8    wanted to have some sold, get cash into the company, we were

9    focused on the wind-down account and administrating

10   insolvency down the path, if that's what happens, but as

11   much value as we can get, keeping in mind our competing

12   interests.

13          So we ultimately got comfortable that somewhere

14   between $200 and $300 million is probably the right number.

15   And when we got on the phone after the auction was completed

16   by Jefferies with counsel for the Debtors and Jefferies, we

17   were given all the information with respect to every single

18   bidder, what every bidder wanted to buy, and what

19   contingencies were placed on those bids as to whether the

20   MTNs were going to be accepted into the CDS auction or not.

21   And the process we went through was let's ignore the

22   conditions.

23          Let's assume as if the Determinations Committee

24   had said the MTNs are in.  Because we didn't know that fact

25   at that point, but in order to try to look at the bids on an

1       apples to apples basis, the Cyrus bid on the one hand and

2       everybody else on the other, what's the right outcome here?

3              And the Cyrus bid was higher than all of the other

4       bids combined.

5              THE COURT:  And didn't have the contingency.

6              MR. DUBLIN:  With no contingencies.  But

7       importantly, we also looked at the fact that what was going

8       to happen when Cyrus facially was going to buy all of the

9       MTNs that were available from the Debtors, every single one

10      that they own.

11             Yes, on its face, they bought all of them.  But

12      they were waiving their right to any recoveries, anything

13      above the $251 that was put in the auction.  So as far as we

14      were looking at it, they weren't sold. They just retired so

15      that there would be no recovery on those notes. There was no

16      ability to sell those notes in the future.

17             THE COURT:  Well, let me -- but if the facts that

18      more than 250 were being sold, if all of them were being

19      sold, was it your view that the other people who were

20      bidding at the auction would've actually bid for them?

21             MR. DUBLIN:  I think they would've bid less.  Our

22      concern was if there was more available on its face, people

23      would've bit less because there was more supply; therefore,

24      you pay generally when there's more supply.  If there were a

25      lot more Cabbage Patch kids out there --

Page 150

1           THE COURT:  Right.

2           MR. DUBLIN:  -- people would be paying less for

3   the Cabbage Patch kids.

4           THE COURT:  But now -- but what I'm saying is I

5   appreciate that point.  The first -- the decision to put up

6   250, I understand that point.  But once you know that Cyrus

7   is buy all of them, was there any calculation of, well, now

8   that we know this, should be put them all up and so make it

9   clear to everyone else that Cyrus is buying all of them and

10  at that point, you know, they might bid more?

11          MR. DUBLIN:  So, again, from our perspective, we

12  didn't look at it as if they were buying all of them.  We

13  looked at it as if they were only buying 251 because all of

14  the rest were going to be effectively retired.

15          THE COURT:  Well, I understand that.

16          MR. DUBLIN:  so there was no --

17          THE COURT:  I understand the effect of the claims,

18  but in terms of the money that would be paid, since Cyrus is

19  buying them all up.  And there are other bonds out there

20  besides these, right?  There are other indicia --

21          MR. DUBLIN:  There's the second lien debt, there's

22  other debt that SRAC has that's available to participate in

23  the CDS auction whenever in January that's going to take

24  place.

25          THE COURT:  And are there other bonds outside of

Page 151

1    the Sears universe or is it just Sears?

2             MR. DUBLIN:  I believe it's just Sears.

3             THE COURT:  All right.  So now that the -- I'm not

4    asking you to accept this.  I'm not necessarily saying I'm

5    accepting it, but now that the rules of the auction changed,

6    instead of selling 250 you're selling 800, assume for the

7    moment that the other folks, if they knew that, would also

8    waive the claim.  Was there any thought given to, well, were

9    they going to bit more than $82 million?

10             MR. DUBLIN:  No, because they only wanted to buy

11   150 to begin with.

12             THE COURT:  And what about the effect of Cyrus

13   tying up all the other bonds?  Would that change that

14   calculus?  Because ultimately, I think that's what this

15   argument that is being made to me is, that if -- we assumed

16   that they're saying -- we assumed that there would

17   eventually be other Sears bonds or Sears Re bonds for sale.

18             I'm not assure that assumption is valid, because

19   there's not -- in fact, the order actually says you have to

20   come to Court to get approval if there's any put up for sale

21   after the auction.

22             But be that as it may, that's what they're saying.

23   And this changes that calculus.  The Cyrus deal changed that

24   calculus, but did that enter into the evaluation of whether

25   to take the Cyrus deal and not explain it to other people

1    that there's more bonds for sale?

2              MR. DUBLIN:  Yeah, I don't think it impacted the

3    calculus at Mr. Kirpalani, Mr. Hansen may disagree with me,

4    at the point in time when their clients were bidding because

5    the CDS auction has now been pushed out further than anybody

6    ever anticipated.  We expected that the CDS auction was

7    going to occur.

8              THE COURT:  Right away.

9              MR. DUBLIN:  Right away.  So there wasn't going to

10   be another opportunity.

11             THE COURT:  And Jefferies didn't say -- did

12   Jefferies say anything like, well now that they tied it up

13   we can probably really squeeze the short sell -- the other

14   side?

15             MR. DUBLIN:  Not that I'm aware of.  I don't know

16   what Jefferies says.

17             THE COURT:  Can I -- Ms. Marcus, did Jefferies

18   give any advice on that?

19             MS. MARCUS:  I don't think so, Your Honor.  I

20   mean, I think Jefferies' view was, they're getting $82.5

21   million, it's much, much, much more than everything else put

22   together.

23             THE COURT:  Even if -- they didn't talk about the

24   effect of Cyrus tying up a lot more bonds?

25             MS. MARCUS:  Nothing.

Page 153

1                 THE COURT:  Okay.

2                 MS. MARCUS:  And frankly, Jefferies obviously

3     didn't make the decision, the Debtors and the board --

4                 THE COURT:  Right, but, well, did Jefferies push

5     for anything other than this, though?  Did they push for

6     telling the other parties that it should be opened up?

7                 MS. MARCUS:  No, Your Honor.

8                 THE COURT:  And that the amount increase from 250

9     you know, in a big, public way?

10                MS. MARCUS:  No, Your Honor.

11                THE COURT:  Okay.

12                MS. MARCUS:  And in fact, as Mr. Dublin said, the

13    251, they did come up with the 251 number based on their

14    expertise as to what was --

15                THE COURT:  No, I'm not talking at the beginning,

16    I'm talking after Cyrus made its bid.

17                MS. MARCUS:  Then, no.

18                THE COURT:  Okay.

19                MR. DUBLIN:  So, Your Honor, separate and apart

20    from the fact, also, is that the 151 that was bid on by the

21    other parties wasn't apportioned conditionally, but again

22    the Committee, we didn't look at it that way.  We said,

23    pretend that they're not conditional, so let's figure out

24    what's the best overall bid here, and the Cyrus

25    (indiscernible) that.  With respect to Sears Re, that's a

Page 154

1    little different.  As, I think Mr. Kirpalani's partners will

2    let you know, we're the ones that gave them the information

3    as to who counsel was to Sears Re.

4         We weren't aware of the limitation that this issue

5    that we're talking about, whether it's inside or outside of

6    the ordinary course of business to do this limitation, but I

7    don't think it ultimately at the end of the day would have

8    changed our position because it was, again, our expectation

9    that CDS auction was going to happen very shortly after the

10   Debtor sold their notes and ultimately, there weren't going

11   to be any more sold.

12        So, I think factually, but for the fact that the

13   determination is going to be has continued to push out, when

14   the CDS auction is, that changes that calculus as it relates

15   to Sears Re.

16        THE COURT:  Do you -- or, I didn't ask you this

17   either, Ms. Marcus, do you have a -- when is that auction

18   now going to happen?

19        MR. DUBLIN:  I think it's in the second of January

20   on that.  But one other point that Mr. Hansen mentioned with

21   respect to the competing interest of Och-Ziff as a creditor

22   versus a CDS participant.  I think we know that they're here

23   today as a CDS participant, they're not here as a creditor.

24        The value that would come in from a sale of

25   additional MTNs, that wouldn't go to SRAC, it wouldn't go to

1    Sears Holding Company.  The ones that Cyrus bought, that

2    value goes to the two protection companies that owned the

3    MTNs, and then if Sears Re ultimately sold notes, those

4    would go to -- the proceeds will go to Sears Re.

5             Ultimately, I don't know what obligations Sears Re

6    has outside of certain inter-company obligations, so I'm not

7    sure how much of that value actually comes back into the

8    Debtors' estates.

9             There are issues being created, and we talked

10   about some of them today with respect to cash management,

11   where there are services being provided by certain Debtor

12   entities covering Sears Re warranty obligations that would

13   presumably provide value back into the estate on that front,

14   but I don't know what other competing interests there are

15   for Sears Re.

16            THE COURT:  Yeah, I mean, I agree with that, but I

17   think the Debtors are getting a certain amount of value from

18   Cyrus for their agreement to cause Sears Re not to sell

19   them.  So, that's the -- that's what, potentially, one could

20   have a second look at.

21            MR. DUBLIN:  Understood.

22            THE COURT:  Money that would come to the Debtors

23   for being relieved of that agreement which, again, I think

24   would also mean that the full value of the Cyrus deal would

25   be off the table.

Page 156

1          MR. DUBLIN:  We have to assume that would be the

2     fact.

3          THE COURT:  Okay.

4          MR. DUBLIN:  We did also receive the Barclays

5     proposal with a blank as to what the dollar amount is, so

6     we're not really sure what that amount would be and it

7     expires at 5:00 today.  So, that wouldn't even permit a

8     process to go forward there.

9          THE COURT:  Okay.

10         MR. DUBLIN:  Thank you, Your Honor.

11         MR. KRELLER:  Good afternoon, Your Honor.

12         THE COURT:  Good afternoon.

13         MR. KRELLER:  Thomas Kreller of Milbank Tweed

14    Hadley & McCloy on behalf of Cyrus Capital.

15         Your Honor, I'll try to be brief, obviously,

16    there's been lengthy discussions on a variety of topics.

17    Under the heading of you can never step in the same river

18    twice, I think there's a fundamental underpinning here

19    that's being missed, and maybe (indiscernible).

20         Your Honor, underlying the motion that Omega takes

21    credit for instigating, was the premise that the Debtors

22    have to sell these notes before the DC determination of

23    whether they would be listed into the ISDA auction or not

24    because if you waited until the determination was made, then

25    -- and ISDA -- and the Determinations Committee decided not

1   to put them on the list, then the Debtors would have lost

2   the opportunity to capture (indiscernible) premium as Omega

3   calls it.

4           And so, that was the judgment that the Debtors had

5   to make.  We have a moment in time to make this sale and we

6   don't know when the DC's going to come out, we don't know

7   what they're going to do, and we risk losing whatever value

8   we might get.

9           That was the status of the assets as they were

10  being sold at the auction on the 20th.  You have Omega, and

11  you have Och-Ziff now telling you, we want to buy a

12  different asset.  We want to buy an asset that's now been

13  put on the list.  We weren't prepared to bid in

14  unconditionally and take the risk that they wouldn't be put

15  on the list.  In fact, our bids were expressly conditional

16  upon them being put on the list.

17          That bid, that conditional bid, is directly

18  contrary to what the Debtors were trying to achieve in the

19  auction, or what the Debtors had to achieve in the auction.

20  The Debtors were looking to de-risk themselves of the

21  Determinations Committee determination with respect to the

22  MTNs.

23          Cyrus said, we'll take that risk.  We're bidding,

24  it's unconditional, here's the price, here's the terms, and

25  guess what?  If they don't go on the list, if the DC comes

Page 158

1    down and says they're not on the list and they were never

2    going to go into the ISDA auction, we just gave the Debtors

3    $82 million.  We took that risk.  Omega wasn't willing to

4    take that risk.  Och-Ziff wasn't willing to take that risk.

5           THE COURT:  Okay, I get all that.  I get all that,

6    but when you say to the auction, you're including something

7    -- Cyrus made three different bids, gave the Debtor a menu.

8           MR. KRELLER:  Correct.

9           THE COURT:  And the third bid, which the Debtors

10   accepted, included something that wasn't in the auction that

11   I approved.

12          MR. KRELLER:  I take issue with that, Your Honor.

13   I think that what was in the auction was the Debtors were

14   authorized to go out and sell the MTNs on whatever terms and

15   conditions generated the highest or otherwise best value for

16   the estate.  And I actually think that's the way your order

17   was.  That is why I think Paragraph 10, which Ms. Marcus

18   pointed you to, is actually -- has more utility than you

19   gave it in your brief colloquy with her, because that

20   paragraph says: "The Debtors are authorized to take all

21   actions necessary to effectuate the relief granted in this

22   Order."

23          Now, when you look at one of the components of

24   relief that are granted in the Order in Paragraph 3, it

25   says: "The Debtors are authorized, but not directed, in

Page 159

1    consultation with the Creditors' Committee, to sell the MTNs

2    to the party or parties that provide the highest or best

3    offer, and to deposit all the net proceeds of the sales into

4    the wind down account," et cetera.

5          The relief granted in 3, Your Honor, says the

6    Debtors can go out and enter into a contract to sell the

7    MTNs on the best terms they can get.  That's exactly what

8    they did.

9          THE COURT:  Well...

10         MR. KRELLER:  That's exactly what they did, Your

11   Honor.

12         THE COURT:  All right, but I don't think anyone --

13         MR. KRELLER:  And Paragraph 10 authorizes --

14         THE COURT:  -- I didn't -- I certainly did not

15   contemplate I was approving the sale of Sears Re's MTNs or

16   the blocking of the sale.

17         MR. KRELLER:  They weren't -- you're -- it's the

18   opposite of (indiscernible).

19         THE COURT:  I know, but it's the same thing.  I

20   mean, by blocking the sale, it means that you bought them,

21   in essence, because they can't go anywhere.

22         MR. KRELLER:  That doesn't mean we bought them,

23   Your Honor, we don't have them.

24         THE COURT:  Well, it effectively does because no

25   one else could have them.

Page 160

1          MR. KRELLER:  But Your Honor, what it also does is

2     -- it prevents the SRAC estate from being diluted to the

3     tune of those $1.3 billion dollars (indiscernible)

4          THE COURT:  No, I understand -- I -- believe me, I

5     get that.  I just -- the other question that I have for you

6     is, it's all well and good to have 363(m) protection but if

7     what was sold was not authorized to be sold at all, does

8     363(m) protection really apply to it?  I mean, wouldn't you

9     want to have that clarified with a separate notice and

10    opportunity to be heard on that issue?

11         MR. KRELLER:  In terms of the scope of the good

12    faith finding?

13         THE COURT:  No, no, not the good faith, the

14    approval of the Debtors' Agreement to cause Sears Re to not

15    sell the property, not sell the notes.  Wouldn't you want to

16    have Court approval of that?  I mean, it's going to be an

17    issue hanging over the whole deal for the next two, three

18    years, if someone wants to appeal it.

19         MR. KRELLER:  Okay, I'm --

20         THE COURT:  It's a close call.  Why not just --

21         MR. KRELLER:  It is a close call, Your Honor, but

22    appeal what?

23         THE COURT:  Appeal --

24         MR. KRELLER:  The Sale Order is the final Order.

25         THE COURT:  But --

1            MR. KRELLER:  It's not appealable.

2            THE COURT:  But it's -- the issue is what the Sale

3    Order covers, and whether -- I mean, the Sale Order

4    authorizes a sale, a transaction, and you've given me one

5    interpretation that says that it authorizes, among other

6    things, tying up the Sears Re notes.  I can see an equally

7    valid interpretation that says, no it doesn't cover that.

8    It covers the sale of the Sears MTN notes and sending out

9    the auction notice and all the other stuff related to that.

10   And that's an issue that could easily go either way, and at

11   least four judges could opine on that over the next two or

12   three years.

13           Wouldn't it be better just to do a Notice of

14   Presentment and see what happens on that for the next week,

15   appreciating the time constraints that Mr. Dublin and Ms.

16   Marcus have told me about the auction, that'd be the second

17   week of January, and then you know?

18           MR. KRELLER:  Your Honor, I feel pretty

19   comfortable that we do know.

20           THE COURT:  Well, okay.

21           MR. KRELLER:  I also think things have happened in

22   the meantime.  Remember, too, we're not just talking about

23   undoing an auction, right?  Most of the cases, I think all

24   of the cases that Omega cites to our cases where there was

25   an auction, the understanding of the sale hearing where

Page 162

1   people are trying to overturn the results were not --

2            THE COURT:  No, look, I -- I know Mr. Kirpalani is

3   going to want to stand up and say something more in

4   response, but I am pretty convinced that under these facts

5   you wouldn't undo the auction based on the notice or any of

6   the chatter or, you know, any of that.

7            But I am, legitimately concerned, I believe, about

8   the agreement to cause Sears Re not to sell any notes.  I

9   don't think I approve that.  I really don't.  I don't think

10  that was in front of me.

11           MR. KRELLER:  I hear you, Your Honor, I'm sorry.

12  I was making a different point.

13           THE COURT:  Okay.

14           MR. KRELLER:  My point was the cases that Omega

15  and Och-Ziff cites were cases where an auction got

16  overturned.  Here, the auction happened, the sale closed and

17  --

18           THE COURT:  I got that, but if -- let's put it

19  differently.  You and the Debtors could have closed the sale

20  on $250 million of bonds without the Debtors ever having

21  made this Motion, right?  That's conceivable.  Sometimes

22  people do that.

23           I represented Lehman Brothers once where they

24  actually bought a lot of securities, not realizing that they

25  were owned by a bankrupt company, and they called me up

Page 163

1    having a heart attack and I went down to Camden, New Jersey

2    and we sat down with Judge Wismar, and she said, well, this

3    is the best price anyway, right?  And everyone said yes, and

4    she said, okay.  It's retroactively approved.

5             But, if it wasn't the best price, if it wasn't

6    proper it's too bad.  It's not authorized, and you're -- you

7    know, that's the condition of when you do business with a

8    bankrupt company.  You need to get Court approval first.

9             So, the fact that it closed I don't think matters

10   for that aspect of the motion.  It does matter for the first

11   aspect, I understand that point.

12            MR. KRELLER:  Okay, and it matters for other

13   aspects of the case too, Your Honor.  And I just want to say

14   this because we had the junior DIP up earlier.

15            THE COURT:  Right.

16            MR. KRELLER:  The $82.5 million dollars came in.

17   Cyrus paid it, the Debtors took it, it went into the wind

18   down reserve.  It's sitting in the wind down reserve as the

19   collateral of the senior DIP lenders and the junior DIP

20   lenders.  If that money comes out --

21            THE COURT:  It would only come out if someone was

22   going to pay $85 million.  It's not going to come out unless

23   the money's there.

24            MR. KRELLER:  I don't know how the sequence would

25   work, Your Honor, that you could keep Cyrus on the hook

Page 164

1    while going out and re-auctioning the assets that they

2    bought.  Don't you have to undo that transaction first?

3              THE COURT:  Wasn't that Cyrus's risk when it

4    unlocked the Sears Re stuff?  I mean, that's the risk they

5    took.

6              MR. KRELLER:  I don't think it -- I don't think

7    so, Your Honor.

8              THE COURT:  Why?  Why not?

9              MR. KRELLER:  Because they were paying the money

10   to purchase the MTNs, not to purchase the Sears Re MTNs.

11             THE COURT:  They were -- but that, I mean, it's

12   very clearly laid out in the three-part offer.  The third

13   part is a higher price in order to get the Sears Re locked

14   up.  So, it just wasn't a gift, they bought it.

15             MR. KRELLER:  Your Honor, the point I'm making is

16   that there are bigger implications in the case by

17   potentially undoing this transaction.  I take your point on

18   the notice and the authorization.

19             THE COURT:  But why -- what are they, other than -

20   - I mean, obviously, if the Cyrus deal is the best deal,

21   then it would stand, and if it's not the best deal, it would

22   have to be replaced by something that would make the estate

23   better off, not worse off.

24             So, I have a hard time seeing how it has greater

25   implications for the case.  And we're talking about a week

Page 165

1    here.  It's not like there's a great deal of uncertainty.

2    It's going to be -- it would be resolved before the CDS

3    auction.

4              MR. SCHROCK:  Your Honor, sorry to -- may I just

5    ask a quick question along the line of thinking?

6              THE COURT:  Yes.

7              MR. SCHROCK:  Are you asking about the best price

8    bid from the facts known right now or at the time?  I'm just

9    trying to understand how you were thinking about it.

10             THE COURT:  Well, I am focusing on the best price

11   now because of the feature in this proposal that has Sears

12   Re.

13             MR. SCHROCK:  Thank you.

14             THE COURT:  Yes.

15             MR. KRELLER:  Your Honor, just to be clear, the

16   three options in the menu, they all require the Sears Re

17   provisions.

18             THE COURT:  Yeah.

19             MR. KRELLER:  It wasn't just one of the levels of

20   bids.

21             THE COURT:  I know, but it was all the deal.  They

22   took the third one, but it was all integral to the proposal.

23             MR. KRELLER:  It was.

24             THE COURT:  So, I mean, this is ultimately a

25   business decision when you come down to it, because we're

Page 166

1    talking now about what's highest and best for something that

2    I don't believe I actually approved beforehand.  And, I

3    could decide it now.

4              I don't want to decide it after the auction, the

5    CDS auction, and I don't have a really strong sense as to

6    what date that is and when Jefferies would have to -- well,

7    Jefferies wouldn't have to do anything.  I mean, basically,

8    if someone wants to make a better proposal at this point,

9    they would have to do it by the deadline that I would set

10   for the motion.  It couldn't be a blank proposal.  It would

11   have to be a firm, committed, no-contingencies proposal.

12             MR. KRELLER:  And a proposal on the assets as they

13   sit today, as opposed to where they sat on the 20th.

14             THE COURT:  No, as they sit today, because I don't

15   see how you can pull out -- the Sears Re was inextricable to

16   all of the bids.  You can't pull it out.

17             MR. KRELLER:  No, you can't pull it out, Your

18   Honor, but you're giving --

19             THE COURT:  If you could pull it out -- how can

20   you -- no, how could you --

21             MR. KRELLER:  But you're giving other parties the

22   ability to leverage post-facto off the DC determination.

23             THE COURT:  I appreciate that, but at the same --

24   but at --

25             MR. KRELLER:  It's a different asset.  That's

Page 167

1   unfair to my client.

2         THE COURT:  But it isn't, because I didn't approve

3   this deal.  That's why it's not unfair.  That's -- that was

4   -- that's the problem.  I didn't approve it.

5         MR. KRELLER:  You approved the highest and best

6   proposal, Your Honor.

7         THE COURT:  Well --

8         MR. KRELLER:  You did.

9         THE COURT:  -- I don't think I did.  I -- look, I

10  don't believe that I approved a lock-up of Sears Re.

11        MR. KRELLER:  Your Honor, I'm not going to spend

12  any time slinging arrows with Mr. Kirpalani.  He stood here

13  and told you that Cyrus did this and Cyrus did that.

14        THE COURT:  I don't think you need to.  I don't --

15  that didn't move me.

16        MR. KRELLER:  There's also no -- just for the

17  record, Your Honor, there is no evidence in the record of

18  that.

19        THE COURT:  Well, look, there was an initial

20  hearing that we had where it was pretty clear to me that

21  your client wanted to blow this up, and it was also pretty

22  clear to me that I think you understood that that wasn't

23  going to happen.  And that if, notwithstanding, what would

24  be happening in Court, you tried to do it out of Court,

25  there'd be consequences.  And the order, as Mr. Dublin says,

Page 168

1    preserves that.  So, I don't think that's -- I don't -- I'm

2    not prepared today to say anything negative about Cyrus'

3    lack of good faith.

4            MR. KRELLER:  Thank you, Your Honor.  I appreciate

5    that.

6            THE COURT:  I don't think the record establishes

7    that just because Cyrus tried to blow it up at one point,

8    and then changed its mind, doesn't mean that when it changed

9    its mind it was acting in bad faith.

10           MR. KRELLER:  Well, Your Honor, we tried to blow

11   it up while at the same time trying to refine --

12           THE COURT:  You had a right to try to blow it up.

13   There's no problem with that, I didn't have --

14           MR. KRELLER:  And to try to refine the order to

15   protect SRAC because we were an SRAC creditor.

16           THE COURT:  Right, I agree with that.

17           MR. KRELLER:  Thank you, Your Honor.

18           MR. KIRPALANI:  You were right that I was going to

19   come back, but I'm not going to take your time up.  You've

20   given us a lot of it and I really appreciate it.

21           I would say I was waiting for confirmation from

22   Barclays, but they have given us authority -- if the Court

23   feels it would be important to in camera with the Debtors

24   and the Committee reveal what the value is in this other bid

25   to help the business --

Page 169

```
1              THE COURT:  All I've been told is it's blank, so
2     I'm not prepared to do that.
3              MR. KIRPALANI:  It's not blank.  No, blank was a
4     misnomer.  It's redacted because there's no confidentiality.
5              THE COURT:  Well, I don't want to do that.  I
6     don't want to do that.  I really --
7              MR. KIRPALANI:  We're happy to tell you.
8              MR. HANSEN:  (Indiscernible) a buyer today?
9              MR. KIRPALANI:  I think that's obviously open to
10    discussion.  So, if you say we're going to reopen this
11    auction after you learn and see that it's actually in your
12    interest to do so we'll work with you.
13             THE COURT:  Well, I -- I don't want to --
14             MR. KIRPALANI:  That's all I wanted to say.
15             THE COURT:  Okay.
16             MR. HANSEN:  Your Honor, I'm sorry to -- Kramer
17    Levin is on a listen only line.  They represent Barclays,
18    they just sent me an email.  I didn't want to read it to the
19    Court.  It says, "We're on a listen only line and not in
20    court.  Barclays executable offer generates more than Cyrus'
21    proceeds in excess of $100 million dollars.  I have been
22    authorized by Barclays to authorize you to make that
23    statement."  That came from Mr. (indiscernible).
24             THE COURT:  Well, all right, that's -- it's easy
25    to say, and I appreciate your saying it, but --
```

1          MR. HANSEN:  They sent it to me.  It's been an

2    issue of dispute and the last thing I would say before I

3    leave the podium is just so we're clear with respect to Och-

4    Ziff, our CDS exposure is much smaller than our claim.  Our

5    CDS exposure is about a third of our claim.

6          THE COURT:  No, I appreciate, but that cuts the

7    other way too, because your guys only bid under $20 million

8    dollars, so I don't see this auction going anywhere, if it

9    was just your two clients bidding.

10          MR. HANSEN:  I agree with that.  Just there was a

11    claim made that we're standing here only in our capacity as

12    a CDS party, but it's not true.

13          THE COURT:  Okay.  All right.  Well, I have a

14    motion in front of me by Omega basically looking to unwind

15    the transaction that was consummated after the conduct of an

16    auction by the Debtors' financial advisor, Jefferies, of so-

17    called MTNs that I addressed in an order dated November 19,

18    2018.

19          There was clear time pressure on the Debtors to

20    have that auction take place, because it needed to precede

21    two events.  First, the determination by the -- well, I'll

22    do it in a different order.  One of those two events was an

23    auction run of applicable or qualifying securities in

24    connection with the fixing of this applicable CDS measuring

25    point for this particular set of credit default swaps

1    pertaining to Sears.

2          Preceding that auction was a determination by the

3    Committee ultimately responsible for that auction, that the

4    MTNs would have been qualifying or would be qualifying

5    securities for that auction.  Again, the Debtors' auction

6    through Jefferies had to precede both of those events,

7    because the intrinsic value of the MTNs was nowhere close to

8    the value they would have if they could be applicable

9    securities for the CDS measuring auction.

10         And the Debtors obviously did not want to risk

11   having those securities being excluded from the auction and

12   consequently had to have their auction before the larger

13   auction.

14         I authorized in the November 19 order the

15   following in Paragraph 3: "The Debtors are authorized, but

16   not directed, in consultation with the Creditors' Committee,

17   to sell the MTNs to the party or parties that provide the

18   highest or best offer and to deposit all net proceeds of the

19   sales into the wind down account as provided in the DIP

20   orders, as defined below, provided that such authorization

21   to sell the MTNs shall terminate at the close of business

22   one business day following the date of the auction, and any

23   further authorization to sell any or all of the MTNs will be

24   subject to Court approval."

25         In other words, my order did not actually

Page 172

1    establish auction rules for the conduct of the auction that

2    I authorized.  I merely said that it would take place under

3    the supervision or direction of Jefferies with the

4    consultation -- in consultation with the Creditors'

5    Committee and the Debtors.

6         The Omega motion contends that the auction that

7    Jefferies ran was unfair and not transparent and, in fact,

8    confusing, primarily because the notice of the auction,

9    which is attached to a copy of its motion, states "Sears

10   Holdings Corporation intends to conduct an auction of no

11   more than 251,245,000 SRAC medium-term notes today at 12:00

12   PM EST.  Bids must be firm until 4:00 PM EST.  Anyone

13   bidding must be a QIB and should submit bids sizes and any

14   stipulations.  Bids must be submitted by email.  Partial

15   bids will be allowed.  Sears will evaluate all bids and

16   select buyers based on the highest or best bid in its sole

17   discretion and business judgment.  The auction may continue

18   from time to time.  Sears reserves the right to sell all,

19   part, or none of the notes, dependent upon price and

20   stipulations."

21        I, of course, approved the sale of more than

22   251,245,000 MTNs, and, pursuant to my approval order, Sears

23   was authorized to sell more, and in fact did sell

24   considerably more MTNs to Cyrus, who was determined to have

25   made the highest and best bid for the MTNs at the auction.

1           The objector and the joinder party contend that,

2    although the order itself authorized the sale that occurred

3    of the MTNs themselves, the auction itself was confusing, as

4    I said, and not transparent and misleading in that one could

5    easily read the language that I just quoted to mean that

6    only 251,245,000 MTNs would be for sale.

7           The last sentence, reservation of rights to sell

8    all, part, or none of the notes, dependent upon price and

9    stipulations, can easily be read not as a reservation to

10   sell more than 251 million of the notes, but simply saying

11   that you would reserve the right to sell less.

12          There were other indications in the auction notice

13   if you went to them, they were hyperlinked, that more could

14   be sold, and of course, that's consistent with the sale

15   order.

16          There's a strong policy under the Bankruptcy Code

17   in favor of the finality of bankruptcy auctions, however,

18   there's a well-recognized exception to that policy where the

19   auction itself had inherent flaws in it to the extent that

20   the court reaches the conclusion that, in balancing out the

21   reasons for the strong policy in favor of the finality of a

22   bankruptcy auction, the fair conduct of the auction

23   overcomes those policies.

24          It is only in that context, i.e. the fairness of

25   the auction, that another bidder would have standing to even

Page 174

1    raise this type of issue.  Omega itself only became a

2    Creditor of these Debtors after the auction, and therefore,

3    lacks any other type of standing to pursue its Motion at

4    this point.  See, for example, Hirsch v. Qingdao Orien

5    Commercial Equip. Co. Ltd., 2015 WL 1014352 at pages 7-9

6    (E.D.N.Y Mar. 6, 2015).  See also, in re Technical Systems,

7    Inc., 896 F.3d 382, 386 (5th Cir. 2008).

8           But as I said, the exception to that rule is where

9    either the Purchaser's conduct or the conduct of the auction

10   in essence change the rules of the auction and in that sense

11   gave them the status of an aggrieved party.

12          The Second Circuit a long time ago addressed what

13   it described as the difficult balancing act a Bankruptcy

14   Court must perform when it conducts an auction of a Debtors'

15   assets, stating that, "It walks a tightrope," this is a

16   quote, "between, on the one hand providing for an orderly

17   bidding process, recognizing the danger that absent such a

18   fixed and fair process bidders may decline to participate in

19   the auction, and on the other hand, retaining the liberty to

20   respond to differing circumstances so as to obtain the

21   greatest return for the bankrupt estate."  That's in in re

22   Financial News Network, Inc., 980 F.2d 165, 166 (2nd Cir.

23   1992).

24          The Seventh Circuit also addressed that concern in

25   Corporate Assets, Inc. v. Paloian, 368 F.3d 761 (7th Cir.

Page 175

1    2004).

2              Generally speaking, the exception to the finality

3    requirement occurs when the facts strongly indicate fraud,

4    mistake, or unfairness toward the frustrated party.  See K.

5    Roe Associates of West Islip, LLC., v. Colony Hill

6    Associates, 111 F.3d 269, 274-6 (2nd Cir. 1997).

7              And again, I think, consistent with the Financial

8    News Network case, one needs to look at the policy behind

9    the rule in favor of the final nature of an auction process.

10   And those are two-fold.  One is that the estate needs to be

11   maximized.  That's a primary obligation of the Bankruptcy

12   Court as well as, of course, the Debtor.

13             But the other is, the integrity of the bankruptcy

14   process and the understanding that the maximization of value

15   depends upon the reliability of the outcome of an auction so

16   that bidders actually make their best bid and don't try to

17   game the system by holding back and then seeing where

18   everyone has gone, and then making a bid under changed

19   circumstances.

20             The exception though, as laid out in the two

21   Circuit Court cases I've cited, includes where the rules of

22   the auction changed without disclosure to all of the auction

23   parties as a factor to take into account, which occurred

24   both in Paloian and Financial News Network.

25             However, this is, I believe, a case-by-case, fact-

Page 176

1   based process again in light of the overall policy.  And

2   here, even though arguably the notice laid out one set of

3   assets that were to be sold, namely 251,245,000 MTNs, in

4   fact, far more MTNs were sold and it does not appear that

5   that was disclosed to other parties.

6          On the other hand, the parties who are complaining

7   about that lack of unfairness have made no contention that I

8   believe is credible that they themselves would have bid

9   differently at the auction than they actually bid, which was

10  for a far smaller number of MTNs than the 251 million or

11  that they would have made their bids firm, as Cyrus did, as

12  opposed to conditioned on the subsequent determination by

13  the CDS Auction Committee, that these notes would be

14  included in the overall CDS auction.

15         So, it is hard for me to see how they were, in

16  fact, aggrieved by the change.  As best as I can tell, both

17  from the pleadings and oral argument, their argument, or

18  their rationale for why they were aggrieved by not knowing

19  that more MTNs were for sale, or that Jefferies would have

20  considered bids for more than $251 million of MTNs, is that

21  they might then have not held their cash in reserve thinking

22  that they might be able to buy MTNs subsequently, either

23  from the Debtors or a non-Debtor entity, Sears Re.

24         There is no indication that any of those MTNs ever

25  would be for sale, and in fact, the Sale Order as far as the

Page 177

1    Debtors MTNs, made it clear the Debtors would have to come

2    back and get separate Court approval.

3           So, I am quite skeptical about the rationale as to

4    why the change in the rules or the arguable change in the

5    rules of the auction as laid out by Jefferies in the notice

6    would have meant anything to the objectors here or the

7    Movant and the Joinder Party here.

8           It has also been contended by Omega that the

9    existence of a potential cloud over SRAC's potential

10   defenses that were preserved under my November 19th Order

11   adversely affected the sale.

12          I think most importantly, the notice itself makes

13   it clear that SRAC waived all those defenses as claims,

14   offsets, et cetera, that were covered by the proviso in the

15   November 19 Order.

16          Moreover, notwithstanding what traders potentially

17   might have thought, notwithstanding the large size of this

18   transaction or series of transactions, if they were going to

19   be bidding for less than the full amount, the proviso in the

20   order was simply black letter law consistent with the New

21   York General Obligations Law and is, in essence, the same

22   type of proviso that applies to the purchase of any note

23   from the Obligor under the note -- I mean with respect to

24   the Obligor under the note.

25          So, I don't believe that that cast any type of

1    cloud over the sale that would merit undoing the auction.

2         Of course, here, I don't really even have a record

3    that I believe is admissible that would show that if I did

4    undo the auction, there would be a different result, a

5    better result.  So, obviously, that consideration was front

6    and center in in re Financial News Networks, and it's absent

7    here.  But that is a relatively minor point, because again,

8    if one looks at the facts here, I do not believe that the

9    auction was conducted in a way that, in fact, prejudiced the

10   Movant or the Joinder Party.

11        I also believe that the evidence before me today

12   does not justify a conclusion that Cyrus has failed to act

13   in good faith, which is the statutory exception to 363(m) of

14   the Bankruptcy Code.

15        Notwithstanding that fact, there is a proviso in

16   the November 19th Order that preserves the rights that it

17   preserves against any buyer covered by the Order, including,

18   obviously, the winning buyer, Cyrus.  It's in Paragraph 7

19   and it says: "Provided further that nothing contained in

20   this Order shall waive any rights of the Debtors, the

21   Creditors' Committee, or any other Party or governmental

22   entity, to the extent it is determined that a Party engaged

23   in inappropriate conduct with respect to the transactions

24   contemplated by this Order."

25        But on the record before me, I do not believe that

Page 179

1    the actions taken by Cyrus here, as detailed in the Motion,

2    and in the other pleadings and on the record today, rise

3    anywhere close to the level of a finding that they have not

4    acted in good faith.

5            As held by the Second Circuit in Licensing by

6    Paolo, Inc. v. Sinatra, in re Gucci 126 F.3d 380, 390 (2nd

7    Cir. 1997), "A purchaser's good faith is lost by fraud,

8    collusion between the purchaser and other bidders or the

9    trustee, or an attempt to take grossly unfair advantage of

10   other bidders."  That, to me, has not been shown here.  All

11   of the foregoing solely deals with the first aspect of

12   Omega's Motion, which attacks the auction itself, and, for

13   the reasons I just stated, I will deny that aspect of the

14   Motion.

15           There is a second aspect of the Motion, however,

16   and it goes to an aspect of the Cyrus transaction, which I

17   have not yet addressed.  In addition to buying the Debtors'

18   MTNs, under the Cyrus transaction, Cyrus required, and the

19   Debtors agreed, that the Debtors would cause their

20   subsidiary, Sears Re, to not sell any of its MTNs that it

21   owned, and there were a lot of them, roughly $1.4 billion.

22           The Motion for approval of the sale of the MTNs

23   did not explicitly address or seek approval of such an

24   agreement by the Debtors.  Omega, in its Motion, contends

25   that that agreement was an action out of the ordinary course

Page 180

1   by the Debtors that requires Bankruptcy Court approval for

2   it to be binding.  363(b) of the Bankruptcy Code states:

3   "The trustee, after notice in a hearing, may use, sell or

4   lease, other than the ordinary course of business, property

5   of the Estate, unless the sale or lease is consistent --"

6   I'm sorry, leave it at that.

7        So, Congress required, in 363(b) that a Debtor-in-

8   Possession, which here is the same as a trustee, has the

9   power to use, sell or lease, other than in the ordinary

10  course, property of the estate only after notice in a

11  hearing and ultimately approval by the court.

12       The Debtors contend that their agreement to cause

13  their subsidiary not to sell its MTNs is not covered by this

14  section, arguing two things.

15       First, that it's not a use, sale or lease - the

16  agreement, that is, and secondly, that it's not a use, sale,

17  or lease of property of the estate.  There is limited case

18  law on this issue.  The Motion cites, among other cases, in

19  re Consolidated Auto Recyclers, Inc., 123 BR 130 at 140-43,

20  (Bankr.D.Me.1991) where the Court granted retroactive

21  authority under 105 and 363(b) to vote stock in a subsidiary

22  to cause it to file a bankruptcy case, and in re Raytech

23  Corp., 190 BR 149 at 150-53 (Bankr. D.Conn.) granting a

24  Debtors' request under 363(b) to authorize the non-Debtor

25  subsidiary's entry into an acquisition agreement that the

Page 181

1    Debtor would cause to happen.

2            But, those are far from controlling opinions.  In

3    essence, the Debtor was asking for comfort orders in both

4    cases.  The issue before me is whether the Debtors'

5    agreement with Cyrus was a sale of property or a use of

6    property.  In essence, the Debtors agreed, in their

7    contract, to cause Cyrus's board members not to take a

8    certain action.  And one can see how that would not be a

9    sale of property, but really, just simply a board decision.

10           On the other hand, Cyrus bargained to have that

11   action memorialized in a contract that would be binding on

12   Sears, as opposed to the board members which, to me,

13   certainly looks, smells and feels like property.  And it was

14   part of a sale.  It was a condition to a sale on each of

15   Cyrus' bids, and not a severable condition.

16           Cyrus argues, and I think the Debtor would,

17   perhaps, agree with this, that the Sale Order itself

18   actually did provide authorization for the Debtors'

19   agreement to cause Sears Re not to sell the MTNs that it

20   owns by providing, in Paragraph 10, "The Debtors are

21   authorized to take all actions necessary to effectuate the

22   relief granted in this order."

23           The problem with that argument, although it's

24   certainly a credible argument, is that the motion itself and

25   the hearing on the motion came nowhere close to alerting

Page 182

1    people, as 363(b) requires in providing for notice in the

2    hearing, that notes owned by Sears Re would be sold or

3    locked up which, in essence, is the equivalent of the sale

4    because the purchaser of the lock-up is in essence tying up

5    the notes basically reserved on that issue.

6           So, while the Debtors have contended to the

7    contrary, and have sought to defeat the Motion by Omega on

8    all grounds, I believe that there is a serious concern here

9    that the sale, as a whole, since the Sears Re part of it is

10   an integral part of it, was not authorized by the Court.  As

11   shown by the Consolidated Auto Recyclers case, and I believe

12   this is consistent with my authority, I could retroactively

13   approve that sale.

14          And if the facts were so exigent that I would need

15   to make that determination today, I think I would approve

16   it, but I don't believe they are, and this is part of the

17   tightrope that the Second Circuit talks about in FNN.  I am

18   told that the CDS auction is now going to occur sometime in

19   the second week of January.

20          I believe, therefore, that it is appropriate to

21   require notice and the opportunity for a hearing on the

22   aspect of the transaction that requires Sears to cause Sears

23   Re not to sell the MTNs to be made, on a shortened basis

24   because of the facts before me, namely the CDS auction being

25   impending, and to evaluate the transaction on today's facts,

Page 183

1   or the facts pertaining at the time that I would have a

2   hearing on that notice.

3          I recognize that that would -- because it's an

4   integrated transaction, mean, if I determined that I

5   wouldn't approve the Sears Re part of the transaction, that

6   the Debtors would lose the entire benefit of the Cyrus deal.

7   But, because they are so integrated, I believe that's the

8   only course to take here.

9          And therefore, I will direct that the Debtors

10  provide notice and an opportunity for a hearing on the Sears

11  Re aspect of the deal, but that will include the whole deal,

12  on seven days' notice and you should schedule a hearing

13  promptly after Christmas on it.  Any objections would be due

14  within that seven days, so the hearing would probably be

15  eight or nine days afterwards.

16          MS. MARCUS:  (Indiscernible) do we count

17  (indiscernible) this or count (indiscernible) after New

18  Years?  Just for clarification.

19          THE COURT:  Well, let's see, today is the 20th, so

20  you could do it on the 28th or 29th, is what I'm thinking,

21  with objections due the 27th or -- I'm sorry, have the

22  hearing on the 29th, objections due on the 28th.

23          MAN 1:  (Indiscernible) is that day, Your Honor.

24          THE COURT:  Well, that's not good.

25          (LAUGHTER IN THE COURTROOM)

Page 184

1           THE COURT:  All right.  So, that would -- I mean,

2    you would get this notice out tomorrow --

3           MR. SCHROCK:  Yes, Your Honor.

4           THE COURT:  So, I'm thinking maybe objections due

5    the 30th?

6           MR. SCHROCK:  Yeah, Your Honor, just to be clear

7    in terms of what your (indiscernible) do you want us to file

8    the -- just a notice of the sale, and the sale would be of -

9    -

10          THE COURT:  Notice of Approval of the Cyrus sale.

11          MR. SCHROCK:  Of the Cyrus sale, okay.  And --

12          THE COURT:  And it's clear, I've approved every

13   aspect of the sale except the Sears Re aspect.  I'm not

14   reopening the auction, I'm not doing any of that, but in

15   effect, I guess I am because of the Sears Re issue.  I think

16   objections would be due, I guess, the 30th.

17          MR. SCHROCK:  And just to be clear, Judge, this --

18   the only thing the Debtors own, right, in terms of what we

19   can auction off, is the right to prohibit, I guess, Sears Re

20   --

21          THE COURT:  That's right.

22          MR. SCHROCK:   -- from selling more notes, or not

23   prohibit, so somebody will have to --

24          THE COURT:  That's right.

25          MR. SCHROCK:  -- somebody will have to put a bid

Page 185

1    on that right, not the notes themselves, I want to make sure

2    this is clear.

3            THE COURT:  No, it would be on that right, and it

4    would have to be better than the Cyrus deal.

5            MR. SCHROCK:  Right, but that's all we own, is the

6    right to --

7            THE COURT:  Absolutely, that's all that should be

8    noticed.

9            MR. SCHROCK:  They're going to be bidding --

10           THE COURT:  The right under the contract.

11           MAN:  Your Honor, how can that --?

12           THE COURT:  Well, no, it would -- I'm sorry.  It

13   would be for the other stuff too, because we're assuming

14   Cyrus, if outbid, would have to get back what it paid.

15           MR. SCHROCK:  I understand, I'm just

16   (indiscernible) as to the Sears Re portion --

17           THE COURT:  Yes, that's all you're offering.

18           MR. SCHROCK:  -- that's all we're offering --

19           THE COURT:  But you're also offering all the other

20   securities.

21           MR. SCHROCK:  The other MTN notes.

22           THE COURT:  Right, exactly, that the Debtors own.

23           MR. SCHROCK:  Right.

24           THE COURT:  And I'm compelling you to do this.

25   This is not voluntary, I appreciate --

Page 186

1          MR. SCHROCK:  And we'll do it, Judge.  No

2    questions.

3          THE COURT:  No, I mean, I don't fault you at all

4    for resisting it.

5          MR. SCHROCK:  We felt like -- honestly, Judge, I

6    feel like we're in a Hobson's choice under the facts, but

7    that's --

8          THE COURT:  Well, that's -- and frankly, I'm that

9    way too, but I believe given the notice of hearing

10   requirement that that needs to be done.  So, I hate

11   scheduling a hearing on New Year's Eve day, but I don't have

12   anything else scheduled for then, so we'll have it at 10:00.

13         MR. SCHROCK:  Sounds like a party.

14         THE COURT:  Not my idea of a party, but it's a --

15         MR. SCHROCK:  Not my idea of a party.

16         THE COURT:  Right.

17         MR. SCHROCK:  Okay, so, if we file the notice for

18   approval of that aspect of the sale --

19         THE COURT:  Tomorrow.

20         MR. SCHROCK:  -- given this is an integrated

21   transaction, we can file it tomorrow --

22         THE COURT:  Yes.

23         MR. SCHROCK:  -- and we'll move it forward

24   expeditiously.  But I do want to make clear to the other

25   buyers that it will -- the only thing the Debtor is going to

Page 187

1     offer is what they own.

2               THE COURT:  Correct, which is the right to --

3               MR. SCHROCK:  The right to block --

4               THE COURT:  Which is the ownership of the bonds

5     that it -- that they own, and the right to block Sears Re

6     under the -- it's the same terms as the contract.

7               MR. SCHROCK:  Understood.

8               MR. KIRPALANI:  Your Honor, Susheel Kirpalani from

9     Quinn on behalf of Omega.

10              I just wanted to notify the Court that there's a

11    lot of things happening today in the CDS market and it may

12    well be that the auction for the CDS is going to be pushed

13    out even further.  We're happy with --

14              THE COURT:  Well, I'm not going to take a risk of

15    that.

16              MR. KIRPALANI:  No, we're happy.  I just want to

17    let the Court know to the extent --

18              THE COURT:  All right.

19              MR. KIRPALANI:  -- that you were only coming to

20    Court on the 31st to deal with this issue because you

21    thought, and we told you when a hearing was -- when an

22    auction was is what's --

23              THE COURT:  Right, but that's the best information

24    I have.

25              MR. KIRPALANI:  I agree.

1           THE COURT:  If -- you know, so -- and I'm not

2    going to adjourn it.  I'm just -- you know, everyone's

3    focused on this, they should file whatever objection they

4    should make, and if they're going to.  So, just to be clear,

5    the notice will say that the Court will review the entire

6    Cyrus transaction solely for the reasons stated in my ruling

7    and for no others and that parties should read that

8    transaction to see what they're objecting to.

9           MR. SCHROCK:  Right, so we'll --

10          THE COURT:  Because the Debtors can't do anything

11   more than is laid out in that transaction.

12          MR. SCHROCK:  Right, and so, we're going to have

13   to -- frankly we'll have to probably attach the terms of the

14   agreement to the notice.

15          THE COURT:  Right, that's fine, I mean, they've

16   been filed.

17          MR. SCHROCK:  Right.

18          THE COURT:  But that's right.

19          MR. SCHROCK:  And we'll -- and the objections, I

20   suppose, will be in the form of competing bids.

21          THE COURT:  Well, I -- it's probably going to be

22   some party in interest who says these people have a

23   competing bid that's fully funded and non-contingent and

24   ready to go.  I mean, the bidders won't be able to object.

25   It's just --

Page 189

1          MR. SCHROCK:  Right, and if we were to act on this

2   timeline, Your Honor, I suppose they would just -- you know,

3   whenever somebody's submitting an objection, then they'll

4   have to prove up that they actually have the money.

5          THE COURT:  Well, yes, because I'm assuming Cyrus

6   will get refunded.

7          MR. SCHROCK:  Yes, that's the implication of your

8   ruling, Judge.

9          THE COURT:  Right.  Right.  Okay.

10         MS. MARCUS:  Just for clarification one more time,

11  in terms of timing, the hearing on the 31st, which will be

12  fine, and objections due on Sunday the 30th?

13         MR. SCHROCK:  What about Friday?  (indiscernible)

14  on Friday the 28th, Your Honor?  Would that be acceptable?

15         THE COURT:  That's fine.

16         MR. SCHROCK:  Okay.

17         THE COURT:  That's fine.

18         THE COURT:  Oh, you're kidding.  It's closed New

19  Year's Eve?  I don't think so.  Well, you guys would know.

20             (LAUGHTER IN THE COURTROOM)

21         MR. SCHROCK:  We could come back on the 2nd, Your

22  Honor, I think that's still (indiscernible).

23         THE COURT:  All right.  Okay, that's fine.  And

24  then you can make objections due on the 31st.

25         MR. SCHROCK:  The 31st.

Page 190

1              THE COURT:  Yeah.  Just file them electronically.

2      I'm always asking them when there's a holiday.  Thank you.

3              MR. SCHROCK:  I believe that's all I have for the

4      matter on today.

5              THE COURT:  Okay, thanks.

6

7

8      (Whereupon these proceedings were concluded at 2:49 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 191

1                        C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2018.12.27 10:59:20 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 24, 2018