**HALPERIN BATTAGLIA BENZIJA, LLP**          Proposed Hearing Date: March 21, 2019
Donna H. Lieberman, Esq.                                                        Time: 10:00 a.m.
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Email: ahalperin@halperinlaw.net
Email: dlieberman@halperinlaw.net

And

**SHUMAKER, LOOP & KENDRICK, LLP**
David J. Coyle, Esq.
1000 Jackson Street
Toledo, OH 43604
Telephone: (419) 241-9000
Email: dcoyle@slk-law.com

*Co-counsel to Kellermeyer Bergensons Services, LLC and
Innovative Facility Services*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
**In re**                                                                             :
                                                                                             :          **Chapter 11**
**SEARS HOLDINGS CORPORATION,** *et al.*,      :
                                                                                             :          **Case No. 18-23538 (RDD)**
                Debtors[1].                                                          :
                                                                                             :          **(Jointly Administered)**
------------------------------------------------------------ x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); Max Serv, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (19870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC ,Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None): SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**MOTION OF KELLERMEYER BERGENSONS SERVICES, LLC AND INNOVATIVE FACILITY SERVICES FOR ENTRY OF AN ORDER (I) COMPELLING THE DEBTORS TO IMMEDIATELY ASSUME OR REJECT THE KELLERMEYER AND INNOVATIVE CONTRACTS AND PAY POST-PETITION AMOUNTS DUE UNDER THE CONTRACTS, AND (II) GRANTING RELATED RELIEF**

Kellermeyer Bergensons Services, LLC ("Kellermeyer") and Innovative Facility Services ("IFS" and together with Kellermeyer, "KBS"), by and through their undersigned counsel, make this motion (this "Motion") for entry of an order, pursuant to §§105(a), 365(d)(2) and 503(b)(1)(A) of Title 11 of the United States Code (the "Bankruptcy Code"), (i) compelling the above-captioned debtors (the "Debtors") to immediately assume or reject their Housekeeping Services Master Service Agreement and Housekeeping Services Agreement (Sears Automotive) with Kellermeyer, and their Housekeeping Services Master Service Agreement with IFS, and pay post-petition amounts due (or overdue) under those contracts, and (ii) granting related relief. In support of the Motion, KBS respectfully represents as follows:

## PRELIMINARY STATEMENT

1. KBS and certain of the Debtors are parties to three contracts, pursuant to which KBS provides housekeeping services and staff at two hundred eighty-six (286) of the Debtors' stores[2], as well as seven (7) of the Debtors' auto centers. Charges under the Agreements (defined below) average in excess of $850,000 per month.

2. The Agreements have not been assumed or rejected by the Debtors, and KBS continues to perform thereunder.[3] However, KBS has received no payment on account of

---

[2] KBS has been notified that forty (40) of the two hundred eighty (280) stores serviced by Kellermeyer will close in the month of March.

[3] KBS's books and records show that as of Petition Date, the amount due and owing to Kellermeyer was $1,845,965.41. That amount is almost identical to the amount shown as due to Kellermeyer on Kmart Corporation's Schedule E/F, which lists the amount owed to Kellermeyer as of the Petition Date as $1,841,322.00 (The debt is not listed as contingent, unliquidated, or disputed.)

numerous invoices for services provided during the period January 1, 2019 through January 31, 2019, which reflect billings for (depending on the services) part or all of the month of January (the "January Invoices"). Copies of the January Invoices are attached to the Shaw Declaration (defined below) as **Exhibits 1 and 2**. The Kellermeyer January Invoices were timely submitted and payment was due on or before February 20, 2019 if the Debtors wanted the Agreements' early payment discount, or on March 2, 2019 without that discount. The IFS invoices were timely submitted and payment was to be initiated and made by March 2, 2019. The total amount due under the January Invoices is $543,218.78.

3. KBS periodically checks the online portal that the Debtors make available to their vendors and service providers, and as stated in the Shaw Declaration, on February 20, 2019, the portal showed the unpaid obligation to KBS for the month of January and indicated that it was scheduled to be paid. When KBS checked the portal again a few days later, the line item referencing the payment obligation to KBS had disappeared. *See* Shaw Declaration, ¶ 7.

4. KBS made numerous efforts to contact the Debtors about the nonpayment and the change to the portal (and had its counsel contact counsel to the Debtors), and on Saturday, March 9th, KBS was informed by David Acquaviva, formerly an employee of the Debtors and apparently now an employee of Transform Holdco LLC (the "Buyer") that there is a dispute between the Debtors and the Buyer about who is obligated to pay the January Invoices. Mr. Acquaviva also informed KBS that the Buyer does not intend to have the Agreements assigned to it. *See* Shaw Declaration, ¶¶ 9-10.

---

(Cont.)
Therefore, even using the Debtors' slightly lower number, the "cure" amount owed to Kellermeyer totals in excess of $2.3 million as of the date of this Motion, exclusive of amounts billed but not yet due and amounts that have not yet been billed.

5. Recent filings in these bankruptcy cases evidence that (a) the question of who is supposed to pay KBS is only one of numerous disputes between the Debtors and the Buyer, and (b) the Debtors are administratively insolvent. [D.N. 2766, 2796]. This puts KBS at risk with respect to not only its pre-petition claims against the Debtors, but with respect to the administrative claims as well. KBS is (directly and through contractors and subcontractors that it is obligated to pay) providing services under the Agreements that benefit the Debtors and the Buyer; it is cleaning and maintaining two hundred eighty-six (286) stores and seven (7) auto centers, and providing janitors and in some instances, porters, at those premises. KBS is currently owed $543,218.78 in connection with the January Invoices, and payment obligations continue to accrue as KBS continues to perform under the Agreements.

6. The Bankruptcy Code provides debtors with many rights and protections, but it does not require that counter-parties to contracts provide services to debtors free of charge during Chapter 11 cases. The Debtors are in post-petition violation of the payment terms of the Agreements, and unfortunately, given the Debtorsø lack of funds, KBS has no assurance that valid administrative claims will ever be paid. For that reason, KBS seeks an Order of this Court (i) compelling the payment of the now overdue January Invoices, as well as timely payment of any and all additional amounts accruing under the Agreements, (ii) compelling the Debtors to immediately assume or reject the Agreements, and (iii) granting KBS related relief.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. Consideration of this motion is a core proceeding pursuant to 28 U.S.C. §157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The statutory predicates for the relief requested herein are §§105(a), 365(d)(2)

and 503(b)(1)(A) of the Bankruptcy Code and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

9.  On October 15, 2018 (the "Petition Date"), the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors have continued as debtors and debtors in possession since the Petition Date.

**The Agreements and Billing Thereunder**

10. As noted above, Kellermeyer has two contracts with the Debtors, and IFS has one contract[4]. Kellermeyer and Sears, Roebuck and Co. ("Sears"), Sears Operations, LLC ("Sears Ops"), K-mart Corporation ("K-Mart"), and Kmart Operations LLC ("Kmart Ops") are parties to a Housekeeping Services Master Service Agreement made as of February 24, 2017 and effective March 1, 2017 (the agreement, including any amendments thereto, being the "Kellermeyer Master Agreement," and Sears, Sears Ops, K-Mart, and Kmart Ops being jointly referred to as the "Contract Debtors").

11. The Kellermeyer Master Agreement currently governs cleaning services provided at two hundred eighty (280) of the Contract Debtors' stores. Specifically, pursuant to the terms of the Kellermeyer Master Agreement, Kellermeyer provides the Debtors with janitors and porters, and provides not only cleaning services, but the equipment and supplies used by Kellermeyer contractors and subcontractors in connection with those services. There are cleaning services that are provided daily, as well as services that are provided at different intervals. Depending upon the particular services rendered, invoices are submitted either once or

---

[4] In Kellermeyer's cure objection [D.N. 2196] it incorrectly stated that it had only one contract with the Debtors. Upon further investigation, it has determined that it has a master agreement that covers all of the retail stores at which Kellermeyer provides services (which is described in the cure objection), and a separate agreement that governs only the Sears auto centers.

twice per month, and payment is due within twenty days of invoice, for any early payment discount, or otherwise within thirty days of invoice. *See* Declaration of Nathaniel Shaw (the "Shaw Declaration"), attached hereto as **Exhibit A.**

12. Kellermeyer is also party to a Housekeeping Services Agreement with Sears that had a commencement date of June 1, 1017, pursuant to which Kellermeyer provides cleaning services and personnel at free-standing Sears' automotive centers (the "Kellermeyer Auto Center Agreement"). Kellermeyer presently provides services under the Kellermeyer Auto Center Agreement to seven (7) standalone Sears' auto centers.

13. IFS is a wholly-owned subsidiary of Kellermeyer, and is party to its own Housekeeping Services Master Service Agreement, dated November 5, 2015, with the Contract Debtors (the "IFS Agreement" and together with the Kellermeyer Master Agreement and the Kellermeyer Auto Center Agreement, the "Agreements").[5] The IFS Agreement is substantially similar to the Kellermeyer Master Agreement, and services are currently provided to six (6) stores under the IFS Agreement.[6]

14. KBS timely submitted invoices dated January 31, 2019 to Sears and the other Contract Debtors, as appropriate, for services provided for the periods January 1 through January 31, 2019, or January 16 through January 31, 2019, as set forth on the individual invoices. (These invoices were previously defined as the "January Invoices." and are exhibits to the Shaw Declaration.) The total amount due under the January Invoices is $543,218.78 and payment is now past due with respect to all of the January Invoices.

---

[5] The Agreements have not been attached to this Motion because of confidentiality provisions in the Kellermeyer Master Agreement. If the Debtors are willing to waive that provision, KBS will promptly submit copies of the documents.

[6] The primary difference between the two agreements is that the workers provided by IFS are entirely union workers.

{00290851.1 / 1293-001 }   6

15. As set forth in the Shaw Declaration, after the payment date had passed without receipt of any payment, representatives of KBS emailed and left phone messages for the individuals at the Contract Debtors they had dealt with historically about payment issues. They received no responses and thereafter directed counsel to pursue the matter with Debtors' counsel. Eventually, on Saturday, March 9th, KBS contacted and spoke to David Acquaviva. Mr. Acquaviva had been the Divisional Vice President, Procurement, at Sears Holdings Corporation, and indicated that as of the date of his call, he is working for the Buyer. *See* Shaw Declaration, ¶ 8.

16. KBS representatives were told by Mr. Acquaviva that there was a dispute between the Debtors and the Buyer about who was responsible for payment of KBS's January Invoices, and that Mr. Acquaviva did not know when or if the invoices would be paid. *See* Shaw Declaration, ¶ 8. Mr. Acquaviva also advised KBS representatives that the Buyer did not intend to assume the Agreement, as it did not want to pay the "cure" amount. *See* Shaw Declaration, ¶ 9. (As of the date of this Motion and using the Debtors' Schedules rather than the slightly higher pre-petition number which KBS believes is correct, the "cure amount" totals $2,384,540.70, exclusive of unbilled amounts and amounts billed but not yet due.)

17. KBS's invoices for the period February 1 through February 15, 2019 were submitted on February 28, 2019. Those invoices have been paid. Invoices for the period February 16 through February 28, 2019, or for certain services, for the period February 1 through February 28, 2019, were submitted on February 28th, and payment of more than $440,000 is due in late March. *See* Shaw Declaration, ¶ 10. However, as of the date of this Motion, no payment has been received in connection with any of the January Invoices.

**The Sale Process**

18.     The sale of some or substantially all of the Debtors' operating assets has been a central component of these bankruptcy cases.  On November 19, 2018, the Court entered the *Order Approving Global Bidding Procedures and Granting Related Relief* [Doc. No. 816]. On January 18, 2019, the Debtors filed a *Notice of Cure Costs And Potential Assumption And Assignment of Executory Contracts And Unexpired Leases In Connection With Global Sale Transaction* [D.N. 1731], which included certain contracts with Kellermeyer.  Kellermeyer filed its *Limited Objection and Reservation of Rights as to Debtors' Proposed Cure Amount and Assumption and Assignment of Executory Contracts in Connection With Global Sale Transaction* [D.N. 2196] in response to the Debtors' notice, asserting a pre-petition cure claim of 1,845,965.41 in connection with the Kellermeyer Master Agreement.

19.     The Court approved the sale of assets to the Buyer, an affiliate of ESL Investments, Inc. (the Debtors' former controlling shareholder) by Order dated February 8, 2019 [D.N. 2507], and upon information and belief, the sale closed on February 11, 2019. Certain executory contracts and leases were assumed by the Debtors and assigned to the Buyer on the closing date, but a much longer list of contracts – including the Agreements – have not yet been either assumed or rejected.

20.     Pursuant to the terms of the sale agreement and related documents, the Buyer has a "designation rights period" of sixty days from the closing date in which to make decisions about what executory contracts and leases it wishes to have assigned to it.  Based upon the sale closing date of February 11th, the Buyer's deadline is April 12, 2019.  As set forth above and in the Shaw Declaration, KBS has been advised that the Agreements will not be assumed by the Buyer, but no notice of rejection has yet been filed with the Court.  Absent rejection or other

relief from the Court, KBS is obligated to continue performing under the Agreements, despite the failure of the Debtors to meet their administrative payment obligations.

21.    Most recently, the Buyer has filed a *Motion to Refer Matters to Mediation* with the Court, asking the Court to authorize mediation with respect to certain disputes between the Buyer and the Debtors [D.N. 2766], and the Debtors have responded with the *Debtors' (I) Motion to (a) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (b) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC Motion to Refer Matter to Mediation* [D.N. 2796] (the "Debtors' Motion").

22.    The Debtors' Motion asserts that (i) the Buyer is improperly withholding $57.5 million that is property of the Debtors under the sale agreement, and (ii) those funds are "critical to maintaining administrative solvency". *See* Debtors' Motion, ¶ 3. The Debtors' Motion also identifies a dispute about, among other things, $166 million in liabilities which the Debtors believe the Buyer assumed under the sale agreement. *See* Debtors' Motion, ¶ 4. Hearings with respect to both the Buyer's motion and the Debtors' Motion are scheduled for March 21, 2019 at 10:00 a.m.

## RELIEF REQUESTED

23.    By this Motion, KBS seeks entry of an order requiring the Debtors to immediately assume or reject their Agreements with KBS and pay post-petition amounts due (or overdue) under the Agreements, and granting related relief.

*(a) The Need for Immediate Assumption or Rejection*

24.    Under section 365(d)(2) of the Bankruptcy Code, a debtor generally may assume or reject an executory contract any time before confirmation of a plan of organization. However, the breathing space afforded the debtor for the assumption or rejection of executory contracts is

not without limits. Section 365(d)(2) itself provides that a court may, on the request of a party to such contract, shorten the period of time within which the debtor must make a decision regarding whether to assume or reject such contract.

25. In this regard, section 365(d)(2) of the Bankruptcy Code provides:

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 .S.C. § 365(d)(2) (emphasis added).

26. Furthermore, pursuant to section 105(d)(2) of the Bankruptcy Code, courts have authority to enter an order compelling debtors to assume or reject executory contracts by a date certain. 11 U.S.C. § 105(d)(2)(A) (courts have the authority to issue various kinds of orders, including an order that õsets the date by which the trustee must assume or reject an executory contract or unexpired leaseö).

27. Indeed, Congress also recognized that the purpose of section 365(d) is to õprevent parties in contractual or lease relationships with a debtor from being left in doubt concerning their status vis-a-vis the estate.ö House Report No. 95-595, 95th Cong. 1st Sess. at 348 (1977); Senate Report No. 989, 95th Cong., 2d Sess. at 59 (1978); *see also*, *In re University Medical Center*, 973 F.2d 1065, 1078-79 (3d Cir. 1992); *In re Beker Indus. Corp.*, 64 B.R. 890 (Bankr. S.D.N.Y. 1986). Although the general rule is that the debtor is afforded a reasonable time within which to decide whether to assume or reject an executory contract, *see In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002), what constitutes reasonable time is left to the bankruptcy courtøs discretion, to be determined on a case by case basis in light of the broad purposes of the entire Bankruptcy Code. *Theatre Holding Corp. Mauro*, 681 F.2d 102 (2d Cir. 1982); *In re*

*Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001).

28. In determining whether to accelerate the debtor's decision, the court must balance the interests of the non-debtor contracting party against the interests of the debtor and the bankruptcy estate. *In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001); *In re Midtown Skating Corp.*, 3 B.R. 194, 198 (Bankr. S.D.N.Y. 1980) (the bankruptcy court "must take into account the nature of the interests at stake, the balance of hurt to the litigants, the good to be achieved, the safeguards afforded those litigants, and whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary").

29. In balancing these interests, relevant considerations include (i) the damage the non-debtor party will suffer beyond the compensation available under the Bankruptcy Code, (ii) the importance of the contract to the debtor's business and reorganization and (iii) whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan. *In re Teligent, Inc.*, 268 B.R. at 738. The list of factors is, however, not exhaustive and there may be other factors that a bankruptcy court should consider. *South Street Seaport Limited Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755 (2d Cir. 1996); *In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006) (listing various factors, including the balance of hurt to the litigants, the good to be achieved and the safeguards afforded the litigants); *In re St. Mary Hosp.*, 89 B.R. 503, 513 (Bankr. E.D. Pa. 1988) (a motion to compel a debtor to assume or reject an executory contract "must be resolved by weighing the nature of the interests at stake, the balance of the hurt to the litigants, the good to be achieved, and the safeguards afforded those litigants"); *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 551-52 (1984) (in certain circumstances, the rights of the non-debtor party to an executory contract to know its position with respect to the debtor and the contract at issue would outweigh

the need of the debtor in possession for unlimited flexibility and breathing space).

30. Weighing the foregoing factors with the facts in these cases militates in favor of shortening the Debtors' time to assume or reject the Agreements and compelling the Debtors to make their decision immediately. KBS was owed more than $1.8 million under the Agreements as of the Petition Date. While the Debtors' bankruptcy filings prevented KBS from pursuing collection actions or other default remedies, KBS believed that sections 365 and 503 of the Bankruptcy Code at least provided it with a degree of protection with respect to services provided during the Chapter 11 cases.

31. It now appears that KBS's confidence in those statutory protections was misplaced. KBS continues to provide services and honor the terms of the Agreement, and to pay the contractors and subcontractors who provide janitors and porters to the locations governed by the Agreements. But the Debtors have failed to meet their post-petition, contractual payment obligations. More than $500,000 is currently past due in connection with the January Invoices, and there is no certainty that KBS will be paid the more than $440,000 that is due later this month in connection with February invoices.

32. If the Debtors were flush with cash, KBS would be dismayed at the Debtors' failure to comply with the terms of the Agreements and timely pay their post-petition obligations, but might have a degree of confidence that administrative obligations would eventually be paid. Unfortunately, that is not the situation here. The Debtors apparently do not have sufficient funds to meet their administrative obligation, *and* according to Mr. Acquaviva (formerly a Divisional Vice President of Sears Holdings and currently with the Buyer), there is a dispute between the Debtors and the Buyer as to who is liable for the January Invoices. *See* Debtors' Motion, ¶ 3; Shaw Declaration, ¶ 8. KBS is therefore being compelled to provide

administrative services for which there is no meaningful prospect of payment.

33. Payment with respect to the January Invoices is already overdue. KBS does not want to accrue additional administrative claims that the Debtors do not have the ability to pay and the Buyer may or may not choose to pay. The Debtors' Motion effectively acknowledges that unless the Debtors prevail in their dispute with the Buyer about $57.5 million that the Debtors' assert is due to them under the sale agreement, these estates are administratively insolvent. And there is a separate dispute between the Debtors and the Buyer about who is responsible for payment of $166 million in liabilities to third parties.

34. KBS notes that at this point in the Chapter 11 cases, the continued provision of services by KBS is largely for the convenience of the Buyer. The sale of the Debtors' assets has closed, and we are in the post-closing "designation rights" period during which the Buyer can think about which contracts and leases it wants (or perhaps try to convince counter-parties to waive cure claims). It is not the Debtors that will be determining what will be assumed and rejected; it is the Buyer.

35. The designation rights period expires on April 12, 2019. However, if KBS is forced to wait until that date for the assumption or rejection of the Agreements, significant additional charges will have accrued for the months of February and March, and the first twelve days of April, bringing KBS's administrative claims (inclusive of the January Invoices) to more than $2.2 million. *See* Shaw Declaration, ¶ 11. That estimate assumes that the Debtors in fact assume or reject the Agreements on or before April 12th, and KBS does not even have that certainty.[7] April 12th is the end of the designation rights period; it is not the statutory deadline for assumption or rejection.

---

[7] Given the nature of the services provided under the Agreement – cleaning and maintaining stores – this is not a fanciful concern. If the Buyer does not have another service provider in place prior to April 12th, it is unlikely to want the Agreement promptly rejected.

36. By requiring the Debtors to either assume or reject the Agreements immediately, this Court would ensure that the Debtors and perhaps the Buyer are not unjustly enriched at KBS's expense. If the Agreements are assumed and assigned, and KBS is afforded the prompt cure payment required under the Bankruptcy Code, then KBS will be compensated for the services provided, albeit belatedly. If the Debtors and the Buyer choose to reject the Agreements, KBS will at least be able to stop providing administrative services for which it may not be paid.

37. Consideration of some of the other factors customarily considered by courts in this context likewise mitigate in favor of KBS. The Agreements are not part of the Debtors' restructuring strategy, as the Debtors, at best, will be proposing a plan of liquidation. Rather, KBS is asking the Court to shorten the *Buyer's* period in which to decide what to do about the Agreements, (a decision that the Buyer's representative advises KBS has already been made), in light of the nonpayment of KBS's administrative bills and the additional risk to KBS if a decision about the Agreements is not promptly made.

*(b) The Payment of KBS's Administrative Expense Claim*

38. KBS also seeks the payment of the January Invoices, which are a valid and overdue administrative expense, and of other amounts that accrue and are unpaid as of the rejection date. (In the event that the Buyer alters its decision about the Agreements, accrued and unpaid amounts would of course be part of the cure claim.) KBS is essentially involuntarily funding the Debtors (and perhaps the Buyer), given KBS's continued provision of services under the Agreements and the failure of payment by either the Debtors or the Buyer.

39. KBS recognizes that the Debtors may not currently have the funds to pay the overdue amounts. If that is determined to be the case, then KBS respectfully requests that its

administrative claim as of the rejection date be allowed, and that the Debtors or the Buyer, as applicable, be directed to promptly pay the allowed claim.[8]

40. In the context of executory contracts, a non-debtor party to an executory contract is entitled to an administrative expense claim equal to the value of any post-petition benefit conferred on the estate prior to assumption or rejection of that contract. *In re Waste Systems Intern., Inc.*, 280 B.R. 824, 826 (Bankr.D.Del. 2002), *see also*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *In re BCE West, LP*, 264 B.R. 578, 584 (9th Cir, BAP 2001). Courts will grant administrative expense status where the debtor's estate received actual benefit to prevent unjust enrichment of the estate. *Enron*, 279 B.R. at 705. Indeed, courts have concluded that if a debtor in possession continues to receive benefits from the non-debtor party to an executory contract pending its decision to assume or reject the contract, it is obligated to pay for the reasonable value of those benefits. *See e.g., id.* Consequently, the claims of the non-debtor party that is forced to provide post-petition benefit to the debtor in possession under an executory contract that has not been rejected are afforded administrative priority status. *Id.*

## NOTICE OF THIS MOTION

41. Notice of this Motion will be provided in accordance with the procedures set forth in the Order Implementing Certain Notice and Case Management Procedures (D.N. 139). KBS respectfully submits that no other or further notice is required. In addition, simultaneously herewith, KBS is moving for an Order shortening notice.

42. No prior motion for the relief sought herein has been made by KBS to this or any other Court.

## CONCLUSION

**WHEREFORE**, KBS respectfully requests that the Court enter an Order, substantially in

---

[8] KBS specifically reserves any and all rights it may have to assert claims directly against the Buyer.

the form annexed hereto, compelling the Debtors to immediately assume or reject the Agreements, directing the Debtors to promptly pay KBS's administrative claim, and granting KBS such other and further relief as this Court deems just and proper.

Dated: March 14, 2019
      New York, New York

                **HALPERIN BATTAGLIA BENZIJA, LLP**

                By:    /s/ Donna H. Lieberman
                      Donna H. Lieberman, Esq.
                40 Wall Street, 37th Floor
                New York, NY   10005
                Telephone:  (212) 765-9100
                Email: dlieberman@halperinlaw.net

                        and

                **SHUMAKER, LOOP & KENDRICK, LLP**
                David J. Coyle, Esq.
                1000 Jackson Street
                Toledo, OH 43604
                Telephone: (419) 241-9000
                Email: dcoyle@slk-law.com

                *Co-counsel to Kellermeyer Bergensons Services, LLC and Innovative Facility Services*