**EXHIBIT A**

# GROUND LEASE

dated as of January 8, 2001

*Rent Commencement date 2/20/2002*

by and between

WARM SPRINGS PROMENADE, L.L.C.

and

SEARS, ROEBUCK AND CO.

## TABLE OF CONTENTS

I - DEFINITIONS. ...................................................................................................................1
II - LEASE PROVISIONS .......................................................................................................6
    2.01    Conditions to Lease............................................................................................................6
    2.02    Lease of Premises .............................................................................................................8
    2.03    Tenant's Control Area ......................................................................................................8
    2.04    Use .....................................................................................................................................8
    2.05    Terms and Options ...........................................................................................................9
    2.06    Rent .................................................................................................................................10
    2.07    Title and Survey .............................................................................................................10
    2.08    Premises Free From Tenancies/Zoning .........................................................................11
    2.09    Quiet Enjoyment ............................................................................................................ 11
III - CONSTRUCTION ..........................................................................................................11
    3.01    Landlord's Improvements ...............................................................................................11
    3.02    Construction of Tenant's Store Building .......................................................................12
    3.03    Construction of Entire Tract ..........................................................................................13
    3.04    Mechanics Liens .............................................................................................................13
IV - LANDLORD'S REPRESENTATIONS AND WARRANTIES .....................................13
    4.01    Landlord as Owner .........................................................................................................13
    4.02    Landlord's Authority ......................................................................................................13
    4.03    Encumbrances .................................................................................................................13
    4.04    Compliance with Laws ..................................................................................................13
    4.05    Due Diligence .................................................................................................................13

4.06   Available Utilities ............................................................................................................ 14

V - LANDLORD'S OPERATIONAL PROVISIONS .................................................................. 14

5.01   Parking ............................................................................................................................ 14

5.02   Landlord's Operating Covenant ...................................................................................... 14

5.03   Future Development ........................................................................................................ 14

5.04   Access Roads .................................................................................................................. 15

VI - TENANT'S OPERATIONAL PROVISIONS ....................................................................... 15

6.01   Opening Date .................................................................................................................. 15

6.02   Continuous Operation ..................................................................................................... 15

6.03   Tenant's Operating Covenant .......................................................................................... 16

6.04   Licensees, Subtenants, Concessionaires ......................................................................... 16

6.05   No Restrictions Outside the Shopping Center ................................................................ 16

6.06   Tenant's Store Operations/Hours .................................................................................... 16

6.07   Parking ............................................................................................................................ 17

6.08   Future Development ........................................................................................................ 17

6.09   Signs ................................................................................................................................ 17

6.10   Utilities ............................................................................................................................ 17

6.11   Compliance with Law. .................................................................................................... 17

6.12   Merchant's Association/Marketing Fund ........................................................................ 17

6.13   Landlord's Right to Recapture ........................................................................................ 17

6.14   Rear Truck Access .......................................................................................................... 19

VII - SHOPPING CENTER CONTROLS/MAINTENANCE ...................................................... 18

VIII - DAMAGE AND DESTRUCTION ..................................................................................... 22

8.01   Damage and Destruction of Shopping Center ................................................................22

8.02   Damage and Destruction of Tenant's Store Building......................................................23

IX - INDEMNIFICATION AND INSURANCE  ................................................................23

9.01   Indemnification ..............................................................................................................23

9.02   Tenant's Insurance..........................................................................................................24

9.03   Landlord's Insurance ......................................................................................................25

9.04   Waivers of Subrogation .................................................................................................26

X - REAL ESTATE TAXES AND ASSESSMENTS  ........................................................26

10.01  Real Estate Taxes on the Shopping Center ...................................................................26

10.02  Real Estate Taxes on the Premises.................................................................................27

10.03  Tax Incentives................................................................................................................27

10.04  Indemnity by Landlord ..................................................................................................27

10.05  Indemnity by Tenant......................................................................................................27

XI - DEFAULTS AND REMEDIES ....................................................................................28

11.01  Defaults..........................................................................................................................28

11.02  Remedies .......................................................................................................................29

XII - EMINENT DOMAIN  .................................................................................................29

12.01  Total Condemnation......................................................................................................29

12.02  Partial Condemnation....................................................................................................29

12.03  Condemnation Awards..................................................................................................29

XIII - HAZARDOUS MATERIALS ....................................................................................30

13.01  Landlord's Representations and Warranties..................................................................30

13.02  Landlord's Covenants....................................................................................................30

13.03  Tenant's Covenants ..................................................................................................30

XIV - END OF TERM .......................................................................................................31

14.01  Effect of Tenant's Holding Over ..............................................................................31

14.02  Redelivery of Premises ............................................................................................31

14.03  Disposition of Improvements at End of Term .........................................................31

XV - GENERAL PROVISIONS ........................................................................................31

15.01  Notices .....................................................................................................................31

15.02  Waiver ......................................................................................................................32

15.03  Memorandum of Lease and Transfer and Recording Taxes ....................................32

15.04  Assignment and Subletting ......................................................................................32

15.05  Successors and Assigns ...........................................................................................33

15.06  Encumbrance of Tenant's Leasehold Interest ..........................................................33

15.07  Time of the Essence .................................................................................................33

15.08  Broker ......................................................................................................................33

15.09  Captions ...................................................................................................................33

15.10  Governing Law ........................................................................................................33

15.11  No Partnership .........................................................................................................34

15.12  Severability ..............................................................................................................34

15.13  Authority ..................................................................................................................34

15.14  Subordination, Non-disturbance and Attornment Agreement .................................34

15.15  Estoppel Certificates ................................................................................................34

15.16  Construction ............................................................................................................34

15.17   Survival of Indemnities..................................................................................34

15.18   Non-Recourse to Landlord ............................................................................35

15.19   Enforcement Costs........................................................................................ 35

# GROUND LEASE

THIS GROUND LEASE (this "**Lease**") is made and entered into as of January 8, 2001, by and between **WARM SPRINGS PROMENADE, L.L.C.** ("**Landlord**"), and **SEARS, ROEBUCK AND CO.** ("**Tenant**").

### Recitals

A. Landlord is the owner of approximately 34 acres of land located at West Warm Springs Road and Julia Drive in the City of Henderson, Clark County, Nevada, as designated as the "**Entire Tract**" on the site plan attached hereto as **Exhibit "A"** and incorporated herein by this reference (the "**Site Plan**").

B. Landlord wishes to lease to Tenant and Tenant wishes to lease from Landlord the Premises (as hereinafter defined), which constitutes a portion of the Entire Tract.

C. Landlord intends to develop the Entire Tract as a retail shopping development (the "**Shopping Center**") known as Warm Springs Promenade.

D. Tenant intends to construct a one-level store building containing approximately 121,310 square feet on the Premises (**"Tenant's Store Building"**).

E. After construction of Tenant's Store Building, Landlord's Improvements (as defined herein) and the balance of the improvements shown on the Site Plan, the Shopping Center will contain approximately 371,000 square feet of Gross Leasable Area (as hereinafter defined).

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

### I - DEFINITIONS

1.01 **"Access Points"** are those points of ingress to, and egress from the Shopping Center to public or private roads, as identified on the Site Plan.

1.02 **"Blackout Period"** means the period between November 1 of any year and February 1 of the following year or between May 1 and July 15 of any year.

1.03 **"Building Pad"** is defined in Section 3.01(a) hereof.

1.04 **"Commencement Date"** is defined in Section 2.04(a) hereof.

1.05 **"Common Areas"** means all exterior portions of the Entire Tract that may from time to time be available for the general non-exclusive use, convenience and benefit of Tenant, and other owners, tenants and occupants of the Entire Tract, including, without limitation, truck ramps, loading facilities and docks, automobile parking areas, access roads, sidewalks, traffic lanes, bus stations, taxi stations, parcel pickup areas, entrances and

exits from and to public roads, landscaping, and utility facilities. No barrier which would prevent access across the Entire Tract shall be permitted unless approved by Landlord and Tenant in writing.

1.06     "**Entire Tract**" is defined in the Recitals of this Lease.

1.07     "**Environmental Laws**" means all federal, state and local laws, statutes, ordinances, regulations, criteria, guidelines, rules, standards, rules of common law now or hereafter in effect, and in each case as amended, and any judicial or administrative order, consent, decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources.

1.08     "**Fixed Rent**" is defined in Section 2.05(a) hereof.

1.09     "**Force Majeure**" or "**force majeure events**" shall mean any prevention, delay or stoppage of work which is a direct result of causes (except financial) beyond the reasonable control of the party obligated to perform, including acts of God (but excluding rain, winds and other typical weather conditions), labor strikes, inability to obtain labor and/or materials or reasonable substitutes therefor (but only if such materials were timely ordered in the first instance), government actions or restrictions, civil disturbances, war or casualty, of which the party intending to seek an extension as a result of such condition or event has given the other party written notice within ten (10) days of the occurrence or event, in which event such party shall be allowed such additional period of time to complete such work as is reasonably necessary, but in no event more time than is equivalent to the actual time lost as a result of such condition or event.

1.10     "**Gross Leasable Area**" means the total number of square feet of floor space covered and enclosed within a particular store or building on the Entire Tract, whether rented or rentable, measured to the outside of the exterior walls of the store or building, to the center line of party walls and to the exterior of walls abutting exit or service corridors, but not including Common Areas, exterior open truck docks, outdoor sales areas, garden shop areas, mall offices or enclosures used exclusively for mechanical equipment or non-structural mezzanines.

1.11     "**Hazardous Material**" means any hazardous or toxic substance, chemical, material or waste, or any pollutant, contaminant or other substance, that is or becomes defined, listed, or regulated by Environmental Laws, including, without limitation, polychlorinated biphenyls, asbestos, radioactive materials and petroleum, crude oil or any fraction thereof.

1.12     "**Initial Term**" is defined in Section 2.04(a) hereof.

1.13     "**Julia Drive**" is the roadway adjacent on the west boundary at the Shopping Center. This is a public street but may become a private roadway; if it becomes private Landlord shall, throughout the Term, service and maintain, or cause to be serviced and maintained such easements or rights which are appropriate to maintain continuous access to and ingress and egress over Julia Drive from the Shopping Center.

1.14     "**Landlord's Improvements**" is defined in Section 3.01 hereof.

1.15     "**Landlord's Parcel**" means the Entire Tract less the Premises .

1.16     "**Lease Year**" shall mean any period of 12 consecutive months during the Term that begins on the first day of the first full calendar month after the Opening Date or on any anniversary of such date.

1.17     "**Leasehold Encumbrance**" is defined in Section 15.06 hereof.

1.18     "**Leasehold Estate**" means all of Tenant's right, title and interest in the Premises and under this Lease.

1.19     "**Leasehold Lender**" is defined in Section 15.06 hereof.

1.20     "**Major Store**" means any or all of the store buildings designated as Major A, B, C and E on the Site Plan, as those spaces may be reconfigured as provided for in this Lease.

1.21     "**Net Sales**" means gross retail sales of merchandise made by Tenant from Tenant's Store Building and deducting or excluding (as the case may be):

- All returns, cancellations, and allowances;

- Rental Charges, including but not limited to, charges for or pursuant to rentals of automobiles, tools and other merchandise and equipment;

- Charges to customers for or pursuant to services, deluxing, delivery, installation, installed business sales, or inspection;

- Amounts, debits or charges of, for or pursuant to maintenance or service agreements (currently known as "Maintenance Agreements"), or for replacement or repair parts of merchandise furnished without additional charge in connection with repairs or replacements pursuant to warranties, guarantees, good will adjustments or Maintenance Agreements;

- All sales ordered through the use of or from catalogs, the internet, or other electronic means, or filled through channels regardless of the place of order, payment or delivery ("Off-Site Sales");

- Finance charges or other amounts in excess of Tenant's (or its concessionaires' or licensee's) cash sales price charged on, for or pursuant to sales made on credit or under a time payment or layaway plan;

- The amount of all sales, use, excise, retailers' occupation, or other similar taxes imposed in a specific amount of percentage upon, or determined by, the amount of sales made from Tenant's Store Building;

- Sales of departments, divisions or offices not located in Tenant's Store Building, even though administratively controlled therefrom;

- Amounts received for, or in connection with, the making of personal loans and the rendering of other financial services, including transactions through ATMs, and

premiums, proceeds, commissions, payments and other amounts received, collected or charged for or in connection with the sale of policies of insurance or investment fund shares and other securities, whether or not sold on or from the Tenant's Store Building;

- Contract sales, as hereinafter defined, regardless whether Tenant maintains an office, showroom or samples for the merchandise, or whether made on or from the Tenant's Store Building;

- Receipts from vending, weighing machines, amusement devices and public telephones;

- Receipts from sales of tickets for admission to entertainment, sporting or other similar events, from sales of licenses issued by governmental agencies and from collection of utility bills and check cashing, gifts and prizes;

- Receipts from the operation of eating facilities primarily available for employee use and not generally open to the public;

- Receipts from the sale of merchandise or gift certificates and purchase coupons; however, the sale of merchandise made by Tenant from Tenant's Store Building, paid for with gift certificates or purchase coupons, is included in Net Sales, unless otherwise excluded;

- Fees for building and like permits in connection with sales of merchandise or services;

- Amounts credited on the purchase price of merchandise by reason of merchandise traded in, or employee or other discounts;

- Unclaimed funds and property;

- Sales made by Tenant's subtenants, concessionaires and licensees; provided, such areas shall not exceed 25%, in the aggregate, of the sales area of Tenant's Store Building.

- Commercial sales of truck tires made through Sears Truck Tire Division;

- The amount of all governmentally required levies for parking if passed on to customers, and/or all parking revenues;

- Commissions or amounts received in conjunction with the sale, leasing or financing of real estate.

The phrase "contract sales" means sales of goods or merchandise made to persons or entities other than the general public (e.g., sales made to or on behalf of builders or contractors, whether

local or national, or allowances given to customers of such builders or contractors) and including, but not limited to, sales of merchandise made to industrial, commercial or institutional purchasers or to governmental or quasi-governmental bodies, and sales of goods manufactured to the purchaser's specifications whether or not installed by Tenant. These sales are generally known as "Contract Sales".

All of the terms utilized in this Section, including "returns", "allowances", "Contract Sales" and installed business sales, will have the meaning used by Tenant in the normal course of its business.

Within sixty (60) days after the end of each Lease Year, Tenant will furnish to Landlord a statement of Tenant's Net Sales and the payment of Percentage Rent, if any, payable for that Lease Year. If the Commencement Date is other than the first day of a calendar month, all Net Sales from the Commencement Date to the first day of the month next following shall be included in the Percentage Rent for the first Lease Year. Landlord will have one hundred and twenty (120) days following its receipt of Tenant's statement of Net Sales within which to notify Tenant of Landlord's dissatisfaction with Tenant's statement or else Landlord will be deemed to have accepted Tenant's statement as correct. If Tenant's Net Sales for the period are reported at less than $12,000,000, and Landlord is dissatisfied with Tenant's statement of Net Sales, Landlord may, at Landlord's expense, cause an impartial, reputable firm of certified public accountants, nationally known and doing business on a nationwide basis, reasonably satisfactory and approved in writing by both Landlord and Tenant, to audit Tenant's Net Sales for the period covered by the statement within ninety (90) days after the giving of notice. If the auditor does not submit a detailed report to Landlord and Tenant in support of its findings within one hundred thirty-five (135) days after its selection and approval by the Tenant's statement of Net Sales will be deemed correct and conclusive. Time, wherever specified in this Section, is deemed to be of the essence.

Tenant makes no representation or warranty as to the amount of sales or mix of merchandise and services which it expects to make from Tenant's Store Building. Landlord will hold in confidence all sales figures and other information obtained from Tenant or upon the inspection and audit of Tenant's books and records.

1.22   **"Opening Date"** means the date on which Tenant opens its business in Tenant's Store Building to the public.

1.23   **"Partial Lease Year"** means the period, if any, commencing with the Opening Date and continuing through the last day before the first Lease Year of the Term, and the portion of the Term, if any, after the last Lease Year of the Term.

1.24   **"PBA"** or **"permissible building area"** means those areas of the Shopping Center shown on the Site Plan to be, or proposed to be, improved with buildings, or so improved with buildings, as permitted by this Lease.

1.25   **"Premises"** is defined in Section 2.02 hereof.

1.26   **"Prime Rate"** means, at any time, the rate of interest most recently published as the "Prime Rate" in the Money Rates section of the Wall Street Journal.

1.27   **"Real Estate Taxes"** means ad valorem real property taxes and does not include any special assessments relating to the initial construction of the Shopping Center, other than Tenant's Store Building, and does not include any estate, gift, inheritance, succession, franchise, income or excess profits taxes which may be payable by Landlord or Landlord's legal representative, successors or assigns and any tax that might become due on account of ownership of property other than the Entire Tract that might become a lien on any part of the Entire Tract or collectable out of the same.

1.28   **"Rent,"** unless otherwise limited by the context, shall mean Fixed Rent, Additional Rent, and Percentage Rent.

1.29   **"Shopping Center"** is defined in the Recitals of this Lease.

1.30   **"Site Criteria"** means Sears Construction Criteria – Company Owned or Ground Leased - Developer Responsibilities dated October 5, 1999, revised 1/4/00, attached hereto as **Exhibit "B".**

1.31   **"Site Plan"** is defined in the Recitals of this Lease.

1.32   **"Tenant's Control Area"** is defined in Section II of this Lease.

1.33   **"Tenant's Hazardous Material"** means Hazardous Material brought or released (or permitted to be brought or released) onto the Premises by Tenant, its agents, contractors or employees.

1.34   **"Tenant's Improvement"** means any building or other permanent improvement (including replacements thereof) installed, affixed or attached in or to the Premises (including, without limitation, plumbing fixtures or equipment, heating, ventilating or air conditioning equipment, floor coverings affixed to the floors and paneling, tile or other similar materials affixed to the walls or ceilings), but does not include Tenant's inventory or stock in trade, such trade fixtures, electrical fixtures or other property that, under the terms hereof, may be removed by Tenant upon termination or expiration of the Term or any fixtures or other improvements installed by or at the expense of Landlord.

1.35   **"Tenant's Pro Rata Share"** means a fraction, the numerator of which is the land area, in square feet, of the Premises, and the denominator of which is the total land area of the Entire Tract.

1.36   **"Tenant's Store Building"** is defined in the Recitals of this Lease.

1.37   **"Term"** is defined in Section 2.04(a) hereof.

1.38   **"Turnover Date"** means the date on which Landlord tenders to Tenant the Building Pad and actual possession of the Premises, provided that: (a) the Building Pad shall have been completed in accordance with the requirements of the Site Criteria and this Lease, except for minor punch list items accepted by Tenant; and (b) Landlord shall have performed all of the obligations to be performed by Landlord under Section 3.01 hereof.

## II - LEASE PROVISIONS

2.01   Conditions to Lease. Intentionally omitted.

2.02   Lease of Premises.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord approximately 9.65 acres of land situated in the Shopping Center and more particularly described in **Exhibit "C"** attached hereto and by this reference incorporated herein and as shown on the Site Plan (the **"Premises"**). Landlord further grants to Tenant all non-exclusive rights, appurtenances, servitudes, charges, easements, rights of ingress and egress, parking, loading, unloading, licenses and hereditaments thereto, including, without limitation, rights of ingress and egress over Julia Drive. Landlord further grants to Tenant during the Term a non-exclusive easement for parking the vehicles of Tenant, its customers, employees and business invitees, and for access, use, ingress and egress for vehicles and pedestrians in common with the other tenants and occupants of the Entire Tract and their respective customers, employees and business invitees, over the Common Areas, including, without limitation, all parking areas, alleys, roadways, sidewalks, walkways, landscaped areas and surface water drainage systems and for use of parking lot lighting, all as shown on the Site Plan and as provided for in the REA.

2.03   Tenant's Control Area.  The parties acknowledge and agree that Tenant shall have control, to the extent provided for in this Lease, with regard to the Access Points, and any changes to the Shopping Center within the area designated as **"Tenant's Control Area"** on the Site Plan.  If any Access Point is relocated for any reason whatsoever, then Tenant's Control Area shall be revised to include such Access Points, as relocated.

(a)   Landlord agrees that, except as may be required by governmental authorities having jurisdiction, it will not perform or allow within the Tenant's Control Area, any changes to the Site Plan as currently configured which would (i) materially and adversely impact the parking count or configuration of parking within the Tenant's Control Area; (ii) materially and adversely affect the visibility of the Tenant's Store Building; or (iii) affect ingress to or egress from the Premises to public roads or to Julia Drive.

(b)   Tenant shall be notified in writing prior to any party or person undertaking any Changes, as defined herein, within Tenant's Control Area.

(c)   Tenant shall have thirty (30) days from its receipt of such notice of proposed Change within which to object, with reasonable specificity, to the proposed Change.  If Tenant does not object to the proposed change within such thirty day period, then Tenant shall be deemed to have consented to such Change.

(d)   Any one or more of the following changes proposed within Tenant's Control Area (**"Changes"**) shall require Tenant's prior consent:
i.   changes to the Site Plan, including changes to the size or configuration of the parking spaces or the Access Points;
ii.  any construction, reconstruction, or alteration of the improvements and/or the Common Areas, including landscaping; and
iii. any changes which would materially affect the visibility of the Tenant's Store Building from any public road or from Julia Drive.

S:\gfilice\Henderson,NV Ground Lease FINAL.dot   7

(e)     The foregoing rights of Tenant with regard to Tenant's Control Area shall be recorded against the Landlord's Parcel in the Memorandum of Lease, and shall run with the land until this Lease expires or is terminated.

2.04    Use.

(a)     Tenant's Store Building. The Tenant's Store Building may be used by Tenant for the sale, servicing and storing of merchandise, all other items or services normally sold in department stores and all other lawful retail uses.

(b)     The Shopping Center. Pads A, B and F of the Shopping Center, as shown on the Site Plan, shall be used for retail and compatible service uses consistent with a first class shopping center. Those uses listed on **Exhibit "D"**, attached hereto and made a part hereof **("Permitted Uses")** shall be acceptable uses for Pads A, B and F within the Shopping Center. No party shall allow, within the Shopping Center, any "Prohibited Use" as shown on **Exhibit "E"**, attached hereto and made a part hereof.

2.05    Term and Options

(a)     Initial Term. The initial term of this Lease shall be twenty (20) Lease Years (the **"Initial Term"**) and shall commence on the date (the **"Commencement Date"**) that is the earlier of (i) the Opening Date or (ii) the date that is 360 days after the Turnover Date. As used herein, **"Term"** and **"Term of this Lease"** refer to such Initial Term and to any extension thereof as hereinafter provided. Upon the request of either party to this Lease, Landlord and Tenant shall enter into a supplemental agreement setting forth the Commencement Date.

(b)     Options to Extend. Provided Tenant is not in material default under this Lease beyond any applicable cure periods, Landlord grants to Tenant four (4) consecutive options to extend the Initial Term for periods of ten (10) years each. Each option can be exercised by Tenant giving Landlord written notice of the exercise thereof at least 360 days before the expiration of the then-existing Term; provided, however, that if Tenant shall fail to give such notice within such 360-day time limit, Tenant's right to exercise its option shall nevertheless continue until 30 days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of such 30-day period. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the options set forth in this Section 2.04(b) through inadvertent failure to give notice thereof within the time limits prescribed.

2.06    Rent

(a)     Fixed Rent. As of the Commencement Date, Tenant shall pay Landlord fixed rent for the Premises **("Fixed Rent")** as follows:

| Lease Year | Annual Rent | Monthly Rent | | |
|---|---|---|---|---|
| 1-10 | $350,000 | $29,167 | 2/20/2002 — | 2/28/2012 |
| 11-20 | $400,000 | $33,333 | 3/1/2002 — | 2/28/2022 |
| Option 1 | | | | |
| 21-30 | $440,000 | $36,667 | | |
| Option 2 | | | | |
| 31-40 | $484,000 | $40,333 | | |
| Option 3 | | | | |
| 41-50 | $532,400 | $44,367 | | |
| Option 4 | | | | |
| 51-60 | $585,640 | $48,803 | | |

*(handwritten at top: 29333.66)*

(b) <u>Percentage Rent</u>. In addition to Fixed Rent, Tenant shall pay Landlord as percentage rent two percent (2%) of Net Sales between $0 and $12,000,000 ("**Percentage Rent**") with respect to each Lease Year or Partial Lease Year during the Initial Term of this Lease.

(c) <u>Additional Rent.</u> Tenant's obligation for the payment of Real Estate Taxes and the Julia Drive Payment, as defined herein, shall be Additional Rent under this Lease.

(d) <u>Payment</u>.

  (i) Fixed Rent for each Lease Year shall be due and payable in advance in equal monthly installments on or before the first day of each month in such Lease Year, without notice or demand, or right of set-off, except as specifically provided in this Lease. Tenant agrees to pay a late charge of $250 for any monthly payment of Fixed Rent received by Landlord after the tenth day of the month, provided no late charge shall be due for the first late payment of Fixed Rent in any Lease Year.

  (ii) Percentage Rent for any Lease Year or Partial Lease Year during the Initial Term shall be paid in monthly estimated installments, subject to adjustment at the end of each Lease Year based on actual Net Sales for the subject period . Landlord or Tenant, as applicable, shall pay the additional Percentage Rent, or refund any overpayment of Percentage Rent, within thirty (30) days after the final adjustment. No Percentage Rent shall be due for any period after the expiration of the Initial Term of this Lease.

  (iii) In the manner provided for notices in this Lease, Landlord will, from time to time, designate some one person, firm or corporation to receive rent payments. Rent will be made payable to Landlord and mailed to the following address:

*(handwritten: over paid $166.66 / month)*

S:\gfilice\Henderson,NV Ground Lease FINAL.dot   9

>Warm Springs Promenade, L.L.C.
>c/o Kimco Realty Corporation
>P.O. Box 5020
>3333 New Hyde Park Road, Suite 100
>New Hyde Park, New York  11042-0020

until the address is changed by written notice from Landlord.  Landlord's Federal Employer Identification Number is 51-0395459.

(e) If Tenant should cease continuous operations within Tenant's Store Building after the expiration or termination of Tenant's Operating Covenant, then for the balance of the Initial Term, Tenant shall pay as Rent (i) Fixed Rent, plus (ii) the average of the Percentage Rent paid by Tenant for the three (3) previous Lease Years.  During any option term, Tenant shall pay Fixed Rent only.

2.07    Title and Survey.

(a) Promptly after the date hereof, Landlord shall deliver to Tenant an ALTA 1970 Form B Owner's Policy of title insurance with a leasehold policy conversion endorsement, if available, or, if such an endorsement is not available, an ALTA 1970 Form B leasehold policy of title insurance insuring the Leasehold Estate (the **"Title Policy"**), issued by First American Title Insurance Company (the **"Title Company"**).  Landlord and Tenant shall each pay one half of the cost of the Title Policy, in the amount of $10,700,000.  Tenant may, at Tenant's sole expense request such endorsements to the Title Policy as Tenant may desire.  The Title Policy shall be subject only to:  (i) the matters listed on **Exhibit "F-1"** attached hereto and by this reference incorporated herein, with respect to the Premises; and (ii) the matters listed on **Exhibit "F-2"** attached hereto and by this reference incorporated herein, with respect to the rest of the Entire Tract.

(b) Promptly after the date hereof and at Landlord's sole cost, Landlord shall deliver to Tenant and the Title Company a survey of the Premises dated after the date hereof and certified to the Title Company and Tenant as having been prepared in accordance with ALTA Standards and showing the location of all utility easements and the location of all utility lines on the Premises or servicing the Premises; and (c) copies of current real estate tax bills related to the Entire Tract and copies of all recorded documents disclosed in the Title Policy.

2.08    Premises Free From Tenancies/Zoning.  On the Turnover Date, Landlord shall deliver actual possession of the Premises to Tenant free of all tenancies and occupancies and zoned to permit the construction and operation of a retail store of the size allowed pursuant to this Lease.  If the Premises are not so free of tenancies and zoned on the Turnover Date, then Tenant may terminate this Lease upon notice to Landlord.

2.09    Quiet Enjoyment.  Throughout the Term, Tenant shall have the right to peaceably and quietly have, hold and enjoy the Premises as against Landlord and any person claiming by, through or under Landlord or claiming title paramount to that of Landlord.

## III - CONSTRUCTION

3.01　Landlord's Improvements.  In entering into this Lease and in constructing Tenant's Store Building on the Premises, Tenant is relying upon Landlord's covenant to complete the following improvements on the Entire Tract (the **"Landlord's Improvements"**) within the time periods provided for herein.

　　(a)　Building Pad.  Subject to force majeure events, on or before March 15, 2001, Landlord shall complete the building pad for Tenant's Store Building (the **"Building Pad"**) in accordance with the Site Criteria.  The Building Pad shall be constructed by Landlord in such a manner so that: (i) Tenant has vehicular access to the Building Pad for its construction vehicles; (ii) the Building Pad complies with the Site Criteria, including, without limitation, the elevation and location; and (iii) all temporary utility facilities and construction areas for Tenant's construction of Tenant's Store Building are in place as required in the Site Criteria and fully usable for Tenant's construction of Tenant's Store Building.  Landlord shall provide Tenant with a Building Pad certification in the form attached hereto as **Exhibit "G"**, attached hereto and made a part hereof, promptly after Tenant accepts the Building Pad.

　　(b)　On-Site and Off-Site Improvements.  Landlord shall perform all on-site and off-site improvements to the Entire Tract, including the Premises, as shown on the Site Plan and as provided in the Site Criteria and as necessary for Tenant to construct Tenant's Store Building and to operate its store therein, including, but not limited to, all surveying and engineering work, and all work necessary to bring all utility lines to within five feet of the Building Pad in accordance with the Site Criteria.  Landlord shall perform any required modifications to perimeter streets and access roads and, within Tenant's Control Area shall complete parking lot paving, striping and parking lot lighting, landscaping and curbing and irrigation systems.  Subject to force majeure events, Landlord shall substantially complete all such work (excepting seasonal landscaping) at its sole cost and expense on or before February 14, 2002, and thereafter diligently pursue final completion.

　　(c)　Governmental Approvals.  Landlord shall obtain all necessary consents, permits and approvals of governmental authorities, including Site Plan approval and zoning approvals for the construction of Landlord's Improvements (excluding the building permit for Tenant's Store Building).  Landlord shall file all environmental impact reports and all other necessary documents as required to permit commencement of operation of Tenant's businesses on the Premises.  If Landlord does not obtain all such consents, permits and approvals by the Turnover Date, and thereafter fails to secure such consents and approvals within thirty (30) days after written notice from Tenant, then Tenant may terminate the Term of this Lease by giving notice to Landlord of such termination.

(d) Third Party Consents and Approvals. Landlord shall obtain all necessary consents and approvals of lenders or other private parties with approval rights of the Site Plan, the construction to be performed by Landlord hereunder, the construction of Tenant's Store Building and all other transactions contemplated hereunder. Landlord shall certify that it has secured all necessary approvals to Tenant in writing. If Landlord does not obtain all such consents and approvals on or before the Turnover Date, and thereafter fails to secure such consents and approvals within thirty (30) days after written notices from Tenant, then Tenant may terminate the Term by giving notice to Landlord of such termination.

(e) Outside Date for Turnover Of Building Pad. Subject to force majeure events, if the Turnover Date shall not have occurred on or before April 15, 2001, then, at Tenant's option, the Term shall not thereafter commence, this Lease shall terminate and Landlord and Tenant shall have no further obligations or liabilities hereunder other than liabilities that may have arisen before such date. Tenant may exercise such option by giving notice of such exercise to Landlord.

3.02 Construction of Tenant's Store Building

(a) Construction. After the Turnover Date, Tenant shall have access to the Premises. Subject to force majeure events, Tenant will use its best efforts to complete construction of, and open in Tenant's Store Building on or before the first anniversary of the Turnover Date.

(b) Landlord shall have the right to review the architectural plans and elevations for Tenant's Store Building to insure architectural compatibility with the balance of the Shopping Center.

(c) Construction Staging Areas. Tenant may use areas of the Premises as construction staging areas. Upon reasonable prior notice from Landlord, Tenant agrees to relocate such staging areas as necessary to allow Landlord to complete its improvements to the Premises.

3.03 Construction on Entire Tract. Except for the construction referenced in Sections 3.01 and 3.02 (a), other construction on the Entire Tract shall be subject to the terms of this Lease.

3.04 Mechanics Liens.

(a) Tenant shall keep the Premises and the Entire Tract free and clear of any and all mechanics', materialmen's and other liens for or arising out of, or in connection with, work or labor claimed to have been done, services performed or materials or appliances used or furnished for or in connection with any construction, repairs or operations of Tenant on or about the Premises. Tenant shall, subject to the provisions below, promptly and fully pay and discharge any such lien. Tenant shall indemnify and hold Landlord harmless against all such liens and claims of liens and suits or other proceedings pertaining thereto.

(b)     Landlord shall keep the Premises free and clear of any and all mechanics', materialmen's and other liens for or arising out of, or in connection with, work or labor claimed to have been done, services performed or materials or appliances used or furnished for or in connection with any construction, repairs or operations of Landlord on or about the Entire Tract. Landlord shall, subject to the provisions below, promptly and fully pay and discharge any such lien. Landlord shall indemnify and hold Tenant harmless against all such liens and claims of liens and suits or other proceedings pertaining thereto.

(c)     If Tenant or Landlord, as applicable, elects to contest any such lien, it shall notify the other party of its intention to do so within sixty (60) days after such party receives notice of such lien. The responsible party shall, within sixty (60) days after the final determination of the validity thereof, satisfy and discharge such lien to the extent held valid; provided that in any event the satisfaction and discharge of any such lien shall be made before execution is had on any judgment rendered thereon. In the event of any such contest which may affect the Entire Tract or the Premises, as applicable, the responsible party shall protect and indemnify the other party against all loss, expense and damage, excluding consequential damages, resulting therefrom and shall post such bond or provide such other assurances as the Title Company may reasonably require to insure over such liens.

## IV - LANDLORD'S REPRESENTATIONS AND WARRANTIES

Landlord represents and warrants to Tenant that, as of the date of this Lease or as of the Turnover Date, as applicable:

4.01     Landlord as Owner. Landlord is the owner of the Entire Tract. As of the date of its execution of this Lease, no further consents are required and Landlord's execution of this Lease does not violate any contract, mortgage, lease, operating agreement or any other written or oral agreement to which Landlord is a party or to which the Entire Tract or any portion thereof is subject.

4.02     Landlord's Authority. Landlord has the full right and lawful authority to enter into and perform its obligations under this Lease.

4.03     Encumbrances. Landlord has not created and has no actual knowledge, after reasonable inquiry, of any easements, restrictions, mortgages and other liens, encumbrances or defects in title: (i) affecting the Premises, other than the matters listed in **Exhibit "F-1"** hereto; and (ii) affecting the rest of the Leasehold Estate, other than the matters listed in **Exhibit "F-2"** hereto.

4.04     Compliance with Laws. To Landlord's actual knowledge, the Premises are in full compliance with all applicable laws, regulations and ordinances.

4.05     Due Diligence. To Landlord's actual knowledge, the reports and test results listed in **Exhibit "H"**, attached hereto and by this reference incorporated herein, are all environmental reports and environmental test results for the Entire Tract that are within