**Hearing Date and Time: March 21, 2019 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: March 14, 2019 at 4:00 p.m. (Eastern Time)[1]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                             :
In re:                                                       :    **Chapter 11**
                                                             :
**SEARS HOLDINGS CORPORATION**, *et al.*,                    :    **Case No. 18-23538-rdd**
                                                             :
          Debtors.[2]                                        :    **(Jointly Administered)**
                                                             :
                                                             :    **Re: Docket No. 2796**
                                                             :
-------------------------------------------------------------X

## TRANSFORM HOLDCO LLC'S RESPONSE TO DEBTORS' (I) MOTION TO (A) ENFORCE ASSET PURCHASE AGREEMENT AND AUTOMATIC STAY AGAINST TRANSFORM HOLDCO LLC AND (B) COMPEL TURNOVER OF ESTATE PROPERTY AND REPLY IN FURTHER SUPPORT OF ITS MOTION TO ASSIGN MATTER TO MEDIATION

---

[1]    The Hearing Date and Time and Objection Deadline listed here are for the Mediation Motion. The Proposed Hearing Date and Time and Objection Deadline for the Turnover Motion are March 21, 2019 at 10:00 AM (Eastern Time) and March 18, 2019 at 4:00 PM (Eastern Time), respectively. The Debtors' Motion to Shorten is still pending and has not yet been addressed by the Court as of the time of this submission. See *Notice of Hearing on Motion of Debtors for Order Shortening Notice with Respect to Motion of Debtors for Order (A) Enforcing Asset Purchase Agreement and Automatic Stay against Transform Holdco LLC and (B) Compelling Turnover of Estate Property* (the "Motion to Shorten") [Docket No. 2798].

[2]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

Transform Holdco LLC (the "Buyer" or "Transform"), the buyer under a certain Asset Purchase Agreement, dated as of January 17, 2019, by and among Sears Holdings Corporation ("SHC" or "Sears"), each of SHC's subsidiaries party thereto (together with SHC, the "Sellers," collectively with respect to SHC's chapter 11 affiliates, the "Debtors," and together with the Buyer, the "Parties") and the Buyer (as may be amended, restated, supplemented or modified from time to time, the "APA"),[3] hereby submits this response to *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation,* filed on March 11, 2019 (the "Turnover Motion") [Docket No. 2796] and reply in further support of its *Motion to Assign Matter to Mediation* (the "Mediation Motion") [Docket No. 2766].

## PRELIMINARY STATEMENT

1. On March 6, 2019, Transform filed the Mediation Motion seeking the appointment of a mediator to facilitate the resolution of egregious breaches of the APA by the Debtors. That motion raised significant concerns regarding the Debtors' compliance with the APA.

2. **Debtors have breached the APA.** In the short period between signing and Closing, the Debtors dramatically and intentionally breached their obligations under the APA, including their obligation to act in the ordinary course of business. They did so by intentionally delaying the purchase of business-critical inventory and the payment of obligations that had come due prior to

---

[3]     The APA refers to the Asset Purchase Agreement filed as Ex. B to the *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief* [Docket No. 2507] (the "Sale Order"), as amended by the Amendment No. 1 to Asset Purchase Agreement filed as Ex. E to the *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No. 1 to the Asset Purchase Agreement* [Docket No. 2599] (the "Notice of Filing of Amendment No. 1 to the APA"). All capitalized terms used but not defined herein shall have the meaning ascribed to them in the APA.

Closing.  In contemporaneous cash reports, the Debtors explicitly stated that they were taking these steps to preserve value and liquidity for themselves so they could meet their Closing obligations under the APA.  See *Declaration of Katherine R. Lynch in Support of Transform Holdco LLC's Motion to Assign Matter to Mediation* (the "Lynch Decl.") [Docket No. 2767] at 34 ("In order to maintain $850 1L outstanding balance, certain payments contractually due this week have been delayed until next week.").  The Mediation Motion proposed a non-binding and expedited process pursuant to the General Order to establish a framework for resolving these disputes without the expense and delay of formal disputes or the attendant burden on this Court's docket.

3.    **Debtors have refused to engage in discussions.**  Rather than responding to the important concerns raised in the Mediation Motion, or engaging with Transform in good faith negotiations, or pursuing mediation, the Debtors now have doubled-down and engage in a tit-for-tat.  Not only do the Debtors oppose the Mediation Motion (for reasons Transform cannot fathom) but they also assert spurious claims of their own in response and seek to transform a bona fide contractual dispute over the APA into a turnover proceeding and purported violation of the automatic stay.

4.    **The Turnover Motion is deeply flawed.**  The Turnover Motion that the Debtors now bring is, in parts, moot, procedurally improper, premature, and legally flawed.  The Debtors purport to seek "turnover" of certain funds under the APA and enforcement of the APA.  But Transform has already turned over to the Debtors the only identifiable funds to which the Debtors are entitled—the Israeli Cash and GOB Store Cash.  Transform agreed to turn over those funds on March 8, promptly after the relevant amounts had been confirmed and before the filing of the Debtors' motion, and actually transferred the funds on March 12.  To the extent the motion seeks turnover of Israeli Cash and GOB Store Cash, it should never have been filed and is now moot.

5.      The law also makes clear that a turnover claim cannot be brought by motion. Bankruptcy Rule 7001, as well as governing case law, provides that if the Debtors seek to pursue turnover, they must initiate an adversary proceeding with the filing of a complaint to which Transform would have the opportunity to answer or move to dismiss.  The Turnover Motion should be rejected for that reason alone.  This is not a matter of Transform seeking delay for the sake of delay:  the significant contractual disputes at issue in the Mediation and Turnover Motions raise complicated issues of fact and law that need to be resolved by complaint, answer or motion, joinder of issue, discovery, and—if need be—an evidentiary hearing.   Even if the Debtors were not required to initiate an adversary proceeding, the hearing currently scheduled for March 21, 2019 is not the appropriate forum to resolve these disputes under Local Rule 9014-2 and Paragraph 34 of the Case Management Order, as it plainly requires discovery and evidence in order to be resolved by the Court.

6.      The motion is also premature and unsupported by the facts.  A substantial portion of the monies at issue are subject to agreed-upon and ongoing reconciliation and accounting efforts, which could result in a reduction in the amounts or monies being due from Transform and, in any event, mean that they are not yet even final and due.

7.      Further, the Debtors' substantive arguments are both unsupported and legally flawed.  As demonstrated by the response and the supporting declarations, the realities of the $57.5 million claimed due by the Debtors are diametrically different from the narrative presented in the Turnover Motion:

- ***Credit Card Proceeds.***  The Debtors seek approximately $14.6 million proceeds from "excess" Credit Card Accounts Receivable.  But there was no such "excess" and the Debtors arrive at that amount only by mischaracterizing as Credit Card Accounts Receivable certain reserves held as security by credit card issuers and processors.  These

reserves are not Credit Card Accounts Receivable but Security Deposits,[4] and as such are other Acquired Assets pursuant to Section 2.1(o) of the APA. The Debtors' spurious argument is betrayed by the clear text of the relevant provisions of the APA, the agreement read as a whole and in context, the Parties' negotiations, and the legal reality and evidence that the reserves are security deposits and not receivables (and are not reflected as such in Sears' books and records).

- *Cash in Transit.* The Debtors seek approximately $18.5 million in cash that was in transit at the time of Closing and deposited into Transform's cash management system after the Closing (the "Cash in Transit"). In so doing, the Debtors seek to style Transform's assumption of Sears' cash management system—a complex system of hundreds of bank accounts that is central to the retail operations of the business acquired by Transform—as an accommodation from the Debtors that Transform has somehow abused. The reality is that after the APA was signed, and in order to permit the sale transaction to close on the expedited schedule requested (and in fact, demanded) by the Debtors, Transform agreed to step into the shoes of the existing cash management system as the only available option to effect the extremely accelerated Closing schedule.

  More important, as the Parties fully recognized, Transform's agreement to step into the shoes of Sears' cash management system would require a complex reconciliation process after Closing to ensure that the funds flowing both into *and out of* the cash management system were properly allocated between the Parties. In their motion, the Debtors focus only on one half of the reconciliation required in connection with Transform's assumption of the cash management system—the Cash in Transit. But they ignore the second half of the equation that benefits Transform—checks and other debits that were issued by the Debtors prior to Closing with respect to obligations that were not assumed by Transform but that have been paid out of the cash management system after Closing.

- *Israeli Cash and GOB Store Cash.* The Debtors seek cash in transit from the Debtors' Israeli bank accounts prior to Closing, which they calculate to be approximately $4.5 million (the "Israeli Cash"), and approximately $3.7 million in credit card proceeds for GOB Store proceeds (the "GOB Store Cash"). Transform has already transferred to the Debtors the $3.7 million of GOB Store Cash, and all of the amounts that it has received from the Debtors' Israeli bank accounts—approximately $3.26 million.

- *Proration Claim.* Finally, the Debtors seek approximately $16.2 million with respect to the proration of certain expenses. But they omit that the Debtors failed to timely deliver a conforming Initial Prorations Schedule as required by the APA and did not deliver a schedule containing each of the items they were required to deliver until many days after the Closing, frustrating the already abbreviated seven business-day period to confer on prorations, thereby also relieving Transform of any current obligation to make a proration

---

[4] "Security Deposits" is a defined term under the APA that is broadly defined to include "restricted cash, security deposits, letters of credit, escrow deposits and cash collateral, including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit, utility deposits, performance, payment or surety bonds, credits, allowance, prepaid rent or other assets, charges, setoffs, prepaid expenses, other prepaid items and other security . . . ." APA § 2.1(o).

payment.  Transform could not work with the Debtors to account for each of the items to be prorated when the Debtors did not provide Transform with a schedule of each of the items to be prorated.  Now that the Debtors have (belatedly) provided that information, Transform and its advisors are working cooperatively with the Debtors to finalize a proration schedule, but the net proration payment need not be made under the APA until April 29, 2019.  In any event, the Debtors' request for proration is at most a disputed contract claim for payment of certain expenses under the APA.  There is no existing "property" of the estates that could be subject to turnover.

8.      Accordingly, each of the items constituting the $57.5 million claimed due by the Debtors is either already paid, not yet finalized and due, and in any event is subject to a significant contractual dispute between the Parties raising complex issues of fact and law.  Because these amounts are disputed in every respect, turnover is prohibited by settled law and there is no violation of the automatic stay.  Transform respectfully submits that the Court should deny the Turnover Motion and appoint a mediator to facilitate the resolution of the Parties' disputes over the APA.

9.      Should mediation be unsuccessful, or the Court prefer, Transform is prepared to pursue the claims in its Mediation Motion by complaint in a full-fledged adversary proceeding and to defend against the Debtors' claims.[5]

10.      But, to be clear, it is not Transform's preference in the first instance to engage in extensive discovery, nor a full-fledged adversary proceeding culminating in an evidentiary hearing, on the contractual disputes at issue.  The Mediation Motion seeks to avoid precisely the expense and other burdens on the Parties, the estates and the Court that such proceedings would entail, assuming mediation would be successful.  And it is only if mediation is unsuccessful (a result that Transform is not prepared to assume) that litigation will be necessary.  Nonetheless, Transform is compelled by the Turnover Motion to correct the record and to raise in part answers and defenses to each of the items set forth in the Turnover Motion.  The substantial nature of these disputes is

---

[5]      If the Court determines that these issues should not be resolved through mediation, Transform would be prepared to serve discovery promptly.

detailed below and is further evidenced by the declarations submitted by Andrew Hede, Senior

Managing Director at EY Turnaround Management Services LLC ("EY"), an advisor to Transform

(the "Hede Declaration"), and Joseph Lanzkron, a Partner at Cleary Gottlieb Steen & Hamilton

LLP, counsel for Transform (the "Lanzkron Declaration").[6]  Transform also proffers certain facts

it would be prepared to show through discovery.  Transform reserves its right to assert additional

defenses and additional allegations as its investigation of the Debtors' claims continues.

## ARGUMENT

## I.    THE TURNOVER MOTION IS PROCEDURALLY DEFECTIVE

11.    The Debtors' request for a turnover order pursuant to Section 542(a) of the

Bankruptcy Code is procedurally defective and, for this reason alone, must be denied.  Federal

Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7001(1) mandates that any "proceeding to

recover money or property, other than a proceeding to compel the debtor to deliver property to the

trustee," must be brought as an adversary proceeding.  Fed. R. Bankr. P. 7001(1).  Because a

request for turnover under Section 542(a) seeks the recovery of assets, "[a] turnover action is an

adversary proceeding which must be commenced by a properly filed and served complaint."  In re

MF Glob. Inc., 531 B.R. 424, 431 (Bankr. S.D.N.Y. 2015) (quoting In re Perkins, 902 F.2d 1254,

1258 (7th Cir. 1990)).  Furthermore, by seeking to have the Court act on a contested matter, without

filing a complaint, the Debtors are in effect trying to have the Court enter orders against Transform

without permitting it the discovery and procedural rights permitted by Part 7 after allegations are

made.  See Fed. R. Bankr. P. 9014(c); In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y.

---

[6]    Transform also intends to submit an additional declaration with the relevant card agreements in further support of this response regarding the Debtors' arguments with respect to credit card reserves so that the Court will have the opportunity to review the relevant provisions of the agreements.  Transform is in the process of providing notice to the relevant credit card processors in order to address the confidentiality provisions in their card agreements. Once that process is complete, Transform plans to submit a motion to file the declaration and card agreements under seal.

2002) (noting "the well recognized rule that once an adversary proceeding or contested matter is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004").

12.    The law is clear that turnover claims brought by motion rather than by adversary proceeding must be dismissed as procedurally defective.  See id.[7]  Indeed, all of the cases on which the Debtors rely in support of their request for a turnover order were brought by adversary proceeding rather than by motion.[8]

13.    Even if an adversary proceeding had been filed, it could still not be resolved at the March 21, 2019 omnibus hearing.  Where, as here, a contested matter "cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing ***must be held*** at which testimony of witnesses is taken in the same manner as testimony is taken in an adversary proceeding or at trial in a district court civil case."  Fed. R. Bankr. P. 9014 advisory committee's note to 2002 amendment (emphasis added).[9]

---

[7]    See also In re Perkins, 902 F.2d 1254, 1258 (7th Cir. 1990) (turnover claim brought by motion rather than adversary proceeding will be dismissed); Camall Co. v. Steadfast Ins. Co. (In re Camall Co.), 16 F. App'x 403, 407-408 (6th Cir. 2001) (unpublished decision) (affirming dismissal of turnover motion on procedural grounds); In re Interpictures, Inc., 86 B.R. 24, 29 (Bankr. E.D.N.Y. 1988) (dismissing turnover claim brought by order to show cause as "procedurally defective" because "the turnover and recovery of assets sought . . . must be brought pursuant to Bankruptcy Rule 7001 in an adversary proceeding properly commenced by a party in interest."); Will v. Ford Motor Credit Co. (In re Will), 303 B.R. 357, 362 (Bankr. N.D. Ill. 2003) (noting that court had sustained objection to turnover request improperly brought by motion rather than by complaint).

[8]    See Geron v. Peebler (In re Pali Holdings, Inc.), 488 B.R. 841, 843 (Bankr. S.D.N.Y. 2013); NWL Holdings, Inc. v. Eden Ctr., Inc. (In re Ames Dep't Stores, Inc.), 317 B.R. 260, 264 (Bankr. S.D.N.Y. 2004); Kramer v. Mahia (In re Khan), No. 10-46901-ESS, Adv. Pro. No. 11-01520-ESS, 2014 WL 10474969, at *1 (E.D.N.Y. Dec. 24, 2014); La Monica v. CEVA Grp. PLC (In re CIL Ltd.), 582 B.R. 46, 61 (Bankr. S.D.N.Y. 2018), amended on reconsideration, No. 13-11272-JLG, Adv. Pro. No. 14-02442-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018).

[9]    See also Am. Express Travel Related Servs. Co. v. Menchaca (In re Dolch), Nos. CC-0701467-KBMd, LA 05-40150-EC, 2008 WL 8448330, at *4 (B.A.P. 9th Cir. Apr. 17, 2008) (remanding a contested matter related to objections to proofs of claim, noting that "[t]he bankruptcy court did not conduct the required evidentiary hearing with witnesses available for direct testimony and cross-examination on the disputed material factual issues, as required by Rule 9014(d)"); In re 212 W. 18 LLC, 568 B.R. 613, 614 (Bankr. S.D.N.Y. 2017) (holding that a creditor's motion for an order modifying the automatic stay for cause was "a contested matter under Bankruptcy Rule 9014 and, therefore, an evidentiary hearing is required").

14.     The Turnover Motion raises numerous disputed issues of fact—as detailed in part in this response and accompanying declarations—that cannot be resolved without an adequate period for the preparation of a responsive pleading, the taking of any necessary discovery if these disputes are to be resolved in this manner, and the presentation of evidence and discovery if necessary.  The hearing scheduled for March 21, 2019 does not provide Transform with adequate time to set forth all of its defenses and to prepare for a contested hearing on the complex contractual disputes at issue.  In any event, the Debtors have not requested an evidentiary hearing, and Local Rule 9014-2 and Paragraph 34 of the Case Management Order, ECF No. 405, preclude the March 21 hearing from being converted into one.  While Transform believes that the Parties should pursue mediation rather than litigation, Transform is prepared to answer a complaint or raise a counterclaim and present evidence at a subsequent hearing.

## II.    THE TURNOVER MOTION FAILS BECAUSE IT SEEKS TURNOVER OF DISPUTED ITEMS UNDER THE APA

15.     Even if the Turnover Motion were not procedurally defective, it would still fail as each item sought in the Turnover Motion has either already been transferred to the Debtors, is not final and due, and/or is the subject of a bona fide contractual dispute between the Parties.

16.     Under settled law, "[t]urnover is not permitted where a bona fide dispute exists as to ownership of the subject property."  Finley Grp. v. Roselli (In re RedF Mktg., LLC), 589 B.R. 534, 546 (Bankr. W.D.N.C. 2018).  Consequently, "Section 542(a) does not apply if title is disputed."  Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.), 335 B.R. 66, 76 (Bankr. S.D.N.Y. 2005).[10]  On this basis, courts routinely dismiss turnover complaints as "premature"

---

[10]     See also Jurista v. Amerinox Processing, Inc., 492 B.R. 707, 756 (D.N.J. 2013) ("Implicit in the bankruptcy concept of turnover is the idea that the property being sought is clearly property of the Debtor but not in the Debtor's possession.  Turnover . . . is *not* the provision of the Code to determine the rights of the parties[.]") (alteration in original) (citation omitted).

where they fail to "identify any undisputed assets of the estate." Schlossberg v. Madeoy (In re Madeoy), 576 B.R. 484, 505 (Bankr. D. Md. 2017).[11]

17.     Although the Turnover Motion only seeks relief under Section 542(a), the same result obtains under Section 542(b), which applies to "debt that is property of the estate and that is matured, payable on demand, or payable on order." 11 U.S.C. § 542(b). That is because "[t]he terms 'matured, payable on demand, or payable on order' [in Section 542(b)] create a strong textual inference that an action should be regarded as a turnover only when there is no legitimate dispute over what is owed to the debtor." Hassett v. Bancohio Nat'l Bank (In re CIS Corp.), 172 B.R. 748, 760 (S.D.N.Y. 1994).[12]

18.     Similarly, claims for violations of the automatic stay under Section 362(a) are inappropriate where title to the property or debt at issue is in dispute, as is the case here. See, e.g., United States v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir. 1991), cert denied, 112 S. Ct. 913 (1992). As relevant here, Section 362(a) enjoins "any act . . . to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). While the estate "includes property recoverable under the Code's 'turnover' provisions," it is also "settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute." Inslaw, 932 F.2d at 1471, 1472; accord Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.), Nos. 13-13098, 14-CV-3179 SAS, 2014 WL 2998529, at *3 & n.36 (S.D.N.Y. July 3, 2014); Hirsch v. London Steamship Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.), 198 B.R. 45, 50 & n.7 (S.D.N.Y. 1996) (both adopting the reasoning in Inslaw).

---

[11]     See also RedF Mktg., 589 B.R. at 546 ("Not surprisingly, turnover claims for assets which are the subject of disputed causes of action are routinely dismissed as not being ripe.").

[12]     See also Dev. Specialists, Inc. v. Peabody Energy Co. (In re Coudert Bros.), No. 11 CIV. 4949(PAE), 2011 WL 7678683, at *4 (S.D.N.Y. Nov. 23, 2011) (holding that Section 542(b) did not apply in light of an ongoing dispute over whether payment was required).

19.     For this reason, in <u>Inslaw</u>, the D.C. Circuit held that the automatic stay did not bar

a party from using computer software claimed by a debtor in bankruptcy, because to expand the

definition of "exercise of control" in Section 362(a) to reach assets that are subject to a dispute in

title would "turn every act of the possessor that implicitly asserts his title over disputed property

into a violation of § 362(a), . . . creating a kind of universal end-run around the limits on turnover."

<u>Inslaw</u>, 932 F.2d at 1472-73.  As the court noted, such a broad interpretation of Section 362(a)

"would take it well beyond Congress's purpose" in enacting the automatic stay provision, which

was "to make sure that creditors do not destroy the bankrupt estate in their scramble for relief."

<u>Id.</u> at 1473.  The D.C. Circuit in <u>Inslaw</u> recognized that "[f]ulfillment of that purpose cannot require

that every party who acts in resistance to the debtor's view of its rights violates § 362(a) if found

in error by the bankruptcy court."  <u>Id.</u>

20.     The Debtors' own case law makes clear that "[i]t is settled law that the debtor

cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose

title is in dispute."  <u>In re CIL</u>, 582 B.R. at 116 (quoting <u>Inslaw</u>, 932 F.2d at 1472).[13]  The same is

true under Section 362(a)—Congress did not intend "to convert a matter of contract dispute into a

violation of the automatic stay."  <u>Mountaineer Coal Co. v. Liberty Mut. Ins. Co. (In re Mountaineer</u>

<u>Coal Co., Inc.)</u>, 247 B.R. 633, 644 (Bankr. W.D. Va. 2000); <u>see also</u> <u>Inslaw</u>, 932 F.2d at 1473.  As

detailed below, the Debtors' Turnover Motion seeks to do exactly what this case law prohibits by

turning complex contractual disputes into a purported motion for turnover and violation of the

automatic stay.  Because each of these items has either already been paid, is not yet final and due,

and/or is the subject of a bona fide dispute, the established law detailed above precludes the

---

[13]     <u>In re CIL</u> was decided in connection with an adversary proceeding on defendants' motion to dismiss.  The
court denied the motion, finding that defendants' "mere denial" of plaintiff's entitlement to relief was insufficient to
grant the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  <u>See id.</u> at 118.

Debtors from obtaining turnover of these amounts or using them to manufacture a purported violation of the automatic stay.[14]

21.  **Israeli Cash and GOB Store Cash.**  On March 8, 2019, the Friday before the Debtors filed this Turnover Motion, counsel for Transform relayed to the Debtors that Transform was "prepared to release the Israeli and GOB cash and we believe the Debtors should release the pharmacy receivables lock box."  See *Declaration of Mohsin Y. Meghji in Support of Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* (the "Meghji Decl.") [Docket No. 2797], Ex. B.  On the morning of March 12, 2019, Transform wired to the Debtors $3.26 million in respect of the Israeli Cash and $3.7 million in respect of the GOB Store Cash.  Hede Decl. ¶ 12.  As to the Israeli Cash, Transform's review of the cash management system shows that only $3.26 million of Israeli Cash was wired into Transform's bank accounts, which is the amount that Transform subsequently wired to the Debtors.  Id.  Accordingly, Transform has transferred the full amount due in respect of GOB Store Cash and Israeli Cash to the Debtors, and it disputes any obligation to transfer additional amounts.  Id.  Nevertheless, as with the other issues raised by the Debtors, Transform believes that any difference in views as to the exact amount of the Israeli Cash can be resolved through continued dialogue with the Debtors.

22.  **Credit Card Accounts Receivable.**  The Debtors claim—based on faulty assumptions and false representations of the APA—that they are entitled to $14.6 million in

---

[14]  For the same reasons, the Debtors have no basis for relief in the Sale Order, which in any case expressly provides that "[t]he Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement, and Related Agreements, documents or other instruments.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order."  Sale Order ¶ 57.

"excess" Credit Card Accounts Receivable. The APA included a closing condition that the Debtors deliver at least $1,657 million of collateral at Closing consisting of Acquired Inventory (excluding any Pending Inventory), Pharmacy Receivables and Credit Card Accounts Receivable. As a concession to the Debtors, the APA provided that if they delivered more than the minimum of $1,657 million, then they could reduce the collateral to $1,657 million by: (i) first, transferring Acquired Inventory to GOB stores until the Inventory Value of the Acquired Inventory was equal to $1,553 million; and (ii) second, retaining as an Excluded Asset the oldest of any Credit Card Accounts Receivable or Pharmacy Receivables. But no "excess" collateral was in fact delivered since the Debtors improperly characterized reserves taken by credit card company processors as Credit Card Accounts Receivable.

23.    The Debtors' argument is flawed as a matter of law and as a matter of fact. The reserves taken by the card processing companies were not "Credit Card Accounts Receivable" under the plain meaning of the APA but rather security related to an Acquired Asset, the agreements with the card processing companies. Accordingly, the amount of collateral delivered at Closing was not $1,657 million, but by our count only $1,643.3 million (including only $39.9 million of Credit Card Accounts Receivable). There was no "excess;" instead, there was a shortfall of $13.7 million.[15]

24.    The Debtors' characterization of the reserves as Credit Card Accounts Receivable borders on the risible. It is contrary to the plain language of the APA, the structure and purpose of that agreement including Section 10.9, and the Parties' contemporaneous understanding and negotiating history.

---

[15]    Even assuming that the Debtors delivered more than $1,657 million in collateral, they were not entitled to retain Credit Card Accounts Receivable pursuant to Section 10.9. The Debtors never purported to treat any Credit Card Accounts Receivable as an Excluded Asset at Closing and Transform therefore acquired those receivables pursuant to Section 2.1(d).

25.     "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." Salamone v. Gorman, 106 A.3d 354, 367-68 (Del. 2014) (quoting Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010)).  When a "contract is clear and unambiguous," the court "will give effect to the plain-meaning of the contract's terms and provisions," Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159-60 (Del. 2010), with "'priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions," Salamone, 106 A.3d at 368 (quoting GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P., 36 A.3d 776, 779 (Del. 2012)).  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."  Id. (quoting Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997)).  Moreover, "[t]he parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."  Osborn, 991 A.2d at 1160 (interpreting contract by giving effect to plain meaning of its terms).

26.     On the other hand, "[w]hen a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity."  Salamone, 106 A.3d at 374.  Parol evidence includes "all admissible evidence relating to the objective circumstances surrounding the creation of the contract," which may consist of "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry."  Id. (alteration in original) (quoting In re Mobilactive Media, LLC, No. CIV.A. 6725-VCP, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013)).  "[T]he court's 'primary search'" in evaluating parol evidence is "to

14

find the parties['] shared intent or common meaning." <u>Julian v. Julian</u>, No. CIV.A. 1892-VCP, 2010 WL 1068192, at *5 (Del. Ch. Mar. 22, 2010) (interpreting ambiguous contract term by reviewing parol evidence including drafting history and parties' course of performance).

27.     Here, the plain language of the APA belies the Debtors' argument that the reserves are Credit Card Accounts Receivable, and the relevant parol evidence leads to the same conclusion. The very name of the category—Credit Card *Accounts Receivable*—shows that it was intended to include only assets constituting accounts receivable, which the reserves are not.  This is also clear from the APA's definition of Credit Card Accounts Receivable.  The APA limits Credit Card Accounts Receivable to "each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, *owed* by a credit card payment processor or an issuer of credit cards to a Seller resulting from charges by a customer of a Seller on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Seller or services performed by a Seller, in each case in the ordinary course of its business." APA § 1.1 (emphasis added).  To be a Credit Card Accounts Receivable, the item must be "receivable"; it must also be "owed."

28.     The definitional provisions of the APA thus distinguish Credit Card Accounts Receivable from Security Deposits, which are defined as "restricted cash, security deposits, letters of credit, escrow deposits and cash collateral, . . . utility deposits, performance, payment or surety bonds, credits, allowance, prepaid rent or other assets, charges, setoffs, prepaid expenses, other prepaid items and other security . . . related to any Acquired Asset."  APA § 2.1(o).  Security

Deposits are addressed by Section 2.1(o) of the APA, pursuant to which the Debtors agreed to transfer those assets to Transform "free and clear" of any Claims.[16]

29.    As a factual matter, the reserves are simply not accounts receivable and accordingly are not treated as such in Sears' or Transform's books and records.  At the time of Closing, they were not receivable—neither Sears nor Transform had the right to require payment of such amounts—and they were not owed to Sears or Transform.  Between October 2017 and October 2018, certain credit card processors required Sears to provide reserves as a condition of continuing to do business with Sears, based on their view that certain events triggering their right to establish reserves had occurred.  The reserves are held by those companies as security deposits or security. As one example, the credit card processors may use the reserves to recover refunds—known as "chargebacks"—that they regularly issue to customers (e.g., for undelivered goods).  As a further example, if Transform is not able to satisfy certain obligations to the processors, the reserves serve as security deposits for that default.  The reserves can be funded in a number of ways, including by the credit card processors' withholding of amounts that would otherwise be due to Sears in connection with card transactions, by Sears' deposit of the funds, and by Sears' provision of letters of credit.  But the reserves do not correspond to the amounts owed to Sears at any particular point.

30.    Nor, unlike accounts receivable, were the funds held in reserve "owed" at the time of Closing.  The credit card processing companies exercised the right, at the time of Closing, to retain the reserves.  The credit card processors could draw down on the reserves as security for Sears' obligations.  Sears could not demand the return of the reserves.

---

[16]    Credit Card Accounts Receivable, by contrast, are addressed by different sections of the APA.  In particular, Section 2.1(d) (and not Section 2.1(o)), requires the Debtors to transfer to Transform "all Acquired Receivables," which are defined, in turn, to include "all Credit Card Accounts Receivable."  APA §§ 1.1, 2.1(d).

31.    The reserves thus resemble in every respect the category of asset—i.e., "Security Deposits"—required to be delivered under Section 2.1(o) and not subject to the cap in Section 10.9—a security deposit, a letter of credit, an escrow deposit, cash collateral, a prepaid item, or security related to the card processing agreements.  See Del. Bd. of Nursing v. Gillespie, 41 A.3d 423, 427 (Del. 2012) ("words grouped in a list should be given related meaning") (quoting Dole v. United Steelworkers of America, 494 U.S. 26, 36 (1990)).  Like any other security deposit, the reserves are held by the card processing companies as security for Sears' performance of its obligations.  See Deposit, Black's Law Dictionary (10th ed. 2014) (defining "security deposit" as "[m]oney placed with a person as earnest money or security for the performance of a contract"); In re Velo Holdings Inc., 475 B.R. 367, 375 (Bankr. S.D.N.Y. 2012) (credit card processor had "the right to build a cash *reserve*' by withholding a portion of the proceeds of [the merchant's] sales drafts as *security* to protect [the processor] from exposure in the event it is required to make payments or incur liabilities on [the merchant's] behalf" (emphasis added)).[17]  Like any other cash collateral, they collateralize Sears' obligations to the card processors.  They resemble a prepaid item in the respect that—if Sears does not pay what it owes to the card processing companies— they can be applied to services provided by the companies.  And, they are intended to and do provide "security" for Sears' obligations to the card processors.  See id. at 390 (finding that the credit card processor held a "reserve to mitigate any potential losses it might suffer as a result of its relationship with" the merchant); In re Nat'l Audit Def. Network, 332 B.R. 896, 913 (Bankr. D. Nev. 2005) (noting that the reserve "exist[ed] only to ensure" the merchant "had the wherewithal

---

[17]    The term "reserve" is used in the credit card industry to refer to a security deposit for performance of contractual obligations. See, e.g., Security Deposit, Deposits.org, https://www.deposits.org/dictionary/ term/security-deposit (last visited Mar. 17, 2019) (defining security deposit to include deposits with a counterparty to secure contractual obligations to that party).

to pay the obligations it owed to [the credit card processor]").  Indeed, the card processing companies are permitted to fund the reserves by withholding amounts otherwise due to Sears or by requiring a letter of credit.  It is indisputable that were the reserves funded by a letter of credit they would be Acquired Assets under Section 2.1(o) not subject to the Section 10.9 cap.  It should similarly be indisputable that the happenstance that Sears chose not to provide a letter of credit but instead to have the reserves funded by withholding cash otherwise due does not change the present character of those reserves.

32.    The Debtors' argument is also contrary to the whole structure and purpose of the APA.  Section 10.9 was a key aspect of the APA.  Transform would be prepared to prove that, as the Debtors knew prior to signing, the borrowing base for Transform's new ABL facility was secured by Inventory, Credit Card Accounts Receivable, and Pharmacy Receivables.[18]  That is the significance of the $1,657 million in Acquired Inventory, Credit Card Accounts Receivable, and Pharmacy Receivables.  Each of those items, in their entirety, could be used as collateral to satisfy Transform's funding obligations at Closing and $1,657 million was the precise number necessary to satisfy those conditions.  But, as the Debtors well knew prior to Closing, reserves—which are someone else's collateral and which are not receivables—cannot be used as eligible collateral under the ABL.

33.    The last clause of Section 10.9 further confirms this reading.  That clause was carefully negotiated to strike a balance between Transform's interest first in having sufficient inventory to operate the business and second, after acquiring just that amount of inventory to operate the business, in receiving the assets that would provide Transform with the greatest borrowing power and thus permit it to go forward without the need for additional borrowing.

---

[18]    This is also an area for discovery.

Thus, it stipulates that if the Debtors delivered more than $1,657 million of collateral at Closing, then Debtors could reduce the collateral to $1,657 million by first reducing the Acquired Inventory until it equaled $1,553 million (ensuring Transform received the necessary inventory), and only then by retaining as an Excluded Asset Credit Card Accounts Receivable and Pharmacy Receivables (starting with the oldest of the receivables). The clause represented a significant concession by Transform—permitting the Debtors to reduce the value of the collateral they delivered if it was more than necessary to satisfy Transform's funding obligations. As significantly, it reflects the Parties' common understanding that Credit Card Accounts Receivable would be those assets that, more than Acquired Inventory, provided the greatest liquidity. In effect, this clause prevented the Debtors from using the very liquid Credit Card Accounts Receivable to reduce all excess collateral while at the same time requiring them to leave a minimum level of Inventory. The reference in this clause to "the oldest" of any receivables further underscores that receivables are limited to amounts that are owed, which the reserves were not at the time of Closing.

34.     Finally, to the extent that there is any ambiguity in the contractual language, the negotiating history and parol evidence defeat the Debtors' arguments. During the Parties' negotiations that led to the APA executed on January 17, 2019, the Parties all understood and agreed that the Debtors would be providing the collateral pursuant to Section 10.9 that was necessary to satisfy Transform's funding obligations, that receiving $1,657 million of assets that could be used as collateral was critical to those funding obligations, that Credit Card Accounts Receivable—representing monies that card processing companies typically paid within approximately 3 days of a charge being incurred—were particularly valuable collateral, and that reserves were not accounts receivable and could not be used as collateral. The Debtors reviewed and were required to approve Transform's borrowing facilities and to ensure that Transform would

have sufficient liquidity post-Closing under the agreement the Debtors presented to the Court. Thus, they knew (and know) that by characterizing reserves as Credit Card Accounts Receivable they are undermining the fundamental deal reached by the Parties as well as violating the letter and spirit of the APA.

35.     Indeed, Transform would be prepared to show that it was not until after the APA was signed, and on the eve of Closing, that the Debtors for the first time included the reserves in a schedule of Credit Card Accounts Receivable to be transferred at Closing.  On or about February 10, 2019, weeks after the signing and the Sunday preceding the anticipated Monday Closing, the Debtors claimed in a letter sent by their Chief Restructuring Officer, Mohsin Meghji, that the Credit Card Accounts Receivable transferred at Closing would include $35 million in reserves. See Lynch Decl. at 89.  Counsel for Transform responded to the Debtors prior to Closing, indicating that while Transform would proceed with Closing, Transform reserved all rights, including for breach of the APA, with respect to the Debtors "improperly classifying certain reserves of credit card processors as Credit Card Receivables."  See Exhibit A, at 2, to the Declaration of Lewis J. Liman, dated March 18, 2019 and filed herewith (the "Liman Decl.").

36.     The Debtors' post-signing position is contrary to the plain terms of the APA and at best a type of "after-the-fact professed subjective intent" that Delaware "courts typically refuse to consider" in interpreting contracts.  Eagle Force Holdings, LLC v. Campbell, 187 A.3d 1209, 1235 n.180 (Del. 2018) (internal quotation marks omitted).  It thus is irrelevant to the contract claim presented by the Debtors.  As important, Transform would be prepared to prove that the Debtors' eleventh and a half hour post-signing change of position is a demonstration of the Debtors' bad faith and an independent breach by the Debtors of both Section 10.9 and the ordinary course covenants of the APA.

37.    **Cash in Transit**.  The Debtors' request for approximately $18.5 million in Cash in Transit is also legally defective.  The Debtors ground that claim on the Reconciliation Plan, which "describe(s)" (without limiting) the post-Closing reconciliation process and provides generally that "the Buyer and its Advisors (EY) will work with the company and its advisors to complete this reconciliation in a timely manner."  See Meghji Decl., Ex. A. at 9, 11; Hede Decl. ¶ 10.

38.    The Reconciliation Plan was intended to address an operational issue that arose in the Closing of the sale transaction.  The Parties recognized that time was of the essence in the Closing of the transaction and the Debtors wanted a speedy Closing (just three weeks after the APA was signed), in part out of concern that with every passing day there was an increased risk that they might not be able to satisfy the conditions of Closing.  Hede Decl. ¶¶ 5, 7.  In order to expedite Closing, however, it was necessary that Transform step into the shoes of the Debtors' cash management system.  Id. ¶ 7.  That cash management system consists of hundreds of discrete bank accounts through which millions of dollars run on a daily basis, from a number of different sources, including cash in transit, credit card proceeds, debits from checks, and other wires.  Id. ¶ 6.  For a number of practical reasons, the Debtors' cash management system could not be turned off on a dime and a new cash management system set up on a dime.  Id.  And without a functioning cash management system, Sears' retail business simply could not function as a going concern and Transform would not close.  Id. ¶ 7.

39.    As the Parties fully recognized and the Reconciliation Plan reflects, the operational decision to transfer the Debtors' cash management system to Transform was not intended to alter the allocation of assets and liabilities under the APA.  Id. ¶ 8.  Obligations that were not assumed by Transform remained those of the Debtors regardless of whether they were debited from the cash management system, while assets (including cash in transit) that were not transferred to Transform

remained those of the Debtors regardless of whether they were deposited into the cash management system.  Id. ¶ 14.  Thus, the Parties agreed to work cooperatively with each other following Closing to achieve a "timely"—and proper—reconciliation.  See Meghji Decl., Ex. A. at 9, 11; Hede Decl. ¶ 10.

40.    That is precisely what has been happening.  Since Closing, Transform and EY have worked around the clock and in good faith to reconcile funds in the cash management system. Hede Decl. ¶ 11.  Transform and EY have devoted tremendous resources to this effort, including upward of 200 billable hours by EY personnel alone.  Id.  For certain items—namely, the Israeli Cash and GOB Store Cash—the reconciliation process has been completed and Transform has wired the associated funds to the Debtors.  Id. ¶ 12.

41.    For other items, the process took longer than contemplated and remains ongoing. The Cash in Transit represents cash proceeds from transactions at retail stores that occurred prior to Closing, but that were still in transit from regional banks or stores at Closing and therefore not yet reflected in the Debtors' bank accounts.  Id. ¶ 13.  Due to the manner in which the cash management system tracks cash or checks received at stores and corresponding deposits in the system's bank accounts, it is particularly difficult to match with precision pre-Closing sales transactions at stores with post-Closing deposits and therefore to determine which deposits relate to Cash in Transit at Closing.  Id.

42.    The Debtors seek to have the Court disrupt the reconciliation process and also to unfairly and improperly weigh in on one side of the ledger ignoring the other.  There is no legal dispute that the Cash in Transit at Closing belonged to the Debtors.  Nor is there any legal dispute that the checks that were written by the Debtors to satisfy pre-Closing obligations are the

responsibility of the Debtors and that those liabilities were not assumed by Transform. The two sums need to be reconciled against each other.

43.     There were many checks that were issued by the Debtors prior to Closing but that have been debited from the cash management system only after Closing. Hede Decl. ¶ 14. These checks were issued by the Debtors to pay for their own pre-Closing obligations. Id. Transform did not assume those obligations as part of the sale transaction.[19] Id. But due to the happenstance of assuming the Debtors' cash management system, these checks have been paid out of the bank accounts that Transform now funds. Id. These amounts must be reconciled as part of the general reconciliation process currently underway. Id. Although this reconciliation work also remains ongoing, Transform and EY have already identified payments of $14.8 million made out of the cash management system in respect of checks issued by the Debtors prior to Closing, and expect this figure to rise by millions as additional checks clear through the system. Id.

44.     There can be no dispute that Transform has acted in a "timely" manner and accordingly, there is no amount currently set and due from Transform to the Debtors that could be subject to turnover. These "uncertainties as to the amount to be turned over make use of the turnover power inappropriate." Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.), 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016).[20] Based on the reconciliation work completed thus far,

---

[19]     See APA §§ 2.4(a)-(b), (d) (treating as Excluded Liabilities "all Liabilities of the Seller or any of its Subsidiaries arising out of the ownership of the Acquired Assets or operation of the Business or the Acquired Assets prior to the Closing Date," with certain exceptions not relevant here; "all Liabilities relating to the payment or performance of obligations arising solely out of facts or circumstances in existence prior to the Closing Date or Designation Assignment Date, as applicable, with respect to the Assigned Agreements"; and "all Liabilities to the extent arising prior to the Closing Date or arising from or related to the operation of a Seller's business or any of Sellers' products or services").

[20]     See also Dev. Specialists, Inc. v. Peabody Energy Corp. (In re Coudert Bros.), No. 11 CIV. 4949 PAE, 2011 WL 7678683, at *4 (S.D.N.Y. Nov. 23, 2011) (turnover claim under 542(b) improper because dispute over contingency fees owed meant debt was not matured); J.T. Moran Fin. Corp. v. Am. Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.), 124 B.R. 931, 938 (S.D.N.Y. 1991) (turnover claim improper where dispute existed over specific interest payments due).

Transform also believes that the amount ultimately due will be substantially reduced by Transform's payment of the checks issued by the Debtors prior to Closing.  Hede Decl. ¶ 14.

45.    Furthermore, as a matter of recoupment, Transform is permitted to net the Debtors' obligations in respect of uncleared checks and debits from its eventual obligations to deliver the Cash in Transit to the Debtors.  Recoupment is appropriate where, as here, "both debts . . . arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations."  See Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 147 (2d Cir. 2002) (internal quotation marks and citations omitted). Courts have consistently held that recoupment is not a violation of the automatic stay.  See Malinowski v. N.Y. State Dep't. of Labor (In re Malinowski), 156 F.3d 131, 133 (2d Cir. 1998) ("The automatic stay is inapplicable, because funds subject to recoupment are not the debtor's property."); Delta Airlines v. Bibb (In re Delta Air Lines), 359 B.R. 454, 467 (Bankr. S.D.N.Y. 2006).  The reconciliation necessitated by the transfer of the cash management system is a single integrated transaction through which the Parties must account to one another to ensure that the funds flowing into and out of the cash management system are properly allocated.  Permitting the Debtors to reap the benefits of the reconciliation process without accounting to Transform would create the very inequitable result that recoupment is intended to prevent.

46.    **Prorations.**  Transform presently has no legal obligation under the APA to make any proration payment until April 29, 2019, including the $16.2 million that the Debtors claim is due in respect of occupancy expenses for February 2019, because the Debtors failed to deliver a timely and conforming schedule of each item to be prorated pursuant to the APA.

47.    Section 9.11 of the APA requires the Debtors and Transform to prorate items of revenue and expenses with respect to the real estate transferred pursuant to the APA and sets forth

a detailed, and two-tiered, schedule for the provision of information regarding all payments to be pro-rated, meetings regarding those items, and settlement.  Pursuant to Section 9.11(d)(i), if the Debtors wished to receive an initial payment on items to be prorated, they were required to provide to Transform, prior to the Closing Date, an Initial Prorations Schedule "setting forth each item to be prorated pursuant to this Section 9.11."  The APA then contemplates that during the seven business days following Closing:  (i) Transform and the Debtors will work in good faith to account for each of those items; (ii) after meeting and conferring, there will be a settlement on the eighth business day; (iii) with the Debtors being paid if the net amount of prorations results in a payment owed from Transform to the Debtors, and Transform being paid if the net amount results in a payment from the Debtors to Transform (the "Initial Prorations Payment").

48.    The APA also contemplates that 75 days after Closing, Transform will provide to the Debtors an updated calculation of the Post-Closing Prorations Schedule, "reflecting all invoices and payments received within the period following Closing and accounting for all amounts owed by Buyer and Seller pursuant to the Occupancy Agreement and the Seller Occupancy Agreement" and that there will be a settlement of those additional items within one business day after delivery of the Final Prorations Schedule (the "Final Prorations Payment").  It is obviously critical under those provisions that, if a payment is to be made to the Debtors, they satisfy the condition precedent of timely delivering a conforming schedule.  If the Debtors do not do that, then the tight timetable for working in good faith to settle items is frustrated.

49.    The Debtors, however, failed to timely deliver a conforming Initial Prorations Schedule.  On February 8, 2019, the last business day before Closing, the Debtors delivered a schedule listing some but not all items required to be prorated (rent and certain other occupancy costs) and calling for a proration payment of $20.3 million from Transform.  Lanzkron Decl. ¶ 6.

That schedule did not include—as required—each item required to be prorated pursuant to Section 9.11, viz, "all items of revenue and expense with respect to the Owned Real Property, the Lease Premises, the lease identified in Schedule 1.1(r) and the Sparrow Properties as of the Closing Date." Id. ¶¶ 5,6. Specifically, it omitted one of the critical  "items to be prorated," namely certain property taxes associated with those properties.  See APA § 9.11(a)(v); Lanzkron Decl. ¶ 6.

50.    The Debtors delivered a second schedule two days after Closing, on February 13, 2019 (and two days into the seven–business day period for meeting and conferring), this one calling for a payment of $16.2 million from Transform—a difference of more than 20% from the first schedule. Lanzkron Decl. ¶ 7. Once again, the schedule omitted items required to be prorated. Id.

51.    It was not until February 19, 2019, *six business days* after Closing, that the Debtors delivered a schedule purporting to list each item to be prorated.  Id. ¶ 9. This schedule was not limited to additional invoices and requests for payment received after Closing, but contained crucial property tax information required to be prorated that was in the possession of the Debtors prior to Closing.  Id.

52.    Under the clear text of the APA, then, the Debtors failed to deliver a conforming Initial Prorations Schedule prior to Closing.  Id. ¶ 8. Section 9.11(d)(i) required the Debtors to list "each" of the items required to be prorated, and not only the particular items they chose to list prior to Closing, as is consistent with the plain meaning of the word "each."  See Sierra Club v. EPA, 536 F.3d 673, 678 (D.C. Cir. 2008) ("'Each' means '[e]very one of a group considered individually.'" (quoting American Heritage Dictionary 269 (4th ed. 2001))); Spillman v. Murphy, 16-CV-00437-LJV-JJM, 2016 WL 11268703, at *2 (W.D.N.Y. July 28, 2016) ("[t]he word 'each' means 'every one'").

53.    The timely delivery of a conforming Initial Prorations Schedule was a condition precedent to Transform making an Initial Prorations Payment.  See Cato Capital LLC v. Hemispherx Biopharma, Inc., 70 F. Supp. 3d 607, 619 (D. Del. 2014) ("A condition precedent is '[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises.'") (internal citations omitted), aff'd, 625 F. App'x 108 (3d Cir. 2015). Because the Debtors failed to satisfy that condition precedent, Transform was relieved of its obligation to make any Initial Prorations Payment.  See Wagner v. Hendry, No. CIV. A. 16364, 2000 WL 238009, at *5 (Del. Ch. Feb. 23, 2000) (A party "seeking to compel performance must demonstrate freedom from fault with respect to performance of dependent promises, counterpromises or conditions precedent.") (internal quotation marks and citations omitted); see also 23 Williston on Contracts § 63:6 (4th ed.) ("Generally there can be no breach of a promise until all the conditions qualifying it have happened or been performed.").

54.    The Debtors' failure to timely deliver a conforming Initial Prorations Schedule also frustrated the purpose of Section 9.11.  See, e.g., Akorn, Inc. v. Fresenius Kabi AG, C.A. No. 2018-0300-JTL, 2018 WL 4719347, at *57 (Del. Ch. Oct. 1, 2018) (the "black-letter doctrine of frustration of purpose . . . operates to discharge a contracting party's obligations when his principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made") (citation omitted), aff'd, 198 A.3d 724 (Del. 2018).  That provision did not require Transform to make payment for whatever items the Debtors included on a schedule delivered prior to Closing, whether based on fact or not.  It required the Debtors to list "each item" required to be prorated.  Lanzkron Decl. ¶ 8.  It also required the schedule to be an accurate estimate—not one that was 20% off.  Id. ¶ 7. Without such a proper and conforming schedule, it would be impossible for Transform and the

Debtors to conduct the seven-business day good-faith discussion required to account for each of those items. Because the Debtors failed to do so (and, indeed, did not deliver a conforming schedule until the seven-business day period was about to expire), Transform was not able to "work in good faith" to account for each of those items "during the seven (7) Business Day period following the Closing Date" and the purposes of Section 9.11 were defeated.

55.    This was no mere technicality under the APA. The missing real property tax information was critical to the post-Closing proration process contemplated by Section 9.11. Id. ¶ 6. As the Court is aware, one of the central aspects of the APA—Article V—entitled Transform to assume or reject certain leases listed in schedules to the APA. If Transform elects not to assume a lease, its obligation to pay for occupancy expenses with respect to such lease generally ceases five business days after delivering the rejection notice to the Debtors.

56.    That property tax information is also critical to the proration process. A significant amount of the $63.5 million in property taxes that the Debtors have now belatedly scheduled were amounts paid for pre-Closing periods under certain of the Debtors' leases. Id. ¶ 9. Transform may be required to pay the Debtors for these amounts if it assumes the respective leases. But, what is important for the proration process is that Transform has the option to reject assuming certain leases and therefore reduce or eliminate the prorated expenses associated with those leases. As a result, Transform's election to accept or reject certain leases—a decision driven in part by the prorated property taxes associated with those leases—could increase or reduce the amount of the proration payment due to the Debtors.

57.    By not delivering information regarding one of the most important items under Section 9.11—real property taxes—until the *sixth business day* after Closing, the Debtors defeated Transform's ability to intelligently determine prior to that sixth business day whether to reject

assuming a lease and thus frustrated the Parties' ability to intelligently discuss the proration schedule at all.  The Debtors have now delivered that information and the Parties are proceeding quickly to discuss the Section 9.11 items and to agree on the appropriate proration.  Transform has in fact delivered a notice to the Debtors of leases it has elected not to assume and one of the motivations for the initial timing of the delivery of such rejection notice was to avoid incurring additional occupancy expenses with respect to such leases for the month of March.

58.    That said, as Transform has repeatedly informed the Debtors, it is prepared to and is working in good faith to account for the items to be prorated.  But Transform's agreement to work in good faith to resolve items earlier than the seventy-five day period cannot defeat the plain language of the APA or somehow convert Transform's failure to make a payment it was not obligated to make into a breach of the APA or a violation of the automatic stay.

59.    Moreover, even if there were some doubt regarding Transform's compliance with the proration provisions of the APA, there is no "property" of the estate that could be subject to turnover.  The Debtors' request for proration is at most a disputed contract claim for payment of certain expenses under the APA.  But the law is clear.  The Debtors cannot use a "garden variety contract claim" to somehow invoke the automatic stay and turnover provisions of the APA.  In re Soundview Elite Ltd., 543 B.R. at 97 (quotation omitted).[21]

## III.    MEDIATION IS APPROPRIATE AT THIS TIME

60.    Mediation of the ongoing disputes entailed in the Parties' briefing is in the best interest of the Debtors and their estates, creditors, and stakeholders.  Contrary to the Debtors' suggestion that Transform's mediation request is a mere delay tactic, the mediation process, if

---

[21]    See also Inslaw, 942 F.2d at 1473 ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."); Mountaineer, 247 B.R. at [644] (Congress did not intend "to convert a matter of contract dispute into a violation of the automatic stay.").

successful, would actually be far faster than the full-fledged adversary proceeding required to properly litigate the Debtors' purported turnover claim.  If not successful, the Parties will know that quickly.

61.    The Debtors' intransigence with respect to the matters at issue demonstrates the need for this Court's intervention and for a mediation order.  Transform expressed concerns with respect to the Debtors' compliance with the APA shortly after the Closing, both orally and then, when they were unanswered, in writing and asked to meet to discuss those concerns.  See Lynch Decl. at 4-9.  The Debtors refused even to meet.  Instead, they waited ten days after the receipt of Transform's letter and then responded that they would not even engage in discussions regarding Transform's concerns unless Transform first confirmed within several hours after receipt of the Debtors' letter that Transform would, by noon the following day, pay all amounts the Debtors claim they were due (without regard to whether those amounts were disputed by Transform and would benefit from discussion).  Id. at 105 (correspondence from the Debtors' counsel stating that they would not meet with Transform and its advisors until "payment is made" in the amount of $57.5 million); Liman Decl., Ex. B (email from the Debtors' counsel indicating that they would meet only after the "funds are turned over to the Estate").  Without a mediation order, it is unclear whether the Debtors will meet even now.

62.    Indeed, the Debtors set forth a number of frivolous arguments for why the Court should not order mediation.  This Court's rules belie those arguments.  The Debtors are flat wrong that mediation is inappropriate outside the context of a plan dispute between multiple parties or where there is no consensus to enter into the mediation.  See Turnover Mot. ¶¶ 40-44.  Courts in this jurisdiction have the power to assign matters to mediation for "*any* adversary proceeding, contested matter or other dispute."  General Order M-452 ¶ 1.3 (emphasis added).  The General

Order does not limit mediation to any subject matter or require that there be consensus.  Indeed, an order for mediation frequently is most necessary when one or more parties do not consent.  Thus, the General Order provides that the Court may order mediation on motion by any party, in addition to upon stipulation of counsel.  See General Order M-452 ¶¶ 1.1, 1.2.  The case law is to the same effect; courts have referred parties to mediation for non-plan related disputes and where not all parties consent.  For example, in In re A.T. Reynolds & Sons, Inc., the court directed the relevant parties to mediation to "attempt to resolve disputes by and between the Mediation Parties relative to the section 363 sale . . . and the sequelae flowing therefrom, including but not limited to the payment of wages . . . ."  Order Assigning Disputed Matter to Mediation & Setting Mediation Deadlines, Case No. 08-37739 (CGM) (Bankr. S.D.N.Y. Aug. 27, 2009) (Docket No. 224) (emphasis omitted).  In In re Teligent, Inc., the court directed the parties to the adversary proceedings to mediation to resolve disputes with respect to the various claims under Chapter 5 of the Bankruptcy Code despite receiving over 100 objections to the mediation motion.  Order Approving Mediation Procedures & Appointing a Mediator, Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. Feb. 4, 2004) (Docket No. 1806).  To prevent further delays in resolving the issues at hand, now is the appropriate time for the Court to direct Transform and the Debtors to mediation.

## RESERVATION OF RIGHTS

63.     Transform reserves its rights to supplement the defenses and arguments set forth in this response based on its continuing investigation into the Debtors' claims.

## CONCLUSION

64.     For the reasons stated above, Transform requests that the Court deny the Debtors' Turnover Motion and grant Transform's Mediation Motion and such other and further relief as is justified under the circumstances.


Dated: March 18, 2019
       New York, New York

                              CLEARY GOTTLIEB STEEN & HAMILTON LLP


                              */s/ Abena A. Mainoo*
                              Lewis J. Liman
                              Sean A. O'Neal
                              Luke A. Barefoot
                              Abena A. Mainoo
                              One Liberty Plaza
                              New York, New York 10006
                              Telephone: (212) 225-2000
                              Facsimile: (212) 225-3999

                              *Attorneys for Transform Holdco LLC*