UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                                                :
In re:                                                          :    Chapter 11
                                                                :
SEARS HOLDINGS CORPORATION, *et al.*,[1]                        :
                                                                :    Case No. 18-23538-rdd
                    Debtors.                                    :
                                                                :    (Jointly Administered)
                                                                :
---------------------------------------------------------------X

## DECLARATION OF ANDREW D. HEDE IN SUPPORT OF TRANSFORM HOLDCO LLC'S RESPONSE TO DEBTORS' MOTION TO (A) ENFORCE ASSET PURCHASE AGREEMENT AND AUTOMATIC STAY AGAINST TRANSFORM HOLDCO LLC AND (B) COMPEL TURNOVER OF ESTATE PROPERTY AND REPLY IN FURTHER SUPPORT OF ITS MOTION TO ASSIGN MATTER TO MEDIATION

I, Andrew D. Hede, declare under penalty of perjury as follows:

1.  I respectfully submit this declaration ("Declaration") in support of *Transform Holdco LLC's Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and*

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

*Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property and Reply in Further Support of Its Motion to Assign Matter to Mediation.*[2]

2. I am a Senior Managing Director of EY Turnaround Management Services LLC, a direct, wholly owned subsidiary of Ernst & Young U.S. LLP and an affiliate of Ernst & Young LLP ("EY"). In January 2019, Transform Holdco LLC ("Transform") retained EY to assist with setting up the newly-formed Transform entities and completing the acquisition of substantially all of Sears' assets.

3. Since EY's retention, I have devoted substantial time and attention to such transition matters and I have become knowledgeable about and familiar with Sears' day-to-day operations, business and financial affairs, and books and records. I have more than 25 years of financial and operational restructuring experience in both the United States and Australia, including financial and operational reviews, liquidity management, business and asset divestment, business plan preparation and review, recapitalization strategies and negotiation of reorganization plans. I have experience across a broad range of sectors and served in various interim management roles.

4. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge of Transform's and the Debtors' pre- and post-Closing operations and finances gleaned during the course of my engagement with Transform; my discussions with Transform's other advisors, other members of EY's team, company management and the Debtors' advisors; my review of relevant documents; and my views based upon my experience. If called to testify, I would testify competently to each of the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of EY for Transform.

---

[2] All capitalized terms used but not defined in this Declaration shall have the meaning ascribed to them in the APA.

5. After the APA was signed on January 17, 2019, the Debtors, the Debtors' advisors, and Transform engaged in numerous discussions about the need for an accelerated closing date given the terms of the APA and the company's financial situation. Among other things, the discussions focused on ensuring a prompt closing, which needed to occur during or shortly after the first full week of February. The parties recognized that in order to close quickly and allow Transform to operate the business, Transform would need to have a fully functioning cash management system, both to receive funds from operations, and to make payments to vendors and other third-parties. In my experience, a period of approximately three weeks (*i.e.*, the period between signing and expected Closing) is extremely short for a transaction as complex as this one.

6. Around this time, the parties were advised by Sears' principal bank, Bank of America, that it was impossible as a practical matter for Transform to create and put into operation a new cash management system prior to Closing. The cash management system for Sears, a retail business, involved hundreds of discrete bank accounts; millions of dollars run into and out of these accounts on a daily basis, from a number of different sources, including cash in transit, credit card proceeds, debits from checks, and other wires. In addition to this complexity, several other issues were identified, including that Transform would need to: (i) create many new legal entities to receive the transferred assets; (ii) acquire Federal Employer Identification Numbers ("FEINs") for these new legal entities in the midst of the federal government shutdown occurring at that time; (iii) respond to know your customer ("KYC") requests for the new legal entities that would be required by banks; and (iv) set up a new cash management system based on the new accounts.

7. Given these realities, the parties recognized that it would be impossible to set up a new cash management system prior to the desired closing date, and that without a viable cash management system, the transaction could not close. As a result, the parties agreed that Transform at Closing would step into the shoes of the Debtors' existing cash management system and use that system to continue to run the business after Closing. This was a creature of necessity in light of the need to have an accelerated closing, and not a concession by the Debtors. Rather, given the desire to close the transaction on a very accelerated timeline, the parties proceeded with what they viewed as the only realistic option available to permit them to do so.

8. Prior to Closing, the parties fully recognized that the transfer of the Debtors' cash management system to Transform would result in a number of operational complexities, in particular as to allocating cash between transactions that occurred prior to and after Closing. The parties, represented by sophisticated advisors, determined that this was the best option among imperfect options. As a result, the parties fully recognized that, following Closing, they would need to engage in a reconciliation process to ensure that the funds flowing into and out of the cash management system were properly allocated between the Debtors and Transform.

9. Given the immense complexity of this process, representatives of the Debtors advisors, company management and EY worked together prior to Closing toward establishing a framework by which the reconciliation would occur. The parties exchanged several drafts that described the flow of funds on the Closing Date and the post-Closing reconciliation process. The last iteration of this draft framework was exchanged on the day of the Closing (the "Reconciliation Plan").

10. The parties understood that the Reconciliation Plan did not, and was not intended to, account for every item that would need to be reconciled due to Transform's taking control of

the cash management system. There was simply not enough time to account for every detail or predict every eventuality. Rather, the intent was for the parties to work cooperatively with each other following Closing to achieve a timely and proper reconciliation. This is reflected in the text of the Reconciliation Plan, which purports to "describe," but without limiting, the post-Closing reconciliation process and provides generally that "[Transform] and its Advisors (EY) will work with the company and its advisors to complete this reconciliation in a timely manner." See Meghji Decl., Ex. A. at 9, 11.

11.     In the five weeks since Closing, Transform and EY have worked diligently, promptly, and in good faith to reconcile funds in the cash management system. Transform and EY have devoted tremendous resources to this effort, including upward of 200 billable hours just by EY personnel alone. The process has proven substantially more complex than Transform and EY anticipated prior to Closing.

12.     For certain items, EY has completed the reconciliation process and Transform has transferred the associated funds to the Debtors. On the morning of March 12, 2019, Transform wired to the Debtors approximately $3.7 million in respect of certain post-Closing credit card proceeds associated with GOB stores, which accounts for the entire amount of such proceeds that the Debtors claim is due from Transform. Around the same time, Transform transferred to Debtors approximately $3.26 million of cash wired from the Debtors' Israeli bank accounts into the cash management system. Transform wired the total amount that it received from the Israeli bank accounts and therefore reconciled the full amount due to the Debtors in respect of the Israeli bank accounts.

13.     For certain other items, the reconciliation process remains ongoing. In particular, Transform and EY are continuing to reconcile cash proceeds from transactions that occurred

prior to Closing, but that were still in transit from regional banks or stores at Closing and therefore not yet reflected in Debtors' bank accounts.  Due to the manner in which the cash management system tracks cash or checks received at stores and corresponding deposits in the system's bank accounts, it has been particularly difficult, and more difficult than anticipated, to match with precision pre-Closing sales transactions at stores with post-Closing deposits and therefore to determine which deposits relate to cash in transit at Closing.  Given the Debtors' and their advisors' familiarity with the cash management system, they are well aware of the complexity and costs involved with this task.  Transform and EY are engaging in this process as quickly as possible under the circumstances, but have not yet completed their reconciliation of deposits received after Closing that pertain to "cash in transit" at Closing.  It is likely that as the reconciliation process continues more issues will arise requiring additional allocation of funds between Transform and the Debtors.

14. Another significant item that remains to be fully reconciled relates to checks that were issued by the Debtors prior to Closing, to pay for obligations that the Debtors incurred prior to Closing, but that have been debited from the cash management system only after Closing.  The obligations that Debtors incurred prior to Closing were not assumed by Transform, but rather remained with the Debtors.  These pre-Closing checks have been paid after the Closing out of the accounts from which these checks were drawn, which are now part of Transform's cash management system.  The net effect is that due to the cash management system, cash in transit that was received into the cash management system after the Closing Date has been used to pay the pre-Closing checks.  These amounts must be reconciled as part of the general reconciliation process being undertaken by Transform and EY to properly allocate the funds flowing into and out of the cash management system.  Although this reconciliation work remains ongoing,

Transform and EY have already identified post-Closing payments of $14.8 million made out of the cash management system in respect of checks issued by the Debtors prior to Closing, and expect this figure to rise by at least $3.2 million as additional checks clear through the system.

15. EY will continue to work diligently and in good faith to finish the reconciliation of the funds in the cash management system and currently estimates that this work may take an additional 3-4 weeks to complete. I reserve the right to supplement or modify this Declaration in the event that additional facts or information are discovered as part of this reconciliation process or otherwise.

*    *    *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 18, 2019 in Chicago, Illinois.

Respectfully submitted,

_____
Andrew D. Hede