Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   February 6, 2019

17                   9:17 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

1    HEARING re Evidentiary Hearing

2

3    HEARING re Notice of Agenda of Matters Scheduled for Hearing

4    on February 6, 2019 at 9:00 a.m.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for the Debtor

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8   BY:  PAUL R. GENENDER

 9         JARED R. FRIEDMANN

10         DAVID J. LENDER

11         JESSIE B. MISHKIN

12         RAY S. SCROCK

13

14   AKIN GUMP STRAUSS HAUER & FELD LLP

15         Attorneys for UCC

16         One Bryant Park

17         New York, NY 10036

18

19   BY:  ABID QURESHI

20         JOSEPH L. SORKIN

21         LACY LAWRENCE

22

23

24

25
```

1   CLEARY GOTTLIEB STEEN & HAMILTON LLP

2        Attorneys for ESL

3        One Liberty Plaza

4        New York, NY 10006

5

6   BY:  LEWIS J. LIMAN

7        JAMES L. BROMLEY

8        SEAN A. O'NEAL

9        RAHUL MUKHI

10

11   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12        Attorneys for Independent Restructuring Subcommittee

13        601 Lexington Avenue

14        New York, NY 10022

15

16   BY:  PAUL BASTA

17        LEW CLAYTON

18        SUSANNA BUERGEL

19

20

21

22

23

24

25

Page 5

1    PENSION BENEFIT GUARANTY CORPORATION

2         1200 L Street MW

3         Washington, DC 20005

4

5    BY:  MICHAEL I. BAIRD

6         KELLY CUSICK

7         GARTH D. WILSON

8

9    LOCKE LORD LLP

10        Attorney for PBGC

11        111 South Wacker Drive

12        Chicago, IL 60606

13

14   BY:  BRIAN A. RAYNOR

15        P. RUSSELL PERDEW

16

17   CHOATE

18        Attorneys for Wells Fargo

19        Two International Place

20        Boston, MA 02110

21

22   BY:  KEVIN J. SIMARD

23

24

25

Page 6

```
 1   HALPERIN BATTAGLIA BENZIJA, LLP

 2        Attorneys for Relator Carl Ireland

 3        40 Wall Street, 37th Floor

 4        New York, NY 10005

 5

 6   BY:  DONNA H. LIEBERMAN

 7

 8   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 9        Attorneys for ABL Agent

10        4 Times Square

11        New York, NY 10036

12

13   BY:  SHANA A. ELBERG

14

15   COZEN O'CONNOR

16        Attorneys for National Distribution Centers, LLC

17        1201 North Market Street, Suite 1001

18        Wilmington, DE 19801

19

20   BY:  MARK E. FELGER

21

22

23

24

25
```

Page 7

1    BROWN RUDNICK LLP

2         Attorneys for Primark US Corp.

3         7 Times Square

4         New York, NY 10036

5

6    BY:  GERARD T. CICERO

7

8    BARCLAY DAMON LLP

9         Attorneys for Creditors in objections at dockets 2241,

10        2246, 2247, 2248, 2251, 2253, 2255, 2293 and 2294

11        Barclay Damon Tower

12        125 East Jefferson Street

13        Syracuse, NY 13202

14

15   BY:  KEVIN M. NEWMAN

16

17   SEYFARTH SHAW LLP

18        Attorneys for Wilmington Trust, NA as Indenture Trustee

19        and Collateral Agent

20        620 Eighth Avenue

21        New York, NY 10018

22

23   BY:  EDWARD M. FOX

24

25

Page 8

```
 1   CRAVATH, SWAINE & MOORE LLP
 2        Attorneys for Stanley Black & Decker, Inc.
 3        825 Eighth Avenue
 4        New York, NY 10019
 5
 6   BY:  PAUL H. ZUMBRO
 7
 8   MILBANK, TWEED, HADLEY & MCCLOY LLP
 9        Attorneys for Cyrus Capital
10        2029 Century Park East, 33rd Floor
11        Los Angeles, CA 90067
12
13   BY:  THOMAS R. KRELLER
14
15   WITNESSES:
16   MOHSIN MEGHJI
17   MICHAEL WELCH
18   KUNAL KAMLANI
19   SAUL BURIAN
20   ALAN CARR
21   MATTHEW DIAZ
22   ROBERT RIECKER
23   RONALD GREENSPAN
24
25
```

Page 9

```
 1    APPEARING TELEPHONICALLY:

 2    ELIZABETH A. BEITLER

 3    MATTHEW BREST

 4    KRISTOFFER GREDSTED

 5    COLLEEN MAKER

 6    RYAN P. QUINN

 7    PRASHAN RAI

 8    PAUL L. RATELLE

 9    RICHARD M. SELTZER

10    ARTEM SKOROSTENSKY

11    MYCHI TO

12    RAFAIL ZAHRAIDDIN-ARAVENA

13    ARLENE R. ALVES

14    SAM N. ASHURSEY

15    JOSEPH BADTKE-BERKOW

16    DEREK J. BAKER

17    NEGISA BALLUKU

18    DUSTIN T. BRANCH

19    ALIX BROZMAN

20    JULIAN BULAON

21    JONATHAN D. CANFIELD

22    STEVEN H. CHURCH

23    BRYAN M. CIMALA

24    SARA COELHO

25    SONIA E. COLON
```

Page 10

1   ANNE D'INNOCENZIO

2   JASON DIBATTISTA

3   KELLIE ELL

4   WILLIAM P. FENNELL

5   ADAM FLETCHER

6   DEBORAH L. FLETCHER

7   CHRISTOPHER GARTMAN

8   KIMBERLY B. GIANIS

9   MICHAEL S. GREGER

10   THOMAS HALS

11   TAYLOR B. HARRISON

12   CATHERINE HEIZENRATER

13   ANA LUCIA HURTADO

14   CHRISTOPHER ISIDORE

15   KELLY E. KLEIST

16   MATTHEW KOCH

17   MATTHEW I. KRAMER

18   ZACHARY D. LANIER

19   ROBERT LAPOWSKY

20   BERNICE C. LEE

21   ZACHARY D. LEVINE

22   LAWRENCE A. LICHTMAN

23   MARK LIGHTNER

24   TERESA LII

25   STEPHEN MILLER

1   MICHAEL MITTELMAN

2   LAWRENCE PARK

3   RICHARD PEDONE

4   LILLIAN A. RIZZO

5   CHRISTOPHER SAFAYA

6   JOSEPH E. SARACHEK

7   MICHAEL L. SCHEIN

8   PAUL SCHWARTZBERG

9   MICHAEL J. SMALL

10  NATASHA SONGONUGA

11  FREDRIC SOSNICK

12  CHRIS STAUBLE

13  JOHN STOKKE

14  BRAD SWEENEY

15  MY CHI TO

16  EMILY TOMLINSON

17  AUSTIN H. VINY

18  DAVID WANDER

19  ADAM J. WEBB

20  ROBERT WEISBERG

21  ERICA S. WEISGERBER

22  JAMES WILTON

23  EVAN J. ZUCKER

24  LAUREN E. ZUMBACH

25

```
 1                    P R O C E E D I N G S

 2              CLERK:  All rise.

 3              THE COURT:  Please be seated.  Okay, good morning.

 4   In re:  Sears Holdings Corporation.  When we left off on

 5   Monday, we were in the middle of continuing cross-

 6   examination of Mr. Transier.  Mr. Transier, you're still

 7   under oath, do you understand that?

 8              MR. TRANSIER: Yes, sir.

 9              THE COURT:  Okay.  Very well.  Thank you.  Okay,

10   you can continue.

11              MR. GOLDSTEIN:  Good morning, Your Honor.  Michael

12   Goldstein, Goodwin Procter.  Mr. Transier, good morning.

13   Your Honor, Mr. Transier, I have no further questions at

14   this time.

15              THE COURT:  Okay, very well.  Any redirect?

16              MR. GENENDER:  Thank you, Your Honor.  Paul

17   Genender from Weil Gotshal for the Debtors.

18              REDIRECT EXAMINATION OF WILLIAM TRANSIER

19   BY MR. GENENDER:

20   Q    Good morning, Mr. Transier.

21   A    Good morning.

22   Q    On Monday, during cross-examination you were asked

23   questions about your October 15th emails to and from Mr.

24   Lampert, do you recall that?

25   A    Yes.
```

1   Q     Did the sentiments you shared with Mr. Lampert in any

2   way suggest you were influenced by him or ESL?

3   A     No.

4   Q     Were you influenced by ESL and Mr. Lampert in doing

5   your work on the Restructuring Committee?

6   A     No.

7   Q     Or on the Restructuring Subcommittee?

8   A     No.

9   Q     Did your vote to reject -- did you vote to reject ESL's

10  bid to the company on more than one occasion?

11  A     Several times, yes.

12  Q     Did you, in fact, vote at one point to direct the

13  company's attorneys to advise this Court that the company

14  was pivoting to liquidation?

15  A     Yes.

16  Q     Do you recall if you were asked about ESL's plan to

17  close three stores a month this year?

18  A     Yes.

19  Q     How would that compare to the stores -- to store

20  closures if this transaction is not approved?

21  A     I think if it went into a liquidation, you'd close the

22  remaining 425 stores fairly quickly.

23          MR. GENENDER:  I have no further questions.

24          THE COURT:  Okay.  Anything on that on cross?  Re-

25  cross?

1          WOMAN 1:  No, Your Honor, thank you.

2          THE COURT:  Okay.  You can step down, Mr.

3    Transier.

4          MR. TRANSIER:  Thanks.

5          MR. LENDER:  Your Honor, good morning.  David

6    Lender from Weil Gotshal for the Debtors.  For our next

7    witness we call Mohsin Meghji, the chief restructuring

8    officer and managing partner of M3 Advisory Partners.

9    That's Tab 41, Docket Number 2336.  And we move at this time

10   his declaration into evidence.

11         THE COURT:  Okay, I have it.  Let me just swear in

12   the witness.  Would you raise your right hand, please?  Do

13   you swear or affirm to tell the truth, the whole truth, and

14   nothing but the truth, so help you God?

15         MR. MEGHJI:  I do.

16         THE COURT:  Okay.  And it's M-E-G-H-J-I?

17         MR. MEGHJI:  Correct.

18         THE COURT:  And the first name, M-O-H-S-I-N?

19         MR. MEGHJI:  Yes.

20         THE COURT:  Okay.  Mr. Meghji, I have your

21   declaration that was earlier submitted in this case dated

22   February 1, 2019.  Sitting where you are today on the 6th of

23   February, would this declaration still constitute your

24   direct testimony in this case?

25         MR. MEGHJI:  It does.

1         THE COURT:  Okay, very good.  So I'll admit the

2    declaration as Mr. Meghji's direct testimony.

3         MR. SERKIN:  Your Honor, Joseph Serkin from Akin

4    Gump on behalf of the Creditors Committee.  Before the Court

5    formally admits the declaration, the Creditors Committee

6    would like to lodge an objection under Rule 602.

7         There are two significant areas of Mr. Meghji's

8    declaration, which are based solely on hearsay.  He has no

9    personal knowledge in both in connection with the business

10   plan, Paragraphs 8 through 10, and in connection with the

11   work that JLL did in the appraisal process in the real

12   estate sale process, as well as the work that others at M3

13   did in the real estate sale process.  Mr. Meghji has no

14   firsthand knowledge of what was actually done.

15        THE COURT:  This is -- I'm sorry, Paragraph 6

16   through 10, you said?

17        MR. SERKIN:  It's Paragraph 8 through 10, Your

18   Honor.  And, specifically, the first three sentences of

19   Paragraph 8 we do not object to.  But beginning with "As the

20   company's chief digital officer..." the rest of that

21   paragraph, Paragraph 9, and then the first sentence of

22   Paragraph 10 confirm that the work done in connection with

23   the business plan was done by others and is not based on Mr.

24   Meghji's firsthand knowledge or any personal knowledge.

25        MR. LENDER:  All right, Your Honor, I think it

1   will become clear during cross-examination that Mr. Meghji

2   was involved as the chief restructuring officer in helping

3   to oversee and put together the going forward business plan.

4   So, and to be honest, the same thing with the real estate

5   process -- it was all done under his supervision and

6   involvement as chief restructuring officer.  I think it'll

7   become clear in the cross-examination what Mr. Meghji's role

8   was, if Your Honor wants to take all that into

9   consideration.  But the idea that he had no personal

10  knowledge of this stuff I think will become -- it'll become

11  clear that that's just not correct.

12          THE COURT:  Well, he's just describing the work he

13  did with these people.  I don't think -- I mean, what is it

14  that you're saying that is being introduced for the truth of

15  the matter here as to anything?

16          MR. SERKIN:  And, Your Honor, in connection with

17  Paragraphs 8 through 10, what Mr. Meghji is trying to

18  introduce and what the Debtors are trying to rely on the

19  truth for are the changes that were implemented over the

20  course of 2018 in connection with online sales, retail

21  sales, the ShopYourWay Program that is being introduced to

22  explain why the business plan going forward is viable.

23  Because they intend to rely on some of those same changes --

24  yet, they have not put forth a witness who can explain what

25  those changes were.

1        And Mr. Meghji's declaration on its face makes

2    clear that his only understanding is the first sentence in

3    Paragraph 10.  I spent a good deal of time with Ms. Munjal,

4    Mr. Ladley, and others discussing the changes the two had

5    implemented.  They are offering the changes for the truth to

6    support why the business plan is viable.  We have not had an

7    opportunity to cross-examine the individuals who implemented

8    it.  We had no understanding of what those changes were.

9        THE COURT:  This is the type of (indiscernible)

10   would take.  It may be right, it may be wrong but he's not

11   saying that these -- he's not...  I just...  I don't...

12   He's reviewing company results, which you have and he has.

13   I'm not taking that as anything more than what a CRO would

14   be provided with.

15        MR. SERKIN:  Your Honor, if all we are talking

16   about are --

17        THE COURT:  Well, let's go through it, all right?

18   This is ten minutes.  All right, you said the two sentences

19   of 8.  Let's go through those, all right?  And let's see if

20   this is really a valid hearsay objection.

21        "As the company's chief digital..." Well, I'm

22   sorry.  "I observed that in August and September 2018, the

23   company's same source sales numbers were healthier than they

24   had been in the preceding months, and I sought to understand

25   why." All right, you're not objecting to that?  All right.

1          MR. SERKIN:  No, Your Honor.

2          THE COURT:  All right.  Well, let's see if any of

3    the other information that you are objecting to is any

4    different than that.  "Her efforts had been centered on

5    driving sales and marketing, among other things." That's a

6    problem?  That's somehow hearsay?  Their CRO wouldn't be

7    able to say that about his chief digital officer, what he

8    charged her to do?

9          MR. SERKIN:  "Her efforts had been centered on

10   driving sales and marketing, among other things." Your

11   Honor, to the extent they are relying on what those changes

12   were for the truth --

13         THE COURT:  He's not.  He's just saying that's

14   what she was doing.  So that part of the objection is

15   withdrawn.  Do you want to spend the next 20 minutes doing

16   this?  Why don't you look it over carefully and really tell

17   me what it is instead of wasting our time?  All right?

18         So I will not admit this declaration until later,

19   but I want you and your colleagues to take a break and

20   really think about what you're talking about here.  I do not

21   view this as a verification of the ESL business plan.  Or,

22   in fact, the company's numbers.  You have had experts who

23   were paid hundreds of thousands of dollars a month to vet

24   the numbers, and you have done that.  I don't view this as

25   anything other than presenting the numbers for anyone to

Page 19

1    vet.

2              MR. SERKIN:  Your Honor, if the Debtors are not

3    offering it for the truth, then we withdraw --

4              THE COURT:  Truth of what?  Truth that this is her

5    job?  That's why I say you're wasting our time.  We can go

6    through this and your time for cross-examination will be

7    deducted for all the time we spent on this objection, unless

8    you can narrow it down to something that actually makes

9    sense under the hearsay rules.

10             "Ms. Munjal and Mr. Ladley implemented..." We're

11   doing it right now unless you want to change your mind.

12   "Ms. Munjal and Mr. Ladley implemented some changes

13   concerning how the ShopYourWay Program operated and took a

14   new approach to this offline business for apparel."

15             MR. SERKIN:  That is exactly the point we're

16   talking about, Your Honor.

17             THE COURT:  You think the CRO cannot testify as to

18   that?  That the people working under him did this work?

19             MR. SERKIN:  I had no opportunity to understand

20   what those changes were to cross-examine him.

21             THE COURT:  All right, the objection is overruled

22   on that sentence.  Let's keep going.  "The two began to

23   apply a combination of points offerings along with pricing

24   adjustments and began pricing conducting experiments, so to

25   speak, to determine which of the initiatives would possibly

Page 20

1    impact performance."

2              MR. SERKIN:  That's the same objection, Your

3    Honor.  We have no --

4              THE COURT:  He's just describing what they were

5    tasked to do; not whether they succeeded in doing it.

6              MR. SERKIN:  And in the record we have no evidence

7    that they did succeed --

8              THE COURT:  Respond to my question.  Is he asking

9    for anything -- is this testimony being admitted for

10   anything other than that?

11             MR. SERKIN:  Your Honor, the Debtors would have to

12   speak to that.  My understanding is there are --

13             THE COURT:  Well, I think I can understand what

14   they're saying and I think you can, too.  So that objection

15   is overruled.  Eight comes in.  "Ms. Munjal and Mr. Ladley

16   initiated those strategies in January and February 2018."

17   You don't think a CRO would know that -- whether they did

18   the work or not?

19             MR. SERKIN:  Your Honor --

20             THE COURT:  We can ask that and see, all right?

21   At least he understood that that's what they did because

22   that's what they told him.  Whether it was done or not, this

23   is what the CRO did.  We know at least that amount.

24             MR. SERKIN:  Whether it was done or not is exactly

25   the question we're asking, Your Honor.

Page 21

```
1              THE COURT:  This is just -- I'm sorry, I'm sorry,

2     sir, I stand by what -- I am not going to let you waste our

3     time.  You take a look at this after we hear him and then

4     we'll see what you're really talking about here.

5              MR. SERKIN:  Okay, Your Honor, just briefly --

6              THE COURT:  First of all, we're talking about a

7     business plan for a buyer, all right?  So you need to

8     explain to me why that is relevant here and exactly where,

9     and we will narrow it down to its relevance.  I have rarely

10     seen a business plan for a buyer ever vetted, except when

11     you're talking about adequate assurance, which is not your

12     issue.

13              MR. SERKIN:  Your Honor, the business plan of the

14     buyer is based on the work that the seller did in conducting

15     their business plan, and the work they did in 2018.

16              THE COURT:  Why is it relevant to know the

17     business plan of the buyer except as far as adequate

18     assurance of future performance is concerned?  You need to

19     tell me that first before we spend any time on this.

20              MR. SERKIN:  Your Honor, whether or not the

21     Debtors, as they remain post-sale, will be paid and whether

22     the liabilities that are allegedly being assumed will get

23     paid are absolutely relevant and this witness --

24              THE COURT:  That is relevant.  But I'm not -- I

25     don't really quite see why this is the case.  So, again,
```

1    this is not the time to make this objection.  We will hear

2    his testimony, we'll see what it is that he knows about the

3    work that these people did.  But I don't view this as saying

4    that their conclusions are the truth.  Frankly, I don't

5    think anyone can say any conclusions about a business plan

6    are the truth.  It's a business plan.

7              MR. SERKIN:  Your Honor, but it's based on

8    performance, past performance, and that is exactly what is

9    critical here.  That is what we are trying to understand.

10             THE COURT:  We all have their past performance

11   numbers.

12             MR. SERKIN:  We have the numbers but what it was

13   that caused those numbers is what they are relying on go

14   forward, both for the company's business plan and for ESL's

15   business plan.  And whether or not these Debtors will get

16   paid in the --

17             THE COURT:  This doesn't say any of that.  This

18   isn't testimony as to that.

19             MR. SERKIN:  Your Honor, we can move on --

20             THE COURT:  Explain to me how it is.  Explain to

21   me sentence by -- all right, all right, your time is

22   deducted for the next half hour while you explain to me why

23   these three paragraphs really do what you're saying.

24             MR. SERKIN:  Your Honor, there is nowhere in the

25   record where there is any --

Page 23

1          THE COURT:  No, no, I'm saying sentence by

2     sentence, where they are actually trying to convince me of

3     the truth that these particular things affect in a material

4     way the accuracy of the business plan, which your client's

5     relying on, too.  Let's go.  Paragraph 9.

6          MR. SERKIN:  Your Honor, I believe we were on

7     Sentence 2.  "They expanded them to the brick and mortar

8     apparel business over the course of time." We don't have any

9     understanding about how those were implemented, when,

10    exactly what changes were made, and we still don't know what

11    the strategies are.

12         THE COURT:  But that's -- he's the CRO.  He talked

13    -- this is his job.  Do you think the CRO has to actually do

14    all the work like Jimmy Carter planning the tennis match?

15         MR. SERKIN:  I don't, Your Honor.  I would just --

16    in order for the record, that is not what we are saying.

17    What we are saying is there is no evidence in the record to

18    establish that the changes that were made in 2018 and

19    implemented were effective in actually changing the same

20    store sales growth and the performance of the company to the

21    extent they are attempting to rely on this --

22         THE COURT:  Where does it say that?

23         MR. SERKIN:  If they are not relying on this --

24         THE COURT:  Where does it say that in these three

25    paragraphs?

Page 24

1          MR. SERKIN:  Your Honor --

2          THE COURT:  That you think it says?  Where?

3          MR. SERKIN:  "From there..." If we move on to the

4    second to the last full sentence on Page 5, the carryover

5    paragraph.  "From there, Ms. Munjal and Mr. Ladley

6    implemented some changes around supply and logistics issues.

7    Finally, in July and August 2018, they layered in some

8    traditional television and other modes of advertising, and

9    the combination of these efforts really started to improve

10   the outlook for same store sales comps."

11          To the extent they are relying on this declaration

12   and this information as evidence of what the changes were

13   and that it had an impact and changed those, that is

14   hearsay.  There is no evidence in the record that those same

15   store sales comps changed as a result of the work that Mr.

16   Ladley and Ms. Munjal did.

17          THE COURT:  I think they can cross-examine -- you

18   can establish your foundation for that with Mr. Meghji,

19   including in Paragraph 10, where he says, "I spent a good

20   deal of time with Ms. Munjal and Mr. Ladley and others

21   discussing the changes the two had implemented."

22          I mean, what is the purpose of a CRO other than to

23   deal with the people that work under him?  I just -- you

24   know, I will take it for what he knows, all right?

25          MR. SERKIN:  Understood, Your Honor.  Under the

1    second category, and I will very briefly is the real estate

2    sales process that begins in Paragraph 23 -- Paragraph 23

3    through 49 describe the real estate sale process that JLL

4    performed and undertook, describes the appraisal process

5    that JLL undertook, and describes the work that Mr. Bill

6    Gallagher at M3 did.  During the course of his deposition,

7    Mr. Meghji made absolutely clear that he was not directly

8    involved.

9              For example, who prepared these appraisals?  And

10   I'm reading from Page 234.

11             THE COURT:  We have all those people's

12   declarations.  That's what I'm going to focus on.  This goes

13   to his knowledge of the process.

14             MR. SERKIN:  Your Honor, we don't have those

15   people's declarations.  Instead, what we have --

16             THE COURT:  We have a JLL expert.

17             MR. SERKIN:  We have an expert.  We don't have

18   anyone talking about the sale process.  For example,

19   Paragraph 30 --

20             THE COURT:  That's him.  He's talking about the

21   sale process.

22             MR. SERKIN:  Not based on personal knowledge he's

23   not, Your Honor.

24             THE COURT:  He's the CRO whose...

25             MR. SERKIN:  Your Honor --

1            THE COURT:  I'm sorry, JLL's declaration talks

2    about what they reviewed.  Right?

3            MR. SERKIN:  Understood, Your Honor.  Different

4    than the sales process.  Paragraph 30 talks in excruciating

5    detail about emails that were sent by Naveen Jaggi, JLL,

6    Craig Meyer, JLL, Jay Koster and Blake Lacher, the co-heads

7    of Capital Markets.

8            THE COURT:  Right.

9            MR. SERKIN:  All individuals.  And the process

10   that they are relying on for the validity of the process

11   which is what indications of interests were relied on to

12   determine the value of the real estate in the waterfall

13   analysis in the wind-down scenario, that is off -- that we

14   are alleging is off by hundreds of millions of dollars.

15           THE COURT:  We have your expert, we have their

16   expert, we can discuss that.  Did you ask to take those

17   people's deposition?

18           MR. SERKIN:  Your Honor --

19           THE COURT:  What he's saying here is what he

20   understands as the CRO.  Now I guess if you want to question

21   the truth of whether these people actually did this, you can

22   do it.  That's fine.  Unbelievable.  If, in fact, your

23   approach would work, you would win -- you would win because

24   we would not finish this process until April.

25           So I get what you're doing.  I get it.  I get it.

Page 27

1    And I've read your client's declaration, and I've read their

2    declarations, and we'll deal with them then about the real

3    estate.

4              MR. SERKIN:  Your Honor, we are simply trying to

5    make the record that we believe it's appropriate here and

6    raise the objections that we think are valid and

7    appropriate.

8              THE COURT:  All right, fine, go ahead.  Go ahead.

9    I am taking this as his knowledge as the CRO, going to

10   issues such as the good faith of the transaction.  I guess

11   if I assumed that all these people were lying to him and

12   were going to submit fee applications based on the work that

13   they did and the like, I can assume that.

14             MR. SERKIN:  Your Honor, if they are not offering

15   it for the truth we have no objection and withdraw it.

16             THE COURT:  Very well.  All right, that took a

17   good 20 minutes.  It was really productive, sir.  Now, go

18   ahead with your cross.

19             MR. SERKIN:  Your Honor, we have witness binders.

20   May I hand them out --

21             THE COURT:  Yes.  The cross will last until when,

22   do you think?

23             MR. SERKIN:  Your Honor, I suspect that it will be

24   35 minutes.

25             THE COURT:  35 minutes?  Go ahead.

1          MR. SERKIN:  Thank you, Your Honor.

2          CROSS-EXAMINATION OF MOHSIN MEGHJI

3    BY MR. SERKIN:

4    Q    Good morning, Mr. Meghji.

5    A    Good morning.

6    Q    Your firm M3 Advisory Partners was first engaged by

7    Sears in roughly April or May of 2016, correct?

8    A    Correct.

9    Q    And that was to assist Sears with respect to liquidity

10   and treasury planning among other things, correct?

11   A    Yes.

12   Q    M3 first became involved in preparing the company's

13   bankruptcy filings in early October of 2018, correct?

14   A    Correct.

15   Q    And M3 was not engaged with Sears in an effort to

16   prepare for selling assets in connection with the bankruptcy

17   filing prior to early 2018, correct?

18   A    That's correct.

19   Q    Early October 2018, excuse me.  Now, can we start with

20   your wind-down analysis?  M3 performed a wind-down and

21   liquidation analysis that assessed the potential value of

22   the Debtor's assets in any amounts the Debtor's creditors

23   would recover on their claim in the context of an orderly

24   wind-down liquidation.  That was from your declaration,

25   correct?  That's the work you performed?

1    A    Amongst other things.

2    Q    Understood.  And if you can look at Tab 4 in the binder

3    in front of you, I believe that has been marked as Joint

4    Exhibit 11.  Is that the wind-down analysis that M3

5    performed and that was presented to the Restructuring

6    Committee to help them assess the value associated with the

7    ESL bid?

8    A    That's a summary of the wind-down analysis and the

9    results we did.

10   Q    Now, the wind-down analysis is based on a 12-month

11   orderly wind-down in liquidation beginning in January of

12   2019, correct?

13   A    Yes.

14   Q    And it was January 14th, specifically, the date of the

15   auction, right?

16   A    Of course.

17   Q    And the analysis is based on a number of assumptions,

18   correct?

19   A    Yes.

20   Q    One of those is that the Debtors would sell previously

21   unencumbered assets, correct?

22   A    Yes.

23   Q    And one of the most valuable sort of group of assets

24   that was previously unencumbered was the company's real

25   estate, correct?

Page 30

1    A    Yes.

2    Q    And M3 advised the Restructuring Committee concerning

3    the liquidation proceeds the Debtor's estates could expect

4    to receive from the sale of the Debtor's unencumbered real

5    estate assets, correct?

6    A    Yes.

7    Q    Now, in connection with the value of the unencumbered

8    real estate, your testimony covers three main subjects.  One

9    is the real estate sales process, correct?

10   A    Correct.

11   Q    The second is appraisals, correct?

12   A    Yes.

13   Q    And the last is M3's calculation of likely liquidation

14   proceeds, correct?

15   A    Of course.

16   Q    Okay.  Now, let's turn to your testimony about the real

17   estate sales process.  In connection with that process, the

18   Debtors engaged Jones Lang LaSalle, or JLL, as their

19   advisor, correct?

20   A    Yes.

21   Q    And that was done in late November-early October of

22   2018?

23   A    Late November-early December.

24   Q    Thank you for clarifying that.  I apologize.  You were

25   not the individual at the company who was responsible for

Page 31

1    providing direction to JLL, correct?

2    A    I'm the chief restructuring officer of the company.

3    The people who interacted directly with the JLL were really

4    two individuals:  Jane Bordon, who was the president of the

5    real estate group, and Bill Gallagher, who was one of my

6    partners.  Both of them reported up to me.

7    Q    Okay.  But you weren't the one directly interacting

8    with JLL, correct?

9    A    Not on a day to day basis.

10   Q    Okay.  Around the time that the Debtors decided to

11   market not only their go-forward stores but the entirety of

12   the real estate assets... Strike that.  Around the time

13   that the Debtors decided to market their go-forward stores,

14   they also decided to market the real estate assets, correct?

15   A    Correct.  Under the global vetting procedures.

16   Q    And there were approximately 1,168 real estate assets,

17   is that correct?

18   A    It sounds right

19   Q    The deadline for any party wishing to submit a

20   nonbinding indication of interest was December 28, 2018,

21   correct?

22   A    Correct.

23   Q    And that was about 25 days after the distribution of

24   the JLL process letter, correct?

25   A    Yes.

Page 32

1   Q    Now, ultimately, as a result of the real estate process

2   that was run by JLL, prospective bidders submitted a total

3   of around 440 nonbinding indications of interest, correct?

4   A    Correct.

5   Q    And notwithstanding that, it's correct that when

6   potential bidders asked about attending the auction, they

7   were told not to show up unless contacted the weekend

8   before, isn't that correct?

9   A    It sounds right.

10  Q    Now, I want to turn to the exercise M3 performed to

11  estimate the proceeds Debtors could realize in a sale of

12  their unencumbered real estate assets.  So, in your direct

13  testimony, your declaration, you state that M3 estimated the

14  Debtors would recover $561 million net of transaction costs

15  from the liquidation of the Debtor's unencumbered real

16  estate assets in connection with the wind-down or

17  liquidation, correct?

18  A    Correct.

19  Q    And that was what you -- the estimate you provided to

20  the Restructuring Committee, correct?

21  A    That's what we included in the wind-down analysis.

22  Q    And if you look at, again, Joint Exhibit 11, Tab 4,

23  Slide 5, you'll see that under the second highlighted

24  bullet, Unencumbered Real Estate Values, the recoveries

25  assumed were $561 million of transaction costs, correct?

Page 33

1    A    Yes.

2    Q    That amount did not include three or four properties

3    for which you belatedly received appraisals, isn't that

4    correct?

5    A    Correct.

6    Q    And if you were to take into account those appraisals,

7    it would increase the overall amount of approximately $38

8    million net of transaction fees, correct?

9    A    Yeah, I think about $36-37 million.  That sounds about

10   right.

11   Q    And raising the amount to just a little under $600

12   million?

13   A    Yes.

14   Q    Now, the analysis that M3 performed -- and, again, just

15   to clarify, JLL and others -- I think it was ANG, performed

16   appraisals on certain parcels of real estate, correct?

17   A    Yes.

18   Q    M3 then took that information and did another analysis

19   to determine the amount that would be included in the wind-

20   down, correct?

21   A    Correct.

22   Q    And that was something that was done by one of your

23   colleagues, primarily Bill Gallagher, right?

24   A    Yes.

25   Q    Now, that estimate was not an appraisal methodology,

Page 34

1    correct?  The work that M3 did?

2    A    No, we did not do an appraisal.

3    Q    And it was not a valuation exercise, right?

4    A    No.

5    Q    Instead, it was a process of applying judgment to

6    various data points and coming up with an estimated value on

7    the portfolio of unencumbered assets, correct?

8    A    Yes.

9    Q    And you didn't determine that methodology, correct?

10   A    No, but I discussed it with Mr. Gallagher and others as

11   the process was going.

12   Q    Okay.  And Mr. Gallagher was the one primarily who

13   determined that methodology?

14   A    Along with others at the company in discussions with

15   people at the company.

16   Q    And you'd never seen that methodology applied before,

17   correct?

18   A    We estimated the proceeds for that.  I don't know that

19   there was a specific methodology that was sort of done

20   that's repeated.  There was an exercise of judgment using

21   various data points.

22   Q    Do you recall, Mr. Meghji, last week that I took your

23   deposition, correct?

24   A    Yes.

25   Q    And the testimony you provided, the answers you gave in

Page 35

1   that deposition were true and accurate to the best of your

2   ability, correct?

3   A    Correct.

4   Q    Okay.  On Page 260 of that deposition, talking about

5   the methodology that was employed by M3, I asked you "Who

6   determined that methodology?" And you answered, "I believe

7   that was done by Mr. Gallagher." Did I ask that question and

8   did you give that answer?

9   A    Yes.

10   Q    And then I asked "Have you ever seen this methodology

11   applied before?" And your answer was "I have not, no, but

12   I've not seen kind of appraisals for estimated values done

13   at this scale either." Did I ask that question and did you

14   give that answer?

15   A    Yes.

16   Q    And you don't know whether Mr. Gallagher has ever

17   performed this methodology before, correct?

18   A    I know Mr. Gallagher was CEO of a real estate finance

19   company which I worked with him on, which was a liquidation,

20   a lot of real estate, commercial real estate both properties

21   and loans.  So I know he had experience in selling real

22   estate and loans back for real estate.

23   Q    Okay.  And I think my question was a little different.

24   So, if we go back to Page 260 of your deposition, Line 20,

25   did I ask this question and did you give this answer?  "Do

Page 36

1    you know if Mr. Gallagher has ever applied this methodology

2    before?" Answer:  "I don't." Did I ask that question and did

3    you give you that answer?

4            MR. LENDER:  Your Honor, this is allegedly

5    impeachment to a response that he used as judgment and

6    wasn't using (indiscernible) proceeds.  And he just ignores

7    the very next question where Mr. Meghji said exactly that.

8    This was the question that he asked and the answer that Mr.

9    Meghji gave him.  Headline 260, Line 24 to 261 on 12.

10            Question:  "You don't know one way or the other.

11    So you don't know whether this methodology is based on any

12    commonly accepted treatises in the real estate valuation

13    industry?" Answer:  "No, I don't know whether it's -- you k

14    now, this was not an appraisal methodology.  This was a

15    process of kind of applying some judgment to data points in

16    coming up with an estimated value on a portfolio in terms of

17    what the unencumbered properties would realize." That's what

18    he said.  This is not impeachment...

19            THE COURT:  Do you want to cut him off?

20            MR. SERKIN:  Your Honor, I did.  I didn't want to

21    be rude to Mr. Lender, but I have a limited amount of time,

22    I'm going to do my best to get in the --

23            THE COURT:  I mean, I think the objection was

24    asked and answered.  He said it's a judgment.

25            MR. SERKIN:  Understood.

1          THE COURT:  Okay.

2          MR. SERKIN:  Mr. Lender has an opportunity to

3     redirect.

4          THE COURT:  Okay.

5          MR. SERKIN:  If he wants to probe further.

6          THE COURT:  Okay.

7     Q    Mr. Meghji, can we now look at what M3 actually did to

8     arrive at this $561 million number?  So, if you can look at

9     Tab 11, which is marked Joint Exhibit 60.  You'll see that

10    Joint Exhibit 60, the first page is a series of emails

11    between some of your colleagues, Mr. Gallagher, and others.

12    What I want to look at is the attachment, which shows on,

13    just after the emails, a summary of the total value.  And

14    then a series of Excel Spreadsheets.  Do you see that?

15    A    Yes.

16    Q    Okay.  Now, what I want to look to is the first Excel

17    Spreadsheet.  I recognize that this is not easy to read, but

18    if you go down the fifth line, I want to look at Torrance.

19    And, again, why don't we step back for just a minute?  So,

20    if you look at the page before, there's a summary table.  Do

21    you see that?  Now I just want to go back to the slide

22    before.  The top says Transaction Fee Assumed 6 Percent, and

23    then it has a summary.  Do you see that, Mr. Meghji?

24    A    Yes.

25    Q    Okay.  And the estimated gross proceeds from the sale

1    of the real estate are $634.5 million.  Do you see that?

2    A    Yes.

3    Q    Okay.  And then the net proceeds are 596 million,

4    correct?  Now, the column headings going below the next page

5    to the table, if you look at the right you'll see an

6    Estimated Proceeds sort of just past midway column, 50

7    percent.  The 50 percent is the deduction that was taken to

8    get to the estimated proceeds, correct?  For the leased

9    properties shown on the first six pages -- or excuse me,

10   five pages of the exhibit?

11   A    Yes.

12   Q    Okay.  And the next column over, Current High

13   Indicative Offer, that is the indication of interest, if

14   any, that was received for a particular property, correct?

15   A    I believe so.

16   Q    The JLL value next was the JLL appraisal value for

17   appraisals done in the October 2018 timeframe, correct?

18   A    Correct.

19   Q    And the JLL liquidation value were appraisals done in

20   the January 2019 timeframe, correct?

21   A    Correct.

22   Q    And then the ANG value were appraisals done in, again,

23   the October 2018 timeframe, correct?

24   A    Yes.

25   Q    Now, with respect to the nonbinding indications, you

1   weighted those nonbinding indications of interest equally

2   with the formal market appraisals received from JLL or ANG

3   in performing M3's estimate, correct?

4   A    We did.

5   Q    And in some instances, the indication of interest was

6   the sole basis of your view of realizable proceeds, correct?

7   A    Yes.

8   Q    In addition, M3 also applied a liquidation discount,

9   and that's the 50 percent for these lease properties we

10  talked about, correct?

11  A    Yes.  Only as against the market value appraisals or

12  the high indications.

13  Q    Okay.  And just to be clear, in addition to the 50

14  percent against the market value appraisals, you took that

15  50 percent discount against the indications of interest as

16  well, correct?

17  A    Yes.

18  Q    Okay.  And so let's actually look at one of those

19  examples.  In Row 28, do you see Miami?

20  A    Yes.

21  Q    And if you go over, you'll see that there is no

22  appraisal from Miami, from JLL, JLL Liquidation, or ANG,

23  correct?

24  A    Correct.

25  Q    And, instead, there's a $9 million indication of

Page 40

1   interest, correct?

2   A    Correct.

3   Q    And in that situation you applied the 50 percent

4   liquidation discount to the indication of interest to get to

5   $4-1/2 million, correct?

6   A    Yes.

7   Q    Now, let's go back up to Torrance, where I started a

8   little earlier.  That's Line 5.  If you go across you'll see

9   that Torrance had a $500,000 indication of interest, a

10  little over $46 million JLL value, and a little over $25

11  million ANG value, correct?

12  A    Yes.

13  Q    And in doing these calculations, M3 took the average of

14  those three to get to a little over $24 million, correct?

15  A    I'm sorry, can you repeat that question?

16  Q    Sure.  To do the process, M3 took $500,000 high

17  indication of interest, $46 million-plus JLL value, $25

18  million ANG value, added them up and divided by 3, correct?

19  A    Yes.

20  Q    And in doing that, came up with a number of a little

21  over $24 million, correct?

22  A    Correct.

23  Q    And then took the 50 percent discount to get to $12

24  million, correct?

25  A    Yes.

Page 41

1    Q    Now, if you can turn to Slide 7 of your wind-down

2    analysis, which was Tab 4, Joint Exhibit 11, and go to Slide

3    7, please.  In this wind-down analysis -- again, this is

4    dated January 2014, the day of the auction, correct?  The

5    first day of the auction, correct?

6    A    Are you looking at Page 7, which is the recovery -- you

7    know, the creditor recovery matrix?

8    Q    I'm looking at the first cover page of the slide,

9    January 14.

10   A    Yes.

11   Q    And January 14th was the first day of the auction,

12   correct?

13   A    Yes.

14   Q    And the information in terms of wind-down, this was the

15   most up to date information presented to the Restructuring

16   Committee, correct?

17   A    Correct.

18   Q    In the wind-down analysis, administrative and other

19   priority claims would have 100 percent recovery, correct?

20   A    Yes.

21   Q    And if you look at the Determination of Unsecured and

22   Deficiency Claims, there's a footnote, Footnote 6.  Do you

23   see that?

24   A    So you're looking --

25   Q    I'm on Slide 7.  And you'll see that in determining the

1   total amount of unsecured and deficiency claims, there's an

2   assumption of $1 billion of protection agreement liability,

3   do you see that?

4   A    Yes.

5   Q    And do you agree that the estimate of the amount on the

6   books and records at Sears of the cost to service that

7   liability is approximately $430-450 million, correct?

8   A    The present value of that, yes.

9   Q    And you'll also see that there's an assumption with

10  respect to deficiency claims of approximately $1.8 billion,

11  correct?

12  A    Yes.

13  Q    How much of that $1.8 billion in deficiency claims

14  would belong to ESL in a wind-down scenario?

15  A    I don't know the exact amount but it would be a

16  significant portion of that, I would think.

17  Q    Mr. Meghji, one other question going back to -- you can

18  actually put the wind-down analysis to the side for a

19  minute.

20  A    Thank you.

21  Q    Going back to the real estate valuation, we talked a

22  little bit about the methodology that M3 employed.  And feel

23  free to go back and look at Joint Exhibit 60, but I think

24  when I began, there were approximately a little over 1,100

25  in the total portfolio.  The number of properties that are

Page 43

1    included in the valuation is hundreds less than that.  And

2    it's true that there were several hundred unencumbered real

3    estate assets that you assigned no value, correct?

4    A    Yes.

5    Q    Mr. Meghji, I want to move to the comparison of the

6    wind-down scenario to the ESL bid.  So, in assessing the ESL

7    bid, the company prepared an analysis comparing creditor

8    recoveries under the ESL bid to those in the wind-down that

9    we just looked at, correct?

10   A    That's correct.

11   Q    And you have called that -- and that's been called a

12   variance analysis, is that correct?

13   A    Yes.

14   Q    That variance analysis is reflected in Joint Exhibit

15   12, which is Tab 5 in your binder.  So if you could just

16   take a look at Joint Exhibit 12, please.  And if you look at

17   Slide 7, I think is the Summary Comparison...

18   A    I'm sorry, are you looking at Tab 12?

19   Q    I'm looking at Tab 5, which has been marked Joint

20   Exhibit 12.  Apologies.  Ideally, we would've had the

21   exhibit numbers and the tabs the same but we were working up

22   to the last minute to get exhibit numbers.

23          If you look at Slide 7, there's the comparison of

24   the ESL going concern bids in the wind-down.  Do you see

25   that?

Page 44

1   A    Yes.

2   Q    And you'll see that under the ESL bid, administrative

3   and other -- or, excuse me, administrative and Other

4   priority claims have an 80 percent recovery, whereas -- in

5   the ESL bid, whereas in the wind-down there's 100 percent

6   recovery, do you see that?

7   A    Yes.

8   Q    And if you look down at the recoveries below the

9   Adequate Protection line in the ESL bid scenario -- do you

10  see where I am?

11  A    Adequate Protection 507B line?

12  Q    Correct.  And I'm looking at the ESL bid scenario.  Do

13  you see that?

14  A    Yes.

15  Q    And the adequate protection, that -- whether or not you

16  included information was based solely on advice of counsel,

17  correct?

18  A    Yes.

19  Q    Okay.  So, below that, the second lien line of credit

20  loans, the ESL second lien term loan, the second lien term

21  loans, the Dove loans, and the GLIP loan, there are certain

22  amounts, percentages of recovery, do you see that?

23  A    Yes.

24  Q    And how much -- what percentage of those recoveries

25  would be received by ESL?

Page 45

1   A    Again, I don't know the percentage of their holdings

2   but I think a substantial proportion of those were owned by

3   ESL.

4   Q    Okay.  And you understand that ESL is the largest

5   holder of the claims that do better in an ESL bid scenario,

6   correct?

7   A    Yes.

8   Q    And you agree that the benefit of a going concern

9   transaction largely approves to ESL because of ESL's claims,

10  correct?

11  A    It's mathematically correct.

12  Q    And, in fact, that was what you told the Restructuring

13  Committee, what you told the board, correct?

14  A    Yes.

15  Q    Mr. Meghji, can you look at Tab 13 in your binder?

16  This is Joint Exhibit 115.  These are minutes from January

17  6, 2019.  Can you look at the second to last paragraph from

18  the bottom that starts "Mr. Meghji stated...?" Do you see

19  that?

20  Can you read that paragraph out loud, please?

21  A    The second to last paragraph?

22  Q    Yes, Mr. Meghji.

23  A    "Mr. Meghji stated that the variance analysis showed

24  that the benefit of the going concern transaction largely

25  accrued to ESL and, therefore, it was appropriate for ESL to

Page 46

1   take the risk of the estate's administrative insolvency by

2   backstopping payment of the administrative claims. Mr.

3   Schrock agreed with Mr. Meghji's assessment."

4   Q    Okay, you can set that aside, Mr. Meghji.  I want to

5   move now to the business plan.  And I want to talk about the

6   company's business plan as opposed to ESL.  We talked at the

7   beginning of this hearing a little bit about the information

8   that's in your declaration.  I want to move past that for

9   just a minute.  If you can look at Tab 1 of your binder.

10  Mr. Meghji, is Tab 1 the company's business plan that you

11  referred to in your declaration?

12  A    Yes.

13  Q    If you look at Slide 7, in the Assumptions, the third

14  bullet down, there's a statement that "Management

15  operational initiatives drive improving same store sales

16  comps of..." and there are three same store sales comps

17  predictions for 2019, 2020, and 2021.  Do you see that?

18  A    Yes.

19  Q    And for 2019 it is negative 2.4 percent, correct?

20  A    Yes.

21  Q    Now, at the time of your deposition, the current same

22  store sales growth assumed in the DIP forecast was negative

23  15 percent, correct?

24  A    Yes.

25  Q    And your understanding that the assumption of negative

Page 47

1    2.4 percent same store sales growth for 2019 is based on

2    continuing improvements achieved in 2018, correct?

3    A    Can you repeat the question?

4    Q    Sure.  Your understanding of that -- what went into

5    that assumption of negative 2.4 percent same store sales

6    growth is based on improvements that were begun in 2018 and

7    achieved in 2018, and that will continue forward in 2019,

8    correct?

9    A    They were based on the process the management team went

10   through from January-February 2018 through August-September

11   2018, and I believed -- and I do believe that that process

12   can be replicated by NewCo after bankruptcy.

13   Q    Now, those improvements are based on initiatives that

14   we saw implemented by Mr. Ladley and Ms. Munjal, correct?

15   A    Yes.

16   Q    And, specifically, ShopYourWay initiatives really drove

17   those improvements, correct?

18   A    No.

19   Q    Well, if I wanted to talk to someone about how they

20   were going to replicate the improvements over the course of

21   2018 by using ShopYourWay in 2019, I would have to talk to

22   Mr. Ladley or Ms. Munjal, correct?

23   A    Well, I spoke to them and they had explained how they

24   had done it.  We had had many discussions around this topic.

25   As I indicated to you in my deposition, it was a combination

Page 48

1    of how ShopYourWay was implemented, pricing changes, various

2    other things around minimum shipping orders, etc.

3    Q    Understood, Mr. Meghji.

4    A    It was a combination of all of those things that led --

5    Q    And I know what you heard.  And we've heard in your

6    declaration what you've heard.  What I want to know is if I

7    wanted to talk to someone about how they were going to

8    replicate the improvement and performance over the course of

9    2018 by using ShopYourWay in 2019, and on a faster timeline,

10    I would need to talk to Ms. Munjal and Mr. Ladley, right?

11    A    Correct.

12    Q    Okay, now, let's look for a minute at the ESL business

13    plan.  It is included in Tab 2, it's Joint Exhibit 9.  Mr.

14    Meghji, you considered the ESL business plan to better

15    understand NewCo's liquidity picture and viability as a

16    going concern, correct?

17    A    Yes.

18    Q    And understanding ESL's liquidity picture is important

19    to make sure that the liabilities that ESL is assuming are

20    capable of being discharged, correct?

21    A    Yes.

22    Q    You also requested ESL's liquidity analysis, correct?

23    A    Sorry.  Say that again, please?

24    Q    Sure.  You requested ESL's liquidity analysis, right?

25    We were looking at the business plan in Joint Exhibit 9.

Page 49

1    I'm asking about the liquidity analysis.

2    A    Yes, they did.

3    Q    And you requested that after the auction, correct?

4    A    Yes.

5    Q    You understand that in ESL's business plan, ESL

6    projects a negative 1 percent same store sales growth in

7    2019 as opposed to the negative 2.4 percent that the company

8    projected, correct?

9    A    I do.

10    Q    And you have done no specific analysis to determine

11    whether or not you believe ESL can achieve negative 1

12    percent same store sales growth as opposed to the negative

13    2.4 percent projected for the company, correct -- or by the

14    company, correct?

15    A    I have not.

16    Q    And you simply presumed that ESL had some other

17    thoughts and ideas around what they could do to get that

18    down, correct?

19    A    Yes.

20    Q    And you did not provide any advice to the Restructuring

21    Committee or any individual member of the Restructuring

22    Committee at any point that the ESL business plan was

23    viable, correct?

24    A    No, I have not discussed that.

25    Q    I want to ask you very quickly about allocation.  Mr.

1    Meghji, you've not seen any allocation of the purchase price

2    ESL is paying in connection with this transaction that

3    allocates value to the specific assets being purchased,

4    correct?

5    A    I have not.

6    Q    Mr. Meghji, let's move now to Administrative Solvency.

7    Since the beginning of this case, it was very important for

8    the company that the estates remained administratively

9    solvent, correct?

10   A    Yes.

11   Q    And in your declaration you talk about an

12   administrative solvency analysis that the company performed,

13   and if you look at Tab 6, which is Joint Exhibit 13, that is

14   the administrative solvency analysis you were talking about

15   in your declaration, correct?

16   A    Yes.

17   Q    Okay, I'm going to actually turn now to Tab 12, Joint

18   Exhibit 141, which contains the same analysis but it's just

19   a little easier to read.

20   A    Thank you.

21   Q    And just quickly, Tab 12, the cover email is an email

22   that was sent the evening of January 16th.  So this was

23   after the ESL bid had been agreed to by the Restructuring

24   Committee but before the auction was closed and the

25   agreement was finalized, correct?

1    A    Yes.

2    Q    And if you look at Slide 1 of the analysis you'll see

3    that there's a $62 million pro forma additional value

4    required in order to get the company to solvency, correct?

5    A    Correct.

6    Q    The left hand side, 503B9 claims. You'll see then there

7    was an estimated amount of $173 million for 503B9 claims,

8    correct?

9    A    Yes.

10   Q    And ESL's liability, your understanding, is capped at

11   $139 million, correct?

12   A    Correct.

13   Q    You understand no bar date has been set by 503B9

14   claims?

15   A    Yes.

16   Q    And you can't tell the Court today what's been done to

17   reconcile the claims made in this bankruptcy proceeding on

18   the docket and the claims or potential claims on the

19   company's books and records, correct?  To get to that $173

20   million number?

21   A    I'm going to have to ask you to repeat the question.

22   Q    Sure.  You can't tell the Court what has been done with

23   respect to any reconciliation as between the claims, the

24   503B9 claims that have been filed and the potential claims

25   that are contained on the company's books and records,

Page 52

1   correct?

2   A    I can't.  They have not been reconciled, to my

3   knowledge.

4   Q    And you don't know what the amount of inventory

5   purchased across all of the Debtor entities during the 20

6   days pre-filing this, do you?

7   A    Not off the top of my head.

8   Q    Okay, you don't know whether it's 200 million, 300

9   million, or 400 million, correct?

10  A    I just said I didn't know.

11  Q    And you understand that the 503B9 claims have increased

12  by $10 million in your second to most recent analysis that

13  was provided on February 3rd, correct?

14  A    Yes.

15  Q    You also have no understanding of the mechanics of how

16  the $139 million in 503B9 claims that ESL is purporting to

17  assume will be paid post-close, correct?

18  A    I think as we've discussed at my deposition, ESL

19  assumed that liability.  The specific mechanics of how the

20  claims are determined, and validated, and paid out, which

21  will be the context of the plan process, remain to be worked

22  out.

23  Q    Do you know whether ESL is actually assuming those

24  liabilities, meaning that the entity that has a claim

25  against the Debtor will now have a direct claim against ESL?

Page 53

```
1    A    That's my understanding, but I'm not a lawyer.  As a
2    businessperson, my understanding is they will assume that
3    liability and pay it.
4    Q    Okay.  And as a businessperson, that was your
5    understanding.  So if the APA says something different,
6    that's not -- that has nothing to do with what your business
7    understanding is, correct?
8    A    I'm looking at who's going to be economically
9    responsible for the liability.
10   Q    Okay.  Thank you, Mr. Meghji.  And as far as making
11   sure that the right people are paid the right amounts at the
12   right time in terms of the mechanics, that's a discussion
13   you expect to have with ESL at some point, correct?
14   A    Yes.  So the estate will be involved in determining
15   that as well.
16   Q    Mr. Meghji, I want to turn now to a topic of discussion
17   from Monday's hearing, the accounts payable.  That's the
18   second category on Slide 1.  The accounts payable show $196
19   million of estimated accounts payable.  Do you see that?
20   A    Yes.
21   Q    And ESL has agreed to assume up to $166 million of that
22   liability, correct?
23   A    Correct.
24   Q    The $196 million made up of merchandise and non-
25   merchandise payables that are estimated to be on the books,
```

Page 54

1    correct?

2    A    Yes.

3    Q    And those are payables received after filing that have

4    not been paid for yet, correct?

5    A    Correct.

6         MR. SERKIN:  Your Honor, may I approach?  I have a

7    copy of the APA, and I understand the Court's admonishment.

8    I am not asking him to interpret or read provisions; it's

9    just important to understand exactly what the $166 million

10   is, and it's laid out clearly here.

11        THE COURT:  So you have questions on what?  On

12   what the payments are?

13        MR. SERKIN:  On what the agreement is and whether

14   there is an agreement.

15        THE COURT:  Well --

16        MR. SERKIN:  It is three pages, Your Honor.  It's

17   a short line of questioning.  And I think it will clarify

18   for the Court where we were on Monday.

19        THE COURT:  Well, I read the provision.  I read it

20   again this morning, so I don't know what...  You don't need

21   to clarify where it is or what it says to me.  If you have

22   questions of the witness about what these payables are

23   comprised of or something like that, I understand, but...

24        MR. SERKIN:  Your Honor, let me see if I can do

25   this way.

1           THE COURT:  Okay.

2   Q    Mr. Meghji, your understanding is that -- your

3   businessperson's understanding is that ESL will agree to

4   take on up to $166 million in accounts payable, correct?

5   A    Yes.

6   Q    And you understand that in the APA, those payables, at

7   least in the version on the docket, are defined as, quote,

8   Capital O, "Other Payables," correct?

9           MR. LENDER:  Wait, Your Honor, they're asking him

10  to interpret the --

11          MR. SERKIN:  I'm not, Your Honor.  I'm asking for

12  his understanding of what is included in those payables.

13          THE COURT:  Well, the section says Other Payables.

14  Q    Mr. Meghji, Other Payables as defined to mean the

15  accounts payables set forth on Schedule 1.1G, do you

16  understand that?

17  A    Sure.

18  Q    Have you ever seen a 1.1G?

19  A    I don't recall.

20          MR. SERKIN:  Your Honor, may I approach?  I have a

21  document that we are marking for identification as Exhibit

22  181, which is the first several pages to a draft set of

23  schedules we received in the course of production on this

24  matter.

25          THE COURT:  It's a draft, right?

Page 56

1           MR. SERKIN:  It is a draft, Your Honor.

2           THE COURT:  Look, I haven't seen Schedule 1.1G.  I

3    have the same question you had, which is what is it?  So I

4    think rather than questioning Mr. Meghji on it, we should

5    put the question to ESL.  Obviously, I'm not approving the

6    agreement that has a blank schedule to it and is contrary to

7    the assumptions in the sale motion.

8           MR. SERKIN:  Your Honor, what I'm trying to

9    understand from this witness, who is the witness who

10   understands the $166 million, is whether there is even an

11   agreement on the 166...  The agreement is they will assume

12   up to 166 million; we don't know if they've agreed to any.

13   And that's what this shows.  It simply has --

14          THE COURT:  What is your understanding as to

15   whether -- of the purpose of the schedule that was to be

16   attached to the agreement and so far isn't as far as the

17   defined term "other payables?"

18          MR. MEGHJI:  My understanding is that they would -

19   - ESL would assume up to $166 million of merchandise and

20   non-merchandise payables that were post-petition payments.

21          THE COURT:  Do you know why it was referenced in

22   terms of the schedule as opposed to just saying that

23   definitionally?

24          MR. MEGHJI:  I don't specifically, no.

25          THE COURT:  Okay.

Page 57

1    Q    Mr. Meghji, if we can go down again, continue on Slide

2    7 -- excuse me, Slide 1, from Tab 12, Exhibit 141 to the

3    cure cost.  Do you see that?

4    A    Yes.

5    Q    And there's a $200 million number assumed for cure

6    cost, correct?

7    A    Yes.

8    Q    You did not determine that $200 million, correct --

9    $200 million number, correct?

10   A    Not personally.

11   Q    And you don't think anyone at M3 was involved in

12   determining whether the $200 million was a correct estimate,

13   correct?

14   A    I believe the cure cost number was estimated by

15   Deloitte.

16   Q    Is it your understanding that cure cost assumed by ESL

17   could include cure cost related to the Debtor's encumbered

18   real estate that would be transferred to ESL?

19   A    I think cure costs could include any cure costs

20   relating to any contract.

21   Q    And you don't have an understanding with respect to

22   real estate assets how much of this $200 million relates to

23   encumbered real estate versus unencumbered real estate,

24   correct?

25   A    I don't.

Page 58

1  Q    Mr. Meghji, has a transition of services agreement been

2  agreed to at this point?

3  A    I think one is being discussed and negotiated.

4  Q    Do you have an understanding of the economic terms of

5  that agreement, meaning, specifically, which entity, NewCo

6  or Debtors will be obligated to pay what amounts to each

7  other over what time?

8  A    No, I don't think that's been finalized.

9  Q    Have you done any analysis to determine whether the

10  Debtors will have the liquidity to pay the amounts in the

11  transition services agreement going forward, to the extent

12  there are any amounts required to be paid by the Debtors?

13  A    Well, those amounts haven't been agreed yet.

14  Q    I want to talk for a minute about some other potential

15  expenses that appeared in the proposed sale order.  Again, I

16  am not asking you to look at the order and interpret it.

17  But are you aware of any costs associated with real property

18  or leases that are being transferred to ESL other than cure

19  costs that would remain with the Debtors?

20  A    Property taxes payable is an example of cost that would

21  be transferred to ESL.

22  Q    Other than property taxes payable, anything else?

23  A    Not that I can think of right now.

24  Q    What about insurance, rents, other maintenance charges,

25  promotional funds?  Is there anything else that you have

1   estimated would remain with the Debtors?

2   A    Would remain with the Debtors after --

3   Q    After -- post-close?

4   A    I think it's really just payroll costs through the

5   closing date, as well as payroll-related costs.

6   Q    And what I want to ask specifically is about with

7   respect to designated leases.  Are you aware -- have you

8   done any analysis of the amount of cost that would remain

9   with the Debtor's post-close outside of cure costs?

10  A    No, I have not.

11  Q    Do you know whether the Debtors...  Strike that.  Have

12  you done any analysis of any amounts that the Debtors could

13  be liable for for tort liability at any of their stores from

14  petition date until close?

15  A    No.

16  Q    Mr. Meghji, if you could look at Tab 8.

17          THE COURT:  You're over your time.  Do you have a

18  lot more to go?

19          MR. SERKIN:  I do not, Your Honor.

20          THE COURT:  Okay.

21          MR. SERKIN:  This is the last category I intend to

22  cover.

23          THE COURT:  Okay.  Fine.

24  Q    Mr. Meghji, Exhibit -- Joint Exhibit 48, which is at

25  Tab 8 is a weekly tracking report tracking the

Page 60

1      administrative solvency of the company, correct?

2      A    Yes.

3      Q    Okay.  And this is something you are ultimately

4      responsible for and that you are tracking on a regular

5      basis, correct?

6      A    Correct.

7      Q    And Tabs 9, 10, and 16 are the tracking reports.  And

8      just for the record, Tab 9 is Joint Exhibit 166, Tab 10 is

9      Joint Exhibit 167, and Tab 16 is Joint Exhibit 167A.  Those

10     are the updated tracking reports over the course of the last

11     week, correct?

12     A    Yes.

13     Q    And if you look at the most recent one, the one we

14     received last night at 9 p.m., it looks like the shortfall

15     is $43 million.  Do you see that?

16     A    Yes.

17     Q    And the one before, which was Tab 10, the shortfall was

18     $35 million, correct?

19     A    Yes.

20     Q    And that was two days earlier on February 3rd?

21     A    Correct.

22     Q    And is it fair to say that the amount of the shortfall

23     has increased and decreased over the last week?

24     A    Has increased and decreased?

25     Q    The amount of the shortfall has both increased and

Page 61

1    decreased over the last week, correct/

2    A    Yes.

3    Q    Okay.  You mentioned -- there's one item I want to

4    discuss that you mentioned.  Payroll.  The payroll

5    obligations of the Debtors -- so, the amounts paid to

6    employees at close, was not included on the January 23rd or

7    January 25th tracker, correct?

8    A    It was not but we had discussed it with the

9    Restructuring Committee on that call, and indicated to them

10   that that was an amount that we were working to estimate,

11   and it would be included on the next one.

12   Q    So it was an amount indicated on which call?

13   A    On the January 23rd call there was just a discussion

14   kind of.

15   Q    On the January 23rd call with the Restructuring

16   Committee, you mentioned the payroll obligations at close

17   that the Debtors would have?

18   A    Correct, yes.

19   Q    And over the course of the last week, that item has now

20   been included on the tracker, first at $39 million and now

21   last night at $45 million, correct?

22   A    Yes.

23   Q    And that amount was not included until after the

24   committee filed its objection, correct?  On the tracker?

25   A    I'm not sure it had anything to do with the committee's

1    objection.

2    Q    Okay.  And, Mr. Meghji, I just want to make sure I

3    understand.  With respect to -- I recognize there are a lot

4    of numbers on the tracker, both items that can lead to a

5    greater amount of insolvency and a less amount of

6    insolvency.  With respect to the $166 million we've been

7    talking about, in the event that ESL does not agree to the

8    full $166 million, that would increase the amount of

9    administrative insolvency, correct?

10   A    The 166 million would negatively impact administrative

11   solvency, yes.

12             MR. SERKIN:  Thank you, Your Honor.

13             THE COURT:  Okay.  Does anyone else want to --

14   have any questions of Mr. Meghji?  Okay, any redirect?

15             MR. LENDER:  Yes, please, Your Honor.

16             THE COURT:  Okay.

17             REDIRECT EXAMINATION OF MOHSIN MEGHJI

18   BY MR. LENDER:

19   Q    A couple of items. Mr. Meghji, first question is -- you

20   were asked by Mr. Serkin about Tab 13 which were some

21   meeting minutes dated January 6, 2019.  And you were asked

22   some questions about some comments attributed to you.  Do

23   you recall that?

24   A    Yes.

25   Q    Did the -- at the time of January 6th when you made

1    those comments, did that reflect the final terms of the

2    deal?

3    A    No.

4    Q    You were also asked by Mr. Serkin about an analysis

5    that you did comparing projected recoveries between a going

6    concern sale versus a wind-down, do you recall that?

7    A    Yes.

8    Q    Let's be clear.  Based on your analysis, under which

9    scenario did you conclude that creditors did better?

10   A    On the ESL sale.

11   Q    And is that limited just to ESL or did that also

12   include other creditors as well?

13   A    No.  It included other creditors as well.

14   Q    Mr. Meghji, under which scenario do workers do better,

15   to your understanding?

16   A    Under the ESL sale.

17   Q    And under which scenario do vendors do better?

18   A    Under the ESL sale scenario.

19   Q    Mr. Meghji, is administrative solvency guaranteed under

20   the wind-down scenario?

21   A    No.

22   Q    Now, it seemed like Mr. Serkin was questioning the

23   methodology you and your team use to try to come up with the

24   anticipated proceeds in a wind-down scenario.  So, I wanted

25   to ask you a couple of questions about that.  First of all,

1    do you believe that the method that you and your team used

2    to calculate Debtor's cash proceeds from the sale of the

3    real estate assets in a wind-down scenario was reasonable?

4    A    Absolutely.

5              MR. SERKIN:  Objection, Your Honor.  The opinion

6    of this witness --

7              THE COURT:  Well, if it leads to something else.

8    But that in itself, it's not an expert opinion.

9    Q    What were -- well, let me ask you this.  Explain

10   exactly how did you come up with your methodology?  What did

11   you do?

12   A    So, the methodology --

13             MR. SERKIN:  Objection, Your Honor.  He testified

14   that he didn't come up with the methodology.  We've

15   established no foundation.

16   Q    What was the methodology that you and your team used to

17   come up with these valuations?

18   A    The methodology that was used by the company was to

19   essentially take the market value appraisals, the highest

20   indication of interest, average those -- and I'm summarizing

21   here -- discount those by 50 percent and apply that as sort

22   of the estimated proceeds.

23             In the case where JLL had done the liquidation

24   appraisals in January 2019, we simply used those as the

25   basis for what the estimated proceeds were.  That

1    methodology, I believe, based on my experience as well as

2    the discussions I've had with Mr. Gallagher --

3              MR. SERKIN:  Objection, Your Honor.

4    A    -- around --

5              THE COURT:  Why don't you stop for a second?  Let

6    me ask the question differently.  Why didn't you question

7    that methodology, as the company CFO?

8              MR. MEGHJI:  Your Honor, I'll explain exactly why.

9              THE COURT:  Okay.

10             MR. MEGHJI:  I sat on the board of Toys R Us,

11   which went through a property liquidation where the leases -

12   - 35 percent of the leases were sold for a discount of 56

13   percent from appraised value.  So, applying a 50 percent

14   discount to the data points we had on various appraisals and

15   high indications of interest because there had been no

16   diligence done by any of the buyers.  Some of them on an

17   individual property basis you could certainly identify some

18   properties where the bids were too high or too low.  But

19   this was -- these individual bids went both ways.

20             As a whole, when we looked at the portfolio, it

21   seemed very reasonable to me to apply a 50 percent discount

22   to the average of those data points.

23             THE COURT:  Okay.

24             MR. SERKIN:  Thank you.

25   Q    Now, Mr. Meghji, you were also asked --

Page 66

1            THE COURT:  Can I interrupt you for a second?

2            MR. LENDER:  Yes.

3            THE COURT:  I want to make sure -- when you say

4    you applied the highest indications of interest, I want to

5    make sure I understand.  You're not saying that you applied

6    those only where it was the highest value.  You applied

7    whatever was highest?

8            MR. MEGHJI:  Yes.

9            THE COURT:  So even if it was $500, you would

10   apply it?

11           MR. MEGHJI:  Yes.

12           THE COURT:  Why did you not question that approach

13   and say, well, this is obviously 10 times lower than the

14   appraisal.  Why would we factor that in?

15           MR. MEGHJI:  So, Your Honor, the other analysis I

16   did, we looked at 145 properties where there were

17   indications of interest, appraisals, and so forth, and bids

18   for all of these properties, where you had multiple bids for

19   certain properties.  We compared those to estimated

20   liquidation proceeds.

21           For those 145 properties where we had multiple

22   bids, our estimated liquidation proceeds were about $370

23   million.  The highest aggregate bid for those properties --

24   this is the check and balance I did -- were about 365

25   million.  The lowest bids were 282 million.

Page 67

1          So, the methodology we applied did not simply

2     discount the indications of interest.  It applied market

3     value appraisals, averaged those with the highest indication

4     of values...  And the other data point I used was had we

5     simply excluded all of the indications of value from that

6     analysis, the total impact of that would be reduced by $70

7     million.

8          So, it was very much within the margin of error.

9     The way I looked at the $561 million was that -- and what I

10    advised the Restructuring Committee, as that within plus or

11    minus 20 percent, that was a reasonable band to assume as

12    liquidation proceeds.

13             THE COURT:  So you're saying the delta if you

14    excluded the expressions of interest was approximately $17

15    million?

16             MR. MEGHJI:  70.  Seven-zero.

17             THE COURT:  Seven-zero?

18             Mr. MEGHJI:  Yes.

19    Q    Then just to further on that -- and if you had, for

20    example, instead of applying a 50 percent discount but you

21    applied the 56 percent discount that you actually saw in the

22    real world in toys, that delta presumably would be even

23    smaller, correct?

24    A    Correct.

25    Q    And, by the way, just so we have it clear, the stores

1    that were being sold, the size of the stores and toys, how

2    did they compare to the size of the stores we're talking

3    about in Sears?

4    A     Sears and K-Mart have much bigger stores.  The toy

5    stores were much smaller, therefore, arguably much more

6    marketable.

7    Q     Now, just to go on to a different topic, you also

8    talked about the solvency analyses that you had done.  Mr.

9    Serkin asked you about the original projection of 62

10   million.  Is the current projected shortfall less than $62

11   million?

12   A     Yes.

13   Q     And what is the current projected shortfall?

14   A     It's $43 million.

15   Q     And have you also come up with a calculation of

16   projected mitigating items, if you will?  Other sources of

17   revenue to make up that differential?

18   A     Yes.

19   Q     And how much is the current anticipated improvements,

20   the mitigating items, if you will?

21   A     $125 million.

22   Q     Now, Mr. Meghji, did M3 solvency analysis include the

23   value of the (indiscernible) or the land ends claims against

24   ESL that are being retained?

25   A     It did not.

Page 69

 1   Q    And, if necessary, can you also use the 35 million

 2   payment to be paid by ESL to fill any administrative

 3   shortfall?

 4   A    Yes.

 5   Q    You were also asked about cure costs by Mr. Serkin.  To

 6   your understanding, is there any cap on the cure amounts?

 7   A    No.

 8   Q    And is it possible that some of the cure amounts would

 9   actually include 503B9 claims?

10   A    Yes.

11          MR. SERKIN:  That's it, Your Honor.  Thank you.

12          THE COURT:  Why would they include 503B9 claims?

13          MR. MEGHJI:  To the extent that cure costs

14   included settling 503B9 claims, they would reduce -- they

15   would essentially reduce the 503B9 pool.

16          THE COURT:  Okay.  I.e., it's not just real estate

17   cure, it's --

18          MR. MEGHJI:  Exactly.

19          THE COURT:  Okay.  Any re-cross?

20          MR. SERKIN:  Your Honor, very briefly.

21          RE-CROSS EXAMINATION OF MOHSIN MEGHJI

22   BY MR. SERKIN:

23   Q    Mr. Meghji, in Toys R Us, can you tell the Court what

24   the difference was between the industrial assets available

25   at Toys R Us versus the industrial assets available at

Page 70

1    Sears?

2            THE COURT:  I'm sorry, I didn't -- industrial?

3            MR. SERKIN:  Industrial.

4            THE COURT:  Okay.

5    A    Yeah, I was referring more to the store leases than the

6    industrial assets.

7    Q    Okay.  Can you explain the difference between the

8    tenure of the store leases in the Toys R Us case versus the

9    tenure of the store leases here?

10   A    I think the tenure in the toys leases were shorter.

11   Q    The toys leases were shorter, and they were current,

12   correct, relative to these leases?

13   A    Maybe as a generalization.

14   Q    Right.  Meaning that the value available on toys was

15   significantly less than the value available in this case,

16   correct?

17   A    Potentially.  But I think there was a sort of broader

18   issue here around marketability of the size of the -- you

19   know, of these stores, and the volume, and the compressed

20   timeframe under which this would happen.

21   Q    You were asked, Mr. Meghji, about the $125 million of

22   potential opportunities, correct?

23   A    Yes.

24   Q    Can you look at Tab 16, please?  Joint Exhibit 167A.

25   And if you look at Slide 5, Slide 5 identifies a number of

1    those opportunities and actions.  Do you see that?

2    A    Yes.

3    Q    Can we go through one by one and explain to the Court

4    which of these opportunities expire at close?  So, the first

5    one, the prescriptions.  Is that something that the company

6    can take advantage of post-closing?

7    A    No, this one's actually done.  So, I think an appraisal

8    was received a couple of days ago, so it's been -- it's

9    done.

10   Q    So is that number included in the $43 million

11   shortfall?  Meaning it's already benefited the company and

12   gotten the company to only $43 million in the hole?

13   A    This really applies to the conditions to close summary,

14   not the solvency amounts.

15   Q    The next one, the inventory, that $40 million.  Is that

16   an opportunity, that $40 million that goes away at close?

17   A    It doesn't go away at close.  It's excess inventory

18   over and above the minimum limit that we have.  And so what

19   we would do there is monetize that inventory after closing.

20   Q    Okay, so just so we're clear and so we all understand,

21   if you look at Slide 4, the first category, ADL collateral -

22   - the cushion there, the $40 million, that's the $40 million

23   opportunity you're talking about, correct?

24   A    Correct.

25   Q    And so what that means is there's an additional $40

Page 72

1  million in the stores or in the pipeline to the stores that

2  Sears, that the Debtors can access and monetize, correct?

3  A    Can you repeat the question?

4  Q    Sure.

5  A    When you say pipeline, I'm not too...

6  Q    Maybe you can explain it better.  That $40 million in

7  excess inventory, what you're suggesting is that the Debtors

8  can monetize that $40 million to make up an administrative

9  claims whole, correct?

10 A    Right.  So, if you look at Footnote Number 1 on Page 4,

11 the 1697 consists of 1.579 billion of inventory, credit card

12 receivables of 74, pharmacy receivables of 7, and then the

13 pharmacy script value of 37.  Essentially, there's a $40

14 million cushion and we could move inventory out of the Sears

15 kind of -- you know, before we hand it over to NewCo and

16 sell it separately.

17 Q    Before close?

18 A    Before close, yes.

19 Q    What plans do you have to move $40 million worth of

20 inventory out of the stores between now and Friday?

21 A    We have created some contingency plans around

22 potentially either moving inventory, or we may even do that

23 in part with receivables, with credit card receivables.  So

24 it doesn't just have to be inventory.

25 Q    If that doesn't happen by Friday, that opportunity goes

Page 73

1    away, correct?

2    A    I think we have it in hand.

3         THE COURT:  I'm sorry, I didn't hear that.

4    A    I think we have a plan in hand to either move

5    receivables or inventory by Friday.

6    Q    I'm sorry, maybe I missed it.  What is that plan?

7    A    We have the ability to move inventory out of RDCs into

8    stores where necessary.  It would not necessarily be the

9    full 40 million.  We're also looking at some receivables

10   that we may be able to move -- elect those as opposed to

11   inventory.

12   Q    So, literally, it is taking trucks and moving industry

13   from distribution centers out of distribution centers to the

14   currently 80 GOB sales that are happening?

15   A    Or setting it aside.

16   Q    Okay.  And that has to happen before the anticipated

17   close on Friday, correct, assuming the Court approves the

18   sale?

19   A    I think subject to agreement with ESL we can agree to

20   set that aside and not have to move it to the stores.

21   Q    Do you have that agreement with ESL?

22   A    No, we're discussing that as part of the transition

23   services agreement.

24   Q    Next one, Specified Receivables, $26 million.  Does

25   that go away at close?

Page 74

1   A    No, it does not.  We have a cushion of $52 million and

2   we've estimated that about 50 percent of that would be

3   collateral.

4   Q    Okay.  And, again, just so we're clear, if you look at

5   Slide 4, Specified Receivables is the second category down.

6   Do you see that?

7   A    Yes.

8   Q    And the cushion, that's the $52 million you're talking

9   about, correct?

10  A    Yes.

11  Q    And you estimate that you can collect $26 million of

12  that, half of it, correct?

13  A    That's what we've estimated, yes.

14  Q    And you don't need to actually collect that before the

15  closing, correct?

16  A    Correct.

17  Q    The 503B9 claims, back to Slide 5.  Is that an

18  opportunity that goes away at close?

19  A    No.

20  Q    The Accounts Payable, is that an opportunity that goes

21  away at close?

22  A    No.

23  Q    What is that, the $5 million?

24  A    The $5 million basically is dispute accounts payable.

25  So, it may be damaged goods, it may be sort of just items

Page 75

```
 1    that get there.  So it's really working that through with

 2    individual vendors around disputed accounts payable.

 3    Q    And is that $5 million included in the $166 million

 4    that you help ESL assume?

 5    A    I think...  It partly is, but that number is moving

 6    around daily depending on how much we pay to suppliers.  So

 7    we're kind of managing the accounts payable and the senior

 8    DIP balance over the next couple of days in terms of what we

 9    pay.  So, for instance, if we pay $5 million tomorrow, then

10    that would take the accounts payable down.  If we don't,

11    it'll leave it higher.

12    Q    Okay.  And just so we're clear, that's a way of

13    managing cash, not actually reducing liabilities overall

14    net-net, correct?

15    A    It's both.  It's both.  We've managed our debtor in

16    possession balance down as of last night to $854 million.

17    So we're daily managing that.

18    Q    And if you're able to manage it below $850 million to,

19    say, $825 million, then ESL would not have to take $25

20    million of liabilities, correct?

21    A    Under the terms of the agreement, correct.

22    Q    Let's look at one more on Slide 5, the $35 million

23    holdback receivables.  Do you see that?  It's the last

24    category on Slide 5.

25    A    Yes.
```

Page 76

1   Q    And that includes a $28 million deposit that is

2   currently with First Data, the credit card vendor that Sears

3   uses, correct?

4   A    Yes.

5   Q    And that opportunity, that $28 million opportunity goes

6   away at close, correct?

7   A    I don't believe so.  I think that we are discussing it

8   with counsel, so I'm waiting for some clarity and guidance

9   from them.  But I don't believe that it necessarily goes

10  away.

11  Q    Well, First Data hasn't agreed to return that $28

12  million, have they?

13  A    It has not yet agreed to do that, yes.

14  Q    Mr. Meghji, if we can go back to an earlier tracker.

15  It's at Tab 7.  This is Exhibit 14.  It was the exhibit

16  attached to your declaration.  And if you look at Slide 4,

17  those are the opportunities listed there.  For specified

18  receivables do you see an SHO receivable of $34 million?

19  A    Yes.

20  Q    What happened to that?

21  A    I think some of that has been -- I don't know the exact

22  amount, but some of that has been collected.  As I mentioned

23  to you earlier, I think our debtor in possession senior DIP

24  balance as of last Friday was about 893 million.  As we've

25  collected some of these receivables, that balance has come

Page 77

1   down.  As of last night, it was 854 million.  So it's come

2   down by $40 million.  Some of those--some of that has to do

3   with collecting those.  I don't remember the exact amount.

4   Q    And last night, though, the overall amount of the gap

5   to solvency increased by $8 million from the last report,

6   correct?

7   A    Correct.

8           MR. SERKIN:  Thank you, Your Honor.

9           THE COURT:  Okay.  Anything on that?

10          MR. LENDER:  Yeah, very quick, Your Honor.

11          RE-DIRECT EXAMINATION OF MOHSIN MEGHJI

12   BY MR. LENDER:

13   Q    Mr. Meghji, just going back to Tab 16 in your book,

14   Joint Exhibit 167A, Mr. Serkin went through all the

15   different opportunities listed on Page 5.  Do you remember

16   that?

17   A    Yes.

18   Q    Is an additional opportunity not listed here the claims

19   preserved against ESL?

20   A    Yes.

21   Q    Is an additional opportunity not listed here the $35

22   million payment?

23   A    Yes.

24   Q    So that would be in addition to the $125 million here?

25   A    Absolutely.

Page 78

1   Q    Thank you.

2            THE COURT:  Can you sit down, sir?

3            MS. MISHKIN:  Your Honor, Jessie Mishkin, on

4   behalf of the Debtors.  The Debtors would like to call

5   Michael Welch of Jones Lang LaSalle Valuation and Advising

6   Services.

7            THE COURT:  Okay.

8            MS. MISHKIN:  And respectfully submit into the

9   record his declaration, which was filed as ECF Number 2342,

10  and I believe is at Tab 43 of your binder.  Mr. Welch is in

11  the courtroom today and available for cross-examination.

12           THE COURT:  Okay.

13           MS. MISHKIN:  And at this time, on the basis of

14  his declaration, which sets forth his testimony and

15  opinions, we would like to tender Mr. Welch as an expert

16  witness with respect to the two opinions that are summarized

17  in Paragraph 13 of his declaration.

18           Those are that the Debtors applied a fair and

19  reasonable methodology to determine the liquidation value of

20  their real estate assets, and that there are efficiencies

21  that the committee's expert, Mr. Greenspan, finds in the

22  Debtor's methodology that are not prevalent.

23           THE COURT:  Okay, could you take the stand, sir?

24  You can sit down.  Would you raise your right hand, please?

25           MR. WELCH:  Yes, sir.

1            THE COURT:  Do you swear or affirm to tell the

2    truth, the whole truth, and nothing but the truth, so help

3    you God?

4            MR. WELCH:  I do.

5            THE COURT:  And it's W-E-L-CH?

6            MR. WELCH:  Yes, sir.  Thank you.

7            THE COURT:  Okay.  All right.  And I have your

8    declaration, Mr. Welch, that's dated January 31, 2019.  Now

9    that you're sitting here testifying today, would this

10   constitute your direct testimony?

11           MR. WELCH:  Yes, sir, it would.

12           THE COURT:  Okay.  All right.  Is there any

13   objection to the qualification of Mr. Welch as an expert?

14           MR. SERKIN:  Not to the qualifications as it were

15   articulated by Ms. Mishkin, no.

16           THE COURT:  Okay.  All right.  So...

17           MR. CHAPMAN:  Your Honor, for the record, Dean

18   Chapman of Akin Gump on behalf of the Creditor's Committee.

19           THE COURT:  Okay.

20           MR. CHAPMAN:  We are locating two documents we

21   intend to hand to the witness and to Your Honor.  They are

22   the expert report submitted by Mr. Welch and also the expert

23   report submitted by the committee's expert, Mr. Greenspan.

24           THE COURT:  Okay.

25           DIRECT EXAMINATION OF MICHAEL WELCH

Page 80

1    BY MR. CHAPMAN:

2    Q    All right, Mr. Welch, I'd just like to start by asking

3    you about JLL's appraisal work in connection with the Sears

4    bankruptcy.  Sears was retained to -- I'm sorry, JLL was

5    retained to appraise certain of Debtor's real estate assets

6    to assist the Debtors in determining the value of those

7    assets in this proceeding, correct?

8    A    I'm sorry, Mr. Chapman.  When you handed me this

9    document you said we're going to start with yours and you

10   handed me Mr. Greenspan's?

11   Q    That's Mr. Greenspan's.  No, we are locating yours and

12   as soon as we find it we'll pass that out as well.

13   A    I'm sorry, can you restate your question?

14   Q    To the question, yes, sir.  So, JLL was retained to --

15         THE COURT:  The Debtor's counsel is going to give

16   him a copy of his declaration.

17         MR. CHAPMAN:  Thank you.

18         MR. WELCH:  Thank you.

19   Q    JLL was retained to appraise certain of the Debtor's

20   real estate assets to assist the Debtors in determining the

21   value of those assets in this proceeding, correct?

22   A    That is correct.

23   Q    And JLL has performed two sets of appraisals on behalf

24   of the Debtors, correct?

25   A    Yes.

Page 81

1   Q    The first, which you refer to in your report as the

2   Phase 1 appraisals are for 21 properties of the Debtor's

3   properties, correct?

4   A    I believe it was 24.  It was the Phase 1 properties,

5   that's correct.

6   Q    That's right.  And then for Phase 2 properties there

7   were approximately 400 different properties that JLL

8   appraised, correct?

9   A    Approximately, that's correct.

10  Q    And there are additional real estate assets in the

11  Debtor's portfolio that JLL did not appraise, correct?

12  A    There are.

13  Q    JLL appraised a subset of the overall Debtor's real

14  estate assets, correct?

15  A    We did.

16  Q    Turn to Page 22 of the committee's expert, Mr.

17  Greenspan's report, which is the document I originally

18  handed to you.  You'll see Exhibit 10 on this page.

19  A    I do.

20  Q    Can you see in the -- there's a shaded bar chart called

21  Excluded by Debtor.  Below that it indicates unencumbered

22  and an asset count of 555.  Do you see that?

23  A    I do.

24  Q    And do you see here that Mr. Greenspan's identified 555

25  unencumbered assets to which the Debtors have attributed no

Page 82

1    value.  Is that correct?

2    A    That's what the chart says.  As I mentioned, I didn't

3    value these properties.  I don't know if one of the other

4    groups did or not.

5    Q    Well, that's where we're going.  JLL never valued these

6    particular properties, correct?

7    A    They did not.

8    Q    Okay.  And to be clear, you're not offering any formal

9    opinion on the value of these properties today, correct?

10   A    I don't intend to.

11   Q    You have your report in front of you, is that correct?

12   A    I do.

13         MR. CHAPMAN:  And, Your Honor, let me hand you a

14   copy of --

15         THE COURT:  No, I have it.

16         MR. CHAPMAN:  Oh, you do?  Wonderful.

17   Q    Okay.  Can you turn to Page 15 of the report?  And I'm

18   focused on Page 15, Section D entitled, The Debtor's

19   Marketing and Sales Process Appears Reasonable.  Do you see

20   that?

21   A    Yes, I'm with you.

22   Q    In this section you express an opinion that the

23   Debtor's marketing sales process for its real estate assets

24   was, quote, "Consistent with normal business practices for

25   the time requirements allotted," correct?

Page 83

1   A    Yeah, that's what I believe.

2   Q    Your expertise is in real estate valuation, correct?

3   A    It's certainly my primary area of expertise, certainly.

4   Q    And you don't really get involved in the sale of

5   properties, is that right?

6   A    Well, in our valuation process, the sale of property is

7   often the ultimate goal.  So understanding of the process is

8   certainly critical as inherent in the definition of market

9   value, its exposure and marketing, willing buyer, willing

10  seller.  So we have to have expertise in the process as well

11  even though we're not conducting the process ourselves.

12  Q    Is the sales process something that you're involved in

13  on a day to day basis?

14  A    Well, from a valuation standpoint I am, because we are

15  justifying a sales price, we're helping set a sales price,

16  or providing individuals with a bases for whether or not

17  they should conduct a transaction.

18          MR. CHAPMAN:  I'm going to hand you a copy of your

19  deposition transcript, with your Honor's permission.

20          THE COURT:  Sure.

21  Q    Turn with me to page 15 of your deposition transcript.

22  Look at Line 7.  Are you there?

23  A    Yes, sir.

24  Q    And the question was "Do you have any expertise in the

25  marketing sales process of real estate?" And Ms. Mishkin

Page 84

1   objected to form.  And you said, "Well, I work for the

2   second largest real estate firm in the world and I know

3   those folks.  I know the reputation of their ability.  We

4   refer things back and forth.  So I'm aware of their

5   expertise, but I don't really get involved in the sale of

6   properties." Do you see that?

7   A    That's consistent.

8   Q    Do you see that and you believe that's true and

9   accurate, correct?

10  A    I do.

11  Q    And it continues:  "Do you consider yourself an expert

12  in the sale of real estate?" And you say, "I would say I

13  have more than a layman's understanding of the processes

14  that are involved but it's not what I do on a day to day

15  basis," correct?

16  A    That's correct.

17  Q    So, that's correct.  The sale of real estate is not

18  something you do on a day to day basis, right?

19  A    That is correct.

20  Q    And you only became aware of the Debtor's marketing and

21  sale process in connection with responding to Mr.

22  Greenspan's expert report, correct?

23  A    That's true.

24  Q    You weren't actually involved in the Debtor's marketing

25  and sale process, right?

Page 85

1    A     By design I was not.

2    Q     And you don't have any knowledge of the information,

3    for example, uploaded to the data rooms for prospective

4    purchasers to review, correct?

5    A     Generally.

6    Q     Generally you don't have any knowledge of it?

7    A     Generally I have a limited understanding of what was

8    uploaded.

9    Q     Can you turn to Page 199 in your deposition transcript?

10   I'm looking at Line 3.  Are you there?  I asked you, "Do you

11   have a view as to the sufficiency of the information placed

12   in the data rooms for prospective purchasers to review?"

13   Answer: "I have no knowledge of it."

14   A     That's correct.

15   Q     And how would you reconcile your answer that said you

16   had no information -- no knowledge of the sufficiency of the

17   information placed in the data rooms for prospective

18   purchasers last week and what you just told me about having

19   a general understanding?

20   A     Well, the types of information would be property

21   specific.  I'm certain there were leases -- property

22   specific information like surveys and things like that.  I

23   did not view the data room so I can't comment on the

24   sufficiency of it, but the types of information that are

25   generally located there I would certainly be aware of.

Page 86

1   Q    And you're aware of that type of information because of

2   the conversation you had with your colleague Mr. Jaggy at

3   JLL?

4   A    That's correct.

5   Q    And anything else?

6   A    Well, you asked me additional questions regarding

7   another declaration which we discussed, where you noted some

8   items that you believed were to be deficient.  So we did

9   have an additional discussion there about it.

10  Q    Okay, that's fine.  Now, you don't know what JLL's

11  overall marketing strategy was in connection with the sale

12  process, correct?

13  A    I do not.

14  Q    And you're not actually testifying as an expert on the

15  real estate process run by Sears, right?

16  A    I've expressed opinions as to what I believe to be the

17  reasonableness of the process after discussions with the

18  gentleman in charge of it.  If those are considered to be

19  expert opinions, then so be it.  But I've expressed my

20  opinions through the declaration and I stand by them.

21  Q    Now, you're aware that the sales process resulted in

22  the Debtor's receiving nonbinding indications of interest

23  for some of their real estate assets, correct?

24  A    I am.

25  Q    You said you are?

Page 87

1   A     I said I am.

2   Q     Thank you.  But you agree that in a bankruptcy scenario

3   these indications of interest are not a reliable indication

4   of the valuation of the properties, correct?

5   A     I think they're indications of interest in real estate.

6   The value or the price would be determined after a

7   negotiation.

8   Q     And so as a result, the indications of interest aren't

9   a basis of evaluation of the properties, correct?

10  A     I don't think they're certainly a data point you have

11  to consider.  It certainly lets you know that an asset has

12  interest as opposed to some properties with no interest

13  where we may not be able to have a transaction prior to a

14  specified date.  So it is a data point that gives

15  consideration to value but it's not an indication of price.

16  Q     And I believe you told me when you were deposed last

17  week that it's not uncommon, in your words, in a bankruptcy

18  situation to see bottom-fishers coming in to make lowball

19  offers, knowing that the seller is in financial distress,

20  correct?

21  A     I think that's to be expected.

22  Q     Let's talk for a moment about the Phase 2 appraisals

23  that JLL did and those were the approximately 400 properties

24  that were appraised, correct?

25  A     That's correct.

Page 88

1   Q    For those properties JLL first calculated a market

2   value and then applied a liquidation discount, correct?

3   A    That is correct.

4   Q    And those liquidation discounts were assumed a sales

5   period concluding by May 13, 2019, is that right?

6   A    Yes, sir.

7   Q    And that was the date you understood the leases would

8   have to be assumed or rejected, correct?

9   A    That was my understanding.

10  Q    And in light of the fact that the wind-down period

11  would begin in mid-January, that meant an approximately

12  four-month sales process, correct?

13  A    Yes, sir.

14  Q    You also considered a four-month sales process or

15  period for owned assets as well as leased assets, right?

16  A    I did.

17  Q    And it was important for you to understand the

18  timelines of the sales process in order to appropriately

19  measure the impact to value, correct?

20  A    It is.

21  Q    For example, you could probably get more people at the

22  table in four months than you could in 30 days, all else

23  equal, right?

24  A    Yes, sir.

25  Q    And you could probably get more people at the table in

1  12 months rather than four months, all else equal, correct?

2  A    I believe you could.

3  Q    And as a result of the liquidation discount you would

4  apply over a 12-month period, it would be less than the

5  discount you would apply over a four-month period, all else

6  equal, correct?

7  A    To a certain extent.  Once you deal with the volume of

8  properties, it'll be placed on the market here for the type

9  of asset we have -- there's going to be a point of

10  diminishing returns, because these stores are so large and

11  there are so many of them, at some point no one else is

12  coming to the table.  But your general premise that a longer

13  time period will allow for more exposure is certainly true.

14  Q    Thank you.  Can you turn to Paragraph 26 of your expert

15  report?  This is located on Page 10 of the document.  And in

16  this paragraph you discuss the possibility of an additional

17  bulk sale discount -- oh, tell me when you get there.

18  A    I'm there now.

19  Q    26.  In this paragraph you discuss the possibility of

20  an additional bulk sale discount over and above the

21  liquidation discount you applied to the Phase 2 appraisals,

22  correct?

23  A    I do.

24  Q    I want to draw your attention to what's the fourth

25  sentence of this paragraph, begins, "If all..." Do you see

1    where that is?

2    A    Yes, sir.

3    Q    It says, "If all or a substantial portion of the

4    Debtor's properties were simultaneously liquidated, a higher

5    discount would need to be applied to account for the lower

6    sales price that would result if the market was flooded with

7    hundreds of assets that cannot be quickly absorbed as only a

8    finite amount of purchasers even have uses for such spaces."

9    Do you see that?

10   A    I do.

11   Q    In this sentence you refer to market in the singular,

12   correct?

13   A    Meaning, the global market for this type of asset.

14   Q    And you agree that Sears properties, the Sears

15   properties you valued are located in more than 200 different

16   markets, correct?

17   A    They're located in a single market of big box stores of

18   approximately 100,000 square feet, of which there is a

19   limited pool of purchasers.  Those assets in a single asset

20   class or asset market are located across the United States

21   in multiple markets.

22   Q    In fact, more than 200 separate markets, correct?

23   A    Yes, sir.

24   Q    And as a result, those markets wouldn't necessarily be

25   affected by the fact the properties were hitting the market

1    at once, because an individual market might only have one

2    property in it, right?

3    A    If I understand your correction -- your question

4    properly, if you're in a market where there is demand and

5    you only had one asset, then a transaction is likely to

6    occur.  When we're dealing with 1,000 assets or 500 assets

7    across multiple markets for an asset class that's

8    distressed, then it becomes less probable.  This is intended

9    to reflect what would occur to the net proceeds if you

10   liquidated all these properties at one time.

11   Q    I want to confirm -- can you turn your deposition to

12   Page 75?

13   A    I'm there, Mr. Chapman.

14   Q    And look at -- Line Number 9.  I asked you "So, many

15   markets wouldn't necessarily be affected by the fact that

16   the properties were hitting the market at once because an

17   individual market might only have one property, is that

18   correct?" Answer:  "Correct.  That is correct." Did I ask

19   you that question and did you give me that answer?

20   A    From where you started reading, your read it correctly.

21   Q    Okay.  The paragraph we were just looking at, Paragraph

22   26, can you go down to the last sentence of that paragraph?

23   It begins "And even if..."

24   A    Yes, sir.

25   Q    It says, "And even if some of the properties were

1    absorbed, they would be sold for a lower price than if they

2    were individually released to the market because buyers are

3    unwilling to pay premium prices when they know that the

4    seller is in a distressed or precarious position."

5    Do you see that?

6    A    I do.

7    Q    And we discussed in your deposition this is because, in

8    your view, the seller is distressed or precarious financial

9    situation, provides the prospective buyer with a negotiating

10   advantage.

11   A    I believe it does.

12   Q    Okay.  Now you're worried on this bankruptcy that the

13   Debtors conducted a sale of 13 U-Haul properties; is that

14   right?

15   A    I am.

16   Q    And you have -- but you haven't reviewed any

17   documentation relating to that sale, correct?

18   A    I have not.

19   Q    And you haven't seen any appraisals of the property

20   subject to that sale, correct?

21   A    No, sir.  I have not.

22   Q    And you haven't seeing anything about what the sales

23   price of those properties, correct?

24   A    I have not.

25   Q    And you don't know how the sales price compares to the

Page 93

1    appraisals of those proprieties, correct?

2    A    I do not.

3    Q    There's a brief discussion of Toys 'R Us in your

4    declaration, correct?

5    A    There is.

6    Q    Let's turn to that, Paragraph 30.  And I'm going to

7    begin reading the third-to-last line on Paragraph 30 where

8    it says "Mr. Greenspan also appears to." Are you with me?

9    A    I'm sorry, page and line again, please?

10   Q    Yeah.  Page 12, Paragraph 30, the sentence being "Mr.

11   Greenspan also appears to omit."

12   A    Yes, sir.  I'm there with you.

13   Q    "Mr. Greenspan also appears to omit from his report any

14   credible absorption analysis explaining how hundreds of

15   properties could be sold in 18 months.  For example, it is

16   my understanding that in the Toys 'R Us liquidation, only

17   approximately 35 percent of the leases sold, and for

18   approximately 44 percent of their appraised dark value."

19   Your source for the information contained in this sentence

20   was Mr. Emilio Amendola at A&G Realty, correct?

21   A    That's correct.

22   Q    And he's the one who told you that the lease property

23   sold for 44 percent of their appraised dark value.

24   A    That's correct.

25   Q    You personally don't know anything about the appraisals

Page 94

1    of the Toys 'R Us stores referenced in this sentence, right?

2    A    Heard a lot of from Mr. Amendola.

3    Q    Only through Mr. Amendola is how you have understanding

4    of these appraisals, correct?

5    A    That's correct.

6    Q    So you haven't seen the appraisals.

7    A    I have not.

8    Q    You don't know who actually formed them, do you?

9    A    I do not.

10   Q    You don't know what methodologies were used in these

11   appraisals, correct?

12   A    That's correct.

13   Q    You don't even know if they were accurate, correct?

14   A    Well, I haven't seen them.  I can't opine to that.

15   Q    You're not familiar with the Toys 'R Us bankruptcy

16   process generally, right?

17   A    That's correct.

18   Q    And you don't have any understanding as to the

19   circumstances under which Toys 'R Us stores were sold in

20   that bankruptcy process, correct?

21   A    That's correct.

22            MR. CHAPMAN:  Nothing further.

23            THE COURT:  Okay.  Any redirect?

24            MS. MISHKIN:  Redirect, Your Honor.

25            REDIRECT EXAMINATION OF MICHAEL WELCH

Page 95

1    BY MS. MISHKIN:

2    Q    Mr. Welch, was there a division at JLL between the team

3    conducting the valuation of real estate properties and the

4    team conducting the marketing and sale process?

5    A    Yes, ma'am, there was, by design.

6    Q    And what was that design?

7    A    Well, it's important valuers in the United States to be

8    impartial.  We don't have a set objective when we determine

9    market value of real estate.  And so obviously folks

10   involved in the sale of real estate have a vested interest

11   in the transaction and the corresponding commission.  So our

12   charge was to determine the market value of these

13   properties, irrespective of who was selling them, and turn

14   that information over to M-III so they could then use that

15   information to determine the proceeds through a process that

16   JLL was performing.

17   Q    Mr. Welch, what, if anything, did you do to learn about

18   the specific sales and marketing procedures for real estate

19   assets the Debtors conducted in this case?

20   A    Well, when I learned that it was at issue, I contacted

21   Naveen Jaggi the president of our retail brokerage group and

22   asked him about the process and his ability to generate

23   interest.

24   Q    Mr. Welch, you testified that JLL assigned certain

25   unencumbered real estate assets that you appraised as having

1   zero value.  Why would certain of those assets be appraised

2   at a zero?

3   A    So many cases, Ms. Mishkin, were appraising Sears'

4   position where they hold a lease.  If -- for example, Sears

5   currently has a lease where they paid $4 a square foot in

6   rent and the market is $5 per square foot in rent.  The

7   delta or the arbitrage in that rent is not large enough to

8   get a sub-tenant and then create net proceeds.  There are

9   numerous leases that fall into that category where the delta

10  between the rent was so small that it wouldn't create value.

11          Additionally, there were numerous leases where

12  Sears -- the remaining lease terms were 10 years or less.

13  And it's less likely you'll get someone to undertake the

14  capital investment necessary or the risk to assume a lease

15  with a shorter time frame without having options to go to

16  stay longer.  So there were assets in the Sears portfolio

17  that we didn't just ascribe zero value to.  The data

18  involved around those lent a value -- or supported a value

19  estimate of zero.

20  Q    And to your understanding, Mr. Welch, did the

21  committee's advisors, FTI, and Mr. Greenspan generally agree

22  with that approach?

23  A    They both omitted several hundred properties from their

24  valuation on that very same basis.

25  Q    So those 550 excluded assets that Mr. Chapman pointed

Page 97

1    out before, it is your understanding that Mr. Greenspan also

2    excluded several hundred of those from his analysis?

3    A    I believe it was somewhere near 400, and I believe they

4    were both correct to do so.  I think their methodology was

5    sound, and their reasoning was appropriate.  I think the

6    presentation was a little misleading, but I think what they

7    did was appropriate.

8    Q    Mr. Welch, with respect to the 13 U-Haul properties

9    that Mr. Chapman asked you about, do you have an

10   understanding as to whether the contract of sale for those

11   was negotiated pre-petition?

12   A    I don't know that, but for it to close in that short

13   time frame, it would appear that there was some discussion

14   that would've occurred.  The information that folks have

15   talked about being lacking, like environmental reports and

16   service, and things like that take time.  It would be

17   unlikely that in a 10- or 12-day period all that could've

18   been accomplished, but I'm unaware of the specific dates.

19            MS. MISHKIN:  Thank you, Mr. Welch.  I have no

20   further questions at this time.

21            THE COURT:  Okay.  Any --

22            MR. CHAPMAN:  Nothing further, Your Honor.

23            THE COURT:  Okay.  You can sit down.

24            MR. WELCH:  Thank you, Your Honor.

25            MR. CLAYTON:  Your Honor, Lew Clayton from Paul,

Page 98

1   Weiss for the restructuring subcommittee.  We call Alan Car,

2   and I've handed Mr. Carr a copy of his declaration.

3            THE COURT:  Okay.  Would you raise your right

4   hand?  Do you swear or affirm to tell the truth, the whole

5   truth, and nothing but the truth, so help you God?

6            MR. CARR:  I do.

7            THE COURT:  And on this -- I'm looking for your

8   declaration here.  Okay.  And its C-A-R-R, correct?

9            MR. CARR:  Yes, Your Honor.

10            THE COURT:  Okay.  So, Mr. Carr, I have your

11   declaration, which is at Tab 45 in my binder.  It's dated

12   February 1, 2019.  Sitting here today, would this constitute

13   your direct testimony?

14            MR. CARR:  Yes, it would, Your Honor.

15            THE COURT:  Okay.  All right.  Do you want to go

16   ahead with cross?

17            MR. QURESHI:  Good morning, Your Honor.  For the

18   record, Abid Qureshi, Akin Gump, on behalf of the Committee.

19   May approach the witness binders?

20            THE COURT:  Sure.

21            MR. QURESHI:  May I proceed, Your Honor?

22            THE COURT:  Yes.

23               CROSS EXAMINATION OF ALAN CARR

24   BY MR. QURESHI:

25   Q    Mr. Carr, good morning.

1   A    Good morning.

2   Q    Sir, you were appointed to serve as an independent

3   director at Sears on about October the 3rd, about two weeks

4   or so before the petition date, correct?

5   A    That's correct.

6   Q    And you served both as a member of the restructuring

7   committee of the board and also the subcommittee of the

8   restructuring committee, correct?

9   A    That's correct.

10  Q    And that's the subcommittee that, among other things,

11  is charged with investigating claims that the Sears estates

12  may have against Mr. Lampert and against ESL, correct?

13  A    That's correct.

14  Q    And you were first approached by Mr. Schrock from Weil,

15  Gotshal in late September of 2018 about your interest in

16  serving as an independent director, correct?

17  A    Correct.

18  Q    And after you got a call from Mr. Schrock but before

19  you were appointed to the board of Sears, you were

20  interviewed by Mr. Lampert, correct?

21  A    I had a conversation.  I wouldn't call it an interview,

22  but I had a conversation.

23  Q    Okay.  All right.  We don't have to call it an

24  interview.  But in that conversation, Mr. Lampert wanted to

25  understand your background, right?  He asked you about your

Page 100

1    background.

2    A    Yes.

3    Q    And he also asked you about your qualifications,

4    correct?

5    A    Yes.

6    Q    Okay.  And Mr. Lampert also used the opportunity during

7    that telephone conversation to give you his perspective on

8    Sears, correct?

9    A    Yes.

10   Q    And that happened before you were appointed to the

11   board, right?

12   A    Yes.

13   Q    Okay.  Now, let's talk a little bit about the

14   investigation that has been conducted by the subcommittee

15   that you've addressed in your declaration.  Now, the -- as

16   you set forth in the declaration, the subcommittee has

17   investigated potential claims that Sears can assert against

18   Mr. Lampert and ESL among other partners, right?

19   A    That's correct.

20   Q    Okay.  And the subcommittee has, in fact, concluded

21   that Sears has valuable claims that can be asserted against

22   both Mr. Lampert and ESL, correct?

23   A    Correct.

24   Q    And you state in your declaration that those claims

25   include, with respect to the Seritage transaction and the

Page 101

1    Lands' End transaction, right?

2    A    Correct.

3    Q    And those transactions in the aggregate involved

4    transfers of approximately $3.7 billion going from Sears to

5    those two entities, right?

6    A    Yeah.  I can't remember the exact number.  I know it's

7    -- that sounds about right.

8    Q    Okay.  And in addition, the subcommittee has

9    investigated circumstances concerning a number of loans made

10   by ESL to Sears between 2016 and 2018, right?

11   A    That's correct.

12   Q    Rough -- roughly $2 billion.  It's in your declaration.

13   A    Yeah, that sounds right.

14   Q    Okay.  And you understand, of course, that as part of

15   granting ESL the right to credit bit in this case, the

16   subcommittee gave up on behalf of the estate the ability of

17   Sears to pursue as a remedy against ESL for its role in

18   those various transfers the disallowance of any of the

19   claims that ESL has against Sears.

20   A    Yes, that's right.

21   Q    And so am I right, Mr. Carr, that if any of the claims

22   against ESL or against Mr. Lampert, those claims that you

23   describe in your declaration as valuable, actually succeed,

24   the Sears estate to get a remedy has to pursue ESL and Mr.

25   Lampert personally for damages, right?

Page 102

1    A    That's correct.

2    Q    Okay.  And you understand that ESL has secured claims

3    that it has filed against the Sears Debtors at approximately

4    $2.4 billion, right?

5    A    I'll take that.  I'd never seen a proof of claim.

6    Q    But you understand it's approximately that order of

7    magnitude.

8    A    Yes.

9    Q    Okay.  And I think you also understand, sir, that in

10   the final ESL bid, the one that your subcommittee accepted

11   on behalf of the estates, ESL has been given the right to

12   credit bid, right?

13   A    That's right.

14   Q    And you understand that what they are credit bidding is

15   approximately $1.3 billion of the 2.4 that it has.

16   A    Right.

17   Q    Okay.  So not all of it.

18   A    That's right.

19   Q    Okay.  And as you sit here today -- you didn't know at

20   your deposition, but I take it that since your deposition,

21   you've come to learn that all of the more than $2.4 billion

22   in claims that ESL has against the Debtors are being deemed

23   allowed claims as part of the credit bid.

24   A    That's right, with certain limitations on rights to

25   recovery, but that's right.  They're all being allowed.

Page 103

1   Q    Sure.  So, in other words, although what ESL is credit

2   bidding here is $1.3 billion of its claims, what they're --

3   what they're getting is a deemed allowance of all $2.4

4   billion of their claims, correct?

5   A    Correct.

6   Q    Okay.  Now, let's talk for a minute about the release

7   in one other respect.  Now, in your declaration, you don't

8   anywhere make reference to a decision by the subcommittee to

9   grant a release to Cyrus, do you?

10  A    I don't believe I do.

11  Q    Okay.  And are you aware, sir, that on Friday -- this

12  past Friday, February 1st, so one business day before this

13  trial commenced -- the Debtors filed with the Court a

14  revised sale order?  Or I should say a proposed sale order?

15  A    I'm not that familiar with it, no. Sorry.

16  Q    Do you -- did you come to learn that a sale order was

17  filed with the Court that released a for Cyrus?

18  A    I did not.  Didn't discuss it with my advisors.

19  Q    I'm sorry.  You did not?

20  A    No, I did not.

21  Q    So you did not know that a release was provided to

22  Cyrus?

23  A    I understand now that a release -- if that's what

24  you're asking, I do understand that a release was provided

25  to Cyrus.

1   Q     Okay.

2   A     I don't know that the order was -- I mean, being a

3   little technical, I don't know what was filed on Friday.

4   Q     Okay.  Well, did the restructuring committee approve,

5   as far as you are aware, the granting of a release to Cyrus?

6   A     I believe it was part of the overall deal when we

7   approved the term sheet in the -- around January 16th.

8   Q     So your testimony is that prior to the restructuring

9   committee accepting this deal, there was an understanding

10  that Cyrus was getting a release?

11  A     I believe that's right.

12  Q     Well, do you know, sir, if in the asset purchase

13  agreement that was originally filed with the Court, the one

14  that was agreed to after the auction, there is any mention

15  of a release to Cyrus?

16  A     I don't know.  I don't know whether there is or there

17  isn't.

18  Q     Okay.  You're not aware of there being one, right?

19  A     I'm not -- I'm not aware either way.

20  Q     Okay.  and Mr. Carr, did you ask your advisors to

21  undertake any analysis of any potential claims that might

22  exist against Cyrus?

23  A     My --

24  Q     I should add -- I'm sorry to intort -- prior to when

25  you believe Cyrus was granted a release.  So before then --

1    A    I understand.

2    Q    -- did you instruct your advisors --

3    A    I understand your question.  I understand your

4    question.

5    Q    Okay.

6         MR. CLAYTON:  Your Honor, I would just object to the

7    extent that those advisors include lawyers, and I don't

8    think he should invade --

9              THE COURT:  Well, he's just -- did you -- did he

10   discuss as opposed to what did he say?

11             MR. QUIRES:  Did it happen?

12             THE COURT:  Right.

13             MR. CARR:  My recollection is well before the

14   auction, we reviewed a variety of claims and looked at all

15   the debt claims.  And I believe that would've included any

16   parties who received securities, and I know Cyrus was

17   involved in some of those financings.

18   Q    Okay.  Well, were you aware prior to the alleged date

19   on which a release was granted to Cyrus that the committee

20   had filed a Rule 2004 motion as against a number of parties,

21   including Cyrus, relating to the auction for the MTN notes?

22   A    I know -- I know you have.  I don't recall what the

23   date was.

24   Q    Okay.  And do you know, sir, whether in connection with

25   agreeing to a release for Cyrus you instructed your advisors

1    to conduct an investigation with respect to Cyrus's actions

2    in the MTN auction?

3    A    I did not.

4    Q    You did not do that?

5    A    No.

6    Q    Okay.  Has it ever been reported to you that there was

7    any investigation conducted by the Debtors into Cyrus's

8    conduct with respect to the MTN auction?

9    A    It was not.

10   Q    Okay.  Now, are you aware -- let me back up.  I'm going

11   to make a representation to you because we don't have a lot

12   of time, and your counsel, I'm sure, will point it out if

13   I'm wrong that in the initial form of asset purchase

14   agreement that was filed with this Court, there is no

15   mention of a release to Cyrus.  Okay.

16            Now, my question to you, Mr. Carr, is are you

17   aware of the Debtors receiving any consideration that was

18   not already provided for in the asset purchase agreement

19   that was filed with this Court on account of granting a

20   release to Cyrus?

21   A    Could you ask it again?  I want to make sure I answer

22   this properly.

23   Q    Sure.  I made the representation to you that the asset

24   purchase --

25   A    Yeah, I got the representation.

Page 107

1    Q    -- does not have a release for Cyrus.

2    A    Yep.

3    Q    Okay.  So what I'm now asking is subsequent to that

4    asset purchase agreement being filed with this Court, so

5    after the action was closed, are you aware of Cyrus

6    providing any consideration to the Debtors in return for

7    which Cyrus received the release that is contained in the

8    proposed sale order?  Do you understand the question?

9    A    I do understand the question.

10   Q    Great.

11   A    So I'm going to saner it in a more complete way, if I

12   can, to make clear what my understanding was.

13   Q    Well -- okay.  Go ahead.

14   A    Because I had understood that Cyrus, as a condition to

15   their part in the bid, were demanding a release for them,

16   and I have a recollection of that discussion during the

17   auction process.  So they were putting consideration and

18   including rolling I think $250 million junior DIP as part of

19   that there, but if you're asking me between the time and

20   then, nothing additional came obviously in the deal.  The

21   deal was not sweetened between January 17th and this

22   weekend.

23   Q    Okay.  So let me make sure I've got this right.  So

24   your testimony is that Cyrus demanded a release in return

25   for its participation in this bid, right?  Do I have that

Page 108

1    part right?

2    A    That's my best recollection, yes.

3    Q    Okay.  And yet, that release is not in the asset

4    purchase agreement that was filed with the Court.  So is it

5    your testimony that there was an understanding with Cyrus,

6    and between Cyrus and the company that that release wouldn't

7    be in the asset purchase agreement, but subsequent to filing

8    the asset purchase agreement with the Court, that release

9    would end up in a proposed sale order?

10   A    What I'm saying is I have a recollection that it was a

11   term of the deal that there would be a release for Cyrus as

12   part of the negotiation.  I don't know where things went in

13   legal documents and things of that sort, so I don't know the

14   mechanics of how they got to where they did.

15   Q    Okay.  So you don't know how it came to be that the

16   relies that you think Cyrus demanded didn't end up in the

17   asset purchase agreement, and you're not aware of Cyrus

18   getting any -- providing, rather, any consideration to the

19   estate after the asset purchase agreement was filed,

20   correct?

21   A    That's correct.

22   Q    Okay.  Let's switch topics again, Mr. Carr, and talk

23   about the bid.  Now, am I correct that ESL in the bid that

24   you, on behalf of the restructuring committee, accepted did

25   not allocate the amounts being paid for each of the assets

Page 109

```
 1    that it is acquiring.

 2    A    That's correct.

 3    Q    Okay.  And as a consequence of ESL not doing that

 4    allocation, am I right, sir, that you're unable to tell this

 5    Court whether the credit bid of ESL is being used to acquire

 6    encumbered or unencumbered assets?

 7    A    That's correct.

 8    Q    And you understood, I take it, at the time that you

 9    approved the bid, that the bid procedures order did require

10    allocation?

11    A    I did.

12    Q    Okay.  Now, let's turn, if we could, Mr. Carr, to your

13    decision again to accept the ESL bid as the final bid.  Now,

14    one of your roles, obviously, on that evening was to assess

15    whether the ESL going-concern bid was the highest and best,

16    correct?

17    A    I think the highest or best.

18    Q    Right.  And in the context of assessing what the

19    highest or best bid was at the auction -- you don't

20    understand what the concept of good faith means, right?  Do

21    you recall that exchange at your deposition?

22    A    I do understand it in the -- in the context of -- that

23    it was presented, it was not clear and was very confusing in

24    my deposition.

25    Q    Right.  And what you said -- and we can refresh your
```

Page 110

```
 1   recollection with your deposition testimony if you like --

 2   is that if somebody's money is green, it's green.

 3   A    Right.

 4   Q    Okay.  Your focus was as long as the bidder, here ESL,

 5   is creditworthy, and as long as you're comfortable with the

 6   execution risk, good enough for you, right?

 7   A    I don't -- if you want to get my transcript, we can go

 8   through it.  I believe I was speaking in generalities around

 9   how I think about the good faith of bidders in processes --

10   Q    Well, I'm asking --

11   A    -- I've been involved in many, many times.  So --

12   Q    I'm asking you right now.

13   A    Yeah.

14   Q    Forget about what happened at your deposition.  I think

15   that's clear that your focus was if ESL was creditworthy and

16   if you were comfortable in the execution risk for the

17   Debtors of transacting with ESL, that was good enough for

18   you.

19   A    There were other factors, but that would be

20   satisfactory, yes.

21   Q    Okay.  Now, at the auction -- and to be clear, I'm now

22   talking about the auction commenced on the 14th at Weil,

23   Gotshal's offices and ended in the early hours of the 16th,

24   I believe.

25   A    I think the 17th, actually.
```

1    Q    17th.  You're right.  You did not at any time during

2    that process meet with the creditor's committee in advance

3    of accepting the ESL bid, right?

4    A    There was no formal meeting.  I saw advisors in the

5    hall and things of that sort.

6    Q    And I'm not talking about passing Mr. Dizengoff in the

7    hallway.  I'm talking about you didn't have a meeting during

8    the course of that auction with Creditors' --

9    A    I did not.  No.

10   Q    Okay.  And you have no knowledge of your advisors

11   meeting with the creditor's committee at the auction in

12   advance of accepting the ESL bid, right?

13   A    That's right.

14   Q    Okay.  And were you present at the auction when Mr.

15   Dizengoff, lead counsel for the committee, made a statement

16   on the auction record that the committee had not been

17   consulted with throughout the auction?

18   A    I forget exactly, but I remember that in the early

19   morning of the 16th, after Mr. Schrock made the announcement

20   of the determination of the -- of the restructuring and

21   subcommittee.  Yes.

22   Q    Right.  And you have no basis to disagree with what Mr.

23   Dizengoff said on the transcript, do you?

24   A    No.

25   Q    And you personally, Mr. Carr, did not think it was

Page 112

1    important to consult with the UCC because you believed that

2    you already had the opinion of the committee before the

3    auction.

4    A    I was well aware of their opinion, yes.

5    Q    Now, am I right that as you sit here today, there are

6    still aspects of the asset purchase agreement that are being

7    negotiated?

8    A    I believe there are some, yes.

9    Q    Okay.  Including the terms of the release?

10   A    I'm not sure where exactly that stands.  I got an

11   update this morning that where was a draft floating around.

12   I don't know whether it's done or not.

13   Q    Well, do you understand ESL and the company to be in

14   ongoing negotiations concerning the terms of the release?

15   A    As I understand it -- as I understand that the --

16   there's discussion on the precise wording of it and I think

17   to address some other concerns the UCC raised at the

18   beginning of the hearing on Monday to clarify what it said.

19   But my understanding also was that at this point, the

20   substance -- the material substance of the release has not

21   changed.

22   Q    Mr. Carr, you should have in front of you in the very

23   front of your binder your declaration.

24   A    Mh hmm.

25   Q    And if you could please, turn to Paraph 26.

Page 113

1    A    26?

2    Q    Yes.

3    THE COURT:  I'm sorry.  Someone is on a call.  The phone is

4    not on mute.  You need to put it on mute.

5    Q    Now --

6    A    Okay.

7    Q    Mr. Carr, you'll see that in Paragraph 26, you refer to

8    the APA, and you say it does not include a global release,

9    and you go on from there.  I want to focus your attention to

10   the last sentence before the enumerated A, B, C, D, E.  Do

11   you see that?

12   A    Yes.

13   Q    And what you write -- and tell me if this is consistent

14   with your understanding -- "The limited release expressly

15   excludes all other claims and causes of action, including,"

16   and then there's a list of A, B, C, and I want to focus you

17   on D, which says, "All claims related to the Lands' End or

18   Seritage transactions."

19   A    I see that.

20   Q    Is that consistent with your understanding of what the

21   scope of the release was that you agreed to the night of the

22   auction?

23   A    Yes.

24          MR. QURESHI:  Okay.  Now, I am going to mark for

25   identification as Exhibit 181 an amendment to the asset

Page 114

1    purchase agreement that the committee received late last

2    night, Your Honor.

3    Q    Mr. Carr, take a look, if you would, at this amendment.

4    Tell me if you've seen it before.

5    A    I have not seen it before.

6    Q    Okay.  Now, I will direct you, please, to Page 23 of

7    the document.  And actually, let me ask you before you take

8    a look at that paragraph, Mr. Carr, did you become aware at

9    any point that the scope of the release as it relates to

10   Seritage and Lands' End in particular was being altered from

11   what you agreed to the night of the auction?

12   A    No.

13   Q    Okay.  And did you become aware at any point that the

14   company's advisors were going to propose to ESL a release

15   that, with respect to Lands' End and Seritage had a

16   different scope than what you agreed to at the auction?

17   A    I can't recall any notice of that.

18   Q    Okay.  And just so we're clear, Mr. Carr, I don't mean

19   to suggest that this amendment that I've had -- handed you

20   has been agreed to.  I will represent to you that my

21   understanding is that this is a proposed amendment that went

22   from the Debtors to ESL.  To my knowledge, it has not been

23   agreed to, but again, I'm not here testifying, and I don't

24   know --

25             MR. CLAYTON:  Your Honor, if I may object.  There

Page 115

1    was a lot of discussion about this release yesterday in open

2    court.  I don't think there's a disbarment as to what the

3    language is supposed to do.  The parties, as everyone in

4    this courtroom knows, have been -- and part of the request

5    of the UCC clarified this release.  This is a

6    20-something-page document.  You cannot from this document

7    determine a loan from the document exactly what it means

8    because it has inserts into another document.  It's not

9    agreed to, as Mr. Qureshi says.  I don't understand why

10   we're getting anywhere asking Mr. Carr about his

11   understanding of this -- of this document.  And I will say

12   that if it turns out that we proffer to the Court a document

13   that does not reflect what everybody knows the intent of

14   this document is, it will not be accepted by the Court.  And

15   if we made a drafting error, we will correct it.  So I

16   respectfully suggest this is not an appropriate line of

17   inquiry, except if it's simply to make a rhetorical point

18   that has no meaning in this proceeding.

19             MR. QURESHI:  Well, Your Honor, Mr. Carr

20   represents the decision maker here.  I think it's entirely

21   fair to inquire of Mr. Carr what he, as the decision maker,

22   understands the scope of the release to be.

23             THE COURT:  Well, I actually -- we went through

24   this yesterday, and I'm the decision maker, and I made it

25   clear what the release should say.  So this is a waste of

Page 116

1   time.  I mean, the point that we are dealing a document that

2   needs to be changed has been made.  And I made the point

3   yesterday, I think quite clearly, that it needs to be

4   changed and how it needs to be changed.  So that's enough on

5   this topic.

6          MR. QURESHI:  Okay.  And just -- if I may make one

7   comment for the record, Your Honor.  What I had intended to

8   do with this document is to make the point that it now

9   releases certain --

10          THE COURT:  It is not a binding document.  And I

11   don't care what it says.  I care what I said yesterday,

12   which was largely what you said yesterday, or your

13   colleague.  So I wouldn't turn victory into something less

14   than that, if I were you --

15          MR. QURESHI:  I am --

16          THE COURT:  -- on this point.

17          MR. QURESHI:  I am happy to move on, Your Honor.

18          THE COURT:  Okay.

19   Q   All right.  Mr. Carr, let's talk for a minute about

20   administrative solvency.  Now, from time to time, sir, you

21   communicated with various advisors of yours and of companies

22   by text message, right?

23   A   Yes.

24   Q   And I want to show you just a handful of those.  And

25   the first appears at Tab 6 of the binder that I have put in

Page 117

```
 1    front of you.

 2    A    Tab 6?

 3    Q    Yes.

 4    A    Yep.

 5    Q    And it's been marked as JX-171.

 6            THE COURT:  I'm sorry, JX-171?

 7            MR. QURESHI:  171.  It's at Tab 6 of the binder,

 8    Your Honor.

 9            THE COURT:  Right.

10    Q    And you will see, Mr. Carr, that this is an exchange

11    that includes you and Dan Aronson.  Now, Mr. Aronson you

12    recognize to be your investment banker from Evercore,

13    correct?

14    A    Yes, for the special committee.

15    Q    Yes.  And this series of text messages that I have put

16    before you, you'll see the date of those is January the 4th.

17    And if you'd like, if it refreshes your recollection, Mr.

18    Carr, there was also a meeting of the restructuring

19    committee on January the 4th.  And if you look behind Tab 7

20    of the binder, you will see the minutes from that meeting,

21    and you will see on those minutes first that you were in

22    attendance and secondly that there was a discussion, and it

23    appears on Page 2 of the minutes, of the administrative

24    claims and shortfalls.  So do you have that context?

25    A    Yes.
```

1    Q    Okay.  Let's go back to the text message.

2    A    Yeah.  I mean, if you're asking me before we start that

3    these texts were either contemporaneous or not, there's been

4    a confusion with all these texts, just to be clear.  The

5    timestamp on them is -- I don't know if you figured -- I

6    haven't figured out exactly when they are.

7    Q    The -- I can represent to you that the timestamp is not

8    accurate.

9    A    Yeah.

10   Q    It's a function of how these were produced.

11   A    Yeah.

12   Q    So I understand the confusion.

13   A    Yeah.

14   Q    Now, let's look at the texts.  And the first text from

15   Mr. Aronson to you, he says this is a scary conversation

16   now.  Do you see that?

17   A    Yes.

18           THE COURT:  So, I'm sorry.  What is the date of

19   these texts?  Do we --

20           MR. CARR:  This is January 4th.

21           THE COURT:  Okay.

22           MR. QURESHI:  This is January the 4th.

23           THE COURT:  Okay.

24           MR. QURESHI:  And you respond to Mr. Aronson on

25   the next page, very.  Then you write, not a firm number in

Page 119

1    our hands.  And then in the next page of the exhibit, if you

2    look at the production number, it's the page that ends in

3    775.  It's a text from Mr. Aronson to you.  There's a

4    reference to Mo.  Do you understand that to be a reference

5    to Mr. Meghji?

6    A    Mr. Meghji, yes.

7    Q    Okay.  Read, please, if you could, what Mr. Aronson

8    wrote to you in that text on January the 4th.

9    A    "You need to tell Mo to give you a number to make sure

10   the company will not be administratively insolvent and have

11   Ray tell other side.  Best and final.  No more this moving

12   deck chairs."

13   Q    Okay.  And turn on, if you could, please, to the last

14   page of the exhibit.  And there's another text message from

15   Mr. Aronson to you.  And just read, if you could, what Mr.

16   Aronson was advising you there.

17   A    "Unequivocal answer.  Professionals must represent to

18   you that we are administratively solvent.  Without it, this

19   is dead.  Ray is right."

20   Q    Thank you.  Mr. Carr, you never did receive, did you,

21   an unequivocal representation from your advisors that the

22   estate would be administratively insolvent if --

23   administratively solvent if they selected the ESL bid,

24   right?

25   A    That's correct.

Page 120

1    Q    You can put that exhibit aside.  Now, I don't want to

2    get into APA provisions with you, but you understand

3    generally that there is a provision of this deal that has

4    been referred to as the least designation provision?

5    A    Yes.

6    Q    Do you remember it was discussed at your deposition?

7    A    I actually don't recall the discussion.

8    Q    Okay.  That's fine.  But you're familiar generally with

9    that provision, right?

10   A    Very generally.

11   Q    Okay.  And your presumption is that the purpose of that

12   provision is to give the buyer, here ESL, the option to

13   monetize leases if it wants to.

14   A    I believe that's right.

15   Q    And if they did that, that would be a benefit that

16   would occur to ESL and not to Sears, right?

17   A    That's right.

18   Q    And that provision of the APA gives ESL 60 days to

19   designate leases that it may wish to monetize, and you're

20   unable to say, sir, right, how it is that the 60-day time

21   period was arrived at as an appropriate period of time?

22   A    I don't recall.

23   Q    Okay.  Let's switch topics again, Mr. Carr, and talk

24   very briefly about ESL's business plan.  Now, sometime in

25   January, you and your colleague on the restructuring

1    committee, Mr. Transier, had a call with Mr. Lampert,

2    correct?

3    A    No.  Not a phone call.  It was -- it was a video

4    conference --

5    Q    Okay.

6    A    -- I think of the entire restructuring committee,

7    including Ms. Reese and Mr. DePodesta as well with Mr.

8    Lampert.

9    Q    I see.  You don't recall there being a phone call with

10   Mr. Lampert that involved just you and Mr. Transier?

11   A    Nope.

12   Q    Okay.  So whatever this call or video was, do you

13   recall that one of the pursues of the conversation you had

14   with Mr. Lampert was for him to make his pitch to you as to

15   why ESL's bid ought to be accepted?

16   A    Yes.

17   Q    And during that call, there was also a discussion of

18   ESL's go-forward business plan, right?

19   A    Yes.

20   Q    And your recollection is that that was a very general

21   call about how Mr. Lampert intended to run the business,

22   right?

23   A    Right.

24   Q    And at the time of that call, you did not have before

25   you any document that represented the ESL go-forward

Page 122

1    business plan, right?

2    A    That's right.  I think Mr. Transier made a request --

3    Q    Right.

4    A    -- to have it.

5    Q    And there hasn't been any occasion where you have had

6    an opportunity to question anybody from ESL about their

7    business plan, right?

8    A    I don't know if I had an opportunity, but I didn't have

9    a conversation --

10   Q    Okay.

11   A    -- after I had the business plan.

12   Q    Okay.  Now, let's switch gears again, and I want to

13   look at another text message exchange.  This time it's at

14   Tab 8 of your binder, and it's JX-170-C.

15   A    Yep.

16   Q    And just to give you context here again, the date of

17   this exchange is January the 17th.

18   A    Yeah.

19   Q    And if you look at the next tab -- again, I'm just

20   trying to give you context here.

21   A    Yep.

22   Q    The next tab contains minutes of a meeting of the

23   restructuring committee --

24   A    Yep.

25   Q    -- that began on January the 16th at 11:30 p.m. --

Page 123

```
 1    A    Right.

 2    Q    -- Western time.  Do you see that?

 3    A    Right.

 4    Q    And you will see in the minutes, Mr. Carr, that there

 5    is a discussion about the so-called DIP shortfall, if you

 6    look on the second page of the minutes.

 7    A    Yes.

 8    Q    Okay.  Now -- and again, I'm understanding the

 9    difficulty we have with the timestamps.

10    A    This one, I'm very familiar with the timestamps.

11    Q    Right.  Okay.  And you understand --

12    A    So these texts actually are not related to this board

13    call.

14    Q    Okay.

15    A    They relate to the one before it.

16    Q    Okay.

17    A    Maybe an hour or two earlier.

18    Q    And do you recall the substance of the meeting an hour

19    or two earlier?

20    A    Yeah.  It's because this second call was requested by

21    me actually in relation to the text message you see in that

22    exchange.

23    Q    Okay.  So let's look at the text.  Let's look at the

24    third page.  Mr. Stogsdill is on this text message.  He is

25    your financial advisor from A&M, correct?
```

Page 124

1   A     That's correct.

2   Q     And the other two individuals on here, again, Mr.

3   Aronson your banker and, of course, you.

4   A     Yep.

5   Q     And Mr. Stogsdill writes, "Nick has been flagging that

6   DIP issue to the company for weeks.  It's been the structure

7   for a while now."  Do you have an understanding of what

8   that's a reference to?

9   A     Yeah.  So to give some context for Your Honor as well,

10  the -- probably the morning before, we had chosen the ESL

11  bid as the highest or best bid and announced it at the

12  auction, left the auction open.  But we still had to go back

13  and finish some legal documentation.  There was a call --

14  there was a series of calls the afternoon of the 16th and

15  the end of the evening the 16th identifying what open points

16  had been negotiated to.  And the one that was raised, I

17  believe in the afternoon, was explained that there was

18  language around this DIP shortfall issue.

19  Q     Right.

20  A     Which ironically, shortfall actually means better than.

21  If we -- if we come in with a DIP delivery less than 850,

22  whether that -- we get a credit or a benefit for that.  And

23  it was -- we were advised that ESL was being insistent that

24  that not be that way, that they get the benefit.  But if we

25  delivered more than 850 of DIP, that's an unsatisfying

Page 125

1    condition to closing.

2            So we were concerned we wouldn't understand what

3    the benefit effectively to ESL could be in that scenario.

4    What would be that among of money?  So we asked for some

5    analysis of that.  On the 10 p.m. call, luckily -- I mean,

6    it was 9:45 that evening, which is when these texts were

7    taking place -- we got on the call and Lazard got in -- was

8    sort of throwing a lot of numbers at us.  And I was getting

9    -- I was getting, frankly, quite confused about where the

10   numbers were coming from.  This is what the identification

11   of the DIP issue was about.  And so I asked that we actually

12   get something in front of us.  And that's where the minutes

13   -- just to give you the time line how it worked.

14   Q    Okay.

15   A    I wanted to see something first we actually could see

16   what that looked like and what would have to happen to

17   create a scenario in the likely -- the likelihood of

18   actually hitting a scenario where we outperformed the 850

19   deliverable DIP and ESL gets a benefit.

20   Q    Okay.  And you understand that the way that provision

21   ultimately came to be in the final document is that if there

22   is a shortfall -- in other words, if the Debtor does better

23   in minimizing its draws on the DIP -- the benefit occurs to

24   ESL in the form of ESL dollar for dollar assumes fewer

25   liabilities, right?

Page 126

1    A     Right.

2    Q     Okay.  And that's the provision that was being

3    discussed in this exchange of text messages?

4    A     That's right.

5    Q     Okay.  All right.  Now, let's turn, if we could please,

6    to Tab 10 of your binder.  This is another series of text

7    message.  And again, if you look at the timestamp, I believe

8    -- but you can correct me if I'm wrong, Mr. Carr -- that,

9    again, there was that same meeting of the restructuring

10   committee on the 16th for which I showed you the minutes

11   where, again, the DIP shortfall provision was discussed.

12   And I want to turn your attention -- and these text

13   messages, by the way, it's again you, Mr. Stogsdill, and Mr.

14   Aronson.  And I want to turn your attention -- you should

15   look at them all -- they're very short -- to get the

16   context.

17   A     Yep.  I'm familiar with these.

18   Q     I want you to look at -- bear with me for a second --

19   the page -- if you look at the production numbers at the

20   bottom ending in 941.

21   A     941.  Yes.

22   Q     Okay.  Now, there's a text written from Mr. Stogsdill

23   to you and to Mr. Aronson.  And he writes -- and I'm going

24   to skip the expletive when I read it.

25   A     Mm hmm.

Page 127

1   Q    "We should plant the seed of this -- blank -- up

2   provision with the UCC so they carry the flag.

3   A    Yes.

4   Q    Do you have an understanding of what provision Mr.

5   Stogsdill was referring to, sir?

6   A    I believe he was referring to this issue around the

7   outperformer, the DIP shortfall --

8   Q    The DIP shortfall.

9   A    Yes, yes.

10  Q    Okay.  Mr. Carr, just two more text exchanges to go

11  through, and then I will be done.

12  A    I'm sorry, the court reporter asked me a question.

13  Could you start again?

14  Q    I said I have just two more text exchanges that I'm

15  going to take you through, and then I will be done.

16  A    Okay.

17  Q    And if you could turn to Tab 11, please?  And this

18  series of texts has been marked JX 168.  And again for

19  context, I've placed behind Tab 12 minutes of a January 8th

20  meeting of the structuring committee.  That's at JX 103,

21  which bears the same date as this series of text messages,

22  which is to say January the 8th of 2019.  Does that help you

23  place these text messages in context, sir?

24  A    Yes.  I assume that the timestamps are right, which

25  they -- it kind of makes sense.  They probably were during

Page 128

1    this restructuring committee meeting.

2    Q    And you will see as you flip through these texts that

3    it appears that you and Mr. Stogsdill are both on the phone

4    listening to a court hearing, right?  You say on the page

5    ending in 879 --

6    A    I don't know if it's --

7    Q    -- I don't have a dial-in.  On the next page Mr.

8    Stogsdill says $17.9 million of the $120 million deposit is

9    non-refundable.  Then you write, "Actually got on."  Does

10   that refresh your recollection, that you were texting with

11   Mr. Stogsdill during a status conference?

12   A    I don't recall being on a status conference.  I don't

13   know.  It may have been -- I don't recall ever being dialed

14   into a status conference.

15   Q    Okay.  But you recall that generally speaking -- you

16   don't have to be specific on the date -- that there came a

17   time where at a status conference Mr. Schrock announced that

18   if ESL paid a deposit of $120 million and if they agreed

19   that 17.9 of that was non-refundable, they could participate

20   in an auction on the 14th?

21   A    That's right.

22   Q    Okay.  And I want you to read if you could -- go to the

23   page ending in 888 of this exhibit.  And I want you to read

24   the text message from Mr. Stogsdill to you.  And I want you

25   to read please the response from you to him on the next

Page 129

```
 1    page.
 2    A    Mr. Stogsdill said, "Judge made it clear he wanted a
 3    deal, so wanted more time for us."
 4         My text, "This is good and gives us cover."
 5    Q    Mr. Carr, Tab 13 if you would, please.  And behind Tab
 6    13 is a text message from Mr. Aronson to you dated January
 7    the 10th.  Do you see that?
 8    A    Yes.
 9    Q    And I want you to turn over the page to the text that
10    you wrote to Mr. Aronson, and I want you to read it, please.
11    A    "Think the judge has given us a window to imperfection,
12    close enough for government work."
13    Q    Thank you, Mr. Carr.  That's all I have.
14                    REDIRECT EXAMINATION OF ALAN CARR
15    BY MR. CLAYTON:
16    Q    Just a handful of questions, Mr. Carr.  You were asked
17    a number of questions about texts on -- we don't know what
18    time of day those texts were sent.  We do know the dates.
19    And I believe the dates were January 4, January 8, January
20    10.  Do those dates sound correct to you?
21    A    I think the 16th, 17th.  That would --
22    Q    Well, you were just asked some questions about --
23    A    Yes.
24    Q    -- texts from the 4th, the 8th, and the 10th.  Do you
25    recall?
```

Page 130

1    A    Yes.

2    Q    Was the deal that you and the other members of the

3    restructuring committee approved on the 16th, was that the

4    same deal that was under discussion on those dates, January

5    4, January 8, January 10, or did the deal change?

6    A    It changed.

7    Q    Okay.  You were asked some questions about consultation

8    with representatives of the UCC.  And if I remember

9    correctly, you said that the restructuring committee was

10   well aware, I think that was your phrase, of the UCC's

11   opinion.  Do you remember saying that a couple minutes ago?

12   A    Yes.

13   Q    To your knowledge was there any point on which -- at

14   which time you were serving on the committee that the UCC or

15   its representatives ever indicated that they would support

16   anything other than a liquidation of Sears?

17   A    No.

18   Q    Just two or three more questions.  You were asked a

19   number of questions about communications with your advisors,

20   the advisors of the restructuring committee or the

21   subcommittee.  Do you recall that?

22   A    Yes.

23   Q    And you were shown some minutes of meetings of the

24   restructuring committee.  Do you recall that?

25   A    Yes.

Page 131

1          MR. CLAYTON:  Your Honor, if I may approach the

2      witness just to hand him an additional document.  This is in

3      evidence I believe.  Your Honor, would the Court like a

4      copy?

5          THE COURT:  Sure.  Yes.

6          MR. CLAYTON:  It's a set of the minutes.

7          THE COURT:  Thanks.

8      Q    And, Mr. Carr, this is Joint Exhibit 149.  I think you

9      were not actually shown this set of minutes.  But this is --

10     in the interest of time, I will just say to you that if you

11     look on the first page, you will see these are minutes of a

12     meeting held on January 16, 2019.  It begins at 1:00 in the

13     morning.  Do you recall that meeting?

14     A    I do.

15     Q    And I think it ended, if you look at the last page, at

16     1:35 A.M.  Now, I'm just going to direct your attention very

17     quickly to the last page of this document.  It's the third

18     page I think of the minutes.  It's the one where the Bates

19     numbers end 3795.  If you look three paragraphs up from the

20     bottom, there's a short -- there are three short sentences.

21     "The committee sought confirmation that the recommendation

22     of Weil, M3, Lazard, and management was to pursue the ESL

23     final bid.  Mr. Meghji stated that while administrative

24     solvency could not be assured or be agreed, Mr. Riecker

25     stated that he believed the company's liquidity could be

Page 132

1   managed, and he agreed on behalf of management."  Do those

2   sentences accurately state what you recall the advice was

3   that you received at this meeting of the committee at one

4   A.M. on January 16th?

5   A    Yes.  I mean, it actually didn't say -- I think all

6   three advisors, Weil, M3, and Lazard, recommended --

7   A    Yes.  Now, I just want to direct you very briefly to

8   another set of minutes.  I think if you look at the binder

9   that you have, I think you were questioned about Tab 9.  Tab

10  9 is another set of minutes.  And again, in the interest of

11  time, this was another meeting of the committee that

12  occurred at 11:30 P.M. on January 16.  That's 18, 19 hours

13  or so after your meeting between 1:00 A.M. and 1:35 A.M.

14  And again, I'm just going to direct you to one paragraph on

15  the last page of this document.  One, two, three, four

16  paragraphs up.  Short paragraph.  It says, "Mr. Aebersold

17  confirmed that the presentation demonstrated that there were

18  ways to manage the 'risk', that the company would generate

19  more cash than needed to reduce the senior DIP to a maximum

20  of $850 million at closing and trigger the 'DIP shortfall'

21  provision.  He stated that from Lazard's perspective, ESL's

22  revised bid represented the best alternative for the

23  company.  Mr. Meghji agreed."  And my last question to you

24  today, Mr. Carr, do those sentences, again, accurately state

25  the advice that the committee got at this meeting at 11 P.M.

Page 133

1      on January 16th?

2      A     Yes.

3             MR. CLAYTON:  Your Honor, no further questions.  I

4      believe there may be questions from Weil.  We represent, as

5      you know, only the restructuring subcommittee.  Thank you.

6             THE COURT:  Okay.  You can have a re-cross after

7      that.

8             MR. GENENDER:  Paul Genender from Weil Gotshal,

9      Your Honor.

10     BY MR. GENENDER:

11     Q     Mr. Carr, just a couple of questions.  The Cyrus

12     release that you were asked about, did that relate solely to

13     the credit bid?

14     A     That's my understanding.

15     Q     And I believe you testified to this, but was it your

16     understanding that the consideration for that was rolling

17     the junior DIP?

18     A     Yeah.  And there may have been other -- but that's the

19     one that comes to mind.  I know they were a key part to

20     that.

21     Q     And is it also your understanding that there was no

22     intent from that release to release any claims related to

23     the creditor committee's 2004 motion or the MTN sale?

24     A     It wasn't my intent.

25     Q     And is it also your understanding that the Cyrus

Page 134

1    release was disclosed to the Court in a filing on February

2    1?

3    A    I don't know because I dialed in and -- I didn't get to

4    hear the whole hearing, so I don't know.

5    Q    That may be an unfair question.

6              MR. GENENDER:  For Your Honor I'll represent

7    docket entry 2332, Paragraph 8, which is in Tab 34 in your

8    notebook.  Thank you.  No further questions.

9              THE COURT:  Okay.  Any re-cross?

10             MR. QURESHI:  Nothing, Your Honor.

11             THE COURT:  Okay.  You can step down.

12             MR. CARR:  Thank you, Your Honor.

13             MR. QURESHI:  Your Honor, just on scheduling, if I

14   could suggest -- I think my partner, Mr. Serkin, will be

15   handling Mr. Riecker's examination.  We expect it to be

16   reasonably short, 25 minutes or so.

17             THE COURT:  Okay.

18             MR. QURESHI:  Our suggestion would be to charge

19   through with that one and then --

20             THE COURT:  That was my thought, too.

21             MR. QURESHI:  Then take a break.  Mr. Kamlani will

22   be I think a little bit longer than that.

23             THE COURT:  Okay.

24             MR. QURESHI:  So if we could do that after lunch,

25   that would be great.

Page 135

1          THE COURT:  Okay.

2          MR. LENDER:  Your Honor, again, David Lender from

3    Weil Gotshal for the Debtors.  For our next witness, we call

4    Robert Riecker.  And for the record, his declaration is at

5    Tab 46 of your binder, Docket Number 2339.  And we move his

6    declaration into the record as Mr. Riecker's direct

7    examination.

8          THE COURT:  Okay.  Can you raise your right hand,

9    please?  Do you swear or affirm to tell the truth, the whole

10   truth, and nothing but the truth, so help you God?

11         MR. RIECKER:  I DO.

12         THE COURT:  And it's Robert, R-i-e-c-k-e-r?

13         MR. RIECKER:  Correct.

14         THE COURT:  Okay.  Thank you.

15         MR. SERKIN:  Your Honor --

16         THE COURT:  Oh, I'm sorry, I forgot to ask Mr.

17   Riecker.  I have your declaration, sir, which is dated

18   February 1, 2019.  It's Tab 46 in my binder.  Sitting here

19   today, would this still constitute your direct testimony?

20         MR. RIECKER:  Yes, it does.

21         THE COURT:  Okay.  All right.

22         MR. SERKIN:  Your Honor, for the record, Joseph

23   Serkin.  And again, we have witness binders.  May I

24   approach?

25         THE COURT:  Sure.

Page 136

```
 1              CROSS EXAMINATION OF ROBERT RIECKER

 2    BY MR. SERKIN:

 3    Q    Good afternoon, Mr. Riecker.

 4    A    Hello.

 5    Q    You are currently a member of the office of the CEO for

 6    Sears, correct?

 7    A    Correct.

 8    Q    And you've also been the CFO of Sears since 2016,

 9    correct?

10    A    2017.

11    Q    2017.  And you've actually held a number of different

12    roles in the financial reporting group at Sears since 2005,

13    correct?

14    A    Correct.

15    Q    Now, I want to talk about the go-forward business plan

16    that was prepared post-filing.  Okay?  You started

17    participating in the creation of the company's business

18    plans pre-filing when you became CFO in 2017, correct?

19    A    Yes.

20    Q    Okay.  And with respect to the go-forward plan post-

21    filing, you began working on the company's plan about two

22    weeks after the filing itself, correct?

23    A    That's correct.

24    Q    And you had a preliminary plan that was created on or

25    around November 12th, correct?
```

1    A    I believe that's correct.

2    Q    And then revised in December, correct?

3    A    Yes.

4    Q    And if you could look at Tab 1 in your binder.  It's

5    Joint Exhibit 2.  That is the revised plan from December

6    that we just talked about, correct?

7    A    Yes.

8    Q    And in preparing the go-forward plan, you and others

9    reviewed historical data related to the stores that were

10   part of that plan, correct?

11   A    Correct.  This plan was built on 505 stores.  And I

12   reviewed the historical data related to those stores.

13   Q    And in preparing the go-forward plan, you focused on

14   the last 12 months of historical performance, correct?

15   A    That's correct.

16   Q    The go-forward plan rests on a number of assumptions

17   that are laid out on Page 7 of Joint Exhibit 2.  So if you

18   could flip to Page 7, please.

19   A    Okay.

20   Q    Okay.  And Mr. Riecker, before we go through some of

21   these assumptions, you recall that you provided deposition

22   testimony with respect to the business plans, I think it was

23   two Fridays ago now.  Do you recall --

24   A    Yes, I did.

25   Q    And you recall that in addition to providing deposition

1    testimony with respect to your individual knowledge, you

2    were designated as the corporate representative concerning

3    Sears' go-forward business plan, correct?

4    A    Yes.

5    Q    And that included the information and assumptions on

6    which the business plan was based, correct?

7    A    Yes.

8    Q    Now, let's discuss some of those assumptions.  We won't

9    go through all of them.  Let's start with the third bullet

10   on Slide 7.  Management Operational Initiatives.  Those are

11   the initiatives.  And it says drive improving same-store

12   sales comps of negative 2.4 percent for fiscal year 2019,

13   positive 2.7 percent for fiscal year 2020, and positive 3.5

14   percent for fiscal year 2021.  That's correct?

15   A    Yes.

16   Q    Okay.  Now, with respect to -- well, just so we're all

17   clear, the same-store sales comps, that shows the change

18   year over year within the same month within the same store,

19   correct?  So it's showing the change in sales, same store,

20   same month, next year.  Correct?

21   A    Correct.  It is a measure that we measure on a daily

22   basis year over year.

23   Q    Got it.  And since the company has been in bankruptcy,

24   the current same-store sales comps have been roughly

25   negative low teens to 15 percent, correct?

Page 139

1    A    Yes.

2    Q    And when we talk about the management operational

3    initiatives that are identified, those are related to the

4    Shop Your Way promotional program, correct?

5    A    Yes.

6    Q    And specifically they relate to the use of points and

7    the pricing of products, correct?

8    A    Correct.

9    Q    And you arrived to the negative 2.4 percent number in

10   looking at the company's same-store sales in 2018 leading

11   into the company filing for bankruptcy, correct?

12   A    That is correct.

13   Q    And if we flip to Page 11 in the same exhibit, then you

14   see the chart on the right-hand side of the page?

15   A    Yes, I do.

16   Q    And that shows the same-store sales improvement from

17   February to September of 2018, correct?

18   A    Yes.

19   Q    Then over the course of those eight months, it went

20   from, depending on whether you're looking at Sears or Kmart

21   stores, negative 17 percent to negative one percent, or

22   negative 15 percent to zero percent.

23   A    Correct.

24   Q    Yes.  And you attribute this growth in the 2018 same-

25   store sales to a number of promotional activities related to

Page 140

1    Shop Your Way, correct?

2    A    Yes.

3    Q    And you believe that those Shop Your Way initiatives

4    were mainly cash back offers, right?

5    A    That was the majority of them, yes.

6    Q    And you also understand that these Shop Your Way

7    initiatives in 2018 improved the company's gross margin at

8    the same time as improving same-store sales, correct?

9    A    Correct.

10   Q    Okay.  And gross margin, that is simply the difference

11   between the revenue and the cost of goods paid for to attain

12   that revenue, correct?

13   A    Correct.

14   Q    Now, can you tell me specifically what the change in

15   margin percentage was between July and August of 2018?

16   A    Without having that type of data in front of me, I

17   cannot tell you specifically those numbers.

18   Q    Okay.  Now, with respect to go-forward planning and

19   determining the negative 2.4 percent for 2019, you

20   anticipate that the same initiatives that led to the growth

21   reflected on Page 11 will be used going forward in 2019 and

22   beyond, correct?

23   A    The same and or similar types of promotional items will

24   be used.

25   Q    Okay.  And, now, aside from being mainly cash back

Page 141

1    offers that you talked about, you don't know what

2    specifically those Shop Your Way initiatives actually are,

3    correct?

4    A    They traditionally will be very similar to what was

5    done during this time period and what say were cash back and

6    points offers.  That allowed participants in the Shop Your

7    Way program to purchase products, receive cash back and

8    points that would then be available to be utilized in future

9    purchases of that member.

10   Q    Now, with respect to the negative 2.4 percent number,

11   you don't know whether there was any specific analysis or

12   buildup based on historical numbers that was looked to to

13   arrive at that precise number of negative 2.4 percent,

14   correct?

15   A    We have -- we utilized a number of data points,

16   including the specific performance of each one of these

17   stores and how these stores performed.  The grid that you

18   show on the right -- that is shown on the right-hand side of

19   Page 11 is the performance of those 505 stores last year.

20   Q    Understood.  My question was a little bit different,

21   Mr. Riecker.  With respect to the negative 2.4 percent

22   that's being projected in JX 2, this is the management's

23   best guess as to what the performance will be going forward

24   in 2019.  You can't tell me what the specific analysis or

25   buildup was based on historical numbers in order to arrive

Page 142

1    at that precise negative 2.4 percent number, can you?

2    A    The negative 2.4 percent number is a calculation.  The

3    sales numbers that were produced to drive this plan then

4    result in the negative 2.4 percent calculation.

5    Q    Mr. Riecker, I'm going to refer to your deposition,

6    Page 46, Line 13.  The question I asked, "With respect to

7    the precision associated with the negative 2.4 percent

8    number, do you know whether there was an analysis or a

9    buildup based on historical numbers?"

10           Answer, "I did not know firsthand based off of

11   historical numbers."

12           Question, "Do you know who would?"

13           Answer, "Mr. Sinha."

14           Did I ask those questions and did you give that

15   answer, those answers?

16   A    That sounds correct.

17   Q    Okay.  Now, with respect to the projections for 2020

18   and 2021, the positive 2.7 percent in 2020 and the positive

19   3.5 percent in 2021 that are reflected in the company's

20   business plan, those are all based on the same actions and

21   activities that drive same-store sales growth for 2019 and

22   that did for 2018, correct?

23   A    Correct.

24   Q    And those actions are all primarily related to the Shop

25   Your Way initiatives, correct?

Page 143

1    A    Yes.

2    Q    Now, turning back to Shop Your Way generally, Shop Your

3    Way was originally implemented at Sears in 2009, correct?

4    A    In the fourth quarter of 2009 is when it started.

5    Q    And the actual implementation of how the Shop Your Way

6    program has changed since 2009, correct?

7    A    It has evolved.

8    Q    But the underlying strategy of Shop Your Way and the

9    underlying tenets of Shop Your Way have not changed,

10   correct?

11   A    For the most part, correct.

12   Q    And sitting here today, you can't describe how the Shop

13   Your Way point system differs from other sorts of point

14   systems at other retailers, correct?

15   A    That's correct.

16   Q    I'm going to turn for a moment now, Mr. Riecker, to the

17   ESL business plan.  ESL has a different plan than the

18   company, correct?

19   A    Based on my cursory review of it, yes.

20   Q    Okay.  And if we could look at Tab 2, which is Joint

21   Exhibit 55.  Exhibit 55 was a lender presentation prepared

22   by ESL and its advisors and made to potential ABL lenders on

23   January 24th of this year, correct?

24   A    I believe that's the date.

25   Q    And if you look at Slide 3, you'll note that you were

Page 144

1    one of the presenters listed on Exhibit 55, correct?

2    A    That's correct.

3    Q    Okay.  And did you actually attend the meeting and

4    present?

5    A    I did.

6    Q    Now, this presentation contains projections created by

7    ESL that are different than the company's projections,

8    correct?

9    A    Yes.

10   Q    And if you look at Page 14, you'll see in the table at

11   the bottom, "Preliminary 2019 Estimated Forecasted

12   Financials."  Do you see that?

13   A    Yes.

14   Q    And the first line down, same-store sales percentage

15   change.  Across all of the columns and including for the

16   entire year, it's a negative one percent.  Do you see that?

17   A    Yes.

18   Q    And you don't know what analysis went into the ESL plan

19   to make ESL believe this number is achievable, correct?

20   A    I do not.

21   Q    Let's look at some of the specifics, because there is

22   some similarity in the two plans.  One of the initiatives

23   that's contained in both is on Page 17.  So if we can go

24   back to Tab 1, Joint Exhibit 2, Page 17.  This is in the

25   company's binder.  And you'll see, Mr. Riecker, just to

Page 145

1   understand where we are in the presentation, if you go back

2   to Slide 16 -- again, this is Tab 1 in the binder, Slide 16.

3   This is a section titled, "Our Go-Forward Initiatives".  Do

4   you see that?

5   A    Yes.

6   Q    Okay.  So these are the go-forward initiatives and the

7   company's business plan from December 2018, correct?

8   A    Yes.

9   Q    Okay.  And then go to Slide 17.  The initiative --

10           THE COURT:  Seventeen in Tab --

11           MR. SERKIN:  Sorry, 17 in Tab 1, Your Honor.

12           THE COURT:  Tab 2.

13   Q    Initiatives two and three, assortment optimization and

14   in-stock and replenishment.  Do you see that?

15   A    In Tab 1 on Page 17?

16   Q    Tab 1, Page 17.  I see "Small store footprint" on Page

17   17.

18           MR. SERKIN:  Your Honor, may I approach and see if

19   --

20           THE COURT:  Yeah.  Why don't you -- because that -

21   - I think you maybe have the wrong page.

22   Q    So Mr. -- I'm looking at Tab 1, Page 17, at the bottom

23   right-hand corner of the slide.  It's in very light print.

24   Do you see that?

25   A    Yes.

1   Q    And initiatives number two and three are assortment

2   optimization and in-stock and replenishment.  Do you see

3   that?

4   A    Yes.

5   Q    And can you take just a minute -- and you don't need to

6   read it out loud, but at the base case forecast, the

7   description for those two.  If you could take just a moment

8   to read the description to yourself.

9   A    Okay.

10  Q    And then if you look at the next slide, Slide 18,

11  you'll see a bridge showing the financial impact based on

12  key initiatives.  And if you look at two and three, which

13  correlate to the two and three on Page 17 for assortment

14  optimization and in-stock and replenishment, the potential

15  financial impact is positive $38 million of those two.  Do

16  you see that?

17  A    Yes.

18  Q    Now, if we can go to the ESL plan.  So Tab 2, Page 32.

19  A    Okay.

20  Q    And if you can read the heading, states, "Assortment

21  optimization and in-stock and replenishment."  Do you see

22  that?

23  A    Yes.

24  Q    And the subheading under that indicates, "Assortment

25  optimization and in-stock and replenishment initiative

Page 147

1    drives $80 million in incremental EBITDA in fiscal year

2    2019."  Do you see that?

3    A    Yes.

4    Q    And you have no understanding of how these same

5    initiatives drive very different incremental EBITDA between

6    the two plans, correct?

7    A    I don't have a detailed knowledge of the numbers on

8    Page 32.

9    Q    Okay.  Mr. Riecker, I want to look at another slide in

10   the lender presentation, so what reflects ESL's business

11   plan.  Slide 29.  We're still on Tab 2.

12   A    Okay.

13   Q    Okay.  This slide is titled, "Significant SG&A Run Rate

14   Impact From Reductions".  Do you see that?

15   A    Yes, I do.

16   Q    And before we look in more detail at this slide, let me

17   ask you, have you had any -- strike that.  You haven't had

18   any discussions with ESL or any of its advisors about what

19   their plan is with respect to any planned future reductions

20   post-closing of the sale, correct?

21   A    I have not.

22   Q    And you don't know in any other way or have any other

23   understanding about their intention with respect to future

24   payroll reductions, correct?

25   A    I do not.

Page 148

1    Q    In other words, what they might do with employees post-

2    close, you don't know?

3    A    Correct.

4    Q    So then if we look at Slide 29 and we look at the

5    bottom, this document shows a bridge, or how they will

6    accomplish certain of the SG&A reductions that they are

7    predicting.  You'll see Wave 1, Wave 2, and then a series of

8    four that relate to Wave 3.  Do you see that?

9    A    Yes.

10   Q    And Wave 1 and Wave 2 are -- those are head count

11   reductions that have already occurred, right?

12   A    Correct.

13   Q    And those are the green check marks that are completed,

14   right?

15   A    Yes.

16   Q    And those reductions amounted to a savings of $84

17   million and $57 million respectively, correct?

18   A    Yes.

19   Q    Okay.  With respect to the Wave 3 reductions that are

20   next to that, you'll see that the supply chain reductions

21   are on track, correct?

22   A    I believe that's correct, yes.

23   Q    And the sourcing are started based on the arrows to the

24   right?

25   A    Yes.  Based on the legend?

Page 149

1    Q    Based on the legend, yes.  And the Wave 3 IT reductions

2    are -- there's a timing shift, and those amount to $32

3    million.  Do you see that?

4    A    Yes.

5    Q    And then Wave 3 reductions, other, are $18 million.  Do

6    you see that?

7    A    Yes.

8    Q    So with respect to those head count reductions, you

9    don't know how many people are included in those reductions,

10   correct?

11   A    I don't know the specific head count number.

12   Q    Okay.  And you don't know whether the people contained

13   in those employee reductions are included in the 45,000

14   employees ESL is providing or intends to or is suggested

15   that they were provide employment to post-close, correct?

16   A    Correct.

17   Q    Mr. Riecker, during the presentation that you were at

18   and that was made to potential ABL lenders, when you

19   presented, there were no questions from the lenders that you

20   recall about whether ESL could achieve the targets in this

21   plan, correct?

22   A    That's correct.

23   Q    And there were no questions that you recall generally

24   about the assumptions ESL made and the projections that were

25   included in ESL's plan, correct?

Page 150

1    A    Correct.

2    Q    The questions that you remember from lenders were more

3    around the collateral that supported the loan as opposed to

4    the business plan associated with the loan, correct?

5    A    That's my recollection.

6    Q    Now, prior to presenting to the lenders, the company

7    and the office of the CEO reviewed the ESL business plan but

8    had no discussion with ESL as to whether it agreed with the

9    plan, correct?

10   A    That is correct.

11   Q    And you did not evaluate the ESL plan in the course of

12   evaluating ESL's bid, correct?

13   A    That is correct.

14   Q    You did not provide any analysis to the board or

15   restructuring committee whether the plan was achievable,

16   correct?

17   A    I did not, correct.

18   Q    In fact, you don't know whether anyone at the company

19   did, correct?

20   A    If it would have been someone at the company, it would

21   have been me.

22   Q    Okay.  And you didn't.

23   A    I did not.

24   Q    And no one asked you for your opinion about whether the

25   ESL plan was achievable, correct?

Page 151

1    A    Not to my recollection, correct.

2    Q    Mr. Riecker, I want to turn now to a document that is

3    at Tab 3 in your binder.  It's Joint Exhibit 152.  Mr.

4    Riecker, there's an email and an attachment.  The email is

5    from Luke Valentino, dated January 3rd at 5:25 P.M., to the

6    members of the restructuring committee, correct?

7    A    That is correct.

8    Q    You're copied on this email, aren't you?

9    A    Yes.

10   Q    And Mr. Valentino is attaching a letter that's sent on

11   behalf of the office of the CEO, correct?

12   A    That is correct.

13   Q    Okay.  Let's look at the letter, the attachment itself.

14   This is a letter signed by the members of the office of the

15   CEO, including you, correct?

16   A    Yes.

17   Q    It's addressed to the members of the restructuring

18   committee, right?

19   A    Correct.

20   Q    Can you read the first paragraph, please?

21   A    "On behalf of the 50,000 employees of Sears Holdings

22   Corporation, we are respectfully requesting that a bid,

23   which could allow the whole company to be part of an ongoing

24   business concern, considered qualified and allowed to

25   participate in the going concern auction process.  We firmly

Page 152

1   believe this would be better than the alternative."

2   Q    And You however actually didn't write this letter at

3   the request of the employees, did you?

4   A    We did write this letter based on our representation of

5   all of the employees of Sears Holding Corp.

6   Q    But you actually wrote this letter because Eddie

7   Lampert asked you to, right?

8   A    Eddie Lampert had a conversation with myself, Ms.

9   Munjal, and Mr. Ladley, asking our thoughts of whether we

10  support or do not support a go-forward company.  Did not

11  request us to write a letter, did not require us to write a

12  letter.

13  Q    And if you could turn to Tab 5 in your binder.  It's JX

14  100.  JX 100 are the minutes of a meeting of the

15  restructuring committee dated January 4th, 2019.  Do you see

16  that?

17  A    I do see that.

18  Q    And -- it's Joint Exhibit 114 for the record.  And if

19  you look back to your letter that was Joint Exhibit 152 at

20  Tab 3.  It's not dated, but it was sent to the restructuring

21  committee the evening of January 3rd.  Do you see that?

22  A    It was sent to the board of directors of the company,

23  which includes the restructuring committee.

24  Q    Okay, understood.  And so if we go back to Joint

25  Exhibit 114, the minutes from January 4th, that's the next

Page 153

1    day, correct?

2    A    I'm assuming that's correct, yes.

3    Q    And you'll see that this meeting was held by phone on

4    January 4th beginning at 12:30 Eastern.  Do you see that?

5    A    I do see that.

6    Q    And if you look underneath the materials presented, you

7    are identified as present by invitation, correct?

8    A    If you say so, yes.  Somewhere within there.

9    Q    It is the second line, second sentence, "Also present

10   by invitation were Rob Riecker, CFO," as well as others,

11   correct?

12   A    Got it.

13   Q    If you could turn to the third page.  The second

14   paragraph.  Can you read that sentence, please?

15   A    "Mr. Schrock reported to the committee that ESL had

16   asked for the letter from the office of the chief executive

17   to be drafted and that Cleary had indicated that it had seen

18   a draft as stated."

19   Q    Can Cleary is the law firm that represents Mr. Lampert

20   and ESL, correct?

21   A    Yes.

22          MR. SERKIN:  No further questions, Your Honor.

23          THE COURT:  Any redirect?

24          MR. PERDEW:  Very, very brief, Your Honor.

25          MAN 1:  Your Honor, just a few minutes of cross.

Page 154

```
 1                 THE COURT:  Sure, that's fine.
 2                 MR. PERDEW:  Your Honor, Russell Purdew of Locke
 3    Lord on behalf of the Pension Benefit Guaranty Corporation.
 4                 REDIRECT EXAMINATION OF ROBERT RIECKER
 5    BY MR. PERDEW:
 6    Q    Good afternoon, Mr. Riecker.  In addition to your role
 7    with the Debtors, you were also on the board of managers of
 8    KCD IP, LLP; is that right?
 9    A    That is correct.
10    Q    Since when have you held that position?
11    A    I do not know.
12    Q    Has it been since the filing?
13    A    It has been since the filing.
14    Q    Okay. The KCD board consists of three managers, is that
15    right?
16    A    That's correct.
17    Q    Other than you, who are the other two?
18    A    A Mr. Prakash and -- without looking at the name, I
19    can't recall the third name.  But it's not a Sears Employee.
20    Q    Mr. Prakash is a Sears employee, is that right?
21    A    That's correct.
22    Q    And the third manager is the independent manager who
23    does not have any affiliations with the Debtors, is that
24    right?
25    A    That is correct.
```

Page 155

1    Q    And the business of KCD IP, LLP is holding and

2    licensing Kenmore and Diehard trademarks to Debtors, is that

3    correct?

4    A    To the debtors and I believe others, yes.

5    Q    The debtors are Sears Roebuck and Kmart?

6    A    Yes.

7    Q    And the revenue that KCD receives are the royalty

8    payments related to those trademarks, is that right?

9    A    That is correct.

10   Q    And since the filing of this case, those debtors have

11   stopped making their royalty payments to KDC, is that your

12   understanding?

13   A    Yes.

14   Q    Has KCD retained any independent counsel to advise it

15   with respect to this bankruptcy?

16   A    Not to my understanding.

17   Q    The only firm that advises it is Weil Gotshal, is that

18   correct?

19   A    Correct.

20   Q    As part of the proposed sale, KCD has now approved as

21   of January 30th giving an exclusive and perpetual license of

22   the Kenmore and Diehard trademarks to the buyer in the sale,

23   is that right?

24   A    That is correct.

25   Q    And it's your understanding that that was a condition

Page 156

1    precedent to closing?

2    A    That's my understanding, yes.

3    Q    And that was decided on January 30th?

4    A    The exact date I can't tell, but around there.

5    Q    Did the independent manger of KCD vote for that

6    exclusive license?

7    A    They didn't vote.

8    Q    It was approved by the vote of the two managers who are

9    affiliated with the debtors, correct?

10   A    Correct.

11   Q    The KCD -- we talked before about the fact that the

12   Debtors have stopped paying KCD royalties.  KCD has

13   therefore accrued a claim for those royalties, is that

14   correct?

15   A    That would have to be based on the discussions that

16   I've had with counsel, but it would appear so.

17   Q    The number that I've seen, and the number I believe you

18   discussed at your deposition, is $112 million; is that

19   correct?

20   A    I believe that's the correct amount.

21   Q    I've also heard the number around the administrative

22   and solvency calculation of around $63 million of the

23   shortfall that is going to be managed as part of the sale

24   transaction.  Is that right?

25   A    I believe Mr. Meghji updated that number this morning,

Page 157

1    and it's around $43 million.

2    Q    Okay.  But that number does not include the $112

3    million KCD royalty claim, is that right?

4    A    That is correct.

5    Q    And so the calculation of 63 million, updated to 43

6    million, assumes no payment to KCD for those royalties; is

7    that right?

8    A    That would be correct.

9           MR. PERDEW:  Your Honor, can I approach the

10   witness to hand him Joint Exhibit 39, please?

11          THE COURT:  Sure.

12          MR. PERDEW:  Thanks.  Your Honor, would you like a

13   copy?

14          THE COURT:  Yes.  Thanks.

15   Q    And this is Docket Number 1731.  Mr. Riecker, have you

16   ever seen this document before?

17   A    I believe I've seen it from a cursory review

18   perspective.

19   Q    Okay.  Do you know what it is?

20   A    Without reading it, it looks like it's about the

21   bidding procedures.

22   Q    Okay.  Has anyone ever made you aware of the fact that

23   this document, which is titled Notice of Cure Costs,

24   Potential Assumption and Assignment of Executory Contracts,

25   relates in part to KCD's $112 million royalty claim?

Page 158

1   A    That specificity has not been discussed with me.

2   Q    Has KCD ever discussed at a board meeting the need to

3   respond to this document?

4   A    I do not believe that at the board meetings this was

5   discussed.

6   Q    And so to your knowledge then KCD has never filed a

7   response to this document?

8   A    I can't answer yes or no on that.

9   Q    Okay.

10            MR. PERDEW:  Your Honor, nothing else.

11            THE COURT:  Okay.

12            MR. LENDER:  Again, Your Honor, David Lender from

13   Weil Gotshal for the Debtors.

14              REDIRECT EXAMINATION OF ROBERT REICKER

15   BY MR. LENDER:

16   Q    Just a few questions, Mr. Riecker, if we could.  And

17   let's just start briefly back to the company's business

18   plan, tab, Exhibit 1.  I just want to make sure I understand

19   your testimony from before.  Your testimony was that same-

20   scale stores the trend was going up for the entire year?

21   A    For 2018, yes.

22   Q    Yes.  And is your testimony also that for 2018 margins

23   were also going up?

24   A    Yes.

25   Q    And were prices also going up in 2018?

Page 159

1    A    It's a combination of pricing, product costs, et

2    cetera, that go into the margin calculation.

3    Q    Thank you.  You also were asked about Shop Your Way.

4    Mr. Riecker, were changes made in the past year in the

5    approach to Shop Your Way and how it is operated?

6    A    The delivery of the promotional side of Shop Your Way

7    was adjusted throughout the year to achieve the results that

8    were achieved.

9    Q    And those changes, are they described and set forth in

10   your declaration?

11   A    I believe that they are.

12   Q    Okay.  The last thing I wanted to just ask you about

13   briefly is Mr. Serkin asked you to turn to Page 7 of the

14   company's business plan.  I just wanted ask you a quick

15   question on that.  And you recall he asked you about the

16   company's business plan, which projects for 2019 fiscal year

17   negative 2.4 percent same-store sales.  Do your recall that?

18   A    Yes.

19   Q    I think you testified that for ESL it was negative one

20   percent?

21   A    Yes.

22   Q    Now, the company's business plan here also has a

23   projection for gross margin improvement in 2019.  Do you see

24   that?

25   A    Yes.

Page 160

1   Q    And can you just tell us what that is in the company's

2   business plan?

3   A    So in the company's business plan we assume that based

4   on better product selection from our vendors, vendor

5   confidence coming back, that we would be able to get better

6   selection of product than we had going into and during

7   bankruptcy that would enable us to improve our margin rates

8   between 250 and 300 basis points.

9   Q    And do you recall what assumption ESL made in its

10  business plan as it pertains to gross margin improvement?

11  A    I believe that there was around a hundred basis points.

12  It was less than the company's.

13  Q    So to make sure I understand it, some places the

14  company's business plan was more conservative and in other

15  places the ESL business plan was more conservative?

16  A    That is correct.

17          MR. SERKIN:  Objection, Your Honor.  Leading,

18  lacks foundation.

19          THE COURT:  It's limited to just the two points

20  that's been made.

21  Q    Mr. Riecker, in Paragraph 31 of your declaration, you

22  wrote, "Because the ESL plan is similar to the company's go-

23  forward plan presented by the management team in November

24  and December of 2018, I believe the objectives in the ESL

25  plan are achievable and the projections are reasonable based

Page 161

1    on, among other things, its smaller footprint."  Can you

2    still stand by that testimony?

3    A    Yes, I do.

4    Q    Thank you, Mr. Riecker.  No further questions.

5            THE COURT:  Do you have any --

6            MR. LENDER:  Nothing further, Your Honor.

7            THE COURT:  On that last question, is the smaller

8    footprint in your view under the ESL plan a positive or a

9    negative as far as in comparison to the company's earlier

10    business plan with a larger footprint?

11            MR. RIECKER:  I believed that it is a positive to

12    the company.

13            THE COURT:  And why is that?

14            MR. REICKER:  Because over the past few years the

15    company has carried money-losing stores.  These stores have

16    all been profitable within one or more of the last three

17    years.  And I believed that that footprint allows us to

18    properly structure the SG&A of the company to serve that

19    smaller footprint, which will allow those stores to be more

20    profitable than they had been in the past.

21            THE COURT:  What about negotiating leverage with a

22    larger footprint?  That would argue that it would be better

23    to have a larger footprint, right?  With vendors and the

24    like.

25            MR. REICKER:  Yes, that is one of the -- could be

Page 162

1    one of the concepts.  I guess how I would respond to that is

2    going into bankruptcy over the last couple of years we've

3    had difficulty in negotiating with our vendors.  We believed

4    that the smaller footprint will allow us to buy the right

5    amount of product for those stores as opposed to having

6    stores where I'm trying to optimize the inventory and

7    merchandise contained in those stores and starving other

8    stores or potentially starving other stores.

9            THE COURT:  Okay.  Any questions on that?

10           MR. LENDER:  No questions.

11           THE COURT:  Okay.  You can step down.  Okay, it's

12   about quarter to one.  There are two more witnesses to come.

13           MAN 1:  Just one more for us, Your Honor.

14           THE COURT:  Oh, I'm sorry, yes.  Which is an ESL

15   witness.  And then we have three from the committee, right?

16           MAN 1:  Yes, Your Honor.

17           THE COURT:  Okay.  All right.  So appreciate --

18   you're going to have to walk fast to get a sandwich.  But

19   can we get back here around 1:30?  I mean, a practical

20   matter.  It's going to take a while for you all to get in

21   again.  So be back here as if you were going to start at

22   1:30.  I have a feeling that we might start a little later.

23   And I will ask those of you who are taking the laboring war

24   hero to have some designatee in the front of the line who

25   maybe could just eat some pretzels for lunch and save a

Page 163

1    space for those of you that -- so we can get started on

2    time.

3              The last thing I'll say is that in a normal

4    transaction like this that requires bankruptcy court

5    approval where there's an active committee, the buyer knows

6    that it may not have put its absolute bottom line on the

7    table for the transaction.  Committee's cross-examination

8    has highlighted some issues pertaining to the actual terms

9    of the APA and in some cases the lack of certain terms,

10   including with respect to a transition services agreement

11   and a mechanism for how to liquidate Section 503(b)(9)

12   claims so that the liquidation cost is not borne by the

13   estate.

14             Normally I would expect a committee and a bidder

15   or a buyer to negotiate those sorts of points.  And I hope

16   that happens.  Because otherwise it's a bit of empty

17   rhetoric as opposed to the larger issue, which is does the

18   deal as drafted make sense.  So I would urge, since there

19   are many of you here, that some subset of you consider the

20   key points of potential improvements to this transaction.

21             So I'll see you let's say at 1:30, although I have

22   a feeling it'll be 15 minutes later.

23        (Recess)

24             THE COURT:  Please be seated.  Okay, we're back on

25   the record in re Sears Holdings Corporation.  And I think we

Page 164

1    are now at Mr. Kamlani.

2            MR. BROMLEY:  Yes, Your Honor.  James Bromley of

3    Cleary Gottlieb on behalf of ESL.  We'd like to call Mr.

4    Kunal Kamlani to the stand.

5            THE COURT:  Would you raise your right hand,

6    please?  Do you swear or affirm to tell the truth, the whole

7    truth, and nothing but the truth, so help you God?

8            MR. KAMLANI:  I do.

9            THE COURT:  And it's K-a-m-l-a-n-i?

10           MR. KAMLANI: It is.

11           THE COURT:  Kunal, K-u-n-a-l.

12           MR. KAMLANI:  Correct.

13           THE COURT:  Okay.  And Mr. Kamlani, you submitted

14   a declaration last week in connection with this hearing.

15   Sitting here today, would that declaration still constitute

16   your direct testimony?

17           MR. KAMLANI:  It would.

18           THE COURT:  Okay.  All right.  Want to cross?

19           MR. BROMLEY:  And just as a matter of form, Your

20   Honor, we'd like to move the declaration in as his direct

21   testimony.

22           THE COURT:  Okay.

23           MR. QURESHI:  Thank you, again.  For the record,

24   Abid Qureshi, Akin Gump Strauss Hauer on behalf of the

25   committee.

Page 165

1           Your Honor, I've left a witness binder on the

2     witness table.  May I hand one up, you know?

3           THE COURT:  Yes.

4           MR. QURESHI:  May I proceed, Your Honor?

5           THE COURT:  Yes.

6                CROSS-EXAMINATION OF KUNAL KAMLANI

7     BY MR. QURESHI:

8     Q     Mr. Kamlani, good afternoon, sir.

9     A     Good afternoon.

10    Q     You are currently a member of the board of directors at

11    Sears, correct?

12    A     I am.

13    Q     And you first became a member of the board in

14    approximately November of 2014, right?

15    A     That's correct.  I believe it was December 3rd of '14.

16    Q     And at the time you joined the board, you also became a

17    member of what then was called the Related Party

18    Transactions Committee, correct?

19    A     That's correct.

20    Q     And the role of that committee, among other things

21    perhaps, but the role included reviewing all transactions

22    that were being considered or entered into between Sears on

23    the one hand and ESL and Mr. Lampert or any of his

24    affiliates on the other, correct?

25    A     That's correct.

Page 166

1    Q    So you were part of both the board of directors of

2    Sears and a member of the Related Party Transactions

3    Committee at the time the Seritage transaction came before

4    the board, correct?

5    A    Yes, I was.

6    Q    And when I refer to the Seritage transaction, you

7    understand what I mean, right?  The transaction that was

8    investigated by the subcommittee.

9    A    I do.

10   Q    Okay.  And indeed you voted to approve the Seritage

11   transaction in your role as a member of the Related Party

12   Transaction Committee, correct?

13   A    I did.

14   Q    And subsequent to that, in approximately 2016, you

15   became the president of ESL, correct?

16   A    Correct.

17   Q    So sometime after the Seritage transaction happened,

18   did you then become a full-time employee of ESL?

19   A    I did, in March of '16, 2016.

20   Q    Okay.  And subsequent to becoming a full-time employee

21   at ESL, you continued to maintain your position on the board

22   of directors at Sears, correct?

23   A    I immediately stepped down from the Related Party

24   Transaction Committee as well as the Audit Committee.

25   Q    Right.  Okay.  If you could can just speak up a little

Page 167

1    bit, please, it would be helpful.

2    A    Sure.

3    Q    Just a couple of questions about the structure of ESL,

4    where you are presently employed.  Am I right, sir, that at

5    least prior to the present transaction that we are here in

6    court on today, Sears comprised approximately 50 percent of

7    the assets under management of ESL, its investment in Sears?

8    A    That -- that approximately.

9    Q    Okay.  And in addition to that, approximately 20

10   percent of ESL's value was invested in Seritage?  Again,

11   rough order of measurements here?

12   A    I actually couldn't tell you the exact percentage.

13   Q    Okay.  And with respect to the amount of ESL's assets

14   under management tied up in Sears, do you know whether that

15   number's going to go up if this transaction closes?

16   A    I do not.

17   Q    Okay.  Am I right that of ESL's assets under

18   management, approximately 75 percent of that money is

19   actually Mr. Lampert's as opposed to third-party investors

20   in ESL?

21   A    With 20 percentage points, that might be right.

22   Q    Okay.  Now let's talk a little bit about your role in

23   the business planning process at Sears.  So prior to joining

24   the Board of Directors of Sears, you had no experience in

25   retail at all, right?

Page 168

1    A    No, that's not correct.  I was on the board of Staples,

2    which is one of the largest retailers in the country by size

3    of revenue from 2015 until we sold the company to a private

4    equity firm I believe it was mid-2017, but I might be off on

5    that -- on that date.  But I served on that board, and I was

6    a member of several different committees on that board,

7    including the audit committee, finance committee, the

8    compensation committee, also.

9    Q    Okay.  Perhaps you misheard me.  Prior to joining with

10   Sears Corp, you had no experience in retail?

11   A    You're -- you're correct, prior to 2014.

12   Q    And you had no role while at Sears in the development

13   of business plans in your capacity as a board member, right?

14   A    Can you repeat the question?

15   Q    Sure.  In your role as a member of the board of

16   directors of Sears, you did not have a role in developing

17   the company's business plans, as distinct from reviewing it?

18   A    I believe that would be an accurate statement.

19   Q    What you did is you regularly reviewed business plans

20   that were put together by the management team, right?

21   A    Correct.

22   Q    And as a board member, you also had a role in approving

23   those business plans, correct?

24   A    I did.

25   Q    Now there was some testimony earlier today about a

Page 169

1   debtor business plan from December of 2018.  You had no

2   involvement putting that plan together, did you?

3   A    No, I did not.

4   Q    And that's the plan that serves as the basis for the

5   ESL business plan for go-forward Sears, correct?

6   A    It does.

7   Q    Okay.  Now I want to talk a little bit about the

8   historical performance of the company.  I'm going to try to

9   do this as quickly as I can with as few documents as I can.

10  So you joined the board late 2014, so am I right that at

11  least during that period of time the ordinary course process

12  at Sears was in January/February of each year is when

13  business plans would be presented to the board and in that

14  time frame, they would get finalized and approved, right?

15  A    Discussions, I think, began prior to January/February,

16  but that -- that would be the approval time frame.

17  Q    Okay.  Now what I'd like to do is if you have in your

18  binder, sir, if you'd turn to Tab 9, now to try to save some

19  time, what I have in Tab 9 are some excerpts from an expert

20  report that the Committee has submitted in this case.  And

21  what I want to show you in particular, and we've got the

22  full report if you need to see it.  Indeed, we have all of

23  the underlying business plans if you need them.  But what is

24  labeled as Exhibit 12 to that report, it's in the last page

25  of that tab, and it's a bar chart.  And what it does is it

Page 170

1    just compares projections in each year to historical

2    performance.  Do you see that?

3    A    I do see the page.

4    Q    Okay.  And what I'd like to understand, Mr. Kamlani,

5    let's take a look at 2015, all right.  So 2015 at the time

6    of the projections for 2015, you were on the Board of

7    Directors at Sears, correct?

8    A    I -- I was.  Can I just take a minute to --

9    Q    Yeah, sure.

10    A    -- figure out what I'm looking at?

11    Q    Sure.

12    A    Thanks.  What's the P in after EBITDA?

13    Q    Pension.

14    A    Pension.

15            MR. BROMLEY:  Your Honor, I'm a little confused as

16    to exactly what we're doing.  Mr. Kniffen hasn't testified,

17    and his report hasn't been admitted.  This is an excerpt

18    from it.  I think the witness should have the entire report

19    in front of him for context.

20            MR. QURESHI:  Your Honor, I'm happy to do that.

21    I'm happy to pull out every one of these business plans and

22    every set of projections and do it that way.  I'm merely

23    trying to have a record as to this witness's role in

24    approving projections and when those were approved, what the

25    actual numbers were.  And so I'm certainly not directing him

Page 171

1    to this exhibit for proof of what the numbers were.

2              THE COURT:  Well, he's already testified about his

3    role in approving projections.

4              MR. QURESHI:  Yes.

5              THE COURT:  So the other point is the actual

6    numbers.

7              MR. QURESHI:  Yes.

8              THE COURT:  So I think you could ask him those

9    questions and then maybe ask him if this exhibit refreshes

10   his recollection.

11             MR. QURESHI:  Sure.  Why don't we do it that way.

12             THE COURT:  Okay.

13   BY MR. QURESHI:

14   Q    So, Mr. Kamlani, if you look at 2015 on this chart, so

15   again, we're looking at a summary that was prepared by the

16   Committee's expert, and it's in your binder.  Do you have

17   that in front of you?

18   A    I do.

19   Q    And you'll see that what it shows is that in 2015, what

20   Sears projected for EBITDA was positive $461 million, the

21   green bar, right?

22   A    I do see that here.

23   Q    Okay.  And you would have been on the board that

24   approved that set of projections at that time, correct?

25   A    Yeah.  The reason I asked you about the P earlier is

Page 172

1    'cause I don't ever recall seeing an EBITDAP figure in my

2    entire stay on the board.  We looked at EBITDA.

3    Q    Okay.

4    A    But what's -- I just want to make that clear.

5            THE COURT:  You're not doing what I suggested.

6    Look, this is a summary.  You're asking him to accept the

7    validity of this summary and then asking him whether it's

8    correct.  It doesn't really follow.  So I mean you're going

9    to have a chance to get that in later.  Unless he has a

10   photographic memory, I don't know if he's going to be able

11   to remember the exact projections.

12           MR. QURESHI:  Okay.  Your Honor, I was just trying

13   to shortcut it and do this a little bit quicker.

14           THE COURT:  Well, no, but it doesn't --

15           MR. QURESHI:  Let me try it another way.

16           THE COURT:  Okay.

17   BY MR. QURESHI:

18   Q    Put the document aside, Mr. Kamlani.  Do you recall

19   generally that in every year that you were on the board of

20   directors of Sears and in every year that you approved

21   business plans, it was a massive miss relative to the

22   projections?

23   A    I do recall us missing our plan for every single year

24   since I've been on the board, yes.

25   Q    Right.  And do you recall those misses in some years

Page 173

1    exceeding a billion dollars?

2    A    If -- if -- if not a billion, 800 million.  But you may

3    be right.

4    Q    Okay.  And so in every year from 2014 since you joined

5    the board, so '15, '16, '17, '18, the magnitude of the miss

6    when comparing Sears' actual performance in its projections

7    was in the many hundreds of millions of dollars, correct?

8    A    Yes.

9    Q    Okay.  Now --

10            THE COURT:  Well, that was shorter.

11   BY MR. QURESHI:

12   Q    Now let's take a look at the exhibit behind Tab 7,

13   please, and that is JX-139.  Do you have that document in

14   front of you, sir?

15   A    Tab 7, Project Transform Business Plan.  I do.

16   Q    And does this represent ESL's business plan for the go-

17   forward business?

18   A    There are many versions.  If you give me a minute to

19   look at the page, I can --

20   Q    Sure.

21   A    I'm sorry.  I take that back.  This is the larger plan

22   without the financials.  Yes, this is it.

23   Q    I'm sorry.  I didn't --

24   A    Yes, this is -- this is the business plan.

25   Q    Okay.

Page 174

1    A    There is a financial component that goes along with

2    this business plan, and I just so I know if that's in here

3    or not.

4    Q    Okay.  It's in a separate exhibit.

5    A    Okay.

6    Q    And we will get to that.

7    A    So, yes, this is a part of the business plan.

8    Q    Okay.  And this business plan, if I'm right, sir, was

9    developed just a few weeks after the company's stand-alone

10   business plan that we talked about earlier that was in

11   December of 2018, right?

12   A    That sounds -- that sounds about right.  This business

13   plan would have come together in mid to late-November.

14   Q    Okay.  Look at Page 4, if you could, please.

15   A    Sorry, page?

16   Q    Four.  And you will --

17   A    Executive summary?

18   Q    Yes.  And you will see on Page 4 underneath the first

19   bullet point, there's a line that says, "Base case assumes

20   brick and mortar of same-store sales growth of negative 1

21   percent in 2019."  Is that your understanding of what the

22   forecast is for ESL business plan for 2019?

23   A    It is.

24   Q    And you understand that to be, well, you understand

25   that in the December stand-along business plan prepared by

Page 175

1    the company, the forecast for that same metric, same-store

2    sales growth, was negative 2.4 percent, right?

3    A    I'm aware of that.

4    Q    Okay.  And you're aware that Mr. Riecker in the

5    declaration that he submitted expresses the view that for

6    2019 a reasonable projection could be anywhere between the

7    negative 1 percent in your plan and the negative 2.4 percent

8    in his plan, right?

9    A    I haven't memorized his declaration, but I take your

10    word for it.

11    Q    Okay.  And over the same period of time that in the ESL

12    plan you're projecting negative 1 percent same-store sales

13    growth, you're also projecting an increase in margin growth

14    of 125 basis points, right?  It's the next bullet --

15    A    Yes.

16    Q    -- on the executive summary.  And positive EBITDA for

17    2019 of $338 million, correct?

18    A    Just to be clear, that $338 million is for the retail

19    footprint only and not Sears consolidated EBITDA, which from

20    memory is only $25 million.

21    Q    Okay.  And for the retail footprint, that positive

22    EBITDA that you're projecting for 2019 continued on an

23    upward trajectory into the out years of the plan, correct?

24    A    Yeah.  And I would note that on the latest 12-months

25    basis, the 4 Wall EBITDA for these stores is positive today.

Page 176

```
 1   I don't know the number from memory, but it's north of $100
 2   million.
 3   Q    And turn to Page 46, please, of this plan.  And you'll
 4   see that Page 46 says, "Optimized SG&A Summary Description
 5   of Key Initiatives."  Do you have that?
 6   A    Yes.
 7   Q    Okay.  And am I right, sir, that what ESL is projecting
 8   is that SG&A is going to fall in half from $1.2 billion
 9   dollars where it currently is approximately to 600 -- to an
10   annual run rate of $600 million, right?
11   A    Yes.  Our SG&A plan is consistent with the company's
12   view of SG&A except for timing and additional overhead that
13   we've put in for additional hires.
14   Q    Okay.  And, again, sir, to try to move this along, I'm
15   not asking you if it's consistent with the company or not.
16   A    Okay.
17   Q    Your counsel will have an opportunity to ask you those
18   questions, okay?
19   A    Okay.
20   Q    Now that forecast that you have of cutting SG&A from
21   1.2 billion to an annual run rate of $600 million, you
22   forecasted that can be achieved at the same time as
23   increasing margin, correct?
24   A    Yes.
25   Q    And ESL does not have a detailed model or at least did
```

Page 177

```
 1    not at the time this business plan was put together that

 2    identified the impact of the various SG&A initiatives on

 3    gross margin, correct?

 4    A    We spent four days in Hoffman Estates doing detailed

 5    due diligence on just about every material business unit of

 6    the company, including SG&A.  And I was comfortable with the

 7    relationship between the right sizing of the company as it

 8    relates to SG&A as well as gross margin.

 9    Q    That's not my question, sir.

10    A    Okay.

11    Q    My question was simply isn't it the case that there is

12    no detailed model that ESL has that shows the impact of the

13    various SG&A initiatives on gross margin.

14    A    You're correct.  I do not have an SG&A model tied to

15    gross margin.

16    Q    All right.  Let's talk a little bit about what the

17    business plan says in terms of store closures.  Now, you in

18    your declaration -- and feel free to look at it, if you

19    like.  It's at the front of the binder.  You characterize

20    ESL's bid for Sears as the "only available opportunity to

21    preserve the jobs of approximately 45,000 Sears associates

22    while returning severance pay to pre-petition levels."  You

23    recall that, right?  That's your view?

24    A    Yes.

25    Q    Okay.  And as you sit here today, sir, you're not able
```

Page 178

1    to tell me what the Sears store count is going to be at the

2    end of, say, 2019?

3    A    I -- I could not tell you that, no.

4    Q    Okay.  And, in fact, sir, the store count at the end of

5    2019, that's going to be a function of a number of factors,

6    right, one of which is how much real estate ESL decides to

7    sell between now and the end of the year, right?

8    A    As well as many other factors --

9    Q    Sure.

10   A    -- including how many new stores we opened.

11   Q    Sure.  Well --

12   A    And how many dark stores we sell.

13   Q    Okay.  So let's deal with those.  Your business plan

14   makes no assumption about opening new stores, right?

15   A    That is correct.  We took a very conservative view on

16   that.

17   Q    And you also have nothing in your business plan about

18   what the capital expenditures would be that would be

19   associated with any new store openings, correct?

20   A    That is correct.

21   Q    Okay.  Now, at the time that you and I met at your

22   deposition, sir, the ESL business plan assumed that ESL

23   would sell $200 million a year worth of real estate for each

24   of the first three years of this plan, so that's $600

25   million in the first three years, correct?

Page 179

1    A    Correct.

2    Q    And ESL has not identified with specificity which

3    parcels of real estate it is going to sell in order to

4    generate that $600 million in proceeds, right?

5    A    We do have a pipeline report, which informs our view of

6    what proceeds we think ultimately can be achieved.

7    Q    And when did that pipeline report first come into

8    being?

9    A    On a pre-petition basis, I probably got the pipeline

10   report once every two weeks.  Since the petition date, the

11   first time I saw the pipeline was probably ten-ish days ago.

12   Q    Okay.  So at the time I took your deposition when you

13   told me that you were not able to identify any specific

14   properties that are going to be sold to generate those

15   proceeds.  Has that answer changed?  Are you now able to?

16   A    Well, I'm able to tell you I've got confidence that I

17   think we'll be able to generate more than $200 million in

18   real estate proceeds in the first year based on the pipeline

19   report that I saw.

20   Q    Okay.  And of the 425 go-forward stores that are part

21   of the ESL bid, am I right that approximately 150 to 175 of

22   those stores generate negative EBITDA on a stand-alone

23   basis?

24   A    Yeah, I think -- I think the number's 156.

25   Q    One fifty-six, okay.

Page 180

1   A     I think.

2   Q     And those stores have asset value though, right?

3   A     Yes, they do.

4   Q     Okay.  And selling a store that generates negative

5   EBITDA, that could actually have a positive impact on your

6   plan, right?

7   A     Depending on the purchase price, yes.

8   Q     Okay.  And those 156 stores out of the 425 that

9   generated negative EBITDA are candidates to be sold to

10  generate the 200 million a year that you need to generate?

11  A     Yes.

12  Q     Okay.  Let's look at Tab 6, please.  And behind Tab 6

13  is what's been marked as Joint Exhibit 56.  Would you tell

14  me what this document is?

15  A     This is the private supplement to the lender

16  presentation for the purposes of the ABL syndication

17  process.

18  Q     And you attended a meeting at which this document was

19  presented to lenders?

20  A     I did.

21  Q     Okay.  I'd like you to turn to Slide 8, please.  And,

22  Mr. Kamlani, I turned to this version of the document merely

23  because it's more legible than the black and white document

24  we were looking at earlier.  But you agree with me that what

25  was presented to the lenders in terms of ESL business plans,

Page 181

1    it's the same thing that was provided to the Committee,

2    correct?

3    A    I believe so.  Again --

4    Q    Okay.

5    A    -- we -- we update this model regularly, so --

6    Q    Understood.

7    A    -- if -- if you checked them, I take your word for it.

8    Q    Understood.  And this is as it existed on January the

9    24th.  So look at Page 8, and in particular I want to direct

10   you to Footnote 9.  And what Footnote 9 says is, "Assumes

11   three stores with negative 4 Wall EBITDA sold per month in

12   2019, assumes no EBITDA benefit associated with sale of

13   stores."  Did I read that correctly?

14   A    You did.

15   Q    And if you then go to where Exhibit -- I'm sorry,

16   Footnote 9 is -- appears on the chart, and it's rather

17   difficult to read, but you'll see there's -- if you go to

18   the right side under 2019, there's a $200 million number

19   that appears both in '19, '20, and '21.

20   A    Yes.

21   Q    Okay.  So is it in fact the case, Mr. Kamlani, that

22   under ESL's ownership, Sears is going to sell three stores

23   per month for each month of 2019?

24   A    I -- I wish it were that simple, but it's not.  I can't

25   tell you how many stores will sell next month or the month

Page 182

1    after that, if -- if any.

2    Q    Okay.

3    A    But I will share with you that on the pipeline report,

4    which is probably the one that informs me the most, out of

5    the roughly 200-plus million of actionable properties that

6    could be sold in the next three to five months, it's maybe

7    20 to 25 properties of which I believe only three stores,

8    maybe four, are in the 425-store footprint.

9    Q    Now, on -- if you go to Page 6 of this presentation,

10   Performance By Business Unit, up at the top of that page,

11   there's a line that shows store count for each year, and for

12   each year in the out years of the forecast for '19, '20, and

13   '21, it shows 425.  But, in fact, it's not your projection

14   that there will 425 stores in each of those years, correct?

15   A    Can you repeat the question for me?

16   Q    Sure.  So a footnote to your plan says you're closing

17   three a month.  You've told me that's not right, okay.  A

18   page earlier in the plan, it says we're not closing three

19   stores a month.  We're going to have 425 stores every year

20   in '19, '20, and '21.  As I understand your testimony,

21   you've got a bunch of real estate you're going to sell to

22   generate the 200 million, but you're not sure how many

23   stores that's going to involve, at least not in the first

24   year.  So my question is it's not accurate, is it, that your

25   projected store count is going to be 425 for each of '19,

Page 183

1    '20, and '21.  Yes or no?

2    A    Sitting here today, it is unlikely that it'll be 425 in

3    '19, '20, or '21.  But I would add that this is a

4    projection.  It is a forecast.  If we come back three years

5    from now, my guess is every number on this page will be

6    different from the actuals.

7    Q    Now, Mr. Kamlani, you've referred to -- and it's in the

8    business plan -- you talk about the overall ecosystem of

9    Sears assets.  You know what I mean when I refer to that,

10   right?

11   A    Yes.  It's critically important.

12   Q    Right.  And in your belief is that the larger the

13   footprint for Sears, the more value that whole ecosystem

14   has, right?

15   A    That's correct.

16   Q    Now, going back to this footnote on Page 8 that talks

17   about the three stores a month, am I right that from the

18   perspective of your lenders, the ABL lenders that are

19   providing financing to the ESL-owners Sears, their focus is

20   not whether it's three stores or five stores a month.  Their

21   focus is generating $200 million a year in proceeds, right?

22   A    That's correct.

23   Q    And am I also right that whatever real estate ESL ends

24   up selling to satisfy this requirement to generate $200

25   million a year of proceeds, you've done no analysis around

Page 184

1   head-count reductions that might be associated with those

2   sales?

3   A    No, because I don't know which stores will be sold and

4   also, I do not know when we sell a store depending on the

5   price, whether we'll have an opportunity to lease it back or

6   not.   Again, to your ecosystem point you made earlier, we

7   would much prefer to lease back a store and sell it than to

8   sell the store and exit it.

9   Q    Mr. Kamlani, the answer to my question, do you have a

10  projection of head count reduction is no, right?

11  A    That's correct.

12  Q    Okay.   Now you also plan to close a number of

13  distribution centers, correct?

14  A    Yes, I believe it's five conveyable distribution

15  centers are being reduced in the SG&A plan.

16  Q    Okay.   And do you know what the head count is

17  associated with those reductions?

18  A    I -- I don't sitting here today, no.

19  Q    Okay.   Now you're aware, I take it, that as a part of

20  this Chapter 11 process, one of the things the Debtor had

21  considered was selling the Sears Home Services business as a

22  stand-alone business on its own, right?

23  A    I am aware of that.

24  Q    And you're aware that there was interest expressed from

25  buyers who might acquire that business as a growing concern?

Page 185

```
 1    A    I was aware that that interest is predicated on a store

 2    footprint surviving the transaction.

 3    Q    Okay.  And how many employees are at Sears Home

 4    Services, if you know?

 5    A    I -- I don't know the number exactly.

 6    Q    Order of magnitude 10,000 about right?

 7    A    Eight to ten thousand.

 8    Q    Okay.  And Innovel, that's another business that the

 9    Debtors were considering selling on a stand-alone basis,

10    correct?

11    A    I believe they were trying to sell everything.

12    Q    Right.  And Innovel, in order of magnitude, roughly

13    2,000 employees at Innovel?

14    A    That I wouldn't have.  I -- I'm not as close to on the

15    employee number.

16    Q    Okay.  Let's look, if we could, please, behind Tab 5,

17    which is JX-55.  And it's the lender presentation.  Now, you

18    talk about the meeting at which this was presented.  And Mr.

19    Riecker was at that meeting as well, right?

20    A    He was.

21    Q    Now let's go -- I apologize for flipping back and forth

22    -- back to JX-56, which is the supplement that's behind Tab

23    6

24    A    So we're on Tab 6?

25    Q    Tab 6.  This is --
```

Page 186

1    A    What page?

2    Q    We're going to go to the page I was on, Page 8.

3    A    Okay.

4    Q    Now in the top right-hand corner of the document, there

5    is a box that's labeled "Real Estate Debt."  Do you see

6    that?

7    A    I do.

8    Q    And what it says is real estate debt 175 million.

9    Below that, appraised value 1.652 billion.  And loan to

10   value, 10.6 percent.  Do you see where I am?

11   A    I see exactly where you are.

12   Q    Okay.  Thank you.  So let's just see if we can get an

13   understanding of what this all means.  So the real estate

14   debt, am I right that that's a reference to a $175 million

15   real estate loan that will be funded at closing 50 percent

16   by ESL, 50 percent by Cyrus?

17   A    Currently, that real estate loan will be funded 50

18   percent by Cyrus, the 20 million by Mr. Tisch --

19   Q    Okay.

20   A    -- and the remaining 67 and a half million dollars by

21   ESL.

22   Q    Okay.  And would I be correct in understanding, sir,

23   from this chart that the real estate that has an appraised

24   value that's referenced here of $1.652 billion serves as

25   collateral or will serve as collateral for that loan?

Page 187

1    A     That's correct.  That appraisal value is roughly 13, 14

2    months old, so that's correct.

3    Q     Okay.  Now, I want you to go to Tab 12, please.  And

4    what is behind Tab 12 is -- what is behind Tab 12, sir, is a

5    commitment letter.  It's marked as JX-180.  And what I would

6    like you to do, if you could, I put just because it's hard

7    to follow the page numbers, I put a tab.

8    A     I appreciate that.  You made it easy for me.

9    Q     Thank you.

10   A     I found it.

11   Q     Great.  And what's behind that tab is a term sheet for

12   $175 million real estate loan.  Is that the same 175 --

13              UNIDENTIFIED SPEAKER:  (Indiscernible)

14        (Pause)

15   BY MR. QURESHI:

16   Q     And am I right, Mr. Kamlani, that the term sheet for

17   this $175 million loan, this is the same 175 million loan

18   that is referred to in the prior document that I showed you?

19   A     That's correct.

20   Q     Okay.  Now let's look for a minute at the interest rate

21   on this loan.  So the term sheet says -- it's paragraph 6,

22   it's on the first page, "One month LIBOR plus 850 basis

23   points if paid in cash and one month LIBOR plus 1,050 basis

24   points if paid in kind and added to the principal."

25   Correct?

Page 188

1    A    Correct.

2    Q    Okay.  So would you disagree with me that one month

3    LIBOR today is roughly two and a half percent?  Does that

4    sound right?

5    A    That sounds right.

6    Q    Okay.  And so for this loan, if New Sears decides to

7    pay the interest on it in cash, the interest rate will be 11

8    percent roughly?

9    A    That's right.

10    Q    And if New Sears elects instead to add interest to the

11    principal amount of the loan, the rate will be 13 percent,

12    right?

13    A    That's right.

14    Q    And as we saw from the prior exhibit, the loan-to-value

15    based on the value of the collateral that secures this loan

16    is 10 percent, right?

17    A    That's correct.

18    Q    So you have $175 million loan secured by over a billion

19    six in real estate.  Mr. Kamlani, you're not suggesting, are

20    you, that an interest rate of somewhere between 11 and 13

21    percent represents a market rate of interest for that loan?

22    A    No.  The interest rate on this loan is a function of

23    where Cyrus is willing to participate in this loan.

24    Q    Okay.

25    A    We'd originally proposed a materially lower rate, which

Page 189

```
 1    I don't remember off the top of my head.  We would -- it's a

 2    market loan by the fact that that's where it got priced.  Am

 3    I happy with the terms?  I'm very, very unhappy with the

 4    terms.

 5    Q    Well, has Mr. Lampert decided whether New Sears is

 6    going to pay this interest in cash or whether the interest

 7    is going to PIK?

 8    A    That decision has not been made.  It's a PIK -- PIK

 9    toggle feature.

10    Q    Okay.

11    A    But I would point out that with 250 million of asset

12    sale proceeds a year, that I would expect this loan to be

13    gone and extinguished within the first 12 to 14, 15 months.

14    Q    Okay.  Now in this term sheet in the very first

15    paragraph, it says that the loan, the $175 million loan that

16    we're talking about is secured by a property contained in

17    the Dove and Sparrow pools of collateral.  Is that right?

18    A    Yes.

19    Q    It's consistent with your understanding?

20    A    Yes.

21    Q    Okay.  And am I correct, Mr. Kamlani -- and again, I

22    can take you to the APA if it helps -- that as part of its

23    credit bid, ESL is credit bidding its Dove loan in the

24    amount of $544 million?

25    A    Correct.
```

Page 190

1    Q    Okay.  And so of the total real estate value that

2    you're getting here, that New Sears is getting, of $1.65

3    billion, 544 million of that value is attributable to the

4    properties that secure the Dove loan?

5    A    Yes, that's 544 million of real dollars that we lent to

6    the company.

7    Q    Okay.  Again, this will go faster if you just answer my

8    questions.

9    A    I -- I got it.  I'm answering them.

10   Q    Okay.  And the balance of the $1.65 billion in real

11   estate loans, in real estate value that secures this loan,

12   is therefore attributable to the Sparrow properties, is that

13   correct?

14   A    The difference between the total minus the Dove would

15   equal Sparrow, yes.

16   Q    Okay.  And ESL is not credit bidding any of its Sparrow

17   debt as part of this transaction, is it?

18   A    There's a mechanic there that I'm not familiar with,

19   but I believe you're correct.

20   Q    Right.  Because Sparrow's a non-debtor, right?

21   A    Correct.

22   Q    Okay.  And so are you able to explain to me how NewCo

23   is paying for the billion dollars of Sparrow real estate

24   assets?

25   A    Not in any accurate way.

Page 191

1   Q    Okay.  Let's go back to Tab 6, please.  And, again, I'm

2   going to focus on the repayment terms here.  So do you have

3   Page 8 in front of you?

4   A    I do.

5   Q    Okay.  If you see -- if you look at the line -- and,

6   again, apologies for the small font.  It's a little

7   difficult to follow, but there's a line that says --

8   A    It's -- it's my font.  You don't apologize.

9   Q    It says "Real estate sale proceeds" and then if you

10   look across for each month of 2019, it just shows the flat

11   $17 million all the way across, right?

12   A    It does.

13   Q    And so what that represents, if I'm reading this

14   correctly, is that the $200 million in real estate proceeds

15   for 2019, you just divided it up evenly over 12 months,

16   correct?

17   A    That's correct.

18   Q    Okay.

19   A    Because I didn't have a view on --

20   Q    Right.

21   A    -- what was going to sell when.

22   Q    And if you go down to Footnote 6, Footnote 6 tells us

23   what happens to that $200 million, right?  Footnote 6 says a

24   hundred percent of --

25   A    It starts with "assumes," right?

Page 192

1    Q     Right.   "Assumes 200 million of annual sale leaseback

2    transactions from '19 to '21.  It does not account for

3    incremental associated lease expense."  And then here's the

4    part I want to focus on, "Assumes 100 percent of proceeds

5    are used to pay down any of the ABL in the first four months

6    and then 80 percent of the proceeds used starting June of

7    2019."  So let's just pause there.

8         So for the first four months after you close, you sell

9    a bunch of real estate, the first $100 million, the ABL

10   lenders have said we have to get that.  That goes to us,

11   right?

12   A     So let's -- I just want to very, very clear on this

13   point.  If NewCo draws -- draws on the revolver --

14   Q     Yep.

15   A     -- and we sell $100 million of real estate, that $100

16   million goes to repay the draw on the revolver, which is

17   still available to the company.

18   Q     Right.

19   A     It is not a permanent reduction in the revolver.  It's

20   simply repaying the draw on the revolver.

21   Q     And after that $100 million is repaid to your ABL

22   lenders when we get past the four-month mark, then it's

23   80/20, right?  Eighty percent of the proceeds go to pay down

24   the real estate loan that you and Cyrus and Mr. Tisch are

25   funding, and 20 percent goes to pay down the ABL lenders?

Page 193

1    A    Again, it's not paying down the ABL lenders.  It is

2    repaying the draw on the ABL so that the cash is available

3    to the company to bolster its liquidity on its balance

4    sheet.

5    Q    Now let's go one row down from where we were on the top

6    there, and there's a line that says, "Asset Sale Proceeds."

7    Do you see that?

8    A    Bear -- bear with me for one moment.

9    Q    Sure.

10   A    I do see it.

11   Q    Okay.  And if you go over to 2019 and 2020 and 2021 on

12   the right side, there's $150 million in that line item for

13   2019.  Do you see that?

14   A    I do.

15   Q    And 130 for 2020, correct?

16   A    Correct.

17   Q    So am I right that what your business plan contemplates

18   is in addition to the $200 million that we've been talking

19   about of annual real estate proceeds for 2019, there will be

20   additional asset sales that will generate an additional $150

21   million, right?

22   A    It is -- it's not necessarily just asset sales that's

23   in that number.  If you'd like me to, I can elaborate.

24   Q    Well, let's look at Footnote 7, which is the footnote

25   that goes along with that line.  And what Footnote 7 says

Page 194

1    is, "Assumes the sale of previously unencumbered assets

2    acquired in conjunction with the rollover of the junior DIP

3    of 100 million in June of '19, 100 million in June of '20,

4    and 30 million in December of 2020."  And then it goes on

5    and says, "All proceeds assumed to pay down the junior DIP

6    rollover."

7        Is that an accurate statement of what you presented to

8    the lenders, sir?

9    A   A more accurate statement of that footnote would have

10   been, Assumes the sale or collection of receivables

11   associated with et cetera, et cetera, et cetera.  And the

12   reason I mention that is a major component of the

13   unencumbered collateral is 255 million of accounts

14   receivable.  And as those accounts receivables are

15   collected, they can be used to pay down the junior DIP.

16       If we collect a hundred cents on the dollar, the junior

17   DIP falls from 350 million to 96 million dollars.

18   Q   Mr. Kamlani, turn to Tab 8 in your binder, please.  And

19   Tab 8 for the record is JX-178.  And you will see on the

20   first page, sir, that this is an email that you've sent to

21   it looks like a couple of recipients at Bank of American,

22   Merrill Lynch on Sunday, February 3rd, so the night before

23   trial at 10:46 p.m.  Is that right?

24   A   Yes.

25   Q   And subsequent to that, it was produced by your lawyers

1    at Cleary Gottlieb.  And let's just look at the cover email.

2    And what you write to the recipients of this email, "We

3    wanted to provide you with the latest version of the model

4    that will be shared with all of the key parties this

5    evening."  You go on from there, and then there are a number

6    of changes that you highlight.  And I'd like to direct your

7    attention to the fourth one, which says, "RE Sale Proceeds."

8    Am I right that "RE" means Real Estate?

9    A    Yes.

10   Q    So "Real estate sale proceeds of an incremental 50

11   million in 2019 based on the latest pipeline report."  Did

12   read that correctly?

13   A    You did.

14   Q    So am I right that Sunday night you're informing the

15   lenders that the $200 million that we've been talking about

16   is now going to increase to 250?

17   A    That's correct.

18   Q    Okay.  So --

19   A    That's our best estimate as of today.

20   Q    Right.  And so that means that for 2019, the plan,

21   should this transaction close, is to sell a total of $400

22   million in assets, right?  So the 200 has become 250, and

23   then we still have the 150 that we talked about previously?

24   A    Of which 255 million are accounts receivables.

25   Q    Yeah.  And you referenced again the pipeline report.

Page 196

1   And so what is it about the pipeline report, Mr. Kamlani,

2   that caused ESL to decide that for 2019, it was going to

3   increase by another $50 million the amount of assets that it

4   was going to sell?

5   A    The pipeline report's divided into three sections.  One

6   is a section that shows that buyers are ready to transact.

7   The second section is, you know, significant interest in --

8   in discussions.  And then the third part of that was a list

9   of all the dark Dove and Sparrow stores of which I believe

10  there are close to 80 of them.  And when I looked at the

11  value of those three components, I had confidence that in

12  Fiscal Year '19, we would be able to sell $250 million with

13  of real estate, not 200.

14  Q    Right.  And so do I understand correctly from that

15  answer -- and I should add that your counsel has not

16  produced to us the pipeline report, so I've never seen it.

17  But with that important caveat, do I understand correctly

18  that the decision to sell more assets rather than less

19  assets in 2019 is not one forced upon you by the banks.

20  It's ESL's decision?

21  A    Yes, that is -- that would be ESL's decision.  That's

22  correct.

23  Q    Okay.  And, Mr. Kamlani, any possibility that that 250

24  number's going to be increased further?

25  A    It could go up, it could go down.

Page 197

1   Q    Now we talked earlier about the first 100 million

2   dollars, if that is generated in the first, I think it's 90

3   days or 120 days.  That has to go to pay down any draws

4   under the revolver, correct?

5   A    That's correct.

6   Q    Now, are you also aware -- and, again, just trying to

7   short-circuit things.  We can look at the document if you'd

8   like -- that the ABL requires that if at the conclusion of

9   that 90-day period less than 100 million of any draws on the

10  revolver has been paid down, then ESL has to make a loan

11  equal to that amount?

12  A    The company has to make a loan equal to that amount.

13  Q    Okay.

14  A    Whether it's ESL or another party, I don't know --

15  Q    Okay.

16  A    -- if we get it.

17  Q    Got it.  Let's go back to the business plan that you

18  presented, the one we first looked at.  It's behind Tab 7.

19  And for the record, it's JX-139.

20  A    You said Tab 7?

21  Q    Tab 7.  And I want to direct you to Slide 4 in this

22  document, which is the executive summary, and talk for a

23  minute about the ShopYourWay program.  Now ShopYourWay, you

24  would agree with me, I take it, sir, is an area of focus for

25  Mr. Lampert?

Page 198

1    A    It does.

2    Q    Okay.  And in slide 4, the executive summary, you

3    write, "NewCo will leverage its state-of-the-art ShopYourWay

4    intelligence platform and integrate a retail platform to

5    deliver value and convenience to its members."  Right?

6    A    Yes.

7    Q    Okay.  Let's turn to Slide 9.  And Slide 9 is called

8    "Integrating and Digitizing the Sears Platform" under the

9    heading ShopYourWay.  Do you see that?

10   A    I do.

11   Q    Now these initiatives that are described on this page,

12   those are not new initiatives for ShopYourWay, are they?

13   A    No, they're not.

14   Q    In fact, sir, this slide that is in the January 2019

15   business plan is actually a slide that you yourself created

16   something like 12 to 18 months ago, right?

17   A    I did.  I worked on this slide with members of the

18   ShopYourWay management team for presentation at the time.

19   Q    And I think what you -- the way you described it to me

20   at your deposition is that this slide is a reflection of the

21   evolution of what ShopYourWay will become over time, right?

22   A    It is -- it is a continuum.  That is correct.

23   Q    Okay.

24   A    We will never -- yes.

25   Q    And it's the path the company's been on for some time?

Page 199

1    A    That's correct.

2    Q    And you've not been able to acquire the number of

3    partners for the ShopYourWay program that you would have

4    liked, correct?

5    A    I've had very high expectations.  It has not yet met my

6    expectations.

7    Q    Right.  So historically, ShopYourWay as a whole has

8    missed your expectations, correct?

9    A    It has not yet met my expectations.  That's correct.

10   Q    And ShopYourWay's membership has been on a steady

11   decline since 2013?

12   A    Largely as a function of closing several hundred

13   stores, yes.

14   Q    All right.  Now for your go-forward business, ESL is

15   still looking to recruit a CEO, correct?

16   A    That is correct.

17   Q    And the lenders have a provision in their ABL that if I

18   understand it correctly, requires that if the CEO is not

19   unaffiliated with ESL, in other words, if Mr. Lampert were

20   to serve as CEO, if you were to serve as CEO, the lenders

21   can require a chief restructuring officer be put in place,

22   correct?

23   A    That is correct.

24   Q    So the only circumstance under which you end up with a

25   CEO that's not affiliated with ESL and that is not Mr.

1    Lampert is if you hire somebody completely independent?

2    A    I think by definition that's accurate.

3    Q    Okay.  Now in addition to looking for a CEO, you're

4    also looking to fill a number of other senior positions at

5    the company, correct?

6    A    That's correct.

7    Q    Including senior leadership of retail operations?

8    A    Yes.

9    Q    Sears Auto Center?

10   A    We're looking at complementing the management team in

11   material businesses across the company in order to make sure

12   that we execute significantly better going forward than we

13   have in the past.

14   Q    You're looking for new senior leadership at retail

15   operations, auto center, Innovel Home Services, Kenmore and

16   Diehard, right?

17   A    If you ask me to make a list today, I would put all

18   those on the list, yes.

19   Q    Okay.  And to your knowledge, no outside recruiting

20   firm has yet been hired to fill any of those positions?

21   A    That's correct.

22   Q    And Mr. Lampert has not yet told you whether he intends

23   to hire an outside recruiting firm to fill those positions,

24   correct?

25   A    We certainly had a discussion about it.  Quite frankly,

Page 201

```
 1    this has been a fast and furious process, and I don't

 2    believe he or I have had the time to sit down and interview

 3    the top recruiting person.

 4    Q    Let's switch gears again and talk about the option

 5    process.  Now you were involved in the negotiations that led

 6    to the ESL bid being accepted, correct?

 7    A    Yes.

 8    Q    And ESL has created an entity, I think you called it

 9    Transform Hold Co.  Technically that's the legal entity

10    that's the buyer, right?

11    A    Tranform Co or Hold Co, yes.

12    Q    Okay.  And am I right that the three equity

13    participants in that entity are ESL, Cyrus, and Mr. Tisch?

14    A    I believe there's another minority group related to the

15    2L credit bid.  And I don't know the mechanics, but there's

16    a company out there that's supposed to tell us who those

17    people are.

18    Q    Okay.  Now at some point in the negotiating process,

19    you were the lead negotiator, if you will, on the terms of

20    the asset purchase agreement on ESL's behalf, right?

21    A    I -- I was the person on the ground with Mr. Lampert.

22    With respect to any material decision, I would have taken

23    his guidance.

24    Q    Okay.  And with respect to the release in particular,

25    that is the release that ESL is receiving as part of this
```

Page 202

1    transaction, should it be approved, those negotiations were

2    handled directly by Mr. Lampert and not you, correct?

3    A    That's correct.

4    Q    And so you're not going to be able to provide the Court

5    with any insight into the negotiations that led to $35

6    million being paid for the right to credit bid, correct?

7    A    I would not be able to.

8    Q    Okay.  Now you were there at Weil Gotshal the night of

9    the auction, correct?

10   A    I was.  It was a four-day night, but I was there.

11   Q    And did anybody from the Debtors ever tell you that as

12   part of the bidding process, there was a requirement that

13   ESL allocate its bid to the different assets that it was

14   acquiring?

15   A    I -- I don't recall whether it was during that three-

16   to four-day process, but there definitely was requests from

17   the Debtor through this 45-ish-plus day process for us to

18   allocate our bid.  And I believe we did send sources and

19   uses tables to the Debtor at some point that did provide an

20   allocation of our bid.  Probably never to the level of

21   granularity that they wanted, but there -- there were

22   allocations that were provided.

23   Q    Well, am I right, Mr. Kamlani, that ESL has not

24   allocated in any way the purchase price among the various

25   assets that it's acquiring?

Page 203

1    A    At this point in time, no, there's not an allocation.

2    Q    Now a portion of ESL's overall credit bid here is on

3    account of the IP ground lease loan, correct?

4    A    I'm sorry.  Repeat that again.  What paid the loan?

5    Q    Sure.  A portion of ESL's credit big here is the debt

6    that ESL has on account of what's called the IP ground lease

7    loan.  Is that right?

8    A    That's correct.

9    Q    And your understanding is that what you're credit

10   bidding for there are the leases that serve as collateral

11   for that loan, right?

12   A    And all of the --

13   Q    And the IP.

14   A    -- intellectual property except for Kenmore and

15   Diehard.

16   Q    And the amount outstanding under that loan is $231

17   million, correct?

18   A    That sounds right, yes.

19   Q    Okay.  And but what you have not done is any kind of

20   evaluation of what the assets are worth that secure that

21   loan, correct?

22   A    We did a valuation at the time of making that loan.  I

23   have not done a valuation since then.

24   Q    Right.  So to ask the question differently, you don't

25   know whether today the value of the leases and the IP that

Page 204

1    secure that loan equal the $231 million amount of that loan

2    that's being credit bid or not, right?

3    A    I -- I do not other than I know what we're paying and

4    what we're getting for it.  That's it.

5    Q    And, likewise, sir, for the Dove loan that we talked

6    about, the 544 million, the appraised value that is referred

7    to in the schedule that I showed you earlier, that's the

8    most recent valuation information that ESL has on those

9    properties, is that right?

10   A    Yes.  And as I mentioned earlier, those appraisals are

11   roughly 12 to 14 months old.

12   Q    Okay.  Now, are you aware of whether in the course of

13   negotiations, the Debtors asked ESL to backstop its credit

14   bid with cash or with a letter of credit?

15   A    They did.

16   Q    And ESL refused to do that, right?

17   A    We declined.

18   Q    Okay.  Now, you're also aware, I take it, Mr. Kamlani,

19   that under the asset purchase agreement, the buyer has the

20   ability to designate certain leases for a period of time

21   that the buyer's then free to sell to third parties,

22   correct?

23   A    Yes.  We did purchase the designation rights.

24   Q    Okay.  And those designation rights exist for how long?

25   A    I believe 60 days from closing.

Page 205

1  Q     And am I right that in the course of negotiations, the

2  Debtors sought to limit the number of properties for which

3  or over which ESL could exercise this designation right?

4  A     The properties and the time frame.

5  Q     Right.

6  A     We were looking for a much longer time frame.

7  Q     And ESL ended up with no limit on the properties,

8  right?

9  A     But, unfortunately, very restricted limit on the time

10  frame, yes.

11  Q     So yes, no limit on the properties.  You can designate

12  whatever properties you want, and you have 60 days to do it,

13  right?

14  A     That's what we paid for.

15  Q     And this particular provision, the ability to designate

16  leases, then sell them to third parties was one that was of

17  particular importance to Mr. Lampert, correct?

18  A     It was.

19  Q     And it was one in which Mr. Lampert became the primary

20  negotiator, right, on ESL's behalf?

21  A     That's a fair statement, yes.

22  Q     Okay.  Now you as part of your prior answer, Mr.

23  Kamlani, testified that ESL paid for the right to designate

24  any lease it wants in the company for 60 days and sell it to

25  a third party.  What did ESL pay for that?

Page 206

1   A    At some point internally, we had a internal -- we -- we

2   had a number next to designation rights.  I -- I don't

3   recall what it is, but it was not explicitly laid out in our

4   -- in any interim bid or final bid that I can recollect.

5   But there's no doubt in my mind that that is a part of our

6   purchase price.

7   Q    Well, did the Debtor ever make a demand that ESL pay X

8   dollars for the right to designate any lease it wants and

9   sell that lease to a third party for 60 days?

10  A    I believe there was a discussion at some point in time

11  around the value of designation rights.  Again, as you

12  pointed out, I was not the lead on it, but I'm familiar with

13  the topic.

14  Q    Okay.  Now, Mr. Kamlani, as part of this overall

15  transaction, there are certain liabilities that ESL or the

16  buyer is going to assume, correct?

17  A    That's correct.

18  Q    And in the course of negotiations, am I right that the

19  company took the position, Sears, the Debtors took the

20  position that NewCo should assume of its liabilities, right?

21  A    They did.

22  Q    Okay.  Now, let's turn to some of those in particular,

23  and let's start with accounts payable.  So, as of the time I

24  took your deposition, your understanding is that NewCo was

25  assuming up to $166 million in accounts payable, right?

Page 207

1    A    That's correct.

2    Q    Okay.  And those payables were to be identified in a

3    schedule to the asset purchase agreement.  I think it's

4    Schedule 1.1G, right?

5    A    I only learned that today.

6    Q    Okay.  So I gather then that you have not seen a

7    schedule that sets forth the AP that the 166 million in

8    accounts payable or any other amount of accounts payable

9    that the buyer is going to assume as part of this

10   transaction?

11   A    We have seen accounts payable schedules twice.  One was

12   probably a couple of weeks ago, and one might have been four

13   or five days ago.  And the spirit of those schedules were,

14   here are the accounts payable at this point in time.

15        We would expect that based on running the business

16   in the ordinary course, when we close, the accounts payable

17   schedule that you inherit should largely look like the one

18   we're giving you today.  That was the spirit of the

19   schedules that were...  I'm not talking about Schedule C

20   asset purchase agreement.

21        In the ordinary course of business discussions and

22   negotiations, we were provided with a snapshot of AP by

23   vendor, so we had a sense of what it was AP looked like and

24   who the vendors were.

25   Q    Mr. Kamlani, turn to Tab 2, please, in your book.

Page 208

```
 1              MR. QURESHI:  And for the record, that's Joint

 2    Exhibit 10.

 3    Q    This is the liquidity analysis that went along with the

 4    ESL business plan, right?

 5    A    It was certainly one of them.

 6    Q    Okay.  Turn, if you could, to Page 8 of the document.

 7    And I get to blame you, I think, for being illegible,

 8    because this is not the one you created, right?

 9    A    Yeah.  I was looking for a date so I could get grounded

10    on which version this is.  But I'll figure it out, I guess,

11    as we go along.

12    Q    It's not dated.  If it helps, it's the same one I

13    showed you at your deposition.

14    A    Okay.

15    Q    Page 8 of that document, again, it's difficult to read

16    --

17    A    Yep.

18    Q    -- but if you look on the left side, there's a line

19    item that says accounts payable.  And then you go across the

20    top and you look at dates, and the first column says

21    closing, and the number underneath closing for accounts

22    payable is $166 million.  Am I reading that correctly?

23    A    You are.

24    Q    Okay.  And your understanding was that certainly at the

25    time that you put this forecast together, $166 million was a
```

Page 209

1   good estimate and indeed you understood that that was the

2   cap of ESL's liability to take on accounts payable, correct?

3   A    Correct.

4   Q    Okay.  And indeed, you told me at your deposition that

5   it was definitely a good estimate because contractually, you

6   were picking up $166 million, so you described it to me as a

7   certainty, right?

8   A    I believe what I described was that we had a

9   contractual obligation to pick up no more than $166 million

10   of accounts payable, with inventory to be delivered

11   associated with that accounts payable post-close that was

12   not a part of the stock ledger as of the closing date.

13   Q    Well, with the benefit of a transcript, I can tell you

14   exactly what you told me at your deposition.

15   A    That would be helpful.

16   Q    What you told me at your deposition, I asked you, "So

17   on Page 8" -- same document we're looking at -- "where

18   accounts payable at closing is listed at $166 million, is

19   that a good estimate as far as you are aware?  Answer:  It's

20   definitely a good estimate because contractually, we're

21   picking up that $166 million.  So that's a certainty."

22          Did I ask you that question, and did you give that

23   answer?  Yes or no?

24   A    In that section of the deposition, yes.

25   Q    Okay.  Now let's go back to Tab 8, please.  And behind

Page 210

1    Tab 8, again, is JX-178.  This is the email you sent to your

2    lenders on Sunday night around 11:00 PM.  And if you look at

3    the cover email, you say, "Lastly, please take a look at

4    Footnote 10 on Slide 7 regarding the AP of $166 million.  As

5    you would expect, we are in discussions with the debtors on

6    this issue."  Is that what you wrote?

7    A    Yes, that's what I wrote.

8    Q    Okay.  So, let's go to Page 7 and let's look at

9    Footnote 10.  And what you write in Footnote 10 is, "Debtors

10   have asserted that the ABA obligates buyer to assume up to

11   $166 million in accounts payable with respect to..."  And

12   then it goes on to describe a couple of buckets of that.

13           So, I gather from the way the footnote is worded,

14   but you can tell me if I have it wrong, that what you're

15   describing is the Debtors' assertion, and it's one with

16   which the buyer disagrees.

17   A    That's correct.  And I know you didn't reference it in

18   my deposition, but my understanding is also in that

19   deposition.

20   Q    And Mr. Kamlani, that footnote then goes on to say,

21   "Buyer disputes this interpretation of the ABA and any

22   obligation to assume accounts payable that relate to any of

23   the $1.553 billion of inventory acquired a closing, or any

24   such expenses incurred prior to closing."  Does that

25   represent the buyer's position with respect to the

1   assumption of accounts payable today?

2   A    That is my understanding of the business agreement.

3   That's my understanding of the contract.

4   Q    Well, as you sit here on the stand today, is the buyer

5   agreeing with the Debtors that it will assume $166 million

6   of accounts payable, or is the buyer continuing to dispute

7   that obligation?

8   A    We continue to be in discussions to try and resolve

9   that issue.

10   Q    It is presently unresolved?

11   A    It is unresolved as I sit here today.

12        MR. QURESHI:  Your Honor, can I have a minute?

13        THE COURT:  Sure.

14        MR. QURESHI:  Nothing further.

15        THE COURT:  Okay.  Anyone else wish to cross-

16   examine the witness?  Nope?  Okay.  Redirect?

17        MR. BROMLEY:  I'll be brief, Your Honor.

18        THE COURT:  Okay.

19        REDIRECT EXAMINATION OF KUMAL KAMLANI

20   BY MR. BROMLEY:

21   Q    Mr. Kamlani, Mr. Qureshi had asked you a few questions

22   about the company's business plan from December.  Do you

23   recall those questions?

24   A    Yes.

25   Q    And in particular, there was a comparison that Mr.

Page 212

1    Qureshi drew between a negative one percent growth that --

2    or negative growth that is built into the ESL business plan,

3    and a negative 2.4 percent growth that was -- or negative

4    growth built into the company's plan.  Do you recall that?

5    A    Yes, I do.

6    Q    Now, in the company's plan in December, that was on a

7    footprint of 505 stores, correct?

8    A    Five hundred and five stores, correct?

9    Q    And the negative one percent that's built into the ESL

10   plan, what's the store footprint?

11   A    That's 425 stores, the difference being the company

12   chose to put into going out of business sales 80 stores,

13   which is the difference between the 505 and the 425, and

14   those were the worst performing stores of the 525.

15   Q    And so, with the removal of the worst performing stores

16   out of the 505, would you expect that to have any positive

17   impact on these numbers?

18   A    Absolutely.  It would have a mathematically positive

19   impact.

20   Q    Now, Mr. Kamlani, the business plan that ESL put

21   together, you said that it was based on the company's

22   business plan, correct?

23   A    That was the foundation for it, yes.

24   Q    And I believe in one of Mr. Qureshi's questions, you

25   had described a process that you had went through in terms

Page 213

1    of diligence and visiting Hoffman Estates do you recall

2    that?

3    A    Yes.

4    Q    Now, Mr. Kamlani, you were not permitted to give your

5    full explanation.  I wonder if you could just tell us what

6    you were going to say in terms of that exercise?

7    A    I'm sorry, could you say that again?

8    Q    The exercise that you went through in the Hoffman

9    Estates.  Could you please explain that?

10   A    Yeah, we were at Hoffman Estates probably for three to

11   four full business days with our investment advisors from

12   Moelis.  Citi sent two investment bankers.  They were 14-

13   hour days and we met with all team members of the management

14   team who were responsible for critical business units that

15   would have a material impact on the plan in any way.

16   Q    Now, Mr. Qureshi also asked you a number of questions

17   that went to the number of employees that are being

18   committed to be taken on as a result of this transaction.

19   Is there a contractual commitment to make offers of

20   employment to the employees that are currently employed by

21   Sears?

22   A    There is, and the offer letters have been generated.

23   And I suspect that they're going to go out shortly, subject

24   to the transaction being approved and cost.

25   Q    And that's for the entire 45,000 employees?

Page 214

1    A    The offer letters I just referred to, I think, are to

2    roughly the top 300 executives.  I'm not yet familiar with

3    the communication to -- for the other 44,000-plus employees,

4    of which a significant portion are part-time.  But there

5    will be a formal communication.

6    Q    Now, with respect to the number of stores that ESL is

7    planning to maintain in the future, there was a number of

8    questions and back-and-forth with respect to stores that

9    might be closed and stores that might be open.  In one of

10   your answers, you referred to dark stores.  Could you please

11   explain what you mean by dark stores?

12   A    Yeah.  So, within the Dove & Sparrow portfolio, which I

13   think we spoke about with respect to the loan that it's

14   collateral for, I believe there are roughly 80 dark stores

15   that have substantial value.  Obviously, since they're dark,

16   there are no employees associated with those stores.  Those

17   stores don't generate any revenue.  It's a cost to carry

18   those stores.

19        It would certainly be our strong preference to

20   monetize those dark stores for fair value as soon as

21   possible.  They're not a part of the ecosystem in any way,

22   shape or form.

23   Q    So, it's fair to say that closing a dark store doesn't

24   have any impact on employment numbers?

25   A    Zero.  In fact, it generates liquidity to continue to

Page 215

1   invest in the business, grow the ecosystem, and employ more

2   people.

3   Q    You also used the term lease-back.  So, is it true that

4   ESL is considering sale-leasebacks of operating stores?

5   A    We have.  Consistent with the past, we've sold stores

6   on a sale-leaseback basis, and there have been some stores

7   where we did not sell on a sale-leaseback basis.  Yes.

8   Q    And what would the impact on employment be if a store

9   was sold and then leased back?

10   A    There would be no impact on employment.

11   Q    There was a couple of questions that Mr. Qureshi ask

12   you about opening new stores.  Now, is there a particular

13   type of format of new stores that ESL is considering

14   opening?

15   A    Yeah.  We have a new concept store that's about 12,500

16   square feet.  It's been in the marketplace for roughly two

17   years.  So, it's not a test.  It's tried and true.  We're in

18   four markets, Hawaii, Colorado, Pennsylvania, and Pharr,

19   Texas.  These are state-of-the-art, all-digital stores that

20   are a function of how you change your retail model to

21   survive in the environment that we rent.

22        Sears is a very, very large company.  It's a

23   battleship.  You can't turn it on a dime.  Over time, what I

24   expect would happen is that as large 135,000 square foot box

25   real estate gets sold, because it is -- you cannot survive

Page 216

1    in this retail market by running businesses anymore with

2    that sort of inefficient space.  We will open up a multiple

3    of these new 12,500 square foot boxes that are far more

4    efficient.

5           What's particularly important is that as you drive

6    the type of volume for bulky goods through those new format

7    stores, they have a benefit to the Sears Home Services

8    business, which is responsible for repairing appliances that

9    are sold, and it's a boon to the Innovel business, which is

10   responsible for delivering and installing in customers'

11   homes.

12          So, I would actually expect, if we were to look

13   out two to three years from now, that this new company, if

14   we're successful -- it's a business; we're in the business

15   of taking risk -- if we're successful, we should be

16   employing more than 45,000 people by a wide margin.  If

17   we're not successful, then we won't.

18   Q    And with respect to the employees going forward, has

19   ESL made any determination with respect to severance

20   programs that you've put in place for employees on a go-

21   forward basis?

22   A    We have.  Associates or employees are the most

23   important factor in running any single business, in my mind.

24   When the petition date happened, the severance plan was

25   watered down.  We wanted to send a very strong message to

Page 217

1    our employees that they're critically valuable to success.

2    And so, we've committed to move the severance plan to as of

3    the closing date, to the extent that there is a closing,

4    back to the pre-petition severance plan.

5    Q    So, just so I'm clear, the pre-petition severance plan

6    was more beneficial to employees than the post-petition?

7    A    It was more beneficial to the employee.  I just -- I

8    can't make this point enough.  Jack Ma said focus on your

9    customers and then focus on your associates, and your

10   shareholders will be taken care of.

11            I think he got it backwards.  If you focus on your

12   associates and they're happy, they'll take care of your

13   customers.  And if your customers are taken care, then your

14   shareholders definitely have nothing to worry about.

15            It starts with the associates.  Every day it's

16   about the associates.  And at the end of the day, it's still

17   about the associates.  The rest of the business then takes

18   care of itself.

19   Q    Mr. Qureshi also asked you a couple of questions about

20   the ShopYourWay program.

21   A    He did.

22   Q    And I think he elicited testimony that you were not

23   happy -- have not been happy with ShopYourWay fulfilling

24   your expectations to date.  Is that correct?

25   A    Correct.

Page 218

1   Q    During the course of 2018, are you aware of any

2   improvements in the performance of Sears that were

3   attributable to the ShopYourWay program?

4   A    Yes.  The same store sales performance from February of

5   '18 leading right up until about mid-September was a

6   tremendous positive trajectory from roughly negative 15

7   percent.  I think we actually -- it was actually positive at

8   some point in mid-September.

9        The management team had done a terrific job in

10  continuing to refine the ShopYourWay program as it relates

11  to providing ShopYourWay members with points back in their

12  pocket.  Combined with promotional discounts and the right

13  marketing, it finally started to move the needle on same

14  store sales from that period of February to September 15th.

15       Very, very unfortunate we've had to go through

16  this petition process, which we lost that momentum during --

17  since October 15th, or slightly before then.

18  Q    And do you have an expectation that that momentum can

19  be regained?

20  A    Absolutely.  There have been a number of companies that

21  have gone through a bankruptcy that are strong and healthy

22  today; the car manufacturers, just about every single

23  airline.  There are companies that have gone through all

24  sorts of exogenous shocks in consumer confidence.  Chipotle

25  comes to mind with their E. coli issue.  That company is

Page 219

1   doing well again today.

2           This company went through an exogenous shock.

3   This is a company that is based on consumer confidence and

4   trust to buy appliances in the home.  We are going to come

5   out of the gate building consumer confidence and let the

6   world know that thanks for rooting for us, we survived, we

7   are part of the fabric of this country, and we hope you'll

8   continue to support us.

9   Q    Now, Mr. Qureshi asked you a couple of questions about

10  the talent recruitment exercise.  Just one question on this.

11  Is the existence of the publicity relating to the UCC's

12  opposition a problem in recruiting top talent at the moment?

13  A    Yes.  It's been very difficult to recruit top talent,

14  not only now but even pre-petition, given the lack of

15  visibility with respect to the runway of the company.  The

16  discussions, you know, with talent on a pre-petition basis

17  was if you're able to figure out how to restructure the

18  company in court or out of court and there is certainty, you

19  know, then we'd like to have a conversation.

20          It's very hard to get a top CEO in their job to

21  commit to being the CEO of a company that might not even

22  exist.  Could I hire a CEO last week?  I could, but probably

23  not the one I'd want.  So, the decision has been made to

24  wait for certainty so we can offer that certainty to the

25  market and hire the type of CEO that this company deserves

Page 220

1    going forward.

2    Q    So, there were a couple of questions that Mr. Qureshi

3    asked you about the allocation of value with respect to

4    particular credit bidding elements.  And in particular,

5    there was a reference to the IP ground lease loan?  Do you

6    remember that?

7    A    Yes.

8    Q    And you referenced the fact that you did do a valuation

9    with respect to the underlying assets at the time you did

10   the loan.  Is that correct?

11   A    That's correct.

12   Q    And that was about a year ago?  Is that right?

13   A    It feels longer than that, but I know you might be

14   right.  It feels longer than that.

15   Q    And at the time that ESL participated in that loan, was

16   ESL confident that the value of the collateral exceeded the

17   amount being lent?

18   A    We felt like we had adequate coverage, yes.

19   Q    And is there anything that's happened in the time since

20   that would give you an indication that you don't have that

21   adequate coverage today?

22   A    No.

23   Q    Okay.  I'll ask you the same questions with respect to

24   the Dove loans.  Do you have that -- when you said that --

25   respect to those loans, there were appraisals done over 14

Page 221

1    months ago, correct?

2    A    Correct.

3    Q    And at the time you made those loans, you felt you had

4    adequate collateral coverage?  Is that right?

5    A    Absolutely.

6    Q    And is there any reason -- anything that's happened in

7    the interim that would give you a sense that you don't have

8    that coverage today?

9    A    No, I don't believe there's been any material change or

10   shock in the real estate market that would shake my

11   confidence.

12   Q    Okay.  And with respect to this lease designation

13   issue, you mentioned the 60 days --

14   A    Yes.

15   Q    -- not having the right to designate leases within 60

16   days.  During the negotiation, did ESL as the Debtors to

17   provide a longer period of time?

18   A    I believe we may have asked for as long as six months.

19   Q    And in those negotiations, you came down from six

20   months to 60 days?

21   A    Yes.  Again, Mr. Lampert was more front and center on

22   those negotiations then I am, but I am aware that it ended

23   up at 60 days.

24   Q    Now, you recall, Mr. Kamlani, that ESL provided a bid

25   by the bid deadline of December 28th, correct?

1   A    That's correct.

2   Q    What is the difference in value between the bid that

3   went in on the 28th and the bid that is up for consideration

4   today?

5   A    I believe it's $800 million.

6   Q    So, in that period of time, the bid value has gone up

7   by $800 million?

8   A    I believe so.

9   Q    And that was a product of the negotiations that took

10  place between the 28th and the end of the auction?

11  A    That's exactly -- yes.

12  Q    Thank you.

13           MR. BROMLEY:  No further questions, Your Honor.

14           THE COURT:  Any re-cross?

15           MR. QURESHI:  Just two very quick points.

16             RE-CROSS-EXAMINATION OF KUMAL KAMLANI

17  BY MR. QURESHI:

18  Q    Mr. Kamlani, you agree, I take it, that there is no

19  contractual commitment on ESL's part to employ a certain

20  number or minimum number of employees for any period of

21  time?

22  A    There's no contractual commitment beyond the closing

23  date to make offers.  To the extent we were to reduce

24  employment the next day, we would be paying severance in

25  very, very large sums.

Page 223

1  Q    And you also agree with me, sir, that when it comes to

2  store closures that are likely to occur to generate the

3  hundreds of millions of dollars that we're talking about,

4  that it's a fair assumption that among the real estate that

5  will be sold to generate those proceeds will be lit stores,

6  currently operating stores?

7  A    Certainly.  What I don't know is whether or not we will

8  have them on a sale-leaseback basis so there's no adverse

9  impact to the employee base.

10 Q    Okay.

11 A    That I don't know.

12        MR. QURESHI:  That's all I've got.

13        THE COURT:  Okay.  You can step down.

14        MR. KAMLANI:  Thank you.

15        THE COURT:  Okay.  I think that's the end of the

16 Debtors' case, except for rebut -- you know, obviously,

17 cross-examining the Committee's witnesses.

18        MR. LENDER:  Your Honor, just one housekeeping

19 matter.  I think, just so the record's clear, again, we

20 would formally move in Mr. Meghji's declaration as his

21 direct examination.  I believe you reserved on that earlier.

22 So, I just want to make sure that this is part of the

23 record.

24        THE COURT:  Okay.  Again, except as to the

25 validity of the real estate appraisals where there is

Page 224

1    separate testimony, and which I'm admitting for purposes of

2    his understanding of the appraisals, I would admit it.

3          (Declaration of Mohsin Meghji Admitted Into Evidence)

4               THE COURT:  Okay.  I have the -- I read the

5    deposition designations also.  So, when I say the end of the

6    company's case, that would include the company's

7    designations as part of the company's and the Committee's

8    designations.

9               So, why don't we turn to the Committee's

10   witnesses?

11              MR. QURESHI:  Thank you, Your Honor.  Again, for

12   the record, Abid Qureshi, of Akin Gump, for the Committee.

13   Our first witness is Mr. Saul Burian.

14              THE COURT:  Okay.  You can take a seat.  So, would

15   raise your right hand, please?  Do you swear or affirm to

16   tell the truth, the whole truth, and nothing but the truth,

17   so help you God?

18              MR. BURIAN:  I hereby affirm.

19              THE COURT:  Okay.  And it's B-U-R-I-A-N?

20              MR. BURIAN:  Correct.

21              THE COURT:  Okay.  And Mr. Burian, I have your

22   declaration here dated January 26, 2019.  Sitting here

23   today, would this constitute your direct testimony?

24              MR. BURIAN:  Yes.

25              THE COURT:  Okay.

1          MR. QURESHI:  Your Honor, if I may, we did file

2     on the docket last night an update to Mr. Burian's

3     declaration, which has a cover page of February the 3rd.

4     There is no substantive change to it.  It's just to cover a

5     declaration that says it's his direct testimony, and that's

6     all.

7          THE COURT:  All right.  Which we just went

8     through?

9          MR. QURESHI:  Yes.

10         THE COURT:  Okay.  Very well.  So, you can go

11    ahead on cross.

12         MR. FRIEDMANN:  Thank you, Your Honor.  Good

13    afternoon.  Jared Friedmann, from Weil, Gotshal & Manges, on

14    behalf of the Debtors.  If I may, Your Honor, we also have

15    exhibit books.  If I could hand one -- permission to hand

16    one to you as well as to the witness?

17         THE COURT:  Okay.

18         MR. FRIEDMANN:  Thank you.

19         THE COURT:  Thanks.

20              CROSS-EXAMINATION OF SAUL BURIAN

21    BY JARED FRIEDMANN:

22    Q    Good afternoon, Mr. Burian.

23    A    (indiscernible)

24    Q    Mr. Burian, as the financial advisor to the UCC, there

25    came a time when you personally made the decision that a

Page 226

1  liquidation was a better alternative to maximize value than

2  ESL did, correct?

3  A    When you say personally, I think what I testified in my

4  deposition was there came a time when I wanted to make sure

5  we evaluated all alternatives, that I no longer was

6  comfortable spending significant amounts of money chasing

7  something that appeared to be destined to be a lower

8  recovery for unsecured recoveries than a going concern bid.

9  Q    And the point at which you made that determination that

10 going after a potential ESL bid would be unlikely to succeed

11 and therefore a liquidation made more sense to you was right

12 after Debtors' financial advisor, M-III, presented their

13 first go forward plan, correct?

14 A    So, to be clear, you mischaracterize what I said.  But

15 generally, I believe that we always want to leave the

16 opportunity for ESL to make an emotional bid if they don't

17 want to overpay significantly and actually for unencumbered

18 assets and meet all three conditions that the company had

19 established.  We will be more than happy to accept that bid.

20          However, what I testified to was there came a time

21 when liquidation was better than the more likely

22 alternative, and therefore, we encouraged the company not to

23 spend time and money specifically and exclusively that going

24 concern bid, because they're not the same thing.

25 Q    And to clarify, that moment for you that decision was

1     made when the Debtors' financial advisor, M-III, presented

2     their first go forward business plan, correct?

3     A    I believe that what I testified in my deposition was

4     that I had an open mind and we very much wanted to preserve

5     employment.  And then the night after or the night of the

6     business plan, when I had a chance to really look at it

7     carefully, is when I became convinced that continuing to

8     spend money exclusively to pursue that alternative no longer

9     made sense.

10    Q    And the business plan that M-III presented, the one

11    that you're thumbing through right now, which is Tab 1 in

12    the book, it was marked as -- admitted into evidence as

13    Joint Exhibit 131, that was the presentation that M-III gave

14    on or about November 12th, 2018, correct?

15    A    This is the written portion of the presentation.  I had

16    a lot more discussions that day about a number of topics

17    that influenced my decision.

18    Q    But in terms of timing, November 12, 2018 is the day on

19    which you reviewed this business plan, you had those

20    discussions, and as you just referred to before, it was

21    later that evening that you had the opportunity to think

22    this through and came to that conclusion, correct?

23    A    So, I forgot to check since our deposition what the

24    exact date was.  You had said at the end of the deposition

25    that it was November 12th when that meeting and presentation

Page 228

1   was, and I trust you in that regard.

2   Q    Well, Mr. Burian, you don't have to trust me in that

3   regards insofar as the document in front of you, Joint

4   Exhibit 131, is dated November 12th, 2018, correct?

5   A    Correct.

6   Q    You don't have any reason to doubt that the November

7   12th, 2018 is in fact the correct date, right?

8   A    I don't have any reason to doubt that the date is

9   wrong.  I'm saying that we received many presentations.  I

10  did not spend a lot of time working and comparing each one,

11  and I said I'm willing to believe -- trust you that this is

12  the one from the meeting we discussed in my deposition.

13  Q    This November 12th presentation given by M-III on or

14  about November 12th, that was done before ESL had provided

15  its initial indicative bid, correct?

16  A    If I remember correctly, the ESL bid was around

17  December 5th, the first bid, so that's --

18  Q    So, this was at least a couple of weeks before that?

19  A    Correct.

20  Q    Okay.  And November 12th was also a point where

21  Houlihan Loki had not yet prepared a wind down analysis,

22  correct?

23  A    We had not formally prepared a wind down analysis.

24  That is correct.

25  Q    The first time -- when Loki prepared a wind down

1    analysis, that was sometime between December 20th and

2    December 26th, correct?

3    A    What I testified was it was the first time that

4    together with counsel and FTI we finalized one and

5    distributed it to our clients.  That's what I testified to.

6    It is not the first time that we looked at wind down

7    analyses and thought about the issues.

8    Q    Mr. Burian, do you remember at your -- you were deposed

9    in this case, it was only about a week ago, correct?

10   A    It feels like longer.

11   Q    For all of us, I promise.  And you swore to tell the

12   truth that day, and you did in fact tell the truth, correct,

13   to the best of your ability?

14   A    To the best of my -- I definitely, when I spoke at the

15   deposition, was telling the truth.  And if I made a mistake,

16   it was inadvertent.

17   Q    Let me read you the question and answer from that day

18   and tell me if you inadvertently misspoke then.  I asked

19   you, "When did Houlihan Loki, whether it was you or your

20   team, first put together a wind down analysis in connection

21   with this case?  Obviously, I don't mean outside of this

22   case."  And your answer was, "So, the first one that we put

23   together was sometime between December 20th and 26th."  Do

24   you recall that question and giving that answer?

25   A    Not specifically, but it's consistent with what I've

1    said.

2    Q    Okay.

3    A    Today.

4    Q    Okay.  And therefore, that initial wind down analysis

5    that Houlihan Loki put together was more than a month after

6    the November 12th meeting with M-III regarding the first

7    presentation of their business plan, correct?

8    A    It is correct that the final -- the then final version

9    of the wind down analysis that I distributed to the

10   Committee on the advice of counsel was roughly 30 days or

11   more after November 12th.

12   Q    Was that the then final version, or was that, as you

13   testified at your deposition, the first one that you or your

14   team put together?

15   A    It's the first version that we put together for

16   distribution to clients and outside parties.  It's not the

17   first time we thought about the issues, considered the

18   issues, and compared estimates to potential alternatives.

19   Q    Mr. Burian, as the financial advisor to the UCC, your

20   primary contacts with the Committee have been with its co-

21   chairs, correct?

22   A    What I testified in my deposition, which is still true

23   today, that is not correct.  We were a very active

24   Committee, and that I speak to many of them quite often.  I

25   did say that there were two co-chairs and that the two co-

Page 231

1    chairs had responsibility -- I don't know if we talked about

2    that at the deposition -- the two co-chairs -- there were

3    times when we spoke to the two co-chairs separate from the

4    committee.  But I would not say to the exclusion of the

5    other Committee members.

6    Q    Let me clarify before I go back to your deposition

7    again.  The two co-chairs of the Committee were your primary

8    contacts on the Committee, correct, that you primarily spoke

9    to?

10   A    Again, I'm not so sure that's true with at least one of

11   the co-chairs.  I have spoken to other Committee members

12   just as often, both in terms of time of the conversations

13   and number of conversations.  They are all co-chairs.  They

14   do have some responsibility in setting agendas.  And I

15   recollect at least one meeting with only the co-chairs.

16           But most of the interaction has been with the

17   whole Committee together.  And there have been times when

18   I've had conversations with one Committee member or another.

19   It has not been primarily the co-chairs.

20   Q    At your deposition, I asked, "Who do you communicate

21   with on the UCC?  Answer:  With a very active Committee.  We

22   had two co-chairs, one of whom left the Committee.  So,

23   primarily, we are spending a significant amount of time with

24   the two co-chairs together and individually."  Do you recall

25   that question and answer from your deposition?

Page 232

1    A    I do.  I also recall probably the next two pages of the

2    deposition, that continues to discuss with you our

3    interactions with the whole Committee, how this case was

4    substantially different than most cases I'm involved with in

5    which the Committee calls are long and involved and all the

6    Committee members participate.

7    Q    Ron Tucker of Simon Properties is one of the co-chairs

8    on the Creditors' Committee, correct?

9    A    He is now the only chair.

10   Q    The other co-chair resigned, so now he's the only chair

11   of the Creditors' Committee?

12   A    I believe that is true.

13   Q    Okay.  For a number of years prior to this bankruptcy,

14   Chairman Tucker has represented Simon Property Group as a

15   counterparty to both Sears and Mr. Lampert, correct?

16   A    I testified, and the same is true today, that I'm not

17   sure and not aware of Mr. Tucker's role in a non-bankruptcy

18   context.  I know that he has been active as a Committee

19   member representing Simon Properties, but there are many

20   people at Simon Properties who could be the primary person

21   to interact with ESL and Sears pre-bankruptcy.

22   Q    Other than Mr. Tucker?

23   A    In addition to Mr. Tucker.

24   Q    Okay.  And Chairman had the strong view that a

25   liquidation would be the better option for creditors such as

Page 233

1      himself, correct?

2      A    Yes.

3      Q    In fact, Chairman Tucker has expressed to you that he

4      felt strongly that in light of Mr. Lampert's pre-petition

5      conduct, providing releases to Mr. Lampert would be

6      inappropriate, or should only be provided in exchange for

7      significant payments, correct?

8      A    Correct.

9      Q    But you're not sure whether Chairman Tucker's negative

10     views of Mr. Lampert were formed prior to becoming Chairman

11     of the Creditors' Committee or after he joined the

12     Creditors' Committee, correct?

13     A    Correct.

14     Q    Now, notwithstanding Chairman Tucker's role in the

15     Creditors' Committee, your understanding is that Simon

16     Properties would be permitted to buy Sears' assets in the

17     event of a liquidation, correct?

18     A    Correct.  We would hope that they would actively

19     participate in an auction process.

20     Q    And in fact, Chairman Tucker has told you that Simon

21     Property Group intends to bid on Sears' assets in the event

22     of a liquidation, correct?

23     A    I'm not sure I've had that direct conversation with Mr.

24     Tucker.  I believe it's public record that Simon Properties,

25     with a consortium of landlords, did put in a bid.  So, I

Page 234

1    think it's public knowledge that they are a bidder and they

2    would like to bid.  But I don't remember specifically if Mr.

3    Tucker told me that.

4    Q    In fact, a liquidation for Sears would present

5    financial opportunities Simon Property Group, correct?

6    A    Opportunities and risks.

7    Q    And there are different types of creditors represented

8    by the unsecured Creditors' Committee, correct?

9    A    Correct.

10   Q    There are landlords like Simon Properties, which we've

11   just been discussing, correct?

12   A    Correct.

13   Q    There are also trade creditors?

14   A    Correct.

15   Q    Employees?

16   A    To the extent they have a pre-petition unsecured claim,

17   correct.

18   Q    And there are at least certain trade creditors, you

19   would agree, for whom a go forward sale to ESL would be a

20   better option than a liquidation, correct?

21   A    I believe in my deposition I testified that there might

22   be a small group of trade creditors for whom the ESL

23   transaction would be better than what we call the

24   alternative sale process.

25   Q    And you also would agree that there are at least

1    certain Sears employees that a go forward sale to ESL would

2    be better for than a liquidation, correct?

3    A    Most likely, there would be a group of employees who

4    would be better off.

5    Q    For example, a go forward sale would be better for

6    Sears employees at stores that continue to operate, correct?

7    A    Generally.  The question is for what period of time and

8    under what conditions, similar to the vendor question, which

9    is you have to think about what are the likely alternatives

10   and who you're talking about, and you can't just generalize.

11           As I told you in my deposition, if you're a vendor

12   with a very, very small claim, and therefore you don't care

13   that you're getting much less in value for that claim than

14   the claim is worth, and if your inventory turns over quickly

15   at high margin, so you don't care whether Sears survives a

16   long time or not, you could probably do significantly better

17   at that vendor.  They would also be making money on new

18   Sears fast enough to make up what you're leaving on the

19   table.  But we also talked --

20   Q    Mr. Burian, I'm going to ask you to try to refrain your

21   responses to my questions and afterwards -- after I'm done

22   with my cross-examination, your attorneys can have an

23   opportunity to redirect you and ask you any clarification.

24   But in order to try to get through this quickly, I'll ask

25   you very direct questions.  And if you could just answer

Page 236

1    those, that would be great.  Okay?

2    A    I can try.

3    Q    All right.  I know, it's not always easy.  Also, as you

4    explained in your deposition, you were not overly concerned

5    about the impact of a potential liquidation on Sears' rank

6    and file employees because you figured that those employees

7    who lose their jobs could just go out and find new jobs,

8    right?

9    A    That's not what I said.  If you'd like to save time,

10   instead of reading it to me, I could tell you what I said.

11   Q    Oh, we'll help you out here.

12            MAN 1:  (indiscernible)

13            MR. FRIEDMANN:  Yeah, I'm sorry, I should be in

14   the page before.

15   Q    This is on Page 165, Lines 3 through 17.  You stated,

16   "When it comes to in-store employees, we don't really know.

17   I mean, ESL's track record is clear.  And I think if you

18   just look at that track record, you could draw conclusions

19   as to whether store employees are better off or not.  But

20   even taking him at his word that he will operate X number of

21   stores, those types of jobs do not disappear from the

22   economy and would be more likely than not available

23   elsewhere if those stores closed."  Do you recall saying

24   that at your deposition?

25   A    That's a partial quote from my deposition.  It does not

Page 237

1   provide --

2   Q    Well, I'm not going to read your entire deposition

3   transcript.  Do you recall making that statement in your

4   deposition?

5   A    I'm sure no one in this room would like you to read all

6   400 pages, but I think that in the questions you're asking

7   me, it might be nice to provide the door to context and the

8   full answer to the question you asked.

9   Q    Okay.  There will be opportunity on redirect for your

10  counsel to clarify.  My question is whether or not you

11  remember making that statement during your deposition?

12  A    So, my answer is, assuming you read it correctly, I do

13  remember our conversation, and I remember that partially

14  represents the answer I provided to you.

15  Q    And when you stated that those types of jobs do not

16  disappear from the economy and would be more likely than not

17  available elsewhere if those doors closed, what you were

18  suggesting was that those employees who might lose their

19  jobs could find a job elsewhere, correct?

20  A    I was referring to the specific example that you

21  provided, and I was also talking generally.  And if you

22  remember, we stratified employees into a number of buckets

23  and discussed each bucket in turn.  If you don't want the

24  Judge to fully understand the answer, you can move on to

25  your next question.

1   Q     In the analyses attached to your declaration where you

2   compare the value of the ESL bid to an orderly wind down,

3   you adopted the Debtors' assumptions for the value of each

4   of the non-real estate assets, correct?

5   A     Wrong.  To save time, most of them, obviously, with

6   respect to the antitrust litigation, we adopted a different

7   assumption, and then there were other methodological issues

8   I described in my report that were different.  So, primarily

9   in an excess of caution and conservatism, we adopted the low

10  values that M-III used in their analysis.

11  Q     And again, going to your deposition -- I'm on Page 335,

12  Line 20, through 336, Line 4 -- "If you look at Page 14 of

13  the dec. attached to my affidavit" -- and you can -- a copy

14  of your affidavit is included at Tab 4, I believe, before

15  you --  it says, "And if you look at Page 14 of the

16  dec.attached to my affidavit, we make it very clear for

17  purposes of the analyses, comparing the ESL bid, the

18  alternative sale process, we used the company's assumption

19  for their value of each and every one of the assets that are

20  listed on Exhibit 5."  Correct?

21  A     I believe I was referring to the page you received

22  before the deposition that had $300-500 million of value

23  that we spent significant amount of time on, things like

24  Monark NOLs, the $800 million FF&E, which magically has no

25  value, according to the company.  And I said that we did not

Page 239

1    include the values on that page in my report.

2            I don't remember if in that quote or later we

3    pointed out to the specific page I was referring to in my

4    report, which is Page 14.  What I directed you to that we

5    made three changes on our Page 14, which is the question

6    you're asking me.  Unencumbered real estate, which you

7    acknowledged; credit card tort, which I specifically

8    mentioned to make sure you didn't miss it; and then the

9    other encumbered assets, we left the same.  The third change

10   was methodological.

11   Q    Okay.  So, the additional value that you ascribed an

12   orderly wind down as compared to the company's analyses,

13   that largely comes from the proceeds you assumed could be

14   derived from real estate assets, correct?

15   A    It comes from the three buckets I just testified to.

16   Q    With respect to the real estate assets, you didn't do

17   your own valuation, correct?

18   A    I have not done an appraisal or valuation of each of

19   the properties.

20   Q    One of the other UCC's paid experts, Mr. Greenspan, he

21   provided you with appraised values for Sears real estate

22   assets that he believed were within a range of value that

23   those assets could be sold for as part of the liquidation,

24   and that's what you rely on, correct?

25   A    Correct.  In parts of this report, we incorporated Mr.

Page 240

1    Greenspan's conclusions.  We did not adjust it for the $80

2    million revision that was done at some point this week.

3    Q    Okay.  And so, because you took Mr. Greenspan's

4    analysis and values and incorporated your report, in the

5    event that Mr. Greenspan made any errors on the likely

6    recoveries from the sale of these real estate assets, those

7    errors necessarily would carry through to your report as

8    well, correct?

9    A    Well, to the extent did I slavishly just take someone

10   else's numbers and put it into an Excel spreadsheet and

11   print a result, that might be true.  But I would look at Mr.

12   Greenspan's conclusions.  I would 5:23:28 I would continue

13   to use judgment about the issue and my experience.

14          If it's a small change, like the $80 million

15   change that was made earlier this week, yeah, I think the

16   purpose is demonstrating that the ESL bid is deficient.  I

17   think it's good enough.  I think if you're actually asking

18   whether or not I was comfortable with an exact value or

19   dollar amount, I want to look at the changes more

20   specifically.

21   Q    But to be clear, when you prepared your report and your

22   analyses, you simply adopted the valuations Mr. Greenspan

23   provided in his report and included them in your report?

24   A    I agree that I adopted them.  I disagree with the word

25   "simply."

Page 241

```
 1   Q     Thank you.

 2              MR. FRIEDMANN:  No further questions, Your Honor.

 3              THE COURT:  Okay.  Any redirect?

 4              MR. QURESHI:  Again, for the record, Abid Qureshi,

 5   of Akin Gump.

 6   REDIRECT EXAMINATION OF SAUL BURIAN

 7   BY MR. QURESHI:

 8   Q    Mr. Burian, just two areas of inquiry.  You were asked

 9   a number of questions about the impact on employees, sir.

10   In putting together the analysis that you did comparing a

11   wind down scenario to the ESL bid, did you in fact consider

12   the impact on employees?

13   A    It's not arithmetic in our report, Your Honor, but as a

14   financial advisor to the Committee who represents all

15   unsecured creditors, we thought a lot about vendors,

16   sharehold -- vendors, employees, and the other

17   constituencies.

18   Q    Mr. Burian, were you in court earlier today for the

19   testimony of Mr. Meghji?

20   A    I was.

21   Q    And did you hear what Mr. Meghji testified to with

22   respect to Toys "R" Us?

23   A    I did.

24   Q    And were you involved in Toys "R" Us?

25   A    I was very, very actively involved in Toys "R" Us.
```

Page 242

1    Q    And do you agree with what you heard from Mr. Meghji?

2    A    No.

3    Q    Please tell the court what you don't agree with --

4    A    Mr. Meghji --

5              MR. FRIEDMANN:  Objection, Your Honor.  I object

6    to this testimony as outside the scope of the cross-

7    examination.

8              MR. QURESHI:  Your Honor, I agree it's outside of

9    the scope of cross-examination.  Obviously, in our written

10   direct, we weren't able to have Mr. Burian react to

11   testimony that preceded him.  If we had live direct, this is

12   something that I would have addressed in his direct.  It

13   goes to the same subject matter.  It is squarely within his

14   declaration, which is the sale process.  And it's a subject

15   area about which Mr. Burian has direct knowledge.

16             THE COURT:  Well, that is what?  Toys "R" Us

17   generally, or...?

18             MR. QURESHI:  The sale process, specifically.

19             THE COURT:  The sale process?

20             MR. QURESHI:  There were comparisons made to the

21   process in Toys with the process here.  The realization of -

22   -

23             THE COURT:  Well, I understand the realization.  I

24   don't understand the testi -- I don't think there was

25   testimony as to the process of the sale in Toys "R" Us.

Page 243

```
 1              MR. QURESHI:  There was testimony, Your Honor,
 2    that led -- that was in the direction of the recoveries that
 3    were realized --
 4              THE COURT:  No, I understand that point.
 5              MR. QURESHI:  -- in Toys and --
 6              THE COURT:  I understand that point.
 7              MR. QURESHI:  And that was used by Mr. Meghji to
 8    support --
 9              THE COURT:  No, you can ask him on that point.
10    Q    So, with respect to that issue in particular, do you
11    agree with what you heard from Mr. Meghji around the
12    recoveries were realized in the sale process in Toys?
13    A    I think Mr. Meghji --
14              THE COURT:  Well, can you be a little more
15    specific?  You're focusing on the percentage recovery on
16    sales of leases, right?
17              MR. QURESHI:  Yes.
18    Q    But before I get to that, please describe for the Court
19    what your role was in Toys, and specifically with respect to
20    the sale process.
21    A    Sure.  I mean, Your Honor, the way Toys "R" Us worked
22    is there were a number of entities, a number of boards of
23    directors, HoldCo, U.S. operating company, II PropCo,
24    foreign entities, and then another blizzard of entities that
25    are not relevant.
```

Page 244

1         I represented the primary at risk stitch you and

2     see, called the B3 and B4 lenders.  They were the junior

3     secured lenders and the primary parties in interest,

4     realizing the proceeds of these sales across all the

5     entities, as prepared to, for instance, Mr. Meghji, who is a

6     director of the HoldCo entity, which had, frankly, a much

7     smaller portfolio of real estate than were at the PropCo,

8     the operating companies, and the entities for which I was

9     most concerned about.

10    Q    Mr. Burian, what did you observe, given your role in

11    the constituency that you were advising, about recovery

12    percentages that were realized in connection with the sale

13    of the lease interests in Toys "R" Us?

14    A    So, first of all, it's important to understand that the

15    words "recovered percentages" are only meaningful when

16    you're comparing them to something that is apples to apples.

17    So that you have an appraisal done shortly before the event,

18    and then you get a recovery percentage, you can say, hey,

19    look at this; that percentage is greater than the appraisal

20    from before.  Something that is three years before, then you

21    could say that appraisal may not be as meaningful.

22         Mr. Meghji was drawing a comparison in saying that

23    he was looking at the values of real estate and in some

24    respects, 50 percent discounts, in part because it is Toys

25    "R" Us experience.  And there's nothing in Toys "R" Us that

Page 245

1    can support that level of conclusion.  And that is for the

2    following reasons:

3         Number 1, is it is true that the leases of the

4    parent company where Mr. Meghji was did not sell that well,

5    so it was compared to whatever appraisals were done.  But

6    those stores and the tenure when the leases were signed,

7    completely different than Toys "R" Us.  Toys "R" Us is --

8    then Sears.

9         Toys "R" Us, Your Honor, is 40,000 square feet,

10   relatively recent, 10-15 years, with escalators that made

11   the rents close to market, and without significant

12   noneconomic rights that would impair and impede third-party

13   development of the surrounding land and shopping centers.

14        Whereas the Sears locations, even those that are

15   technically leased, are much closer to being owned, in the

16   sense of these are anchor stores of 140,000 feet.  They

17   actually control, in most parts, the entryway to these

18   centers for which development cannot be done in or around

19   the center without the consent of the third parties/

20        One of the reasons why we hope that people like

21   Simon Properties will bid, and bid often, in order to buy

22   back their ownership rights from the estate.

23        So, first and foremost, the properties are nothing

24   alike.  Secondly, quoting lease information has very little

25   bearing on the fact that we have over 150-something

Page 246

```
1    industrial assets, warehouse, distribution centers, and the

2    like, fee-owned in Sears.  And those property sold for 110-

3    120 percent of dark value appraisals in Toys "R" Us.

4              In this process, where we're relying on this

5    complex timeframe for indications of interest that may or

6    may not be dealt with for properties that may or may not be

7    sold, we got -- we didn't even get bids or indications of

8    interest for 50 percent of the fee-owned properties that are

9    the most valuable properties with respect to industrial

10   assets in the Internet world of retail.

11             As a matter of fact, we got bids for almost -- I

12   think we got bids for less than just over 50 percent of the

13   fee-owned properties generally.  And as a matter of fact,

14   with respect to indications of interest, according to the

15   JLL report that was shared with us, they only managed to

16   find two expressions of interest with respect to other and

17   industrial assets.

18             So, there it was a robust sale process that

19   concluded that fee-owned properties with a lot of money,

20   zero bids.  How many bids did we get in Toys "R" Us?  Not a

21   single fee-owned property wasn't sold in that process.  And

22   most of them, we had multiple bids.

23             I'm not telling you I was thrilled with all the

24   conclusions.  But I'm telling you that in a half-decent-run

25   process, you're not going to have 50 percent of fee-owned
```

Page 247

1    properties ignore long-term leases, ignoring property rights

2    embedded in long-term leases, ignoring ground leases.

3    Right?  We're talking about the simple gravy of the process.

4              So, when I hear Mr. Meghji talk about Toys "R" Us

5    and use it as support for any conclusion of value in Sears,

6    I think Mr. Meghji is making a mistake in focusing on the

7    leases at the Inc. level of Toys "R" Us and not the bigger

8    picture.

9    Q    Thank you, Mr. Burian.

10             THE COURT:  I had a couple of questions on Toys

11   "R" Us.  Was there a going concern competitive process, or

12   did it which right to liquidation?

13             MR. BURIAN:  No, Your Honor.  And that's a very

14   good question.  In that case, my client spent $350 million

15   chasing a wild goose chase down a going concern, because the

16   Debtors' financial advisor, who was Lazard in that

17   situation, told us, A, there would be a buyer for domestic

18   and, B, don't worry, the investment is worth it, because the

19   foreign assets will be worth over $1 billion, which would

20   accrue for the U.S. business.

21             We spent $350 million pursuing that opportunity.

22   March 14th of last year, the Debtor told us, unfortunately,

23   there were no going concern bids.  And then later this year,

24   the Debtor confirmed the foreign asset, the Asian business,

25   as a going concern at roughly $750 million, paying the Inc.

Page 248

1      entity that Mr. Meghji is a director of, zero.

2              THE COURT:  So, you were affected by that process?

3      That affected --

4              MR. BURIAN:  What I'm saying --

5              THE COURT:  -- your analysis of this case?

6              MR. BURIAN:  I'm just saying --

7              THE COURT:  Just yes or no?

8              MR. BURIAN:  The answer is yes.

9              THE COURT:  All right.  I have another question

10     for you.  What happened to the employees in Toys "R" Us?

11             MR. BURIAN:  It depends which ones and where.  I

12     will tell you that a significant number of the properties in

13     Toys "R" Us were relet or purchased.  Last I checked, when

14     you walk through a mall, many clients that have gone out of

15     business, that space is refilled with profitable businesses

16     and there are people working behind the cashier, and people

17     working selling products in those stores.

18             I don't remember -- I didn't expect to be asked --

19     how many of the Toys "R" Us locations were redone.  But

20     those for which we received significant amounts of money

21     were certainly purchased in order to reopen.

22             I can tell you, if you look at the general

23     statistics of labor and you see where jobs are moving in

24     warehouses, distribution centers, trucking --

25             THE COURT:  I'm talking about stores.

Page 249

1          MR. BURIAN:  -- and delivering.  Sorry?

2          THE COURT:  I'm talking about stores.

3          MR. BURIAN:  In the Sears stores, there's a

4    significant number of people that work in stockrooms.  They

5    do some Internet fulfillment through those stores.  But I

6    can't tell you, Your Honor, that every single person in a

7    Sears sales associate position will be reemployed in a Sears

8    in a liquidation.

9          THE COURT:  Well, of course not.

10          MR. BURIAN:  Right.

11               THE COURT:  All right, I think I've

12    heard enough of this.  But you worry about that a lot in

13    your analysis, right?  You've thought about it.

14          MR. BURIAN: We did three things with respect to

15    store employees.  One, we focused on the recovery with

16    respect to the PBGC and payments on our retirement funds.

17    As you know, there's a view that this is going to result in

18    significantly lower value for the PBGC.  Number two --

19          THE COURT:  In their capacity as a secured

20    creditor of the entity that's not a Debtor.

21          MR. BURIAN:  And also in the capacity as one of

22    the largest unsecured creditors.  Number two --

23          THE COURT:  It's lower because they say they have

24    a lower recovery on (indiscernible) secured creditor of a

25    non-debtor entity.

Page 250

1          MR. BURIAN:  I think if you ask the question, Your

2     Honor --

3          THE COURT:  Well, I will.  Let's go ahead.  Point

4     two.

5          MR. BURIAN:  Point two, we have suggested a

6     process where we liberate Innovel, Monark, and ship parts

7     direct and the repair maintenance business, where thousands

8     of employees work, where they can move to healthy platforms

9     and work in the business that is not controlled by the same

10    management team and the same owners that have run Sears so

11    far.

12         THE COURT:  Okay, and part three?

13         MR. BURIAN:  Sorry?

14         THE COURT:  And part three?

15         MR. BURIAN:  And then part three was the actual

16    in-store -- well, there actually are four, because there are

17    people in Hoffman Estates that unfortunately, we believe

18    that in other liquidations, middle management white-collar

19    workers in support functions for large retail businesses do

20    have a very hard time finding other employment.  Not clear

21    to me, Your Honor, that that should be the single most

22    important motivating factor in determining whether to

23    receive less as an unsecured creditor of the estate.  But

24    there's no question, as I testified in my deposition, that

25    there's going to be a significant number of those employees

1    for whom finding alternative employment will be difficult.

2            With respect to part-time employees and the store-

3    level sales associates, the sales and economic activity is

4    highly unlikely to go away.  And, yes, it will be difficult

5    on those families, and yes, there will be a period of time

6    when there will be uncertainty, but generally -- but

7    generally -- sales associate positions remain relatively

8    even.

9            THE COURT:  You haven't analyzed how many of those

10   people live week-to-week on their salary, right?  Or you

11   don't care?

12           MR. BURIAN:  Or what?

13           THE COURT:  Or you don't care, one or the other?

14           MR. BURIAN:  I do care, and as I said throughout -

15   -

16           THE COURT:  Have you analyzed it?

17           MR. BURIAN:  I can't hear you, Your Honor.

18           THE COURT:  Have you analyzed it?

19           MR. BURIAN:  Your Honor, my capacity as a

20   financial advisor to the unsecured creditors' committee, I

21   don't think I was ever asked by my client to analyze how

22   many post-petition employees are living well or less well at

23   Sears.  I will tell you that I was asked that -- not that

24   long ago, there were 300,000 employees.  Now there's 45,000.

25   Under the company's business plan, there's going to be many,

Page 252

1    many, many less thousands of employees by a factor -- by a

2    significant factor.  So I don't know if we're talking about

3    5,000 or 25,000 employees that are going to be adversely

4    affected by this outcome, because we have not been given

5    insight into the business plan.  But if I were running the

6    process, we would do everything we could to maximize

7    employment in the operating businesses at Sears, both

8    because it's the right thing to do, and to minimize claims.

9            THE COURT:  Okay, you can go ahead.

10           MAN 1:  I have nothing further, Your Honor.

11           THE COURT:  Okay.  Do you have anything further?

12           MAN 2:  No, Your Honor.  Thank you.

13           THE COURT:  Okay.

14           MAN 1:  Your Honor, I would just offer Mr.

15   Burian's declaration of evidence.

16           THE COURT:  That's fine.  It's admitted.  Okay,

17   Matthew Diaz.

18           MR. SORKIN:  Yes, Your Honor, the Creditors'

19   Committee offers Matthew Diaz.  His declaration was

20   submitted.  There was an updated declaration that was

21   submitted with the Court last evening that simply updates

22   the numbers that we've been provided in connection with the

23   administrative solvency tracking reports that have come over

24   the next -- excuse me, over the last week.

25           THE COURT:  Right, I saw that.  Okay, let me just

Page 253

1    -- would you raise your right hand, please?

2              MR. DIAZ:  Yeah.

3              THE COURT:  No, you can sit down; just raise your

4    right hand.  Do you swear or affirm to tell the truth, the

5    whole truth, and nothing but the truth, so help you God?

6              MR. DIAZ:  I swear to tell the truth.

7              THE COURT:  Okay.  And it's D-I-A-Z.

8              MR. DIAZ:  A-Z, yes, sir.

9              THE COURT:  Okay.  All right, so you can go ahead

10   with -- well, let me ask -- I'm sorry.  Mr. Diaz, I have

11   your declaration from January 26, 2019.  I got another one,

12   which is an update in light of information you received from

13   the Debtors.  I got that last night.  Sitting here where you

14   are today, would those two declarations constitute your

15   direct testimony?

16             MR. DIAZ:  That's right.

17             THE COURT:  Okay.

18             MR. LENDER:  Your Honor, if I may approach, I have

19   a binder with his declarations in it, a couple of exhibits

20   that I may or may not use.

21             THE COURT:  Okay.

22             MR. LENDER:  Thank you.  May I proceed, Your

23   Honor?

24             THE COURT:  Yes.

25                   CROSS-EXAMINATION OF MATTHEW DIAZ

Page 254

1    BY MR. LENDER:

2    Q    Mr. Diaz, you prepared a declaration in support of the

3    UCC's objections in this case, right?

4    A    I've prepared two declarations.

5    Q    Last night, you actually sent us your supplemental

6    declaration, correct?

7    A    That's correct.

8    Q    Now, one of the things you were tasked to do in this

9    case was to try to assess whether a sale of the company to

10   ESL will leave the Debtors administratively insolvent,

11   correct?

12   A    That's correct.

13   Q    And the supplemental declaration that you provided to

14   us last night addresses that issue, correct?

15   A    That is correct.

16   Q    And what -- if you can, I put inside your binder, in

17   the flap, a copy of the supplemental Diaz declaration, and

18   if you could just turn to Page 7 in your supplemental

19   declaration, and I wanted to ask you to confirm that this is

20   your latest calculation of the potential administrative

21   shortfall.

22            THE COURT:  I think it's 6, right?

23            MR. LENDER:  I'm sorry, Page 6.  Thank you, Page

24   6.  I'll try that again, so the record's clear.

25   Q    If you turn to Page 6, this is your latest calculation

Page 255

1    of the potential administrative shortfall, correct?

2    A    That is my latest calculation.   That is correct.

3    Q    And what you've concluded, based on taking account of

4    certain potential upsides and certain downsides that you've

5    identified, that there could be a potential shortfall of

6    $218 million, correct?

7    A    $218 million, plus some unquantified downsides as well,

8    too.

9    Q    It actually says plus or minus some unidentified

10   downsides, right?

11   A    Yeah.

12   Q    Or upsides.

13   A    That's right.

14   Q    Now, one of the deductions you made is $112 million for

15   KCD royalties, correct?

16   A    That is in the calculation.

17   Q    And is that -- is it your understanding that that is an

18   administrative claim?

19   A    It is my understanding that it may be an administrative

20   claim.

21   Q    You also deducted the $166 million accounts payable

22   amount that was part of the topic of discussion over the

23   last two days, correct?

24   A    That is in my analysis, correct.

25   Q    So, to be clear, if the $166 million payment is ESL's

Page 256

```
1    responsibility and the Debtors resolve the $112 million KCD
2    issue, then under your own calculation, there would be no
3    administrative shortfall, correct?
4    A    That is not correct.
5    Q    Well, Mr. Diaz, you have calculated the potential
6    administrative shortfall at $218 million, plus or minus,
7    right?
8    A    Two hundred and eighteen, plus or minus TBD, correct.
9    Q    And $112 million for KCD and $166 for accounts payable,
10   I add those two together, and you deducted both of those,
11   that's more than $218 million, right?
12   A    So, Counselor, a couple things to keep in mind, just to
13   make sure we have --
14   Q    Can you first start with answering my question, and
15   then you can explain?  You deducted both the $112 million
16   number and the $166 million numbers, and those two
17   deductions combined is more than the $218 million number
18   that you put down on your sheet as the potential
19   administrative shortfall, correct?
20   A    So, do you want me to do arithmetic for you, or --
21              THE COURT:  It's 60.
22              MR. LENDER:  Okay.  Thank you, Your Honor.  I
23   would have thought that somebody from FTI could do the math,
24   but I appreciate you doing it for us.
25   Q    Now, you also understand that your client, the UCC
```

Page 257

1   believes that there are valuable claims that have been

2   preserved that can be brought against Mr. Lambert and

3   yourself, correct?

4   A    There are claims that are being preserved, correct.

5   Q    Your understanding is that your client believes those

6   are valuable claims, correct?

7   A    They are potentially valuable claims, correct.

8   Q    And if you client is correct, recoveries on those

9   claims also could help fill any administrative shortfall,

10  correct?

11  A    If those claims are successful, those could be

12  additional proceeds, correct.

13  Q    Now, Mr. Diaz, you also did an assessment of liquidity

14  for the Debtors going concern business, correct?

15  A    That is correct.

16  Q    And if you could turn to your original declaration,

17  which is Tab 1 in your binder, and I believe -- and I want

18  you to confirm -- that Exhibit A to your original

19  declaration, that's your assessment of the Debtors'

20  liquidity as a going concern business, correct?  Or NewCo's

21  -- let me try that again.  Exhibit A is your assessment of

22  NewCo's liquidity analysis as a going concern business,

23  correct?

24  A    Sir, what Exhibit A is, it is ESL's liquidity analysis,

25  adjusted for two things.  One, what a called an error in my

Page 258

1    report, and two, certain adjustments that were provided to

2    me by Mr. Kniffen with respect to their operating

3    assumptions.

4    Q    Great, let's go through that, because I was going to go

5    through the methodology, but let me just go through it

6    correctly.  You first started with ESL's projected liquidity

7    analysis for the going concern business for 2019, correct?

8    A    That is for fiscal year of 2019.

9    Q    And ESL's projected liquidity analysis showed that

10   NewCo had sufficient liquidity for all of fiscal year 2019,

11   correct?

12   A    ESL shows varying levels of liquidity for 2019.

13   Q    But every year, there's positive liquidity at the end

14   of each month, correct?

15   A    In the unadjusted analysis, there was positive

16   liquidity shown on their report.

17   Q    Right, and what you did was you made adjustments to

18   certain items in ESL's projected liquidity analysis,

19   correct?

20   A    That's right.

21   Q    For example, you just mentioned one of the things you

22   adjusted for was that accounts payable number, that $166

23   million, right?

24   A    That's correct.

25   Q    And to be clear, deducting just that $166 million

Page 259

```
 1    number would still leave NewCo with sufficient liquidity for

 2    every month of fiscal year 2019, correct?

 3    A    If one only made that adjustment, there would be

 4    liquidity that was above zero.

 5    Q    So the next thing you did was you made a series of

 6    other adjustments to the ESL liquidity analysis, based on

 7    certain assumptions that you received from another UCC

 8    expert, Mr. Kniffen, correct?

 9    A    The Category 2 assumptions were provided to me by Mr.

10    Kniffen.

11    Q    And you relied on Mr. Kniffen's opinion for that work,

12    right?

13    A    That's right.

14    Q    Now, essentially, UCC hired another expert, Mr.

15    Kniffen, who says that in his view, he disagrees with

16    certain of the assumptions contained in the ESL liquidity

17    analysis, right?

18    A    Mr. Kniffen's stated -- Mr. Kniffen disagreed and

19    thought that -- disagreed with certain of the assumptions

20    that were in the ESL business plan.

21    Q    And he provided you different assumptions to make with

22    regard to things like same-source -- same-store sales, gross

23    margin, and days payable outstanding, correct?

24    A    That's correct.

25    Q    And you just accepted those opinions and ran them
```

Page 260

1    through your calculation, right?

2    A    I took his more reasonable assumptions and ran them

3    through the calculation, that's right.

4    Q    Well, actually, you said they were reasonable, but to

5    be clear, you did no independent verification of Mr.

6    Kniffen's opinions, correct?

7    A    I took his assumptions, correct.

8    Q    You had absolutely no basis to agree or disagree with

9    any of Mr. Kniffen's opinions contained in his report that

10   you relied upon, right?

11   A    I took Mr. Kniffen's assumptions to create this

12   analysis, correct.

13   Q    In fact, you've never even met Mr. Kniffen, right?

14   A    I've not met Mr. Kniffen.

15   Q    You've never even spoken to him, correct?

16   A    I've spoken with members of his team many times.

17   Q    You never specifically spoke with Mr. Kniffen, correct?

18   A    I am -- I've spoken to member -- I don't believe I

19   have, no.  Correct.

20   Q    What you did is you just took certain of Mr. Kniffen's

21   --

22            THE COURT:  No, we already -- he said yes.

23            MR. LENDER:  Got it.

24   Q    Now, Mr. Diaz, looking at your Exhibit A to your

25   report, even after making all of the adjustments you made,

Page 261

1    you calculated that NewCo would have adequate liquidity and

2    not violate any debt covenant until October of 2019,

3    correct?

4    A    I show that -- so in my footnote -- I'm sorry, can you

5    repeat the question, please?

6    Q    Looking at the Exhibit A, which is your calculation,

7    even after making all of the adjustments you made, you

8    calculated that NewCo would have adequate liquidity and not

9    violate its debt covenant until October of 2019, correct?

10   A    I show that in October of 2019, the debt covenant would

11   be breached starting October of 2019.  I don't make an

12   assessment on liquidity prior to that.

13   Q    The analysis you performed for the UCC shows a positive

14   liquidity number through September of 2019, right?

15   A    That's right.

16   Q    Now, one of the assumptions you made and changed in the

17   ESL liquidity analysis, based on the assumption -- the input

18   you got from Mr. Kniffen, was to same-store sales, correct?

19   A    That's right.

20   Q    The ESL model assumed that same-store sales would go

21   down by negative 1 percent in fiscal year 2019, right?

22   A    The ESL business plan showed negative 1 percent,

23   correct.

24   Q    And you have no idea what methodology ESL used to come

25   up with that number, correct?

Page 262

1    A    Correct.  As I said before, I relied on Mr. Kniffen for

2    that assumption -- for that revised assumption.

3    Q    You didn't test or critique ESL's analysis with coming

4    up with their same-store sales projection for 2019, correct?

5    A    Mr. Kniffen tested and critiqued those assumptions; I

6    did not.

7    Q    Now, looking at Exhibit A, you calculated the impact of

8    changing same-store sales from negative 1 to negative 5.5

9    percent in October of 2018 as a $54 million hit on

10   liquidity, right?

11   A    That's right.

12   Q    So, to be clear, if the ESL liquidity analysis is

13   correct, and Mr. Kniffen's assumption is wrong, most of the

14   liquidity shortfall for October of 2019 would go away,

15   right?

16   A    So if the ESL analysis was correct, there would be no

17   change.  It will still be minus 1 percent.

18   Q    Okay, thank you.  The next thing you changed was gross

19   margin adjustment, right?

20   A    That's right.

21   Q    And the ESL liquidity analysis assume a margin

22   improvement of 1.25 percent in fiscal year 2019, right?

23   A    That's right.

24   Q    And Mr. Kniffen assumed it would be flat.

25   A    That's right.

Page 263

1   Q    And, again, you did no independent analysis of the

2   gross margin adjustment proposed by Mr. Kniffen, right?

3   A    As discussed before, for all three of these

4   adjustments, I relied on Mr. Kniffen's critique of that

5   analysis.

6   Q    And for October 2019 again, you calculated the impact

7   of gross margin adjustments as if it was flat instead of

8   1.25 percent, and that was a $48 million hit on liquidity,

9   right?

10  A    For the month of October, that was the impact of that

11  change.

12  Q    Okay, you've been sitting here during the trial for the

13  two days of the trial?

14  A    I have.

15  Q    And you're aware that the company's -- the company's

16  going forward business plan actually assumes a gross margin

17  of up to 2.5 to 3 percent in fiscal year 2019, right?

18  A    As I said, I relied on Mr. Kniffen to critique this

19  line.

20  Q    Sorry, my question is -- was a different question.

21  You're aware that the company's going forward business plan

22  actually assumes that gross margin would be up 2.5 to 3

23  percent in fiscal year 2019, right?

24  A    Yeah, I don't -- I don't exactly recall on that exact

25  number.

Page 264

```
 1   Q     And just how your math works, if the company turns out

 2   to be right instead of ESL, not only would you not deduct

 3   $48 million, like you did in October 2019, but in fact you

 4   would add another $48 million of liquidity, right?

 5   A     If the company's gross margin is -- if the actual gross

 6   margin is favorable to the ESL estimated gross margin, then

 7   that would be a positive adjustment.  That's how the

 8   arithmetic would work, correct.

 9   Q     Thank you.  Now the third adjustment you made was for

10   days payable outstanding, or what we've referred to in this

11   case as DPO, right?

12   A     That's right.

13   Q     And days payable outstanding essentially is the number

14   of days suppliers give you to pay when you purchase

15   merchandise from them, right?

16   A     Days payable outstanding is a mathematical calculation

17   that calculates how much liabilities you have in relation

18   to, you know, the number of days of your cost of goods sold.

19   Q     Well, what it's trying to measure is the number of days

20   that suppliers are giving you to pay when you purchase

21   merchandise from them, right?

22   A     Suppliers is a broad term, but it's, you know, your --

23   you know, the components of your cost of goods sold, the

24   credit -- the vendors who provide you, you know, your goods

25   that help to, you know, make the products or sell the
```

Page 265

```
1   products.

2   Q    The idea is, if instead of -- if you have to pay in 30

3   days instead of 20 days, that's 10 more days where you have

4   cash where you can use it for other things, right?  That's

5   kind of the idea.

6   A    Yeah, so it's vendor financing, and if you have 30

7   days, that's better than 20 days, which is better than 10

8   days.  That's right -- for the company.

9   Q    And days payable outstanding, it has nothing to do with

10  payments of things like rent, right?

11  A    It's a simple calculation of what are the number of

12  days that are outstanding.  And what I did for this analysis

13  was I took the 22-day assumption that Mr. Kniffen provided

14  to me, and the Debtors provided -- not the Debtors.  The ESL

15  business plan assumed in some cases 32 days, so I ratcheted

16  it -- that down, you know, by 10 days.  And that was the

17  extent of the analysis that I did.

18  Q    I'll try my question again.  Based on your

19  understanding of what days payable outstanding is, that has

20  nothing to do with the payment of rent, does it?

21  A    Yeah, no, like I said, I would defer to Mr. Kniffen's

22  analysis with respect to this component of the calculation.

23  Q    How about common area of maintenance?  The way you

24  understand what days payable outstanding is about, could it

25  have anything to do with things like rent or common area of
```

Page 266

1    maintenance?  Does that have anything to do with buying

2    merchandise from vendors, to your understanding as a

3    business man, FTI, anything?

4    A    Yeah, no, I'll repeat my answer.  I defer to Mr.

5    Kniffen's calculation with respect to this.

6    Q    Okay.  Now the ESL liquidity analysis assumed that,

7    starting in July of 2019, NewCo days payable outstanding

8    would get to 32 days and then remain constant there at the

9    end of the year, right?

10   A    That is correct.  Starting in July this year, it would

11   go from 20 days in June to 32 days in July.  That's right.

12   Q    And what Mr. Kniffen assumed was that it would only get

13   to 22 days by July of 2009, and that's what you used for

14   your calculation, right?

15   A    That's exactly right.

16   Q    And, like with all the other adjustments you made, you

17   did no independent analysis of what the correct days payable

18   outstanding number should be, right?

19   A    I relied on his critique for that assumption, correct.

20   Q    Now, looking back at your Exhibit A, your analysis of

21   liquidity, that 10-day adjustment that you made to days

22   payable outstanding had a significant impact on the

23   liquidity in your calculations, right?

24   A    So, month of October, it had a $100 million impact, for

25   example.  Or, month of July, which was the month we were

Page 267

1    just talking about, it was $113 million impact.

2    Q    The impact was between $113 million and $201 million,

3    depending on the month, correct?

4    A    That was my arithmetic, correct.

5    Q    Mr. Diaz, if you had not made that one adjustment to

6    days payable outstanding, your calculation would have shown

7    positive liquidity for all of fiscal year 2019 and no

8    covenant default, correct?

9    A    So, had we not made -- had I not made that adjustment,

10   for example, the month of October, instead of it being

11   negative $66, you would add back $102, which would have

12   been, give or take, positive $40.  In the month of November,

13   instead of it being negative $151, it would have been -- I'm

14   sorry, instead of it being negative $118, it would have been

15   positive $33, you know, et cetera.

16   Q    So, to be clear, if you had not made just that one

17   adjustment to days payable outstanding, based on the very

18   calculation you did, NewCo would have adequate liquidity

19   every single month of fiscal year 2019 and would trigger no

20   covenant default, right?

21   A    So, let me just take that into two pieces.  So, one,

22   you said adequate liquidity.  I'm not making a judgment on

23   adequate liquidity.  Two, the arithmetic here would show

24   that liquidity would be in above the adjusted excess

25   liquidity.  But you need to continue this into February and

Page 268

1    March of 2020, which would be an ongoing calculation that

2    you need to do to see how those months would be impacted.

3    Q    The only calculation that you did on behalf of the UCC

4    was for fiscal year 2019, right?

5    A    What I did here was through January 2020.

6    Q    You have -- this is only that, right?

7    A    Correct.

8    Q    Okay.  Now your understanding is how Mr. Kniffen

9    calculated the DPO numbers that he provided to you, those 22

10   days, was he used a formula to derive his DPO numbers,

11   correct?

12   A    He did a calculation of historical DPO for the company.

13   He also looked at the DPOs as well, in connection when Kmart

14   emerged from bankruptcy, you know, a number of years ago,

15   you know, as laid out in his expert report.

16           MR. LENDER:  Your Honor, may I approach?

17           THE COURT:  Okay.

18   Q    Let me show you a copy of Mr. Kniffen's report --

19   A    Thank you.

20   Q    -- and ask you to take a look, if you could, at the

21   formula that Mr. Kniffen used to calculate days payable

22   outstanding.  Now, first of all, let's be clear: you've seen

23   this report before, correct?

24   A    I've seen Mr. Kniffen's report.

25   Q    And if we turn to Exhibit 22, which is probably close

Page 269

1   to the back -- let me know when you're there.

2   A    I am there.

3   Q    And if you look at Footnote number 1, this tells you

4   how Mr. Kniffen came up with this DPO numbers, correct?

5   A    I'm sorry, I'm at Exhibit -- I'm on Page 54, Exhibit

6   22.

7   Q    Comparison, actual and planned, Sears days payable

8   outstanding.  Do you see that?

9   A    I do.

10          THE COURT:  Why don't you show it to him, just to

11  make sure?

12          MR. LENDER:  Thank you, yes.

13          MR. DIAZ:  Is there a footnote on here?

14  Q    No, I'm sorry, Exhibit 22 in the back.

15  A    Oh, sorry.  There's two Exhibit 22s, I guess.

16  Q    Oh, yeah, it's the Exhibit 22 in the back.  Let me know

17  when you're there.

18  A    Yes.

19  Q    Great.  And Exhibit 22, just for the record, is

20  comparison of actual and planned Sears days payable

21  outstanding, DPO.  And you see that Mr. Kniffen dropped a

22  footnote that explained how he calculated the DPO numbers

23  that he then provided to you, that you used in your

24  adjustments to the liquidity analysis.  Do you see that?

25  A    I see Footnote number 1 on Exhibit 22.

```
 1   Q    And what Footnote number 1 says is that DPO is
 2   calculated as merchandise payable divided by cost of sales,
 3   buying, and occupancy, times the days in fiscal period.  Do
 4   you see that?
 5   A    I see that.
 6   Q    And are you aware that Mr. Kniffen explained at his
 7   deposition that cost of occupancy is rents, common area
 8   maintenance, things like that?  And, Your Honor, for the
 9   record, that's Page 309-2 to 309-6 of Mr. Kniffen's
10   deposition.  Were you aware of that?
11   A    I'll just -- I'll restate my previous testimony.  With
12   respect to this assumption, I used the 22 days, which was an
13   assumption provided to him by me -- sorry, an assumption
14   provided by him to me.  In terms of the specific
15   calculation, I did not get into that calculation.
16   Q    Mr. Diaz, you know how fractions work, correct?
17   A    Absolutely.
18   Q    If you make the denominator bigger, it reduces the
19   value, correct?
20   A    If you make denominator bigger, that would reduce the
21   value.
22   Q    And here, Mr. Kniffen put the cost of rent and common
23   area maintenance into the denominator, correct?
24   A    Can you repeat the question, please?
25   Q    Here, Mr. Kniffen put the cost of rent and common area
```

Page 271

1   maintenance into the denominator, correct?

2   A    So, the denominator, the footnote says occupancy.

3   Q    And as I said, Mr. Kniffen explained he would know what

4   is cost of occupancy, and he said that's rents and common

5   area maintenance, right?

6   A    I think Mr. Kniffen's deposition, testimony and

7   footnotes speak for themselves.

8   Q    Okay.  Has anyone brought it to your attention that Mr.

9   Meghji included in his declaration the actual terms provided

10  by vendors, and that he said that the mean DPO for Sears in

11  2018 was 42 days, and the median was 34 days?

12  A    Yeah, I'm not sure that -- I mean, I think that

13  contradicts what is in the ESL liquidity analysis, which

14  says there's a 22-day pre-petition day terms for DPOs.

15  Q    Do you have any idea, sitting here today, what period

16  of time that statement covers, whether that's just right

17  before the filing or the whole of 2018?

18  A    Yeah, I mean, I refer you to this Exhibit 1, which

19  shows in Q3, the DPO was four.  In Q2 for 2018, it was 18.

20  In Q1, it was 20.

21  Q    But, Mr. Diaz, we already explained these numbers are

22  based on Mr. Kniffen's calculation, right?

23  A    Correct.

24  Q    Now, Mr. Diaz, the sole basis for you using 22 days for

25  DPO starting in July 2019, rather than 32 days, was Mr.

Page 272

1    Kniffen, right?

2    A    Correct.

3    Q    So if the Court concludes that Mr. Kniffen's use of a

4    formula to derive DPO that adjusts DPO for payment of rent

5    and common area maintenance should be rejected, the support

6    for you using 22 days as opposed to 32 days for DPO starting

7    in July 2019 goes away, correct?

8    A    So, going back to my previous testimony, if 22 days is

9    the correct number, which is what Mr. Kniffen provided to

10   me, that's the number I've put into this analysis.  If a

11   different number, whether it's higher or lower, that would

12   change my analysis, and it's the arithmetic on that.

13   Q    Let me ask you one more thing, Mr. Diaz, or one more

14   quick set of questions.  Would you concede that for each of

15   these assumptions, it's possible that either ESL could turn

16   out to be right, Mr. Kniffen could turn out to be right, or

17   it's possible it could come in somewhere between the two?

18   A    I think Your Honor will decide which assumptions he

19   thinks is reasonable and he will decide what he thinks is

20   right.

21   Q    And, Mr. Diaz, based on your calculations, if it turns

22   out that for all these adjustments you made, it actually

23   kind of comes down the middle, then for every single month,

24   there would be positive liquidity and no covenant default,

25   correct?

Page 273

```
 1    A    I haven't done that calculation.

 2    Q    Trust me, that's the way the math works.  Thank you,

 3    Your Honor.  No further questions.

 4              THE COURT:  Okay, redirect?

 5              MR. SERKIN:  Thank you, Your Honor.  Again, Joseph

 6    Serkin, Akin Gump.

 7                 REDIRECT EXAMINATION OF MATTHEW DIAZ

 8    BY MR. SERKIN:

 9    Q    Mr. Diaz, if you could look back at Page 6 of your

10    supplemental declaration.

11    A    Okay.

12    Q    And Mr. Lender asked you to assume that if $112, the

13    accrued KCD royalties, and $166, the accounts payable

14    liabilities, were taken out of this analysis, that you would

15    have a $60 million positive liquidity, so positive in terms

16    of administrative solvency.  Is that what this chart shows?

17    A    No, it does not.  And I'm sure you're referring to the

18    chart on Page 7, for the record.  What --

19    Q    On the supplement.  So, just so we're on the same page,

20    we are on the supplemental declaration, and if I need to

21    hand that to you, I'm happy to.  So it's Page 6 of the

22    supplemental declaration.

23    A    Yes.  Yes, I apologize, Page 6 of the supplemental

24    declaration.  No.  No, that assumption -- the arithmetic

25    that he mentioned is the way the math works, as Your Honor
```

1    pointed out.  But on Page 6, let me discuss a few things

2    here.  You know, one is we heard earlier today, by the

3    Debtors' own math, the company shows that they're

4    administratively insolvent by $35 million, which was as of

5    February 3rd.  I got another version last night, you know,

6    very late, which shows $42 million.  But for all sets and

7    purposes, you know, the number's, you know, is the same.

8        In my previous declaration, there were some errors and

9    omissions to the Debtors' analysis.  Some of them, they've

10   corrected; some of them, they have not corrected.  For

11   example, in the previous analysis, they did not include

12   accrued payroll.  That's something that I put in my

13   declaration.  That's something they subsequently

14   (indiscernible).

15       On this Page 6, the big critique that I have in the

16   Debtors' administrative solvency analysis is that includes

17   $125 million of "upsides."  Maybe they'll happen, maybe they

18   won't.  I give information on that in my report.  But

19   there's substantial risk of whether that will happen, and a

20   lot of these things have to happen in the next couple days,

21   i.e. before Friday, assuming that's the close day.

22       There's also a tremendous amount of downsides in the

23   administrative solvency analysis that the Debtors have not

24   addressed in their calculation.  Counselor identified two

25   shortfalls, talked about KCD, talked about accounts payable.

Page 275

1    I agree, those are two very large shortfalls.  There's also

2    many others.  You know, 506(c), there's been no

3    administrative bar date.  There's hundreds of claims that

4    have been filed, which may substantially --

5              THE COURT:  You don't mean 506(c).

6    A    503(b)(9), thank you.  Excuse me.  There are hundreds

7    of claims that have been filed that may impact that

8    503(b)(9) calculation that the Debtors have.  We heard from

9    Mr. Meghji that they've not reconciled that.  That gets me

10   very nervous.

11        There are employee benefits under the account -- under

12   the APA.  Employee benefits, as of the closing date, stick

13   with the sellers in terms of the accrued cost.  I do not see

14   that addressed in the Debtors analysis.  Hopefully, you

15   know, if this does get approved, then, you know, there's a

16   big closing date.  If the closing date happens on Friday,

17   then, you know, that's the numbers, but if that extends out,

18   that can extend additional cost.

19        There are costs --

20              THE COURT:  I'm sorry, the employee benefits are

21   actually in this chart.  I thought you were just talking

22   about things that weren't in the chart.

23              MR. DIAZ:  I'm sorry, let me make that clearer.

24   What I was indicating was in the Debtors administrative

25   solvency analysis that they prepared and provided to the

Page 276

1    Unsecured Creditors' Committee, it only shows upsides, Your

2    Honor.  It doesn't show these downsides that --

3            THE COURT:  Maybe I wasn't clear, or maybe I just

4    didn't understand the point you were making.  I thought what

5    you were saying is that the chart here that shows $218

6    million shortfall takes into account certain items,

7    including liabilities regarding employee benefits,

8    warranties, accounts payable, the $166.  If you add all

9    those up, there's the -- and then you subtract the two

10   items, you have the $60 million.  But then I thought what

11   you were saying is there are other risks.  And all I was

12   saying is, I think the risks on the employee benefits are

13   already in your chart.  You've already -- you've already

14   factored that risk in.

15           MR. DIAZ:  So, you're correct.  I've put an

16   estimated number for that.  Company has self-insured benefit

17   plans.  That number could be higher, that number could be

18   lower.  It's a plus-or-minus number.  That's the reason why

19   I pointed that out.

20           THE COURT:  Okay.

21           MR. DIAZ:  There's also, you know, in the EPA, the

22   seller is responsible for the protection agreement

23   liabilities until a Bermuda regulatory authority -- you

24   know, I put in $30 million.  That assumes that those notes

25   get transferred in a month.  If that extends out much longer

Page 277

1    than a month, there will be additional costs that the

2    sellers will be responsible for.

3            THE COURT:  I'm not sure I quite followed that.

4            MR. DIAZ:  So, I'll say it a little bit slower.  I

5    apologize.

6            THE COURT:  Okay.

7            MR. DIAZ:  So, in the EPA, ESL has agreed to

8    assume certain protection agreements associated with, you

9    know, protection agreements that customers have on various

10   products.

11           THE COURT:  Right.

12           MR. DIAZ:  And, however, that assumption does not

13   happen until these KCD notes are transferred to ESL, and

14   that requires regulatory authority, or Bermuda authority.

15   And until that transfer happens, the seller is responsible

16   for the cost of servicing these protection agreements.  The

17   estimated cost per month of these is $30 million.  So, you

18   know, if you get that resolved in a month, $30 million is

19   right.  That's what I have on this sheet of paper.  If it

20   goes on forever, you know, that number keeps clicking away,

21   because the seller is responsible for those protection

22   agreement costs until that happens, as I understand that

23   agreement.

24           THE COURT:  Okay.

25           MR. DIAZ:  There's also some other things.  I had

Page 278

1   mentioned the declaration.  But the point being is, is that

2   you can't just do the simple arithmetic.  There's other

3   unquantified downsides that one needs to take into account

4   that risk -- that increase the risk of administrative

5   insolvency.

6   Q    And, Mr. Diaz, if we could just look at Section 4 on

7   Page 6, the potential mitigating items identified by

8   Debtors, the first category, upsides that need to be

9   realized prior to close.

10  A    Yeah, no, I would note, too, that the arithmetic isn't

11  that simple.  On my Page 6 chart, I show for purposes of

12  this that the full $125 million of upsides that the Debtors

13  identified are actually realized.  But as I identify in

14  Paragraph 5 of my supplemental declaration on Page 4, you

15  know, there's a lot of risk to this.  You know, there's

16  receivables that, you know, as we understand the EPA aren't

17  going to go to the buyer, so that essentially means you have

18  a couple days to collect this $20 million receivables, you

19  know, which is a lot.  If they can do that, that's great,

20  but that's a lot of work to do.

21       In terms of the excess inventory, I think you heard

22  from the questioning on Mr. Meghji some of our concerns on

23  that, that one, you have to identify what that excess

24  inventory is.  You know, two, you have to get ESL's consent

25  to move that excess inventory.  Three, you have to move that

Page 279

1    to your stores.

2              THE COURT:  Can I just interrupt you?  Is that the

3    basis for your $115 million deduction?  I'm just trying to

4    figure out --

5              MR. DIAZ:  Yeah, I was just being conservative.

6    On Page 6, I show --

7              THE COURT:  So you have deducted.

8              MR. DIAZ:  I deducted the full amount, and the

9    point being is that there's a risk that the Debtors don't

10   get those upsides, is the point.

11             THE COURT:  So you're not counting those upsides.

12             MR. DIAZ:  On Page 6, I counted those upsides.

13   But the reason why the arithmetic isn't so simple is that

14   there's a good chance, I believe, that they don't realize

15   those upsides.

16             THE COURT:  Okay.

17   Q    And just to clarify, Mr. Diaz, in terms of the

18   question, if you look at Page 6, are you intending to

19   reflect a specific number, a determination of administrative

20   solvency?

21   A    I am not.  I am showing a calculation of, based on the

22   downsides that I've seen, based on the upsides that I've

23   seen, that there's a very big shortfall, and it could be

24   substantially higher.

25   Q    Thank you, Mr. Diaz.  No further questions.

Page 280

```
 1              THE COURT:  Okay, any redirect?

 2              MR. LENDER:  No, Your Honor.  Thank you.

 3              THE COURT:  Okay, you can step down.

 4              MR. DIAZ:  Great, thank you.

 5              MR. SERKIN:  Your Honor, just for the record, we

 6    would move in Mr. Diaz's supplemental declaration that also

 7    contains the original --

 8              THE COURT:  It's his direct testimony.  It's fine.

 9    All right, so that leaves Mr. Greenspan?

10              MR. CHAPMAN:  Your Honor, for the record, Dean

11    Chapman of Akin Gump on behalf of the Creditors' Committee.

12    Your Honor, we have submitted a declaration and an extra

13    report for Ron Greenspan, Senior Managing Director at FTI.

14    Mr. Greenspan leads FTI's corporate finance and

15    restructuring practice in the western United States and co-

16    leads FTI's global real estate solutions practice.  A

17    summary of Mr. Greenspan's qualifications is contained --

18              THE COURT:  I read it.

19              MR. CHAPMAN:  You've read it?  Fantastic.  And at

20    this time, Your Honor, we would move to qualify Mr.

21    Greenspan as an expert in the field of real estate

22    valuation.

23              THE COURT:  Okay, is there any objection to that

24    expert qualification?

25              MAN 3:  No, Your Honor.
```

Page 281

1           THE COURT:  Okay.  Would you raise your right

2      hand, please?  Do you swear or affirm to tell the truth, the

3      whole truth, and nothing but the truth, so help you God?

4           MR. GREENSPAN:  I do, Your Honor.

5           THE COURT:  And it's G-R-E-E-N-S-P-A-N?

6           MR. GREENSPAN:  Correct.

7           THE COURT:  Okay.  Now, Mr. Greenspan, I have your

8      declaration, which is -- well, I have one from January 26th

9      and an update from -- or it's really not an update.  It just

10     states that it's his direct testimony, from February 2nd.

11     So, sitting here today, would that still constitute your

12     direct testimony?

13          MR. GREENSPAN:  It does, Your Honor, but I do need

14     to make one correction.

15          THE COURT:  Okay.

16          MR. GREENSPAN:  Subsequent to my report and my

17     deposition, Mr. Welch, the lead of the JLL Appraisal

18     Practice, gave his deposition.  You will have noted that in

19     Footnote 7, I noted that it appeared to me there was a

20     modeling in JLL's reports, in their appraisals.  Because I

21     relied on those appraisals, we corrected what we believed

22     was a modeling error, and my report was based on those

23     corrected appraisals.  Mr. Welch couldn't explain what

24     appeared to be the error, either.  They took a break, he

25     came back in and acknowledged that the reports are not

1    particularly clear, but he gave an explanation why he

2    believes it is not a modeling error.  I've accepted that

3    explanation.  My numerical conclusions and my opinions are

4    unchanged by un-correcting the correction.  However, I would

5    withdraw Footnote number 7, and also, the numbers on Table

6    10 are no longer precisely accurate.  The recoveries on the

7    unencumbered real estate would go down between $50 and $70

8    million between the low and the high, and the totality of

9    recoveries would go down between $70 and $90 million.

10            MAN 4:  Can I have those repeated one more time?

11   I just did not write them down.

12            MR. GREENSPAN:  It's $50 to $70 million on the

13   unencumbered assets, and the totality, which is the bottom

14   line number, could go down $70 to $90 million, from low to

15   high.

16            THE COURT:  So I don't understand, when you say

17   your numerical includes are unchanged, how do those two

18   things reconcile with each other?

19            MR. GREENSPAN:  Because if you actually look at my

20   -- I have two opinions in there.  My opinion of the -- one

21   of them is not affected at all by this, but the other one

22   where we -- where I indicate that it's my  opinion that the

23   overall recovery would be $1.6 to $2.1 billion, I actually

24   rounded down in reaching that.  So what actually happens,

25   when you actually make the correction, if you round off the

Page 283

1    corrected numbers, it's still $1.6 to $2.1 billion, so the

2    change is within the rounding of what I did.  If you look at

3    my opinion number -- opinion number one has the $1.6 to $2.1

4    -- I'm sorry, opinion number two is $1.6 to $2.1 billion.

5    That's unchanged, and it's unchanged because it was rounded.

6              THE COURT:  Okay, thanks.

7              MR. GENENDER:  Thank you, Your Honor, Paul

8    Genender on behalf of the Debtors.  I know I have the last

9    live witness of the day, and I will be as quick as I

10   possibly can.  And I have between $50 and $90 million less

11   to deal with than I did a few minutes.  May I approach with

12   a book, Your Honor, for the Court and the witness?

13             THE COURT:  Sure.

14             DIRECT EXAMINATION OF RON GREENSPAN

15   BY MR. GENENDER:

16   Q    Good afternoon, Mr. Greenspan.

17   A    Good afternoon.

18   Q    You have a book in front of you that has nine tabs, and

19   in the left pocket has a copy of your deposition, in the

20   even that we need it, okay?

21   A    Yes, sir.

22   Q    Mr. Greenspan, you're not licensed to render an opinion

23   of value, are you?

24   A    I am not.

25   Q    You were tasked here with determining the value of the

Page 284

1   Debtors' real estate interest in a liquidation.  Is that

2   right?

3   A    Amongst other things, yes.

4   Q    You just mentioned Tab -- Exhibit 10 to your report.

5   Can you turn to Tab 5 of the notebook in front of you?  That

6   is the exhibit you were just referring to in amending your

7   testimony to the Court, correct?

8   A    That is correct.

9   Q    So those -- that is a summary of your conclusions, save

10  for the adjustments that you just announced to the Court at

11  the commencement of your testimony, correct?

12  A    That is correct.

13  Q    Okay.  You made various assumptions in arriving at your

14  opinions, correct?

15  A    Yes.

16  Q    One of those assumptions you made in deriving your

17  values is that Sears has 20 to 22 months to dispose of its

18  assets.  Is that right?

19  A    Yes.

20  Q    And that includes leaseholds, correct?

21  A    Yes.

22  Q    You'd agree that the amount -- that the amount a seller

23  would reasonably expect to realize on real -- on a real

24  estate asset can be affected by how much time the seller has

25  to dispose of that asset, correct?

Page 285

1   A    Yes.

2   Q    It's fair to say that the value of real estate assets

3   that Sears could dispose of would be lower if it only had

4   four months to dispose of them, correct?

5   A    No.  As I explained to you, I don't believe the value

6   of the asset changes, which is what you just asked me.  But

7   rather, as I explained before, the amount one can realize is

8   usually detrimentally affected by doing a forced

9   liquidation, a fire sale.

10  Q    The proceeds would be less, correct?

11  A    Correct.

12  Q    Thank you.  Appreciate the clarification.  You've not

13  attempted to offer any opinion as to how much the real

14  estate proceed -- real estate assets at issue would realize

15  as proceeds if Sears had only four months to dispose of

16  them, correct?

17  A    Correct.

18  Q    Are you aware that the Debtors have a court-ordered

19  deadline of May 13 to assume or reject an executory contract

20  for non-residential real estate property?

21  A    Unless extended by the landlord, that's correct.

22  Q    And have you, for the record, that is docket entry 776,

23  have you seen that order?

24  A    I don't recollect having read it.

25  Q    Okay, but you understand that that's in effect and a

Page 286

1    ruling of this Court?

2    A    It's my understanding.

3    Q    Okay.  The comparables you used to inform the discounts

4    you applied in your conclusions do not include previous

5    wind-down situations, do they?

6    A    Well, they -- I mean, as I explained to you, everything

7    I've done is informed by my 35 years in this business and

8    thousands and thousands of sales.  But specifically, I would

9    put this as the disposition of assets by an out-of-business

10   retailer.

11           THE COURT:  I'm sorry, I didn't hear, by a?

12           MR. GREENSPAN:  By an out-of-business retailer,

13   not specifically looking at bankruptcy situations.

14           THE COURT:  Okay.

15   Q    Mr. Greenspan, can you turn to your deposition in front

16   of you and turn to Page 77, please?  Do you have it in front

17   of you?

18   A    Yes.

19   Q    Do you see 77, Line 10, I ask you, "Do the comps that

20   you used in connection with your work include previous wind-

21   down situations?"  On Line 13, can you please read your

22   answer?

23   A    "I don't believe so."

24   Q    Thank you.  You acted as an advisor to the Committee of

25   the Unsecured Creditors in the Toys "R" Us matter, isn't

Page 287

1    that right?

2    A    Correct.

3    Q    And the Toys "R" Us bankruptcy resulted in the

4    liquidation of the retail business, correct?

5    A    Correct.

6    Q    As part of that liquidation, the company attempted to

7    dispose of the real estate assets.

8    A    That is correct.

9    Q    Have you reviewed Paragraph 30 of Mr. Welch's

10   declaration, which is in your binder at Tab 2?

11   A    I have.

12   Q    Okay, well let's take -- I want to be -- I want to give

13   you an opportunity to know for sure.  Can you turn to, under

14   Tab 2, Paragraph 30?  In particular, I want to call your

15   attention -- it's highlighted, but a particular -- the part

16   at the bottom of the page which starts, "For example," on

17   Page -- on Page 12.

18   A    Yes.

19   Q    Okay.  So you have reviewed that paragraph, correct?

20   A    I have.

21   Q    Okay, and have you reviewed Paragraph 36 in Mr.

22   Meghji's declaration, which is Tab 3 of your binder,

23   Paragraph 36?

24   A    I did, but it's been a while.

25   Q    I could not hear you, sir.  I'm sorry.

Page 288

1    A    I said I did review it, but it's been a while.

2    Q    Okay.  Well, please, take a moment to refresh your

3    recollection.

4    A    I've read it.

5    Q    Thank you very much.  So you see each of -- each Mr. --

6    each of those witnesses' testimony, and in the Toys "R" Us

7    liquidation, only around 35 percent of the leases sold,

8    correct?

9    A    Correct.

10   Q    And you see their testimony that of the leases that did

11   sell, they only real -- they only sold for around 44 percent

12   of their appraised dark value.  You see that?

13   A    Yes.

14   Q    Which would mean a discount of 56 percent, correct?

15   A    That's the math.

16   Q    Okay.  You agree that Sears stores are bigger than the

17   Toys "R" Us stores, correct?

18   A    In general, yes.

19   Q    And you'd also agree that in deriving the value of

20   Sears and Kmart leaseholds in your work, that you applied

21   discounts as low as 20 percent, but no higher than 40

22   percent, correct?

23   A    Correct.

24   Q    Notwithstanding the Toys "R" Us data, correct?

25   A    Actually, I would look at this and say probably because

Page 289

1    of the Toys "R" Us data.

2    Q    Okay, but you're not -- your range is 20 to 40 percent,

3    correct?

4    A    Correct, because you have to realize, when you start

5    with how big the appropriate discount is, it's the quality

6    of what you're discounting off of, and I can talk to you

7    about the data that -- the two stores.

8    Q    Well, I'm just asking what the range of your discounts

9    is, 20 to 40 percent, correct?

10   A    Yeah, if you're asking me purely the numbers, yes.  But

11   I will tell you that what you're discounting off of is

12   radically different.

13   Q    Thank you for your answer.  In fact, with the exception

14   of offices, all discounts that you applied in your analysis

15   were between 20 and 40 percent, so all leaseholds, is that

16   right?

17   A    That is correct.

18   Q    And that's on your report, Page 19, Exhibit 9, correct?

19   A    Correct.

20   Q    And you did this notwithstanding the Debtors may have

21   only 4 months, and not 22 months, to dispose of all

22   leaseholds, correct?

23   A    I think as I made clear, both in the report and my

24   deposition, that I'm not assuming four months as the period

25   of time.  That would be a fire sale, a liquidation sale, and

Page 290

1    I am not attempting to indicate what the proceeds would be

2    under those circumstances.

3    Q    You were in the Court -- well, I think I saw you in the

4    back that -- to hear Mr. Burian's testimony, right?

5    A    I was.

6    Q    And he referred to Toys "R" Us as, what, did he call it

7    an auction?

8    A    There was three-wave auction, yes.

9    Q    And you testified to that fact as well, right?

10   A    In my deposition I did.

11   Q    Right, and he was talking about a situation here where

12   there might be an auction of the Sears real estate assets,

13   correct?

14   A    I don't recollect that as part of his -- that's

15   certainly not the analysis that I operated on if you talk

16   about a fire sale auction.  An auction can be a very valid

17   way to dispose of real estate, but it's the timing and the

18   manner in which the auction is conducted that's relevant,

19   not the methodology.

20   Q    Okay.  You understand that in Toys "R" Us, all the real

21   estate assets were leased, correct?

22   A    I'm sorry, were leased?

23   Q    Leased.

24   A    Yes, unlike here, where you have fee simple.

25   Q    Thank you.  And you understand in this situation, in

Page 291

1    this case for Sears, that the industrial assets that are

2    owned here are mostly encumbered, correct?

3    A    Mostly encumbered, you have -- I mean, you have I think

4    probably a multiple of 10 times the number of industrial

5    assets here than we had in Toys.

6    Q    You can't point me to one comparable scenario where a

7    bankrupt company sold the volume of real estate assets as

8    are at issue here, of leases, in a short period of time and

9    got 75 percent of the market value, correct?

10   A    I told you I couldn't do that because there's no

11   precedent for this bankruptcy (indiscernible) you're selling

12   400 assets (indiscernible) those type of sales regularly.

13   Q    Thank you.  And, actually, you also can't point me to a

14   comparable scenario where a bankrupt company sold this

15   volume of leases in a short period of time and even got less

16   than 75 percent of the market value, correct?

17   A    That's correct.  There haven't been this amount sold in

18   a short period of time in a bankruptcy.

19   Q    Okay, and I want to look -- go back to Tab 5, which is

20   your summary numbers, if you can, please.  And your

21   testimony is that if you look at the low, mid, and high,

22   that on average, on average, okay, the high is a 15 percent

23   discount, the mid is a 25 percent discount, and the low is a

24   35 percent discount, correct?

25   A    As I explained to you, I didn't use those numbers, 15,

Page 292

1    25, or 35 in anything, but that is the arithmetic average.

2    Q    Correct, and I want to be -- I'm going to be fair to

3    you.  That's not where you intended to go, but that's where

4    your numbers, on Exhibit 9, 20 to 40 percent, those ranges,

5    that's what they led to when you compiled them all together,

6    correct?

7    A    That is correct.

8    Q    Thank you.  And you'd want to gather as much

9    information as possible about current market conditions

10   before making any assumptions or determining appropriate

11   discounts in your valuation.  Is that right?

12   A    Within the available time and information constraints,

13   that's correct.

14   Q    Sure.  And if information relevant to your assumptions

15   was available, you'd want to consider it, correct?

16   A    Yes.

17   Q    But you didn't consider any available information about

18   the Bon-Ton liquidation, did you?

19   A    I did not.

20   Q    And you didn't do any research on that, did you?

21   A    I have not.

22   Q    And you didn't do any research to determine that there

23   was information publicly available that from May of last

24   year through January of this year, it took seven months to

25   dispose of just seven leases, correct?

Page 293

1   A    I have not done that research, nor can I confirm that's

2   accurate.

3   Q    Okay, well, and if I represent to you that there is

4   public information about that, would you accept my

5   representation?

6   A    There's a newspaper article.

7   Q    If there was?  Do you want to see it?

8   A    No, no, I said there is a newspaper article.  I know

9   that.

10  Q    Okay, and you've read the same information?

11  A    I've read the newspaper article, yes.

12  Q    Okay.  Okay, do you have any reason to dispute the

13  newspaper account?

14  A    I -- a lot of reason to dispute that it's relevant, but

15  I have no reason to dispute the fact they've sold seven

16  stores.

17  Q    Okay, and you agree that if you applied that pace to

18  this case, it would take decades to dispose of the leases in

19  this case, correct?

20  A    Sure, if the number was longer, it would take longer,

21  and if the number was bigger, it would take shorter.

22  Q    And nothing about Bon-Ton has informed any of your

23  opinions in this case, correct?

24  A    No, I've subsequent done research, and I can talk to

25  you about that.  So, but nothing -- nothing about Bon-Ton

Page 294

1    informed my opinion.  I've subsequently done research, and I

2    can explain to you the (indiscernible) and why, frankly, it

3    probably supports what I projected here.

4    Q    Well I only get to cross-examine you on those opinions

5    that you put forth, and you updated your declaration last

6    night, correct?

7    A    No, I updated the numbers.

8    Q    Correct.  You were deposed last Thursday, and your

9    report was updated last night.  You made an adjustment

10   today, which I understand and I appreciate, but no mention

11   of Bon-Ton in your opinions, correct?

12   A    Correct.

13   Q    And no mention of Sports Authority, either, correct?

14   A    Correct.

15   Q    Thank you.  I want to go back to Tab 5 again or maybe

16   we're still there.  You have numbers next to encumbered

17   assets; do you see those?

18   A    Yes.

19   Q    When calculating the value of Debtor -- in Debtors'

20   real estate assets, you didn't make any assumption with

21   regard to the debt on the encumbered assets, did you?

22   A    I did not.

23   Q    And you know that there's debt on those properties,

24   correct?

25   A    I do.

Page 295

1   Q    And you understand that the debt on those, the nominal

2   debt on those properties exceeds the values that you have

3   listed on your Exhibit 10, which is Tab 5 in the notebook.

4   A    The nominal debt does.

5   Q    Yes.  By way of example, the nominal debt, if you look

6   at the second line of -- where it says included by Debtor,

7   are 502 million for unencumb- -- for encumbered does from

8   the higher end, the nominal debt is more than 502 million,

9   correct?

10  A    That's my understanding.  I was dealing with the assets

11  side and other people were dealing with the liabilities

12  side.

13  Q    Understood.  But if you look at the encumbered numbers

14  on the two sections of Exhibit 10, in each situation, the

15  nominal debt will be higher than the high end of your range,

16  correct?

17  A    Again, that's my understanding the nominal debt is.

18  I'm not dealing with the liabilities side.

19  Q    Wouldn't you agree that the proceeds that you ascribed

20  to encumbered assets is really not relevant to a proceeds

21  discussion?

22  A    No, I think it is potentially relevant.  The reason I

23  included it is twofold, is, one, as you'll see up on the

24  top, the debtor included 18 assets in their analysis of

25  proceeds available, 18 encumbered assets.  If they're going

Page 296

```
 1    to include encumbered assets, I can only do an apples-to-

 2    apples comparison if I also include encumbered assets.

 3               Secondly, as I understand it -- as I said, I'm not

 4    handling the liability side -- there's likely to be a

 5    challenge to the priority and/or recharacterization of some

 6    or all of that debt, in which case -- let me just finish my

 7    answer.

 8    Q    Okay.

 9    A    In which case, I do think that the asset values may be

10    of relevance to this Court.

11    Q    Those proceeds would now flow to creditors in a

12    winddown, would they?

13    A    Again, I'm not dealing with -- I have no opinion.  I'm

14    not dealing with that side of the --

15    Q    Okay.

16    A    -- analysis.

17    Q    I appreciate your candor.  In terms of methodology,

18    generally speaking, where third-party values were available,

19    you used that value to inform estimated proceeds, correct?

20    A    Yes.  Discounted, of course, but I did use it to inform

21    it.

22    Q    Sure.  One of your reports, quote/unquote, biggest

23    flaws that you know with respect to the Debtors' analysis is

24    that their estimated proceeds exclude 555 unencumbered

25    properties; is that right?
```

Page 297

```
 1    A    That's right.  I explain in my report my understanding

 2    of that.

 3    Q    Yes.  And you actually say, you call it flaw no. 1, and

 4    it's on Page 9 of your report, which is behind Tab No. 1,

 5    where you state, the Debtors winddown analysis subscribes

 6    value to only 484 out of 1054 properties owned or leased by

 7    the Debtors, a total of 570 properties, 54 percent of the

 8    portfolio by asset count, 555 of which are unencumbered are

 9    ascribed zero value in the Debtors' model.  Do you see that?

10    A    Yes.

11    Q    You called that a flaw, right?

12    A    Correct.

13    Q    And those 555 assets listed on your Exhibit 10 behind

14    Tab 5 under unencumbered, and you have 555 listed and you

15    say, Debtors' estimated proceeds nothing, and you have your

16    range of 126 to 165, correct?

17    A    Correct.

18    Q    Of those 555, Mr. Greenspan, your work, your valuation

19    assigns a value of zero to 438 of those 555 properties,

20    correct?

21    A    Correct, and the distinction is the second --

22    Q    Is that correct?

23    A    -- sentence you didn't read.  I said correct.

24    Q    Thank you.

25    A    And the distinction is the second sentence you did not
```

Page 298

1    read, which is the flaw.

2    Q    Okay.  Bottom line is, 80 percent of those 555

3    properties, both you and the Debtors assign a value of zero,

4    right?

5    A    I did an analysis and concluded -- the Debtor actually

6    assigned an n/a to it, not a zero.  The Debtor did not look

7    at those.  And when we inquired why did you not analyze

8    those, they said they didn't have the information.  So the

9    Debtors did not do an analysis of those, and I said that's

10   the flaw.  I did an analysis of them, and what we found was,

11   in fact, 80 percent had not value not because we didn't

12   look, but because we found the value, 20 percent did, and

13   it's a pretty stunning $160 million.

14   Q    I didn't ask you why.  I asked you what.  So wouldn't

15   you agree that both you and the Debtors agreed that at least

16   80 percent of those 550 unencumbered assets have no value?

17   A    No.

18   Q    Is that correct?

19   A    No.  The Debtor ascribed n/a.  They didn't duly come to

20   a conclusion of zero.  There's no evidence whatsoever what

21   the Debtors think that value is.

22           THE COURT:  Let's not spend any more time on that

23   point.

24           MR. GENENDER:  Got it.  Thank you, Your Honor.

25   Q    I want to talk about the 20 percent of those 555 to

Page 299

1    which you do, you did ascribe value.  And you ascribe a

2    value has a midpoint of $145 million; is that right?  I'm

3    looking at Tab 5, Exhibit 10.  Tab 5.

4    A    I'm sorry.

5    Q    You there?

6    A    You need me to point out a discount offer in 36

7    million.

8    Q    You have a range of up -- between 126 and $165 million,

9    with a midpoint of 145 for those properties, correct?

10   A    Correct, after discount.

11   Q    After discount.  Is your adjustment that you made when

12   you announced to the Court, does that affect that range as

13   well?

14   A    No, because the only adjustment we made was to the

15   (indiscernible) appraisal.

16   Q    Thank you.  I want to talk about one of the 117

17   properties, okay?  I'm going to ask you to look at Tab 7 in

18   the notebook in front of you, and I'm going to -- this

19   relates to the Pearl City Distribution Center.  Okay?  Do

20   you see that?  And what we've done is we've taken an excerpt

21   from one of your spreadsheets.  All right?  And it relates

22   to distribution center in Pearl City, Hawaii.  And you see

23   that it listed a lease expiration of April 30th, 2028, and

24   it has a last expiration of April 30th, 2038.  It says that

25   it's 299,000 square feet.  Do you see that?

Page 300

1    A    Yes.

2    Q    Speaking with n/a, you list an annual rate of n/a,

3    correct?

4    A    Correct.

5    Q    You list a market rent of $8.50, correct?

6    A    Correct.

7    Q    And the source is your firm, FTI?

8    A    From the research we did, correct.

9    Q    Thank you.  And you have a rent arbitrage, which is the

10   difference between annual rent and market rent, correct?

11   You list it at $8.50.  Okay, do you see that?

12   A    I see that.

13   Q    And then if you go down to the second line, you have a

14   low, midpoint, and high valuation of this asset between

15   $13.1 and $16.8 million, with a midpoint of just under 15

16   million.  Do you see that?

17   A    Correct.

18   Q    That's your math, right?

19   A    Yes.

20   Q    Did you do this work yourself or someone on your team

21   do it?

22   A    Someone on my team did the actual modeling.

23   Q    Okay.  Did you go ahead and check -- did you check this

24   one?

25   A    I did a -- we have a QC team that looked at all of

1   them.  I personally checked some.  I can't tell you if I

2   personally checked this one.

3   Q    So you'd agree that this 13.1 to 16.8 accounts for

4   roughly, maybe more, than 10 percent of the $126 to $165

5   million amount that you list on Tab 5 of your Exhibit 10,

6   correct?

7   A    It's approximately 10 percent.

8   Q    Just this one property, right?

9   A    Approximately.

10  Q    Okay.  Mr. Greenspan, are you aware that the actual

11  rent of this property is not zero, but, in fact, it's $6.36?

12  A    That's the issues you -- looking at this, you can't

13  tell whether when they put in market rent that that's

14  actually the calculation of the arbitrage number or not.

15  Q    Well, but it's -- your report says -- your report says

16  market rent $8.50 and has n/a next to actual rent, doesn't

17  it?  That's your calculation, right?

18  A    And it may be the reason they put n/a in there for

19  actual rent is because they put the arbitrage rent in for

20  the market rent.

21  Q    Do you know that or are you speculating?

22  A    Knowing what my team did, that would be my informed

23  impression.  I would have to go back and look at the full

24  work papers, but that's what I would conclude if there's n/a

25  for annual rent, the 8.50 is in there under market.

1   Q   N/A means not applicable, right?

2   A   That's correct.  It's not applicable to this analysis

3   because what they're showing is the arbitrage under market

4   rent.

5   Q   Well, Mr. Greenspan, I want to -- there's a distinction

6   between your sworn testimony and your assumption.  I want to

7   ask which one it is.

8   A   It's sworn testimony and it's an assumption.  The

9   reason being is, you see this is a ground lease.  A ground

10   lease, you don't pay on the same basis as what you rent the

11   facility out at.  One, you've got a lot of square feet in

12   the ground.  Often, the ground lease is set as either a

13   specific amount, a fixed amount, or dollars per square foot

14   of the ground.  Whereas, when you're re-leasing out, you're

15   actually renting the building.  Let me just finish.  You're

16   not renting the ground lease.

17          Therefore, very often, since you don't have an

18   apples-to-apples on a spreadsheet, you can put in n/a as the

19   annual rent because the person isn't renting the ground, and

20   you put the arbitrage amount in the market rent and it's the

21   same as what's being shown there as the arb.

22          So looking at all -- everything put together, it

23   would not surprise me.  It would be my expectation that

24   you've got the arbitrage shown there as market rent.

25   Q   Are you aware that the actual rent for this property is

Page 303

1    $6.35 -- $6.36 a square foot?

2    A    Per square foot for the ground or per square for the

3    building?

4    Q    Can you turn to Tab 6 -- Tab 8, please, in the binder

5    in front of you?  And this is an excerpt and the document

6    itself is behind.  And for the record, this is marked as

7    Debtors' Exhibit 132, Bates Numbered Sears UCC-138236

8    through 243.  Looking at the first page, do you see where it

9    lists the rent, the annual rent of $1,900,611 per year?

10   A    For the ground, not for the building.

11   Q    Okay.  And you see that the denominator there would be

12   299,000 square feet for a rent of $6.36 per square foot?

13   A    Again, you're dividing the rent for the ground, which

14   is much, much larger, by the square footage of the building.

15   Q    Where --

16   A    That's apples-to-oranges.

17   Q    Where does your report indicate what the actual market

18   rent is, as opposed to any -- strike that.  Is your -- do

19   you have an analysis that you did that indicates the market

20   rent is anything other than $8.50 for this property?

21   A    I cannot give you a hundred percent assurance sitting

22   here on a specific property out the 1,054 we did.  But I

23   believe we, in fact, did do a market rent study for the

24   299,000 square feet for this facility; that's how we came to

25   our value.

Page 304

1    Q    Are you 100 percent certain?

2    A    As certain as I can -- knowing our methodology, I'm

3    99.9 percent certain.  As I said, we did 1,054 assets.  I

4    don't recollect.  And that was a -- that's what we did on

5    every asset, so I'd be very certain.

6    Q    As a matter of math, Mr. Greenspan, since you are here

7    as an expert, if the actual rent were $6.38 -- $6.36 and the

8    market rent were, as your spreadsheet indicates, $8.50, that

9    would have an arbitrage instead of only $2.14, correct?

10   A    As I said, you're comparing apples-to-oranges, but the

11   math is right.

12   Q    Thank you.  And if that were the arbitrage on a lease

13   of this size with this much term, that would significantly

14   affect -- that one valuation would be significantly less, if

15   not zero, compared to $13 to $16 million for that one

16   property, correct?  If that math were correct.

17   A    If the math -- it certainly wouldn't be zero.  You

18   still have the $2.30 arbitrage for the remaining term of the

19   lease, but it certainly would be less.

20   Q    And you heard -- did you hear -- were you here for Mr.

21   Welch's testimony?

22   A    Yes.

23   Q    And sometimes when you're -- when the arbitrage was

24   just a couple of dollars, that means that there's not any

25   value in that means that there's not any value in that lease

Page 305

```
 1    because there's not enough spread to -- for a subtenant to -
 2    - sublessor to realize value; did you hear that testimony?
 3    A    That testimony would not -- I heard his testimony --
 4    would not be applicable to this building where it's 300,000
 5    square feet.  So even two and a half bucks is almost a
 6    million dollars a year of arbitrage.  You still have a lease
 7    term going out to 2038.  Twenty years at two and a half
 8    dollars a foot comes to a million -- a million dollars times
 9    the net in those 20 years, comes to be a $20 to $30 million
10    spread.  That's enough to get peoples' attention and to buy
11    it.
12    Q    But if your math is wrong, you're off by three-fourths
13    at least.
14    A    No, that math is just under 2.50 a foot.
15    Q    Okay.
16    A    2.50 a foot times 300,000 square feet is three-quarters
17    of a million dollars a year -- three-quarters of a million
18    dollars a year is what you'll hypothesize in the arbitrages
19    -- for 20 years is $15 million, close difference.  You'd run
20    that through a present value calculation and your number's
21    probably $7 million/$8 million as a net press in value.
22    Q    Mr. Greenspan, are you telling this Court that $2.14
23    arbitrage would yield $7 million, but an $8.50 arbitrage
24    would yield 13 to 16?  That math doesn't add up, does it?
25    A    Actually, well, I gave -- well, where the difference is
```

Page 306

1    the 13 to 16 and you'd have discount it off of the market

2    value.  As I said, every single one of these, we calculate

3    the value, which is what you would get using the revised

4    numbers.  If you want to use revised numbers, again, market

5    value.  I then discounted, as we talked about since this is

6    a lease, it's discounted another 20 to 40 percent to get

7    down to the values that we're showing.

8    Q    Can you turn to Tab 9 in the book in front of you?

9    Let's try -- I'm going to wrap this up.  You see that's your

10   Exhibit 10 with some -- with some annotations on it?

11   A    Yes.

12   Q    The top annotation is for the 8.53 to 1.123 billion

13   reflect the average -- okay, consistent with your testimony

14   -- the average discounts of 35, 25 and 15, correct?

15   A    That's correct.

16   Q    Okay.  The -- where the bracketed debt numbers, there's

17   a bracket that says less than the debt; that reflects your

18   testimony that the nominal debt exceeds those numbers for

19   those encumbered properties, correct?

20   A    No.  Well, my testimony was I understand the nominal

21   debt exceeds --

22   Q    Fair enough.

23   A    -- the encumbered property values, but I don't know for

24   sure.

25   Q    Fair enough, okay.  And then I very artfully put an

Page 307

1    arrow around the midpoint of 145 million and put CEG, the

2    distribution center that I'm sure we talked about enough.

3    Do you see that?

4    A    Yes.

5    Q    And I guess the only other adjustment we would have to

6    make would be what you testified earlier at the adjustment

7    between $50 and $90 million to the overall numbers, 50 to 70

8    or 70 to 90 of your overall numbers because of the adjusted,

9    which we appreciate, in connection with Mr. Welch's

10   testimony, correct?

11   A    Correct.  So just to be clear on that, so if we're

12   talking about only the unencumbered, which is what you've

13   circled here, it's 50 to 70.  The mid, which you're pointing

14   at, the number would be 60 million.

15   Q    Fair enough, and I appreciate that.  So if it's 50 to

16   70 for the unencumbered, let's put a real fine point on

17   that.  The debt -- you have the Debtors' proceeds for

18   unencumbered being 634 million, and if you took away 50

19   million from your low end of the range, 853, that would be

20   803.  So you're talking about a difference on the low end of

21   the Debtors' number of 634 and your number of 803; is that

22   right?

23   A    On the very lowest end, that's correct.

24   Q    Thank you.

25             MR. GENENDER:  Pass the witness.  Thank you, Your

Page 308

```
 1   Honor.

 2            THE COURT:  Okay.  Redirect?

 3            MR. CHAPMAN:  Yes, Your Honor.

 4               REDIRECT EXAMINATION OF MR. GREENSPAN

 5   BY MR. CHAPMAN:

 6   Q    Mr. Greenspan, you just were asked a number of

 7   questions about the FTI's valuation of the Pearl City

 8   Distribution Center.

 9   A    Yes.

10   Q    Do you have any opinions on the Pearl City Distribution

11   Center valuation, in addition to those you've already

12   expressed in your question and answer with Mr. Genender?

13   A    Yes, I was.

14   Q    Do you have any additional observations on the Pearl

15   City Distribution Center valuation, in addition to those

16   which you already made in connection with your testimony

17   from Mr. Genender?

18   A    My comment would be, it is a very, very attractive

19   property.  It's eminently, eminently marketable, and I'm

20   probably being very conservative on that asset.  I can't

21   tell for sure, but it would be -- I would be all but certain

22   that we're looking at the delta, what the arbitrage is to

23   showing it at market because we put n/a for the square

24   footage, you can't calculate.

25            If we had put a number in there and there's n/a
```

Page 309

1    for the square footage, which is common on a ground lease,

2    because the ground lease -- the facility is 299,000 square

3    feet; the ground lease is -- the ground we're renting is

4    probably well over a million square feet and so, you can't

5    do that calculation.  You put n/a and you put the spread in

6    there under the market rent.

7    Q    Do you recall being asked questions about the timeline

8    over which you assumed Sears would be able to dispose of its

9    real estate assets?  And I believe you said something in the

10   neighborhood of 20 to 22 months; is that correct?

11   A    That is the outside date of the very last disposition.

12   Q    Why did you make that assumption?

13   A    Made the assumption that what we're looking at the

14   alternative with respect to these assets to the sale that's

15   being contemplated here is presumably a value maximizing

16   process to monetize the real estate as the alternative.  I

17   don't believe there's any reason to do a fire sale.

18          The analysis I did assumed, on the fee simple

19   assets, there's no deadline on the fee simple.  And on the

20   lease assets, as is very common, those assets that have

21   value, and we're looking over a billion dollars of value in

22   the leased assets; those assets that have value, we put into

23   a process that allows a reasonable time to monetize.  And

24   that would be something that can typically affect a

25   liquidating trust.

Page 310

1          It allows you -- you assume the leases that have

2     value and you go ahead and market those in a reasonable

3     process and JLL gave reasonable marketing values for those

4     that they would market over a reasonable period of time.

5     Q    You're aware that Mr. Welch assumed a four-month

6     disposition period, based upon the May 13th assumption of

7     rejection deadline?

8     A    Well, I mean, interestingly, we know he did both.  He

9     did both the market value and a liquidation value.  He

10    explained that his liquidation value assumed a four-month

11    period of time.  We also gave a full market value, which

12    showed that there were hundreds and hundreds and hundreds of

13    millions of dollars of value being left on the table in

14    order to accommodate a fire sale.

15    Q    And to be clear, why do you believe that a period of

16    greater than four months is appropriate?

17    A    Because that's the only way to get a commercially

18    reasonable value for these assets.  And Mr. Welch agrees and

19    Mr. Meghji's testimony was the same.

20    Q    You were asked a series of questions with respect to --

21    I hope I get the (indiscernible) correct -- but the 555

22    unencumbered properties to which you said the Debtors did

23    not value into which you did value; is that fair?

24    A    That's correct.

25    Q    And, of course, the questioning was that in 80 percent

1    of those cases, you ascribed a zero value, correct, or

2    approximately 80 percent?

3    A    After doing the research, yes.

4    Q    Okay.  And approximately 20 percent, you concluded

5    there was value there, correct?

6    A    That's correct.

7    Q    And what was the basis for your conclusion that there

8    was value in that approximately 20 percent of the assets,

9    the 555 assets the Debtors didn't value?

10   A    Again, we used the same methodology we used in all the

11   assets.  If the Debtors had actually acquired and paid for

12   valuations, we looked at them.  If they looked reasonable,

13   we used those as a basis and then discounted them.  So

14   within those assets were 17 major properties that they had

15   Cushman & Wakefield value.  Cushman & Wakefield came back

16   and said those assets were worth $167 million.  The Debtors

17   still didn't even put in an effort to value or to use those.

18            On all the others, we used our same methodology.

19   And if we did not have a valuation that the Debtor had paid

20   for, we did our own analysis and looked at market values,

21   market comparables, did our analysis, and then discounted

22   all of that.

23   Q    In your view, why is it appropriate to rely on the

24   Cushman & Wakefield appraisals?

25   A    Cushman has been the Debtors' long-time real estate

Page 312

1    consultant.  They prepared extensive valuations.  They know

2    the portfolio very well.  They were relatively recent

3    appraisals.  So absolutely not reason not to incorporate

4    their values, albeit discounted.  Also, Cushman & Wakefield,

5    before the Debtor prepared multiple values on those assets,

6    one of those values was the as-dark value, which is lower

7    market value, and we started with that; we used the as-dark.

8    But their professional opinion was what this asset was worth

9    with no Sears in it and we then further discounted that 20

10   to 40 percent.

11   Q    You may have just answered this question.  In a

12   winddown scenario, what assumption do you make about whether

13   the properties are lit or dark?

14   A    Well, on a winddown, I mean, the proper assumption

15   should always be the dark; as lit, they're generally worth

16   more and they're not lit.

17   Q    And if they're dark, what assumptions do you make about

18   carrying costs?

19   A    If those carry costs have to be paid until there's a

20   transaction, or else until the lease is rejected if it's a

21   lease.

22   Q    And any assumptions about the quantum of carrying

23   costs?

24   A    Well, for our purposes, we qualified those.  And the

25   carrying costs we assumed were the full underlying rent and

Page 313

1    the canvas property taxes and insurance.

2    Q    You were asked questions earlier about Bon-Ton; do you

3    recall that?

4    A    Yes.

5    Q    Why didn't you include bond time in your analysis?

6    A    I don't think it's has any relevance to what we're

7    dealing here.  Bon-Ton was converted to a Chapter 7, and the

8    Debtors' estate just wholesale bulked out the assets to a

9    consortium that included Tiger, and I think also included

10   A&G, the entity that's disposing of -- that the Debtors

11   retained.  But they bought all the assets in bulk, including

12   all the stores; the overwhelming percentage of them were

13   leased.  They are in literally what are known as the dying

14   towns.  It's a Western Pennsylvania chain.  It's

15   predominantly in the small towns in the upper Midwest.

16           I've subsequently taken -- actually did an

17   analysis.  And the Sears towns, we rate the markets --

18   major, minor, and tertiary and minor.  Sears has 55 percent

19   of the lease in major markets, such as the Sears here.  Bon-

20   Ton had fewer than a third in major markets, and a great

21   number, double the number of Sears in the bottom category,

22   which are going to be virtually unobtainable, unsaleable

23   assets in today's market.

24   Q    Final question on Toys "R" Us.  First of all, what was

25   your involvement in Toys "R" Us?

Page 314

1    A    We're the advisers to the committee.

2    Q    And what was the timeframe of the disposition of real

3    estate in the Toys "R" Us bankruptcy?

4    A    The -- it was ultimate fire sale.  It was intending to

5    be a going concern.  A terrible Christmas season and they

6    abruptly had to liquidate.  They did it, the sale, in three

7    waves.  Two of the waves, essentially from the time the bid

8    procedures order was entered to the bid deadlines, one was

9    30 days, the other was 40 days.  I mean, truly a fire sale

10   for these types of assets.  The third wave was 60 days, and

11   they got considerably better returns on the third wave.

12              I mean, it's no surprise the realization, but

13   importantly, everybody's talking about the 35 percent they

14   got bids on that they sold.  I've -- my numbers only assume

15   34 percent of the Sears leases are sold; that I'm actually

16   assuming a fewer percent of the Sears leases are able to be

17   monetized from the Toys leases that were monetized in that

18   process.

19              And, I mean, there's no question the Toys sale was

20   an absolute fire sale.  And also, Sears would get less if

21   they fire sale the assets than what I've predicted, but

22   that's not the way they should be sold if you really want to

23   monetize appropriate value for the stakeholders.

24              MR. CHAPMAN:  Nothing further.  Thank you.

25              MR. GENENDER:  Your Honor, we have nothing further

Page 315

1   for this witness.

2           THE COURT:  Okay.  You can step down, sir.

3           MR. GREENSPAN:  Thank you.

4           THE COURT:  Okay.  I think that concludes the

5   committee's presentation, recognizing obviously that I have

6   Mr. Kniffen's declaration.

7           MR. QURESHI:  That was the only reason for which I

8   rose, Your Honor, is to move that into evidence.  But other

9   than that -- and Mr. Greenspan's as well, but other than

10  that --

11          THE COURT:  All the declarations are moved in, are

12  admitted into evidence as direct testimony.  The one caveat

13  on the ruling was on the portion of the hearsay ruling.  I

14  sustained Mr. Meghji.  And there were no objections on

15  either side as to the witness declaration designations,

16  right?  So that's part of the evidentiary record.  Okay.  So

17  you all are planning coming back here at 10:00?

18          MR. QURESHI:  We have been told 11:00 AM, Your

19  Honor, but whatever time the Court has available.

20          THE COURT:  I do have a couple of -- you know,

21  plan to be here at 10:00.  I -- we may start at, like,

22  10:30.  It's not a huge calendar tomorrow.

23          MR. QURESHI:  Very well.

24          THE COURT:  Okay.  You're absolutely right.  My

25  crack assistant here, who tole me that Ms. Lee moved the

Page 316

1    morning calendar to 2:00.  So you guys can get here at 9:00.

2    Okay?

3              MR. QURESHI:  So what time are you starting, Your

4    Honor?

5              THE COURT:  9:00.

6              MR. QURESHI:  9:00, okay.

7              THE COURT:  Yes.  Mr. (indiscernible) and Mr.

8    (indiscernible), can I just see you for a brief period in my

9    chambers?

10             (Whereupon these proceedings were concluded at

11   5:11 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 317

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6       Sonya                    Digitally signed by Sonya Ledanski
                                 Hyde
                                 DN: cn=Sonya Ledanski Hyde, o, ou,
7    Ledanski Hyde               email=digital1@veritext.com, c=US
                                 Date: 2019.02.08 16:21:13 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 8, 2019