THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
Telephone: 216.566.5500
Facsimile: 216.566.5800
John C. Allerding, Esq. (*pro hac vice*)

*Counsel for Luxottica Retail North America Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE:** | Chapter 11 |
| **SEARS HOLDINGS CORPORATION,** *et al.* | Case No. 18-23538-RDD |
| Debtors.[1] | (Jointly Administered) |

### MOTION OF LUXOTTICA RETAIL NORTH AMERICA INC. FOR ENTRY OF AN ORDER (I) COMPELLING ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT; OR, IN THE ALTERNATIVE, (II) GRANTING LIMITED RELIEF FROM STAY

Luxottica Retail North America Inc. ("**Luxottica**"), by and through undersigned counsel, hereby moves (the "**Motion**") this Court for entry of an order: (i) pursuant to section 365(d)(2) of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings, Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holding Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Product, Inc.(8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

title 11 of the United States Code (the "**Bankruptcy Code**"), compelling Sears, Roebuck and Co. ("**Sears**") and Transform HoldCo LLC (the "**Buyer**") to assume or reject the License Agreement (as defined herein); or, in the alternative, (ii) pursuant to section 362 of the Bankruptcy Code, granting Luxottica limited relief from stay until such time as the License Agreement (as defined herein) is assumed and assigned to (a) relieve Luxottica from any obligation to use any aspect of the Cash Management System (as defined herein), including the Sears POS System (as defined herein); and (b) temporarily terminate other related obligations under the License Agreement, including any obligation to turnover funds to either the Debtors or the Buyer. In support of this Motion, Luxottica respectfully states as follows:

**I.      Preliminary Statement**

1.     According to recent filings with this Court, the Buyer assumed control of the Debtors' cash management system (the "**Cash Management System**"), including their bank accounts, as of February 11, 2019 (the "**Closing Date**").

2.     Information regarding this transfer was not clearly conveyed to Luxottica, despite the fact that Luxottica, as the operator of the Sears Optical business under the License Agreement, is required to use certain aspects of the Cash Management System in its day-to-day operations.

3.     As a result of the transfer, Luxottica may be exposed to potential loss as a result of its continued use of the Cash Management System, and specifically its use of the Sears POS System for the clearing of checks and collection of credit sales documents, and the turnover of certain funds for deposit into bank accounts that are now owned and/or controlled by the Buyer.

4.     Specifically, as this Court is aware, the License Agreement contains provisions (i) requiring Luxottica to use the Sears POS System for sales made in the Sears Optical stores; (ii)

2

requiring Luxottica to turnover funds, checks, and credit sales documents for sales entered through the Sears POS System for collection by Sears; and (iii) requiring Sears to hold those funds remitted to Sears and collected by Sears with respect to the turned over checks and credit sales documents in trust for Luxottica's sole benefit.

5. Luxottica and the Debtors engaged in significant negotiations regarding the Debtors' compliance with the trust fund provisions post-petition. Eventually, the Court included provisions in the Junior DIP Order (as defined herein) protecting Luxottica with respect to the funds turned over to the Debtors under the License Agreement.

6. The Junior DIP Order, however, does not refer to the Buyer.[2] Moreover, the Buyer has not exercised its rights under the APA (as defined herein) to designate the License Agreement for assumption and assignment.

7. This current situation leaves Luxottica in a precarious position. Absent a finding that the Buyer has implicitly or equitably agreed to be bound by the terms of the Junior DIP Order and/or the License Agreement, Luxottica may not be able to enforce the terms of that order and/or License Agreement against the Buyer – but the Debtors no longer have the ability to perform or accept performance under the License Agreement and/or Junior DIP Order.

8. Nothing in in law nor equity requires Luxottica to remain in this untenable position. As a result, Luxottica requests that this Court either (i) order the Debtors and the Buyer to immediately assume or reject the License Agreement; or (ii) grant Luxottica limited relief from stay until such time as the License Agreement is assumed and assigned to (a) relieve Luxottica from any obligation to use any aspect of the Cash Management System, including the

---

[2] Luxottica reserves the right to take the position that by accepting funds under the License Agreement, the Buyer implicitly agreed to be bound by the terms of the Junior DIP Order applicable to the License Agreement and the funds transferred thereunder. Nothing contained herein is intended to waive any claims, defenses or other arguments that Luxottica may have with respect to the Debtors, the Buyer, and the License Agreement.

3

Sears POS System; and (b) temporarily terminate other related obligations under the License Agreement, including any obligation to turnover funds to either the Debtors or the Buyer.

## II.  Jurisdiction

9.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

10. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The statutory predicates for the relief requested herein are sections 362 and 365(d)(2) of the Bankruptcy Code.

## III.  Background

### A.  *The License Agreement*

12. On or around May 31, 2015, Sears and Luxottica entered into a License Agreement (as amended from time to time, the "**License Agreement**") pursuant to which Sears granted Luxottica a license to operate an optical goods and services business (Sears Optical) within certain Sears' store locations (collectively, the "**On-Premises Locations**"), certain free-standing locations (the "**Off-Premises Locations**"), and via the internet (www.searsoptical.com).[3] License Agreement, § 1.1.

13. Pursuant to the terms of the License Agreement:

   a.  Luxottica was required to have all checks accepted at the On-Premises Locations and Off-Site Premises Locations made payable to Sears or Sears Optical. License Agreement, § 9.1.

   b.  Luxottica was required to accept certain credit cards bearing Sears' or a Sears affiliate's name for sales of goods and services at the On-Premises Locations, the Off-Premises Locations, and via the internet. Luxottica was

---

[3] The License Agreement includes a confidentiality provision that permits disclosure of its terms only in limited circumstances. While those circumstances exist here, permitted disclosure is limited to that which is necessary under those circumstances. As a result, Luxottica has summarized only the terms of the License Agreement and has not attached the License Agreement to this Motion. Should the Court require review of the License Agreement, Luxottica is prepared to provide a copy in connection with this Motion.

4

    further required to submit the documents relating to such Sears credit card receivables to Sears for settlement (i.e., Sears settled such credit card receivables directly with the issuing bank). License Agreement, § 9.2(a). Luxottica authorized Sears to collect such credit card receivables on Luxottica's behalf. License Agreement, § 9.2(c).

c. Luxottica was required to accept third-party credit cards at the On-Premises Locations and to submit the documents relating to such third-party credit card receivables to Sears for settlement with the respective credit card issuer (i.e., Sears settled such credit card receivables directly with the issuing bank). License Agreement, § 9.2(b).

e. Luxottica was required to process all transactions, including cash, check, and credit card transactions, made at the On-Premises Locations through the Sears Point of Sale System (the "**Sears POS System**").[4] License Agreement, § 9.2(c).

f. At the close of each business day, Luxottica was required to deliver the total of all cash, checks, and credit sales documents for transactions completed that day at the On-Premises Locations to Sears. License Agreement, § 9.3.

g. Specifically, with respect to the cash, checks, and credit card receivables generated by Luxottica and delivered to Sears pursuant to the License Agreement (the "**Trust Funds**"), the License Agreement provided that:

> [Sears] and [Luxottica] agree and intend for the funds reflected in the cash, checks and credit sales documents, minus the Company Fee, to be held by [Sears] for the benefit of and in trust for [Luxottica] and that title to such funds shall not pass to [Sears]."

License Agreement, § 9.3.

h. Moreover, Sears collected payments and settlements with respect to checks and credit cards on behalf of Luxottica – not as its own accounts receivable. License Agreement, §§ 9.2(c); 9.3.

i. On a weekly basis, Sears was required to return the cash delivered by Luxottica under the License Agreement, as well as the cash collected by Sears on Luxottica's behalf with respect to the checks and credit card receivables (all credit card receivables for On-Premises Locations and Sears credit card receivables for Off-Site Location and internet

---

[4] Portions of the transactions paid by a third-party issuer were excepted from this requirement.

5

transactions), net of a fee (the "**Company Fee**") that Sears was entitled to retain pursuant to the License Agreement. License Agreement, § 9.3.

B.  *The Junior DIP Order*

14. On October 15, 2018 (the "**Petition Date**"), the Debtors filed for protection under chapter 11 of title 11 of the United States Code.

15. On November 25, 2018, the Debtors filed their *Supplemental Motion for Authority to (i) Obtain Junior Postpetition Financing; and (ii) Schedule Final Hearing* (ECF. No. 872) (the "**Junior DIP Financing Motion**") requesting authorization to incur certain additional secured post-petition indebtedness.

16. On December 14, 2018, Luxottica filed its *Objection to Debtors' Supplemental Motion for Authority to (i) Obtain Junior Postpetition Financing; and (ii) Schedule Final Hearing* (ECF. No. 1234) (collectively with the Senior DIP Financing Objection, the "**DIP Financing Objections**") wherein it objected to certain exposure that it faced as a result of the Debtors' unwillingness or inability to comply with certain aspects of the License Agreement – including the requirement to hold the Trust Funds in trust for Luxottica's sole benefit.

17. On December 28, 2018, the Court entered its *Final Junior DIP Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Grant Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* (ECF No. 1436) (the "**Junior DIP Order**"). The Junior DIP Order granted Luxottica a number of protections, including without limitation (i) the establishment of a segregated reserve account (the "**Segregated Account**") in which the Debtors were required to hold Post-Petition License Funds[5] in which neither the Debtors nor their creditors held an interest; and (ii) to the extent the Court determined that (a) any unremitted Post-Petition License

---

[5] As used herein, the term "**Post-Petition License Funds**" shall have the meaning ascribed to such term in the Junior DIP Order.

6

Funds are not property of the Debtors' estates and (b) such funds were paid over to the DIP Lenders upon the final repayment of the DIP Financing, Luxottica was granted a first priority interest in such funds and the requirement that any Post-Petition License Funds remitted to the DIP ABL Lenders or the Junior DIP Lenders be turned over to Luxottica.[6]

18. On January 14, 2019, the Debtors commenced an auction for the sale of substantially all of their assets – including certain executory contracts and unexpired leases to be identified at a later date. The Buyer was determined to have submitted the highest and best offer for such assets. *See Notice of Successful Bidder and Sale Hearing* (ECF No. 1730).

19. The Court began hearings on the contested sale on February 4, 2019, ultimately approving the sale on February 8, 2019. *See* Sale Order.[7] The sale closed on February 11, 2019 (the "**Closing Date**"). *See* Motion to Enforce the APA.[8]

20. Prior to the time of closing, the Buyer advised the Debtors that it had not done the work necessary to implement its own cash management system or to set up its own bank accounts. Meghji Decl., ¶ 6.[9]

21. To avoid delay in the closing of the APA, the Debtors agreed to give the Buyer possession and control of the Cash Management System, including its bank accounts as of the Closing Date and those means by which Debtors previously processed credit card payments. *See* Meghji Decl., ¶¶ 7-9.

---

[6] As used herein, the terms "**DIP ABL Lenders**" and "**Junior DIP Lenders**" shall have the meaning respectively ascribed to such terms in the Junior DIP Order.

[7] *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**").

[8] *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform HoldCo LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform HoldCo LLC's Motion to Assign Matter to Mediation* (ECF No. 2796) (the "**Motion to Enforce the APA**").

[9] *Declaration of Moshin Y. Meghji in Support of Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform HoldCo LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform HoldCo LLC's Motion to Assign Matter to Mediation* (ECF No. 2797) (the "**Meghji Decl.**")

22. The documents filed with this Court did not clearly reflect the transaction now described by the Motion to Enforce the APA. Indeed, the Services Agreement[10] filed with the Court indicated that the Buyer was performing cash management services for the Debtors – including "movement of funds as necessary." Services Agreement, Schedule A-2, ¶ 9. the Motion to Enforce the APA paints a picture where the Buyer is operating the Cash Management System, including the Sears POS System, for its own operations subject to some limited post-closing adjustments not relevant to this Motion – not one where the Buyer is moving the funds collected under the License Agreement to the Debtor's accounts (including the Segregated Account) as necessary.

## IV. Relief Requested

23. By this Motion, Luxottica respectfully requests that the Court either (i) order the Debtors and the Buyer to immediately assume or reject the License Agreement; or (ii) grant Luxottica limited relief from stay until such time as the License Agreement is assumed and assigned to (a) relieve Luxottica from any obligation to use any aspect of the Cash Management System, including the Sears POS System; and (b) temporarily terminate other related obligations under the License Agreement, including any obligation to turnover funds to either the Debtors or the Buyer.

## V. Basis for Relief Requested

### A. *The Court should compel the Debtors and the Buyer to assume or reject the License Agreement.*

24. Luxottica requests that the Court compel the Debtors and the Buyer to assume or reject the License Agreement immediately. Neither law nor equity requires Luxottica to continue doing business with the Buyer – who has not taken assignment of the License Agreement. On the

---

[10] *Notice of Filing Executed (i) Employee Lease Agreement, (ii) Services Agreement, and (iii) Amendment No. 1 to the Asset Purchase Agreement* (ECF No. 2599), Exhibit C (the "**Services Agreement**").

8

other hand, the Debtors cannot perform or accept performance under the License Agreement because they are no longer in possession or control of their Cash Management System, including the Sears POS System and their former bank accounts, the intellectual property licensed to Luxottica, or the On-Premises Locations where Luxottica operates the Sears Optical businesses.

25. Section 365(d)(2) of the Bankruptcy Code authorizes the Court to require a debtor to assume or reject an executory contract within a specified period of time upon the request of any party to such executory contract. Specifically, section 365(d)(2) states:

> the trustee may assume or reject an executory contract…at any time before the confirmation of a plan…but the court, on request of any party to such contract…may order the trustee to determine within a specified period of time whether to assume or reject such contract[.]

11 U.S.C. § 365(d)(2).[11]

26. The determination of what constitutes a reasonable time to assume or reject is within the bankruptcy court's discretion "in light of the circumstances of each case." *Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 105 (2d Cir. 1982); *see also In re Dana Corp.*, 350 B.R. 144, 147–48 (Bankr. S.D.N.Y. 2006) (citations omitted).

27. Although the general rule under § 365 is intended to afford a debtor reasonable time in which to make a determination with respect to its executory contracts, such a

---

[11] There is no reasonable dispute that the License Agreement here is executory. Although the Bankruptcy Code does not define what constitutes an executory contract, the legislative history to section 365 of the Bankruptcy Code provides that, "though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 58 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5844, 6303. In determining whether a contract is executory, courts within the Second Circuit follow the definition proposed by Professor Countryman, who defines an executory contract as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperfected that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L. Rev. 439, 460 (1973) quoted in *In re Helm*, 335 B.R. 528, 534 (Bankr. S.D.N.Y. 2006); *see also In re Riodizio, Inc.*, 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997); *In re 375 Park Ave. Assocs., Inc.*, 182 B.R. 690, 697 (Bankr. S.D.N.Y. 1995); *In re Chateaugay Corp.*, 102 B.R. 335, 344–45 (Bankr. S.D.N.Y. 1989).

determination cannot be made without regard to the interest of non-debtor parties to such agreements. Indeed, courts must consider the balance of harms to the litigants in determining when to require a decision on assumption or rejection under § 365(d)(2). *See In re Beker Indus. Corp.*, 64 B.R. 890, 896–97 (Bankr. S.D.N.Y. 1986) (granting motion to compel where uncertainty and harm to non-debtor party outweighed potential benefit to the debtor's estate); *see also In re Enron*, 279 B.R. 695, 709 (Bankr. S.D.N.Y. 2002) (setting date certain by which the debtor must assume or reject contracts). In considering the balance of harms, Courts may look at a variety of factors, including those discussed below. *In re Dana Corp.*, 350 at 147–48.

      a.    <u>The importance of the contracts to the debtor's business and reorganization</u>

28.    Here, the License Agreement is not important to the Debtors' business or reorganization. The Debtors are not continuing their business operations and are not reorganizing. Thus, requiring the immediate assumption or rejection of the License Agreement will have no effect on the Debtors or their estate.

      b.    <u>The debtor's failure or ability to satisfy post-petition obligations</u>.

29.    The Debtors do not have the ability to perform or accept performance under the License Agreement. Moreover, because they can no longer accept performance under the License Agreement, it is questionable whether Debtors have the ability to perform certain of their obligations under the Junior DIP Order – obligations that were ordered by this Court to protect Luxottica in its ongoing operations under the License Agreement.

      c.    <u>The nature of the interests at stake</u>

30.    The Buyer has an interest in having ample time to determine whether to take assignment of the License Agreement. But here, the Buyer has been involved in the purchase of the Debtors' assets for near (perhaps more than) three months. Moreover, Mr. Lampert and his

hedge fund were intimately involved with the Debtors for much longer. This is an executory contract that provided the Debtors with tens of millions of dollars of profits over of the years – and provided the additional benefit of increasing foot traffic within the Sears stores. This isn't a difficult decision that requires significant consideration. Moreover, the Buyer brought this situation upon itself when it failed to diligently perform the work necessary to implement its own cash management system pre-closing. *See* Meghji Decl., ¶ 6.

31.     In contrast, Luxottica has a significant interest in not being left in no man's land during this "gap" period. Luxottica and the Buyer will be irreparably harmed from a reputational and consumer confidence standpoint if Luxottica is forced to cease performance under License Agreement. However, the Debtors cannot perform or accept performance during this "gap" period. Congress did not intend to force non-debtor contracting counterparties into doing business with the buyer of assets under section 365 prior to the assumption and assignment of the relevant executory contract.[12] Here, the nature of the interests at stake favor granting the requested relief.

        d.     <u>The balance of harm to the litigants and the good to be achieved</u>

32.     If Luxottica is forced to continue performance under the License Agreement prior to the Buyer's assumption of that agreement, it exposed to potential loss in excess of a million dollars. On the other hand, granting the Motion does not expose the Buyer to any harm – it

---

[12] A debtor's desire to assess and obtain a benefit from an executory contract or unexpired lease should not come at the expense of the non-debtor party. *See In re Beker Indus. Corp.*, 64 B.R. at 898–99 (stating "there is no indication that an obligee is to be forced…to fund someone else's desire for [maximizing] benefit" to the debtor's estate). In fact, when enacting section 365(d)(2), it was Congress's intention to provide a means to resolve any uncertainty relating to the status of a debtor's contract with non-debtor parties. *See id.* at 989 (citing H. Rep. No. 95-595, 95th Cong., 1st Sess. 348–49 (1977)). The *Beker* court stated that "[s]uch doubt from the risk of rejection, when it [] jeopardiz[es] a major investment, can be paralyzing, and far outweigh[s] the benefit to be derived by creditors." *Id.* (citing *In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561 (Bankr. W.D. Wash. 1983)).

merely requires the Buyer to make a decision (whatever that decision is) regarding assumption or rejection at this time.

e.  **Whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan**

33.  This factor is not applicable post-sale. However, Luxottica anticipates that the Buyer will raise an argument regarding the time that was afforded under the Sale Order for the assumption or rejection of executory contracts. While the Sale Order anticipates that the Buyer will have until April 12, 2019 to designate additional contracts for assumption or rejection, that Sale Order does not preclude contracting counterparties from seeking an expedited decision on such matters when called for by the equities of a particular situation. For the reasons discussed herein, those equities are present here.

f.  **The safeguards afforded the litigants / the damage the non-debtor will suffer beyond the compensation available under the Bankruptcy Code**

34.  The Bankruptcy Code provides certain protections for contracting counterparties that do business with a debtor post-petition. Here, however, the Motion to Enforce the APA paints a picture where Luxottica is not doing business with the Debtor – but rather is doing business with the Buyer. As a result, Luxottica may face a challenge to an asserted administrative priority claim for any loss it suffers as a result of post-closing performance under the License Agreement.

35.  On the other hand, and in stark contrast to the vulnerable position that Luxottica finds itself in, the Buyer has the power to choose how it wants to proceed. Nothing in this Motion seeks to take that power away. And the Buyer has all of the information necessary to make an informed decision. Thus, there is no need to safeguard the Buyer here.

g.  **Whether there is a need for judicial determination as to whether an executory contract exists**

36. There is no dispute that the License Agreement is an executory contract. This factor favors granting the requested relief.

      h. <u>Whether the exclusivity has been terminated</u>

37. This factor is not applicable in the post-sale situation now before the Court.

      i. <u>Whether the action to be taken is so in derogation of Congress's scheme that the court may be said to be arbitrary</u>

38. The requested relief is not in derogation of Congress's intended scheme in enacting section 365 of the Bankruptcy Code. In fact, denying the requested relief would be in derogation of Congressional intent. Nothing in section 365 suggests that Congress intended to put a contracting counterparty into the situation where it was forced to perform an executory contract for the benefit of a non-debtor prior to assumption and assignment of such contract to that non-debtor.

      j. <u>The purpose of chapter 11, which is to permit successful rehabilitation of debtors</u>

39. This factor is not applicable in the post-sale situation now before the Court.

40. For these reasons, Luxottica respectfully requests this Court compel the Debtors and the Buyer to assume or reject the License Agreement.

    B. *Alternatively, cause exists for limited modification of the automatic stay.*

41. The Debtors are no longer in possession or control of their Cash Management System, including the Sears POS System and their former bank accounts, the intellectual property licensed to Luxottica, or the On-Premises Locations where Luxottica operates the Sears Optical businesses. As a result, the Debtors cannot perform or accept performance under the License Agreement – performance that is required on a day-to-day basis under that agreement.

42. The Buyer has not designated the License Agreement for assumption pursuant to the terms set forth in APA and the Sale Order. And while the Buyer can certainly choose to

13

accept performance – and can even voluntarily perform the Debtors' obligations under the License Agreement if it so chooses – it may not be legally bound to perform those obligations until it takes assignment of that agreement. Moreover, the Buyer has not agreed that it is bound by the protections provided to Luxottica under the terms of the Junior DIP Order.

43. Under these circumstances, sufficient cause exists to modify the automatic stay to limit Luxottica's exposure for its continued performance under the License Agreement while the Buyer decides whether to take assignment of that agreement.

44. Section 362(d)(1) of the Bankruptcy Code states that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause . . . ." 11 U.S.C. § 362(d)(1). The Bankruptcy Code does not define "cause." *See Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002). Because the Bankruptcy Code does not define "cause," courts conduct a case-by-case inquiry and look into the totality of the circumstances to determine whether sufficient cause exists to grant relief from the automatic stay. *See, e.g., In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 738 (Bankr. S.D.N.Y. 2004).

45. It is well settled that the decision to lift the automatic stay is within the discretion of the bankruptcy court. *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990). In determining whether to lift the automatic stay, courts consider the impact of the stay on the parties and the balance of harm if the stay is lifted. *In re Abrantes Constr. Corp.*, 132 B.R. 234, 238 (N.D.N.Y. 1991).

46. Ample cause exists to lift the automatic stay to permit Luxottica to terminate its use of the Cash Management System, including the Sears POS System. The continued use of the Sears POS System under the circumstances described above requires Luxottica to turnover its

own funds to the Buyer – who has not taken assignment of the License Agreement (or otherwise explicitly agreed to be bound by that agreement) or agreed that it is bound by the provisions of the Junior DIP Order regarding performance under the License Agreement. If the Buyer decides not to assume the License Agreement, Luxottica may be exposed. If the Buyer finds itself in financial trouble, Luxottica is exposed. Nothing in law nor equity requires Luxottica to subject itself to such exposure.

47. On the other hand, granting the limited relief requested herein has no effect on the Debtors or the Buyer. The Debtors cannot perform or accept performance with respect to the obligations under the License Agreement relating to the Cash Management System. Any amounts due to the Debtors under the License Agreement will still be due, subject to Luxottica's rights under the License Agreement and/or in law and equity. The Buyer is not entitled to performance under the License Agreement. The License Agreement will remain available for assumption and assignment on the schedule requested by the Buyer. Moreover, the Buyer will receive the added benefit of the operation of the Sears Optical locations in the On-Premises Locations – increasing foot traffic in those locations and improving the Buyer's bottom line.

48. For these reasons, sufficient cause exists for this Court to grant Luxottica limited relief from stay until such time as the License Agreement is assumed and assigned to (a) relieve Luxottica from any obligation to use any aspect of the Cash Management System, including the Sears POS System; and (b) temporarily terminate other related obligations under the License Agreement, including any obligation to turnover funds to either the Debtors or the Buyer.

## Motion Practice

49. This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this

Motion. Accordingly, Luxottica submits that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## **No Prior Request**

50. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, Luxottica respectfully requests entry of an order (i) either (a) compelling the Debtors and the Buyer to assume or reject the License Agreement on or before March 22, 2019; or (b) granting Luxottica limited relief from stay until such time that the License Agreement is assumed and assigned (a) relieve Luxottica from any obligation to use any aspect of the Cash Management System, including the Sears POS System; and (b) temporarily terminate other related obligations under the License Agreement, including any obligation to turnover funds to either the Debtors or the Buyer; and (ii) requiring the Buyer to immediately turnover any funds that came into its possession related to the Sears Optical business, including any funds that came into its possession as a result, in whole or in part, of Luxottica's performance under the License Agreement; and (iii) granting such other further relief as is just and proper.

Dated: March 18, 2019  
New York, New York

Respectfully submitted,

*/s/ John C. Allerding*  
THOMPSON HINE LLP  
3900 Key Center  
127 Public Square  
Cleveland, Ohio 44114-1291  
Telephone: 216.566.5500  
Facsimile: 216.566.5800  
John C. Allerding (*pro hac vice*)

*Counsel for Luxottica Retail North America Inc.*