Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-23538-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    SEARS HOLDINGS CORPORATION,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    February 7, 2019

17                    9:27 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  NAROTAM RAI

Page 2

1    HEARING re Evidentiary Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4        Attorneys for the Debtor

 5        767 Fifth Avenue

 6        New York, NY 10153

 7

 8   BY:  SUNNY SINGH

 9        RAY S. SCHROCK

10

11   AKIN GUMP STRAUSS HAUER & FELD LLP

12        Attorneys for UCC

13        One Bryant Park

14        New York, NY 10036

15

16   BY:  ABID QURESHI

17

18   CLEARY GOTTLIEB STEEN & HAMILTON LLP

19        Attorneys for ESL

20        One Liberty Plaza

21        New York, NY 10006

22

23   BY:  JAMES L. BROMLEY

24

25
```

```
 1   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

 2        Attorneys for Independent Restructuring Subcommittee

 3        601 Lexington Avenue

 4        New York, NY 10022

 5

 6   BY:  ROBERT A. BRITTON

 7        PAUL BASTA

 8

 9   COHEN WEISS AND SIMON LLP

10        Attorney for UAW, USW, Workers United, SEIU

11        900 Third Avenue

12        New York, NY 10022

13

14   BY:  RICHARD M. SELTZER

15

16   PENSION BENEFIT GUARANTY CORPORATION

17        1200 L Street MW

18        Washington, DC 20005

19

20   BY:  MICHAEL I. BAIRD

21        KELLY CUSICK

22        GARTH D. WILSON

23

24

25
```

1   ALLEN MATKINS

2        Attorney for LBA Realty, Weingarten Realty

3        And other landlords

4        3 Embarcadero Center, 12th Floor

5        San Francisco, CA 94111-4074

6

7   BY:   IVAN GOLD

8

9   LOCKE LORD LLP

10        Attorney for PBGC

11        111 South Wacker Drive

12        Chicago, IL 60606

13

14   BY:   BRIAN A. RAYNOR

15

16   CHOATE

17        Attorneys for Wells Fargo

18        Two International Place

19        Boston, MA 02110

20

21   BY:   KEVIN J. SIMARD

22

23

24

25

Page 6

1    HALPERIN BATTAGLIA BENZIJA, LLP

2         Attorneys for Relator Carl Ireland

3         40 Wall Street, 37th Floor

4         New York, NY 10005

5

6    BY:  DONNA H. LIEBERMAN

7

8    NIXON PEABODY LLP

9         Attorney for Cascade Water Service

10        Tower 46

11        55 West 46th Street

12        New York, NY 10036

13

14   BY:  CHRISTOPHER J. FONG

15

16   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

17        Attorneys for ABL Agent

18        4 Times Square

19        New York, NY 10036

20

21   BY:  SHANA A. ELBERG

22        PAUL D. LEAKE

23

24

25

Page 7

1   BLANK ROME LLP

2        Attorneys for Kim Properties

3        1825 Eye Street NW

4        Washington, DC 20006

5

6   BY:  JEFFREY RHODES

7

8   BROWN RUDNICK LLP

9        Attorneys for Primark US Corp.

10        7 Times Square

11        New York, NY 10036

12

13   BY:  GERARD T. CICERO

14

15   BARCLAY DAMON LLP

16        Attorneys for Creditors in objections at dockets 2241,

17        2246, 2247, 2248, 2251, 2253, 2255, 2293 and 2294

18        Barclay Damon Tower

19        125 East Jefferson Street

20        Syracuse, NY 13202

21

22   BY:  KEVIN M. NEWMAN

23

24

25

1    NORTON ROSE FULBRIGHT US LLP

2         Attorney for Living Spaces Furniture

3         1301 Avenue of the Americas

4         New York, NY 10019

5

6    BY:  DAVID A. ROSENZWEIG

7

8    K&L GATES

9         Attorneys for Amazon.com Services, Inc. and Affiliates

10        599 Lexington Avenue

11        New York, NY 10022

12

13   BY:  ROBERT T. HONEYWELL

14

15   SEYFARTH SHAW LLP

16        Attorneys for Wilmington Trust, NA as Indenture Trustee

17        and Collateral Agent

18        620 Eighth Avenue

19        New York, NY 10018

20

21   BY:  EDWARD M. FOX

22

23

24

25

Page 9

```
 1   CRAVATH, SWAINE & MOORE LLP
 2         Attorneys for Stanley Black & Decker, Inc.
 3         825 Eighth Avenue
 4         New York, NY 10019
 5
 6   BY:  PAUL H. ZUMBRO
 7
 8   KELLEY DRYE & WARREN LLP
 9         Attorney for Trustees of the Estate of
10         Bernice Pauahi Bishop
11         101 Park Avenue
12         New York, NY 10178
13
14   BY:  ROBERT L. LEHANE
15
16   TRIAX CAPITAL ADVISORS
17         75 Rockefeller Plaza # 14
18         New York, NY 10019
19
20   BY:  JOSEPH E. SARACHEK
21
22
23
24
25
```

Page 10

1    FREJKA PLLC

2         Consumer Privacy Ombudsman

3         420 Lexington Avenue, Suite 310

4         New York, NY 10170

5

6    BY:  ELISE S. FREJKA

7

8    APPEARING TELEPHONICALLY:

9    MATTHEW BREST

10   SONIA E. COLON

11   PAUL E. HARNER

12   COLLEEN MAKER

13   TYAN P. QUINN

14   PRASHANT RAI

15   RYAN P. QUINN

16   STEVEN SMITH

17   PENNY R. STARK

18   ARLENE R. ALVES

19   DEREK J. BAKER

20   NEGISA BALLUKU

21   ELIZABETH A. BELTER

22   LAUREN N. BESLOW

23   DUSTIN T. BRANCH

24   ALIX BROZMAN

25   JONATHAN D. CANFIELD

Page 11

1   PATRICIA CHEN

2   STEVEN H. CHURCH

3   SARA COELHO

4   BRANDON J. CORY

5   ANNE D'INNOCENZIO

6   ANDREW DIAZ

7   JASON DIBATTISTA

8   KELLIE ELL

9   MARK E. FELGER

10  WILLIAM P. FENNELL

11  ADAM FLETCHER

12  DEBORAH L. FLETCHER

13  CHRISTOPHER GARTMAN

14  KIMBERLY B. GIANIS

15  KRISTOFFER GREDSTED

16  TAYLOR B. HARRISON

17  CATHERINE HEIZENRATER

18  ANA LUCIA HURTADO

19  CHRISTOPHER ISIDORE

20  VLADIMIR JESIAVCIC

21  WILLIAM J. JONES

22  KELLY E. KLEIST

23  MATTHEW KOCH

24  MATTHEW I. KRAMER

25  ZACHARY D. LANIER

Page 12

1    BERNICE C. LEE

2    ZACHARY D. LEVINE

3    LAWRENCE A. LICHTMAN

4    MARK LIGHTNER

5    TERESA LII

6    CATHERINE LOTEMPIOR

7    KATHERINE E. MASSEY

8    MAEGHAN J. MCLOUGHLIN

9    STEPHEN MILLER

10   MICHAEL MITTELMAN

11   BRYANT OBERG

12   LINDA A. RIFKIN

13   RITA MARIE RITROVATO

14   LILLIAN A. RIZZO

15   JENNIFER RODBURG

16   CHRISTOPHER SAFAYA

17   JOSEPH E. SARACHEK

18   MICHAEL L. SCHEIN

19   RICHARD M. SELTZER

20   MICHAEL J. SMALL

21   NATASHA SONGONUGAN

22   FREDRICK SOSNICK

23   SEAN C. SOUTHARD

24   CHRIS STAUBLE

25   JOHN STOKKE

1    BRAD SWEENEY

2    MY CHI TO

3    EMILY TOMLINSON

4    DAVID WANDER

5    RAFAEL ZAHRAIDDIN-ARAVE

6    LAUREN E. ZUMBACH

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Sears Holdings Corporation.  Before we

3    begin, I just want to make double sure that Court Call is

4    hooked in, that the people are on there, Court Call

5    operator.

6              OPERATOR:  Yes, Your Honor, we are all set.

7              THE COURT:  All right, because there'd been an

8    earlier email that maybe that wasn't the case.  Okay.  You

9    can go ahead, Mr. Schrock.

10             MR. SCHROCK:  Okay.  All right, good morning, Your

11   Honor.  For the record, Ray Schrock, Weil, Gotshal, and

12   Manges on behalf of the Debtors.

13             THE COURT:  Morning.

14             MR. SCHROCK:  Your Honor, we are here on closing

15   arguments to finish up the summary preceding for approval of

16   substantially all of the Debtors -- sale of substantially

17   all of the Debtors' assets to an ESL owned entity, Transform

18   Co.  Your Honor, I do have a few slides that I'd like to

19   walk through to organize my points and my thoughts.  May I

20   approach?

21             THE COURT:  Sure.  Thanks.

22             MR. SCHROCK:  Your Honor, today is obviously a

23   very important day for Sears and there have been many of

24   those in the short course of this case, but this, in fact,

25   may be the most important day.  Everything depends on it.

Page 15

1    The fate of Sears is going to be in the Court's hands.  We

2    have done everything that we can to save this company over

3    the last several months and as Your Honor may remember, when

4    we first started this case, we put it on a very fast

5    timeline and we knew that it was going to be a tremendous

6    amount of work to even get to this position, but I think

7    even by -- and I think I speak on behalf of all the

8    professionals, the stakeholders involved -- I think

9    everybody would acknowledge it's frankly been even more than

10   that.  It's been extraordinary.

11        We very much are in support of approving the sale

12   to ESL and the primary objections that have been lodged

13   against the sale revolve around whether the sale transaction

14   has been the product of an adequate sale process, the high -

15   - you know, whether it's the highest or best alternative.

16   And we believe that the evidence submitted during the

17   summary proceeding overwhelmingly demonstrates that the

18   Debtors have carried their burden.

19        Now, Your Honor, on Slide 2, we also note that we

20   have addressed a few other key issues at the request of the

21   Court that I'll be covering this morning:  ESL's assumption

22   of $166 million of accounts payable, the potential overhang

23   of warranty liabilities, the Transition Service Agreement,

24   Cyrus' allowance of claims, the "non-credit" bid value for

25   unencumbered assets, clarifying the scope of release for

Page 16

1    ESL, and the KCD administrative claim.  I'll be turning the

2    podium over to Mr. Basta following my comments to cover

3    issues related to the subcommittee and the credit bid and

4    release issues.

5          Last night and this morning, we filed a few

6    documents with the Court.  We did file a form of Transition

7    Services Agreement.  It's in substantially final form.

8    Parties are still working out a few issues, but we believe

9    that it's very close.  We filed the schedules to the asset

10   purchase agreement.  Importantly, these schedules were done

11   at the time of signing the asset purchase agreement and that

12   schedule contains, among other things, a Schedule 1G that

13   demonstrates that the $166 million of accounts payable was,

14   in fact, agreed to be assumed by ESL.

15         And just to put it out there, Judge, this is an

16   important issue.  We have not come to terms with ESL on that

17   particular point.  The Debtors are prepared to close on the

18   contract as written, but we will be asking the Court for

19   Court's guidance on -- we're not going to engage in

20   litigation post-closing.  If ESL's prepared to close on the

21   agreement as written, take the 166, we have a deal.  If

22   they're not, then we don't have a deal, and I think that's

23   where the parties are at the moment but I do have copies of

24   the schedules.

25         THE COURT:  I was going to ask you for that

1    schedule in particular because I think it's 1.1G or 1G.

2            MR. SCHROCK:  Yes, Your Honor.

3            THE COURT:  For other payables.

4            MR. SCHROCK:  So, Your Honor, as it does

5    demonstrate on Schedule 1G -- 1.1G which is defined as other

6    payables --

7            THE COURT:  It just says $166 million.  I assumed

8    accounts payable.

9            MR. SCHROCK:  Yes.

10           THE COURT:  Okay.

11           MR. SCHROCK:  Yes.

12           THE COURT:  It's about a broad as you can get.

13           MR. SCHROCK:  That's about as far as we could get,

14   Your Honor.

15           THE COURT:  Okay.

16           MR. SCHROCK:  I'm taking these a little bit out of

17   order, but on the KCD administrative claim, I do have an

18   important announcement for the Court and parties in

19   interest.  I'm very pleased to report that last evening the

20   Debtors' Restructuring Committee agreed to a settlement

21   terms sheet with the PBGC.  That settlement results in a

22   number of things and a number of benefits for these estates,

23   but it doesn't just resolve their objection to the sale.  It

24   also resolves their claims in these cases.

25               Your Honor, I do have a copy of the settlement

Page 18

1    terms sheet that I'll be prepared to walk through.  I'm

2    going to hand it up to you and we have copies available for

3    parties in interest.

4              THE COURT:  Okay.  Thanks.

5              MR. SCHROCK:  So, Your Honor, this settlement

6    proposal which really is phenomenal, we have come to an

7    arrangement where the PBGC will withdraw their objection to

8    the ESL sale.  This agreement is not contingent upon closing

9    of ESL transaction, but we have agreed and the Debtors have

10   agreed, importantly, that to the consensual termination of

11   the Sears pension plan and the Kmart pension plan effective

12   as of January 31, 2019.  And importantly, this is just an

13   agreement to the Debtors.  This does not affect the

14   obligations or the rights and cannot be used as a sword

15   against non-debtors.

16             There's going to be an agreement on a claim that -

17   - a general unsecured claim that would be held against all

18   Debtors because there is a joint and several claim.  It's

19   been lowered from the asserted amount of roughly $1.7

20   billion to $800 million.  The termination premium is not

21   going to -- the Debtor is not going to be liable for that.

22   And importantly, the PBGC would be willing to support a

23   chapter -- and will support a Chapter 11 plan, subject to

24   approval of a disclosure statement in both their claims in

25   favor of a plan.

Page 19

1           The PBGC, which holds -- which has a director at

2  KCD will also take steps with the Debtors to ensure that any

3  claims of KCD against the Debtors are waived in total.  So

4  importantly, the $111 million claim that's been talked about

5  and then I think the Committee's witnesses, the Debtor, and

6  myself have said, listen, this is an administrative claim.

7  That claim --

8           THE COURT:  Well, potentially want.

9           MR. SCHROCK: Potentially want, is in fact

10  resolved.  Because of the steps that the PBGC has taken in

11  conjunction with the sale because of the steps they're

12  taking to assist with all of the issues with the

13  administrative -- purported administrative claim, the

14  substantial reduction and their allowed claim as a general

15  unsecured claim for 1.6 down to roughly $800 million, we are

16  agreeing that under the terms of a plan, that they would

17  have a priority right to $80 million of net proceeds and

18  litigation actions.

19           There's also a release, and this is subject to

20  documenting this and moving forward for approval on

21  settlement.  Now importantly, that settlement is not up for

22  approval today, but I think for purposes of this hearing,

23  Your Honor, what matters is the PBGC withdrawing its

24  objection and the Debtors, we believe we have a path forward

25  to resolve the KCD administrative claim.  Nothing's

Page 20

1    guaranteed and nothing's guaranteed in this case on

2    administrative solvency and on any ESL nor is it guaranteed,

3    certainly, in a winddown.  There's heavy risk, in our view,

4    around the winddown and we'll talk more about that.

5              THE COURT:  So you'll be seeking approval of this

6    settlement.

7              MR. SCHROCK:  Mm hmm.

8              THE COURT:  The aspects that are in effect

9    immediately.

10             MR. SCHROCK:  That's correct.

11             THE COURT:  I'm assuming reasonably promptly;

12   although, maybe it'll be in the context of seeking approval

13   of a plan, maybe it'll be separate.

14             MR. SCHROCK:  Yeah, I would expect, Your Honor,

15   we're going to document a plan and likely a restructuring

16   support agreement promptly and be moving forward with

17   approval.  We're also going to sit down with the Committee

18   on the terms of a plan.  So we haven't worked out precisely

19   if it's going to be in the context of the plan or separate,

20   but we'll be moving forward promptly.

21             THE COURT:  Okay.  Now, I know counsel for the

22   PBGC has participated.  Is that a fair summary of the

23   settlement?  I mean, I have the signed terms sheet, but...

24             MR. RAYNOR:  Good afternoon, Your Honor.  For the

25   record, Brian Raynor on behalf of the PBGC.  Everything that

Page 21

```
 1    Mr. Schrock said is consistent with the terms sheet and one

 2    obligation under the terms sheet is to formally withdraw our

 3    objection to the sale and I'd like to do that on the record

 4    right now.

 5              THE COURT:  Okay.  Very well.  Thank you.

 6              MR. RAYNOR:  Thank you, Your Honor.

 7              THE COURT:  Okay.

 8              MR. SCHROCK:  So, Your Honor, moving on from the

 9    PBGC settlement, that -- you know, we think the evidence in

10    this matter is very much largely uncontroverted.

11              THE COURT:  I'm sorry, can I --

12              MR. SCHROCK:  Yes.

13              THE COURT:  Can I go back to your Slide --

14              MR. SCHROCK:  Which one?

15              THE COURT:  -- Number 1.  You mentioned a

16    Transition Services Agreement and I haven't had a chance to

17    review that yet.  Is it essentially neutral to the Debtors?

18    Are the Debtors performing obligations under it that they

19    can't perform because they don't have the money to do so or,

20    alternatively, are they relying on ESL to perform

21    obligations that they don't have the money to do so?

22              MR. SCHROCK:  Your Honor, I think it's fair to

23    say, like most Transition Services Agreement, it's a

24    framework for the parties to work together over the near

25    term.  And given the pace at which this is closing, there
```

Page 22

1    are some things that ESL needs from the Debtor such as

2    Transform Co. is not licensed to conduct business and

3    they're going to need to use the Debtors' licenses.  They're

4    agreeing they're leasing the Debtors' employees.  We're

5    getting access to books and records to finish the conduct of

6    the case.  There is agreement from the Debtors for some cash

7    payments over the next 60 days for the use of, basically,

8    facilities, conducting GOBs, liquidating inventory.

9             THE COURT:  Cash payment by the Debtors.

10            MR. SCHROCK:  By the Debtors.

11            THE COURT:  In respect to the sold assets.

12            MR. SCHROCK:  Yes, over the next 60 days.  Now, we

13    can agree to extend that 60-day timeframe.  We can come to

14    an agreement as is common.  I don't -- one thing is for

15    certain, Your Honor, and like every other Transition

16    Services Agreement I'm very confident that the parties are

17    going to have to supplement it because as -- if we are

18    fortunate enough to close the transaction tomorrow, parties

19    are going to need to be able to work together.

20            THE COURT:  No, I understand that.  I just want to

21    make sure that it's essentially neutral, that the benefits

22    the Debtors are getting out of it are no less than what

23    they're paying for and vice versa.

24            MR. SCHROCK:  That is very much the --

25            THE COURT:  That the benefits ESL's getting out of

Page 23

1   it are going to be paid for by ESL.

2          MR. SCHROCK:  That is very much the intent, Your

3   Honor.

4          THE COURT:  Okay.

5          MR. SCHROCK:  So there is -- there are modest cash

6   payments from the company coming out of that, but, you know,

7   when you go through all of the back and forth --

8          THE COURT:  But is the company providing services

9   to ESL that it isn't being compensated for that?

10         MR. SCHROCK:  It's all being taken into account in

11  terms of the back and forth, in terms of who's providing

12  what services.  At the end of the day, there's a net payment

13  coming from the Debtors.

14         THE COURT:  Right.

15         MR. SCHROCK:  But we believe that it's a fair

16  compromise in light of what's being required from all the

17  parties on each side.  But primarily, we're going to need

18  access to somewhat transform those transform those assets to

19  liquidate them.

20         THE COURT:  Well, as far as the services that the

21  Debtors are providing, will they have the resources to

22  provide those services?

23         MR. SCHROCK:  Yes, Your Honor.

24         THE COURT:  And/or be paid for it if they don't?

25         MR. SCHROCK:  Yes, Your Honor.

Page 24

1            THE COURT:  Okay.  Is that ESL's understanding,

2      too?

3            MR. BROMLEY:  Your Honor, James Bromley from

4      Cleary Gottlieb on behalf of ESL.  So, the answer is yes,

5      the TSA is structured in a way that the Debtors will be

6      paying $1.25 million a month during this period of time,

7      subject to extension, to ESL for a vast host of services,

8      the cost of which is much in excess of the 1.25.  For the

9      services that the Debtors are providing back to ESL,

10     there'll be a payment from ESL of $250,000 a month.  So the

11     net is a million dollars a month during that period of time,

12     the 60 days subject --

13            THE COURT:  Okay.

14            MR. BROMLEY:  -- to extension.

15            THE COURT:  And the primary services are, in

16     essence, being able to do GOB sales?  I mean, is that

17     keeping the -- access to the properties?

18            MR. BROMLEY:  There's a variety of things.  That's

19     one of them, Your Honor.  But upon closing, assuming that

20     the sale closes, nearly all of the Debtors' operations will

21     be transferring to the buyer and the Debtor needs some of

22     the services back in order to continue its operations in

23     winddown.

24            THE COURT:  Okay.

25            MR. BROMLEY:  So in that sense, ESL or the NewCo

Page 25

1  will be providing those services back to the estate.

2          THE COURT:  All right.

3          MR. BROMLEY:  And in terms of the cost neutral

4  element of it, the cost of providing the services by NewCo

5  is far in excess of the net million dollars that's going to

6  be paid by the Debtor.

7          THE COURT:  Okay.

8          MR. SCHROCK:  And from the estate's perspective,

9  Judge, the primary thing that we believe we're getting, I

10  mean access to books and records, we don't think that's

11  something --

12          THE COURT:  No, that's not a big -- I mean, that's

13  in the contract.

14          MR. SCHROCK:  That's in the contract.  It's not

15  really a big deal.

16          THE COURT:  Right.

17          MR. SCHROCK:  But we need access to finish GOBs,

18  to bring those assets into the estate --

19          THE COURT:  Right.

20          MR. SCHROCK:  -- they need from us licensing.

21  That's the real trade here over the next 60 days, but when

22  we did the math --

23          THE COURT:  And they're taking some of your -- or

24  all of your people, primarily, or almost all of them, so --

25          MR. SCHROCK:  Almost all the people.  Yes.

Page 26

1           THE COURT:  So some of them will continue to

2    provide the services you need related to the winddown of the

3    --

4           MR. SCHROCK:  Well --

5           THE COURT:  -- rest of the case.

6           MR. SCHROCK:  Yes, Your Honor.  Well, importantly,

7    we are agreeing to -- we leasing employees, in fact, to --

8    under the Transition Services Agreement, to Transform Co.

9    over the near term.  So those employees are still going to

10   be technically the Debtors' employees for a period of time

11   until they get their systems up and running.

12          THE COURT:  Okay.  And the -- you have some other

13   things on here.  Are you going to get to those later or do

14   you want to cover them now?  The overhang on warranties, the

15   Cyrus --

16          MR. SCHROCK:  Yeah --

17          THE COURT:  -- release.

18          MR. SCHROCK:  So, Your Honor, we can take those

19   out of order.  So on the potential overhang on warranties,

20   if Your Honor were to turn to Slide 27, there's a provision

21   in the agreement that pending the transfer of the KCD notes

22   --

23          THE COURT:  I'm sorry, so this isn't anything new?

24          MR. SCHROCK:  No --

25          THE COURT:  I just want you to summarize anything

Page 27

 1   new.  I'm not --

 2              MR. SCHROCK:  Okay, okay, yeah --

 3              THE COURT:  I'm sorry, I didn't want to have you

 4   get out of the order.

 5              MR. SCHROCK:  That's just a clarification under

 6   the agreement.  That's already handled.

 7              THE COURT:  All right.

 8              MR. SCHROCK: Yeah, so --

 9              THE COURT:  Okay.

10              MR. SCHROCK:  Going through this list --

11              THE COURT:  Yes.  If there's anything new on here

12   as opposed to just explaining each part of the oral

13   argument, you should let me know.

14              MR. SCHROCK:  The scope of the release is the only

15   other thing that I think Mr. Basta will address that after -

16   -

17              THE COURT:  Okay.  And related to that is Cyrus, I

18   guess, clarifying that.

19              MR. SCHROCK:  That's right.  But Cyrus, again, is

20   just -- I'll handle it in argument --

21              THE COURT:  Okay.

22              MR. SCHROCK:  -- Mr. Basta, but it's --

23              THE COURT:  All right.

24              MR. SCHROCK:  It's, literally, nothing changed.

25              THE COURT:  Okay.

1           MR. SCHROCK:  Your Honor, moving forward on Slide

2      3, the evidence in this matter is largely uncontroverted in

3      favor of a number of conclusions, including that the sale

4      transaction is subject to the business judgment standard and

5      that we meet the standard of a valid exercise of the

6      Debtors' business judgment.  The sale process was thorough,

7      competitive, and a highly public process carried out in

8      compliance with Court's approved global bidding procedures.

9           The sale transactions' superior to the winddown

10     alternative and Transform Co. has provided adequate

11     assurance of future performance.  Your Honor, the legal

12     standard is set out in 363(b)(1), that the Trustee after

13     notice and hearing may use, sell, or lease other than in the

14     ordinary course, the property of the estate.

15          Courts in this circuit and others in applying this

16     section have required that the sale of the Debtors' assets

17     must be based on the sound business judgment of the Debtor.

18     Now, where the transaction is negotiated or supervised by an

19     independent fiduciary such as the Restructuring Committee,

20     the business judgment standard, we believe, undoubtedly

21     continues to apply.

22          This is an unusual auction, Judge, in that in

23     every other auction, I think certainly that I've been

24     involved in, you are comparing two live bidders, one bid

25     being -- you know, could be a going concern bid and another

Page 29

```
 1    bid, at least if there's a liquidation alternative, there's

 2    at least a liquidator that's really putting up cash, that's

 3    providing real value.  Here, the company only had one

 4    qualified bid, okay, for the auction, for a going concern

 5    sale.  We were comparing it to a winddown alternative run by

 6    the Debtors, okay, and we took that obligation very

 7    seriously nevertheless, but I do think it's worth noting

 8    that the only qualified bid was for -- was from ESL and

 9    Transform Co.

10              THE COURT:  Can I explore that a little bit?

11              MR. SCHROCK:  Sure.

12              THE COURT:  There really was not a whole lot in

13    the record on this, but the prior hearings leading up to the

14    auction referenced the Debtors' soliciting, in essence, bulk

15    bids from liquidators.

16              MR. SCHROCK:  Yes.

17              THE COURT:  And the Debtors announced their

18    conclusion that their retained liquidator, Abacus, actually

19    had the best of that lot, of that group.  Abacus -- when you

20    refer to Abacus being the best of that group, is that just

21    based on the terms of Abacus' retention?

22              MR. SCHROCK:  It is, Your Honor.  Based on the

23    terms of Abacus' retention and when we were looking at so-

24    called equity bids from liquidators where they were actually

25    going to be purchasing the assets, the recoveries that could
```

Page 30

```
 1    be had on the company's assets was simply superior under a

 2    company-run GOB, and I don't really think that issue is in

 3    controversy by any of the stakeholders.

 4             THE COURT:  Well, certainly no one has raised the

 5    argument that any of the liquidators made a higher or better

 6    bid.

 7             MR. SCHROCK:  Yeah.

 8             THE COURT:  But I -- those proposals including the

 9    Abacus one, did they include Abacus running anything more

10    than GOB sales; i.e., did they assume that the company would

11    be -- that the Debtors would be marketing the real estate

12    assets separately from the liquidators?

13             MR. SCHROCK:  Your Honor, there were various

14    permutations of those bids and the Debtors actually ran an

15    informal auction during the first week of January among the

16    liquidators in the event that we were going to go the GOB

17    route.  The result of that auction --

18             THE COURT:  Right, and you announced that.

19             MR. SCHROCK:  Yeah.  And the result of that was

20    that Abacus was a higher or better bid, but we don't have

21    deposits, qualified bids from liquidators and I think that

22    all the parties and the Committee and the Debtors certainly

23    agreed that the recovery under -- it was in Abacus and we

24    also supplemented with SB360 -- Schottenstein, the

25    Schottenstein-run venture to provide additional capacity
```

Page 31

1   that those two parties running the GOBs with the Debtors

2   would provide the highest recoveries and that's what we were

3   comparing in the context of the auction in the winddown

4   alternative.

5          THE COURT:  But I guess my question is, the Abacus

6   terms, were those set forth in their retention, right, they

7   didn't change those?

8          MR. SCHROCK:  Yes, Your Honor.

9          THE COURT:  Except maybe they added SB360, which

10   sounds like a product that Sears would be selling as opposed

11   to a firm, but --

12          MR. SCHROCK:  Yes, Your Honor.  So that -- the

13   answer is yes.

14          THE COURT:  Okay.

15          MR. SCHROCK:  It was very modest --

16          THE COURT:  So --

17          MR. SCHROCK:  -- and --

18          THE COURT:  So can I interrupt you?  As I remember

19   that retention, they didn't take on the responsibility to

20   market real estate.  It was really straight GOB.

21          MR. SCHROCK:  That's correct.

22          THE COURT:  Okay, so --

23          MR. SCHROCK:  That's right.

24          THE COURT:  So when you compared the various ESL

25   proposals including the one that was ultimately accepted, to

Page 32

1   a liquidation alternative, it was a combination of Abacus,

2   GOB sales, and the Debtors' marketing of real estate?

3          MR. SCHROCK:  That's correct, Your Honor.  So we

4   used a combination of -- as provided in the testimony from

5   Mr. Meghji as well as Mr. Welch -- the combination of

6   appraisals that we had conducted for assets as well as

7   indications of interest received and comparing how we would

8   receive --

9          THE COURT:  I guess there're some miscellaneous

10   assets like potential litigation claims, credit card

11   antitrust issue that -- litigation, that sort of thing but

12   it was primarily GOB and real estate.  And you're still

13   doing the GOB.

14          MR. SCHROCK:  We are still doing the GOBs, Your

15   Honor.

16          THE COURT:  All right, so it largely comes down to

17   the real estate.

18          MR. SCHROCK:  That is it.  I think that when you

19   really looked at the differences between the Committee's

20   assumptions and the Debtors' assumptions around the

21   winddown, it really did, in our view, come down to the real

22   estate.

23          THE COURT:  Okay.

24          MR. SCHROCK:  You had from the one perspective,

25   the Debtors' valuations that are in the record.  They are

Page 33

1   uncontested.  And during Mr. Greenspan's live testimony, he

2   retracted his two important criticisms of the Welch

3   declaration and lessened his valuation by $50 to $90

4   million.

5            I note that Mr. Greenspan also was assuming what I

6   can only say is just a process that's not bound in reality

7   or 365(d)(4) of the Bankruptcy Code that you can liquidate

8   leases over the course of 20 to 24 months and saying you're

9   going to assume those leases and put them in a trust, I

10  think, just does not recognize what the legal restrictions

11  are and the assumption and assignment under the Bankruptcy

12  Code.

13           And as Mr. Welch further explained, the discounts

14  applied by M3 related to the real estate were reasonable

15  because they accounted for an unprecedented expedited bulk

16  sale of big box properties from a distressed seller.  In

17  fact, Mr. Greenspan himself testified that a sale of the

18  properties of the magnitude contemplated by the Debtors was

19  unprecedented.  The liquidation winddown analysis reasonably

20  values the real estate.

21           We think the Toys experience does support our

22  valuation, but I do believe that overall when you look at

23  the appraisals and the rigor through which the Debtors put

24  all of these properties through that test demonstrates that

25  the ESL -- and we'll talk more about it -- was, in fact,

Page 34

1    much greater for all of the creditors, writ large.

2          Your Honor, in Slide 5, we talk a little bit about

3    the marketing process, and I think it's really worth noting

4    that Mr. Aebersold's testimony in this matter is largely

5    uncontroverted.  Their initial phase was designed to provide

6    a large number of potential purchasers with information.  We

7    engaged with over 250 potential investors, 128 under NDA.

8    It was extraordinary.

9          The Debtors' and their buyers responded to several

10   hundred diligence questions, held over 40 formal diligence

11   calls and in-person meetings.  In multiple formal meetings

12   and numerous other informal discussions with the UCC, the

13   Debtors outlined their marketing strategy, shared the

14   identify of prospective bidders, facilitated in-person

15   meetings with management, and gave the opportunity to review

16   and comment on proposed purchase agreements for prospective

17   bidders.

18          Now, the UCC had the opportunity to ask Mr.

19   Aebersold about the sales process but they really didn't ask

20   a single question, I believe, about that process and they

21   cannot now challenge that process with the evidence closed.

22          THE COURT:  Well, can I interrupt you on that?

23          MR. SCHROCK:  Sure.

24          THE COURT:  You're about to go to a different

25   point.  Turning back the real estate, the Creditors'

Page 35

1    Committee asserts that the Debtors did not run a real estate

2    auction, per se.  They instead ran an auction where they

3    posited their assumed values for the real estate as a

4    counter to the one going concern proposal that was

5    qualified, which was the ESL proposal.

6              And they suggest that if you had run a parallel

7    real estate auction, that instead of the relatively modest

8    number of expressions of interest and/or -- well,

9    indications of interest, you would've gotten a much bigger

10    number.  And I guess my question is, why wasn't that done

11    and could it have been done?

12             MR. SCHROCK:  Yes, Your Honor.  I think, with due

13    respect to my friends on the Committee, I think that they

14    have a selective memory on this issue because when we first

15    undertook the global sale process and had it approved, we

16    were very open with the Committee, we were very open with

17    all parties that we have to do what's within the realm of

18    the possible.  So we'd set up the case so we had a chance to

19    run a process, an expedited process on a going concern sale.

20             We told parties in -- during December that if they

21    wanted to put in indications of interest for the Debtors to

22    consider, that we would certainly -- that we would consider

23    them, but as we told the Committee, we were going to be

24    relying also on nonbinding indications of interest which

25    were due by the 28th and the Debtors' appraisals in

Page 36

1    comparing the market value.  We have plan exclusivity.

2            We think that the record -- that you don't have to

3    run a full real estate process and I think, frankly,

4    marketing 500 properties in this amount of time, when you

5    talk about what's within the realm of the possible, Your

6    Honor, in our judgment  -- and we have a lot of people

7    working on this matter -- that was not possible to run a

8    full real estate process simultaneously with running the

9    going concern process.  But we did test the market.  The

10   evidence is uncontroverted on exactly what the Debtors did

11   do.

12           I think that if -- you know, we were in contact

13   with the Committee during this time, we had a global asset

14   sale procedure process that we followed to the letter with

15   the Court and, Your Honor, during that process we found that

16   there was one -- effectively one qualified bid.  But those

17   nonbinding indications of interest, you know, we didn't have

18   a lot of deposits.  We didn't have a lot of serious offers.

19           It was our contemplation that if we weren't able

20   to have a going concern sale, because we looked at the

21   values and we made, we though, generous assumptions around

22   the real estate, that if we couldn't really substantially

23   reduce claims, have a going concern opportunity, either in

24   whole or part by selling divisions or selling the whole

25   business, that then in fact we would have to pivot during

Page 37

1    the winddown process to a full real estate liquidation

2    process.

3              THE COURT:  Okay.  So, I mean, let me make sure I

4    understand this.  To summarize, I guess this is consistent

5    with both Mr. Welch and Mr. Greenspan's testimony, you're

6    saying you could not run an actual real estate sale process

7    in the roughly month-and-a-half, two months that you had.

8    In fact, the minimum time for such a process would be four

9    months and according to Mr. Greenspan it would have to be

10   over a year.

11             MR. SCHROCK:  That's right, Your Honor.

12             THE COURT:  So you did, instead, recognizing that

13   time was valuable here and recognizing the risks of going

14   with just a going concern process without some reality check

15   beyond appraisals which is -- real estate is not like

16   valuing tech assets or -- real estate's real estate.  You

17   can do a pretty good valuation of real estate.

18             You did indicate strongly to those who might

19   believe that a liquidation process with the sale of the real

20   estate would be better to actually put their best foot

21   forward and make at least indications of interest, which is

22   frankly what I said, too, during the hearing on the approval

23   of the sale procedures, looking right at counsel for various

24   potential buyers of real estate and the Creditors'

25   Committee; i.e., if you really believe this, put your best

Page 38

1    foot forward and make a proposal.  Okay.

2            MR. SCHROCK:  And, Your Honor, building on that,

3    on Slide 6, we do note that -- and it's really worth

4    emphasizing -- this is a process that was conducted pursuant

5    to the Court-approved global bidding procedures.  We have

6    followed those procedures throughout the case.  The record

7    is uncontroverted on that piece.  We had -- we determined

8    what is a successful bid consistent with the global bidding

9    procedures, which qualified bids constitute the highest or

10   best qualified bids.  And pursuant to the auction rules,

11   that was determined in the business judgment of the Debtors.

12           We also had an independent Chief Restructuring

13   Officer that the Court heard from, Mr. Meghji, an

14   independent Restructuring Committee.  You've heard from both

15   of the subcommittee members.  They were all very active

16   during this process.  And, Your Honor, on Slide 7 we do note

17   that there -- I think the record is wholly uncontroverted

18   that the Restructuring Committee here is independent and

19   having certainly live through this, Your Honor, I can vouch

20   that it very much is.

21           There's a couple of anecdotes here just in regard

22   to that, that the testimony of Mr. Carr as well as Mr.

23   Transier is that they did not have any association or

24   interactions with Mr. Lampert prior to joining the board.

25   We put together an independent Restructuring Committee.  I

Page 39

1    think ESL knew that if they, given their position within the

2    capital structure that this is going to be necessary, but

3    there's no personal or business relationship either prior to

4    or since that time with either of the Subcommittee members.

5           This independent Restructuring Committee

6    negotiated with the authority to negotiate and approve the

7    ESL transaction, and the record in these proceedings is that

8    the Restructuring Committee was actively involved.  No less

9    than 58 times prior to the proposed ESL transaction being

10   approved did the Restructuring Committee meet since being

11   formed in October 2018, and these were not short meetings.

12   These were lengthy, involved meetings, numerous in-person

13   meetings.  The directors, the professionals, everyone took

14   their job extremely seriously and their responsibilities to

15   these estates.

16           Mr. Aebersold further testified that consistent

17   with his experience, that the sale process was extensive.

18   We have you some anecdotes to that earlier and that to his

19   knowledge and based upon his observations and experience,

20   the auction was conducted in good faith and the sale process

21   provided a fair and reasonable opportunity to purchase

22   components of substantially all the Debtors' assets and

23   operations.  That evidence is uncontroverted.

24           And further, Your Honor, in talking about how

25   independent this Committee was, Committee formally voted to

Page 40

1    reject separate bids by ESL on at least two occasions.  This

2    was, in my experience, very unusual.  I mean, it's a very

3    tight transaction, I think, for ESL as well as the estate,

4    but this is not something where anyone was pandering to

5    anyone at ESL and there's certainly no record to support

6    that.  We think the sound business justifications here are

7    consistent with the caselaw in the Second Circuit.

8         We'd point to Chrysler among others, but there's -

9    - in announcing and looking at what types of consideration

10   that the Court would consider, I think it's worth

11   reiterating just looking at what ESL and Transform Co. are

12   providing.  They're committing approximately $5.2 billion in

13   the form of cash and noncash consideration including a cash

14   payment of approximately $885 million.  There's a credit bid

15   pursuant to 363(k) of the Bankruptcy Code of secured debt

16   facilities totally approximately $1.3 billion.  There's the

17   assumption of $621 million of senior debt including $350

18   million of the amounts owed under the Junior DIP facility

19   and $271 million of the stand-along LC facility.

20        Those are all senior claims to general unsecured

21   creditors.  There's further, the assumption of certain other

22   of the Debtors' liabilities in the total amount of

23   approximately $1.3 billion including liabilities for

24   warranties and protection agreements or other service

25   contracts, certain customer credits to existing customer

Page 41

1   loyalty programs, the Shop Your Way program.  All cure costs

2   are being assumed by ESL.  There's up to $43 million of

3   certain severance reimbursement obligations.  There's up to

4   $139 million of 503(b)(9) claims, and just to hit that for

5   Your Honor, you'd asked what's the mechanism to do that.

6        The Debtors are obligated to reconcile those

7   claims and there's not an independent right of claimants to

8   go after ESL, but ESL is obligated to the estate to pay

9   those 503(b)(9) claims upon the earlier of 120 days and

10   confirmation of a plan.  Our experience -- and we do have an

11   $80 million winddown budget that's built into how we intend

12   to finish these cases -- it's our expectation that we'll do

13   the reconciliation, finish the reconciliation around the

14   503(b)(9) claims.

15        We don't expect a lot of costly litigation,

16   certainly, around the 503(b)(9) claims, but those claims are

17   going to be paid by ESL at confirmation of the plan.

18        THE COURT:  The $89 million winddown budget, is

19   that included in the projections that Mr. Meghji went

20   through on the --

21        MR. SCHROCK:  Yes.

22        THE COURT:  -- solvency analysis?

23        MR. SCHROCK:  It is, Your Honor.

24        THE COURT:  Okay.  So the Debtors will be

25   reconciling those claims, potentially objecting to them.

Page 42

1    Many of those claimants, I would assume, would have an

2    ongoing relationship with -- if I approve the sale -- the

3    buyer.

4              MR. SCHROCK:  That's right.

5              THE COURT:  Is it contemplated that there are

6    going to be some interactions since the buyer's liable for

7    them, in how to resolve those claims?

8              MR. SCHROCK:  There's going to be a lot of

9    interaction, Your Honor, and I think one thing that ESL and

10   the Debtors do recognize, if the sale's approved and we

11   close tomorrow, it's still all the same people that are

12   really doing this work at the company and we're going to be

13   working together and the TSA, the Transition Services

14   Agreement, certainly contemplates that we're going to

15   cooperate, work in good faith to finish the administration

16   of the cases.  ESL is heavily incentivized.

17             They're still a very large claimant as is Cyrus in

18   these estates to have these cases administered efficiently

19   and I don't want that to be lost on the Court.  They still

20   have claims in these cases.  They still have every incentive

21   to cooperate.  They still have every incentive to work with

22   the company to minimize the costs associated with the

23   administration of the estate.

24             But when I look at what are the noncredit bid

25   items that are really being provided for unencumbered assets

Page 43

1    -- and I'm looking at Slide 13 and 14 -- all of these

2    liabilities -- okay, it's just the one -- you just have the

3    one credit bid item, but paying off senior debt, okay,

4    before unsecureds are going to be paid, the assumption of

5    all of these liabilities, the cure costs, these are all

6    things that we negotiated for in order to ensure that these

7    are unsecured claims that are getting paid:  property taxes,

8    environmental liabilities.  The mechanics' liens are senior

9    secured claims.

10             So they're all either senior or parry with general

11   unsecured creditors, but there's a lot of -- we focused on

12   the exit facility, but there's cash being paid for these

13   senior claims.  And when we look at Cyrus, Your Honor, Cyrus

14   is rolling the entire Junior DIP facility.  They went out

15   and purchased the rest of it, repurchased the claim.  They

16   put it -- and it's part of the exit financing for this

17   company upon emergence.

18             And I think that if you didn't give them something

19   in terms of an allowance of claim we would be defeating the

20   very purpose of doing this transaction because the Committee

21   could simply -- or any party could, frankly, just go

22   challenge Cyrus' claims for recharacterization.

23             So although ESL can technically drag other parties

24   within their facility along for a credit bid, if you think

25   about it, if they didn't have the ability to credit bid, if

Page 44

1    that wasn't part of the release for Cyrus, you could move to

2    recharacterize, go after those Cyrus claims and undo the

3    very transaction that we're trying to accomplish here.

4              So we have to have certainty of closing and we

5    thought that -- Your Honor, they're still liable.  The scope

6    of the release is just related to the credit bid, okay?

7    It's not -- and the allowance of their claims.  It's not any

8    broader than that and for the transaction even to work, for

9    the transaction to close, we had to provide that.

10             But we did take that into account in looking at,

11   you know, Cyrus is a very substantial claimholder.  They've

12   come into this process.  Nothing's going to affect the

13   investigation and the ongoing claims that the estate has

14   other than just related to that credit bid and we think at

15   the end of the day that was a very fair compromise as part

16   of this transaction.

17             THE COURT:  So it wouldn't pertain, for example,

18   if it turned out -- I have no view on whether it will turn

19   out this way, but if it turned out that the sale of the MTN

20   notes --

21             MR. SCHROCK:  Right.  Nothing --

22             THE COURT:  -- was somehow collusive, then that's

23   not being released.

24             MR. SCHROCK:  That is not being released.

25   Avoidance actions, not being released.  The only thing is

Page 45

1    just, again, it's consistent with the scope of the ESL

2    release and I think Mr. Basta will be hitting some of those

3    points.  Your Honor, on Slide 15 just to point it out, when

4    you look at the benefits of the wind -- the risks of the

5    winddown --

6             THE COURT:  I'm sorry, can -- before you get to

7    that slide --

8             MR. SCHROCK:  Yeah.

9             THE COURT:  So you were talking about the amount

10   of consideration in addition to the credit bid.

11            MR. SCHROCK:  Yes.

12            THE COURT:  When you look at a -- this is a

13   question for both sides.  When you look at the presumed

14   value or assumed value of the unencumbered assets, the

15   assets that, in other words, that ESL/Cyrus don't have a

16   lien on, how do they match up?  Because you can't credit bid

17   on something you don't have a lien on, so that means you

18   have to pay something else for it.

19            MR. SCHROCK:  Yes.  Of course, Your Honor.  So a

20   couple of things here.  I mean, of course when we're

21   comparing it to the alternative in the winddown, we don't

22   have the luxury of just assuming you just get all of those

23   amounts, of course.  We have to look at them in the context

24   of the winddown analysis and the continued burn that would

25   occur and costs that would be incurred that are senior to

Page 46

1    those unsecured claims.

2            But to answer your question directly, I think it's

3    fair, Your Honor.  The credit bid is $1.3 billion.

4    Everything else here, Your Honor, payment of claims that are

5    senior to unsecured creditors.  Okay, those all have to be

6    paid regardless of whether or not we're here, we're in

7    winddown --

8            THE COURT:  So just to cut through it, just to do

9    the math, you're saying that basically it's the total value

10   of the ESL deal is $5.2 billion if you subtract a billion

11   three from that --

12           MR. SCHROCK:  That's right.

13           THE COURT:  -- there's $3.9 billion of value

14   provided for the unencumbered assets.

15           MR. SCHROCK:  That's right.

16           THE COURT:  Has anyone placed a value on the

17   unencumbered assets anywhere close to $3.9 billion?

18           MR. SCHROCK:  No, Your Honor.

19           THE COURT:  Okay.

20           MR. SCHROCK:  Your Honor, we think it's

21   unquestionable that the benefits of a sale transaction

22   outweigh --

23           THE COURT:  I'm sorry, can I interrupt you again?

24           MR. SCHROCK:  No, please.

25           THE COURT:  We went --

1           MR. SCHROCK:  That's why I'm here.

2           THE COURT:  You were going through the sale

3    process and the conduct of what people have referred to as

4    the auction here.  One of the provisions of the sale

5    procedures order, all of which are waivable in the exercise

6    of fiduciary duties, is to require qualified bidders to

7    provide an allocation of what they're -- what assets they're

8    paying what for.  It's uncontroverted that ESL did not do

9    that.  I have traditionally viewed --

10          MR. SCHROCK:  We waived it, Your Honor.

11          THE COURT:  You waived that condition?

12          MR. SCHROCK:  We did.

13          THE COURT:  I have viewed that condition which

14   appears in sale orders generally as serving the purpose of

15   letting a seller, the Debtor, and its constituents value a

16   global proposal as against piecemeal proposals so that you

17   can slice and dice the auction to see whether some

18   combination of bids will equal a global bid or a reduced

19   global bid.

20          It also, though, does have the benefit of giving

21   you the Debtors' -- giving you the buyer's viewpoint of what

22   the -- when the buyer's a credit bidder -- of what the

23   unencumbered assets are.  But maybe you can just tell me,

24   why did you waive it here?

25          MR. SCHROCK:  Your Honor, at the end of the day,

Page 48

1    we didn't have qualified bids for even sections of the

2    business and when we looked at this in total, and given that

3    the structure of the auction was going to be comparison of

4    the Debtors looking at a going concern versus a winddown,

5    while we did have some indications from ESL around

6    allocations and a view, we had to take -- and I think it's

7    fair to take -- we took a global view as to what

8    consideration was being provided to the company and we

9    understood that the entire business would have to be valued

10   as a whole.

11          But given that we didn't have any particular bids

12   or qualified bids for particular divisions, that wasn't as

13   much of a concern for the company.

14          THE COURT:  Okay.

15          MR. SCHROCK:  So the benefits of the sale

16   transaction really do significantly outweigh an orderly

17   winddown.  And, Your Honor, I know there's been press around

18   the Debtors' severance obligations and what we were doing.

19   I do want to make clear for the record that under either

20   scenario, the Debtors were honoring severance obligations.

21   Those claims are administrative claims in these cases under

22   governing Second Circuit -- Second Circuit precedent.

23          We deliberately made sure that -- and it was one

24   of the primary purposes around having the winddown, to make

25   sure we could pay severance claims.  But we are entitled to

Page 49

1    take into account in turning a highest or best offer, not

2    just the economic points.  And people make light of it, but

3    there's 45,000 people out there that are working for this

4    company, and it matters.  These people will have jobs.  As a

5    going concern, we've got uncontroverted testimony from Mr.

6    Kamlani about the steps that they're taking with this

7    business plan.

8           This business plan is being financed by major

9    commercial banks.  They and we are true believers in a going

10   concern for sales -- for Sears, rather.  In a winddown,

11   we're going to lose all those jobs.  With the exception of

12   probably a few stores and perhaps in Guam, Puerto Rico where

13   there, you know, have some highly profitable operations, we

14   would have to GOB them and we'd see that certain businesses

15   could be possibly be sold in divisions, in parts.

16          But, Your Honor, this truly is -- like many

17   retailers, it's a melting ice cube and the timing is so

18   urgent, and we saw that even with the Services.com purchase

19   of Parts Direct, which ended up with them not closing.

20   We're now going to end up having to argue with them around

21   the return of the deposit.  But we saw, and we believe the

22   evidence is uncontroverted, that there were significant

23   risks around the winddown.

24          The protection agreement liabilities are going to

25   be honored in a sale transaction.  In a winddown, they would

Page 50

1    very likely be rejected unless we could find somebody to

2    take those liabilities and basically sell that part of the

3    business for zero or negative value.

4            THE COURT:  Well, while we're on this subject of

5    the protection of the warranty, the protection agreements,

6    there was some discussion yesterday about the risk that

7    there would be a delay in the approval of the KCD --

8            MR. SCHROCK:  Yes.

9            THE COURT:  -- transfer.  I thing your

10   announcement of the PBGC resolution somewhat ameliorates

11   that or more than somewhat, but you still have to go to a

12   third party to get approval.  How is the risk allocated

13   pending that approval?

14           MR. SCHROCK:  So, Your Honor, we've handled that.

15   If you take a look at Slide 27, section -- this is handled

16   in Section 2.8B of the Asset Purchase Agreement which states

17   that from the closing date until such time as the transfer

18   of the KCD notes and the assumption of purchase agreement

19   liability occurs, the buyer provides services to the

20   applicable sellers sufficient to enable the sellers to

21   perform the purchase agreement liabilities and in

22   consideration for such services, the sellers are paying to

23   the buyer an amount equal to the aggregate amounts paid by

24   buyers or sellers with respect to any licenses which buyers

25   license as the KCD IP.

1          So effectively, instead of making payments under

2     the new KCD exclusive license, the buyer is going to get to

3     keep it, but that results in the buyer paying for -- during

4     the interim period, they're paying for and bearing the

5     economic risk associated with the purchase agreement

6     liabilities.  That's -- I'm sure ESL will standup and

7     confirm that, and that amount is in excess of the royalties

8     that would ever be paid during that interim period.  So ESL

9     -- in short, ESL is bearing the risk associated with the

10    administration of the purchase agreement liabilities pending

11    --

12          THE COURT:  During that interim period.

13          MR. SCHROCK:  During that interim period.  The

14    avoidance actions, no claims are being released in a

15    winddown, but of course, there's a very limited release here

16    and we thought that was very meaningful to the estates that

17    the litigation is very largely preserved for the benefit of

18    the estates.  That was a key compromise that we came to in

19    accepting the bid.

20          Mr. Basta hit on the 507(b) claims and some of the

21    nuances around the release, but the vendors of this company

22    are -- the company has an excess of 10,000 vendors, so when

23    we talk about just, you know, there's a couple of people, I

24    think Mr. Burian mentioned that might be affected by this,

25    by Sears closing.  We beg to differ.  The company's

Page 52

1    schedules are on file.  There's hundreds of millions of

2    dollars in vendor claims.  All of these parties have

3    relationships with Sears.  They will continue to have those

4    relationships moving forward in very large part as a result

5    of the benefits of this deal.

6            The claims pool is very substantially reduced, and

7    if you take a look at the next slide, on Slide 16, we put in

8    -- we put this chart in our reply, but it bears worth

9    emphasizing.  When you look at the recoveries to creditors

10   overall, there is a very significant benefit in terms of the

11   reduction of the claims pool in conjunction with this

12   transaction even compared to a winddown as well as we --

13   some creditors getting enhanced or better treatment.  Now,

14   the Committee --

15           THE COURT:  This is before litigation, in

16   litigation of the company.

17           MR. SCHROCK:  That's right.  Litigation is not

18   included in these recoveries in either the Committee's or

19   the company's charts.  But the wind down of this company,

20   for the Committee, it's never been done.  From the company,

21   you have witnesses saying it's never been done by we would

22   do our best to manage it.

23           We have a 365(d)(4) deadline that's on May 3rd.  I

24   think everybody would try their very best in the context of

25   a winddown, but when you have a transaction like this that's

Page 53

1   on the table that actually gives the company a chance -- and

2   nothing's for certain -- but substantially reduces the claim

3   pool, treats creditors better, saves 45,000 jobs, Judge,

4   it's not close.

5          Now, the sale transaction does not guarantee

6   administrative solvency and it was certainly a very

7   important point for the company since the start of these

8   cases.  It's not required, okay, to sell assets.  You don't

9   have to have administrative solvency, but we believe we're

10  administratively solvent.  I think under the Debtors'

11  analysis, they're short -- latest shortfall's $42 million.

12         We did not take into account any litigation claims

13  in considering that.  We have opportunities in excess of

14  $100 million.  But in the context of a winddown, there's

15  certainly, according to Mr. Meghji, there's also no

16  guarantee that the company will be administratively solvent.

17  But importantly, the sale transaction, we think, gives us

18  the highest or best opportunity.

19         Mr. Transier talked about, in accepting the

20  successful bid, all of the things that they've looked at,

21  the nature and amounts, the ability of both parties to

22  close, the recovery the successful bid would provide to non-

23  ESL creditors, liquidity, the alternative to this successful

24  bid which is a winddown and the loss of tens of thousands of

25  jobs.  That alternative of liquidation, in our judgment

Page 54

1    after consultation with numerous parties, was no9t in the

2    best interest of stakeholders.

3          Now, Mr. Kamlani gave testimony around adequate

4    assurance of future performance.  It's worth noting that

5    adequate assurance does not mean absolute assurance or

6    guaranteed performance.  They have a business plan.  They

7    have financing.  They have excess availability at closing in

8    excess of $400 million.  They have a means and a business

9    plan to move this company forward with a very substantially

10   reduced balance sheet, much less debt.  They have a smaller

11   footprint, but they kept open the profitable stores and

12   giving Sears a chance, Your Honor, we think it's more than

13   warranted under the facts that are before the Court.

14         We go through, on the next couple of slides, which

15   I won't belabor, just all of the uncontroverted evidence

16   that's in favor of adequate assurance of future performance.

17   There's nothing out there that has been put forth by the

18   Committee that's really put this evidence into serious

19   question and we do think that the company's witnesses, when

20   considered overall and the Court were to make a ruling, that

21   the company's witnesses have been interested, dedicated.

22         They are very credible and they were in the

23   details compared to the high-level views that we received

24   from the Unsecured Creditors' Committee witnesses in these

25   cases.  Your Honor, overall, I'm going to cede my time and

Page 55

1    allow Mr. Basta to come up here and say a few words about

2    the release, but we are very much in favor of approval of

3    this sale.  We do need some guidance and clarity from the

4    Court around the $166 million issue in the event that we

5    don't resolve it.

6              We think the issue's clear under the terms of the

7    document, but we're prepared to move the closing providing

8    that the Debtors are not liable -- provided the agreement's

9    respected, rather, and the $166 million is actually taken on

10   by ESL, but I'm happy to answer any further questions.

11   Otherwise, I can cede the podium and respond to any

12   objections.

13             THE COURT:  Okay.  That's fine.  Thanks.

14             MR. BASTA:  Good morning, Your Honor.  Paul Basta

15   from Paul Weiss on behalf of the Restructuring Subcommittee.

16             THE COURT:  Morning.

17             MR. BASTA:  Mr. Britton, my partner, will end up

18   the clarifications to the ESL release that were discussed on

19   the record at the beginning of the hearing.  I think there's

20   one or two issues that the Committee still has with the

21   language and once that's done, I'll provide a closing

22   statement on behalf of the Restructuring Subcommittee, if

23   that's okay with the Court.

24             THE COURT:  Okay.

25             MR. BRITTON:  Good morning, Your Honor.

Page 56

1                THE COURT:  Morning.

2                MR. BRITTON:  Bob Britton, Paul Weiss, on behalf

3    of the Restructuring Subcommittee.  I have a amendment to

4    the Asset Purchase Agreement that was filed by the Debtors

5    this morning.  The revisions to the release provisions of

6    the APA are embodied in that document.  I have a copy here

7    that I can hand up to Your Honor, if that's --

8                THE COURT:  Okay.  Thanks.

9                MR. BRITTON:  Yeah, we have copies.  Your Honor,

10   there's a lot of changes in the amendment to the APA that

11   I've capped for you at the back of that document, a redline

12   that just goes to the release provisions that fall within

13   the mandate of the Restructuring Subcommittee.

14               THE COURT:  Okay.

15               MR. BRITTON:  Okay.  So the first thing that we

16   were focused on, Your Honor, following the filing of the

17   original Asset Purchase Agreement was ensuring that the

18   actual purchase of assets didn't somehow cause ESL to

19   purchase claims and therefore sort of get a backdoor

20   release; otherwise, we're carved out of our release.  And so

21   we started in the acquired assets section of the APA and

22   that's in Section 2.1P.

23               What we provided here is that ESL, as part of its

24   commercial negotiation with the larger Restructuring

25   Committee negotiated the purchase, ordinary commercial

Page 57

1    claims against counterparties that they're continuing to do

2    business with and we've carved Section 2.1P, the acquired

3    asset purchase of claims back to essentially those claims

4    and then adding clarifying language that none of the

5    excluded assets or excluded liabilities are included in

6    those purchased assets.

7            We also deleted Section 2.1T which was largely

8    duplicative of Section 2.1P and also said that ESL was

9    buying claims and actions.  Then in Section 2.2I, Your

10   Honor, which is the excluded assets, we provided that all

11   claims, proceedings, and causes of action are excluded

12   assets other than those claims and causes of action that are

13   specifically called out as an acquired asset in Section 2.1.

14   And we also added clarifying language here that nothing in

15   this provision affects the scope of the releases that are

16   set forth in Section 913.

17           That brings us to Section 913, Your Honor.  And so

18   in Section 913, Section B is the actual allowance of the

19   ESL-funded debt claims per our negotiation.  We've added to

20   that in response to comments from Your Honor language that

21   clarifies that the allowance of any ESL claims -- and ESL

22   claims is defined as the claims that are -- the funded debt

23   claims that are allowed by the limited release.  "The

24   allowance of any ESL claims shall not limit or preclude any

25   claim under any applicable law or doctrine of collateral

1    estoppel, res judicata, claim or issue, conclusion, or

2    otherwise."

3            Then you go to the actual release which is really

4    -- you have to go to the definition of released estate

5    claims in Subsection E2.  And what we've done here, Your

6    Honor, is clarify again that the only claims that are being

7    released are claims that could be brought to challenge the

8    allowance of the ESL claims.  So, they're claims against ESL

9    under applicable principles of subordination or

10   recharacterization under Sections 363(k), 502(a), or 510(c)

11   of the Bankruptcy Code.

12           We've also provided, Your Honor, that any claims

13   against the buyer as a momentary holder of the ESL claims

14   before the credit bid are being released and that the only

15   causes of action that we'll retain are against ESL and ESL-

16   related parties.  The rest of this -- that's really the

17   first five lines of the definition.  The rest of this is for

18   the avoidance of doubt, clarifying things that are not

19   included in the released estate claims.

20           Among things that are not included in the released

21   estate claims are -- I won't list them all but I'll call out

22   -- any claims for causes of action for constructive or

23   fraudulent transfer under 11 U.S.C. 544(b), 548, or 550 and

24   there's new clarifying language in the parenthetical at the

25   end that says, "Including but not limited to any claims for

Page 59

1    damages for equitable relief other than disallowance of the

2    ESL claims."  What we've meant to clarify with that is

3    language, Your Honor, is that we can bring fraudulent

4    conveyance claims related to the ESL claims.  The funded

5    debt claims have been allowed.  The remedy just can't be

6    avoidance of those claims.

7                THE COURT:  But this is all for the avoidance of

8    doubt.  I mean, it's --

9                MR. BRITTON:  That's all for the avoidance of

10   doubt.

11               THE COURT:  The first sentence is the key

12   sentence.

13               MR. BRITTON:  Correct, Your Honor.  Now, the UCC,

14   the Creditors' Committee, and the Akin Law Firm sent across

15   comments to these release provisions last night and we

16   incorporated certain of those comments, and I think we still

17   have a disagreement on at least one substantive point, which

18   is that Akin had asked us to include in this released estate

19   claim definition language to the effect that the Debtors --

20   the estates could continue to pursue claims for equitable

21   subordination and recharacterization provided that the only

22   remedy on account of those claims could be -- it wouldn't be

23   disallowance of the ESL claims.  It would be, presumably,

24   damages against ESL.

25               Our view, Your Honor, is twofold.  One, equitable

Page 60

1    subordination and recharacterization are remedies in

2    equitable conduct.  They don't give rise to money damages.

3    But separately and apart from that, equitable conduct that

4    the Committee is focused on, we have preserved claims that

5    get equitable conduct.  If, in fact, there is an equitable

6    conduct there, that's included in the avoidance of doubt

7    language and that would include, Your Honor, claims for

8    fraudulent transfer and actual fraud.

9           And we intend to continue to investigate and

10   pursue those claims on behalf of the estate, but allowing

11   the ability to continue to pursue equitable subordination

12   and recharacterization claims against ESL goes directly

13   contrary to the scope of the limited release that we had

14   negotiated with them in order to allow the credit bids.

15           THE COURT:  Okay.

16           MR. BRITTON:  Thank you, Your Honor.

17           THE COURT:  Do you want to address this now or

18   later?

19           MR. QUERSHI:  Happy to address it now, Your Honor.

20           THE COURT:  Okay.

21           MR. QUERSHI:  For the record, Abid Qureshi of Akin

22   Gump on behalf of the Committee.  It is our view, Your

23   Honor, that what is by design supposed to happen with this

24   release is no claims against NewCo, no claims against their

25   allowed claims, but in every other respect we should be

Page 61

1    permitted to pursue those claims against ESL.  So really,

2    the language that built into the release, Your Honor, was

3    aimed at ensuring that the very same remedy that one could

4    get against their claims for equitable subordination or

5    recharacterization should be a remedy that is available to

6    be pursued only as against ESL.  And that is what we tried

7    to do with the language that we suggested and that --

8              THE COURT:  I'm sorry, but is that remedy -- that

9    remedy is either a subordination of the claim or a

10   recharacterization of the claim.  It's not a damages remedy;

11   right?

12             MR. QUERSHI:  Well, it's the economic equivalent,

13   Your Honor.

14             THE COURT:  Well, but that's --

15             MR. QUERSHI:  That's the point.

16             THE COURT:  If it's damages, I understand it but

17   if it's equitable subordination, then by definition it's a

18   claim-related remedy.

19             MR. QUERSHI:  It's the measure of damages on

20   account of either equitable subordination or

21   recharacterization.  So as Your Honor is well aware, those

22   are remedies or causes of action, I should say, where the

23   Court has great latitude in terms of what the remedy is:

24   how much of a claim to subordinate, how much of a claim to

25   recharacterize.  What we are saying is we should be able to

Page 62

1    pursue ESL for the dollar equivalent, economic equivalent of

2    whatever that amount might be.

3            THE COURT:  But I've never -- by definition,

4    that's not what they are.  Those remedies are claim-related

5    remedies.  I mean, they affect the defendant's claim as

6    opposed to an affirmative claim against it.  This preserves

7    equitable claims.  I mean, it just doesn't preserve

8    equitable subordination which means the claim is

9    subordinated or recharacterization which means the claim is

10   recharacterized either as an equity interest or maybe as an

11   unsecured claim.  But, I mean, I think the preservation of

12   equitable damages does what you want.

13           MR. QUERSHI:  Well, again, Your Honor --

14           THE COURT:  Except to say that it's not -- it

15   wouldn't be in the rubric of equitable subordination.  I've

16   never seen an equitable subordination opinion that says that

17   you have to pay damages.  Or again, recharacterization, they

18   won't say you have to pay damages.  It just doesn't...

19           MR. QUERSHI:  Agreed.  Again, the purpose of the

20   language we were looking for was to preserve the economic

21   equivalent, if you will, of whatever remedy that might be.

22   That's all that it was designed to ensure.

23           THE COURT:  I don't -- but that's creating a new -

24   - the language that's in here preserves equitable remedies

25   other than disallowing the claim or subordinating the claim.

1   That, to me, is the economic equivalent.  But to say that

2   you're creating a new form of equitable subordination, I'm

3   not prepared to do that.  It's a different -- that's like

4   you're asking me in a contract to say that a remedy that is

5   well defined is no longer well defined and it's an

6   affirmative claim as opposed to a reduction of a claim or a

7   recharacterization of a claim.

8            MR. QUERSHI:  Well, Your Honor, the important

9   point, I think here is if this Court's reading of the

10  language that has been presented is that all of the

11  equitable claims as against ESL and Mr. Lampert are

12  preserved --

13           THE COURT:  Well, except equitable subordination

14  or recharacterization.

15           MR. QUERSHI:  Right.

16           THE COURT:  Right.  Okay.  All right.

17           MR. BRITTON:  Thank you, Your Honor.  Unless Your

18  Honor has any other questions about the scope of the

19  releases, I'm happy to --

20           THE COURT:  No, I --

21           MR. BRITTON:  -- Mr. Basta.

22           THE COURT:  I mean, I read them quickly, but I

23  think they did the trick.

24           MR. BRITTON:  Thank you, Your Honor.

25           THE COURT:  Okay.  And I appreciate the parties

Page 64

1    working on it to clarify.

2              MR. BASTA:  Good morning, Your Honor.  Paul Basta

3    from Paul Weiss on behalf --

4              THE COURT:  Oh, I'm sorry to interrupt you.  So

5    this language will also be the language in the order as far

6    as Cyrus is concerned?  Is that -- when people say it's the

7    same thing, that what they mean?

8              MR. BRITTON:  Yes.

9              THE COURT:  But it would be in the order instead

10   in this agreement.

11             MR. BRITTON:  The scope of the Cyrus release,

12   although outside the provision of the Restructuring

13   Subcommittee, will be and should be the same as --

14             THE COURT:  Although --

15             MR. BRITTON:  -- ESL.

16             THE COURT:  You know, I may want to add the MTN

17   Note language.  It was MTN, right?  Okay.  Okay.

18             MR. SINGH:  Your Honor, Sunny Singh from Weil.

19   It's more general in the sale order, there's just a general

20   reservation of rights.  We didn't go into all the details it

21   was a little less prominent than the ESL.

22             THE COURT:  Well, we say that the release is no

23   broader than as set forth in Section 9. --

24             MR. SINGH:  Right.

25             THE COURT:  Yeah, right.

Page 65

1          MR. SINGH:  Yeah, we could add it.

2          MR. BRITTON:  I think we should put in the MTN --

3          THE COURT:  Right, we should put in the MTN, too.

4          MR. SINGH:  And I'll just confer with counsel.

5          THE COURT:  Right.  Okay.

6          MR. BASTA:  Your Honor, Paul Basta from Paul Weiss

7     on behalf the Restructuring Subcommittee.  I will try to

8     avoid any overlap with Mr. Schrock.  This Subcommittee

9     statement, Your Honor, Mr. Schrock walked through the

10    execution risks associated with this deal.  Our Subcommittee

11    statement is predicated on ESL not reneging on the $166

12    million assumption.  That was a critical component of the

13    Subcommittee's decision to provide the credit bid release

14    and so this statement is on the assumption that ESL is going

15    to honor the agreement in that respect.

16          The decision before the Restructuring Subcommittee

17    in this case was whether to provide a release to ESL in

18    order to facilitate a going concern transaction that would

19    maximize --

20          THE COURT:  Can I interrupt you?  I'm sorry.

21    Let's assume -- I hope this doesn't happen, and I assume it

22    won't happen, but just hypothetically assume that the deal

23    closes.  ESL doesn't reimburse for the debts listed on

24    Schedule 1.1G.  It's ultimately determined that the deal is

25    breached, right?

1          MR. BASTA:  Right, yes.

2          THE COURT:  Is the release -- the release isn't

3     effective --

4          MR. BASTA:  Release is not --

5          THE COURT:  at that point, right, because they've

6     breached the agreement?

7          MR. BASTA:  Release is not effective.

8          THE COURT:  Okay.

9          MR. BASTA:  But, Your Honor, we wanted to effect

10    the -- when we looked at the release, for a long time the

11    release was on the back burner because the concept here was

12    we needed a deal.  We needed a viable deal.  It only made

13    sense to talk about a release in connection with the viable

14    deal.  So the 166 from the Subcommittee's perspective was

15    critical to get to a deal that was viable and the release

16    was predicated on that assumption.

17         THE COURT:  Okay.

18         MR. BASTA:  So the decision before the

19    Subcommittee was whether to provide a release to ESL in

20    whatever form we could negotiate in order to facilitate a

21    going concern transaction or, alternatively, to choose

22    liquidation.  That was it.  Release deal or liquidation.

23    And ultimately, the Restructuring Subcommittee determined in

24    good faith to approve a limited credit bid release to

25    facilitate a reorganization and came to the view that that

Page 67

1    was better for the estate than proceeding to a winddown.

2            THE COURT:  Can I just -- I think I have the

3    chronology here, but all of the ESL proposals that the

4    Restructuring Committee, the Subcommittee rejected contained

5    a general release, right?

6            MR. BASTA:  Yes.

7            THE COURT:  Only the one that was accepted had

8    this --

9            MR. BASTA:  Right.

10           THE COURT:  -- limited release.

11           MR. BASTA:  Right.

12           THE COURT:  Okay.

13           MR. BASTA:  Your Honor, if I can walk you through

14    that for one second.  On December 5th, 2018 was the first

15    indicative bid by ESL and it contained a broad ESL release

16    and on December 9th and 12th, it was rejected in writing by

17    both the Restructuring Committee and the Subcommittee.  On

18    December 28th bid by ESL, it contained a broad release and

19    it was rejected on January 4th.  On January 6th bid, there

20    was also a broad release and it was rejected on January 6th.

21    On January 7th, Cleary sent a letter threatening the

22    Restructuring Subcommittee with breach of fiduciary duty if

23    they did not accept the ESL bid.

24            On January 9th, ESL put a bid on the auction

25    record and we rejected it because it contained a broad

Page 68

1   release, among other things.  It wasn't until January 15th,

2   late in the evening -- I'm sorry, January 15th there was yet

3   another bid that also contained a broad release that was

4   rejected by the Subcommittee.  It wasn't until the limited

5   release was accepted by ESL and other components of the deal

6   were improved that the Subcommittee agreed to provide the

7   limited release.

8           We believe that the limited release is the

9   solution to this case.  If Your Honor remembers, in the

10  early bidding procedures, there was a requirement that in

11  order to credit bid, ESL was going to have to cash backstop

12  any credit bid.  And that was where we were for a long time

13  and ESL indicated there would be no going concern with cash

14  bid, so we had to figure out a way to facilitate a credit

15  bid if we wanted to achieve the benefits of a going concern,

16  and so we came up with the bifurcated structure and the

17  bifurcated structure is one where we retain the valuable

18  causes of action while allowing the company to receive the

19  benefits of a reorganization.

20          We think that's the linchpin of the case and the

21  obvious benefit of moving forward.  There were a number,

22  Your Honor, of less obvious benefits that came out of the

23  Subcommittee's negotiations around the credit bid.  The

24  credit bid was the key and there was substantial

25  improvements to the deal in addition to the limited release

Page 69

1    that stemmed from that credit bid negotiation.  They closed

2    the administrative insolvency gap by hundreds of millions of

3    dollars.  The deal provides, in our view -- when we looked

4    at this, we always look at, is the going concern better than

5    the winddown, not is the going concern good.  It's is it --

6    provide a proportionally -- a incrementally better

7    alternative.

8              Our analysis showed that in the final bid, that

9    third-party secured creditors are benefitted compared to a

10   winddown and that's not including, obviously, ESL to the

11   tune of $152 million.  It's our analysis that general

12   unsecured creditors that are getting assumed under the deal

13   which include protection agreement and other consumer-

14   related claims of $524 million are getting paid under this

15   deal and they would not get paid in a winddown.

16             I'm going to get into some more detail about that

17   later, but earlier iterations of the contract from ESL had

18   it a condition to the assumption of the protection agreement

19   liabilities that they be reaffirmed by the consumer and we

20   were able to get that out of the contract to make that an

21   absolute requirement to assume those liabilities, and that

22   allowed us to value that as a contribution to the estates.

23             There's a $621 million avoidance of additional

24   administrative claims in a reorg versus a winddown, which we

25   think is very significant and there are jobs that are being

Page 70

1    preserved.  There's also a substantial limitation in ESL's

2    ability to recover from litigation proceeds with respect to

3    its deficiency claims.

4            We negotiated so that there would be no right of

5    ESL to share on any Land's End or Seritage litigation, no

6    right of ESL to share on any litigation relating to any ESL

7    misconduct, and we were able to cap ESL's 507(b) claim at

8    $50 million which -- of is there's other non-ESL litigation

9    recovery, their 507(b) claim is capped.

10           The decision to provide the limited release is

11   coming from a process where Mr. Carr and Mr. Transier

12   faithfully discharged their fiduciary duties.  There's some

13   allegation in the Committee's papers that Mr. Carr and Mr.

14   Transier were hand picked by Mr. Lampert.  There's no

15   evidence in the record to support that.  In fact, the

16   evidence in the record is that they were introduced to the

17   board by Mr. Schrock and that they had -- the evidence is

18   clear that they had no prior relationships with ESL.

19           Your Honor observed the demeanor of Mr. Transier

20   and Mr. Carr in person and I think anyone who watched that

21   testimony would see that they were not pulling any punches

22   whatsoever and were faithfully trying to do what was best

23   for the estate.  And of course, Mr. Carr and Mr. Transier

24   have found that there's hundreds of millions of dollars of

25   valuable claims against ESL and repeatedly rejected ESL's

Page 71

1    bids that contained a release even in the face of litigation

2    threats from ESL.

3            It's also unmistakable that Mr. Carr and Mr.

4    Transier satisfy the duty of care.  The Debtors set up a

5    purely independent Subcommittee because it could see what

6    was coming down the pike, and if there was any way to get

7    this through given the conflicts involved, you needed a

8    truly independent Committee.

9            And Mr. Carr and Mr. Transier directed all of the

10   professionals for the Subcommittee, including A&M and

11   Evercore, to do a massive amount of work investigating the

12   claims up front so that we would be in a position at the

13   auction to assess the value of those claims and all of that

14   work led to the bifurcation approach that was an informed

15   approach so we could present to this Court a solution that

16   would allow a reorganization instead of making a liquidation

17   a fait accompli.

18           Mr. Schrock talked about the 58 Restructuring

19   Committee meetings, many of which the Subcommittee's

20   professionals attended.  There were also three times a week

21   calls of the Subcommittee and a myriad of other one-off

22   conversations on the process.  Mr. Carr and Mr. Transier, as

23   you could see, were not passive recipients of professional

24   advice.  They were deep in the weeds on what the numbers

25   are.  The Committee presented the Court with texts of Mr.

Page 72

 1    Carr.  What those texts show is that Mr. Carr wanted to get

 2    to the right answer and was not satisfied with the numbers

 3    that were coming out of the professionals upon which to make

 4    a decision, so he didn't make a decision until those numbers

 5    settled down.  That is the embodiment of satisfying the duty

 6    of care.

 7            Your Honor, I have two slides I'd like to hand up.

 8    Mr. Carr and Mr. Transier had a deep understanding of what

 9    fiduciary duty means in an insolvent situation.  If you

10    look, I've given Your Honor a quote from Gheewalla.  This

11    is, of course, the seminal decision where this is arising in

12    the context where the Delaware Supreme Court is concluding

13    that there's no separate duty -- fiduciary duty of a board

14    to creditors.

15            And if Your Honor reads the sentence, it says, "To

16    recognize a new right for creditors to bring direct

17    fiduciary duty claims against those directors would create a

18    conflict between those directors' duties to maximize the

19    value of the insolvent corporation for the benefit of all

20    those having an interest in it and the newly directed

21    fiduciary duty to individual creditors."

22            This is a sophisticated sentence that understands

23    the difficult job that directors have to undertake because

24    there are numerous constituents that have an interest in the

25    corporation.  So by saying you have a duty to the

Page 73

1    corporation, you have to take into account the impact on all

2    of its constituents and this is different than a Creditors'

3    Committee who has a duty to its unsecured creditor

4    constituency.

5           And so if you look at it through that lens where

6    the Restructuring Subcommittee had a broader constituency

7    group to consider than the Unsecured Creditors' Committee,

8    I've given the Court a slide that talks about what the

9    release consideration that we considered separate for the

10   reason to provide the limited release.  And if you go

11   through this, Your Honor, I think it's very compelling.

12          We're getting $35 million of cash.  We're getting

13   $152 million to third-party secured creditors.  We're

14   getting $453 million of assumption for protection agreement

15   liabilities.  We're getting gift card liability assumption

16   of $13 million.  We're getting $68 million of assumption of

17   Shop Your Way liabilities.  We're avoiding $621 million of

18   administrative expense claims.  We are preserving the

19   litigation against ESL and other defendants.  We're getting

20   the cap on ESL recoveries and we're preserving tens of

21   thousands of jobs.

22          THE COURT:  Other than the cap, now this is part

23   of the sale consideration.  Your point is that the sale

24   wouldn't have happened without the credit bid.

25          MR. BASTA:  To get a release under Drexel, there

Page 74

1    needs to be consideration.  But there need to be --

2              THE COURT:  No, I --

3              MR. BASTA:  -- consideration, it needs to be more

4    than the winddown.

5              THE COURT:  I -- well --

6              MR. BASTA:  So in other words, if they had showed

7    up with a deal --

8              THE COURT:  But the winddown includes what you

9    carved out of the release, so I guess I'm looking this a

10   little differently which is that there's value that ESL is

11   paying for the Debtors in addition to the credit bid.  But I

12   view that as value that I would measure against a winddown.

13   The alternative.  I wouldn't also measure it as

14   consideration for the limited release, but I understand your

15   point which is that that value wouldn't be there without the

16   limited release, which is a little bit of a different thing.

17             MR. BASTA:  Well, Your Honor, I think --

18   respectfully disagree which is that if they had showed up

19   with $35 million for the credit bid release, we would not

20   have provided it.

21             THE COURT:  Well, no, because the whole deal

22   wouldn't make sense.

23             MR. BASTA:  The whole deal wouldn't have made

24   sense.

25             THE COURT:  Right.

Page 75

1          MR. BASTA:  The whole deal wouldn't have been

2     better than a liquidation.

3          THE COURT:  Right.

4          MR. BASTA:  You had to measure whether to give the

5     release on whether there were benefits to the company --

6          THE COURT:  Right.

7          MR. BASTA:  -- the liquidation.

8          THE COURT:  And it's a limited release.

9          MR. BASTA:  And it's a limited release.

10         THE COURT:  Right.

11         MR. BASTA:  And so I think the question that I'd

12    like to focus in conclusion, Your Honor, is why does the

13    Subcommittee value these things as important but the

14    Creditors' Committee does not value them as important?

15    Because I think that's the key as to what's really going on

16    in this case.  If Your Honor looks at whatever the Committee

17    -- Creditors' Committee describes this deal, they say it's

18    $35 million for the release.

19         They never acknowledged that there were very

20    significant unsecured creditor constituencies that are doing

21    better in this deal than what they would do in a winddown.

22    In a winddown, the protection agreement liabilities would

23    not get paid, gift card, consumer, jobs.  In fact, Mr.

24    Burian said that the Creditors' Committee is not supposed to

25    look at jobs.  I guess he views employees -- I think he said

Page 76

1    that they're not prepetition creditors or that in our

2    vibrant economy they can go and find another job, so he

3    didn't even view them as a constituency that the Unsecured

4    Creditors' Committee in its lens needs to consider.

5            And I think this is the key.  It's just why

6    doesn't the Committee view these benefits as being important

7    enough to support this deal, and I want to suggest to the

8    Court that there are four reasons and that none of those

9    reasons warrant denial of this transaction.

10           The first is that none of the unsecured creditors

11    that are on this list as receiving a benefit are on the

12    Committee.  The Committee is not dominated by trade.  It

13    does not have employee representative.  It does not have

14    consumer representatives.  The Committee constituency is not

15    actually getting these benefits.

16           The second reason, I think, is that I think the

17    Creditors' Committee is focused on equitable subordination

18    as an important remedy for them because they can hold that

19    debt essentially in the case and recover from the

20    liquidation proceeds and subvert the priority scheme.  And I

21    understand that as an important consideration for the

22    Committee, but from our perspective when we've preserved

23    other remedies by preserving the litigation, we don't think

24    that preserving equitable subordination as an independent

25    remedy is a reason to thwart a reorganization.

Page 77

1          The third argument that they've made -- and Your

2     Honor asked Mr. Schrock about it -- relates to the

3     unencumbered real estate value and it's that in a

4     liquidation if you believe that the unencumbered real estate

5     value could get a lot of value, then your whole analysis as

6     to whether reorg versus winddown would change.  But the way

7     the Subcommittee looked at that is that in the winddown

8     analysis, the unencumbered real estate was consumed by the

9     newly created administrative claims.

10          So the way we looked at it is when you compare the

11     two transactions, the unencumbered property wouldn't flow

12     down to unsecured creditors to give them a recovery.  Now, I

13     understand that there's a debate about what the value of

14     that is, but the Restructuring Committee's professionals

15     reported on what their view of the valuation of those assets

16     was and that that value would not result in a recovery to

17     the unsecureds.

18          THE COURT:  Unless you hit a home run.

19          MR. BASTA:  Unless you hit a home run.

20          THE COURT:  Well, not on the real estate, on the

21     litigation against ESL including under Section 507(d) and

22     506(c).

23          MR. BASTA:  Yes.

24          THE COURT:  They basically assume out any claim

25     there.

1          MR. BASTA:  They assume -- no --

2          THE COURT:  They would be a super priority claim

3    under 507(d).

4          MR. BASTA:  Right.  Right.  And then the last

5    thing that I think they're focused on is they could say they

6    don't believe in NewCo, and if you don't believe in NewCo

7    then maybe the benefits that we are considering that would

8    be assumed by the new company shouldn't be valued because

9    the company is not going to survive.  I would say, while

10   they have questioned it, at no point in the process has the

11   Unsecured Committee ever said, this deal gives valuable

12   consideration to some of our constituencies.  Let us work

13   the contract to make the contract better to preserve these

14   benefits.

15         The entire time, the focus has really been on just

16   causing a liquidation.  They announced that in the very

17   beginning of the case.  Irrespective of --

18         THE COURT:  Well, maybe here that's the best

19   negotiating strategy.  I don't know.

20         MR. BASTA:  Well, that --

21         THE COURT:  That we could leave that for business

22   schools.

23         MR. BASTA:  We can leave that for another day.  I

24   would say --

25         THE COURT:  Okay.

1          MR. BASTA:  -- Your Honor, that the Subcommittee's

2     professionals and the Restructuring Committee professionals

3     believe that there's a reasonable prospect that NewCo can

4     succeed and that in light of all the benefits that can be

5     achieved and the retention of the litigation, that it should

6     be approved.

7          Three legal points, and then I'll sit down.  We're

8     going to defer to the Restructuring Committee on standard of

9     review.  We would point out, Your Honor, that even if the

10    Court applied the entire fairness test to this transaction,

11    we think that this is entirely fair.  There's been

12    tremendous Court oversight through the entire process.  We

13    have a truly independent Subcommittee and we believe that

14    entire fairness test is about a fair process and fair price,

15    and given the auction process as well as the transparency

16    with all the parties, that even if entire fairness test

17    applies, it has been satisfied.

18         Two cases I want to refer to Court to, as Your

19    Honor considers this.  The first is a case that says that

20    the estate has the right to settle 502(d) or release 502(d)

21    claims.  There was some reference in the Committee

22    objection.  It is In RE:  Foundation of New Era

23    Philanthropy, 1996 Bankruptcy Lexis 1829 (1996).  And the

24    second is the Applied Theory case from the Second Circuit

25    which holds that equitable subordination claims are

Page 80

1    derivative especially in the context where the complaint

2    that is the grounds for equitable subordination harm all of

3    the creditors equally and therefore our view is that we have

4    an ability -- because they're derivative, they belong to the

5    estate to release them or settle them as part of this

6    transaction.

7            THE COURT:  Okay.

8            MS. SONGONUGA:  Your Honor, (indiscernible) for

9    Court Call.  For the benefit of those appearing through

10   Court Call, that have objections in the agenda that have not

11   been disposed of.  Will we have an opportunity to address

12   the Court regarding those objections?

13           THE COURT:  Yes.

14           MS. SONGONUGA:  Thank you, Your Honor.

15           MR. BROMLEY:  Good morning, Your Honor.

16           THE COURT:  Morning.

17           MR. BROMLEY:  Jim Bromley from Cleary Gottlieb on

18   behalf of ESL.  I stand here before you today, Your Honor,

19   as an advocate to ask you to approve the transaction that's

20   before you.  I can't help, however, but feeling a little bit

21   like a character from that Monty Python skit where somebody

22   walks in looking for an argument and he finds himself

23   getting hit on the head lessons.

24           This is a difficult exercise, Your Honor.  We are

25   being criticized both by the Creditors' Committee and, to a

Page 81

1    certain extent on his $166 million, by both the Debtors and

2    the Subcommittee.  It is true that what happened in this

3    case from the very beginning was that ESL has indicated very

4    clearly that it was interested in a going concern

5    transaction.  It is also very true that from the very

6    beginning, ESL indicated that it wanted releases in

7    connection with pursuing that and the ability to credit bid.

8         ESL lent the company over $2.6 billion in the

9    prepetition period, of which about $2.4 billion was secured.

10   The vast majority of that effort was -- well, the entire

11   majority of that effort was made to keep this company in

12   business and to allow it to avoid the very feed frenzy that

13   we're facing today here in Bankruptcy Court.  But while it

14   might've been on a back burner for Mr. Basta, it's important

15   for everyone to realize from the very beginning it was on

16   the front burner for ESL.

17        ESL has been criticized substantially and

18   consistently throughout the case by the Creditors' Committee

19   and it is important for us to state on the record that we

20   uncategorically deny any of the allegations that have been

21   made.  We believe that the releases that are being provided

22   are appropriate under the circumstances, and we also believe

23   that the claims being retained are worthless.  So from an

24   administrative solvency perspective, Your Honor, we don't

25   believe that the claims retained have any value.  We

Page 82

1    understand that there's a difference of opinion there, but

2    it is important that before we go any further that that

3    claim and position be made clear.

4           I'd like to turn to the one hundred and sixty --

5    yes?  Something to say, Your Honor?

6           THE COURT:  No, go ahead.

7           MR. BROMLEY:  Okay.  I thought you had a question.

8    With respect to the $166 million, both Mr. Basta and Mr.

9    Schrock made comments that were somewhat inconsistent.

10   First, they said they believe the contract is in their favor

11   and they are ready to close.  And then they said they're

12   ready to close so long as Your Honor gives some guidance or

13   makes some kind of decision that indicates that they are

14   right and we are wrong.

15          We are ready to close based on the contract as

16   written, regardless of the ultimate interpretation.  But we

17   believe that the ultimate interpretation is not for here

18   today.

19          THE COURT:  It isn't.  Under Orion Pictures, I

20   don't have the authority to decide that issue; although, I

21   do have to evaluate as, in essence, whether it's reasonable

22   to assume the Debtors' interpretation because it's clear to

23   me that the Debtors don't believe that the deal is worth

24   pursuing unless their interpretation is right.  So I'm not

25   able to make a decision today, as the Second Circuit held in

Page 83

1   Orion Pictures.  But on the other hand, it needs to be

2   evaluated as Judge Chapman recently did in one of her cases.

3           MR. BROMLEY:  And it's in that context, Your

4   Honor, that I feel that I do need to address it to a certain

5   extent.  There are lots of information that is not before

6   the Court, but what is before the Court is the contract and

7   the schedules.  And with great fanfare, the Debtors today

8   told you what was on Schedule 1.1G which is the number $166

9   million.  That, I think is fair to say, not particularly

10  enlightening guidance as to the specific of accounts payable

11  that are supposed to go forward, and that is exactly the

12  issue.

13          The way the contract is written, Your Honor, and

14  the way our bid letter went in, the way Mr. Kamlani

15  testified, consistently from our perspective is that with

16  respect to the $166 million, it is about accounts payable

17  with respect to product that is ordered before the closing

18  and delivered after the closing.

19          THE COURT:  Well, it just doesn't say that.

20          MR. BROMLEY:  Well, Your Honor, actually we

21  believe it does.

22          THE COURT:  Well, okay.  The schedule doesn't.

23          MR. BROMLEY:  The schedule has to be read together

24  with 1.1F and 1.1G and they both say $166 million and --

25          THE COURT:  Other payables.

Page 84

1            MR. BROMLEY:  And other payables.

2            THE COURT:  Which the definition refers you to the

3      schedule.

4            MR. BROMLEY:  And ordered inventory, the way the

5      line is written, ordered inventory in our view is clearly

6      included within other payables.

7            THE COURT:  Okay.

8            MR. BROMLEY:  So with that, Your Honor, regardless

9      of the ultimate outcome, ESL stands before you today ready

10     to close on the basis of the contracts as signed.  With

11     respect to the arguments that have been made and will be

12     made, I think that there's a couple of points that we want

13     to add to those that have been made by Mr. Schrock and Mr.

14     Basta.

15            When viewed through the appropriate lens, Your

16     Honor, there's really no question that all of the standards

17     for approval have been met and exceeded in this case.  For a

18     buyer, one of the most important aspects of the sale order

19     is to find in good faith and with respect to a participant

20     in these proceedings like ESL, that is important --

21     critically important because of all the allegations that

22     have been made --

23            THE COURT:  I'm sorry.  What is it?

24            MR. BROMLEY:  Good faith.

25            THE COURT:  Oh, okay.  Right.  I just didn't hear

Page 85

1   you.

2           MR. BROMLEY:  Sorry.  Sorry, Your Honor.  And the

3   evidence is replete with evidence -- the record is replete

4   with evidence of good faith, that from the very beginning,

5   prior to the petition date, Mr. Lampert who had been the CEO

6   resigned.  The Restructuring Committee was appointed.  The

7   Restructuring Committee was -- and the Subcommittee in

8   particular were vested with dual roles, to both investigate

9   potential claims that may exists as well as to evaluate any

10  transactions that would involve ESL.

11          And there's no evidence at all in the record that

12  anything happened where either Mr. Lampert, Mr. Kamlani, or

13  anyone else representing ESL had any influence over the

14  Debtors' process, any influence over the Debtors' business

15  plan, any influence over the Debtors in the post-petition

16  period at all.  Indeed, Your Honor, if anything the evidence

17  is overwhelming with respect to the intensity of these

18  negotiations.

19          This is a deal that has fallen apart and come

20  together on numerous occasions.  The intensity and, frankly,

21  contentiousness of the negotiations that have taken place

22  are marked.  They are -- when at least two of the witnesses,

23  Mr. Transier and Mr. Kamlani referred to the auction as a

24  four-day night, that really is a perfect encapsulation of

25  the exercise that went on during that week at Weil Gotshal's

Page 86

1   offices.  Our offers were rejected repeatedly.  They were

2   rejected formally and informally, and at every moment in

3   time, we came back to the table to put more consideration on

4   the table.

5          With respect to the releases, we did start off

6   looking for a global release.  That was our intention from

7   the beginning and that was our desire.  As the transaction

8   continued to move forward, we understood that in order to

9   make this get over the finish line, that we needed to

10  identify an opportunity to negotiate a more limited release

11  and it was in that context that on the night of the 15th and

12  into the early morning of the 16th that we sat down and were

13  able to cut that deal.

14         It is what is reflected in the document.  It's

15  reflected in the comments of Mr. Britton and certainly with

16  respect to the attempt by the Creditors' Committee to

17  recapture certain of the release elements, particularly with

18  respect to equitable subordination and recharacterization

19  and disallowance.  We reject that entirely.  That is not the

20  deal and we have to have the ability to credit bid or the

21  transaction cannot go forward.

22         And that includes, frankly, the release -- the

23  allowance of the claims in their entirety.  The cabining of

24  the opportunities for those claims to recover with -- that

25  Mr. Basta described were hard fought negotiations and

Page 87

1    provide, we believe, both protection for the estates as well

2    as protection for ESL.  But it was protection that was hard

3    fought in the context of a global transaction.

4            Your Honor, you've heard from Mr. Kamlani who's

5    the president of ESL with respect to the business plan and

6    there's been a lot made by the Creditors' Committee about

7    the going forward business plan of NewCo.  The criticisms of

8    the business plan, I think, are important to take for a

9    moment.  One of -- the Creditors' Committee, frankly, relied

10   almost entirely on their purported expert, Mr. Kniffen.  He

11   did not appear in Court and was not cross examined.  The

12   parties have relied on the designations of his testimony.

13           But I think it is important to look at those

14   designations because Mr. Kniffen is by no -- in no way,

15   shape, or form an expert on anything.  Mr. Kniffen is a

16   pundit on cable TV.  He has worked in the retain industry

17   but hasn't been involved in it in any way, shape, or form

18   for about 15 years and he hasn't even set foot in a Sears

19   store in a year and a half at least.

20           His expert opinion is no more worthwhile than if

21   we brought in a parade of Sears customers who said they like

22   Sears and they like Kenmore products and they enjoy shopping

23   at Sears.

24           And when you take Mr. Kniffen off of the table, we

25   believe he wouldn't survive a Daubert challenge in any

Page 88

1    circumstance that we do not bore the Court with it.  You

2    have simply nothing on the side to criticize the g-forward

3    business plan.

4            Mr. Diaz as well relies almost entirely on Mr.

5    Kniffen's assumptions.  He does the math for Mr. Kniffen but

6    if it wasn't for Mr. Kniffen, there'd be no math for Mr.

7    Diaz to do.  And so if you take both Kniffen and Diaz off of

8    the table, which we believe is appropriate in light of Mr.

9    Kniffen's obvious incapacity to be qualified as an expert,

10   there's simply no evidence whatsoever that the business plan

11   for NewCo going forward is anything other than appropriate.

12           Notwithstanding that, Your Honor, Mr. Kamlani was

13   very clear as to the opportunities that are being provided

14   with respect to the go forward business plan.  The go

15   forward business plan is not a plan to close stores and fire

16   employees.  The go forward business plan is a plan to

17   maximize the opportunities provided by the Sears ecosystem.

18   That includes the Innovel and SHS, Sears Home Services

19   network to transition from larger footprint stores to

20   smaller footprint stores and to transform this company.  To

21   transform this company, which is exactly what ESL has been

22   trying to do for the past 13 or 14 years.

23           Now, the fact that the company has not succeeded

24   is obvious because we're here in Bankruptcy Court.  But when

25   we're looking at the commitment of ESL to Sears, it's

1   important to contrast the commitment of ESL to Sears and the

2   commitment of others in other situations.  There was

3   testimony yesterday about Toys "R" Us.  The private equity

4   sponsors in Toys "R" Us did a leveraged buyout of the

5   company and abandoned it.

6         Mr. Lampert and ESL have been with Sears and

7   believers in Sears, long-term contrarian investors and they

8   are continuing to put money and resources behind this

9   business model and this plan.  Now, we can sit here and

10  criticize that business decision, but we should not

11  misinterpret that business decision for some kind of evil

12  intent.  Mr. Lampert's dedication and ESL's dedication to

13  Sears really is without question and the idea that we're

14  doing anything other than to try make this company succeed

15  and succeed going forward is completely belied by the other

16  options on the table.

17        If this was an exercise in trying to obtain real

18  estate and liquidate that real estate, we would simply be

19  credit bidding the liens that we have with respect to the

20  real estate.  If this was an exercise to keep Sears alive to

21  protect our investment in Seritage, there would've been no

22  reason to have put two point five or six billion dollars

23  into Sears instead of into Seritage, the investment of which

24  was only about $750 million.

25        We're dealing with a universe of incompatible

Page 90

1    positions, right?  The Creditors' Committee right now says

2    we're getting too much value and we're not paying enough for

3    it.  And at the same time, they're saying that that very

4    NewCo that's getting too much value and not paying enough

5    for it is going to fail because it's inadequately

6    capitalized and incapable of providing adequate assurance of

7    future performance.

8             Quite simply, the Creditors' Committee can't have

9    it both ways.  We can't be stealing assets and unable to pay

10   our creditors when those debts come due doing forward.

11   We're doing nothing with respect to taking assets other than

12   to incorporate them into a valid and viable going forward

13   business.  And every time the Creditors' Committee stands up

14   and talks out of both sides of its mouth, we have to

15   recognize it for what it is, right?

16           Creditors' Committee is dominated by Simon

17   Property, their chair, the largest real estate mall owner in

18   the country, and what are we doing?  We're sitting here

19   criticizing the real estate sale process.  I submit, Your

20   Honor, that Simon knows more and better about every one of

21   the properties in their malls than anyone else, including

22   Sears.  So if they wanted to be here and be bidding against

23   this transaction, they have every opportunity and that goes

24   for every other large real estate developer.

25           The idea that this Sears process has been going on

1    under some sort of cover of darkness is just ridiculous.

2    Sears has been under a microscope for years.  Mr. Lampert

3    has been under a microscope for years.  This entire

4    bankruptcy has been under a microscope with live blogging

5    the moment anything is said, and including almost

6    instantaneous reports of whatever is going on in chambers

7    conferences, which we find frankly outrageous.

8            There's nothing hidden in this case.  Anytime

9    something is said, it is broadcast almost immediately and

10   the idea that we're doing something under cover of darkness

11   is frankly outrageous.  Now, Your Honor, I am -- I want to

12   talk a little bit about the reasonableness of the settlement

13   and the 9019 standards.

14           I know that Mr. Basta covered it and that Mr.

15   Britton described the release, but it is very important that

16   when we're taking a look at this that we're not conflating

17   things, right?  The 9019 standard for approval of a

18   settlement which we understand is part and parcel of the 363

19   standard for the sale, is such that we have to take into

20   account the strength of these claims but not have a

21   minitrial with respect to the claims.

22           You've heard from Mr. Carr, from Mr. Transier.

23   You've seen from the pleadings submitted by the

24   Restructuring Subcommittee that they have conducted an

25   extensive investigation.  They have taken a look very

Page 92

1    specifically at these equitable subordination, disallowance,

2    and recharacterization claims and they have some to a

3    reasoned conclusion that the consideration being provided

4    both in the form of the $35 million as well as all of the

5    other assumptions of liabilities is more that enough to

6    justify this release.

7              And I think it's important for a moment to stop

8    and go back to Mr. Basta's timeline.  It is true,

9    absolutely, we wanted a complete release all through the

10   process.  We did not get to the point where we were willing

11   to engage on a more limited release until the time of the

12   auction.  And it was in that same period of time in

13   conversations with the Debtors and the Subcommittee that ESL

14   did two things.

15             One, decided that it would be willing to put a

16   proposal on the table or consider a proposal, depending on

17   which point of view you have with respect to a more limited

18   release, but at the same time also assuming substantial

19   amounts of liability -- substantial amounts of liability and

20   increasing the overall value.  Mr. Kamlani testified

21   yesterday uncontradicted that the bid that went in on the

22   28th of December, the bid deadline, compared to the bid that

23   was accepted had a difference, a positive increase in value

24   of $800 million.

25             So between the time that our bid went in on the

Page 93

1   28th and the winning bid was selected in the early morning

2   hours of the 16th, subject to documentation, we did two

3   things.  We increased the amount of consideration by

4   approximately $800 million and we also agreed to the more

5   limited release.  Now with respect to those -- and a lot of

6   this ties into all different pieces, but another piece of

7   this is that the same time that we were assuming

8   liabilities, we were addressing issues that dealt with the

9   so-called allocation with respect to unencumbered assets.

10          I think Your Honor's math is exactly right.  We've

11  got $5.2 billion of consideration, $1.3 billion of credit

12  bidding so that means there's $3.9 of other consideration.

13  But just to put a finer point on that to give you a couple

14  of data points, the protection agreements that had been

15  discussed, what are the protection agreements, right, and

16  what is the value with respect to that?  It was in the

17  context of that December 28th to January 17th period that we

18  increased our bid to take on responsibility for the entirety

19  of the protection agreements.

20          The protection agreements are if you go and buy a

21  stove or washing machine at Sears and they ask if you want

22  an extended warranty and you say yes and you pay $300 for

23  it, something along those lines.  That is an obligation of

24  Sears to continue to provide service and come out to your

25  home and fix these appliances to the extent they break.

Page 94

1    Like any insurance, it's a bet.  It's a bet that the quality

2    of the product is going to be such that you're not going to

3    have to spend nearly as much in repairing the appliance as

4    you did to buy the protection.  And so the accounting for

5    these is obvious when you describe it, but a little tricky

6    from a distance.

7              There's about a billion dollars' worth of

8    liabilities right now for protection agreements.  It's a

9    little less than a billion, but it's close enough to a

10   billion.  And so the question becomes, well, we took on the

11   responsibility for that in this transaction.  The present

12   value of discharging the obligations is somewhere in the

13   neighborhood of 400 to $430 million. However you view it, we

14   are taking on a substantial obligation.  If Sears

15   liquidates, that's a billion dollar claim.  It's a billion

16   dollar claim because everybody who bought those protection

17   agreements will no longer have protection and have a billion

18   dollars' worth of claims against Sears.  The fact that they

19   could be serviced for $430 million is irrelevant if there's

20   no one there to service it.

21             So we're taking on the obligations of about a

22   billion dollars.  Yes, it'll cost us about 430 to service

23   it, but we are takin off of the liquidation balance sheet of

24   the Debtors approximately a billion dollars' worth of

25   liabilities.

Page 95

1          There are several other instances where the bid

2     was improved substantially during that period of time, all

3     of which accrues for the benefit of the -- you know, for

4     credit with respect to the non-encumbered assets.

5          Also with respect to the non-encumbered assets,

6     Your Honor, there's an issue that goes into liquidation, the

7     liquidation analysis.  And I think as Your Honor has

8     appropriately said, what we're doing is comparing this

9     transaction to the opportunity presented, maybe the less-

10    desirable opportunity hopefully, of liquidation.  And when

11    you look at the liquidation analysis, including the one that

12    was just presented to Your Honor by the Debtors in their

13    deck, what you're looking at there is a question of the

14    liability with respect to the priority scheme on how

15    obligations flow through.

16          In this circumstance, this transaction that is

17    being proposed to be approved is substantially better than

18    the liquidation alternative, and it's substantially better

19    than the one that the Debtors have shown you.

20          If you have their deck, Your Honor, I can direct

21    you to -- this is Page 16 of their deck.  Right?  It says

22    the benefits of the sale transaction outweigh an orderly

23    wind down.  And it's got two columns; the wind down column

24    and the sale transaction with assumed creditor recoveries

25    under each column.  The first column, under wind down, is

Page 96

1    the liquidation alternative.  So looking at that first

2    category, administrative and other priority claims, there's

3    an assumed recovery under that liquidation scenario of a

4    hundred percent.

5              That's simply incorrect, Your Honor.  Because if

6    you go one, two, three, four, five lines down, there is a

7    line for second lien 507(b) claims, and it says 41 percent.

8    Now, the 507(b) claims, Your Honor will recall, relate to

9    the second lien facility that has second lien positions with

10   respect to all of the collateral securing the first lien

11   ABL.  There has been a diminution in value since the filing

12   of the case.  The amount of the collateral, the amount of

13   the collateral as of the petition date versus the amount of

14   the collateral today is substantially diminished.  And the

15   diminution was used to fund the estates and the operations.

16             The 41 percent number is incorrect because the

17   507(b) claims are senior, both by statute and by the DIP

18   order that Your Honor entered to the administrative and

19   other priority claims.

20             So whatever those amounts are, and we understand

21   that the Debtors may disagree with our point of view, which

22   we think is in the neighborhood of $700 to $900 million,

23   those 507(b) claims are entitled to recovery before and

24   above the administrative and other priory claims.

25             So what we're talking about here when you flow

Page 97

```
 1    that through is that the administrative and solvency in a

 2    wind down scenario is enormous.  And the only way it's not

 3    is if you ignore the law and if you ignore the orders that

 4    this Court has entered with respect to the 507(b) claims and

 5    the diminution of value since the petition date.

 6              THE COURT:  At least you'd have a fight over it.

 7              MR. BROMLEY:  We would certainly have a fight

 8    about it, Your Honor.

 9              THE COURT:  Okay.

10              MR. BROMLEY:  And there's a lot of fights to be

11    had.  Hopefully that's not one of them.  But on that one we

12    feel good that the statute tells us very clearly, and so

13    does the order that Your Honor entered.

14              So, Your Honor, with respect to the -- going back

15    into the analysis of the release and, you know, the

16    subcommittee and the Paul Weiss brief made very clear, I

17    won't belabor the point, both equitable subordination and

18    recharacterization are extraordinary remedies.  We don't

19    believe that there were facts or circumstances that would

20    give rise to any valid claim.  But in the context of trying

21    to make a commercial transaction work here and because of

22    the huge desire that ESL has to try to go forward and make

23    this company succeed in the future, we were willing to put

24    the settlement proposal on the table.  But it doesn't mean

25    that you shouldn't take into account the fact that the
```

Page 98

1    caselaw is very clear.  Those are extraordinary remedies.

2    They do not come across any of our desks in a fully-

3    litigated fashion very often.  And the reason for that is

4    they are incredibly factually intensive and the standards

5    are very high.

6            Your Honor, there's been some criticism made about

7    the conduct of the auction and whether it was open and fair

8    and transparent.  We were a mere participant, and to an

9    extent there was nothing that we did to have any role in

10   trying to keep anyone out or anyone in.  When we showed up

11   at Weil's offices for the auction, we had no idea who would

12   be there or who wouldn't be there or what we were bidding

13   against.  We were not provided with any advanced notice of

14   any competing bids, and frankly as we stand here today have

15   no idea who bid what for anything, notwithstanding demands

16   that we had made for that information.

17           THE COURT:  You're going to have to let other

18   people who want to object to have a chance.  I mean, I don't

19   know how much longer you're going, but --

20           MR. BROMLEY:  I'll be wrapping up, Your Honor.

21   I'm sorry.

22           One thing I do want to say is -- you know, I'm not

23   going to go into any detail on refuting the allegations that

24   have been made in the creditors committee's pleadings.

25   Thirty or 40 of their pleadings were filled with accusations

Page 99

1   about my client, about actions that they may or may not have

2   taken in the pre-petition period.  We don't view this to be

3   the time or the place to be dealing with any of those, and

4   would hope that Your Honor would be of the same view.  To

5   the extent that Mr. Qureshi's colleagues feel a need to get

6   into that and Your Honor allows it, I would want to reserve

7   time to respond to that.  Let me just see if I have anything

8   else here.

9           So I think in light of the issues that have been

10  covered by my colleagues from Weil Gotshal and Paul Weiss,

11  that's all I have for Your Honor today.  Again, reserving my

12  rights to the extent that there is a need.  Thank you.

13          THE COURT:  Very well.  What?  I'm sorry.  I hope

14  your leg hasn't gone to sleep.

15          MR. SELTZER:  Your Honor, I'll only be about two

16  minutes.

17          THE COURT:  Okay.

18          MR. SELTZER:  Very quickly.  Richard Seltzer of

19  Cohen, Weiss, and Simon for the United Auto Workers, the

20  United Steel Workers, and Workers United SEIU.  These three

21  unions were also creditors representing employees of five

22  distribution and soft goods centers of the Debtors in

23  Pennsylvania, New York, and California.

24          And the first thing I'd say I think it's important

25  listening to this morning, that the Debtors and the buyer if

Page 100

1    the sale is approved, be in excellent communication with

2    employees about their status.  It sounds like they're going

3    to continue being employees of the Debtors for some period

4    of time under services leased.  Whatever the story is, I

5    think it's important that that be communicated to the

6    employees.

7              THE COURT:  I agree with that.

8              MR. SELTZER:  We've been in communications with

9    the Debtors, and it's our understanding that the five

10   locations that we represent people at will be sold, and

11   probably three of them will continue operations.

12             We represent -- the unions I represent represent

13   hundreds of workers whose jobs are important to them, their

14   families, and their communities.  And we hope that the

15   Debtors and the buyers will have the sense to assume the

16   respective collective bargaining agreements that are on the

17   list of agreements that may be assumed because we think that

18   makes sense for labor stability, business stability, and

19   equitable treatment.

20             One of the main goals of Chapter 11 is to preserve

21   jobs.  The one case that the creditors committee cited for

22   sort the opposite proposition was the in re After Six case

23   of Judge Scholl in Philadelphia.  And the case actually

24   stands for exactly the opposite.  It may be limited in its

25   analysis, but it certainly held that a Debtor exercising its

Page 101

1    business judgement can take into consideration the

2    preservation of jobs in a sale.

3         The point I ultimately rise to make is simple but

4    telling.  While the unions we represent do not condone some

5    of the kinds of activities that at least are alleged in the

6    creditors committee's papers, and while we do not look at

7    life through rose-colored glasses, either for the past or

8    the future, at the end of the day the unions' members and

9    other employees will either have the opportunity to continue

10   their jobs working for Sears or Kmart, or they'll be out of

11   work.  In the real world of real, working people and real

12   jobs, not the world of armchair experts who sounded to me

13   like we're thinking about this ultimate universe.  These

14   jobs are vital, they're important, and they're not easily

15   replaced.  There was no other offer that even suggested the

16   possibility of maintaining jobs.

17        And so the UAW, the USW, and Workers United SEIU,

18   while supportive of any efforts to improve the offer or

19   improve the lot of employees or improve the value of the

20   estate, support this sale.  Thank you.

21        THE COURT:  Okay, thanks.  Okay.  Why don't I hear

22   from the committee and any other objectors.

23        MR. QURESHI:  Thank you, Your Honor.  For the

24   record, Abid Qureshi, Akin Gump, for the committee.  Your

25   Honor, may I approach with a short presentation?

Page 102

1          THE COURT:  Sure.

2          MR. QURESHI:  Your Honor, before I get into the

3    presentation, there's just a couple of things that I'd like

4    to respond to from Mr. Basta's remarks initially.  And the

5    first is -- and we'll say I'm going to approach this a

6    little bit differently.  Unlike Mr. Basta and Mr. Schrock

7    and Mr. Bromley, I'm not going to testify from the podium,

8    which I think Your Honor heard a lot of.  I'm going to focus

9    instead on the evidence that's in the record.  But I do want

10   to respond to the allegation concerning the committee and

11   the committee's decision-making process.

12          And the suggestion has been made that somehow this

13   committee is dominated by landlords.  It's not, Your Honor.

14   The committee's membership is two landlords, two trade

15   creditors, one indenture trustee, as well as the PPGC.  Your

16   Honor, every member of the committee and all of the

17   committee's professionals take their fiduciary duties very

18   seriously, and every action the committee has taken in this

19   case has been with the unanimous support of the committee

20   members.

21          Secondly, Your Honor, Mr. Basta suggested that

22   committee has never said -- let us work the contract I think

23   was the phrase he uses.  And frankly, Your Honor, given what

24   transpired here, I find that comment really hard to take.

25   Your Honor, there's record evidence that at this auction the

Page 103

1   committee was not consulted.  Yes, it is true --

2            THE COURT:  I took what Mr. Basta said with a

3   grain of salt.  And frankly, I don't need to get into

4   committee deliberations.  I'm just evaluating what's in

5   front of me, and motivations are not particularly relevant

6   to me.

7            MR. QURESHI:  I agree wholeheartedly with that,

8   Your Honor.  I --

9            THE COURT:  And I also take -- I mean, it sounded

10  facetious, but I also take seriously the point that the

11  committee being a total pain in the neck may be the best

12  negotiating strategy.  So I don't want to get into that.

13           MR. QURESHI:  I raise it only, you know, because

14  the consultation provision is there so that the committee

15  can be used to improve the deal.  And we'd love nothing more

16  than a better deal.  We don't have -- we have the deal that

17  we have, and it's one that we object to.

18           And with that, Your Honor, if I could ask the

19  Court to turn to the second page of the presentation that

20  I've handed up.  And I want to start with what I think is

21  the fundamental defect in this bid, and it relates to the

22  allocation point.  Now, as Your Honor observed already, the

23  testimony is unanimous from all of the witnesses that there

24  was no allocation.  Now, Mr. Carr in his cross-examination

25  made clear why that's an issue.  Because he could not

Page 104

1    explain how the credit bid was being allocated as --

2              THE COURT:  Well, let's just go to my question.

3              MR. QURESHI:  Sure.

4              THE COURT:  Is there a value here in the

5    unencumbered assets on a reasonable basis in excess of

6    either $3.9 billion or $3.5 billion depending on how you

7    count the rollover of the DIP, the junior DIP?

8              MR. QURESHI:  I think there is, Your Honor.  If

9    Your Honor turns to slide three -- and what I'll try to do

10   here is walk through the numbers.  But before I do that,

11   Your Honor, we don't accept that the right way to do this is

12   to simply globally take 5.2, deduct 1.3, get 3.9 and it's

13   that simple.  The DIP order requires that the ABL only be

14   satisfied by the ABL collateral.  This is not an estate

15   that's been substantively consolidated, and so I don't think

16   it's necessarily appropriate to look at it globally on that

17   basis.

18              But, Your Honor, let me if I could walk through a

19   few of the numbers.  So on --

20              THE COURT:  I'm sorry, the ABL is -- I didn't

21   follow that point.  I mean, what is happening with the ABL

22   under this deal?

23              MR. QURESHI:  So it's being repaid.

24              THE COURT:  In cash.  Not a credit bid.

25              MR. QURESHI:  Correct.

1            THE COURT:  All right.  So let's move on from that

2       point.

3            MR. QURESHI:  Okay.  So, Your Honor, if Your Honor

4       looks at this chart.  And this is a chart that appeared in a

5       slightly different form in our objection.  There have been

6       some changes to it based on the testimony and the evidence

7       that has come in.  If Your Honor looks at the consideration

8       paid column here.  And what I'd like to focus on first of

9       all is the assumed administrative claims.  So the 503(b)(9)

10      numbers, the severance and warrant, all those numbers that

11      add --

12           THE COURT:  This is page what?

13           MR. QURESHI:  Page 3 of the presentation.

14           THE COURT:  Page 3, thank you.

15           MR. QURESHI:  And there's a chart there.  And I'm

16      beginning --

17           THE COURT:  I just want to make sure I'm on the

18      right page.

19           MR. QURESHI:  Sure.  It's beginning on the right

20      side, the consideration paid side of this page.  And what's

21      set forth here is a number of the assumed liabilities.  And

22      on the top, the junior DIP we have at $175 million, gift

23      card liabilities at $13 million.  A total of 789.  Now, if

24      Your Honor looks a little further down, we've included two

25      additional items that we don't think are appropriately in

Page 106

1    the consideration paid column, and I'll explain why.  But

2    even if Your Honor disagrees with that, we think there's

3    still a shortfall of consideration for the unencumbered

4    assets.  Those two items that we disagree with are the PA

5    liabilities, the protection agreement liabilities at $465

6    million, and the additional junior DIP at $175 million.

7              And just briefly on those two, Your Honor.  The

8    assumption of the junior DIP, why we in our analysis think

9    that it's only fair to look at half of that as being an

10   assumption, that's because -- and this is detailed on the

11   next slide.  But, Your Honor, the company's own numbers show

12   that the second draw of $175 million, the only purpose that

13   served was to get these estates from the auction to the

14   closing date essentially.  But again --

15             THE COURT:  So you're saying that that's a 506(c)

16   claim instead?

17             MR. QURESHI:  Well, Your Honor --

18             THE COURT:  Not reciting Flagstar?  Come on, let's

19   be realistic here.  So I'm going to create law now that

20   every DIP loan is subject to 506(c)?  Give me a break.

21             MR. QURESHI:  So, Your Honor --

22             THE COURT:  And I want to -- now let's go to the

23   PA liabilities.  You ever liquidated insurance company?  So

24   how are those claims treated?

25             MR. QURESHI:  The reason that we suggest that the

Page 107

1    PA liabilities are not appropriate here is because in the

2    wind down scenario there were expressions of interest for

3    the Sears Home Services business.  And those expressions of

4    interest included --

5                THE COURT:  All right, well, get to that point.

6    All right.

7                MR. QURESHI:  -- assumption of the liabilities.

8                THE COURT:  Okay, fine.

9                MR. QURESHI:  So, Your Honor, let's not take those

10   items out.  So consideration paid --

11               THE COURT:  Well, no.  You're treating them at 465

12   instead of a billion.

13               MR. QURESHI:  That is correct, Your Honor.  And

14   the reason we do that is, again, because of the record

15   evidence and the testimony as cited on Page 5 --

16               THE COURT:  That's what they're booked at.  But as

17   a claim, it's a billion dollars.  I go back to -- have you

18   ever liquidated an insurance company?

19               MR. QURESHI:  No, Your Honor.

20               THE COURT:  All right.

21               MR. QURESHI:  And then over on the asset purchased

22   side, Your Honor, I want to focus in particular -- so

23   there's a low and a high.  And the differences are driven,

24   number one, by the real estate valuation.  And I'll get to

25   that talking only about the low-end numbers.  And beyond

Page 108

1    that, Your Honor, it's what we believe to be equity value in

2    Sparrow, in the Sparrow assets and equity value in the

3    assets securing the IGPL loan, which is set forth at the

4    bottom of the page.  And if you total those two up and you

5    add it to the other assets that are being purchased, that,

6    Your Honor, is where we think we get to the shortfall.

7             And if I can ask the Court to turn first -- next

8    to Slide 6.  And what I want to talk about very briefly is

9    the real estate value, to make sure that the Court is clear

10   as to in our low-end number what constitutes the difference.

11   So there are 555 properties in the Debtor's unencumbered

12   real estate valuation that the Debtors did not value.  What

13   Mr. Greenspan did with those properties is he said, well,

14   let's take a look at them and see if there's any basis to

15   value them.  Eighty percent of them he agreed, he gave a

16   zero.  The balance he valued at $126 million.

17            Now, two important things with respect to Mr.

18   Greenspan's valuation.  One, he did the valuation on a dark

19   basis.  So there was no assumption that there would be an

20   operating company that would keep these properties lit with

21   all of the expenses associated with that.

22            Secondly, he deducted from his valuation an

23   estimate of carrying costs for those dark properties to

24   carry them through the lengthened sale process that his

25   analysis was based on.  The second bucket of properties

Page 109

1   there's 402 at, his valuation, $800 million as against the

2   debtors at 634.  So that difference is made up of two

3   things.  One is, Your Honor, the Debtors took a 75 percent

4   discount to liquidation value, Mr. Greenspan took a 60

5   percent discount to liquidation value for reasons explained

6   in his report, which we think are well-founded.

7           So in addition on the Debtor's side of that

8   analysis, Your Honor, what the Debtors did is their expert

9   gave equal weight in that analysis to non-binding

10  indications of interest, including those that came in at

11  zero or, as your honor asked Mr. Meghji, did that apply

12  equally to a $500 expression of interest.  And the answer is

13  that it did.  So we do think --

14          THE COURT:  Right.  Do you dispute that he said

15  the delta there if you didn't include any of that was $70

16  million?

17          MR. QURESHI:  I believe that's right, Your Honor.

18          THE COURT:  Do you dispute Mr. Greenspan's

19  testimony that the $70 million was just a rounding error, so

20  he didn't even include it in his adjustment?

21          MR. QURESHI:  I think mathematically the way he

22  expressed his overall range for all of the properties,

23  that's correct.

24          Now, Your Honor, if I could move on --

25          THE COURT:  Do you dispute that he ascribed value

Page 110

1        to leases where the secured interest in the lease exceeded

2        the value of the lease?

3                MR. QURESHI:  Your Honor, I don't know the answer

4        to that question.  I'll try to get that.

5                THE COURT:  Okay.

6                MR. QURESHI:  Your Honor, if I could ask the Court

7        to then turn to Slide 8.  And this gets to the collateral

8        that secures the Dove and the Sparrow properties.  And Your

9        Honor will recall that I took Mr. Kamlani through this

10       document.  There is an appraised value and a schedule

11       prepared by Mr. Kamlani of those properties of $1.65

12       billion.  The term sheet which is also in evidence quite

13       clearly identifies the Dove and the Sparrow collateral as

14       the collateral that secures that loan.

15                If Your Honor turns to the next page, we know from

16       the asset purchase agreement that $544 million of the Dove

17       debt is part of the credit bid here.  Mr. Kamlani

18       acknowledged that with that credit bid what ESL was

19       acquiring was the collateral that secured that.  So by

20       simple math of subtracting that 544 from the overall 165,

21       the remainder of that value is attributable to the Sparrow

22       properties, as acknowledged by Mr. Kamlani.  The Sparrow

23       properties have some debt on them that's not in credit bid.

24       So you back out that debt and, Your Honor, you're left with

25       $560 million of equity value in Sparrow.  And there's no

Page 111

1    evidence as to how that's being paid for other than by

2    credit bid.

3                Your Honor, similarly, the IPGL loan.  If Your

4    Honor turns to Slide 10.  Now, the IGPL loan is being credit

5    bid, as set forth in the asset purchase agreement, in the

6    amount of $231 million.  Now, the value of the collateral

7    pledged under that loan exceeds that debt.  The Debtors --

8    there's two components to that debt, Your Honor.  One is the

9    IP, and the second is the leases.  So looking first at the

10   intellectual property.  We've excerpted on the page, Your

11   Honor, of the wind down recovery from the Debtors that shows

12   that the IP in the IGPL loan was valued by Ocean Tomo at

13   $345 million.  And with respect to the ground leases that

14   are part of that loan, those were valued by the Debtors at

15   $119 million.  That's also excerpted.  And that, by the way,

16   represents a 50 percent discount to the appraised value.  So

17   those are conservative values.

18                And Mr. Kamlani, in response to questioning not by

19   me, Your Honor, but by Mr. Bromley, confirmed that at the

20   time of that loan, the collateral value exceeded the amount

21   being lent, and he confirmed, as he did with respect to

22   Sparrow, same questions, that he's not aware of any change

23   in those values as of the time that he testified.

24                Your Honor, one more difference from between the

25   committee's numbers and the Debtor's numbers with respect to

Page 112

1    the unencumbered value.  And that relates to unencumbered

2    collateral where we had, Your Honor, back on Slide 3 for the

3    other unencumbered accounts receivable a value of $60 to $80

4    million.  We now have record testimony from Mr. Kamlani that

5    the value of that is significantly higher, $255 million

6    according to Mr. Kamlani.

7             So, Your Honor, the bottom line here is we don't

8    think that there is value being received by these estates

9    for all of the unencumbered assets, and we don't think

10   there's evidence in the he record that supports that there

11   is.  And on that basis, we don't think that the credit bid

12   can be approved.

13            Okay, Your Honor, if I could move on to the

14   accounts payable issue.  And this is addressed on Slide 12.

15   If I understand correctly what I've heard from both the

16   Debtors and from ESL, we don't have a deal.  We don't have a

17   deal because there is a disagreement over what the Debtors

18   consider to be, and we agree, a very material term.  And,

19   Your Honor, in an estate that is indisputably being left

20   administratively insolvent today if this transaction closes

21   tomorrow, this estate is simply not in a position to close

22   this transaction and then immediately litigate with Mr.

23   Lampert.

24            And so we do think that this is an issue to the

25   extent Your Honor is otherwise prepared to approve this

Page 113

1    transaction that needs to be resolved and resolved in the

2    Debtor's favor before there is a closing.  It just makes no

3    sense to close the transaction and begin to litigate.

4              I also think, Your Honor --

5              THE COURT:  That's exactly what the Second Circuit

6    says I'm supposed to do.

7              MR. QURESHI:  Well, we think, Your Honor, that

8    certainly in a context here where the estate is

9    administratively insolvent, the company's evidence, not the

10   committee's argument, $42 million was the amount of the

11   insolvency.  And if, as I understand the bid and the ask in

12   terms of what ESL is prepared to pay, the amount of

13   administrative insolvency goes up another $43 million.  So

14   while I don't disagree that in other circumstances it might

15   be appropriate to close the transaction and allow that

16   litigation to happen here, respectfully, Your Honor, I don't

17   think that the Debtors in the exercise of their sound

18   business judgement can or should do that.  Not when there is

19   an alternative in the form of what we have called the

20   alternative sale transaction, the liquidation option, which

21   we think yields a better result to begin with, and not when

22   the estate is simply not going to have the resources to

23   litigate.

24             In addition, Your Honor, I think that when one

25   adds what's happening in court today on this provision to

1    all of the other conduct of ESL and of Mr. Lampert that is

2    part of the record, it rises to the level of whether this is

3    a good faith offer under 363 --

4            THE COURT:  What other conduct is part of the

5    record other than litigation claims that you and the special

6    committee have asserted?

7            MR. QURESHI:  Your Honor, I'm about to get to it.

8            THE COURT:  Okay.

9            MR. QURESHI:  So for all of those reasons, Your

10   Honor, we don't think it's appropriate in these

11   circumstances with an administratively insolvent estate to

12   close on a dispute like this.

13           And unless I misheard the Debtors, I don't believe

14   the Debtors are prepared to close so long as this is an open

15   issue, either.  That's how thin the line is in this case

16   between whether this transaction makes economic sense or

17   does not.

18           Now, Your Honor, I think there are a number of

19   other issues that remain unresolved.  And I will add that we

20   received overnight more than 600 pages of deal documents.

21   Revised sale order, revised asset purchase agreement, a

22   transition services agreement, new releases.  Your Honor,

23   we're simply not in a position, despite literally having the

24   entire team up all night, to respond in a detailed way to

25   very dense documents that have very material terms in them.

Page 115

1    And yet despite that flood of overnight documents, as I

2    understand it, there are still material things that,

3    frankly, I'm not sure are resolved.  503(b)(9) claims for

4    example.

5              THE COURT:  Have you read the order?

6              MR. QURESHI:  I'm sorry?

7              THE COURT:  Have you read the order or has anyone

8    on your team read the order with the blackline?

9              MR. QURESHI:  Yes, Your Honor.

10             THE COURT:  Okay.

11             MR. QURESHI:  And we are --

12             THE COURT:  And you heard the representations

13   about the transition services agreement.

14             MR. QURESHI:  Right.  And, Your Honor, we are

15   concerned about the mechanics that are going to be in place

16   to deal post-closing with 503(b)(9) to ensure that to the

17   extent there's risk there, that is risk that is borne by ESL

18   and as the buyer --

19             THE COURT:  How concerned?  Did you raise the

20   issue ever until I raised it yesterday in light of your

21   cross-examination to kill the deal?

22             MR. QURESHI:  Your Honor, we have had numerous

23   conversations with the Debtors.

24             THE COURT:  No, no.  Did you propose a specific

25   change?

Page 116

1              MR. QURESHI:  Not prior to last night, Your Honor.

2              THE COURT:  Okay.  Why don't you propose one now

3     so I can hear it?

4              MR. QURESHI:  Again, Your Honor, not having had

5     the time to go through --

6              THE COURT:  No, no.  You haven't thought about it.

7     It was not to cross-examine someone about it, to raise the

8     issue in my mind.  So I raised it immediately.  But you're

9     so concerned about these people that you haven't made one

10    proposal.

11             MR. QURESHI:  Your Honor --

12             THE COURT:  Maybe the two vendors on your

13    committee might think about that.

14             MR. QURESHI:  Your Honor --

15             THE COURT:  I wasn't going to speculate, but I do

16    now have a record on one big issue as far as your

17    committee's operation.

18             MR. QURESHI:  Your Honor, we --

19             THE COURT:  So make the proposal that you say

20    should fix it.

21             MR. QURESHI:  We have made clear, Your Honor, that

22    the 503(b)(9) provisions, the reconciliation of those claims

23    needs to happen in a way so that the debtor is able to

24    reconcile those liabilities without bearing the risk, that

25    the risk of that should be borne by ESL.

Page 117

1           THE COURT:  But ESL is picking it up.  it's just

2    the Debtor is liquidating it and it's within the budget

3    that's part of the calculation of the going forward costs,

4    unless you dispute that.

5           MR. QURESHI:  Your Honor, it's not that we dispute

6    it, it's that we haven't been shown the details.

7           THE COURT:  It's a claim objection process.

8           MR. QURESHI:  Your Honor, also with respect to the

9    Cyrus release, we just don't understand why a Cyrus release

10   should be approved.  First of all, Cyrus does not need

11   release in order to credit bid.  Cyrus' consent to a credit

12   bid isn't even required.  ESL can and has directed the

13   indenture trustee to credit bid those claims.  And secondly,

14   our understanding and the reason, I think, that the asset

15   purchase agreement as it was originally filed did not have a

16   release for Cyrus is that ESL had obtained the financing

17   commitments to satisfy the junior DIP, and they did that

18   without the need for any release from Cyrus.  And so the

19   auction record was clear on that point.  And then all of the

20   sudden Cyrus shows up and says we want to release and, by

21   the way, we're not prepared to pay for it.

22           THE COURT:  Well, they roll over the DIP.

23           MR. QURESHI:  Well, but again, Your Honor, the

24   estate isn't getting anything in return for that.  The

25   estate had --

Page 118

```
 1              THE COURT:  I'm sorry, the DIP is rolled over.
 2    It's not paid for in cash.
 3              MR. QURESHI:  Your Honor --
 4              THE COURT:  How much is that junior DIP?
 5              MR. QURESHI:  $300 million.
 6              THE COURT:  All right.  And what would happen if
 7    it wasn't rolled over, to your administrative claims
 8    analysis, your professed concern about administrative
 9    insolvency?
10              MR. QURESHI:  The concern is not professed, Your
11    Honor.
12              THE COURT:  Well, what would happen to that
13    amount?
14              MR. QURESHI:  ESL --
15              THE COURT:  What would happen to that amount?
16    Would it get paid or not?  Would it have to get paid as a
17    priority administrative expense?
18              MR. QURESHI:  My understanding, Your Honor, is it
19    would have been paid by the financing commitments that --
20              THE COURT:  No, no, not would have.
21              MR. QURESHI:  -- ESL had in place.
22              THE COURT:  Today, today.  The Second Circuit in
23    FNN says that the bankruptcy court has a difficult balancing
24    act in dealing with these decisions in real time.  So today
25    what would happen to that $335 million if you go into a wind
```

Page 119

```
 1   down?

 2            MR. QURESHI:  Today it would be an administrative

 3   claim, of course.

 4            THE COURT:  All right.  And instead it's being

 5   rolled over.  And you don't think there's any value to the

 6   debtor in that?

 7            MR. QURESHI:  Your Honor, we are looking at it

 8   from the perspective of if the transaction closes.

 9            THE COURT:  But in past tense.  Because that's

10   what litigators do; they like to litigate things that happen

11   in the past.  But that's not what bankruptcy lawyers and

12   bankruptcy judges do.  They have to look at transactions

13   that are supposed to happen in the he future.

14            MR. QURESHI:  And when the ESL bid was selected as

15   the highest bid at the auction, ESL had committed financing

16   in place to satisfy the junior DIP.  And they had that

17   financing in place without the need for a release from

18   Cyrus.

19            THE COURT:  And now they don't.

20            MR. QURESHI:  And now they don'[t.

21            THE COURT:  Right.

22            MR. QURESHI:  They changed the deal --

23            THE COURT:  So we should just pull the plug.

24            MR. QURESHI:  No, we shouldn't pull the plug.  We

25   should say to Cyrus, go forward, but without a release.  Or
```

Page 120

1    we should --

2              THE COURT:  Well, I said that last night.  I don't

3    know if you did or your partner did.  I did.  And they

4    carved out what seemed to be the real concern, which is

5    something beyond the release that ESL was getting.  So let's

6    move on.

7              MR. QURESHI:  Very well.

8              THE COURT:  Basically so far I'm finding all of

9    this highly pretextual.

10             MR. QURESHI:  I will nonetheless continue to make

11   the record, if I may, Your Honor.

12             THE COURT:  Yes.  I know it's hard for you, but

13   you should go ahead and do that.

14             MR. QURESHI:  Your Honor, the transition services

15   agreement, again, one of the documents that we received

16   overnight.  And, Your Honor, these are not documents about

17   which we are consulted before we get them.  These are not

18   documents about which our input is sought before we receive

19   them.

20             THE COURT:  Let me tell you how I look at the

21   transition services agreement.

22             MR. QURESHI: Sure.

23             THE COURT:  I agree with you completely on that

24   point.  All right?  But I have a record here, which is that

25   this agreement is more than neutral for the Debtor, that the

Page 121

1    Debtor actually does better under this agreement than if

2    they were just compensating each other for the fair value of

3    the services.  And if that's not true, that's not what I

4    approved.  That's what I'm approving; what I just said and

5    what the record says.

6              MR. QURESHI:  Your Honor, I didn't think there was

7    any evidence about the TSA.

8              THE COURT:  There were representations by both

9    sides as to what it contains and its bottom line.

10             MR. QURESHI:  Your Honor, let me move on to

11   another area that I have no doubt the Court will disagree

12   with.

13             THE COURT:  Okay.

14             MR. QURESHI:  But I will, again, make the

15   argument, nonetheless.

16             We do think that ESL in a number of ways acted

17   inappropriately in the auction process and acted in a way

18   that we think influenced the outcome.  And let me go through

19   a handful of the ways in which we think that happened.

20             First of all, we introduced into evidence an email

21   from Mr. Transier which we found somewhat odd, that an

22   independent director put in place in a role designed to

23   investigate Mr. Lampert would at the very outset of that

24   process send him an email with the subject line, Very

25   Impressed, followed by a request from Mr. Lampert that they

Page 122

1    meet in person.

2         And then we get into the auction process itself

3    when these independent directors, Mr. Transier and Mr. Carr,

4    are supposed to be assessing ESL's bids.  And what happens?

5    Threats from Mr. Lampert.  You're going to get sued

6    immediately, you should be removed from your role as an

7    independent director, you should be bypassed completely

8    because you didn't approve my bid.

9         THE COURT:  The threat that you're referring to is

10   the letter, right?

11        MR. QURESHI:  Yes.  It's on Slide 21.

12        THE COURT:  Were you a party to the chambers

13   conference that we all had on that that was called

14   immediately after that letter was delivered?

15        MR. QURESHI:  I was, Your Honor.

16        THE COURT:  So since I ran it, I will for the sake

17   of the record state that I said that letter should be put in

18   a drawer and forgotten about because it had no effect and

19   was half-baked because, among other things, it did not deal

20   with the fact that ESL's bids had at that point insisted

21   upon a complete release.  And there's no doubt in my mind

22   that everyone in that conference understood that that letter

23   was a dead letter.  And I believe the record reflects in

24   terms of negotiations thereafter that understanding.  And if

25   anyone believed to the contrary, including you and your

Page 123

1   partners, you could have come to me and said no, they're

2   still leaning on it.  And I didn't get that.  And you know

3   that I would have reacted immediately if I had been apprised

4   of that.

5            MR. QURESHI:  And neither I nor my partners had a

6   different understanding, Your Honor.  But that is not what's

7   relevant here.  What's relevant here is did it have an

8   impact on the decisionmakers?  And for that, Your Honor,

9   look at the next slide, Slide 22.  We have minutes where Mr.

10  Schrock explains that it was describing what the advisors

11  and the management have been doing to get to a deal.  It was

12  hard to do amidst threats of court action from the primary

13  counterpart where Mr. Schrock describes in the auction

14  transcript a situation that was very difficult for his

15  subcommittee where an insider and a chairman is threatening

16  litigation with the very party whose bid they are supposed

17  to be evaluating.

18           So from that perspective, Your Honor, while we

19  certainly as counsel to the committee viewed the threats to

20  be empty, that's not what's relevant.  What's relevant is

21  the decisionmakers and how did the decisionmakers view it.

22  And that is why we referred to it here.

23           Next, Your Honor, the letter from the office of

24  the CEO.  And this one, Your Honor, is the one that I find

25  most troubling.

Page 124

1           So, subsequent to Mr. Lampert's resignation as the

2   CEO, the office of the CEO was created that consists of the

3   three people whose names are here on Slide 23.  Now, Your

4   Honor, this is the senior management team of the company

5   whose job it is to provide guidance and make recommendations

6   to the board of directors on numerous important operational

7   issues, and most of all during this timeframe the ESL bid.

8   And yet the very people that are supposed to be doing that

9   were requested by Mr. Lampert to write a letter to the

10  board.  They then apparently wrote that letter, sent a draft

11  of it to Mr. Lampert's counsel.  And then that letter was

12  sent to the board.  And the letter says, Mr. Lampert, we

13  support you and we support your bid.  And that's the

14  management team that the board is supposed to take advice

15  from, all engineered by Mr. Lampert.

16          So do we think that had an impact on the decision-

17  making process?  Yes, we do.  Do we think that was

18  inappropriate conduct by Mr. Lampert?  Yes, we do.

19          Now, Your Honor, moving on to the release.  And I

20  am not going to get into the merits of the claims.  It was

21  never our intention to do that.  I will state simply that we

22  incorporated by reference into our pleading our standing

23  motion in the complaint that was attached thereto.  We think

24  the claims are very well-founded.  We think that that

25  complaint in every respect easily passes a motion to

Page 125

1    dismiss.  We think the claims are more than colored.

2            Why do we think the release and the consideration

3    for the release are woefully insufficient here?  Two

4    principal reasons, Your Honor.  Number one, the claim

5    allowance that was allowed here to allow ESL to credit bid,

6    it's more than was needed to allow them to credit bid.  We

7    think that if the claims allowance was limited to the $1.3

8    billion that is credit bid and the balance of the claims

9    were subject to recharacterization and equitable

10   subordination, that would have been a more appropriate

11   balance.

12           Secondly, Your Honor, in light of all of all of

13   ESL's claims being allowed, what is fundamentally

14   problematic from our perspective with the release, the

15   credit bid, and the consideration for those two things, is

16   that with the 502(d) remedy given up, the estate is now in

17   the position of having to look to ESL and to Mr. Lampert to

18   recover on what the restructuring subcommittee agrees are

19   very valuable claims.  There is no record evidence at all

20   that the subcommittee conducted any diligence to inquire

21   into is it going to be easy or difficult to recover against

22   ESL.  Where are ESL's assets?  Are they offshore, are they

23   in trusts?  How are Mr. Lampert's assets held?  Those are

24   all potentially significant collection issues that the

25   estate is now being put at risk of because the 502(d) remedy

Page 126

1    has been given up and has been given up to a greater degree

2    than necessary to allow the credit bid.  And that's

3    problematic, particularly on a record where no such

4    diligence was performed.

5              In addition to that, we know from the testimony of

6    Mr. Kamlani that a very substantial portion of the value of

7    ESL is tied up in Sears.  And another significant chunk of

8    the value of ESL is tied up in Seritage.  Seritage will be a

9    defendant for a very substantial claim.  And we know that a

10   substantial amount of the value of ESL is Mr. Lampert's

11   personal capital, all tied up in Sears and in Seritage.

12             Your Honor is aware from the evidence we've

13   presented --

14             THE COURT:  No, I thought the personal capital was

15   separate from Sears and Seritage.

16             MR. QURESHI:  Well, I think the evidence is that

17   of the assets undermanagement by ESL, some very substantial

18   portion of that, I think maybe 70 percent, is Mr. Lampert's

19   personal money.

20             THE COURT:  Right.

21             MR. QURESHI:  So, Your Honor, there is --

22             THE COURT:  I understand the remedies point.  In

23   terms of the showing that you would have to make, it's

24   basically the same.  It's very close.  I mean, there's some

25   more discretion that a judge would have under equitable

Page 127

1    subordination, but it's actually quite close, particularly

2    given the other -- the language we went through early on in

3    the release.  But as far as the remedies issue is concerned,

4    the valuations, either on a liquidation basis or -- I mean,

5    committee's valuations on a wind down basis or the

6    valuations of the deal show that there is substantial value

7    not subject to liens in the purchased assets.  And frankly

8    even 30 percent of the remaining 30 percent of ESL would

9    seem to me to be still a very large amount of money when

10   you're talking here.

11            So I understand the issue, that you have to go and

12   collect.  But given that it's a public company and given

13   that they're certainly on notice of these claims and that

14   any transfers of assets out after that notice would be per

15   se a fraudulent transfer, under New York law at least, to

16   me, I just -- I'm not sure why it is such a big deal to

17   equate a release for credit bidding and claim allowance

18   purposes as a general release in essence.

19            MR. QURESHI:  Your Honor, I think it all comes

20   down to the collection risk on the estate and whether it

21   makes sense to take that collection risk when a much more

22   certain remedy is at hand in the form of 502(d) and when

23   that could have been achieved while still allowing a credit

24   bid.

25            THE COURT:  Well, except at that point you're

Page 128

1    collecting from the proceeds of a liquidation of the real

2    estate assets and GOB sales over a relatively short time and

3    fighting with ESL and Cyrus over 507(b), which is a

4    superpriority, and 503(c).  So, you know, it's not like you

5    could snap your fingers and bring in the money.

6         MR. QURESHI:  Your Honor, let me move on to --

7         THE COURT:  I mean, no, I'm not -- that's not a

8    rhetorical statement.  Am I missing something on that?

9    Because that's how I've been looking at it.

10        MR. QURESHI:  No, look, Your Honor, I think that

11   when we assess the reasonableness of the deal that was

12   struck and we weigh the value of the claims on the one hand

13   with the consideration that was received on the other hand -

14   - and there was testimony from Mr. Basta about what that

15   consideration was.  It doesn't line up at all with what the

16   witness said, but that's a different story.

17        THE COURT:  But again, it's consideration for a

18   limited release on remedies.

19        MR. QURESHI:  Yes.

20        THE COURT:  And, you know, 35 million in cash plus

21   a cap on recoveries from certain -- which are effectively

22   going to be their only remaining assets -- in return for a

23   limitation on remedies as opposed to bring claims and to go

24   after what at least appear to me to be substantial assets,

25   seems to me to be a pretty fair deal.

Page 129

1           MR. QURESHI:  Your Honor, the other concern that

2    we have, and it continues to relate to collection risk, is

3    very strong doubts about what's going to happen with new

4    Sears after this transaction should close.  And in

5    particular, Your Honor, I'm referring to $930 million of

6    budgeted-for asset sales in three years.  That is a very

7    substantial chunk of the value here that's going to get

8    sold.  And where those proceeds are going to go, we

9    obviously don't know.  Whether those assets are going to, as

10   they have been in the past, get spun off to some other

11   entity that ESL and Mr. Lampert has an interest in, whether

12   that pattern is going to continue, we don't know.  What we

13   do know is there is a plan in place for very material

14   ongoing selling of assets.  And that's a point I'm going to

15   come back to when I talk about jobs.

16           THE COURT:  Right.  That's fair.  On the other

17   hand, I would hope you would be able to progress your

18   litigation faster than three years.  I know you would

19           MR. QURESHI:  We certainly intend to try to

20   progress as fast as possible, but we also know, Your Honor,

21   because it happened last week, we got a liquidity forecast

22   that said $200 million of real estate sales in 2019, and

23   then it was changed.  Now it's 250.

24           THE COURT:  I understand.  I understand.

25           MR. QURESHI:  So how fast that's going to change,

Page 130

1    particularly once ESL's decisions in that respect are no

2    longer subject to bankruptcy court review, we shall see.

3            Your Honor, if I could turn to Slide 27.  And I

4    want to talk briefly about from the committee's perspective

5    why we view the alternative to a sale to ESL to be superior.

6    And I will come back to the employee point, Your Honor,

7    after I walk through the numbers.

8            So on this chart, Your Honor, what shows first of

9    all is the administrative insolvency.  But I also want to

10   make that point here -- and it was a point made by Mr.

11   Meghji.  Who is the principal beneficiary of the going

12   concern transaction?  And again, I'm going to come back to

13   the employees and the vendors and all the like.  The

14   principal beneficiary of the going concern transaction is

15   ESL.

16           THE COURT:  I guess that has some appeal to people

17   that don't understand bankruptcy law.  But anyone who has

18   read the RadLax decision in 363(k) knows how much is left

19   unstated in that statement.  Right?  I mean, the reason they

20   are the principal beneficiary is because they're being

21   allowed to credit bid.  And we just talked about I think a

22   pretty nuanced evaluation of that settlement which preserved

23   claims against them.  So, you know, it's true they are the

24   beneficiary in the sense that they're being allowed to

25   exercise a right that the supreme court said they have

Page 131

1     unless the bankruptcy court says they don't for cause.  And

2     that's what the settlement is about.

3               MR. QURESHI:  Part and parcel, Your Honor, of what

4     we think is going to happen post-close and whether post-

5     close this enterprise is likely to survive as a going

6     concern and whether as a result of that all of the creditors

7     that would benefit are in fact ever going to realize that

8     benefit and whether in fact all of those creditors might

9     actually be better off if we look at an alternative

10    scenario.

11              THE COURT:  Okay, that's a separate point, but

12    that -- go ahead.

13              MR. QURESHI:  And so on the alternative scenario,

14    Your Honor, if Your Honor turns to Slide 28.  And what Slide

15    28 is is an excerpt from Mr. Burian's declaration.  And I

16    just want to highlight to Your Honor how few things need to

17    move in order to demonstrate that creditor recoveries are

18    actually better in the alternative scenario.

19              So for unsecured creditors, first of all, there is

20    an issue, and it's described in Mr. Burian's declaration in

21    some detail, but around the allocation of administrative

22    claims and the extent to which those administrative claims

23    burden unencumbered assets versus the ABL collateral.  We

24    don't think that the way the debtors have proposed in their

25    analysis of the wind down scenario to burden the unsecured

Page 132

1    claims is appropriate.  And what is --

2              THE COURT:  Is that a 506(c) point?

3              MR. QURESHI:  Yes.  And --

4              THE COURT:  Okay.  So how are you going to get

5    around the Second Circuit on that point, and the other

6    circuits, including Domistyle, that you would have to show

7    primary and direct benefit.

8              MR. QURESHI:  Well, Your Honor, we think that when

9    the ABL collateral --

10             THE COURT:  Including when you have a 506(c)

11   waiver in the DIP agreement.

12             MR. QURESHI:  But there is no waiver for the

13   second lien, Your Honor.

14             THE COURT:  I'm talking about the first one.  So

15   you're not really talking about the ABL; you're talking

16   about the second lien.

17             MR. QURESHI:  I'm sorry, that is correct.  The

18   number here that has moved, that is boxed in Mr. Burian's

19   analysis, it's the second lien.

20             THE COURT:  Okay.  And so then you would have to

21   establish, notwithstanding Flagstar and Domistyle and all

22   the other cases dealing with 506(c), that this is as simple

23   a case as selling a piece of real estate for the entity that

24   has the mortgage on the property.

25             MR. QURESHI:  Your Honor, I have no doubt there

Page 133

1    would be litigation around the issue, but we do think there

2    is an argument that a reallocation is appropriate.

3              THE COURT:  I understand the argument.  I also

4    went through that experience with a very inexperienced

5    secured lender group in a case last year where they didn't

6    agree to carveouts and the like or to fund the case, even

7    though they wanted the case funded.  It was -- you may well

8    be better lawyers, and their lawyers -- although the lawyers

9    were pretty good for the Debtor's side, it's not an easy

10   case to win.  And it was settled with major haircuts to the

11   professionals and the administrative expense creditors

12   because the standard is a high one to make.  Second Circuit

13   has set a high standard, and that's been followed by the

14   other courts.

15             MR. QURESHI:  You know, the other significant

16   driver is --

17             THE COURT:  I didn't seen any briefing of that

18   issue, by the way.  It's just assumed by Mr. Burian, who I

19   know he's a lawyer, but he hasn't been a lawyer for a long

20   time.

21             MR. QURESHI:  Your Honor, the other issue, and we

22   do address it in our brief, is that second lien 507(b)

23   claim.  Mr. Bromley mentioned it briefly as well, so I won't

24   spend any more time there.

25             THE COURT:  Right.  You're giving no value to that

Page 134

1    though, right?

2         MR. QURESHI:  In this analysis, we are not.

3         THE COURT:  No, okay.

4         MR. QURESHI:  Your Honor, if I could then move on

5    --

6         THE COURT:  Is that because the value of the

7    collateral declined or didn't -- I mean, didn't decline

8    during the case?  Is there evidence in the record to show

9    that the value of the collateral didn't decline?

10        MR. QURESHI:  Your Honor, again, that's --

11        THE COURT:  I don't think there's evidence that

12   shows it did decline, but to say that it didn't is kind of a

13   stretch here given the amounts that at least the Debtors

14   have said that they've been operating at a deficit at times.

15        MR. QURESHI:  Your Honor, if I could turn to very

16   briefly the business plan.  And this starts on Slide 30.

17   And, you know, our point with the business plan is simply

18   this; that history has to be a guide here, and it has to be

19   a guide in circumstances where you have the same management

20   team in place that put together the ESL business plan.  That

21   what evidence shows.  Obviously the same ownership structure

22   in terms of Mr. Lampert being at the helm of the go forward

23   business.  And when Your Honor looks at the historical

24   results -- I mean, frankly, Your Honor, I've never seen

25   anything like it.  Magnitudes of misses so huge.  And yet

Page 135

1    year after year those misses having no impact on the

2    projections for the next year, as though history didn't

3    occur.  And when we look at the go forward plan -- and Yes,

4    Mr. Kniffen did not testify here, and it's curious that Mr.

5    Bromley expresses so much confidence in his ability to have

6    him excluded by way of a Daubert Challenge and yet nobody

7    wanted to cross-examine him.  Your Honor --

8              THE COURT:  I did read the deposition.  I mean,

9    it's true, there's no challenge.  I guess he's been accepted

10   as an expert, right?

11             MR. QURESHI:  He has.

12             THE COURT:  So -- but he also is clear that he's

13   never written anything on this issue, there's no peer review

14   on his analysis or the methodology of his analysis.  So I

15   took it for what it's worth.  An I understand your point

16   about his projections.  The Debtors are asking me to accept

17   the projections basically -- for basically 2018.  And I

18   mean, the performance in -- the real performance in 2018 to

19   counteract all of the years of misprojections.  And I

20   understand that point.

21             MR. QURESHI:  And, Your Honor, what Mr. Kniffen

22   does have is 30 years of experience as a senior executive in

23   the retail industry.

24             THE COURT:  Yeah.  Although he also says retail

25   has changed a lot since his last time that he actually

Page 136

1      worked for a retail company, which was I think 2005, right?

2              MR. QURESHI:  2005 I believe since he left he May

3      Department Stores, that's right, which is where he was.

4              THE COURT:  I mean, I was trying to think --

5              MR. QURESHI:  But he has obviously remained in the

6      business since then.

7              THE COURT:  I was trying to think back what sort

8      of computer I had in 2005.  It's -- you know, it's a totally

9      different world today.

10             MR. QURESHI:  And it's a world he's still involved

11     in, Your Honor --

12             THE COURT:  Sort of.

13             MR. QURESHI:  -- on a day to day basis as a

14     consultant.  Well, Your Honor says sort of.  I think his

15     deposition is clear; he's a full-time consultant in the

16     retail industry.

17             THE COURT:  I know.  He walks through malls.  I

18     understand.  I read his deposition.  I just -- I didn't --

19     look, this is an inexact exercise to begin with.  And

20     frankly, there was, you know, one element of his exercise

21     that just was flat-out wrong I think.  You should respond to

22     that, which is the occupancy point.

23             MR. QURESHI:  Your Honor, on the occupancy point

24     he is, as I understand it, pulling numbers from the Debtor's

25     filings.  And I don't think that has a material impact on

1    his observations.  I think the key observations that he

2    makes, Your Honor, are that -- if you look at the excerpt

3    from his report that we have on Page 30, the type of growth

4    that is projected at the same time that SG&A is going to get

5    slashed by $600 million a year, something this company has

6    been trying successfully to do for years, that EBIDA growth

7    is going to continue, that margin growth is going to

8    continue.  It's something that he says.  It's just

9    unprecedented to see that kind of a turnaround.  And when

10   you peel the onion back, the next layer, Your Honor, and you

11   look at the business plan and you ask yourself, well, what's

12   driving it?  Well, the key is apparently Shop Your Way.

13   That's what we heard from Mr. Kamlani.  He went on at length

14   in his deposition about it.  Mr. Lampert went on even longer

15   in his interview about it.  And yet the initiatives that are

16   going to be the source of all this revenue are the same

17   initiatives that are in the business plans from years past.

18   Nothing's changed.

19          And in addition to that, Your Honor, we have some

20   contradictory testimony in that Mr. Kamlani says, well, the

21   ecosystem, is how he referred to it, is important.  And the

22   bigger the ecosystem, the better for Shop Your Way.  And Mr.

23   Riecker says a smaller footprint is better because we're

24   getting rid of all of these EBIDA-negative stores and we can

25   shrink our SG&A.

Page 138

1           THE COURT:  How are the parties -- I want to make

2    sure I understand the defined term ecosystem.  I understood

3    it to mean the fact that Sears has warranties, service

4    people, you know, that sort of stuff, the Innovel, the --

5    that's how I interpreted it.  And I don't know, is that how

6    the parties are -- is that how he's using it in your --

7           MR. QURESHI:  I believe that that is how Mr.

8    Kamlani is using it.  And when he uses it --

9           THE COURT:  So those aren't going away.

10          MR. QURESHI:  No.  But when he uses it in the

11   context of Shop Your Way, I believe -- and there's a long

12   back and forth between Mr. Kamlani and I in his deposition

13   about this -- that what he is also talking about is that the

14   value of Shop Your Way is dependent on attracting partners,

15   outside partners.

16          THE COURT:  I understand that.

17          MR. QURESHI:  And that's easier to do when you

18   have a bigger footprint.

19          THE COURT:  Or -- yeah.  Or maybe more profitable

20   stores where people like to shop more.

21          MR. QURESHI:  Well, all I can --

22          THE COURT:  No, no, no.  I agree with you.  I

23   mean, unfortunately in today's world, whether it's a company

24   that used to print textbooks or a company that sells plus-

25   size clothes, the internet's changed everything.  And,

Page 139

1    frankly, any projection is more in doubt than, you know, a

2    normal projection that you would have had 15 years ago or

3    ten years ago.  Because of that, it's very hard to predict.

4    I agree with all of that, definitely.

5              MR. QURESHI:  Yeah.  And in an industry when it's

6    very hard to predict, hockey-stick-like projections, which

7    is what these look like, are even more unreasonable than in

8    an industry where that's not the case.  Where the history of

9    the company is wild misses year after year and it's the same

10   company going forward with the same management team --

11             THE COURT:  Well, see, that's the part I'm not so

12   sure about, the same company going forward.  I understand

13   the management team.  It does seem to me that they had a

14   huge drag with the size of the company and the debt load.

15   And, you know, whether that's enough or not --

16             MR. QURESHI:  So, Your Honor, let me go on as I

17   said I would to address the issue of jobs.  And the first

18   thing I'm going to do is defend the committee and defend the

19   committee's advisors.  Because, Your Honor, it's just not

20   the case that we have ignored the interests of employees,

21   that we don't care about the interests of employees, that

22   Mr. Burian doesn't care about the interests of employees, or

23   that that wasn't something that was considered in connection

24   with all of the analyses that we did.  This committee and

25   every member on it owe fiduciary duties, and those duties

Page 140

1    have been taken very seriously, everybody has acted faithful

2    to those duties.  And, Your Honor, the bottom line is there

3    are situations in bankruptcy where liquidation can be the

4    better option.  It's never pleasant.  It's not something

5    anybody involved in a bankruptcy case wishes for, but

6    sometimes it's the better result.  And here we believe that

7    it is the better result for all of the reasons we've been

8    talking about.

9            But what I want to make clear is that this has

10   been presented, Your Honor, as a decision between 45,000

11   jobs on the one hand and zero on the other.  And that's also

12   not right.  Because in the alternative scenario, there are

13   standalone pieces of this business, like Sears Home

14   Services, like Innovel, like Parts Direct, that in the

15   aggregate employ over 10,000 people.  And those are jobs

16   that would be preserved.

17           THE COURT:  What sort of bids were made on those

18   during the sale process?

19           MR. QURESHI:  So, Your Honor, it's detailed in Mr.

20   Burian's report.  And if Your Honor goes back to Slide 3 of

21   the deck, the values that are on the asset purchase side

22   there for Sears Home Services and the repair business and

23   ship business, that reflects indications of interest or bids

24   that were put in as part of the sale process.  Because of

25   how that process went, Your Honor, those never were

Page 141

1    progressed to definitive bids.  But those as all, as I

2    understand it, indications of interest where the intent was

3    that the business would continue to be run.

4            THE COURT:  And would those indications of

5    interest assume that Sears would continue?

6            MR. QURESHI:  Your Honor, I don't think so.  With

7    respect to, I believe it was the Sears Home Services

8    business, I think there was one bid that originally did

9    contemplate and had some contingency in it about Sears

10   stores, and then there was a revision of that or at least

11   discussions concerning that where that was then no longer

12   the case, at least with respect to one of those parties.  So

13   it's not a case of 45,000 versus zero.

14           And the other thing that I think is significant,

15   Your Honor, and it's part of the record.  Look at Slide 31.

16   Slide 31 is the history of jobs --

17           THE COURT:  No doubt it's gone down.  There's no

18   doubt about that.

19           MR. QURESHI:  And more to the point, Your Honor,

20   so it's the trajectory under Mr. Lampert's leadership.  And

21   it's not that I'm suggesting that the internet didn't

22   happen.  But with all of the substantial asset spinoffs that

23   obviously have a very significant impact on employment.

24           And in addition, Your Honor, I'll come back to

25   what we've excerpted on Slide 32, which is the asset sales.

1      Your Honor, when Mr. Burian talks about the process and the

2      process failings here as far as the sale process and how

3      rushed it was, let's be clear that Mr. Burian is not

4      criticizing Lazard, the Debtor's investment bankers.  It's

5      really a criticism of Mr. Lampert.  Lazard was brought in

6      basically at the filing.  There was no time to prepare a

7      proper sale process.  And frankly, we think it's because

8      that's exactly how Mr. Lampert wanted it.  He set up a

9      process where there was no alternative but for ESL to be

10     standing alone as the only party that could possibly put

11     forward a going concern bid in the very limited time that

12     was left.  It was a chaotic filing at the most important

13     time of year for a retailer.  And looking at that from the

14     outside, it made no sense.  And that was preceded by a long

15     period of time where in effect what Mr. Lampert --

16             THE COURT:  Is there anything in the record

17     indicate that any other going concern party said, for

18     example, give me a little more time, I'm happy to make a

19     bid, et cetera?

20             MR. QURESHI:  Your Honor, there are a number of

21     statements in Mr. Burian's declaration that go to

22     conversations that he had with bidders where, as Your Honor

23     just put it, those statements were not expressing --

24             THE COURT:  I'm talking about a going concern

25     bidder.

Page 143

1              MR. QURESHI:  For the entirety of the business,

2      no, Your Honor.

3              THE COURT:  So we're really talking about the

4      segments.

5              MR. QURESHI:  We're really talking about the

6      segments.  But again, this entire process was, in our

7      review, set up to fail.  Not Lazard's fault.  They did the

8      best they could in the very limited amount of time that they

9      had.

10             THE COURT:  Did anyone ask to extent the process

11     in any way or raise those concerns?  I don't remember

12     hearing from Mr. Burian about those concerns, and you know

13     how active I am when anyone does raise a concern.  For

14     example, when I got a call from one of the real estate

15     council, I think I responded to the Debtors and him within

16     five minutes of getting the email.  Was that concern ever

17     raised to me during the sale process?

18             MR. QURESHI:  Your Honor, the concern was raised

19     by this committee from day one --

20             THE COURT:  No, no.  To me.

21             MR. QURESHI:  Which concern specifically, Your

22     Honor?

23             THE COURT:  Articulated to Mr. Burian's

24     declaration about information not being available, people

25     wanting to bid and not knowing -- their requests being

Page 144

1    denied, et cetera, et cetera, et cetera.

2              MR. QURESHI:  Your Honor, we raised those concerns

3    with the Debtors.  We did not file a motion, we did not seek

4    relief from the Court.

5              THE COURT:  Or even request a chambers conference

6    to discuss it.

7              MR. QURESHI:  We did not.  Your Honor --

8              THE COURT:  Might it be because you didn't want a

9    going concern sale in the first place?

10             MR. QURESHI:  Your Honor, we made it clear from

11   the very early days of this case that we were very concerned

12   by the administrative burden.  Millions of dollars a day --

13             THE COURT:  Right.  So it would have to be a fast

14   process anyway.

15             MR. QURESHI:  Given the way it was set up by Mr.

16   Lampert, it absolutely would have to be a fast process.  And

17   unfortunately, that's one of the reasons and one of the

18   dynamics why we think in this circumstance the alternative

19   would be better.  It's just the reality of the situation,

20   Your Honor.

21             Now, had -- and certainly in the claims that will

22   be brought against Mr. Lampert and that will be brought

23   against ESL these facts will come to light.  And I'm not

24   here to litigate those now.  But we do think, and we think

25   there's evidence to support that Mr. Lampert knew exactly

Page 145

1    what he was doing when he elected not to commence a

2    reorganization for Sears years earlier than he did.  With

3    advice from investment bankers he had retained at the time

4    telling him of exactly the risk of what would happen if he

5    didn't do it, which is what would happen here, telling him

6    specifically that with retailers, there is a high risk of

7    liquidation --

8            THE COURT:  I'm sorry.  I guess -- you know, I

9    usually don't pay a whole lot of attention to the buyer when

10   they stand up in support of a sale.  But there was to me

11   some cogency to Mr. Bromley's argument that if ESL really

12   wanted to take the assets, it would actually cause a

13   liquidation and that it could cherry-pick the assets it

14   wanted.

15           MR. QURESHI:  I think, Your Honor, that that for

16   ESL is a far inferior result to being able to credit bid all

17   of their claims.  And by the way, Mr. Bromley --

18           THE COURT:  Well, you could credit bid on just the

19   assets you want.

20           MR. QURESHI:  And Mr. Bromley also --

21           THE COURT:  That you have liens on.

22           MR. QURESHI:  I'm sorry?

23           THE COURT:  That you have liens on.

24           MR. QURESHI:  And Mr. Bromley also says that the

25   claims against his client have no merit.

Page 146

1           THE COURT:  No, that's a separate -- I'm accepting

2    that they have merit because I have two independent parties

3    with well-staffed law firms telling me so.  Now, that'll

4    have to be sorted out in the future, but --

5           MR. QURESHI:  And what we see, Your Honor, in the

6    business plan, and in particular in the plans for asset

7    sales under that business plan, is a continuation post-close

8    of what happened pre-petition, which is a continuing selling

9    of assets.  And, Your Honor, Mr. Kamlani and ESL I think are

10   very careful in saying, look, we're making offers of

11   employment to these 45,000 people, there is no obligation to

12   employ them for more than a day.  He's clear that he doesn't

13   know or at least hasn't yet decided exactly what's going to

14   be sold and what the employee reductions are going to be as

15   a result of that.  But it doesn't take much, Your Honor, to

16   figure out that at $930 million worth of asset sales,

17   there's going to be a lot of lit stores in that number that

18   end up getting sold, and likely a lot of job losses as a

19   results.

20           So, Your Honor, to sum up, the very party that was

21   accused by the restructuring committee -- and, Your Honor,

22   on Slide 33 there's an excerpt from the auction transcript.

23   And this is Mr. Basta speaking.  He talks about ESL's abuse

24   of its control and about the transfers of hundreds of

25   millions of dollars of assets, and those transfers hurting

1    Sears and its employees.  It's rather ironic that that very

2    individual is now presented as a savior for all of these

3    jobs.

4            Your Honor, I had shown Mr. Carr a series of text

5    messages that he was exchanging with his advisors.  And he

6    was doing so right around the time the ESL bids were being

7    considered.  And the one in particular that I focused on,

8    and the reason I focused on it is where Mr. Carr says, it's

9    close enough.  Respectfully, Your Honor, a proper analysis

10   here where we have everything that we have going on -- an

11   insider -- an insider who is not just a regular insider,

12   he's the chairman and the CEO of the company.  An insider

13   against whom valuable claims have been alleged.  When that

14   same insider who has taken the steps that I've described in

15   terms of his involvement in the auction process, when that's

16   what's going on, and a bid by that insider is tabled, close

17   enough doesn't cut it.  Whatever the standard is -- and

18   we've briefed the issue of whether it should be heightened

19   scrutiny or business judgement.  Under either standard,

20   under any standard, close enough and we've got cover,

21   shouldn't cover --

22           THE COURT:  Show me the email.  I'm not sure I

23   understand the close enough.  I think you're quoting that

24   out of context, unless I'm missing something.

25           MR. QURESHI:  It's the very -- second-to-last

Page 148

1   page, Your Honor.  It's Page 34.  So this is the text

2   message exchange on January the 8th.

3            THE COURT:  Yeah, that's January 8th.

4            MR. QURESHI:  Yes.

5            THE COURT:  That's -- all right, I will tell you

6   what that is.  All right?  That's when everyone came into my

7   office and said we don't think we can go any farther.  I

8   heard the parties and made the assessment, no, you can go

9   farther.  And that's what he's referring to when he says

10  close enough for government work.  I think he's saying he's

11  not so sure I'm right, but he did then testify that $800

12  million was added to the transaction thereafter and the

13  release was limited, as we've already discussed and I think

14  as you conceded was reasonable.  So I think you've misquoted

15  that.

16           MR. QURESHI:  Well, Your Honor, the text right

17  above it where Mr. Carr writes to Mr. Stogsdill and says,

18  "This is good and gives us cover."

19           THE COURT:  Yeah, January 8th.  Exactly.

20           MR. QURESHI:  Yeah.

21           THE COURT:  Yeah, that's fine.  Blame it on the

22  judge.  That's fine.  That's what the judge does sometimes.

23  Look, I appreciate -- I remember Eastern.  Eastern, you

24  know, the judge said this airline should survive.  It

25  didn't.  And it didn't because the person who ran the

Page 149

1    airline messed it up.  All right?  I understand those

2    things.  I've been around for a while.  So -- but don't

3    misquote someone about their decision based on something

4    that happened seven days before the decision was made and

5    after several rejections of interim offers.

6              MR. QURESHI:  Your Honor, I'm certainly not

7    blaming the judge, as the Court put it, by any stretch.

8              THE COURT:  No, no, but that's not the point.  I'm

9    saying don't misquote Mr. Carr.  It's totally out of

10   context.

11             MR. QURESHI:  I don't believe we are misquoting

12   Mr. Carr.

13             THE COURT:  Well, I do.  I do.  He's talking about

14   a specific point when I say keep talking to each other,

15   period.  That's all he's talking about.  And he was pretty

16   much fed up with Mr. Lampert at that point.  As people got

17   fed up with Mr. Lorenzo, you know, 30 years ago.  And I

18   believed that -- and he certainly was within his rights,

19   because the judge only sees about five percent of what's

20   going on in a case.  But I believed, based on the conference

21   that I had with the parties, that there was a basis for a

22   limited period with protection for the estate to keep

23   talking.  And that's what he's talking about, and that's the

24   cover.  So I don't fault him for the email, but I do fault

25   you for misquoting it in the context.  It's not the approval

Page 150

1    of the overall deal; it's the approval of an interim step in

2    the deal.

3              MR. QURESHI:  Your Honor, I will end with this.  I

4    don't think there's a deal to be done today.

5              THE COURT:  Okay.  So I know there may be other --

6    I know there's at least one other party that wanted to

7    speak, because she was on the phone.  Are there other

8    parties that want to address their objections?  Just a

9    moment.  I'm sorry, my courtroom deputy tells me this --

10   this oral argument is going a lot longer than oral argument

11   normally goes on front of me.  And she tells me that we

12   don't have this room beyond 1:00, that we have to go into my

13   courtroom.  So I think it may make sense, since it's only

14   ten minutes to one and there are about 150 people in this

15   room, that we should break now, set up the call again, and

16   then hear the other objectors.  Unless --

17             MR. LEHANE:  I've got an update, but not an

18   argument.

19             THE COURT:  Okay.  If someone has like a two-

20   minute update that --

21             MR. LEHANE:  I have a one minute --

22             THE COURT:  All right, a one-minute update.

23   That's fine.

24             MR. LEHANE:  Thank you very much, Your Honor.  For

25   the record, Robert Lehane, Kelley, Drye, and Warren on

Page 151

1    behalf of Brookfield Property, SITE Centers, and numerous

2    other landlords.

3         Your Honor, as Mr. Schrock indicated on the first

4    day of the case, we have been working a group of landlord

5    council on behalf of a significant portion of the landlords

6    to try to work and make sure that the form of order

7    incorporated the concept that all landlord rights would be

8    adjourned and preserved, that the designation rights process

9    would fully do that.  It's obviously been a moving process.

10   I believe we're there and we've really been able to work

11   closely with counsel for the Debtor and ESL throughout the

12   four or five days now.  There were some curveballs thrown at

13   us, including the lien on leases and new financing package.

14   I think we've resolved those consistent with your prior

15   decisions in that.  We're waiting to hear from counsel for

16   the secured lenders on the exit facility to confirm that.

17   but as far as that goes, Your Honor, I believe we're in a

18   place where we believe all our rights have been reserved

19   until the --

20        THE COURT:  I did see the blackline of the order

21   that I think did that.  But I appreciate the confirmation of

22   that.

23        MR. LEHANE:  Thank you, Your Honor.

24        WOMAN 1:  Your Honor?

25        THE COURT:

Page 152

1            I'm serious, unless it's like 30 seconds.  I

2    really need to get the people out of this room because

3    they're going to be having a jury assembly here or something

4    for the district court.  So I'm going to adjourn for about

5    ten minutes, and we'll get you back on the phone, all of you

6    who are on the phone, and resume at about five after one.

7        (Recess)

8            THE COURT:  Okay.  We're back on the record in In

9    Re Sears Holdings Corporation.  Just want to make sure I --

10   we have CourtCall on, correct?  I mean, the Court -- the

11   people on the phone?  Let's put it that way.

12           WOMAN 1:  Yes, Your Honor.  We are connected.

13           THE COURT:  Okay.  All right.  So when we left

14   off, I was hearing or about to hear the remaining other

15   objections or reservations or statements.

16           MR. ZUMBRO:  May I proceed, Your Honor?

17           THE COURT:  Yes.

18           MR. ZUMBRO:  Good afternoon, Your Honor.  Paul

19   Zumbro from Cravath, Swaine & Moore on behalf of Stanley

20   Black & Decker.

21           Your Honor, we have no objection to the sale

22   itself.  As Mr. Schrock just reminded me, we have a discrete

23   issue in the overall context of this hearing, but it's

24   important to my client.

25           Our objection is at Docket Number 2072, we have an

Page 153

1    assumption and assignment objection and a cure objection.

2    The cure objection is relatively straightforward.  I will

3    address that briefly at the end of my presentation.

4           The assumption and assignment objection, however,

5    is a bit more complex.  That objection concerns the proposal

6    to assume and assign a valuable trademark license without

7    our consent.

8           Now, by way of background, Your Honor, my client,

9    Stanley Black & Decker, purchased the Craftsman brand and

10   the related trademarks from Sears in early 2017 for

11   approximately $900 million.  In connection with that

12   transaction, SBD licensed that to Sears, a license to allow

13   Sears to use the Craftsman mark in the sale of

14   Craftsman-branded tools and other Craftsman-branded products

15   in Sears retail stores.  That trademark license agreement

16   was included in the list of initial assigned agreements that

17   the Debtors recently filed in connection with the proposed

18   sales.

19          Your Honor, as I mentioned, we have not consented

20   to that assignment.  And unlike a garden-variety contract

21   where the bankruptcy code overrides anti-assignment

22   provisions, applicable law here gives a trademark owner

23   clear consent right.

24          The starting point, Your Honor, is Section

25   365(c)(1) of the code.

Page 154

1          THE COURT:  Can I -- can I just interrupt you?  I

2     think I understand the basis for the Debtor's objection --

3          MR. ZUMBRO:  The Debtor's?

4          THE COURT:  -- in response to this, but I'm not

5     sure you need to get into all of that.

6          MR. ZUMBRO:  Sure.

7          THE COURT:  Because I think the Debtor has a more

8     limited objection.  Your object --

9          MR. ZUMBRO:  More limited response, sir?

10         THE COURT:  Yes.

11         MR. ZUMBRO:  Yeah.  Sure, I'll hop right to that.

12    I mean, but basically it just comes down, just quickly,

13    trademark law is very clear that the trademark owner's

14    consent is required unless there's an explicit express

15    assignment provision in the contract.  There is an express

16    assignment provision in the contract, but in our case, it's

17    limited to sale of all or sustainably all of the

18    assignments.  Those are the only circumstances in which the

19    licensee can assign the license.  Right?  And we understand,

20    Your Honor, that the Debtor's position is that because all

21    that's left over is being sold to ESL, that satisfies the

22    all or substantially all test.

23         THE COURT:  Right.

24         MR. ZUMBRO:  But that's not a correct recitation

25    of New York law.  The Debtor's cite solely and unpublished

Page 155

1    chancellor court opinions from Delaware.  The actual law in

2    the Second Circuit on this topic is Sharon Steel on the one

3    hand, and Sharon Steel teaches that if there's been a plan

4    of liquidation or a plan of sales, you have to look back to

5    the beginning of the plan, and then you compare what the

6    assets were at the beginning of the plan versus what's now

7    proposed to be sold to test whether it's all or

8    substantially all.

9            And then there's another case that's also recent

10   where the Delaware Supreme Court was interpreting New York

11   law, and it said very clearly that a sale of all that's left

12   over does not constitute a sale of all or substantially all.

13           So we think it's very clear, Your Honor, that this

14   --

15           THE COURT:  I'm sorry.  So you're saying those

16   cases stand for the proposition that you look at what point

17   in time to determine whether it's all or substantially all?

18           MR. ZUMBRO:  Your Honor, it's not crystal clear

19   under the law.  The Debtor will say it's not at the time of

20   the contract.  And even if I concede that, if it's at the

21   time of the contract, there was 1,430 stores --

22           THE COURT:  Right.

23           MR. ZUMBRO:  At the time.

24           THE COURT:  Right.

25           MR. ZUMBRO:  But if I point Your Honor to mid-2017

Page 156

1      where Sears publicly announced an intention, a plan, to

2      liquidate all of its unprofitable stores in a sort of

3      planned event, I think that's an appropriate time to look

4      back to, which is mid-2017 when they publicly said they were

5      going to start liquidating their stores.  So if -- there was

6      about 1,150 stores at that time versus the 425 that are

7      being proposed to be sold today.  It's like 30 percent.

8      It's nowhere near all or substantially all.

9              If we even looked at the petition date, Your

10     Honor, just looked at what's happened during the course of

11     this case, we've gone from 687 stores down to 425 stores

12     which are now being proposed to be sold.  That's about 60

13     percent, Your Honor.  That is not all or substantially all

14     under any -- either a common use of the term or what the

15     courts have said all or substantially all means.  It's a

16     very high threshold, Your Honor.

17             So what we're saying --

18             THE COURT:  Well, except -- frankly, as I remember

19     it, the case law was pretty sparse on this either way.  I

20     mean, I don't think it said -- the whole issue is the timing

21     issue and when you -- when you -- how you define the process

22     of selling all the assets or substantially all the assets.

23             MR. ZUMBRO:  I'd have to --

24             THE COURT:  I mean, right now it's just two

25     lawyers talking to me.  I don't really have a factual record

Page 157

1    on that.  I know what happened in this case, and I would say

2    that this is a sale of all or substantially all of the

3    assets because it is substantially of the assets.  But, you

4    know, I don't -- I don't know what was done pre-petition as

5    far as some sort of formal plan to sell assets.

6              MR. ZUMBRO:  I understand, Your Honor.  But even

7    if I could just focus the Court on what's happened during

8    the case while this case has been under your supervision.

9    You know, like I said, the Liberty Media case, which we cite

10   to in direct response to the Debtor's response, says it very

11   clear that purchasing whatever assets are left at the time

12   of the sale, which is exactly what we're doing here, doesn't

13   constitute all or substantially all.  We think the --

14             THE COURT:  Well, were those substantially all of

15   the assets on the start of the petition date in Liberty

16   Media?

17             MR. ZUMBRO:  It wasn't a bankruptcy case.  It was

18   a plan -- there was a plan --

19             THE COURT:  So --

20             MR. ZUMBRO:  -- in that case where there were

21   sales over a period of time.

22             THE COURT:  So this is -- I mean, it's a really

23   different context the we're in at this point.  I mean, they

24   were certainly heading towards this sale.

25             MR. ZUMBRO:  Look, Your Honor.  I -- cutting

Page 158

1    through it, we think we have a right to determine who our

2    licensee is here, right?

3                 THE COURT:  Right.

4                 MR. ZUMBRO:  And that's fundamentally what

5    trademark law provides.

6                 THE COURT:  I know, but the parties could vary

7    that by their agreement.

8                 MR. ZUMBRO:  I understand that, but they -- here

9    their agreement was if someone is purchasing Sears, all of

10   Sears, they can continue the license, but this is not Sears.

11   I think I just heard Your Honor during Mr. Qureshi's

12   presentation say it's not clear to the Court that this is

13   the same company going forward as it was -- as Sears.  And

14   we agree with that.  We have that same concern.

15                THE COURT:  Well, as --

16                MR. ZUMBRO:  It's not clear to us either.

17                THE COURT:  As far as this case is concerned,

18   these are the assets that matter.  The rest was GOB sales.

19   I mean, that's just selling stuff on the shelves.

20                MR. ZUMBRO:  I understand, but our license was

21   very specifically crafted to Sears and to very specifically

22   identified channels of retail to trade, which is defined as

23   Sears retail stores of a certain type, of a certain size.  I

24   think you've heard lots of testimony over the last couple of

25   days as we don't know what New Co is going to be going

Page 159

1    forward.  We don't know what their footprint is going to be

2    like, what their store is going to be.

3              THE COURT:  No, but I know what's being sold,

4    which is substantially all of the assets.

5              MR. ZUMBRO:  It's substantially all of the

6    remaining assets, not of the assets --

7              THE COURT:  Well, it's substantially --

8              MR. ZUMBRO:  -- at the beginning of the plan.

9              THE COURT:  -- all of the assets as of the

10   petition date.

11             MR. ZUMBRO:  I disagree with that, sir.  60

12   percent is not substantially all.  425 over 687 --

13             THE COURT:  But that's just -- that's -- those are

14   -- those are closing stores.  I mean, in terms of your

15   client's brand, I mean, it seems to me that the --

16             MR. ZUMBRO:  Well --

17             THE COURT:  You tell me.  You were about to tell

18   me, and I interrupted you.  What was it that you think the

19   client wanted to have this mark associated with, that it

20   wanted to be associated with the operating assets of Sears

21   or the sale of inventory and closed, non-operating stores

22   that --

23             MR. ZUMBRO:  It's a bigger issue than just the

24   going out of business.

25             THE COURT:  -- which were liquidized in that first

Page 160

1    month of the case.

2              MR. ZUMBRO:  It's not just a going-out-of-business

3    sale.  We think that in order for this New Co or new Sears

4    to have the ability to sell Craftsman-branded marks, branded

5    products, they need to enter into a new license agreement

6    with Stanley Black & Decker.

7              THE COURT:  I know that's what you say, but I'm

8    just trying to say what is it -- what is it that you're

9    protecting here?

10             MR. ZUMBRO:  We're --

11             THE COURT:  I mean, I guess if your -- I could

12   understand why you want to have consent in connection with

13   the sale of part of the brand, in essence, to someone and

14   part to someone else and part to someone else.  But I can

15   also understand why the parties would agree that if it's

16   basically going to one entity, then it's the same thing.

17   And what you're saying is that the sales that are not to

18   anybody who's using the mark but just liquidation sales, I'm

19   not sure why that -- why that affects the mark and why that

20   wouldn't be consistent with the parties' bargain to say that

21   when substantially all the assets are sold, then the mark

22   can be assigned.

23             MR. ZUMBRO:  Well, Your Honor, I think --

24   fundamentally, we're trying to protect the quality of the

25   mark and the brand.

1              THE COURT:  Right.

2              MR. ZUMBRO:  Your Honor, there's been a lot of

3    testimony over the last couple days about whether or not New

4    Co is or isn't a viable entity.  And that's not --

5              THE COURT:  No, but that's a separate -- that's a

6    separate issue.

7              MR. ZUMBRO:  But it's not, Your Honor, because the

8    ability -- the liability of New Co to continue to use our

9    mark and potentially degrade our mark is very important to

10   us, and the law doesn't impose that risk on the owner of the

11   trademark license.  The law --

12             THE COURT:  Unless the parties agree, and I'm

13   trying to understand the basis for the agreement.  And I

14   guess -- again, I understand your point, which is that

15   there've been sales of assets of the company during the

16   first couple of months of the bankruptcy case.  But they

17   certainly weren't operating or going-concern sales or sales

18   that involve the mark at all.

19             MR. ZUMBRO:  Understood, but --

20             THE COURT:  So it's not -- it's not like it's, you

21   know -- so anyway, why don't I -- I understand your point.

22   I don't think you need to say it -- tell me more.  You've

23   succinctly stated it, and clearly.  Let me just hear the

24   Debtor on this.

25             MR. SCHROCK:  Your Honor, Ray Schrock, Weil,

1    Gotshal for the Debtors.  Your Honor, I think you have it.

2    When -- if you look at the record in this proceeding, first

3    of all, you know, there was no cross taken even though the

4    opportunity was there if they wanted to build a record

5    around whether or not there was some kind of plan for an

6    extended liquidation, either pre-petition or post-petition.

7            But the agreement says that if there's a transfer

8    of all or substantially all of the assets, it's a permitted

9    assignment.  Clearly, that's exactly what's happening here.

10   I don't think the testimony can be read any other way from,

11   you know, as supported by any party.

12           When we entered bankruptcy, we had 687 stores,

13   including those stores that were going out of -- had GOBs

14   that were being conducted.  We have had to shut down some

15   stores that were unprofitable, but this has been one plan to

16   try and save Sears.  And although we're conducting this

17   under an asset sale under 363, there's nothing in this

18   agreement, first of all, that says substantially all of the

19   assets as were held at the time of this agreement.  That is

20   not in the license agreement.

21           THE COURT:  No, but I think that's kind of a

22   strawman.  The point is that there may be a -- some creeping

23   sale process, but --

24           MR. SCHROCK:  Right, and I understand, you know,

25   Mr. Zumbro, you know, pointing to cases where there's, you

Page 163

1   know, several different sales, and it's the last step in a

2   -- in a protracted liquidation process.  That's not what we

3   have here.  There's been one sale, and clearly the parties

4   were bargaining for this mark staying with Sears.  I mean,

5   that's what's happening.  These are the Sears stores.  I

6   mean, these are the Sears marks and, you know, to try to

7   take Craftsman away from the buyer takes away the

8   fundamental right that we really bargained for, you know, as

9   the -- as the licensee of the mark.

10          So, Your Honor, we don't think that there's any

11  support, you know, under the law.  We think that there's no

12  support in the record, and we don't think that Mr. Zumbro

13  has even built an evidentiary record to support, you know,

14  his position around an extended liquidation or a, you know,

15  a multi-part liquidation, which this would be the last step,

16  and we'd ask you to overrule the objection.

17          THE COURT:  Okay.

18          MR. ZUMBRO:  Just to respond, Your Honor, I think

19  it's quite clear that this company has been in, sort of

20  effectively, a sort of slow-moving liquidation for quite

21  some time.

22          THE COURT:  Well, I --

23          MR. ZUMBRO:  But --

24          THE COURT:  I don't know how that's quite clear.

25  I mean, I don't really have a record on that.  I do have a

Page 164

1    record of what's happened in the bankruptcy case, but they

2    have consistently said they're pursuing a going-concern sale

3    of the whole business.

4              MR. ZUMBRO:  I understand, but from a --

5              THE COURT:  Are these the same headquarters, the

6    same people running it?

7              MR. ZUMBRO:  A going-concern sale, we don't have

8    any -- we're -- to be clear, we are not objecting to the

9    sale.

10             THE COURT:  No, but what I'm saying --

11             MR. ZUMBRO:  But a going-concern sale --

12             THE COURT:  No, I know you're not.  But what I'm

13   saying is when you look at sale of all or substantially all,

14   it's --

15             MR. ZUMBRO:  I guess there's -- I guess I --

16   perhaps -- I wish I had this in the record, but, you know,

17   Sears made public statements to Eddie Lampert on July 7th,

18   2017.  Said going forward, we have a plan to start selling

19   stores and selling our unprofitable stores, and then only

20   maintaining the profitable stores.  I think that's a plan,

21   and --

22             THE COURT:  Well, all right.  But --

23             MR. ZUMBRO:  -- that is what has happened since

24   then.

25             THE COURT:  -- it is we, and he's kind of selling

1    it to himself, right?

2            MR. ZUMBRO:  He is selling it to himself.  We

3    understand that, and that's why it's a little awkward, but

4    we do think we bargained for, and we have the right to

5    consent to who holds and has the right to exploit our mark.

6            THE COURT:  Okay.  I'm going to -- I'm going to

7    disagree on that.  I'm going to deny the objection.

8            MR. ZUMBRO:  Okay.

9            THE COURT:  On the cure, I think it's just

10   reserved; is that right?  I thought the -- all the cure

11   objections were reserved.

12           MR. SINGH:  That's correct, Your Honor.

13           MR. ZUMBRO:  That's fine.  They didn't object.

14   Just to be clear for the record, they had designated the

15   cure as relating to this IP agreement, and it does, and it

16   relies to a different agreement.  So I just want to make

17   sure that the Debtors and we are on the same page --

18           THE COURT:  Okay.

19           MR. ZUMBRO:  -- for that, and I expect you're

20   going to deny this too, but, Your Honor, I would ask for --

21   I'm not asking for a stay of the sale closing, but I am

22   asking you orally to move for a stay of the Court's order

23   that this license can be assigned tomorrow -- at tomorrow's

24   closing.  I'd like a stay of that pending appeal so that we

25   can pursue our appellate rights.

Page 166

```
 1                THE COURT:  Well, I --

 2                MR. ZUMBRO:  Because otherwise, it's part of the

 3    transferred assets, as I understand it.  Will -- which will

 4    be assigned to the -- to the Debtor -- or, excuse me, to the

 5    New Co tomorrow, and I don't want to get up in 363(m) and

 6    statutory mootness.  I'd like to move for a stay pending

 7    appeal of the assignment of this particular agreement and

 8    their ability to use the Craftsman mark pending our appeal.

 9                MR. SCHROCK:  Not surprisingly, Your Honor, we

10    object.

11                THE COURT:  I mean, it's used -- it's in all the

12    stores, right?

13                MR. SCHROCK:  Yeah.  It's used in all the stores.

14    There's no bond being posted.  I -- frankly, I don't think

15    that -- you know, ESL can speak to this.  I doubt the sale

16    is going to be going through if we're not able to use the

17    Craftsman mark.

18                THE COURT:  Well, I mean, just the image of

19    putting a sign on every Craftsman and Black & Decker, it

20    just --

21                MR. SCHROCK:  Yeah.

22                THE COURT:  I think the prejudice is outweighed

23    here.

24                MR. ZUMBRO:  Understood.  Thank you for your

25    consideration, Your Honor.
```

Page 167

1          THE COURT:  Okay.  Is that the line going out the

2     door there?

3          MS. LIEBERMAN:  Hopefully not going out the door,

4     Your Honor.

5          THE COURT:  Okay.

6          MS. LIEBERMAN:  Good afternoon, Your Honor.  Donna

7     Lieberman from Halperin Battaglia Benzija.

8          Your Honor, we represent Paul Ireland, the

9     administrator of the estate of James Garbe.  The objection

10    that we filed as at Docket Number 1931, and it's a fairly

11    discrete objection, Your Honor.  Although, as you can

12    imagine, it's one that's very important to our client.

13         Your Honor, the objector as well as the United

14    States of America holds a mortgage against one piece of

15    Sears real estate.  That piece of real estate is identified

16    by the Debtors as 8975.  It is listed on APA Schedule

17    1.1(p), the operating owned property.  So it is presumably a

18    piece of real estate that the Debtors wish to convey to the

19    buyer.

20         The objection is very simple, Your Honor.  The

21    mortgagees have a perfected first lien mortgage on this

22    property.  The Court may recall that we actually filed a

23    limited objection to the DIP motions in connection with

24    this.  My colleague, Mr. Halperin, argued that -- and both

25    of the -- both the final DIP orders have specific language

Page 168

1    about the fact that this mortgage is not primed.  Nobody is

2    pari passu with this mortgage lien.

3            Your Honor, the face amount of the mortgage note

4    is $17.4 million.  There is a provision in the mortgage note

5    and the related documents for a small amount of annual

6    interest as well as a provision for professional fees.  I'm

7    sure the Court will not be surprised, as we state in our

8    objection, we do not consent to the sale of our collateral.

9    We want to know that if this -- if this mortgage is not

10   going to be paid at closing that the amount -- that the

11   amount of the mortgage, which we've calculated and we've

12   given the Debtor the precise number, that that amount is

13   segregated and reserved.

14           THE COURT:  Okay.

15           MS. LIEBERMAN:  And obviously the second piece is

16   if we cannot reach agreement with the Debtor about the value

17   of the collateral that either party can bring that issue to

18   this Court on motion.

19           THE COURT:  Okay.  So what is the Debtor's

20   proposed treatment of this -- through the sale?  I mean,

21   obviously the Lender is entitled to adequate protection of

22   its interest in the property.

23           MR. SINGH:  That's right, Your Honor.  We have --

24           THE COURT:  State your name, please.

25           MR. SINGH:  Sorry.  Sonny Singh, Weil, Gotshal on

Page 169

1     behalf of the Debtors, Your Honor.

2              I think we've got a very narrow issue here.  The

3     valuation reservation of rights, I think we have no problem

4     with that.  If we have to come back later and deal with

5     that, we can.  And our position simply is that under 363(f),

6     their liens get to attach to the proceeds of sale, excuse

7     me, which -- right here, as Your Honor knows, the

8     transaction is primarily assumptions of liabilities, which

9     are the proceeds that are coming in.  There're no other

10    liens on this asset, so whatever those proceeds may be we'll

11    have to fight about another day with the objecting party,

12    but there's no basis to -- they haven't traced -- There's no

13    basis to say we set aside $17.8 million of cash that's just

14    sitting aside in the company's --

15             THE COURT:  Well, I think you need to give them an

16    adequate protection lien on assets then.  I mean, I don't

17    know how -- they're actually protected otherwise.

18             MR. SINGH:  I believe under the DIP order -- so,

19    Your Honor, as long as it's not against a particular asset,

20    right, and we don't have to --

21             THE COURT:  But they have a super priority that --

22    where they're actually covered then.  I think that's --

23             MR. SINGH:  Right, which --

24             THE COURT:  And then you can litigate what the

25    actual value was and what you're entitled to be paid.

Page 170

```
 1              MR. SINGH:  And, Your Honor, I think we would be

 2     fine with that because that doesn't require any segregation

 3     of whatever funds they're asserting.

 4              THE COURT:  Okay.

 5              MR. SINGH:  We have no problem with that.

 6              THE COURT:  All right.

 7              MS. LIEBERMAN:  Your Honor, as you can imagine,

 8     our only concern is that once the value is set that we know

 9     that the money is there and available --

10              THE COURT:  Right.

11              MS. LIEBERMAN:  -- for our client.

12              THE COURT:  Okay.

13              MS. LIEBERMAN:  Because we have been hearing a

14     great deal about competing claims --

15              THE COURT:  Right.

16              MS. LIEBERMAN:  And whether this is an

17     administratively solvent estate.

18              THE COURT:  All right.  So I vaguely remember the

19     carveout in the DIP order.  But, I mean, this is a first

20     lien on this property.  It's worth what it's worth, and it

21     can't be paid just by a, you know, just saying we're going

22     to pay you someday.  They need to have a -- indubitable

23     equivalent in something.  So --

24              MR. SINGH:  Yes, Your Honor.

25              THE COURT:  -- you need to give them that to them.
```

Page 171

1           MR. SINGH:  I think we could probably add a short

2    paragraph to specifically give the adequate protection lien

3    that Your Honor outlined --

4           THE COURT:  Okay.

5           MR. SINGH:  -- relating to -- with everybody's

6    rights reserved as to the underlying claim.

7           THE COURT:  As to the value and either party's

8    right to --

9           MR. SINGH:  And value.

10          THE COURT:  -- bring the -- bring that issue to

11   the Court.

12          MS. LIEBERMAN:  Thank you, Your Honor.

13          MR. SINGH:  Exactly.  Thank you, Your Honor.

14          THE COURT:  Okay.

15          MR. FONG:  Good afternoon, Your Honor.  Chris Fong

16   from Nixon Peabody on behalf of US Bank in its capacity as

17   the KCD indenture trustee.

18          THE COURT:  Yes.

19          MR. FONG:  We don't have any objection to the

20   sale.  I just rise with respect to a discrete issue that we

21   have with the sale documents with which we would like to

22   reserve our rights.

23          I think, as you know, US Bank is the indenture

24   trustee under indenture with KCDIP, a non-debtor subsidiary.

25          THE COURT:  Right.

1           MR. FONG:  We've negotiated with the Debtor for

2      the inclusion of what is now Paragraph 10 of the order,

3      which number one reserves our rights as indentured trustee

4      and requires that all the closing transactions that are

5      relevant to KCD be consistent with the indenture.

6           Paragraph BB of the order requires that as part of

7      closing, KCD enter into an exclusive licensing agreement

8      with the buyer.  We have not seen that agreement yet, so I

9      rise just to reserve our rights to ensure that that

10     transition complies with the indenture and that nothing in

11     the order, if it is further modified --

12          THE COURT:  Changes what's already there.

13          MR. FONG:  Changes our risk.  Yes, Your Honor.

14          THE COURT:  Okay.  That sounds reasonable to me.

15     is there any issue that the Debtors have with that?

16          MR. SINGH:  No, Your Honor.

17          THE COURT:  Okay.  Very well.

18          MR. CICERO:  Good afternoon, Your Honor.

19          THE COURT:  Okay.

20          MR. CICERO:  Gerard Cicero from Brown Rudnick on

21     behalf of Primark.  Primark leases two properties from the

22     Debtors.  Primark is a clothing retailer.

23          THE COURT:  It's a tenant?

24          MR. CICERO:  It's a tenant.

25          THE COURT:  Right.

Page 173

1          MR. CICERO:  It's a tenant of the property.

2          THE COURT:  Right.

3          MR. CICERO:  One of its -- one of the proprieties

4    it leases is in Pennsylvania where it's a -- the Debtors own

5    that property in fee, and Primark just leases it.  And one

6    property is Braintree, Massachusetts.  The Debtors actually

7    lease that from a ground lessor and sublease it to Primark

8    where Primark operates its stores.

9          We -- I arise to let you know that we have reached

10   a temporary resolution of our objection with the buyers, but

11   I wanted to give you a little insight into what's going on.

12         The first version and the initial versions of the

13   sale orders would've sold the Debtors' interests in their

14   fee property and arguably in their -- the -- their interest

15   in property -- in the property of the ground lease -- they

16   have a ground lease to free and clear of our tenancy and of

17   our leases.  And we had raised an objection under a number

18   of grounds -- 365(h), that the Debtors couldn't meet 363(f),

19   and then in the alternative that under 363(e), we would

20   request adequate protection of tenancy.

21         I would say that the Buyer's counsel and the

22   Debtors have been very helpful and our issue has been punted

23   to another day should they continue to want to try and sell

24   the property free and clear of our leases because they --

25   there's been an inclusion as far as I understand it in

Page 174

1    Paragraph 19 of the sale order that carves out tenants who

2    have objected on these bases to the free and clear -- to the

3    free and clear sale of their -- of their interests in

4    property.

5                THE COURT:  Okay.  And you're -- and your client

6    is one of those that's listed.

7                MR. CICERO:  It --

8                THE COURT:  Or it's unlisted.  It's anyone who's

9    objected on that basis.

10               MR. CICERO:  Yes.  And I --

11               THE COURT:  Okay.

12               MR. CICERO:  And I'm not sure Your Honor has any

13   --

14               THE COURT:  No.  I think that's a reasonable --

15               MR. CICERO:  Okay.

16               THE COURT:  -- resolution.  I mean, it may be that

17   the two leases are dealt with differently under the law.  I

18   don't know.  It may be depending on Pennsylvania law, but I

19   understand your objection.

20               MR. CICERO:  Okay.

21               THE COURT:  And I also understand that you're

22   reserving your rights, and therefore the 363(f) objection

23   has actually been waived -- not been waived, excuse me.

24   it's whereas those who didn't like -- well, it be argued it

25   was waived.

Page 175

1              MR. CICERO:  Thank you, Your Honor.

2              THE COURT:  Okay.

3              MR. ROSENZWEIG:  Your Honor, good afternoon.

4    David Rosenzweig, Norton Rose Fulbright.

5              THE COURT:  Okay.

6              MR. ROSENZWEIG:  I'm jumping in now because we

7    have the same issue.

8              THE COURT:  It's the same issue?

9              MR. ROSENZWEIG:  Yeah.  We --

10             THE COURT:  Are you on the -- did you file an

11   objection?

12             MR. ROSENZWEIG:  We did.

13             THE COURT:  Okay.

14             MR. ROSENZWEIG:  We represent Living Spaces

15   Furniture, which is a furniture retailer.  Has three stores,

16   two in Arizona, one in California.  They sublease from Sears

17   or Kmart the entirety of the store.  And --

18             THE COURT:  Okay.

19             MR. ROSENZWEIG:  -- we filed our objection as well

20   raising all those issues 365 --

21             THE COURT:  Right.

22             MR. ROSENZWEIG:  -- H, 363(f).

23             THE COURT:  And E.

24             MR. ROSENZWEIG:  Adequate protection, E, and so we

25   have worked with ESL's counsel to include in Paragraph 19

Page 176

1   the reservations for those parties that filed objections.

2           THE COURT:  Okay.  That's fine.

3           MR. ROSENZWEIG:  Thank you.

4           MR. SARACHECK:  Good afternoon, Your Honor.

5           THE COURT:  Okay.

6           MR. SARACHECK:  Joe Saracheck.  We filed on behalf

7   of MIEN and six other vendors.

8           First of all, I want to say thank you to Mr.

9   Lampert for stepping up; and to the Court; to Weil, Gotshal

10  and the professionals who worked on this.

11          I represent trade vendors who really need Sears to

12  stay in business.  They want Sears to stay in business.

13  These -- you know, you talked about 45,000 employees, but

14  with 10,000 vendors, there are thousands -- there's probably

15  hundreds of thousands of families of vendors who are

16  dependent on Sears to stay in business.

17          That said, we're totally supportive of this sale.

18  The issue is timing of payment.  And I've been before you

19  before to talk about the 503.  You asked the creditors'

20  committee attorney had he thought of any ideas.

21          You know, quite frankly, this is an unusual

22  situation, and we are suggesting that the Court appoint a

23  503(b)(9) ombudsman, an independent party to make sure that

24  -- there is a 120-day period by which ESL is supposed to pay

25  --

Page 177

1          THE COURT:  Well, it's the shorter of a plan

2    confirmation or 120 days.

3          MR. SARACHECK:  Right, but presumably --

4          THE COURT:  There's a lot of incentive here to get

5    a plan done very fast because there's -- you know, we just

6    want to set up a litigation trust, basically.  So -- but I

7    understand.  Listen, I --

8          MR. SARACHECK:  So --

9          THE COURT:  I'm sorry to interrupt you.

10         MR. SARACHECK:  No, Your Honor.  So, you know,

11   it's a suggestion, just so you know.  I'd like to take

12   credit for it, but there are always kind of far more

13   brilliant bankruptcy lawyers out there.

14         THE COURT:  Well, can I -- can I interrupt you?

15         MR. SARACHECK:  Yes.

16         THE COURT:  First of all, it's M-E-N-E, right?

17         MR. SARACHECK:  M-I-E-N.

18         THE COURT:  M-I-E-N.

19         MR. SARACHECK:  And, by the way, they're the

20   nicest people, even though their name is Mien.

21         THE COURT:  All right.  So I -- my reaction to

22   that is the following.  It seems to me that with -- if I

23   were to approve the sale, the likelihood of these claims

24   getting resolved promptly goes way up because there's

25   actually someone to negotiate with then who's a customer of

Page 178

1    the vendor.

2           I think that if the Debtors and ESL don't work out

3    a process promptly to deal with 503(b)(9) claims, then

4    someone should ask for a case conference to just literally

5    deal with that issue.  But before doing that, or before

6    adding another layer of administrative expense to the estate

7    through another professional, I would like to see the -- now

8    that -- well, if, in fact, I approve the transaction, now

9    that there would be a customer on the other side to deal

10   with the vendor, I think those things move a lot faster in

11   that context.  If it doesn't -- and by that, I mean like in

12   another few weeks, two or three weeks, you know, that sort

13   of thing -- then I think I might have to actually direct a

14   process, which may involve an administrative layer expense

15   or it may just say, look, you've got to do this now.  You've

16   got to have a process to deal with these claims now that

17   will involve the vendor and the buyer as well as the

18   Debtors.

19          MR. SARACHECK:  Because of, course -- thank you,

20   Your Honor.

21          THE COURT:  Because these -- a lot of these are

22   small businesses.

23          MR. SARACHECK:  They are.

24          THE COURT:  And they're facing their own financial

25   troubles.  I get that.

Page 179

1            MR. SARACHECK:  And the issue, of course, is that

2     the definition of receipt and --

3            THE COURT:  Right.

4            MR. SARACHECK:  You know.

5            THE COURT:  So there's -- so there's -- there are

6     two things.  There's a legal process issue and there's a

7     business process issue.  What's been lacking so far, I

8     think, is the business process because you didn't know

9     whether this was going to go to liquidation or sale.

10            If it goes to a liquidation, then that should

11     happen right away.  I understand that the process of

12     liquidating this claim should happen right away.  If it goes

13     to the sale, then I would like to give the Debtors and the

14     Buyer two or three weeks to come up with a process that will

15     work so that they can be communicating with the vendors

16     directly and resolving those issues.  If that doesn't

17     happen, then someone like yourself can put it on the

18     calendar so we can go over it.

19            MR. SARACHECK:  Thank you.  One other point I want

20     to make about the 160 million, and I'm not sure I fully

21     appreciate the issue.  But if the issue is what I think it

22     is, which is current accounts payable, you know, I want to

23     say to everyone these vendors need to be paid, and they need

24     to be paid timely because they are out of a lot of money.

25     They're recognizing that they're -- or realizing that their

Page 180

1    unsecured claims are likely worthless and -- other than

2    their 503(b)(9), and they need to be paid.  And this is a

3    big, big issue.

4              THE COURT:  Okay.

5              MR. SARACHECK:  I mean, this is an issue that

6    China will hear about in minutes --

7              THE COURT:  Okay.

8              MR. SARACHECK:  -- after this hearing.  Thank you,

9    Your Honor.

10             THE COURT:  Right.  Thank you.

11             MR. HONEYWELL:  Good afternoon, Your Honor.

12   Robert Honeywell, K&L Gates for Amazon.com services.

13             THE COURT:  Afternoon.

14             MR. HONEYWELL:  Very briefly, we're one of the

15   parties that cares about the language in Paragraph 19.

16   There's some procures for reserving recoupment and sell-off

17   rights.  We've worked on new language to the 4-AM order that

18   will fix that, and we're just reserving our rights.

19             THE COURT:  Okay.

20             MR. HONEYWELL:  It's a minor, minor glitch.  We've

21   worked it out with the Debtor's attorneys and ESL's.

22             THE COURT:  All right.  So this is not in the

23   redline I got, but --

24             MR. HONEYWELL:  It is not in the redline.

25             THE COURT:  But it's --

Page 181

1           MR. HONEYWELL:  It's literally a two-word glitch.

2           THE COURT:  Okay.

3           MR. HONEYWELL:  That has to do with notice

4    procedures.

5           THE COURT:  Okay.

6           MR. HONEYWELL:  So we worked it out, and we're

7    just reserving our rights.

8           THE COURT:  Okay.

9           MR. HONEYWELL:  Thank you.

10          THE COURT:  Is that right from the Debtor's point

11   of view?

12          MR. SINGH:  Yes, Your Honor.

13          THE COURT:  Okay.

14          MR. CHAFETZ:  Hello, Your Honor.  Eric Chafetz of

15   Lowenstein Sandler of behalf of two, LG Electronics Entities

16   and Valvoline LLC.  I rise for the same reason as Mr. Gates.

17   We've been negotiating that Paragraph 19 language as well,

18   and we saw what we think is the final version.  Just

19   reserving our rights.

20          THE COURT:  The same words?

21          MR. CHAFETZ:  Exactly.

22          THE COURT:  Okay.

23          MR. CHAFETZ:  Exactly.  And, yeah.  Thank you,

24   Your Honor.

25          THE COURT:  Okay.

Page 182

```
1              MR. SINGH:  Your Honor, before anybody else gets

2      up, I promise we'll fix that language.

3              THE COURT:  All right.  Very well.

4              For those of you on the phone that want to be

5      heard, I -- no one's coming up to the podium, so this is

6      your time.

7              MS. COLON:  Your Honor, Sonia Colon on behalf of

8      Santa Rosa Mall LLC.  Santa Rosa's objections on their

9      docket 2013 --

10             THE COURT:  I'm sorry.  Can I -- can I get the

11     name -- ma'am, can I get the name of your client again?  It

12     went by very quickly.

13             MS. COLON:  Sonia Colon on behalf of Santa Rosa

14     Mall LLC.

15             THE COURT:  Santa Rosa Mole, LLC.  Okay.

16             MAN 1:  Mall.

17             THE COURT:  Mall.  Sorry.  Long day, ma'am.  I'm

18     sorry.  Very well.  Yes, ma'am.

19             MS. COLON:  Santa Rosa's objections on their

20     Docket 2013 and Docket 2425 were filed to protect and to

21     preserve its rights to some hurricane insurance profits for

22     a store that was destroyed as a result of Hurricanes Irma

23     and Maria in 2017 in Puerto Rico.

24             Although Santa Rosa does not object to the

25     proposed asset sale transaction in principle, it does object
```

Page 183

1    and reserve its rights with regards to the proposed

2    retention of 13 million in hurricane-related insurance

3    profits when Santa Rosa is a loss payee under the insurance

4    policy for Store 1915 until its motion to compel Debtor to

5    deposit insurance profits under Docket (indiscernible) is

6    resolved in February 14th.

7            Further, Santa Rosa reserves its rights to the

8    transfer of any hurricane insurance profit that may have

9    been dispersed under the proposed agreement.  Note that

10   under the APA, acquired assets include any and all insurance

11   assets with respect to a loss or damage to any acquired

12   assets occurring prior to the asset purchase agreement.

13           Despite Debtor's objection last Friday under

14   Docket 2013 at Pages 96 and 97 that the $13 million were

15   unrelated to any insurance coverage under a lease agreement.

16   The sworn statements filed that day by Sonny Singh under

17   Docket 2344 and William Transier under Docket 2341 shows

18   that $13 million were in fact hurricane insurance profits.

19           THE COURT:  Okay.  So could -- if I could

20   understand, you're --

21           MS. COLON:  -- (indiscernible) in an effort to --

22           THE COURT:  I'm sorry, ma'am.  So let me make sure

23   I understand.  You're reserving your rights.  There's a

24   hearing scheduled for Valentine's Day, I guess on the merits

25   of this issue, or at least partly.  And I guess the Debtors

Page 184

1    are reserving their rights too.  I mean, you can't sell what

2    isn't yours, so --

3            MR. SINGH:  Your Honor, just --

4            THE COURT:  I mean, if it is yours --

5            MS. COLON:  (Indiscernible), Your Honor --

6            THE COURT:  -- we can -- we (indiscernible) the

7    Debtors can sell --

8            MS. COLON:  -- we need to reserve our right.

9            THE COURT:  Yeah.

10           MS. COLON:  We need -- Santa Rosa needs to -- and

11   they agreed to reserve our rights with respect --

12           THE COURT:  Okay.

13           MS. COLON:  -- to the insurance profits that were

14   received by the Debtors or any third parties for the damages

15   by Hurricane Irma and Maria, but also that may be received

16   by the purchasers because under the acquired assets that can

17   be insurance profits as well.

18           THE COURT:  All right.  But again --

19           MS. COLON:  So we need to reserve the rights.

20           THE COURT:  Yeah.

21           MS. COLON:  We proposed language that should be

22   included in the proposed order to the Debtors, but they did

23   not include the same in the proposed orders, the redlines,

24   that have been submitted to this Court.

25           THE COURT:  Okay.

Page 185

1          MS. COLON:  So we submit to this Court, Your

2     Honor, that (indiscernible) reservations be included in

3     Sections 3 regarding the objections of (indiscernible) and

4     also in the free and clear of any claims because claims --

5     it should be limited that any claims shall be limited to

6     loss or damages for those caused by Hurricane Maria.  We

7     have submitted that --

8          THE COURT:  No, it's a different -- I think --

9          MS. COLON:  -- language to the Debtor.

10          THE COURT:  I think it's a different concept.  The

11     free and clear point goes to claims or interests in assets

12     that the Debtors own.  If the Debtors don't own the asset,

13     if they don't -- if it's not a -- if it's not property of

14     the estate, if it's actually someone else's, then they can't

15     sell it.  So I'm fine with a reservation like that.

16          MR. SINGH:  That's right, Your Honor.

17          MS. COLON:  We request, Your Honor, that they

18     reserve that reservation language of the Santa Rosa be

19     specifically included in the order, but the Debtors have

20     refused to include it in the redline.

21          MR. SINGH:  Your Honor, Sonny Singh.  If I could

22     just respond really quick.  There's a reference to $13

23     million of insurance proceeds that are not being sold, to

24     which the claimant -- that, you know, is coming back to the

25     estate to which the claimant is asserting claims.  Their

Page 186

```
 1    rights are reserved.  Our rights are reserved.  We can be

 2    heard on the 14th.  There was a lot of back and forth on the

 3    language of the order.  Frankly, Your Honor, what Counsel

 4    laid out, I'm happy that their rights are reserved would

 5    stipulate that that is all fine, and we'll deal with it on

 6    the 14th.  These are not proceeds that are actually being

 7    transferred.  The $13 million referenced in the APA is

 8    actually a reference to being retained by the estate, so

 9    it's not going anywhere.

10            THE COURT:  All right.  Well, I think Counsel is

11    worried that --

12            MS. COLON:  (Indiscernible).

13            THE COURT:  Let me finish, ma'am.  Please.  I

14    think --

15            MS. COLON:  Yes.

16            THE COURT:  I think you were worried that in the

17    future, proceeds might be transferred, future proceeds that

18    might come in.  And I don't know whether those are proceeds

19    that the Debtor can sell or not, but to the extent the

20    Debtor can't sell them, then they can't.

21            MR. SINGH:  Then they're not subject to 363(f),

22    and we can't transfer them.

23            THE COURT:  All right.  I mean -- I mean, I don't

24    think we need to put in the order because it's a given that

25    you can't sell assets that you don't own, you know.  And
```

Page 187

1    you're not making a representation to ESL that you can sell

2    assets that you don't own, right?

3            MR. SINGH:  No, of course not, Your Honor.

4            THE COURT:  All right.  So I think -- I think your

5    point is noted on the record, ma'am, and I think it's clear.

6            MS. COLON:  Noted, Your Honor.

7            THE COURT:  Okay.

8            MS. SONGONUGA:  Good afternoon, Your Honor.

9    Natasha Songonuga of Gibbons P.C. on behalf of the American

10   Lebanese Syrian Associated Charities Inc.  It is a

11   not-for-profit Section 501(c)(3) corporation founded

12   exclusively to raise funds for St.  Jude's Children's

13   Research Hospital, Your Honor.

14           St.  Jude's does not have and does not object to

15   the sale motion.  As a matter of fact, Your Honor, I wanted

16   to be clear that St.  Jude's considers Kmart, which is the

17   Debtor that the relationship exists with, to be part of the

18   St.  Jude's family, and together both St.  Jude's and Kmart

19   have made a tremendous impact on the mission of St.  Jude's,

20   which is finding cures and saving children.

21           I've filed a limited objection on behalf of St.

22   Jude's at Docket Number 1947, Your Honor.  And without going

23   into the specifics of that objection, I was advised

24   yesterday by email that either Debtor's counsel or ESL's

25   counsel would be making a representation to the Court

Page 188

1    regarding that limited objection.  And so far, I have not

2    heard that representation made to the Court, so I'm waiting

3    for the representation.

4              THE COURT:  Well, now is the time.  So let me --

5              MR. SINGH:  Your Honor, Sonny Singh, Weil on

6    behalf of the Debtors.  The Debtors and the Buyer will work

7    with St.  Jude's to review and work towards reconciliation

8    of the among of funds to be turned over to St.  Jude's on

9    March 1 pursuant to the applicable contract, and the party's

10   rights are preserved and will not be prejudiced by the sale

11   transaction.

12             THE COURT:  Okay.  Was that the language?

13             MS. SONGONUGA:  Your Honor --

14             THE COURT:  Was that the language you were looking

15   for?

16             MS. SONGONUGA:  Your Honor, that -- Your Honor,

17   that addresses one part.  To be clear, the Debtors continue

18   to collect donation.  There is actually currently a

19   Valentine's Day donation campaign ongoing in the stores, and

20   the Debtors continue to collect donation on behalf of St.

21   Jude's.  Those donations are not due on March 1st.  They are

22   not part of the proceeds that are due on March 1st, so --

23             THE COURT:  But they're not -- they're not being

24   sold.

25             MS. SONGONUGA:  -- that representation --

Page 189

1          THE COURT:  I mean, these -- again, it's --

2          MS. SONGONUGA:  Well --

3          THE COURT:  It's the same point.  It's even worse

4     here.  I mean, you can't -- you can't -- you can't sell what

5     you don't own.

6          MS. SONGONUGA:  Your --

7          THE COURT:  You certainly can't sell what people

8     have decided to give to St.  Jude's.

9          MR. SINGH:  Yes, Your Honor.

10         MS. SONGONUGA:  Your Honor, exactly.  And we agree

11    with that, Your Honor.  It was not a matter of selling those

12    donations.  It was just simply a matter of ensuring that the

13    purchaser would be collect -- continuing to collect those

14    donations on behalf of St.  Jude's.

15         MR. SINGH:  Yes, Your Honor.  We will work with

16    St.  Jude's.

17         THE COURT:  To do that.

18         MR. SINGH:  To deal with the reconciliation and

19    all -- and the Buyers agreed to do that too.

20         THE COURT:  Okay.  Not just --

21         MS. SONGONUGA:  Thank you, Your Honor.

22         THE COURT:  -- as of that particular date.

23         MR. SINGH:  Not limited to March.

24         THE COURT:  But going --

25         MR. SINGH:  Not limited to March 1.

Page 190

```
1              THE COURT:  Going forward.

2              MR. SINGH:  Whatever the amounts are.

3              THE COURT:  Okay.  Very well.

4              MS. SONGONUGA:  Thank you, Your Honor.

5              THE COURT:  Okay.  I think that I can assume,

6    then, that the other objections are either, as was precisely

7    stated, being adjourned -- and that's largely the cure

8    objections -- or have been resolved, or the parties are

9    reserving as -- to a mechanism to resolve them; is that a

10   fair --

11             MR. SINGH:  Yes, Your Honor.

12             THE COURT:  -- summary.

13             MR. SINGH:  That's exactly right, and we've got --

14   you know, we built in most of that language, I'd say 99

15   percent of it, in the order that was filed last night.

16   We've gotten some clean-up changes throughout the day today

17   that we can build in.  I don't think it's even worth

18   reviewing on the record, and some of the stuff the

19   counselors have already -- have already notified --

20             THE COURT:  Okay.

21             MR. SINGH:  -- Your Honor about.  And we've also

22   worked out the clarification on the Cyrus release language

23   that Your Honor mentioned earlier.

24             THE COURT:  Okay.  All right.  So, you know, it's

25   late in the day.  It's much longer than I thought we would
```

Page 191

1    have on this.  But I'm happy to hear a very brief response

2    by those who are seeking approval of the transaction.

3              MR. BASTA:  Your Honor, Paul Baste from Paul Weiss

4    for the Subcommittee.  I literally have one minute.

5              THE COURT:  Okay.

6              MR. BASTA:  The -- Mr. Qureshi pointed out my

7    testimony from the podium.  All the numbers in my argument

8    tie to Mr. Carr's declaration.  Your Honor --

9              THE COURT:  Well, the other thing about -- in

10   bankruptcy cases, there are times when the lawyers who are

11   speaking to you were intimately involved in the very things

12   that they're being asked about, such as when did a meeting

13   take place, etc.  So I take those representations by people

14   who are subject to discipline from me as close to evidence.

15             MR. BASTA:  Understood, Your Honor.  Your Honor

16   had a discussion with Mr. Qureshi about what it meant to

17   give up equitable subordination because, as a remedy, it

18   would mean that the Debtors would then have to go and chase

19   a recovery.

20             THE COURT:  Right.

21             MR. BASTA:  A primary defendant in the Debtor's

22   litigation claims that is not included in the complaint

23   that's attached to the standing motion that the committee

24   filed is, of course, Seritage.  And if Your Honor looks on

25   Yahoo, you'll see that Seritage has a market cap of $2.27

Page 192

1    billion, and ESL's interest in --

2              THE COURT:  Well, that actually is evidence.  But

3    I understand.

4              MR. BASTA:  No, no.  I'm just saying -- I'm just

5    saying -- I know that is evidence.  I'm just saying that MR.

6    -- ESL owns 45 percent of Seritage.  So when we looked at it

7    from the collection issue, there -- Mr. -- ESL has a

8    significant interest in Seritage, which has a large market

9    cap.  And Seritage itself is a significant defend.  The --

10             THE COURT:  Okay.

11             MR. BASTA:  The third point, Your Honor, is -- Mr.

12   Qureshi pointed out that the letter from ESL attacking the

13   subcommittee somehow trained the process.  I think the

14   record is uncontroverted that Mr. Carr and Mr. Transier made

15   their decisions without any fear and without any bias and,

16   in fact, rejected the ESL bids after the receipt of that

17   letter.

18             THE COURT:  Okay.

19             MR. SCHROCK:  Your Honor, Ray Schrock, Weil,

20   Gotshal for the Debtors.  Subject to any questions you have,

21   I actually am willing to stand on the record on this before

22   you.

23             THE COURT:  Well, I actually did have -- I did

24   have a couple questions I forgot to ask you when you were

25   speaking this morning.  I have the statement by the consumer

Page 193

1    privacy ombudsman in which she makes a number of

2    recommendations.  She said as long as the Debtors and ESL

3    abide by those recommendations, she supports the sale.  She

4    thinks it's -- you know, it's proper as far as the

5    bankruptcy code and applicable law with regard to consumer

6    identifying information and other related topics.

7             So I -- have the Debtors and ESL agreed to those

8    recommendations?

9             MR. SCHROCK:  Yes, we have, Your Honor.

10            THE COURT:  And ESL too?

11            MR. BROMLEY:  Yes, Your Honor.

12            THE COURT:  Okay.  That's Mr. Bromley?

13            MR. SCHROCK:  Yes.

14            THE COURT:  Okay.  All right.  And then my other

15   issue here is what is your response on the argument that Mr.

16   Qureshi made that certain of the assets being purchased here

17   aren't being purchased with the non-credit-bid portion of

18   the sale?

19            MR. SCHROCK:  Your Honor, I just don't think

20   that's -- frankly, that's inconsistent with the asset

21   purchase agreement, that assertion as well as, you know, the

22   record in these -- in this case.  They are -- ESL is

23   purchasing, you know, with the credit bid, and then they are

24   paying off, you know, senior secured claims.  Those -- and,

25   by the way, we keep calling them the unencumbered assets.

Page 194

1    The DIP loans have liens on those assets, of course.  The

2    DIP loans have to be paid -- repaid.

3               THE COURT:  Well, on -- the DIP loans have liens

4    on Dove & Sparrow?

5               MR. SCHROCK:  Certainly on the -- I believe on the

6    equity, the underlying equity that the Debtors hold.

7               THE COURT:  Okay.

8               MR. SCHROCK:  That's correct, Your Honor.

9               THE COURT:  And IPGL?

10              MR. SCHROCK:  Yes.

11              THE COURT:  Okay.

12              MR. SCHROCK:  Yes, and so there's, you know -- as

13   Your Honor noted, there's 3.9 billion --

14              THE COURT:  So it's like 850 million of DIP loan.

15              MR. SCHROCK:  That's correct.  There's 850 million

16   of the DIP loans.  There's $350 million junior DIP --

17              THE COURT:  Okay.

18              MR. SCHROCK:  -- that's there.

19              THE COURT:  And the --

20              MR. SCHROCK:  The assumption of liability

21              THE COURT:  The committee's -- I'm sorry to

22   interrupt you, but the committee's argument is that there's

23   $560 million equity value in Dove & Sparrow, and 300 and --

24   I'm sorry, 233 in IPGL, so that's less than the DIP loans, I

25   guess.

Page 195

1          MR. SCHROCK:  Then, Your Honor, I would -- we'll

2     rely on the record as to the value of the collateral, but I

3     -- you know, we didn't get there on the math.

4          THE COURT:  I'm just saying --

5          MR. SCHROCK:  It was in the presentation.

6          THE COURT:  I mean, assuming that value.

7          MR. SCHROCK:  Yes.

8          THE COURT:  Okay.  Any -- Mr. Qureshi, any

9     response on that?

10          MR. QURESHI:  Your Honor, I'm not sure that that's

11     consistent with how the DIP order is supposed to work, and

12     in particular the marshaling provisions under the DIP order.

13          THE COURT:  All right.  I thought -- I mean, I

14     thought they waived marshaling.  I mean, they normally do.

15          MR. QURESHI:  I mean, Your Honor, again, I'm -- I

16     don't think that's how --

17          THE COURT:  Can I -- can I interrupt you?  I know

18     there were reservations of rights with respect to the junior

19     DIP.

20          MR. QURESHI:  Yes.

21          THE COURT:  But on the senior DIP, I thought there

22     was a waiver of 506(c) and marshal.

23          MR. QURESHI:  Your Honor, I'll let Mr. Dublin

24     handle that question.  He's more --

25          THE COURT:  Okay.

Page 196

1              MR. QURESHI:  -- familiar with the DIP provisions.

2              THE COURT:  He's the financing guy.

3              MR. DUBLIN:  Phil Dublin, Akin Gump on behalf of

4     the Committee.  I apologize, Your Honor.  I don't have the

5     DIP order handy, but when we negotiated the DIP, the final

6     DIP order with the ABL lenders, we actually had a whole

7     construct of marshaling built in where there was marshaling

8     waiver, except there's a provision in the back of the order,

9     which I don't remember the paragraph number, that provides

10    that even in connection with a sale process, the proceeds of

11    the sale are supposed to be used that are -- that are

12    applicable to what was pre-petition ABL collateral -- I

13    think that might be the defined term -- are used in a

14    specific order of distribution such that, for example, here,

15    since the new ABL loan is being funded and the collateral

16    for the new ABL loan is the -- are the ABL assets that exist

17    at the company, the proceeds from that new ABL loan that

18    come into the estate should be used to repay the existing

19    ABL DIP thereafter whatever pre-petition ABL obligations

20    have not been repaid, which I think what's left is the FILO

21    and the LC facility, which have liens on the ABL assets.

22    And then after that, there's a whole litany of order of

23    marshaling.  That's also included in the junior DIP order.

24    And I apologize I don't have the document with me, but I

25    believe that that's the way the marshaling provisions work,

Page 197

1    notwithstanding the fact that technically there's a

2    marshaling waiver.

3               MR. SCHROCK:  But again, Your Honor, we don't have

4    the luxury of evaluating this bid in a vacuum.  There's --

5    undisputably -- indisputably, there's billions of dollars of

6    assumed liabilities that are general unsecured claims,

7    administrative claims that are being, you know, put into --

8    and are being paid off.

9               THE COURT:  I understand that point.

10              MR. SCHROCK:  Right.

11              THE COURT:  If you look at it in the aggregate --

12              MR. SCHROCK:  Right.

13              THE COURT:  -- I understand it.  Dove & Sparrow

14   are separate debtors, or are they --

15              MR. SCHROCK:  The Sparrow entities are in a --

16   it's a REMIC structure where we hold the equity.  They're

17   non-debtors.

18              THE COURT:  Right.  So, I mean, in terms of the --

19              MR. SCHROCK:  But that equity is held by the

20   Debtors.

21              THE COURT:  But I'm assuming, because I thought

22   they were like special purpose real estate entities, that

23   they don't have a lot of the types of debts that ESL is

24   taking on.  So you have to look at other value that's going

25   to them, which would be the DIP unless there's some

Page 198

1     carveout.

2            MR. SCHROCK:  Right, Your Honor.  But, you know, I

3     think when I just look at the -- when you think about the --

4     in a wind-down, right, there's going to be a number --

5            THE COURT:  No, I -- all I'm saying is I just want

6     to make sure --

7            MR. SCHROCK:  Mh hmm.

8            THE COURT:  -- that the sale is fair to those

9     particular debtors.  Now, the easiest way to make sure of

10    that is to see whether they are obligated in respect to

11    debts that are being repaid one way or the other, including

12    with cash by taking out the DIP.  On the --

13           MR. SCHROCK:  But we've been -- we've been

14    servicing their collateral with money that's being generated

15    from sales.  You know, it's an integrated operation.

16           THE COURT:  Well, I -- the other way to ensure

17    that it's fair is to recognize some sort of inter-company

18    claim against the, you know, the people that get the better

19    benefit.  But --

20           MR. SCHROCK:  Those are all reserved.

21           THE COURT:  All right.  But I would like to look

22    at the DIP order, which I had printed out actually last

23    night.  So I think you could find it pretty quickly.

24           MR. SCHROCK:  Okay.

25           THE COURT:  Okay.  All right.  Anyone else?  Okay.

Page 199

```
 1              Oh, I'm sorry.  Mr. Bromley, I've got a question

 2     for you.

 3              MR. BROMLEY:  Great.  That's why I sat over here.

 4              THE COURT:  This issue about the 166 million, your

 5     favorite issue, I have the schedule now.  There's no dispute

 6     that that was the schedule that was attached to the

 7     agreement, correct?

 8              MR. BROMLEY:  Correct.

 9              THE COURT:  And I have the provisions in the

10     agreement that relate to this issue.  There's the assumption

11     provision and there's the cross-reference to the

12     definitional provision of other payables.

13              So I understand the Debtor's argument completely

14     on this one.  What is the -- in terms of the plain language

15     of the agreement, what is ESL's argument?

16              MR. BROMLEY:  Can I get the document, Your Honor?

17              THE COURT:  Sure.

18              MR. BROMLEY:  So, Your Honor, the -- do you have

19     the document in front of you?

20              THE COURT:  I thought I did, but...  The Debtors

21     have the most recent version.  Do you have that, that you

22     could give me, of the APA, the copy?

23              MR. SINGH:  Your Honor, there's been no change to

24     the original version.

25              THE COURT:  Oh, I'm --
```

Page 200

```
1              MR. SINGH:  But we do have copies.

2              THE COURT:  So do the -- do the -- so the

3    amendments don't cover this.

4              MR. SINGH:  The amendment does not relate to this

5    issue.

6              THE COURT:  They don't relate to it.  I thought I

7    had it.  I'm not quite sure why I don't.

8              MR. SINGH:  But we do have extra copies if Your

9    Honor (indiscernible).

10             THE COURT:  Could you give me an extra copy just

11   so we don't spend --

12             MR. SINGH:  Yes.

13             THE COURT:  -- more time looking for it?

14             MR. SINGH:  Just a moment, Your Honor.  We have to

15   find the box.  Just the transition over.

16             THE COURT:  Yeah.  Do you have a copy?

17             MR. BROMLEY:  I only have --

18             THE COURT:  Maybe you can just read me this out.

19             MR. BROMLEY:  Okay.  I'll just read it to you,

20   Your Honor.

21             MR. SINGH:  Your Honor, it is quoted in -- sorry

22   -- in the presentation if you'd like to read it.

23             MR. BROMLEY:  Oh, do you have the Debtor's

24   presentation from earlier?

25             THE COURT:  Yes.  The slides from today?
```

1          MR. BROMLEY:  Yeah.  It's Slide 24.  24, Your

2     Honor.

3          THE COURT:  Okay.

4          MR. BROMLEY:  That's the -- that's the relevant

5     language that's quoted.

6          THE COURT:  Right.  Okay.

7          MR. BROMLEY:  So, Your Honor, the way that the

8     document works is Section 2 of the asset purchase agreement,

9     Article 2, deals with purchase and sale with Section 2.1

10    being the purchase and sale of the acquired assets, and

11    Section 2.2 dealing with the excluded assets.  Section 2.3

12    deals with the assumption of liabilities.

13         So this is the way a standard asset purchase

14    agreement is structured, so what you're buying, what you're

15    not buying, and then what you're assuming.

16         So Section 2.3 is the assumption of liabilities,

17    and the header for that, you know, says that the -- on the

18    closing date, the Buyer shall assume effective as the

19    closing and timely perform and discharge in accordance with

20    their respective terms the following liabilities.  If you

21    have a 2.3(k), it's -- there's several things that are going

22    on in 2.3(k), and it has a total of 10 subsections.

23         So what 2.3(k) says that the assumed liabilities

24    include the severance reimbursement obligations, the --

25    which is a defined term -- the assumed 503(b)(9)

1    liabilities, other payables -- defined term -- and all

2    payment obligations with respect to the ordered inventory.

3    All right.

4             And then there's the sub -- 10 subsections which

5    I'll -- a couple of them reference these terms.

6             But then when you go back to the definitions, so

7    you have other payables as a defined term and ordered

8    inventory as a defined term.

9             MR. SCHROCK:  And, Your Honor, those are on the

10   next page, the next slide.

11            THE COURT:  Okay.

12            MR. SCHROCK:  Ordered inventory as well as the

13   other (indiscernible).

14            THE COURT:  Right.

15            MR. BROMLEY:  And so when you look at other

16   payables, and that is on Page 24, other payables shall mean

17   the accounts payable set forth on 1 point -- Schedule

18   1.1(g).

19            "Ordered inventory," another defined term, "shall

20   mean inventory," which itself is a defined term, "other than

21   prepaid inventory," again, a defined term, "of the type set

22   forth on Schedule 1.1(f), that has been ordered by the

23   Sellers, prior to the closing date, but as to which the

24   Sellers have not taken title or delivery prior to the

25   closing date," all right?  So, if you go back to 2.3(k), the

Page 203

1    -- and look at the -- and each of those have a schedule,

2    right?  So, if you go to Schedule 1.1(f), which is Ordered

3    Inventory, and I'm not sure if that's in your chart.

4              MR. SCHROCK:  It is.

5              MR. BROMLEY:  Okay.  Can I actually see -- I just

6    wanted to make sure --

7              MR. SCHROCK:  Yeah, this is in there.

8              MR. BROMLEY:  Great, thank you.  Okay, and that's

9    on Page 23 of the charts, of the slide deck that you got

10   this morning, Your Honor.

11             THE COURT:  25, isn't it?

12             MR. BROMLEY:  I'm sorry.  25, yes.  And that's --

13   that box at the bottom is exactly how it appears, and how

14   I've cut it out and put it in the back of my binder.  And

15   so, what does it say?  It says, "Ordered Inventory."

16   "Ordered Inventory," and then it says: "As of January 7,

17   2019."  And it has two categories, Domestic and Imports, it

18   has a Total line -- Total on Order, Less Paid In Transit,

19   Less on the Order, Total Amount of Ordered Inventory, and

20   you go all the way over to the far right-hand side, $278

21   million dollars total on order, deducting what has been paid

22   in transit, and is on the order, which is also, in effect,

23   title as transferred, you get a total of $166,557,000, all

24   right?  But there's two things that are important to keep in

25   mind about the way that Schedule 1.1(f) is written, and how

Page 204

1    Ordered Inventory is defined.

2            Ordered Inventory on Schedule 1.1(f) is Ordered

3    Inventory as of January 7, 2019, so this is an example, Your

4    Honor.  This is not a definition, this is going to be the

5    Ordered Inventory as of the moment of closing, because if

6    you go back to what the definition of "closing" is, it says:

7    "Goods of the type set forth on Schedule 1.1, so it's not

8    saying it's exactly on 1.1, meaning 1.1(f) is an example.

9    That has been ordered by the Sellers prior to the closing

10   date, as to which the Sellers have not taken title or

11   delivery prior to the closing date.  So, what we have is,

12   anything as to which there are orders out, but it hasn't

13   been delivered, title hasn't been taken.  That's what

14   Ordered Inventory means.

15           It just so happens that on -- as of January 7,

16   2019, Schedule 1.1(f) had a number of $166.6 million

17   dollars.  That is what, from ESL's perspective, in terms of

18   the negotiations it was having with respect to the bid

19   letter that it put in, dated January 5th, because that's

20   when this was added in, the expectation through ESL is that

21   what we were doing with respect to the accounts payable was

22   that we were taking accounts payable that relate to Ordered

23   Inventory, that is accounts that are going -- amounts that

24   are going to be due for inventory that was paid that has not

25   yet been received, but will be delivered after the closing

Page 205

1    date, right?  And so, that number is 166 -- as of January

2    7th, was $166.6 million dollars.

3           And it was that number that we were operating in

4    respect of.  Now, Other Payables is a defined term as well,

5    and if you go 2.3(k), it says Other Payables is the Accounts

6    Payable set forth on Schedule 1.1(g), and that schedule was

7    made public today, and that schedule simply is an amount

8    that says $166 million dollars, that is on Page 24 of the

9    dec from this morning.

10           Right, so there's no -- Schedule 1.1(g) is not a

11   schedule of particular payables, it's a dollar amount,

12   right?  And so, if you go further down, in 2.3(k), and

13   there's subnumbers, romanettes (i) through (x), there is

14   romanette (v): "Buyer's obligation with respect to the Other

15   Payables shall not exceed $166 million in the aggregate."

16   It's not a coincidence that the number $166 million is with

17   respect to both the schedule relating to Ordered Inventory,

18   or Other Payables, because it was, indeed, the other party's

19   intention, at least as ESL's point of view, that what Other

20   Payables meant in 2.3(k) is that it's Other Payables and

21   payment obligations with respect to the Ordered Inventory.

22   So, that total amount is $166 million dollars, the Schedule

23   1.1(f) makes it clear that the Ordered Inventory expectation

24   was $166 million dollars.

25           THE COURT:  Yes, but it -- if it was Other

Page 206

1  Payables and all payment obligations, then you defined Other

2  Payables as -- and all -- in five -- (k) little roman (v)

3  you'd say: "Buyers obligations with respect to the Other

4  Payables and all payment obligations shall not exceed $166

5  million."  And this just refers to the Other Payables, not

6  the clause that follows it: "and all payment obligations

7  with respect to Ordered Inventory."

8           MR. BROMLEY:  I hear what you're saying, Your

9  Honor, but there's no other use of the word Ordered

10  Inventory.  What we're talking about here is, it may be that

11  Ordered Inventory is an -- is an additional defined term

12  that's not necessary, but what we're talking about is --

13           THE COURT:  Well, the parties defined it.

14           MR. BROMLEY:  But it's the exact same definition.

15  It's $166 million dollars.  It's the same number, Your

16  Honor.

17           MR. SCHROCK:  But that would -- but that's why we

18  had --

19           THE COURT:  Well, then, why are you fighting over

20  it?  It's the same thing, then it's $166 either way.

21           MR. BROMLEY:  The point is, Your Honor, whether

22  there's two $166s or one, the schedule that Mr. Schrock

23  refers to, it's not a schedule, it's just a number on a

24  page.  That's not a schedule.

25           THE COURT:  No, but it is, because that's what the

1    schedule says.

2              (Laughter in the Courtroom)

3              MR. SCHROCK:  Right, but Your Honor, that -- the

4    Other Payables are payables that exist, right, that were --

5    that we specifically negotiated as a bridge (indiscernible).

6              THE COURT:  I don't care what people negotiated.

7    It certainly looks to be that the parties used two different

8    terms, they've actually defined them differently, and put a

9    cap on one, and assumed the other one.

10             MR. BROMLEY:  Your Honor --

11             THE COURT:  Now, it may be that, definitionally,

12   they overlap, in which case, there's no reason to pay more

13   than once, but if they don't overlap, then --

14             MR. BROMLEY:  But Your Honor, I think, at a

15   minimum, there's an ambiguity here, and there's no documents

16   in the record because this is not the time to do it but it's

17   clear that the communication --

18             THE COURT:  Well, I'm not deciding this issue

19   today, because I can't, but I don't see an ambiguity.

20             MR. BROMLEY:  All -- well, I'm saying --

21             (Laughter in the Courtroom)

22             THE COURT:  I mean, you can't make one by saying -

23   - you can't say one -- you can't make one under New York law

24   by saying the parties disagree about what they meant, unless

25   the document itself is ambiguous.

1          THE COURT:  -- oh, I have it.  Yeah.

2          MR. BROMLEY:  I understand, Your Honor.  Look --

3          THE COURT:  Can I interrupt you just for a second?

4          MR. BROMLEY:  Oh, sure.

5          THE COURT:  Is Mr. Dublin here, still?

6          MR. DUBLIN:  Yes.

7          THE COURT:  Behind the pillar.

8          MR. DUBLIN:  Just stepping on the --

9          THE COURT:  Can you --

10         MAN:  -- yeah, sure.

11         THE COURT:  Can you look and see where this

12   provision is in case --

13         MR. SINGH:  Yeah, Your Honor, I think it's

14   Paragraph 13 of the final.

15         MR. BROMLEY:  Paragraph 13 for the

16   (indiscernible).

17         THE COURT:  Let me just -- what page is that, do

18   you know?

19         MR. SINGH:  It starts on Page 37, if you have the

20   Senior DIP Order, Your Honor.

21         THE COURT:  Okay, yeah, I do.

22         MR. SINGH:  It's a very, very long paragraph.

23         THE COURT:  I'm sorry.

24         MR. BROMLEY:  That's okay.

25         THE COURT:  I mean, I think that's -- I don't need

Page 209

1    -- I don't really need -- now I understand the rationale.

2              MR. BROMLEY:  But I have some more, so.

3              THE COURT:  Okay, all right, go ahead.

4              MR. BROMLEY:  Oh, you --

5              THE COURT:  No, go ahead.

6              MR. BROMLEY:  Oh, I'm sorry, Your Honor.  Yeah,

7    so, the fact is that, that's not the only point.  There's

8    two -- that these two definitions are sitting here together

9    is not happenstance, but what we're talking about as well is

10   that there is an ongoing obligation of the Debtors to --

11   with respect to these numbers, to be performing the business

12   in the -- to operate the business in the ordinary course.

13   To order things and pay for them as they come due, right?

14   And what we know --

15             THE COURT:  That's a separate issue, though.

16             MR. BROMLEY:  Well, it's the --

17             THE COURT:  And the Debtors haven't looked for a

18   different interpretation of that.

19             MR. BROMLEY:  Well, it is and it isn't, Your

20   Honor.  To the extent that the -- what has happened is, to

21   the extent that there's two buckets, which we don't agree

22   with, and this one bucket is being filled up because what is

23   happening is, the Debtors are not paying their obligations

24   as they come due, they're violating another portion of the

25   agreement.  This is an extraordinarily complex document, but

Page 210

1   it cannot be that, on the one hand, the Debtors can choose

2   voluntarily not to pay things --

3           THE COURT:  All right, but that -- now we're kind

4   of shift -- but the Debtors are willing to live with the

5   Ordinary Course provision, right?

6           MR. SINGH:  We are, Your Honor.

7           MR. BROMLEY:  Well, Your Honor, to the extent that

8   there's a dispute going forward, I just wanted to let you

9   know, the issues are, right, as to whether or not the

10  Debtors are performing --

11          THE COURT:  I understand that point.  I think --

12  correct me if I'm wrong, but I think the concern that the

13  Special Committee and the Debtors had was that, was not over

14  that issue, but rather, over the first argument you made.

15          MR. BROMLEY:  Oh, I know because they're --

16  they're not concerned about the first issue because it helps

17  them, because what they've been doing is not performing in

18  the ordinary course --

19          THE COURT:  No, but that's a separate -- the

20  Ordinary Course is a separate provision.  They'll live with

21  that.

22          MR. BROMLEY:  They relate to each other, Your

23  Honor.

24          THE COURT:  Well, I don't know.

25          MR. BROMLEY:  So.

1            THE COURT:  Okay.  All right, thank you.

2            MR. BROMLEY:  Thank you, Your Honor.

3            THE COURT:  So, I'm sorry, now, Page 37, you said,

4    Mr. Singh?

5            MR. SINGH:  Your Honor, (indiscernible).

6            THE COURT:  Well, this is the --

7            MR. SINGH:  One second, Your Honor.

8            THE COURT:  This is the five-page paragraph.

9            (Laughter in the Courtroom)

10           THE COURT:  Okay.

11           MR. SINGH:  Your Honor, are we looking at ECF 5 if

12   (indiscernible).

13           THE COURT:  Well, I have what's called the Final

14   Order.

15           MR. SINGH:  Yeah.  Yeah, it's Paragraph 13, on

16   Page 37, sort of talking about reverse marketing provisions.

17           THE COURT:  Right.

18           MR. SINGH:  And, as you said, Your Honor, it's a

19   very long order, but it gets to -- a very long paragraph.

20   It's going -- at about Page 40, right after the Definition

21   of Reverse Marketing Provisions, Your Honor.

22           THE COURT:  Yeah?

23           MR. SINGH:  I think the relevant provision you

24   were talking about before is that the DIP ABL agents, starts

25   that first sentence: "will not apply proceeds of pre-

Page 212

1    division unencumbered."

2              THE COURT:  "received in connection with any

3    exercise of Secured Creditor remedies, or from any sale,

4    transfer or the disposition of such assets."

5              MR. SINGH:  That's right, Your Honor, so the point

6    of the provision being that the Senior DIP ABL agents agree

7    to first lien basis as to the inventory, and then if they

8    came up short, they would look to the other unencumbered

9    collateral, but it wasn't that they didn't have a lien on

10   the other unencumbered collateral.

11             THE COURT:  Right.  Okay, so it's basically -- I

12   don't think Mr. Dublin was saying they don't have a lien,

13   it's just a marshalling provision, right?  So, I think he's

14   -- you've summarized that correctly.

15             MR. SINGH:  Yes.

16             THE COURT:  I think he summarized that correctly.

17   So -- it's amazing he remembered all of this.

18             (Laughter in the Courtroom)

19             THE COURT:  All right.  Okay.  So, I have before

20   me a Motion by the Debtors in these cases for approval of an

21   Asset Purchase Agreement and modified, in related exhibits

22   and documents, between them, and a newly-created entity that

23   is going to be owned by the Debtors' current controlling

24   shareholder, ESL, and other parties in the -- who will be in

25   a minority position in that NewCo.  The Second Circuit has

Page 213

1    been addressing motions of the approval of the sale of all

2    or substantially all of the business of a Debtor-in-

3    Possession, which this sale, in essence, is, for decades,

4    starting with in re Lionel Corp, 722 F.2d 1063 (2d Cir.

5    1983), in which the Second Circuit held that a Debtor-in-

6    Possession can sell all or substantially all of its assets

7    outside of a Chapter 11 plan, provided that the Judge finds

8    a good business reason, based on the evidence before him or

9    her.  That's at Page 1071.  And the sale is not -- outside

10   of plan is not the result of undue pressure, separate and

11   apart from there being a good business reason.

12          The sale here, at this point, is essentially

13   unopposed, which the exception of an objection by the

14   Debtors' Official Creditors' Committee.  I have dealt with

15   the other objections, which are primarily reservations of

16   rights, with the exception of the Craftsman/Black and Decker

17   objection, which I dealt with on the merits, but that

18   involved the assignment of one particular asset, a trademark

19   license.  The Creditors' Committee does not oppose the sale

20   of substantially all of the assets outside of a Chapter 11

21   plan.  Indeed, the basis, or the primary basis for its

22   objection, is that it would rather have all of the assets

23   sold on a liquidation basis, outside of the -- outside of a

24   Chapter 11 plan.  So, the standard by which I should review

25   the sale here is the essential standard laid out by Lionel,

Page 214

1    which again, is, the Court needs to find a good business

2    reason, based on the evidence before it.

3            As that standard has evolved over the years, it's

4    important to note at the outset, the Second Circuit has made

5    it clear that, these types of motions, even though they are

6    of extreme importance in a bankruptcy case, are summary

7    proceedings.  That is, the Court, unless that proceeding is

8    combined with an adversary proceeding, is not to determine

9    interest in property or other issues that might affect the

10   sale on a final basis, but rather, needs to determine the

11   merits of the proposed sale itself.  See, for example, in re

12   Orion Pictures, 4F.3d 1095 (2d Cir. 1993), and in re Genco

13   Shipping and Trading, Ltd., 509 B.R. 455 (Bankr. S.D.N.Y.

14   2014).

15           The general inquiry that the Court should make

16   when considering the propriety of a sale motion under §

17   363(b) of the Bankruptcy Code is well laid out by Judge Lane

18   in, in re Advanced Contracting Solutions, LLC., 582 B.R.

19   285, 310 (Bankr. S.D.N.Y. 2011), quote: "§ 363(b) of the

20   Bankruptcy Code governs the proposed sale and use of Estate

21   property outside of the ordinary course of business.  The

22   standard for approval under § 363(b) is whether the Debtor

23   exercised sound business judgment."  The case law concerning

24   § 363 provides that the Court needs to review the business

25   decision and whether it was made on a disinterested basis

Page 215

1    with due care in good faith and according to some Court

2    commentators, no abuse of discretion or waste of corporate

3    assets.  See also, in re GMC 407 B.R. 463, 493-94 (Bankr.

4    S.D.N.Y. 2009), where the Court held to approve a § 363(b)

5    sale: "A Court must be satisfied that notice has been given

6    to all creditors and interested parties, the sale

7    contemplates a fair and reasonable price, and the purchaser

8    is proceeding in good faith."

9              A number of courts in this district, with the

10   seminal case being in re Integrated Resources Inc., 147 B.R.

11   650, at 656 (S.D.N.Y 1992), and including the Advanced

12   Contracting case that I quoted, go further and say that, in

13   analyzing whether the proposed sale is a proper exercise of

14   good or sound business judgment, the Court may apply the

15   business judgment rule, which is essentially, as interpreted

16   by those courts, a rule applying to transactions in the non-

17   bankruptcy context that presumes that corporate decision

18   makers and their decisions -- presumes, excuse me, that

19   corporate decision makers and their decisions will be

20   protected from judicial second guessing, and that courts are

21   loath to interfere with corporate decisions, absent a

22   showing of bad faith, self-interest or gross negligence, and

23   will uphold the board's decisions as long as they are

24   attributable to a rational business purpose, with the burden

25   being on parties opposed to the exercise of such a decision,

Page 216

1    and I appreciate the analysis that the courts in this

2    district have done to apply that standard, but I have

3    consistently held, and believe that Lionel and Orion, in the

4    plain language of the statute, require more of an inquiry,

5    at least where there are substantive objections to the

6    proposed sale, which is the case here.

7              Ultimately, as laid out by the Second Circuit in

8    the Orion Pictures case, albeit that that case involved the

9    business decision to assume or reject contracts, but that

10   decision was still out of the ordinary course, and I think

11   the logic therefore applies to § 363(b).  Ultimately, as

12   laid out by the Second Circuit in the Orion Pictures is one

13   where the Bankruptcy Court has to exercise its business

14   judgment to determine, in light of all of the facts laid out

15   on the record in the summary proceeding, whether, in fact,

16   the decision does make business sense to sell the assets as

17   proposed by the Debtor.  And that's the standard that I have

18   applied here.

19             The Second Circuit, in putting that burden on the

20   Bankruptcy Court, also made it clear that the bankruptcy

21   judge is looking into the future, and therefore cannot

22   assure the benefits of the proposed transaction, but

23   nevertheless, needs to evaluate it based on what it knows in

24   the present day, to decide whether, in fact, the transaction

25   makes good business sense.  In doing so, the courts are

Page 217

1    guided by not only the underlying consideration being

2    provided for the assets, but also the process by which the

3    assets were sold, and whether it was generally fair and

4    within the constraints under which the selling party was

5    operating, including the need for speed in some

6    circumstances, and the like, designed to maximize the value.

7    The case law is clear that § 363(b) sales do not require a

8    formal auction process, as is confirmed by the SDNY

9    guidelines on asset sales developed by the judges in the

10   Bankruptcy Court in the Southern District, and that, with

11   the right process, sales to insiders may be approved.

12   However, an inquiry in the process is clearly warranted,

13   especially where the sale is to an insider, as is the case

14   here.

15           Again, though, the Second Circuit has given the

16   Bankruptcy Courts guidance in dealing with sale processes,

17   as stated by the Second Circuit in, in re Financial News

18   Network, Inc., 980 F.2d 165 at 166, (2d Circ. 1992): "a

19   Bankruptcy Court must perform a difficult balancing act when

20   it conducts an auction of a Debtor's assets.  It walks a

21   tight rope between, on the one hand, providing for an

22   orderly bidding process, recognizing the danger that, absent

23   such a fixed and fair process, Debtors may decline to

24   participate in the auction, and on the other hand, retaining

25   the liberty to respond to different circumstances so as to

Page 218

1    obtain the greatest return for the bankrupt Estate."  What

2    one takes away from that opinion, and subsequent opinions is

3    that, as reflected in the sale procedures order entered by

4    the Court to govern the process for selling the Debtors'

5    assets, regular procedures are important so that parties can

6    rely on them, but overall supervision by the Court, with the

7    input from key parties in interest, including the Debtors

8    and the exercise of their fiduciary duties, the creditors'

9    committee and other interested parties, is necessary to deal

10   with issues that come up during the sale process, and that

11   need to be addressed, if, in fact, addressing them will lead

12   to increased value in a fair manner.

13          The last couple of points I will make, generally,

14   on the Court's standard for reviewing this motion is that,

15   typically, courts will consider whether the sale price was

16   fair and the transaction in which it's being paid is one

17   that makes good business sense, by looking to the sale price

18   for all of the assets together, without discussion of the

19   constituent parts, and as a subset of that proposition, the

20   courts recognize that, provided that one keeps within the

21   priority scheme of the Bankruptcy Code, there may be

22   individual constituencies in a case who benefit more from a

23   sale than others.  For example, those who are parties to

24   executory contracts or unexpired leases, whose contracts are

25   being assumed by the buyer, will have their pre-petition

Page 219

1    claims cured provide -- or there will be adequate assurance

2    of a cure, whereas other unsecured creditors, after the

3    payment of the sale proceeds to secured creditors, may get

4    far less in respect of their unsecured claims.

5    Nevertheless, such a sale, as long as the overall price is

6    fair, and again, it doesn't violate other provisions of the

7    Bankruptcy Code, will be approved.  See, for example, in re

8    TWA 2001 Bankr. Lexis 980, *32 (Bankr. D.Del., Apr. 2,

9    2001), and in re Ionosphere Clubs, Inc., 100 B.R. 675, 677

10   (Bankr. S.D.N.Y. 1989).  See also, Mission Iowa Wind Co. v.

11   Enron Corp., 291 B.R. 39, 43 (S.D.N.Y. 2003).

12           That case, that is the Enron/Mission Wind case,

13   however, also stands for another proposition, which is that,

14   as I said before, a sale cannot violate substantive rights,

15   except as permitted by the Bankruptcy Code, for example,

16   under § 363(f) of the Code, or violate the general priority

17   scheme of the Bankruptcy Code.  So, for example, in the

18   Mission Wind case, the Debtor sought approval of a sale of

19   assets that included not only its own assets, but assets of

20   non-Debtor entities.  Obviously, the proceeds of that sale

21   needed to be allocated among the two sellers, which the

22   District Court required to be done on a thorough basis.

23   Allocation may also be important if assets are being sold by

24   more than one Debtor to ensure that no particular Debtor is

25   shortchanged for the assets that it is selling in respect of

1   the sale proceeds or consideration received from the sale,

2   so that, to the extent that it has separate creditors, those

3   creditors are not prejudiced.  There has been a fair amount

4   of talk during the trial in this similar proceeding as to

5   whether or not the proposed sale would leave the Debtors,

6   after the sale, administratively insolvent, that is, unable

7   to pay their post-petition in 503(b)(9) pre-petition

8   administrative expenses in full, as is required under a

9   Chapter 11 plan for that plan to be confirmed, unless the

10  administrative expense creditors waive that right.

11        There is no requirement under the Bankruptcy Code

12  to ensure that a proposed sale of substantially all of the

13  assets of an operating business result in administrative

14  solvency.  Indeed, there are a number of opinions cited in -

15  - indeed a number of opinions as cited in the Debtors'

16  Memorandum of Law, to the contrary, but even more so, there

17  are hundreds of cases that result in going concern sales

18  with the subsequent dismissal of the case with unpaid

19  administrative expenses.  The Court's concern about

20  administrative insolvency, nevertheless, is real, because

21  the Debtor needs to be left with resources to ensure that

22  the transaction's benefits will be received, and generally

23  speaking, one wants to get as many claims paid as possible.

24  But it is that context that I've reviewed the testimony

25  regarding the effect of the proposed sale on the

Page 221

1     administrative solvency of these Debtors.  This sale motion

2     has resulted in a far longer evidentiary hearing than most

3     sale motions.  I heard the testimony of 10 witnesses live,

4     as well as reviewed deposition designations for one other

5     witness, Mr. Kniffen, K-N-I-F-F-E-N, and deposition

6     designations for Mr. Diaz, one of the Committee's experts.

7     There are also several binders of agreed exhibits, which

8     have been admitted into evidence.

9          But, it appears clear to me, having heard all of

10    that testimony, and reviewed the evidence as deemed to be

11    significant by the parties, that essentially, there are

12    three underlying grounds for the Creditors' Committee

13    objection to the proposed sale.  The first is that the sale

14    process under which the Debtors proceeded with the marketing

15    of their assets that resulted in the sale that's sought to

16    be approved today, was flawed to such an extent that the

17    sale should not be approved, or if it were to be approved, I

18    should not provide a finding under § 363(m) of the

19    Bankruptcy Code, that the Purchaser engaged in the

20    transaction in good faith, which is essentially the same

21    thing as saying that I would not approve the sale, because

22    no Purchaser would enter into an agreement without that

23    finding.

24          The second argument that the Committee has made is

25    that, in light of the only reasonable alternative here,

Page 222

1    which is a prompt liquidation of the Debtors' assets, the

2    proposed going concern sale is deficient, i.e., the

3    hypothetical liquidation of the Debtors' assets would result

4    in a higher or better transaction.  Finally, the Committee

5    has argued that there is insufficient value being provided

6    by the Purchaser here, over and above its credit bid, in

7    relation to the assets that it is purchasing that are not

8    encumbered by a lien that would support the credit bid.

9            I'll address each of those objections in order,

10   but before doing so, I will note that currently, there are

11   no objections to the proposed sale, by any party, to an

12   executory contract or lease that is sought to be assumed in

13   today's order, other than cure objections, which the parties

14   have agreed to resolve in the future.  In other words, no

15   party today whose contract is being assumed, or whose lease

16   is being governed by this order, has objected today on the

17   grounds of a lack of adequate assurance of future

18   performance.  The parties have been careful to reserve all

19   rights in respect of that issue, in respect of any lease

20   that is not specifically being assumed at the closing or

21   executory contract, except where there has not been an

22   objection and no expressed reservation of rights.  As I

23   noted, I entered an order approving a sale process here that

24   contemplated taking bids for all or substantially all of the

25   Debtors' assets, as well as bids for substantial portions of

Page 223

1    the Debtors' assets, which could then be aggregated, if they

2    were submitted in a qualifying way, to compete as a group to

3    any bids that were made for all or substantially all of the

4    assets.

5            I also made it clear that, any party seeking to

6    make a proposal for real estate assets should do so, and the

7    Debtors should take such proposals seriously.  The record

8    here is clear that, to thoroughly market the Debtors' real

9    estate assets, one would need a minimum of four months.  The

10   Committee's expert has opined that it would be a disaster to

11   market the real estate assets for anything less than over a

12   year, and as much as 20 months.  Obviously, the Debtors here

13   could not, therefore, run a full real estate marketing

14   process along with a going concern sale process that also

15   would have contemplated bids for substantial portions of the

16   Debtors' business to be aggregated, as I stated earlier.

17   Nevertheless, as I said, those wishing to make material bids

18   for real estate were encouraged, strongly, to put their best

19   foot forward by me to do so - in the Bidding Procedure

20   Order, it contemplated it.  The Bidding Procedures Order

21   contemplated that the Creditors' Committee, and other

22   parties in interest, would have the right to come back to

23   this Court to complain about how the process was being

24   conducted in real time, and to seek a prompt pivot if the

25   process was not being conducted in a way that would maximize

Page 224

1    value, to a liquidation process that would start the active

2    marketing of the Debtors' real estate assets in the manner

3    that I previously described.

4            I have reviewed the testimony here on the process

5    issues, including from the Debtors' side, the testimony by

6    Brandon Aebersold, and the two independent directors,

7    William Transier and Alan Carr.  I've also considered the

8    testimony of the Committee's investment banker, Saul Burien,

9    and I conclude that, as far as a going concern sale process

10   is concerned, the Debtors engaged in a thorough and fair

11   process, given the constraints under which they were

12   operating, mainly the need that all parties recognized,

13   including the Creditors' Committee, that they could not

14   sustain continuing operations for any meaningful length of

15   time.  The Committee, through Mr. Burien, has complained

16   that certain potential buyers of segments of the Debtors'

17   business were confused, or given short shrift, during the

18   sale process, and that that is the reason that they were

19   only indicative, or insufficient, rather, expressions or

20   bids for parts of the Debtors that might be hived off on a

21   standalone basis.

22           I have considered that allegation carefully, and

23   concluded that, given the nature of this process, as

24   supervised by me on a hands-on basis, that all parties in

25   interest, including Mr. Burien, knew, if, indeed, these

Page 225

1    problems were truly troublesome, they would have been raised

2    to me so that I could have stepped in to have ensured either

3    a little more time or a little more focus to maximize

4    potential competing offers.  None of that happened.  It is

5    also reasonably clear to me, based on the testimony not only

6    by the bankers and directors that I've previously mentioned,

7    but certain other witnesses, that the so-called potentially

8    standalone businesses are closely integrated with the rest

9    of Sears, and that there are meaningful issues related to

10   separating them, that would potentially adversely affect a

11   potential buyer's willingness to bid for such assets.

12   That's, I believe, simply a fact that may well go to explain

13   why the bidding for those assets was not more robust.

14          The Committee has also complained, as a process

15   matter, that the insider purchaser tainted the sale process

16   to its advantage.  As a set of facts to support that

17   conclusion, the Committee has pointed to three or four

18   things.  But before addressing them, I should note that the

19   Debtors, then controlled by ESL, and before the commencement

20   of these cases, and with ESL's consent, replaced ESL as the

21   controlling party for purposes of a transaction of this

22   kind, as well as a review of any claims against ESL,

23   independently, and as how that may relate to a transaction

24   of this kind, to third parties.  The Restructuring

25   Committee, and then a subset of that through a Restructuring

Page 226

1    Subcommittee.  Those independent third parties were

2    represented by independent counsel and financial advisors.

3    The two members of the Restructuring Subcommittee testified

4    in the hearing before me on the sale motion, Mr. Transier

5    and Mr. Carr.

6              I believe the record is crystal clear that the

7    Restructuring Committee and Restructuring Subcommittee, a)

8    actually had control of the Debtors with respect to the sale

9    process and the Debtors' decision throughout that process as

10   to whether to accept or reject any offers and how to conduct

11   the process, b) that they were, in fact, truly independent,

12   as evidenced by, among other things, their rejection of

13   numerous proposals by ESL and heated and lengthy

14   negotiations with ESL, c) that they were well and thoroughly

15   advised by independent professionals, and d) that their

16   focus was the proper one, which essentially, is the same

17   standard that I have already outlined: does the proposed

18   transaction represent the highest and best transaction

19   available to these Debtors?  I believe that they exercised

20   their responsibilities in an active and informed way, and

21   that they themselves were experienced in this area and

22   brought their experience to bear, as opposed to being

23   passive receptacles for their professionals' advice.  There

24   are numerous incidences in the record to reflect that.

25   Under the circumstances, therefore, I believe that the

Page 227

1    involvement of the proposed buyer here, as a bidder for the

2    assets, was effectively neutralized, in respect of the

3    Debtors' review of that bid, and the process that led to the

4    bid, and the bid's acceptance.

5          The Committee, that is, the Creditors' Committee,

6    has attacked that process, I believe, only by pointing to

7    the fact that, after Mr. Transier first met Mr. Lampert, the

8    controlling party of ESL, that meeting having been by phone,

9    to lay out the -- in a board meeting that laid out the

10   duties of the new board members of the Restructuring

11   Subcommittee, and the fact that a joint office of the CEO

12   would be formed, including Mr. Meghji and Mr. Riecker, and

13   Mr. Transier, and therefore, Mr. Lampert, step down from

14   making any decisions over the fate of Sears.  Mr. Transier

15   sent an email to Mr. Lampert in which he stated to Mr.

16   Lampert that he admired how Mr. Lampert had handled those

17   sensitive issues.  Given the sensitivity of that transfer, I

18   believe the email was appropriate.  I don't believe it

19   indicated that Mr. Transier took any less seriously his role

20   as an Independent Director/Co-CEO and member of the

21   Restructuring Subcommittee.  Rather, it was simple diplomacy

22   dealing with someone who potentially would regret and

23   therefore cause problems later, the decision that he had

24   made to turn over power over the fate of what had been his

25   company to people he had never met before.  There was no

1    suggestion of any subsequent communications between Mr.

2    Transier and Mr. Lampert that would indicate Mr. Transier

3    was anything other than an Independent Director who

4    recognized that the company's interest, separate and apart

5    from Mr. Lampert and ESL, needed to be protected, and that

6    it was his job to do so.

7          The Committee also points to a letter sent by,

8    among others. Mr. Riecker, R-I-C-K-E-R (sic), one of three

9    of Sears Senior Managers, to the board, stating that they

10   strongly hoped that the board would seriously consider a

11   going concern exit for Sears, as opposed to a liquidation.

12   There is evidence in the record that Mr. Riecker and the

13   other authors of that letter were approached by Mr. Lampert

14   before they sent the letter, and that they ran the letter by

15   Mr. Lampert's counsel, but having assessed Mr. Riecker's

16   credibility on the witness stand, it is clear to me that

17   that letter, and the sentiment behind it, came from him

18   personally, and that he would have said it whether Mr.

19   Lampert told him to or not.

20         Finally, the Committee challenges the process, not

21   based on how the parties, who were in charge of the process,

22   conducted it or evaluated it, but, to the contrary, by the

23   actions of ESL in the process.  It points to two things.

24   First, a letter sent on behalf of ESL to the Debtors' board

25   during the course of negotiations leading up to the January

Page 229

1    15th, sliding into the January 16th period auction.  The

2    letter was sent at a time when the Restructuring Committee

3    and Restructuring Subcommittee had quite firmly indicated to

4    ESL that it was not going to accept the current proposal by

5    ESL that was then on the table, and was instead prepared to

6    pivot to a liquidation.

7           The letter threatened the board with legal action

8    for abuse of fiduciary -- breach of fiduciary duty, if it so

9    took -- if it took such an action.  The Debtors' counsel,

10   the Restructuring Committee and Restructuring Subcommittee's

11   counsel, the Committee's counsel and other parties, raised

12   this issue immediately with the Court, which held a Chambers

13   conference on the issue, at which those parties, as well as

14   ESL's counsel participated.  I made it clear in no uncertain

15   terms that that letter was a mistake and should be ignored

16   by all parties, including those who were handling the sale

17   on behalf of the Debtor, including the independent board

18   members.  It is clear from the letter, and I made it clear

19   at the Chambers conference, that the letter did not

20   recognize that one of the major reasons, although not the

21   only reason, that ESL's proposal had been rejected was that

22   ESL was still insisting on a global release of all claims

23   against it.  In other words, the letter was half baked.  I

24   believe that it had literally no effect on the subsequent

25   negotiations, other than, perhaps, giving the negotiators on

Page 230

1    behalf of the company a little more negotiating leverage

2    against ESL because obviously, I was unhappy that the letter

3    had been sent, and had so characterized it.  But clearly, it

4    did not give ESL any more negotiating leverage, or affect

5    the sale price.  When I weigh that one mistake against the

6    actions that ESL took to enable the sale process to be

7    conducted in an independent way, it is clear to me that, all

8    told, ESL conducted itself in this case, with respect to the

9    sale process, in good faith, for purposes of § 363(m) of the

10   Bankruptcy Code.

11          The Committee has also pointed to pre-petition

12   actions by ESL that it contends means that it did not engage

13   in good faith in the sale process that has led to the sale

14   today.  The evidence supporting that contention is, frankly,

15   rather vague in the record, but I gather the argument is

16   that, sometime in the past, ESL started to cause the sale of

17   Sears, but resisted, until shortly before the bankruptcy

18   petition date, actually setting up a structure to enable the

19   sale in a meaningful way.  Besides the evidentiary issue

20   that I already addressed, my focus is primarily, if not

21   exclusively, on the post-petition period, for purposes of §

22   363(m).  Moreover, I don't really understand the argument in

23   the first place.  To have a true sale process here of a

24   store that relies on trade credit and the like, one needs to

25   act fast, and generally in a bankruptcy environment, because

Page 231

1     the sale would not have happened except in a bankruptcy

2     environment.  So, conducting the type of sale process that,

3     apparently, the Committee thinks Mr. Lampert and ESL should

4     have conducted, or Sears should have conducted some time

5     before the petition date truly is not realistic.  Certain of

6     the groundwork could be laid, but the actual process needed

7     to go through, for a business of this kind, a Court-

8     supervised process under the Bankruptcy Code, because no

9     buyer, really, would take these assets, at this point, I

10    believe, without a Court order protecting it.

11          I believe that properties have -- I'm sorry, let

12    me back up.  I believe that the law is further clear that my

13    focus should be on the post-petition period, not actions

14    that the buyer may have taken pre-petition.  See in re Wing

15    Spread Corp, 92 B.R. 87, (Bankr. S.D.N.Y. 1988) at *93.  But

16    more importantly, I don't see the rationale behind the

17    argument in the facts before me, which reflect, again, I

18    think, a more important reality, which is that, there really

19    were no other going concern buyers here, and the parties

20    reasonably understood the liquidation alternative, and used

21    the value that could have been derived in that alternative

22    effectively in negotiating with ESL.

23          So, I conclude that the process here was proper

24    and appropriate.  If anyone wanted to, they could have

25    complained.  Mr. Lehane, counsel for a group of landlords

Page 232

1   did complain at one point, the day of the auction, and I --

2   as I said during the trial, I responded to him, I believe,

3   within five minutes as well as to the Debtors' counsel, to

4   make it clear that the landlords could attend and continue

5   to make indicative proposals, if they wanted to, but,

6   notwithstanding the various protestations of an improper

7   sale process, I did not receive other complaints until after

8   the fact.

9           The second basis for the objection is that the

10  proposed transaction is inferior to a liquidation sale of

11  the Debtors.  To be clear, this appears to me to be

12  primarily a dispute over the value of the Debtors' real

13  estate assets, and secondly, the likelihood that ESL will

14  perform the non-cash payment aspects of its proposed

15  purchase agreement.  It is true that the Debtors have --

16  would have in a liquidation scenario, the ability to sell

17  certain business segments, although I believe the parties

18  agree, and frankly, if they didn't, I believe it to be the

19  case, that the value of those business segments is

20  substantially tied to an ongoing Sears, and would be greatly

21  reduced if Sears were liquidating.  I believe there is

22  little disagreement about the value of those segments, or

23  frankly, about the other assets besides real estate, that is

24  in any way meaningful.

25          The parties do disagree over the realizable value

Page 233

1    of the Debtors' real estate.  I carefully considered the

2    testimony offered on that subject by Michael Welsh, the

3    Debtors' expert from Jones Lang LaSalle, and to some extent,

4    Mr. Meghji, the Debtors' CRO, and from the company side --

5    I'm sorry, from the Committee's side, Mr. Greenspan of FTI

6    Consulting.  I found that the assumed value of the Debtors'

7    real estate to the Debtor, as opposed to those that might

8    have a lien on that real estate, i.e., those who would be

9    entitled to the proceeds before the Debtor received them, to

10   be credibly set forth by Mr. Welsh, and supported by Mr.

11   Meghji.

12           Mr. Welsh's valuation assumed the reality here,

13   which is that the pivot to a real estate sale would be

14   extremely difficult, given the number of Debtors' properties

15   and the big box size of so many of them, as well as the fact

16   that, with respect to the Debtors' leased assets, which

17   comprised most of the real estate assets, the Debtors'

18   ability to keep landlords at bay under § 365, would end at

19   the beginning of May of this year, at which point, any

20   landlord, who believes that there, in fact, is value in the

21   lease, would have a strong incentive not to consent to a

22   further extension of the time to assume or reject.

23           Any buyer would know that too, and therefore would

24   prefer to deal with the landlord directly as opposed to the

25   Debtor.  So, the Debtors' window for a real estate sale

Page 234

1    process was constrained, as Mr. Welsh properly opined.  The

2    committee has criticized the Debtors' evaluation of the real

3    estate, other than focusing on the timing point, by noting

4    that, where there were indicative bids for the real estate,

5    even if those bids were substantially smaller than the

6    professional estimates by Jones Lang LaSalle, the Debtors

7    included them as a data point equally with the other

8    appraisal information.

9           There is something to be said for the Committee's

10   point, particularly if an indicative bid was a clear

11   outlier, as was the case with many of the bids for certain

12   leases or other real estate assets.  On the other hand,

13   given the, I believe, relatively small number of large

14   potential bidders here, the response by potential bidders

15   for the real estate to the Court's invitation to put their

16   best foot forward and at least an indicative bid, was

17   certainly underwhelming.  I believe it's consistent, at a

18   minimum, with Mr. Welsh's view that, given the number and

19   size of the Debtors' real estate assets, parties wanted to

20   keep their options open to see how the case shook out.  that

21   works both ways.  They didn't put their best bid forward,

22   but they also weren't reserving their right to make a much

23   lower bid in the future, if the Debtors' negotiating

24   leverage, as was inevitable with the ticking of the clock,

25   under § 365, would decrease.

Page 235

1          In any event, Mr. Meghji testified that the delta,

2    if one included as the Debtors did, those indicative bids in

3    the valuation, and if the Debtors didn't include it, was

4    roughly $70 million dollars, which no one on the Committee

5    side has contradicted.  Mr. Greenspan, in dealing with

6    another $70 million-dollar error, which he recognized, did

7    not actually reflect it in one of his valuations, because he

8    said it was just a mere rounding error.

9          Turning to Mr. Greenspan, I don't think I have

10   ever seen an appraisal of a real estate portfolio that was

11   more divorced from reality than his determination that we

12   should value these assets based on an 18- to 22-month

13   marketing period.  That is simply not what the Debtors had

14   available to them.  When you take that out of his

15   calculation, and when you recognize, as one must, that the

16   period really would be approximately four months, the

17   valuations are substantially the same.

18          The other minor number of assets that FTI

19   evaluated, that the Debtors didn't evaluate, could be

20   potentially available to the Debtors, was limited to about

21   20 percent, according to Mr. Greenspan's testimony, of the

22   assets that the Debtor didn't evaluate at all.  Of that 20

23   percent, he appears to have not recognized that, in a number

24   of cases, there were prior lienholders that would have a

25   right to all of the proceeds, and would have in fact -- that

Page 236

1    they would, in fact, not be paid in full from the proceeds

2    before the Debtors' Estate would, and at least in one case,

3    that, by his own analysis, comprised approximately 10

4    percent of that extra value, he clearly just got wrong

5    whether the Debtor was paying any current rent under the

6    lease.

7            His explanation for that omission, frankly, didn't

8    make sense to me.  He said that the market rent number of

9    $8.50 must actually reflect the arbitrage number, ignoring

10   the fact that the very next column was headed Arbitrage, and

11   also had the $8.50 number.  So, clearly, arbitrage was the

12   whole market rent that he stated.

13           Obviously, that was just 1/10th of the

14   unencumbered asset valuation that the Debtors didn't

15   undertake, but it certainly cast more doubt on his

16   testimony, which frankly, I completely discounted anyway,

17   given his view on the ability of the Debtors to conduct

18   their real estate sales that he posits, within the timeframe

19   that he posits.  It's simply not a viable basis for a

20   comparison to the deal presently before the Court.

21           That leaves the Committee's argument that the

22   value in the ESL transaction, which I find -- if I find --

23   found it to be, on its face, $5.2 billion, clearly exceeds

24   the value to the Estate of a liquidation approached, based

25   on the foregoing analysis.  The Committee, as I said,

Page 237

1    contends that that value isn't really there, that it's

2    illusory.  I conclude to the contrary, that there is a

3    reasonable basis to believe that, in fact, the value will be

4    received by the Debtors.  There are several different issues

5    that this raises, or this analysis raises.  First, the

6    Debtors contend that the limited release that ESL will

7    receive as part of this transaction, leaves the Debtors with

8    substantial, valuable litigation claims against ESL, that

9    the release is carefully confined to equitable subordination

10   and recharacterization claims for which ESL is paying not

11   only $35 million dollars, but also, the entire deal, which

12   is premised on a portion of the deal, $1.3 million being the

13   credit bid, and a settlement of ESL's recovery in respect of

14   its allowable claims from other assets of the Estate.

15          It appears to me, based on oral argument, at

16   least, that the Committee, when pushed, does actually

17   recognize that the release is, in fact, limited, and that

18   the remaining causes of action are appropriately preserved.

19          The Committee contends, and this is a tautology,

20   that in granting the release that would be granted to ESL,

21   the Estate is giving up a potential remedy, which is assets

22   to -- is to limit the recovery that ESL would get in the

23   bankruptcy case through equitable subordination or

24   recharacterization, and that concomitant with that, the

25   proceeds that would otherwise go to ESL from the liquidation

Page 238

1   would go to other creditors.  I have two responses to that

2   argument.  The first is that it appears to me that there are

3   substantial sources of recovery at ESL and assets that it

4   owns, including Seritage, that remain available to the

5   Estate on its litigation claims.

6           Secondly, I want to reiterate that the underlying

7   causes of action that are preserved have, essentially, the

8   same quantum of proof as equitable subordination claims

9   have.  Unfortunately for her, Judge Chapman has had to deal

10  with these issues, more than her fair share in the recent

11  past, including in, in re LightSquared, Inc. 511 B.R. 253

12  (Bankr. S.D.N.Y. 2014) and in re Sabine Oil and Gas Corp.,

13  457 B.R. 503 (Bankr. S.D.N.Y. 2016).

14          In those cases, she goes through the elements of

15  equitable subordination, and I think, accurately summarizes

16  them, in addition to noting that it is a remedial equitable

17  power, and that the revenue is limited to a subordinating a

18  claim to the extent of any actual damages, the damages would

19  need to be shown for equitable claims outside of bankruptcy

20  as well, although, with regard to fraudulent transfer, the

21  transfer is what would be avoided.

22          She states that: "Courts of this District have

23  held that there is no different or heightened standard by

24  which to judge a non-insider's conduct for the purposes of

25  equitable subordination, though there may be fewer

Page 239

1    traditional grounds available because neither under

2    capitalization nor breach of fiduciary duty applies to the

3    conduct of a non-insider."  That's at Page 348.

4            Here, the Debtors are preserving breach of

5    fiduciary duty claims and other equitable claims.  It's a

6    complete overlap.  So, in other words, Sears gets to

7    reorganize, but these claims are preserved, nevertheless.

8    To me, that is a completely fair and reasonable settlement,

9    considering all of the issues, including collection issues.

10           Secondly, the Committee contends that certain of

11   the obligations that ESL is undertaking to pay don't have to

12   be paid immediately upon closing, but will be paid over

13   time, albeit over a relatively short period of approximately

14   three to four months, at most.  In that context, it

15   challenges the ESL business plan that was introduced into

16   evidence and supported by the testimony of not only ESL's

17   witness, Mr. Kamlani, but also Mr. Meghji, Mr. Riecker, and

18   to some extent, Mr. Transier and Mr. Carr, although to a

19   much more limited extent.  That business plan in itself is

20   premised upon a standalone business plan that Sears

21   developed shortly after the start of these bankruptcy cases,

22   for a somewhat larger footprint of stores, 505 instead of

23   425.  The Committee points out that, in the past, Sears has

24   dramatically underperformed as against projections.  The

25   Debtors have pointed out that in the more recent past,

Page 240

1    literally meaning months before the bankruptcy filing, which

2    acknowledges a brief period, the Debtors have actually -- or

3    did actually perform well and consistent with their

4    projection, and consistent with the projections in the Sears

5    and ESL business plans, or at least reasonably consistent

6    with those projections, given that, under the ESL business

7    plan, one is talking about 80 fewer stores and a far lower

8    debt load, and dealing with stores that truly have value.

9            I have carefully reviewed Mr. Kniffen's deposition

10   excerpts that were introduced to go along with his

11   declaration, which I've also carefully reviewed.  I do not

12   view his conceitedly expert testimony with any greater

13   degree of deference than the testimony I received from Mr.

14   Kamlani, Mr. Riecker, or the other Debtor witnesses.

15   Clearly, the latter group are far closer to the actual facts

16   of Sears.  Mr. Kniffen has not actually worked in retail

17   since 2005.  He's been a consultant to people who are

18   interested in retail since then, but has not actually had

19   the pleasure of dealing with the admittedly, and he admits

20   this, changed environment over the last decade for big box

21   retailers.

22           For the period that really is at issue here, which

23   is the next several months, I believe, based on the evidence

24   before me, that ESL or the buyer, will, in effect, will in

25   fact, rather, perform its obligations under the agreement.

Page 241

1    If it breaches the agreement, it will be the subject of

2    every lawsuit, including equitable subordination, and it

3    will have lost a substantial new investment that it will be

4    making in this business.  Accordingly, I conclude that the

5    execution risk for this transaction, when one considers the

6    alternative, which has its own execution risk, is reasonable

7    to take.  One aspect of the transaction creates additional

8    execution risk, which we spent some time on in oral

9    argument.  It is the proper interpretation of § 2.3(k) of

10   the Asset Purchase Agreement.

11          As set forth in the Orion Pictures case that I

12   previously cited, given the procedural context of this

13   matter, I cannot conclude that issue, those two different

14   interpretations, dispositively.  See also, in re Sabine Oil

15   and Gas Corp., 550 B.R. 59, (Bankr. S.D.N.Y. 2016).  I do,

16   however, have an obligation to review the issue, make sure I

17   understand it, and determine how I believe it would turn out

18   with a proper record, in the proper procedural conduct --

19   context, just as Judge Chapman did in the Sabine case that I

20   just cited, when she interpreted a similar contract issue.

21   Based on my review of § 2.3, including subsection (k),

22   subsection little roman (v) of that subsection (k), and the

23   schedule that is incorporated into the definition of the

24   defined term, "Other Payables," which appears in the

25   definitional section of the agreement, as well as my

Page 242

1    evaluation of the analysis given to me by ESL's counsel that

2    includes a review of the defined term, "Other Inventory"

3    that appears in the APA and Schedule 1.1(f), that deal with

4    other inventory, I believe it's reasonable to assume that

5    the Debtors' interpretation of § 2.3 would prevail in a

6    proper litigation.  Namely, that the parties defined

7    separately the concept of Other Payables from all payment

8    obligations with respect to ordered inventory, which is the

9    clause that precedes the words, "Other Payables" in § 2.3(k)

10   and further, that the parties clearly set forth in little

11   roman (v) of subsection (k) that the cap of $166 million

12   would apply only to other payables, not to the phrase that

13   follows, those two words in subsection (k), namely, quote,

14   "and all payment obligations with respect to ordered

15   inventory."  I'm more than reasonably confident that that

16   would be the result in a contested matter brought before the

17   Court under the Part 7 rules.

18          That leaves, of course, the Debtors with their

19   obligation to as, and I'm summarizing the agreement, the

20   agreement will control, obviously, conduct their operations

21   in the ordinary course, pre-closing, and any other rights

22   under the agreement, that either party has.  But the Debtors

23   have stated to me, they're willing to live with that --

24   those terms of the agreement.

25          There are certain other conditions to the

Page 243

1    agreement, closing conditions that need to be satisfied.  I

2    am reasonably confident, based on Mr. Meghji's testimony,

3    and Mr. Riecker's testimony in particular, that they will

4    be, and further, that the parties will deal with each other

5    in good faith to enable those conditions to happen,

6    particularly given the identification of ESL with this

7    business and the consequences that would happen to it.  That

8    is, the Sears business with which it's identified, if they

9    do not deal with it -- each other in good faith to resolve

10   those conditions to closing.

11           And the last point I will make, although I believe

12   only the asset side really needs to be addressed, and I've

13   already done so, when comparison -- when comparing the ESL

14   transaction to the liquidation alternative, but I will,

15   nevertheless, mention that, in each of the committee's

16   calculations, it has made assumptions regarding the

17   treatment of ESL's claims in these cases that I believe are

18   not warranted, and that would, at a minimum, lead to

19   substantial litigation and litigation risk for the Estates.

20   Namely, the Committee has assumed that, notwithstanding a

21   pivot to a liquidation sale at its request, the Estate would

22   be able to prevail on making substantial charges to the

23   underlying collateral that secures the ESL secured debt, and

24   the DIP loans.

25           The ability to surcharge collateral under § 506(c)

Page 244

1    of the Bankruptcy Code is constrained by the language of the

2    statute itself, and the case law, including the leading case

3    of in re Flagstaff Food Service Corporation, 739 F.2d 73

4    (1984).  See also in re Domistyle, Inc., 811 F.3d 691 (5th

5    Cir. 2015), cert denied,2017 US Lexis 3509, May 30, 2017.

6         Those cases make it clear that the determination

7    of surcharging collateral is a difficult one for the Court.

8    It requires the Court to make judgments as to whether the

9    expenses incurred by a Debtor were for the primary and

10   direct benefit of the secured creditor, as opposed to other

11   parties in interest in the case.

12        This issue is usually dealt with by stipulations

13   between the parties, because they know how difficult it is

14   to litigate.  Properly here, the Committee insisted on

15   certain carveouts from 506(c) waivers, but that didn't

16   eliminate the difficulty of litigating such an issue.  The

17   word "primary" does not appear in the statute, but the

18   courts have applied it, because otherwise, as the Domistyle

19   court notes, the statute could, in essence, eat up the

20   narrow -- the interpretation could eat up the narrow nature

21   of the statute, which is a direct benefit.

22        Secondly, the Committee has completely discounted

23   any right that ESL would have under § 507(b) to a super-

24   priority administrative expense, based on the decline of its

25   collateral value since the start of the bankruptcy cases.

Page 245

1  Until disallowed, ESL's secured claim is entitled to

2  adequate protection, including under 361(3), a super-

3  priority claim under § 503(b) and § 507(b).  Determining the

4  decline in value of the collateral during the course of the

5  bankruptcy case, it's again, an extremely difficult issue.

6  It was dealt with by Judge Glenn in, in re Residential

7  Capital, LLC., 501 B.R. 549, (Bankr. S.D.N.Y. 2013).  It's

8  fact-based, dependent upon the value of the collateral at

9  Time 1 and Time 2.  To give absolutely no consideration to

10  that claim, I believe, in terms of comparing creditor

11  recoveries under a liquidation process to the ESL going

12  concern transaction, I believe, is quite inappropriate.

13          So, for all those reasons, I will grant the

14  motion.  I believe the proposed order needs some work, along

15  the lines of the marks that were stated on the record in

16  oral argument today, but that that work is relatively modest

17  and, it would appear to me, that I should be in a position

18  to enter it tomorrow morning, if it's provided to me in a

19  black line form.  It will include, for the reasons that I

20  stated on the record, a finding that the transaction and the

21  parties to it are entitled to the protection of §363(m) of

22  the Bankruptcy Code.

23          I would like to say one other thing, which is

24  simply to echo remarks that Mr. Seltzer made, not only on

25  behalf of prospective union employees, but all employees of

Page 246

1    this company.  During the course of this case, Mr. Lampert

2    in particular, and ESL generally, has been subject to

3    substantial verbal abuse.

4              (Laughter in the Courtroom)

5              THE COURT:  He is a wealthy individual and a big

6    boy, and I guess he can take it.  Some of it based on past

7    years, maybe justified, or may not be justified.  That will

8    be part of the record in the litigation that's fully

9    preserved, here.  I can say that, that abuse has led to, as

10   Mr. Bromley kind of probably, more like what I am about to

11   say, summarized two conflicting views of him, that he's

12   somehow Jay Gould and Barney Fife at one -- one and the same

13   time.  He has the opportunity now not to be a cartoon

14   character, and to take actions that, I believe, Mr. Kamlani

15   mentioned, would in fact, be of great meaning to the

16   Debtors' constituents.  He should do that.  A clear

17   communication process, both with vendors, but importantly,

18   with employees, is really warranted.  Okay, thank you.

19        (Whereupon these proceedings were concluded at 3:53 PM)

20

21

22

23

24

25

Page 247

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5        Sonya                    Digitally signed by Sonya Ledanski
                                  Hyde
6        Ledanski Hyde            DN: cn=Sonya Ledanski Hyde, o, ou,
                                  email=digital@veritext.com, c=US
7                                 Date: 2019.02.11 10:13:05 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 9, 2019