WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| **Debtors.[1]** | : | **(Jointly Administered)** |

-------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**DEBTORS' REPLY IN FURTHER SUPPORT OF THE
MOTION TO (A) ENFORCE ASSET PURCHASE AGREEMENT
AND AUTOMATIC STAY AGAINST TRANSFORM
HOLDCO LLC AND (B) COMPEL TURNOVER OF ESTATE PROPERTY[2]**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

The Debtors respectfully submit this reply ("**Reply**") in further support of the

Motion to Enforce.[3]  For all of the reasons stated in this Reply and the Motion to Enforce, the

Debtors request that the Court issue an order: (i) enforcing the Sale Order and automatic stay

pursuant to 11 U.S.C. § 362(a)(3); (ii) compelling the Buyer to turn over the Debtors' property

pursuant to the Sale Order, APA, and 11 U.S.C. § 542(a); and (iii) denying the Buyer's Motion

to Mediate.  A Revise Form of Order is attached hereto as **Exhibit A** with a redline against the

version of the Order submitted with the Motion to Enforce.

I.      **Preliminary Statement**

1.      The Buyer's Response to the Debtors' Motion to Enforce (ECF No. 2864)

(the "**Response**") presents no material factual disputes with respect to Estate assets that the

Buyer continues to withhold.  Rather, the issues at hand are, at their core, legal questions of

contract interpretation as the Buyer resists turning over assets that plainly belong to the Estate by

relying on strained and imaginary readings of the APA, in direct violation of the automatic stay,

the APA, and the Sale Order.  As demonstrated below, these are open-and-shut issues that can,

---

[2] Capitalized terms used in this Reply but not otherwise defined herein will have the meanings set forth in the *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* (ECF No. 2796) ("**Motion to Enforce**") or in the APA, as applicable.  The APA is attached as Exhibit B to the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**").

[3] The Debtors fully incorporate the Motion to Enforce, as well as the arguments made in the *Joinder of the Official Committee of Unsecured Creditors to Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* (ECF No. 2808) ("**UCC Joinder**"), in this Reply.

and should, be resolved by the Court through the Motion to Enforce.  There is no need for a separate mediation, an evidentiary hearing, or for the Buyer (who is already in possession of the relevant information) to take discovery.

2.      The Buyer's insistence that the issues arising from its admitted failure to turn over Estate funds—in violation of the Court's prior orders—should be resolved either through a time-consuming adversary proceeding or through mediation (potentially also followed by an adversary proceeding) demonstrates the Buyer's delay tactics.  The longer the Buyer can put off turning over funds that plainly belong to the Estate, the longer it can use the Estate's assets as its own interest-free bank loan.  Put simply, these delay tactics are highly advantageous to the Buyer at the direct and immediate expense of the Debtors and all creditors, depriving the Estates of their needed and rightly-due assets, and detracting focus and resources away from the Debtors' plan process.

3.      To its credit, the Buyer has conceded that certain categories of withheld funds—including GOB Store proceeds and Israeli cash—belong to the Debtors and has transferred those payments accordingly.  These two categories of Estate property previously held by the Buyer, and discussed in the Motion to Enforce, are no longer at issue.[4]

4.      Unfortunately, the Buyer still improperly refuses to transfer three other categories of Estate property in violation of the automatic stay and Sale Order; but, as noted above, the material facts surrounding each are undisputed:

- **February Rent Proration**:  The Buyer concedes that by February 19, the Debtors provided an amended schedule listing each item to be prorated, including the "crucial" property tax information.  Resp. ¶ 51.  Assuming the initial Rent Proration payment would be made seven business days

---

[4] The Debtors understand the Buyer is no longer withholding any outstanding GOB Store proceeds.  However, as such funds continue to flow into the cash management system now controlled the Buyer, the Debtors anticipate and expect that the Buyer will continue to turn over any additional GOB Store proceeds to the Estate as they are received.

WEIL:\96957390\15\73217.0004

after the schedule was provided, at the latest, that payment of $16.2 million should have been made by February 28. The Debtors' slight delay in providing the amended schedule, even if its provision was a "condition precedent" to receiving the payment—which it is not—does not excuse the Buyer from its obligation to make the initial Rent Proration payment after receipt of the schedule, nor does the APA provide a basis for the Buyer to continue withholding Estate property for the full 75-day period. The Buyer should be ordered to transfer the $16.2 million Rent Proration immediately.

- **Cash-in-Transit**: There is no dispute that the Debtors' cash management system was transferred to the Buyer at Closing and that the transfer was not intended to alter the allocation of assets and liabilities under the APA. Both sides also agree that the Cash-in-Transit at Closing belonged to the Debtors and that checks written by the Debtors to satisfy pre-Closing obligations should be reconciled against the Cash-in-Transit. The $18.5 million sought by the Debtors in the Motion to Enforce is based on the latest information made available to the Debtors almost three weeks ago; since that time the Buyer has ceased providing information to the Debtors. More than five weeks have passed since the Closing. During such time, the Buyer has been withholding Estate assets, and, according to the Buyer, at its current pace, it could be at least another month before the reconciliation is complete. This delay must end; time is of the essence. The Buyer must be required to provide its reconciliation immediately and to transfer the amount it determines is owed to the Debtors, i.e., that it does not in good faith dispute, by no later than three business days from the entry of an order granting the Motion to Enforce.

- **Credit Card Accounts Receivable**: The Buyer does not dispute that the reserves being held by First Data were funded by withholding Credit Card Accounts Receivables otherwise due to Sears from sales of inventory at its stores. These are credit card receivables that First Data has advised the Debtors and the Buyer that it will release upon the receipt of certain documentation establishing the Buyer's creditworthiness; documents that the Buyer has not provided. The Buyer's gamesmanship in this regard should not be countenanced, and the fact that First Data has temporarily held back disbursement of these Credit Card Accounts Receivable (as it is permitted to do by agreement) does not somehow convert these funds into something other than Credit Card Accounts Receivable. Accordingly, the Credit Card Accounts Receivable held by First Data should be counted toward the total Credit Card Accounts Receivable delivered at Closing—satisfying that Closing condition—and the Buyer should be ordered to remit to the Debtors the additional $14.6 million in pre-Closing Credit Card Accounts Receivable that it is holding without justification.

4

5.     For all of these reasons and those set forth in the Motion to Enforce, the Court should compel the Buyer to turn over the Estate assets that it is withholding in violation of this Court's prior orders.

## II.     The Court Can and Should Enforce Its Prior Orders

6.     Section 105 of the Bankruptcy Code allows courts to "enforce and implement" their earlier lawful orders—i.e., to "vindicate the interests of the court." *See NWL Holdings, Inc. v. Eden Center, Inc. (In re Ames Dep't Stores, Inc.)*, 317 B.R. 260, 274 (Bankr. S.D.N.Y. 2004). The authority under § 105 is "broader than the automatic stay provisions of section 362." *Kagan v. Saint Vincents Catholic Med. Ctrs. of N.Y. (In re Saint Vincents Catholic Med. Ctrs. of N.Y.)*, 449 B.R. 209, 217 (S.D.N.Y. 2011) (quoting *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin–United Corp. Litig.)*, 765 F.2d 343, 348 (2d Cir.1985)). Section 105 allows courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. *Lyondell Chem. Co. v. Centerpoint Energy Gas Servs., Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 587 (Bankr. S.D.N.Y. 2009).

7.     Courts have "proceeded by motion, as opposed to an adversary proceeding, to enforce the terms of [a] Sale Order." *See Luan Inv., S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)*, No. 95B44528(AJG), 2001 WL 826122, at *6 (S.D.N.Y. July 19, 2001) (holding that a bankruptcy court could proceed by motion when interpreting a contract and enforcing its previous sale order pursuant to "its inherent power" under § 105 of the Bankruptcy Code); *see also In re Continental Airlines, Inc.*, 236 B.R. 318, 327 (Bankr. D. Del. 1998) (holding that "an adversary proceeding is not necessary where the relief sought is the enforcement of an injunction *previously obtained*" and such relief may be sought by motion).

8.     Paragraph 58 of the Sale Order provides that this "Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and

provisions of this Sale Order and the Asset Purchase Agreement [and] to adjudicate disputes related to this Sale Order or the Asset Purchase Agreement." *See also* Sale Order ¶ Y ("The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms."). Here, the Debtors seek to enforce that same Sale Order in response to the Buyer's refusal to comply with its obligations as set out in the APA. The APA's terms are straightforward and unambiguous and, in situations such as this, the Court can exercise its inherent power to enforce its prior orders by giving effect to the parties' intent pursuant to the plain language of the APA. *See Luan*, 2001 WL 826122 at *6, 9–11. Notably, none of the cases cited by the Buyer concerning a dispute over assets were in the context of an unambiguous asset purchase agreement and related sale order; in fact, the Buyer did not cite any cases that would limit this Court's ability to enforce its prior orders pursuant to its inherent authority under § 105.

### A.    No Bona Fide Disputes Regarding Estate Assets Exist

9.    The Buyer seeks to prevent the Court from considering these APA issues—or at least delay the Court's consideration of these issues—by asserting that bona fide disputes exist over the Estate assets being withheld by the Buyer. *See* Resp. ¶ 16. But as discussed below, there are no material issues of fact concerning any of the three categories of funds that are being withheld, and the Buyer cannot avoid enforcement of the Sale Order by asserting facially meritless arguments and farcical interpretations of unambiguous APA terms.

10.    To find whether a bona fide dispute exists, the court "must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *See, e.g.*, *Miller v. D&M Holdings US, Inc. (In re Dig. Networks N. Am., Inc.)*, Case No. 15-11535 (KG), 2018 WL 3869599, at *6 (Bankr. D. Del. Aug. 13, 2018) (finding, despite "operating with a dearth of information," that there was no bona fide dispute). Merely claiming

WEIL:\96957390\15\73217.0004

a dispute exists does not make it so and, on that basis, does not extinguish the Debtors' right to relief under the automatic stay and to seek enforcement of this Court's prior orders. *See LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*, 582 B.R. 46, 118 (Bankr. S.D.N.Y. 2018) (holding that "mere denial" of the movant's entitlement to turnover is insufficient to establish a bona fide dispute).

11.    As explained below, the Buyer's arguments boil down to issues of contract interpretation arising from undisputed facts. To the extent there *may be* disputed payment amounts, those disputes will be addressed by future reconciliation procedures expressly provided for in the APA and in the E&Y Memo, which sets out the agreed cash management reconciliation procedures. *See* APA § 9.11(d); *see also* Declaration of Mohsin Meghji, dated Mar. 11, 2019 ("**Meghji Decl.**") ¶ 9. Simply put, *anticipated* factual disputes are premature and can be raised with the Court if and when they arise. The Buyer should not be permitted to "engage in extensive discovery" (*cf.* Resp. ¶ 10) of unnecessary and inadmissible parole evidence. *Eagle Indus., Inc. v. DeVilbiss Health Care*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

**B.    An Adversary Proceeding is Not Required**

12.    In addition, although a motion for turnover under § 542 typically is brought as an adversary proceeding, *In re MF Global Inc.*, 531 B.R. 424, 431 (Bankr. S.D.N.Y. 2015), "[c]ompliance with the requisites of an adversary proceeding may be excused by waiver of the parties," *Village Mobile Homes, Inc. v. First Gibraltar Bank (In re Village Mobile Homes, Inc.)*, 947 F.2d 1282, 1283 (5th Cir. 1991). Also significant, courts have proceeded by motion

7

when "the interests of justice will be more readily served by the expeditious resolution of [a] matter without further delay." *See In re Wlodarksi*, 115 B.R. 53, 56 (Bankr. S.D.N.Y. 1990).

13.     As this Court noted in *In re Metiom, Inc.*, 301 B.R. 634, 639 (Bankr. S.D.N.Y. 2003), compliance with the adversary proceeding rules "should *not* require the elevation of form over substance to prejudice a party if the matter can proceed on the merits consistent with Part VII" of the Bankruptcy Code. Requiring an adversary proceeding to compel the Buyer to comply with the Court's prior orders would do just that. Given the Court's familiarity with the parties, their respective obligations under the APA, and the Sale Order entered by this Court, the Court can and should resolve these issues expeditiously and without the unnecessary delay of an adversary proceeding or mediation. The Buyer has similarly recognized the need for expediency in its Motion to Mediate:

> The estates are now substantially without assets or revenue generating operations, but are burdened by the substantial expenses of these ongoing cases. Every day of further delay and also of professional fees only further dissipates the few remaining assets in the estates to the detriment of all creditors. These disputes also represent a distraction from the Buyer's focus on turnaround of the business operations purchased pursuant to the APA for the benefit of all stakeholders.

Motion to Mediate ¶ 37.

14.     The Buyer makes similar statements in the Response, recognizing that the parties require an "expedited process . . . to establish a framework for resolving these disputes without the expense and delay of formal disputes." Yet, the Buyer's Response is internally inconsistent as the Buyer is prepared to pursue a "full fledged adversary proceeding culminating in an evidentiary hearing" while conceding the need for a swift conclusion. Resp. ¶¶ 2, 10. If the Buyer truly seeks a quick resolution, there should be no objection to the procedures laid out in the Debtors' Motion to Enforce, which specifically seeks to avoid protracted adversary proceedings or mediation processes. Forcing the Debtors to refile and move to compel

8

compliance through an adversary proceeding or pushing these issues off onto a third-party mediator would only cause unnecessary delay and detract from the Debtors' chapter 11 plan process.

15.    For all of the foregoing reasons, this Court should exercise its broad authority to enforce its prior Sale Order and the automatic stay and compel the return of the Estate assets through motion practice without the necessity of a costly, time-consuming adversary proceeding.

## III.    The Court Should Grant the Debtors' Motion to Enforce

16.    The Debtors seek to have the Court enforce the Sale Order and compel the Buyer to turn over Estate property based on the four corners of the APA and Sale Order, the provisions of which are straightforward and unambiguous.

17.    The primary objective of contract interpretation is to "give priority to the intention of the parties . . . by looking to the four corners of the contract." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).   Under Delaware law, which governs the APA, courts interpret contracts according to their "ordinary and usual meaning." *Id.*; *see also* APA § 13.8(a).  "A contract is not rendered ambiguous simply because the parties do not agree" as to its meaning. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).  "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.*  "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus.*, 702 A.2d at 1232.

18.    The language of the Sale Order and the APA are unambiguous and must be enforced according to their plain meaning and without resort to parole evidence.  In doing so,

9

several canons of contract interpretation apply. *First*, when there is an inconsistency between a specific and general provision of a contract, the specific controls. *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). *Second*, "a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (courts must "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage") (internal quotations omitted).

### A.    $16.2 Million Rent Proration

19.    The Buyer does not dispute that it is currently withholding $16.2 million[5] in February Rent Proration. Instead, the Buyer argues that it is rightfully withholding such amounts due to the Debtors' late delivery of the amended Initial Prorations Schedule on February 19, 2019. In fact, the Buyer has taken an extreme position, stating that the Debtors' belated schedule delivery somehow relieves the Buyer "of any current obligation to make a proration payment" prior to April 29, 2019 (i.e., 75 days after closing). Resp. ¶¶ 7, 46. The Buyer's position is wholly unsupported by the APA—there is *no provision* relieving the Buyer of its obligation to provide the Rent Proration. In fact, the Buyer's tortured reading of § 9.11 of the APA would completely frustrate the express intent of the APA, which was to reimburse the Debtors for rent advanced on behalf of the Buyer almost immediately after the Closing.[6]

20.    As set forth in the Motion to Enforce, the APA sets out a two-part process to true-up the February Rent Proration. The APA states, in relevant part:

---

[5] The precise amount of the Rent Proration payment due and owing to the Debtors is $16,187,136.00.

[6] *See Akorn, Inc. v. Fresenius Kabi AG, C.A.*, No. 2018-0300-JTL, 2018 WL 4719347, at *57 (Del. Ch. Oct. 1, 2018) (explaining that frustration of purpose occurs when a "contract's principal purpose is completely or nearly completely frustrated").

(iii)    during the ***seven (7) Business Day period following the Closing Date***, ***Buyer and Seller shall work in good faith*** to account for each of the items set forth in the Initial Prorations Schedule (taking into account any additional invoices, payments and requests for payment received during such period) ***and shall reasonably cooperate to agree on an updated calculation of such prorations to be on account or credit to Buyer and Seller*** (the "Post-Closing Prorations Schedule");

(iv)    if the net amount of prorations set forth in the Post-Closing Prorations Schedule results in a payment due from Buyer to Seller then Buyer ***shall make such payment to Seller within 1 Business Day*** after the end of such seven (7) Business Day period following Closing . . . ;

(v)    ***seventy-five (75) days following the Closing Date***, Buyer shall deliver to Seller an updated calculation of the Post-Closing Prorations Schedule setting forth all updated proration items reflecting all invoices and payments received within the period following Closing and accounting for all amounts owed by Buyer and Seller pursuant to the Occupancy Agreement and the Seller Occupancy Agreement (the "Final Prorations Schedule");

(iv)    . . . If the net amount of prorations set forth in the Final Prorations Schedule results in a payment due from Seller to Buyer (taking into account any credit or payment made following the Final Prorations Schedule) then ***Seller shall make such payment to Buyer within 1 Business Day*** after delivery of the Final Prorations Schedule.

APA § 9.11(d) (emphases added).

21.    Simply put, this provision expressly requires the Buyer to make an initial payment to the Debtors according to the Post-Closing Prorations Schedule. Any discrepancies later identified are then to be trued-up—regardless of the beneficiary—in the Final Prorations Schedule, 75 days after Closing. Nothing in § 9.11 of the APA suggests that the timely delivery of the Initial Prorations Schedule is a condition precedent to the Initial Proration Payment. Further, there is nothing in the four corners of the APA that says if the Initial Prorations Schedule is delayed by a few days, the Buyer is entitled to withhold the entirety of that Initial

Proration payment until 75 days after Closing. *See* APA § 9.11(d). To be clear, nothing in the APA excused the Buyer from its obligation to transfer the $16.2 million to the Debtors by, at the very latest, seven business days after receiving the amended Initial Proration Schedule on February 19, 2019 (i.e., by February 28, 2019). Nor does the Buyer provide any justification under the plain and unambiguous terms of the APA for its failure to pay the Debtors the Initial Proration since, at least, February 28. Accordingly, the Buyer should immediately transfer the $16.2 million in Rent Proration to the Debtors.

### B.   Cash Proceeds from Transactions that Occurred Prior to Closing

22.   The Buyer also is withholding cash proceeds from pre-Closing transactions, in violation of the Sale Order, the automatic stay, and the APA ("**Cash-in-Transit**"). Although the Debtors and the Buyer do not agree on why the Debtors' cash management system had to be transferred to the Buyer, the Buyer does not dispute that the Cash-in-Transit at Closing belongs to the Debtors. Resp. ¶¶ 38, 42; *see also* APA § 2.2(f) (stating that "all cash and cash equivalents . . . including . . . bank deposits" are Excluded Assets that are retained by the Debtors). The Buyer attempts to defend its failure to turn over the Cash-in-Transit to the Debtors by asserting that, more than five weeks after the Closing, it still needs to reconcile the Cash-in-Transit against any checks written by the Debtors to satisfy pre-Closing obligations. *Id.* ¶ 42.

23.   To be sure, the Debtors do not dispute that such a reconciliation, at least in theory, is appropriate; but the Buyer has been conducting this prolonged reconciliation in isolation. The Buyer has refused to share information with the Debtors' advisors and embarked on an unnecessarily protracted process—estimating at least another month before completion—requiring approximately ten weeks in total for reconciliation. *Id.* ¶ 40 (stating that for over five weeks, the Buyer's advisor E&Y has devoted a mere 200 hours to this project, or just one person

working full time); *Decl. of Andrew D. Hede* (ECF No. 2868) ¶¶ 14–15 (estimating that the reconciliation process could take "an additional 3–4 weeks"). All the while, the Buyer continues to improperly withhold Estate assets that it concedes it has no legal entitlement to.

24.    The $18.5 million sought by the Debtors in the Motion to Enforce is based on the latest information made available to the Debtors almost three weeks ago. *See* Supplemental Declaration of Mohsin Meghji, dated Mar. 20, 2019 ("**Supp. Meghji Decl.**") ¶ 3. Because the Buyer now controls the cash management system and has failed to provide the Debtors with any information regarding amounts to be reconciled, the Debtors lack the requisite information to agree with, or dispute, the Buyer's reconciled amounts.[7] For example, the purported $14.8 million offset for checks issued pre-Closing (Resp. ¶ 43) was never raised with the Debtors before the Buyer filed its Response, and no support for that figure has been provided to the Debtors to date. *See* Supp. Meghji Decl. ¶ 4.

25.    Accordingly, the Buyer should be ordered to, no later three business days from the entry of the an order granting the motion to enforce, to: (i) turn over to the Debtors its reconciliation of pre-Closing cash proceeds held in the cash management system, including all backup analyses and supporting information used by the Buyer and its advisors to calculate the reconciled amount of Cash-in-Transit; and (ii) transfer to the Debtors the amounts reconciled and due to the Debtors, as Cash-in-Transit, which the Buyer is currently withholding in breach of the automatic stay and the Sale Order. After such turnover and transfer, the parties and their

---

[7] Because the Buyer, and not the Debtors, now control the cash management system, the suggestion that the Buyer needs discovery on this issue is puzzling. *Cf.* Resp. ¶ 5.

WEIL:\96957390\15\73217.0004

advisors can review and assess whether any dispute remains regarding the Buyer's reconciliation of the Cash-in-Transit.[8]

### C.    $14.6 Million Credit Card Accounts Receivable

26.    The Buyer attempts to avoid its obligation to remit $14.6 million[9] in pre-Closing Credit Card Accounts Receivable to the Debtors by mischaracterizing approximately $35 million in pre-Closing Credit Card Accounts Receivable that were retained as "reserves" by First Data in the weeks leading up to these bankruptcy cases. *See* Resp. ¶¶ 22–36; *cf.* APA § 10.9. But the Buyer does not dispute that these "reserves" were funded by withholding credit card receivables otherwise due to Sears from sales of inventory at its stores. *See, e.g.*, Resp. ¶ 31.

27.    Nonetheless, the Buyer attempts to justify its refusal to turn over the $14.6 million in pre-Closing Credit Card Accounts Receivable by claiming that the $35 million in withheld credit card receivable—what the Buyer refers to as "reserves"—are not "Credit Card Accounts Receivable" but rather a "Security Deposit" within the meaning of the APA. Resp. ¶ 23. Based on that recharacterization of the withheld credit card receivables, the Buyer argues that such credit card receivables should not count toward the Debtors meeting the $1.657 billion aggregate threshold requirement in § 10.9 of the APA. Resp. ¶ 22. And, under the Buyer's theory, the Debtors therefore failed to meet the threshold closing requirement and, as a result, are not entitled to receive the $14.6 million in pre-Closing Credit Card Accounts Receivable the Buyer now is withholding. Of course, if the Court determines that the credit card receivables

---

[8] To the extent the Buyer subsequently discovers additional payments that it contends should have been reconciled against the Cash-in-Transit, it can reserve its right to amend its reconciliation and seek return of any "over payment."

[9] The precise amount of the pre-Closing Credit Card Accounts Receivable due and owing to the Debtors is $14,639,618.38.

WEIL:\96957390\15\73217.0004

remained "Credit Card Accounts Receivable" even though they were being withheld by First Data, then the Buyer would have no basis for refusing to turn over the $14.6 million. Accordingly, before the Court is a pure and straightforward legal question of whether the reserves are Credit Card Accounts Receivable or a Security Deposit.

28.     As the Buyer acknowledges, "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014). When interpreting a contract, Delaware courts "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Id.* at 368. "[W]hen parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract." *Id.* at 370. Only "[w]hen a contract's plain meaning . . . is susceptible to more than one reasonable interpretation . . . may [courts] consider extrinsic evidence to resolve the ambiguity." *Id.* at 374.

29.     This Court need not look beyond the four corners of the APA to give effect to the parties' intent—as reflected in the clear and unambiguous language of the APA— that the reserves are Credit Card Accounts Receivable under the APA.

30.     The APA defines Credit Card Accounts Receivable as follows:

> [E]ach Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, **owed by a credit card payment processor or an issuer of credit cards to a Seller** resulting from charges by a customer of a Seller on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Seller or services performed by a Seller, in each case in the ordinary course of its business.

WEIL:\96957390\15\73217.0004

APA § 1.1 (emphasis added).

31.    The reserves indisputably satisfy this definition.  They are "proceeds . . . owed by [the relevant] credit card payment processor[s] . . . to [the Debtors] resulting from charges by a customer of [the Debtors] on credit cards processed by such processor[s] . . . in connection with the sale of goods by [the Debtors]."  *See id.*  As noted above, the Buyer does not dispute this fact, nor could it.  Significantly, the APA's definition of Credit Card Accounts Receivable includes "***all*** . . . ***proceeds***."  *See id.* (emphasis added).  To give effect to the Buyer's interpretation would be to add a temporal limitation the parties did not intend and excise the term "all" out of the provision, *see id.*; *In re DPH Holdings Corp.*, 553 B.R. 20, 27 (Bankr. S.D.N.Y. 2016), in contravention of black-letter Delaware law, *Salamone*, 106 A.3d at 370.

32.    The Buyer attempts to argue that because the credit card processors can purportedly use the reserves to recover any refunds they issue to customers, or to address any potential breach by the Buyer of its obligations to the processors, the reserves are therefore somehow no longer owed to or receivable by the Debtors.  *See* Resp. ¶¶ 29–30.  This is simply wrong.  The proceeds withheld by the credit card processors were unquestionably "owed [to the Debtors] by [the relevant] credit card payment processor[s]."  And the fact that the credit card processors have temporarily withheld these credit card receivables (as they are permitted to do by agreement) does not somehow convert the funds into something other than Credit Card Accounts Receivables.  *See* APA § 1.1; *see also In re Nat'l Audit Def. Network*, 332 B.R. 896, 917 (Bankr. D. Nev. 2005) (holding that a reserve account did not "effect a gift to [a credit card processor]" and that the value represented by the reserve account did not "belong[] to [the credit card processor] forever for it to use as it wishe[d]").  Moreover, and contrary to the Buyer's assertion, the Debtors could have—and ***did***—request the return of the reserves.  *Cf.* Resp. ¶ 30

16

*with* Supp. Meghji Decl. ¶ 5.  First Data has advised the Debtors and the Buyer that it will release the Credit Card Accounts Receivable being held as reserves upon the receipt of certain documentation establishing the Buyer's creditworthiness—documents that to date the Buyer has refused to provide.  *See infra* ¶ 34.

33.     The Buyer's effort to liken the reserves to a "security deposit" ignores the undisputed facts.  *See* Resp. ¶¶ 28–31.  First, a security deposit is just that—a ***deposit***.  To "deposit" property means to "giv[e]" it "to another," or to "plac[e]" it with another.  *See Black's Law Dictionary* 504 (9th ed. 2012).  The Debtors did not ***deposit*** the reserves with the credit card processors—they did not give the reserves to or place the reserves with the credit card processors.  The credit card processors ***withheld*** Credit Card Accounts Receivable otherwise due to Sears.  The Buyer, itself, cites a case that makes a distinction between a security deposit and a reserve account.  *See In re Nat'l Audit Def. Network*, 332 B.R. at 917 ("The Agreement [between the debtor and the credit card processor] required [the debtor] to pay a security deposit, ***and*** allowed [the credit card processor] to withhold a percentage of the money it received from [the debtor's] credit-card customers in a reserve account . . . .") (emphasis added).  The distinction is not a semantic one.  When a creditor has concerns about a debtor's credit exposure, the creditor asks the debtor to post some security or to issue a letter of credit.  The reserves here are fundamentally different.  They are, at bottom, receivables that Sears generated in connection with the sale of its inventory, and the credit card processors are obligated to disburse those receivables to Sears once certain conditions are met. [10]

---

[10] The Buyer cites to dicta in *Velo Holdings Inc., et al. v. Paymentech, LLC*, 475 B.R. 367 (Bankr. S.D.N.Y. 2012), as part of its campaign to conflate the terms "reserve" and "security."  Resp. ¶ 31.  But the citation is unavailing.  A reserve may serve as security without being a deposit, and *Velo Holdings* does not suggest otherwise.  Moreover, the court in *Velo Holdings* nowhere held that the reserve at issue somehow ceased to be owed to the merchant by virtue of its being withheld by the credit card processor.

WEIL:\96957390\15\73217.0004

34.    The Buyer's attempt to suggest that the reserves are more like the categories of Acquired Assets listed in § 2.1(o) of the APA than the accounts receivable defined in § 1.1 is likewise unavailing.   The Buyer cites a case involving the interpretation of a child-abuse reporting statute for the proposition that "words grouped in a list should be given related meaning."   Resp. ¶ 31 (quoting *Del. Bd. of Nursing v. Gillespie*, 41 A.3d 423, 427 (Del. 2012)).   Even were the case on point (and it plainly is not—in that case, the court sought to construe a general term in light of a series of specific terms that preceded it in a list), the reserves are not akin to the categories listed in § 2.1(o), e.g., "restricted cash, security deposits, letters of credit, escrow deposits and cash collateral," for all of the reasons discussed above.   Accordingly, the Court should reject the Buyer's specious reading of the APA.

35.    Finally, it is the Buyer who is refusing to provide the information that First Data has requested in order to consider dispersing the at-least $28.1 million in Credit Card Accounts Receivable that it is currently holding as a reserve.   After signing, and well in advance of the Closing, the Debtors' Chief Restructuring Officer, a senior member of the Debtors' finance organization and a principal of the Buyer, had a discussion with the Chief Financial Officer of First Data concerning return of these funds.   Supp. Meghji Decl. ¶ 5.   First Data expressed openness to the request and, in order to act on such request, asked for financial information about the Buyer and the future operations of the business.   *Id.* (citing Ex. A).   The Buyer, however, has refused to provide the information to First Data.   *Id.*   The Debtors cannot help but think the Buyer is intentionally withholding these documents so that it can assert this tortured argument and avoid paying the $14.6 million in excess Credit Card Accounts Receivable owed to the Debtors (or, at the very least, delay doing so).

WEIL:\96957390\15\73217.0004

36.     For these reasons, the Court should order the Buyer to immediately transfer to the Debtors the $14.6 million in pre-Closing Credit Card Accounts Receivable that it has been holding in violation of the automatic stay and the Sale Order.

## IV.     <u>Conclusion</u>

37.     For all of the reasons stated in this Reply and the Debtors' Motion to Enforce, the Buyer is in violation of the Sale Order, the APA, and the automatic stay. Accordingly, the Court is well within the bounds of its statutory authority to address the Buyer's violations without need of adversary proceedings and the Debtors respectfully request that the Court enter the proposed order enforcing the Sale Order and automatic stay and denying the Buyer's Motion to Mediate.

Dated: March 20, 2019
      New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                          :
In re                                     :        **Chapter 11**
                                          :
**SEARS HOLDINGS CORPORATION,** *et al.*, :        **Case No. 18-23538 (RDD)**
                                          :
Debtors.[1]                               :        **(Jointly Administered)**
                                          :
---------------------------------------------------------------x

### ORDER (I) ENFORCING (A) ASSET PURCHASE AGREEMENT AND AUTOMATIC STAY AGAINST TRANSFORM HOLDCO LLC AND (B) COMPELLING TURNOVER OF ESTATE PROPERTY, AND (II) DENYING TRANSFORM'S MOTION TO MEDIATE

Upon the motion, dated March 11, 2019 (ECF No. 2796) (the "**Motion to Enforce**"),[2] of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (the "**Order**") enforcing the Sale Order and automatic stay, compelling turnover of Estate

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion to Enforce.

funds, and denying Transform Holdco LLC's *Motion to Assign Matter to Mediation* (ECF No. 2766) ("**Transform's Mediation Motion**") pursuant to sections 105, 362, 541, and 542 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"); and the Court having jurisdiction to decide the Motion to Enforce, Transform's Mediation Motion, and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion to Enforce and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Motion to Enforce and the opportunity for a hearing thereon having been provided in accordance with the Amended Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion to Enforce and Transform's Mediation Motion on March 21, 2019 (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion to Enforce establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      Transform's Mediation Motion is denied.

2.      The Motion to Enforce is granted to the extent set forth in this Order.

3.      Within one (1) business day of the entry of this Order, Transform Holdco LLC ("**Transform**") is directed to transfer to the Debtors payment of:

2

      a.      $16,187,136.00 on account of February rent proration; and

      b.      $14,639,618.38 on account of Excess Credit Card Receivables.

4.    Within three (3) business days of the entry of this Order, Transform is directed to:

      a.      turn over to the Debtors its reconciliation of pre-Closing cash proceeds held in its cash management system ("**Cash-in-Transit**"), including all backup analyses and supporting information used by Transform and its advisors to calculate the reconciled amount of Cash-in-Transit; and

      b.      transfer to the Debtors the amounts reconciled and due to the Debtors, as Cash-in-Transit; provided, that, for the avoidance of doubt, the payment of reconciled Cash-in-Transit shall not prejudice either party's right to subsequently amend and/or dispute the reconciled amount.

5.    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
      White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

WEIL:\96961787\5\73217.0004

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
: 
In re                                                           :        **Chapter 11**
: 
**SEARS HOLDINGS CORPORATION,** *et al.*,        :        **Case No. 18-23538 (RDD)**
: 
Debtors.[1]                                                :        **(Jointly Administered)**
: 
------------------------------------------------------------x

**ORDER (I) ENFORCING (A) ASSET PURCHASE AGREEMENT**
**AND AUTOMATIC STAY AGAINST TRANSFORM HOLDCO LLC AND**
~~AGAINST THE BUYER AND~~(B) COMPELLING TURNOVER OF ESTATE
**PROPERTY, AND**
**(II) DENYING TRANSFORM'S MOTION TO MEDIATE**

Upon the motion, dated ~~[       ]~~March 11, 2019 (ECF No. ~~[      ]~~2796) (the "**Motion to Enforce**"),[2] of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (the "**Order**") enforcing the ~~APA~~Sale Order and automatic stay, compelling turnover of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion to Enforce.

eEstate funds, and denying Transform Holdco LLC's *Motion to Assign Matter to Mediation* (ECF No. 2766), **("Transform's Mediation Motion")** pursuant to sections 105, 362, 541, and 542 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"); and the Court having jurisdiction to decide the Motion to Enforce, Transform's Mediation Motion, and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion to Enforce and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Motion to Enforce and the opportunity for a hearing thereon having been provided in accordance with the Amended Case Management Order; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion on to Enforce and Transform's Mediation Motion on March 21, 2019 (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Motion to Enforce establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    Transform's Mediation Motion is denied.

2.    1. The Motion to Enforce is granted to the extent set forth hereinin this Order.

WEIL:\96961787\5\73217.0004

3.    ~~2.  Transform Holdco LLC is directed to turn over to the Debtors $57,500,000 being withheld by Transform Holdco LLC w~~Within one (1) business day of the entry of this Order~~.~~, Transform Holdco LLC ("**Transform**") is directed to transfer to the Debtors payment of:

~~3. The Motion to Mediate is denied.~~

    a.    $16,187,136.00 on account of February rent proration; and

    b.    $14,639,618.38 on account of Excess Credit Card Receivables.

4.    Within three (3) business days of the entry of this Order, Transform is directed to:

    a.    turn over to the Debtors its reconciliation of pre-Closing cash proceeds held in its cash management system ("**Cash-in-Transit**"), including all backup analyses and supporting information used by Transform and its advisors to calculate the reconciled amount of Cash-in-Transit; and

    b.    transfer to the Debtors the amounts reconciled and due to the Debtors, as Cash-in-Transit; provided, that, for the avoidance of doubt, the payment of reconciled Cash-in-Transit shall not prejudice either party's right to subsequently amend and/or dispute the reconciled amount.

5.    ~~4.~~ The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
       White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE