UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:

SEARS HOLDINGS CORPORATION, et al.

                      Debtors

---------------------------------------------------------------x

Chapter 11

Case No. 18-23538 (RDD)

(Jointly Administered)

Hearing Date: April 18, 2019, 10:00 a.m. ET
Objection Deadline: April 11, 2019, 4:00 p.m. ET

## DECLARATION OF ASHOK AGGARWAL IN SUPPORT OF MOTION TO COMPEL DEBTORS TO ASSUME OR REJECT UNEXPIRED REAL PROPERTY LEASE

I, ASHOK AGGARWAL, declare as follows:

1.  I am the Treasurer of Dedeaux Inland Empire Properties ("Dedeaux Properties"). I make this declaration based on personal knowledge except for matters stated on information and belief, which matters I believe to be true, and if called as a witness, I could testify competently to the following:

2.  I make this declaration in support of Dedeaux Properties' motion to compel the Debtors to assume or reject an unexpired real property lease with Dedeaux Properties.

3.  Dedeaux Properties is the lessor and Debtor, Innovel Solutions, Inc., fka "Sears Logistics, Inc." ("Innovel"), is the lessee under an unexpired lease of nonresidential real property located at 5691 Philadelphia Avenue, Ontario, California 91761 (the "Ontario Lease"). The Ontario Lease covers a warehouse and fulfillment center ("the Ontario Warehouse") and I am informed Sears has designated it as Lease No. 347, Contract No. S8729-73-A (see Exhibit B-1 to Sears' January 24, 2019 Supplemental Cure Notice [Dkt. 1774, p.55]).

/ / /

4.    Dedeaux Properties and Innovel originally entered the Ontario Lease in 1993, with a term to run to 2009. The lease was amended and extended in 2009 and again in 2014 and currently runs until June 30, 2024. A true and correct copy of the Ontario Lease, as amended and extended, is attached to this declaration as **Exhibit A**.

5.    Transform HoldCo, the buyer of the Debtors' assets, has recently proposed to Dedeaux Properties that it agree to amend the Ontario Lease by substantially lowering the rent HoldCo would have to pay as the lessee and proposing that it should be allowed a double credit of future lease payments as also eliminating the amounts currently in default. Attached to this declaration as **Exhibit B** is a true and correct copy of a proposed term sheet sent to Dedeaux Properties by Transform HoldCo during the week of March 18 to 22, 2019. That term sheet reflects the proposed rent reductions and default credits against future rent.

6.    Dedeaux Properties has informed Transform HoldCo the proposed lease modification terms are unacceptable and that it does not consent to have the defaults owed to it to be considered satisfied by future rent payments.

7.    The defaults on the Ontario Lease are the following: Paragraphs 8 and 10 of the Ontario Lease (Exhibit A, pp. DART000012-16, 18-20) require Innovel as lessee to periodically maintain and upgrade the warehouse facility. Under ¶8(b) the lessee is required to maintain overhead doors, dock ramps and levelers. Under ¶8(g) if a lessee fails to do the door and dock maintenance, Dedeaux Properties as landlord can perform these items and add them to the lessee's obligations. Paragraph ¶10 of the lease requires Dedeaux Properties to obtain insurance on the Ontario Warehouse and Innovel is required to pay the premiums for that insurance.

///

8.    Innovel has failed to maintain and upgrade the overhead doors, dock ramps and levelers despite periodic ordinary course demands from Dedeaux Properties.  Moreover, these failures of maintenance are not just a default on the Ontario Lease, they also imperil Dedeaux Properties' ability to maintain the required insurance.  The insurer for the property recently performed its annual audit and advised Dedeaux Properties the failure to repair and update the doors and docks is a security issue, making the warehouse more vulnerable, for example, to inventory theft.  The insurer has, accordingly, informed Dedeaux if the repairs are not promptly made, the insurance premiums will increase and it is, in my opinion, possible coverage could be cancelled.  Thus, Dedeaux Properties will shortly be forced to make the repairs and upgrades itself.  The current estimate of the costs of these operations is estimated to be $400,000.  This amount will be the subject of Dedeaux Properties forth coming Proof of Claim.

9.    Innovel's failure to pay for and perform the necessary and required maintenance has also caused Dedeaux's line of credit lender and mortgage lender to question whether it is in full compliance with its loan obligations.  As with the insurance, this means Dedeaux Properties could soon be facing higher borrowing costs and may eventually have difficulty maintaining or obtaining financing facilities.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

10.   In addition to the problems with the doors and docks, Dedeaux has been informed by the San Bernardino County Storm Water Authority the Ontario site is out of compliance with run off regulations.   As with the other maintenance, it is a condition of the Ontario Lease that Innovel pay the costs of the storm water upkeep, which it has failed to do.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, executed this 28th day of March 2019 at Los Angeles, California.

_____

Ashok Aggarwal

# EXHIBIT A

## LEASE

THIS LEASE ("Lease") is made as of this _20TH_ day of
_OCTOBER_, 1993 between DEDEAUX INLAND EMPIRE PROPERTIES, a
California partnership ("Landlord"), and SEARS LOGISTICS
SERVICES, INC., a Delaware corporation (f/k/a Terminal Freight
Handling Company) ("Tenant"). The parties agree:

1. <u>Premises.</u>

(a) Landlord leases to Tenant and Tenant takes from
Landlord the following premises situated in the City of Ontario,
County of San Bernadino, State of California, more particularly
described as:

> The real property consisting of approximately 34.74 acres
> (the "Entire Tract"), legally described on the attached
> Exhibit "A" and outlined in red on the attached Exhibit
> "A-1", and that certain building consisting of
> approximately 823,820 square feet outlined in blue on
> Exhibit "A-1" (the "Direct Delivery Center" or "DDC"), and
> all other site improvements, including loading docks and
> parking lots to be constructed thereon by Landlord under
> this Lease (said DDC and other improvements being
> collectively referred to hereinafter as the "Leasehold
> Improvements"), including ingress and egress to the public
> roadways as shown on Exhibit "A1". The Leasehold
> Improvements and the Entire Tract are collectively referred
> to hereinafter as the "Demised Premises" and are located in
> the Vintage Industrial Park.

(b) Landlord also leases to Tenant all privileges,
appurtenances, and any other improvements now or hereafter
situated on and or appertaining to the Demised Premises and
belonging to Landlord.

DART000001

Premises in good condition (excluding ordinary wear and tear and changes in condition due to casualty loss covered by applicable insurance).

(c) If Tenant remains in possession of the Demised Premises after expiration of this Lease, or termination of this Lease, as provided herein, Tenant's holding over shall constitute a month-to-month tenancy at Rent equal to one hundred thirty percent (130%) of that in effect prior to the end of the Term.

(d) Notwithstanding anything contained in this Lease to the contrary, Tenant does not expressly or impliedly, directly or indirectly agree to operate a business in the Demised Premises.

(e) During the period beginning with the date of this Lease and ending with the Commencement Date (such period being hereinafter referred to as the "Interim Term"), Tenant and Landlord shall have all rights and all obligations as provided in this Lease, including insurance obligations, except that during the Interim Term no Rent or any monetary obligations due hereunder shall be charged except as specifically provided for herein.

(f) Landlord's and Tenant's obligations under this Lease are hereby conditioned on Landlord's obtaining a commitment(s) for construction and permanent financing in connection with the construction of the Landlord Improvements from a source(s), and on terms and conditions, acceptable to Landlord. Landlord shall use reasonable, diligent efforts to obtain said financing commitment(s). In the event Landlord is unable to obtained said Commitment(s) within sixty (60) days of the date hereof, Tenant may elect to terminate this lease by giving written notice to landlord of such election within five (5) business days of said date.

(DEDEAUX.LSE)                          3

DART000002

4.   Rent.

(a)   The initial rental payment ("Initial Rental Payment") shall be due Landlord on the Commencement Date, subject, however, to Tenant's right to set off as set forth hereinafter.

(b)   Tenant agrees to pay annual rent ("Rent") in the amount of Two Million Six Hundred Nineteen Thousand Seven Hundred Forty-Seven and 60/100 Dollars ($2,619,747.60), to be paid in equal monthly installments of Two Hundred Eighteen Thousand Three Hundred Twelve and 30/100 Dollars ($218,312.30), for the first five (5) years of the Term; and annual Rent in the amount of Three Million One Hundred Eighty-Seven Thousand One Hundred Ninety-Four and 72/100 Dollars ($3,187,194.72), to be paid in equal monthly installments of Two Hundred Sixty-Five Thousand Five Hundred Ninety-Nine and 56/100 Dollars ($265,599.56) for the next ten (10) years of the Term.   Rent shall be payable in advance, on the first day of each month, or a proportionate sum during partial months.   The Rent shall be made payable to Landlord and mailed to Landlord's address set forth in the "Notice" Section of this Lease until the payee or address is changed by written notice from Landlord.   Rent not timely paid will be subject, after thirty (30) days after date due, to an interest penalty of ten percent (10%) per annum.

5.   Construction of Leasehold Improvements.

(a)   Landlord warrants that Landlord shall at its sole cost and expense construct certain improvements on the Demised Premises, including but not limited to the Direct Delivery Center containing approximately 823,820 square feet of floor area, and parking facilities, loading docks, dock levellers, fencing and utilities (the "Leasehold Improvements"), with construction documents to be developed by Landlord's architect and Landlord's general contractor ("Landlord's Construction Documents").   The Landlord's Construction Documents are listed on Exhibit "B" attached hereto, and incorporated by such

(DEDEAUX.LSE)                    4

DART000003

(b) There shall be no deviation from material specifications provided to Landlord by Tenant without the prior written approval of Tenant, except that Landlord may substitute materials of equal or better quality upon written notice to Tenant of Landlord's intention to do so, specifying therein the nature of such substitution and that said substitute materials are of equal or better quality than those specified in the Tenant's specifications. Tenant shall have the right to approve the manufacturer and schedule of delivery of major equipment components, which approval shall not be unreasonably withheld or delayed. Landlord shall procure and pay for all necessary permits and approvals for construction of the Leasehold Improvements, (except, however, for permits and approvals for construction of Tenant Improvements (as hereinafter defined)) including, without limitation, building permits required by municipal, state or utility subdivisions of public or private bodies having jurisdiction over the Entire Tract.

(c) Landlord shall use all reasonable efforts to substantially complete, or cause to be substantially completed, the construction of the Demised Premises nine (9) months following the date Landlord pulls the construction permit on the site for construction of the DDC. Landlord shall use its best efforts to diligently pursue approval of the project and to pull the construction permit at the earliest possible date after the date of execution of this Lease, but in no event shall substantial completion be later than October 30, 1994. For purposes of this Lease, "Substantial Completion" shall mean that Landlord has completed construction of the DDC and the Leasehold Improvements in substantial accordance with Landlord's Construction Documents (exclusive of any equipment or fixtures to be installed by Tenant and exclusive of Punchlist items as hereinafter defined), and that Landlord has certified that the Demised Premises are ready for occupancy by Tenant, free and clear of all unpermitted liens and encumbrances, and are in a condition as required by the governmental agencies having jurisdiction over the Entire Tract for issuance of a Temporary

(DEDEAUX.LSE)                                  6

DART000004

Certificate of Occupancy.  If Landlord fails to complete and
deliver the Demised Premises to Tenant by July 31, 1994 as
provided herein above (except for Punchlist items), then all
Rent shall be off-set pending such completion and delivery and
Landlord shall pay all costs and expenses incurred by Tenant for
remaining in Tenant's existing facilities, which exceed the rent
which would have been due in Tenant's existing facilities (e.g.,
if the holdover rent on Tenant's existing facilities equals 150%
of prior rent, Tenant pays 100% of base rent and Landlord pays
the 50% excess) or for the necessary temporary relocation of
Tenant's operations pending the Substantial Completion of the
DDC and Leasehold Improvements and delivery of the Demised
Premises to Tenant. Tenant shall have the right, upon prior
written notice to Landlord at any time after October 30, 1994
until the Demised Premises have been completed and delivered to
Tenant, to terminate this Lease.  If Tenant does not terminate
this Lease, Tenant shall complete construction of the DDC and
Leasehold Improvements, pay all outstanding bills for labor and
materials and cure any failure of compliance with or completion
in accordance with Landlord's Construction Documents; and Tenant
may deduct these costs, together with interest at the prime rate
then being charged by Continental Illinois National Bank and
Trust Company of Chicago from Rent payable, and together with
Tenant's costs and expenses associated with obtaining or
utilizing alternative facilities as aforesaid, until Tenant has
been fully reimbursed, with interest.  In no event shall the
date for Substantial Completion be extended for more than a
total of six (6) months by reason of Unavoidable Delay occurring
after the commencement of construction. Within sixty (60) days
after the date of Substantial Completion, Landlord shall use its
best efforts to obtain and deliver to Tenant a Final Certificate
of Occupancy, if such has not been issued, from the applicable
governmental authority.

(d)  Landlord and Tenant recognize that during the course
of construction of the improvements, Tenant may desire to amend
or revise Landlord's Construction Documents.  Tenant may,

DART000005

therefore, amend or revise Landlord's Construction Documents
after they have been approved by Landlord and Tenant. Landlord
shall have the right to approve any proposed revision or
modification affecting the structure or exterior appearance of
the DDC to insure that, as modified it is architecturally sound
and harmonious with the remainder of the DDC. If Tenant
requests for such amendments or revisions cause an increase
in the project cost, then Rent shall be increased accordingly;
provided that as to any such increase in the project cost that
exceeds the amount of Landlord's construction financing
commitment from Landlord's lender, Tenant shall pay such excess
no later than the Commencement Date, and provided further that
any such increase in the project cost of less than $25,000.00
shall be paid by Tenant when incurred. All amendments and
revisions proposed by Tenant shall be submitted to Landlord's
construction manager, who shall obtain from Landlord's general
contractor a cost for the work which shall be promptly submitted
in writing to Tenant and Landlord. Work on the amendment or
revision will not start until a construction change order is
approved by Tenant's construction manager, or his authorized
representative. Immediately upon approval, Tenant shall forward
a copy to Landlord. If any changes requested by Tenant delay
Landlord's construction schedule, Landlord's performance dates
contained in Section 5(d) shall be extended by a number of days
equal to the delay.

(e) Landlord agrees to obtain and maintain, or cause
Landlord's general contractor to obtain and maintain, during the
erection and construction of the Leasehold Improvements and
until completion thereof, reasonable and customary insurance
coverage, including worker's compensation, commercial general
liability, motor vehicle liability insurance, and builder's risk
insurance.

(f) (i) Promptly after the date of Substantial
Completion, Tenant shall inspect the Demised Premises
and shall furnish to Landlord a written statement
setting forth any uncompleted or deficient portions of

(DEDEAUX.LSE)                    8

the Demised Premises (the "Punchlist"). Landlord shall diligently proceed to cause completion of the Punchlist items. If Landlord fails to complete the Punchlist items within sixty (60) days after the delivery notice of any or all of such Punchlist items to Landlord (which period shall be extended for any delays caused by Tenant and in accordance with the provisions of Section 30 hereof regarding Unavoidable Delay), Tenant may, but is not obligated to, complete such Punchlist items. Tenant may demand the payment from Landlord of such costs, plus interest thereon at the prime rate then being charged by Continental Illinois National Bank and Trust Company of Chicago. If said Punchlist items are of a nature that they cannot be completed within said sixty (60) days, said sixty (60)-day period shall be extended for so long as Landlord is diligently proceeding to complete such Punchlist items.

(ii) Sixty (60) days prior to the first year anniversary of the Commencement Date, an inspection of the Demised Premises will be conducted by representatives of Tenant, Landlord, Landlord's general contractor, and Landlord's architect. From such inspection a written statement shall be prepared setting forth any defects as to design, workmanship or materials attributable to Landlord, Landlord's general contractor, Landlord's architect, or any material fabricator (the "Warranty Punchlist"). Landlord shall remedy or cause to be remedied all Warranty Punchlist items pursuant to the warranties to Tenant specified in Section 5(j) prior to the expiration of said warranties. Amounts paid by Landlord, Landlord's general contractor, and Landlord's architect in remediating Warranty Punchlist items shall not constitute a portion of Rent.

DART000007

(g)  In the event of labor disputes in connection with
construction, alterations, repairs or replacements, curing of
defects or restoration of the Demised Premises pursuant to
provisions of this Lease, Landlord will use reasonable efforts
to adjust and settle them to avoid unfavorable publicity and
unnecessary delay, in a manner reasonably satisfactory to
Tenant.

(h)  During Landlord's construction period, prior to
Tenant's occupancy, Tenant shall have the right to place signs
on the Demised Premises announcing Tenant's forthcoming
occupancy and intentions.

(i)  Within sixty (60) days after the Commencement Date and
the completion of construction of the DDC and other Leasehold
Improvements, Landlord agrees to obtain from its architect, and
to deliver to Tenant, a complete set of "as-built" plans for the
DDC and specifications for the construction, incorporating all
changes made during the course of construction.  If the Landlord
fails to deliver such "as-built" plans to Tenant within the
sixty (60)-day period, Tenant shall itself obtain such plans and
make demand of Landlord for the cost thereof.

(j)  Landlord shall, at its sole cost and expense:

(i)  for a period of two (2) years from the
Commencement Date, guarantee all work performed by
Landlord, its employees, agents, and contractors
pursuant to this Section 5 against defective design,
workmanship and materials, and assign or pass through
to Tenant the benefit of any warranties available from
contractors or suppliers.

(ii) throughout the Term, provide Tenant with a
habitable facility and indemnify, protect, defend and

DART000008

hold Tenant, its directors, officers, employees, agents, contractors, and subcontractors (collectively, "Tenant's Employees"), harmless from all losses, damages, liabilities, cost and expenses (including attorneys' fees and court costs) incurred by any and all parties for work, labor, repairs alterations, improvements, services and/or materials supplied pursuant to this Section by or at the direction of Landlord (except arising from the gross negligence or willful acts of Tenant or Tenant's employees); and

(iii) assign to Tenant all building and equipment warranties obtained by Landlord from Landlord's general contractor and others with respect to design, workmanship and materials employed in the construction of the DDC and other Leasehold Improvements and the preparation of the Demised Premises for Tenant's intended use hereunder. Said warranties shall be effective for a minimum of one year from the Commencement Date or for such longer period as they by their terms provide.

(k) Tenant agrees and covenants to indemnify, protect, defend, and hold Landlord, its directors, officers, employees, agents, contractors and subcontractors (collectively, "Landlord's Employees") harmless from and against any and all claims, actions, losses, damages, costs, expenses (including reasonable attorneys' fees and expenses) and liabilities relating to any and all losses or damages (including, without limitation, injury to or death of person or persons and damage to property) suffered by any person or persons and arising out of or incidental to the work, services and activities of Tenant and Tenant's Employees in connection with construction of the Tenant Improvements or any of its other pre-opening activities except for any of the foregoing arising out of the gross

negligence or willful misconduct of Landlord or Landlord's
Employees.

## 6.    Landlord's Warranties.

Landlord warrants and represents that presently, and
during the Term:

(a)  Landlord has the full power and authority to execute
and deliver this Lease and to perform its obligations under this
Lease;

(b)  prior to the Commencement Date Landlord will hold good
and marketable fee title to the Demised Premises and to all
improvements appertaining thereto, free and clear of all
restrictions, covenants, easement, mortgages, tenancies and
occupancies in the Demised Premises, and any other encumbrances
other than those encumbrances listed in Exhibit "C" ("Permitted
Encumbrances"), except as agreed to by Tenant in writing.

(c)  the execution and delivery of this Lease shall not be
precluded by or cause a breach of any other agreement, mortgage,
contract or other instrument or document to which Landlord is a
party;

(d)  the Demised Premises is and will be in good condition
and repair, and in full compliance with all applicable laws,
regulations, environmental standards, building and health codes,
including without limitation the requirements of the federal
statute known as the Americans with Disabilities Act, and with
all requirements of insurance carriers of Landlord and Tenant.
Landlord shall obtain all necessary governmental consents,

(DEDEAUX.LSE)                    12

DART000010

permits, approvals and zoning, including evidence of satisfactory zoning for the use described in Section 2 above; provided, however, Landlord shall not be responsible for changes to the Demised Premises required by law as a result of Tenant's use or business, or for permits or licenses which Tenant may need in order to construct any Tenant Alterations, (as defined in Section 7), install its trade fixtures, machinery, equipment and other Personal property on the Demised Premises, and to conduct its operations;

(e)    Tenant, upon paying the Rent and performing its obligations as herein provided, shall and may peaceably and quietly have, hold and enjoy the Demised Premises;

(f)    all utilities, including gas, electric, water, sanitary sewer and other utilities as required by Tenant's Plans and Specifications, shall have been constructed and/or provided for by Landlord as of the Commencement Date;

(g)    the exterior portions of the Demised Premises, including the paved area, and any parking and sidewalks, shall be in first class condition and repair, and usable for the purposes intended.

7.    <u>Tenant's Alterations.</u>

Tenant shall have the right, at any time, to make non-structural, non-exterior alterations, additions improvements or replacements to the Demised Premises, including, but not limited to, lighting, electrical wiring, and the usual and customary signage which Tenant employs in a majority of Tenant's other facilities performing the same function as that described in Section 2 hereof ("Tenant's Alterations"); provided that, prior to making any of Tenant's Alterations whose cost exceeds $100,000.00 or which affect structural elements ("Substantial Alterations"), Tenant shall request Landlord's written approval and in soliciting such approval shall deliver plans for such

DART000011

Tenant Alterations and the identity of the general contractor or list of bidders. Landlord's approval will not be unreasonably withheld or delayed. Tenant shall be responsible for Landlord's reasonable architectural and engineering expenses incurred by Landlord in reviewing any proposed Tenant's Alteration. All of Tenant's Alterations which are so permanently attached or affixed to the Demised Premises that their removal would cause substantial damage to the Demised Premises, shall become the property of Landlord upon the expiration of this Lease, unless Tenant elects or Landlord in its sole discretion requires Tenant to remove them and repair the damage caused by their removal. All trade fixtures, machinery, equipment and personal property shall be the property of Tenant upon the expiration of this Lease, and Tenant shall be entitled to remove them no later than thirty (30) days following expiration. Landlord grants a license for the thirty (30)-day period to Tenant to remove the personal property. Landlord acknowledges, in consideration of Tenant executing this Lease, this right shall be deemed coupled with an interest. If Tenant does not remove such items within said thirty (30)-day period, Landlord may thereafter remove, store, and dispose of such items at Tenant's expense. Landlord, at Tenant's cost, shall assist Tenant in securing building and other permits or authorizations required for Tenant's Alterations. Following completion, Tenant shall deliver to Landlord a copy of its "as built" plans or whatever other plans Tenant may have for all alterations, additions or improvements, or relocation of electrical facilities Tenant undertakes.

8. **Repairs and Maintenance.**

(a) Except for damage caused by Tenant, its agents, employees, invitees, licensees, subtenants or assigns, Landlord shall, at its cost:

(i) maintain, repair and/or replace all structural elements, exterior and fire walls, floor slab, electrical and plumbing systems, heating,

DART000012

ventilation and air conditioning ("HVAC")
systems, exterior painting, foundations, and
roofs, affecting, relating to or in the Demised
Premises;

(ii) maintain, repair and/or replace when necessary
all storm, sewage and drainage systems, and other
utility facilities, which affect, relate to or
benefit the Demised Premises;

(iii) repair and/or replace when necessary all truck
and parking areas, including lighting therefor;

(iv) notwithstanding the waiver of subrogation
contained in Section 11, after required notice
from Tenant make all repairs or replacements
necessary due to or arising out of the negligence
of Landlord, its agents, contractors, or
employees, or by reason of the breach of this
Lease by Landlord;

(v) indemnify, protect, defend and hold Tenant
harmless from all losses, damages, liabilities,
costs and expenses (including attorneys' fees and
court costs) which may occur, result from or
arise out of the failure of Landlord to properly
make required repairs or perform maintenance.
This subsection shall not make Landlord
responsible for any consequential damages
unless Tenant has informed Landlord in writing
of the need for any such repairs or maintenance,
such notice to specify the nature and extent of
possible damage in the event Landlord fails to
perform the repairs or maintenance, and Landlord
has failed to perform such work beyond any
applicable cure period;

DART000013

(vi)   cooperate with Tenant to enforce all warranties
and guarantees received in connection with the
Demised Premises. Notwithstanding such efforts,
Landlord shall not be relieved from any
obligations herein.

Landlord's building and site maintenance and repair obligations
will be renegotiated upon Tenant's exercise of an extension
option prior to commencement of the given Extension Term.   At
the termination of this Lease, Tenant will surrender the Demised
Premises in good condition and reasonable cleanliness, normal
wear and tear excepted.

(b)   Except for damage caused by Landlord, its agents,
employees, invitees, licensees, other tenants or assigns, Tenant
shall, at its cost:

(i)   make repairs and/or replacements (except such
repairs or replacements that are Landlord's
responsibility or become necessary as a result
of any loss by fire or other casualty) within
the Demised Premises which become necessary
during Tenant's occupancy of the Demised
Premises by reason of the fault or neglect of
Tenant, notwithstanding the waiver of
subrogation contained in Section 11;

(ii)   keep the Demised Premises, including truck and
parking areas, in a clean condition, meeting
applicable laws and ordinances, including, but
not limited to, trash removal and exterminating;

(iii)   maintain, repair, and/or replace when necessary
overhead doors, dock levelers, and exterior and
interior lighting bulb and ballast replacement,
relating to or in the Demised Premises.

(DEDEAUX.LSE)                    16

DART000014

(c)  Tenant shall have the right at all times, at its sole option, without prior notice to Landlord, to make emergency repairs or replacements as Tenant deems necessary.  Tenant shall notify Landlord of such emergency as soon as reasonably possible by telephone or otherwise.  Upon demand and documentation of costs by Tenant, Landlord shall pay Tenant (unless specified otherwise in Subsection 8 (b)) the cost of repairs; Landlord shall also pay an amount equal to the prime rate then being charged by the Continental Illinois National Bank and Trust Company of Chicago if such costs are not paid by Landlord within forty-five (45) days after such demand.  If Landlord fails to pay to Tenant the repair cost and interest within said forty-five (45)-day period, then Tenant may deduct it from Rent and other charges payable by Tenant.

(d)  Landlord shall have access to the Demised Premises at any time in the event of a true emergency (but not if solely for Landlord's convenience in performing Landlord's obligations hereunder), and Landlord shall notify Tenant of such emergency as soon as reasonably possible by telephone or otherwise. In all other instances, Landlord shall, upon prior arrangement with Tenant and at times reasonably approved by Tenant's local management, have access to the Demised Premises for examining or repairing it.  In any event, Landlord shall not unreasonably interfere with the conduct of Tenant's business in performing Landlord's obligations under this Section.

(e)  If Landlord fails to promptly perform the obligations in Subsection 8(a) after being given written notice by Tenant, then Tenant, upon thirty (30) days' prior written notice to Landlord and any Landlord's lender of which Tenant has been notified in writing, shall have the right to make or cure them and to recover Tenant's cost with interest from Landlord at the annual rate equal to the prime rate then being charged by the Continental Illinois National Bank and Trust Company of Chicago. If the cost and interest are not paid within forty-five (45)

DART000015

days of demand, Tenant shall have the right to deduct them from any installments of Rent and other charges payable by Tenant.

(f)  Landlord and Tenant will indemnify, protect, defend and hold the other harmless from all losses, damages, liabilities, cost and expenses (including attorneys' fees and court costs) excluding consequential damages, if any mechanics' or materialmen's liens or any other statutory or equitable lien is filed or any litigation is commenced for breach of contract or otherwise during the Term against a party for work, repairs, alterations, improvements, labor, services and/or materials supplied to the Demised Premises by or at the direction of a party.

(g)  If the Tenant fails to perform or commence to perform and diligently proceed to completion its obligations under Section 8(b), the Landlord may (but is not required to) enter the Demised Premises, after thirty (30) days' prior written notice to the Tenant, to make or cure them.  Landlord's cost of so doing shall be due and payable as additional rent to the Landlord.  If such costs exceed fifty percent (50%) of the amount of then-current Rent, Tenant may pay such costs in installments of not less than fifty percent (50%) of the amount of then-current Rent. Landlord shall have no liability to the Tenant for any damage, inconvenience or interference with the Tenant's use of the Demised Premises as a result of any repair work by the Landlord under this Section except in the event of gross negligence or willful conduct of Landlord or Landlord's employees or agents.

9.  Taxes.

(a)  Tenant shall pay when due all real estate taxes levied or assessed upon the Entire Tract and the Demised Premises. "Real Estate Taxes" include all forms of general or special real estate assessment, levy, or tax (other than inheritance, estate, franchise or income taxes or any other

DART000016

taxes imposed upon or measured by Landlord's income or profits),
imposed by any authority having the direct or indirect power to
tax, including any city, county, state or federal government, or
their agencies or improvement districts, against any legal or
equitable interest of the Landlord in the Demised Premises or in
the DDC or any tax, charge or fee imposed in substitution,
partially or totally, of any real property tax, or any
additional tax the nature of which was previously included
within the definition of a real property tax.

(b)  If Tenant deems the Real Estate Taxes excessive or
illegal, Tenant may contest the validity or the amount thereof
in good faith.  Tenant shall have the right to contest the Real
Estate Taxes provided, that if at any time payment of the whole
or any part of said Real Estate Taxes should become necessary to
prevent the foreclosure of a tax lien on the Demised Premises or
any part thereof, or to prevent interference with Landlord's
interest in the Demised Premises, then Tenant shall pay or cause
to be paid the same, together with all penalties, in sufficient
time to prevent the foreclosure of a tax lien or to prevent
interference with Landlord's interest in the Demised Premises.
If Tenant successfully contests the Real Estate Taxes, Tenant
shall be entitled to any refund of overpayment of Real Estate
Taxes and penalties or interest which may have been paid by
Tenant.  In any case, Tenant shall pay all costs, expenses,
attorneys' fees, any bond costs, penalties, interest and court
costs.  In the event Tenant is successful in such contest,
Tenant shall be reimbursed first from the remission or refund
for its reasonable costs, expenses and attorneys' fees incurred
before payment is made to any other party.

(c)  Tenant shall pay prior to delinquency all taxes
assessed against and levied upon its trade fixtures,
furnishings, equipment, and all other personal property at the
Demised Premises or elsewhere.  When possible, the Tenant shall
cause its fixtures, furnishings, equipment and all other
personal property to be assessed and billed separately from the

DART000017

real property.  If any of Tenant's personal property is assessed within the Demised Premises as real property, Tenant shall pay the Landlord the taxes attributable to Tenant's personal property within twenty (20) days after receipt of a written statement setting forth those included taxes.

10. <u>Insurance.</u>

(a)  Except as provided in Section 10(d) below, Landlord shall maintain, at the expense of Tenant, during the Term, the following policies covering the Demised Premises, including the DDC, the Leasehold Improvements, and all other improvements, and all buildings and improvements thereon:

(i)  <u>Commercial General Liability Insurance.</u>
Including,  but not limited to, coverage for personal  injuries with limits of  not less than $2,000,000 combined single limit for death, bodily injury and property damage, per occurrence, and including contractual liability, naming Landlord, Tenant and any Landlord's lender as an additional insured.

(ii)  <u>"All Risk" Property Insurance.</u>  Upon all building improvements and alterations on the Demised Premises, in an amount sufficient to prevent Landlord from becoming a co-insurer of any loss but in any event in amounts not less than one hundred percent (100%) of full replacement cost, with flood and earthquake endorsements, having a deductible in a commercially reasonable amount subject to the reasonable approval of Landlord's lender, naming Landlord as an additional insured with loss in the event of insured physical damage to the building improvements and alterations payable to Landlord's lender.

The insurance premiums for insurance required in this

DART000018

Section 10(a) shall be reimbursed by Tenant to Landlord within thirty (30) days after presentation to Tenant of receipts marked paid in full.

(b)  So long as Section 10(d) below is operative, Landlord (but not Landlord's lender, unless Landlord's lender takes title to the Entire Tract or the Demised Premises, either through foreclosure or deed in lieu of foreclosure) shall pay for and maintain, during the Term, a policy of commercial general liability insurance on the Entire Tract, including the Demised Premises, including but not limited to coverage for personal injuries with limits of not less than $2,000,000.00 combined single limit for death, bodily injury and property damage, per occurrence, and including contractual liability, naming Tenant and Landlord's lender as additional insureds.

(c)  All policies described in Section 10(a) and Section 10(b) above shall be issued in form reasonably acceptable to Landlord and Landlord's lender and will expressly provide that such policies will not be subject to cancellation or material change without at least thirty (30) days' prior written notice to Tenant, Landlord and Landlord's lender.  Tenant will furnish Landlord and Landlord's lender, upon request, with satisfactory evidence of such insurance coverage.  Tenant or Landlord may meet its insurance obligations herein by means of a blanket insurance policy, or, with respect to Tenant, any program of self-insurance Tenant may maintain, subject (except with respect to Sears Logistics Services, Inc. or its affiliates or Sears, Roebuck and Co. or its affiliates) to the prior written approval of Landlord's lender, which approval will not be unreasonably withheld.  Landlord's insurance shall be in forms and with endorsements satisfactory to Landlord's lender and obtained from companies qualified to do business in the State of California and rated A/VII or better in the most current edition of Best's Insurance Reports.

(d)  Notwithstanding the provisions of Section 10(a) above,

and so long as Sears Logistics Services, Inc. or its affiliates
or Sears, Roebuck and Co. or its affiliates is the Tenant under
this Lease, Tenant shall maintain, in the place and stead of
Landlord and at the expense of Tenant, the insurance provided in
Section 10(a) above. The deductions, or exclusions from
coverage, permitted under the "all risk" policy of property
insurance to be so maintained by Tenant, shall (except with
respect to earthquake coverage) be up to a maximum of
$1,000,000, which sum Tenant shall pay to, or at the direction
of Landlord and Landlord's lender, for application as provided
under the Lease.

(e)    Tenant shall maintain, at the expense of Tenant,
during the Term (subject to the blanket and self-insurance
coverage rights permitted to Sears Logistics Services, Inc.,
Sears, Roebuck and Co., and their affiliates, as provided in
Section 10(c) above:

(i)    **Workers' Compensation Insurance.** Covering all
costs, benefits and liabilities under State
Workers' Compensation and similar laws for
Tenant's employees, and Employer's Liability
Insurance, with limits of not less than $500,000
per occurrence; and

(ii)    **Personal Property Insurance.** Replacement cost
fire and extended coverage insurance, with
vandalism and malicious mischief, sprinkler
leakage and earthquake endorsements, in an amount
sufficient to cover not less than one hundred
percent (100%) of the full replacement cost, as
the same may exist from time to time, of all of
Tenant's personal property, fixtures, equipment
and Tenant's alterations in the Demised Premises.

## 11. Waiver of Subrogation

(a)    Landlord and Tenant hereby waive any and every claim

DART000020

which arises or may arise in its favor and against the other
party during the Term hereof for any and all loss of or damage
to any of its property located within or upon the Demised
Premises, covered by the insurance policies maintained by
Landlord or Tenant covering the Demised Premises, or any portion
thereof, or any personal property located thereon.

(b) This waiver will be in addition to, and not in
limitation or derogation of, any other waiver or release
contained in this Lease with respect to any loss of or damage to
property of Landlord or Tenant.

(c) Landlord and Tenant agree to furnish to each insurance
company which has or will issue policies of insurance, written
notice of the terms of such mutual waivers and to have the
insurance policies properly endorsed, if necessary, to
acknowledge such waivers.

12. <u>Indemnity</u>

(a) Landlord agrees to indemnify, protect, defend and hold
Tenant, its directors, officers, employees and agents harmless
from and against all claims, actions, losses, damages, costs,
expenses and liabilities (except those caused solely by the
willful or negligent acts or omissions of Tenant), arising out
of willful or negligent acts or omissions of Landlord or
Landlord's employees, agents, contractors or invitees resulting
in actual or alleged injury to or death of any person or loss of
or damage to property in or upon the Entire Tract, including the
person and property of Tenant, its director, officers,
employees, agents, invitees, licensees or others.

(b) Tenant agrees to indemnify, protect, defend and hold
Landlord, its directors, officers, employees and agents harmless
from and against all claims, actions, losses, damages costs,
expenses and liabilities (except those caused solely by the

DART000021

willful or negligent acts or omissions of Landlord), arising out
of willful or negligent acts or omissions of Tenant or Tenant's
employees, agents, contractors or invitees resulting in actual
or alleged injury to or death of any person or loss of or damage
to property in or upon the Demised Premises, including the
person and property of Landlord, its directors, officers,
employees, agents, licensees or others.

13. **Damage or Destruction**

(a) If during the Term the Demised Premises are partially
damaged or destroyed by fire or other casualty, and repair or
restoration can be completed within twelve (12) months after the
date of the occurrence of such damage or destruction as
reasonably determined by Landlord:

> (i) Rent and other charges payable by Tenant shall
> abate in the same proportion as the area in the
> Demised Premises so damaged or destroyed and
> unusable by Tenant bears to the total number of
> square feet of floor area contained within the
> Demised Premises such abatement to be effective
> from the date of the partial damage or
> destruction until the date the Demised Premises
> have been repaired and restored (or the date the
> Demised Premises would have been repaired or
> restored but for default hereunder by Tenant), as
> herein provided;

> (ii) this Lease shall not terminate and Landlord
> shall, at Landlord's sole cost, promptly and with
> due diligence repair and restore the Demised
> Premises (but not Tenant's Alterations) to
> substantially the same condition as existed
> immediately prior to the occurrence of such
> damage or destruction; provided, however, that if
> the damage or destruction is covered by fire and

extended coverage insurance, Landlord's obligation to restore and repair shall be to the extent of and conditioned upon the proceeds of such insurance being made available to Landlord for such purposes by any lender having a mortgage lien on the Demised Premises.  Provided further that if such damage or destruction shall occur during the last year of the Term or any Extension Term of this Lease, Landlord or Tenant may elect to terminate the Lease upon sixty (60) days' prior written notice to the other;

(iii)    if Landlord within sixty (60) days of the date of damage or destruction reasonably determines that it will be unable to substantially complete the necessary repairs and restoration within twelve (12) months after the occurrence of such damage or destruction, Landlord will so advise Tenant in writing within thirty (30) days of such determination, Tenant may elect to terminate this Lease by giving written notice of termination to Landlord, and upon such termination neither Landlord nor Tenant shall have any further rights, duties, obligations or liabilities hereunder, except that each party shall remain liable to the other for the performance of its duties and obligations arising prior to such termination, including indemnification.  Absent Tenant's timely written election, the Lease will remain in full force;

(iv)    if Landlord undertakes, but fails to substantially complete, the necessary repairs and restoration within twelve (12) months after the occurrence of such damage or destruction, Tenant may thereafter elect to terminate this Lease by giving prior written notice of termination to

DART000023

Landlord, and upon such termination neither Landlord nor Tenant shall have any further rights, duties, obligations or liabilities hereunder, except that each party shall remain liable to the other for the performance of its duties and obligations arising prior to such termination, including indemnification.

(b)  If during the Term the Demised Premises are totally destroyed by fire or other casualty, or the Demised Premises are rendered unfit for Tenant's use by fire or casualty, or if the Demised Premises should be damaged by fire or other casualty to such an extent that repair and restoration thereof cannot be completed within twelve (12) months after the date of the occurrence of such damage or destruction, as reasonably determined by Landlord:

    (i)  Rent and other charges payable by Tenant shall abate, from the date of the fire or casualty, until the Demised Premises have been restored as herein provided;

    (ii)  Landlord shall promptly pay to Tenant any unearned Rent paid or Tenant shall promptly pay to Landlord any Rent then earned;

    (iii)  either Landlord or Tenant shall have the right, within thirty (30) days thereafter, upon prior written notice to the other, to terminate this Lease as of the date of the fire or casualty. Upon such termination, neither Landlord nor Tenant shall have any further rights, duties, obligations or liabilities hereunder, except that each party shall remain liable to the other for the performance of its duties and obligations arising prior to such termination, including indemnification;

DART000024

(iv) if neither Landlord nor Tenant terminates this Lease, Landlord shall, at Landlord's sole cost, promptly and with due diligence, rebuild and restore the Demised Premises (but not Tenant's Alterations) to substantially the same condition existing just prior to the destruction or damage. If such damage or destruction shall occur during the last year of the Term or any Extension Term of this Lease, Landlord or Tenant may elect to terminate the Lease upon thirty (30) days' prior written notice to the other.

(c)    The parties expressly waive the application and effects of California Civil Code Sections 1932 and 1933, the intention being that this Lease will control all instances of damage or destruction.

## 14. Eminent Domain.

(a)    If all or a substantial part of the Demised Premises are taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain or by purchase in lieu thereof, and such taking would prevent or materially interfere with the use of the Demised Premises permitted by Section 2 of this Lease, then either party may terminate this Lease effective as of the date on which the condemning authority takes physical possession of the portion of the Demised Premises taken, by giving to the other party to this Lease at sixty (60) days' prior written notice of such termination.  Upon such termination, the Rent and any other charges payable by Tenant shall be abated during the unexpired portion of the Term or then existing Extension Term, and upon such termination neither Landlord nor Tenant shall have any further rights, duties, obligations or liabilities hereunder, except that each party shall remain liable to the other for the performance of its duties and obligations arising prior to such termination, including indemnification.

DART000025

(b)    If less than a substantial portion of the Demised
Premises shall be taken for any public or quasi-public use under
any governmental law, ordinance or regulation, or by right of
eminent domain or by purchase in lieu thereof, Landlord shall,
at Landlord's sole cost, promptly and with due diligence, repair
and restore the Demised Premises to, as nearly as may be
reasonably possible, the condition existing immediately prior to
such taking; provided, however that Landlord's obligation to
repair and restore shall be conditioned upon and limited to the
extent that the proceeds of such condemnation or other taking
are made available to Landlord for such purposes by any lender
having a mortgage lien on the Demised Premises.  Rent and other
charges payable by Tenant shall abate during the unexpired
portion of the Term in the same proportion as the number of
square feet in the Demised Premises so taken bears to the total
number of square feet in the Demised Premises, such abatement to
be effective as of the date on which the condemning authority
takes physical possession of that portion of the Demised
Premises taken.

(c)    If such taking described in Section 14(b) shall have
occurred during the last year of the Term or any Extension Term
of this Lease, Landlord or Tenant may elect to terminate the
Lease upon thirty (30) days' prior written notice to the other.

(d)    If all or any part of the Demised Premises are taken
for any public or quasi-public use under any governmental law,
ordinance or regulation, or by right of eminent domain or by
purchase in lieu thereof, the rights of Landlord and Tenant,
respectively, in and to the proceeds thereof shall be as
follows:

(i)    Landlord shall be entitled to receive the entire
condemnation award or proceeds in lieu thereof,
except for any separate award to which Tenant may
be entitled as provided in Section 14(d)(ii) of
this Lease, so long as such award to Tenant does
not diminish Landlord's award to an amount that

DART000026

is less than the outstanding balance of all loans on the Demised Premises from Landlord's lender; and

(ii)   Tenant may file such claims for a separate award as may be permitted by applicable law for the loss of its Leasehold interest, dislocation damages, moving expenses and other damages to Tenant caused by such taking.

(e)   For purposes of this Section, a taking shall be deemed substantial of it has a material adverse effect on the conduct of Tenant's business.

## 15.  Defaults.

(a)   Tenant shall be in default of this Lease, and Landlord shall have the remedies described below, if Tenant

(1)   should be voluntarily or involuntarily adjudicated bankrupt or insolvent, (unless in the case of an involuntarily petition, the same is dismissed within sixty (60) days of such filing); applies for or permits the appointment of a receiver and trustee for all or for a substantial portion of its assets; makes a general assignment for the benefit of creditors; admits in writing its inability to pay its debts, convenes a meeting of its creditors for purposes of effecting a moratorium, extension or composition of its debts; or permits to continue in effect for sixty (60) days any attachment, levy, execution or seizure of all or a substantial portion of Tenant's assets or of Tenant's interest in this Lease;

(2)   fails to make, as and when due, any payment of Rent if after receiving written notice form Landlord, Tenant fails to make within twenty (20) days thereafter such Rent payment past due; or

DART000027

(3) abandons the Demised Premises or fails to observe or perform any of the Tenant's non-monetary covenants or provisions of this Lease where such failure has continued for a period of thirty (30) days after written notice thereof from Landlord to Tenant specifying the particulars of such failure, provided however, if such default is susceptible to cure, Tenant shall not be deemed to be in default if within such thirty (30) day period Tenant commences to effect a cure and thereafter diligently prosecutes the cure to completion.

(b) The notices specified in Section 15(a) above shall be in lieu of, and not in addition to, any notice required under California Code of Civil Procedure Section 1161 or any similar or superseding statute.

(c) Upon the occurrence of any event of default set forth above, and subject to Section 15(d) below, Landlord shall have the option to pursue any one of the remedies set forth herein:

(1) give Tenant written notice of Landlord's intention to terminate this Lease on the date of such notice or on any later date specified therein, and on the date specified this Lease shall terminate and Tenant shall immediately surrender possession of the Demised Premises to Landlord; or

(2) with demand and notice, to re-enter and take possession of the Demised Premises or any part thereof as provided by law;

(3) continue this Lease in effect and enforce any or all rights and remedies of Landlord under this Lease, including the right to recover Rent and charges equivalent to Rent as they become due under this Lease, for so long as Landlord does not terminate Tenant's right to possession of the Demised Premises; or

(4)   seek any legal or equitable relief permitted by law.

(d)  If, but only so long as, Sears Logistics Services, Inc. or its affiliates or Sears, Roebuck and Co. and its affiliates is the Tenant under this Lease, the remedies set forth in Section 15(c) above are limited as follows:

(1)  Landlord may re-enter and take possession of the Demised Premises in accordance with all applicable statutes, and relet the Demised Premises on behalf of Tenant to a tenant with reasonable credit rating and reputation for a use permitted hereunder and on such other terms (other than rent) not more onerous to Landlord than contained in this Lease, and receive rent directly by reason of the relating, provided Tenant continues to be obligated to pay Rent hereunder.  Tenant agrees to pay Landlord on demand any deficiency that may arise by reason of any reletting of (or inability to relet) the Demised Premises.

(2)  Landlord may enter upon the Demised Premises in the manner prescribed by statute and do whatever Tenant is obligated to do under the terms of this Lease; Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur affecting compliance with Tenant's obligations under this Lease.

(e)  Unless notice is given in writing, then in the event of Tenant default the following acts by Landlord shall not constitute a termination of Tenant's right to possession of the Demised Premises;

(1)  maintenance or preservation of the Demised Premises;

(2)  efforts to relet the Demised Premises; or

DART000029

(3)  the appointment of a receiver upon initiative of Landlord to protect Landlord's interest under this Lease.

(f)  Landlord in pursuing the remedies herein provided shall have the right to recover its reasonable attorneys' fees.

(g)  If Landlord terminates this Lease as provided in Sections 15(c)(1) or (2) above, and subject to and as limited by Section 15(d) above, Landlord shall have the right to recover from Tenant:

(1)  the worth, at the time of the award, of the unpaid Rent that has been earned at the time of termination; and

(2)  the worth, at the time of the award, of the amount by which the unpaid Rent that would have been earned after the date of termination of this Lease until the time of award exceeds the amount of the loss of Rent that Tenant proves could have been reasonable avoided; and

(3)  the worth, at the time of the award, of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of the loss of Rent that Tenant proves could have been reasonably avoided; and

(4)  any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's breach or which in the ordinary course of things would be likely to result therefrom, such as, the cost of recovering possession of the Demised Premises, expenses of reletting, including attorneys' fees, and any real estate commissions paid or payable, necessary repair, restoration, renovation, or alteration of the Demised Premises, and care and safekeeping of the Demised Premises.
"The worth, at the time of the award," as used in subparagraphs (1) and (2) of this paragraph, is to be computed by allowing interest at the maximum legal rate in effect when each installment of Rent referred to in said subparagraphs became

(DEDEAUX.LSE)                    32

payable. "The worth, at the time of the award," as referred to in subparagraph (3) of this paragraph, is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%).

(h) If Landlord is in default in performing any of the terms or provisions of this Lease and Landlord and any Landlord's lender of which Tenant has been notified in writing receives a notice of the default from Tenant, and Landlord or such lender fails to cure the default within (30) days after receipt of the notice, or if the default is of a character as to require more than thirty (30) days to cure and Landlord or such lender fails to use its best efforts in curing the default after receipt of notice, then after said thirty (30) day period notice Tenant may cure the default, at the expense of Landlord, and may deduct from Rent and other charges payable by Tenant all sums expended, plus interest, until Tenant is reimbursed in full.

(i) If any of the covenants, conditions or other provisions of this Lease are breached, Landlord or Tenant shall have the right to obtain an injunction or other appropriate judicial relief against the other. No failure by Landlord or Tenant to insist upon the performance or the strict performance of any covenant, condition or other provisions of this Lease or to exercise any right or remedy consequent upon a breach or other default hereof shall constitute a waiver or assumption thereof by the other party, and no acceptance, use or occupancy of the Demised Premises shall constitute a waiver or assumption by Tenant of any duty or obligation of Landlord with respect thereto. The grant or reservation herein or the exercise of any right or remedy, or of any supplementary or alternative rights or remedies, shall not affect or prejudice any other rights or remedies which Landlord or Tenant may have under this Lease or under law.

DART000031

16. <u>Subordination, Non-Disturbance and Attornment.</u>

If at the Commencement Date, or during the Term or any
Extension Term, the Demised Premises shall be, or becomes
subject to one or more mortgages:

(a) Landlord, or its mortgagee, and Tenant, upon written
request, shall execute and deliver to Landlord a Subordination,
Non-Disturbance and Attornment Agreement in the form attached
hereto as Exhibit "D";

(b) Tenant shall, at all reasonable times, upon thirty
(30) days' prior written request from Landlord, provide an
Estoppel Certificate in the form attached hereto as Exhibit "E",
for the exclusive use of any mortgagee or a prospective
purchaser of the Demised Premises; and

(c) No trade fixtures, machinery, equipment and personal
property of Tenant shall be subject to a mortgage lien.

17. <u>Assignment and Sublease.</u>

(a) Tenant (for so long as Sears Logistics Services, Inc.
or its affiliates or Sears, Roebuck and Co. or its affiliates is
Tenant hereunder) shall have the right to assign this Lease or
sublet the Demised Premises to a financially capable person or
entity for warehousing or distribution uses upon prior written
consent of Landlord, which consent shall not be unreasonably
withheld or delayed. In such event, Tenant shall remain
responsible for the payment of Rent and the performance of its
other obligations, but not beyond the Term or any Extension Term
to which Tenant has agreed in writing.

(b) If Tenant (for so long as Sears Logistics Services,
Inc. or its affiliates or Sears, Roebuck and Co. or its

affiliates is Tenant hereunder) proposes to sublet the Demised Premises or assign this Lease for other than warehousing or distribution uses permitted in Section 2, it shall so notify Landlord in writing. Upon receipt of Tenant's notice (the "Tenant's Notice"), Landlord shall have ninety (90) days within which to notify Tenant, in writing either of its intention to terminate this Lease; of its disapproval of the proposed assignment or sublease; or of its approval of the proposed new use and approval of the proposed sublessee or assignee (the "Landlord's Notice"). If Landlord chooses to terminate this Lease and sends Tenant such Landlord's Notice, all of Tenant's obligations and duties under the Lease shall terminate in respect of the period subsequent to such termination date as specified in Landlord's Notice (but in no event later than 180 days after Tenant is served with Landlord's Notice), and all Rents and other charges payable hereunder shall be prorated as of the termination date stated in Landlord's Notice. If Landlord, without terminating this Lease, disapproves of the proposed sublease or assignment, this Lease shall remain in effect through the then current Term or Extension Term, subject to Tenant's right to seek other assignees or subtenants. If Landlord approves of the proposed new use of the Demised Premises and the proposed Subtenant or assignee, the Demised Premises may be assigned or sublet by Tenant under the same terms and conditions as contained in Section 17(a) above. If Landlord does not terminate this Lease within such ninety (90)-day period after receipt of Tenant's notice and Landlord does not otherwise deliver to Tenant written Notice of its reasonable objection to such assignment or sublease within said time, Landlord shall be deemed to have consented to Tenant's assignment of the Lease or sublease of all or part of the Demised Premises, but Tenant shall remain liable for all obligations under this Lease regardless of assignment or sublet.

(c)   With respect to Tenants other than Sears Logistics Services, Inc. or its affiliates or Sears, Roebuck and Co. or its affiliates:

DART000033

(i) Tenant shall not directly or indirectly, voluntarily or by operation of law, sell, assign, encumber, pledge or otherwise transfer or hypothecate all or any part of the Demised Premises or Tenant's leasehold estate hereunder (collectively "Assignment") or sublet or otherwise permit any part of the Demised Premises to be occupied by anyone other than Tenant (collectively "Sublease") without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld if the proposed assignee or Subtenant shall have submitted to Landlord reasonably conclusive evidence that it has sufficient financial strength to meet the obligations of Tenant hereunder when and as the same become due, but which otherwise may be granted or withheld by Landlord in its sole and absolute discretion. Notwithstanding the foregoing, Tenant shall not be required to obtain Landlord's prior written consent to its entering into an Assignment or Sublease with an Affiliate (an Affiliate being an entity which controls, is controlled by or is in common control with, Tenant) (hereinafter a "Permitted Transfer"); in such event, Tenant shall be required to notify Landlord of the Permitted Transfer prior to its taking effect.

(ii) If Tenant desires at any time to enter into an Assignment or a Sublease, it shall first give written notice to Landlord of its desire to do so, which notice shall contain (A) the name of the proposed assignee or subtenant, (B) the nature of the proposed assignee's or subtenant's business to be carried on at the Demised Premises, (C) the terms and provisions of and all documentation evidencing the proposed Assignment or Sublease, and (D) such financial information to the extent made available to Tenant. At any time within fifteen (15) business days after Landlord's receipt of the full notice specified above, Landlord may by written notice to Tenant elect to consent to the Sublease or Assignment, or disapprove the Sublease or Assignment. In the event that Landlord neither consents to nor disapproves of such proposed Assignment or Sublease within fifteen (15) business days after Landlord's receipt of the full notice specified above, approval of such proposed Assignment or

Sublease shall have been deemed to have been given by Landlord. In the event Landlord consents to the Sublease or Assignment within said fifteen (15) business day period, Tenant may, but only within thirty (30) days thereafter, enter into such Assignment or Sublease, but only upon the terms and conditions set forth in the notice furnished by Tenant to Landlord.   In the event Landlord disapproves of the Sublease or Assignment within said fifteen (15) business day period, Landlord shall furnish such notice of disapproval to Tenant, and such notice shall specify the reason for Landlord's disapproval of such proposed Sublease or Assignment and shall further specify what changes to the proposed Sublease or Assignment, if any, would enable Landlord to consent to the proposed Assignments or Sublease. Upon Landlord's consent to any such approved Assignment or Sublease, Tenant immediately and irrevocably shall assign to Landlord, as security for Tenant's obligations under this Lease, all rent from any Sublease and Landlord, as assignee for Tenant, or a receiver for Tenant appointed on Landlord's application, may collect such rent and apply it toward Tenant's obligations under this Lease; provided, however, that until the occurrence of any monetary or material non-monetary default under this Lease, Tenant shall have the right to collect such rent.

(iii)   No consent by Landlord to any Assignment or Sublease or Permitted Transfer shall relieve Tenant of any obligation to be performed by Tenant under this Lease, whether arising before or after the Assignment, Sublease or Permitted Transfer, including the obligation to obtain Landlord's express written consent to any other Assignment or Sublease.   Any Assignment, Sublease or Permitted Transfer that is not in compliance with this Section 17(c) shall at the option of Landlord, be void and shall constitute a material default by Tenant under this Lease.   The acceptance of rent or additional rent by Landlord from a proposed assignee or subtenent shall not constitute the consent by Landlord to such Assignment or Sublease.

DART000035

(iv)    Any sale or other transfer (collectively, a
"Transfer"), including transfer by consolidation, merger or
reorganization, of a majority of the voting stock of Tenant, or
any sale or other transfer of a majority of the partnership
interests in Tenant, if Tenant is a partnership, and any
Sublease or Assignment to any corporation within Tenant's
"controlled group of corporations" under Internal Revenue Code
Section 1563 shall be an Assignment or Sublease for purposes of
this Section 17(c); however, provided all other provisions of
this Section 17(c) have been satisfied, Landlord hereby consents
to such Assignment or Sublease.    Notwithstanding the foregoing,
the Transfer (A) in which Tenant (or, in the case of a
consolidation, merger or reorganization, the surviving entity)
has a net worth which exceeds TWENTY-FIVE MILLION DOLLARS
(25,000,000.00) or (B) which is financed by a public stock
offering, shall not be considered a Transfer for the purpose of
this Section 17(c).    The net worth of the surviving entity shall
be determined by a "Big Six" public accounting firm using
generally accepted accounting principles.

(v)    Each assignee or other transferee other than
Landlord shall assume all obligations of Tenant under this Lease
and shall be and remain liable, jointly and severally, with
Tenant for the payment of Rent and additional rent and for the
performance of all the terms, covenants, conditions and
agreements herein contained on Tenant's part to be performed for
the Term; provided, however, that with respect to Rent, only for
rent in the amount set forth in the Assignment.    No Assignment
or Permitted Transfer shall be binding on Landlord unless the
assignee shall deliver to Landlord a counterpart of the
Assignment and an instrument that contains a covenant of
assumption by the assignee satisfactory in substance and form to
Landlord, consistent with the requirements of this Section
17(c), but the failure or refusal of the assignee to execute
such instrument of assumption shall not release or discharge it
from its liability as set forth above.    Each Subtenant shall
acknowledge, in writing, that it has become subject to all

DART000036

obligations of Tenant under this Lease and shall be and remain liability, jointly and severally, within Tenant for the payment of Rent and additional rent and for the performance of all the terms, covenants, conditions and agreements herein contained on Tenant's part to be performed for the term; provided, however, that with respect to rent, only for rent in the amount set forth in the Sublease. No Sublease shall be binding on Landlord unless the subtenant shall deliver to Landlord a counterpart of the Sublease and an instrument satisfactory in substance and form to Landlord, executed by the subtenant, acknowledging that subtenant understands that it has become subject to all obligations of Tenant consistent with the requirements of this Section 17(c), but the failure or refusal of the subtenant to execute such instrument shall not release or discharge it from its liability as set forth above.

(vi) Tenant shall pay to Landlord the greater of (A) FIVE HUNDRED DOLLARS ($500.00), or (B) all of Landlord's actual expenses in connection with its review and processing of each proposed Assignment or Sublease, whether or not Landlord approves or disapproves the same.

## 18. Notices.

Notices shall be in writing and shall be deemed properly served when deposited with the United Sates Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or when sent by overnight express carrier (e.g., Federal Express, Purolator Courier, Express Mail) with a request that the addressee sign a receipt evidencing delivery, and addressed as follows:

Tenant-          Sears Logistics Services, Inc.
                 225 Windsor Drive
                 Itasca, IL   60143-1223

                                                      DART000037

Attn:  Vice President
      Network Management


Copy to:  General Counsel

Landlord-        Dedeaux Inland Empire Properties
                 Dart Building
                 1430 S. Eastman
                 Los Angeles, CA 90023


or to any other address furnished in writing by any of the
foregoing.   However, any change of address furnished shall
comply with the notice requirements of this Section and shall
include a complete outline of all current notice of addresses to
be used for all parties.

19.  <u>Hazardous Materials.</u>

(a)  Landlord hereby represents and warrants to Tenant, to
the best of Landlord's knowledge, that it is not aware that any
Hazardous Material has been used, disposed of or is located on
or in either the Demised Premises or the soil and ground water
on or under the Demised Premises.

(b)  Landlord hereby covenants to Tenant as follows:

(i)  Landlord shall be responsible for all costs
     incurred in complying with any order, ruling or
     other requirement of any court or governmental
     body or agency having jurisdiction over the
     Demised Premises requiring Landlord to comply
     with any laws which related to Hazardous Material
     or which relate to Hazardous Material created,
     handled, placed, stored, used, transported or
     disposed of by Landlord, including, without
     limitation, the cost of any required or necessary
     repair, cleanup or detoxification and the
     preparation of any closure or other required

plans, and Landlord shall diligently pursue to
completion of all such work required in
connection with the same (excluding however any
such costs relating to Hazardous Material on the
Demised Premises established to have been brought
onto the Demised Premises by Tenant or its
employees, agents, or contractors ("Tenant's
Hazardous Material"), unless Tenant's Hazardous
Material is released onto the Demised Premises by
reason of the negligence or fault of Landlord,
its employees, agents, or contractors); and

(ii) Landlord shall indemnify, defend and hold Tenant,
its directors, officer, employees and agents and
any successor Tenant's interest in the Demised
Premises harmless from and against any and all
claims, judgments, damages, penalties, fines
costs, liabilities or losses (including, without
limitation, sums paid in settlement of claims,
attorneys' fees, consultant fees, and expert
fees) and all foreseeable and unforeseeable
consequential damages whether known or unknown,
which might directly or indirectly or in whole or
in part be caused by, arise out of, or be related
to (a) Hazardous Material which was created,
handled, placed, stored, used, transported or
disposed of by Landlord or its employees, agents
or contractors, or (b) Hazardous Material with
respect to which any court, governmental body or
agency having jurisdiction over the Demised
Premises holds Landlord responsible or otherwise
requires Landlord to undertake any repair,
cleanup, detoxification or other remedial action
(excluding Tenant's Hazardous Material, unless
Tenant's Hazardous Material was released onto the
Demised Premises by reason of the negligence or
fault of Landlord, its employees agents or

DART000039

contractors), or (c) the breach of any
representation, warranty or covenant contained
herein. In the event of any such breach of any
representation, warranty or covenant contained
herein or in the event of the presence of
Hazardous Material (excluding Tenant's Hazardous
Material unless Tenant's Hazardous Material was
released onto the Demised Premises by reason of
the negligence or fault of Landlord employees,
agents or contractors), Tenant has the right
(without waiving any of its other remedies) to
either (a) terminate this Lease at its sole
election by written notice to Landlord, such
termination to be effective as of the date of
Tenant's notice, but only after Landlord shall
have had thirty (30) days written notice of such
breach and the opportunity to cure such breach
within said 30 days or commence to cure within
said period, or (b) have its monthly Rent and any
other charges payable by Tenant hereunder abated
in proportion to the extent of interference with
Tenant's business until such time as the Demised
Premises comply with all laws and Landlord has
cured its breach of any representation, warranty
or covenant contained herein in a manner
satisfactory to Tenant. Tenant shall also have
the right after thirty (30) days written notice
to Landlord to perform any necessary repair,
cleanup, detoxification or other remedial action
to the extent required by governmental authority
with respect to Hazardous Material to which
either Landlord has no obligation, or has failed
to perform its obligation, to repair, cleanup,
detoxify or take remedial action, and to offset
from Tenant's monetary obligations hereunder the
amount so expended by Tenant, except for amounts
expended toward Tenant's Hazardous Material.

DART000040

(iii)    To the extent Landlord deems it economically
reasonable, Landlord shall diligently pursue any
responsible parties in connection with the
performance of any cleanup, repair,
detoxification or other remedial action with
respect to Hazardous Material to which Landlord
is not obligated to take any action.

(c)    Tenant hereby covenants to Landlord as follows:

(i)    Tenant shall be responsible for all costs
incurred in complying with any order, ruling or
other requirement of any court or governmental
body having jurisdiction over the Demised
Premises requiring Tenant to comply with any laws
which relate to Tenant's Hazardous Material
including, without limitation, the cost of any
required or necessary repair, cleanup or
detoxification and the preparation of any closure
or other required plans, and Tenant shall
diligently pursue to completion of all such work
required by any court or governmental body in
connection with the same, excluding however any
such costs relating to Hazardous Material on the
Demised Premises established to have been caused
directly either by use of the Demised Premises by
the Landlord or Landlord's acts or omissions
relating to the Demised Premises, or use of the
Demised Premises by any other third party not
permitted or suffered by Tenant; and

(ii)    Tenant shall indemnify, defend and hold Landlord,
its directors, officers, employees and agents and
any successor to Landlord's interest in the
Demised Premises harmless from and against any
and all claims, judgments, damages, penalties,

(DEDEAUX.LSE)                    43                    DART000041

fines, costs, liabilities or losses (including, without limitation, sums paid in settlement claims, attorneys' fees, consultant fees and expert fees) and all foreseeable and unforeseeable consequential damages, whether known or unknown, which might directly or indirectly or in whole or in part be caused by, arise out of, or be related to (a) Tenant's Hazardous Material, or (b) Hazardous Material with respect to which any court, governmental body or agency having jurisdiction over the Demised Premises holds Tenant responsible or otherwise requires Tenant to undertake any repair, cleanup, detoxification or other remedial action, excluding however Hazardous Material on the Demised Premises established to have been caused directly either by use of the Demised Premises by Landlord, or Landlord's or its employees, agents, or contractors acts or omissions relating to the Demised Premises, or use of the Demised Premises by any co-tenant or third party not permitted or suffered by Tenant, or (c) the breach of any representation, warranty or covenant contained herein.

(d)   As used herein, the term "Hazardous Material" means petroleum products, asbestos, and any other hazardous or toxic substance, material or waste which is or becomes regulated by any local government's authority, the State of California, or the United States government, whether originating from the Demised Premises or, as to Landlord, migrating, flowing, percolating, diffusing or in any way moving onto or under the Demised Premises or the Entire Tract.

20.   **Time of Essence.**

Time is of the essence in this Lease.

21. <u>Entire Agreement.</u>

This Lease and the attached exhibits constitute the entire agreement between Landlord and Tenant with respect to the Demised Premises. Neither this Lease nor any of its provisions may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the parties.

22. <u>Choice of Law.</u>

This Lease shall be construed in accordance with and governed by the laws of the state in which the Demised Premises are located.

23. <u>Binding Effect.</u>

Subject to the restrictions on transfer, assignment and subletting herein, this Lease shall benefit and be binding upon Landlord and Tenant and their respective heirs, executors, legal representatives, and successors and assigns.

24. <u>No Partnership.</u>

Nothing contained in this Lease shall be construed to make Landlord and Tenant partners or joint venturers or to render either party liable for the debts or the obligations of the other.

25. <u>Third Party Beneficiaries.</u>

Except as herein specifically provided, no other person, subtenants, customer, employee or invitee of Tenant or any other third party shall be deemed to be a third-party beneficiary of any of the provisions herein.

(DEDEAUX.LSE)                45

DART000043

26.  **Partial Invalidity.**

If any section, paragraph, subparagraph, sentence, clause or phrase of this Lease shall be declared or judged invalid or unconstitutional, such adjudication shall not affect the other sections, paragraphs, subparagraphs, sentences, clauses or phrases.

27.  **Recordings.**

At the cost of the requesting party, either party may require the other to execute all documents necessary to record a short form of this lease, which short form of Lease shall be in the form attached hereto as Exhibit "F".

28.  **Assignments, Transfers, and Financing.**

(a)  Subject to the provisions of Section 17, as to Tenant, this Lease may be assigned by either party. Except as specifically provided in subsections (b) and (c) below, the assignment or transfer by any party of all or any part of its interest in its premises, or assignment of provisions of this Lease during the Term, will not release the party from any of its obligations under this Lease.

(b)  If Landlord makes a _bona fide_ sale, transfer or assignment to an individual, corporation, partnership, limited partnership or other legal entity (whether or not Landlord has an interest in the grantee or transferee) of all of Landlord's right, title and interest in the Demised Premises after it has completed all of Landlord's construction obligations, including Punchlist items, pursuant to Section 5, and if at the time of the sale, transfer or assignment, Landlord has complied with its obligations under this Lease, Landlord will be released and discharged from all further liability under this Lease arising on and after the date of the sale, transfer or assignment provided the purchaser or assignee will assume in writing all of

(DEDEAUX.LSE)                    46

DART000044

Landlord's obligations under this Lease, and a copy of the
instrument of assignment and assumption, in proper form for
recondition, is delivered to Tenant.

(c)   Notwithstanding Sections 28(a) and 28(b) hereof,
Landlord may assign its interest in this Lease as collateral
security to any mortgagee, trustee, or landlord (in a
sale-leaseback) in connection with any present or future
financing in connection with the Demised Premises. So long as
Landlord retains a possessory or legal interest in all or any
part of the Demised Premises pursuant to the security
instrument, the Landlord will not be deemed to have assigned or
transferred any of its powers or obligations under this Lease.
If the legal or possessory interest of the Landlord terminates
pursuant to the security instrument, this power and obligation
will vest with the holder of the security instrument or anybody
who acquires the interest of the holder by virtue of foreclosure
of the instrument or deed in lieu of foreclosure.

## 29.   Mechanics' Liens.

Should any mechanics' or materialmen's or other lien be
filed against the Demised Premises or any part thereof by reason
of construction, alterations, additions, improvements or
installations performed by Tenant or because of Tenant's acts or
omissions or because of a claim against Tenant, Tenant shall,
within thirty (30) days following receipt of notice of the
existence of such lien, cause the same to be cancelled and
discharged of record. If Tenant has not paid or desires to
contest any claim of lien, Tenant agrees to indemnify, hold
Landlord harmless from, and defend Landlord against any
liability, loss, damage, costs, and all related expenses
(including attorneys' fees and court costs) arising out of
Tenant's non-payment or contest of such lien. Tenant shall also
execute such indemnity agreements as would be necessary to
induce Landlord's title company to insure over any such lien.
Tenant shall not be obligated to update Landlord's tile

DART000045

insurance policy at the time of the contest. If a final
judgment establishing the validity or existence of any contested
lien is entered, Tenant shall pay and satisfy the same at once.

## 30.  Unavoidable Delays.

A time within which Landlord or Tenant shall be required to
perform any act under this Lease (except the obligation to pay
any sum of money) shall be extended by a period of time equal to
the number of days during which the performance of such act is
prevented or delayed by unavoidable delays, strikes, lockouts,
sit-downs, material or labor restrictions by any governmental
authority, act or omission of Tenant, unusual transportation
delay, force majeure, acts of God, fire, earthquake, floods,
explosions, riots, acts of public enemy, wars, insurrections,
actions of the elements, storms, inclement weather, or orders of
government or similar causes not within the reasonable control
of such party (excluding any financial inability) and which by
exercise of due diligence such party is unable wholly or in part
to prevent or overcome. Notwithstanding the foregoing, unless
the party entitled to such extension shall give notice to the
other interested party of its claim to such extension within
fifteen (15) days after the event giving rise to such claim
shall have occurred, there shall be excluded in computing the
number of days by which the time for performance of the act in
question shall be extended, the number of days which shall have
elapsed between the occurrence of such event and the actual
giving of notice.

## 31.  Limitation of Warranty.

Landlord and Tenant expressly agree that there are and
shall be no warranties which extend beyond those expressly set
forth in this Lease including, without limitation, those created
by statue, law, ordinance, or regulation which may or may not
provide for treble damage type recovery. Notwithstanding the
foregoing, this limitation shall in no way serve to limit or

modify any obligation of Landlord or Tenant as expressly set forth under the terms of this Lease.

32. <u>Broker.</u>

Landlord represents to Tenant and Tenant represents to Landlord that Landlord and Tenant, respectively, have not dealt with any real estate broker, sales person or finder in connection with this Lease except,_____NONE_____ and each agrees to indemnify and hold the other and its directors, officers, employees and partners harmless from and against any and all claims, demands, liabilities, actions, damages, costs and expenses (including reasonable attorneys' fees) arising out of any breach of the parties' respective agreements with said brokers.

33. <u>Headings.</u>

The section headings are for convenience and are not a part of this Lease.

IN WITNESS WHEREOF, the parties have caused this Lease to be executed as of the date first written above.

~~ATTEST OR~~ WITNESS:                    LANDLORD:

By: _Robert A. Santich_                   DEDEAUX INLAND EMPIRE
                                          PROPERTIES
Name: _ROBERT A. SANTICH_

(DEDEAUX.LSE)                49                    **DART000047**

Title: _____

By: _____

Name: RAOUL DEDEAUX

Title: Mgr. Df.

ATTEST:                                TENANT:

Joe B. Maund
Secretary

**SEARS LOGISTICS SERVICES, INC.,**
(f/k/a Terminal Freight Handling
Company)

Robert P. Hosch
Vice President
Network Management



List of Exhibits:


EXHIBIT A  - LEGAL DESCRIPTION
EXHIBIT A1 - SITE PLAN (1)

EXHIBIT B  - LANDLORD'S CONSTRUCTION DOCUMENTS(5)
EXHIBIT C  - PERMITTED ENCUMBRANCES (6)
EXHIBIT D  - SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
             AGREEMENT (16)
EXHIBIT E  - ESTOPPEL CERTIFICATE (16)
EXHIBIT F  - SHORT FORM OF LEASE (27)


(DEDEAUX.LSE)                    50

DART000048

## EXHIBIT "A"

## LEGAL DESCRIPTION

DART000049

Order No.
Page

LEGAL DESCRIPTION

## DESCRIPTION

ALL OF LOT 28 AND A PORTION OF LOT 27 OF TRACT NO. 13645, IN THE CITY OF ONTARIO, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, TOGETHER WITH ALL OF PARCELS B AND C OF THAT CERTAIN LOT LINE ADJUSTMENT NO. L-90-16, RECORDED SEPTEMBER 26, 1990, AS INSTRUMENT NO. 90-385040 OFFICIAL RECORDS, BOTH IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF PARCEL B OF SAID LOT LINE ADJUSTMENT; SAID POINT BEING DISTANT SOUTH 0° 10' 38" WEST 681.00 FEET FROM THE NORTHWEST CORNER OF LOT 20 OF SAID TRACT NO. 13645;
THENCE ALONG THE NORTHERLY LINE OF PARCELS B AND C, SOUTH 89° 58' 32" EAST 1,941.97 FEET TO THE NORTHEAST CORNER OF SAID PARCEL C; SAID POINT BEING DISTANT SOUTH 0° 01' 42" EAST 681.00 FEET FROM THE NORTHWEST CORNER OF LOT 26 OF SAID TRACT NO. 13645;
THENCE ALONG THE EASTERLY PROLONGATION OF THE NORTHERLY LINE OF SAID PARCEL C, SOUTH 89° 58' 32" EAST 398.83 FEET;
THENCE PARALLEL WITH THE EASTERLY LINE OF LOT 27 OF SAID TRACT, SOUTH 0° 08' 14" WEST 51.73 FEET;
THENCE PARALLEL WITH THE NORTHERLY LINE OF PARCEL C, SOUTH 89° 58' 32" EAST 195.00 FEET TO A POINT ON THE WESTERLY LINE OF ETIWANDA AVENUE (120.00 FEET WIDE);
THENCE ALONG SAID WESTERLY LINE SOUTH 0° 08' 14" WEST 527.86 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHWESTERLY AND HAVING A RADIUS OF 20.00 FEET;
THENCE SOUTHERLY, SOUTHWESTERLY, AND WESTERLY 31.36 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 89° 04' TO A POINT ON THE NORTHERLY LINE OF PHILADELPHIA STREET (88.00 FEET WIDE);
THENCE ALONG SAID NORTHERLY LINE SOUTH 89° 58' 18" WEST 2501.24 FEET TO THE BEGINNING OF A CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 15.00 FEET;
THENCE WESTERLY, NORTHWESTERLY, AND NORTHERLY 23.62 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 90° 12' 20" TO A POINT ON THE EASTERLY LINE OF VINTAGE AVENUE (88.00 FEET WIDE);
THENCE ALONG SAID EASTERLY LINE NORTH 0° 10' 38" EAST 586.82 FEET TO THE POINT OF BEGINNING.

EXCEPT ALL MINERALS AND ALL MINERAL RIGHTS OF EVERY KIND AND CHARACTER NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, OIL AND GAS RIGHTS THERETO, TOGETHER WITH THE SOLE, EXCLUSIVE AND PERPETUAL RIGHT TO EXPLORE FOR, REMOVE AND DISPOSE OF SAID MINERALS BY ANY MEANS OR METHODS SUITABLE TO GRANTOR, ITS SUCCESSORS AND ASSIGNS, BUT WITHOUT ENTERING UPON OR USING THE SURFACE OF THE LANDS HEREBY CONVEYED, AND IN SUCH MANNER AS NOT TO DAMAGE THE SURFACE OF SAID LAND OR TO INTERFERE WITH THE USE THEREOF BY GRANTEE OR GRANTEE'S SUCCESSORS OR ASSIGNS, AS RESERVED IN THE DEED FROM UPLAND INDUSTRIES CORPORATION RECORDED JANUARY 3, 1989 AS INSTRUMENT NO. 89-001212, OFFICIAL RECORDS.

SAID DESCRIPTION IS PURSUANT TO CERTIFICATE APPROVING LOT LINE ADJUSTMENT RECORDED JULY 28, 1992 AS INSTRUMENT NO. 92-312523, OFFICIAL RECORDS.

DART000050

# EXHIBIT A-1

## SITE PLAN

EXHIBIT A-1
SITE PLAN



Real Estate Graphics, Inc. ©COPYRIGHT 1978

**DART000052**

# CITY OF ONTARIO
## LOT LINE ADJUSTMENT NO. L-92-09



SCALE : 1" = 300'

ANNA M. BEAL, L.S. 4955
LICENSE EXPIRES 12/31/93

### DATA TABLE

① N 89°58'32" W    195.00'
② N 0°08'14" E    51.73'
③ Δ = 69°50'04"    R=20.00'    L=31.35'
④ Δ = 90°12'20"    R=15.00'    L=23.62'

### NOTES:

Ⓐ    EXISTING PROPERTY
       LINE TO BE ELIMINATED

SEE SHEET 2 FOR EASEMENTS

This plat is for your aid in locating your land with reference to
streets and other parcels. It is not a survey. While it is not
believed to be correct, the Company assumes no liability for
any loss occuring by reason of reliance thereon."
   CHICAGO TITLE INSURANCE COMPANY

DART000053

# EXHIBIT "B"

[Landlord's Construction Documents)

# EXHIBIT B
## LANDLORD'S CONSTRUCTION DOCUMENTS

### ARCHITECTURAL:

| | |
|---|---|
| A1.0 | COMPOSITE SITE PLAN |
| A1.1B | SITE PLAN BUILDING B |
| A1.2B | SITE PLAN BUILDING B |
| A1.3B | SITE PLAN ENLARGEMENTS BLDG. B |
| A2.1B | FLOOR PLAN BUILDING B |
| A2.2B | FLOOR PLAN BUILDING B |

sls1018/c

**EXHIBIT "C"**

[Permitted Encumbrances - copy of title policy to be
supplied by Landlord]

# SUPPLEMENTAL AGREEMENT

THIS **SUPPLEMENTAL AGREEMENT** ("Supplement") is made on _____, 1994 between **DEDEAUX INLAND EMPIRE PROPERTIES**, a California partnership ("Landlord") and **SLS, INC.**, a Delaware corporation ("Tenant").

**WHEREAS**, Landlord and Tenant entered into a Lease Agreement ("Lease") dated as of October 20, 1993 for property in the City of Ontario, County of San Bernadino, State of California, more specifically described in the Lease; and

**WHEREAS**, Section 3(a) of the Lease provides that the Landlord and Tenant shall specify the Commencement Date of the Lease by Supplemental Agreement; and

**WHEREAS**, Section 3(a) of the Lease provides that the Commencement Date shall be the date on which Landlord's construction of the Leasehold Improvements is substantially complete and Tenant has accepted the Demised Premises in accordance with Section 5 of the Lease; and

**WHEREAS**, Section 4(a) of the Lease provides that Rent shall begin to accrue on the Commencement Date.

**NOW, THEREFORE**, Landlord and Tenant agree to supplement the Lease as follows:

1.    Tenant accepted the Demised Premises as substantially complete in accordance with Section 5 on Juhe 24, 1994.

2.    The Commencement Date of the Lease is June 24, 1994, and Rent shall accrue on and from said date.

3.    The Term of the Lease is June 24, 1994 through June 30, 2009.

4.    The Lease, except as herein supplemented, is in all other respects fully ratified and confirmed.

5.    Except as otherwise defined herein, all capitalized

DIEPSUPP.SAM/PEG/7-13-94

DART000057

terms used in this Supplement shall have the meaning ascribed to such terms in the Lease.

6. Landlord represents and warrants that Landlord has full right, power and authority to enter into this Supplement.

**IN WITNESS WHEREOF,** Landlord and Tenant have caused this Supplement to be executed as of the date first stated above.

WITNESS:

LANDLORD:

DEDEAUX INLAND EMPIRE PROPERTIES

By: _G. Robut_____

By: _Raoul Dedeaux_

Name: _Raoul Dedeaux_

Title: _Managing General_ Partner

LEGAL

ATTEST:

TENANT:

SLS, INC.

By: _Phillip E. Goodchild_
   ASSISTANT SECRETARY

By: _____

Name: _M M KENNEY_

Title: _VP MANNING & Eg._

R. E. LEGAL

LEGAL

DIEPSUPP.SAM/PEG/7-13-94

2

**DART000058**

*Leasefeld*

# FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** (the "First Amendment") is made and dated as of this ____ day of August, 1994, by and between **DEDEAUX INLAND EMPIRE PROPERTIES**, a California partnership ("Landlord") and **SLS, INC.**, a Delaware corporation (f/k/a Sears Logistics Services, Inc.) ("Tenant").

**WHEREAS,** Landlord and Tenant entered into a Lease Agreement ("Lease") dated as of October 20, 1993 for property located in the City of Ontario, County of San Bernardino, State of California, more specifically described in the Lease, at the Rent and upon the other terms, covenants and conditions contained in the Lease; and

**WHEREAS,** the parties now mutually desire to modify and amend the Lease, as hereinafter set forth.

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant, each intending to be legally bound, hereby covenant and agree as follows:

1. The first sentence of Section 4(b) is deleted and replaced by the following:

Tenant agrees to pay annual rent ("Rent") in the amount of Two Million Nine Hundred Sixteen Thousand Three Hundred Twenty-Two and 80/100 Dollars ($2,916,322.80), to be paid in equally monthly installments of Two Hundred Forty-Three Thousand Twenty-Six and 90/100 Dollars ($243,026.90), for the first five (5) years of the Term; annual Rent in the amount of Two Million Nine Hundred Thirty-Six Thousand Seven Hundred Seven and 32/100 Dollars ($2,936,707.32), to be paid in equal monthly installments of Two Hundred Forty-Four Thousand Seven Hundred Twenty-Five and 61/100 Dollars ($244,725.61), for the second five (5) years of the Term; and annual Rent in the amount of Three Million One Hundred Thirty-Four Thousand Four Hundred Twenty-Four and 12/100 Dollars ($3,134,424.12), to be paid in equal monthly installments of Two Hundred Sixty-One Thousand Two Hundred Two and 01/100 Dollars ($261,202.01) for the last five (5) years of the Term. Tenant agrees that Rent, as adjusted herein, shall begin to accrue from the Commencement Date and shall apply retroactively from the Commencement Date and during the Term.

DIEPAM1.SAM                                            1

2.    Except as modified or amended by this First Amendment, all of the terms, covenants and conditions of the Lease, as amended, shall continue and remain in full force and effect and are hereby ratified and confirmed.

3.    Landlord and Tenant each represent and warrant to the other that they have full right, power and authority to enter into this First Amendment.

4.    Capitalized terms used in this First Amendment are intended to have the meanings ascribed to them in the Lease unless otherwise defined herein.

**IN WITNESS WHEREOF,** the parties hereto have executed this First Amendment as of the day and year first above written.

WITNESS:                          LANDLORD:

                                  **DEDEAUX INLAND EMPIRE
                                  PROPERTIES**

By:_____      By:_____

                                  Name:_____

Title:_____

ATTEST:                           TENANT:

                                  **SLS, INC.**

By:_____      By:_____
                                      James J. Strauss
                                      Vice President of
                                      Planning and Operations
                                      Services

DIEPAM1.SAM                    2

DART000060

RECEIVED AUG 1 8 1994

# M E M O R A N D U M

cc:    R. Callahan
       R. Rute
       R. A. Santich
       J. Smith
       W. Smollen

TO:      R. Dedeaux

FROM:    A. Robert Wessel

DATE:    August 17, 1994

SUBJ:    Amendment to SLS Ontario Lease

The first amendment to the SLS lease has been drafted by SLS and
sent to us for execution. (Copy attached).

The amendment changes Section 4 (b) of the lease to reflect new
rental rates.  A preliminary review indicates the numbers in the
amendment are accurate.  We need to confirm and verify the accuracy
of the numbers.

The amendment <u>does not appear</u> to include any tenant improvement
money (it is my understanding that the TI money and rent
adjustments are two distinct issues).  Before we execute the
amendment, we  should review our position on each issue and
determine how to proceed.


Attachments:

ARW/dvm

DART000061

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE ("**Second Amendment**") is made and dated as of this 3ʳᵈ day of ~~February~~, 2009 by and between **DEDEAUX INLAND EMPIRE PROPERTIES**, a California partnership ("**Landlord**") and **SEARS LOGISTICS SERVICES, INC.**, a Delaware corporation ("**Tenant**").

WHEREAS, Landlord and Tenant entered into a Lease Agreement ("**Original Lease**") dated as of October 20, 1993, for property located in the City of Ontario, County of San Bernardino, State of California, more specifically described in the Original Lease, at the Rent and upon the other terms, covenants and conditions contained in the Original Lease; and

WHEREAS, Landlord and Tenant subsequently entered into a Supplemental Agreement ("**Supplemental Agreement**") dated as of July 13, 1994, which, among other things, supplemented the Original Lease to establish the Commencement Date as June 24, 1994 and the expiration date as June 30, 2009; and

WHEREAS, Landlord and Tenant also entered into a First Amendment to Lease ("**First Amendment**") dated as of August 31, 1994, which modified the first sentence of Section 4(b) of the Original Lease setting forth the Rent to be paid by Tenant during the first fifteen (15) years of the Term. The Original Lease, as modified by the Supplemental Agreement and the First Amendment, is hereinafter referred to as the "**Lease**".

WHEREAS, the parties now mutually desire to modify and amend the Lease, as hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant, each intending to be legally bound, hereby covenant and agree as follows:

1.    <u>Extension of Term of Lease</u>.  The Term of the Lease is hereby extended for a period of five (5) years so that the expiration date of the Lease shall be June 30, 2014, unless sooner terminated in accordance with the provisions of the Lease as amended by this Second Amendment.  The five (5) year period commencing July 1, 2009 and ending June 30, 2014 is hereinafter referred to as the "**Extended Term**".  Tenant, by execution hereof, hereby exercises the right to extend the Term of the Lease as set forth above, and Landlord further acknowledges such extension by Tenant.  Landlord hereby expressly acknowledges and agrees to the validity of such exercise and extension, and waives any and all claims as to the effectiveness, enforceability, or timeliness thereof.

2.    <u>Annual Rent During Extended Term</u>.  Tenant agrees to pay annual rent during the Extended Term ("**Rent**") in the amount of Three Million Three Hundred Sixty-One Thousand One Hundred Eighty-Eight and 00/100 Dollars ($3,361,188.00), to be paid in equal monthly installments of Two Hundred Eighty Thousand Ninety-Nine and 00/100 Dollars ($280,099.00), for the first thirty (30) months of the Extended Term (July 1, 2009 through December 31, 2011); and annual rent in the amount of Three Million Four Hundred Sixty-Two Thousand Twenty-Four

1

DART000062

and 00/100 Dollars ($3,462,024.00), to be paid in equal monthly installments of Two Hundred
Eighty-Eight Thousand Five Hundred Two and 00/100 Dollars ($288,502.00), for the second
thirty (30) months of the Extended Term (January 1, 2012 through June 30, 2014).

3.      Restatement of Lease.    Except as modified or amended by this Second
Amendment, all of the terms, covenants and conditions of the Lease, as amended, shall continue
and remain in full force and effect and are hereby restated and republished.

4.      Authority.  Landlord and Tenant each represent and warrant to the other that they
have full right, power and authority to enter into this Second Amendment.  Landlord further
represents and warrants that Landlord does not need the consent of any party, other than Allianz
Life Insurance Company of North America, to enter into this Second Amendment.

5.      Capitalized Terms.    Capitalized terms used in this Second Amendment are
intended to have the meanings ascribed to them in the Lease unless otherwise defined herein.

6.      Successors and Assigns.    This Second Amendment shall be binding upon, and
shall inure to the benefit of, the successors and assigns of the parties hereto.

7.      Entire Agreement.    This Second Amendment sets forth the entire agreement
between the parties with respect to the matters set forth herein.   There have been no additional
oral or written representations or agreements with respect to the matters set forth herein.   In case
of any inconsistency between the provisions of the Lease and this Second Amendment, the
provisions of this Second Amendment shall govern and control.

8.      Time is of the Essence.   Time is of the essence for this Second Amendment and
the Lease and each provision hereof.

9.      No Presumption Against Drafter.   This Second Amendment shall be construed
without regard to any presumption or any other rule requiring construction against the party
drafting a document.   The parties acknowledge that this Second Amendment is the result of
negotiations between the parties, and in construing any ambiguity hereunder no presumption
shall be made in favor of either party.

10.     Severability.    If any provision of this Second Amendment or the application
thereof to any person or circumstances is or shall be deemed illegal, invalid, or unenforceable,
the remaining provisions hereof shall remain in full force and effect and this Second Amendment
shall be interpreted as if such illegal, invalid, or unenforceable provision did not exist herein.

11.     Counterpart Signatures.    This Second Amendment may be executed in any
number of counterpart originals, each of which, when taken together, shall be deemed to be one
and the same instrument.   Executed copies of this Second Amendment may be delivered between
the parties via facsimile or electronic mail and such shall be deemed effective and binding upon
the parties the same as if such document was an original.

DART000063

**IN WITNESS WHEREOF,** the parties hereto have executed this Second Amendment as of the date and year first above written.

LANDLORD:

**DEDEAUX INLAND EMPIRE PROPERTIES,**
**a California partnership**

By: _Terry Dedeaux_

Name: _TERRY DEDEAUX_

Its: _MANAGER_

TENANT:

**SEARS LOGISTICS SERVICES, INC.,** a
**Delaware corporation**

By: _____

Name: ___James B. Terrell___
      Vice President Real Estate

Its: _____



REAL ESTATE
LEGAL

3

DART000064

## CONSENT BY MORTGAGEE

**ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, a Minnesota corporation** (the "**Mortgagee**"), the current owner and holder of certain obligations secured by that certain Deed of Trust, Security Agreement, Fixture Filing with Absolute Assignment of Rents from DEDEAUX INLAND EMPIRE PROPERTIES, a California limited partnership, ("Owner") dated July 20, 1994, and recorded July 28, 1994 in the land records of San Bernardino County, as Document No. 321648 (the "Mortgage"), which Mortgage encumbers the Premises, as defined in the Second Amendment to Lease attached hereto, hereby (i) consents to Owner's execution and delivery of the Second Amendment to Lease to which this Consent by Mortgagee is attached, (ii) consents to the Owner's execution and delivery of the Supplemental Agreement dated July 13, 1994 and First Amendment to Lease dated August 31, 1994 as defined in the Second Amendment to Lease, (iii) agrees and acknowledges that the lien of the Mortgage is hereby made subject and subordinate to the instruments defined in the Second Amendment to Lease to which this Consent is attached pursuant to the terms and provisions of the Amendment and Restatement of Subordination, Non-Disturbance and Attornment Agreement dated May 31, 1995 and recorded June 22, 1995 in the land records of San Bernardino County as Document No. 19950215171 (the "Subordination").

IN WITNESS WHEREOF, the Mortgagee has executed this Consent by Mortgagee this 26th day of March, 2009.

MORTGAGEE:

ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, a Minnesota corporation

By: _____
Its: _____
          GARY BROWN
     ASSISTANT TREASURER

By _____
Its: _____
        PAMELA J. CORNELL
     ASSISTANT TREASURER

4

DART000065



## THIRD AMENDMENT TO LEASE

**THIS THIRD AMENDMENT TO LEASE** ("**Third Amendment**") is made and dated as of this _____ day of April, 2014 by and between **DEDEAUX INLAND EMPIRE PROPERTIES,** a California partnership ("**Landlord**") and **SEARS LOGISTICS SERVICES, INC.,** a Delaware corporation ("**Tenant**").

    **WHEREAS,** Landlord and Tenant entered into a Lease Agreement ("**Original Lease**") dated as of October 20, 1993, for property located in the City of Ontario, County of San Bernardino, State of California, more specifically described and defined in the Original Lease as the Demised Premises (the "**Demised Premises**"), at the Rent and upon the other terms, covenants and conditions contained in the Original Lease; and

    **WHEREAS,** Landlord and Tenant subsequently entered into a Supplemental Agreement ("**Supplemental Agreement**") dated as of July 13, 1994, which, among other things, supplemented the Original Lease to establish the Commencement Date as June 24, 1994, and the expiration date as of June 30, 2009.

    **WHEREAS,** Landlord and Tenant also entered into a First Amendment to Lease ("**First Amendment**") dated as of August 31, 1994, which modified the first sentence of Section 4(b) of the Original Lease setting forth the Rent to be paid by Tenant during the first fifteen (15) years of the Term. The Original Lease, as modified by the Supplemental Agreement and the First Amendment, is hereinafter referred to as the "**Lease**".

    **WHEREAS,** Landlord and Tenant also entered into a Second Amendment to Lease ("**Second Amendment**") dated as of April 3, 2009, which extended the term and condition of the Lease dated October 20, 1993 from July 1, 2009 to and ending on June 30, 2014.

    **WHEREAS,** the parties now mutually desire to modify and amend the Lease, as hereinafter set forth.

    **NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant, each intending to be legally bound, hereby covenant and agree as follows:

1.    Incorporation of Recitals.  The foregoing recitals are hereby incorporated as if fully re-written and restated at length herein.

2.    Undefined Capitalized Terms. Capitalized terms used, but not defined in this Agreement, shall have the same meaning ascribed to such capitalized and defined terms in the Lease.

3.    Extension of Term of Lease.  The Term of the Lease is hereby extended for a period of ten (10) years so that the expiration date of the Lease shall be June 30, 2024,

unless sooner terminated in accordance with the provisions of the Lease as amended by this Third Amendment.  The ten (10) year period commencing July1, 2014 and ending June 30, 2024 is hereinafter referred to as the "**Extended Term**".  Tenant, by execution hereof, hereby exercises the right to extend the Term of the Lease as set forth above, and Landlord further acknowledges such extension by Tenant.  Landlord hereby expressly acknowledges and agrees to the validity of such exercise and extension, and waives any and all claims as to the effectiveness, enforceability, or timeliness thereof.

4.      Annual Rent During Extended Term.  Tenant agrees to pay annual rent during the Extended Term ("**Rent**") in the amount of Three Million Six Hundred Eight Thousand Three Hundred Thirty-One and 60/100 Dollars ($3,608,331.60) to be paid in equal monthly installments of Three Hundred Thousand Six Hundred Ninety-Four and 30/100 Dollars ($300,694.30) for the first thirty (30) months of the Extended Term (July 1, 2014 through December 31, 2016; and annual rent in the amount of Three Million Seven Hundred Seventy-Nine Thousand Five Hundred Seventy-Three and 17/00 Dollars ($3,779,573.17) to be paid in equal monthly installments of Three Hundred Sixteen Thousand Six Hundred Thirty-One and 10/100 Dollars ($316,631.10) for the second thirty (30) months of the Extended Term (January 1, 2017 through June 30, 2019; and annual rent in the amount of Four Million Nine Hundred Fifty and 55/100 Dollars ($4,000,950.55) to be paid in equal monthly installments of Three Hundred Thirty-Three Thousand Four Hundred Twelve and 55/00 Dollars ($333,412.55) for the third thirty (30) months of the Extended Term (July 1, 2019 through December 31,2021; and annual rent in the amount of Four Million Two Hundred Thirteen Thousand and 93/100 Dollars ($4,213,000.93), to be paid in equal monthly installments of Three Hundred Fifty-One Thousand Eighty Three and 41/100 Dollars ($351,083.41) for the fourth thirty (30) months of the Extended Term (January 1, 2022 through June 30, 2024.

| RENT SCHEDULE | | | | |
|---|---|---|---|---|
| **Square Feet** | **Months** | **Monthly Rate / Sq. ft.** | **Monthly Rent** | **Annual Rent** |
| 823,820 | July 1, 2014 - December 31, 2016 | $0.3650 | $300,694.30 | $3,608,331.60 |
| 823,820 | January 1, 2017 - June 30, 2019 | $0.3843 | $316,631.10 | $3,799,573.17 |
| 823,820 | July 1, 2019 - December 31, 2021 | $0.4047 | $333,412.55 | $4,000.950.55 |
| 823,820 | January 1, 2022 - June 30, 2024 | $0.4262 | $351,083.41 | $4,213,000.93 |
| Monthly rent per square foot is shown as rounded to four decimals | | | | |

DART000067

5.     Termination.  Tenant shall have the right to terminate the Lease at the end of the
sixtieth (60th) month (June 30, 2019) by providing Landlord with twelve (12) months
prior written notice (June 30, 2018 is the notice date) and payment by Tenant to Landlord
of a termination option payment (the "**Termination Option Payment**") which
Termination Option Payment shall be the *aggregate* sum of: (1)  Six Hundred Twenty-
Five Thousand and 00/100 Dollars ($625,000.00); and (2) the costs of the unamortized
Tenant improvements as set forth in Schedule 1 (as hereinafter defined) attached hereto
(the "**Tenant Improvements**") (amortized at the rate of eight percent (8%)) at an amount
not to exceed Four Hundred Forty Nine Thousand Six Hundred Six and 00/100 Dollars
($449,606.00) and supported by paid invoices from contractors; and (3) the cost of the
unamortized broker fees of Three Hundred Five Thousand Nine Hundred Thirty-Eight
and 01/100 Dollars ($305,938.01) (also amortized at the rate of 8% over the Extended
Term).

6.     Condition of Space.  As of the date of this Third Amendment, all mechanical
equipment, plumbing, HVAC, door doors and related equipment of the Demised
Premises is to be in good working order (or placed or maintained in good working order)
by the party required pursuant to the terms and conditions of the Lease.

7.     Improvements to be made by the Landlord.  On or before ninety (90) days after
the parties' execution of this Third Amendment (the "**Completion Date**"), Landlord shall
complete the following improvements:

   a.  Paint the building interior a mutually agreed upon white color.
   b.  Remodel the break rooms in Suite 100 and 125 including replacing
       cabinets, countertops, fixtures and flooring.
   c.  Remodel the women's restroom in Suite 100 including repainting,
       replacing/repairing fixtures and lighting, and replacing flooring.
   d.  Repair the ventilation in all restrooms in Suites 100 and 125.
   e.  Remodel the main guard shack including repainting interior and exterior
       walls and replacing flooring and countertop.
   f.  Remodel secondary guard shack near Suite 125 including repainting
       interior and exterior walls and replacing flooring and countertop.
   g.  Recarpet office Suites 100 and 125 with a mutually agreed upon industrial
       grade carpet.
   h.  Replace chain link fence on the exterior side of the office Suites 125 and
       150.
   i.  Repair/replace inoperable dock levelers.
   j.  Repair/replace worn/torn dock seals on west and north end of building.
   k.  Repair/replace inoperable dock doors.

(collectively, the "**Improvements**").  The Improvements are further specified
in **Schedule 1** attached hereto and made a part hereof.  Landlord agrees that
all construction of the Improvements shall be in lien free completion, and
construction undertaken in a good and workmanlike manner and in

DART000068

compliance with all applicable laws and regulations, including obtaining required permits for same. In the event Landlord fails to undertake the work for the Improvements or diligently prosecutes the work to completion, then Tenant may, in its sole discretion, undertake to cause the Improvements to be completed and deduct from the next installment(s) of rent due and payable to Landlord hereunder, all reasonable costs and expenses that Tenant incurred in order to complete the Improvements until Tenant has been reimbursed in full for the costs and expenses it incurred on Landlord's behalf regarding the Improvements.

8.    Solar.  Landlord shall have the right (at Landlord's sole cost and expense) to install solar panels on the roof of the Premises at any time and from time to time, provided same do not impact or interfere with Tenant's operations at the Demised Premises.  Any income procured from any solar installation shall be solely retained by Landlord.

9.    Renewal Option.  Landlord hereby grants to Tenant one - five (5) year option to extend the Term for a period commencing on July1, 2024 and ending June 30, 2029 (the "**Renewal Option Term**").  The Renewal Option Term shall be exercisable on written notice by Tenant to Landlord no later than two hundred ten (210) days prior to the expiration of the then current Extended Term, provided however, that if Tenant shall fail to give any such notice within such two hundred ten (210) day time limit, Tenant's right to exercise such option shall nevertheless continue (not to exceed the expiration of the Extended Term) until thirty (30) days after Landlord shall have given Tenant notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said 30-day period.  It is the intention of the parties to avoid forfeiture of Tenant's right to extend the Renewal Option Term of this Lease through inadvertent failure to give notice thereof within the time limits prescribed.  If Tenant exercises the Renewal Option Term, all references in the Lease to the word "Term" shall also mean the "Renewal Option Term" as the context and circumstances require.

If Tenant exercises the Renewal Option Term, rent to be paid by Tenant under the Lease shall be paid in the time, place and manner as set forth in the Lease at the rate of ninety-eight percent (98%) of the Fair Market Rental Value (as defined below) at the end of the Extended Term.  The Fair Market Rental Value of the Demised Premises at the end of the Extended Term shall be determined by written agreement of Landlord and Tenant.  Should Landlord and Tenant fail to reach an agreement in writing as to the Fair Market Rental Value of the Demised Premises within thirty (30) days after Tenant exercises the Renewal Option Term, the Fair Market Rental Value of the Demised Premises for the Renewal Option Term, shall be estimated by two qualified MAI or SREA real estate appraisers with experience in appraising commercial rental property, one to be appointed and compensated by Tenant and the other to be appointed and compensated by Landlord.  Landlord and Tenant shall appoint such appraisers within fifteen (15) days after the date either party notifies the other that it is unable to reach an

agreement as to the Fair Market Rental Value. If, within thirty (30) days from their appointment, the two appraisers can agree on a Fair Market Rental Value not differing by more than fifteen percent (15%), then an average of the two values shall be used for the Fair Market Rental Value of the Demised Premises. If the two appraisals differ by more than fifteen percent (15%), then the two appraisers shall appoint a third appraiser chosen from a list of three appraisers designated by the National Headquarters of the American Institute of Real Estate Appraisers (or a similar organization, or neutral third party, if the National Headquarters of the American Institute of Real Estate Appraisers is not in existence, or is otherwise unable to provide the list). The fee of the third appraiser shall be split equally by Landlord and Tenant. The three appraisers so appointed shall then, within thirty (30) days of the date the third appraiser is appointed, estimate the Fair Market Rental Value of the Demised Premises. If the appraisers, or a majority of them, cannot agree on the Fair Market Rental Value of the Demised Premises, it shall be determined by adding all three estimates and dividing the total of all three estimates by the number three. The decision of the appraisers, or a majority of them, or the value so determined in the absence of agreement of the appraisers, shall be binding upon the parties, except that Tenant may reject the Fair Market Rental Value by giving notice of such rejection to Landlord within fifteen (15) days after Tenant receives written notice of the determination of such value, provided Tenant reimburses Landlord for its reasonable appraisal costs. The Lease shall thereupon terminate at the later of (i) fifteen (15) days after such notice from Tenant to Landlord, or (ii) at the expiration date of the Extended Term. For purposes hereof, the term Fair Market Rental Value (the "**Fair Market Rental Value**") shall mean that rate charged for space of comparable size and condition in the market area of the Demised Premises, under the market terms, conditions and obligations (exclusive of the amount of the rent) for a term of five (5) years or more beginning on the first day of the Renewal Option Term to a single user tenant, assuming that (x) Landlord has had a reasonable time to locate a tenant who rents with knowledge of the then rental market, and (y) neither Landlord nor such Tenant is under any compulsion to rent, and taking into consideration any relevant factors and considerations in the market place at the time of renewal, including, without limitation:

a.   the location, quality, age and condition of the building located on the Demised Premises;

b.   the Demised Premises will be vacant; and

c.   a standard brokerage commission which Landlord would incur if the Demised Premises were leased to a third party.

Following the determination of the Fair Market Rental Value (unless Tenant exercises its right to reject the Fair Market Rental Value and allow the Lease to terminate in the manner set forth above) the parties shall enter in an agreement establishing the rent to be paid by Tenant during the Renewal Option Term.

DART000070

10.    Brokerage Fee. Upon the mutual execution of this Third Amendment, Landlord (at Landlord's sole cost and expense) agrees to pay Colliers International (Tenant's Broker), a leasing commission equal to 2% of the total base net rental lease consideration for the first 5 years of the Extended Term and 1% of the total base net rental lease consideration for the next 5 years of the Extended Term.

11.    Ratification of the Lease. Except as modified or amended by this Third Amendment, all of the terms, covenants and conditions of the Lease, as amended, are hereby ratified and shall continue and remain in full and effect and are hereby restated and republished.

12.    Authority. Landlord and Tenant each represent and warrant to the other that they have full right, power and authority to enter into this Third Amendment. Landlord further represents and warrants that Landlord does not need the consent of any party, other than Allianz Life Insurance Company of North America, to enter into this Third Amendment.

13.    Capitalized Terms. Capitalized terms used in this Third Amendment are intended to have the meanings ascribed to them in the Lease unless otherwise defined herein.

14.    Successors and Assigns. This Third Amendment shall be binding upon, and shall insure to the benefit of, the successors and assigns of the parties hereto.

15.    Entire Agreement. This Third Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein. There have been no additional oral or written representations or agreements with respect to the matters set forth herein. In case of any inconsistency between the provisions of the Lease and this Third Amendment, the provisions of this Third Amendment shall govern and control.

16.    Time is of the Essence. Time is of the essence for this Third Amendment and the Lease and each provision hereof.

17.    No Presumption Against Drafter. This Third Amendment shall be construed without regard to any presumption or any other rule requiring construction against the party drafting a document. The parties acknowledge that this Third Amendment is the result of negotiations between the parties, and in construing any ambiguity hereunder no presumption shall be made in favor of either party.

18.    Severability. If any provision of this Third Amendment or the application thereof to any person or circumstances is or shall be deemed illegal, invalid, or unenforceable, the remaining provisions hereof shall remain in full force and

DART000071

effect and this Third Amendment shall be interpreted as if such illegal, invalid, or unenforceable provision did not exist herein.

19.    Counterpart Signatures.  This Third Amendment may be executed in any number of counterpart originals, each of which, when taken together, shall be deemed to be one and the same instrument.  Executed copies of this Third Amendment may be delivered between the parties via facsimile or electronic mail and such shall be deemed effective and binding upon the parties the same as if such document was an original.

**IN WITNESS WHEREOF**, the parties hereto have executed this Third Amendment as of the date and year first above written.

"LANDLORD"

**DEDEAUX INLAND EMPIRE PROPERTIES,**
a California partnership

By: _____

Name: _TERRY DEDEAUX_

Its: _MANAGING PARTNER_

"TENANT"

**SEARS LOGISTICS SERVICES, INC.,**
a Delaware corporation

By: _____

James B. Terrell
Vice President, Real Estate

REAL ESTATE
LEGAL

## SCHEDULE 1

### SUPPLEMENT
### IMPROVEMENT WORK AGREEMENT

### PROJECTED IMPROVEMENT WORK COST PROJECTIONS FOR
### 5691 EAST PHILADELPHIA, ONTARIO, CALIFORNIA

| | | |
|---|---|---|
| 1. | Break room and office cabinets, plumbing, electrical, demo, new toilets, HVAC, paint. | $37,285.00 |
| 2. | Flooring in offices Add of $7,000 for moisture membrane below the materials. | $22,740.00 |
| 3. | Guard Shack remodel. | $7,200.00 |
| 4. | Painting of Shell inside and out with offices and site walls. | $238,625.00 |
| 5. | Fencing Repairs- includes core drilling, mesh, and pole straightening. | $10,200.00 |

6.  Truck Docks/Doors

| | | |
|---|---|---|
| Dock Seals | $5,942.00 | |
| Dock door repair | $7,456.00 | |
| Core drilling, mesh, and pole straightening | $120,158.00 | |
| Total for dock work | | $133,556.00 |

**Grand Total**      **$449,606.00**

DART000073

## CONSENT BY MORTGAGEE

**ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA**, a Minnesota corporation (the "Mortgagee"), the current owner and holder of certain obligations secured by that certain Deed of Trust, Security Agreement, Fixture Filing with Absolute Assignment of Rents from DEDEAUX INLAND EMPIRE PROPERTIES, a California limited partnership, ("Owner") dated *7-20-1994* and recorded *7-28-1994* in the land records of *San Bernardino* County, California as Document No. *94-321648* (the "**Mortgage**"), which Mortgage encumbers the Premises, as defined in the Third Amendment to Lease dated *April*, 2014 (copy attached hereto), hereby (i) consents to Owner's execution and delivery of the Third Amendment to Lease to which this Consent by Mortgagee is attached, and (ii) agrees and acknowledges that the lien of the Mortgage is hereby made subject and subordinate to the Third Amendment to Lease.

IN WITNESS WHEREOF, the Mortgagee has executed this Consent by Mortgagee this *8th* day of *May*, 2014.

MORTGAGEE:

ALLIANZ LIFE INSURANCE COMPANY OF
NORTH AMERICA, a Minnesota corporation

By: _____
Its: **PAUL D. WOLTERS**
**ASSISTANT TREASURER**

By: _____
Its: **ERIC J. BERGWALL**
**ASSISTANT TREASURER**

DART000074

# EXHIBIT B

# Distribution Center Deal Terms

## Store #8729 – Ontario, CA

**Revised Occupancy Effective Date:** 4/01/19. Upon the occurrence of these conditions the rent relief provided for in this Amendment will then become effective retroactively and as a credit against future rent.

**Current Gross Rent:** $3,799,573.20

**Revised Gross Rent:** $2,469,722.58

Tenant and Landlord will work to allocate Revised Gross Rent values amongst the Base Rent and NNN expenses within the final definitive Lease Amendment.

**Current Lease Expiration Date**: 6/30/2024

**Revised Lease Expiration Date**: 6/30/2024

**Option(s):** Tenant to be granted one (1) additional three (3) year option at the Revised Gross Rent.  If there are currently Options per the Lease, those Options remain and are pushed out beyond this new additional three year option.

**Assignment/Sublease Clause:** Notwithstanding anything to the contrary contained in the Lease or any Lease Amendment, Landlord and Tenant acknowledge and agree that the Tenant shall have the unemcumbered right, without Landlord consent, to assign or sublease the premises in whole or in part at any time during the term of the lease and any option periods.

**Go Dark Clause/Recapture or Purchase Options:** Notwithstanding anything to the contrary contained in the Lease or any Lease Amendment, Landlord and Tenant acknowledge and agree Tenant shall have the right to cease operations at any time during any term of the lease without any consequences so long as the Tenant continues to pay rent per the terms of the lease.

**Tenant Termination Option:** Notwithstanding anything to the contrary contained in the Lease or any Lease Amendment, Landlord and Tenant acknowledge and agree that the Tenant shall have the right to terminate the Lease for any reason with 120 days notice provided to the Landlord.

**Use Modification:** Notwithstanding anything to the contrary contained in the Lease or any Lease Amendment, Landlord and Tenant acknowledge and agree that the Tenant and/or its successors has the right to use the premises for any lawful use.

**Alterations Modification:** Notwithstanding anything to the contrary contained in the Lease or any Lease Amendment, Landlord and Tenant acknowledge and agree that the Tenant and/or its successors has the right to any non-structuring alterations to the premises without prior written consent of the Landlord.

**Cure Waiver:**  Landlord hereby waives, releases and discharges Tenant and all of its affiliated companies, the Debtors (as defined in the Bankruptcy Proceedings) and their bankruptcy estates, and their respective successors and assigns, from any and all claims, damages, obligations, liabilities, actions and causes of action of every kind and nature whatsoever it may have for any cure payments or other amounts due and owing under the Lease, or that otherwise arose under or in connection with the Lease, through and including October 15, 2018, including but not limited to claims for so-called "stub rent," (whether or not asserted as administrative priority claims pursuant to Section 503(b) of the Bankruptcy Code) whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, now existing or hereafter arising, including any claims and causes of action for damages, payments, or amounts owing or that may become owing pursuant to section 365(b) of the Bankruptcy Code.

*Please sign below confirming the deal terms agreed to so that these terms can be submitted to Sears for approval.*

Name:

_____