Allen G. Kadish
Lance A. Schildkraut
ARCHER & GREINER, P.C.
630 Third Avenue
New York, New York 10017
Tel: (212) 682-4940
Email: akadish@archerlaw.com
        lschildkraut@archerlaw.com

        and

Kenneth M. Florey
M. Neal Smith
ROBBINS, SCHWARTZ, NICHOLAS,
LIFTON & TAYLOR, LTD.
631 E. Boughton Road, Suite 200
Bolingbrook, Illinois 60440
Tel: (630) 929-3639
Email: kflorey@robbins-schwartz.com
        nsmith@robbins-schwartz.com

        and

Matthew T. Gensburg
GENSBURG CALANDRIELLO & KANTER, P.C.
200 West Adams Street, Suite 2425
Chicago, Illinois 60606
Tel: (312) 263-2200
Email: mgensburg@gcklegal.com

*Attorneys for Community Unit School District 300*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————————— ) | | |
| In re: | ) | Chapter 11 |
| | ) | |
| SEARS HOLDINGS CORPORATION, *et al.,* | ) | Case No. 18-23538 (RDD) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ———————————————————— ) | | |

## COMMUNITY UNIT SCHOOL DISTRICT 300'S
## (I) OBJECTION TO DEBTORS' MOTION TO COMPEL
## TURNOVER OF ESTATE PROPERTY, AND (II) REPLY TO
## DEBTORS' OBJECTION TO MOTION OF COMMUNITY
## UNIT SCHOOL DISTRICT 300 FOR RELIEF FROM THE
## AUTOMATIC STAY OR, IN THE ALTERNATIVE, ABSTENTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ii

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     BACKGROUND ........................................................................................ 1

III.    THIS COURT SHOULD LIFT THE AUTOMATIC STAY ......................... 3

IV.     THE COURT SHOULD ABSTAIN FROM HEARING THE DISPUTE. ...... 8

        A.      The Court is required to abstain pursuant to 28 U.S.C. §1334(c)(2). ............... 9

        B.      The Court should abstain pursuant to 28 U.S.C. §1334(c)(1). ........................ 14

V.      SEARS IS NOT ENTITLED TO TURNOVER ............................................ 15

VI.     SEARS IS NOT ENTITLED TO THE EDA FUNDS .................................... 17

        A.      Background on Illinois Property Tax System and Illinois EDA Act .................. 18

        B.      4,250 Full Time Equivalent Sears Jobs Must be Maintained in 2018 ............... 22

        C.      Sears Did Not Maintain 4,250 Full Time Equivalent Jobs in 2018 and
                Therefore is Not Entitled to the EDA Funds ...................................................... 25

                i.      Sears erroneously counts tenants and contractors towards its
                        required number of full-time equivalent jobs ......................................... 26

                        a.      The Illinois EDA Act does not allow for employees of
                                tenants and contractors to be counted ......................................... 26

                        b.      The EDA Agreement does not allow for employees of
                                tenants, contractors and other non-Sears businesses to be
                                counted ....................................................................................... 28

                        c.      Legislative history of the Illinois EDA Act does not allow
                                for employees of tenants, contractors and other non-Sears
                                businesses to be counted ............................................................ 28

                ii.     Sears has not maintained 4,250 full-time equivalent jobs in 2018
                        and is not eligible for the EDA Funds currently held by the
                        Village. ................................................................................................. 30

VII.    CONCLUSION .......................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Anton*,
  145 B.R. 767 (Bankr. E.D.N.Y. 1992) ....................................................................................7

*In re AOG Entertainment, Inc.*,
  569 B.R. 563 (Bankr. S.D.N.Y. 2017) ..............................................................4, 10, 12, 13

*In re Bison Resources, Inc.*,
  230 B.R. 611 (Bankr. N.D. Okla. 1999) ..............................................................................7

*In re Breitburn Energy Partners LP*,
  571 B.R. 59 (Bankr. S.D.N.Y. 2017) .............................................................................6, 7

*In re CIL Limited*,
  582 B.R. 46 (Bankr. S.D.N.Y. 2018) .................................................................................15

*In re CIS Corp.*,
  172 B.R. 748 (S.D.N.Y. 1994) ...........................................................................................16

*Cline v. Kaplan*,
  323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944) ................................................................16

*In re David X. Manners Company Inc.*,
  2018 WL 1997674 (Bankr. D. Conn. April 4, 2018) ...........................................................8

*Executive Benefits Ins. Agency v. Arkison (In re Bellingham Insurance Agency, Inc.)*,
  -- U.S. --, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014) ..........................................................13

*In re Fairfield Sentry Ltd. Litig.*,
  458 B.R. 665 (S.D.N.Y. 2011) .....................................................................................10, 11

*Geron v. Peebler (In re Pali Holdings, Inc.)*,
  488 B.R. 841 (Bankr. S.D.N.Y. 2013) .....................................................................11, 16, 17

*Halper v. Halper*,
  162 F.3d 830 (3d Cir. 1999) ................................................................................................9

*Harrison v. Chamberlin*,
  271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897 (1926) ............................................................17

*Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*,
  198 B.R. 45 (S.D.N.Y. 1996) .............................................................................................16

*J.T. Moran Fin. Corp. v. American Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.)*,
    124 B.R. 931 (S.D.N.Y. 1991) ................................................................................16

*In re Kessler*,
    430 B.R. 155 (Bankr. M.D. Pa.2010) .......................................................10, 14, 15

*LFD Operating, Inc. v. Gen. Elec. Capital Corp.(In re Ames Dep't Stores, Inc.)*,
    2008 WL 7542200 (S.D.N.Y. June 4, 2008), *aff'd*, 319 Fed.Appx. 40 (2d Cir. 2009) .............9

*In re Lyondell Chemical Company*,
    402 B.R. 596 (Bankr. S.D.N.Y. 2009) ................................................................5, 6

*Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ............................................11

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993) ....................................................................................12

*Parmalat Capital Fin. Ltd. b. Bank of Am. Corp.*,
    639 F.3d 572, 582 (2d Cir.2011) ...........................................................................12

*In re Project Orange Associates, LLC*,
    432 B.R. 89 (Bankr. S.D.N.Y. 2010) ................................................................4, 6, 7

*Quackenbush v. Allstate Ins. Co.*,
    517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) ...........................................12

*In re SCO Group, Inc.*,
    395 B.R. 852 (Bankr. D. Del. 2007) .........................................................................5

*In re Soundview Elite Ltd.*,
    543 B.R. 78 (Bankr. S.D.N.Y. 2016) ......................................................................10

*In re Teligent, Inc.*,
    325 B.R. 134 (Bankr. S.D.N.Y. 2005) ....................................................................11

*U.S. v. Inslaw, Inc.*,
    932 F.2d 1467 (D.C. Cir. 1991),
    *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992) ....................................15

*In re Veluchamy*,
    879 F.3d 808 (7th Cir. 2018) ..................................................................................15

*Weiner's, Inc. v. T.G. & Y. Stores Co.*,
    191 B.R. 30 (S.D.N.Y. 1996) ..................................................................................16

*In re Willis*,
    2014 WL 2890429 (Bankr.D.Colo. June 25, 2014.) ...............................................14

**State Cases**

*Krohe v. City of Bloomington*,
    204 Ill.2d 392 (2003) ...................................................................................29

*Madison Two Associates v. Pappas*,
    227 Ill.2d 474 (2008) ...................................................................................18

*People v. 1946 Buick, VIN 34423520*,
    127 Ill.2d 374 (1989) ...................................................................................27

*People v. Donoho*,
    204 Ill.2d 159 (2003) ...................................................................................26

*People v. Jones*,
    214 Ill.2d 197 (2005) ...................................................................................26

*People v. McClure*,
    218 Ill.2d 375 (2006) .............................................................................26, 29

*Prazen v. Shoop*,
    2013 IL 115035 (2013) ................................................................................29

**Federal Statutes**

11 U.S.C. § 362....................................................................................................4

11 U.S.C. § 542.............................................................................2, 10, 11, 15, 16, 17

28 U.S.C. § 157.............................................................................................9, 13

28 U.S.C. §158...................................................................................................9

28 U.S.C. § 1134..............................................................................2, 4, 8, 9, 14, 15, 33

**State Statutes**

20 ILCS § 620/4(e) ......................................................................................21, 27

20 ILCS § 620/4(g) ..........................................................................................19

20 ILCS § 620/4.5(b) ................................................................................18, 20, 21

20 ILCS § 620/2(c) .............................................................................................6

35 ILCS § 200/1-1, *et seq.* ..................................................................................24

35 ILCS § 200/1-115 ........................................................................................24

35 ILCS § 200/15-172 ...............................................................................................................24

105 ILCS § 5/1-1, *et seq.* ...........................................................................................................1

20 ILCS § 620/1, *et seq.* .............................................................................................................2

35 ILCS § 10/1, *et seq.* ..............................................................................................................27

**Rules**

Fed. R. Bankr. P. 7001 .............................................................................................................15

**Other Authorities**

H.R.Rep. No. 95-595 ...................................................................................................................4

S.Rep. No. 95-989.........................................................................................................................4

COMMUNITY UNIT SCHOOL DISTRICT 300, an Illinois school district existing and operating pursuant to the Illinois School Code, 105 Illinois Compiled Statutes ("**ILCS**") § 5/1-1, *et seq.* (the "**School District**"), a party in interest to this case, by and through its attorneys, Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., Gensburg Calandriello & Kanter, P.C., and Archer & Greiner, P.C., for its (i) objection to the *Debtors' Motion to Compel Turnover of Estate Property* [Dkt. No. 2715] (the "**Motion to Compel**"), and (ii) reply to the Debtors' Objection [Dkt. No. 1280] to the School District's *Motion for Relief from the Automatic Stay or, in the Alternative, for Abstention* [Dkt. No. 652] (the "**Motion to Lift Stay**"), states as follows:

## I.    PRELIMINARY STATEMENT

This response addresses the following three issues relevant to both the School District's Motion to Lift Stay and the Debtors' Motion to Compel: (i) that the automatic stay should be lifted so the Illinois Court can interpret and apply the unique single purpose tax incentive statute at issue; (ii) that this Court should abstain in favor of the Illinois Court; and (iii) that as a substantive matter, the relief sought by the Debtors in the Motion to Compel and in the objection to the Motion to Lift Stay must be denied because Sears does not qualify for the tax rebate under the special tax incentive act.

## II.    BACKGROUND

On November 12, 2018, the School District filed the Motion to Lift Stay.  With that motion, the School District seeks to modify the automatic stay so that it can continue prosecuting a pending action against the Village of Hoffman Estates, Illinois (the "**Village**") and Sears Holdings Corporation (the "**Debtor**" or "**Sears**") in the Circuit Court of Cook County in the State of Illinois, Case No. 2018 CH 12683 (the **"Illinois Action"**).  In the Illinois Action, the School District is seeking to enjoin a ten million dollar ($10,000,000) tax subsidy payment, which are the same funds sought by Sears via the Motion to Compel, to the Debtor made under the Economic Development

1

Area and Tax Increment Allocation Act, 20 ILCS § 620/1, *et seq.* (the "**Illinois EDA Act**").  The School District asserts that Sears failed to maintain 4,250 full-time equivalent jobs at its corporate headquarters in the Village during calendar year 2018, a statutory and contractual prerequisite for the tax rebate.  As an alternative to modifying the automatic stay, the School District requests that the Court abstain from hearing the matters in dispute in the Illinois Action pursuant to 28 U.S.C. §§ 1334(c)(1) and (2).

On February 28, 2019, the Debtor filed its Motion to Compel.  Filed pursuant to Section 542(a) of the Bankruptcy Code, the Debtor seeks an order from this Court directing the Village to turn over the same taxes at issue in the Illinois Action, alleging that the Debtor has created and maintained the requisite 4,250 full-time equivalent jobs at its corporate headquarters in the Village. In the Motion to Compel, the Debtor alleges (1) the relevant year in which its compliance needs to be measured is 2017, not 2018, as alleged by the School District, and (2) critically and contrary to the plain language of the Illinois EDA Act and the practice of the Village and Sears for the past seven years, that the Debtor can count the full-time equivalent jobs created and maintained by tenants and contractors of the Debtor and extraordinarily other retail and service businesses simply located within the economic development area.

Put simply, it is uncontested that if Sears is required to meet the jobs prerequisites created by the Illinois EDA Act based on 2018 data, rather than 2017 data, or is unable to take credit for the full-time equivalent jobs created and maintained by the tenants, outside contractors, and other retail and service businesses in the economic development area, then Sears will fail to meet the prerequisites of the Illinois EDA Act and, therefore, will have no right to the $10 million tax subsidy at issue (the "**EDA Funds**").

### III.    THIS COURT SHOULD LIFT THE AUTOMATIC STAY

On December 17, 2018, Sears filed its objection to the Motion to Lift Stay.  With this objection, Sears notes that the automatic stay is designed to give debtors such as Sears time "to organize its affairs," but then files a motion to compel turnover, seeking judicial resolution of the exact issues raised in the Illinois Action, filed five months earlier.  Sears recognizes the existence of the *Sonnax* factors, but improperly evaluates them on the fallacious premise that the School District is simply seeking to resolve an unsecured claim, with a goal of obtaining a distributive advantage.  Ultimately, Sears takes positions fundamentally at odds with one another, and has consciously ignored the unique public policy and comity issues which pervade this particular dispute.

With respect to the first *Sonnax* factor, Sears states that lifting the automatic stay will not result in a complete resolution of the issues, because "[t]he School District Litigation is in its infancy." (¶ 14).  In doing so, Sears provides a response which has no correlation to the inquiry.  The procedural stage of the Illinois Action has no relevancy to the question of whether, if allowed to proceed, it would completely resolve the matters in dispute.  Similarly, Sears states that modifying the automatic stay to allow the Illinois Action to proceed risks the occurrence of "protracted litigation."  Sears provides no evidence to support this conclusion but, nonetheless, then contradicts its position by stating that the factual issues underlying the Illinois Action are "straightforward."  Regardless, both positions are also unresponsive to the inquiry made in *Sonnax* factor 1.  Given the declaratory relief sought in the Illinois Action, there can be no dispute that its continuation will result in a complete resolution of the underlying question of whether Sears has any interest in the EDA Funds held by the Village.

With respect to the second *Sonnax* factor, Sears states that lifting the automatic stay will interfere with its bankruptcy case.  Sears tries to explain that the automatic stay is meant to shield

3

debtors from creditor harassment and litigation in a "multitude" of forums.  However, Sears

ignores that the legislative history of Section 362(d)(1) reveals that Congress intended "that one

of the factors to consider when determining whether to modify the stay is whether doing so would

permit pending litigation involving the debtor to continue in a nonbankruptcy forum," as "[i]t will

often be more appropriate to permit proceedings to continue in their place of origin, where no great

prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum

and to relieve the bankruptcy court form duties that may be handled elsewhere." H.R.Rep. No. 95-

595, at 5963, 6297; S.Rep. No. 95-989, at 50 (1978), U.S. Cong. & Admin. News 1978, at. 5787,

5836; *In re Project Orange Associates, LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010).  Similarly,

federal courts abstain out of deference to the paramount interests of another sovereign and concerns

with respect to principles of comity and federalism.  *In re AOG Entertainment, Inc.*, 569 B.R. 563,

573 (Bankr. S.D.N.Y. 2017).  Here, there is not federal jurisdiction over this state law action other

than 28 U.S.C. §1334, and it would be appropriate to allow the Illinois state courts to interpret

their own legislation.

    With respect to this second factor, Sears fails to detail any prejudice, let alone "great

prejudice," which might arise from a modification of the automatic stay.  Rather, it summarily

states that continuation of the Illinois Action will distract it from operating its business, and

planning for a successful strategy of maximizing value for creditors.  Yet its Motion to Compel

belies this response.  Almost four months after the School District filed its Motion to Lift Stay,

Sears now admits that this issue needs to be resolved, adding that turnover of the EDA Funds

"would be highly consequential for Debtors." (Motion to Compel ¶ 29).  This inconsistency,

among others, can only be reconciled with the unexplained conclusion that resolving Sears's

entitlement to the EDA Funds before the Bankruptcy Court will not distract Sears from its

operations, while doing so in Illinois will.  Yet, the logic of this argument is negated by the fact that Sears's corporate headquarters, its officers and corporate employees (leased or otherwise) as well as its very books and records (including those related to its alleged compliance with the Illinois EDA Act) are all located in Illinois.  The very full-time equivalent jobs which Sears is required to create and maintain, of course, must exist and reside in Illinois.  Illinois state courts are not foreign courts for Sears, and while an evidentiary hearing might require attendance of Sears officers or employees, Illinois courts arguably provide the most convenient forum for Sears, and will certainly not harm the estate, let alone cause Sears "great prejudice."  *See In re SCO Group, Inc.*, 395 B.R. 852, 858 (Bankr. D. Del. 2007).

Sears argues that the third *Sonnax* factor supports denying the School District's motion, because bankruptcy courts regularly determine matters of state law.  While there is no doubt that this Court, like other federal courts, determines issues under state law on a regular basis, the School District respectfully submits that under the facts of this case, Illinois courts will be materially better equipped to construe the Illinois EDA Act and have a greater interest in doing so.  *See In re Lyondell Chemical Company*, 402 B.R. 596, 609 (Bankr. S.D.N.Y. 2009).  The matters in dispute will require a court to interpret, clarify and otherwise expound on the Illinois EDA Act, social and economic legislation with respect to which no case law exists and are matters of first impression in Illinois.  Sears states that the disputes are straightforward, but a brief review the Illinois EDA Act reveals that there may be more complexity in interpreting the statute than Sears admits, including undecided questions involving Sears's entitlement to count the full-time equivalent jobs created by tenants and contractors, and determining the relevant taxing year in which Sears's full-time equivalent jobs must be calculated.  Given the nature of the controversy, the constituents large

and small who will be impacted, deference and mutual respect suggests that Illinois courts should take the lead in deciding these issues.  *See Lyondell*, 402 B.R. at 609.

The Illinois EDA Act and EDA Agreement are not simply commercial contracts of interest to nobody other than the parties to that particular agreement.  Rather, the Illinois EDA Act, and its implementing EDA Agreement, are forms of economic and social legislation designed to "protect against the economic burdens associated with the loss of job opportunities, the consequent spread of economic stagnation and the resulting harm to the tax base of the State * * * [which] can best be provided by promoting, attracting, stimulating, retaining and revitalizing industry, manufacturing, and commence within the State." 20 ILCS § 620/2(c) (legislative declaration of public purpose).  The legislation is structured to increase employment in a targeted economic area by diverting and rebating real estate taxes from communities and taxing districts that would otherwise be entitled to the funds, impacting not merely the 20,000 students in Community Unit School District 300, but all residents who live or are served by the affected taxing authorities.  The job prerequisite of 4,250 full-time equivalent jobs which Sears was and is required to create and maintain is the socio-economic benefit paid for through the tax rebates.  Illinois courts have an obvious expertise in Illinois law, and even if they do not have the very specialized expertise that an administrative agency would, given the public nature of the matters at issue, its potential impact on the local residents at large, and the fact that the legislation has yet to be interpreted, Illinois courts should have a first say on its construction.

The ultimate burden of persuasion rests with Sears to show an absence of "cause" to modify the stay.  *See Project Orange,* 432 B.R. at 103; *In re Breitburn Energy Partners LP,* 571 B.R. 59, 65 (Bankr. S.D.N.Y. 2017).  Sears has failed to show that any "great prejudice to the bankruptcy estate would result" if the automatic stay were modified to allow the Illinois Action to proceed.

6

As noted, while unsettled, Sears argues that the issues are straightforward.  If this is accurate, then

it is just a matter of making legal arguments in the Illinois Action and then responding to the ruling.

If factual issues need to be resolved, Sears will presumably use the same witnesses in the Illinois

Action as it would before this Court.   And although Sears will clearly incur some expense in

defending its rights to the EDA Funds, there is no evidence that such expenses would be any greater

than in litigating the claim in the Illinois Action.   Anyway, "[t]he costs of defending litigation, by

itself, has not been regarded as constituting 'great prejudice' precluding relief from the automatic

stay." *In re Anton*, 145 B.R. 767, 770 (Bankr. E.D.N.Y. 1992); *Project Orange,* 432 B.R. at 106

("[w]hile the costs of defense is a factor to be considered, that factor, standing alone, is ordinarily

insufficient reason to deny relief from the automatic stay") (*quoting In re Bison Resources, Inc.*,

230 B.R. 611, 616-17 (Bankr. N.D. Okla. 1999)).

Sears states that modifying the automatic stay to allow the Illinois Action to proceed will

prejudice creditors because "it would further dilute the unsecured claims pool and encourage other

prepetition creditors to seek stay relief and litigate their claims prematurely in courts around the

country."   However, the fact that the School District might have a claim which dilutes the

unsecured pool is not the type of prejudice contemplated by *Sonnax*.   In *Breitburn*, the court

refused to modify the automatic stay to allow tort claims to proceed, noting that "[f]orcing the

Debtors to bear the costs and disruption involved in liquidating these unsecured claims before

knowing what distribution will be made to unsecured creditors unnecessarily interferes with the

bankruptcy case and prejudices the unsecured creditors."  *Breitburn*, 571 B.R. at 68.  If Sears's

argument is that the School District's motion prejudices creditors by forcing "premature" litigation

of the School District's claims, the argument loses any validity with the Motion to Compel which

results in this same outcome.  With the Motion to Compel, the issue is not *when* to determine

7

whether Sears has breached its obligations under the Illinois EDA Act, but *where* that determination should be made.  And no evidence exists which suggests that the creditors of this estate have a sufficient legitimate interest in resolving these non-core issues in this Court as opposed to the Illinois Court.

As was noted in *In re David X. Manners Company Inc.,* 2018 WL 1997674 (Bankr. D. Conn. April 4, 2018), any risk to creditors here can be addressed by limiting the scope of stay relief.  The School District seeks to simply resolve the issue of whether Sears has complied with the prerequisites of the Illinois EDA Act and the Economic Development Agreement in the Illinois Action, and if that state court finds that Sears has failed to do so, determine when that failure first occurred.  The School District will then come back before this Court to determine the nature and extent of any remedies it may have as a result of Sears's failure.

In weighing the impact of the stay on the parties and balancing the harms, the School District submits that the stay presently impedes the administration of this bankruptcy estate, a fact the Debtors appear to admit with the Turnover Motion.  Any harms to the parties would be materially outweighed by the resolution of issues germane to the advancement of this case.  This Court should allow the Illinois state courts to determine whether Sears has complied with the Illinois EDA Act and Economic Development Agreement.  Following the disposition of these issues, the parties should return to this Court to determine the appropriate remedy under bankruptcy law.

## IV.    THE COURT SHOULD ABSTAIN FROM HEARING THE DISPUTE

As an alternative to its request that the Court modify the automatic stay, the School District in its Motion to Lift Stay also requested the Court to abstain from hearing the underlying state law disputes, pursuant to 28 U.S.C. §§ 1134(c)(1) and/or (2).  The Debtors filed objections to this request, with the objections to the Motion to Lift Stay.  The Debtors stated that the abstention was

8

"premature" because the Debtors had not removed any state causes of action to the Federal Court. Whether that argument was valid when made, it lost its validity because the pending Motion to Compel replicates issues raised in the Illinois Action. Therefore, the School District renews its request that the Court abstain, incorporates its arguments made in the Motion to Lift Stay, and briefly addresses the few specific arguments made thereto in the Debtors' objection.

### A.    The Court is required to abstain pursuant to 28 U.S.C. § 1334(c)(2)

The Debtors only raised one objection, and suggested a second, to the School District's argument that mandatory abstention applies, pursuant to 28 U.S.C. §1334(c)(2). First, the Debtors stated that the underlying issues raised in the Motion to Lift Stay, and now in the Motion to Compel, are core matters under 28 U.S.C. §157(b)(2)(A) (matters concerning the administration of the estate) and 28 U.S.C. §157(b)(2)(E) (orders to turn over property of the estate), precluding mandatory abstention. However, the matters at issue, whether improperly raised in the context of a turnover request, or otherwise, are issues based solely on state law, and do not fall with this Court's "arising in" or "arising under" jurisdiction. At best the issues are non-core matters related to the bankruptcies, with respect to which the Court will be limited to making proposed findings of fact and conclusions of law to the district court.

28 U.S.C. §157(b)(2) sets forth a non-exclusive list of core proceedings. Nevertheless, 28 U.S.C. § 158(b) provides no precise definition of a "core" proceeding, and the Section 157(b)(2) list, at best, only "provides an illustrative list of proceedings that *may* be considered 'core'" *Halper v. Halper,* 162 F.3d 830, 836 (3d Cir. 1999) (emphasis added). *See also LFD Operating, Inc. v. Gen. Elec. Capital Corp.(In re Ames Dep't Stores, Inc.),* 2008 WL 7542200, at *6 (S.D.N.Y. June 4, 2008), *aff'd*, 319 Fed. Appx. 40 (2d Cir. 2009) ("The determination of whether a particular proceeding is core or non-core cannot be made by simply consulting that list."). Rather "[w]hether a claim is core or non-core is determined on a 'case-by-case basis by evaluating both the form and

the substance of the particular proceeding.'" *In re Fairfield Sentry Ltd. Litig.,* 458 B.R. 665, 675 (S.D.N.Y. 2011) (*quoting Ames*, 2008 WL 7542200, at *6). Proceedings are core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function. *In re AOG Entertainment, Inc.*, 569 B.R. 563, 574 (Bankr.S.D.N.Y.2017). Non-core proceedings involve claims that do not arise in a bankruptcy case or arise under the Bankruptcy Code, but the outcome of which may have a "conceivable effect" on the bankruptcy case.

The matters at issue between the Village, Sears and the School District solely involve the Illinois EDA Act and the EDA, and only implicate state law claims. The proceeding does not entail substantive rights provided by Title 11. Nonetheless, the Debtors argue that the issues raised in the Motion to Lift Stay and Motion to Compel arise in the context of a bankruptcy case because, dependent on the outcome, they may establish whether assets are property of the estate. Case law does not support this argument. A true core proceeding can *only* arise in context of a bankruptcy case. *In re Kessler*, 430 B.R. 155, 162 (Bankr. M.D. Pa. 2010), and Sears' bankruptcy filing has not given rise to this dispute. If an order for relief had never been entered, the dispute would still exist, and the parties would simply adjudicate Sears's entitlement to the EDA Funds in an appropriate state forum, which was, in fact, filed pre-petition. The matters at issue are non-core.

The Motion to Compel does not change this outcome. Section 542 contains two substantive provisions. Under Section 542(a), a trustee may compel the turnover of property that the trustee can use, sell, or lease. Described, in substance, as a federal right of replevin, it is a right to recover the estate's property in kind, with the ability to obtain the value of the estate's property as a substitute. *In re Soundview Elite Ltd.*, 543 B.R. 78 (Bankr. S.D.N.Y. 2016). Under Section 542(b)

the trustee can seek the turnover of debts, and monetize a receivable that is property of the estate. *Id.* at 97. Significantly, however, Section 542 is used to recover possession, not title.

The Debtor ignores this case law through a footnote stating that "post-*Stern* decisions have overwhelmingly held that bankruptcy judges can constitutionally enter final judgments in turnover actions," *citing Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 849-50 (Bankr. S.D.N.Y. 2013). This basic proposition is not disputed. *Pali Holdings* notes that where the turnover power is properly invoked, it is simply an effort to recover property that is already property of the estate. In that situation, the court is simply exercising its *in rem* jurisdiction over the bankruptcy *res.* But the Debtor disregards that *Pali Holdings* went on to distinguish the situation where there is a significant dispute regarding ownership or entitlement to the property at issue. In doing so, the court recognized that "the turnover power can be improperly invoked, especially when it is used as a Trojan Horse for bringing garden variety contract claims; when the property in question is not already property of the estate; or when the turnover statute is used to recover assets with disputed title when the estate's claim of ownership is legitimately debatable." *Id.* at 851. In these latter situations, "[i]t is well established that the turnover power may not be used for such purposes." *Id.* Stated another way, an action for turnover of property is core when its purpose is the collection, rather than the creation, recognition or liquidation of a matured debt." *Fairfield Sentry,* 458 B.R. at 683. Such latter actions are non-core, and to allow them to proceed under Section 542 is "to transform a garden-variety pre-petition common law cause of action into a core proceeding [which] would eviscerate the Supreme Court's holding in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and permit the bankruptcy court to exercise the type of judicial power reserved for an Article III court." *In re Teligent, Inc.,* 325 B.R. 134, 138 (Bankr. S.D.N.Y. 2005); *see Orion Pictures Corp. v.*

11

*Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1102 (2d Cir. 1993) (treating an action to collect a disputed pre-petition account receivable as "core" "creates an exemption to *Marathon* that would swallow the rule").

Second, Sears argued that the School District failed to satisfy the sixth element for mandatory abstention, *i.e.*, whether the Illinois Action "can be timely adjudicated in the Illinois Court." This argument is also faulty. First, *Parmalat Capital Fin. Ltd. Bank of Am. Corp.,* 639 F.3d 572, 582 (2d Cir. 2011), states that "particularly in the context of removal, where any doubts are to be resolved against removability, the burden should be on defendants to prove that the state court *cannot* adjudicate the claims in a *timely* manner." (emphasis in original). Sears has failed to meet that burden. Further, *AOG Entertainment* noted that because federal courts abstain out of deference to the paramount interests of another sovereign and given concerns with respect to principles of comity and federalism, "[a]bsent contrary evidence, a federal court must presume that a state court will operate efficiently and effectively in adjudicating the matters before it." *AOG Entertainment*, 569 B.R. at 573 (*quoting Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 723, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996)).

Further, the Debtors suggest that timeliness requires a determination as to which court can "resolve the dispute in a more timely fashion" (¶ 28), *i.e.*, some sort of judicial race. However, as noted in *AOG Entertainment*, "[t]he inquiry does not turn exclusively on whether an action could be adjudicated most quickly in state court." *Id.* at 579. Rather, it is informed by the status of the "related to" bankruptcy case, *i.e.*, "a court must consider whether the litigants in a state proceeding need the state law claims to be quickly resolved as a result of the status of the ongoing title 11 bankruptcy proceeding." *Id.* at 580. If the lawsuit will not prolong the administration of the bankruptcy case, it supports the position that it can be timely adjudicated in state court. *Id.* (citation

omitted).  "Thus, a state court may be a 'timely' forum, even if it requires longer to adjudicate an action than a federal court, as long as the relevant bankruptcy proceedings will not be hindered by the relative delay." *AOG Entertainment*, 569 B.R. at 580.  The Sears bankruptcy was filed approximately five months ago, no plan has been filed, the bar date has not passed, and Sears has already sold most of its operating assets.  There is no reason to believe that the Illinois Action will unduly prolong the administration of this case.

Further, case analytics for the Circuit Court in Cook County, Illinois do not suggest there will be undue delay.  In civil actions, 81% of motions filed are resolved within 30 days.[1]  The caseload in the Illinois state courts has dropped by approximately 800,000 cases between 2012 and 2017 (the last reporting period),[2] and the clearance rate for civil actions in Cook County courts was 94.3% in 2017, but averaged at 111.5% over the last five years.[3]

Finally, given that the matters at issue are non-core related proceedings, the court cannot issue a final judgment and order.  Instead, the Court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected."  28 U.S.C. §157(c).  *See also Executive Benefits Ins. Agency v. Arkison (In re Bellingham Insurance Agency, Inc.)*, -- U.S. --, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014).  Delay naturally arises from this process, suggesting, to the extent the relative speed of the state and federal court is relevant, that resolution might be more expedient in the state court.

---

[1] THOMSON REUTERS WESTLAW EDGE, Litigation Analytics for Circuit Court of Illinois, Motion Analytics: Case Type – Time to Rule.
[2] Annual Report of the Illinois Courts: Statistical Summary – 2017, Compiled and Published by the Administrative Office of the Illinois Courts, Pg 9 Circuit Courts of Illinois, Five-Year Trends Chart.
[3] Annual Report of the Illinois Courts: Statistical Summary – 2017, Compiled and Published by the Administrative Office of the Illinois Courts, Pg 16: Clearance Rates by Circuit.

### B.    The Court should abstain pursuant to 28 U.S.C. §1334(c)(1)

Even if the court is not required to abstain pursuant to the mandatory abstention provisions of 28 U.S.C. §1334(c)(2), it should determine that abstention is appropriate under the permissive provisions of 28 U.S.C. §1334(c)(1).  Section 1334(c)(1) provides the Court with the discretion to abstain from hearing non-core matters.  Where a bankruptcy court is not required to abstain, it may use its discretion to do so where its interest in hearing the matter is outweighed by other factors. The factors often considered were outlined in the Motion to Lift Stay (¶ 31), and commented upon in the Debtors' objection.

In this case, the discretionary abstention factors favor abstention.  First, there is no basis for federal jurisdiction over this state law action other than 28 U.S.C. §1334, and it is generally held that discretionary abstention is appropriate it when serves the interest of comity or respect for state law. *Kessler,* 430 B.R. at 167 ("comity is a significant consideration in permissive abstention"); *In re Willis,* 2014 WL 2890429, at *4 (Bankr. D. Colo. June 25, 2014.)  As has been noted, the state law issues do not only predominate, but they are the <u>only</u> issues in these proceedings, as the outstanding disputes will be determined entirely in accordance with Illinois state law.  Moreover, the matters in dispute will require a court to interpret, clarify and otherwise expound on the Illinois EDA Act, legislation respect to which no case law exists.  These proceedings involve unsettled matters of statutory construction and will be matters of first impression regarding a piece of important social and economic legislation within the State of Illinois.  An Illinois court should resolve these disputes.

Further, the School District is willing to limit the Illinois Action to only resolving whether Sears has complied with the prerequisites of the Illinois EDA Act and the EDA, and if it failed to meet those requirements, determine when that event occurred.  The School District will then come back before this Court to determine the nature and extent of the School District's resulting claim

14

and remedies. Therefore, although the issues might affect property of the estate, the mere impact on the estate is not enough to change these issues from ones involving purely state law to a mix of state and federal bankruptcy law. *Kessler,* 430 B.R. at 166-67. This Court should abstain under 28 U.S.C §1334(c)(1).

## V.    SEARS IS NOT ENTITLED TO TURNOVER

If the Court denies the School District's Motion to Lift Stay, and determines that mandatory abstention is not applicable and that it will not permissively abstain, then the issue is whether Sears is entitled to the relief under the Motion to Compel. Sears filed the Motion to Compel as a contested matter even though Rule 7001 of the Bankruptcy Rules provides that an action against a third party for turnover pursuant to Section 542 is brought by an adversary proceeding. Notwithstanding, if the Court decides to hear the Motion to Compel, the School District has agreed not to insist upon treating the Motion to Compel under the adversary proceeding rule.

A more fundamental problem with the Motion to Compel is that it improperly seeks turnover of funds under Section 542, when entitlement to those funds is a matter of intense dispute. Section 542 contains two substantive provisions. Section 542 cannot be used to adjudicate a debtor's underlying rights in property when those rights are in dispute. *In re Veluchamy*, 879 F.3d 808, 816 (7th Cir. 2018); *see In re CIL Limited,* 582 B.R. 46, 116 (Bankr. S.D.N.Y. 2018) (Section 542 applies only to property that belongs to the estate). As a result, *CIL* recognized that "Congress envisioned the turnover provision of §542 of the Code * * * to apply to tangible property and money due to the debtor without dispute which are fully matured and payable on demand. Thus, '[i]t is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute'" *CIL,* 582 B.R. at 116 (*quoting U.S. v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992)). *See also Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re*

*Seatrain Lines, Inc.),* 198 B.R. 45, 50 n. 7 (S.D.N.Y. 1996) ("It is settled law that the debtor cannot

use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title

is in dispute") (Sotomayor, J.) (*quoting Inslaw,* 932 F.2d at 1472; *Weiner's, Inc. v. T.G. & Y. Stores*

*Co.,* 191 B.R. 30, 32 (S.D.N.Y. 1996) ("an action to determine the amount of a claimed debt to the

estate that is, as yet, wholly disputed and unliquidated cannot properly be styled an action to

'turnover' estate 'property'")); *In re CIS Corp.,* 172 B.R. 748, 760 (S.D.N.Y. 1994) (the language

of Section 542(b) creates "a strong textual inference that an action should be regarded as a turnover

only when there is no legitimate dispute over what is owed to the debtor"); *J.T. Moran Fin. Corp.*

*v. American Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.*), 124 B.R. 931, 938 (S.D.N.Y. 1991)

("Where, as here, the court must resolve whether or not the debt claimed is due, the action to

collect the disputed funds cannot be regarded as a turnover proceeding under the core jurisdiction

of the bankruptcy court") (report and recommendation of Schwartzberg, J.).

Therefore, in evaluating whether turnover relief is warranted, the Court must evaluate

whether the Debtor's alleged entitlement to a tax rebate under the Illinois EDA Act and EDA

Agreement is subject to dispute. *Pali Holdings*, 488 B.R. at 849-50, allowed the trustee to proceed

with his turnover action, determining that the defenses raised thereto were "frivolous." *Id.* at 842.

In doing so, the court provided an analytical framework for evaluating that dispute:

> Under the 1898 Act, if the property was not in the court's possession and a third
> person asserted a bona fide claim adverse to the trustee, the third party had the right
> to have the merits of his claim adjudicated in a plenary lawsuit. *See Cline v.*
> *Kaplan,* 323 U.S. 97, 98, 65 S.Ct. 155, 89 L.Ed. 97 (1944). But "the mere assertion
> of an adverse claim [would] not oust a court of bankruptcy of its jurisdiction." *Id.*
> at 99. 65 S.Ct.155. Rather, the bankruptcy court had "both the power and the duty
> to examine a claim adverse to the bankrupt estate to the extent of ascertaining
> whether the claim is ingenuous and substantial." *Id.* Only once it was established
> that the claim was not colorable nor frivolous did the claimant have the right to
> have the merits of his claim passed on in a plenary suit and not summarily. *Id.* at
> 99.

Quoting from *Harrison v. Chamberlin*, 271 U.S. 191, 194, 46 S.Ct. 467, 70 L.Ed. 897 (1926), *Pali Holdings* similarly noted that:

> The court is not ousted of its jurisdiction by the mere assertion of an adverse claim; but, *having the power in the first instance to determine whether it has jurisdiction to proceed, the court may enter upon a preliminary inquiry to determine whether the adverse claim is real and substantial* or merely colorable. And *if found to be merely colorable the court may then proceed to adjudicate the merits summarily;* but if found to be real and substantial it must decline to determine the merits and dismiss the summary proceeding.

As noted below, and based on only the limited discovery completed to date, the evidence clearly shows that the Debtor is not entitled to the EDA Funds. Sears failed to live up to the prerequisite that it create and/or maintain 4,250 jobs at its corporate headquarters located in the Village of Hoffman Estates, Illinois. Sears seeks to avoid this outcome through a notional interpretation of the Illinois EDA Act and EDA Agreement, which would allegedly allow it to count not only Sears employees, but also those of its tenants, contractors and other retail and service businesses within the entire EDA District. Moreover, Sears fumbles the distribution formula by suggesting that taxes paid in 2017 are rebated in 2018 based on 2017 employee counts. Sears is not entitled to the EDA Funds held by the Village, and the School District's objections are far from frivolous. The Debtors are not entitled to proceed under Section 542.

## VI.    SEARS IS NOT ENTITLED TO THE EDA FUNDS

The Illinois EDA Act, as properly understood and as previously applied by Sears and the Village for the seven years since the Illinois EDA extension has been in existence, requires Sears to have 4,250 full-time equivalent jobs at its corporate office in Hoffman Estates during calendar year 2018 in order to be eligible to claim the funds which are at issue in both the Illinois Action and the Motion to Compel (the "**EDA Funds**").[4] To date, Sears has refused to provide in discovery

---

[4] The School District has standing in this case because Section 4.5 of the Illinois EDA Act gives it to the School District and the School District is an intended third-party beneficiary to the Development Agreement entered into

any jobs data for 2018. Without proving it maintained 4,250 jobs in 2018, Sears has no claim to the EDA Funds.

In attempting to satisfy the prerequisite of 4,250 full-time equivalent jobs, Sears now extraordinarily counts not only Sears employees, but also improperly counts employees of tenants, contractors and other retail and service businesses located in the EDA District  As noted below, the Illinois General Assembly enacted the Illinois EDA Act as part of a package of incentives to encourage Sears to keep its corporate headquarters in Hoffman Estates, Illinois and to require Sears, and not any other non-Sears employer which receives no tax subsidy, to maintain 4,250 jobs.

As the burden of proof is on Sears to demonstrate its eligibility to the EDA Funds, Sears's failure to meet this burden defeats its claim to those funds

### A.    Background on Illinois Property Tax System and Illinois EDA Act

The basic timing of the Illinois property tax system, which is relevant for the existing dispute, is as follows:  In December of each year, every local taxing body initiates the property tax cycle by approving a levy which informs the County Clerk how much property tax revenue to collect in the following calendar year.  The School District is one such taxing district and approved its levy in December 2017.  During calendar year 2018, the Cook County Clerk accepted the 2017 levies and: (1) applied those levies to the property values in Cook County (property tax extension);

---

between the Village and Sears to implement terms of the EDA Act.  Section 4.5 of the Illinois EDA Act states that "in the event the developer fails to maintain 4,250 jobs…the developer shall forfeit an amount of its allocations from the special tax allocation fund…Any funds that are forfeited shall be distributed to the taxing districts…"  20 ILCS § 620/4.5(b).  According to the Illinois Supreme Court, taxing districts are all distinct entities from each other and from the county or city which is also a taxing body.  *Madison Two Associates v. Pappas*, 227 Ill.2d 474 (2008).  The School District is a different party than the Village of Hoffman Estates, even though the Village is the one tasked with administrating and holding taxes.  Further, individual taxing districts have a legally cognizable interest in tax assessment proceedings.  *Id.*  Ultimately, this is a tax assessment proceeding. The School District is a taxing district who should have the forfeited funds distributed to it.  The EDA Funds are money that should go to the School District and, therefore, the School District is a proper party to this case.

(2) created Property Tax Bills called the Property Tax Bill for 2017 (the levy date, not the year in which the tax bills are created and collected); (3) sent out two, spring and fall, Property Tax Bills to all property owners with due dates in the spring and fall, respectively; (4) collected Property Tax Bill payments; and (5) sent the local governments their property tax revenue as it came in from the property taxpayers. The Cook County Clerk received nearly all of the Property Tax Bill payments by the end of December of 2018.

To implement the Illinois EDA Act provisions, the Cook County Clerk sent the property tax revenue paid by Sears in 2018 and derived from the government levies (including the School District that levied approximately 70% of the entire Property Tax Bill) to the Village by the end of December 2018. In November 2018, the Village sought a certification from Sears based on the 2018 data that throughout calendar year 2018 Sears had complied with the Illinois EDA Act's requirement of maintaining 4,250 jobs. Erroneously, Sears sent the Village a certification for compliance based on the jobs data for the calendar year 2017, rather than for calendar year 2018 as required by the Illinois EDA Act. Had Sears provided a compliant certification, the Village Board at its January 2019 meeting may have considered approving an Ordinance which, among other matters, provided for (i) refunding back to Sears 55% of the net property taxes paid by Sears; and (ii) distributing the remaining 45% of the Sears property taxes to local taxing districts, of which the largest is the School District.

All of this is done pursuant to Section 4(g) of the Illinois EDA Act (20 ILCS § 620/4(g)), which sets forth the formula for allocating property tax revenues from the Economic Development Area (the "**EDA**") as those revenues are received each calendar year. The formula each year is based on the conditions existing during the calendar year taxes are **paid**. Each year, the first $350,000 is paid into an administrative fund (the balance of which is liquidated by December 31st),

19

the next $5 million is paid to the Village, and the remaining balance is split 55% to Sears and 45% to the taxing districts.  Section 4.5 provides the caveat that Sears's share under the formula each year is premised on Sears maintaining at least 4,250 full-time equivalent jobs.  If Sears has not maintained the requisite jobs for the calendar year in which taxes are **paid**, then Sears's share is reduced by the "the percentage of the year that [Sears] failed to maintain 4,250 jobs." (20 ILCS § 620/4.5(b).

The funds currently held by the Village, that are in dispute, represent taxes paid in calendar year 2018.  The employment prerequisites for calendar year 2018 drive the formula for the allocation of those funds.  This is consistent with what occurred in every other year including calendar year 2017, when Sears and the Village followed the statute and predicated the distribution of the taxes **paid** in 2017 on the number of qualifying jobs Sears had during 2017.

The Illinois General Assembly originally passed the Illinois EDA Act in 1989 to specifically incentivize Sears to relocate its headquarters from downtown Chicago, to undeveloped farmland in Hoffman Estates, Illinois, a suburb of Chicago (the "**Economic Development Project Area**").  The Illinois EDA Act authorized Sears and the Village of Hoffman Estates to enter into the EDA Agreement for a maximum term of 23 years to finance improvements in the Economic Development Project Area. The agreement provided considerable financial assistance and subsidies for Sears and not to any other business which creates and maintains jobs within the EDA District to develop its corporate campus in the Village. It allowed Sears to recapture a large portion of the property taxes paid on its corporate campus to cover costs incurred in the development of the corporate campus.

In 2011, the Illinois General Assembly amended the Illinois EDA Act as part of a package of additional incentives to keep Sears from acting on its threat to relocate its headquarters to outside

of Illinois. The amended Illinois EDA Act authorized an extension of the term of the EDA

Agreement (*see* EDA Agreement, attached hereto as <u>Exhibit A</u>) for an additional 15 years provided

that new conditions were met.  Specifically relevant here, the extension was expressly conditioned

on the requirement that "the developer or any of its successor entities and its subsidiaries shall

**create or retain** not less than 4,250 full-time equivalent jobs." 20 ILCS § 620/4(e) (emphasis

added). In the event the developer (a.k.a., Sears) fails to meet the jobs requirement for any portion

of the 15 year extension period, "the developer shall forfeit an amount of its allocations from the

special tax allocation fund for that time period in which the developer failed to **maintain** 4,250

jobs …. Any funds that are forfeited shall be distributed to the taxing districts[.]"  20 ILCS §

620/4.5(b) (emphasis added). Critically, "the developer" is defined under the EDA Agreement as

Sears and Sears alone and not as any other non-Sears employer which Sears now, after filing for

bankruptcy protection, asserts.

The School District filed the Illinois Action against the Village and Sears to stop the Village

from illegally distributing taxes paid in 2018 under the Illinois EDA Act and to recover illegally

distributed taxes paid in 2017. The School District filed its suit after attempts to work

collaboratively with Sears were summarily rejected.[5] Sears continues to take every effort to

obstruct an open and transparent determination of its eligibility for millions in tax dollars. And

now, when forced support its assertion that it is eligible for the EDA Funds, Sears tries to

manipulate the data and the Illinois EDA Act to obfuscate the issues and apparently hide the fact

---

[5]  Counsel for the School District sent correspondence to Sears on July 30, 2018 (well before publicity of Sears's imminent bankruptcy filing) to invite "open communication with Sears about the administration of the EDA. Clarification and corroboration on whether and how Sears is maintaining the requisite 4,250 jobs in the face of continuing layoffs is a critical concern for the school district." Sears responded on August 24, 2018 by saying, "Sears has no obligation to provide the School District with any information regarding 'jobs' within the EDA.  Sears has not provided this information to the School District in the past and sees no reason to begin doing so now."

that it, and it alone, does not have or cannot prove that it has maintained the requisite 4,250 jobs which is the critical issue in the Motion to Compel, the Motion to Lift Stay, and the Illinois Action.

### B.    4,250 Full Time Equivalent Sears Jobs Must be Maintained in 2018

The Debtor, in its Motion to Compel, erroneously asks for turnover of the EDA Funds because Sears, together with its outside contractors, tenants and other non-Sears retail and service businesses, allegedly maintained the requisite number of full-time equivalent jobs throughout 2017 in its headquarters campus.  The Debtors fundamentally misunderstand and misapply the Illinois EDA Act.  The EDA Funds consist of property tax revenue levied in 2017 but actually paid in 2018. In order for Sears to successfully claim the EDA Funds at issue, Sears must show that it maintained 4,250 full-time equivalent jobs at its headquarters campus for the year in which the taxes were paid.  In other words, Sears, and Sears alone, needs 4,250 jobs in 2018 to claim a rebate of taxes it paid in 2018.  This is exactly how Sears and the Village handled the Illinois EDA Act funds distribution in every prior year, when Sears was not on the verge of bankruptcy.

The Illinois EDA Act establishes an annual procedure in which property taxes are paid, accounted for, and distributed based on conditions existing for the applicable year.  The Illinois EDA Act is very specific in this regard.  Section 4(g)(2) provides that "real estate taxes *paid* on property within the economic development project area during calendar year 2013 … shall be the "base amount" [and allocated] as follows …" (emphasis added). Section 4(g)(3) states that "[f]or real estate taxes *paid* in 2012 and *remitted* to the developer and the taxing districts in 2013 and prior years, the allocation formula contained in any economic development plan in effect immediately prior to the effective date of this amendatory Act of the 97th General assembly shall apply" (emphasis added). Subsection 4(g)(3) addresses the distribution of funds prior to the first year of the 15-year extension (which was calendar year 2013). Section 4(g)(4) further states that "[b]eginning with real estate *taxes paid* in 2014 and *remitted* to the developer and the taxing

22

districts in 2015 and each year thereafter, if the taxes paid within the economic development project area change from the base amount, the allocation of the special tax allocation fund shall be as follows…" (emphasis added).[6] These sections (and the other multiple sections that use the term "**taxes paid**") make it clear that the Illinois EDA Act bases the Sears subsidy on Sears's operation during the calendar year in which taxes are paid.

The distribution formula further underscores the annual distribution procedure based on the calendar year in which taxes are paid. Under the formula, taxes are paid (generally in March and August of each year) and then distributed by the end of the year so that the balance in the special tax allocation fund by December 31 of each year is zero. The Illinois EDA Act provides for taxes paid in 2014 and each year thereafter to be allocated annually as follows:

(1)     The first $350,000 is allocated to an administrative fund, the unspent balance of which is distributed to the taxing districts each year by December 31st;

(2)     The next $5 million is allocated annually to the Village;

(3)     The amount remaining after the allocation to the administrative fund and the Village is then distributed 55% to Sears and 45% to the taxing districts; and

(4)     For years in which the total taxes paid exceeds the "base amount" (which is the amount of taxes paid in 2013), the excess amount is split 75% to Sears and 25% to the taxing districts.

This allocation formula, which is based on money in and money out each year taxes are paid further demonstrates that the conditions existing the year taxes are paid drive the distribution.

This annual procedure is borne out by the actual allocations performed by the Village. Each year that taxes are paid, money flows in, money flows out, and the balance each December

---

[6] The language "*taxes paid* in 2014 and *remitted* to the developer and the taxing districts in 2015" does not lend itself to the Debtor's interpretation. When the Illinois EDA Act was amended in 2011, the second installment of real estate tax bills in Cook County was routinely not billed and collected until November or December of each year. Under the circumstances prevailing at the time of the statutory amendment, it was plausible that taxes would be paid so late in one year that they would have to be distributed in the following year. *See* Cook County Treasurer Press Release, attached hereto as Exhibit H.

31st is effectively zero.  Furthermore, in 2015 and 2016, the amount of taxes paid in those calendar years (as opposed to the levy or taxable years) exceeded the base amount.  The 75%-25% allocation of the excess amount occurred in December 2015 and 2016, respectively, which were the years the taxes were paid, not the years the taxes were levied.  Therefore, both the language of the Illinois EDA Act and the actual administration of the EDA clearly show that it is the conditions existing in the year taxes are paid that control the allocation of the EDA Funds.

The Debtor improperly argues that when the Illinois EDA Act says "taxes paid" it really means "the year taxes were levied."  Under this erroneous interpretation, the Debtor maintains that it is entitled to taxes levied in 2017 because Sears allegedly had 4,250 qualifying jobs in 2017. This opportunistic interpretation ignores the plain language of the statute and the actual process both Sears and the Village followed in prior years for the EDA funds distributions.

Illinois law is also very precise in differentiating between the year taxes are levied and the year taxes are paid.  To refer to the year in which taxes are levied, the Illinois Property Tax Code (35 ILCS § 200/1-1, *et seq.*) uses the terms "Levy Year" or "Taxable Year." The term "Levy Year" "when used with reference to taxes of or for a year, means a calendar year." 35 ILCS § 200/1-115. The term "Taxable Year" means "the calendar year during which ad valorem property taxes payable in the next succeeding year are levied." 35 ILCS § 200/15-172.  If the Illinois General Assembly intended the Illinois EDA Act to mean that Sears needed 4,250 jobs for the year in which taxes were levied (rather than paid), it would have said "beginning with the 2013 levy year" or "beginning with the 2013 taxable year." Instead, the statute sets the annual timeframes "beginning with real estate taxes **paid** in 2014" and each year thereafter.[7]

---

[7]  The Illinois EDA Act uses the term "levy" or "levied" with regard to real estate taxation at least 14 times. In no instance are these terms used with regard to the timeframe for distributions or meeting the jobs requirement.

Furthermore, both Sears and the Village previously followed the Illinois EDA Act requirement that Sears have the requisite jobs for the year in which taxes were paid. In November 2017, the Village sent a letter to Sears requesting that Sears report the number of qualifying jobs it had in 2017.  Sears sent to the Village a letter stating that it had maintained 4,250 jobs in 2017 and therefore was entitled to the distribution of taxes paid in 2017.  The Village, in turn, memorialized Sears's compliance with the Illinois EDA Act with regard to tax dollars paid in 2017 by referencing Sears's letter concerning jobs in 2017.  *See* Village 2017 Letter attached hereto as Exhibit B, Sears 2017 Letter attached hereto as Exhibit C, and Hoffman Estates 2017 Board Cover Memo, attached hereto as Exhibit D.[8]

It was only when Sears fell below the required 4,250 jobs that Sears attempted to change its interpretation of the statute.  In November 2018, the Village sent a letter requesting that Sears report the number of qualifying jobs it had in 2018.  In January 2019, Sears sent a letter to the Village attempting to again rely upon its jobs in 2017 to claim the distribution of taxes paid in 2018.  *See* Village 2018 Letter attached hereto as Exhibit E, Sears 2019 Letter attached hereto as Exhibit F.

In the instant case, the EDA Funds consist of property taxes levied in 2017 and paid in 2018.  Under the Illinois EDA Act, the annual distribution cycle is determined by the year taxes are paid.  Therefore, to determine whether Sears is entitled to the EDA Funds, Sears must show that it had 4,250 qualifying jobs during 2018.  As shown below, Sears did not maintain the requisite number of full-time equivalent jobs in 2018 as would be required to be remitted the $9.6 million being held by the Village.

> **C.    Sears Did Not Maintain 4,250 Full Time Equivalent Jobs in 2018 and Therefore is Not Entitled to the EDA Funds**

---

[8]  It is important to understand when reading Exhibit D that the Village operates on a calendar fiscal year.

### i.    Sears erroneously counts tenants and contractors towards its required number of full-time equivalent jobs

There are three different authorities that preclude Sears from counting the employees of tenants, contractors and other non-Sears businesses located in the EDA District towards the requisite 4,250 full-time equivalent jobs: the Illinois EDA Act, the EDA Development Agreement, and the legislative history of the Illinois EDA Act.

### a.    The Illinois EDA Act does not allow for employees of tenants and contractors to be counted

When possible, the court should interpret the language of a statute according to its plain and ordinary meaning.  *People v. McClure*, 218 Ill.2d 375, 382 (2006) (*citing People v. Donoho*, 204 Ill.2d 159, 171 (2003)).  Additionally, courts should construe the statute as a whole, so that no part of it is rendered meaningless or superfluous.  *McClure,* 218 Ill.2d at 382 (*citing People v. Jones,* 214 Ill.2d 197, 193 (2005)).

To date, Sears has provided jobs data only for 2017 and refuses to provide data for any other year.  The 2017 data clearly demonstrates that Sears did not have 4,250 full-time equivalent jobs for that year.[9]  Instead, Sears attempts to pad its jobs numbers with jobs of tenants, contractors and other non-Sears businesses located in the EDA District, none of which receives any benefit of the rebated property taxes.  However, under the Illinois EDA Act, Sears must bear the burden of carrying a specific number of employees in order to receive tax rebates, a fact of which it is surely aware from conduct in prior (non-bankruptcy) years.  Sears's new attempt to use non-Sears jobs to meet its jobs burden under the Illinois EDA Act is contrary to the statutory language and purpose.

---

[9]  The admissibility and reliability of the documents provided by Sears is in serious question.  To date, it is unclear whether Sears can meet the foundational requirements to admit the documents into evidence.  Further, even if the documents are admissible, the methods used to determine jobs counts is highly suspect.

Sears may not count the employees of tenants, contractors and other non-Sears businesses as full-time equivalent jobs that it has maintained.  This is very clear in the EDA Agreement and the Illinois EDA Act. The Illinois EDA Act expressly requires that the developer alone shall create or retain the requisite number of jobs. The EDA Illinois Act deliberately separates "developer, user, or tenant of any property to be located within the economic development project area" when discussing the written plan that must be set forth by the Village.  This same phrase is repeated multiple times throughout the Illinois EDA Act. However, in other places, the Illinois EDA Act references the "developer" alone.  Specifically, only the developer is referenced in regards to who must create/retain/maintain the requisite number of jobs.  The Illinois EDA Act states "the ***developer*** or any of its successor entities and its subsidiaries shall create or retain not less than 4,250 full-time equivalent jobs" (emphasis added). 20 ILCS § 620/4(e).  This means that only the developer's (Sears's) employees and the developer's employees alone or its successors and subsidiaries may be counted towards the required 4,250 full-time equivalent jobs.  There is absolutely no language in the Illinois EDA Act that allows Sears to count tenants', contractors' and other non-Sears employees at the campus toward the jobs requirement.

The Illinois EDA Act was part of a package of incentives to persuade Sears to keep its corporate headquarters in Illinois.[10]  Other components of this package included income tax credits premised on Sears maintaining 4,250 jobs.  *See* Illinois Economic Development for a Growing Economy Tax Credit Act (35 ILCS 10/1, *et seq.*).  The primary purpose of these incentives was to reward Sears for keeping its headquarters jobs (not other employers' jobs) in Illinois.

---

[10]  The Illinois EDA Act and the Illinois Economic Development for a Growing Economy Tax Credit Act (35 ILCS § 10/1, *et seq.*) were both amended by Public Act 097-0636 to provide incentives to Sears to keep its headquarters in Hoffman Estates provided Sears maintained 4,250 jobs at its headquarters.  The public act and the amended statutes should be read as a whole.  *People v. 1946 Buick, VIN 34423520*, 127 Ill.2d 374, 376 (1989) ("when two statutes are concerned with the same subject matter, they are to be construed together").

> **b.    The EDA Agreement does not allow for employees of tenants, contractors and other non-Sears businesses to be counted**

The original EDA Agreement provides further evidence that only Sears's jobs, and those of its successors and subsidiaries, may be counted towards the requisite 4,250 jobs count. The EDA Agreement defines "developer" as "Sears, Roebuck and Co., a New York corporation." *See* Exhibit A, Lines 70-71. Similarly to the Illinois EDA Act, the EDA Agreement separates developer from tenant and contractors. *Id.* at Lines 1828 and 2093. It is very clear that any benefits of the EDA Agreement are to be in favor of Sears, Roebuck and Co. and its successors and subsidiaries only. The EDA Agreement further defines "SMG" as "Sears Merchandise Group, a group of Sears, Roebuck and Co., a New York corporation." It is the SMG home office complex and the SMG occupancy date that are the primary subject of the EDA Agreement.

Additionally, Article 18 of the EDA Agreement discusses, in relevant part, the assignment of developer rights and states as follows:

> (b) Except as provided in paragraph (c) of this section 18.1, *all rights of the Developer established by the terms of this Agreement shall inure solely to the benefit of the Developer* and shall not be subject to assignment by the Developer and, specifically but without limitation, the Village shall not be required to issue Revenue Bonds in order to satisfy and pay for Project Costs except for the Developer.

(emphasis added). *See* Exhibit A, Lines 2396-2425. The developer -- Sears, and Sears alone -- reaps the benefits of this agreement and only Sears employees may be counted in the requisite job count.

> **c.    Legislative history of the Illinois EDA Act does not allow for employees of tenants, contractors and other non-Sears businesses to be counted**

"The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature." *McClure,* 218 Ill.2d at 382. In determining the legislative intent of a statute, a

28

court may consider not only the plain and ordinary language of the statute, but also the reason and necessity for the law and the purposes to be achieved. *Prazen v. Shoop*, 2013 IL 115035, ¶ 21 (2013). A statute's legislative history and debates are valuable construction aids in interpreting a statute. *Krohe v. City of Bloomington*, 204 Ill.2d 392, 398 (2003).

The legislative history of the Illinois EDA Act is also clear on the question of who can be counted as a full-time equivalent job. On December 12, 2011, the Illinois House of Representatives debated the Illinois EDA Act. The transcript of that debate is attached hereto as Exhibit G. It is clear through the debate that the legislature was clearly only relying upon Sears and its subsidiaries, and not tenants, contractors and other non-Sears businesses, when it created the jobs requirement. The sponsors of the Illinois EDA Act clearly and unequivocally did not intend to allow Sears to count just anyone in its full-time equivalent job requirement.

> Tryon: "Okay. What happens if Sears leaves Illinois and keeps not zero jobs but let's say 100 jobs are skeletal staff…"
> Bradley: "I…I think that would've…"
> Tryon: "…just to maintain the building."
> Bradley: "…I think that would effectively end the EDA."
> Tryon: "So, your intention here is that if that were to happen, if Sears were to leave and there was only a minimal workforce left here, that the EDA would…would cease…"
> Bradley: "Yeah."
> Tryon: "…to exist and Hoffman would then have one more year."
> Bradley: "Sears…Sears would be forfeiting all their benefits and EDA would wind up."

*See* Exhibit G, pg. 62. It is clear from this passage that if Sears were to have only tenants', contractors' and other non-Sears businesses' employees at this location, Sears would not be eligible for the benefits. Otherwise, the result would be absurd. For instance, based on this legislative history, if another large corporation in Illinois were to move its headquarters from one village to the Sears complex in Hoffman Estates, but Sears left 100 employees at its former

headquarters, Sears would not be eligible for any of the benefits inured in the agreement. Further

illustrating this point is the following discussion.

> Sullivan: "Also, on page 45 of the Bill, it refers to developer or any
> of its success[ors] entities. By success[or] entities are we referring
> to success[or] or Sears operating companies and not to an entity
> simply occupying the Sears premises in Hoffman Estates?"
> Bradley: "Yes."

*See* Exhibit G, pg. 65.  This further supports the legislative interpretation that it is only the

developer -- Sears -- and its legal successors' employees who may be counted to qualify for the

benefits of the Illinois EDA Act.  The legislature wanted to ensure that Sears did not take advantage

of the generosity of the State and local governments by simply moving its headquarters whenever

and wherever it wanted, but maintaining skeletal control of the premises and renting it to

whomever it pleased.  Put simply, Sears cannot count tenants' employees, contractors' employees

and other non-Sears businesses' employees to attempt to qualify for the Illinois EDA Act property

tax rebates.  Because Sears cannot count tenants' and contractors' employees, Sears did not employ

at least 4,250 full-time equivalent employees in 2018 and is therefore, not eligible for the

remittance of the $9.6 million being held by the Village.

> ii.    **Sears has not maintained 4,250 full-time equivalent jobs in 2018
> and is not eligible for the EDA Funds currently held by the
> Village**

Sears has not shown, and cannot show, that it had the requisite number of full-time

equivalent jobs for calendar year of 2018, or even for the year 2017, without counting tenants',

contractors' and other non-Sears businesses' employees.  Sears, in its Motion to Compel, states

that when reporting on its monthly compliance with the Illinois EDA Act, it counts "all workers

employed at its Hoffman Estates campus for 35 hours or more per week by Sears, contractors, and

tenant companies."  *See* Motion to Compel, ¶ 11.  However, as discussed above, the Illinois EDA

Act permits Sears to count its jobs, not those of contractors and tenants.  Further, in the Declaration

by Mohsin Meghji [Dkt. No. 2717], there are two major issues for Sears.  First, Sears states in its

Motion to Compel that it only counts employees located in the Village.  That is false as shown in

Debtor's Exhibits 1-12 which all list employees and the city they are located in. These cities

include not only Hoffman Estates but also Chicago[11] which is over 35 miles away.

Second, Debtor's Exhibit 13 to the Declaration of Mohsin Meghji details the number of

active badges and the number of daily entries into the Hoffman Estates complex.  These numbers

show that at the very latest, the number of active associate badges (which excludes contractors,

tenants, and field badges) drops below the requisite number of full-time equivalent jobs in June

2017.  It does not rise above 4,250 after that.  This conclusion is bolstered by a settlement

agreement between Sears and the Illinois Department of Commerce and Economic Opportunity in

2017 in which Sears agreed that it no longer **maintained** the requisite 4,250 jobs necessary to

qualify for income tax credits based on having 4,250 jobs at its corporate headquarters.

The Illinois General Assembly enacted the Illinois EDA Act as part of a package of

incentives to encourage Sears to keep its corporate headquarters in Hoffman Estates, Illinois.  The

property tax incentives were predicated on the developer (Sears) maintaining 4,250 jobs at its

corporate headquarters for each year taxes were paid by and then rebated to Sears.  The Village

currently has $9.6 million in property taxes Sears paid in 2018.  In order for Sears to now claim

those funds, it must show that it, as the developer, maintained 4,250 jobs at its headquarters in

---

[11]  Sears asserts that the Illinois EDA Act is silent as to any geographic requirements for the 4,250 jobs, however, the EDA Agreement clearly refers to the "Subject Property" in many places.  The "Subject Property" is defined as "that certain parcel of real estate under the ownership or control of the Developer … bounded generally on the north by Higgins Road, on the east by Route 59, on the south by I-90 and on the west by Beverly Road…"  This is all within the Village of Hoffman Estates, not Chicago, nor any other locale. It would also be absurd to provide property tax incentives for a specific property based on jobs located elsewhere. Based on Sears's logic, it could maintain 4,250 jobs anywhere in Illinois or even outside of Illinois and still qualify for a property tax incentive rebated in Hoffman Estates, Illinois by the local governments located in Hoffman Estates.  Additionally, the term "economic development project area," is used 137 times in the Illinois EDA Act and 59 times in the EDA Agreement, and defined in both in geographic terms.  The Sears corporate campus is the area that is the purpose and focus of this law. It is about a specific property being used for a specific purpose.

Hoffman Estates during calendar year 2018.  This it cannot do.  Therefore, the Debtors' Motion to

Compel should be denied.

## VII.    CONCLUSION

WHEREFORE, the School District respectfully requests that this Court enter an order (i)

denying the Debtors' Motion to Compel; (ii) granting the School District's Motion to Lift Stay by

lifting the stay, or in the alternative, by abstaining under 28 U.S.C. §§ 1334(c)(1) or (2); and (iii)

providing such other and further relief as this Court deems just and proper.

Dated: New York, New York                          ARCHER & GREINER, P.C.
        March 29, 2019

                                       By: /s/ Allen G. Kadish
                                          Allen G. Kadish
                                          Lance A. Schildkraut
                                      630 Third Avenue
                                      New York, New York 10017
                                      Tel: (212) 682-4940
                                      Email: akadish@archerlaw.com
                                          lschildkraut@archerlaw.com

                                                  and

                                      Kenneth M. Florey
                                      M. Neal Smith
                                      Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd.
                                      631 E. Boughton Road, Suite 200
                                      Bolingbrook, Illinois 60440
                                      Tel: (630) 929-3639
                                      Email: kflorey@robbins-schwartz.com
                                          nsmith@robbins-schwartz.com

                                                  and

                                      Matthew T. Gensburg
                                      Gensburg Calandriello & Kanter, P.C.
                                      200 West Adams Street, Suite 2425
                                      Chicago, Illinois 60606
                                      Tel: (312) 263-2200
                                      Email: mgensburg@gcklegal.com

                                      *Attorneys for Community Unit School District 300*

## **EXHIBITS**

Exhibit A:      EDA Agreement

Exhibit B:      Village  2017 Letter

Exhibit C:      Sears 2017 Letter

Exhibit D:      Hoffman Estates 2017 Board Cover Memo

Exhibit E:      Village 2018 Letter

Exhibit F:      Sears 2019 Letter

Exhibit G:      Legislative History Transcript

Exhibit H:      Cook County Treasurer Press Release

216190508v1