# <u>EXHIBIT A</u>

# ECONOMIC DEVELOPMENT AGREEMENT

## BY AND BETWEEN

## THE VILLAGE OF HOFFMAN ESTATES

## AND

## SEARS, ROEBUCK AND CO.

**TABLE OF CONTENTS**

**ARTICLE**                                                                                    **PAGE**

DEFINITIONS............................................................   1

RECITALS..............................................................  15

ARTICLE 1.    INCORPORATION OF RECITALS....................  17

ARTICLE 2.    GOALS, MUTUAL ASSISTANCE AND COOPERATION......  17

              2.1. Goals and Mutual Assistance.............  17

              2.2. Cooperation in Seeking Financial Aid
                   and Assistance..........................  18

ARTICLE 3.    DEVELOPMENT OF THE SUBJECT PROPERTY...........  19

              3.1. Phase I Development......................  19
                   (a)   General............................  19
                   (b)   Permits............................  20
                   (c)   Preliminary Grading.................  21
                   (d)   Submission of Development
                         Documentation......................  22
                   (e)   Construction of Phase I Develop-
                         ment Public Site Improvements.......  26
                   (f)   SMG Occupancy Date.................  29

              3.2. Phase II Development.....................  29
                   (a)   General............................  29
                   (b)   Construction of Phase II Develop-
                         ment Public Site Improvements.......  30

              3.3. Construction of Public Works and
                   Improvements............................  32

              3.4. Covenant to Run With Land Regarding Uses
                   of the Subject Property..................  32

              3.5. Insurance...............................  33

              3.6. Compliance of Plats, Plans and Construc-
                   tion Activities with Village Ordinance....  34

ARTICLE 4.    COSTS OF THE DEVELOPMENT CONSTITUTING "PROJECT
              COSTS" WHICH ARE TO BE PAID OR FINANCED PURSUANT TO
              THE PROVISIONS OF THIS AGREEMENT..............  35

              4.1. General.................................  35

**PAGE**

4.2. Project Costs Agreed Upon as the Date of this Agreement........................... 35

4.3. Project Costs Incurred in Connection With the Construction of Public Site Improvements Identified by the Village After the Date of this Agreement........................... 38

4.4. Determining "Reasonable or Necessary" Costs.................................... 42

ARTICLE 5.   SPECIAL TAX ALLOCATION FUND.................... 42

5.1. Deposit of Monies into Fund.............. 42

5.2. Accounting of Monies Deposited in Fund.... 42

5.3. Investment of Monies Deposited in the Fund.................................... 43

ARTICLE 6.   PAYMENT AND FINANCING OF PROJECT COSTS......... 43

6.1. Project Costs Other Than Village Project Costs.................................... 43

6.2. Payment and Financing of Village Project Costs.................................... 44

6.3. Issuance of Bonds/Execution and Delivery of Notes................................ 45

6.4. Limited Liability of the Village......... 47

6.5. Developer Advances...................... 47

6.6. Procedure for Payment and Reimbursement to the Developer of Project Costs............ 48

ARTICLE 7.   UTILIZATION OF TAX INCREMENT REVENUES.......... 50

7.1. Tax Increment Revenues Received Prior to the Phase I Tax Increment Revenue Commencement Date...................... 50

7.2. Tax Increment Revenues Received On and Subsequent to Phase I Tax Increment Revenue Commencement Date....... 50

**PAGE**

7.3. The Village's Distribution of The Phase
I Allocated Tax Increment
Revenue Amounts........................... 52

ARTICLE 8.   BONDS AND NOTES................................ 54

8.1. Issuance, Execution and Delivery.......... 54

8.2. Interest Payment, Maturity, Priorities and
Credit Enhancements....................... 55

8.3. Tax-Exempt Issues......................... 56

8.4. SMG Completion Guaranty Note.............. 56

ARTICLE 9.   TAX PROTESTS AND APPEALS/PAYMENT OF REAL ESTATE
TAXES......................................... 57

9.1. Tax Protests and Appeals.................. 57

9.2. Miscellaneous............................. 58

ARTICLE 10.   SPECIFIC DEVELOPER ADVANCES AND DONATIONS...... 58

10.1. Developer Advance for Costs of Administer-
ing the Economic Development Plan......... 58

10.2. Developer Advance for Police and Fire
Personnel................................. 59

10.3. Donation of Village Municipal Site........ 60

10.4. Donations Relating to Redevelopment of
PCMT Property............................. 61
(a)   Loss of Contracted Service Income.... 61
(b)   Reductions in Equalized
Assessed Value....................... 62
(c)   Municipal Entertainment Tax.......... 63

10.5. Developer Advance for Miscellaneous
Village Project Costs..................... 63

10.6. No Other Donations........................ 64

ARTICLE 11.   NOTICES....................................... 65

ARTICLE 12.   MEMORANDUM OF AGREEMENT........................ 66

ARTICLE 13.   PERMITTED DELAYS............................... 67

02/27/90-H.E.                    iii

**PAGE**

ARTICLE 14.    MORTGAGE HOLDERS............................... 67

14.1. Rights and Obligations................... 67

14.2. Notice/Assumption of Obligations......... 68

14.3. Village Right to Cure Defaults........... 70

ARTICLE 15.    NO DISCRIMINATION-CONSTRUCTION................ 71

ARTICLE 16.    NO DISCRIMINATION-USE......................... 71

ARTICLE 17.    REMEDIES-LIABILITY............................ 72

17.1. Developer Remedies...................... 72

17.2. Village Remedies........................ 73

17.3. Defaults-Rights to Cure................. 74

17.4. Acts and Omissions of Default........... 75

17.5. Dispute Resolution...................... 75

17.6. Right to Continue Construction
      Activities.............................. 77

ARTICLE 18.    ASSIGNMENT    OF    DEVELOPER    RIGHTS    AND
               OBLIGATIONS/CONVEYANCES OF THE SUBJECT
               PROPERTY...................................... 78

18.1. Assignment of Developer Rights and
      Obligations............................. 78

18.2. Conveyances of the Subject Property...... 82

18.3. ...................................... 85

ARTICLE 19.    DEDICATIONS AND EASEMENTS..................... 85

ARTICLE 20.    DEVELOPER INDEMNIFICATION..................... 85

ARTICLE 21.    AMENDMENT/INTEGRATION......................... 87

ARTICLE 22.    DUPLICATE ORIGINALS........................... 88

ARTICLE 23.    TIME IS OF THE ESSENCE........................ 88

ARTICLE 24.    TERM.......................................... 88

02/27/90-H.E.                    iv

**PAGE**

ARTICLE 25.    INTERPRETATION.................................. 88

ARTICLE 26.    SEVERABILITY.................................... 88

ARTICLE 27.    CAPTIONS AND PRONOUNS........................... 88

LIST OF EXHIBITS       ......................................... 91

## ECONOMIC DEVELOPMENT AGREEMENT

    **THIS ECONOMIC DEVELOPMENT AGREEMENT** is made by and entered into on the _____ day of _____, 1990, by and between the **VILLAGE OF HOFFMAN ESTATES,** an Illinois home rule municipal corporation located in Cook and Kane Counties, Illinois, and **SEARS, ROEBUCK AND CO.,** a New York corporation.

### DEFINITIONS

    The following words and terms used in this Agreement shall have the following meanings unless the context or use indicates another or different meaning:

| | |
|---|---|
| **ACQUISITION CONTRACTS** | The sale/purchase contracts which have been executed by Developer, or Developer's nominee, that provide for the Developer's acquisition of the Subject Property.  A summary of the Acquisition Contracts is attached hereto as Exhibit "A". |
| **ACT** | The Economic Development Area Tax Increment Allocation Act, Ill.Rev.Stat. (1989) Ch.67 1/2,SS1001 et seq., as amended from time to time. |
| **AGREEMENT** | This Economic Development Agreement and all exhibits attached hereto, as the same may be amended from time to time by the Parties in accordance with the terms hereof. |
| **ALLOCATED TAX INCREMENT REVENUE AMOUNTS** | The amounts of Tax Increment Revenues which are to be paid to the Village and the other Taxing Districts, consisting of the "Phase I Allocated Tax Increment Revenue Amounts" set forth on Exhibit "B" attached hereto, and the "Phase II Allocated Tax Increment Revenue Amounts," as determined by using the percentages set forth on Exhibit "C" attached hereto. |
| **AMENDMENT TO THE ANNEXATION AGREEMENTS** | Such amendment to the Beverly Annexation Agreement and the Nederlander Annexation Agreement as the Parties may execute in order to further the development of the Subject |

02/27/90-H.E.                                  1

| | | |
|---|---|---|
| 44 | | Property.   The Amendment to the Annexation |
| 45 | | Agreements may also constitute the annexation |
| 46 | | agreement for the portion of the Subject |
| 47 | | Property that is commonly described as the |
| 48 | | "Studz Parcel". |
| 49 | | |
| 50 | **BEVERLY** | That certain annexation agreement dated |
| 51 | **ANNEXATION** | January 19, 1981 and approved by the Village |
| 52 | **AGREEMENT** | by Village Ordinance No. 1248-1981, as |
| 53 | | amended. |
| 54 | | |
| 55 | **BOARD OF TRUSTEES** | The Board of Trustees of the Village holding |
| 56 | | office from time to time. |
| 57 | | |
| 58 | **BONDS** | The Revenue Bonds and the General Obligation |
| 59 | | Bonds. |
| 60 | | |
| 61 | **CORPORATE** | The President and Board of Trustees of the |
| 62 | **AUTHORITIES** | Village holding office from time to time. |
| 63 | | |
| 64 | **DEPARTMENT** | The State's Department of Commerce and |
| 65 | | Community Affairs. |
| 66 | | |
| 67 | **DESIGNATED** | The Village Manager of the Village holding |
| 68 | **OFFICER** | office from time to time. |
| 69 | | |
| 70 | **DEVELOPER** | Sears, Roebuck and Co., a New York |
| 71 | | corporation. |
| 72 | | |
| 73 | **DEVELOPER** | The advances made to or on behalf of the |
| 74 | **ADVANCES** | Village by the Developer in order to pay |
| 75 | | Project Costs, which advances shall be |
| 76 | | reimbursed to the Developer by the Village, in |
| 77 | | accordance with the provisions of this |
| 78 | | Agreement and the Act. |
| 79 | | |
| 80 | **DEVELOPMENT** | The Phase I Development and Phase II |
| 81 | | Development. |
| 82 | | |
| 83 | **ECONOMIC** | The economic development plan dated August 4, |
| 84 | **DEVELOPMENT** | 1989, entitled "Hoffman Estates Economic |
| 85 | **PLAN** | Development Project Area Plan and Project" |
| 86 | | which constitutes the comprehensive program of |
| 87 | | the Village for the Project Area, as approved |
| 88 | | by the Corporate Authorities by Village |
| 89 | | Ordinance No. 2106-1989, adopted on September |
| 90 | | 11, 1989, together with any amendments |
| 91 | | thereto. |
| 92 | | |
| 93 | **ECONOMIC** | The economic development project approved by |
| 94 | **DEVELOPMENT** | the Corporate Authorities by Village Ordinance |
| 95 | **PROJECT** | No. 2106-1989, adopted on September 11, 1989, |

02/27/90-H.E.                          2

| | | |
|---|---|---|
| 96 | | in furtherance of the objectives of the |
| 97 | | Economic Development Plan. |
| 98 | | |
| 99 | **FUND** | The Special Tax Allocation Fund. |
| 100 | | |
| 101 | **GENERAL** | Those general obligation bonds which the |
| 102 | **OBLIGATION** | Village may issue pursuant to the terms of |
| 103 | **BONDS** | this Agreement. |
| 104 | | |
| 105 | **NEDERLANDER** | That certain annexation and development |
| 106 | **ANNEXATION** | agreement dated August 22, 1978 and approved |
| 107 | **AGREEMENT** | by the Village by Village Ordinance No. 1039- |
| 108 | | 1978, as amended. |
| 109 | | |
| 110 | **NOTE(S)** | The economic development project tax increment |
| 111 | | revenue note(s) authorized to be issued by the |
| 112 | | Village pursuant to the terms of this |
| 113 | | Agreement, including Notes to evidence |
| 114 | | Developer Advances, Notes to evidence |
| 115 | | obligations to reimburse private financing |
| 116 | | costs and Notes evidencing obligations to any |
| 117 | | credit enhancers. |
| 118 | | |
| 119 | **OBLIGATIONS** | The Bonds, the Notes, special service area |
| 120 | | bonds and any other instrument evidencing the |
| 121 | | obligation of the Village to pay money in |
| 122 | | furtherance of the Economic Development Plan |
| 123 | | and the development of the Subject Property |
| 124 | | (including, without limitation, bonds, notes, |
| 125 | | installment or financing contracts, |
| 126 | | certificates, tax anticipation warrants or |
| 127 | | notes, vouchers, and any other evidence of |
| 128 | | indebtedness). |
| 129 | | |
| 130 | **PCMT PROPERTY** | The real estate upon which the Poplar Creek |
| 131 | | Music Theater is situated. The PCMT Property |
| 132 | | is legally described on Exhibit "C" to the |
| 133 | | Nederlander Annexation Agreement. |
| 134 | | |
| 135 | **PARTIES** | The Village and the Developer. |
| 136 | | |
| 137 | **PHASE I** | That development occurring during the life of |
| 138 | **DEVELOPMENT** | the Economic Development Project either within |
| 139 | | or outside the boundaries of the Project Area |
| 140 | | (including, without limitation, site |
| 141 | | preparation, the construction of buildings, |
| 142 | | structures, utility installations, roadways |
| 143 | | and other improvements) which is undertaken |
| 144 | | on, in connection with, or in furtherance of |
| 145 | | the use, occupancy and development of the |
| 146 | | Phase I Site. |
| 147 | | |

02/27/90-H.E.                              3

| | | |
|---|---|---|
| 148<br>149<br>150<br>151<br>152<br>153<br>154<br>155<br>156<br>157 | **PHASE II**<br>**DEVELOPMENT** | That development occurring during the life of the Economic Development Project either within or outside the boundaries of the Project Area (including, without limitation, site preparation, the construction of buildings, structures, utility installations, roadways and other improvements) which is undertaken on, in connection with, or in furtherance of the use, occupancy and development of the Phase II Site. |
| 159<br>160<br>161<br>162<br>163<br>164 | **PHASE I SITE** | That portion of the Subject Property, consisting of approximately two hundred (200) acres, which is located in the northwest corner of the Subject Property. The Phase I Site is legally described on Exhibit "D" attached hereto. |
| 166<br>167<br>168<br>169<br>170<br>171 | **PHASE II SITE** | The Subject Property, exclusive of the Phase I Site. The Phase II Site consists of approximately five hundred eighty-eight (588) acres and includes the PCMT Property. The Phase II Site is legally described on Exhibit "E" attached hereto. |
| 173<br>174<br>175<br>176<br>177<br>178<br>179<br>180<br>181<br>182<br>183 | **PHASE I TAX**<br>**INCREMENT**<br>**REVENUES** | The ad valorem taxes levied upon taxable real property within the Phase I Site by any and all Taxing Districts having the power to tax real property in the Phase I Site, which taxes are attributable to the increase in the then current equalized assessed valuation of each taxable lot, block, tract, or parcel of real property in the Phase I Site over and above the initial equalized assessed value of each such lot, block, tract or parcel of real property. |
| 185<br>186<br>187<br>188<br>189 | **PHASE I TAX**<br>**INCREMENT**<br>**REVENUE**<br>**COMMENCEMENT**<br>**DATE** | The date on which the Phase I Tax Increment Revenues received and deposited in the Fund reflect a full year's assessment of the SMG Home Office Complex. |
| 191<br>192<br>193<br>194<br>195<br>196<br>197<br>198<br>199 | **PHASE II TAX**<br>**INCREMENT**<br>**REVENUES** | The ad valorem taxes levied upon taxable real property within the Phase II Site by any and all Taxing Districts having the power to tax real property in the Phase II Site, which taxes are attributable to the increase in the then current equalized assessed valuation of each taxable lot, block, tract or parcel of real property in the Phase II Site over and above the initial equalized assessed value of |

02/27/90-H.E.                                4

200                      each such lot, block, tract or parcel of real
201                      property.
202
203     **PROJECT AREA**        The Hoffman Estates Economic Development
204                      Project Area, which is legally and commonly
205                      described on Exhibit "F" attached hereto, and
206                      pictorially depicted on Exhibit "G" attached
207                      hereto, as heretofore established by the
208                      Corporate Authorities by Village Ordinance No.
209                      2107-1989, adopted September 11, 1989, and as
210                      certified by the Department on October 6,
211                      1989.
212
213     **PROJECT COSTS**       The reasonable or necessary costs incurred by
214                      the Village incidental to the Economic
215                      Development Project. Project Costs shall
216                      include, without limitation, "economic
217                      development project costs", as defined in the
218                      Act as of the date of this Agreement, and the
219                      following:
220
221                                (a)    Costs of studies, surveys,
222                                        development of plans and
223                                        specifications, implementation and
224                                        administration of the Economic
225                                        Development Plan, including, but not
226                                        limited to, personnel and
227                                        professional service costs for
228                                        architectural, engineering, legal,
229                                        marketing, financial, planning,
230                                        police, fire, public works or other
231                                        services, provided, however, that no
232                                        charges for professional services
233                                        may be based on a percentage of the
234                                        incremental tax revenues;
235
236                                (b)    Property assembly costs within the
237                                        Project Area, including, but not
238                                        limited to, acquisition of land and
239                                        other real or personal property, or
240                                        rights or interests therein, and
241                                        specifically including payments to
242                                        the Developer and other
243                                        nongovernmental parties as
244                                        reimbursement for, respectively,
245                                        Property Assembly Costs and the
246                                        property assembly costs incurred by
247                                        such other nongovernmental parties;
248
249                                (c)    Site preparation costs,
250                                        including, but not limited to,
251                                        clearance of any area within the

02/27/90-H.E.                        5

Project Area by demolition or removal of existing buildings, structures, fixtures, utilities and improvements, and clearing and grading; and including installation, repair, construction, reconstruction, or relocation of public streets, public utilities, and other public site improvements (and the acquisition of necessary rights-of-way and easements therefor) within or outside the boundaries of the Project Area which are essential to the preparation of the Project Area for use in accordance with the Economic Development Plan; and specifically including payments to the Developer and other nongovernmental parties as reimbursement for site preparation costs incurred by the Developer or such other nongovernmental parties;

(d) Costs of renovation, rehabilitation, reconstruction, relocation, repair or remodeling of any existing public or private buildings, improvements and fixtures within the Project Area, and specifically including payments to the Developer or other nongovernmental parties as reimbursement for such costs incurred by the Developer or such other nongovernmental parties;

(e) Costs of construction within the Project Area of public works or improvements, including but not limited to, buildings, structures, works, utilities or fixtures;

(f) Financing costs, including, but not limited to, all necessary and incidental expenses related to the issuance of any Obligations, payment of any interest on any Obligations issued hereunder which accrues during the estimated period of construction of the part of the Economic Development Project for which such Obligations are issued and for not exceeding thirty-six

02/27/90-H.E.                    6

(36) months thereafter, and any reasonable reserves related to the issuance of such Obligations;

(g) All or a portion of a Taxing District's capital costs resulting from the Economic Development Project necessarily incurred or estimated to be incurred by a Taxing District in the furtherance of the objectives of the Economic Development Plan and Economic Development Project, to the extent the Village, by written agreement, accepts and approves such costs;

(h) Relocation costs to the extent that the Village determines that relocation costs shall be paid or is required to make payment of relocation costs by federal or State law;

(i) The estimated tax revenues from real property in the Project Area acquired by the Village which, according to the Economic Development Plan, is to be used for a private use and which any Taxing District would have received had the Village not adopted tax increment allocation financing for the Project Area and which would result from such Taxing District's levies made after the time of the adoption by the Village of tax increment allocation financing to the time the current equalized assessed value of real property in the Project Area exceeds the Total Initial Equalized Assessed Value of real property in said area;

(j) Costs of job training, advanced vocational or career education, including, but not limited to, courses in occupational, semi-technical or technical fields leading directly to employment, incurred by one or more Taxing Districts, provided that such costs are related to the establishment and

356
357
358
359
360
361
362
363
364
365
366
367
368
369
370
371
372
373
374
375
376
377
378
379
380
381
382
383
384
385
386
387
388
389
390
391
392
393
394
395
396
397
398
399
400
401
402
403
404
405
406
407

maintenance of additional job training, advanced vocational education or career education programs for persons employed or to be employed by employers located in the Project Area and further provided that when such costs are incurred by a Taxing District or Taxing Districts other than the Village they shall be set forth in a written agreement by or among the Village and the Taxing District or Taxing Districts, which agreement describes the program to be undertaken, including, but not limited to, the number of employees to be trained, a description of the training and services to be provided, the number and type of positions available or to be available, itemized costs of the program and sources of funds to pay the same, and the term of the agreement. Such costs include, specifically, the payment by community college districts of costs pursuant to SS3-37, 3-38, 3-40 and 3-40.1 of the Public Community College Act (Ill.Rev.Stat.Ch.103, S103 et.seq.) and by school districts of costs pursuant to SS10-22.20a and 10-23.3a of The School Code (Ill.Rev.Stat.Ch. 122);

(k) Private financing costs incurred by the Developer or other nongovernmental parties in connection with the Economic Development Project, and specifically including payments to the Developer or other nongovernmental parties as reimbursement for such costs incurred by the Developer or such other nongovernmental parties, provided that:

(i) private financing costs shall be paid or reimbursed by the Village only pursuant to the prior official action of the Village evidencing an intent to

02/27/90-H.E.                    8

pay or reimburse such private financing costs;

(ii) except as provided in subparagraph (iv), the aggregate amount of such costs paid or reimbursed by the Village in any one year shall not exceed 30% of such costs paid or incurred by the Developer or such other nongovernmental parties in that year;

(iii) private financing costs shall be paid or reimbursed by the Village solely from the Special Tax Allocation Fund established pursuant to the Act and shall not be paid or reimbursed from the proceeds of any Obligations issued by the Village;

(iv) if there are not sufficient funds available in the Special Tax Allocation Fund in any year to make such payment or reimbursement in full, any amount of such interest cost remaining to be paid or reimbursed by the Village shall accrue and be payable when funds are available in the Special Tax Allocation Fund to make such payment; and

(v) in connection with its approval and certification of the Economic Development Project pursuant to Section 5 of the Act, the Village shall forward a copy of this Agreement to the Department;

(1) Other eligible expenses, as permitted by the Act; and

(m) Developer Advances made to satisfy or pay any of the foregoing Project Costs (other than those identified in paragraph (k) above).

| | | |
|---|---|---|
| 460 | **PROPERTY** | The purchase price that is to be paid for the |
| 461 | **ASSEMBLY COSTS** | Subject Property pursuant to the Acquisition |
| 462 | | Contracts, and all reasonable title and survey |
| 463 | | charges; reasonable brokerage fees; reasonable |
| 464 | | attorneys fees; reasonable escrow charges; and |
| 465 | | all reasonable costs of soil, engineering and |
| 466 | | other "due diligence" tests and studies |
| 467 | | incurred in connection with the acquisition of |
| 468 | | the Subject Property. |
| 469 | | |
| 470 | **PUBLIC** | The Public Site Improvements and the Public |
| 471 | **IMPROVEMENTS** | Works and Improvements. |
| 472 | | |
| 473 | **PUBLIC** | The public streets, public utilities and other |
| 474 | **SITE** | public site improvements consisting of the |
| 475 | **IMPROVEMENTS** | Phase I Development Public Site Improvements, |
| 476 | | all of which are set forth on Exhibit "H" |
| 477 | | attached hereto and the Phase II Development |
| 478 | | Public Site Improvements, all of which are set |
| 479 | | forth on Exhibit "I" attached hereto, which |
| 480 | | are constructed, or to be constructed, by the |
| 481 | | Village or the Developer, and all reasonable |
| 482 | | or necessary activities which are undertaken |
| 483 | | in connection with such construction, within |
| 484 | | the Project Area (or outside the boundaries of |
| 485 | | the Project Area but essential to the |
| 486 | | preparation of the Project Area for use in |
| 487 | | accordance with the Economic Development |
| 488 | | Plan), which result in the Village's incurring |
| 489 | | "site preparation costs", as defined by |
| 490 | | Section 3(e)(3) of the Act. Exhibits "H" and |
| 491 | | "I" may be amended by the Parties, from time |
| 492 | | to time, pursuant to the provisions of this |
| 493 | | Agreement. Natural gas, electric and |
| 494 | | telephone service shall not be included within |
| 495 | | the definition of "public utilities", as used |
| 496 | | above and as used in Section 4.3 of this |
| 497 | | Agreement, except to the extent that they |
| 498 | | relate to natural gas, electric and telephone |
| 499 | | service improvements which are to be dedicated |
| 500 | | to, and owned by, the Village (e.g. public |
| 501 | | street lights). |
| 502 | | |
| 503 | **PUBLIC WORKS** | Those public improvements (including, but not |
| 504 | **AND** | limited to, buildings, structures, works, |
| 505 | **IMPROVEMENTS** | utilities or fixtures) identified on Exhibit |
| 506 | | "J" attached hereto which are constructed, or |
| 507 | | to be constructed, by the Village, and all |
| 508 | | activities which are undertaken in connection |
| 509 | | with such construction, which are authorized |
| 510 | | by this Agreement and the Economic Development |
| 511 | | Plan which result in the Village's incurring |

02/27/90-H.E.                    10

| | | |
|---|---|---|
| 512 | | "costs of construction", as defined by Section |
| 513 | | 3(e)(5) of the Act.  Exhibit "J" may be |
| 514 | | amended by the Parties, from time to time, |
| 515 | | pursuant to the provisions of this Agreement. |
| 516 | | |
| 517 | **REVENUE** | The economic development project tax increment |
| 518 | **BONDS** | revenue bonds authorized to be issued by the |
| 519 | | Village pursuant to the terms of Section |
| 520 | | 6.3(b) and Article 8 of this Agreement. |
| 521 | | |
| 522 | **SANITARY SEWER** | The sanitary sewer interceptor and related |
| 523 | **IMPROVEMENTS** | facilities which, pursuant to the terms of |
| 524 | | this Agreement, are to be constructed by the |
| 525 | | Village in order to provide sanitary sewer |
| 526 | | service to the Project Area. |
| 527 | | |
| 528 | **SMG** | Sears Merchandise Group, a group of Sears, |
| 529 | | Roebuck and Co., a New York corporation. |
| 530 | | |
| 531 | **SMG** | The mixed use complex of no less than |
| 532 | **HOME OFFICE** | 1,600,000 square feet of low to mid-rise |
| 533 | **COMPLEX** | development which is to be constructed on a |
| 534 | | portion of the Phase I Site for purposes of |
| 535 | | housing Developer's Merchandise Group home |
| 536 | | office and related uses.  The location of such |
| 537 | | portion of the Phase I Site is generally |
| 538 | | depicted on Exhibit "K" attached hereto. |
| 539 | | |
| 540 | **SMG OCCUPANCY DATE** | The date the Developer substantially completes |
| 541 | | the SMG Home Office Complex and applies to the |
| 542 | | Village, in accordance with Village |
| 543 | | ordinances, for issuance of a temporary or |
| 544 | | permanent certificate of occupancy for the SMG |
| 545 | | Home Office Complex. |
| 546 | | |
| 547 | **SMG OCCUPANCY** | The written notice which the Developer is to |
| 548 | **DATE NOTICE** | deliver to the Village confirming that the |
| 549 | | Developer has received the last governmental |
| 550 | | permit or approval necessary to the |
| 551 | | Developer's commencement of construction of |
| 552 | | the SMG Home Office Complex.  The SMG |
| 553 | | Occupancy Date Notice shall be substantially |
| 554 | | in the form of Exhibit "L" attached hereto. |
| 555 | | |
| 556 | **SPECIAL TAX** | The 1989 Hoffman Estates Economic Development |
| 557 | **ALLOCATION** | Project Area Special Tax Allocation Fund, |
| 558 | **FUND** | which is a special fund established pursuant |
| 559 | **(OR FUND)** | to the provisions of the Act and created by |
| 560 | | Village Ordinance No. 2108-1989, adopted by |
| 561 | | the Corporate Authorities on September 11, |
| 562 | | 1989, which shall be the repository for: (i) |
| 563 | | the Tax Increment Revenues; (ii) the other |

564                                 monies which are to be deposited in the Fund
565                                 pursuant to the Act or this Agreement; and
566                                 (iii) the income earned on the investment of
567                                 the monies deposited in the Fund.
568
569   **SUBJECT**                   That certain parcel of real estate under the
570   **PROPERTY**                  ownership   or   control   of   the   Developer
571                                 consisting of approximately 788 acres, bounded
572                                 generally on the north by Higgins Road, on the
573                                 east by Route 59, on the south by I-90 and on
574                                 the   west   by   Beverly   Road   (excluding   the
575                                 approximately 44 acres located east of Old
576                                 Sutton Road and north of the corporate limits
577                                 of  the  Village).   The  Subject  Property  is
578                                 legally  described  on  Exhibit  "M"  attached
579                                 hereto.
580
581   **TAX INCREMENT**             The sum of the Phase I Tax Increment Revenues
582   **REVENUES**                  and the Phase II Tax Increment Revenues.
583
584   **TAXING DISTRICTS**          Counties,   townships,   municipalities,   and
585                                 school,   road,   park,   library,   sanitary,
586                                 mosquito abatement, forest preserve, public
587                                 health, fire protection, river conservancy,
588                                 tuberculosis   sanitarium   and   any   other
589                                 municipal corporations or districts with the
590                                 power to levy taxes on real property located
591                                 in the Project Area.
592
593   **TOTAL INITIAL**             The total initial equalized assessed value of
594   **EQUALIZED**                 the taxable real property within the Project
595   **ASSESSED VALUE**            Area, as determined by the County Clerk of
596                                 Cook County in accordance with the provisions
597                                 of the Act.
598
599   **TOTAL MINIMUM**             That amount of the assessed valuation of the
600   **ASSESSED**                  Subject Property for a given levy year which,
601   **VALUATION**                 when taken together with the applicable tax
602                                 rate and state equalization factor for such
603                                 levy year, will be required to produce Tax
604                                 Increment Revenues sufficient:  (i) to satisfy
605                                 the   debt   service   requirements,   including
606                                 additions to required reserves, on outstanding
607                                 Revenue Bonds for the next succeeding year, as
608                                 required   by   then   outstanding   Village
609                                 ordinances  authorizing  issuance  of  such
610                                 Revenue   Bonds;   and   (ii)   to   pay   the
611                                 appropriate Allocated Tax Increment Revenue
612                                 Amounts for the next succeeding year, as set
613                                 forth on Exhibits "B" and "C" attached hereto.
614
615

02/27/90-H.E.                   12

| 616 | **VILLAGE** | The Village of Hoffman Estates, an Illinois |
| 617 | | home rule municipal corporation. |
| 618 | | |
| 619 | **VILLAGE MUNICIPAL** | The municipal service facility which is to be |
| 620 | **FACILITY** | constructed on the Village Municipal Site |
| 621 | | which may include offices, a Village fire |
| 622 | | station, a Village police station and an |
| 623 | | interior public works area. A "Village Green" |
| 624 | | may adjoin the Village Municipal Facility and |
| 625 | | be located on the Village Municipal Site. |
| 626 | | |
| 627 | **VILLAGE** | That certain fifteen (15) acre portion of the |
| 628 | **MUNICIPAL SITE** | Subject Property which is to be agreed upon |
| 629 | | and identified by the Parties on the |
| 630 | | conceptual land use plan submitted pursuant to |
| 631 | | Section 3.1(d)(1)(iv) of this Agreement. |
| 632 | | |
| 633 | **VILLAGE PROJECT** | Those Project Costs incurred at any time by |
| 634 | **COSTS** | the Village which shall include, and be |
| 635 | | limited to, the following (to the extent |
| 636 | | permitted under the Act): |

(a) Costs of studies, surveys, development of plans and specifications, and administration, personnel and professional service costs related to the Village's implementation and administration of the Economic Development Plan and Economic Development Project, (including, but not limited to, personnel and professional costs for administrative, engineering, legal, marketing, financial, planning, public works or other services);

(b) Costs of providing police and fire protection to the Development and the Project Area;

(c) Costs of development, construction, maintenance, repair and replacement of the Public Works and Improvements (including, without limitation, the Village Municipal Facility and the Village Water Tank);

(d) Costs of: (i) maintenance and repair of the Public Site Improvements after their conveyance to, and acceptance by, the Village; and Village-owned water lines and sewer

02/27/90-H.E.                    13

668
669
670
671
672
673
674
675
676

lines existing as of the date of
this Agreement either within or
outside the boundaries of the
Project area; and (ii) replacement
of Public Site Improvements after
their conveyance to, and acceptance
by, the Village in accordance with
Village ordinance; and

677
678
679
680
681
682
683
684
685
686
687
688
689
690
691
692
693
694
695
696
697

(e)   All financing costs related to the
costs identified in (a) through (d)
above, including, but not limited
to, all necessary and incidental
expenses related to the issuance of
those Village Obligations (including
the General Obligation Bonds) which
are issued to pay the costs
identified in (a) through (d) above;
payment of any interest on any such
Village Obligations which accrue
during the estimated period of
construction of the part of the
Economic Development Project for
which such Village Obligations are
issued and for not exceeding thirty-
six (36) months thereafter; and any
reasonable reserves related to the
issuance of such Village
Obligations.

698
699
700
701
702
703
704
705
706
707
708
709
710
711
712

**VILLAGE WATER TANK**   The water storage tank which is to be
constructed by the Village within the Project
Area or within the vicinity of the Project
Area for purposes of furthering the use of the
Project Area in accordance with the Economic
Development Plan.  The Village Water Tank is
to provide storage for not less than seven
hundred fifty thousand (750,000) gallons of
water.

02/27/90-H.E.                    14

713                                    **RECITALS**

714         A.    Pursuant to the Act and to the terms of the Economic

715    Development Plan, the Village proposed the Economic Development

716    Project for economic development of certain designated areas either

717    within its municipal limits or pending annexation to the Village.

718    The site proposed for the Economic Development Project is the

719    Project Area.  The Project Area includes the Subject Property.  The

720    Economic Development Plan sets forth a mixture of land use

721    activities within the Project Area.

722         B.    On September 11, 1989, the Village adopted Ordinance No.

723    2108-1989 adopting tax increment allocation financing for the

724    Project Area.    Such ordinance provides that the Tax Increment

725    Revenues which are realized within the Project Area are to be paid

726    to the Village for deposit in the Special Tax Allocation Fund in

727    order to pay Project Costs and principal and interest obligations

728    coming due on the Obligations.

729         C.    The Corporate Authorities, after due and careful

730    consideration, have concluded that the development of the Project

731    Area, as provided in this Agreement and in the Economic Development

732    Plan, will: (i) create or retain not less than 2,000 full-time

733    equivalent jobs; (ii) cause private investment in an amount of not

734    less than $100,000,000 to occur in the Project Area; (iii)

735    encourage the increase of commerce and industry within the State of

736    Illinois, thereby reducing the evils attendant upon unemployment

737    and increasing opportunities for personal income; (iv) increase or

738    maintain the property, sales and income tax bases of the Village

739    and of the State of Illinois and enable the Village to control the
740    development of the Subject Property; and (v) otherwise be in the
741    best interests of the Village.

742        D.    Subject to the terms and provisions of the Act and this
743    Agreement: (i) the Developer intends to acquire, or to cause its
744    nominee to acquire, the Subject Property, and the Village intends
745    to reimburse the Developer for the Property Assembly Costs the
746    Developer incurs, or to pay the Developer's Property Assembly
747    Costs, out of Tax Increment Revenues (other than the Allocated Tax
748    Increment Revenue Amounts), or other monies deposited in the Fund,
749    the proceeds of Revenue Bonds, and the proceeds of Developer
750    Advances; (ii) the Developer intends to develop the Phase I Site
751    with at least the SMG Home Office Complex; (iii) the Developer may
752    hereafter develop the Phase II Site with the uses specified in the
753    Economic Development Plan; and (iv) the Village intends to
754    reimburse the Developer for the Project Costs the Developer pays,
755    incurs or advances to, or on behalf of, the Village out of Tax
756    Increment Revenues (other than the Allocated Tax Increment Revenue
757    Amounts), other monies deposited in the Fund, or from the proceeds
758    of Revenue Bonds.

759        E.    The  Parties  acknowledge  that  the  purchase  price
760    established by the Acquisition Contracts for the Subject Property
761    is reasonable.

762        F.    The  development  of  the  Subject  Property,  and  the
763    fulfillment  generally  of  the  terms  and  provisions  of  this
764    Agreement, are in the vital and best interest of the Village and

765    the health, safety, and welfare of its residents and taxpayers.

766          G.    The Parties intend to enter into this Agreement under the

767    authority of the Act and pursuant to the Village's home-rule

768    authority.

769          **NOW, THEREFORE,** in consideration of the foregoing Recitals,

770    and the mutual agreements set forth below, it is hereby agreed by

771    and between the Parties as follows:

772          **ARTICLE 1.**          **INCORPORATION OF RECITALS**

773          The representations set forth in the foregoing Recitals are

774    material to this Agreement and are hereby incorporated into and

775    made a part of this Agreement as though they were fully set forth

776    in this Article 1.

777          **ARTICLE 2.**          **GOALS, MUTUAL ASSISTANCE AND COOPERATION**

778          **2.1. Goals and Mutual Assistance**

779          The Parties acknowledge that it is their mutual goal and

780    desire to further the objectives of the Economic Development Plan

781    and Economic Development Project, to further the improvement and

782    development of the Project Area, and to finance all costs of the

783    Development as Project Costs (to the fullest extent permitted by

784    law and in the most economically efficient manner) pursuant to the

785    provisions of this Agreement.  Accordingly, the Parties shall do

786    all things necessary or appropriate to carry out the terms and

787    provisions of this Agreement and to aid and assist each other in

788    furthering the objectives of this Agreement and the intentions of

789    the Parties as reflected by said terms.  Specifically, if it shall

790    become necessary, the Village: (i) shall assist the Developer in

02/27/90-H.E.                            17

791   acquiring portions of the Subject Property (whether or not such

792   portions are the subject of the Acquisition Contracts); and (ii) at

793   the request of the Developer, shall attempt to acquire properties,

794   rights-of-way and easements necessary to the development of the

795   Project Area by the use of its power of eminent domain (provided,

796   however, that the Village makes no representation or warranty

797   regarding its ability to acquire any such portions of the Subject

798   Property, or any of such properties, rights-of-way or easements by

799   use of its power of eminent domain, and provided further that the

800   Developer shall pay and satisfy all purchase prices, settlements,

801   judgments, orders or other costs and expenses incurred by the

802   Village in the exercise of such powers by making a Developer

803   Advance in the amount of such costs and expenses).   In the event

804   the Village acquires all or any portion of the Subject Property

805   through the use of its power of eminent domain as set forth above,

806   it shall convey the same to the Developer immediately thereafter

807   for one dollar ($1.00).

808       2.2. **Cooperation in Seeking Financial Aid and Assistance**

809       The Parties shall cooperate with each other in seeking

810   financial or other aid and assistance required for or useful to the

811   construction of roadway, highway and utility improvements

812   (including a two million three hundred thousand dollar

813   ($2,300,000.00) "Build Illinois" infra-structure grant for the

814   construction of the Sanitary Sewer Improvements) within the Project

815   Area or outside the boundaries of the Project Area (but essential

816   to the preparation of the Project Area for use in accordance with

02/27/90-H.E.                    18

817   the Economic Development Plan) from all appropriate governmental

818   bodies (whether Federal, State, County or local).  In addition, in

819   order to gain the Department's certification of the Village's

820   designation of the Project Area as an "Enterprise Zone" for the

821   maximum statutory term pursuant to the Illinois Enterprise Zone Act

822   (Ill.Rev.Stat.  Ch.  67  1/2,SS601 et seq.),  the Village,  in

823   accordance with the provisions of said statute and within sixty

824   (60) days of the date of this Agreement, shall: (i) pass an

825   ordinance designating the Project Area as an "Enterprise Zone";

826   (ii) submit a complete written application to the Department

827   seeking the Department's certification of the Village's designation

828   of the Project Area as an "Enterprise Zone"; and (iii) take such

829   other actions as may be necessary or appropriate under the

830   provisions of said statute to gain certification by the Department

831   of the Project Area as an "Enterprise Zone".  The Village, pursuant

832   to said statute or other applicable state statutes or local

833   ordinances, shall also consent to local sales tax exemption for

834   construction materials purchased in connection with the

835   Development.

836       **ARTICLE 3.      DEVELOPMENT OF THE SUBJECT PROPERTY**

837       **3.1. Phase I Development**

838       **(a)   General.**

839            The Phase I Development shall be the first priority of

840            the Parties.  The first stage of that development shall

841            encompass the construction of the SMG Home Office

842            Complex.   The SMG Home Office Complex shall be

02/27/90-H.E.                    19

843              constructed in a manner consistent with the goals and

844              objectives of the Economic Development Plan and shall be

845              of a quality that is consistent with other first-class

846              office facilities located in the Greater Chicagoland

847              Metropolitan Area.

848      **(b)**   **Permits.**

849              Before commencement of construction of any portion of the

850              SMG Home Office Complex, the Developer, at its expense,

851              shall secure, or cause to be secured, all permits or

852              approvals which may be required by the Village and other

853              governmental agencies having jurisdiction over such

854              construction, in whole or in part, including, without

855              limitation, all permits required, if any, from the U.S.

856              and Illinois Environmental Protection Agencies, the

857              Metropolitan Water Reclamation District, the U.S. Army

858              Corps of Engineers, the Illinois Department of

859              Transportation and all other local, Federal and State

860              agencies having or exercising any jurisdiction over such

861              construction or over the portion of the Project Area that

862              is affected by such construction.   The Village shall

863              provide all proper assistance to the Developer in

864              securing such permits and shall promptly execute all

865              permits and permit applications which require or benefit

866              from such execution provided such permits and permit

867              applications (and the plans relating thereto) are in

868              proper form and comply with all lawful requirements.   The

869          Village shall promptly issue all permits required to be

870          issued by the Village provided such permits (and the

871          permit applications and plans relating thereto) are in

872          proper form and comply with all lawful requirements.

873    (c)   **Preliminary Grading.**

874          Notwithstanding the provisions of the foregoing paragraph

875          (b), and provided the public hearings described in

876          Section 3.1(d) have commenced, the Board of Trustees

877          shall authorize issuance to the Developer of a site

878          development permit for mass grading and storm water

879          management installation and other similar excavation-

880          related tasks on the Subject Property prior to receipt of

881          all of the foregoing permits, prior to final Village

882          approval of the Amendment to the Annexation Agreements

883          and prior to approval of final engineering plans for the

884          Phase I Development provided that:

885          (1)   The Developer satisfies the Village staff and Board

886                of Trustees that the Developer is providing the

887                necessary erosion and sedimentation control

888                measures to satisfy the principles set forth in

889                Sub-Section A of Section 10-8-6 of the Village's

890                Municipal Code (Erosion and Sedimentation Control);

891                and

892          (2)   The Board of Trustees receives a tree survey from

893                the Developer showing all trees having a four inch

894                (4") caliper or more and the Board approves a tree

02/27/90-H.E.                    21

895              preservation plan satisfying the principles set

896              forth in Sub-section D in Section 10-8-11 of the

897              Hoffman Estates Municipal Code and issues or

898              directs the Village staff to issue any necessary

899              tree removal permits; and

900    (3)    That such grading and other work shall be

901              undertaken at the Developer's sole cost and risk

902              and the Developer, pursuant to Article 20 of this

903              Agreement, shall indemnify the Village against,

904              and hold the Village harmless from, all costs,

905              expenses, reasonable attorney fees, losses,

906              liabilities and damages that may be suffered or

907              sustained by the Village as a result of Developer's

908              undertaking such grading and other work.

909    (4)    That the President and Board of Trustees shall find

910              that provisions C - (1), (2) and (3) above are

911              satisfied and grant approval for such preliminary

912              grading.

913    **(d)    Submission of Development Documentation**

914    (1)    On or before March 1, 1990, the Developer shall

915              submit the following to the Village for the

916              Village's review and approval:

917         (i)    A Community Impact Statement for the Subject

918              Property submitted pursuant to Village

919              Ordinance No. 914-1977;

920        (ii)    An application for approval by the Corporate

02/27/90-H.E.                    22

921      Authorities of the Amendment to the Annexation

922      Agreements;

923   (iii) An application for the granting of the relief

924      provided   for   in   the   Amendment   to   the

925      Annexation Agreements;

926   (iv) A conceptual land use plan for the Subject

927      Property (which plan identifies, among other

928      things, estimates of square footage, proposed

929      land uses, internal roadway plans and the

930      proposed location of the Village Municipal

931      Site); and

932   (v) A preliminary site plan, preliminary plat of

933      subdivision, preliminary engineering plans,

934      preliminary   landscaping   plans   and   other

935      appropriate preliminary documentation for the

936      Phase I Development.

937   Within thirty (30) days of the Village's receipt of

938  the last of the foregoing submittals (provided such

939  submittals are complete and in a form acceptable to the

940  Village), the Village shall schedule, and give all

941  notices required to be given for, all public hearings

942  required to be conducted by the Corporate Authorities,

943  the Board of Trustees, the Plan Commission, the Zoning

944  Board of Appeals and all other commissions and committees

945  of the Village for purposes of considering the

946  Developer's applications, plats and plans.  Such public

947     hearings shall be conducted by the Village in an
948     expeditious manner and, to the extent practicable, but in
949     the sole discretion of the Village, such public hearings
950     shall be conducted concurrently before the aforesaid
951     entities, commissions and committees. The Developer, at
952     any of such public hearings, shall have the right, at the
953     Developer's option, to present preliminary and final
954     plats and plans concurrently or to bypass the submittal
955     of preliminary plats and plans entirely in favor of
956     proceeding directly with the review and approval of final
957     plats and plans.

958   (2) Not later than sixty (60) days after the Village's
959     adoption of the ordinances and resolutions
960     authorizing the execution of the Amendment to the
961     Annexation Agreements and granting the relief
962     provided for in the Amendment to the Annexation
963     Agreements, the Developer shall submit the
964     following to the Village for the Village's review
965     and approval:

966    (i) A final plat of subdivision for the Phase I
967     Development;

968    (ii) Final grading, utility and roadway plans for
969     the construction of the SMG Home Office
970     Complex;

971    (iii) Final engineering plans for the Public Site
972     Improvements which are to be constructed as

02/27/90-H.E.     24

973            part of the Phase I Development (as identified
974            on Exhibit "H" to this Agreement), which
975            improvements shall include all Public Site
976            Improvements necessary to the construction,
977            use and occupancy of the SMG Home Office
978            Complex; and

979    (iv)    Such other documentation as the Village may
980            reasonably request as a condition precedent to
981            the issuance of a building permit for the SMG
982            Home Office Complex.

983        The Village's staff and representatives, during the
984    time the Developer is preparing all such final plats and
985    plans, shall meet with the Developer, and its
986    representatives, to coordinate the preparation of such
987    plats and plans and their submission to, and review by,
988    the Village.   The Village and the Developer shall
989    communicate and consult informally with each other as
990    frequently as is necessary to insure that the review,
991    processing and approval of all such plats and plans
992    receives prompt consideration by the Village.

993        The Board of Trustees shall approve or disapprove
994    all such final plats and plans within thirty (30) days of
995    their submission to the Village provided: (i) such plats
996    and plans are complete, have been reviewed by the Plan
997    Commission upon an expedited schedule that shall be
998    provided for in the Amendment to the Annexation

02/27/90-H.E.                    25

999           Agreements, and are in a form acceptable to the Village;

1000          (ii) the Amendment to the Annexation Agreements has then

1001          been approved by the Corporate Authorities and executed

1002          by the Parties; (iii) all annexation and zoning

1003          ordinances provided for in the Amendment to the

1004          Annexation Agreements have been adopted by the Village;

1005          and (iv) such plats and plans substantially conform to

1006          the preliminary plats and plans. If such plats or plans

1007          are disapproved, as soon as reasonably possible

1008          thereafter, the Developer shall submit revised plats and

1009          plans to the Village.

1010    (e)   **Construction of Phase I Development Public Site**
1011          **Improvements.**

1012          (1)   The Developer is hereby appointed as the Village's

1013                sole and exclusive agent for purposes of managing

1014                and overseeing the engineering, design and

1015                construction of those Public Site Improvements

1016                which are to be constructed as part of the Phase I

1017                Development (as identified on Exhibit "H" to this

1018                Agreement), provided, however, that: (i) before

1019                either the Village or the Developer enters into any

1020                contract for construction or construction services

1021                relating to the construction of such Public Site

1022                Improvements, the Developer shall select a

1023                contractor and the Village shall approve such

1024                contractor provided the conditions of this Section

1025                3.1(e) are met and further provided the contractor

02/27/90-H.E.                    26

1026    can complete the improvements in such a manner and
1027    in accordance with such a timetable as may be
1028    agreed to by the Parties; and (ii) all such
1029    contracts shall be executed by the Village to the
1030    extent necessary to further the goals of this
1031    Agreement. The Developer shall not be required to
1032    advertise for bids or to submit multiple bids to
1033    the Village prior to entering into such contracts.
1034    (2)  The Board of Trustees shall receipt all contracts
1035    submitted to it by the Developer in order to
1036    review: (i) that the contractors which are to
1037    perform work pursuant to such contracts are
1038    sufficiently experienced in doing the size and type
1039    of work required for the construction of the
1040    improvements to be constructed; (ii) that all such
1041    contracts accurately reflect the cost of completing
1042    such improvements; and (iii) that no purpose would
1043    be served in the Village's obtaining further bids
1044    for the construction of such improvements. The
1045    Board of Trustees shall have twenty-one (21) days
1046    to review and approve or disapprove the contracts
1047    submitted to it by the Developer. If disapproved,
1048    the Village Manager shall give reasons, in writing,
1049    to the Developer for such disapproval. All
1050    construction contracts shall provide for payment in
1051    accordance with the provisions of this Agreement.

02/27/90-H.E.                    27

1052
1053
1054
1055
1056
1057

1058
1059
1060
1061
1062
1063
1064
1065
1066
1067
1068
1069
1070
1071
1072
1073
1074
1075
1076
1077

With respect to such construction contracts, and where the provisions of this Section 3.1(e) are satisfied, the Board of Trustees, in accordance with Ill.Rev.Stat. Ch. 24, S8-9-1 (1987), shall hereafter waive any advertising for bids by the Village.

Notwithstanding the foregoing, the Village hereby approves those contracts which have been entered into as of the date of this Agreement or which are to be entered into, by or on behalf of the Developer, with the parties and for the services identified on Exhibit "N" to this Agreement; waives advertising for bids for the services to be provided by such contracts; and acknowledges that all costs incurred pursuant to those contracts shall be considered Project Costs that relate directly to Public Improvements or Public Site Improvements or Property Assembly Costs as Project Costs and both the Village and Sears agree that Chapman & Cutler as Bond Counsel for the Village will determine what costs in Exhibit "N" qualify as Project Costs under the Act. The provisions of Section 17.5 of this Agreement, Dispute Resolution shall not apply to the determination made by Chapman & Cutler relating to Exhibit "N" which are to be paid or reimbursed pursuant to the terms of this Agreement.

(3) Notwithstanding the provisions of the foregoing paragraphs (1) and (2), the Village retains the

02/27/90-H.E.                    28

1078      right and the obligation to undertake the

1079      engineering, design and construction of the

1080      Sanitary Sewer Improvements and agrees to

1081      substantially complete, or cause the substantial

1082      completion of, the construction of the Sanitary

1083      Sewer Improvements by the SMG Occupancy Date.

1084   **(f)**   **SMG Occupancy Date.**

1085      The Developer shall deliver the SMG Occupancy Date

1086      Notice to the Village not more than sixty (60) days after

1087      the date of the Amendment to the Annexation Agreements,

1088      and the Developer shall substantially complete, or cause

1089      the substantial completion of, the SMG Home Office

1090      Complex, and cause the SMG Occupancy Date to occur, not

1091      later than thirty (30) months after the date the

1092      Developer delivers the SMG Occupancy Date Notice to the

1093      Village provided the Village has completed construction

1094      of the Village Water Tank and the Sanitary Sewer

1095      Improvements.

1096   **3.2.**   **Phase II Development**

1097   **(a)**   **General.**

1098      The Phase II Development shall be constructed in

1099      accordance with the terms and provisions of the Economic

1100      Development Plan and shall include amenities, facilities

1101      and landscaping that are of a similar quality to other

1102      first-class office and mixed use developments located in

1103      the Greater Chicagoland Metropolitan Area. The Phase II

1104                Development may occur in stages or phases.  The Developer

1105                shall not be obligated to commence construction of the

1106                Phase II Development, or any portion thereof, at any

1107                time.

1108      **(b)**    **Construction of Phase II Development Public Site**
1109                **Improvements.**

1110          (1)    The Village retains the right to manage and oversee

1111                the engineering, design and construction of those

1112                Public Site Improvements which are to be

1113                constructed as part of the Phase II Development

1114                (except those Phase II Development Public Site

1115                Improvements identified on Exhibit "I" which are to

1116                be constructed upon the Subject Property), provided

1117                that the Village shall coordinate such engineering,

1118                design and construction with the Developer.  The

1119                Developer shall act as the Village's agent for

1120                purposes of managing and overseeing the

1121                engineering, design and construction of the Phase

1122                II Development Public Site Improvements identified

1123                on Exhibit "I" to this Agreement which are to be

1124                constructed on the Subject Property provided,

1125                however, that: (i) before either the Village or the

1126                Developer enters into any contract for construction

1127                or construction services relating to the

1128                construction of such Phase II Development Public

1129                Site Improvements, the Developer shall select a

1130                contractor and the Village shall approve such

1131        contractor provided the conditions of this Section

1132        3.2(b) are met and further provided the contractor

1133        can complete the improvements in such a manner and

1134        in accordance with such a timetable as may be

1135        agreed to by the Parties; and (ii) all such

1136        contracts shall be executed by the Village to the

1137        extent necessary to further the goals of this

1138        Agreement.  The Developer shall not be required to

1139        advertise for bids or to submit multiple bids to

1140        the Village.

1141    (2)   The Board of Trustees shall receipt all contracts

1142        submitted to it by the Developer in connection with

1143        the construction of the Phase II Development Public

1144        Site Improvements identified on Exhibit "I" to this

1145        Agreement in order to review: (i) that the

1146        contractors which are to perform work pursuant to

1147        such contracts are sufficiently experienced in

1148        doing the size and type of work required for the

1149        construction of the improvements to be constructed;

1150        (ii) that all contracts accurately reflect the cost

1151        of completing such improvements; and (iii) that no

1152        purpose would be served in the Village's obtaining

1153        bids for the construction of such improvements.

1154        The Board of Trustees shall have twenty-one (21)

1155        days to review and approve or disapprove the

1156        contracts submitted to it by the Developer.  If

02/27/90-H.E.             31

1157           disapproved, the Village Manager shall give

1158           reasons, in writing, to the Developer for such

1159           disapproval.   All construction contracts shall

1160           provide for payment in accordance with the

1161           provisions of this Agreement. With respect to such

1162           construction contracts and where the provisions of

1163           this Section 3.2(b) are satisfied, the Board of

1164           Trustees, in accordance with Ill.Rev.Stat.

1165           Ch.24,S8-9-1(1987), shall hereafter waive any

1166           advertising for bids by the Village.

1167    **3.3. <u>Construction of Public Works and Improvements</u>**

1168       The Village retains the right to manage and oversee the

1169 engineering, design and construction of the Public Works and

1170 Improvements.   The design and location of the Village Water Tank

1171 and the parameters for the design and construction of the Village

1172 Municipal Facility and the Village Water Tank shall be provided for

1173 in the Amendment to the Annexation Agreements.

1174    **3.4. <u>Covenant to Run With Land Regarding Uses of the Subject</u>**
1175          **<u>Property.</u>**

1176       The Developer hereby covenants that, for the term of the

1177 Economic Development Plan, the Subject Property shall be devoted

1178 only to the uses specified in the Economic Development Plan. Such

1179 covenant shall constitute a covenant running with the land which

1180 shall terminate upon expiration of the Economic Development Plan.

1181 At the request of the Village, the Developer shall execute, and

1182 record in the Cook County Recorder of Deeds Office, a Declaration

1183 of Covenants that confirms such covenant and that subjects the

02/27/90-H.E.               32

1184    Subject Property to the terms of this Agreement and the Economic

1185    Development Plan.

1186    3.5. <u>Insurance</u>

1187    Prior to the commencement of construction of any portion of

1188    the Development, the Developer shall furnish, or cause to be

1189    furnished, to the Village certificates of insurance evidencing the

1190    procurement of comprehensive bodily injury and property damage

1191    liability insurance policies in the amount of at least two million

1192    dollars ($2,000,000.00) for any injury or death to persons, five

1193    million dollars ($5,000,000.00) for any injury or death to any

1194    number of persons arising out of any aggregate occurrence and five

1195    hundred thousand dollars ($500,000.00) for property damage, which

1196    certificates confirm the naming of the Village, its officials,

1197    agents and employees as "additional insureds" under all such

1198    policies.  The Developer shall have the option to provide the

1199    required insurance in a combined single limit form of not less than

1200    $5,000,000.00. All such policies shall provide for at least thirty

1201    (30) days' notice to the Village of the cancellation or termination

1202    of such policies.  Liability under the Illinois Structural Work Act

1203    and contractual liability for indemnification of the Village, its

1204    officials, agents and employees, shall be fully insured under these

1205    policies for the limits set forth above.  The Developer shall cause

1206    such insurance to be maintained in force for so long as the

1207    Developer is undertaking the construction of any improvements on

1208    the Subject Property.  Provided the Developer delivers to the

1209    Village documents that provide assurances to the Village equivalent

02/27/90-H.E.                    33

1210    to the assurances provided by the certificates of insurance as

1211    required above, the Developer shall have the right to self-insure

1212    for any or all of the losses described above.

1213    **3.6. Compliance of Plats, Plans and Construction Activities**
1214    **with Village Ordinances.**

1215    (a)    All plats and plans submitted to the Village for the

1216    Village's review and approval shall comply with the codes

1217    and ordinances of the Village that are in effect at the

1218    time of such submittal except to the extent such codes or

1219    ordinances conflict with, or are made inapplicable to the

1220    Subject Property by, the Beverly Annexation Agreement,

1221    the Nederlander Annexation Agreement or the Amendment to

1222    the Annexation Agreements.

1223    (b)    All construction activities undertaken on the Subject

1224    Property by, or under the direction of, the Developer

1225    shall be undertaken in compliance with the codes and

1226    ordinances of the Village that are in effect at the time

1227    of such construction except to the extent such codes or

1228    ordinances conflict with, or are made inapplicable to the

1229    Subject Property by, the Beverly Annexation Agreement,

1230    the Nederlander Annexation Agreement, the Amendment to

1231    the Annexation Agreements or this Agreement.

1232

1233

02/27/90-H.E.                    34

ARTICLE 4.    COSTS OF THE DEVELOPMENT CONSTITUTING "PROJECT COSTS" WHICH ARE TO BE PAID OR FINANCED PURSUANT TO THE PROVISIONS OF THIS AGREEMENT

4.1. **General**

To the fullest extent permitted by law, but subject to the provisions of Section 4.3 of this Article 4, all costs incurred by the Parties in furtherance of the Economic Development Plan and the Economic Development Project and the Development shall be deemed Project Costs and such costs shall be paid for or financed pursuant to the provisions of Article 6 of this Agreement.

4.2. **Project Costs Agreed Upon as of the Date of this Agreement.**

As of the date of this Agreement, the Parties acknowledge the following costs to be Project Costs which are to be paid for or financed pursuant to the provisions of this Agreement:

(a)    All reasonable or necessary Property Assembly Costs (including, without limitation, those costs identified on Exhibit "O" attached hereto) and both the Village and Sears agree that Chapman & Cutler as Bond Counsel for the Village will determine what costs in Exhibit "O" qualify as Project Costs under the Act.    The provisions of Section 17.5 of this Agreement, Dispute Resolution shall not apply to the determination made by Chapman & Cutler relating to Exhibit "O";

(b)    All reasonable or necessary costs of construction of the Public Improvements (including, without limitation, those costs identified on Exhibit "P" attached hereto) and both the Village and Sears agree that Chapman & Cutler as Bond

02/27/90-H.E.                    35

1262  Counsel for the Village will determine what costs in

1263  Exhibit "P" qualify as Project Costs under the Act.  The

1264  provisions of Section 17.5 of this Agreement, Dispute

1265  Resolution shall not apply to the determination made by

1266  Chapman & Cutler relating to Exhibit "P";

1267  (c)  All reasonable or necessary costs of preparation of

1268  surveys, development of plans and specifications,

1269  implementation and administration of the Economic

1270  Development Plan, and retention of personnel and

1271  professionals for architectural, engineering, legal,

1272  marketing, financial, planning, police, fire, public

1273  works and other services;

1274  (d)  All reasonable or necessary financing costs (including,

1275  without limitation, all necessary and incidental expenses

1276  related to the issuance of the Obligations, payment of

1277  any interest on any such Obligations which accrues during

1278  the estimated period of construction of the Economic

1279  Development Project for which such Obligations are issued

1280  and for not exceeding thirty-six (36) months thereafter,

1281  and any reasonable reserves related to the issuance of

1282  such Obligations);

1283  (e)  All reasonable or necessary Village Project Costs; and

1284  (f)  All reasonable or necessary private financing costs

1285  incurred by the Developer in furtherance of the Economic

1286  Development Plan, the Economic Development Project and

1287  the Development, and specifically including payments to

02/27/90-H.E.                    36

1288          the Developer as reimbursement for such costs incurred by

1289          the Developer, provided that:

1290    (1)    Such private financing costs shall be paid or

1291          reimbursed by the Village only pursuant to the

1292          prior official action of the Village evidencing an

1293          intent to pay or reimburse the Developer for such

1294          private financing costs (which action shall be

1295          deemed to have been taken by the Corporate

1296          Authorities' adoption of an ordinance authorizing

1297          the Village's execution of this Agreement);

1298    (2)    Except as provided in subparagraph (4) hereof, the

1299          aggregate amount of such costs paid or reimbursed

1300          by the Village to the Developer in any one year

1301          shall not exceed thirty percent (30%) of such costs

1302          paid or incurred by the Developer in that year;

1303    (3)    Private financing costs shall be paid or reimbursed

1304          by the Village solely from the Special Tax

1305          Allocation Fund and shall not be paid or reimbursed

1306          from the proceeds of Obligations issued by the

1307          Village;

1308    (4)    If there are not sufficient funds available in the

1309          Special Tax Allocation Fund in any year to make

1310          such payment or reimbursement in full, any amount

1311          of such interest cost remaining to be paid or

1312          reimbursed by the Village shall accrue, and, at

1313          Developer's request, be evidenced by the execution

02/27/90-H.E.                    37

1314      and delivery of a Note, and be payable when funds

1315      are available in the Fund to make such payment (and

1316      any such payment shall be made without regard to

1317      the limitations contained in subparagraph (2)

1318      hereof); and

1319      (5) In connection with the Department's approval and

1320      certification of the Economic Development Project

1321      pursuant to Section 5 of the Act, the Village shall

1322      forward a copy of this Agreement to the Department.

1323 **4.3. <u>Project Costs Incurred in Connection With the</u>**
1324 **<u>Construction of Public Site Improvements Identified by</u>**
1325 **<u>the Village After the Date of this Agreement.</u>**

1326 (a) If:

1327      (1) After the date of this Agreement, the Village

1328      determines that a public street, public utility or

1329      other public improvement that is not identified on

1330      either Exhibit "H" or Exhibit "I" to this Agreement

1331      must be constructed in order to further the

1332      Economic Development Project and the Development;

1333      and

1334      (2) The Developer accepts and agrees with such

1335      determination;

1336      then such public street, public utility or public

1337      improvement shall be deemed a "Public Site Improvement"

1338      and the entire cost of constructing such Public Site

1339      Improvement shall be deemed a Project Cost which is to be

1340      paid for or financed pursuant to the provisions of

Article 6 of this Agreement.

2          (b)    If:

1343              (1)    After the date of this Agreement, the Village
1344                     determines that a public street, public utility or
1345                     other public improvement that is not identified on
1346                     either Exhibit "H" or Exhibit "I" to this Agreement
1347                     must be constructed in order to further the
1348                     Economic Development Project and the Development;
1349                     and

1350              (2)    The Developer believes that such public street,
1351                     public utility or other public improvement
1352                     provides a material benefit to areas outside the
1353                     boundaries of the Project Area;

1354              then, subject to the provisions of paragraph (d) of this
1355              Section 4.3, such public street, public utility or public
1356              improvement shall be deemed a "Public Site Improvement"
1357              and that portion, and only that portion, of the cost of
1358              constructing such Public Site Improvement which is
1359              specifically and uniquely attributable to the Development
1360              shall be deemed a Project Cost which is to be paid for or
1361              financed pursuant to the provisions of Article 6 of this
1362              Agreement.

1363          (c)    Not less than 30 days after the Village makes a
1364                 determination pursuant to the foregoing paragraph (a) or
1365                 paragraph (b) that a public street, public utility or
1366                 public improvement must be constructed in order to

02/27/90-H.E.                    39

1367 further the Economic Development Project and the
1368 Development, the Village shall deliver notice to the
1369 Developer identifying:

1370 (1) The public street, public utility or public
1371 improvement and the basis for the Village's
1372 determination that such public street, public
1373 utility or public improvement must be constructed
1374 in order to further the Economic Development
1375 Project and the Development;

1376 (2) The Village's determination of the anticipated cost
1377 of constructing such public street, public utility
1378 or public improvement;

1379 (3) The Village's determination as to whether or not
1380 such public street, public utility or public
1381 improvement provides a material benefit to areas
1382 outside the boundaries of the Project Area; and

1383 (4) The Village's determination as to the portion of
1384 the cost of constructing such public street, public
1385 utility or public improvement which is specifically
1386 and uniquely attributable to the Development.

1387 (d) If the Developer agrees with the Village's determinations
1388 made pursuant to the foregoing paragraph (c), then the
1389 portion of the cost of constructing such public street,
1390 public utility or public improvement which is
1391 specifically and uniquely attributable to the Development
1392 shall be deemed a Project Cost.   If the Developer

1393        disagrees with any determination made by the Village

1394        pursuant to the provisions of this Section 4.3, then the

1395        following process shall occur:

1396        (1)    The Developer shall deliver notice to the Village

1397                identifying the specific Village determination with

1398                which the Developer disagrees;

1399        (2)    The Village, at the Village's cost, shall retain a

1400                consultant to provide evidence which supports the

1401                Village's determination and shall submit that

1402                evidence, with a report that summarizes the

1403                consultant's methodologies and conclusions, to the

1404                Developer;

1405        (3)    If the Developer disagrees with such consultant's

1406                evidence, methodologies or conclusions, then the

1407                Developer, at the Developer's cost, shall retain a

1408                consultant to provide evidence which supports the

1409                Developer's conclusions relative to the Village's

1410                determination and shall submit that evidence, with

1411                a report that summarizes such consultant's

1412                methodologies and conclusions, to the Village; and

1413        (4)    If the Parties are thereafter unable to resolve

1414                their difference of opinion, then the Village's

1415                consultant and the Developer's consultant shall

1416                jointly choose a third consultant, at a cost to be

1417                shared equally by the Village and the Developer,

1418                who shall make a final determination as to the

1419          matter in dispute, and such determination shall be

1420          final and binding on the Parties.

1421     **4.4. Determining "Reasonable or Necessary" Costs**

1422     Determinations of the Parties as to what costs are "reasonable

1423     or necessary" costs that are incidental to the Economic Development

1424     Project, as such terms are used in the Act and this Agreement,

1425     shall be consistent with the provisions of Sections 2.1 and 4.1 of

1426     this Agreement.

1427     **ARTICLE 5.     SPECIAL TAX ALLOCATION FUND**

1428     **5.1. Deposit of Monies into Fund**

1429     In accordance with the Act, the Village Treasurer shall

1430     promptly deposit in the Special Tax Allocation Fund, upon receipt,

1431     all Tax Increment Revenues, all other monies required by the Act or

1432     this Agreement to be deposited in the Fund, and all earnings

1433     realized upon the investment of such monies. Monies deposited in

1434     the Fund shall be used only for the purposes, and in the manner,

1435     specified in this Agreement and the Act.

1436     **5.2. Accounting of Monies Deposited in Fund**

1437     The Village shall establish such accounts and keep such books

1438     and records as are necessary to implement the provisions of this

1439     Agreement, the Act and the ordinances adopted in connection with

1440     each issue of Bonds. From and after the date of this Agreement,

1441     the Village shall provide the Developer with its annual financial

1442     report which shall include a statement of monies deposited into and

1443     disbursed from the Fund. Such report shall be undertaken in

1444     accordance with generally accepted auditing standards by a

02/27/90-H.E.               42

1445   certified public accounting firm designated by the Village.  The

1446   Developer shall have the right to review the books and records of

1447   the Village which relate to the Fund and any fund or account

1448   holding proceeds of Revenue Bonds and Notes.  At the request of the

1449   Developer, a separate compliance audit shall be performed to

1450   provide sufficient detail to enable the Parties to determine

1451   whether or not there has been compliance with the provisions of

1452   this Agreement and the Act.  Both the accounting records and all

1453   financial audits of the Fund shall separately identify Phase I Tax

1454   Increment Revenues and Phase II Tax Increment Revenues.  If the

1455   Developer requests a separate compliance audit of the Fund, the

1456   cost of such compliance audit shall not be a Village Project Cost

1457   unless the compliance audit indicates material non-compliance; in

1458   that event, the cost shall be a Village Project Cost.

1459        **5.3. Investment of Monies Deposited in the Fund**

1460        The Village shall invest monies in the Fund from  time to time

1461   only in those investment vehicles as are identified, as of the date

1462   of this Agreement, in Section 2 of "An Act Relating to Certain

1463   Investments    of    Public    Funds    by    Public    Agencies"

1464   (Ill.Rev.Stat.Ch.85,SS902).  All income earned on the investment of

1465   such monies shall be deposited in the Fund pursuant to Section 5.1

1466   of this Article 5.  The Village shall not transfer or loan monies

1467   deposited in the Fund to other Village funds.

1468        **ARTICLE 6.     PAYMENT AND FINANCING OF PROJECT COSTS**

1469        **6.1.  Project Costs Other Than Village Project Costs**

1470        The  Village  shall  pay  and  finance  those  Project  Costs

02/27/90-H.E.                    43

1471   identified in Article 4 of this Agreement other than Village

1472   Project Costs solely from Tax Increment Revenues, the proceeds of

1473   Obligations, the proceeds of Developer Advances, grants from the

1474   State of Illinois or other monies made available for such purposes

1475   pursuant to the Act or the provisions of this Agreement. The

1476   Village shall reimburse the Developer for the Project Costs

1477   identified in Article 4 of this Agreement which the Developer has

1478   paid or incurred out of Tax Increment Revenues or other monies

1479   deposited in the Fund, the proceeds of Revenue Bonds, or other

1480   monies made available for such purposes pursuant to the Act or the

1481   provisions of this Agreement. The foregoing provision shall not

1482   preclude the Parties, as provided in Article 2 of this Agreement,

1483   from seeking and securing other funding sources for the

1484   construction of public improvements which are deemed reasonable or

1485   necessary to the implementation of the Economic Development Plan

1486   and the furtherance of the Economic Development Project.

1487        **6.2. Payment and Financing of Village Project Costs**

1488        All Village Project Costs shall be paid out of, or financed

1489   by, the Village's portion of the Phase I Allocated Tax Increment

1490   Revenue Amounts (as identified in Column 2 of Exhibit "B" attached

1491   hereto); those Developer Advances and donations specified in

1492   Sections 10.1, 10.2 and 10.5 of this Agreement, or the proceeds of

1493   General Obligation Bonds or Village Obligations secured solely by

1494   the Village's portion of the Phase I Allocated Tax Increment

1495   Revenue Amounts.  Debt service on Village Obligations which are

1496   issued to pay Village Project Costs shall be paid solely out of the

1497  Village's portion of the Phase I Allocated Tax Increment Revenue

1498  Amounts and such other monies as may be available to the Village

1499  for such purposes.  Any portion of the Village's portion of the

1500  Phase I Allocated Tax Increment Revenue Amounts (as identified in

1501  Column 2 of Exhibit "B" attached hereto) which is not used or

1502  encumbered to pay or finance Village Project Costs or to pay such

1503  debt service shall be paid by the Village to the Cook County

1504  Collector for distribution to the Village and the affected Taxing

1505  Districts in accordance with the surplus distribution provisions of

1506  the Act.  The portion of the Phase II Allocated Tax Increment

1507  Revenue Amounts which are distributed to the Village pursuant to

1508  Article 7 of this Agreement need not be used by the Village to pay

1509  or finance Village Project Costs.  Notwithstanding any other

1510  provisions of this Agreement, the estimated three million dollar

1511  ($3,000,000.00) cost for constructing the Sanitary Sewer

1512  Improvements shall not be considered a Village Project Cost

1513  although the Parties acknowledge the Village's intention to secure

1514  the "Build Illinois" grant referenced in Section 2.2 of this

1515  Agreement and the Village's agreement to apply the proceeds of such

1516  grant, if and when received, to the construction of the Sanitary

1517  Sewer Improvements.  The Developer shall have no obligation to pay

1518  Village Project Costs, or to make Developer Advances for the

1519  purpose of paying Village Project Costs, except to the extent

1520  provided for in Sections 10.1, 10.2 and 10.5 of this Agreement.

1521  **6.3. Issuance of Bonds/Execution and Delivery of Notes**

1522  The Village shall issue Bonds and execute and deliver Notes,

02/27/90-H.E.                    45

1523    as necessary to fulfill its obligations under the terms of this

1524    Agreement, as follows:

1525    (a)    From time to time, the Village, in its sole discretion,

1526    may issue its General Obligation Bonds, and tax increment

1527    revenue bonds secured solely by the Village's portion of

1528    the Phase I Allocated Tax Increment Revenue Amounts, in

1529    amounts sufficient to satisfy and pay for Project Costs,

1530    including without limitation Village Project Costs.

1531    Notwithstanding the foregoing, the Village shall not

1532    issue any General Obligation Bonds until it has received

1533    the SMG Occupancy Date Notice from the Developer;

1534    (b)    From time to time, the Village pursuant to the terms of

1535    this Agreement and after it has received the SMG

1536    Occupancy Date Notice from the Developer, shall issue

1537    economic development project tax increment revenue bonds

1538    in amounts sufficient to satisfy and pay for the Project

1539    Costs described in Article 4 of this Agreement other than

1540    Village Project Costs (but in no event shall private

1541    financing costs incurred by the Developer in connection

1542    with the Economic Development Project be paid or

1543    reimbursed from the proceeds of Revenue Bonds);

1544    (c)    To the extent:

1545    (1)    The proceeds of Revenue Bonds are not sufficient to

1546    satisfy, or cannot be used to satisfy, the Project

1547    Costs described in Article 4 of this Agreement; and

1548    (2)    The Tax Increment Revenues (other than the

1549                           Allocated  Tax  Increment  Revenue  Amounts)  then

1550                           deposited  in  the  Fund,  are  not,  and  will  not  be,

1551                           sufficient  or  available  to  satisfy  such  Project

1552                           Costs; and

1553                 (3)  Such  Project  Costs  do  not  constitute  Village

1554                           Project Costs;

1555 the Developer, to the extent permitted by the Act, shall make a

1556 Developer Advance to satisfy such Project Costs and the Village

1557 shall execute and deliver its Note to evidence such Developer

1558 Advance.  Notwithstanding the foregoing, the Developer shall not

1559 advance, or be required to advance, monies needed to satisfy debt

1560 service requirements on the Obligations, to establish reserves for

1561 the debt service requirements of the Obligations or to retire or

1562 redeem any Obligations and no Developer Advance shall be used for

1563 such purpose.

1564       **6.4. <u>Limited Liability of the Village</u>**

1565     The Village shall not be required to pay and finance any of

1566 those Project Costs identified in Article 4 of this Agreement

1567 (other than Village Project Costs) unless funds for such purposes

1568 are available from Tax Increment Revenues (other than Allocated Tax

1569 Increment Revenue Amounts), the proceeds of Obligations, the

1570 proceeds of Revenue Bonds, the proceeds of Developer Advances,

1571 grants from the State of Illinois or other monies made available

1572 for such purposes pursuant to the Act or the provisions of this

1573 Agreement.  The Village shall not be required to reimburse the

1574 Developer for such Project Costs unless funds for such purposes are

1575    available from Tax Increment Revenues (other than Allocated Tax

1576    Increment Revenue Amounts), or other monies deposited from time to

1577    time in the Fund, the proceeds of Revenue Bonds or other monies

1578    made available for such purposes pursuant to the Act or the

1579    provisions of this Agreement.

1580    **6.5. Developer Advances**

1581    All monies paid to the Village by the Developer in furtherance

1582    of the Economic Development Project and pursuant to the provisions

1583    of this Agreement shall be accounted for separately within the Fund

1584    and all such advances shall be deemed Developer Advances, unless

1585    provided otherwise in this Agreement.  All Developer Advances made

1586    in connection with the incurring of various Project Costs may be

1587    paid to the Village prior to or subsequent to the incurring of such

1588    Project Costs.  All Developer Advances shall be evidenced by the

1589    Village's execution and delivery of a Note in accordance with the

1590    provisions of Article 8 of this Agreement.  The Developer shall

1591    advance the funds necessary to pay any such Project Costs within

1592    fourteen (14) days of its receipt of a written request therefor

1593    from the Village Manager.  Notwithstanding the foregoing, the

1594    Developer shall not be required to make any Developer Advance until

1595    the terms and conditions and the form of the Note which is to be

1596    executed and delivered to evidence such Developer Advance have been

1597    agreed upon by the Parties, which terms, conditions and form shall

1598    be consistent with the terms of this Agreement.

1599    **6.6. Procedure for Payment and Reimbursement to the Developer**
1600    **of Project Costs**

1601    All payment and reimbursement requests of the Developer in the

02/27/90-H.E.                          48

1602    amount of four thousand dollars ($4,000.00) or less, and all
1603    payment or reimbursement requests of the Developer of more than
1604    four thousand dollars ($4,000.00) made pursuant to contracts which
1605    have been previously approved by the Board of Trustees (whether
1606    pursuant to this Agreement or otherwise) shall be undertaken
1607    pursuant to the authorization of the Village Manager.  In order to
1608    effect such payment or reimbursement (whether being made to the
1609    Developer or others), the Developer shall submit to the Village
1610    Manager, for his review and approval (which approval shall not be
1611    unreasonably withheld or delayed), all affidavits, lien waivers and
1612    other documentation as may be necessary to effect such payment or
1613    reimbursement.  The Village Manager shall inform the appropriate
1614    Village financial officer of such approval within ten (10) working
1615    days of receipt of such documentation or, within said period, shall
1616    provide the Developer with a specific written explanation of his
1617    reasons for disapproving such request.  Such Village financial
1618    officer shall effect payment or reimbursement within five (5)
1619    working days of receipt of the Village Manager's approval of any
1620    request for payment or reimbursement. All payment or reimbursement
1621    requests of the Developer of more than four thousand dollars
1622    ($4,000.00) which are not being made pursuant to a contract which
1623    has been previously approved by the Board of Trustees shall be
1624    submitted to the Board of Trustees for its review and approval
1625    (which approval shall not be unreasonably withheld or delayed).

1626

1627

02/27/90-H.E.                    49

1628        **ARTICLE 7.        UTILIZATION OF TAX INCREMENT REVENUES**

1629        **7.1. <u>Tax Increment Revenues Received Prior to the</u>**
1630        **<u>Phase I Tax Increment Revenue Commencement Date.</u>**

1631        Prior to the Phase I Tax Increment Revenue Commencement Date,

1632   the Village from time to time shall disburse or allocate Tax

1633   Increment Revenues as they are received and deposited in the Fund,

1634   subject to the provisions of any ordinance authorizing the issuance

1635   of Revenue Bonds, as follows:

1636                    (1)   First, the Village shall pay, or allocate amounts

1637                          sufficient to satisfy, debt service requirements

1638                          (and any increases in required reserves) due in the

1639                          current year and coming due in the following year

1640                          on all outstanding Revenue Bonds; and

1641                    (2)   The balance, if any, shall be reserved by the

1642                          Village to pay Project Costs (other than Village

1643                          Project Costs) to be incurred within the next three

1644                          (3) years and to provide reserves needed to secure

1645                          outstanding Revenue Bonds and Notes.

1646        **7.2. <u>Tax Increment Revenues Received On and Subsequent to</u>**
1647        **<u>Phase I Tax Increment Revenue Commencement Date.</u>**

1648        Commencing with the Phase I Tax Increment Revenue Commencement

1649   Date and continuing thereafter as Tax Increment Revenues are

1650   received and deposited in the Fund, the Village from time to time

1651   shall disburse or allocate Tax Increment Revenues, subject to the

1652   provisions of any ordinance authorizing the issuance of Revenue

1653   Bonds, as follows:

1654                    (1)   First, subject to the last sentence of Section 8.2

        02/27/90-H.E.                    50

1655      of this Agreement, the Village shall: (i) disburse

1656      or allocate Phase I Allocated Tax Increment Revenue

1657      Amounts to the Village up to the maximum amounts

1658      set forth in Column 1 of Exhibit "B" to this

1659      Agreement; and (ii) disburse or allocate the Phase

1660      II Allocated Tax Increment Revenue Amounts to the

1661      Village and the affected Taxing Districts in an

1662      aggregate amount that is determined by multiplying

1663      the percentages set forth on Exhibit "C" to this

1664      Agreement times the amount of Phase II Tax

1665      Increment Revenues received and deposited in the

1666      Fund, which Phase II Allocated Tax Increment

1667      Revenue Amounts shall be distributed to the Village

1668      and the affected Taxing Districts in accordance

1669      with the surplus distribution provisions of the

1670      Act;

1671   (2)  Next, the Village shall pay, or allocate amounts

1672      sufficient to satisfy, debt service requirements

1673      due in the current year and coming due in the

1674      following year on all outstanding Revenue Bonds,

1675      and to provide reserves needed to secure

1676      outstanding Revenue Bonds;

1677   (3)  Next, the Village shall pay, or allocate amounts

1678      sufficient to satisfy, debt service requirements

1679      due in the current year and coming due in the

1680      following year on all outstanding Notes (unless the

02/27/90-H.E.            51

1681      holder of such Notes agrees, in writing, to defer

1682      such payment);

1683      (4)   Next, the Village shall pay, or allocate amounts

1684      sufficient to pay, outstanding Project Costs (other

1685      than Village Project Costs); and

1686      (5)   Next, the Village shall pay, or allocate amounts

1687      sufficient to pay Project Costs (other than Village

1688      Project Costs) to be incurred within three (3)

1689      years, or to purchase or redeem all or a portion of

1690      the outstanding Notes or Revenue Bonds, as the

1691      Parties by mutual agreement shall annually

1692      determine.

1693      (6)   The balance, if any, shall be paid to the Cook

1694      County Collector for distribution to the Village

1695      and the affected Taxing Districts, for deposit in

1696      their appropriate accounts, in accordance with the

1697      surplus distribution provisions of the Act.

1698 **7.3.**   **The Village's Distribution of The Phase I Allocated Tax**
1699       **Increment Revenue Amounts**

1700      Upon receipt, the Village, subject to the provisions of any

1701 ordinance authorizing the issuance of General Obligation Bonds, and

1702 from time to time shall disburse or allocate the Phase I Allocated

1703 Tax Increment Revenue Amounts as follows:

1704      (1)   First, the Village may pay, or allocate an amount

1705      sufficient to satisfy, debt service requirements

1706      due in the current year and coming due in the

1707      following year on any outstanding Village

02/27/90-H.E.        52

1708            Obligations;

1709        (2)  Next, the Village shall pay, or allocate an amount

1710            sufficient to satisfy, outstanding Village Project

1711            Costs;

1712        (3)  Next, the Village shall pay, or allocate an amount

1713            sufficient to reimburse the Village for, Village

1714            Project Costs which have been theretofore paid or

1715            incurred by the Village;

1716        (4)  The balance, if any, shall be paid to the Cook

1717            County Collector for distribution to the Village

1718            and the affected Taxing Districts, for deposit in

1719            their appropriate accounts, in accordance with the

1720            surplus distribution provisions of the Act,

1721    provided, however, that the amount of Phase I Tax Increment Revenue

1722    Amounts paid to, or allocated by, the Village annually pursuant to

1723    paragraphs (1), (2), and (3) above shall not exceed the amounts

1724    specified in Column 2 of Exhibit "B" to this Agreement.

1725

1726

1727

1728

02/27/90-H.E.                    53

1729    **ARTICLE 8.    BONDS AND NOTES**

1730    **8.1. Issuance, Execution and Delivery**

1731    The Parties acknowledge that the acquisition of the Subject

1732    Property and the Development, and the construction of the Public

1733    Improvements, as provided in the Economic Development Plan and this

1734    Agreement, necessitate the use of proceeds from one or more issues

1735    or series of Revenue Bonds and from the execution and delivery of

1736    one or more Notes to pay Project Costs as provided in the Economic

1737    Development Plan and in this Agreement.  Accordingly, the Village

1738    shall issue Revenue Bonds and execute and deliver Notes to finance

1739    Project Costs pursuant to the Act and the terms of this Agreement.

1740    Such Revenue Bonds shall be in the aggregate amounts which

1741    reasonably can be sold based upon the security which can be

1742    provided to the purchasers of such Revenue Bonds under the

1743    provisions of this Agreement.  Such Revenue Bonds and Notes shall

1744    not be secured by the full faith and credit of the Village.  One or

1745    more issues or series of Revenue Bonds to pay for Project Costs

1746    (other than Village Project Costs) may be sold at one or more times

1747    in order to implement the Economic Development Plan and the

1748    Economic Development Project, provided that the Village shall not

1749    be required to issue such Revenue Bonds until necessary credit

1750    enhancements and security, as may reasonably be deemed necessary by

1751    the Village, have been established.  The amount of each series of

1752    Revenue Bonds to be issued by the Village shall be supported by a

1753    feasibility report prepared by, or at the direction of, the

1754    Developer, which shall reasonably determine the amount of each

1755 series of such Revenue Bonds which can be issued and which shall be

1756 satisfactory to the Village. Such report shall analyze the

1757 projected cash flows (from Tax Increment Revenues and other

1758 sources), credit enhancements and other security provisions related

1759 to the issuance of such series of such Revenue Bonds, all then

1760 outstanding Revenue Bonds and all Revenue Bonds expected to be

1761 issued thereafter.

1762    **8.2.  Interest Payment, Maturity, Priorities and Credit**
1763       **Enhancements**

1764 All Bonds issued pursuant to this Agreement shall bear

1765 interest at prevailing market rates for similar instruments and

1766 shall be subject to such other terms and conditions as are agreed

1767 to by the Village and the Developer, subject to the Village

1768 ordinances authorizing issuance of such Bonds and the provisions

1769 of this Agreement applicable at the time of issuance of the Bonds.

1770 All taxable Notes executed and delivered pursuant to this Agreement

1771 shall bear interest at the rate of interest announced from time to

1772 time by Continental Bank N.A. at Chicago, Illinois, as its "prime

1773 rate". If, for any reason, Continental Bank N.A. shall cease to

1774 announce a "prime rate" then such taxable Notes shall bear interest

1775 at the rate of interest announced from time to time by The First

1776 National Bank of Chicago at Chicago, Illinois, as its "prime rate"

1777 or "base rate". The Parties shall agree upon the interest rate to

1778 apply to any tax-exempt Notes executed and delivered pursuant to

1779 this Agreement and prior to their execution and delivery. All

1780 Bonds and Notes shall mature on or before September 11, 2012 and in

1781 any event within 20 years of the date of issuance or execution and

02/27/90-H.E.                    55

1782   delivery thereof.  All Revenue Bonds issued, and all Notes executed

1783   and delivered, pursuant to this Agreement shall be limited

1784   obligations of the Village payable solely from Tax Increment

1785   Revenues (subject to the last sentence of this Section 8.2) and the

1786   other monies deposited from time to time in the Fund as a result of

1787   the investment of such Tax Increment Revenues, as and to the extent

1788   available for such purposes, and by such capitalized interest, debt

1789   service reserves and sinking funds or other available credit

1790   enhancements as may be provided by the ordinances adopted by the

1791   Village from time to time in conjunction with each issue of Revenue

1792   Bonds and each delivery of Notes.   Revenue Bonds issued and

1793   outstanding pursuant to this Agreement shall be secured by a first

1794   priority pledge of amounts in the Fund subsequent and subordinate

1795   only to the obligation to make the payments due under Section

1796   7.2(1) (unless the Village shall have agreed upon an alternative

1797   mechanism to provide for the payments which are otherwise to be

1798   made under Section 7.2(1).)

1799       **8.3.  Tax-Exempt Issues**

1800       The Village, as issuer of the Obligations, and the Developer

1801   shall cooperate with each other in an attempt to ensure that

1802   interest paid on the Obligations is exempt from Federal income

1803   taxes, provided that the Village shall not be required to take any

1804   action that is inconsistent with the provisions of this Agreement

1805   or the Village's rights herein.

1806       **8.4.  SMG Completion Guaranty Note.**

1807       Upon the Village's issuance of any General Obligation Bonds

1808 pursuant to Section 6.3(a) of this Agreement, the Developer shall

1809 execute and deliver to the Village a note guaranteeing substantial

1810 completion of the SMG Home Office Complex by the end of the

1811 calendar year in which the SMG Occupancy Date is to occur (as

1812 established by the SMG Occupancy Date Notice) and providing for the

1813 payment to the Village when due of liquidated damages to be agreed

1814 upon by the Parties.  Notwithstanding the foregoing, the Village

1815 shall not issue any General Obligation Bonds until the Village has

1816 received the SMG Occupancy Date Notice from the Developer.

1817 **ARTICLE 9.**     **TAX PROTESTS AND APPEALS/PAYMENT OF REAL ESTATE**
1818                   **TAXES**

1819 **9.1. Tax Protests and Appeals**

1820 The Parties acknowledge that certain assumptions will be made

1821 relative to the future assessed valuations of the Subject Property

1822 as and when the Development occurs and as and when Bonds are issued

1823 by the Village in connection with the Development.  The Parties

1824 further acknowledge that attaining and maintaining said assessed

1825 valuations will have a material effect on the revenue available to

1826 pay debt service on such Bonds. Accordingly, for so long as such

1827 Bonds are outstanding, neither the Developer nor its agents,

1828 representatives, successors, assigns, tenants or transferees of any

1829 portion of the Subject Property shall initiate, take or perform any

1830 acts attempting to reduce the assessed valuation of any portion of

1831 the Subject Property if such reduction will cause the then-current

1832 total assessed valuation of the Subject Property to be less than

1833 the Total Minimum Assessed Valuation.  The Total Minimum Assessed

1834 Valuation of the Subject Property shall be established, in writing,

02/27/90-H.E.                    57

1835   by the Parties from time to time as Bonds are issued in connection

1836   with the development of the Subject Property. The foregoing shall

1837   not preclude or prohibit the Developer from protesting the assessed

1838   value of the SMG Home Office Complex for the limited purpose of

1839   establishing a partial year assessment of the building assessment

1840   for the year in which the SMG Occupancy Date occurs.

1841   **9.2. Miscellaneous**

1842   Except as otherwise expressly set forth in this Article 9, the

1843   Developer shall have the same right to challenge real estate taxes

1844   as is offered to the taxpayers and owners of other real property

1845   situated within Cook County, Illinois, but no such challenge shall

1846   be made without notice to the Village. The Developer further

1847   agrees, that to the extent it is obligated to pay any portion of

1848   the real estate tax bills for the Subject Property, it shall pay

1849   such taxes promptly before the date of delinquency of such tax

1850   bills. The Developer shall file necessary documentation with the

1851   appropriate governmental authorities in order to cause the Phase I

1852   Site, the Phase II Site and the PCMT Property to be identified by

1853   separate permanent tax index numbers so that the provisions of this

1854   Agreement can be given effect.

1855   **ARTICLE 10.      SPECIFIC DEVELOPER ADVANCES AND DONATIONS**
1856
1857   **10.1.      Developer Advance for Costs of Administering the**
1858   **Economic Development Plan**

1859   The Developer shall advance to the Village the sum of two

1860   hundred ten thousand dollars ($210,000) to be used by the Village

1861   to pay for one (1) new employee and for clerical support to be

1862   hired   specifically   for   the   purpose   of   implementing   and

02/27/90-H.E.                    58

1863    administering the Economic Development Plan and Economic

1864    Development Project during the period commencing with the date of

1865    this Agreement and terminating on September 30, 1992.  This sum

1866    shall be advanced to the Village in three (3) equal installments of

1867    seventy thousand dollars ($70,000.00) each, with the first

1868    installment being advanced upon execution of this Agreement; the

1869    second installment being advanced on November 1, 1990; and the

1870    third installment being advanced on November 1, 1991.  Funds

1871    advanced to the Village pursuant to this Section 10.1 shall be

1872    considered Developer Advances.  Principal and interest obligations

1873    coming due on the Notes executed by the Village to evidence such

1874    Developer Advances shall not be paid out of the Village's portion

1875    of the Phase I Allocated Tax Increment Revenue Amounts (as

1876    identified in Column 2 of Exhibit "B" attached hereto).

1877         **10.2.**       **Developer Advance for Police and Fire Personnel**

1878    The Developer shall advance to the Village the sum of one

1879    million, two hundred twenty-five thousand dollars ($1,225,000)

1880    which the Developer agrees shall be used by the Village to pay the

1881    cost of hiring and training sufficient police officers and

1882    firefighters in the sole discretion of the Village, to serve the

1883    Development upon the Developer's occupancy of the SMG Home Office

1884    Complex.  This sum shall be advanced to the Village as follows:  an

1885    initial installment of five hundred twenty-five thousand dollars

1886    ($525,000.00) shall be advanced to the Village on January 1, 1991;

1887    and the balance of seven hundred thousand dollars ($700,000.00)

1888    shall be advanced to the Village on January 1, 1992.  In addition,

1889   commencing January 1, 1993 and continuing on the first day of each

1890   month thereafter through and including April 1 of the calendar year

1891   in which the Phase I Tax Increment Revenue Commencement Date is to

1892   occur, the Developer shall advance an amount which is not more than

1893   sixty-three thousand eight hundred dollars ($63,800.00), which

1894   amount shall be increased by 10% on January 1, 1994 and by 10% on

1895   each January 1 thereafter, in order to reimburse the Village for

1896   police and fire personnel costs incurred by the Village for that

1897   period of time subsequent to the SMG Occupancy Date established by

1898   the SMG Occupancy Date Notice through and including April 30 of the

1899   calendar year in which the Phase I Tax Increment Revenue

1900   Commencement Date occurs.  Notwithstanding the above, the Developer

1901   shall not be obligated to make monthly payments after January 1,

1902   1993 for any months wherein the delay of the Phase I Tax Increment

1903   Revenue Commencement Date is due to breach by the Village as

1904   provided in Article 17 of this Agreement. Funds advanced to the

1905   Village pursuant to this Section 10.2 shall be considered Developer

1906   Advances.   Principal and interest obligations coming due on the

1907   Notes executed by the Village to evidence such Developer Advances

1908   shall not be paid out of the Village's portion of the Phase I

1909   Allocated Tax Increment Revenue Amounts (as identified in Column 2

1910   of Exhibit "B" attached hereto).

1911   **10.3.   Donation of Village Municipal Site**

1912   The Developer shall donate and convey the Village Municipal

1913   Site to the Village, or cause such donation and conveyance to be

1914   made to the Village.  Such donation and conveyance shall occur not

02/27/90-H.E.                 60

more than thirty (30) days after the date the Developer, or the Developer's nominee, acquires title to the portion of the Subject Property which contains the Village Municipal Site, and, in any event, such donation and conveyance shall occur prior to issuance of the first building permit for a structure which is to be constructed on the Subject Property. The donation of the Village Municipal Site shall constitute the donation of land required to be made to the Village for municipal purposes pursuant to the Beverly Annexation Agreement.

**10.4.** **Donations Relating to Redevelopment of PCMT Property**

(a) **Loss of Contracted Service Income.**

If, during the Term of this Agreement, the Poplar Creek Music Theater is permanently closed due to the redevelopment of the PCMT Property (hereafter referred to as "closure"), and provided such redevelopment occurs at the request of the Developer, the Developer shall make a one-time donation to the Village of the sum of four hundred fifty thousand dollars ($450,000.00) for deposit in its general fund to compensate for loss of income to the Village for contracted services. Such donation shall be made on June 1 of the first year following the date of the Poplar Creek Music Theater closure as aforesaid. Funds donated to the Village pursuant to this Section 10.4(a) shall not be considered Developer Advances and such sums shall not be paid out of Tax Increment Revenues or out of the proceeds of Revenue Bonds.

02/27/90-H.E.                    61

1942    **(b)**    **Reductions in Equalized Assessed Value.**

1943    If, as a result of the Poplar Creek Music Theater closure

1944    and the redevelopment of the PCMT Property, provided such

1945    redevelopment occurs at the request of the Developer, the

1946    equalized assessed value of that property, during the

1947    period of redevelopment, falls below the portion of the

1948    Total    Initial    Equalized    Assessed    Value    which    was

1949    attributable to the property, the Developer shall pay to

1950    the Village an amount equal to the Village's loss in real

1951    property tax revenue occasioned by said closure.    Such

1952    loss in real property tax revenue shall be computed by

1953    multiplying: (i) the difference between that portion of

1954    the Total Initial Equalized Assessed Value which was

1955    attributable to the property and the then equalized

1956    assessed value of such property; by (ii) the Village's

1957    real estate tax rate for the applicable tax year.    This

1958    donation    shall    be    recomputed    every    year    and    shall

1959    continue for so long as the Village realizes a loss in

1960    real property tax revenue as a result of the closure of

1961    the Poplar Creek Music Theater (as computed above) or

1962    until this Agreement terminates, whichever first occurs.

1963    Funds    paid    to    the    Village    pursuant    to    this    Section

1964    10.4(b)    may    be    used    by    the    Village    for    any    legal

1965    purposes.    Such funds shall not be considered Developer

1966    Advances and such funds shall not be paid out of Tax

1967    Increment    Revenues    or    out    of    the    proceeds    of    Revenue

1968   Bonds.   Notwithstanding the foregoing, no such funds

1969   shall be paid to the Village unless the Village shall

1970   first have obtained the opinion of a nationally

1971   recognized bond counsel that such payment will not affect

1972   the tax-exempt status of any outstanding Bonds.

1973   **(c)**   **Municipal Entertainment Tax.**

1974   If, as a result of the closure or the Poplar Creek Music

1975   Theater and the redevelopment of the PCMT Property,

1976   provided such redevelopment occurs at the request of the

1977   Developer, then the Developer shall pay to the Village an

1978   amount equal to the amount of municipal entertainment tax

1979   revenue which was realized by the Village in the year

1980   immediately preceding such closure provided, however,

1981   that the Developer shall only be required to pay such

1982   sums to the Village for so long as the Village shall be

1983   entitled to receive funds under Section 10.4(b).  Funds

1984   paid to the Village pursuant to this Section 10.4(c) may

1985   be used by the Village for any legal purposes.  Such

1986   funds shall not be considered Developer Advances and such

1987   funds shall not be paid out of Tax Increment Revenues or

1988   out of the proceeds of Revenue Bonds.

1989   **10.5.**   **Developer Advance for Miscellaneous Village Project**
1990   **Costs**

1991   The Developer shall advance to the Village, within thirty (30)

1992   days of the date of this Agreement, the sum of fifty-eight thousand

1993   three hundred dollars ($58,300.00) in order to reimburse the

1994   Village for the fees of Chapman & Cutler (in the amount of

02/27/90-H.E.                     63

1995   $40,000.00) and the fees of Teska & Associates, Inc. (in the amount

1996   of $18,300.00), which fees were incurred by the Village in

1997   establishing the Economic Development Project and preparing the

1998   Economic Development Plan.  Funds advanced to the Village pursuant

1999   to this Section 10.5 shall be considered a Developer Advance.

2000   Principal and interest obligations coming due on the Note executed

2001   by the Village to evidence such Developer Advance shall not be paid

2002   out of the Village's portion of the Phase I Allocated Tax Increment

2003   Revenue Amounts (as identified in Column 2 of Exhibit "B" attached

2004   hereto).

2005        **10.6.    No Other Donations**

2006        In consideration of the donations which the Developer has

2007   agreed to make in accordance with the provisions of this Article

2008   10, and in further consideration of the fact that the Parties

2009   contemplate satisfying and financing all public costs of developing

2010   the Subject Property pursuant to the provisions of this Agreement,

2011   the Developer shall not be required by the Village, directly or

2012   indirectly, to make any other donations of land or cash to the

2013   Village or any other public body as a result of the Development of

2014   the Subject Property or in furtherance of the Economic Development

2015   Project.  Specifically, but without limitation, the Developer shall

2016   not be required by the Village: (i) to pay any impact fees for

2017   Village Project Costs, or for improvements which are to be financed

2018   pursuant to this Agreement (other than customarily and uniformly

2019   imposed sewer and water connection and user charges, building and

2020   occupancy permit fees and engineering inspection and plan review

2021    fees); or (ii) to make any donations of land or cash to the Village

2022    for school, park, library or other public purposes (whether

2023    pursuant to the Beverly Annexation Agreement, the Nederlander

2024    Annexation Agreement, or otherwise).

2025         **ARTICLE 11.   <u>NOTICES</u>**

2026         All notices required or permitted to be given pursuant to the

2027    provisions of this Agreement shall be in writing and shall be

2028    served on the Parties, either personally, with evidence of receipt,

2029    or by certified or registered mail, return receipt requested, as

2030    follows:

2031         **if to the Village:**        Village of Hoffman Estates
2032                                        1200 North Gannon Drive
2033                                        Hoffman Estates, Illinois 60196
2034                                        Attn:  Village Manager
2035
2036         **with copies to:**          Village of Hoffman Estates
2037                                        1200 North Gannon Drive
2038                                        Hoffman Estates, Illinois 60196
2039                                        Attn:  Corporation Counsel
2040
2041                                        Burke & Ryan
2042                                        33 North Dearborn Street
2043                                        Suite 402
2044                                        Chicago, Illinois 60602
2045                                        Attn:  William E. Ryan, Esq.
2046
2047         **if to the Developer:**     Sears, Roebuck and Co.
2048                                        Sears Tower
2049                                        Chicago, Illinois 60684
2050                                        Attn:  Senior Vice President
2051                                             Resources and Administration,
2052                                             Department 707
2053
2054         **with copies to:**          Sears, Roebuck and Co.
2055                                        Sears Tower
2056                                        Chicago, Illinois 60684
2057                                        Attn:     General Counsel
2058                                                  Merchandise Group
2059                                                  Department 766
2060
2061
2062

```
                         Tully & Weinstein
                         77 West Washington Street
                         Suite 1500
                         Chicago, Illinois 60602
                         Attn:  Thomas Tully, Esq.


                                   and

                         Rudnick & Wolfe
                         203 North LaSalle Street
                         Suite 1800
                         Chicago, Illinois 60601
                         Attn:    J. Kevin Garvey, Esq.
                                  Harold W. Francke, Esq.
```

Either party's address may be changed from time to time by such

party giving notice, as provided above, to the other party.

Notices delivered personally shall be deemed given on receipt.

Notices delivered by certified or registered mail shall be deemed

given two (2) business days after the date of post-marking.

### ARTICLE 12.    MEMORANDUM OF AGREEMENT

Neither of the Parties shall record this Agreement, but each

party agrees to execute and to deliver to the other party, when

this Agreement is executed and delivered, multiple copies of a

Memorandum of this Agreement in a form acceptable to their

respective counsel.   Either of the Parties, at its sole expense,

may record such Memorandum in the Office of the Recorder of Deeds

of Cook County, Illinois.   Such Memorandum shall recite the

covenants contained in Article 9 of this Agreement and such

covenants shall run with the land and be binding upon the Developer

and its agents, representatives, successors, assigns, tenants and

transferees for so long as any Bonds are issued and outstanding.

If and when the Bonds have been paid in full and redeemed (other

than by a refunding), the covenants contained in Article 9 of this

02/27/90-H.E.                     66

2097 Agreement shall become null and void and the Village shall issue a

2098 release of such covenants in recordable form and deliver such

2099 release to the Developer for recording in the Office of the Cook

2100 County Recorder of Deeds.

2101 **ARTICLE 13.   PERMITTED DELAYS**

2102 Neither of the Parties shall be deemed to be in default

2103 hereunder in the performance of any obligation where delays or

2104 defaults in such performance are due to war, insurrection, strikes,

2105 lockouts, riots, floods, earthquakes, fires, casualties, acts of

2106 God, acts of the public enemy, epidemics, quarantine restrictions,

2107 freight embargoes and lack of transportation, or the inability to

2108 secure, or the revocation or suspension of, necessary governmental

2109 licenses, permits, authorizations and approvals or the failure of

2110 the other party to this Agreement to keep and perform the covenants

2111 and obligations on its part to be kept and performed.  An extension

2112 of time for any such cause shall be for the period of the delay,

2113 which period shall commence to run from the time of the

2114 commencement of the cause, provided that written notice by the

2115 party claiming such extension is sent to the other party not more

2116 than twenty (20) days after the commencement of such cause.

2117 **ARTICLE 14.   MORTGAGE HOLDERS**

2118 **14.1.   Rights and Obligations**

2119 The holder of any mortgage, deed of trust or other security

2120 interest, the lessor under any ground lease, and the grantee under

2121 any other conveyance for financing, shall not be obligated by the

2122 provisions of this Agreement to construct or complete the

02/27/90-H.E.                    67

2123    improvements which are contemplated by this Agreement or the

2124    Economic Development Plan or to guarantee such construction or

2125    completion, notwithstanding the collateral assignment of this

2126    Agreement to such party by the Developer.    Nothing in this

2127    Agreement shall be deemed to permit or authorize any such holder,

2128    lessor or grantee to devote the Subject Property to  any uses, or

2129    to construct any improvements thereon, other than those uses or

2130    improvements provided for or authorized by this Agreement or the

2131    Amendment to the Annexation Agreements, any such unauthorized use

2132    or improvements being expressly prohibited.

2133        **14.2.    Notice/Assumption of Obligations**

2134        Whenever the Village shall deliver any notice or demand to the

2135    Developer with respect to any alleged breach or default by the

2136    Developer hereunder, the Village, at the same time, shall deliver

2137    to each holder of record of any mortgage, deed of trust or other

2138    security interest, and to the lessor of any ground lease and to the

2139    grantee under any other conveyance for financing, a copy of such

2140    notice or demand, provided the Village has been advised in writing

2141    by the Developer, or such holder, lessor, or grantee, of the name

2142    and address of any such holder, lessor or grantee.  Each such

2143    holder, lessee or grantee (insofar as the rights of the Village are

2144    concerned) shall have the same right to cure or remedy, or to

2145    commence to cure or remedy, any such default, provided, however,

2146    that in the event of a default by the Developer hereunder which is

2147    not curable by such holder, lessor or grantee (e.g., insolvency or

2148    bankruptcy of the Developer), such holder, lessor or grantee shall

02/27/90-H.E.                    68

2149   be deemed to have cured such noncurable defaults by its execution

2150   of the assumption agreement contemplated in the later portions of

2151   this Section 14.2.   Nothing contained in this Agreement shall be

2152   deemed to permit or authorize such holder, lessor or grantee to

2153   undertake or continue the construction or completion of the

2154   improvements contemplated by this Agreement (beyond the extent

2155   necessary to conserve or protect the improvements or construction

2156   already made) without first having expressly assumed the

2157   Developer's obligations (with respect to the portion of the Subject

2158   Property on which the holder, lessor or grantee has a security

2159   interest) to the Village by written agreement satisfactory to the

2160   Village.   In such event, the holder, lessor or grantee shall agree

2161   to complete, in the manner provided in this Agreement, the

2162   improvements to which the security interest of such holder, lessor

2163   or grantee relates, and submit evidence satisfactory to the Village

2164   that it has the qualifications and financial responsibility

2165   necessary to perform such obligations.   The assumption agreement

2166   shall provide that such holder, lessor or grantee shall only be

2167   deemed to have assumed the Developer's obligations for as long as

2168   they have a security interest in the Subject Property, and that the

2169   Village's sole and exclusive remedy for a breach of the assumption

2170   agreement is forfeiture of the equity interest of such holder,

2171   lessor or grantee in the Subject Property.   No such assumption

2172   agreement shall relieve the Developer of any of its obligations

2173   under this Agreement.   Any such holder, lessor or grantee properly

2174   completing such improvement shall be entitled, upon written request

02/27/90-H.E.                    69

2175    made to the Village, to a certificate of occupancy from the Village

2176    with respect to such improvements.  To the extent of a conflict,

2177    ambiguity or inconsistency between the provisions of this Section

2178    14.2 and the provisions of any underlying agreement between the

2179    Developer and a holder, lessor or grantee of any security interest

2180    in the Subject Property, the former shall control.

2181        **14.3.    Village Right to Cure Defaults**

2182        In the event the Developer, or any entity acquiring title to

2183    the Subject Property, or any portion thereof, defaults in the

2184    construction or completion of construction of the improvements

2185    contemplated by the provisions of this Agreement, and such default

2186    is also a default under any mortgage, deed of trust, other security

2187    instrument or lease-back or obligation to the grantee under any

2188    other conveyance for financing, and the holder, lessor or grantee,

2189    as the case may be, elects not to exercise its option to cure such

2190    default, the Village may cure such default, or cause the same to be

2191    cured, prior to completion of any foreclosure, termination of lease

2192    or other remedial proceeding as a result of such default.  In such

2193    event, the Village, or its nominee, shall be entitled to

2194    reimbursement from the Developer, or such other entity, of all

2195    reasonable costs and expenses incurred by the Village in curing the

2196    default (including reasonable attorney's fees).  The Village shall

2197    also be entitled to a lien upon the Subject Property to the extent

2198    of such reasonable costs and expenses (including reasonable

2199    attorneys' fees).  Any such lien shall be subject to the lien of

2200    the mortgages, deeds of trust and other security instruments, and

02/27/90-H.E.                    70

2201  to the prior interests of a lessor under any lease-back or ground

2202  lease, executed for the purpose of obtaining funds to purchase or

2203  develop the Subject Property, to construct the improvements

2204  contemplated by this Agreement, to finance the costs of such

2205  construction or to pay the costs reasonably related to the

2206  Developer's performing its obligations under this Agreement.

2207  **ARTICLE 15.**    <u>**NO DISCRIMINATION-CONSTRUCTION**</u>

2208  The Developer, in connection with the development of the

2209  Subject Property, shall not discriminate against any employee or

2210  applicant for employment because of race, color, religion, sex or

2211  national origin.  The Developer shall take affirmative action to

2212  require that applicants are employed, and that employees are

2213  treated during employment, without regard to their race, color,

2214  religion, sex or national origin.  Such action shall include, but

2215  not be limited to, the following:  employment upgrading, demotion,

2216  or transfer; recruitment or recruitment advertising, solicitations

2217  or advertisements for employees; layoff or termination; rates of

2218  pay or other forms of compensation; and selection for training,

2219  including apprenticeship.  The Developer agrees to post in

2220  conspicuous places, available to employees and applicants for

2221  employment, notices which may be provided by the Village setting

2222  forth the provisions of this non-discrimination clause.

2223  **ARTICLE 16.**    <u>**NO DISCRIMINATION-USE**</u>

2224  The Developer shall not discriminate against any person, or

2225  group of persons, on account of sex, race, color, religion or

2226  national origin in the sale, lease, sublease, transfer, use,

02/27/90-H.E.                      71

2227  occupancy, tenure or enjoyment of the Subject Property, nor shall

2228  the Developer establish or permit, or knowingly allow any person

2229  claiming under or through the Developer to establish or permit, any

2230  such practice or practices of discrimination with reference to the

2231  selection, location, number, use, or occupancy of tenants, lessees,

2232  subtenants, sublessees, or vendees of any portion of the Subject

2233  Property.

2234  **ARTICLE 17.    REMEDIES-LIABILITY**

2235  **17.1.    Developer Remedies**

2236  The sole remedies of the Developer in the event of a breach by

2237  the Village in any of the terms of this Agreement shall be: (i) to

2238  institute legal action for specific performance, mandamus or

2239  mandatory injunction against the Village (including the right to

2240  require the Village to make any payment required to be made by this

2241  Agreement and to issue Revenue Bonds); and (ii) to maintain an

2242  action at law for the Developer's actual (but not consequential or

2243  punitive) damages, provided, however, that such right to maintain

2244  an action for actual damages shall be limited to a Village default

2245  in the performance of one or more of the following Village

2246  obligations, which default results in a breach of the terms of this

2247  Agreement:

2248  (a)  The obligation to issue Revenue Bonds, to the extent and

2249  when provided for by the provisions of this Agreement;

2250  (b)  The obligation to make payments to the Developer or

2251  others on construction contracts which have been approved

2252  by the Board of Trustees pursuant to the provisions of

2253      this Agreement; and

2254      (c)   The obligation to reimburse the Developer for Project

2255            Costs which the Developer has paid or incurred, to the

2256            extent and when provided for by the provisions of this

2257            Agreement.

2258   In the event the Developer obtains a final non-appealable judgment

2259   against the Village for either legal or equitable relief as

2260   provided above, as a result of a breach of this Agreement by the

2261   Village, the Developer shall be entitled to recover the reasonable

2262   attorneys fees and court costs it has incurred in securing such

2263   judgment.

2264      Notwithstanding the foregoing, the Developer shall have the

2265   right to terminate this Agreement at any time before it occupies

2266   any part of the SMG Home Office Complex upon paying the Village all

2267   costs, expenses, claims, liabilities and all fees including

2268   attorneys fees that the Village has incurred that relate directly

2269   to the creation of the Economic Development Project, the

2270   preparation and adoption of the Economic Development Plan and this

2271   Agreement, as more fully set forth in Article 20.

2272   **17.2.   Village Remedies**

2273      The Village shall have all remedies at law or equity against

2274   the Developer for any breach by the Developer in any of the terms

2275   of this Agreement including the right to reasonable attorneys fees

2276   and court costs, subject to the Developer's right to terminate this

2277   Agreement as set forth in Section 17.1.   Notwithstanding the

2278   foregoing, the Village shall not have the right to maintain an

2279  action against the Developer for consequential or punitive damages.

2280  **17.3.**    **Defaults-Rights to Cure**

2281  Subject to the extensions of time set forth in Article 13 of

2282  this Agreement, failure or delay by either party to perform any

2283  term or provision of this Agreement shall constitute a default

2284  under this Agreement.  The party who so fails or delays must, upon

2285  receipt of written notice of the existence of such default,

2286  immediately commence to cure, correct or remedy such default and

2287  thereafter proceed with diligence to cure such default.  The party

2288  claiming such default shall give written notice of the alleged

2289  default to the party alleged to be in default specifying the

2290  default complained of by the injured party.  Except as required to

2291  protect against further damages, and except as otherwise expressly

2292  provided in this Agreement, the injured party may not institute

2293  proceedings against the party in default until thirty (30) days

2294  after giving such notice.  If such default is cured within such

2295  thirty (30) day period, the default shall not be deemed to

2296  constitute a breach of this Agreement.  If the default is one which

2297  cannot reasonably be cured within thirty (30) days, and if the

2298  defaulting party shall commence to cure the same within such thirty

2299  (30) day period, said thirty (30) day period shall be extended for

2300  such time as is reasonably necessary for the curing of the same, so

2301  long as the defaulting party diligently proceeds to cure such

2302  default.  If such default is cured within such extended period, the

2303  default shall not be deemed to constitute a breach of this

2304  Agreement.  However, a default not cured as provided above shall

constitute a breach of this Agreement. Except as otherwise expressly provided in this Agreement, any failure or delay by either party in asserting any of its rights or remedies as to any default or alleged default or breach shall not operate as a waiver of any such default or breach or any rights or remedies it may have as a result of such default or breach.

**17.4.    Acts and Omissions of Default**

At the option of the Village, each of the following acts or omissions of the Developer shall constitute a default under this Agreement:

(a)    The Developer transfers, or suffers any involuntary transfer of, the Subject Property in violation of the terms of Article 18 of this Agreement;

(b)    The Developer files a petition seeking any debtor relief or executes any instrument for the purpose of effecting a composition of creditors;

(c)    The Developer makes an assignment for the benefit of creditors; or

(d)    The Developer is adjudicated as bankrupt.

**17.5.    Dispute Resolution**

(a)    If, at any time during the Term of this Agreement, the Parties do not agree on any of the following three issues:

(i)    Whether or not a given Project Cost which is to be paid or financed pursuant to the terms of this Agreement is "reasonable or necessary"

02/27/90-H.E.                    75

2331            to the Economic Development Project;

2332          (ii)    Whether a given Project Cost constitutes a

2333                Village Project Cost; or

2334          (iii)   Whether the Parties have fulfilled their

2335                respective obligations under this Agreement

2336                relative to the issuance of Revenue Bonds;

2337       then, at the option of either the Village or the

2338       Developer, the Parties shall attempt to resolve such

2339       disagreement pursuant to the provisions of this Section

2340       17.5. If either the Village or the Developer seeks to

2341       exercise such option, notice of such election shall be

2342       given to the other party within thirty (30) days of the

2343       date it first becomes apparent to the Parties that such

2344       disagreement exists.

2345    (b)   If, pursuant to the provisions of the foregoing paragraph

2346       (a), either of the Parties shall seek to resolve a

2347       disagreement that pertains to one of the issues described

2348       in said paragraph (a), such party shall select an expert,

2349       at such party's cost, who shall have the responsibility

2350       to consider the issue in dispute and render an opinion,

2351       within twenty-one (21) days, relative to the resolution

2352       of such disagreement. If, following the receipt of such

2353       opinion, the other party wishes to retain its own expert,

2354       such other party shall have the right to do so, at such

2355       party's cost, and, in such event, such expert shall also

2356       proceed to consider the issue in dispute and render an

2357            opinion, within twenty-one (21) days, relative to the

2358            resolution of such disagreement.  If, after receipt of

2359            the foregoing opinions, the Parties are still unable to

2360            resolve their disagreement, the Parties' respective

2361            experts shall jointly designate a third expert, at a cost

2362            to be shared equally by the Parties, who shall have the

2363            responsibility to consider the issue in dispute and

2364            render such expert's opinion, within twenty-one (21)

2365            days, relative to the resolution of such disagreement.

2366            None of the opinions rendered by any of the foregoing

2367            experts shall be binding on the Parties unless both

2368            Parties agree otherwise.

2369      (c)    Either of the Parties shall have the right, after

2370            completing the procedure provided for in paragraph (b)

2371            above, to seek the resolution of a disagreement in a

2372            trial de novo before the Circuit Court of Cook County.

2373            No damages (actual, consequential or punitive) shall be

2374            claimed by either of the Parties during the period the

2375            Parties are attempting to resolve, or as a result of the

2376            Parties' attempt to resolve, a disagreement pursuant to

2377            the  provisions of the foregoing paragraph (b).

2378      **17.6.**     **Right to Continue Construction Activities**

2379      The Parties acknowledge that one of the primary objectives of

2380 this Agreement is the Developer's timely completion of the SMG Home

2381 Office Complex.  Accordingly, the Village shall not take any action

2382 to delay, hinder or prevent the construction of the SMG Home Office

02/27/90-H.E.                  77

2383 Complex, or the construction of any of the Public Site
2384 Improvements, notwithstanding any actual or alleged breach or
2385 default by the Developer in any of the obligations imposed on the
2386 Developer by the terms of this Agreement that relate to the payment
2387 or financing of Project Costs, and notwithstanding the pendency of
2388 any dispute resolution or court proceeding under Section 17.5
2389 hereof.  The foregoing shall not preclude the Village from taking
2390 any action against the Developer in the event of a violation of any
2391 law, ordinance or regulation or the exercise of the Village's
2392 police powers in the public interest.

2393 **ARTICLE 18.    ASSIGNMENT    OF    DEVELOPER    RIGHTS    AND**
2394 **OBLIGATIONS/CONVEYANCES OF THE SUBJECT PROPERTY**

2395 **18.1.    Assignment of Developer Rights and Obligations**

2396 The rights and obligations of the Developer under this
2397 Agreement shall not be assigned except as provided by this Section
2398 18.1.

2399 (a)   The term "Developer", as used in this Section 18.1, shall
2400 mean only:

2401 (i)    Sears, Roebuck and Co., a New York
2402 corporation;

2403 (ii)   Any entity which is a parent, controlling
2404 shareholder (i.e. owning fifty-one percent
2405 (51%) or more of the capital stock), or fifty-
2406 one percent (51%) or more owned subsidiary of
2407 Sears, Roebuck and Co.;

2408 (iii)  Any entity which is owned, to the extent of at
2409 least a fifty-one percent (51%) controlling

02/27/90-H.E.                          78

2410                  interest, by Sears, Roebuck and Co. or an

2411                  entity described in the foregoing paragraph

2412                  (ii); and

2413        (iv)     Any entity to whom the Developer has conveyed

2414                  a portion of the Subject Property consisting

2415                  of one hundred (100) acres or more and

2416                  assigned its rights under this Agreement

2417                  pursuant to Section 18.2.

2418    (b)     Except as provided in paragraph (c) of this Section 18.1,

2419        all rights of the Developer established by the terms of

2420        this Agreement shall inure solely to the benefit of the

2421        Developer and shall not be subject to assignment by the

2422        Developer and, specifically but without limitation, the

2423        Village shall not be required to issue Revenue Bonds in

2424        order to satisfy and pay for Project Costs except for the

2425        Developer.

2426    (c)     The following rights established by the terms of this

2427        Agreement shall inure to the benefit of: (i) the

2428        Developer; and (ii) any assignee of such rights acquiring

2429        an ownership interest in the Subject Property pursuant to

2430        a sale or conveyance of a portion of the Subject Property

2431        (or pursuant to an assignment of an interest in a

2432        corporation, partnership or land trust) that does not

2433        violate Section 18.2 of this Agreement:

2434        (i)     The right to have costs incurred in

2435                  furtherance of the Economic Development Plan

2436      and the Development deemed Project Costs (to

2437      the fullest extent permitted by law) and,

2438      subject to the rights of holders of any

2439      Obligations and subject to the provisions of

2440      paragraph (b) above, to have such Project

2441      Costs paid for, financed or reimbursed

2442      pursuant to Article 6 of this Agreement;

2443    (ii) The right to challenge real estate taxes (as

2444      provided in Section 9.2 of this Agreement);

2445    (iii) The right to develop the Subject Property

2446      without regard to then existing Village

2447      donation requirements (as provided in Section

2448      10.6 of this Agreement);

2449    (iv) The right to maintain an action against the

2450      Village and to only recover reasonable

2451      attorneys fees and court costs from the

2452      Village in the event of a Village default

2453      under the provisions of this Agreement (as

2454      provided in Section 17.1 of this Agreement);

2455      and

2456    (v) The right to sell, convey, mortgage, lease and

2457      otherwise transfer interests in and to the

2458      Subject Property (subject to the limitations

2459      of, and as provided for in, Section 18.2 of

2460      this Agreement).

2461  (d) Except as provided in paragraph (e) of this Section 18.1,

02/27/90-H.E.      80

2462          all obligations, including Developer's indemnification

2463          obligations under Article 20 of this Agreement, of the

2464          Developer established by the terms of this Agreement

2465          shall be solely the obligations of the Developer.

2466    (e)   With respect to the development of the various portions

2467          of the Subject Property, the following obligations shall

2468          be the obligations of the party or entity undertaking

2469          such development or causing such development to be

2470          undertaken:

2471        (i)   The obligation to devote such portion of the

2472            Subject Property as is being developed to only

2473            the uses specified in the Economic Development

2474            Plan (as provided in Section 3.4 of this

2475            Agreement);

2476       (ii)   The obligation to procure and maintain

2477            insurance covering construction on such

2478            portion of the Subject Property (as provided

2479            in Section 3.5 of this Agreement);

2480      (iii)   The obligation to submit plats and plans, and

2481            to undertake construction, in accordance with

2482            the codes and ordinances of the Village (as

2483            provided in Section 3.6 of this Agreement);

2484       (iv)   The obligation to refrain from protesting real

2485            estate taxes or assessed valuations of the

2486            Subject Property (as provided in Section 9.1

2487            of this Agreement);

2488         (v)    The obligation to grant and provide

2489            dedications, easements and rights of way

2490            necessary to the development of such portion

2491            of the Subject Property (as provided in

2492            Article 19 of this Agreement); and

2493         (vi)   The obligation to indemnify the Village

2494            against costs and expenses incurred by the

2495            Village as a result of construction activities

2496            on such portion of the Subject Property and as

2497            a result of the negligence of general

2498            contractors, subcontractors and their

2499            respective employees (as provided in Article

2500            20 of this Agreement).

2501     **18.2.**    **Conveyances of the Subject Property**

2502     The Developer shall have the right to sell, convey, mortgage,

2503 lease and otherwise transfer interests in and to the Subject

2504 Property without limitation and without the approval of the Village

2505 provided, however, that:

2506        (a)    The Developer shall not sell or transfer any interest in

2507           and to that portion of the Phase I Site on which the SMG

2508           Home Office Complex is to be constructed until issuance

2509           by the Village of the first occupancy permit for the SMG

2510           Home Office Complex and until after the Developer's

2511           Merchandise Group, or another entity, division or group

2512           controlled or owned by Developer, shall have occupied the

2513           SMG Home Office Complex for at least ten (10) years

2514    following the SMG Occupancy Date; and

2515    (b)    If:

2516    (1)    The Developer seeks to sell, transfer or convey any

2517    portion of the Subject Property consisting of one

2518    hundred (100) acres or more; and

2519    (2)    The Developer seeks to be relieved of liability

2520    under this Agreement with respect to such portion

2521    of the Subject Property; and

2522    (3)    Bonds are outstanding;

2523    then the Village shall have the right to require that any

2524    purchaser/grantee of such portion of the Subject Property

2525    satisfy the following conditions and meet the following

2526    standards:

2527    (i)    Any such purchaser/grantee shall have the

2528    experience and financial responsibility

2529    necessary to fulfill the Developer's

2530    obligations under this Agreement (to the

2531    extent applicable to such portion of the

2532    Subject Property);

2533    (ii)    Any such purchaser/grantee shall have expressly

2534    assumed, in writing, the Developer's

2535    obligations under this Agreement (to the

2536    extent applicable to such portion of the

2537    Subject Property);

2538    (iii)    All instruments confirming the matters

2539    specified in the foregoing paragraphs (i) and

2540              (ii) Shall be submitted to the Village for

2541              review and approval (which approval shall not

2542              be unreasonably withheld or delayed).

2543     Upon the occurrence of a sale or conveyance that satisfies the

2544     foregoing conditions and meets the foregoing standards, the

2545     Developer shall be relieved of all liability under this Agreement

2546     (to the extent applicable to such portion of the Subject Property).

2547     No conveyance of a portion of the Subject Property consisting of

2548     one hundred (100) acres or more that fails to satisfy the foregoing

2549     conditions or meet the foregoing conditions, shall be deemed to

2550     relieve the Developer of any of its obligations under this

2551     Agreement with respect to such portion of the Subject Property.

2552     The provisions of this Section 18.2 are intended to be

2553     applicable to a sale and assignment of a beneficial interest in a

2554     land trust, a sale and assignment of partnership interests, a sale

2555     and transfer of capital stock in a corporation, and other

2556     comparable transactions which would effectively frustrate the

2557     spirit and intent of these provisions. However, the provisions of

2558     this Section 18.2 are not intended to preclude or be applicable to,

2559     and such provisions shall not preclude or be applicable to, the

2560     financing, refinancing, sale-leaseback or leasing of any portion of

2561     the Subject Property by the Developer; the sale or transfer of any

2562     interest in and to the Subject Property to an entity controlled or

2563     owned by the Developer; or an assignment of a beneficial interest

2564     in a land trust to, the assignment of partnership interests to, or

2565     the transfer of capital stock in a corporation to an entity

2566    controlled or owned by the Developer.  Any entity in which the

2567    Developer holds more than a fifty percent (50%) interest shall be

2568    considered to be controlled or owned by the Developer for purposes

2569    of this Section 18.2.

2570         18.3.    The terms and provisions of this Agreement shall be

2571    binding upon and inure to the benefit of the Corporate Authorities

2572    (including successor Corporate Authorities).

2573         **ARTICLE 19.**   **DEDICATIONS AND EASEMENTS**

2574         The Developer, at no cost to the Village, shall grant and

2575    provide all reasonable street dedications and permanent and

2576    temporary easements and rights-of-way reasonably requested by the

2577    Village in connection with the Development, including, but not

2578    limited to, easements and rights-of-way for vehicular access,

2579    pedestrian access, parking facilities, sanitary sewers, storm

2580    drains, water lines, street lighting, and electrical power,

2581    telephone, cable TV and natural gas lines.

2582         **ARTICLE 20.**   **DEVELOPER INDEMNIFICATION**

2583         (a)   The Developer shall indemnify and hold harmless the

2584             Village, its agents, officers and employees, against all

2585             injuries, deaths, losses, damages, claims, suits,

2586             liabilities (including any liability under the Illinois

2587             Structural Work Act, known as the Scaffolding Act),

2588             judgments, costs and any reasonable expenses of

2589             consultants, lawyers and other reasonable expenses of any

2590             type, except Village Project Costs, that are directly or

2591             indirectly related to the creation of the Economic

02/27/90-H.E.                   85

2592    Development Project, the preparation or adoption of the

2593    Economic Development Plan and this Agreement, including,

2594    but not limited to any breach of the terms of this

2595    Agreement by the Developer; the sale and use of any Bonds

2596    pursuant to this Agreement (other than General Obligation

2597    Bonds and other Village Obligations secured solely by the

2598    Village's portion of the Allocated Tax Increment Revenue

2599    Amounts); the Developer's improvement of the Subject

2600    Property and construction of the Development, and from

2601    any negligence or reckless misconduct of the Developer,

2602    its general contractor or its employees and agents, or of

2603    a subcontractor of the general contractor or his

2604    employees, if any, in connection therewith, and the

2605    Developer shall, at its own expense, appear, defend and

2606    pay all charges of attorneys and costs and other expenses

2607    arising therefrom or incurred in connection with any

2608    claim for which the Developer is responsible hereunder,

2609    and, if any judgment shall be rendered against the

2610    Village, its agents, officials or employees in any such

2611    action involving any claim for which the Developer is

2612    responsible hereunder, the Developer shall, at its own

2613    expense, satisfy and discharge the same.  The Developer

2614    expressly understands and agrees that the insurance

2615    protection required by Section 3.5 of this Agreement

2616    shall in no way limit the responsibility to indemnify,

2617    hold harmless and defend as herein provided in this

2618    Article 20, but to the extent a particular claim, action

2619    or liability is covered by such insurance, the Developer

2620    shall be released of liability hereunder.

2621    (b)    The indemnification obligations of the Developer

2622    contained in the foregoing paragraph (a) shall not extend

2623    to injuries, deaths, losses, damages, claims, suits,

2624    liabilities, judgments, costs and expenses incurred as a

2625    result of or arising out of: (i) the negligence or

2626    reckless misconduct of the Village, its officers, agents,

2627    employees and contractors; (ii) obligations which the

2628    Village has agreed to pay or incur pursuant to the

2629    provisions of this Agreement; (iii) the Village's breach

2630    in any of the terms of this Agreement; (iv) the Village's

2631    construction of the Public Works and Improvements and the

2632    Sanitary Sewer Improvements; and (iv) the Village's

2633    improvement and use of the Village Municipal Site.

2634    **ARTICLE 21.**    **AMENDMENT/INTEGRATION**

2635    This Agreement, and any exhibits attached hereto, may be

2636    amended only by the mutual consent of the Parties with, on the part

2637    of the Village, the adoption of an ordinance or resolution of the

2638    Board of Trustees approving said amendment, as provided by law, and

2639    by the execution of said amendment by the Parties or their

2640    successors in interest.  The Amendment to the Annexation Agreements

2641    and this Agreement, when both are fully executed by the Parties,

2642    shall constitute the entire understanding and agreement of the

2643    Parties relative to the subject matter hereof superseding all prior

02/27/90-H.E.                    87

2644 agreements, negotiations and discussions relative to such subject

2645 matter. All exhibits to this Agreement are expressly incorporated

2646 herein by this reference thereto.

2647 **ARTICLE 22.   DUPLICATE ORIGINALS**

2648 This Agreement is executed in four (4) duplicate originals,

2649 each of which is deemed to be an original.

2650 **ARTICLE 23.   TIME IS OF THE ESSENCE**

2651 Time is of the essence of this Agreement.

2652 **ARTICLE 24.   TERM**

2653 This Agreement shall remain in full force and effect until

2654 termination of the Project Area and the Economic Development Plan

2655 or until otherwise terminated pursuant to the terms hereof.

2656 **ARTICLE 25.   INTERPRETATION**

2657 The laws of the State of Illinois shall govern the

2658 interpretation and enforcement of the terms and provisions of this

2659 Agreement.

2660 **ARTICLE 26.   SEVERABILITY.**

2661 In the event any phrase, paragraph, article or portion of this

2662 Agreement is found to be invalid, illegal or unenforceable by any

2663 court of competent jurisdiction, such finding of invalidity,

2664 illegality or unenforceability as to that phrase, paragraph,

2665 article or portion shall not affect the validity, legality or

2666 enforceability of the remaining portions of this Agreement.

2667 **ARTICLE 27.   CAPTIONS AND PRONOUNS.**

2668 The captions and headings of the various articles and sections

2669 of this Agreement are for convenience only, and are not to be

02/27/90-H.E.                    88

2670  construed as confining, defining, expanding or limiting in any way
2671  the scope or intent of the provisions hereof.  Whenever the context
2672  requires or permits, the singular shall include the plural, the
2673  plural shall include the singular, and the masculine, feminine and
2674  neuter shall be freely interchangeable.

2675

02/27/90-H.E.                    89

2676        **IN WITNESS WHEREOF** this Agreement has been duly authorized and

2677    approved by the President and Board of Trustees of the Village of

2678    Hoffman Estates, Cook and Kane Counties, Illinois, and executed by

2679    the Parties as the day and year first above set forth.

2680
2681                                **VILLAGE:**
2682
2683                                **VILLAGE OF HOFFMAN ESTATES,** an
2684                                Illinois  home  rule  municipal
2685                                corporation
2686
2687
2688                                By: _____
2689                                    Its:    Village President
2690
2691    **ATTEST:**
2692
2693
2694    By: _____
2695        Its:  Village Clerk
2696        (Seal)
2697
2698                                **DEVELOPER:**
2699
2700                                **SEARS, ROEBUCK AND CO.,** A New
2701                                York corporation
2702
2703
2704                                By: _____
2705                                    Its:  Chairman and Chief
2706                                          Executive Officer
2707                                          Merchandise Group
2708
2709
2710    **ATTEST:**
2711
2712
2713    By: _____
2714        Its:  Assistant Secretary
2715        (Seal)
2716
2717
2718
2719
2720
2721
2722
2723

## LIST OF EXHIBITS

EXHIBIT A        Summary of Acquisition Contracts

EXHIBIT B        Phase I – Allocated Tax Increment Revenue Amounts

EXHIBIT C        Phase II – Allocated Tax Increment Revenue Amounts

EXHIBIT D        Legal Description of the Phase I Site

EXHIBIT E        Legal Description of the Phase II Site

EXHIBIT F        Legal Description of the Hoffman Estates Economic
                 Development Project Area

EXHIBIT G        Depiction   of   the   Hoffman   Estates   Economic
                 Development Project Area

EXHIBIT H        Phase I Development Public Site Improvements

EXHIBIT I        Phase II Development Public Site Improvements

EXHIBIT J        Public Works and Improvements

EXHIBIT K        General Depiction of Portion of Phase I Site to
                 Contain SMG Home Office Complex

EXHIBIT L        SMG Occupancy Date Notice

EXHIBIT M        Legal Description of Subject Property

EXHIBIT N        Contracts  in  Existence  or  To  Be  Let  by  the
                 Developer

EXHIBIT O        Property Assembly Costs Paid, Incurred, or Known by
                 the Developer as of the Date of this Agreement

EXHIBIT P        Project Costs Paid or Incurred by the Developer as
                 of the Date of this Agreement in Connection with
                 Construction of the Public Site Improvements

## EXHIBIT A

## SUMMARY OF ACQUISITION CONTRACTS

1. **Origer Property** - Two (2) Contracts - Approximately 520 acres

   I.    Date of Contracts:  June 23, 1989

   II.   Owners:

      1.   Approximately 360 acres are owned by two (2) land trusts having as beneficiary The Thomas J. Origer Inter-Vivos Trust;

      2.   Approximately 160 acres are owned by two (2) land trusts with beneficial owners being the children of Thomas J. Origer (seven individuals).

   III.  Purchase Price:

      1.   $__*__ per square foot;

      2.   $___*___ (in the aggregate)

   IV.   Closing Date:  The thirtieth (30th) day following the earlier to occur of: (i) satisfaction of zoning contingency; and (ii) June 23, 1990.  If extended the Closing Date shall be no later than October 24, 1990.

B. **Nederlander Property** - Two (2) Contracts - Approximately 221 acres

   I.    Date of Contracts:  June 24, 1989.

   II.   Owner:  LaSalle National Bank Trust No. 54757 having as beneficiary Ned-Prop, an Illinois joint venture.

   III.  Purchase Price:

      1.   $___*___ per square foot;

      2.   $_____*_____ (in the aggregate)

   IV.   Closing Date:  The thirtieth (30th) day following the earlier to occur of: (i) satisfaction of zoning contingency; and (ii) June 25, 1990.  If extended the Closing Date shall be no later than September 24, 1990.

   V.    Leaseback:  Poplar Creek Music Theatre is to be leased to the Seller at closing for an initial period (with renewal rights provided it does not interfere with Sears' development) for a rent of $1.00 per year.

* Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

C.   **Studz Property** - Approximately 40 acres

    I.   Date of Contract:  June 25, 1989

    II.   Owner:  Charter Bank and Trust Company Trust No. 769 having as beneficiary Ruth Studz

    III.   Purchase Price:

        1.   $\_\_*\_\_  per square foot (based on 40 acres);

        2.   $\_\_\_\_\_*\_\_\_\_  (in the aggregate)

    IV.   Closing Date:  the thirtieth (30th) day following the earlier to occur of: (i) satisfaction of zoning and annexation contingency; and (ii) June 25, 1990. If extended the Closing Date shall be no later than October 24, 1990.

D.   **"Watson" Property** - Approximately 7 acres

    I.   Date of Contract:  June 26, 1989

    II.   Owner:  Sutton Road Partnership, an Illinois general partnership (Contract Buyer)

    III.   Purchase Price:

        1.   $\_\_*\_\_  per square foot

        2.   $\_\_\_\_*\_\_\_\_  in the aggregate

    IV.   Closing Date:  Property was acquired on September 7, 1989.

E.   **Totals**:

    Acreage:  Approximately 788 acres

    Purchase Price:  Approximately $\_\_\_\_\_*\_\_\_\_\_  or $\_\_\_*\_\_  per square foot

*   Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

## EXHIBIT B

### PHASE I
### ALLOCATED TAX INCREMENT REVENUE AMOUNTS

| YEAR | COLUMN 1<br>Total Amount of Phase I<br>Tax Increment Revenues<br>which are to be Received<br>and Deposited in Fund<br>for Benefit of Village<br>and Other Taxing Districts | COLUMN 2<br>Portions of<br>Column 1 Amounts<br>which are Subject<br>to Disbursement<br>to the Village |
|---|---|---|
| 1st Year of Payment | $2,000,000 | $1,500,000 |
| 2nd | 2,100,000 | 1,575,000 |
| 3rd | 2,205,000 | 1,653,750 |
| 4th | 2,315,250 | 1,736,438 |
| 5th | 2,431,013 | 1,823,260 |
| 6th | 3,000,000 | 2,250,000 |
| 7th | 3,150,000 | 2,362,500 |
| 8th | 3,307,500 | 2,480,625 |
| 9th | 3,472,875 | 2,604,656 |
| 10th | 3,646,519 | 2,734,889 |
| 11th | 3,828,845 | 2,871,634 |
| 12th | 4,020,287 | 3,015,215 |
| 13th | 4,221,301 | 3,165,976 |
| 14th | 4,432,366 | 3,324,275 |
| 15th | 4,653,985 | 3,490,488 |
| 16th | 4,886,684 | 3,665,013 |
| 17th | 5,131,018 | 3,848,264 |
| 18th | 5,387,569 | 4,040,677 |
| 19th | 5,656,947 | 4,242,711 |
| 20th | 5,939,795 | 4,454,846 |

## EXHIBIT C

### PHASE II
### ALLOCATED TAX INCREMENT REVENUE AMOUNTS

| YEAR | PERCENTAGE OF PHASE II TAX INCREMENT REVENUES WHICH ARE TO BE PAID TO TAXING DISTRICTS |
|---|---|
| 1st year of payment | 15 |
| 2nd | 15 |
| 3rd | 15 |
| 4th | 15 |
| 5th | 15 |
| 6th | 20 |
| 7th | 20 |
| 8th | 20 |
| 9th | 20 |
| 10th | 20 |
| 11th | 25 |
| 12th | 25 |
| 13th | 25 |
| 14th | 25 |
| 15th | 25 |
| 16th | 30 |
| 17th | 30 |
| 18th | 30 |
| 19th | 30 |
| 20th | 30 |

## EXHIBIT D

### LEGAL DESCRIPTION OF THE PHASE I SITE

That part of the Northeast 1/4 of Section 31, and that part of the Northwest 1/4 of Section 32, all in Township 42 North, Range 9 East of the Third Principal Meridian, more particularly described as follows:

Commencing at the Southwest corner of the Northwest 1/4 of said Section 32, thence Westerly along the Southline of the Northeast 1/4 of said Section 31, North 89 degrees 42 minutes 57 seconds West, a distance of 1,320.70 feet to a point on the West line of the East 1/2 of the Northeast 1/4 of said Section 31, said point being the point of beginning; thence Northerly along said West line, North 00 degrees 25 minutes 04 seconds East, a distance of 2,432.03 feet to a point on the Southwesterly line of Higgins Road (Route 72) as recorded per documents: No. 12079013, recorded November 8, 1937, No. 12284905, recorded March 20, 1939, No. 12309896, recorded May 10, 1939, and No. 12647599, recorded March 27, 1941, the following three courses:

(1)     A distance of 189.90 feet along an arc of a circle, convex to the Southwest, having a radius of 10,257.06 feet, and whose chord of 189.90 feet bears South 82 degrees 59 minutes 46 seconds East;

(2)     South 83 degrees 31 minutes 35 seconds East, a distance of 2,317.28 feet;

(3)     A distance of 1,239.98 feet along an arc of a circle, convex to the Northeast, having a radius of 9,965.07 feet, and whose chord of 1,239.18 feet bears South 79 degrees 57 minutes 42 seconds East;

Thence South 13 degrees 53 minutes 26 seconds West, 29.15 feet; thence Southerly along a curve tangent to the last described course, concave Easterly having a radius of 1,550.00 feet, an arc distance of 582.50 feet, and whose chord bears South 03 degrees 07 minutes 28 seconds West, a distance of 579.08 feet; thence South 07 degrees 38 minutes 30 seconds East, tangent to the last described course, a distance of 150.00 feet; thence Southwesterly along a curve concave Northwesterly having a radius of 1,350.00 feet, an arc distance of 2,402.00 feet, and whose chord bears South 43 degrees 19 minutes 50 seconds West, a distance of 2,097.46 feet; thence North 85 degrees 41 minutes 51 seconds West, tangent to the last described course, a distance of 150.00 feet; thence Northwesterly along a curve concave Northeasterly having a radius of 3,450.00 feet, an arc distance of 539.63 feet, and whose chord bears North 81 degrees 12 minutes 59 seconds West, a distance of 539.08 feet; thence North 76 degrees 44 minutes 08 seconds West, tangent to the last described course, a distance of 170.49 feet; thence Northwesterly along a curve concave Southwesterly having a radius of 3,550.00 feet, an arc distance of 789.05 feet and whose chord bears North 83 degrees 06 minutes 11 seconds West, a distance of 787.43 feet; thence North 89 degrees 28 minutes 15 seconds West, a distance of 642.09 feet to a point on the West line of the East 1/2 of the Northeast 1/4 of aforementioned Section 31; thence Northerly along said West line, North 00 degrees 31 minutes 45 seconds East a distance of 116.16 feet to the point of beginning all in Cook County, Illinois. Containing 8,762,404 square feet (201.157 acres) of land, more or less.

## EXHIBIT E

### LEGAL DESCRIPTION OF THE PHASE II SITE

The Phase II Site is legally described as that certain real property legally described on Exhibit M as the Subject Property excepting therefrom that certain real property legally described on Exhibit D as the Phase I Site.

## EXHIBIT F

### LEGAL DESCRIPTION OF THE HOFFMAN ESTATES
### ECONOMIC DEVELOPMENT PROJECT AREA

That part of the East 1/2 of the East 1/2 of Section 31, lying South of the Northerly line of Higgins Road (S.R. 72) and North of the Southerly line of Section 31, and excluding property owned by the Northwest Tollroad; also that part of Section 32, lying South of the Northerly line of Higgins Road; North of the Southerly line of the Section 32 and excepting those portions of right-of-way (100' wide) belonging to E. J. & E. Railway (except the southerly 300' within the Northeast 1/4 of Section 32); and excluding property owned by the Northwest Tollway; also that part of the Southwest 1/4 of the Northwest 1/4 and the West 1/2 of the Southwest 1/4 of Section 33 lying south of the Northerly line of Higgins Road and North of the Southerly line of Section 33 except that portion of property owned by the Northwest Tollway; also the entire right-of-way of Beverly Road from the Northerly Line of Higgins Road to the Southerly Line of Section 31; also, that part of the east 1/2 of the Southwest 1/4 of Section 33 along with the Southeast 1/4 of the Northwest 1/4 of Section 33 lying south of the southerly line of Higgins Road right-of-way, except that portion of property owned by the Northwest Tollway, all of the above being in Township 42 North, Range 9, West of the Third Principal Meridian, in Cook County, Illinois. Also, that part of Section 4 lying Easterly of the Easterly right of way line of the Elgin, Joliet and Eastern Railroad Company and North of the Northerly Line of the Northern Illinois State Toll Highway Commission right of way, and that part of the West half of the West Half of Section 3, Township 41, North, Range 9, East of the Third Principal Meridian, lying North of the. Northerly line of the Northern Illinois State Toll Highway Commission right of way, in Cook County, Illinois, and that part of the East half of the West half of fractional Section 3, lying North of the Northerly right of way line of the Northern Illinois State Toll Highway, excepting therefrom that part thereof conveyed to the Northern Illinois State Toll Highway Commission by instrument recorded May 13, 1957, as document 16902251 in Township 41 North, Range 9, East of the Third Principal Meridian, in Cook County, Illinois, and also except the following described parcels located in Township 42 North, Range 9, West of the Third Principal Meridian in Cook County, Illinois.

That part of the South 20.04 chains of the East 1/2 of the Southwest 1/4 of Section 33 lying South and East of the Northwesterly line of property owned by the Northwest Tollroad (Interstate 90) and lying south and East of New Sutton Road (S.R. 59);

Also that part of the Northeast 1/4 of the Southwest 1/4 of Section 33 lying West of the Westerly line of the New Sutton Road (S.R. 59) Right of Way;

Also that part of the Southeast 1/4 of the Northwest 1/4 of Section 33 lying South of the Southerly line of the Higgins Road (S.R. 72) Right of Way.



EXHIBIT G

DEPICTION OF THE HOFFMAN ESTATES ECONOMIC
DEVELOPMENT PROJECT AREA

# ECONOMIC DEVELOPMENT PROJECT BOUNDARY
## HOFFMAN ESTATES
# ECONOMIC DEVELOPMENT AREA

VILLAGE OF HOFFMAN ESTATES

 

TESKA
ASSOCIATES
INC.

## EXHIBIT H

### PHASE I DEVELOPMENT PUBLIC SITE IMPROVEMENTS

The following is a description of the Phase I Development Public Site Improvements, as that term is used in the Agreement. The Phase I Development Public Site Improvements consist of those public streets, public utilities and other public site improvements which are constructed, or to be constructed, by, or under the direction of, the Developer, and all activities which are undertaken in connection with such construction: (i) within the Phase I Site; or (ii) outside the boundaries of the Phase I Site but within the Project Area and in connection with, or in furtherance of, the use, occupancy, and development of the Phase I Site; or (iii) outside the boundaries of the Project Area (to the extent such public streets, public utilities and public improvements are essential to the preparation of the Project Area in accordance with the Economic Development Plan). Natural gas, electric and telephone service shall not be included within the definition of "public utilities", as used above, except to the extent that they relate to natural gas, electric and telephone service improvements which are to be dedicated to, and owned by, the Village (e.g. public street lights).

The Phase I Site encompasses that portion of the Subject Property consisting of approximately two hundred (200) acres, which is located in the northwest corner of the Subject Property.

Specifically, the Phase I Development Public Site Improvements consist of the following:

A.    **DEMOLITION**

Demolition and removal of existing structures within the Phase I Site and removal of all waste piles, underground storage tanks, if any, and similar conditions.

B.    **EARTHWORK**

Earth-moving and grading within the Project Area to prepare for the construction and installation of the Phase I Development Public Site Improvements and construction of necessary storm water management improvements.

C.    **WETLANDS MITIGATION**

Processing of necessary wetlands regulatory applications, satisfaction of all wetlands regulatory requirements, wetlands protection, and engineering and implementation of wetlands mitigation plans for the Subject Property.

D.    **SANITARY SEWER**

Construction of necessary sanitary sewer mains and lines; lifts station and appurtenances; and acquisition of the easements and rights-of-way necessary to such construction. These improvements include, without limitation, essential trunk sewer mains from existing Metropolitan Water

Reclamation District lines to the Project Area; sewer mains and lines through the Phase II Site and to the Phase I Site; and arterial sewer lines, and feeder lines from arterial sewer lines to structures, as required throughout the Phase I Site.

E.   **WATER MAINS**

Construction of necessary potable water mains and lines and appurtenant facilities, and acquisition of the easements and rights-of-way necessary to such construction. This includes the construction of trunk mains located outside the Project Area that connect the Project Area to existing Village or Joint Area Water Association (JAWA) water mains; and the construction of arterial water lines through the Phase II Site, as necessary to connect the Subject Property to the existing municipal water system.

F.   **ROADWAYS**

Construction of necessary roadways and ancillary roadway improvements and acquisition of the easements and right-of-ways necessary to such construction. These roadways and ancillary roadway improvements shall include the following (or their equivalents):

(a)   *

(b)   *

(c)   *

(d)   *

Construction of each of the foregoing roadway improvements may include, but shall not be limited to: (i) levelling and grading of earth; (ii) preparation of roadbed; (iii) paving; (iv) construction of curbs, sidewalks and gutters; (v) landscaping of medians and shoulders; (vi) installation of storm sewers; (vii) installation of street lighting; and (viii) installation of traffic signals.

G.   **PIPELINE RELOCATION**

Relocation of existing pipeline(s) so as to permit construction of infrastructure and structures.

H.   **INDIRECT COSTS**

Permit costs and fees related to the construction of all Phase I Development Public Site Improvements.

---

*  Document on file. Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

**EXHIBIT I**

## PHASE II DEVELOPMENT PUBLIC SITE IMPROVEMENTS

The following is a description of the Phase II Development Public Site Improvements, as that term is used in the Agreement. The Phase II Development Public Site Improvements consist of those public streets, public utilities and other public site improvements which are constructed, or to be constructed, by, or under the direction of, either the Village or the Developer, and all activities which are undertaken in connection with such construction: (i) within the Phase II Site; or (ii) outside the boundaries of the Phase II Site but within the Project Area and in connection with, or in furtherance of, the use, occupancy, and development of the Phase II Site; or (iii) outside the boundaries of the Project Area (to the extent such public streets, public utilities and public improvements are essential to the preparation of the Project Area for use in accordance with the Economic Development Plan). Natural gas, electric and telephone service shall not be included within the definition of "public utilities", as used above, except to the extent that they relate to natural gas, electric and telephone service improvements which are to be dedicated to, and owned by, the Village (e.g. public street lights).

The Phase II Site consists of the Subject Property, exclusive of the Phase I Site. The Phase II Site consists of approximately five hundred eighty-eight (588) acres and includes the PCMT Property.

Specifically, the Phase II Development Public Site Improvements consist of the following:

A.    **DEMOLITION**

Demolition and removal of the remaining structures within the Project Area.

B.    **EARTHWORK**

Earth-moving and grading within the Project Area to prepare for the construction and installation of the Phase II Development Public Site Improvements and construction of necessary storm water management improvements.

C.    **SANITARY SEWER**

Construction of necessary sanitary sewer mains and lines, lift station and appurtenances, and acquisition of the easements and right-of-ways necessary to such construction. This includes, without limitation, construction of sanitary sewer mains and lines throughout the Phase II Site; construction of arterial lines from sanitary sewer trunk mains to structures located within the Phase II Site; and construction of all other sanitary sewer mains and lines, lift station and appurtenances that are essential to the preparation of the Project Area in accordance with the Economic Development Plan (except for those sewer mains and lines, lift stations and appurtenances constructed as Phase I Development Public Site Improvements).

D.    **WATER MAINS**

Construction of necessary potable water mains and lines and appurtenant facilities, and acquisition of the easements and rights-of-way necessary to such construction.    This includes, without limitation, construction of feeder lines from arterial lines to structures located within the Phase II Site; and all other water mains and lines and other appurtenant facilities essential to the preparation of the Project Area in accordance with the Economic Development Plan (except for those water mains and lines and appurtenant facilities constructed as Phase I Development Public Site Improvements).

E.    **ROADWAYS**

Construction of necessary roadways and ancillary roadway improvements and acquisition of the easements and rights-of-way necessary to such construction.    These roadways and ancillary roadway improvements shall include the following (or their equivalents):

(a)    *

(b)    *

(c)    *

(d)    *

(e)    *

(f)    *

(g)    *

(h)    *

(i)    *

(j)    *

Construction of each of the foregoing roadway improvements may include, but shall not be limited to: (i) levelling and grading of earth; (ii) preparation of roadbed; (iii) paving; (iv) construction of curbs, sidewalks and gutters; (v) landscaping of medians and shoulders; (vi) installation of storm sewers; (vii) installation of street lighting; and (viii) installation of traffic signals.

F.    **INDIRECT COSTS**

Permit costs and fees related to the construction of all Phase II Development Public Site Improvements.

*    Document on file.  Confidentiality protected by Chapter 116, Section 207(s) of the Illinois Revised Statutes.

## PUBLIC WORKS AND IMPROVEMENTS

The following is a list of Public Works and Improvements which are to be constructed, by or on behalf of the Village and all activities which are undertaken in connection with such construction, which are authorized by this Agreement and the Economic Development Plan which the Parties agree are reasonable or necessary.  This Exhibit may be amended by the parties, from time to time, pursuant to the provisions of this Agreement.

1.    <u>VILLAGE MUNICIPAL FACILITY</u>

2.    <u>VILLAGE WATER TANK</u>

3.    <u>INDIRECT COSTS</u>

   Fees related to the construction of Public Works and Improvements listed herein or as otherwise allowed by the provisions of this Agreement.

Exhibit J



## SMG OCCUPANCY DATE NOTICE

Village of Hoffman Estates
1200 North Gannon Drive
Hoffman Estates, IL  60196
Attn:  Village Manager

Village of Hoffman Estates
1200 North Gannon Drive
Hoffman Estates, IL  60196
Attn:  Corporation Counsel

Re:   **SMG Occupancy Date Notice Given Pursuant to
Economic Development Agreement Dated By and Between
the Village of Hoffman Estates and Sears, Roebuck
and Co., ("Agreement")**

Date: _____

Ladies and Gentlemen:

This will confirm that Sears, Roebuck and Co., as Developer under the Agreement, has received the last governmental permit or approval necessary to its commencement of construction of the SMG Home Office Complex.

All terms not otherwise defined herein shall have the meanings given them in the Agreement.

SEARS, ROEBUCK AND CO., a
New York Corporation

By: _____
Its: _____

CC:   Senior Vice President - Sears/Resources and Administration
General Counsel - Sears Merchandise Group
Thomas Tully, Esq.
J. Kevin Garvey, Esq.
Harold W. Francke, Esq.

Exhibit L

## EXHIBIT M

## LEGAL DESCRIPTION OF SUBJECT PROPERTY

THAT PART OF THE EAST ½ OF SECTION 31, AND THAT PART OF SECTION 32, AND THAT PART OF THE WEST ½ OF SECTION 33, ALL IN TOWNSHIP 42 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, AND ALSO THAT PART OF FRAC-TIONAL SECTION 3, AND FRACTIONAL SECTION 4, BOTH IN TOWNSHIP 41 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST ¼ OF SAID SECTION 32;
THENCE ALONG THE SOUTH LINE OF THE SOUTHWEST ¼ OF SAID SECTION 32, NORTH 89°41'27" WEST, A DISTANCE OF 1343.48 FEET;
THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF TOLLWAY I-90 AS CONVEYED TO THE ILLINOIS STATE TOLL HIGHWAY COMMISSION, PER DOCUMENT NO. 17 400 695, RECORDED DECEMBER 10, 1958, THE FOLLOWING FIVE COURSES:
(1)     NORTH 73°44'44" WEST, A DISTANCE OF 291.20 FEET;
(2)     NORTH 53°26'13" WEST, A DISTANCE OF 372.02 FEET;
(3)     NORTH 89°41'27" WEST, A DISTANCE OF 550.00 FEET;
(4)     SOUTH 54°08'29" WEST, A DISTANCE OF 461.68 FEET;
(5)     SOUTH 87°54'36" WEST, A DISTANCE OF 612.13 FEET;
THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼ OF SAID SECTION 31, NORTH 89°33'24" WEST, A DISTANCE OF 350.18 FEET;
THENCE ALONG THE EASTERLY RIGHT-OF-WAY LINE OF BEVERLY ROAD, AS RECORDED DECEMBER 18, 1956, PER DOCUMENT NO. 16 783 799, THE FOLLOWING FOUR COURSES:
(1)     NORTH 19°28'22" WEST, A DISTANCE OF 93.54 FEET;
(2)     A DISTANCE OF 379.80 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHWEST, HAVING A RADIUS OF 1087.92 FEET, AND WHOSE CHORD OF 377.87 FEET BEARS NORTH 9°28'19" WEST;
(3)     NORTH 7°32'23" WEST, A DISTANCE OF 178.10 FEET;
(4)     NORTH 89°28'14" WEST, A DISTANCE OF 33.00 FEET;
THENCE ALONG THE WEST LINE OF THE EAST ½ OF THE SOUTHEAST ¼ OF SAID SECTION 31, NORTH 0°31'46" EAST, A DISTANCE OF 1997.96 FEET;
THENCE ALONG THE WEST LINE OF THE EAST ½ OF THE NORTHEAST ¼ OF SAID SECTION 31, NORTH 0°25'04" EAST, A DISTANCE OF 2432.02 FEET;
THENCE ALONG THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD (ROUTE 72), AS PER DOCUMENTS: NO. 12 079 013, RECORDED NOVEMBER 8, 1937, NO. 12 284 905, RECORDED MARCH 20, 1939, NO. 12 309 896, RECORDED MAY 10, 1939, NO. 12 647 599, RECORDED MARCH 27, 1941, AND NO. 12 288, RECORDED FEBRUARY 20, 1939, THE FOLLOWING FOUR COURSES:
(1)     A DISTANCE OF 189.90 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHWEST, HAVING A RADIUS OF 10,257.06 FEET, AND WHOSE CHORD OF 189.90 FEET BEARS SOUTH 82°59'46" EAST;
(2)     SOUTH 83°31'35" EAST, A DISTANCE OF 2317.28 FEET;
(3)     A DISTANCE OF 2532.01 FEET, ALONG AN ARC OF A CIRCLE, CONVEX TO THE NORTHEAST, HAVING A RADIUS OF 9965.06 FEET, AND WHOSE CHORD OF 2525.20 FEET BEARS SOUTH 76°14'50" EAST;
(4)     SOUTH 68°58'05" EAST, A DISTANCE OF 1233.00 FEET;

THENCE ALONG THE NORTHWESTERLY RIGHT-OF-WAY LINE OF ELGIN, JOLIET AND EASTERN RAILROAD, AS RECORDED JULY 1, 1889, PER DOCUMENT NO. 1 123 185, SOUTH 11°12'47" WEST, A DISTANCE OF 3844.25 FEET;
THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼, OF SAID SECTION 32, NORTH 89°42'33" WEST, A DISTANCE OF 1425.69 FEET TO THE POINT OF BEGINNING;

AND ALSO:
COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 32;
THENCE ALONG THE SOUTH LINE OF THE SOUTHEAST ¼ OF SAID SECTION 32, NORTH 89°42'33" WEST, A DISTANCE OF 1111.55 FEET TO THE POINT OF BEGINNING;

THENCE ALONG THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF SAID ELGIN, JOLIET AND EASTERN RAILROAD, NORTH 11°12'47" EAST, A DISTANCE OF 3807.64 FEET;
THENCE ALONG THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD (ROUTE 72), SOUTH 68°58'05" EAST, A DISTANCE OF 1336.48 FEET;
THENCE SOUTH 0°07'09" WEST, A DISTANCE OF 178.58 FEET;
THENCE SOUTH 89°52'51" EAST, A DISTANCE OF 185.00 FEET;
THENCE NORTH 0°07'09" EAST, A DISTANCE OF 12.00 FEET;
THENCE SOUTH 89°52'51" EAST, A DISTANCE OF 141.20 FEET;
THENCE NORTH 01°07'09" EAST, A DISTANCE OF 41.94 FEET;
THENCE ALONG SAID SOUTHWESTERLY RIGHT-OF-WAY LINE OF HIGGINS ROAD, SOUTH 68°58'05" EAST, A DISTANCE OF 135.51 FEET;
THENCE AS MONUMENTED AND OCCUPIED, SOUTH 0°07'09" WEST, A DISTANCE OF 1769.21 FEET;
THENCE ALONG A LINE PARALLEL WITH, AND 1323.61 FEET NORTH OF THE SOUTH LINE, OF THE SOUTHWEST ¼ OF SAID SECTION 33, SOUTH 89°44'52" EAST, A DISTANCE OF 1210.76 FEET;

THENCE ALONG THE WESTERLY RIGHT-OF-WAY LINE OF STATE HIGHWAY NO. 59 (NEW SUTTON ROAD), AS RECORDED AUGUST 30, 1934, PER DOCUMENT NO. 11 451 859, A DISTANCE OF 83.94 FEET ALONG AN ARC OF A CIRCLE, CONVEX TO THE SOUTHEAST, HAVING A RADIUS OF 1458.06 FEET, AND WHOSE CHORD OF 83.93 FEET BEARS SOUTH 18°01'24" WEST;
THENCE ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF TOLLWAY I-90, RECORDED MAY 13, 1957 PER DOCUMENT NO. 16 902 251, AS MONUMENTED AND OCCUPIED, THE FOLLOWING TEN COURSES:
(1)    SOUTH 32°03'22" WEST, A DISTANCE OF 312.00 FEET;
(2)    SOUTH 40°38'44" WEST, A DISTANCE OF 517.39 FEET;
(3)    NORTH 49°12'41" WEST, A DISTANCE OF 70.00 FEET;
(4)    NORTH 89°52'22" WEST, A DISTANCE OF 635.00 FEET;
(5)    SOUTH 0°28'49" WEST, A DISTANCE OF 237.60 FEET;
(6)    SOUTH 50°39'29" WEST, A DISTANCE OF 501.20 FEET;
(7)    SOUTH 74°15'09" WEST, A DISTANCE OF 472.21 FEET;
(8)    NORTH 89°44'13" WEST, A DISTANCE OF 1513.85 FEET;
(9)    NORTH 0°23'47" EAST, A DISTANCE OF 15.00 FEET;
(10)   NORTH 89°44'13" WEST, A DISTANCE OF 81.60 FEET;
THENCE ALONG SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF ELGIN, JOLIET AND EASTERN RAILROAD, NORTH 11°12'47" EAST, A DISTANCE OF 44.75 FEET, TO THE POINT OF BEGINNING, ALL IN COOK COUNTY, ILLINOIS.

## EXHIBIT N

### CONTRACTS IN EXISTENCE OR TO BE LET BY THE DEVELOPER[1]

| CONSULTANT | SCOPE OF WORK |
|---|---|
| Barton-Aschman | Traffic Analysis and Consultation |
| Ludlow & Associates | Surveying |
| Tornrose Campbell | Civil Engineering (including civil engineering on Phase II Site which supports Phase I Development) |
| STS Consultants | Geotechnical Analysis |
| Hey & Associates | Environmental Studies |
| Schal Associates | Value Engineering |
| Donohue Associates[2] | Civil Engineering/Planning/Landscape (including civil engineering, planning and landscape on Phase II Site which supports Phase I Development) |
| Perkins & Will | Master Planning[3] 788 Acres |
| Homart Development Co. | Project Coordinator |

1    The Village reserves the right to confirm that dollar amounts expended under contracts relate to property assembly costs, site preparation costs, and costs of construction of the Public Improvements, all as defined in the Act.

2    Includes subcontract to Johnson, Johnson & Roy.

3    Does not include costs for master planning of Phase I Site (200 acre), which costs are not deemed to be a "Project Cost".

## EXHIBIT O

### PROPERTY ASSEMBLY COSTS PAID, INCURRED OR KNOWN AS OF THE DATE OF THIS AGREEMENT

**I.    CONSULTANT COSTS**

| CONSULTANT | SCOPE OF WORK[1] | EDA COSTS[2] |
|---|---|---|
| Ludlow | ALTA Survey[3] | |
| Coldwell Banker Commercial | Brokerage | |
| Tornrose Campbell | Preliminary Civil | |
| STS Consultants | Preliminary Soils | * |
| Rudnick & Wolfe | Property Assemblage, Zoning, Environmental, Economic Development | |

**Subtotal**                                              **$1,550,000.00**

**II.    PURCHASE PRICE**

|  |  | EDA COSTS |
|---|---|---|
| (1) | Origer Estate | * |
| (2) | Origer Children | |
| (3) | Studz | |
| (4) | Nederlander: | |
| | 73 acre parcel[4] | |
| | 148 acre parcel[4] | |
| (5) | Watson[5] | |

**Subtotal**                                              **$87,368,618.00**

**III.    TITLE AND SEARCHES[3]**

|  |  |  | EDA COSTS[2] |
|---|---|---|---|
| (1) | Origer Estate: | | |
| | (a) | Title[6] | * |
| | (b) | Searches | |
| (2) | Origer Children: | | |
| | (a) | Title[6] | * |
| | (b) | Searches | |
| (3) | Studz: Purchaser to receive a credit for: | | |
| | (a) | Title[6] | * |
| | (b) | Searches | |

\*    Document on file.  Confidentiality protected by Chapter 24, Section 207(s) of the Illinois Revised Statutes.

(4)    Nederlander: For both parcels:
    (a)    Title[6]                                                    *
    (b)    Searches

(5)    Watson:[5]
    (a)    Title                                                    *
    (b)    Searches

        Subtotal                                        $40,000.00

IV.    **ESCROW CHARGES**[3]

                                                  **EDA COSTS**[2]

(1)    Origer Estate and Origer Children                        *
(2)    Nederlander
(3)    Studz

        Subtotal                                        $5,000.00

---

1    Contracts are subject to execution of change orders.

2    Costs are estimated and are not intended to be final.

3    Subject to credits pursuant to Acquisition Contracts.

4    Provided the initial closing date is not extended. If the initial closing date is extended beyond June 29, 1990, Sears must deliver into the strict joint order escrow at Ticor Title Insurance Company an additional $_____ per parcel, of which $_____ per parcel will not be credited against the purchase price for each parcel.

5    Acquisition closed on September 7, 1989. All charges related to such closing have been paid in full.

6    This quote from Ticor Title Insurance Company is based on a title insurance premium of $.40 per $1,000.00 and a zoning 3.0 endorsement fee of $.05 per $1,000.00. No other endorsements are included in the quote, nor is the cost of reinsurance included.

*    Document on file. Confidentiality protected by Chapter 24, Section 207(s) of the Illinois Revised Statutes.

## EXHIBIT P

### PROJECT COSTS PAID OR INCURRED BY THE DEVELOPER
### AS OF THE DATE OF THIS AGREEMENT IN CONNECTION WITH
### THE CONSTRUCTION OF THE PUBLIC SITE IMPROVEMENTS

I.    **PROJECT COSTS PAID OR INCURRED BY THE DEVELOPER**

| CONSULTANT | EDA COSTS[1] | DESCRIPTION OF WORK |
|---|---|---|
| **Planning** | | |
| Barton-Aschman | $278,332 | Traffic impact analysis; roadway design |
| Perkins & Will | 244,152 | Site and master planning |
| Subtotal | $522,484 | |
| **Engineering** | | |
| Ludlow & Associates | $173,000 | Surveying; topographic studies |
| STS Consultants | 97,742 | Geotechnical studies |
| Tornrose Campbell | 65,328 | Utility design |
| Hey & Associates | 152,080 | Environmental studies |
| Chicago Area Transport-ation Study | 2,248 | Traffic data |
| Subtotal | $490,398 | |

1    Costs are not intended to be final; additional Project Costs are expected to be incurred.



Mayor
**MICHAEL J. O'MALLEY**

Village Clerk
**VIRGINIA M. HAYTER**

Village Manager
**PETER T. BURCHARD**

Board of Trustees
**BRUCE C. LIND
WILLIAM D. McLEOD
SUSAN H. KENLEY
MICHAEL D. FRIESEN
RICHARD A. COCHRAN
LOUIS G. DESRUISSEAUX**

**HOFFMAN** **ESTATES**

March 19, 1990

Mr. Michael Bozic
Chairman and Chief Executive Officer
Sears Merchandise Group
Sears Tower
Chicago, IL 60684

>   **Re:   Letter of Clarification of Intent of Village Board Amendment of
>   February 26, 1990 Prior to Approval of Economic Development
>   Agreement By and Between The Village of Hoffman Estates and
>   Sears, Roebuck and Co.**

Dear Mr. Bozic:

On February 26, 1990, the Village Board of the Village of Hoffman Estates approved, by
Ordinance No. 2161-1990, the above referenced Economic Development Agreement. Prior
to such approval, amendments to Sections 3.1-(e)-(2), 4.2(a) and 4.2(b) were made which
stated that in regard to service contracts (Exhibit "N"), property assembly costs (Exhibit "O")
and costs of construction activities (Exhibit "P"), that "both the Village and Sears agree that
Chapman and Cutler as Bond Counsel for the Village, will determine what costs. . .qualify
as Project costs under the Act".

In order to clarify the scope of such determination, please be advised that, after discussion
with Corporation Counsel and the Board of Trustees, I can represent that the intent of such
amendment was not to have Chapman and Cutler determine specific dollar amounts of
expenditures or the reasonableness or necessity of any given expenditure. Rather, the
Village's intent is to make Chapman and Cutler the party responsible for determining if the
amounts payable under such service contracts, as well as the amount payable as "property

assembly costs", as "site preparation costs", and as costs of construction of the Public Improvements (as defined in the Agreement), qualify as "economic development project costs" under the State Statute referenced as the "Act" in the Agreement.

Specifically, with respect to Exhibit "N", it is understood that, to the extent service contracts relate to construction activities which do not constitute "site preparation costs" as that term is defined in the Act, or costs of construction of Public Improvements as that term is defined in the Agreement, then to such extent the costs incurred under such service contracts shall not be deemed to qualify under the Act and under the Agreement as a "Project Cost".

However, it remains the Village's intention to have the prorated share of the "qualified" portions of service contracts, property assembly costs, site preparation costs and costs of construction of the Public Improvements and to have the reasonableness or necessity of the "qualified" portions of service contracts, property assembly costs, site preparation costs and cost of construction of the Public Improvements determined under the provisions of Sections 4.3, 4.4 and 17.5 of the Agreement.

If this is your understanding and agreement, please sign one copy and return.

Sincerely,

Michael J. O'Malley
Village President

MJO/ds

Understood and Agreed to:

Michael    Bozic
Chairman and Chief Executive Officer
Sears Merchandise Group