**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                  :
In re:                                            :    Chapter 11
                                                  :
SEARS HOLDINGS CORPORATION, *et al.*,[1]           :
                                                  :    Case No. 18-23538-rdd
                     Debtors.                     :
                                                  :    (Jointly Administered)
                                                  :
                                                  :    **Re: Docket No. 2796**
-------------------------------------------------------------X

**INITIAL SUPPLEMENTAL BRIEF IN RESPONSE TO DEBTORS' MOTION
TO (A) ENFORCE ASSET PURCHASE
AGREEMENT AND AUTOMATIC STAY AGAINST TRANSFORM
HOLDCO LLC AND (B) COMPEL TURNOVER OF ESTATE PROPERTY**

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SRC Sparrow 1 LLC (None); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); SRC Sparrow 2 LLC (None); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); SRC O.P. LLC (None); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); SRC Facilities LLC (None); and SRC Real Estate (TX), LLC (None). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 2

BACKGROUND ................................................................................................................... 4

   A.   The Relevant Provisions of the APA ............................................................... 4

   B.   The Credit Card Reserves ............................................................................... 6

   C.   The Treatment of the Reserves and the Collateral Through the Signing and Presentation of the APA to the Court ............................................................................................. 8

   D.   Debtors' Change of Position Post-Closing and the Instant Dispute ............................... 8

I.   Under the Plain Language of the APA, Reserves Are Not "Credit Card Accounts Receivable" .................................................................................................................. 11

   A.   The Relevant Contractual Provisions of the APA ......................................... 11

   B.   The Relevant Contractual Provisions in the Card Agreements ..................... 13

   C.   The Reserves Are Not CCAR Under the Plain Meaning of That Term ........................ 20

   D.   The Reserves Were Not "Due" Under Section 10.9 .................................... 22

   E.   Each Reserve Is a Security Deposit Under the APA ..................................... 23

   F.   The Right to Return of Each Reserve Is a Claim Under the Card Agreements ............... 29

II.   Transform's Understanding Is Consistent With the APA's Structure and Purpose .......... 30

III.   Debtors' Arguments That Reserves Exclusively Fall Under 2.1(d) and 10.9 of the APA Fail   34

IV.   Debtors Did Not "Exclude" the Reserves Under § 10.9 .................................................. 37

V.   Transform Has Not Violated the Automatic Stay ............................................................ 39

## PRELIMINARY STATEMENT

1.       The question now before the Court is whether, under the Asset Purchase Agreement
("APA"),[2] certain reserves held by credit card processing companies as security against the risk of
default were Credit Card Accounts Receivable ("CCAR") at the time of Closing that were then
due, as Debtors claim, or instead either Security Deposits or Claims or even a receivable that was
not then due, as Transform asserts.  If the reserves are characterized as CCAR that were due,
Debtors would have been entitled to exclude a certain portion of them at Closing (albeit not what
they now claim) and collect on them from the credit card companies.  If, on the other hand, they
were not CCAR, Debtors would have under-delivered on the amount of collateral.

2.       Transform respectfully submits that the answer to that question is clear.  At
Closing, and in the hands of Debtors, the right to recover each reserve was not CCAR.  Instead,
such reserves were Security Deposits—a defined term that includes a variety of forms of security
related to the credit card agreements—and the contingent right to recover such Security Deposits
were Claims related to those agreements.  That conclusion follows from the plain language of the
APA and the relevant credit card agreements, as well as the structure and purpose of the APA.

3.       Under the plain language of the APA and the card agreements, each of the reserves
constituted a Security Deposit and Debtors had a contingent Claim with respect to the release of
the reserves.  By their plain language, the reserves were intended to protect the credit card
processing companies against the risk of default.  The credit card processing companies had no
current obligation to release those reserves (or any portion of them) at the time of Closing, and any
claim that Debtors had to the return of any amount of those funds was contingent and unmatured.

---

[2]       All capitalized terms used but not defined herein shall have the meaning ascribed to them in the APA.

4.      That understanding comports with the purpose and structure of the APA as a whole. Under the APA, Transform purchased a variety of different assets that were necessary to run the going-forward business and that are identified in § 2.1 of the APA, including real estate, intellectual property, inventory, and importantly credit card agreements and the security necessary for Transform to procure the services of the credit card processing companies under those agreements. In § 10.9, the Parties identified a small subset of assets that would be used to provide collateral for Transform's asset-based lending ("ABL") financing that made the transaction possible and required those assets to have a minimum value as a condition to Closing. As Debtors knew, those were the types of high-quality liquid assets—inventory and certain types of receivables—that could serve as a borrowing base for the credit facilities necessary to repay Debtors' senior credit facilities at Closing and to run the going-forward business thereafter. The undisputed evidence establishes that Debtors' interest in the credit card reserves was not the type of asset eligible as collateral for Transform's credit facility.

5.      Debtors' claim to remittance of $14.6 million in cash is wrong for additional reasons. At most, § 10.9 gave Debtors the right to "exclude" the oldest of the CCAR, which, on their account, would have been portions of the reserves held by two of the credit card processing companies. But Debtors did nothing to "exclude" those CCAR prior to Closing and Transform has assumed the agreements, taking their benefits and burdens. Not only does Debtors' inaction demonstrate that the reserves were not CCAR, but it independently dooms their claim for a return of cash proceeds from newer CCAR (which even under Debtors' view are not the "oldest" CCAR).

6.      Finally, even if Debtors did have a Claim with respect to the reserves, Transform has not violated the automatic stay. Debtors' only rights under the APA would have been to retain the oldest of the reserves. But the $14.6 million of the oldest reserves continues to be held by the

3

credit card processing companies as security.  Transform has no control over the reserves

themselves and thus the fact that it did not turn over the reserves—which it could not have done—

does not establish a violation of the automatic stay.

## BACKGROUND

### A.    The Relevant Provisions of the APA

7.    On January 17, 2019, Sears Holdings Corporation and certain of its subsidiaries

("Sears" or "Debtors") and Transform Holdco LLC ("Transform") (collectively, the "Parties")

signed the APA providing for Transform to purchase substantially all of Debtors' assets in order to

operate their retail business on a going-forward basis in exchange for consideration in the form of

cash, a credit bid, and the assumption of significant liabilities.

8.    Among the provisions that were critical to the consummation of the transaction

were (i) a condition that Debtors would deliver a minimum amount of highly liquid assets, e.g.,

that could be used as the borrowing base Transform would need to obtain its asset-based financing

that would permit repayment at Closing of Debtors' DIP facilities and Transform's post-Closing

operations; and (ii) Debtors' promise to deliver the credit card processing agreements necessary for

Transform to run a retail business and any security related to those agreements.

9.    The first promise was reflected in APA § 10.9, which provided that Transform was

not required to close the sale unless Debtors delivered to Transform a minimum of $1,657,000,000

in inventory and CCAR and Pharmacy Receivables due and owing.  Only if Debtors delivered

more than $1,657,000,000 in such assets could they exclude assets in excess of that amount, and

then only by retaining those assets at Closing according to a specified waterfall, including by

permitting Debtors, after first excluding inventory, to exclude only the "oldest" of such

receivables.  APA § 10.9.

10.     Debtors' promise to deliver the credit card processing agreements and the security
that related to those agreements was reflected in APA § 2.1(a), which required Debtors to deliver
all the Assigned Agreements, including the credit card processing agreements, and APA § 2.1(o)
and § 2.1 (p), in which Debtors agreed to deliver without restriction any "security deposits," "cash
collateral," "restricted cash," "prepaid items," "credits," "letters of credit," or "other security"
related to "any" of the Assigned Agreements and "any and all" Claims related to any of the
Assigned Agreements.

11.     Each of those provisions was critical to the consummation of the transaction.  The
condition to deliver the specific assets reflected in § 10.9, and to exclude assets only in accordance
with the waterfall, was essential to the financing of the transaction and thus to the ability of
Transform to acquire the Business and to operate it on a going-forward basis.  The capital structure
embedded in the APA contained a combination of financing from ESL and the Cyrus Lender, and
debt financing in the form of real estate loans and ABL from a consortium of banks.  If Debtors
failed to deliver the necessary collateral to secure the asset-based lending, Transform would not
receive the contemplated funding necessary to close the transaction.

12.     Debtors' promise with respect to the credit card processing agreements and related
security deposits was equally critical, for perhaps obvious reasons.  At Closing, Debtors had credit
card processing agreements with each of First Data Merchant Services Corporation and Wells
Fargo Bank, N.A. (for the processing of charges on Visa and Mastercard cards) ("First Data"),
American Express Travel Related Services Company, Inc. (for American Express cards)
("Amex"), and Discover (for Discover cards).  The abilities to accept those cards and to have the
card charges processed and paid are necessary for a retail business.  At the time of Closing,
however, each of those credit card processing companies had insisted that Sears post security as a

condition of continuing to process Sears' card transactions and Sears had done so.  Only with that

security would Transform be able to operate the going-forward business. [3]

### B.    The Credit Card Reserves

13.    Specifically, beginning in the summer of 2017—after Sears Canada Inc. filed for

bankruptcy—and accelerating in the fall of 2018, as Debtors' financial condition continued to

deteriorate, the credit card processing companies sought to protect themselves against the

heightened risk that Debtors would default and fail to honor their obligations under the respective

agreements.

14.    

. *Declaration of*

*Terrence E. Rolecek in Support of Transform Holdco LLC's Response to Debtors' Motion to (A)*

*Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B)*

*Compel Turnover of Estate Property and Reply in Further Support of Its Motion to Assign Matter*

*to Mediation* (the "Rolecek Decl.") [Docket No. 2915] ¶¶ 12-13.

---

[3]    Along with the benefits of the credit card processing agreements, came the burdens and obligations of those
agreements, including burdens and obligations created by card charge activity that preceded the Closing.
[4]

See *Supplemental Declaration of Terrence E. Rolecek in Support of Transform Holdco LLC's Initial
Supplemental Brief in Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay
Against Transform Holdco LLC and (B) Compel Turnover of Estate Property* ("Supp. Rolecek Decl.").

15. ███████████████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████

16. ██████████████████████████████████████████

██████████████████████████████████████████
██████████████████████████████████████████
████████████████

17.     At all times prior to and through Closing, the credit card processing companies

insisted that they needed the reserves to continue to do business with Sears and that they had no

obligation to release the reserves to Sears. ████████████████████████████████

████████████████████████████████ *See, e.g.*, *Declaration of Abena A. Mainoo in*

*Support of Transform Holdco LLC's Initial Supplemental Brief in Response to Debtors' Motion to*

*(A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and*

*(B) Compel Turnover of Estate Property* ("Mainoo Decl."), Ex. A, October 24, 2018 email from

Mohsin Meghji (stating that First Data will not release reserve).[5]

---

[5]     Transform has redacted certain privileged content from this email but would be prepared to provide it to the Court on request.

18.    ████████████████████████████████████████████

████████████████████████████████████████████████.[6]

### C.    The Treatment of the Reserves and the Collateral Through the Signing and Presentation of the APA to the Court

19.    Debtors' and Transform's understanding that Debtors would deliver to Transform the credit card processing agreements (and related security) and a minimum amount of high quality assets that could serve as collateral for Transform's credit agreement was reflected in the plain language of the APA (which, as indicated below, alone should decide this case in favor of Transform), borrowing base certificates generated by Debtors in the ordinary course of their business and liquidity analyses shared by the Parties.  All Parties understood that for Transform to obtain the borrowing facilities it would need under the APA, it would need $1,657,000,000 in collateral and that the reserves held by the credit card processing companies could not serve as such collateral.

### D.    Debtors' Change of Position Post-Closing and the Instant Dispute

20.    After the APA was signed and presented to this Court, and shortly before Closing on February 11, 2019, Debtors presented to Transform a borrowing base certificate that, for the first time explicitly included the reserve amounts.[7]  That certificate replicated most of the tabs in all of the earlier borrowing base certificates, including borrowing base availability, borrowing base, inventory, pharmacy receivables, and credit card receivables.  It also properly included credit card

---

[6]    To the extent that Debtors are entitled to any of the reserves, they would only receive the portion of the oldest reserve that is equivalent to the net amount after deducting any of the reserve amounts that were held by the credit card companies that the Court determines were not due credit card accounts receivable.  Transform has been provided with discrepant numbers that would need to be reconciled, if the Court were to determine that any of the reserves were, in fact, CCAR.

[7]    The drafts of the borrowing base certificate (which would be delivered by Transform to its lenders shortly prior to the Closing and permit an initial draw that would be used to pay the cash consideration to Debtors at Closing) were the vehicle by which Debtors advised Transform of the assets they proposed to deliver to satisfy the Closing condition in § 10.9.

receivables that were greater than five days old, which would have been the oldest receivables had there been an overage under § 10.9. However, apparently in an attempt to meet the § 10.9 minimum, in a new tab labeled "CC Rec New," Debtors included in a row labelled "[h]oldback" the reserves. Mainoo Decl., Ex. B. Although they included the line under a heading called ineligible CCAR, there was nothing else in the document indicating these to be CCAR.

21.    Transform immediately objected. <u>See</u> *Declaration of Lewis J. Liman in Support of Transform Holdco LLC's Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property and Reply in Further Support of Its Motion to Assign Matter to Mediation* [Docket No. 2865], Ex. A, February 11, 2019 Letter from Cleary Gottlieb to Weil.

22.    Even then, Debtors did nothing to attempt to exclude the reserves from the assets being transferred to Transform or to retain the reserves. It was not until long after the Closing, and after Transform itself had objected to Debtors' breach of their pre-Closing covenants by including the reserves, that on February 22, 2019 Debtors for the first time, through their advisors, M-III Advisors LP, wrote to demand that Transform transfer to Debtors approximately $14.6 million in cash, representing the value of the assets in "excess" of $1,657,000,000 that Debtors allegedly delivered to Transform.

23.    The dispute now before the Court turns upon whether the Court agrees with Debtors' litigation position that a contingent right to a return of those reserves is properly considered to be CCAR that was due at the time of Closing or instead whether the Court agrees with Transform's position that such right is a Claim under the related credit card processing agreements and the related reserves are a Security Deposit purchased by Transform. And, if Debtors prevail on that question, the Court would need to determine whether Debtors would be

entitled to the claimed $14.6 million in cash proceeds from CCAR that were indisputably not the "oldest" of such accounts receivable.

## ARGUMENT

24.     Under the plain language of the APA, each of the First Data Reserves, Amex Reserve, and Discover Reserve (collectively, the "Reserves") constitute Security Deposits and the rights to return of such Reserves were Claims under the related credit card agreements.  This reading is further supported by the structure and purpose of the agreement as a whole.  The Reserves were not CCAR.

25.     Under Delaware law,[8] courts gives a contract the construction "which would be understood by an objective, reasonable third party."  Salamone v. Gorman, 106 A.3d 354, 367-68 (Del. 2014) (quoting Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010)).  When a "contract is clear and unambiguous," courts "give effect to the plain-meaning of the contract's terms and provisions."  Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159-60 (Del. 2010) (citation omitted).

26.     A contract "must be read as a whole, and contractual provisions must be interpreted in a way that give[s] effect to every term of the instrument and reconcile[s] all provisions of the instrument."  Intercept Pharm., Inc. v. Fiorucci, 277 F. Supp. 3d 678, 686 (D. Del. 2017) (alteration in original) (internal quotation marks and citation omitted).  Courts interpret contractual language such that the "clear, literal meaning of the terms in a legally binding agreement should be given effect when those terms establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC, 948 A.2d 411, 418 (Del. Ch. 2007)

---

[8]     Delaware law is the governing law of the APA.  See APA § 13.8(a).

(internal quotation marks and citation omitted), aff'd, 945 A.2d 594 (Del. 2008). "When interpreting a contract, the role of a court is to effectuate the parties' intent." Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006).

## I. Under the Plain Language of the APA, Reserves Are Not "Credit Card Accounts Receivable"

27.     Under the plain language of the APA, the Reserves are not CCAR that are due. Instead, the Reserves are Security Deposits and the right to return of each reserve is a Claim under the card agreements. That conclusion ineluctably follows from the language of the APA and the credit card agreements.

### A.     The Relevant Contractual Provisions of the APA

#### i.     Section 2.1

28.     Section 2.1 of the APA lays out the full variety of "assets, properties and rights" that Debtors were required to transfer to Transform as "Acquired Assets." Three particular provisions of § 2.1 are relevant to the dispute now pending before the Court.

29.     First, § 2.1(d) provides for the transfer "on the Closing Date" of "all Acquired Inventory, all Acquired Receivables, all Acquired Equipment and All Acquired Improvements." The definition of Acquired Receivables, in turn, includes "all Credit Card Accounts Receivable." APA § 1.1. CCAR, in turn, is defined as "each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, *owed* by a credit card payment processor or an issuer of credit cards to a Seller *resulting from charges* by a customer of a Seller on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Seller or services performed by a Seller, in each case *in the ordinary course* of its business." Id. (emphasis added).

30.    Second, § 2.1(o) provides for the transfer of "any and all" rights to "any" "Security Deposits" "to the extent related to any Acquired Asset." The defined term "Security Deposit" is expansive. It is not limited to security deposits as conventionally understood but includes the full variety of security held by contractual parties related to "any" acquired contract. Section 2.1(o) thus includes, among other things, restricted cash, security deposits, letters of credit, cash collateral, credits; prepaid items, and any other security. Likewise, the term "Acquired Assets" is expansive and includes all Assigned Agreements. Id. § 2.1(d).

31.    Section 2.1(p) provides for the transfer of "any and all . . . Claims . . . of Sellers as of the Closing that . . . arose in connection with . . . the operation of the Business." "Claims" is defined in § 1.1 as "all rights to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or rights to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, in each case, of whatever kind or description against any Person."

### ii.    Section 10.9

32.    Section 10.9 of the APA identifies a limited number of the assets acquired by Transform and requires that those assets have a certain minimum value as a Closing condition. Specifically, § 10.9 conditions Transform's obligation to close the transaction on Debtors' delivery of a minimum amount of liquid assets that would constitute the borrowing base necessary for Transform to repay Debtors' senior credit facilities and operate the business as a going concern post-Closing.

33.    Section 10.9 thus ensured that Transform would receive "[an] aggregate amount of (i) the Inventory Value of the Acquired Inventory (excluding any Pending Inventory), (ii) the

amounts due to Seller with respect to (A) the Credit Card Accounts Receivable and (iii) the

Pharmacy Receivables [of] at least $1,657,000,000." It further provides that "[t]o the extent that

the aggregate amount of [those] items . . . exceed[ed] $1,657,000,000 on the Closing Date,

[Debtors] may reduce such amount to be equal to $1,657,000,000 by *first*, transferring (at

[Debtors'] expense and in consultation with Buyer) Inventory that would otherwise be Acquired

Inventory to a GOB Leased Store or a GOB Owned Store or any other location designated by

[Debtors] that is not a Property, until the Inventory Value of the Acquired Inventory is equal to

$1,553,000,000 and *second*, ***retaining as an Excluded Asset*** the oldest of any Credit Card

Accounts Receivable or Pharmacy Receivables." <u>Id.</u> § 10.9 (last emphasis added).

34.     There are several key elements to this provision. First, only Acquired Inventory,

CCAR and Pharmacy Receivables—assets that were highly liquid—counted against the minimum

collateral of $1,657,000,000. Second, CCAR only counted towards the minimum if they were also

"due to Seller." If there were CCAR that were not "due," they would not count as part of the §

10.9 collateral, and any excess created by such sums could not create a right to retain any assets.

Third, if there was any overage above the $1,657,000,000 counting receivables that were owed,

Debtors had the option—but Transform had no obligation—to exclude the assets in excess from

what they delivered to Transform at Closing according to a required waterfall that, with respect to

CCAR, permitted the exclusion of the ***oldest*** such receivables.

**B.     The Relevant Contractual Provisions in the Card Agreements**

35.     At argument on March 21, 2019, the Court recognized that the question whether the

reserves were CCAR could not be answered as Debtors claimed by noting that the monies used to

fund them were generated from card sales. Hr'g. Tr. 27:15-28:1, Mar. 21, 2019. The answer

turned at least in part on "the credit card agreements" and the nature of the relationship they

created at the time of Closing. <u>Id.</u> 28:13-15. Under the credit card agreements, the monies held by

13

each of the card companies in Reserves were—at the time of Closing—a Security Deposit as to which a Claim (a contingent right to return thereof) might have existed.  Moreover, they were not CCAR that were due.

        **i.**        **First Data**

36.     Sears' relationship with First Data is governed by a Merchant Services Bankcard Agreement between First Data and Sears Holdings Management Corporation on behalf of certain of its affiliates.  Rolecek Decl., Ex. A ("First Data MSBA").

37.

38.



---

9     A chargeback is "a reversal of a Card sale [First Data] previously presented, pursuant to Card Organization Rules."  Id. § 17.6.  It can occur, among other things, when the customer does not receive the goods or services for which it has used a card to pay or attempts to return those goods.



39.

40.

41.

42.



████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

      ii.        **Amex**

48.     The relationship between Sears and Amex was governed by the Agreement for

American Express Card Acceptance between Amex and Sears Holdings Management Corporation.

Rolecek Decl., Ex. E (the "<u>Amex Agreement</u>").

49.     The Amex and First Data agreements are similar in all relevant respects.

50.     ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████

51.     ███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

52.     ███████████████████████████████████████████

████████████████████████████████████████████

53.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

54.    ████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

55.    ████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

█████████    Supp. Rolecek Decl., Ex. A, Amended Amex Agreement § 2.

    **iii.**    **Discover**

56.    The Merchant Operating Regulations ("<u>MOR</u>") with respect to Discover are

similar. ███████████████████████████████████████████

█████████████████████████████████████████████████



████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

███████████████

### C.    The Reserves Are Not CCAR Under the Plain Meaning of That Term

64.    Under the APA, for an account to be a CCAR it must be (1) "owed by a credit card payment processor or an issuer of credit cards to a Seller"; (2) "resulting from charges by a customer of a Seller on credit cards"; and (3) "in the ordinary course of its business."  APA § 1.1. The right to a return of the Reserves does not satisfy any of the three elements of this definition.

65.    The card agreements themselves all make clear that the reserves were not accounts payable that were owed to Sears as a result of customer charges on credit cards.  The agreements define what was due to Sears as a result of card charges in the ordinary course and make clear that such amount does not include reserves.  See supra ¶¶ 37-39, 50, 56-57.  Thus, the amount owed is based on sales data net of adjustments for fees, penalties, and the like—including deductions for reserve amounts.  It is that amount which is CCAR.  On the plain language of the APA, and of those agreements, the reserve amounts were not accounts receivable from card charges and therefore do not count against the § 10.9 minimum.

66.    The conclusion that the Reserves were not CCAR also follows naturally from the very nature of those sums.  The credit card companies did not simply delay the payment of accounts receivable on individual charges, in order to protect themselves against risk on those charges—████████████████████████████, and as hypothesized by Debtors at the March 21, 2019 hearing.  Hr'g Tr. 32:13-20, Mar. 21, 2019.  Rather, as a result of exogenous

events raising issues with respect to Sears' general creditworthiness, Sears was obligated to post an amount (either through the withholding of payments otherwise due or the posting of new cash) sufficient to protect those companies against the trailing risk from Sears' prior (and ongoing) charge activity and the companies claimed a contractual entitlement to retain those funds and use them against any of Sears' contractual obligations until the risk was averted.[10]  Thus, what Sears had at Closing with respect to the Reserves was a contingent unmatured contractual right to have that portion of the Reserves left after debiting all amounts due and owing on all obligations by Sears be released to it when under the contract Sears was no longer required to post a reserve.  It did not have CCAR that were owed.  At the time of the Closing, the card companies had no obligation to return the Reserves, and depending on the amount of unsatisfied obligations, the card companies might have no obligation to return any sums to Sears.

67.    Moreover, once (in the future) any of those sums would become payable, they would not be owed as a "result[]" of "charges by a customer of a Seller on credit cards."



Once those sums were retained, Sears' reserve obligation was discharged.  And if and when the Reserves became payable to Sears, it would not have been as a result of card charges—regardless of the original source of the funds—but rather as a result of Sears having satisfied the financial condition and other provisions of the card processing

---

[10]    See Mainoo Decl., Ex. C, November 29, 2017 email from Louis Sablich (First Data) to Monica Galvan (Sears) (establishing specific and finite funding schedule of First Data Reserve).

[11]

agreements that entitled Sears to payment of the funds.  See Frontline Processing Corp. v. Merrick Bank Corp., No. 13 Civ. 3956, 2014 WL 837050, at *6-7 (S.D.N.Y. Mar. 3, 2014) (rejecting conversion claim upon finding that Reserve Account was being held in accordance with terms of credit card processing agreement); Tigrent Grp., Inc. v. Process Am., Inc., No. 12 Civ. 1314(BMC), 2012 WL 2049526, at *2 (E.D.N.Y. June 6, 2012) (noting it "makes sense" that processing company would not have to return Reserve Account funds until it was no longer exposed to risk).

68.    Finally, even assuming that the Reserves constituted a debt that the card companies owed to Sears, that debt would not have been incurred or be oweable in the ordinary course of business.  Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd., No. CIV.A. 8980-VCG, 2014 WL 5654305, at *15 (Del. Ch. Oct. 31, 2014) (defining "the contractual term 'ordinary course' to mean 'the normal and ordinary routine of conducting business'") (citation omitted). ███

████████████████████████████████████████████████████████████

████████████████████████████████████████  The creation of the Reserves was anything but ordinary course.  Rather, as the card agreements themselves make clear, they arose from extraordinary and exogenous factors that put Sears' credit at risk, and only outside ordinary course events permit their release.  The creation of the Reserves outside the ordinary course of business firmly establishes that the Reserves do not fall within the definition of CCAR.  Thus, there is no tension between the definitions of CCAR and Security Deposit.

### D.    The Reserves Were Not "Due" Under Section 10.9

69.    In their prior argument to this Court, Debtors omitted a critical word from § 10.9.  Under that provision, the collateral that count towards the minimum (aside from inventory) is "the amounts due to Seller with respect to" CCAR and Pharmacy Receivables.  Thus, the only CCAR that are counted toward the collateral are those that, at the time of Closing, were "due to Seller."

70.    Even if the right to return of the Reserves is characterized as CCAR, those sums

plainly were not "due" from the credit card companies.  See In re Kopf, 299 F. Supp. 182, 185

(E.D.N.Y. 1969) (stating "due" connotes "a definite or precise date when a debt matures and

becomes payable"); Burris v. HSBC Bank USA Nat'l Ass'n, 2014 WL 12772260, at *6 (C.D. Cal.

Dec. 19, 2014) ("Moreover, focusing on the literal meaning, due is defined as 'immediately

enforceable.'  When the listed due date on the billing statement is a future date, a billing statement

cannot be 'due' or 'immediately enforceable' when it is sent to a cardholder.") (citations omitted);

Due, Black's Law Dictionary (10th ed. 2014) (defining "due" as "immediately enforceable" and as

"owing or payable").

71.    There is and can be no dispute that at Closing the card companies continued to

claim an entitlement to the reserves.  If Sears were to have terminated the agreement at or prior to

Closing it would have been entitled to the release of at most a fraction of the Reserves.  (It also

would have breached the APA.)  See Mainoo Decl., Ex. A, October 24, 2018 12:47 p.m. email

from Mohsin Meghji ███████████████████████████████████████████████

██████████████████████████); id. at October 24, 2018 1:22 p.m. email from Mohsin

Meghji ████████████████████████████████████████████████████████);

*Supplemental Declaration of Mohsin Y. Meghji in Support of the Debtors' Motion to Enforce*

[Docket No. 2914], Ex. A, January 26, 2019 email from Mohsin Meghji; Supp. Rolecek Decl. ¶ 11.

### E.    Each Reserve Is a Security Deposit Under the APA

72.    The terms of the First Data MSBA, the Amex Agreement, and the Discover MOR

all make clear that the Reserves held by those entities were best characterized as Security Deposits

under the APA.

73.    First, the Reserves bear all the hallmarks of a "security deposit," "[m]oney placed

with a person as earnest money or ***security for the performance of a contract***."  Security Deposit,

Black's Law Dictionary (10th ed. 2014) (emphasis added).[12] Like any security deposit, the funds

held by each of First Data, Amex, and Discover were held as security against the risk of default by

Sears. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

74.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

75.    The Reserves also bear the hallmarks of "cash collateral," i.e., "property acceptable

as security for a[n] . . . obligation."  Collateral, The American Heritage Dictionary (5th ed. 2019).

---

[12]    The Court may consult dictionary definitions to give those words their plain and ordinary meaning.  See,
e.g., In re La Toya Jackson, 434 B.R. 159, 164 (Bankr. S.D.N.Y. 2010) (using Black's Law Dictionary and Merriam
Webster to interpret the undefined term "liquidating purpose" in an agreement).

As commonly understood, cash collateral is money that a party holds as security that its contractual

counterparty will fulfill its obligations.  See Wilmington Tr. Co. v. Keith, No. C.A. 00C-11-016,

2002 WL 1748622, at *5 (Del. Super. Ct. June 26, 2002) ("The very purpose of collateral is to

provide a creditor with something of value lest the debtor default on his obligations.  Creditors are

not required to release their collateral unless and until the loan obligations are satisfied.").

76.



77.     For similar reasons, the cash held by the credit card companies partakes of the

character of "restricted cash," "money that is held for a specific purpose and therefore not available

to [a] company for immediate or general business use."  Restricted Cash, Investopedia,

https://www.investopedia.com/terms/r/restricted-cash.asp (June 18, 2018); see also In re Barwood,

Inc., Nos. 07-10860-WIL, at *1 (Bankr. D. Md. Oct. 17, 2008) ("Restricted Cash" means certain

account "which cannot be withdrawn without the consent of [certain non-debtor.]").  The funds in

the Reserves were held specifically to provide security for Sears' obligations, see supra ¶¶ 74-75,

and were patently unavailable to Sears for immediate and general business use.

78.     Further, the Reserves functioned as "prepaid items" or as a "credit," that is,

"something on which payment has been made in advance," Prepaid, Oxford English Dictionary (3d

ed. 2007), or "([t]he balance of) prepaid money . . . available for the use of a service, product, etc."

Credit, Oxford English Dictionary (3d ed. 2013); see Clark Rest. Co. v. Evatt, 64 N.E.2d 113, 115

(Ohio 1945) (giving the undefined statutory term "prepaid items" its ordinary meaning by defining

prepayments as "aris[ing] in transactions in which the usual credit relationship is reversed:

payment is made in advance of the receipt and utilization of goods and services"); see also State ex

rel. Caulk v. Nichols, 281 A.2d 24, 27 (Del. 1971) (mentioning other cases "dealing with

requirements for *prepayment* or *security* for payment of costs or payment for transcripts)

(emphasis added).

79.    ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████

80.    Finally, if the Reserves do not fit in any of the above categories, they clearly fall within the capacious definition of "any other security."  Under the principle of *ejusdem generis*,[13] the term "other security" is best understood to capture all other property held by a contractual counterparty to protect against the risk of loss or default, whether in the form of cash or other collateral, whether funded through new money or by withholding funds otherwise due.  See Other, Oxford English Dictionary (3d ed. 2004) (defining "other" as "designating the remainder of a number of like people, objects, etc.").

81.    ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

82.    The Reserves need not have been funded through the deposit of new cash for them to qualify as an APA-defined Security Deposit, as Debtors claimed in their Reply.  *Debtors' Reply in Further Support of the Motion To (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property* [Docket No. 2913] ¶ 33 ("Debtors' Reply").  The Parties did not limit Security Deposits to security funded by a deposit of new cash.  They intentionally defined Security Deposit to include a long list of items that provided security regardless how and in what form it was funded and then followed that long list with the intentionally broad language "any . . . other security."

83.    ███████████████████████████████

████████████████████████████████████████

---

[13]    Specific and general words; the *Ejusdem Generis* Doctrine, 11 Williston on Contracts § 32:10 (4th ed.) ("The rule of *ejusdem generis,* literally meaning 'of the same kind or class,' applies when there is an enumeration or listing of specific things, followed by more general words relating to the same subject matter, in which case the general words are interpreted as meaning things of the same kind as the specific matters to which the parties refer.").

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

84.     Indeed, it is not uncommon for collateral to be posted by withholding assets as opposed to posting assets.  For example, a holdback, or a retainage, is commonly used in the building industry pending the contractor's satisfactory completion of the job.  See Del. Code Ann. tit. 29, § 6962(5)(a)(1) (stating that "[a]gencies may retain a portion of the payments to be made to a contractor for work performed pursuant to a public works contract"); see also N.Y. State Fin. Law § 139-f (stating that, in the context of public work projects the "public owner shall retain not more than five per centum of each progress payment to the contractor" unless certain conditions apply).  That the funds are "held back" does not mean that they are not security.  Likewise, in many merger and acquisition transactions, the buyer withholds proceeds from the sale and puts them into escrow pending the expiration of the warranty period.  See Wachtell, Lipton, Rosen, & Katz, Takeover Law and Practice 72 (2018) ("In a private transaction where there is doubt about the credit quality of the Debtors or the Debtors' intent to continue operating rather than distributing its assets to a dispersed group of owners, private acquisition agreements often provide for an escrow as security for indemnification obligations.").  That, in those instances, the security is funded by agreeing that a party did not have to pay sums it otherwise would have paid rather than by the deposit of new cash does not make them any less security deposits.

85.     Finally, Debtors' argument would render the promises Debtors made to Transform reflected in § 2.1(o) illusory.  See Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010) ("We will not read a contract to render a provision or term 'meaningless or illusory.'") (citation omitted).  Debtors promised to deliver to Transform the security that related to each of the

agreements Debtors agreed to assign to Transform.  That promise was not incidental.  It was

critical to the transaction.  Had Debtors not promised it to Transform, Transform would have had

to spend tens of millions of dollars (and perhaps more) of fresh money simply to run the business

on a going-forward basis.

86.    Debtors, by their argument, would make that promise meaningless.  They would

agree that had the card companies simply written checks to Sears, and then Sears endorsed them

immediately back over to the card companies, that would be a Security Deposit and it would travel

unimpeded to Transform with the contract.  But, according to their argument if Sears had simply

agreed with the card companies that they could hold the checks and agreed that the funds

represented by the checks would be held as security, Sears magically would be entitled to a return

of those Reserves at the time of Closing.  The Parties included the language "other security"

precisely to avoid such chicanery.

### F.    The Right to Return of Each Reserve Is a Claim Under the Card Agreements

87.    The contingent right to a return of each Reserve is a Claim that Transform

purchased—pursuant to § 2.1(p).  That section provides that Claims against counterparties that

arose in connection with the operation of the Business or the Acquired Assets are themselves

Acquired Assets, and uses the broad definition of "Claims" that is also in the Code and includes

contingent and unmatured claims.  Berkelhammer v. Novella (In re Berkelhammer), 279 B.R. 660,

669 (Bankr. S.D.N.Y. 2002) (Drain, J.) ("Congress adopted the broadest possible definition of

'claim' in § 101(5) of the Bankruptcy Code, so that a 'claim' is 'nothing more nor less than an

enforceable obligation.'") (quoting Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 558

(1990)).

88.    That is precisely what Sears' rights were with respect to the reserves at the time of

Closing.  It had an enforceable obligation but one that was contingent and unmatured.  See P.A.

Props., Inc. v. B.S. Moss' Criterion Ctr. Corp., No. 02 Civ. 4900 LTSTHK, 2004 WL 2979984, at

*12 (S.D.N.Y. Dec. 23, 2004) ("It is generally agreed that a [claim] is contingent if it does not

become an obligation until the occurrence of a future event.") (alteration in original) (quoting

Mazzeo v. United States (In re Mazzeo), 131 F.3d 295, 303 (2d Cir. 1997)).  In particular, under

each of the agreements, Sears did not have a present and uncontingent claim, much less one that

was definite or liquidated, to any sum certain.  At best, it had a right to the release of some portion

of the Reserves at some point in the future if it satisfied certain conditions and only then if the

Reserves were not necessary to satisfy Sears' obligations.  If they were necessary to satisfy any of

Sears' obligations, Sears might not have had any right at all to return of any portion of the

Reserves.

89.    If the right to release of the Reserves ripened into a mature enforceable claim based,

e.g., either on Transform's financial condition or performance or its choice not to continue with a

particular card agreement, it would be Transform that would be entitled to release of those reserves

net of any obligations (including those based on Debtors' pre-Closing activity).

## II.    Transform's Understanding Is Consistent With the APA's Structure and Purpose

90.    Transform's interpretation is also consistent with the structure and the purpose of

the APA.  In exchange for the infusion of equity capital by ESL, Cyrus, and others in the form of

cash and a credit bid and the provision of some debt capital and the agreement to assume certain of

Debtors' liabilities, Transform purchased an operating retail business as well as the assets

necessary to finance it.  Through § 2.1, Transform purchased the assets necessary to operate and to

finance the business.  The only excluded assets were those set forth in § 2.2 as Excluded Assets.

Through § 2.3, Transform agreed to assume certain liabilities.

91.    Section 10.9, which is a Closing condition, was critical to the structure and to the

consummation of the transaction.  By that provision, Debtors agreed to provide to Transform, at

Closing, $1,657 million in value of the collateral necessary to obtain and secure ABL financing

from a consortium of banks led by Bank of America, N.A. without which there would not have

been a transaction.

92.     The purpose of that provision is demonstrated by the basket of assets set forth in it.

Those assets correspond to those set forth in the ABL Commitment Letter, which lists as the items

that make up the borrowing base: (i) CCAR, (ii) pharmacy receivables, (iii) pharmacy scripts and

(iv) inventory (in-transit and non-in-transit).  Mainoo Decl., Ex. D at B-5, Project Transform: $1.3

Billion Senior Secured Credit Facilities Commitment Letter, dated January 17, 2019.

93.     That purpose is further demonstrated by the last clause of § 10.9.  It stipulates that if

the aggregate amount of the collateral exceeded $1,657 million on the Closing Date, Debtors were

required to reduce the collateral according to a specified waterfall:  first reducing the less valuable

Acquired Inventory down to a minimum necessary to operate the business and only then by

retaining as an Excluded Asset the oldest of the CCAR and Pharmacy Receivables (which are

generally more valuable as collateral), thus ensuring that Transform would be left with the most

valuable collateral.  If the Parties had intended Reserves to be included in CCAR that counted

against the minimum, Transform would never have agreed to the exclusion of those Reserves only

*after* Debtors retained inventory; it would have insisted that those be the first assets Debtors

exclude.

94.     The borrowing base certificates that Debtors prepared for their own ABL facilities

in the lead up to the signing of the APA thus all included Acquired Inventory, Pharmacy

Receivables, and CCAR, ***but did not include*** the Reserves even though they had been funded and

were on Debtors' books.[14]  For example, the borrowing base certificate dated as of December 22, 2018 contains lines for each of inventory, pharmacy receivables, and CCAR and omitted the Reserves.  Goodin Decl., Ex. A, Week 46 Borrowing Base Certificate, "Pro Forma BBC" Tab.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

95.     The borrowing base certificate dated as of January 19, 2019—two days after the APA was signed—also contains lines for each of inventory, pharmacy receivables, and CCAR and omitted the Reserves.  Goodin Decl., Ex. B, Week 50 Borrowing Base Certificate, "Pro Forma BBC" Tab. ████████████████████████████████████████████████

██████████████████████████████████████████

96.     That was the understanding against which the Parties negotiated the APA.  The collateral included the inventory, the pharmacy receivables, and the CCAR but not Reserves.

97.     That understanding was further reflected in the liquidity analyses shared by the Parties and that were critical to the consummation of the transaction.  These documents reflected the shared understanding that Debtors were going to provide Transform the collateral to support the ABL lending and that such collateral would include the CCAR (a category that could support an asset-based loan) but would not include reserves.  Thus, for example, weeks in advance of the Closing, Transform provided Debtors with a lender presentation that contained an "Estimated Closing Borrowing Base" slide.  Transform, along with representatives of Debtors, presented that analysis at a meeting with the bank syndication members on January 24, 2019, shortly after the

---

[14] Debtors' facilities were the model for Transform's ABL and relied on similar collateral as Transform's ABL, which was also the collateral referred to in § 10.9.  The Court need only consider the borrowing base certificates if it determines that the language of the credit card agreements and APA is ambiguous.

APA was signed.[15]  Riecker Dep. 131:19-132:10; Fed. R. Evid. 801(d)(2)(B).  Tellingly, the lender

presentation applies a 90% advance rate to 100% of the CCAR listed,[16] indicating that the

estimated CCAR for purposes of calculating the borrowing base do not include Reserves, which

have an advance rate of 0% and would thus significantly reduce the overall advance rate and the

resulting credit card receivables availability, if included.[17]  Mainoo Decl., Ex. E, Lender

Presentation.  The total inventory, CCAR, pharmacy receivables and pharmacy scripts on the

Estimated Closing Borrowing Base slide sum to $1,654 million—$3 million off from the § 10.9

minimum collateral, further demonstrating that Reserves are demonstrably excluded from the

calculation of collateral under § 10.9.

98.    It was not until after the APA was signed, and after the Parties were committed to

the transaction, that Debtors—apparently recognizing that they may have been short of the

collateral minimum in § 10.9—first changed the position on which the Parties based the

transaction.

99.    On February 7, 2019, hours after the Court had approved the APA from the bench

and just days before Closing, Debtors provided a Transform borrowing base certificate with a tab

labeled "CC Rec New (L)."[18]  Debtors included a tally of CCAR, including both CCAR that was

outstanding for fewer than five days and CCAR that was outstanding for more than five days

(which would be the oldest collateral that would be retained if there was an overage).  In addition,

---

[15] At the time, Mr. Riecker, in his capacity as Chief Financial Officer of Sears, was reporting to Mr. Meghji, the
Chief Restructuring Officer.

[16] ███████████████████████████████████████████

[17] Transform's credit agreement, which was reviewed and approved by Debtors as a condition of closing, likewise
applies a 90% advance rate to CCAR. *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition
Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C)
Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the
Automatic Stay; and (IV) Granting Related Relief*, Ex. A, ABL Credit Agreement [Docket No. 955-1].

[18]    Mainoo Decl., Ex. B, February 7, 2019 email from Chris Good, attaching a spreadsheet titled "Week 52
2018 BB Both Formats Final."

and for the first time, they included a separate tally for "Holdbacks," which contained the Reserve

amount. Aside from Debtors' placement of that new row under a heading "Total Eligible Credit

Card Receivables" there was nothing in the document that supported the conclusion that these were

CCAR.



Ex. B, Week 52 Borrowing Base Certificate, "CC Rec New" Tab. Less prominently, the tab

indicated that the "Total Eligible Credit Card Receivables" included "[h]oldback" and

"[r]eceivables > 5 days" that were "[i]neligibles." Id.

100.    Transform immediately objected. See February 11, 2019 Letter.

### III.    Debtors' Arguments That Reserves Exclusively Fall Under 2.1(d) and 10.9 of the APA Fail

101.    At argument on March 21, 2019, Debtors claimed that the Reserves had to be

understood as CCAR to avoid a conflict in the terms of the APA and because the specific governs

over the general. See Hr'g Tr. 24:20-25:2, 29:14-20, Mar. 21, 2019. That argument

misunderstands the law of contractual interpretation and the APA.

102.    As a matter of law, contracts are to be interpreted not to create conflicts but to avoid

them; the Court is required to give effect to all of the terms of an agreement, and to read contract

provisions in *pari materia* to render them "compatible, not contradictory." See E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co., 498 A.2d 1108, 1114 (Del. 1985) (noting a "cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions"); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory"). That can easily be done here.

103.    Section 2.1(o) requires Debtors in "sweeping terms" to deliver to Transform at the Closing "any and all" rights to "any" Security Deposits related to "any Acquired Asset." See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc., No. CV 12946-VCS, 2017 WL 5956877, at *29 (Del. Ch. Nov. 30, 2017) (describing as "sweeping" a lien that encumbered "all investment property" and "any and all other property"); iBio, Inc. v. Fraunhofer USA, Inc., No. CV 10256-VCMR, 2016 WL 4059257, at *10 (Del. Ch. July 29, 2016) (describing as "broad" a definition of intellectual property rights that included "any and all proprietary rights"). The word "any" appears in three separate places. The Section does not admit of exceptions, certainly not for security related to credit card processing agreements, among the most important agreements acquired by Transform as part of the transaction.

104.    Indeed, when the Parties wanted to exclude a particular item from a clause with the adjective "any", they did so explicitly, as they did in the adjacent clause of § 2.1(p). See § 2.1(p) ("any and all Claims (*other than* returns of merchandise for warranty claims . . . )") (emphasis added). It thus gives Transform the right, at Closing, to all security related to any assigned agreement even if that agreement is a credit card processing agreement.

105.    The definition of CCAR is more limited. It refers only to credit card accounts receivable that are generated in the ordinary course, that are receivable as a result of card charges,

35

and that are presently owed.  It thus does not pick up reserves that are not ordinary course and that are deducted from sales data before the card companies determine the amount owed on customer charge activity and that the card companies are not required to release until after the contractual conditions have been satisfied and are used to offset any contractual obligations.

106.    Giving effect to all of the terms and reading contract provisions in *pari materia* to avoid conflicts, the definition of CCAR can be read to exclude security related to the credit card agreements.  To read the APA otherwise would fail to honor the Parties' decision in § 2.1(o) to refer to any other security related to any Acquired Asset and to read into that section an exception that is not there.  See Saudi Am. Bank v. Shaw Grp., (In re Stone & Webster, Inc.), 354 B.R. 686, 691-92 (D. Del. 2006) (while defendant argued that "any and all expenses" specifically excluded attorney's fees related to litigation under a guarantee contract, because "those fees are not specifically named," the Court "is persuaded that attorneys' fees and costs were contemplated under the language" of the contract), amended, 360 B.R. 64 (D. Del. 2007), vacated on other grounds, 558 F.3d 234 (3d Cir. 2009).

107.    In any event, Debtors' argument is based on a false premise.  Section 2.1(o) is not more general than § 2.1(d).  Section 2.1(o) lists a number of specific provisions followed by the catch-all "other security."  CCAR covers accounts receivable in the ordinary course. Thus, assuming there was a conflict between the two provisions, there would be no reason to prioritize CCAR.  Applying the same rule of contract interpretation invoked by Debtors, the definition of security would govern and limit the meaning of CCAR.  See DCV Holdings, Inc. v. Conagra, Inc., No. 98C-06-301-JEB, 2005 WL 698133, at *12 (Del. Super. Ct. Mar. 24, 2005) (holding that narrow, specific provisions control over broad, general provisions), aff'd, 889 A.2d 954 (Del.

2005); Conley v. Dan-Webforming Int'l. A/S (Ltd.), Civ. A. No. 91-401 MMS, 1992 WL 401628,

at *8 (D. Del. Dec. 29, 1992) (same).

## IV.    Debtors Did Not "Exclude" the Reserves Under § 10.9

108.    Section 10.9 requires Debtors if there is an overage and if they wish to reduce the

amount of collateral delivered to Transform to do so at Closing by "***retaining*** as an Excluded Asset

the oldest" of any CCAR or Pharmacy Receivables.  APA § 10.9 (emphasis added).  After Closing,

the APA gives Transform "free and clear of any and all Encumbrances of any kind . . . and any

Claims," the right to assume the credit card agreements.  Id. §§ 2.1, 2.7.

109.    Even if the Reserves were due as CCAR, Debtors would have defaulted on any

rights with respect to them because they did not "retain" them at Closing.  Rather, it was not until

February 22, 2019, and after Transform first raised the issue that Debtors had under-delivered on

their § 10.9 obligations that Debtors for the first time wrote Transform to say that, rather than

owing Transform the amount under-delivered, they were entitled to the amount over-delivered.

See Mainoo Decl., Ex. F, February 22, 2019 email correspondence between Nick Weber, Andrew

Hede, Sheshan Swaminathan and others.

110.    However, after Closing, Transform had the right to assume the credit card

agreements and, along with the right to assume the agreements, the rights to all of the benefits and

burdens that come with assignment.[19]  Those rights manifestly include the right—once the

---

[19]    While certain executory contracts with First Data were inadvertently omitted from the original list of Initial Assigned Agreements, the rights to assume those contracts passed to Transform at Closing under the APA and Debtors have filed a revised list of such Initial Assigned Agreements, which were assumed and assigned to Transform as of the Closing.  See Notice of Filing of Further Revised List of Initial Assigned Agreements in Connection with the Sale Transaction [Docket No. 2910] ¶ 4 ("The agreements listed in Exhibit A attached hereto are assumed and assigned to the Buyer as of the Closing Date.")  While Transform and Debtors agreed at the time that the treatment of these agreements as Initial Assigned Agreements rather than subsequently-designated agreements would not prejudice the rights of Debtors, regardless of when the First Data agreements were designated for assumption and assignment, upon such assignment, all rights and obligations under those agreements—including the right (if any) to amounts owed thereunder—were assigned to Transform at Closing.

conditions to obtain a release of the reserve have been satisfied—to claim that the reserve should

be released.  See Thompson v. Tex. Mexican Ry. Co., 328 U.S. 134, 141 (1946) ("[T]he

bankruptcy rule is that he takes the contracts of the debtor subject to their terms and conditions.

Contracts adopted by him are assumed cum onere."); In re Italian Cook Oil Corp., 190 F.2d 994,

997 (3d Cir. 1951) ("The trustee . . . may not blow hot and cold.  If he accepts the contract he

accepts it cum onere.  If he receives the benefits he must adopt the burdens.  He cannot accept one

and reject the other.").  Transform has assumed responsibilities under the card agreements,

including the liabilities in respect of pre-Closing credit card transactions.  See APA §§ 2.3(b), 3.5.

Now that the agreements have been assumed, it is also entitled to the benefits including to the

benefit of the Reserves.  For those two reasons also (because Debtors failed to "retain" at Closing

and because Transform has assumed), Debtors' motion should be denied.

111.    Moreover, the most Debtors would have been entitled to in any event was retention

of the Reserves as an Excluded Asset.  That inconvenient fact illustrates the fundamental

inconsistency of Debtors' position.  They seek to characterize the contingent right to a return of the

Reserves as a CCAR that is due and thereby create "excess" CCAR delivered under § 10.9.  But

once that "excess" has been established, they then ignore the express language of § 10.9 permitting

exclusion of only the "oldest" receivables and instead seek recovery of $14.9 million cash proceeds

from conventional CCAR that are indisputably "newer" than the right to return of the Reserves.

Debtors can't have it both ways—either the right to a return of the Reserves is not a CCAR that is

due (and therefore there is no "excess" under § 10.9) or such right is a CCAR that is due and there

would be an excess of $14.6 million.  But even if there were such an excess, all Debtors would be

entitled to would be the right to a return of the last $14.6 million in cash from the Reserves (if and

when recovered).

## V.    Transform Has Not Violated the Automatic Stay

112.    Finally, even if the Reserves constituted CCAR that counted towards the minimum, Transform has not violated the automatic stay because it has not "exercise[d] control over property of the estate." 11 U.S.C. § 362(a)(3); In re Weidenbenner, 521 B.R. 74, 79 (Bankr. S.D.N.Y. 2014) (stating "to exercise control" means "to exercise restraining or directing influence over or to have power over") (internal quotation marks and citation omitted).

113.    Transform manifestly has not exercised control over the Reserves.  The Reserves are in the control of the credit card companies.  Thus, both before the Closing, and after the Closing, the credit card companies have insisted that they are entitled to maintain the Reserves and that they will not release them.[20]

114.    Because Transform cannot direct the companies to release the Reserves, it does not exercise control over estate property within the meaning of 11 U.S.C. § 362(a)(3).

## CONCLUSION

115.    Transform requests that the Court deny Debtors' Turnover Motion.


Dated: April 2, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ Abena A. Mainoo

Lewis J. Liman
Sean A. O'Neal
Luke A. Barefoot
Abena A. Mainoo
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Attorneys for Transform Holdco LLC

---

[20]    See Supp. Rolecek Decl.; Mainoo Decl., Ex. A.