**Hearing Date and Time: April 18, 2019 at 10:00 a.m. (Eastern Time)**
**Objection Date and Time: April 11, 2019 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

|  |  |  |
|---|---|---|
| **In re** | : |  |
|  | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.,* | : |  |
|  | : | **Case No. 18-23538 (RDD)** |
|  | : |  |
| **Debtors.**[1] | : | **(Jointly Administered)** |

---------------------------------------------------------- x

### NOTICE OF HEARING ON MOTION OF
### DEBTORS FOR AUTHORITY TO ASSUME
### <u>UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "**Motion**"), of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (i) authorizing the assumption of unexpired nonresidential leases, and (ii) granting related relief, all as more fully set forth in the Motion, will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **April 18, 2019 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405), so as to be filed and received no later than **April 11, 2019 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to

2

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: April 3, 2019
New York, New York

/s/ Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\96974338\11\73217.0004

Hearing Date and Time: April 18, 2019 at 10:00 a.m. (Eastern Time)
Objection Date and Time: April 11, 2019 at 4:00 p.m. (Eastern Time)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | **Case No. 18-23538 (RDD)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |
|  | : |  |

------------------------------------------------------------x

## MOTION OF DEBTORS
## FOR AUTHORITY TO ASSUME UNEXPIRED
## LEASES OF NONRESIDENTIAL REAL PROPERTY

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Background

1.     Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On October 24, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee or examiner has been appointed in these chapter 11 cases.

3.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4.      On February 8, 2019, the Bankruptcy Court entered the Order *(I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507), pursuant to which the Debtors sold substantially all their assets to Transform Holdco LLC.

5.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York, sworn on October 15, 2018 (the "**Riecker Declaration**") (ECF No. 3).[2]

## Jurisdiction

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Riecker Declaration.

2

(Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

7.    By this motion, pursuant to section 365 of the Bankruptcy Code, the Debtors request authority to assume the following unexpired nonresidential real property leases: (i) that certain Lease Agreement by and between 5525 S. Soto St. Associates (the "**Landlord**"), as successor in interest to Connecticut General Life Insurance Company, and Debtor Sears, Roebuck and Co. ("**Sears Roebuck**"), dated April 3, 1947, as amended, a copy of which is annexed hereto as **Exhibit A** (the "**Warehouse Lease**"), (ii) that certain Sublease by and between Sears Roebuck and Henry Shahery (the "**Subtenant**"), dated December 21, 2017, a copy of which is annexed hereto as **Exhibit B** (the "**Warehouse Sublease**"), (iii) that certain Parking Lot Lease Agreement by and between 51st Street Partnership (the "**Parking Lot Landlord**") and Debtor Innovel Solutions, Inc. ("**Innovel**"), as successor in interest to Sears Logistics Services, Inc., dated December 15, 1998, a copy of which is annexed hereto as **Exhibit C** (the "**Parking Lot Lease**" and, together with the Warehouse Lease, the "**Leases**"), and (iv) that certain Sublease by and between Innovel, as successor in interest to Sears Logistics Services, Inc., and Subtenant and Shason, Inc. (the "**Parking Lot Subtenants**" and together with the Landlord, the Subtenant, and the Parking Lot Landlord, the "**Vernon Counterparties**"), dated December 21, 2017, a copy of which is annexed hereto as **Exhibit D** (the "**Parking Lot Sublease**" and, together with the Warehouse Sublease, the "**Subleases**").  The Leases and the Subleases shall be referred to hereinafter as the "**Vernon Leases**".  The Debtors intend to assign the Vernon Leases to a third party for consideration at a later time.

8.    A proposed form of order granting the relief requested herein is attached hereto as **Exhibit E** (the "**Proposed Order**").

### The Vernon Leases

9.    The Warehouse Lease and the Parking Lot Lease provide the Debtors with 416,000 square feet of warehouse space and 2.33 acres of parking lot space, respectively, in Vernon, California (the "**Leased Premises**").  The Debtors have not operated the warehouse on the Leased Premises since early 2006.  Instead, the Debtors sublease the Leased Premises under the Subleases, generating an average expected annual profit of $1,480,000.00 in excess of the rents and taxes owed annually over the next 13 years under the Leases.  As a result of the difference between the rent paid under the Leases and the rent received under the Subleases, the Vernon Leases have a substantial market value.

10.    The Vernon Leases were not among the assets sold to Transform Holdco LLC under that certain Asset Purchase Agreement dated January 17, 2019, by and between Sears Holdings Corporation and Transform Holdco LLC.

11.    Pursuant to section 365(d)(4) of the Bankruptcy Code and the *Order Extending Time to Assume or Reject Unexpired Leases and Subleases of Nonresidential Real Property*, dated November 16, 2018 (ECF No. 776), the Debtors have until May 13, 2019 to assume the Vernon Leases, or they will be deemed rejected.  To capture the inherent value of the Vernon Leases for the benefit of their creditors and, at the same time, spare their estates the rejection damage claims that might arise from the rejection of the Vernon Leases, the Debtors have decided to seek assumption of the Vernon Leases at this time.

4

### Assumption of the Vernon Leases
### <u>Is a Sound Exercise of the Debtors' Business Judgment</u>

12.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any . . . unexpired lease of the debtor."  11 U.S.C. § 365(a).  Courts defer to a debtor's business judgment in assuming an unexpired lease.  *See, e.g.*, *COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 376 (2d Cir. 2008) (noting that a "deferential standard [is] applied to debtors' business judgments as to whether to assume or reject executory contracts"); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (stating that a debtor may assume or reject an unexpired lease under section 365(a) of the Bankruptcy Code in the exercise of its "business judgment").  A debtor's decision to assume or reject an unexpired lease or executory contract is a proper exercise of its business judgment if it is "rational" and does not "demonstrate bad faith or whim or caprice."  *In re Old Carco LLC*, 406 B.R. 180, 196 (Bankr. S.D.N.Y. 2009).

13.     It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.  *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

5

14.     Assumption of the Vernon Leases at this time is a proper exercise of the Debtors' business judgment and should be approved.  Due to their below market rents, the Vernon Leases have intrinsic value.  The Debtors believe that after a reasonable marketing period they will be able to assign the Vernon Leases for substantial consideration, which will inure to the benefit of their creditors.  Moreover, given the economic terms of the Subleases, the Debtors' estates will not have to bear any incremental expense under the Leases during the marketing period.  Importantly, as set forth on **Exhibit 1** to the Proposed Order, the Debtors have determined that the cure costs required to be paid in connection with assumption of the Vernon Leases are less than $25,000.00.

### The Debtors Can Assume the Vernon Leases and Assign Them Later

15.     The Bankruptcy Code does not require the Debtors to assume and assign the Vernon Leases at the same time.  Faced with a similar situation in *In re Eastman Kodak Co.*, 495 B.R. 618, 622 (Bankr. S.D.N.Y. 2013), Judge Gropper noted:

> Construction of the Code to permit the assignment of a previously assumed commercial lease outside the deadline for assumption reasonably balances the goal of providing protection to landlords and the goal of maximizing the value of a debtor's estate.  On assumption, the landlord obtains a cure of defaults and reinstatement of the lease; if there is a subsequent default or rejection by the debtor, the landlord will have an administrative claim for some of its damages.  Construction of § 365(d)(4) to cut off assignment rights would shift the balance in favor of landlords beyond what Congress provided and improperly undermine the policy of § 365 that gives a debtor broad rights to benefit from beneficial contracts and thereby maximize the value of the estate.

*See id.* at 623 (internal citations omitted).  In this case, allowing the Debtors to assume the Vernon Leases before the May 13th deadline, while they further explore assignment of the Leases, is consistent with the policy of section 365.  Accordingly, if the Court approves the

6

assumption of the Vernon Leases, the Debtors will retain the ability to assign the Vernon Leases

in the future.

**The Anti-Assignment Provisions in the Vernon Leases**
**Are Unenforceable Pursuant to Section 365(f) of the Bankruptcy Code**

16.    Section 365(f)(1) provides in pertinent part that, "notwithstanding a

provision in an executory contract or unexpired lease of the debtor, or in applicable law, that

prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign

such contract or lease . . . ."  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that

"[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in

applicable law that terminates or modifies, or permits a party other than the debtor to terminate

or modify, such contract or lease or a right or obligation under such contract or lease on account

of an assignment of such contract or lease, such contract, lease, right, or obligation may not be

terminated or modified under such provision because of the assumption or assignment of such

contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

17.    The Leases include anti-assignment clauses.  *See* Exhibit A, at ¶18;

Exhibit C, at §17.  The anti-assignment clauses in the Subleases, however, do not apply to

assignments by Sears Roebuck and Innovel, as sublandlords.  *See* Exhibit B, at §23; Exhibit D, at

§6.

18.    To facilitate the assumption and potential assignment of the Vernon

Leases, the Debtors further request that the Court find that the anti-assignment provisions in the

Leases, whether such provisions expressly prohibit or have the effect of restricting or limiting

assignment of such lease, are unenforceable pursuant to section 365(f) of the Bankruptcy Code.

7

## The Requirements of Section 365 Are Satisfied

19.      Pursuant to section 365(b) of the Bankruptcy Code, for a debtor to assume an executory contract or unexpired lease, the debtor must cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults.  11 U.S.C. § 365(b)(1)(A). In addition, the debtor must provide adequate assurance of future performance.  11 U.S.C. § 365(b)(1)(C).

### A.      The Bankruptcy Code's Cure Requirements Are Satisfied

20.      The Debtors believe the prepetition amounts owed under the Warehouse Lease and the Parking Lot Lease are $0.00 and $24,188.00, respectively (collectively, the "**Cure Amounts**").  The Debtors provided notice of the Cure Amounts in the *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Global Sale Transaction*, dated January 23, 2019 (ECF No. 1774). Neither the Landlord nor the Parking Lot Landlord filed an objection to the Cure Amounts. Consistent with the Bankruptcy Code, the Proposed Order provides the undisputed Cure Amounts, as set forth on **Exhibit 1** to the Proposed Order, will be paid within three business days of assumption.

21.      In light of the cure provisions of the Proposed Order, the Debtors satisfy the Bankruptcy Code's cure requirements.

### B.      The Bankruptcy Code's Adequate Assurance Requirements are Satisfied

22.      The meaning of "adequate assurance of future performance" is determined on a case-by-case basis, taking into account all relevant facts and circumstances.  *See Androse Assocs. of Allaire, LLC v. The Great Atl. & Pac. Tea Co., Inc.*, (*The Great Atl. & Pac. Tea Co., Inc.*), 472 B.R. 666, 676 (S.D.N.Y. 2012); *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del.

8

2009).  It should be given "practical pragmatic construction."  *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp.* (*In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 592 (S.D.N.Y. 1992). "[N]o single solution will satisfy every case, [and] the required assurance will fall considerably short of an absolute guarantee of performance." *Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

23.     Considering all relevant facts and circumstances, the Debtors are able to provide adequate assurance of future performance under the Vernon Leases.  They have remained current on all postpetition obligations.  The Debtors have the financial resources to meet their obligations under the Leases as reflected by the income generated through the Subleases, as discussed above.  Critically, the Debtors' obligations under the Vernon Leases are expected to be short-lived, as the Debtors expect to market the Vernon Leases this month with the hopes of assigning them to a purchaser in the near-term.  As a result, the Vernon Counterparties have adequate assurance of future performance.

## Notice

24.     Notice of this Motion will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered November 1, 2018 (ECF No. 405).  The Debtors respectfully submit that no further notice is required.

25.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

9

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated:  April 3, 2019
       New York, New York

       /s/ Jacqueline Marcus        
       WEIL, GOTSHAL & MANGES LLP
       767 Fifth Avenue
       New York, New York  10153
       Telephone:  (212) 310-8000
       Facsimile:  (212) 310-8007
       Ray C. Schrock, P.C.
       Jacqueline Marcus
       Garrett A. Fail
       Sunny Singh

       *Attorneys for Debtors*
       *and Debtors in Possession*

WEIL:\96974338\11\73217.0004

## Exhibit A

**Warehouse Lease**

## INDENTURE OF LEASE

THIS INDENTURE OF LEASE, made this 3rd day of April,
1947, between CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a
Connecticut corporation, (hereinafter sometimes called "Landlord"),
Party of the First Part, and SEARS, ROEBUCK AND CO., a New York
corporation, (hereinafter sometimes called "Tenant"), Party of
the Second Part;

### W I T N E S S E T H:

THAT Landlord, having full authority to make the agreements
hereinafter set forth, for and in consideration of the rents,
covenants and agreements hereinafter mentioned, to be kept and
performed by both parties hereto, has demised and leased to Tenant
the premises in the City of Vernon, County of Los Angeles, and
State of California, bounded and described as follows:

PARCEL 1: That portion of Lot 2 of Tract No. 2336,
in the City of Vernon, County of Los Angeles, State
of California, as per map recorded in Book 35, Pages
88 and 89 of Maps, in the Office of the County Re-
corder of said County, described as follows:

Commencing at the intersection of the Westerly line
of said Lot 2, with the center line of 54th Street,
60 feet wide, extending Westerly from said Westerly
line; thence North 83° 27' 15" East parallel with
the Northerly line of said Lot, 19.51 feet to the
true point of beginning; thence South 0° 09' 00"
East along an Easterly line of a parcel of land
described in the deed to the Los Angeles & Salt Lake
Railroad Company, recorded in Book 13243, Page 314,
of Official Records, of said County, 106.93 feet to
the beginning of a tangent curve therein, concave

-1-

to the Northeast, having a radius of 328.93 feet;
thence Southeasterly along said curve, being also
the Northeasterly line of said parcel of land, 517.69
feet; thence North 89° 40' 30" East along the Northerly
line of said land, 100.07 feet to an angle point
therein, being the beginning of a curve concave to
the Northeast, having a radius of 348.93 feet, a
tangent to said curve at said point bearing North 70°
49' 55" West; thence Northwesterly along said curve,
being also a Southwesterly line of a parcel of land
described in said deed, 430.45 feet to the beginning
of a tangent curve therein, concave to the west,
having a radius of 663.26 feet; thence Northerly,
along said last mentioned curve, in the Westerly
line of said parcel of land, 55.60 feet; thence North
4° 55' 00" West, along said westerly line, 21.76 feet
to the beginning of a curve therein, concave to the
East, having a radius of 650.26 feet; thence Northerly
along said curve, 33.75 feet to a point in a line
parallel with the Northerly line of said Lot 2 and
which passes through the true point of beginning, said
point being distant North 56° 27' 15" East, on said
parallel line, 210 feet from the westerly line of said
Lot 2; thence South 88° 27' 15" West 190.49 feet to
the true point of beginning.

ALSO that portion of said Lot 2, described as follows:

Commencing at the intersection of the westerly line
of said Lot 2, with the center line of 54th Street,
60 feet wide, extending Westerly from said westerly
line; thence North 88° 27' 15" East, parallel with the
Northerly line of said Lot 242.22 feet to the true
point of beginning, being the beginning of a curve in
an Easterly line of a parcel of land described in the
deed to the Los Angeles & Salt Lake Railroad Company,
recorded in Book 13243, Page 314 of Official Records
of said County, said curve being concave to the West,
having a radius of 683.26 feet, the tangent to said
curve at said point of beginning bears South 01° 44'
30" West; thence Southerly along said curve, 34.54
feet; thence South 4° 57' 00" West along said Easterly
line, 21.76 feet to the beginning of a tangent curve
therein, concave to the East having a radius of 668.26
feet; thence Southerly, along said curve in said East-
erly line, 55.60 feet to the beginning of a tangent
curve therein, concave to Northeast having a radius
of 328.93 feet; thence Southeasterly along said last
mentioned curve, being also the Northeasterly line of
said parcel of land, 517.69 feet; thence North 89° 40'
30" East along the Northerly line of said land, 100.07
feet to an angle point therein, being the beginning of
a curve, concave to the Northeast, having a radius of
348.93 feet, a tangent to said curve at said point

bearing North 70° 49' 55" West; thence Northwest-
erly along said curve, being also a Southwesterly
line of parcel of land described in said deed, 430.45
feet; thence North 0° 09' 00" West along the Westerly
line of said parcel of land, 115.67 feet to a point
in a line parallel with the Northerly line of said Lot
2 and which passes through the true point of beginning,
said point being distant North 88° 27' 15" East, on
said parallel line, 432.63 feet from the Westerly line
of said Lot 2; thence South 38° 27' 15" West 190.41
feet to the true point of beginning.

ALSO that portion of said Lot 2, described as follows:

Commencing at the intersection of the westerly line
of said Lot 2, with the center line of 54th Street,
60 feet wide, extending Westerly from said westerly
line; thence North 88° 27' 15" East, parallel with
the Northerly line of said Lot, 452.64 feet to the
true point of beginning; thence South 0° 09' 00" East
along an Easterly line of a parcel of land described
in the deed to the Los Angeles & Salt Lake Railroad
Company, recorded in Book 15245, Page 511 of Official
Records of said County, 116.15 feet to the beginning
of a tangent curve therein, concave to the Northeast,
having a radius of 326.93 feet; thence Southeasterly
along said curve, being also the Northeasterly line
of said parcel of land, 464.99 feet to a line parallel
with the westerly line of said Lot 2 and which passes
through a point in the Northerly line of said Lot,
distant Easterly therein, 750 feet from the North-
westerly corner of said Lot 2; thence North 0° 09'
00" West along said parallel line, 450.31 feet to a
line parallel with the Northerly line of said Lot 2
and which passes through the true point of beginning;
thence South 88° 27' 15" West, along said last men-
tioned parallel line, 297.35 feet to the true point
of beginning.


PARCEL 2:  That portion of Lot 2 of Tract No. 2336
partly in the City of Vernon and partly in the City
of Huntington Park, in the County of Los Angeles,
State of California, as per map recorded in Book 35,
Pages 88 and 89 of Maps, in the Office of the County
Recorder of said County described as follows:

Beginning at the Southwesterly corner of said Lot 2,
thence along the Southerly line of said Lot North 39°
40' 30" East 316.34 feet to the center line of Seville
Avenue as said Avenue is shown on the said of Tract No.
6674, recorded in Book 70, Page 130 of said Map Records;

thence parallel with the Easterly line of said Lot
2, North 1° 24' 45" West 390.51 feet to the Southerly
line of the land described in the deed to Los Angeles
& Salt Lake Railroad Company recorded in Book 15243,
Page 314, Official Records of said County, thence
Westerly and Northwesterly along the Southerly and
Southwesterly line of said last mentioned land 439.33
feet along a curve concave Northeasterly having a
radius of 348.93 feet; to the West line of said Lot
2, thence along said West line South 0° 09' 00" East
719.31 feet to the point of beginning.

PARCEL 3: That portion of Lot 2 of Tract No. 2836,
in the County of Los Angeles, State of California, as
per map recorded in Book 35, Pages 88 and 39 of Maps,
in the Office of the County Recorder of said County,
described as follows:

Beginning in the South line of said Lot 2 at a point
distant South 89° 40' 30" East 40 feet from the South-
east corner of said lot, said point of beginning being
on the West line of Soto Street as said street now
exists, 30 feet in width; thence along said South line,
South 89° 40' 30" West 942.45 feet, more or less, to
the center line of Seville Street, as said Seville
Street is shown 50 feet in width on the Map of Tract
No. 6674 recorded in Book 70, Page 100 of said Map
Records; thence on a line parallel to the East line
of said Lot 2, North 1° 24' 45" West 390.51 feet,
more or less, to the Southerly line of the right of
way in said Lot 2 conveyed to the Los Angeles & Salt
Lake Railroad Company by deed recorded in Book 15243,
Page 314, Official Records of said County; thence
Southeasterly along said right of way line and along
a curve concave to the Northeast, the center of which
curve bears North 6° 26' 30" East 348.93 feet, a dis-
tance of 41.21 feet to the end of said curve; thence
along said right of way line and on the radial line to
said curve North 0° 19' 30" West 1.5 feet; thence along
said right of way line, North 89° 40' 30" East 301.39
feet; thence South 0° 19' 30" East 1.5 feet to the point
of beginning of a curve concave Northerly and having
a radius of 4595.75 feet, a tangent to which curve at
said point bears North 89° 40' 30" East thence North-
easterly along said curve 39.39 feet; thence tangent
to said curve North 89° 25' 45" East 0.13 feet to the
West line of Soto Street, as said street now exists,
30 feet in width; thence along said West line of Soto
Street, South 1° 24' 45" East 369.17 feet, more or
less, to the point of beginning.

The above described premises are leased subject to deed
restrictions, easements, rights-of-way encroachments, if any, and
zoning and building restrictions and governmental regulations now
in effect or hereafter adopted by the City of Vernon, County of
Los Angeles, and State of California, or other governmental
authority.

TO HAVE AND TO HOLD the same, together with all the ease-
ments, rights of ingress and egress, tenements, hereditaments,
appurtenances, fixtures, rights and privileges thereunto belonging
or in any wise appertaining, unto the said Tenant, for and during
the term of thirty-five (35) years commencing on the first (1st)
day of April, 1947, and ending on the thirty-first (31st) day of
March, 1932, upon the following terms and conditions:

1.   Tenant agrees to pay as rent for said premises during
the term hereof the sum of Twenty-Four Thousand, Thirty-Six and
26/100 ($24,036.26) Dollars per annum, payable in monthly install-
ments of Two Thousand, Three and 02/100 ($2,003.02) Dollars each,
in advance on the last day of each month during said term.

On all installments of rent overdue more than ten (10)
days, Tenant shall pay Landlord on demand interest at the rate of
six (6%) per cent per annum.

2.   As additional rent Tenant agrees to pay, in the name of
Landlord, to the public authorities charged with collection
thereof, promptly as the same become due and payable, all taxes,
assessments and other public charges levied upon or assessed
against the leased premises and/or any building, structure,

-5-

fixtures or improvements now or hereafter located thereon, or
arising in respect of the occupancy, use or possession of the
leased premises, and which become due and payable during the term
of this lease, and Tenant agrees to exhibit to Landlord, on demand,
receipts evidencing payment of all such taxes, assessments and
public charges so payable by Tenant, such taxes for the last year
of the term of this lease to be equitably pro rated.  It is ex-
pressly agreed, however, that Tenant shall not be obligated to
pay any income tax, profits tax, excise tax or other tax or
charge that may be payable by or chargeable to Landlord under
any present or future law of the United tates, of the State of
California, or imposed by any political or taxing subdivision
thereof, or any other governmental agency upon the rent received
by Landlord under this lease, or the performance by Tenant of any
obligation hereunder assumed by Tenant, provided, however, that
in any case where an income tax may be levied, assessed or imposed
by the State of California or any political subdivision thereof,
upon the income arising from the rents provided hereunder for the
use and occupancy of said leased premises in lieu of or as a sub-
stitute for a tax upon said real estate or premises, the Tenant,
and not the Landlord, shall be required, and hereby agrees to pay
the same; and provided further that in no event shall Tenant be
obligated to pay for any year any greater amount than would have
been payable by Landlord by way of such substitute income tax
had the rentals upon which such tax was imposed been the sole
taxable income of such recipient Landlord for the year in question.
Nor shall Tenant be obligated to pay any inheritance, transfer,

-6-

estate, succession or other similar tax or charge that may be payable under any present or future law of the United States or the State of California, or imposed by any political taxing subdivision thereof, or by any other governmental agency, by reason of the devolution, succession, transfer, passing by inheritance, devise, acquisition or becoming effective of the right to possession and enjoyment of all or any part of the estate of Landlord in said premises, whether by descent, deed, testamentary provision, trust deed, gift, mortgage, or otherwise.

3.  It is expressly agreed, however, that Tenant shall not be required to pay, discharge or remove any tax, assessment, tax lien, forfeiture or other imposition or charge upon or against said premises, or any part thereof, or the improvements at any time situated thereon, so long as Tenant shall in good faith contest the same or the validity thereof by appropriate proceedings which shall operate to prevent the collection of the tax, assessment, forfeiture, lien or imposition so contested, and the sale of said premises, or any part thereof, to satisfy the same, and that pending any such legal proceedings Landlord shall not have the right to pay, remove, or discharge the tax, assessment, forfeiture, lien or imposition thereby contested, provided Landlord shall, prior to the date such tax or imposition is due and payable, have given such reasonable security as may be demanded by the Landlord to insure such payments and prevent any sale or forfeiture of the leased premises by reason of such non-payment, not to exceed one and one-half times the amount of such tax, assessment, forfeiture or lien, including any penalties and interest charges thereon imposed by law.

4.  Any proceeding or proceedings for contesting the validity or amount of taxes, assessments or other public charges, or to recover back any tax, assessment or other imposition paid by Tenant, may be brought by Tenant in the name of Landlord or in the name of Tenant, or both, as Tenant may deem advisable; however, if any such proceeding be brought by Tenant, Tenant shall indemnify and save harmless Landlord against any and all loss, cost, or expense of any kind that may be imposed upon Landlord in connection therewith.

If Tenant shall default in the payment of any taxes, assessments or public charges above required to be paid by the Tenant, Landlord shall have the right to pay the same, together with any penalties and/or interest, in which event the amount so paid by Landlord shall be paid by Tenant to Landlord on demand, together with interest thereon at the rate of six (6%) per cent per annum.

5.  Tenant hereby agrees to pay, in addition to the rents above specified, for all electricity, gas and water used by it upon the demised premises.

6.  Tenant covenants that in the use and occupation of the leased premises and the buildings, structures, fixtures and improvements thereon, and the sidewalks adjacent thereto, Tenant will comply with all applicable laws, ordinances and regulations of duly constituted public authorities in any manner affecting the leased premises or any buildings, structures, fixtures and improvements thereon or the use thereof.  Tenant further agrees that it will

not permit any unlawful occupation, business or trade to be con-
ducted on said premises, or any use to be made thereof contrary to
any law, ordinance or regulation as aforesaid with respect thereto.

7. Tenant, when not in default of performance of any of its
obligations hereunder, shall have the right, during the term of
this lease from time to time, in such manner and to such extent
as Tenant may in its sole judgment deem advisable, (1) to erect,
place or install upon the leased premises buildings, structures,
improvements and equipment in addition to or in substitution for
those now or hereafter located thereon, and/or (2) to rearrange,
remodel and/or alter improvements now or hereafter located on the
leased premises. Tenant shall, before commencing same, inform
Landlord of any contemplated rearrangement, remodeling, alteration
or addition, which will lessen the value of the premises by, or
involve an expenditure of Twenty-Five Thousand ($25,000.00) Dollars
or more.

Tenant is hereby expressly granted the right to erect an
addition to the warehouse building upon the demised premises in
any manner as in Tenant's judgment may be reasonably necessary to
fit the demised premises for the conduct of Tenant's business
thereon. Upon the completion of the erection of such addition to
said warehouse building and the furnishing by Tenant to Landlord
of an itemized statement, certified to by Tenant's President or
any Vice-President, showing the cost thereof to Tenant (such cost
at Tenant's option to include architectural, drafting, engineering
and other costs and fees but not legal expenses or any expense in-
cluded in the price of said property sold to Landlord by Tenant)

all within five years from the commencement of the term hereof,
Landlord agrees, on the last day of the lease year in which such
improvements have been completed, to reimburse Tenant for the amount
of Tenant's said cost, not to exceed, however, the sum of Six Hundred
Twenty-Five Thousand ($625,000.00) Dollars, and in such event, not-
withstanding any other terms or provisions hereof, the monthly
installments of rental payable by Tenant to Landlord during the
remainder of the term of said lease shall be Two Thousand, Three
and 02/100 ($2,003.02) Dollars, plus a sum equal to

    (1) $4.191 for each $1,000 of the amount for which
Tenant shall be reimbursed by Landlord if such reim-
bursement is made at the end of the first year of the
term hereof; or

    (2) $4.253 for each $1,000 of said amount if re-
imbursement is made at the end of the second year of
the term hereof; or

    (3) $4.333 for each $1,000 of said amount if re-
imbursement is made at the end of the third year of
the term hereof; or

    (4) $4.408 for each $1,000 of said amount if re-
imbursement is made at the end of the fourth year of
the term hereof; or

    (5) $4.491 for each $1,000 of said amount if re-
imbursement is made at the end of the fifth year of
the term hereof.

All improvements by whomsoever erected, upon the demised premises shall inure to the benefit of Landlord and be and become part of the premises hereby demised.

All signs and all electric, store and other fixtures and equipment which have been or may be installed, placed or attached in or about the demised premises by Tenant shall always remain the property of Tenant and upon termination by expiration of time or otherwise of this lease, or of any renewal thereof, or at any prior time or times, Tenant will, if it desires to do so, be permitted to remove all or any of said signs, fixtures and equipment so installed, placed or attached, provided, however, that any damage caused to the demised premises by reason of such removal shall be paid by Tenant.

8.   Landlord shall not be obliged to incur any expense for repairing any improvements upon the demised premises and the Tenant acknowledges that it has received the premises in good condition, order and repair, and agrees that it will, at its own expense, make all repairs and replacements necessary to maintain the same in a good, tenantable and wholesome condition, complying with all applicable laws, regulations, ordinances and requirements of all authorities having jurisdiction. Tenant further agrees that upon termination by lapse of time or otherwise of the term hereby created, it will deliver and surrender up to the Landlord said premises in good condition and repair, any damage, deterioration or destruction resulting from ordinary wear and tear excepted.

9.   Tenant agrees to protect, indemnify and save harmless Landlord from and against any and all claims, demands and causes

-11-

of action of any nature whatsoever, and any expenses incident to
defense of and by Landlord therefrom, for injury to or death of,
persons and/or loss of or damage to property occurring on the
leased premises or the adjoining sidewalks, streets or ways, or
in any manner growing out of or connected with Tenant's use and
occupation of said premises, or the condition thereof, or of the
adjoining sidewalks, streets, or ways, during the term of this
lease.

10.    Damage to or destruction of any portion or all of the
buildings, structures and fixtures upon the leased premises by
fire, the elements or any other cause whatsoever, whether or not
without fault on the part of Tenant, shall not terminate this
lease or entitle the Tenant to surrender the leased premises, or
entitle Tenant to any abatement of or reduction in rent payable
by Tenant hereunder, or otherwise affect the respective obligations
of the parties hereto, any law to the contrary notwithstanding.
Furthermore, if the use of the leased premises for any purpose
should at any time during the term of this lease be prohibited by
law or ordinance or other governmental authority, or prevented by
injunction or other local interference by any private person, firm
or corporation, this lease shall not be thereby terminated, nor
shall Tenant be entitled by reason thereof to surrender the leased
premises, or any abatement or reduction in rent, or otherwise affect
the respective obligations of the parties hereto.

11.    Tenant shall have the right to use the leased premises
for any lawful purpose.

-12-

12.   In each fiscal year during the term hereof Tenant
shall maintain in force, with at least an eighty (80) per cent
co-insurance and a one than a Ten Thousand (10,000.00) Dollar
deductible clause, insurance against loss or damage by fire to
the improvements located upon the leased premises, up to the full
insurable value thereof, with extended coverage.  Such insurance
shall be procured from responsible insurance company or companies
reasonably satisfactory to Landlord and authorized to do business
in California, and shall provide for payment of loss thereunder
to Landlord and Tenant, as their respective interest may appear,
and the policies of insurance or certificates therefor shall be
delivered to Landlord.  In the event of loss under such policies,
the insurance proceeds shall be made available to Tenant for the
repair and/or rebuilding of the improvements of the leased premises
for a period of two (2) years after payment of such proceeds, pro-
vided, however, that if Tenant shall be unable to complete such
repairs or rebuilding by reason of strikes, accidents, governmental
restrictions or priority or any other reason beyond its reasonable
control such two (2) year period shall be extended by the period
of such inability.  As soon as the parties hereto know whether
there is an excess of such proceeds over the cost of such repair
and rebuilding -- and for this purpose all proceeds of insurance
not used for repair or rebuilding after payment thereof as here-
inabove provided shall be deemed to constitute proceeds in excess
of the cost of repair and rebuilding -- they shall agree on the
equitable apportionment of such excess between themselves, and
also upon what reduction, if any, should equitably be made as a

-13-

result of such apportionment in the rentals thereafter payable by Tenant hereunder during the term or any extension hereof.

If Landlord and Tenant are unable, within thirty (30) days after they know the amount of the excess of such proceeds, to agree upon what equitable apportionment thereof and upon what equitable reduction in such rentals should be made, these matters and any other adjustments which should equitably be made in this lease as a result of the apportionment shall be made by three (3) disinterested arbitrators, one of whom shall be chosen by each of the parties hereto, and the third by the two so chosen.

The party desiring arbitration, as aforesaid, shall give written notice to the other party of such desire, naming therein the arbitrator selected by it. In the event the other party shall fail, within a period of fifteen (15) days after giving of such notice, to notify the other in writing of the arbitrator selected by it, or in the event the two arbitrators chosen shall fail, within fifteen (15) days after their selection, to agree upon the third, then any court of general equity jurisdiction in the county in which the leased premises are situated shall, on request of the party not in default, or upon the request of either party if neither is in default, appoint, within fifteen (15) days after such request, an arbitrator, or arbitrators, to fill the place, or places, remaining vacant.

The decision of any two (2) of the arbitrators in conformity with the foregoing direction shall be final and conclusive upon the parties hereto. The decision of the arbitrators shall be in writing, signed in duplicate by any two (2) of said arbitrators and one copy shall be delivered to each of the parties hereto.

13. In the event the leased premises or any part thereof shall be condemned and taken for a public or a quasi-public use, then upon payment of any award or compensation arising from such condemnation there shall be such division of the proceeds, such abatement in rent payable during the term or any extension of the term hereof, and such other adjustments as the parties may agree upon as being just and equitable under all the circumstances regardless of any technical rule of law. If Landlord and Tenant are unable to agree within thirty (30) days after such an award has been paid into court upon what division, annual abatement in rent, and other adjustments are just and equitable, these matters shall be determined by three (3) disinterested arbitrators ~~who shall be chosen and act as and within the limitations provided in Clause 12 hereof~~.

14. Tenant is hereby granted the right to extend this lease for ten (10) successive terms of five (5) years each, upon giving to Landlord written notice of each such extension in writing at least six (6) months prior to the expiration of the stated term of this lease, or the prior expiration of the term hereof under the provisions of Clause 6, or of this lease as theretofore extended, as the case may be. Such extensions shall be at a monthly rental of Four Hundred Three and 35/100 ($403.35) Dollars, plus 1/12th of 1% of the amount for which Tenant shall have been reimbursed under the provisions of Clause 7 hereof, said extension to be otherwise upon the terms and provisions herein contained, subject to any adjustments which may be or have been made under Clauses 12 and 13 hereof.

15. Provided Tenant performs all its covenants, agreements and obligations hereunder, Landlord covenants that Landlord will warrant and defend Tenant in the peaceful and quiet enjoyment of the leased premises against the lawful claims of all persons claiming by, through or under Landlord.

16. If Tenant at any time during the term of this lease (and regardless of the pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings, in law, in equity, or before any administrative tribunal, which have or might have the effect of preventing Tenant from complying with the terms of this lease) shall default (a) in the payment of any installments of rent or other sum herein specified to be paid by Tenant, or (b) in the observance or performance of any of Tenant's covenants, agreements or obligations hereunder, and if such default shall not be cured as to (a) within thirty (30) days after such default, or as to (b) within sixty (60) days after Landlord shall have given to Tenant written notice specifying such default or defaults, or if Tenant, finally and without further possibility of appeal or review:

(a) is adjudicated a bankrupt or insolvent, or

(b) has a receiver appointed for all or substanti-
ally all of its business or assets on the ground of
Tenant's insolvency, or

(c) has a Trustee appointed for it after a petition
has been filed for Tenant's reorganization under the
Bankruptcy Act of the United States known as the
Chandler Act or any future law of the United States
having the same general purpose,

or if Tenant shall make an assignment for the benefit of its creditors, then in any such event Landlord shall have the right at its election at any time thereafter while such default or defaults continue, to re-enter and take complete and peaceable possession of the leased premises and any and all improvements then forming part of the realty, title and interest of Tenant hereunder shall be deemed forfeited, and shall be of no further force and effect. And in such event Landlord shall have the right to sue for and recover all rents and other sums accrued up to the time of such forfeiture, including damages arising out of any breach on the part of Tenant. Landlord shall also have the right without re-entering said premises or forfeiture of this lease to sue for and recover all rents and other sums including damages, at any time and from time to time accruing hereunder.

Except where contrary to any provision of this lease, no right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each right or remedy given hereunder is in addition to any now or hereafter existing at law or in equity or by statute.

17. Except to the extent that Landlord may have otherwise agreed in writing, no waiver by Landlord of any breach by Tenant of any of its obligations, agreements or covenants hereunder shall be deemed to be a waiver of any subsequent breach of the same or any other covenant, agreement or obligation. Nor shall any forbearance by Landlord to seek a remedy for any breach by Tenant be deemed a waiver by Landlord of its rights or remedies with respect to such breach.

18. As part of the consideration for this lease it is understood and agreed by the parties hereto that during the term of this lease no right, title, interest, estate or obligation of Tenant under this lease shall be assigned or transferred to any person, firm or corporation whatsoever, and this lease is hereby declared to be non-assignable during said period. However, Tenant shall have the right, during said period, to sublet the leased premises, or any part thereof, for any period or periods which will expire prior to the expiration of the term of this lease, for any lawful purpose; but Tenant shall remain liable for the payment of rent and for the performance of all of the covenants herein contained to be performed by Tenant.

19. Each installment of rent herein provided to be paid by Tenant to Landlord shall be paid by check, draft or like instrument, payable to the order of Landlord, or of such person, firm or corporation as Landlord shall designate to receive such payment from time to time during the term of this lease.

20. Any notice herein required or permitted to be given shall be deemed given if and when mailed in a sealed wrapper, by United States registered mail, postage prepaid, return receipt requested, properly addressed to the party to whom such notice is given. Any notice herein required or permitted to be given by Tenant to Landlord shall be deemed given if and when mailed to Landlord and addressed (until changed as hereinafter provided) as follows:

Connecticut General Life Insurance Company,
Hartford, Connecticut,

-18-

and notices to the Tenant shall be addressed as follows:

> Sears, Roebuck and Co.
> 2650 East Olympic Boulevard
> Los Angeles, California
>
> Attention:  Vice-President.

Each party shall have the right to specify as its proper address any other address in the United States of America by giving to the other party at least fifteen (15) days' prior written notice thereof.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and affixed their seals, the day and year first above written, the corporate party by its proper officers duly authorized thereunto.

CONNECTICUT GENERAL LIFE INSURANCE CO

By _E. C. Henderson_

E. C. Henderson, Vice President and Actuary

ATTEST:

_O. P. Scheller_

Assistant Secretary
O. P. Scheller

SEARS, ROEBUCK AND CO.

_President_

President

ATTEST:

_Secretary_

Secretary

STATE OF CONNECTICUT    )
                        )  SS.
COUNTY OF HARTFORD      )

    BE IT REMEMBERED, That on this 3rd day of __April__,
1947, before me, a Notary Public in and for said County in the
State aforesaid, personally appeared __E. C. Henderson__, who
being by me duly sworn on his oath says that he is the Vice
President of CONNECTICUT GENERAL LIFE INSURANCE COMPANY, the Land-
lord named in the foregoing instrument; that he well knows the
corporate seal of said corporation; that the seal affixed to said
instrument is the corporate seal of said corporation; that the said
seal was so affixed and said instrument signed and delivered by
__O. P. Scheller__, who was at the date thereof the Assistant
Secretary of said corporation and at the same time acknowledged
that he signed, sealed and delivered the same as his voluntary act
and deed, and as the voluntary act and deed of said corporation,
by virtue of authority from the Board of Directors.

                                            _Paul E Huntington_
                                            Notary Public
                                      Paul E. Huntington

My commission expires April 1, 1952


STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF COOK       )

    BE IT REMEMBERED, That on this 3d day of __April__,
1947, before me, a Notary Public in and for said County in the
State aforesaid, personally appeared _F B McConnell_, who being
by me duly sworn on his oath says that he is the _President_
of SEARS, ROEBUCK AND CO., a New York corporation, the Tenant
named in the foregoing instrument; that he well knows the corporate
seal of said corporation; that the seal affixed to said instrument
is the corporate seal of said corporation; that the said seal was
so affixed and said instrument signed and delivered by _C. E. Humm_
who was at the date thereof the _____ Secretary of said
corporation and at the same time acknowledged that he signed,
sealed and delivered the same as his voluntary act and deed, and
as the voluntary act and deed of said corporation, by virtue of
authority from its Board of Directors.

                                            Notary Public

## FIRST AGREEMENT SUPPLEMENTING LEASE

THIS AGREEMENT made and entered into this *5th* day of *April*, 1949, by and between CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a Connecticut corporation, (hereinafter sometimes called "Landlord"), Party of the First Part, and SEARS, ROEBUCK AND CO., a New York corporation, (hereinafter sometimes called "Tenant"), Party of the Second Part;

## W I T N E S S E T H :

That the parties hereto do mutually agree as follows:

1. The lease herein referred to is that certain lease executed by Connecticut General Life Insurance Company, a Connecticut corporation, as Landlord, and Sears, Roebuck and Co., a New York corporation, as Tenant, on the 3rd day of April, 1947, wherein Landlord leased to Tenant certain premises located in the City of Vernon, County of Los Angeles, and State of California, as more particularly described in said lease.

2. For and in consideration of the payment by Landlord to Tenant of the sum of Seven Hundred and Sixty Thousand Dollars ($760,000.00) on April 1st, 1949, said sum being paid to Tenant to reimburse it for additions erected to the warehouse building on the demised premises, on April 1st, 1949, Section 1 of said lease shall be void and of no effect, and in lieu thereof the following provision shall be substituted:

> 1. Tenant agrees to pay as rent for said demised premises, commencing on April 1st, 1949, and for the remainder of the term of said lease

1.

the sum of Sixty-three Thousand Five Hundred and
Sixty-three and 88/100 Dollars ($63,563.88) per
annum payable in monthly installments of Five
Thousand Two Hundred and Ninety-Six and 99/100
Dollars ($5,296.99) each, in advance, on the first
day of each month during said term.  On all install-
ments of rent overdue more than ten (10) days,
Tenant shall pay Landlord, on demand, interest at
the rate of six per cent (6%) per annum.

3.  In line 21 of page 7 of the said lease, the word
"Landlord" shall be deleted and in lieu thereof the word "Tenant"
shall be substituted.

4.  All of that portion of Section 7 beginning
"Tenant is hereby expressly granted" on line 17, page 9, running
through, and including, the bottom line of page 10, shall be void
and of no effect.

5.  Except as herein modified and amended, each and
every covenant, warranty, condition and agreement of said lease shall
apply with full force and effect during the term hereof to the premises
demised by said lease.

IN WITNESS WHEREOF, the parties hereto have hereunto
set their hands and seals the day and year first above written.

ATTEST:

_P. L. Garms_
Assistant Secretary

CONNECTICUT GENERAL LIFE
INSURANCE CO.

BY _____
Vice President

as Landlord

LEGAL
APPROVAL
76 L-PC

ATTEST:

SEARS, ROEBUCK AND CO.

STATE OF CONNECTICUT )
                     ) SS.
COUNTY OF HARTFORD )

On this *16th* day of *March* 1949, before me,
a Notary Public in and for said County and State, personally
appeared I. G. Bjork known to me to be the Vice President and
R. L. Garvan known to me to be the Assistant Secretary of
CONNECTICUT GENERAL LIFE INSURANCE COMPANY, the corporation
that executed the within instrument, known to me to be the
persons who executed the within instrument on behalf of the
corporation therein named, and acknowledged to me that such
corporation executed the same.

WITNESS my hand and official seal.

*Paul E. Huntington*
Notary Public in and for said
County and State.

STATE OF *California*
COUNTY OF *Los Angeles* )SS.

On this *5th* day of *April* 1949, before me,
a Notary Public in and for said County and State, personally
appeared *A. T. Cushman*
known to me to be the Vice President, and *R. G. Curry*
known to me to be the Assistant Secretary
of SEARS, ROEBUCK AND CO., the corporation that executed the
within instrument, known to me to be the persons who executed
the within instrument on behalf of the corporation therein
named, and acknowledged to me that such corporation executed
the same.

WITNESS my hand and official seal.

Notary Public in and for said
County and State.

My Commission Expires August 26, 1949

SECOND AGREEMENT SUPPLEMENTING LEASE

This Second Agreement Supplementing Lease is hereby executed this 27th day of May, 1983, by and between 5525 S. SOTO ST. ASSOCIATES, a New York partnership, as "Landlord", and SEARS, ROEBUCK AND CO., a New York corporation, as "Tenant".

1.   The lease herein referenced is that certain Indenture of Lease dated April 3, 1947, as amended by that certain First Agreement Supplementing Lease dated April 5, 1949, and that certain Amendment to Indenture of Lease dated in January, 1950, all executed by and between Connecticut General Life Insurance Company, Landlord's predecessor in interest, and Tenant herein, pertaining to property more particularly described therein and hereinafter collectively referred to as the "Lease".

2.   The parties hereby warrant and covenant that they have the authority to enter into this Second Agreement Supplementing Lease.

3.   It is hereby agreed that the Lease was properly and effectively extended for the first option period of April 1, 1982 thorugh March 31, 1987, and that all of the remaining nine (9) five-year option periods provided for in the Lease remain subject to exercise by Tenant upon notice to Landlord of

1

Tenant's intention to extend within the time period required by
the Lease.

4.    Commencing April 1, 1982 and continuing for the
five (5) year period from April 1, 1982 through March 31, 1987,
Tenant shall pay as rent for the property the sum of One Hundred
Fifty Thousand Dollars ($150,000.00) per annum, in equal monthly
installments of Twelve Thousand Five Hundred Dollars ($12,500.00).

5.    The annual rent shall be increased by Eighteen
Thousand Seven Hundred Fifty Dollars ($18,750.00) over the then
existing rent, at the commencement of each succeeding five (5)
year option period exercised by Tenant, such annual rent payable
in equal monthly installments.    The rent determined by such
increase shall remain at the increased level throughout the
entire five (5) year option period.

6.    At any time during the present option period or
any subsequent option period, Tenant shall have the right to
terminate the Lease as hereby amended, upon giving Landlord at
least twelve (12) months prior written notice.

7.    Section 16 of the Indenture of Lease is hereby
amended to require that Tenant shall be in default with respect
to Tenant's obligation to pay rent only if Tenant shall fail to
make such payment within thirty (30) days after written notice

2

from Landlord specifying the nature and extent of such non-payment. Tenant shall not be default with respect to any obligation of Tenant other than the payment of rent if Tenant shall commence to cure such default within thirty (30) days after Tenant receives notice from Landlord specifying the nature of default and thereafter fails to diligently pursue such cure to completion.

8.    Section 20 of the Indenture of Lease is hereby amended to delete the address set forth for Landlord and insert in place thereof the following:

    5525 S. Soto St. Associates
    c/o I. Reiss & Son
    60 East 42nd Street, Room ~~2325~~ /940
    New York, NY   10165

and to delete the address set forth therein for Tenant and insert in place thereof the following:

    Sears, Roebuck and Co.
    900 South Fremont Avenue
    Alhambra, CA   91802
    Attn:   Territorial Facilities
            Planning Manager

with a copy to:

    Sears, Roebuck and Co.
    900 South Fremont Avenue
    Alhambra, CA   91802
    Attn:   Territorial Real
            Property Attorney

9.    Within thirty (30) days of the execution hereof by both parties, Tenant shall pay to Landlord the sum of One Hundred Eighty-seven Thousand Five Hundred Dollars which is the rent due for the period from April 1, 1982 to June 30, 1983.

3

10.    Except as herein modified and amended, each and
every covenant, warranty, condition, and agreement of said Lease
thereto shall apply with full force and effect to the leased
premises during the term herein.

IN WITNESS WHEREOF, the parties hereto have hereunto
set their hands the day and year first above-written.

SEARS, ROEBUCK AND CO.                    5525 S. SOTO ST. ASSOCIATES

By_____                By_____
J. E. Duggan                                Arthur Reiss
Territorial Facilities
Planning Manager

        as Tenant                          By_____
                                            Marvin M. Reiss

                                               as Landlord

                786 W
                5-31-83

4

**<u>Exhibit B</u>**

**Warehouse Sublease**

## SUBLEASE

(Vernon, CA S#68738)

THIS SUBLEASE ("Sublease") is made and entered into as of this 21st day of December, 2017 (the "Effective Date"), by and between SEARS, ROEBUCK AND CO., a New York corporation ("Sublandlord") and Mr. Henry Shahery, an individual as subtenant ("Subtenant"), and Shason, Inc. a California corporation as guarantor ("Guarantor").

## RECITALS:

A.    Sublandlord is the lessee of the Premises pursuant to the Master Lease.

B.    Subtenant desires to sublease from Sublandlord and Sublandlord desires to sublease to Subtenant the Premises pursuant to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the Premises, the rents reserved herein and the mutual benefits to be derived, the parties hereby agree as follows:

**1.     Incorporation of Recitals, Definitions and Basic Terms.**

The foregoing recitals are hereby incorporated as if fully rewritten and set forth at length herein. The following terms and basic provisions shall control.

Base Year:    Calendar year 2017.

Commencement Date: The date which is five (5) business days following the date on which Sublandlord provides notice to Subtenant (which notice may be via phone call or electronic mail) that the Sublandlord's Work (other than Roofing Work (as hereinafter defined) is substantially complete, but in no event earlier than March 1, 2018.

Construction Escrow:  That certain construction escrow by and among Subtenant, Sublandlord and Chicago Title Insurance Company (as escrowee), the terms of which are acceptable to Sublandlord and which govern the dispersal of the Escrowed Funds from time to time to Sublandlord's Contractor or to Sublandlord to reimburse it for amounts paid for Sublandlord's Work as Sublandlord's Work is completed.  Sublandlord and/or Sublandlord's Contractor shall provide applicable waivers of lien rights from Sublandlord's Contractor for the amounts paid for Sublandlord's Work as such amounts are received by Sublandlord's Contractor.  The term of the Construction Escrow shall terminate at the earlier of (i) all of the funds held thereunder being disbursed in full or (ii) the expiration of the Term of this Sublease.  Subject to Subtenant's rights in Section 10 hereof to use Excess Funds and Enclosure Funds for the Enclosure Work, any Escrowed Funds not used or reserved for the Sublandlord's Work shall be retained in the Construction Escrow and may be applied by Sublandlord from time to time throughout the Term as reimbursement for Sublandlord's obligations set forth in Section 12.  The funds deposited into the Construction Escrow shall remain the property of Subtenant until the Sublease is fully executed by all parties.  This provision shall be part of the Construction Escrow terms.

Cross Sublease: That certain Sublease between Innovel Solutions, Inc., a Delaware corporation and Subtenant for that certain 2.33 acre parcel located adjacent to the smaller building on the Premises.

**Enclosure:** The 90,000 square foot structure to be erected and constructed by and through the Enclosure Work.

**Enclosure Work:** All work that is required to fully enclose the 90,000 square foot covered area of the Premises in compliance with the City of Vernon's requirements for use and occupancy thereof as a warehouse, including obtaining a certificate of occupancy for such Enclosure from the City of Vernon. Enclosure work may include any and all improvements required by the City of Vernon and other improvements generally found in a commercial warehouse, including without limitation, electrical, plumbing, doors and compliance with the American With Disabilities Act; provided that in no case shall Enclosure Work include items generally classified as tenant improvements such as furniture, shelving, equipment, fixtures, offices and similar items. Enclosure Work to be performed by Subtenant, at Subtenant's sole cost and expense (subject to Section 10 hereof) under a contract between Subtenant and Sublandlord's Contractor.

**Escrowed Funds:** The initial amount of One Million Two Hundred Thousand and No/100 US Dollars ($1,200,000.00) placed into the Construction Escrow by Subtenant on or before the Effective Date (subject to increase as set forth in Section 10 and further subject to recovery as set forth in Section 10).

**Sublandlord's Work:** The repairs and maintenance to the Premises set forth on Exhibit B attached hereto and made a part hereof, which shall be substantially completed by Sublandlord prior to the Commencement Date subject to Landlord receiving reimbursement from the Construction Escrow for all of the costs thereof.

**Master Landlord:** 5525 S. Soto St. Associates, a New York partnership as successor in interest to Connecticut General Life Insurance Company.

**Master Lease:** That certain Indenture of Lease dated April 3, 1947 with Master Landlord, as amended by First Amendment Supplementing Lease dated April 5, 1949 and as amended by Second Agreement Supplementing Lease dated May 27, 1983 ("Second Amendment"), as amended from time to time.

**Operating Expenses:** Real estate taxes and the Sublandlord's costs to carry the property/casualty insurance with respect to the Premises set forth herein. To the extent that Sublandlord elects to self-insure the property/casualty insurance, Sublandlord shall be deemed to have incurred an expense for such insurance at commercially reasonable market rates which amount shall be included in Operating Expenses. The Operating Expenses the Base Year are estimated to be $364,079.00. Sublandlord will provide the actual Operating Expenses for the Base Year prior to the Commencement Date.

**Premises:** Those certain premises generally outlined on the site plan attached hereto as Exhibit A-1 and more particularly identified on Exhibit A-2 attached hereto which contain an approximate 416,580 square foot warehouse and an approximate 90,000 square foot covered area.

**Security Deposit:** $160,000.00, on the terms and conditions set forth in Section 38 of this Sublease. Security Deposit to be increased to $350,000 at the commencement of the first Option Term.

**Sublandlord's Contractor:** J S Construction.

**Term:** Commencing on the Commencement Date and terminating on January 31, 2022, subject to extension as set forth herein.

**2.     Premises**

Subject to all of the terms and conditions of the Master Lease, including, without limitation, the extension, expiration, rejection or earlier termination provisions thereof, and subject to the terms and conditions hereof, Sublandlord hereby subleases and demises to Subtenant and Subtenant hereby subleases and takes from Sublandlord the Premises for the Term and Subtenant hereby accepts from Sublandlord the Premises, subject to the Master Lease, the covenants, terms, provisions and conditions of this Sublease and all covenants, conditions, restrictions, easements and documents of record recorded against and/or pertaining to the Property.

Provided that Subtenant has delivered the Security Deposit to Sublandlord and has deposited the Escrowed Funds into the Construction Escrow and has delivered evidence of the insurance required by Subtenant hereunder, Subtenant shall have the right to access the Premises prior to the Commencement Date solely for the purpose of measuring and inspecting the Premises for budgeting purposes (and specifically excluding any installation of any property, equipment or fixtures)  and provided further that Subtenant does not interfere with any other work being done in the Premises.

**3.     Use**

Subtenant shall use the Premises solely for warehousing and distribution facility, truck delivery, fulfillment with supporting office areas ("Permitted Use") and for no other purpose or business, except by and with the written consent of Sublandlord which may not be unreasonably withheld.  Subtenant shall not use the Premises for any unlawful purpose, and will conform to and obey all present and future laws, ordinances, rules and regulations of the United States, the City of Vernon, State of California, and subdivisions and agencies thereof, respecting the Premises and the use and occupancy thereof.

**4.     Condition of the Premises**

a.     With the exception of Sublandlord's Work, Subtenant has inspected the Premises and accepts the Premises in its "AS IS" "WHERE IS" "WITH ALL FAULTS" condition.  Subtenant acknowledges that its decision to enter into this Sublease, and to use and occupy the Premises, was based on its own knowledge and analysis and not on any representations by Sublandlord, and Subtenant hereby waives any and all claims against Sublandlord in connection therewith.  Pursuant to Civil Code section 1938, Sublandlord states that, as of the Effective Date, the Premises has not undergone inspection by a "Certified Access Specialist" to determine whether or not the Premises meet all applicable construction-related accessibility standards under California Civil Code Section 55.53.

**5.     Term**

The term "Sublease Year" as used in this Sublease shall mean each consecutive twelve (12) calendar month period, during the Term with the first Sublease Year commencing on the Commencement Date.  If the Commencement Date falls on a date other than the first of a month then the first Sublease Year shall also include the remainder of the month in which the Commencement Date occurs together with the subsequent 12-month period.    If the Term or any Sublease Year consists of less than twelve (12) full months, then any charges or payments due from Subtenant hereunder shall be prorated accordingly.

**6.     Option of Subtenant to Renew**

Sublandlord grants to Subtenant two (2) additional five (5) year options to extend the Term (each an "Option Term" and collectively the "Option Terms"), which shall be exercisable on written notice by Subtenant to Sublandlord no later than (i) for the first Option Term,  January 31, 2021 and (ii) for the

3

second Option Term, January 31, 2026, provided, however, that Subtenant shall not be in default at the time of any such option exercise or at any time after the exercise and prior to the applicable Option Term. Failure by Subtenant to exercise such option shall result in Subtenant waiving its rights to extend the Term of this Sublease. Subtenant acknowledges and agrees that Subtenant's right to exercise any option shall be subject to Sublandlord's decision (which shall be made in Sublandlord's sole and unfettered discretion) to extend the term of the Master Lease; in no event shall Sublandlord have the obligation to exercise any option it may have to extend the term of the Master Lease, and Subtenant hereby waives all claims with respect thereto. If exercised, all references in this Sublease to the word "Term" shall mean and include any applicable Option Term as the context and circumstances require unless otherwise specifically stated to the contrary.

7.    **Rent**

a)    Rent Defined. All monetary obligations of Subtenant to Sublandlord under the terms of this Sublease are deemed to be rent ("Rent").

b)    Payment. Subtenant shall cause payment of Rent to be received by Sublandlord in lawful money in United States currency, payable in advance on the first day of each month of the Term, subject to offset as provided below. Rent shall be paid to Sublandlord at 12670 Collections Center Drive, Chicago, Illinois 60693 or to such other payee or at such other address as Sublandlord shall direct by written notice to Subtenant. Acceptance of a payment which is less than the amount then due shall not be a waiver of Sublandlord's rights to the balance of such Rent, regardless of Sublandlord's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Subtenant to Sublandlord is dishonored for any reason, Subtenant agrees to pay to Sublandlord the sum of $300.00 in addition to interest at the Default Rate (as hereinafter defined) on the past due amount from the date such amount was due and owing until the date same is paid to Sublandlord. An administrative charge of five percent (5%) of the monthly payment of Rent shall be due for any payments not received by Sublandlord by the fifth (5th) day after Sublandlord gives written notice to Subtenant that Sublandlord did not receive such Rent payment, provided such notice shall only be required one (1) time in any calendar year and any late payment after the second late payment shall not require a notice as a condition to Subtenant being obligated to pay the late fee, administrative fee and interest. The term "Default Rate" as used herein shall mean the annual rate of interest most recently published as the "Prime Rate" in the Money Rates section of The Wall Street Journal, plus four percent (4%), but in any event, not more than the maximum rate of interest permitted by applicable law in the State of California.

c)    Base Rent. Base rent ("Base Rent") shall begin to accrue from, and shall be due to Sublandlord on the Commencement Date. Subtenant agrees to pay Base Rent under the following schedule:

| LEASE MONTHS | MONTHLY BASE RENT* | TOTAL BASE RENT |
|---|---|---|
| First Sublease Year | $156,000.00 | $1,872,000.00 |
| Second Sublease Year | $160,650.00 | $1,927,800.00 |
| Third Sublease Year | $165,440.00 | $1,985,280.00 |
| Fourth Sublease Year | $170,373.00 | $2,044,476.00 |
| Fifth Sublease Year (partial) | $175,454.00 | $TBD |

| Option Period | As set forth in 7(e) below |
|---|---|

\* subject to Section 10 below.

or a proportionate amount on a per diem basis during partial months or nonpayment during free rent periods, in advance, on the first day of each month.

d)    <u>Security Deposit</u>. Sublandlord shall provide Subtenant with a copy of its Tax Form W-9. Simultaneously with the execution of this Sublease and as a condition to the effectiveness of this Sublease, Subtenant shall pay to Sublandlord the Security Deposit.

e)    <u>Option Term Base Rent</u>. The Option Terms, if exercised by Subtenant in accordance with the terms and conditions of this Sublease, shall be upon the same terms and conditions contained in the Sublease except that annual Base Rent which shall be payable during each applicable Option Term shall be 105% of the most current Base Rent for the first year of such Option Term and thereafter the Base Rent shall increase by three percent (3%) per year on each January 31 throughout such Option Term.

f)    <u>Sales and other Taxes</u>. If during the Term (or the Option Terms, if any) of this Sublease, any privilege, sales, gross income or other tax (not including income tax) imposed by a governmental or public authority having jurisdiction thereof upon the Rent herein provided to be paid by Subtenant, or upon Sublandlord in an amount measured by the rent received by Sublandlord, shall be paid by Subtenant, in addition to the amounts set forth herein. This provision specifically excludes the existing City of Vernon Parcel Tax which are part of the Base Year Operating Expenses.

g)    <u>No Offset</u>. Notwithstanding anything herein contained to the contrary, with the exception of Section 10, Subtenant shall pay Rent and all other sums due hereunder and Subtenant shall perform all of its obligations under this Sublease at its cost and when due or required without deduction or offset whatsoever.

**8.    Personal Property Taxes; Increase Operating Expenses**

Subtenant shall pay all taxes and assessments of every nature, kind and description, levied and assessed against Subtenant's fixtures, equipment, merchandise and goods stored in or about the Premises and also general license and franchise taxes, if any, and any other fee or charges imposed on the property of Subtenant, whether directly or indirectly related to Subtenant's use and occupancy of the Premises, including but not limited to, any use, occupancy, margin, rental, parking or other taxes. Subtenant shall file any returns concerning such taxes which are required by governmental authority.

In addition to Base Rent, Subtenant shall pay to Sublandlord within ten (10) days after being invoiced by Sublandlord all Operating Expenses incurred by Sublandlord in any Sublease Year which are in excess of the Operating Expenses for the Base Year ("Increased Operating Expenses"). Sublandlord shall have the right to estimate such Increased Operating Expenses and charge Subtenant monthly with 1/12 of the such estimated amount.

**9.    Utilities**

Subtenant agrees to make all arrangements for, and to pay directly all costs of, utility services supplied to the Premises, including but not limited to, water, gas, heat, light, power, telephone, and sewer. In the event it is not possible for Subtenant to obtain separate utility and/or other services, or if Sublandlord, in its sole discretion, elects to provide any such utility and/or other services to Subtenant, such utility and/or other services may, at Sublandlord's discretion, be obtained in Sublandlord's name,

and Subtenant will pay Sublandlord the cost of any utility services provided by Sublandlord either: (a) by a separate charge payable by Subtenant to Sublandlord; or (b) by a separate charge billed by the applicable utility company and payable directly by Subtenant. Sublandlord reserves the right to separately meter any such service at any time during the Term. If Subtenant is billed directly by a public utility with respect to Subtenant's electrical usage at the Premises, then, upon request, Subtenant shall provide monthly electrical utility usage for the Premises to Sublandlord for the period of time requested by Sublandlord (in electronic or paper format) or, at Sublandlord's option, provide any written authorization or other documentation required for Sublandlord to request information regarding Subtenant's electricity usage with respect to the Premises directly from the applicable utility company.

Sublandlord will not be liable or deemed in default, nor will there be any abatement of rent, breach of any covenant of quiet enjoyment, partial or constructive eviction or right to terminate this Sublease, for (a) any interruption or reduction of utilities, utility services or telecommunication services, (b) any telecommunications or other company (whether selected by Sublandlord or Subtenant) failing to provide such utilities or services or providing the same defectively, and/or (c) any utility interruption in the nature of blackouts, brownouts, rolling interruptions, hurricanes, tropical storms or other natural disasters. Notwithstanding the foregoing, if (1) the Premises, or a material portion of the Premises, are made untenantable for a period in excess of 5 consecutive business days after written notice to Sublandlord and materially and adversely affects Subtenant's ability to conduct business in the Premises and Subtenant ceases doing business in the Premises (or a material portion thereof) and (2) such interruption or termination was caused solely by the Sublandlord's gross negligence or willful misconduct and (3) such interruption or termination of services is otherwise reasonably within the control of Sublandlord to correct (a "Service Failure"), then Subtenant, as its sole remedy, shall be entitled to receive an abatement of the Base Rent payable hereunder during the period beginning on the 6th consecutive business day after written notice to Sublandlord and ending on the day the interrupted service has been restored. If the entire Premises have not been rendered untenantable by the Service Failure, the amount of abatement shall be equitably prorated. Subtenant agrees to comply with any energy conservation programs required by law or reasonably implemented by Sublandlord. Sublandlord reserves the right, in its sole discretion, to designate, at any time, the utility and service providers for Subtenant's use within the Property, provided that that the rates charged by such utility and service providers are reasonably competitive; no such designation shall impose liability upon Sublandlord. Subtenant has satisfied itself as to the adequacy of any Sublandlord owned utility equipment and the quantity of telephone lines and other service connections to the "Building's Point of Demarcation" available for Subtenant's use.

Subtenant shall, at its own cost and expense, enter into a regularly scheduled preventive maintenance/service contract with a maintenance contractor approved by Sublandlord for servicing all heating and air conditioning systems and equipment serving the Premises. The service contract must include all services suggested by the equipment manufacturer in the operation/maintenance manual and must become effective within thirty (30) days following the Commencement Date. Should Subtenant fail to do so, Sublandlord may, upon notice to Subtenant, enter into such service contract on behalf of Subtenant or perform the work and, in either case, charge Subtenant the cost thereof along with a reasonable amount for Sublandlord's overhead.

10. **Construction Escrow.**

a)      No later than two (2) business days after the Sublandlord informs the Subtenant that subject to confirmation of receipt of the Escrowed Funds in the Construction Escrow, Sublandlord is prepared to execute this Sublease, the Subtenant shall (1) execute and deliver to the Sublandlord the construction escrow agreement for the Construction Escrow and (2) deposit the Escrowed Funds into the Construction Escrow in immediately available funds. The escrow agreement for the Construction Escrow

shall provide that if Sublandlord does not execute and deliver this Sublease to Subtenant (which shall be evidenced by provided a copy of the transmittal thereof to Subtenant, which can be by email, to the escrowee) within five (5) business days after Sublandlord's confirmation from the escrowee that escrowee has received the Escrowed Funds, Subtenant shall have the right to a return of the Escrowed Funds upon notice to escrowee given prior to Subtenant's receipt of this Sublease signed by Sublandlord. Subtenant's failure to make the foregoing deposit shall entitle Sublandlord to revoke any and all prior agreements and/or discussions regarding this Sublease and to be able to enter into one or more subleases with other parties for the Premises. The Construction Escrow shall provide that Sublandlord shall have the right to disbursements thereunder to pay for and/or reimburse Sublandlord for Sublandlord's Work as and when such Sublandlord's Work, or portions thereof are completed. No consent or approval from Subtenant shall be required for such disbursements to Sublandlord. Notwithstanding anything else herein or in Exhibit B to the contrary, Subtenant acknowledges and agrees that the $150,000.00 allocated in Sublandlord's Work for roofing repair and/or maintenance ("**Roofing Work**") may be held in the Construction Escrow and used by Sublandlord if and when Landlord performs such Roofing Work, even if such Roofing Work is to be completed pursuant to Section 12 hereof.

b)    In the event the cost of Sublandlord's Work, including without limitation the amounts reserved for Roofing Work, exceeds $1,200,000.00, then within 2 business days following request by Sublandlord, Subtenant shall place into the Construction Escrow such additional amounts as are necessary to complete Sublandlord's Work (such additional funds, the "**Actual Overage**") and such additional funds shall be deemed to be Escrowed Funds. Upon deposit of such Actual Overage, provided that there is no Default by Subtenant hereunder, Subtenant shall have the right to recoup such Actual Overage by an offset from the monthly Base Rent due hereunder. If any funds remain in the initial Escrowed Funds of $1,200,000.00 after the later of (i) the disbursement to Sublandlord and/or Sublandlord's Contractor of all amounts required to pay in full the costs of Sublandlord's Work (except the Escrowed Funds held for Roofing Work); (ii) the Commencement Date or (ii) the date that the Landlord is satisfied that all requirements of the City of Vernon for occupancy of the Premises by Subtenant have been fulfilled ("**Final Completion Date**"), such funds (not including the Escrowed Funds held for Roofing Work) shall be referred to as "**Excess Funds**".

c)    Provided that (i) Subtenant commences the Enclosure Work not later than sixty (60) days after the Final Completion Date; (ii) Subtenant completes such Enclosure Work on or before one (1) year after the Commencement Date; (iii) Subtenant fulfills all of the requirements in Section 15 hereof for such Enclosure Work; and (iv) there is no Default hereunder (the foregoing subparts (i) through and including (iv) being referred to here as the "**Conditions**"), Subtenant shall have the right to use such Excess Funds to pay for the completion of the Enclosure Work. The Construction Escrow Agreement shall provide for the release of Excess funds in like manner as Escrowed Funds upon payment demand by Sublandlord's Contractor. Notwithstanding anything else herein to the contrary, in no event shall Subtenant have the right to recoup by an offset and/or abatement of monthly Base Rent any Excess Funds paid to and/or used by Subtenant.

d)    In the event that there are no Excess Funds and/or the Excess Funds are not sufficient to complete the Enclosure Work, the Subtenant shall deposit into the Construction Escrow funds which when added to any Excess Funds are sufficient to pay for the Enclosure Work (such additional deposited funds being referred to as the "**Enclosure Funds**" and such Enclosure Funds together with any Excess Funds being collectively referred to herein as the "**EW Funds**"). Subject to the fulfillment of the Conditions, Subtenant shall have the right to use the EW Funds for the completion of the Enclosure Work. Provided that the Conditions are fulfilled, the Subtenant shall have the right to recoup by an offset and/or abatement from monthly Base Rent the amounts disbursed from Enclosure Funds for the payment of the Enclosure Work; provided that in no event shall monthly Base Rent be offset and/or abated in excess of a total of $300,000.00 for Enclosure Funds. Any unused Enclosure Funds shall be returned to

Subtenant upon completion of the Enclosure Work and the receipt from the Sublandlord's Contractor of a full and final mechanic's lien release for the Enclosure Work and a certificate of occupancy for the Enclosure from the City of Vernon. To the extent that the cost of the Enclosure Work exceeds $300,000, Subtenant shall pay such additional cost directly to Sublandlord's Contractor and it shall not be recoverable as rent under Section 10 hereof.

For the avoidance of doubt, and notwithstanding any other provision of this Sublease to the contrary, Subtenant may recover as an offset and/or abatement of monthly Base Rent a maximum total of $300,000 for the Enclosure Funds provided by Subtenant for the completion of the Enclosure Work. Any portion of the cost of the Enclosure Work that is in excess of the EW Funds, shall be the sole responsibility of Subtenant and shall not be abated against base rent due hereunder.

## 11.    Regulations

Except for Sublandlord's Work, Subtenant, at Subtenant's expense, shall comply with all federal, state, county and municipal laws, ordinances, rules, regulations and orders, and the rules, regulations and orders of all duly constituted governmental agencies, authorities and subdivisions now in force or which may hereafter be in force, including without limitation, the Americans with Disability Act ("ADA"). Subtenant shall reimburse Sublandlord for all costs and expenses of any nature whatsoever incurred by Sublandlord in connection therewith. All licenses, permits, or inspection fees required for Subtenant's use, occupancy and operations of the Premises shall be obtained and continued by Subtenant at its own cost and expense throughout the Term of this Sublease.

In addition, Subtenant agrees to comply with all reasonable rules and regulations issued by Sublandlord governing the conduct of businesses on of about the Property so long as the same does not negatively impact the Project or Premises or Subtenant's use, occupancy and enjoyment thereof or Subtenant's rights under this Sublease.

## 12.    Repairs and Maintenance

During the Term of this Sublease, Sublandlord shall, as determined by Sublandlord in its sole but reasonable discretion, keep in good, safe, tenantable condition, sightly in appearance, and in good order and repair, (and replace as necessary) the exterior and structural portions of the Premises including the foundations, structural supports, roof structures including roof membrane and exterior walls (not including exterior entrances, doors, door frames, closure devices, window glass, window casing or moldings, window frames, windows or any of the hardware or appurtenances of said entrances, doors or window casings, window frames and windows or any attachment thereto or any loading docks), provided that any such maintenance, repair and/or replacement was not caused by the act, negligence, omission or willful misconduct of the Subtenant, its employees, agents, concessionaires, licensees, contractors or invitees.

During the Term of this Sublease, Subtenant shall, at Subtenant's expense, keep in good, safe, tenantable condition, sightly in appearance, and in good order and repair (and replace as necessary) all portions of the Premises, including, without limitation, (i) all heating, ventilating and air conditioning equipment located within the Premises; (ii) the painting and redecorating of the interior of the Premises; (iii) all water, sewer, gas, electric and other utility lines and all sprinkler systems and the fire systems, if any, and all electrical equipment; (iv) the parking lot and covered parking area, including the loading and dock areas. In addition, Subtenant shall make, at its sole cost and expense, all repairs, maintenance and replacements to the Premises as necessary to keep the Premises clean and in good order, condition and repair, (and replace as necessary) including, without limitation, repairing broken and damaged walls, fixtures and equipment in the Premises, maintaining, repairing and replacing, as necessary, the light bulbs

8

and all light fixtures in the Premises, all doors, windows, and plate glass in the Premises (including the replacement of all broken window glass in the Premises with like grade and quality), doors, interior walls and finish work of the Premises, floor coverings, downspouts, dock boards, truck doors, dock bumpers, dock levelers, service doors, alarm systems, and the above ground plumbing system and its components, including electrical and utility lines and other conduits and its components (and the sprinkler system and fire systems, if any) and the parking lot and driveways located in the Premises. In addition, Subtenant shall also, at Subtenant's expense make all repairs and replacements caused by the act, negligence, omission or willful misconduct of the Subtenant, its employees, agents, concessionaires, licensees, contractors or invitees; keep the Premises in clean condition; perform all cleaning and janitorial service (Subtenant shall carry on a regular maintenance and daily cleaning program for the Premises in order to reflect a proper public image). Subtenant will provide pest extermination for the Premises. Subtenant shall store all trash and any other refuse in proper containers and arrange for a regular weekly pick-up of such trash and any other refuse from the Premises and the truck services areas at Subtenant's expense. Such trash shall not be burned in or about the Premises. Subtenant shall, at its sole cost and expense, be responsible for any modifications, damage or upgrades to the sprinkler system required due to Subtenant's use of the Premises.

Any non-compliance by Subtenant with any of its obligations as set forth herein shall be considered a Default of this Sublease by Subtenant.

Except as otherwise provided in this Sublease, Subtenant hereby waives the right or option, if any, which may exist now or hereafter at law or in equity, or under this Sublease, or otherwise, to exercise any self-help remedies at Sublandlord's expense or to deduct or offset from Rent for any failure of Sublandlord to perform any of its maintenance, repair and replacement obligations as set forth herein.

All maintenance, alterations, repairs and replacements to be done by Sublandlord or Subtenant shall be begun and completed within a reasonable time and shall be performed in a manner which minimizes interference with the rights of the other.

**13.    Insurance**

Subtenant will not do or permit anything to be done within or about the Premises or the Building which will increase the existing rate of any insurance on any portion of the Building or cause the cancellation of any insurance policy covering any portion of the Building (including, without limitation, any liability coverage). Subtenant will, at its sole cost and expense, comply with any reasonable requirements of any insurer of Sublandlord. Subtenant agrees to maintain policies of insurance described in this Section. Sublandlord reserves the right, from time to time, to require additional coverage (including, flood insurance, if the Premises is located in a flood hazard zone), and/or to require higher amounts of coverage in the event that (i) Sublandlord reasonably determines that the amount of insurance carried by Subtenant hereunder is materially less than the amount or type of insurance coverage typically carried by tenants of the Building and owners or tenants of comparable buildings located in the geographical area in which the Premises are located which are operated for similar purposes as the Premises or (ii) if Subtenant's use of the Premises should change with or without Sublandlord's consent.

Subtenant shall maintain the following insurance ("Subtenant's Insurance"):

a)    Commercial General Liability Insurance applicable to the Premises and its appurtenances providing, on an occurrence basis, a minimum of $2,000,000.00, and not less than $5,000,000.00 in the annual aggregate, covering third-party bodily injury, property damage, personal injury and advertising injury, product/completed operations as applicable, medical expenses and contractual liability. Defense

costs will be in addition to the limit of liability. A combination of a General Liability policy and an umbrella policy or excess liability policy may be used to satisfy this limit;

b)      Property Insurance written on an All Risk or Special Cause of Loss Form at replacement cost value for property and actual loss sustained covering all of Subtenant's business and trade fixtures, equipment, movable partitions, furniture, merchandise, plate glass and other personal property within the Premises, including for which Subtenant has repair obligations and all Sublandlord's Work and Subtenant Alterations performed by or for the benefit of Subtenant, including without limitation the Enclosure Work and Enclosure. No coinsurance provision will apply;

c)      Excess Liability in the amount of $2,000,000.00 per occurrence;

d)      Workers' Compensation Insurance in amounts not less than the amounts required by Law;

e)      Employers Liability Coverage of at least $2,000,000.00 (each accident, disease – each employee, disease – policy limit);

f)      Automobile Liability coverage of not less than $1,000,000.00 combined single limit including property damage covering Subtenant's owned, and hired vehicles; and

g)      If Subtenant uses any part of the Premises or the Building to store or to perform work on vehicles, Subtenant shall maintain garage liability insurance in such form and amount as Sublandlord may require from time to time, but not less than $2,000,000.00.

Any company writing Subtenant's Insurance shall be licensed to do business in the state in which the Premises is located and shall have an A.M. Best rating of not less than A-VIII.

Subtenant will deliver to Sublandlord simultaneously with its execution of this Sublease and thereafter prior to expiration, cancellation or change in insurance, certificates acceptable to Sublandlord of insurance evidencing, at a minimum, the coverage specified in this Section. All such certificates shall be in form and substance reasonably satisfactory to Sublandlord, shall affirmatively demonstrate all coverage and requirements set forth in this Sublease, shall contain no disclaimers of coverage. Subtenant's insurance policy shall provide that the insurer will give Sublandlord notice prior to cancellation or change in any coverage; provided however, that in the event that Subtenant's insurance carrier will not provide such notice to Sublandlord, then Subtenant must provide such written notice to Sublandlord at least 30 days prior to any cancellation or change in any coverage required hereunder.

All insurance to be carried by Subtenant will be primary to, and non-contributory with, Sublandlord's insurance, and there will be no exclusion for cross-liability endorsements and will in addition to the above coverage specifically insure Sublandlord against any damage or loss that may result either directly or indirectly from any default of Subtenant under Section 18 (Environmental Compliance) herein. Any similar insurance carried by Sublandlord will be non-contributory and considered excess insurance only.

Subtenant will name Sublandlord, Sublandlord's agents, and/or any other parties designated by Sublandlord as additional insureds on all insurance policies required of Subtenant under this Sublease, other than Worker's Compensation, Employer's Liability, and Fire and Extended Coverage insuring Sublandlord and such other additional insureds regardless of any defenses the insurer may have against Subtenant and regardless of whether the subject claim is also made against Subtenant. The foregoing shall be evidenced in Subtenant's certificate of insurance.

Sublandlord will secure and maintain all-risk property and general liability insurance coverage insuring Sublandlord in such limits as Sublandlord may deem reasonable in its sole judgment to afford Sublandlord adequate protection, together with such other insurance coverage as Sublandlord, in its sole but reasonable judgment, may elect to maintain, provided that Sublandlord shall have the right to self-insure through itself or one or more affiliates. The premiums for such coverage are deemed to be an Operating Expense. Any proceeds of such insurance shall be the sole property of Sublandlord to use as Sublandlord determines. Subtenant will provide, at its own expense, all insurance as Subtenant deems adequate to protect its interests.

Sublandlord and Subtenant hereby waive and shall cause their respective insurance carriers to waive any and all rights of recovery, claims, actions or causes of action against the other for any loss or damage with respect to Subtenant's personal property, fixtures and equipment, Sublandlord's Work and any Subtenant Alterations, the Building, the Premises, or any contents thereof, including rights, claims, actions and causes of action based on negligence, which loss or damage is (or would have been, had the insurance required by this Sublease been carried) covered by insurance. For the purposes of this waiver, any deductible up to a maximum amount of $50,000 with respect to a party's insurance shall be deemed covered by and recoverable by such party under valid and collectable policies of insurance.

Whenever Subtenant shall undertake any alterations, additions or improvements in, to or about the Premises, including, without limitation, Sublandlord's Work and any Subtenant Alterations ("Work") the aforesaid insurance protection must extend to and include injuries to persons and damage to property arising in connection with such Work, without limitation including liability under any applicable structural work act, and such other insurance as Sublandlord shall reasonably require; and the policies of or certificates evidencing such insurance must be delivered to Sublandlord prior to the commencement of any such Work.

## 14. Building Systems

a)    Any security alarms and energy management systems located in the Premises on the Commencement Date and not installed by Subtenant shall remain the property of Sublandlord. Subtenant may install, maintain and monitor security alarm protection for the Premises at Subtenant's sole cost and expense.

b)    Any fire alarm system and fire suppression system, including without limitation, a fire sprinkler system located within the Premises on the Commencement Date shall remain the property of Sublandlord. Notwithstanding the foregoing, if any governmental authority requires a modification to any of the fire systems in order for Subtenant to comply with local codes pursuant to its use, occupancy and operations at the Premises under the terms and conditions of this Sublease, Subtenant shall make such a modification at Subtenant's sole cost and expense, and Subtenant shall be required to monitor and maintain any such modifications.

## 15. Alterations

The following provisions apply to "Subtenant Alterations" which means and includes (a) any alterations, additions or improvements to the Premises undertaken by or on behalf of Subtenant, (b) any utility installations at the Premises undertaken by Subtenant, and (c) any repair, restoration, replacement, or maintenance work at the Premises undertaken by or on behalf of Subtenant. Subtenant shall not commence any Subtenant Alteration without first obtaining the prior written consent of Sublandlord in each instance, which consent shall not be unreasonably withheld. Sublandlord's consent shall not be required with respect to alterations which (i) are not structural in nature, (ii) are not visible from the exterior of the Building, (iii) do not affect or require modification of the Building's electrical, mechanical, plumbing, HVAC or other systems, and (iv) in aggregate do not cost more than $25,000. In addition,

11

Sublandlord agrees not to unreasonably withhold its approval if Subtenant elects to add walls and other improvements to the structure on the Premises which is currently open-sided provided that Subtenant used Sublandlord's Contractor for such work. Subtenant shall submit such information regarding the intended Subtenant Alteration as Sublandlord may reasonably require, including without limitation, final plans, specifications and working drawings, and no request for consent shall be deemed complete until such information is so delivered. The following provisions apply to all Subtenant Alterations: (i) Subtenant shall hire a licensed general contractor approved by Sublandlord, such approval not to be unreasonably withheld, who, in turn, shall hire only licensed subcontractors; (ii) Subtenant shall obtain all required permits and deliver a copy of the same to Sublandlord. Subtenant shall install all Subtenant Alterations in strict compliance with all Laws, permits, any plans approved by Sublandlord, and all conditions to Sublandlord's approval; subject to the provisions below, unless Sublandlord elects otherwise, Subtenant shall remove each Subtenant Alteration at the end of this Sublease or Subtenant's right of possession and restore the Premises substantially to its prior condition, all at Subtenant's sole expense and Subtenant shall deliver to Sublandlord, within ten (10) days following installation of each Subtenant Alteration, (A) accurate, reproducible as-built plans (if necessary for the issuance of required permits or if reasonably deemed necessary by Sublandlord due to the nature of the work to be performed), (B) proof of final inspection and approval by all governmental authorities, (C) complete lien waivers acceptable to Sublandlord for all costs of the Subtenant Alteration, and (D) a copy of a recorded notice of completion. The parties agree that Sublandlord's approval of the general contractor to perform any Subtenant Alterations shall not be considered to be unreasonably withheld if any such general contractor (a) does not have trade references reasonably acceptable to Sublandlord, (b) does not maintain insurance as required pursuant to the terms of the Sublease, (c) does not have the ability to be bonded for the work in an amount of no less than 150% of the total estimated cost of the Subtenant Alterations, or (d) is not licensed as a contractor in the state/municipality in which the Premises is located. Subtenant acknowledges the foregoing is not intended to be an exclusive list of the reasons why Sublandlord may reasonably withhold its consent to a general contractor. Sublandlord's approval of any Subtenant Alterations and/or Sublandlord's approval or designation of any general contractor, subcontractor, supplier or other project participant will not create any liability whatsoever on the part of Sublandlord. Subtenant shall reimburse Sublandlord for any costs incurred by Sublandlord for reviewing any of Subtenant's plans for any Subtenant Alterations and any other reasonable costs incurred by Sublandlord in connection with such Subtenant Alterations. Notwithstanding anything to the contrary set forth herein, once the Sublandlord has approved the initial design and layout for the Enclosure, as long as such Enclosure Work is performed by the Sublandlord's Contractor and completed in accordance with all applicable laws, rules and regulations, any changes to such plans shall not require further consent from Sublandlord.

Subtenant shall pay all costs of Subtenant Alterations as and when due. Subtenant shall not allow any lien to be filed. Subtenant shall obtain lien waivers and third-party beneficiary agreements from all contractors, subcontractors, suppliers, and others providing equipment, labor, materials, or services, in the form reasonably required by Sublandlord. If any lien is filed, Subtenant shall within 10 days remove such lien, provide a security bond equal to one hundred fifty percent (150%) of the amount of the lien, or provide Sublandlord with insurance against the same issued by a major title insurance company or such other protection against the same as Sublandlord shall accept in its sole discretion. In addition, if any such lien is filed and Subtenant fails to remove such lien within 10 days, or provide a security bond equal to one hundred fifty percent (150%) of the amount of the lien or provide Sublandlord with insurance against the same issued by a major title insurance company or such other protection against the same as Sublandlord shall accept in is sole discretion, then, without waiver of any other right or remedy, Sublandlord shall have the right to cause such lien to be removed by any means allowed by Law. All sums expended by Sublandlord in connection with such lien and/or its removal, including attorney fees, shall be immediately due from Subtenant to Sublandlord, together with interest at the Default Rate or the highest per annum rate of interest permitted from time to time under applicable Law (whichever is less).

All Subtenant Alterations affixed to the Premises are part of the realty and belong to Sublandlord. Subtenant shall be solely responsible for all taxes applicable to any Subtenant Alterations and to insure all Subtenant Alterations. Notwithstanding anything else to the contrary set forth herein, Sublandlord may require that Subtenant remove all, or any part of the Subtenant Alterations at its sole cost and expense and repair any damage caused by such removal. If Subtenant fails to perform its obligations in a timely manner, Sublandlord may perform such work at Subtenant's expense. The provisions of this Section 15 shall survive the expiration or any earlier termination of this Sublease. Further and notwithstanding any provision of this Sublease to the contrary, Subtenant shall not remove any of the Sublandlord's Work listed in **Exhibit B**.

In addition to the foregoing, Subtenant shall remove from the Premises all items and structural characteristics installed by Subtenant that are indicative of Subtenant's business and may otherwise "de-identify" the Premises, as Subtenant reasonably believes necessary or appropriate for the protection of Subtenant's interest in Subtenant's trademarks, trade names, copyrights or trade dress. Subtenant shall repair any damage to the Premises or the Building caused by such removal, including patching and filling holes. This provision shall apply under all circumstances, including default by Subtenant under this Sublease.

## 16. Condemnation

a)    Total Taking.  In the event all of the Premises shall be permanently taken by a public or quasi public authority by condemnation or eminent domain, this Sublease shall terminate as of the date of actual taking or conveyance, or conveyance in lieu of condemnation and Rent shall be paid through the date of such taking.

b)    Substantial Taking.  In the event that less than the whole, but more than thirty-five percent (35%), of the Premises shall be permanently taken by public or quasi public authority by condemnation or eminent domain, or if the points of ingress and egress to the public roadways substantially as in existence on the Commencement Date be materially impaired (with no reasonable replacement points of ingress and egress provided) (each of the foregoing being hereinafter referred to as a "Substantial Taking"), Subtenant or Sublandlord shall have the option to terminate this Sublease on written notice to the other served within thirty (30) days after the date such party receives notice that such a taking has been finalized or agreed to by Sublandlord. Such termination shall be effective as of the date of such taking or conveyance in lieu thereof and Rent shall be paid through the date of such taking.

c)    Restoration.  In the event of a taking of less than a Substantial Taking, this Sublease shall continue as to that portion of the said Premises which shall not have been taken, in which event Sublandlord shall promptly restore said Premises, and such other portions of the Building as reasonably determined by Sublandlord in its sole and absolute discretion, as nearly as practicable to a complete unit of like quality and character as existed just prior to such expropriation.

d)    Right to Seek Award.  All damages awarded for such taking under the power of eminent domain, whether for the whole or a part of the Demised Premises, shall belong to and be the property of Sublandlord whether such damages shall be awarded as compensation for diminution in value to the leasehold or to the fee of the Demised Premises; provided, however, that Sublandlord shall not be entitled to any separate and additional award made to Subtenant for loss of business, or for depreciation to, and cost of removal of, stock and trade fixtures; provided, however, that any award or other recovery by Subtenant shall not, in any way, reduce or otherwise impede any award or recovery of Sublandlord for its interest in the Shopping Center or the Demised Premises.

e)    Master Lease.  Notwithstanding the foregoing, if the Master Lease (if any) terminates as a result of condemnation or taking by eminent domain, this Sublease shall also simultaneously terminate.

The provisions of this Section shall survive any termination of this Sublease.

## 17.    Surrender; Hold Over

On the expiration or earlier termination of the Term (or Option Term, if any),  Subtenant shall surrender possession of the Premises to Sublandlord, together with the keys thereto, "broom clean" and with all trash and debris removed and shall remove all of Subtenant's signs from both the interior and exterior of the Premises in a manner so as to not cause damage to the walls and other areas and shall leave the Premises in the same condition as at the  Commencement Date, normal wear and tear excepted and consistent with the provisions of Section 15 and shall inform Sublandlord of all combinations on locks, safes and vaults, if any, located on the Premises.  No act or thing done by Sublandlord or its agents during the Term (or Option Term, if any) hereof shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid, unless the same be made in writing and executed by the Sublandlord.  Sublandlord at its sole and absolute discretion may request Subtenant not to remove certain improvements if, in Sublandlord's opinion, such removal would cause material damage to the Premises.  Subtenant's obligations under this Section 17 shall survive the expiration or other termination of this Sublease.

If Subtenant shall for any reason fail to surrender possession of the Premises as required hereunder and remain in possession of the Premises after the expiration of the Term (or Option Term, if any) or earlier termination of the Sublease hereof, such possession shall be as a month-to-month tenant on the same terms and conditions of the Sublease then in effect, during which time Subtenant shall pay as rent the greater of (a) (i) one hundred fifty percent (150%) of the Rent prorated on a per diem basis for each day that Subtenant holds over with respect to the Premises on the first day of each month at a rate equal to the amount of monthly average Rent payable during the last year of the preceding term, (ii) all additional charges, including without limitation, additional loss, cost, damage and expense incurred by Sublandlord as a result of Subtenant's holding over and (iii) all other sums, if any, payable by Subtenant pursuant to the provisions of this Sublease with respect to the Premises; and (b) the amounts due to Master Landlord by Sublandlord under the Master Lease.  During such period of month-to-month tenancy, Subtenant shall be obligated to perform and observe all of the terms, covenants and conditions of this Sublease, but shall have no rights thereunder other than the right, of a month to month possession, to continue its occupancy and use of the Premises.  Nothing contained herein, including but not limited to acceptance of rent, shall constitute the consent, express or implied, of Sublandlord to the holding over of Subtenant after the expiration or earlier termination of this Sublease.

## 18.    Environmental Compliance.

a)    Compliance With Law.  Subtenant, at Subtenant's expense, shall comply with all Environmental Laws (as hereinafter defined) pertaining to Subtenant's use and occupancy of the Premises, regardless of when they become effective and with all directions, regardless of when they become effective, of all public officers, pursuant to any Environmental Law, which shall impose any duty upon Sublandlord or Subtenant with respect to Subtenant's use or occupation of the Premises.

b)    Notices.  Subtenant shall give prompt written notice within ten (10) days to Sublandlord of:

14

i.        any proceeding or inquiry by any governmental authority with respect to the presence of any Regulated Substances (as hereinafter defined) on the Premises or the migration thereof from or to other property;

ii.        all claims and potential claims made or threatened by any third party against Subtenant or the Premises relating to any loss or injury resulting from any Regulated Substances; and

iii.        Subtenant's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Premises that could cause the Premises or any part thereof to be subject to the restrictions on the ownership, occupancy, transferability or use of the Premises under any Environmental Law.

c)        Indemnity.  Subtenant hereby agrees to and does indemnify and holds the Sublandlord harmless from and against any and all liability, obligations, losses (including, without limitation, diminution in value of the Premises, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorney fees, consultant fees and expert fees), damages, penalties, claims, environmental response and cleanup costs, fines, civil penalties and actions, suits, costs, taxes, charges, expenses and disbursements, including legal fees and expenses of whatever kind or nature (collectively, "claims" or "damages") imposed on, incurred by, or reserved against the Sublandlord in any way relating to or arising out of the existence or presence of any Regulated Substance on, under or from the Premises from and after the Effective Date; any liability, claims or damages in any way related to or arising out of Subtenant's removal, treatment, storage, disposal disposition, mitigation, cleanup or remedying of the Regulated Substances on the Premises; any claims or damages arising out of Subtenant's breach of this Section 18.  This indemnification shall include, without limitation, liability, claims or damages arising out of any violations by Subtenant of applicable Environmental Laws, regulations, ordinances, or subdivisions thereof, regardless of any real or alleged fault, negligence, willful misconduct, gross negligence, breach of warranty, or strict liability on the part of the Subtenant.  The foregoing environmental indemnity shall survive the expiration or termination of this Sublease and/or any transfer of all or any portion of the Premises, or of any interest in this Sublease, and shall be governed by the laws of the State of California or the applicable federal laws.  Sublandlord agrees that Subtenant has no obligation to and does not indemnify Sublandlord for any claims or damages due to any Regulated Substances existing or present on the Premises prior to or on the Effective Date.

d)        Definitions.  For the purposes of this Sublease,

i.        the term "Regulated Substances" shall include but not be limited to petroleum products and their constituents, substances defined as "regulated substances," "hazardous waste," "hazardous materials," "toxic substances," "pollutants," "toxic pollutants," "herbicides," "fungicides," "rodenticides," "insecticides," "contaminant," or "pesticides" in any Environmental Law.

ii.        "Environmental Law" means any laws, regulations, ordinances, rules, orders, directions, requirements or court decrees pertaining to health, industrial hygiene, or the environmental conditions on, under or about the Premises, including without limitation the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984, the Comprehensive Environmental Response, Compensation and Liability Act, the Hazardous Materials Transportation Act, the Toxic Substance Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Clean Water Act, the Safe Drinking Water Act, the Clean Air Act, all parallel, similar or relevant local and state environmental laws, and the regulations, rules and ordinances adopted and publications promulgated pursuant to the local, state and federal laws.

e)      Warranties.  Subtenant represents and warrants to Sublandlord that:

i.      Subtenant is not in violation of or subject to any existing, pending or threatened investigation by any governmental authority under any Environmental Law.

ii.      Subtenant has not and is not required by any Environmental Law to obtain any permits or license to construct or use any improvements, fixtures or equipment forming a part of the Premises.

iii.      Subtenant's use of the Premises will not result in the disposal or release of any Regulated Substances on, to or from the Premises.

f)      Inspection.  Sublandlord and its agents shall have the right, but not the duty, to inspect the Premises at any time to determine whether Subtenant is complying with the terms of this Sublease.  If Subtenant is not in compliance with this Sublease, Sublandlord shall have the right to immediately enter upon the Premises to remedy, at Subtenant's expense, any contamination caused by Subtenant's failure to comply notwithstanding any other provision of this Sublease.  Such remediation measures shall be done in accordance with the recommendations of Sublandlord's geotechnical engineers and/or consultants, and/or the requirements of any governmental authority having jurisdiction over such matters.  Subtenant shall pay to Sublandlord all costs and expenses incurred by Sublandlord in performing any such remediation measures made necessary by the conduct of Subtenant within thirty (30) days after Sublandlord's written request therefor.  Sublandlord shall use reasonable efforts to minimize interference with Subtenant's use and occupancy of the Premises but shall not be liable for any interference caused thereby.

g)      Underground Storage Tanks.  If underground storage tanks exist on the Premises at the commencement of the Term hereof, then this Section 18.g shall apply.  Such tanks, pumps and all other equipment used in connection with the operation of same shall be deemed to be excluded from the definition of the term "Premises".  Such equipment and underground tanks shall be and remain the property of Sublandlord and Subtenant shall not take any actions with regard thereto.  Subtenant is prohibited from using, removing, damaging or disturbing or allowing its employees, contractors and invitees to use, remove, damage or disturb any such equipment, including tanks.

## 19.    Damage and Destruction

In the event the Premises shall be partially or totally destroyed by fire or other casualty insured under the Property Insurance carried by Sublandlord or Master Landlord so as to become partially or totally untenantable, then the damage to the Premises shall be promptly repaired, to the extent of any proceeds received from such insurance, unless Sublandlord shall elect not to rebuild as hereinafter provided or Master Landlord elects not to rebuild if so empowered under the terms of the Master Lease. If Sublandlord elects to cause such repairs to be made, the obligation of Sublandlord hereunder shall be limited to restoring the Premises to substantially the same condition of the Premises that existed prior to such casualty; provided that Subtenant shall be obligated to repair and replace the Sublandlord's Work damaged by such casualty.  In no event shall Sublandlord be required to repair or replace Subtenant's merchandise, trade fixtures, furnishings or equipment or Subtenant Alterations.  If more than thirty-five percent (35%) of the floor area of the building in which the Premises are located shall be damaged or destroyed by fire or other casualty, or if during the last year of the Term (as may be extended) more than twenty-five percent (25%) percent of the Premises or of the floor area of the building in which the Premises are located shall be damaged or destroyed by fire or other casualty, then Sublandlord may elect either that the building and/or Demised Premises, as the case may be, be repaired or rebuilt or, at its sole option, terminate this Sublease by giving written notice to Subtenant of its election to so terminate, such

notice to be given within ninety (90) days after the occurrence of such damage or destruction.  If Sublandlord elects to repair or rebuild the Premises, it shall, within ninety (90) days after the occurrence of such damage or destruction give Subtenant notice of its intention to repair or rebuild the Premises and then proceed to repair or rebuild same with reasonable dispatch, subject, however, to delays of the type referred to in Section 33(f) of this Sublease.  If Sublandlord is required or elects to repair or rebuild the Premises as herein provided, Subtenant shall repair or replace its merchandise, trade fixtures, furnishings and equipment and the Sublandlord's Work in a manner and to at least a condition equal to that prior to its damage or destruction, and if closed, promptly reopen for business. During the course of restoration of the Premises there shall be no abatement of Rent or any other charges unless the Premises shall have been rendered totally or partially untenantable by reason of such damage or partial destruction, in which case the Rent which is fairly allocable to the space which has been damaged and unusable shall abate until such restoration work shall have been completed.  If this Sublease is terminated as set forth in this Section 19, Subtenant shall assign to Sublandlord any and all of its rights in and to all insurance carried by Subtenant hereunder for all of any portion of the Premises, including without limitation insurance covering the Sublandlord's Work.

Subtenant covenants that Sublandlord shall not be liable for damage to or destruction of Subtenant's property by any fire or other casualty from any cause whatsoever, including, without limitation, any damage to Subtenant's property as caused by the Fire Systems.

Notwithstanding any provision in this Sublease to the contrary, in the event that any law (which includes, but is not limited to, any ordinance, building code, zoning, rule, regulation, municipal policy or approval, or regulatory approval) prevents Subtenant from using the Premises (or any portion thereof) for the Permitted Use following any damage or destruction to the Premises (provided that such damage or destruction was not intentionally and willfully caused by Subtenant), then the Rent payable by Subtenant shall be reduced in the proportion to the rentable area of the portion of the Premises that Subtenant is prevented from using.

20. **Signs**

Subtenant may install signs on the Premises provided that such signs: (a) are in conformance with all laws, codes and ordinances, including without limitation, the City of Vernon's sign criteria; (b) have been approved by Sublandlord in writing prior to any installation of such signs which approval will not be unreasonably withheld; and, (c) are installed through a coordination effort with Sublandlord's Building manager.  The costs to design, install, maintain, repair and remove such signage shall be sole responsibility of Subtenant.  All such signs shall be maintained in good order and condition and repair, and replaced as necessary, by Subtenant at its sole cost and expense.

21. **Liens**

Subtenant shall keep the Premises free and clear of any and all liens, including, without limitation, those arising out of work performed, materials furnished, or obligations incurred by Subtenant.

22. **Sublandlord's Access to Premises**

Upon reasonable prior written notice, Sublandlord shall have free access to the Premises for the purpose of examining the same during business hours and for any other reasonable purpose; provided, however, Sublandlord shall not unreasonably interfere with the business of Subtenant in exercising such rights.

### 23.    Assignment or Subletting

Subtenant shall not sell, assign, hypothecate, pledge, or in any manner transfer this Sublease or any estate or interest therein by operation of law or otherwise, nor sublet or license the Premises or any part thereof nor allow anyone to conduct business at, upon or from the Premises, without the prior written consent of Sublandlord (which consent shall not be unreasonably withheld) except as set forth below; provided, however, that if Subtenant requests Sublandlord's consent and Sublandlord fails, within 10 business days following receipt of such request, to either consent or notify Subtenant of Sublandlord's reasonable objections, then on the 11th business day following such request such consent shall be deemed granted. Consent by Sublandlord to one or more assignments of this Sublease or to one or more sublettings of the Premises or the collection of rent by Sublandlord from any subtenant or assignee of Subtenant shall not constitute a waiver hereof or operate to exhaust any of the Sublandlord's rights under this Article. The sale, issuance, or transfer of any voting capital stock of Subtenant or Subtenant's guarantor, if any (if Subtenant or Subtenant's guarantor, if any, be a non-public corporation the stock of which is not traded on any exchange or over the counter), which directly or indirectly results in a change in the voting control of Subtenant or Subtenant's guarantor, if any, shall be deemed to be an assignment of this Sublease within the meaning of this Section. Any such transfer, either voluntarily or involuntarily or by operation of law or otherwise, without the consent of Sublandlord shall, at Sublandlord's option, terminate this Sublease, in addition to any remedies it may have under Section 24 of this Sublease or at law, and any purported such transfer shall be null and void. If the Subtenant's interest in and to this Sublease is assigned, the Subtenant's liability for performance of any terms, conditions, covenants and agreements contained herein to be performed by Subtenant shall remain in full force and effect, notwithstanding the fact that Sublandlord may have consented to such assignment.

Notwithstanding the foregoing, provided that the floor area of the Premises involved is less than fifty thousand square feet, Subtenant shall have the absolute right to sublet or license such portion of the Premises for a use compatible with Section 3 hereof, without Sublandlord's consent. Provided, however, and notwithstanding the foregoing or anything else in this Sublease, during the first three years of the Term, in no event shall Subtenant be allowed to sublet or license any portion of the Premises which, whether individually or when aggregated with other subleases, licenses and similar agreements would result in more than 200,000 square feet of the Premises being subject to a sublease, license or similar agreement at any time. After the first three years there shall be no limit on the square footage that Subtenant may sublease, license or use for businesses other than the business of Subtenant.

Upon Subtenant's request for Sublandlord's approval of an assignment of this Sublease or the subletting of the Premises, Subtenant shall pay simultaneously to Sublandlord a nonrefundable administrative review fee in the amount of $1,500.00, which shall not impose any obligation whatsoever on Sublandlord to consent to the proposed assignment or subletting.

Any attempted assignment or subletting without Sublandlord's prior written consent shall be void and of no legal affect, and shall be an immediate Default under this Sublease. Notwithstanding any assignment of this Sublease or sublet of the Premises, Subtenant shall remain liable to Sublandlord for all obligations of the Subtenant as set forth herein.

Sublandlord shall have the right to transfer, assign and convey in whole or in part, any and all rights, obligations and interests of Sublandlord under this Sublease. Thereafter, Sublandlord shall have no further liability under this Sublease.

### 24.    Defaults by Subtenant.

Subtenant shall be in "Default" for purposes of this Sublease if:

i.        Subtenant shall fail to pay any installment of Rent when due, or any other charge required to be paid by Subtenant as and when due, and such failure shall continue for a period of five (5) days, including without limitation Subtenant's failure to pay the Security Deposit, the Escrowed Funds and/or any Actual Overage as required hereunder;

ii.        Subtenant shall fail to comply with any term, provision or covenant of this Sublease, other than those expressly addressed within clause (i) above, and shall not cure such failure within ten (10) days after written notice thereof to Subtenant;

iii.        Subtenant or any guarantor of Subtenant's obligations under this Sublease shall become insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors;

iv.        Subtenant or any guarantor of Subtenant's obligations under this Sublease shall file a petition under any section or chapter of the Federal Bankruptcy Code, as amended, or under any similar law or statute of the United States or any State thereof; or Subtenant or any guarantor of Subtenant's obligations under this Sublease shall be adjudged bankrupt or insolvent in proceedings filed against Subtenant or any guarantor of Subtenant's obligations under this Sublease;

v.        A receiver or Trustee shall be appointed for all of the Premises or for all or substantially all of the assets of Subtenant or any guarantor of Subtenant's obligations under this Sublease;

vi.        Subtenant shall desert or vacate any portion of the Premises;

vii.        Subtenant shall do or permit to be done anything which creates a lien upon the Premises and fails to remove such lien promptly (but in no event more than 20 days following attachment of such lien or claim of lien);

viii.        Subtenant shall assign this Sublease or sublet any portion of the Premises in violation of the provisions of this Sublease;

ix.        The business operated by Subtenant shall be closed by an applicable governmental agency for failure to pay any State sales tax as required or for any other reason;

x.        Subtenant shall fail to comply with any terms or conditions of any other contract or agreement by and between Sublandlord and Subtenant which relate to the Demised Premises, including without limitation any construction escrow agreement for the Construction Escrow;

xi.        Any three (3) failures by Subtenant to observe and perform any provision of this Sublease during any twelve (12) month period of the Term, as such may be extended, shall constitute, at the option of Sublandlord, a separate and noncurable Default;

xii.        A Default as noted in any other Section of this Sublease;

xiii.        A default occurs under the Master Lease due to Subtenant's actions or failure to act; or

xiv.        A default occurs under the Cross Sublease which remains uncured after any applicable notice and cure periods provided for in such Cross Sublease.

If Subtenant is in Default, as defined herein then in addition to any other remedies available to Sublandlord herein or at law or in equity, Sublandlord shall have the immediate option to terminate this

Sublease and all rights of Subtenant hereunder by giving written notice of such intention to terminate. In the event that Sublandlord shall elect to so terminate this Sublease, then Sublandlord may recover from Subtenant:

a)    the worth at the time of award of any unpaid rent which had been earned at the time of such termination; plus

b)    the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss Subtenant proves could have been reasonably avoided; plus

c)    the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that Subtenant proves could be reasonably avoided; plus

d)    any other amount necessary to compensate Sublandlord for all the detriment proximately caused by Subtenant's failure to perform its obligations under this Sublease or which in the ordinary course of events would be likely to result therefrom; and at Sublandlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by the applicable laws of the State of California.

The term "rent", as used in this Sublease, shall be deemed to be and to mean the Rent and all other sums required to be paid by Subtenant pursuant to the terms of this Sublease. In the event of any Default by Subtenant, Sublandlord shall also have the right, with or without terminating this Sublease, to reenter the Premises and remove all persons and property from the Premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Subtenant, or at Sublandlord's option, all of Subtenant's fixtures, furniture, equipment, improvements, additions, alterations and other personal property shall remain upon the Premises and in that event, and continuing during the length of such Default, Sublandlord shall have the sole right to take exclusive possession of such property and to use it, rent or charge free, until all Defaults are cured or, at Sublandlord's option, at any time during the term of this Sublease, to require Subtenant to forthwith remove such property.

The "worth at the time of award" of the amounts referred to in subparagraphs (a) and (b) of this Section is computed by allowing interest at such maximum contractual rate which could be legally charged in the event of a loan of such cost to Subtenant in the State of California, such interest to accrue continuously on any unpaid balance due to Sublandlord by Subtenant during the period commencing with the aforesaid due date and terminating with the date on which Sublandlord receives full payment of all amounts owing to Sublandlord at the time of said payment. The worth at the time of award of the amount referred to in subparagraph (c) is computed by discounting such amount at the discount rate of four percent (4%).

In the event that Sublandlord shall elect to reenter, or shall take possession of the Premises pursuant to legal proceeding or pursuant to any notice provided by law, then if Sublandlord does not elect to terminate this Sublease as provided in this Section, this Sublease shall continue in effect for so long as Sublandlord does not terminate Subtenant's right to possession, and Sublandlord may enforce all its rights and remedies under this Sublease, including, without limitation, Sublandlord's right to from time to time, without terminating this Sublease, either recover all rental as it becomes due or relet the Premises or any part thereof for such term or terms and at such rental or rentals and upon such other terms and conditions as Sublandlord, in its sole discretion, may deem advisable with the right to make alterations and repairs to the Premises. Acts of maintenance or preservation or efforts to relet the Premises or the appointment of a receiver upon initiation of Sublandlord or other legal proceeding granting Sublandlord or its agent

possession to protect Sublandlord's interest under this Sublease shall not constitute a termination of Subtenant's right to possession. In the event that Sublandlord shall elect to so relet, then rentals received by Sublandlord from such reletting shall be applied: first, to the payment of any indebtedness other than rent due hereunder from Subtenant to Sublandlord; second, to the payment of any cost of such reletting; third, to the payment of the cost of any alterations and repairs to the Premises; fourth, to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Sublandlord and applied in payment of future rent as the same may become due and payable hereunder. Should that portion of such rentals received from such reletting during any month, which is applied by the payment of rent hereunder, be less than the rent payable during that month by Subtenant hereunder, then Subtenant shall pay such deficiency to Sublandlord immediately upon demand therefor by Sublandlord. Such deficiency shall be calculated and paid monthly. Subtenant shall also pay to Sublandlord, as soon as ascertained, any costs and expenses incurred by Sublandlord in such reletting or in making such alterations and repairs not covered by the rentals received from such reletting. No reentry or taking possession of the Premises or any other action under this Article shall be construed as an election to terminate this Sublease unless a written notice of such intention be given to Subtenant or unless the termination thereof be decreed by a court of competent jurisdiction. Notwithstanding any reletting without termination by Sublandlord because of any default by Subtenant, Sublandlord may at any time after such reletting elect to terminate this Sublease for any such Default.

Sublandlord has the remedy described in California Civil Code Section 1951.4 (Sublandlord may continue Sublease in effect after Subtenant's breach and abandonment and recover rent as it becomes due).

Efforts by Sublandlord to mitigate the damages caused by Subtenant's default in this Sublease shall not constitute a waiver of Sublandlord's right to recover damages hereunder.

In the event that Sublandlord shall obtain possession by reentry, summary proceedings, legal or equitable actions or proceedings or other lawful measures as a result of any Default by Subtenant, Subtenant agrees to pay to Sublandlord all expenses incurred by Sublandlord in obtaining possession of the Premises and, in addition to any sum provided to be paid above, broker's fees incurred by Sublandlord in connection with reletting the whole or any part of the Premises; the costs of removing and storing Subtenant's or other occupant's property; the cost of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Sublandlord in enforcing or defending Sublandlord's rights and/or remedies including reasonable attorneys' fees. Subtenant further agrees in such event to remain liable for and to pay all rents and other sums herein reserved, for and during the balance of the term of this Sublease.

The remedies of Sublandlord in this Sublease are cumulative and shall be deemed additional to any and all other remedies to which it is now or may hereafter be entitled at law or in equity and shall include the right to restrain by injunction any violation or threatened violation, by Subtenant, of any of the terms, covenants or conditions of this Sublease and by decree to compel performance of any such term, covenant or condition. No delay or omission by Sublandlord to exercise any right or power accruing upon any noncompliance or Default by Subtenant with respect to any of the terms of this Sublease shall impair any such right or power to be construed to be a waiver thereof, except as otherwise herein provided. A waiver by Sublandlord of any of the covenants, conditions or agreements hereof to be performed by Subtenant shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant, condition or agreement herein contained.

21

**25.    Attorney's Fees.**

If suit shall be brought for recovery of possession of the Premises, for the recovery of Rent or any other amount due under the provisions of this Sublease, or because of the breach of any other covenant herein contained on the part of Subtenant to be kept and performed, and a breach shall be established, Subtenant shall pay to Sublandlord all expenses incurred therefor, including reasonable attorneys' fees.

**26.    Waiver of California Code Sections.**

In this Sublease, numerous provisions have been negotiated by the parties, some of which provisions are covered by statute. Whenever a provision of this Sublease and a provision of any statute or other law cover the same matter, the provisions of this Sublease shall control. Therefore, Subtenant waives (for itself and all persons claiming under Subtenant) the provisions of Civil Code Sections 1932(2) and 1933(4) with respect to the destruction of the Premises; Civil Code Sections 1941 and 1942 with respect to Sublandlord's repair duties and Subtenant's right to repair; Code of Civil Procedure Section 1265.130, allowing either party to petition the Superior Court to terminate this Sublease in the event of a partial taking of the Premises by condemnation as herein defined; and any right of redemption or reinstatement of Subtenant under any present or future case law or statutory provision (including Code of Civil Procedure Sections 473 and 1179 and Civil Code Section 3275) in the event Subtenant is dispossessed from the Premises for any reason. This waiver applies to future statutes enacted in addition to or in substitution for the statutes specified herein.

**27.    Indemnity**

Subtenant shall indemnify Sublandlord, its members, shareholders, directors, officers, employees, attorneys, agents and their respective successors and assigns against, and save such parties harmless of and from, any and all loss, cost, damage, expense or liability (including, but not limited to, attorneys' fees and disbursements) incurred by reason of, and defend such parties against all claims, actions, proceedings and suits relating to: (1) the conduct of Subtenant's business in, or use, occupancy and management and operations of the Premises; (ii) any injuries to persons or damages to property occurring in, on or about the Premises; (iii) any breach or default by Subtenant in the observance or performance of the covenants and agreements contained herein on the part of Subtenant; (iv) any work or thing whatsoever done by Subtenant, its employees, agents, contractors, servants, invitees, guests or licensees or any condition created, in, on or about the Premises or the Property during the Term hereof by any of such persons; or (v) any act or omission of Subtenant, its agents, contractors, servants, employees, invitees, guests or licensees. Subtenants' obligations under this Section shall survive the expiration of the Term or earlier termination of this Sublease.

Sublandlord shall indemnify Subtenant, its members, shareholders, directors, officers, employees, attorneys, agents and their respective successors and assigns and save Subtenant harmless of and from any and all loss, costs, damages, expenses or liability (including, but not limited to, attorneys' fees and disbursements) whether for personal injury or property damage; occurring on the Premises prior to the Effective Date  (except if caused by any act or omission of Subtenant, its employees, agents, contractors, servants, invitees, guests or licensees); or arising from the gross negligence and/or willful misconduct of Sublandlord. The foregoing provisions shall survive the termination of this Sublease.

**28.    Sublandlord Exculpation and Limitation of Liability**

Anything in this Sublease to the contrary notwithstanding, Subtenant agrees that it shall look solely to the estate and property of the Sublandlord in the Premises or in the underlying Master Lease, as the case may be, subject to prior rights of any mortgagee of the premises or underlying lessor, for the

collection of any judgment (or other judicial process) requiring the payment of money by Sublandlord in the event of any default or breach by Sublandlord with respect to any of the terms, covenants and conditions of this Sublease, and no other assets of the Sublandlord shall be subject to levy, garnishment, attachment, execution or other procedures for the satisfaction of Subtenant's remedies. In the event the Sublandlord named on this Sublease transfers this Sublease, except as collateral security for a loan, upon such transfer such Sublandlord will be released from all liability and obligations hereunder, provided that the transferee assumes the obligations of this Sublease thereafter accruing. Under no circumstances whatsoever shall Sublandlord be liable for special, extraordinary or consequential damages. The provisions of this Section 28 shall survive the expiration of the term or any earlier termination of this Sublease.

## 29.    Signing Authority

Each party represents and warrants to the other that: (i) such party is duly organized, validly existing under the laws of the state of its formation (which such party represents is accurately reflected in the introductory paragraph of this Sublease) and has the power to own its property and assets and carry on its business in all the jurisdictions where the Premises is located; (ii) the execution of this Sublease constitutes the binding obligation of such party and has been authorized by all requisite actions necessary therefore; and (iii) this Sublease of the Premises will not conflict with or result in a breach of such party's formation or governance documents or any agreement to which such party is a party or by which it may be bound.

## 30.    OFAC

As an inducement to Sublandlord to enter into this Sublease, Subtenant hereby represents and warrants that: (i) Subtenant is not, nor is it owned or controlled directly or indirectly by, any person, group, entity or nation named on any list issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 or any similar list or any law, order, rule or regulation or any Executive Order of the President of the United States as a terrorist, "Specially Designated National and Blocked Person" or other banned or blocked person (any such person, group, entity or nation being hereinafter referred to as a "Prohibited Person"); (ii) Subtenant is not (nor is it owned or controlled, directly or indirectly, by any person, group, entity or nation which is) acting directly or indirectly for or on behalf of any Prohibited Person; and (iii) neither Subtenant (nor any person, group, entity or nation which owns or controls Subtenant, directly or indirectly) has conducted or will conduct business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including without limitation any assignment of this Sublease or any subletting of all or any portion of the Premises or the making or receiving of any contribution of funds, goods or services to or for the benefit of a Prohibited Person. Subtenant covenants and agrees (a) to comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect, (b) to immediately notify Sublandlord in writing if any of the representations, warranties or covenants set forth in this Section 30 are no longer true or have been breached or if Subtenant has a reasonable basis to believe that they may no longer be true or have been breached, (c) not to use funds from any Prohibited Person to make any payment due to Sublandlord under the Sublease and (d) at the request of Sublandlord, to provide such information as may be requested by Sublandlord to determine Subtenant's compliance with the terms hereof. Any breach by Subtenant of the foregoing representations and warranties shall be deemed a Default by Subtenant under this Sublease.

As an inducement to Subtenant to enter into this Sublease, Sublandlord hereby represents and warrants that: (i) Sublandlord is not, nor is it owned or controlled directly or indirectly by, any person, group, entity or nation named on any OFAC list or any similar list or Prohibited Person list; (ii) Sublandlord is not (nor is it owned or controlled, directly or indirectly, by any person, group, entity or

nation which is) acting directly or indirectly for or on behalf of any Prohibited Person; and (iii) neither Sublandlord (nor any person, group, entity or nation which owns or controls Sublandlord, directly or indirectly) has conducted or will conduct business or has engaged or will engage in any transaction or dealing with any Prohibited Person, including without limitation any assignment of this Sublease or the making or receiving of any contribution of funds, goods or services to or for the benefit of a Prohibited Person. Sublandlord covenants and agrees (a) to comply with all requirements of law relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect, (b) to immediately notify Subtenant in writing if any of the representations, warranties or covenants set forth in this Section 30 are no longer true or have been breached or if Sublandlord has a reasonable basis to believe that they may no longer be true or have been breached, and (c) at the request of Subtenant, to provide such information as may be requested by Subtenant to determine Sublandlord's compliance with the terms hereof. Any breach by Sublandlord of the foregoing representations and warranties shall be deemed a default by Sublandlord under this Sublease.

The representations and warranties contained in this section shall be continuing in nature and shall survive the expiration or earlier termination of this Sublease

## 31.    Notices

Notices shall be in writing and shall be deemed properly served:  (a) five (5) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) one (1) business day after being deposited with a reputable overnight express carrier (e.g. Federal Express, UPS) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery, or (c) upon receipt if personally delivered. Notices shall be addressed as follows:

| | |
|---|---|
| If to Sublandlord | Sears Roebuck and Co.<br>333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attn: Vice President, Real Estate<br>Department 824RE |
| Copy to: | Sears Roebuck and Co.<br>333 Beverly Road<br>Hoffman Estates, Illinois 60179<br>Attn: Assistant General Counsel Real Estate<br>Department 824RE |
| If to Subtenant: | Mr. Henry Shahery<br>9777 Wilshire Blvd., Suite 470<br>Beverly Hills, Ca 90212<br>Tel. (424) 343-0371 Ext 220<br>Fax (424) 343-0379 |
| Copy to: | Law Offices of Saul Reiss<br>2800 28th Street, Suite 328<br>Santa Monica, California 90405-6201<br>Tel. (310) 450-2888<br>Fax (310) 450-2885 |

or to any other address furnished in writing by either of the respective parties.  However, any change of address furnished shall comply with the notice requirements of this Section and shall include a complete outline of all current notice addresses to be used for the party requesting the change.

**32.    Master Lease**.

Subtenant acknowledges receipt of a copy of the Master Lease (omitting all financial and business terms) and that Subtenant has reviewed the Master Lease and accepts all of the terms, covenants, provisions, conditions and agreements contained in the Master Lease (as may be applicable hereto).  Notwithstanding anything to the contrary contained herein or in the Master Lease, Sublandlord and Subtenant understand and agree that: (i) this Sublease is a sublease and is subject and subordinate to the Master Lease and any legal requirements; (ii) no right, power or privilege granted to Subtenant hereunder may be exercised or enjoyed by Subtenant and no term, covenant or condition of this Sublease benefiting Subtenant or binding Sublandlord shall be operative if and to the extent that such exercise, enjoyment or operation would not be permitted by or would violate or be in conflict with any term, covenant or condition of the Master Lease or any legal requirements; and (iii) in the event of the expiration or termination of the Master Lease for any reason whatsoever, this Sublease shall automatically terminate on the date of the expiration or termination of the Master Lease, and Subtenant shall have no claim against Sublandlord of any kind whatsoever on account thereof, and the parties hereto shall thereupon be relieved of all liability and obligation hereunder, excepting liabilities and obligations which accrued or arose prior to the date of such termination or expiration. In the event of a termination of this Sublease pursuant to the foregoing Section 32(iii), such Sublease termination shall be effective immediately and without any additional notice or compensation as may otherwise be contemplated hereunder following a termination of this Sublease.  Except for obligations which are expressly provided otherwise under this Sublease, Subtenant shall comply with and fully perform all of the requirements and obligations of Sublandlord under the Master Lease as applicable to the Demised Premises.   Subtenant shall not violate or breach any of the terms, covenants or conditions of the Master Lease nor do or fail to do or permit anything to be done which would violate, breach or be contrary to the Master Lease or cause the Master Lease to be terminated or forfeited. Subtenant is not hereby granted any of the rights granted to Sublandlord under the Master Lease, including, without limitation, Sublandlord's right to exercise renewal term options.  Subtenant acknowledges and agrees that Subtenant shall not have the right to enforce any of Sublandlord's or Master Landlord's obligations under the Master Lease.   Subject to Subtenant paying all Rent that is due under the Sublease, Sublandlord covenants and agrees that it will promptly pay all rent due under the Master Lease and otherwise observe and perform all of its covenants and agreements thereunder, except those assumed by Subtenant under this Sublease, so as not to permit any default remaining uncured after applicable notice and cure under the Master Lease to occur.  The Subtenant and Sublandlord hereby agree that Paragraph 6 of the Second Amendment and Sections 1, 7, 8, 10, 11, 12, 13, 14 and 18 in the Master Lease are herein are specifically excluded from this Sublease and Subtenant has no rights with respect thereto.

**33.    General**

a)    <u>Interpretation</u>.  The recitals to this Sublease are hereby incorporated in this Sublease.  The Section and subsection captions are for the convenient reference of the parties only and are not intended to and shall not be deemed to modify the interpretation of the Section or subsection from that which is indicated by the text of the Section or subsection alone.  This Sublease is the product of negotiation and the parties agree that it shall be interpreted in accordance with its fair and apparent meaning and not for or against either party.  The use in the text of this Sublease of the singular or any particular gender shall, if the context so requires, be deemed to include the plural and all other genders.

b)    <u>Entire Agreement; No Implied Terms</u>.  This Sublease contains the entire agreement between the parties with respect to the Premises and all prior negotiations or agreements, whether oral or written, are superseded and merged herein.  This is an arms-length transaction and relationship.  There exist no implied or otherwise unstated covenants, rights or obligations by, of, for or against either party.  Sublandlord and Subtenant hereby expressly disclaim the existence of any implied covenant of good faith and/or fair dealing.

c)    <u>Amendment</u>.  This Sublease may not be changed or amended except by a writing duly authorized and executed by the party against whom enforcement is sought.

d)    <u>Separability</u>.  If any provision of this Sublease or its application to any person or circumstance shall be declared invalid or unenforceable, the remaining provisions of this Sublease, or the application of such provision to persons or circumstances other than those to which it is invalid or unenforceable, shall not be affected thereby and each provision shall be valid and enforceable to the extent permitted by law.

e)    <u>Accord And Satisfaction</u>.  No payment by Subtenant or receipt by Sublandlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction and Sublandlord shall accept such check or payment without prejudice to Sublandlord's right to recover the balance of such Rent or pursue any other remedy provided in this Sublease.

f)    <u>Force Majeure</u>.  Except as otherwise provided herein, in the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, acts of terrorism, insurrection, war or other reason of a like nature not the fault of the party delayed in performing the work or doing the acts required under the terms of this Sublease, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.  The provisions of this Section shall not operate to excuse Subtenant from prompt payment of Rent or any other payments required by the terms of this Sublease.

g)    <u>Cumulative Remedies; Waiver</u>.  All rights, remedies and benefits provided under this Sublease to either party shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by law or at equity.  The failure of Sublandlord or Subtenant to enforce any covenant or condition of this Sublease shall not be deemed a waiver thereof or of the right of Sublandlord or Subtenant to enforce each and every covenant and condition of this Sublease.  No provision of this Sublease shall be deemed to have been waived by Sublandlord or Subtenant unless such waiver shall be in writing and signed by Sublandlord or Subtenant, as the case may be.

h)    <u>Governing Law; Invalidity</u>.  With respect to each of the Premises, this Sublease shall be governed by and construed in accordance with the substantive and procedural laws of the State of California without regard to its conflicts of law principles.  If any clause or provision of this Sublease is illegal, invalid, or unenforceable under present or future laws effective during the Term (and the Option Terms, if any), then it is the intention of the parties hereto that the remainder of this Sublease shall not be affected thereby.  It is also the intention of both parties that in lieu of each clause or provision that is illegal, or unenforceable, there is added as a part of this Sublease a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and still be legal, valid, and enforceable.

26

i)      Date Of Event. If an event specified to occur herein falls on a Saturday, Sunday or on a day on which, banking institutions in the State of California are authorized by law to close, then such event shall occur on the next day which is not a Saturday, Sunday or day on which banking institutions in such state are authorized by law to close.

j)      Counterparts. This Sublease may be executed in any number of counterparts, each of which shall be considered an original but which, taken together, shall be deemed one and the same instrument. Executed copies hereof may be delivered between the parties via facsimile or electronically with executed originals being forwarded for delivery the same day via nationally recognized overnight delivery service, hand delivery service or U.S. Certified Mail, Return Receipt Requested (provided that, the failure to forward such executed originals shall not vitiate the delivery made via facsimile or electronically).

k)      Headings. The article and section headings and the indices used herein are for reference and convenience only, and shall not enter into the interpretation hereof. The Exhibits referred to herein and attached hereto are incorporated in this Sublease to the same extent as if set forth in full herein. References herein to Exhibits, Articles, Sections, or portions thereof shall be deemed references to Exhibits, Articles, and Sections of this Sublease unless otherwise expressly provided.

l)      WAIVER OF TRIAL BY JURY; INJUNCTION. SUBLANDLORD AND SUBTENANT EACH HEREBY WAIVE TRIAL BY JURY OF ANY DISPUTE ARISING UNDER THIS SUBLEASE. IN ADDITION TO ALL OTHER REMEDIES, SUBLANDLORD IS ENTITLED TO THE RESTRAINT BY INJUNCTION OF ALL VIOLATIONS BY SUBTENANT, WHETHER ACTUAL, ATTEMPTED OR THREATENED, OF ANY COVENANT, CONDITION OR PROVISION OF THIS SUBLEASE.

m)      Reservation of Sublandlord's Rights in Bankruptcy. This Sublease is not intended, nor shall be construed, as Sublandlord's assumption of the Master Lease, nor should the same be relied upon, it being the intention of the parties that this Sublease merely accommodates Subtenant and permits Subtenant's tenancy within the Premises and is not intended to create a post-petition contract which cannot be subsequently rejected pursuant to the Bankruptcy Code. The Sublandlord reserves all rights to assume or reject the Master Lease and this Sublease. Nothing herein contained shall be construed as a waiver by Subtenant of any claims in bankruptcy arising out of the rejection of this Sublease.

n)      Joint and Several. If this Lease is signed by more than one entity, the singular includes the plural, and the tenants under this Lease are jointly and severally liable for all obligations described in this Lease.

## 34.    Quiet Enjoyment

Subtenant, on paying the Rent and other obligations reserved herein and performing the covenants of this Sublease on Subtenant's part to be performed, shall and may peacefully and quietly have, hold and enjoy the Premises for the term of this Sublease without molestation or hindrance of any person claiming by, through or under Sublandlord.

## 35.    Subordination And Attornment

This Sublease, at Sublandlord's option, shall be subordinate to any present or future mortgage, ground lease or declaration of covenants regarding maintenance and use of any areas contained in any portion of the Premises, and to any and all advances made under any present or future mortgage and to all renewals, modifications, consolidations, replacements, and extensions of any or all of same. Subtenant

agrees, with respect to any of the foregoing documents, that no documentation other than this Sublease shall be required to evidence such subordination. If any holder of a mortgage shall elect for this Sublease to be superior to the lien of its mortgage and shall give written notice thereof to Subtenant, then this Sublease shall automatically be deemed prior to such mortgage whether this Sublease is dated earlier or later than the date of said mortgage or the date of recording thereof. Subtenant agrees to execute such documents as may be further required to evidence such subordination or to make this Sublease prior to the lien of any mortgage or deed of trust, as the case may be so long as Subtenant receives a non-disturbance agreement in the lender's customary form. Subtenant hereby attorns to all successor owners of the Premises, whether or not such ownership is acquired as a result of a sale through foreclosure or otherwise. Each party shall, at such time or times as the other party may request, upon not less than ten (10) days' prior written request by the requesting party, sign and deliver to the requesting party a certificate stating whether this Sublease is in full force and effect; whether any amendments or modifications exist; whether any monthly Rent and any and all other expenses and charges of the Subtenant as indicated herein have been prepaid and, if so, how much; whether to the knowledge of the certifying party there are any defaults hereunder; and in the circumstance where Sublandlord is the requesting party, such other information and agreements as may be reasonably requested, it being intended that any such statement delivered pursuant to this Section may be relied upon by the requesting party and by any prospective purchaser of all or any portion of the requesting party's interest herein, or a holder or prospective holder of any mortgage encumbering the Premises. Subtenant's failure to deliver such statement within five (5) days after Sublandlord's second written request therefor shall constitute a Default and shall conclusively be deemed to be an admission by Subtenant of the matters set forth in the request for an estoppel certificate.

36.     **Prejudgment Remedy, Redemption, Counterclaim, And Jury**

Subtenant, for itself and for all persons claiming through or under it, hereby expressly waives any and all rights which are, or in the future may be, conferred upon Subtenant by any present or future law to redeem the Premises, or to any new trial in any action for ejection under any provisions of law, after reentry thereupon, or upon any part thereof, by Sublandlord, or after any warrant to dispossess or judgment in ejection. If Sublandlord shall acquire possession of the Premises by summary proceedings, or in any other lawful manner without judicial proceedings, it shall be deemed a reentry within the meaning of that word as used in this Sublease. Subtenant and Sublandlord both waive a trial by jury of any or all issues arising in any action or proceeding between the parties hereto or their successors, under or connected with this Sublease, or any of its provisions.

37.     **Brokers**.

With the exception of JLL (the "Broker"), Sublandlord and Subtenant each covenant and represent to the other party that it has not entered into any agreement providing payment to any party of any fee or commission in connection with the transactions contemplated by this Sublease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder (other than the Broker), then the party who is alleged to have retained such individual or entity or whose acts, omissions or representations are alleged to give rise to such claim shall defend (with counsel reasonably acceptable to the other party), indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon. Any and all commissions due and payable to the Broker shall be paid pursuant to that certain Listing Agreement by and between Sublandlord and Broker.

38.     **Security Deposit**.

Subtenant shall deposit with Sublandlord, in conjunction with execution of this Sublease, the Security Deposit. Said deposit shall be held by Sublandlord without liability for interest as security for

the faithful performance by Subtenant of all the terms and provisions of this Sublease by Subtenant to be observed and performed and all terms to be performed by Subtenant under the Cross Sublease. The security deposit shall not be mortgaged, assigned, transferred or encumbered by Subtenant, and any such act on the part of the Subtenant shall be without force and effect and shall not be binding upon Sublandlord. If any of the rents herein reserved or any other sum payable by Subtenant to Sublandlord or any amount due under the Cross Sublease by Subtenant shall be overdue and unpaid or should Sublandlord or the Sublandlord under the Cross Sublease make payments on behalf of the Subtenant, or Subtenant shall fail to perform any of the provisions or terms of this Sublease or the Cross Sublease, the Sublandlord may, at its option and without prejudice to any other remedy which Sublandlord may have on account thereof expressly granted in this Sublease or at law or in equity, appropriate and apply said entire deposit or so much thereof as may be necessary to compensate Sublandlord toward the payment of Rent or loss or damage sustained by Sublandlord or the Sublandlord under the Cross Sublease due to such breach by Subtenant, and Subtenant shall forthwith upon demand restore said security to the original sum deposited. Should Subtenant duly comply with all of said terms and provisions of this Sublease and promptly pay all of the rentals as they fall due and all other sums payable by Subtenant to Sublandlord and shall do the same under the Cross Sublease, then said deposit shall be returned in full to Subtenant at the end of the Sublease Term but in no event is the said security to be returned until the Subtenant has vacated the Premises and the premises under the Cross Sublease and delivered possession satisfactorily to the Sublandlord and left a valid forwarding address for Sublandlord to deliver any amount of the security deposit remaining after Subtenant vacates the Premises. Failure of Subtenant to provide a valid forwarding address to Sublandlord allows Sublandlord to retain the security deposit in full. Sublandlord's right to the possession of the Premises for non-payment of Rent or for any other reason shall not in any event be affected by reason of the fact that the Sublandlord holds this security. In the event of bankruptcy or other credit-debtor proceedings against Subtenant, all securities shall be deemed to be applied first to the payment of Rent and other charges due Sublandlord for all periods prior to the filing of such proceedings. The Sublandlord shall not be obliged to keep the said security as a separate fund, but may mix the said security with its own funds. In the event of a sale of the Premises or lease of the land on which it stands subject to this Sublease, the Sublandlord shall have the right, at its option, to transfer this security to the vendee or lessor and the Sublandlord shall thereupon be considered released by the Subtenant from all liability for the return of such security and the Subtenant shall look solely to the new Sublandlord for the return of said security. In the event of any rightful and permitted assignment of this Sublease by Subtenant, the said security deposit shall be deemed to be held by Sublandlord as a deposit made by the assignee and Sublandlord shall have no further liability with respect to the return of said security deposit to the assignor. Any mortgagee of Sublandlord shall be relieved and released from any obligation to return such security in the event such mortgagee comes into possession of the Premises by reason of foreclosure of its security interest or any proceeding in lieu thereof.

## 39.    Sublandlord's Right To Recapture

Notwithstanding anything herein to the contrary, nothing herein shall be construed as an obligation for Subtenant to open or operate its business in the Premises. Subtenant shall have the right to remove Subtenant's property, vacate the Premises, and cease operations in the Premises at any time and at Subtenant's sole discretion. In the event Subtenant ceases its use and occupancy of the Premises for sixty (60) consecutive days or more for reasons other than a condemnation, casualty, fire, acts of God, major repair or remodeling or strike, Sublandlord shall have the right but not the obligation, at anytime after the expiration of such sixty (60) day period and until Subtenant resumes operation of its business, to notify Subtenant in writing of Sublandlord's intent to terminate this Sublease and recapture the Premises, in which event Subtenant and Sublandlord shall be relieved of any further rights or obligations under this Sublease except for obligations and liabilities with respect to any state of facts that arose prior to the date of termination or other indemnification obligations under this Sublease which by their terms survive such termination.

IN WITNESS WHEREOF, the parties have executed this Sublease as of the day and year first above written.



**SUBLANDLORD**:

SEARS, ROEBUCK AND CO., a
Delaware corporation

By: _____

Title: _Robert A. Riecker_
_Chief Financial Officer_

**SUBTENANT**:

_____

MR. HENRY SHAHERY

**GUARANTOR**:

SHASON, INC., a California
corporation

By: _____

Title: Henry Shahery President

List of Exhibits:

A-1 – Site Plan

A-1 – Legal

B – Sublandlord's Work

**EXHIBIT A-1**

Site Plan

**EXHIBIT A-2**

Legal

PARCEL 1-A:

THAT PORTION OF LOT 2 OF TRACT NO. 2836, IN THE CITY OF VERNON, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 36 PAGES 88 AND 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE WESTERLY LINE OF SAID LOT 2 WITH THE CENTER LINE OF FIFTY-FOURTH STREET, 60 FEET WIDE, EXTENDING WESTERLY FROM SAID WESTERLY LINE; THENCE NORTH 88°27'15" EAST, PARALLEL WITH THE NORTHERLY LINE OF SAID LOT, 19.51 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 0°09'00" EAST ALONG AN EASTERLY LINE OF A PARCEL OF LAND DESCRIBED IN THE DEED TO THE LOS ANGELES & SALT LAKE RAILROAD COMPANY, RECORDED IN BOOK 13243 PAGE 314 OF OFFICIAL RECORDS OF SAID COUNTY, 106.93 FEET TO THE BEGINNING OF A TANGENT CURVE THEREIN CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 328.93 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE, BEING ALSO THE NORTHEASTERLY LINE OF SAID PARCEL OF LAND, 517.69 FEET; THENCE NORTH 89°40'30" EAST ALONG THE NORTHERLY LINE OF SAID LAND, 100.07 FEET TO AN ANGLE POINT THEREIN, BEING THE BEGINNING OF A CURVE CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 348.93 FEET, A TANGENT TO SAID CURVE AT SAID POINT BEARING NORTH 70°49'55" WEST; THENCE NORTHWESTERLY ALONG SAID CURVE, BEING ALSO A SOUTHWESTERLY LINE OF A PARCEL OF LAND DESCRIBED IN SAID DEED, 430.45 FEET TO THE BEGINNING OF A TANGENT CURVE THEREIN, CONCAVE TO THE WEST, HAVING A RADIUS OF 668.26 FEET; THENCE NORTHERLY, ALONG SAID LAST MENTIONED CURVE, IN THE WESTERLY LINE OF SAID PARCEL OF LAND, 55.60 FEET; THENCE NORTH 4°55'00" WEST ALONG SAID WESTERLY LINE 21.76 FEET TO THE BEGINNING OF A CURVE THEREIN, CONCAVE TO THE EAST, HAVING A RADIUS OF 688.26 FEET; THENCE NORTHERLY ALONG SAID CURVE 33.75 FEET TO A POINT IN A LINE PARALLEL WITH THE NORTHERLY LINE OF SAID LOT 2 AND WHICH PASSES THROUGH THE TRUE POINT OF BEGINNING, SAID POINT BEING DISTANT NORTH 88°27'15" EAST, ON SAID PARALLEL LINE, 210 FEET FROM THE WESTERLY LINE OF SAID LOT 2; THENCE SOUTH 88°27'15" WEST 190.49 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 1-B:

ALSO THAT PORTION OF SAID LOT 2, DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE WESTERLY LINE OF SAID LOT 2 WITH THE CENTER LINE OF FIFTY-FOURTH STREET, 60 FEET WIDE, EXTENDING WESTERLY FROM SAID WESTERLY LINE; THENCE NORTH 86°27'15" EAST PARALLEL WITH THE NORTHERLY LINE OF SAID LOT, 242.22 FEET TO THE TRUE POINT OF BEGINNING, BEING THE BEGINNING OF A CURVE IN AN EASTERLY LINE OF A PARCEL OF LAND DESCRIBED IN THE DEED TO THE LOS ANGELES & SALT LAKE RAILROAD COMPANY, RECORDED IN BOOK 13243 PAGE 314 OF OFFICIAL RECORDS OF SAID COUNTY, SAID CURVE BEING CONCAVE TO THE WEST, HAVING A RADIUS OF 688.26

FEET, THE TANGENT TO SAID CURVE AT SAID POINT OF BEGINNING BEARS SOUTH 01°44'30" WEST; THENCE SOUTHERLY ALONG SAID CURVE, 34.54 FEET; THENCE SOUTH 4°17'00" WEST ALONG SAID EASTERLY LINE, 21.76 FEET TO THE BEGINNING OF A TANGENT CURVE THEREIN, CONCAVE TO THE EAST, HAVING A RADIUS OF 668.26 FEET; THENCE SOUTHERLY ALONG SAID CURVE IN SAID EASTERLY LINE, 55.60 FEET TO THE BEGINNING OF A TANGENT CURVE THEREIN, CONCAVE TO NORTHEAST HAVING A RADIUS OF 328.93 FEET; THENCE SOUTHEASTERLY ALONG SAID LAST MENTIONED CURVE, BEING ALSO THE NORTHEASTERLY LINE OF SAID PARCEL OF LAND, 517.69 FEET; THENCE NORTH 89°40'30" EAST ALONG THE NORTHERLY LINE OF SAID LAND 100.07 FEET TO AN ANGLE POINT THEREIN, BEING THE BEGINNING OF A CURVE, CONCAVE TO THE NORTHEAST HAVING A RADIUS OF 348.93 FEET, A TANGENT TO SAID CURVE AT SAID POINT BEARING NORTH 70°49'55" WEST; THENCE NORTHWESTERLY ALONG SAID CURVE BEING ALSO A SOUTHWESTERLY LINE OF PARCEL OF LAND DESCRIBED IN SAID DEED 430.45 FEET; THENCE NORTH 0°09'00" WEST ALONG THE WESTERLY LINE OF SAID PARCEL OF LAND 115.67 FEET TO A POINT IN A LINE PARALLEL WITH THE NORTHERLY LINE OF SAID LOT 2 AND WHICH PASSES THROUGH THE TRUE POINT OF BEGINNING, SAID POINT BEING DISTANT NORTH 88°27'15" EAST ON SAID PARALLEL LINE, 432.63 FEET FROM THE WESTERLY LINE OF SAID LOT 2; THENCE SOUTH 88°27'15" WEST 190.41 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 1-C:

ALSO THAT PORTION OF SAID LOT 2, DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE WESTERLY LINE OF SAID LOT 2 WITH THE CENTER LINE OF FIFTY-FOURTH STREET, 60 FEET WIDE, EXTENDING WESTERLY FROM SAID WESTERLY LINE; THENCE NORTH 88°27'15" EAST, PARALLEL WITH THE NORTHERLY LINE OF SAID LOT, 452.64 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 0°09'00" EAST ALONG AN EASTERLY LINE OF A PARCEL OF LAND DESCRIBED IN THE DEED TO THE LOS ANGELES & SALT LAKE RAILROAD COMPANY, RECORDED IN BOOK 13243 PAGE 314 OF OFFICIAL RECORDS OF SAID COUNTY, 116.16 FEET TO THE BEGINNING OF A TANGENT CURVE THEREIN, CONCAVE TO THE NORTHEAST, HAVING A RADIUS OF 328.93 FEET; THENCE SOUTHEASTERLY ALONG SAID CURVE, BEING ALSO THE NORTHEASTERLY LINE OF SAID PARCEL OF LAND, 484.99 FEET TO A LINE PARALLEL WITH THE WESTERLY LINE OF SAID LOT 2, AND WHICH PASSES THROUGH A POINT IN THE NORTHERLY LINE OF SAID LOT, DISTANT EASTERLY THEREIN, 750 FEET FROM THE NORTHWESTERLY CORNER OF SAID LOT 2; THENCE NORTH 0°09'00" WEST ALONG SAID PARALLEL LINE, 450.81 FEET TO A LINE PARALLEL WITH THE NORTHERLY LINE OF SAID LOT 2 AND WHICH PASSES THROUGH THE TRUE POINT OF BEGINNING; THENCE SOUTH 88°27'15" WEST, ALONG SAID LAST MENTIONED PARALLEL LINE, 297.36 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF LOT 2 OF TRACT NO. 2836, PARTLY IN THE CITY OF VERNON AND PARTLY IN THE CITY OF HUNTINGTON PARK, BOTH IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 35 PAGES 88 AND 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWESTERLY CORNER OF SAID LOT 2; THENCE ALONG THE SOUTHERLY LINE OF SAID LOT, NORTH 89°40'30" EAST 316.84 FEET TO THE CENTER LINE OF SEVILLE AVENUE, AS SAID AVENUE IS SHOWN ON THE MAP OF TRACT NO. 6674, RECORDED IN BOOK 70 PAGE 100 OF SAID MAP RECORDS; THENCE PARALLEL WITH THE EASTERLY LINE OF SAID LOT 2, NORTH 1°24'45" WEST 390.51 FEET TO THE SOUTHERLY LINE OF THE LAND DESCRIBED IN THE DEED TO LOS ANGELES & SALT LAKE RAILROAD COMPANY, RECORDED IN BOOK 13243 PAGE 314, OFFICIAL RECORDS OF SAID COUNTY; THENCE WESTERLY AND NORTHWESTERLY ALONG THE SOUTHERLY AND SOUTHWESTERLY LINE OF SAID LAST MENTIONED LAND, 489.13 FEET ALONG A CURVE CONCAVE NORTHEASTERLY HAVING A RADIUS OF 348.93 FEET TO THE WEST LINE OF SAID LOT 2; THENCE ALONG SAID WEST LINE, SOUTH 0°09'00" EAST 719.31 FEET TO THE POINT OF BEGINNING.

PARCEL 3:

THAT PORTION OF LOT 2 OF TRACT NO. 2836, IN THE CITY OF VERNON, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 35 PAGES 88 AND 89 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING IN THE SOUTH LINE OF SAID LOT 2, AT A POINT DISTANT SOUTH 89°40'30" WEST 40 FEET FROM THE SOUTHEAST CORNER OF SAID LOT, SAID POINT OF BEGINNING BEING ON THE WEST LINE OF SOTO STREET AS SAID STREET NOW EXISTS, 80 FEET IN WIDTH; THENCE ALONG SAID SOUTH LINE, SOUTH 89°40'30" WEST 942.45 FEET, MORE OR LESS, TO THE CENTER LINE OF SEVILLE STREET, AS SAID SEVILLE STREET IS SHOWN 60 FEET IN WIDTH, ON THE MAP OF TRACT NO. 6674, RECORDED IN BOOK 70 PAGE 100 OF SAID MAP RECORDS; THENCE ON A LINE PARALLEL TO THE EAST LINE OF SAID LOT 2, NORTH 1°24'45" WEST 390.51 FEET, MORE OR LESS, TO THE SOUTHERLY LINE OF THE RIGHT OF WAY IN SAID LOT 2, CONVEYED TO THE LOS ANGELES & SALT LAKE RAILROAD COMPANY BY DEED RECORDED IN BOOK 13243 PAGE 314 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE SOUTHEASTERLY ALONG SAID RIGHT OF WAY LINE AND ALONG A CURVE CONCAVE TO THE NORTHEAST, THE CENTER OF WHICH CURVE BEARS NORTH 6°20'30" EAST 348.93 FEET A DISTANCE OF 41.21 FEET TO THE END OF SAID CURVE; THENCE ALONG SAID RIGHT OF WAY LINE AND ON THE RADIAL LINE TO SAID CURVE NORTH 0°19'30" WEST 1.5 FEET; THENCE ALONG SAID RIGHT OF WAY LINE NORTH 89°40'30" EAST 801.39 FEET; THENCE SOUTH 0°19'30" EAST 1.5 FEET TO THE POINT OF BEGINNING OF A CURVE CONCAVE NORTHERLY AND HAVING A RADIUS OF 4593.75 FEET A TANGENT TO WHICH CURVE AT SAID POINT BEARS NORTH 89°40'30" EAST; THENCE NORTHEASTERLY ALONG SAID CURVE 99.89 FEET; THENCE TANGENT TO SAID CURVE NORTH 88°25'45" EAST 0.13 FEET TO THE WEST LINE OF SOTO STREET AS SAID STREET NOW EXISTS, 80 FEET IN WIDTH; THENCE ALONG SAID WEST LINE OF SOTO STREET, SOUTH 1°24'45" EAST 389.17 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

**EXHIBIT B**

**SUBLANDLORD'S WORK**

1. Install (50) dock bumpers on the North dock - $25,623.
2. Replace (2) overhead doors and service balance of doors, (on the North dock only) - Allowance- $25,000.
3. Replace building water main, (interior overhead water main only) - $149,940.
4. Replace All Lighting - $171,212.
     i. Includes warehouse, offices and exterior lights with energy efficient T-5 & T-8 Lighting
     ii. 335 (6) Lamp fixtures in warehouse 1 & 2.
     iii. 175 (4) Lamp fixtures in warehouse 3.
     iv. 850 Lamps (Re-lamp Office).
     v. Does not include ballast or damaged fixtures.
5. Upgrade to LED lights - $28,019.
6. Electrical: Replace Main Switchgear per the City of Vernon with a three phase four wire system, (this cost includes repair to damaged equipment, and temporary power) - $382,500.
7. Perform Title 19 per the City of Vernon - $74,100.
8. As to main building only, and not covered area, install ADA Ramp as required by the City of Vernon for Subtenant, and if required by City of Vernon, for any additional tenants as determined after walkthrough by Subtenant with Sublandlord's Contractor and City's inspection. Cost to be determined, and if more than $62,025 plus any remaining contingencies after all work is completed, such additional funds shall be advanced by Subtenant and recouped pursuant to Section 10 b)
9. Misc. clean up, (dumpsters, trash, weeds, labor, etc.) - $31,105.
10. $150,000 which Landlord will hold in Construction Escrow towards roof repair and/or maintenance
11. All building systems, including without limitation, all fire alarm and suppression, plumbing, electrical, heating, ventilation, air conditioning and the computerized and mechanical control systems associated with each of the foregoing shall be placed in good working order.
12. Such other work as may be required to meet the City of Vernon's Certificate of Occupancy requirements for the Premises (not including the Enclosure and/or any Enclosure Work, all of which is Tenant's obligation).

**Total Base Scope items 1-10:   $1,099,524.00**

**Total Base Scope Items 1-10 plus contingency of $100,476.00 = $1,200,000**

## **Exhibit C**

**Parking Lot Lease**

WEIL:\96974338\11\73217.0004

AUG-07-2007 11:08    F GAVINA & SONS INC    8006979947   P.03
18-23538-shl   Doc 3033   Filed 04/03/19   Entered 04/03/19 23:09:40   Main Document
Pg 79 of 105

## PARKING LOT LEASE AGREEMENT

THIS PARKING LOT LEASE AGREEMENT (hereinafter the "Lease") is made as of the 15th day of December, 1998, by and between **51ST STREET PARTNERSHIP**, a California general partnership ("Landlord"), and **SEARS LOGISTICS SERVICES, INC.**, a Delaware corporation ("Tenant"). In consideration of the mutual covenants contained herein, the parties agree as follows:

1.    **Premises.** Landlord leases to Tenant and Tenant leases from Landlord that certain parcel of real estate consisting of approximately 2.33 acres as depicted on Exhibit "A" attached hereto and legally described on Exhibit "B" attached hereto, including the parking lot improvements located thereon (the "Demised Premises") owned by Landlord situated in the City of Vernon, County of Los Angeles, and State of California.

2.    **Use.** The Demised Premises may be used by Tenant as an open-air ground level parking lot, on a 24 hours per day, 7 days per week basis, and all other lawful uses. In the event Tenant is prohibited from conducting its operations on the Demised Premises throughout the Term (as hereinafter defined) by the effect of any zoning or noise ordinances or other governmental use restrictions, or applicable rules or regulations thereunder, Tenant shall have the right to terminate this Lease by written notice to Landlord, effective upon the date on which continuing such operations would subject Tenant to prosecution or civil penalty. Tenant agrees to comply, at the Lease Commencement Date (as hereinafter defined) and during the Term, with all federal, state and local governmental laws, rules, regulations, and ordinances applicable to Tenant's use of the Demised Premises.

3.    **Term.**

(a)    The term of this Lease shall commence on December 15, 1998 (the "Commencement Date") and end on March 31, 2002 (the "Term").

(b)    Landlord grants to Tenant six (6) consecutive options to extend this Lease for periods of five (5) years each. Each option can be exercised by Tenant giving Landlord written notice of the exercise thereof at least six (6) months prior to the expiration of the then existing Term, provided, however, that if Tenant shall fail to give any such notice within such six (6) months time limit, Tenant's right to exercise its option shall nevertheless continue until thirty (30) days after Landlord shall have given Tenant written notice of Landlord's election to terminate such option, and Tenant may exercise such option at any time until the expiration of said thirty (30) day period. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the options set forth in this Section 3 through inadvertent failure to give notice thereof within the time limits prescribed. During any extension, all Sections of this Lease will be effective, and references to Term will incorporate the extensions.

(c)     Any holding over after the expiration of the Term of this Lease shall be construed to be a tenancy from month-to-month, at the same monthly rental as required to be paid by Tenant for the period immediately prior to the expiration of the Term hereof, and shall otherwise be on the terms and conditions herein specified, so far as applicable.

4.     **Rent**. Rent for the Demised Premises shall be Seven Hundred Fifty and 00/100ths Dollars ($750.00) per month, payable on the first of each month during the Term (partial month to be prorated) commencing on the Commencement Date. Such rent shall be made payable to Landlord and mailed to Landlord's address as set forth in the "Notice" section of this Lease, until the payee or address is changed by written notice from Landlord to Tenant. Rent shall not be in default, however, until the fifteenth (15th) day after the date for payment.

5     **Utilities**. Tenant shall be responsible for arranging for and paying directly to the applicable utility for any utility services Tenant desires in connection with Tenant's use of the Demised Premises.

6.     **Taxes**.

(a)     Landlord shall pay when due all real estate taxes, general and special assessments and any other charges, levies or impositions levied or assessed upon Landlord's land and buildings, including the Demised Premises. Upon request, Landlord will provide to Tenant paid receipts or other evidence of payment of such taxes, assessments and charges. In the event Landlord does not timely pay such taxes, assessments and charges, then Tenant may elect, but shall not be obligated, to pay such taxes, assessments and charges, in which event Landlord shall promptly refund to Tenant any such payments made by Tenant or, in the alternative, Tenant may set off any such payments against rent or other charges due under this Lease.

(b)     As used herein, the term "Base Taxes" shall mean real estate taxes for the land only for the tax year July 1, 1998 to June 30, 1999. Tenant shall reimburse Landlord for Tenant's Pro Rata Share (as hereinafter defined) of real estate taxes applicable to the land only in excess of Base Taxes within thirty (30) days after receipt of the tax bill and receipt marked "paid in full". Tenant's "Pro Rata Share" shall be determined on the basis of the acreage of the Demised Premises divided by the acreage of the tax parcel which includes the Demised Premises. Notwithstanding the foregoing, Tenant shall not be responsible for any assessments, special or otherwise, levied or imposed upon the land as a result of any improvements to or for the balance of the tax parcel which includes the Demised Premises. Additionally, Tenant shall not be responsible for any estate, gift, inheritance, succession, franchise, income or excess profit taxes which may be payable by Landlord with respect to the Demised Premises or the tax parcel which includes the Demised Premises.

7.  **Repairs and Maintenance**.

(a)  Tenant shall, at its cost, during the Term keep the Demised Premises in a clean condition and sightly condition.

(b)  Upon the expiration or earlier termination of the Term, Tenant shall redeliver the Demised Premises "broom clean" and in the same condition as on the Commencement Date, normal wear and tear and casualty loss excepted.

8.  **Landlord Improvements**.

(a)  Landlord shall, at Landlord's sole cost and expense, separate the Demised Premises from the balance of Landlord's land and buildings with a six (6) feet tall wrought iron fence or similar partition to be mutually agreed upon by Landlord and Tenant (hereinafter referred to as the "Improvements"). All of the Improvements shall be completed and acceptable to Tenant within sixty (60) days of the execution of this Lease in a good and workman-like manner, and cause no significant interference with Tenant's day to day business. If the Improvements have not been completed within the specified time period above, then at Tenant's election, Tenant may complete the Improvements and deduct the cost from rent or other charges due from Tenant hereunder. Landlord agrees to obtain and maintain, or cause Landlord's contractors to obtain and maintain, during the construction of the Improvements and until completion thereof, reasonable and customary insurance coverage, including workers' compensation, commercial general liability insurance, motor vehicle liability insurance, and builder's risk insurance. Landlord shall at its sole cost and expense guarantee all work done by or on behalf of Landlord in constructing the Improvements against defective design, workmanship, and materials. Notwithstanding the foregoing, during the period of time in which Landlord is remodeling and renovating the improvements located on the property immediately adjacent to the Demised Premises, Landlord may substitute a temporary chain link fence in place of the wrought iron fence or similar partition. Upon completion of Landlord's remodeling and renovation, the wrought iron fence or similar partition shall be completed within sixty (60) days.

(b)  Tenant acknowledges that it was the prior owner of the Demised Premises and is familiar with the condition of the Demised Premises, applicable zoning and other laws, ordinances, regulations relating to the Demised Premises and its suitability for Tenant's intended use. Accordingly, except as provided in paragraph 8(a) above, Tenant accepts the Demised Premises in their "as is" condition.

9.  **Indemnity**.

(a)  Landlord agrees to indemnify, protect, defend and hold Tenant, its directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses and liabilities (except those caused solely by the willful or negligent acts or

omissions of Tenant), arising out of the actual or alleged injury to or death of any person or loss of or damage to property in or upon the Demised Premises, including the person and property of Tenant, its directors, officers, employees, agents, invitees, licensees or others, arising out of or in connection with the willful or negligent acts or omissions of Landlord or Landlord's employees, agents, or contractors.

(b)     Tenant agrees to indemnify, protect, defend and hold Landlord, its directors, officers, employees and agents, harmless from and against all claims, actions, losses, damages, costs, expenses and liabilities (except those caused by the willful or negligent acts or omissions of Landlord), arising out of the actual or alleged injury to or death of any person or loss of or damage to property in or upon the Demised Premises, including the person and property of Landlord, its directors, officers, employees, agents, licensees, or others, arising out of or in connection with the willful or negligent acts or omissions of Tenant or Tenant's employees, agents, or contractors.

10.     **Insurance.** Tenant shall maintain, at Tenant's expense, during the Term, commercial general liability insurance for the Demised Premises, including, but not limited to, coverage for personal injury and contractual liabilities with combined single limits of not less than $2,000,000 per occurrence for bodily injury and/or property damage, which policy shall name Landlord as an additional insured. Tenant may meet its insurance obligations under this Lease through a blanket insurance policy, through any combination of primary or umbrella/excess coverage, or through a program of self-insurance.

11.     **Hazardous Substances.**

(a)     The term "Hazardous Substances" means any material amounts (i.e., amounts that could cause a violation of any environmental protection or control laws, rules or regulations) of toxic or hazardous wastes, pollutants, or substances, including, without limitation, (A) 4 PCB's (B) petroleum products or byproducts, (C) substances defined or listed as "hazardous substances" or "toxic substances" or similarly identified in or pursuant to (1) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sec. 9601 et seq., (2) the Hazardous Materials Transportation Act, 47 U.S.C. Sec. 1802, et seq., or (3) the Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6901 et seq., (D) any chemical substance or mixture regulated under the Toxic Substance Control Act of 1976, as amended, 15 U.S.C. Sec. 2601 et seq., (E) any "toxic pollutant" under the Clean Water Act, 33 U.S.C. Sec. 466 et seq., as amended, (F) any hazardous air pollutant under the Clean Air Act, 42 U.S.C. Sec. 7401 et seq., and (G) any hazardous or toxic substance or pollutant regulated under any other applicable federal, state or local environmental, health or safety laws, regulations, and rules of common law.

(b)     Tenant shall not release any Hazardous Substances on the Demised Premises and Tenant shall indemnify and hold Landlord harmless from and against all liabilities, losses,

costs, fines, demands, claims, judgments, damages, expenses, actions or rights of action arising from such a release by it or its employees, agents, or contractors.

(c)    Landlord shall not release any Hazardous Substances on the Demised Premises. Landlord shall be responsible for all costs incurred in complying with any order, ruling, or other requirement of any court or governmental body or agency having jurisdiction over the Demised Premises requiring Landlord to comply with any laws which related to Hazardous Substances or which relate to Hazardous Substances created, handled, placed, stored, used, transported or disposed by Landlord, including without limitation the cost of any required or necessary repair, clean-up or detoxification and the preparation of any closure or other required plans, and Landlord shall diligently pursue to completion all such work in connection with same. In the event of any breach of any covenant contained herein by Landlord, or of the presence of Hazardous Substances (excluding Hazardous Substances established to have been brought on to the Demised Premises by Tenant or Tenant's employees, agents or contractors, unless released on to the Demised Premises by reason of the fault or negligence of Landlord), which breach or presence materially adversely affects Tenant's use of the Demised Premises, Tenant has the right either (i) to terminate the Lease by written notice to Landlord, to be effective as of the date of Tenant's notice, or (ii) to have its rent and any other charges payable by Tenant abated to the extent of interference with Tenant's business until such time as the Demised Premises comply with all laws and Landlord has cured its breach in a manner satisfactory to Tenant. Landlord shall indemnify, protect, defend and hold Tenant harmless from and against all liabilities, losses, costs, fines, demands, claims, judgments, damages, expenses, actions or rights of action arising from such a release by it or its employees, agents, contractors or invitees.

12.    **Landlord's Warranties.** Landlord warrants and represents that presently, and during the Term:

(a)    Tenant, on paying the rent and performing Tenant's obligations hereunder, shall and may peaceably and quietly have, hold and enjoy the Demised Premises for the Term.

(b)    The execution and delivery of this Lease shall not be precluded by or cause a breach of any other agreement, mortgage, contract or other instrument or document to which Landlord is a party.

(c)    If the Demised Premises are, on the Commencement Date, subject to any mortgage or mortgages, Landlord will furnish Tenant a copy of such mortgage documents, together with Non-Disturbance Agreements executed by each of Landlord's mortgagees in the form attached hereto as Exhibit "C". If Landlord fails to provide Tenant with executed Non-Disturbance Agreements from all such mortgage holders within thirty (30) days of the date hereof, Tenant shall have the right to terminate this Lease upon written notice to Landlord.

13.    **Default**. Landlord may either terminate the Lease or reenter the Demised Premises, recover possession and dispossess Tenant in the manner prescribed by statute if, after receiving prior written notice from Landlord, Tenant fails: (i) to make within fifteen (15) days thereafter any rental payment past due hereunder; or (ii) to start performance within thirty (30) days thereafter or within such additional time as may be necessary, of any other covenant or agreement to be performed by Tenant herein. If Tenant, after receiving notice, proceeds to cure the default, then no default shall be deemed continuing.

14.    **Notices**. All notices herein provided for shall be given by registered mail or certified mail, postage prepaid, return receipt requested, or sent by overnight express carrier (e.g., Federal Express or Express Mail) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery to the following addresses:

> If to Landlord:    51st Street Partnership
> 2369 E. 54th Street
> Vernon, California  90058
> Attn: Jose Gavina

> If to Tenant:    Sears Logistics Services, Inc.
> 3333 Beverly Road, A-3
> Hoffman Estates, IL 60179
> Attn:  Director, Logistics
>        Real Estate

> copy to:    Sears Logistics Services, Inc.
> 3333 Beverly Road, A-3
> Hoffman Estates, IL 60179
> Attn:  General Counsel

Notice shall be deemed given when so mailed and addressed. Either party may change such address by written notice to the other party as provided for herein.

15.    **Damage or Destruction**. If during the Term the Demised Premises are partially damaged or destroyed by fire or other casualty, or the Demised Premises are rendered unfit for Tenant's use, in Tenant's sole judgment, by fire or other casualty:

> (a)    Rent and all other charges payable by Tenant shall abate, from the date of the fire or casualty, until the Demised Premises have been restored as herein provided;

> (b)    Landlord shall promptly pay to Tenant any unearned rent or other charges paid by Tenant, or Tenant shall promptly pay to Landlord any rent earned and unpaid; and

(c)    Tenant shall have the right, within sixty (60) days thereafter, upon written notice to Landlord, to terminate this Lease as of the date of the fire or other casualty; and

16.   **Condemnation.**

(a)    Landlord shall promptly notify Tenant in writing of any proposed taking or condemnation which will affect the Demised Premises or any part thereof.

(b)    If any part or all of the Demised Premises are involved in a taking or condemnation, the rights of Landlord and Tenant to share in the proceeds of any award shall be determined as follows:

(i)    The court in the condemnation proceedings shall, if not prohibited by law, be requested by both Landlord and Tenant to make separate awards to Landlord and Tenant; and

(ii)    If the court is unwilling or unable to make separate awards, the award shall be divided between Landlord and Tenant in proportion to the fair market value of their respective interests. If Landlord and Tenant are unable to agree upon the division, it shall be resolved by appraisal conducted by a mutually acceptable neutral appraiser.

(c)    Tenant shall have, at its option, the right to terminate this Lease upon a taking or condemnation of any part or all of the Demised Premises.

(d)    If Tenant elects to terminate this Lease under this Section, Tenant shall notify Landlord in writing of this election within sixty (60) days after the taking effective on the date title vests in the condemnor. Tenant's rental obligation shall cease as of the date title vests in the condemnor, and Landlord shall promptly refund rent and other charges paid by Tenant for periods beyond that date.

(e)    If Tenant does not elect to terminate this Lease, Landlord shall, at its sole cost, promptly and diligently restore the remaining part of the Demised Premises, replace the parking area taken and/or replace the points of ingress and egress taken, so the Demised Premises, parking areas and points of ingress and egress are returned to, as nearly as reasonably possible, the condition existing prior to the taking or condemnation. Tenant shall not be obligated to make any payment or contribution toward the repair or restoration work, except, however, Tenant shall make the proceeds of any award made to Tenant in connection with such condemnation proceedings available for such repair or restoration work. Tenant's rental obligation shall be proportionately reduced by the percentage of the Demised Premises taken.

17.   **Assignment or Subletting**. Tenant shall have the right, with Landlord's prior written approval, which approval shall not be unreasonably withheld or delayed, to assign this Lease or sublet all or part of the Demised Premises. In such event, Tenant shall remain responsible for the payment of rent and the performance of its other obligations hereunder, but not beyond the Term to which Tenant has agreed in writing and specifically excluding any option period not exercised by Tenant prior to such assignment or sublease. Notwithstanding the foregoing, Landlord's consent shall not be required for an assignment or sublease to any entity which is owned or controlled by Tenant, which owns and controls Tenant, which is owned or controlled by an entity which owns or controls Tenant or which results from the merger with or acquisition of Tenant.

18.   **Attorneys' Fees**. Should either party hereto institute any action or proceeding in court to enforce any provision hereof or for damages, or declaratory or other relief hereunder, the prevailing party shall be entitled to receive from the losing party, in addition to court costs, such amount as the court may adjudge to be reasonable as attorneys' fees for services rendered to said prevailing party and said amount may be made a part of the judgment against the losing party.

19.   **Choice of Law**. This Lease shall be construed in accordance with and governed by the laws of the state in which the Demised Premises are located.

20.   **Independent Status**. Nothing contained in this Lease shall be construed to make Landlord and Tenant partners or joint venturers or to render either party liable for the debts or obligations of the other.

21.   **Broker's Commission**. Landlord agrees to pay any commission or fee due to or claimed by any real estate broker in connection with this Lease.

22.   **Time of The Essence**. Time is of the essence of this Lease, and of each and every covenant, term, condition and provision hereof.

23.   **Waiver**. The waiver by either party of, or the failure of either party to take action with respect to any breach of any term, covenant or condition herein contained, shall not be deemed to be a waiver of such term, covenant or condition, or subsequent breach of the same, or any other term, covenant or condition therein contained.

24.   **Remedies Cumulative**. All remedies hereinbefore and hereafter conferred on Landlord and Tenant shall be deemed cumulative and no one exclusive of the other, or of any other remedy conferred by law.

25.   **Severability**. Any provision or provisions of this Lease which are or become illegal or legally void shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions of this Lease shall nevertheless remain in full force and effect.

8

26.    **Headings**. The Section headings are for convenience and are not a part of this Lease.

27.    **Counterparts**. This Lease may be executed in counterparts, which when taken together shall be interpreted as a single document.

28.    **Entire Agreement and Binding Effect**. This Lease covers in full every obligation between the parties hereto concerning the Demised Premises, and the provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, as the case may be, subject at all times to all provisions and restrictions regarding the assignment, transfer and encumbrance of any interest hereunder.

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Lease to be executed as of the date and year first above written.

LANDLORD:

51ST STREET PARTNERSHIP

By: _____
Name: _JOSE A. GAUGLIA_
Title: _General Partner_

TENANT:

SEARS LOGISTICS SERVICES, INC.

By: _____
Name: __James E. Comerford__
Title: ___President and CEO___

**Schedule of Exhibits**:

Exhibit "A" - Site Plan
Exhibit "B" - Legal Description
Exhibit "C" - Subordination, Non-Disturbance and Attornment Agreement

CHIDOCS2/1146/448961.v3 11/18/1998 3:10 PM          9

## EXHIBIT "A"

## SITE PLAN

SEE ATTACHED

EXHIBIT_____ *A*

# Plat Map



= DEMISED PREMISES

# EXHIBIT "B"

## LEGAL DESCRIPTION

That portion of the following legally described property depicted
on Exhibit A as the Demised Premises:

The land referred to in this Commitment is in the State of
California, County of Los Angeles, and is described as follows:

That portion of Lot 2 of Tract 2836, in the city of Vernon, as per
map recorded in Book 35 Pages 88 and 89 of Maps, in the office of
the county recorder of said county, described as follows:

Beginning at the Northwesterly corner of said Lot 2; thence South
0° 09' East along the Westerly line of said Lot, 871.50 feet to
the center line of 54th Street, (60 feet wide) extending Westerly
from said Lot 2; thence parallel with the Northerly line of said
lot, North 88° 25' East 750 feet; thence North 0° 09' West
parallel with the Westerly line of said Lot 2, a distance of 334
feet to a point distant South 0° 09' West 557.50 feet from the
North line of said Lot; thence South 89° 51' West 300 feet; thence
North 0° 09' West 550 feet, more or less, to the Northerly line of
said Lot 2; thence South 88° 25' West along said Northerly line,
450 feet, more or less, to the point of beginning.

EXCEPT therefrom all oil, gas, mineral and other hydrocarbon
substances in and under a plane 500 feet below the surface of said
land, but without any right of surface entry above said 500 foot
plane, as reserved in the deed from Malmo Inc., recorded in Book 4
Page 24, of Deeds..

## <u>Exhibit D</u>

**Parking Lot Sublease**

## SUBLEASE

**THIS SUBLEASE** ("Sublease") is made and entered into as of the _21ˢᵗ_ day of December, 2017 (the "Effective Date"), by and between INNOVEL SOLUTIONS, INC., a Delaware corporation (as successor-in-interest to Sears Logistics Services, Inc.) ("Sublessor") and Mr. Henry Shahery, an individual, and Shason, Inc. (individually and collectively, jointly and severally, "Sublesee").

### RECITALS

The facts underlying the execution of this Sublease are as follows:

A.     Sublessor presently leases approximately 2.33 acres of that certain parcel located in the City of Vernon, County of Los Angeles, State of California, which is identified on the site plan attached hereto as <u>Exhibit A</u> (the "Leased Premises") under a certain Lease dated December 15, 1998 (the "Lease") by and between Sublessor and 51ˢᵀ STREET FRUITLAND AVE., LLC, a California limited liability company ("Landlord").

B.     Sublessor and Sublessee have entered into that certain sublease, dated of even date herewith (the "Adjacent Sublease"), for premises, including land and a building, situated adjacent to the Leased Premises and located at 5525 S. Soto Street, Vernon, California.

C.     Sublessor desires to sublease the Leased Premises to Sublessee, and Sublessee desires to sublease the Leased Premises from Sublessor.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein, execution of the Adjacent Sublease, and other valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.     **Sublease.** Sublessor hereby subleases to Sublessee, and Sublessee hereby takes and hires from Sublessor, the Leased Premises for the term (including any renewal terms) and subject to the terms, covenants, agreements and conditions set forth herein.   Sublessee is accepting the Leased Premises "AS IS," "WHERE IS," without representation or warranty from Sublessor, and without fixtures, furniture or equipment.

2.     **Term.** The term of this Sublease shall commence on the Effective Date.   The term shall end on January 31, 2022 (subject to Sublessor's renewal options as set forth in Section 3(b) of the Lease).   If Sublessee timely elects to exercise an Option Term under the Adjacent Sublease and Sublessor elects to extend the term of the Adjacent Sublease and the "Master Lease" (as defined in the Adjacent Sublease) then Sublessor shall extend the term of this

DM535077

Sublease so that the term of this Sublease and the term of the Adjacent Sublease are co-terminous.

3.    **Rent and Additional Rent.**

A.    During the initial term of this Sublease and during all renewal terms, Sublessee shall pay to Sublessor rent in the amount of Forty-Eight Thousand and 00/100 Dollars ($48,000.00.00) annually payable in monthly installments of Four Thousand Dollars ($4,000.00) per month commencing on the "Commencement Date" (as defined in the Adjacent Sublease).

B.    Rent shall otherwise be payable by Sublessor to Landlord pursuant to the terms of Section 4 of the Lease.

4.    **Lease.** Sublessee's rights pursuant to the Sublease are subject and subordinate at all times to the Lease and to all of the covenants and agreements of the Lease, except as expressly modified by this Sublease.  Sublessee shall not do, permit or tolerate anything to be done in, or in connection with Sublessee's use or occupancy of the Leased Premises which would violate any Lease covenants or agreements.  Sublessee expressly agrees to be bound by all obligations, covenants and restrictions which are set forth in the Lease, with the exception of the obligations contained in Section 4 of the Lease, in the same manner as these obligations, covenants and restrictions are binding upon the Sublessor, as tenant under the Lease, except as expressly modified by this Sublease.  Sublessee shall be entitled to all of the rights and benefits of Sublessor, as tenant under the Lease and except as modified and amended by this Sublease. Except as modified hereby, Sublessee shall perform all of Sublessor's duties and obligations under the Lease.  Sublessor shall have the same rights against Sublessee with respect to this Sublease as the Landlord has against the Sublessor, as Tenant, pursuant to the Lease.  This Sublease shall not be construed or interpreted to grant any greater rights than the Sublessor has received as tenant from the Landlord pursuant to the Lease.  Sublessee does not have any greater rights against Sublessor with respect to this Sublease than Sublessor has as tenant against the Landlord with respect to the Lease.

5.    **Services.**

A.    Notwithstanding anything contained in this Sublease, Sublessee agrees and acknowledges that Sublessor shall have no obligation or responsibility whatsoever to provide or perform any service, repair, alteration or other similar obligation which is the obligation of Landlord to provide or perform pursuant to the provisions and terms of the Lease.  Sublessor shall provide Sublessee with written notice of any termination or cancellation of the Lease.

B.    Sublessee recognizes that Sublessor does not control the operation of the Premises or the furnishing of any services thereon.  Accordingly, all of the agreements and obligations of Sublessor under this Sublease, express or implied, without limitation, any agreement or obligation to furnish services, are expressly dependent upon the performance and observation by the Landlord of its agreements and obligations under the Lease.  If the Landlord shall default in the performance or observance of any of its agreements or obligations under the Lease, either for the furnishing of utilities or services or otherwise, Sublessor shall not be liable therefor to Sublessee (except and to the extent such default is caused by Sublessor).  Any

condition resulting from such default by the Landlord shall not constitute an eviction, actual or constructive, and Sublessee shall not be entitled to cancel this Sublease or to any reduction in or abatement of the rents provided for herein, unless Sublessor receives the same reduction in or abatement of rent from Landlord under the terms of the Lease.

C.      If Landlord shall default in any of its obligations to Sublessor, Sublessee shall promptly notify Sublessor in writing and Sublessor shall use its reasonable efforts to enforce Sublessor's rights against Landlord. If Sublessor is unable to enforce its rights under the Lease, the Sublessor shall permit Sublessee, at Sublessee's sole cost and expense, to enforce Sublessor's rights against Landlord in Sublessor's name, provided, however, that Sublessee shall indemnify and hold Sublessor harmless from and against all liability, loss, demands, penalties or damage which Sublessor may incur or suffer by reason of such action. Sublessor shall also execute any and all documents reasonably required in furtherance of such action. In amplification and not in limitation of the foregoing and without any allowance to Sublessee or other reduction or adjustment of rent, Sublessor will not be responsible (i) for any service to the Building or the Leased Premises or (ii) for any maintenance, repairs or alterations in or to the Building or the Leased Premises, unless caused by any act or omission of Sublessor, its agents or employees.

6.      **Assignment and Subletting.**  Sublessee shall not voluntarily, by operation of law, or otherwise, assign or permit to be assigned this Sublease or any interest herein or sublease the Leased Premises or any part thereof without written consent of the Landlord and Sublessor. Any attempt to do any of the foregoing without such prior written consent shall be void and of no effect and shall be a material default under this Sublease.

7.      **Default.**  Any act or omission by Sublessee which could constitute a default by Sublessor as Tenant under the Lease shall constitute a default by Sublessee under this Sublease. Sublessor has the right, but not the obligation, upon five (5) days prior written notice to Sublessee, to cure any act or omission by Sublessee which would constitute a default under the Lease or could after notice and the passage of time, constitute a default under the Lease and to recover from the Sublessee the actual costs incurred by Sublessor, including reasonable attorneys' fees, in curing the act or omission by Sublessee. All remedies provided by the Lease which are hereby expressly incorporated by reference, shall be available to Sublessor against Sublessee in the event of default.

8.      **Cross-Default**. This Sublease is cross-defaulted with the Adjacent Sublease. In furtherance thereof, Sublessee acknowledges and agrees that a Default (as defined in Section 24 of the Adjacent Sublease) under the Adjacent Sublease shall constitute a default under this Sublease.

9.      **Notices.**  Notices shall be in writing and shall be deemed properly served: (a) five (5) business days after being deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage, or (b) one (1) business day after being deposited with a reputable overnight express carrier (e.g. Federal Express, UPS) for guaranteed next business day delivery with a request that the addressee sign a receipt evidencing delivery, or (c) upon receipt if personally delivered. Notices shall be addressed as follows:

If to Sublessor:        c/o Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attention: President, Real Estate

With a copy to:        Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attention: Associate General Counsel, Real Estate

If to Sublessee:        Mr. Henry Shahery
9777 Wilshire Blvd., Suite 470
Beverly Hills, Ca 90212
Tel. (424) 343-0371 Ext 220
Fax (424) 343-0379

If to Guarantor:        Shason, Inc.
@ Mr. Henry Shahery
9777 Wilshire Blvd., Suite 470
Beverly Hills, Ca 90212
Tel. (424) 343-0371 Ext 220
Fax (424) 343-0379

With a copy to:        Law Offices of Saul Reiss
2800 28th Street, Suite 328
Santa Monica, CA 90405-6201

or to any other address furnished in writing by either of the respective parties. However, any change of address furnished shall comply with the notice requirements of this Section and shall include a complete outline of all current notice addresses to be used for the party requesting the change.

      10.    **No Consequential or Punitive Damages.**    Notwithstanding anything to the contrary contained herein, neither Sublessor nor Sublessee shall be liable to the other party for any lost profits or other consequential, special, punitive, incidental or indirect damages (and the injured party shall not recover for such amounts).

      11.    **Sublessor Estoppel**.  Sublessor represents, to its knowledge, that the Lease is in full force and effect, no defaults by Landlord or Sublessor are continuing under the Lease, and a true and complete copy of the main body of the Lease is attached hereto as Exhibit B.

      12.    **Entire Agreement.**  The Lease, as modified by this Sublease, constitutes the entire agreement of the parties hereto; all prior agreements between the parties, whether written or oral, are merged herein and shall be of no force and effect.

13.    **Amendments.**   No provision of this Sublease may be altered, amended and/or waived, except by a written document signed by both parties hereto setting forth such alteration, amendment, and/or waiver.

**IN WITNESS WHEREOF**, Sublessor and Sublessee have executed this instrument as of the date first above written.



SUBLESSOR:

INNOVEL SOLUTIONS, INC.
A Delaware corporation

By: _____

Its: _____
     Robert A. Riecker
     Vice President

SUBLESSEE:

MR. HENRY SHAHERY

_____

GUARANTOR:

SHASON, INC.,

A California corporation

By: _____

Its: _____

**EXHIBIT A**

<u>SITE PLAN</u>

**EXHIBIT B**

<u>LEASE</u>

DM535077

**<u>Exhibit E</u>**

**Proposed Order**

WEIL:\96974338\11\73217.0004

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **SEARS HOLDINGS CORPORATION,** *et al.*, | : | |
| | : | **Case No. 18-23538 (RDD)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |

------------------------------------------------------------- x

### ORDER PURSUANT TO SECTIONS 365(a) AND 365(f) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO ASSUME UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY

Upon the motion ("**Motion**")[2] of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),  pursuant to sections 365(a) and 365(f) of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order authorizing the Debtors to assume certain unexpired nonresidential real property leases identified on **Exhibit 1** hereto (the "**Vernon Leases**"), all as more fully set forth in the Motion; and the Court having jurisdiction to consider

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and

the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the requested relief being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the relief requested in the Motion having been provided in

accordance with the Amended Case Management Order; and such notice having been adequate

and appropriate under the circumstances, and it appearing that no other or further notice need be

provided; and the Court having found and determined that the relief sought in the Motion is in

the best interests of the Debtors, their estates, their creditors, and all parties in interest, and that

the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.       The Motion is granted to the extent set forth herein.

2.       The assumption of the Vernon Leases by the Debtors is authorized and

approved pursuant to section 365(a) of the Bankruptcy Code.

3.       Within three (3) business days of the date hereof, the Debtors shall pay to

the applicable contract counterparty the Cure Amount set forth on **Exhibit 1** under the column

heading, "Undisputed Cure Amount," which payment shall constitute full and final satisfaction

of any and all defaults under the Vernon Leases, whether monetary or non-monetary.

4.       Following the payment of the Cure Amount, the non-debtor party to the

Leases shall be forever barred, estopped, and permanently enjoined from asserting against the

Debtors, their successors or assigns, or the property of any of them, any default existing under

the Vernon Leases as of the date hereof.

2

5.       Any and all anti-assignment provisions in the Vernon Leases, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.

6.       Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

7.       Upon successful marketing of the Vernon Leases, the Debtors shall serve the Vernon Counterparties and file with the Court a notice of the assignment (the "**Assignment Notice**") to an assignee (the "**Assignee**").   Any Vernon Counterparty seeking to object to adequate assurance of future performance must (a) file a written objection in compliance with the Bankruptcy Rules and the Local Rules with the Court (an "**Objection**"), so that such objection is filed no later than eight (8) calendar days after the later of the date on which (i) the Assignment Notice is filed with the Court and (ii) evidence of adequate assurance of future performance is served on the Vernon Counterparties (the "**Objection Deadline**"), and (b) serve the Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Assignee on or before the Objection Deadline.   In the event that no objection is filed prior to the Objection Deadline, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Assignment Notice, which order may be entered without further notice or opportunity to be heard.   If an Objection is timely filed and served with respect to the Assignment Notice, or to the extent that it remains unresolved, such Objection shall be set for a hearing (the "**Hearing**") before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York Courtroom 118, 300 Quarropas Street, White Plains, New York 10601-4140 on a date to be announced.

3

8.      Nothing in this Order, shall impair, prejudice, waive or otherwise adversely affect the rights of the Debtors and their estates, subject to compliance with the notice provisions set forth in paragraph 7, unless otherwise agreed to by the parties, to assign any of the assumed Vernon Leases pursuant to, and in accordance with, the requirements of section 365 of the Bankruptcy Code.

9.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

10.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
           White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

4

**<u>Exhibit 1</u>**

**Leases**

| Unexpired Lease | Counterparty | Property Address | Description of Unexpired Lease | Undisputed Cure Amount |
|---|---|---|---|---|
| 1.  Warehouse Lease | 5525 S. Soto St. Associates | 5525 S. Soto Street, Vernon, CA 90058 | Lease dated April 3, 1947 between Connecticut General Life Insurance Company, as predecessor in interest to 5525 S. Soto St. Associates, as landlord, and Sears, Roebuck and Co., as tenant, as same may have been modified, amended, and/or extended. | $0.00 |
| 2.  Warehouse Sublease | Henry Shahery | 5525 S. Soto Street, Vernon, CA 90058 | Sublease dated December 21, 2017 between Sears, Roebuck and Co. as sublandlord, and Henry Shahery, as subtenant, as same may have been modified, amended, and/or extended. | $0.00 |
| 3.  Parking Lot Lease | 51st Street Partnership | 2700 Fruitland Ave, Vernon, CA 90058 | Lease dated December 15, 1998 between 51st Street Partnership as landlord, and Sears Logistics Services, Inc., as predecessor in interest to Innovel Solutions, Inc., as tenant, as same may have been modified, amended, and/or extended. | $24,188.00 |
| 4.  Parking Lot Sublease | Henry Shahery and Shason, Inc. | 2700 Fruitland Ave, Vernon, CA 90058 | Sublease dated December 21, 2017 between Innovel Solutions, Inc. as sublandlord, and Henry Shahery and Shason, Inc., as subtenants, as same may have been modified, amended, and/or extended. | $0.00 |