**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Evan C. Hollander
Raniero D'Aversa, Jr.
Emmanuel Fua

*Counsel for TELUS International (U.S.) Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| SEARS HOLDINGS CORPORATION., *et al.*, | ) | Case No. 18-23538-RDD |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**EMERGENCY MOTION OF TELUS INTERNATIONAL (U.S.) CORPORATION FOR AN ORDER (I) LIFTING THE AUTOMATIC STAY TO ALLOW IT TO TERMINATE MASTER OUTSOURCED SERVICES AGREEMENT; OR, IN THE ALTERNATIVE, (II) COMPELLING ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings, Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holding Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Product, Inc.(8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ............................................................................................................................ 2

JURISDICTION ............................................................................................................................. 5

REQUESTED RELIEF .................................................................................................................. 5

ARGUMENT .................................................................................................................................. 5

    I.    TELUS's Claim For Ongoing Post-Petition Services Under The Agreements Is An Administrative Expense Of The Estate Which SEARS Has Refused To Pay, And Both SEARS And Buyer Have Made It Clear That Neither Will Cure Any Defaults In Connection With An "Assumption" Of The Agreements ........................................................................... 5

    II.    Cause Exists To Lift The Automatic Stay To Allow TELUS To Terminate The Agreements ............................................................................................... 7

    III.    In The Alternative, SEARS And The Buyer Should Be Compelled To Assume Or Reject The Agreements .................................................................... 10

WAIVER OF STAY OF ORDER ................................................................................................ 11

NOTICE ....................................................................................................................................... 12

NO PRIOR REQUEST ................................................................................................................ 12

CONCLUSION ............................................................................................................................ 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Beker Industries Corp.*,
    64 B.R. 890 (Bankr. S.D.N.Y. 1986)................................................................................11

*In re Dana Corp.*,
    350 B.R. 144 (Bankr. S.D.N.Y. 2006)..............................................................................11

*In re Deppe*,
    110 B.R. 898 (Bankr. D. Minn. 1990) ................................................................................7

*Matter of Joyner*,
    55 B.R. 242 (Bankr. M.D. Ga. 1985).................................................................................9

*In re New York Medical Group, P.C.*,
    265 B.R. 408 (Bankr. S.D.N.Y. 2001)................................................................................8

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984)............................................................................................................6

*In re Patient Educ. Media, Inc.*,
    221 B.R. 97 (Bankr. S.D.N.Y. 1998)..........................................................................5, 6, 9

*In re Penn Traffic Co.*,
    524 F.3d 373 (2d Cir. 2008).............................................................................................10

*In re Project Orange Assocs., LLC*,
    432 B.R. 89 (Bankr. S.D.N.Y. 2010)..............................................................................7, 8

*In re Quinones Ruiz*,
    98 B.R. 636 (Bankr. D.P.R. 1988) .....................................................................................7

*In re Sonnax Indus, Inc.*,
    907 F.2d 1280 (2d Cir. 1990).............................................................................................8

*In re Uvaydov*,
    354 B.R. 620 (Bankr. E.D.N.Y. 2006).............................................................................12

**Statutes**

11 U.S.C. § 362.................................................................................................1, 5, 7, 8, 10

11 U.S.C. § 365....................................................................................................1, 5, 7, 10, 11

11 U.S.C. § 503.............................................................................................................5, 6

11 U.S.C. § 507 ......................................................................................................................... 5, 6

11 U.S.C. § 1129 .......................................................................................................................... 7

28 U.S.C. § 157 ............................................................................................................................. 5

28 U.S.C. § 1334 ........................................................................................................................... 5

28 U.S.C. § 1408 ........................................................................................................................... 5

28 U.S.C. § 1409 ........................................................................................................................... 5

28 U.S.C. § 1746 ........................................................................................................................... 3

**Rules**

Fed. R. Bankr. P. 4001 ......................................................................................................... 1, 5, 11

TELUS International (U.S.) Corporation ("**TELUS**"), by and through its undersigned counsel, hereby moves (the "**Motion**") this Court for entry of an order pursuant to section 362(d) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") lifting the automatic stay to allow TELUS to take steps to terminate the Master Outsourced Services Agreement dated as of March 1, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "**MOSA**") entered into between TELUS, as supplier, and Debtor Sears Holdings Management Corporation ("**SEARS**"), as customer, and Statement of Work #2, dated as of May 1, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "**SOW**", and together with the MOSA, the "**Agreements**"), between TELUS, as supplier, and SEARS, as customer.[1]  In the alternative, TELUS moves this Court for entry of an order pursuant to section 365(d)(2) of the Bankruptcy Code compelling SEARS and Transform HoldCo LLC (the "**Buyer**") to assume or reject the Agreements.  In support of this Motion, TELUS respectfully states as follows:

## PRELIMINARY STATEMENT

1.  TELUS brings this Motion because SEARS and the Buyer have advised TELUS in no uncertain terms that neither of them will make any further payments to TELUS under the Agreements during the administrative period, nor will either of them, under any circumstances, cure the already extensive pre- and post-petition defaults under those call center and customer care agreements.  Despite these refusals, the Buyer has demanded that TELUS continue providing services to SEARS.  Although the Bankruptcy Code affords chapter 11 debtors numerous rights, neither law nor equity requires TELUS to continue providing services to SEARS free of charge

---

[1] The MOSA and SOW have not been attached to this Motion because of confidentiality provisions in the MOSA. If SEARS is willing to waive such provisions, TELUS will promptly submit copies of the documents to the Court.

-1-

under these circumstances. Moreover, because bankruptcy law obligates a debtor to cure, or provide adequate assurance that it will promptly cure, all monetary defaults in connection with the assumption of an executory agreement, it is abundantly clear that Buyer has already decided that it will not assume the Agreements. Accordingly, TELUS respectfully requests that the Court lift the automatic stay to permit it to terminate the Agreements, or, alternatively, to compel SEARS and the Buyer to accept or reject the Agreements immediately.

## BACKGROUND

2. TELUS is a vendor to SEARS in the all-important area of website customer service and sales. TELUS provides SEARS with over 200 customer service agents, serving 44% of the volume for SEARS "online sales & service" business and 100% of the volume for SEARS's "Mattress Care" business. TELUS has supported SEARS's "online sales & service" line of business since May of 2013, with sales revenue of $102MM in 2017. Due to TELUS's exemplary performance in online sales and service, SEARS awarded TELUS its customer care business to grow the SEARS "Mattress Care" business in May of 2017. Over the past six years, TELUS has consistently met or exceeded its sales and support goals with SEARS. Support and generation of online sales has been an important element of SEARS's business, and TELUS has been an important partner to SEARS in that regard.

3. On March 1, 2013, TELUS and SEARS entered into the MOSA, and on May 1, 2014, TELUS and SEARS entered into the SOW. Pursuant to the Agreements, TELUS performed—and continues to perform—call center and other customer care services on behalf of SEARS. Section 8.6 of the MOSA requires SEARS to pay TELUS's properly submitted invoices within 60 days from the date thereof.

4. On October 15, 2018 (the "**Petition Date**"), SEARS and the other above-captioned debtors (collectively, the "**Debtors**") commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5. On January 14, 2019, the Debtors commenced an auction for the sale of substantially all of their assets. The Buyer was determined to have submitted the highest and best offer. *See* ECF No. 1730. Following a hearing, the Court approved the sale of the Debtors' assets to the Buyer on February 8, 2019, and the sale closed on February 11, 2019. *See* ECF Nos. 2507, 2796.

6. Meanwhile, TELUS continued to provide services to SEARS at substantial cost, and on January 15, 2018, TELUS properly submitted to SEARS Invoice Number USOP201900050 ($446,240.37), USOP2019000053 ($18,679.58), USOP2019000051 ($40,024.24) (the "**December Invoice**") in accordance with the MOSA. The total amount due thereunder of $506,794.12 (the "**December Amount Due**") was due to TELUS by March 18, 2019. SEARS has not disputed the December Amount Due or the December Invoice. Despite several requests for payment of the amounts due and owing by TELUS, SEARS has categorically refused to pay the December Amount Due. By refusing to pay the December Amount Due, SEARS has committed a material breach of the MOSA pursuant to Section 8.6 thereof, and such breach is continuing.

7. On March 11, 2019, Ronald Donohoe, Division Vice President and Head of Member Services at SEARS ("**Mr. Donohoe**"), contacted Mary Antonette Munoz, Site Lead and Senior Director at TELUS ("**Ms. Munoz**"), by email to discuss the sale of assets by SEARS to the Buyer. Mr. Donohoe noted that "existing contracts need to be either assumed or new ones drafted." Declaration of Mary Antonette Munoz Pursuant to 28 U.S.C. § 1746, dated April 3, 2017 ("**Munoz**

**Decl.**"), submitted concurrently herewith, Ex. A. Mr. Donohoe and Ms. Munoz scheduled a telephone call for March 14, 2019.

8. The telephone call occurred as scheduled on March 14, 2019, and was attended by Mr. Donohoe and his team and Ms. Munoz on behalf of TELUS. On the call, Mr. Donohoe – who stated that he was speaking on behalf of *both* SEARS and the Buyer – gave TELUS two options with respect to its contract with SEARS. The first option was to agree to "assign" the contract from SEARS to the Buyer and abandon TELUS's pre-petition claim of approximately $1.65MM and post-petition claim for unpaid invoices of approximately $1.01MM. The second option was to enter into a new contract with the Buyer and maintain TELUS's pre- and post-petition claims against SEARS. Munoz Decl. ¶¶ 4-5 & Ex. A.

9. On March 21, 2019, another telephone call was held between Mr. Donohoe and his team and Ms. Munoz and several other TELUS representatives. On that call, again speaking on behalf of both SEARS and the Buyer, Mr. Donohoe made clear that SEARS would no longer honor its obligations under the MOSA, and that neither the Buyer nor SEARS would pay TELUS any portion of its pre- or post-petition claims. Thus, it became clear that under both options provided by Mr. Donohoe noted above, TELUS would not be paid for its continued post-petition services to SEARS, and thus under no circumstances would the Agreements be assumed and assigned in accordance with the provisions of the Bankruptcy Code. Munoz Decl. ¶ 6.

10. On March 22, 2019, TELUS delivered a letter to SEARS noting SEARS's breach of the MOSA and express repudiation of the MOSA. TELUS also demanded immediate payment in full of the December Invoice. Finally, TELUS stated that it intended to terminate the Agreements. Munoz Decl., Ex. B.

11. On March 29, 2019, the Buyer, rather than SEARS, responded to TELUS's letter, stating that TELUS "is required to continue performing under [the MOSA] because the Bankruptcy Code requires non-debtor counterparties to perform under executory contracts with debtors." Munoz Decl., Ex. C. While the Asset Purchase Agreement between the Debtors and the Buyer provided the Buyer with 60 days to designate certain contracts for assumption and assignment, Mr. Donohoe has made clear that under no circumstances would either SEARS or the Buyer agree to cure defaults in connection with an assignment of the Agreements. Munoz Decl. ¶ 6.

## JURISDICTION

12. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

13. Venue for this proceeding and this Motion is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

14. The statutory predicates for the relief sought herein are sections 362(d) and 365(d)(2) of the Bankruptcy Code and Bankruptcy Rule 4001.

## REQUESTED RELIEF

15. By this Motion, TELUS respectfully requests that the Court enter an order lifting the automatic stay to allow TELUS to take steps to terminate the Agreements, or, in the alternative, compelling SEARS and the Buyer to assume or reject the Agreements immediately.

## ARGUMENT

**I.    TELUS's Claim For Ongoing Post-Petition Services Under the Agreements Is An Administrative Expense Of The Estate Which SEARS Has Refused To Pay, And Both SEARS And Buyer Have Made It Clear That Neither Will Cure Any Defaults In Connection With An "Assumption" Of The Agreements**

16. Section 503(b)(1)(A) of the Bankruptcy Code grants administrative expense status to the "actual, necessary costs and expenses of preserving the estate." These administrative

expenses are afforded a first priority pursuant to section 507(a)(2) of the Bankruptcy Code. *See In re Patient Educ. Media, Inc.*, 221 B.R. 97, 100-01 (Bankr. S.D.N.Y. 1998) ("The priority furthers the goal of rehabilitation by encouraging third parties to supply goods and services on credit to the estate.").

17. It cannot be disputed that TELUS's post-petition claim seeking payment for call center and customer care services rendered is an administrative expense under section 503(b)(1)(A) of the Bankruptcy Code. An administrative claimant "must demonstrate that (1) his claim arose from a transaction with or on account of consideration furnished to the debtor-in-possession, and (2) the transaction or consideration directly benefitted the debtor-in-possession." *Patient Educ. Media*, 221 B.R. at 101. "Consideration exists generally where (1) the debtor-in-possession induces the creditor to perform postpetition, or (2) the creditor performs under an executory contract prior to rejection." *Id.* Where, as here, "'the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services.'" *Id.* (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984)).

18. Here, TELUS has continued to perform call center and customer care services for SEARS pursuant to the Agreements without interruption post-petition. These services have directly benefitted SEARS and now benefit the Buyer; without these services, SEARS and the Buyer will have no one to answer the telephone and assist customers for 44% of the SEARS "online sales & service" business and 100% of its "Mattress Care" business. Further, the Buyer itself has characterized the MOSA as an "executory contract" under which TELUS is required to continue performing despite SEARS's and the Buyer's refusal to pay TELUS. Munoz Decl., Ex. C. Accordingly, TELUS's claim is an administrative expense, which is afforded a first priority

under the Bankruptcy Code. *See* 11 U.S.C. §§ 503(b)(1)(A), 507(a)(1). In accordance with the Bankruptcy Code, SEARS must pay this claim. *See Patient Educ. Media*, 221 B.R. at 104.

19.  Despite the clear and unequivocal benefit to the SEARS and the Buyer, those parties have made it clear that they do not intend to make any further payments in respect of the post-petition services provided by TELUS. Munoz Decl. ¶¶ 4-6. Moreover, the Buyer has coupled this refusal with a demand that TELUS continue performing under the Agreements. Given the size of TELUS's operation on behalf of SEARS, such performance costs TELUS roughly $500,000 per month. Moreover, both SEARS and Buyer have made it absolutely clear that they will under no circumstances "assume" the Agreements in accordance with the provisions of the Bankruptcy Code.

## II.    Cause Exists To Lift The Automatic Stay To Allow TELUS To Terminate The Agreements

20.  Cause exists to lift the automatic stay because both SEARS and the Buyer have indicated that under no circumstances will TELUS receive any further payments for its ongoing administrative services to SEARS, and that neither the ongoing administrative claims, nor the large prepetition default will be "cured" in connection with an "assumption" of the Agreements.[2] Meanwhile, TELUS continues to perform valuable call center and customer care services for SEARS for no consideration, thereby unjustly enriching SEARS and the Buyer.

21.  Pursuant to section 362(d)(1), the Court has the discretion to lift the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." "'Neither Section 362(d)(1) nor the legislative history defines 'cause.'" *In re Project*

---

[2] All pre and post-petition defaults must be paid in full in connection with the assumption of an executory contract, *see* 11 U.S.C. § 365(b)(1), and all post-petition administrative claims must be paid in full in connection with the consummation of a chapter 11 plan, *see* 11 U.S.C. § 1129(a)(9).

-7-

*Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (citation omitted). Courts, however, have determined that "cause" is an "'intentionally broad and flexible concept which must be determined on a case-by-case basis.'" *Id.* (citation omitted); *see, e.g.*, *In re Deppe*, 110 B.R. 898, 905 (Bankr. D. Minn. 1990) (holding, among other grounds, that the debtor's "deemed rejection" of a franchise agreement provided cause to lift stay to terminate agreement); *In re Quinones Ruiz*, 98 B.R. 636, 638-39 (Bankr. D.P.R. 1988) (holding that noncurable breach of franchise relationship constituted cause for lifting stay to terminate relationship).

22. The burden of proof on a motion to lift the automatic stay first rests with the movant, but after an initial showing of cause, "Section 362(g) places the burden of proof on the debtor for all issues other than 'the debtor's equity in property.'" *In re Sonnax Indus, Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990) (quoting 11 U.S.C. § 362(g)); *see also In re New York Medical Group, P.C.*, 265 B.R. 408, 413 (Bankr. S.D.N.Y. 2001) ("The party opposing stay relief has the ultimate burden of disproving the existence of 'cause,' . . . , but the movant has the initial burden to show that 'cause' exists.").

23. In determining whether to lift a stay for cause, courts "either (1) analyze twelve factors enumerated by the Second Circuit in *Sonnax*; or (2) engage in fact-intensive inquiries which appear to be loosely based on the *Sonnax* factors." *Project Orange Assocs.*, 432 B.R. at 103. The *Sonnax* case arose in the context of a motion to lift a stay to permit litigation to proceed in another forum, and thus not all of its factors are relevant in all circumstances. *See Sonnax*, 907 F.2d at 1286. Accordingly, courts have recognized that they "need only apply the factors that are relevant to the particular case." *Project Orange Assocs.*, 432 B.R. at 104. In applying these factors, "'[a] court may consider the policies reflected in the bankruptcy code, and the interests of the debtor,

other creditors and any other interested parties.'" *Id.* at 103 (citation omitted). Further, a court need not afford each *Sonnax* factor equal weight. *Id.* at 104.

24. The twelve *Sonnax* factors are:

(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*Sonnax*, 907 F.2d at 1286.

25. Only factors (1), (2), and (12) are relevant here.

26. Under factor (1), lifting the stay would completely resolve the issue at hand because, upon terminating the Agreements, TELUS would no longer be obligated to provide valuable call center and customer care services to SEARS free of charge.

27. Under factor (2), the contract termination would not interfere with the bankruptcy case. SEARS has already sold substantially all of its assets to the Buyer, and SEARS has already repudiated the Agreements by affirming that it will no longer honor its obligations thereunder. The practical impact of lifting the stay here would only be that the Buyer would no longer be unjustly enriched by TELUS's services.

28. Under factor (12), the balance of harms weighs heavily in TELUS's favors. TELUS is incurring substantial costs for its services daily, as its over 200 customer service agents devote their time to SEARS. TELUS also has unpaid invoices both pre- and post-petition in excess of $2.5MM. Lifting the stay to allow TELUS to terminate the Agreements would allow it to exit its

relationship with SEARS and reassign its over 200 customer service agents performing work on behalf of SEARS to other projects for which TELUS will actually be paid. In short, "it is not equitable . . . to require [TELUS] to continue doing business with [SEARS]." *Matter of Joyner*, 55 B.R. 242, 246 (Bankr. M.D. Ga. 1985). The harm to SEARS, on the other hand, will only be in that it will be unable to extract a substantial benefit for no consideration.

29. Finally, lifting the stay here would further the purposes of the Bankruptcy Code – specifically, its provisions requiring administrative expenses to be paid on a first priority basis. *Patient Educ. Media*, 211 B.R. at 100-01. As discussed above, TELUS's claim is undisputedly an administrative claim, and both SEARS and Buyer have unequivocally refused to pay any portion of it under any circumstances. Moreover, both SEARS and the Buyer have made it clear that they do not intend to comply with their obligations under the Bankruptcy Code in connection the assumption and assignment of the Agreements. Munoz Decl. ¶¶ 4-6. Thus, both SEARS and the Buyer have already effectively rejected the Agreements. *Cf.* 11 U.S.C. § 365(b)(1) (providing that assumption of a contract requires curing defaults).

30. In sum, cause exists pursuant to section 362(d)(1) to lift the automatic stay to permit TELUS to take steps to terminate the MOSA and SOW.

### III.  In The Alternative, SEARS And The Buyer Should Be Compelled To Assume Or Reject The Agreements

31. In the alternative, TELUS requests that the Court compel SEARS and the Buyer to assume or reject the Agreements immediately, given the Buyer's demand that TELUS continue providing services to SEARS, and SEARS and the Buyer's representations that under no circumstances will TELUS receive any further payments for its ongoing administrative services to

SEARS or any payments for TELUS's pre-petition claims, regardless of whether the MOSA and SOW are assumed or rejected.[3]

32. Section 365(d)(2) of the Bankruptcy Code provides that, although "the trustee may assume or reject an executory contract . . . at any time before the confirmation of a plan," "the court, on request of any party to such contract . . . may order the trustee to determine within a specified period of time whether to assume or reject such contract."

33. In determining whether to compel a debtor to assume or reject an executory contract by a date certain, courts consider "the nature of the interests at stake, the balance of hurt to the litigants, the good to be achieved, the safeguards afforded those litigations, and whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary." *In re Beker Industries Corp.*, 64 B.R. 890, 896 (Bankr. S.D.N.Y. 1986); *accord In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006).

34. As discussed above, the balance of harms weighs heavily in favor of TELUS. While TELUS continues to incur costs and waste its resources in providing services to SEARS, both SEARS and the Buyer have plainly stated their intention not to pay TELUS for either its pre-petition claims or its ongoing administrative claims under any circumstances. Munoz Decl. ¶¶ 4-6. Thus, SEARS and the Buyer have made clear that they have no intention to assume the Agreements. Assumption requires that defaults be cured, *see* 11 U.S.C. § 365(b)(1), and both

---

[3] There can be no reasonable dispute as to whether the MOSA and SOW are executory. Although the Bankruptcy Code does not define "executory contract," courts in the Second Circuit find that an executory contract is one "'under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'" *In re Penn Traffic Co.*, 524 F.3d 373, 378 (2d Cir. 2008) (citation omitted). The MOSA and SOW are service contracts under which TELUS performs services for SEARS and SEARS pays TELUS for such performance. Furthermore, the Buyer has conceded the MOSA is an executory contract. *See* Munoz Decl., Ex. C.

SEARS and the Buyer have represented that they will not cure. Accordingly, it is apparent that when prompted by the Court, they will reject the Agreements and spare TELUS the ongoing harm in rendering services for which it will not be compensated. It would be inequitable to require TELUS to continue providing services to SEARS free of charge while awaiting the inevitable rejection of the Agreements. SEARS and the Buyer should therefore be compelled to assume or reject the Agreements immediately.

## WAIVER OF STAY OF ORDER

35. Bankruptcy Rule 4001(a)(3) provides that "any order granting a motion for relief from the automatic stay made in accordance with Bankruptcy Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The decision to waive the stay provided for under Bankruptcy Rule 4001(a)(3) is committed to the sound discretion of the bankruptcy court. *Fed. R. Bankr. P.* 4001, Committee Notes on Rules (1999 Amendment). The stay should be waived here because SEARS has already repudiated the Agreements and failed to pay TELUS's post-petition claim, and the Buyer continues to be unjustly enriched by TELUS's services for which neither SEARS nor the Buyer will compensate TELUS. *See In re Uvaydov*, 354 B.R. 620, 624 (Bankr. E.D.N.Y. 2006) (waiving stay pursuant to Fed. R. Bankr. P. 4001(a)(3) where debtor failed to pay post-petition mortgage payments).

## NOTICE

36. Notice of this Motion will be provided in accordance with the procedures set forth in the Order Implementing Certain Notice and Case Management Procedures. ECF No. 139. TELUS respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

37. No prior request for the relief sought herein has been made by TELUS to this or any other court.

## CONCLUSION

For the foregoing reasons, TELUS respectfully requests that the Court enter an order lifting the automatic stay to permit TELUS to take steps to terminate the Agreements or, in the alternative, compelling SEARS and the Buyer to assume or reject the Agreements.

Dated: New York, New York
April 4, 2019

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

By:  /s/ Evan. C. Hollander

51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Evan C. Hollander
Raniero D'Aversa, Jr.
Emmanuel Fua

*Counsel for TELUS International (U.S.) Corporation*