# EXHIBIT A

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

October 18, 2016

<u>VIA CERTIFIED MAIL/</u>
<u>RETURN RECEIPT REQUESTED</u>
#7014 2120 0001 5427 0594

<u>VIA CERTIFIED MAIL/</u>
<u>RETURN RECEIPT REQUESTED</u>
#7014 2120 0001 5427 0600

Grand Central Plaza, Inc.
1020 Center Street, Suite 4
Horseheads, NY  14845
Attn:  Bebette Yunis

Grand Central Plaza, Inc.
1020 Center Street, Suite 4
Horseheads, NY  14845
Attn:  Georgia Reynolds

Re:  Lease dated January 31, 1975, as amended,
for the premises located at 1020 Center Street,
<u>Horseheads, NY, and known as Kmart # 7065</u>

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing August 1, 2017 to and including July 31, 2022, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION,
a Michigan corporation

By: _____
S. Jeffrey Stollenwerck
SVP and President, Real Estate

JS/cm

cc:  J. Catanese
Lease File

# SEARS HOLDINGS

3333 Beverly Road
Hoffman Estates, IL  60179

October 17, 2011

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7010 0290 0000 0644 8933**

Grand Central Plaza Inc.
1020 Center Street
Suite 4
Horseheads, NY  14845
Attn:  Jeffrey N. Yunis

> Re:   Lease dated January 31, 1975, as amended,
>        for the premises located at 1020 Center Street,
>        Horseheads, NY, and known as Kmart # 7065

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing August 1, 2012, to and including July 31, 2017, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION,
a Michigan corporation

By:   _____
        Jeffrey Stollenwerck
        Sr. Vice President of Real Estate

JS/ljb

cc:    J. Catanese
        Lease File



Dean M. Zurmely

Kmart Corporation
International Headquarters
Real Estate Department
3100 West Big Beaver Road
Troy MI  48084-3163
313 643 1730

June 29, 1992

Mr. Jeffery N. Yunis
Counsel/Vice President
Grand Central Plaza, Inc.
416 East Church Street
Elmira, New York  14901

RE:   Expansion of Kmart #7065
Horseheads, New York

Dear Jeff:

The expansion of our store in Horseheads, New York is scheduled to be
completed on June 30, 1992.  For purposes of the First Amendment to
Lease and Development Agreement I propose that we establish July 1,
1992, as the Effective Date.  If this date is acceptable to you, would
you please have this Letter Agreement executed and return the original
to me.

Sincerely,

Dean M. Zurmely

DMZ/vlb

Grand Central Plaza, Inc hereby consents to establishing July 1, 1992,
as the effective date of the 1st Amendment to Lease and Development
Agreement covering the expansion of Kmart #7065 Horseheads, New York.

Grand Central Plaza, Inc.
a New York Corporation

By: _____

Its: _____

**GRAND CENTRAL PLAZA, INC.**
DESIGNERS • DEVELOPERS • BUILDERS
416 E. CHURCH STREET
ELMIRA, N.Y. 14901
(607) 737-5233
FAX (607) 732-4667

July 13, 1992

Mr. Dean M. Zurmely
Real Estate Department
K Mart Corporation
3100 West Big Beaver Road
Troy, MI 48084-3163

Re:   Expansion of K Mart #7065
      Horseheads, NY

Dear Dean:

Enclosed herein please find original of the executed letter
dated June 29, 1992 establishing an effective date for the
First Amendment to Lease and Development Agreement as July 1,
1992.

I would also like to advised that at this time the landlord
has substantially completed all of the items required of it
in paragraph 1.7 of said agreement.  The repaving and restriping
of the entire shopping center lot was completed on Thursday,
July 9, 1992.  The lighting has been completely replaced rather
than painting the existing lights, the new facia and canopy is
complete over 70% of the shopping center and the balance should
be completed by July 17, 1992.

As we would like to establish the completion of these items, I
request that either a representative of the construction division
or the real estate department inspect the premises on or after
July 17, 1992 and advise that the landlord's work under paragraph
1.7 is complete.  In the meantime I will take photographs of the
shopping center and forward them on to you for your review.

Very truly yours,

Jeffery N. Yunis
Counsel/Vice President

JNY/ab



**Kmart Holdings Corporation**
3100 West Big Beaver Road
Troy, MI  48084-3163

October 20, 2006

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**#7004 2510 0004 8747 0670**

Grand Central Plaza, Inc.
416 East Church Street
Elmira, NY  14901
Attn:  Jeffrey N. Yunis

> Re:  Lease dated January 31, 1975, as amended, for
> the premises located at 1020 Center Street,
> <u>Grand Central Plaza, Horseheads, NY, and known as Kmart #7065</u>

Dear Landlord:

The undersigned hereby elects to extend the subject Lease for an additional term of five (5) years, commencing August 1, 2007, to and including July 31, 2012, upon the terms, conditions, and rental as set forth in said Lease, as amended.

Sincerely,

KMART CORPORATION,
a Michigan Corporation

By _____
Jeffrey Stollenwerck
Senior Vice President of Real Estate

JS/jc

cc:    J. Catanese
       Lease File

## FIRST AMENDMENT TO LEASE AND DEVELOPMENT AGREEMENT

This Agreement is made this _16_ day of _July_, 1990, by and between GRAND CENTRAL PLAZA, INC., a New York corporation (hereinafter referred to as "Landlord"), whose address is 416 East Church Street, Elmira, New York 14901, and K MART CORPORATION, a Michigan corporation (hereinafter referred to as "Tenant"), having its principal office at 3100 West Big Beaver Road, Troy, Michigan 48084.

WHEREAS, Landlord is the owner of real property in the Village of Horseheads, County of Chemung, State of New York, more specifically described in Exhibit A of the Lease (the "Shopping Center"); and

WHEREAS, by a Lease dated January 31, 1975, (the "Lease"), Landlord demised to Tenant a portion of the Shopping Center described in Exhibit "A" (the "Demised Premises"); and

WHEREAS, Landlord and Tenant desire to amend the Lease and establish certain agreements regarding the enlargement of the Demised Premises in this First Amendment To Lease And Development Agreement (the "Lease Amendment"); and

WHEREAS, Tenant, at its own cost and expense, intends to expand its existing building of approximately Seventy Thousand (70,000) square feet (the "Existing Building") situated on the Demised Premises to approximately Ninety-Five Thousand Eight Hundred Sixty-Six (95,866) square feet (the "Expanded Building") by constructing an addition to its Existing Building (the "Addition") in the approximate location and dimensions depicted as "K mart Expansion Area" on Exhibit B attached hereto and made a part hereof (the "Plot Plan"). The expansion of the Existing Building and other improvements to the Existing Building related to such work shall hereinafter collectively be referred to as the "K mart Expansion".

WHEREAS, the parties hereto desire to amend the Lease as hereinafter set forth to enlarge the Demised Premises, to evidence Landlord's consent to the K mart Expansion, and to establish certain agreements regarding the same.

NOW THEREFORE, in consideration of the mutual promises and other covenants and conditions contained herein, it is hereby agreed by and between Landlord and Tenant as follows:

### ARTICLE I

### AMENDMENT TO LEASE

1.1 Demised Premises.

A. Article 1 of the Lease is hereby amended to delete Exhibit B, the Plot Plan of the Demised Premises, and to substitute the new Exhibit B, attached hereto. Any reference in the Lease to Exhibit B shall hereafter refer to the attached Exhibit B.

B. Article 1 of the Lease is further amended to delete:

"K mart Building: 260 feet in width by 250 feet in depth,
                    TOTAL SIZE: 70,000 square feet."

and to substitute therefor:

"K mart store unit:  361'5" in width by 251'5" in depth, with a 50 feet in width by 100 feet in depth appendage, for a total of 95,866 square feet."

"Outdoor Garden Shop: 50 feet in width by 140 feet in depth for a total of 7,000 square feet."

C. Any reference in the Lease to Tenant's building shall hereafter refer to the Tenant's Expanded Building, and any reference in the Lease to the Demised Premises shall hereafter refer to the Demised Premises as enlarged.

1.2 Term.

Article 2 of the Lease is hereby amended to provide that a new fifteen (15) year lease term (the "Term") shall begin on the effective date of the Lease Amendment and shall terminate on the last day of the month in which the Lease Amendment becomes effective.

K mart #7065, Horseheads, NY (7065AMEN) 6/5/90; 6/14/90; 7/10/90
*upon such date that shall be 15 years from

1.3 <u>Annual Minimum Rental</u>.

Article 3 of the Lease is hereby amended to delete the stated annual minimum rental of One Hundred Thirty-Five Thousand DOLLARS ($135,000.00), and substitute in its place a new annual minimum rental of One Hundred Seventy-One Thousand One Hundred Twenty-Two and 43/100 DOLLARS ($171,122.43).

Article 3 is further amended to provide that during the option periods Tenant shall pay to the Landlord, in equal monthly installments, the following annual minimum rental:

| | | |
|---|---|---|
| A. | 1st Option: | $177,345.00 |
| B. | 2nd Option: | $183,568.00 |
| C. | 3rd Option: | $189,790.00 |
| D. | 4th Option: | $196,013.00 |
| E. | 5th Option: | $202,236.00. |

1.4 <u>Additional Rental</u>.

Article 4 of the Lease is hereby amended to delete Six Million Two Hundred Fifty Thousand DOLLARS ($6,250,000.00) as the existing percentage rental breakpoint to calculate additional rental on Tenant's "gross sales", and substitute in its place a new percentage rental breakpoint that shall equal Fourteen Million DOLLARS ($14,000,000.00).

1.5 <u>Options To Extend Lease</u>.

Article 12 of the Lease is hereby amended to delete paragraphs a, b, c, and d and substitute in their place the following paragraph which shall read as follows:

"Tenant shall have five (5) successive options to extend the Term of the lease for an additional period of five (5) years on each such option. Each option shall begin respectively upon the expiration of the Term of the lease or the expiration of a prior option and the same terms and conditions as herein set forth shall apply to each. If Tenant shall elect to exercise the aforesaid options, it shall do so by giving notice to Landlord not less than nine (9) months prior to the expiration of the Term of the lease or the expiration of any option."

1.6 <u>Common Area Maintenance</u>.

Article 9 of the rider to the Lease which is entitled, "Parking And Other Common Areas (cont'd from Article 9)" is deleted in its entirety and replaced by the following:

"Tenant shall pay to Landlord, as additional rental, its proportionate share of the common area maintenance costs required to be performed by Landlord hereunder. Tenant's proportionate share of the aforesaid costs shall be based upon the ratio that the total ground floor area of Tenant's Expanded Building (95,866 square feet) bears to the total ground floor area of all buildings and structures existing at anytime upon the land described in Exhibit "A". Notwithstanding any provision to the contrary contained herein, Tenant's payment pursuant to this Article shall not exceed the following dollar amounts, payable quarterly and certified by Landlord annually:

| | | |
|---|---|---|
| 1. | Years 1 - 10: | $18,000.00 |
| 2. | Years 11 - 15: | $20,500.00 |
| 3. | 1st Option: | $23,000.00 |
| 4. | 2nd Option: | $25,500.00 |
| 5. | 3rd Option: | $28,000.00 |
| 6. | 4th Option: | $30,500.00 |
| 7. | 5th Option: | $33,000.00. |

In the event that Tenant constructs the Addition or Landlord expands the Shopping Center in areas previously reserved therefore, Landlord shall not be obligated to furnish additional parking spaces in substitution of the spaces thereby built over, and the number of parking spaces required under this Article shall be reduced by the number of spaces, if any, covered by the Addition and any new garden shop."

1.7  Landlord's Representations And Warranties.

Landlord represents and warrants that it shall, prior to the effective date of this Lease Amendment, as defined in Article 3.3, renovate the Shopping Center at its own cost and expense, which shall include, but not be limited to, the following (the "Renovation Project"): (i) repaving and restriping the entire Shopping Center parking lot; (ii) painting the existing light standards; (iii) placing a new fascia and canopy on the Shopping Center excluding Tenant's Expanded Building. Landlord shall coordinate with, and receive approval for, the design, materials, and color of all renovation work, as well as restriping of the parking lot, from K mart's Design Department. Tenant shall remodel the fascia of its Expanded Building at its own cost and expense and coordinate the design, materials, and color of the project with Landlord's renovation project for the Shopping Center. It is understood that Landlord's renovation work does not include any work on Tenant's Existing or Expanded Building.

In the event Landlord's representations and warranties are not fulfilled within 90 days after the effective date of this Lease Amendment, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option of (1) paying Landlord a reduced annual minimum rental that shall equal One Hundred Thirty-Five Thousand Dollars ($135,000.00) per annum until such representations and warranties are fulfilled; or (2) completing the aforementioned work itself and deducting its cost from annual minimum rental.

1.8  Real Estate Taxes.

The second sentence contained in the first paragraph of Article 5 of the Lease rider which is entitled "Real Estate Taxes (cont'd from Article 5)" is amended by adding the word "Existing" between the words "the" and "building", and to capitalize the letter "b" in the word building, and to strike "at any time", and to insert after the word "land" the phrase "prior to expansion".

The first paragraph of Article 5 of the Lease rider is further amended to include the following additional sentence between the second and the third sentence of the paragraph: "In addition, Tenant shall also be responsible for paying all real estate taxes and assessments attributable to its Addition and Garden Shop."

The first sentence of paragraph 2 of Article 5 to the rider is also amended by adding the phrase "Seventy-three percent (73%) of" to the beginning of the sentence before the phrase "All excess tax payments."

The second sentence of paragraph 2 of Article 5 to the rider is also amended by changing the word "cumulative" to "noncumulative".

Paragraph 2 of Article 5 to the rider is further amended to add the following sentence to the end of the paragraph: "Any accumulated real estate tax offset is hereby waived by Tenant."

1.9  Repairs.

Article 14 and the rider thereto is hereby amended to provide that Landlord and Tenant shall continue to repair and maintain the Existing Building as provided under the Lease; while Tenant, at its own cost and expense, shall maintain and repair the Addition without any contribution from Landlord.

1.10  Fire And Extended Coverage Insurance.

Article 18 of the Lease is amended to provide that Tenant shall reimburse Landlord for twenty-seven percent (27%) of its pro rata share of Landlord's cost of insuring the buildings depicted on Exhibit "B", including Tenant's Expanded Building, against damage or destruction by fire or other casualties insured under a standard extended coverage endorsement. Tenant's pro rata share shall be calculated by multiplying the cost of providing the aforementioned insurance by a fraction, the numerator which shall equal the gross leaseable area of Tenant's Expanded Building (95,866 square feet), and the denominator which shall equal the gross leaseable area of all buildings in the Shopping Center, including Tenant's Expanded Building, with the resulting product representing Tenant's share of Landlord's insurance costs.

1.11 **Public Liability Insurance.**

The fourth paragraph of Article 9 of the Lease is amended to provide that Tenant shall reimburse Landlord for twenty-seven percent (27%) of its pro rata share of Landlord's cost of providing public liability insurance for the common areas. Tenant's pro rata share shall be calculated by multiplying the cost of providing public liability insurance for the common areas by a fraction, the numerator which shall equal the gross leaseable area of Tenant's Expanded Building (95,866 square feet), and the denominator which shall equal the gross leaseable area of all buildings in the Shopping Center, including Tenant's Expanded Building, with the resulting product representing Tenant's share of Landlord's public liability insurance costs.

ARTICLE II

DEVELOPMENT AGREEMENT

2.1 **Construction of the K mart Expansion.**

A. Landlord hereby consents to the expansion of the Existing Building in the approximate location and dimensions depicted on Exhibit B at Tenant's sole cost and expense; and the construction of all improvements related to the K mart Expansion.

B. All work in connection with the K mart Expansion shall be performed, as aforesaid, at the sole cost and expense of Tenant, including renovations of its Existing Building, in a good and workmanlike manner, in accordance with all rules, regulations, building codes and ordinances, of all local, municipal, state and/or federal authorities having jurisdiction thereof. Any and all approvals, licenses and/or permits required in conjunction therewith shall be obtained by Tenant from the authorities having jurisdiction thereof, likewise at the sole cost and expense of Tenant. To the extent required in connection with the foregoing, Landlord agrees, at the request of Tenant, to execute any and all documents and applications and to otherwise cooperate with Tenant in an effort to expedite the grant and issuance of the approvals, licenses and/or permits required for the work contemplated hereunder.

C. Tenant shall begin construction of the Addition within one year after receiving all required governmental consents, approvals, and permits, and shall proceed with due diligence to complete the project and open Tenant's Expanded Building for business. All construction shall be completed substantially in accordance with the drawings and specifications approved by Landlord as provided under Article 2.2. Tenant's obligation to construct the Addition under the Lease Amendment is contingent upon its receipt of all governmental consents, approvals, and permits.

D. Tenant agrees to install a roof manufactured by The Carlisle Corporation on the Addition. Also, Tenant shall obtain from the manufacturer an affirmation that Landlord's current manufacturer's warranty on the roof of the Existing Building will not be revoked, modified, or altered as a result of its roofing of the Addition. In any event, Tenant's work shall not adversely affect Landlord's warranty on the Existing Building.

2.2 **Landlord Approval Of Drawings And Specifications.**

Prior to commencing construction of the K mart Expansion Tenant shall submit to Landlord for review and approval detailed working drawings and specifications of the expansion and related site work. Landlord shall not unreasonably withhold such approval. Within thirty (30) days after receipt of such working drawings and specifications, Landlord shall notify Tenant in writing of any objections thereto. Tenant shall address such objections and resubmit such working drawings and specifications to Landlord for further review and approval. Landlord shall then have an additional fifteen (15) days after receipt of Tenant's revised working drawings and specifications to approve or disapprove. If Landlord shall fail to give Tenant written notice of its objections to the submitted working drawings and specifications within the periods provided herein, Landlord's acceptance and approval shall be inferred.

2.3 **Mechanic's Or Construction Liens.**

Tenant shall not permit any mechanic's, construction, or similar liens to be lodged against and/or remain upon the Demised Premises or otherwise upon the Shopping Center for labor or material furnished to or claimed to have been furnished to Tenant in connection with work of any character performed or claimed to have been performed relative to the K mart Expansion or otherwise with respect to any of the renovations and improvements contemplated hereunder, at the direction or with the consent of Tenant, whether such work was performed or materials furnished before or

-4-

after the commencement thereof. Tenant may contest the validity of any such liens or claim, provided that such contest does not expose the Landlord to the risk of a sale, foreclosure, or forfeiture of the Demised Premises and/or the Shopping Center by reason of any such non-payment, in which event the Landlord shall have, and does hereby reserve the right to require the Tenant to properly and adequately bond such lien or claim, which shall be provided to Landlord within 20 days of its request therefore. Upon a final determination of the validity of such lien or claim, Tenant shall immediately pay any judgment or decree rendered against Tenant or Landlord with all proper costs and charges and shall cause such lien to be fully released without cost to Landlord.

2.4  <u>Tenant's Damage To The Existing Building</u>.

In the event that any of the work performed by Tenant under and pursuant to this Lease Amendment requires penetrations of the structural portions (including the roof, demising walls and/or floor slab) of the Demised Premises, or otherwise results in damage to those portions of the Demised Premises for which, by the applicable provisions of the Lease, the Landlord may be obligated to maintain or perform required repairs or maintenance on, the same shall be repaired and/or restored, as the case may be, in a good and workmanlike manner to substantially the same condition as existing immediately prior to such penetrations and/or damage, by and at the sole cost of Tenant.

2.5  <u>Indemnification</u>.

K mart agrees to indemnify, defend and save Landlord, Landlord's Mortgagee, and their respective agents, servants, employees, officers and directors, from any and all loss, damage, liability, cost, claim or expense (including reasonable attorneys fees), which Landlord, Landlord's Mortgagee, and their respective agents, servants, employees, officers and directors, may pay or become obligated to pay on account of any, all and every demand or claim, or assertion of liability, or any claim or action bounded thereon arising or alleged to have arisen out of any act or omission of Tenant, its agents, servants and employees, and contractors and subcontractors, in connection with the construction of the K mart Expansion, whether such claim or claims, action or actions be for damages, injury to person or property, including the property of Landlord, or death of any person, made by any person, group or organization, whether employed by either of said parties hereto or otherwise.

ARTICLE III

<u>MISCELLANEOUS PROVISIONS</u>

3.1  <u>Default Remedies</u>.

In the event of a default by either Landlord or Tenant under this Lease Amendment, the nondefaulting party shall have the right to do any one or more of the following: (i) exercise any rights and remedies provided in the Lease; and/or (ii) exercise any and all other rights and remedies available at law or in equity.

3.2  <u>Representations And Warranties Of Landlord And Tenant</u>.

A. Landlord represents and warrants to Tenant that (i) the execution, delivery and performance of this Lease Amendment are within its powers, have been duly authorized, and are not in contravention of any law or the terms of any agreement which the Landlord is a party; (ii) this Lease Amendment is the valid, binding, and enforceable obligation of Landlord in accordance with its terms; and (iii) this Lease Amendment is fully effective without the consent of any other party except as set forth in this Agreement.

B. Tenant represents and warrants to Landlord that (i) the undersigned's execution of this Lease Amendment has been duly authorized by the corporation's Board of Directors; (ii) the undersigned officer has the authority to execute this Lease Amendment on behalf of the corporation; and (iii) this Lease Amendment is a valid binding obligation of Tenant in accordance with its terms and is fully effective without the consent of any other party.

3.3  Effective Date.

The effective date of this Lease Amendment shall begin sixty (60) days after Tenant has completed construction of the expansion and a certificate of occupancy has been issued by the city, or upon the date that Tenant's expanded store is first open to the public for business whichever is earlier.

3.4  Notices.

All notices required under this Lease Amendment shall be in writing, and sent by certified United States mail to Landlord or Tenant at the respective addresses stated on page one herein or at such other address as the parties may designate in writing. Date of notice shall be date on which such notice is deposited with a post office of the United States Post Office Department.

3.5  Memorandum.

This Lease Amendment or a memorandum of this Agreement may be recorded by either party at its own expense.

3.6  No Joint Venture or Partnership.

By executing this Lease Amendment Landlord and Tenant do not intend to create a partnership or joint venture. Landlord and Tenant merely intend to set forth the terms and conditions of their obligations regarding the K mart Expansion and other related matters.

3.7  Partial Invalidity.

If any clause, sentence or other portion of this Lease Amendment shall become illegal, null or void for any reason, or shall be held by any court of competent jurisdiction to be so, the remaining portions thereof shall remain in full force and effect.

3.8  Captions.

The titles and captions contained in this Lease Amendment are inserted only as a matter of convenience, and in no way define, limit, extend, or describe the scope of this agreement or the intent of any provision hereof.

3.9  Successors and Assigns.

This Lease Amendment shall be binding upon and shall inure to the benefit of both Landlord and Tenant, their respective heirs, legal representatives, successors, successors-in-title and assigns.

3.10  Continuation of Lease.

Except as set forth herein, all other provisions of the Lease shall remain in full force and effect.


IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first hereinabove set forth.

WITNESSED:

D. H. Burdick II

Sandra H. Cerny

Jeffrey M. ___

___ H. Aurora


K MART CORPORATION, a Michigan Corporation

_M. I. Shl_

Its: _Vice President_


GRAND CENTRAL PLAZA, INC.
A New York Corporation

By: _Nicholas Jurin_

Its: _Pres._


-6-

<u>ACKNOWLEDGEMENTS</u>

STATE OF MICHIGAN )
                ) SS.
COUNTY OF OAKLAND )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Michael L. Skiles, known to me to be the Vice President of K MART CORPORATION, a Michigan corporation, the corporation which executed the foregoing instrument, who acknowledged that he did sign and seal the foregoing instrument for, and on behalf of said corporation being thereunto duly authorized by its Board of Directors that the same is his free act and deed as such officer and the free act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Troy, Michigan this _26th_ day of _July_, 1990.

MARILYN J. THOMAS
Notary Public, Oakland County, Mich.
My Commission Expires January 10, 1994

_Marilyn J. Thomas_
Notary Public

STATE OF _New York_ )
                ) SS.
COUNTY OF _Chemung_ )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, _Nicholas Yunis_, known to me to be the _President_ of GRAND CENTRAL PLAZA, INC., a New York corporation, the corporation which executed the foregoing instrument, who acknowledged that he did sign and seal the foregoing instrument for, and on behalf of said corporation being thereunto duly authorized by its Board of Directors that the same is his free act and deed as such officer and the free act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _Elmira_, _N Y_ this _16_ day of _July_, 1990.

_Jeffrey N Yunis_
Notary Public
JEFFREY N. YUNIS
Notary Public, State of New York
No. 4631635
Chemung County
Commission Expires ~~March 30, 1991~~
_Nov 30, 1990_

-7-

**Parties**

THIS LEASE made and entered into as of this *31st* day of *January* , 19 75,
between    GRAND CENTRAL PLAZA, INC.,

a    New York,              corporation having its principal office at  214 East Church Street,
Elmira, New York, 14901
(herein referred to as "Landlord"), and S. S. KRESGE COMPANY, a Michigan corporation having
its principal office at 3100 West Big Beaver Road, Troy, Michigan, 48084 (herein referred to as
"Tenant").

WITNESSETH: That in consideration of the rents, covenants and conditions herein set forth,
Landlord and Tenant do hereby covenant, promise and agree as follows:

**Demised Premises**

1.  Landlord does demise unto Tenant and Tenant does take from Landlord for the term here-
inafter provided, and any extension thereof, the following property: Tenant's completed building
or buildings (designated K mart ~~and K mart Food~~), together with site improvements to be con-
structed, as hereinafter specified, by Landlord at its expense on the land comprising not less than
twenty        (   20    ) acres described in Exhibit "A", attached hereto and made a part
hereof, situated in the      Town  of  Horseheads       , County of Chemung       , State
of  New York       , said building or buildings to be in the locations depicted on Exhibit "B",
attached hereto and made a part hereof, and of the following dimensions:

K mart:  260' x 250'  (70,000 square feet)

Said completed buildings and site improvements, together with the licenses, rights, privileges and
easements set forth in Article 9 hereof, shall be hereinafter collectively referred to as the "demised
premises".

**Term**

2.  The term of this lease shall commence upon the "date of occupancy by Tenant", as that
term is defined in Article 10 hereof, and shall terminate upon such date as shall be   Twenty
( 20  ) years from the last day of the month in which said date of occupancy by Tenant shall occur;
provided, however, the term of this lease may be extended as provided in Article 12 hereof. The phrase
"lease term", as used in this lease, shall be the term of this lease and any extension thereof pursuant
to said Article 12.

**Annual Minimum Rental**

3.  Tenant shall, during the lease term, pay to Landlord, at such place as Landlord shall desig-
nate in writing from time to time, an annual minimum rental of ONE HUNDRED THIRTY-FIVE
THOUSAND AND NO/100------------------------------ DOLLARS ($135,000.00    ),
unless abated or diminished as hereinafter provided, in equal monthly installments on the first day of
each month, in advance, commencing upon the first day of the lease term; provided, however, in the
event the first day of the lease term shall not be the first day of a calendar month, then the rental for
such month shall be prorated upon a daily basis.

**Additional Rental**

4.  In addition to the aforesaid annual minimum rental, with respect to any lease year during the lease term in which Tenant's "gross sales", as hereinafter defined, shall exceed the sum of SIX MILLION TWO HUNDRED FIFTY THOUSAND AND NO/100------------------------------------ DOLLARS ($6,250,000.00     ), Tenant shall pay to Landlord as additional rental an amount equal to one percent (1%) of gross sales exceeding SIX MILLION TWO HUNDRED FIFTY THOUSAND AND NO/100------------------------------------------- DOLLARS ($6,250,000.00     ) ~~up to but not in excess of~~

DOLLARS ($                              );

and Tenant shall pay to Landlord as additional rental an amount ~~equal to five-tenths of one percent~~ (.5%) of gross sales for such lease year exceeding

DOLLARS ($                              )

~~up to but not in excess of~~

~~DOLLARS ($                              );~~

Said additional rental shall be paid on or before the ~~twenty-first (21st)~~ thirtieth (30th) day following the end of each "lease year". For the purposes of this lease, a "lease year" shall be each successive period of twelve (12) consecutive calendar months from the last day of the month in which said lease term shall commence. Sales for any period preceding the first lease year shall be included in gross sales reported for the first lease year. Tenant shall, on or before the ~~twenty-first (21st)~~ thirtieth (30th) day following the end of each lease year or "lesser period", deliver to Landlord a statement signed by an officer of Tenant certifying the true amount of the gross sales for such lease year or lesser period. The term "lesser period", as used herein, shall be any period beginning on the first (1st) day of any lease year and ending, by reason of the termination of this lease, prior to the end of such lease year. In the event that a period of more or less than twelve (12) months shall be so required to be included in any such statement, then the dollar amounts referred to in the preceding paragraph shall be proportionately increased or decreased, as the case may be.

Should Tenant at its option operate its fountain and lunch counter prior to opening for other business, such operation shall not be an acceptance of the demised premises, or an acknowledgment that the representations and warranties of Article 11 shall have been fulfilled, or an opening for business under Article 10 or any other provision of this lease, but sales from such operation shall be included in Tenant's reported gross sales for the first lease year.

Landlord or its agent may inspect Tenant's record of gross sales annually, provided such inspection shall be made at Tenant's principal office within ~~six (6)~~ twelve months after the statement of sales shall be delivered to Landlord and shall be limited to the period covered by such statement. Except to the extent that disclosure shall be required for any bona fide sale or mortgage of demised premises or for legal proceedings in any court, at law or in equity, Landlord shall hold in confidence sales figures or other information obtained from Tenant's records.

The term "gross sales", as used herein, shall be the total sales of merchandise or services made by Tenant or any occupant of demised premises, whether wholesale or retail, cash or credit (including merchandise ordered on demised premises and delivered from another place) and shall include sales made from trucks, trailers, vans or other temporary facilities used by Tenant on any part of the land described in Exhibit "A", except that the following shall be excluded:

(a)  Sales of merchandise subsequently returned for refund or credit, merchandise transferred to a warehouse or another store of Tenant, discounts on merchandise which shall be allowed to employees of Tenant, or merchandise which shall be issued in redemption of trading stamps, if any, which shall have been issued free of charge to Tenant's customers at the time of sale of other merchandise or services;

(b)  Any and all taxes levied upon, assessed against, or measured by the receipt or purchase of merchandise by any occupant of said demised premises, and any and all occupational sales taxes and other taxes levied upon, assessed against, based upon, or measured by (i) such occupant's gross receipts, or any part thereof, or (ii) the sale or sales price of merchandise and services, or either, and which shall be payable by such occupant, whether or not collected by such occupant from its customers as reimbursement or as agent of the taxing authority, and whether or not the same shall be commonly known as a sales tax, use tax, retailers' occupational tax, gross receipts tax or excise tax; provided, however, said taxes to be excluded from gross sales shall not include any net income tax, franchise tax, or any other tax not levied upon or computed upon gross sales or gross receipts, or any portion thereof; provided, further, said taxes to be excluded from gross sales shall be excludable regardless of whether imposed under any existing or future orders, regulations, laws, statutes or ordinances;

4/19/72

**Additional Rental (cont'd)**

(c) Receipts from cigarettes, lockers, stamp machines, public telephones, pay toilets, "kiddie rides", money orders and all licenses sold to the public;

(d) Service and interest charges for time payment accounts and charge accounts;

(e) ~~All sales of merchandise or services made by any supermarket grocery store, which shall~~ occupy any portion or portions of demised premises, ~~provided that the aggregate area of~~ said portion or portions ~~shall not exceed~~ ~~( ) square feet of floor area.~~

(f) All sales of automotive gasoline or diesel fuel.

**New Building by Landlord**

~~5. Tenant's said buildings and site improvements shall be completed and delivered to Tenant~~ promptly and with due diligence, giving consideration to scarcity of materials, strikes, lockouts, fire or other casualty, governmental restrictions and regulations, and construction delays; and Landlord warrants that a general contract for construction of said buildings and improvements referred to in Article 11 hereof shall be let, rough site grading shall be completed and foundations and footings commenced not later than                     . If for any reason whatever Landlord shall fail to comply fully with this warranty, Tenant shall have, in addition to other remedies which may be available to it by law or otherwise, the option to terminate this lease by notice to Landlord; provided, further, in the event that, regardless of the reason therefor, said buildings and site improvements shall not have been completed in accordance with Tenant's typical plans and specifications and possession thereof tendered to Tenant prior to                     , then Tenant shall, at any time thereafter, have the further option of terminating this lease by notice to Landlord. Notwithstanding anything to the contrary herein contained, in the event that the lease term shall not have commenced prior to such date as shall be seven (7) years from the date of this lease, then this lease shall be automatically term-~~inated without further act of either party hereto.~~

**Plans and Specifications**

~~6. Tenant's said buildings and site improvements shall be constructed by Landlord, at its sole~~ cost and expense, in accordance with working plans and specifications prepared by Landlord which shall, with respect to standards of construction ~~and division~~ of responsibility for supplying materials and equipment, ~~substantially satisfy~~ the provisions of Tenant's typical store plans and specifications, ~~prior receipt of which Landlord hereby acknowledges and which are identified as Set No.~~

## REAL ESTATE TAXES

5. (See Rider)

~~Said typical plans and specifications are subject to the following exceptions and such other deviations~~ as may be approved in writing by Tenant's Construction Department:

(a) Such modifications of arrangement of space, location of entrances, exits, and columns and other structural members as shall be indicated on a store layout drawing which shall be prepared by Tenant and be delivered to Landlord within thirty (30) days after receipt of Landlord's written request therefor, which request shall be accompanied by preliminary building outlines, together with any available elevations and sections;

(b) Changes of type and standards of construction and of arrangement to the extent as shall ~~be required by applicable laws, codes or ordinances.~~

**Plans and Specifications (cont'd)**

~~Said working plans and specifications shall be submitted to Tenant for approval prior to com~~mencement of construction and such approval shall not be unreasonably withheld. ~~Within sixty~~ (60) days after receipt of such working plans and specifications Tenant shall, ~~in writing,~~ inform Landlord of required revisions or corrections thereto, and Landlord shall ~~make~~ such revisions or corrections and resubmit them for Tenant's final approval. In ~~the event~~ Tenant shall not inform Landlord of such desired revisions or corrections within ~~said sixty~~ (60) days, said working plans and specifications shall be deemed approved and ~~accepted~~ for the purposes hereof.

Said ~~typical~~ plans and specifications, store layout drawing and working plans and specifications, ~~as approved by Tenant, shall constitute a part of this lease.~~

**Guarantee of Materials**

~~7. Landlord shall unconditionally guarantee all work performed by Landlord, or at its expense,~~ in the construction of Tenant's buildings and site improvements ~~against defective workmanship~~ and materials either for the period of ~~one (1) year from the date of completion thereof~~ or for the period of ~~any guarantee therefor given Landlord, whichever period shall be the longer.~~

**Advance Possession for Fixturing**

~~8. For a period of four (4) weeks prior to completion of Tenant's buildings by Landlord, Tenant~~ shall have the privilege, rent free, of entering said buildings ~~for installing~~ storage bins, storing merchandise, and other purposes not ~~creating unreasonable~~ interference with the work of Landlord. Such entry shall ~~not be construed~~ as an acceptance thereof by Tenant under the provisions of this ~~lease, or as a waiver of any of the provisions hereof.~~  (See Rider.)

**Parking and Other Common Areas**

                                                  represents that it has constructed
9. ~~Prior to the date of commencement of the lease term,~~ Landlord ~~shall construct~~ (as hereinafter provided) the sidewalks, service drives, parking aisles, driveways, streets and parking areas (all of which shall be hereinafter sometimes referred to as the "common facilities") substantially as shown on Exhibit "B". The aggregate area provided for the parking of automobiles shall, during the lease term, be ~~either in the ratio of~~                    (      ) square feet of parking area for each square foot of gross floor area ~~contained in buildings at any time located on site depicted on Exhibit "B" or~~ sufficient to accommodate not less than  one thousand          (1,000) automobiles ~~on basis of arrangement depicted on Tenant's typical plans, whichever shall be the greater.~~ All sidewalks shall be of concrete construction, and all service drives, parking aisles, driveways, streets and parking areas shall be graded, levelled and paved with concrete or asphalt, and properly marked with painted lines to be repainted annually, for the orderly distribution of automobiles. Landlord covenants, represents and warrants that, during the lease term, there shall be adequate sidewalks, driveways and roadways for automotive and pedestrian ingress and egress to and from Tenant's buildings and adjacent public streets and highways. Landlord shall make no charge ~~of any kind or nature for the use of said common facilities or any additions thereto.~~ All of said common facilities, including any signs owned by Landlord, shall be constructed in a workmanlike manner and shall, during the lease term, be maintained by Landlord, at its sole cost and expense, in good order and repair and in an adequate, sightly and serviceable condition. Said maintenance shall include, without limitation, keeping the same reasonably free and clear of foreign objects, papers, debris, obstructions, standing water, snow and ice, and supplying illumination during Tenant's business hours, and a reasonable period prior and subsequent thereto. ~~to a minimum of one and one-half (1½) foot candles measured at ground level, for each square foot of common facilities.~~ To assure the foregoing the Landlord shall cause the common facilities to be thoroughly cleaned not less than once weekly, and more often if necessary, and snow to be promptly removed on every occasion where it impedes the use of said facilities.       or crushed stone

During the lease term, Landlord shall maintain paved driveways at the rear of Tenant's buildings in order to provide convenient ingress and egress from the delivery or service entrances to adjacent public streets and highways for the purpose of receiving and delivering merchandise and otherwise servicing said buildings. Said driveways shall be of sufficient width so as to permit the passage, unloading and, if necessary, the turning around of trailer trucks and other commercial vehicles.

The term "common areas", as used in this lease, shall include the following: (a) said common facilities indicated on Exhibit "B" and those which shall at any time and from time to time be contained within the site depicted on Exhibit "B" or any future enlargement thereof, (b) areas within the said site which shall be open to the public generally, such as rest rooms and other facilities, if any, and (c) all other areas (except those areas which shall be occupied from time to time by building structures) included within the confines of the land described in Exhibit "A" or any enlargement of said site. Landlord will maintain said "common areas" and the property, if any, between the demised premises and any street or roadway serving demised premises in a reasonably clean and sightly condition and will mow and weed not less than once weekly when necessary. (See Rider)

During the lease term, Landlord shall keep Tenant insured against all statutory and common law liabilities for damages on account of injuries to property or person, including death, sustained by any person or persons while within said common areas, in a policy or policies in the amount of Two Hundred Fifty Thousand Dollars ($250,000) with respect to injury to any one person and in the amount of One Million Dollars ($1,000,000) with respect to any one accident or disaster, and in the amount of One Hundred Thousand Dollars ($100,000) with respect to damage to property; and Landlord shall also indemnify and save Tenant harmless against any such liability. Any such policies shall bear endorse-

                                                                    9/12/69

**Parking and Other Common Areas (cont'd)**

ments to the effect that Tenant shall be notified not less than five (5) days in advance of any modification or cancellation thereof. Copies of such policies, so endorsed, or certificates evidencing the existence thereof, shall be promptly delivered to Tenant upon written request therefor.

Landlord hereby gives and grants unto Tenant, including Tenant's agents, employees, customers, licensees and invitees the full licenses, rights, privileges and easements to use said common areas, in common with Landlord and other tenants, if any, of the land described in said Exhibit "A", and their respective agents, employees, customers, licensees and invitees. No persons other than those described in the preceding sentence of this paragraph shall be permitted to park upon or exercise any other rights over any of the parking areas of said site. In the event that unauthorized persons, including tenants or invitees of tenants occupying buildings now, or at any future time located beyond the limits of the land described in Exhibit "A", utilize said parking areas for parking or other purposes to an extent which shall be objectionable to Tenant, Landlord shall, upon written request by Tenant, take whatever action as shall be so requested to prevent said unauthorized utilization, including the erection of fences or other barricades.

Tenant may, at its election, from time to time, utilize portions of the common areas for carnival or circus type shows and entertainment, outdoor shows, home shows, automobile shows or such other uses which in Tenant's judgment tend to attract the public. Tenant shall give Landlord notification of such intended use a reasonable time in advance thereof, and on request supply Landlord with reasonable proofs of adequate insurance or indemnification against injuries to property or person, including death, sustained in connection therewith. In addition, Tenant shall be responsible for any physical damage to said common areas resulting from said use. Rent, if any, from such use shall be included as part of "gross sales" under Article 4 hereof.

**Store Opening**

10. The term "date of occupancy by Tenant," as used in this lease, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date upon which (i) Tenant's buildings and site improvements shall be completed in accordance with said working plans and specifications and the possession thereof shall be tendered to Tenant, and (ii) all of the representations and warranties set forth in Article 11 shall be fulfilled; except, however, notwithstanding anything to the contrary in this lease contained, in the event said date of occupancy shall occur during the period between November 1 and the last day of February, the lease term shall not commence until March 1 unless Tenant shall elect to open for business prior to such date. Tenant shall have the option to open for business prior to the completion of the matters set forth in subdivisions (i) and (ii) of this Article 10, and in the event of the exercise of such option, Landlord shall complete said buildings and site improvements as expeditiously as possible; provided, however, if Landlord shall have failed to complete said buildings and improvements according to the said working plans and specifications within ninety (90) days after Tenant opens for business, Tenant shall thereafter at any time be privileged, but not obligated, to complete, correct or remedy in all or part, any such deficiency, and the cost thereof shall be deducted from the rentals due under this lease, without waiver of Tenant's other remedies hereunder.   (See Rider)

has completed

**Landlord's Representations and Warranties**

11. Landlord represents, warrants and covenants that it shall, prior to commencement of the lease term, complete the buildings and site improvements substantially in accordance with the site plan depicted on said Exhibit "B", including completion of said common facilities in accordance with the provisions of Article 9 hereof. Landlord further covenants that it will not erect any buildings or other structures on the land described in Exhibit "A" except as shown on said Exhibit "B".



**Landlord's Representations and Warranties (cont'd)**

Notwithstanding the provisions of Article 10 or any other provision of this lease, the lease term shall not commence and said annual minimum rental, and other charges payable under this lease, shall not commence to accrue until the foregoing representations and warranties shall have been fulfilled; provided, however, in the event that Tenant shall elect to open for business before the Landlord shall have fulfilled the foregoing representations and warranties, the term of this lease shall commence, but Tenant shall not be obligated to pay the annual minimum rental or the additional rental; provided further, in lieu thereof, Tenant shall pay monthly in arrears one per cent (1%) of said gross sales and Tenant shall continue said payment until Landlord's said representations and warranties shall be fulfilled, at which time Tenant shall commence payment of the rental as set forth in Articles 3 and 4 hereof.

In the event Landlord's said representations and warranties shall not be fulfilled within twelve (12) months after such date as Tenant shall open for business, Tenant may notify Landlord in writing thereof and Landlord shall have ninety (90) days within which to fulfill said representations and warranties. If said representations and warranties shall not have been fulfilled within said ninety (90) day period, Tenant thereafter shall have the option of terminating this lease by notice to Landlord, which notice shall state an effective date of termination of not less than sixty (60) days from the date of such notice.

**Option to Extend Lease**

12. (a) Tenant shall have the option to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than ~~six (6)~~ nine (9) months prior to expiration of the term hereof.

(b) If Tenant shall have exercised the foregoing option, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than ~~six (6)~~ nine (9) months prior to the expiration of such extended term.

(c) If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than ~~six (6)~~ nine (9) months prior to the expiration of such further extended term.

(d) If Tenant shall have exercised the foregoing options, it shall have the option further to extend the term of this lease for an additional period of five (5) years upon the same terms and conditions of this lease, which option shall be exercised by notice to Landlord not less than ~~six (6)~~ nine (9) months prior to the expiration of such further extended term.

(e) ~~If Tenant shall have exercised the foregoing options, it shall have the option further~~ to extend the term of this lease for an additional period of ~~five (5) years~~ upon the same terms and conditions of this lease, ~~which option shall be~~ exercised by notice to Landlord not less than ~~six (6)~~ nine (9) ~~months prior to the expiration of such further extended term.~~

(f) Regardless of the exercise or nonexercise by Tenant of any or all of the foregoing options, Tenant shall have, unless the last day of the lease term shall be January 31 of any year, the option to extend (or further extend, as the case may be) the term of this lease for such period of time as shall cause the last day of the term of this lease to be the January 31 next succeeding the date upon which the term of this lease would expire but for the exercise of this option. This option shall be exercised by notice to Landlord not less than ~~six (6)~~ nine (9) months prior to the expiration of the term of this lease, or any extension thereof.

**First Refusal to Purchase Option**

13. ~~Anything in this lease contained to the contrary notwithstanding, and without in any~~ manner affecting or limiting any of the rights, privileges, options or estates granted to Tenant under this lease, it is agreed that if the Landlord, at any time during the term of this lease or any extension thereof, receives one or more bona fide offers from third parties to purchase the demised premises, or property of which the demised premises are a part, and if any such offer is acceptable to the Landlord, then Landlord agrees to notify Tenant in writing, giving the name and address of the offeror, and the price, terms and conditions of such offer, and Tenant shall have thirty (30) days from and after the receipt of such notice from Landlord in which to elect to purchase the property for the consideration and on the terms and conditions contained in the bona fide offer. If Tenant does not elect to purchase said property and Landlord sells the property, the purchaser shall take the property, subject to and burdened with all the terms, provisions and conditions of this lease, including this Article 13, and the rights of the Tenant under this lease as against the new owner shall not be lessened or diminished by reason of the change of ownership. Tenant's failure at any time to exercise its option under this Article 13 shall not affect this lease or the continuance of Tenant's rights and options under this Article 13 ~~or any other article.~~

**Repairs**

14. Tenant shall make and pay for all replacement of plate glass and all nonstructural repairs and replacements to the interior of Tenant's buildings which it deems necessary to keep the premises in a good state of repair, but in no event shall Tenant be obligated to make repairs and replacements which Landlord shall be required to make under any provision of this lease or which shall be necessitated by Landlord's negligence, default or failure to repair. Landlord shall make and pay for all repairs and replacements (except those which Tenant shall be specifically obligated to make under the provisions of this Article and those due to Tenant's negligence) to said buildings which shall be necessary to maintain the same in a safe, dry and tenantable condition, and in good order and repair. Notwithstanding anything to the contrary herein contained, Tenant shall not be required to make any repairs or replacements (or be liable for the cost thereof) which shall be necessitated by any damage or destruction with respect to which Landlord shall be insured or against which Landlord shall be required by the terms of this lease to insure, but Landlord shall make all such repairs or replacements. (See Rider)

In the event buildings or improvements constituting demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, and which shall be necessary to protect the buildings or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed One Thousand Dollars ($1000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.

**Alterations and Additional Construction**

15. Tenant may, at its own expense, from time to time make such alterations, additions or changes, structural or otherwise, in and to its buildings as it may deem necessary or suitable; provided, however, Tenant shall obtain Landlord's prior written consent to plans and specifications for structural alterations, additions or changes; provided, further, Landlord shall not withhold its consent thereto if the structural strength of the building will not be impaired by such work. The term, "structural changes", as used herein, shall not include moving of stud partitions, minor plumbing and electrical work, modification and rearrangement of fixtures or other minor changes. Landlord, at Tenant's cost, shall cooperate with Tenant in securing building and other permits or authorizations required from time to time for any work permitted hereunder or installations by Tenant. (See Rider)

~~Tenant may, at its own expense, at any time erect or construct additional buildings or structures~~ on any portion of the "common facilities" areas as defined in Article 9 and depicted on Exhibit "B"; provided, however, gross sales made in or from said additions shall be excluded from gross sales as defined in Article 4 of this lease and provided further, Tenant shall reimburse Landlord for any real estate taxes imposed on said additions or new construction, which taxes are solely attributable thereto, and Tenant shall reimburse Landlord for any increase in insurance premiums attributable thereto. Tenant shall also be solely responsible for exterior and interior repairs thereto, except those necessitated by fire or casualty for which Landlord is obligated to insure. In the event Tenant constructs any such additions or new construction, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, nor shall the floor area thereof be utilized in any computation with respect to required ratio of building area to parking area under said Article 9, and the number of parking spaces required thereunder shall be reduced by the number of spaces covered ~~by such additional buildings or structures.~~ (See Rider)

**Utilities**

16. Tenant shall promptly pay for all public utilities rendered or furnished to Tenant's buildings during the lease term, including water, gas and electricity, provided separate meters shall be installed for Tenant. Landlord covenants, represents and warrants that, during the lease term, said buildings shall at all times be connected to electric, water and gas lines of an adequate source of supply, and to storm and sanitary sewer systems of adequate capacity.

Landlord may provide a disposal or septic tank system in lieu of public sanitary sewer, subject to Tenant's written approval of plans and specifications and Landlord's continuing obligation to clean and maintain said system at all times in good and serviceable condition during the full term of this lease or any extension and at its sole expense. Sewer charges or sewer taxes, regardless of the manner billed or assessed, shall be paid by Landlord.

**Governmental Regulations**

17. Tenant shall observe and comply with all rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting said buildings, including the making of nonstructural alterations, insofar as they are due to Tenant's occupancy; provided, however, in the event such rules, orders and regulations shall either (a) require structural changes including, but not limited to the erection of a fire escape or exit, installation of a sprinkler system or other fire preventive device of a structural nature, or (b) require nonstructural changes which would have been required irrespective of the nature of the tenancy, then, in either such event, the same shall be complied with by Landlord at its sole expense.

**Fire**

18.  From and after the date on which Tenant shall be privileged to enter upon demised premises for the purposes specified in Article 8 hereof, Landlord shall insure the buildings depicted on Exhibit "B", including Tenant's buildings, against damage or destruction by fire and other casualties insured under a standard extended coverage endorsement. Said insurance shall be in an amount equal to not less than eighty per cent (80%) of the insurable value of the permanent improvements thereof. All such policies shall bear endorsements to the effect that Tenant shall be notified not less than five (5) days in advance of modification or cancellation thereof and that the assured has waived right of recovery from Tenant. Copies of such insurance policies or certificates evidencing the existence thereof, so endorsed, shall be promptly delivered to Tenant upon written request therefor. Irrespective of the cause thereof, Tenant shall not be liable for any loss or damage to said buildings resulting from fire, explosion or any other casualty.

In the event that, at any time during the lease term, the permanent improvements then constituting Tenant's buildings and site improvements shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, if as a result of any such damage or destruction during the last two (2) years of the lease term, Tenant's fixtures, equipment or other property shall be damaged or destroyed in an amount exceeding Twenty-five Thousand Dollars ($25,000.00), then either party may terminate this lease as of the date of such damage or destruction by giving written notice to the other party within thirty (30) days thereafter and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. Notwithstanding any such termination of this lease by Landlord as provided in this Article, Tenant shall have the right to exercise any option to extend the term hereof in accordance with the provisions of Article 12 within thirty (30) days after the date of the receipt of Landlord's notice of termination, and, upon the exercise of any such option (other than the option set forth in subparagraph (f) of Article 12) by Tenant, then this lease shall continue in full force and effect despite such notice of termination by Landlord and Landlord shall repair, rebuild and restore the said permanent improvements as above provided. In the event that this lease shall be terminated as above provided, all unearned rent and other charges paid in advance shall be refunded to Tenant.

During any period commencing upon the date of any such damage or destruction and ending upon the "date of reoccupancy by Tenant", the annual minimum rental and any other charges payable under this lease shall abate in the proportion that the part of Tenant's buildings which shall be untenantable shall bear to the whole. The term "date of reoccupancy by Tenant", as used herein, shall be the first to occur of the following two dates: (a) the date upon which Tenant shall open for business in that part of Tenant's building rendered untenantable by such damage or destruction, or (b) the date which shall be sixty (60) days (plus a period of time equal to any delays due to conditions beyond Tenant's control) after the date of completion of the repairs, rebuilding and restoration required of Landlord herein.

In the event that, at any time during the lease term except the last two (2) years thereof, any building or buildings within the site depicted on Exhibit "B", other than Tenant's building or buildings, shall be damaged or destroyed (partially or totally) by fire, the elements or any other casualty, Landlord shall, at its expense, promptly and with due diligence repair, rebuild and restore the same as nearly as practicable to the condition existing just prior to such damage or destruction; provided, however, during such period of time (including the last two (2) years of the lease term) that either (a) twenty per cent (20%) or more of the gross rentable floor area of said buildings shall be so rendered untenantable, or (b) any of the stores of tenants specifically required to be open for business prior to Tenant's opening for business (by terms of Article 11) shall not be open for business because of such damage or destruction, then the annual minimum rental for such period of time shall be abated, whether or not Tenant's buildings shall be damaged or destroyed and during such period Tenant shall pay monthly in arrears one per cent (1%) of its gross sales.

**Eminent Domain**

19.  In the event all of Tenant's buildings shall be expropriated by public or quasi-public authority, this lease shall terminate as of the date Tenant shall be deprived of the physical possession thereof.

In the event that less than the whole, but more than ten per cent (10%) of Tenant's buildings shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date Tenant shall be dispossessed from the part so expropriated, by giving notice to Landlord of such election so to terminate within ninety (90) days from the date of such dispossession.

**Eminent Domain (cont'd)**

In the event of an expropriation of any portion of Tenant's buildings, if this lease shall not be terminated as hereinabove provided, it shall continue as to that portion of the said buildings which shall not have been expropriated or taken, in which event Landlord shall, at its sole cost and expense, promptly and with due diligence restore said buildings as nearly as practicable to complete units of like quality and character as existed just prior to such expropriation. The annual minimum rental and other charges shall abate during the period of demolition and restoration, and thereafter the annual minimum rental and minimum basis of sales shall be reduced in the proportion the ground floor area of the part of Tenant's buildings so expropriated shall bear to the total ground floor area of said buildings prior to such expropriation.

Without limiting the foregoing, in the event that more than ten per cent (10%) of the land described in Exhibit "A" shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease as of the date possession of the land shall be taken by such authority, by giving notice to Landlord of such election within ninety (90) days thereafter; provided, however, said termination by Tenant shall be null and void if, within ninety (90) days following the date possession of said land shall be so taken, Landlord shall substitute equivalent and similarly improved lands contiguous to and properly integrated with the remainder of the site depicted on Exhibit "B". Notwithstanding any other provision of this lease, in the event that more than ten per cent (10%) of the aggregate number of square feet of ground floor area in the buildings located on said site shall be expropriated by public or quasi-public authority, Tenant may terminate this lease at any time following notice of such expropriation. Any such termination shall be effective as of the date of notice to Landlord. Landlord shall immediately notify Tenant of any notice of any such proposed expropriation.

In the event this lease shall be terminated pursuant to this Article, any annual minimum rental and other charges paid in advance shall be refunded to Tenant, and Tenant shall have an additional sixty (60) days, rent free, within which to remove its property from the demised premises. In the event that at the time of any expropriation of Tenant's buildings, Tenant shall not have fully amortized expenditures which it may have made on account of any improvements, alterations or changes to its buildings, Landlord shall assign to Tenant so much of any award payable as a result of such expropriation as shall equal the unamortized portion of Tenant's said expenditures. Said unamortized portion of Tenant's said expenditures shall be determined by multiplying such expenditures by a fraction, the numerator of which shall be the number of remaining years of the lease term at the time of such expropriation and the denominator of which shall be the number of remaining years of the lease term at the time such expenditures shall have been made plus the number of years for which the lease term may have been subsequently extended.

**Assignment and Subletting**

20. The premises hereby demised shall not be used for any unlawful purpose. Tenant may assign this lease or sublet the whole or any part of said demised premises, but if it does so without Landlord's consent, it shall remain liable and responsible under this lease.

**Signs**

21. The demised premises shall be referred to by only such designation as Tenant may indicate. Landlord expressly recognizes that the service mark and trademark "K mart" is the valid and exclusive property of Tenant, and Landlord agrees that it shall not either during the term of this lease or thereafter directly or indirectly contest the validity of said mark "K mart", or any of Tenant's registrations pertaining thereto in the United States or elsewhere, nor adopt or use said mark or any term, word, mark or designation which is in any aspect similar to the mark of Tenant. Landlord further agrees that it will not at any time do or cause to be done any act or thing, directly or indirectly, contesting or in any way impairing or tending to impair any part of the Tenant's right, title and interest in the aforesaid mark, and Landlord shall not in any manner represent that it has ownership interest in the aforesaid mark or registrations therefor, and specifically acknowledges that any use thereof pursuant to this lease shall not create in Landlord any right, title or interest in the aforesaid mark.

Tenant shall have the option to erect at its sole cost and expense upon any portion of the premises described in Exhibit "A", one or two pylon-type signs. Any such sign shall be of such height and other dimensions as Tenant shall determine and shall bear such legend or inscription advertising Tenant's store as Tenant shall determine. Tenant shall have the option to utilize the lighting standards in the parking lot for advertising purposes by attaching, or causing to be attached, signs advertising any and all products and services as Tenant shall elect.   (See Rider)

Landlord shall not permit any other advertising signs, billboards or posters to be displayed on any portion of the premises described in Exhibit "A" hereof, excepting flat wall signs which may be



**Signs (cont'd)**   placed on stores, if any, now depicted on Exhibit "B" or in the future erected on "future building areas" as depicted thereon, providing such signs shall be utilized solely for the purpose of advertising the names of the respective tenants thereof.

Landlord shall not, without Tenant's written consent, at any time utilize the exterior of Tenant's buildings, or the space above, for sign display purposes.

**Ingress and Egress**   22. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide and will maintain for the period of this lease and any extension thereof, ingress and egress facilities to public streets and highways in the number and substantially in the locations depicted on Exhibit "B", subject to unavoidable temporary closings or relocations necessitated by public authority or other circumstances beyond Landlord's control.

**Landlord's Remedies**   23. If the rent reserved in this lease, or any part thereof, shall remain unpaid for a period of thirty (30) days or if Tenant shall be in default under any other provision of this lease and shall remain so for a period of thirty (30) days after notice to Tenant of said nonpayment or other default, then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, either (a) terminate this lease, or (b) re-enter demised premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet said premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of said premises and of any repairs and alterations necessary to prepare it for reletting. Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent. If any default by Tenant (except nonpayment of rent) cannot reasonably be remedied within thirty (30) days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default before this lease can be terminated or other remedy enforced by Landlord. Except for the legal remedy of damages (provided Landlord shall, in all instances, be required to mitigate damages) and the equitable remedy of an injunction, the remedies of Landlord herein shall be exclusive of any other remedies.

**Bankruptcy**   24. If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver of all the property of Tenant shall be appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may terminate this lease by giving notice to Tenant of its intention so to do; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or someone claiming under it.

**Covenant of Title**   25. Landlord covenants, represents and warrants that it has full right and power to execute and perform this lease and to grant the estate demised herein and that Tenant, on payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the lease term without molestation or hindrance of any person whomsoever, and if at any time during the term hereby demised the title of Landlord shall fail or it be discovered that its title shall not enable Landlord to grant the term hereby demised, Tenant shall have the option at Landlord's expense to correct such defect or to annul and void this lease with full reservation of its right to damages, if any.

Landlord further covenants, represents and warrants that it is seized of an indefeasible estate in fee simple in the land described in Exhibit "A" free and clear of any liens, encumbrances, restrictions and violations (or claims or notices thereof) with exceptions as follows:

    (a)   Public utility easements not impairing Tenant's use of the demised premises

    (b)   Any mortgage permitted under Article 26.



**Covenant of Title (cont'd.)**

Landlord shall, without expense to Tenant, and within thirty (30) days after written request by Tenant, furnish (a) ~~a certification by an attorney acceptable to Tenant that Landlord's title is as herein represented and certifying that the premises depicted on Exhibit "B" are within the bounds of the property described in Exhibit "A",~~ (b) a survey by licensed surveyor of the land described in Exhibit "A", and (c) agreements wherein each holder of any lien against the demised premises shall consent to this lease and warrant that Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such holder unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**an updated title policy of Monroe Abstract and Realty Co.**

**Mortgage Sub-ordination**

26. Upon written request by Landlord, Tenant shall execute and deliver an agreement subordinating this lease to any first mortgage upon the demised premises; provided, however, such subordination shall be upon the express condition that the validity of this lease shall be recognized by the mortgagee, and that, notwithstanding any default by the mortgagor with respect to said mortgage or any foreclosure thereof, Tenant's possession and right of use under this lease in and to the demised premises shall not be disturbed by such mortgagee unless and until Tenant shall breach any of the provisions hereof and this lease or Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this lease.

**Tenant Indemnifies Landlord**

27. During the lease term, Tenant and its assignees and sublessees shall indemnify and save Landlord harmless against all penalties, claims or demands of whatsoever nature arising from Tenant's use of its buildings, except those which shall result, in whole or in part, and directly or indirectly, from the default or negligence of Landlord.

**Tenant's Right to Cure Landlord's Defaults**

28. In the event Landlord shall neglect to pay when due any taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days (two (2) days with respect to defaults under Article 9 hereof) after notice thereof by Tenant, pay said taxes, assessments, principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall on demand pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of six per cent (6%) per annum, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness.

Provided the holder of a properly recorded first mortgage shall have notified Tenant in writing that it is the holder of such lien on the demised premises and shall so request, Tenant shall, (with respect to taxes or any obligations on any mortgage or encumbrance affecting title to demised premises and to which this lease shall be subordinate) in the event it shall notify Landlord to correct any default, give a similar notice to such holder, and such holder shall be granted sixty (60) days after receipt thereof to correct or remedy such default.

**Condition of Premises at Termination**

29. At the expiration or earlier termination of the lease term, Tenant shall surrender demised premises, together with alterations, additions and improvements then a part thereof, in good order and condition except for the following: ordinary wear and tear, repairs required to be made by Landlord, and loss or damage by fire, the elements and other casualty or occurrence excepted. All furniture and trade fixtures installed in said buildings at the expense of Tenant or other occupant shall remain the property of Tenant or such other occupant; provided, however, Tenant shall, at any time and from time to time during the lease term, have the option to relinquish its property rights with respect to such trade fixtures (including, but not limited to, air conditioning machinery and lighting fixtures), which option shall be exercised by notice of such relinquishment to Landlord, and from and after the exercise of said option, the property specified in said notice shall be the property of Landlord.

**Holding Over**

30. In the absence of any written agreement to the contrary, if Tenant should remain in occupancy of demised premises after the expiration of the lease term, it shall so remain as a tenant from month-to-month and all provisions of this lease applicable to such tenancy shall remain in full force and effect.

**Notices**

31. Notices required under this lease shall be in writing and deemed to be properly served on receipt thereof if sent by certified or registered mail to Landlord at the last address where rent was paid or to Tenant at its principal office in Troy, Michigan, or to any subsequent address which Tenant shall designate for such purpose. Date of notice shall be date on which such notice is deposited in a post office of the United States Post Office Department.

**Captions and Definitions**

32. Marginal captions of this lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions thereof. The necessary grammatical changes which shall be required to make the provisions of this lease apply (a) in the plural sense if there shall be more than one Landlord, and (b) to any Landlord which shall be either a corporation, an association, a partnership, or an individual, male or female, shall in all instances be assumed as though in each case fully expressed. Unless otherwise provided, upon the termination of this lease under any of the Articles hereof, the parties hereto shall be relieved of any further liability hereunder except as to acts, omissions or defaults occurring prior to such termination.

**Successors and Assigns**

33. The conditions, covenants and agreements contained in this lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. All covenants and agreements of this lease shall run with the land.

**Memorandum of Lease**

34. The parties hereto have simultaneously with the execution and delivery of this lease executed and delivered a Memorandum of Lease which Landlord shall at its sole expense cause to be recorded within sixty (60) days following delivery of this lease and returned to Tenant by Landlord within sixty (60) days thereafter.

IN WITNESS WHEREOF, the parties hereto have executed these presents in duplicate and affixed their seals hereto as of the day and year first above written.

WITNESSES:

GRAND CENTRAL PLAZA, INC.

By: _Tuffee J. Yunis_
　　Tuffee J. Yunis,　　　　　President

Attest: _Nicholas Yunis_
　　　Nicholas Yunis,　　　　　Secretary

S. S. KRESGE COMPANY

By: _J. F. Johnson_
　　J. F. Johnson,　　　　Vice President

Attest: _J. G. Schmidt_
　　　J. G. Schmidt,　　Assistant Secretary

9/19/72

## ACKNOWLEDGMENTS

STATE OF  NEW YORK  }ss:
COUNTY OF  CHEMUNG

I do hereby certify that on this 15ᵗʰ day of January , 19 75 , before me, , a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared TUFFEE J. YUNIS and  NICHOLAS YUNIS , known to me to be the President and Secretary of GRAND CENTRAL PLAZA, INC.,

who, being by me duly sworn, did depose and say that they reside in Town of Elmira, New York

respectively; that they are the President and Secretary respectively of  GRAND CENTRAL PLAZA, INC., the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires: March 20, 1975

_Notary Public_

RANSOM P. REYNOLDS, JR.
Notary Public, State Of New York
No. 03-5261783
Chemung County
Commission Expires March 30, 19.75.


STATE OF MICHIGAN }ss:
COUNTY OF OAKLAND

I do hereby certify that on this 31st day of  January , 19 75 , before me, Margaret T. Rossier , a Notary Public in and for the County and State aforesaid, and duly commissioned, personally appeared J.P. Johnson and  J. G. Schmidt known to me to be the Vice President and Assistant Secretary of S. S. Kresge Company, who, being by me duly sworn, did depose and say that they reside in Birmingham, Mich.  and  Lake Orion, Mich. respectively; that they are the Vice President and Assistant Secretary respectively of S. S. Kresge Company, the corporation described in and which executed the foregoing instrument; that they know the seal of said corporation; that the seal affixed to said instrument is the corporate seal of said corporation; that, on behalf of said corporation and by order of its board of directors, they signed, sealed and delivered said instrument for the uses and purposes therein set forth, as its and their free and voluntary act; and that they signed their names thereto by like order.

In Witness Whereof, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

My commission expires:

_Notary Public_

MARGARET T. ROSSIER
Notary Public, Oakland County, Mich.
My Commission Expires June 12, 1977

CODE 920-00                                                              13

THIS RIDER, CONSISTING OF FIVE
PAGES, IS ATTACHED TO AND FORMS
A PART OF THE LEASE ENTERED INTO
BETWEEN GRAND CENTRAL PLAZA, INC.,
AS LANDLORD, AND S.S. KRESGE COMPANY,
AS TENANT.

**REAL ESTATE
TAXES**
(Cont'd from
Article 5)

5.  As further rental hereunder and subject to all the pro-
visions of this Lease, Tenant shall pay to the Landlord its pro-
portionate share of the increased annual real estate taxes which
exceed $ 42,708.29     , assessed against the land described on
Exhibit "A" together with all improvements now or hereafter
erected thereon (the shopping center) as they become due and payable
such amount shall be hereinafter referred to as an "excess
tax payment." The Tenant's proportionate share of said excess tax
payment shall be determined by multiplying the amount of
such increase by a fraction, the numerator of which shall
be the number of square feet of total ground floor area occupied
by the Tenant in the building hereby demised (70,000 sq.
ft.) and the denominator of which shall be the number of
square feet of total ground floor area of buildings and
structures existing at anytime upon the land described in
Exhibit "A". The Tenant's obligation pursuant to this paragraph,
if any, shall become due and payable within thirty (30) days
after the payment by the Landlord of such increased property
taxes upon submission to the Tenant by the Landlord of a
verified statement showing the computations upon which the
Tenant's payment under this paragraph is based together with
photostatic copies of all applicable tax bills paid by the
Landlord.

All excess tax payments shall be deductible by Tenant
from additional rentals as defined in Article 4, due and payable
for such Lease Year. In the event the excess tax payment
for any Lease Year exceeds said additional rental due and payable





during the same Lease Year, the amount by which said excess tax payment exceeds said additional rental shall be carried forward and be deductible from additional rentals due and payable for succeeding Lease Years on a cumulative basis.

The Tenant shall not be responsible or liable for any assessments or special levies whatever nor for any income or other taxes of the Landlord, its liability under this article being limited to its proportionate share of the increase in ad valorem real estate taxes as provided above. Excess tax payments for any odd portion of a calendar year in which this lease commences and terminates shall be pro-rated on a per diem basis.

The Tenant shall have the right to participate in all negotiations of tax assessments.  Tenant shall have the right to contest the validity or the amount of any tax or assessment levied against the taxable premises by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such obligations, pay same under protest, or take such other steps as Tenant may deem appropriate; provided, however, Tenant shall take no action which will cause or allow the institution of any foreclosure proceedings or similar action against the demised premises.  Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by the Tenant and will execute any documents required therefor.

Should the Landlord institute proceedings to contest the validity or the amount of any tax or assessment levied against the taxable premises, the Tenant will cooperate in such proceedings.

Should any of the proceedings referred to in the preceding two paragraphs of this Article 5 result in reducing the total annual real estate tax liability against the taxable premises, the Tenant shall be entitled to receive its proportionate




share of refunds paid by the taxing authorities.

ADVANCE
POSSESSION
FOR FIXTURING
(cont'd from
Article 8)

8.    Tenant shall have the privilege, rent free, of entering
said building for the purpose of making additional leasehold
improvements, for installing storage bins, storing merchandise
and other purposes as Tenant may deem necessary to prepare
said building for its intended purpose.  Such entry shall not
be construed as the "date of occupancy by Tenant."

PARKING AND
OTHER COMMON
AREAS
(Cont'd from
Article 9)

9.    Tenant will pay to Landlord, as additional rental,
its proportionate share of the cost of the common area main-
tenance required to be performed by Landlord hereunder.  Tenant's
proportionate share of the aforesaid will be based upon the
ratio that the total ground floor area of Tenant's building
(70,000 square feet) bears to the total ground floor area of
all buildings and structures existing at anytime upon the land
described in Exhibit "A".  Notwithstanding any provision to the
contrary contained herein, Tenant's payment pursuant to this
Article shall not exceed Ten Thousand and No/100 ($10,000.00)
Dollars per year, payable quarterly and certified by the Landlord
annually.

STORE
OPENING
(Cont'd from
Article 10)

10.    Tenant shall exercise its best efforts to open
Tenant's building for business no later than July 1, 1975.
In no event, however, shall Tenant fail to open for business
later than September 1, 1975.

REPAIRS
(Cont'd from
Article 14)

14.    The following maintenance replacement or repair
shall remain the Landlord's sole responsibility:

(a)    all maintenance, replacement and repair to the roof,
outer walls and structural portion of the buildings;
and

(b)    all repairs, maintenance or replacement of or to the
demised premises, including but not limited to,
underground utility installations and underground
electrical conduit and wire, which are occasioned
by settlement of the premises or a portion thereof,
or caused by soil conditions; and





(c)  all repairs and replacement (inclusive of sweeping, striping and snow and ice removal) necessary to maintain all driveways, sidewalks, street and parking areas free of all settling, clear of standing water, and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks (Tenant to remove snow and ice from its sidewalk areas).

ALTERATIONS
AND ADDI-
TIONAL CON-
STRUCTION
(Cont'd from
Article 15)

15.  Landlord herewith grants its consent for all work, whether structural or non-structural, as shown on Interior Lay Out Drawing dated December 17, 1974, being a preliminary block-out of the sales area of the demised premises, which Drawing is annexed hereto and made a part hereof as Exhibit "C". Tenant shall have the right to make such structural or non-structural changes as it may require for a typical K mart operation without the consent of Landlord.  In the event Tenant shall make any structural repairs to the demised premises, the same shall be done in a good and workmanlike fashion and shall not weaken the structure. In the event said structural repairs are negligently made by Tenant, Tenant shall be responsible for any damages ensuing therefrom and shall continue to maintain said structural repairs.

Tenant may, at its own expense, at any time erect a TBA and a gasoline facility and garden shop center to extend along the easterly building line of the demised premises as depicted on Exhibit "B".  Tenant shall reimburse Landlord for any real estate taxes imposed on said addition, which taxes are solely attributable thereto and Tenant shall reimburse Landlord for any increase in insurance premiums attributable thereto.  Tenant shall also be solely responsible for exterior and interior re-pairs thereto, except those necessitated by fire or casulaty for which Landlord is obligated to insure.  In the event Tenant constructs such addition, Landlord shall not be obligated to furnish additional parking areas in substitution of areas thereby built over, and the number of parking spaces required under Article 9 of said Lease shall be reduced by the number of spaces



covered by such addition. Gross Sales made in and from said
TBA facility and garden shop center shall be included in Gross Sales
as defined in Article 4 of this Lease. All municipal approvals shall
be obtained by Landlord at Tenant's sole cost and expense and Landlord
shall upon receipt of construction plans from Tenant proceed diligently
with all necessary applications so as to accomplish Tenant's additional
building requirements.

Landlord shall, simultaneously with the commencement of
the Lease Term, give Tenant a check in the sum of $300,000.00
to reimburse Tenant for refurbishing the interior of the demised
premises and for any expenses it may incur in the construction
of the proposed TBA facility and garden shop center referred
to hereinabove. It is expressly understood and agreed that
Landlord shall make such payment to Tenant upon the commencement
of the Lease Term and Tenant shall have the right to retain
the sum of $300,000.00 even though Tenant shall not construct
the TBA facility and/or the garden shop center.

Landlord agrees that no building or improvement shall be
built, within the area outlined in red, as shown on Exhibit "B"
annexed hereto and made a part hereof.

**SIGNS**
(Cont'd from
Article 21)

21. Tenant and Landlord acknowledge that there is presently
existing on the demised premises a pylon sign standard. Tenant
shall have the right to erect at its sole cost and expense
upon any portion of the standard, a sign as described in the
immediately preceding paragraph. Landlord shall obtain all
necessary governmental approvals in connection with the foregoing.





EXHIBIT A

ALL that tract or parcel of land with the buildings and improvements thereon erected, situate in the Village of Horseheads, County of Chemung and State of New York bounded and described as follows:

BEGINNING at an iron pin marking the westerly line of Center Street and the northerly line of Chemung Street in said Village of Horseheads; thence (1) north 9° 02' east along the west line of center Street 296.83 feet to a concrete monument marking the westerly line of Center Street and the southerly right-of-way line of land appropriated by the State of New York in Liber 439 of Deeds, page 313 for New York State Highway Route 17; thence (2) north 58° 40' west along said southerly line of said New York State Highway Route 17, making an interior angle of 112° 28' with the last course a distance of 595 feet to a monument; thence (3) north 62° 25' west and continuing along said highway a distance of 34.42 feet to a monument; thence (4) north 61° 54' west and continuing along said highway a distance of 607.53 feet to a monument; thence (5) north 54° 08' west and continuing along said highway a distance of 205.52 feet to a monument in the easterly line of the Pennsylvania Railroad property; thence (6) south 30° 26' west and making an interior angle of 84° 34' with the last course and along said Pennsylvania Railroad right-of-way a distance of 898.20 feet more or less, to a monument in the northerly line of Chemung Street; thence (7) south 81° 28' east along said northerly line of Chemung Street and making an interior angle of 68° 06' a distance of 1680.56 feet, more or less to the point of Beginning.

Excepting and reserving therefrom a perpetual easement as granted to the State of New York and set forth in Liber 409 of Chemung County Deeds at page 24.

