# Exhibit 1

1/15/12

DATE

## SCAN-BASED TRADING AND CONSIGNMENT AGREEMENT

This Scan-Based Trading and Consignment Agreement (the "Agreement") is entered into by and between Kmart Corporation (together with its subsidiaries "Kmart"), Sears, Roebuck and Co (together with its subsidiaries "Sears") and all other subsidiaries of Sears Holdings Corporation (jointly, "Company") 3333 Beverly Road, Hoffman Estates, IL 60179 and Royal Consumer Products LLC, 108 Main Street, Norwalk, CT 06851 signing this Agreement as Vendor below. In consideration of and reliance on the mutual promises and representations contained in this Agreement, Vendor and Company agree as follows:

1.  Vendor and Company desire to enter into a scan-based trading and consignment arrangement for the supply of certain merchandise by Vendor to Company for resale to retail customers pursuant to the terms set forth in this Agreement. As used in this Agreement, scan-based trading ("SBT") refers to an arrangement in which: (i) Company payments to Vendor are based on Company's point of sale ("POS") data, (ii) Vendor delivers merchandise to Company's stores as defined in related Agreements between Company and Vendor in the absence of a purchase order relative to such merchandise, (iii) Vendor retains title and ownership of such merchandise until the merchandise is scanned by Company at the register, at which time Company purchases the merchandise and instantaneously resells it to the retail customer, (iv) Company only pays Vendor for merchandise that is scanned by Company at the register, and, (v) Company shall pay vendor net 30 days from the date the merchandise is scanned by Company at register.

2.  Vendor will deliver to Company on a consignment basis such merchandise as identified in one or more SBT inventory form(s) executed by Vendor and Company (the "SBT Merchandise"), a representative form of which is attached and incorporated by reference. The parties intend by this Agreement to enter into a "consignment" arrangement agreement as defined in § 9-102(20) of the Uniform Commercial Code and agree that all SBT Merchandise delivered by Vendor and received by Company is consigned merchandise. Title to the SBT Merchandise will remain with Vendor until (i) the SBT Merchandise is scanned by Company at the register, at which point title will pass to Company and the SBT Merchandise will be resold to the retail customer or (ii) purchased by Company in accordance with paragraph 11 of this Agreement. Company is responsible for establishing appropriate initial inventory levels of SBT Merchandise in Company's retail stores and distribution centers and replenishing such merchandise based on reported sales (as reflected in Company's POS data).

3.  Company and Vendor will mutually agree upon the purchase price and payment terms of the SBT Merchandise as between Company and Vendor. Company will have the sole discretion to determine the retail price of the SBT Merchandise for sales to retail customers. For each unit of SBT Merchandise sold (as determined by Company POS data, which is subject to audit by Vendor as provided below), Company will pay Vendor the agreed upon purchase price for the unit, pursuant to the agreed upon payment terms. The following SBT Merchandise will not be counted as a sale for purposes of calculating payments to Vendor: any SBT Merchandise that (i) is sold and returned by a retail customer in accordance with Company's return policy, or (ii) is defective. Company may take deductions from payments due to Vendor for any and all returned or defective SBT Merchandise for which Vendor has previously received payment.

4.  All transactions between Company and Vendor concerning this Agreement (e.g., remittance advises, payments, etc.) will be conducted via electronic data interchange ("EDI") pursuant to the Electronic Data Interchange Trading Partner Agreement in place between Company and Vendor. Company will provide Vendor with EDI transaction set No. 852 "Product Activity Data" (also known as POS) via EDI (which reflects unit sales of SBT Merchandise) at no charge within 48 hours of the end of each business day. In the event of any conflict between the terms of the Electronic Data Interchange Trading Partner Agreement and this Agreement, the terms of this Agreement will control.

5.  Risk of loss or damage to the SBT Merchandise caused by fire, flood, wind or other natural disaster and shrink shall remain with Vendor until title passes to Company as provided in paragraph 1.

6.  Vendor will maintain true and correct books and records concerning the delivery of SBT Merchandise to Company's distribution centers, which will govern in determining the quantity of SBT Merchandise received by Company from Vendor and which is subject to audit as provided below.

(5)

Company will maintain a record of the perpetual inventory of the SBT Merchandise. If physical inventories of the SBT Merchandise are performed, the company that performs Company's annual physical cycle inventories at the retail stores will perform the physical inventories of the SBT Merchandise at Company's cost; provided, however, that Vendor may at its own cost conduct its own periodic physical inventories or observe physical inventories conducted by Company. Company may audit Vendor's books and records concerning the delivery of SBT Merchandise to Company (i) once per calendar year on 15 days written notice to Vendor and (ii) thereafter, at any other time upon 15 days written notice to Vendor, subject to Vendor's written consent, with such consent not to be unreasonably withheld or delayed. If Company chooses to conduct such an audit, Company or its auditors will sign a commercially reasonable confidentiality agreement.

7. Company is responsible for collecting, paying, and reporting all sales, use, excise, gross receipts and other federal, state or local taxes or other assessments (other than any tax based on the income of Vendor or the value of the consigned SBT Merchandise) arising from the sale of the SBT Merchandise to the retail customer. Vendor is responsible for reporting and paying any personal property, inventory, and ad valorum taxes assessed by any taxing authority on the consigned SBT Merchandise located at the Company retail stores and distribution centers. At Company's request, Vendor will furnish Company evidence of paying such taxes. Company represents that the SBT Merchandise will not be identified or treated as Company-owned inventory for the Company's accounting, financial reporting or any other purpose

8. The consigned SBT Merchandise, even if conforming and non-defective, may be returned to Vendor at Company's sole option. For such returns, the responsibility for freight costs will be Company's responsibility (freight prepaid).

9. Company consents to Vendor filing financing statements, any amendments and other appropriate Uniform Commercial Code forms and/or other documents reflecting Vendor's consigning the SBT Merchandise (and proceeds) and forwarding notices to other secured parties, if any, as contemplated by § 9-319 of the Uniform Commercial Code, in order for Vendor to have and a maintain a first priority, perfected consignment interest. Company will cooperate with Vendor to protect and secure Vendor's interest in the SBT Merchandise (and proceeds), including without limitation the executing such other security documents and notices as Vendor may deem reasonably necessary in order to maintain a perfected interest in the SBT Merchandise (and proceeds).

10. The terms and conditions governing the relationship between Vendor and Company are those signed by Vendor and on file from Vendor, all of which are incorporated by reference (the "Terms and Conditions"). In the event there is a conflict between this Agreement and the applicable Terms and Conditions, this Agreement will supersede and control; in all other respects, the applicable Terms and Conditions will remain in full force and effect. This Agreement is incorporated by reference into any "Orders" (as defined in the Terms and Conditions).

11. This Agreement will commence and be effective as the term is provided in the Terms and Conditions unless earlier terminated as provided in this document. Company may terminate this Agreement on 30 days written notice without cause. Breaching, expiring or terminating this Agreement shall have no impact on Vendor's ownership interest and consignment interest or security interest in the SBT Merchandise.



ViewAttachment

12.     This agreement shall be governed by the laws of the Sate of Illinois, without regard to its conflicts of law principles.

SEE RIDER DATED 5/8/12 SIGNED 6/15/12 WHOSE PROVISIONS ARE INCORPORATED HEREIN.

COMPANY                                VENDOR

By: _____         By: _____
Its: VP/GM                             Its: PRESIDENT
Date: 8/14/2012                        Date: 6/15/2012


Approved as to form

_____
Sears Holdings Corporation
Legal Department

3

ViewAttachment

05/08/12

## SCAN-BASED TRADING AND CONSIGNMENT AGREEMENT RIDER

This Scan-Based Trading and Consignment Agreement Rider ("Rider") is attached to and hereby made part of the Scan-Based Trading and Consignment Agreement, dated January 15, 2012 between Kmart Corporation (together with its subsidiaries "Kmart"), Sears, Roebuck and Co. (together with its subsidiaries "Sears") and all other subsidiaries of Sears Holdings Corporation (jointly, "Company") and Royal Consumer Products, LLC ("Vendor"). Absolutely no changes are to be made to this Rider without prior written agreement between the parties.

This Rider is solely with respect to the terms herein and does not affect any other obligations within the Scan-Based Trading and Consignment Agreement. In the event the terms of this Rider conflict with the terms of the Scan-Based Trading and Consignment Agreement, the terms of this Rider shall be deemed controlling.

**1-Duration and Termination of Consignment.** The Company and Vendor agree that this Rider, and the underlying Scan-Based Trading and Consignment Agreement shall remain in effect from Effective Date to the start of the 13th month from such date and then thereafter until termination by either party upon 45 days written notice. All obligations set out in or arising from this agreement shall continue until fully satisfied or until otherwise discharged after any termination. The Effective Date is September 9, 2012.

A. Either party may terminate for cause upon fifteen (15) days written notice for a material breach of this Rider, or the underlying Scan-Based Trading and Consignment Agreement which has not been promptly remedied. In the event Vendor has committed a material breach, and otherwise failed to promptly remedy to the satisfaction of Company, then Company shall deduct the verifiable, actual damage of such breach and Company may terminate in accordance to the terms and conditions of Section 1B. In the event Company has committed a material breach, including failing to make timely payment to Vendor and otherwise failed to promptly remedy to the satisfaction of Vendor, the Vendor shall be paid by the Company the verified actual damage of such breach and Vendor may terminate in accordance with Section 1C.

B. If Company terminates with cause during the 12 month term or Vendor terminates without cause after the 12 month term a consigned item or product line or this Rider or the underlying Scan-Based Trading and Consignment Agreement, the Company will continue to sell the consigned inventory, without replenishment, for ninety (90) days from the date of notice. During the last thirty (30) days, the Company will reduce the sale price of the consigned items by 50% and similarly Vendor shall reduce its price to the Company for the consigned items by 50%. Non-sold consignment inventory will be liquidated by Company without further payment to the Vendor.

C. If Vendor terminates with cause during the 12 month term or Company terminates without cause after the 12 month term a consigned item or product line or this Rider or the underlying Scan-Based Trading and Consignment Agreement, and except as otherwise provided for herein this Section 1, the Company will continue to sell the consigned inventory, without replenishment, for ninety (90) days from the date of notice. At the end of these ninety days, the Company will guarantee and pay for at full price any unsold consigned inventory.



05/08/12

**2. Efforts to Sell.** The Company agrees to accept and sell the consignment inventory in a manner similar to the manner under which these product lines were sold prior to this Agreement. The product lines that will be sold under this Agreement are Posterboard & Foamboard & Project Board consisting of 21 items to be consigned for which similar items were sold by competitors and 7 Accessories items sold by Vendor to Company to be consigned. Actual product selection and pricing is the subject of further negotiations between Vendor and Company prior to the execution of this Agreement and thereafter during this Agreement and parties agree that failure of the parties to agree on pricing as set out in Section 2 of the Agreement supports declaration and notice by either party to the other of termination without cause and, in which event, Sections 1.B. and 1.C. shall control.

**3. Consigned Inventory.** The parties agree that the consigned inventory provided by Vendor and carried by Company shall average three (3) months running average demand and either party has the right to restrict orders to maintain the inventory aligned with the three (3) months running average demand. The parties shall each provide reasonably necessary documentation for the calculation of such running average demand.

**4. Rebate.** In the event there has been no material breach of this agreement that has not been promptly cured by the Company or there is not a bankruptcy or insolvency declaration of the Company, including but not limited to filing or continued bankruptcy or insolvency proceeding, Vendor shall rebate to Company 10% of the annual net revenues received from the Company from the sales of the Consigned Inventory for the prior calendar year. Vendor shall remit such rebate directly to Company for each prior calendar year, having a remittance date on or about April 15. In the event there has been an uncured material breach that has not been promptly cured by the Company or there is a bankruptcy or insolvency declaration of the Company through April 15, including but not limited to filing or continued bankruptcy or insolvency proceeding, there shall be no rebates issued by Vendor, regardless of the sale of the consigned inventory hereunder.

**5. Store Closing.** In the event of a store closing where Vendor's consigned goods are being marketed and/or sold, the Company shall guarantee and remit to the Vendor the value of the store consigned inventory at the time of closing.

**6. Bankruptcy or Insolvency.** In the event of bankruptcy or insolvency declaration of the Company, or any subsidiary thereof, this Agreement shall terminate and the Company shall return in undamaged condition and at its cost including return freight cost any unsold consigned inventory at the time of such declaration.

**7. Security Interest Filing.**
Article 9 of Uniform Commercial Code ("UCC") provides the means whereby a consignor can establish a valid, protected security interest in its own inventory, even when that inventory has been delivered to a consignee. Vendor may at its option file a conforming financing statement amendment and other related documents as may be allowed under the UCC in order to protect its security interest in the consigned goods. Moreover, the parties agree that at the moment of sale to the Company's customer of consigned inventory (at the scan) ,the Vendor advances the payment received for its goods sold and Vendor has a first secured interest in proceeds then due to Vendor as its rightful accounts receivable.

05/08/12

**8. Assignment.** The Company shall not assign the Rider, or the underlying Scan-Based Trading and Consignment Agreement, without written consent of Vendor.

**9. Governing Law.** The parties agree that this Rider, and the underlying Scan-Based Trading and Consignment Agreement, shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Kentucky.

**10. Attorney Fees.** Each party hereto shall bear all attorney's fees and costs arising from the actions of its own counsel in connection with this Rider, and the underlying Scan-Based Trading and Consignment Agreement, the matters and documents referred to herein, and all related matters.

**11. Counterparts; Headings.** This Rider, and the underlying Scan-Based Trading and Consignment Agreement, may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall constitute but one and the same instrument. The headings in the sections of this Rider are inserted for convenience only and in no way alter, amend, modify, limit or restrict the contractual obligations of the parties.

**12. Severability and Subordination.** If any provision of this Rider, or the underlying Scan-Based Trading and Consignment Agreement, is deemed or held to be invalid, illegal or unenforceable, such invalidity, unenforceability or illegality shall not affect the validity, enforceability or legality of the remaining provisions of this Rider and this Rider will be deemed to be amended to the extent necessary to make it valid, enforceable and legal. The remaining provisions will remain in full force and effect.

**13. Customer Returns, Inventory Shortages, Damaged in Store.** Both parties acknowledge that customer returns, inventory shortages and store damage ( "RS&D") are part of the business process for which under this agreement Royal will be financially responsible up to a 2% maximum as calculated on RS&D each quarter divided by net sales to the Company from Vendor for each quarter ("Cap RS&D %"). Both parties also understand that the industry average for these classes of products is below 2%. If the actual RS&D percentage exceeds Cap RS&D %, then both companies will work together to determine the cause and execute the necessary steps to correct the cause. If the determination is that the actual RS&D is in excess of the Cap RS&D % because of defective Vendor products, Vendor shall issue credit for all defective Vendor products in addition to the Cap RS&D credit. To the extent that the determination is that the actual RS&D percentage is the result from normal activity and results within the Company, then both parties will agree to negotiate an increase the Cap RS&D % and a corresponding price increase both effective at the same time.

14. Mark downs and Reset Fees and Racks.
Marketing costs are the amount paid or agreed to be paid at a future date by Vendor to Company or on behalf of Company for markdowns, racks, and reset fees.

If there is a material breach by the Company which has not been promptly cured, or if there is a termination by the Company of this agreement on part thereof without cause, or if there is a bankruptcy or insolvency declaration of the Company, including but not limited to the filing or continued bankruptcy or insolvency proceeding, such amounts of marketing costs not amortized by Vendor shall be due and payable to the Vendor by the Company. The Vendor amortizes such costs over a 36 month period from the date incurred.



05/08/12

**15. Scanned Based Sales.** With regard to the Section 1 of the Scanned based Trading Agreement: "Company shall pay vendor net 30 days from the date the merchandise is scanned by Company at register", it is agreed that the applicable consigned inventory shall be scanned whenever a customer exits a Company store with such inventory to the same standard of care that it maintains for its other Inventory.

AGREED AND ACCEPTED. IN WITNESS WHEREOF, the parties have executed this Rider as of the day and year first above written.

COMPANY  
By: _[signature]_  
As: VP/GMM  
Date: 6/20/2012

VENDOR _[signature]_  
by: _[signature]_  
As: PRESIDENT  
Date: 6/15/2012

WITNESS:

_____

WITNESS:

_____

Approved as to form  
_[signature]_  
Sears Holdings Corporation  
Legal Department