WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

*Attorneys for Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
In re                               :
                                    :          Chapter 11
SEARS HOLDINGS CORPORATION, et al., :
                                    :          Case No. 18-23538 (RDD)
                                    :
            Debtors.¹               :          (Jointly Administered)
                                    :
------------------------------------------------------------x
```

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

## DEBTORS' SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO ENFORCE THE AUTOMATIC STAY[2]

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

The Debtors respectfully submit this Supplemental Memorandum of Law in Further Support of Their Motion to Enforce the Automatic Stay ("**Supplemental Response**")[3] requesting that the Court issue an order: (i) enforcing the Sale Order and automatic stay pursuant to 11 U.S.C. § 362(a)(3); and (ii) compelling the Buyer to turn over the Debtors' property pursuant to the Sale Order, the Asset Purchase Agreement ("**APA**"), and 11 U.S.C. § 542(a).

## I.    Preliminary Statement

1.    Prior to the March 21 hearing, the Debtors moved the Court to compel the Buyer to turn over $14.6 million in pre-closing Credit Card Accounts Receivable that are property of the Estates, but which the Buyer has been improperly withholding in violation of the automatic stay and the APA.  The Buyer argued in response that         in Credit Card Accounts Receivable delivered by the Debtors at Closing fall outside the APA's definition of Credit Card Accounts Receivable because various credit card payment processors ("**Credit Card Payment Processors**," or "**Processors**") were holding those amounts in reserve accounts ("**Reserve Accounts**").  The Court asked the parties to submit supplemental briefs addressing

---

[2] Capitalized terms used in this Supplemental Response but not otherwise defined herein will have the meanings set forth in the *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* (ECF No. 2796) ("**Motion to Enforce**") or in the APA, as applicable.  The APA is attached as Exhibit B to the *Order (I) Approving the Asset Purchase Agreement Among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* (ECF No. 2507) (the "**Sale Order**").

[3] The Debtors fully incorporate the Motion to Enforce, as well as the arguments made in the *Joinder of the Official Committee of Unsecured Creditors to Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* (ECF No. 2808) ("**UCC Joinder**"), in this Supplemental Response.

whether the credit card processing agreements ("**Credit Card Processing Agreements**," or "**Processing Agreements**")[4] filed by the Buyer on the eve of the March 21 hearing helped clarify whether the Reserve Accounts at issue fall within the APA's definition of Credit Card Accounts Receivable.

2.      The Buyer's assertion that, at the Closing, the Debtors failed to deliver the requisite $1.657 billion aggregate of inventory and receivables pursuant to § 10.9 of the APA and that, therefore, there is no "excess" that is being withheld is meritless.  Specifically, the Buyer's argument that the Reserve Accounts do not fall within the plain and unambiguous definition of Credit Card Accounts Receivable—defined in the APA to include accounts owed by the Credit Card Payment Processors to Sears made up of funds generated from customers that used credit cards to purchase goods or services from Sears—misses the mark.  As discussed below, the Buyer's arguments contravene basic principles of law, logic, and the English language.  Furthermore, the Processing Agreements demonstrate—or, at the very least, do nothing to refute—that the Reserve Accounts fall within the definition of Credit Card Accounts Receivable under the APA (which they do).

3.      The Buyer's 39-page *Initial Supplemental Brief in Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property* (ECF No. 2796) ("**Supplemental Brief**") repeats the same argument over and over: that, because the Reserve Accounts are "security" (lower-case "s") or "collateral" (lower-case "c") under the Credit Card Processing Agreements,

---

[4] The Debtors are redacting the commercially sensitive information in the Processing Agreements so as to be consistent with the March 20, 2019 *Motion of Transform Holdco LLC for Leave to File Under Seal Portions of the Declaration of Terrence E. Rolecek and Accompanying Exhibits* (ECF No. 2916) and the April 2, 2019 *Motion of Transform Holdco LLC for Leave to (1) File Under Seal Portions of Transform Holdco LLC's Initial Supplemental Brief in Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay and (B) Compel Turnover of Estate Property and (2) File in Native Format* (ECF No. 3012) and pursuant to the Court's April 2, 2019 *Order granting the March 20 Motion to File Under Seal* (ECF No. 3007).

they cannot be "Credit Card Accounts Receivable" and must be a "Security Deposit" or a "Claim" under the APA. However, that the Reserve Accounts are described or treated as "security" under the Processing Agreements does not mean that they are a "Security Deposit" within the meaning of the APA. All that matters, here, is how the Debtors and the Buyer defined Credit Card Accounts Receivable in the APA and whether the Reserve Accounts fall within that definition—which they plainly do. Accordingly, the Buyer's arguments must be rejected, and the Court should grant the Debtors' Motion to Enforce and order the Buyer to turn over the $14.6 million in pre-closing Credit Card Accounts Receivable.

## II.    **Background**

4.      On March 11, 2019, the Debtors moved this Court to enforce the automatic stay against the Buyer. *See generally* Motion to Enforce. The Debtors asserted, *inter alia*, that the Buyer was improperly holding—in willful violation of the automatic stay—$14.6 million in Credit Card Accounts Receivable that were property of the Estates. These Credit Card Accounts Receivable were generated by pre-Closing credit card transaction proceeds—not yet accounted for at the time of Closing—that were in excess of the $1.657 billion aggregate of inventory and receivables that the Debtors delivered to the Buyer at Closing pursuant to § 10.9 of the APA (the "**Excess Credit Card Accounts Receivable**"). *See id.* ¶ 16. The Buyer took the positon that the Debtors were not entitled to turnover of the Excess Credit Card Accounts Receivable. The Buyer argued that                in Credit Card Accounts Receivable delivered at Closing did not count as Credit Card Accounts Receivable under the APA because they were being temporarily withheld by the Credit Card Payment Processors in Reserve Accounts. *See* Transform Holdco LLC's Resp. to Debtors' Motion to Enforce (ECF No. 2864) ("**Resp. to Motion to Enforce**") ¶ 7. By not counting the Reserve Accounts toward the total amount of Credit Card Account Receivables delivered by the Debtors at Closing, the Buyer claims that the

Debtors fell short of the $1.657 billion threshold and, therefore, the Debtors are not entitled to the return of the Excess Credit Card Accounts Receivable. *Id.* At bottom, the dispute turns on whether the Reserve Accounts fall within the definition of Credit Card Accounts Receivable in the APA.

5.     On the eve of the March 21, 2019 hearing to decide whether the Excess Credit Card Accounts Receivable were the Estates' property and therefore had to be turned over to the Debtors (the "**Hearing**"), the Buyer filed several agreements by and between Sears and the Credit Card Payment Processors governing their rights and obligations with respect to the processing of Sears-related credit card transactions.   This included the Merchant Services Bankcard Agreement by and between Sears and First Data Merchant Services Corporation (the "**First Data Agreement**"); the "Agreement for American Express Card Acceptance" by and between Sears and American Express Travel Related Services Company, Inc. (the "**American Express Agreement**"); and the DFS Services LLC Merchant Operating Regulations (the "**Discover Agreement**").

6.     These Processing Agreements describe the process, called settlement, by which the Processors credit what are generally referred to as settlement accounts ("**Settlement Accounts**") with the proceeds of Sears customers' credit card transactions less any amounts owed under the terms of the Processing Agreements,

Both Sears and the Processors have access to the Settlement Accounts—

7.      The Processing Agreements also describe the process by which the Processors may establish Reserve Accounts.[5]

8.      Finally, the Processing Agreements describe the circumstances under which the proceeds temporarily withheld in Reserve Accounts will be released back into the Settlement Accounts.

---

[5]

9.      Nothing in the Processing Agreements indicates or even suggests that the Reserve Accounts should not be treated as Credit Card Accounts Receivable under the unambiguous language of the APA.

10.     At the Hearing, both parties agreed that the APA was unambiguous and must be enforced according to its plain meaning and without resort to parol evidence. Debtors' Motion to Enforce Mar. 21, 2019 Hr'g Tr. ("**Hr'g Tr.**") 49:21–23. The Court likewise determined that its analysis of whether the Reserve Accounts are Credit Card Accounts Receivable under the APA should "focus on the plain meaning of the [APA]," *id.* at 52:18–25, and that it would not consider "parol evidence" in connection with that analysis, *id.* at 34:17–18 and 50:2–3 (THE COURT:  "I don't think we should get into [parol evidence] until I conclude that there is an ambiguity."). The Court made clear that the Processing Agreements were relevant only to the extent they addressed whether the Reserve Accounts satisfied the APA's definition of Credit Card Accounts Receivable—in other words, as "context"—and directed the parties to submit briefing addressing that narrow issue. *Id.* 27:9–28:1; 28:13–23; and 34:15–20.

## III.    Argument and Authorities

### A.     The Reserve Accounts are Credit Card Accounts Receivable under the Unambiguous Language of the APA, and Nothing in the Processing Agreements Warrants a Different Conclusion.

11.     The only question before the Court is whether the APA's definition of Credit Card Accounts Receivable encompasses the Reserve Accounts. If so, then the Debtors' inclusion of the Reserve Accounts as part of the Credit Card Accounts Receivable delivered to the Buyer at Closing meant that the Debtors satisfied (and exceeded) their obligations under § 10.9 of the APA.

12.    The unambiguous definition of Credit Card Accounts Receivable contains three parts:

> **[i]** [E]ach Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof
>
> **[ii]** owed by a credit card payment processor or an issuer of credit cards to a Seller
>
> **[iii]** resulting from charges by a customer of a Seller on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Seller or services performed by a Seller, in each case in the ordinary course of its business.

*See* APA § 1.1.

13.    The Buyer does not, indeed, cannot, dispute that the Reserve Accounts satisfy parts (i) and (iii) of the definition of Credit Card Accounts Receivable—that they are "Accounts" together with their proceeds (part (i)) or that they comprise the proceeds of charges by Sears customers on credit cards processed by the Credit Card Payment Processors in connection with the sale of goods by Sears or services performed by Sears (part (iii)).  *See* Suppl. Br. ¶ 76

); *see also id.* at ¶¶ 14, 14 n.4, 15, 16, 66; Resp. to Motion to Enforce ¶¶ 28–31.  Accordingly, the Court need only determine whether, at the time of Closing, those proceeds were in fact owed by the Credit Card Payment Processors to Sears despite their status as Reserve Accounts.  They were.

14.    The Buyer incorrectly argues in its Supplemental Brief that the Reserve Accounts were not Credit Card Accounts Receivable within the meaning of the APA and that, therefore, the Debtors were not entitled to deliver the Reserve Accounts to the Buyer at Closing as Credit Card Accounts Receivable to satisfy the Debtors' obligations under § 10.9.  Suppl. Br. ¶ 2.  In support of its position, the Buyer advances a flurry of misplaced arguments that can be distilled as follows:

(i) the Reserve Accounts were not Credit Card Accounts Receivable at Closing because they were neither "owed" nor "due" at Closing as required by §§ 1.1 and 10.9 of the APA, respectively, *id.* ¶¶ 27–65, 69–71;

(ii) because the Reserve Accounts were "security" or "collateral" under the Processing Agreements, they must fall within the definition of a "Security Deposit" under § 2.1(o) of the APA—that is, unless they fall within the definition of a "Claim" under § 2.1(p) of the APA, *id.* ¶¶ 72–89;

(iii) even if the Credit Card Accounts Receivable were owed at Closing, they were neither owed "as a result of" charges on credit cards nor owed "in the ordinary course of business" as required by § 1.1 of the APA, *id.* at ¶¶ 67–68;

(iv) the broad definitions of "Security Deposit" and "Claim" in §§ 2.1(o) and 2.1(p) of the APA, respectively, control the characterization of the Reserve Accounts, *id.* ¶¶ 72–89; and, finally,

(v) characterizing the Reserve Accounts as Credit Card Accounts Receivable is inconsistent with the text of the APA as a whole, *id.* ¶¶ 90–100.

As set forth below, each of these arguments is flawed and lacks basis in law, logic, or, in many cases, the English language's basic principles of grammar.

### 1. The Reserve Accounts were Credit Card Accounts Receivable at Closing Because They were Both "Owed" and "Due" Closing.

15. The Buyer mistakenly argues that the Reserve Accounts were not Credit Card Accounts Receivable at Closing because they were neither "owed" nor "due" at Closing as required by §§ 1.1 and 10.9 of the APA, respectively. *Id.* ¶¶ 27–65, 69–71.

16. As a threshold matter, had the parties wanted to exclude the Reserve Accounts from the Credit Card Accounts Receivable to be delivered to the Buyer at Closing under the APA, they would have done so explicitly. *Cf.* Suppl. Br. ¶ 104 ("Indeed, when the Parties wanted to exclude a particular item from a clause with the adjective 'any,' they did so explicitly . . . ."). There is no carve-out in the APA's definition of Credit Card Accounts Receivable that provides that, in the event credit card transaction proceeds are withheld by a credit card payment processor as reserves pursuant to a processing agreement, the proceeds will

no longer be treated as Credit Card Accounts Receivable under the APA. Throughout the APA, when the parties wanted to exclude an asset or liability from a broader category, they did so expressly. *See, e.g.*, APA § 2.1 (excluding all "Excluded Assets" from "Acquired Assets").[6] For that reason alone, the Buyer's argument fails.

17.    More fundamentally, though, the Buyer's argument misses (or ignores) the distinction between *owed*, *due*, and *ultimately payable*, on the one hand, and *immediately payable*, on the other. *See, e.g.*, Suppl. Br. at ¶¶ 69–71. Something that is "owed" or "owing" is "*[y]et to be paid*." *Black's Law Dictionary* 1214 (9th ed. 2009) (emphasis added).[7] Something that is "due" is "owing" or "payable." *Id.* at 574.[8] And something that is "payable" is "*to be paid*," "due," or "owing."[9] Simply put, "owed," "due," and "payable" are synonyms. Not one of those terms means "immediately payable." Accordingly, that an amount of money is not *immediately* payable does not mean that the amount is not owed, due, or ultimately payable, as is true with respect to the Reserve Accounts. *See* Suppl. Br. ¶ 55 (



) (emphasis added).

---

[6] *See also, e.g.*, APA § 2.1(k) ("all rights (*but not obligations*) of Sellers under any non-disclosure or confidentiality, non-compete or non-solicitation agreements") (emphasis added); *id.* § 2.1(q) ("*subject to* Section 5.1(a)(v), Section 5.1(a)(vi) and Section 9.8(c)"; and "*less* any proceeds in respect of the Acquired Assets set forth on Schedule 2.1(q) in an aggregate amount not to exceed $13,000,000") (emphasis added); *id* § 2.1(r) ("*subject to* Section 2.8(e), the KCD Notes from Sears Re as Seller") (emphasis added); *id* § 2.1(t) ("*excluding for the avoidance of doubt*, any Claims arising under any Transaction Document") (emphasis added); *id.* § 2.1(w) ("*other than* data which is the subject of Section 2.1(g); and Intellectual Property which is the subject of Section 2.1(e)") (emphasis added); *id.* § 2.1(z) ("*if the SHIP Closing shall have occurred prior to the Closing Date*") (emphasis added).

[7] *See* Suppl. Br. ¶ 73 n.12 (citing *In re La Toya Jackson*, 434 B.R. 159, 164 (Bankr. S.D.N.Y. 2010), for the proposition that the Court may consult dictionary definitions—including those contained in *Black's* and *Merriam-Webster*, to give contract terms their plain and ordinary meaning).

[8] *See also* "payable," *Merriam-Webster Dictionary* (accessed Apr. 6, 2019), https://www.merriam-webster.com/dictionary/payable?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (defining "due" as "owed or owing as a debt").

[9] *See* "payable," *Oxford English Dictionary* (accessed Apr. 2, 2019), http://www.oed.com/view/Entry/139176?redirectedFrom=payable#eid (emphasis added).

18.    The Buyer asserts that *Black's Law Dictionary* defines "due" as "'*immediately enforceable*' and as 'owing or payable.'"  Suppl. Br. ¶ 70 (emphasis added).  But the Buyer ignores (i) that *Black's* lists "immediately enforceable" and "owing or payable; constituting a debt" as two separate definitions (nos. 2 and 3, respectively) and (ii) the contextual illustrations associated with "immediately enforceable" ("<payment is due on delivery>") and "owing or payable; constituting a debt" ("<the tax refund is due from the IRS>").  *See Black's Law Dictionary* at 574.  The Reserve Accounts are more akin to the latter illustration than the former.  "Payment is due on delivery" clearly refers to a situation in which a seller has delivered goods to a buyer pursuant to an agreement which provides that "payment" for those goods "is due on delivery," as opposed to a deferred payment.

19.    The very mechanics of settlement, as described in the Processing Agreements (and above), demonstrate that the Reserve Accounts are owed, due, and ultimately payable even if not immediately payable.  Settlement involves the payment to a merchant of the amount of each credit card transaction that has been submitted to the merchant's credit card payment processor.

20.

Stated differently, the funds in the Settlement Accounts are owed *and* payable to Sears, less any amounts due under the Processing Agreements.

21.    A Processor's establishment of a Reserve Account merely changes the *timing* of settlement.

[10] While establishment of a Reserve Account may mean that the proceeds of a portion of Sears's customers' credit card transactions are not *immediately* payable to Sears, it does not mean that these proceeds are not owed—and nothing in the Processing Agreements suggests otherwise.

To "withhold" means to "keep in one's possession *what belongs to* or *is due to* another."[11]    The word indicates that the thing withheld will ultimately be released.[12]    The Credit Card Payment Processors have *withheld* the

---

[10] The Buyer argues that "[t]he credit card companies did not simply delay the payment of accounts receivable on individual charges[] in order to protect themselves against risk."  Suppl. Br. ¶ 66.  On the contrary, and as the Processing Agreements themselves demonstrate, that is exactly what the Credit Card Payment Processors did.

[11]    *See*   "withhold,"   *Oxford   English   Dictionary*   (accessed   Mar.   29,   2019), http://www.oed.com/view/Entry/229665?redirectedFrom=withhold#eid (emphasis added).
[12] *See id.* (including, as alternative definitions, "to defer, postpone" and "to detain").

proceeds pursuant to the Processing Agreements; they have not *converted* them—have not appropriated or applied them to their own use.[13]  *See In re Nat'l Audit Def. Network*, 332 B.R. 896, 917 (Bankr. D. Nev. 2005) (holding that a reserve account did not "effect a gift to [a credit card processor]" and that the value represented by the reserve account did not "belong[] to [the credit card processor] forever for it to use as it wishe[d]").  When Sears—now the Buyer—satisfies the various conditions specified in the Processing Agreements, the Processors will release the credit card transaction proceeds.[14]

22.    No argument the Buyer makes in its Supplemental Brief alters the fundamental point that Sears's customers' credit card transaction proceeds are **withheld**, not converted, and **owed**, even if not immediately payable.

[15] *Id.* ¶ 39; *see also id.* ¶¶ 50, 57 (advancing a similar argument with respect to the American Express and Discover Agreements).  As discussed above, the Debtors concede that the

---

[13]    *See* "convert," *Oxford English Dictionary* (accessed Mar. 29, 2019), http://www.oed.com/view/Entry/40777?rskey=fSmuns&result=2&isAdvanced=false#eid.
[14]

[15] The Buyer's use of a lower-case "r" here is telling; the issue the Court must determine is not whether the Reserve Accounts are "receivables," but rather whether they are Credit Card Accounts Receivable within the meaning of the APA.

proceeds withheld in Reserve Accounts are not payable until the satisfaction of certain specified

conditions (

).  That the

Reserve Accounts are not immediately payable does not mean that, however, they are not owed

or that they are not Credit Card Accounts Receivable within the meaning of the APA.  They are.

> **2.    That the Reserve Accounts were "collateral" or "security" under the Processing Agreements Does Not Mean That They were a "Security Deposit" or "Claim" under the APA.**

23.    The Buyer advances different versions of a flawed argument again and

again in its 39-page brief: that, because the Reserve Accounts are "collateral" (lower-case "c") or

"security" (lower-case "s") within the meaning of the Processing Agreements, they are a Security

Deposit and not a Credit Card Account Receivable within the meaning of the APA.  *See, e.g.*,

Suppl. Br. ¶ 66.  This argument fails each time because it is based upon a premise that is

fundamentally flawed: that, because something is called or treated as *x* in one contract, it is "*X*"

(or cannot be "*Y*") in another.  The one has nothing to do with the other.

24.

25.    What matters, here, is what *the Debtors* and *the Buyer* agreed were Credit

Card Accounts Receivable or Security Deposits *in the APA*.  Again, the Court acknowledged at

the Hearing that the Processing Agreements are only relevant to the extent they address whether the Reserve Accounts satisfy the definition of Credit Card Accounts Receivable within the meaning of the APA.  Hr'g Tr. 27:9–28:1; 28:13–23; and 34:15–20.  As shown herein, the relevant provisions in the Processing Agreements demonstrate—or, at the very least, do nothing to undermine—that the Reserve Accounts are Credit Card Accounts Receivable under the APA.

> **3.    The Buyer's Argument That the Reserve Accounts Must Have been Owed "in the Ordinary Course of Business" or Owed "as a Result of" Charges on Credit Cards Is Based on an Erroneous Construction of the APA's Definition of Credit Card Accounts Receivable.**

26.    The Buyer argues incorrectly that, even if the Reserve Accounts were owed at Closing, they nevertheless do not satisfy the APA's definition of Credit Card Accounts Receivable because they were not (a) owed "in the ordinary course of business," *id.* ¶ 68; or (b) owed "*as a 'result[]' of* 'charges by a customer of a Seller on credit cards,'" *id.* ¶ 67 (emphasis added).  These arguments fail for several reasons.

> **a.    The Reserve Accounts Need Not Be Owed "in the Ordinary Course."**

27.    The Buyer's argument that the Reserve Accounts are not Credit Card Accounts Receivable under the APA unless they are owed "in the ordinary course of business" must be rejected.  Pointing to the modifier at the end of the APA's definition of Credit Card Accounts Receivable, *id.* ¶ 68, the Buyer erroneously contends that the Reserve Accounts must be owed "in the ordinary course of business":[16]

---

[16] The Court first raised this issue during the March 21, 2019 Hearing.  *See* Hr'g Tr. 32:3–12.

"<u>Credit Card Accounts Receivable</u>" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, *owed* to a credit card payment processor or an issuer of credit cards to a Seller resulting from charges by a customer of a Seller on credit cards processed by such processor or issued by such issuer in connection with the sale of goods by a Seller or services performed by a Seller, *in each case in the ordinary course of its business*.

28.    The Buyer's strained argument is that, because the Reserve Accounts are not owed to Sears "in the ordinary course of [Sears's] business," they are not Credit Card Accounts Receivable within the meaning of the APA.  *Id.*

29.    The Buyer, however, misapprehends the significance of the "ordinary course" modifier.  The phrase "in each case in the ordinary course of its business" does not modify "owed;" rather, the phrase modifies, or describes, "the sale of goods" and "services performed" by a Seller (here, Sears):

"<u>Credit Card Accounts Receivable</u>" means each Account or Payment Intangible (each as defined in the UCC) together with all income, payments and proceeds thereof, owed by a credit card payment processor or an issuer of credit cards to a Seller resulting from charges by a customer of a Seller on credit cards processed by such processor or issued by such issuer in connection with the *sale of goods* by a Seller *or services performed* by a Seller, *in each case in the ordinary course of its business*.

30.    Unlike the Buyer's tortured interpretation, the Debtors' interpretation is consistent with common sense.  "[I]n each case" in the boxed modifier clearly refers to each of "the sale of goods" and "services performed," and "its" just as clearly refers to the "Seller" (in this case, Sears).  The Debtors' interpretation is likewise consistent with the rules of grammar. Modifiers come as close to their targets as possible.  If the phrase were meant to modify "owed by," "resulting from charges," "processed by," or "issued by," it would be misplaced.  Further,

under the canons of textual construction, "words are to be given the meaning that proper grammar and usage would assign them." ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 140–43 (2012) [hereinafter SCALIA & GARNER, READING LAW]; *see also ITG Brands, LLC v. Reynolds Am., Inc.*, No. CV 2017-0129-AGB, 2017 WL 5903355, at *6 (Del. Ch. Nov. 30, 2017) ("Courts also may look to the grammatical construction of a contractual provision to discern its meaning."); *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (considering grammatical construction in interpreting the plain meaning of a contract).[17]

31.    The Debtors' interpretation is also consistent with the nearest-reasonable-referent canon of textual construction, which provides that a "modifier normally applies only to the nearest reasonable referent." *See* SCALIA & GARNER, READING LAW 152; *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1111–12 (11th Cir. 2016) (holding, pursuant to the nearest-reasonable-referent canon, that a modifier in a federal statute applied to its nearest reasonable referent); *Parm v. Nat'l Bank of Cal.*, 835 F.3d 1331, 1336 (11th Cir. 2016) (applying the nearest-reasonable-referent canon to a contractual provision).

32.    Finally, the Debtors' interpretation makes practical sense. The contracting parties would have wanted to ensure that proceeds categorized as Credit Card Accounts Receivable arose out of sale or service transactions that occurred in the ordinary course of business—for example, a Sears customer buying a Kenmore washing machine at a Sears location using his or her credit card.

---

[17] *See also* 11 Williston on Contracts § 32:9 (4th ed.) ("Courts often pay attention to grammar and punctuation in determining the proper interpretation of a contract.").

b.     **The Reserve Accounts Need Not Be Owed "as a Result of" Credit Card Charges.**

33.     The Buyer asserts that, because the Reserve Accounts are not owed "*as a 'result[]' of* 'charges by a customer of a Seller on credit cards[,]'" they are not Credit Card Accounts Receivable within the meaning of the APA.  Suppl. Br. ¶ 67 (emphasis added).  The Buyer argues that, "if and when" the Reserve Accounts become "payable to Sears," it will be "*as a result of* Sears having satisfied the financial condition and other provisions of the" Processing Agreements.  *Id.* (emphasis added).

34.     This strained argument is yet another example of the Buyer twisting the unambiguous language of the APA and ignoring the rules of grammar to support its tenuous position.  Under the APA, Credit Card Accounts Receivable are "Account[s] or Payment[s] Intangible," "together with all income, payments and proceeds thereof," "*resulting from* charges by a customer of a Seller on credit cards . . . ."  APA § 1.1 (emphasis added).  "Resulting from" and "as a result of" are not interchangeable.  "Resulting from" is a predicate adjective (resulting) plus preposition (from) that is properly made part of noun phrases (e.g., "the proceeds are *resulting from* credit card charges," or "the proceeds *result from* credit card charges"); "as a result of" is a conjunctive adverbial phrase used to indicate cause-and-effect relationships (e.g., "owed *as a result of*").  "Resulting from" in the APA's definition of Credit Card Accounts Receivable describes "Accounts . . . together with [their] proceeds."  The definition does not require, as the Buyer suggests, Suppl. Br. ¶ 67, that the Accounts and their proceeds be owed *as a result of* credit card charges.  Accordingly, the Buyer's argument fails.

35.     Further, as noted above, the Buyer does not dispute that the Reserve Accounts comprise the proceeds resulting from charges by Sears customers on credit cards processed by the Credit Card Payment Processors in connection with the sale of goods by Sears

or services performed by Sears.  *See id.* ¶ 76; *see also id.* at ¶¶ 14, 14 n.4, 15, 16, 66; Resp. to Motion to Enforce ¶¶ 28–31.

36.    The Buyer points out that

proportionally.  Suppl. Br. ¶¶ 45–46.  Presumably, the Buyer highlights this fact to support an argument that, because the Reserve Accounts are tied to the Processors'                               they are more akin to security than receivables and thus are not Credit Card Accounts Receivable under the APA.  That argument is of no moment.

, a fact that the Buyer itself acknowledges multiple times and in multiple ways, Suppl. Br. ¶¶ 14, 14 n.4, 15, 16, 66, 76.

> **4.    The Specific Definition of Credit Card Accounts Receivable in Section 1.1 of the APA—Not the "Expansive" Sections 2.1(o) or 2.1(p) of the APA—Controls the Characterization of the Reserve Accounts.**

37.    The Buyer incorrectly argues in its Supplemental Brief that the broad definitions of "Security Deposit" and "Claim" in §§ 2.1(o) and 2.1(p) of the APA, respectively, control the characterization of the Reserve Accounts.  This argument, like the Buyer's other arguments, must yield to law and logic.

38.    "As a general rule of contract interpretation, when a document contains both general and specific provisions relating to the same subject, the specific provision controls." *Ins. Comm'r of Pa. v. PRS Ins. Grp., Inc. (In re PRS Ins. Grp., Inc.)*, No. 00-4070 (MFW), 2003 WL 21262446, at *2 (Bankr. D. Del. May 30, 2003) (citing *Boatmen's Nat'l Bank of St. Louis v. Smith*, 835 F.2d 1200, 1203 (7th Cir.1987)); *In re G-I Holdings, Inc.*, 755 F.3d 195, 205 (3d Cir. 2014) (quoting *DVC Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005)).  "If the

apparent inconsistency is between a clause that is general and broadly inclusive in nature and one that is more limited and specific in its coverage, the more specific term should usually be held to prevail over the more general term." MARGARET N. KNIFFIN, CORBIN ON CONTRACTS § 24.23 (Rev. ed. 1998). When possible, provisions that address the same subject matter should be read in harmony. *In re FBI Wind Down, Inc.*, 252 F. Supp. 3d 405, 422–23 (D. Del. 2017).

39.    In contrast to the APA's specific definition of Credit Card Accounts Receivable, §§ 2.1(o) and (apparently now) 2.1(p) are extremely broad. Section 2.1(o) enumerates four broad categories of collateral, over a dozen unspecified categories of cash collateral that have been drawn or paid, and includes sweeping references to "other assets" and "other security." *See* § 2.1(o). Section 2.1(p) is even broader. The Buyer's argument that the character of the Reserve Accounts is controlled by these broad provisions defies precedent. *See, e.g.*, *In re G-I Holdings, Inc.*, 755 F.3d at 205 (quoting *DVC Holdings, Inc.*, 889 A.2d at 961). Indeed, the breadth and inapplicability of these provisions are best evidenced by the Buyer's inability to designate a single category or provision it thinks best applies to the Reserve Accounts.

40.    The Buyer also takes the tenuous position that § 2.1(o) and (p) are the more specific provisions (as compared to the definition of Credit Card Accounts Receivable) and then attempts to convince this Court that the Reserve Accounts are properly defined by no fewer than ***seven distinct terms or phrases***. This includes, according to the Buyer, the "capacious" and "sweeping" phrase "any other security" as well as the term "Claim," which is afforded "the broadest possible definition." *See* Suppl. Br. ¶¶ 73, 75, 77, 78, 80, 87, 103. The Buyer's untenable argument contradicts black-letter law governing the interpretation of contracts and that disconnect underscores the true purpose of provisions like § 2.1(o): to provide a catch-all for

incidental assets not specifically defined in the APA that are otherwise necessary to effectuate the transaction. *See* § 2.1(o). Given enough time, a party could devise arguments to fit virtually any asset into such "broad," "expansive," "sweeping," and "capacious" provisions, as the Buyer itself described them.

41.    The Buyer gives mere lip service to the rule that the specific qualifies the general. *S3 Graphics Co., Ltd. v. ATI Techs., ULC*, Civ. No. 11-1298-LPS, 2015 WL 7307241, at *10 (D. Del. Oct. 21, 2015) (holding that a "broader category" of one provision is qualified by the specific language concerning specific assets in another). While the Buyer meanders through a litany of catch-all provisions and far-reaching terms, the Debtors have focused at all times on a single and specific provision—which the Buyer itself concedes "is more limited," Suppl. Br. ¶ 105—that, as illustrated above, precisely describes the character of the Reserve Accounts in every respect.

42.    Contrary to the Buyer's arguments, it is *the Buyer's* application of the canons of contract interpretation that is wrought with contradictions and would render whole provisions of the APA "meaningless" or "illusory." *Cf. id.* ¶¶ 85, 102; *see Space Imaging Eur., Ltd. v. Space Imaging L.P.*, 38 F. Supp. 2d 326, 336 (S.D.N.Y. 1999) (discussing a number of possible interpretations that could give *meaning* to the provision in question); *Mohammed v. Uber Techs., Inc.*, 2018 WL 1184733, at *7 (N.D. Ill. Mar. 7, 2018) (holding that an illusory promise is one in which the promisor has not promised to do anything). The Buyer claims that any reading that would exclude the Reserve Accounts from the definition in § 2.1(o) would render the provision "illusory" because the Debtors "promised to deliver . . . the security that related to each of the agreements Debtors agreed to assign to Transform." Suppl. Br. ¶ 85. To be clear, there is no dispute that the Debtors transferred the Reserve Accounts to the Buyer at

Closing; the only dispute is whether those Reserve Accounts were Credit Card Accounts Receivable under the APA. The Buyer's argument also ignores the untold millions of dollars' worth of *actual* Security Deposits appropriately transferred under § 2.1(o).

43.    The Buyer's contention that the parties' failure to exclude Credit Card Accounts Receivable from the categories of assets described by § 2.1(o) (because that provision is a "clause with the adjective 'any,'") completely ignores the structure of the APA. Suppl. Br. ¶ 104. All "Excluded Assets" are excepted from the category Acquired Assets in the first paragraph of § 2.1 of the APA, and § 10.9 provides the criteria (that the Debtors met) by which the $14.6 million Excess Credit Card Accounts Receivable qualified as an Excluded Asset.

44.    At bottom, even if the Reserve Accounts also fit into one of the generic categories in § 2.1(o) or 2.1(p), the more specific definition of Credit Card Accounts Receivable controls, thereby precluding those assets from falling within § 2.1(o) or 2.1(p). *See In re G-I Holdings, Inc.*, 755 F.3d at 205.

45.    Finally, the Buyer's argument that the Reserve Accounts were not "retained" and thus somehow forfeited strains credulity. Suppl. Br. ¶ 109. Such a reading improperly divorces "retained" from the context provided by the whole phrase: "retaining as an Excluded Asset." *See* APA § 10.9. An Excluded Asset is not an Acquired Asset under the express terms of the APA. *See id.* § 2.1. Assets that are not Acquired Assets are property of the Estate whether or not any specific action is taken to "retain" them. *See, e.g.*, *Weber v. SEFCU (In re Weber)*, 719 F.3d 72, 79 (2d Cir. 2013) ("Section 542 requires that any entity in possession of property of the estate deliver it to the [debtor], without condition or any further action: the provision is self-executing."). Moreover, the only known excess at the time of Closing was $7

million, and the Debtors accommodated the Buyer by agreeing to "retain" $7 million in inventory instead of the oldest Credit Card Accounts Receivable. *See infra* at Part III.C.2.

### 5. Reading the APA as a Whole Does Not Alter the Conclusion That the Reserve Accounts Are Credit Card Accounts Receivable within the Plain Meaning of the APA.

46.    The Buyer makes a meritless claim that only its artificially narrowed interpretation of Credit Card Accounts Receivable, in which Reserve Accounts are excluded, is consistent with the structure and purpose of the APA. *See* Suppl. Br. ¶ 90. The Buyer inaccurately suggests that the only purpose of § 10.9 was to ensure that the Debtors delivered the necessary assets at Closing to satisfy the Buyer's borrowing base requirements to procure financing. *See id.* ¶ 91. As an initial matter, the Debtors specifically negotiated that the Buyer's obligation to close was not subject to a financing condition, and there is none in the APA. Accordingly, there is nothing in § 10.9 that purports to tie the definitions of Inventory and Credit Card Accounts Receivable to whatever the definitions are in the Buyer's loan agreement, an agreement that was entirely outside the APA. *See* APA § 13.4. Moreover, the Buyer's narrow view of § 10.9 ignores the rest of the paragraph which provided the Debtors with an equally critical mechanism that would return to the Debtors any excess—unsupported by the consideration provided by the Buyer—in delivered Acquired Inventory, Credit Card Account Receivables (as that term is defined in the APA), and Pharmacy Receivables.[18]

47.    The various provisions of the APA align perfectly when read together and the terms are given their plain meaning, including treating the Reserve Accounts as Credit Card Accounts Receivable. The Credit Card Accounts Receivable, like the Pharmacy Receivables,

---

[18] The Buyer also claims that had it intended the Reserve Accounts to be included in Credit Card Account Receivables that counted against the $1.657 billion threshold, it would have insisted that it would have been the first assets that Debtors exclude, not only after Debtors retained inventory. Suppl. Br. ¶ 93. But, even if true, this assertion does not alter the meaning of the plain language of the APA or change it to what the Buyer now may wish it had negotiated for in retrospect.

were specifically defined in § 1.1.  Both were receivables which, at the time of Closing, were

owed to the Debtors and which the Debtors agreed to transfer to the Buyer.  But the pre-Closing

amount of those receivables fluctuated on a daily basis, and the precise amount to be transferred

to the Buyer at Closing was capped so as not to provide the Buyer with a windfall.

48.    If the Reserve Accounts were found not to be Credit Card Accounts

Receivable—and therefore also not to count toward the $1.657 billion aggregate threshold

requirement in § 10.9—the result would be an improper windfall to the Buyer.  Although the

Buyer would have the right to proceeds from the Reserve Accounts, the Buyer still would be able

to seek redress against the Debtors for failing to deliver the required assets at Closing and could

then turn around and liquidate the Reserve Accounts (or use them to fund its own reserve

account).  That have-its-cake-and-eat-it-too scenario is not supported by the APA.

## B.    The Buyer Remains in Willful Violation of the Automatic Stay.

49.    The automatic stay prevents "any act to obtain possession . . . or to

exercise control over property of the estate."   11 U.S.C. § 362(a)(3).  During bankruptcy

proceedings, the automatic stay works in tandem with Sections 541 and 542 "to shelter the

debtor's estate from action by creditors."  *In re Weber*, 719 F.3d at 76.  The automatic stay is

"self-executing"—that is, debtors are not required to initiate adversarial proceedings to return

property to the estate.  *Id.* at 79.  To that end, the property must be returned to the estate absent

an order from the court and without demand of adequate protection as a condition.  *Id.* at 78–79.

50.    Further, a debtor "injured by any willful violation of a stay provided by

[section 362] shall recover actual damages, including costs and attorneys' fees, and, in

appropriate circumstances, may recover punitive damages."  *Id.* at 76 (quoting 11 U.S.C.

§ 362(k)(1)).   "A willful violation of the automatic stay occurs when the creditor acts

deliberately with knowledge of the bankruptcy proceedings"—no specific intent is required and

good faith does not excuse the violation.  *Knaus v. Concordia Lumber Co., Inc. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1989); *In re Weber*, 719 F.3d at 82.  Section 362(k) of the Code also provides for punitive damages "in appropriate circumstances."  *In re Knaus*, 889 F.2d at 776; 11 U.S.C. § 362(k)(1).

51.    At this point, the Buyer is well aware of the principles outlined above, which were previewed by the Court at the Hearing.  The Buyer claims that it cannot turn over the disputed funds because the oldest Credit Card Accounts Receivable to which the Debtors are entitled under the waterfall in § 10.9 are in the possession of the Processors.

,

further demonstrating that the Reserves are owed.  Despite the Court's multiple warnings to turn over the property, *see, e.g.*, Hr'g Tr. 41:15–18, 53:11–13, the Buyer continues to refuse, without basis, to arrange for the $14.6 million of the funds being held by First Data to be either turned over to the Debtors or placed in escrow.  The Buyer continues to willfully violate the automatic stay, and the Court should impose damages in the form of attorneys' fees and costs for the Debtors' efforts to effect the return of the property.

**C.    The Extrinsic Evidence Improperly Submitted by the Buyer in Its Supplemental Brief Does Not Yield a Different Result.**

52.    As noted above, the Court stated at the Hearing that it could discern the parties' intentions with respect to the APA's definitions of Credit Card Accounts Receivable and Security Deposit by examining the plain meaning of those two definitional provisions.  Hr'g Tr. 34:15–20; 52:18–24.    The Processing Agreements were relevant only to the extent they addressed whether the Reserve Accounts satisfied the APA's definition of Credit Card Accounts

Receivable, and the Court directed the parties to submit briefing addressing that narrow issue. *Id.* 27:9–28:1, 28:13–23; 34:15–20.

53.    The Court asked for a glass of water; the Buyer gave it a fire hydrant.  In its Supplemental Brief, the Buyer offers pages upon pages of "evidence" outside the four corners of the APA in an apparent effort to give the Court the impression that, notwithstanding what the APA says, the parties must have meant something different.  The introduction of this extrinsic evidence is improper; it is parol evidence that may not be considered unless the terms of the APA are ambiguous (they are not).  *See Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity."); *see also* Hr'g Tr. 49:21–23 (THE COURT: "I don't think we should get into [parol evidence] until I conclude that it is an ambiguity.").  Most importantly, the APA includes an integration clause, which provides that the APA would "supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter."  APA § 13.4.  Nevertheless, the Debtors are now compelled to correct any misimpression that the Buyer's parol evidence may have given the Court.

### 1.    The Buyer Knew That the Reserve Accounts Were Included in the Credit Card Receivables Delivered at Closing.

54.    Prior to the Closing, the Debtors had sought the release of the First Data Reserve Account and had contemplated using those funds in connection with paying down the DIP to a level of $850 million, which was a closing condition that the Debtors had to meet pursuant to § 10.10 of the APA.  Second Supplemental Declaration of Mohsin Y. Meghji ("**Second Suppl. Meghji Decl.**") ¶ 3; APA § 10.10.  But the Buyer refused to provide First Data

with the requested diligence necessary to secure the release of the First Data Reserve Account. Suppl. Meghji Decl. ¶ 5.  On or about February 3, 2019, more than a week before Closing, the Debtors abandoned their plan to obtain the release of funds in the First Data Reserve Account and use them toward meeting the DIP requirement (which the Debtor subsequently satisfied with other funds).  Second Suppl. Meghji Decl. ¶ 4.  The Debtors then advised the Buyer that the

of Reserve Accounts would be included as part of the aggregate Credit Card Accounts Receivable delivered to Buyer at Closing.  *Id.*  Contrary to the Buyer's multiple misstatements,[19] the Buyer was made aware that these proceeds were included in assets the Debtors were delivering under § 10.9 during a phone call on February 5, 2019, and the Reserves were included in the Final Inventory and Receivables tracker sent to the Buyer at Closing.[20]  *Id.*

**2.    The Buyer Conceded That the Debtors Had Met the Condition Precedent Set out in § 10.9 by Delivering Designated Assets (including the Reserve Accounts) in Excess of the Threshold.**

55.    As the parties moved toward Closing, the Debtors notified the Buyer that the Debtors would deliver an excess of aggregate inventory.  *Id.* ¶ 5.  This included $1.557 billion in Inventory, $60 million in Credit Card Accounts Receivable, and $47 million in Pharmacy Receivables and Pharmacy Script Value, for an aggregate value of $1.664 billion.  *Id.*

56.    The Buyer, of course, now argues that the Debtors were not entitled to deliver the Reserve Accounts to the Buyer at Closing to satisfy the Debtors' obligations under § 10.9 of the APA.  However, this is entirely inconsistent with the position that the Buyer took before, during, and for some period after Closing.

---

[19] The Debtors respond here in kind to the Buyer's footnote 19 simply to point out the irony of the Buyer's multiple (mis)statements regarding their lack of notice of these Reserve Accounts as juxtaposed against the Buyer's own failure to properly designate the First Data Agreement as assumed under the APA.  *See* APA § 2.7.

[20] Courts have held that categorical descriptions of assets—such as the one contained in § 2.1(o)—should yield to specific and scheduled references.  *See, e.g.*, *S3 Graphics Co., Ltd. v. ATI Techs., ULC*, Civ. No. 11-1298-LPS, 2015 WL 7307241, at *11 (D. Del. Oct. 21, 2015); *Clean Harbors, Inc. v. Arkema, Inc. (In re Safety-Kleen Corp.)*, 380 B.R. 716, 736 (Bankr. D. Del. 2008).

57.     Specifically, the Buyer requested that the Debtors retain the excess above $1.657 billion by taking $7 million[21] in prepaid inventory, rather than the oldest Credit Card Accounts Receivable to which the Debtors were entitled under the formula in § 10.9.  *Id.* at Ex. C.  By promising to return the excess, the Buyer conceded that the Debtors had met the condition precedent set out in § 10.9 by delivering Acquired Inventory and Credit Card Accounts Receivable (including the Reserve Accounts) in excess of the threshold.

58.     It was only *after* the Debtors sought return of the $14.6 million in Excess Credit Card Accounts Receivable that any dispute arose regarding whether the Reserve Accounts were properly included as Credit Card Accounts Receivable to satisfy the aggregate threshold in § 10.9.  At the time of the Closing, there was no dispute that the Reserve Accounts were delivered by the Debtors as part of the aggregate Credit Card Accounts Receivable that went toward that threshold; the Buyer's counsel "reserved rights" as to whether the Reserve Accounts were Credit Card Accounts Receivable under the APA, but the Buyer closed notwithstanding.  In fact, as many as five days before the sale closed, the Buyer was aware that these proceeds were included in assets the Debtors were delivering under § 10.9.  *Id.* ¶ 4.  Although the Buyer acknowledged that the threshold had been met by virtue of asking that the Debtors retain the $7 million excess they had delivered in the form of inventory, *id.*, the Buyer now looks to unrelated catch-all provisions in the APA to attempt to improperly retain assets in excess of the $1.657 billion threshold.

**3.      The Buyer's Inaction Is the Direct Cause of the Processors' Continued Possession of the Reserve Accounts.**

59.

                                          .  Declaration of Terrence E. Rolecek in Support

---

[21] Despite multiple requests by the Debtors' financial advisors', the Buyer has not routed the $7 million of prepaid inventory to the Debtors.  Second Suppl. Meghji Decl. ¶ 5.

of Transform Holdco LLC's Resp. to Debtors' Mot. to Enforce (ECF No. 2915) at Ex. C. At first, the Processors were concerned about the Debtors' financial stability as contemplated by the Processing Agreements. *See generally id.* at Exs. B–D, F–G, I. But once the Court approved the sale, the Processors indicated they were willing to return the Reserve Accounts after seeing the Buyer's financial information. Suppl. Meghji Decl. ¶ 5. However, despite repeated requests from the Debtors, the Buyer refused to provide First Data with the necessary financial information. Second Suppl. Meghji Decl. ¶ 3. This is the same type of information that the Debtors had, prior to the bankruptcy filing, regularly provided both pursuant to the First Data Agreement and in the ordinary course of business. *Id.* And this information likely would have made the First Data Reserve Account immediately payable. *Id.* The Buyer's own inaction is the direct cause of the Processors' continued possession of the Reserve Accounts.

## IV.    Conclusion

60.    In conclusion, the Buyer admits that the Reserve Accounts comprise the proceeds of charges by Sears's customers on credit cards processed by the Credit Card Payment Processors in connection with the sale of goods by Sears or services performed by Sears, in each case in the ordinary course of Sears's business and also admits that the $14.6 million should be in the form of the oldest Credit Card Accounts Receivable. Further, it is indisputable that the Reserve Accounts were "owed" to Sears by the Credit Card Payment Processors. Nothing in the Processing Agreements leads to a different conclusion. The Reserve Accounts are Credit Card Accounts Receivable within the plain meaning of the APA, and the Debtors were entitled to deliver them as Credit Card Accounts Receivable to Buyer at Closing to satisfy the Debtors' obligations under § 10.9 of the APA. Accordingly, the $14.6 million of additional pre-Closing Credit Card Accounts Receivable, in excess of the aggregate threshold amounts in § 10.9, were excluded from the sale and are property of the Estates improperly being withheld by the Buyer.

61.    For all of the reasons stated in this Supplemental Response and the Debtors' Motion to Enforce, the Buyer is in violation of the Sale Order, the APA, and the automatic stay.  Accordingly, the Court is well within the bounds of its statutory authority to address the Buyer's violations without need of adversary proceedings, and the Debtors respectfully request that the Court enter the proposed order enforcing the Sale Order and automatic stay, ordering immediate turnover of $14.6 million in respect of Credit Card Account Receivables that belong to the Estates, and awarding the Debtors such other and further relief, at law or in equity, to which they are entitled.

Dated: April 8, 2019
       New York, New York

/s/ Sunny Singh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
David J. Lender
Paul R. Genender
Jared R. Friedmann
Sunny Singh

Attorneys for Debtors
and Debtors in Possession