# COMPOSITE

# EXHIBIT A

## MASTER HOSTED SOFTWARE AND SERVICES AGREEMENT

### Dated: January 15, 2013

**THIS MASTER HOSTED SOFTWARE AND SERVICES AGREEMENT** ("**Agreement**") is made as of this 15th day of January, 20113 ("**Effective Date**") by and between Beeline.com, Inc., a Florida corporation ("**Contractor**"), and Sears Holdings Management Corporation, a Delaware corporation ("**Company**"), on behalf of itself and for the benefit of its Affiliates. For purposes of this Agreement "**Affiliate(s)**" means any individual, entity (e.g., corporation, L.L.C., etc.) that, at the applicable time, directly or indirectly controls, is controlled with or by or is under common control with, a party. Notwithstanding the foregoing, only entities directly or indirectly controlled by Sears Holdings Corporation shall be deemed Affiliates of Company for purposes of this Agreement. The date of this Agreement is the Effective Date.

In consideration of the mutual terms and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   **TERM.**

> This Agreement will become effective on the Effective Date and will continue for a period of three year(s) ("**Term**"), unless earlier terminated as provided for herein. UPON WRITTEN NOTICE, COMPANY MAY UNILATERALLY ELECT TO EXTEND THE TERM ON A MONTH TO MONTH BASIS FOR A PERIOD NOT TO EXCEED 12 MONTHS FROM THE EXPIRATION DATE PROVIDED SUCH EXTENDED TERM SHALL BE TERMINABLE UPON 30 DAYS PRIOR WRITTEN NOTICE.

2.   **PROCUREMENT DOCUMENTS.**

> 2.1     General Description.   This Agreement contains the terms upon which Company may procure access to and use of Contractor hosted software programs ("**Hosted Software Services**"), as well as other services described in this Agreement (collectively, "**Services**"). Company makes no representations as to the amount of business Contractor can expect under this Agreement. Certain terms are defined below; while others are defined in **Appendix #1** (Glossary).

> 2.2     Purchase Orders and Statements of Work.   If Company elects to procure Services from Contractor on the terms and conditions contained in this Agreement, then Company will issue a purchase order (as further described below, each a "**Purchase Order**") or a statement of work (as further described below, each a "**SOW**") to Contractor for such Services. SOW's and Purchase Orders are collectively referred to herein as "**Procurement Documents**". Any orders for Services subject to terms and conditions in addition to or different from those contained in this Agreement (other than price), will be subject to the execution of a SOW. All Services provided by Contractor will be subject to the terms of this Agreement (regardless of whether a SOW is actually signed, or a Purchase Order issued). Neither Company nor its Affiliates will be under any obligation to compensate Contractor for Services provided by Contractor that are not set forth in a Procurement Document.

> 2.3     Relationship Between Contract Documents.   Each Procurement Document will be subject to the terms and conditions of this Agreement.

2.3.1 <u>Purchase Orders</u>. Other than: (a) a description of the Services being procured, (b) price, (c) quantity (d) delivery location, and (e) Specifications, a Purchase Order will not contain any additional or different terms or conditions and this Agreement and any SOW issued in connection with such Services will control over any inconsistent terms in a Purchase Order.

2.3.2 <u>SOW's</u>. SOW's may include additional or different terms and conditions than this Agreement; <u>provided</u> that in order for any such terms to control over this Agreement, they must be expressly stated in such SOW.

2.3.3 <u>Click To Accept Terms</u>. Click to accept terms that Company may be required to accept in order to access and use the Hosted Software Services are superseded by this Agreement.

2.3.4 <u>Change Order Procedure</u>. Company may request changes to a Procurement Document, at any time. Within four days after Company's request, Contractor will submit to Company a proposed amendment (each an "Amendment") to such Procurement Document describing the impact of the change, if any, on the compensation, schedule and other terms of the applicable Procurement Document and this Agreement. An Amendment must be signed by both parties in order to be effective. Contractor represents to Company that it has factored into Contractor's fees adequate contingencies for de minimis Amendments. An Amendment will prevail over any inconsistent terms of the Procurement Document or this Agreement. Absent the execution of such an Amendment, the parties must fulfill their obligations under the Procurement Document and this Agreement without change.

2.4 <u>Ordering Affiliates</u>. Affiliates of Company may procure Services from Contractor under the terms and conditions of this Agreement; <u>provided</u> that Contractor and such Affiliate enter into a Procurement Document governing such purchase (or Contractor accepts such Affiliates Purchase Order for such Services). Any Affiliate who enters into such a Procurement Document with Contractor will be deemed to be "Company" hereunder for purposes of such procurement; <u>provided</u> Contractor will look solely to such Affiliate (and not to Company) for satisfaction of any liability arising under or relating to such Procurement Document.

3. **HOSTED SOFTWARE SERVICES.**

3.1 <u>License Grant</u>. Contractor hereby grants to Company and its Authorized Users a non-exclusive, worldwide, unlimited user, enterprise-wide, and irrevocable (except as otherwise provided herein) license to access and use the Hosted Software Services identified in the applicable Procurement Document at the fees and for the term stated therein. Company may only use the Hosted Software Services for its internal use and may not sell, rent, lease, timeshare, sublicense, disclose, publish, assign, market, transfer or distribute any portion of the Hosted Software Services to any third party.

3.2 <u>Acceptance</u>. Intentionally Omitted.

3.3 <u>Service Levels and Credits</u>. The Hosted Software Services will meet the service levels set forth in the Service Level Agreement, attached hereto as Appendix 2.

3.4    Changes in the Services Environment.    Contractor will not make any changes to the Hosted Software Services that materially adversely affects Company's use of or access to the Hosted Software Services or the costs incurred by Company in utilizing the Hosted Software Services without the prior written consent of Company.

3.5    Source Code Escrow Agreement.    If required under the applicable Procurement Document, Contractor will deposit object code and source code for the software components of the Hosted Software Services ("Software") pursuant to the terms of a source code escrow agreement for the Software to be executed by the parties and by a Source Code escrow agent acceptable to them (the "**Source Code Escrow Agreement**"). The parties agree that Iron Mountain is an acceptable agent. Any such Source Code Escrow Agreement will be deemed supplementary to this Agreement and a material breach of thereof will be deemed to be a material breach of this Agreement. If the object code and source code is delivered to Company pursuant to the Source Code Escrow Agreement, Company and its Authorized Users will have the right to use and modify the source code and thereafter all references herein to Software will include the Source Code.

4.    **ADDITIONAL SERVICES.**

4.1    Professional Services.    Contractor will provide consulting and implementation services ("**Professional Services**") to Company as the parties may agree upon from time to time. Such Professional Services are to be documented in a Procurement Document prior to commencement of work.

4.2    Customer Support Services.    During the Term of the Agreement or any applicable Procurement Document, Contractor will provide the customer support services for the Hosted Software Services as stated in **Appendix #3** ("**Customer Support Services**").

4.2.1    Support Standards. Contractor will perform the Support Services in a good, workmanlike and professional manner using qualified people fully familiar with the Software. Any Enhancements to the Hosted Software Services will be of at least equivalent quality as the Hosted Software Services originally delivered under a Procurement Document.

4.3    Implementation Delays.    If Contractor fails to meet a Milestone set forth in a Procurement Document due to Contractor acts or omissions and not Company, then in addition to any other rights and remedies that may be available to Company, at no additional cost to Company and at Company's option, Contractor will provide to Company all necessary additional Contractor Personnel to accelerate performance as may be required or necessary to timely achieve the next Milestone or, if there is no next Milestone, to achieve the missed Milestone as soon as is practicable.

4.4    Company Responsibilities.    References to Company's responsibilities in a Procurement Document (other than Company's promise to pay for the Services procured there under), are intended solely for purposes of indicating what is not Contractor's responsibility, and will not in any circumstance constitute grounds for a claim of breach of such Procurement Document by Company. Company's failure to perform any responsibility assigned to Company may, however, to the extent such non-performance

impedes Contractor's ability to perform, limit Contractor's responsibilities under the Procurement Document and may affect the timelines for any Work Products; provided, in each such case, Contractor promptly notifies Company in writing of such non-performance. Any changes to a Procurement Document necessitated by Company's non-performance will be subject to **Section 2.3.4** (Change Order Procedure). If Contractor does not promptly notify Company in writing of any such non-performance, Contractor will be deemed to have waived such non-performance.

5.    **COMPANY DATA AND INTELLECTUAL PROPERTY.**

5.1    Grant of License for Company Data:    Company hereby grants to Contractor a non-exclusive, non-transferable license to use, upload, display, copy and store Company Data for the term of this Agreement for the purpose of delivering the Hosted Software Services pursuant to this Agreement. Company agrees that it shall have sole responsibility and liability for: (i) acquiring any and all authorization(s) necessary for use of Company Data as contemplated by this Agreement; (ii) the completeness and accuracy of all of Company Data and other materials provided to Contractor by Company pursuant to this Agreement; and (iii) ensuring that Company Data does not infringe or violate any patents, copyrights, trademarks or other intellectual property rights, or misappropriate the trade secret, of any third party. Subject to the foregoing license, Company shall retain ownership of Company Data.

5.2    Company Intellectual Property.    The Parties acknowledge and agree that each party and its Affiliates have the exclusive right, title, and interest in and to all their respective trademarks, trade names, service marks, logos, program and event names, identifications, and other proprietary rights and privileges (**"Intellectual Property"**) This Agreement and its various provisions are not a license or assignment of any right, title, or interest in the Intellectual Property divulged by one party ("Disclosing Party") to the other ("Receiving Party"). Receiving Party must not, in any manner, represent that it has any ownership or other interest in the Disclosing Party's Intellectual Property. Receiving Party must not do or cause to be done anything that impairs Disclosing Party's exclusive license in the Disclosing Party's Intellectual Property. Receiving Party must not use, print, or duplicate the Disclosing Party's Intellectual Property except to the extent permitted under this Agreement. Any permitted use by Receiving Party of the Disclosing Party's Intellectual Property is limited to the Term of this Agreement. Upon the expiration or termination of this Agreement, or upon request of company, Receiving Party must immediately cease all use of the Disclosing Party's Intellectual Property and shall promptly return all materials to Disclosing Party. Receiving Party must not assign or attempt to assign any rights with regard to the Disclosing Party's Intellectual Property that arise under this Agreement and any such attempted assignment is void.

5.3    Return of Company Data.    Upon the expiration or termination of this Agreement or applicable Procurement document, Contractor shall immediately return all Company Data and Company Intellectual Property in Contractor's possession in the same form the Company Data and Company Intellectual Property was provided to Contractor if practically possible and, if not practically possible, in an agreed upon format.

6.    **SECURITY AND DATA BACK-UP**

6.1    <u>System Security.</u>  Contractor will provide physical security of the data center, security of the network on which the Software is run, and security of the buildings where the network is housed in accordance with Company's Security Requirements, a copy of which is attached hereto as Appendix 4.

6.2    <u>Data Back-up.</u>    Unless agreed to otherwise in a Procurement Document, Contractor will back up of Company Data with daily back up of incremental data and full back up of data on a weekly basis. Contractor will use industry best practices to store the backup data.

7.    **COMPENSATION.**

7.1    <u>Fees and Expenses.</u>  The compensation for all Services will be set forth in the applicable Procurement Document and will remain in effect for the term thereof. With the exception of Hosted Software Services, Contractor will only charge Company for time spent in the performance of the Professional Services (e.g., travel time is not billable). All costs incurred by Contractor in performance of this Agreement will be borne by Contractor and Contractor will not be entitled to any compensation or reimbursement in connection with any services unless such amounts are explicitly set forth in the applicable Procurement Document. Reimbursable expenses, if any, must be reasonable and will be: (a) subject to Company's expense reimbursement policy, as delivered to Contractor from time to time; and (b) billed at Contractor's actual out of pocket cost.

7.2    <u>Method of Payment and Timing.</u>  Except as otherwise stated in an SOW, subject to Section 3.4, Company will make payment on Contractor's properly submitted invoices 60 days after receipt of invoice. Payment of invoices for Hosted Software Services are subject to Acceptance. Company has no obligation to pay any fees or expenses invoiced more than six months after they accrue. Company is not required to pay any disputed charge until after the resolution of the dispute. All fees and expenses are payable in U.S. Dollars.  Contractor agrees to establish, implement and maintain "Electronic Funds Transfer" (EFT), or ePayables (credit card settlement), in accordance with Company's policies and requirements as communicated to Contractor, as the only means to receive payments from Company during the term of this Agreement.

7.4    <u>Setoff.</u>  Company will have the right to set off any amounts due Company or its Affiliates against any amounts owed to Contractor.

7.5    <u>Invoice.</u>  Company MSP Provider shall invoice Company monthly using Contractor's Technology for Company approved services provided by the Supplier Personnel and for the services provided by Contractor. All invoices shall be submitted to Company via the Technology or as otherwise agreed to by Company and Contractor.

7.6    <u>Service Level Credits.</u>  Contractor's failure to meet the requirements, set forth in Appendix 2 (Service Level Agreement) will be subject to the Service Credits provision stated therein.  Service Credits will be deducted from amounts due to Contractor, and will be deemed an adjustment to the fee for such Maintenance Services. The parties agree that any Service Credits are not damages nor are they intended to be punitive in nature, but

rather are measurement tools used to highlight the lower level of performance received by Company.

**7.7    Taxes.**    Contractor will timely calculate, assess, and remit all sales taxes, and Company will pay all sales and use taxes resulting from this Agreement. Taxes for each jurisdiction will be separately stated on the invoice by tax category (e.g., taxable and non-taxable Services will be separately stated).

**7.8    Most Favored Company.**    Contractor agrees to treat Company as its most favored customer. Contractor represents that all of the prices, warranties, benefits and other terms being provided are equivalent to or better than the terms being offered by Contractor to its current customers of like size and industry. If, during the term of this Agreement, Contractor enters into an agreement with any other customer providing such customer with more favorable terms, then this Agreement shall be deemed appropriately amended to provide such terms to Company. Contractor shall promptly provide Company with any refund or credits hereby created.

**7.9    Records.**    Contractor will: (a) retain records to reasonably document the Services provided and fees paid or payable by Company under this Agreement until the later of: (i) five (5) years after billing (or such longer period as required by law), and (ii) final resolution of any actively pending disputes between the parties relating to Contractor's charges; and (b) upon five days notice from Company, provide Company's Personnel with reasonable access to such records and documents. Contractor will, at Company's election, either deliver copies of such records to Company or provide access to such records at Contractor's facility. Contractor and Company will each bear their own costs associated with the review.

8.    **REPRESENTATIONS AND WARRANTIES.**

**8.1    General.**    Contractor represents, warrants to Company (as of the Effective Date of this Agreement and each SOW), and covenants to Company during the Term of this Agreement (including any SOW's) that:

   **8.1.1    Authority.**    (a) Contractor has full authority to enter into this Agreement, to carry out its obligations under this Agreement and to grant the rights and licenses granted to Company in this Agreement; (b) there are no outstanding obligations of Contractor (whether written, oral or implied) that are inconsistent with this Agreement; and (c) Contractor's performance of the Services and compliance with this Agreement will not violate any applicable federal, state or local laws, rules, regulations, ordinances or orders or any other agreements binding upon Contractor.

   **8.1.2    Quality.**    Contractor will: (a) perform all services in a competent and workmanlike manner in accordance with industry standards; and (b) utilize sufficient personnel possessing the skills, experience and abilities to perform the Services all in accordance with such additional requirements as may be reasonably imposed by Company from time to time.

   **8.1.3    Conflict of Interest.**    Contractor represents and warrants that: (i) its performance under this Agreement will at all times conform to the highest professional and ethical standards; (ii) due care and commercially reasonable

efforts will be utilized by Contractor in the performance of this Agreement; and (iii) it is under no obligation or restriction that would conflict with Contractor's provision of Services. Contractor must immediately disclose to Company any actual or potential conflict of interest that may arise during the Contractor's performance of this Agreement.

8.1.4   <u>Warranty Periods</u>.  For the Term of the Agreement and any extensions thereto, the Hosted Services will contain the functionality, will operate in accordance with, and/or will conform to, the applicable Documentation and Specifications.

8.1.5   <u>Infringement</u>.  All Software and equipment utilized by Contractor to deliver Services hereunder are either owned by Contractor or licensed to Contractor with the right to sublicense to Company and its Authorized Users (in accordance with **Section 3.1 (License Grant))** or are in the public domain, and the use of such Software and equipment by Company and its Authorized Users will not infringe or misappropriate any proprietary rights of any third party. Further, that there is no action, suit, claim, investigation or proceeding pending, or to Contractor's knowledge threatened, against, by or affecting Contractor, the Software or the equipment which, if adversely decided, might adversely affect: **(a) Contractor's ability to enter into this Agreement; (b) Contractor's performance of its obligations herein; or (c) Company's and its Personnel's use of the Software equipment** ; nor to Contractor's knowledge is their any basis for such an action.

8.1.6   <u>Unauthorized Code</u>.  That the Services will be free of any Unauthorized Code.

8.1.7   <u>Documentation</u>.  That upon delivery of the  Services (or such sooner period as is requested by Company), Contractor will provide to Company all Documentation for the Services and that such Documentation is detailed and complete and accurately describes the functional and operational characteristics of the Services.  Company and its Authorized Users will have the right to use and copy, such Documentation; <u>provided</u> that Company does not remove any copyright notices or other proprietary notices appearing in such Documentation.

9.   **PERSONNEL.**

9.1   <u>Independent Contractor</u>.   Contractor is an independent contractor in the performance of this Agreement, and nothing contained in this Agreement shall be construed to create or constitute a joint venture, partnership, agency, franchise, lease, or any other arrangement other than as expressly granted in this Agreement. Contractor is responsible for its own operation. Contractor must exercise control over its employees, agents, representatives, subcontractors, and suppliers and is solely responsible for the verification of identity and employment eligibility, for the payment of any wages, salaries, benefits or other remuneration of its employees, agents, representatives, subcontractors, and suppliers, and for the payment of any payroll taxes, contributions for unemployment or workers compensation, social security, pensions, or annuities that are imposed as a result of the employment of Contractor's employees, agents, representatives, subcontractors, and suppliers. Contractor's Personnel are not employees of Company or

its Affiliates and are not eligible to participate in any employment benefit plans or other conditions of employment available to Company or its Affiliates' employees. Contractor must not pledge, credit, incur any obligation or liability, hire any employee, nor purchase any merchandise or services in the name of Company. Unless otherwise provided in this Agreement, all costs, charges, and expenses incurred in connection with Contractor's performance of this Agreement must be borne by Contractor.

9.2    Subcontractors.    Contractor will remain solely responsible to Company for the acts, errors and omissions of Contractor's subcontractors  . Such subcontractors shall maintain the same insurance as is required to be carried by Contractor. There shall be no additional costs incurred by Company for the use of subcontractors and Contractor shall be solely responsible for payments due to any subcontractors. Contractor shall remain fully responsible for the performance of its subcontractor's obligations under this Agreement to the same extent as if Contractor had performed the Services. Company reserves the right to require Contractor to immediately remove any Personnel objectionable to Company.

10.    **CONFIDENTIALITY.**

10.1    Definition.    The parties  agree that all non-public information (including the terms of this Agreement) received by a party (the "Receiving Party"), its Affiliates and their Personnel relating to  the disclosing party (the "Disclosing Party") , its customers, or its Authorized Users in connection with this Agreement, including all: business plans, strategies, forecasts, analyses financial information; employee information, information technology information, and other proprietary information (collectively, "**Confidential Information**"), regardless of the manner or medium in which it is furnished to or otherwise obtained by the Receiving Party, its Affiliates and their Personnel will be held in confidence by the Receiving Party.  This **Section 10** (Confidentiality) also applies to any information exchanged between the parties regarding proposed business, regardless of whether the parties enter into a Procurement Document or other contract regarding such proposed business.

10.2    Use of Confidential Information.

10.2.1 Restrictions. The Receiving Party, its Affiliates and their Personnel will use all reasonable efforts to avoid disclosure, publication or dissemination of any Confidential Information. Further, the Receiving Party: (a) may use the Confidential Information only as necessary to perform the Services and its other obligations under this Agreement or to use the Services, (b) may not disclose the Confidential Information except to its Personnel who have a need to know such Confidential Information in connection with this Agreement, and (c) must restrict disclosure of Confidential Information to its Personnel who have executed a written agreement by which they agree to be bound by terms substantially similar to this Section. the Receiving Party is liable for any unauthorized disclosure or use of Confidential Information by its Affiliates and its Personnel.   For the avoidance of doubt, Company may disclose this Agreement to any of its Affiliates.

10.2.2 <u>Exceptions.</u> The obligations under this Section do not apply to any Confidential Information that the Receiving Party can demonstrate: (i) the Receiving Party possessed, without an obligation of confidentiality, prior to disclosure in connection with this Agreement; (ii) is or becomes public through no fault of the Receiving Party, its Affiliates and their Personnel; (iii) is independently developed by the Receiving Party without use of any Confidential Information; or (iv) is received by the Receiving Party from a third party (other than the Receiving Party's Personnel) that does not have an obligation of confidentiality to the Disclosing Party.

10.2.3 <u>Disclosure.</u> If, in the reasonable opinion of its legal counsel, the Receiving Party is required by applicable laws or court orders to disclose any Confidential Information in connection with any legal proceeding, then the Receiving Party may disclose such information to the arbitrator, court or other governmental authority, as the case may be; <u>provided,</u> in each case, the Receiving Party notifies the Disclosing Party a reasonable time prior to such disclosure (in order to permit the Disclosing Party to seek appropriate protective measures); and the Receiving Party requests and supports the Disclosing Party's efforts to seek appropriate protective measures.

10.2.4 <u>The Receiving Party Notification.</u> The Receiving Party must immediately notify the Disclosing Party upon the discovery of the loss, unauthorized disclosure or unauthorized use of any Confidential Information and cooperate with the Disclosing Party, at no additional charge, in the investigation of any such unauthorized disclosure.

10.2.5 <u>Return or Destruction of Confidential Information.</u> Within 10 days following the earlier of: (a) termination or expiration of this Agreement, or (b) completion of a project for which the Confidential Information has been provided, the Receiving Party must, at the Disclosing Party's discretion, either return to the Disclosing Party all Confidential Information (including all copies/derivatives thereof); or certify in writing to the Disclosing Party that such Confidential Information (including all copies/derivatives thereof) have been destroyed in such a manner that it cannot be retrieved.

10.3    <u>Special Rules for Confidential Personal Information.</u>

10.3.1 <u>Definition.</u> The following information (which is a subset of Confidential Information) must be held in the strictest confidence by Contractor: all information regarding Company's individual customers and employees, including but not limited to names, addresses, telephone numbers, account numbers, social security numbers, customer lists, and demographic, financial and transaction information (**"Confidential Personal Information"**).

10.3.2 <u>Additional Restrictions.</u> In addition to the restrictions set forth above, Contractor may not: (x) disclose Confidential Personal Information to any third parties (including Affiliates) without Company's prior written permission, nor (y) duplicate or incorporate the Confidential Personal Information into its own records or databases. In addition, Contractor must establish and maintain written

policies and procedures and conduct its operations to ensure: (i) the security, confidentiality and proper disposal of the Confidential Personal Information; (ii) protect against any anticipated threats or hazards to the security or integrity of such information; and (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer. Copies of such policies and procedures will be provided to Company upon Company's request.

10.3.3 <u>Confidential Personal Information Exceptions</u>. The exceptions to Contractors obligations set forth in **Section 10.2.2** (Exceptions) shall not apply to Confidential Personal Information. However, the restrictions on Confidential Personal Information do not apply to information independently developed by Contractor without the use of Confidential Personal Information; <u>provided</u> that Contractor is not using such information on Company's behalf.

10.3.4 <u>Company Audit Rights</u>. Contractor must permit Company to audit Contractor's compliance with the provisions of this **Section 10.3** at any time during Contractor's regular business hours.

10.3.5 <u>Contractor Breach</u>. A breach of this **Section 10.3** is grounds for immediate termination of this Agreement. In addition, Company is entitled to the recovery of any pecuniary gain realized by Contractor from the unauthorized use or disclosure of Confidential Personal Information.

11. **INDEMNIFICATION.**

11.1 <u>Third Party Claims</u>. To the fullest extent permitted by law: Contractor must defend, indemnify and hold harmless Company, its Affiliates, and their respective present, former, and future: shareholders, Authorized Users successors and assigns (collectively, the "**Indemnified Parties**") against all damages, losses, costs, expenses (including attorneys' fees, costs and expenses) and other liabilities arising out of any claims, demands, suits, or causes of action by third parties (collectively, "**Claims**"), arising out of or in connection with this Agreement (including claims of negligence by the Personnel of either Party) which result or are claimed to result in whole or in part from (i) any act or omission of Contractor, its Affiliates or their Personnel; (ii) any breach of this Agreement by Contractor, its Affiliates or their Personnel; (iii) the violation of any intellectual property rights of third parties caused by Contractor, its Affiliates or their Personnel or resulting from Company's use of the Hosted Software (iv) the violation by Contractor, its Affiliates or their Personnel of any law or regulation. Contractor will not be relieved of its foregoing obligations by any allegation of negligence or willful misconduct by Company and its Authorized Users; however, Contractor will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Company or its Authorized Users as determined in a final, non-appealable order of a court of competent jurisdiction. Contractor shall not be obligated to defend Company under (iii) to the extent the Claim is based on Company's failure to use the Hosted Software according to the documentation provided to Company, this Agreement or the instructions received from Contractor.

11.2    Infringement.    In the event the Software or any part of the Services are held or is likely to be held to constitute an infringement, Contractor, at its own expense, will first use reasonable and prompt efforts to: (a) procure for Company the right to continue to use the Software and/or Services; (b) modify the Software and/or Services so that it is non-infringing and of at least equivalent performance and functionality; or (c) upon adequate showing to Company that both of the foregoing options are not commercially feasible, to either provide functionally equivalent replacement Software to Company or reimburse Company for all costs and expenses (including any software license, maintenance, installation fees and/or other expenses) of obtaining and implementing such replacement software. Company's rights under this Section will be in addition to and will not limit Company's rights under **Section 11** (Indemnification).

11.3    Procedures.    Contractor has the right to control the defense of any Claim; provided that Company may participate in the defense at its cost. Upon Contractor's request, Company will reasonably cooperate in such defense and Contractor must reimburse Company for its reasonable out-of-pocket expenses in providing such cooperation. Company will provide prompt notification of any Claim; provided however, that any delay by Company in giving such notice will not relieve Contractor of its obligations pursuant to this **Section 11** (Indemnification), except to the extent that Contractor demonstrates actual damage caused by such delay.

11.4    Independent Obligation.    The obligations of Contractor to defend, indemnify and hold harmless, the Indemnified Parties under this **Section 11** (Indemnification) are independent of each other and any other obligation of the parties under this Agreement.

12.    **INSURANCE.**

12.1    Required Insurance.    Contractor will, at its own expense, obtain and maintain the following insurance:

12.1.1    Commercial General Liability, with coverage including, but not limited to, premises/operations, contractual, personal and advertising injury, and products/completed operations liabilities, with limits of at least $3,000,000 per occurrence for bodily injury and property damage combined. Company shall be named as an additional insured, with the standard "separation of Insureds" provision or an endorsement for cross-liability coverage. The policy shall be endorsed with forms CG 20 10 07 04 and CG 20 37 07 04 or their equivalent, to state that coverage is primary, and non-contributory with other available coverage. Except where prohibited by law, the insurance carrier shall waive all rights of subrogation that the insurer may have against Company and the Indemnified Parties. Contractor warrants that its subcontractors will maintain Commercial General Liability insurance, and Contractor shall indemnify Company for any loss, cost, liability, expense and/or damage suffered by Company as a result of failure of its subcontractors to maintain such insurance. Contractor further warrants that, if a subcontractor does not maintain Commercial General Liability insurance, Contractor's Commercial General Liability insurance shall insure the subcontractor. Limits of liability requirements may be satisfied by a combination of Commercial General Liability and Umbrella Excess Liability policies.

12.1.2 If any persons are employed or uninsured independent contractors are hired by Contractor at any time during the term of this Agreement, Workers' Compensation insurance, including coverage for all costs, benefits, and liabilities under Workers' Compensation and similar laws which may accrue in favor of any person employed by Contractor, for all states in which the Contractor will perform services for Company, and Employer's Liability insurance with limits of liability of at least $100,000 per accident or disease and $500,000 aggregate by disease. Except where prohibited by law, the insurance carrier shall waive all rights of subrogation that the insurer may have against Company and the Indemnified Parties. Such insurance shall contain an Alternate Employer Endorsement naming Company as the alternate employer. Contractor warrants that its subcontractors will maintain Workers' Compensation and Employer's Liability insurance, and Contractor shall indemnify Company for any loss, cost, liability, expense and/or damage suffered by Company as a result of failure of its subcontractors to maintain such insurance. Contractor further warrants that, if a subcontractor does not maintain Workers' Compensation insurance, Contractor's Workers' Compensation insurance shall insure the subcontractor. Contractors may self-insure Workers' Compensation only in states where the governing state bureau has issued to the Contractor a qualified self-insurance license for Workers' Compensation.

12.1.3 Automobile Liability insurance for owned, non-owned and hired vehicles, with limits of at least $1,000,000 per occurrence for bodily injury and property damage combined. If no vehicles are owned or leased, the Commercial General Liability insurance shall be extended to provide insurance for non-owned and hired automobiles in lieu of separate Automobile Liability insurance. Limits of liability requirements may be satisfied by a combination of Automobile Liability and Umbrella Excess Liability policies.

12.1.4 Professional Liability or Errors & Omissions Insurance with limits of not less than $3,000,000 per claim and annual aggregate, covering all acts, errors, omissions, negligence, infringement of intellectual property (except patent and trade secret) and network risks (including coverage for unauthorized access, failure of security, breach of privacy perils, as well at notification costs and regulatory defense) in the performance of services for Company or on behalf of Company hereunder. The policy shall contain an affirmative coverage grant for contingent bodily injury and property damage emanating from the failure of the technology services or an error or omission in the content/information provided. Such insurance shall be maintained in force at all times during the term of the agreement and for a period of 3 years thereafter for services completed during the term of the agreement. Company shall be given at least 30 days notice of the cancellation or expiration of the aforementioned insurance for any reason.

12.2  Policies.  Insurance shall be purchased from companies having a rating of A-VII or better in the current Best's Insurance Reports published by A.M. Best Company. Insurance policies shall not be cancelled or materially changed without at least 30 days prior written notice to Company. Evidence of insurance shall be submitted in advance of

or concurrent with the execution of this Agreement, on each insurance policy renewal thereafter, and annually for two years after this Agreement ends.

12.3    Coverage.    If Contractor does not provide Company with such evidence of insurance or such policies do not afford adequate protection for Company, Company will so advise Contractor, but Company failure to do so is not a waiver of these insurance requirements. If Contractor does not furnish evidence of acceptable coverage within 15 days, Company shall have the right, in its sole discretion, to (a) withhold payments from the Contractor until evidence of adequate coverage is provided, or (b) immediately terminate this Agreement.

Failure to obtain and maintain required insurance or failure by Company to notify Contractor shall not relieve Contractor of any obligation contained in this Agreement. Additionally, any approval by Company of any of Contractor's insurance policies shall not relieve Contractor of any obligation contained in this Agreement, including liability for claims in excess of described limits.

13.    **LIMITATION OF LIABILITY.**

13.1    Limitation on Certain Damages.    **EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, NEITHER PARTY (NOR SUCH PARTY'S AFFILIATES NOR THEIR SHAREHOLDERS, AUTHORIZED USERS OR PERSONNEL) WILL BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS) ARISING IN CONNECTION WITH THIS AGREEMENT OR THE PERFORMANCE, OMISSION OF PERFORMANCE, OR TERMINATION HEREOF WITHOUT REGARD TO THE NATURE OF THE CLAIM (E.G., BREACH OF CONTRACT, NEGLIGENCE OR OTHERWISE), EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

13.2    Exclusions From Limitations of Liability.    Notwithstanding anything contained herein to the contrary, the limitations of liability contained in this **Section 13** (Limitation of Liability) will not apply to: (a) Contractor's obligations under **Section 5** (Company Data and Intellectual Property), **Section 10** (Confidentiality), and **Section 11** (Indemnification); (b) personal injury, including death, and damage to tangible property caused by the negligent or intentional acts of a party, its Affiliates or their Personnel; or (c) either party's obligation to pay litigation costs and attorneys' fees incurred by the other party in enforcing the terms of this Agreement as set forth in **Section 15.4** (Attorneys' Fees).

13.3    Disclaimer.    **EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT EACH PARTY DISCLAIMS ALL OTHER EXPRESS OR IMPLIED REPRESENTATIONS, WARRANTIES AND COVENANTS. FURTHER, COMPANY AND CONTRACTOR EACH AGREE THAT RELIANCE ON ANY REPRESENTATION, WARRANY OR COVENANT NOT CONTAINED IN THIS AGREEMENT (OR ANY SOWS HERETO) WOULD NOT BE REASONABLE.**

14.    **TERMINATION.**

14.1    Termination for Convenience.    Company shall have the right to terminate this Agreement or any Procurement Document, in whole or in part, without cause or penalty by providing thirty (30) days written notice to Contractor. Termination of this Agreement for convenience shall result in the immediate termination for convenience of all Procurement Documents hereto.

14.2    Termination With Cause.    Any Procurement Document or this Agreement may be terminated by either party in the event of: (i) a material breach of such Procurement Document or this Agreement, as applicable, by the other party; (ii) the voluntary or involuntary insolvency of, or the institution of proceedings by or against, the other party under any federal or state bankruptcy or insolvency law; (iii) an assignment by the other party for the benefit of all or substantially all of its creditors; (iv) a cessation of the operations of the other party; (v) refusal by the other party to furnish appropriate guaranties or assurances as may be requested by Company; or (vi) a failure by the other party to maintain or produce evidence of insurance required under this Agreement. Such termination shall be effective 30 days after written notice is provided by the non-breaching party that identifies the basis of the default or breach. The right of the non-breaching party to terminate is subject to the right of the breaching party to cure any default and provide evidence thereof to the non-breaching party before the effective date of termination. Termination of this Agreement for cause shall result in the immediate termination for cause of all SOW's hereto.

14.3    Obligations Upon Termination.    Upon termination of this Agreement or any Procurement Document(s) for convenience, Company will only be liable for: (a) Software licensee fees (which will be prorated on a daily basis for Software licensed on a non-perpetual basis), subject to Company right to reject such Software pursuant to **Section 3.2** (Acceptance); and (b) any Service fees earned for Services actually performed and/or Work Products (including any partial versions thereof) actually delivered to Company provided prior to the date of such termination. Within 3 days of any termination or expiration of a Procurement Document, Contractor must: (x) remove all of its property from Company's premises, and (y) deliver to Company all of Company's property, including all the then-current version of any Work Products, whether complete or in process, related to the terminated/expired activities.

14.4    Effect of Expiration/Termination.

14.4.1    Intentionally omitted.

14.4.2    Transition Rights.    During the Term of this Agreement or any Procurement Document and upon expiration or termination of this Agreement or any Procurement Document by either party for any reason, Contractor will provide Company, or Company's designated Authorized Users, as the case may be, all reasonable transition Services ("**Transition Services**") requested by Company, for up to 6 months after such termination (the "**Transition Period**"), relating to the transition from the Software and Services to another system or provider, including Maintenance Services and all other Services necessary for an orderly conversion of the Software/Services. Such services may include month to

month extensions of existing Procurement Documents. For Services which Company was receiving from Contractor prior to such expiration/termination, the fees applicable to such Transition Service will be the rates which Company was paying prior to such expiration/termination. For all other Transition Services, Contractor will not charge Company fees in excess of the Contractor's then standard rates (taking into account the average discount Contractor provides to its similarly sized customers). Contractor may require prepayment of any Transition Services fees if the Agreement was terminated for lack of payment. Company's payment of any such Transition Services fees will not be a waiver of Company's right to claim such amount as damages, in the event Contractor has breached this Agreement or the applicable Procurement Document. Notwithstanding anything to the contrary in this Agreement, termination of this Agreement will not terminate any licenses granted under this Agreement until expiration of the Transition Period.

15.    **GENERAL.**

15.1    Assignment.    The rights and obligations under this Agreement may not be assigned by either party without the prior written consent of the other party. This Agreement will be binding upon and inure to the benefit of the parties and their respective heirs, permitted successors and assigns. Any attempted assignment or transfer in violation of this Section will be null and void, and will entitle Company to terminate this Agreement, at its option.

15.2    Governing Law.    This Agreement, and all other aspects of the business relationship between the parties, is construed, interpreted, and enforced under and in accordance with the laws of Illinois without regard to conflict of law provisions.

Contractor agrees, with respect to any litigation arising directly or indirectly out of, or that in any way relates to, this agreement, the business relationship or any other transaction, matter, or issue between the parties, to commence it exclusively in the State of Illinois Courts of Cook County, Illinois or the United States District Court, and Contractor by this Agreement consents to the jurisdiction of these courts.

15.3    Notices. All notices given by one party to the other under this Agreement must be: (a) hand delivery; (b) certified mail, return receipt requested; (c) nationally recognized overnight courier service; or (d) facsimile, to:

| If to Company: | Sears Holdings Management Corporation<br>3333 Beverly Road, Mail Station: B6 157B<br>Hoffman Estates, Illinois 60179<br>Attn.: CIO<br>Facsimile: (847) 286-7574 |
|---|---|
| with a copy to: | Sears Holdings Management Corporation<br>3333 Beverly Road, Mail Station: B6-210B<br>Hoffman Estates, Illinois 60179<br>Attn.: General Counsel |

Facsimile: (847) 286-2471

| If to Contractor: | Beeline.com, Inc. |
|---|---|
| | 12724 Gran Bay Parkway West, Suite 200 |
| | Jacksonville, FL 32258 |

All notices will be effective: (i) upon actual receipt; (ii) three business days after being sent by certified mail; (iii) the next business day after being sent by a nationally recognized courier; or (iv) on the same business day on which it is sent by facsimile (or the next business day if transmission is completed after 5:00 p.m., recipient's time). Facsimile notice must be followed by notice under subsection (i), (ii) or (iii) above. A party may change its notice information set forth above by giving the other party written notice.

15.4   Attorneys' Fees.   In the event of an alleged breach of this Agreement, the prevailing party will be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, costs and expenses incurred in connection with such dispute, claim or litigation, including any appeal therefrom. For purposes of this Section, the determination of which party is to be considered the prevailing party will be decided by the court of competent jurisdiction or independent party (i.e., mediator or arbitrator) that resolves such dispute, claim or litigation.

15.5   Access to Electronic Systems.   If Contractor has access, whether on-site or through remote facilities, to any of Company's hardware, software, electronic data storage systems or other electronic systems (each an "**Electronic System**"), in connection with this Agreement, Contractor will limit its access and use solely to: (a) the Contractor Personnel who have a need to access such systems to perform the Services, (b) those Electronic Systems that Company has authorized Contractor to access and (c) the performance of its obligations under this Agreement. Contractor will immediately cease using such Electronic Systems upon termination or expiration of the applicable Procurement Document. Upon Company's request, Contractor will notify Company in writing of the names of its Personnel who have accessed such systems. Contractor is responsible for any unauthorized access or unauthorized use by its Personnel. All user identification numbers and passwords disclosed to Contractor and any information obtained from use of Company Electronic Systems will be Company's Confidential Information and Contractor will cooperate with Company in investigating any apparent unauthorized access by Contractor or its Personnel of Company's computer or Electronic Systems. Contractor acknowledges that to the extent it receives cardholder data in connection with the Agreement, Contractor is responsible for the security of the cardholder data Contractor possesses and Contractor will comply with current Payment Card Industry ("**PCI**") Data Security Standards (as updated by PCI from time to time). In the event of a data breach of Company's cardholder information involving Contractor or Contractor's environment, Contractor will notify Company within 24 hours of the

identified breach and cooperate fully with Company and/or industry/government officials in a review and/or forensic investigation of Contractor's environment and/or processes.

15.6   Disablement of Systems.   Except during and in conjunction with Maintenance Services or any other authorized servicing or support, in no event will Contractor, its Personnel, or anyone acting on its behalf, disable or otherwise impair the functionality or performance of (or permit or cause any embedded mechanism to disable or impair the functionality or performance of) the Software or any other Electronic System owned or utilized by Company or its Authorized Users without the written permission of a corporate officer of Company. Contractor waives and disclaims any right or remedy it may have to de-install, disable or repossess the Software or any portion thereof without due process of law.

15.7   Export Controls.   Sears acknowledges that Sears may have an obligation (independent of this Agreement), to comply with export laws of the United States in connection with its use of the Software. Contractor will comply with all applicable export control laws of the United States with respect to the Software and/or Services. Upon Company's request, Contractor will identify which export laws (and the applicable classifications related thereto) apply to Contractor's Software. Contractor will cooperate with Company in obtaining any regulatory approvals, permits, or licenses that are necessary to enable Company to exercise its rights herein.

15.8   Security Policies.   Contractor will (and will require its Personnel) to follow Company's facility safety and security rules.

15.9   Severability.   If any provision of this Agreement is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, then such provision shall be deemed modified to the extent necessary to make such provision enforceable by such court, and the invalidity in whole or in part of any portion of this Agreement shall not impair or affect the validity or enforceability of the remaining provisions of this Agreement.

15.10   Publicity.   Contractor will not reveal the existence of this Agreement or disclose that Company is client of Contractor's in any advertising, promotional activities, sales presentations or publicity releases without the Company's prior written consent.

15.11   No Waiver.   No waiver by either party shall be effective unless in writing. Any waiver by either party of any default, delinquency or other breach by the other party shall not be deemed to be a waiver of any other or subsequent default, delinquency or breach. "Approval" or "acceptance" by Company of any Services or Work Products shall neither be construed as an endorsement by Company as to the technical means Contractor has selected to achieve the required results, nor as a waiver of any of Company's rights or Contractor's obligations under this Agreement. Contractor acknowledges that Company is relying upon Contractor's technical expertise in providing such Services and Work Product.

15.12   Cumulative Remedies.   In the event Contractor breaches any of the representations, warranties or covenants in this Agreement, Company may exercise all rights and remedies available under this Agreement (including any SOW's hereto), at law or in equity. All rights and remedies are cumulative, and the exercise of any right or

remedy shall be without prejudice to the right to exercise any other right or remedy provided herein, at law or in equity.

15.13    Electronic Communications.

15.13.1If required by Company, in order to more effectively communicate electronically with one another and automate various operations between Company and Contractor, the parties shall utilize Company's third party e-commerce service provider, currently Ariba Supplier Network, or as otherwise identified by Company to Contractor from time to time ("E-Commerce Provider"). This will allow the parties to transmit to one another various documents and communications, including but not limited to, purchase orders, work orders, change requests, advance ship notices, delivery schedules and receipt confirmations, requests for proposals, invoices, acknowledgements, catalogs, catalog punch-outs, portal usage, fees, discount rates, acceptances of discounts, reports provided by Contractor to Company, product literature and information, parts lists, notices as required or allowed hereunder, clarifications and confirmations (E-Documents").

15.13.2Company and Contractor shall be individually responsible for purchasing or acquiring a license to install and/or use any software application, host site, support services agreement, equipment, maintenance service agreement or any other process or service deemed necessary by Company, and any renewals thereof, in order to access and utilize the E-Commerce Provider's electronic communications portal, record retention system and any other modules or accessory applications deemed necessary by Company (the "E-Network"). Company shall not be responsible for Contractor's failure to pay fees due to the E-Commerce Provider or Contractor's failure to adhere to the terms of use of the E-Network. Contractor shall adhere to the terms and conditions of its agreements with the E-Commerce Provider. In the event that Contractor fails to maintain a relationship or breaches or defaults on its agreements with the E-Commerce Provider, such failure may result in a cross-default of this Agreement, and the cancellation by Company of purchase orders or work orders placed with Contractor with no liability to Company for any such cancellation.

15.13.3Contractor shall be solely responsible for the purchase price or licensing fees, transaction fees, renewal fees, etc. assessed by the E-Commerce Provider, and Contractor shall not pass along any such fees to Company. Contractor shall also be responsible for the training of its employees or agents in utilizing the E-Network and for their proper use of the E-Network and any associated user IDs and passwords. Contractor shall maintain current email addresses and other contact information in the E-Network so to maintain the timely and efficient routing of all E-Documents with Company.

15.13.4The transmission of E-Documents via the E-Network shall have the same validity and enforceability as if they were delivered as signed, written paper documents or communications. If Company submits its purchase orders or work orders to Contractor via the E-Network then Contractor shall submit its invoices under those purchase orders or work orders to Company via the E-Network. If

Contractor fails to do so, then Company may give Contractor notice with a thirty (30) day period to cure if Company deems Contractor's invoices submitted by Contractor outside the E-Network to be unacceptable. The party submitting its E-Document via the E-Network is responsible to confirm the transmission of the E-Document and its availability on the E-Network to the other party, and to resubmit its E-Document in the event of any transmission or submission error, due to whatever cause. Neither party shall use the failure, crash or temporary unavailability of the E-Network as a basis or excuse for any breach it commits under this Agreement.

15.14   Interpretation.   The term this **"Agreement"** includes any SOW's, Purchase Orders, or Appendixes to this Agreement. In this Agreement: (a) section headings are for reference only and do not affect the interpretation of this Agreement, (b) defined terms include the plural as well as the singular, and (c) "include" and its derivatives ("including," "e.g." and others) mean "including but not limited to."

15.15   Third Party Beneficiaries.   Other than Authorized Users to whom Company grants access to the Software in accordance with this Agreement, there are no third party beneficiaries to this Agreement.

15.16   Vendor Code of Conduct.   The Sears Holdings Corporation Code of Vendor Conduct ("Code of Conduct") is hereby incorporated into the Agreement by reference which may be amended from time to time. Contractor agrees to adhere to such Code of Conduct. http://www.searsholdings.com/govern/SHCCodeofVendorConduct.pdf

15.17   Survival.   Any terms of this Agreement that would, by their nature, survive the termination of this Agreement will so survive including **Section 1 (Term), Section 3 (Hosted Software Services), Section 5 (Company Data and IP), Section 7 (Compensation), Section 8 (Representations, Warranties), Section 9 (Personnel), Section 10 (Confidentiality), Section 11 (Indemnification), Section 12 (Insurance), Section 13 (Limitation of Liability), Section 14 (Termination), and Section 15 (General).**

15.18   Signatures.   This Agreement and any Procurement Document hereto may be executed in counterparts, which together constitute one and the same agreement. Each party may rely on a facsimile signature on this Agreement. If a party sends a signed copy of this Agreement (or any Procurement Document hereto) via facsimile, such party will, upon request by the other party, provide an originally signed copy of this Agreement.

15.19   Entire Agreement.   This Agreement, together with all exhibits, schedules and statements of work or other attachments to this Agreement ("**Attachments**") constitutes the complete and final agreement of the parties and supersedes all prior agreements, understandings, negotiations and discussions. No modification or rescission of this Agreement shall be binding unless executed in writing by the parties. In the event of any conflict between the terms and conditions of this Agreement and any Attachment, the terms and conditions of the Attachment shall prevail. Notwithstanding the foregoing, if the parties have executed an agreement of confidentiality or nondisclosure prior to or contemporaneously with this Agreement, the provisions of non-disclosure agreement shall remain in force, except to the extent that the terms and conditions of this Agreement shall impose stricter requirements or standards, in which case the stricter terms and

conditions of this Agreement shall control the Contractor's duties and obligations. This Agreement also supersedes, and Company and its Authorized Users will not be bound by, any "shrink wrap license" which is bundled with the Services or the Work Products or any "disclaimers" or "click to approve" terms or conditions contained in the Work Products or any web site which Company, or its Authorized Users use in connection with Contractor's Services or Work Products now or in the future.

*Signature Page Follows*

**IN WITNESS WHEREOF,** the parties warrant and represent that they have the full power and authority to execute this Agreement on behalf of their respective parties and have caused this Agreement to be executed by persons authorized as of the Effective Date.

**Sears Holdings Management Corporation**

By: *David Little*
Name: DAVID LITTLE
Title: DVP PROCUREMENT
Dated: FEBRUARY 8, 2013

**Beeline.com, Inc.**

By: *Chris Langeland*
Name: Chris Langeland
Title: VP of Program Services
Dated: 2/4/2013

*Signature Page – Master Hosted Software and Services Agreement*

## APPENDIX #1

## GLOSSARY

"**Authorized User(s)**" means: (a) Company, (b) Company's Affiliates, (c) each subsidiary and each business that is divested by Company or its Affiliates but only for a period of five years following the divestiture, (d) each individual and each entity that (i) is licensed to do business using the Company's or its Affiliates' name (e.g., Sears Hometown Stores and Company franchisees), or (ii) does business with one of Company's or its Affiliates' retail businesses (e.g., licensed businesses), and (e) all of the Personnel of each of the foregoing entities.

"**Company Data**" means all data or other information of Company and its Authorized Users, provided to Contractor hereunder for storage and access through the Hosted Software Service. "**Defect**" means any failure of the Software to contain the functionality, operate in accordance with, and/or conform to, the applicable Specifications.

"**Documentation**" means, collectively: (a) all of the written, printed, electronic or other format materials published or otherwise made available by Contractor that relate to the functional, operational and/or performance capabilities of the Software and Hosted Software Services; and (b) all user, operator, system administrator, technical, support and other manuals and all other written, printed, electronic or other format materials published or otherwise made available by Contractor that describe the functional, operational and/or performance capabilities of the Software. Documentation does not include Source Code.

"**Enhancements**" means any new Software, releases, improvements, modifications, upgrades (e.g., ver. 1 to ver 1.1, 1.1.1 or 2.1), updates, patches, updated data, fixes and additions to the Software that Contractor deploys as part of the Services from time-to-time to correct deficiencies and/or improve or extend the capabilities, including, but not limited to, increases in the speed, efficiency or ease of operation of the Services, and will include any replatformed software, whether on different operating systems or equipment. The terms "Software" will be deemed to include any Enhancements for purposes of this Agreement.

"**Milestone**" means any deadline set forth in a Procurement Document or a timeline agreed upon by the parties in writing.

"**Personnel**" means the directors, officers, employees, partners, agents, advisers, independent contractors, subcontractors and outsourcers of a party and its Affiliates, or another entity, as applicable; provided that the Personnel of Contractor and its Affiliates will not be deemed to be Personnel of Company.

"**Software**" means all software that is made available to Company as a service by Contractor under this Agreement and all Documentation related thereto, including all software, application interfaces, third party software, and all Enhancements thereto.

"**Source Code**" means the source statements (rather than object code) for the Software and other deposit material related thereto as further identified in any Source Code Escrow Agreement entered into between the parties pursuant to **Section 2.3** (Source Code Escrow Agreement) and the applicable Procurement Document.

"**Specifications**" consist of: (a) any specifications and Company's requirements contained in the Procurement Document and (b) any technical specifications and Documentation which

Contractor makes publicly available and which are in effect as of the effective date of the applicable Procurement Document (or the date any Enhancement is provided to Company). In the event of any inconsistency between the "Specifications" contained in the Procurement Document and any Specifications Contractor makes generally available, the Specifications in the Procurement Document will control. Upon Company's request, Contractor will provide copies of all applicable Specifications.

"**Unauthorized Code**" means any feature, routine or device that is intended or designed, either automatically, upon the occurrence of a certain event, upon the taking of or failure to take a certain action or under the control of a third person to disrupt the operation of, destroy, erase, damage or otherwise render inoperable a Work Product or any other Company Electronic System (e.g., malicious programs, viruses, worms, password checking, CPU serial number checking, time dependencies, etc.).

*End of Appendix*

## APPENDIX #4

### (Information Security)

At a minimum and as specified herein, Contractor or "Vendor" shall provide security for all data and communication systems in support of the Agreement to which this Appendix 4 is attached ("Exhibit").

Vendor's security efforts will include, without limitation:

**Logical Access Controls:** Vendor agrees to employ effective logical access control measures over all systems used to create, transmit, or process SHMC Confidential Information), including but not limited to:

- User authentication must use unique identifiers ("**User ID's**") consistent with individual accountability; shared User ID's do not provide the level of accountability required by Sears Holdings Management ("SHMC");

- A complex password policy, including the prohibition of clear-text credentials must be enforced;

- User access rights/privileges to information resources containing SHMC Confidential Information must be granted on a need-to-know basis consistent with role-based authorization.

- User access to SHMC Confidential Information must be removed immediately upon user separation or role transfer eliminating valid business need for continued access.

- Default passwords and security parameters must be changed in third-party products/applications used to support SHMC Confidential.

- Two-factor authentication such as token devices, smart cards, biometrics, or public keys shall be used to secure all remote administrative access to SHMC Confidential Information.

**Network Security Architecture:** Vendor agrees to employ effective network security control measures over all systems used to create, transmit, or process SHMC Confidential Information including but not limited to:

- Firewalls shall be operational at all times and shall be installed at the network perimeter between Vendor's internal (private) and public (Internet) networks.

- Properly configured and monitored IDS/IPS (Intrusion Detection/Prevention Systems) must be used on Vendor's network.

- Databases must be logically or physically separated from the web server, and the database may not reside on the same host as the web server, where applicable.

- The database and other information systems used for the purposes of processing SHMC Confidential Information must have only those services/processes and ports enabled to perform routine business. All other services/processes on the host must be disabled.

- All information systems, repositories, etc. used for SHMC by Vendor, or its business partners, must be physically located in a controlled data center environment used for the purpose of protecting information systems.

- Secure channels (e.g., SSL, SFTP, SSH, IPSEC, etc.) must be used at all times.

**Physical Access Controls**: Vendor agrees to maintain servers, databases, and other hardware and/or software components that store information related to SHMC's business activities in an access controlled and consistently monitored Data Center secured by appropriate alarm systems, which will not be commingled with another unrelated party's hardware, software or information.

**Risk Assessment**: At no additional cost, Vendor agrees to provide responses to a risk assessment questionnaire (if provided by SHMC),

- Vendor agrees to perform regular security vulnerability assessments and shall provide SHMC with results of a current security assessment by an accredited third-party (e.g., penetration test results of internet-facing devices, SAS 70-Type II reports, ISO 27001 certification, etc) as well as action plans describing how Vendor will address all identified security vulnerabilities affecting systems used to store, process or otherwise access SHMC Confidential Information.
- Vendor will permit SHMC or its designee to conduct audits of SHMC's data maintained or stored by the Vendor.

**Security Policy**: Vendor agrees to maintain and enforce security policies consistent with security best practices, and all applicable regulatory and legal security and privacy requirements, including but not limited to Massachusetts 201 CMR 17.00 et. seq. "Standards for the Protection of Personal Information of Residents of the Commonwealth". Upon request, Vendor shall provide copy of current security policy and standards as well as security architecture. Vendor shall comply with SHMC's Privacy Policy with respect to any SHMC customer personal information it receives.

**Protection of SHMC Confidential Information**: In addition to what may be described in the Agreement or Procurement Document to which this Exhibit is attached, Vendor agrees to protect SHMC Confidential Information as it would its own. For purposes of clarity, SHMC Confidential Information may include, but is not limited to, the following:

- Credit Card numbers
- Credit Card Validation Codes
- Personal Identification (PIN) numbers
- Loyalty Card Numbers with or without any associated PIN or Access Code
- Checking Account number (alone or in combination with checking account routing information)
- Bank Account number (alone or in combination with routing information)
- Drivers License Number or State-issued Identification Card Number
- Customer or Employee Names, in whole or in part
- Customer or Employee Postal Address
- Customer or Employee email address

- Date of Birth
- Social Security Numbers
- Health Insurance Card or Policy Identification Number
- Medical or Health Information
- Personal Telephone Number (when used with a customer/employee name or address)

Additionally, Vendor agrees to adhere to the following controls surrounding the use and protection of SHMC Confidential Information:

- SHMC Confidential Information must be encrypted with 256-bit encryption.

- Clear text (ftp, telnet, etc.) protocols may not be used to access or transfer SHMC Confidential information. SHMC Confidential Information must be encrypted when stored on portable media, which by way of example shall include USB Sticks, Portable hard drives, Laptops, DVD/CDs, and when transmitted on wireless networks or across public networks.

- SHMC Confidential Information may not be copied, sold or used for solicitation purposes by the Vendor or its business partners. SHMC Confidential Information may only be used in conjunction with and within the scope of the Procurement Document or the Agreement to which this Exhibit is attached.

- SHMC Confidential Information (data) must be segregated (physically and/or logically if in a database or virtual (VM) environment) from other Vendor customers. If data is not physically segregated from other customers, systems, or applications unrelated to SHMC, vendor must provide appropriate data security controls over data at rest, including, access controls and encryption.

- Payment Card information must be masked on display rendering in a manner consistent with the Payment Card Industry Data Security Standard (PCI-DSS), the Fair and Accurate Credit Transaction Act (FACTA) and all other applicable laws and regulations.

- Vendor must disclose where SHMC data will be stored and processed. Storage and Processing of SHMC Confidential Information shall take place within the United States.

- Ensure secure processes and procedures (e.g., degaussing, anti-static bags, etc.) for handling or removal of physical media or equipment that may contain SHMC Confidential Information.

**System Monitoring.** Vendor agrees to regularly audit and monitor information systems processing SHMC's business activities to ensure the protection of SHMC's information. Monitoring includes, but is not limited to, potential breaches or hacking activity and access to devices. Vendor must have defined processes for security alerting, escalation and remediation that are consistent with the Services procured pursuant to the Agreement. Vendor must ensure that event logs with SHMC data are not provided to other subscribers. If Vendor using virtual

machines, must ensure there is granular monitoring of traffic that is crossing the virtual machine backplanes.

**Vulnerability Management Controls**. Vendor agrees to employ effective vulnerability management control measures over all of its systems used to create, transmit, or process SHMC Confidential Information, including; but, not limited to:

- Third-party vulnerability scans or audits of any external-facing (public) infrastructure devices.

- Annual third-party assessment of applications or processes supporting SHMC customer credit card information.

- Deploy and maintain currency of up-to-date commercially available anti-virus, anti-spam, anti-malware software on all information system components including personal computers, laptops, and interconnecting networks, where applicable, used for the purpose of managing SHMC Confidential Information. Additionally, provide for regular scanning for viral infections and update virus signature files frequently.

- Maintain a standard patch management process and practice to ensure the protection of any devices used to access, process or store SHMC Confidential Information. Vendor agrees to provide SHMC with their patch management policies and procedures upon request.

- Regularly auditing and monitoring to ensure the protection of SHMC Confidential Information.

- Any security breach that involves SHMC Confidential Information must be reported to SHMC in accordance with the Notice provision of the Agreement without unreasonable delay.  Vendor shall immediately perform a root cause analysis as well as provide detailed information about measures taken by the Vendor to prevent future breaches.  All efforts to rectify or resolve the situation must include subsequent and regular notification for the reported incident.

- Within 1 hour of suspected fraudulent or malicious activity occurring on the Vendor site, Vendor will notify the SHMC's Kathryn Stafford– Director of Information Security by phone at 847-286-4646or to inform the SHMC team about the activity.  Any request by the SHMC team for such information will be provided to SHC within two hours.

- Vendor agrees to provide full cooperation with SHMC and in the event of a data breach involving SHMC Confidential Information including, but not limited to: server log information showing network and application traffic.

- SHMC must be immediately notified of any known attacks occurring against Vendor systems used to store or process SHMC Confidential Information.

- Vulnerabilities discovered by the SHMC's or Vendor's Security Scanning tools must be resolved by following the schedule outlined below (the level of vulnerability will be determined by SHMC):

  o P1 vulnerabilities: A successful exploit of this vulnerability may result in catastrophic and significant physical or property damage or loss. Or, there may be a catastrophic and significant loss of revenue or productivity (e.g., Denial of Service Attack, exploit

'kits' exist, buffer overflows high jacking, or source code exposure, etc.). Such a vulnerability must be resolved before a site launch or within 2 hours of discovery if the application is currently publically available.

o   P2 vulnerabilities: A successful exploit of this vulnerability may result in moderate physical or property damage, or, there may be a moderate loss of revenue or productivity to the organization (e.g., Weak encryption, or possible phishing opportunity, etc.). Such vulnerability must be resolved within 2 days of site launch or within 4 hours of discovery if the application is currently publically available.

o   P3 vulnerabilities: A successful exploit of this vulnerability may result in minor physical or property damage. Or, there may be a minor loss of revenue or productivity to the organization (e.g., FTP use or missing service pack, etc.). Such vulnerability must be resolved within 3 days of a site launch or within 8 hours of discovery if the application is currently publically available.

**Data Recovery and Availability.** Vendor must provide detailed disaster recovery and business continuity plans that support the pre-defined recovery time objective (RTO) / recovery point objective (RPO) requirements defined by SHMC.

•   Vendor must utilize industry best practices for data, services, and communications recoverability. Data and applications must be replicated across multiple independent sites and alternate communication channels must be available.

•   Vendor is expected to validate and verify their existing capabilities through realistic scenario testing. Vendor must agree to participate in periodic recovery testing with SHMC. Proof of successful testing of the Vendor plan must be provided to SHMC upon request.

•   Vendor systems must be device (computer machine) and provider independent in order to ensure portability and successful recovery of applications and backup or restoration services, or both.

•   Vendor must provide company name, and contact information on all third-party relationships as well as services provided by each wherever those services create, transmit or process SHMC Confidential Information.

**Data Destruction.** Vendor shall ensure that residual magnetic, optical, or electrical representation of SHMC Confidential Information that has been deleted may not be retrieved or reconstructed when storage media is transferred, become obsolete or is no longer usable or required by SHMC.

•   Vendor should be utilizing minimum 256-bit encryption that renders data unreadable when storage is recycled, disposed of, or accessed by any means outside of authorized applications.

•   Vendor data retention and destruction must align with SHMC requirements and policies as well as comply with applicable laws or regulations.

•   SHMC information stored on vendor media (e.g., hard drive, optical discs, tapes, paper, etc.) must be rendered unreadable or unattainable using the NIST Guidelines for Media Sanitization (Special Pub 800-88), prior to the media being recycled, disposed of, or moved off-site.

**Application Vendor**. Vendor agrees to adhere to the following controls surrounding application development for applications developed and hosted off-site as well as off-site application development for on-site deployment:

1. Vendor must provide supporting documentation that commonly accepted web application security guidelines and frameworks are used for developing Internet-facing applications (e.g. Open Web Application Security Project [OWASP], SANS).

2. Vendor must provide a data flow diagram that includes the entry points (the main pages and the i-framed pages as may be applicable), a description of the data flowing from each node in the system (e.g., username, password, address, captcha, etc.), a listing of all attributes stored, processed, or transmitted, and how the data is securely stored. The diagram must also demonstrate all security controls in place.

3. Vendor must demonstrate how Internet-facing applications are tested for security vulnerabilities and remediated prior to the source code being promoted to production.

4. If Vendor has performed prior security testing, the results of such test(s) must be made available to SHMC for evaluation prior to launch else allow penetration testing and/or application source code review to be performed by SHMC, when requested.

5. Vendor must provide supporting documentation describing how fraud is detected and prevented when requested by SHMC.

6. Vendor agrees to supply, within the requested timeframe, detailed information, and demonstrate full cooperation with SHMC, pertaining to all inquires deemed necessary by SHMC to determine the risk of any third-party systems and procedures related to and affecting SHMC. This includes, but is not be limited to, inquiries pertaining to servers, server logs showing detailed application traffic, operating systems, applications, databases, network configuration, data encryption algorithms being utilized, fraud detection and prevention controls, physical inspection of facilities, incident response procedures, and disaster recovery measures.

7. Upon request by SHMC, Vendor shall   provide performance statistics relating to availability and performance prepared for Vendor by Vendor's contractors or generated by Vendor's internal tools. While monitoring requirements may change based on the applications in scope, Vendor will agree to provide continuous monitoring of application(s) and application(s) infrastructure used by Vendor or vendor's contractors.

**Personnel Roles and Responsibilities**. Vendor agrees to identify in writing the person who will be responsible for overall security of the application development, management, and update process throughout the Contract period. The person identified shall be a single senior technical security specialist, to be known as the project Security Lead. The Security Lead shall confirm in writing the security of each deliverable. The Security Lead shall confirm to SHMC in writing that the software meets the security requirements, all security activities have been performed, and all identified security issues have been documented and resolved. Any exceptions to the confirmation status must be fully documented with the delivery.

## SOW #1
### (VMS)
### Dated:January 15, 2013

ThisStatement of Work #1("**SOW #1**") is made as of the 15thday of January, 2013("**SOWEffective Date**") between Sears Holdings Management Corporation("**Company**"), on behalf of itself and for the benefit of its Affiliates and Beeline.com, Inc. ("**Contractor**"). This SOW is incorporated as part of, and is governed by the terms and conditions of, that certain Master Hosted Software and Services Agreement dated January 15, 2013, between Contractor and Company ("**Agreement**"). The date of this SOW is the Effective Date.

| **Sears Holdings Management Corporation** | | **Beeline.com, Inc.** | |
|---|---|---|---|
| By: | *David Little*<br>8E7831E00EE7400... | By: | *Chris Langeland*<br>537D4D16F2A848B... |
| Name: | David Little | Name: | Chris Langeland |
| Title: | DVP Procurement | Title: | VP of Program Services |

*End of Cover Page*

DocuSign Envelope ID: F5445FBD-H51E-49C2-831C-57DD2C86B48A

1.      **Software**.

Company retains Beeline to provide its Contingent Workforce Solution, consisting of Contractor's Vendor Management System (the "Technology"), to facilitate Company's procurement of Supplier personnel from sources and suppliers identified and selected by Company's managed services provider ("MSP") and Company ("Suppliers") and in accordance with Company specifications. Company will be provided with approved access to utilize the Technology to facilitate the procurement and management of Supplier personnel from Suppliers ("Company Program").   Company shall also receive publicly released upgrades and version releases as they become available.

Beeline, at its discretion, may make available updates to the Technology as communicated in a market launch and available for all clients to use. Updates are designed to improve, enhance, and further develop the Technology and may take the form of bug fixes, enhanced functions, new software modules. Beeline will only be required to promote Technology updates in an off mode when a modification (i) requires Company to define parameters or settings in order to function properly, (ii) requires specific configuration or testing in client environment to function properly, and/or (iii) alters Company's customized workflow or business process.  In the case where Beeline is required to promote Technology updates in an off mode, Technology will be unaffected and Company may reject usage of those specific enhanced functions and/or new modules.

Beeline follows both an agile development process and a seasonal product release schedule. Updates occur every five weeks following our agile development process. These minor technical release increments allow Beeline to promote features and updates quickly, to receive and respond to feedback from clients frequently, and to limit unexpected changes that would impact Company's day to day use of the software. Features are announced and released for public use four times per year; spring, summer, autumn, and winter. All enhancements must follow our Product Management's software development lifecycle process for evaluation, requirement definition, user documentation, development review and release scheduling.


The Technology, a web-based application delivered through a software-as-a-service (SaaS) model, will automate the process of procuring, managing and analyzing the entire flexible workforce (all non-employee personnel). Technology will assist Companygain control and visibility by funneling the procurement, management, and payment of Companyflexible labor across all categories and geographies into one system;

- Contingent workers used to augment full-time staff
- 1099 workers
- Project-based workers fulfilling a statement of work
- Outsourced service workers fulfilling short and long-term service agreements


Contractor will provide Company a hosted UAT site post go-live for accepting future Technology changes.

# Remainder of SOW #1 REDACTED

© 2008 Beeline, Inc. Confidential and Proprietary



Exhibit 1:Implementation Project Tasks Matrix
Exhibit 2:Service Levels

REDACTED

# Remainder of Exhibit 1 REDACTED



Exhibit 2

# REDACTED

© 2008 Beeline, Inc. Confidential and Proprietary

# Remainder of Exhibit 2 REDACTED

© 2008 Beeline, Inc. Confidential and Proprietary

DocuSign Envelope ID: 2B4696A2-69A5-43B9-9CB1-82F4939FEB65

**AMENDMENT 001 TO THE**
**MASTER HOSTER SOFTWARE AND SERVICES AGREEMENT**

**THIS AMENDMENT 001**("Amendment"),effective as of January 15, 2016("Amendment Effective Date"),amends the Beeline Access and Services Agreement ("Agreement"), dated as of January 15, 2013, between Beeline.com, Inc., a Florida corporation located at 12724 Gran Bay Parkway West, Jacksonville, Florida 32258 ("Beeline"), and Sears Holdings Management Corporation, a Delaware corporation ("Company").  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

**WHEREAS**, the parties have agreed to extend the term of the Agreement for an additional 3 year period.

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agreeas follows, all as of the Amendment Effective Date:

1.  Section 1 TERM of the Agreement shall be deleted and replaced by the following:

    **TERM**.
    A new term will become effective on the Amendment Effective Date and will continue for a period of three year(s) ("Term"), unless earlier terminated as provided for herein. UPON WRITTEN NOTICE, COMPANY MAY UNILATERALLY ELECT TO EXTEND THE TERM ON A MONTH TO MONTH BASIS FOR A PERIOD NOT TO EXCEED 12 MONTHS FROM THE EXPIRATION DATE PROVIDED SUCH EXTENDED TERM SHALL BE TERMINABLE UPON 30 DAYS PRIOR WRITTEN NOTICE.

**IN WITNESS WHEREOF**, Company and Beeline have caused this Amendment to be signed by their duly authorized representatives.

**SEARS HOLDINGS MANAGEMENT CORPORATION**

By: _David Little_
8E7831E66EE7400
Name: David Little

Title: DVP Procurement

Date: 2/3/2016

**BEELINE.COM, INC.**

By: _Autumn Vaupel (Jan 29, 2016)_

Name: Autumn Vaupel

Title: Chief Operating Officer

Date: Jan 29, 2016

**BEELINE.COM, INC.**

By: _J. Douglas Leeby (Jan 28, 2016)_

Name: J. Douglas Leeby

Title: President

Date: Jan 28, 2016

**AMENDMENT 002 TO SOW #1 OF THE
MASTER HOSTER SOFTWARE AND SERVICES AGREEMENT**

**THIS AMENDMENT 002** ("Amendment"), effective as of June 20th, 2017 ("Amendment Effective Date"), amends SOW #1 with an SOW Effective Date of January 15, 2013 to the Beeline Access and Services Agreement ("Agreement"), dated as of January 15, 2013, between Beeline.com, Inc., a Florida corporation located at 12724 Gran Bay Parkway West, Jacksonville, Florida 32258 ("Beeline"), and Sears Holdings Management Corporation, a Delaware corporation ("Company"). Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

**WHEREAS**, the parties have agreed to add certain additional VMS functionality, Resource Tracking, and pricing for that functionality which may be introduced if an additional SOW is executed between the parties; and,

**WHEREAS**, Company has requested Beeline to pay Staffing vendors amounts due on a schedule agreed to between the parties; and,

**WHEREAS,** the parties have agreed to update certain terms in VMS SOW #1.

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows, all as of the Amendment Effective

1.  The section titled "**Outsourced Worker Services**" in section 1 of the VMS SOW #1 dated January 15, 2013, is deleted and replaced with the following new section:

    "**Resource Tracking**" is a simple alternative to full sourcing automation to enable compliance, full headcount visibility, and visibility to Supplier engagement across the Company.

    i.      **Resource Management.** The VMS provides a Centralized repository to capture auditable information on all non-employee workers not otherwise captured in a Beeline solution and who have access to the organization's physical and intellectual assets. Company defines the business rules that control the flow of workers through the engagement creation and expiration process. The following capabilities comprise Resource Tracking, but do not represent an exhaustive feature set: resource headcount, bulk upload to resource pool, amendments and extensions.

    ii.     **Onboarding.** Automation of onboarding activities such as background checks, asset management, and access management supports compliance with Company organizational policies. The following capabilities comprise onboarding, but do not represent an exhaustive feature set: Third-party background and drug testing checks and integrations, HRIS system integration, Onboarding notifications and alerts.

    iii.    **Offboarding.** Automation of offboarding activities such as notifications for system access termination, badge suspension, and asset management enforces compliance with Company organizational policies. The following capabilities comprise offboarding, but do not represent an exhaustive feature set: HRIS system integration (e.g., initiate deactivation of building access), notifications and alerts.

    iv.     **Compliance.** Automation of the process for compliance processes. The following capabilities comprise compliance, but do not represent an exhaustive feature set: background and drug testing requirements and tracking, certifications, tenure requirements and tracking, notification, credentialing and alerts.

**v.**    **Recertification.** Automation of the process for verifying all non-employee workers are still engaged with the Company through the Supplier on file. Supplier receives request to validate non-employee workers are still active and must respond with Company defined time periods. The following capabilities comprise recertification, but do not represent an exhaustive feature set: Supplier request for validation, recertification workflow.

**vi.**    **Resource Tracking Plus.** "Resource Tracking Plus" includes all of the features of Resource Tracking along with; (i) access to the time system for non-billable time entry; (ii) recording of specific Bill rates; (iii) job descriptions on the assignment record, and (iv) additional financial reporting based on approved timesheets.

2.    A new section titled "Supplier Settlement" is appended to section 1 of the VMS SOW #1 dated January 15, 2013:

**Supplier Settlement Services.** Company and Beeline may agree to have Beeline be responsible for paying staffing Suppliers amounts due according to invoices created by Beeline on behalf of Suppliers ("Supplier Settlement Services"). Unless otherwise agreed to, Supplier Settlement Services may include the following standard conditions:

I)    Payments to Beeline for consolidated invoices, issued by Beeline on behalf of Suppliers, must be made in full, and with sufficient remittance information.

II)    Each Supplier must be properly vetted and provide to Beeline proper credentials and information that may be required to complete payment.

III)    Providing that the above two points are met, Beeline shall make Payment to Suppliers within seven (7) business days of receipt of funds from Company.

IV)    In all cases prior to engaging Supplier Settlement Services Company and Beeline shall agree in detail on the conditions and processes to be employed to ensure a consistent and timely payment is made to Suppliers.  Fees shall be as stated in section 5 herein.

V)    Company shall ensure all Suppliers are properly vetted and accept Beeline's access terms prior to entering the Beeline VMS.

3.    The sentence of immediately under the table in section 5, "**Charges and Expenses**" of the VMS SOW #1 dated January 15, 2013 is deleted and replaced with the following:

Contractor's annual Contingent and SOW Fee and Resource Tracking Fee together shall in no event exceed $REDACTED, excluding the Beeline fee for Supplier Settlement.

4.    The section titled "*Outsourced Workers Fee*" in section 5, "Charges and Expenses" of the VMS SOW #1 dated January 15, 2013 is deleted and replaced with the following:

*Resource Tracking Fee.*  The monthly fee for Resource Tracking shall be based upon the number of active Assignments present in the VMS on the last calendar day of each month.  The total monthly Services Fee shall be the sum of the monthly Services Fee and the additional Services Fee as shown in the table below:

| Monthly count of Active Assignments | RT Monthly Fee (USD) |
|---|---|
| 0-500 | $REDACTED |
| 501-1000 | $REDACTED |
| 1001-1500 | $REDACTED |

| 1501-2000 | $REDACTED |
| 2001-3000 | $REDACTED |
| 3001-5000 | $REDACTED |
| 5000+ | TBD |

The monthly Services Fee for Resource Tracking shall be invoiced monthly and for avoidance of doubt shall be calculated as described in the following example.

If the number of active assignments in the VMS is 1,200 at the end of the calendar month, then the monthly Services Fee for Resource Tracking shall be $REDACTED for that month.

5. The first table in section 5, "Charges and Expense" is deleted and replaced with the following revised table and a new paragraph describing the Supplier Settlement fees is added beneath the table.

| Annual Spend (excluding light industrial and payroll spend) | Beeline Fees | | VMO Fee | Supplier Program Fee |
| --- | --- | --- | --- | --- |
| | Contingent Fee | Supplier Settlement Fee | | |
| 0 - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED  - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED  - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED  - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED  - $REDACTED | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| $REDACTED  + | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| All annual spend for Light Industrial and payroll services | REDACTED% | REDACTED% | REDACTED% | REDACTED% |
| SOW Pricing | SOW Fee | Supplier Settlement Fee | | |
| 0 - $REDACTED | REDACTED% | TBD | TBD | TBD |
| $REDACTED - $REDACTED | REDACTED% | TBD | TBD | TBD |
| $REDACTED - $REDACTED | REDACTED% | TBD | TBD | TBD |
| $REDACTED - $REDACTED | REDACTED% | TBD | TBD | TBD |
| $REDACTED  - $REDACTED | REDACTED% | TBD | TBD | TBD |
| $REDACTED  - $REDACTED | REDACTED% | TBD | TBD | TBD |
| | | | | |
| Customization Cost | $REDACT / Hour | | | |
| Support Hours in excess of 400 | $REDACT / hour | | | |

**Supplier Settlement.** Company has elected to have Beeline be responsible for Supplier Settlement as described in section 2 on the invoice following the Amendment Effective Date. Any change in this election may only happen once in a calendar year with at least 90 days prior written notice In all cases Beeline shall configure the Beeline VMS to record a percentage amount to be deducted from Supplier amounts due for participation in the Company program ("Supplier Program Fee"). For avoidance of doubt the Program Fee shall always be at least equal to or greater than the sum of the Beeline Contingent Fee and Supplier Settlement Fee. The difference between the Program Fee and Fees due Beeline is the vendor management fee ("VMO Fee"). Company shall include the full Program Fee in funds transferred to Beeline, Beeline shall retain its fee and rebate to Company monthly the VMO Fee. Company may elect to retain the VMO portion and include only the Beeline Fee amounts in funds transferred to Beeline. In all cases if Beeline is not providing Supplier Settlement Customer shall only pay Beeline its fees due.

6.  The section titled "**Implementation Fee-Outsourced Services**" in item (b) of section 5, "Charges and Expenses" of the VMS SOW #1 dated January 15, 2013 is deleted and replaced with the following:

    **Implementation Fee for Resource Tracking.** Beeline will charge Company an implementation fee of $<sup>REDACTED</sup> USD for each country where Resource Tracking is implemented. Should Sears choose to implement Resource Tracking Plus, Beeline will charge Sears an implementation fee of $<sup>REDACTED</sup> USD. In all cases the implementation of Resource Tracking shall require a separate SOW to detail exact requirements and costs.

7.  The section titled "**Payment Schedule**" in item (f) of section 5, "Charges and Expenses" of the VMS SOW #1 dated January 15, 2013 is deleted and replaced with the following:

    *Supplier Invoices*. On a weekly basis, Beeline will transmit to Company an electronic invoice (unless otherwise agreed by the parties) with each Supplier's charges to Company, calculated by the number of hours entered by the Temporary Workers for the prior weekly billing period that are approved by Company times the agreed upon bill rate that is captured in the VMS. Company shall require Suppliers to submit Company-approved expenses to Beeline, for billing through the VMS. Beeline will include all such approved expenses in its weekly invoices to Company. The approved expenses will not be subject to a Beeline, VMO or Supplier Program Fee.

    *VMO Fee*. Beeline shall produce reports weekly that verify the VMO Fee for each invoice period. (ii) If the VMO Fee amounts were transferred to Beeline, then Beeline shall pay the VMO Fee to Sears Holdings Corporation on a monthly basis no later than the 20th of the subsequent month. The VMO remittance will be sent via priority delivery to the address below;

    IT Procurement Director
    3333 Beverly Road
    A2-169A
    Hoffman Estates, IL 60179

    *Submission.* Unless otherwise agreed to between the parties invoices shall be sent electronically to Sears from Beeline on a weekly basis.

    *Payment.* Sears shall pay Beeline amounts due Suppliers, inclusive of the Program Fee, within sixty (60) of receipt of the statement date on Beeline's invoice to Sears. Providing that such amounts are received and can be reconciled, Beeline shall pay Suppliers amounts due, less the Program Fee, within seven (7) business days of receipt of funds. Beeline shall pay Sears the VMO Fee as described above. In all cases Beeline shall retain its Beeline Fee for Services and Supplier Settlement Fee if applicable.

8.  Section 6 titled "**Personnel**" of the VMS SOW #1 dated January 15, 2013 is deleted and replaced with the following:

**6.  SUPPORT**

Beeline shall provide the following support to Company:

a) **Help Desk Support:** Beeline "Help Desk Support" is available 24 hours per day 7 days a week in English during the complete year.  Company is responsible for reporting any system issues or usability related questions related to VMS Solutions ("Problem Report") that have been implemented through the published Beeline Help Desk Support number or email.  Beeline will be responsible for assessing, prioritizing and resolving in accordance with the SERVICE LEVEL STANDARDS outlined herein.  Reported issues are classified as, (i) a Problem Report, or (ii) a Service Request or, (iii) a Project Request, or (iv) a Development Request.  Reported issues that are determined to be caused solely by Company program management or program policy will be referred back to the Company Program Office for resolution.  For avoidance of doubt time spent on Problem Reports does not count against the annual allotment of hours for Service Requests.

b) **Company Relationship Manager:**  The Beeline Company relationship manger ("CRM") serves as an additional layer of strategic support and program expertise.  The assigned individual will be a senior level resource with extensive experience and knowledge around the evolving VMS industry and day-to-day management of programs.  Beeline will assign and introduce the CRM during the implementation of the Company Program. Responsibilities of the CRM shall include but are not limited to:

   I)      Management of the overall Company relationship for Beeline.
   II)     Serves as the primary contact for the Company executive sponsor.
   III)    Provides a designated point of contact for escalation and Company representation.
   IV)     Endorses and champions Beeline solution.
   V)      Ensures rollout and adoption are successful.
   VI)     Partners with Company to develop a collaborative strategic roadmap.
   VII)    Accountable for the management and execution of all relationship and management meetings including operations reviews, quarterly business reviews, and bi-annual executive meetings.
   VIII)   Scheduling and attending, on Company site, a regular operational status review meeting on a schedule agreed to with Company.
   IX)     Offers guidance and advice on program management and new feature adoption.
   X)      Conducts quarterly business reviews.

c) **System Evolution Support:** Beeline will provide Company with on-going System Evolution Support and such support shall include access to specific support resources such as a Company Operations Manager ("COM").  COM responsibilities include:

   I)      Accountable for the vision and execution of your operational roadmap to promote program growth and operational efficiencies.
   II)     Proactively assesses, clarifies, and validates Company and MSP or VMO needs on an ongoing basis.
   III)    Works closely with CRM to understand strategic vision for program.
   IV)     Collaborates with other Beeline internal subject matter experts to execute all operational tasks to achieve program objectives

d) **Service Requests.**  "Service Requests" include optimizations or support to existing, implemented, VMS Solutions such as, (i) configuration support, or (ii) reporting support. Configuration support includes changing terminology, adding or removing an approver in a workflow, adding or removing visibility from a predefined role, or, within the current scope of the program introduction of new labor categories, new request types or simple changes to the procurement process.  Reporting support includes providing Company access to common reports which normally meet the expected needs.  Should Company

DocuSign Envelope ID: 5C495B74-8B3A-4A2C-93F9-45E29BAA1268

require a specific custom report layout the Program Office will be responsible for identifying and collecting requirements and using their resources to create the report. If necessary and at the request of Company Beeline will provide additional reporting support to modify an existing report or create a new report where no software development is required.

e) **Project Requests.** A "Project Request" is any Company requested (i) change to an existing integration; (ii) new standard Integration; (iii) introduction of a new VMS Solution; (iv) expansion of current VMS Solutions to new business areas or geographies; or (v) complex Service Request that cannot be accomplished by a COM. A separate SOW is required for each Project Request and shall include associated costs using rates detailed in Exhibit B. For avoidance of doubt hours attributed to a Project Request are accounted for separately in a SOW and not included in the annual hours allotted for Service Requests.

f) **Development**: The VMS Solutions described herein are intended to be implemented in a standard fashion utilizing the VMS technology without customization or change of software code. Any Company or MSP request that requires a change or alteration of software code ("Development Request") including non-standard integrations must be agreed to by the Parties in a separate SOW with additional costs outlined. Beeline reviews each Development Request rigorously and is under no obligation to accept or implement a Company requested Development Request until such request is approved and a SOW executed. Hours attributed to Development Requests are not included in the annual hours allotted for Service Requests.

g) **Annual Hours.** Beeline will provide up to 400 hours each calendar year, or pro-rated portion thereof, in support of Company requested Service Requests which can be executed by a COM and do not require a change or customization to the software code. If the annual number of hours exceeds 400 Beeline shall invoice the excess hours according to the rates specified in section 5.

**6.1. Customizations and Software Application Development:** The VMS Solutions described herein are intended to be deployed in a standard fashion utilizing the VMS technology without customization or change of software code ("Application Development"). Any requested Application Development change including new or changed integrations must be agreed to by the Parties in a separate SOW and as such is subject to Beeline approval and additional costs as outlined in the SOW.

9. Exhibit 2. "Service levels", of the VMS SOW #1 dated January 15, 2013 is deleted in its entirety and replaced with a revised Exhibit 2 attached as Exhibit 2 to SOW No.1 attached hereto in Schedule 1.

[Signature page follows]

DocuSign Envelope ID: 5C495B74-B93A-4A36-93F9-45E29BAA1268

**IN WITNESS WHEREOF**, Company and Beeline have caused this Amendment to be signed by their duly authorized representatives.

**SEARS HOLDINGS MANAGEMENT CORPORATION**

By: _Robert Walsh_
    F302CF31B830484

Name: Robert Walsh

Title: CPO

Date: 6/19/2017

**BEELINE.COM, INC.**

By: _Autumn Vaupel_
    A2E52B800CA441E...

Name: Autumn Vaupel

Title: Chief Operating Officer

Date: 6/18/2017

[Schedule 1 follows]

DocuSign Envelope ID: 5C485B74-BB3A-4A36-93F9-45E29BAA1868

**SCHEDULE 1 to Amendment 002**
EXHIBIT 2
Service Levels

**Service Levels:**
The Applications and support services shall comply with the following service levels throughout the term of this Agreement:

## 1.    TECHNOLOGY PERFORMANCE/SERVICE LEVELS

On a quarterly basis, Beeline shall provide Company with a report (content to be agreed to by both parties) that details Beeline's VMS performance during the preceding quarter with respect to each measure set forth in the service levels set forth below.

### 1.1.    APPLICATION SERVICE LEVEL AGREEMENT MEASURES

On a quarterly basis, Beeline shall provide Company with a report (content to be agreed to by both parties) that details Beeline's VMS performance during the preceding quarter with respect to each measure set forth in the service levels set forth below.

**APPLICATION SERVICE LEVEL AGREEMENT MEASURES**

Each Application Service Level measurement shall be calculated on a complete calendar month basis. The maximum credit due to Company in any month shall not exceed 10% of the Beeline Monthly Fee.  Any Company claim for a remedy must be made within thirty (30) days of receipt of the report which includes the month for which a claim is being requested.

| Application SLA Number 1 – System Availability | |
|---|---|
| **Description** | **Detail** |
| Service Level Standard and Description | System Availability is the degree to which Beeline's application is generally available to support the core activities of procurement, approval, record keeping and time entry.  System Availability is defined as Beeline's application accepting and responding to page requests from the internet.<br>Beeline scheduled recurring maintenance windows are from:<br>• Monday at 10:00 p.m. Eastern Time to Tuesday at 12:00 a.m. Eastern Time.<br>• Wednesday at 10:00 p.m. Eastern Time to Thursday at 12:00 a.m. Eastern Time.<br>• Beeline reserves the right to schedule periodic maintenance windows from:<br>• Friday at 10:00 p.m. Eastern Time to Sunday at 5:00 a.m. Eastern Time.<br>Beeline will provide Company with no less than 5 business days advance notice of periodic maintenance windows.<br>Beeline's application may not be available during scheduled recurring and periodic maintenance windows, therefore, such time periods are not considered part of System Availability for purposes of SLA measurement. |

| Application SLA Number 1 – System Availability | |
| --- | --- |
| **Description** | **Detail** |
| Service Level Measurement | The measurement of System Availability will be a unit of time during which Beeline's application can be accessed during the calendar month beginning on the first calendar day of the month and ending on the last calendar day of the month. System Availability shall not include periodic or recurring maintenance periods or System being unavailable due to events outside of Beeline's control (i.e. transmission, internet and Company operating environment issues) or any extraordinary events (i.e. virus or systems attack despite diligent security measures in place by Beeline). Beeline's application will have a System Availability of REDACTED% in each calendar month. |
| Service Level Remedy | In the event System Availability in each calendar month is less than:<br>a) REDACTED% -- Company shall receive a credit equal to REDACTED percent (RED%) of the Beeline Monthly Fee.<br>b) REDACTED% -- Company shall receive a credit equal to REDACT percent (RED%) of the Beeline Monthly Fee. |

| Application SLA Number 2 – System Response Time (ASP Internal Page Loading) | |
| --- | --- |
| **Description** | **Detail** |
| Service Level Standard and Description | The internal page load time for RED% of web page requests processed during a month excluding, reporting, analytics, Company defined query customizations, internal issue tracking requests, and exclusive of the maintenance windows detailed in SLA Number 1, ("Qualified Web Pages") will be processed in two (2) seconds or less.<br><br>Note:  Although not covered in this SLA should it be perceived that the end-to-end response time from Company workstation to Beeline and back exceeds an average of 8 seconds, both parties will work to isolate the performance issue through normal problem resolution efforts. |
| Service Level Measurement | The time to load a Qualified Web Page is measured by internal page load time which is defined as the elapsed time from when a valid page request is received at Beeline's web server until the page is loaded and available for transmission. |
| Service Level Remedy | If during the month less than RED% of Qualified Web pages are processed in 2 seconds or less, Company shall receive a percentage of the monthly Beeline Fee ("Service Credit") as follows:<br><br>| Percentage Processed | Service Credit |<br>| --- | --- |<br>| REDAC REDA% | RED% |<br>| REDAC% | RED% | |

DocuSign Envelope ID: 5C435B74-B93A-4A36-93F9-45E29BAA1868

| Application SLA Number 3 – Help Desk Support | |
|---|---|
| **Description** | **Detail** |
| Service Level Standard and Description | Beeline will maintain a help desk system with personnel available 24 hours a day, 7 days per week.  Company or Company's Program Office is responsible for reporting any system issues or usability related questions related to the technology through the published Beeline Help Desk number or email.  Beeline will be responsible for assessing, prioritizing and using commercially reasonable best efforts to resolve in accordance with the Severity Levels and Resolution targets below. |
| Service Level Measurement | Each properly reported incident will be logged into the Beeline Service Desk system for tracking and resolution.  At Company's request Beeline will provide Company with a report of activity which will provide monthly statistics. |

| Application SLA Number 4 – Integration Exception Report | |
|---|---|
| **Description** | **Detail** |
| Service Level Standard and Description | For each daily or less frequent Integration file received in the agreed-to format Beeline will send Company's Integration team an Exception Report which will be sent within 3 hours of the file being received and processed by Beeline. |
| Service Level Measurement | Exception report must be complete and on-time.  Company to identify late or missing items and log a service ticket. |
| Application SLA Number 5 – Technology Invoice Process | |
| **Description** | **Detail** |
| Service Level Standard and Description | Beeline will resolve issues related to the Technology Invoice Process by the end of the next business day for each Invoice run according to the schedule agreed to with Company excluding failures related to Company or User data. |
| Service Level Measurement | During the calendar year, the count of Technology Invoice Process failures related to the Technology that are not resolved before the end of the next business day ("Extended Failures"). |
| Service Level Remedy | Beeline and Company shall review the Extended Failures and agree on performance improvements. |

DocuSign Envelope ID: 5C435B74-8B3A-4A36-93F9-45E29BAA1B68

**SEVERITY LEVEL RESPONSE TIMES**

**Company shall reasonably cooperate and make information, systems and personnel available to assist Beeline in problem identification and resolution. Beeline shall use commercially reasonable best efforts to comply with the specific Target Resolution time.

| SEVERITY LEVEL RESPONSE TIMES | | | | |
|---|---|---|---|---|
| **SEVERITY LEVEL** | **TICKET ESCALATION AND NOTIFICATIONS** | **TARGET RESOLUTION**** | **INITIAL RESPONSE TARGET** | **Status Updates** |
| 1 | A service ticket is immediately escalated to a Tier Two Senior Product Support Specialist. A development ticket is entered and immediately escalated to the Operations Team. The Operations Team confirms the reported outage and immediately notifies all members of the Beeline Management Team, Company-site Beeline team members and appropriate network services and/or development team members. The development ticket is assigned to the appropriate team member(s) for resolution. All members of the Beeline Management Team can track its progress. | 5 hours | 30 minutes | Every 60 minutes |
| 2 | A service ticket is immediately escalated to a Tier Two Senior Product Support Specialist, who replicates and confirms the reported item and immediately opens and escalates a development ticket. The Operations Team confirms the reported critical item and immediately notifies all members of the Beeline Management Team, Company-site Beeline team members and appropriate network services and/or development team members. The development ticket is assigned to the appropriate team member(s) for resolution. All members of the Beeline Management Team can track its progress. | 3 Business Days | 1 hour | 1 update every business day |

DocuSign Envelope ID: 5C435B74-BP3A-4A3C-93F9-45E29BAA1268

| SEVERITY LEVEL RESPONSE TIMES | | | | |
|---|---|---|---|---|
| SEVERITY LEVEL | TICKET ESCALATION AND NOTIFICATIONS | TARGET RESOLUTION** | INITIAL RESPONSE TARGET | Status Updates |
| 3 | A service ticket is immediately escalated to a Tier Two Senior Product Support Specialist, who replicates and confirms the reported item and immediately opens and escalates a development ticket. The Operations team confirms the reported item and assigns the development ticket to the appropriate team member(s) for resolution.  The recipient of the development ticket receives a notification.  Company Services Management monitors progress and resolution time of all level 3 items. *Level 3 items that require a code change will adhere to Beeline's standard "hot fix" release cycle. "Hot fix" releases are done every Monday and Wednesday evening. The time spent awaiting Company testing for any code change that requires Company UAT testing prior to production deployment shall not count toward the target resolution time. | 7 Business Days* | 2 hours | Current updates made available to Company through access granted to Beeline's ticket tracker technology (JIRA). |
| 4 | A service ticket is escalated to a Tier Two Senior Product Support Specialist, who replicates and confirms the reported item and opens and escalates a development ticket. The Operations team confirms the reported high item and assigns the development ticket to the appropriate team member.  The recipient of the development ticket receives a notification.  Company Services Management monitors progress and resolution time of all high items. *High items that require a code change will adhere to Beeline's standard release cycle. | 25 Business Days | 1 Business Day | Current updates made available to Company through access granted to Beeline's ticket tracker technology (JIRA). |

| SEVERITY LEVEL RESPONSE TIMES | | | | |
|---|---|---|---|---|
| **SEVERITY LEVEL** | **TICKET ESCALATION AND NOTIFICATIONS** | **TARGET RESOLUTION\*\*** | **INITIAL RESPONSE TARGET** | **Status Updates** |
| 5 | No escalation occurs for non-severe items.  No notifications occur for non-severe issues. | During initial communication | | Current updates made available to Company through access granted to Beeline's ticket tracker technology (JIRA). |

**Severity Level 1** – a Beeline production system is offline and/or does not function at all, and there is no circumvention for the problem.  A significant number of users are affected, and the production business system is inoperable.

**Severity Level 2** – multiple users cannot perform essential Beeline functions and there is no acceptable alternative solution.  Level 2 issues are normally represented by a system error preventing the function from being processed or completed.  Configuration related errors or requested changes are not considered critical.

**Severity Level 3** – an essential Beeline function cannot be performed, however the issue is isolated to either a single user or a single data element and/or there is an acceptable alternative solution.  Note for Data Imports: All data imports into a Company production environment are considered a Level 3 and can only be done by a Tier Two Product Support Specialist.  Once the Support Specialist receives a correctly completed data import template form from the requestor a ticket is created.  If the import fails for any reason the Support Specialist will immediately return the rejected line items to the requestor with the rejection reason.  The requestor must make any required data corrections and return the import.  Target resolution starts upon receipt of data in a correct data format.  If the file is returned due to data rejection the target resolution time resets.

**Severity Level 4** – the reported issue is not critical to the day-to-day operations of any single user, and there is an acceptable alternative solution.  Severity Level 4 items are typically resolved through Beeline's Business Case Solution process or custom development process, as appropriate.

**Severity Level 5** – The Product Support team creates and closes the ticket when the issue is fully resolved during the initial call and/or email communication.  No escalation is required.  Note for Configuration Changes & Enhancements:  Configuration changes and product enhancements are considered non-severe items.  If any request for a configuration change and/or enhancement should come through Product Support it will be classified as a Level 5 ticket and referred to Company's Account Manager.

[End of Schedule]



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 5C165D74B93A4A2692F945E29BAA1666 | | Status: Completed |
| Subject: Beeline - SHCLCW5710 - Amendment 02 to SOW 01 | | |
| Source Envelope: | | |
| Document Pages: 13 | Signatures: 2 | Envelope Originator: |
| Supplemental Document Pages: 0 | Initials: 0 | Sears - Contract Management - P |
| Certificate Pages: 2 | | |
| AutoNav: Enabled | Payments: 0 | 3333 Beverly Rd. |
| EnvelopeId Stamping: Enabled | | Hoffman Estates, IL  60179 |
| Time Zone: (UTC-06:00) Central Time (US & Canada) | | pREDACTED                        .com |
| | | IP Address: REDACTED |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Sears - Contract Management - P | Location: DocuSign |
|     6/16/2017 1:35:17 PM |     pREDACTED                  .com | |

## Signer Events | Signature | Timestamp

| Signer Events | Signature | Timestamp |
|---|---|---|
| Autumn Vaupel<br>aREDACTED                .com<br>Chief Operating Officer<br>Chief Operating Officer<br>Security Level: Email, Account Authentication (None) | *Autumn Vaupel*<br>A2E52B800CA441E...<br>Using IP Address: REDACTED<br>Signed using mobile | Sent: 6/18/2017 6:07:05 PM<br>Viewed: 6/18/2017 8:52:19 PM<br>Signed: 6/18/2017 8:52:41 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| Sears - Contract Management - P<br>pREDACTED                  .com<br>Contract Management Team<br>Sears Holdings Corporation<br>Security Level: Email, Account Authentication (None) | **Completed**<br><br>Using IP Address: REDACTED | Sent: 6/18/2017 8:52:42 PM<br>Viewed: 6/19/2017 2:00:50 PM<br>Signed: 6/19/2017 2:01:04 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| Robert Walsh<br>RREDACTED            .com<br>CPO<br>Security Level: Email, Account Authentication (None) | *Robert Walsh*<br>F302CF31B830484...<br>Using IP Address: REDACTED | Sent: 6/19/2017 2:01:06 PM<br>Viewed: 6/19/2017 2:03:24 PM<br>Signed: 6/19/2017 2:08:28 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| john Maur<br>jREDACTED          .com<br>Security Level: Email, Account Authentication (None)<br><br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 6/18/2017 6:07:05 PM<br>Viewed: 6/19/2017 2:16:28 PM |
| Tina Roesslein<br>TREDACTED          .com<br>Security Level: Email, Account Authentication (None)<br><br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 6/18/2017 8:52:42 PM<br>Viewed: 6/19/2017 12:05:48 PM |
| Tina Roesslein<br>TREDACTED          .com<br>Security Level: Email, Account Authentication (None)<br><br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 6/19/2017 2:01:06 PM |
| Procurement Savings Team<br>REDACTED          .com<br>Security Level: Email, Account Authentication (None)<br><br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 6/19/2017 2:08:29 PM |
| SHC Contract Management<br>sREDACTED          .com<br>Security Level: Email, Account Authentication (None)<br><br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 6/19/2017 2:08:29 PM |
| Tina Roesslein<br>TREDACTED          .com<br>Security Level: Email, Account Authentication (None)<br><br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 6/19/2017 2:08:30 PM |

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/19/2017 2:08:30 PM |
| Certified Delivered | Security Checked | 6/19/2017 2:08:30 PM |
| Signing Complete | Security Checked | 6/19/2017 2:08:30 PM |
| Completed | Security Checked | 6/19/2017 2:08:30 PM |

| Payment Events | Status | Timestamps |
|---|---|---|