**Hearing Date and Time: April 18, 2019 at 10:00 am (Eastern Time)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
:
In re:                                                                          :          Chapter 11
:
SEARS HOLDINGS CORPORATION, *et al.*,[1]          :
:
:          Case No. 18-23538-rdd
Debtors.          :
:          (Jointly Administered)
:
:          **Re: Docket Nos. 2796, 3079**
-------------------------------------------------------------X

**TRANSFORM HOLDCO LLC'S SUPPLEMENTAL REPLY BRIEF IN RESPONSE TO**
**DEBTORS' MOTION TO (A) ENFORCE ASSET PURCHASE AGREEMENT AND**
**AUTOMATIC STAY AGAINST TRANSFORM HOLDCO LLC AND (B) COMPEL**
**TURNOVER OF ESTATE PROPERTY**

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................ 4

I.    The Reserves Were Not "Credit Card Accounts Receivable" Under The Card Agreements. ................................................................................................................ 4

II.   The Reserves Were Not CCAR Under The Plain Meaning Of That Term. .................... 7

III.  There Is No Conflict Between The Definition Of "Security Deposit" And CCAR. ..... 10

IV.  Debtors Ignore The APA's Structure And Purpose. ...................................................... 11

V.   Debtors Ignore That The Reserves Were Not Due At Closing. ..................................... 13

VI.  Debtors Did Not "Retain" The Reserves Before Closing Under Section 10.9. ............. 14

VII. Transform Has Not Violated The Automatic Stay. ...................................................... 17

CONCLUSION ....................................................................................................................... 18

Transform respectfully submits this *Supplemental Reply Brief in Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property* ("Supp. Reply").[2]  For the reasons stated here and in *Transform Holdco LLC's Initial Supplemental Brief in Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property* [Docket No. 3011] ("Initial Supp. Br."), Transform requests that the Court deny *Debtors' (I) Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property, and (II) Response to Transform Holdco LLC's Motion to Assign Matter to Mediation* [Docket No. 2796] (the "Turnover Motion").

## PRELIMINARY STATEMENT

1.      Debtors' *Supplemental Memorandum of Law in Further Support of Their Motion to Enforce the Automatic Stay* [Docket No. 3079] ("Debtors' Supp. Response") fails to refute any of the arguments in Transform's Initial Supplemental Brief demonstrating that the amounts held by each of First Data, Amex, and Discover as security in reserve accounts were not, in the hands of Debtors and at the time of Closing, Credit Card Accounts Receivable ("CCAR") that count towards the § 10.9 minimum:

- Under the APA's plain language, the sums held by the credit card companies were not accounts or payment intangibles and were not "resulting from" card sales "in the ordinary course of business."

---

[2]      Capitalized terms used in this Supplemental Reply but not otherwise defined herein shall have the meaning ascribed to them in the Initial Supplemental Brief or in the APA, as applicable.

The APA refers to the Asset Purchase Agreement filed as Ex. B to the *Order (I) Approving the Asset Purchase Agreement among Sellers and Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection therewith and (IV) Granting Related Relief* [Docket No. 2507], as amended by the Amendment No. 1 to Asset Purchase Agreement filed as Ex. E to the *Notice of Filing Executed (I) Employee Lease Agreement, (II) Services Agreement, and (III) Amendment No.1 to the Asset Purchase Agreement* [Docket No. 2599].

1

- To the contrary, both by their description in the agreements that were the object of the APA and by their characteristics, the monies held by the credit card companies fall within the definition of a number of terms within the umbrella "Security Deposit," including security deposit, collateral, prepaid item, credit, and other security. They provided security, or protection, against the risk of default and constituted a prepayment or credit against Debtors' future liabilities under those agreements.

- Even if the reserves were CCAR, they would not count against the § 10.9 minimum because they were not "due." At Closing, Debtors did not have a right to be paid the amounts reserved (and might never have had a right to receive any of them).

- The purpose and structure of the APA are consistent with Transform's understanding. By making the delivery of a specified amount of CCAR, pharmacy receivables, and inventory a condition to Transform's obligation to close, the Parties intended that Transform have the assets necessary to obtain an ABL facility.

- Debtors did nothing to "retain" the oldest of the CCAR before Closing and after Closing, Transform has assumed the contingent claim to the reserves "*cum onere*" as it has assumed all of the other benefits and burdens of the card agreements.

2.    Instead, Debtors engage in non-sequiturs. They admit that the language the APA uses to define the credit card receivables that are part of § 10.9 is identical to the language the card agreements use to define those assets, but argue that the language in CCAR is self-defining and that the court need not look at the language of the card agreements. Debtors' Supp. Response ¶¶ 21-22. The Court correctly rejected that position at argument on March 21, 2019, concluding that it was necessary to look at the card agreements that are the object of the relevant provisions of the APA. See Hr'g Tr. (Mar. 21, 2019), at 26:17-28:23. Debtors' position is no more persuasive now:

- Debtors suggest that the Court should ignore the card agreements and that the treatment of the reserves as security in the card agreements "has nothing to do with" the treatment of the reserves under the APA. Debtors' Supp. Response ¶ 3. But the card agreements are the object of the relevant provisions of the APA, are integrated in it, and form the backdrop against which it was drafted. As the Court recognized, it is impossible to determine whether an obligation under a credit card agreement is a CCAR or a Security Deposit without examining the agreement that creates that obligation.

2

- Debtors argue that the reserves are CCAR because prior to Closing, Sears paid them with "funds generated from customers that used credit cards to purchase goods or services from Sears." Debtors' Supp. Response ¶ 2. But that is not the language used in the APA, which looks to the character of the obligation (including whether it is an "Account or Payment Intangible") and the source of that obligation and not the source of the funds Sears used to satisfy it.

- Debtors argue that reserves constitute obligations that the card companies "owed" Debtors at the time of Closing. Debtors' Supp. Response ¶ 2. But § 10.9 applies not to all accounts and payment intangibles but to particular types of accounts and payment intangibles—viz., those that result from card transactions, in the ordinary course. And the card agreements themselves demonstrate, whatever obligation the card companies might potentially have in the future to release the reserves, that obligation will be based on Transform having satisfied the conditions for release of a reserve and not on Debtors' having generated card transactions pre-sale.

- Debtors claim that there was no financing condition in the APA. Debtors' Supp. Response ¶ 46. But that argument cuts against them. They do not offer any reason why the Parties would have made the delivery of $1,657 million in Inventory, Pharmacy Receivables, and Credit Card Accounts Receivable a condition to Transform's obligation to close unless the Parties intended for those assets to serve as collateral for Transform's financing. Nor do they explain how—if the provision was intended to provide collateral—the Parties could have intended that half of the collateral represented by CCAR (which Debtors do not dispute was more valuable collateral) could have been made up of reserves that were someone else's collateral and could not be used by Transform as collateral against which the asset-backed lenders would advance funds.

- Debtors acknowledge that § 10.9 contains two requirements before any funds owed by card companies may be used to satisfy the § 10.9 minimum: (1) they must be CCAR (including that they are "owed" resulting from card transactions) and (2) they must be "due." Debtors' Supp. Response ¶ 15. But Debtors then read that second requirement out of the APA in violation of the cardinal principle of contract interpretation that when parties use a word in an agreement they do so with a purpose and all words in a contract must be given meaning to avoid surplusage.

- Debtors also do not dispute that under the card agreements, all they had was a contingent claim to any sums remaining in the reserves after the conditions for release of the reserves had been satisfied and after deducting any amounts due the card companies. They do not show that at Closing that value was greater than zero—and it was probably a negative.

- Debtors also do not identify any acts that they took pre-Closing to "retain" the reserves as required under § 10.9 and do not dispute that Transform now has assumed the card agreements entitling it, under the Code, to all of the benefits and burdens of those agreements including the reserves.

- Finally, Debtors do not dispute that Transform does not now have the assets to which, under their reading of the APA, they are entitled: the oldest of the reserves.

## **ARGUMENT**

I.    **The Reserves Were Not "Credit Card Accounts Receivable" Under The Card Agreements.**

3.    The card agreements themselves, in language virtually identical to that used in the APA, define what constitutes credit card accounts receivable and what constitutes security and make clear that the reserves the card companies held were not, at Closing, CCAR.



4.    Thus, under the card agreements, the Reserve Account amounts are not "payable" from sales in the "ordinary course."  Only the sum of money remaining after the Reserves, fees, charges and other items were deducted from the gross Sales Data was owed to Sears and was payable.  See Initial Supp. Br. ¶¶ 38-39.

5.

████████ That is the very definition of security.  See Security, Oxford English Dictionary (3d

ed. 2011) (describing "security" as being "liable to forfeit in the event of a default").  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████

6.    ███████████████████████████████    ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████

7.    ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

8.    Debtors admit that "the Reserve Accounts are described or treated as 'security' under

the Processing Agreements," and do not dispute that the card agreements do not treat them as credit

card accounts receivable.  See Debtors' Supp. Response ¶ 15.  But Debtors offer no basis why the

Court should not treat them similarly and follow the card agreement language when deciding whether they are CCAR or something else under the APA.

9. 

Those citations are telling, but not for a reason that helps Debtors.

See *Declaration of Terrence E. Rolecek in Support of Transform Holdco LLC's Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property and Reply in Further Support of Its Motion to Assign Matter to Mediation* [Docket No. 2796] ("Rolecek Decl."), Ex. B (                              ), Ex. D (                    ), Ex. I (                         ).

███████████—is yet further demonstration that the reserves were not CCAR but were security under the plain meaning of the APA.

10.    Debtors also suggest that the card agreements are parol evidence and of limited weight.  See Debtors' Supp. Response ¶ 10.  Not so.  The obligations and rights under the card agreements were incorporated into an assignment to Transform pursuant to the APA and thus those rights are an integrated element of the agreement between Debtors and Transform defining the terms and conditions of their relationship.  See APA §§ 1.1, 13.4.  They are not parol evidence. More important, the card agreements are the very object of the provisions defining CCAR and security and the backdrop against which those provisions were drafted.  And the law is clear that terms in the same and related agreements should be given the same meaning.  See Taracorp, Inc. v. NL Indus., Inc., 73 F.3d 738, 744–45 (7th Cir. 1996) ("[T]he meaning of separate contract provisions should be considered in light of one another and the context of the entire agreement."); Int'l Fid. Ins. Co. v. Cty. of Rockland, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000); see also Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 52–53 (2d Cir. 1993); Madeleine, LLC v. Casden, 950 F. Supp.2d 685, 695 (S.D.N.Y. 2013) ("Under New York law, all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.") (alteration in original) (internal quotation marks and citation omitted).

11.    Thus, reading the card agreements against the plain language of the APA, it is clear that the reserves established by each of First Data, Amex, and Discover were not CCAR at the time of Closing.  The Court need go no further.

## II.    The Reserves Were Not CCAR Under The Plain Meaning Of That Term.

12.    Straining to avoid that obvious result, Debtors also distort the plain language of the APA.  They argue that the reserves constitute CCAR under the APA, even if not under the card

7

agreements, because the APA defines CCAR "to include accounts owed by the Credit Card Payment Processors to Sears made up of funds generated from customers that used credit cards to purchase goods or services from Sears."  Debtors' Supp. Response ¶ 2; see also id. ¶¶ 35-36.

13.    There are at least two flaws in that argument.  First, § 10.9 applies only to "accounts" and "payment intangibles," and the reserves are not accounts or payment intangibles.  See First State Bank v. Morristown Lincoln-Mercury, Inc. (In re Morristown Lincoln-Mercury Inc.), 27 B.R. 801, 803 (E.D. Tenn. 1983) (ruling that a reserve account established "to provide security for all obligations of the debtor to [the credit company]" by withholding proceeds that would normally have gone to the debtor, did not fall within state law definitions, mirroring the UCC definitions, of account and general intangible).

14.    Second, assuming the reserves could be considered an account or payment intangible, § 10.9 does not apply to just any reserve or payment intangible, but only those resulting from credit card transactions in the ordinary course.  The language of the APA is that a CCAR is an "Account or Payment Intangible . . . , owed by a credit card payment processor . . . to a Seller *resulting from* charges . . . in connection with the sale of goods by a Seller or services performed by a Seller, in each case in the ordinary course of its business."  APA § 1.1 (emphasis added).  That definition incorporates a causal relationship.  See Resulting, Oxford English Dictionary (3d ed. 2010) ("Arising, produced, or obtained as a result; resultant, consequent."); Result, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/result ("[T]o proceed or arise as a consequence, effect, or conclusion").  It is not sufficient that Sears satisfied its obligation to post a reserve by using funds that otherwise would have been payable to it from card transactions.  The "account" or "payment intangible" (viz., the obligation) must result from the card transactions.  And, here, even if the card companies once had an obligation to pay Sears out of card transactions

8

in the ordinary course, once the reserve amounts were debited from the Sales Data and, with Sears' agreement, held to satisfy Sears' reserve obligations, they ceased to be owed as a result of card transactions in the ordinary course and instead were held as a result of the extraordinary condition of having triggered the reserve requirements.

15.    Indeed, Debtors' argument admits of no limiting principle.  Under their argument, a reserve is a CCAR if it is funded by revenues generated by "'the sale of goods' and 'services performed'" "in each case in the ordinary course of its business."  Debtors' Supp. Response ¶¶ 29, 30.  But Sears operated a retail business; it sold goods and performed services.  See In re UAL Corp., 293 B.R. 183, 189 (Bankr. N.D. Ill. 2003) (stating "nearly all retailers in the present day economy sell their goods and services through credit cards"), aff'd, Nos. 02-B-48191, 03 C 3909, 2003 WL 22955997 (N.D. Ill. Dec. 12, 2003), aff'd sub nom. In re United Airlines, Inc., 368 F.3d 720 (7th Cir. 2004).  By Debtors' measure, under which assets are CCAR if funded by credit card sales, virtually all of Sears' assets would be CCAR because virtually all would have been paid for or funded with "funds generated from customers that used credit cards to purchase goods or services from Sears."  Debtors' Supp. Response ¶ 2.

16.    For that reason also, Debtors' extended discursion into whether the reserves were "owed," id. ¶ 17, is much ado about nothing.  There is no dispute that Debtors had not satisfied the conditions for release of any of the reserves and that they were not due.  Debtors' discussion of the word "withholding" is consistent with that point.  Id. ¶ 21.  They state that "[t]o 'withhold' means to 'keep in one's possession what belongs to . . . another.'"  Id.  If that were so, it would not advance Debtors' argument. ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

That is no different than any security deposit.  If they were already owing from card transactions, they could not simultaneously be security.

17.    At bottom, Debtors' argument reads out of the definition of CCAR both account and payment intangible and what it is that must be "owed"—accounts or payment intangibles resulting from card transactions in the ordinary course.  Even if the reserve obligation could be characterized as an account or payment intangible, it did not result from card transactions in the ordinary course. And even if there was a debt, it was not a CCAR.

### III.    There Is No Conflict Between The Definition Of "Security Deposit" And CCAR.

18.    Debtors argue that because the card companies' obligations with respect to the reserves could be characterized as satisfying any number of the items under § 2.1(o) and Transform cannot "designate a single category or provision it thinks *best* applies to the Reserve Accounts[,]" Debtors' Supp. Response ¶ 39 (emphasis added), they cannot satisfy any item that is a Security Deposit.  But Transform need not identify which provision best describes the reserves.  That they fall within § 2.1(o) demonstrates all the more that they are Security Deposits and not CCAR.

19.    Debtors do not dispute that the Reserves bear all the hallmarks of a "security deposit."  ████████████████████████████████████████████████████

████████████████████████████    see also Initial Supp. Br. ¶¶ 41, 51, 58.  Notably, Debtors retreat from their earlier position that a reserve has to be funded with new cash to be a security deposit. See *Debtors' Reply In Further Support Of The Motion To (A) Enforce Asset Purchase Agreement And Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover Of Estate Property*

10

[Docket No. 2913] ¶¶ 31-33.  Even if the reserves were not "security deposits," they were "other security."  See Initial Supp. Br. ¶ 80.

20.    The reserves also bear all of the hallmarks of either collateral or restricted cash. ████

████████████████████████████████████████████  and, by Debtors' own definition of "withholding," it is clear they are also restricted cash.  Id. ¶¶ 51, 77.

21.    Finally, Debtors offer no response that the reserves functioned as prepaid items or credit, that is, an advance payment on Sears' future obligations.  Id. ¶ 78.

22.    Thus, there is no conflict between the CCAR definition and § 2.1(o) that would give rise to the doctrine of the "specific" over the general," even if (which is not true) § 2.1(o) could be considered more general than CCAR.  DVC Holdings, Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del. 2005).

23.    The job of the court is to construe contract terms "*in pari materia*" and to adopt an interpretation that gives meaning to all of the words in an agreement and render them "compatible, not contradictory."  See Initial Supp. Br. ¶¶ 101-102.  Here, but for Debtors' strained reading of CCAR, that is easily done.  CCAR is limited to payables owed as a result of card transactions in the ordinary course.  And "Security Deposit" applies to funds held against the risk of default or that are designed to be used as a credit against future obligations even if those funds were generated from card transactions in the ordinary course.  To read the APA otherwise would be to ignore the thrice-over use of the word "any" in § 2.1(o) and to import into that provision an exception that the Parties chose to make express elsewhere but decidedly chose not to do in § 2.1(o).  See id. ¶¶ 103-104.

## IV.    Debtors Ignore The APA's Structure And Purpose.

24.    Debtors do not dispute that one "purpose of § 10.9 was to ensure that the Debtors delivered the necessary assets at Closing to satisfy the Buyer's borrowing base requirements to

procure financing." Debtors' Supp. Response ¶ 46. But they do not identify any other purpose. The Parties did not just choose any assets listed in § 2.1 to be a condition to Transform's obligation to close but precisely those assets that had value as part of the borrowing base for both Transform and Debtors. To that end, the categories in § 10.9 carefully tracked those in the borrowing base in the period before signing, which included sums that were payable from the card companies in respect of card transactions in the ordinary course, but not reserves. When Transform and Debtors jointly presented to the banks in the period immediately after signing, they presented the borrowing base that would be delivered to Transform as including sums payable in respect of card transactions in the ordinary course, but not reserves. See Initial Supp. Br. ¶¶ 91-96.

25.    Debtors argue that there was no financing condition to the APA. See Debtors' Supp. Response ¶ 46. But that proves Transform's point. The reason why Transform insisted that Debtors provide, and Debtors agreed to provide, $1.657 billion in inventory, CCAR and pharmacy receivables before Transform would be obligated to close and the reason why Debtors would have to reduce lower value inventory first, and then only the oldest of the CCAR or pharmacy receivables, was precisely because there was no financing condition. Transform needed the assurance that it would have the assets to be able to get financing before Transform would have to close. It is inconceivable and contrary to all of the evidence and the structure and purpose of the APA that, if the Parties intended § 10.9 to guarantee Transform the assets to be able to secure borrowing, they also intended Debtors to satisfy that obligation by supplying $35 million of reserves (funded by credit card transactions), which the card companies would have the right to hold indefinitely to satisfy Sears' obligations and which—even if they could be released at some future time—could be released only in the net amount remaining (if any) after satisfaction of those obligations. Indeed, it was not until long after the signing and shortly before Closing, that Debtors

suddenly changed course and claimed that the reserves—which were never previously considered § 10.9 collateral—would be delivered to satisfy Debtors' closing condition.[4]

26.    There is thus particular irony in Debtors' argument that Transform conceded that Debtors met the § 10.9 condition by agreeing that Debtors could retain $7 million in prepaid inventory rather than retaining the oldest of the CCAR.  It was only because Debtors concealed until the last minute that a portion of the § 10.9 collateral they were delivering were reserves held for security that Debtors were able to make the false claim that they had over-delivered and that, in response to Debtors' threat to reduce inventory by shipping inventory from going-forward stores to GOB stores, Transform agreed to exclude the $7 million in prepaid inventory, not yet delivered to stores, that was rightfully Transform's.  Transform objected as soon as it became aware of Debtors' inclusion of the reserves in the § 10.9 collateral.  See Initial Supp. Br. ¶ 21.  And, at no point then did Debtors claim a right to exclude the reserves.

## V.    Debtors Ignore That The Reserves Were Not Due At Closing.

27.    Debtors' argument also ignores the plain language regarding the assets that count against the § 10.9 minimum: not all CCAR and pharmacy receivables but only "the amounts *due to Seller* with respect to" CCAR.  APA § 10.9 (emphasis added).  Even if the obligations

---

[4]    Prior to Closing, based on their estimates of inventory, CCAR and pharmacy receivables, Debtors threatened to reduce inventory by $7 million by physically shipping inventory, at great expense, from going-forward stores to retained GOB stores.  See *Second Supplemental Declaration of Mohsin Y. Meghji in Support of the Debtors' Motion to Enforce* [Docket No. 3080], Exs. B and C.  Transform did not agree with Debtors' estimates, the characterization of reserves as CCAR or any right to move such inventory (in fact, that same day, Transform expressly informed Debtors that Transform disagreed with the classification of reserves as CCAR, that by proceeding to Closing, Transform was not waiving any rights with respect to the APA, and that it was preserving them), but agreed to credit $7 million of prepaid inventory that had not yet been delivered to stores to the Debtors to forestall Debtors' threats to move the inventory, which would have further reduced the borrowing base available to Transform at Closing.  See *Declaration of Lewis J. Liman in Support of Transform Holdco LLC's Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property and Reply in Further Support of Its Motion to Assign Matter to Mediation* [Docket No. 2865], Ex. A, February 11, 2019 Letter from Cleary Gottlieb to Weil.

represented by the Reserve Accounts could be considered CCAR, they were not "due." <u>See</u> Initial Supp. Br. ¶¶ 69-71.

28.    Debtors' only response is to ignore the canons of contractual interpretation. They argue that "owed," which is the word used in CCAR, and "due" "are synonyms." Debtors' Supp. Response ¶ 17. But the law requires every word in a contract to be given meaning so that surplusage is avoided, and here that is easily accomplished. <u>See</u> <u>Intercept Pharm., Inc. v. Fiorucci</u>, 277 F. Supp. 3d 678, 686 (D. Del. 2017). CCAR within the scope of § 10.9 must not only be owed, but also due. Thus, they cannot be contingent. If they are contingent, they are a "Claim" under § 2.1(p). This is consistent with the purpose of § 10.9—funds that were not due would not have value as collateral. And Debtors themselves concede that any right to the Reserves at Closing was conditional.[5] <u>See, e.g.</u>, Debtors' Supp. Response ¶¶ 8, 22.

## VI.    Debtors Did Not "Retain" The Reserves Before Closing Under Section 10.9.

29.    To the extent that Debtors were entitled to the Reserves as CCAR, that contingent right was extinguished both (and independently) by (1) Debtors' inaction at the Closing and (2) Transform's assumption of the card agreements. It was not until February 22, 2019, long after Closing, and after Transform first raised the issue that Debtors had under-delivered on their § 10.9 obligations, that Debtors for the first time wrote Transform to claim that collateral had been over-delivered and they were entitled to a portion of the reserves. By that time, however, Transform already had the right to assume the credit card agreements and, along with that right, the right to the benefits and burdens of those agreements. <u>See</u> Initial Supp. Br. ¶¶ 109-110.

---

[5]    Debtors' assertion that Transform refused to provide First Data with certain financial information and that Transform as a result somehow engaged in misconduct, <u>see</u> Debtors' Supp. Response ¶ 59, is not only unfounded, but also serves as further proof that the reserves were not due to Debtors at Closing. <u>See</u> *Declaration of Kunal S. Kamlani in support of Transform Holdco LLC's Supplemental Reply Brief in Response to Debtors' Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco LLC and (B) Compel Turnover of Estate Property* ("<u>Kamlani Decl.</u>") ¶¶ 4-6.

30.    Debtors argue that no specific action was required to "retain" Excluded Assets because background bankruptcy law makes an asset that is not an Acquired Asset property of the Estate.  Debtors' Supp. Response ¶ 45.  According to Debtors, they could have waited quietly for months (or longer), and until long after Transform and the card companies had assumed the card agreements, to ask for release of the reserves that the Parties were then relying on.  But Debtors' argument reads out of the APA language the Parties intentionally placed in it.  The Parties used active verbs in § 10.9 to describe the conduct Debtors were required to take before Closing if they wished to exercise their option to make an asset an Excluded Asset: in the case of inventory, by "transferring" inventory, and in the case of receivables by "retaining" the oldest of them.  That language required Debtors to take action.  If Debtors did not take action and did not exercise those rights prior to Closing, then under APA § 2.1(d), the receivables passed to Transform as Acquired Receivables at the time of Closing.  See Intercept Pharm., 277 F. Supp. 3d at 686 ("contractual provisions must be interpreted in a way that give[s] effect to every term of the instrument and reconcile[s] all provisions of the instrument") (alteration in original) (internal quotation marks and citation omitted).

31.    There are Bankruptcy Code and policy reasons why the Parties insisted on that language that provide an independent basis for the Court to reject Debtors' motion.  Once Closing occurred, without Debtors having "retained" the reserves as Excluded Assets, Transform had the right to elect to have Debtors assume the card agreements, and to have those agreements assigned to it.  See APA § 2.7(a).  And, under the Code, Transform had the right (and the card companies the corresponding expectation) that those Agreements would be assumed *cum onere*—with all the benefits and burdens that come with those Agreements.  Among those benefits and burdens indisputably were the reserves and the obligations and rights that came with them.  See City of

15

Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1226-27 (6th Cir. 1995) ("When the debtor assumes the lease or the contract under § 365, it must assume both the benefits and the burdens of the contract. . . .  [T]he Agreement becomes property of the estate in the same shape as it existed prior to bankruptcy, with all of its benefits and burdens.") (quoting In re Village Rathskeller, Inc., 147 B.R. 665, 671 (Bankr. S.D.N.Y. Nov. 20, 1992)) (alteration in original) (internal quotation marks omitted); see also Citibank, N.A. v. Tele/Resources, Inc., 724 F.2d 266, 269 (2d Cir. 1983) ("An assignment does not modify the terms of the underlying contract. . . . Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor.").  It would undermine Section 365 and the reasonable expectations of the Parties now that Transform has assumed the card agreements to deprive Transform after the fact of one of the more important elements of consideration relating to those agreements.

32.    It would also be inconsistent with the Code provisions regarding assignment and adequate assurance.  Had Debtors announced prior to signing that they intended not to honor their obligations under the credit card agreements, and that prior to Closing (and before the agreements were assumed and assigned to Transform) they would strip the card companies of the reserves that were protecting the card companies against the lingering liabilities incurred by Debtors, the card companies plainly would have been entitled to adequate assurance of future performance, including potentially the posting of a new reserve.  15 U.S.C. 365(b)(1); In re UAL Corp., 293 B.R. at 190-91 (holding that card processor was not entitled to further adequate assurance when debtors had not defaulted and card processor continued to hold reserve account established to assure debtors' performance); see also Adrose Assocs. of Allaire, LLC v. Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac. Tea Co., Inc.), 472 B.R. 666, 675 (S.D.N.Y. 2012) (noting that, in the

lease context, courts look to the "presence of guarantee and/or security deposit" to assess adequate

assurance).

33.     But, by their argument, Debtors are seeking to do the same thing after the fact that

they could not do before the fact—to strip the card companies of their right either to performance

(i.e., the continued posting of the reserve) or, in the alternative, to adequate assurance, and to pin

that obligation on Transform.  Nothing in the definition of CCAR contemplates that result.

## VII.   Transform Has Not Violated The Automatic Stay.

34.     Finally,



That argument is both

legally flawed and factually incorrect.  If the processors were holding the reserves because they

were "concerned about the Debtors' financial stability," Debtors' Supp. Response ¶ 59, that further

demonstrates that, prior to Closing, the reserves were not CCAR and were not then owed to

Debtors.

35.     Debtors' argument is also factually flawed and illogical.

Rolecek

Decl. ¶¶ 7, 13, 22.

17

36. 

See Kamlani Decl. ¶¶ 4-6.

37.    Indeed, Debtors have almost admitted as much.

See *Declaration of Abena A.*

*Mainoo in Support of Transform Holdco LLC's Supplemental Reply Brief in Response to Debtors'*

*Motion to (A) Enforce Asset Purchase Agreement and Automatic Stay Against Transform Holdco*

*LLC and (B) Compel Turnover of Estate Property* ("Second Mainoo Decl."), Ex. A, April 6, 2019

email from Lewis Liman.  That Debtors do not respond to that information in their brief is further

telling evidence that even if the reserve obligations were CCAR, and even if they were "due" at

Closing, Transform has not violated the automatic stay.

## **CONCLUSION**

38.    Debtors say that Transform is seeking a windfall.  Debtors' Supp. Response ¶ 48.  To

the contrary, it is Debtors who are trying to do so, and belatedly.   Under the APA, Transform

acquired the card agreements and the credit card reserves that were necessary to process card

transactions.  It also was promised the collateral that would be necessary to fund the asset backed

lending. Debtors failed to perform on the latter obligation and now are seeking to revoke the first promise. See Initial Supp. Br. ¶¶ 10, 98, 109.

39.    For all of the reasons stated in this Reply and Transform's Initial Supplemental Brief, Transform requests that Debtors' Turnover Motion be denied.

Dated: April 11, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/ Abena A. Mainoo
Lewis J. Liman
Sean A. O'Neal
Luke A. Barefoot
Abena A. Mainoo

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Attorneys for Transform Holdco LLC

19