Hearing Date and Time:  April 18, 2019 10:00 AM (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jared R. Friedmann
Sunny Singh
Jessie B. Mishkin

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :
In re                                     :
                                          :     **Chapter 11**
**SEARS HOLDINGS CORPORATION**, *et al.*, :
                                          :     **Case No. 18-23538 (RDD)**
                                          :
            Debtors.[1]                   :     **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

## REPLY IN SUPPORT OF DEBTORS'
## MOTION TO COMPEL TURNOVER OF ESTATE PROPERTY

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .....................................................................................................................4

I.      The EDA Act and EDA Agreement...............................................................................4

II.     The Village Accepts Sears's Certification of 2017 Compliance ........................................6

ARGUMENT ..........................................................................................................................9

I.      The Debtors are Entitled to Turnover of the EDA Funds....................................................9

        a.      Non-Sears Employees Count for EDA Act Compliance ......................................11

        b.      Employees in the EDA Count for EDA Act Compliance......................................13

        c.      2017 is the Relevant Compliance Year.............................................................14

                i.      Misrepresentation of the EDA Act ........................................................14

                ii.     Mischaracterization of Prior Conduct ......................................................15

II.     The Turnover Motion Does Not Justify Lifting the Stay Or Abstention. .........................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*19 Entm't, Inc. v. Phillips (In re AOG Entm't, Inc.)*,
   2016 Bankr. LEXIS 4514 (Bankr. S.D.N.Y. Dec. 30, 2016)...................................................19

*In re Breitburn Energy Partners LP*,
   571 B.R. 59 (Bankr. S.D.N.Y. 2017)........................................................................................18

*In re Chittur & Assocs., P.C.*,
   2018 U.S. Dist. LEXIS 213968 (S.D.N.Y. Dec. 18, 2018) ......................................................18

*In re CIS Corp.*,
   172 B.R. 748 (S.D.N.Y. 1994)..................................................................................................10

*In re Fairfield Sentry Ltd.*,
   458 B.R. 665 (S.D.N.Y. 2011)............................................................................................ 19-20

*Geron v. Peebler*,
   488 B.R. 841 (Bankr. S.D.N.Y. 2013)......................................................................................10

*Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd.*,
   198 B.R. 45 (S.D.N.Y. 1996)....................................................................................................10

*J.T. Moran Fin. Corp. v. Am. Consol. Fin. Corp.*,
   124 B.R. 931 (S.D.N.Y. 1991)..................................................................................................10

*Keybank Nat'l Ass'n v. Franklin Adv., Inc.*,
   No. 18-CV-3762(RA), 2019 WL 1349655 (S.D.N.Y. Mar. 26, 2019)....................................19

*LaMonica v. CEVA Grp. PLC (In re CIL Ltd.)*,
   582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration on other
   grounds*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15,
   2018) ........................................................................................................................................10

*Lawrence v. Motors Liquidation Co.*,
   10 Civ. 36 RJH, 2010 WL 4966018 (S.D.N.Y. Nov. 8, 2010)...............................................18

*In re Residential Capital, LLC*,
   501 B.R. 624 (Bankr. S.D.N.Y. 2013).....................................................................................18

*In re Stancil*,
   473 B.R. 478 (Bankr. D.D.C. 2012) .........................................................................................10

*In re SunEdison, Inc.*,
   557 B.R. 303 (Bankr. S.D.N.Y. 2016)......................................................................................18

*In re Veluchamy*,
  879 F.3d 808 (7th Cir. 2018) ................................................................................................10

*In re Vill. Mobile Homes, Inc. v. First Gibraltar Bank, F.S.B. (In re Vill. Mobile Homes)*,
  947 F.2d 1282 (5th Cir. 1991) ...............................................................................................1

*Weiner's, Inc. v. T.G. & Y. Stores Co.*,
  191 B.R. 30 (S.D.N.Y. 1996).................................................................................................10

**Statutes**

28 U.S.C. § 157(b)(1) ...............................................................................................................19

Economic Development Area and Tax Increment Allocation Act, 20 ILCS 620/1
  *et seq.* ..............................................................................................................................*passim*

Economic Development for a Growing Economy Tax Credit Act, 35 ILCS 10/5-1
  *et seq.* ..............................................................................................................................*passim*

Hoffman Estates Ordinance No. 2106-1989 (Sept. 12, 1989), *available at*
  http://www.hoffmanestates.org/home/showdocument?id=5138 (last visited
  Apr. 11, 2019)........................................................................................................................5

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and certain of its affiliates (including Sears, Roebuck & Co. as the "developer" under the Economic Development Area and Tax Increment Allocation Act, 20 ILCS 620/1 (the "**EDA Act**" or the "**Act**")), as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "**Sears**" or the "**Debtors**"), hereby respectfully submit this reply in further support of Debtors' motion to compel turnover of estate property (ECF No. 2715) (the "**Turnover Motion**"), and in response to the Community School District 300's (the "**School District**") objection to the Turnover Motion (ECF No. 2996) (the "**Objection**").[1]

## PRELIMINARY STATEMENT

1.      The Village of Hoffman Estates (the "**Village**") is holding approximately $9.7 million in property taxes levied and collected for the 2017 tax year in a special tax allocation fund (the "**Special Tax Allocation Fund**"), maintained pursuant to the EDA Act (the "**EDA Funds**").  As set forth in the Turnover Motion, Sears certified that it complied with the EDA Act's requirements by maintaining 4,250 qualifying full-time equivalent jobs during the relevant compliance period.  Debtors should therefore receive the EDA Funds as annual reimbursement for costs paid by Sears in the 1990s to develop the Economic Development Area (the "**EDA**").

2.      The Village—which is responsible for holding and distributing EDA Funds—did not object to the Turnover Motion.  The Village also does not contest Sears's compliance with the EDA Act in 2017, nor does it contest Sears's right to the EDA Funds.  Under ordinary circumstances, the Village would have distributed the EDA Funds to Debtors in December 2018.

---

[1]  The School District and the Village consent to resolution of this issue by motion, so the Court may resolve it without filing as an adversary proceeding.  *In re Vill. Mobile Homes, Inc. v. First Gibraltar Bank, F.S.B. (In re Vill. Mobile Homes)*, 947 F.2d 1282, 1283 (5th Cir. 1991) ("Compliance with the requisites of an adversary proceeding may be excused by waiver of the parties"); Obj. at 15 ("the School District has agreed not to insist upon treating the Motion to Compel under the adversary proceeding rule").

1

The *only reason* that the Village has not yet done so is the School District's baseless lawsuit, filed in Illinois State court on the eve of the Debtors' bankruptcy filing, threatening the Village if it made this distribution (the "**Illinois Action**"). The Village is ready and willing to turn over the EDA Funds to the Debtors so long as there is a Court order to do so.

3.      Prompt distribution of this close to $10 million in estate property is crucial at this point in the Debtors' bankruptcy proceeding, when it is necessary for the Debtors to make every effort to preserve estate resources and confirm a plan.

4.      Not surprisingly, the only objection to the Turnover Motion was filed by the School District, which also has petitioned this Court for relief from the automatic stay in order to pursue its State-court litigation. As explained below, all of the School District's objections to the Turnover Motion are meritless, and many are frivolous.

5.      *First*, the School District argues that the Debtors cannot count full-time equivalent non-Sears employees for purposes of determining its entitlement to the EDA Funds. But nothing in the EDA Act says that. The School District's position conflicts with the purpose of the EDA Act: to foster *job creation*, not merely to transfer Sears employees from Chicago to Hoffman Estates. Moreover, unlike the Economic Development for a Growing Economy Tax Credit Act, 35 ILCS 10/5-1 *et seq*. (the "**EDGE Act**")—which requires Sears to "*employ***[ ]** a minimum of 4,250 full-time employees *at its corporate headquarters in Illinois* at the time of application"— the EDA Act contains no such language, and merely requires Sears to "*maintain* 4,250 *jobs*." If the EDA Act was meant to be identical to the EDGE Act, it would use the same language.

6.      *Second*, the School District argues that the Debtors improperly counted Sears employees in Chicago. This simply is wrong.

7.      *Third,* the School District argues that 2018, not 2017, is the relevant compliance

2

year for determining Sears's entitlement to the EDA Funds.  This argument, too, is baseless.  The

School District misrepresents the statute, first relying on entirely irrelevant language in Section 4

of the EDA Act, and then purporting to cite language in Section 4.5 of the Act that does not

exist.  The School District also mischaracterizes the past conduct of the Village and Sears.

Illinois property tax is paid in arrears (*e.g.*, taxes levied for 2017 are collected during 2018), and

the Village has historically distributed EDA Funds in December of the year the taxes are

collected.  The relevant compliance year, therefore, could not be the year in which the taxes are

collected, since the Village would not yet know whether Sears would drop below the jobs

threshold during December.  The School District also reads between the lines of two letters from

a single Village representative to support its argument, but ignores other evidence, such as an

agenda item from the Village's Special Finance Committee for its March 4, 2019 meeting,

discussing Sears's 2017 EDA Act compliance in connection with recommending disbursement to

Sears of the funds currently held in the Special Tax Allocation Fund upon court order.  *See* Decl.

of Jessie B. Mishkin ("**Mishkin Reply Decl**."), Ex. 1, at 8.

8.    The School District's argument that the Turnover Motion invalidates the

automatic stay or supports abstention by this Court is similarly baseless.  The Turnover Motion

does not raise the exact issues that the School District raised in the Illinois Action, and the

*Sonnax* factors still apply with equal force to warrant a continuation of the stay.  Lifting the stay

to allow the School District to pursue what is essentially a prepetition claim will open the

floodgates for thousands of other prepetition creditors to seek similar relief against the Debtors,

at a time when preservation of every estate resource is critical.  As to abstention, the mere

allegation of a dispute is not sufficient to turn this into a non-core matter.  The Turnover Motion

can be decided here and now, and the School District offers no basis for its belief that this Court

will not be as effective and efficient as the state court in deciding the matters at issue.

9.      For these reasons, and as explained in detail in the Turnover Motion and herein, the Court should grant the Turnover Motion and deny the School District's Motion for Relief from the Automatic Stay.

## BACKGROUND

### I.      The EDA Act and EDA Agreement

10.      The EDA Act was originally passed in 1989 to incentivize Sears to relocate its headquarters from downtown Chicago to undeveloped prairie farmland in the Village.  The 1990 Economic Development Agreement between Sears and the Village (the "**EDA Agreement**") provides for Sears to be reimbursed for certain costs it incurred in developing its approximately 200-acre corporate campus and the rest of the 788 acres of land that comprise the EDA.[2]

11.      As intended, the job creation spurred by Sears's investment in the EDA was not limited only to Sears employees located on the fraction of the EDA occupied by its headquarters campus; it also included contractors and tenant businesses at the headquarters campus, as well as jobs created by other developments and businesses within the rest of the EDA.

12.      The 1989 EDA Act required that any municipality approving an economic development plan in accordance with the Act must include a finding that the economic development project "shall create or retain not less than 2,000 full-time equivalent jobs."  *See* Ill. Pub. Act 86-38, Art. 1 § 4(e), *codified at* 20 ILCS 620/4(e) (1989).[3]  The Village made that

---

[2] *See* Decl. of Jessie Mishkin, dated Feb. 28, 2019 ("**Mishkin Moving Decl**.") Ex. 1 (ECF No. 2716), at 13-130 (1990 Economic Development Agreement).

[3] The EDA Act defines an "economic development project" as a "development project in furtherance of the objectives of this Act." 20 ILCS 620/3(c).  The EDA Act defines "economic development project area" as, *inter alia*, a contiguous area that "is not less in the aggregate than three hundred twenty acres . . . ." *Id.* 620/3(d). Thus, the "economic development project area" is the entire 788-acre EDA.

finding in 1989.  *See* Hoffman Estates Ordinance No. 2106-1989, at 2 (Sept. 12, 1989), *available at* http://www.hoffmanestates.org/home/showdocument?id=5138 (last visited Apr. 11, 2019).

13.    As of 2012, Sears had not yet been fully reimbursed.  The EDA Act was amended that year, extending the period of reimbursement for up to 15 years.  *See* Mishkin Reply Decl. Ex. 2 (Ill. Public Act 097-0636, hereinafter "**Act 0636**"), at Section 15-5, § 4(g) (amended text), *codified at* 20 ILCS 620/4(g) (2012).  Section 4(e) was amended to require that any municipality approving an economic development plan must now make a finding that the developer or any of its successor entities and its subsidiaries would create or retain not less than 4,250 full-time equivalent jobs.  *Id.* at § 4(e), *codified at* 20 ILCS 620/4(e) (2012).  Section 4(e) still only requires the approving municipality to make a jobs finding at the time of initial economic development plan approval, and is not retroactively applicable to the 1990 EDA Agreement.

14.    The 2012 Amendment also added a section titled "Recapture," which provides for the Village to reduce its annual EDA payment to Sears, pro rata, for any time period in which Sears failed to maintain 4,250 jobs.  *See* Act 0636, at Section 15-5, § 4.5 (amended text), *codified at* 20 ILCS § 620/4.5 (2012).  Accordingly, the Village confirms with Sears its compliance with the jobs requirement before distributing EDA Funds.

15.    Nothing in the EDA Act or the EDA Agreement specifies that the full-time equivalent jobs that Sears was to "create," "retain," or "maintain" were or are limited to Sears employees at Sears's headquarters campus.  *See* 20 ILCS 620/4(e), 4.5(b).  To the contrary, the EDA Act contains a clear legislative declaration of purpose to "relieve conditions of unemployment, maintain existing levels of employment, create new job opportunities, retain jobs within the state, [and] increase industry and commerce within the state, thereby creating job opportunities for residents of the State and reducing the evils attendant upon unemployment, and

increase the tax base of the State and its political subdivisions." 20 ILCS 620/3. Indirect creation and retention of new jobs—as through, for example, contractor relationships and development of businesses around Sears's headquarters campus that would not otherwise exist without Sears's investment in the EDA—advances this declaration of purpose; simply shifting headquarters jobs from Chicago to Hoffman Estates does not.[4]

## II.    The Village Accepts Sears's Certification of 2017 Compliance

16.    The property taxes used by the Village to make these reimbursements are paid one year in arrears. As a result, in the ordinary course, Sears's EDA reimbursement for a particular tax year is paid at the end of the following calendar year, after all taxes have been collected for the tax year at issue. As an example, the Village disbursed Sears's 2016 tax year EDA Funds at the end of 2017, following collection of 2016 property taxes in 2017.[5] After taxes are collected, but until the Village disburses the payments, they are held in the Village's Special Tax Allocation Fund. *See* Turnover Motion ¶¶ 1, 12.

17.    The EDA Funds currently held by the Village were levied for the 2017 tax year. Sears initially certified its compliance with the EDA Act's jobs requirements for 2017 in a November 27, 2017 letter to the Village. *See* Declaration of Mohsin Meghji dated Feb. 28, 2019 ("**Meghji Decl.**") (ECF No. 2717), Ex. 15.

18.    In the ordinary course, the 2017 EDA Funds held by the Village would have been

---

[4] The example provided by the School District (Obj. at 29-30) is a perfect illustration of this point. If Sears left its headquarters and another corporation moved in, it would no longer be the company maintaining or retaining the tenant or contractor jobs in the EDA. But while Sears remains at its campus, it is Sears's presence that results in the existence of tenant and contractor jobs in the EDA.

[5] *See* Mishkin Reply Decl. Ex. 3 (Dec. 18, 2017 Village Board Minutes) ¶ 5.J (approving "[r]equest [for] Board authorization to declare $16,182,608.01 as the developer and taxing district allocation *for tax levy year 2016* within the EDA Special Tax Allocation Fund, and direct the Treasurer to remit said funds . . . ." (emphasis added)). The Village disbursed Sears's EDA Funds for the 2015 tax year at the end of 2016. *Id.* Ex. 4 (Dec. 19, 2016 Village Board Minutes) ¶ 5.G (same, "for tax levy year 2015").

6

distributed at the end of 2018. However, on October 10, 2018, on the eve of Sears's bankruptcy petition, the School District filed the Illinois Action, in which it alleges that Sears failed to comply with the EDA Act's jobs requirement in 2017. *See* Turnover Motion ¶¶ 17-19. As a result, the Village has not yet disbursed the EDA Funds for the 2017 tax year. *Id.* ¶ 20.

19.     The School District's assertion that Sears failed to comply is incorrect. As part of the ordinary course of business, Sears contemporaneously tracked its monthly compliance with the EDA Act by counting full-time equivalent employees of Sears and non-Sears entities located at its Hoffman Estates campus throughout 2017.[6]

20.     Full-time equivalent employees of Sears entities (*e.g.*, Sears Holdings Management Corp. and Sears Roebuck & Co.) at the Hoffman Estates campus were counted using headcount reports originally produced by Sears's human resources department for tracking compliance with the EDGE Act, a separate tax-incentive statute with different requirements. *See infra* ¶¶ 32-33. These EDGE reports included full-time equivalent employees of Sears entities located in Hoffman Estates *and* in Chicago, but for purposes of EDA Act compliance tracking, Chicago employees were omitted from the count. *See* Meghji Decl. ¶ 6.

21.     As to full-time equivalent non-Sears employees in 2017, Sears's real estate department provided data showing the number of individuals working 35 hours or more per week who held active badges that gave them access to Sears's Hoffman Estates campus each month in 2017. *See* Meghji Decl. Exs. 13, 14. The badge data was analyzed to remove any part-time employees and former employees, as well as employees of Sears entities (which were already counted using EDGE reports), allowing Sears to determine the number of active full-time

---

[6] *See, e.g.*, Meghji Decl. Ex. 14 at 1 (Table 2, listing the sources of EDA Eligible headcount as: (1) "Total EDGE Eligible, Less: Chicago Location EDGE," (2) "Tenants," (3) "Daycare," (4) "Building Contractors," and (5) "Contractors").

equivalent employees of tenant companies, daycare providers, and contractors (including building contractors) located at its Hoffman Estates campus each month. *Id.*

22.    Based on this accounting, Sears calculated that the number of EDA Act-qualifying full-time equivalent jobs at Sears's Hoffman Estates campus alone exceeded 4,250 in every month in 2017. *See* Turnover Motion ¶ 14; Meghji Decl. ¶ 6. As a result, there was no need to compile 2017 data regarding jobs in the rest of the 788-acre EDA. *See* Mishkin Reply Decl. Ex. 5 (Transcript of the 30(b)(6) Dep. of Mohsin Meghji, Apr. 4, 2019), at 109:9-21.

23.    Contrary to the School District's misrepresentation that "the Village Board at its January 2019 meeting may have considered approving" the distribution if Sears had certified its compliance with the EDA Act during the 2018 calendar year (Obj. at 19), the *only* reason that the Village has not yet distributed Sears's EDA Funds is the School District's state-court lawsuit. *See* Mishkin Reply Decl. Ex. 1 at 8-9. As set forth in the Joint Stipulation between Sears, the Village and the School District, the Village requested a Court order before distributing the EDA Funds to Sears in order to protect itself from the School District's litigation. *See* Stipulation (ECF No. 1453). In December 2018, the Village also requested, through counsel, that the Debtors provide another letter certifying compliance with the EDA Act throughout all of 2017. Debtors did so on January 2, 2019. *See* Meghji Decl. Ex. 16.

24.    The Village did not object to the Turnover Motion, and it does not contest Sears's compliance with the EDA Act in 2017, nor does it contest Sears's entitlement to the EDA Funds. The Village's Special Finance Committee, in confirming the amounts to be distributed pursuant to the EDA Act, also recently noted Sears's certification of compliance with the EDA Act's jobs requirement *in 2017* in connection with the EDA Funds currently held by the Village:

**<u>DISCUSSION</u>**

[T]he creditors of Sears have this week filed a petition with the bankruptcy court

seeking an order directing the Village to turnover to them the 55% increment which PA097-0636 requires to be paid to the developer or any of its successor entities and its subsidiaries (now estimated to be $9,661,977.33). We do expect this motion will be argued before the bankruptcy court on March 21, 2019 and that District 300 will vigorously oppose the requested turnover, arguing that Sears did not maintain the required 4,250 full-time equivalent jobs within the economic development project area for the fiscal year. *The Village, however, has previously received confirmation from Sears Holdings that, in fact, there were 4,250 or more jobs at the Sears campus for all of TL Y2017 (attached)*.

The FY2018 allocation calculation, *which is related to tax levy year 2017* and is the fourth year under the new legislation, is summarized below . . . .

## RECOMMENDATION

Request authorization to remit $9,661,977.33 as the developer allocation *for tax levy year 2017* within the EDA Special Tax Allocation Fund, conditioned upon the Village's prior receipt of an order entered by the bankruptcy court granting the turnover motion.

Mishkin Reply Decl. Ex. 1 at 9; *id.* Ex. 6, at 6 (minutes showing approval of recommendation). In connection with this summary and recommendation, the Special Finance Committee attached copies of Sears's two letters certifying compliance with the EDA Act's jobs requirement *in 2017*. *Id.* Ex. 1, at 10-11.

## ARGUMENT

### I.    The Debtors are Entitled to Turnover of the EDA Funds

25.    The Village did not object to the Turnover Motion. Other than requesting further confirmation that Sears was in compliance with the EDA Act's job requirement throughout 2017—a request which Sears addressed with its January 2, 2019 letter—the Village has not asked the Debtors for any additional information before recommending distribution of the EDA Funds to the Debtors.

26.    The only objection to turnover comes from the School District, a third party that has opportunistically held-up distribution of EDA Funds to Sears without any legitimate justification. But, as the cases cited by the School District itself show, turnover should not be

denied where, as here, there is no *legitimate* ownership dispute. *See In re Veluchamy*, 879 F.3d

808, 816 (7th Cir. 2018) (affirming turnover order, even though the party resisting turnover

introduced testimony and documentary evidence contesting ownership); *LaMonica v. CEVA Grp.*

*PLC (In re CIL Ltd.)*, 582 B.R. 46, 116-18 (Bankr. S.D.N.Y. 2018) (denying motion to dismiss

turnover claim where the parties resisting turnover "have done nothing more than assert that they

dispute CIL's right to the CIL Cash"), *amended on reconsideration on other grounds*, No. 13-

11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018); *Geron v. Peebler*, 488 B.R.

841, 849-50 (Bankr. S.D.N.Y. 2013) (affirming turnover despite the opposing party's assertion

that the funds were disputed).[7]

27.    The School District falls far short of this standard.  It asserts three meritless

grounds for its Objection, none of which creates a "legitimate" or "bona fide" dispute. *See In re*

*CIL*, 582 B.R. at 118; *In re Stancil*, 473 B.R. 478, 483 (Bankr. D.D.C. 2012).  Specifically, the

School District argues: (1) Sears improperly counted non-Sears employees for purposes of EDA

Act compliance; (2) Sears improperly counted jobs outside the relevant geographic area for

purposes of EDA Act compliance; and (3) 2018, not 2017, is the relevant compliance year.

None of these baseless arguments justifies denial of the Turnover Motion.

---

[7] The principal cases relied upon by the School District resulted in turnover.  The few that did not were cited only for general principles, and are not relevant to this legal issue. *See Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd.,* 198 B.R. 45, 50 n.7 (S.D.N.Y. 1996) (denying motion to withdraw reference to the bankruptcy court in adversary proceeding brought to determine the scope of the debtor's insurance coverage); *Weiner's, Inc. v. T.G. & Y. Stores Co.,* 191 B.R. 30, 32 (S.D.N.Y. 1996) (post-petition, run-of-the-mill state negligence action filed by the debtor after it suffered fire damage could not be characterized as a turnover motion against the allegedly negligent party, where the claim had not been adjudicated or damages assessed); *In re CIS Corp.*, 172 B.R. 748, 760 (S.D.N.Y. 1994) (denying motion to withdraw reference to the bankruptcy court); *J.T. Moran Fin. Corp. v. Am Consol. Fin. Corp.*, 124 B.R. 931, 938 (S.D.N.Y. 1991) (finding adversary proceeding did not qualify as a core proceeding because, *inter alia*, it was not a turnover motion because of counterclaims asserted by defendants seeking compensatory and punitive damages and cancellation of notes due to fraud and breach of contract).

a.    **Non-Sears Employees Count for EDA Act Compliance**

28.    First, the School District claims that the EDA Act and EDA Agreement "do[ ] not allow for employees of tenants and contractors to be counted." Obj. at 26-27. Nothing in the Act or the Agreement says that.

29.    As noted above, the EDA Act was passed to incentivize Sears not only to move its headquarters to within the EDA, but to develop all 788 acres of undeveloped land that comprise the EDA, in order to foster job creation. *See supra* ¶¶ 10-11, 15. Though Sears itself only occupies a fraction of the EDA, its presence in the area has resulted in the creation of thousands of jobs, including not only Sears employees, but also jobs created by tenant companies and contractors located at Sears's headquarters and by development within the rest of the EDA. *Id.* This is exactly the "creat[ion of] job opportunities" intended by the Act, as made clear in the Act's Legislative Statement of Purpose. *See supra* ¶ 15.[8]

30.    Other text in the EDA Act also supports the same principle. When the EDA Act was passed, it required the Village to make a finding that the "economic development project" would create or retain not less than 2,000 "full-time equivalent jobs." *See supra* ¶¶ 12.[9] This text did not require Sears itself to employ 2,000 people. It could have, for example, said that Sears must "employ a minimum of 2,000 full-time employees" at its headquarters campus. It did

---

[8] The School District notes that under the EDA Agreement, Sears receives reimbursement for its own development costs. *See* Obj. at 28 (citing EDA Agreement lines 70-71 and 2396-2425). No one disputes that point. But much like the School District's other points, the School District's argument that because Sears "reaps the benefit of this agreement [] only Sears employees may be counted in the requisite job count" is entirely unexplained and unsupported.

[9] The EDA Act linked the definition of the "economic development project" that was the subject of this jobs finding to the "economic development project area"—itself defined, *inter alia*, as a contiguous area "not less in the aggregate than three hundred twenty acres . . . ." 20 ILCS 620/3(c), (d) (1989). As to Sears's economic development project, the economic development project area is the 788-acre EDA. The required finding therefore must apply to jobs to be created throughout the entire EDA, not merely Sears employees at the 200-acre headquarters campus.

not, even though this language was used in the EDGE Act. *See infra* ¶ 32-33.[10]

31.     The "Recapture" provision in Section 4.5 of the EDA Act—which was added in the 2012 Amendment—states that the developer forfeits its EDA Fund allocations on a pro rata basis if it "fails to maintain 4,250 jobs." 20 ILCS 620/4.5(b).  As the legislative history cited by the School District demonstrates, this language was intended to keep Sears from leaving Hoffman Estates entirely—and with it, all of the jobs created as a result of its development of the EDA—*not* to substantively change the underlying categories of qualifying employees for the EDA Act's jobs requirement.

32.     This is especially clear when the EDA Act is compared to the EDGE Act, which was also amended in 2012.  The legislature amended the EDGE Act in 2012 to provide a new tax incentive to Sears in exchange for Sears itself employing a certain number of employees within Illinois.  Act 0636, at Section 5-15, § 1.6 (adding the entirely new Section 10/5-15(1.6)), *codified at* 35 ILCS 10/5-15(1.6).  EDGE tax credits, unlike EDA payments, are not reimbursements for Sears's EDA development costs, and are not paid by the Village.  *Id.*  The EDGE Act clearly states that the EDGE tax credit—unlike EDA Funds—will only be paid if Sears, among other things, "*employs* a minimum of 4,250 full-time employees *at its corporate headquarters in Illinois at the time of application . . . .*"  *Id.* (emphasis added).

33.     As the School District admits, the EDGE Act and the EDA Act were amended at

---

[10] When the EDA Act was amended in 2012—after Sears's economic development project had already been completed, Sears had already incurred all qualifying development costs, and all that remained was reimbursement of those costs—Section 4(e) was amended to require a municipality approving an economic development project make a finding that "the developer or any of its successor entities and its subsidiaries shall create or retain not less than 4,250 full-time equivalent jobs."  Act 0636, at Section 15-5, § 4(e) (amended text), *codified at* 20 ILCS 620/4(e) (2012).  This amendment was not made retroactively applicable to Sears's development project, nor did the Village approve a new project or amend the EDA Agreement in 2012 or thereafter.  As a result, amended Section 4(e)—on which the School District relies (*see* Obj. at 21, 27)—is simply inapplicable here.

the same time, as part of the same legislation. *See* Act 0636 at Sections 15-5 and 5-15. If the legislature had intended the EDA Act to mirror the EDGE Act, it would have used the same language. It did not. Instead, it used the broader and more expansive "maintain . . . jobs" in the EDA Act, and used the much narrower "employs . . . employees" in the EDGE Act.

### b.    Employees in the EDA Count for EDA Act Compliance

34.    Second, the School District incorrectly asserts that Sears also counted employees outside the relevant geographic area—namely, employees in Chicago. *See* Obj. at 31. The School District simply failed to read or understand the Turnover Motion, which detailed how Sears tracked jobs to confirm compliance with the EDA Act's job requirements. Contrary to the School District's careless reading of the Turnover Motion and documents provided to it more than a month before it filed its Objection, *employees in Chicago were not counted* for purposes of EDA Act compliance.[11]

35.    To be clear, the EDA Act and EDA Agreement allow Sears to count all full-time employees within the full EDA, not just at the Sears campus. The School District itself makes this point, arguing that the jobs within the "Subject Property" as defined in the EDA Agreement should be counted. Obj. at 31, n. 11. The "Subject Property" *is* the full 788-acre Economic Development Area. *See* Mishkin Moving Decl. Ex. 1, at 31.

36.    In any event, because Sears determined it was in compliance with the EDA Act in all of 2017 based solely on jobs located at its headquarters campus, it did not need to collect data on jobs within the rest of the 788-acre EDA. It certified compliance for 2017 based on full-time

---

[11] *Compare* Meghji Decl. ¶ 6(b) (jobs figures "do[ ] not include any Sears employees working in Chicago"), *and id.* ¶¶ 7-19 (listing Chicago employees removed from the EDA Act count in 2017), *with* Obj. at 31 ("Sears states in its Motion to Compel that it only counts employees located in the Village. That is false as shown in Debtor's Exhibits 1-12 which all list employees and the city they are located in. These cities include not only Hoffman Estates but also Chicago which is over 35 miles away.").

equivalent employees at the headquarters campus only.  *See supra* ¶¶ 20-22.

      **c.**    **2017 is the Relevant Compliance Year**

37.    Third, the School District argues that Debtors "must show that [Sears] maintained 4,250 full-time equivalent jobs at its headquarters campus for the year in which the taxes were paid."  Obj. at 22. [12]  The School District's argument relies entirely on misrepresenting the relevant statute and mischaracterizing the parties' past conduct.

      **i.**    *Misrepresentation of the EDA Act*

38.    The School District misreads Section 4(g) of the Act, which it claims "make[s] it clear that the Illinois EDA Act bases the Sears subsidy on Sears's operation during the calendar year in which taxes are paid."  Obj. at 23; *see also id.* at 19-24.  Section 4(g) does no such thing.  Instead, it simply describes how taxes levied and collected on a given year should be *allocated* between Hoffman Estates, Sears, and other taxing districts.  Section 4(g)(2) sets forth the default allocation of property tax receipts to Sears and the taxing districts until Sears is fully reimbursed.  Section 4(g)(4) specifies that if property tax receipts for a given year vary from the amount levied for 2012 and collected in 2013 (defined as the "base amount"), a different allocation formula applies.  When defining the term "base amount," the drafters of the 2012 Amendment apparently anticipated that property taxes paid in 2013 would be remitted as EDA Funds in 2014, but the more recent practice of the Village has been to pay out the EDA distributions in December of the same year the property taxes are paid.  *See* Mishkin Decl. Exs. 3, 4.  In any event, nothing in Section 4(g) speaks to the School District's position at all.

39.    To be clear, the School District's claim that Debtors "argue[ ] that when the Illinois EDA Act says 'taxes paid' it really means 'the year taxes were levied'" (Obj. at 30) is a

---

[12] This is a new argument, which the School District raised for the first time after Debtors produced business records showing their compliance with the EDA Act during 2017.

straw man.  The Village calculates the *proportion* of EDA Funds due to Sears and other taxing

districts using the formula set forth in Section 4(g).  The Village has already made that

calculation, and determined that under Section 4(g), Debtors should receive 55% of the EDA

Funds ($9,661,977.33) and the taxing districts should receive 45% of the EDA Funds

($7,905,254,17).  Mishkin Reply Decl. Ex. 1 at 9.[13]  Section 4(g) has no other relevance here.

40.    The School District also purports to cite statutory language that in fact does not

exist.  Specifically, the School District asserts that Section 4.5 of the EDA Act provides "[i]f

Sears has not maintained the requisite jobs for the calendar year in which taxes are **paid**, then

Sears's share is reduced by the 'the percentage of the year that [Sears] failed to maintain 4,250

jobs.' (20 ILCS § 620/4.5(b))."  Obj. at 20 (bold text in original).   But the statute does not

actually say that.  In its entirety, the relevant subsection of Section 4.5 reads:

> **In the event the developer fails to maintain 4,250 jobs at any time before the
> termination** of the economic development project area, except as provided in
> subsection (c), **the developer shall forfeit an amount of its allocations from the
> special tax allocation fund for that time period in which the developer failed
> to maintain 4,250 jobs.** The amount forfeited shall equal the percentage of the
> year that the developer failed to maintain 4,250 jobs multiplied by the amount the
> developer would have received if they maintained 4,250 jobs for the entire year.
> Any funds that are forfeited shall be distributed to the taxing districts in the same
> manner and proportion as the most recent distribution by the county collector to
> those taxing districts (inclusive of the municipality) in the economic development
> project area.

20 ILCS 620/4(b) (emphasis added).   The language that the School District relies on, *i.e.*, a

purported requirement to "maintain[] the requisite jobs for the calendar year in which taxes are

**paid**" (Obj. at 20)—which is the core of its argument—appears nowhere in the statute.

## ii.    *Mischaracterization of Prior Conduct*

41.    The School District also either misrepresents or miscomprehends the past conduct

___

[13] Pursuant to the parties' December 31, 2018 stipulation, the Village has already distributed the taxing
districts' 45% share.

of the Village and Sears.  In either case, the prior course of dealing supports a finding that 2017—the year for which the subject tax was levied— is the relevant compliance year.

42.    Section 4.5(b) provides that if the EDA developer (Sears) fails to maintain 4,250 jobs at any point during the relevant compliance year, its annual EDA distribution must be reduced to exclude taxes for the time that it was below the threshold, on a pro rata basis.  *Id*.  As noted above, the Village has historically distributed EDA Funds in mid-December—*before* the end of the calendar year during which the relevant taxes were paid and collected.  *See supra* ¶ 7. Accordingly, the relevant compliance year could not be the year in which taxes were paid, as the School District argues, because the Village would not be in a position to remit full payment before the end of that year—as it did in 2016 and 2017—since it would not yet know if the amount should be prorated based on potential noncompliance during December.

43.    The School District also points to a single letter, sent by Village Manager James Norris to Sears in November 2017, in which he requested certification of 2017 compliance by December 1, 2017.  *See* Obj. Ex. F (ECF No. 2996-6).  Sears simply responded to this request (*see* Meghji Decl. Ex. 15), but neither the Mr. Norris's letter nor Sears' response make clear whether 2017 compliance was required for full payment of EDA funds then held by the Village, which were collected in 2017 (for taxes levied for the 2016 calendar year).  In November 2018, the Village Manager sent Sears a similar request (with dates changed to 2018).  Sears did not initially respond to this letter.  In January 2019, at the Village's request, Sears submitted another letter to the Village, again certifying that Sears was in compliance with the jobs requirement of the Sears EDA Act for all of 2017, in order to allow the Village Board to approve disbursement of the EDA Funds it is holding.  *See* Meghji Decl. Ex. 16.  Even if these letters could be read, as the School District suggests, to imply that the individual at the Village who drafted these letters

believed that the relevant compliance year was the one in which the taxes were paid, rather than levied, the letters are of little import because the alleged implications that the School District draws from those letters are in no way binding on the Village Board or this Court.

44.    The School District also points to an agenda item from early December 2017, written by a single member of the Village's Special Finance Committee, to suggest that EDA compliance in calendar year 2017 was relevant to the distribution in December 2017. *See* Obj. at 25. But as discussed above, the Special Finance Committee—including *the same member* who drafted that 2017 agenda item—later prepared an agenda item for the Committee's March 4, 2019 meeting that plainly referenced Sears's 2017 EDA Act compliance in recommending distribution of funds currently held in the Special Tax Allocation Fund upon Court order. *See* Mishkin Reply Decl. Ex. 1, at 8-11. That later agenda item also attached the November 2017 and January 2019 letters from Sears, both of which certified compliance in 2017. *Id.*

45.    In short, examining the School District's purported authority reveals that its argument is based only on its own *ipse dixit*, and is unsupported by any citation to relevant fact or law. Simply saying that 2018 EDA compliance should somehow be relevant to payment of EDA Funds made up of taxes levied for 2017 does not make it true, and does not create a legitimate dispute sufficient to block the Turnover Motion.

## II.    The Turnover Motion Does Not Justify Lifting the Stay Or Abstention.

46.    The fact that Debtors filed the Turnover Motion does not create any basis for granting the School District relief from the automatic stay with respect to the Illinois Action. With or without the Turnover Motion, the School District failed to meet the heavy burden required for it to be granted such relief: "The burden on the movant seeking relief from the automatic stay to prosecute an unsecured claim is especially heavy. '[T]he general rule is that claims that are not viewed as secured in the context of § 362(d)(1) should not be granted

relief from the stay unless extraordinary circumstances are established to justify such relief,' lest the unsecured creditor receive a distributive advantage contrary to the principle of equality of distribution." *In re Breitburn Energy Partners LP*, 571 B.R. 59, 65 (Bankr. S.D.N.Y. 2017) (citing *In re Leibowitz*, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992)) (internal citations omitted).[14]

47.    First, the Turnover Motion—which is based solely on the EDA Funds being held by the Village for 2017—does not raise the exact issues raised in the Illinois Action, which not only challenged Sears' entitlement to distributions of EDA Funds for 2017, but also those already paid for 2016, as well as distributions that may be made in connection with 2018. Accordingly, for the reasons set forth in the Debtors' Objection to the School District's Motion for Relief from the Automatic Stay (ECF No. 1280) (the "**Debtors' Objection**"), the Illinois Action should remain stayed.

48.    Second, with respect to the EDA Funds that are the subject of the Turnover Motion, the *Sonnax* factors still apply with equal force, such that the automatic stay should remain in place with respect to the Illinois Action.  The School District ignores that lifting the stay and proceeding with the entirety of the Illinois Action, even if it ultimately resolved the matter (after appeals), would come at a substantial cost to the Debtors' estates at a time when an effort to preserve every estate resource is necessary, and likely well after the Debtors have confirmed a plan.  *See In re Chittur & Assocs., P.C.*, 2018 U.S. Dist. LEXIS 213968, at *7 (S.D.N.Y. Dec. 18, 2018); *In re SunEdison, Inc.*, 557 B.R. 303, 309 (Bankr. S.D.N.Y. 2016). Nor can the School District credibly believe its own argument (Obj. at 4, 7-8) that the fact that the Debtors sought turnover of the EDA Funds to which they are entitled—an effort that would substantially aid the Debtors in maximizing value for the estates and all stakeholders—means

---

[14]*Accord Lawrence v. Motors Liquidation Co.*, 10 Civ. 36 RJH, 2010 WL 4966018, at *4 (S.D.N.Y. Nov. 8, 2010); *In re Residential Capital, LLC*, 501 B.R. 624, 643-44 (Bankr. S.D.N.Y. 2013)).

that the Debtors and other creditors also would not be prejudiced by the Debtors having to *defend* state court litigation of additional claims at the same time.[15]

49.    The School District also fails to meet its burden for establishing, in the alternative, that the Bankruptcy Court should abstain from hearing the dispute.  The party seeking mandatory abstention bears the burden of proving he is entitled to it, and "the failure to satisfy even one factor will be fatal."  *19 Entm't, Inc. v. Phillips (In re AOG Entm't, Inc.)*, 2016 Bankr. LEXIS 4514, at *20-21 (Bankr. S.D.N.Y. Dec. 30, 2016) (internal citations omitted).  The School District has failed to satisfy multiple factors for mandatory abstention.

50.    First, the School District fails to accurately identify the standard or conduct the appropriate analysis to determine whether this is a core or non-core dispute. "Proceedings "arising in"—as with ones "arising under"—Title 11 correspond to the Court's core bankruptcy jurisdiction.  28 U.S.C. § 157(b)(1) provides that "[B]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . ."  *See Keybank Nat'l Ass'n v. FranklinAdvisers, Inc.*, No. 18-CV-3762(RA), 2019 WL 1349655, at *7 (S.D.N.Y. Mar. 26, 2019).   "A proceeding may be deemed core, by its nature, 'if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings . . . or (2) the proceedings directly affect a core bankruptcy function.'"  *Id*.

51.    Second, the School District essentially argues that because they dispute the Turnover Motion, the proceeding is therefore non-core.  *See* Obj. at 10-12.  But, as even the School District recognizes (*Id*. at 16-17), the mere assertion of a dispute is not sufficient to wrest this Court of its jurisdiction.  As the court recognized in *In re Fairfield Sentry Ltd.*, 458 B.R. 665, 683, 687 (S.D.N.Y. 2011), an action for turnover like this one is core because its purpose is

---

[15] The School District also does not raise any arguments in support of permissive abstention that have not already been refuted in the Debtors' Objection ¶¶ 30-35.

the *collection* of a matured debt.   Here, for the reasons set forth in the Turnover Motion and above, the Debtors are entitled to collect the EDA Funds currently held by the Village, which are owed to and rightfully the property of the estate.   The School District has offered no colorable, legitimate basis for disputing that fact, and so cannot refute that the matter is core.

52.      Finally, the Objection does not adequately rebut the Debtors' argument (Debtors' Obj. ¶¶ 28-29) that these matters will not be as timely adjudicated in state court as in the Bankruptcy Court.   The Turnover Motion can be decided here and now.   And the School District offers no basis for a belief that this Bankruptcy Court will not be as effective and efficient as the state court in deciding the matters at issue in the Illinois Action, which would undisputedly be matters of first impression before the state court in any event.

53.      The Debtors are moving toward filing and confirming a Plan, such that proceeding in state court instead would constitute an untimely and inefficient use of precious estate resources at a critical time.   Moreover, lifting the stay now to allow the School District to pursue what is essentially a prepetition claim would set a precedent that would open the floodgates for thousands of other prepetition creditors to seek similar relief against the Debtors. There is no reason the School District should receive special treatment.   Finally, the School District's alternative proposal (Obj. at 8), to proceed in part in state court and then return to this Bankruptcy Court for further proceedings, would do nothing to create any judicial or party efficiencies.   Accordingly, abstention is not appropriate in the circumstances.

WHEREFORE the Debtors respectfully request entry of the Amended Proposed Order attached hereto granting the relief requested herein and such other and further relief as is just.

Dated: April 11, 2019
      New York, New York

 

/s/ Sunny Singh
                                          
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Ray C. Schrock, P.C.
Jared R. Friedmann
Sunny Singh
Jessie B. Mishkin

*Attorneys for Debtors and Debtors in Possession*

**Exhibit A**

**Amended Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

In re                                                    :

                                                         :          **Chapter 11**

**SEARS HOLDINGS CORPORATION,** *et al.*,                :

                                                         :          **Case No. 18-23538 (RDD)**

                                                         :

                 Debtors.[1]                             :          **(Jointly Administered)**

--------------------------------------------------------------x

## ORDER COMPELLING TURNOVER OF ESTATE PROPERTY

Upon the motion, dated February 28, 2019 (ECF No. 2715) (the "**Motion**")[2] of Sears

Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order compelling

turnover of estate funds, pursuant to sections 541 and 542 of chapter 11 of title 11 of the United

States Code (the "**Bankruptcy Code**"); and the Court having jurisdiction to decide the Motion

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); Sears Brands Management Corporation (5365); and SRe Holding Corporation (4816). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the requested relief being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the relief sought in the Motion and the opportunity for a

hearing thereon having been provided in accordance with the Amended Case Management

Order; such notice having been adequate and appropriate under the circumstances, and it

appearing that no other or further notice need be provided; and the Court having held a hearing

to consider the relief requested in the Motion on April 18, 2019 (the "**Hearing**"); and upon the

record of the Hearing, and upon all of the proceedings had before the Court; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein and that such relief is in the best interests of the Debtors, their estates,

their creditors, and all parties in interest; and after due deliberation and sufficient cause

appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted to the extent set forth herein.

2.    Pursuant to sections 541 and 542 of the Bankruptcy Code, the Village of Hoffman

Estates is hereby ordered and directed to turn over to Sears, Roebuck & Co. ("**Sears**") EDA

Funds in the amount of $9,661,977.33 due to Sears for the year 2017 currently held in the

Village's Special Tax Allocation Fund within five (5) business days of the entry of this Order.

3.    The Debtors and the Village of Hoffman Estates are each authorized to take all

actions necessary to effectuate the relief granted in this Order.

4.    The Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
      White Plains, New York

                              _____
                              THE HONORABLE ROBERT D. DRAIN
                              UNITED STATES BANKRUPTCY JUDGE