Defendants insist that the focus should not be on sale of the MPAs, but rather on their subsequent performance under them. Defendants contend that the remedies available to class members will depend on whether they received repairs under their MPAs, and if not, why not. Moreover, Defendants say, because it was their policy to provide repairs regardless of whether a product was on the Eligible Brand List, predominance cannot be found. Because the Magistrate Judge did not agree with Defendants' focus on repairs and the variety of factors contributing to them, Defendants argue the certification analysis fails.

This Court agrees with the Magistrate Judge's analysis, however, and concludes that Plaintiffs have demonstrated the predominance of common issues. "[A] common question predominates over individual claims if 'a failure of proof on the [common question] would end the case" and the whole class 'will prevail or fail in unison.'" *Bell*, 800 F.3d at 378 (quoting *Amgen*, 568 U.S. at 460). It is the predominance of common questions that is key, not whether the answers will be resolved in the plaintiffs' favor. *See Bell*, 800 F.3d at 376 (citing *Amgen*, 568 U.S. at 459). While Defendants heavily emphasize evidence supporting their assertion that Sears had no uniform coverage position flowing from the Eligible Brand List or otherwise, Plaintiffs also submit evidence supporting their claims and their position that Defendants engaged in standardized conduct with regard to the sale of MPAs. Unlike Defendants' cited authority, *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2011), where individual issues predominated over common ones on plaintiffs' claim that defendant insurer underpaid hail damage claims in bad faith, Plaintiffs' claims here rely on the assertion of Defendants' standardized conduct in the sale of coverage. Issues regarding Defendants' alleged course of conduct in selling MPAs are central issues capable of common proof for the class, and for the reasons discussed above Plaintiffs' damages methodology comports with their claims.

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 2 of 35
Case: 1:15-cv-02546 Document #: 200 Filed: 06/25/18 Page 16 of 18 PageID #:3581

Defendants' objection notwithstanding, moreover, a finding of predominance does not adopt Plaintiffs' view of the case. Rather, it reflects the analysis a court must undertake in weighing class certification. The court "must walk a balance between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *Bell*, 800 F.3d at 377.

Likewise, Defendants' arguments that some members of the class may have made a mistake in the information provided to Sears or that both contracting parties may have made a mistake in entering MPAs is "at best an argument that some class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification." *Messner*, 669 F.3d at 823. "A class will often include persons who have not been injured by defendant's conduct, but this possibility, or indeed, inevitability, does not preclude class certification." *Bell*, 800 F.3d at 380.

*UTPCPL Class*

Defendants also contend that Plaintiffs' UTPCPL claim is inappropriate for class treatment because Plaintiffs' burden of showing "justifiable reliance" under the statue is incompatible with Rule 23's predominance requirement. According to Defendants, justifiable reliance cannot be demonstrated collectively because it requires individualized findings. The Magistrate Judge rejected this argument and recommended certifying the class, finding that justifiable reliance would be demonstrated by virtue of the class members' purchase of MPAs. Defendants object to the recommendation, arguing it is based on an inference that is impermissible under Pennsylvania law.

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 3 of 35
Case: 1:15-cv-02546 Document #: 200 Filed: 06/25/18 Page 17 of 18 PageID #:3582

Defendants' objection is overruled.  This Court agrees with the Magistrate Judge that Plaintiffs may prove the element of justifiable reliance by virtue of their purchase of the MPAs. Unlike Defendants' cited authorities, *Abraham v. Ocwen Loan Servicing*, LLC, 321 F.R.D. 125 (E.D. Pa. 2017), and *Coleman v. Commonwealth Land Title Ins. Co.*, 318 F.R.D. 275, where the claims required individualized assessments of the reasons for the transactions, justifiable reliance may be shown by common proof here where the nature of the alleged deception and the transactions at issue do not permit alternate explanations.

*Timing of Class Certification*

Finally, the Court overrules Defendants' objection to the Magistrate Judge's recommendations based on the argument that he should have determined the merits of the defenses to Plaintiffs' claims or deferred ruling on certification until Defendants' summary judgment motion had been addressed.  This Court already denied Defendants' request, and it was not within the scope of the referral to the Magistrate Judge to alter that decision.  Having chosen this course of action, "a peek at the merits" could be taken "before certifying a class," but "this peek is limited to those aspects of the merits that affect the decisions essential under Rule 23." *Schleicher*, 618 F.3d 685.

**CONCLUSION**

For all of the reasons discussed above, Defendants' Objections to the Report and Recommendation of the Magistrate Judge [189] on Defendants' motion to exclude the purported expert opinions of Christopher Jackman [156] are overruled, and Defendants' Objections to the Report and Recommendation [191] on Plaintiffs' class certification motion [141] are sustained in part and overruled in part.  The Reports and Recommendations are adopted as discussed herein.

17

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 4 of 35
Case: 1:15-cv-02546 Document #: 200 Filed: 06/25/18 Page 18 of 18 PageID #:3583

Status hearing previously set for August 8, 2018 is stricken and reset to August 29, 2018 at 9:30

a.m.

Date: 6/25/18

Jorge L. Alonso
United States District Judge

# EXHIBIT 4

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 6 of 35
Case: 1:15-cv-02546 Document #: 214 Filed: 08/29/18 Page 1 of 1 PageID #:3634

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.2.2
### Eastern Division

Nina Greene, et al.

                              Plaintiff,

v.                                                    Case No.: 1:15−cv−02546
                                                      Honorable Jorge L. Alonso

Sears Protection Company, et al.

                              Defendant.
_____

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, August 29, 2018:

        MINUTE entry before the Honorable Jorge L. Alonso: Status hearing held and
continued to 9/20/18 at 9:30 a.m. Motion hearing held. For the reasons stated on the
record, Defendants' motion to correct the June 25, 2018 memorandum opinion and order
certifying the fourteen−year UTPCPL class [203] is denied. The UTPCPL class definition
is amended as follows: All residents of Pennsylvania who paid for aftermarket MPAs on
March 25, 2009 to the present (including post−point−of−sale purchases of coverage,
purchases of coverage for products bought from a retailer other than Sears, and/or
subsequent renewals of coverage) for products which were not covered by nor eligible for
coverage under the MPA, and did not receive a full refund. Defendants#039; motion for
leave to withdraw as counsel [212] is granted. Attorney Josephine Tung is given leave to
withdraw as counsel for Defendants. Notice mailed by judge's staff (ntf, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at **www.ilnd.uscourts.gov**.

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NINA AND GERALD GREENE, | ) | No. 1:15-cv-02456 |
| | ) | |
| Plaintiffs, | ) | Judge Jorge L. Alonso |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| SEARS PROTECTION Company, SEARS, | ) | |
| ROEBUCK and Co. and SEARS | ) | |
| HOLDINGS Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT**

**Christopher Jackman**
**Executive Vice President**
Monument Economics Group, LLC.
1530 Wilson Blvd.
Suite 560
Arlington, VA 22209

July 28, 2017

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 9 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 2 of 27 PageID #:1939

# TABLE OF CONTENTS

I.   Introduction ........................................................................................................................... 1

    A.   Background .................................................................................................................. 1

    B.   Assignment .................................................................................................................. 3

    C.   Materials Reviewed ..................................................................................................... 5

    D.   Conclusions ................................................................................................................. 5

II.  Key Sears Databases ............................................................................................................ 6

III. Breach of Contract Claims .................................................................................................. 8

    A.   Availability of data ...................................................................................................... 8

    B.   Methodology to measure damages suffered by proposed Breach of Contract Class
        members ..................................................................................................................... 13

IV.  Unjust Enrichment Claims ................................................................................................ 15

    A.   Availability of data .................................................................................................... 15

    B.   Methodology to measure damages suffered by proposed Unjust Enrichment Class
        members ..................................................................................................................... 16

V.   Consumer Fraud Claims .................................................................................................... 16

    A.   Availability of data .................................................................................................... 17

    B.   Methodology to measure damages suffered by proposed Consumer Fraud Class members
        ....................................................................................................................................... 17

VI.  Conclusions ........................................................................................................................ 18

i

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 10 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 3 of 27 PageID #:1940

# I. Introduction

## A. Background

1.     I am the Executive Vice President at Monument Economics Group, LLC.
("Monument"), an economic consulting firm based in Arlington, Virginia.
Monument provides economic research and quantitative and statistical analyses
to clients in the United States, Canada, and elsewhere internationally.  I graduated
from Johns Hopkins University with a B.A. in Economics.  I also earned an
M.B.A. from Indiana University.

2.     Prior to co-founding Monument, I held positions at other consulting firms.
From 2004 until 2008, I was a Research Analyst (later Associate and Senior
Associate) at LECG in Cambridge, MA, and Washington, DC; from 2008 until
2011, I was a Consultant at Econ One Research in Washington, DC; from 2011
until 2013 I was an Economist at Advanced Analytical Consulting Group in
Arlington, VA; and from 2013 until 2016, I was a Managing Director at Nathan
Associates Inc. where I managed the litigation consulting activities in the
Arlington, VA and Irvine, CA offices.  Throughout my career, I have consulted
on a variety of complex litigation matters in areas such as antitrust, finance, and
consumer fraud.  I have analyzed business valuation, liability, and damages issues
in support of multi-million dollar awards and assisted counsel with economic
damages estimates for pre-litigation and settlement purposes.  My experience
includes developing econometric models used to measure overcharges in
horizontal price-fixing conspiracies and implicit prices associated with bundled
goods in consumer fraud matters, as well as complex income, market and asset-
based financial models for use in valuation and forecasting.  I have also developed
and maintained current and interactive indexes in various industries for use in the
evaluation of assets and securities.  Many of the matters I have worked on and
managed have involved the cleaning, coding, compilation, and analysis of large
transaction-level databases.  A copy of my C.V. is attached to this report as
Appendix A.

1

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 11 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 4 of 27 PageID #:1941

3.    Monument is being compensated for my work in this matter at my customary hourly rate of ████████. Monument's compensation in this matter is not contingent upon the content of my Expert Report or the outcome of this litigation.

4.    I understand that Plaintiffs allege that Defendants[1] Sears Protection Company ("SPC") and Sears, Roebuck and Co. ("SRC") (collectively "Sears") entered into master protection agreements ("MPAs") that were "deceptive and illusory because Sears did not in fact provide the bargained for coverage of the products that the agreements purported to cover."[2] I understand that customers "can enter into an MPA by adding protection coverage when the product is originally purchased at a store, or online."[3] Further, I understand customers can obtain "coverage to other products in the house, post-point-of-purchase," by speaking with a Sears technician or a Sears call center.[4] I understand Plaintiffs allege that "Sears engaged in a course of conduct whereby it deceived consumers, misrepresenting to customers that their products were covered by the master service agreement after Plaintiffs and members of the Class identified the products that they wanted to include in the agreements and paid the charges Sears billed for such coverage."[5] I understand Plaintiffs allege that "Sears did not determine whether Sears actually could or would provide service maintenance coverage for those products until a repair or service request was made by the owner."[6] I understand Plaintiffs allege that "Sears continued to charge for

---

[1] I understand that the Court has dismissed Sears Holdings Corporation as a Defendant in this matter. See United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Memorandum Opinion and Order, filed February 2, 2016; and United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Memorandum Opinion and Order, filed March 27, 2017.

[2] United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, First Amended Class Action Complaint, filed March 11, 2016 (hereafter "Complaint") at ¶¶2-3.

[3] Complaint at ¶24.

[4] Complaint at ¶24.

[5] Complaint at ¶41.

[6] Complaint at ¶41.

2

products it could not and never intended to repair or service, and that "Sears did
not communicate to its customers that it could not or would not provide service
maintenance coverage."[7] I further understand that Plaintiffs allege that Sears did
not return all monies "wrongfully received for products that Sears does not
actually cover."[8]

  *B. Assignment*

5.    I have been asked by Counsel for the Plaintiffs in this matter to analyze
whether a standard and reliable methodology exists that would allow me to utilize
data and information possessed by Sears to measure damages suffered by
proposed class members as a result of the alleged misconduct (if it is found to
have taken place) without resorting to individualized inquiry under three causes of
action: a breach of express contract; unjust enrichment; and a violation of
Pennsylvania's Unfair Trade Practices and Consumer Protection Law.[9] I
understand from Counsel for the Plaintiffs that the proposed class with respect to
Plaintiffs' breach of express contract claim ("Breach of Contract Class") is
defined as follows:

> All individuals and entities who paid for aftermarket MPAs
> (including post-point-of-sale purchases of coverage, purchases of
> coverage for products bought from a retailer other than Sears,
> and/or subsequent renewals of coverage) for products which were
> not covered by or eligible for coverage under the MPA, and never
> received a full refund.

I understand from Counsel for the Plaintiffs that the earliest date that the Court
could apply the statute of limitations with respect to the proposed Breach of
Contract Class is March 25, 2000. Therefore, I have limited my analysis of the

---

[7] Complaint at ¶41.
[8] Complaint at ¶41.
[9] For the purposes of my analysis contained in this Expert Report, I have assumed that the
Plaintiffs prevail on their claims with respect to the alleged misconduct.

3

proposed Breach of Contract Class to the period from March 25, 2000 to the present ("Relevant Breach of Contract Period").[10]

6.    I understand from Counsel for the Plaintiffs that the proposed class with respect to Plaintiffs' unjust enrichment claim ("Unjust Enrichment Class") is defined as follows:

> All individuals and entities who paid for aftermarket MPAs (including post-point-of-sale purchases of coverage, purchases of coverage for products bought from a retailer other than Sears, and/or subsequent renewals of coverage) for products which were not covered by or eligible for coverage under the MPA, and never received a full refund.

7.    I understand from Counsel for the Plaintiffs that the earliest date that the Court could apply the statute of limitations with respect to the proposed Unjust Enrichment Class is March 25, 2005.  Therefore, I have limited my analysis of the proposed Unjust Enrichment Class to the period from March 25, 2005 to the present ("Relevant Unjust Enrichment Period").[11]

8.    I understand from Counsel for the Plaintiffs that the proposed class with respect to Plaintiffs' Pennsylvania Unfair Trade Practices and Consumer Protection Law claim ("Consumer Fraud Class") is defined as follows:

> All residents of Pennsylvania who paid for aftermarket MPAs (including post-point-of-sale purchases of coverage, purchases of coverage for products bought from a retailer other than Sears, and/or subsequent renewals of coverage) for products which were

---

[10] Should any additional information regarding any statute of limitation applied by the Court with respect to Plaintiffs' breach of contract claim be made known at a time following the filing of this Expert Report, I reserve the right to revise my analysis accordingly in light of such new information.

[11] Should any additional information regarding any statute of limitation applied by the Court with respect to Plaintiffs' unjust enrichment claim be made known at a time following the filing of this Expert Report, I reserve the right to revise my analysis accordingly in light of such new information.

18-23538-shl   Doc 3170-4   Filed 04/12/19   Entered 04/12/19 12:38:29   EXHIBIT A
(part 3) - SRC Claim   Pg 14 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 7 of 27 PageID #:1944

not covered by or eligible for coverage under the MPA, and never received a full refund.

I understand from Counsel for the Plaintiffs that the earliest date that the Court could apply the statute of limitations with respect to the proposed Consumer Fraud Class is March 25, 2004. Therefore, I have limited my analysis of the proposed Consumer Fraud Class to the period from March 25, 2004 to the present ("Relevant Consumer Fraud Period").[12]

### C.  Materials Reviewed

9.     In performing my analysis, I have reviewed a variety of materials that were produced as part of this litigation, including sample datasets, deposition transcripts, and miscellaneous Sears company documents. A complete list of the materials I have relied upon in forming my opinions is contained in Appendix B. I understand that discovery is ongoing in this matter. Should any additional information regarding Sears' MPAs be made available to me at a later stage of this litigation, I reserve the right to revise my analysis accordingly.

### D.  Conclusions

10.    Based on the materials I have reviewed to date, I have determined that a standard and reliable methodology exists that could allow me to utilize data and information likely possessed by Sears to measure damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes during the Relevant Breach of Contract Period, Relevant Unjust Enrichment Period, and Relevant Consumer Fraud Period, respectively, as a result of the alleged misconduct (if it is found to have taken place) without resorting to

---

[12] Should any additional information regarding any statute of limitation applied by the Court with respect to Plaintiffs' consumer fraud claim be made known at a time following the filing of this Expert Report, I reserve the right to revise my analysis accordingly in light of such new information.

18-23538-shl   Doc 3170-4   Filed 04/12/19   Entered 04/12/19 12:38:29   EXHIBIT A
(part 3) - SRC Claim   Pg 15 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 8 of 27 PageID #:1945

individualized inquiry.[13] I discuss the bases of these conclusions in more detail below.

## II.   Key Sears Databases

11.   Based on my review of the materials that have been made available to me to date, Sears appears to maintain data and information that could likely allow to measure damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes during the Relevant Breach of Contract Period, Relevant Unjust Enrichment Period, and Relevant Consumer Fraud Period, respectively, as a result of the alleged misconduct without resorting to individualized inquiry. This data and information appears to be spread out over a number of databases. Connecting these databases for Sears sales associates is a software platform called Ciboodle, which is a "desktop system that associates use to retrieve and produce price quotes to customers."[14] "Ciboodle is the more mouse-click-friendly user application that the majority of front line agents use."[15] Feeding into Ciboodle are two key Sears databases: NPS and NPJ.[16] According to Katrina Means, Director of Sears' Service Contracts division, NPS is a database that stores information related to "the service side of the business," while NPJ is a database related to the "service contract side" of the business and stores "all of the Pricing Customer Service Contract Agreements."[17] Collectively, NPS and NPJ are referred to as the "Legacy system."[18] Storing the data that feeds Sears'

---

[13] Should any additional information regarding Sears' MPAs be made available to me at a later stage of this litigation, I reserve the right to revise my opinions in light of this new information at the appropriate time.
[14] United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Oral Deposition of Dainon Setzer, December 17, 2015 (hereafter "December 2015 Setzer Deposition") at 121:2-14.
[15] December 2015 Setzer Deposition at 121:21-122:9.
[16] United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Deposition of Katrina Means, June 29, 2016 (hereafter "Means Deposition") at 23:13-18, 63:2-6.
[17] Means Deposition at 6:14-18, 22:23-23:12.
[18] Means Deposition at 23:19-24:1. I have noted that, at his December 2015 deposition, Dainon Setzer of Sears appears to refer to NPS singularly as the "legacy system the lives kind of below Ciboodle," expanding further that it's a "mainframe green screen old technology, but it's still the

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 16 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 9 of 27 PageID #:1946

Legacy system is its data warehouse, or LCI.[19]  According to Dainon Setzer,
National Operations Manager at Sears, this data warehouse functions as "the
server behind NPS."[20]  Further, Mr. Setzer testified that the information stored in
Sears' data warehouse goes back "at least 20 years."[21]

12.  In addition to Sears' data warehouse and Legacy system, Sears also
maintains a "merchandise brand qualification" called Manage Merchandise
Information ("MMI") that is incorporated into Ciboodle's infrastructure that
contains information on the brands and products that are covered under its
MPAs.[22]  MMI was implemented into Ciboodle on March 17, 2009.[23]

13.  Prior to the incorporation of MMI into Ciboodle, Sears associates relied on
an "Eligible Brands List" that was maintained internally by Sears to determine if a
given product was eligible for coverage under an MPA.[24]  The information
contained in the Eligible Brands List was accessible through the PA Resource
Center, which is an internal Sears "intranet home page for protection agreement
coverage," which is "meant as the internal associate-facing helpful tool place for
administering and selling and talking about and understanding protection
agreements."[25]  From time to time, the Eligible Brands List is revised
"[c]ompletely as brands come and go in coordination with product engineers and
repair services."[26]  According to Mr. Setzer, prior versions of the Eligible Brands

---

source of most of our pricing and customer database." See December 2015 Setzer Deposition at
121:21-122:9.
[19] Means Deposition at 62:8-63:6.
[20] December 2015 Setzer Deposition at 16:1-4, 175:19-23.
[21] December 2015 Setzer Deposition at 176:23-177:1.
[22] See December 2015 Setzer Deposition at 137:18-139:9 and Exhibit 10 at SEARS0003023. See,
also, Means Deposition at 24:2-8; SEARS0009942.
[23] United States District Court for the Northern District of Illinois Eastern Division, Nina Greene,
et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No, 1:15-cv-02456, Defendants'
Second Supplemental Answer to Plaintiffs' Interrogatory No. 3 of Plaintiffs' Second Set of
Interrogatories, November 30, 2016, p. 4.
[24] Means Deposition at 93:23-94:8, 108:14-22, and Exhibit 11; December 2015 Setzer Deposition
at 152:16-157:24. The Eligible Brands List is still maintained by Sears. See December 2015
Setzer Deposition at 152:20-155:20.
[25] December 2015 Setzer Deposition at 63:13-15, 118:3-120:8; Means Deposition at 108:14-109:4.
[26] December 2015 Setzer Deposition at 153:16-154:15.

18-23538-shl   Doc 3170-4   Filed 04/12/19   Entered 04/12/19 12:38:29   EXHIBIT A
(part 3) - SRC Claim   Pg 17 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 10 of 27 PageID #:1947

List have been "saved somewhere" by Sears, and that there is a way to determine
the "revision date" of those documents.[27] Mr. Setzer also testified that his
recollection was that, when accessing the Eligible Brands List in the PA Resource
Center, the user was able to see the revision date of the most current list.[28]

14.   I discuss in more detail below the data and information likely contained in
these databases that could allow me to apply my methodology to measure
damages suffered by proposed class members as a result of the alleged
misconduct (if it is found to have taken place) without resorting to individualized
inquiry. Should any additional information regarding the data and information
maintained by Sears with respect to its MPAs be made available to me at a later
stage of this litigation, I reserve the right to revise my opinions accordingly.

### III.   Breach of Contract Claims

15.   As I previously discussed, I have been asked by Counsel to analyze whether
a standard and reliable methodology exists that could allow me to utilize data and
information possessed by Sears to measure damages suffered by proposed Breach
of Contract Class members as a result of the alleged misconduct (if it is found to
have taken place) without resorting to individualized inquiry. Based on the
materials I have reviewed to date, it is my opinion that such a methodology exists.
I discuss this methodology in more detail below.

#### A.   Availability of data

16.   I discussed above certain key databases maintained by Sears. In this
section, I discuss the types of data and information likely contained in these

---

[27] December 2015 Setzer Deposition at 153:16-158:9. At his December 2015 deposition, Mr.
Setzer caveated this testimony to reflect that he was only certain of this practice dating back to
2010, when he took over responsibility of updating the Eligible Brands List. See December 2015
Setzer Deposition at 155:15-157:24. However, evidence I have reviewed suggests that Sears has
likely maintained versions of the Eligible Brands List prior to 2010 that include a revision date on
them. For example, one set of Eligible Brand Lists produced as part of this litigation reflect a
revision date of March 31, 2004 for certain categories of products. See, for example,
SEARS0008985-09056. Further, Mr. Setzer testified that the Eligible Brands List has been used
by Sears since at least 1996 when he started working for Sears. See December 2015 Setzer
Deposition at 37:10-13, 142:14-143:8.
[28] December 2015 Setzer Deposition at 154:16-155:14.

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 18 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 11 of 27 PageID #:1948

databases that could allow me to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct without resorting to individualized inquiry.

17.    For example, to start, Sears' data warehouse can be queried in order to identify all MPAs in existence at any given time, including during the Relevant Breach of Contract Period.[29] Such a dataset can then be limited to aftermarket MPAs sold by Sears.[30] Further, based on my review of the materials produced to date, certain key information about the customers who purchased aftermarket MPAs from Sears during this time are likely available. For example, the name and address of each customer who purchased a given aftermarket MPA during the Relevant Breach of Contract Period, as well as the Sears-generated customer number associated with each of those customers, can be queried from the data warehouse.[31] In addition, the agreement number (which is also referred to as the certificate number) associated with each MPA sold by Sears can be queried from the data warehouse, as can the start and end dates associated with each MPA.[32] Furthermore, a list of the products covered by a given MPA, including information on product type and brand, can be queried from Sears' data warehouse.[33]

18.    Another piece of information that could be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged

---

[29] December 2015 Setzer Deposition at 175:1-177:1.

[30] For example, Katrina Means testified at deposition that a query could be built to identify MPAs that were sold that covered products that were not purchased at a Sears store or on Sears.com. See Means Deposition at 60:3-20, 76:20-78:17. See, also, United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Deposition of Dainon Setzer, June 28, 2016 (hereafter "June 2016 Setzer Deposition") at 18:2-11, 50:20-51:5, 75:4-13; December 2015 Setzer Deposition at 29:16-30:1.

[31] See, for example, June 2016 Setzer Deposition at 6:17-12:5, Exhibit 17, Exhibit 20a; December 2015 Setzer Deposition at 171:8-16, Exhibit 16 at SEARS0002515; Means Deposition at 62:11-15.

[32] June 2016 Setzer Deposition at 6:17-16:12, Exhibit 17. The agreement number associated with a given MPA consists of the customer number of the customer who purchased the MPA, followed by a five-digit agreement suffix. See June 2016 Setzer Deposition at 12:6-18.

[33] December 2015 Setzer Deposition at 171:8-16; Means Deposition at 62:11-15; June 2016 Setzer Deposition at 6:17-19:17, 40:4-15, 62:7-63:9, Exhibit 20a.

18-23538-shl   Doc 3170-4   Filed 04/12/19   Entered 04/12/19 12:38:29   EXHIBIT A
(part 3) - SRC Claim   Pg 19 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 12 of 27 PageID #:1949

misconduct is a record of the products that were eligible for coverage under a
Sears MPA at a given point in time during the Relevant Breach of Contract
Period. One such source of this information is the Eligible Brands Lists, which
contain information on the brands and types of products that are eligible for
coverage under an MPA at a given point in time.[34] Eligible Brands Lists have
been used by Sears to determine product eligibility for MPAs since at least 1996,
prior to the start of the Relevant Breach of Contract Period, and are still currently
in use.[35] As I previously discussed, from time to time, Sears revised its Eligible
Brands List as certain brands were added or removed from eligibility for MPA
coverage over time.[36] In addition, as I previously discussed, evidence indicates
that prior versions of the Eligible Brands List have been "saved somewhere" by
Sears, and that there is a way to determine the "revision date" of those
documents.[37,38]

19.   In order to incorporate this information into my damages methodology, I
would first take the information contained in all of the Eligible Brands Lists that
were effective at any point during the Relevant Breach of Contract Period and
create a database that, for every brand-product type combination (e.g. Maytag
Refrigerator), includes any relevant start or end date(s) for aftermarket MPA
coverage eligibility that may have occurred during the Relevant Breach of
Contract Period (hereafter "BOC Eligible Brands Database"). As I discuss in
more detail below, this BOC Eligible Brands Database could allow me to
determine if a given product that was covered by an aftermarket MPA that was

---

[34] December 2015 Setzer Deposition at 152:20-155:20.

[35] December 2015 Setzer Deposition at 37:10-13, 142:14-143:8, 152:20-155:20.

[36] December 2015 Setzer Deposition at 153:16-154:15.

[37] December 2015 Setzer Deposition at 153:16-158:9.

[38] Earlier in this Expert Report, I discussed MMI, which is "merchandise brand qualification" that
is incorporated into Ciboodle's infrastructure that contains information on the brands and products
that are covered under its MPAs. See December 2015 Setzer Deposition at 137:18-139:9 and
Exhibit 10 at SEARS0003023. See, also, Means Deposition at 24:2-8. According to Mr. Setzer,
the information contained in MMI matches the information contained on Sears' Eligible Brand
Lists. See December 2015 Setzer Deposition at 152:16-153:7. Therefore, the information
included in MMI could potentially serve as an alternative source of information regarding eligible
brands and product types for MPA coverage for the period for which MMI was being used by
Sears.

purchased during the Relevant Breach of Contract Period was, in fact, eligible for
coverage at the time of purchase.

20.    Another piece of information that could be used to measure damages
suffered by proposed Breach of Contract Class members as a result of the alleged
misconduct is the price paid for each product covered by a given MPA.
According to Mr. Setzer, the data warehouse can be queried to determine "how
much Sears charged for a particular MPA."[39]  Mr. Setzer further testified that
when a customer purchases an aftermarket MPA covering multiple products, the
MPA is priced on a per-product basis.[40]  Further, if customers wished to discuss
the prices they were being charged for individual products covered under a single
MPA, Mr. Setzer indicated that Sears sales representatives would have access to
the information necessary to discuss these individual product prices with
customers.[41]  This implies that individual product MPA pricing information is
likely maintained internally by Sears in a database such as the data warehouse to
enable Sears sales representatives to access such information in the event a
customer wishes to discuss those prices.

21.    However, in the event that prices for individual products covered by a single
MPA are not available through the data warehouse, evidence I have reviewed
indicates that this information can likely be obtained through other means. For
instance, at deposition, Mr. Setzer described the process that Sears uses to price
individual products that are covered by aftermarket MPAs.[42]  Mr. Setzer further
testified that a record of "prices [...] for every single [...] type of product that
could be covered" by an MPA is "stored and saved" by Sears.[43]  Therefore, if
information on the prices paid by customers for individual products covered by an

---

[39] December 2015 Setzer Deposition at 177:2-6.
[40] December 2015 Setzer Deposition at 84:16-19.
[41] December 2015 Setzer Deposition at 84:20-85:3.
[42] December 2015 Setzer Deposition at 82:5-83:12.
[43] December 2015 Setzer Deposition at 82:5-84:14.  At her deposition, Ms. Means also discussed
some of the details associated with how pricing is determined for individual products covered by
an aftermarket MPA.  She noted that the availability of information on prices that Sears charged
for different types of products for MPA coverage was "all system."  See Means Deposition at
125:19-127:22.

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 21 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 14 of 27 PageID #:1951

MPA is not available through a query of the data warehouse or any other Sears database, then the aforementioned record of prices for product types based on Sears' pricing formula could likely be used to determine the individual product prices paid by customers associated with their MPAs.

22.    Another piece of information that could be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct is the refund amount, if any, that was issued by Sears for a given product that was covered by an aftermarket MPA during the Relevant Breach of Contract Period. According to Mr. Setzer, the Sears Legacy system can be queried to determine if a refund was issued on a particular MPA, as well as the amount and the date of any such refunds.[44] Further, evidence I have reviewed indicates that information on refunds issued by Sears for specific products covered by aftermarket MPAs is likely available through the Sears Legacy system.[45]

23.    Furthermore, I understand that prior to offering a refund, Sears offered customers replacement authorization credits for a certain dollar amount that customers could use to purchase a replacement item from Sears.[46] Evidence I have reviewed indicates that Sears maintains data on replacement authorizations for products included in customers' MPAs that were ultimately fulfilled by the customer.[47] Included in these data are information on the brand and type of product that is included in a given MPA for which a replacement authorization was approved by Sears and fulfilled by the customer.[48] Further, these data include information on the value of the replacement authorization credits Sears offered a customer for a given product, as well as the retail price of the Sears

---

[44] December 2015 Setzer Deposition at 179:15-180:2; June 2016 Setzer Deposition at 27:2-18, Exhibit 17.

[45] See, for example, December 2015 Setzer Deposition at 190:23-191:16. See, also, June 2016 Setzer Deposition at 6:17-8:22, 19:10-17, 62:7-63:5, Exhibit 17, Exhibit 20a.

[46] See, for example, SEARS0000397-0401 at 0398; SEARS0008724-743 at 735-736. At deposition, Mr. Setzer explained how the replacement authorization credit was determined. See June 2016 Setzer Deposition at 67:22-68:6.

[47] June 2016 Setzer Deposition at 56:2-57:13, Exhibit 20a

[48] June 2016 Setzer Deposition at 62:7-63:9, Exhibit 20a.

12

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 22 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 15 of 27 PageID #:1952

product the customer opted to purchase as a replacement.[49]  In addition, these data also include information on the "date that the replacement authorization value was given to the customer."[50]

24.    As I discussed, evidence I have reviewed indicates that the data discussed above are likely maintained by Sears in the regular course of business, and could likely be used to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry.  Should any additional information regarding these data be made available to me at a later stage of this litigation, I reserve the right to revise my opinions accordingly.

### B.  Methodology to measure damages suffered by proposed Breach of Contract Class members

25.    Above I described the data and information likely maintained by Sears that could allow me to measure damages suffered by proposed Breach of Contract Class members as a result of the alleged misconduct without resorting to individualized inquiry.  Here I describe the methodology I could implement using those data to measure damages suffered by members of the proposed Breach of Contract Class.  This methodology would begin by creating an MPA dataset ("Master BOC MPA Dataset") that includes the following fields of data discussed above: agreement number, MPA start date, MPA end date, MPA type (point-of-sale or aftermarket), customer name, customer address, customer number, product brand,[51] product type, and price.[52]  The Master BOC MPA Dataset would then be

---

[49] June 2016 Setzer Deposition at 65:7-10, 67:11-68:6, Exhibit 20a; December 2015 Setzer Deposition at 56:14-57:3.

[50] June 2016 Setzer Deposition at 65:24-66:5.

[51] I understand that, prior to the implementation of MMI into Ciboodle in March 2009, there were instances in which the brand associated with a given product covered by an aftermarket MPA was not recorded by the Sears sales representative, leaving this field blank in the data warehouse. According to Mr. Setzer, "the majority of coverage had a brand name listed because we would always ask, but it wasn't as good as it is now because it wasn't a required field."  See December 2015 Setzer Deposition at 142:14-143:24.  I understand from Counsel for the Plaintiffs that it may be appropriate to include some or all of these products in my damages analysis.  Should that be the case, my damages methodology would allow me to do so using reasonable assumptions where necessary.  Should any additional information regarding missing product brand information

limited to aftermarket MPAs with start dates that occurred during the Relevant Breach of Contract Period (March 25, 2000 to the present).

26.   Next, in order to identify the products in the Master BOC MPA Dataset that were included as part of an aftermarket MPA sold by Sears, yet were not covered by or eligible for coverage under the MPA, I would merge certain information from the BOC Eligible Brands Database (discussed above) onto the Master BOC MPA Dataset. Specifically, using the product type and product brand information included in both datasets, I would create two new fields of data in the Master BOC MPA Dataset: the start date and the end date during which a given product brand-type combination (e.g. Maytag Refrigerator) was included on Sears' Eligible Brands List. Once these two fields of data are merged onto the Master BOC MPA Dataset, I could run a query to determine if the MPA start date for a given product falls inside or outside of this eligible brands range of coverage for that product. Then, any MPA start dates that fall inside their corresponding eligible brands range of coverage will be eliminated from the Master BOC MPA Dataset.

27.   The last step before calculating damages is to determine if Sears has issued any refunds or replacement authorization credits (that were fulfilled by the customer) in connection with any of the products that remain in the Master BOC MPA Database. I discussed the availability of such refund and replacement authorization credits above. Using the agreement number, product brand, and product type data fields, I would merge the dollar amount of any refund or replacement authorization credit (fulfilled by the customer) issued by Sears during the Relevant Breach of Contract Period for a given product covered by a given aftermarket MPA onto the Master BOC MPA Database. Once this information is

---

related to sales of aftermarket MPAs be made available to me at a later stage of this litigation, I reserve the right to revise my analysis accordingly.
[52] In the Master BOC MPA Dataset, each individual product covered by an MPA would constitute its own observation (or row) of data in the database. For example, if a single MPA covered five different products, the data in the Master BOC MPA Dataset with respect to that MPA would constitute five separate observations.

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 24 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 17 of 27 PageID #:1954

merged, I would eliminate any observations for which a customer received a full
refund (or equivalent replacement authorization credits) of the MPA price for a
given product during the Relevant Breach of Contract Period from the Master
BOC MPA Database.

28.    Lastly, to calculate damages, I could simply subtract the refund or
replacement authorization credit amounts (if any) associated with the remaining
products in the Master BOC MPA Database from the MPA prices paid by
customers for those products.  Then, summing these differences across all
products in the Master BOC MPA Database would yield damages suffered by
members of the proposed Breach of Contract Class.

### IV.    Unjust Enrichment Claims

29.    In addition to Plaintiffs' breach of contract claims, I have also been asked by
Counsel for the Plaintiffs to analyze whether a standard and reliable methodology
exists that could allow me to utilize data and information possessed by Sears to
measure damages suffered by proposed Unjust Enrichment Class members as a
result of the alleged misconduct (if it is found to have taken place) without
resorting to individualized inquiry.  Based on the materials I have reviewed to
date, it is my opinion that such a methodology exists.  I discuss this methodology
in more detail below.

#### A.    Availability of data

30.    In Section III.A of this Expert Report I discussed a variety of data that are
likely maintained by Sears that could be used to measure damages suffered by
proposed Breach of Contract Class members as a result of the alleged misconduct
(if it is found to have taken place) without resorting to individualized inquiry.
This included the data contained in the Master BOC MPA Database, the BOC
Eligible Brands Database, and additional data with respect to the dollar amount of
any refund or replacement authorization credit (fulfilled by the customer) issued
by Sears during the Relevant Breach of Contract Period for a given product
covered by a given aftermarket MPA.  It is my opinion that these data could likely

15

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 25 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 18 of 27 PageID #:1955

also be used to measure damages suffered by proposed Unjust Enrichment Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry with one key difference, which I discuss in more detail below. Should any additional information regarding these data be made available to me at a later stage of this litigation, I reserve the right to revise my opinions accordingly.

### B. Methodology to measure damages suffered by proposed Unjust Enrichment Class members

31.    In Section III.B of this Expert Report, I described a methodology I could implement using data discussed in Section III.A to measure damages suffered by members of the proposed Breach of Contract Class. These data could likely also be used to measure damages suffered by proposed Unjust Enrichment Class members as a result of the alleged misconduct without resorting to individualized inquiry with one key difference. As I previously discussed, the Relevant Unjust Enrichment Period for the purposes of my analysis is March 25, 2005 to the present. In light of this later start date to the Relevant Unjust Enrichment Period as compared to the Relevant Breach of Contract Period, I would create alternate versions of the Master BOC MPA Database and the BOC Eligible Brands Database that are limited to the Relevant Unjust Enrichment Period, hereafter referred to as the "Master UE MPA Database" and the "UE Eligible Brands Database" respectively. My damages analysis could then proceed in the same manner I described above with respect to the Breach of Contract Class.

### V.    Consumer Fraud Claims

32.    In addition to Plaintiffs' breach of contract and unjust enrichment claims, I have also been asked by Counsel for the Plaintiffs to analyze whether a standard and reliable methodology exists that could allow me to utilize data and information possessed by Sears to measure damages suffered by proposed Consumer Fraud Class members as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry in

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 26 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 19 of 27 PageID #:1956

connection with an alleged violation of Pennsylvania's Unfair Trade Practices and
Consumer Protection Law. Based on the materials I have reviewed to date, it is
my opinion that such a methodology exists. I discuss this methodology in more
detail below.

### A.  Availability of data

33.    In Section III.A of this Expert Report, I discussed a variety of data that are
likely maintained by Sears that could be used to measure damages suffered by
proposed Breach of Contract Class members as a result of the alleged misconduct
(if it is found to have taken place) without resorting to individualized inquiry.
This included the data contained in the Master BOC MPA Database, the BOC
Eligible Brands Database, and additional data with respect to the dollar amount of
any refund or replacement authorization credit (fulfilled by the customer) issued
by Sears during the Relevant Breach of Contract Period for a given product
covered by a given aftermarket MPA. It is my opinion that these data could likely
also be used to measure damages suffered by proposed Consumer Fraud Class
members as a result of the alleged misconduct (if it is found to have taken place)
without resorting to individualized inquiry with two key differences, which I
discuss in more detail below. Should any additional information regarding these
data be made available to me at a later stage of this litigation, I reserve the right to
revise my opinions accordingly.

### B.  Methodology to measure damages suffered by proposed Consumer Fraud
   Class members

34.    In Section III.B of this Expert Report, I described a methodology I could
implement using data discussed in Section III.A to measure damages suffered by
members of the proposed Breach of Contract Class. These data could likely also
be used to measure damages suffered by proposed Consumer Fraud Class
members as a result of the alleged misconduct without resorting to individualized
inquiry with two key differences. First, as I previously discussed, the Relevant
Consumer Fraud Period for the purposes of my analysis is March 25, 2004 to the

18-23538-shl   Doc 3170-4   Filed 04/12/19   Entered 04/12/19 12:38:29   EXHIBIT A
(part 3) - SRC Claim   Pg 27 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 20 of 27 PageID #:1957

present. In light of this later start date to the Relevant Consumer Fraud Period as compared to the Relevant Breach of Contract Period, I would create alternate versions of the Master BOC MPA Database and the BOC Eligible Brands Database that are limited to the Relevant Consumer Fraud Period, hereafter referred to as the "Master CF MPA Database" and the "CF Eligible Brands Database" respectively. In addition, as I previously discussed, the proposed Consumer Fraud Class is limited to residents of Pennsylvania. As such, as part of my damages analysis, I would also limit the Master CF MPA Database to residents of Pennsylvania using the customer address data field. My damages analysis could then proceed in the same manner I described above with respect to the Breach of Contract Class.[53]

## VI.   Conclusions

35.   Based on the materials I have reviewed to date, I have determined that a standard and reliable methodology exists that could allow me to utilize data and information likely possessed by Sears to measure damages suffered by members of the proposed Breach of Contract, Unjust Enrichment, and Consumer Fraud Classes during the Relevant Breach of Contract Period, Relevant Unjust Enrichment Period, and Relevant Consumer Fraud Period, respectively, as a result of the alleged misconduct (if it is found to have taken place) without resorting to individualized inquiry.

Christopher Jackman

July 28, 2017

---

[53] I understand from Counsel for the Plaintiffs that under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, the Court may award damages up to three times the actual damages suffered by the Plaintiffs. Should the Court decide to do so, I could adjust my measurement of damages accordingly.

18

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 28 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 21 of 27 PageID #:1958

# Appendix A.

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 29 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 22 of 27 PageID #:1959



## Christopher Jackman

Executive Vice President
Monument Economics Group
Phone: (703) 465-5600
Email: cjackman@megconsulting.com

### Professional Summary

Christopher Jackman has over thirteen years of experience assisting clients with complex litigation in the areas of antitrust, finance, and consumer fraud. Mr. Jackman specializes in supporting analyses for expert testimony in litigation and business matters. In addition, he has analyzed business valuation, liability, and damages issues in support of multi-million dollar awards and assisted counsel with economic damages estimates for pre-litigation and settlement purposes.

Mr. Jackman's experience spans industries including telecommunications, energy, healthcare, investment services, chemicals, airlines, cabotage, real estate, banking, baby products, oil, and consumer electronics. His experience includes developing sophisticated econometric models used to measure overcharges in horizontal price-fixing conspiracies and implicit prices associated with bundled goods in consumer fraud matters, as well as complex income, market and asset-based financial models for use in the valuation and forecasting processes. He has also developed and maintained current and interactive indexes in various industries for use in the evaluation of assets and securities.

Before co-founding Monument Economics Group, Mr. Jackman was a Managing Director at Nathan Associates. Prior to that, he was an Economist at Advanced Analytical Consulting Group, a Consultant at Econ One Research, Inc., and a Senior Associate at LECG Corp.

Mr. Jackman has a B.A. in Economics from Johns Hopkins University and an M.B.A. from Indiana University.

1

18-23538-shl   Doc 3170-4   Filed 04/12/19   Entered 04/12/19 12:38:29   EXHIBIT A
(part 3) - SRC Claim   Pg 30 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 23 of 27 PageID #:1960

## Education

- B.A., Economics, Johns Hopkins University, 2002
- M.B.A., Indiana University, 2014

## Testifying Experience

*Benjamin Hankinson, et al. v. R.T.G. Furniture Corp. et al.*

- United States District Court Southern District of Florida
- Case No.: 9:15-cv-81139-COHN/SETZLER
- Declaration, August 31, 2016
- Testified at deposition, October 26, 2016
- Opinion concerning data processing and analysis issues
- Retained by Cohen Milstein Sellers & Toll PLLC

## Selected Consulting Experience

- *In Re: Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation.* In a class action antitrust matter involving ductile iron pipe fittings, managed analysis of class certification, merits, and damages issues, industry research and preparation of expert declaration and exhibits.

- *In Re: Cast Iron Soil Pipe and Fittings Antitrust Litigation.* In a class action antitrust matter involving cast iron soil pipes and fittings, managed analysis of class certification and damages issues, industry research and preparation of expert declaration and exhibits.

- *Lane's Gifts and Collectibles, LLC v. Microsoft Online, Inc.* In a class action antitrust matter involving online advertisements, managed analysis of damages issues, as well as the preparation of expert report and exhibits.

- *BlueCross BlueShield of Tennessee, Inc., et al. v. King Pharmaceuticals, Inc., et al.* In an antitrust matter involving the delayed entry of a generic muscle relaxant drug, managed analysis of defendant transaction-level database, and the preparation of expert report and exhibits.

- *Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.* In a class action antitrust matter involving aftermarket automotive sheet metal, managed analysis of class certification, merits, and damages issues, industry research and preparation of expert reports and exhibits.

- *In Re: Polyurethane Foam Antitrust Litigation.* In a class action antitrust matter involving flexible, slabstock polyurethane foam, managed analysis of class certification, merits, and damages issues, industry research and preparation of expert reports and exhibits, as well as critiques of opposing expert analyses.

- *Thomas Boland, v. Consolidated Multiple Listing Service, Inc., et al.* In a class action antitrust matter involving commission rates associated with real estate services, assisted expert with analysis of class certification issues, industry research, and

preparation of expert report. Managed development of damages model using defendants' transaction-level data.

- *Eugene Allan, et al., v. Realcomp II, Ltd., et al.* In a class action antitrust matter involving commission rates associated with real estate services, assisted expert with analysis of class certification issues, industry research, preparation of expert report and critique of opposing expert analysis. Managed development of damages model using defendants' transaction-level data.

- *Nancy Jean Adams v. Apple, Inc., et al.* In a class action antitrust matter involving eBooks, managed analysis of class certification issues, industry research and preparation of expert affidavit, report, and exhibits.

- *In Re: Titanium Dioxide Antitrust Litigation.* In a class action antitrust matter involving titanium dioxide pigment, managed analysis of class certification, merits, and damages issues, industry research and preparation of expert declarations and exhibits, as well as critiques of opposing expert analyses.

- *Danny Lynn Electrical & Plumbing, LLC, et al., v. Veolia ES Solid Waste Southeast, Inc.* In a class action RICO matter involving certain fees associated with waste removal services in the southeastern United States, managed analysis of class certification issues, industry research, appropriateness of defendants' fee calculations, and worked with testifying expert on development of methodology for measuring damages and the preparation of expert report and exhibits.

- *Thomas L. Logue, et al., v. West Penn Multi-List, Inc. et al.* In a class action antitrust matter involving commission rates associated with real estate services, assisted expert with analysis of class certification issues, industry research, preparation of expert report and critique of opposing expert analysis. Managed development of damages model using defendants' transaction-level data.

- *In Re: Puerto Rican Cabotage Antitrust Litigation.* In a class action antitrust matter involving cabotage services along the U.S.-Puerto Rican trade route, managed analysis of class certification issues, market research, preparation of expert affidavits and response to opposing experts' affidavits. Performed estimate of damages for settlement purposes and assisted counsel with settlement claims process.

- *In Re: Mercedes-Benz Tele Aid Contract Litigation.* In a class action consumer fraud matter involving telematic equipment in Mercedes-Benz vehicles, managed analysis of market definition and class-wide impact, discovery support, market research, and preparation of expert report and exhibits.

- *In Re: Aftermarket Automotive Lighting Products Antitrust Litigation.* In a class action antitrust matter involving aftermarket auto lights, managed analysis of defendants' transaction-level databases for use in damages model.

- *Clarke and Rebecca Wixon, et al., v. Wyndham Resort Development Corp. (F/K/A Trendwest Resorts, Inc.), et al.* In a class action consumer fraud matter involving vacation timeshares, managed class certification analysis, discovery support, industry research, preparation of expert report and testimony, estimation of damages and response to opposing expert's reports.

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 32 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 25 of 27 PageID #:1962

- *Nathan Nygren, et al, v. Hewlett-Packard Company.* In a class action consumer fraud matter involving wireless functionality in laptop computers, managed market definition, class-wide impact and damages analyses, discovery support, preparation of expert report, testimony and response to opposing expert's report.

- *In Re: General Motors OnStar Litigation.* In a class action consumer fraud matter involving OnStar telematic equipment, managed analysis of class certification issues, damages analysis, discovery support, industry research, preparation of expert report and testimony, and critique of opposing expert's analysis.

- *McDonough, et al, v. Toys "R" Us, Inc. d/b/a Babies "R" Us, et al.* In a class action antitrust matter involving resale price maintenance agreements associated with various baby products, managed industry research, discovery support, and preparation of expert report and exhibits focusing on class-wide damages associated with the alleged misconduct. Developed and implemented damages model.

- *Tess Wiltz D/B/A Opelousas Crawfish House, et al, v. Bayer Cropscience, L.P., et al.* In a class action product liability matter involving crawfish, assisted expert with industry research, discovery support, and preparation of expert report, exhibits and testimony.

- *Chevron Phillips Chemical Company LP, v. BDP International, Inc.* In a breach of contract matter involving currency exchange fees, managed industry research, discovery support, verification of plaintiff's own damages model, alternative measurement of damages, and preparation of expert report and testimony.

- *Michael Harris, v. LG Philips LCD Co., Ltd., et al.* In a class action antitrust matter involving LCD panels and products, assisted expert with analysis of class certification issues, damages analysis, industry research, discovery support, preparation of expert report and exhibits and critique of opposing expert analysis.

## Professional Experience

- Monument Economics Group, LLC, Arlington, VA, Executive Vice President, October 2016 - present

- Nathan Associates Inc., Arlington, VA, Managing Director, January 2013 – October 2016

- Advanced Analytical Consulting Group, Inc., Arlington, VA, Economist, March 2011 – January 2013

- Econ One Research, Inc., Washington, DC, Consultant, September 2008 – March 2011

- LECG, Corp., Cambridge, MA and Washington, DC, Senior Associate, February 2004 – September 2008

## Publications

- "Mini-Roundtable – Evaluating Damages" (with Russell Lamb), *Corporate Disputes Magazine, October-December 2014,* 97-103.

# Appendix B.

18-23538-shl    Doc 3170-4    Filed 04/12/19    Entered 04/12/19 12:38:29    EXHIBIT A
(part 3) - SRC Claim    Pg 34 of 35
Case: 1:15-cv-02546 Document #: 151 Filed: 08/29/17 Page 27 of 27 PageID #:1964

## Materials Relied Upon

### Pleadings and Legal Correspondence

United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Memorandum Opinion and Order, filed February 2, 2016.

United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, First Amended Class Action Complaint, filed March 11, 2016.

United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Memorandum Opinion and Order, filed March 27, 2017.

United States District Court for the Northern District of Illinois Eastern Division, Nina Greene, et al., Plaintiffs, v. Sears Protection Company, et al., Defendants, No. 1:15-cv-02456, Defendants' Second Supplemental Answer to Plaintiffs' Interrogatory No. 3 of Plaintiffs' Second Set of Interrogatories, November 30, 2016.

### Depositions and Declarations

Deposition and Exhibits of Dainon Setzer, December 17, 2015.
Deposition and Exhibits of Dainon Setzer, June 28, 2016.
Deposition and Exhibits of Katrina Means, June 29, 2016.

### Produced Documents and Data

Documents

SEARS0000397-0401.        SEARS0008985-09056.
SEARS0008724-743.         SEARS0009942.

FedEx Ship Manager – Print Your Label(s)



ORIGIN ID:REDA    (215) 735-8700
DEBORAH R. GROSS, ESQ.
KAUFMAN, COREN & RESS, P.C.
TWO COMMERCE SQ., STE. 3900
2001 MARKET STREET
PHILADELPHIA, PA 19103
UNITED STATES US

SHIP DATE: 04APR19
ACTWGT: 1.90 LB
CAD: 1696420/INET4100

BILL SENDER

TO  C/O PRIME CLERK LLC

SEARS HOLDINGS CORP CLAIMSPROCESSI

850 3RD AVENUE

SUITE 412

BROOKLYN NY 11232

(215) 735-8700    REF: SEARS BKY
INV:
PO:    DEPT:

RECEIVED
APR 0 5 201
PRIME CLERK LLC

FedEx
Express

FRI - 05 APR 3:00P

STANDARD OVERNIGHT

TRK#
0201    7748 8941 6074

ASR

11232

E2 FBTA    NY-US    EWR

After printing this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

https://www.fedex.com/shipping/shipmentConfirmationAction.handle?method=doContinue

4/4/2019