# EXHIBIT E

*Certification Motion*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NINA GREENE and GERALD GREENE, | ) | No. 1:15-cv-02546 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Judge Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge Michael T. Mason |
| SEARS PROTECTION Company, SEARS, | ) | |
| ROEBUCK and Co. and SEARS HOLDINGS | ) | |
| Corporation, | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Nina and Gerald Greene, by and through their undersigned counsel, hereby move the Court for certification of two classes (defined in Plaintiffs' accompanying Memorandum of Law). In support of their motion, Plaintiffs contemporaneously submit a supporting Memorandum of Law and the Expert Report of Christopher Jackman.

DATED: July 28, 2017

Respectfully submitted,

_/s/ Deborah R. Gross_
Deborah R. Gross
Benjamin M. Mather
Andrew J. Belli
**KAUFMAN, COREN & RESS, P.C.**
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 735-8700

Email: dgross@kcr-law.com
Email: bmather@kcr-law.com
Email: abelli@kcr-law.com

Marvin A. Miller
Lori A. Fanning
Kathleen E. Boychuck
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Email: MMiller@millerlawllc.com
Email: LFanning@millerlawllc.com
Email: KBoychuck@millerlawllc.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| NINA GREENE and GERALD GREENE, | ) | No. 1:15-cv-02546 |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | Judge Jorge L. Alonso |
| v. | ) |  |
|  | ) | Magistrate Judge Michael T. Mason |
| SEARS PROTECTION Company, SEARS, | ) |  |
| ROEBUCK and Co. and SEARS HOLDINGS | ) |  |
| Corporation, | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## RENEWED MOTION FOR CLASS CERTIFICATION

**KAUFMAN, COREN & RESS, P.C.**

Deborah R. Gross
Benjamin M. Mather
Andrew J. Belli
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 735-8700
Email: dgross@kcr-law.com
Email: bmather@kcr-law.com
Email: abelli@kcr-law.com

July 28, 2017

**MILLER LAW LLC**

Marvin A. Miller
Lori A. Fanning
Kathleen E. Boychuck
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Email: MMiller@millerlawllc.com
Email: LFanning@millerlawllc.com
Email: KBoychuck@millerlawllc.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

I.    INTRODUCTION ..........................................................................................1

II.   RELEVANT FACTUAL BACKGROUND...................................................1

      A.    Sears' Billion-Dollar Protection Agreement Business ........................1

      B.    Plaintiffs' Unwitting Purchase of Illusory MPA Coverage ....................3

      C.    Sears' Implementation of the MMI Program...........................................5

III.  LEGAL STANDARD.....................................................................................7

IV.   ARGUMENT ..................................................................................................8

      A.    Plaintiffs' Proposed Class Definitions Are Clearly Defined And Based On
            Objective Criteria...................................................................................8

      B.    The Proposed Classes Satisfy The Four Requirements of Rule 23(a) ....9

            1.    Numerosity.....................................................................................10

            2.    Commonality.................................................................................11

            3.    Typicality.......................................................................................12

            4.    Adequacy.......................................................................................13

      C.    The Proposed Classes Satisfy The Requirements of Rule 23(b)(3)......14

            1.    Common Questions of Law and Fact Predominate over Individual
                  Issues......................................................................................14

            2.    A Class Action Is a Superior Method for the Fair and Efficient
                  Adjudication of This Controversy ............................................15

V.    CONCLUSION..............................................................................................15

i

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)....................................... 14

*Arenson v. Whitehall Convalescent and Nursing Home, Inc.*, 164 F.R.D. 659, 663
(N.D. Ill. 1996)...................................................................................................... 11

*Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008)........................................... 12

*Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015) ............... 10

*Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015) ................................ 7

*Birchmeier v. Carribean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014) ................. 9, 14

*Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417-18
(N.D. Ill. 2012)........................................................................................... 9, 13, 14, 15

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ......................... 15

*Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*,
797 F.3d 426, 433 (7th Cir. 2015) ........................................................................... 7

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ........................................ 14

*In re AT&T Mobility Wireless Data Servs. Litig.*, 270 F.R.D. 330, 343-44 (N.D. Ill. 2010) ....... 13

*In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014)..................... 11

*In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. 2009) ................. 13

*Johnson v. Yahoo!, Inc.*, 2016 WL 25711, at *1 (N.D. Ill. Jan 4, 2016) ........................... 7, 8, 9

*Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) ................................................. 12

*Levitan v. McCoy*, 2003 WL 1720047, at *3 (N.D. Ill. Mar. 31, 2003) ...................... 10

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) .............................. 15

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814-15 (7th Cir. 2012).................... 14

*Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015)........................ passim

*N.B. v. Hamos*, 26 F. Supp. 3d 756, 770 (N.D. Ill. 2014)........................................ 10

*Nat'l Org. for Women, Inc. v. Scheidler*, 172 F.R.D. 351, 359 (N.D. Ill. 1997) ........................... 9

*Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475-76 (N.D. Ill. 2009),
*aff'd*, 606 F.3d 391 (7th Cir. 2010) .................................................................. 8, 9, 12, 14

*Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010) .............................................. 14

*Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D. Ill. 1992) ................... 10, 11

*Smith v. Family Video Movie Club, Inc.*, 311 F.R.D. 469, 474 (N.D. Ill. 2015) .................... 9, 11

*Starr v. Chicago Cut Steakhouse, LLC*, 75 F. Supp. 3d 859, 871 (N.D. Ill. 2014) ....................... 7

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ........................................ 11, 14

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ......................................................... 12

**Rules**

Federal Rules of Civil Procedure 23(a) and 23(b)(3) .......................................................... passim

**Regulations**

Pennsylvania's Unfair Trade Practices and Consumer Protection Law ............................... 1, 8, 12

## I.    INTRODUCTION

This case arises out of a deceptive business practice engaged in by Defendants, who for decades have sold expensive "repair or replace" Master Protection Agreements ("MPAs") for appliances they knew they had no intention of repairing or replacing.  Plaintiffs assert claims for breach of contract, as well as for unjust enrichment and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

Plaintiffs now move for certification of two classes (defined in Section IV.A below). Plaintiffs' proposed classes fulfill each of the requirements set forth in Federal Rules of Civil Procedure 23(a) and 23(b)(3), and are defined clearly and based on objective criteria. Accordingly, Plaintiffs respectfully request that the Court grant their motion.[1]

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Sears' Billion-Dollar Protection Agreement Business

Sears, through its Home Services unit, sells MPAs for terms of up to 5 years.  *See* Exhibit A, Deposition Testimony of Dainon Setzer ("Setzer Dep."), 17:24-18:7, 56:6-7.  MPA sales represent a major segment of Sears' business.  Indeed, from 2010 to 2016, Sears sold **35,615,237** MPA agreements, resulting in **over $12.4 billion** in net sales.  *See* Exhibit B.

An MPA covers product repairs, parts and labor, and replacement of the product (if necessary) "due to damages caused from normal wear and tear under standard usage conditions." Exhibit A, Setzer Dep. 43:13-19.  Terms and conditions are set forth in a standard MPA[2] (to which a certificate listing the customer's information and products is then attached), and the customer has no ability to change or negotiate these terms.  *Id.* 93:19-94:8.

---

[1]    Plaintiffs contemporaneously submit the Expert Report of Christopher Jackman ("Jackman Report"), which sets forth Plaintiffs' proposed methodology for evaluating damages across the classes.

[2]    *See, e.g.*, Exhibit C, Master Protection Agreement.

1

Case: 1:15-cv-02946 Document #: 142-1 filed: 07/28/17 Page 9 of 24 PageID #:1612

Sears' protection agreement business is split into "retail" and "aftermarket" segments. "Retail" refers to point-of-sale transactions, such as when a customer adds protection coverage onto their purchase of the product in a Sears-affiliated brick-and-mortar store or on Sears' website. "Aftermarket" refers to any purchase of a protection agreement occurring after the point-of-sale purchase of the product, including by purchasing over the phone through a Sears' call center. *Id.* 40:21-41:16, 44:9-20. "About half [of MPAs] are sold in retail in point of sale, and about half are sold in some sort of aftermarket." *Id.* 45:24-46:2.

The customer is required to pay for the MPA (whether retail or aftermarket) at the time of purchase. *Id.* 46:4-47:4. When purchasing an aftermarket MPA, a customer may add on additional items in their home, including items which were not originally purchased at Sears and/or which Sears does not carry. *Id.* 41:17-43:12, 52:3-12, 53:17-19. Sears' computer system calculates the pricing for such an MPA on a per-product basis, though the paperwork sent to the customer only contains the lump-sum price. *Id.* 83:13-85:21.

Although MPAs include a provision in which Sears reserves the right to inspect the products listed to determine eligibility for coverage,[3] Sears makes no such inspections. *Id.* 54:4-12; Exhibit D, Deposition Testimony of Katrina Means ("Means Dep."), 129:1-16. Rather, when a customer purchases an aftermarket MPA agreement on products not purchased from Sears, Sears typically either relies on information from the customer (via telephone, for example) regarding the product, or information from technicians who signed up customers for additional coverage while working in their home. Exhibit A, Setzer Dep. 48:12-22. The particular model or serial number of the item is not required in order to sell an MPA for the product. *Id.* 50:8-13.

Sears maintains an "Eligible Brands List," which lists product brands for which Sears

---

[3]     *See* Exhibit C, Master Protection Agreement, Section 9.

offers protection agreement coverage[4] and is updated as needed, based on various factors. *Id.* 209:6-22; Exhibit D, Means Dep. 111:7-9. If at any point Sears decides to stop covering a certain brand, the MPAs currently covering such brands will purportedly remain in effect until they expire, *but* the product would no longer be eligible for coverage on a subsequent renewal of the MPA. Exhibit A, Setzer Dep. 208:12-209:1.

With respect to High-End Products (a sub-section of the Eligible Brands List), those products are purportedly *only* eligible for coverage sold at point-of-sale (i.e., within a Sears' retail location when the item is purchased), but – significantly – are not eligible for coverage after expiration of the initial MPA term, or otherwise eligible for coverage in the aftermarket. *See* Exhibit E, Eligible Brands List, section entitled "Sears, Kmart, The Great Indoors and High-End Merchandise" ("These products are eligible for PA coverage **AT THE TIME OF SALE ONLY**. You are **NOT** to sell PA's on these items in the Aftermarket. […] Currently covered items cannot be bundled, upsold, or renewed.") (emphasis in original); Exhibit A, Setzer Dep. 166:22-167:10.

### B.    Plaintiffs' Unwitting Purchase of Illusory MPA Coverage

Between 1994 and 2014, the Greenes paid Sears over $18,000 for a series of Master Protection Agreements ("MPAs"), which purportedly provided service and repair coverage for a variety of the Greenes' household items and appliances. *See* Exhibit G, Summary of Greenes' Master Protection Agreements. However, the Greenes were informed in 2012 that several items which had been listed on their MPAs for nearly 15 years were not actually covered.

For example, the Greenes paid for coverage of their Nautilus Trotter treadmill on four successive MPAs, from 1999 to 2014. In March 2012, Ms. Greene requested service but was

---

[4]      *See, e.g.*, Exhibit E, Eligible Brands List. The Eligible Brands Lists is primarily organized by category ("Refrigeration," "Electronics," etc.), but also contains a separate category for brands which are specifically designated as "High-End Merchandise."

Case 1:15-cv-02946 Document #: 142 Filed 07/28/15 Page 8 of 26 PageID #:1614

told the treadmill was not actually covered, and had never been covered.  *See* Exhibit H,
Deposition Testimony of Nina Greene, 99:9-15; Exhibit I, Repair History (containing 3/6/12 note
regarding Nautilus treadmill not being covered).  Although Sears at one point offered a refund of
$545, purportedly reflecting the cost of the treadmill on the Greenes' most recent MPA, they
received no refund for the 3 prior MPAs in which they had paid for coverage on an item Sears
never actually intended to service.  Indeed, Sears' personnel discussed as much in a March 2014
email exchange in which Claims Consultant Tina Anthony stated:

> The Member [Ms. Greene] deserves a full refund if we sold them
> an MPA for a product that we do not service […]  Even though it
> is years later – it would be unethical to keep their money if we
> never planned on servicing the products. […] So who can tell me
> when Sears quit providing service for Nautilus Trotter Supertrainer
> Treadmills and AMF Commercial Compactors and how much the
> Member should receive for a full refund for ALL MPAs regarding
> these products.

Product Manager Ashly Jobin replied:

> In 2009 or earlier, we did not have the ability to restrict the sale of
> an MPA on a brand we did not service and therefore we could have
> potentially sold PA on a brand we did not service. […]  [T]o now
> refund the PA on coverage that was in force and expired does not
> make sense because it suggests by extension that we were not
> intending to service.

*See* Exhibit J, March 31, 2014 email conversation between A. Jobin and T. Anthony.

In another example, the Greenes paid for coverage of their AMF trash compactor on five
successive MPAs, but were informed in 2012 that the compactor was never actually covered.
*See* Exhibit K, April 19, 2012 letter from N. Greene to Sears, Roebuck & Co.; *see also* Exhibit I,
Repair History (containing 4/19/12 note regarding compactor).  Nevertheless, Sears continued to
charge the Greenes for the compactor, as it was still listed on a revised version of Certificate No.
033455042200088 (attached hereto as Exhibit L) printed on May 11, 2012.   Similarly, the

Greenes paid for coverage of their Viking cooktop on three successive MPAs, but were informed in April 2012 that it was not covered.  *See* Exhibit K.  Once again, though, the cooktop was still listed on the "revised" MPA certificate issued May 11, 2012.  *See* Exhibit L.

### C.    Sears' Implementation of the MMI Program

Sears was aware that they had an issue with selling protection agreement coverage on ineligible products.  Exhibit A, Setzer Dep. 159:22-160:7.  When asked how many times he personally encountered situations in which Sears sold a protection agreement on a noncovered brand, Sears' National Operations Manager Dainon Setzer responded, "At least dozens, I'm sure."  *Id.* 137:5-11.  In response to that problem, Sears developed a program referred to as "MMI," purportedly designed to prevent the sale of protection agreements on product brands which were not eligible for coverage.  *Id.* 139:18-22, 140:6-17.  MMI was implemented on March 17, 2009.  *See* Exhibit M, Sears' Second Supplemental Answer to Interrogatory No. 3.

Prior to MMI, Sears' sales associates were not required to ask for brand information in order to sell or renew an MPA.  *If* they did so, they simply typed it into a freeform, optional field, but the field could have been left blank, could have a misspelled or otherwise inaccurate brand name, or could simply have a period as a placeholder.  Exhibit A, Setzer Dep. 142:18-143:8, 144:1-7.  Because an MPA could be sold or renewed without brand information and because there was no audit process to identify blank brand fields within the database, the only time Sears would become aware that it had sold an MPA without having any brand information would be once the customer had contacted Sears or requested service.  *Id.* 146:12-24.

Following implementation of the MMI system, the "brand" field was purportedly a required field within the system, with a drop-down list from which the sales associate had to pick from a list of "covered" brands.  *Id.* 142:18-143:8.  The brand information contained within MMI was intended to match the current version of the Eligible Brands List being used by Sears at any

Case 1:15-cv-02546    Document # 142-1 Filed: 07/28/09 Page # of 20 PageID #:1026

given time. *Id.* 152:24-153:10.

However, MMI did not entirely solve the problem of selling or renewing MPAs on non-covered items, and the brands list within the system still did not accurately reflect eligibility for protection agreement coverage. *See, e.g.*, Exhibit N, November 21, 2011 email attaching Memorandum regarding "HVAC Brand Clarification" ("If the brand name of the customer's unit is not listed, the associate will enter 'Sears' in the 'brand' section."; "**Note**: Intertherm, Miller, and Thermal Zone brand names have recently been added to the product brands list; however, these are not eligible for Protection Agreement coverage."); Exhibit O, June 20, 2011 email from K. Means to K. Lopez ("Retail is offering the PA on Soleus Air brand room air conditioners and the MMI table shows we do not service."); *see also* Exhibit P, email chain containing September 20, 2011 email from M. Strasser to B. Truong and S. Schmidt ("Of course, NPS can be used to override anything. […]  Depending on the agent, I know some legacy agents have access.  I can confirm that Dacor is not a brand in Ciboodle but in NPS the agent can override as there are not any checks/balances."); Exhibit Q, email chain containing November 12, 2013 email from K. Lopez to R. Pirc ("We had a process set up where product engineering would notify me of any changes in serviceability (new product types, brands, discontinued brands, etc.), but it hasn't seemed to work very well in quite a long time.").

Indeed, even after the MMI system had been in place for several years, Sears' associates were still coming across MPAs for ineligible products – a problem which, just as before implementation of MMI, was only being dealt with *if and when* the customer called in for service.  *See* Exhibit R, July 11, 2012 email conversation between C. Smith and K. Lopez (copying others) (discussing a "provision in MMI to require a hard stop transfer to PABA" when an agent comes across an ineligible brand covered by a protection agreement, for which "[t]he

intent was that PABA would cancel the agreement on the ineligible item, and refund the customer's money").[5]

## III.    LEGAL STANDARD

"The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that any one individual might not otherwise bring on her own." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015).  The district court has "broad discretion" to determine whether certification of a class is appropriate.  *Starr v. Chicago Cut Steakhouse, LLC*, 75 F. Supp. 3d 859, 871 (N.D. Ill. 2014) (citation omitted).

As a threshold requirement, the plaintiffs' class definition must be "defined clearly and based on objective criteria."  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). To then demonstrate that certification of the proposed class is appropriate, the plaintiffs must show each of the following: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a); *see also Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015).

In addition to fulfilling the four requirements of Rule 23(a), the proposed class must also satisfy the requirements of at least one of the subsections contained in Rule 23(b).  *Johnson v. Yahoo!, Inc.*, 2016 WL 25711, at *1 (N.D. Ill. Jan 4, 2016).  When the purported class is seeking monetary damages, subsection 23(b)(3) applies.  *Bell*, 800 F.3d at 373.  To certify a class under Rule 23(b)(3), the district court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and that the class

---

[5]    The acronym "PABA" stands for Protection Agreement Benefit Administration.

action "is superior to other available methods" to adjudicate the controversy fairly and

efficiently. FED. R. CIV. P. 23(b)(3).

## IV.    ARGUMENT

### A.    Plaintiffs' Proposed Class Definitions Are Clearly Defined And Based On Objective Criteria.

A class definition must be "defined clearly and based on objective criteria." *Mullins*, 795

F.3d at 659.  The ascertainability requirement is intended to avoid vague or subjective classes, or

classes that are defined in terms of success on the merits (known as "fail-safe" classes), *not* to

require a plaintiff to specifically identify every potential member at the class certification stage.

*Id.* at 659-60, 665; *see also Johnson*, 2016 WL 25711, at *2; *Saltzman v. Pella Corp.*, 257 F.R.D.

471, 475-76 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010).

With respect to Plaintiffs' breach of contract and unjust enrichment claims (Counts I and

II),[6] Plaintiffs seek certification of the following nationwide class:

> All individuals and entities who paid for aftermarket MPAs (including post-point-of-sale purchases of coverage, purchases of coverage for products bought from a retailer other than Sears, and/or subsequent renewals of coverage) for products which were not covered by nor eligible for coverage under the MPA, and did not receive a full refund.

With respect to Plaintiffs' UTPCPL claim (Count IV),[7] Plaintiffs seek certification of the

following Pennsylvania-only class:

> All residents of Pennsylvania who paid for aftermarket MPAs (including post-point-of-sale purchases of coverage, purchases of coverage for products bought from a retailer other than Sears, and/or subsequent renewals of coverage) for products which were

---

[6]    The relevant class period with respect to Plaintiffs' breach of contract claim is March 25, 2000 to the present, and the relevant class period with respect to Plaintiffs' unjust enrichment claim (pled in the alternative) is March 25, 2005 to the present.

[7]    The relevant class period with respect to Plaintiffs' UTPCPL claim is March 25, 2004 to the present.

not covered by nor eligible for coverage under the MPA, and did
not receive a full refund.[8]

These definitions identify the particular group of individuals at issue (purchasers of

MPAs, nationwide or within Pennsylvania, respectively), and the particular way in which those

individuals were harmed (by paying for illusory coverage, without receiving a full refund).[9]  *See*

*Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417-18 (N.D. Ill. 2012).

Membership in the proposed Class is thus properly based on objective criteria: the customer's act

of purchase and Sears' conduct in selling "coverage" on non-covered items.  *See Mullins*, 795

F.3d at 661 (class definition "focuse[d] on the act of purchase and [defendant's] conduct in

labeling and advertising the product" met the objectivity requirement); *Nat'l Org. for Women,*

*Inc. v. Scheidler*, 172 F.R.D. 351, 359 (N.D. Ill. 1997) (class definition based on objective

conduct, rather subjective state of mind, was sufficiently ascertainable).[10]

Because Plaintiffs' have precisely and objectively defined their proposed classes, and do

not propose "fail-safe" classes, they are sufficiently ascertainable for purposes of class

certification.  *See Johnson*, 2016 WL 25711, at *2 ("Nothing more is required.").

### B.    The Proposed Classes Satisfy The Four Requirements of Rule 23(a).

---

[8]    Excluded from both of Plaintiffs' proposed classes are: Defendants' board members and
executive-level officers, as well as their legal and immediate family members; any of
Defendants' parents, subsidiaries, and affiliates; any consumer that already received a full refund
from Defendants for the entire amount paid for his/her MPA coverage; and the heirs, successors,
and assigns of any excluded entity.

[9]    To the extent there is difficulty determining the identity of individual class members due
to Sears' failure to keep and/or produce records regarding its customers, this does not provide a
basis for denying class certification.  Courts in the Seventh Circuit have held that a defendant
cannot avoid class certification, or restrict the definition of an otherwise appropriate class, based
on its own recordkeeping (or lack thereof).  *See, e.g., Mullins*, 795 F.3d at 668; *Smith v. Family*
*Video Movie Club, Inc.*, 311 F.R.D. 469, 474 (N.D. Ill. 2015); *Birchmeier v. Carribean Cruise*
*Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014); *see also Saltzman*, 257 F.R.D. at 476.

[10]    In addition, Plaintiffs' proposed classes are not so-called "fail-safe" classes, because
membership does not hinge on an ultimate determination as to Sears' liability.  *See Mullins*, 795
F.3d at 660; *Smith*, 311 F.R.D. at 475-76.

1.    **Numerosity.**

Rule 23(a)(1)'s numerosity requirement is satisfied when it is "extremely difficult or inconvenient to join all members of the class," such that joinder is impracticable. *Levitan v. McCoy*, 2003 WL 1720047, at *3 (N.D. Ill. Mar. 31, 2003) (citation omitted). Courts consider the number of class members and "common sense assumptions" to determine whether a proposed class satisfies the numerosity element. *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D. Ill. 1992).

A plaintiff is not required to identify the exact number of class members at the class certification stage. *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 770 (N.D. Ill. 2014) (certifying class "defined in such a way that the number of class members is knowable even if presently unknown"). Here, the evidence – including Plaintiffs' experience with having purchased illusory MPA coverage on multiple occasions, the substantial volume of MPA agreements sold by Sears, Sears' non-compliance with its policy that High-End Products (a subsection of the Eligible Brands List) are not eligible for aftermarket or renewal coverage,[11] Sears' creation of MMI for the specific purpose of preventing MPA sales on ineligible products, and Dainon Setzer's testimony that he personally recalled "at least dozens" of instances in which coverage was sold on an ineligible product – points to a large estimate of potential members, numbering into the thousands. *See Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008) (finding numerosity where plaintiff identified 14 class members and put forth evidence that "support[ed] a much larger estimate").

---

[11]    Materials produced by Sears indicate that it continued selling MPAs for High-End Products in the aftermarket despite its policy that such items were not eligible for coverage. *See* Exhibit F (chart showing total number of MPAs for High-End Products sold from 2010 to 2016, as well as the corresponding breakdown of "Retail" vs. "Aftermarket" sales). Of the 589 MPAs sold on High-End Products from 2010 to 2016, 75 of those were sold in the aftermarket. *Id.*

Moreover, "[n]umerosity does not rest on any magic number." *Arenson v. Whitehall Convalescent and Nursing Home, Inc.*, 164 F.R.D. 659, 663 (N.D. Ill. 1996).[12]  Rather, courts consider multiple factors in determining whether joinder is impracticable, including judicial economy, the ability of class members to institute individual lawsuits, and geographic diversity of class members.  *Id.*  Here, it would be impracticable and uneconomical to require thousands of purchasers of illusory MPA coverage to individually litigate their claims, for relatively small sums of money.  *See Scholes*, 143 F.R.D. at 184; *Mullins*, 795 F.3d at 658, 666-67.

In light of the anticipated size of the classes, and the difficulty and impracticability of joining all of their members, Plaintiffs' proposed classes are sufficiently numerous for certification under Rule 23.

## 2.    Commonality.

For purposes of Rule 23(a)(2), a common question exists "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).  "Neither Rule 23 nor any gloss that decided cases have added to it requires that *every* question be common."[13]  *Id.* (emphasis in original).

Plaintiffs' core allegations are that Sears sold MPA coverage to class members on certain products that Sears did not, and did not intend to, cover.  Accordingly, a common question exists across the classes as to whether MPA coverage sold by Sears on such products was illusory. "This is a 'common contention' that is 'capable of classwide resolution' because the 'determination of its truth or falsity will resolve an issue that is central to the validity of each one

---

[12]    Nonetheless, "the number forty is often cited as the point at which joinder becomes impracticable." *Smith*, 311 F.R.D. at 476.

[13]    For example, "[i]t is routine in class actions to have a final phase in which individualized proof must be submitted." *Suchanek*, 764 F.3d at 756 (*citing In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014)).

of the claims in one stroke.'  Nothing more is required to satisfy Rule 23(a)(2)." *Mullins*, 795

F.3d at 673 (*quoting Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Further common questions include: whether Defendants' conduct constitutes a breach of

the MPA agreements; whether Defendants' conduct violates the UTPCPL; whether Defendants

have been unjustly enriched; and the damages to the class arising from Defendants' conduct (as

well as the appropriate measure of those damages).[14]  Each of these questions arises from the

same core of operative facts, and are founded on the same legal theories and common

allegations, such that Rule 23(a)(2)'s commonality requirement is satisfied.

### 3.    Typicality.

"The issue of typicality is closely related to commonality and should be liberally

construed." *Saltzman*, 257 F.R.D. at 479.  Typicality requires only that the claims of the class

representatives be substantially similar to those of the class members. *See Keele v. Wexler*, 149

F.3d 589, 595 (7th Cir. 1998) (citation omitted) (plaintiff's claim considered typical if it "arises

from the same event or practice or course of conduct that gives rise to the claims of the other

class members and his or her claims are based on the same legal theory").

Here, the Greenes allege and must prove the same violations that all members of the

proposed classes must prove.  In particular, Plaintiffs allege that they entered into and paid for an

MPA for products which were not actually covered, and that Sears breached that agreement by

not providing (and never intending to provide) protection coverage for which they accepted

payment.  Plaintiffs also allege that they were misled into purchasing illusory coverage, that their

payments for such coverage constituted a benefit conferred upon Sears, and that Sears

wrongfully kept those benefits.  Finally, with respect to Plaintiff's Pennsylvania UTPCPL claim,

---

[14]    *See* Jackman Report, Sections III.B, IV.B, and V.B (setting forth methodology to
measure damages suffered by the proposed classes).

Plaintiffs allege that Sears knowingly misrepresented that they covered certain products, which led Plaintiffs to unwittingly purchase illusory MPAs. Plaintiffs' and the classes' claims arise out of the same alleged operative facts and conduct, are based on the same alleged theories, and will require the same kinds of evidence to prove.[15]  Moreover, Plaintiffs and all class members possess the same interests and suffered the same or similar injuries. This is sufficient to satisfy Rule 23(a)(3)'s typicality requirement.

### 4.    __Adequacy.__

Representative parties must "fairly and adequately protect the interests of the class." Rule 23(a)(4). Rule 23's adequacy requirement is met when the class representatives retain adequate counsel and have no conflicting interests with other class members. *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. 2009); *In re AT&T Mobility Wireless Data Servs. Litig.*, 270 F.R.D. 330, 343-44 (N.D. Ill. 2010).

Here, the interests of the Greenes are aligned with those of other class members because the Greenes have been injured by the same conduct on the part of Sears, and share an interest in establishing Sears' liability and maximizing class-wide damages. *See Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. at 168. Moreover, the Greenes are represented by counsel with substantial consumer class action litigation experience who have pursued this matter vigorously on behalf of the proposed classes thus far. There is no ground for supposing that the Greenes will not adequately represent the classes going forward. *See AT&T Mobility*, 270 F.R.D. at 344.

---

[15]    The factual particulars of class members' individual MPAs or dealing with Sears do not have to be identical for purposes of Rule 23(a)(3). Rather, what matters is *Sears'* sale of illusory coverage on non-covered products – a course of conduct out of which all class members' claims arise. *See Boundas*, 280 F.R.D. at 412-13.

**C.**     <u>The Proposed Classes Satisfy The Requirements of Rule 23(b)(3).</u>

**1.**     <u>Common Questions of Law and Fact Predominate over Individual Issues.</u>

Predominance is similar to Rule 23(a)(2)'s commonality requirement, but is a "more demanding" inquiry into "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Boundas*, 280 F.R.D. at 415 (*citing Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)); *see also Birchmeier*, 302 F.R.D. at 253. However, "[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance. [… L]ike commonality, predominance is found where there exists a common nucleus of operative facts." *Saltzman*, 257 F.R.D. at 484 (citation omitted).[16]

Every issue need not be common; rather, the question is whether substantial common issues that can be resolved on a class-wide basis predominate. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814-15 (7th Cir. 2012). The common issues here, as discussed in Section IV.B.2 above, represent a significant aspect of the case and can be resolved on a class-wide basis. Sears' course of conduct in selling MPAs for products which were not actually covered are central issues that call for proof common to all members of both classes, and have resulted in damages which are "susceptible of measurement across the entire class."[17] *Suchanek*, 764 F.3d at 760 (*quoting Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013)). Accordingly, the predominance requirement has been met.

---

[16]     Moreover, "[t]he importance of the class action device in vindicating the rights of consumers is one reason why the Supreme Court held that '[p]redominance is a test readily met in certain cases alleging consumer … fraud,' among others." *Suchanek*, 764 F.3d at 760 (*citing Amchem*, 521 U.S. at 625).

[17]     Because there is a method through which damages can be estimated across the class (*see* Jackman Report, Sections III.B, IV.B, and V.B), individualized issues relating to certain class member's damages do not defeat a finding of predominance or render class certification inappropriate. *See Mullins*, 795 F.3d at 671; *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).

## 2.    A Class Action Is a Superior Method for the Fair and Efficient Adjudication of This Controversy.

Considerations relevant to the superiority requirement include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability and undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  FED. R. CIV. P. 23(b)(3).

Rule 23's superiority requirement is easily satisfied here.  Class members' interests in individually controlling prosecution or defense of separate actions are minimal, in light of the relatively small amount of money at stake for each illusory MPA sold by Sears.  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Boundas*, 280 F.R.D. at 416 (*quoting Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)); *see also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  Finally, the likely difficulties in managing the class action are minimal, due to, as discussed at length above, the predominance of common issues and relative ease in measuring damages.[18]

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' renewed motion for class certification.

---

[18]    The second and third considerations listed in Rule 23(b)(3) are neutral here, as Plaintiffs are not aware of any other litigation relating to Sears' MPAs and "the Northern District of Illinois is no better and no worse than any other forum" for class members to obtain relief. *Boundas*, 280 F.R.D. at 417.  Plaintiffs chose to bring this action in the Northern District of Illinois because Sears maintains its headquarters in Hoffman Estates, Illinois, within this District.

DATED: <u>July 28, 2017</u>                                   Respectfully submitted,


                                  <u>    /s/ Deborah R. Gross    </u>
                                  Deborah R. Gross
                                  Benjamin M. Mather
                                  Andrew J. Belli
                                  **KAUFMAN, COREN & RESS, P.C.**
                                  Two Commerce Square, Suite 3900
                                  2001 Market Street
                                  Philadelphia, PA 19103
                                  Telephone: (215) 735-8700
                                  Email: dgross@kcr-law.com
                                  Email: bmather@kcr-law.com
                                  Email: abelli@kcr-law.com

                                  Marvin A. Miller
                                  Lori A. Fanning
                                  Kathleen E. Boychuck
                                  **MILLER LAW LLC**
                                  115 South LaSalle Street, Suite 2910
                                  Chicago, IL 60603
                                  Telephone: (312) 332-3400
                                  Email: MMiller@millerlawllc.com
                                  Email: LFanning@millerlawllc.com
                                  Email: KBoychuck@millerlawllc.com

                                  *Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I, Deborah R. Gross, hereby certify that on July 28, 2017 I caused a copy of Plaintiffs'

Renewed Motion for Class Certification, Memorandum of Law in support thereof, and Expert

Report of Christopher Jackman to be served by electronic means on all Electronic Filing Users of

Record, and that all parties required to be served have been served.


                                       */s/ Deborah R. Gross*
                                       Deborah R. Gross

# Exhibit A

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


NINA GREENE and GERALD GREENE,)

               Plaintiffs,    )

    -vs-                  ) Case No.

SEARS PROTECTION Company,    ) 1:15-cv-02546

SEARS ROEBUCK and Co. and    )

SEARS HOLDINGS Corporation,   )

               Defendants.    )


ORAL DEPOSITION OF DAINON SETZER

CHICAGO, ILLINOIS

THURSDAY, DECEMBER 17, 2015


Reported by:

DEBORAH HABIAN, CSR, RMR, CRR, CLR,

JOB NO: 8903

Page 2

1

2

3

4

5

6                          DECEMBER 17, 2015

7                          9:31 A.M. CST

8

9

10          Oral deposition of DAINON SETZER, held

11     at the offices of Dentons, 233 South Wacker

12     Drive, Suite 5900, Chicago, Illinois, before

13     Deborah Habian, a Certified Shorthand Reporter,

14     Registered Merit Reporter, Certified Realtime

15     Reporter and a Certified LiveNote Reporter.

16

17

18

19

20

21

22

23

24

Page 3

1                    A P P E A R A N C E S

2

3     FOR THE PLAINTIFFS

4              KAUFMAN COREN & RESS, P.C.

5              BY:  DAVID M. DeVITO, ESQ.

6              Two Commerce Square

7              Suite 3900, 2001 Market Street

8              Philadelphia, Pennsylvania 19103-7042

9

10    FOR THE DEFENDANTS:

11             SALANS FMC SNR DENTON McKENNA LONG

12             BY: LEAH R. BRUNO, ESQ.

13                  KRISTINE M. SCHANBACHER, ESQ.

14             233 South Wacker Drive,

15             Suite 5900,

16             Chicago, Illinois 60606-6361

17

18

19

20

21

22

23

24

1    those kind of things.

2        Q.  And what's the name of the entity that

3    employs you?

4        A.  Sears Holdings Corporation, to the best

5    of my knowledge.  Over the years it's been Sears

6    Protection Company or Sears and Roebuck, but I

7    think my official W-2 says Sears Holdings

8    Corporation.

9        Q.  And what is Sears Protection Company?

10       A.  That's a wholly-owned subsidiary under

11   the Sears Holdings Corporation that is built for

12   the -- as the obligor of protection agreements.

13       Q.  And that continues to today to be the

14   case?

15       A.  Sears Protection Company?

16           MS. BRUNO:  Objection as to form.

17           But you can answer if you know.

18           THE WITNESS:  Okay.

19           Yes.

20   BY MR. DEVITO:

21       Q.  What's Sears Home Services?

22           MS. BRUNO:  Objection as to form.

23           You can answer if you know.

24           THE WITNESS:  It is the business unit

Page 18

1    that -- within the holding company, Home

2    Services is the business unit that houses

3    protection agreements and in-home repair, home

4    improvement, parts direct.  A lot of those after

5    retail type interactions that customers would

6    have with Sears exist under the Home Services

7    business unit.

8    BY MR. DEVITO:

9        Q.  So -- so it's business unit, not an

10   entity; is that correct?

11       **A.  To my knowledge, it's not set up as an**

12   **entity, like a -- like, we have -- Sears**

13   **Protection Company is, to my knowledge,**

14   **registered as an operating business, because**

15   **that's on the back and bottom of a**

16   **certificate -- when we send a customer a**

17   **confirmation of protection agreement, that's set**

18   **up.  I've never seen Sears Home Services as**

19   **anything more than a business structure, but**

20   **I've never been part of the finance team to**

21   **fully understand that.**

22           MS. BRUNO:  And I think this is a good

23   point to put this on the record:  Dainon is here

24   as Sears 30(b)(6) witness on certain identified

Thompson Court Reporters, Inc
(312) 421-3377

Page 40

1          Q.  I've handed you what's been marked as

2     Exhibit 6.  If you look at the bottom of page 2

3     and then going on to page 3, you'll see your

4     name and then a listing of things on which you

5     have information.  And I'm just -- I want to ask

6     about the first one of those, which says

7     "...issues relating to post-point-of-purchase

8     service agreement sales and marketing."

9               Could you explain what

10    post-point-of-purchase means there?

11              MS. BRUNO:  Objection as to form.

12    Mr. Setzer didn't write that.  So if you want to

13    ask him what post-point-of-purchase service is,

14    that's fine, but I don't think it's appropriate

15    to ask him what --

16              MR. DEVITO:  Okay.  That's fair.

17    BY MR. DEVITO:

18         Q.  Not what post -- not what it means

19    there but what it means to you.

20              MS. BRUNO:  That's fine.

21              THE WITNESS:  That would be synonymous

22    to aftermarket to me, meaning not a retail

23    purchased protection agreement.  That's

24    something purchased after the customer's left

Page 41

```
 1    the store.

 2    BY MR. DEVITO:

 3        Q.  Okay.  So when you say "retail," that

 4    means someone buying something in a store?

 5        A.  A brick and mortar store or Sears.com

 6    and adding the protection agreement to the total

 7    purchase of the refrigerator, for example.  So

 8    yes, I want that refrigerator and I want a

 9    three-year or a five-year Master Protection

10    Agreement with it.  In the store or online, they

11    can add that right in and it would show up as

12    one charge on their credit card statement.

13            If they decline that coverage at point

14    of sale, meaning when they bought the physical

15    product, then post-point-of-purchase would be

16    the next world aftermarket reference.

17        Q.  Okay.  If they buy it in the store

18    along with the refrigerator, can they add the

19    other products in their house to the MPA while

20    they're in the store?

21        A.  No.

22        Q.  How could they do that?  How can that

23    be done, if it can be done?

24            MS. BRUNO:  Objection as to form.
```

1        But you can answer.

2        THE WITNESS:  For the customer to

3    initiate that, they would have to call one of

4    our inbound call centers using a toll-free

5    number.

6    BY MR. DEVITO:

7        Q.  Okay.  And correct me if I'm wrong, but

8    when you're making outbound sales calls, some

9    of -- at least some of that activity is calling

10    people who have purchased a product in a store

11    and perhaps bought an MPA that covers that

12    product, and you're attempting to sell them on

13    other products in their -- an MPA that covers

14    other products in their house; is that correct?

15        MS. BRUNO:  I'm just going to object to

16    form.

17        But you can answer.

18        THE WITNESS:  Potentially, yes.

19    BY MR. DEVITO:

20        Q.  That sort of sale that I've just

21    hypothesized to you, the selling of an MPA that

22    covers other products in the customer's home, is

23    that always then going to be a

24    post-point-of-purchase sale from your

Page 43

1    perspective?

2              MS. BRUNO:  Objection as to form.

3              But if you understand, you can answer.

4              THE WITNESS:  Let me have the question

5    one more time, please.

6    BY MR. DEVITO:

7         Q.  If a customer is going to purchase an

8    MPA that covers products in their house that

9    they didn't necessarily buy from Sears, is that

10   always going to be a post-point-of-purchase

11   sale?

12        **A.  Yes.**

13        Q.  Can you describe for me in general

14   terms what an MPA covers?

15        **A.  The -- it covers repairs, parts and**

16   **labor up to and including replacement of the**

17   **product from -- due to damages caused from**

18   **normal wear and tear under standard usage**

19   **conditions.**

20        Q.  We went over a little bit of this, I

21   think, but what are the ways in which customers

22   can purchase MPAs?

23        **A.  Point of sale, which could be brick and**

24   **mortar or dot com.  They can call an inbound**

1    call center.  They could have been selected for

2    marketing either through outbound telemarketing

3    or by receiving some sort of direct mail or more

4    recently e-mail correspondence offering them

5    coverage, or the service technicians can, in

6    certain circumstances, offer protection

7    agreement coverage while they're out in the home

8    working on that or some other item.

9         Q.  When you say "brick and mortar," that

10    obviously is a Sears store.  What else could it

11    be?

12         A.  Anywhere we sell -- Sears sells

13    reparable merchandise that's

14    protection-agreement eligible, so a Sears

15    outlet, a Sears hometown store.  Sometimes the

16    Sears product and repair services centers will

17    have inventory, Kmart stocks, some merchandise

18    that's protection-agreement eligible.  So

19    there's -- it's a large corporation.  There's

20    lots of retail formats.

21         Q.  Is that all of them or there could be

22    others --

23         A.  Oh, I'm --

24         Q.  -- that you're not remembering?

1      A.  I'm confident there are others.  I just

2  can't --

3      Q.  Okay.

4      A.  I've never worked on the retail side of

5  the business, so I'm -- I wouldn't be able to

6  give you an exhaustive list.

7      Q.  You said, I think, more recently

8  customers have been solicited via e-mail; is

9  that correct?

10     A.  Yes.

11     Q.  When did you start doing that?

12     A.  Early 2015.  March-ish if you have an

13  "ish" on that keyboard.

14     Q.  It's probably becoming increasingly

15  poplar.

16     A.  Probably.

17     Q.  Do you know -- and if you don't,

18  obviously just tell me that -- any sort of

19  general breakdown as to how, by percentage, MPAs

20  are sold by Sears, in which channel?

21        MS. BRUNO:  I'm just going to object as

22  to form.

23        But if you understand, you can answer.

24        THE WITNESS:  About half are sold in

1    retail in point of sale, and about half are sold

2    in some sort of aftermarket.

3    BY MR. DEVITO:

4        Q.  When is the customer required to pay

5    for the MPA?

6        **A.  At time of purchase.**

7        Q.  So in the post-point-of-purchase world,

8    is that typically the customer gives a credit

9    card either online or over the phone?

10       **A.  Yes.  Some pay with a check.**

11       Q.  You'll accept checks over the phone

12   or --

13       **A.  Yeah, we have a check-by-phone process**

14   **and -- or some of them mail it back with their**

15   **direct mail coupon, mail a physical check back**

16   **to us.**

17       Q.  And in the cases where they don't pay

18   immediately, I guess you bill them or they --

19   at -- I'm sorry, this isn't a very good

20   question, but if they're paying by physical

21   check, you've basically made the sale and then

22   they have to pay for it; is that accurate?

23           MS. BRUNO:  Objection as to form.

24           But if you understand, you can answer.

Thompson Court Reporters, Inc
(312) 421-3377

Page 47

1              THE WITNESS:  I would describe it as

2     we've offered them coverage and their contract

3     would go into force and become effective when we

4     receive the check.

5     BY MR. DEVITO:

6         Q.  Better at answering that question than

7     I was asking it.

8         **A.  Okay.**

9         Q.  The coverage wouldn't become effective

10    until you received the check; is that right?

11        **A.  Correct.  We would create an agreement**

12    **number either when we've obtained the credit**

13    **card or have received the physical check or ran**

14    **the check by phone.  That's when we would record**

15    **an agreement on behalf of the customer.**

16        Q.  So the -- when a customer purchases an

17    MPA at point of purchase, is that always limited

18    to a product that they are at the same time

19    purchasing in a Sears store?

20             MS. BRUNO:  Object as to form.

21             But you can answer if you know.

22             THE WITNESS:  We're talking point of

23    sale?

24    BY MR. DEVITO:

Thompson Court Reporters, Inc
(312) 421-3377

Page 48

1      Q.  Yes.

2      A.  Yes.  It's always limited -- I'm paying

3  for that product and I want to add a protection

4  agreement on to that product.  It's always that

5  product that I'm buying, that I'm eligible to

6  buy coverage on.  Point of sale has no

7  visibility to other merchandise that the

8  customer my own.

9      Q.  So it's only the product being

10 purchased that that MPA could cover?

11     A.  Yeah.

12     Q.  So now sort of focusing on

13 post-point-of-purchase, if a customer wants to

14 add products that they already own to an MPA,

15 how can that get communicated to Sears?  How can

16 the products that they want to add get

17 communicated to Sears?

18     A.  By telephone, if I understand the

19 question correctly.

20     Q.  Is that the only way?

21     A.  No.  Technicians can record additional

22 coverage while they're in the home.

23     Q.  How about online?

24     A.  We do not currently have an aftermarket

 1    so that we could select the most appropriate

 2    merchandise code.

 3              We would ask the customer for the age

 4    of the product, we would ask the customer for

 5    the brand name, and we would ask the customer if

 6    it is in good working order and located at their

 7    residence.

 8        Q.  Do you ask them for a particular model?

 9        A.  We do not require it.  We have the

10    fields to record model and serial number, but we

11    do not require the customer to provide us model

12    and serial over the telephone to sell a

13    protection agreement.

14        Q.  Do you know why you don't require --

15        A.  In our --

16              MS. BRUNO:  Model?  In the question,

17    model?

18              MR. DEVITO:  Model, yes.

19              THE WITNESS:  In my experience, it's

20    not a customer-friendly question to ask.  Lots

21    of consumers don't know where the model number

22    tag would be located on a furnace or a water

23    heater and it's -- it's not a requirement of us

24    being able to successfully fulfill the contract.

Case: 1:18-cv-02546 Document #: 142-2 Filed: 07/26/19 Page 21 of 40 PageID #:1844
EXHIBIT E - Certification Motion   Pg 41 of 113

Page 52

1      volunteers it; is that right?

2          A.  Yes.

3          Q.  Now, in these types of sales, the

4      post-point-of-purchase sales of MPAs, I take it

5      that the customer doesn't need to purchase any

6      of the products from Sears in order for them to

7      be covered; is that right?

8          A.  It varies by product.

9          Q.  Okay.  Can you explain further?

10         A.  For the majority of products, the

11     common things, washers, driers, refrigerators,

12     we don't care where you bought those.  There are

13     a few smaller divisions like computers, and I

14     don't think anybody still makes them anymore,

15     but rear projection TVs were a business

16     requirement, that those had been bought at Sears

17     for us to offer you protection agreement

18     coverage.  Lawn and garden equipment, which is a

19     repair protection agreement -- we've been

20     talking mostly about master protection

21     agreements but --

22             MS. BRUNO:  I assume you only want

23     Master Protection Agreement information, right?

24             THE WITNESS:  Oh.

Page 53

1          MR. DEVITO:  I do, yeah.  I don't want

2    to cut you off, but if your attorney feels

3    comfortable doing that, let's --

4          MS. BRUNO:  No.  I don't want to be

5    interrupting things, but this case is about

6    MPAs.  So I assume you're only interested in

7    information about MPAs.

8          MR. DEVITO:  I am.

9    BY MR. DEVITO:

10        Q.  How would Sears go about determining

11   whether or not the customer bought the item at

12   Sears?

13        **A.  We would ask the customer.**

14        Q.  And you would just take their word for

15   it, whether or not they bought it at Sears?

16        **A.  Yeah.**

17        Q.  Does the product have to be something

18   that Sears carries?

19        **A.  No.**

20        Q.  Does Sears confirm that the customer

21   actually owns the specific product that they're

22   seeking coverage for?

23        MS. BRUNO:  I'm going to just object to

24   form.

Page 54

1          But you can answer if you understand.

2          THE WITNESS:  No, we don't.

3    BY MR. DEVITO:

4       Q.  And does Sears make any effort to

5    inspect products or otherwise see what condition

6    they're in?

7       **A.  During that phone call?**

8       Q.  Or subsequent to the phone call.

9       **A.  Not a stand-alone inspection, no.**

10      Q.  And not as a condition of selling the

11   MPA?

12      **A.  Correct, not as a condition of selling.**

13          MS. BRUNO:  David, if you're going to a

14   different area, want to take a break?

15          MR. DEVITO:  Yeah.

16          MS. BRUNO:  Because we've been going

17   about an hour.

18          MR. DEVITO:  Sure.  That's fine.

19                 (Recess taken from 10:30 a.m.

20                  to 10:37 a.m.)

21                 (Exhibit 7 was marked for

22                  ID.)

23   BY MR. DEVITO:

24      Q.  Mr. Setzer, we're back on the record.

Page 56

1      Q.  So when you say "up to five years," I

2   assume that means that there are exceptions to

3   the five-year limit; is that right?

4      **A.  Yes.**

5      Q.  What are those?

6      **A.  We offer coverage in one, two, three,**

7   **four and five-year increments.**

8      Q.  It's not a product-specific exception?

9      **A.  Correct.**

10     Q.  So the duration of the coverage is

11  something that's selected by the customer; is

12  that right?

13     **A.  Yes.**

14     Q.  Below that and at the bottom there, it

15  says "Maximum repair/replace liability, no

16  maximum."  What's your understanding of what

17  that means?

18     **A.  That if we are going to replace a**

19  **product because it is deemed un-repairable or**

20  **uneconomical to repair by our technician and**

21  **team, that we do a feature-for-feature match-up**

22  **of the product to give the customer a new**

23  **product that's as close to the product they**

24  **currently have and it's being replaced if**

Page 83

1    **what the rest of the marketplace is doing so we**

2    **can remain competitive and try to find that**

3    **balance between volume and margin.**

4        Q.  Is the age of the product taken into

5    account?

6        **A.  Yes.**

7        Q.  Is the cost of the repairs for a

8    particular product taken into account?

9        **A.  Yes.**

10       Q.  Is the cost of a replacement product

11   taken into account?

12       **A.  Yes.**

13       Q.  And is there a written list or matrix

14   that sets out the prices?

15           MS. BRUNO:  Objection as to form.

16           You can answer.

17           THE WITNESS:  Not that's accessible to

18   the average -- certainly not to the associates.

19   There is no price list for the call center

20   agents and not even one that's readily available

21   to most of the team.  It's stored in a, you

22   know, software program that looks at the

23   variables that determine pricing and returns it

24   for that particular customer's quote.

Page 84

1    BY MR. DEVITO:

2        Q.  But the prices exists somewhere --

3        **A.  Yes.**

4        Q.  -- for every single --

5        **A.  Sorry.**

6        Q.  -- type of product that could be

7    covered?

8        **A.  Yes.**

9        Q.  So such a list does exist, right?

10           MS. BRUNO:  Objection as to form.

11           You can answer if you know.

12           THE WITNESS:  I wouldn't describe it as

13    a list, but yes, there's set prices that are

14    stored and saved in our -- maintained.

15    BY MR. DEVITO:

16        Q.  And for a customer who is purchasing an

17    aftermarket MPA on a handful of products, is the

18    MPA priced on a per-product basis?

19        **A.  Yes.**

20        Q.  Does the customer receive the

21    per-product pricing?

22           MS. BRUNO:  Objection as to form.

23           You can answer if you know.

24           THE WITNESS:  It would be discussed by

Page 85

```
 1    telephone, but the paperwork we send the

 2    customer would not break down the individual

 3    prices.

 4    BY MR. DEVITO:

 5       Q.  When you say "it would be discussed by

 6    telephone," is there a policy that says Sears

 7    has to, on one of these calls, explain to the

 8    customer this product is going to cost you X,

 9    this product is going to cost you Y?  Does that

10    always happen?

11       A.  No.

12            MS. BRUNO:  Just going to object to

13    form.

14            THE WITNESS:  Oh.

15            MS. BRUNO:  Your answer can stand.

16            THE WITNESS:  Sorry.  I'll slow down.

17    BY MR. DEVITO:

18       Q.  So other than the total price, is there

19    anything that's -- any pricing information that

20    is communicated to the customer in writing?

21       A.  No.

22       Q.  And who -- who at Sears is responsible

23    for setting prices?

24            MS. BRUNO:  Objection.
```

Page 93

1    data warehouse lost records.  It's usually just

2    a matter of finding the right customer

3    agreement.

4        Q.  The MPA certificates, are they -- other

5    than the listing of the particular products on

6    them, are they ever modified for particular

7    customers?

8            MS. BRUNO:  Your question being the

9    actual certificate?

10            MR. DEVITO:  Yes.

11            THE WITNESS:  I don't -- I don't

12    understand the question.

13    BY MR. DEVITO:

14        Q.  Meaning can a customer say, you know,

15    "I don't like this provision in here; would you

16    take it out," for example?

17        A.  They could ask, but we've never done

18    that to my knowledge.

19        Q.  So the -- I think the answer, then, to

20    my question is "no," that -- or the MPA

21    certificates are not modified on a particular --

22    on a customer-by-customer basis?

23        A.  The terms and conditions, no.

24        Q.  So other than the information

Case: 1:18-cv-02545 Document #: 142-7 Filed: 07/26/19 Page 25 of 40 PageID #:1852
18-23538-shl    Doc 3170-12    Filed 04/12/19    Entered 04/12/19 12:38:29    Exhibit
EXHIBIT E - Certification Motion    Pg 49 of 113

Page 94

1    identifying the customer and identifying the

2    products that are covered by the MPA, is there

3    anything else on those certificates that could

4    vary?

5         **A.  No.**

6         Q.  In other words, they're not negotiable

7    by the customer in any way?

8         **A.  Correct, they are not.**

9         Q.  Now, we went over a little bit earlier

10   about different versions of the MPA that have

11   been used by Sears.  There's the version that

12   we're -- we were looking at in Exhibit 9.

13   That's from 2010, and you said that there were

14   two others subsequent, 2013 and 2015.

15         Do you know of, in your time working at

16   Sears, how many other versions of the document

17   there have been?

18         **A.  Best guess would be ten, over twenty**

19   **years that I've been there, but that's not**

20   **something I've ever kept an accurate count on.**

21         Q.  And other than the 2013 and 2015

22   versions which you talked about, did you have

23   any input regarding the terms of any of the

24   other MPAs?

1    fact it's an Acme.

2        Q.  How often does that occur?

3        **A.  Rarely, but I have no percentage I**

4    **could assign.**

5        Q.  From your personal experience, how many

6    times approximately have you encountered

7    situations where Sears sold a protection

8    agreement on a noncovered brand?

9        **A.  How many times have I experienced that?**

10       Q.  Yes.

11       **A.  At least dozens, I'm sure.**

12           MS. BRUNO:  And for clarification, do

13   you mean over the course of your time?

14           THE WITNESS:  Twenty years, yeah,

15   that's the context I understood the question to

16   be.

17   BY MR. DEVITO:

18       Q.  The next paragraph down says "Ciboodle

19   has an automated merchandise brand qualification

20   incorporated into its infrastructure."  And then

21   the following paragraph says "By automating the

22   merchandise verification process the system will

23   prevent associates from or renewing Protection

24   Agreements on merchandise where the merchandise

Page 139

1    or that somebody could trace it back to when the

2    first one was out there.  2009-ish, that's a

3    really rough -- I could be plus or minus --

4    well, minus five years on that.  I don't know.

5    BY MR. DEVITO:

6         Q.  And do you know what MMI stands for?

7         **A.  No.  We always just call it MMI.**

8    **Everybody knows what that means.  It's the brand**

9    **name list.**

10        Q.  Was that -- this automated merchandise

11   brand qualification thing, can I call that MMI

12   or -- is -- is that fair?

13        **A.  Yes.**

14        Q.  Was the MMI instituted because Sears

15   was having issues selling protection agreements

16   on noneligible brands?

17        **A.  I don't know that I would agree with**

18   **that assessment.  I would say it was put in**

19   **place to further ensure that we have a brand**

20   **name on record and that it's one that's -- meets**

21   **our current brand list.  It was an improvement**

22   **process.**

23        Q.  Were you involved in the institution of

24   this MMI feature?

1      A.  No, not in this creation, no.

2      Q.  Does the use of the MMI feature prevent

3   completely -- does it completely prevent Sears

4   from selling protection agreements on brands

5   that are not eligible for coverage?

6      **A.  It prevents us from recording an**

7   **agreement on a brand we don't cover.**

8   **Completely?  Again, the Kenmore/Acme thing, if**

9   **the associate is either behaving fraudulently,**

10  **in which case we're going to take disciplinary**

11  **steps with that associate, or if the associate**

12  **makes a, you know, good faith mistake, then**

13  **sure, we could have recorded it that way.  But**

14  **we would never -- the system won't allow you to**

15  **record a protection agreement on an Acme item if**

16  **Acme is not an approved brand list on that MMI**

17  **system.**

18     Q.  Have you had situations where sales

19  associates were acting fraudulently and

20  recording things that they shouldn't have been?

21     **A.  Yeah.**

22     Q.  Approximately how many times has that

23  happened?

24          MS. BRUNO:  Are you talking about --

Page 142

1    to update the merchandise brand name."

2         How can a situation arise where the

3    brand name is blank?

4    **A.   The coverage could have predated MMI or**

5    **the coverage could have been created by our**

6    **technician sales flow.  They don't use Ciboodle,**

7    **so they don't have the same MMI creation**

8    **requirement, or somebody with NPS access deleted**

9    **the brand name for whatever reason.**

10        MR. DEVITO:  Would you read that answer

11   back?

12                    (Record read.)

13   BY MR. DEVITO:

14    Q.   Okay.  So I just want to unpack that a

15   little bit, if I could.  If the PA predated MMI,

16   that just -- does that mean that their -- Sears

17   did not have brand information prior to that?

18    **A.   As long as I've worked for the company,**

19   **we've had an authorized brands list, but it**

20   **wasn't built into the system as a required field**

21   **that bounced against its own check.  So it was**

22   **more the sales associate would, yep, we're okay,**

23   **let me key it in.  Now it's a required field in**

24   **the system that's automated.**

1          So if it was created prior to that,

2     somebody left it blank or put a period as a

3     placeholder, you know, that kind of thing

4     without checking the list, the agreement could

5     have been recorded.  Once we put MMI in, we said

6     it has to be from this drop-down list also so

7     there's not -- so you don't type it in as

8     "Kenmore" instead of "Kenmore," typos.

9          Q.  So prior to putting in the MMI, there

10    could have been potentially a lot of situations

11    where Sears didn't have the brand information in

12    its system; is that right?

13          MS. BRUNO:  Objection as to form.

14          You can answer.

15          THE WITNESS:  Yeah, I -- define "a

16    lot," but yeah, I mean, sure, yes, it's

17    possible.

18    BY MR. DEVITO:

19          Q.  Well, you tell me what the reality was.

20    Were --

21          A.  I would say the majority of coverage

22    had a brand name listed because we would always

23    ask, but it wasn't as good as it is now because

24    it wasn't a required field.

Page 144

1      Q.  So was it possible, prior to

2  instituting the MMI, to sell or renew a PA where

3  the brand name was blank?

4      **A.  Prior to MMI, was it possible?  Yes.**

5      Q.  Or where Sears otherwise did not know

6  the brand name?

7      **A.  Yes.**

8      Q.  So at some point, Sears became aware

9  that it had sold PAs where the brand was not

10  covered or it didn't know what brand the

11  customer owned; is that accurate?

12          MS. BRUNO:  Objection as to form.

13  BY MR. DEVITO:

14      Q.  Well, let me break it into two pieces.

15  So at some point Sears became aware that it had

16  sold PAs where the brand was not covered; is

17  that correct?

18          MS. BRUNO:  Same objection.

19          THE WITNESS:  I don't -- I don't -- I'm

20  trying to understand in the context of MMI and I

21  don't.  Help me understand.

22  BY MR. DEVITO:

23      Q.  Well, you could divorce it from MMI --

24      **A.  Oh, okay.**

Thompson Court Reporters, Inc
(312) 421-3377

Page 146

1    brand the customer owned; is that correct?

2        **A.  Yes.**

3        Q.  And when it becomes aware of that, it

4    does not contact the customer; is that correct?

5            MS. BRUNO:  Objection to form.

6            But you can answer if you understand.

7            THE WITNESS:  I want to give you a

8    straightforward answer, but I need to qualify it

9    a little bit.  I'm sorry.

10   BY MR. DEVITO:

11       Q.  Sure.

12       **A.  We don't have some audit process that**

13   **searches the entire database for blank fields.**

14   **So the only way we'd become aware of that is**

15   **either a sales associate working that customer's**

16   **file and seeing, "Oh, my gosh, why is this**

17   **blank?  Let me talk to the customer and ask**

18   **about it," or a technician out there trying to**

19   **work on something and get parts to fix it and**

20   **those kind of situations.  So the "become aware**

21   **of it" and do we contact you, we would only**

22   **become aware of it if we were in contact with**

23   **you because nobody's searching millions of**

24   **records.**

Page 152

1    **specific brand in certain circumstances, but for**

2    **the most part, it's just a refrigerator is a**

3    **refrigerator.  We don't care if it's a Kenmore**

4    **or a Maytag or a GE.**

5        Q.  And it says "The age is determined by

6    purchase date or delivery installation date."

7    And how does Sears know these dates if the item

8    wasn't purchased at Sears?  Is that just the

9    customer representation to them?

10        **A.  Exactly, yes.**

11            MR. DEVITO:  What are we at?  11?

12            THE REPORTER:  Yes.

13                    (Exhibit 11 was marked for

14                    ID.)

15    BY MR. DEVITO:

16        Q.  So you've been handed what's been

17    marked as Exhibit 11.  Are you familiar with

18    this document?

19        **A.  Yes.**

20        Q.  Is this the verification table that

21    we've been discussing?

22        **A.  Kind of.**

23        Q.  Okay.

24        **A.  It's the brands list that's on the**

Page 153

1    PA Resource Center.  This is not MMI.  MMI is a

2    software program maintained elsewhere, but they

3    match.  The content of both would be the same.

4        Q.  So the information that MMI would spit

5    out is the same as what's on the PA Resource

6    Center which is this document?

7        A.  Yes.

8        Q.  Is there some way that those two things

9    speak to each other so that a change made to one

10    automatically is made to the other?

11        A.  Nope.

12        Q.  So if a change is being made, someone

13    has to separately input it to each of those two

14    things?

15        A.  Yes.

16        Q.  And is this a comprehensive list of all

17    the brands that Sears will cover in an MPA?

18        A.  (Reviewing document.)

19            The only qualification I have to that

20    as being a yes/no answer is I don't see a

21    revision date on here.  So I don't know by heart

22    which version I'm looking at.  But whenever this

23    would have been printed out and pulled from,

24    this would have been the representation of that,

Page 159

```
 1    this document is still just about as current --

 2    this -- that section still exists on the current

 3    document, yes.

 4    BY MR. DEVITO:

 5        Q.  Okay.  And it would still say The Great

 6    Indoors on it, correct?

 7        A.  Yes.

 8        Q.  At the bottom, it says "Currently

 9    bundled items cannot be bundled, upsold, or

10    renewed.

11            By "currently covered," that's

12    referring to items that are already listed on an

13    existing PA?

14        A.  Yes.

15        Q.  And the -- does this then mean that if

16    there's an existing PA with one of these brands

17    on it, that that PA should not be renewed?

18        A.  Correct.

19        Q.  And are you aware of any situations

20    where such a PA was renewed anyway?

21        A.  No.

22        Q.  Was it possible, before you put in the

23    MMI, that a purchase agreement could have been

24    renewed with a noneligible brand on it?
```

Thompson Court Reporters, Inc
(312) 421-3377

1    A.  Yeah.

2    Q.  Was that something that Sears was aware

3  of being an issue?

4        MS. BRUNO:  Objection as to form.

5        You can answer.

6        THE WITNESS:  I would say we were aware

7  of the gap, yes.

8  BY MR. DEVITO:

9    Q.  And this indicates that Thermador is a

10  brand that is not -- not eligible; is that

11  correct?

12    A.  (Reviewing document.)

13        Not eligible for protection agreement

14  renewal?

15    Q.  Yes.  Well --

16    A.  Agreed.

17    Q.  Is there more to that answer that --

18    A.  Well, I mean, it's on the list as an

19  authorized brand.  So I can't say it's not

20  eligible, but it's eligible under the

21  circumstances of it was bought at the store at

22  point of sale, and then there's the whole next

23  paragraph that we've been discussing that says

24  why it wouldn't be eligible for future coverage.

Page 166

1    for a brand to be both eligible and

2    nonserviceable?

3        **A.   No.   I can't think of -- or at least I**

4    **can't think of an instance where that's ever**

5    **happened.**

6        Q.  So we were looking at the eligible

7    brands list -- or the -- I think -- correct me

8    if I'm wrong, but if you go -- looking at the

9    high-end merchandise --

10       **A.   Okay.**

11       Q.  -- you told me that the brands on here

12   are eligible but classified as high end, right?

13       **A.   Yeah.**

14       Q.  If you take Thermador as an example,

15   it's eligible but high end on Exhibit 11 and

16   it's nonserviceable on Exhibit 12.

17       **A.   It's nonserviceable under the**

18   **in-warranty repair.**

19       Q.  Okay.  So it's serviceable under a PA?

20       **A.   In this particular situation where they**

21   **bought the PA at the retail store, yes.**

22       Q.  So Sears will, for the high-end items,

23   still sell a PA at point of sale on the items

24   listed in there but that's it; is that right?

Page 167

1      A.   "That's it," meaning?

2      Q.   Meaning they won't sell an aftermarket

3  PA and they won't renew.

4      **A.   Fair statement, yes.**

5      Q.   And has it always been the case that

6  Sears would not renew PAs for high-end

7  merchandise listed on here (indicating to

8  document)?

9      **A.   To my knowledge, yes, that's always**

10  **been the case.**

11      Q.   Going back to Exhibit 12 -- I know

12  you're not familiar with it, but are there any

13  brands that are not on here that you know Sears

14  doesn't service?

15          MS. BRUNO:   Objection as to form.   This

16  is about in-warranty service.   So I think your

17  question is going far broader than that, but --

18          MR. DEVITO:   I'm happy to limit it.

19  BY MR. DEVITO:

20      Q.   Are there any brands not on here that

21  you know Sears doesn't provide in-warranty

22  service for?

23      **A.   Yeah, NordicTrack would be the example**

24  **that comes to mind.**

1    **exported to Excel and manipulated that way.  So**

2    **you get all the bells and whistles of Excel, so**

3    **yes, sir.**

4              MS. BRUNO:  This was produced in Excel.

5              MR. DEVITO:  I thought you produced it

6    in a searchable PDF, but I could be wrong.  I

7    don't believe I've ever seen the columns with

8    the numbers next to them.  If I had, I certainly

9    wouldn't have asked that question.

10             MS. BRUNO:  I hear you.  Got it.

11   BY MR. DEVITO:

12        Q.  So moving away from these documents,

13   has there -- or are you aware of any situation

14   in which Sears has changed its position on

15   whether or not a particular product is covered,

16   meaning up until X date we covered this product

17   and then we decided we're not going to cover

18   this anymore?

19        **A.  Yes, we've exited the market on new**

20   **contracts for certain merchandise, but we've**

21   **always honored that contract at the customer**

22   **level for its original duration.  So we**

23   **wouldn't -- vacuum cleaners, for example, we**

24   **stopped renewing, stopped selling new coverage,**

Case: 1:18-cv-02546 Document #: 142-7 Filed: 07/26/19 Page 40 of 40 PageID #:1867
18-23538-shl    Doc 3170-12    Filed 04/12/19    Entered 04/12/19 12:38:29    Exhibit
EXHIBIT E - Certification Motion    Pg 64 of 113

Page 209

1    **honored all contracts up until they expired.**

2        Q.  And what goes into the determination

3    not to continue covering a product?

4            MS. BRUNO:  Objection as to form.

5            If you know, you can answer.

6            THE WITNESS:  A variety of factors,

7    including the value of the product in the

8    marketplace as -- you know, DVD players used to

9    be an MPA item and now they're an SPP item

10   because they're so cheap and inexpensive.  They

11   become a disposable product rather than a

12   serviceable merchandise item.

13           Sometimes the manufacturer has gone out

14   of business, so we're not going to be able to

15   find a supply of aftermarket parts to repair

16   future items.  So we don't want to expose

17   ourselves to any further coverage.  So we

18   stopped renewing and extending.  Maybe it's just

19   not a profitable venture for us anymore, that

20   product with the service costs and those kind of

21   things.  So we just want to exit that space in

22   the market or any combination -- you know.

23   BY MR. DEVITO:

24       Q.  Sure.  I want to ask you a few

# Exhibit B

# FILED UNDER SEAL

# Exhibit C

# MASTER PROTECTION AGREEMENT

Retain this document as proof of ownership.

**This is not a contract of insurance.**

In this Master Protection Agreement (hereinafter referred to as "MPA" or "Agreement"), the terms "we," "us," "our" and "Obligor" refer to Sears Protection Company ("SPC"), a wholly-owned subsidiary of Sears, Roebuck and Co. ("Sears"), in states where SPC is the Obligor, Sears in states where Sears is the Obligor , Sears Home Improvement Products, Inc. ("SHIP"), a wholly-owned subsidiary of Sears in states where SHIP is the Obligor, and Sears Roebuck de Puerto Rico, Inc. ("Sears PR"), a wholly-owned subsidiary of Sears, in Puerto Rico. The terms "you" and "your" refer to the purchaser of this MPA. Obligations under this Agreement are backed by the full faith and credit of the Obligor. See Section 16 for a state specific Obligor listing. **ALSO SEE SPECIAL STATE EXCLUSIONS BELOW.**

1.  COVERAGE AND TERM.  Subject to the terms and conditions of this MPA, and during the Term (as that term is hereinafter defined) we will directly pay on your behalf the cost of parts and services performed by a qualified repair provider that we shall designate ("Sears Repair") necessary to maintain the proper operating condition of the product(s) as to which you specifically purchased this MPA to protect (the "Covered Product") as set forth on the reverse side, including repairs necessary due to normal wear and tear of such Covered Product(s). Any parts and service necessitated by a Sears Repair on Covered Product(s) which is then subject to any manufacturer's warranty or manufacturer's recall will be performed by Sears in accordance with the procedures and dictates of such manufacturer's warranty or manufacturer's recall. Parts used to repair out of warranty product(s) may be either new or rebuilt or non-original manufacturer's parts, at our option. Products including those within the original manufacturer's warranty period may be repaired or replaced with a comparable product (which may have a lower selling price than the Covered Product(s)) from a Sears or Sears affiliated store, or, at our discretion, we will issue a credit for the replacement value of the Non-Repairable Covered Product(s), which value could be substantially less than the price paid for the Covered Product(s).

    The term of this MPA ("Term") begins on the date coverage was purchased on the Covered Product(s) and expires on the date set forth on the reverse side.

    Any manufacturer's warranty period on the Covered Product(s) may run simultaneously with the Term or a portion of the Term, however at no time will the Total Price (as that term is defined in Section 14 of this MPA) you paid for this MPA include the scope of coverage within such coverage time period that is specifically set forth in such manufacturer's warranty as any manufacturer's warranty on the Covered Product(s) is separate and distinct from the coverage being provided to you under this MPA.

    **THERE ARE CERTAIN LIMITATIONS TO COVERAGE UNDER THIS MPA WHICH ARE SET FORTH IN SECTIONS 2, 12, 13 AND 15 BELOW, INCLUDING CERTAIN SPECIAL STATE PROVISIONS WHICH ARE ALSO SET FORTH BELOW.**

2.  ELIGIBILITY FOR COVERAGE. **You represent that the product(s) listed on the reverse side is in proper operating condition at the start of coverage and the information related to "Date Purchased" is correct.** Covered Products must have a legible model and serial number. Covered Products without the proper identification will not be eligible for any service under this agreement and this agreement will be cancelled. We reserve the right to inspect the products listed on the reverse side to determine eligibility for coverage. Coverage applies only to products which are located at one (1) address within a single dwelling unit.

3.  DISCOUNT ON NON-COVERED REPAIRS. On the Covered Product(s), you are entitled to a 10% discount off the regular retail price on any service performed and related installed parts provided by Sears Repair that is not covered by this MPA.

4.  TRANSFERABILITY. This MPA is transferable to any subsequent owner of the Covered Product(s) subject to the terms and conditions of this MPA.

5.  PREVENTIVE MAINTENANCE.  At your request, we will directly pay Sears Repair to perform one (1) preventive maintenance check-up within any contract year that the Covered Product(s) is covered. under this MPA

6.  FOOD LOSS REIMBURSEMENT FOR REFRIGERATORS AND FREEZERS.  We will reimburse you up to $250 within any continuous twelve (12) month period during the Term of this MPA for any food spoilage that is the result of a mechanical failure of the Covered Product(s) that is covered for such food spoilage. The food loss must be verified by us.  If the Covered Product at issue is still under a manufacturer's warranty, any

National MPA AM E  Jan2010



FORM 4/G

SEARS0000410

reimbursement under this MPA is in addition to any reimbursement under such manufacturer's warranty. In no case shall the total reimbursement under the manufacturer's warranty and this MPA, in the aggregate, exceed the value of the food loss.

7. RENTAL REIMBURSEMENT. In the event that you will be without the use of your Covered Product(s) due to a covered Sears Repair for a period of time that is longer than our original promised completion date, SPC will reimburse you for reasonable rental expenses of a comparable product for a period of time from one (1) day after the original promise date until the covered Sears Repair is completed. For in-home service, original promised completion date is the first date that a technician is scheduled to arrive to perform service on such Covered Product(s). All reimbursements for rental expenses must be pre-authorized by SPC and require copies of original receipts from a vendor approved by SPC along with completed claim forms for such rental. To secure authorization, call **1-800-927-7836**.

8. REPLACEMENT AND NO LEMON GUARANTEE. If we determine that a Covered Product is not repairable due to unavailability of functional parts or technical information (a "Non-Repairable Covered Product"), you are entitled, at your option, to either: (1) a comparable product replacement based solely on the replacement value of such Non-Repairable Covered Product as determined by us, from a Sears or Sears affiliated store; or (2) a merchandise credit for such Non-Repairable Covered Product based solely upon the comparable product replacement value as determined by us. If neither of the two options in the immediately preceding sentence is selected by you, then SPC may cancel this MPA and refund the Total Price of your current MPA coverage for the Non-Repairable Covered Product. You have up to ninety (90) days from the date of authorization by SPC to select your replacement product. Replacement products may be new or rebuilt to meet the manufacturer's specifications of the original product. We shall not be responsible for reconfiguring space to accommodate replacement product(s) when a product of identical dimensions is not available. **TECHNOLOGICAL ADVANCES AND REPLACEMENT PRODUCT AVAILABILITY MAY RESULT IN A REPLACEMENT PRODUCT WITH A LOWER SELLING PRICE THAN THE ORIGINAL PRODUCT (BEING THE NON-REPAIRABLE COVERED PRODUCT). IN ALL CASES, PRODUCT COMPARABILITY FOR A REPLACMENT PRODUCT WILL BE DETERMINED BY US AT OUR SOLE DISCRETION.** In accordance with the foregoing provisions, we will also, at your request, replace the Covered Product(s) covered by this MPA in the event of four (4) or more separate product failures, as determined by us, due to a defect in parts or workmanship within any continuous twelve (12) month period that the Covered Product(s) is covered. Product failures for these purposes must include repair or replacement of a functional, non-expendable part, and do not include preventive maintenance, product diagnosis, customer instruction, accessory, cosmetic, or non-functional repair or replacement, or any repair covered under a manufacturer's product recall. Your request for replacement of a Covered Product(s) must occur within sixty (60) days from its fourth (4th) product failure (the "Fourth Failure Time Period"). To secure authorization, call **1-800-927-7836** prior to the expiration of the Fourth Failure Time Period.

9. COSMETIC DEFECTS COVERAGE. Cosmetic defects are covered under this MPA for the first three (3) years of ownership of the Covered Product(s) from its purchase date as set forth on the reverse side. Cosmetic defects or cosmetic incompatibility of parts are not eligible for product replacement, they are only eligible for repair. Limitations of coverage still apply. See Section 13 below.

10. BUSINESS OR COMMERCIAL USE. A product is "used for business or commercial purposes" if it is used for any purpose other than single family household purposes. Any product not listed in Section 13(c) below that is used for business or commercial purposes may be covered under this Agreement. All products used for business or commercial purposes must have been purchased from a Sears or Sears affiliated store. Central heating and cooling products must also have been installed by a Sears authorized installer with no modifications to the original installation

11. TIME AND PLACE OF SERVICE. Service will be performed during the Sears Repair provider's normal business hours. If, due to the loss of the use of your Covered Product, your health or safety is endangered or if damage to or loss of your property is threatened, we will make commercially reasonable efforts to expedite service. To arrange for service where your Covered Product is located, call **1-800-4-MY-HOME®** at any time. For service on digital cameras, computers and other home office equipment, call **1-800-877-8701**. On some products, telephone support by a technician will be available and you will be required to check some basic operational functions and be given possible solutions before a technician is dispatched to your home. If the reverse side of this certificate indicates Shop Service, you must bring the Covered Product(s) to a Sears Repair location and pick it up following completed service. In some cases, you will be provided packaging and you must ship the Covered Product to our service provider, at our expense, for repair. For select types of merchandise, we

National MPA AM  E  Jan2010                                                  FORM 4/G

SEARS0000411

may transfer Covered Product from your home to a specialized facility in order to complete the repair, at our expense if the Covered Product is covered by an in-home agreement.

12. **SAFETY AND ACCESSIBILITY.** In the event that Sears Repair determines that it cannot service your Covered Product(s) due to poor accessibility or unsafe working conditions or that it cannot restore your Covered Product(s) to safe, working conditions due to reasons beyond the scope of this Agreement, such as, but not limited to, code violations, improper storage, installation, use or movement of the product or equipment, including the failure to place the product or equipment in an area that complies with the manufacturer's published space or environmental requirements, Sears Repair shall not be required to proceed until you remedy the applicable cause.

13. **LIMITATIONS OF COVERAGE. THIS MPA DOES NOT COVER:**

   a. any product located outside the United States, Puerto Rico and Guam. Service is available in Canada provided your Covered Product(s) is CSA certified.
   b. any lawn and garden, gasoline powered or gas grill product.
   c. any floor care, fitness, sewing, coin operative laundry, computer equipment or power tool product used for any business or commercial purposes.
   d. repair of any product which is damaged or malfunctioning due to causes beyond our control including, but not limited to, repairs necessitated by operator or owner negligence (such as the failure to maintain the product according to the owner's manual instructions), improper installation, CRT-based or Plasma television burn-in, accidental damage, abuse, misuse, vandalism, theft, rust, corrosion, animal or insect infestation, damage caused by lightning and acts of nature.
   e. service required as a result of any alteration of the product or equipment or repairs made during the Agreement Term which are not authorized by us, or are made by parties not specifically authorized by us, such as, but not limited to, product(s) that are in a disassembled state.
   f. expendable items, including, but not limited to: any filters, bulbs (micro display lamps are covered) or batteries (camcorder batteries are covered), vacuum cleaner bags, ink jet print heads, printer cartridges or drums, fluids (gasoline, oil, etc.), sewing machine needles, saw blades, and other operating supplies and consumable items.
   g. the following products, parts, and services: installation (other than re-installation required to complete a covered repair, or replacement required under Section 8 of this MPA), antenna systems, pulling and re-installing of deep well, jet or submersible well pumps.
   h. telephone, water, gas, electrical or other lines, drains, or ductwork connecting to the product or equipment. Upgrades to your Covered Product(s), permits or any additional expense incurred in order to comply with local, state or federal building codes and other laws and regulations are your responsibility.
   i. This MPA also does not cover any nonfunctional repairs, parts or cosmetic defects of product(s) purchased as "Reconditioned" or "Used" or purchased at Sears Outlet stores.
   j. coverage to your Covered Product(s) if poor accessibility or unsafe working conditions exist.

The following additional exclusions and limitations specifically apply to computer equipment:

   k. any software, including, but not limited to, application programs, databases, files, source codes, object codes or proprietary data, or any support, configuration, installation or reinstallation of any software or data. You are responsible for backing up copies of all your data and software on a regular basis.
   l. service required as a result of non-compatible software or due to improper software use or software virus.
   m. hardware upgrade(s) not purchased at Sears or Sears PR. Hardware upgrades include memory, hard disk drive, multimedia products, and printer font cartridges. Hardware upgrades purchased at Sears or Sears PR and installed into products and equipment are covered under this MPA. This MPA does not cover installation of hardware upgrades.

14. **CANCELLATION AND REFUNDS.** You may cancel this MPA at any time for any reason by calling 1-800-4-MY-HOME® or by mailing written notice of cancellation to: Cancellation Services, P.O. Box 2570, High Point, NC, 27263. We may cancel this MPA if you fail to pay, make a material misrepresentation, substantially breach your duties under this MPA, or if Sears Repair or its representatives determines that it cannot service or repair your Covered Product(s). We may also cancel this Agreement if the Covered Product(s) does not have a legible model or serial number. We will notify you of any cancellation being made by us for the reasons set forth above in accordance with applicable law and the terms and conditions of this MPA. If this MPA is cancelled by you or us, as the case may be, within the first sixty (60) days of the Term or prior to the expiration of the full manufacturer's warranty for the Covered Product at issue (whichever occurs last), excluding warranties covering component parts of the Covered Product, we will refund 100% of the total price you paid for this MPA (the "Total Price") for the MPA coverage on the Covered Product(s) actually being cancelled. If there is more than one

National MPA AM E Jan2010                                                      FORM 4/G

SEARS0000412

product being covered under the terms and conditions of this MPA and only one of the products is being cancelled from this Agreement, the Total Price shall mean the price paid for this MPA that is allocated to such product being cancelled as the MPA shall remain in effect for any other Covered Product(s) not the subject of such cancellation. For multiple Covered Product(s) covered by this MPA, refer to your sales receipt for the Total Price itemized allocation on each Covered Product(s).

If this MPA is cancelled after the first sixty (60) days of the Term or after the expiration of the full manufacturer's warranty for the Covered Product at issue (whichever occurs last), excluding warranties covering component parts of the Covered Product, we will refund the Total Price allocable to the remainder of the Term of this MPA prorated on a monthly basis, for the Covered Product that is specifically the subject of such cancellation. Any refund will be made in the same form as the original payment of this MPA.

15.  LIMITATION OF LIABILITY.   EXCEPT AS STATED IN SECTION 6, WE AND OUR AGENTS, CONTRACTORS OR LICENSEES ARE NOT LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, PROPERTY DAMAGE, LOST TIME, LOSS OF USE OF COVERED PRODUCT(S) OR ANY OTHER DAMAGES RESULTING FROM THE BREAKDOWN OR FAILURE OF COVERED PRODUCT(S), DELAYS IN SERVICING OR THE INABILITY TO SERVICE ANY COVERED PRODUCT(S) EXCEPT AS MAY OTHERWISE BE REQUIRED BY LAW.

**UNDER NO CIRCUMSTANCES WHATSOEVER SHALL THE OBLIGATIONS OF OBLIGOR UNDER THIS MPA TO YOU FOR MONETARY RECOVERY EXCEED THE TOTAL PRICE PAID FOR THE COVERED PRODUCT(S) UNDER THIS MPA.**

16.  OBLIGOR. The Obligor of this Agreement shall be determined by the ultimate location of the Covered Product(s) covered by this Agreement at the time of sale.  For Covered Products located in California, SPC shall be the Obligor for the following products: home electronics, appliances, power tools and fitness equipment. For HVAC equipment located in California and purchased from SHIP, SHIP shall be the Obligor. For all other Covered Products in California, Sears shall be the Obligor. In Puerto Rico, Sears PR is the Obligor. In all other states, SPC shall be the Obligor.

17.  RENEWAL. No party is obligated to renew this MPA beyond the expiration date of the Term.  The Total Price paid by you for this MPA may change or increase upon a renewal of this MPA.  By purchasing this Agreement, you agree that Sears may call you to notify you of renewals terms and upgrade plans for this MPA.

18.  PUERTO RICO, CALIFORNIA, NEW MEXICO, WYOMING AND NEW YORK CUSTOMERS.  A 10% penalty per month shall be added to any refund that we fail to make within thirty (30) days of your cancellation of this Agreement and request for a refund.

19.  UTAH CUSTOMERS. Coverage under this Agreement is not guaranteed by the Property and Casualty Guaranty Association.  In the event of cancellation of this Agreement by Obligor in accordance with the "Cancellation and Refunds" provisions above, Utah residents will receive thirty (30) day prior written notice of cancellation.  There is no deductible applied for the performance of this Agreement.

20.  KENTUCKY AND VIRGINIA CUSTOMERS.  If we fail to pay any valid claim within sixty (60) days of proof of loss, you may make a claim directly against Safeco Insurance Company of America, Safeco Plaza, Seattle, WA 98185.

21.  INDIANA AND WEST VIRGINIA CUSTOMERS.  This Agreement is not an insurance policy and is not regulated by the Departments of Insurance for the states of Indiana and West Virginia.

22.  IOWA CUSTOMERS.  Obligor is subject to regulation by the insurance division of the Iowa Department of Commerce.  Complaints that are not settled by us may be sent to the insurance division

23.  TEXAS CUSTOMERS. Any questions concerning the regulation of us under this Agreement or any unresolved complaints may be directed to the Texas Department of Licensing and Regulations - P.O. Box 12157 Austin, Texas 78711 or (512) 463-6599.

24.  SOUTH CAROLINA CUSTOMERS. Any questions concerning the regulation of us under this Agreement or any unresolved complaints (within sixty (60) days of proof of loss) may be directed to the South Carolina Department of Insurance – P.O. Box 100105 Columbia, South Carolina 29202-3105 or (800) 758-3467. A 10% penalty per

SEARS0000413

month shall be added to any refund that we fail to make within forty-five (45) days after the return of the Agreement to the provider.

25. **NORTH CAROLINA CUSTOMERS.** Upon cancellation a reasonable administrative fee not to exceed 10% of the pro rata refund may be charged. Obligor must notify the consumer before the purchase of this Agreement that its purchase is not necessary in order to purchase or obtain financing of the Covered Product.

26. **ALABAMA CUSTOMERS.** A 10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for a refund. This Agreement will not charge a deductible for services rendered.

27. **GEORGIA CUSTOMERS.** Notwithstanding the CANCELLATION AND REFUNDS section, we will only cancel this Agreement for fraud, material misrepresentation or nonpayment of amounts due under this Agreement. We will mail to you a written notice at least ten (10) days prior to the date of cancellation for nonpayment, or at least thirty (30) days prior to the date of cancellation for fraud or material misrepresentation. Obligor will not provide services under this Agreement if poor accessibility or unsafe working conditions exist, but these conditions are not grounds for cancellation. Nothing contained in any provision elsewhere in this Agreement shall affect your right to make a claim directly against Safeco Insurance Company of America if we fail to pay any valid claim within sixty (60) days. The claim should be sent to Safeco Insurance Company of America, Safeco Plaza, Seattle, WA 98185 or (847) 490-2320 Attn: Ms. Ann Hester.

28. **MINNESOTA CUSTOMERS.** In the event of cancellation of this Agreement by us in accordance with the "Cancellation and Refunds" provision above, Minnesota residents will receive five (5) days prior written notice of cancellation if for reason of nonpayment, material misrepresentation or substantial breach of duties, or at least fifteen (15) days for all other reasons. A 10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for a refund.

29. **NEW HAMPSHIRE CUSTOMERS.** In the event that you do not receive satisfaction under this Agreement, you may contact the New Hampshire Insurance Department, 21 South Fruit Street, Suite 14, Concord, NH 03301; telephone 1-800-852-3416; e-mail consumerinquiries@ins.nh.gov.

30. **ARKANSAS CUSTOMERS:** In the event of cancellation of this Agreement by us in accordance with the "Cancellation and Refunds" provision above, Arkansas residents will receive fifteen (15) days prior written notice of cancellation for reasons other than for nonpayment, material misrepresentation or substantial breach of duties. A 10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for a refund.

31. **WASHINGTON CUSTOMERS:** In the event of cancellation of this Agreement by us in accordance with the "Cancellation and Refunds" provision above, Washington residents will receive twenty-one (21) days prior written notice of cancellation for reasons other than for nonpayment, material misrepresentation or substantial breach of duties. A 10% penalty per month shall be added to any refund that we fail to make within forty-five (45) days of your cancellation of this Agreement and request for a refund.

Sears Protection Company, Obligor, Dept. 702SRC, 3333 Beverly Road, Hoffman Estates, IL 60179
Sears, Roebuck and Co., Obligor, Dept. 702SRC, 3333 Beverly Road, Hoffman Estates, IL 60179
Sears, Roebuck de Puerto Rico, Inc., Obligor, 9410 Los Romeros Ave., San Juan, Puerto Rico 00925
Sears Home Improvement Products, Inc., Obligor, 1024 Florida Central Parkway, Longwood, FL 32750

National MPA AM E  Jan2010                                    FORM 4/G

National MPA AM E  Jan2010                                    FORM 4/G

# Exhibit D

```
                                                   Page 1

 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                      EASTERN DIVISION

 4    NINA GREENE and GERALD           )

 5    GREENE,                          )

 6                   Plaintiffs,       )

 7              vs.                    )   No. 1:15-CV-02546

 8    SEARS PROTECTION COMPANY,        )

 9    SEARS ROEBUCK AND CO. and        )

10    SEARS HOLDINGS CORPORATION,      )

11                   Defendants.       )

12

13              The deposition of KATRINA MEANS, called

14    for examination, taken pursuant to the Federal Rules

15    of Civil Procedure of the United States District

16    Courts pertaining to the taking of depositions,

17    taken before Lynn A. McCauley, CSR No. 84-003268,

18    RPR, a Certified Shorthand Reporter of the State of

19    Illinois, at 115 South LaSalle Street, Suite 2910,

20    Chicago, Illinois, on June 29, 2016, at 9:30 a.m.

21

22

23

24
```

```
                                          Page 2

 1   PRESENT:
 2        KAUFMAN, COHEN & RESS, P.C., by
          MS. DEBORAH R. GROSS
 3        Two Commerce Square, Suite 3900
          2001 Market Street
 4        Philadelphia, Pennsylvania 19103-7042
          215-735-8700
 5        dgross@kcr-law.com
                   Appeared on behalf of Plaintiffs;
 6
 7                   and
 8
          BAKER HOSTETLER, by
 9        MR. ERIN BOLAN HINES
          191 North Wacker Drive, Suite 3100
10        Chicago, Illinois 60606-1901
          312-416-6215
11        ehines@bakerlaw.com
                   Appeared on behalf of Defendants.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

                                                        Page 111

1    BY MS. GROSS:

2           Q.   What is your understanding as to how

3    changes to the Eligible Brands List comes about?

4                   Like how do the Product Managers --

5    how do the Product Managers make decisions concerning

6    changes to the Eligible Brands List?

7           A.   Usually with conversations they've had

8    with the Engineering Team, Product Engineering Team,

9    and the Buyers as new products come into market.

10          Q.   And so is the Product Engineering Team a

11   different segment than -- or reporting segment at

12   Sears?

13          A.   They reported to Home Services.  They do

14   not report to Gary Mitzner.

15          MS. GROSS:  Got it.  Okay.  Let's take a

16   quick break.

17                          (WHEREUPON, a recess was

18                              had.)

19          MS. GROSS:  Back on.

20   BY MS. GROSS:

21          Q.   I'd like to show you what's been

22   previously marked as Plaintiffs' Exhibit 13.

23                   Have you ever seen this document

24   before?

Page 128

1   pricing?

2          A.   They can get to it, but their register

3   tells them the price.

4          Q.   Are you aware of any discussions within

5   your group concerning the need to inspect products

6   that -- for which NPAs have been entered into?

7          MS. HINES:   Object to form.

8   BY THE WITNESS:

9          A.   No.

10  BY MS. GROSS:

11         Q.   Is there any kind of analysis of the

12  number of inspections of products for which NPAs have

13  been entered into?

14         MS. HINES:   Object to form.

15  BY THE WITNESS:

16         A.   I don't know what you mean by

17  inspections.

18         MS. GROSS:   Okay.   Let me try it a different

19  way.

20  BY MS. GROSS:

21         Q.   In the NPA agreement Sears reserves the

22  right to inspect a product.

23                  Do you recall that?

24         A.   Yes.

1       Q.    Okay.  So has there ever been any
2  discussions at Sears or within your group about Sears
3  performing such inspections?
4       A.    No.
5       Q.    Okay.  Do you know if any such
6  inspections of products for which NPAs have been
7  entered into have been done other than when a service
8  call is made?
9       A.    That we would just go out to inspect?
10      Q.    Correct.
11      A.    No, we would not.
12      Q.    So the only time Sears performs an
13 inspection of a product for which an NPA has been
14 purchased is when a Sears -- when a service call has
15 been made?
16      A.    Correct.
17      Q.    Okay.  Have you heard of a person named
18 Sujatha?
19      A.    Yes.
20      Q.    And have you had any dealings with her?
21      A.    Uh-huh.
22      Q.    For what purpose?
23      A.    If I want her to assist with a query.
24      Q.    Okay.  And do you know what type of query

# Exhibit E

## Eligible Brands List

Eligible PA Products & Brands

In order to sell a Protection Agreement, the following products must be purchased from Sears:

1. Gas Grills
2. Hardware / Workshop
3. Home Office Equipment
4. Lawn & Garden Equipment (Division 71)
5. Pumps - Sump & Well
6. Projection TV's
7. Digital Cameras
8. Water Treating Equipment - Distillers, Filters & Softeners

NordicTrack Fitness products are NOT eligible for Protection Agreement coverage, regardless of purchase location.

### Home Office Equipment

| Computer | Fax/Copier/Printer | Modem | Monitor | Typewriter |
|---|---|---|---|---|
| + | COMPAQ | COMPAQ | APPLE | COMPAQ |
| 3COM | DELL | DELL | COMPAQ | DELL |
| ACER | EPSON | HP | DELL | HP |
| APPLE | HP | | GATEWAY | SONY |
| ASUS | IBM | | HP | |
| ATI | PANASONIC | | IBM | |
| AVERATEC | SAMSUNG | | NEC | |
| CASIO | SONY | | SONY | |
| CISNET | TOSHIBA | | | |
| COMPAQ | | | | |
| CREATIVE LAB | | | | |
| DELL | | | | |
| EMA | | | | |
| EMACHINES | | | | |
| GATEWAY | | | | |
| HP | | | | |
| IBM | | | | |
| INFOCUS | | | | |
| LENOVO | | | | |
| LIQUID VIDEO | | | | |
| LITE-ON | | | | |
| MIRUS | | | | |
| MSI | | | | |
| SAMPO | | | | |
| SONY | | | | |
| TOSHIBA | | | | |
| VELOCITY | | | | |
| VIEWSONIC | | | | |

### Recreational

| Exerciser | Treadmill |
|---|---|
| AFG | AFG |
| BODY BY JAKE | BH |
| BOWFLEX | BODY BY JAKE |
| DIAMONDBACK | BOWFLEX |
| HEALTH RIDER | HEALTH RIDER |
| HORIZON | HORIZON |
| IMAGE | IMAGE |
| LIFESTYLER | LIFESTYLER |
| PROFORM | PROFORM |
| REEBOK | REEBOK |
| SEARS | SEARS |
| VELOPRO | WEIDER |
| WEIDER | WESLO |
| WESLO | |

### Workshop / Hardware & Garage Door Openers

EXHIBIT
Plaintiff
11
DH 12-17-15

SEARS0000516

| Air Compressor | Drill Press/Sander/Saw, Joiner/Planer/Shaper, Power Washer | Generator | Cleaning & Router | Welder | Garage Door Opener |
|---|---|---|---|---|---|
| BLACK&DECKER | BLACK&DECKER | AGRIFAB | BLACK&DECKER | BLACK&DECKER | CHAMBERLAIN |
| BOSCH | BOSCH | ARIENS | BOSCH (Cleaning Only) | BOSCH | CRAFTSMAN |
| CAMPBLHSFLD | CRAFTSMAN | BLACK&DECKER | CRAFTSMAN (Cleaning Only) | CRAFTSMAN | CRAFTSMANPRO |
| CRAFTSMAN | CRAFTSMANPRO | BRIGGS&STRAT | DELTA (Cleaning Only) | CRAFTSMANPRO | GENIE |
| DELTA | DELTA | COMPANION | DEWALT (Cleaning Only) | DELTA | SEARS |
| DEWALT | DEWALT | CRAFTSMAN | MAKITA (Cleaning Only) | DEWALT | |
| INGERSOLLRND | GENERAC | CRAFTSMANPRO | MILWAUKEE (Cleaning Only) | MAKITA | |
| MAKITA | MAKITA | GENERAC | PORTERCABLE (Cleaning Only) | MILWAUKEE | |
| MILWAUKEE | MILWAUKEE | HOMELITE | SEARS (Cleaning Only) | PORTERCABLE | |
| PORTERCABLE | PORTERCABLE | HONDA | WAGNER (Cleaning Only) | SEARS | |
| SEARS | SEARS | HUSQVARNA | BLACK&DECKER (Cleaning Only) | WAGNER | |
| SKIL | SKIL | KAWASAKI | COBALT (Cleaning Only) | | |
| WAGNER | WAGNER | KOHLER | ROTOZIP (Cleaning Only) | | |
| | | LAWNBOY | TRADESMAN (Cleaning Only) | | |
| | | LIFETIME | | | |
| | | MACKISSIC | | | |
| | | MANTIS | | | |
| | | MCCLANE | | | |
| | | MCCULLOCH | | | |
| | | MURRAY | | | |
| | | OHIOSTEEL | | | |
| | | POULAN | | | |
| | | ROBINS/SUBARU | | | |
| | | SEARS | | | |
| | | SNOWKING | | | |
| | | TECUMSEH | | | |
| | | WEEDEATER | | | |

## Heating and Cooling

| Central A/C | Window A/C | Air Treatment | Furnace | Boiler | Space, Floor & Wall Furnace |
|---|---|---|---|---|---|
| ADDISON | ADDISON | ADDISON | ADDISON | ADDISON | ADDISON |
| ADOBEAIR | ADOBEAIR | ADOBEAIR | ADOBE | ADOBEAIR | ADOBE |
| AIR QUEST | AIR QUEST | AIR QUEST | ADOBEAIR | AIR QUEST | ADOBEAIR |
| AMANA | AMANA | AMERICAN STD | AIR QUEST | AMERICAN STD | AIR QUEST |
| AMERICAN STD | AMERICAN STD | APRILAIRE | AMANA | ARCOAIRE | AMERICAN STD |
| APRILAIRE | APRILAIRE | ARCOAIRE | AMERICAN STD | ARMSTRONG | ARCOAIRE |
| ARCOAIRE | ARCOAIRE | ARMSTRONG | ARCOAIRE | BARD | ARMSTRONG |
| ARMSTRONG | ARMSTRONG | BARD | ARMSTRONG | BRYANT | BARD |
| BARD | BARD | BRYANT | BARD | COMFORTGLOW | BRYANT |
| BRYANT | BRYANT | COMFORTGLOW | BRYANT | COMFORTMAKER | COMFORTGLOW |
| CARRIER | CARRIER | COMFORTMAKER | CARRIER | DAY & NIGHT | COMFORTMAKER |
| COLEMAN | COLEMAN | DAY & NIGHT | COLEMAN | DUNKIRK | DAY & NIGHT |
| COMFORTGLOW | COMFORTGLOW | DELONGHI | COMFORTGLOW | GE | GE |
| COMFORTMAKER | COMFORTMAKER | DYNAMIC | COMFORTMAKER | GOODMAN | GOODMAN |
| DAY & NIGHT | DAY & NIGHT | FEDDERS | DAY & NIGHT | HEIL-QUAKER | HEIL-QUAKER |
| DELONGHI | EMERSON | FRIGIDAIRE | GE | ICP | ICP |
| FEDDERS | FEDDERS | GE | GOODMAN | INTERCITY | INTERCITY |

SEARS0000517

| | | | | | |
|---|---|---|---|---|---|
| FRIGIDAIRE | FRIGIDAIRE | GOODMAN | HEIL-QUAKER | INTL CMF PRD | INTL CMF PRD |
| GE | GE | HEIL-QUAKER | ICP | JANITROL | JANITROL |
| GOODMAN | GOODMAN | HONEYWELL | INTERCITY | KEEPRITE | KEEPRITE |
| HEIL-QUAKER | HEIL-QUAKER | ICP | INTL CMF PRD | KENMORE | KENMORE |
| ICP | ICP | INTERCITY | JANITROL | LUXAIRE | LUXAIRE |
| INTERCITY | INGLIS | INTL CMF PRD | KEEPRITE | MAGIC CHEF | MAGIC CHEF |
| INTL CMF PRD | INTL CMF PRD | JANITROL | KENMORE | NORDYNE | NORDYNE |
| JANITROL | JANITROL | KEEPRITE | LENNOX | ONEIDA ROYAL | PANASONIC |
| KEEPRITE | KEEPRITE | KENMORE | LUXAIRE | PANASONIC | RHEEM |
| KENMORE | KENMORE | LG | MAGIC CHEF | RHEEM | RUUD |
| LENNOX | LG | LUXAIRE | NORDYNE | RUUD | SEARS |
| LG | LUXAIRE | MAGIC CHEF | PANASONIC | SEARS | SINGER |
| LUXAIRE | MAGIC CHEF | NORDYNE | PAYNE | SINGER | SNYDER GENER |
| MAGIC CHEF | NORDYNE | PANASONIC | RHEEM | SNYDER GENER | STYLECREST |
| MAGICPAK | PANASONIC | PAYNE | RUUD | STYLECREST | TAPPAN |
| MASTER COOL | PAYNE | RHEEM | SEARS | TAPPAN | TEMPSTAR |
| MASTERCOOL | RHEEM | RUUD | SINGER | TEMPSTAR | WEATHERKING |
| MIDEA | ROYAL SOVERE | SEARS | SNYDER GENER | WEATHERKING | WESTINGHOUSE |
| MITSUBISHI | RUUD | SINGER | STYLECREST | WESTINGHOUSE | WHIRLPOOL |
| NORDYNE | SEARS | SNYDER GENER | TAPPAN | WHIRLPOOL | WILLIAMS |
| PANASONIC | SINGER | STYLECREST | TEMPSTAR | WILLIAMS | WILLIAMSON |
| PAYNE | SNYDER GENER | TAPPAN | TRANE | YORK | YORK |
| RHEEM | SOLEUS AIR | TEMPSTAR | WEATHERKING | ZONAIRE | ZONAIRE |
| RUUD | STYLECREST | TRANE | WESTINGHOUSE | | |
| SEARS | TAPPAN | WEATHERKING | WHIRLPOOL | | |
| SINGER | TEMPSTAR | WESTINGHOUSE | WILLIAMS | | |
| SNYDER GENER | TOYOTOMI | WHIRLPOOL | YORK | | |
| SPACE PAC | TRANE | WILLIAMS | ZONAIRE | | |
| STYLECREST | WEATHERKING | YORK | | | |
| TAPPAN | WESTINGHOUSE | ZONAIRE | | | |
| TEMPSTAR | WHIRLPOOL | | | | |
| TRANE | WILLIAMS | | | | |
| WEATHERKING | YORK | | | | |
| WESTINGHOUSE | ZONAIRE | | | | |
| WHIRLPOOL | | | | | |
| WILLIAMS | | | | | |
| YORK | | | | | |
| ZONAIRE | | | | | |

## Cooking Products

| Cooktop | Range | Rangehood | Walloven | Warming Drawer | Microwave |
|---|---|---|---|---|---|
| ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL |
| AMANA | AMANA | AMANA | AMANA | AMANA | AMANA |
| APOLLO | APOLLO | APOLLO | APOLLO | BOSCH | APOLLO |
| BOSCH | BOSCH | BOSCH | BOSCH | CALORIC | BOSCH |
| CALORIC | CALORIC | BROAN | CALORIC | ELCTRLX ICON | CALORIC |
| ELCTRLX ICON | ELCTRLX ICON | CALORIC | ELCTRLX ICON | ELECTROLUX | CROSLEY |
| ELECTROLUX | ELECTROLUX | ELCTRLX ICON | ELECTROLUX | ESTATE | ELCTRLX ICON |
| ESTATE | ESTATE | ELECTROLUX | ESTATE | FISHERPAYKEL | ELECTROLUX |
| FISHERPAYKEL | FISHERPAYKEL | ESTATE | FISHERPAYKEL | FRIGIDAIRE | ESTATE |
| FRIGIDAIRE | FRIGIDAIRE | FISHERPAYKEL | FRIGIDAIRE | GALAXY | FISHERPAYKEL |
| GALAXY | GALAXY | FRIGIDAIRE | GALAXY | GALLERY | FRIGIDAIRE |
| GALLERY | GALLERY | GALAXY | GALLERY | GE | GALAXY |
| GE | GE | GALLERY | GE | GE PROFILE | GALLERY |
| GE PROFILE | GE PROFILE | GE | GE PROFILE | GIBSON | GE |
| GIBSON | GIBSON | GE PROFILE | GIBSON | HAIER | GE PROFILE |
| HAIER | HAIER | GIBSON | HAIER | HOTPOINT | GIBSON |
| HOTPOINT | HOTPOINT | HAIER | HOTPOINT | IKEA | GOLDSTAR |
| IKEA | IKEA | HOTPOINT | IKEA | INGLIS | HAIER |
| INGLIS | INGLIS | IKEA | INGLIS | JENN-AIR | HOTPOINT |
| JENN-AIR | JENN-AIR | INGLIS | JENN-AIR | KELVINATOR | IKEA |
| KELVINATOR | KELVINATOR | JENN-AIR | KELVINATOR | KENMORE | INGLIS |
| KENMORE | KENMORE | KELVINATOR | KENMORE | KENMORE ELIT | JENN-AIR |
| KENMORE ELIT | KENMORE ELIT | KENMORE | KENMORE ELIT | KENMORE PRO | KELVINATOR |
| KENMORE PRO | KENMORE PRO | KENMORE ELIT | KENMORE PRO | KITCHENAID | KENMORE |
| KITCHENAID | KITCHENAID | KENMORE PRO | KITCHENAID | LG | KENMORE ELIT |

SEARS0000518

| | | | | | |
|---|---|---|---|---|---|
| LG | LG | KITCHENAID | LG | MAGIC CHEF | KENMORE PRO |
| MAGIC CHEF | MAGIC CHEF | LG | MAGIC CHEF | MAYTAG | KITCHENAID |
| MAYTAG | MAYTAG | MAGIC CHEF | MAYTAG | MODERN MAID | LG |
| MODERN MAID | MODERN MAID | MAYTAG | MODERN MAID | NORGE | MAGIC CHEF |
| NORGE | NORGE | MODERN MAID | NORGE | ROPER | MAYTAG |
| ROPER | ROPER | NORGE | ROPER | SEARS | MODERN MAID |
| SEARS | SAMSUNG | ROPER | SEARS | SHARP | NORGE |
| SHARP | SEARS | SEARS | SHARP | TAPPAN | PANASONIC |
| TAPPAN | SHARP | TAPPAN | TAPPAN | WCI | ROPER |
| WCI | TAPPAN | WHIRLPOOL | WCI | WHIRLPOOL | SAMSUNG |
| WHIRLPOOL | WHIRLPOOL | | WHIRLPOOL | | SANYO |
| | | | | | SEARS |
| | | | | | SHARP |
| | | | | | TAPPAN |
| | | | | | WCI |
| | | | | | WHIRLPOOL |

## Compactor, Dishwasher & Disposer

| Compactor | Dishwasher | Disposer |
|---|---|---|
| ADMIRAL | ADMIRAL | ADMIRAL |
| AMANA | AMANA | AMANA |
| BOSCH | BOSCH | BOSCH |
| BROAN | CALORIC | ELCTRLX ICON |
| ELCTRLX ICON | ELCTRLX ICON | ELECTROLUX |
| ELECTROLUX | ELECTROLUX | EMERSON |
| ESTATE | ESTATE | ESTATE |
| FRIGIDAIRE | FISHERPAYKEL | FRIGIDAIRE |
| GALAXY | FRIGIDAIRE | GE |
| GALLERY | GALAXY | GE PROFILE |
| GE | GALLERY | GIBSON |
| GE PROFILE | GE | HOTPOINT |
| GIBSON | GE PROFILE | IKEA |
| GLADIATOR | GIBSON | INGLIS |
| HOTPOINT | GLADIATOR | INSINKERATOR |
| IKEA | HAIER | JENN-AIR |
| INGLIS | HOTPOINT | KELVINATOR |
| JENN-AIR | IKEA | KENMORE |
| KELVINATOR | INGLIS | KENMORE ELIT |
| KENMORE | JENN-AIR | KENMORE PRO |
| KENMORE ELIT | KELVINATOR | KITCHENAID |
| KENMORE PRO | KENMORE | LG |
| KITCHENAID | KENMORE ELIT | MAYTAG |
| LG | KENMORE PRO | MODERN MAID |
| MAYTAG | KITCHENAID | NORGE |
| MODERN MAID | LG | ROPER |
| NORGE | MAGIC CHEF | SEARS |
| ROPER | MAYTAG | TAPPAN |
| SEARS | MODERN MAID | WHIRLPOOL |
| TAPPAN | NORGE | |
| WHIRLPOOL | ROPER | |
| | SAMSUNG | |
| | SEARS | |
| | SHARP | |
| | TAPPAN | |
| | WHIRLPOOL | |

## Laundry

| Washer | Dryer | Dryer Cabinet | Dispenser | Iron Center |
|---|---|---|---|---|
| ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL |
| AMANA | AMANA | AMANA | AMANA | AMANA |
| BOSCH | BOSCH | BOSCH | BOSCH | BOSCH |
| ELCTRLX ICON | ELCTRLX ICON | ELCTRLX ICON | ELCTRLX ICON | ELCTRLX ICON |
| ELECTROLUX | ELECTROLUX | ELECTROLUX | ELECTROLUX | ELECTROLUX |
| ESTATE | ESTATE | ESTATE | ESTATE | ESTATE |
| FISHERPAYKEL | FISHERPAYKEL | FISHERPAYKEL | FRIGIDAIRE | FRIGIDAIRE |
| FRIGIDAIRE | FRIGIDAIRE | FRIGIDAIRE | GALAXY | GALAXY |

SEARS0000519

| | | | | |
|---|---|---|---|---|
| GALAXY | GALAXY | GALAXY | GALLERY | GALLERY |
| GALLERY | GALLERY | GALLERY | GE | GE |
| GE | GE | GE | GE PROFILE | GIBSON |
| GE PROFILE | GE PROFILE | GE PROFILE | GIBSON | HOTPOINT |
| GIBSON | GIBSON | GIBSON | HOTPOINT | IKEA |
| HAIER | HAIER | HOTPOINT | IKEA | INGLIS |
| HOTPOINT | HOTPOINT | IKEA | INGLIS | JENN-AIR |
| IKEA | IKEA | INGLIS | JENN-AIR | KELVINATOR |
| INGLIS | INGLIS | JENN-AIR | KELVINATOR | KENMORE |
| JENN-AIR | JENN-AIR | KELVINATOR | KENMORE | KENMORE ELIT |
| KELVINATOR | KELVINATOR | KENMORE | KENMORE ELIT | KENMORE PRO |
| KENMORE (including SDS) | KENMORE (including SDS) | KENMORE ELIT | KENMORE PRO | KITCHENAID |
| KENMORE ELIT (including SDS) | KENMORE ELIT (including SDS) | KENMORE PRO | KITCHENAID | LG |
| KENMORE PRO | KENMORE PRO | KITCHENAID | LG | MAYTAG |
| KITCHENAID | KITCHENAID | MAYTAG | MAYTAG | MODERN MAID |
| LG (including SDS) | LG (including SDS) | MODERN MAID | MODERN MAID | NORGE |
| MAGIC CHEF | MAGIC CHEF | NORGE | NORGE | ROPER |
| MAYTAG | MAYTAG | ROPER | ROPER | SEARS |
| MODERN MAID | MODERN MAID | SEARS | SEARS | TAPPAN |
| NORGE | NORGE | TAPPAN | TAPPAN | WCI |
| ROPER | ROPER | WCI | | |
| SAMSUNG | SAMSUNG | | | |
| SEARS | SEARS | | | |
| TAPPAN | TAPPAN | | | |
| WHIRLPOOL | WHIRLPOOL | | | |

## Water Equipment

| Water Heater | Water Treatment | Pump |
|---|---|---|
| ACE | ACE | CRAFTSMAN |
| AMBASSADOR | AMBASSADOR | CRAFTSMANPRO |
| AMERICAN | AMERICAN | SIMER |
| AOSMITH | AOSMITH | |
| GE | ECODYNE | |
| KENMORE | ECOWATER | |
| KENMORE ELIT | KENMORE | |
| MARATHON | KENMORE ELIT | |
| MAYTAG | MARATHON | |
| RELIANCE | MAYTAG | |
| REXEL | RELIANCE | |
| RHEEM | REXEL | |
| RUUD | RHEEM | |
| SEARS | RUUD | |
| SENTRY | SEARS | |
| STATE | SENTRY | |
| SUPERIOR | STATE | |
| THE BOSS | SUPERIOR | |
| THERMO-KING | THE BOSS | |
| WHEELERS | THERMO-KING | |
| WHIRLPOOL | WHEELERS | |
| | WHIRLPOOL | |

## Refrigeration

| Refrigerator | Beer Cooler | Freezer | Icemaker | Wine Cooler |
|---|---|---|---|---|
| ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL | ADMIRAL |
| AMANA | AMANA | AMANA | AMANA | AMANA |
| AMERICANA | BOSCH | AMERICANA | BOSCH | BOSCH |
| BOSCH | ELCTRLX ICON | BOSCH | ELCTRLX ICON | ELCTRLX ICON |
| DANBY | ELECTROLUX | DANBY | ELECTROLUX | ELECTROLUX |
| ELCTRLX ICON | ESTATE | ELCTRLX ICON | ESTATE | ESTATE |
| ELECTROLUX | FRIGIDAIRE | ELECTROLUX | FRIGIDAIRE | FRIGIDAIRE |
| ESTATE | GE | ESTATE | GALAXY | GALAXY |
| FISHERPAYKEL | GE PROFILE | FRIGIDAIRE | GALLERY | GALLERY |
| FRIGIDAIRE | GIBSON | GALAXY | GE | GE |
| GALAXY | HAIER | GALLERY | GE PROFILE | GE PROFILE |

SEARS0000520

|  |  |  |  |  |
| --- | --- | --- | --- | --- |
| GALLERY | HOTPOINT | GE | GIBSON | GIBSON |
| GE | IKEA | GE PROFILE | HOTPOINT | HOTPOINT |
| GE PROFILE | INGLIS | GIBSON | IKEA | IKEA |
| GIBSON | JENN-AIR | GLADIATOR | INGLIS | INGLIS |
| GLADIATOR | KELVINATOR | HAIER | JENN-AIR | JENN-AIR |
| HAIER | KENMORE | HOTPOINT | KELVINATOR | KELVINATOR |
| HOTPOINT | KENMORE ELIT | IKEA | KENMORE | KENMORE |
| IKEA | KENMORE PRO | IMPERIAL | KENMORE ELIT | KENMORE ELIT |
| INGLIS | KITCHENAID | INGLIS | KENMORE PRO | KENMORE PRO |
| JENN-AIR | LG | JENN-AIR | KITCHENAID | KITCHENAID |
| KELVINATOR | MAYTAG | KELVINATOR | LG | LG |
| KENMORE (including SDS) | MODERN MAID | KENMORE | MAGIC CHEF | MAGIC CHEF |
| KENMORE ELIT (including SDS) | NORGE | KENMORE ELIT | MAYTAG | MAYTAG |
| KENMORE PRO | ROPER | KENMORE PRO | MODERN MAID | MODERN MAID |
| KITCHENAID | SEARS | KITCHENAID | NORGE | NORGE |
| LG (including SDS) | TAPPAN | LG | ROPER | ROPER |
| MAGIC CHEF | WHIRLPOOL | MAGIC CHEF | SEARS | SEARS |
| MAYTAG | | MAYTAG | TAPPAN | TAPPAN |
| MODERN MAID | | MODERN MAID | WHIRLPOOL | WHIRLPOOL |
| NORGE | | NORGE | | |
| ROPER | | ROPER | | |
| SAMSUNG | | SAMSUNG | | |
| SANYO | | SANYO | | |
| SEARS | | SEARS | | |
| TAPPAN | | TAPPAN | | |
| WHIRLPOOL | | WHIRLPOOL | | |

### Electronics

| Audio | Camcorder | Digital Camera | Home Theater & Players/Recorders | Television | TV/Player |
| --- | --- | --- | --- | --- | --- |
| Audio Video System | | | | | |
| Cassette Player | | | | | |
| Compact Disc - Play/Record | | | | | |
| Equalizer | | | | | |
| Receiver | | | | | |
| Speaker(s) | | | | | |
| Stereo System | | | | | |
| Turntable | | | | | |
| AIWA | BOSE | CANON | BOSE | ELEMENT | FUNAI |
| BOSE | CANON | CASIO | FUNAI | FISHER | GE |
| CERWIN VEGA | FUNAI | FUNAI | GE | GE | GOLDSTAR |
| DENON | GE | GE | GO VIDEO (VCR Only) | GOLDSTAR | HAIER |
| FISHER | GOLDSTAR | GOLDSTAR | GOLDSTAR | HAIER | HITACHI |
| FUNAI | HAIER | HAIER | HAIER | HITACHI | JVC |
| GE | HITACHI | HITACHI | HITACHI | JVC | LG |
| GOLDSTAR | JVC | JVC | JVC | LG | LXI |
| HAIER | LG | KODAK | LG | LG | MAGNAVOX |
| HARMAN KARDO | LG | LG | LG | LXI | MEMOREX |
| HARMON KARDO | MAGNAVOX | LXI | MAGNAVOX | MAGNAVOX | MITSUBISHI |
| HITACHI | MEMOREX | MAGNAVOX | MEMOREX | MEMOREX | PANASONIC |
| INFINITY | MITSUBISHI | MEMOREX | MITSUBISHI | MITSUBISHI | PHILIPS |
| JBL | PANASONIC | MITSUBISHI | PANASONIC | NEC | PROSCAN |
| JENSEN | PHILIPS | NIKON | PHILIPS | PANASONIC | QUASAR |
| JVC | PROSCAN | PANASONIC | PIONEER | PHILIPS | RCA |
| KENWOOD | QUASAR | PHILIPS | PROSCAN | PIONEER | SAMSUNG |
| LG | RCA | POLAROID | QUASAR | PROSCAN | SANSUI |
| LXI | SAMSUNG | PROSCAN | RCA | QUASAR | SEARS |
| MAGNAVOX | SEARS | QUASAR | SAMSUNG | RCA | SHARP |
| MEMOREX | SHARP | RCA | SEARS | SAMSUNG | SONY |
| MITSUBISHI | SONY | SAMSUNG | SHARP | SANSUI | SYLVANIA |
| ONKYO | SYLVANIA | SHARP | SONY | SEARS | SYMPHONIC |
| ORION | SYMPHONIC | SONY | SYLVANIA | SEIKI | TOSHIBA |
| PANASONIC | TOSHIBA | SYLVANIA | SYMPHONIC | SHARP | VENTURER |

SEARS0000521

| PHILIPS | VIZIO | SYMPHONIC | TOSHIBA | SONY | VIORE |
|---|---|---|---|---|---|
| PIONEER | YORX | TOSHIBA | VIZIO | SYLVANIA | VIZIO |
| POLK AUDIO | ZENITH | VIZIO | YORX | SYMPHONIC | YORX |
| PROSCAN | | YORX | VENTURER (VCR Only) | TOSHIBA | ZENITH |
| QUASAR | | ZENITH | ZENITH | VENTURER | |
| RCA | | | | VIORE | |
| SAMSUNG | | | | VIZIO | |
| SANSUI | | | | YORX | |
| SEARS (VCR Only) | | | | ZENITH | |
| SHARP | | | | | |
| SONY | | | | | |
| SYLVANIA | | | | | |
| SYMPHONIC | | | | | |
| TECHNICS | | | | | |
| TOSHIBA | | | | | |
| VIZIO | | | | | |
| YAMAHA | | | | | |
| YORX | | | | | |
| ZENITH | | | | | |

## Lawn and Garden

| Lawn Mower / Riding Mower / Tractor | Snow Thrower / Gas Attachment | Brush Wacker / Chain Saw / Chipper Shredder / Edge Trimmer / Log Splitter / Tiller / Weed Wacker | Blower | Grill |
|---|---|---|---|---|
| AGRIFAB | AGRIFAB | AGRIFAB | AGRIFAB | CHAR-BROIL |
| ALLPOWER | ARIENS | ARIENS | ARIENS | COLEMAN |
| ARIENS | BLACK&DECKER | BLACK&DECKER | BLACK&DECKER | FIESTA |
| BLACK&DECKER | BRIGGS&STRAT | BRIGGS&STRAT | BRIGGS&STRAT | KENMORE |
| BRIGGS&STRAT | CRAFTSMAN | CRAFTSMAN | CRAFTSMAN | KENMORE ELIT |
| CRAFTSMAN | CRAFTSMANPRO | CRAFTSMANPRO | EAGER 1 | KITCHENAID |
| CRAFTSMANPRO | EAGER 1 | EAGER 1 | GENERAC | NEXGRILL |
| EAGER 1 | GENERAC | GENERAC | HOMELITE | SEARS |
| GENERAC | HOMELITE | HOMELITE | HONDA | SUNBEAM |
| HOMELITE | HONDA | HONDA | HUSQVARNA | THERMOS |
| HONDA | HUSQVARNA | HUSQVARNA | KAWASAKI | |
| HUSQVARNA | KAWASAKI | KAWASAKI | KOHLER | |
| KAWASAKI | KOHLER | KOHLER | LAWNBOY | |
| KOHLER | LAWNBOY | LAWNBOY | LIFETIME | |
| LAWNBOY | LIFETIME | LIFETIME | MACKISSIC | |
| LIFETIME | MACKISSIC | MACKISSIC | MANTIS | |
| MACKISSIC | MANTIS | MANTIS | MCCLANE | |
| MANTIS | MCCLANE | MCCLANE | MCCULLOCH | |
| MCCLANE | MCCULLOCH | MCCULLOCH | MURRAY | |
| MCCULLOCH | MURRAY | MURRAY | OHIOSTEEL | |
| MURRAY | OHIOSTEEL | OHIOSTEEL | POULAN | |
| OHIOSTEEL | POULAN | POULAN | ROBINS/SUBARU | |
| POULAN | ROBINS/SUBARU | ROBINS/SUBARU | SEARS | |
| ROBINS/SUBARU | SEARS | SEARS | SNOWKING | |
| SEARS | SNAPPER (Snow Thrower Only) | SNOWKING | SWISHER | |
| SNAPPER | SNOWKING | TECUMSEH | TECUMSEH | |
| SNOWKING | SWISHER | WEEDEATER | WEEDEATER | |
| SWISHER | TECUMSEH | | | |
| TECUMSEH | WEEDEATER | | | |
| WEEDEATER | | | | |
| YARDMAN (Riding Mower / Tractor Only) | | | | |

## Sears, Kmart, The Great Indoors and High-End Merchandise

The following is a list of merchandise codes and brands sold at Sears, Kmart or The Great Indoors (TGI) or are otherwise considered High-End. These products are eligible for PA coverage **AT THE TIME OF SALE ONLY**. You are **NOT** able to sell PA's on these items in the Aftermarket. The following documentation is for informational pupuses only.
Currently covered items cannot be bundled, upsold, or renewed.

SEARS0000522

## Game Tables & Scooters

| Game Table | Power Vehicle | Scooter |
|---|---|---|
| DMI SPORTS | AMERICAN SPO | BAJA MOTOR |
| SPORTCRAFT | EAGER 1 | E-MOTO |

## Cooking

| Oven | Cooktop | Warming Drawer | Range | Range Hood | Microwave |
|---|---|---|---|---|---|
| AGA | AGA | AGA | AGA | AGA | AGA |
| BEST | BEST | BEST | BEST | BEST | BEST |
| BROAN | BROAN | BROAN | BROAN | BROAN | BROAN |
| DACOR | DACOR | DACOR | DACOR | DACOR | DACOR |
| DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) | DYNAMIC COOKING SYSTEMS (DCS) |
| DYNASTY | DYNASTY | DYNASTY | DYNASTY | DYNASTY | DYNASTY |
| FIVE STAR | FIVE STAR | FIVE STAR | FIVE STAR | FIVE STAR | FIVE STAR |
| GAGGENAU | GAGGENAU | GAGGENAU | GAGGENAU | GAGGENAU | GAGGENAU |
| GARLAND | GARLAND | GARLAND | GARLAND | GARLAND | GARLAND |
| MIELE | MIELE | MIELE | MIELE | MIELE | MIELE |
| MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM |
| THERMADOR | THERMADOR | THERMADOR | THERMADOR | THERMADOR | THERMADOR |
| VENMAR | VENMAR | VENMAR | VENMAR | VENMAR | VENMAR |
| VENT-A-HOOD | VENT-A-HOOD | VENT-A-HOOD | VENT-A-HOOD | VENT-A-HOOD | VENT-A-HOOD |
| VIKING | VIKING | VIKING | VIKING | VIKING | VIKING |
| WOLF | WOLF | WOLF | WOLF | WOLF | WOLF |
| ZEPHYR | ZEPHYR | ZEPHYR | ZEPHYR | ZEPHYR | ZEPHYR |

## Dishwasher & Compactors

| Compactor | Dishwasher |
|---|---|
| ASKO | ASKO |
| DACOR | DACOR |
| GAGGENAU | GAGGENAU |
| MONOGRAM | MONOGRAM |
| THERMADOR | THERMADOR |
| VIKING | VIKING |

## Laundry

| Dryer | Washer |
|---|---|
| ASKO | ASKO |
| EQUATOR | EQUATOR |
| LG | LG |

## Refrigeration

| Dispenser | Freezer | Humidor | Ice Maker | Refrigerator | Wine Cooler |
|---|---|---|---|---|---|
| EQUATOR | EQUATOR | EQUATOR | EQUATOR | EQUATOR | EQUATOR |
| DACOR | DACOR | DACOR | DACOR | DACOR | DACOR |
| MARVEL | MARVEL | MARVEL | MARVEL | MARVEL | MARVEL |
| MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM | MONOGRAM |
| SCOTSMAN | SCOTSMAN | SCOTSMAN | SCOTSMAN | SCOTSMAN | SCOTSMAN |
| SUB-ZERO | SUB-ZERO | SUB-ZERO | SUB-ZERO | SUB-ZERO | SUB-ZERO |
| U-LINE | U-LINE | U-LINE | U-LINE | U-LINE | U-LINE |
| VIKING | VIKING | VIKING | VIKING | VIKING | VIKING |

# Exhibit F

# FILED UNDER SEAL

# Exhibit G

Nina Greene

Sears Master Protection Agreements

Page 1 of 2

| MPA Certificate Number | Printed | Expiration | Product | Model Number | Purchase Date | Service Location | MPA Price | Tax | Total |
|---|---|---|---|---|---|---|---|---|---|
| 033455042200050 | 11/17/1999 | 11/21/2004 | Vacuum Cleaner, Central | | 1/1/1992 | In-Home | 1,447.08 | 64.66 | $ 1,511.74 |
| 033455042200050 | 11/17/1999 | 11/21/2004 | Compactor | | 1/1/1995 | In-Home | | | |
| 033455042200050 | 11/17/1999 | 11/21/2004 | Ex. Bike/Skier/Stepper | | 1/1/1995 | In-Home | | | |
| 033455042200050 | 11/17/1999 | 11/21/2004 | Freezer, Over 9 Cu. Ft. | 501F | 1/1/1996 | In-Home | | | |
| 033455042200050 | 11/17/1999 | 11/21/2004 | Grill, Outdoor, Gas | 1598S | 5/19/1998 | In-Home | | | |
| | | | | | | | | | |
| 033455042200051 | 11/17/1999 | 11/21/2004 | Refrigerator w/Ice Maker | 501R | 1/1/1994 | In-Home | 801.11 | 56.08 | $ 857.19 |
| 033455042200051 | 11/17/1999 | 11/21/2004 | Treadmill, Power | | 1/1/1995 | In-Home | | | |
| | | | | | | | | | |
| 033455042200065 | 11/23/2004 | 11/21/2008 | Refrigerator w/Ice Maker | 501R | 1/1/1994 | In-Home | 1,786.29 | 72.62 | $ 1,858.91 |
| 033455042200065 | 11/23/2004 | 11/22/2008 | Compactor | | 1/1/1995 | In-Home | | | |
| 033455042200065 | 11/23/2004 | 11/23/2008 | Treadmill, Power | | 1/1/1995 | In-Home | | | |
| 033455042200065 | 11/23/2004 | 11/24/2008 | Freezer, Over 9 Cu. Ft. | 501F | 1/1/1996 | In-Home | | | |
| 033455042200065 | 11/23/2004 | 11/25/2008 | Dishwasher, Built-In | | 10/1/1998 | In-Home | | | |
| 033455042200065 | 11/23/2004 | 11/26/2008 | Dishwasher, Built-In | | 10/1/2001 | In-Home | | | |
| 033455042200065 | 11/23/2004 | 11/27/2008 | Washer Front Load Prem | 11044932200 | 10/14/2003 | In-Home | | | |
| | | | | | | | | | |
| 033455042200052 | 06/28/2005 | 10/20/2008 | Washer Front Load Prem | 11044932200 | 10/14/2003 | In-Home | 241.99 | 14.52 | $ 256.51 |
| | | | | | | | | | |
| 033455042200053 | 06/28/2005 | 10/20/2008 | DryerG, Prem Plus | 11094832200 | 10/14/2003 | In-Home | 209.99 | 12.60 | $ 222.59 |
| | | | | | | | | | |
| 033455042200065 | 06/28/2005 | 11/21/2008 | Refrigerator w/Ice Maker | 501R | 1/1/1994 | In-Home | 1,786.29 | 72.62 | $ 1,858.91 |
| 033455042200065 | 06/28/2005 | 11/21/2008 | Compactor | | 1/1/1995 | In-Home | | | |
| 033455042200065 | 06/28/2005 | 11/21/2008 | Treadmill, Power | | 1/1/1995 | In-Home | | | |
| 033455042200065 | 06/28/2005 | 11/21/2008 | Freezer, Over 9 Cu. Ft. | 501F | 1/1/1996 | In-Home | | | |
| 033455042200065 | 06/28/2005 | 11/21/2008 | Dishwasher, Built-In | | 10/1/1998 | In-Home | | | |
| 033455042200065 | 06/28/2005 | 11/21/2008 | Dishwasher, Built-In | | 10/1/2001 | In-Home | | | |
| 033455042200065 | 06/28/2005 | 11/21/2008 | Washer Front Load Prem | 11044932200 | 10/14/2003 | In-Home | | | |
| | | | | | | | | | |
| 033455042200067 | 06/28/2005 | 11/21/2008 | Oven, Built-In | | 5/20/1998 | In-Home | 248.08 | 0.52 | $ 248.60 |
| 033455042200067 | 06/28/2005 | 11/21/2008 | DryerG, Prem Plus | 11094832200 | 10/14/2003 | In-Home | | | |
| | | | | | | | | | |
| 033455042200070 | 06/28/2005 | 11/21/2008 | Cooktop | | 1/1/1996 | In-Home | 236.60 | 14.20 | $ 250.80 |
| | | | | | | | | | |
| 033455042200076 | 01/03/2006 | 11/21/2008 | Dishwasher, 1 Yr, O800/U1300 | 666KUDS02SRWH | 12/7/2005 | In-Home | 199.19 | 0.00 | $ 199.19 |
| | | | | | | | | | |
| 033455042200086 | 11/25/2008 | 11/21/2011 | Refrigerator w/Ice Maker | 501R | 2/20/1994 | In-Home | 2,563.15 | 150.74 | $ 2,713.89 |
| 033455042200086 | 11/25/2008 | 11/21/2011 | Compactor | | 1/1/1995 | In-Home | | | |
| 033455042200086 | 11/25/2008 | 11/21/2011 | Treadmill, Power | | 1/1/1995 | In-Home | | | |
| 033455042200086 | 11/25/2008 | 11/21/2011 | Cooktop | | 1/1/1996 | In-Home | | | |
| 033455042200086 | 11/25/2008 | 11/21/2011 | Freezer, Over 9 Cu. Ft. | 501F | 2/20/1996 | In-Home | | | |
| 033455042200086 | 11/25/2008 | 11/21/2011 | Oven, Built-In | CT230W | 5/20/1998 | In-Home | | | |
| 033455042200086 | 11/25/2008 | 11/21/2011 | Dishwasher, Built-In | | 10/1/1998 | In-Home | | | |

Greene0002



DEFENDANT'S
EXHIBIT
1
JWB   5-6-16

Nina Creene

Sears Master Protection Agreements

*Page 2 of 2*

| MPA Certificate Number | Printed | Expiration | Product | Model Number | Purchase Date | Service Location | MPA Price | Tax | Total |
|---|---|---|---|---|---|---|---|---|---|
| 033455042200086 | 11/25/2008 | 11/21/2011 | Washer Front Load Prem | 11044932200 | 10/14/2003 | In-Home | | | |
| 033455042200086 | 11/25/2008 | 11/21/2011 | DryerG, Prem Plus | 11094832200 | 10/14/2003 | In-Home | | | |
| 033455042200086 | 11/25/2008 | 11/21/2011 | Dishwasher, 1 Yr, O800/U1300 | 666KUDS02SRWH | 12/7/2005 | In-Home | | | |
| | | | | | | | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Refrigerator w/Ice Maker | 501R | 2/20/1994 | In-Home | 4,499.85 | 264.24 | $ 4,764.09 |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Compactor | | 1/1/1995 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Treadmill, Power | | 1/1/1995 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Cooktop | | 1/1/1996 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Freezer, Over 9 Cu. Ft. | 501F | 2/20/1996 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Oven, Built-In | CT230W | 5/20/1998 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Dishwasher, Built-In | | 10/1/1998 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Washer Front Load Prem | 11044932200 | 10/14/2003 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | DryerG, Prem Plus | 11094832200 | 10/14/2003 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Dishwasher, 1 Yr, O800/U1300 | 666KUDS02SRWH | 12/7/2005 | In-Home | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Vacuum Clnr, Cannister | CV850 | 4/26/2007 | Repair Center | | | |
| 033455042200088 | 01/27/2009 | 1/12/2014 | Vacuum Clnr, Cannister | CV850 | 4/26/2007 | Repair Center | | | |
| | | | | | | | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Oven Built-In TGI Only | CT230W | 5/20/1998 | In-Home | 3,984.80 | 234.05 | $ 4,218.85 |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Cooktop TGI Only | Verify | 1/1/1996 | In-Home | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Refrigerator, W/Ice Maker | 501R | 2/20/1994 | In-Home | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Compactor | NA | 1/2/1995 | In-Home | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Freezer, Full Size TGI Only | 501F | 2/20/1996 | In-Home | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Front Load Washer | 11044932200 | 10/14/2003 | In-Home | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | DryerG, Prem Plus | 11094832200 | 10/14/2003 | In-Home | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Dishwasher, Built-In | G885SC1 | 10/1/1998 | In-Home | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Dishwasher, 1 Yr, O800/U1300 | 666KUDS02SRWH | 12/7/2005 | In-Home | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Vacuum Clnr, Cannister | CV850 | 4/26/2007 | Shop | | | |
| 033455042200088 | 05/11/2012 | 1/12/2014 | Vacuum Clnr, Cannister | CV850 | 4/26/2007 | Shop | | | |
| | | | | | | | | | |
| | | | | | | | 18,004.42 | 956.85 | $ 18,961.27 |

Greene0003

# Exhibit H

Page 1

1               NINA A. GREENE

2       IN THE UNITED STATES DISTRICT COURT

3     FOR THE NORTHERN DISTRICT OF ILLINOIS

4               EASTERN DIVISION

5                   - - -

6    NINA GREENE and        :

7    GERALD GREENE          :

8         Vs.               :

9    SEARS HOLDINGS         :

10   CORPORATION, et al.    :1:15-cv-02456

11                   - - -

12           Oral deposition of

13   Nina A. Greene, taken pursuant to Notice, held

14   at the law offices of BakerHostetler, 2929

15   Arch Street, 12th Floor, Philadelphia, PA, on

16   Friday, May 6, 2016, at 9:05 a.m., before

17   John W. Begley, a Federally Approved

18   Registered Professional Reporter-Notary

19   Public in and for the Commonwealth of

20   Pennsylvania.

21

22

23

24

Page 2

1                    NINA A. GREENE

2     A P P E A R A N C E S:

3     KAUFMAN, COREN & RESS, PC

4     BY:  DEBORAH R. GROSS, ESQUIRE

5          DAVID M. DE VITO, ESQUIRE

6     Two Commerce Square - Suite 3900

7     2001 Market Street

8     Philadelphia, PA 19103

9     Phone:  215 - 735-8700

10    dgross@kcr-law.com

11    ddevito@kcr-law.com

12    Representing the Plaintiffs

13

14    BAKER HOSTETLER

15    BY:  CRAIG M. WHITE, ESQUIRE

16    191 North Wacker Drive

17    Chicago, IL 60606

18    Phone:  312 - 416-6207

19    cwhite@bakerlaw.com

20    Representing the Defendants

21

22    ALSO PRESENT:  Gerald R. Greene

23

24

```
 1                    NINA A. GREENE

 2         form.

 3                    THE WITNESS:  I don't remember.

 4    BY MR. WHITE:

 5         Q.     All right.  Do you recall how

 6    it was that you learned that the commercial

 7    trash compactor was never covered?

 8         A.     No.

 9         Q.     Do you recall how you learned

10    that the treadmill was never covered?

11         A.     When I called for service and

12    they told me that they never heard of the

13    Trotter treadmill and they would never have

14    covered that, and they had never done service

15    on it.

16         Q.     All right.  Earlier, when we

17    were discussing the treadmill, my

18    recollection is that you told me that on at

19    least two occasions that you remembered Sears

20    had come and serviced the treadmill.

21         A.     Correct.

22         Q.     Was that prior to April 2012?

23         A.     Yes.

24         Q.     So the information that you're
```

# Exhibit I

# FILED UNDER SEAL

# Exhibit J

# FILED UNDER SEAL

# Exhibit K

# Nina Greene

5 St. Davids Road • St. Davids, PA 19087
Home: 610-989-9999   Work: 610-649-7650
e-mail: nina@oldies.com

April 19, 2012

Sears, Roebuck & Co.                              *via fax: 336-883-9601*
2080 Brentwood Street                                    *(1 page)*
High Point, NC 27263-1806

RE:    *Sears Home Service Contracts*
       033455042200052              033455042200070
       033455042200053              033455042200076
       033455042200065              033455042200086
       033455042200067              033455042200088

To Whom It May Concern:

I have been paying to maintain the referenced Sears Home Service contracts for a number of years
(about 12).   However, in inquiring about service for some of the items covered, I have been
informed that they are not now covered, nor have they ever been.

Among the items for which I purchased coverage are a Viking cooktop, two built-in vacuum units,
a commercial trash compactor, and a Trotter treadmill.   I learned that the trash compactor and
treadmill were never covered, and that the built-in vacuum units were somehow "converted" to two
vacuum cleaners.

I pay every year to maintain the coverage for these items, and therefore am requesting that the
considerable monies paid over the years to cover them be refunded to me.   I can be reached at the
contact numbers above.

Sincerely,

Nina Greene

Nina Greene

NG/amm

DEFENDANT'S
EXHIBIT

8

JWS    5·6·16

# Exhibit L



Master Protection Agreement

**Sears**

Don't worry. This isn't a bill.
It's confirmation of your coverage.

0334550422 00088
Nina Greene
5 Saint Davids Rd
WAYNE, PA 19087

| CONTRACT NUMBER | PAYMENT METHOD | CONTRACT EXPIRATION* |
|---|---|---|
| 03345504200088 | 4934 | 01/12/14 |

| PRODUCT | MODEL NUMBER | SERVICE LOCATION | PURCHASE DATE |
|---|---|---|---|
| OVEN BUILT-IN TGI ONLY | CT230W | IN-HOME | 05/20/98 |
| COOKTOP TGI ONLY | VERIFY | IN-HOME | 01/01/96 |
| REFRIGERATOR, W/ICE MAKER | 501R | IN-HOME | 02/20/94 |
| COMPACTOR | NA | IN-HOME | 01/02/95 |
| FREEZR,FULL SIZE TGI ONLY | 501F | IN-HOME | 02/20/96 |
| FRONT LOAD WASHER | 11044932200 | IN-HOME | 10/14/03 |
| DRYERG, PREM PLUS | 11094832201 | IN-HOME | 10/14/03 |
| DISHWASHER, BUILT-IN | G885SC1 | IN-HOME | 10/01/98 |
| DISHWASHER,1YR,O800/U1300 | 666KUDS025RWH | IN-HOME | 12/07/05 |
| VACUUM CLNR, CANNISTER | CV850 | SHOP | 04/26/07 |
| VACUUM CLNR, CANNISTER | CV850 | SHOP | 04/26/07 |

*Alf Crespo*

*ALEX CRESPO*

*Customer Solutions*

*Case #*

*6057529*



DEFENDANT'S
EXHIBIT

5

JWS 5-6-16

Price: $3,984.80
Tax Paid: $234.05
Total Paid: $4,218.85
See reverse side for terms and conditions.
* May reflect any warranty and current Service Agreement coverage.

To schedule a repair, please call
**1-800-4-MY-HOME**
1-800-469-4663 or go online at www.sears.com.

Unit #: 009468
Printed: 05/11/12
MPA TIOT01

Greene0149

Case 3:16-cv-02946 Document #: 142-14 Filed: 07/28/17 Page 1 of 23 PageID #:1904

# Exhibit M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NINA GREENE and GERALD GREENE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 15-cv-02546 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| SEARS PROTECTION COMPANY, SEARS, | ) | |
| ROEBUCK AND CO., and SEARS | ) | Magistrate Judge Michael T. Mason |
| HOLDINGS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' SECOND SUPPLEMENTAL ANSWER TO PLAINTIFFS' INTERROGATORY NO. 3 OF PLAINTIFFS' SECOND SET OF INTERROGATORIES

Sears Protection Company and Sears, Roebuck and Co. (collectively, "Sears" or "Defendants"), by and through its attorneys, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby supplements its answer to Interrogatory No. 3 of Plaintiffs' Second Set of Interrogatories as follows:

### PRELIMINARY STATEMENT

1.    Sears makes its responses to the Interrogatory ("Responses") without waiving, or intending to waive, but on the contrary, preserving and intending to preserve its: (i) right to further object on the grounds of competency, privilege, relevancy, materiality, or any other proper grounds, to the use of any information for any purpose in whole or in part, in any subsequent proceeding in this or any other action; (ii) right to object on any and all grounds, at any time, to other interrogatories or other discovery procedures involving or relating to the subject matter of the Interrogatory; (iii) right to object on any grounds to the use of such document, information disclosed, or the subject matter thereof in any subsequent proceedings, including the trial of this or any other action; and (iv) right at any time to revise, correct, add to,

or clarify any Response made herein as required by the applicable Federal Rules of Civil Procedure.

2.      Nothing contained in the Responses is intended as, or shall in any way be deemed a waiver of any attorney-client privilege, any work product privilege, or any other applicable privilege or doctrine.

3.      Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Sears has indicated it will produce documents in lieu of providing responses to some of the Interrogatories. The production will be made at a time and in the manner agreed to by counsel for Sears and counsel for Plaintiffs and/or upon such terms as may be entered by the Court.

4.      Sears' production of certain documents in response to the Interrogatories is made pursuant to the agreed terms and provisions of the Agreed Confidentiality Order entered by the Court in this matter on July 29, 2015.  In particular, certain documents have been produced or will be produced with the indication that they are "Confidential" and must be handled in compliance with the procedures for such documents as set forth in the Agreed Confidentiality Order.  Sears' production of other documents in response to the Interrogatories is in no way intended to waive any of its rights to later designate documents as "Confidential" as set forth in the Agreed Confidentiality Order.

5.      Sears reserves the right to further discuss certain objections raised in response to Plaintiffs' Interrogatories in an appropriate meet and confer conference pursuant to Local Rule 37.2.  To the extent that Plaintiffs can provide an explanation to support a reasonable basis for seeking certain requested information, Sears reserves the right to amend their responses on those issues.

## GENERAL OBJECTIONS

Sears makes the following General Objections to the Interrogatories:

1.      The objections set forth in this section apply to each and every Interrogatory and are not necessarily repeated in response to each individual Interrogatory.  The assertion of the same, similar or additional objections in Sears' specific objections to an individual Interrogatory or the failure to assert any additional objection to an Interrogatory does not waive any of Sears' objections set forth in this section.

2.      Sears objects to each of the Interrogatories to the extent that they purport to seek the disclosure of information:  (a) constituting, collecting or disclosing any information protected by any immunity or privilege, including, but not limited to, the work-product doctrine and attorney-client privilege; (b) which is in the possession, custody or control of persons other than Sears; (c) which Plaintiffs or Plaintiffs' attorney already have in their possession (including, but not limited to, all pleadings, discovery responses, produced documents, correspondence, and filings in this action and other matters of public record), and to which Plaintiffs or Plaintiffs' attorney have equal or superior access; and/or (d) which would impose any burden upon Sears not required by the applicable discovery provisions of the Federal Rules of Civil Procedure and/or the Local Rules of the United States District Court for the Northern District of Illinois.

3.      Sears objects to Plaintiffs' Interrogatories, including (but not limited to) Plaintiffs' Definitions and Instructions, to the extent they seek to impose burdens that exceed the requirements of the Federal Rules of Civil Procedure or the Rules of this Court.

4.      Sears generally objects to these Interrogatories to the extent they seek information or documents which were prepared, generated or received in anticipation of, or after the commencement of this litigation.

Case 3:15-cv-02546 Document # 142-14 Filed: 07/28/17 Page 15 of 23 PageID #:1908

18-23538-shl    Doc 3170-12    Filed 04/12/19    Entered 04/12/19 12:38:29    Exhibit
EXHIBIT E - Certification Motion    Pg 105 of 113

5.      Sears objects to the Interrogatories to the extent they are vague, indefinite, ambiguous, unintelligible or otherwise unclear, or not reasonably calculated to lead to the discovery of admissible evidence.

### ANSWERS TO INTERROGATORIES

3.      Identify the date Sears initially implemented MMI and state its reasons for doing so.

**ANSWER TO INTERROGATORY NO. 3:**  In addition to the General Objections set forth above, Sears objects to this Interrogatory to the extent it seeks information that is not relevant and the claims or defenses asserted in this action. Sears further objects to this Interrogatory to the extent is seeks information and documents protected by the attorney work product doctrine, the attorney client privilege or any other applicable privilege or rule of confidentiality that makes such information otherwise discoverable. Additionally, Sears objects to this Interrogatory on the grounds that the term "implemented" is undefined, vague, and overly broad.

Subject to and without waiving the foregoing objections, Sears supplements this Interrogatory further answering that in or about 2009 Sears began using MMI as part of the Call Center Desktop Application redesign project to update the process for the PA sales procedure. The update included a change to the eligible brands list input process from a type-in form to a dropdown menu to streamline the process.   MMI was implemented on March 17, 2009.

Case: 3:15-cv-02546 Document #: 142-11 Filed: 07/28/17 Page 10 of 23 PageID #:1900

November 30, 2016

Respectfully Submitted,

By:  /s/Erin Bolan Hines
          One of Defendants' Attorneys

Craig M. White
*cwhite@bakerlaw.com*
Erin Bolan Hines
*ehines@bakerlaw.com*
Josephine Tung
*jtung@bakerlaw.com*
BAKER & HOSTETLER LLP
191 North Wacker Drive, Suite 3100
Chicago, Illinois 60606
Telephone: (312) 416-6200
Facsimile: (312) 416-6201

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Erin Bolan Hines, an attorney, certify that on November 30, 2016 I caused a true copy

of the foregoing DEFENDANTS' SECOND SUPPLEMENTAL ANSWER TO PLAINTIFFS'

INTERROGATORY NO. 3 OF PLAINTIFFS' SECOND SET OF INTERROGATORIES to be

served upon the following by email:

> Lori A. Fanning
> *lfanning@millerlawllc.com*
> MILLER LAW LLC
> 115 South LaSalle Street, Suite 2910
> Chicago, IL 60603

> Andrew J. Belli, Esq.
> *abelli@kcr-law.com*
> KAUFMAN, COREN & REES, P.C.
> Two Commerce Square, Suite 3900
> 2001 Market Street
> Philadelphia, PA 19103


                                          /s/Erin Bolan Hines

Case 3:16-cv-02540 Document #: 142-15 Filed: 07/28/17 Page 1 of 1 PageID #:1511

# Exhibit N

# FILED UNDER SEAL

# Exhibit O

# FILED UNDER SEAL

# Exhibit P

# FILED UNDER SEAL

# Exhibit Q

# FILED UNDER SEAL

# Exhibit R

# FILED UNDER SEAL

# Expert Report of Christopher Jackman

# (FILED UNDER SEAL)