**EXHIBIT D**

Allen G. Kadish
Lance A. Schildkraut
ARCHER & GREINER, P.C.
630 Third Avenue
New York, New York 10017
Tel: (212) 682-4940
Email: akadish@archerlaw.com
       lschildkraut@archerlaw.com

    and

Kenneth M. Florey
M. Neal Smith
ROBBINS, SCHWARTZ, NICHOLAS,
LIFTON & TAYLOR, LTD.
631 E. Boughton Road, Suite 200
Bolingbrook, Illinois 60440
Tel: (630) 929-3639
Email: kflorey@robbins-schwartz.com
       nsmith@robbins-schwartz.com

    and

Matthew T. Gensburg
GENSBURG CALANDRIELLO & KANTER, P.C.
200 West Adams Street, Suite 2425
Chicago, Illinois 60606
Tel: (312) 263-2200
Email: mgensburg@gcklegal.com

*Attorneys for Community Unit School District 300*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SEARS HOLDINGS CORPORATION, *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |

**CERTIFICATION OF E. PHILIP GROBEN IN SUPPORT OF RULE 30(b)(6) MOTION TO STRIKE DECLARATION AND TESTIMONY OF MOSHIN MEGHJI FOR FAILURE TO COMPLY WITH RULE 30(b)(6) NOTICE OF DEPOSITION**

I, E. Philip Groben, state as follows:

1.  I am an associate at the law firm of Gensburg Calandriello & Kanter, P.C. (hereinafter referred to as the "**Law Firm**") and represent Community Unit School District 300 (the "**School District**") in the above-captioned proceeding. I submit this declaration in support of the School District's Motion to Strike.

2.  On March 14, 2019 the School District served a Notice of Deposition upon the Debtor pursuant to Bankruptcy Rule 7030 (the "**Rule 30(b)(6) Notice**"). Attached to the Rule 30(b)(6) Notice is a Rider in which the School District sets forth 8 topics for the examination.

3.  On March 25, 2019 the Debtor provided its Objection and Responses to the Rule 30(b)(6) Notice (the "**Debtors' Objections to Deposition**"). The Debtors' Objections to Deposition do not raise any substantive objections to the Rule 30(b)(6) Notice, and the Debtors elected to produce Meghji to testify as to 7 of the 8 topics set forth in the Rule 30(b)(6) Notice, and specifically, the following:

- Documents attached to the Meghji Declaration.
- Communications regarding Sears's eligibility for EDA Funds for the 2017 tax year currently being held in the Village's Special Tax Allocation Fund.
- The documents produced in response to the document request sent from Kenneth M. Florey of Robbins Schwartz dated January 15, 2019.
- Sears's compliance with the jobs requirement set forth in the EDA Act and agreements reached thereunder during the 2017 tax year.
- Business records created and maintained for the purpose of counting eligible jobs under the EDA during the 2017 tax year.
- Sears's compliance with the jobs requirement set forth in the EDA Act and agreements reached thereunder during the 2017 tax year.
- Software used to count the number of EDA Credit-qualifying jobs created or maintained at Sears's Hoffman Estates campus in 2017.

(collectively referred to as "**Rule 30(b)(6) Topics**")

4.  On April 4, 2019 the School District conducted an examination of Mohsin Meghji. During the examination, Mr. Meghji was unable to answer questions related to the Rule 30(b)(6) Topics.

5.  On April 12, 2019, the School District conducted an examination of Misty Redman (the "**Redman Examination**") regarding the Rule 30(b)(6) Topics. During the Redman Examination the Debtor was represented by Jessie B. Mishkin. During the Redman Examination Ms. Redman was unable to answer questions related to the Rule 30(b)(6) Topics.

6.  Immediately after the conclusion of the Redman Examination, I asked Ms. Mishkin whether the Debtor would produce a designee per Rule 30(b)(6) knowledgeable as to the Rule 30(b)(6) Topics. Ms. Mishkin stated that the Debtors would not consent to another deposition under Rule 30(b)(6).

7. On April 12, 2019, I sent an email to Debtors' counsel with a written demand for the following forms of relief related to Mr. Meghji's inability to answer questions within the scope of the Rule 30(b)(6) Topics:

(i) Voluntarily withdraw the Declaration of Mr. Meghji and/or strike it from the bankruptcy docket,
(ii) Produce a witness under Rule 30(b)(6) knowledgeable as to those topics set forth in the original Notice of 30(b)(6) Deposition, and
(iii) Reimburse the School District for the fees and costs incurred in attending Mr. Meghji's deposition.

8. On April 15, 2019, the Debtors responded via email that no further Rule 30(b)(6) designees would be provided (the "**April 15 Correspondence**"). A true and accurate copy of the April 15 Correspondence is included below.

9. The School District has, in good faith, conferred or attempted to confer with the Debtors in an effort to obtain a Rule 30(b)(6) deposition without court action.

10. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

FURTHER AFFIANT SAYETH NAUGHT.

By: /s/ E. Philip Groben
E. Philip Groben

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

BY E-MAIL

**Jared R. Friedmann**
+1 (212) 310-8828
jared.friedmann@weil.com

April 15, 2019

E. Philip Groben, Esq.
Gensburg Calandriello & Kanter, P.C.
200 West Adams Street, Suite 2425
Chicago, IL 60606

Re: *In re: Sears Holding Corporation, et al.*:  Community Unit School District 300

Dear Philip,

  We write in response to the email you sent on April 12, 2019 at 8:15pm ET on behalf of Community Unit School District 300 (the "School District") regarding the April 4, 2019 Rule 30(b)(6) deposition of Mohsin Meghji.  In your email—which you sent *more than a week* after Mr. Meghji's deposition—you make the baseless assertion that Mr. Meghji was unprepared to provide information requested by your Rule 30(b)(6) Notice.  For the reasons set forth below, this assertion is belied by the transcript of Mr. Meghji's deposition.

  As an initial matter, please recall that Mr. Meghji's deposition was initially noticed in his individual capacity as the Debtors' Chief Restructuring Officer, after he provided a declaration in support of the Debtors' Turnover Motion that described certain company records that had been contemporaneously created on a monthly basis to track Sears's compliance with the EDA Act's jobs requirement in 2017.  Following the School District's Rule 30(b)(6) deposition notice, the Debtors designated Mr. Meghji to serve as their Rule 30(b)(6) deponent.  By agreement, Mr. Meghji's April 4, 2019 deposition covered both his individual and Rule 30(b)(6) testimony.  Many of your questions were outside the scope of the noticed Rule 30(b)(6) topics (as limited by the Debtors' responses and objections to those topics, served on March 25, 2019), but Mr. Meghji was allowed to respond in his individual capacity.  However, with respect to any questions outside the scope of the noticed topics, Mr. Meghji responded based only upon his existing individual knowledge; plainly there was no obligation for him to have been prepared to testify beyond that.

  Throughout the deposition, counsel for the School District repeatedly questioned Mr. Meghji about whether he had personal knowledge of the topics about which he was testifying, and complained when Mr. Meghji stated that he did not.[1]  But nothing in Rule 30(b)(6) requires an entity to designate an

---

[1] *See, e.g.*, Tr. 30:22-25 ("Q.  So you have no personal knowledge as to how those numbers are tracked?  A.  No, I have not been involved in the badge management process."); *id.* 32:10-13 ("Q.  So just to be clear, you don't have personal knowledge, again, as to how these counts were actually derived?  A.  I don't."); *id.* 84:25-85:19 ("Q.  For that reason, you don't have personal knowledge that that number was correct or not; is that correct?  A.  I relied on the person responsible who had reported on that.  So I believe it to be correct based on that.  Q.  Did you rely

E. Philip Groben, Esq.  
April 15, 2019  
Page 2

**Weil, Gotshal & Manges LLP**

individual with personal knowledge about the noticed topics. Rather, the individual designated need only be educated about "information known or reasonably available to the organization." Fed. R. Civ. P. 30; *see also Rodriguez v. Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y. 2003) ("it is settled law that a party need not produce the organizational representative with the greatest knowledge about a subject; instead, it need only produce a person with knowledge whose testimony will be binding on the party"), *aff'd*, 293 F. Supp. 2d 315 (S.D.N.Y. 2003); *Gucci Am., Inc. v. Exclusive Imports Int'l*, No. 99 CIV.11490 RCC FM, 2002 WL 1870293, at *8 (S.D.N.Y. Aug. 13, 2002) ("Because Rule 30(b)(6) witnesses testify on the corporation's behalf, courts routinely hold that such deponents need not have personal knowledge on a given subject, so long as they are able to convey the information known to the corporation."). During the deposition, Mr. Meghji repeatedly reminded the School District that he was not the CRO in 2017, and that, at this point, because the two individuals responsible for the process in 2017 were no longer with the company, he was simply able to testify about how compliance with the EDA was tracked in 2017 based on his review of the company's business records.[2]

Moreover, "[s]imply because defendant's witness could not answer every question posed to him does not equate to the fact that defendant did not satisfy its obligation to prepare its 30(b)(6) witness." *Costa v. Cty. of Burlington*, 254 F.R.D. 187, 190 (D.N.J. 2008) (denying sanctions); *accord Freedom's Path at Dayton v. Dayton Metro. Hous. Auth.*, No. 3:16-CV-466, 2018 WL 2948021, at *11–12 (S.D. Ohio June 13, 2018) ("the inability of a designee to answer every question on a particular topic does not necessarily mean that the corporation has failed to comply with its obligations under the Rule . . . . a 30(b)(6) witness is not expected to perform with absolute perfection") (quoting *Pogue v. NorthWestern Mut. Life Ins. Co.*, No. 3:14-CV-598-CRS, 2017 WL 3044763, at *8 (W.D. Ky. July 18, 2017)); *Chick-fil-A v. ExxonMobil Corp.*, No. 08-61422-CIV, 2009 WL 3763032, at *12 (S.D. Fla. Nov. 10, 2009) ("There is no obligation to produce witnesses who know every single fact, only those that are relevant and material to the incident or incidents that underlie the suit . . . a 'rule of reason' applies in determining adequacy of preparation for a 30(b)(6) deposition") (quoting *Wilson v. Lakner*, 228 F.R.D. 524, 529 n. 7 (D.Md. 2005)).

Your email broadly identifies four topics as to which you claim Mr. Meghji was "completely and utterly unprepared," but the deposition transcript demonstrates that Mr. Meghji provided fulsome information concerning each of these topics (even though the questions asked were often unclear and confusing). Your email fails to identify *any* specific questions posed to Mr. Meghji that he was unable to answer, but that (at least in your view) a Rule 30(b)(6) deponent in Mr. Meghji's situation could reasonably have been expected to be able to answer. Mr. Meghji was prepared to testify based on

---

on the person or the email? A. The email. Q. So again, you don't have personal knowledge, then? A. I did not count it myself.").

[2] *See, e.g.*, Tr. 10:15-20; 53:9-20; 58:11-18; 83:16-8; 94:12-19.

E. Philip Groben, Esq.  
April 15, 2019  
Page 3

**Weil, Gotshal & Manges LLP**

information reasonably available to the Debtors at the time they received your deposition notice, in compliance with Rule 30(b)(6), including with respect to all four of the topics referenced in your email.

**First,** you claim that Mr. Meghji was unprepared to testify about "counting of employees, tenant employees, and contractors on the Hoffman Estates campus." This complaint is so broad as to be almost meaningless; Mr. Meghji's entire deposition covered the "counting" of EDA-qualifying jobs, including employees, tenants, and contractors on the Hoffman Estates campus (a topic which was also covered at length in the Debtors' Responses and Objections to the School District's Interrogatories). In any event, Mr. Meghji provided substantial testimony on this topic. For example, Mr. Meghji testified regarding Sears's interpretation of who it counted as an "EDA qualifying employee."[3] Mr. Meghji gave examples of the types of tenant companies whose employees were included in this definition.[4] Mr. Meghji also testified about *who* at Sears was tasked with tracking the number of such EDA qualifying employees in 2017.[5] Mr. Meghji also identified the documents created by and/or relied upon by those individuals, Ms. Agarwal and Ms. Mendoza, upon which Sears relied in confirming its compliance with the EDA Act in 2017 (attached to Mr. Meghji's Declaration as Exhibits 1 through 14), and established that they were business records contemporaneously created and maintained in the ordinary course in 2017.[6] Mr.

---

[3] *See* Tr. 23:12-24 (Q. Can you tell me what is an EDA qualifying employee, as you used that term in your declaration? MR. FRIEDMANN: Object to form. A. Yes. An EDA qualifying -- let me just take a quick look here, if you don't mind. Essentially, for EDA certification, Sears counted full time equivalent employees of contractors, tenant companies and building contractors, as well as full-time Sears employees located at Hoffman Estates, so resident at Hoffman Estates."); *id.* 108:22-25 ("The 4,250 benchmark was for the Economic Development Area as a whole. It was not a criteria simply for Hoffman Estates, the Sears campus.").

[4] *See* Tr. 28:22-29:10 ("Q. So can you generally describe the type of tenants that worked at the corporate headquarters. A. So Sears Hometown stores, which is a separate public company, is located on the Hoffman Estates campus. So that would be one. There's a bunch of full-time employees. And then there are places like, I'll use Jared's favorite example, Sbarro, which had a place there. So there's a coffee shop, there's various other sort of smaller -- that I could think of. There might be one or two others that I can't think of.").

[5] *See* Tr. 24:10-25:3 ("Q. Okay. And then generally speaking, how do you know the number of these employees that are EDA qualifying employees? A. How do I know that? Q. Yes. A. Well, as indicated in my declaration, there were reports generated by individuals during 2017. The two individuals were Amita Agarwal, A-M-I-T-A, A-G-A-R-W-A-L, who was a member of Sears SG&A team, who took count of all the full-time Sears employees resident at Hoffman. And then Jennifer Mendoza, who was a manager of business process, operations integration, who collected based on sort of badge count data tracked of employees, whether it was contractors, building contractors, or tenant employees, that were part of Hoffman Estates.").

[6] *See* Tr. 111:8-112:8 ("Q. If you could turn to Exhibit A, which is your declaration. If I can direct you to paragraph 6. Did you see there where it says, I'll read, "In connection with my role as CRO, I have been provided with certain company records relevant to this motion which were contemporaneously generated on or around a monthly basis and kept and maintained by certain of the debtor's employees in the ordinary course of business." Did I read that correctly? A. Yes. Q. You were asked earlier regarding whether or not the EDGE reports and other

3

E. Philip Groben, Esq.  **Weil, Gotshal & Manges LLP**
April 15, 2019
Page 4

Meghji also explained why Sears did not go to the trouble of counting jobs in the portion of the EDA outside of Sears's Hoffman Estates campus.[7] Complaining broadly that Mr. Meghji's testimony was deficient as to some unspecified aspect of this topic does not make Mr. Meghji an inadequate Rule 30(b)(6) witness.

**Second**, you claim that Mr. Meghji was unprepared to testify about "computation of 'full time equivalent jobs' maintained on the Hoffman Estates campus." Setting aside the fact that it is unclear how "computation" of full-time equivalent jobs differs in any way from "counting" of EDA-qualifying jobs—an issue raised in the Debtors' objections and responses to the School District's Rule 30(b)(6) Notice, but never clarified by the School District—Mr. Meghji testified at length on this topic, based on information he ascertained from the company's business records and discussions with Misty Redman, Sears's divisional vice president of government affairs. For example, in addition to the testimony discussed above, Mr. Meghji also explained that Ms. Agarwal tracked the number of full-time equivalent Sears employees at the Hoffman Estates campus in 2017 based on information maintained and provided by Sears's human resources/payroll department.[8] Mr. Meghji explained that Ms. Mendoza tracked the number of full-time equivalent non-Sears employees at the Hoffman Estates campus using information provided by Sears's real estate department, which maintained the relevant information for tenants and contractors.[9] Mr. Meghji also testified on a month-by-month basis, in response to a lengthy

---

documents, when those were created, were they've created for the bankruptcy, whether they were created back then. Does this help refresh your recollection as to the origins of the documents that are attached to your declaration? A. Yes. These were generated on a normal course basis monthly by the company, and we rely on those records. They were not specially generated after the fact for this process.").

[7] Tr. 109:9-21 ("Q. So up until now we've looked at EDGE reports month by month. We've looked at occupancy reports that rely on active badges which give access to the corporate campus. Up until now we've seen no data that indicates the counting of jobs outside of the headquarters. So what methods and processes did Sears use to count jobs outside of the corporate headquarters? MR. FRIEDMANN: In what year? MR. ATKINSON: 2017. A. There was no need to do that because we were compliant without that.").

[8] *See* Tr. 26:2-16 ("[ ] How did Sears make that determination that these individuals are actually working 35 hours or more per week? . . . . A. We're talking about full-time employees now. Sears employees who were full-time employees. Q. Or just any Sears employees that you're counting as full time. A. I think Sears tracks through what they pay people and their payroll records and personnel records who is full time and who's not.").

[9] *See* Tr. 26:22-27:17 ("Q. Now looking at the other group, so we have tenants that are purportedly being counted -- or I should say employees of tenants that are purportedly being counted towards the number of employees at Hoffman. How did Sears determine the number of those employees and whether they worked 35 hours or more per week? A. So essentially the way it was done by Jennifer Mendoza and Sears's real estate department in collecting this, was that they looked at sort of total badge data, people coming in and out sort of daily in '17, and from that total badge count Ms. Agarwal and Ms. Mendoza removed the number of badges held by part-time employees, which they knew, all former employees, which they also knew, employees based somewhere other than Hoffman Estates, and all employees of Sears entities who were already counted using the kind of EDGE

E. Philip Groben, Esq.                                                                    **Weil, Gotshal & Manges LLP**
April 15, 2019
Page 5

series of unartfully crafted and painstakingly repetitive questions, regarding the 2017 business records in which the EDA-qualifying jobs figures were set forth.[10]

      **Third**, you claim that Mr. Meghji was unprepared to testify about "identification of persons who would be knowledgeable as to the accounting of personnel on the Hoffman Estates campus." This is demonstrably false. As noted above, Mr. Meghji testified that former employees Ms. Agarwal and Ms. Mendoza were responsible for tracking and reporting on Sears's compliance with the EDA Act's jobs requirement in 2017. *See supra* n. 5; *see also* Tr. 80:24-81:13. Mr. Meghji also testified that Ms. Agarwal and Ms. Mendoza are no longer employed by Sears or Transform, and that neither he nor Sears

---

reports."); *id.* 29:11-16 ("Q. And how would Sears know the number of employees that each of those tenants had for purposes of recording -- A. Because they had badges to go in and out of the building, which was tracked by our real estate department. Security's tight."); *id.* 30:7-21 ("Q. Let me back up. I'm not talking about Sears employees, I'm talking about the employees of the tenants. So how would Sears know how many hours the employees of the tenants were working? A. Again, I was not involved in the sort of day-to-day kind of negotiations or anything. But my understanding of this today is Sears has -- gets an indication of how many badges it's issued and how many of those are full time badges versus, you know, kind of -- if people aren't resident there and working full time, then they would get a part time badge. So there's different badges that are assigned, is my understanding."); *id.* 21:17-23 ("17 Q. And would these contractors -- I should say either contractors or employees of the contractors, would they have been subjected to the same badge requirement as everyone else? A. Yes. There was a separate contractor badge.").

[10] *See, e.g.*, Tr. 40:23-41:19 ("23 Q. So in paragraph 8 of your declaration, you indicate that as of 25 January 2017, there were 1,512 employees and contractors; is that correct? A. Yes. Q. Referring back to Exhibit 13, can you show me where that number, the 1,512, is coming from? A. Yes. If I may use my -- so it's -- if you look under the column AA for January 2017, the three lines that it aggregates to get to the 1,512 number are the contractor badge line, which is line 14; tenant badges, which is line 17; and OTB contractor badges, which is line 18. The numbers for January 2017 are 668 plus 649 plus 195, which adds up to 1,512. Q. The figures that you just provided us, those are the number of active badges for those different classification of persons? A. Correct."); *id.* 77:9-78:6 ("Q. Turning to paragraph 14 of Exhibit A. You state that based on Exhibit 7, which is the July 31, 2017, EDGE report, that there were 4,043 Sears employees in Hoffman Estates and Chicago as of July 31, 2017; is that correct? A. Yes. Q. Exhibit 7 also reports 47 Sears employees located in Chicago? A. Yes. Q. And that would indicate a total number of Sears employees in Hoffman Estates at 3,996? A. Correct. Q. Paragraph 14 also you declare that there were 1,151 tenant employees or contractors in July of '17? A. Yes. Q. And again, those numbers are a compilation of active badges for contractors, tenants, and OTB contractors? A. Correct."). *See also id.* 84:13-24 ("Q. Well, the first row says October '17, I should say the first row of the table says October '17 and number eligible is 4,733. Am I reading that correctly? A. That's what it says. Again, I haven't sort of interpreted or gone over the table. I relied on the conclusion line at the top as opposed to cross-reconciling these two because my understanding was Amita was the person who was responsible for reporting this, she was charged with it, and so that's who I relied on.").

E. Philip Groben, Esq.  
April 15, 2019  
Page 6

**Weil, Gotshal & Manges LLP**

is aware of their current whereabouts. *See* Tr. at 102:23-103:16. Additionally, Mr. Meghji testified that Ms. Redman helped collect the relevant business records upon which he relies in his declaration.[11]

**Fourth**, you claim that Mr. Meghji was unprepared to testify as to his "knowledge of documents produced and attached to his Declaration filed with the Bankruptcy Court on February 28, 2019." Again, this is incorrect. As plainly set forth in Mr. Meghji's declaration, he did not create the documents attached to his declaration, but rather in his capacity as CRO, he collected and analyzed those business records which had been contemporaneously created by Sears in the ordinary course of business. *See supra* n. 6. Mr. Meghji also testified regarding which portions of the documents Sears used at the time as the basis for tallying its EDA-qualifying jobs figures in order to confirm compliance with the EDA Act's job requirement. *See supra* n. 10.

As noted above, your email appears to evidence some confusion on your part due to the combined nature of Mr. Meghji's testimony as both a Rule 30(b)(6) and individual deponent. As an example, you repeatedly ignored the Debtors' long-standing objections to irrelevant and disproportionate discovery about Sears's *2018* compliance with the EDA. *See* Tr. at 110:17-21 ("So the question is*: for 2018, calendar year 2018*, what methods or processes did Sears use to calculate the number of jobs inside the Economic Development Area, but outside of the Sears corporate campus.").[12] In light of the Debtors' long-standing objections—including specific objections in response to the Rule

---

[11] *See* Tr. 54:17-22 ("Q. So I guess who told you that that was the information in this report to rely on for making your declaration? A. It was in discussions with my counsel, as well as Misty Redman, who is the VP of government affairs.").

[12] *See also* Tr. at 59:10-11 ("Have you seen a report, either this report or one similar to it*, for 2018*?"); 59:17-18 ("Do you know whether the jobs data *for 2018* has been maintained?"); 89:15-17 ("Do you know whether, based on Ms. Agarwal's estimate, if Sears fell below the threshold by the end of *January 2018*?"); 98:15-17 ("Does this change the reliability, in your eyes, of the reports you received that Sears had the required number of jobs *in 2018*?"); 101:3-10 ("I understand this is a moving projection, but it says the next step is to advise Mr. Lampert . . . So she is recommending informing the CEO of a potential risk to most of the 8.7 million in 2018. Does that in any way change your impression for Sears compliance for the jobs numbers at Hoffman Estates *in 2018*?"); 101:20-23 ("Could you give us the names of the individuals that you say you relied on to say or to testify today that Sears was in compliance with the EDA minimum job counts *for 2018*?"); 102:7-9 ("There are some—and there's no one else other than Misty that you talked to about *2018 jobs compliance*?"); 107:18-22 ("And so looking at this e-mail and these projections, does that change in any way your sense of confidence that Sears maintained 4,250 jobs at the Hoffman Estates campus *in calendar year 2018*?"); 108:16-21 ("Having seen this e-mail from December 14, 2017, with the projection saying three months out they fall below, would that prompt you in any way to go back to Ms. Redman or anyone else at Sears to verify that Sears remained above the 4,250 [in 2018]?"); 114:24-115:4 ("So *for 2018*, for your testimony today saying that Sears was in compliance with the 4,250 figure, you personally didn't rely on Sears records to reach that conclusion, is that correct?"); 115:20-22 ("Do you recall when you had conversations with Ms. Redman about *2018 compliance*?").

6

E. Philip Groben, Esq.  **Weil, Gotshal & Manges LLP**
April 15, 2019
Page 7

30(b)(6) Notice—as well as Judge Drain's order denying the School District's requested additional discovery on this topic, the Debtors did not prepare Mr. Meghji to testify about Sears's 2018 EDA compliance in his capacity as a Rule 30(b)(6) witness. Nevertheless, we allowed Mr. Meghji to respond to these questions in his individual capacity. *See, e.g.,* Tr. at 60:4-8 ("A. My understanding from speaking to Misty Redman was that the company was in compliance with the 4,250 limit in 2018, as well, but I've not seen any data or anything like that.").

In short, the Debtors satisfied the requirements of Rule 30(b)(6), and will not agree to another Rule 30(b)(6) deposition in response to your eleventh-hour request. Mr. Meghji was educated on information known or reasonably available to the Debtors, including through his review of contemporaneously created business documents and discussions with Ms. Redman, and the Debtors' counsel. Mr. Meghji identified the sources of the information in his declaration, explained Sears's methods of tracking EDA Act compliance (whether characterized as "counting" or "calculation"), and identified the key individuals involved. No other Rule 30(b)(6) deponent would be able to provide any more information than Mr. Meghji already provided in light of the fact that the individuals directly responsible monitoring compliance with the EDA Act's job requirements are no longer employed by Sears. Just hours before you sent your email, at the School District's request, the Debtors also produced Ms. Redman for deposition; a deposition which the School District took despite the Debtors' warning that it would be a futile exercise since Ms. Redman, too, was not directly responsible for monitoring compliance with the EDA Act's job requirements. As predicted, that deposition added nothing to record beyond confirming that fact. Additional depositions would just be more of the same.

The Debtors also will not agree to yet another continuance. The EDA Funds currently held by the Village are critical to the Debtors' estates and they need the funds now. The Debtors have made every effort to accommodate the School District up to this point. The Debtors produced relevant documents *before* even filing their Turnover Motion. The Debtors promptly responded to the School District's interrogatories and document requests. The Debtors agreed to continue the hearing on the Turnover Motion from March to April. The Debtors produced Mr. Meghji as their Rule 30(b)(6) witness, and then produced Ms. Redman as a fact witness on three days' notice. In an effort to avoid further disputes, the Debtors even have permitted inquiry into topics which extend well beyond the scope of the Turnover Motion and into the merits of the School District's Illinois Action (*e.g.*, 2018 EDA Act compliance). At a certain point, the stalling and abusive discovery tactics must end. That time is now.

E. Philip Groben, Esq.  **Weil, Gotshal & Manges LLP**
April 15, 2019
Page 8

                              Sincerely,

                              */s/ Jared R. Friedmann*
                              Jared R. Friedmann

cc:    Kenneth Florey, Esq.
       Allen Kadish, Esq.
       Matthew Gensburg, Esq.
       Kory Atkinson, Esq.
       Sunny Singh, Esq.
       Jessie B. Mishkin, Esq.