# <u>EXHIBIT J</u>

☑ RULE/LA RÈGLE 26 02 (_____)
☐ THE ORDER OF_____
   L'ORDONNANCE DU
DATED / FAIT LE _____

REGISTRAR
SUPERIOR COURT OF JUSTICE

GREFFIER
COUR SUPÉRIEURE DE JUSTICE

Court File No. CV-19-617792-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

B E T W E E N:

**1291079 ONTARIO LIMITED**

Plaintiff

- and -

**SEARS CANADA INC., SEARS HOLDINGS CORPORATION, ESL
INVESTMENTS INC., WILLIAM C. CROWLEY, WILLIAM R. HARKER,
DONALD CAMPBELL ROSS, EPHRAIM J. BIRD, DEBORAH E. ROSATI, R.
RAJA KHANNA, JAMES MCBURNEY and DOUGLAS CAMPBELL**

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**FRESH AS AMENDED STATEMENT OF CLAIM**

TO THE DEFENDANTS:

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the Plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a Statement of Defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the Plaintiff's lawyer or, where the Plaintiff does not have a lawyer, serve it on the Plaintiff, and file it, with proof of service in this court office, WITHIN TWENTY DAYS after this Statement of Claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your Statement of Defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

2

Instead of serving and filing a Statement of Defence, you may serve and file a Notice of Intent to Defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your Statement of Defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

TAKE NOTICE: THIS ACTION WILL AUTOMATICALLY BE DISMISSED if it has not been set down for trial or terminated by any means within five years after the action was commenced unless otherwise ordered by the court.

Date    October 21, 2015        Issued by    "Deborah Farquharson"

Local Registrar

Address of        Toronto Commercial List
court office:     330 University Avenue, 7th Floor
                  Toronto, ON  M5G 1R7

TO:        SEARS CANADA INC.
           290 Yonge Street, Suite 700
           Toronto, Ontario
           M5B 2C3

AND TO:    SEARS HOLDINGS CORPORATION
           3333 Beverly Road
           Hoffman Estates, IL  60179
           United States of America

18-23538-shl   Doc 3242-10   Filed 04/16/19   Entered 04/16/19 15:13:48   Exhibit J -
Fresh as Amended Statement of Claim amended April 9   2019   Pg 4 of 43

3

**AND TO:**  **ESL INVESTMENTS INC.**
c/o Polley Faith LLP
Suite 1300 – 80 Richmond St. W.
Toronto, ON M5H 2A4
**Harry Underwood**
hunderwood@polley.faith.com
**Andrew Faith**
afaith@polley.faith.com
**Jeffrey Haylock**
jhaylock@polley.faith.com
**Sandy Lockhart**
slockhart@polley.faith.com
Tel: 416-365-1600
Fax: 416-365-1601

**AND TO:**  **WILLIAM C. CROWLEY**
c/o Cassels Brock & Blackwell LLP
Scotia Plaza
Suite 2100 – 40 King Street West
Toronto, ON M5H 3C2

**John N. Birch**  LSO #38968U
jbirch@casselsbrock.com
Tel: 416-860-5225
Fax: 416-640-3057
**Mary I.A. Buttery** LSO #34599R
mbuttery@casselsbrock.com
Tel: 604-691-6118
Fax: 604-691-6120
**Natalie Levine** LSO #64908K
nlevine@casselsbrock.com
Tel: 416-860-6568
Fax: 416-640-3207

**AND TO:**  **WILLIAM R. HARKER**
c/o Cassels Brock & Blackwell LLP
Scotia Plaza
Suite 2100 – 40 King Street West
Toronto, ON M5H 3C2

**John N. Birch**  LSO #38968U
jbirch@casselsbrock.com
Tel: 416-860-5225
Fax: 416-640-3057

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 5 of 43

4

**Mary I.A. Buttery** LSO #34599R
mbuttery@casselsbrock.com
Tel:    604-691-6118
Fax:    604-691-6120
**Natalie Levine** LSO #64908K
nlevine@casselsbrock.com
Tel:    416-860-6568
Fax:    416-640-3207

AND TO:    **DONALD CAMPBELL ROSS**
c/o Cassels Brock & Blackwell LLP
Scotia Plaza
Suite 2100 – 40 King Street West
Toronto, ON M5H 3C2

**John N. Birch**  LSO #38968U
jbirch@casselsbrock.com
Tel:    416-860-5225
Fax:    416-640-3057
**Mary I.A. Buttery** LSO #34599R
mbuttery@casselsbrock.com
Tel:    604-691-6118
Fax:    604-691-6120
**Natalie Levine** LSO #64908K
nlevine@casselsbrock.com
Tel:    416-860-6568
Fax:    416-640-3207

AND TO:    **EPHRAIM J. BIRD**
c/o Cassels Brock & Blackwell LLP
Scotia Plaza
Suite 2100 – 40 King Street West
Toronto, ON M5H 3C2

**John N. Birch**  LSO #38968U
jbirch@casselsbrock.com
Tel:    416-860-5225
Fax:    416-640-3057
**Mary I.A. Buttery** LSO #34599R
mbuttery@casselsbrock.com
Tel:    604-691-6118
Fax:    604-691-6120
**Natalie Levine** LSO #64908K

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 6 of 43

5

nlevine@casselsbrock.com
Tel:    416-860-6568
Fax:    416-640-3207


**AND TO:**    **DEBORAH E. ROSATI**
c/o Bennett Jones LLP
Suite 3400 – P.O. Box 130
1 First Canadian Place
Toronto, ON M5X 1A4

**Richard Swan**
swanr@bennettjones.com
Tel:    416-777-7479
Fax:    416-863-1716
**Sean Zweig**
zweigs@bennettjones.com
Tel:    416-777-6254
Fax:    416-863-1716

**AND TO:**    **R. RAJA KHANNA**
c/o Bennett Jones LLP
Suite 3400 – P.O. Box 130
1 First Canadian Place
Toronto, ON M5X 1A4

**Richard Swan**
swanr@bennettjones.com
Tel:    416-777-7479
Fax:    416-863-1716
**Sean Zweig**
zweigs@bennettjones.com
Tel:    416-777-6254
Fax:    416-863-1716

**AND TO:**    **JAMES MCBURNEY**
c/o Cassels Brock & Blackwell LLP
Scotia Plaza
Suite 2100 – 40 King Street West
Toronto, ON M5H 3C2

**John N. Birch** LSO #38968U
jbirch@casselsbrock.com
Tel:    416-860-5225

6

Fax:    416-640-3057
**Mary I.A. Buttery** LSO #34599R
mbuttery@casselsbrock.com
Tel:    604-691-6118
Fax:    604-691-6120
**Natalie Levine** LSO #64908K
nlevine@casselsbrock.com
Tel:    416-860-6568
Fax:    416-640-3207


**AND TO:**      **DOUGLAS CAMPBELL**
c/o Cassels Brock & Blackwell LLP
Scotia Plaza
Suite 2100 – 40 King Street West
Toronto, ON M5H 3C2

**John N. Birch**  LSO #38968U
jbirch@casselsbrock.com
Tel:    416-860-5225
Fax:    416-640-3057
**Mary I.A. Buttery** LSO #34599R
mbuttery@casselsbrock.com
Tel:    604-691-6118
Fax:    604-691-6120
**Natalie Levine** LSO #64908K
nlevine@casselsbrock.com
Tel:    416-860-6568
Fax:    416-640-3207

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 8 of 43

7

## CLAIM

1.    The plaintiff claims on behalf of itself and all members of the Proposed Class:

(a)    a declaration that the plaintiff is a "complainant" under the *Canada Business Corporations Act*, R.S.C. 1985, c. C. 44 (the "**CBCA**");

(b)    a declaration that the plaintiff has been oppressed by the defendants under the CBCA;

(c)    compensation pursuant to s. 241(3)(j) of the CBCA in an amount not exceeding $80,000,000;

(d)    pre-judgment and post-judgment interest pursuant to the *Courts of Justice Act*, R.S.O. 1990, c. C.43;

(e)    costs of this action on a substantial-indemnity scale, plus applicable goods and services and harmonized sales taxes; and;

(f)    such further and other relief as this Honourable Court deems just, including all further necessary or appropriate accounts, inquiries and directions.

**Parties**

2.    The plaintiff, 1291079 Ontario Limited ("**129**"), is incorporated under the laws of Ontario.  Until December, 2013, 129 carried on business in the Town of Woodstock, Ontario, as a retailer under the "Sears Hometown" store program.  129 is the class

18-23538-shl   Doc 3242-10   Filed 04/16/19   Entered 04/16/19 15:13:48   Exhibit J -
Fresh as Amended Statement of Claim amended April 9   2019   Pg 9 of 43

8

representative in a certified class proceeding against Sears Canada Inc., bearing Court File

No. CV- 3769 /13-CP (the "**Class Action**") commenced in Milton, Ontario

3.      The defendant, Sears Canada Inc. ("**Sears**"), is incorporated under the laws of

Canada and has its head office in the City of Toronto, Province of Ontario.  Sears' stock is

publicly traded on the Toronto Stock Exchange and on the NASDAQ.

4.      The defendant, Sears Holdings Corporation ("**Holdings**"), is incorporated under the

laws of the State of Delaware in the U.S.A.    Until October, 2014, Holdings owned 51%

of  the  common  shares  of  Sears,  at  which  time  its  shareholdings  were  reduced  to

approximately 12% following a sale of its shares.  On October 15, 2018, Holdings filed for

relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court.

5.      The defendant, ESL Investments Inc. ("**ESL**"), is incorporated under the laws of

the State of Delaware in the U.S.A. ESL is a privately-owned hedge fund controlling over

approximately $9 billion in assets.  Until October, 2014, ESL was a 27% shareholder of

Sears, at which time it increased its shareholdings in Sears to approximately 48% through

the acquisition of shares previously held by Holdings.

6.      The principal individual behind both Holdings and ESL is hedge-fund billionaire

Edward Lampert ("**Lampert**").  Lampert is the chairman and CEO of Holdings and the

founder, chairman and CEO of ESL.  Lampert is also the largest individual shareholder of

Holdings.

7.      Holdings and ESL are affiliates of Sears as defined under section 2 of the CBCA.

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9   2019    Pg 10 of 43

9

8.      The defendant, William C. Crowley ("**Crowley**"), is an individual residing in New York, New York in the United States of America. Crowley was a director of Sears in 2013.

9.      The defendant, William R. Harker ("**Harker**"), is an individual residing in Brooklyn, New York in the United States of America. Harker was a director of Sears in 2013.

10.     The defendant, Donald Campbell Ross ("**Ross**"), is an individual residing in Toronto, Ontario. Ross was a director of Sears in 2013.

11.     The defendant, Ephraim J. Bird ("**Bird**"), is an individual residing in Salado, Texas in the United States of America. Bird was a director of Sears in 2013.

12.     The defendant, Deborah E. Rosati ("**Rosati**"), is an individual residing in Wainfleet, Ontario. Rosati was a director of Sears in 2013.

13.     The defendant, R. Raja Khanna ("**Khanna**"), is an individual residing in Toronto, Ontario. Khanna was a director of Sears in 2013.

14.     The defendant, James McBurney ("**McBurney**"), is an individual residing in London, England. McBurney was a director of Sears in 2013.

15.     The defendant, Douglas Campbell ("**Campbell**"), is an individual residing in Toronto, Ontario. Campbell was a director of Sears in 2013.

16.     Crowley, Harker, Ross, Bird, Rosati, Khanna, McBurney and Campbell are hereinafter, collectively, referred to as the "**Directors**".

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 11 of 43

10

17.    At all material times, including on November 18, 2013 through December 6, 2013, Holdings, ESL, Lampert, and Harker (collectively, the "**Primary Shareholders**") were a direct or beneficial shareholder of Sears, and held the following ownership interests:

(a)    Holdings beneficially owned 51,962,391 shares in Sears, representing approximately 51% of the outstanding shares;

(b)    ESL beneficially owned 17,725,280 shares in Sears, representing approximately 17.4% of the outstanding shares, which were directly held as follows:

   i.    ESL Partners, LP – 15,821,206 shares;

   ii.    SPE I Partners, LP – 830,852 shares;

   iii.    SPE Master I, LP – 1,068,522 shares;

   iv.    ESL Institutional Partners, LP – 4,381 shares; and

   v.    CRK Partners, LLC (an affiliate of ESL that was voluntarily cancelled effective June 1, 2018, and is not a party to these proceedings – 319 shares;

(c)    Lampert owned 10,433,088 shares in Sears, representing approximately 10.2% of the outstanding shares; and

(d)    Harker owned 4,604 shares in Sears.

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 12 of 43

11

**Background**

18.     129 is a Sears Hometown Store dealer.  Hometown Store dealers, before they were

all shut down, were small hardware and appliance stores operated by independent retailers

pursuant to a Dealer Agreement with Sears. The Hometown Dealers operated under the

"Sears" brand.

19.     On July 5, 2013, 129 commenced a class proceeding against Sears on behalf of all

Hometown Store dealer stores operating under a Dealer Agreement with Sears at any time

on or after July 5, 2011 (hereinafter collectively referred to as the **"Class"** or **"Hometown**

**Dealers")**).  The Class Action seeks $100 million in damages on behalf of the Class for,

*inter alia*, breach of contract and breaches of the *Arthur Wishart Act (Franchise*

*Disclosure), 2000*, S.O. 2000, c. 3 ("**Wishart Act**").

20.     The Class Action was certified as a class proceeding on September 8, 2014.

21.     129 proposes that the class in this action be defined in the same manner as the class

in the Class Action, namely:

> all corporations, partnerships, and individuals carrying on business as a Sears
> Hometown Store under a Dealer Agreement with Sears at any time from July 5,
> 2011 to June 22, 2017

**Overview of the Claim**

22.     ESL—acting at all times at founder and namesake Lampert's direction—engaged

in serial asset stripping, taking Sears's best assets out of the enterprise and away from the

12

claims of creditors, including the Class, so as to monetize these assets and have those funds

delivered to ESL and Holdings by way of dividend and before its inevitable insolvency

proceedings.  Over the course of Lampert's and ESL's reign, Sears closed hundreds of

stores, cut thousands of jobs, and lost untold billions in value.  In effect, Lampert and ESL

managed Sears as if it were a private portfolio company that existed solely to provide the

greatest returns on their investment, recklessly disregarding the damage to Sears, its

employees, and its creditors, including the Class.

23.    In November and December 2013, the Directors issued and paid an extraordinary

dividend in the amount of approximately $509 million which was made possible by ESL

and the Directors' asset stripping, conflict of interest, and self-dealing. The extraordinary

dividend was oppressive and unfairly disregarded and prejudiced the interests of the Class.

**The Beginning of the End for Sears**

24.    Sears is a retailer of home appliances, furnishings, mattresses, electronics and

apparel, among other things.  It has operated in Canada for over 60 years. Sears' retail

network includes many different channels of retail, such as full-line department stores,

furniture and appliance stores, Dealer Hometown stores, catalogue selling locations, and

outlet stores.  Sears also sells direct to customers through its website, www.sears.ca and its

1-800 telephone number.

25.    Beginning in 2011, Sears' financial performance began to decline sharply.

According to Sears' publicly-disclosed audited annual financial statements for 2010 – 2013

13

(as amended, in certain cases) Sears' revenues operating profits/losses and gross margin

rates were as follows:

| Year | Total Revenues ($ million) | Operating Profit (Loss) ($ millions) | Gross Margin Rate |
|---|---|---|---|
| 2010 | 4,938.5 | 106.3 | 39.3% |
| 2011 | 4,619.3 | (50.9) | 36.5% |
| 2012 | 4,300.7 | (82.9) | 36.7% |
| 2013 | 3,991.80 | (187.8) | 36.2% |

26.    As early as 2011, Sears' management recognized that drastic, transformative action

would be required for Sears to re-establish a foothold in the Canadian retail market.  In the

2011 strategic plan (the **2011 Strategic Plan**) prepared for Sears' board of directors (the

**Board**), then-Chief Executive Officer Calvin McDonald ("**McDonald**") described the state

of Sears as follows:

> Sears Canada is not a good retailer.  Our business is broken; trading is
> awkward and inefficient, we lack product and merchandising focus and we
> are becoming irrelevant to customers while losing touch with our core.
>
> [...]
>
> We lack many of the fundamental processes, structures and culture of a
> strong retailer.  In short, we lack "retail rhythm".  However most of our
> challenges are self-induced, meaning we are in a position to fix them.

27.    The 2011 Strategic Plan also made clear that if transformative action was not taken,

Sears could not expect to re-emerge as a successful retailer: "If we do not innovate, we

14

will cease to be relevant." More directly, the 2011 Strategic Plan warned that "the current trajectory of growth and margin decline would take EBITDA into negative territory if we do not take drastic action."

28.     Notwithstanding the concerning operational trends identified in the 2011 Strategic Plan, Sears failed to take the necessary action to reinvigorate its business. Between 2011 and 2013, Sears consistently invested fewer resources on growth and transformational initiatives relative to its industry peers. In particular, the Board of Directors for Sears rejected multiple attempts by management, including, in particular, McDonald, to use Sears' capital to revitalize its business.

**2013 Plan to Dispose of Real Estate Assets to Fund Dividends (the Monetization Plan)**

29.     By 2013, ESL and Lampert had an immediate need for cash from Sears. ESL had raised money from investors years earlier on terms that precluded these investors from redeeming their investment for a period of time. In 2013, this holding period expired, investors were entitled to withdraw funds and ESL investors faced significant redemptions.

30.     In order to satisfy its redemption obligations, ESL and Lampert devised a plan to extract cash from Sears through (a) the disposition of its most valuable real estate assets, and (b) the payment of an extraordinary dividend for the benefit of ESL and Lampert (collectively, the "**Monetization Plan**").

15

31.     To give effect to the Monetization Plan, Lampert personally directed the disposition of Sears' real estate assets in 2013.  Lampert provided specific instructions to Sears on the price sought by Sears for its dispositions.

32.     At all material times, Lampert directed and acted in concert with officers and directors of Sears to implement the Monetization Plan, including, in particular, with Crowley (then Chair of the Sears Board), Harker (then a director of Sears) and E.J. Bird (then Chief Financial Officer of Sears).  Jeffrey Stollenwerck (then President, Real Estate Business Unit of Holdings) was also engaged by ESL and Lampert on these matters. Lampert had a long standing professional and personal relationship with each of them:

(a)     Crowley had acted as President and Chief Operating Officer of ESL from January 1999 to May 2012, Executive Vice-President and Chief Administrative Officer of Holdings from September 2005 to January 2011 and Chief Financial officer of Holdings for periods in 2005-2007;

(b)     Harker was an Executive Vice-President and General Counsel of ESL from February 2011 to June 2012 and an officer of Holdings from September 2005 until August 2012, during which time he acted variously as General Counsel, Corporate Secretary and Senior Vice-President, among other roles;

(c)     Bird was the Chief Financial Officer of ESL from 1991 to 2002; and

(d)     Stollenwerck was the President of the Real Estate Business Unit of Holdings from February 2008 to April 2018 and a Senior Vice President, Real

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 17 of 43

16

Estate for Holdings from March 2005 to February 2008.  Before joining Holdings, Stollenwerck had acted as Vice-President, Research at ESL.

33.    In accordance with the Monetization Plan, Sears entered into an agreement with Oxford Properties Group on or about June 14, 2013, to terminate Sears' leases at Yorkdale Shopping Centre and Square One Mississauga in exchange for a payment to Sears of $191 million (the **"Oxford Terminations"**).  The Oxford Terminations closed June 24, 2013.

**September 2013 Board Presentations**

34.    On September 23, 2013, two years after the 2011 Strategic Plan, the Board of Directors for Sears received a series of management presentations directly addressing Sears' deteriorating operational and financial performance (the **"2013 Board Presentations"**).  Among other things, the 2013 Board Presentations reported that:

(a)    sales continued to decline across Sears' business at a rate of 2.6% per year;

(b)    based on year-to-date current trends (and without appropriately accounting for stores closed in connection with the Monetization Plan), Sears' projected EBITDA by 2016 would be negative $105 million; and

(c)    Sears was struggling operationally: "Basics not fixed".

35.    Earlier that month, presentations to the Board had also recognized that competition in the Canadian retail space was increasing with Target's entry into the market.  Target had

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 18 of 43

17

opened 68 stores in Canada in the second quarter of 2013 and planned to open a further 124 stores in Canada by year end.

36.    On or about September 24, 2013, MacDonald (Sears then CEO) resigned from the company. MacDonald resigned because of disagreements with Lampert over commitment to MacDonald's turnaround plan for Sears. That same day, Sears announced that Campbell was appointed its CEO and President.

37.    Following the 2013 Board Presentations, the Board knew or ought to have known that Sears' business was in decline and that its long term viability was at risk.

**Continued Disposition of Real Estate Assets**

38.    Further to the Monetization Plan, Sears pursued an agreement with Cadillac Fairview Corporation Limited ("**Cadillac Fairview**") to terminate five additional high-value leases (Toronto Eaton Centre, Sherway Gardens, Markville Shopping Centre, Masonville Place and Richmond Centre) (the "**Cadillac Terminations**").

39.    Lampert directed the negotiating strategy in connection with the Cadillac Terminations with a view to ensuring a dividend of the proceeds before the end of 2013. Rowley and Stollenwerck negotiated directly with Cadillac Fairview, including with respect to the final price of $400 million.

40.    On October 28, 2013, the Board approved the Cadillac Terminations. The Board was not advised of the role that Lampert, Crowley or Stollenwerck had played in

18

negotiating the Cadillac Terminations.  The Cadillac terminations closed on November 12, 2013.

41.    In the same period, Sears and Stollenwerck negotiated the sale of Sears' 50% interest in eight properties jointly owned with The Westcliff Group of Companies.  Sears' 50% interest was sold to Montez Income Properties Corporation in exchange for approximately $315 million (the "**Montez Sale**").

42.    The Sears Board approved the Montez Sale on November 8, 2013.  The approval was made by written resolution and without an in-person board meeting.

43.    The Montez Sale closed in January 2014.

44.    The assets disposed of by Sears were its "crown jewels".  It was plain that the divestiture of these key assets in 2013, while Sears was struggling in the face of stiffer retail competition from Target and others, would have a dramatic negative impact on Sears. The negative impact, in fact, unfolded:

| Year | Total Revenues ($ million) | Operating Profit (Loss) ($ millions) | Gross Margin Rate |
|------|------|------|------|
| 2012 | 4,300.7 | (82.9) | 36.7% |
| 2013 | 3,991.8 | (187.8) | 36.2% |
| 2014 | 3,424.5 | (407.3) | 32.6% |
| 2015 | 3,145.5 | (298.3) | 31.8% |
| 2016 | 2,613.6 | (422.4) | 27.3% |

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 20 of 43

19

45.    Lampert directed Sears to complete each of the Oxford Terminations, the Cadillac Terminations and the Montez Sale. These dispositions were part of the Monetization Plan and completed in order to provide ESL with funds to address its redemption obligations.

**The 2013 Dividend**

46.    On November 12, 2013, the same day Sears received $400 million in proceeds from the Cadillac Terminations, Crowley directed Bird to move forward with an extraordinary dividend of between $5.00 and $8.00 per share.

47.    On November 18 and 19, 2013, six days after the closing of the Cadillac Terminations, the Board held an in-person meeting (the "**November Meeting**"). Although Sears had no business operations in the United States, the November Meeting was held in New York City at the Offices of Wachtel, Lipton, Rosen & Katz ("**Wachtel**").

48.    The November Meeting began with a short pre-dinner discussion on November 18 and continued with a full day session on November 19, 2013.

49.    During the short pre-dinner discussion on November 18, 2013, the Board unanimously resolved to declare the 2013 Dividend, an extraordinary dividend of $5.00 per common share, for an aggregate dividend payment of approximately $509 million (the "**2013 Dividend**").

50.    The circumstances surrounding the 2013 Dividend raised a series of red flags.

18-23538-shl   Doc 3242-10   Filed 04/16/19   Entered 04/16/19 15:13:48   Exhibit J -
Fresh as Amended Statement of Claim amended April 9   2019   Pg 21 of 43

20

**Lack of Notice to the Board**

51.     The Board had no advance notice that it would be asked to consider an extraordinary dividend at the November Meeting.

52.     On Friday, November 15, 2013, the Board was provided with a package of material for the November Meeting (the "**Board Materials**"). The Board Materials included a detailed agenda with 15 separate items for the Board to consider during the November Meeting.

53.     Neither the agenda nor any of the other Board Materials made any reference to the fact that the Board would be asked to consider an extraordinary dividend or any dividend at all. Moreover, the possible payment of a dividend had not been tabled in any prior Board meeting in 2013.

**Lack of Information**

54.     The Board was not provided with the information necessary to assess the appropriateness of an extraordinary dividend.

55.     Unlike past instances in which the Board was asked to consider an extraordinary dividend, the Board Materials did not contain any financial or operational information regarding the payment of a proposed dividend. The Board did not receive:

    (a)     any written materials regarding a proposed dividend or possible dividend structures;

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 22 of 43

21

(b)    any written presentation analyzing the impact of the proposed dividend would have on Sears' business, including taking into account possible downside scenarios;

(c)    any *pro forma* assessment of Sears' liquidity and cash flows following the payment of a dividend.  Rather, the *pro forma* cash flows included in the Board Materials assumed that no dividend would be paid in either 2013 or 2014; or

(d)    no financial statement was available which addressed the outstanding liability created by the Class Action. No contingency reserve was set aside and no written description of the existence of the Class Action was provided to the Board.

56.    While Sears' management had identified the need to provide the Board with various cash flow analyses covering various dividend scenarios, the limited analysis that was done by management was incomplete and never presented to the Board.

57.    Moreover, and unlike past meetings in which the Board had considered extraordinary dividends:

(a)    management did not prepare a written presentation to the Board on the proposed dividend and there was no written recommendation or proposal from management to the Board; and

(b)    the Directors were not provided with legal advice with respect to their duties in connection with the declaration of a dividend.

18-23538-shl   Doc 3242-10   Filed 04/16/19   Entered 04/16/19 15:13:48   Exhibit J -
Fresh as Amended Statement of Claim amended April 9   2019   Pg 23 of 43

22

**Financial Uncertainty**

58.     On November 12, 2013, prior to the November Meeting, the Board received a financial update on the performance of Sears. Management reported that throughout the first three quarters of the year, Sears had negative net income of $49 million ($27 million worse than the same period in 2012) and negative total cash flow of $26.3 million.

59.     On November 14, 2013, the Investment Committee of Sears' Board was presented with material showing an estimated pension plan deficiency of $313 million at December 2013. The members of the Investment Committee were Crowley, Harker and Bird. This fact was not presented to the Board at the November Meeting.

60.     In advance of the November Meeting, the Board was provided with only high level *pro forma* cash flows for 2014. The cash flows were based on a 2014 Plan EBITDA of $135 million, of which $118 million was based on aspirational changes to the business that management hoped would result in financial improvement but that management and the Board should have known were unreasonably optimistic. Moreover, the *pro forma* cash flows presented to the Board assumed the receipt of proceeds of the Montez Sale even though the transaction had not closed. Again, no information was provided to the Board on the impact of an extraordinary dividend would have on future investment opportunities and future cash flows.

61.     The Board Materials did, however, include two analyst reports, both of which reviewed the financial circumstances of Sears and predicted its eventual failure:

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 24 of 43

23

**Desjardins Capital Markets Report (October 30, 2013)**

As long as consumers do not perceive that Sears Canada is going out of business and desert it, Sears may be able to manage its demise slowly over time, selling prime and non-core assets, and waiting for the elusive purchaser of 60-80 store locations to appear.

**CIBC Report (November 4, 2013)**

It is possible that SCC will simply operate its way into irrelevance, gradually selling off stores to stem the cash drain. That strategy would likely result in Sears occasionally cutting a special dividend cheque to all shareholders, not the worst way to create shareholder value. But that is dangerous to the operations, particularly as the primary, and most profitably flagship stores are vended.

**A Conflicted Board**

62.    The 2013 Dividend was approved by the Board unanimously and without any abstentions.

63.    Crowley and Harker participated in the Board's deliberations to pay the 2013 Dividend and approved the payment of the 2013 Dividend despite the fact that Sears had specifically determined that:

(a)    Crowley and Harker were not "independent" directors; and

(b)    pursuant to National Instrument 52-110, Crowley and Harker had a material relationship with Holdings and/or ESL that could "be reasonably expected to interfere with the exercise of [their] independent judgment".

64.    Further, Crowley did not disclose to the Board that he, Lampert and Stollenwerck were personally involved in the 2013 real estate divestitures or that the timetable and size

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 25 of 43

24

of the proposed dividend was dictated by ESL's need for funds. Rather, the Board was led to believe that Sears' management was responsible for the 2013 real estate divestures. For example, Crowley expressly advised the independent members of the Board: "I do not think that the Board or the independents should attempt to insert themselves in the negotiations [of real estate transactions]. Bill [Harker] and I did not and do not do that."

65.    Crowley and Harker in particular were focused on the interests of ESL and Lampert. Crowley and Harker failed to disclose the motivations of ESL and Lampert to the Board and the fact that both the real estate dispositions and 2013 Dividend were driven by the needs of ESL and Lampert and not the best interests of Sears and its other stakeholders, including the Class.

**Departure from Past Governance Practices**

66.    The Board process for the 2013 Dividend represented a sharp departure from past practice of the Sears Board and ordinary standards of good corporate governance.

67.    For example, in December 2005, the Board approved an extraordinary dividend. The process for approving that dividend included:

(a)    multiple Board meetings on September 7, 2005, September 14, 2005, and December 2, 2005, to discuss the merits and risks of a potential dividend in light of the company's operational needs;

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 26 of 43

25

(b)      multiple oral presentations from management and a dividend recommendation by the Chief Financial Officer;

(c)      separate meetings between the independent directors of Sears and the Chief Financial Officer to assess the company's financial state;

(d)      legal advice from both in-house and external counsel to the Board; and

(e)      review by the Board of draft press releases and an officer's certificate with respect to the dividend.

68.    In May 2010, the Board approved another extraordinary dividend, again with the benefit of a robust process:

(a)      multiple meetings of the Board on April 23, 2010, May 7, 2010, and May 18, 2010, to discuss the merits and risks of a potential dividend in light of the company's operational needs;

(b)      separate meetings of the independent directors on May 7, 2010, and May 12, 2010, with their own counsel present, to discuss the options available to Sears with respect to its excess cash and the amount of the potential dividend in light of the company's operation needs;

(c)      multiple presentations by management, including a 40-page presentation dated April 23, 2010, and a subsequent 20-page presentation dated May 7, 2010,

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 27 of 43

26

providing detailed analyses of excess cash and financial forecasts (with downside scenarios) for multiple dividend options;

(d)    a dialogue between management and the Board continuing over several meetings with respect to various options for a potential dividend;

(e)    consideration of multiple potential uses for excess cash, including cash dividends in various amounts, a substantial issuer bid and a normal course issuer bid; and

(f)    a deferral of half of the proposed dividend pending a full assessment of the company's operational needs.

69.    In September 2010, the Board approved a second extraordinary dividend for 2010. The process for approving that dividend included:

(a)    multiple meetings of the Board on or around August 23, 2010, and September 10, 2010, to discuss the capital structure of the company and the merits and risks of a potential dividend in light of the company's operational needs;

(b)    multiple presentations by management, including a "capital structure update" dated August 3, 2010, and a 32-page presentation assessing the capital structure of the company and potential dividend options, including financial forecasts and downside scenarios, which the Board reviewed in advance of approving the dividend; and

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 28 of 43

27

(c)    a separate meeting of the independent directors on or around September 8, 2010, with their own counsel present, to discuss the options available to Sears with respect to its excess cash and the amount of the potential dividend in light of the company's operational needs.

70.    In December 2012, the Board approved a smaller extraordinary dividend.  While not as fulsome as previous governance processes, the process for approving the 2012 dividend nonetheless included:

(a)    a meeting on December 12, 2012, which included thorough discussion and analysis of the impact of a potential dividend on available cash, EBITDA and total debt, the company's need to retain cash for operational uses and downside scenarios in respect of a possible dividend;

(b)    a report entitled "Dividend Discussion" which was prepared by Sears' Chief Financial Officer and which the Board reviewed in advance of approving the dividend; and

(c)    a review of the draft officer's certificate with respect to the dividend by external counsel to the independent directors and a dialogue with the Chief Financial Officer of Sears addressing counsel's comments.

71.    In stark contrast, the 2013 Dividend was the first item of business at a pre-dinner discussion at the outset of the November Meeting and was declared without any adequate financial, operational or cash flow information upon which the exercise proper business

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 29 of 43

28

judgment. It was dealt with before any of the planned presentations to the Board, which addressed Sears' financial results or the reports on management priorities, asset valuations, operating efficiency and Sears' 2014 financial plan and without the benefit of any independent legal advice regarding the directors' duties in the circumstances.

72.    The Board's inability to make a proper business decision in respect of the 2013 Dividend was apparent from the fact that one of the Board members, Weissman, had been appointed to the Board that day. Weissman, a resident of Texas, had no material prior dealings with Sears or knowledge of Sears' financial or operational circumstances upon which to base his decision to approve the 2013 Dividend.

**The Hometown Dealers' Interest in the Affairs of Sears**

73.    The 2013 Dividend was declared by the Directors and paid by Sears with knowledge by the defendants of the substantial claim against Sears by the Hometown Dealers in the Class Action.

74.    The defendants knew that by implementing and proceeding with the Monetization Plan, culminating in the 2013 Dividend, that Sears would likely be unable to pay the damages of the Class if and when the Class succeeded in the Class Action.

75.    The Class' claim was sizeable when compared to the assets of Sears at the time of the 2013 Dividend, its overall liabilities in 2013, its grim financial outlook, and its increasingly rapid financial deterioration. As a result, the Class had a direct financial interest in how Sears was being managed.

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 30 of 43

29

76.    The Class was in a position of inequality of power and knowledge vis-à-vis the defendants and was unable to exert any influence over their decisions. The Class had no legal right to influence or change conduct contrary to Sears' interests, and to the interests of its creditors and other stakeholders.

77.    The Class, in good faith, attempted to protect its interests, but the defendants ignored the Class' attempts.

(a)    On November 26, 2013, after the declaration of the 2013 Dividend but prior to its payment, counsel for the plaintiff in the Class Action wrote to counsel for Sears requesting assurances that, having regard to the assets, liabilities (existing and contingent) and actual and likely future operating losses of Sears, it had set aside a sufficient reserve to satisfy a judgment against Sears should the Class Action be certified and succeed on the merits.  No answer was provided.

(b)    On December 3, 2013, counsel for the plaintiff in the Class Action wrote to each Director to put them on notice that should Sears be unable to satisfy an eventual judgment against Sears in the Class Action, that each Director who authorized the 2013 Dividend may be jointly and severally liable with Sears for such damages. No answer was provided.

78.    The defendants ignored the Class' letters and paid the 2013 Dividend on December 6, 2013.

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 31 of 43

30

**The Hometown Dealers' Reasonable Expectations**

79.      At the time the Monetization Plan was being implemented and the 2013 Dividend
was issued, the Hometown Dealers were creditors of Sears with a claim of up to $100
million. As creditors, the Hometown Dealers' reasonable expectations were as follows:

(a)      the Directors would not cripple Sears' ability to pay the Hometown Dealers
by implementing and continuing the Monetization Plan and declaring the 2013
Dividend.

(b)      the Directors, the management of Sears, and the Primary Shareholders
would factor in its ability to pay the Hometown Dealers, as creditors, before
continuing with the Monetization Plan, and declaring and paying the 2013
Dividend;

(c)      the Directors, the management of Sears, and the Primary Shareholders
would not engage in the Monetization Plan by stripping Sears of its best assets and
selling Sears' crown jewels, and significantly erode its capitalization to the
disadvantage of Sears' creditors, including the Hometown Dealers;

(d)      the affairs of Sears would be conducted by the Defendants honestly, fairly
and in good faith, in relation to the interests of the Hometown Dealers, and in a
manner that did not unfairly prejudice or affect the Hometown Dealers' interests
as creditors; and,

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 32 of 43

31

(e)      the Directors would exercise care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances before the Directors implemented, and continued with, the Monetization Plan and declared the 2013 Dividend.

**The 2013 Dividend Provided No Value to Sears**

80.    The 2013 Dividend provided no value to Sears and solely benefited its direct and indirect shareholders, including ESL, Lampert and Harker.  The amounts of the gratuitous benefit received by them were:

(a)      ESL: $88,626,400;

(b)      Lampert: $52,165,440; and

(c)      Harker: $23,020.

81.    The Defendants also caused approximately $259 million to be paid to Holdings through the 2013 Dividend.

**Non-Arm's Length Dealings**

82.    At all material times:

(a)      Holdings was the controlling shareholder of Sears, was a related entity to Sears and was not dealing at arm's length with Sears;

32

(b)      ESL and Lampert exercised both *de facto* and *de jure* control over Holdings. As Holdings stated in its 2013 Annual Report, Lampert had "substantial influence over many, if not all, actions to be taken or approved by our stockholders"; and

(c)      ESL and Lampert were not dealing at arm's length with Sears as a result of their direct and indirect beneficial control position in Holdings, which in turn held a controlling interest in Sears. Further, Holdings, ESL and Lampert collectively held more than 75% of Sears' shares. ESL, Lampert and Holdings (at the direction of ESL and Lampert) acted in concert with respect to the control of Sears and specifically acted in concern and with a single mind to exercise influence over Sears in connection with the 2013 Dividend and the Monetization Plan.

83.      As a result of these relationships, each of Holdings, ESL, Lampert and Sears are related entities who are presumed not to have acted at arm's length in respect of the 2013 Dividend. ESL and Lampert used their position of control over Sears to direct and/or influence Sears and its directors to carry out the Monetization Plan and the 2013 Dividend.

**The Defendants' Actions were Oppressive and Unfairly Prejudicial to and Unfairly Disregarded the interests of the Plaintiff**

84.      The Defendants' actions in implementing the Monetization Plan and paying the 2013 Dividend were done for the purpose of denuding Sears of its prime assets and reducing its capitalization, and paying the funds from the realization of the assets to the

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 34 of 43

33

primary benefit of Holdings and ESL to the detriment of the Class. These actions were oppressive and unfairly prejudicial to and unfairly disregarded the interests of the Class.

85.    The 2013 Dividend was effected by the defendants for the primary purpose of satisfying the immediate financial needs of ESL and Lampert and in reckless disregard of the reasonable expectations of Sears' creditors, including the Class. The 2013 Dividend was made with the specific intention to prioritize the interests of Lampert, ESL, and Holdings over Sears' creditors, including the Class, and other stakeholders.

86.    In particular, considering the surrounding circumstances, the defendants knew but unfairly disregarded the fact that the 2013 Dividend would have a material adverse impact on its ability to continue as a viable business and pay its creditors, including the Class. In particular, the 2013 Dividend was:

(a)    a non-arm's length transaction made outside the usual course of business;

(b)    paid in the face of significant outstanding indebtedness to Sears' creditors, including the Class, in circumstances where:

i.    Sears had dwindling operating income to repay its debts, including to the Class and other creditors;

ii.    applying reasonable assumptions, the Board could only reasonably have expected Sears to be significantly cash flow negative from 2014 onwards;

18-23538-shl   Doc 3242-10   Filed 04/16/19   Entered 04/16/19 15:13:48   Exhibit J -
Fresh as Amended Statement of Claim amended April 9   2019   Pg 35 of 43

34

iii.    the Board had no real plan to repay such indebtedness;

iv.    Sears was aggressively liquidating its prime assets and would continue to do so in the future;

v.    Sears was experiencing growing, unsustainable operating losses each quarter and would continue to do so in the future;

vi.    the defendants Holdings and ESL were not prepared to allow Sears to commit the funds and resources necessary to implement a viable turnaround of Sears' operations, and that MacDonald and other executives had resigned as a result;

vii.    Sears was slashing its operating budget which would deprive it of the ability to effect a turnaround of its operations and would continue to do so in the future;

viii.    the Sears Hometown stores network was and would continue in the future to be abandoned by Sears. Every senior executive involved in the Sears Hometown store network either left the organization or would leave in the near future as a result of this abandonment and the growing despair of the independent dealer network; and

ix.    the class members, which are independent owner operators of Sears Hometown stores, were experiencing and would continue to

18-23538-shl   Doc 3242-10   Filed 04/16/19   Entered 04/16/19 15:13:48   Exhibit J -
Fresh as Amended Statement of Claim amended April 9   2019   Pg 36 of 43

35

experience massive, unsustainable losses which would lead to their financial demise.

(c)     paid in circumstances that raise a series of "red flags", including as a result of the following facts:

i.      the 2013 Dividend was declared with unusual haste and with no advance notice to the Board;

ii.     the 2013 Dividend was declared in the absence of proper Board materials and with a deficient corporate governance process;

iii.    the Board received no independent legal advice to properly discharge its duties with respect to a material transaction involving related parties: Holdings, ESL and Lampert;

iv.     the divestiture of Sears' crown jewel assets had an obvious negative impact on its business;

v.      Sears had not addressed its negative cash flows or operational challenges despite years of effort;

vi.     there were clear conflicts of interest within the Board and management at the time the 2013 Dividend was declared; and

vii.    the 2013 Dividend was driven by ESL, Lampert, Bird as Chief Financial Officer of Sears and Crowley and Harker as non-

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 37 of 43

36

independent directors of Sears in order to satisfy ESL's urgent need
for funds.

87.    In March of 2014, the Board was presented with a proposal for a further, more
modest dividend on short notice. The proposed dividend was not approved by the Board
due to concerns about Sears' financial position, only three months after the payment of the
2013 Dividend.

88.    At all material times, Holdings and ESL controlled and directed Sears and directed
the payment of the 2013 Dividend by Sears. The Directors voted for and consented to the
resolution authorizing the payment of the 2013 Dividend. The defendants have interfered
with the plaintiff's and the Class' rights as creditors of Sears.

89.    Specifically, by directing and authorizing Sears to pay the 2013 Dividend and its
other actions as described above, the defendants have:

    (a)    effected a result;

    (b)    carried on their business and affairs and those of Sears in a manner; and

    (c)    exercised their powers in a manner,

that was oppressive and unfairly prejudicial to and that unfairly disregarded the
interests of the Class, contrary to section 241 of the CBCA.

90.    The plaintiff and the Class are complainants under ss. 238(d) of the CBCA.

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 38 of 43

37

91.    The plaintiff pleads and relies on the CBCA, and particularly Part XX thereof.

**The Continuing Path Towards Insolvency**

92.    Following the payment of the 2013 Dividend on December 6, 2013, Sears continued aggressively down the path of winding-up operations in Canada and liquidating what remained of its valuable assets.

93.    Having received the 2013 Dividend and facing its own financial issues, on May 14, 2014, Holdings announced that it was exploring strategic alternatives for its shareholding in Sears, including a possible divestiture of its shares. Holdings retained the firm of Bank of America Merrill Lynch for this purpose.

94.    In May, 2014, Sears announced that it had sold its minority ownership interest in the Centre commercial Les Rivières shopping centre in Trois-Rivières, Quebec, for $33.5 million.

95.    In August, 2014, Sears announced that it had entered into an agreement to sell its interest in Kildonan Place, a shopping centre located in Winnipeg, for $33.5 million.

96.    In September, 2014, Sears announced that Campbell would resign as CEO by the end of the year.

97.    In October, 2014, Ronald Boire ("**Boire**") was named as Campbell's replacement as CEO.  Boire was Sears' third different CEO in just under two years.

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 39 of 43

38

98.    In November, 2014, Sears and JPMorgan Chase Bank, N.A. announced that their agreement relating to the Sears-branded credit card would terminate on November 15, 2015.

99.    In February, 2015, Sears released its financial results for the previous quarter and fiscal year. Sears suffered an operating loss of $154.7 million for the last quarter of 2014. For the 2014 fiscal year, Sears suffered an operating loss of $407.3 million.

100.    In March 11, 2015, Sears announced that it had entered into an agreement to sell and lease back three of its properties for $140 million. The locations include store space and adjacent property located at the Metropolis at Metrotown in Burnaby, British Columbia, Cottonwood Mall in Chilliwack, British Columbia and North Hill Shopping Centre in Calgary, Alberta.

101.    On May 20, 2015, Sears released its financial performance for the first quarter of 2015. Sears suffered a $59.1 million net loss for this quarter.

102.    On July 2, 2015, Boire announced that he would be leaving his position as CEO of Sears by the end of the 2015 summer.

103.    All of the Hometown Dealer stores have closed.

**Sears Enter CCAA Proceedings**

104.    On June 22, 2017 Sears and a number of its operating subsidiaries sought and obtained an initial order (as amended and restated on July 13, 2017, the "**Initial Order**"),

39

under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the

"CCAA") (collectively the "**CCAA Proceedings**").

105.    On July 18, 2017, as part of the CCAA Proceedings, the Court issued an order

approving an agreement and a process for the liquidation of inventory and FF&E at certain

initial closing Sears locations, which liquidation process is now complete.

106.    On October 13, 2017, as part of the CCAA Proceedings, the Court issued, among

other orders, an order approving an agreement and a process for the liquidation and the

inventory and FF&E at all remaining Sears retail locations, which liquidation commenced

shortly thereafter and is now completed.

107.    The liquidation of assets at Sears retail locations is now completed, all retail

locations are closed, and leases in respect of such locations have been disclaimed or

surrendered back to the landlord.

108.    All of the Hometown Dealers stores have closed and there will be available to the

creditors of Sears, including the Hometown Dealers, only pennies on the dollar after its

liquidation, a fate which was materially exacerbated by the Monetization Plan and the

issuance of the 2013 Dividend.

109.    Effective as of December 14, 2018, the Monitor, which had run a claims process in

the CCAA, entered into an amended and restated settlement agreement with the Class (the

"**Agreement**").    In the Agreement, the Monitor agreed that, in the event a Plan of

Arrangement to be filed by Sears in the CCAA Proceedings is implemented, the Class in

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 41 of 43

40

the Class Action would have a proven unaffected unsecured claim against Sears of $80,000,000.

110.    The Agreement will form part of the Plan of Arrangement. The Directors and ESL have each filed an indemnity claim in the CCAA proceedings and will be bound to the Plan of Arrangement, including the Agreement, if the Plan of Arrangement is approved.

111.    The plaintiff seeks to have this action proceed and be tried together with the following related actions:

(a)    Sears Canada Inc., by its Court-appointed Litigation Trustee, J. Douglas Cunningham, Q.C. v. ESL Investments Inc., et al. bearing Court File No. CV-18-006111214-00CL;

(b)    Morneau Shepell Ltd. in its capacity as administrator of the Sears Canada Inc. Registered Pension Plan v. ESL Investments Inc. et al., bearing Court File No. CV-18-00611217-00CL; and,

(c)    FTI Consulting Canada Inc., in its capacity as Court-appointed monitor in proceedings to the Companies Creditors Arrangement Act, RSC 1985, c. c-36 v. ESL Investments Inc. et al., bearing Court File No. CV-18-00611219-00CL.

18-23538-shl    Doc 3242-10    Filed 04/16/19    Entered 04/16/19 15:13:48    Exhibit J -
Fresh as Amended Statement of Claim amended April 9    2019    Pg 42 of 43

41

October 21, 2015

**SOTOS LLP**
Suite 1200 - 180 Dundas Street West
Toronto ON  M5G 1Z8

**David Sterns (LSO # 36274J)**
dsterns@sotosllp.com
**Andy Seretis (LSO # 57259D)**
aseretis@sotosllp.com

Tel:    416-977-0007
Fax:    416-977-0717

**BLANEY McMURTRY LLP**
Suite 1500 - 2 Queen Street East
Toronto, ON  M5C 3G5

**Lou Brzezinski  (LSO # 19794M)**
lbrzezinski@blaney.com
**Alexandra Teodorescu (LSO # 63889D)**
ateodorescu@blaney.com

Tel:    (416) 596-4279
Fax:    (416) 593-5437

Lawyers for 1291079 Ontario Limited

1291079 ONTARIO LIMITED     -and-          SEARS CANADA INC., et al.
Plaintiff                                          Defendants

Court File No. CV-19-617792-00CL

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

PROCEEDING COMMENCED AT MILTON

---

**FRESH AS AMENDED STATEMENT OF CLAIM**

---

| **SOTOS LLP** | **BLANEY McMURTRY LLP** |
|---|---|
| Suite 1200 - 180 Dundas Street West | Suite 1500 - 2 Queen Street East |
| Toronto ON  M5G 1Z8 | Toronto, ON  M5C 3G5 |
| | |
| **David Sterns (LSO # 36274J)** | **Lou Brzezinski  (LSO # 19794M)** |
| dsterns@sotosllp.com | lbrzezinski@blaney.com |
| **Andy Seretis (LSO # 57259D)** | **Alexandra Teodorescu (LSO # 63889D)** |
| aseretis@sotosllp.com | ateodorescu@blaney.com |
| | |
| Tel:    416-977-0007 | Tel:    (416) 596-4279 |
| Fax:    416-977-0717 | Fax:    (416) 593-5437 |

Lawyers for 1291079 Ontario Limited