# EXHIBIT K

Court File No.:    CV-18-00611219-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

B E T W E E N :

FTI CONSULTING CANADA INC.,
in its capacity as Court-appointed monitor in proceedings
pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. c-36

Plaintiff

and

ESL INVESTMENTS INC., ESL PARTNERS, LP, SPE I PARTNERS, LP, SPE MASTER I, LP,
ESL INSTITUTIONAL PARTNERS, LP, EDWARD S. LAMPERT, SEARS HOLDINGS
CORPORATION, WILLIAM HARKER and WILLIAM CROWLEY

Defendants

**AMENDED STATEMENT OF CLAIM**

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the *Rules of Civil Procedure*, serve it on the plaintiff's lawyer or, where the plaintiff does not have a lawyer, serve it on the plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days.  If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the *Rules of Civil Procedure*.  This will entitle you to ten more days within which to serve and file your statement of defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

TAKE NOTICE: THIS ACTION WILL AUTOMATICALLY BE DISMISSED if it has not been set down for trial or terminated by any means within five years after the action was commenced unless otherwise ordered by the court.

Date:  ~~December   19,   2018~~
**[DATE]**

Issued by  _____
                                    Local registrar

Address of   330 University Avenue
court office   7th Floor
                     Toronto, Ontario  M5G 1E6

TO:            **MCMILLAN LLP**
                   Brookfield Place
                   181 Bay Street, Suite 4400
                   Toronto ON M5J 2T3

                   **Wael Rostom**
                   Tel:     +1 416.865.7790
                   **Brett Harrison**
                   Tel:     +1 416.865.7932
                   **Tushara Weerasooriya**
                   Tel:     +1 416.865.7890
                   **Stephen Brown-Okruhlik**
                   Tel:     +1 416.865.7043
                   Fax:    +1 416.865.7048

                   wael.rostom@mcmillan.ca
                   brett.harrison@mcmillan.ca
                   tushara.weerasooriya@mcmillan.ca
                   stephen.brown-okruhlik@mcmillan.ca

                   Lawyers for Edward S. Lampert, ESL Investments Inc., and ESL Partners, LP

AND TO:     **POLLEY FAITH LLP**
                   The Victory Building
                   80 Richmond Street West, Suite 1300
                   Toronto, ON M5H 2A4

                   **Harry Underwood**
                   **Andrew Faith**
                   **Jeffrey Haylock**
                   **Sandy Lockhart**
                   Tel:     +1 416.365.1600
                   Fax:    +1 416.365.1601

                   hunderwood@polleyfaith.com
                   afaith@polleyfaith.com
                   jhaylock@polleyfaith.com
                   slockhart@polleyfaith.com

Lawyers for Edward S. Lampert, ESL Investments Inc., and ESL Partners, LP

AND TO:       **LENCZNER SLAGHT ROYCE SMITH GRIFFIN LLP**
Suite 2600
130 Adelaide Street West
Toronto ON M5H 3P5

**Peter J. Osborne**
Tel:     +1 416.865.3094
Fax:     +1 416.865.3974
**Matthew B. Lerner**
Tel:     +1 416.865.2940
Fax:     +1 416.865.2840
**Chris Kinnear Hunter**
Tel:     +1 416.865.2874
Fax     +1 416.865.2866
**Chris Trivisonno**
Tel:     +1 416.865.3059
Fax     +1 416.865.3707

posborne@litigate.com
mlerner@litigate.com
chunter@litigate.com
ctrivisonno@litigate.com

**Lawyers for Sears Holdings Corporation**


AND TO:       **CASSELS BROCK & BLACKWELL LLP**
Suite 2100, Scotia Plaza
40 King Street West
Toronto, Ontario M5H 3C2

**Mary Buttery**
Tel:     +1 604.691.6118
Fax:     +1 604.691.6120
**John Birch**
Tel:     +1 416.860.5225
**Natalie E. Levine**
Tel:     +1 416.860.6568
Fax:     +1 416.640.3207

mbuttery@casselsbrock.com
jbirch@casselsbrock.com
nlevine@casselsbrock.com

Lawyers for William (Bill) C. Crowley and William (Bill) R. Harker

AND TO:      **SPE I Partners, LP**
             1170 Kane Concourse, Suite 200
             Bay Harbor, FL, 33154
             U.S.A.


AND TO:      **SPE Master I, LP**
             1170 Kane Concourse, Suite 200
             Bay Harbor, FL, 33154
             U.S.A.


AND TO:      **ESL Institutional Partners, LP**
             1170 Kane Concourse, Suite 200
             Bay Harbor, FL, 33154
             U.S.A

**CLAIM**

1       The Plaintiff, FTI Consulting Canada Inc., in its capacity as Court-appointed monitor of
Sears Canada Inc. (**Sears**) in proceedings pursuant to the *Companies' Creditors
Arrangement Act*, RSC 1985, c. c-36 (the **CCAA**) (the **Monitor**) claims against the
Defendants:

(a)     a declaration that the transfer of funds to the Defendants, ESL Investments Inc.
(**ESL Investments**), ESL Partners, LP, SPE I Partners, LP, SPE Master I, LP,
ESL Institutional Partners, LP, ~~and~~ Edward S. Lampert (**Lampert**), Harker and
Sears Holdings Corporation (**Holdings**), by means of a dividend of $5.00 per
share paid by Sears on December 6, 2013 (the **2013 Dividend**):

(i)     was a transfer at undervalue for the purposes of section 96 of the
*Bankruptcy and Insolvency Act*, RSC, 1985, c. B-3 (the **BIA**), as
incorporated into the CCAA by section 36.1 thereof (the **Transfer at
Undervalue**); and

(ii)    is void as against the Monitor;

(b)     an order that the Defendants, either as parties to the 2013 Dividend or as privies
thereto, or both, shall jointly and severally pay to Sears the full amount of the
2013 Dividend, being approximately $509 million in total;

(c)     in the alternative, an order that the Defendants, either as parties to the 2013
Dividend or as privies thereto, or both, shall jointly and severally pay to Sears the
portion of the 2013 Dividend received by the Defendants, collectively;

(d)     in the further alternative, an order that each of the Defendants, either as parties
to the 2013 Dividend or as privies thereto, or both, shall pay to Sears the amount
of the 2013 Dividend that such Defendant received, or directly or indirectly
benefitted from;

(e)     pre and post-judgment interest in accordance with the *Courts of Justice Act*,
RSO 1990, c. C.43; and

(f)     costs of this action on a substantial indemnity basis.

## The Parties

2     Sears and its affiliate companies obtained protection under the CCAA on June 22, 2017,
and pursuant to section 11.7 of the CCAA, the Plaintiff was appointed as Monitor under
the Initial Order. On December 3, 2018, the Monitor obtained authorization from the
Court to bring this action.

3     The Defendant ESL Investments is a privately-owned hedge fund incorporated under
the laws of Delaware with its principal executive offices located at 1170 Kane
Concourse, Bay Harbor Islands, Florida. The Defendants ESL Partners, LP, SPE I
Partners, LP, SPE Master I, LP, and ESL Institutional Partners, LP (collectively, and
together with ESL Investments, **ESL**) are affiliates of ESL Investments.

4     The Defendant Lampert is an individual residing in Indian Creek, Florida. At all material
times, Lampert controlled ESL, and has served as ESL Investments' Chairman and
Chief Executive Officer since its creation in 1988.

5     The Defendant Holdings is a corporation incorporated under the laws of Delaware.
Holdings principal executive offices are located at 3333 Beverly Road, Hoffman Estates,

Illinois. *On October 15, 2018, Holdings filed for Chapter 11 protection from creditors with the United States Bankruptcy Court.*

6    ~~5~~ The Defendant William Crowley was a non-independent director of Sears from March 2005 to April 2015, including at the time the 2013 Dividend was approved by the Sears Board and paid to Sears' shareholders.

7    ~~6~~ The Defendant William Harker was a non-independent director of Sears from November 2008 to April 2015, including at the time the 2013 Dividend was approved by the Sears Board and paid to Sears' shareholders.

8    ~~7~~ At all material times, including on November 18, 2013 through to December 3, 2013, Lampert and ESL held a controlling ownership interest in Sears Holdings Corporation (**Holdings**) and beneficially owned 55% of Holdings' outstanding shares. In turn, at all material times, Holdings held a controlling ownership interest in Sears. ~~*On October 15, 2018, Holdings filed for Chapter 11 protection from creditors with the United States Bankruptcy Court.*~~ ~~Holdings is not a party to this action.~~

9    ~~8~~ At all material times, including on November 18, 2013 through to December 6, 2013, ~~Holdings and~~ each of the Defendants other than Crowley was a direct or beneficial shareholder of Sears, and held the following ownership interests:

(a)    Holdings beneficially owned 51,962,391 shares in Sears, representing approximately 51% of the outstanding shares~~.~~;

(b)    ESL beneficially owned 17,725,280 shares in Sears, representing approximately 17.4% of the outstanding shares, which were directly held as follows:

(i)    ESL Partners, LP: 15,821,206 shares;

(ii)    SPE I Partners, LP:  830,852 shares;

(iii)    SPE Master I, LP: 1,068,522 shares;

(iv)    ESL Institutional Partners, LP: 4,381 shares; and

(v)    CRK Partners, LLC (an affiliate of ESL Investments, Inc. that was voluntarily cancelled effective June 1, 2018 and is not a party to these proceedings): 319 shares;

(c)    Lampert owned 10,433,088 shares in Sears, representing approximately 10.2% of the outstanding shares; and

(d)    Harker owned 4,604 shares in Sears.

10    ~~9~~ In this action, the Monitor seeks a declaration that the 2013 Dividend was a transfer at undervalue pursuant to section 96 of the BIA (as incorporated into proceedings under the CCAA by section 36.1 thereof) and is therefore void as against the Monitor, and it seeks payment from the Defendants who were parties and/or privies to the Transfer at Undervalue.

## Sears' Operational Decline

11    ~~10~~ Beginning in 2011, Sears' financial performance began to decline sharply. According to Sears' publicly-disclosed audited annual financial statements for 2010 – 2013 (as amended, in certain cases), Sears' revenues, operating profits/losses and gross margin rates were as follows:

| Year | Total Revenues ($ million) | Operating Profit (Loss) ($ millions) | Gross Margin Rate |
|------|------|------|------|
| **2010** | 4,938.5 | 196.3 | 39.3% |
| **2011** | 4,619.3 | (50.9) | 36.5% |
| **2012** | 4,300.7 | (82.9) | 36.7% |
| **2013** | 3,991.8 | (187.8) | 36.2% |

12     ~~11~~ As early as 2011, Sears' management recognized that drastic, transformative action would be required for Sears to re-establish a foothold in the Canadian retail market. In the 2011 strategic plan (the **2011 Strategic Plan**) prepared for Sears' board of directors (the **Board**), then-Chief Executive Officer Calvin McDonald described the state of Sears as follows:

> Sears Canada is not a good retailer. Our business is broken: trading is awkward and inefficient, we lack product and merchandising focus and we are becoming irrelevant to customers while losing touch with our core.
>
> […]
>
> We lack many of the fundamental processes, structures and culture of a strong retailer. In short, we lack 'retail rhythm'. However, most of our challenges are self-induced, meaning we are in a position to fix them.

13     ~~12~~ The 2011 Strategic Plan also made clear that if transformative action was not taken, Sears could not expect to re-emerge as a successful retailer: "If we do not innovate, we will cease to be relevant." More directly, the 2011 Strategic Plan warned that "the current trajectory of growth and margin decline would take EBITDA into negative territory if we do not take drastic action."

14     ~~13~~ Notwithstanding the concerning operational trends identified in the 2011 Strategic Plan, Sears failed to take the necessary action to reinvigorate its business. Between

2011 and 2013, Sears consistently invested fewer resources on growth and
transformational initiatives relative to its industry peers. In particular, the Board rejected
multiple attempts by management, including in particular McDonald, to use Sears'
capital to revitalize its business.

### 2013 Plan to Dispose of Real Estate Assets to Fund Dividends

15    14 By 2013, ESL Investments and Lampert had an immediate need for cash from Sears.
ESL Investments had raised money from investors years earlier on terms that precluded
these investors from redeeming their investment for a period of time. In 2013, this
holding period had expired, investors were entitled to withdraw funds and ESL
Investments faced significant redemptions.

16    15 In order to satisfy its redemption obligations, ESL and Lampert devised a plan to
extract cash from Sears through (a) the disposition of its most valuable real estate
assets, and (b) the payment of an extraordinary dividend for the benefit of ESL and,
Lampert, and Holdings (collectively the **Monetization Plan**).

17    16 To give effect to the Monetization Plan, Lampert personally directed the disposition of
Sears' real estate assets in 2013. Lampert provided specific instructions to Sears on the
price sought by Sears for its dispositions.  The Monitor specifically denies Lampert's
public statement on  February 11, 2018:

> While I take no issue with the decisions that the board of Sears Canada
> made with regard to dividends and certain real estate sales, I have to
> emphasize that I have never served as a director or officer of Sears
> Canada, so I don't have firsthand knowledge of their internal deliberations
> and the alternatives considered.

18    17 At all materials times, Lampert directed and acted in concert with officers and
directors of Sears to implement the Monetization Plan, including in particular with
Crowley (then Chair of the Sears Board), Harker (then a director of Sears), and E.J. Bird

(then Chief Financial Officer of Sears).   Jeffrey Stollenwerck (then President, Real Estate Business Unit of Holdings) was also engaged by ESL and Lampert on these matters.   Lampert had a longstanding professional and personal relationship with each of them:

(a)    Crowley had acted as President and Chief Operating Officer of ESL Investments from January 1999 to May 2012, Executive Vice-President and Chief Administrative Officer of Holdings from September 2005 to January 2011 and Chief Financial Officer of Holdings for periods in 2005-2007;

(b)    Harker was an Executive Vice-President and General Counsel of ESL Investments from February 2011 to June 2012 and an officer of Holdings from September 2005 until August 2012, during which time he acted variously as General Counsel, Corporate Secretary and Senior Vice-President, among other roles;

(c)    Bird was the Chief Financial Officer of ESL Investments from 1991 until 2002; and

(d)    Stollenwerck was the President of the Real Estate Business Unit of Holdings from February 2008 to April 2018 and a Senior Vice President, Real Estate for Holdings from March 2005 to February 2008. Before joining Holdings, Stollenwerck had acted as Vice-President, Research at ESL Investments.

19    ~~18~~ In accordance with the Monetization Plan, Sears entered into an agreement with Oxford Properties Group on or about June 14, 2013 to terminate Sears' leases at Yorkdale Shopping Centre and Square One Mississauga in exchange for a payment to

Sears of $191 million (the **Oxford Terminations**). The Oxford Terminations closed June 24, 2013.

### September 2013 Board Presentations

20    ~~19~~ On September 23, 2013, two years after the 2011 Strategic Plan, the Board received a series of management presentations directly addressing Sears' deteriorating operational and financial performance (the **2013 Board Presentations**).  Among other things, the 2013 Board Presentations reported that:

(a)    sales continued to decline across Sears' business at a rate of 2.6% per year;

(b)    based on year-to-date current trends (and without appropriately accounting for stores closed in connection with the Monetization Plan),  Sears' projected EBITDA by 2016 would be negative $105 million; and

(c)    Sears was struggling operationally: "Basics not fixed".

21    ~~20~~ Earlier that month, Board presentations had also recognized that competition in the Canadian retail space was increasing with Target's entry into the market.  Target had opened 68 stores in Canada in the second quarter of 2013, and planned to open a further 124 stores in Canada by year end.

22    ~~21~~ Following the 2013 Board Presentations, the Board knew or ought to have known that Sears' business was in decline and that its long term viability was at risk.

### Continued Disposition of Real Estate Assets

23    ~~22~~ In accordance with the Monetization Plan, Sears pursued an agreement with Cadillac Fairview Corporation Limited (**Cadillac Fairview**) to terminate five additional high-value

leases (Toronto Eaton Centre, Sherway Gardens, Markville Shopping Centre, Masonville Place and Richmond Centre) (the **Cadillac Terminations**).

24   ~~23~~ Lampert directed the negotiating strategy in connection with the Cadillac Terminations with a view to ensuring a dividend of the proceeds before the end of 2013. Crowley and Stollenwerck negotiated directly with Cadillac Fairview, including with respect to the final price of $400 million.

25   ~~24~~ On October 28, 2013, the Board approved the Cadillac Terminations. The Board was not advised of the role that Lampert, Crowley or Stollenwerk had played in negotiating the Cadillac Terminations.  The Cadillac Terminations closed on November 12, 2013.

26   ~~25~~ In the same period, Sears and Stollenwerck negotiated the sale of Sears' 50% interest in eight properties jointly owned with The Westcliff Group of Companies. Sears' 50% interest was sold to Montez Income Properties Corporation in exchange for approximately $315 million (the **Montez Sale**).

27   ~~26~~ The Sears Board approved the Montez Sale on November 8, 2013.  The approval was made by written resolution and without an in-person board meeting.

28   ~~27~~ The Montez Sale closed in January 2014.

29   ~~28~~ The assets disposed of by Sears were its "crown jewels".  It was plain that the divestment of these key assets in 2013, while Sears was struggling in the face of stiffer retail competition from Target and others, would have a dramatic negative impact on Sears.  The negative impact in fact unfolded:

| Year | Total Revenues ($ million) | Operating Profit (Loss) ($ millions) | Gross Margin Rate |
|------|------|------|------|
| 2012 | 4,300.7 | (82.9) | 36.7% |
| 2013 | 3,991.8 | (187.8) | 36.2% |
| 2014 | 3,424.5 | (407.3) | 32.6% |
| 2015 | 3,145.5 | (298.3) | 31.8% |
| 2016 | 2,613.6 | (422.4) | 27.3% |

30    ~~29~~ Lampert directed Sears to complete each of the Oxford Terminations, the Cadillac Terminations and the Montez Sale. These dispositions were part of the Monetization Plan, and completed in order to provide ESL Investments with funds to address its redemption obligations.

### The 2013 Dividend

31    ~~30~~ On November 12, 2013, the same day Sears received $400 million in proceeds from the Cadillac Terminations, Crowley directed Bird to move forward with an extraordinary dividend of between $5.00 and $8.00 per share.

32    ~~31~~ On November 18 and 19, 2013, six days after the closing of the Cadillac Terminations, the Board held an in-person meeting (the **November Meeting**).  Although Sears had no business operations in the United States, the November Meeting was held in New York City at the offices of Wachtell, Lipton, Rosen & Katz (**Wachtell**), legal counsel to Holdings.

33    ~~32~~ The November Meeting began with a short pre-dinner discussion on November 18 and continued with a full day session on November 19, 2013.

34     ~~33~~ During the short pre-dinner discussion on November 18, 2013, the Board unanimously resolved to declare the 2013 Dividend, an extraordinary dividend of $5.00 per common share, for an aggregate dividend payment of approximately $509 million.

35     ~~34~~ The circumstances surrounding the 2013 Dividend raise a series of red flags.

### *Lack of Notice to the Board*

36     ~~35~~ The Board had no advance notice that it would be asked to consider an extraordinary dividend at the November Meeting.

37     ~~36~~ On Friday November 15, 2013, the Board was provided with a package of material for the November Meeting (the **Board Materials**).  The Board Materials included a detailed agenda with 15 separate items for the Board to consider during the November Meeting.

38     ~~37~~ Neither the agenda nor any of the other Board Materials made any reference to the fact that the Board would be asked to consider an extraordinary dividend or any dividend at all.  Moreover, the possible payment of a dividend had not been tabled in any prior Board meeting in 2013.

### *Lack of Information*

39     ~~38~~ The Board was not provided with the information necessary to assess the appropriateness of an extraordinary dividend.

40     ~~39~~ Unlike past instances in which the Board was asked to consider an extraordinary dividend, the Board Materials did not contain any financial or operational information regarding the payment of a proposed dividend.  The Board did not receive:

(a)     any written materials regarding a proposed dividend or possible dividend structures;

(b)     any written presentation analyzing the impact the proposed dividend would have on Sears' business, including taking into account possible downside scenarios; or

(c)     any *pro forma* assessment of Sears' liquidity and cash flows following the payment of a dividend.  Rather, the *pro forma* cash flows included in the Board Materials assumed that no dividend would be paid in either 2013 or 2014.

41      40 While Sears' management had identified the need to provide the Board with various cash flow analyses covering various dividend scenarios, the limited analysis that was done by management was incomplete and never presented to the Board.

42      41 Moreover, and unlike past meetings in which the Board had considered extraordinary dividends:

(a)     management did not prepare a written presentation to the Board on the proposed dividend and there was no written recommendation or proposal from management to the Board; and

(b)     the directors were not provided with legal advice with respect to their duties in connection with the declaration of a dividend.

### *Financial Uncertainty*

43      42 On November 12, 2013, prior to the November Meeting, the Board received a financial update on the performance of Sears.  Management reported that throughout the first three quarters of the year, Sears had negative net income of $49 million ($27

million worse than the same period in 2012) and negative total cash flow of $26.3 million.

44    43 On November 14, 2013, the Investment Committee of Sears' Board was presented with material showing an estimated pension plan deficiency of $313 million at December 2013. The members of the Investment Committee were Crowley, Harker and Bird.  This fact was not presented to the Board at the November Meeting.

45    44 In advance of the November Meeting, the Board was provided with only high level *pro forma* cash flows for 2014.  The cash flows were based on a 2014 Plan EBITDA of $135 million, of which $118 million was based on aspirational changes to the business that management hoped would result in financial improvement but that management and the Board should have known were unreasonably optimistic. Moreover, the *pro forma* cash flows presented to the Board assumed the receipt of proceeds of the Montez Sale even though the transaction had not closed.  Again, no information was provided to the Board on the impact an extraordinary dividend would have on future investment opportunities and future cash flows.

46    45 The Board Materials did however include two analyst reports, both of which reviewed the financial circumstances of Sears and predicted its eventual failure:

> **Desjardins Capital Markets Report (October 30, 2013)**
>
> As long as consumers do not perceive that Sears Canada is going out of business and desert it, Sears may be able to manage its demise slowly
>
> over time, selling prime and non-core assets, and waiting for the elusive
>
> purchaser of 60–80 store locations to appear.

**CIBC Report (November 4, 2013)**

It is possible that SCC will simply operate its way into irrelevance, gradually selling off stores to stem the cash drain. That strategy would likely result in Sears occasionally cutting a special dividend cheque to all shareholders, not the worst way to create shareholder value. But that is dangerous to the operations, particularly as the primary, and most profitably flagship stores are vended.

### *A Conflicted Board*

47    46  The 2013 Dividend was approved by the Board unanimously and without any abstentions.

48    47  Crowley and Harker participated in the Board's deliberations to pay the 2013 Dividend and approved the payment of the 2013 Dividend despite the fact that Sears had specifically determined that:

(a)    Crowley and Harker were not "independent" directors; and

(b)    pursuant to National Instrument 52-110, Crowley and Harker had a material relationship with Holdings and/or ESL that could "be reasonably expected to interfere with the exercise of [their] independent judgment."

49    48  Further, Crowley did not disclose to the Board that he, Lampert and Stollenwerck were personally involved in the 2013 real estate divestitures or that the timetable and size of the proposed dividend was dictated by ESL Investment's need for funds. Rather, the Board was led to believe that Sears' management was responsible for the 2013 real estate divestures. For example, Crowley expressly advised the independent members of the Board:  "I do not think that the Board or the independents should attempt to insert themselves in the negotiations [of real estate transactions].  Bill [Harker] and I did not and do not do that."

50    49 Crowley and Harker in particular were focused on the interests of ESL and Lampert.
Crowley and Harker failed to disclose the motivations of ESL and Lampert to the Board
and the fact that both the real estate dispositions and 2013 Dividend were driven by the
needs of ESL and Lampert, and not the best interests of Sears.

***Departure from Past Governance Practices***

51    50 The Board process for the 2013 Dividend represented a sharp departure from past
practice of the Sears Board and ordinary standards of good corporate governance.

52    51 For example, in December 2005, the Board approved an extraordinary dividend. The
process for approving that dividend included:

(a)    multiple Board meetings on September 7, 2005, September 14, 2005, and
December 2, 2005 to discuss the merits and risks of a potential dividend in light
of the company's operational needs;

(b)    multiple oral presentations from management and a dividend recommendation
by the Chief Financial Officer;

(c)    separate meetings between the independent directors of Sears and the Chief
Financial Officer to assess the company's financial state;

(d)    legal advice from both in-house and external counsel to the Board; and

(e)    review by the Board of draft press releases and an officer's certificate with
respect to the dividend.

53    52 In May 2010, the Board approved another extraordinary dividend, again with the
benefit of a robust process:

(a)    multiple meetings of the Board on April 23, 2010, May 7, 2010, and May 18,
2010 to discuss the merits and risks of a potential dividend in light of the
company's operational needs;

(b)    separate meetings of the independent directors on May 7, 2010 and May 12,
2010, with their own counsel present, to discuss the options available to Sears
with respect to its excess cash and the amount of the potential dividend in light
of the company's operational needs;

(c)    multiple presentations by management, including a 40-page presentation dated
April 23, 2010 and a subsequent 20-page presentation dated May 7, 2010,
providing detailed analyses of excess cash and financial forecasts (with
downside scenarios) for multiple dividend options;

(d)    a dialogue between management and the Board continuing over several
meetings with respect to various options for a potential dividend;

(e)    consideration of multiple potential uses for excess cash, including cash dividends
in various amounts, a substantial issuer bid and a normal course issuer bid; and

(f)    a deferral of half the proposed dividend pending a full assessment of the
company's operational needs.

54    53 In September 2010, the Board approved a second extraordinary dividend for 2010.
The process for approving that dividend included:

(a)    multiple meetings of the Board on or around August 23, 2010 and September 10,
2010 to discuss the capital structure of the company and the merits and risks of
a potential dividend in light of the company's operational needs;

(b)     multiple presentations by management, including a "capital structure update" dated August 3, 2010 and a 32-page presentation assessing the capital structure of the company and potential dividend options, including financial forecasts and downside scenarios, which the Board reviewed in advance of approving the dividend; and

(c)     a separate meeting of the independent directors on or around September 8, 2010, with their own counsel present, to discuss the options available to Sears with respect to its excess cash and the amount of the potential dividend in light of the company's operational needs.

55     54 In December 2012, the Board approved a smaller extraordinary dividend. While not as fulsome as previous governance processes, the process for approving the 2012 dividend nonetheless included:

(a)     a meeting on December 12, 2012 which included thorough discussion and analysis of the impact of a potential dividend on available cash, EBITDA and total debt, the company's need to retain cash for operational uses, and downside scenarios in respect of a possible dividend;

(b)     a report entitled "Dividend Discussion" which was prepared by Sears' Chief Financial Officer and which the Board reviewed in advance of approving the dividend; and

(c)     a review of the draft officer's certificate with respect to the dividend by external counsel to the independent directors, and a dialogue with the Chief Financial Officer of Sears addressing counsel's comments.

56    55 In stark contrast, the 2013 Dividend was the first item of business at a pre-dinner discussion at the outset of the November Meeting and was declared without any adequate financial, operational or cash flow information upon which to exercise proper business judgment.  It was dealt with before any of the planned presentations to the Board, which addressed Sears' financial results, or the reports on management priorities, asset valuations, operating efficiency and Sears' 2014 financial plan and without the benefit of any independent legal advice regarding the directors' duties in the circumstances.

57    56 The Board's inability to make a proper business decision in respect of the 2013 Dividend was apparent from the fact that one of the Board members, Ronald Weissman, had been appointed to the Board that day.  Weissman, a resident of Texas, had no material prior dealings with Sears or knowledge of Sears' financial or operational circumstances upon which to base his decision to approve the 2013 Dividend.

## The 2013 Dividend is a Transfer at Undervalue and Void

### A Transfer at Undervalue

58    57 The 2013 Dividend provided no value to Sears and solely benefited its direct and indirect shareholders, including the Defendants Holdings, ESL, Lampert and Harker. The amounts of the gratuitous benefit received by the Defendants were:

(a)    Holdings: $259,811,955;

(b)    (a) ESL : $88,626,400;

(c)    (b) Lampert: $52,165,440; and

(d)    (c) Harker: $23,020.

58    ~~The Defendants also caused approximately $259 million to be paid to Holdings through the 2013 Dividend.~~

### Non-Arm's Length Dealings

59    At all materials times:

(a)    Holdings was the controlling shareholder of Sears, was a related entity to Sears, and was not dealing at arm's length with Sears;

(b)    ESL and Lampert exercised both *de facto* and *de jure* control over Holdings.  As Holdings stated in its 2013 Annual Report, Mr. Lampert had "substantial influence over many, if not all, actions to be taken or approved by our stockholders"; and

(c)    ESL and Lampert were not dealing at arm's length with Sears as a result of their direct and indirect beneficial control position in Holdings, which in turn held a controlling interest in Sears. Further, Holdings, ESL and Lampert collectively held more than 75% of Sears' shares.  ESL, Lampert and Holdings (at the direction of ESL and Lampert) acted in concert with respect to the control of Sears, and specifically acted in concert and with a single mind to exercise influence over Sears in connection with the 2013 Dividend and the Monetization Plan.

60    As a result of these relationships, each of Holdings, ESL, Lampert, and Sears are related entities who are presumed not to have acted at arm's length in respect of the 2013 Dividend.  ESL and Lampert used their position of control over Sears to direct and/or influence Sears and its directors to carry out the Monetization Plan and the 2013 Dividend.

**_Intention to defraud, defeat or delay Sears' creditors_**

61    The 2013 Dividend was effected by Sears for the sole purpose of satisfying the immediate financial needs of ESL Investments and Lampert, and in reckless disregard of the interests of Sears' creditors. The 2013 Dividend was made with the specific intention to prioritize the interests of Lampert and ESL over Sears' creditors and other stakeholders.

62    In particular, considering the surrounding circumstances, Sears knew but recklessly disregarded the fact that the 2013 Dividend would have a material adverse impact on its ability to continue as a viable business and pay its creditors. In particular, the 2013 Dividend was:

   (a)    a non-arm's length transaction made outside the usual course of business;

   (b)    paid in the face of significant outstanding indebtedness to Sears' creditors, including pensioners, in circumstances in which:

      (i)    Sears had no operating income to repay its debts, including to its pensioners and other creditors;

      (ii)    applying reasonable assumptions, the Board could only reasonably have expected Sears to be significantly cash flow negative from 2014 onwards; and

      (iii)    the Board had no real plan to repay such indebtedness;

   (c)    paid in circumstances that raise a series of "red flags", including as a result of the following facts:

(i) the 2013 Dividend was declared with unusual haste and with no advance notice to the Board;

(ii) the 2013 Dividend was declared in the absence of proper Board materials and with a deficient corporate governance process;

(iii) the Board received no independent legal advice to properly discharge its duties with respect to a material transaction involving related parties: Holdings, ESL and Lampert;

(iv) the divestiture of Sears' crown jewel assets had an obvious negative impact on its business;

(v) Sears had not addressed its negative cash flows or operational challenges despite years of effort;

(vi) there were clear conflicts of interest within the Board and management at the time the 2013 Dividend was declared; and

(vii) the 2013 Dividend was driven by Lampert, Bird as Chief Financial Officer of Sears, and Crowley and Harker as non-independent directors of Sears, in order to satisfy ESL Investments' urgent need for funds.

63    In March of 2014, the Board was presented with a proposal for a further, more modest dividend on short notice. The proposed dividend was not approved by the Board due to concerns about Sears' financial position, only three months after the payment of the 2013 Dividend.

64      Sears knew or recklessly disregarded the fact that the 2013 Dividend would defraud, defeat or delay Sears' creditors. Shortly after the 2013 Dividend, Crowley supported further dividends in an email to Harker, stating:

> "… we cannot hold cash because we may watch the business spiral down and do nothing…. Keeping the cash to fund a dying business does not make sense."

65      The Transfer at Undervalue effected by means of the 2013 Dividend is therefore void as against the Monitor within the meaning of section 96 of the BIA.

### ESL, Lampert, Crowley and Harker are Liable as Privies

66      The Defendants ESL, Lampert, Crowley and Harker were privies to the Transfer at Undervalue and are liable to Sears.

67      None of ESL, Lampert, Crowley or Harker was dealing at arm's length with Holdings or Sears.  Each of them knew that the 2013 Dividend would benefit ESL and Lampert, and each of them sought to cause or confer that benefit.  Further, each of them received either a direct or indirect benefit from the 2013 Dividend.

### Director Indemnities

68      In order to preserve any indemnity rights Harker or Crowley may have against Sears, the Monitor will agree that any recoveries received from Harker or Crowley in connection with this claim will be reduced by the amount of any distribution that Harker or Crowley, respectively, would have received on account of an unsecured indemnity claim from the Sears estate. The purpose of this adjustment is to make Harker and Crowley whole for any such indemnity claims while not requiring the Sears estate to reserve funds for such indemnity claims.

**Service Ex Juris, Statutes Relied Upon, and Location of Trial**

69    The Monitor is entitled to serve Holdings, SPE I Partners, LP, SPE Master I, LP, and ESL Institutional Partners, LP without a court order pursuant to rule 17 of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194, because the claim is authorized by statute to be made against a person outside Ontario by a proceeding commenced in Ontario (Rule 17.02(n)).

70    The Monitor pleads and relies on the BIA and the CCAA.

71    The Monitor proposes that the trial of this matter be heard in Toronto, Ontario.

December 19, 2018[DATE]                        **Norton Rose Fulbright Canada** LLP
                                               Royal Bank Plaza, South Tower, Suite 3800
                                               200 Bay Street, P.O. Box 84
                                               Toronto, Ontario  M5J 2Z4  CANADA

                                               **Orestes Pasparakis, LSO#: 36851T**
                                               Tel:    +1 416.216.4815
                                               **Robert Frank LSO#: 35456F**
                                               Tel:    1 416.202.6741
                                               **Evan Cobb, LSO#: 55787N**
                                               Tel:    +1 416.216.1929
                                               Fax:    +1 416.216.3930

                                               orestes.pasparakis@nortonrosefulbright.com
                                               robert.frank@nortonrosefulbright.com
                                               evan.cobb@nortonrosefulbright.com

                                               Lawyers for FTI Consulting Canada Inc.,
                                               as Court-Appointed Monitor

| FTI Consulting Canada Inc.,<br>in its capacity as Court-appointed monitor | and | ESL Investments Inc. *et al*. | Court File No.:  CV-17-11846-00CL |
| :---: | :---: | :---: | :---: |
| Plaintiff | | Defendants | |

|  | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br><br>Proceeding commenced at TORONTO |
| --- | --- |
|  | **STATEMENT OF CLAIM** |
|  | **NORTON ROSE FULBRIGHT CANADA LLP**<br>Royal Bank Plaza, South Tower<br>200 Bay Street, Suite 3800, P.O. Box 84<br>Toronto, Ontario  M5J 2Z4<br><br>**Orestes Pasparakis, LSO#: 36851T**<br>Tel:    +1 416.216.4815<br>**Robert Frank LSO#: 35456F**<br>Tel:    1 416.202.6741<br>**Evan Cobb, LSO#: 55787N**<br>Tel:    +1 416.216.1929<br>Fax:    +1 416.216.3930<br><br>orestes.pasparakis@nortonrosefulbright.com<br>robert.frank@nortonrosefulbright.com<br>evan.cobb@nortonrosefulbright.com<br><br>Lawyers to FTI Consulting Canada Inc.,<br>as Court-Appointed Monitor |

CAN_DMS: \1231629849 7171