Hearing Date: April 18, 2019
Time: 10:00 a.m.

Edward M. Fox
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 218-4646
Facsimile: (917) 344-1339
Email: emfox@seyfarth.com

*Attorneys for Wilmington Trust, National Association,
as indenture trustee and collateral agent*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SEARS HOLDINGS CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 18-23538 (RDD)<br><br>(Jointly Administered) |

**REPLY IN FURTHER SUPPORT OF THE MOTION OF WILMINGTON
TRUST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE AND
COLLATERAL AGENT TO PROHIBIT OR CONDITION DEBTORS'
CONTINUED USE OF COLLATERAL, INCLUDING CASH COLLATERAL**

Wilmington Trust, National Association, as indenture trustee ("Wilmington Trust") for the

6-5/8% Senior Secured Notes due 2018 (the "2010 Notes") issued by Sears Holdings Corporation

("Sears"), and as collateral agent, by its undersigned attorneys, files this Reply in Further Support of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365) (collectively, the "Debtors"). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

56308761v.1

the Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, including Cash Collateral (the "Reply"),[2] and in support thereof states as follows:

## INTRODUCTION

1. In an attempt to whistle past the graveyard of administrative insolvency by paying administrative expenses using Cash Collateral in which the holders of Prepetition Second Lien Obligations[3] have an interest, the Debtors cherry pick certain provisions of the Final DIP Order to claim that they are fully compliant with the terms of the Final DIP Order despite the fact that that is clearly not the case.

2. The Debtors take the position that they are entitled to the benefit from provisions of the Final DIP Order which can no longer be enforced against them, while claiming they can ignore the provisions of the Final DIP Order with which they can no longer comply.

3. Indeed, the Debtors seem to argue that they can spend Cash Collateral as they wish, even in violation of the Final DIP Order, not because the Final DIP Order allows them to, but because the Final DIP Order does not give the Holders of Prepetition Second Lien Obligations the ability to stop the Debtors from doing so.

4. Ultimately, however, the Debtors' Objection is an exercise in wishful thinking. The Debtors hope to continue to use Cash Collateral without following the constraints of the Final DIP Order and without otherwise adequately protecting the interests of the Holders of the Prepetition Second Lien Obligations, even if that means they will ultimately have to address the Superpriority

---

[2] By agreement between Wilmington Trust and the Debtors, the time for the Debtors to file the Debtors' Objection to Motion of Wilmington Trust, National Association, as Indenture Trustee (the "Objection") was extended to April 15, 2019 at 3:00 p.m. and the time for Wilmington Trust to file this Reply was extended to April 17, 2019 at 4:00 p.m.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion of Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent to Prohibit or Condition Debtors' Continued Use of Collateral, Including Cash Collateral (the "Motion").

2

56308761v.1

administrative expense claims of the Holders of the Prepetition Second Lien Obligations, because they would prefer Section 507(b) litigation tomorrow to administrative insolvency today. The reality, however, is that the Court can, and, indeed, must, enforce the Final DIP Order to insure that the Final DIP Order is complied with and the Holders of Prepetition Second Lien Obligations are adequately protected from any continued use of Cash Collateral, for which there is presently no adequate protection.

## ARGUMENT

### A.   The Court May Enforce the Terms of the Final DIP Order

5.     The Debtors argue that the Final DIP Order remains in effect because a Termination Date under the Final DIP Order has not yet occurred. Thus, despite the fact that an Event of Default,[4] which constitutes a Termination Event, appears to have occurred by virtue of the Debtors' failure to reach actual agreement with the DIP ABL Agent and the DIP ABL Co-Collateral Agents over an extension of the Approved Budget, the Debtors argue that Wilmington Trust can do nothing because the Final DIP Order provides that

> upon the occurrence and during the continuation of a Termination Event, with no further action of the Court, the DIP ABL Administrative Agent may . . . notify the DIP ABL Loan Parties, the Junior DIP Agent and the Creditors committee in writing that a Termination Event has occurred and is continuing . . . .

Final DIP Order ¶ 34(a).

6.     This provision of the Final DIP Order merely authorizes the DIP ABL Agent to provide a Termination Notice without further action of the Court. Nothing in the Final DIP Order

---

[4] An Event of Default is as defined in the DIP ABL Loan Documents. Pursuant to Section 7.01(c)(i) of the DIP ABL Credit Agreement, see Fox Dec'l Ex. A, 955-2 pg. 123 of 161, the failure of any Loan Party (as defined in the DIP ABL Credit Agreement) to "comply (i) in all respects . . . with all of the requirements and obligations set forth in the Financing Orders . . . ." constitutes an Event of Default. Fox Dec'l Ex. A, 955-2 pg. 117 of 161. The term "Financing Orders" includes the "Final Financing Order" as defined in Section 1.01 of the DIP ABL Credit Agreement, which is the DIP ABL Order.

3

56308761v.1

prohibits Wilmington Trust, or any other party, from asking the Court to enforce its own order, which the Court is always free to do. *Bank of America, N.A. v. Wilmington Trust FSB*, 943 F. Supp. 2d 417, 424 (S.D.N.Y. 2013 ("As the Second Circuit held in *In re Millenium Seacarriers, Inc.*, 'Bankruptcy courts retain jurisdiction to enforce and interpret their own orders.' 419 F.3d 83, 97 (2d Cir. 2005); see also *In re Gen. Growth Props., Inc.*, 460 B.R. 592, 598 (Bankr. S.D.N.Y. 2011) ('A bankruptcy court always has jurisdiction to interpret its own orders. . . .'")

### B. The Debtors May Only Expend Cash Collateral In Accordance With the Approved Budget

7. The Debtors also argue that "Wilmington Trust's reliance on an Approved Budget as a condition to use of Cash Collateral is incorrect" because Wilmington Trust "had no rights to enforce the Approved Budget." Objection ¶ 9.

8. The fact that the Final DIP Order may not have authorized Wilmington Trust to provide a Termination Notice without further action of the Court, however, does not mean that the Debtors are free to ignore the terms of the Final DIP Order or that the Court cannot enforce the Final DIP Order.

9. The Debtors also assert that "the Approved Budget was only to be a condition for use of the DIP ABL Facility," Objection ¶ 9, but that assertion is manifestly incorrect. The second decretal paragraph of the Final DIP Order provides:

> 2. Use of Prepetition ABL Collateral Approved. Subject to and consistent with the terms of the DIP ABL Loan Documents, the DIP Orders, and the Approved Budget, the DIP ABL Loan Parties are hereby authorized to use the Prepetition ABL Collateral (including Cash Collateral) until the Termination Date to the extent set forth herein . . . .

Final DIP Order ¶ 2. This provision clearly relates to the use of Cash Collateral, and makes clear that the Debtors' compliance with the Approved Budget was not just a condition to use of the DIP ABL Facility. Indeed, if the Debtors are correct that the Second Decretal Paragraph of the Final

4

56308761v.1

DIP Order only related to conditions for use of the DIP ABL Facility, and not also to the Debtors' use of Cash Collateral, then the Final DIP Order does not provide any authorization for the Debtors to use Cash Collateral under any circumstances because there is no other operative decretal paragraph in the Final DIP Order authorizing the Debtors to do so.

10. Although the Debtors assert that "prior to the closing of the Sale Transaction and satisfaction of the DIP Facilities, the Debtors continued to provide updated budgets to the DIP Agents (which then became Approved Budgets) as well as other DIP reporting," Objection ¶ 10, the Debtors do not allege that these "updated budgets" were actually agreed to by the DIP ABL Agent and each DIP ABL Co-Collateral Agent, or otherwise explain how they "then became Approved Budgets." Objection ¶ 10.[5]

11. The Debtors then assert that although the Prepetition Second Lien Agents have reporting and information rights under the Final DIP Order equivalent to those granted to the DIP ABL Agents, they do not have the "comprehensive suite of testing and enforcement rights provided to the DIP ABL Agents in the Final DIP Order" and "should not be permitted to modify a reporting requirement into a condition to use Cash Collateral.

12. Wilmington Trust is doing no such thing, however. It is simply asking the Court to enforce the Final DIP Order in accordance with its terms as written and agreed to by the Debtors.

---

[5] The Debtors and Wilmington Trust agreed that

> The factual issue of whether the DIP ABL Agent and the DIP ABL Co-Collateral Agents agreed to any extension of the Approved Budget for any period after February 16, 2019 up to, and including, March 16, 2019, and any remedy available to Wilmington Trust as a result of any unauthorized use of cash collateral if the DIP ABL Agent and the DIP ABL Co-Collateral Agents did not so agree, will not be litigated at the hearing on the Motion on April 18, 2019, but will be reserved for the following omnibus hearing date.

Because the Debtors nevertheless asserted in their Objection that "the Debtors continued to provide updated budgets to the DIP Agent (which then became Approved Budgets)," Objection ¶ 10, it is worth noting that those "updated budgets," which are referred to in Paragraph 22(a) of the Final DIP Order as "Rolling Budget[s]" do not automatically become Approved Budgets. Moreover, each Rolling Budget, the last of which prior to the sale on February 11, 2019, was dated January 30, 2019, is labeled "Draft for Discussion Purposes Only and Subject to Change."

5

13. Of course, Wilmington Trust is fully entitled to seek the relief requested in the Motion at any time. 11 U.S.C. § 363(e) provides:

> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest . . . .

11 U.S.C. § 363(e).

14. As Collier explains:

> [T]he requirement of adequate protection in section 363(e) is mandatory. If adequate protection cannot be offered, such use, sale or lease of the collateral must be prohibited . . . [I]f a trustee seeks to use cash collateral and cannot obtain the consent of the entity with an interest in the collateral, adequate protection must be furnished before the cash collateral may be used . . .

3 Collier on Bankruptcy, ¶ 363.05[2] (R. Levin & H. Sommer eds.), 16th ed.

15. In any hearing under Section 363(e), "the trustee has the burden of proof on the issue of adequate protection." 11 U.S.C. § 363(P)(1).

16. Consequently, the Debtors' assertion that the Final DIP Order prohibits Wilmington Trust from seeking relief in the Motion is incorrect as a matter of law. *In re Hollie*, 42 B.R. 111 (Bankr. M. D. Ga. 1984 ("Congress recognized that adequate protection must be judged on the facts that exist at any given time during the reorganization process and not just as of the bankruptcy filing." Id.); see *In re Alchar Hardware*, 73 F.2d 1386, 1989 (1984) (11th Cir. 1984) ("Section 363(e) allows the owner of property that is to be sued by the trustee to petition the court "at any time" and allows the court to condition or prohibit such use "as is necessary" to provide adequate protection, which clearly indicates the bankruptcy court's determination is not static." Id.).

17. The Debtors are manifestly attempting to use Cash Collateral to pay administrative expenses in order to claim administrative solvency so that they will be able to satisfy the

6

56308761v.1

requirement of 11 U.S.C. § 1129(a)(9) to confirmation of a plan. The end result, however, will be to increase the superpriority claims of the Holders of the Prepetition Second Lien Claims against the Debtors' estates. While the Debtors may prefer litigation under 11 U.S.C. § 507(b) concerning the amount of those claims to a current inability to satisfy Section 1129(a)(9), the Holders of the Prepetition Second Lien Obligations are entitled to adequate protection of their property rights now, rather than litigation claims in the future. Consequently, although the Debtors may, for whatever reason, wish to take a chance on Section 507(b) litigation or avoid use of the proceeds of the Wind Down Account, their desires do not give them license to engage in the unauthorized use of Cash Collateral or to leave the Holders of Prepetition Second Lien Obligations without adequate protection.

### C.  Wilmington Trust Has Standing To Bring The Motion

18. The Debtors assert that Wilmington Trust has "questionable standing" to bring its Motion because of its "deeply subordinated and almost certainly unsecured position as of the Commencement Date." Objection ¶ 5.

19. It is more than a little disingenuous for the Debtors to now assert that the Prepetition Second Lien Collateral Agent and Prepetition Second Lien 2010 Indenture Trustee lacks standing to ask the Court to enforce an order which was entered at the Debtors' request for the very benefit of the Prepetition Second Lien Collateral Agent and the Prepetition Second Lien 2010 Indenture Trustee, and the Debtors should be estopped from even making such an argument in response to the Motion.

20. Moreover, Wilmington Trust clearly has standing to bring the Motion. As the Amended and Restated Security Agreement, which the Debtors annexed as Exhibit B to their Objection, shows, Wilmington Trust, as Prepetition Second Lien Collateral Agent, is the secured

7

party under the Security Agreement for the benefit of the Holders of all of the Prepetition Second Lien Obligations. Consequently, whether the 2010 Notes were, as the Debtors feebly claim, "almost certainly unsecured" as of the Commencement Date, Objection ¶ 5, is irrelevant to the Motion, which Wilmington Trust was clearly entitled to bring in its capacity as the Prepetition Second Lien Collateral Agent.

21. Moreover, the Debtors' use of its own hearsay Borrowing Base Certificate to establish the value of the Collateral is nonsensical.

22. First, the Collateral consists of more than just inventory, including credit card receivables and proceeds, neither of which is listed in the Borrowing Base Certificate. According to the Schedule of Assets and Liabilities (the "Schedules") for Sears Roebuck and Co. (("SR"), SR had $99,523,903 of Accounts Receivable, and at least $50,30,743 of "Credit Card Deposits in Transit" at the Petition Date. SR Schedules [Dkt. No. 1711] at page 30 of 1461. According to the Schedules for Kmart Corporation ("Kmart"), Kmart had $69,467,489 of Accounts Receivable and $13,966,578 of Credit Card Deposits in Transit at the Petition Date. Accordingly, based on the Debtors own analysis, and taking into account the smallest amount of credit card receivables listed in the schedules of SR and Kmart, the 2010 Notes were secured by at least $64,268,321 of value at the Petition Date, and appear to have been oversecured.

23. Moreover, the Borrowing Base Certificate lists only "Sears" and "Kmart", yet there are 29 Debtor entities which are grantors under the Security Agreement, many of which, in addition to SR and Kmart, had substantial inventory and receivables as of the Petition Date, according to their schedules.

8

56308761v.1

24. In addition, the Borrowing Base Certificate is based on Net Orderly Liquidation Value, or "NOLV", only 87.5% of which counted towards the Borrowing Base. See Fox Dec'l Ex. A, 955-2 at Pg. 14 of 161 (ABL Credit Agreement at 8).

25. As of the Petition Date, however, the Debtors were a going concern and, except for a portion of their stores which were scheduled to go out of business, intended to remain in business and sell themselves as a going concern which, in fact, happened. Accordingly, Net Orderly Liquidation Value is not the proper basis on which the Debtors' inventory would be valued as of the Petition Date.

26. Although the hearing on the Motion is not the time or the place to value the Collateral, the Second Circuit has explained, "We believe the correct result is that no fixed value, whether it be retail, wholesale, or some combination of the two, should be imposed on every bankruptcy court conducting a § 506(a) valuation." *GMAC v. Valenti (In re Valenti)*, 105 F.3d 55, 62 (2d Cir. 1997). "As the legislative history to § 506(a) explains: "'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts [must] . . . determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case." *Id.* (quoting H.R. Rep. No. 95-595, at 356 (1977)).

27. "While the amount of a claim is determined as of the petition date, the Bankruptcy Code does not specify the time period for valuation of collateral, and many courts have adopted a flexible approach." *In re South Side House, LLC*, 474 B.R. 391, 413 (Bankr. E.D.N.Y. 2012) (citations omitted). This flexible approach has been adopted by a majority of courts. *See In re SW Hotel Venture, LLC*, 460 B.R. 4, 31-32 (Bankr. D. Mass. 2011). "[D]etermining the value of the

9

secured and unsecured portions of the claim is context sensitive." *In re Sneijder*, 407 B.R. 46, 52 (Bankr. S.D.N.Y. 2009).

28.     Indeed, "The Supreme Court has emphasized that 'actual use, rather than a foreclosure sale' or some other event 'that will not take place, is the proper guide' in valuing collateral." *In re Motors Liquidation Co.*, 576 B.R. 325, 423 (S.D.N.Y. 2017) (quoting *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 954 (1997)); *See In re Muncy*, No. 09-17583, 2010 Bankr. LEXIS 1718, at *6-8 (Bankr. S.D. Ohio June 4, 2010) ("Forced sale or liquidation value is inappropriate where the debtor proposes to retain and use the collateral being valued. A going-concern value has been used instead. While a forced sale standard for appraising collateral may comport with the economic realities in a liquidation case, that standard may be altogether unsuitable in circumstances where the collateral consists of inventory and accounts receivable, the debtor continues to operate, and reasonable prospects persist that the debtor can continue to generate and collect accounts receivable and replace inventories in the ordinary course of business.") (quoting Bankruptcy Service, L. Ed. § 6A:9). In other words, use of liquidation value for purposes of valuing collateral, as the Debtors attempt here, when liquidation was not contemplated, is improper.

WHEREFORE, Wilmington Trust requests that the Court enter an order in the form annexed hereto as Exhibit A directing the Debtors to (i) segregate and account for the Cash Collateral, and (ii) prohibit the Debtors from using the Cash Collateral in which the Second Lien Collateral Agent has an interest, unless and until the Debtors are able to reach agreement with the Prepetition Second

56308761v.1

Lien Collateral Agent on a budget for the use of such Cash Collateral and on the provision of satisfactory adequate protection for the continued use of the Collateral, including the Cash Collateral.

Dated: New York, New York
      April 17, 2019

                                        SEYFARTH SHAW LLP

                                        By: /s/ *Edward M. Fox*
                                            Edward M. Fox
                                            *Attorneys for Wilmington Trust, National Association,*
                                            *as indenture trustee and collateral agent*
                                          620 Eighth Avenue
                                         New York, NY  10018
                                         Telephone:  (212) 218-4646