EXHIBIT 3

CIELO VISTA PARKING LEASE

<u>**SUB-LEASE**</u>

511/SEA1111/
1476

**THIS SUB-LEASE** (hereinafter referred to as the "Lease") is made and entered into as of the 4th day of July 1981, by and between SEARS, ROEBUCK AND CO., a New York corporation, having an office at 1000 Belleview Street, Dallas, Texas (hereinafter referred to as "Lessor") and CIELO DEVELOPMENT COMPANY, a Texas limited partnership, having an office at 1712 North Meridian Street, Indianapolis, Indiana (hereinafter referred to as "Lessee").

## W I T N E S S E T H   T H A T:

**WHEREAS**, the City of El Paso, Texas, a municipal Corporation (hereinafter referred to as the "City"), is the fee simple title owner of certain land situated in the City of El Paso, State of Texas, more particularly described by metes and bounds in Exhibit "A" (hereinafter referred to as the "City Tract"); and

**WHEREAS**, Lessor has leased the City Tract from the City under a certain lease (hereinafter referred to as the "Underlying Lease") dated July 1, 1966, a Memorandum of which was recorded in the Office of the Clerk of El Paso County, Texas, in Book 1117, Page 455; and

**WHEREAS**, the City Tract, together with the land described in Exhibit "B" attached hereto, will form a single tract of land and will constitute the Cielo Vista Mall Shopping Center, as expanded (hereinafter referred to as the "Shopping Center Tract"); and

**WHEREAS** Lessee desires to sublease from Lessor and Lessor desires to sublease to Lessee a portion of the City Tract, which portion is more particularly described by metes and bounds in Exhibit "C" attached hereto, and located as shown on Exhibit "D" attached hereto, and is hereinafter referred to as the "Lessee's Tract", with the balance of the City Tract (described in Exhibit "E"), together with the land described in Exhibit "F" being hereinafter referred to as the "Sears Tract"; and

**WHEREAS**, contemporaneously with the execution of this Lease, Lessor and Lessee have entered into and executed other agreements of even date herewith, to-wit, a certain Construction, Operation and Reciprocal Easement Agreement (hereinafter referred to as the "REA"), Supplemental Agreement, and a Tie-In Agreement; and

**WHEREAS**, the REA, Supplemental Agreement and Tie-In Agreement provide for the development and operation of the Shopping Center Tract and all component tracts contained therein as a regional shopping center.

**NOW, THEREFORE**, in consideration of the rent and the mutual premises, covenants and agreements contained herein, it is agreed by and between Lessor and Lessee as follows:

### ARTICLE I

#### OTHER AGREEMENTS; DEFINITIONS

##### Section 1.  Incorporation of Defined Terms.

Unless otherwise specifically provided in this Lease, all terms that are defined in either the REA or the Supplemental

1/12/81

Agreement shall have the same respective meanings when used in this Lease as given to said defined terms in said REA and Supplemental Agreement.

### Section 1.2.  Term.

"Term" means the initial term of this Lease and any and all renewal terms and extensions.

### Section 1.3.  Service Equipment.

"Service Equipment" means machinery, apparatus, equipment, fittings and fixtures of every kind and nature whatsoever in or placed in or on the Lessee's Tract and constituting real or personal property and used or procured for use in connection with the operation and maintenance of the building on the Demised Premises, including, without limiting the generality of the foregoing, all engines, furnaces, boilers, stokers, pumps, heaters, tanks, dynamos, motors, generators, switchboards, electrical equipment, heating, plumbing, lifting and ventilating apparatus, air cooling and air conditioning apparatus, gas and electric fixtures, elevators, escalators, radiators, meters, public address systems, lights, heating and sprinkler systems, but excluding all other personal property including movable trade fixtures, partitions, furniture, furnishings and other equipment used or procured for use in connection with the operation of the business conducted on the Demised Premises, whether or not affixed to real estate.

## ARTICLE II

### THE DEMISED PREMISES; USE

Lessor hereby leases to Lessee and Lessee hereby takes and hires from Lessor, upon the terms and provisions and subject to the conditions of this Lease, the Lessee's Tract, hereinafter referred to as the "Demised Premises".

Subject to the terms and provisions of this Lease, the Underlying Lease and the REA, Lessee may use the Demised Premises for any use or purpose permitted by law or applicable zoning ordinances.

## ARTICLE III

### LEASE TERM

### Section 3.1.  Lease Term.

The Term of this Lease shall commence on the date upon which the Underlying Lease commences (hereinafter referred to as the "Commencement Date"), and shall expire on the last day of the thirtieth (30th) anniversary thereafter.

### Section 3.2.  Lease Year Defined.

"Lease Year" as used herein, means a period of twelve (12) consecutive months during the Lease Term constituting a "Lease Year" under the Underlying Lease.

### Section 3.3.  Extensions.

Lessee shall have the right and option to extend the original Term of this Lease for six (6) successive additional periods of five (5) years each, upon all of the same

- 2 -

terms and conditions as are set forth herein. Such option to extend shall be exercised in each instance by Lessee giving to Lessor written notice of its exercise of such option to extend the then current Term of this Lease at least four (4) months prior to the expiration of the then current term of this Lease. Failure to exercise such extension option for any period shall nullify the option for all subsequent periods. If Lessee notifies Lessor of its election to extend the Term of this Lease for a period which would either commence after or extend beyond the original Term of the Underlying Lease, Lessor will, in each instance, exercise its option to extend the Term of the Underlying Lease of a period of time sufficient to accomodate Lessee's extension of the Term of this Lease. After the exercise of any Option to Extend, all references in this Lease to the Term hereof shall be deemed to mean the Lease Term, as extended.

## ARTICLE IV

### RENT

#### Section 4.1. Rent.

From and after the Commencement Date, Lessee shall, not later than the sixtieth (60) day after the Commencement of each Lease Year and the receipt of written notice from Lessor, pay to Lessor rent equal to One Dollar ($1.00) plus the amount by which Lessor's "Basic Rental" under the Underlying Lease for such Lease Year thereof (as the term "Basic Rental" is defined in said Underlying Lease), will exceed the sum of Fifteen Thousand Dollars ($15,000.00). Lessor's written notice to Lessee under this Section 4.1 shall include a statement of the amounts to be paid by Lessor to the City of El Paso, Texas, as "Basic Rental" for said Lease Year and the amount of rent owed by Lessee to Lessor for said Lease Year.

#### Section 4.2. Payments for Lessee.

If Lessor pays or advances any monies or incurs any expense to correct a breach of this Lease by Lessee or to do or pay anything in this Lease required to be done or paid by Lessee, all amounts so paid, advanced or incurred shall, on notice to Lessee, be considered additional rent by Lessee, due and payable hereunder, with interest thereon at the lesser of twelve percent (12%) per annum or the highest lawful interest rate permitted in the State of Texas, and may be collected as by law provided in the case of rent.

## ARTICLE V

### TAXES AND ASSESSMENTS

#### Section 5.1. Tax Definitions.

(a) The term "Land Tax" shall be deemed to include all levies, taxes, assessments, water and sewer rents and charges, use and occupancy taxes, and all other like charges, imposts or burdens of whatsoever kind and nature, whether or not particularised by name, and whether general or special, ordinary or extraordinary, foreseen or unforeseen, which at any time during the Term of this Lease (or prior thereto) may be created, levied, assessed, imposed or charged upon or with respect to the Shopping Center Tract or on any part thereof or any appurtenances thereto by any federal, state, municipal or other authority, or under any law, ordinance or regulation of any such authority, including, among others,

- 3 -

all special tax bills and general, special or other assessments and liens or charges made on local or general improvements or under any governmental or public power or authority whatsoever (excluding the amount of the same assessed with respect to the Improvements located upon the Shopping Center Tract).

The term "Land Tax" shall not include Lessor's or Lessee's Personal Tax.

(b) The term "Improvement Tax" shall be deemed to include all levies, taxes, assessments, water and sewer rents and charges, use and occupancy taxes, and all other like charges, imposts or burdens of whatsoever kind and nature, whether or not particularized by name, and whether general or special, ordinary or extraordinary, foreseen or unforseen, which at any time during the Term of this Lease (or prior thereto) may be created, levied assessed, imposed or charged upon or with respect to the Improvements located in or upon the Shopping Center Tract or on any part thereof or any appurtenances thereto, by any federal, state, municipal or other authority, or under any law, ordinance or regulation of any such authority, including, among others, all special tax bills and general, special or other assessments and liens or charges made on local or general improvements or under any governmental or public power or authority whatsoever.

The term "Land Tax per square foot" shall mean Land Tax divided by the number of square feet of land contained in the Shopping Center Tract or the portion thereof to which the Land Tax applies.

(d) The term "Building Improvement Tax per square foot" shall mean that portion of the Improvement Tax based upon the aggregate total assessed valuation of all buildings located upon the Shopping Center Tract, divided by the number of square feet of Gross Floor Area (as defined in the REA) of all buildings located upon the Shopping Center Tract. The term "Common Area Improvement Tax per square foot" shall mean that portion of the Improvement Tax based upon the aggregate total assessed valuation of all Common Area Improvements within the Shopping Center Tract, divided by the number of square feet of land contained in the Shopping Center Tract.

(e) The term "Personal Tax" shall mean any income, franchise, corporation, capital levy, excise, inheritance, devolution, gift or estate tax which may be charged or assessed against Lessee and/or Lessor or any tax upon the sale, transfer or assignment of the title or estate of Lessee and/or Lessor in the Shopping Center Tract or any portion thereof.

### Section 5.3. Tax Payment by Lessor.

Lessor shall pay, or cause to be paid, when due all Land Tax and all Improvement Tax not required to be paid by Lessee pursuant to Sections 5.4, 5.5 and 5.6.

### Section 5.4. Lessee's Land Separately Assessed.

In the event that the land comprising the Lessee's Tract shall be assessed as a separate tax parcel from the land comprising the remainder of the Shopping Center Tract, Lessee shall pay when due the Land Tax applicable to the Lessee's Tract.

### Section 5.5.  Lessee's Improvements Separately Assessed.

In the event that the Improvements upon the Lessee's Tract either (i) shall be assessed as a separate tax parcel or (ii) shall be given separate assessed valuation(s) by the tax assessor, exclusive, in each event, of the Improvements upon the remainder of the Shopping Center Tract, Lessee shall pay when due the Improvement Tax applicable to the Improvements on the Lessee's Tract.  In the event that the provisions of this Section 5.5 are applicable, the Improvement Tax applicable to the Improvements on the Lessee's Tract shall be determined by multiplying the aggregate of the separate assessed valuations of the Improvements on the Lessee's Tract times the applicable tax rate.

### Section 5.6.  Lessee's Tract Land and Lessee's Tract Improvements Assessed Together.

In the event land comprising the Lessee's Tract shall be assessed as a separate tax parcel only with the Improvements located upon the Lessee's tract, Lessee shall pay when due the Land Tax applicable to the Lessee's Tract and the Improvement Tax applicable to the Improvements on the Lessee's Tract, and Lessee shall, upon request of the Lessor, furnish to Lessor proof of payment for the Land Tax and Improvement Tax required to be paid by Lessee pursuant to this Section 5.6.

### Section 5.7.  Lessee's Land Not Separately Assessed.

In the event that the land comprising the Lessee's Tract is assessed and included in a tax parcel which also includes all or any portion of the land comprising the Sears Tract, Lessor shall pay when due the Land Tax applicable to all of said land, and Lessee shall reimburse Lessor for Lessee's proportionate share of said Land Tax, which said proportionate share shall be a sum obtained by multiplying the Land Tax per square foot by the number of square feet of land contained in the Lessee's Tract, and Lessee shall so reimburse Lessor within twenty (20) days after Lessee receives from Lessor:

(a)  a statement showing in reasonable detail the computation of Lessee's portion of the Land Tax; and

(b)  a copy of the Land Tax bill that Lessor used in making its computation; and

(c)  a copy of the paid Land Tax bill or other proof of payment.

### Section 5.8.  Lessee's Tract Improvements Not Separately Assessed.

In the event the Improvements on the Lessee's Tract are assessed together with all or any portion of the Improvements on the Sears Tract and separate assessed valuations are not given to the Improvements on the Lessee's Tract, Lessee shall pay when due the Improvement Tax applicable to all of said Improvements, and Lessee shall reimburse Lessor for Lessee's proportionate share of said Improvement Tax, which said proportionate share shall be the sum of (i) the product obtained by multiplying the Building Improvement Tax per square foot by the number of square feet of Gross Floor Area of all buildings located on the Lessee's Tract, plus (ii) the product obtained by multiplying the Common Area Improvement Tax per square foot by the number of square feet

- 5 -

of land contained in the Lessee's Tract, and Lessee shall so
reimburse Lessor within twenty (20) days after Lessee re-
ceives from Lessor:

(a)  a statement showing in reasonable detail the
computation of Lessee's portion of the Improvement Tax; and

(b)  a copy of the paid Improvement Tax bill or other
proof of payment.

Section 5.9.  Commencement and Termination of Lessee's
Tax Duty.

Lessee's obligation to pay Land Tax and Improvement Tax
pursuant to the preceding provisions of this Article V shall
commence on the date hereof, and shall terminate upon the
termination of this Lease.

Section 5.10.  Contesting Taxes.

Lessee may, subject to Lessor's approval, which appro-
val shall not be unreasonably withheld, delayed or denied,
at its expense, in Lessee's own name and/or in the name of
Lessor, and/or the fee owner of the Demised Premises, if the
inclusion of such other names be required by law, contest
the amount, applicability or validity, in whole or in part,
of any tax on the Demised Premises, or a tax block in which
all or a part thereof are located, or the amount, applica-
bility or validity of any assessment or valuation of the
Demised Premises, or a tax block in which all or part there-
of are located, in appropriate proceedings properly initiated
and diligently conducted in good faith.

Lessor may, at its expense, in Lessor's own name con-
test the amount, applicability or validity of any assessment
or valuation of the Sears Tract, or a tax block in which all
or part thereof are located, in appropriate proceedings
properly initiated and diligently conducted in good faith.

All taxes contested pursuant to this Section 5.10 shall
nonetheless be paid when due unless such payment would
operate as a bar to the contest thereof or interfere mater-
ially with the prosecution thereof, in which case the con-
testing party may defer payment of such tax during such
proceeding if:

(a)  such deferral does not cause a forfeiture, judi-
cial sale or loss of the Demised Premises, the Sears Tract,
Lessor's or Lessee's interest therein, or any part thereof;
and the non-contesting party and the fee owner would not be
subject to any criminal liability for failure to pay such
tax; and

(b)  the contesting party shall have deposited with a
mutually acceptable escrow agent (agreement upon the iden-
tity of which shall not be unreasonably withheld, it being
agreed that first mortgagee of the Tract of the contesting
party is hereby approved as escrow agent) having surplus or
net worth of at least $25,000.00, such reasonable security
(which at the option of the contesting party may be readily
marketable obligations of the United States Government or
certificates of deposit issued by commercial banks located
in the United States and having combined capital and/or
surplus of not less than $25,000.00) as is equal in value to
the amount of deferred taxes, plus estimated interest and
penalties.  If Lessor or Lessee is the contesting party, the
other shall accept, in lieu of the said security deposit, an
indemnification agreement from the contesting party in which
the contesting party shall agree to defend, hold harmless
and indemnify the other for any and all losses which the

other may sustain by reason of the deferral of the payment of the said taxes and the contest thereof.

Upon the termination of any such proceedings by final unappealable decision, settlement or otherwise, the contesting party shall pay the amount then unpaid of the said tax finally determined or agreed to be due together with any costs, fees, interest, penalties or other liabilities existent in connection therewith or the contest thereof, provided, however, if the contesting party fails to pay any of the said amounts within one (1) month of the termination of such proceedings or at any time that such payment may be necessary in the escrow agent's opinion to prevent any of the occurrences listed in subsection 5.10 (a) above, the escrow agent shall pay from the escrow funds the amount necessary to liquidate all such obligations. After such tax liability is satisfied, the escrow agent shall return the balance of security deposited with it, if any, to the party that deposited it initially, together with any interest or increment earned thereon less the charges, if any, of the escrow agent.

If both parties shall be simultaneously contesting taxes pursuant to this Section 5.10, or shall join in a contest, each shall bear its own expenses and they shall cooperate in one action, if possible. Each party shall be entitled to any refund allocable to a tax or part of a tax paid by it. The part of any such refund paid to either party which is allocable to a tax payment made by the other party shall be held in trust by the party receiving such refund. In the event such refund has been obtained in a proceeding instituted and conducted solely by the other party, the refund shall be reduced by a share of the expenses incurred in such contest calculated by multiplying the amount of the total expenses by a fraction, the numerator of which shall be the refund allocable to the non-contesting party and the denominator of which shall be the total refund.

If the non-contesting party be in default in any of its obligations under this Lease, any sum due such party may be first used to cure such default.

Each party agrees to cooperate with a contesting party and upon request to execute or join in the execution of any necessary papers in connection with such contest, but a non-contesting party need not incur any expenses in connection with such cooperation.

Any party who intends to contest taxes shall give prompt notice to the other party of said intention prior to the commencement of any proceeding permitted by this Section, and upon request of the other party, the contesting party shall inform the other party of the progress and conclusion of same.

Section 5.11. Definition of the term "when due".

The term "when due" as used with respect to payments required by this Article V shall mean any time prior to the time when interest or penalties would begin to accrue on the payment.

# ARTICLE VI

## CONTRIBUTIONS TO SITE WORK

Pursuant to the terms of the REA and the Supplemental Agreement, Lessor and Lessee have agreed to the performing and furnishing of certain Off-Site Work and On-Site Work, as defined in the REA. Lessor and Lessee have agreed on the

contributions to be made for said Site Work, such contributions to equal and to be paid as provided in the REA and Supplemental Agreement.

## ARTICLE VII

### LESSOR'S CONTRIBUTION TO
### MAINTENANCE OF COMMON AREAS AND ENCLOSED MALL

Pursuant to the terms of the REA and the Supplemental Agreement, Lessee is required to perform certain duties in connection with the operation and maintenance of the Common Areas and Enclosed Mall, all as more particularly provided in the REA and Supplemental Agreement, and Lessor is required to pay and contribute to Lessee a portion of the cost thereof. Accordingly, Lessee agrees to operate and maintain the Common Areas and Enclosed Mall in accordance with the terms of the REA and Lessor hereby agrees to pay and contribute to Lessee a portion of Lessee's cost and expense of maintaining and operating the Common Areas and Enclosed Mall in accordance with the terms of the REA and the Supplemental Agreement.

## ARTICLE VIII

### EASEMENTS

The parties hereto have granted, exchanged and agreed upon easements respecting the use of the Shopping Center Tract, and the same are set forth in the REA and incorporated herein by this reference thereto.

## ARTICLE IX

### CONSTRUCTION AND OWNERSHIP OF IMPROVEMENTS

#### Section 9.1. Construction.

The parties hereto have agreed upon their respective obligations in connection with construction of Improvements on the Demised Premises, the Sears Tract and Shopping Center Tract under the terms of the REA, which terms are incorporated herein by this reference thereto, and each party shall perform its construction obligations as and when provided in the REA.

#### Section 9.2. Ownership of Improvements.

Title to the Improvements and Service Equipment which may be erected and placed in, on, about or affixed to the Lessee's Tract by, for or through Lessee shall be and remain in Lessee during the Term of this Lease. Upon the expiration or prior termination of the Term of this Lease all such Improvements and Service Equipment located upon the Lessee's Tract and not removed therefrom by Lessee shall be and become the property of Lessor and Lessee shall have no further right, title or interest therein, without the necessity of any further instrument or document.

## ARTICLE X

### QUIET ENJOYMENT

Lessor covenants, represents and warrants:

(1)  that Lessor has full right and lawful authority to enter into and perform the Lessor's obligations under

this Lease for the full term aforesaid and for all extensions herein provided,

(2) that Lessor has good marketable leasehold title to the Demised Premises, free and clear of all contracts, leases, tenancies, agreements, restrictions, violations, mortgages or other rights, encumbrances or defects in title of any nature whatsoever affecting the Demised Premises.

(3) that this Lease is not and shall not be subject or subordinate to any mortgage except for such subordination as may be accomplished in accordance with the provisions of this Lease.

(4) that if Lessee shall discharge the obligations herein set forth to be performed by Lessee, Lessee shall have and enjoy, during the term hereof, and all extensions herein provided, the quiet and undisturbed possession thereof, together with the right to use the Demised Premises as in this Lease contemplated.

## ARTICLE XI

### CONDEMNATION

#### Section 11.1. General Provisions.

The parties hereto have agreed upon their respective rights and obligations in the event of any condemnation or taking by or in lieu of eminent domain of the Shopping Center Tract and the same are set forth in the REA; provided, however, to the extent the provisions of this Lease are inconsistent with the REA, the provisions of this Lease shall be controlling as between the parties hereto.

#### Section 11.2. Termination of Lease; Prorated Rent.

In the event the REA is terminated by reason of any condemnation or taking by or in lieu of eminent domain, as provided in the REA, and the Demised Premises are also taken, this Lease also shall be terminated and all other rents, taxes and other charges shall be prorated as of the date of such termination, and Lessee shall have no further right, title or interest in and to the Demised Premises. If the REA is not terminated by reason of any such condemnation or taking by or in lieu of eminent domain, then this Lease shall remain unaffected and in full force and effect without any amendment or modification thereto (except for the deletion of that portion of the Demised Premises so taken), and without an abatement or reduction of rent.

#### Section 11.3. Prosecution of Claims for and Apportionment of Condemnation Awards.

In any condemnation proceedings whereby all or part of the Demised Premises or any other portion of the Shopping Center Tract is taken, whether or not this Lease is terminated, the entire award shall be and become the sole property of Lessee, and Lessee shall have no right to make any claim whatsoever against the condemning authority for any amount of damages or award.

Lessor hereby expressly waives any right to claim or share in any award for a taking of all or any part of the Demised Premises.

- 9 -

## ARTICLE XII

### ASSIGNMENT, SUBLETTING AND LEASEHOLD MORTGAGING

#### Section 12.1.  Assignment and Subletting.

(a)  Lessee shall have the absolute and unrestricted right, without the consent of Lessor, to assign this Lease or to sublet the Demised Premises, in whole or in part, to any person or entity (as used in this Section "entity" shall be deemed to mean and include, without limitation, any generally recognized form of business organization, such as a corporation, general or limited partnership or business or investment trust) without the necessity of obtaining any consent or approval of Lessor, provided that such assignment or subletting is done in connection with Lessee's use and operation of the Leased Premises as a part of the Shopping Center, or in connection with Lessee's transfer of its entire ownership interest in the Shopping Center.  Any such assignee may from time to time further assign this Lease or sublet the Demised Premises, in whole or in part, without the necessity of obtaining any consent or approval of Lessor.

(b)  Lessee and any assignee, mortgagee or sublessee of Lessee shall have the absolute and unrestricted right, at any time and from time to time, without Lessor's consent, to grant to others subleases for the use and occupancy of the Demised Premises or any part thereof, on such terms as Lessee or any such assignee or mortgagee, as the case may be, shall see fit, and in addition grant concessions or licenses to operate divisions or departments of the businesses which may be carried on in the Demised Premises.  Nothing herein contained shall preclude any sublessee of Lessee from assigning its interest in any sublease or from subletting all or any part of the subleased premises or from granting to others concessions or licenses to operate divisions or departments of the sublessee's business which may be carried on in the Demised Premises.  Notwithstanding anything herein to the contrary, Lessor expressly agrees that any subleases made by Lessee prior to termination of this Lease on account of the default of Lessee shall survive such termination and shall continue in full force and effect, provided that after such termination Lessor shall be substituted for Lessee in such subleases and shall be entitled to exercise all of the rights of Lessee in and under said subleases and thereafter to collect all rents and other payments falling due and under said subleases including the right to collect any sums falling due under such subleases prior to termination of this Lease which are unpaid on the date of termination of this Lease.

#### Section 12.2.  Leasehold Mortgaging.

Lessee and every successor and assignee of Lessee shall have the absolute and unrestricted right, at any time and from time to time, without Lessor's consent, to mortgage its interest in this Lease and all subleases, under a leasehold mortgagee or mortgagees, and to assign its interest in this Lease and all sublessees as collateral security for such mortgage or mortgagees to an "Institutional Lender" (herein defined as an insurance company, bank, trust company, savings and loan association, Real Estate Investment Trust as defined in Section 856 of the Internal Revenue Code of 1954 as amended, educational or charitable institution, union pension, profit sharing or retirement fund and any other public or private lending institution empowered to make loans on real estate subject to regulation, however, by state or federal law) or to the Lessee if made in connection

with a purchase money leasehold mortgage arising out of a
sale or assignment of the Lessee's interest under this
Lease, upon condition that all rights acquired under such
mortgage shall be subject to each and all of the covenants,
conditions, and restrictions set forth in this Lease and to
all rights and interests of Lessor under this Lease, none of
which covenants, conditions, restrictions, rights or inter-
ests is or shall be waived by the Lessor by reason of the
right given Lessee to mortgage its interest in this Lease.
If Lessee or Lessee's successors or assigns shall mortgage
this leasehold in accordance with the foregoing provisions
and if the holder thereof shall, within ten (10) days of its
execution send to Lessor a true copy thereof together with
written notice specifying the name and address of the mort-
gagee and the pertinent recording data with respect to such
mortgage, Lessor agrees that so long as any such leasehold
mortgage shall remain unsatisfied of record or until written
notice of satisfaction is given by the holder to Lessor, the
following provisions shall apply:

(i)  There shall be no cancellation, surrender, or
modification of this Lease by joint action of
Lessor and Lessee without the prior consent in
writing of the leasehold mortgagee;

(ii) Lessor shall, upon serving the Lessee with
any notice of default at or about the same time
serve a copy of such notice upon the holder of
such leasehold mortgage specifying the nature
and/or amount of the default.  The leasehold
mortgagee shall thereupon have the same period,
after service of such notice upon it, to remedy or
cause to be remedied the defaults complained of,
and Lessor shall accept such performance by or at
the instigation of such leasehold mortgagee as if
the same had been done by Lessee;

(iii)  Anything herein contained notwithstanding,
while such leasehold mortgage remains unsatisfied
of record, or until written notice of satisfaction
is given by the holder to the Lessor, if an event
or events of default shall occur which under any
provision of this Lease shall entitle Lessor to
terminate this Lease, and if before the expiration
of thirty (30) days from the date of service of
notice of termination such leasehold mortgagee
shall have notified the Lessor of its desire to
nullify such notice and shall have paid to Lessor
all rent and other payments herein provided for
and then in default, and discharge all other obli-
gations of Lessee hereunder theretofore accrued,
and except as set forth in subparagraph (vii)
hereof shall have complied or shall engage in the
work of complying with all of the other require-
ments of this Lease, if any are then in default
and shall prosecute the same to completion with
all due diligence, then in such event Lessor shall
not be entitled to terminate this Lease and any
notice of termination theretofore given shall be
null and void and of no effect;

(iv) If the Lessor shall elect to terminate this
Lease by reason of any default of the Lessee, the
leasehold mortgagee shall not only have the right
to nullify any notice of termination by curing

such default, as aforesaid, but shall also have
the right to postpone and extend the specified
date for the termination of this Lease as fixed by
the Lessor in its notice of termination, for a
period of not more than six (6) months, provided
that such Leasehold Mortgagee shall cure or cause
to be cured any then existing money defaults and
meanwhile pay the rent and comply with and perform
or be engaged in complying with or performing all
of the other terms, condition and provisions of
this Lease on the Lessee's part to be complied
with and performed, and provided further that the
leasehold mortgagee shall forthwith take steps to
acquire or sell the Lessee's interest in this
Lease by foreclosure of the mortgage or otherwise
and shall prosecute the same to completion with
all due diligence. If at the end of said six (6)
month period the leasehold mortgagee shall be
actively engaged in steps to acquire or sell the
Lessee's interest herein, the time of said mort-
gagee to comply with the provisions of this Article
shall be extended for such period as shall be
reasonably necessary to complete such steps with
due diligence and continuity provided that during
any such extensions no further default by the
Lessee or leasehold mortgagee shall be permitted
to continue hereunder;

(v)  Lessor agrees that the name of the leasehold
mortgagee may be added to the "Loss Payable Endorse-
ment" of any and all insurance policies carried
by the Lessee;

(vi) Lessor agrees that in the event of termina-
tion of this Lease by reason of any default by
Lessee or upon any termination of this Lease
pursuant to any rights granted to Lessee under the
provisions of this Lease, Lessor will enter into a
new lease of the Demised Premises with the holder
of the first mortgage on this Lease or its nomi-
nee, for the remainder of the term effective as of
the date of such termination, at the rent and
additional rent and upon the terms, provisions,
covenants and agreements as herein contained and
subject only to the same conditions of title as
this Lease is subject on the date of the execution
hereof, and to the rights, if any, of any parties
then in possession of any part of the Demised
Premises, provided:

    (A)  Said mortgagee shall make written
    request upon the Lessors for such new
    lease within thirty (30) days after the
    date of such termination and such written
    request is accompanied by payment to the
    Lessor of sums then due to the Lessor
    under this Lease;

    (B)  Said mortgagee shall pay to the
    Lessor at the time of the execution and
    delivery of said new lease any and all
    sums which would at the time of the
    execution and delivery thereof be due under
    this Lease but for such termination, and
    in addition thereto any expenses including

- 12 -

legal and attorneys' fees to which the Lessor shall have been subjected by reason of such default; and

(C)  The Lessee under the new lease shall perform and observe all covenants herein contained on the Lessee's part to be performed and shall further remedy any other conditions which the prior Lessee was obligated to perform under the terms of this Lease; and upon execution and delivery of such new lease, any subleases which may have theretofore been assigned and transferred by the Lessee to the Lessor as security under this Lease, shall thereupon be deemed to be held by the Lessor as security for the performance of all of the obligations of the Lessee under the new lease.

(vii)  Nothing herein contained shall require the leasehold mortgagee or its nominee to cure any default of the Lessee arising out of its bankruptcy, insolvency, reorganization or other Proceeding under the Bankruptcy or Insolvency Laws of the United States or of the several states or arising out of its abandonment of the Demised Premises.

## ARTICLE XIII

### REPAIRS, ALTERATIONS AND RESTORATIONS

The parties hereto have agreed upon their respective obligations in connection with repairs, alterations and restorations of Improvements on the Shopping Center Tract and the same are set forth in the REA and incorporated herein by this reference thereto.  Notwithstanding anything to the contrary contained herein or in the Underlying Lease, Lessee shall, during the term of this Lease, as extended, if extended, keep the retention pond and outlet structure beneath the Demised Premises (as defined in the Underlying Lease) free from debris and obstructions.  Further, Lessee shall periodically remove accumulated silt from the retention basin to maintain the elevations therefore as approved by the City pursuant to the Underlying Lease.

### ARTICLE XIV

### INSURANCE

The parties hereto have agreed upon all insurance requirements and obligations respecting the Shopping Center Tract (including, without limitation, waiver of subrogation), and the same are set forth in the REA and incorporated herein by this reference thereto.

### ARTICLE XV

### SURRENDER OF AND HOLDING OVER OF LESSEE'S TRACT

### Section 15.1.  Surrender of Lessee's Tract and Lessee's Improvements.

This Lease and the tenancy hereby created shall terminate at the end of the Term hereof, as extended, if extended (unless sooner terminated as herein provided), without the necessity of notice by either party to the other, and Lessee shall vacate and surrender the Demised Premises to Lessor on the last day of such Term.

## Section 15.2.  Holding Over.

In the event that Lessee shall hold the Lessee's Tract after termination of this Lease, as described in Section 15.1, with the consent of Lessor, express or implied, such holding over shall, in the absence of written agreement on the subject, be deemed to have created a tenancy from month to month terminable on thirty (30) days' written notice by either Lessee or Lessor to the other, upon the same rental as was last in effect pursuant to Article IV of this Lease (calculated and payable on a monthly basis) and otherwise subject to all of the terms and provisions of this Lease.

## Section 15.3.  Removal of "Personal Property".

At any time during the Term of this Lease, and upon the termination of this Lease, Lessee shall have the right to remove from the Demised Premises all inventory, furniture, furnishings, signs, trade fixtures, shelving, counters, wall cases, store fixtures and equipment and any personal property and Service Equipment then installed or in place in, on or about the Demised Premises, whether or not affixed thereto, which may be owned or have been installed by Lessee or anyone claiming by, through or under Lessee.  If this Lease shall terminate at any time other than the time herein fixed as the expiration of the Term upon lapse of time, Lessee shall have thirty (30) days thereafter to effect the removal of the foregoing items.  In addition to the foregoing provisions, any sublessee, licensee, concessionaire or other person claiming by, through or under Lessee shall have the right to remove from the Demised Premises any and all of their personal property and trade fixtures.  Any of the aforementioned removable items which are not removed from the Demised Premises in accordance with the foregoing provisions within thirty (30) days of said termination shall be deemed to have been abandonded and to have become the property of Lessor.  In no event shall the leaving of any property on the Demised Premises after the termination or expiration of the term of this Lease, or of a tenancy from month to month, make Lessee liable for storage charges or rent or constitute a hold-over tenancy.

## ARTICLE XVI

## DEFAULT PROVISIONS

## Section 16.1.  Defaults.

Any one or more of the following events shall constitute an "event of default":

> (1)  If default shall be made in the due and punctual payment of any rent payable under this Lease or any part thereof when and as the same shall become due and payable, and such default shall continue for a period of thirty (30) days after written notice thereof from Lessor to Lessee, and if such default shall not have been cured by Lessee within said period of thirty (30) days;

> (2)  If default shall be made by Lessee in the performance of or compliance with any of the covenants, agreements, terms or conditions contained in this Lease other than those referred to in the foregoing subparagraph (1), and such default shall continue for a period of thirty (30) days after written notice thereof from Lessor to

- 14 -

Lessee, or in the case of a default or a contingency which cannot with due diligence be cured within such period of thirty (30) days, the Lessee fails to proceed with due diligence to cure the same and thereafter to prosecute the curing of such default with due diligence (it being intended that in connection with a default not susceptible of being cured with due diligence within thirty (30) days that the time of the Lessee within which to cure the same shall be extended for such period as may be reasonably necessary to complete the same with all due diligence).

## Section 16.2. Remedies.

(a) No default by Lessee in the performance or payment of any of Lessee's covenants and obligations hereunder shall entitle Lessor to terminate or cancel this Lease, and the sole remedy of Lessor hereunder in the event of any default by Lessee shall be by means of an action for damages and/or injunction. No default by Lessee in its covenants and obligations to pay rental hereunder shall entitle Lessor to terminate or cancel this Lease, but Lessor shall in any and all events be entitled to recover all such rental by an action at law as and when the same shall come due.

(b) No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent during the continuance of any such breach, shall constitute a waiver of any beach or of such covenant, agreement, term or condition. No covenant, agreement term or condition of this Lease, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by the other party. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other existing or subsequent breach thereof.

## Section 16.3. Grace Periods.

In the event of any conflict between different grace or notice periods contained in this Lease, and those contained in the REA or if a reasonable construction would indicate that two (2) or more different grace or notice periods may apply to a particular event of default by Lessee under this Lease or under the REA, the grace or notice period of shortest duration shall apply.

## ARTICLE XVII

## ARBITRATION

The parties hereto have agreed upon the procedures for arbitration with respect to certain disputes that may arise under this Lease and the same are set forth in the REA and incorporated herein by this reference thereto; provided, however, notwithstanding anything to the contrary contained herein, no dispute shall be submitted to arbitration unless all parties to such dispute agree in writing, upon or after the occurrence of such dispute, to submit the same to arbitration. Arbitration hereunder and under the REA shall be

permissive and not mandatory. All remedies at law and in
equity are hereby reserved.

## ARTICLE XVIII

### NOTICES

The parties hereto have agreed upon the procedure re-
garding notices to be given under this Lease and the same
are set forth in the REA and incorporated herein by this
reference thereto.

## ARTICLE XIX

### CONFLICT WITH UNDERLYING LEASE

#### Section 19.1.

To the extent that any term or provision of this Lease
as to the duties and obligations of Lessor is in conflict
with the duties and obligations of lessor as the "Lessee"
under the Underlying Lease, then the terms and provisions of
the Underlying Lease, as to the scope of Lessor's duties and
obligations shall control. Nothing contained in the foregoing
sentence shall permit or excuse Lessor from the performance
of any duty or obligation hereunder that will not create or
constitute a default under the Underlying Lease.

## ARTICLE XX

### LESSOR'S DEFAULT ON UNDERLYING LEASE

#### Section 20.1.  New Underlying Lease.

In the event that Lessor, as the Lessee under the Underlying
Lease, causes or permits an "event of default" to occur within
the meaning of the Underlying Lease, which "event of default"
serves as the basis for a termination of the Underlying
Lease by the City, the City will, as the Lessor under the
Underlying Lease, at the written request of Lessee made
within sixty (60) days after the termination of the Under-
lying Lease, enter into a new lease with the Lessee here-
under, beginning on the date of termination of the Under-
lying Lease and continuing for the remainder of the term of
the Underlying Lease, together with all renewal and exten-
sion rights contained therein, leasing the City Tract to the
Lessee hereunder. Such new lease shall otherwise contain
the same terms and provisions as those set forth in the
Underlying Lease (including, without limitation, all provi-
sions pertaining to the payment of Rent and Additional
Rent), except for requirements which are then no longer
applicable or which have already been performed, or which
cannot be performed by the Lessee hereunder or which are
not susceptible of being performed by the Lessee hereunder.
It is the intention of the parties that such new lease shall
have the same priority relative to other rights or interests
to or in the fee estate in the City Tract as the Underlying
Lease, and the Lessee hereunder shall not be obligated to
cure or correct said "events of default" as a condition
precedent to the exercise of its rights under this Section
20.1.

### Section 20.2. New Lessor.

In the event that a termination of the Underlying Lease occurs as set forth in Section 20.1 hereof as aforesaid, but Lessee under this Lease does not request said new lease from the City, this Lease shall survive the termination of the Underlying Lease and shall continue in full force and effect, provided that after termination of the Underlying Lease, the City shall be substituted for Sears, Roebuck And Co., as the "Lessor" under this Lease, and shall be entitled to exercise all of the rights of Lessor and this Lease and collect all rents and other payments falling due under this Lease.

### Section 20.3. Termination of Underlying Lease.

Any termination of the Underlying Lease shall terminate all rights of Sears, Roebuck And Co., as the Lessor under this Lease, but shall not cause a termination of any of the rights of Lessee under this Lease, and this Lease shall survive and remain in full force and effect directly between the City, as Lessor, and Lessee hereunder. No failure by Lessee hereunder to cure any defaults of Sears, Roebuck and Co. under the Underlying Lease shall constitute or be deemed to constitute a waiver of any rights of the Lessee contained in this Article XX.

## ARTICLE XXI

## MISCELLANEOUS

### Section 21.1. Memorandum of Lease.

Neither Lessor nor Lessee shall record this Lease unless it first secures the consent of the other. However, Lessor and Lessee shall contemporaneously with the execution of this Lease execute and acknowledge a Memorandum of this Lease for recordation.

### Section 21.2. Exhibits.

Each reference herein to an Exhibit refers to the applicable Exhibit that is attached to this Lease. All such Exhibits constitute a part of this Lease and by this Section are expressly made a part hereof.

### Section 21.3. References to Articles and Sections.

All references herein to a given Article or a given Section refer to the applicable Article or Section of this Lease unless otherwise indicated.

### Section 21.4. Table of Contents and Captions.

The table of contents and captions of this Lease are inserted only as a matter of convenience and for reference. They do not define, limit or describe the scope or intent of this Lease and they shall not affect the interpretation hereof.

### Section 21.5. Locative Adverbs.

The locative adverbs "herein", "hereunder", "hereto", "hereby", "hereinafter", etc., wherever the same appear herein, mean and refer to this Lease in its entirety and not to any specific Article, Section or subsection hereof, unless the context otherwise requires.

### Section 21.6. Lease for Exclusive Benefit of Parties.

The provisions of this Lease are for the exclusive benefit of the Parties, their successors, successors in interest and assigns, and not for the benefit of any third person. This Lease shall not be d to have conferred any rights upon any third person , ir shall be no third party beneficiaries hereof.

### Section 21.7. Waiver of Default.

The parties hereto have previously agreed as to waiver of default in Section 32.3 of the REA, which is hereby incorporated by this reference and shall b served by the parties and construed as if this Lease a part of the REA.

### Section 21.8. Indemnity.

The parties hereto have previously agreed as to indemnity against liability in Paragraph 30.1 of the REA, which Paragraph is incorporated herein by this reference and shall be applicable to any and all claims, actions, damages, liability and expenses arising under this Lease or in connection with the Demised Premises.

### Section 21.9. Payments for Lessor.

If Lessee pays or advances any monies or incurs any expense to correct a breach of this Lease by Lessor or a breach or default by Lessor as the Lessee under the Underlying Lease, all amounts so paid, advanced or incurred shall, on notice to Lessor, become immediately due and payable hereunder, together with interest thereon at the lesser of twelve percent (12%) per annum on the highest lawful interest rate permitted in the State of Texas. Any amounts due and owing Lessee hereunder may be set off by Lessee against rental due and payable by Lessee under this Lease.

### Section 21.10. No Partnership, Joint Venture or Principal-Agent Relationship.

Neither anything in this Lease nor any acts of the parties shall be deemed by the parties, or by any third person, to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association between the parties other than the relationship of landlord and tenant, and no provisions of this Lease are intended to create or constitute any person a third party beneficiary hereof.

### Section 21.11. Successors and Assigns.

This Lease shall be binding upon and inure to the benefit of the respective heirs, administrators, executors, transferees, successors, successors in interest and assigns of Lessor and Lessee.

### Section 21.12. Severability.

Any provision or provisions of this Lease which shall be to any extent in violation of any law or ordinance, or which shall prove to be to any extent, invalid, unenforce-

able, void or illegal, shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions hereof shall nevertheless remain in full force and effect and shall be valid and enforceable to the fullest extent permitted by law.

### Section 21.13. Texas Law Governs.

This Lease and the rights and duties of the parties hereunder shall be governed by the laws of Texas where the Shopping Center Tract is located.

### Section 21.14. Time and Standard of Consents and Approvals.

The parties hereto have previously agreed as to time and standard of consents and approvals in Paragraph 34.11 of the REA, which Paragraph of the REA is incorporated herein by this reference and shall be observed by the parties and construed as if this Lease were a part of the REA.

### Section 21.15. Covenants to Run with the Land.

Unless the context indicates otherwise, each covenant, warranty, agreement, promise or duty of either Lessor, or Lessee as set forth herein shall be construed as a covenant and not as a condition. These covenants, warranties, agreements, promises and duties shall, to the fullest extent legally possible, either run with the land or constitute equitable servitudes and they shall be appurtenant to the land to which they pertain and shall be deemed to run to and for the joint and severable benefit of the other party.

### Section 21.16. Other Remedies.

The rights and remedies given to a party by this Lease or the REA shall be deemed to be cumulative and none of such rights and remedies shall be exclusive of any of the others, or of any other right or remedy at law or in equity which a party might otherwise have, and the exercise of one such right or remedy by a party shall not impair such party's standing to exercise any other right or remedy.

### Section 21.17. Time is of the Essence.

Time is of the essence with respect to the performance of each of the covenants and agreements under this Lease.

### Section 21.18. Entire Agreement; Amendments and Modifications in Writing.

This Lease, together with the REA and the Supplemental Agreement, contains the entire agreements between the parties, and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever. This Lease may be amended or otherwise modified only by a writing signed by the parties hereto and any agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this Lease, in whole or in part, unless such agreement is in writing and signed by the discharge or abandonment is sought.

- 19 -

### Section 21.19. Counterparts.

This Lease may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument.

### Section 21.20. Broker's Fees.

Each party hereto represents to the other that it has conducted no negotiations with any broker in connection with the signing and delivery of this Lease. Each party covenants to indemnify and hold the other harmless from all claims, damages, costs, expenses and liabilities (resulting from the act or omission of the covenanting party) for any brokers' or similar fee in connection with the negotiation, signing and delivery of this Lease.

### Section 21.21. Limited Liability of Lessee and Exculpation of Partners.

Notwithstanding anything contained in this Lease to the contrary, if at any time Lessee shall fail to perform or pay any covenant or obligation on its part to be performed or paid hereunder, and as a consequence thereof Lessor shall recover a money judgment against Lessee, such judgment shall, to the extent provided by law, be a lien upon and shall be enforced against and satisfied out of (subject to the rights of any mortgagee or deed of trust holder whose lien predates the filing of the complaint which results in such judgment) only (i) the proceeds of sale produced upon execution of such judgment and levy thereon against Lessee's interest in the Total Development Tract (as defined and described in the REA) and the Improvements thereon, (ii) the rents, issues or other income from such property receivable from the Total Development Tract and the Improvements thereon, (iii) the consideration received by Lessee from the sale of all or any part of Lessee's interest in the Total Development Tract and Improvements made after such failure of performance (which consideration shall be deemed to include any assets at any time held by Lessee to the extent that the value of same does not exceed the proceeds of such sale), and (iv) any insurance proceeds or condemnation award payable to Lessee as the result of any casualty to or condemnation of the Total Development Tract and the Improvements thereon. Neither Lessee, its successors and assigns, nor any of the partners, general or limited, in the limited partnership referred to herein as "Lessee" shall be personally liable to Lessor, its successors and assigns, or to any other party, for the performance or payment of any covenant, obligation, liability or indebtedness of Lessee hereunder or for any judgment thereon. Lessor shall not seek specific performance by or against Lessee or any partner in the Lessee partnership hereunder. It is expressly understood and agreed that nothing in this Lease contained shall be construed as creating any personal liability whatsoever against the Lessee or the partners in the Lessee partnership. Lessor, its successors and assigns, and any other owner or holder of any claim or action against Lessee under this Lease, or any indebtedness, obligation or liability of accruing hereunder, shall look solely to the Lessee's interest in the Total Development Tract and any improvements thereon and proceeds therefrom, as aforesaid, for the payment and satisfaction of any such claim, action, indebtedness, obligation or liability, as aforesaid. The provisions of this Section 21.21 are not intended to relieve Lessee from the performance of any of its obligations hereunder, but

rather to limit liability whatsoever, as aforesaid; nor shall any of the provisions of this Section 21.21 be deemed to limit or otherwise affect Lessor's right to obtain injunctive relief or other equitable relief necessary to enforce other rights specifically granted to Lessor in this Lease (with the exception of specific performance, which is hereby waived). The provisions of this Section 21.21 also shall enure to the benefit of Lessee's successors and assigns.

IN WITNESS WHEREOF, Lessor and Lessee have each caused their duly authorized officers to sign and seal this Lease as of the day and year first above written.

CELINA DEVELOPMENT COMPANY,
a Texas limited partnership

By _____
Herbert Simon, General Partner

"Lessee"

SEARS, ROEBUCK AND CO.,
a New York corporation

By _____

ATTEST _____

"Lessor"

766V:
RJR

STATE OF INDIANA    )
                    ) SS:
COUNTY OF MARION    )


Before me, a Notary Public in and for said County and
State, on this day personally appeared HERBERT SIMON,
known to me to be the person whose name is subscribed to
the foregoing instrument, and known to me to be a General
Partner in CELINA DEVELOPMENT COMPANY, a Texas limited
partnership, and acknowledged to me that he executed said
instrument for the purposes and consideration therein
expressed, and as the act of said limited partnership.

Given under my hand and seal of office this 21st day
of January, 1981.

                              Jo Ann Allen, Notary Public

My Commission expires:

    September 5, 1983

My county of residence:

    Marion



STATE OF CALIFORNIA )
                    ) SS:
COUNTY OF LOS ANGELES)


On this the ___ day of ___March___, 1981,
before me, a Notary Public duly authorized in and for the
said County in the State aforesaid to take acknowledgements,
personally appeared ___J. B. Brown___
and known to me to be the Facilities Planning Manager of SEARS,
ROEBUCK AND CO., a New York corporation, and acknowledged that
as such officer, being authorized so to do, he executed the
foregoing instrument on behalf of said corporation by subscribing
the name of said corporation by himself as such officer and
caused the corporate seal of said corporation to be affixed
thereto, as his free and voluntary act, and as the free and
voluntary act of said corporation, for the uses and purposes
therein set forth.

IN WITNESS WHEREOF, I hereunto set my hand and official
seal.

My Commission expires:

    October 8, 1982

-22-

## JOINDER AND CONSENT

The undersigned, City of El Paso, Texas, a municipal corporation, as the fee simple title owner of the Demised Premises described in this SUB-LEASE, and as the Lessor in the Underlying Lease, hereby joins in the execution of this SUB-LEASE for the purpose of consenting thereto, and for the further purpose of agreeing to be bound by and subject to the respective rights, obligations and duties of the Lessor and the Lessee hereunder.

It is expressly understood and agreed that nothing in this Sub-Lease contained shall be construed as creating any personal liability whatsoever against the City, its officials, agents or employees, and there shall be no personal liability on the part of the City, its officials, agents or employees to pay any indebtedness accruing under this Sub-Lease; that all personal liability of the City under this Sub-Lease is hereby jointly and severally expressly waived and released by the Lessor and Lessee and by every person now or hereafter claiming any right or security hereunder; and that so far as the City is concerned, the owner or holder of any indebtedness or liability accruing under this Sub-Lease shall look solely to the City's interest in the City Tract and any improvements thereon for the payment thereof. The liability of the City shall be limited to its interest in the City Tract and any improvements thereon. The provisions of this Paragraph are not designed to relieve the City from the performance of any of its obligations hereunder, but rather to limit its liability in the case of the recovery of a judgment against it, as aforesaid. Nothing contained herein shall waive or be deemed to waive the right of Lessee to obtain and enforce a decree for specific performance of the City's obligations under Article XX of this Sub-Lease. The Lessor and Lessee, and every person now or hereafter claiming any right or security hereunder, shall not seek specific performance by or against the City of the City's obligations under any other provisions hereof except to the extent tha the same can be enforced _in rem_ against the City Tract and the improvements thereon.

Dated this 11th day of August , 1981.

THE CITY OF EL PASO

By: _____ , MAYOR

ATTEST:

_____ , CITY CLERK

STATE OF TEXAS }
                } SS:
COUNTY OF EL PASO }

I, the undersigned, a Notary Public in and for the County and State aforesaid, whose notarial commission expires on the 11th day of August , 1981, do hereby certify that _____ , the Mayor and City Clerk respectively, of the City of El Paso, Texas, whose names as such are subscribed to the foregoing writing bearing date on the 11th day of August , 1981, have this day acknowledged the same before me in my County and State aforesaid.

GIVEN under my hand this 11th day of August , 1981.

_____ , Notary Public

My Commission Expires:

My County Of Residence:

EXHIBIT "A"


Cielo Vista Mall Shopping Center
El Paso County, Texas


### CITY OF EL PASO TRACT

### PROPERTY DESCRIPTION


Description of a parcel of land being all of Block 8, Celine Plaza, El Paso
County, Texas and being more particularly described by metes and bounds as
follows:

From a point, said point being the southwest corner of Celine Plaza and said
point also lying on the northerly right-of-way line of U.S. Interstate Highway
No. 10; thence South 61° 38' 34" East along said right-of-way line a distance of
1,230.00 feet; thence North 28° 21' 26" East a distance of 959.98 feet; thence
South 61° 38' 34" East along the northerly boundary line of Block 3, Celine
Plaza a distance of 118.00 feet to the POINT OF BEGINNING;

      Thence North 28° 21' 26" East along the westerly boundary line
of Block 8, Celine Plaza a distance of 500.00 feet;

      Thence South 61° 38' 34" East along the northerly boundary line
of said Block 8, a distance of 900.00 feet;

      Thence South 28° 21' 26" West along the easterly boundary line
of said Block 8, a distance of 500.00 feet;

      Thence North 61° 38' 34" West along the southerly boundary line
of said Block 8, a distance of 900.00 feet to the POINT OF BEGINNING and contain-
ing in all 11.3636 acres of land more or less.


Ramon E. Lara, P.E.
CREIGHTS, INC.


April 11, 1988

Cielo Vista Mall Shopping Center
El Paso, Texas

## CIELO VISTA MALL SHOPPING CENTER

### PROPERTY DESCRIPTION

Description of a parcel of land being Portions of Blocks 1, 2, 3, and 4 and all of Blocks 5 and 6, Colina Plaza, El Paso County, Texas and being more particularly described by metes and bounds as follows:

From a point, said point being the southwest corner of Colina Plaza and said point lying in the northerly right-of-way line of U.S. Interstate Highway No. 10; thence South 61° 38' 34" East along the northerly right-of-way line of U.S. Interstate Highway No. 10 a distance of 1250.00 feet to a point, said point being THE POINT OF BEGINNING;

Thence North 28° 21' 26" East a distance of 741.98 feet;

Thence 201.26 feet along the arc of a curve to the right whose interior angle is 26° 25' 22", whose radius is 448.99 feet, and whose chord bears North 44° 06' 13" West a distance of 199.72 feet;

Thence North 31° 47' 33" West a distance of 96.73 feet;

Thence 205.42 feet along the arc of a curve to the left whose interior angle is 20° 54' 54" whose radius is 562.74 feet, and whose chord bears North 42° 14' 59" West a distance of 204.28 feet;

Thence 87.76 feet along the arc of a curve to the left, whose interior angle is 8° 56' 08", whose radius is 562.74 feet, and whose chord bears North 57° 10' 30" West a distance of 87.67 feet;

Thence North 64° 18' 34" West a distance of 288.86 feet;

Thence North 25° 41' 26" East a distance of 819.03 feet;

Thence 288.91 feet along the arc of a curve to the left whose interior angle is 16° 53' 18" whose radius is 979.93 feet, and whose chord bears North 19° 51' 34" East a distance of 287.86 feet;

Thence North 11° 22' 18" East a distance of 27.98 feet to a point, said point lying on the southerly right-of-way line of Viscount Blvd.;

Thence South 79° 03' 33" East along the southerly right-of-way line of Viscount Blvd. a distance of 88.00 feet;

Thence South 11° 22' 18" West a distance of 27.98 feet;

Thence 301.73 feet along the arc of a curve to the right whose interior angle is 16° 30' 11" whose radius is 1035.68 feet, and whose chord bears South 19° 51' 34" West a distance of 303.05 feet;

Thence South 28° 21' 26" West a distance of 300.03 feet;

Thence 31.42 feet along the arc of a curve to the left whose interior angle is 90° 00' 00" whose radius is 20.00 feet, and whose chord bears South 16° 38' 34" East a distance of 28.28 feet;

Thence South 61° 38' 34" East a distance of 310.00 feet;

Thence 97.73 feet along the arc of a curve to the right whose interior angle is 8° 26' 18" whose radius is 663.74 feet, whose chord bears South 57° 25' 25" East a distance of 97.64 feet;

Thence North 28° 21' 26" East a distance of 421.35 feet;

Thence South 61° 38' 34" East a distance of 585.00 feet along the southerly boundary line of Block 1, Colina Plaza;

Thence North 28° 21' 26" East a distance of 130.00 feet along the westerly boundary line of Block 8, Colina Plaza;

Thence South 61° 38' 34" East a distance of 900 feet along the northerly boundary line of Block 8, Colina Plaza;

Thence North 28° 21' 26" East a distance of 10.00 feet;

Thence 145.83 feet along the arc of a curve to the right whose interior angle is 11° 27' 45" whose radius is 728.92 feet; and whose chord bears North 34° 05' 18" East a distance of 145.58 feet;

Thence North 39° 49' 11" East a distance of 175.32 feet to a point on the southerly right-of-way line of Viscount Blvd;

Thence 50.00 feet along said southerly right-of-way line of Viscount Blvd. and along the arc of a curve to the left whose interior angle is 0° 46' 20" whose radius is 3710.00 feet and whose chord bears South 50° 10' 49" East a distance of 50.00 feet;

Thence South 39° 49' 11" West a distance of 175.32 feet;

Thence 135.82 feet along the arc of a curve to the left whose interior angle is 11° 27' 45" whose radius is 678.92 feet and whose chord bears South 34° 05' 18" West a distance of 135.60 feet;

Thence South 28° 21' 26" West a distance of 10.00 feet to a point on the southerly boundary line of Block 1, Colina Plaza;

Thence South 61° 38' 34" East along said boundary line a distance of 380.90 feet;

Thence South 45° 29' 22" East along said boundary line a distance of 363.77 feet;

Thence South 44° 53' 18" East along said boundary line a distance of 908.43 feet;

Thence South 57° 58' 38" East a distance of 350.30 feet along said boundary line to a point on the westerly right-of-way line of Hawkins Blvd;

Thence 28.71 feet, along said right-of-way line, along the arc of a curve to the left whose interior angle is 0° 31' 17", whose radius is 3155.30 feet; and whose chord bears South 31° 49' 44" West a distance of 28.71 feet to a point said point being the northeast corner of Block 6, Colina Plaza;

Thence 175.09 feet continuing along said right-of-way line, along the arc of a curve to the left, whose interior angle is 30° 10' 46", whose radius is 3155.30 feet, and whose chord bears South 29° 54' 42" West a distance of 175.07 feet;

Thence continuing along said right-of-way line, South 28° 19' 18" West a distance of 108.98 feet;

Thence South 28° 19' 19" West along said westerly right-of-way line a distance of 516.72 feet to a point, said point being the southeasterly corner of a railroad right-of-way easement;

Thence 228.60 feet along the southerly railroad right-of-way easement line and along the arc of a curve to the left whose interior angle is 35° 38' 26", whose radius is 367.50 feet; whose chord bears North 86° 51' 28" West a distance of 224.94 feet;

Thence South 73° 19' 19" West continuing along said right-of-way easement line a distance of 330.83 feet;

Thence 197.07 feet continuing along said railroad right-of-way easement line and along the arc of a curve to the right whose interior angle is 28° 21' 52", whose radius is 398.07, whose chord bears South 87° 30' 15" West a distance of 195.06 feet to a point;

Thence South 37° 08' 34" East a distance of 33.94 feet;

Thence 7.32 feet along the arc of a curve to the left, whose interior angle is 3° 39' 37", whose radius is 114.64 feet, and whose chord bears South 38° 58' 23" East a distance of 7.32 feet to a point lying on the northerly right-of-way line of U.S. Interstate Highway No. 10;

Thence North 61° 38' 34" West along said northerly right-of-way line a distance of 151.47 feet;

Thence North 61° 38' 34" West continuing along said northerly right-of-way line, said line also being common with the said southerly railroad right-of-way easement line a distance of 1712.51 feet to THE POINT OF BEGINNING and containing 3,688,872.397 square feet or 84.684 acres of land more or less, subject to all easements of record.

Ronald T. Cremans, P.E.
CREMANS, INC.

December 31, 1979

EXHIBIT "C"

Cielo Vista Mall Shopping Center
El Paso County, Texas

SEARS TO CIELO VISTA MALL TRACT

PROPERTY DESCRIPTION

Description of a parcel of land being a Portion of Block 8, Collins Plaza,
El Paso County, Texas and being more particularly described by metes and
bounds as follows:

From a point, said point being the southwest corner of Collins Plaza and said
point also lying on the northerly right-of-way line of U.S. Interstate Highway
No. 10; thence South 61° 38' 34" East along said right-of-way line a distance
of 1,350.00 feet; thence North 28° 21' 26" East a distance of 953.96 feet;
thence South 61° 38' 34" East along the northerly boundary line of Block 3,
Collins Plaza a distance of 118.00 feet to the POINT OF BEGINNING;

Thence North 28° 21' 26" East along the westerly boundary
line of Block 8, Collins Plaza a distance of 311.16 feet;

Thence South 61° 38' 34" East a distance of 550.00 feet;

Thence South 28° 21' 26" West a distance of 35.04 feet;

Thence South 61° 38' 34" East a distance of 213.57 feet;

Thence South 2° 22' 08" West a distance of 94.30 feet;

Thence South 61° 38' 34" East a distance of 95.11 feet;

Thence South 28° 21' 26" West along the easterly boundary
line of Block 8, Collins Plaza a distance of 91.35 feet;

Thence North 61° 38' 34" West along the southerly boundary line of
Block 8, Collins Plaza a distance of 900.00 feet to the POINT OF BEGINNING and
containing in all 5.8560 acres of land more or less.

Ramon E. Loro, P.E.
CROMUS, INC.

April 11, 1989

EXHIBIT "D"



CONTAINING:
3.8560 Act

PLAT

CITY OF EL PASO TO CIELO VISTA MALL TRACT
BEING A PORTION OF BLOCK 8 CIELA PLAZA
EL PASO COUNTY, TEXAS

EXHIBIT "B"

Cielo Vista Mall Shopping Center
El Paso County, Texas

CITY OF EL PASO, TEXAS TO SEARS TRACT

PROPERTY DESCRIPTION

Description of a parcel of land being a Portion of Block 8, Colina Plaza, El
Paso County, Texas and being more particularly described by metes and bounds
as follows:

From a point, said point being the southwest corner of Colina Plaza and said
point also lying on the northerly right-of-way line of U.S. Interstate Highway
No. 10; thence South 61° 38' 34" East along said right-of-way line a distance
of 1,250.00 feet; thence North 28° 21' 26" East a distance of 959.98 feet; thence
South 61° 38' 34" East along the northerly boundary line of Block 3, Colina
Plaza a distance of 118.00 feet; thence North 28° 21' 26" East along the westerly
boundary line of Block 8, Colina Plaza a distance of 237.16 feet to the POINT OF
BEGINNING;

Thence North 28° 21' 26" East along said westerly boundary line
a distance of 338.84 feet;

Thence South 61° 38' 34" East along the northerly boundary
line of Block 8 a distance of 900.00 feet;

Thence South 28° 21' 26" West along the easterly boundary
line of said Block 8 a distance of 458.65 feet;

Thence North 61° 38' 34" West a distance of 95.11 feet;

Thence North 1° 22' 00" East a distance of 94.30 feet;

Thence North 61° 38' 34" West a distance of 213.57 feet;

Thence North 28° 21' 26" East a distance of 38.04 feet;

Thence North 61° 38' 34" West a distance of 590.00 feet to the
POINT OF BEGINNING and containing in all 7.8077 acres of land more or less.

Ramon E. Lara, P.E.
ORDWARD, INC.

April 11, 1980

EXHIBIT "F"

Cielo Vista Mall Shopping Center
El Paso, Texas

Dillard's Tract To Sears - NEW PARCEL B-1

## PROPERTY DESCRIPTION

Description of a parcel of land being a Portion of Block 3, Celina Plaza,
El Paso County, Texas and being more particularly described by metes
and bounds as follows:

From a point, said point being the southwest corner of Celina Plaza and
said point lying in the northerly right-of-way line of U. S. Interstate Highway
No. 10; thence South 61° 38' 34" East along the northerly right-of-way line
of U. S. Interstate No. 10 a distance of 1250.00 feet; thence North 28° 21' 26"
East a distance of 969.98 feet; thence South 61° 38' 34" East a distance of
1818.00 feet; thence North 28° 21' 26" East a distance of 91.35 feet to THE
POINT OF BEGINNING;

   Thence North 28° 21' 26" East a distance of 409.00 feet;

   Thence South 61° 38' 34" East a distance of 198.30 feet;

   Thence South 28° 21' 26" West a distance of 409.00 feet;

   Thence North 61° 38' 34" West a distance of 198.30 feet to THE POINT
OF BEGINNING and containing 81,513.70 square feet or 1.871 acres of land
more or less.

Donald T. Cremans, P.E.
CREMANS, INC.

December 21, 1979