EXHIBIT 5

CIELO VISTA REA

EL PASO, TEXAS

RE... ...MENT AND OPERATING AGREEMENT

THIS AGREEMENT, made as of the _6ᵗʰ_ day of _July_, 1981, between CELINA DEVELOPMENT COMPANY, a Texas limited partnership ("Developer") and SEARS, ROEBUCK AND CO., a New York corporation ("Sears"),

## WITNESSETH:

WHEREAS, Developer is the fee owner, easement owner and lessee of certain land located in the City of El Paso, County of El Paso and State of Texas, a metes and bounds description of said land being set forth on Exhibit "A-1" which is attached hereto and hereby made a part hereof ("Developer Tract"), and

WHEREAS, Developer is a party to a certain Reciprocal Easement and Operating Agreement with Dillard Department Stores, Inc. ("DDSI") and Construction Developers, Incorporated ("Condev") (said DDSI and Condev being hereinafter referred to collectively and jointly and severally as "Dillard") dated February 1, 1973 and recorded in Book 433 at Page 894 in the Office of the Clerk of El Paso County, Texas, as amended by Amendment dated May 15, 1973 and recorded in Book 465, at Page 391 in said Clerk's Office, further amended by Amendment to Reciprocal Easement and Operating Agreement dated as of May 23, 1974, recorded in Book 559 at Page 1269 in said Clerk's Office and further amended by Third Amendment to Reciprocal Easement and Operating Agreement dated as of October 29, 1974, recorded in Book 559 at Page 1276 in said Clerk's Office, pertaining to the land formerly owned by Condev and described in Exhibit "A-2" attached hereto and hereby made a part hereof ("Dillard Tract"), and providing for the construction and operation of a Dillard Department Store in said Shopping Center, which Dillard Tract is now owned in part by Dillpaso Properties Corp. and leased to DDSI, and owned in part by Developer and leased to DDSI, and

WHEREAS, Montgomery Ward & Co., Incorporated ("Ward") is the owner of a tract of real estate more particularly described in Exhibit "A-3" attached hereto and hereby made a part hereof ("Ward Tract"), and is a party to a certain Reciprocal Easement and Operating Agreement with Developer dated July 18, 1973 and recorded in Book 465 at Page 416 in said Clerk's Office, as amended by Amendment dated January 7, 1974 and recorded in Book 557 at Page 821 in said Clerk's Office, and by Second Amendment dated September 25, 1974 and recorded in Book 557 at Page 825 in said Clerk's Office, pertaining to said Ward Tract and providing for the construction and operation of a Montgomery Ward Department Store in said Shopping Center, and

WHEREAS, Developer is a party to a certain Reciprocal Easement and Operating Agreement with Amfac Merchandising Corporation ("Amfac") dated July 18, 1973 and recorded in Book 465 at Page 497 in said Clerk's Office, as amended by Amendment dated September 3, 1974 and recorded in Book 557 at Page 829 in said Clerk's Office, and as further amended by Amendment dated August 30, 1978 and recorded in Book 940 at Page 2052 in said Clerk's Office, pertaining to the land described in Exhibit "A-4" attached hereto and hereby made a part hereof ("Allied Tract"), which land is now leased by Amfac to Allied Stores of Texas, Inc. ("Allied"), and Allied presently operates a Joske Department Store thereon in said Shopping Center, and

WHEREAS, Sears concurrently with the execution hereof, has acquired a subleasehold estate from Developer in and to a tract of real estate described in Exhibit "A-5(a) attached hereto and hereby made a part hereof (the "Sears Parcel I"), pursuant to a certain sub-sublease from Developer (the "Developer Lease"), a memorandum of which is recorded in Book

_____, at Page _____ in said Clerk's Office, and Sears has heretofore acquired a leasehold estate from the City of El Paso in and to a tract of real estate described in Exhibit "A-5(b)" attached hereto and hereby made a part hereof (the "Sears Parcel II") pursuant to a certain Lease from the City of El Paso (the "City Lease"), a memorandum of which is recorded in Book 455, at Page 455, in said Clerk's Office (the said Sears Parcel I and Sears Parcel II being hereinafter collectively referred to as the "Sears Tract" and said Developer Lease and City Lease being hereinafter referred to collectively as the "Sears Leases"), and

WHEREAS, Developer has acquired a portion of the Developer Tract by Sublease from Sears, a memorandum of which is recorded in Book _____, at Page _____, Deed Records of El Paso County, Texas, out of the land which Sears has leased from the City of El Paso under the City Lease as aforesaid, and

WHEREAS, the real estate as described in the aforesaid Exhibits "A-1" through "A-5(a)" and "A-5(b)" comprise a tract of land used and to be used for an existing integrated regional shopping center known as Cielo Vista Mall, and here-after designated "Shopping Center". A metes and bounds description of said Shopping Center, consisting of the Developer Tract, Ward Tract, Dillard Tract, Allied Tract and Sears Tract is as described in Exhibit "A-6" attached hereto and hereby made a part hereof, and a Plot Plan of said Shopping Center set forth in Exhibit "A-7" attached hereto and hereby made a part hereof, and

WHEREAS, Developer has leased a portion of the Developer Tract to J. C. Penney Company, Inc. ("Penney") for the operation of a Penney Department Store on said portion of the Developer Tract, as shown on the Plot Plan, Exhibit "A-7", and

WHEREAS, Sears and Developer desire that Sears should con-struct, open and operate a department store on the Sears Tract and a Parking Deck on portions of the Sears Tract and Developer Tract in the Shopping Center, and that Developer should expand the existing facilities of the Shopping Center on the Developer Tract to accommodate the addition of Sears to the Shopping Center, and

WHEREAS, Developer, Ward, Dillard, Allied and Amfac heretofore have entered into a certain tie-in agreement dated July 18, 1973 and recorded in Book 465 at Page 573 in said Clerk's Office, as amended by amendment dated September 3, 1974 and recorded in Book 558 at Page 342 in said Clerk's Office, and amendment dated August 30, 1978 and recorded in Book 940 at Page 2064 in said Clerk's Office, providing for the coordination of the various reciprocal easement and operating agreements between and among the parties, and

WHEREAS, Developer will require the execution by Sears, Ward, Dillard, Allied and Amfac of a further tie-in agreement providing for the use by Sears and its said premises, the common areas and the easements hereunder conferred, and will further require such parties to join in mutual and reciprocal easement agreements reasonably consistent in form and substance hereto, and

WHEREAS, it is the intention that Sears, as owner and lessee of the Sears Tract, shall construct on the Sears Tract, in accordance with the plans and specifications approved by Developer as hereinafter in this agreement provided, a building and improvements to be operated by Sears as a Sears Department Store, and Developer and Sears therefor desire to enter into this written agreement ("Operating Agreement"), providing for their respective rights and duties relating to the construction of the building and improvements on the Sears Tract and for the operation and maintenance of their respective Tracts and the Shopping Center, and for other matters; and

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt of which is hereby acknowledged, Developer and Sears hereby agree as follows:

-2-

P A R T  O N E

Article 1 Definitions

As used in this Agreement, the following words and phrases shall mean:

1    "Developer" - the owner or owners collectively for the time being of the fee and/or leasehold estate in the entire Developer Tract; provided, however, that the mortgagee or lessor of the Developer Tract shall be liable for the performance of the Developer's covenants and obligations hereunder only if and for so long as such mortgagee or lessor comes into and holds possession of the Developer Tract, but not before or after such possession.

2    "Shopping Center" - the Shopping Center Tract and all improvements situated thereon.

3    "Commence Construction" or "Commencement of Construction" - the date a party lets a firm contract with a responsible contractor on any building for the construction of the footings and foundations.

4    "Affiliate" - any party, person, firm or corporation which controls, or is controlled by, such party, or is controlled by the same person, firm or corporation which then controls such party, and any person, firm or corporation which is a member with such party in the relationship of joint venture, partnership or other form of business association concerning the subject matter involved.  ("Control" for the purpose of this Agreement means the legal or beneficial ownership of 50% of the voting securities of the party controlled.)  In no event shall Developer or Sears be deemed to be an affiliate of the other.

5    "Floor Area" - the space in a horizontal plane occupied by the surface of each floor within a completed Building and the space in a horizontal plane occupied by the surface of each floor within a complete kiosk, boutique or similar income producing improvements within or without a building; said space being measured in square feet determined by the linear dimensions in feet from the outside of the exterior building perimeter walls to the outside of the exterior building perimeter walls (except party walls as to which the center thereof, instead of the exterior faces thereof, shall be used) including any such space covered by:

-3-

(1)   basements and other similar subterranean areas;

(2)   balconies and mezzanines, other than additional space created by fixture installations designed to increase the usability of space exclusively for stock or storage purposes;

(3)   walls and columns;

(4)   elevators, dumb waiters, stairs, escalators and conveyors;

(5)   Outdoor Selling Area, if any, to the extent that it is enclosed ' mechanically heated or air conditioned;

(6)   all other similar spaces located within the exterior facade of the exterior perimeter walls;

but excluding such space covered by:

(a)   the Covered Mall;

(b)   electrical and/or mechanical equipment rooms and/or penthouses used to serve any occupant;

(c)   transformer room or vault;

(d)   junk tire or rubbish storage spaces;

(e)   trash and rubbish storage and/or bailing rooms;

(f)   paved or concrete aprons (whether or not covered by canopies) and gasoline pump islands located at any Tire, Battery and Accessory (TBA) automotive service station;

(g)   sheds used exclusively for Common Area maintenance purposes;

(h)   truck docks, except to the extent permitted in "leased premises" under a lease agreement wherein Developer is "landlord";

(i)  decked storage areas above floor level;

(j)  public service corridors required by safety fire codes or similar public laws; and

(k)  Parking Deck (as hereinafter defined);

and the said Floor Area, including future additions thereto, of each Party hereto, shall be certified by said Party's architect to the other Party; provided that any dispute about such certification shall be submitted to arbitration under the provisions of the Article on Arbitration contained in this Agreement.

6    "Gross Leasable Area" - Floor Area intended, and ready, for the exclusive use and occupancy of an Occupant, prospective or actual, measured in square feet, determined by the linear dimensions in feet, from the center of joint partitions, party or interior walls (or the outside of the exterior Building perimeter walls, as applicable) to the center of joint partitions, party or interior walls (or the outside of the exterior Building perimeter walls, as applicable); excluding any Floor Area:

(1)  in any public meeting hall or auditorium that is neither leased by an Occupant nor owned by any Department Store, not to exceed 3,000 square feet;

(2)  in any public restroom that is neither leased by an Occupant nor owned by any Department Store;

(3)  in Shopping Center management offices and storage and in Merchants Assoc    ion offices, all of which is not to excee    otal of 7,500 square feet; and

(4)  to be used by, or for the Occupants and their Permittees, in common with each other;

and the said Gross Leasable Area, including future additions thereto, of each Party hereto shall be certified by said Party's architect to the other Party, provided that any dispute about such certification shall be submitted to arbitration under the provisions of the Article on Arbitration contained in this Operating Agreement.

-5-

7   "Building" - all Improvements to and upon the Shopping Center Tract, or any other component Tract thereof, excluding underground utility installations, the Common Area, the Parking Deck, the Covered Mall, the Outdoor Selling Area, if any, the landscaping, if any, between the exterior perimeter walls of Buildings and the Building Perimeter Sidewalk.

8   "Outdoor Selling Area" - the land, being a portion of the Shopping Center Tract and any improvements situated thereon, that may be, from time to time, exclusively appropriated for permanent or temporary outdoor selling, as designated on Exhibit "A-1", or as agreed upon later by consent of all the Parties hereto; said Outdoor Selling Area being exclusive of the Common Area, the Covered Mall, and the Buildings and the landscaping, if any, between the exterior perimeter wall of Buildings and the Building Perimeter Sidewalk situated upon the Shopping Center Tract; and any areas within the Common Area or the Parking Area temporarily used by any Occupant for the "truck load" and "sidewalk" sales under rights granted in the provisions of a lease agreement wherein Developer is "landlord".

9   "Temporary Cessation" - any such reasonable interruption of such business as is incident to a Department Store business, not to exceed thirty (30) days in any twelve (12) month period, shall not be deemed a discontinuance of the operation of the same business.

10  "Common Area" - certain improved portions of the Shopping Center Tract which are for the general use, convenience and benefit of all the Parties hereto and all Occupants (and their respective tenants, sub-tenants, customers, employees, concessionaires and other Permittees) and not Floor Area intended for the exclusive use and occupancy of an Occupant (and its customers, concessionaires and other Permittees) including, but not limited to:

(1)  Parking Areas and individual Parking Spaces for automobiles of customers and employees of any Department Store, any Mall Tenant and other Occupants, including, without limitation, the Parking Deck (as hereinafter defined and provided), provided that there shall be no further multi-level Parking Areas without the approval of Developer and all Department Stores;

-6-

(2)  roadways (including ring road, if any, as shown on Plot Plan, Exhibit "A-7"), driveways, aisles, islands, private streets, entrances and exits to and from public roadways and streets to provide vehicular access and ingress and egress to and from Parking Areas;

(3)  sidewalks, walkways and stairways to provide pedestrian access included in such Parking Spaces;

(4)  ramps, truckways, loading areas, delivery passages, truck tunnel and service corridors connecting therewith; except as located within any Building belonging to any Department Store which is a Party hereto;

(5)  landscaped and exterior planted areas, excluding landscaped and exterior planted areas, if any, between the exterior perimeter walls of Buildings and the Building Perimeter Sidewalks;

(6)  curbs, lighting standards, paving, traffic and directional signs and traffic stripings and markings, as located upon the Shopping Center;

(7)  all common utility facilities serving, or used by, more than one Party hereto and/or in common with other Occupants;

(8)  outside courts and courtyards;

(9)  public stairways, escalators, bus stops and public service corridors; and

(10) retention pond and outlet structure beneath the Parking Deck (as described and provided in the City Lease and the Sublease from Sears to Developer of even date herewith);

in the Shopping Center, all as shown on the Plot Plan, Exhibit "A-7", but excluding:

(a)  any portions of the Shopping Center , which may, from time to time, be occupied by any duly dedicated public street or highway;

(b)  such portions of the Shopping Center, as may be, from time to time, exclusively appropriated for use as permanent or temporary Outdoor Selling Area, if any, as indicated on Exhibit "A-7";

(c)  such portions of the Shopping Center as shall comprise the areas and spaces in the Covered Mall. the Developer Building and in any Building belonging to any Department Store which is a Party hereto; and

(d)  existing and permissible kiosks as shown on the Plot Plan, Exhibit "A-7".

11   "Small Store Floor Area" - all Gross Leasable Area In the Shopping Center, other than Department Store Floor Area, built for and devoted to the purpose of selling goods and/or services to the public at retail.  Included in the term are banks, insurance, savings and loan, personal loan and post office operations, service operations such as beauty salon, barber shop, travel agency and the like, and motion picture theaters; excluded from the term are residential buildings such as hotels, motels and apartment houses, hospitals, office space not directly related to or part of a retail selling operation within the Shopping Center and any space in an office building, except in the case of any of the foregoing types of buildings, area on the ground floor thereof which is devoted to retail selling purposes.

12   "Supporting Facilities" - all Common Areas in the Shopping Center, including the Covered Mall, the Parking Deck, the parking areas, the access and perimeter roads, retaining walls and all utilities and utility systems in the Shopping Center, including, but not limited to, electric, gas, water (for fire and domestic purposes), storm water drainage and sewerage systems, necessary to service the Shopping Center and any other improvements whether on-site or off-site necessary for the operation of the Shopping Center.

13 **"Taxes"** - (i) real estate taxes, and (ii) assess-
ments or taxes imposed on interests in real estate
for general public improvements, benefits or
purposes, and (iii) assessments or taxes which are
specifically imposed on interests in real estate
for public improvements, and (iv) taxes and
assessments imposed on interests in real estate
upon the occupancy, use, possession, estates or
rights of any party having an interest in the
premises upon which the same is imposed, and (v)
any penalties, fines or interest added to any of
the foregoing and actually paid arising out of the
failure of the party who is responsible to pay the
foregoing in making payments thereof in accordance
with the provisions of this Agreement, except that
franchise, corporate, gift, estate, inheritance,
succession capital levy, transfer taxes, income
taxes, excess profits taxes or other tax based
upon or measured by revenue and any levy or charge
measured by consumption or use for water, sewage
disposal, telephone, gas, electricity or any other
facility commodity or service shall not be in-
cluded in the definition of "Taxes".

14 **"Shopping Center"** - the land containing the
Developer's Tract and all Department Store Tracts,
and all Improvements thereon; and being fully
described by metes and bounds on Exhibit "A-2",
and as shown on the Plot Plan, Exhibit "A-7".

15 **"Department Store"** - Sears, Ward, Dillard, Penney,
Allied and any other Occupant which occupies
80,000 square feet or more of Gross Leasable Area
in the Shopping Center, and containing a number of
departments for the sale of soft and hard line
goods and miscellaneous merchandise and services.

16 **"Occupant"** - any person or legal entity, including
any Party hereto, who is legally entitled to the
exclusive use and occupancy of any Gross Leasable
Area under the rights contained in a deed or a
written lease agreement.

17 **"Improvements"** - all improvements to land of every
nature and kind, including underground utility
installations, upon the Shopping Center Tract, or
any other component Tract thereof, including the
Common Area, the Parking Deck, the Covered Mall,
the Buildings, the Outdoor Selling Area, if any,
landscaped areas, including the landscaping, if
any, between the exterior perimeter wall of
Buildings and the Building Perimeter Sidewalk.

18 **"Agreed Interest Rate"** - the rate of interest
which is one percent (1%) over the rate of interest,
averaged on a monthly basis, charged from time to
time for commercial loans to most-preferred cus-
tomers by The Chase Manhattan Bank, N.A., computed
separately for each month during which the obliga-
tion, or any part thereof, upon which such interest
is charged remains unpaid hereunder.

## Construction

### Article 2 Sears Construction

**Paragraph**

2.01  Subject to Article 26 Force Majeure, Sears shall, no later than February 1, 1981, at its sole cost and expense, commence construction and thereafter diligently proceed with continuity to complete construction of a retail department store building with attached TBA automotive center ("Sears Building") on the Sears Tract, and an elevated parking deck ("Parking Deck") on a portion of the Sears Tract and a portion of the Developer Tract, all as more particularly shown on the Plot Plan, Exhibit "A-7". The Sears Building shall consist of two (2) levels and shall be built substantially in accordance with the Plans referred to in this Article and shall contain approximately 140,000 square feet of Floor Area. The Parking Deck shall be built strictly in accordance with the Plans referred to in this Article. The Sears Building and the Parking Deck shall be located within the lines of the areas marked "Sears Building" and "Parking Deck", respectively, all as shown on the Plot Plan attached hereto as Exhibit "A-7", and the Sears Building shall have major entrances abutting and fronting on the Covered Mall, together with such walkways, if any, shown on the Plans required to connect such entrances to the Covered Mall. Except as provided in this Paragraph, the footings, marquees and canopies and Sears Building shall be situated entirely inside the perimeter boundaries of the Sears Tract. The Sears Building may include underground footings extending not more than six (6) feet beyond the Sears Tract, and may include covered entrances and walkways, marquees, canopies, and other overhangs extending not more than five (5) feet beyond the boundaries of the Sears Tract, subject to Developer's right to approve the exterior design thereof, which approval shall not be unreasonably withheld, it being understood that none of such entrances, walkways, marquees, canopies and other overhangs will be so located as to interfere with the construction, operation or maintenance of the Covered Mall or any other Building or Buildings constructed or to be constructed on the Developer's Tract. The Parking Deck shall be and become part of the Common Area hereunder. Sears also shall cause all necessary Site and Utility Work (as hereinafter defined) to be done on the Sears Tract and the Developer Tract, as hereinafter provided in Paragraph 2.01A of this Article. Sears has employed Kelley-Nelson Construction Company of Little Rock, Arkansas (hereinafter referred to as the "Contractor"), as its contractor for all such work, and all Plans referred to in this Article shall be prepared by Gordon Sibeck & Associates, Inc. of Dallas, Texas (hereinafter referred to as the "Architect").

2.01A  In addition to the construction of the said Sears Building and Parking Deck as hereinabove provided, Sears also shall cause all necessary site preparation and utility installation work ("Site and Utility Work") to be done by Contractor on the Sears Tract and the Developer Tract in order to facilitate the enlargement, extension and relocation of the Common Areas, the construction of the Sears Building and Parking Deck, and the expansion of the Covered Mall and the construction of additional Small Store Floor Area on the Developer Tract, all as contemplated by this Agreement. Plans and specifications (collectively called "Plans") for the Site and Utility Work on the Sears Tract and the Developer Tract shall be prepared for Sears by the Architect and submitted to Developer for approval prior to the commencement of such construction, which approval shall not be unreasonably withheld, delayed or denied. Said

Plans for the Site and Utility Work shall be submitted by Sears to Developer no later than sixty (60) days prior to the construction commencement date hereinafter set forth, in reproducible form accompanied by a transmittal enumerating all sheets, data, all drawings properly indexed and all drawings and specifications bound in sets. Developer shall notify Sears in writing of its approval or objections to said Plans within thirty (30) days after receipt thereof; provided, however, notwithstanding anything to the contrary contained herein, working drawings may be submitted for approval in stages or phases after commencement of construction, in order to expedite the work. In each instance where an objection has been raised by Developer, subsequent approval of the matter to which such objection has been raised shall not be given or implied unless and until such matter has been corrected and resubmitted by Sears to Developer for approval in accordance with the foregoing procedure. Sears has let a certain contract to Contractor, dated August 29, 1980 (hereinafter referred to as the "Contract"), in order to cause such Site and Utility Work, and other work, to be done on the Sears Tract and the Developer Tract. Sears represents and warrants to Developer that said Contract contains a warranty from the Contractor that all materials and equipment furnished under the Contract will be new unless otherwise specified, and that all of the work will be of good quality, free from faults and defects and in conformance with the Plans, and an obligation o` the part of said Contractor to correct any defective or non-conforming work appearing within one (1) year after the date of substantial completion or within such longer period as may be prescribed by law, all in accordance with the terms of AIA Document A111 (1978 Edition) and AIA Document A201 (General Conditions of the Contract for Construction, 1976 Edition), and Sears shall cause such warranty from its said Contractor to expressly extend and inure directly to the benefit of Developer. In the event Sears fails or neglects to obtain such warranty from its said Contractor for the benefit of Developer, in written form reasonably satisfactory to Developer, Sears shall be and remain liable to Developer for any and all defects which appear in said work, and for the correction thereof, after completion thereof by said Contractor and final acceptance thereof by Developer. If Sears obtains a satisfactory warranty from its said Contractor for the benefit of Developer and delivers the same to Developer, Sears will have no further liability to Developer in connection with such work from and after its completion and the final acceptance thereof by Developer. Nothing contained herein shall preclude Developer from obtaining any different or additional warranty from said Contractor for the benefit of Developer, which shall be in addition to the warranty contained in said Contract. All such Site and Utility Work shall be done by Sears in strict accordance with the approved Plans, and shall at all times be subject to inspection and approval by Developer, its engineers and contractors, which approval shall not be unreasonably withheld, delayed or denied. Any such Site and Utility Work which is not satisfactory and acceptable to Developer promptly shall be corrected and re-executed by Sears or its said Contractor at no expense to Developer. The fact that Developer shall have approved the Plans for the Site and Utility Work and the Contractor selected by Sears to perform such work, shall not relieve or release Sears from its obligation, liability and responsibility to perform and furnish all such Site and Utility Work in a first-class and workmanlike manner and in strict accordance with established and recommended construction practices and procedures for such work, to the reasonable satisfaction of Developer and its engineers and contractors. Subject to Article 26 Force Majeure, Sears shall commence such Site and Utility Work on or before November 1, 1980 and shall deliver the building pad for construction of the Covered Mall expansion and additional Small Store Floor Area on the Developer Tract to Developer, ready for commencement of construction of said Improvements by Developer, no later than January 15, 1981. All such Site and Utility Work shall be done at Sears' sole cost and expense, and Sears shall

-11-

make all payments due to contractors from time to time for all such Site and Utility Work on the Sears Tract and the Developer Tract. Within thirty (30) days after Sears completes and pays in full for all such Site and Utility Work in the Shopping Center and delivers said building pad on the Developer Tract to Developer as hereinabove provided, and Developer accepts said building pad, Developer shall pay and reimburse Sears for the cost of such building pad in the amount set forth in that certain Supplemental Agreement of even date herewith by and between Sears and Developer, which shall be Developer's sole obligation to Sears in connection with such Site and Utility Work. Prior to making such payment to Sears, Developer shall be entitled to receive from Sears lien waivers from contractors and suppliers and other evidence to show that all costs of such Site and Utility Work for the Shopping Center have been paid in full and that there are no outstanding liens or claims which could ripen into liens for any such Site and Utility Work. Sears shall indemnify, defend and hold harmless Developer and the Developer Tract and all Improvements thereon, from and against any and all liens and claims arising out of or resulting from the Site and Utility Work to be performed and furnished by Sears hereunder, and Sears shall cause any and all such liens and claims to be paid and discharged in accordance with Paragraph 2.12 of this Article.

2.02   Sears shall complete the preparation of both outline and final plans and specifications (collectively called "Plans") for the Sears Building and the Parking Deck, as well as other matters relating to construction of the Sears Building and the Parking Deck, except as may expressly be provided otherwise herein, without cost or expense to the Developer. Such Plans shall be consistent with the provisions of this Agreement and the general purposes and intentions of the Developer and Sears as indicated by this Agreement and the Plans shall provide for construction of Improvements by Sears which are substantially similar to department stores and parking decks constructed by or for Sears and Developer, respectively, and presently in operation as of the date of execution hereof.

2.03   All Plans for the Sears Building and the Parking Deck shall be prepared by Sears architects and engineers and, prior to the commencement of construction, all such Plans shall be submitted to Developer. Plans for the Sears Building shall be submitted to Developer for informational purposes only. Sears covenants and agrees that the exterior design and appearance of the Sears Building shall be in conformity with the exterior design and appearance of the existing buildings in the Shopping Center and shall be architecturally harmonious and compatible therewith, and that Sears shall cause the Plans for the Sears Building to be prepared in accordance with such criteria. Plans for the Sears Building shall strictly conform to the Plot Plan, Exhibit "A-7". Plans for the Parking Deck shall be submitted to Developer for approval by Developer prior to the commencement of construction of the Parking Deck, which approval shall not be unreasonably withheld, delayed or denied. Said Plans for the Parking Deck shall be submitted by Sears to Developer no later than sixty (60) days prior to the construction commencement date hereinabove set forth, in reproducible form accompanied by a transmittal enumerating all sheets, data, all drawings properly indexed and all drawings and specifications bound in sets. Developer shall notify Sears in writing of its approval or objections to said Plans within thirty (30) days after receipt thereof; provided, however, notwithstanding anything to the contrary contained herein, working drawings may be submitted for approval in stages or phases after commencement of construction, in order to expedite the work. In each instance where an objection has been raised by Developer, subsequent approval of the matter to which such objection has been raised shall not be given or implied unless

-12-

and until such matter has been corrected and resubmitted by
Sears to Developer for approval in accordance with the
foregoing procedure. Without limitation upon the generality
of the foregoing requirements, it is expressly understood
and agreed that the design and construction of said Parking
Deck shall conform to the recommendations of Raba, Kistner,
Anderson Consultants, Inc., of El Paso, Texas, who shall be
the soils engineer for such project, and Nagler, Pitt and
Merritt, Consulting Engineers, Inc., of Dallas, Texas, who
shall be the structural engineer for such project, all of
whom shall be employed by and at the expense of Sears or its
said contractor. The aforesaid Contract between Sears and
Contractor described in Paragraph 2.01A also covers and
includes construction and erection of the Parking Deck on
the Sears Tract and on the Developer Tract, to be done at
Sears' expense, as herein provided. Sears represents and
warrants to Developer that said Contract contains a warranty
from the Contractor that all materials and equipment furnished
under the Contract will be new, unless otherwise specified,
and that all of the work will be of good quality, free from
faults and defects and in conformance with the Plans, and an
obligation on the part of said Contractor to correct any
defective or non-conforming work appearing within one (1)
year after the date of substantial completion or within such
longer period as may be prescribed by law, all in accordance
with the terms of AIA Document A111 (1978 Edition) and AIA
Document A201 (General Conditions of the Contract for Construction,
1976 Edition), and Sears shall cause such warranty from its
said Contractor to expressly extend and inure directly to
the benefit of Developer. In the event Sears fails or
neglects to obtain such warranty from its said Contractor
for the benefit of Developer, in written form reasonably
satisfactory to Developer, Sears shall be and remain liable
to Developer for any and all defects which appear in said
work, and for the correction thereof, after completion
thereof by said Contractor and final acceptance thereof by
Developer and, notwithstanding anything to the contrary
contained elsewhere in this Operating Agreement, Developer
shall have no liability, obligation or responsibility for
the repair and maintenance of said Parking Deck unless and
until Sears obtains such warranty from said Contractor for
the benefit of Developer, and Sears shall indemnify, defend
and hold Developer harmless from and against any such liability,
obligation or responsibility until such time as Sears delivers
such warranty to Developer from its said Contractor. If and
when Sears obtains such warranty from its said Contractor
for the benefit of Developer and delivers the same to Developer,
Sears shall have no further liability to Developer in connection
with the construction of said Parking Deck from and after
its completion and the final acceptance thereof by Developer,
and Developer shall assume responsibility for maintenance of
said Parking Deck as hereinafter provided in this Operating
Agreement. Nothing contained herein shall preclude Developer
from obtaining any different or additional warranty from said
Contractor for the benefit of Developer, which shall be in
addition to the warranty contained in said Contract. Said
Parking Deck shall be erected in strict accordance with the
approved Plans. The fact that Developer shall have approved
the Plans for the Parking Deck and the Contractor selected
by Sears to erect the same, shall not relieve or release
Sears or its said Contractor from the obligation, liability
and responsibility to erect said Parking Deck in a first-
class and workmanlike manner and in strict accordance with
established and recommended construction practices and
procedures for such work, including, without limitation, the
recommendations of the aforesaid soils and structural engineers,
to the reasonable satisfaction of Developer.

2.04  In connection with the Site and Utility Work and the
erection of Sears Building and the Parking Deck and the purchase
and installation of Sears Building equipment, Sears shall select
and pay for all personnel, labor, materials, equipment, services,

utilities and other elements, enter into contracts therefor (subject to approval by Developer with regard to the selection of a contractor for Site and Utility Work and the erection of the Parking Deck), and determine and do any and all matters of things, all upon such terms and conditions as Sears may deem necessary or advisable and all at Sears' own cost and expense, it being the intention of the parties that Sears shall be solely responsible for the Site and Utility Work and the planning, supervision, construction and equipping of the Sears Building and the Parking Deck; provided, however, that all work schedules, timetables and completion dates and all construction procedures, practices, means and methods proposed by Sears in connection with the Site and Utility Work and construction of the Parking Deck shall be subject to approval by Developer, which approval shall not be unreasonably withheld, delayed or denied.  To facilitate coordination, and to the extent not otherwise provided for herein, Sears, at Developer's request, and Developer, at Sears' request, shall furnish each other copies of their respective plans and specifications, as such plans and specifications are developed, for the purpose of coordinating interface detailing, but no approval thereof shall be required except as otherwise expressly provided in this Agreement.  Developer and Sears agree to cooperate with one another so as to avoid labor disputes in connection with the construction of Sears' Improvements and the expansion of the Shopping Center.

2.05  At Developer's request, Sears shall cause to be furnished to Developer from time to time, proposed work schedules, timetables and estimated completion dates for said Site and Utility Work and Improvements, also progress reports, so that the work referred to hereinafter which is to be done at the Shopping Center by Developer and the timetable for such work may be coordinated with the Site and Utility Work and the construction of the Sears Building and Parking Deck and the installation of the Building equipment to be done by Sears hereunder.  All such work schedules, timetables and completion dates proposed by Sears shall be subject to approval by Developer, which approval shall not be unreasonably withheld, delayed or denied.

2.06  At Sears' request, Developer shall likewise cause to be furnished to Sears from time to time, the estimated completion date of the Shopping Center addition; also, progress reports so that the construction of the Building and the installation of the Building equipment and the timetable for such work may be coordinated with the work referred to hereafter which is to be done at the Shopping Center by Developer.

2.07  Sears shall be responsible for proceeding in compliance with building, zoning and other applicable laws, ordinances, rules and regulations and requirements of all Federal, State and municipal governments and the appropriate departments, commissions, boards and officers thereof and in such manner that Sears shall be able to obtain the insurance required to be carried by Sears pursuant to Article 19 of this Operating Agreement.  Sears shall cause to be obtained all building permits, licenses, and other governmental approvals and authorizations which may be required for the Site and Utility Work and the construction, use and occupancy of the Sears Building and the Parking Deck, and Developer agrees to cooperate with Sears (at no expense to Developer) to the extent that Sears may request or require such cooperation to obtain such permit, license, compliance, approval or authorization and in all other respects to the end that the Site and Utility Work, the Sears Building and the Parking Deck shall be done and constructed and the fixtures and equipment may be installed as efficiently and expeditiously as possible.

2.08  Developer, any designee of Developer, and their respective agents and employees shall have access to the Sears Tract and the Parking Deck at all reasonable times while construction of said Improvements is in progress, for the purpose of observing performance of the work but Developer shall not interfere with Sears' construction of the Sears Buildings in so doing.  Sears shall cause all construction work performed or caused to be performed by it in the Shopping Center to be done in a first-class, workmanlike manner.  Sears shall correct and repair, or cause to be corrected and repaired, any defects which appear in the Parking Deck as the result of faulty or deficient design, workmanship or materials, whenever the same appear, all at Sears' expense; provided, however, that Sears shall be released and relieved of this obligation to correct and repair defects which appear in the Parking Deck if and when Sears shall obtain the necessary warranty and contractual obligation from its contractor providing for such correction and repair of defects in the Parking Deck, which shall extend and inure to the benefit of Developer and which shall be covered by the necessary performance bond naming Developer as an additional obligee, all as hereinabove provided in Paragraph 2.03 of this Article.  Sears agrees to comply with and conform to the Plans as submitted to Developer and, in the case of the Parking Deck, approved by Developer. Sears agrees that, upon completion, the Sears Building and the Parking Deck shall fully comply with any applicable building and zoning laws and with the requirements of all other applicable laws, rules, orders, notices, codes, ordinances, requirements and regulations of municipal, State, Federal and other governmental authorities, and of the Board of Fire Underwriters, and the appropriate departments, commissions, boards and officers thereof, whether or not the same are now in contemplation of the parties or require amendments to the aforesaid Plans.  Sears shall obtain, and if requested in writing by Developer, shall deliver to Developer, true copies of any temporary or permanent certificate or certificates of occupancy and all other government authorizations, licenses and permits which may be necessary to permit the use of the Sears Building as a Department Store (as distinguished from any such certificate, authorization or permit which may be necessary for the conduct by Sears, its assignees or sublessees of any business therein) and the use of the Parking Deck.

2.09  Subject to Article 26 Force Majeure, Sears shall substantially complete construction of the Sears Building and Parking Deck and deliver to Developer, if requested in writing, a true copy of the Certificate of Occupancy and Architect's Certificate pursuant to Paragraph 2.09 hereof and shall open the Sears Building and Parking Deck for business no later than March 1, 1982 (hereinafter referred to as the "Opening Date").  Provided, however, that Sears shall not be required to open for business with the public unless and until Developer completes and opens the new portion of the Covered Mall to be constructed hereunder.  In no event

-14-

shall the foregoing be construed to require the opening of the Sears Building for business to the public during the period after August 1 of any year to February 1 of the succeeding year, or during the thirty (30) day period prior to Easter Sunday.

2.10 The parties recognize that the work called for herein constitutes the expansion of an existing Shopping Center for purposes of adding the Sears Building and the Parking Deck. Accordingly, Sears hereby covenants and agrees that it will cause its work to be done in such a manner as will not unduly interfere with the operation of the Shopping Center and use and enjoyment by tenants, occupants, customers and patrons thereof. Sears shall take and observe all necessary precautions to prevent and avoid any undue interference with or interruption of the normal operation of the Shopping Center or any injury to persons or property during the performance of its work. Sears shall indemnify, defend and hold harmless Developer from and against any and all loss, cost, expense, damages, liability, claims and actions arising out of the work to be done and performed by Sears and its officers, agents, employees and contractors hereunder including, without limitation, any and all claims for personal injury and property damage, occasioned wholly or in part by any omission or act of negli- gence of Sears, its agents, officers, employees or contractors. A special staging area for construction of the Sears Building and Parking Deck shall be located and maintained by Sears on the Sears Tract, as shown on the Plot Plan, Exhibit "A-7", or as otherwise agreed upon by Sears and Developer.

2.11 [Omitted]

2.12 Sears shall not permit any mechanic's, laborer's or materialman's lien to be filed at any time against the Developer's Tract or any part thereof resulting from acts of Sears or its contractors, agents or employees. If any such lien shall be filed, and after written notice thereof, Sears shall promptly cause the same to be discharged of record by payment, deposit, bond, order of a court of competent juris- diction or otherwise. So long as Sears causes such lien to be discharged of record as aforesaid, Sears shall have the right to contest same. If Sears shall fail to cause such lien to be so discharged then, in addition to any other right or remedy which Developer may have, Developer may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in any such event Developer shall be entitled, if Developer so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor with interest, costs and allowance. Any amount so paid by Developer and all costs and expenses (including reasonable counsel fees) incurred by Developer in connection therewith, together with interest thereon at the Agreed Interest Rate from the respective dates of Developer's making of the payment or incurring of the cost and expense, shall be paid by Sears to Developer on demand.

2.13 Notwithstanding the foregoing provisions of Paragraph 2.12, so long as Sears is a corporation which has a net worth according to its last published report of at least $20,000,000, or an affiliate of Sears having such net worth has undertaken and agreed to guarantee or cause the performance of Sears' covenants and obligations hereunder, Sears shall not be required to discharge any mechanic's, laborer's or materialman's lien which it is contesting until ten (10) days after the final determination thereof, when Sears shall satisfy and discharge such lien to the extent held valid; but the satisfaction and discharge of any such lien shall not be delayed until execution is had on any judgment rendered thereon. In the event of any such contest, Sears shall indemnify Developer and Developer's Site against all loss, cost, expense and damage resulting therefrom including, without limitation, attorney fees.

-15-

2.14 Until such time as Sears completes the installation of the necessary utility lines as provided under Paragraph 2.01A of this Article, Sears shall furnish its own temporary utility lines to the Sears Tract during construction, at Sears' expense. Sears shall pay for all utility services used and consumed by Sears for and during construction hereunder.

## Construction

### Article 3 Developer Construction

3.01  Subject to Article 26 Force Majeure, and provided that Sears delivers the necessary building pad to Developer on the Developer Tract as hereinabove required, Developer shall, at no cost to Sears, except as otherwise provided herein, begin by not later than February 1, 1981, and complete (or cause tc be completed) by not later than March 1, 1982, the construction of the following Improvements on the Developer Tract:

(1)  An expansion of the existing two (2) level Covered Mall, containing approximately 40,000 square feet of additional mall and court area, connecting to the Sears Building and providing a main entrance for the Sears Building opening onto the Covered Mall, as expanded, all as more particularly shown on the Plot Plan, Exhibit "A-7"; and

(2)  Approximate'y 74,000 square feet of additional Smal! Store Floor Area, substantially as shown on the Plot Plan, Exhibit "A-7".

3.02 The timing, commencement, progress and completion of the construction of the improvements to be constructed or provided by Developer in accordance with this Article and by Sears in accordance with Article 2 hereof, shall be in accordance with a construction schedule to be worked out by mutual agreement between the parties. The dates contained in such construction schedules shall be subject to extension by reason of Unavoidable Delays. Completion of construction of said Shopping Center expansion and additional improvements shall be evidenced by a certificate of Developer's architect to the effect that the construction of all the structures and other improvements in the Center have been substantially completed and by temporary or permanent certificates of occupancy from the appropriate governmental authorities which shall permit the use thereof for its intended purposes, except that: (i) completion of leased Small Store Floor Area being added may be evidenced by a Certificate of Developer's architect to the effect that the building shell has been completed, all utilities have been roughed in, and the premises have been turned over to the lessees thereof for the lessees' work, and (ii) completion of unleased Small Store Floor Area being added may be evidenced by a Certificate of Developer's architect to the effect that the building shell has been completed and all utilities have been roughed in, in either of which cases, a temporary or permanent certificate of occupancy shall not be required. Developer agrees to use its best efforts to cause the tenants of Small Store Floor Area to complete their work in accordance with their leases and agree to use its best efforts to cause said tenants to obtain a certificate of occupancy for their premises promptly after completion. If a temporary certificate of occupancy is issued, Developer covenants that it shall be replaced with a permanent certificate of occupancy within six months of the date of the issuance of the temporary certificate of occupancy except that, in the case of unleased Small Store Floor Area, a permanent certificate of occupancy shall not be required earlier than six months after such space is opened for business to the public. To achieve the most economical cost of construction, the parties hereto agree that they shall cooperate prior to and during the construction period of Sears Building and the addition to the Shopping Center with respect to division and coordination of work and the payments therefor in areas where work of construction by Developer and Sears are joined, except that no payments shall be required of Sears which shall have the force and effect of causing Sears to participate in a cost over-run.

-14-

Exhibit 5

3.03 Developer shall cooperate with Sears by submitting for approval by Sears, which approval shall not be unreasonably withheld, delayed or denied, complete working plans and drawings for the Common Area and Improvements for the additional portion of the Shopping Center from time to time as they are developed, insofar as it is reasonably possible so to do. Said working plans and drawings shall be consistent with the layout and design of the Shopping Center shown in Exhibit "A-7". Within thirty (30) days after Sears' receipt of said working plans and drawings, Sears shall either notify Developer in writing of its approval of said working plans and drawings or its objections to them. Failure of Sears to notify Developer within said thirty (30) day period of its approval of said working plans and drawings or its objections to them shall be deemed to constitute approval of said working plans and drawings. Said working plans and drawings shall be revised until mutually agreed upon by Developer and Sears.

3.04 Developer shall cause all construction work in the Shopping Center performed by it to be done in a first-class, workmanlike manner and in compliance with the building, zoning and other applicable laws, ordinances, rules, regulations and requirements of all Federal, State and municipal governments and the appropriate departments, commissions, boards and officers thereof, and in such manner that Developer shall be able to obtain the insurance required to be carried by Developer pursuant to Paragraph 19.1; and Developer shall cause to be obtained all building permits, licenses and other governmental approvals (except such licenses, certificates or approvals relating solely to the Sears Building), which may be required to permit the construction and occupancy of the Shopping Center; and all approvals, if any, of the Site Plan as may be required by any such government, department, commission or board. Sears agrees to cooperate with Developer (at no expense to Sears) to the extent that Developer may request or require such cooperation to obtain any such permit, license, compliance, approval or authorization and in all other respects, to the end that the Shopping Center may be constructed as efficiently and expeditiously as possible.

3.05 Developer shall construct the extension of the Covered Mall so that the attachment thereof to the Sears Building shall not increase the Sears fire insurance rates.

3.06 Developer agrees to maintain or cause to be maintained builder's risk insurance with extended coverage endorsement on the additional improvements to be constructed by Developer in the Shopping Center (excluding the **Sears Building**). Developer agrees to use best efforts that all builder's risk insurance policies shall contain appropriate provisions pursuant to which the insurance carriers waive all rights of subrogation against Sears and those holding under Sears with respect to losses payable under such policies, conditioned upon a similar waiver by the insurance carriers of Sears acceptable in form to Developer's carriers.

3.07 The Covered Mall, and the manner of attachment thereof to **the Sears Building shall** be designed in accordance with good construction practice in the manner customary for structures of this type and so as to be structurally independent. All costs of installation, maintenance, repair or restoration of the Covered Mall shall be paid by the Developer. The Developer grants to Sears a license for Sears to install and maintain flood lights in the Covered Mall to shine upon and light the Sears Building. The number, size, type and location of such flood lights shall be subject to approval by Developer, which approval shall not be unreasonably withheld. Sears shall pay for such maintenance and for the use and maintenance, repair and replacement thereof, as provided for in the Supplemental Agreement executed between the Parties hereto.

3.08 Developer shall not permit any mechanic's, laborer's or materialman's liens to be filed at any time against the Shopping Center or any part thereof resulting from acts of the Developer or its contractors, agents or employees. If any such lien shall be filed, the Developer shall promptly cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction, or otherwise. So long as the Developer causes such lien to be discharged of record, as aforesaid, Developer shall have the right to contest the same. If the Developer shall fail to cause such lien to be so discharged, then, in addition to any other right or remedy which Sears may have, Sears may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in such event, Sears shall be entitled, if

-20-

Sears so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor to pay the amount of the judgment in favor of the lienor with interest, costs and allowance. Any amount so paid by Sears and all costs and expenses (including reasonable counsel fees) incurred by Sears in connection therewith, together with interest thereon at the Agreed Interest Rate from the respective dates of Sears making of the payment or incurring of the costs and expenses shall be paid by Developer to Sears on demand.

3.09 Neither Developer or any affiliate, nor any subsidiary of Developer, shall file or assert any mechanic's lien against any of the Buildings, Improvements or land included within the Shopping Center.

3.10 The Parties recognize that the work called for herein includes the expansion of an existing Shopping Center for purposes of adding additional Small Store Floor Area on the Developer Tract. Developer shall indemnify, defend and hold harmless Sears from and against any and all loss, cost, expense, damages, liability, claims and actions arising out of the work to be done and performed by Developer and its officers, agents, employees and contractors hereunder including, without limitation, any and all claims for personal injury and property damage, occasioned wholly or in part by any omission or act of negligence of Developer, its agents, officers, employees or contractors.

3.11 Subject to Article 26 Force Majeure, Developer shall have the new portion of the Covered Mall open for business with the public on or before March 1, 1982.

## Construction

### Article 4 Future

Except as otherwise provided and recognized in this
Agreement or as shown on the Plot Plan, Exhibit "A-7",
neither Party shall expand any Building, or construct any
additional Building, upon its Tract outside its permissible
building area or in any areas of the Shopping Center without
the prior written approval of the other Party, which
approval shall not be unreasonably withheld, delayed or
denied.

## Construction

### Article 5 Insurance

**Paragraph**

5.1 Developer shall cause each of its contractors to carry contractor's protective liability insurance, at its sole expense or at each of its contractor's sole expense, covering Developer and Sears as named insureds, in the minimum limits of:

(1) $2,000,000 for death of, or bodily injury to, or personal injury to, one person;

(2) $2,000,000 for death of, or bodily injury to, or personal injury to, more than one person, in or resulting from one occurrence; and

(3) Property damage to the limit of not less than $500,000 for each occurrence;

during the period of time from the beginning of the construction work on the Developer Tract, to and including the completion of the construction of the proposed improvements on such Tract.

5.2 Sears shall cause each of its Building, Parking Deck and Site and Utility Work contractors to carry owner's and contractor's protective liability insurance, at its sole expense or at each of its contractor's sole expense, covering Sears and Developer, as named insureds, in the minimum limits of:

(1) $2,000,000 for death of, or bodily injury to, or personal injury to, one person;

(2) $2,000,000 for death of, or bodily injury to, or personal injury to, more than one person, in or resulting from one occurrence; and

(3) Property damage to the limit of not less than $500,000 for each occurrence;

during the period of time from the beginning of Site and Utility Work in the Shopping Center, to and including the completion of the construction of the Sears Building and Parking Deck Improvements on such Tract.

5.3  Each Party shall maintain, or cause to be maintained, all-risk Builder's Risk and Workmen's Compensation insurance during all the period of time any construction of improvements upon its Tract is in progress and uncompleted.  Such insurance shall contain provisions and be in amounts satisfactory to each Party, and shall be adequate to protect each Party from and against any and all claims for death of, or injury to, person or persons, or damage to, or loss of, property, which may arise upon said Shopping Center during any periods of construction.

5.4  Each Party shall, during any period of expansion, remodeling, extensive repairs or maintenance to any of the improvements upon its Tract, maintain such insurance as is herein required to be carried and maintained during the said construction period, except that the amounts thereof shall be reduced or increased according to the extent of such expansion, remodeling, repairs or maintenance.

5.5  Each Party hereby waives any and every claim which arises, or may arise, in its favor against the other Party during the period of construction for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Shopping Center, which loss or damage is recoverable under said insurance policies and to the extent that this waiver is permitted under said insurance policies and does not invalidate any such insurance coverage.  Said mutual waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release regarding any loss of, or damage to, the said property of the other Party.  Each Party shall use its best efforts to cause its insurance policies to provide for and permit such waiver of subrogation, provided the same is available at standard premium rates and at no additional cost or expense to the other Party.  To the extent that any Party is unable to furnish such waiver of subrogation to the other Party hereunder, this waiver of subrogation by the other Party shall be ineffective and inapplicable as to the Party who is unable to furnish such waiver of subrogation.  This waiver shall apply equally to any Party who elects to be self-insured, in whole or in part, as herein provided, as if such Party were independently insured.

5.6  Sears shall have the right, at its option, to comply with and satisfy its obligations under this Article (except the obligations under Paragraph 5.2) by means of self-insurance, in accordance with the terms of Paragraph 19.8 of this Operating Agreement.

## Construction

## Article 6 Liens

**Paragraph**
6.1 When, under the provisions of this Operating Agreement, construction is permitted to be performed or caused by a Party, and such construction is performed and done, it is understood and agreed that the Party performing or causing such construction shall not permit any mechanic's or materialmen's liens, to stand against or attach to any part of the Shopping Center.

6.2 The Party performing such construction may bond and contest the validity and amount of any such lien, but on final determination of the validity and the amount of the lien, said Party shall immediately pay any judgment rendered, with all proper costs and charges, and shall have the lien released at said Party's expense.

6.3 The Party performing such construction shall indemnify, defend and hold harmless the other Party and the other Party's Tract from all loss, cost, damage, liability and expense (including attorneys' fees) resulting from the assertion of any such liens.

## Construction

## Article 7 [Omitted]

## Construction

## Article 8
## Remedies of Developer Prior to Opening Date

Paragraph

8.1   In the event that Sears shall fail to commence or
carry forward to completion, the construction provided to be
done by Sears under the provisions of "Construction Article
2 Sears Construction" on or before the commencement dates or
completion dates, respectively, as therein stipulated, or
defaults, without reasonable cause, in its payment for said
construction at any time, and such failure or default shall
not have been remedied on or before the later of the expiration
of twelve (12) months after the occurrence of such default
or six (6) months after notice thereof by Developer to
Sears, then Developer, within thirty (30) days after the
conclusion of the aforesaid grace period, may give notice to
Sears requesting the following information:

    (1)   An itemization of the cost of the Site and Utility
        Work, common utility facilities and the Improvements
        on the Sears Tract to the extent then completed and
        paid for by Sears, plus

    (2)   All other sums actually expended by Sears in connection
        with the acquisition, development and improvement
        of its Tract,

then, at any time before sixty (60) days after such information
is furnished by Sears, Developer may elect to acquire the
Sears Tract (i.e. Sears' leasehold estate in Sears Parcel I
and Sears Parcel II), together with the Improvements thereon
to the extent then completed, for a purchase price equal to
all of Sears' costs and expenses theretofore incurred in
connection with the acquisition and development of the Sears
Tract and construction of its Improvements (collectively
referred to as the "Buy Back Price"), together with interest
at the Agreed Interest Rate, costs and expenses from the date
paid by Sears until the date of payment by Developer.

8.2   The closing of title and the conveyance of the Sears Fee Parcel to Developer by Special Warranty Deed and the assignment of the City Lease to Developer under Paragraph 8.1 shall take place, at such place as the Developer shall designate in the general area in which the Shopping Center is located, sixty (60) days after the giving of such notice of election, free and clear of all liens, charges and encumbrances created or suffered by Sears, except current real estate taxes which shall be prorated; provided, however, that Developer shall not be required to assume any personal liability under the City Lease.

8.3   This Operating Agreement shall terminate as to Sears on the closing of title.

8.4   Notwithstanding anything to the contrary contained herein, Developer shall have all other rights and remedies available at law and in equity to enforce the terms, covenants and provisions of this Operating Agreement against Sears, if in default, all of which rights and remedies are hereby expressly reserved, and the right and option of the Developer to acquire the Sears Tract, as hereinabove provided, shall be in addition to, and not in lieu of, all other rights and remedies of Developer against Sears; provided, however, that if Developer elects to exercise its right and option to acquire such Sears Tract under this Article, the exercise of such right and option shall constitute an election of remedies by Developer and shall preclude the enforcement of any other rights and remedies of Developer against Sears, and the acquisition of the Sears Tract by Developer shall satisfy all liability of Sears hereunder.

8.5   Notwithstanding anything to the contrary contained herein, and in addition to all remedies available to Developer hereunder and at law and in equity, in the event that Sears shall fail to commence and diligently prosecute to completion the Site and Utility Work and construction of the Parking Deck as required under Article 2 of this Agreement, Developer shall have the right (but not the obligation) to cause such work to be done and performed at Sears' expense, and Sears shall pay and reimburse Developer for the cost thereof, together with interest at the Agreed Interest Rate, upon demand.

Exhibit 5

P A R T   T W O

Operation

Article 9 Term

**Paragraph**

9.1   This Operating Agreement shall be fully en-
forceable and fully effective upon the date of its proper
execution by all of the Parties hereto and shall continue
in full force and effect thereafter until the date of its
termination.

9.2   The term of this Operating Agreement shall (unless
sooner terminated under conditions contained in this Op-
erating Agreement) be for a period of fifty (50) years,
commencing upon the Opening Date, as defined in Paragraph
2.09 hereof, and Sears shall have four (4) separate options
to extend the term of this Operating Agreement for addi-
tional periods of five (5) years each, so long as at least
two (2) Department Store Tracts and Developer's Tract are used
for the purposes for which this Operating Agreement provides.

9.3   Immediately after the occurrence of the Opening
Date the parties hereto shall execute a memorandum in
recordable form setting forth such Opening Date.

## Operation

### Article 10 Shopping Center Name

For identification, public relations and advertising purposes, the name of the Shopping Center is and shall be "Cielo Vista Mall" and such name shall not be changed during the Term of this Operating Agreement without the written consent of Sears hereto, which consent shall not be unreasonably withheld, delayed or denied.

<u>Operation</u>

Article 11 Publicity Releases

No Party hereto shall issue any statement or publicity release or otherwise publicize this Operating Agreement except in such form or at such time as may be approved by the other Party; provided, however, that said approval shall not be unreasonably withheld, delayed or denied; and provided, further, that nothing herein contained shall be construed to prohibit, prevent or interfere with the usual type of advertising and promotion customarily done by Sears and Developer.

## Operation

### Article 12 Tenant Leasing

**Paragraph**

12.1  Developer shall begin its leasing activities as to the new construction of the additional Small Store Floor Area as promptly after the date of this Operating Agreement as Developer shall deem necessary.

12.2  Developer shall use its best efforts to negotiate with prospective tenants for the purpose of obtaining executed written lease agreements for the new Small Store Floor Area in the expansion of the Covered Mall provided for herein.

12.3  It is in the mutual and best interest of the Parties, and imperative to the maximum utilization of their adjoining properties, that the Shopping Center be developed and maintained as an integrated, first-class regional shopping center, to contain a combination of merchants and businesses which, in the sole judgment and discretion of Developer:

   (1)  Represent a sound, balanced and generally compatible diversification of merchandise and services (i.e., "tenant mix");

   (2)  Are qualified and willing to be a part of continuous merchandising and promotional program;

   (3)  Will efficiently utilize the available Parking Spaces, all other portions of Common Areas and the Covered Mall, or any portion thereof, to obtain the maximum amount of business profits; and

   (4)  Will fixture, decorate and maintain their respective stores and business premises in a clean, safe, sightly, tasteful and decorous manner, having regard for the general standards of good appearance prevailing in the Shopping Center.

Developer will use its best efforts to effectuate a balanced distribution of said tenants in the new Small Store Floor Area to be erected and opened hereunder, on all levels of the new portion of the Covered Mall to be erected and opened hereunder, in order to avoid an undue concentration of any particular type or class of tenant in any one area, and in order to effect, insofar as reasonably possible in the judgment and discretion of Developer, an equitable distribution of various types and classes of tenants in proximity to Sears. Provided, however, that nothing contained in this Article 12 shall be deemed to regulate or restrict Developer's leasing efforts, or to prohibit or preclude the leasing of any such Small Store Floor Area to such tenants as Developer shall see fit in its discretion.

12.4   The Parties acknowledge that a balanced and integrated regional shopping center is now in existence and operating on the Shopping Center in accordance with good shopping center practice. Developer agrees that there will be no common area public facilities located in the Covered Mall in such manner as to materially interfere with access to the Sears Building or adversely affect visibility of Sears' signs, display windows or entrances.

## Operation

### Article 13 Merchants Association

<u>Paragraph</u>

13.1  Sears shall, prior to the Opening Date, examine the organizational structure, articles of incorporation and by-laws of any "Merchants Association" formed by Developer for the purpose of promoting business in the Shopping Center, with membership therein offered to tenants and Occupants in the Shopping Center; and if such organizational structure, articles of incorporation and by-laws are satisfactory and acceptable to Sears, it shall approve the same, which approval shall not be unreasonably withheld, and it shall join said association commencing with its Opening Date and remain a member thereof, and pay such dues and contributions thereto, for at least three (3) years from and after its Opening Date.  Sears agrees to contribute annually to the Merchants Association, so long as Sears remains a member thereof, the amount set forth in the Supplemental Agreement of even date herewith between the Parties. Sears' annual contribution to the Merchants Association shall be payable in equal monthly installments in advance during the Merchants Association's fiscal year for which contribution is being made.  The agreement of Sears to contribute as specified herein is subject to the following terms and conditions:

(1)  Membership therein is available to it on a fair and equitable basis;

(2)  Developer and Occupants of at least eighty percent (80%) of the Gross Leasable Area of the Shopping Center used for the sale of selling goods, wares and merchandise and related services at retail are members of said association, including each tenant occupying 5,000 square feet or more on the Shopping Center upon the Covered Mall;

(3) Said by-laws provide for the business and affairs of such Merchants Association to be managed by a Board of Directors consisting of nine (9) members, including one (1) from each of the four (4) other Department Stores;

(4) Developer has agreed to pay not less than twenty-five percent (25%) of the amounts payable annually by occupants, such payment by Developer to be in addition to the amounts payable by tenants of Developer;

(5) Said by-laws provide that each member shall, at any time, be entitled to a number of votes approximately proportionate to the money contribution being made at such time by such member, and shall contain no provisions which would regulate, or empower, said association to regulate, the manner or hours of operation of the Sears store;

(6) Sears shall not be bound by an act or omission of said Merchants Association; the obligation of Sears to said Merchants Association being to pay dues and contributions in conformance with the provisions of this Article; and

(7) If Sears shall not be the corporate affiliate actually conducting business on its Tract, Sears shall cause such corporate affiliate to so become a member of the Merchants Association.

Operation

Article 14 Covered Mall

Paragraph

14.1 Developer shall, at its sole cost and expense (except for payment of contributions by Sears and other Department Stores as provided for herein or in other documents) at all times during the Term of the Operating Agreement (subject to the provisions of "Operation Article 20 Maintenance", and subject to acts beyond its control, as set forth in "General Article 26 Force Majeure"):

(1) Keep and maintain the Covered Mall in a clean, safe and sightly condition and in good order and repair, and cause the same to be well-lighted, attractive, in good appearance and open to the public at all times when the Building belonging to Sears shall be open and doing business, and, in addition, the Developer shall cause the Covered Mall to be opened at least one (1) hour before Sears opens for business and to be kept open until at least one (1) hour after Sears closes on each business day;

(2) Keep and maintain the Covered Mall heating and cooling system in good operating condition to:

(a) Cool the Covered Mall to the average temperature of not more than 75° Dry Bulb and to produce a relative humidity not exceeding 50% when the outside Dry Bulb temperature is 95° F. and the outside Wet Bulb temperature is 78° F. during each day of the Term hereof when local climatic conditions require, throughout all hours when the Building belonging to Sears, or any part of said Building is open and doing business, and for at least one (1) hour before Sears opens for business until at least one (1) hour after Sears closes on each business day;

-35-

(b) Heat the Covered Mall with sufficient heat to maintain therein, an average temperature of at least 75° F. during each day of the Term hereof when local climatic conditions require, throughout all hours when any Building belonging to Sears is open and doing business, and for at least one (1) hour before Sears opens for business until at least one (1) hour after Sears closes on each business day;

for which Sears, commencing with the date it opens its Building for business, for the duration of its operating covenant and for so long thereafter as it shall maintain at least one (1) entrance to the Covered Mall, as more particularly provided in the Supplemental Agreement of even date herewith, shall pay to Developer the annual amount set forth in the Supplemental Agreement of even date herewith as its contribution toward the expenses of heating, ventilating and cooling the Covered Mall. Such annual amount shall be paid in monthly installments on or before the tenth day of each calendar month;

(3) Prohibit any kiosk in the Covered Mall (i) at any location or locations other than as shown on the Plot Plan, Exhibit "A-7", or (ii) which exceeds nine (9) feet in total height (including signs) or exceeds one hundred twenty (120) square feet in area or exceeds dimensions of ten (10) feet in width by twelve (12) feet in length;

(4) Developer shall utilize a system of engineering control (whether by varying pressure or otherwise) which shall insure that the heating and/or cooling of the Covered Mall shall not draw heated and/or cooled air from the Sears store, and, similarly, Sears shall utilize a system of engineering control (whether by varying pressure or otherwise) which will insure that the heating or cooling of the Sears store shall not draw heated and/or cooled air from the Covered Mall.

-36-

14.2 Each Party shall use its best efforts, consistent with applicable laws, to prevent:

(1) The distribution of any hand bills, or other advertising material, on or about any part of the Covered Mall;

(2) The installation in, on or about the Covered Mall premises, of any amplifiers or similar devices, or the use in or about any Building in the Covered Mall of any advertising medium, which may be heard or experienced outside such Building, such as, flashing lights, spot lights, loud speakers, phonographs or radio broadcasts;

(3) The burning of any papers, trash or garbage of any kind in the Covered Mall;

(4) The use of any portion, or portions, of the Covered Mall for the purposes of loading or unloading any truck or other delivery vehicle, except in those portions designated on each Tract as "Loading Area" or "Truck Dock" on Exhibit "A-7"; and

(5) The distribution, or use, of any printed, or handwritten, papers or materials (including magazines and newspapers) of any kind or character on or about any part of the Covered Mall, unless and except as approved by the Merchants Association.

14.3 At all times during the Term, and any renewal thereof, Sears and Developer shall not permit any fence, barricade, structure, building, or other obstruction of any kind whatsoever, placed, kept, permitted or maintained on or in the Covered Mall, or any part thereof, without the prior written consent of the other Party, except that Developer shall have the right, at least once in each calendar year, to erect barriers or chains for the purpose of blocking off access to the Covered Mall in order to avoid the possibility of dedicating the same for public use or creating prescriptive rights therein, such barriers or chains to be erected for such purposes, if possible, at a time or upon a day when the Shopping Center is not open for business.

-37-

**Operation**

**Article 15 Common Area**

**Paragraph**

15.1  At all times during the Term of this Operating Agreement, Sears shall maintain upon its Tract a minimum parking index of 5.0 automobile parking spaces (allowing at least 400 square feet per parking space, including aisles, driveways, entrances, exits, landscaped areas and sidewalks) for each 1,000 square feet of Gross Leasable Area upon the Sears Tract, all as more particularly shown on the Plot Plan, Exhibit "A-7", and the Typical Parking Layout set forth on said Plot Plan.

15.2  At all times during the term of this Operating Agreement, Developer shall maintain upon the Developer Tract the lesser of (a) a minimum parking index of 5.0 automobile parking spaces (allowing at least 400 square feet per parking space, including aisles, driveways, entrances, exits, landscaped areas and sidewalks) for each 1,000 square feet of Gross Leasable Area upon the Developer Tract, or (b) that number of automobile parking spaces which, when taken in the aggregate with the total number of automobile parking spaces on all of the other Tracts in the Shopping Center (including the Sears Tract), provides, in the aggregate, a minimum parking index of 5.0 automobile parking spaces for each 1,000 square feet of Gross Leasable Area in the Shopping Center, all as more particularly shown on the Plot Plan, Exhibit "A-7", and the Typical Parking Layout set forth on said Plot Plan.

15.3  In the event at any time during the term of this Operating Agreement, there shall be any reduction in the Common Area under the right of Eminent Domain, or for any other reason, any Party, upon whose Tract there becomes a lesser number of parking spaces than is required under this Article, shall (simultaneously with the reduction in such Common Area) exert its best efforts to provide parking spaces, either multi-level upon its Tract or upon available unimproved land, if any, which is owned by such Party and adjacent, contiguous or nearby, constructed as set forth in "Construction Article 2 Sears Construction", and being at least in number necessary to re-establish and thereafter maintain the parking index required under this Article; provided, however, that no multi-level parking, other than the Parking Deck herein provided for, shall be utilized without the consent of all Parties, which consent shall not be unreasonably withheld.

-38-

15.4 At all times during the Term of this Operating Agreement, no Party shall permit any fence, barricade, barrier, chain, structure, building or other obstruction of any kind whatsoever, placed, kept, permitted or maintained on the Common Area, or any part thereof, without prior written consent from the other Party; except to the extent such temporary obstruction shall be reasonably required:

(1) In connection with the use of any easements granted to any Party by the provisions of this Operating Agreement; or

(2) In connection with the expansion, repair or replacement of any of the improvements from time to time located in the Shopping Center; or

(3) At least once in each calendar year, for the purpose of blocking off access to the Common Area in order to avoid the possibility of dedicating the same for public use or creating prescriptive rights therein, such barriers to be temporarily erected, for such purpose, if possible, at a time or upon a day when the Shopping Center is not open for business.

15.5 Each Party shall use its best efforts, consistent with applicable laws, to prevent:

(1) The distribution of any hand bills or other advertising material on or about any part of the Common Area;

(2) The installation in, on or about the Common Area of any amplifiers or similar devices, or the use in or about any Building on the Common Area of any advertising medium which may be heard or experienced outside such Building, such as, flashing lights, spot lights, loud speakers, phonographs or radio broadcasts;

(3)  The burning of any papers, trash or garbage
of any kind on the Common Area;

(4)  The use of any portion, or portions, of the
Common Area for the purposes of loading or
unloading any truck or other delivery vehicle,
except in those portions designated on each
Tract as "Loading Area" or "Truck Dock" on
Exhibit "A-7"; and

(5)  The distribution, or use, of any printed, or
handwritten, papers or materials (including
magazines and newspapers) of any kind or
character on or about any part of the Common
Area, unless and except as approved by the
Merchants Association.

## Operation

## Article 16 Signs

Developer shall use its best efforts to prohibit the erection of any sign on the Developer Tract, or on any Building within such Tract; and Sears shall use its best efforts to prohibit the erection of any sign on its Tract; except in conformity with the following policy;

(1)    There shall be no flashing, rotating or moving signs or markers of any type;

(2)    There shall be no signs painted on the exterior surface of any Building, except that any tenant or Occupant occupying more than 10,000 square feet of Floor Area in the Shopping Center may install and maintain an illuminated identification sign on the exterior of the Building which it occupies, excluding Mall entrances;

(3)    There shall be no free-standing or pylon signs other than (i) a pylon sign or signs to be erected and maintained by Developer at the location or locations shown therefor on the Plot Plan and which shall display only the name of the Shopping Center, and (ii) a pylon sign which may be erected by Sears in connection with its TBA Building; provided, however, that one or more free-standing theater reader-boards shall be permitted at the location or locations shown on the Plot Plan, with the proviso that the height, dimensions, design and lighting thereof shall be first subject to the approval of Sears;

(4)    All signs which front on the Covered Mall, shall be (i) not more than 6 feet in height, except in the case of any Building having two or more floors above ground level, (ii) approximately flush with the wall of the Building to which affixed, (iii) of a length which does not exceed 80% of the linear frontage of the store upon which it fronts, and (iv) of a design which is uniform with other signs similarly placed;

-41-

(5) Signs which are under Building canopies shall be (i) at right angles to the store front, (ii) of a design which is uniform with other signs similarly placed under Building canopies, and (iii) not more than 4 1/2 feet wide and 12 inches high;

(6) There shall be no roof-top signs except that signs affixed to the sides of Sears' mechanical equipment penthouse shall not be considered roof-top signs;

(7) No signs will be permitted at the rear of any Buildings, except customer entrances opening directly onto the parking areas and designation of loading areas; and

(8) There shall be no paper signs permitted in Occupants' windows.

Notwithstanding anything to the contrary contained herein, Sears acknowledges that all existing signs in the Shopping center are acceptable and satisfy the requirements of this Agreement.

Operation

Article 17 Utilities

**Paagraph**

17.1  Sears shall, at Sears' expense, provide, or cause to be provided, all common utility facilities, including water, gas (if available), electric, telephone, sanitary sewers and storm sewers to a point within five (5) feet of the Building line on the Sears Tract and the Covered Mall expansion and additional Small Store Floor Area to be erected by Developer on the Developer Tract, as approved by Developer.

17.2  Except as otherwise expressly provided in this Operating Agreement with regard to utility service for the parking area on each Tract, each Party shall make arrangements for and pay, or cause to be paid, any and all charges for utility services supplied on its own Tract and no Party shall have any liability for utility services to the other Party's Tract.

17.3  Developer shall maintain, or cause to be maintained, in good condition and repair, all common utility facilities located upon the Developer Tract, including the portions of the common utility facilities serving the Sears Tract which are located on the Developer Tract. Sears shall maintain, or cause to be maintained, in good order and repair the common utility facilities located upon its Tract, including the portions of the common utility facilities serving the Developer Tract and any other Buildings within the Shopping Center which are located on the Sears Tract. Provided, however, notwithstanding anything to the contrary contained herein, each Party agrees that with regard to water loop and sanitary sewer line which furnishes water and sanitary sewer service, respectively, to each Party's Tract, and which traverses each Party's Tract, such installations shall be kept and maintained in good condition and repair by the Party on whose Tract the portion of said installations requiring such expenditure shall be located (except to the extent that such services or systems may be operated and maintained by public agencies or utilities, and that a proportionate part of the cost thereof shall be borne and paid by each of the Parties hereto in the ratio which the acreage of each Party's respective Tract bears to the aggregate acreage of the Shopping Center; provided, further, however, that each Party shall be solely responsible for the maintenance and repair of its own water and sewer laterals on its own Tract.

## Operation

## Article 18 Taxes

**Paragraph**

18.1 Each Party shall pay, when due, all real estate taxes and assessments upon its Tract which shall be assessed, levied, imposed or become a lien thereon during the Term of this Operating Agreement.

18.2 In the event Developer shall deem any real estate tax or assessment (including the rate thereof or the assessed valuation of the property in question or any other aspect thereof) to be paid by Developer to be excessive or illegal, Developer shall have the right, at its own cost and expense, to contest the same by appropriate proceedings, and nothing contained in this Article shall require Developer to pay any such real estate tax or assessment as long as the amount or validity thereof shall be contested in good faith if, in the opinion of counsel for Developer, the Developer Tract shall not thereby be in danger of being forfeited.

18.3 In the event Sears shall deem any real estate tax or assessment (including the rate thereof or the assessed valuation of the property in question or any other aspect thereof) to be paid by Sears to be excessive or illegal, Sears shall have the right, at its own cost and expense, to contest the same by appropriate proceeding and nothing contained in this Article shall require Sears to pay any such real estate tax or assessment as long as the amount or validity thereof shall be contested in good faith if, in the opinion of counsel for Sears, its Tract shall not thereby be in danger of being forfeited.

18.4 The Parties to this Operating Agreement shall cooperate with each other (and shall consult with each other as may be appropriate) in matters pertaining to property tax assessments on the Shopping Center. Each Party shall furnish the Tax Assessor with information concerning the value of its Tract or its improvements, only after notifying the other Party that it intends to furnish information to the Tax Assessor. No Party shall, however, be bound or obligated to furnish any such information to the other Party.

18.5 Any assessments for public improvements (exclusive, however, of assessments for initial Off-Site Work) levied against the Shopping Center shall be paid by both Parties hereto in the ratio that the land area of each Party's Tract bears to the land area of the Shopping Center; provided, however, that any such assessment initiated by any one or more of the Parties hereto shall be borne solely by the Party initiating same; and provided further, however, that any such assignment (except one initiated by one of the Parties) benefiting less than both the Parties shall be borne solely by the Party so benefiting.

**Operation**

**Article 19 Insurance**

Paragraph

19.1  Developer shall, effective with the completion of
construction of the Building, the expansion of the Covered
Mall and all the other Improvements on the Developer Tract,
and thereafter during the Term of this Operating Agreement,
continuously keep, or cause to be kept, all Buildings, the
Covered Mall and all other Improvements upon said Tract
insured, at its sole expense, against loss or damage by
fire and such other risks and casualties as are from time
to time included in the standard extended coverage of
insurance policies issued in the locality of the Shopping
Center, and shall furnish the other Party with satisfactory
evidence of such insurance coverage.  Said insurance shall
be in an amount equal to the full insurable value of
Developer's said Building, Covered Mall and other Improvements
on the Developer's Tract, such "full insurable value" being
the actual replacement costs of said Buildings and Improve-
ments, including the Covered Mall, but excluding foundations,
excavation costs and the costs of underground flues, pipes
and drains if such costs are properly excludable under
current co-insurance requirements.

19.2  Sears shall, effective with the completion of
construction of the Buildings and all the other Improvements
on its Tract, and thereafter during the Term of this Operating
Agreement, continuously keep all the Buildings and other
Improvements upon said Tract insured, at its sole expense,
against loss or damage by fire and such other risks and
casualties as are, from time to time, included in the
standard extended coverage provisions of insurance policies
issued in the locality of the Shopping Center, and shall
furnish the other Party evidence with satisfactory evidence
of such insurance coverage.  Said insurance shall be in
amounts at least sufficient to avoid the effects of co-
insurance provisions of the policies, that is, not less than
90% of the actual replacement costs of said Buildings and
Improvements, but excluding foundations, excavation costs, and
the costs of underground flues, pipes and drains if such
costs are properly excludable under current co-insurance
requirements.

-46-

19.3  Such policies may be made payable to the holder of any first mortgage or deed of trust (hereinafter called "mortgagee") which is a lien upon the site of the insured under a standard mortgagee clause, or to a ground lessor, provided such mortgagee or ground lessor is a bank, trust company, insurance company, pension fund, retirement fund or other reputable institutional lender; provided that (i) with regard to the Developer's Tract, such mortgagee and/or ground lessor agree that they will, in the event of loss, apply the proceeds in accordance with this Operating Agreement, provided Developer is not in default under such mortgage and/or ground lease, and (ii) with regard to the Sears Tract, Sears agrees to repair, restore and rebuild the Building and other Improvements on its Tract in accordance with this Operating Agreement, without regard to the availability of such insurance proceeds, and Sears, or a corporation which has guaranteed performance of Sears' obligations hereunder, has a net worth of more than $40,000,000.  Any loss covered by such insurance shall be adjusted with the insured Party, and if the loss is in excess of $50,000 and neither the insured Party nor a corporation which has guaranteed performance of the insured Party's obligations hereunder shall have a net worth of more than $40,000,000, the insurance proceeds shall be deposited in a bank or trust company satisfactory to each Party hereto to be held in trust and disbursed as the work or restoration progresses; if the loss does not exceed $50,000 or the insured Party or a corporation which has guaranteed performance of the insured Party's obligations hereunder shall have a net worth of $40,000,000 or more, the insurance proceeds shall be paid to the insured Party and applied by it toward the cost of restoration.

19.4  Each Party hereby waives any and every claim which arises, or may arise, in its favor against the other Party during the Term of this Operating Agreement for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Shopping Center, which loss or damage is covered by valid and collectible fire and extended coverage insurance policies, to the extent that such loss or damage is recoverable under said insurance policies and to the extent that this waiver is permitted under said insurance policies and does not invalidate any such insurance coverage.  Said mutual waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release regarding any loss of, or damage to, the said property of any Party.  Each Party shall use its best efforts to cause its insurance policies to provide for and permit such waiver of subrogation, provided the same is available at standard premium rates and at no additional cost or expense to the other Party.  To the extent that one of the Parties is unable to furnish such waiver of subrogation to the other Party hereunder, this waiver of subrogation by the other Party shall be ineffective and inapplicable as to the Party who is unable to furnish such waiver of subrogation.  This waiver shall apply equally to any Party who elects to be self-insured, in whole or in part, as herein provided, as if such Party were independently insured.

-47-

19.5  At all times during the Term of this Operating
Agreement, each Party shall, at its sole expense, continuously
maintain Comprehensive General Liability Insurance, endorsed
to cover personal injury and contractual liability recognizing
the indemnities contained in this Operating Agreement, covering
the Building, or Buildings, Outdoor Selling Area, if any, and the
landscaping, if any, between the exterior perimeter wall of
Buildings and Building Perimeter Sidewalk, on its Tract within
the Shopping Center Tract, and on any other portions of its
Tract not covered by the insurance hereinafter provided for in
Paragraph 19.6.  Such insurance shall afford protection to each
Party as named insured under its own policy, to the limit of
not less than:

> (1) $3,000,000 for death of, or bodily injury to,
> or personal injury to, one person;

> (2) $3,000,000 for death of, or bodily injury to,
> or personal injury to, more than one person,
> in or resulting from one occurrence; and

> (3) Property damage to the limit of not less than
> $500,000 for each occurrence.

Either Party shall, upon request of the other Party, furnish
certificates of such insurance or other satisfactory written
evidence of such insurance at any time during the Term hereof.
Any policy required hereunder shall provide that such policy
shall not be cancellable without at least 10 days' prior writ-
ten notice to the Parties hereto.

19.6  At all times during the Term of this Operating Agree-
ment, Developer and Sears shall continuously and jointly maintain
Comprehensive General Liability Insurance, endorsed to cover
personal injury (including false arrest) and contractual liability,
covering the Common Area and the Covered Mall in the Shopping
Center.  Such insurance shall afford protection to Developer
and Sears, as named insureds, to the limit of not less than:

> (1) $3,000,000 for death of, or bodily injury to,
> or personal injury to, one person;

> (2) $3,000,000 for death of, or bodily injury to,
> or personal injury to, more than one person,
> in or resulting from one occurrence; and

> (3) Property damage to the limit of not less than
> $500,000 for each occurrence.

Developer may, but shall not be obligated to, act as agent of Sears for the purpose of obtaining such insurance; provided that the approval of Sears as to the insurer, terms and cost shall first be obtained. The premiums for said policy shall be apportioned between the Parties and reimbursed to Developer, in the proportion which Sears Tract contributes to the total risk insured by said policy as determined by the insurer. Developer shall deliver to Sears copies of said insurance policy, or a certificate or other document evidencing its existence, on or prior to the beginning of the Term, and, thereafter, not less than fifteen (15) days prior to the expiration dates of the expiring policy, or policies, during the Term. Any policy required hereunder shall provide that such policy shall not be cancelled without at least 10 days prior notice to each Party. If it shall be hereafter determined that it would be more feasible to insure each Party's Tract separately, then, it is agreed that the insurance coverage herein required by this Paragraph will be placed in separate policies, each for the amounts indicated, from the same insurance company, to avoid a conflict of claims, and each Party shall be a named insured on the other Party's policy. Notwithstanding anything herein to the contrary, Developer shall have no liability for failure to obtain any such insurance for Sears.

19.7 Each Party hereby indemnifies and agrees to save harmless the other Party from and against all claims, actions, damages, liability and expense in connection with bodily injury, death or property damage arising out of accidents occurring on any part of its Tract occasioned wholly or in part by any negligent act or omission of its employees, agents or contractors; excepting, however, as respects any person claiming the right to be indemnified hereunder, any such claims, actions, damages, liability and expense arising from or as a result of the negligent act or omission of any person so claiming the right to be indemnified, or the employees, agents or contractors of such claiming person. The Comprehensive General Liability Insurance furnished by each Party shall include contractual liability coverage recognizing this indemnity.

19.8  Sears shall have the right, at its option, to comply
with and satisfy its obligations under this Article (except the
obligations under Paragraph 19.5) by means of self-insurance which
is guaranteed by a corporation having a published net worth
exceeding $40,000,000.00.  As used herein, the term "net worth"
shall mean the stockholder's or shareholder's equity as determined
in accordance with sound accounting practices.  Provided,
however, that if the net worth of any Party or its guarantor
declines to $40,000,000.00 or less, then the provisions of
Paragraph 19.3 regarding application of insurance proceeds
shall apply to such Party.

19.9  Notwithstanding anything to the contrary contained
herein, it is understood and agreed that Developer and Sears
shall jointly maintain fire and extended coverage insurance on
the Parking Deck, as their respective interests appear.  Developer
shall act as agent for Sears for the purpose of obtaining such
insurance, provided that the approval of Sears as to the insurer,
terms and cost shall first be obtained.  The premium for such
insurance on the Parking Deck shall be apportioned between the
Parties and reimbursed to Developer, in the ratio which the portion
of the surface area (measured in square feet) of the Parking Deck
erected upon and over each Party's Tract bears to the total surface
area (measured in square feet) of the entire Parking Deck.  Any
loss covered by such insurance shall be adjusted by Developer, for
itself and on behalf of Sears, and all proceeds of such insurance
shall be paid to Developer, for itself and as trustee for Sears,
as their respective interests appear.  All such insurance proceeds
shall be applied to the repair and restoration of the Parking Deck
or disbursed to the Parties in accordance with the terms of Para-
graph 21.7 hereof.

Operation

Article 20 Maintenance

Paragraph

20.1  Developer shall keep, repair, manage, operate and
maintain the Common Area on each Tract (exclusive of land-
scaping, if any, between the exterior perimeter wall of
Buildings and Building Perimeter Sidewalks, but including the
retention pond and outlet structure beneath the Parking Deck,
to the extent provided and required under the City Lease),
Supporting Facilities (including, without limitation, the
Parking Deck) and the Covered Mall in all cases in good and
clean order, operation, condition and repair, in conformity
with the best shopping center standards, and in such manner
as to establish, maintain and present, at all times, the
appearance of a clean, well managed, attractive, coordinated
and unified operation of all of the Common Area and the
Covered Mall on the Shopping Center, commencing on the
Opening Date, subject to the right of reimbursement from
Sears for the allocable cost thereof as hereinafter provided
in Paragraph 20.4 hereof.  Developer, its agents and employees,
shall have, and is hereby granted, access to the Sears Tract
for the purpose of performing such maintenance.  Sears shall
be responsible for the maintenance of the interior and
exterior of its Building (including said perimeter landscaping)
on its own Tract at its own expense.  All maintenance shall
include keeping the entire premises reasonably clean and
free of debris, ice, snow and trash, but maintenance shall
not include major repairs or capital replacements, except as
otherwise hereinafter provided.

20.2  With respect to the Common Areas on the Sears Tract
and as to the Developer Tract and the Covered Mall, in the event
either Party should be in default under this Article, which
default continues for a period of sixty (60) days after either
Party gives written notice to the defaulting Party (or for
forty-eight [48] hours in the case of an emergency), and the
other Party thereafter shall elect to perform such maintenance
and services as are authorized, the said other Party, its agents
and employees, shall have, and is hereby granted, access to
the premises of the defaulting Party for the purpose of the
said other Party performing the maintenance obligations required
under this Article.  The Party performing such maintenance and
services on behalf of the defaulting Party shall be entitled
to receive reimbursement from the defaulting Party for all costs
and expenses incurred in performing such maintenance and services,
payable upon demand with interest at the Agreed Interest Rate;
provided, however, notwithstanding anything to the contrary
contained herein, Sears shall not have the right to perform
any such maintenance or services on the Tract of any other Department
Store or to take over Developer's obligations with respect to
another Department Store's Tract or to take over the furnishing of
heating, ventilating and air conditioning for the Covered Mall.

-51-

20.3 Except as hereinafter expressly provided from and after completion of construction of the Covered Mall, Developer shall operate and maintain, or cause to be operated and maintained, the said Covered Mall and the Common Area on each Tract in good order, condition and repair during the Term hereof and any renewal thereof, in accordance with the standards and requirements set forth in Paragraph 20.1 hereof.  In such operation and maintenance, Developer shall observe the following standards:

(1) Maintain the Covered Mall heating and cooling system in good operating condition under the requirements set out in "Operation Article 14 Covered Mall";

(2) As required, remove all papers, debris, filth and refuse and wash or thoroughly sweep floors, walkways and stairways;

(3) Clean lighting fixtures and relamp as needed;

(4) Except as otherwise provided in Paragraph 20.6, with regard to major repairs and replacement, and Paragraphs 2.03 and 2.08, with regard to repair and correction of defects in the Parking Deck, maintain the surface of Parking Spaces and repaint striping, markers, directional signs, etc., as necessary, to maintain in first-class condition;

(5) Maintain landscaping, fountains and seating areas, as necessary, to keep in a first-class condition (except landscaping between the Sears Building exterior perimeter walls and Building Perimeter Sidewalks, which shall be the responsibility of Sears as to such landscaping on its own Tract);

(6) Employ courteous and uniformed personnel, in adequate numbers, for effective security patrol and security functions during store hours and such other hours as are deemed necessary by the Parties, both as to the Covered Mall and the Common Area on each Tract;

-52-

(7)  Clean signs of the Shopping Center (other than those of Occupants), including relamping and repairs being made as required);

(8)  Maintain and keep in a sanitary condition public restrooms, if any, and other common use facilities on the Covered Mall;

(9)  Clean, repair and maintain all common utility facilities to the extent that the same are not cleaned, repaired and maintained by public utilities;

(10) Keep all Common Areas adequately lighted during all darkness hours while the Shopping Center is open, until at least one (1) hour after Sears has closed for the evening, and furnish night lighting of at least 25% of full lighting capacity after closing;

(11) Employ a qualified resident manager;

(12) Promulgate and enforce reasonable rules, regulations and policies for the use and control of the Covered Mall and Common Areas; and

(13) Keep the retention pond and outlet structure beneath the Parking Deck free from debris, obstructions and silt accumulations, as required under the City Lease and the Sublease from Sears to Developer of even date herewith.

20.4  Sears shall pay and reimburse Developer for Sears' allocable share of Developer's cost and expense of operating and maintaining the Covered Mall, Common Area and Supporting Facilities hereunder, in the annual amount set forth in the Supplemental Agreement of even date herewith between the Parties.  Such annual amount shall be paid by Sears to Developer in monthly installments on or before the tenth day of each calendar month.  Provided, however, that the cost of maintaining and repairing, as necessary, any utility line traversing any Tract shall be borne by the Parties in accordance with the terms of Paragraph 17.3 of "Operation Article 17 Utilities" of this Operating Agreement.  The obligation to maintain and repair such utility lines which traverse the various Tracts and to pay the cost of such repair and maintenance as aforesaid shall survive the termination of this Operating Agreement as to each Party.  Provided further, notwithstanding anything to the contrary contained herein, that the cost of repairing or correcting any defects in the Parking Deck resulting from faulty or deficient design, workmanship or materials shall be solely the responsibility and obligation of Sears and its contractors, as provided in Article 2 of this Agreement, and Developer's obligation to maintain the Parking Deck shall not include the repair or correction of any such defects or deficiencies.

20.5 Unless the Parties otherwise consent and agree, in writing, no charge of any type shall be made to, or collected from, any occupant or permittee for parking, or the right to park vehicles in the parking spaces. Permittees shall not be prohibited or prevented from so parking so long as parking spaces are available, and so long as they do not violate the reasonable rules and regulations covering the use of the parking spaces promulgated from time to time by the Parties. The Parties shall, by mutual agreement, prescribe certain sections within the Common Area, or on other land outside the Common Area within a reasonable distance from the nearest boundary of the Shopping Center, for use as parking spaces for employees, contractors, licensees and concessionaires to use only such sections as are so prescribed for parking. Each Party agrees to use reasonable efforts to enforce the provisions hereof.

20.6 Notwithstanding anything to the contrary contained in this Operating Agreement, in the event any major repair or replacement of any of the paving, curbs or lighting standards is required as to any portion of the parking area (including the Parking Deck) located anywhere upon and within the Shopping Center (other than repairs and replacements necessitated by any casualty covered by insurance or repairs and replacements covered by the warranties referred to in Paragraph 2.03 hereof), such repairs and replacements shall be performed, furnished and paid for by each Party on its own Tract.

20.7 Notwithstanding anything to the contrary contained herein, Sears may, upon the giving of written notice to Developer not less than ninety (90) days prior to doing so (but not more than once in any five [5] year period), elect to keep, maintain and operate the Common Area and common utility facilities on its Tract in accordance with the provisions set forth in this Article, commencing with the calendar year following the giving of such notice, and in the event of such election and except as hereinafter otherwise provided, the Party so electing shall no longer be required to share in the cost thereof as set forth in Paragraph 20.4 hereof, commencing with such calendar year. Thereafter, Sears may, upon the giving of written notice to Developer not less than ninety (90) days prior to the beginning of any calendar year (but not more than once in any five [5] year period), elect to return to and require the Developer to keep and maintain and operate the Common Area and common utility facilities on its Tract in accordance with the provisions of this Article, commencing

ninety (90) days following the giving of such notice, and in the event of such election, Sears shall again be required to share in the cost thereof as set forth in Paragraph 20.4 Provided, however, anything to the contrary herein notwithstanding, Sears shall not have any right or option to take over the repair and maintenance and operation of the Covered Mall, or any part thereof, or to take over the furnishing of heating, ventilating and air conditioning for the Covered Mall or any part thereof. Notwithstanding anything to the contrary contained herein, in the event that Sears elects to take over the maintenance and operation of the Common Area and common utility facilities on its Tract as herein provided, Sears nevertheless shall continue (i) to pay to Developer the annual amount set forth in said Supplemental Agreement as its contribution toward the expense of heating, ventilating and cooling the Covered Mall as provided in Paragraph 14.1 of "Operation Article 14 Covered Mall" hereof, and (ii) to reimburse Developer for Sears' proportionate share of the cost of electrical service furnished by Developer, through a single meter on Developer's Tract, for lighting of the Parking Area on the Sears Tract in the ratio which the acreage in the Sears Tract bears to the total acreage in the Shopping Center, and (iii) to reimburse Developer for Sears' proportionate share of the cost of furnishing security personnel for the Common Areas in the Shopping Center and the cost of maintaining and operating the Supporting Facilities.

Operation

Article 21 Improvements Destruction

**Paragraph**

21.1  In the event of the destruction of, or damage to, the Buildings, the Covered Mall or other Improvements (except the Parking Deck) upon the Developer Tract, or any part thereof, at any time during the period of fifteen (15) years from and after the Opening Date, by fire, windstorm or other casualty required to be insured against hereunder, Developer shall promptly and diligently rebuild, repair and restore such Improvements so that there shall then be substantially the same number of square feet of Floor Area on the Developer Tract, in the same location as presently shown on Exhibit "A-7", and of the general appearance, type and quality, in as good condition and constituting an integrated, first-class, regional shopping center, including the Covered Mall as existed prior to the damage or destruction, provided that Sears and at least one (1) other Department Store are then open and operating as such named Department Stores in the Shopping Center, or are repairing and rebuilding their Buildings and Improvements to be duly re-opened and operated as such; provided, however, that Developer shall not be obligated to so rebuild, repair and restore any "Major Damage" (as hereinafter defined) unless (i) Sears and at least one (1) other Department Store are then open and operating as such named Department Stores in the Shopping Center or are repairing and rebuilding their Buildings and Improvements to be duly re-opened and operated as such, and (ii) Sears and at least one (1) other Department Store are then obligated or then agree in writing to continue the operation of their named Department Stores in the Shopping Center for the longer of their remaining Operating Period, as provided in "Operation Article 23 Sears Operating Period", as to Sears and as provided in any other agreement or lease as to such other Department Store, or five (5) years from the date of completion of such repair and restoration.  In the event of any such destruction or damage to the Buildings, the Covered Mall or other Improvements (except the Parking Deck) upon the Developer Tract, or any part thereof, at any time after the expiration of such fifteen (15) year period following the Opening Date, Developer shall be obligated to so rebuild, repair and restore only in the event that (i) Sears and at least one (1) other Department Store are then either operating as such named Department Stores in the Shopping Center, or are repairing and rebuilding their Buildings and Improvements to be duly re-opened and operated as such named Department Stores, and (ii) Sears and at least one (1) other Department Store enter into a new written operating agreement with Developer to use and operate their respective Buildings in the Shopping Center for at least five (5) years following the completion of the repair and restoration, except that if such damage or destruction is less than "Major Damage" (as hereinafter defined) Developer shall be obligated to so rebuild, repair and restore if Sears and at least one (1) other Department Store are then either operating as such named Department Stores in the Shopping Center, or are repairing and rebuilding their Buildings and Improvements to be duly re-opened and operated as such.  The term "Major Damage" as used herein shall mean damage or destruction requiring repairs and restoration which would cost more than twenty percent (20%) of the full replacement cost (exclusive of costs of excavations, foundations and footings) of the particular Improvements as originally constructed.  Repair and restoration of the Parking Deck shall be effected in accordance with the terms of Paragraph 21.7 hereof.

-56-

21.2  Any Building, Covered Mall or other Improvements required to be rebuilt, repaired and restored by Developer, pursuant to this Operating Agreement, shall be rebuilt, repaired and restored and ready for occupancy with due diligence, not to exceed eighteen (18) months from the time when the loss or destruction occurred (except where such repairs and restoration amounts to less than $100,000.00 in cost, in which event the same shall be completed and ready for occupancy within sixty [60] days after such occurrence), subject, however, to unavoidable delays stipulated under the provisions of General Article 26 Force Majeure.

21.3  In the event of the destruction of, or damage to, the Buildings or other Improvements (except the Parking Deck), or any part thereof, upon the Sears Tract, at any time during the Sears Operating Period when it is required to operate as provided in "Operation Article 23 Sears Operating Period", by fire, windstorm or other casualty required to be insured against hereunder, Sears shall promptly and diligently rebuild, repair and restore its Building and Improvements (except the Parking Deck), so that there will then be substantially the same number of square feet of Floor Area on the Sears Tract, in the same location as presently shown on Exhibit "A-7", and of the same general appearance, type and quality, in as good condition and constituting an integrated Building, as existed prior to the damage or destruction, and Sears shall resume its operation on its Tract for the remainder of its Operating Period, provided that (i) the Covered Mall and Developer Building are then open and operating or are being rebuilt, repaired and restored by Developer to be duly re-opened and operated as hereinabove provided in Paragraph 21.1, and (ii) at least two (2) other Department Stores are then open and operating in their respective Buildings or are repairing and rebuilding the respective Buildings and Improvements to be duly re-opened and operated as such Department Stores; provided, however, that Sears shall not be required to re-open until Developer and at least two (2) other Department Stores have completed their repairs and restoration and have re-opened or are about to re-open.  Notwithstanding anything to the contrary expressed or implied herein, it is understood and agreed that if the Sears Building and Improvements (except the Parking Deck) are damaged or destroyed by any such casualty required to be insured against hereunder, Sears shall be obligated to rebuild, repair and restore its Building and Improvements and resume operation of its Department Store if such damage or destruction occurs during Sears Operating Period provided for hereunder.  In the event of any such destruction or damage to the Sears Building after the expiration of Sears Operating Period, Sears shall not be obligated to rebuild, repair and restore, but if it elects to do so, its Tract shall be and remain subject to the terms, provisions and restrictions of "Operation Article 23 Sears Operating Period".  Repair and restoration of the Parking Deck shall be effected in accordance with the terms of Paragraph 21.7 hereof.

-57-

21.4 Any Building or other Improvements required to be rebuilt, repaired and restored by Sears pursuant to this Operating Agreement shall be rebuilt, repaired and restored and ready for occupancy with due diligence, not to exceed 18 months from the time when the loss or destruction occurred (except where such repairs and restoration amounts to less than $100,000.00 in cost, in which event the same shall be completed and ready for occupancy within 60 days after such occurrence); subject, however, to unavoidable delays stipulated under the provisions of "General Article 26 Force Majeure".

21.5 Any repair, reconstruction and replacement of any Building or other Improvements performed by Developer or Sears, pursuant to this Article, shall be performed in accordance with the following requirements:

(1) Plans and specifications therefor not previously approved for the construction of the Shopping Center expansion shall be approved by Developer and by Sears, as to exterior architectural design, exterior construction and location of improvements being restored, prior to the commencement of the work of such repair, reconstruction, and replacement, which approvals shall not be withheld without good and valid reason and notice thereof made in writing;

(2) The Buildings or other Improvements being restored shall be at least of equal value per square foot, and at least as usable for its intended purpose, as such Building or other improvements were just prior to the happening of such casualty;

(3) Substantially the same public entrances in relation to location on the Covered Mall shall exist as existed just prior to the happening of such casualty; and

(4) Such repair, reconstruction and replacement shall be done in conformity with the provisions of this Operating Agreement concerning construction.

-58-

rebuild and restore its damaged Building or other Improvements under the provisions of this Article, and it does not, in fact, make such restoration, such Party shall clear its Tract of all debris and hazardous conditions, and shall maintain its Tract in a clean, safe and sightly condition; provided, however, that in no event shall any Party have the right to withdraw its Tract or portion thereof from the Parking Area, or other Common Areas, or from the ring road easement or any other easements created and provided for hereunder, at any time during the Term of this Operating Agreement, and in the event of any such damage or destruction each Party shall cause that portion of its Tract which is devoted to use as part of the Parking Area to be repaired and restored to the condition the same was in immediately prior to the occurrence of such damage and destruction, and thereafter to be maintained in such condition and as part of the Parking Area during the remaining Term of this Operating Agreement in accordance with the terms hereof; provided further, however, that if Sears should rightfully withdraw its Tract under the terms of this Operating Agreement, it shall not pay or be liable for any Common Area Maintenance or Covered Mall charges, unless and until its Tract again becomes subject to the terms of this Operating Agreement.

21.7   In the event of the destruction of, or damage to, the Parking Deck, or any part thereof, at any time during the period of fifteen (15) years from and after the Opening Date, or at any time thereafter while Sears is open and operating a retail department store in the Sears Building, by fire, windstorm or other casualty required to be insured against hereunder, the Parties shall be jointly responsible and obligated for the repair and restoration of said Parking Deck.  In such event, and unless the Parties otherwise agree in writing at that time, Developer shall promptly and diligently commence and undertake the repair and restoration of the Parking Deck for itself and on behalf of Sears, and Developer shall let the necessary contract for such work for itself and Sears, jointly, as their respective interests appear.  The Parties shall pay and contribute to the cost of repairing and restoring the Parking Deck pro rata, in the ratio which the portion of the surface area (measured in square feet) of the Parking Deck erected upon and over each Party's Tract bears to the total surface area (measured in square feet) of the entire Parking Deck; provided, however, that in the event of damage or destruction of only a portion of the Parking Deck, located entirely on the Tract of only one Party, then the Party upon whose Tract such damage or partial destruction of the Parking Deck has occurred shall be solely responsible for making and contracting for such repairs to the Parking Deck on its Tract at its own expense.  If any such damage or destruction of the Parking Deck occurs after the expiration of the period of fifteen (15) years from and after the Opening Date, and Sears is not then open and operating a retail department store in the Sears Building, either Party shall have the right, but not the obligation, to cause the necessary repairs and restoration to be made to the Parking Deck on its own Tract and/or the Tract of the other Party, as the case may be, solely at the expense of the Party undertaking such repairs and restoration.  The Parties shall jointly insure the Parking Deck, as their respective interests appear, against fire and other risks and casualties covered by extended coverage policies, as hereinabove provided in Paragraph 19.9 hereof.  All proceeds of such insurance, regardless of when or to what portion of the Parking Deck any such damage or destruction occurs or to whom such proceeds are paid, shall be applied to the repair and restoration of such Parking Deck as hereinabove provided, unless the Parties agree in writing at that time not to repair the Parking Deck, in which event such insurance proceeds shall be paid to and retained by the Parties as their respective interests appear.

Article 22
Developer Operating Period

Paragraph

22.1  Provided that Sears and at least one other
Department Store shall not be in default under their
respective operating covenants and shall be open and
operating their respective Department Stores as hereinafter
set forth in "Operation Article 23 Sears Operating Period",
as to Sears, and as provided under the operating covenant
of such other Department Store, Developer shall use the
Developer Tract and the Developer Building and the Covered
Mall thereon solely for the purpose of operating and managing,
or causing to be operated and managed, a multi-unit retail
and commercial facility (being the Shopping Center less
Department Store Improvements) containing at least 225,000
square feet of Gross Leasable Area for a period of fifteen
(15) years from and after the Opening Date of the Sears
Building, and for so long thereafter as Sears and at least
one (1) other Department Store are using their respective
Tracts and the Buildings thereon for retail purposes cus-
tomarily found in such a covered mall regional shopping
center, but in no event for a period of longer than fifty
(50) years from such Opening Date.

22.2  The provisions of this Article shall be subject
to all the provisions of the Operating Agreement, such as
the provisions of "General Article 27 Eminent Domain" and
"Operation Article 21 Improvements Destruction".  Any failure
to comply with the provisions of this Article for temporary
periods of time during which the Developer Building, or any
part thereof, is uninhabitable or inoperable because of fire
or other casualty, or such Building is temporarily closed
because of acts beyond Developer's control (as defined in
"General Article 26 Force Majeure"), shall not be deemed a
default under the provisions of this Article, so long as
diligent efforts are being made by Developer to restore such
Building to the condition in which it was just prior to the
happening of such casualty or act within the time provided
in Paragraph 21.2.

22.3  The Parties acknowledge that damages for the
breach of the operating covenants contained in this Article
may be difficult to ascertain.  Accordingly, Sears shall be
entitled not only to damages but also to injunctive relief to
enforce the foregoing operating covenants against Developer
and to restrain and enjoin any breach or threatened breach
thereof.

-60-

Operation

Article 23
Sears Operating Period

**Paragraph**

23.1   Provided (i) the Developer shall not be in default
under its operating covenant set forth in Article 22 hereof,
(ii) at least one (1) other Department Store is open and
operating in the Shopping Center under its operating covenant,
and (iii) tenants and operators occupying at least sixty
percent (60%) of the Small Store Floor Area in the Developer
Building upon the Covered Mall are conducting business,
Sears covenants and agrees with Developer and its successors,
that (a) Sears shall, for a period of fifteen (15) years
following the Opening Date of the Sears Building (the "Sears
Operating Period"), keep open and continuously operate, or
cause to be kept open and continuously operated, a retail
department store in the Sears Building on the Sears Tract,
containing a Floor Area at least equal to that specified in
Paragraph 2.01 hereof, under a trade name which includes the
words "Sears Roebuck" or the word "Sears" or under such
other trade name as is used by the majority of its stores in
the State of Texas, and (b) the Sears Tract and Building
thereon shall not be used for any use or purpose other than
that specified in clause (a) of this sentence during such
fifteen (15) year period; provided, however, that if such
occupancy of the Small Store Floor Area in the Developer
Building falls below sixty percent (60%), Sears nevertheless
shall remain open and continue to operate and observe and
perform its operating covenant contained herein and shall
not cease, or exercise any right to cease, operating unless
such condition continues for more than one (1) year (without
any extension for Force Majeure) after Sears has given
written notice to Developer and to any mortgagee of the
Developer Tract entitled thereto pursuant to Paragraph 32.12
hereof that such condition exists, during which period of
one (1) year following receipt of such notice Developer
shall have the opportunity to restore the occupancy of the
Developer Building to the required minimum of sixty percent
(60%) of Small Store Floor Area.  In addition, Sears further
covenants and agrees that during the remaining term of this
Operating Agreement, after the expiration of said fifteen
(15) year Sears Operating Period, so long as at least two
(2) other Department Stores are using their respective
Buildings for purposes customarily found in an enclosed
mall regional shopping center, and at least sixty percent
(60%) of the Small Store Floor Area in the Developer Building
is being operated for retail purposes, then Sears, its
successors and assigns, shall not use the Sears Building or
Sears Tract, or any part thereof, for any use or purpose which
is incompatible or inconsistent with, or detrimental, injurious or
inimical to, the operation of a first-class enclosed mall regional
shopping center.  Nothing contained in this Article 23 shall be
construed as requiring Sears to operate or use the Sears
Building following expiration of the Sears Operating Period.
Nothing contained in this Article 23 shall require Sears to
operate or utilize any portion of the Sears Building for a
TBA operation.  Developer covenants with Sears that it shall
not assign the covenants and obligations of Sears under
this paragraph to any other Department Store.

23.2   The provisions of this Article shall be subject
to all the provisions of this Operating Agreement, such as
"Operation Article 21 Improvements Destruction" and "General
Article 29 Eminent Domain".  Any failure to comply with the

provisions of this Article for temporary periods of time
during which the Sears Building, or any part thereof, is
uninhabitable because of fire or other casualty, or such
Building is temporarily closed because of acts beyond Sears'
control (i.e., as defined in "General Article 26 Force
Majeure"), shall not be deemed a default under the provisions
of this Article, so long as reasonable efforts are being
made by Sears to promptly restore its Building to the condition
in which it was just prior to the happening of such casualty
or act within the time provided in "Operation Article 21
Improvements Destruction".

2        The Parties acknowledge that damages for the
breach of any of the operating covenants contained in this
Article may be difficult to ascertain. Accordingly, Developer
shall be entitled not only to damages but also to injunctive
relief to enforce the foregoing operating covenants against
Sears and to restrain and enjoin a breach or threatened
breach thereof.

23.4   A.   (1)  If at any time during the Sears Operating
Period, Sears shall not, except for Temporary Cessation or
as provided in Paragraph 23.2 hereof, keep open and continuously
operate, or cause to be kept open and continuously operated,
a retail department store in the Sears Building on the Sears
Tract, containing a floor area at least equal to that specified
in Paragraph 2.01 hereof, under a trade name which includes
the words "Sears Roebuck" or the word "Sears") or under such
other trade name as is used by the majority of its stores in
the State of Texas, or (2) at any time after the expiration
of the Sears Operating Period, Sears shall not, except for
Temporary Cessation or as provided in Paragraph 22.2 hereof,
use and operate at least sixty percent (60%) of the Floor
Area in the Sears Building, or (3) if at any time Sears
shall use, or attempt or threaten to use, the Sears Building
or Tract, or any part thereof, for any use or purpose which
is incompatible or inconsistent with, or detrimental, injurious
or inimical to, the operation of a first-class enclosed mall
regional shopping center while two (2) or more other Department
Stores are using their respective buildings for purposes
customarily found in an enclosed mall regional shopping
center, and at least sixty percent (60%) of the Small Store
Floor Area in the Developer Building is being operated for
retail purposes, then, in any such event, Developer, its
successors and assigns, shall have the exclusive and irrevocable
continuing right and option (but not the obligation) to purchase
and acquire Sears' leasehold estates in the Sears Tract and all
Improvements thereon, including, without limitation, the Parking
Deck, in accordance with the terms hereinafter set forth in this
Agreement.  Developer's right and option to purchase Sears'
leasehold estates in the Sears Tract and Improvements may be
exercised by Developer at any time within six (6) months after
(i) the occurrence of any one of events (1), (2) and (3) des-
cribed in the immediately preceding sentence of this Paragraph
(hereinafter referred to as an "Option Event"), or (ii)
Developer has received written notice from Sears of the
occurrence of any such Option Event, whichever is later, by
giving written notice to Sears of such exercise.  Developer's
failure to exercise said option upon the occurrence of any
such Option Event shall not extinguish or constitute a
waiver of such option with regard to the future occurrence
of the same or any other Option Event, and this option shall
remain in full force and effect.  This option to purchase
Sears' leasehold estates in the Sears Tract and Improvements
shall be in addition to all other rights and remedies of
Developer against Sears in the event of any breach or default
by Sears in the performance and observance of its covenants
and obligations under this Operating Agreement.  This option
shall run with the land and be binding upon Sears and upon
its successors and assigns.

(Continued on page 62a)

B.  If Developer elects to exercise its right and option
to purchase Sears' leasehold estates in the Sears Tract and
all Improvements thereon, Developer shall give written notice
of such exercise to Sears within the time hereinabove provided
and in the manner provided for giving notices under the
Operating Agreement.  If Developer exercises its option to
purchase Sears' leasehold estates in the Sears Tract and
Improvements, the purchase price to be paid by Developer to
Sears therefor shall be an amount equal to the net fair
market value of the Improvements on the Sears Tract at the
time of the exercise of such option by Developer, determined
as hereinafter provided, excluding, however, any value
attributable to the land itself or to Sears' leasehold

estates therein. Such net fair market value shall be determined by appraisal, made by a board of three (3) reputable real estate appraisers, each of whom shall be a member of the American Institute of Real Estate Appraisers and shall have no "disqualifying interest" (as hereinafter defined). All costs, fees and expenses of any appraiser appointed pursuant to the provisions of this Agreement shall be borne by the party required to appoint such appraiser, or, in the case of a third appraiser who is not appointed by a party, shall be borne equally by the parties required to appoint the first and second appraisers. One appraiser shall be appointed by Sears and one appraiser shall be appointed by Developer. At any time after the date upon which Developer or Sears exercises its said option, either Developer or Sears may institute such appraisal to determine such net fair market value. Such appraisal shall be instituted by a notice served by the party desiring to institute such appraisal (sometimes the "first party") upon the other party (sometimes the "second party") containing the appointment of the first appraiser by the first party. The second appraiser shall be appointed by the second party within twenty (20) days after the appointment of the first appraiser. The third appraiser shall be appointed by the first two appraisers within twenty (20) days after the appointment of the first appraiser. If the first two appraisers are unable to agree on a third appraiser within thirty (30) days after the appointment of the first appraiser, or if the second party refuses or neglects to appoint an appraiser as herein provided within twenty (20) days after the appointment of the first appraiser, then such third appraiser or such other appraiser whose appointment was not made as aforesaid shall be appointed, within ten (10) days after any request by either party for such appointment, by the then President of the American Institute of Real Estate Appraisers or such successor body hereinafter constituted exercising similar functions, unless such President shall have any direct or indirect financial or other business interest in any of the parties other than financial holdings of not more than one percent (1%) of the value of any class of securities issued by any party or by any corporation or partnership affiliated therewith (herein referred to as a "disqualifying interest"), in which case the third appraiser or such other appraiser whose appointment was not made as aforesaid shall be appointed by the highest ranking officer of the American Institute of Real Estate Appraisers or such successor body who shall not have a "disqualifying interest". Such appraisal shall be completed within twenty (20) days after the appointment of the third appraiser. The parties agree that time shall be of the essence with respect to the appointment of the second and third appraisers and the completion of the appraisal as herein provided. If the determinations as of any two or all three of the appraisers shall be identical in amount, said amount shall be deemed to be the net fair market value of the interest in question. If the determinations of all three appraisers shall be different in amount, the highest appraised value shall be averaged with the middle value (said average being hereinafter referred to as "Sum A"), the lowest appraised value shall be averaged with the middle value (said average being hereinafter referred to as "Sum B"), and the net fair market value of the interest in question shall be determined as follows:

(i)  If neither Sum A nor Sum B differs from the middle appraised value by more than five percent (5%) of such middle appraised value, then the net fair market value of the interest in question shall be deemed to be the average of the three appraisals;

(ii)  If either Sum A or Sum B (but not both of said sums) differs from the middle appraised value by more than five percent (5%) of such middle appraised value, then the net fair market value of the interest in question shall be deemed to be the average of the middle appraised value and appraised value closest in amount to said middle value; and

(iii)  If both Sum A and Sum B differ from the middle
appraised value by more than five percent (5%) of such
middle appraised value, the appraisals shall have no force
and effect, and the net fair market value of the interest in
question shall be determined by a panel of not less than
three qualified real estate appraisers who shall be members
of the American Institute of Real Estate Appraisers and who
shall have no "disqualifying interest".  Such panel shall be
appointed, within ten (10) days after any request by either
party for the appointment of such panel, by the then Presi-
dent of the American Institute of Real Estate Appraisers or
such successor body hereafter constituted exercising similar
functions, unless such President shall have a "disqualifying
interest", in which case the panel shall be appointed by the
highest ranking officer of the American Institute of Real
Estate Appraisers or such successor body hereafter con-
stituted exercising similar functions who shall not have a
"disqualifying interest".  Such panel shall complete such
appraisal within twenty (20) days after its appointment.
Written notice of the net fair market value as determined in
accordance with the provisions of this Agreement shall be
promptly given to the parties and shall be binding and
conclusive on the parties.

C.  If Developer exercises its option to purchase Sears'
leasehold estates in the Sears Tract and Improvements pursuant
to the terms of this Operating Agreement, such sale and con-
veyance shall be closed and consummated within sixty (60) days
after notice of the determination of said net fair market value
of the Sears Improvements, and Sears shall transfer and assign
the Sears Leases to Developer or its nominee by written assign-
ment in recordable form, free and clear of all liens and
encumbrances, with the exception of current real estate taxes
which shall be adjusted to the day of the closing and the
easements and covenants granted and conveyed under this
Operating Agreement, and possession of the Sears Tract and
Improvements shall be delivered to Developer at closing.  If
Sears acquires fee simple title to the Sears Tract, or any
part thereof, at any time, Developer's option to acquire the
Sears Tract as provided in this Paragraph 23.4 shall extend
to such fee simple title and Developer shall have the right to
acquire the same from Sears on all of the same terms and con-
ditions as are provided herein, except that the net fair
market value of that portion of the Sears Tract to which Sears
has acquired title, determined as hereinabove provided, shall
be included in the purchase price, and such land shall be con-
veyed to Developer by Special (Limited) Warranty Deed.

D.  From and after the date of this Operating Agreement,
Sears shall not modify, amend, relinquish, cancel, surrender,
terminate or otherwise alter or impair the Sears Leases or Sears'
leasehold estates in the Sears Tract and Improvements without the
prior written consent of Developer; nor shall Sears sell, convey,
transfer, assign, mortgage or otherwise encumber or dispose
of the Sears Leases or Sears' leasehold estates in the Sears
Tract and Improvements except as otherwise expressly provided
and permitted under Article 28 of this Operating Agreement.
Any transfer, conveyance, mortgage or other disposition or
encumbrance of the Sears Leases or Sears' leasehold estates in
the Sears Tract and Improvements shall be subject always to
Developer's rights and option under this Paragraph 23.4.

E.  Notwithstanding anything to the contrary contained
herein, this option, if not theretofore exercised, shall
expire and terminate upon the expiration of (a) the term of
this Operating Agreement (as extended, if extended), (b)
twenty-one (21) years after the death of the youngest descendant
of Melvin Simon living at the date of this Operating Agreement,
or (c) the period of limitation under the applicable rule
against perpetuities or remoteness of vesting or similar rule
of law, if any, whichever of (a), (b) and (c) is the first
to expire.

-64-

(Continued on page 64a)

F.    Notwithstanding anything to the contrary contained herein, Developer shall have all other rights and remedies available at law and in equity to enforce the terms, covenants and provisions of this Operating Agreement against Sears, all of which rights and remedies are hereby expressly reserved, and the right and option of the Developer to purchase Sears' leasehold estates in the Sears Tract and Improvements thereon as hereinabove provided shall be in addition to, and not in lieu of, all other rights and remedies of Developer against Sears hereunder and under the Supplemental Agreement and the Developer Lease.

P A R T   T H R E E

RECIPROCAL EASEMENTS

Article 24  Easements

**Paragraph**

24.1 This Article sets forth easements and licenses and the
terms and conditions thereof, which the respective Parties hereby
grant to each other, for the respective periods set forth in the
case of each such easement or license.  As used in this Article,

(a) A Party granting an easement or license is referred
to as the "Grantor" thereof, it being intended that
the grant shall thereby bind, and include, not only
such Party but its successors and assigns as well;
and

(b) A Party to which an easement or license is granted,
is referred to as the "Grantee" thereof, it being
intended that the grant shall benefit, and include,
not only such Party but its successors and assigns
as well; and

(c) The word "in", in respect of an easement granted "in"
a particular Tract, shall be deemed to mean, as the
context may require, "in", "to", "on", "over", "through",
"upon", "across", and/or "under".

As to the easements herein granted:

(d) The grant of a particular easement by a Grantor shall
bind and burden its respective Tract as described in
Exhibit "A-7" which shall, for the purpose of this
Article, be deemed to be the servient tenement, but
where only a portion thereof is bound and burdened
by the particular easement, only that portion thereof
so bound and burdened shall be deemed to be the
servient tenement; and

-65-

(e)  The grant of a particular easement to a Grantee shall benefit its respective Tract, as described in Exhibit "A-7", which shall, for the purposes of this Article, be deemed to be the dominant tenement, but where only a portion thereof is so benefited, only that portion shall be deemed to be the dominant tenement.

(f)  All easements and licenses granted in this Article shall exist by virtue of this Operating Agreement, without the necessity of confirmation by any other document; and likewise, upon the extinguishment, expiration or termination of any easement or license, in whole or in part, or its release in respect of all or any portion of any Tract, pursuant hereto, the same shall be extinguished or released or be deemed to have expired or terminated without the necessity of confirmation by any other document. However, each Party shall, as to any easement or license, at the request of any other Party, upon the submission by the requesting Party of an appropriate document in form and substance acceptable to both Parties, execute and acknowledge such a document memorializing the existence, or the extinguishment (in whole or in part), or the release in respect of all or any portion of any Tract, as the case may be, of any easement or license.

(g)  All easements and licenses hereby granted are, unless limited herein, non-exclusive and irrevocable.

(h)  All easements and licenses hereby granted are subject to all existing easements, licenses, covenants, conditions and agreements of record as of the date of this Operating Agreement.

24.2  Each Party hereby grants to the other Party and to the architect and contractors performing the work, as set out elsewhere in this document, a temporary license for the performance of the work.  The license granted by this Paragraph shall not permit the use of any portion of any Tract upon which a Building is to be located if construction of such Building would thereby be interfered with or delayed.

-66-

24.3  Subject to the terms and conditions of Paragraph 2.10 of this Operating Agreement, during the period of the construction of the Sears Building and the Developer's Building and the perimeter sidewalks thereto, each Party grants to the other Party, its architects, contractors and others engaged in performing such work, a temporary license to use portions of the Tract of the Grantor, as and to the extent reasonably necessary for the purpose of performing the construction in question; provided that each such license as to any particular Tract benefited thereby shall end when the construction of the Building or structure, the construction of which gives rise to such license, shall be completed but shall not extend beyond the time when it is needed under good construction practice.  During the periods of construction, each Party grants to the other the temporary license to be used for so long as reasonably necessary in the performance of such construction:

    (i)  To use any roads, constituting part of the Common Area, to provide access for personnel, equipment supplies and like matters to and from the site of the particular construction, to the extent so reasonably necessary; and

    (ii) To use, notwithstanding anything to the contrary in this Operating Agreement contained, such parts of the Parking Area on the Tract where the work is being done as may be reasonably needed for access to the work site and/or storage and shack sites and location of such other materials as are needed in doing such construction.

24.4  Commencing upon completion of construction of each portion of the Common Area on its Tract, each Party grants to the other Party easements to use each portion of the Common Area so constructed on its respective Tract (other than the Covered Mall, the Ring Road and common utility facilities) for its respective intended purposes and to perform the repairs and maintenance provided in "Operation and Maintenance"; such easements to be for the use of the Grantee thereof and its invitees.  Included with the easements granted by this Article are, without limitation:

(i)    Easements to use the respective parking facilities, including, without limitation, the Parking Deck, for the parking and passage of passenger motor vehicles (and trucks, so long as there is no unreasonable interference with customers and employee parking) and passage by pedestrians;

(ii)   Easement to use such roadways to provide passage by motor vehicles (passenger and truck) and pedestrians between each Tract in the Shopping Center and the abutting highways and to provide passage between the various portions of each Tract in the Shopping Center; and

(iii)  Easement to use the various walkways and all other portions of the Common Area for the general use of the Grantee, the Grantor and the invitees of either.

The easements provided in this Paragraph are subject, in each case to the rights to use the Common Area for other purposes specifically provided in this Operating Agreement and the rights, if any, of each Grantor to change and relocate portions of the Common Area to the extent (but only to the extent) specifically provided in this Operating Agreement. The easements provided in this Paragraph shall terminate as to the respective Grantee thereof (1) on such date as there shall no longer be operated on such Grantee's respective Tract, a retail facility as provided in "Operation Article 22 Developer Operating Period" and "Operation Article 23 Sears Operating Period" hereof; in such event the Party so continuing retail operations in at least 60,000 square feet of Floor Area of its Building shall have the right to erect a suitable barricade or take such other measures as may be appropriate to terminate the use of the easements; any such action to be accomplished only with the consent of the other Party which so continues to operate at retail not less than the above Floor Area; or (2) termination date, whichever shall first occur.

24.5  Commencing on completion of the Covered Mall, Developer grants to Sears easements (i) to have the Sears Building abut and open on the Covered Mall and (ii) to use the Covered Mall to any other stores or Buildings opening on the Covered Mall for it and its invitees, in common with the Grantor and its invitees.  These easements are subject to the right of Developer to relocate various elements of the Covered Mall to the extent specifically provided in this Operating Agreement.  The easement provided in this Paragraph shall terminate as to the Sears Tract as Grantee at such date as a retail facility is no longer being operated in its Building.

-68-

24.6  Each Party grants to the other Party and its employees, agents and contractors, easements to enter upon the Tract of the Grantor, and into all Improvements thereon, for the purpose of performing any obligation which the Grantor is required to perform under this Operating Agreement, but fails or refuses to do, and which the Grantee has the right then so to perform as provided in the Operating Agreement.

24.7  Sears grants to Developer easements in its Tract for the following purposes:

(i)  The development and performance of construction thereon of portions of the Covered Mall located on the Sears Tract; and

(ii)  The management, operation, maintenance, reconstruction and repair of the Common Area pursuant to the applicable provisions of this Operating Agreement.

The easements provided in this Paragraph shall terminate as to the Common Area on the Sears Tract on the date Developer is no longer obligated to maintain the Common Area pursuant to this Operating Agreement on the Sears Tract, but in any event on the termination date.

24.8  Sears grants to Developer the right to have the Covered Mall and the Developer Building abut and attach to the Sears Building as mutually to be approved.  The easements as provided in this Paragraph shall terminate if and when:

(i)  The Covered Mall and/or the Developer Building are demolished or destroyed and not replaced with reasonable promptness, or

(ii)  The Sears Building shall, insofar as the Covered Mall abuts upon it, be demolished or destroyed and Sears does not replace it with reasonable promptness.

24.9  Each Party grants to the other easements for the purpose of maintaining, repairing or reconstructing any of the facilities of the Grantee located in such proximity to the Tract of the Grantor that such facilities can, as a practical matter, be so maintained, repaired or reconstructed most advantageously from the Tract of the Grantor; such easements shall permit the Grantee and its employees, agents

-69-

and contractors, to enter upon and use such parts of the
Tract of the Grantor as are adjacent to the perimeter of
said facilities to such extent, in such manner (including,
without limitation, the erection of scaffolding) and for
so long as is reasonably necessary to the accomplishment
of said purpose; provided, however, and on condition that,
each such Grantee shall restore the portion of the Tract and
any facilities thereon so used to the same or as good
condition as immediately before such work was begun and
provided, further, that no such use by such Grantee and no
such scaffolding as may be erected by it shall interrupt the
business therewith.  Grantee shall, in the course of maintaining,
repairing or reconstructing its facilities from the Grantor's
Tract, fully indemnify and hold harmless Grantor from any and
all expenses, costs or liability for any injury or damage
which arises because of Grantee's actions.  The easements
provided in this Paragraph with respect to any servient
tenement shall be perpetual, but shall terminate (except
as required in order to repair the Ring Road) as to the
right to maintain, repair or reconstruct any facility if,
on a date after which a retail facility (being then no
longer required to be operated thereon) is not being
operated on the Grantee's Tract, any alteration or new
construction is made to such facility which caused the
need for or any exercise of Paragraph 24.9 easements to
be substantially more onerous on the Grantor than it was
prior thereto.

24.10 (a) Commencing on the completion of construction,
and of each portion thereof as the same may be built or
extended, the owner of each of the Tracts grants to the
owner of the other Tract easements for use, for itself and
its invitees, respectively, in common with the Grantor and
its invitees, the portion of the Ring Road (as shown on the
Plot Plan, Exhibit "A-7") located on the Tract of the particular
Grantor, for the purposes of two-way vehicular traffic
(passenger vehicles and trucks) and pedestrian access, between
the Tracts of each Grantee and abutting highways, and
between the various portions of each such Tract.

(b)  The owner of any respective Tract may, at
any time after termination when a retail facility is no
longer being operated on its Tract, relocate, enlarge,
narrow or alter, at its own expense, and without the
necessity of consent of any Grantee, the location of any
place of access from its Tract.

(c)  The easements provided in this Paragraph 24.10
shall be perpetual.

-70-

(d) From and after the date when Developer is no longer obligated to maintain the Common Area on the Sears Tract, Sears shall, at its own cost and expense, keep the portions of the Ring Road on its Tract in good repair and condition, properly lighted, and available for its intended purpose.

(e) In the event of a condemnation of any portion of the Ring Road, the Parties will endeavor in good faith to agree on a substitute for the portion thereof condemned; failing such agreement, the matter shall be submitted to arbitration, the arbitrator to be a recognized traffic engineer, it being intended that a Ring Road shall in such event continue to exist.

(f) Notwithstanding anything to the contrary in this Operating Agreement:

    (i) No Party shall have the right, without the consent of the ownersof the other Tracts which are benefited by these easements applicable to the Ring Road to relocate any juncture point of the Ring Road on its Tract with that on any other Tract, or narrow the Ring Road on its Tract, or change, other than insubstantially, the grade of the Ring Road on its Tract, and

    (ii) The owner of any Tract on which is located an entrance or exit between the Ring Road and an abutting highway shall not have the right, without the consent of the Grantee of these easements applicable to the Ring Road, to make any change in the location, design or number, or reduce the size, of such entrance and exit, but (d) subject to the foregoing, the owner of any burdened Tract can change the location of the Ring Road within its Tract provided that it shall provide a reasonably direct route between the juncture points or the juncture points and terminus points, on the boundary of its Tract, and such new location shall provide a new Ring Road at least as wide, serviceable and safe as that substituted for and be improved in a manner at least equal to that of the portion of the Ring Road for which it is a substitute;

-71-

provided further, that any dispute between. the Parties with reference to the Ring Road, its juncture points or any entrances or exits between the Ring Road and the abutting highway shall be determined by arbitration by a nationally recognized traffic engineer and otherwise in accordance with "General Article 31 Arbitration".

24.11 Each Party grants to the other Party the following perpetual easements in their Tracts for common utility facilities and other utility facilities (the term "pipe" or "pipes", as used in this Section shall mean "pipes", and/or "lines", and/or "conduits", and/or "wires" and/or "cables, and/or "other means of providing utility facilities", as the context may require:

(a) From and after the date of installation, easements for all pipes comprising the common utility facilities, to the extent that any or all of the same are so installed, may be located in the Tracts of the respective Grantor, for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any of the Common Utility Facilites; subject to the provisions of this Section,

(b) Easements in the Tract of the respective Grantor for the purposes of installing therein in the future other pipes, not part of the common utility facilities as originally constructed, to provide gas, water, fire loops, and hydrants therefor, electric power, other forms of energy, signal, telephone, sanitary sewer and storm sewer services, or any of them, to or from any present or future facilities on the respective Tract; subject to the provisions of this Section,

(c) Easements in the Tract of the respective Grantor for the purposes of connecting any and all of the pipes or the common utility facilities, referred to in (a) or (b) hereof, with any facilities on the Tract of the Grantee to the extent that location thereon is necessary properly in the Grantee's judgment so to service such facilities; and after any such connection, for the purpose of using, operating, maintaining, repairing, relocating, replacing and enlarging any or all of said pipes; subject to the provisions of this Section,

-72-

(d) For the purpose of exercising the rights granted in (a), (b) and (c) of this Section, the Grantee, and its respective employees, agents and contractors, shall have the right to enter upon and use the Tract of the Grantor to such extent and so long as reasonably necessary to accomplish such purposes; subject to the following conditions and requirements:

(i) No less than 10 days' prior written notice shall be given to the Grantor that Grantee anticipates doing such work, together with notification of the proposed area of such work, and the anticipated date of start of such work; but if the work involved is emergency repair work, only such advance notice, written or oral, as is reasonably practicable need be given;

(ii) That after such work, the pipes in question shall be underground and not beneath or unreasonably close to any Floor Area on Grantor's Tract, any Outdoor Selling Area thereon, or any ground area as a place where Grantor may build Floor Area or Outdoor Selling Area (but this (ii) shall not require the moving of any pipes theretofore installed not in violation of this Agreement, nor permit any such work if as a result thereof any Party utilizing the common utility facilities to provide utilities to improvements owned by it would be required to relocate any connection between any common utility facilities and such improvement in order for such Party to continue to be able so to utilize the common utility facilities therefor, or if its ability so to utilize the same is otherwise materially adversely affected, unless in any such case, each Party shall consent to such work, or the Grantee proposing to do such work shall agree (and place the money therefor in escrow, if reasonably required by the Grantor to pay all (direct or indirect) costs of the Grantor consequent upon the performance of such work by such Grantee;

-73-

(iii) That such work shall be done at the sole cost of the Grantee undertaking the same and shall be performed in such a manner as not to cause any interruption of or undue interference with the business conducted on the Tract of the Grantor; or any unreasonable interruption in the services provided in the pipes servicing the Grantor's Tract; and

(iv) That after the completion of such work, the Grantee shall restore the portion of the Tract and improvements of the respective Grantor so used in the same or as good condition as existed immediately before the commencement of such work at its own cost and expense.

(e) The easements granted in (a), (b) and (c) of this Section shall be exclusive insofar as they relate to pipes (as laterals to service the building in question) located within 5 feet of the building line of the Grantee and any other pipes not a common utility facility and non-exclusive insofar as they relate to common utility facilities. To the extent that any such easement is exclusive, the Grantee in question shall at all times do all work necessary to maintain the same and shall assume and pay all costs incurred in the maintenance, repair, replacement and/or enlargement thereof.

(f) If any Party physically disconnects, other than temporarily, from any pipes which is a common utility facility, it may reconnect only with the consent of the Party then using the pipe.

24.12 With respect to such of the foregoing easements as are in this article declared to be "perpetual", each such easement shall, notwithstanding such characterization, expire, terminate, and be extinguished in relation to the Grantee (a) when such easement is no longer being used by the Grantee, or those holding under or through the Grantee, and (b) when it is reasonable to believe that such easement will no longer be useful, or that the right to exercise the same in the future will not be valuable, to the Grantee, or those holding under the Grantee, for the purposes of the Tract of the Grantee or  use then, or which may reasonably

be expected in the future to be, made thereof. An assertion by
the Grantor that the easement in question has ceased, terminated
or been extinguished in accordance with the foregoing sentence,
shall be deemed to have been made when notice to that effect,
citing this Section is given by the Grantor to and received by
the Grantee; and such assertion shall be deemed to have been
agreed to by the Grantee unless it shall, within 30 days there-
after, by notice to Grantor, deny such assertion and gives its
reasons therefor. Pending the resolution of such dispute the
easement in question shall be deemed to continue.

24.13 Except as otherwise specifically provided in this
Agreement, the Grantee of the easements shall be responsible for
the installation, maintenance and repair of all facilities which
are the subject of such easements and in so doing shall comply
with the provisions of this Operating Agreement.

24.14 Each Party covenants and agrees with the other Party
that it will grant to governmental or public authorities or any
public utility company in the area easements in its respective
Tract, located all in accordance with the requirements of Para-
graph 24.11 and otherwise in form acceptable to the Grantor
for the installation and/or maintenance and operation of utility
facilities reasonably required for any or all Tracts. Such ease-
ments shall be perpetual so long as such authority or companies
use the same to provide utility services to any part of the
Shopping Center Site.

24.15 Any of the easements or licenses granted hereby may
be (a) released or extinguished, or (b) amended, waived, or
modified by instrument, in recordable form, executed by the owners
of all the Tracts benefited or burdened by the respective easements
or licenses affected thereby.

P A R T   F O U R

General

Article 25 Land Covenants

Except as otherwise expressly provided, all covenants, conditions and agreements contained in this Operating Agreement, affecting the use and maintenance of the Shopping Center, shall be and constitute covenants running with the land and shall bind and inure to the benefit of both Parties, their successors and assigns.  All easements granted hereunder shall be appurtenant to and run with the Grantee's Tract.

-76-

<u>General</u>

Article 26 Force Majeure

Each Party shall be excused from performing any obligation provided under this Operating Agreement (except the obligation to pay any sum of money) in the event, or as long as, the performance of any such obligation is prevented or delayed, retarded or hindered by Acts of God; fire; earthquake; floods; explosion; actions of the elements; war, declared or undeclared (including "police action"); invasion; insurrection; riot; mob violence; sabotage; inability to procure labor, equipment, facilities, materials or strikes; lockouts; actions of labor unions; condemnation; requisition laws; orders of government; or civil or military authorities; or any other cause, whether similar or dissimilar to the foregoing, not within the reasonable control of such Party (excluding a Party's inability to obtain required financing).  In no event, however, shall any Party be excused from performance hereunder for a period of more than one (1) year; provided, how-ever, that the Party seeking to be excused hereunder shall give each other Party notice within thirty (30) days of the event upon which the excuse from performance is based.

-77-

<u>General</u>

Article 27 Eminent Domain

<u>Paragraph</u>

27.1 In the event that all, or a substantial part (more than 50%) of the Covered Mall or the Floor Area in any Building, or in the event that all or a substantial part (more than twenty percent (20%)) of the Common Area, all on the Developer Tract, or a majority of the existing major entrances or driveways on the Developer Tract, as shown on the Plot Plan, should be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of Eminent Domain, or by voluntary conveyance in lieu thereof, then, and in any of such events, this Operating Agreement shall terminate, except (a) that in the case of such taking of a substantial part of the Common Area or entrances or driveways on the Developer Tract, this Operating Agreement shall not terminate if the Developer is willing and able to provide for the replacement of the Parking Spaces lost by such taking as hereinafter more particularly provided in subparagraph 27.6(b) of this Article or for alternate entrances reasonably satisfactory to Sears, as the case may be, and (b) that, notwithstanding any such termination, the reciprocal easements created hereunder shall survive to the extent provided in subparagraph 29.2 of "General Article 29 Termination Rights". Sears shall thereupon be released from any further liability under this Operating Agreement. It is understood and agreed that the limitation of access which amounts to less than a total permanent closing of an entrance or driveway to the Shopping Center on any Tract shall not constitute a "taking" of such entrance or driveway for purposes of this Operating Agreement.

27.2 Such termination shall be effective, at the option of Sears, either on the date notice of the condemning authority's intention to take such property shall have been received by Developer, or within a period of 180 days thereafter, by giving Developer at least 30 days' prior written notice of Sears' intention so to terminate.

-78-

27.3 In the event that all, or a substantial part (more than 50%) of the Floor Area in any Building, or in the event that all or a substantial part (more than twenty percent (20%)) of the Common Area, all on the Sears Tract, or a majority of the existing major entrances or driveways on Sears Tract, if any, as shown on the Plot Plan, should be taken for any public or quasi-public use under any governmental law, or ordinance or regulation, or by right of Eminent Domain, or by voluntary conveyance in lieu thereof, then, and in any of such events, this Operating Agreement shall terminate as to the Sears Tract so taken, except (a) that in the case of su.. taking of a substantial part of the Common Area or entrances or driveways on the Sears Tract, this Operating Agreement shall not terminate as to Sears Tract if Sears or the Developer is willing and able to provide for the replacement of the Parking Spaces lost by such taking as herein-after provided in subparagraph 27.6(b) of this Article, or for alternate entrances reasonably satisfactory to both Parties, as the case may be, and (b) that, notwithstanding any such termination, the reciprocal easements created hereunder shall survive to the extend provided in Paragraph 29.2 of "General Article 29 Termination Rights". If it is Developer who provides for such replacement of parking spaces on the Sears Tract, Sears shall be obligated to apply its award thereto. The Party to whom this Operating Agreement has been terminated due to any such taking thereupon be released from any further liability under this Operating Agreement, except as provided in Paragraph 27.7 of this Article. It is understood and agreed that the limitation of access which amounts to less than a total permanent closing of an entrance or driveway to the Shopping Center on any Tract shall not constitute a "taking" of such entrance or driveway for purposes of this Operating Agreement.

27.4 Such termination shall be effective, at the option of Developer either on the date of notice of the condemning authority's intention to take such property shall have been received by Sears, or within a period of 180 days thereafter, by giving Sears at least 30 days' prior written notice of Developer's intention so to terminate.

27.5  If this Operating Agreement is not terminated following a partial taking, all of its conditions and provisions shall continue in full force and effect; provided, however, that each Party shall, at its sole expense, promptly begin and prosecute with diligence, the making of all necessary repairs, restorations and replacements to all Buildings and other Improvements (including the Covered Mall on the Developer Tract) on that Party's Tract which shall have been partially taken.  All parking spaces taken in a partial taking shall be restored, either multi-level on such Party's Tract or upon available unimproved land, if any, which is owned by such Party and adjacent and contiguous to the Shopping Center, to provide at least the minimum index of Parking Spaces to Gross Leasable Area on each Party's Tract, as required by the provisions of "Operation Article 15 Common Area".  The portion of the Shopping Center so remaining shall be a complete architectural unit with adequate Parking Spaces and Covered Mall in accordance with the provisions of this Operating Agreement.

27.6  In the event less than all of the Sears Tract is excluded herefrom, each Party still bound by this Operating Agreement shall apply any award first, before devoting such award to any other purposes, as follows:

(a)  In the case of a taking affecting any Building(s), to the restoration of such Building(s) to a complete architectural and structural unit(s) as similar as is reasonably possible in design, character and quality to the original Building(s) and to the replacement of any totally condemned Building(s) insofar as is reasonably possible, with a Building(s) similar in design, character and quality to the Building(s) so taken.

(b)  In the case of a taking affecting a Common Area, to the replacement of the Parking Spaces lost by such taking with double decking parking facilities at a location acceptable to each Party or toward the acquisition of contiguous land, acceptable to each Party, for parking purposes as otherwise provided in this Operating Agreement.

27.7  If Sears shall have excluded its Tract from the operation and effect of this Operating Agreement, as aforesaid, it will not thereafter, during the remaining Term of this Operating Agreement, for so long as the Developer's Tract is being operated as a regional shopping center and one other Department Store Tract is being utilized for retail purposes, use its Tract for heavy industry, a slaughter house, a sewerage plant, any use emitting obnoxious odors or any other similar use, which, in the reasonably exercised judgment of such Department Store, is incompatible with the adjacent operation of a first class regional shopping center on the Developer's Tract.  If Sears shall have excluded its Tract from the operation and effect of this Operating Agreement and shall, at any time thereafter, conduct business on its Tract of the same or substantially the same character as that being conducted prior to the event giving rise to such exclusion, such exclusion shall ipso facto be deemed rescinded and Sears Tract shall again become subject to the operation and effect of this Operating Agreement.

## General

### Article 28 Assignment

**Paragraph**

28.1   Except as expressly permitted by this Article and other applicable provisions of this Operating Agreement, a Party shall not assign this Operating Agreement without the prior written consent of all other Parties.

28.2   Subject to the provisions of "Operation Article 22 Developer Operating Period" and "Operation Article 23 Department Store Operating Periods", Developer and Sears shall have the right, at any time, or from time to time, during the Term hereof, without obtaining the consent of any other Party to assign this Operating Agreement and all of its rights, interests and easements hereunder to:

    (1)  A corporation, resulting from a merger or
         consolidation of Developer or Sears, or

    (2)  A parent, affiliated or wholly-owned sub-
         sidiary corporation, or

    (3)  A successor corporation, or

    (4)  Other business entity to which all, or
         substantially all, of the assets of Developer
         or Sears shall be transferred;

provided that such Assignee has a no less favorable condition than Developer or Sears, as the case may be, and provided that such Assignee shall execute and deliver to all other Parties a written instrument in recordable form, in which it assumes all of the provisions, terms, covenants and obligations of this Operating Agreement; and provided, further, that this Operating Agreement shall be assigned only in conjunction with the conveyance or lease of the Assignor's Tract to the Assignee.  Upon such assumption by

-82-

such Assignee, the Assignor (subject to the provisions of
"Operation Article 22 Developer Operating Period" and
"Operation Article 23 Sears Operating Period") shall be,
thenceforth, released of any and all liabilities, obli-
gations and covenants pursuant to this Operating Agreement
(subject to all other conditions in this Article), except
that Developer shall not be released from its covenants and
obligations under "Article 3 Developer Construction" and
"Operation Article 22 Developer" (except to the extent
provided in Paragraph 32.9) and Sears shall not be released
from its covenants and obligations under "Article 2 Sears
Construction" which requires Sears to erect certain Improve-
ments on its Tract, and under "Operation Article 23 Sears
Operating Period", which requires Sears to operate a retail
department store on its Tract under its specified trade
name, and under "Operation Article 14 Covered Mall" and
"Operation Article 20 Maintenance", and under its Supple-
mental Agreement.

    28.3  [Deleted]

    28.4  Except as otherwise expressly provided in this
Paragraph 28.4 and in Paragraphs 23.4, 28.6 and 28.13 hereof,
nothing contained in this Operating Agreement shall restrict
the right of Sears to sell, lease, mortgage or otherwise
convey its Tract and to assign this Operating Agreement in
conjunction therewith; however, notwithstanding any such con-
veyance and assignment, Sears shall not be released or relieved
of any of its covenants, obligations and liabilities under
this Operating Agreement during its Operating Period but
shall be and remain bound and obligated thereon; provided
that if Sears shall sell or otherwise convey its entire Tract
and in connection with such sale or conveyance shall assign
this Operating Agreement, and if such Assignee shall execute
and deliver to Developer a written instrument in recordable
form by which it assumes all of the provisions, terms,
covenants and obligations of this Operating Agreement, then
Sears shall be released from all liability arising under this
Operating Agreement in respect of any period after the
termination of its Operating Period.  Notwithstanding anything
to the contrary contained herein, any sale, transfer, convey-
ance, assignment, mortgage or other disposition or encumbrance
by Sears of the Sears Tract or any interest therein shall
be subject to this Operating Agreement and all of Developer's
rights hereunder, and no such disposition or encumbrance shall
be effective unless it is made expressly subject to this
Operating Agreement and all of Developer's prior rights
hereunder.

-83-

28.5  Nothing contained in this Operating Agreement
shall, in any way, restrict Developer's right to sell,
lease, mortgage or otherwise convey the Developer's Tract
and to assign this Operating Agreement in conjunction
therewith; however, notwithstanding any such conveyance and
assignment, Developer shall not be released or relieved of
any of its covenants, obligations and liabilities under
this Operating Agreement, but shall be and remain bound and
obligated thereon, with the exception that if Developer
shall sell, convey, lease or otherwise dispose of the etire
Developer Tract at any time after a date two (2) years after
the Opening Date, Developer shall be released and relieved
from all of its covenants, obligations and liabilities under
this Operating Agreement (other than its liabilities which
have theretofore matured or accrued), provided that any such
purchaser or transferee of Developer's Tract shall have a
net worth in excess of $5,000,000, shall be of good repute,
and shall either be experienced in the operation of such
shopping centers or shall agree to employ qualified pro-
fessional management for the Shopping Center.

28.6  Notwithstanding anything to the contrary herein,
except Paragraph 28.12 and subject always to the terms and
conditions of Paragraphs 23.4 and 28.13 hereof, Sears shall
not sell, lease, assign or convey its Tract until Sears shall
have opened for business with the general public as provided in
this Operating Agreement.  The terms "Developer" and "Sears"
as used in this Operating Agreement, shall mean the owner,
or owners, from time to time, of all parts of the Developer's
Tract and all parts of the Sears Tract, respectively.  The
covenants, provisions and conditions of this Operating
Agreement shall be binding on each Party and its successors
and assigns, except as otherwise provided with regard to the
liability of mortgagees under Paragraph 28.12 of this
Operating Agreement.  Nothing contained in this Paragraph
28.6 shall be construed as restricting or limiting Paragraph
28.12.

-84-

28.7  At the time any sale, transfer or conveyance results in any kind of change in ownership of the Developer Tract, or any portion thereof, or of the Sears Tract, or any portion thereof, as the case may be, any grantee or other transferee thereof (herein called grantee) shall take such ownership interest subject to the covenants, provisions, conditions and easements contained in this Operating Agreement, which are applicable to such ownership interest. Except as otherwise provided in this Operating Agreement, the grantor, or other transferor thereof (herein called grantor) shall be and remain bound and obligated upon all of its covenants, obligations and liabilities hereunder.

28.8  Any such grantor shall give written notice to each other Party of any such sale, transfer or conveyance (other than a mortgage) promptly, but not later than thirty (30) days after the instrument effecting the same shall be duly filed for record.  Developer also shall give written notice to Sears of any change in the membership of the Developer limited partnership and shall furnish a true copy of the amendment to the Developer's certificate of limited partnership whereby such change in membership is effected, within fifteen (15) days after the same is filed for record.

28.9  The Tract of a Party shall not be divided.  In the event, under any circumstances, a Tract may be owned by more than one person in undivided ownership interests, such persons nevertheless shall constitute only a single Party. Of all such persons constituting only a single Party, those persons owning at least seventy percent (70%) of the undivided ownership interest in the Tract of such Party, shall:

   (1)  Designate one of their number to act as agent, authorized to act for, and to bind and obligate, all of such persons constituting only a single Party, as the act and obligation of such Party; and

   (2)  Notify the other Party hereunder, in writing, of such designation as set out in the provisions of "General Article 35 Notices".

28.10  Furthermore, any grantor or other transferor shall, under this Article, remain liable for any and all events which have occurred prior to such sale, transfer or conveyance.

28.11  The term "ownership" or "ownership interest", as used in this Article, shall mean and include the tenant interest in any long-term "Ground Lease", or any other similar type of lease, of all, or any part of, the Developer Tract or the Sears Tract.  The term "mortgage" as used anywhere in this Operating Agreement shall include any deed of trust, and the term "mortgagee" shall include the beneficiary of any such deed of trust.

28.12  Notwithstanding anything to the contrary contained in this Operating Agreement, Developer may mortgage its Tract and/or sell and leaseback its Tract and, in conjunction therewith, may mortgage and/or assign (either absolutely or conditionally) all of its rights, interests and easements under this Operating Agreement to any such mortgagee or grantee.  The mortgagee of any Tract shall be liable for the performance of its mortgagor's covenants and obligations hereunder only if and for so long as such mortgagee comes into and holds possession of such Tract, but not before or after, and the lessor of any Tract shall be liable hereunder only if and for so long as such lessor comes into possession of such Tract and holds the same, but not before or after.  This Operating Agreement and the rights, interests and easements created hereunder shall be prior and superior to any mortgage upon or against any Tract.  Notwithstanding anything to the contrary herein contained in this Operating Agreement, Sears may:

    (a)  lease portions of its Building or license departments thereof or grant concessions to other parties, and

    (b)  lease or sell its Tract to any parent company who owns all of the outstanding shares of such Department Stores or to any corporation which may succeed to the business of such Department Store or such parent company in the State in which the Shopping Center is situated or to any corporation which may, as the result of reorganization, merger, con-

-86-

solidation or sale of stock or assets,
succeed to such business, and in either
such case, Sears shall be released from
all further obligations under this
Operating Agreement if such lease or sale
is to a corporation which acquires all or
substantially all of its assets and which,
by written instrument in recordable form,
expressly assumes all of its obligations
hereunder, and

(c)   mortgage its Tract and/or sell and leaseback
or lease and subleaseback its Tract, and i..
connection with any such transaction, assign
its interest in this Operating Agreement,
including transactions of sale and assign-
ments with subsidiaries and/or affiliates.
If any such mortgage is foreclosed or a deed
delivered in lieu of foreclosure, or if
Sears shall have entered into a sale and
leaseback or a lease and subleaseback trans-
action involving its Tract under which Sears
or any parent company who owns all of the
outstanding shares of Sears is the lessee or
sublessee thereunder and such lessee or
sublessee shall be deprived of possession of
such Tract by reason of its failure to comply
with the terms of such leaseback or sublease-
back, anyone who has acquired, or shall
thereafter acquire, title to such Tract or a
leasehold estate therein shall hold the same
free of any requirement that a Sears
Deaprtment Store be operated on such Tract,
as set forth in "Operation Article 23 Sears
Operating Period", but Sears shall not, in
such case, be released from its obligations
under said Article 23 or from any liability
for damages arising out of the breach by
Sears of any such obligation; provided,
however, that during Sears' Operating Period
as set forth in Article 23 hereof, Sears'
Tract and Building shall be occupied, if at
all, only for retail purposes.

28.13   Notwithstanding anything to the contrary contained
in this Operating Agreement, if Sears shall receive an acceptable
bona fide offer (the "Offer") from an independent and unrelated
third party to purchase the Sears Tract or any interest therein
at any time or from time to time, Sears shall immediately
deliver a true copy of such Offer to Developer, which shall
constitute an offer on the part of Sears to sell and convey
the Sears Tract, or such interest therein, to Developer on all
of the same terms and conditions as are contained said Offer.
Developer then shall have a period of ninety (90) days after
receipt of a copy of such Offer in which to notify Sears of
Developer's election to purchase the Sears Tract, or such
interest therein, on all of the same terms and conditions
as are contained in said Offer, if Developer desires to purchase
the Sears Tract.  If Developer elects to exercise this option
and right of first refusal to purchase the Sears Tract, Sears
and Developer shall proceed with such sale and purchase of the
Sears Tract in accordance with the terms of said Offer, except
that if such Offer calls for the delivery of any consideration
other than the payment of money for the purchase of the Sears
Tract, Developer shall be entitled to substitute the cash
equivalent of such consideration in order to complete the purchase
of the Sears Tract.  If Developer does not notify Sears of its

election to purchase the Sears Tract, or such interest therein, within such ninety (90) day period, then Sears shall be free to proceed with the sale of the Sears Tract to such third party strictly in accordance with the terms of said Offer; provided, however, that if the terms of said Offer are changed, or if such sale is not consummated with such third party within one hundred twenty (120) days after such Offer was originally received by Sears, Sears shall again be required to offer the Sears Tract for sale to Developer in accordance with the terms of this paragraph before proceeding to sell to a third party under said Offer or any other offer.  In the event of any situation in which there is or appears to be a conflict between the terms and provisions of this Paragraph 28.13 and the terms and provisions of Paragraph 23.4 of this Operating Agreement, the terms and provisions of Paragraph 23.4 hereof shall prevail and control, and Developer shall have the right and option to purchase the Sears Tract in accordance with the terms of Paragraph 23.4 hereof.  Notwithstanding anything to the contrary contained herein, this option and right of first refusal, if not theretofore exercised, shall expire and terminate upon the expiration of (a) the term of this Operating Agreement (as extended, if extended), (b) twenty-one (21) years after the death of the youngest descendant of Melvin Simon living at the date of this Operating Agreement, or (c) the period of limitation under the applicable rule against perpetuities or remoteness of vesting or similar rule of law, if any, whichever of (a), (b) and (c) is the first to expire.

28.14  In the event that Sears, as the lessee under the City Lease, causes or permits an event of default to occur within the meaning of the City Lease, Developer shall have the right (but not the obligation) to perform and pay the covenants and obligations of Sears as lessee under the City Lease, in the place and stead of Sears, in order to cure and correct such event of default under the City Lease.  In such event, Developer hereunder shall be entitled to have and receive an assignment of the City Lease from Sears to Developer or its nominee, free and clear of all liens and encumbrances, and Sears shall execute, acknowledge and deliver such assignment of the City Lease to Developer or its nominee, in form satisfactory and acceptable to Developer, immediately upon receipt of written request therefor made by Developer within ninety (90) days after Developer takes any such action to cure and correct such event of default, without the payment of any further consideration being required from Developer to Sears for such assignment.

28.15  Notwithstanding anything to the contrary contained herein, Sears' rights under this Article 28 shall be subject always to the terms, conditions and restrictions contained in Paragraphs 23.4, 28.13 and 28.14 and the prior rights of Developer thereunder.

<u>General</u>

## Article 29 Termination Rights

<u>Paragraph</u>

29.1  Upon the expiration or earlier termination of this Operating Agreement, in accordance with its provisions and conditions, all rights and privileges derived from, and all duties and obligations created and imposed by all provisions of this Operating Agreement shall terminate and thereafter cease to exist; except, that the rights and easements conferred and granted by Paragraph 3.5 of "Construction Article 3 Developer" and by "Reciprocal Easements Article 24 Easements" shall not terminate except as therein provided.

29.2  Notwithstanding anything to the contrary herein contained, it is understood and agreed that the right of either Party hereto to withdraw or exclude its Tract from the operation and affect of this Operating Agreement or to terminate this Operating Agreement as to its Tract shall in no way limit, restrict, impair, abrogate, release, terminate or curtail any of the rights, privileges or easements that the other Party may have in and to any of the Common Areas located upon the Tract so excluded or withdrawn or as to which this Operating Agreement is terminated, which rights, privileges and easements shall continue, notwithstanding such exclusion, withdrawal or termination, during the remaining Term of this Operating Agreement.

29.3  Such termination of this Operating Agreement shall not limit or affect any remedy at law or in equity of either Party against the other Party, with respect to any liability or obligation arising, or to be performed under this Operating Agreement prior to the date of such termination.

29.4  Except as herein expressly provided, no breach of this Operating Agreement or default by either Party shall entitle the other Party to terminate or cancel this Operating Agreement, and the sole remedy of either Party hereto against the other Party in default shall be by means of an injunction and/or an action for damages.

## General

### Article 30 Indemnity

Except for claims paid pursuant to the insurance policy, or policies, carried by the Parties hereto, under the provisions of "Construction Article 5 Insurance" and "Operation Article 19 Insurance":

(1) Sears shall indemnify and save Developer harmless from and against any and all claims, actions, damages, liability and expense in connection with bodily injury, loss of life, personal injury or death to persons and damage to property, or any of them, occurring in or upon the Shopping Center, occasioned wholly or in part, by any negligent act or omission of Sears, its agents, contractors or employees; and

(2) Developer shall indemnify and save Sears Sears harmless from and against any and all claims, actions, damages, liability and expense, in connection with bodily injury, loss of life, personal injury or death to persons, and damage to property, or any of them, occurring in or upon the Shopping Center occasioned wholly or in part by any negligent act or omission of Developer, its agents, contractors or employees; and

(3) Excepting, however, as respects any Party claiming the right to be indemnified hereunder, any such claims, actions, damages, liability and expense arising from or as a result of the negligent act or omission of any Party so claiming the right to be indemnified or the agents, contractors or employees of such Party.

-89-

<u>General</u>

Article 31 Arbitration

<u>Paragraph</u>

31.1 Except when otherwise provided in this Operating Agreement, whenever there is any monetary dispute between the two parties hereto, under the provisions of this Operating Agreement, not exceeding $250,000.00 in amount, which cannot be settled by agreement of the two Parties, and if both Parties shall agree in writing, upon or after the occurrence of such dispute, to arbitrate such dispute, either Party desiring arbitration (hereinafter called "First Party") shall give the other Party (hereinafter called "Second Party") written notice to that effect, describing the matter in dispute to be determined by arbitration, and naming an arbitrator to act for the First Party. Unless such matter shall be agreed upon between the Parties in the interim, the Second Party, within 10 days after receipt of such notice, shall name an arbitrator to act for Second Party by a written notice to First Party and, concurrently therewith, by notices, in writing, shall notify each of said arbitrators of their obligation to appoint a third arbitrator. The two arbitrators so appointed shall, within 30 days thereafter, appoint a third arbitrator and make all necessary arrangements for conducting such arbitration.

31.2 If Second Party shall fail or refuse to name an arbitrator, the arbitrator appointed by First Party shall act as sole arbitrator, or, at his option, shall appoint an arbitrator to act for the Second Party. In the event the arbitrator appointed by First Party shall be the sole arbitrator, his decision shall be final and conclusive upon the Parties. In the event the three arbitrators are appointed in either of the manners set forth in this Article the decision of any two of said three arbitrators shall be final and conclusive upon the Parties. In the event the first two arbitrators appointed shall fail to appoint a third arbitrator within 30 days of the appointment of the second arbitrator, or in the event any arbitrator appointed shall become incapacitated, die or resign, or refuse to act, at any time before the complete determination of the matter in dispute, a Judge of competent local jurisdiction shall appoint an arbitrator to fill the vacancy of the arbitrator not appointed or not acting.

-90-

31.3 The cost and expense of the arbitrators and the arbitration proceeding shall be paid and shared by the Parties equally. The decision of the arbitrators shall be in writing, a signed copy thereof shall be delivered to each Party and shall be made as promptly as possible after their appointment, but in no event, later than 30 days after the date of appointment of the third arbitrator. If the said arbitrators so appointed do not make a binding decision within said 30 day period, the appointment of the third arbitrator shall be deemed revoked, a new third arbitrator shall be appointed and the three arbitrators so appointed shall again act in the same manner and within the same time limits as though the third arbitrator had not previously been appointed.

31.4 In the alternative, any Party may elect that: Any monetary dispute not exceeding $250,000.00, arising out of, or relating to this Operating Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator, or arbitrators, may be rendered in any court having jurisdiction thereof.

31.5 Provided, however, notwithstanding anything to the contrary contained herein, no dispute shall be submitted to arbitration unless all Parties to such dispute agree in writing, upon or after the occurrence of such dispute, to submit the same to arbitration. Arbitration under this Operating Agreement shall be permissive and not mandatory. All remedies at law and in equity are hereby reserved.

## General

## Article 32 Miscellaneous

**Paragraph**

**32.1 Recording.** A fully executed and acknowledged counter-part of this Operating Agreement shall be fully recorded in its entirety in the public records of the county in which the Shopping Center is located, immediately following execution of this Operating Agreement by both Parties. Developer shall effect such recording at its expense.

**32.2 Parties not Partners.** Nothing contained in this Operating Agreement shall be construed to make the Parties hereto partners or joint venturers, or to render any Party liable for the debts or obligations of the other, except as in this Operating Agreement expressly provided.

**32.3 No Waiver.** No delay or omission by any of the Parties in exercising any right or power accruing upon any non-compliance or failure of performance by the other Party under the provisions of this Operating Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver, by either of the Parties of any covenant, condition, provision or performance under this Operating Agreement, shall not be construed to be a waiver of any succeeding breach thereof, or of any other covenant, condition, provision or performance of this Operating Agreement.

**32.4 Captions.** The table of contents preceding this Operating Agreement, Article headings, captions and other similar designations are for convenience and reference only, and in no way define or limit the scope and content of this Operating Agreement, or in any way affect its provisions.

**22.5 Governing Law.** This Operating Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

-92-

**32.6    Severable Provisions.** In the event any pro-
vision, or any portion thereof, of this Operating Agreement,
or the application thereof, to any person or circumstances,
shall, to any extent, be held invalid or unenforceable, the
remainder of this Operating Agreement, all of its other
provisions and all portions thereof, and the application
thereof, to any other person or circumstances, shall be
severed therefrom and shall not be affected thereby, and
each such provision, and portion thereof, of this Operating
Agreement shall be valid and enforceable to the fullest
extent permitted by law.

**32.7    Modification.** No agreement shall be effective to
add to, change, amend, modify, waive or discharge this
Operating Agreement, in whole or in part, unless such
agreement is in writing and signed by each Party.

**32.8    Counterparts.** This Operating Agreement is
executed in several counterparts, each of which shall be
deemed an original, and all such counterparts shall together
constitute one and the same instrument.

**32.9    Limited Liability of Developer and Exculpation of
Partners.** Notwithstanding anything contained in this
Operating Agreement to the contrary, if at any time De-
veloper shall fail to perform any covenant or obligation on
its part to be performed hereunder, and as a consequence
thereof, Sears shall recover a money judgment against De-
veloper, such judgment shall be enforced against and satis-
fied (subject to the rights of any mortgagee or deed of
trust holder whose lien predates the filing of the Complaint
which results in such judgment) out of only (i) the proceeds
of sale produced upon execution of such judgment and levy
thereon against Developer's interest in the Developer Tract
and the improvements thereon, (ii) the rents or other income
from such property receivable by Developer and (iii) the
consideration received by Developer from the sale of all or
any part of Developer's interest in the Developer Tract made
after such failure of performance (which consideration shall
be deemed to include any assets at any time held by De-
veloper to the extent that the value of same does not exceed
the proceeds of such sale), and neither Developer nor its
successors or assigns nor any of the partners in the limited
partnership referred to herein as "Developer" shall be
liable for any deficiency or other liability whatsoever to
the other Party or the successors or assigns of that Party.
Sears shall not seek specific performance by or against
Developer or any partner in the Developer partnership hereunder,
except to the extent that the same can be enforced in rem
against the Developer Tract and Improvements thereon and
satisfied from the property specified in clauses (i), (ii) and
(iii) above. It is expressly understood and agreed that nothing

in this Agreement contained shall be construed as creating any
personal liability whatsoever against the partners in the
Developer partnership except to the extent of such partners'
interest in the Developer partnership or in the Developer Tract,
and, in particular, without limiting the generality of the fore-
going there shall be no personal liability on the part of any such
partner to pay any indebtedness accruing under this Agreement or
to perform any covenant, either express or implied, contained
in this Agreement; that all personal liability of the partners of
the Developer partnership is hereby jointly and severally expressly
waived and released by the other Party, and by every person now
or hereafter claiming any right or security hereunder; and that
so far as the partners of the Developer partnership are concerned
the owner or holder of any indebtedness or liability accruing under
this Agreement shall look solely to said property which constitutes
the Developer Tract and any improvements thereon for the payment
thereof, as aforesaid.  The liability of Developer shall be limited
to its interest in the Developer Tract and any improvements there-
on, as aforesaid.  The provisions of this Paragraph are not de-
signed to relieve Developer from the performance of any of its
obligations hereunder, but rather to limit its liability in the
case of the recovery of a judgment against it, as aforesaid, and
to relieve the partners of the Developer partnership from any
such liability as aforesaid; nor shall any of the provisions of
this Paragraph be deemed to limit or otherwise affect Sears'
right to avail itself of any other right or remedy which may be
accorded to it by law or this Operating Agreement as against the
Developer only, but not against any partner in the Developer
partnership, and provided that any such right or remedy can be
enforced and satisfied against the Developer's interest in the
Developer's Tract and improvements only, without any personal or
financial liability on the part of any of the partners in the
Developer partnership.  The provisions of this paragraph also
shall inure to the benefit of Developer's successors and assigns.

32.10 **Default.**  Unless otherwise provided in this Operating
Agreement, neither Party shall be deemed to be in default under
this Operating Agreement, until that Party shall have been given
written notice describing the nature of such impending default,
and within 15 days after the receipt of such notice, or such
longer period of time as may otherwise be provided in this
Operating Agreement, shall have failed to commence to cure such
impending default and to proceed diligently to complete the curing
of such impending default as promptly as possible, utilizing all
reasonable means to effectuate and expedite the curing of such
impending default.

**32.11 Agreement Conditional.** This Operating Agreement is conditional upon there being no laws, ordinances, rules, resolutions or regulations of any kind and/or nature whatsoever (including, without limitation, those concerning zoning, ecological, Environmental Protection Agency and/or other matters) in effect (i) at the time of recording of this Operating Agreement, (ii) at the time of commencement of construction of the Developer improvements and/or Sears improvements and/or (iii) upon completion by Sears of the footings and underground supports for its respective Buildings, which would prevent the construction, reconstruction and/or use of same. If such laws, ordinances, rules, resolutions or regulations should be in existence at any of such times and the Parties within a period of 4 months after such time shall be unable to obtain appropriate relief from same so as to permit compliance with the terms of, and the enjoyment of their rights under, this Operating Agreement, Sears may elect to terminate this Operating Agreement as to it or them, as the case may be, and require the reconveyance of its Tract to Developer at a cost equivalent to the purchase price therefor paid by it or them, as the case may be, plus all of its or their, as the case may be, actual costs and expenses theretofore incurred in connection with the acquisition of its Tract, together with interest at a rate of 8% per annum on such purchase price, costs and expenses from the date paid by Sears, until the date of payment or repayment by Developer; provided, however, that such election must be exercised by Sears by giving written notice to Developer within 30 days after the expiration of said 4 month period or such termination right shall be deemed to have been waived by Sears. In the event Sears so elects to require reconveyance and purchase by Developer, the provisions of "Construction Article 7 Remedies of Sears Prior to Opening Date", shall be applicable. If no such laws, ordinances, rules, resolutions or regulations are in existence at any of the times set forth in clauses (i), (ii) and (iii) above in this paragraph, then this Operating Agreement shall be and become absolute and unconditional. The conditions contained in this paragraph constitute conditions subsequent, and nothing herein contained shall impair, abrogate, limit, reduce, negate or otherwise affect the covenants and obligations of the Parties hereunder unless and until the occurrence of any of said conditions subsequent.

-95-

**32.12 Mortgagee Notice.** Notwithstanding any other pro-
visions in this Operating Agreement for notices of default
under this Operating Agreement, Sears shall notify Developer's
mortgagee of any default hereunder, in the same manner that
other notices are required to be given under this Operating
Agreement, provided, however, that said mortgagee shall have
first notified Sears of its mailing address.

**32.13 Estoppel Certificate.** Either Party shall, from
time to time (but not more frequently than once in any 4 month
period) upon not less than 20 days' notice from the other Party,
execute and deliver to the other Party a certificate in record-
able form stating that this Operating Agreement is unmodified
and in full force and effect or, if modified, that this Operat-
ing Agreement is in full force and effect, as modified, and
stating the modifications; and stating whether or not, to the
best of its knowledge, the other Party is in default in any
respect under this Operating Agreement, and, if in default,
specifying such default; and stating whether any of the con-
ditions subsequent set forth in Paragraph 32.11 have occurred
and, if so, stating which such conditions; and stating whether
this Operating Agreement has become absolute and unconditional
as provided in Paragraph 32.11.

**32.14 No Public Dedication.** No provision contained in this
Operating Agreement shall be construed to grant any gift, dedica-
tion or any irrevocable rights to the general public or for any
quasi-public purpose whatsoever, of, in, or to, any portion of
the Shopping Center Tract or any improvements therein; it being
the intention of the Parties hereto that this Operating Agree-
ment shall be strictly limited to, or for, the purposes herein
expressed.

**32.15 No Third Party Beneficiary.** Except as herein
specifically provided, no rights, privileges or immunities of
either Party hereto shall inure to the benefit of any tenant,
customer, employee or invitee of the Shopping Center or any
third party; nor shall any tenant, customer, employee or invitee
of the Shopping Center or any other third party be deemed to
be a third party beneficiary of any of the provisions contained
herein.

32.16 <u>Ordinances</u>.  Each Party shall, at all times, both during and after the completion of construction of its improvements, comply with all Federal, State, County and Municipal laws, ordinances, rules and regulations, with all regulations of the local Fire Insurance Rating organizations having jurisdiction or any other organization or board exercising similar functions, respecting the construction, maintenance and operation of its improvements and with all Factory Mutual Insurance Companies.

<u>General</u>

**Article 34 Exhibits**

The exhibits to this Operating Agreement have been signed by the duly authorized officers, agents or attorneys of each Party and are hereby incorporated by reference into, and made a part of, this Operating Agreement, as fully as if set forth in full herein.

General

Article 35 Successors

Except as herein otherwise expressly provided, the covenants, conditions and agreements contained in this Operating Agreement shall bind and inure to the benefit of Developer and Sears and their respective heirs, successors, administrators and assigns.

General

Article 36 Joinder by City of El Paso

The City of El Paso, Texas ("City") hereby joins in the execution of this Operating Agreement for the purpose of consenting and agreeing to the terms, provisions, covenants, conditions, limitations, restrictions, easements and options contained in this Operating Agreement, insofar as the same affect those portions of the Shopping Center owned by the City and leased to either of the other Parties hereto (hereinafter referred to as the "City Land"), and the City hereby grants and conveys to the other Parties hereto, their successors and assigns, all of the easements created and described in Article 24 of this Operating Agreement, insofar as the same affect the City Land.  The City hereby acknowledges and agrees that its ownership and interest in the City Land which comprises a portion of the Shopping Center shall be and hereby is made subject and subordinate to this Operating Agreement and all of the terms, provisions, covenants, conditions, limitations, restrictions, easements and options contained herein, and in the event of the cancellation or termination of the City Lease or any other lease from the City to any of the Parties hereto covering any portion of the City Land in the Shopping Center, such City Land shall be and remain subject to this Operating Agreement, as the same now exists or as it may be amended from time to time with the written consent of the City (which consent shall not be unreasonably withheld, delayed or denied), and the rights of Developer hereunder, and to the rights of all other Occupants in the Shopping Center under other agreements with Developer and Sears as the same may exist from time to time.  This Operating Agreement shall survive the cancellation or termination of the City Lease or any other lease from the City to any of the Parties covering the City Land or any part thereof, and termination of the City Lease or any other such lease shall not cause a termination of this Operating Agreement or any rights of Developer hereunder as to the City Land or any part thereof, and shall not be affected or impaired thereby.  In the event of tne termination of the City Lease between the City and Sears for any reason at any time, the City immediately shall notify Developer in writing of such termination, and the City

-100-

shall, as the Lessor under the City Lease, at the written
request of Developer made within sixty (60) days after receipt
of written notice of the termination of the City Lease, enter
into a new lease with Developer, beginning as of the date of
termination of the City Lease and continuing for the remainder
of the term of the City Lease, together with all renewal and
extension rights contained therein, leasing the Sears Tract
and all other City Land covered by the City Lease to Developer.
Such new lease shall otherwise contain the same terms and
provisions as those set forth in the City Lease (including,
without limitation, all provisions pertaining to the payment
of Rent and Additional Rent), except for requirements which
are then no longer applicable or which have already been
performed, or which cannot be performed by Developer or which
are not susceptible of being performed by Developer.  It is
the intention of the parties that such new lease shall have
the same priority relative to other rights or interests to or
in the fee estate in the Sears Tract and other City Land
covered by the City Lease as the City Lease, and Developer
shall not be obligated to cure or correct any "events of
default" as a condition precedent to the exercise of its
rights hereunder; provided, however, that the City shall
accept a cure of any such event of default under the City
Lease by Developer, for and on behalf of Sears, and performance
by Developer of Sears' covenants and obligations under the
City Lease, if and when Developer should elect to so cure and
perform for and on behalf of Sears under the City Lease as
provided in Paragraph 28.14 hereof.  From and after the date
of this Operating Agreement the City shall not modify, amend,
cancel, terminate or otherwise alter or impair the City Lease
or Sears' leasehold estate thereunder, without the prior
written consent of Developer, which consent shall not be
unreasonably withheld, delayed or denied.

It is expressly understood and agreed that nothing in
this Operating Agreement contained shall be construed as
creating any personal liability whatsoever against the City,
its officials, agents or employees, and there shall be no
personal liability on the part of the City, its officials,
agents or employees to pay any indebtedness accruing under
this Operating Agreement; that all personal liability of the
City under this Operating Agreement is hereby jointly and
severally expressly waived and released by the other Parties
and by every person now or hereafter claiming any right or
security hereunder; and that so far as the City is concerned,
the owner or holder of any indebtedness or liability accruing
under this Operating Agreement shall look solely to the
City's interest in the City Land and any improvements thereon
for the payment thereof.  The liability of the City shall be
limited to its interest in the City Land and any improvements
thereon.  The provisions of this Paragraph are not designed
to relieve the City from the performance of any of its obligations
hereunder, but rather to limit its liability in the case of
the recovery of a judgment against it, as aforesaid.  Nothing
contained herein shall waive or be deemed to waive the right
of either Developer to obtain and enforce a decree for specific
performance of the City's obligations under Paragraph 28.14
hereof or the City's obligations as to the execution of a new
lease with Developer as set forth in this Article 36.  The
undersigned parties shall not, however, obtain and enforce a
decree for specific performance by or against the City of the
City's obligations under any other provision hereof except to
the extent that the same can be enforced _in rem_ against the City
land and any improvements thereon.

-101-

STATE OF INDIANA        )
                        ) SS:
COUNTY OF MARION        )


       Before me, a Notary Public in and for said County and
State, on this day personally appeared HERBERT SIMON,
known to me to be the person whose name is subscribed to
the foregoing instrument, and known to me to be a General
Partner in CELINA DEVELOPMENT COMPANY, a Texas limited
partnership, and acknowledged to me that he executed said
instrument for the purposes and consideration therein
expressed, and as the act of said limited partnership.

       Given under my hand and seal of office this  21st  day
of ___January___ , 1981.

                              _____
                              Jo Ann Owen,    Notary Public

My Commission expires:

   _September 5, 1983_

My county of residence:

   _Marion_



STATE OF CALIFORNIA )
                    ) SS:
COUNTY OF LOS ANGELES


       On this the  __3__  day of _____March_____ , 1981,
before me, a Notary Public duly authorized in and for the
said County in the State aforesaid to take acknowledgements,
personally appeared _____J. E. Duggan_____ ,
and known to me to be the Facilities Planning Manager of SEARS,
ROEBUCK AND CO., a New York corporation, and acknowledged that
as such officer, being authorized so to do, he executed the
foregoing instrument on behalf of said corporation by subscribing
the name of said corporation by himself as such officer and
caused the corporate seal of said corporation to be affixed
thereto, as his free and voluntary act, and as the free and
voluntary act of said corporation, for the uses and purposes
therein set forth.

       IN WITNESS WHEREOF, I hereunto set my hand and official
seal.

                              _____
                              Notary Public
My Commission expires:        R. J. Kautzi

   _October 8, 1983_


                         -103-

IN WITNESS WHEREOF, the Parties hereto and the City have caused this Operating Agreement to be signed and executed as of the day and year first above written, the corporate Party and the City by its duly authorized officers and by affixing its seal.

CELINA DEVELOPMENT COMPANY,
a Texas limited partnership

By _____
Herbert Simon,
General Partner

"Developer"

SEARS, ROEBUCK AND CO.,
a New York corporation

By _____
Executive Vice President

Attest:

_____
Assistant Secretary

"Sears"

CITY OF EL PASO, TEXAS

By _____
Mayor

Attest:

_____
City Clerk

approved
as to form:
_____
City attorney
8-7-81

"City"

-102-

STATE OF TEXAS          )
                        ) SS:
COUNTY OF EL PASO       )


On this the _11th_ day of _August_ , 198 , before me, a Notary Public duly authorized in and for the said County in the State aforesaid to take acknowledgements, personally appeared _Jonathan W. Rogers_ , to me known and known to me to be the Mayor of the City of El Paso, Texas, and acknowledged to me that he executed the foregoing instrument as his free and voluntary act for the purposes and consideration therein expressed.

_Billie Jean Burnham_
Notary Public

My Commission expires:

_6/30/84_

-104-

## GUARANTY

For value received, in consideration of the sum of One Dollar ($1.00) paid by Sears, Roebuck and Co. ("Sears") to the undersigned, receipt whereof is hereby acknowledged, and in consideration for and as an inducement to Sears to enter into the foregoing Construction, Operation and Reciprocal Easement Agreement ("Operating Agreement") with Celina Develop- ment Company ("Developer"), of even date herewith, the undersigned, for itself and its successors in interest and assigns, hereby guarantees to Sears, its respective successors and assigns, the full and faithful performance and observance by Developer of all of the covenants, conditions and agreements therein provided to be performed and observed by Developer, together with the payment of all costs, attorneys' fees and other expenses incurred by Sears in enforcing such performance and observance, without requiring any notice of non-payment, non-performance or non-observance or proof of notice of demand whereby to charge the undersigned therefor, all of which the undersigned hereby expressly waives and expressly agrees that the validity of this Guaranty and the obligations of the undersigned hereunder shall in no wise be terminated, affected or impaired by reason of assertion by Sears against Developer of any of the rights or remedies reserved to Sears pursuant to said Operating Agreement.

The undersigned expressly agrees that Sears may, without notice to the undersigned, modify said Operating Agreement by written agreement with Developer and grant extensions and concessions to Developer in respect thereof without in any manner affecting the liability of the undersigned hereunder.

The liability of the undersigned hereunder is primary and may be enforced by Sears before or after proceeding against Developer.

The provision for Limited Liability of Developer contained in Paragraph 32.9 of said Operating Agreement shall not in any way or to any extent limit, reduce, impair, abrogate, negate, discharge or otherwise affect the liability of the undersigned hereunder.

Notwithstanding anything to the contrary contained herein, this Guaranty and the liability of the undersigned hereunder and under the Operating Agreement shall lapse, expire, terminate and become null and void and of no further force and effect when Developer satisfies and fulfills its covenants and obligations under "Article 3 Developer Construction" of the Operating Agreement and completes the construction of improvements on the Developer Tract as called for under said Article 3.

The undersigned hereby waives notice of acceptance of this Guaranty.

Dated: _January 21_ , 198_1_ .

MELVIN SIMON & ASSOCIATES, INC.

By _____
        Herbert Simon, President

Attest: _____

STATE OF INDIANA   )
                   ) SS:
COUNTY OF MARION   )

On this 21st day of January , 198 1, before me appeared HERBERT SIMON, to me personally known, who, being by me duly sworn, did say that he is the President of MELVIN SIMON & ASSOCIATES, INC., an Indiana corporation, and that the seal affixed to the foregoing instrument is the corporate seal of the corporation, and that the foregoing instrument was signed and sealed in behalf of the corporation by authority of its Board of Directors, and said HERBERT SIMON acknowledged the instrument to be the free act and deed of the corporation.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Jo Ann Owen   Notary Public

My Commission expires:

_____September 5, 1983_____

My County of residence:

_____Marion_____

-106-

PREPARED FOR:  Melvin Simon and Associates
Developers Tract, Celina Plaza
Cielo Vista Mall Shopping Center
El Paso County, Texas

### DEVELOPERS TRACT

### PROPERTY DESCRIPTION

Description of a parcel of land being a Portion of Block 2 and a Portion of
Block 3, Celina Plaza, El Paso County, Texas and being more particularly des-
cribed by metes and bounds as follows:

From a point, said point being the southwesterly corner of Celina Plaza, El Paso
County, Texas and said point also lying in the northerly right-of-way line of
U.S. Interstate Highway No. 10; thence South 61° 38' 34" East along said north-
erly right-of-way line a distance of 1,310.00 feet to the POINT OF BEGINNING;

Thence North 28° 21' 26" East a distance of 460.00 feet;

Thence South 61° 38' 34" East a distance of 500.51 feet;

Thence South 28° 21' 26" West a distance of 20.00 feet;

Thence South 61° 38' 34" East a distance of 300.00 feet;

Thence North 28° 21' 26" East a distance of 370.00 feet;

Thence North 61° 38' 34" West a distance of 120.51 feet;

Thence North 28° 21' 26" East a distance of 150.00 feet;

Thence North 61° 38' 34" West a distance of 740.00 feet;

Thence South 28° 21' 26" West a distance of 218.03 feet;

Thence 201.26 feet along the arc of a curve to the right
whose interior angle is 24° 35' 22", whose radius is
468.95 feet and whose chord bears North 44° 05' 13" West
a distance of 199.72 feet;

Thence North 31° 47' 32" West a distance of 96.73 feet;

Thence 205.42 feet along the arc of a curve to the left
whose interior angle is 20° 54' 54", whose radius is
562.74 feet and whose chord bears North 42° 14' 59" West
a distance of 204.28 feet;

Thence North 28° 21' 26" East a distance of 105.42 feet;

Thence South 61° 38' 34" East a distance of 585.00 feet;

Thence North 28° 21' 26" East a distance of 147.55 feet;

Thence South 61° 38' 34" East a distance of 550.00 feet;

Page 1 of 6

Exhibit A-1

Thence South 28° 21' 26" West a distance of 35.04 feet;.

Thence South 61° 38' 34" East a distance of 213.57 feet;

Thence South 02° 22' 08" West a distance of 94.30 feet;

Thence South 61° 38' 34" East a distance of 294.41 feet;

Thence North 28° 21' 26" East a distance of 409.00 feet;

Thence South 61° 38' 34" East a distance of 168.68 feet;

Thence South 28° 21' 26" West a distance of 409.00 feet;

Thence North 61° 38' 34" West a distance of 126.05 feet;

Thence South 28° 21' 26" West a distance of 221.35 feet;

Thence South 61° 38' 34" East a distance of 321.58 feet;

Thence North 28° 21' 26" East a distance of 51.50 feet;

Thence South 61° 38' 34" East a distance of 101.00 feet;

Thence South 28° 21' 26" West a distance of 601.50 feet;

Thence South 61° 38' 34" East a distance of 20.00 feet;

Thence South 28° 21' 26" West a distance of 250.00 feet;

Thence North 61° 38' 34" West a distance of 20.00 feet;

Thence South 28° 21' 26" West a distance of 30.00 feet;

Thence North 61° 38' 34" West along the northerly right-of-way line
of U.S. Interstate Highway No. 10, a distance of 1,622.51 feet to the POINT OF
BEGINNING and containing in all 34.038 acres of land more or less.

Isaac J. Pino, P.E.
CREHANS, INC.

June 25, 1981

Together with the following described parcel:

Page 2 of 6

Exhibit A-1

Description of a parcel of land being a portion of Block 4,
Celina Plaza, El Paso County, Texas and being more particularly
described by metes and bounds as follows to wit:

From a point, said point being the southwesterly corner of
Celina Plaza, said point lying in the northerly right-of-way
line of U.S. Interstate Highway No. 10; Thence South 61°
38' 34" East along said northerly right-of-way line, said line
being common with the southerly boundary line of Celina Plaza,
a distance of 2,962.51 feet to THE POINT OF BEGINNING;

Thence 115.82 feet along the southerly right-of-way line of
a 30.00 foot wide railroad right-of-way easement and along the
arc of a curve to the left whose interior angle is 16° 40'
15", whose radius is 398.07 feet and whose chord bears South
69° 58' 41" East a distance of 115.41 feet;

Thence South 37° 08' 34" East for a distance of 33.54 feet;

Thence 7.32 feet along the arc of a curve to the left whose
interior angle is 3° 39' 37", whose radius is 114.64 feet and
whose chord bears South 38° 58' 23" East a distance of 7.32
feet to a point lying in the southerly boundary line of Celina
Plaza, said boundary line being common with the northerly
right-of-way line of U.S. Interstate Highway No. 10;

Thence North 61° 38' 34" West along said common boundary and
right-of-way line a distance of 151.47 feet to THE POINT OF
BEGINNING and containing in all 939.064 square feet or 0.021
acres of land more or less.

Together with the following described parcel:

Page 3 of 6

EXHIBIT A-1

Description of a parcel of land being Block 6, Colina Plaza, El Paso County, Texas and being more particularly described by metes and bounds as follows to wit:

From a point, said point being the intersection of the centerline of Hawkins Boulevard with the northerly right-of-way line of U.S. Interstate Highway No. 10; thence North 28° 19' 19" East along the centerline of Hawkins Boulevard a distance of 976.83 feet;

thence North 61° 40' 41" West a distance of 60.00 feet to a point lying in the westerly right-of-way line of Hawkins Boulevard, said point also being the southeasterly corner of City of an El Paso Public Service Board Well Site and said point also being the POINT OF BEGINNING;

Thence North 61° 40' 41" West along the southerly boundary line of said well site a distance of 280.00 feet to a point, said point being the southwesterly corner of said well site;

Thence North 28° 19' 19" East along the westerly boundary line of said well site a distance of 280.00 feet to a point, said point being the northwesterly corner of said well site;

Thence South 61° 40' 41" East along said the northerly boundary line of said well site a distance of 284.86 feet to a point lying in the westerly right-of-way line of Hawkins Boulevard said point also being the northeasterly corner of said well site;

Thence 175.09 feet along the westerly right-of-way line of Hawkins Boulevard and also being the easterly boundary line of said well site and along the arc of a curve to the left whose interior angle is 3° 10' 46", whose radius is 3,155.30 feet and whose chord bears South 29° 54' 42" West a distance of 175.07 feet;

Thence South 28° 19' 19" West along said common boundary line a distance of 105.00 feet to the POINT OF BEGINNING and containing in all 1.806 acres of land more or less.

Together with the following described parcel:

Description of an access road easement, being a portion of Lot 4, Block 1, Celina Plaza, El Paso County, Texas, and being more particularly described by metes and bounds, as follows, to-wit:

Beginning at a point, said point being the northeasterly corner of Block 8, (City of El Paso Retention Basin Site), Celina Plaza, El Paso County, Texas;

Thence North 28° 21' 26" East a distance of 10.00 feet;

Thence 145.83 feet along the arc of a curve to the right whose interior angle is 11° 27' 45", whose radius is 729.92 feet, and whose chord bears North 34° 05' 18" East a distance of 145.53 feet;

Thence North 39° 49' 11" East a distance of 175.32 feet to a point, lying in the southerly right of way line of Viscount Blvd.;

Thence 50.00 feet along said right of way line, and along the arc of a curve to the right whose interior angle is 0° 46' 20", whose radius is 3,710.00 feet, and whose chord bears South 50° 10' 49" East a distance of 50.00 feet;

Thence South 39° 49' 11" West a distance of 175.32 feet;

Thence 135.82 feet along the arc of a curve to the left whose interior angle is 11° 27' 45", whose radius is 678.92 feet, and whose chord bears South 34° 05' 18" West a distance of 135.60 feet;

Thence South 28° 21' 26" West a distance of 10.00 feet to a point, said point lying in the common boundary line of Blocks 1 and 3, Celina Plaza;

Thence North 61° 38' 34" West along said common boundary line a distance of 50.00 feet to the Point of Beginning, and containing in all 16,310.625 square feet or 0.374 acres of land, more or less.

Together with the following described parcel:

Exhibit 5

Description of a [ ] access road easement, be[ ] a portion of
Lot 1, Block 1, [ ] also a portion of Bloc[ ], Celina Plaza,
El Paso County, Texas, and being more particularly described
by metes and bounds, as follows, to-wit:

From a point, said point being the northwesterly corner of
Celina Plaza, and said point also lying on the southerly right
of way line of Viscount Blvd., thence South 79° 02' 23" east
along said southerly right of way line a distance of 274.81
feet to the Point of Beginning;

Thence south 79° 02' 23" east continuing along said right
of way line a distance of 50.00 feet;

Thence south 11° 22' 15" west a distance of 37.46 feet;

Thence 303.73 feet along the arc of a curve to the right
whose interior angle is 16° 59' 11", whose radius is 1,024.49
feet, and whose long chord bears south 19° 51' 51" west a
distance of 302.62 feet;

Thence south 28° 21' 26" West a distance of 359.03 feet;

Thence 31.42 feet along the arc of a curve to the left
whose interior angle is 90° 00' 00", whose radius is 20.00
feet, and whose chord bears south 16° 38' 34" east a distance
of 28.28 feet;

Thence south 61° 38' 34" east a distance of 310.00 feet;

Thence 87.72 feet along the arc of a curve to the right
whose interior angle is 8° 20' 18", whose radius is 602.74
feet, and whose chord bears south 57° 28' 25" east a distance
of 87.64 feet;

Thence south 28° 21' 26" west a distance of 40.46 feet;

Thence 87.76 feet along the arc of a curve to the left whose
interior angle is 8° 56' 08", whose radius is 562.74 feet, and
whose chord bears north 57° 10' 30" west a distance of 87.67
feet;

Thence north 61° 38' 34" west a distance of 695.59 feet
to a point, said point lying in the westerly boundary line of
Celina Plaza;

Thence North 28° 21' 26" east along said westerly boundary
line a distance of 40.00 feet;

Thence south 61° 38' 34" east a distance of 295.59 feet;

Thence 31.42 feet along the arc of a curve to the left
whose interior angle is 90° 00' 00", whose radius is 20.00
feet, and whose chord bears north 73° 21' 26" east a distance
of 28.28 feet;

Thence north 28° 21' 26" east a distance of 359.03 feet;

Thence 289.91 feet along the arc of a curve to the left
whose interior angle is 16° 59' 11", whose radius is 974.49
feet, and whose long chord bears north 19° 51' 51" east a
distance of 287.85 feet;

Thence north 11° 22' 15" east a distance of 37.10 feet
to the Point of Beginning, and containing in all 67,133.263
square feet or 1.541 acres of land, more or less.

EXHIBIT A-1

PREPARED FOR: Melvin Simon and Associates
Portion of Block 3, Celina Plaza,
El Paso County, Texas

NEW DILLARD'S TRACT - PARCEL 'B' REVISED

PROPERTY DESCRIPTION

Description of a parcel of land being a Portion of Block 3, Celina Plaza,
El Paso County, Texas and being more particularly described by metes and
bounds as follows:

From a point, said point being the southwest corner of Celina Plaza and said
point lying in the northerly right-of-way line of U.S. Interstate Highway
No. 10; thence South 61° 38' 34" East along the northerly right-of-way line
of U.S. Interstate No. 10 a distance of 2,932.51 feet; thence North 28° 21' 26"
East a distance of 881.50 feet to THE POINT OF BEGINNING;

> Thence North 61° 38' 34" West a distance of 101.00 feet;

> Thence South 28° 21' 26" West a distance of 51.50 feet;

> Thence North 61° 38' 34" West a distance of 321.58 feet;

> Thence North 28° 21' 26" East a distance of 221.35 feet;

> Thence South 61° 38' 34" East a distance of 126.05 feet;

> Thence North 28° 21' 26" East a distance of 409.00 feet;

> Thence North 61° 38' 34" West a distance of 367.98 feet;

> Thence North 28° 21' 26" East along the east line of Block B
> a distance of 49.65 feet;

> Thence South 61° 38' 34" East along the north line of Block 3
> a distance of 330.98 feet;

> Thence South 45° 29' 22" East continuing along said north line
> a distance of 263.77 feet;

> Thence South 46° 53' 12" East continuing along said north line
> a distance of 505.45 feet;

> Thence South 57° 58' 38" East continuing along said north line
> a distance of 350.00 feet to a point, said point being the south-
> easterly corner of Block 1, Celina Plaza, said point also lying
> on the westerly right-of-way line of Hawkins Boulevard;

> Thence 28.71 feet along said westerly right-of-way line at Hawkins
> Boulevard, said line being common with the easterly boundary line
> of Celina Plaza and along the arc of a curve to the left whose
> interior angle is 00° 31' 17", whose radius is 3,155.30 feet and
> whose chord bears South 31° 45' 44" West, a distance of 28.71 feet
> to a point, said point lying in the northerly boundary line of
> Block 6, Celina Plaza, (City of El Paso Public Service Board Well
> Site);

Thence North 61° 40' 41" West along the northerly boundary
line of Block 6 a distance of 284.86 feet to a point, said
point being the northwesterly corner of said block;

Thence South 28° 19' 19" West along the westerly boundary line
of said Block 6 a distance of 130.00 feet;

Thence North 61° 38' 34" West a distance of 471.42 feet;

Thence South 28° 21' 26" West a distance of 245.12 feet to THE POINT
OF BEGINNING and containing in all 7.913 acres of land more or less,

## TOGETHER WITH THE FOLLOWING DESCRIBED PARCEL OF REAL ESTATE:

Description of a parcel of land being a Portion of Block 3, Celina Plaza, El Paso
County, Texas and being more particularly described by metes and bounds as follows:

From a point, said point being the southwest corner of Celina Plaza and said
point also lying on the northerly right-of-way line of U.S. Interstate Highway
No. 10; thence South 61° 38' 34" East along said right-of-way line a distance of
2,932.51 feet; thence North 28° 21' 26" East a distance of 1,060.67 feet to the
POINT OF BEGINNING;

Thence North 28° 21' 26" East a distance of 65.95 feet;

Thence South 61° 38' 34" East a distance of 471.42 feet to
a point lying on the westerly boundary line of Block 6,
Celina Plaza;

Thence South 28° 19' 19" West along said boundary line
a distance of 65.95 feet;

Thence North 61° 39' 34" West a distance of 471.42 feet to the
POINT OF BEGINNING and containing in all 31,090.149 square feet or 0.7137 acres
of land, more or less.

## Together with the following described parcel of real estate:

Description of a parcel of land being a Portion of Block 2, Celina Plaza, El Paso County, Texas and being more particularly described by metes and bounds as follows:

From a point, said point being a reference point for the southwest corner of Celina Plaza; thence South 61° 38' 34" East along the northerly right-of-way line of U.S. Interstate 10 a distance of 1250.00 feet; thence North 28° 21' 26" East a distance of 959.98 feet; thence South 61° 38' 34" East a distance of 118.00 feet; thence North 28° 21' 26" East a distance of 63.61 feet to a point lying on the common boundary line of Block 2 and Block 8, said point being the POINT OF BEGINNING;

Thence North 61° 38' 34" West a distance of 585.00 feet to a point located on the westerly boundary line of Block 2;

Thence North 28° 21' 26" East along the westerly boundary line of Block 2, a distance of 356.39 feet to a point lying at the northwest corner of Block 2;

Thence South 61° 38' 34" East along the northerly boundary line of Block 2, a distance of 585.00 feet to a point lying on the common boundary line of Block 2 and Block 8;

Thence South 28° 21' 26" West along the common boundary line of Block 2 and Block 8 a distance of 356.39 feet to the POINT OF BEGINNING and containing in all 208,431.08 square feet or 4.7863 acres of land, more or less.

Isaac J. Ping, P.E.
CREMANS, INC

June 25, 1981

PREPARED FOR: Melvin Simon and Associates
Cielo Vista Mall Shopping Center
El Paso County, Texas


:      MONTGOMERY WARD - PARCEL 'A' REVISED

PROPERTY DESCRIPTION


Description of a parcel of land being a portion of Blocks 3 and 4, Celina
Plaza, El Paso County, Texas being more particularly described by metes and
bounds as follows;

Beginning at a point, said point being the southwest corner of Celina Plaza
and said point also lying on the northerly right-of-way line of U.S. Interstate
No. 10; thence South 61° 38' 34" East along said right-of-way line a distance
of 2,932.51 feet to THE POINT OF BEGINNING;

        Thence North 28° 21' 26" East a distance of 30.00 feet;

        Thence South 61° 38' 34" East a distance of 20.00 feet;

        Thence North 28° 21' 26" East a distance of 250.00 feet;

        Thence North 61° 38' 34" West a distance of 20.00 feet;

        Thence North 28° 21' 26" East a distance of 780.67 feet;

        Thence South 61° 38' 34" East a distance of 471.42 feet to a
        point lying on the westerly line of Block 6;

        Thence South 28° 19' 19" West along said line a distance of
        84.05 feet to a point, said point being the southwesterly corner
        of said Block 6;

        Thence South 61° 40' 41" East along the southerly boundary line
        of said Block 6, a distance of 280.00 feet to a point lying on
        the westerly right-of-way line of Hawkins Boulevard;

        Thence South 28° 19' 19" West along said westerly right-of-way
        line a distance of 516.72 feet to a point, said point being the
        southeasterly corner of a railroad right-of-way easement;

        Thence 228.60 feet along the southerly railroad right-of-way
        easement line and along the arc of a curve to the left whose
        interior angle is 35° 38' 26", whose radius is 367.50 feet,
        whose chord bears North 88° 51' 28" West a distance of
        224.94 feet;

        Thence South 73° 19' 19" West continuing along said right-of-way
        easement line a distance of 339.82 feet;

        Thence 314.89 feet continuing along said railroad right-of-way
        easement line and along the arc of a curve to the right whose
        interior angle is 45° 02' 07" whose radius is 398.07 feet, whose chord
        bears North 84° 09' 38" West a distance of 304.89 feet to a point,
        said point lying in the northerly boundary line of U.S. Interstate
        No. 10;

EXHIBIT A-3

Ward Tract

Thence North 61° 38' 34" West along said northerly right-of-way line, said line also being common with the said southerly railroad right-of-way easement line a distance of 30.00 feet to THE POINT OF BEGINNING and containing in all 14.171 acres of land more or less.

Ramon E. Lara, P.E.
CREMANS, INC.

April 1, 1980

Exhibit 5

PREPARED FOR: Melvin Simon and Associates
Being a portion of Block 3
Celina Plaza
El Paso County, Texas

JOSKE'S - PARCEL 'E' REVISED

PROPERTY DESCRIPTION

Description of a parcel of land being a portion of Block 3, Celina Plaza,
El Paso County, Texas, being more particularly described by metes and bounds
as follows to wit:

From a point, said point being the southwesterly corner of Celina Plaza, El
Paso County, Texas, said point also lying in the northerly right-of-way line
of U.S. Interstate Highway No. 10; thence South 61° 38' 34" East along said
northerly right-of-way line a distance of 1,250.00 feet to a point, said point
being the POINT OF BEGINNING;

      Thence North 28° 21' 26" East a distance of 959.98 feet;

      Thence South 61° 38' 34" East a distance of 740.00 feet;

      Thence South 28° 21' 26" West a distance of 150.00 feet;

      Thence South 61° 38" 34" East a distance of 120.51 feet;

      Thence South 28° 21' 26" West a distance of 370.00 feet;

      Thence North 61° 38' 34" West a distance of 300.00 feet;

      Thence North 28° 21' 26" East a distance of 20.00 feet;

      Thence North 61° 38' 34" West a distance of 500.51 feet;

      Thence South 28° 21' 26" West a distance of 460.00 feet to a point
      lying in the northerly right-of-way line of U.S. Interstate Highway
      No. 10;

      Thence North 61° 38' 34" West along said northerly right-of-way line
a distance of 60.00 feet to the POINT OF BEGINNING and containing in all
10.234 acres of land more or less.

Ramon E. Luna, P.E.
CH MANS, INC.

May 2, 1980

EXHIBIT "A-4"

PREPARED FOR: Melvin Simon and Associates
Cielo Vista Mall Shopping Center
El Paso, Texas

Dillard's Tract To Sears - NEW PARCEL B-1

## PROPERTY DESCRIPTION

Description of a parcel of land being a Portion of Block 3, Celina Plaza, El Paso County, Texas and being more particularly described by metes and bounds as follows:

From a point, said point being the southwest corner of Celina Plaza and said point lying in the northerly right-of-way line of U.S. Interstate Highway No. 10; thence South 61° 38' 34" East along the northerly right-of-way line of U.S. Interstate No. 10 a distance of 1250.00 feet; thence North 28° 21' 26" East a distance of 959.98 feet; thence South 61° 38' 34" East a distance of 1018.00 feet; thence North 28° 21' 26" East a distance of 91.35 feet to THE POINT OF BEGINNING;

Thence North 28° 21' 26" East a distance of 409.00 feet;

Thence South 61° 38' 34" East a distance of 199.30 feet;

Thence South 28° 21' 26" West a distance of 409.00 feet;

Thence North 61° 38' 34" West a distance of 199.30 feet to THE POINT OF BEGINNING and containing 81,513.70 square feet or 1.871 acres of land more or less.

Donald T. Cremans, P.E.
CREMANS, INC.

December 21, 1979

PREPARED FOR: Melvin Simon & Associates
Cielo Vista Mall Shopping Center
El Paso County, Texas

CITY OF EL PASO, TEXAS TO SEARS TRACT

PROPERTY DESCRIPTION

Description of a parcel of land being a Portion of        8, Celina Plaza, El
Paso County, Texas and being more particularly descr... .. by metes and bounds
as follows:

From a point, said point being the southwest corner of Celina Plaza and said
point also lying on the northerly right-of-way line of U.S. Interstate Highway
No. 10; thence South 61° 38' 34" East along said right-of-way line a distance
of 1,250.00 feet; thence North 28° 21' 26" East a distance of 959.98 feet; thence
South 61° 38' 34" East along the northerly boundary line of Block 3, Celina
Plaza a distance of 118.00 feet; thence North 28° 21' 26" East along the westerly
boundary line of Block 8, Celina Plaza a distance of 211.16 feet to the POINT OF
BEGINNING;

Thence North 28° 21' 26" East along said westerly boundary line
a distance of 338.84 feet;

Thence South 61° 38' 34" East along the northerly boundary
line of Block 8 a distance of 900.00 feet;

Thence South 28° 21' 26" West along the easterly boundary
line of said Block 8 a distance of 458.65 feet;

Thence North 61° 38' 34" West a distance of 95.11 feet;

Thence North 2° 22' 08" East a distance of 94.30 feet;

Thence North 61° 38' 34" West a distance of 213.57 feet;

Thence North 28° 21' 26" East a distance of 35.04 feet;

Thence North 61° 38' 34" West a distance of 550.00 feet to the
POINT OF BEGINNING and containing in all 7.5077 acres of land more or less.

Ramon E. Lara, P.E.
CREMANS, INC.

April 11, 1980

EXHIBIT "A-3(b)"

PREPARED FOR:  Melvin Simon and Associates
Cielo Vista Mall Shopping Center
El Paso, Texas

## CIELO VISTA MALL SHOPPING CENTER

### PROPERTY DESCRIPTION

Description of a parcel of land being Portions of Blocks 1, 2, 3, and 4 and all
of Blocks 8 and 6, Celina Plaza, El Paso County, Texas and being more particularly
described by metes and bounds as follows:

From a point, said point being the southwest corner of Celina Plaza and said
point lying in the northerly right-of-way line of U.S. Interstate Highway No. 10;
thence South 61° 38' 34" East along the northerly right-of-way line of U.S. Inter-
state Highway No. 10 a distance of 1250.00 feet to a point, said point being THE
POINT OF BEGINNING;

Thence North 28° 21' 26" East a distance of 741.95 feet;

Thence 201.26 feet along the arc of a curve to the right whose interior
angle is 24° 35' 22", whose radius is 468.95 feet, and whose chord bears
North 44° 05' 13" West a distance of 199.72 feet;

Thence North 31° 47' 32" West a distance of 96.73 feet;

Thence 205.42 feet along the arc of a curve to the left whose interior
angle is 20° 54' 54" whose radius is 562.74 feet, and whose chord bears
North 42° 14' 59" West a distance of 204.28 feet;

Thence 87.76 feet along the arc of a curve to the left, whose interior
angle is 8° 56' 08", whose radius is 562.74 feet, and whose chord bears
North 57° 10' 30" West a distance of 87.67 feet;

Thence North 61° 38' 34" West a distance of 380.00 feet;

Thence North 28° 21' 26" East a distance of 419.03 feet;

Thence 288.91 feet along the arc of a curve to the left whose interior
angle is 16° 59' 11" whose radius is 974.49 feet; and whose chord bears
North 19° 51' 51" East a distance of 287.85 feet;

Thence North 11° 22' 15" East a distance of 37.10 to a point, said point
lying on the southerly right-of-way line of Viscount Blvd;

Thence South 79° 02' 23" East along the southerly right-of-way line of
Viscount Blvd. a distance of 50.00 feet;

Thence South 11° 22' 15" West a distance of 37.46 feet;

Thence 303.73 feet along the arc of a curve to the right whose interior
angle is 16° 59' 11" whose radius is 1024.49 feet; and whose chord bears
South 19° 51' 51" West a distance of 302.62 feet;

Thence South 28° 21' 26" West a distance of 359.03 feet;

Thence 31.42 feet along the arc of a curve to the left whose interior
angle is 90° 00' 00" whose radius is 20.00 feet; and whose chord bears
South 16° 38' 34" East a distance of 28.28 feet;

Thence South 61° 38' 34" East a distance of 310.00 feet;

Thence 87.72 feet along the arc of a curve to the right whose interior
angle is 8° 20' 18" whose radius is 602.74 feet; whose chord bears
South 57° 28' 25" East a distance of 87.64 feet;

Thence North 28° 21' 26" East a distance of 421.35 feet;

Thence South 61° 38' 34" East a distance of 585.00 feet along the southerly boundary line of Block 1, Celina Plaza;

Thence North 28' 21' 26" East a distance of 130.00 feet along the westerly boundary line of Block 8, Celina Plaza;

Thence South 61° 38' 34" East a distance of 900 feet along the northerly boundary line of Block 8, Celina Plaza;

Thence North 28° 21' 26" East a distance of 10.00 feet;

Thence 145.83 feet along the arc of a curve to the right whose interior angle is 11° 27' 45" whose radius is 728.92 feet; and whose chord bears North 34° 05' 18" East a distance of 145.58 feet;

Thence North 39° 49' 11" East a distance of 175.32 feet to a point on the southerly right-of-way line of Viscount Blvd;

Thence 50.00 feet along said southerly right-of-way line of Viscount Blvd. and along the arc of a curve to the left whose interior angle is 0° 46' 20" whose radius is 3710.00 feet and whose chord bears South 50° 10' 49" East a distance of 50.00 feet;

Thence South 39° 49' 11" West a distance of 175.32 feet;

Thence 135.82 feet along the arc of a curve to the left whose interior angle is 11° 27' 45" whose radius is 678.92 feet and whose chord bears South 34° 05' 18" West a distance of 135.60 feet;

Thence South 28° 21' 26" West a distance of 10.00 feet to a point on the southerly boundary line of Block 1, Celina Plaza;

Thence South 61° 38' 34" East along said boundary line a distance of 280.98 feet;

Thence South 45° 29' 22" East along said boundary line a distance of 263.77 feet;

Thence South 46° 53' 12" East along said boundary line a distance of 505.45 feet;

Thence South 57° 58' 38" East a distance of 350.00 feet along said boundary line to a point on the westerly right-of-way line of Hawkins Blvd;

Thence 28.71 feet, along said right-of-way line, along the arc of a curve to the left whose interior angle is 0° 31' 17", whose radius is 3155.30 feet; and whose chord bears South 31° 45' 44" West a distance of 28.71 feet to a point said point being the northeast corner of Block 6, Celina Plaza;

Thence 175.09 feet continuing along said right-of-way line, along the arc of a curve to the left, whose interior angle is 03° 10' 46", whose radius is 3155.30 feet, and whose chord bears South 29° 54' 42" West a distance of 175.07 feet;

Thence continuing along said right-of-way line, South 28° 19' 19" West a distance of 105.00 feet;

Thence South 28° 19' 19" West along said westerly right-of-way line a distance of 516.72 feet to a point, said point being the southeasterly corner of a railroad right-of-way easement;

Thence 228.60 feet along the southerly railroad right-of-way easement line and along the arc of a curve to the left whose interior angle is 35° 38' 26", whose radius is 367.50 feet; whose chord bears North 88° 51' 28" West a distance of 224.94 feet;

Thence South 73° 19' 19" West continuing along said right-of-way easement line a distance of 339.82 feet;

Thence 197.07 feet continuing along said railroad right-of-way easement line and along the arc of a curve to the right whose interior angle is 28° 21' 52", whose radius is 398.07, whose chord bears South 87° 30' 15" West a distance of 195.06 feet to a point;

Thence South 37° 08' 34" East a distance of 33.54 feet;

Thence 7.32 feet along the arc of a curve to the left, whose interior angle is 3° 39' 37", whose radius is 114.64 feet, and whose chord bears South 38° 58' 23" East a distance of 7.32 feet to a point lying on the northerly right-of-way line of U.S. Interstate Highway No. 10;

Thence North 61° 38' 34" West along said northerly right-of-way line a distance of 151.47 feet;

Thence North 61° 38' 34" West continuing along said northerly right-of-way line, said line also being common with the said southerly railroad right-of-way easement line a distance of 1712.51 feet to THE POINT OF BEGINNING and containing 3,688,872.297 square feet or 84.684 acres of land more or less, subject to all easements of record.


*Donald T. Cremans*

Donald T. Cremans, P.E.
CREMANS, INC.

December 21, 1979



8-01 EAST ELEVATION

8-02 NORTH ELEVATION

8-03 WEST ELEVATION

8-04 SOUTH ELEVATION

SEARS ROEBUCK AND COMPANY

RETAIL   STORE   AND   AUTOMOTIVE   CENTER

CIELO VISTA MALL                                      EL PASO, TEXAS

SIGN STUDY     #7912     11-24-81

GORDON SIBECK & ASSOCIATES INC. ARCHITECTS
DALLAS, TEXAS